**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| CRYSTALLEX INTERNATIONAL CORP., | : |
| *Plaintiff*, | : : C.A. No. 17-mc-00151-LPS |
| v. | : : |
| BOLIVARIAN REPUBLIC OF VENEZUELA, | : : |
| *Defendant*. | : : : |

**MEMORANDUM OF LAW OF PETRÓLEOS DE VENEZUELA, S.A.
IN SUPPORT OF ITS CROSS-MOTION TO DISMISS FOR LACK OF JURISDICTION
AND IN OPPOSITION TO CRYSTALLEX INTERNATIONAL CORPORATION'S
MOTION FOR ORDER AUTHORIZING THE ISSUANCE OF A WRIT OF
ATTACHMENT *FIERI FACIAS* PURSUANT TO 28 U.S.C. § 1610(c)**

OF COUNSEL:

Joseph D. Pizzurro (pro hac vice pending)
Kevin A. Meehan (pro hac vice pending)
Julia B. Mosse (pro hac vice pending)
Juan O. Perla (pro hac vice pending)
CURTIS, MALLET-PREVOST,
COLT & MOSLE LLP
101 Park Avenue
New York, NY 10178
(212) 696-6000
jpizzurro@curtis.com
kmeehan@curtis.com
jmosse@curtis.com
jperla@curtis.com

November 3, 2017

HEYMAN ENERIO GATTUSO & HIRZEL LLP
Samuel T. Hirzel, II (#4415)
300 Delaware Avenue, Suite 200
Wilmington, DE 19801
(302) 472-7300
SHirzel@hegh.law
*Attorney for Intervenor Petróleos de Venezuela,
S.A.*

## TABLE OF CONTENTS

NATURE AND STAGE OF PROCEEDINGS ..............................................................................1

SUMMARY OF ARGUMENT ...................................................................................................2

STATEMENT OF FACTS .........................................................................................................4

        A.     Procedural History .....................................................................................4

        B.     PDVSA Is a Typical National Oil Company .................................................6

ARGUMENT ..........................................................................................................................9

**I.**     The Court Lacks Subject Matter Jurisdiction Over the Attachment Motion ...........9

**II.**     The Attachment Motion Must Be Denied Because PDVSA Is Not a Judgment Debtor and, Under *Bancec*, Is Not Liable for the Republic's Debts .........................................................................................................13

        A.     Crystallex Cannot Demonstrate that PDVSA's Corporate Form Was Abused to Perpetrate a Fraud or Injustice that Harmed Crystallex ...............................................................................................16

        B.     The Record Also Establishes that PDVSA  Is a "Typical Government Instrumentality" ...................................................................25

**III.**     Crystallex's Attachment Motion Must Be Denied Because the PDVH Shares Are Immune from Attachment and Execution under the FSIA .................37

CONCLUSION.......................................................................................................................40

# TABLE OF AUTHORITIES

**Pg.**

**Cases**

*Af-Cap, Inc. v. Chevron Overseas (Congo), Ltd.,*
  475 F.3d 1080 (9th Cir. 2007) ............................................................................. 38, 39

*Arch Trading Corp. v. Republic of Ecuador,*
  839 F.3d 193 (2d Cir. 2016) ......................................................................... 14, 16, 29

*Argentine Republic v. Amerada Hess Shipping Corp.,*
  488 U.S. 428 (1989) ................................................................................................. 12

*Arriba Ltd. v. Petroleos Mexicanos,*
  962 F.2d 528 (5th Cir. 1992) ................................................................................... 15

*Aurelius Capital Partners LP v. Republic of Arg.,*
  584 F.3d 120 (2d Cir. 2009) ............................................................................... 38, 39

*Baglab Ltd. v. Johnson Matthey Bankers Ltd.,*
  665 F. Supp. 289 (S.D.N.Y. 1987) .......................................................................... 29

*Banco Nacional de Cuba v. Chemical Bank N.Y. Trust Co.,*
  782 F.2d 377 (2d Cir. 1986) .................................................................................... 16

*Bank of New York v. Yugoimport,*
  745 F.3d 599 (2d Cir. 2014) .................................................................................... 14

*BCI Aircraft Leasing v. Republic of Ghana,*
  No. 06-C-0130, 2006 WL 2989291  (N.D. Ill. Oct. 13, 2006) ................................ 36

*BRIDAS S.A.P.I.C v. Gov't of Turkm.,*
  447 F.3d 411 (5th Cir. 2006) ............................................................................ passim

*Butler v. Sukhoi Co.,*
  579 F.3d 1309 (11th Cir. 2009) ........................................................................... 3, 12

*Canfield v. Statoil USA Onshore Props. Inc.,*
  Civ. No. 3:16-0085, 2017 WL 1078184 (M.D. Pa. Mar. 22, 2017) ................... 16, 17

*Conn. Bank of Commerce v. Republic of Congo,*
  309 F.3d 240, 247 (5th Cir. 2002) ............................................................... 37, 38, 39

*De Letelier v. Republic of Chile,*
  748 F.2d 790 (2d Cir. 1984) ............................................................................. passim

*Dewhurst v. Telenor Invest AS,*
  83 F. Supp. 2d 577 (D. Md. 2000) ........................................................................... 30

*Doe v. Holy See*,
    557 F.3d 1066 (9th Cir. 2009) ......................................................................... 15

*Dole Food Co. v. Patrickson*,
    538 U.S. 468 (2003) ................................................................................. 14, 16

*DRC, Inc. v. Republic of Hond.*,
    71 F. Supp. 3d 201 (D.D.C. 2014) .................................................................. 26

*EBG Holdings LLC v. Vredezicht's Gravenhage 109 B.V.*,
    No. 3184-VCP, 2008 WL 4057745 (Del. Ch. Sept. 2, 2008) ................................ 17

*EM Ltd. v. Banco Central de la Republica de Arg.*,
    800 F.3d 78 (2d Cir. 2015) ................................................................ 18, 27, 29

*EM Ltd. v. Republic of Arg.*,
    473 F.3d 463 (2d Cir. 2007) ....................................................................... 26, 39

*Epperson v. Entm't Express, Inc.*,
    242 F.3d 100 (2d Cir. 2001) ............................................................................. 10

*Exp.-Imp. Bank of the Republic of China v. Grenada*,
    768 F.3d 75 (2d Cir. 2014) .......................................................................... 38, 39

*First Inv. Corp of the Marsh. Is. v. Fujian Mawei Shipbuilding Ltd.*,
    858 F. Supp. 2d 658 (E.D.La. 2012) ................................................................ 26

*First Inv. Corp. of Marsh. Is. v. Fujian Mawei Shipbuilding Ltd.*,
    703 F. 3d 742 (5th Cir. 2012) ................................................................ 16, 26, 27

*First Nat'l City Bank v. Banco Para El Comercio Exterior de Cuba*,
    462 U.S. 611 (1983) .............................................................................. passim

*Flatow v. Islamic Republic of Iran*,
    308 F.3d 1065 (9th Cir. 2002) ...................................................................... 26, 32

*Gabay v. Mostazafan Found. of Iran*,
    151 F.R.D. 250 (S.D.N.Y. 1993) ...................................................................... 24

*Gambone v. Lite Rock Drywall*,
    288 F. App'x. 9 (3d Cir. 2008) ........................................................................ 10

*Gen. Star Nat'l Ins. Co. v. Administratia Asigurarilor de Stat*,
    713 F. Supp. 2d 267 (S.D.N.Y. 2010) ................................................... 16, 25, 29

*GSS Grp Ltd. v. Republic of Liber.*,
    31 F. Supp. 3d 50 (D.D.C. 2014) ...................................................................... 32

*GSS Grp. Ltd. v. Nat'l Port Auth. of Liber.*,
  822 F.3d 598 (D.C. Cir. 2016) ................................................................. 29, 31, 32

*Hercaire Int'l, Inc. v. Argentina*,
  821 F.2d 559 (11th Cir. 1987) ................................................................. 16

*Hester Int'l Corp. v. Fed. Republic of Nigeria*,
  879 F.2d 170 (5th Cir. 1989) ................................................................. 16, 26

*Hilton v. Guyot*,
  159 U.S. 113 (1895) ................................................................. 14

*IFC Interconsult, AG v. Safeguard Int'l Partners, LLC*,
  438 F.3d 298 (3d Cir. 2006) ................................................................. 11

*Kensington Int'l Ltd. v. Republic of Congo*,
  No. 03 Civ. 4578 (LAP), 2007 WL 1032269 (S.D.N.Y. Mar. 30, 2007) .............. 17, 18, 19, 24

*Ladjevardian v. Republic of Arg.*,
  663 F. App'x 77 (2d Cir. 2016) ................................................................. 20

*LNC Invs. Inc. v. Banco Central de Nicar.*,
  228 F.3d 423 (2d Cir. 2000) ................................................................. 26

*LNC Invs. Inc. v. Republic of Nicar.*,
  115 F. Supp. 2d 358 (S.D.N.Y.) ................................................................. 26

*Marnavi SpA v. Keehan*,
  900 F. Supp. 2d 377 (D. Del. 2012) ................................................................. 17

*Mason v. Network of Wilmington, Inc.*,
  No. CIV.A. 19434-NC, 2005 WL 1653954 (Del. Ch. July 1, 2005) ...................... 17

*Minpeco, S.A. v. Hunt*,
  686 F. Supp. 427 (S.D.N.Y. 1988) ................................................................. 24, 32

*Mobil Oil Corp. v. Linear Films, Inc.*,
  718 F. Supp. 260 (D. Del. 1989) ................................................................. 17

*NML Capital Ltd. v. Republic of Arg.*,
  No. 09 Civ. 7013 (TPG), 2011 WL 524433 (S.D.N.Y. Feb. 15, 2011) ...................... 31, 32, 34

*NML Capital, Ltd. v. Banco Central de la Republica Arg.*,
  652 F.3d 172 (2d Cir. 2011) ................................................................. 33

*NML Capital, Ltd. v. Republic of Arg.*,
  No. 06 Civ. 7792 (TPG), 2010 WL 2399560 (S.D.N.Y. June 11, 2010) .................. 40

*Peacock v. Thomas*,
    516 U.S. 349 (1996) ............................................................................................ 2, 10

*Republic of Arg. v. Weltover*,
    504 U.S. 607 (1992) ................................................................................................. 39

*Roberts v. City of Shreveport*,
    397 F.3d 287 (5th Cir. 2005) .................................................................................. 35

*Rubin v. Islamic Republic of Iran*,
    637 F.3d 783 (7th Cir. 2011) .................................................................................. 39

*Rubin v. Islamic Republic of Iran*,
    830 F.3d 470 (7th Cir. 2016) .................................................................................. 39

*S&S Mach. Co. v. Masinexportimport*,
    706 F.2d 411 (2d Cir. 1983) ................................................................................... 13

*Saudi Arabia v. Nelson*,
    507 U.S. 349 (1993) ............................................................................................ 3, 12

*Seijas v. Republic of Arg.*,
    No. 10 Civ. 4300 (TPG), 2011 WL 1137942 (S.D.N.Y. Mar. 28, 2011) ..................... 20, 32, 34

*TransAmerica Leasing, Inc. v. La Republica de Venez.*,
    200 F.3d 843 (D.C. Cir. 2000) ........................................................................ passim

*Trevino v. Merscorp, Inc.*,
    583 F. Supp. 2d 521 (D. Del. 2008) ...................................................................... 17

*UMS Partners, Ltd. v. Jackson*,
    Nos. 94J-12-159H-17-076, 95E-01-043, 1995 WL 413395 (Del. Super. Ct. June 15, 1995) .. 11

*United States v. Bestfoods*,
    524 U.S. 51 (1998) .................................................................................................. 30

*USI Props. Corp. v. M.D. Const. Co.*,
    230 F.3d 489 (1st Cir. 2000) .................................................................................. 10

*Wallace v. Wood*,
    752 A.2d 1175 (Del. Ch. 1999) .............................................................................. 17

*Walters v. Indus. & Commercial Bank of China Ltd.*,
    651 F.3d 280 (2d Cir. 2011) ............................................................................ 37, 39

