## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| CRYSTALLEX INTERNATIONAL CORPORATION, | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | C.A. No. 17-mc-151-LPS |
| | : | |
| BOLIVARIAN REPUBLIC OF VENEZUELA, | : | PUBLIC VERSION |
| | : | RELEASED AUGUST 10, 2018 |
| Defendant. | : | |

Raymond J. DiCamillo, Jeffrey L. Moyer, Travis S. Hunter, RICHARDS, LAYTON & FINGER, P.A., Wilmington, DE

Robert L. Weigel, Jason W. Myatt, Rahim Moloo, GIBSON, DUNN & CRUTCHER LLP, New York, NY

Miguel A. Estrada, GIBSON, DUNN & CRUTCHER LLP, Washington, DC

　　Attorneys for Plaintiff.

Samuel T. Hirzel, II, HEYMAN ENERIO GATTUSO & HIRZEL LLP, Wilmington, DE

Joseph D. Pizzuro, Kevin A. Meehan, Julia B. Mosse, Juan O. Perla, CURTIS, MALLET-PREVOST, COLT & MOSLE LLP, New York, NY

　　Attorneys for Intervenor Petróleos de Venezuela, S.A.

### OPINION

August 9, 2018
Wilmington, Delaware

*[signature]*

**STARK, U.S. District Judge:**

Plaintiff/Judgment Creditor Crystallex International Corporation ("Crystallex") holds a

$1.2 billion judgment against the Bolivarian Republic of Venezuela ("Venezuela" or "the

Republic"). (D.I. 1) Crystallex has registered the judgment in Delaware. (*Id.*) Venezuela has

not appeared in the litigation. However, Petróleos de Venezuela, S.A. ("PDVSA"), an oil

company, has intervened. (D.I. 14) This is because Crystallex seeks to collect on its judgment

against Venezuela by executing on property nominally owned by PDVSA, specifically shares of

common stock PDVSA owns in PDV Holding Inc. ("PDVH"), a Delaware corporation.

Crystallex's theory is that PDVSA is the alter ego of Venezuela, making PDVSA's property

subject to execution for payment of Venezuela's debt.

Crystallex and PDVSA have each filed a motion. Crystallex moves for a writ of

attachment *fieri facias* ("*fi. fa.*") pursuant to the Foreign Sovereign Immunities Act, 28 U.S.C.

§ 1601(c). (D.I. 2) In turn, PDVSA has filed a motion to dismiss for lack of subject matter

jurisdiction. (D.I. 25) Together, the parties'[1] motions present numerous complex questions,

some of which have been addressed by no previous court, and others on which different courts

have reached competing conclusions. The Court's careful consideration of the issues before it

has included reviewing numerous briefs (D.I. 3-1, 26, 33), letter briefs (D.I. 51-54, 70-71),

submissions of supplemental authority (D.I. 41, 46, 59-60, 63-65), six substantive declarations

(D.I. 7-8, 28-29, 35-36), and hundreds of exhibits (*see, e.g.*, D.I. 4-6, 11, 27, 34, 37, 47). The

Court also heard oral argument on two separate occasions. (*See* Transcript of Dec. 21, 2017 Hr'g

---

[1]The Court will refer to Crystallex and PDVSA as "the parties," as they are the only entities who
have appeared and have provided briefing and evidence to the Court.

(D.I. 49) ("Tr."); Transcript of Aug. 3, 2018 Hr'g (D.I. 74) ("Aug. Tr."))

Having undertaken the required analysis, the Court will grant Crystallex's motion and deny PDVSA's motion.

## BACKGROUND

In 2002, the Government of Venezuela awarded Crystallex, a Canadian corporation, a Mine Operating Contract ("Contract") by which Crystallex was granted the opportunity to develop the Las Cristinas gold mines. (D.I. 3-1 at 1; D.I. 26 at 4-5) Completion of the mining project was dependent on Crystallex obtaining certain permits from Venezuela. (D.I. 26 at 5) Crystallex never obtained such permits. (*Id.*) Instead, in 2011, Venezuela seized the Las Cristinas mines. (D.I. 3-1 at 5)

"In accordance with a bilateral investment treaty (BIT) between Canada and Venezuela, Crystallex pursued its grievances against Venezuela before an international arbitration tribunal . . . ." *Crystallex Int'l Corp. v. Bolivarian Republic of Venezuela*, 244 F. Supp. 3d 100, 105 (D.D.C. 2017) ("*Crystallex*"). Specifically, in 2011, Crystallex initiated arbitration proceedings against Venezuela before the International Centre for Settlement of Investment Disputes ("ICSID") in Washington, D.C. (D.I. 3-1 at 1, 5) On April 4, 2016, an arbitration panel found that Venezuela's actions constituted an indirect expropriation of Crystallex's rights under the Contract. (D.I. 26 at 5) The ICSID awarded Crystallex $1.2 billion plus interest. (*Id.*; D.I. 3-1 at 5)

Crystallex then filed suit in the United States District Court for the District of Columbia (the "D.C. Court") seeking to confirm the arbitral award. *See Crystallex Int'l Corp. v. Bolivarian Republic of Venezuela*, C.A. No. 16-0661 (RC) D.I. 1 (D.D.C. Apr. 7, 2016). On March 25,

2017, Judge Rudolph Contreras issued an opinion and order confirming the award. (*See* D.I. 1;

D.I. 26 at 6; D.I. 4-1 Exs. 6, 7)  On April 7, 2017, the D.C. Court entered judgment against

Venezuela. (D.I. 1; D.I. 26 at 6)  Just over two months later, on June 9, 2017, Judge Contreras

found that a "reasonable period" had elapsed since entry of judgment but Venezuela had not paid

its debt. *Crystallex Int'l Corp. v. Bolivarian Republic of Venezuela*, C.A. No. 16-0661 (RC) D.I.

36 (D.D.C. June 9, 2017) (*see* D.I. 4-1 Ex. 8) ("*Crystallex II*").  Hence, pursuant to Section

1610(c) of the FSIA, the D.C. Court ruled that Crystallex could commence proceedings in aid of

execution of the judgment. *Id.*[2]

Accordingly, on June 19, 2017, Crystallex registered the D.C. Court's judgment in this

Court. (D.I. 1; *see also* 28 U.S.C. § 1963 (providing district court in which judgment is

registered with same power to enforce it that is possessed by district court which issued

judgment))[3]  Crystallex filed its pending motion for a writ of attachment on August 14, 2017,

seeking to attach shares of PDVH, which are owned by PDVSA, which Crystallex alleges is an

alter ego of Venezuela. (D.I. 3-1 at 1; *see also* Tr. at 36 (PDVSA stating "the PDV Holding

---

[2]When advised that Crystallex viewed PDVSA's holdings in Delaware as attachable to satisfy Crystallex's judgment against Venezuela, and that Venezuela challenged whether PDVSA's assets would be subject to the judgment against Venezuela, Judge Contreras "decline[d] the invitation to adjudicate whether or not those assets will ultimately be attachable by Petitioner [Crystallex] because such a determination is unnecessary at this stage." (*Crystallex II* at 4)  As the instant motions make plain, such a determination is necessary now.

Venezuela's appeal of the D.C. Court's orders is pending before the Court of Appeals for the D.C. Circuit. *See* C.A. No. 16-0661 (RC) D.I. 34.

[3]Crystallex has also filed the judgment in other courts, including the United States District Court for the Southern District of New York. (*See* D.I. 3-1 at 2; *Crystallex Int'l Corp. v. Bolivarian Republic of Venezuela*, C.A. No. 17-mc-205-VEC)  According to the parties, there has been no litigation in S.D.N.Y. that is of any relevance to any of the issues before this Court. (*See* Tr. at 66; Aug. Tr. at 13)

shares they want to attach belong to PDVSA")) Thereafter, PDVSA moved to intervene for the purpose of opposing the attachment motion (D.I. 14), a request the Court granted on August 28, 2017 (D.I. 17), without objection from Crystallex (D.I. 16).  Subsequently, on November 3, 2017, PDVSA filed its pending cross-motion to dismiss for lack of subject matter jurisdiction. (D.I. 25)

The parties initially completed briefing on the motions on November 22, 2017 (D.I. 3-1, 26, 33) and were scheduled for oral argument on December 5, 2017 (D.I. 23).  When they appeared on December 5, Crystallex requested a continuance in light of a recent settlement reached between it and Venezuela.  (*See* D.I. 40; *see also* Transcript of Dec. 5, 2017 Chambers Conference)  The Court continued the argument until December 21, at which point the parties again appeared, indicated that Venezuela had not met a condition precedent to the settlement, and proceeded to present argument.  (*See* D.I. 43; Aug. Tr. at 12-13)

Over the ensuing months, the parties have advised the Court of subsequent authorities and developments (*see, e.g.*, D.I. 59-60, 63-65) and responded to the Court's orders for supplemental briefing (*see* D.I. 51-54, 70-71).  On July 30, 2018, the Court provided the parties with a list of additional questions on which it sought their input.  (*See* D.I. 68)  Then, on August 3, the Court heard additional oral argument.  (*See* Aug. Tr.)

## APPLICABLE LAW

### A.    Writ Of Attachment

Pursuant to Federal Rule of Civil Procedure 69(a)(1), "[a] money judgment is enforced by a writ of execution, unless the court directs otherwise. The procedure on execution – and in proceedings supplementary to and in aid of judgment or execution – must accord with the

4

procedure of the state where the court is located, but a federal statute governs to the extent it

applies." Under Rule 69, "a district court has the authority to enforce a judgment by attaching

property in accordance with the law of the state in which the district court sits." *Peterson v.*

*Islamic Republic of Iran*, 876 F.3d 63, 89 (2d Cir. 2017) (internal quotation marks omitted).

Delaware law permits a judgment creditor to obtain a writ of attachment *fi. fa.*, as set out

in 10 Del. C. § 5031:

> The plaintiff in any judgment in a court of record, or any person for
> such plaintiff lawfully authorized, may cause an attachment, as
> well as any other execution, to be issued thereon, containing an
> order for the summoning of garnishees, to be proceeded upon and
> returned as in cases of foreign attachment.[4]  The attachment,
> condemnation, or judgment thereon, shall be pleadable in bar by
> the garnishee in any action against the garnishee at the suit of the
> defendant in the attachment.

As expressly provided by statute, the types of property a judgment creditor may attach include a

debtor's shares in a Delaware corporation:

> The shares of any person in any corporation with all the rights
> thereto belonging . . . may be attached under this section for debt,
> or other demands, if such person appears on the books of the
> corporation to hold or own such shares, option, right or interest.

8 Del. C. § 324(a).[5]  Delaware law further provides that judgment creditors may execute on their

judgments by "the attachment of a defendant's property in the hands of a third party." *UMS*

*Partners, Ltd. v. Jackson*, 1995 WL 413395, at *5 (Del. Super. Ct. June 15, 1995).

---

[4]"By its reference to cases of foreign judgment, § 5031 incorporates Chapter 35 of Title 10 of the
Delaware Code.  Under those provisions, '[g]oods, chattels, rights credits, moneys, effects, lands
and tenements' may be attached." *LNC Invests., Inc. v. Democratic Republic of Congo*, 69 F.
Supp. 2d 607, 611 (D. Del. 1999) (citing 10 Del. C. § 3508).

[5]The statute sets out specific procedural requirements for, among other things, a "public sale to
the highest bidder." 8 Del. C. § 324(a).

## B.    Subject Matter Jurisdiction

Federal Rule of Civil Procedure 12(b)(1) "authorizes dismissal of a complaint for lack of

jurisdiction over the subject matter, or if the plaintiff lacks standing to bring his claim."

*Samsung Elecs. Co., Ltd. v. ON Semiconductor Corp.*, 541 F. Supp. 2d 645, 648 (D. Del. 2008).

"At issue in a Rule 12(b)(1) motion is the court's very power to hear the case." *Petruska v.

Gannon Univ.*, 462 F.3d 294, 302 (3d Cir. 2006) (internal quotation marks omitted).

Usually, a motion to dismiss for lack of subject matter jurisdiction presents either a facial

or factual challenge. *See CNA v. United States*, 535 F.3d 132, 139 (3d Cir. 2008).  A facial

attack "concerns an alleged pleading deficiency," while a factual attack concerns the "failure of a

plaintiff's claim to comport factually with the jurisdictional prerequisites." *Id.* (internal

quotation marks and brackets omitted).

Where the motion presents a facial challenge to the Court's jurisdiction, or one based

purely on the sufficiency of the plaintiff's allegations, the Court must accept well-pled factual

allegations as true and generally may consider only the complaint and any documents referenced

in or attached to it. *See Lincoln Benefit Life Co. v. AEI Life, LLC*, 800 F.3d 99, 105 (3d Cir.

2015); *see also Mortensen v. First Fed. Sav. & Loan Ass'n*, 549 F.2d 884, 891 (3d Cir. 1977)

("[T]he court must consider the allegations of the complaint as true.").  "Affidavits and briefs in

opposition do not fall in this category." *Lincoln Benefit*, 800 F.3d at 110.

"The factual attack, however, differs greatly . . . ." *Mortensen*, 549 F.2d at 891.

> Because at issue in a factual 12(b)(1) motion is the trial court's
> jurisdiction . . . there is substantial authority that the trial court is
> free to weigh the evidence and satisfy itself as to the existence of
> its power to hear the case.  In short, no presumptive truthfulness
> attaches to plaintiff's allegations, and the existence of disputed

6

> material facts will not preclude the trial court from evaluating for
> itself the merits of jurisdictional claims.  Moreover, the plaintiff
> will have the burden of proof that jurisdiction does in fact exist.

*Id.*

Occasionally, the Court must consider both facial and factual challenges to its subject matter jurisdiction.  *See Carrier Corp. v. Outokumpu Oyj*, 673 F.3d 430, 440 (6th Cir. 2012) ("Outokumpu has presented arguments for both a facial and factual challenge to subject-matter jurisdiction, and we address each in turn."); *Hopewell Valley Reg'l. Bd. of Educ. v. J.R.*, 2018 WL 2411616 (D.N.J. May 29, 2018) (addressing motion to dismiss presenting both types of challenges); *In re PennySaver USA Publ'g, LLC*, 2018 WL 3222618, at *3 (Bankr. D. Del. July 2, 2018) ("Defendant has made both factual and facial challenges in its Rule 12(b)(1) Motion. . . . [T]he Court will review the factual and then facial challenges, in that order.").  When a motion presents both types of attacks, the plaintiff must overcome both in order for its claims to proceed.

Here, PDVSA presents both a facial and factual attack to subject matter jurisdiction. (*See, e.g.*, D.I. 26 at 20 (discussing facial attack); *id.* at 22-27 (discussing factual attack); *see also infra* n.16)

## DISCUSSION

### A.    Foreign Sovereign Immunity

#### 1.    The Parties' Disputes Are Governed By The FSIA

The Foreign Sovereign Immunities Act ("FSIA" or "Act"), 28 U.S.C. § 1602 *et seq.*, "establishes a comprehensive framework for determining whether a court in this country, state or federal, may exercise jurisdiction over a foreign state." *Republic of Argentina v. Weltover, Inc.*, 504 U.S. 607, 610 (1992).  The FSIA is the "sole basis for obtaining jurisdiction over a foreign

state in our courts." *Argentine Republic v. Amerada Hess Shipping Corp.*, 488 U.S. 428, 434

(1989).  "[F]oreign sovereign immunity is a matter of grace and comity on the part of the United

States, and not a restriction imposed by the Constitution." *Verlinden B.V. v. Centr. Bank of*

*Nigeria*, 461 U.S. 480, 486 (1983).

    "Under the Act, a 'foreign state shall be immune from the jurisdiction of the courts of the

United States and of the States' unless one of several statutorily defined exceptions applies."

*Weltover*, 504 U.S. at 610-11 (quoting 28 U.S.C. § 1604).  Hence, "a district court has subject

matter jurisdiction over a suit against a foreign state if – and only if – the plaintiff's claim falls

within a statutorily enumerated exception." *Odhiambo v. Republic of Kenya*, 764 F.3d 31, 34

(D.C. Cir. 2014).  Accordingly, the FSIA

> must be applied by the District Courts in every action against a
> foreign sovereign since subject matter jurisdiction in any such
> action depends on the existence of one of the specified exceptions
> to foreign sovereign immunity, 28 U.S.C. § 1330(a).[6]  At the
> threshold of every action in a District Court against a foreign state,
> therefore, the court must satisfy itself that one of the exceptions
> applies – and in doing so it must apply the detailed federal law
> standards set forth in the Act.

*Verlinden*, 461 U.S. at 493-94 (internal footnote omitted).  "[T]he FSIA exceptions are

exhaustive; if no exception applies, the district court has no jurisdiction." *Odhiambo*, 764 F.3d

at 34; *see also Verlinden*, 461 U.S. at 497 ("[I]f a court determines that none of the exceptions to

sovereign immunity applies, the plaintiff will be barred from raising his claim in any court in the

---

[6]Section 1330(a) provides: "district courts shall have original jurisdiction without regard to
amount in controversy of any nonjury civil action against a foreign state as defined in section
1603(a) of this title as to any claim for relief in personam with respect to which the foreign state
is not entitled to immunity either under sections 1605-1607 of this title or under any international
agreement."

United States . . . .").

