**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

|  |  |  |
|---|---|---|
| CRYSTALLEX INTERNATIONAL CORP., | : | |
| *Plaintiff*, | : | |
| v. | : | C.A. No. 17-mc-00151-LPS |
| BOLIVARIAN REPUBLIC OF VENEZUELA, | : | |
| *Defendant*. | : | |

**MEMORANDUM OF LAW OF PETRÓLEOS DE VENEZUELA, S.A. IN SUPPORT OF
ITS MOTION TO CONTINUE THE UNCONDITIONAL STAY PENDING APPEAL**

**HEYMAN ENERIO GATTUSO & HIRZEL LLP**
Samuel T. Hirzel, II (#4415)
300 Delaware Avenue, Suite 200
Wilmington, DE 19801
(302) 472-7300
SHirzel@hegh.law

OF COUNSEL:

Joseph D. Pizzurro
Julia B. Mosse
Kevin A. Meehan
Juan O. Perla

*Attorneys for Intervenor*
*Petróleos de Venezuela, S.A.*

CURTIS, MALLET-PREVOST,
COLT & MOSLE LLP
101 Park Avenue
New York, NY 10178
(212) 696-6000
jpizzurro@curtis.com
jmosse@curtis.com
kmeehan@curtis.com
jperla@curtis.com

August 31, 2018

# TABLE OF CONTENTS

NATURE AND STAGE OF PROCEEDINGS ............................................................... 1

SUMMARY OF ARGUMENTS ................................................................................... 4

FACTUAL BACKGROUND ........................................................................................ 6

ARGUMENT ............................................................................................................... 10

I.    The Third Circuit's Test for Granting a Stay Favors PDVSA ........................... 10

    A.    PDVSA Meets the Likelihood of Success Standard .................................. 11

    B.    Absent a Stay, PDVSA Will Be Irreparably Harmed ................................ 13

    C.    A Stay Does Not Irreparably or Substantially Harm Other Parties ........... 15

    D.    The Public Interest Favors a Stay .............................................................. 16

II.   Imposing a Bond under Federal Rule 62(d) Is Unnecessary and Inefficient ...... 16

CONCLUSION ............................................................................................................ 20

# TABLE OF AUTHORITIES

## Cases

*Abur v. Republic of Sudan*,
    437 F. Supp. 2d 166 (D.D.C. 2006) ........................................................................... 16

*ASARCO LLC v. Ams. Mining Corp.*,
    419 B.R. 737 (S.D. Tex. 2009) .................................................................................. 20

*Ascher v. Gutierrez*,
    66 F.R.D. 548 (D.D.C. 1975) .................................................................................... 21

*Beaty v. Republic of Iraq*,
    No. 03-cv-0215 (JDB), 2007 U.S. Dist. LEXIS 28950 (D.D.C. Apr. 19, 2007) ..................... 16

*Bechtel Corp. v. Local 215, Laborers' Int'l Union of N. Am., AFL-CIO*,
    544 F.2d 1207 (3d Cir. 1976) .................................................................................... 10

*Blue Ridge Invs., L.L.C. v. Republic of Argentina*,
    735 F.3d 72 (2d Cir. 2013) ....................................................................................... 16

*Bolivarian Republic of Venezuela v. Helmerich & Payne Int'l Drilling Co.*,
    137 S. Ct. 1312 (2017) .............................................................................................. 15

*Butler v. Sukhoi Co.*,
    579 F.3d 1309 (11th Cir. 2009) ................................................................................ 13

*C. Albert Sauter Co. v. Richard S. Sauter Co.*,
    368 F. Supp. 501 (E.D. Pa. 1973) ............................................................................ 21

*Cayuga Indian Nation of N.Y. v. Pataki*,
    188 F. Supp. 2d 223 (N.D.N.Y. 2002) ...................................................................... 14

*Dillon v. City of Chicago*,
    866 F.2d 902 (7th Cir. 1988) .................................................................................... 22

*Doe v. Boyertown Area Sch. Dist.*,
    897 F.3d 518, 2018 U.S. App. LEXIS 20792 (3d Cir. 2018) .................................... 14

*EM Ltd. v. Banco Cent. De La Republica Argentina*,
    800 F.3d 78 (2d Cir. 2015) ................................................................................ 13, 16

*Fastov v. Christie's Int'l P.L.C.*,
    No. 97-0578 (PLF), 2008 U.S. Dist. LEXIS 59803 (D.D.C. Aug. 5, 2008) ............ 20

*Fed. Ins. Co. v. Richard I. Rubin & Co.*,
    12 F.3d 1270 (3d Cir. 1993) .................................................................................... 16

*Fed. Prescription Serv., Inc. v. Am. Pharm. Ass'n*,
    636 F.2d 755 (D.C. Cir. 1980) ................................................................................. 19

*First Nat'l City Bank v. Banco Para El Comercio Exterior de Cuba*,
    462 U.S. 611 (1983) ................................................................................... 2, 5, 12, 22

*Gambone v. Lite Rock Drywall*,
    288 F. App'x 9 (3d Cir. 2008) ................................................................................. 13

*Hilton v. Braunskill*,
    481 U.S. 770 (1987)...................................................................................................... 11

*IFC Interconsult, AG v. Safeguard Int'l Partners, LLC*,
    438 F.3d 298 (3d Cir. 2006) ......................................................................................... 13

*In re Diet Drugs*,
    582 F.3d 524 (3d Cir. 2009) ......................................................................................... 20

*In re Papandreou*,
    139 F.3d 247 (D.C. Cir. 1998) ..................................................................................... 12

*Landis v. North American Co.*,
    299 U.S. 248 (1936)...................................................................................................... 11

*Mamani v. Berzain*,
    No. 07-22459, 2010 U.S. Dist. LEXIS 147349 (S.D. Fla. Mar. 16, 2010)............................ 16

*Martinez v. Republic of Cuba*,
    No. 10-22095-CIV-MORE, 2011 U.S. Dist. LEXIS 160659 (S.D. Fla. June 27, 2011).......... 18

*Minard Run Oil Co. v. U.S. Forest Serv.*,
    670 F.3d 236 (3d Cir. 2011) ......................................................................................... 17

*Munoz v. City of Philadelphia*,
    537 F. Supp. 2d 749 (E.D. Pa. 2008) ........................................................................... 22

*Olympia Equip. Leasing Co. v. W. Union Tel. Co.*,
    786 F.2d 794 (7th Cir. 1986) ........................................................................ 22, 23, 24, 25

