IN THE UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF DELAWARE

CRYSTALLEX INTERNATIONAL
CORPORATION,

Plaintiff,

v.

BOLIVARIAN REPUBLIC OF VENEZUELA,

Defendant.

C.A. No. 17-mc-00151-LPS

## CRYSTALLEX'S OPPOSITION TO MOTIONS TO INTERVENE AND FOR STAY PENDING APPEAL

OF COUNSEL:

Robert L. Weigel
Jason W. Myatt
Rahim Moloo
GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue
New York, New York 10166
Tel: (212) 351-4000
Fax: (212) 351-4035

Raymond J. DiCamillo (#3188)
Jeffrey L. Moyer (#3309)
Travis S. Hunter (#5350)
RICHARDS, LAYTON & FINGER, P.A.
One Rodney Square
920 North King Street
Wilmington, Delaware 19801
Tel: (302) 651-7700
Fax: (302) 651-7701
dicamillo@rlf.com
moyer@rlf.com
hunter@rlf.com

*Attorneys for Plaintiff*

Dated: September 14, 2018

**TABLE OF CONTENTS**

Page

INTRODUCTION ................................................................................................... 1

NATURE AND STAGE OF THE PROCEEDINGS ............................................... 2

SUMMARY OF ARGUMENT ............................................................................... 4

STATEMENT OF FACTS ...................................................................................... 7

I.    Venezuela And PDVSA Engage in Fraudulent Transfers To Frustrate Crystallex's
      Efforts To Enforce Its Arbitration Award ....................................................... 7

II.   The Current Proceedings ................................................................................. 10

ARGUMENT .......................................................................................................... 11

I.    Absent A Bond, There Is No Reason To Stay Execution Pending Appeal .... 11

      A.    The Third Circuit's Four-Factor Test Balances Against Granting a Stay ........... 11

            1.    PDVSA Has Not Demonstrated A Likelihood of Success On the
                  Merits ..................................................................................... 12

            2.    PDVSA and The Proposed Intervenors Have Failed to Show That
                  They Will Suffer Irreparable Harm ......................................... 16

            3.    Issuance of the Stay Will Substantially Injure Crystallex ....... 21

            4.    Public Interest Weighs Against Granting a Stay ..................... 23

      B.    PDVSA Must Post a Full Bond In Order to Continue The Stay of
            Execution ................................................................................ 24

II.   The Proposed Intervenors Have No Right To Intervene ............................... 29

      A.    The Motions To Intervene Are Untimely ........................................... 30

      B.    None Of The Proposed Intervenors Has Demonstrated A Protectable
            Interest In The Litigation ................................................................ 34

      C.    The Proposed Intervenors' Purported Interests Will Not Be Impaired By
            The Execution Of This Court's Judgment ........................................ 36

      D.    The Proposed Intervenors Interests (If Any) Are Adequately Represented
            By PDVSA And Crystallex .............................................................. 38

# TABLE OF CONTENTS
(continued)

Page

III.    This Court Should Deny The Motions For Permissive Intervention .............................. 38

CONCLUSION ..................................................................................................................... 40

# TABLE OF AUTHORITIES

Page(s)

## Cases

*7-Eleven, Inc. v. Sodhi*,
   2017 WL 466514 (D.N.J. Jan. 31, 2017) ............................................................... 19

*767 Third Ave. Assocs. v. Permanent Mission of Rep. of Zaire to United Nations*,
   787 F. Supp. 389 (S.D.N.Y. 1992) ......................................................................... 13

*Am. Civil Liberties Union Fund of Michigan v. Livingston Cty.*,
   2014 WL 12662064 (E.D. Mich. May 27, 2014) .................................................... 14

*Anthony v. Indep. Ins. Advisors, Inc.*,
   2012 WL 1313413 (V.I. Apr. 2, 2012) ............................................................. 30, 31

*Arlington Indus., Inc. v. Bridgeport Fittings, Inc.*,
   2013 WL 5937342 (M.D. Pa. Nov. 4, 2013) .......................................................... 23

*ASARCO LLC v. Ams. Mining Corp.*,
   419 B.R. 737 (S.D. Tex. 2009) ............................................................................... 26

*Atl. Props. Grp., Inc. v. Deibler*,
   1994 WL 45433 (Del. Super. Ct. Jan. 6, 1994), *aff'd*, 652 A.2d 553 (Del.
   1995) ....................................................................................................................... 22

*Baker v. Socialist People's Libyan Arab Jamahirya*,
   810 F. Supp. 2d 90 (D.D.C. 2011) ............................................................. 12, 16, 20

*C. Albert Sauter Co. v. Richard S. Sauter Co.*,
   368 F. Supp. 501 (E.D. Pa. 1973) .......................................................................... 26

*In re Chemed Corp. S'holder Derivative Litig.*,
   2017 WL 1712530, (D. Del. Apr. 25, 2017) ........................................................... 36

*Choike v. Slippery Rock Univ. of Pennsylvania of State Sys. of Higher Educ.*,
   297 F. App'x 138 (3d Cir. 2008) ....................................................................... 31, 33

*Church & Dwight Co. v. SPD Swiss Precision Diagnostics, GmbH*,
   2015 WL 5051769, (S.D.N.Y. Aug. 26, 2015), *aff'd*, 836 F.3d 153 (2d Cir.
   2016), and *aff'd*, 843 F.3d 48 (2d Cir. 2016) ........................................................ 18

*Citibank, N.A. v. Nyland (CF8) Ltd.*,
   705 F. Supp. 188 (S.D.N.Y. 1989) ......................................................................... 20

*In re Color Spot Holdings*,
   2018 WL 3996938 (D. Del. Aug. 21, 2018) ........................................................... 16

*Comm'rs Freedman's Sav. & Tr. Co. v. Earle*,
   110 U.S. 710 (1884) ................................................................................................ 23

**TABLE OF AUTHORITIES**
*(continued)*

Page(s)

*In re Commonwealth Renewable Energy, Inc.*,
    2016 WL 1238199 (Bankr. W.D. Pa. Feb. 10, 2016) ............................................................14

*Cottillion v. United Ref. Co.*,
    2014 WL 7344005 (W.D. Pa. Dec. 23, 2014).........................................................................23

*Crystallex Int'l Corp. v. Bolivarian Republic of Venezuela*,
    1:16-cv-00661-RC (D.D.C. Aug. 8, 2017) .......................................................................5, 29

*Crystallex Int'l Corp. v. Bolivarian Republic of Venezuela*,
    Case No. 18-2797, Dkt. 003113020904 (3d Cir. Aug. 29, 2018)...........................................13

*Crystallex Int'l Corp. v. Petróleos de Venezuela*,
    15-CV-01082-LPS (D. Del. Nov. 23, 2015) ("*Crystallex I*").............................................8, 21

*Crystallex Int'l Corp. v. PDV Holding, Inc.*,
    16-CV-01007-LPS (D. Del. Oct. 28, 2016) ("*Crystallex II*").........................................8, 9, 21

*Crystallex Int'l Corp. v. Petróleos de Venezuela, S.A.*,
    879 F.3d 79 (3d Cir. 2018)..............................................................................................1, 8, 21

*In re Culp*,
    550 B.R. 683 (D. Del. 2015)...................................................................................................16

*De Csepel v. Republic of Hungary*,
    2011 WL 13244741 (D.D.C. Nov. 30, 2011) ........................................................................13

*Del. Vall. Citizens' Council for Clean Air v. Pennsylvania*,
    674 F.2d 970 (3d Cir. 1982)...................................................................................................40

*In re Diet Drugs*,
    582 F.3d 524 (3d Cir. 2009)...................................................................................................25

*District Title v. Warren*,
    2015 WL 12964656 (D.D.C. Jan. 9, 2015)............................................................................12

*Doroshow, Pasquale, Krawitz & Bhaya v. Nanticoke Mem'l Hosp., Inc.*,
    36 A.3d 336 (Del. 2012) ........................................................................................................23

*Edwards v. City of Houston*,
    37 F.3d (5th Cir. 1994), *on reh'g en banc*, 78 F.3d 983 (5th Cir. 1996) ...............................30

*Enron Nigeria Power Holding, Ltd. v. Federal Rep. of Nigeria*,
    70 F. Supp. 3d 457 (D.D.C. 2014) .........................................................................................20

# TABLE OF AUTHORITIES

*(continued)*

Page(s)

*Fastov v. Christie's Int'l P.L.C.,*
2008 WL 3200733 (D.D.C. Aug. 7, 2008) ...........................................................................26

*Fed. Election Comm'n v. O'Donnell,*
2017 WL 2200911 (D. Del. May 19, 2017)............................................................................24

*Fed. Ins. Co. v. Richard I. Rubin & Co.,*
12 F.3d 1270 (3d. Cir. 1993)...................................................................................15, 20

*In re Fine Paper Antitrust Litig.,*
695 F.2d 494 (3d Cir. 1982)...................................................................................31

*Gambone v. Lite Rock Drywall,*
288 Fed. App'x 9 (3d Cir. 2008).............................................................................15

*Gates v. Texaco, Inc.,*
2008 WL 1952162 (Del. Super. Ct. May 2, 2008) ................................................25

*Getty Oil Co. v. Dep't of Energy,*
117 F.R.D. 540 (D. Del. 1987) ...........................................................................39, 40

*Griffin v. Harrington,*
2013 WL 3873958 (C.D. Cal. Jan. 18, 2013) .......................................................14

*Harris v. Pernsley,*
820 F.2d 592 (3d Cir. 1987)....................................................................................30

*Hilton v. Braunskill,*
481 U.S. 770 (1987)................................................................................................12

*Horsey v. Stockley,*
4 Del. Ch. 536 (1872) .............................................................................................22

*IFC Interconsult, AG v. Safeguard Int'l Partners, LLC,*
438 F.3d 298 (3d Cir. 2006)....................................................................................15

*In Gusdonovich v. Bus. Info. Co.,*
119 F.R.D. 15 (W.D. Pa. 1987) ..............................................................................17

*In re Karaha Bodas Co., L.L.C.,*
2002 WL 1401693 (D. Del. June 27, 2002), *order clarified,* 2002 WL
1585913 (D. Del. July 18, 2002)............................................................................25

*Kleissler v. U.S. Forest Serv.,*
157 F.3d 964 (3d Cir. 1998).....................................................................................34

# TABLE OF AUTHORITIES
*(continued)*

Page(s)

*Lech v. Jackson,*
2018 WL 2183984 (D. Colo. May 10, 2018)..........................................................28

*Liberty Mut. Ins. Co. v. Pac. Indem. Co.,*
76 F.R.D. 656 (W.D. Pa. 1977) ...........................................................................34

*Liberty Mut. Ins. Co. v. Treesdale, Inc.,*
419 F.3d 216 (3d Cir. 2005)..................................................................................34

*Michigan v. Bay Mills Indian Cmty.,*
2011 WL 13186011 (W.D. Mich. Apr. 14, 2011) ................................................19

*Montalvo v. Larchmont Farms, Inc.,*
2011 WL 6303247 (D.N.J. Dec. 15, 2011)...........................................................24

*Moosehead Sanitary Dist. v. S. G. Phillips Corp.,*
610 F.2d 49 (1st Cir. 1979)...................................................................................39

*Mountain Top Condominium Assoc. v. Dave Stabbert Master Builder, Inc.,*
72 F.3d 361 (3d Cir. 1995)...............................................................................31, 34

*New Orleans Pub. Serv., Inc. v. United Gas Pipe Line Co.,*
732 F.2d 452, 464 (5th Cir. 1984) .......................................................................35

*Owens Corning Fiberglas Corp. v. Carter,*
630 A.2d 647 (Del. 1993) .....................................................................................25

*Peacock v. Thomas,*
516 U.S. 349 (1996)..........................................................................4, 13, 14, 15

*Princz v. Federal Republic of Germany,*
998 F.2d 1 (D.C. Cir. 1993)..................................................................................13

*Rep. of Philippines v. Westinghouse Elec. Corp.,*
949 F.2d 653 (3d Cir. 1991)..................................................................................12

*In re Revel AC, Inc.,*
802 F.3d 558 (3d Cir. 2015)...............................................................12, 16, 17, 20

*Rubin v. Islamic Republic of Iran,*
138 S. Ct. 816 (2018)............................................................................................15

*Ryan v. Asbestos Workers Union Local 42 Pension Fund,*
2002 WL 87470 (D. Del. Jan. 22, 2002)..............................................................30