*Weinstein v. Islamic Republic of Iran*,
    609 F.3d 43 (2d Cir. 2010) ..................................................................................... 11

*Weller v. Ransom-Garner*,
    338 F. App'x 249 (3d Cir. 2009) ................................................................. 35

**Statutes**

28 U.S.C. § 1330 ..................................................................................................... 13

28 U.S.C. § 1604 ....................................................................................................... 3

28 U.S.C. § 1609 ..................................................................................................... 37

28 U.S.C. § 1610(a) ......................................................................................... passim

28 U.S.C. § 1610(b) ........................................................................................ 14, 37

28 U.S.C. § 1610(c) ..................................................................................... 1, 6, 37

28 U.S.C. § 1610(d) ............................................................................................... 13

28 U.S.C. § 1611 ..................................................................................................... 37

Crude Oil Windfall Profit Tax Act of 1980,
    Pub. L. 96-223, 94 Stat. 229 (1980) ......................................................... 33

Emergency Petroleum Allocation Act of 1973,
    Pub. L. No. 93–159, 87 Stat. 627 (1973) ............................................... 8, 31

**Federal Rules**

Fed. R. Civ. P. 69 ............................................................................................. 1, 13

**Legislative History**

H.R. Rep. No. 94-1487 (1976), *reprinted in* 1976 U.S.C.C.A.N. 6604 ...................................... 15

**Other Authorities**

Executive Order 13808, 82 Fed. Reg. 41,155 (Aug. 29, 2017) ................................................. 40

Petróleos de Venezuela, S.A. ("PDVSA") respectfully submits this memorandum of law in support of its motion to dismiss for lack of subject matter and personal jurisdiction under the Foreign Sovereign Immunities Act (the "FSIA") and in opposition to the Motion for an Order Authorizing the Issuance of a Writ of Attachment *Fieri Facias* Pursuant to 28 U.S.C. § 1610(c) (D.I. 2) (the "Attachment Motion") filed by Crystallex International Corp. ("Crystallex") that seeks leave to attach and execute upon PDVSA's shares of PDV Holding, Inc. ("PDVH").

## NATURE AND STAGE OF PROCEEDINGS

Crystallex has brought its application under the guise of 28 U.S.C. § 1610(c) and Federal Rule of Civil Procedure 69, characterizing it as a simple attempt to execute on the assets of its judgment debtor, the Bolivarian Republic of Venezuela (the "Republic").  In reality, Crystallex seeks to impose liability on PDVSA for a judgment that was entered solely against the Republic. PDVSA is a legally distinct corporation, and PDVSA and its property are entitled to their own immunities under the FSIA.  PDVSA was not a party to the arbitration upon which the judgment against the Republic is based.  In fact, the arbitral award does not even mention PDVSA. Indeed, PDVSA had nothing to do with Crystallex's claim against the Republic.  This is an entirely new cause of action involving a new party, new allegations, and new evidence disconnected from the underlying dispute.

Because Crystallex has no judgment against PDVSA, and because the FSIA prohibits the prejudgment attachment of PDVSA's property, Crystallex styles its motion as one for a post-judgment attachment of the Republic's assets when, in fact, Crystallex seeks to shift liability to PDVSA by asserting an alter ego claim designed to reverse pierce the corporate veil between PDVSA and the Republic.  Crystallex does so without naming PDVSA as a defendant, without properly serving PDVSA under the FSIA, and without identifying, much less establishing, any basis for the Court's subject matter jurisdiction over PDVSA.  For these reasons, the Attachment

Motion must be dismissed for lack of subject matter and personal jurisdiction under the FSIA.

Moreover, Crystallex falls far short of rebutting the strong presumption of separateness to which PDVSA is entitled under *First Nat'l City Bank v. Banco Para El Comercio Exterior de Cuba*, 462 U.S. 611 (1983) ("*Bancec*").  Crystallex has not, and cannot, identify any abuse of PDVSA's corporate form, much less an abuse that resulted in harm to Crystallex.  And the evidence proffered by Crystallex demonstrates that PDVSA is nothing more than a "typical government instrumentality" which the Supreme Court in *Bancec* held is entitled to a presumption of separateness.  Thus, not only does Crystallex fail to establish its alter ego claim against PDVSA, but to the extent that Crystallex relies upon its alter ego allegations as a basis for the Court's subject matter jurisdiction over PDVSA, that effort likewise fails.[1]

Finally, PDVSA's shares of PDVH are presumptively immune from attachment and execution under the FSIA.  Crystallex cannot show that the PDVH shares are "used for a commercial activity in the United States," as is required to rebut their immunity from attachment under 28 U.S.C. § 1610(a).

## SUMMARY OF ARGUMENT

1.     This Court lacks subject matter jurisdiction over the Attachment Motion under the FSIA.  The Supreme Court's decision in *Peacock v. Thomas*, 516 U.S. 349 (1996), and its progeny, hold that a plaintiff seeking to shift liability on a judgment to a third party, as

---

[1] This Court should be aware that at the time that it filed this Attachment Motion, Crystallex had already been pursuing an attempt to enforce the Award against PDVSA's assets in The Netherlands, as well as alternative claims against PDVSA for alleged wrongful acts and unjust enrichment.  As a result of a decision of the District Court of The Hague rendered on October 18, 2017, the only surviving claims in that action are predicated not on any theory of alter ego, but rather on the assumption that PDVSA is a legal entity separate and distinct from the Republic, responsible only for its own actions and not for the actions of, or judgments against, the Republic.  (Declaration of Kevin A. Meehan, dated November 3, 2017 ("Meehan Decl."), Ex. 3.)  Crystallex should not be allowed to pursue such fundamentally inconsistent claims in different fora.

Crystallex seeks to do here, must establish an independent basis for the Court's subject matter jurisdiction with respect to the claim against the third party.  The FSIA provides the sole and exclusive source of subject matter jurisdiction over actions against a foreign state or its agencies or instrumentalities, such as PDVSA.  Under the FSIA, foreign states are presumptively immune from the jurisdiction of U.S. courts unless a statutory exception to jurisdictional immunity applies.  *Saudi Arabia v. Nelson*, 507 U.S. 349, 355 (1993) (citing 28 U.S.C. § 1604).  Because Crystallex has not established that any such exception applies, the Court lacks subject matter jurisdiction over Crystallex's claim against PDVSA and therefore must deny the Attachment Motion and dismiss the case.  To the extent that Crystallex relies upon an alleged alter ego relationship between PDVSA and the Republic as a basis for the Court's subject matter jurisdiction, unhinged from any of the FSIA's enumerated exceptions, that effort fails "as a matter of law."  *Butler v. Sukhoi Co.*, 579 F.3d 1309, 1313 (11th Cir. 2009).  In any event, as set forth below, Crystallex cannot overcome the presumption of separateness to which PDVSA is entitled under *Bancec*.

        2.      The Supreme Court's decision in *Bancec* establishes that a foreign state and its agencies and instrumentalities are presumptively treated as separate entities for purposes of liability.  Crystallex does not have a judgment against PDVSA and cannot satisfy its heavy burden of rebutting the strong presumption of separateness set forth in *Bancec*.  Contrary to Crystallex's assertions, nothing in the record establishes that PDVSA is the alter ego of the Republic.  There is no allegation, much less evidence, that the Republic abused PDVSA's corporate form to perpetrate a fraud or injustice on Crystallex.  That alone precludes a finding of alter ego liability.  Furthermore, Crystallex has not demonstrated the level of extensive control necessary to establish an alter ego relationship between PDVSA and the Republic.  At most,

3

Crystallex has shown that PDVSA is a "typical government instrumentality" which *Bancec* held is entitled to a presumption of separateness.

3.      The Attachment Motion must also be denied because PDVSA's shares of PDVH are immune from execution under the FSIA because they are not "used for a commercial activity in the United States," as required for any attachment under 28 U.S.C. § 1610(a).

## STATEMENT OF FACTS

### A.      Procedural History

Crystallex is a Canadian corporation with its principal place of business in Canada.  It has no arbitral award or judgment against PDVSA.  Rather, Crystallex has a judgment against the Republic entered on an arbitral award rendered solely against the Republic.

In April 2002, the Republic issued Decree No. 1757, which reserved to the Republic the right to explore and exploit the gold deposits in the Cristina 4, 5, 6 and 7 mining blocks in Venezuela ("Las Cristinas") and empowered the Ministry of Energy and Mines (the "Ministry") to delegate the right to explore and exploit Las Cristinas to Corporación Venezolana de Guayana ("CVG"), a corporation wholly-owned by the Republic but having no affiliation with PDVSA other than the fact that both are state-owned companies.  (Declaration of Jason Myatt [D.I. 4] ("Myatt Decl."), Ex. 80.)  Several months later, on September 17, 2002, CVG and Crystallex entered into a Mine Operating Contract (the "Operating Contract"), which "laid out the framework of rights and responsibilities of the parties for the development of Las Cristinas." (Meehan Decl., Ex. 1 ¶ 18.)  The Operating Contract granted Crystallex the right to develop gold mines at Las Cristinas in exchange for a payment of $15 million to CVG and an obligation to finance various social works.  (*Id.*)  The Operating Contract did not grant Crystallex any property rights in Las Cristinas or any resources therein.  While Crystallex was entitled to retain the

proceeds from the sale of gold produced from Las Cristinas, the Operating Contract required Crystallex to pay royalties to CVG on all gold produced at Las Cristinas.  (*Id.*)

Crystallex was also required to obtain certain permits from the Republic before it could commence mining operations at Las Cristinas.  (*Id.* ¶ 21.)  Those permits were not obtained, and on February 3, 2011, CVG notified Crystallex that it was rescinding the Operating Contract due to the cessation of activities for more than one year.  (*Id.* ¶¶ 44-46, 59.)

On February 11, 2011, Crystallex commenced arbitral proceedings against the Republic, asserting that the Republic violated its obligations under an investment treaty between the Republic and Canada by denying Crystallex's requests for mining permits.  (*Id.* ¶¶ 7, 64.)  In addition, Crystallex asserted that the denial of the permits and resulting "destruction of [its] contractual rights" under the Operating Contract constituted an expropriation.  (*Id.* ¶ 638.) Crystallex argued that the Republic denied these permits so that the Republic could enter into a new agreement with CITIC, a Chinese company, to develop Las Cristinas.  (*Id.* ¶¶ 420, 528.) PDVSA was not a party to the Operating Contract, was not a party to the arbitration, and was not involved in any way in the underlying dispute between Crystallex and the Republic. (Declaration of Alejandro Schmilinsky, dated November 1, 2017 ("Schmilinsky Decl.")  ¶ 14.) Crystallex's Request for Arbitration does not mention PDVSA.  (Meehan Decl., Ex. 2.)

On April 4, 2016, the arbitral tribunal issued an award (the "Award"), which held that the Republic's actions constituted an indirect expropriation of Crystallex's contract rights under the Operating Contract (*i.e.*, an expropriation occurring in the absence of a "transfer of title or physical seizure") and awarded Crystallex $1.202 billion plus interest as compensation.  (*Id.*, Ex. 1 ¶¶ 667-68, 708, 961.)  The Award was entered solely against the Republic and does not purport to hold PDVSA liable. The Award does not mention PDVSA except to discuss the interest rate

5

paid on certain PDVSA bonds as a data point for determining pre-award interest.

On March 25, 2017, the United States District Court for the District of Columbia (the "D.C. Court") confirmed the Award.  (Myatt Decl., Ex. 6.)  Judgment against the Republic was entered on April 7, 2017.  (*Id.*, Ex. 7.)  On June 9, 2017, the D.C. Court entered an order, pursuant to 28 U.S.C. § 1610(c), that a reasonable period of time had elapsed since entry of judgment and that Crystallex could commence proceedings in aid of execution of the judgment. (*Id.*, Ex. 8.)  However, that court specifically declined "to adjudicate whether or not [the Delaware assets identified by Crystallex] will ultimately be attachable" and stated that its order "has no bearing on whether any assets will ultimately be 'leviable' to satisfy the judgment and the Court takes no position on that issue."  (*Id.*)

Crystallex registered the judgment in this Court on June 19, 2017.  (D.I. 1.)  On August 14, 2017, Crystallex filed the Attachment Motion, which seeks to attach PDVSA's property to satisfy its judgment against the Republic.  (D.I. 2.)  Crystallex did not name PDVSA as a party to this action and did not serve PDVSA in accordance with the procedures mandated by the FSIA.  On August 28, 2017, this Court granted PDVSA's motion to intervene for purposes of opposing the Attachment Motion to protect its assets from attachment.  (D.I. 17.)