Therefore, the disputes among Crystallex, Venezuela, and PDVSA are governed by the FSIA.  Unless Crystallex can meet its burden to establish the applicability of exceptions to sovereign immunity, the Court is required to dismiss this case.[7]

### 2.   Crystallex Must Establish An Exception to Jurisdictional Immunity, Although It Need Not Show An Independent Basis For Subject Matter Jurisdiction With Respect to PDVSA

Venezuela, as a foreign sovereign state, is presumptively immune from suit in all courts in the United States.  *See* 28 U.S.C. § 1604 ("Subject to existing international agreements to which the United States is a party at the time of enactment of this Act a foreign state shall be immune from the jurisdiction of the courts of the United States and of the States except as provided in sections 1605 to 1607 of this chapter.").  Crystallex contends, and PDVSA does not dispute, that Venezuela is subject to the Court's jurisdiction under § 1605(a)(6), the arbitration exception.  Section 1605(a)(6) states, in relevant part:

> (a) A foreign state shall not be immune from the jurisdiction of courts of the United States or of the States in any case
>
> . . .
>
> (6) in which the action is brought, . . . to confirm an award made pursuant to . . . an agreement to arbitrate, if (A) the arbitration takes place or is intended to take place in the United States . . . .

The Act defines a "foreign state" to include "a political subdivision of a foreign state or

---

[7]The FSIA also imposes procedural requirements that must be met before a party may execute on property held by a foreign sovereign state or its agency or instrumentality, including (i) that a "reasonable period of time has elapsed following the entry of judgment" and (ii) "the giving of . . . notice."  28 U.S.C. § 1610(c).  It is undisputed that these procedural conditions have been satisfied here.

an agency or instrumentality of a foreign state." 28 U.S.C. § 1603(a).  In turn, an "agency or

instrumentality of a foreign state" is defined as any entity:

> (1)  which is a separate legal person, corporate or otherwise, and
>
> (2)  which is an organ of a foreign state or political subdivision thereof, or a majority of whose shares or other ownership interest is owned by a foreign state or political subdivision thereof, and
>
> (3)  which is neither a citizen of a State of the United States as defined in section 1332(c) and (e) of this title, nor created under the laws of any third country.

28 U.S.C. § 1603(b).  It is undisputed that PDVSA is an "agency or instrumentality" of

Venezuela within the meaning of the FSIA.  (*See* D.I. 26 at 12 ("PDVSA indisputably is an

'agency or instrumentality of a foreign state' as defined in the FSIA . . . ."); Tr. at 36 ("Where the

plaintiffs and PDVSA agree is that PDVSA is an agency or instrumentality of Venezuela . . . ."))

Where the parties' views first diverge is on the question of whether the Court must have

an independent basis for subject matter jurisdiction with respect to PDVSA.  PDVSA contends

that because Crystallex's motion seeks to impose liability on PDVSA for Venezuela's debt,

Crystallex is in effect suing PDVSA, and the Court cannot adjudicate such a suit without having

a basis to exercise subject matter jurisdiction over PDVSA.  (*See, e.g.*, D.I. 26 at 10-11; *see also*

Tr. at 36-37)  To PDVSA, the effect of Crystallex prevailing on its motion would be the same as

if PDVSA were added to the judgment Crystallex holds against Venezuela, rendering PDVSA –

a third party, which had no involvement in the events that harmed Crystallex and no involvement

in the arbitration giving rise to the judgment against Venezuela – potentially liable for all of

Venezuela's debts.  Crystallex counters that once it establishes the Court has subject matter

jurisdiction with respect to its dispute with Venezuela, and further establishes that PDVSA is the

alter ego of Venezuela, it will have met its burden to show that the Court has subject matter

jurisdiction with respect to PDVSA as well. To Crystallex, the crucial facts are that Crystallex

has not sued PDVSA and does not seek to add PDVSA as a liable party on its judgment against

Venezuela. (*See, e.g.*, D.I. 70 at 8) ("Crystallex does not seek to hold PDVSA liable for its

judgment but rather seeks a more limited finding, namely that the specific property at issue on

this motion – the shares of PDVH – though nominally held in the name of PDVSA, are, at this

time, really the property of Venezuela.") Alternatively, if an independent basis for subject matter

jurisdiction is necessary with respect to PDVSA, Crystallex argues that it, too, is present. (*See

id.* at 4-5) ("[T]his Court has an independent basis for jurisdiction against PDVSA under 28

U.S.C. § 1330 and Section 1605(a)(6) of the FSIA.") On these points, the Court agrees with

Crystallex.

PDVSA's position is based on the Supreme Court's decision in *Peacock v. Thomas*, 516

U.S. 349, 357 (1996), which stated, "We have never authorized the exercise of ancillary

jurisdiction in a subsequent lawsuit to impose an obligation to pay an existing federal judgment

on a person not already liable for that judgment." *See also Butler v. Sukhoi Co.*, 579 F.3d 1307,

1313 (11th Cir. 2009) ("Because the Butlers sought to invoke the jurisdiction of the United States

courts to enter a new judgment in a separate cause of action against appellants, they bore the

burden of presenting a *prima facie* case that jurisdiction [against the third party] existed.")

(footnote omitted).

However, as Crystallex emphasizes, the Third Circuit has had occasion to consider the

applicability of *Peacock* in the context of garnishment actions. (*See, e.g.*, Tr. at 10) (arguing

"*Peacock* has no application to proper Rule 69 motions") In *IFC Interconsult, AG v. Safeguard International Partners, LLC*, 438 F.3d 298, 310 (3d Cir. 2006), the Third Circuit held that Rule 69 authorizes a garnishment action against an indemnitor of a judgment debtor even when there is no independent basis for federal subject matter jurisdiction – such as diversity – for a new action by the judgment creditor directly against that indemnitor.[8] As the *IFC* Court stated: "*Peacock* itself made clear that it does not apply to Rule 69 actions." *Id.* at 311. *IFC* adds: "Although garnishment actions are new actions in the sense that there is a new party and a new theory for that party's liability, they are not new actions in the sense of a new direct claim." *Id.* at 314.

Crystallex brings its motion for a writ of attachment *fi. fa.* pursuant to, *inter alia*, Rule 69, contending that it, as the garnishor, "is seeking to collect its judgment against Venezuela (the judgment debtor) by stepping into Venezuela's shoes and demanding Venezuela's alter ego's shares from PDVH (the garnishee)." (D.I. 70 at 7; *see also* D.I. 3 at 1; Tr. at 82-83 ("Rule 69 actions are to be treated as part of the original suit. Therefore, if the original suit was a suit against Venezuela, and there was jurisdiction under [Section] 1330, there is jurisdiction to adjudicate rights in the property.")) According to Crystallex, "[t]he fact that this garnishment proceeding involves an alter ego theory does not change the nature of the proceeding." (D.I. 70 at 7; Tr. at 11 ("[T]he fact that you could have a broader alter-ego theory does not mean that all alter-ego theories fall under *Peacock*."))

Again, the Court agrees. Unlike the situation presented in *Peacock*, 516 U.S. at 317, this

---

[8]In reaching this conclusion, the Third Circuit reaffirmed its prior *en banc* holding in *Skevofilax v. Quigley*, 810 F.2d 378, 385 (3d Cir. 1987), finding that *Skevofilax* was not abrogated by *Peacock*. *See IFC*, 438 F.3d at 310.

case is not "a subsequent lawsuit" to "impose an obligation to pay" an "existing federal judgment on a person not already liable for that judgment." To the contrary, it is part of the "same lawsuit" – that is, the action giving rise to the judgment against Venezuela, which has been registered in this District – and does not seek to impose any obligation on PDVSA to pay Venezuela's existing judgment, but, instead, seeks to attach property nominally belonging to PDVSA as truly belonging to Venezuela. (*See* D.I. 70 at 7-8) Rather than attempting to hold PDVSA primarily liable or shifting the judgment to PDVSA, Crystallex seeks to enforce its judgement against debtor Venezuela, "whose immunity has already been defeated on the FSIA and the arbitra[tion] exception," by attaching PDVSA property because it is "*property of the debtor*" under an alter ego theory. (Aug. Tr. at 31) (emphasis added)[9]

Such a theory, seeking only to collect a judgment but not to establish liability, does not require an independent basis for jurisdiction. *See EM Ltd. v. Banco Cent. de la Republica Argentina*, 800 F.3d 78, 91 n.56 (2d Cir. 2015) ("*EM Ltd. II*") ("Our precedent supports the view . . . that once an instrumentality of a sovereign state has been deemed to be the alter ego of that state . . . the instrumentality and the state are to be treated as one and the same for all purposes."); *Transfield ER Cape Ltd. v. Indus. Carriers, Inc.*, 571 F.3d 221, 224 (2d Cir. 2009) (stating alter egos "are treated as one entity for jurisdictional purposes") (internal quotation marks omitted);

---

[9]As Crystallex acknowledges, because its theory is not based on establishing primary liability or adding PDVSA to the judgment, if the Republic were to sell PDVSA before the Court rendered its judgment, Crystallex would have no redress against PDVSA. (*See* Aug. Tr. at 33 ("If you were to rule for us and PDVSA were sold, PDVSA would not be liable in personam if sold to [e.g.] Exxon."); *id.* at 35-36 ("It's very different to get a Writ of Fi Fa against a particular asset than it is to get a judgment. If we were to get a judgment against PDVSA, . . . [w]e could then go and attach any asset of PDVSA. We could take that judgment and go to other courts. . . . What we're asking here . . . is [for] an order [that] applies only to [a] particular asset."))

*Patin v. Thoroughbred Power Boats, Inc.*, 294 F.3d 640, 654 (5th Cir. 2002) (alter egos "are considered to be one and the same under the law"); *Epperson v. Entm't Express, Inc.*, 242 F.3d 100, 106 (2d Cir. 2001) ("Where the post-judgment proceeding is an effort to collect a federal court judgment, the courts have permitted judgment creditors to pursue, under the ancillary enforcement jurisdiction of the court, the assets of the judgment debtor even though the assets are found in the hands of a third party."); *U.S.I. Props. Corp. v. M.D. Constr. Co.*, 230 F.3d 489, 496 (1st Cir. 2000) ("Where the postjudgment claim is simply a mode of execution designed to reach property of the judgment debtor in the hands of a third party, federal courts have often exercised enforcement jurisdiction. . . . Where the state procedural enforcement mechanisms incorporated by Rule 69(a) allow the court to reach assets of the judgment debtor in the hands of third parties in a continuation of the same action, such as garnishment or attachment, federal enforcement jurisdiction is clear."); *Thomas, Head & Greisen Emps. Tr. v. Buster*, 95 F.3d 1449, 1454 & n.7 (9th Cir. 1996) (stating that where judgment creditor "is not attempting to establish the [third party's] liability for the original judgment, . . . *Peacock* [is] inapposite. . . . *Peacock* suggested that whether a judgment creditor's post-judgment action is within a federal district court's ancillary enforcement jurisdiction hinges on whether it seeks not merely 'to ***collect*** a judgment' but also '***to establish liability***' on the part of the third party.").

The Court acknowledges that the proper resolution of this issue is not free from doubt. This case is certainly not an "ordinary" Rule 69 garnishment action. Moreover, PDVSA directs the Court's attention to *Gambone v. Lite Rock Drywall*, 288 Fed. App'x 9, 12 (3d Cir. July 25, 2008), in which the Third Circuit described *Peacock* as holding "that ancillary jurisdiction was not intended for use as a tool for establishing personal liability on the part of a new defendant, for

14

instance by designating that third party *as an alter ego of the indebted party or by piercing the corporate veil*" (emphasis added). *Gambone*, then, suggests that seeking to attach a third-party's property on the basis that the third-party is the alter ego of a judgment-debtor is an effort to impose primary liability on the third-party, an outcome requiring an independent jurisdictional basis with respect to the third party. However, the *Gambone* Court elaborated that "[n]othing in *Peacock* . . . precludes ancillary jurisdiction over suits involving assets already subject to the judgment; it only bars the exercise of ancillary jurisdiction over attempts *to impose personal liability for an existing judgment on a new party.*" *Id.* (emphasis added).

Just as the creditor in *Gambone* was not seeking to impose personal liability on the third party transferees, and thus, the Third Circuit concluded that the district court there had ancillary jurisdiction (*see id.* at 13), here, too, Crystallex does not attempt to impose personal liability on PDVSA, but instead seeks to attach assets that it alleges belong to Venezuela – assets which belong only nominally to Venezuela's alter ego, PDVSA. Where, as here, a plaintiff "does not seek to impose personal liability on" a third party, but rather "the relief [it] seek[s] is solely to corral [the debtor's] assets in an effort to preserve [its] access to them," *id.*, an independent basis for subject matter jurisdiction is not required. Moreover, while the *Gambone* Court explained that "*Peacock* holds that ancillary jurisdiction does not extend to suits demanding that a third party use its legitimately held assets to satisfy a previously rendered judgment," *id.*, the Court finds it is appropriate – if it finds PDVSA is Venezuela's alter ego – to view the instant case as *not* involving a demand that PDVSA use *its* "legitimately held assets" to satisfy Venezuela's judgment. Rather, the issue here is whether PDVSA's assets are, in effect, *Venezuela's* assets; for if they are, then this case is not correctly characterized as one in which Crystallex is attaching

15

a third-party's property.

PDVSA also directs the Court to *IFC*, 438 F.3d at 312, in which the Third Circuit described veil-piercing as a mechanism for imposing "primary liability" on a third party. *Id.* The *IFC* Court explained, "[v]eil-piercing does not make a party secondarily liable. Rather, it collapses corporate distinctions to make for joint primary liability. This contrasts with garnishment, in which there is a new party and a new theory of liability, but not a new direct claim." *Id.* Like *Gambone*, then, *IFC* seems to suggest that the Third Circuit would hold that alter ego liability is a form of "primary liability," which, pursuant to *Peacock*, requires an independent basis to exercise subject matter jurisdiction as to the third party. *See Epperson*, 242 F.3d at 106 ("Since *Peacock*, most courts have continued to draw a distinction between post-judgment proceedings to collect an existing judgment and proceedings, such as claims of alter ego liability and veil-piercing, that raise an independent controversy with a new party in an effort to shift liability.").

But the Court finds persuasive Crystallex's notion of "two different contexts" of alter ego liability. (D.I. 70 at 7-8 & n.8) (citing, for example, *First Horizon Bank v. Moriarty-Gentile*, 2015 WL 8490982, at *4 n.4 (E.D.N.Y. Dec. 10, 2015) (finding independent jurisdiction, but also noting "alternate basis for jurisdiction" based on finding that third party was alter ego of debtor); *Aioi Seiki, Inc. v. JIT Automation, Inc.*, 11 F. Supp. 2d 950, 952-54 (E.D. Mich. 1998) ("An action to pierce the corporate veil is not a new cause of action, but merely a determination of whether multiple entities exist as separate entities or as mere alter egos of each other. . . . Accordingly, [such actions are] brought supplementary to and in an effort to enforce a previous judgment of this court and should therefore be brought pursuant to Fed. R. Civ. P. 69(a).") An

16

alter ego (or veil piercing) theory may be raised either as a basis for primary liability, in which

"the judgment creditor seeks to establish that the alleged alter ego is liable for the original

judgment, and thus obtain a new judgment against the alter ego," or alternatively as a basis for

secondary liability, in which the judgment creditor "seeks a more limited finding, namely that the

specific property at issue . . . though nominally held in the name of [a third party, is], at this time,

really the property of the [judgment debtor]." (D.I. 70 at 7-8)  For the reasons already discussed

in relation to *Gambone*, the Court views the present case as involving garnishment, seeking only

to establish secondary liability (by attaching certain specified property), rather than an action

seeking to impose primary liability on PDVSA.

Therefore, the Court concludes that if Crystallex meets its burden to show that the Court

has subject matter jurisdiction with respect to Venezuela under Section 1605(a)(6), and if

Crystallex further demonstrates that PDVSA is the alter ego of Venezuela, then Crystallex will

also necessarily have established that the Court may exercise subject matter jurisdiction with

respect to PDVSA as well.  Crystallex does not need to additionally prove that some other

independent basis of subject matter jurisdiction exists with respect to PDVSA.  *See Kensington*

*Int'l Ltd. v. Republic of Congo*, 2007 WL 1032269, at *13 (S.D.N.Y. Mar. 30, 2007) ("[I]f the

facts alleged in the Complaint claiming that SNPC is an alter ego of Congo are accepted as true,

then SNPC is Congo, and the only immunity at issue is Congo's immunity.").[10]

---

[10]Even if an independent basis for jurisdiction were required, it is present, based on § 1330 and
FSIA § 1605(a)(6).  (*See* D.I. 70 at 4-5) (Crystallex: "[T]his Court has an independent basis for
jurisdiction against PDVSA under 28 U.S.C. § 1330 and Section 1605(a)(6) of the FSIA.")  The
Court further concludes that whether an independent basis for jurisdiction is required is a
question that does not necessarily need to be answered in this case.  Subject matter jurisdiction
here is so intertwined with the merits of the alter ego issue that the Court must address
Crystallex's alter ego contentions, one way or the other.

### 3.   Crystallex Must Establish An Exception
to Attachment and Execution Immunity

In addition to showing that Venezuela and PDVSA are not immune from exercise of this

Court's subject matter jurisdiction, Crystallex must also establish an exception to attachment and

execution immunity.   *See Rubin v. Islamic Republic of Iran*, 637 F.3d 783, 793 (7th Cir. 2011)

("The Act contains two primary forms of immunity[:] . . . Section 1604 provides jurisdictional

immunity from suit . . . [while] Section 1609 . . . codifies the related common-law principle that

a foreign state's property in the United States is immune from attachment and execution . . . .").