*Peacock v. Thomas*,
    516 U.S. 349 (1996)...................................................................................................... 13

*Republic of Philippines v. Pimentel*,
    553 U.S. 851 (2008)...................................................................................................... 15

*Revel AC, Inc. v. IDEA Boardwalk LLC (In re Revel AC, Inc.)*,
    802 F.3d 558 (3d Cir. 2015) ................................................................................. passim

*United States v. Indianapolis Baptist Temple*,
    No. 98-0498, 1999 U.S. Dist. LEXIS 19209 (S.D. Ind. Nov. 10, 1999) ................................ 20

*United States v. Moats*,
    961 F.2d 1198 (5th Cir. 1992) ...................................................................................... 16

*USA Gateway Travel, Inc. v. Gel Travel, Inc.*,
    No. C06-53JLR 2007 U.S. Dist. LEXIS 28986 (W.D. Wa. Apr. 5, 2007)............................. 20

*Venen v. Sweet*,
    758 F.2d 117 (3d Cir. 1985) ......................................................................................... 15

*Woodson v. Surgitek, Inc.*,
    57 F.3d 1406 (5th Cir. 1995) ........................................................................................ 12

**Statutes**

28 U.S.C. § 1603(b) ............................................................................................................ 2

28 U.S.C. § 1605 .................................................................................................................. 2

28 U.S.C. § 1610(a) ........................................................................................................... 1

31 U.S.C. § 9304 ............................................................................................................. 20

8 Del. C. § 324(c) ........................................................................................................... 15

**Regulations**

Exec. Order No. 13808, 82 Fed. Reg. 41,155 (Aug. 29, 2017) ......................................... 2, 15, 19

Exec. Order No. 13835, 83 Fed. Reg. 24,001 (May 24, 2018) ............................................... 2, 15

**Rules**

Fed. R. App. P. 8(b) ........................................................................................................ 20

Fed. R. Civ. P. 62(d) .......................................................................................... 4, 6, 16, 17

**Other Authorities**

U.S. Dept. of Treasury, OFAC, General License No. 2, Authorizing Certain Transactions
Involving CITGO Holding, Inc. (Aug. 25, 2017) ..................................................... 9

U.S. Dept. of Treasury, OFAC, General License No. 3, Authorizing Transactions Related
to, Provisions of Financing for, and other Dealings in Certain Bonds (Aug. 25, 2017) ............. 9

U.S. Dept. of Treasury, OFAC, General License No. 5, Authorizing Certain Transactions
Related to the Petroleos de Venezuela SA 2020 8.5 Percent Bond (July 19, 2018) .................. 9

U.S. Dept. of Treasury, OFAC, Other Sanctions Programs, *Venezuela Sanctions*, FAQ
No. 596 .................................................................................................... 2, 15

U.S. Dept. of Treasury, OFAC, Other Sanctions Programs: *Venezuela Sanctions*, FAQ
No. 511 ........................................................................................................ 20

Petróleos de Venezuela, S.A. ("PDVSA") respectfully submits this memorandum of law, in accordance with this Court's Memorandum Order of August 23, 2018 [D.I. 95] (the "August 23 Order"), in support of its motion to continue the unconditional stay of execution on the shares of PDV Holding, Inc. ("PDVH") pending final resolution by the U.S. Court of Appeals for the Third Circuit of PDVSA's appeal from this Court's August 9, 2018 Order [D.I. 78] ("August 9 Order"), which granted Crystallex International Corp.'s ("Crystallex") motion for a writ of attachment *fieri facias* and denied PDVSA's cross-motion to dismiss for lack of jurisdiction under the Foreign Sovereign Immunities Act ("FSIA").  By submitting this motion, PDVSA does not waive, and expressly preserves, its position that the filing of its Notice of Appeal [D.I. 80] divested this Court of jurisdiction to take any action with respect to PDVSA or its property pending final resolution of PDVSA's appeal by the Third Circuit.

## NATURE AND STAGE OF PROCEEDINGS

Crystallex commenced judgment enforcement proceedings against the Bolivarian Republic of Venezuela (the "Republic" or "Venezuela") in this Court by registering an out-of-district judgment on an international arbitration award rendered solely against the Republic.  In aid of executing on that judgment, Crystallex moved for an order authorizing a writ of attachment *fieri facias* to attach the shares of PDVH.  Pl's Mot., D.I. 2.  Crystallex's motion conceded that the PDVH shares "are wholly owned by" PDVSA, *id.* at 1, a legally distinct *sociedad anonima* formed under the laws of Venezuela and wholly owned by Venezuela.  But Crystallex argued that PDVSA's shares in PDVH are property of Venezuela subject to execution under the FSIA's exceptions to ***executional*** immunity, 28 U.S.C. § 1610(a), because PDVSA is the Republic's alter ego and because the shares are being used for a commercial activity in the United States.  Pl's Br. 25-26, D.I. 3-1.  Crystallex did not name or serve PDVSA, nor seek a money judgment against it.

PDVSA intervened to protect its assets and invoked its own immunity from suit as an undisputed "agency or instrumentality of a foreign state" under the FSIA, 28 U.S.C. § 1603(b). Because Crystallex's alter ego claim is untethered to any of the FSIA's exceptions to *jurisdictional* immunity, 28 U.S.C. § 1605, and because Crystallex did not name or properly serve PDVSA, PDVSA cross-moved to dismiss for lack of subject matter and personal jurisdiction under the FSIA.  PDVSA's Cross-Mot., D.I. 25; PDVSA's Br. 2-3, 9-13, D.I. 26. PDVSA also asked this Court to deny Crystallex's motion, because Crystallex cannot establish an alter ego relationship between Venezuela and PDVSA in the context of holding PDVSA liable for the Republic's expropriation of Crystallex's assets under *First Nat'l City Bank v. Banco Para El Comercio Exterior de Cuba*, 462 U.S. 611 (1983) ("*Bancec*"), and its progeny.  PDVSA's Br. 13-37, D.I. 26.  PDVSA also argued that the shares of PDVH are not attachable because they are not currently being used, and cannot be used, for any commercial activity within the meaning of the FSIA as a result of U.S. sanctions against Venezuela under Exec. Order No. 13808, 82 Fed. Reg. 41,155 (Aug. 29, 2017) ("E.O. 13808").  PDVSA's Br. 37-40, D.I. 26.  And, in any event, the PDVH shares are not attachable without a license, as clarified by FAQ No. 596, issued by the U.S. Treasury Department's Office of Foreign Assets Control ("OFAC") in connection with Exec. Order No. 13835, 83 Fed. Reg. 24,001 (May 24, 2018) ("E.O. 13835" and, together with E.O. 13808, the "Executive Orders"), and Crystallex has no such license.[1]  PDVSA's July 19, 2018 Ltr., D.I. 63; PDVSA's July 25, 2018 Ltr., D.I. 65; PDVSA's Aug. 2, 2018 Ltr., D.I. 65.