## TABLE OF AUTHORITIES

*(continued)*

Page(s)

*In re Safeguard Scis.*,
220 F.R.D. 43 (E.D. Pa. 2004) ..................................................................32, 33, 38

*In re Swift Energy Co.*,
2016 WL 3566962 (D. Del. June 29, 2016) ...............................................................12

*Town of Chester, N.Y. v. Laroe Estates, Inc.*,
137 S. Ct. 1645 (2017) ...............................................................................36

*In re Tribune Co.*,
477 B.R. 465 (Bankr. D. Del. 2012) .......................................................................27

*U.S. E.E.O.C. v. ABM Indus. Inc.*,
2010 WL 744714 (E.D. Cal. Mar. 3, 2010) ...............................................................34

*United States v. Alcan Aluminum, Inc.*,
25 F.3d 1174 (3d Cir. 1994) ...............................................................................33

*United States v. Indianapolis Baptist Temple*,
1999 WL 1249452 (S.D. Ind. Nov. 10, 1999) ...........................................................27

*United States v. Kurtz*,
528 F. Supp. 1113 (E.D. Pa. 1981) .......................................................................29

*United States v. Moats*,
961 F.2d 1198 (5th Cir. 1992) ...............................................................................20

*United States v. Panhandle E. Corp.*,
696 F. Supp. 983 (D. Del. 1988) ...........................................................................25

*United States v. Territory of Virgin Islands*,
748 F.3d 514 (3d Cir. 2014) ...............................................................................39

*USA Gateway Travel, Inc. v. Gel Travel, Inc.*,
2007 WL 1088582 (W.D. Wa. April 5, 2007) ...........................................................26

*In re W.R. Grace & Co.*,
475 B.R. 34 (D. Del. 2012), *aff'd* 729 F.3d 332 (3d Cir. 2013) ........................................24, 26

*Wallach v. Eaton Corp.*,
837 F.3d 356 (3d Cir. 2016) ...............................................................................39

*Wells Fargo Bank, N.A. v. CCC Atl., LLC*,
2013 WL 595625 (D.N.J. Feb. 15, 2013) ...............................................................14

**TABLE OF AUTHORITIES**
*(continued)*

Page(s)

*Zimmerman v. Crothall*,
    2014 WL 257461 (Del. Ch. Jan. 23, 2014) ............................................................25

**Rules**

Fed. R. Civ. P. 24(b)(1)(B) .........................................................................40

Fed. R. Civ. P. 24(b)(3)............................................................................40

Fed. R. Civ. P. 62(d) ..........................................................................11, 25

**Treatises**

20 Moore's Federal Practice, § 303.32[2][b][vi] (2018) .............................................13

## INTRODUCTION

On August 31, 2018, nearly a month after this Court issued its order granting Crystallex International Corporation's ("Crystallex's") motion for a writ of attachment *fi. fa.* (the "Writ") against the shares of PDV Holding, Inc. ("PDVH"), Petróleos de Venezuela, S.A. ("PDVSA") moved to stay that order and to prevent the U.S. Marshals from selling those shares pursuant to 8 *Del. C.* § 324.  D.I. 98.  But PDVSA offers no bond and no assurance that the shares of PDVH are sufficient to satisfy Crystallex's judgment against PDVSA's alter ego the Bolivarian Republic of Venezuela ("Venezuela").  Nor does PDVSA offer any means of ensuring that PDVSA and Venezuela will not plunder PDVH while they remain in control of PDVH and its subsidiaries but no longer have any long-term interest in the financial success of those companies.  Even before this Court issued its order authorizing service of the Writ, PDVSA engaged in transactions with the "intent . . . to hinder creditors."[1]  Now recognizing that the shares of PDVH will soon be sold to satisfy Crystallex's judgment, PDVSA has every incentive to loot PDVH and its subsidiaries while it still can.  PDVSA offers no legitimate reason why Crystallex, which has already spent years waiting for Venezuela to satisfy Crystallex's arbitral award and judgment, should have to give PDVSA and Venezuela time to further strip their U.S. subsidiaries of value.  Accordingly, the motion for a stay should be denied.

In addition, three purportedly interested third parties—Rosneft Trading S.A. ("Rosneft") (D.I. 100), CITGO Petroleum Corp. ("CITGO") (D.I. 101, 102), and certain holders of bonds issued by PDVSA ("Bondholders") (D.I. 103, 105) (collectively, the "Proposed Intervenors")— have moved to intervene in this action more than a year after Crystallex filed its motion for a

---

[1]  *Crystallex Int'l Corp. v. Petróleos de Venezuela, S.A.*, 879 F.3d 79, 89 (3d Cir. 2018).

writ.[2]  Each of the Proposed Intervenors separately asks this Court for a stay without bond.  But

none of the Proposed Intervenors claims to have a property interest in the shares of PDVH.

Rather, they each speculate that the sale of PDVH could impact the value of other assets and,

based on those supposed interests, request a stay pending appeal.  But speculative harm to assets

outside the scope of the Writ justifies neither intervention nor a stay of enforcement pending

appeal.  Even if it could—and it does not—the harm of which the Proposed Intervenors

complain—the acceleration of other debts of PDVSA and its U.S. subsidiaries that they

nonetheless have an obligation to pay—is a result of contractual rights the risks of which the

Proposed Intervenors knowingly and willingly assumed.  For these reasons, the motions of the

Proposed Intervenors also should be denied.

## NATURE AND STAGE OF THE PROCEEDINGS

On August 14, 2017, Crystallex filed the instant action seeking a ruling that PDVSA is an

alter ego of Venezuela and, accordingly, PDVSA's shares of PDVH are property of Venezuela

subject to execution in order to satisfy Crystallex's judgment against Venezuela.  D.I. 3-1.  The

next day, PDVSA issued a press release responding to Crystallex's motion, and issued an

English version of that press release the following day.  Exs. 1, 2.[3]  The press release stated:

"[PDVSA] informs the public [of] its total rejection in the face of the claims of the Canadian

Enterprise Crystallex that attempt to affect the interests of Venezuela in oil matters. . . .

Crystallex asked the Federal Court of Delaware State for permission to freeze and confiscate the

shares of PDVSA held in PDV Holding, a parent company of Citgo in the USA, in an attempt to

---

[2]  ConocoPhillips, a judgment creditor of PDVSA, submitted a letter to the Court on August 31, 2018, but it did not move to intervene or formally request any other relief.  D.I. 104.

[3]  References to "Ex. [_]" are to the exhibits attached to the Declaration of Jason W. Myatt, dated September 14, 2018 ("Myatt Decl.").

execute an arbitral award against the Bolivarian Republic of Venezuela." Ex. 2.  One week later, on August 22, 2017, PDVSA moved to intervene in the litigation.  D.I. 14.  Despite numerous press reports detailing Crystallex's efforts, *see e.g.*, Exs. 3, 4—and even warnings directly from PDVSA itself, Ex. 2—Rosneft, CITGO, and the Bondholders made no effort to intervene.

Over the course of nearly a year, Crystallex and PDVSA submitted several rounds of briefing and over 150 exhibits and declarations and appeared for oral argument before this Court on multiple occasions.  Following this extensive litigation, on August 9, 2018, the Court issued its final Order granting the relief that Crystallex had requested—a determination that PDVSA is Venezuela's alter ego and a writ attaching PDVSA's shares of PDVH—along with a 75-page Opinion detailing the reasoning underlying the Order.  D.I. 78, 79, 83.  By that Order, the Court completed its adjudication of Crystallex's enforcement motion.  All that remains for the Court to do is issue a ministerial order directing that the Marshals' sale of the PDVH shares occur on a date certain; the Court need make no further merits determinations.  D.I. 95 at 5.

On August 9, 2018, the Court issued its Order determining that PDVSA is Venezuela's alter ego and granting Crystallex's motion for a writ of attachment against PDVSA's shares of PDVH.  D.I. 78, 83.  Two weeks later, on August 23, 2018, the Court issued an order temporarily staying the execution on the attached PDVH shares and requiring that any party or non-party wishing to provide input before the Marshals' sale of the shares is ordered do so no later than August 31, 2018.  D.I. 95.  PDVSA along with three non-parties—CITGO, Rosneft, and Bondholders—filed motions in response to that order.  None offers a substantive response as to how the sale of the shares should proceed, much less a justification for following any procedure other than the Marshals' sale authorized by statute.

## SUMMARY OF ARGUMENT

1.      PDVSA and the Proposed Intervenors have failed to carry their burden of
showing that a stay without a full bond is warranted.  The Third Circuit's test for determining if a
stay of execution should be issued without a bond—an "extraordinary remedy"—has not been
met.  In this case, the merits, balance of harms, and public interest all weigh in favor of denying
a stay without bond.

*PDVSA is not likely to succeed on the merits*.   Neither PDVSA nor any of the Proposed
Intervenors has established that PDVSA is likely to succeed or even that PDVSA's appeal raises
serious questions going to the merits.  PDVSA and the Proposed Intervenors offer no basis for
challenging this Court's factual findings—which are based on largely undisputed evidence and
which will be reviewed on an "abuse of discretion" standard.  This Court's determination that no
independent basis of subject matter jurisdiction over PDVSA is required was well reasoned and
consistent with Third Circuit precedent rejecting the proposition that *Peacock v. Thomas* applies
to Rule 69 garnishment actions.  And, all of the arguments that PDVSA raises again in this
motion have already been considered and dismissed by the Court.

*The balance of harms weighs against granting a stay without bond*.  Crystallex will be
irreparably harmed should the Court allow a stay without bond.  CITGO is managed by people
who are appointed by and loyal to President Nicolás Maduro and who have every incentive to
strip the company—and PDVH's shares—of value before the Marshals' sale.  Moreover,
PDVSA and Venezuela have a history of engaging in schemes to hinder and evade their
creditors—including by looting the assets of their Delaware subsidiaries.  Now, more than ever,
PDVSA has an incentive to take actions that may destroy the value of PDVH's shares.  Any such
action would strip Crystallex of the benefit of this Court's Order and irreparably injure its ability
to collect on the $1.2 billion (plus interest) judgment it is owed by Venezuela.  PDVSA and the

Proposed Intervenors set forth no proof that they will be irreparably harmed by enforcement of the Writ. The speculative harms that they imagine—that if the shares are sold PDVSA and its subsidiaries will fail to honor other debt obligations—are not adequate to meet their burden on a motion to stay and in all events are not sufficient to overcome Delaware law governing enforcement proceedings mandating bonds for stays pending appeal.

Further, Venezuela's prior request for a stay pending appeal without posting a bond was rejected by the United States District Court for the District of Columbia because that Court was "unable to conclude that Crystallex's interests would not be injured" by a stay without a bond given the "likelihood that Venezuela will be either unwilling or unable to satisfy the full judgment," if it were unsuccessful on appeal.[4] PDVSA offers no legitimate reason why this Court should reach a different conclusion.

*Public interest favors enforcement of the Writ*. Crystallex has diligently worked to collect upon its judgment, while Venezuela and its alter ego PDVSA have done everything they can to avoid paying the debt to Crystallex. The public interest in seeing that judgments are enforced and ensuring that diligent creditors are permitted to benefit from their collection efforts weighs heavily against allowing Venezuela and its alter ego PDVSA to continue to thwart the enforcement of Crystallex's judgment. This is particularly true here, where Venezuela seized assets without justification, has had its liability affirmed in multiple jurisdictions across the globe, and yet has avoided its obligations to Crystallex for more than six years.

*The lien on PDVH's shares is not sufficient security for Crystallex's judgment*. Movants offer no factual basis to determine that a lien on PDVH's shares will provide "sufficient

---

[4]  *Crystallex Int'l Corp. v. Bolivarian Republic of Venezuela*, 1:16-cv-00661-RC, at 3-4, 6 (D.D.C. Aug. 8, 2017) (order denying stay motion).

security" for Crystallex's judgment.  Indeed, neither PDVSA nor the Proposed Intervenors has offered any evidence at all as to the value of those shares.  Most importantly, PDVSA also has failed to demonstrate that the value of PDVH's shares will be protected from diminution in the event that a stay is granted.  The value of the shares remains within PDVSA's control and is subject to manipulation, if not outright destruction, at PDVSA's hands.  PDVSA offers no assurance that it will not continue to strip its U.S. subsidiaries of value while its appeal remains pending.  In light of the absence of such evidence, and the burden of production of which falls squarely on PDVSA's shoulders, the Court should not exempt PDVSA from the rule that a stay of execution requires a bond.