### B.     PDVSA Is a Typical National Oil Company

PDVSA is the national oil company ("NOC") of Venezuela.  It was created pursuant to a Presidential Decree in 1975 and is wholly-owned by the Republic.  (D.I. 3-1 at 8.)  PDVSA's directors are appointed by the Republic and several Venezuelan officials sit on PDVSA's board. (*Id.*)  However, PDVSA is not part of the government itself.  (Declaration of Luis A. García Montoya, dated October 31, 2017 ("Montoya Decl.") ¶¶ 16-23.)  PDVSA is a "*sociedad anónima*" – which is the main form of corporate personality that is available to both public and

6

private persons in Venezuela.  (*Id.* ¶¶ 7-11.)  As a *sociedad anónima*, PDVSA possesses a distinct legal personality that is separate from its shareholder, the Republic.  (*Id.*)  PDVSA's separate legal personality is enshrined in the Venezuelan Constitution, is reflected in Venezuelan statutes and has been repeatedly recognized by Venezuelan courts.  (*Id.* ¶¶ 7-15.)

PDVSA's officers and directors control its day-to-day operations, which are carried out by approximately 109,000 employees.  (Schmilinsky Decl. ¶ 11.)  It has its own patrimony, which is very substantial, and the authority to contract, as well as to sue and be sued, in its own name.  (*Id.* ¶ 12.)  As one of the world's largest oil companies, it has entered into commercial transactions and financings with counterparties all over the world, which rely upon PDVSA's own balance sheet.  PDVSA's employees are paid by PDVSA, not the Republic, and they are not government employees under Venezuelan law.  (*Id.* ¶ 11; Montoya Decl. ¶¶ 5-6, 29.)  PDVSA issues financial statements audited by the international accounting firm KPMG.  (Meehan Decl., Exs. 4-6.)  During the seven-year period between 2010 and 2016, PDVSA had revenues of over $724 billion and earned a total net profit of over $45 billion.  (*Id.*)  Like all oil companies operating in Venezuela, PDVSA pays taxes and royalties to the Republic.

Under Venezuelan law, the Republic owns all mineral resources, including hydrocarbon reserves and gold deposits, within Venezuelan territory.  In that regard, it is consistent with the laws of most other nations, which reserve ownership over oil and other natural resources to the State.  (*Id.* ¶¶ 10-11, 14, 16, 20-21, 24-28, 30-31, 35.)  Because the Republic owns Venezuela's oil reserves, PDVSA and other oil companies in Venezuela must pay royalties to the Republic on oil extracted within Venezuela.  This too is not unusual.  Similar to PDVSA, other NOCs are required to pay their respective governments for the oil they extract through various royalties, extraction taxes or other payments, which are made in addition to ordinary income taxes.  (*Id.* ¶¶

7, 15, 18, 22-23.)

Governments around the globe heavily regulate their oil and gas industries.  The Republic is no exception.  Like other oil producing nations, the Republic formulates oil and gas policies and regulations, with which PDVSA and all other companies operating in the Venezuelan oil industry are expected to comply.  (*Id.* ¶¶ 10-11, 14, 16-17, 20, 24-28, 31.)  In addition, because of the importance of oil to the economy of most oil producing nations, it is normal for the governments of such countries not only to appoint the boards of their NOCs, but also to have ministers and other high government officials sit on those boards.  That is the case, for example, for the NOCs of Algeria, India, Indonesia, Iran, Kuwait, Malaysia, Mexico, Qatar, Saudi Arabia and the United Arab Emirates.  (*Id.* at ¶¶ 10, 15, 17, 19, 21-22, 24, 29, 31-32.)

One aspect of the Republic's national energy policy provides subsidized pricing for petroleum and natural gas products sold within the domestic Venezuelan market.  Approximately 40 other countries maintain subsidized fossil fuel prices.  (*Id.*, Ex. 8.)  PDVSA, like other NOCs, is expected to comply with fuel subsidy regulations.  (*Id.* ¶¶ 14-15, 17-18, 22.)  U.S. oil companies were similarly required to comply with price controls set by the United States government under the Emergency Petroleum Allocation Act of 1973, Pub. L. No. 93–159, 87 Stat. 627 (1973) (codified as amended at 15 U.S.C. §§ 751–760h) (expired 1981).

The Republic's regulation of the Venezuelan oil and gas industry is influenced by its membership in the Organization of the Petroleum Exporting Countries ("OPEC").  Venezuela and other oil-rich nations formed OPEC in the 1960s with its principal aims being "the coordination and unification of the petroleum policies of Member Countries," "ensuring the stabilization of prices in international oil markets" and "securing a steady income to the producing countries."  (Meehan Decl. ¶ 9.)  To attain these goals, OPEC periodically

recommends target global oil production levels for achieving optimal market stability.  The Republic has the power to regulate oil production in Venezuela, and does so in line with OPEC's production recommendations.  (Myatt Decl., Ex. 39.)  Many non-OPEC nations, such as Russia, Mexico and Norway, also regulate oil production levels.  (Meehan Decl. ¶¶ 16, 24, 26-27, 30.)

In addition to royalties, PDVSA pays taxes and dividends to the Republic and makes contributions to economic development and social welfare programs in Venezuela.  PDVSA also has programs to aid other developing countries, such as PetroCaribe, which involve the sale of oil on favorable financing terms for the purchasers.  Like PDVSA, many NOCs contribute to development and social welfare programs.  (*Id.* ¶¶ 10-11, 15-18, 21, 25-27, 31-34.)

PDVSA owns 100% of the shares of PDVH, a Delaware corporation, which in turn owns 100% of the shares of CITGO Holding, Inc., which in turn owns 100% of the shares of CITGO Petroleum Corp. ("CITGO"), a multi-billion dollar Delaware corporation headquartered in Texas and founded in 1910.  (Schmilinsky Decl. ¶ 13.)

## ARGUMENT

## I.   The Court Lacks Subject Matter Jurisdiction Over the Attachment Motion

The Attachment Motion must be denied for want of subject matter jurisdiction under the FSIA.  The property that Crystallex seeks to attach – the shares of PDVH – belong to PDVSA, not to the Republic.  (D.I. 2 (acknowledging that the shares of PDVH are "wholly owned by . . . 'PDVSA'")).  Crystallex did not arbitrate against PDVSA, it has no judgment against PDVSA, and it never even alleged in the arbitration that PDVSA had done anything wrong or was in any way involved in the dispute between Crystallex and the Republic.  Thus, although styled as a post-judgment motion for an attachment, the Attachment Motion does not simply seek to enforce a judgment against property of the debtor.  Rather, without naming PDVSA as a defendant or

properly serving PDVSA under the FSIA, Crystallex asserts an alter ego *claim* against PDVSA – entirely disconnected from any of the FSIA's enumerated exceptions and wholly independent from those claims against the Republic upon which Crystallex's judgment is based – in an effort to shift liability on the judgment to PDVSA.  That cannot be done without an independent basis for jurisdiction over PDVSA, which does not exist.

In *Peacock*, the United States Supreme Court drew a distinction between post-judgment proceedings to collect a judgment by executing against property of the judgment debtor, for which a court may have ancillary enforcement jurisdiction, and claims, such as Crystallex's, that seek to shift liability on an existing judgment to a third party not otherwise liable on the judgment.  516 U.S. at 357.  The Court stated:  "We have never authorized the exercise of ancillary jurisdiction in a subsequent lawsuit to impose an obligation to pay an existing federal judgment on a person not already liable for that judgment." *Id.*  The Court held that an action to enforce a federal judgment against a third party based on new facts and new legal theories, such as "veil piercing," must independently satisfy the court's subject matter jurisdiction. *Id.* at 358-59; *see also Gambone v. Lite Rock Drywall*, 288 F. App'x. 9, 12-13 (3d Cir. 2008) (*Peacock* "bars the exercise of ancillary jurisdiction over attempts to impose personal liability for an existing judgment on a new party"); *Epperson v. Entm't Express, Inc.*, 242 F.3d 100, 106 (2d Cir. 2001) ("Since *Peacock*, most courts have continued to draw a distinction between post-judgment proceedings to collect an existing judgment and proceedings, such as claims of alter ego liability and veil-piercing, that raise an independent controversy with a new party in an effort to shift liability."); *USI Props. Corp. v. M.D. Const. Co.*, 230 F.3d 489, 498 (1st Cir. 2000) (*Peacock* drew a "distinction between postjudgment proceedings that simply present a mode of execution to collect an existing judgment and proceedings that raise an independent controversy

with a new party, attempting to shift liability."); *cf. Weinstein v. Islamic Republic of Iran*, 609 F.3d 43, 47-50 (2d Cir. 2010) (recognizing that an independent jurisdictional basis was needed over a foreign state instrumentality of the judgment debtor that was "not itself named in the judgment" and "not itself a defendant in the underlying action" and finding that Section 201(a) of the Terrorism Risk Insurance Act of 2002 provided such an independent jurisdictional basis).

Crystallex cites certain Delaware law on garnishment, suggesting that the Attachment Motion is a typical garnishment action, even though it does not seek to attach property of the debtor in the hands of a third party, but rather seeks to shift liability on the judgment to a third party, PDVSA. (D.I. 3-1 at pp. 24-25). Unlike alter ego or veil-piercing actions, such as the instant one, in a garnishment action, a garnishor, ostensibly Crystallex, seeks to "stand in the judgment debtor's shoes" and must show "that the garnishee is liable to the judgment debtor, not to the garnishor." *IFC Interconsult, AG v. Safeguard Int'l Partners, LLC*, 438 F.3d 298, 312, 314 (3d Cir. 2006). Even the cases that Crystallex cites acknowledge that "[g]arnishment is the attachment of a ***defendant's property*** in the hands of a third party." *UMS Partners, Ltd. v. Jackson*, Nos. 94J-12-159H-17-076, 95E-01-043, 1995 WL 413395, at *5 (Del. Super. Ct. June 15, 1995) (emphasis added) (citations omitted). In any event, characterizing the Attachment Motion as a garnishment proceeding does not change the true nature of Crystallex's claim, nor does it alleviate Crystallex's burden of establishing an independent basis for subject matter jurisdiction over PDVSA. *See IFC*, 438 F.3d at 312 (recognizing distinction between veil-piercing actions that assert a new direct claim against a third party for which an independent basis of subject matter jurisdiction is required, and garnishment actions that seek to collect property of the debtor in the hands of a third party, over which the court may exercise ancillary enforcement jurisdiction).

Thus, before this Court may make a determination as to whether PDVSA is an alter ego of the Republic, there must be an independent basis of jurisdiction over PDVSA.  Because PDVSA indisputably is an "agency or instrumentality of a foreign state" as defined in the FSIA, the FSIA provides "the sole basis for obtaining jurisdiction" in any action against PDVSA. *Argentine Republic v. Amerada Hess Shipping Corp.*, 488 U.S. 428, 443 (1989).  Under the FSIA, PDVSA is presumptively immune from the jurisdiction of this Court unless Crystallex can carry its burden of establishing that an exception to immunity applies.  *See Nelson*, 507 U.S. at 355.  In *Butler*, the Eleventh Circuit found the district court had abused its discretion in allowing an enforcement action to proceed against a third party foreign state based upon an alter ego theory where the plaintiff failed to establish that the putative alter ego's alleged "conduct" satisfied any of the FSIA's statutory exceptions to immunity.  *Butler*, 579 F.3d at 1313-14.  The Court of Appeals concluded that, "even accepting as true [plaintiff's] allegations that appellants are alter-egos of one another and of [the judgment debtor], they are insufficient as a matter of law to demonstrate the existence of subject matter jurisdiction."  *Id.* at 1312.