In order for the Court to issue the requested writ of attachment, the Court must be satisfied that

the specific property on which Crystallex seeks to execute – PDVSA's shares of stock in

Delaware corporation PDVH – are not immune from attachment and execution under the FSIA.

*See generally Rubin v. Islamic Republic of Iran*, 138 S. Ct. 816, 823-25 (2018) (discussing

"attachment and execution immunity" in relation to FSIA terrorism exception, 28 U.S.C.

§ 1605A).

"[T]he FSIA's provisions governing jurisdictional immunity, on the one hand, and

execution immunity, on the other, operate independently." *Walters v. Indus. & Commercial

Bank of China, Ltd.*, 651 F.3d 280, 288 (2d Cir. 2011).[11]   "[T]his means that 'a waiver of

immunity from suit does not imply a waiver of immunity from attachment of property, and a

waiver of immunity from attachment of property does not imply a waiver of immunity from

suit.'"   *Id.* (quoting *Restatement (Third) of Foreign Relations Law of the United States*

---

[11]Because the FSIA does not specify the "circumstances and manner of attachment and execution
proceedings," courts apply Rule 69(a) in attachment actions involving foreign states. *EM Ltd. v.
Republic of Argentina*, 473 F.3d 463, 474 n.10 (2d Cir. 2007) ("*EM Ltd. I*").

§ 456(1)(b) (1987)).[12]

Notably, "the exceptions to attachment immunity are narrower than the exceptions to jurisdictional immunity. Although there is some overlap between the exceptions to jurisdictional immunity and those for immunity from execution and attachment, there is no escaping the fact that the latter are more narrowly drawn." *Rubin*, 637 F.3d at 796 (internal quotation marks omitted). That is, all else being equal, it is easier to establish subject matter jurisdiction over a foreign sovereign entity than it is to attach and execute on the property in the United States of such an entity.

In the instant case, it is also important to understand that the scope of the exceptions to attachment and execution immunity vary depending on whether the property targeted by the plaintiff is property of the foreign sovereign itself or, instead, is property of an agency or instrumentality of the foreign sovereign. Consequently, "property owned by a foreign state's instrumentalities is generally more amenable to attachment than property owned by the foreign state itself." *Id.* at 794. As applied here, however, because of the Court's alter ego finding, Crystallex's burden is the greater of the two: as the Court is treating PDVSA as Venezuela, and therefore treating the property of PDVSA as the property of Venezuela, Crystallex must satisfy the narrower exception to execution immunity applicable to property of foreign states.

---

[12]Several circuits have expressly held that "[f]ederal sovereign immunity from execution does not defeat a court's jurisdiction." *Peterson v. Islamic Republic of Iran*, 627 F.3d 1117, 1125 (9th Cir. 2010); *see also Weinstein v. Islamic Republic of Iran*, 831 F.3d 470, 479, 484 (D.C. Cir. 2016) (subject matter jurisdiction can exist even where plaintiff did not establish exception to attachment immunity under FSIA); *Rubin*, 637 F.3d at 799-800 (finding FSIA § 1609 attachment and execution immunity is "not jurisdictional"). Regardless of whether this would be a correct statement of the law in the Third Circuit, the Court has decided that it must address both jurisdictional immunity and attachment/execution immunity and, accordingly, does so in this Opinion.

### 4.    PDVSA Is Presumptively Separate from Venezuela

It is undisputed that PDVSA is an agency or instrumentality of Venezuela, having been separately formed by Venezuela in the 1970s. (*See, e.g.*, Tr. at 13, 36)  "[D]uly created instrumentalities of a foreign state are to be accorded a presumption of independent status." *First Nat'l City Bank v. Banco Para El Comercio Exterior de Cuba*, 462 U.S. 611, 627 (1983) ("*Bancec*").  This is a strong presumption.  *See Arch Trading Corp. v. Republic of Ecuador*, 839 F.3d 193, 201 (2d Cir. 2016).  "Both *Bancec* and the FSIA legislative history caution against too easily overcoming the presumption of separateness." *De Letelier v. Republic of Chile*, 748 F.2d 790, 795 (2d Cir. 1984); *see also EM Ltd. II*, 800 F.3d at 99 ("[*Bancec*] sets a high bar for when an instrumentality will be deemed an alter ego of its sovereign state.").

Indeed, in *Bancec* – the leading case on how the presumption of separateness between a foreign state and its agency or instrumentality may be overcome – the Supreme Court explained that "the instrumentality's assets and liabilities must be treated as distinct from those of its sovereign in order to facilitate credit transactions with third parties." 462 U.S. at 626.  "Freely ignoring the separate status of government instrumentalities would result in substantial uncertainty over whether an instrumentality's assets would be diverted to satisfy a claim against the sovereign, and might thereby cause third parties to hesitate before extending credit to a government instrumentality without the government's guarantee." *Id.*  "Due respect for the actions taken by foreign sovereigns and for principles of comity between nations leads us to conclude . . . that government instrumentalities established as juridical entities distinct and independent from their sovereign should normally be treated as such." *Id.* at 626-27 (citation omitted).

20

Therefore, the Court must presume that PDVSA retains its status as separate and distinct from the nation of Venezuela.  Unless Crystallex can overcome this strong presumption, the Court must dismiss this case.

### 5.    Federal Common Law Provides The Applicable Disjunctive Test For Rebutting Presumption of Separateness

The FSIA does not address the circumstances under which an agency or instrumentality of a foreign state may be treated as the sovereign state itself for purposes of either jurisdiction or attachment and execution.  Thus, to determine whether Crystallex has rebutted the strong presumption of separateness between PDVSA and Venezuela, the Court applies standards developed pursuant to federal common law.  *See Bancec,* 462 U.S. at 623.  "The controlling case for when an instrumentality of a foreign sovereign state becomes the 'alter ego' of that state" is, once again, *Bancec. EM Ltd. II,* 800 F.3d at 89; *see also Doe v. Holy See*, 557 F.3d 1066, 1080 (9th Cir. 2009) ("The *Bancec* standard is in fact most similar to the 'alter ego' or 'piercing the corporate veil' standards applied in many state courts to determine whether the actions of a corporation are attributable to its owners.").[13]

In *Bancec*, the Supreme Court explained that the "presumption may be overcome in certain circumstances:" (1) "where a corporate entity is so extensively controlled by its owner that a relationship of principal and agent is created, we have held that one may be held liable for the actions of the other," *and "[i]n addition,"* (2) where adhering to "the broader equitable

---

[13]Importantly, it is federal law, not state law, that applies.  PDVSA's reliance on *Canfield v. Statoil USA Onshore Props. Inc.*, 2017 WL 1078184, at *10-11 (M.D. Pa. Mar. 22, 2017), a case applying Delaware state law, is unpersuasive.  *Canfield* involved an alter ego relationship between a Delaware corporation and its foreign-sovereign-owned parent corporation.  Here, the pertinent relationship is that between Venezuela and PDVSA, neither of which is a Delaware corporation.

principle" of corporate separateness "would work fraud or injustice." *Id.* at 628-29 (emphasis added; internal quotation marks omitted).  The test, then, is disjunctive.  A party such as Crystallex may rebut the presumption of separateness by establishing either of the foregoing and need not establish both.  *See Fed. Ins. Co. v. Richard I. Rubin & Co.*, 12 F.3d 1270, 1287 (3d Cir. 1993) ("We recognize that there are two major exceptions to the *Bancec* rule, namely, the independent corporate status of government-owned entities should be disregarded (1) 'where a corporate entity is so extensively controlled by its owner that a relationship of principal and agent is created;' *or* (2) where to give effect to the separate instrumentalities 'would work fraud or injustice.'") (emphasis added); *see also Arch Trading*, 839 F.3d at 201 (stating alter ego may be shown by either extensive control "or . . . fraud or injustice"); *EM Ltd. II*, 800 F.3d at 90-91 (same); *Holy See*, 557 F.3d at 1077-80 (same).[14]

The Court will refer to the *Bancec* disjunctive test for whether the presumption of separateness has been rebutted as the "extensive control" and "fraud or injustice" tests (or

---

[14]PDVSA has been somewhat inconsistent on this point.  After agreeing at the hearing that the applicable standard is disjunctive (*see, e.g.*, Tr. at 50-52), it asserted in a post-hearing letter that "control alone" is not enough, as "it is well established that an alter ego theory, under *Bancec* or otherwise, requires evidence of both extensive control *and* an abuse of the corporate form resulting in an injury to the plaintiff." (D.I. 51 at 3 n.2) (emphasis in original; citing D.I. 26 at 16-18)  PDVSA likewise argued in its letter that "[a]n alter ego relationship exists '*only if* (1) the owner exercised complete control over the corporation with respect to the transaction at issue *and* (2) such control was used to commit a fraud or wrong that injured the party seeking to pierce the veil.'" (D.I. 51 at 1-2 (quoting *BRIDAS S.A.P.I.C. v. Gov't of Turkmenistan*, 447 F.3d 411, 416 (5th Cir. 2006) (emphasis added); *see also id.* at 3 ("[A]buse of PDVSA's corporate form . . . is *required* to establish an alter ego relationship under *Bancec*.") (emphasis added); D.I. 54 at 2 (PDVSA reiterating view that "abuse of PDVSA's corporate form resulting in harm to Crystallex [i]s *required* under *Bancec*") (emphasis added)  As Crystallex observes, *BRIDAS* did not hold that the applicable test is conjunctive; it only held that under the facts presented there, both portions of the test were satisfied. (*See* D.I. 53 at 1 n.1)  The Court concludes – consistent with the authorities cited in the text and Crystallex's consistent position – that the applicable test is disjunctive.

prongs), respectively.[15]

In "examin[ing] . . . the nature of government instrumentalities," the *Bancec* Court noted these entities "vary considerably, but many possess a number of common features." 462 U.S. at 623-24.

> A typical government instrumentality, if one can be said to exist, is created by an enabling statute that prescribes the powers and duties of the instrumentality, and specifies that it is to be managed by a board selected by the government in a manner consistent with the enabling law. The instrumentality is typically established as a separate juridical entity, with the powers to hold and sell property and to sue and be sued. Except for appropriations to provide capital or to cover losses, the instrumentality is primarily responsible for its own finances. The instrumentality is run as a distinct economic enterprise; often it is not subject to the same budgetary and personnel requirements with which government agencies must comply.

*Id.* at 624. A typical government instrumentality would, normally, retain its separate juridical status. *See id.* at 633.

Still, "[d]etermination of who is and is not an agent of whom will be in great part factual, and the fact-finding should be explicit." *Foremost-McKesson, Inc. v. Islamic Republic of Iran,*

---

[15]While the applicable federal common law test is disjunctive, even its excessive control prong inherently assumes that some element of unfairness would result if the Court fails to treat one entity as the alter ego of the other. In this regard, the *Canfield* decision (noted at footnote 13, *supra*), is instructive (though not controlling). It observed, in discussing *Bancec*'s excessive control test, "[t]here are several alter ego tests within this circuit . . . but all seek the same purpose of holding a parent liable for the actions of a subsidiary or a corporation responsible for the actions of its shareholders. . . . In addition, there must be some overall element of injustice or unfairness present" (internal quotation marks and citations omitted). *Canfield*, 2017 WL 1078184, at *11. These generalized equitable considerations, while far from sufficient to overcome the strong immunities set out in the FSIA, have some relevance to any full and fair attempt to apply *Bancec* and distinguish the vast majority of "normal[]" cases – in which separate entities must be treated as separate – from those rare exceptional cases where the presumptions are overcome. *See* 462 U.S. at 627.

905 F.2d 438, 448 (D.C. Cir. 1990) (internal citation and quotation marks omitted).  In *Bancec*,

the Supreme Court emphasized that it was not "announc[ing] [a] mechanical formula for

determining the circumstances under which the normally separate juridical status of a

government instrumentality is to be disregarded." *Bancec*, 462 U.S. at 63; *see also Hester Int'l*

*Corp. v. Federal Republic of Nigeria*, 879 F.2d 170, 179 (5th Cir. 1989) (describing how

"determination of whether a government instrumentality is a separate juridical entity involves the

application of the law to fact-specific situations").

The burden of making the appropriate showing rests on the party seeking to rebut the

presumption of separateness, which here is Crystallex.  *See Hester*, 879 F.2d at 179; *see also*

*Foremost-McKesson*, 905 F.2d at 447 ("It is further clear that the plaintiff bears the burden of

asserting facts sufficient to withstand a motion to dismiss regarding the agency relationship.")

(emphasis omitted).  The Supreme Court has held that a plaintiff must "make out a legally valid

claim" and ultimately prove the facts supporting the court's jurisdiction under the FSIA; it is

insufficient simply to state a "non-frivolous" claim to that effect.  *See Bolivarian Republic of*

*Venezuela v. Helmerich & Payne Int'l Drilling Co.*, 137 S. Ct. 1312, 1316, 1318-19 (2017)

(considering jurisdictional standard under FSIA expropriation exception); *see also Owens v.*

*Republic of Sudan*, 864 F.3d 751, 779 (D.C. Cir. 2017).

**B.      Crystallex Has Met Its Burden with Respect to Jurisdictional Immunity**

It is undisputed that the Court has subject matter jurisdiction with respect to Crystallex's

claim against Venezuela, given the FSIA's arbitration exception.  Nonetheless, PDVSA has

moved to dismiss Crystallex's efforts to collect on its judgment against Venezuela by attaching

the property in the United States of PDVSA, on the theory that PDVSA is Venezuela's alter ego.

In the Court's view, PDVSA's motion presents both a facial and factual attack on the Court's subject matter jurisdiction.[16]

Below, after setting out the statutory basis for the Court's undisputed jurisdiction with respect to Venezuela, the Court addresses PDVSA's facial and factual challenges. As to the facial challenge to the sufficiency of Crystallex's allegations, the Court determines that Crystallex's burden is to rebut the presumption of separateness between Venezuela and PDVSA by showing probable cause. The Court then explains that, taking Crystallex's allegations as true, Crystallex has met this burden by adequately alleging that Venezuela exerts extensive control over PDVSA, including its day-to-day operations, rendering PDVSA the alter ego of Venezuela. However, Crystallex has not shown probable cause to find that recognizing the separateness of PDVSA and Venezuela would work a fraud or injustice.

Turning next to PDVSA's factual challenge, the Court concludes that Crystallex's burden is to prove its allegations by a preponderance of the evidence – not, as PDVSA contends, by clear and convincing evidence. The Court then summarizes the evidence presented by both sides and finds that Crystallex has proven, by a preponderance of the evidence, that Venezuela extensively controls PDVSA, and has, thus, proven that PDVSA is Venezuela's alter ego. With respect to the fraud or injustice prong, however, Crystallex has not met its burden.

---

[16]Among the questions the Court recently directed the parties to address were: "Is PDVSA's motion to dismiss a facial or factual challenge, or both? Is the answer the same for jurisdictional immunity and for execution immunity?" (D.I. 68 at 1) The parties' responses to these seemingly straightforward questions collectively amount to approximately three pages of single-spaced text. (*See* D.I. 70 at 1-2; D.I. 71 at 1-2) The Court's best assessment is that it is presented with both facial and factual challenges. To the extent this is unclear, in an abundance of caution the Court treats PDVSA's motion as if it presents both types of challenges.

### 1. The Court Has Undisputed Jurisdiction With Respect to Venezuela

PDVSA does not challenge the Court's subject matter jurisdiction with respect to

Venezuela. It is undisputed that Crystallex has gone beyond probable cause and fully proven that

Venezuela is not immune from suit due to registration of the confirmed arbitration award against

Venezuela. (*See* D.I. 3-1 at 5-7)

As noted previously, § 1604 of the FSIA renders foreign states like Venezuela "immune

from the jurisdiction of the courts of the United States and of the States except as provided in

sections 1605 to 1607" of the Act. 28 U.S.C. § 1604. The exception Crystallex relies on to

establish subject matter jurisdiction with respect to Venezuela is § 1605(a)(6), relating to

arbitration:

> (a) A foreign state shall not be immune from the jurisdiction of
> courts of the United States or of the States in any case . . .
>
>> (6) in which the action is brought . . . to confirm an
>> award made pursuant to . . . an agreement to
>> arbitrate, if
>>
>>> (A) the arbitration takes place or is
>>> intended to take place in the United
>>> States . . . .

It is undisputed that the Court has subject matter jurisdiction over Venezuela under

§ 1605(a)(6)(A) due to Crystallex's $1.2 billion arbitral award against Venezuela, which was

confirmed by the United States District Court for the District of Columbia, and is now registered

in the District of Delaware.

### 2. PDVSA's Facial Attack

There is no dispute that this litigation can go forward against Venezuela. But Venezuela

26

has not appeared and Crystallex has not identified any specific property directly owned by Venezuela that can be found in the District of Delaware. Instead, as noted throughout this Opinion, Crystallex seeks to execute its judgment against Venezuela by attaching and executing on property owned by PDVSA and found in Delaware; specifically, the shares of Delaware corporation PDVH, which are indisputably directly owned by PDVSA. Hence, the Court now addresses PDVSA's facial attack on the Court's subject matter jurisdiction.