On August 9, 2018, this Court entered its Order denying PDVSA's cross-motion to dismiss for lack of subject matter jurisdiction under the FSIA, and granting Crystallex's motion for a writ authorizing the attachment of PDVSA's shares in PDVH (the "Writ").  August 9 Order

---

[1] U.S. Dept. of Treasury, OFAC, Other Sanctions Programs, *Venezuela Sanctions*, FAQ No. 596, https://www.treasury.gov/resource-center/faqs/Sanctions/Pages/faq_other.aspx#venezuela.

1, D.I. 78.  The Court directed Crystallex and PDVSA to, no later than August 16, 2018, submit

a joint status report setting forth their position(s) as to how the case should proceed, and directed

the Clerk of Court "**not** to issue the writ of attachment until after the Court issues an additional

Order following its review of the forthcoming status report."  *Id*. at 1-2 (emphasis in original).

No separate money judgment has been entered against PDVSA.

The following day, PDVSA filed a timely Notice of Appeal from the August 9 Order.

D.I. 80.[2]  On August 16, 2018, PDVSA and Crystallex submitted a joint status report in which

PDVSA asserted that, because the August 9 Order denies PDVSA's sovereign immunity, the

August 9 Order is an immediately appealable collateral order and thus the filing of PDVSA's

Notice of Appeal conferred exclusive jurisdiction over PDVSA and its property in the Third

Circuit and divested this Court of jurisdiction to take any further actions with respect to issuance

or enforcement of the Writ.  D.I. 86.  As such, PDVSA's position is that this case cannot proceed

in the District Court until final resolution of PDVSA's appeal by the Third Circuit.  *Id*. at 6-8.

For its part, Crystallex asked the Court to "direct the Clerk to issue the writ immediately," taking

the position that the August 9 Order is a "final appealable order" that the District Court "retains

the authority to enforce" unless it issues a stay.  *Id*. at 2.

On August 23, 2018, this Court issued its Order directing the Clerk of Court to issue

Crystallex's Praecipe and issue the Writ to the U.S. Marshals Service, and ordering the U.S.

Marshals Service to serve the Writ in furtherance of an eventual execution on PDVSA's shares

in PDVH through a sale.  D.I. 95.  In its August 23 Order, this Court agreed that "PDVSA is

correct that the Court no longer retains jurisdiction over the issues on appeal," namely whether

"PDVSA's sovereign immunities" under the FSIA "preclude the attachment and execution

---

[2] That appeal was docketed by the U.S. Court of Appeal for the Third Circuit on August 15, 2018.  *Crystallex Int'l Corp. v. Bolivarian Republic of Venezuela*, Case No. 18-2797 (3d Cir.).

sought by Crystallex." *Id*. at 3.  Nevertheless, it decided that, "notwithstanding PDVSA's filing of a Notice of Appeal, the Court retains authority to enforce the judgment that is currently on appeal." *Id*.  The Court stayed execution on the PDVH shares "until further Order" in order to provide itself "the opportunity to consider any additional motions," including a motion to stay under Rule 62(d) of the Federal Rules of Civil Procedure ("Rule 62(d)"), or any "other input any party, or any third party, wishes to provide."  August 23 Order 2, D.I. 95.  It set a briefing schedule pursuant to which a motion to stay would have to be filed no later than seven days after service of the Writ.  *Id*. at 2.  The Writ was issued the same day and subsequently served by the U.S. Marshals Service on August 24, 2018.  D.I. 96.

On August 24, 2018, to protect its position that this Court has been divested of jurisdiction as a result of PDVSA's appeal, PDVSA filed a petition for a writ of mandamus in the Third Circuit.[3]  PDVSA asked the Third Circuit to direct this Court to:  (i) vacate the August 23 Order, and (ii) acknowledge that it has been divested of jurisdiction with respect to PDVSA and its property, and refrain from any enforcement of its August 9 Order, pending final resolution of PDVSA's appeal.  Mandamus Pet. at 3.  The mandamus petition is still pending.

Without prejudice to its position that this Court has been divested of jurisdiction pending its appeal, and in compliance with the August 23 Order, PDVSA now moves, under Rule 62(d), for a continuation of the unconditional stay of execution on the PDVH shares.

## SUMMARY OF ARGUMENTS

1.      The circumstances of this case satisfy the Third Circuit's equitable test for granting a stay, namely assessing the movant's likelihood of success on appeal and balancing the potential harms of granting or denying a stay.

---

[3] The petition was docketed by the Third Circuit on August 27, 2018.  *In re Petroleos de Venezuela, S.A.*, Case No. 18-2889 (3d Cir.).

*First*, PDVSA meets the applicable likelihood of success standard.  U.S. Supreme Court and Third Circuit precedent, and the settled law of two other circuits, embrace PDVSA's position that this Court needed an independent basis of subject matter jurisdiction with respect to PDVSA and that an alter ego claim, untethered to any of the FSIA's exceptions to immunity, does not provide a sufficient basis for the Court's jurisdiction.  Moreover, no court has ever reverse-pierced the corporate veil of a well-established, state-owned company, such as PDVSA.  And the Court's decision finding that the *Bancec* presumption of separateness between a foreign state and its agency or instrumentality was overcome absent *any* evidence that the foreign state abused the agency or instrumentality's corporate form in a manner that resulted in harm to the plaintiff flies in the face of the overwhelming authority on this issue.  Even this Court acknowledged that the issue of its subject matter jurisdiction "is not free from doubt."  Opinion at 14, D.I. 83.

*Second*, the balance of harms firmly favors continuing the stay.  If execution on the PDVH shares is allowed to proceed before the Third Circuit finally resolves PDVSA's appeal, not only will PDVSA be stripped of its ownership rights in the PDVH shares, but the legal and practical value of PDVSA's immunity defense also will be forever destroyed.  There has never been a case in which a court has authorized a judgment creditor of a foreign state to execute directly against the assets of its agency or instrumentality on an alter ego theory before the agency or instrumentality had an opportunity to test its jurisdictional immunity defense on appeal.  In addition, CITGO Holding, Inc. ("CITGO Holding") and CITGO Petroleum Corporation ("CITGO" and, together with CITGO Holding, the "CITGO Entities"), as well as other third parties including U.S. creditors, consumers and workers, also will suffer irreparable harm absent a stay.  A sale of the PDVH shares would trigger a cascade of adverse events across various financing arrangements that could jeopardize the financial well-being of PDVSA and the

CITGO Entities and, as a result, have a significant negative impact on the value of the PDVH shares. Conversely, granting the stay does not put Crystallex in any greater disadvantage than it already faces because the Executive Orders operate as a restraint on the PDVH shares even without the Writ. The Writ acts as additional security for Crystallex.