2.     ***The Proposed Intervenors have no right to intervene***.  Nearly a year after Crystallex filed its highly publicized motion for a writ of attachment, the Court resolved all merits questions and issued its final order on August 9, 2018.  The sole purpose for seeking intervention after the issuance of that order is to further delay Crystallex's ability to collect on its judgment—indeed, each Proposed Intervenor asks this Court for a stay.  Federal Rule of Civil Procedure 24 requires, among other things, that any intervention be timely.  The Proposed Intervenors do not even address, let alone explain, their untimely intervention efforts.  Just as important, the Proposed Intervenors have no interest in, or right to, the PDVH shares, and they have failed to show that any interest that they do have would be impermissibly impaired by enforcement of the Court's Order.  Instead, CITGO may be required to *offer* to repurchase some outstanding debt.  Similarly, the Proposed Intervenors speculate on the impact that might occur should they elect to exercise their own contractual rights against other property as a result of a sale of PDVH.  Of course, there is no reason to believe that Bondholders and other creditors of PDVSA and its affiliates have any interest in causing the destruction of CITGO's value simply

because the companies are out from under Venezuela's management.  In any event, speculation

as to the effect of risks that the Proposed Intervenors knowingly assumed is insufficient to justify

intervention.  The Proposed Intervenors also fail to overcome the presumption of "adequate

representation" afforded in cases, such as this, where third parties are seeking the same exact

remedy (a stay of execution) as one of the parties (PDVSA).

   3.   ***The Proposed Intervenors should not be allowed to permissively intervene***.  The

Proposed Intervenors' proffered reasons for permissive intervention are grounded in financial

self-interest—not an interest in the assets at issue—and not in questions of law or fact as required

under Rule 24(b).  If the Proposed Intervenors' arguments were to be accepted, every creditor of

a parent or subsidiary—no matter how indirect—would properly be a party to every action

against any of that company's affiliates.  Intervention is not intended to open the door to allow a

party to join any case simply because its outcome might affect the proposed intervenor's interests

in other property.  Given the untimeliness of their applications, and prejudice that intervention

will work upon Crystallex, permissive intervention is not warranted at this stage in the

proceedings.

## STATEMENT OF FACTS

**I.   Venezuela And PDVSA Engage in Fraudulent Transfers To Frustrate Crystallex's
Efforts To Enforce Its Arbitral Award**

   In 2011, after Venezuela illegally expropriated Crystallex's investment in the Las

Cristinas gold mine, Crystallex initiated arbitration proceedings pursuant to a bilateral

investment treaty between Canada and Venezuela.  D.I. 3-1 at 5.  Crystallex obtained an award

of $1.2 billion plus approximately $200 million in pre-award interest in April 2016 (the

"Award") and immediately moved to confirm the Award in the United States District Court for

the District of Columbia.  *Id.*  The district court issued a judgment confirming the award on April 7, 2017.  *See* D.I. 1.

During the pendency of the arbitration and U.S. litigation to confirm the Award, Venezuela and its alter ego, PDVSA, used PDVH to extract value out of Venezuela's key U.S.-based asset, CITGO, with the intent to hinder creditors, including Crystallex.  *Crystallex Int'l Corp.*, 879 F.3d at 89.  As a result, Crystallex filed two fraudulent transfer actions before this Court seeking to unwind the transactions in which Venezuela and PDVSA misused PDVH and its assets.  *See Crystallex Int'l Corp. v. Petróleos de Venezuela*, 15-CV-01082-LPS (D. Del. Nov. 23, 2015) ("*Crystallex I*"); *Crystallex Int'l Corp. v. PDV Holding, Inc.*, 16-CV-01007-LPS (D. Del. Oct. 28, 2016) ("*Crystallex II*").

Each of the Proposed Intervenors is tied to the fraudulent transactions in one way or another.  Bondholders contend, without submitting any proof, that they are holders of 2020 bonds issued by PDVSA in October 2016 and secured by a lien against 50.1% of PDVH's shares of CITGO Holding.  Rosneft similarly claims to hold additional PDVSA debt, issued in or around November 2016 and secured by a purported lien on the remaining 49.9% of the shares of CITGO Holding.  Both liens are the subject of Crystallex's fraudulent actions.  Each of the Proposed Interveners had notice of Venezuela's efforts to avoid paying Crystallex's judgment. In the scheme underlying *Crystallex I*, PDVH's wholly owned subsidiary and CITGO's direct parent, CITGO Holding, issued $2.8 billion in debt at 12% interest, the proceeds of which were immediately transferred to PDVH and then "up the chain" to PDVSA and Venezuela.  *Crystallex I*, D.I. 1 at 13-14.  Subsequently, as detailed in *Crystallex II*, PDVSA and Venezuela sought to extract additional value from PDVH and its subsidiaries to the detriment of their creditors by

pledging 100% of PDVH's shares of CITGO Holding as collateral for PDVSA's debts, with no consideration to PDVH.  *Crystallex II*, D.I. 18 at 3.

PDVSA's 2020 Bond offering contained detailed warnings to investors and lenders to PDVSA that Venezuela may use PDVSA's assets for its own purposes and that Crystallex and other creditors were seeking to establish that PDVSA was an alter ego of Venezuela and thereby collect on PDVSA's assets to satisfy judgments against Venezuela.  *See* Ex. 5.  PDVSA issued multiple warnings to its potential future creditors, including that (1) through either Venezuela's or PDVSA's decision-making, the objectives and interests of Venezuela may be placed above the interests of PDVSA and its creditors, *id.* at 29, (2) Crystallex was attempting to enforce its arbitral award against Venezuela and may, as other creditors had done—and as Crystallex itself had done in the Netherlands, *id.* at 121—attempt to attach the assets of PDVSA to satisfy the judgment, *id.* at 120-21, and (3) PDVSA could not guarantee that a creditor of Venezuela would not be able to interfere with the terms of the offering through an attachment of assets, injunction, temporary restraining order, or otherwise, *id.*

Bondholders acknowledged that they "received and reviewed [the] offering circular in its entirety" and were therefore aware of the risk factors disclosed in the offering documents for the bonds they purchased.  *Id.* at 33.  Bondholders' purported lien was a matter of public record and Rosneft was on notice of the issuance of the 2020 Bonds at the time that it reached its own agreement with PDVSA given that Rosneft's purported interest in PDVH's shares of CITGO Holding was the 49.9% of the shares of CITGO Holding—the same collateral purportedly pledged in connection with the 2020 Bond Offering.  *See* D.I. 100 at 2.

Incorporated into PDVSA's Offering Circular at Appendix A were similar warnings from CITGO's parent CITGO Holding, which were originally made as part of the CITGO Holding

2015 debt offering that funded the more than $2.2 billion dividend at the heart of *Crystallex I*. These warnings informed potential creditors that Venezuela may exercise control of PDVSA "in a manner that might adversely affect [CITGO's creditors'] interests," Ex. 5 at A-28, and that "[c]laimants in one or more of [various arbitration and enforcement] proceedings may seek to obtain orders freezing or attaching our assets and/or assets of PDVSA and/or PDV Holding," *id.* at A-30. The offering circulars also clearly set forth the rights and remedies that might be available were PDVSA to cease to own or control PDVH. *See id.* at 20, A-29. It is these provisions that PDVSA and the Proposed Intervenors now seek to avoid triggering.

## II.     Venezuela And PDVSA Mismanagement Of Their Subsidiaries And Other Bad Acts

At the end of 2017, President Maduro appointed a general in the Venezuela military with no oil industry experience to serve as the Minister of Petroleum and head of PDVSA. Around the same time, President Maduro directly appointed a loyalist cousin of late President Hugo Chávez, Asdrúbal Chávez, as the head of CITGO to stop the "steal[ing] [of] Citgo from [Venezuela]" and prevent the "surrendering [of its] assets." D.I. 42-1; *see also* Ex. 6 (suggesting Chávez's appointment was an attempt "to ensure the loyalty of Citgo's management"); Ex. 7 (same). Maduro ordered the arrest of dozens of oil executives, including several top CITGO and PDVSA officials, all of whom now face criminal corruption charges. Exs. 6, 8. The CITGO executives were suspected of embezzlement "stemming from a $4 billion agreement to refinance company bonds." Ex. 9.

After being appointed president of CITGO by President Maduro, Chávez had his visa revoked by the U.S. government amid investigation into potential embezzlement of PDVSA funds by the Maduro regime, rendering the ongoing management of CITGO difficult at best. *See* Ex. 10. The U.S. Government has imposed sanctions via three Executive Orders on PDVSA,

PDVH, and CITGO Holding given concerns that they would inappropriately transfer assets. Exs. 11-13 (the "Executive Orders"); Ex. 14.

These concerns are quite real.  Public accounts report that PDVSA is using CITGO to pay PDVSA's commercial debts.  For example, Reuters has reported that CITGO has paid at least $43.7 million of PDVSA's accounts payable under a purchase agreement with BP.  Ex. 15. Other creditors of Venezuela—in asserting their own claims aimed at seizing assets of PDVSA (as well as of PDVSA's U.S. subsidiaries—have alleged even more transfers, including transfers of purchase contracts with Schlumberger subsidiary Cameron and General Electric.  Ex. 16.

Additionally, PDVSA has used CITGO to hinder creditor efforts to execute on judgments against PDVSA.  PDVSA allegedly directed CITGO to "come from Texas to Aruba to claim ownership of cargoes [of crude] . . . including on cargo expressly consigned under a bill of lading to [PDVSA Petróleo S.A.]."  Ex. 17 at 4.  After attachment orders were served on PDVSA assets in Curacao, assets were transferred to CITGO in order to avoid seizure.  *Id*. at 7; *see also* Ex. 18; Ex. 19; Ex. 20.[5]

## ARGUMENT

## I.   Absent A Bond, There Is No Reason To Stay Execution Pending Appeal

### A.   The Third Circuit's Four-Factor Test Balances Against Granting a Stay

Aggrieved parties appealing district court decisions may stay enforcement as of right by posting a supersedeas bond.  *See* Fed. R. Civ. P. 62(d).  No such bond has been offered here. PDVSA does not state that it lacks the funds to either pay Crystallex's judgment or to post a cash bond.  Nonetheless, PDVSA (and each of the Proposed Intervenors) asks this Court for the

---

[5]  Platts Commodity News also reported that PDVSA had transferred two tankers, totaling nearly 800,000 barrels of crude, from PDVSA to CITGO and delivered to CITGO in Louisiana "to prevent it [being] seized by [creditors]."  Ex. 21.

"extraordinary remedy" of an unbonded stay of execution of the Writ.  Because "[a] stay pending

appeal is an extraordinary remedy . . . [it] is an exercise of judicial discretion," and not a "matter

of right."  *Baker v. Socialist People's Libyan Arab Jamahirya*, 810 F. Supp. 2d 90, 96 (D.D.C.

2011); *see also In re Swift Energy Co.*, 2016 WL 3566962, at *4 (D. Del. June 29, 2016).  In

determining whether to exercise that discretion, courts in the Third Circuit consider:

> (1) whether the stay applicant has made a strong showing that [it] is likely to
> succeed on the merits; (2) whether the applicant will be irreparably injured
> absent a stay; (3) whether issuance of the stay will substantially injure the other
> parties interested in the proceeding; and (4) where the public interest lies.

*Rep. of Philippines v. Westinghouse Elec. Corp.*, 949 F.2d 653, 658 (3d Cir. 1991) (quoting

*Hilton v. Braunskill*, 481 U.S. 770, 777 (1987)).  Although courts consider all four factors in

deciding a motion for a stay, a movant must satisfy the first two.  *In re Revel AC, Inc.*, 802 F.3d

558, 568-69 (3d Cir. 2015) (further inquiry is "unnecessary" "if the movant does not make the

requisite showings on either of the[] first two factors").  Where, as here, "the merits, balance of

harms, and public interest favor the stay opponent—a stay should be denied."  *Id*. at 569.

1.   <u>PDVSA Has Not Demonstrated A Likelihood of Success On the Merits</u>

In order to obtain a stay pending appeal, PDVSA (and the Proposed Intervenors) must

demonstrate that PDVSA's appeal has a "strong . . . likelihood of success," meaning that

PDVSA can "win on the merits" or, "*at a minimum*," has raised "serious questions going to the

merits."  *Id.* at 570-71 (emphasis added).  None of the movants has satisfied this burden.