Crystallex likewise has failed to meet its burden.  Indeed, *nowhere* in Crystallex's 35-page memorandum of law in support of its Attachment Motion does Crystallex even mention the word "jurisdiction," let alone assert that a specific statutory exception to jurisdictional immunity applies; nor could it.  This deficiency alone mandates dismissal for want of subject matter

jurisdiction under the FSIA.[2]

If Crystallex is permitted to circumvent *Peacock* and the strict requirements of the FSIA simply by failing to name PDVSA and couching its Attachment Motion as one for a post-judgment attachment under Federal Rule of Civil Procedure 69, PDVSA and its property would be deprived of the immunities to which they are entitled under the FSIA.  Because Crystallex has no judgment against PDVSA, any attachment or restraint of PDVSA's property, including the shares of PDVH, before the Court makes an independent determination that PDVSA is liable on the arbitral award and thus the judgment against the Republic would be an unlawful prejudgment attachment under the FSIA.  *See* 28 U.S.C. § 1610(d); *S&S Mach. Co. v. Masinexportimport*, 706 F.2d 411, 416 (2d Cir. 1983).

Accordingly, this Court should grant PDVSA's motion and dismiss this action for lack of subject matter and personal jurisdiction under the FSIA.  *See* 28 U.S.C. § 1330.

## II.     The Attachment Motion Must Be Denied Because PDVSA Is Not a Judgment Debtor and, Under *Bancec*, Is Not Liable for the Republic's Debts

The Supreme Court held in *Bancec* that courts must presume that an "agency or instrumentality of a foreign state," such as PDVSA, is separate from the state itself and therefore not liable for the debts of the state.  *See Bancec*, 462 U.S. at 625.  It stated "that government instrumentalities established as juridical entities distinct and independent from their sovereign

---

[2] Crystallex cites a handful of cases for the unremarkable proposition that "[m]ultiple federal courts have recognized post-judgment attachments may be sought against judgment debtors' alter egos."  (D.I. 3-1 at 27 n.123.)  In all of these cases, courts rejected attempts to attach assets of the third party foreign state entity.  None of Crystallex's cited cases stands for the proposition that a court does not need an independent basis for subject matter jurisdiction over an action seeking to shift liability on a judgment to an agency or instrumentality of a foreign state that is not otherwise liable on the judgment.  In any event, to the extent that Crystallex could rely upon the alleged alter ego relationship between PDVSA and the Republic as a basis for the Court's jurisdiction over PDVSA, this effort fails because, as set forth below, Crystallex cannot meet the test for disregarding the presumptive separateness to which PDVSA is entitled under *Bancec*.

should normally be treated as such" and that "the instrumentality's assets and liabilities must be treated as distinct from those of its sovereign …."  *Id.* at 625-27.  *Bancec* establishes a "strong" presumption that foreign states and their instrumentalities are to be accorded separate legal status.  *Arch Trading Corp. v. Republic of Ecuador*, 839 F.3d 193, 201 (2d Cir. 2016).

While the *Bancec* presumption derives, in part, from the "basic tenet of American corporate law … that the corporation and its shareholders are distinct entities," *Dole Food Co. v. Patrickson*, 538 U.S. 468, 474 (2003) ("*Dole*") (discussing *Bancec*), it was forged with interests and principles that are far stronger and more compelling than ordinary corporate law principles. As the Supreme Court explained in *Bancec*, the presumption of separateness between foreign states and their agencies and instrumentalities is compelled by "principles of comity between nations" and "[d]ue respect for the actions taken by foreign sovereigns." *Bancec*, 462 U.S. at 626 (citing *Hilton v. Guyot*, 159 U.S. 113, 163-64 (1895)).  It further explained that:

> Freely ignoring the separate status of government instrumentalities would result in substantial uncertainty over whether an instrumentality's assets would be diverted to satisfy a claim against the sovereign, and might thereby cause third parties to hesitate before extending credit to a government instrumentality without the government's guarantee.  As a result, the efforts of sovereign nations to structure their governmental activities in a manner deemed necessary to promote economic development and efficient administration would surely be frustrated.

*Bancec*, 462 U.S. at 626; *see also Bank of New York v. Yugoimport*, 745 F.3d 599, 614 n.14 (2d Cir. 2014) ("In the case of a developing country, diversion of an instrumentality's assets to satisfy debts of the sovereign could stymie investment and cause third-parties dealing with the instrumentality to demand government guarantees.").

The Supreme Court also found support for according a presumption of separateness between foreign states and their instrumentalities in the legislative history of Section 1610(b) of

the FSIA, "the provision dealing with the circumstances under which a judgment creditor may execute upon the assets of an instrumentality of a foreign government . . . ." *Bancec*, 462 U.S. at 627-28.  The House Report for that provision states:

> Section 1610(b) will not permit execution against the property of one agency or instrumentality to satisfy a judgment against another, unrelated agency or instrumentality.  There are compelling reasons for this.  If U.S. law did not respect the separate juridical identities of different agencies or instrumentalities, it might encourage foreign jurisdictions to disregard the juridical divisions between different U.S. corporations or between a U.S. corporation and its independent subsidiary.

*Id.* (quoting H.R. Rep. No. 94-1487, at 29-30 (1976), *reprinted in* 1976 U.S.C.C.A.N. 6604, 6628-29); *cf.* H.R. Rep. No. 94-1487, at 12 ("The bill is not intended to affect the substantive law of liability.  Nor is it intended to affect … the attribution of responsibility between or among entities of a foreign state; for example, whether the proper entity of a foreign state has been sued, or whether an entity sued is liable in whole or in part for the claimed wrong.").

The *Bancec* presumption can only be overcome in the rare circumstance where the "corporate entity is so extensively controlled by its owner that a relationship of principal and agent is created" and respecting the corporate form "would work fraud or injustice."  *Bancec*, 462 U.S. at 629.  The *Bancec* presumption is therefore rebutted by establishing that the instrumentality is the alter ego of the foreign state.  *See BRIDAS S.A.P.I.C v. Gov't of Turkm.*, 447 F.3d 411, 417 (5th Cir. 2006) ("*Bridas*"); *see also Doe v. Holy See*, 557 F.3d 1066, 1078-79 (9th Cir. 2009); *TransAmerica Leasing, Inc. v. La Republica de Venez.*, 200 F.3d 843, 849 (D.C. Cir. 2000); *Arriba Ltd. v. Petroleos Mexicanos,* 962 F.2d 528, 535 (5th Cir. 1992); *De Letelier v. Republic of Chile*, 748 F.2d 790, 794-95 (2d Cir. 1984).  An alter ego relationship exists "only if (1) the owner exercised complete control over the corporation with respect to the transaction at issue and (2) such control was used to commit a fraud or wrong that injured the party seeking to

pierce the veil." *Bridas*, 447 F.3d at 416.  The *Bancec* presumption is a strong one; "both

*Bancec* and the FSIA legislative history caution against too easily overcoming the presumption

of separateness." *Arch Trading*, 839 F.3d at 201.  And it is the plaintiff who bears the heavy

burden of rebutting the *Bancec* presumption.  *See id.* at 200; *Hester Int'l Corp. v. Fed. Republic

of Nigeria*, 879 F.2d 170, 176 (5th Cir. 1989).

> **A.   Crystallex Cannot Demonstrate that PDVSA's Corporate Form
> Was Abused to Perpetrate a Fraud or Injustice that Harmed Crystallex**

To overcome the *Bancec* presumption on an alter ego theory, the plaintiff "must show

how the [government] manipulated [the instrumentality's] corporate form to perpetuate a fraud

or injustice." *First Inv. Corp. of Marsh. Is. v. Fujian Mawei Shipbuilding Ltd.,* 703 F. 3d 742,

755 (5th Cir. 2012) ("*Fujian*"); *see also Hercaire Int'l, Inc. v. Argentina*, 821 F.2d 559, 564

(11th Cir. 1987) ("[*Bancec*'s] presumption may be overcome only upon a showing that there has

been some abuse of the corporate form."); *Banco Nacional de Cuba v. Chemical Bank N.Y. Trust

Co.*, 782 F.2d 377, 380 (2d Cir. 1986) (refusing to pierce the veil where "the record reveals no

devious use of the corporate form"); *De Letelier*, 748 F.2d at 795 n.1 ("abuse of the corporate

form must be clearly demonstrated [under *Bancec*]"); *Canfield v. Statoil USA Onshore Props.

Inc.,* Civ. No. 3:16-0085, 2017 WL 1078184, at *12 (M.D. Pa. Mar. 22, 2017) (plaintiff failed to

overcome the *Bancec* presumption because she did "not allege … a claim of fraud against Statoil

ASA or SOP"); *Gen. Star Nat'l Ins. Co. v. Administratia Asigurarilor de Stat*, 713 F. Supp. 2d

267, 283 (S.D.N.Y. 2010) ("[A]buse of the corporate form must be clearly demonstrated to

justify holding the subsidiary liable for the debts of its sovereign parent.").

The *Bancec* presumption is predicated, in part, on corporate law principles.  *See Dole*,

538 U.S. at 474-75 (citing *Bancec*, 462 U.S. at 625).  Thus, courts in this circuit have relied on

principles of Delaware corporate law in applying the *Bancec* presumption.  *See, e.g., Canfield*,

2017 WL 1078184, at *11 (citing *Trevino v. Merscorp, Inc.*, 583 F. Supp. 2d 521, 529 (D. Del. 2008)).  Delaware law is crystal-clear that alter ego liability applies only in the rare circumstance where the corporate form is abused to perpetrate a fraud against the plaintiff.  *See Mason v. Network of Wilmington, Inc.*, No. CIV.A. 19434-NC, 2005 WL 1653954, at *3 (Del. Ch. July 1, 2005) ("Delaware Courts … require an element of fraud to pierce the corporate veil."); *Wallace v. Wood*, 752 A.2d 1175, 1184 (Del. Ch. 1999) ("Piercing the corporate veil under the alter ego theory requires that the corporate structure cause fraud or similar injustice.  Effectively, the corporation must be a sham and exist for no other purpose than as a vehicle for fraud."); *see also Marnavi SpA v. Keehan*, 900 F. Supp. 2d 377, 392 (D. Del. 2012) (Stark, J.) (rejecting alter ego claim where "[t]he record d[id] not support a finding that any of the transactions Plaintiff points to amount to fraud in Defendants' use of corporate forms"); *Trevino*, 583 F. Supp. 2d at 530 ("[T]he fraud or injustice that must be demonstrated in order to pierce a corporate veil must be found in the defendants' use of the corporate form." (citation omitted)); *Mobil Oil Corp. v. Linear Films, Inc.*, 718 F. Supp. 260, 268 (D. Del. 1989) ("[R]egardless of which law is applied to the alter ego question—whether federal, Delaware or Oklahoma common law—the outcome is the same.  Fraud or something like it is required."); *EBG Holdings LLC v. Vredezicht's Gravenhage 109 B.V.*, No. 3184-VCP, 2008 WL 4057745, at *12 (Del. Ch. Sept. 2, 2008) ("The requisite element of fraud under the alter ego theory must come from an inequitable use of the corporate form itself as a sham, and not from the underlying claim.").

The principal cases upon which Crystallex relies also predicated their alter ego findings on the fact that the parent abused the subsidiary's corporate form to defraud its creditors.  (D.I. 3-1 at 29-30 (citing *Bridas* and *Kensington Int'l Ltd. v. Republic of Congo*, No. 03 Civ. 4578 (LAP), 2007 WL 1032269 (S.D.N.Y. Mar. 30, 2007)).  As the Second Circuit explained:  "The

common thread in these cases is that the sovereign states at issue abused the corporate form."
*EM Ltd. v. Banco Central de la Republica de Arg.*, 800 F.3d 78, 95-96 (2d Cir. 2015) ("*EM II*")
(reversing finding of alter ego liability because the "allegations … fall far short of the flagrant
frauds and injustices exhibited in these other cases [*i.e. Bancec*, *Bridas* and *Kensington*]").