### a.   Crystallex's burden is probable cause

As previously noted, when considering PDVSA's facial attack on the sufficiency of Crystallex's allegation that PDVSA is Venezuela's alter ego, the Court takes as true all of Crystallex's well-pled factual allegations. *See, e.g., Rong v. Liaoning Province Government*, 452 F.3d 883, 888 (D.C. Cir. 2006) ("If the defendant challenges only the legal sufficiency of the plaintiff's jurisdictional allegations, then the district court should take the plaintiff's factual allegations as true and determine whether they bring the case within any of the exceptions to immunity invoked by the plaintiff. If a foreign state argues that even if taken as true, the plaintiff's allegations are insufficient to come within the commercial activity exception, this amounts to a challenge to the legal sufficiency of the allegations.") (internal quotation marks and citations omitted); *see also Holy See*, 557 F.3d at 1073 ("[A] motion to dismiss for lack of jurisdiction under the FSIA is no different from any other motion to dismiss on the pleadings for lack of jurisdiction, and we apply the same standards in evaluating its merit.").[17]

---

[17]Because this miscellaneous action was initiated not by a complaint but instead by a motion, there is some uncertainty as to what materials the Court should look to for purposes of the facial challenge. The Court concludes it is appropriate to take as true all "well-pled" factual allegations contained in Crystallex's motion, briefs, letters, declarations, expert reports, exhibits, or during any hearing or teleconference with the Court. (*See* D.I. 70 at 3) There is no doubt PDVSA has

The burden is on Crystallex to show that these allegations support a finding of at least probable cause that the *Bancec* presumption of separateness has been rebutted. *See Strick Corp. v. Thai Teak Prods. Co.*, 493 F. Supp. 1210, 1217 (E.D. Pa. 1980) ("The writ should issue only if on its face probable cause exists for accepting its conclusion."); *Local Union No. 626 United Bhd. of Carpenters & Joiners of Am. Pension Fund v. Delmarva Concrete Corp.*, 2004 WL 350452, at *2-3 (E.D. Pa. Feb. 24, 2004) (requiring "factual basis for satisfying" alter ego standard); *see also* 10 Del. C. § 3507 ("A writ of foreign attachment may be issued against any corporation, aggregate or sole, not created by or existing under the laws of this State upon proof satisfactory to the court that the defendant is a corporation not created by, or existing under the laws of this State, and that the plaintiff has a good cause of action against the defendant in an amount exceeding $50."); Del. Super. Ct. Civ. R. 49(b)(1) ("The proof required for the issuance of a mesne writ of attachment under Chapter 35, Title 10, Delaware Code, will be satisfied by filing with the complaint an affidavit of plaintiff or some credible person setting forth the facts required by the applicable statute.").

Undertaking this analysis, the Court concludes that Crystallex has met its burden to

---

had fair notice of each of these allegations and a full opportunity to rebut them. In any event, even were the Court to take a more restrictive approach – for instance, limiting its consideration to only those factual allegations contained in Crystallex's opening brief in support of its motion – the Court would still find that Crystallex had met its burden to show probable cause.

Relatedly, both sides fault the other for purportedly fatal procedural failings. PDVSA complains that "Crystallex should have commenced a plenary action against PDVSA by filing a complaint and serving PDVSA in accordance with the procedures set forth in the FSIA." (D.I. 71 at 2) Crystallex counters that PDVSA should have "move[d] to quash the writ after issuance, as is the ordinary course," rather than intervening and "preemptively" moving to dismiss. (D.I. 70 at 3 n.5) In the Court's view, both parties had options as to how to proceed, and there is nothing deficient in how they chose to do so. Certainly, neither party can credibly contend that it has been denied due process or had an inadequate opportunity to be heard.

overcome PDVSA's facial attack.  Specifically, Crystallex has met this burden with respect to the

extensive control prong of *Bancec*, but not with respect to the fraud or injustice prong.

### b.    Extensive control

Taking Crystallex's allegations as true, Crystallex has shown at least probable cause for a

finding that PDVSA is not immune from suit.  This is because Crystallex has stated sufficient

allegations that, if proven, would rebut the presumption of separateness and establish that

PDVSA is the alter ego of Venezuela.

In determining whether a corporate entity is "so extensively controlled" by a sovereign

state, the Court considers "whether the sovereign state exercises significant and repeated control

over the instrumentality's day-to-day operations." *EM Ltd. II*, 800 F.3d at 91; *see also Walter*

*Fuller Aircraft Sales, Inc. v. Republic of Philippines*, 965 F.2d 1375, 1382 (5th Cir. 1992) ("[W]e

look to the ownership and management structure of the instrumentality, paying particularly close

attention to whether the government is involved in day-to-day operations, as well as the extent to

which the agent holds itself out to be acting on behalf of the government."); *Holy See*, 557 F.3d

at 1079-80 (requiring "day-to-day, routine involvement" to overcome *Bancec* presumption).

Considerations relevant to the fact-intensive inquiry of whether a sovereign state

exercises control over an instrumentality's day-to-day operations include:

> whether the sovereign nation: (1) uses the instrumentality's
> property as its own; (2) ignores the instrumentality's separate status
> or ordinary corporate formalities; (3) deprives the instrumentality
> of the independence from close political control that is generally
> enjoyed by government agencies; (4) requires the instrumentality to
> obtain approvals for ordinary business decisions from a political
> actor; and (5) issues policies or directives that cause the
> instrumentality to act directly on behalf of the sovereign state.
> These factors are relevant to answering the touchstone inquiry for

> "extensive control": namely, whether the sovereign state exercises
> significant and repeated control over the instrumentality's day-to-
> day operations.

*EM Ltd. II*, 800 F.3d at 91.

Crystallex makes sufficient allegations which, taken as true, establish probable cause that

the presumption of separateness is rebutted.  As summarized in Crystallex's briefing on the

motions, Crystallex has alleged each of the factors identified above, as well as other bases for

finding Venezuela exercised significant and repeated control over PDVSA's day-to-day

operations.  Borrowing from Crystallex's briefing, the Court sets out below the well-pled

allegations that, collectively, demonstrate probable cause that Venezuela extensively controls

PDVSA, rebutting the *Bancec* presumption of separateness.[18]

Venezuela Using PDVSA's Property As Its Own

- Venezuela uses PDVSA's property, including aircraft and tanker trucks,
  for its own political purposes

Ignoring PDVSA's Separate Status

- PDVSA discloses Venezuela's control and willingness to direct the
  company to act against its interests as risk factors in its bond offering
  documents

- At least for marketing purposes, including on Twitter, PDVSA
  regularly boasts "PDVSA es Venezuela," which translates to
  "PDVSA is Venezuela"

---

[18]*See, e.g.*, D.I. 3-1 at 7-23; D.I. 33 at 10-12 (internal quotation marks, citations, and footnotes omitted).  Crystallex's allegations as set out in its briefing are rearranged here in order to track more closely the recitation of factors as contained in *EM Ltd. II*.  The pertinent factors are not exhaustive – the Court can (and does) consider other factors, and not every factor need be present – nor are they mutually exclusive, as many of them overlap.  Reasonable minds will differ as to the category into which to place any specific allegation or evidence.

Depriving PDVSA of Independence from Close Political Control

- Venezuela appoints PDVSA's Board of Directors, and several Government Ministers are also members of PDVSA's Board of Directors

- Venezuela's Oil Minister has almost always also been PDVSA's President and Director

- Venezuela's Oil Ministry and PDVSA share physical office space

- Venezuela – including its President – hires and fires, and exerts political pressure on, both high- and low-level PDVSA employees, including by requiring that PDVSA managers be trained according to the Government's social policies

- PDVSA's Articles of Incorporation confirm that it is required to adhere to the guidelines and policies established or agreed upon by the National Executive

Requiring PDVSA to Obtain Approvals for Ordinary Business Decisions

- Venezuela's National Executive regulates and supervises PDVSA's operations

- Venezuela instructs PDVSA to whom it must sell oil internationally and at what price

- Venezuela dictates the price at which oil is sold domestically (forcing PDVSA to subsidize gas prices)

Issuing Policies Causing PDVSA to Act Directly on Behalf of Venezuela

- PDVSA was created by presidential decree not to generate profits but as a national company to implement national policy on hydrocarbons

- From 2010 through 2016, Venezuela required PDVSA to contribute to the State directly (through taxes, royalties, and dividends in the amount of approximately $119 billion) and indirectly (through off-budget social programs and other public expenditures that have nothing to do with the hydrocarbons industry in the amount of approximately $82 billion)

31

- Venezuela uses PDVSA to achieve its social and political goals, both domestically (e.g., through Fondo Nacional para el Desarrollo Nacional ("FONDEN"), a social development fund) and abroad (e.g., through Petrocaribe)

- Venezuela forces PDVSA to provide oil to China and Russia as repayment for loans those countries made to Venezuela

- Venezuela directs PDVSA to sell oil to other friendly nations on non-economic terms to advance Venezuela's foreign policy objectives

Additional Indications of Venezuela's Extensive Control Over PDVSA

- Venezuela manipulates PDVSA's conversion of U.S. Dollars to Venezuelan Bolivars to leverage PDVSA's revenues for the sole benefit of Venezuela and to the detriment of PDVSA

- Venezuela uses PDVSA to expropriate private investment

- PDVSA paid Venezuela's fees to the ICSID tribunal in the underlying arbitration between Venezuela and Crystallex

PDVSA's facial challenge can be summarized as follows:

> [T]he facts asserted in [Crystallex's motion] and supporting memorandum of law demonstrate nothing more than ordinary shareholder control and government regulation that cannot, as a matter of law, satisfy the required showing that the shareholder exercise complete domination and control over the corporation's day-to-day operations.

(D.I. 71 at 4)  The Court is not persuaded.  Crystallex has shown probable cause to rebut the presumption of separateness between the Republic of Venezuela and PDVSA.  PDVSA's arguments are weightier (though ultimately unsuccessful) in connection with its factual challenge, where the Court can (and does) consider PDVSA's evidence, and not just Crystallex's allegations.

### c.      Fraud or injustice

Crystallex contends that it has satisfied both prongs of the disjunctive *Bancec* test:

extensive control as well as fraud or injustice.  While, as already explained, the Court agrees with

the former assertion, it rejects the latter.  Even taking Crystallex's well-pled allegations as true,

there is not probable cause that giving effect to the separateness of Venezuela and PDVSA would

"work a fraud or injustice" as that term is used in *Bancec* (i.e., as a stand-alone test that may be

satisfied independent of whether there is extensive control).[19]  Instead, as PDVSA contends,

Crystallex has not "show[n] that the Republic abused PDVSA's corporate form to perpetrate a

fraud or injustice resulting in harm to Crystallex."  (D.I. 71 at 5)

Crystallex alleges that the expropriation of its interest in the Las Cristinas mines "resulted

in a multibillion dollar benefit to state-owned and controlled PDVSA."  (D.I. 3-1 at 32)  Further,

Crystallex contends that "Venezuela reaps enormous benefits from owning and operating an oil

refining company under the protection of Delaware law . . . in an attempt to protect Venezuela's

Delaware assets from execution." (*Id.*)  From these premises, Crystallex asks the Court to "deem

PDVSA to be Venezuela's alter ego to avoid the obvious injustice that would result if Venezuela

were permitted to violate international law by taking Crystallex's assets, transfer those assets [to]

a state-owned and controlled company, PDVSA, for no consideration, and then use U.S. law to

avoid paying its lawful obligations in the face of PDVSA's receipt of billions for those stolen

assets." (*Id.*; *see also* D.I. 33 at 17 ("Venezuela uses PDVSA to generate billions of dollars in

revenue in the United States through its commercial refining and oil industry subsidiaries, while

---

[19]It follows that neither has Crystallex met its higher burden of proving fraud or injustice by a
preponderance of the evidence.  Therefore, Crystallex's motion with respect to the fraud or
injustice prong also fails to survive PDVSA's factual challenge.

simultaneously using PDVSA to shield those same assets from creditors in the United States.")) 

Crystallex's allegations fail because they do not sufficiently allege that Venezuela used

PDVSA as an instrument to defraud Crystallex. Everything Crystallex alleges that Venezuela did

to harm Crystallex could have been done – and, indeed, was alleged to have been done – by

Venezuela itself, regardless of whether PDVSA even existed. It was Venezuela, not PDVSA,

which expropriated Crystallex's interests in the mines. While Venezuela may have subsequently

transferred those interests to PDVSA, it did not need to do so as part of its scheme to defraud

Crystallex or to engineer an unjust outcome. Crystallex does not even allege that PDVSA

participated in or facilitated the expropriation. Nor does Crystallex allege in anything other than

an insufficient, conclusory manner that PDVSA was created and/or is being maintained by

Venezuela for the purpose of defrauding Crystallex and other creditors.

As PDVSA persuasively explains:

> PDVSA had nothing to do with the underlying dispute between the
> parties to the arbitration. And PDVSA is not a newly created sham
> corporation designed to insulate the Republic from liability.
> PDVSA was established over 40 years ago and is one of the largest
> oil companies in the world. . . . [T]he mere fact that a government
> instrumentality benefits from the actions of the government does
> not demonstrate an abuse of the corporate form required to
> overcome the presumption of separateness under *Bancec*.

(D.I. 26 at 19-20)

Therefore, the Court concludes that Crystallex cannot meet its burden under *Bancec*'s

fraud or injustice prong.

### 2.    PDVSA's Factual Attack

As previously noted, PDVSA's motion presents both a facial and factual attack on

Crystallex's efforts to establish subject matter jurisdiction.  In evaluating the factual challenge, the Court does not assume the truth of Crystallex's allegations.  Instead, the Court must consider the evidence presented by Crystallex, as well as any competing evidence presented by PDVSA, and determine, under the appropriate burden of proof, whether Crystallex's evidence meets that burden.

For the reasons set out below, the Court concludes that (1) Crystallex's burden is to prove, by a preponderance of the evidence, that Venezuela extensively controls PDVSA, and (2) Crystallex has met this burden.

### a.   Crystallex's burden is preponderance of the evidence

While the parties agree that Crystallex bears some burden in order to obtain its requested writ, they disagree as to the nature of that burden.  Crystallex argues for the "'usual . . . rule generally applicable to civil actions in federal courts'": that the plaintiff must prove its case by a preponderance of the evidence.  (D.I. 52 at 1) (quoting *Ramsey v. United Mine Workers of Am.*, 401 U.S. 302, 308 (1971))  PDVSA contends that Crystallex, as "a party seeking to rebut the strong presumption of separateness under *Bancec*, bears the heavy burden of proving an alter ego relationship by clear and convincing evidence."  (D.I. 51 at 1)  The Court agrees with Crystallex.

As Crystallex correctly points out, *Bancec* held there is "no mechanical formula" for assessing whether the presumption of separateness has been rebutted.  462 U.S. at 633.  Nor does *Bancec* speak of a heightened burden.  Neither does the FSIA address the standard of proof or suggest it is a heightened one.  (*See* D.I. 52 at 1)  In this situation, the Court discerns no basis to depart from the ordinarily prevailing standard in a civil case, which is the preponderance of the evidence standard.  *See generally McNutt v. Gen. Motors Acceptance Corp. of Indiana*, 298 U.S.

35

178, 189 (1936) ("[T]he court may demand that the party alleging jurisdiction justify his allegations by a preponderance of evidence.").

The sparse caselaw on the subject further supports this conclusion.[20] While many cases in this area fail to state the standard of proof being applied, Crystallex cites a handful of cases that expressly apply a preponderance of the evidence standard. *See, e.g., Kirschenbaum v. 650 Fifth Ave.*, 257 F. Supp. 3d 463, 472 (S.D.N.Y. 2017) (issuing findings of fact based on "assessment of the preponderance of the credible evidence," while also finding "massive amount of evidence" that left Court "firmly convinced . . . by far more than a preponderance of the evidence"); *Kensington*, 2007 WL 1032269, at *5 (applying preponderance of evidence standard). As Crystallex further notes, other courts have undertaken a "totality of the circumstances" analysis, *Bridas*, 447 F.3d at 417, or assessed whether claims were "well-supported" or supported by "sufficient [evidence of] control," *McKesson Corp. v. Islamic Republic of Iran*, 52 F.3d 346, 351-52 (D.C. Cir. 1995) – approaches which do not suggest that these courts were applying any heightened evidentiary standard. In a case involving alter ego allegations outside the sovereign immunity context, the Third Circuit (applying state law) has applied a preponderance of the evidence standard. *See Plastipak Packaging, Inc. v. DePasquale*, 75 Fed. App'x 86, 90 (3d Cir. 2003).

PDVSA has not cited a single case that applied a clear and convincing evidence standard to an alter ego inquiry in the context of *Bancec* and the FSIA. PDVSA's cases applying state-law

---

[20]As the District Court for the District of Columbia has recognized, "[w]hile the D.C. Circuit has explained that the court must look beyond the pleadings and even conduct limited jurisdictional discovery when a foreign-sovereign defendant challenges the factual basis for subject-matter jurisdiction under the FSIA, there is no authority to direct this court as to the appropriate burden of proof." *Kilburn v. Republic of Iran*, 277 F. Supp. 2d 24, 33 n.5 (D.D.C. 2003).

alter ego standards (like state-law cases cited by Crystallex) are unhelpful, as the Court is (by the parties' agreement) applying a federal law standard.[21]  PDVSA broadly asserts that "the clear and convincing evidence standard applies any time a party seeks to overcome a legal presumption." (D.I. 51 at 2)  But this is incorrect, as Crystallex demonstrates.  (*See* D.I. 53 at 2) ("That ignores decades of decisions holding that a wide range of presumptions across different subject-matter areas could be rebutted by a preponderance of the evidence.") (citing cases)

The Court does not agree with PDVSA that "a preponderance of the evidence standard is inconsistent with" *Bancec*'s "strong presumption" of separateness.  (D.I. 54 at 1-2)  PDVSA does not cite authority to support the view that the strength of the presumption necessarily alters the standard of proof necessary to rebut it.  The "strong" characterization of the presumption helps explain the justification for it and the importance of the Court enforcing it, unless and until it is overcome by the required amount of evidence.  It does not, however, dictate a clear and convincing burden of proof.