2.       As a number of courts have held, a bond under Rule 62(d) is unnecessary because the Writ itself is sufficient security in lieu of a bond. Furthermore, the usual cost-benefit analysis used in deciding whether to waive a bond supports granting an unconditional stay where, as here, a bond is impracticable and inefficient. The Writ and Executive Orders already operate as a restraint on the PDVH shares. Although PDVSA is a large company with billions of dollars in assets, it is currently facing serious liquidity and credit restrictions. And, in light of the Executive Orders, securing additional financing for a bond or other security is legally impossible. Denying an unconditional stay – and proceeding with execution on the PDVH shares – would further risk PDVSA's and the CITGO Entities' financial stability and imperil the position of third-party creditors over a judgment for which this Court may lack jurisdiction. Granting an unconditional stay does not make Crystallex any worse off than it is today.

The more prudent and efficient course is to enter an unconditional stay until PDVSA's immunity and this Court's jurisdiction are conclusively determined.

## FACTUAL BACKGROUND

PDVSA is a large, state-owned enterprise. It owns 100% of the shares of PDVH, a Delaware corporation. And PDVH owns 100% of the shares of CITGO Holding, which in turn owns 100% of the shares of CITGO, a multibillion-dollar Delaware corporation headquartered in Texas and founded more than a century ago. Schmilinsky Decl. ¶ 13, D.I. 29. Relying upon its own balance sheet, PDVSA has entered into transactions with counterparties all over the world. Schmilinsky Decl. ¶ 12, D.I. 29; Montoya Decl. ¶¶ 28, 31-32, D.I. 28.

Those transactions encompass various financing arrangements that provide for default and termination events that could be triggered by a sale of more than 50% of the PDVH shares, setting off a cascade of adverse events that could jeopardize the financial well-being of PDVSA and the CITGO Entities and, as a result, have a significant negative impact on the value of the PDVH shares.  For instance, a sale of more than 50% of the PDVH shares could cause the acceleration of PDVSA's obligation to pay outstanding principal of up to US$2.85 billion plus accrued interest and premium under a series of 8.50% senior notes due 2020 ("PDVSA 2020 Notes"), and since such notes are secured by 50.1% of the shares of capital stock of CITGO Holding, result in foreclosure on 50.1% of the CITGO Holding shares.  Bayrock Decl. ¶¶ 7-8.[4]

Additionally, a sale of more than 50% of the PDVH shares would constitute a "Change of Control" under certain senior notes issued by CITGO Holding (the "CITGO Holding Notes") and CITGO (the "CITGO Notes"), which would trigger affirmative covenants requiring the CITGO Entities to offer to repurchase those notes.  Lack of timely compliance with such repurchase obligations may trigger acceleration of the notes.  If the CITGO Entities fail to repay the notes once they are accelerated, such failure may trigger foreclosure on substantially all of the assets of:  (i) CITGO Holding, including 100% of the shares of capital stock of CITGO, which are pledged to secure the CITGO Holding Notes; and (ii) CITGO, including the three refineries owned by CITGO, which are pledged to secure the CITGO Notes.  Id. ¶ 9.

These events would then trigger consequences under other financing agreements, the most serious being events of default and acceleration of PDVSA's obligation to pay aggregate outstanding principal of up to US$22.49 billion plus accrued interest and premium under eight series of unsecured senior notes issued by PDVSA (the "Unsecured PDVSA Notes").  Id. ¶ 10.

---

[4] References to "Bayrock Decl. ¶ _" are to the Declaration of David Bayrock executed on August 30, 2018 and filed contemporaneously with this motion.

In sum, and as described in more detail in the accompanying Bayrock Decl., the direct and indirect potential consequences of a sale of more than 50% of the shares of PDVH include, without limitation:

- Acceleration of payment obligations of PDVSA of more than $25 billion under the PDVSA 2020 Notes and the Unsecured PDVSA Notes;

- Foreclosure on 50.1% of the CITGO Holding shares pledged as collateral to the holders of the PDVSA 2020 Notes;

- Acceleration of payment obligations of CITGO Holding and CITGO of more than $2 billion under the senior notes issued by those entities; and

- Foreclosure on substantially all the assets of CITGO Holding and CITGO, including the three refineries owned by CITGO in Texas, Louisiana and Illinois.

Ultimately, because PDVH's only significant asset is its shares of capital stock of CITGO Holding, the acceleration of the obligations of the CITGO Entities to repay their financing facilities and the foreclosure on substantially all the assets of the CITGO Entities would result in a significant negative impact on the value of the PDVH shares.  *Id.* ¶¶ 11-12.

This snowball effect could avalanche into broader unintended consequences, especially if CITGO's ability to operate as a going concern is threatened.[5]  CITGO's oil supply reaches U.S. consumers and businesses every day at more than 5,000 gas stations across the country, including in Delaware.[6]  In 2015 alone, "CITGO supplied fifteen billion gallons of gasoline in

---

[5] Amy Myers Jaffe, *How Much Worse Can it Get for Venezuela's Oil Firm PDVSA?*, Council on Foreign Relations (Jan. 23, 2018), https://www.cfr.org/blog/how-much-worse-can-it-get-venezuelas-state-oil-firm-pdvsa.

[6] *See* CITGO Corporate Social Responsibility Report at 2 (2015), http://www.CITGO.com/SocialResponsibility.jsp; CITGO.com, *CITGO Gas Stations Nearest to You in Delaware*, http://gas-stations.CITGO.com/de.

the United States."[7]  CITGO also employs over 3,500 people in the United States, most of them at the three refineries in Texas, Louisiana and Illinois that are pledged as collateral for the CITGO Notes.[8]  U.S. government officials have expressed ongoing interest in CITGO's financial stability.  Accordingly, even though the U.S. Government has sanctioned Venezuela, it "has been reluctant to take action that could spill over to CITGO's ability to operate."[9]  In fact, the U.S. Treasury has issued three general licenses that specifically insulate the CITGO Entities from the effects of the sanctions.  General License No. 2 exempts financing transactions in which the only Venezuelan-owned entities involved are CITGO Holding and any of its subsidiaries.[10]  General License No. 3 exempts dealings in bonds that were issued both before E.O. 13808's effective date and by U.S. entities "owned or controlled, directly or indirectly," by Venezuela, which cover the CITGO Entities.[11]  Most recently, General License No. 5 exempted from E.O. 13835 all financing transactions and other dealings related to the PDVSA 2020 bonds, which are secured by 50.1% of the shares of CITGO Holding.[12]  In essence, the Executive Orders are

---

[7] Jaffe, *supra* note 5.