PDVSA and the Proposed Intervenors "simply reassert[] arguments that th[is] Court has already

rejected" and attempt to manufacture "serious questions" by looking to the Court's application of

settled law to the particular facts before it.  *District Title v. Warren*, 2015 WL 12964656, at *4

(D.D.C. Jan. 9, 2015).  PDVSA also clings to the notion that the presence of sovereign immunity

issues warrants a stay, but its argument is not supported by the law.  *See Baker*, 810 F. Supp. 2d

90 (denying sovereign's motion for a stay pending appeal of decision regarding subject matter jurisdiction); *see also 767 Third Ave. Assocs. v. Permanent Mission of Rep. of Zaire to United Nations*, 787 F. Supp. 389 (S.D.N.Y. 1992) (concluding that movants failed to show likelihood of success on the merits despite raising issues regarding immunity under the FSIA).[6]  Indeed, Venezuela lost its motion for an unbonded stay of execution pending appeal in the District Court for the District of Columbia.  *See infra* at 29 n.25.

PDVSA does not seriously challenge the Court's well-supported factual findings that PDVSA is the alter ego of Venezuela.  Instead, PDVSA's appeal purports to challenge this Court's finding that "Venezuela and PDVSA are not immune from exercise of this Court's subject matter jurisdiction," and that PDVSA's shares in PDVH are not immune from attachment.  D.I. 79, 83 at 18, 75.[7]  But there is nothing novel, or even particularly unusual, in a Court asserting subject matter jurisdiction over a foreign sovereign or a sovereign instrumentality, or in allowing execution against sovereign assets.  And this Court has already heard and rejected PDVSA's argument that, under *Peacock v. Thomas*, the Court needs an independent basis of subject matter jurisdiction over PDVSA.  D.I. 79, 83 at 9-17 (concluding "Crystallex does not need to additionally prove that some other independent basis of subject matter jurisdiction exists with respect to PDVSA").  This Court determined that Crystallex "fully

---

[6]  CITGO incorrectly asserts that the presence of sovereign immunity issues alters the well-established rule that district courts "retain[] the authority to enforce" their own orders. 20 Moore's Federal Practice, § 303.32[2][b][vi] (2018); *accord* D.I. 86 at 2-3; *see also* D.I. 101-1, 102-1 at 5.  The cases CITGO cites do not stand for this proposition and are otherwise inapposite.  The Court in *Princz v. Federal Republic of Germany* prevented the district court from "*proceed[ing] to trial* until the appeal [wa]s resolved," but did not deal with enforcement of an order.  998 F.2d 1, 1 (D.C. Cir. 1993) (emphasis added).  *De Csepel v. Republic of Hungary* likewise involved a stay of litigation proceedings, not the enforcement of a judgment.  2011 WL 13244741, at *3 (D.D.C. Nov. 30, 2011).

[7]  *See Crystallex Int'l Corp. v. Bolivarian Republic of Venezuela*, Case No. 18-2797, Dkt. 003113020904 (3d Cir. Aug. 29, 2018) (PDVSA's summary of the case on appeal).

prove[d] that Venezuela is not immune from suit" under § 1605(a)(6)(A) of the FSIA—a finding

that PDVSA has not challenged.  D.I. 79, 83 at 26.  Because Crystallex has proved that PDVSA

is the alter ego of Venezuela, *see id.* at 34-54, and therefore PDVSA, like Venezuela, is not

immune from suit, PDVSA is not likely to succeed on the merits of its appeal to the Third

Circuit.  PDVSA cannot establish a likelihood of success by simply rehashing rejected

jurisdictional arguments.  *See Wells Fargo Bank, N.A. v. CCC Atl., LLC*, 2013 WL 595625, at *2

(D.N.J. Feb. 15, 2013) (rejecting motion filed after court granted motion to appoint receiver but

before issuance of subsequent order appointing the receiver, where the motion for a stay pending

appeal "reassert[ed]" movants' jurisdictional arguments, which the court "already addressed . . .

and rejected" "as explained in [a] prior opinion"); *see also In re Commonwealth Renewable*

*Energy, Inc.*, 2016 WL 1238199, at *2, 4-5 (Bankr. W.D. Pa. Feb. 10, 2016) (movant did not

show likelihood of success, in part, because the court "provided an extensive analysis of the

caselaw," had a "rational basis for its conclusions," and movant "fail[ed] to identify any legal

error with respect to [those] conclusions").[8]

Moreover, and contrary to PDVSA's assertions, "the Third Circuit has had occasion to

consider the applicability of *Peacock* in the context of garnishment actions," like this one, and

concluded that "Rule 69 authorizes a garnishment action against an indemnitor of a judgment

---

[8]  *See also Griffin v. Harrington*, 2013 WL 3873958, at *3 (C.D. Cal. Jan. 18, 2013) (stay
denied where motion "merely reassert[ed] arguments on the merits of [an] issue" the court
had already "discussed and rejected"); *Am. Civil Liberties Union Fund of Michigan v.*
*Livingston Cty.*, 2014 WL 12662064, at *1 (E.D. Mich. May 27, 2014) ("Defendants'
reliance on the same arguments that th[e] [c]ourt already addressed in the issuance of its
[o]rder . . . , demonstrate[d] Defendants failed to show a probability of success that is
inversely proportional to the amount of irreparable injury Defendants will suffer absent the
stay.") (internal quotations and corrections omitted).

debtor," even without an independent basis for jurisdiction.  D.I. 79, 83 at 11-12; *see also id*. at

12 (citing *IFC Interconsult, AG v. Safeguard Int'l Partners, LLC*, 438 F.3d 298, 310 (3d Cir.

2006), which states "*Peacock* itself made clear that it does not apply to Rule 69 actions").[9]

PDVSA has not pointed to any new authority suggesting that *Peacock* applies to circumstances

in which a party attempts to execute upon "assets already subject to [a] judgment," and where the

judgment creditor is not seeking "to impose personal liability for an existing judgment on a new

party."  *Id.* at 15 (quoting *Gambone v. Lite Rock Drywall*, 288 Fed. App'x 9, 12 (3d Cir. 2008)).

     Nor is there a "serious question" regarding the Court's application of the "*Bancec*

disjunctive test" to determine that PDVSA is the alter ego of Venezuela.  D.I. 79, 83 at 22.  The

Third Circuit has "recognized that there are two major exceptions to the *Bancec* rule[:] . . .

(1) 'where a corporate entity is so extensively controlled by its owner that a relationship of

principal and agent is created;' *or* (2) where to give effect to the separate instrumentalities

'would work fraud or injustice.'"  *Fed. Ins. Co. v. Richard I. Rubin & Co*., 12 F.3d 1270, 1287

(3d. Cir. 1993) (emphasis added); *see also* D.I. 79, 83 at 22 (same).  This long-established

concept—that the *Bancec* test has two independent prongs, extensive control *or* fraud or

injustice—was reinforced by the Supreme Court just this year in *Rubin v. Islamic Republic of

Iran*, 138 S. Ct. 816, 822 (2018).[10]  In support of its motion for a writ of attachment, Crystallex

submitted 116 exhibits that partially formed the basis for this Court's determination that

Crystallex "adequately alleg[ed] that Venezuela exerts extensive control over PDVSA."  D.I. 79,

---

[9]  This Court's acknowledgement that its determination that Crystallex need not provide an
     independent basis for subject matter jurisdiction over PDVSA was "not free from doubt"
     does not mean that its decision was "unprecedented."  D.I. 98 at 13.

[10]  The Supreme Court further described the second prong of the *Bancec* test as applying where
     "recognizing . . . distinct entities would work fraud or injustice," confirming that no showing
     of fraud is required under *Bancec*.  *Id*. (internal quotation mark omitted).

83 at 25.  Neither PDVSA nor the Proposed Intervenors has "made a strong showing that [PDVSA] is likely to succeed[] in demonstrating that th[is] [Court's] findings of fact were clearly erroneous."  *In re Culp*, 550 B.R. 683, 698 (D. Del. 2015) (denying motion to stay).  In any event, the application of well-established legal concepts to a new set of facts does not implicate "serious questions going to the merits," or demonstrate that PDVSA has "more than a mere possibility of success on appeal."  *Baker*, 810 F. Supp. 2d at 97; *Revel*, 802 F.3d at 570.[11]

    2.   <u>PDVSA and The Proposed Intervenors Have Failed to Show That They Will Suffer Irreparable Harm</u>

Neither PDVSA nor the Proposed Intervenors "will suffer irreparable harm"—i.e., "harm that cannot be prevented or fully rectified" "by a legal or equitable remedy"—should execution on the Writ not be stayed.  *Revel*, 802 F.3d at 568; *In re Color Spot Holdings*, 2018 WL 3996938, at *3 (D. Del. Aug. 21, 2018) (citation omitted).  To satisfy this factor, the movant must set forth evidence establishing that the harm is "likely," meaning "more apt to occur than not."  *In re Culp*, 550 B.R. at 696 (*quoting Revel*, 802 F.3d at 569).  Claims of "speculative and purely economic harm . . . [are] insufficient to warrant a stay pending appeal."  *Color Spot Holdings*, 2018 WL 3996938, at *3.  Rather, "the applicant must 'demonstrate that irreparable injury is *likely* [not merely possible] in the absence of [a] [stay].'"  *Revel*, 802 F.3d at 569 (emphasis and alterations in original).  Here, speculation is all that the movants offer.

For example, PDVSA argues that "proceeding with the sale of PDVSA's shares in PDVH *could* set off a cascade of adverse events."  D.I. 98 at 14 (emphasis added).  To support these

---

[11] Bondholders' claim that this Court should have considered the effect that its alter ego finding may have on PDVSA's creditors and the future ability of government-owned corporations to borrow money, D.I. 105 at 16-17, is inappropriate to raise at this stage of the proceedings.  Such an argument is essentially a request for reconsideration on grounds that could have been, but were not, presented earlier in this action.  If anything, Bondholders' argument further demonstrates why their motion to intervene is untimely.  *See infra*, at Sect. II.A.

claims, PDVSA offers a declaration from its own law firm, David Bayrock.  However, Mr.

Bayrock's declaration only emphasizes the speculative nature of PDVSA's claims by noting, for

example, (1) that "[a] sale of more than 50% of the PDVH shares would constitute a breach of

covenant under the PDVSA 2020 Notes," (2) that "*could* ripen into an 'Event of Default' *if*

PDVSA receives written notice of the breach from holders . . . *and* [(3)] PDVSA does not cure

the breach within sixty days," and (4) *if* this event of default occurs, "*and* [] is not waived, *or*

[(5)] the acceleration is not rescinded by the holders, [(6)] the trustee *may* . . . direct the collateral

agent to foreclose on the 50.1% of the shares of capital stock of CITGO Holding."  D.I. 99 ¶¶ 14,

17, 18 (emphases added).[12]  PDVSA offers no evidence that these events—which are dependent

on PDVSA not paying its own debts—are apt to occur.  In essence, PDVSA argues that if the

PDVH shares are sold it will have to pay other debt holders too and, if it chooses to default on

those obligations, those debt holders may resort to their collateral.  But, PDVSA offers no

explanation as to why any stakeholder in the assets held by PDVH or CITGO Holding or CITGO

itself would act to trigger such a purportedly value-destructive event.  But this is a risk that

PDVSA—and its debt holders willingly took on.  In any event, PDVSA fails to explain why

CITGO would not be perfectly capable of continuing its operations under new ownership.[13]

---

[12] *See also, e.g., id.* ¶ 22 (laying out a process whereby four distinct events, involving numerous decision makers, must all come to pass for an "Event of Default" to occur under the CITGO Holding Notes and CITGO Notes).