In *Bridas*, the plaintiff brought an arbitration against Turkmenistan pursuant to an
arbitration provision in a joint venture agreement between the plaintiff and a "Turkmenian Party"
designated by Turkmenistan. *Bridas*, 447 F.3d at 414-15. Shortly thereafter, Turkmenistan
dissolved the "Turkmenian Party" and designated a newly created entity, Turkmenneft, as the
counterparty to the joint venture agreement. *Id.* at 414. The arbitral tribunal concluded that
Turkmenistan was a proper party and entered an award against both Turkmenistan and
Turkmenneft. *Id.* at 415. Turkmenistan then petitioned to vacate the award on the grounds that
it was not a party to the joint venture agreement. *Id.* The Fifth Circuit rejected this argument
and held that Turkmenneft was the alter ego of Turkmenistan. *Id.* The Fifth Circuit reaffirmed
that an abuse of the corporate form to perpetrate a fraud or injustice against the plaintiff is
required to establish alter ego liability and that evidence of control alone is not enough. *Id.* at
416. It explained that its conclusion that Turkmenneft was the alter ego of Turkmenistan was
predicated on its finding "ample evidence" that Turkmenistan abused Turkmenneft's corporate
form to shield itself from liability to the plaintiff because Turkmenistan dissolved the original
"Turkmenian Party" under the joint venture agreement and replaced it with the newly created
and undercapitalized Turkmenneft after arbitration was commenced. *Id.* at 417.

*Kensington* similarly involved a classic abuse of the corporate form designed to defraud
the plaintiff. *See Kensington*, 2007 WL 1032269, at *9, *16. In that case, the plaintiff obtained
an English judgment rendered against the Congo for breach of a loan agreement and then sought

to enforce that judgment against SNPC, one of several companies the Congo created after receiving the plaintiff's demands for payment under the loan agreement. *Id.* at *1-3. The district court held that the plaintiff's alter ego allegations were sufficient, for purposes of a motion to dismiss, to impute the Congo's waiver of foreign sovereign immunity under the loan agreement to SNPC. *Id.* at *15. The allegations showed that SNPC was a "fictitious company" designed to shield the Congo's oil assets and that the Congo had abused SNPC's corporate form to engage in dubious "transactions and charades for the purpose of confounding its creditors," such as the plaintiff. *Id.* at *9. The allegations further showed that the Congo had used SNPC to breach the parties' loan agreement. *Id.* at *16. The court held that it would be unjust to allow the Congo "effectively to revoke [its] waivers [in the agreement] by transferring its most valuable and available assets to a newly formed instrumentality [SNPC] that Congo controls … for the specific purpose of insulating its assets from lawful creditors such as Kensington." *Id.*

The present case is worlds away from *Bridas* and *Kensington*. In both *Bridas* and *Kensington*, the foreign state sought to shield its assets by transferring them to a newly created sham corporation. Unlike the putative alter egos in *Bridas* and *Kensington*, PDVSA had nothing to do with the underlying dispute between the parties to the arbitration. And PDVSA is not a newly created sham corporation designed to insulate the Republic from liability. PDVSA was established over 40 years ago and is one of the largest oil companies in the world. Accordingly, Crystallex cannot establish "the 'classic' abuse of corporate form to which the Supreme Court referred [in *Bancec*]." *De Letelier*, 748 F.2d at 794 ("The broader message [of *Bancec*] is that foreign states cannot avoid their obligations by engaging in abuses of corporate form.").

Nevertheless, Crystallex argues that respecting PDVSA's separate legal personality would work a fraud or injustice on the grounds that, years after the Republic expropriated

Crystallex's assets, those assets were transferred to PDVSA for no consideration and that PDVSA then sold them for $2.4 billion.  (D.I. 3-1 at 32.)  Even if Crystallex's assertions were true, which they are not, the mere fact that a government instrumentality benefits from the actions of the government does not demonstrate an abuse of the corporate form required to overcome the presumption of separateness under *Bancec*.  *See Ladjevardian v. Republic of Arg.*, 663 F. App'x 77, 80 (2d Cir. 2016) ("Appellants' representation that BCRA participated in the April 2016 bond offering and received the proceeds on behalf of Argentina is insufficient to carry their burden [under *Bancec*]."); *see also De Letelier,* 748 F.2d at 794-95 ("Joint participation in a tort is not the 'classic' abuse of corporate form to which the Supreme Court referred in *Bancec*."); *Seijas v. Republic of Arg.*, No. 10 Civ. 4300 (TPG), 2011 WL 1137942, at *7 (S.D.N.Y. Mar. 28, 2011), *aff'd*, 502 F. App'x 19 (2d Cir. 2012) (allegation that state-owned bank was occasionally required to participate in nationalizations of other banks did not support an alter ego finding).

Moreover, Crystallex is effectively arguing that PDVSA separately and independently harmed Crystallex through its supposed receipt of Crystallex's assets in 2013.  However, any harm to Crystallex was complete upon the expropriation of its assets, which the arbitral tribunal found occurred in 2008.  (Meehan Decl., Ex. 1 ¶¶ 854-55.)  Crystallex does not even allege that PDVSA participated in or facilitated the expropriation.  The supposed transfer of Crystallex's assets to PDVSA and subsequent disposition of those assets by PDVSA occurred several years after the expropriation and therefore could not have resulted in any harm to Crystallex.  Thus, even if Crystallex's assets had been transferred to PDVSA and subsequently resold, such activities would not have worked a fraud or injustice against Crystallex that would justify the extraordinary remedy of disregarding PDVSA's legal separateness.

Crystallex relies on these same allegations in the action that it commenced against PDVSA in the District Court in The Hague (the "Hague Court"), in which Crystallex is pursuing claims against PDVSA that are actually premised upon PDVSA's status as a legal entity separate and distinct from the Republic.  When Crystallex commenced its action in The Hague, it asserted three claims against PDVSA:  (1) a claim for a declaratory judgment that the assets of PDVSA should be "equated" with the assets of the Republic such that PDVSA's assets can be used to satisfy the Award; (2) an alternative claim that PDVSA itself acted unlawfully towards Crystallex because it somehow facilitated the Republic's expropriation of Crystallex's rights to Las Cristinas by receiving rights to Las Cristinas years later; and (3) a second alternative claim that PDVSA was unjustly enriched at Crystallex's expense, because PDVSA allegedly acquired the rights to Las Cristinas for no consideration.  (*Id.*, Ex. 3.)

On October 18, 2017, the Hague Court dismissed Crystallex's first claim for declaratory judgment for lack of jurisdiction, but held that the second two direct claims against PDVSA can proceed to the merits.  (*Id.*)  In rejecting the claim that the assets of PDVSA should be equated with the assets of the Republic, the Hague Court recognized that "[t]he proceedings between Crystallex and PDVSA and the arbitral proceedings between Crystallex and Venezuela . . . are separate proceedings between different parties on different subjects."  (*Id.* ¶ 5.48)  The Court likewise acknowledged that Crystallex's second two claims are premised on PDVSA's separateness from the Republic, stating:  "With regard to the ***independent*** unlawful act of PDVSA asserted in the alternative in the principal action and PDVSA's unjust enrichment asserted in the further alternative, there does not exist any immunity from jurisdiction.  These bases concern the ***actual and legally independent*** conduct of PDVSA."  (*Id.* ¶ 5.17) (emphasis added); *see also id.* ¶ 5.43 ("The claims in the alternative and further alternative are based on

acts of PDVSA that are **independently** to be considered as unlawful or unjust enrichment of PDVSA, respectively, which, in the event of the claim being awarded, will make that PDVSA will have an **independent** obligation to pay compensation.") (emphasis added).

As a result of the October 18 decision, the only claims that Crystallex is currently pursuing against PDVSA in The Hague are those direct claims that are premised upon PDVSA's legal separateness from the Republic.  Conversely, Crystallex's Attachment Motion is predicated entirely upon the theory that PDVSA and the Republic are one and the same.  Crystallex should be precluded from pursuing such fundamentally inconsistent positions in different fora.

Furthermore, Crystallex grossly mischaracterizes the facts when it represents to the Court that the Republic took Crystallex's assets and transferred them to PDVSA.  (D.I. 3-1 at 32.) Crystallex's claims against the Republic did not involve a taking of physical property. Crystallex never owned Las Cristinas.  At all times, the Republic held title to Las Cristinas and all resources therein, and the right to manage and control Las Cristinas was held by CVG. (Meehan Decl., Ex. 1 ¶¶ 14-18.)  Crystallex's "asset" was the right granted under the Operating Contract to operate Las Cristinas under the supervision of CVG.  The Operating Contract was terminated by CVG when Crystallex was unable to obtain the permits required to operate Las Cristinas.  (*Id.* ¶ 59.)  Crystallex asserted during the arbitration that the "destruction of [its] contractual rights … amount[ed] to an expropriation."  (*Id.* ¶ 638.)  The arbitral tribunal agreed and held that destruction of Crystallex's contract rights under the Operating Contract constituted an "indirect expropriation" – meaning a frustration of a party's investment that occurs without a "transfer of title or outright seizure."  (*Id.* ¶¶ 667-68, 708.)  Crystallex's contract rights were not assigned or transferred to PDVSA or anyone else.  Those rights simply ceased to exist.

Crystallex's argument that its rights in Las Cristinas were transferred to PDVSA is

predicated entirely on certain Venezuelan laws that were passed years after the expropriation.  In September 2011, the Republic issued Decree No. 8413, which nationalized the entirety of the Venezuelan gold industry, terminated all existing mining contracts that had not already been extinguished and reserved to the State all gold mining activities.  Decree No. 8413 did not affect Crystallex's rights because the Operating Contract had already been terminated.  On January 30, 2013, the Republic issued Decree No. 9368, which granted PDVSA or its designated subsidiary the authority to manage and control gold mining activities within three newly created mining blocks, one of which contains Las Cristinas.  (Myatt Decl., Ex. 79.)[3]  Thereafter, PDVSA's indirect subsidiaries, Corporación Venezolana de Minería, S.A. ("CVM") and Empresa Nacional Aurifera, S.A. ("ENA"), were designated to exercise the authority conferred under Decree No. 9368.  (D.I. 3-1 at 21 n.101.)  However, that decree did not put PDVSA, CVM or ENA in the same position as Crystallex under the Operating Contract.  Rather, Decree No. 9368 effectively granted CVM and ENA rights similar to those that had previously been held by CVG pursuant to Decree No. 1757, which authorized the Ministry to delegate control over Las Cristinas to CVG or any other state-owned company.[4]  Thus, the interests transferred to CVM and ENA were interests that were always vested in the State and were never held by Crystallex.

Moreover, the transfer of shares in ENA by PDVSA to Banco Central did not involve a manipulation of PDVSA's corporate form by the Republic resulting in harm to Crystallex.  The

[3] Crystallex did not make any allegations in the arbitration relating to Decree No. 9368 or Resolution No. 177, which created the new mining blocks (Myatt Decl., Ex. 79), and the Award does not even mention them.

[4] Pursuant to Decree No. 1757, the Republic could have substituted PDVSA or any of its subsidiaries for CVG during the life of the Operating Contract without having any impact on Crystallex's rights under the Operating Contract.  *A fortiori*, the Republic's election to make such a substitution years after the termination of Crystallex's rights cannot possibly have caused any harm to Crystallex.

Republic was not even involved in the transaction. And Crystallex does not, and cannot, assert that the transaction was designed to shield assets from creditors. The transaction between PDVSA and Banco Central does not present the sort of fraudulent abuse of the corporate form faced by the courts in *Bridas* and *Kensington* and thus does not justify the extraordinary relief of disregarding the juridical separateness between PDVSA and the Republic.