Hence, the Court will now turn to evaluating whether Crystallex has met its burden of proof by a preponderance of the evidence.

---

[21]As Crystallex acknowledges, "[t]he Third Circuit has also stated, without citation, that alter-ego claims that 'rely on a fraud theory' require proof by clear and convincing evidence." (D.I. 52 at 2 n.1) (quoting *Kaplan v. First Options of Chi., Inc.*, 19 F.3d 1503, 1522 (3d Cir. 1994))  Since the Court has already concluded that Crystallex failed to establish even probable cause to support application of the fraud or injustice prong of *Bancec*, and cannot prove fraud or injustice by a preponderance of the evidence, it follows that Crystallex also could not meet the clear and convincing evidence standard.  Thus, there is no need for the Court to resolve which of the evidentiary standards applies to the fraud or injustice test.

### b.    Extensive control

Based on the evidence presented by both parties,[22] the Court finds that Crystallex has

proven by a preponderance of the evidence that PDVSA is not immune from suit.  The record

contains sufficient evidence to enable the Court to find – including by resolving disputed issues

of fact[23] – that PDVSA is the alter ego of Venezuela.  In particular, Crystallex has met its burden

to show that Venezuela extensively controls PDVSA.

As noted above, while there is no mechanical formula that applies to this inquiry, the

Court finds it helpful to organize its discussion based initially on factors that are commonly

looked to, in the same order that the Court identified these same factors in connection with

PDVSA's facial challenge.  The Court then considers some additional evidence further

supporting its findings.

### i.    Venezuela's use of PDVSA's property as its own

Crystallex has proven by a preponderance of the evidence that Venezuela regularly uses

PDVSA's assets as its own.  (*See* D.I. 3-1 at 16-17, 31) (citing evidence)

Venezuela uses PDVSA aircraft for travel by Venezuelan officials and to escort other

countries' politicians who are "friendly to Venezuela," even when they are not traveling to or

from Venezuela.  (*See* D.I. 3-1 at 16-17; *see also, e.g.*, D.I. 5-1 Ex. 54 at 1 (LaPatilla reporting,

---

[22]Crystallex requests that the Court take judicial notice of many of the exhibits included in its appendix, particularly those which are acts and statements of various branches of the Venezuela Government as well as orders issued by or public filings made in U.S. Courts.  (*See* D.I. 9)  No opposition to this request has been filed.  (*See generally* Tr. at 67-68)  The Court will take judicial notice as requested.

[23]*See generally Bolivarian Republic of Venezuela*, 137 S. Ct. at 1324 ("If a decision about the matter requires resolution of factual disputes, the court will have to resolve those disputes, but it should do so as near to the outset of the case as is reasonably possible.").

"They don't try to hide it any more.  It is an official policy to use the large fleet of VIP . . .

airplanes of Pdvsa and the government itself not only for the private use of public officials . . .

but also to make use of the Venezuelan people's money . . . ."); *id.* Ex. 55 (BBC reporting, "The

President of Venezuela, Nicolás Maduro, stated . . . that Colombian guerilla leader Rodrigo

Londoño Echeverri, alias 'Timochenko', the senior commander of the [Revolutionary Armed

Forces of Columbia] . . . , traveled in an official Venezuelan airplane [owned by PDVSA] to

Havana."); *id.* Ex. 56 (Noticias24 reporting "Venezuelan Foreign Minister Nicolás Madura . . .

stated . . . that the deposed president of Honduras Manuel Zelaya has left the United States bound

for his country in an airplane bearing Venezuelan registration number . . . and flown by 'a

Venezuelan captain'"); *id.* Ex. 57 (Reportero24 reporting, "Pdvsa allocates 3 luxury airplanes for

the use of the Cuban regime," airplanes which "were previously utilized to serve executives of

the state-owned Petróleos de Venezuela (PDVSA) company" and which "only visit Venezuela

when they require maintenance"))  Venezuela also uses PDVSA trucks as physical barriers to

prevent anti-government demonstrators from gathering.  (*See id.* Ex. 58) (LaPAtilla reporting

PDVSA trucks were blocking central highway and being guarded by Bolivarian National Police

and Bolivarian National Guard)

### ii.      Ignoring PDVSA's separate status

Crystallex has proven by a preponderance of the evidence that Venezuela regularly

ignores PDVSA's separate status.  This is evidenced in numerous statements PDVSA has made

in filings associated with efforts to raise money, including bond offering documents.

For example, in a November 11, 2011 offering document, PDVSA disclosed:

[T]he Venezuelan government *required* us to acquire several

39

> electricity generation and distribution companies, as well as certain
> food companies . . . . The Venezuelan government has also
> nationalized and continues to nationalize other companies in
> Venezuela. . . . [T]he Venezuelan government announced the
> nationalization of Venoco . . . and *required* . . . us to acquire the
> assets of Venoco at a price to be determined in the future.

(D.I. 4-3 Ex. 40 at 16-17) (emphasis added)  In September 2016, PDVSA advised its bondholders

it could provide no assurances that Venezuela would not "*impose* further material commitments

upon us or *intervene* in our commercial affairs in a manner that will adversely affect our

operations, cash flow and financial results." (*Id.* Ex. 44 at 28) (emphasis added)

In the context of the full record developed here, the Court finds that these

acknowledgments by PDVSA of actions Venezuela has "required" it to take, and material

commitments Venezuela has "impose[d]" on it, are indicative of Venezuela, its sole shareholder,

ignoring the separate legal status of PDVSA.

This finding is bolstered by PDVSA's repeated identification of itself, including on

Twitter, as Venezuela.  PDVSA has used the hashtag "#PDVSAesVenezuela," which literally

means "PDVSA is Venezuela." (D.I. 4-1 Ex. 3)  The Court disagrees with PDVSA that

Crystallex's arguments relating to the Twitter hashtag are "frivolous." (D.I. 26 at 37 n.13)

PDVSA also disseminates Venezuelan propaganda through its social media presence by regularly

tweeting messages in support of the Government and portraying a photograph of former

President Hugo Chávez as its banner heading. (D.I. 5-1 Exs. 67-69)

In connection with other evidence in the record, these facts constitute additional evidence

that Venezuela and PDVSA regularly ignore their separate legal status.

### iii.    Depriving PDVSA of independence from close political control

Crystallex has proven by a preponderance of the evidence that Venezuela has deprived PDVSA of independence from close political control.

This is illustrated by the fact that Venezuela's President, Nicolás Maduro, appoints PDVSA's directors, vice-presidents, and members of its shareholder council. (*See* D.I. 4-1 Ex. 13; *see also* D.I. 4-3 Ex. 40 at 16 (PDVSA Nov. 11, 2011 Notes Offering Circular) ("The President of Venezuela appoints our president and the members of our Board of Directors by executive decree.")) In January 2017, President Maduro also appointed Nelson Martínez, former President of Citgo (a corporate subsidiary several steps below the Government of Venezuela), as Minister of the People's Power for Oil and Mining ("Oil Minister") and President of PDVSA. (*See* D.I. 4-2 Exs. 23-24) In November, 2017, a newspaper headline announced, "President Maduro Appoints Asdrúbal Chávez As New President of Citgo." (D.I. 42-1 Ex. 110; *see also* Tr. at 30)

In 2002, then-President of Venezuela, Hugo Chávez, fired two PDVSA employees on national television, fired seven PDVSA executives, and forcibly retired 12 other PDVSA employees. (D.I. 8 at ¶ 21) In 2003, "the Government fired nearly 40% of the PDVSA's workforce at the time (approximately 18,000 PDVSA employees) because of their role in opposing the Government." (*Id.*; *see also* D.I. 7 at ¶ 11) As recently as July 2017, Venezuela continued to threaten to terminate PDVSA employees who were opposed to the governing regime. (*See* D.I. 4-2 Ex. 35 at 2 ("Political appointees are gaining clout at the expense of veteran oil executives, while employees are under mounting pressure to attend government rallies and vote for the ruling Socialists. The increasing focus on politics over performance is

41

contributing to a rapid deterioration of Venezuela's oil industry . . . ."); *id.* at 3 ("Managers told

workers they would be fired unless they voted in Maduro's controversial election . . . ."); *see also*

D.I. 4-3 Ex. 66 (President Maduro reported as stating, "If there are 15,000 workers, all 15,000

workers must vote without any excuses"))

There is also a great deal of overlap between the leadership of Venezuela and that of

PDVSA.  In November 2017, President Maduro appointed a military general as Oil Minister and

also as President of PDVSA.  (*See* Tr. at 29-30)  That individual's predecessors, Nelson

Martínez, Eulogio del Pino, and Rafael Ramírez Carreño, similarly served simultaneously as both

Venezuela's Oil Minister and PDVSA's President.  (*See* D.I. 4-2 Exs. 23-24)  In a speech to the

International Assembly in 2014, former Oil Minister and PDVSA President, Rafael Ramírez,

said: "today we can say with clarity that we have the full and sovereign management of our oil

industry."  (D.I. 4-3 Ex. 38 at 17; *see also* Tr. at 19)  Given the evidence recited throughout this

Opinion, the Court considers it reasonable to infer that when individuals who simultaneously

hold office in the Government of Venezuela and in PDVSA confront situations in which the

interests of their two "bosses" conflict, they make decisions based on what they view to be the

best interests of Venezuela, even if that comes at the expense of PDVSA's interests.[24]

While hiring and firing board members may also be "an exercise of power incidental to

ownership, and ownership of an instrumentality by the parent state is not synonymous with

---

[24]Among other evidence supporting this inference is, as will be described further below, how
PDVSA in its own public filings warns investors that the Republic of Venezuela may force
PDVSA to take actions that are not in PDVSA's own interests as a corporation, when, in the
Republic's view, those actions will further policies and goals of the nation itself.  (*See, e.g.*, D.I.
4-3 Ex. 40 at 16) ("As a result, we may engage in activities that give preference to the objectives
of the Venezuelan government rather than our economic and business objectives.")

control over the instrumentality's day-to-day operations," *EM Ltd. II*, 800 F.3d at 92-93, given

the totality of the circumstances here the Court finds these facts to be evidence that Venezuela

"interfere[d] in and dictate[d] [PDVSA's] daily business decisions," *id.*

Additionally, PDVSA's Articles of Incorporation require that it adhere to policies

established by the National Executive. (*See* D.I. 4-1 Ex. 13; *see also* D.I. 8 at ¶ 20) Venezuela's

National Executive, through the Oil Ministry, also "regulates and supervises PDVSA's

operations, exercises control of PDVSA's production and export of oil, and grants the rights and

mining areas as established under Venezuelan law." (D.I. 8 at ¶ 20) (internal quotation marks

omitted)

###### iv.    Requiring PDVSA to obtain approvals for ordinary business decisions

Crystallex has proven by a preponderance of the evidence that in addition to designating

oil production levels by official decree, Venezuela also "dictates the severely discounted price at

which PDVSA must sell its product to Venezuelan citizens" and "forces PDVSA to 'sell' oil to

third parties for no, or *de minimis*, consideration." (D.I. 3-1 at 12) (citing evidence) In a 2011

debt offering, PDVSA explained: "[t]he Venezuelan government, rather than the international

market, determines the price of products . . . sold by us through our affiliates in the domestic

market." (D.I. 4-3 Ex. 40 at 14) The Government sets the prices for oil sold within Venezuela

and designates oil production levels. (*Id.* Ex. 39; D.I. 7 at ¶ 38)[25]

Venezuela's National Executive regulates and supervises PDVSA's operations. (*See* D.I.

---

[25]Crystallex points to PDVSA's audited financial statements, which reveal that PDVSA received a government subsidy "corresponding to the difference between the cost of production and the regulated sale price of motor and diesel fuels in the national market," which KPMG called "an unusual transaction" and "key audit issue." (D.I. 3-1 at 20; D.I. 7 at ¶ 40)

7 at ¶ 7; D.I. 4-3 Ex. 40)  The Government compels PDVSA to sell oil to China, Russia, and 17

Caribbean countries at a discount in order to support Venezuela's foreign policy.  (*See* D.I. 5-1

Exs. 72-74, 77; *see also* D.I. 8 at ¶¶ 49-50; D.I. 7 at ¶¶ 9, 31-37)  Energy Minister Rafael

Ramírez has explained that PDVSA "is not a company designed to generate profits;" instead, it

"is a national company."  (D.I. 7 at ¶ 39)

PDVSA observes that other oil-producing nations similarly regulate oil policies, making

PDVSA no different from any other national oil company.  (D.I. 26 at 8, 31)  Just because

PDVSA shares this feature (and perhaps others) with "typical" national oil companies does not,

however, deprive this feature of all evidentiary value in assessing whether Venezuela exercises

extensive control over PDVSA.  Nor, of course, is this the only evidence on which the Court is

relying to find an alter ego relationship.

### v.    Issuing policies causing PDVSA to act directly on behalf of Venezuela

The record further establishes that Venezuela causes PDVSA to achieve domestic social

and political goals and to advance Venezuela's foreign policy goals.  (D.I. 3-1 at 17-21) (citing

evidence)

PDVSA was created by Presidential Decree, in 1975, to implement government policy.

(*See* D.I. 4 Exs. 11, 12; D.I. 8 at ¶ 9)  The "History" section of PDVSA's website lists among the

company's "Strategic guidelines" the following: "Support the geopolitical position of the country

and key objectives of Venezuelan foreign policy, such as the promotion of comprehensive

cooperation with strategic allies . . . ."  (D.I. 4-2 Ex. 32 at 1)

In 2002, the National Executive reorganized PDVSA, expanding its corporate mission

beyond the hydrocarbons industry to "take on a more political role." (D.I. 3-1 at 17)  Under the

new structure, PDVSA funds Venezuelan programs that have nothing to do with its business,

causing PDVSA to take on additional debt.  Such programs include PDVSA Agrícola S.A.,

which subsidizes Venezuela's agriculture, industrial infrastructure, and produce sectors, and

PDVSA Desarrollos Urbanos S.A., which subsidizes Venezuela's housing projects. (*Id.* at 18;

D.I. 8 at ¶ 41)  PDVSA's total contributions to the Venezuelan budget between 2010 and 2016

were in excess of $119 billion.  (D.I. 7 at ¶ 20)[26]  As PDVSA disclosed to investors in September

2016: "[T]he government *requires* us to make significant financial contributions to social

programs, including transfers to FONDEN, as well as requiring us to fund specific projects.  In

2014 and 2015, we made total contributions to FONDEN in the amounts of U.S. $974 million

and U.S. $3,306 million, respectively." (D.I. 4-3 Ex. 44 (PDVSA Offer Sept. 16, 2016) at 29)

(emphasis added); *see also* D.I. 4-2 Exs. 19, 30)

PDVSA asserts that "[t]hese taxes and currency regulations, which apply to companies

other than PDVSA, are not a basis for disregarding PDVSA's legal separateness." (D.I. 26 at 33

n.9)  It is true that Venezuela regulates and taxes the entire oil industry operating in the country,

not just PDVSA.  (*See* D.I. 28 at ¶ 5; *see also* D.I. 26 at 7-8)  But that does not mean the taxation

and regulation of PDVSA is inconsistent with a finding of PDVSA being Venezuela's alter ego.

Moreover, the tax and regulatory policies are only some of the Venezuelan policies that

cause PDVSA to act directly on behalf of Venezuela, as already noted.  Venezuela also uses

PDVSA to achieve its foreign policy goals by committing PDVSA to sell oil to certain Caribbean

---

[26]PDVSA points out that in this same period PDVSA had revenues of more than $724 billion and earned a total net profit of over $45 billion.  (D.I. 27-1 Exs. 4-6)

45

and Latin American nations at substantial discounts, without PDVSA's consent.  (D.I. 3-1 at 21)

(citing evidence)  Even when those oil debts are repaid, the money is given to Venezuela, not

PDVSA.  (*Id.*; D.I. 5-1 Ex. 77)  Venezuela has entered into agreements with China whereby

PDVSA acts "on behalf of the Bolivarian Republic of Venezuela" to repay China.  (D.I. 4-3 Ex.

49 at 3; *see also id.* at 5 (additional references to PDVSA taking on duties "on behalf of the

Bolivarian Republic of Venezuela" or "acting on behalf of the Bolivarian Republic of

Venezuela"))  China has thereby paid more than $50 billion to Venezuela (for oil) yet PDVSA

itself has received nothing.  (D.I. 7 at ¶ 37)

      Consistent with the foregoing, PDVSA stated the following in a November 11, 2011

Notes Offering Circular:

> We are controlled by the Venezuelan government, which
> ultimately determines our capital investment and other spending
> programs. . . .  The Bolivarian Republic of Venezuela, as our sole
> owner, has pursued, and may pursue in the future, certain of its
> macroeconomic and social objectives through us.  As a result, we
> may engage in activities that give preference to the objectives of
> the Venezuelan government rather than our economic and business
> objectives.  We may make investments, incur costs and engage in
> sales on terms that affect our results of operations and financial
> condition.