[8] *See* CITGO Corporate Social Responsibility Report, *supra* note 6, at 2, 5.

[9] Jaffe, *supra* note 5.  *See also* WHITE HOUSE, *Statement by the Press Secretary on New Financial Sanctions on Venezuela* (Aug. 25, 2017), https://www.whitehouse.gov/briefings-statements/statement-press-secretary-new-financial-sanctions-venezuela/; Marianna Parraga and Catherine Ngai, *Exclusive: Venezuela state oil firm's credit woes spread to U.S. unit Citgo*, REUTERS (Sept. 14, 2017), https://www.reuters.com/article/us-oil-citgo-pete-credit-exclusive/exclusive-venezuela-state-oil-firms-credit-woes-spread-to-u-s-unit-citgo-idUSKCN1BP2P2.

[10] U.S. Dept. of Treasury, OFAC, General License No. 2, Authorizing Certain Transactions Involving CITGO Holding, Inc. (Aug. 25, 2017), https://www.treasury.gov/resource-center/sanctions/Programs/Documents/venezuela_gl2.pdf.

[11] U.S. Dept. of Treasury, OFAC, General License No. 3, Authorizing Transactions Related to, Provisions of Financing for, and other Dealings in Certain Bonds (Aug. 25, 2017), https://www.treasury.gov/resource-center/sanctions/Programs/Documents/venezuela_gl3.pdf.

[12] U.S. Dept. of Treasury, OFAC, General License No. 5, Authorizing Certain Transactions Related to the Petroleos de Venezuela SA 2020 8.5 Percent Bond (July 19, 2018), https://www.treasury.gov/resource-center/sanctions/Programs/Documents/venezuela_gl5.pdf.

designed to avoid disruption of CITGO's operations.

## ARGUMENT

## I.     The Third Circuit's Test for Granting a Stay Favors PDVSA

Ordinary equitable considerations favor continuing the stay of execution on the PDVH

shares pending PDVSA's appeal from this Court's denial of its sovereign immunity.  A district

court has the inherent power to stay proceedings at any stage of the litigation "with economy of

time and effort for itself, for counsel, and for litigants."  *Bechtel Corp. v. Laborers' Int'l Union*,

544 F.2d 1207, 1215 (3d Cir. 1976) (quoting *Landis v. N. Am.Co.*, 299 U.S. 248, 254-55 (1936)).

Four factors inform a court's decision to grant or deny a stay pending appeal:

> (1) whether the stay applicant has made a strong showing that [it]
> is likely to succeed on the merits; (2) whether the applicant will be
> irreparably injured absent a stay; (3) whether issuance of the stay
> will substantially injure the other parties interested in the
> proceeding; and (4) where the public interest lies.

*Revel AC, Inc. v. IDEA Boardwalk LLC (In re Revel AC, Inc.)*, 802 F.3d 558, 568 (3d Cir. 2015)

(Ambro, J.) (reversing the district court's denial of a stay of an order authorizing the sale of

property pending appeal) (quoting *Hilton v. Braunskill*, 481 U.S. 770, 776 (1987)) (alteration

supplied).

Courts in the Third Circuit follow a "sliding scale approach" in which "the first two

factors are the most critical."  *Id.* at 570.  Once the movant satisfies the first two factors, courts

balance them against the risk of harm to opposing parties.  *Id.* at 569.  The higher the movant's

odds of success, "the less heavily the balance of harms must weigh in its favor, and vice versa."

*Id.* at 570.  Lastly, courts assess the public interest – "in effect, how a stay decision has

consequences beyond the immediate parties."  *Id.* at 569 (internal quotation marks omitted).

"But depending on how strong a case the stay movant has on the merits, a stay is permissible

even if the balance of harms and public interest weigh against holding a ruling in abeyance pending appeal." *Id*. at 571.[13]

### A.      <u>PDVSA Meets the Likelihood of Success Standard</u>

To satisfy the first factor, PDVSA is "required to show, at a minimum, serious questions going to the merits," but it need only establish that its odds of winning are "significantly better than negligible but not greater than 50%." *Revel*, 802 F.3d at 570, 571 (internal quotations omitted). PDVSA's appeal raises "serious questions" going to more than just the merits of Crystallex's alter ego claim; it implicates this Court's subject matter jurisdiction, as well as international comity concerns underlying foreign sovereign immunity. *See Bancec*, 462 U.S. at 626-27 ("Due respect for the actions taken by foreign sovereigns and for principles of comity between nations leads us to conclude . . . that government instrumentalities established as juridical entities distinct and independent from their sovereign should normally be treated as such. We find support for this conclusion in the legislative history of the Foreign Sovereign Immunities Act.") (internal citation omitted).

Furthermore, PDVSA's chance of success is "significantly better than negligible," and at least fifty percent. *Revel*, 802 F.3d. at 571. As this Court acknowledged in its Opinion denying PDVSA's motion to dismiss: "PDVSA is a presumptively separate sovereign instrumentality that is entitled to . . . invoke its own sovereign immunity, and is presumptively immune from the court['s] subject matter jurisdiction, presumptively separate from Venezuela, and its property is presumptively immune from attachment and execution." Opinion at 75, D.I. 83; *see also EM Ltd. v. Banco Cent. De La Republica Argentina*, 800 F.3d 78, 89, 90 (2d Cir. 2015) ("<u>EML</u>").

---

[13] A district court also has the power to stay proceedings "while a petition for mandamus relief is pending." *Woodson v. Surgitek*, 57 F.3d 1406, 1416 (5th Cir. 1995). *Cf. In re Papandreou*, 139 F.3d 247, 256 (D.C. Cir. 1998) (granting mandamus relief to protect a foreign state's jurisdictional immunity).