[13] A sale of PDVH's shares is not a death sentence for CITGO.  PDVSA and CITGO claim that execution would result in foreclosure on CITGO's three oil refineries.  D.I. 98 at 7-8, D.I. 99 ¶¶ 8-9, 24-25 (PDVSA); D.I. 101-1, 102-1 at 7-8 (CITGO).  But, even if some other entity takes control of PDVH, and that change of control results in the acceleration of CITGO Holding's debts, CITGO will still be able to sell oil.  Even if immediate repayment were required, CITGO offers no evidence that CITGO Holding cannot refinance its existing obligations so as to avoid foreclosure on its assets.  *See In Gusdonovich v. Bus. Info. Co.*, 119 F.R.D. 15 (W.D. Pa. 1987) (rejecting claim that was "not verified in any way," through

Bondholders' claims of irreparable harm are similarly based on conjecture.  Their stay motion recites theoretical consequences of a sale of PDVH's shares, positing that a decline in CITGO's value *may result* from a *possible* change in control of PDVH: "[a] change in control *may* reduce or eliminate tax assets," "[d]isorder in or around Citgo *could* cause trade creditors to tighten delivery terms and/or require bonds, thereby damaging the franchise," and "[a change in control would require CITGO to] *potentially* finance the repurchase in cash of all of the notes at a premium."  D.I. 105 at 11, 13 (emphases added).  In fact, Bondholders—who took their purported collateral with full knowledge of Crystallex's claims—admit that they "*do not know* the magnitude of any of these costs." *Id.* at 11-12 (emphasis added).[14]  In other words, they are simply speculating that they would be harmed if the Court does not grant their proposed motion.

In any event, the possibility that a sale of PDVSA's shares of PDVH could lead third parties to exercise their bargained-for contractual rights in a way that negatively affects CITGO does not constitute irreparable harm to PDVSA or any of the Proposed Intervenors.  Courts have rejected the notion that this type of "self-inflicted" injury—injury resulting from the moving party's underlying conduct and not attributable to the judgment on appeal—constitutes irreparable harm. *See Church & Dwight Co. v. SPD Swiss Precision Diagnostics, GmBH*, 2015 WL 5051769, at *3 (S.D.N.Y. Aug. 26, 2015), *aff'd*, 836 F.3d 153 (2d Cir. 2016), and *aff'd*, 843

---

affidavits or corporate documents, that attachment of corporate checking account would cause movant irreparable harm by "imped[ing] [its] ability to carry on its daily affairs").  Nor is it reasonable to assume that CITGO Holding's creditors would necessarily press for foreclosure, as they may view favorably a separation from PDVSA—an entity with tens of billions of dollars of debt and a reputation for corruption and mismanagement.

[14] CITGO's motion to stay similarly suffers from trying to pass off speculative injury as "irreparable harm," claiming "potentially catastrophic … consequences for CITGO," due to the fact that "*[i]f* the CITGO Entities do not pay such amounts [due on accelerated debts] on a timely basis, certain lenders and holders of the notes *may* foreclose on substantially all the assets owned by the CITGO Entities."  D.I. 101-1, 102-1 at 7 (emphases added).

F.3d 48 (2d Cir. 2016) (no irreparable harm where alleged losses were "speculative and . . . attributable to [its] underlying conduct as opposed to the injunction"); *7-Eleven, Inc. v. Sodhi*, 2017 WL 466514, at *5 (D.N.J. Jan. 31, 2017) (moving parties failed to establish irreparable harm where the harm was "self-inflicted," that is, "even if [the moving parties] incur an injury, this injury would not be irreparable because [they] would have brought the injury upon themselves").  PDVSA cannot establish that hypothetical losses that might result from its failure to pay its debts and the potential that other creditors might then exercise their negotiated-for contractual remedies somehow constitutes "irreparable harm."[15]  PDVSA's request for a stay—a plea to the Court's equitable powers—to help it avoid self-inflicted injuries that it claims it might

---

[15] The Court also should reject Bondholders' argument that the sale of the shares of PDVH might trigger change of control provisions in PDVSA's or CITGO Holding's debt documents and thereby cause irreparable harm, *see* D.I. 105 at 11-13, because that was a foreseeable risk at the time Bondholders purchased the bonds. *See Michigan v. Bay Mills Indian Cmty.*, 2011 WL 13186011, at *3 (W.D. Mich. Apr. 14, 2011) (denying stay where movant was aware of the risk of harm resulting and noting that "[w]hen a party is aware of the risk of going forward, the assumed risk cannot form the basis for a claim for irreparable harm").  The change of control provisions predate the issuance of the 2020 bonds in October of 2016. *See* D.I. 105-3 at 1 (dated July 29, 2014); Ex. 5 at 2 (noting that the Exchange Offers for the 2020 Bonds ended October 14, 2016).  Therefore, the risks of a change in control event were foreseeable when Bondholders purchased the bonds.  That those known risks might now come to pass does not represent irreparable harm.

Nor can Bondholders claim that reliance "on PDVSA's status as a separate corporate entity from Venezuela" will cause them to suffer irreparable harm.  D.I. 105 at 11.  At the time the bonds were issued, PDVSA cautioned that (1) "Venezuela may exercise the rights arising from its ownership interest in a manner that would benefit Venezuela's interests above our own interests," Ex. 5 at 29; (2) "we may engage in activities that give preference to the objectives of the Venezuelan government rather than our economic and business objectives," *id*.; and (3) "[s]ome creditors have, in recent years, used litigation tactics against several sovereign debtors, to attach assets of state-owned entities located outside the relevant jurisdiction or interrupt payments made by these [entities]," and, "[w]hile PDVSA and its subsidiaries are entities with a legal personality separate from . . . Venezuela, PDVSA cannot guarantee that a creditor of . . . Venezuela will not be able to interfere with the Exchange Offers, the Collateral or payments made under the New Notes, through an attachment of assets, injunction, temporary restraining order or otherwise," *id*. at 121.

suffer as a result of its having fraudulently liened up PDVH's shares of CITGO Holding in order to raise cash for itself should not be countenanced.

The only "likely" consequence of this Court's decision is the satisfaction of a judgment, which, if found to be improper, is "compensable in money." *Revel*, 802 F.3d at 572. This does not constitute "irreparable harm."[16] *See Baker*, 810 F. Supp. 2d 90 ("economic loss does not, in itself, constitute irreparable harm" and "[f]or an injury to be 'irreparable,' legal remedies after the fact must be inadequate to restore the party seeking a stay to the status quo ante"); *Citibank, N.A. v. Nyland (CF8) Ltd.*, 705 F. Supp. 188 (S.D.N.Y. 1989) (no "irreparable injury" where movant could recover the value of the property sold at court ordered sale if he won on appeal).

Finally, any alleged deprivation of sovereign immunity is insufficient to establish irreparable harm. *See, e.g.*, *Enron Nigeria Power Holding, Ltd. v. Federal Rep. of Nigeria*, 70 F. Supp. 3d 457, 459 (D.D.C. 2014) (rejecting sovereign's argument that it would "suffer irreparable harm absent a stay because . . . the Court ha[d] not established personal jurisdiction over it"). The principle of foreign sovereign immunity exists to provide relief "from the burdens of becoming involved in any part of the litigation process, from pre-trial wrangling to trial itself," thus preventing the harm incurred "defend[ing] [a] lawsuit." *United States v. Moats*, 961 F.2d 1198, 1203 (5th Cir. 1992). Here, the Court already has made its merits determinations and issued its final order granting Crystallex's motion for a writ of attachment. There are no future proceedings for which sovereign immunity is necessary to protect PDVSA from the burdens of litigation. *See Fed. Ins. Co.*, 12 F.3d at 1281-82 (explaining that "[a]t the post-trial stage . . . the

---

[16] Nor can CITGO legitimately claim that it will be irreparably harmed should the sale of shares occur according to the statutorily-defined process under Delaware law as opposed to the process set forth in the declaration of David Maughan—a process for which no statutory or other legal support is offered. D.I. 101-1, 102-1 at 11; *see generally* D.I. 101-2, 102-2.

[sovereign entities] will have been [already] forced to endure the very burden they are arguing they should not be subjected to in the first place").

      3.    <u>Issuance of the Stay Will Substantially Injure Crystallex</u>

Further staying the sale of PDVH's shares would substantially injure Crystallex by giving PDVSA and Venezuela the opportunity to dissipate those assets.  Crystallex has been waiting for nearly a decade to be compensated for Venezuela's unlawful expropriation of its assets, and Venezuela and PDVSA have a long history of acting to the detriment of their creditors, including by looting their Delaware subsidiaries.  The Third Circuit has recognized that Venezuela and PDVSA have (mis)used PDVH and other indirect subsidiaries with the "intent . . . to hinder creditors."  *Crystallex Int'l Corp.*, 879 F.3d at 89.  As this Court is aware, Venezuela and PDVSA diminished the value of PDVH by causing PDVH and its subsidiaries to issue $2.8 billion in debt at 12% interest, the proceeds of which were immediately transferred to PDVH and then "up the chain" to PDVSA in Venezuela.[17]  PDVSA and Venezuela then pledged the primary, if not only, asset of PDVH—its 100% ownership interest in the shares of CITGO Holding—as collateral for obligations of PDVSA for no consideration to PDVH.[18]

Moreover, as discussed above, PDVSA and Venezuela have proven incapable of ridding (or unwilling to rid) CITGO of corruption and mismanagement.  After the ousting of several key executives in 2017, President Maduro's hand-picked successor, Asdrubal Chávez, had his U.S. visa revoked, Ex. 10, and the U.S. government has imposed significant sanctions against Venezuela, PDVSA, and CITGO Holding to prevent improper asset transfers.  *See* Exs. 11-13. In addition, PDVSA used CITGO just this summer to conceal assets from ConocoPhillips, a

---

[17]  *See Crystallex I*, D.I. 1 at 3.

[18]  *See Crystallex II*, D.I. 18 at 6.

creditor of PDVSA, by transferring thousands of barrels of crude oil to avoid attachment. *See* Exs. 17-21. Given these many red flags, the Court has every reason to conclude that PDVSA will continue to misuse its Delaware subsidiaries to the detriment of its creditors for as long as PDVSA retains control of the corporate structure.

Questions of bad faith aside, once the Marshals have sold the PDVH shares, PDVSA will no longer be able to extract value out of PDVH. Thus, PDVSA now has every incentive to strip value from its U.S. subsidiaries while it still can. *See e.g.*, *Atl. Props. Grp., Inc. v. Deibler*, 1994 WL 45433, at *9 (Del. Super. Ct. Jan. 6, 1994), *aff'd*, 652 A.2d 553 (Del. 1995) (recognizing that in the time between the court's order and the sheriff's sale of stock the defendants "dissolve[d] the corporations knowing that the stock had been in *custodia legis* since the levy by the Sheriff," and "execute[d] the deeds, removing the assets from the corporation"). Thus, the loss of its interest in PDVH could cause PDVSA to take actions that are beneficial to itself but potentially destructive of the value of PDVH's shares. For example, in October of this year, PDVSA is scheduled to make a payment of more than $800 million to Bondholders. Exs. 22, 23. Should PDVSA fail to make that payment, Bondholders will not look only to PDVSA for repayment, but may well seek to execute on the assets of PDVH that have been pledged to support that debt. Given that PDVSA is on the verge of losing its interest in PDVH, it may choose to save $800 million by not making the required payment and allowing Bondholders to seize the pledged shares of CITGO Holding—in effect making PDVH pay PDVSA's debt. In such a situation, a default would be economically rational as it would effectively transfer to Crystallex the cost of PDVSA's failure to pay Bondholders.

Delaware law recognizes the long-standing "policy of giving to a creditor the benefit of his diligence as against other creditors." *Horsey v. Stockley*, 4 Del. Ch. 536, 543-44 (1872).

Preventing Crystallex from exercising its rights to enforce against the shares of PDVH while other creditors are looking to collect against those same assets turns this longstanding policy on its head.  Crystallex should not be punished for its diligence.[19]

### 4. Public Interest Weighs Against Granting a Stay

Courts in the Third Circuit have held that the public has an interest in the enforcement of judgments, and therefore the public interest prong favors Crystallex, which has diligently sought to collect on its judgment against Venezuela despite Venezuela's refusal to pay.  *See, e.g.*, *Cottillion v. United Ref. Co.*, 2014 WL 7344005, at *4 (W.D. Pa. Dec. 23, 2014) (denying motion to stay, citing non-moving party's assertion that "there is a public interest in favor of . . . enforcement of judgments"); *Arlington Indus., Inc. v. Bridgeport Fittings, Inc.*, 2013 WL 5937342, at *16 (M.D. Pa. Nov. 4, 2013) (denying motion to stay in part because "the request for a stay is offensive to the . . . public interest in enforcing judgments").