Crystallex also argues that PDVSA's separate status should be disregarded because "Venezuela reaps enormous benefits from owning and operating an oil refining company under the protection of Delaware law, using PDVSA … in an attempt to protect Venezuela's Delaware assets from execution." (D.I. 3-1 at 32.) That a foreign state may benefit financially from its subsidiary's investments in the United States is not the sort of fraud or injustice required by *Bancec*. *See Fed. Ins. Co. v. Richard I. Rubin & Co.,* 12 F.3d 1270, 1290 n.16 (3d Cir. 1993) (noting that foreign state parent's receipt of benefits from its subsidiaries' investments in the U.S. "is completely different" from the fraud or injustice contemplated by *Bancec*). Furthermore, Crystallex's argument assumes its conclusion, *i.e.,* that PDVSA is an alter ego of the Republic, and therefore PDVSA's Delaware assets are the Republic's assets. Courts have rejected such circular reasoning. *See Gabay v. Mostazafan Found. of Iran*, 151 F.R.D. 250, 254, n. 5 (S.D.N.Y. 1993), *aff'd* 152 F.3d 918 (2d Cir. 1998) (rejecting argument that "it would work a 'fraud or injustice' to recognize the independent status of the New York Foundation because doing so would permit the Iranian Foundation to 'shield its assets … based on an illusory corporate fiction'" because "this argument begs the question"); *Minpeco, S.A. v. Hunt*, 686 F. Supp. 427, 432 (S.D.N.Y. 1988) (rejecting argument that "recognition of Minpeco's separate legal status would work an injustice because it would allow Peru a windfall," as it "begs the

question" of whether "Minpeco is indeed Peru's alter ego").[5]

**B.     The Record Also Establishes that PDVSA**
**Is a "Typical Government Instrumentality"**

Apart from the fact that Crystallex cannot establish the indispensable requirement of

abuse of the corporate form to work a fraud or injustice upon it, Crystallex's declarations and

exhibits establish nothing more than the fact that PDVSA possesses the attributes of a "typical

government instrumentality" that is entitled to recognition of its separate status and legal

personality.  The Supreme Court in *Bancec* recognized that government instrumentalities are, by

definition, subject to close supervision and control by the state.  It explained that there are certain

"distinctive features" of a "typical government instrumentality," stating:

> A typical government instrumentality, if one can be said to exist, is
> created by an enabling statute that prescribes the powers and duties
> of the instrumentality, and specifies that it is to be managed by a
> board selected by the government in a manner consistent with the
> enabling law.  The instrumentality is typically established as a
> separate juridical entity, with the powers to hold and sell property
> and to sue and be sued.  Except for appropriation to provide capital
> or to cover losses, the instrumentality is primarily responsible for its
> own finances.  The instrumentality is run as a distinct economic
> enterprise; often it is not subject to the same budgetary and personnel
> requirements with which government agencies must comply.

*Bancec*, 462 U.S. at 624.

While these "distinctive features" reflect the considerable control that a foreign state has

over a "typical government instrumentality," the Supreme Court found that these features also

demonstrate that "[s]eparate legal personality … [is] an almost indispensable aspect of the public

---

[5] While Crystallex also argues that the fraud or injustice element is satisfied because it is "now left seeking to collect on a U.S. judgment that Venezuela refuses to pay" (D.I. 3-1 at 32), a plaintiff's inability to collect on a judgment does not justify disregarding a state corporation's presumptive separateness under *Bancec*.  *See, e.g., Gen. Star*, 713 F. Supp. 2d at 285-86 ("While the Romanian government's refusal to pay its debts is deplorable, that fact alone does not allow this Court to permit Plaintiff to collect its judgment by any means available.").

corporation." *Id.* at 625.  In light of *Bancec*'s emphasis on the "distinctive features" of a "typical

government instrumentality," courts will refuse to find an instrumentality to be an alter ego of

the state where, as here, the instrumentality possesses such features.  *See, e.g.*, *EM Ltd. v.

Republic of Arg.*, 473 F.3d 463, 479 n.15 (2d Cir. 2007) ("*EM I*"); *Flatow v. Islamic Republic of

Iran*, 308 F.3d 1065, 1073 (9th Cir. 2002); *Hester*, 879 F.2d at 181; *LNC Invs. Inc. v. Republic of

Nicar.*, 115 F. Supp. 2d 358, 366 (S.D.N.Y.), *aff'd sub nom. LNC Invs. Inc. v. Banco Central de

Nicar.*, 228 F.3d 423 (2d Cir. 2000) (per curiam); *First Inv. Corp of the Marsh. Is. v. Fujian

Mawei Shipbuilding Ltd.*, 858 F. Supp. 2d 658, 678-79 (E.D.La. 2012), *aff'd* 703 F.3d 742 (5th

Cir. 2012).  Possession of the features identified in *Bancec* effectively provides a safe harbor

from attempts to overcome the presumption of separateness.[6]

      Here, the record establishes that PDVSA possesses all of the "distinctive features" of a

"typical government instrumentality."  It is undisputed that PDVSA was established as a separate

juridical entity.  (Declaration of Jose Ignacio Hernandez [D.I. 8] ("Hernandez Decl.") ¶¶ 13, 26;

Montoya Decl. ¶¶ 4-15.)  It is also undisputed that PDVSA was created by an enabling statute

and is managed by a board selected by the government.  (Hernandez Decl. ¶¶ 12, 28; Declaration

of Dr. Roberto Rigobon [D.I. 7] ("Rigobon Decl.") ¶¶ 10, 14.)  PDVSA has the powers to hold

and sell property and to sue and be sued in its own name.  (Montoya Decl. ¶¶ 4, 25-28.)

PDVSA's employees are not considered government employees under Venezuelan law.  (*Id.*

¶¶ 5-6, 29.)  PDVSA is responsible for its own finances.  PDVSA and the Republic are governed

---

[6] *Bancec* also observed that the "organization and control of [government instrumentalities] vary considerably."  *Bancec*, 462 U.S. at 624.  Thus, any divergence from the characteristics of a "typical government instrumentality" is not, in itself, cause for disregarding the instrumentality's separate status. *See, e.g.*, *DRC, Inc. v. Republic of Hond.*, 71 F. Supp. 3d 201, 210 (D.D.C. 2014) (although the entity in question had "several countervailing attributes" from those of the typical instrumentality, "these features ultimately do not persuade the Court to disregard *Bancec*'s central holding—that when a sovereign elects to create an instrumentality with a separate legal personality, its decision normally should be respected by our courts.").

by two different budgetary regimes under Venezuelan law.  (*Id.* ¶¶ 26-28.)  There are no allegations, much less evidence, that PDVSA is grossly undercapitalized or that the Republic is its primary source of funding.  To the contrary, PDVSA is a large oil company that generates tens of billions of dollars in annual revenues from its own commercial operations.  (Meehan Decl., Exs. 4-6.)

Crystallex cannot demonstrate the level of "extensive control" required to rebut the *Bancec* presumption of separateness.  Under *Bancec*, "control is relevant when it significantly exceeds the normal supervisory control exercised by any corporate parent over its subsidiary and, indeed, amounts to *complete domination* of the subsidiary" such that the parent and subsidiary are "not meaningfully distinct entities."  *TransAmerica Leasing,* 200 F.3d at 848 (emphasis added).  The touchstone of this inquiry is whether the foreign state exercises significant and repeated domination and control over the day-to-day operations of its instrumentality.  *See EM II*, 800 F.3d at 91; *Fujian*, 703 F. 3d at 754; *TransAmerica Leasing,* 200 F.3d at 848.

Crystallex incorrectly claims that the Republic and PDVSA are treated as one and the same under Venezuelan law.  PDVSA was created as a "*sociedad anónima*," which is a type of corporate form having a distinct legal personality separate from its shareholders, regardless of whether the company is owned by the government or private individuals.  (Montoya Decl. ¶¶ 5-16, 24.)  PDVSA's separate and distinct legal personality as a *sociedad anónima* is enshrined in the Venezuelan Constitution.  (*Id.* ¶¶ 11-12.)  Crystallex's argument relies exclusively on the assertion of its Venezuelan law expert, Prof. Jose Hernandez, that Venezuelan courts have found that PDVSA plays a significant role in the Venezuelan economy and is part of the "National Public Administration."  However, Venezuelan courts have consistently held that PDVSA has a separate legal personality distinct from the Republic.  (*Id.* ¶¶ 15, 22.)  The cases cited by Prof.

Hernandez do not hold otherwise – in fact, they deeply undermine his conclusions.  For example, Prof. Hernandez cites Supreme Tribunal of Justice Decision N$^o$ 464 for the proposition that PDVSA is part of the National Public Administration (Hernandez Decl. ¶ 16), but he ignores that court's explicit finding that "the legal nature of Petróleos de Venezuela, S.A. [is] that of a corporation that, as such, and due to the flexibility and independence of administration, is subject to the entire regime of private law for corporations."  (Myatt Decl., Ex. 17.)

Tellingly, Crystallex fails to provide this Court with any explanation of what it means to be part of the "National Public Administration."  Venezuelan law splits the National Public Administration into two distinct branches:  (1) the Centralized Administration, which consists of the government itself and all organs of the government that do not have separate legal personality, and (2) the Decentralized Administration, which consists of all state-owned corporations and other entities that enjoy separate legal personality.  (Montoya Decl. ¶¶ 16-20.)  By definition, entities that are part of the Decentralized Administration are separate and distinct from the Republic.  In fact, even "mixed companies" that have substantial private ownership fall within the Decentralized Administration when they are majority-owned by the state or a state company.  (*Id.* ¶ 21.)  Venezuelan law is clear that PDVSA falls within the Decentralized Administration.  (*Id.* ¶¶ 16-24.)  Prof. Hernandez admits as much by quoting Prof. Allan R. Brewer-Carías's conclusion that PDVSA is "an entity of the decentralized administration, but with a legal nature of a corporation, meaning that of a private individual."  (Hernandez Decl. ¶ 26.)  In a subsequent publication, Prof. Brewer-Carías explained:

> [T]he fact that Petróleos de Venezuela, S.A. has its own legal personality distinct from the Republic and of the other territorial entities [states, municipalities] makes it an autonomous center of imputation of interests, which gives rise to its own legal regime for the purpose of its patrimony, responsibility, taxes, contractual matters, etc., which is distinct from that of the Republic.

(Montoya Decl. ¶ 14.)  Thus, all of the Venezuelan legal authorities submitted in this case point to a singular conclusion: As a matter of Venezuelan law, PDVSA is recognized as being separate and distinct from the Republic.

Next, Crystallex engages in misstatements, mischaracterizations and misinformation about the Republic's role as regulator and sole shareholder of PDVSA.  Crystallex asserts that the Republic exercises day-to-day control over PDVSA because, in 2002, Venezuela's former president, Hugo Chavez, allegedly fired certain officers and directors of PDVSA.  (D.I. 3-1 at 11.)  Crystallex further asserts that the Republic fired approximately 18,000 PDVSA employees in 2003.  However, these allegations of events occurring approximately 15 years ago are irrelevant to whether PDVSA is liable to Crystallex as the Republic's alter ego.  Indeed, courts have routinely held that the government's hiring and firing of an instrumentality's directors and employees does not demonstrate the level of "extensive control" required under *Bancec*.  *See, e.g.*, *EM II*, 800 F.3d at 92 ("[C]ourts have consistently rejected the argument that the appointment or removal of an instrumentality's officers or directors, standing alone, overcomes the *Bancec* presumption."); *Baglab Ltd. v. Johnson Matthey Bankers Ltd.*, 665 F. Supp. 289, 296-97 (S.D.N.Y. 1987) (evidence that foreign state seconded numerous employees to subsidiary did not demonstrate an alter ego relationship).

Crystallex's assertion that Venezuelan officials serve as officers and directors of PDVSA shows nothing more than the typical situation that prevails with most major NOCs and is therefore irrelevant under *Bancec*.  (Meehan Decl. ¶¶ 10, 14-15, 17, 19, 21-22, 24, 29, 31.)  Even in a private context, it is hardly unusual for parent company officers and directors to act in that capacity in important subsidiaries.  *See Arch Trading,* 839 F.3d at 203; *GSS Grp. Ltd. v. Nat'l Port Auth. of Liber.,* 822 F.3d 598, 607 (D.C. Cir. 2016); *see also Gen. Star*, 713 F. Supp. 2d at

282 ("It is unremarkable that a majority shareholder would appoint one of its own to serve on the board of directors of a company it owns."); *Dewhurst v. Telenor Invest AS,* 83 F. Supp. 2d 577, 588 (D. Md. 2000) ("It is a 'well established principle [of corporate law] that directors and officers holding positions with a parent and its subsidiary can and do 'change hats' to represent the two corporations separately, despite their common ownership.'") (quoting *United States v. Bestfoods,* 524 U.S. 51, 69 (1998)).