(D.I. 4-3 Ex. 40 at 16)

### vi.    Additional indications of Venezuela's extensive control over PDVSA

      The record contains additional evidence of Venezuela's extensive control over PDVSA,

evidence that does not neatly fit into one or more of the categories above.

      For instance, it is undisputed that PDVSA paid the administrative fees Venezuela

incurred in connection with the arbitration with Crystallex, which amounted to around $249,000.

(*See* Tr. at 40-41; D.I. 6 (Fung Decl.) at ¶¶ 3-5, Exs. 1-2)[27]

Also, Venezuela manipulates PDVSA's conversion of U.S. Dollars to Venezuelan Bolivars to leverage PDVSA's revenues for the sole benefit of Venezuela and to the detriment of PDVSA. (*See* D.I. 7 at ¶ 26; *see also* D.I. 4-3 Exs. 47-48) PDVSA is required to convert foreign currency into Venezuelan Bolivars at an artificially low U.S. Dollar to Bolivar exchange rate "(which is approximately 1/500th of the market rate)." (D.I. 7 at ¶ 26; *see also* D.I. 8 at ¶ 46; D.I. 4-3 Ex. 48) The Republic can then exchange that currency at more favorable rates. (D.I. 7 at ¶ 26; *see also* D.I. 4-3 Ex. 48)

Additionally, in November 2017, PDVSA announced: "As of today, the command of the oil industry passes into the hands of the country's first worker, Nicolás Maduro." (D.I. 42-1 Ex. 112 at 1) PDVSA has also stated that one of its objectives is to "guarantee control by the State over [PDVSA]." (D.I. 5-1 Ex. 60)

Finally, Venezuela has designated PDVSA as an expropriating entity, thereby authorizing it to exercise a sovereign power. (*Id.* Exs. 86-88, 99)

All of the foregoing is further evidence supporting the Court's conclusion.

### vii.   PDVSA's contrary interpretation wrongly fails to account for the totality of the evidence

PDVSA recognizes the support in the record for the Court's findings identified above. Indeed, as Crystallex notes, the evidence here is "largely undisputed," as PDVSA has instead

---

[27]PDVSA insists there is "nothing untoward" about an entity paying a debt of its shareholder owner. (Tr. at 41; *see also EM Ltd. II*, 800 F.3d at 93 (stating that "repayment by [a government instrumentality] of [a foreign country's] other debts does not establish the existence of an alter ego relationship," at least where instrumentality was a national bank, as "central banks commonly perform payment functions for their governments")) That this observation is true does not mean this evidence lacks relevance or contradicts the Court's findings.

"focus[ed] its challenges on the inferences that may be drawn from the undisputed facts." (D.I. 52 at 2)  PDVSA's arguments against concluding an alter ego relationship exists rest largely on disputing the relevance of Crystallex's evidence and insisting that none of the above-listed findings individually transforms PDVSA into Venezuela's alter ego.

The Court disagrees with PDVSA's protestations that all of Crystallex's evidence is irrelevant. (*See, e.g.*, Tr. at 47 ("extensive regulation by an oil producing state of its hydrocarbon industry" is irrelevant); *id.* at 54 (characterizing as irrelevant whether Venezuela itself benefitted from acts taken by PDVSA); *id.* at 55 (contending designation of PDVSA as expropriating entity, use by Venezuela of PDVSA property without reimbursement, and sale of oil to other countries at reduced prices are "totally irrelevant"))  Based on the caselaw discussed in this Opinion, the Court concludes that all of the considerations on which the Court has relied are relevant to the issue of whether Venezuela so extensively controls PDVSA, including its day-to-day conduct, that it should be treated as Venezuela's alter ego for purposes of application of the FSIA. As has been noted repeatedly in this Opinion, *Bancec* did not establish a mechanical formula for courts to apply. It is appropriate for the Court to consider the totality of circumstances that either side wishes to present.

Much of PDVSA's attack on Crystallex's showing consists of dissecting the totality of Crystallex's evidence and arguing that no single piece of evidence renders PDVSA the alter ego of Venezuela. (*See, e.g.*, D.I. 26 at 20 ("mere fact that a government instrumentality benefits from the actions of the government does not demonstrate an abuse of the corporate form"); *id.* at 33-34 ("mere fact that PDVSA may have been designated as an expropriating entity in certain other cases is not grounds for disregarding its separate legal personality"); *id.* at 35-36

48

(contending that Venezuela's use of PDVSA's planes "would not support" veil piercing); *id.* at

35 (contending sale of oil to other countries on deferred payment and other favorable terms

"do[es] not support a finding of alter ego liability")) Of course, no single piece of evidence in

the record is sufficient on its own to enable Crystallex to meet its burden, but of course that also

is not what the law requires. Again, the Court must consider all of the evidence in the record.

When it does so, the Court finds that it sufficiently proves, by a preponderance of the evidence,

that PDVSA is the alter ego of Venezuela.

PDVSA also characterizes itself as merely a "typical" national oil company, the type of

creature that *Bancec* compels must retain its separate juridical status. (*See* Tr. at 53 ("[A]ll they

have shown is that it is the same as other national oil corporations that are owned by petrol

states."); *see also* D.I. 26 at 2 (arguing PDVSA is "nothing more than a 'typical government

instrumentality'") (quoting *Bancec*)) While the Court agrees with PDVSA that it possesses many

of the characteristics *Bancec*, 462 U.S. at 624, ascribed to "typical" government instrumentalities

– it was created by an enabling statute, is managed by a board selected by the government, has

powers to hold and sell property and sue and be sued, and is primarily responsible for its own

finances – PDVSA also has numerous other characteristics, which the Court has described above

in detail. Considering the totality of the evidence, the Court finds that PDVSA is not merely a

"typical government instrumentality" but is the alter ego of Venezuela.

### viii.    The parties' declarations confirm the Court's findings

The Court's findings described above are further supported by the declarations the parties

submitted. Together, Crystallex and PDVSA have filed six substantive declarations: two each

from Dr. Roberto Rigobon and Professor Jose Ignacio Hernandez, who endorse Crystallex's view

that PDVSA is the alter ego of Venezuela; and one each from Professor Luis A. Garcia Montoya
and Mr. Alejandro Schmilinsky, supporting PDVSA's view that the two entities are properly
viewed as separate. (*See* D.I. 7, 8, 28, 29, 35, 36)[28] While there are certainly disputes among the
various declarations, to the limited extent those disputes are material, the Court resolves them in
favor of Crystallex, for the reasons explained below.

Dr. Rigobon, a professor of management at the Massachusetts Institute of Technology
and Research Associate of the National Bureau of Economic Research, opines on the economic
realities of the relationship between PDVSA and Venezuela, specifically concluding that: (1) the
Venezuelan Government exercises complete economic control over PDVSA's day-to-day
operations; (2) Venezuela relies on PDVSA to sustain its economy; and (3) the Venezuelan
Government uses PDVSA for political purposes. (*See* D.I. 7 at ¶¶ 7-9) Dr. Rigobon also
explains that PDVSA was created by Presidential Decree and initially behaved "like an
economically-driven company," including by setting its own budget, making its own decisions,
and promoting, hiring, or firing its own staff. (*See id.* at ¶ 11) Then, however, in 2002 and 2003,
the Government began getting involved in PDVSA's affairs, effectively converting the formerly
commercial-minded PDVSA into the present State-controlled "New PDVSA." (*See id.* at
¶¶ 11-13)

This transformation was accomplished by the Government's appointment of then-
President Chavez's "most trusted allies" to manage PDVSA, creating "substantial overlap
between the [PDVSA] Board of Directors and senior members of the Government." (*Id.* at

---

[28]Other declarations in the record (*see, e.g.*, D.I. 4-6, 27, 34, 42, 47) transmit documents and
additional evidence to the Court.

¶¶ 13-14)  In 2002, the Government began requiring PDVSA to contribute monetarily to Venezuela, directly through oil revenues (totaling $119 billion from 2010 to 2016) and "extraordinary taxes," and indirectly through social programs such as FONDEN (to which, PDVSA contributed more than $34 billion from 2010 to 2016) and other programs created to subsidize consumer housing and gasoline purchases through PDVSA.  (*See id.* at ¶¶ 15, 21, 23-29; *see also* D.I. 36 at ¶ 2)

Regarding PDVSA's day-to-day operations, Dr. Rigobon opines that "Venezuela dictates the quantity of oil that PDVSA must produce (partly through OPEC[29] commitments), the parties to which PDVSA must sell its oil, and the price at which PDVSA must sell its oil." (D.I. 7 at ¶ 30)  The Government does this, in part, through Petrocaribe, an agreement pursuant to which Venezuela committed PDVSA to supply oil to 17 Caribbean countries on favorable economic terms, and similar agreements Venezuela entered into with China and Russia, all to enable Venezuela to "reap[] enormous political benefits."  (*Id.* at ¶¶ 31-37)  Venezuela controls PDVSA's oil production levels and regulates the price at which all refined products are sold in Venezuela, often causing PDVSA to suffer a loss in profits.  (*Id.* at ¶ 38)

Dr. Rigobon agrees with Professor Montoya that PDVSA is "financially autonomous" from Venezuela (see below), but persuasively opines how "[a]ll that means . . . is that the budget of Venezuela and the budgets of State-owned companies are governed differently;" it does not mean that "PDVSA operates independently from Venezuela as a practical matter (it does not)." (D.I. 36 at ¶ 3)  The Court agrees with Dr. Rigobon that even if "PDVSA is on paper an independent organization from the Venezuelan Government," PDVSA is not "a de-facto

---

[29]Organization of Petroleum Exporting Countries.  (*See* D.I. 26 at 8)

independent organization." (*Id.*)

Professor Hernandez, Crystallex's Venezuelan law expert, opines that "Venezuela and PDVSA are one and the same as a matter of Venezuelan law." (D.I. 8 at ¶ 7)  He describes the Public Administration Organic Law, which "nominally" recognizes PDVSA's "own legal personality," but in fact allows PDVSA's "activities" to be "controlled by the National Executive Branch by 'control agencies or entities.'" (*Id.* at ¶¶ 13-14)  Professor Hernandez further observes that the Venezuelan Supreme Court has recognized that PDVSA has all the "privileges" of the Republic, and "although PDVSA is a company constituted and organized as a corporation," as is enshrined in the country's Constitution, PDVSA nonetheless "falls within the framework of the general structure of the National Public Administration." (*Id.* at ¶ 16)

Professor Hernandez also explains how Venezuela has used PDVSA to assist in the Government's expropriation objectives.  (*See id.* at ¶¶ 22-25)  He opines as to the Government's formulation of PDVSA's pricing policies and management of PDVSA's employment policies (*see id.* at ¶¶ 19-21), the overlap of directors and officers between PDVSA and the Government (*see id.* at ¶¶ 28-33), the Government's increased control after the establishment of "New PDVSA" (*see id.* at ¶¶ 34-38), and the use of PDVSA to achieve Venezuela's social and political objectives (*see id.* at ¶¶ 39-50).  Citing the opinions of various "learned commentators," all of whom have concluded that "PDVSA and its affiliates are considered a state company of a unique nature" (*id.* at ¶ 26), Professor Hernandez persuasively concludes that whether PDVSA has its own legal personality "has no bearing" on the reality that Venezuela and PDVSA are not, in practice, separate entities (D.I. 35 at ¶ 2).

On behalf of PDVSA, Professor Montoya, PDVSA's expert in Venezuelan law, opines

that "PDVSA enjoys a legal personality of its own as a corporation separate and distinct from the Republic." (D.I. 28 at ¶ 4) In his view, "neither the importance of PDVSA in the national economy nor the fact that it is highly regulated changes the fact that PDVSA has all the attributes in law of separate legal personality." (*Id.*) Additionally, Professor Montoya asserts that PDVSA is "financially autonomous from the Republic," "has its own budget, and . . . is subject to a budgetary regime distinct from that of the Republic," and that various tweets and press reports cited by Crystallex carry no legal significance under Venezuelan law. (*See id.* at ¶¶ 28, 33)

Much of Professor Montoya's declaration emphasizes that, according to the PDVSA Bylaws, PDVSA operates as a *sociedad anónima* ("SA"), a corporate form having one or more shareholders, which makes it clear PDVSA is not a department of the Government. (*See id.* at ¶¶ 7-11, 18, 24-26) His opinion is echoed by Mr. Schmilinsky, PDVSA's litigation corporate manager, who explains PDVSA's corporate structure – naming the various directors, officers, and corporate managers – and points out that PDVSA is an SA, whose only shareholder has ever been the Republic. (D.I. 29 at ¶¶ 4, 8-10)[30] Neither of Crystallex's experts disagrees with this conclusion: Dr. Rigobon and Professor Hernandez acknowledge that PDVSA is an SA with its own legal personality. (*See* D.I. 35 at ¶ 5; D.I. 36 at ¶ 3) But the important point – which is the opinion of Crystallex's experts, as well as the finding of the Court, after considering the totality of the evidence, including the views of PDVSA's experts – is that, in practice, PDVSA operates as the alter ego of Venezuela.

Professor Montoya further discusses the distinction made in the Public Administration

---

[30]Mr. Schmilinsky further states that "PDVSA is a stranger to the dispute between Crystallex and the Republic." (D.I. 29 at ¶ 14)

Organic Law between Centralized Administration departments, which do not have their own legal personalities, and the Decentralized Administration, which consists of entities, like PDVSA, which do have their own legal personalities. (*See* D.I. 28 at ¶¶ 16-19) Professor Montoya cites a decision by the Supreme Tribunal of Justice (Constitutional Chamber), which recognized "the legal nature of PDVSA as [an SA] and confirmed that PDVSA is part of the Public Administration, but not part of the Centralized Administration." (*Id.* at ¶ 18) Again, Crystallex's declarants do not challenge the facts of this conclusion, just their significance, and again the Court agrees with Crystallex's view as to their minimal importance.

### ix.    Conclusion as to exclusive control test

Having made the factual findings noted throughout the discussion above by a preponderance of the evidence after considering all of the record evidence cumulatively, the Court finds that Crystallex has rebutted the presumption of separateness and has shown that PDVSA may be deemed the alter ego of Venezuela pursuant to the exclusive control prong of *Bancec* and its progeny. Therefore, Crystallex has proven the applicability of an exception to PDVSA's sovereign immunity. The Court rejects PDVSA's factual challenge to the Court's subject matter jurisdiction.

### C.    Crystallex Has Met Its Burden with Respect to Execution Immunity

Having found that Crystallex has met its burden to rebut the presumption of separateness between PDVSA and Venezuela and proven that PDVSA is the alter ego of Venezuela, and therefore no jurisdictional immunity prevents the Court from having authority to resolve the parties' disputes, the Court must next determine whether Crystallex has also overcome the immunities embodied in the FSIA relating to attachment and execution on property held by

foreign sovereigns in the United States.  On this issue, while again PDVSA's motion can be read as raising both facial and factual attacks, the analysis essentially overlaps and, hence, can be conducted once.

Three issues are presented: (i) which statutory provision applies, (ii) has the property Crystallex seeks to attach – the shares of Delaware corporation PDVH – been used for commercial activity, and (iii) even if the shares have been so used, are they currently being used for commercial activity, which requires consideration of certain Executive Orders issued by the U.S. Treasury Department's Office of Foreign Asset Control ("OFAC").  The Court addresses each in turn.

### 1.    The Court Applies § 1610(a), Not § 1610(b)

"[T]he FSIA codifies the common-law rule that property of a foreign state in the United States is **presumed** immune from attachment and execution.  To overcome the presumption of immunity, the plaintiff must identify the particular foreign-state property he seeks to attach and then establish that it falls within a statutory exception." *Rubin*, 637 F.3d at 796.  "The party in possession of the property may raise the immunity or the court may address it sua sponte." *Id.* at 801.

While "the execution immunity afforded sovereign property is broader than the jurisdictional immunity afforded the sovereign itself," *Walters*, 651 F.3d at 289, the statutory framework for attachment and execution immunity mirrors that for jurisdictional immunity.  Attachment and execution immunity are governed by FSIA § 1609, subject to specific exceptions to that immunity recited in §§ 1610 and 1611.

Section 1609 provides:

> Subject to existing international agreements to which the United
> States is a party at the time of enactment of this Act the property in
> the United States of a foreign state shall be immune from
> attachment arrest and execution except as provided in sections
> 1610 and 1611 of this chapter.

28 U.S.C. § 1609.

Section 1610 identifies exceptions to immunity based on whether the property subject to

attachment is that of a foreign state, § 1610(a), or of an agency or instrumentality of a foreign

state, § 1610(b).  "[T]he property of an agency or instrumentality of a foreign state is afforded

narrower protection from execution than the property of the foreign state itself." *Walters*, 651

F.3d at 289-90.

For property of a foreign state to be subject to attachment under § 1610(a), it must be

"***used for*** a commercial activity in the United States" and, under the subsection implicated here,

§ 1610(a)(6), the attachment must be in aid of a judgment "based on an order confirming an

arbitral award rendered against the foreign state" (emphasis added).  Under the broader

exceptions to immunity under § 1610(b), attachment is proper where the agency "***engaged in***

commercial activity in the United States," regardless of whether the particular property subject to

attachment was used for commercial activity (emphasis added).  Therefore, the Court must

determine whether to apply § 1610(a) or § 1610(b).