Although PDVSA's core jurisdictional argument is a matter of first impression in the Third Circuit, it is based on the settled law of the Second and Eleventh Circuits: U.S. courts lack jurisdiction over a foreign state's agency or instrumentality for an alter ego claim that does not independently satisfy any of the FSIA's exceptions to jurisdictional immunity. *Butler v. Sukhoi Co.*, 579 F.3d 1309, 1313 (11th Cir. 2009); *EML*, 800 F.3d at 96 n. 86. PDVSA's argument is further bolstered by the U.S. Supreme Court's decision in *Peacock v. Thomas*, 516 U.S. 349 (1996), and its progeny, which hold that a federal court must have an independent basis of subject matter jurisdiction over an alter ego claim where, as here, a judgment creditor seeks to enforce its judgment against the legitimately held assets of a third party that is not otherwise liable on the judgment. *See Gambone v. Lite Rock Drywall*, 288 F. App'x 9, 12 (3d Cir. 2008); *IFC Interconsult, AG v. Safeguard Int'l Partners, LLC*, 438 F.3d 298, 312 (3d Cir. 2006).

Moreover, no court has ever reverse-pierced the veil of a well-established, state-owned company, such as PDVSA. And the Court's decision finding that the presumption of separateness to which a foreign state's agency or instrumentality is entitled under *Bancec* was overcome absent *any* evidence that the foreign state abused the agency or instrumentality's corporate form in a manner that resulted in harm to the plaintiff is contrary to the overwhelming authority on this issue. *See* Opinion at 34, D.I. 83 ("Everything Crystallex alleges that Venezuela did to harm Crystallex could have been done – and, indeed, was alleged to have been done – by Venezuela itself, regardless of whether PDVSA even existed."). Indeed, even in the non-sovereign, corporate context, the law is clear that alter ego liability applies *only* in the rare circumstance where the corporate form is abused to perpetrate a fraud against the plaintiff. *See* PDVSA's Br. at 16-17, D.I. 26.

Considering the unprecedented nature of its decision, the Court aptly noted that jurisdiction over this case "is not free from doubt."  Opinion at 14, D.I. 83.  Under these circumstances, PDVSA's odds of winning on appeal are certainly better than negligible.  *Cf. Doe v. Boyertown Area Sch. Dist.*, 897 F.3d 518, 2018 U.S. App. LEXIS 20792, at *21, 24, 33-34 (3d Cir. 2018) (McKee, J.) (defendants were likely to prevail where the law of at least two other circuits and the Supreme Court favored their position, and "no court ha[d] ever" recognized the right plaintiffs were asserting).  Maintaining an unconditional stay pending appeal is warranted here.  *See Cayuga Indian Nation of N.Y. v. Pataki*, 188 F. Supp. 2d 223, 253 (N.D.N.Y. 2002) (staying enforcement where the court had "ruled on an admittedly difficult legal question and when the equities of the case suggest that the status quo be maintained") (internal quotations and citation omitted).  The first factor militates in favor of a stay.

## B.    Absent a Stay, PDVSA Will Be Irreparably Harmed

For the second factor, PDVSA must identify an "actual and imminent" injury, one "that cannot be prevented or fully rectified by a successful appeal."  *Revel*, 802 F.3d. at 568, 571 (internal quotations and citation omitted).  But "the alleged harm need not be occurring or be certain before a court may grant relief."  *Id*. at 569 (internal quotations and citation omitted).  Rather, PDVSA need only "demonstrate that irreparable injury is *likely*," meaning that it is "more apt to occur than not."  *Id.* at 569 (emphasis in original).

If PDVSA's immunity is vindicated on appeal, the Writ will be void *ab initio*.  *Cf. Venen v. Sweet*, 758 F.2d 117, 123 (3d Cir. 1985).  However, if execution is not stayed pending appeal, PDVSA will have lost its property and been irreparably injured as a result of the irreversible deprivation of its sovereign immunity.  *See Bolivarian Republic of Venezuela v. Helmerich & Payne Int'l Drilling Co.*, 137 S. Ct. 1312, 1317 (2017) ("foreign sovereign immunity's basic objective" is "to free a foreign sovereign from *suit*") (emphasis supplied); *Republic of*

*Philippines v. Pimentel*, 553 U.S. 851, 865 (2008) (FSIA immunity "is designed to give foreign

states and their instrumentalities some protection from the inconvenience of suit") (internal

quotations and citation omitted); *Fed. Ins. Co. v. Richard I. Rubin & Co.*, 12 F.3d 1270, 1281-82

(3d Cir. 1993) (the "legal and practical value" of sovereign immunity would be "destroy[ed]" if a

case were allowed to proceed in the district court pending a foreign state's appeal from the denial

of its immunity); *EML*, 800 F.3d at 88 & n. 45, 98 ("it would be inconsistent with the underlying

purpose of the foreign-sovereign-immunity doctrine to subject [an agency or instrumentality of

Argentina] to further burdensome litigation" before determining "conclusively" whether it was

immune from an alter ego claim); *Blue Ridge Invs., L.L.C. v. Republic of Argentina*, 735 F.3d 72,

80 (2d Cir. 2013); *United States v. Moats*, 961 F.2d 1198, 1201, 1203 (5th Cir. 1992) (enforcing

a judgment before an FSIA appeal would lead to "extraordinary harm" and "irreparable loss").[14]

Moreover, proceeding with the sale of PDVSA's shares in PDVH could set off a cascade

of adverse events that could jeopardize the financial well-being of PDVSA and the CITGO

Entities and have a significant negative impact on the value of the PDVH shares.  *See* Bayrock

Decl. ¶¶ 7-12.  Although "a purely economic injury, compensable in money, cannot satisfy the

irreparable injury requirement," the Third Circuit has carved out an exception "where the

potential economic loss is so great as to threaten the existence of the movant's business."  *Revel*,

802 F.3d at 572 (quoting *Minard Run Oil Co. v. U.S. Forest Serv.*, 670 F.3d 236, 255 (3d Cir.

2011) (granting preliminary injunction, finding that a "moratorium on new drilling irreparably

harmed appellees because it infringed their property rights and threatened bankruptcy or closure

---

[14] For this reason, out of an abundance of caution, other courts have entered unconditional stays
pending an appeal of an FSIA immunity determination. *See, e.g.*, *Abur v. Republic of Sudan*,
437 F. Supp. 2d 166, 170 (D.D.C. 2006); *see also Mamani v. Berzain*, No. 07-22459, 2010 U.S.
Dist. LEXIS 147349, at *8 (S.D. Fla. Mar. 16, 2010); *Beaty v. Republic of Iraq*, No. 03-0215
(JDB), 2007 U.S. Dist. LEXIS 28950, at *5-7 (D.D.C. Apr. 19, 2007).

for some businesses")).  Against the backdrop of PDVSA's appeal from the denial of its

sovereign immunity, the threat to PDVSA and the CITGO Entities and, as a result, the value of

the PDVH shares becomes an even more palpable injury.  The second factor weighs heavily in

favor of maintaining proceedings in abeyance.