Contrary to PDVSA's arguments, there is no U.S. governmental interest to offset the public interest in judgment enforcement.  If anything, such interest favors denial of PDVSA's stay motion.  The U.S. government has clearly demonstrated a desire to prevent the Venezuelan government, including PDVSA, from exploiting and looting U.S. assets, as reflected in the Executive Orders aimed at curbing "endemic economic mismanagement and public corruption at

---

[19] ConocoPhillips has filed a letter with the Court seeking to stall execution on PDVH's shares by arguing that if the Third Circuit rules in PDVSA's favor, those assets would have been "available to creditors of PDVSA (such as ConocoPhillips)."  D.I. 104 at 1.  That Crystallex acted more diligently than other creditors in pursuing its judgment is not a reason to stall execution in this matter.  *See Doroshow, Pasquale, Krawitz & Bhaya v. Nanticoke Mem'l Hosp., Inc.*, 36 A.3d 336, 345 (Del. 2012) (recognizing the applicability of "first in time, first in line" rule to determine the priority of creditors); *Comm'rs Freedman's Sav. & Tr. Co. v. Earle*, 110 U.S. 710, 717 (1884) ("Though it be the favorite policy of this court to distribute assets equally among creditors, . . . whenever a judicial preference has been established by the superior legal diligence of any creditor, that preference is always preserved in the distribution of assets.").

the expense of the Venezuelan people and their prosperity." Ex. 13; *see also* Exs. 11, 12.

PDVSA argues that, because the Executive Orders do not expressly restrain actions of CITGO,

this Court should treat those orders as endorsing a public interest in preserving CITGO.  But

exempting CITGO from sanctions simply means that CITGO should be treated as any other

asset, in which case the public interest in enforcing judgments militates against the stay request.

### B.     PDVSA Must Post a Full Bond In Order to Continue The Stay of Execution

Even if this Court were to determine that the factors discussed above weighed in favor of

granting a stay—and it should not—there is no reason to permit a stay without requiring that

PDVSA post a bond.  It is undisputed that PDVSA's alter ego Venezuela owes Crystallex a $1.2

billion judgment (plus interest).  Venezuela could and should pay that judgment, but it has

refused and has forced Crystallex to seek to satisfy its judgment elsewhere.  Given that

Crystallex's judgment is valid and has been outstanding for more than a year already, its interests

should be protected by a bond during the pendency of PDVSA's appeal.

"The purpose of the supersedeas bond" requirement set forth in Federal Rule of Civil

Procedure 62(d) is to "'secure[] the prevailing party against any loss sustained as a result of

being forced to forgo execution on a judgment during the course of an ineffectual appeal.'"  *In re

W.R. Grace & Co.*, 475 B.R. 34, 209 (D. Del. 2012) (citation omitted), *aff'd* 729 F.3d 332 (3d

Cir. 2013) (subsequent affirmations omitted).  Courts may only forego the bond requirement

under "exceptional circumstances" and "when there are other means to secure the judgment

creditor's interests," such that the court is "convinced that the judgment is adequately secured."

*Montalvo v. Larchmont Farms, Inc.*, 2011 WL 6303247, at *2 (D.N.J. Dec. 15, 2011); *Fed.

Election Comm'n v. O'Donnell*, 2017 WL 2200911, at *2 (D. Del. May 19, 2017) (Stark, J.)

(denying motion for stay without bond because defendants failed to show that judgment was

adequately secured and had not "address[ed] the [plaintiff's] concerns about the security of the

24

judgment") (quoting *In re Diet Drugs*, 582 F.3d 524, 552 (3d Cir. 2009)).  In determining

whether a court should "depart[] from the ordinary requirement of a supersedeas bond," "[a] high

priority . . . should be to ensure the collectability of plaintiff's judgment," and "[e]rror, if at all,

should be on the side of *protecting plaintiff's stake*."  *United States v. Panhandle E. Corp.*, 696

F. Supp. 983 (D. Del. 1988) (emphasis added) (rejecting proposed alternative arrangement to

secure payment of the judgment pending appeal).

In addition, Delaware law, which governs this execution proceeding pursuant to Federal

Rule of Civil Procedure 69, provides that stays of execution may be granted only where the

judgment debtor provides "'sufficient security'" which is "at a minimum, the full amount of the

money judgment."  *Gates v. Texaco, Inc.*, 2008 WL 1952162, at *1 (Del. Super. Ct. May 2,

2008); *see also In re Karaha Bodas Co., L.L.C.*, 2002 WL 1401693, at *1 (D. Del. June 27,

2002), *order clarified*, 2002 WL 1585913 (D. Del. July 18, 2002) ("agree[ing]" that "the court

should apply Delaware law to the question of whether [the judgment debtor] must post a bond

pending the removal of the stay order");[20] *Owens Corning Fiberglas Corp. v. Carter*, 630 A.2d

647, 648 (Del. 1993) (affirming denial of stay unless appellant "paid the full amount of the

judgment plus legal interest" into the court).  In general, Delaware courts "do[] not have the

discretion to waive the requirement of a supersedeas bond."  *Gates*, 2008 WL 1952162, at *1;

*see also Zimmerman v. Crothall*, 2014 WL 257461, at *2 n.14 (Del. Ch. Jan. 23, 2014)

("Delaware courts have held that, pursuant to article IV, § 24 of the Constitution and the

applicable Supreme Court Rules, trial courts are without authority to waive the supersedeas bond

---

[20]  In *Karaha Bodas*, the Court declined to "narrowly construe Rule 69's facially broad
language," and instead concluded that "'procedure on execution' includes procedures
regarding and related to execution," including "the court's order stay[ing] proceedings in
furtherance of the execution of a judgment."  *Id*. at *2.

requirement.")  Because state law applies to enforcement procedures, this Court is similarly constrained from waiving the bond requirement here.

Here, PDVSA has failed to demonstrate "why th[is] court should deviate from the ordinary full security requirement." *In re W.R. Grace & Co.*, 475 B.R. at 209.  It has made no effort to show that it is unable to pay the bond, whether through the cash proceeds of its own operations or through non-U.S. debt.[21]  Despite its conclusory assertion that Crystallex's lien on the PDVH shares should suffice as security for a stay (D.I. 98 at 19), neither PDVSA nor any of the Proposed Intervenors has offered any evidence at all as to the value of the shares.[22]  Absent such evidence, it is impossible for the Court to determine whether the shares might present adequate security for Crystallex's judgment.[23]  And, whatever that value is today, it will go down if the Proposed Intervenrors attempt to foreclose on the shares of CITGO Holding.

---

[21]  PDVSA and Venezuela have had no trouble securing funds in the past.  As recently as September 13, President Maduro travelled to China to secure $5 billion "to finance oil projects," which will supplement the $5.25 billion Venezuela has already secured from China for the same purpose.  Ex. 24.

[22]  Thus, PDVSA's cited authority is inapposite.  *See, e.g., ASARCO LLC v. Ams. Mining Corp.*, 419 B.R. 737, 743 (S.D. Tex. 2009) (the "court's security arrangement effectively pledge[d] an amount of . . . shares equal to twice the value of the monetary judgment"); *Fastov v. Christie's Int'l P.L.C.*, 2008 WL 3200733, at *1 (D.D.C. Aug. 7, 2008) (foregoing bond because "the corpus of the [attached brokerage] account exceed[ed]" the judgment and movant w[ould] not be permitted to access the corpus while his appeal [wa]s pending"); *USA Gateway Travel, Inc. v. Gel Travel, Inc*., 2007 WL 1058582, at *1 (W.D. Wa. April 5, 2007) (ordering a supersedeas bond less than the full judgment when bond combined with the attached assets was valued at 60% more than the judgment amount); *C. Albert Sauter Co. v. Richard S. Sauter Co.*, 368 F. Supp. 501, 520-21 (E.D. Pa. 1973) (requiring a partial bond be posted in addition to placing shares in escrow).

[23]  PDVSA's claim that no bond is required because the Executive Orders "operate as a restraint on the PDVH shares" is without support.  D.I. 98 at 17.  The purpose of posting a bond is to ensure that assets are not dissipated so that the appellee's judgment can be satisfied in the event of an ineffective appeal.  *See In re Tribune Co.*, 477 B.R. 465, 478 (Bankr. D. Del. 2012) ("court[s] look[] to whether [a] bond would be necessary to protect 'against diminution

Even assuming that there was evidence that the value of the PDVH shares today is sufficient to satisfy Crystallex's judgment—there is none—a lien on the shares itself is not adequate security. PDVSA's cases recognize that "[t]he function of a supersedeas bond is to 'protect the judgment creditor's position from erosion during any period that its right to execute is obstructed by a stay pending appeal,'" but those cases did not involve judgment debtors with Venezuela's and PDVSA's documented history of attempting to hinder and evade creditors. *United States v. Indianapolis Baptist Temple*, 1999 WL 1249452, at *2 (S.D. Ind. Nov. 10, 1999). The managers of the CITGO Entities are pulled from the ranks of PDVSA's officers and directors, who are themselves current and former Venezuelan officials. *See* Exs. 25-28; D.I. 3-1 at 9-11. There is no reason to believe that, faced with imminent loss of Venezuelan control, these individuals will act in the best interests of the CITGO Entities as opposed to those of Venezuela and PDVSA. As detailed above, management of the CITGO Entities is directed by the same parties responsible for stymieing Crystallex's collection efforts—PDVSA and Venezuela. *See supra* at Sect. I.A.3. There is simply no reason to believe that the value of the PDVH shares will be preserved pending appeal.

At bottom, PDVSA's arguments wholly ignore the significant possibility that PDVSA, and/or Venezuela may take steps while PDVSA's appeal is pending to devalue PDVH and its shares.[24] Rosneft and Bondholders may well do the same—their rights are tied to a default by

---

in the value of property pending appeal' and to 'secure the prevailing party against any loss that might be sustained as a result of an ineffectual appeal'"). Thus, the notion that a non-judicial order—revocable at any time—restricting transfer of PDVH's shares provides Crystallex with security is disregards the possibility that Venezuela and/or PDVSA may take actions in the interim that significantly devalue the shares and render the Writ ineffectual.

[24] For example, Bondholders claim that the PDVH shares are "safely in storage waiting for Crystallex," but fail to address the possibility that those shares may be devalued while "in storage." D.I. 105 at 10. Indeed, should PDVSA default on the 2020 bonds, the value of those shares would be subject to the whims of Bondholders.

PDVSA, not just a sale of the shares.  Given that PDVSA has already defaulted on most, if not

all of its unsecured debt, there is every reason to believe that PDVSA will eventually default on

these obligations too.  And there is no assurance that Rosneft and Bondholders will not seek to

exercise those rights while an appeal is pending, thereby reducing the value of the shares of

PDVH.  Indeed, their intervention motions are premised on the assumption that if PDVSA

defaults they will exercise their purported contractual rights.  This possibility—or even

probability—cautions against dispensing with the bond requirement.  *See, e.g.*, *Lech v. Jackson*,

2018 WL 2183984, at *2 (D. Colo. May 10, 2018) (rejecting argument that the creditor could

"quickly collect on the judgment by garnishing plaintiffs' wages or bank accounts or by placing

liens on their properties" because "plaintiffs [did not provide[] any guarantee that those assets

w[ould] still be available following the outcome of their appeal" and therefore "a lien on

plaintiffs' property [wa]s not a proper substitute for the supersedeas bond requirement").

     PDVSA also has failed to demonstrate that exceptional circumstances exist warranting a

waiver of the bond requirement.  PDVSA provides only conclusory statements such as: (1) the

writ "is more than enough security," such that requiring a bond "would be a waste of money";

(2) "the costs of requiring a bond or authorizing execution . . . outweigh any benefits of denying

an unconditional stay"; (3) "it is 'reasonably clear'" that PDVSA cannot afford a bond because it

cannot take on "new debt" in the United States; and (4) execution "could set off a cascade of

adverse events under various financing arrangements."  D.I. 98 at 19-20.  However, these

arguments are without legal or evidentiary support.  *See Montalvo*, 2011 WL 6303247, at *2

(denying motion for a stay without bond because movant "rel[ied] on bald assertions" that

exceptional circumstances existed).  PDVSA has ignored the possibility of posting a cash bond

or obtaining non-U.S. financing.  And, PDVSA has failed to establish why separate contractual

relationships between non-parties to this action should stand in the way of securing Crystallex's judgment. In contrast, Crystallex has established that the danger in granting an unconditional stay outweighs the benefits, *see supra* Sect. I.A.3.