Crystallex also asserts that the Republic uses PDVSA as a "piggy bank" because PDVSA's financial statements show that it paid $119 billion in taxes, royalties and dividends to the Republic during the seven-year period between 2010 and 2016.[7]  If anything, PDVSA's payment of taxes demonstrates its separateness from the Republic – the Republic does not pay taxes to itself.  Likewise, the payment of dividends reflects a typical parent-subsidiary relationship and does nothing to overcome the *Bancec* presumption.  *See TransAmerica Leasing*, 200 F.3d at 849.  As explained above, PDVSA, like all other oil companies operating in Venezuela, pays royalties to the Republic because, under Venezuelan law, the country's oil and gas reserves are property of the nation.  *See supra* at pp. 7-8.  Again, NOCs all over the world typically pay taxes, royalties and dividends to their respective governments.  (Meehan Decl. ¶¶ 7, 14-15, 18, 22.)  Far from overcoming the *Bancec* presumption, such payments merely show that PDVSA is a typical NOC that is separate and distinct from the Republic.

Crystallex also contends that the Ministry controls PDVSA through regulations designed to ensure compliance with policies formulated by the Ministry with respect to national hydrocarbon activities.  (D.I. 3-1 at 11-12.)  In particular, Crystallex asserts that the Republic controls PDVSA by regulating its oil production levels, citing a Venezuelan Decree that directs

---

[7] During that same period, PDVSA had revenues of over $724 billion and earned a total net profit of over $45 billion.  (Meehan Decl. ¶ 6.)

PDVSA and other Venezuelan companies to modify their production levels in order to meet an OPEC production recommendation, and by regulating the prices at which PDVSA sells certain subsidized products in the domestic market.  (D.I. 3-1 at 12 (citing Myatt Decl., Exs. 39-40)).  However, courts have routinely held that a foreign state's actions as a regulator are irrelevant to determining whether the foreign state exercises extensive control under *Bancec*.  *See GSS Grp.*, 822 F3d at 606 ("[I]t is plain that the National Transitional Government was exercising its regulatory authority when it ordered the Port Authority to cancel the GSS contract — not commandeering the Port Authority in a way that erased the separate juridical boundaries between it and Liberia."); *TransAmerica Leasing,* 200 F.3d at 855 ("[I]t is not uncommon for a government—as regulator, not as shareholder—to require approval for certain transactions in the transportation sector.").

Moreover, the regulatory actions identified by Crystallex, *i.e.*, production and pricing regulations, are precisely the sort of government regulations that one would expect in the oil industry.  Foreign states frequently regulate oil production levels.  (Meehan Decl. ¶¶ 10-11, 16, 20, 24-28, 30-31, 35.)  And many countries regulate and subsidize the price of petroleum products sold in their domestic markets.  (*Id.* ¶¶ 8, 14-15, 17-18, 22.)  Even the United States has imposed price controls on gasoline and other petroleum products.  *See* Emergency Petroleum Allocation Act of 1973, Pub.L. No. 93–159, 87 Stat. 627 (1973).  The fact that PDVSA, like all other oil companies operating in Venezuela, must comply with governmental production and pricing regulations provides no basis for disregarding its legal separateness.  *See NML Capital Ltd. v. Republic of Arg.,* No. 09 Civ. 7013 (TPG), 2011 WL 524433, at *2, *7-8 (S.D.N.Y. Feb. 15, 2011) (fact that "the Ministry of Planning dictates the quantity, price of purchase, and price of sale for ENARSA's natural gas transactions" showed that "the Republic had a substantial

degree of control over ENARSA," but it did not demonstrate "that the Republic intervened in the

daily transactions and affairs of ENARSA").

Crystallex also contends that the Republic controls PDVSA by requiring it to promote the

government's social objectives and contribute to funds that finance economic and social

development programs.  However, courts have repeatedly held that a government

instrumentality's obligation to comply with or carry out policies set by the government is

"irrelevant" under *Bancec*.  *See Minpeco*, 686 F. Supp. at 434; *see also GSS Grp Ltd. v. Republic*

*of Liber.*, 31 F. Supp. 3d 50, 66 (D.D.C. 2014), *aff'd* 822 F.3d 598 (D.C. Cir. 2016) ("[T]his

characteristic likely describes virtually all state-owned enterprises; governments establish

instrumentalities such as the NPA precisely to achieve the economic goals of the state."); *Flatow*,

308 F.3d at1073 (government's exercise of "broad policymaking functions" did not create an

alter ego relationship between Iran and Iranian bank); *Seijas*, 2011 WL 1137942, at *12

("[I]nstrumentalities of states regularly carry out the states' policies without becoming an alter

ego of the state."); *NML Capital,* 2011 WL 524433, at *7 (requirement that state energy

company "comply with the basic policies announced in governing statutes and decrees" was

insufficient to rebut *Bancec* presumption).[8]

Crystallex acknowledges that PDVSA's contributions to economic and social

development programs are disclosed in PDVSA's audited financial statements.  (D.I. 3-1 at 14;

---

[8] Prof. Hernandez asserts that PDVSA's managers are trained in accordance with the Republic's
social policies, citing a decade-old statement by a former PDVSA executive that PDVSA was
employing a new training program developed by a Spanish consulting firm designed to educate
PDVSA managers on social consciousness.  (Hernandez Decl. ¶ 21.)  There is no indication that
this program was implemented at the direction of the Republic.  But even if it were, such a
program is fairly common among state-owned companies.  For example, Chinese law requires all
state-owned companies "to encourage their employees to volunteer for social services, and
actively participate in community and social welfare program, such as charity, donations, and
giving support to schools, cultural or hygiene activities."  (Meehan Decl., Ex. 13 ¶ 15.)

Meehan Decl., Exs. 4-6.)  Such contributions are to be expected of a state-owned enterprise.

Many NOCs make similar contributions to economic and social development programs.

(Meehan Decl. ¶¶ 10-11, 15-18, 21, 26-27, 31-34.)  Indeed, the Supreme Court explicitly stated

in *Bancec* that government instrumentalities are frequently established "as the vehicles through

which to obtain the financial resources needed to make large-scale national investments" and

have "become an essential instrument of economic development in the economically backward

countries." *Bancec*, 462 U.S.  at 624-25.  PDVSA's contributions to development programs only

further demonstrate that PDVSA is a "typical government instrumentality" that must be treated

as separate under *Bancec*.[9]

Crystallex also argues that the Republic controls PDVSA by using it to achieve its

domestic expropriation objectives because, under Venezuela law, the Republic may designate

PDVSA as the expropriating entity with respect to expropriations of property in the oil industry.

(D.I. 3-1 at 21-22.)  As explained above, PDVSA had nothing to do with the expropriation of

Crystallex's rights under the Operating Contract.  And the mere fact that PDVSA may have been

designated as the expropriating entity in certain other cases is not grounds for disregarding its

_____

[9]  Crystallex asserts that PDVSA contributes to Fondo Nacional Para el Desarollo Nacional ("FONDEN") in two ways.  First, it asserts that FONDEN receives funding from the proceeds from a windfall profit tax imposed on oil companies, including PDVSA. (Hernandez Decl. ¶ 46.) However, as Crystallex acknowledges, the windfall profit tax has not applied in years due to depressed oil prices.  (*Id.* ¶ 47.) In any event, many countries, including the United States, have imposed windfall profit taxes on oil companies in response to high oil prices.  *See* Crude Oil Windfall Profit Tax Act of 1980, Pub. L. 96-223, 94 Stat. 229 (1980) (repealed 1988); Meehan Decl. ¶ 14.  Second, Crystallex asserts that, under Venezuelan law, PDVSA is required to sell foreign currencies derived from oil exports to the Venezuelan central bank in exchange for Bolivars and that any amount of foreign currency sold by PDVSA to the central bank in excess of the legal cap on the bank's foreign currency reserves is then transferred by the central bank to FONDEN.  (Hernandez Decl. ¶ 46; Rigobon Decl. ¶ 26.)  Such regulation and management of foreign currency reserves is a traditional central banking function.  *NML Capital, Ltd. v. Banco Central de la Republica Arg.*, 652 F.3d 172, 192 (2d Cir. 2011).  These taxes and currency regulations, which apply to companies other than PDVSA, are not a basis for disregarding PDVSA's legal separateness.  *See supra* at pp. 30-31.

separate legal personality.  *See Seijas,* 2011 WL 1137942, at *7.

Crystallex's reliance on the other expropriations identified in the Attachment Motion is misplaced.  For example, the arbitral tribunal in *Saint-Gobain Performance Plastics Europe v. Bolivarian Republic of Venez.*, ICSID Case No. ARB/12/13 (2016), explicitly stated that "PDVSA is a State-owned company with distinct legal personality."  (Myatt Decl., Ex. 99.)[10] And while Crystallex asserts that PDVSA assisted the expropriation of the investments of certain subsidiaries of Exxon Mobil Corp. ("Mobil"), Mobil's own Venezuelan law expert opined that "because state-owned companies, such as PDVSA, have separate legal personality and are therefore not part of the GOV [the Republic] . . . their acts are not imputable to the GOV under Venezuelan law" and that "[t]here is nothing in the applicable law . . . that makes state-owned companies part of the Executive Power or a government department."  (Montoya Decl. ¶ 20.)

Crystallex further asserts that the Republic controls PDVSA by using it to achieve foreign policy goals by requiring that PDVSA sell oil to China and certain Latin American and Caribbean countries on terms that are economically disadvantageous to PDVSA.  However, such transactions do not support a finding of alter ego liability.  *See NML Capital,* 2011 WL 524433, at *2, *7 (allegations that Argentina required state energy company to purchase natural gas from Bolivia for resale in the domestic market at a loss did not support an alter ego finding); *see also Seijas,* 2011 WL 1137942, at *7 (allegation that state required state-owned bank to provide loans

---

[10] The *Saint-Gobain* tribunal merely found that PDVSA's actions in carrying out the expropriation were attributable to the Republic under Article 5 of the International Law Commission Draft Articles, which states that the "conduct of a person or entity which is not an organ of the State … but which is empowered by the law of that State to exercise elements of the governmental authority shall be considered an act of the State … provided the person or entity is acting in that capacity in the particular instance."  (Myatt Decl., Ex. 99.)  ILC Article 5 attributes conduct of a separate entity to the state for purposes of liability under international law only where (i) the entity is empowered to exercise governmental authority and (ii) it is acting in that capacity in the particular case in question.  It does not permit such attribution in any other circumstance.  ILC Article 5 is irrelevant here.

to promote Argentina-Brazil economic integration did not support an alter ego finding).

Furthermore, Crystallex's assertion that the Republic forced PDVSA to pay off the Republic's debts to China by supplying free oil to China is belied by the very documents on which Crystallex relies.  (D.I. 3-1 at 15-16.)  Crystallex is referring to a contract pursuant to which a PDVSA subsidiary supplied crude oil to China National United Oil Corporation ("CNUOC").  (Myatt Decl., Ex. 49.)  The contract states that "the Purchaser [CNUOC] shall pay all amounts due to PDVSA Subsidiary … directly into the Collection Account" maintained at China Development Bank Corporation ("CDB").  (*Id.* § 3.1.)  While the contract allowed PDVSA to apply the funds in the CDB account to service the Republic's debt obligations to CDB, the contract also states that such funds would constitute payment of royalties owed by PDVSA to the Republic under Venezuelan law.  (*Id.* §§ 5.2.2, 6.1.1.)  Thus, PDVSA received remuneration for this commercially reasonable transaction.[11]

Crystallex further argues that the Republic controls PDVSA because it uses PDVSA's vehicles.  That argument rests exclusively on unsourced internet articles.  (Myatt Decl., Exs. 54-58.)  These "articles … [are] classic, inadmissible hearsay," and cannot be considered as evidence in support of the Attachment Motion.  *See Weller v. Ransom-Garner,* 338 F. App'x 249, 252 (3d Cir. 2009) (quoting *Roberts v. City of Shreveport,* 397 F.3d 287, 295 (5th Cir. 2005)).  In any event, these articles merely state that foreign dignitaries flew on planes registered to PDVSA.  Even if admissible, such evidence would not support the extraordinary measure of

---

[11] PDVSA's sale of oil to certain Latin American and Caribbean countries on deferred payment terms through PetroCaribe is no different from PDVSA's contributions to domestic social welfare and development programs, which, as explained above, do not support a finding of alter ego liability.  *See supra* at pp. 31-33.  In addition, OPEC has repeatedly reaffirmed that Member States and their NOCs should  provide support, including favorable financing terms, to other developing nations.  (Meehan Decl. ¶ 9.)  PDVSA's participation in PetroCaribe is consistent with its role as an NOC of an OPEC Member State.

reverse piercing PDVSA's corporate veil.  *See De Letelier*, 748 F.2d at 794 (state's use of

instrumentality's aircraft did not support alter ego finding); *BCI Aircraft Leasing v. Republic of

Ghana*, No. 06-C-0130, 2006 WL 2989291, at *8 (N.D. Ill. Oct. 13, 2006) (same).