Although there is no dispute that PDVSA is an agency of Venezuela (*see* D.I. 28 at 4-8,

12-14; D.I. 35 at 2, 4; D.I. 36 at 3) and, therefore, one might expect § 1610(b) to apply, because

the Court concludes that PDVSA is to be treated as Venezuela's alter ego for purposes of

jurisdictional immunity, PDVSA must also be treated as Venezuela's alter ego for purposes of

execution immunity.  Therefore, the property subject to attachment – PDVSA's shares in PDVH

– may properly be considered property of Venezuela, implicating § 1610(a).

Moreover, Crystallex expressly moves only under § 1610(a) – and PDVSA appears to

agree that only § 1610(a) applies.  (*See* Tr. at 6 ("[W]e have filed a motion under the FSIA,

Section 1610(a)."); *see also* D.I. 3-1 at 25 (citing § 1610(a), (c)); D.I. 33 at 7 n.6 (same); D.I. 52

at 3 (relying on § 1610(a)); D.I. 26 at 37 (PDVSA stating, "where, as here, a judgment creditor of

a foreign state attempts to reach the assets of an agency or instrumentality on the theory that it is

the alter ego of the state under *Bancec*, the judgment creditor must satisfy the more restrictive

exceptions to execution immunity set forth in Section 1610(a)"); D.I. 51 at 4 (relying on

§ 1610(a))[31]  Thus, the Court will apply § 1610(a).

### 2.     Used For Commercial Activity

As identified above, Crystallex proceeds under § 1610(a)(6), which recites:

> (a) The property in the United States of a foreign state . . . used for
> a commercial activity in the United States, shall not be immune
> from attachment in aid of execution, or from execution, upon a
> judgment entered by a court of the United States or of a State after
> the effective date of this Act, if . . .
>
>> (6) the judgment is based on an order confirming an
>> arbitral award rendered against the foreign state,
>> provided that attachment in aid of execution, or
>> execution, would not be inconsistent with any

---

[31]In the event that § 1610(b) were held to apply, the Court would be required to deny the
requested writ, as Crystallex cannot meet its burden to show applicability of any exception to
immunity enumerated in § 1610(b), as it has failed to prove (or even allege) waiver of attachment
immunity by PDVSA or jurisdiction under §§ 1605(a)(2), (3), (5), (7), 1605(b), or 1605A.  Nor
does Crystallex have a judgment against PDVSA.

provision in the arbitral agreement.[32]

As it is undisputed that Crystallex's judgment is based on an order confirming an arbitral

award rendered against Venezuela, PDVSA's shares in PDVH are subject to post-judgment

attachment and execution if they are "used for commercial activity in the United States." 28

U.S.C. § 1610(a).[33]

"[P]roperty is 'used for a commercial activity in the United States' when the property in

question is put into action, put into service, availed or employed *for* a commercial activity, not *in*

*connection* with a commercial activity or *in relation* to a commercial activity." *Af-Cap Inc. v.*

*Chevron Overseas (Congo) Ltd.*, 475 F.3d 1080, 1091 (9th Cir. 2007). The FSIA defines a

"commercial activity" as "either a regular course of commercial conduct or a particular

commercial transaction or act. The commercial character of an activity shall be determined by

reference to the nature of the course of conduct or particular transaction or act, rather than by

reference to its purpose." 28 U.S.C.A. § 1603(d). "[B]ecause the [Foreign Sovereign Immunity]

Act provides that the commercial character of an act is to be determined by reference to its

'nature' rather than its 'purpose,' the question is not whether the foreign government is acting

---

[32]Section 1610(c) details the procedural requirements for an attachment under § 1610(a) or (b), requiring the Court to first determine that "a reasonable period of time has elapsed following the entry of judgment" and that any required notice is given. It is undisputed that these procedural requirements have been met. (*See* D.I. 4 Ex. 8) (D.C. Court finding reasonable time elapsed)

[33]"[A] foreign sovereign's property is subject to execution under § 1610(a) only when the sovereign itself uses the property for a commercial activity." *Rubin v. Islamic Republic of Iran*, 830 F.3d 470, 479 (7th Cir. 2016); *see also Conn. Bank of Commerce v. Republic of Congo*, 309 F.3d 240, 256 n.5 (5th Cir. 2002) ("[W]hat matters under the statute is how the foreign state uses the property, not how private parties may have used the property in the past."). As PDVSA is the alter ego of Venezuela, it follows that PDVSA's use of the PDVH assets for commercial activity can be said to be the sovereign's use.

with a profit motive or instead with the aim of fulfilling uniquely sovereign objectives. Rather, the issue is whether the particular actions that the foreign state performs (whatever the motive behind them) are the type of actions by which a private party engages in 'trade and traffic or commerce.'" *Weltover, Inc.*, 504 U.S. at 614 (internal citation omitted).[34]  In general, if the sovereign state is using property in the same manner as a private citizen could, then it is being used for a commercial purpose.  If, alternatively, the property is being used in a manner that only a sovereign state can use it, then it is not being used for a commercial purpose and cannot be attached. *See, e.g., id.* at 614-15 ("[A] foreign government's issuance of regulations limiting foreign currency exchange is a sovereign activity, because such authoritative control of commerce cannot be exercised by a private party; whereas a contract to buy army boots or even bullets is a 'commercial' activity, because private companies can similarly use sales contracts to acquire goods . . . .").

In determining whether property is used for a commercial purpose, the Court must "make factual findings concerning how the property was used" and "reach legal conclusions concerning whether that particular use was 'for commercial purposes.'" *Af-Cap Inc. v. Republic of Congo*, 383 F.3d 361, 368 (5th Cir.), *decision clarified on reh'g*, 389 F.3d 503 (5th Cir. 2004).  This requires "a more holistic approach," requiring the Court to "examine the totality of the circumstances surrounding the property." *Id.* at 369.

---

[34]While PDVSA takes issue with Crystallex's reliance on *Weltover* due to its discussion of "commercial activity" arising in the context of jurisdictional immunity, not execution activity (*see* D.I. 26 at 39 n.14), courts have noted that "in defining 'commercial activity,' [the FSIA] does not provide any different definition for § 1605 versus § 1610.  Courts have therefore applied decisions concerning immunity under § 1605 to construe the scope of 'commercial activity' under § 1610." *Aurelius Capital Partners, LP v. Republic of Argentina*, 2009 WL 755231, at *13 (S.D.N.Y. Mar. 12, 2009), *rev'd and vacated on other grounds*, 584 F.3d 120 (2d Cir. 2009).

Crystallex contends that PDVSA – and therefore, Venezuela – uses the PDVH shares for

commercial activity by "exercising its rights as a shareholder" and using the shares to name

directors of PDVH and to approve contracts. (D.I. 52 at 3) Crystallex further contends that

PDVSA uses the PDVH shares to conduct commercial business through PDVH's wholly-owned

subsidiary, CITGO, a Delaware corporation. (*Id.* at 4) PDVSA responds that "Crystallex cannot

demonstrate that PDVSA uses the PDVH shares for a commercial activity in the United States"

(D.I. 26 at 39) and has "presented no evidence concerning PDVSA's use of the PDVH shares"

(D.I. 51 at 4).

The Court finds by a preponderance of the evidence that the PDVH shares are being

"used for a commercial purpose" by PDVSA and, therefore, may be attached (and executed on)

as property of Venezuela's alter ego.[35] The PDVH shares are used for a commercial purpose

because, through them, PDVSA manages its ownership of PDVH and, consequently, CITGO,[36]

in the United States. *See In re 650 Fifth Ave.*, 2014 WL 1516328, at *17 (S.D.N.Y. Apr. 18,

2014), *vacated on other grounds and remanded sub nom. Kirschenbaum v. 650 Fifth Ave. &

Related Props.*, 830 F.3d 107 (2d Cir. 2016) (stating shares in company "were also used for

commercial activity, because they were the mechanism through which the partners owned the

Building and determined the distribution of revenue that it produced").

---

[35]PDVSA insists that Crystallex has not met its burden to overcome the presumption of immunity
from attachment by clear and convincing evidence. (D.I. 51 at 4) For reasons already explained
in connection with exceptions to jurisdictional immunity, the Court agrees with Crystallex that its
burden of proof is a preponderance of the evidence, and not clear and convincing evidence.

[36]As PDVSA acknowledges: "PDVSA owns 100% of the shares of PDVH, a Delaware
corporation, which in turn owns 100% of the shares of CITGO Holding, Inc., which in turn owns
100% of the shares of CITGO Petroleum Corp. ("CITGO"), a multi-billion dollar Delaware
corporation headquartered in Texas and founded in 1910." (D.I. 26 at 9)

Specifically, Venezuela – through PDVSA – uses the shares to appoint directors, approve contracts, and pledge assets as security for PDVSA's debt. (*See, e.g.*, D.I. 42 Ex. 110 (news article announcing Venezuelan President Nicolás Maduro appointed Asdrúbal Chávez as new president of Citgo); D.I. 52 Ex. B at 14 (PDVSA's "main operating segments" use shares to conduct "[r]efining, trade and supply activities in the United States of America compris[ing] the administration of refineries and gasoline and refined products marketing . . . under the CITGO® brand"); D.I. 52 Ex. A at 20 (PDVH may pledge assets, including its CITGO shares, as security for PDVSA's debt)) As Crystallex states, "it is difficult to imagine property with more of a commercial use than shares of a Delaware for-profit corporation that itself owns, through an intermediate holding company, a multi-billion dollar Delaware petroleum corporation." (D.I. 33 at 18; *see also* H.R. Rep. No. 94-1487, at 16, 1976 U.S.C.C.A.N. 6604, at 6615 (1976) ("Activities such as a foreign government's . . . investment in a security of an American corporation . . . would be among those included within the definition of ['commercial activity'].").  In sum, Venezuela is using the shares of PDVH "not as a regulator of a market, but in the manner of a private player within it," rendering its actions "'commercial' within the meaning of the FSIA." *Weltover*, 504 U.S. at 614.

### 3.   Can the PDVH Shares Be Used Now For Commercial Activity?

The property subject to attachment – here the PDVH shares – must also be "'used for a commercial activity' at the time the writ of attachment or execution is issued." *Aurelius Capital Partners, LP v. Republic of Argentina,* 584 F.3d 120, 130 (2d Cir. 2009).  It is not sufficient that a foreign state's property in the United States "will be used" or "could potentially be used" for a commercial activity in the United States. *Id.*; *see also City of Englewood v. Socialist People's*

*Libyan Arab Jamahiriya*, 773 F.2d 31, 36, 37 (3d Cir. 1985) ("The determinative issue is whether [the property] is currently being used in a 'regular course of commercial conduct' [and not whether] the property was acquired by [the foreign state] in a commercial transaction.").

PDVSA contends the PDVH shares are "effectively frozen" and cannot be used for a commercial activity (D.I. 51 at 4) because Executive Order 13808, entitled "Imposing Additional Sanctions With Respect to the Situation in Venezuela," 82 Fed. Reg. 41,155 (Aug. 29, 2017), precludes the issuance of dividends (D.I. 26 at 40; D.I. 54 at 3), while Executive Order 13835, "Prohibiting Certain Additional Transactions With Respect to Venezuela," 83 Fed. Reg. 24,001 (May 24, 2018), and related OFAC guidance, together prohibit attachment and execution of the PDVH shares (D.I. 63 at 2). (*See* Tr. at 34) (PDVSA arguing, "what the Executive Order says is you cannot purchase equity from Venezuela in the United States" and "[t]here can't be a buyer in the United States")

Crystallex responds that "selling these shares so that a judgment of a United States Court could be satisfied is not what these sanctions are trying to prevent." (Tr. at 76) According to Crystallex, "Executive Order [13808] does not change that PDVH is a commercial enterprise and that PDVSA's shares are used for commercial activity – the management of its commercial operations in the United States. . . . PDVSA retains the ability to use the shares to name directors and approve contracts submitted to shareholders for approval. . . . PDVSA can still pledge its PDVH shares to secure its own short term debt (a commercial use)." (D.I. 52 at 5) Moreover, Crystallex contends that the PDVH shares are equity securities, and OFAC has specifically allowed such dealings in equity, notwithstanding the Executive Order. (*Id.*) (quoting D.I. 34 Ex. 107)

The Court agrees with Crystallex.  Once a foreign state has used property in commerce, that property continues to satisfy the commercial use requirement unless that property becomes "cordoned off for use of the [foreign state] in its sovereign capacity."  *Af-Cap*, 383 F.3d at 370. Thus, it is presumed that the use of the property for commercial activity is continuing, in the absence of evidence to the contrary.  PDVSA has presented no evidence to the contrary, other than pointing to the Executive Orders, which, for reasons now to be explained, do not preclude the possibility that the PDVH shares are continuing to be "used for a commercial activity."[37]

### i.    Executive Order 13808

Executive Order 13808 provides, in pertinent part:

> Section 1. (a) All transactions related to, provision of financing for, and other dealings in the following by a United States person or within the United States are prohibited:
>
> . . .
>
>> (iv) dividend payments or other distributions of profits to the Government of Venezuela from any entity owned or controlled, directly or indirectly, by the Government of Venezuela.
>
> (b) The purchase, directly or indirectly, by a United States person or within the United States, of securities from the Government of Venezuela, . . . is prohibited.

82 Fed. Reg. 41,155 (Aug. 29, 2017); *see also* D.I. 26 at 40.

This Executive Order, directed to dividend payments and purchases of securities, has no impact on PDVSA's ability to carry on the commercial activities based on exercise of

---

[37]Notably, both Executive Orders expressly define PDVSA as the "Government of Venezuela." (D.I. 34-1 Ex. 106 at 1-2; D.I. 63 at 2; *see also* Tr. at 71-72 (PDVSA counsel admitting as much))  While this statement does not constitute a finding of fact to which the Court must defer, it appears that the Executive Branch's view is consistent with the Court's conclusions.

shareholder rights (e.g., replacing board members, pledging assets).  Section 1(a)(iv) does not

render the PDVH shares non-commercial property because it does not prohibit PDVSA from

exercising all ownership rights.  Section 1(b) also does not render the PDVH shares non-

commercial property or otherwise pose a bar to the relief Crystallex seeks.  Upon attachment, the

PDVH shares would not be paid or distributed to Venezuela but, eventually, to Crystallex.  In

fact, as Crystallex states, "PDVSA can *and does* continue to engage in a wide array of

commercial uses of the shares, such as: naming directors and officers, including, for example, the

president of PDVH's indirect subsidiary, CITGO Petroleum, months after sanctions were

imposed; running large-scale gas refining and marketing operations in the United States; and

directing PDVH (and its subsidiaries) to enter into related-party transactions for PDVSA's

benefit, including the sale of PDVSA's (low quality) oil to CITGO Petroleum."  (D.I. 53 at 3)

(citing evidence)

  Moreover, the PDVH shares are equity securities and the OFAC has instructed that

"[e]ngaging in transactions related to, providing financing for, or otherwise dealing in any equity

issued by, on behalf of, or for the Government of Venezuela is permissible, if the equity was

issued prior to the effective date of [the Executive Order]."  (D.I. 34-1 Ex. 107 at 2; *see also id.*

("The term *equity* includes stocks, share issuances, depositary receipts, or any other evidence of

title or ownership."))  The shares of PDVH that Crystallex seeks to attach were issued before the

Executive Order was adopted.  The Court, thus, concludes that Executive Order 13808 does not

pose a bar to the relief it has granted today.[38]  The Court further notes that nothing about its

---

[38]It may be that this Executive Order will have some applicability to any transaction Crystallex
might seek to undertake with the PDVH shares once they are attached, but it does not, in the
Court's view, prevent the attachment.

ruling today is inconsistent with the letter or spirit of the Executive Order, which seems intended

to deprive Venezuela of certain assets and opportunities, not to prevent legitimate judgment

creditors in United States Courts to be made whole by Venezuela. (*See* Tr. at 25) (Crystallex

stating, "the idea is that this was, put bluntly, to punish Venezuela, not to punish people who

were owed money by Venezuela")

### ii.    Executive Order 13835

PDVSA contends that Executive Order 13835 and OFAC Frequently Asked Question

("FAQ") No. 596, issued July 19, 2018, "confirm PDVSA's argument that U.S. sanctions

prohibit the attachment and execution of the shares of its wholly-owned Delaware subsidiary,

PDVH." (D.I. 63 at 2; *see also* Aug. Tr. at 24 (PDVSA characterizing FAQ No. 596 as "most on

point" of FAQs parties have discussed))

Executive Order 13835 states, in part:

> Section 1. (a) All transactions related to, provision of financing for,
> and other dealings in the following by a United States person or
> within the United States are prohibited:
>
> . . . .
>
>> (iii) the sale, transfer, assignment, or pledging as
>> collateral by the Government of Venezuela of any
>> equity interest in any entity in which the
>> Government of Venezuela has a 50 percent or
>> greater ownership interest.