### C.   A Stay Does Not Irreparably or Substantially Harm Other Parties

Given the strength of PDVSA's case on the merits, and the fact that it is likely to suffer

irreparable harm absent a stay, "a stay is permissible even if the balance of harms and public

interest weight against" it.  *Revel*, 802 F.3d at 571.  Nonetheless, on the third factor, Crystallex

would not suffer "irreparable" or "substantial" harm from preserving the status quo.  *Id.* at 568,

575.  The PDVH shares are located in Delaware, and they are not going anywhere.  The Writ

prohibits their disposition, and the Executive Orders operate as a restraint by prohibiting PDVSA

from receiving dividends or transferring the shares.  Thus, a stay does not set Crystallex back any

further than where it finds itself today.

Nor does enforcing the Writ improve the state of play for Crystallex.  Indeed, the Writ

could set off a series of adverse events that would bring competing claims against PDVSA's and

PDVH's assets.  Moreover, as this Court has recognized, the only real option for executing on

the PDVH shares is through a sale.  August 23 Order 5, D.I. 95; *see also* 8 Del. C. § 324(c).  Yet,

under the Executive Orders, as Crystallex has conceded, a sale of the PDVH shares cannot occur,

including through judicial process, until OFAC has specifically licensed such a transaction.  Pl's

July 24, 2018 Ltr. 2, D.I. 72.  *See* E.O. 13808 § 1(b)-(c); E.O. 13835 § 1(a)(iii), (b); OFAC FAQ

No. 596.  *See also Martinez v. Republic of Cuba*, No. 10-cv-22095, 2011 U.S. Dist. LEXIS

160659, at *22 (S.D. Fla. June 27, 2011) (vacating garnishment order where the garnishor lacked

an OFAC license as required to attach assets of Cuba and its nationals).  Crystallex has presented

no such license.

Accordingly, a stay does not put Crystallex at any greater disadvantage than it currently

faces, but permitting enforcement would irreversibly injure PDVSA.  *See Revel*, 802 F.3d at 572-

73 (balancing the harms in favor of the movant where its injury was "virtually guaranteed," and

the opponent's alleged harm was "at best speculative").  The third factor therefore also supports

granting the stay.

### D.    The Public Interest Favors a Stay

The fourth factor "balances the benefits and harms to the public if a stay is imposed and

if it is not."  *Id.* at 572.  The Third Circuit has found that "the public certainly has an interest in

saving jobs," and that "public policy strongly favors" the correct application of the law

"especially where property rights are at stake."  *Id*. at 573.  This analysis pits the rights of a

single company, Crystallex, against the interests of numerous other creditors and thousands of

U.S. consumers and workers.  Granting a stay preserves the status quo for all interested parties.

But denying a stay has the real possibility of opening Pandora's box, especially with respect to

CITGO's financial and operational stability.  An unnecessary disruption in CITGO's operations

could cause broader economic harms, including job losses in communities across the United

States.  Accordingly, U.S. government officials have expressed ongoing concern over CITGO's

financial stability amidst PDVSA's broader hardships.

Thus, all four factors weigh in favor of staying proceedings pending appeal.

## II.    Imposing a Bond under Federal Rule 62(d) Is Unnecessary and Inefficient

Rule 62(d) guarantees a stay pending appeal from a money judgment upon posting a

bond.[15]  It "does not limit the district court's power to issue unsecured stays through an exercise

---

[15] The rule states: "If an appeal is taken, the appellant may obtain a stay by supersedeas bond, except in an action described in Rule 62(a)(1) or (2). The bond may be given upon or after filing the notice of appeal or after obtaining the order allowing the appeal. The stay takes effect when the court approves the bond." Fed. R. Civ. P. 62(d).  Rule 62(d) is not usually implicated in

of its sound discretion." *Fed. Prescription Serv., Inc. v. Am. Pharm. Ass'n*, 636 F.2d 755, 760

(D.C. Cir. 1980) (cited by *In re Diet Drugs*, 582 F.3d 524, 552 (3d Cir. 2009)).

Where, as here, a court has issued a writ of attachment, the attached property provides the

same functional security as a supersedeas bond and a bond is not necessary.  *See, e.g.*, *ASARCO*

*LLC v. Ams. Mining Corp.*, 419 B.R. 737, 745 (S.D. Tex. 2009) (accepting shares of sufficient

value to satisfy the judgment in an escrow account in lieu of a supersedeas bond); *Fastov v.*

*Christie's Int'l P.L.C.*, No. 97-0578 (PLF), 2008 U.S. Dist. LEXIS 59803, at *2-4 (D.D.C. Aug.

7, 2008) (writ of attachment on a bank account eliminated the need for a bond); *USA Gateway*

*Travel, Inc. v. Gel Travel, Inc.*, No. C06-53JLR, 2007 U.S. Dist. LEXIS 28986, at *4-5 (W.D.

Wa. Apr. 5, 2007) (reducing the amount of the bond to account for the value of the attached

property); *United States v. Indianapolis Baptist Temple*, No. 98-0498, 1999 U.S. Dist. LEXIS

19209 (S.D. Ind. Nov. 10, 1999) (approving real property as alternate security where the

judgment creditor already held a tax lien on the property); *C. Albert Sauter Co. v. Richard S.*

*Sauter Co.*, 368 F. Supp. 501 (E.D. Pa. 1973) (approving an alternate security interest in the form

of a deposit of shares of stock); *cf. Ascher v. Gutierrez*, 66 F.R.D. 548, 549 (D.D.C. 1975)

(noting that a supersedeas bond's purpose is to "preserve the status quo," rendering an

antecedent levy like a writ of attachment superfluous).  Even without the Writ, Crystallex has

adequate security because the Executive Orders operate as a restraint on the PDVH shares,

providing Crystallex with sufficient protection during the pendency of PDVSA's appeal.  A bond

is thus unnecessary.

---

granting stays during appeals from decisions abrogating a foreign state's immunity from suit.
Those appeals typically occur before a court enters an enforceable judgment or orders attachment
and execution of a sovereign's property. *See supra* 13-14.