In sum, PDVSA has not "demonstrate[d] objectively that posting a full bond is [either] impossible or impractical," or satisfied its "duty to propose a plan that will provide adequate . . . security for [Crystallex]." *United States v. Kurtz*, 528 F. Supp. 1113, 1115 (E.D. Pa. 1981) (finding defendant had not satisfied these requirements because he only offered an "unsupported allegation that he [wa]s financially unable to satisfy the judgment or to post a bond"); *see also Ryan v. Asbestos Workers Union Local 42 Pension Fund*, 2002 WL 87470, at *1 (D. Del. Jan. 22, 2002) (same).[25]

## II.     The Proposed Intervenors Have No Right To Intervene

CITGO, Rosneft, and Bondholders attempt to insert themselves into an enforcement proceeding that has nothing to do with them. Crystallex has a valid and uncontested judgment against Venezuela, and, by this enforcement proceeding, Crystallex simply sought, successfully, to execute against assets belonging to its judgment debtor. But for one administrative task—the entry of an order scheduling the Marshals' sale for a date certain—there is nothing left for the Court to do. Thus, even if the Proposed Intervenors somehow had an interest in this proceeding—they do not—it is too late for them to seek to protect it.

---

[25]   PDVSA's alter ego, Venezuela, was denied a similar request for a stay of enforcement of Crystallex's judgment in the District Court of the District of Columbia after that court found a "likelihood that Venezuela will be either unwilling or unable to satisfy the full judgment," and that "Venezuela's conduct thus far" had not "demonstrated unmistakably its intent and ability to pay." *Crystallex Int'l Corp. v. Bolivarian Republic of Venezuela*, 1:16-cv-00661-RC, at 3-4 (D.D.C. Aug. 8, 2017) (order denying stay motion). The court was also "unable to conclude that Crystallex's interests would not be injured" by a stay without a bond, and therefore "decline[d] to stay the case." *Id.* at 6.

In the Third Circuit, a nonparty-applicant seeking to intervene as of right must demonstrate that "(1) the application for intervention is timely; (2) the applicant has a sufficient interest in the litigation; (3) the interest may be affected or impaired, as a practical matter by the disposition of the action; and (4) the interest is not adequately represented by an existing party in the litigation." *Harris v. Pernsley*, 820 F.2d 592, 596 (3d Cir. 1987). "Although these requirements are intertwined, each must be met to intervene as of right," *id*, and "the applicant bears the burden of persuading the court that each element is met." *Anthony v. Indep. Ins. Advisors, Inc.*, 2012 WL 1313413, at *4 (V.I. Apr. 2, 2012) (applying Third Circuit precedent). None of these factors is met here.

## A.     The Motions To Intervene Are Untimely

The Proposed Intervenors' assertion that this Court has effectively already decided that intervention is permissible when it set a deadline for filing any motions to intervene mischaracterizes the Court's August 23, 2018 Order.[26]  When considering the timeliness of a motion to intervene, "the Third Circuit has instructed that three factors must be considered: (1) the stage of the proceeding; (2) the prejudice that delay may cause the parties; and (3) the reason for the delay." *Anthony*, 2012 WL 1313413, at *5.

---

[26]  While each Proposed Intervenor attempts to rely on the Court's August 23, 2018 Order, only Bondholders cite any authority for the assertion that filing within a deadline creates a presumption of timeliness. *See* D.I. 105 at 5 (citing *Edwards v. City of Houston*, 37 F.3d 1097, 1107 (5th Cir. 1994), *on reh'g en banc*, 78 F.3d 983 (5th Cir. 1996)).  The motions in *Edwards* were motions to intervene on *appeal*, which were filed before the purported deadline set by the district court, but the Fifth Circuit reaffirmed the motions to intervene in the underlying case.  37 F.3d at 1107.  When the Fifth Circuit sitting *en banc* reheard the case, it only granted intervention after conducting a traditional timeliness analysis of the facts, including the expediency of the filings by the two intervenors, the prejudice to the parties, and the intervenors' opportunity to participate meaningfully to protect their rights. 78 F.3d at 1000-04.

First, the Motions to Intervene are untimely because there are no claims or defenses left for the Court to decide and it therefore is too late in the proceedings to intervene.  *See In re Fine Paper Antitrust Litig.*, 695 F.2d 494, 500 (3d Cir. 1982) ("[A] 'motion to intervene after entry of a decree should be denied except in extraordinary circumstances.'").  "[C]ourts generally find intervention untimely" when sought after "the filing of dispositive motions" "unless there is a compelling reason for the delay in filing."  *Anthony*, 2012 WL 1313413, at *6 (citing *Choike v. Slippery Rock Univ. of Pennsylvania of State Sys. of Higher Educ.*, 297 F. App'x 138, 141 (3d Cir. 2008) (unpublished)).  Here, the Motions to Intervene were filed after all legal questions were resolved, after the Court had issued all necessary substantive orders, and when the only remaining task for the Court is a procedural one—ordering a Marshals' sale of the PDVH shares.  Intervention will only create delay—indeed, each of the intervenors seeks a stay in the hope of elevating their financial interests above Crystallex's judgment.  None of the Proposed Intervenors offers an excuse for their year-long delay since the commencement of litigation, nor attempts to explain why they waited until after there was nothing left for this Court to decide before moving to intervene.  The Proposed Intervenors' motions are untimely.[27]

Second, allowing the Proposed Intervenors' to intervene at this late stage would prejudice Crystallex by further delaying execution of the Court's August 9 Order and potentially forcing Crystallex to re-litigate issues that it already has spent time and money briefing before the Court.

---

[27] *Mountain Top Condominium Assoc. v. Dave Stabbert Master Builder, Inc.*, 72 F.3d 361, 370 (3d Cir. 1995), cited by CITGO and Rosneft, D.I. 101, 102 at 3-4; D.I. 100 at 6-7, is not to the contrary.  The movants in *Mountain Top* sought to intervene within a month of learning that escrowed funds—in which they had a direct interest—might be depleted.  72 F.3d at 370.  Unlike the Proposed Intervenors, the movants in *Mountain Top* did not wait for that lawsuit to end, and instead diligently asserted their claims as soon as the risk became apparent.

*See In re Safeguard Scis.*, 220 F.R.D. 43, 47 (E.D. Pa. 2004) (denying motion to intervene as untimely where parties would be prejudiced by having to re-litigate previously decided motion). As detailed above (*supra* at pp. 10-11, Sect. I.A.3), Crystallex will suffer substantial injury by any further delay on execution,[28] and any argument that Crystallex is not prejudiced because its interest in the shares of PDVH is "secured" ignores that until the shares are sold their value is subject to manipulation by Venezuela, PDVSA and even PDVH itself.  *See supra*, pp. 8-9, 32 n.27.  On the other hand, no merits determinations remain to be made in this action, and none of the Proposed Intervenors has an interest in the shares of PDVH.  Accordingly, the Proposed Intervenors would not suffer any prejudice from continuing as non-parties.[29]

Third, the Proposed Intervenors provide no legitimate excuse for their delay in filing the Motions to Intervene.  "To the extent the length of time an applicant waits before applying for intervention is a factor in determining timeliness, it should be measured from the point at which the applicant knew, or should have known, of the risk to its rights."  D.I. 100 at 7 (quoting *United States v. Alcan Aluminum, Inc.*, 25 F.3d 1174, 1183 (3d Cir. 1994); *accord* D.I. 101, 102 at 3-4; D.I. 105 at 5.  Even if the Proposed Intervenors had a substantial interest in this

---

[28]  As the Court is aware, Venezuela expropriated the Las Cristinas mine in 2011.  (D.I. 3-1 at 5)  Seven years later Crystallex still has not been compensated.  Venezuela has refused to satisfy judgments entered in the courts of the United States, Canada and the Netherlands.  Crystallex, which is currently subject to insolvency proceedings, is prejudiced each day the judgment remains unpaid.

[29]  To the extent the Proposed Intervenors wish to provide "input" regarding the sale of the shares of PDVH, they were invited to do so by this Court and thus need not intervene.  *See* D.I. 95.  Indeed, Crystallex welcomes any information regarding the shares and the nature of the Proposed Intervenors' security interests in certain of PDVH's downstream assets that Proposed Interveners wish to share with potential purchasers.  But, so far, they have offered none.  Nor have any of the Proposed Intervenors offered any legal authority for any sales process other than the statutorily-endorsed process proposed by Crystallex.

litigation—they do not—all of the Proposed Intervenors were aware that their interests were at risk the moment this litigation began.

Each of the Proposed Intervenors points to the fact that the Writ was only recently issued, (D.I. 100 at 6-7; D.I. 101, 102 at 3-4; D.I. 105 at 5-6), but ignores that the Court's August 9, 2018 decision was not the beginning of the writ proceeding; it was the end. Once the Court issued its August 9 ruling, the *risk* of an adverse ruling was converted into a *fact* that Crystallex could attach the shares of PDVH to execute on its judgment. None of the Proposed Intervenors even attempts to explain why they could not have moved to intervene a year ago. Instead, it seems they simply believed that Crystallex would be unsuccessful. This is not a basis upon which the Proposed Intervenors can argue that they "did not know nor should have known[] of the possible need to intervene." *In re Safeguard Scis.*, 220 F.R.D. at 47 (incorrect belief that class certification motion would succeed did not justify potential class members' delay in moving to intervene).[30] Nor can the Proposed Intervenors claim a lack of knowledge. This action has generated substantial press, *see, e.g.*, Exs. 1-4, and the Proposed Intervenors do not (and cannot) claim that they only learned about the case following the Court's most recent ruling. *See Choike*, 297 F. App'x at 142 (party who became aware of its rights when the case was filed because "[it] created some publicity," cannot excuse a delay in moving to intervene).

Because they were filed over a year after the commencement of litigation and after PDVSA intervened, because the Proposed Intervenors' delay in filing the motions would cause

---

[30] PDVSA recognized that its supposed interests were at risk and timely moved to intervene. The Proposed Intervenors offer no explanation for their failure to do the same, and now, over a year later, it is too late. *See U.S. E.E.O.C. v. ABM Indus. Inc.*, 2010 WL 744714, at *3 (E.D. Cal. Mar. 3, 2010) (finding inexcusable delay where proposed intervenors sought leave to intervene long after other parties had done so).

prejudice to Crystallex, and because the delay is not justified by any reasonable excuse, the Motions to Intervene should be denied as untimely.

### B. None Of The Proposed Intervenors Has Demonstrated A Protectable Interest In The Litigation

An interest that is contingent and indirect is "not the kind of interest courts have required for intervention under Rule 24(a)." *Liberty Mut. Ins. Co. v. Pac. Indem. Co.*, 76 F.R.D. 656, 660 (W.D. Pa. 1977) (denying motion to intervene where asserted interest depended on future recovery on a judgment). The Third Circuit has repeatedly disposed of arguments—like those in the Motions to Intervene—that conditional interests, rather than direct and substantial rights, are sufficiently protectable to justify intervention as of right.[31] *See, e.g.*, *Liberty Mut. Ins. Co. v. Treesdale, Inc.*, 419 F.3d 216, 222-23 (3d Cir. 2005) (tort plaintiff's interest in insurance proceeds was insufficient to justify intervention because it was exactly "the kind of economic interest" that "does not support intervention as a matter of right").