Finally, while Crystallex relies heavily on the Fifth Circuit's decision in *Bridas*, the majority

of the alter ego control factors identified in that case weigh against a finding of alter ego liability in

the present case.[12]  *See Bridas*, 447 F.3d at 418.  Indeed, the evidence establishes that:  (1) PDVSA

has a legal personality that is separate and distinct from the Republic under Venezuelan law; (2)

PDVSA does not receive funding from the Republic; (3) PDVSA has the authority to contract in its

own name, and regularly exercises that authority with counterparties all over the world that rely on

PDVSA's balance sheet and its attributes as a separate legal person; (4) PDVSA has authority to sue

and be sued in its own name; (5) PDVSA has the right to hold and use property; (6) the Republic

does not pay or guarantee PDVSA's debts; (7) PDVSA and the Republic deal at arm's length; (8)

PDVSA and the Republic do not share business departments; (9) PDVSA issues its own financial

statements audited by KPMG – a large multinational accounting firm; (10) PDVSA finances its own

commercial operations; (11) PDVSA has billions of dollars in revenues and assets and thus does not

operate with grossly inadequate capital; (12) PDVSA pays its own expenses, including the salaries of

its employees, who are not government employees; (13) PDVSA generates its own business and is

not reliant on business received from the Republic; (14) PDVSA pays taxes and royalties like all

other companies in the oil business in Venezuela; and (15) PDVSA's own officers and directors

---

[12] Several of the factors recited in *Bridas* were held irrelevant by *Bancec* and its progeny, including stock ownership and overlapping directors.  *See Bancec*, 462 U.S. at 624; *TransAmerica Leasing*, 200 F.3d at 849.  The *Bridas* court also imported six "public law factors" from the Fifth Circuit's test for determining whether state agencies are entitled to sovereign immunity under the Eleventh Amendment.  *Bridas*, 447 F.3d at 418.  Certain of these "public law factors," such as the entity's "degree of local autonomy" and whether its focus is primarily local or statewide, do not appear to have any relevance to whether an instrumentality of a foreign state is an alter ego of the state.

control its day-to-day operations. (Schmilinsky Decl. ¶¶ 4-13.)[13]

## III.   Crystallex's Attachment Motion Must Be Denied Because the PDVH Shares Are Immune from Attachment and Execution under the FSIA

Property of a foreign state is presumptively immune from attachment and execution

under the FSIA unless a specific exception to immunity applies. *See* 28 U.S.C. §§ 1609-11. The

FSIA explicitly states that a judgment creditor cannot attach or execute upon a foreign state's

property unless it first obtains a court order authorizing such attachment or execution. *See*

28 U.S.C. § 1610(c). Before a court can order such an attachment or execution, it must first

"determine whether the property in question falls within one of the statutory exceptions to

foreign sovereign immunity." *Conn. Bank of Commerce v. Republic of Congo*, 309 F.3d 240,

247, 250 (5th Cir. 2002) *("Conn. Bank")*; *see also Walters v. Indus. & Commercial Bank of*

*China Ltd.*, 651 F.3d 280, 291 (2d Cir. 2011).

The FSIA distinguishes between property of a foreign state itself (*i.e.*, the government)

and property of an "agency or instrumentality of a foreign state." *See* 28 U.S.C. §§ 1610(a)-(b).

Ordinarily, Section 1610(a) governs the immunity of foreign state property and Section 1610(b)

governs the immunity of property of an agency or instrumentality of a foreign state. *See id.*

However, where, as here, a judgment creditor of a foreign state attempts to reach the assets of an

agency or instrumentality on the theory that it is the alter ego of the state under *Bancec*, the

judgment creditor must satisfy the more restrictive exceptions to execution immunity set forth in

Section 1610(a). *See Af-Cap, Inc. v. Chevron Overseas (Congo), Ltd.,* 475 F.3d 1080, 1095 (9th

---

[13] In the end, Crystallex is left with the frivolous claim that PDVSA's use of the Twitter hashtag "#PDVSAesVenezuela" demonstrates that PDVSA is the alter ego of the Republic. (D.I. 3-1 at 3, 8.) That hashtag is nothing more than a marketing tool intended to demonstrate solidarity with the Venezuelan people and to highlight the value of the PDVSA brand within Venezuela. "#PDVSAesVenezuela" is no different from similar marketing efforts by other companies, such as the Dallas Cowboys branding itself "America's Team" or Anheuser-Busch's temporary rebranding of "Budweiser" as "America" during the U.S. Presidential election.

Cir. 2007). Under that provision, a judgment creditor must establish that the property sought to be attached is located in the United States, is "used for a commercial activity in the United States" and that one of the enumerated exceptions to execution immunity applies. 28 U.S.C. § 1610(a). That determination is to be made *at the time* the writ of attachment is issued. *Aurelius Capital Partners LP v. Republic of Arg.*, 584 F.3d 120, 130 (2d Cir. 2009) ("*Aurelius*").

Whether an asset is "***used for*** a commercial activity" under Section 1610(a) depends on how the foreign state employs the asset and not how the asset was acquired. *See Af-Cap,* 475 F.3d at 1091; *Conn. Bank*, 309 F.3d at 251. The Fifth Circuit in *Conn. Bank* explained:

> What matters under the statute is what the property is "used for," not how it was generated or produced. If property in the United States is used for a commercial purpose here, that property is subject to attachment and execution even if it was purchased with tax revenues or some other noncommercial source of government income. Conversely, even if a foreign state's property has been generated by commercial activity in the United States, that property is not thereby subject to execution or attachment if it is not "used for" a commercial activity within our borders. … What matters under the statute is not how the Congo made its money, but how it spends it.

*Conn. Bank*, 309 F.3d at 251. The Ninth Circuit has adopted the same approach, stating: "[W]e conclude that property is 'used for a commercial activity in the United States' when the property in question is put into action, put into service, availed or employed *for* a commercial activity, not *in connection* with a commercial activity or *in relation* to a commercial activity." *Af-Cap,* 475 F.3d at 1091. The Second Circuit has joined the Fifth and Ninth Circuits, stating: "[W]e understand the word 'used,' read literally, to require not merely that the property at issue relate to commercial activity in the United States, but that the sovereign actively *utilize* that property in service of that commercial activity." *Exp.-Imp. Bank of the Republic of China v. Grenada*, 768 F.3d 75, 90 (2d Cir. 2014). In addition, the property at issue must be used for a

commercial activity by the foreign state – the actions of third parties are irrelevant under Section 1610(a).  *See Rubin v. Islamic Republic of Iran*, 830 F.3d 470, 481 (7th Cir. 2016); *Aurelius,* 584 F.3d at 131; *Af-Cap,* 475 F.3d at 1091; *Conn. Bank*, 309 F.3d at 256, n.5.

Here, Crystallex cannot demonstrate that PDVSA uses the PDVH shares for a commercial activity in the United States.  No doubt realizing that it cannot satisfy the "***used for***" requirement of Section 1610(a), Crystallex simply reads that language out of the statute and, instead, argues that attachment and execution is appropriate so long as the property in question is "commercial" in nature.  (D.I. 3-1 at 33-34.)  Crystallex does not cite a single authority that supports its tortured reading of Section 1610(a).  That reading is not only contrary to the plain language of the statute, it is foreclosed by overwhelming authority holding that the "used for" requirement is not satisfied by demonstrating that the property merely relates to some commercial activity in the United States.  *See Grenada*, 768 F.3d at 90; *Af-Cap,* 475 F.3d at 1091; *Conn. Bank*, 309 F.3d at 256; *see also EM I*, 473 F.3d at 484 (holding that funds in a New York account were "not available for attachment under § 1610 because the FRBNY Funds were never '*used for* commercial activity,' and plaintiffs presented no evidence to the District Court that the Republic or BCRA intended the FRBNY Funds to be so designated").[14]

Moreover, it has been held that a foreign state's assets that are frozen at the time of the attachment order cannot be used for a commercial activity in the United States and are therefore immune from attachment under the FSIA.  *See NML Capital, Ltd. v. Republic of Arg.,* No. 06

---

[14] Crystallex's reliance on *Republic of Arg. v. Weltover*, 504 U.S. 607 (1992), is misplaced.  (D.I. 3-1 at 33-34.)  *Weltover* held that the issuance of bonds was a commercial activity outside of the United States for purposes of the FSIA's "direct effect" exception to *jurisdictional* immunity.  It does not address the presumptive immunity accorded to property of a foreign state under the FSIA, much less the requirement that such property be "*used for* a commercial activity" under Section 1610(a).  As courts have repeatedly held, the FSIA's "exceptions to attachment immunity are narrower than the exceptions to jurisdictional immunity."  *Rubin v. Islamic Republic of Iran*, 637 F.3d 783, 796 (7th Cir. 2011); *see also Walters*, 651 F.3d at 289.

Civ. 7792 (TPG), 2010 WL 2399560, at *4 (S.D.N.Y. June 11, 2010) (funds held in a New York

bank account that had been frozen pursuant to a stipulation in a related case were not used for a

commercial activity and were thus immune from attachment under the FSIA).

Here, Executive Order 13808, 82 Fed. Reg. 41,155 (Aug. 29, 2017) (the "Executive

Order") makes clear that PDVSA cannot use the PDVH shares for a commercial activity in the

United States.  The Executive Order states:

> Section 1.  (a) All transactions related to, provision of financing
> for, and other dealings in the following by a United States person
> or within the United States are prohibited:  …
>
> (iv) dividend payments or other distributions of profits to
> the Government of Venezuela from any entity owned or controlled,
> directly or indirectly, by the Government of Venezuela.
>
> (b)  The purchase, directly or indirectly, by a United States person
> or within the United States, of securities from the Government of
> Venezuela … is prohibited.

The Executive Order explicitly prohibits PDVH from paying any dividends or otherwise

transferring profits to PDVSA.  Thus, even if the payment of dividends by PDVH would satisfy

the requirement that the asset be "used for a commercial activity in the United States," which is

not the case, PDVSA is not now receiving any dividends from PDVH, and PDVH is prohibited

from paying any such dividends by the Executive Order.

In addition, the Executive Order in effect prohibits Crystallex from attaching and

executing upon the PDVH shares, since under Delaware law, any attempt to attach and execute

upon the PDVH shares calls for the sale of the shares.  Under Section 1(b) of the Executive

Order, the purchase of the PDVH shares would constitute a "purchase … within the United

States of securities from the Government of Venezuela," and would therefore be prohibited.

## **CONCLUSION**

For the foregoing reasons, this Court should deny the Attachment Motion.

HEYMAN ENERIO GATTUSO & HIRZEL LLP

/s/ Samuel T. Hirzel
Samuel T. Hirzel, II (#4415)
300 Delaware Avenue, Suite 200
Wilmington, DE 19801
(302) 472-7300
SHirzel@hegh.law
*Attorney for Intervenor Petróleos de Venezuela, S.A.*

OF COUNSEL:

Joseph D. Pizzurro (pro hac vice pending)
Kevin A. Meehan (pro hac vice pending)
Julia B. Mosse (pro hac vice pending)
Juan O. Perla (pro hac vice pending)
CURTIS, MALLET-PREVOST,
COLT & MOSLE LLP
101 Park Avenue
New York, NY 10178
(212) 696-6000
jpizzurro@curtis.com
kmeehan@curtis.com
jmosse@curtis.com
jperla@curtis.com

Dated: November 3, 2017