83 Fed. Reg. 24001 (May 21, 2018); *see also* D.I. 63 at 1-2.

FAQ 596 provides:

> **596. Does E.O. 13835 prohibit me from attaching and**
> **executing against assets of the Government of Venezuela,**
> **including vessels, properties, or financial assets, if I have a**

65

**legal judgment against the Government of Venezuela?**

No, provided that the attachment does not involve (i) debt owed to the Government of Venezuela (including accounts receivable) that was pledged as collateral after the effective date of E.O. 13835 (per subsection 1(a)(ii) of the E.O.), or (ii) an equity interest in any entity in which the Government of Venezuela has a 50 percent or greater ownership interest (per subsection 1(a)(iii) of the E.O.). OFAC authorization would likely be required for attachment of equity interest in any entity in which the Government of Venezuela has a 50 percent or greater ownership interest. OFAC would consider license applications seeking to attach and execute against such equity interests on a case-by-case basis.

OFAC FAQs: Other Sanctions Programs, *Venezuela Sanctions.*[39]

On the same day OFAC issued FAQ 596, it also issued FAQ 595, which states:

**595. Why is OFAC issuing General License 5?**

Subsection 1(a)(iii) of E.O. 13835 prohibits U.S. persons from being involved in the transfer by the Government of Venezuela (GOV) of any equity interest in any entity owned 50 percent or more by the GOV, as well as related transactions in the United States. Subsequent to the issuance of E.O. 13835, OFAC received inquiries about how and whether subsection 1(a)(iii) of E.O. 13835 could affect the ability to enforce bondholder rights to the CITGO shares serving as collateral for the PdVSA 2020 8.5 percent bond. Subsection 1(a)(iii) of E.O. 13835 hinders the Maduro regime's ability to dispose of interests in entities owned 50 percent or more by the GOV at terms unfavorable to the Venezuelan people. Authorizing bondholders to enforce rights related to the PdVSA 2020 8.5 percent bond prevents the Maduro regime from using the EO to default on its bond obligations without consequence. In order to provide that authorization, OFAC is issuing General License 5, which removes E.O. 13835 as an obstacle to holders of the PdVSA 2020 8.5 percent bond gaining access to their collateral, and keeps sanctions pressure where it belongs – on the Maduro regime.

*Id.*

---

[39]*See* https://www.treasury.gov/resource-center/faqs/Sanctions/Pages/faq_other.aspx#venezuela.

According to Crystallex, FAQ 596 specifically allows attachment and execution of Venezuelan assets and while FAQ 595 "addresses a specific class of creditors, the same reasoning applies to other creditors such as Crystallex." (D.I. 64 at 2) Crystallex further contends that while, in response to FAQ 596, "OFAC did advise – in a non-binding FAQ response – that a license would likely be needed before attachment and execution could be completed, . . . that has no impact on the question of whether this Court can or should authorize the relief sought by the Writ Motion in the first instance." (*Id.*)

The Court agrees with Crystallex. Notwithstanding PDVSA's assertion, it is not correct that "OFAC's published views *confirm* PDVSA's argument that the U.S. sanctions *prohibit* the attachment and execution of the shares of its wholly-owned Delaware subsidiary, PDVH." (D.I. 63 at 2) (emphasis added) Instead, the OFAC guidance confirms that attaching the PDVH shares "would likely . . . require[]" OFAC authorization, and that, if such authorization were sought, OFAC would evaluate it "on a case-by-case basis." OFAC FAQs: Other Sanctions Programs, *Venezuela Sanctions.* Accordingly, the Court concludes that Executive Order 13835 does not pose a bar to granting the relief it has granted today.[40]

---

[40]In its letter of July 24, 2018, Crystallex represented that OFAC had issued a license to a previously undisclosed third-party,

As Venezuela has not yet made such payments,

Crystallex "can and will seek clarification of the current license . . . and/or the issuance of an additional license to cover the eventual execution sale of the shares of

**D.      Additional Issues Raised by PDVSA**

Although most of PDVSA's arguments against granting Crystallex's requested writ have

been addressed in the course of resolving the many issues discussed to this point in this Opinion,

several additional contentions merit brief discussion. None, however, alters the outcome.

**1.      Prejudgment Attachment**

PDVSA warns that granting the relief sought by Crystallex will amount to a prejudgment

attachment, which is precluded by § 1610(d). (*See, e.g.*, D.I. 71 at 3 ("[T]his Court cannot attach

or otherwise restrain PDVSA's shares of PDVH unless and until it enters judgment against

PDVSA . . . ."); Tr. at 64) The Court rejects this view and instead agrees with Crystallex that it

has a judgment: the confirmed and registered arbitration judgment against Venezuela. (*See, e.g.*,

Tr. at 78; Aug. Tr. at 30 ("It's not that we cleverly labeled this as a Rule 69 motion. It is that we

cleverly already won our case against the Government of Venezuela and we don't have to file it

again and again in every court in the land.")) Crystallex is not seeking to add PDVSA to that

judgment. Provided that, as the Court has found, any sovereign immunity that would otherwise

protect PDVSA and its specified property has been overcome – by the judgment against

Venezuela, the finding that PDVSA is Venezuela's alter ego, and the findings with respect to the

"commercial" use of the PDVH shares – then the FSIA is no bar to the relief sought by

Crystallex. In this context, it is simply incorrect to call what the Court is doing an improper

PDVH once the Writ has issued." (*Id.* at 3) The Court agrees with PDVSA that ███████████

███████████████████████████████████████ But these facts do not alter the Court's rulings.

prejudgment attachment on PDVSA's property.[41]

### 2.    PDVSA's Non-Involvement with Expropriation of Crystallex's Property

Throughout this litigation, PDVSA has emphasized the lack of allegations and evidence that PDVSA had anything to do with "the facts and circumstances that gave rise to [Crystallex's] claim for expropriation. It is a stranger to the entire dispute." (Tr. at 39; *see also* D.I. 51 at 3 ("[I]t is undisputed that PDVSA was a complete stranger to that transaction.")) PDVSA is correct. The only connection Crystallex even alleges between PDVSA and the harm Crystallex has suffered is that, ultimately, Crystallex's expropriated property was given to PDVSA, which then converted part of it into "billions of dollars." (Aug. Tr. at 40; *see also* Tr. at 73 ("[B]asically we had a contract to develop this mine. [Venezuela] took that contract away from us and they gave the mine without the license to PDVSA which went around and sold . . . 40 percent of it for $2.4 billion."); *see also* D.I. 5-1 Exs. 78-82 (showing PDVSA ended up with rights to gold mines))[42]

---

[41]Some of the weight PDVSA's contention might otherwise carry is countered by the Court's finding, as a factual matter based on the present record, that PDVSA is accurately treated as Venezuela's alter ego. Were the Court merely to have resolved PDVSA's facial challenge, and assessed only the sufficiency of Crystallex's allegations as opposed to having also weighed the evidence, the argument that Crystallex is proceeding "prejudgment" would have had more appeal (though nonetheless still lack merit). (*See, e.g.*, D.I. 54 at 2) (PDVSA arguing: "an attachment of a putative alter ego's property *in advance of an adjudication of whether the entity is an alter ego* is effectively a prejudgment attachment and would only pass constitutional muster where the judgment creditor posts a bond") (emphasis added)

[42]It is also undisputed that PDVSA was not a party to the arbitration and its name is not mentioned in the arbitration award. (*See* D.I. 51 at 2-3) Although PDVSA has frequently emphasized this fact, too, it does not impact the pending motions, given the Court's conclusions of law and findings of fact as explained throughout this Opinion. Essentially, it is just another way of arguing that an independent basis of subject matter jurisdiction is required in order to impose primary liability on PDVSA for the arbitration judgment against Venezuela. (*See, e.g.*,

But these facts do not undermine the Court's conclusions. *Bancec* does not require that the alter ego, whose property is being attached and executed, have been involved in the underlying conduct that harmed the judgment creditor. (*See* Tr. at 85-86) (Crystallex noting, "there was not remotely any claim that *Bancec* had been involved at all in the expropriation of the Citibank assets") To the contrary, *Bancec* shows that alter ego status is not limited to "state conduct in which the instrumentality had a key role," as there the Cuban bank – which Citibank sought to hold liable for Cuba's seizure of Citibank's assets – played no role whatsoever in Cuba's seizure of those assets. *See Bancec,* 462 U.S. at 619; *see also Kensington,* 2007 WL 1032269, at *14-16 (finding state oil company liable for nation's default even though company was not involved in underlying loan).[43]

Although, as already noted, there is "no mechanical formula" for assessing whether the extensive control prong of *Bancec* has been satisfied, the factors that have been developed by courts applying *Bancec* have ***not*** included a requirement that the purportedly "separate" entity has been involved in the conduct that harmed the creditor. To the contrary, as reiterated earlier this year by the Supreme Court:

> Over time, the Courts of Appeals coalesced around the following five factors (referred to as the *Bancec* factors) to aid in this analysis:

---

Tr. at 48) (PDVSA suggesting Court needs to ask itself "was PDVSA, as the agency or instrumentality, involved in the underlying arbitration to the extent that I, this Court, can say that it should be liable on the award") These are contentions the Court has thoroughly considered – and rejected – elsewhere in its analysis.

[43]Notably, when the case was before the Court of Appeals, the Second Circuit did hold that instrumentality involvement in the underlying conduct was required. *See Banco Para El Comercio Exterior de Cuba v. First Nat'l City Bank,* 658 F.2d 913, 919-20 (2d Cir. 1981). The Supreme Court's contrary holding shows that it disagreed. (*See* Aug. Tr. at 39-40)

(1) the level of economic control by the government;

(2) whether the entity's profits go to the government;

(3) the degree to which government officials manage the entity or otherwise have a hand in its daily affairs;

(4) whether the government is the real beneficiary of the entity's conduct; and

(5) whether adherence to separate identities would entitle the foreign state to benefits in United States courts while avoiding its obligations.

*Rubin*, 138 S.Ct. at 822-23 (internal quotation marks omitted).[44]  None of these commonly-considered factors[45] suggests that rebutting the presumption of separateness requires that both entities have been involved in the underlying conduct.[46]

### 3.   Judicial Estoppel

PDVSA has directed the Court's attention to a separate action Crystallex commenced against PDVSA in the Hague.  (*See* D.I. 26 at 21-22)  Some of the claims being pressed by Crystallex in the Hague evidently were premised on PDVSA's separateness from the Republic. (*See id.*)  PDVSA concludes that "Crystallex should be precluded from pursuing such fundamentally inconsistent positions in different fora."  (*Id.* at 22; *see also* Tr. at 69-70)

_____

[44]Notably, *Rubin* also reiterated the disjunctive nature of the *Bancec* analysis.  *See* 138 S.Ct. at 822 (noting "liability would be warranted, for example," where extensive control "or" where fraud or injustice prong is satisfied).

[45]The commonly-considered factors as described in *Rubin* are consistent with those the Court has considered in its analysis of PDVSA's facial and factual challenges, although they are stated somewhat differently than the Second Circuit stated them in *EM Ltd. II*.

[46]The dicta in *BRIDAS*, 477 F.3d at 414-15, on which PDVSA relies (*see* D.I. 26 at 18-19, 24) cannot establish the contrary proposition.

The Court disagrees.  As an initial matter, it is not clear what law governs the Hague proceedings, and the parties have not provided the Court with evidence of (for example) Dutch law on conspiracy.  Therefore, the Court does not have a clear understanding of the basis on which the Hague Court dismissed certain of Crystallex's claims.  Moreover, Crystallex explains that it was initially pressing multiple theories in the Hague: some of them premised on PDVSA and Venezuela being separate entities, some premised on a different view.  (*See* Tr. at 26-28)  The Court has no basis to conclude that maintaining alternative theories, particularly at the outset of a case, is improper in the Hague Court.  More importantly, doing so is expressly permitted under the Federal Rules of Civil Procedure.  *See* Rule 8.  As those rules govern this Court's procedures, it is plain that Crystallex is not judicially estopped from advocating inconsistent theories in this very Court (something it is not even accused of doing).  It follows that it is also not (at this point) judicially estopped from taking inconsistent positions in different courts.  Finally, as Crystallex observes, estoppel of the type PDVSA urges on the Court does not apply at least until a party is successful in persuading a tribunal of one position and then seeks to persuade another tribunal of a contradictory position.  (*See* Tr. at 80) (citing *New Hampshire v. Maine*, 532 U.S. 742 (2001))  Crystallex has not prevailed on its position in the Hague.  (*See id.*)

### 4.  Overbreadth of Crystallex's position

PDVSA also highlights what it portrays as the vast breadth of Crystallex's position: if Crystallex is correct that PDVSA is the alter ego of Venezuela, then both entities are potentially liable for all of each other's liabilities, even where (as PDVSA contends is true here) one entity had absolutely nothing to do with the facts giving rise to the liability imposed on the other.  (*See generally* Tr. at 86-87) (Crystallex responding to PDVSA's charge)  The Court does not agree

that this is the necessary outcome of granting the requested writ. The writ is directed (as it must

be) to specifically-identified property, here the shares of PDVH. Were Crystallex (or any other

judgment creditor of Venezuela) to wish to attach other property belonging to PDVSA, it would

have to prove, by a preponderance of the evidence, that the sovereign immunity otherwise

applicable to that property has been overcome – just as Crystallex has done here. That will not

always be possible; for instance, the property might not be currently "used for a commercial

activity," as required by § 1610(a)(6). This is an important distinction between adding PDVSA

to Crystallex's judgment against Venezuela – which would allow Crystallex to attach any of

PDVSA's property to satisfy the judgment, without additional proceedings, if, for example, the

proceeds from the sale of the shares it is attaching are less than the full amount of its judgment –

and only attaching specific property, which is the result being permitted here.

Additionally, the record which has persuaded this Court that PDVSA and Venezuela

should be treated as alter egos of one another may not be the same record that is created in some

other action. Indeed, even in this case, the record may be supplemented in the next stage of the

proceedings (as is further described below), which could potentially lead to different findings.

Other factfinders might deem the record before them to justify different findings. Further, the

state law and procedures applicable in any other District may well vary from those being applied

here, perhaps in material ways. (*See generally* Aug. Tr. at 36) And the collateral estoppel effect

of any ruling from this Court will be a matter to be decided by whatever other court is confronted

with these issues at a later time. (*See id.*)

Finally, even if PDVSA is right about the implications of the Court's holding today (and

Crystallex insists it is not[47]), the Court cannot be deterred from reaching the right conclusion, based on the facts before it and the applicable law, just because it fears the impact of its rulings.

**E.     Next Steps**

By its decision today, the Court is holding that it will, after conferring further with the parties about additional details, direct the Clerk of Court to issue to Crystallex a writ, which Crystallex will then have the opportunity to serve and attach to PDVSA's property in Delaware, i.e., its shares in PDVH.  Some aspects of the parties' dispute, however, remain unsettled.  These include: (i) how quickly should the Court direct the writ to be issued, how quickly should Crystallex be directed to serve it, and how quickly must Crystallex execute on it; (ii) what is the appropriate commercially reasonable procedure by which to effectuate the sale of the PDVH shares, in order to maximize the likelihood of a fair and reasonable recovery, and how involved (if at all) does the Court need to be in that sale process;[48] (iii) does Crystallex, or alternatively a purchaser of the PDVH shares, wish to (or need to) seek a license from OFAC to permit the sale and, if so, when will it do so; and (iv) will Venezuela, PDVSA, and/or any other entity appear and seek to supplement the factual record already developed in this litigation and, if so, will such an entity attempt to (and, if so, be permitted to) argue that additional evidence materially alters the Court's findings, and thereby seek to quash the writ?  *See generally Hibou, Inc. v. Ramsing*, 324 A.2d 777, 783 (Del. Super. Ct. 1974) ("[O]n a motion to quash the order the Court as

---

[47]*See, e.g.*, Tr. at 16 ("They're not being added to the . . . judgment, they're just simply being told that the property they have needs to be turned over to satisfy the underlying judgment.").

[48]The parties appear to agree that Delaware law requires execution of shares of a Delaware corporation to be completed through a "public sale."  (*See* D.I. 71 at 8 (citing 8 Del. C. § 324); *see also* Aug. Tr. at 9, 20-21)

required by 10 Del. C. § 3506 must look at the Prima facie case presented to ascertain whether the plaintiff has 'a good cause of action' against all the defendants whose property has been attached."); D.I. 3-1 at 2 (Crystallex noting, "if any party has a claim to the shares at issue, that party can raise the issue with the Court after the writ is served"); Tr. at 21, 23 (Crystallex recognizing PDVSA, as well as perhaps PDVH and Venezuela, may have right to "come back in and challenge the writ"); D.I. 70 at 2 n.4 (Crystallex noting, "PDVSA may, of course, seek to challenge the writ on non-jurisdictional grounds by a motion to quash brought after the writ has issued and before the Court allows the execution process to commence").

In a separate Order being issued today, the Court will direct the parties to provide their views as to the timing and nature of the next steps in this proceeding.

## CONCLUSION

As PDVSA's counsel succinctly and correctly stated:

> PDVSA is a presumptively separate sovereign instrumentality that is entitled to come to this court, invoke its own sovereign immunity, and is presumptively immune from the court['s] subject matter jurisdiction, presumptively separate from Venezuela, and its property is presumptively immune from attachment and execution.

(Aug. Tr. at 17)  However, for reasons the Court has endeavored to explain, at length, throughout this Opinion, Crystallex has met its burden to rebut each of these presumptions.  Therefore, the Court will grant Crystallex's motion for an order authorizing the issuance of a writ of attachment *fieri facias* (D.I. 2) and deny PDVSA's cross-motion to dismiss (D.I. 25).  An appropriate Order follows.