Moreover, the cost-benefit analysis used under Rule 62(d) for deciding whether to waive the requirement of a supersedeas bond favors PDVSA.  Although the Third Circuit has not yet addressed the relevant considerations, other circuits and district courts within this circuit use the following criteria:

> (1) the complexity of the collection process; (2) the amount of time required to obtain a judgment after it is affirmed on appeal; (3) the degree of confidence that the district court has in the availability of funds to pay the judgment . . . ; (4) whether the defendant's ability to pay the judgment is so plain that the cost of a bond would be a waste of money . . . ; and (5) whether the defendant is in such a precarious financial situation that the requirement to post a bond would place other creditors of the defendant in an insecure position.

*Munoz v. City of Philadelphia*, 537 F. Supp. 2d 749, 751 (E.D. Pa. 2008) (quoting *Dillon v. City of Chicago*, 866 F.2d 902, 904-05 (7th Cir. 1988)) (finding abuse of discretion in the district court's decision to deny an unbonded stay) (ellipses supplied) (internal quotations omitted), *reversed on other grounds*, 346 F. App'x 766 (3d Cir. 2009).  A court need not find that all criteria favor the movant; sufficient grounds exist for waiving the bond "where the requirement would put the defendant's other creditors in undue jeopardy."  *Olympia Equip. Leasing Co. v. W. Union Tel. Co.*, 786 F.2d 794, 796 (7th Cir. 1986) (Posner, J.).[16]

*Olympia* is instructive even though it did not implicate the heightened protections afforded to a sovereign appealing from a denial of jurisdictional immunity.  Olympia obtained a sizeable judgment against Western Union Telegraph ("WUT"), a "large company" that was "financially distressed and illiquid" despite having assets worth billions of dollars.  *Id.* at 796.  WUT could not obtain a bond without a letter of credit, and it contended that no bank was

---

[16] Balancing the interests of third-party creditors is also consistent with *Bancec*.  *See* 462 U.S. at 626 (warning against "[f]reely ignoring the separate status of government instrumentalities" to make their assets available "to satisfy a claim against the sovereign," because it could cause third parties to "hesitate before extending credit" to state-owned enterprises).

willing to undertake the economic risk.  The district court waived the bond and accepted other

security in the form of pledged assets to stay enforcement.  Olympia appealed the stay, arguing

that a bond was mandatory and that the alternative security was inadequate because it was worth

less than the judgment.  *Id*.

The Seventh Circuit disagreed.  Judge Posner first explained that it was "reasonably

clear" that the bond could only be obtained with a letter of credit.  *Id*.  And even though some

bank might have been willing to undertake the risk for a premium, Olympia had not shown that

"this was a realistic possibility here."  *Id*. at 796-97.  Thus, the court affirmed the decision to

waive the bond.  Next, the Seventh Circuit endorsed the district court's approach in accepting

alternative security insofar as it had balanced the interest of the judgment creditor against the

interests of other unsecured creditors, who would have found themselves in a "perilous" position

if WUT had been forced to pledge more assets.  *Id*. at 798.  The need for balance is evident in

cases where the judgment creditor's claim is "contingent" on the outcome of an appeal.  *Id*.  That

reasoning is even more compelling, the court added, where allowing execution before resolution

of the appeal "might not even increase the probability of the plaintiff's collecting the judgment,"

since an attempt to execute on certain assets would "so interfere with [WUT's] business or so

jeopardize the collectability of other creditors' claims" that the plaintiff's ability to collect would

be frustrated as well.  *Id*. at 799.  The court found that the pledged assets were sufficient security.

Both of the conditions identified in *Olympia* are satisfied here.  The Writ itself is more

than enough security in lieu of a bond.  Requiring a bond in addition to the Writ "would be a

waste of money."  *Id.* at 796.  Also, the costs of requiring a bond or authorizing execution

pending appeal outweigh any benefits of denying an unconditional stay.  Like the judgment

debtor in *Olympia*, PDVSA is a large enterprise, but it is currently facing liquidity issues and

other difficulties.  Even assuming PDVSA could afford a bond – even though it is "reasonably clear" that it cannot (*id.*) – OFAC sanctions prevent it from obtaining a bond as a matter of law. Subsection 1(a)(i) of E.O. 13808 prohibits any U.S. person or anyone within the United States from engaging in any financing transactions involving "new debt" of PDVSA "with a maturity of greater than 90 days."  According to FAQ No. 511, that includes any "bonds, loans, extensions of credit, loan guarantees, letters of credit, drafts, bankers acceptances, discount notes or bills, or commercial paper."[17]  No bank or bonding company would or could take that risk.  *See* 31 U.S.C. § 9304 (bond surety must be a U.S. person); Fed. R. App. P. 8(b) (bond surety must submit to jurisdiction of U.S. court).

Furthermore, as in *Olympia*, executing on the PDVH shares pending appeal does not improve Crystallex's position, but rather imperils third parties.  Allowing execution on the PDVH shares could set off a cascade of adverse events under various financing arrangements of PDVSA and the CITGO Entities, possibly prompting their creditors to demand payment in full and to foreclose on the CITGO Holding shares, the CITGO shares, and substantially all of CITGO's assets, including its three refineries.  It "would be a painful irony" to jeopardize "other creditors' claims merely to remove every element of hazard from [Crystallex's] claim," which may not even survive on appeal.  *Olympia*, 786 F.2d at 798.  In sum, where PDVSA's immunity is at stake and the Writ provides more than enough security, the most prudent and efficient course is to preserve the status quo pending appeal.

## **CONCLUSION**

For the foregoing reasons, this Court should grant PDVSA's motion for a continuance of the unconditional stay pending appeal.

---

[17]  U.S. Dept. of Treasury, OFAC, Other Sanctions Programs: *Venezuela Sanctions*, FAQ No. 511, https://www.treasury.gov/resource-center/faqs/Sanctions/Pages/faq_other.aspx#venezuela.

Respectfully Submitted,


HEYMAN ENERIO GATTUSO & HIRZEL LLP

*/s/ Samuel T. Hirzel*

OF COUNSEL:

Joseph D. Pizzurro
Julia B. Mosse
Kevin A. Meehan
Juan O. Perla

CURTIS, MALLET-PREVOST,
COLT & MOSLE LLP
101 Park Avenue
New York, NY 10178
(212) 696-6000
jpizzurro@curtis.com
jmosse@curtis.com
kmeehan@curtis.com
jperla@curtis.com


Dated: August 31, 2018

Samuel T. Hirzel, II (#4415)
300 Delaware Avenue, Suite 200
Wilmington, DE 19801
(302) 472-7300
SHirzel@hegh.law

*Attorneys for Intervenor*
*Petróleos de Venezuela, S.A*