Here, the Proposed Intervenors have no interest in, or right to, the PDVH shares. CITGO merely argues that the sale of the shares will force CITGO Holding to take certain contractual

---

[31] The Proposed Intervenors rely heavily on *Mountain Top* and *Kleissler* to argue that they have a protectable interest in this litigation, but those cases are inapposite. In *Mountain Top*, the intervenors held a property interest in escrow funds deposited with the court in that litigation because they were "assets of an express trust" to which the intervenors "[we]re the intended beneficiaries." *Mountain Top*, 72 F.3d at 368; *see also Liberty Mut. Ins. Co. v. Treesdale, Inc.*, 419 F.3d 216, 221-22 (3d Cir. 2005) (distinguishing *Mountain Top*). In *Kleissler*, environmental groups sought to enjoin the National Forest Service from logging in a specific area. *Kleissler v. U.S. Forest Serv.*, 157 F.3d 964, 967 (3d Cir. 1998). School districts and municipalities were permitted to intervene because they received a share of the proceeds, while logging companies were permitted to intervene to protect their ability to enter into future contracts with the National Forest Service given their "longstanding dependence on [such] contractual relations." *Id.* at 972-73. The *Kleissler* intervenors' interest was directly related to the issue in the underlying litigation—whether the National Forest Service should be permitted to log in the designated area—and would not merely be affected, but wholly destroyed, if the logging ceased.

actions—offering to repurchase on an accelerated schedule debt that it already has to repay, which would presumably be funded by an issuance of new debt—that potentially could affect CITGO's financial position.  And Rosneft and Bondholders assert a conditional economic interest in different property that they claim might be impacted if the PDVH shares are sold. Rosneft claims that it has "a security interest in the principal asset of PDVH" and that the "disposition of [the PDVH shares] necessarily implicates [Rosneft's] interests."  D.I. 100 at 8-9. Rosneft has it backwards.  The disposition of the PDVH shares does not "implicate" Rosneft's interests; rather, the value of the PDVH shares is *affected by* Rosneft's interests.  As Rosneft admits, its purported security interest will not be altered by a sale of the PDVH shares.  D.I. 100 at 14 ("[A]ny buyer of PDVH common stock will take subject to [Rosneft's] rights.").  Bondholders claim that their interest is two-fold: (1) protecting the value of their collateral, and (2) protecting the value of PDVSA's assets.  Bondholders' first interest is identical to Rosneft's asserted interest and fails for the same reasons.  And to the extent Bondholders seek to intervene to protect the inchoate value of the assets of their debtor, that is precisely the sort of pure "economic interest" that the Third Circuit has deemed insufficient to justify intervention.[32]

---

[32]  This limitation on intervention is consistent with the requirement that "[a]n intervenor must meet the [standing] requirements of Article III if the intervenor wishes to pursue relief not requested by a plaintiff."  *Town of Chester, N.Y. v. Laroe Estates, Inc.*, 137 S. Ct. 1645, 1648 (2017) (remanding for consideration of the nature of relief requested by the proposed intervenor).  Moreover, intervention is subject to the requirement of prudential standing, meaning that would-be intervenors must move to intervene to protect their own interests, not the interests of others.  *See, e.g.*, *New Orleans Pub. Serv., Inc. v. United Gas Pipe Line Co.*, 732 F.2d 452, 464 (5th Cir. 1984) (a nonparty seeking to intervene must not assert the interests of others to obtain redress for itself).  The only "relief" Rosneft seeks is to comment on the sale process; it does not submit any question on which the Court must rule.  CITGO and Bondholders, meanwhile, also seek a stay, which (1) is not relief sought by Crystallex, and (2) is relief already sought by PDVSA.  None of these requests creates an actual claim or controversy for this Court to adjudicate.

Even if interests of the sort theorized by Rosneft and Bondholders could support intervention, their intervention motions would fail because neither Rosneft nor Bondholders provides evidentiary support for their motions.  In its brief, Rosneft claims it has an interest in the shares of CITGO Holding, but it fails to submit any documents supporting that claim, much less its claim to have contractual rights that might be implicated by a sale of PDVH.  Bondholders similarly offer no affidavit or other evidence showing that they actually have an interest in the shares.  *Compare In re Chemed Corp. S'holder Derivative Litig.*, 2017 WL 1712530, at \*10 (D. Del. Apr. 25, 2017) (noting that the movant "submitted a declaration and exhibit confirming his Chemed stock ownership").  Accordingly, Rosneft and Bondholders have failed to meet their burden of demonstrating an interest in the litigation.

### C.    The Proposed Intervenors' Purported Interests Will Not Be Impaired By The Execution Of This Court's Judgment

This Court has made no determination as to the Proposed Intervenors' rights (and they do not assert otherwise).  The Proposed Intervenors do not assert that the Court's August 9 Order, or its anticipated sale order, will have any legal effect on their purported interests.  Indeed, the Motions to Intervene are premised on the Proposed Intervenors' bargained-for contractual rights, which contemplated this very scenario, and for which the Proposed Intervenors assumed the risk.

Here, Bondholders and Rosneft were well aware of the risk that Venezuela's creditors would try to reach PDVSA's assets to satisfy Venezuela's debts—including having received or had access to explicit warnings of Crystallex's efforts to collect on its Award against Venezuela.  PDVSA warned investors:

- Some creditors have, in recent years, used litigation tactics against several sovereign debtors, to attach assets of state-owned entities located outside the relevant jurisdiction or interrupt payments made by these. . . . .  PDVSA cannot guarantee that a creditor of the Bolivarian Republic of Venezuela will not be able to interfere with the Exchange Offers, the Collateral or payments made under the New Notes, through an attachment of assets, injunction, temporary restraining order or otherwise. Ex. 5 at 121.

PDVSA also warned that "Venezuela may exercise the rights arising from its ownership interest in a manner that would benefit Venezuela's interests above our own interests, and that Venenuela "we may engage in activities that give preference to the objectives of the Venezuelan government rather than our economic and business objectives. *Id.* at 29.

CITGO issued similar warnings, which were incorporated into PDVSA's Offering Circular at Appendix A, including that:

- PDVSA and the Bolivarian Republic of Venezuela are respondents in various arbitrations and lawsuits that are at various stages.  Claimants in one or more of these proceedings may seek to obtain orders freezing or attaching our assets and/or assets of PDVSA and/or PDV Holding.  Such a freeze or attachment of assets could adversely affect our financial condition and results of operations.  *Id.* at A-30.

CITGO cannot be surprised that events that CITGO itself warned might occur actually did occur.

There is no legitimate argument that these contingent risks were not accounted for when Bondholders and Rosneft accepted the pledge of PDVH's shares in CITGO Holding.  In other words, the price PDVSA paid to issue debt reflected the risks that actions such as this one would follow.  Having accepted those risks, and having priced their investments accordingly, Bondholders and Rosneft cannot now be heard to complain that those risks have come to pass.  Similarly, the risk that CITGO Holding might have to repurchase its own debt influenced the pricing of CITGO Holding's debt.  Because the cost of the potential repurchase was a factor in determining the economics of the initial offering, CITGO cannot now claim injury simply because it may be required to honor its own debt covenants if the shares of PDVH are sold.[33]

---

[33] Regardless, the Proposed Intervenors' supposed interests would not be practically affected by a sale.  Rosneft recognizes that any purchaser of PDVH would "take subject to [Rosneft's] rights," D.I. 100 at 14 and, in any case, the shares will "potentially [be] valued in the billions of dollars" *id.*, which would no doubt be sufficient to pay any legitimate claims.  CITGO asserts that it will be required to offer to repurchase its outstanding debt, D.I. 101, 102 at 6,

### D.    The Proposed Intervenors Interests (If Any) Are Adequately Represented By PDVSA And Crystallex

"Generally, an applicant's rights are not adequately represented where: (1) the interest of the applicant so diverges from those of the representative party that the representative party cannot devote proper attention to the applicant's interest; (2) there is collusion between the existing parties; or (3) the representative party is not diligently prosecuting the suit." *In re Safeguard Scis.*, 220 F.R.D. at 48.  The Proposed Intervenors point only to the first factor—that their interests are not aligned with the interests of PDVSA or Crystallex—but that assertion is incorrect.  They seek the same stay that PDVSA is already pursuing.  In circumstances like these, "[w]here the party seeking to intervene has the same ultimate goal as a party already in the suit, courts have applied a presumption of adequate representation." *Moosehead Sanitary Dist. v. S. G. Phillips Corp.*, 610 F.2d 49, 54 (1st Cir. 1979).  The Proposed Intervenors have made no showing sufficient to overcome this presumption. *Id.* ("To overcome that presumption, petitioner ordinarily must demonstrate adversity of interest, collusion, or nonfeasance.").[34]

## III.    This Court Should Deny The Motions For Permissive Intervention

None of the Proposed Intervenors has anything to say about the validity of the judgment or the Court's determination that PDVSA is an alter ego of Venezuela and therefore do not

---

but there is way to know how many, if any, of its creditors will accept that offer as CITGO's debts are likely to be far more valuable and easily traded without the weight of PDVSA's reputation dragging down their value.  Further, Bondholders argue that a lien on the shares is sufficient security for Crystallex's judgment, D.I. 105 at 5, but Bondholders cannot have it both ways.  Either the value of the shares is at risk, in which case a bond is required, or it is stable, in which no intervention would be necessary.

[34]  To the extent the Proposed Intervenors are concerned with the value of CITGO, Crystallex shares the goal of maximizing the value of all of PDVH's assets in order to achieve the maximum possible price when selling the PDVH shares to execute on its judgment.  Rosneft's and Bondholders' claims that Crystallex and any future purchaser of PDVH would prefer to take without the current liens on CITGO Holding is not disputed.  But, at best that affects the value of the equity of PDVH, not the value of CITGO Holding, the entity in which they purport to have an interest.

possess "a claim or defense that shares with the main action a common question of law or fact." *United States v. Territory of Virgin Islands*, 748 F.3d 514, 524 (3d Cir. 2014) (quoting Fed. R. Civ. P. 24(b)(1)(B)). "In exercising its discretion, the [district court] must consider whether the intervention will unduly delay or prejudice the adjudication of the original parties' rights." *Id*. (alteration in original) (quoting Fed. R. Civ. P. 24(b)(3)).

Although the Proposed Intervenors paint the standard for permissive intervention with a broad brush, they ignore that the Court may only exercise this discretion "[a]ssuming the proposed intervenor presents a common question of law or fact" with the parties. *Getty Oil Co. v. Dep't of Energy*, 117 F.R.D. 540, 549 (D. Del. 1987). More specifically, "a motion for permissive intervention under Rule 24(b) *must* have grounds in claims for relief which share questions of fact or law in common with the main action, *and not in the coincidence of financial interests*." *Pac. Indemn.*, 76 F.R.D. at 660 (emphases added). The Proposed Intervenors' argument that PDVSA and CITGO may not have sufficient resources to satisfy future claims against them should the sale of the shares of PDVH go forward is an argument grounded in a "coincidence of financial interests," not common questions of law or fact. The Proposed Intervenors do not claim that they will assist this Court in determining the question of whether the shares of PDVH are property of Venezuela, nor could they given that the Court has already made that determination. The Proposed Intervenors therefore have not established an interest sufficient to justify intervention and there is no discretionary decision for this Court to make.

Lastly, as with motions to intervene as of right, nonparties seeking permissive intervention must move to intervene in a timely fashion. *See Wallach v. Eaton Corp.*, 837 F.3d 356, 371 (3d Cir. 2016) ("A district court's timeliness inquiry for both types of Rule 24 motions requires considering the totality of the circumstances . . . ."). The Court's interest is in the

expedient execution of justice, and the Proposed Intervenors do not articulate an argument as to how they will aid this goal or why they should be heard on the questions of fact and law that have already been heard and decided by this Court.  *See Getty Oil Co.*, 117 F.R.D. at 550. Allowing the Proposed Intervenors to intervene now would do little more than further delay this action.  *See Del. Vall. Citizens' Council for Clean Air v. Pennsylvania*, 674 F.2d 970, 974-75 (3d Cir. 1982) (denying motions to intervene under Rule 24(a) and 24(b) that were made two years after filing and where "proposed intervenors c[ould] not reasonably claim that they were unaware of the pendency of the lawsuit").

Accordingly, this Court should deny the Proposed Intervenors' requests to intervene.

## CONCLUSION

For the reasons set forth above, Crystallex respectfully requests that this Court deny the Motions to Intervene and the Motions to Stay and proceed forthwith with the sale of the shares of PDVH, permitting Crystallex to execute on the final order of this Court.

<table>
<tr><td></td><td>*/s/ Travis S. Hunter*</td></tr>
<tr><td></td><td>Raymond J. DiCamillo (#3188)</td></tr>
<tr><td></td><td>Jeffrey L. Moyer (#3309)</td></tr>
<tr><td></td><td>Travis S. Hunter (#5350)</td></tr>
<tr><td>OF COUNSEL:</td><td>RICHARDS, LAYTON & FINGER, P.A.</td></tr>
<tr><td></td><td>One Rodney Square</td></tr>
<tr><td>Robert L. Weigel</td><td>920 North King Street</td></tr>
<tr><td>Jason W. Myatt</td><td>Wilmington, Delaware 19801</td></tr>
<tr><td>Rahim Moloo</td><td>(302) 651-7700</td></tr>
<tr><td>GIBSON, DUNN & CRUTCHER LLP</td><td>dicamillo@rlf.com</td></tr>
<tr><td>200 Park Avenue</td><td>moyer@rlf.com</td></tr>
<tr><td>New York, New York 10166</td><td>hunter@rlf.com</td></tr>
<tr><td>(212) 351-4000</td><td></td></tr>
<tr><td></td><td></td></tr>
<tr><td>Dated:  September 14, 2018</td><td>*Attorneys for Plaintiff*</td></tr>
</table>