**ADELSO A. ADRIANZA**

113 Washington Street – Newton, MA 02458 – U.S.A.
M: (859) 803-2279 | aaadrianza@gmail.com

February 19, 2019

The Honorable Chief Judge Leonard Stark
United States District Court
J. Caleb Boggs Federal Building
844 N. King Street
Unit 26, Room 6124
Wilmington, DE 19801-3555

Chief Judge Stark,

The letter Mr. Frank Sisca sent to you a couple of weeks ago compelled me to write this letter to provide important context to his complaint regarding Crystallex International Corporation (KRY). In his letter, Mr. Sisca made statements that the uninformed would quickly dismiss as inconceivable. Mr. Sisca's plight is one faced by hundreds of American and Canadian individual investors who have become increasingly frustrated by a legal process whose end justifies the means. This frustration is exacerbated by their inability to seek and obtain justice in a forum that ensures a level playing field.

I am an individual investor who invested my children's education fund and my wife's and my retirement savings in KRY shares sold on the NYSE AMEX. We invested our savings with a full conviction that both the U.S. and the Canadian laws and regulations would enable us to protect our rights as needed. We could have never imagined how unfounded our conviction was. The facts that follow will make this clear.

Writing this letter, I had two conflicting objectives. On one hand, I was hard pressed to do justice to Mr. Sisca and hundreds of individual investors like him that have endured the plight of seeing their savings being misappropriated by Interested Directors under a complacent legal regime. On the other hand, I was mindful of the length of this letter and strived to limit the information herein to what is necessary to fully understand the situation. I pray that I have not failed at reaching both objectives.

## BACKGROUND

### The Applicant / Debtor in Possession

Crystallex International Corporation (KRY) is a Canadian miner whose sole asset was a Mine Operating Contract (MOC) entered in 2002 with a Venezuelan Government enterprise, the Corporacion Venezolana de Guayana (CVG), to exploit the Las Cristinas gold mine located in the Bolivar State. The MOC was cancelled by Venezuela in 2011. KRY filed an arbitration request in 2012 with The International Centre for Settlement of Investment Disputes (ICSID) for USD 3.4 billion based on the Canada – Venezuela Bilateral Investment Treaty (BIT). The ICSID rendered its decision in 2016 and awarded KRY USD 1.4 billion ($1.2 billion award plus $0.2 billion interest

through the award date) and 6-month LIBOR + 1% interest – currently approximately 3.75% p.a. - until the award is paid in full.

**The DIP Lender**

Tenor Capital Management Company, L.P. (Tenor) is a privately-owned, New York based American investment and financing company and KRY'S Debtor in Possession lender (DIP Lender) in the Canadian Companies' Creditors Arrangement Act (CCAA) proceedings through wholly-owned foreign subsidiaries. Tenor's business is focused on managing investment funds in the U.S., while its Canadian business is focused on arbitration financing based on a loan-to-own, bait-and-switch strategy. In Canada, Tenor has been involved in two notorious arbitration financing schemes: KRY and Eco Oro Minerals Corp. (EOM). In the latter, the shareholders took their case to the British Columbia Supreme Court and the Ontario Securities Commission to protect their rights from a money grab attempt orchestrated by the company's officers and Board of Directors (BOD) members in concert with Tenor (under the leadership of Mr. D. Kay, a Tenor Capital partner, who serves as a BOD member in both companies). The shareholders succeeded in protecting their rights because EOM was not in the legal void the CCAA proceedings place shareholders the moment the company files for insolvency protection.

**The KRY Shareholders**

KRY issued 365 million common shares on the Canadian and U.S. stock exchanges. Before the CCAA filing, U.S. institutional investors held closed to 40% of the Company's equity, and individual Canadian and U.S. investors held the remaining shares. The U.S. investment funds Greywolf Capital   Management (GCM) and Steelhead Partners (SP) are both shareholders and noteholders of the Applicant. GWM and SP held most of the shares owned by institutional investors at the time of the CCAA filing. It is unclear if they still do, given that KRY obtained permission from the Ontario Securities Commission (OSC) to allow institutional investor to trade shares after the OSC's cease trade order was issued.

An Ad Hoc Committee of KRY Shareholders (the Committee) was formed by seven KRY shareholders that together held about 10% of the Company's equity. These investors agreed to pursue legal representation in the CCAA proceedings out of concern that KRY's BOD members were pursuing their own economic interests. The Committee obtained legal representation by Gowling WLG (Gowling) towards the end of 2017 on a contingent fee basis. The equity holdings represented by the Committee was increased to over 30% by individual shareholders that subsequently joined the Committee by opting in. I decided not to join the Committee as an opt-in because it was not clear to me how it would be able to advance the shareholders' interests.

**The KRY / Venezuela Settlement Agreement**

After failed attempts to reach first a settlement and then to get Venezuela to honor it, KRY sued Venezuela in U.S. courts to pursue its arbitration award collection efforts and succeeded in getting the Delaware U.S. District Court to issue a writ of attachment and a sale order on the CITGO shares owned by PDVSA, which was deemed to be an alter ego of the Republic. To delay / prevent the attachment, Venezuela agreed to a second settlement. The Company and Venezuela entered their first settlement agreement in November 2017, but Venezuela did not honor the payment plan involved and stopped making the required payments after making a

single USD 25 million payment. A second settlement agreement was signed at the end of 2018 that provided for a new payment plan, as follows:
- Total payment: USD 1.3 billion
- The republic will:
    a. Issue a first payment within 120 days of the signature of the agreement (in early September 2018), which will consist of about USD 425 million in Venezuelan bearer bonds
    b. Provide adequate collateral for the remain amount due, which KRY will be entitled to receive as payment should Venezuela fail to make the remaining payments,
    c. Issue periodic payments from January 2019 through December 2021 for the balance of the settlement amount.

In return, KRY would a) request and obtain approval of an order by the U.S. Court to withdraw the attachment and sale of the CITGO shares order upon its receipt of bearer bonds worth $425 million and the collateral for the remaining amount due is put in place, and b) give up upwards of $200 million in interest due on the ICSID award from expropriation through the final payment in Dec. 2023; assuming Venezuela honors the payment plan of the second settlement agreement.

To date, KRY has received payments for USD 500 million towards the settlement agreement, most of which was made with Venezuelan bonds. The requirement for Venezuela to provide collateral for the remaining USD 800 million by February 10th, 2019 was not met. Therefore, KRY is again back in the U.S. courts pursuing the enforcement of its arbitration award.

**The Companies' Creditors Arrangement Act (CCAA)**
Historically, the purpose of the CCAA was to provide a forum for financially distressed companies to devise a plan with a view to becoming viable in the future.  The CCAA is best known for the extraordinary leeway it affords judges to tailor solutions to ensure the remedial purpose of the Act.

The Supreme Court of Canada had occasion to interpret the CCAA for the first time in *Century Services Inc v Canada (Attorney General), 2010 SCC 60*. Writing for the majority, Justice Deschamps wrote:

*[70] The general language of the CCAA should not be read as being restricted by the availability of more specific orders. However, the requirements of appropriateness, good faith, and due diligence are baseline considerations that a court should always bear in mind when exercising CCAA authority. Appropriateness under the CCAA is assessed by inquiring whether the order sought advances the policy objectives underlying the CCAA. The question is whether the order will usefully further efforts to achieve the remedial purpose of the CCAA – avoiding the social and economic losses resulting from liquidation of an insolvent company. I would add that appropriateness extends not only to the purpose of the order, but also to the means it employs. Courts should be mindful that chances for successful reorganizations are enhanced where*

*participants achieve common ground and all stakeholders are treated as advantageously and fairly as the circumstances permit.*

However, the CCAA proceedings evolved from their original purpose of affording an insolvent company the opportunity to restructure its operations and emerge as a viable enterprise and avoiding the economic and social cost of a liquidation. The purpose of the CCAA mutated over time to allow liquidation or implementation of pre-packaged business agreements under a plan, or indeed, without a plan, as it is the case with KRY, which would not be possible under another regulatory regime such as the Canadian Business Corporation Act (CBCA). The reason for this is simple: a CCAA proceeding affords the Applicant the opportunity to bypass the checks and balances built into laws and regulations like the CBCA and the Canadian Securities Act (CSA) to protect the integrity of the economic activity they regulate to advance the public interest. As a result, most CCAA filings in recent years pursued liquidations.

The CBCA and the CSA take away the authority and responsibility of the organizations in charge of enforcing the Act once a company registered under the CBCA or listed on a Canadian stock exchange files for CCAA protection. The rationale for this is the a priori presumption that shareholders no longer have an interest in the company that needs to be protected by the law enforcement authorities once a company is declared insolvent.

### The CCAA Monitor

The CCAA Monitor, a licensed bankruptcy trustee chosen and paid by the debtor, is appointed in the initial court order to, among other things, monitor the business and the financial affairs of the debtor company and represent the Applicant in foreign legal proceedings (e.g. Chapter 15 in the U.S.). The Monitor, who is licensed and supervised by the Office of the Superintendent of Bankruptcies (OSB), must comply with a prescribed Code of Ethics. His duty is to act independently, with integrity and impartiality in assisting with the restructuring. He is also mandated to act honestly and in good faith, and in the best interests of all stakeholders in the proceedings. The Code of Ethics includes the following norms:

*38 Trustees shall not assist, advise or encourage any person to engage in any conduct that the trustees know, or ought to know, is illegal or dishonest, in respect of the bankruptcy and insolvency process.*

*39 Trustees shall be honest and impartial and shall provide to interested parties full and accurate information as required by the Act with respect to the professional engagements of the trustees.*

*44 Trustees who are acting with respect to any professional engagement shall avoid any influence, interest or relationship that impairs, or appears in the opinion of an informed person to impair, their professional judgment.*

*45 Trustees shall not sign any document, including a letter, report, statement, representation or financial statement that they know, or reasonably ought to know, is false or misleading, and shall not associate themselves with such a document in any way, including by adding a disclaimer of responsibility after their signature.*

*47 Trustees shall not engage in any business or occupation that would compromise their ability to perform any professional engagement or that would jeopardize their integrity, independence or competence.*

*50 Trustees shall not obtain, solicit or conduct any engagement that would discredit their profession or jeopardize the integrity of the bankruptcy and insolvency process.*

I wrote to the OSB to report violations of the Code of Ethics in the KRY CCAA proceedings by the Monitor by aiding and abating the Applicant's efforts to avoid the disclosure of actions and omissions detrimental to the shareholders. The OBS' response to my complaint states:

*"The CCAA Initial Order specifically address the disclosure of information in the Crystallex CCAA Proceedings.  Paragraph 29 of the Initial Order "… In the case that of information that the Monitor has been advised by the Applicant is confidential, the Monitor shall not provide such information to creditors or any other person unless otherwise directed by this Court or on such terms as the Monitor and the Applicant may Agree."*

*After careful analysis of this issue, we are unable to conclude that the Monitor prevented the disclosure of information to the detriment of Crystallex's stakeholders."*

Ergo, the Code of Ethics issued by the regulatory body whose main duty and responsibility is to protect the integrity of the bankruptcy proceedings is nullified by the decisions of the leading participants in the proceedings said regulatory body is required to regulate.

## THE CCAA PROCEEDINGS

### The CCAA Filing

The company owed under $140 million when it filed for CCAA protection, of which $100 million were notes held by institutional investors, $ 10 million was an asset retirement obligation fund, and the remainder unsecured loan and trade payables.  The KRY noteholders tried to take over the company after the MOC cancellation. As a result, KRY filed for CAAA protection in December 2012. KRY and The DIP Lender entered into a Credit Agreement to provide USD 36 million in DIP financing to fund the ICSID arbitration claim for a 35% share of the Net Arbitration Proceeds (NAP) – the funds remaining from the ICSID award after paying the operating expenses and taxes due, the bondholders debt and 9% p.a. PIK interest, Tenor's DIP loan amount and 10% p.a. PIK interest, and the unsecured creditors. The agreement also set aside 35% of the NAP to be shared by the shareholders (75%) and the company employees participating in the Management Incentive Plan (MIP, 25%). This was necessary for the court's approval of an eventual Plan of Arrangement, given the size of the expected ICSID award amount vs. the outstanding debts, and the standards set by Canadian courts:

The Supreme of Court Canada in its CBE decision:

*The approval of a Plan of Arrangement requires that…*
- *The statutory procedures have been met;*
- *The application has been put forward in good faith; and*

- *The arrangement is fair and reasonable, that is, the arrangement must:*
  *(a) have a valid business purpose; and*
  *(b) resolve the objections of those whose legal rights are being arranged in a fair and balanced way.*

The Alberta Court of Queen's Bench in its Canadian Airlines Corporation decision by Justice Paperny:

*[w]here a company is insolvent, only the creditors maintain a meaningful stake in its assets. Through the mechanism of liquidation or insolvency legislation, the interests of shareholders are pushed to the bottom rung of the priority ladder. The expectations of creditors and shareholders must be viewed and measured against an altered financial and legal landscape. Shareholders cannot reasonably expect to maintain an interest in an insolvent company where creditor's claims are not being paid in full...CCAA proceedings have recognized that shareholders may not have 'a true interest to be protected' because there is no reasonable prospect of economic value to be realized by the shareholders given the existing financial misfortunes of the company...*

**The Amendments to The Credit Agreement**

The original $36 million DIP loan was deemed to be enough to finance the cost of the ICSID arbitration claim through its completion, which on average takes three years from registration to award, plus two years for award annulment request review, the most prevalent post-award remedy request. The average claimant costs in the 55 ICSID arbitration claims concluded between 2011 and 2015, where such information was available, was USD 5.6 million. 64% of the arbitration claimant costs were below USD 5 million and 36% above this amount.

KRY spent the $36 million DIP loan in less than a year and was required to obtain additional funds to continue to pursue the ICSID arbitration claim. Since the Credit Agreement did not allow the payment of the DIP loan and financing by anyone else without defaulting on the agreement, the DIP Lender was the only available source of additional financing. Tenor's DIP Loan increased from USD 36 million to USD 76 million through four additional loans taken by KRY, which increased Tenor's share of the NAP from 35% to over 88%. As a condition for providing the first additional DIP loan, Tenor designated two BOD members: Mr. Robin Shah, and Mr. David Kay. The current KRY BOD is composed as follows:

- Robert A. Fung - Executive Chairman & CEO, Crystallex International Corp.,
- Marc J. Oppenheimer – Director, Crystallex International Corp.,
- Harry J. Near - Designated Director,
- Robin Shah – Director, Tenor Capital Management Founding Partner,
- David Kay – Director, Tenor Capital Management Partner.

The table below shows details on the DIP loan amendments, including date, amount, the resulting NAP share increase and the directors that approved them.

CRYSTALLEX INTERNATIONAL CORPORATION
NET ARBITARTION AWARD ALLOCATION

| | | $ AMOUNT '000s | | NAP % | | | |
|---|---|---|---|---|---|---|---|
| LOAN | DATE | LOAN | CUM | LOAN | CUM | NAP % X $ Million | NOTES |
| ● ORIGINAL DIP FINANCING AGREEMENT | 4/23/2012 | $36,000 | $36,000 | 35.0% | 35.0% | 0.97% | Approved by R. Fung, M. Oppenheimer and H. Near |
| ● FIRST DIP FINANCING AMENDMENT | 5/15/2012 | | | | 35.0% | | Amendment to reflect new BOD composition: R. Fung (KRY), M. Oppenheimer (KRY), H. Near (Independednt), R. Sha (Tenor) D. Kay (Tenor) |
| ● SECOND DIP FINANCING AMENDMENT | 6/5/2013 | $11,100 | $47,100 | 16.2% | 51.2% | 1.09% | Approved by R. Fung, M. Oppenheimer and H. Near |
| ● THIRD DIP FINANCING AMENDMENT | 6/27/2014 | $12,100 | $59,200 | 16.2% | 67.4% | 1.14% | Approved by R. Fung, M. Oppenheimer and H. Near |
| ● FOURTH DIP FINANCING AMENDMENT | 3/13/2015 | $16,533 | $75,733 | 20.6% | 88.0% | 1.16% | Approved by entire BOD. The Tenor / R. Fung and M. Openheimer NAP Share Agreement was approved before this amendment. |

## The Canadian Criminal Code – Section 347

The Canadian Criminal Code includes Section 347 – Criminal Interest Rate (CIR) – to protect the Canadian public and businesses from abusive lending. Its purpose is to preempt loan sharking by prohibiting entering and executing loan agreements with interest charges above 60% p.a. Breaching Section 347 carries monetary and imprisonment penalties. When the breach is unintentional, the Court may amend the agreement to eliminate the offending terms.

Multiple rulings by Canada's Supreme Court and Provincial Superior / Supreme courts have established that not only the interest paid but also most fees and other payments derived from a loan must be included in calculating the interest charged to determine if Section 347 has been breached. The determination of the breach can only be made after the transaction is executed and it can be proven via an actuarial calculation based on actual data, i.e. excluding estimates for future payments.

The Crystallex – Tenor Credit Agreement was drawn with the objective to avoid breaching Section 347. To accomplish this, the agreement provided that:
1. The DIP loan principle cannot be repaid unless the DIP Lender agrees to do so,
2. The DIP loan a and Tenor's share of the NAP will be deposited in an escrow account owned by KRY but for the DIP Lender's exclusive benefit,
3. Tenor will receive annual payments from the escrow account not to exceed an effective interest rate above 59.9% to avoid breaching Section 347 and full discretion in deciding the amount and when the payments are to be made.

The exposure to Section 347 required the Applicant, the DIP Lender and their Legal Counsel to prevent the Criminal Code offense. Despite interest, fees and back-end payments in excess of $800 million on a $76 million DIP Loan, they strived to end-run the regulation by implementing a payment rationing mechanism and avoiding receipt of a large upfront collection that would result in the breach of Section 347. One notable example here is the Applicant's decision to forgo the attachment of the Nomura Notes.

A clear indication of the concerted effort by the Interested Directors and the DIP Lender to delay the Company's exit from the insolvency proceedings is their actions and omissions with $710 million worth of Nomura credit-linked notes (the Notes) owned by Venezuela and in Nomura

Bank - New York possession for sale on behalf of Venezuela. KRY obtained an ex-parte restraining notice (the Notice) from the Southern District of NY Court in June 2017 after it learned through a Reuters report that Nomura had been given the Notes for sale. The Company's lawyers filed an Order Withdrawal request on April 9, 2018 that was justified by *"in consideration for payments received by Plaintiff from the Defendant, Crystallex deems the restraining notice to Nomura withdrawn*), which was subsequently approved by the SDNY Court.  The withdrawal request and approval implied that:

a. The Notes were in Nomura's possession, otherwise the Notice issued by the NY court would have become void as unenforceable,
b.  The Notes were in Nomura's possession and attachable as of the withdrawal request date, otherwise the Order would not have had to be withdrawn with the Company's approval,
c. Since the Notice was issued on June 30, 2017 and was lifted at the Company's request ten months later, legal actions, if any, undertaken by Nomura or Venezuela against the Order were either unsuccessful or simply not undertaken due to lack of merit. Ergo, the Company had the upper hand in the legal action and decided to give it up in pursuit of an ulterior motive.

With this action, the Interested Directors and the DIP Lender chose to discharge an opportunity to obtain $710 million in cash - which was more than enough to pay off the DIP Loan, the secured and unsecured creditors and fund further collection efforts – over a Settlement Agreement that was already in default when the Notice was withdrawn and which resulted in a mere $25 million payment on a $1.2 billion settlement agreement.

I wrote to the CEO & Chairman, the Independent Director and the Monitor to denounce this action. The Monitor was compelled to address it in his Report Number 26 dated August 27, 2018. In it, the Monitor communicated another misrepresentation by the Applicant's BOD by indicating that

*"The Applicant agreed to withdraw the restraining notice in conjunction with the Ingalls Settlement Agreement (defined below). The Monitor has also been advised by the Applicant that Nomura did not raise any cash from restructuring fixed-income securities and therefore the Applicant would not have been able to seize any Venezuela assets by pursuing this restraining notice."*

This justification is false on two counts: First, the Ingalls Settlement Agreement was an agreement between the shipbuilder and KRY to share Venezuelan funds in a bank account and New York Mellon Bank on which Ingalls had a restraining order issued by a Mississippi Federal Court for a frigate repair contract cost dispute with the Venezuelan Defense Ministry. Ingalls and KRY agreed to attach and share the frozen funds in the bank account. As a result, KRY received $19 million in payment towards the ICSID Award. Venezuela opposed the attachment of the funds and never agreed to release the funds voluntarily as payment towards the settlement agreement with KRY. Second, the Nomura Notes were securities issued by Nomura Finance, an international financial organization with a AAA credit rating, that had maturities in Oct. 2018 and Dec. 2023. Venezuela had acquired the Notes from Nomura when the country was "swimming in money", after crude oil hit record high prices for an extended time period. The notes could be sold on the secondary

market or held to maturity, when Nomura was required to redeem the notes. The Oct. 2018 Notes had a $390 million face value and their maturity date was only six months away from the date the restraining order was withdrawn. The Dec. 2013 had a $320 million face value.

### The Compensation Agreement Between the DIP Lender and the Interested Directors

Two KRY senior managers and BOD members, Robert Fung and Mark Oppenheimer, entered into a NAP Share Transfer Agreement with the DIP Lender after they lost most of their share of the MIP through Tenor's increased share of the NAP from 35% to over 88%, which they both approved. This reduced the percentage of the NAP to be shared by to Management to 3% and the shareholders to 9%. The NAP Share Transfer Agreement involves the transfer of an undisclosed percentage of Tenor's 88% share of the NAP to R. Fung and M. Oppenheimer. Although this agreement was sealed by the CCAA Court as confidential business information and remains secret to this date.  It is believed to involve a payment equivalent to the amount Mr. Fung and Mr. Oppenheimer were entitled to under the MIP, which was 10% of the NAP up to $700 million plus an additional percentage for the NAP amount over $700 million. As Tenor Capital executives, Mr. R. Sha and Mr. D. Kay the Tenor BOD representatives will be compensated based on the earnings from the KRY Credit Agreement transaction.

A transaction like this entered by four Interested Directors on a five-mender BOD would never see the light of day in the American judicial system. In the Canadian judicial system this transaction is perfectly legal if a) a company's by-laws allows it and b) the Director discloses the interested transaction to the other BOD members and the disclosure is included in the meeting minutes.

The KRY by-laws include the following article:

> *3. Interest of directors and officers generally in contracts - No director or officer shall be disqualified by his office from contracting with the Corporation nor shall any contract or arrangement entered into by or on behalf of the Corporation with any director or officer or in which any director or officer is in any way interested be liable to be voided nor shall any director or officer so contracting or being so interested be liable to account to the Corporation for any profit realized by any such contract or arrangement by reason of such director or officer holding that office or of the fiduciary relationship thereby established; provided that the director or officer shall have complied with the provisions of the Canada Business Corporations Act.*

As noted above, he CBCA took away the authority and responsibility of the Canada Business Corporation Director to enforce the Act once KRY filed for CCAA protection. In addition, the Entire Fairness Doctrine is non-existent in Canadian corporate law.

### THE SHAREHOLDERS AND THE CCAA LEGAL VOID

### The Shareholders' Reliance on The Laws and The Trust in The Company's BOD

For the legacy KRY shareholders, their investment in the Company was never a speculative bet. Most of us made the decision and started to invest our children's education and retirement funds when the stock traded upwards of $2,00-3.00 per share. It was well-known then that the

Mining Operating Agreement (MOC) gave KRY access to one of the largest gold deposits in the world. In addition, the risk that the contract would be later breached was covered by the Canada-Venezuela Bilateral Investment Agreement (BIT). Further, having bought the stock on U.S. and Canadian stock exchanges, the individual investors had the implicit trust that the laws and regulations in place in the U.S. and Canada would either deter wrongdoing against them or allow the pursuit of remedies.

Individual investors often cite the implicit trust they put in the Company's BOD and the reasonable expectation they had that the BOD would protect their interests based on the Fiduciary, Good Faith and Care duties they owed to the Company and its stakeholders. The fact that the Company's CEO and Chairman stated in sworn affidavits and Justice Newbould reiterated in his decisions and endorsements that the interest of the shareholders were being protected convinced them that this was the case:

Justice Newbould's Initial Order Reason, Dec. 28, 2011:

*(21) It is clear that the CCAA serves the interests of a broad constituency of investors, creditors and employees. See Hong Kong Bank of Canada v. Chef Ready Foods Ltd. (l 990), 4 C.B.R. (3d0 311 (B.C.C.A.). See also Janis P. Sarra, Rescue! The Companies' Creditors Arrangement Act (Thomson Carswell) at p.60. Thus, it is appropriate at this stage to consider the interests of the shareholders of Crystallex.*

*[22] In my view, to cancel the shares of the existing shareholders at this stage is premature. The value of the gold at Las Cristinas is staggering. Las Cristinas contains at least 20,000,000 ounces of gold. At today's gold prices, the gold has increased in value by approximately $20 billion since Crystallex acquired its rights under the MOC. Crystallex's damage claim is for $3.8 billion.*

*[24]    Crystallex has spent over $500 million on the project. In the event that Crystallex only recovered that amount without interest and without any compensation for the loss of the ability to develop the project, Crystallex would still have more than enough to pay all of its debts and have substantial value left over for its shareholders.*

The statement by Justice Newbould in para. 24 above was made in reference to an affidavit by R. Fung that was restated in a later affidavit, as shown below.

R. Fung sworn affidavits dated March 20, 2012:

*4.    Successful conclusion or settlement of the arbitration will allow Crystallex to pay off all of its creditors with interest and retain substantial value for shareholders.*

In addition, the DIP Financing Bid Procedure dated Jan. 20, 2012 approved by the Monitor, the Applicant and the Court included the following condition:

DD.    *Lender Back-End Entitlement* means consideration (in addition to repayment of principal and interest) paid to the Lender in the form of: (i) a payment obligation of Crystallex contingent upon the value of the Net Arbitration Proceeds; (ii) an equity interest in Crystallex; or (iii) a right to convert amounts outstanding under the Financing to an equity interest in Crystallex; provided, however, that the structure, timing of receipt, and quantum of such additional consideration shall conform to all applicable legal requirements, including but not limited to, Canadian usury laws.  In no circumstance shall the Lender Back-End Entitlement involve, or contemplate directly or indirectly, either (i) an acquisition of control of Crystallex, (ii) an acquisition of any interest in the Arbitration Proceeding, or (iii) a receipt of value exceeding a minority of the Net Arbitration Proceeds.

To a shareholder, the idea that the interests of the company and its shareholders do not coincide in law or in equity is an alien concept. Reconciling the fact that shareholders of a company with an ironclad legal claim and assets worth over $1.5 billion, $140 million in pre-filing debt and a $76 million DIP loan stand to receive pennies, if anything, per share, is mind-bending.

**The Set Up**

Given the foregoing, the shareholders had no reason to believe nor fear that their investment in KRY was at risk; and the Applicant, the DIP Lender, with the assistance of the Monitor and the unrestricted approval of the CCAA Court, spared no effort to prevent the shareholders from believing otherwise by throwing a veil of secrecy over the CCAA proceedings.

Questions emerged about the fairness and reasonableness of the terms of the DIP loan when Justice Newbould issued the order approving the Credit Agreement, which granted the DIP Lender 35% of the NAP for USD 36 million loan to an Applicant with a USD 3.4 billion expropriation claim and USD 140 million in pre-filing debt. Nonetheless, the fact that the agreement also assigned 35% of the NAP to the legacy shareholders and that there remained a sizable unassigned NAP amount that would accrue to the Company as earnings made the terms Justice Newbould's order palatable. The Credit Agreement and its subsequent amendments were sealed by the Court at the Applicant's request and the only information ever provided on these was through Monitor's reports. The approval of the Credit Agreement was the first and the last time the Monitor disclosed openly the NAP share assigned to the DIP Lender and the shareholders. From that point onwards, most documents were sealed or redacted and made available only through legal counsel appointed by those who could afford to retain legal counsel for the duration of the CCAA proceedings.

Justice Newbould retired in June 2017 while under a Canadian Judicial Council inquiry to determine whether he should be removed from office for misconduct involving a personal real estate dispute. The Council subsequently stayed permanently the inquiry indicating that it had no jurisdiction to review the conduct of retired judges. Upon retirement Justice Newbould joined a law firm and was recently appointed by the KRY CCAA Court, now presided by Justice Hainey, as the Claims Officer, as requested by the Applicant and with the Monitor's approval.

The believe that the shareholders interests were being protected was strengthened by the fact that a Canadian shareholder and practicing bankruptcy lawyer in Toronto, Mr. Anthony Reyes, participated in the CCAA proceedings from the outset. Mr. Reyes, a partner at a prestigious global law firm, intervened in the Canadian CCAA and the Delaware Chapter 15 proceedings in support of the Applicant's proposals and motions until it was disclosed that he was an investor in Tenor Capital Management. He has not taken part in the CCAA proceedings since then.

The Applicant requested and obtained a CCAA Court order in June 2012 relieving it from the obligation to call and hold the annual shareholder's meeting. No financial statements, audited or otherwise, have been made available to the shareholders after the CCAA filing.

The CCAA Court orders where drafted by the Applicant's and the DIP Lender's lawyers with the intent to keep the company's stakeholders in the dark to allow the Interested Directors' and the DIP Lender to pursue their own interests. The integrity of the Crystallex CCAA proceedings and the Monitor's responsibilities were compromised from the beginning by CCAA Court orders that required the Monitor to be constrained and impaired by the unrestrained power of the Applicant to decide what the Monitor could or could not do.

**The Statute of Limitation**

Canada's Limitations Act (CLA) sets forth the governing principles regarding discoverability:

> [19] Section 5(1) of the Act provides as follows:
>> (1) A claim is discovered on the earlier of,
>> (a) the day on which the person with the claim first knew,
>>> (i) that the injury, loss or damage had occurred,
>>> (ii) that the injury, loss or damage was caused by or contributed to by an act or omission,
>>> (iii) that the act or omission was that of the person against whom the claim is made, and
>>> (iv) that, having regard to the nature of the injury, loss or damage, a proceeding would be an appropriate means to seek to remedy it; and
>> (b) the day on which a reasonable person with the abilities and in the circumstances of the person with the claim first ought to have known of the matters referred to in clause (a).

Canadian courts have interpreted the underlying principles of the statute of limitations as follows:

> *The overarching question in the discoverability analysis under s. 5 of the Act is whether the claimant knew or reasonably should have known, exercising reasonable diligence, the material facts stipulated under s. 5(1)(a) that give rise to a claim. Section 1 of the Act defines a claim as "a claim to remedy an injury, loss or damage that occurred as a result of an act or omission". Section 2(1) provides that the Act "applies to claims pursued in court proceedings". Ferrara v. Lorenzetti, Wolfe Barristers and Solicitors, 2012 ONCA 851, 113 O.R. (3d) 401, at para. 32.*

The Ontario statute of limitations period for contract and tort claims was reduced from six to two years beginning with January 1, 2003. Before 2003, Ontario Courts permitted the extension of a limitation period if the plaintiff could show that there were "special circumstances" justifying the exercise of the Court's discretion. In a decision under the new statute of limitations, the Ontario Court of Appeals held that, because limitation periods are designed to provide certainty to litigants, Courts would no longer be permitted to extend limitation periods beyond the times prescribed by statute.

### The Unrestricted Power to Seal and Redact Case Information

The KRY CCAA proceedings has been wrapped in unprecedented secrecy from the very beginning. A casual perusal of the Court's docket and the Monitor's case record keeping internet site (https://documentcentre.eycan.com/Pages/Main.aspx?SID=229&Redirect=1) will make evident the unparalleled extent of the sealed and redacted documents. In fact, the CCAA Court has not disallowed a single of the many requests by the Applicant to seal and/or redact motions, orders agreements and the like despite well-reasoned arguments by opposing legal counsel.

The prolific use of sealed and heavily redacted motions, agreements and court orders was devised to keep shareholders in the dark until Tenor's and the BOD members' plan was a fait accompli and could not be contested. Justice Hainey succinctly described the aim and modus operandi the Conflicted Directors and the DIP Lender pursued and leveraged to accomplish their objective. In his decision on the motion by Ad Hoc Committee of Shareholders of Crystallex to lift the stay to allow them to file an oppression complaint by Justice Haney stated that…

> [23] The Complaining Shareholders also knew or ought to have known about the Final Orders shortly after they were issued and entered. They were in a position to have known the amounts of the additional DIP loans and the percentage of the NAP to be earned by the DIP Lender. Each of the Final Orders was posted on the Monitor's website after being issued and entered. The Final Orders approving the Second and Third Credit Agreement Amendments contained the amounts of the additional DIP loans and the percentage of the NAP to be earned by the DIP Lender. The order approving the Fourth Credit Agreement Amendment contained a term allowing any creditor or shareholder to obtain a copy of the relevant terms from Crystallex, on such terms as Crystallex and the Monitor agreed, or on further order of the court.

In reality…

1. Except for the original Credit Agreement, the percentage of the NAP allotted to the DIP Lender was consistently sealed or redacted in the Credit Agreement Amendment orders and the Monitor's reports,
2. Access to the unredacted Monitor's reports and all the agreements between the Applicant and the DIP Lender (e.g. Credit Agreement Amendments, Tenor's NAP share transfer to the Interested Directors, etc.) were always sealed by the court,
3. Access to these reports and documents depended on signing a Non-Disclosure Agreement (NDA) that required KRY's approval (without which the Monitor could not issue). Even if individual investors were willing to sign the NDA, they could not do so,

since it required him/her to appoint legal counsel for the duration of the CCAA proceedings, currently in its seventh year, to be able to do so.  Per the NDA:

> *(iii) Access to any Confidential Information shall only be granted to Designated Counsel once the Recipient Party has delivered an executed copy of this agreement to Crystallex. By receiving access to the Confidential information, the Recipient Party is not warranting that he will in fact access such Confidential Information, and nothing in this Confidentiality Agreement requires the Recipient Party to access the Confidential Information.*

Hence, once an order was issued, there was no going back. The motions and the orders were only "made public" on the Monitor's internet site after the fact and redacted to a point that made them meaningless. Importantly, KRY never informed the shareholders about the availability of CCAA proceedings documents on the Monitors' Internet site or anywhere else. Although KRY had the means and the obligation to inform the shareholders about it by mail or through the stock brokers, it never did. Presumably, KRY delegated that responsibility to the Monitor who, purportedly, notified the shareholders. To this date, I have not been able to find such notice, of which there is no record even on the E&Y Crystalex internet site.

Thus, the individual shareholders were systematically denied the means to learn about the Company's BOD actions and omissions that warranted the pursuit of legal remedies.   Their challenge to protect their rights and pursue remedies is underscored by the following facts.

Most individual investors, including me, did not learn about the extent of the dilution of the NAP share until 2018 and only because a copy of unredacted document, which was until then sealed as confidential, was inadvertently filed in a court motion. This document also disclosed several facts until then not known to the individual investors:

a) The DIP loan was not payable and had to be deposited in an escrow account for Tenor's benefit, together with its share of the NAP, so that the DIP Lender could withdraw the funds overtime at its discretion to avoid breaching the Criminal Interest Rate Section of the Criminal Code,

b) The Arbitration Proceeds disbursement was pre-established based on a payment priority ranking set forth in the Mechanics of Distribution schedule. The last two priority payments represent the NAP to be shared by The DIP Lender, the Shareholders and the MIP participants, that, according to the schedule, must be distributed under *pari passu* and *pro rata* terms.

b) The Applicant granted the DIP lender the right to convert its share of the NAP into the company's voting common shares through the issuance of a Contingent Value Right (CVR) that can be converted into common stock at the DIP Lender's request. KRY then proceeded to obtain the required certificate from the Canadian Business Corporation, which contained the terms under which the new shares were issued and the rights of the holder.

As a result,

1.- The goal of the CCAA filing was and continues to be to syphon the Applicant's assets off over time in a process leading inexorably to its liquidation,

2.- The CVR for share conversion agreement between the Applicant and the DIP Lender diluted the legacy shareholders equity share to 9% and granted Tenor the right to vote its 88% equity share in a shareholders meeting before the actual conversion is executed. This even though the Canadian Business Corporation Act disallows the issuance of shares in payment for debt not issued in an arm's length transaction and the Canadian Securities Act requires that shares issued must be fully paid for the holder to derive any rights from them. An important fact here is that the value of a CVR can only be determined after the contingent condition is met. In this case, the contingent condition can only be met after the ICSID Award / settlement agreement is collected and the NAP can be determined. Until then, the CVR has not tangible value.

3.- The terms of the NAP Mechanics of Distribution scheme require that legacy assets worth over USD 300 million be included in the NAP distribution even though these assets are not part of the ICSID Award and, therefore, not subject to the terms of the Credit Agreement. These include assets such as the Las Cristinas gold mine mining data and tax loss carry forward benefits. The former was owned by KRY and in its possession when the ICSID arbitration request was filed and, therefore, not included in it or claimed by Venezuela as its property. Two Canadian gold mining companies also expropriated by Venezuela and issued an arbitration award by the ICSID entered into settlement agreements which include payment for the mining data above and beyond the ICSID award amount (Gold Reserve – USD 240 million, and Rusoro Mining – undisclosed). The tax loss benefits, per Canadian law, can only be claimed by the Company for the benefit of the shareholders that incurred the losses and expire once there is a de facto or de jure change in control. The right the Company granted Tenor to vote at a shareholders' meeting using the shares to be issued under the CVR conversion agreement is deemed, per Canadian tax law, to give Tenor de facto control of the Applicant. Therefore, the BOD agreed to forgo a tax benefit worth in excess of USD 100 million when it granted Tenor the right to convert its 88% NAP share into common stock, so that Tenor could reduce its own tax payment due on the NAP earnings.

Learning the foregoing was of little use for the Individual shareholder, since the original Credit Agreement and the last Credit Agreement Amendment were entered by the Applicant in 2012 and 2015, respectively. Therefore, the right to contest the terms of the Credit Agreement was barred by the statute of limitations. It became clear then that individual investors could do nothing to get the Credit Agreement amended, given i) the CCAA Court and the Monitor's disregard for the shareholders' interests, and ii) the fact that both the Canadian Business Corporation Act and the Canadian and Ontario Securities Acts give up their duty and power to protect shareholders once a company is declared insolvent.

### The Shareholders' Pursuit of Legal Remedies
An ancient Roman legal maxim states that *for every right, there is a remedy.* Oddly, this does not apply in Canadian CCAA proceedings when shareholders are concerned. As indicated above, the Shareholder's Ad Hoc Committee engaged Gowling's services to pursue the protection of the shareholders' interests out of concern that BOD members were advancing their own economic interests. Gowling asked the CCAA Court leave to pursue an oppression claim on behalf of the shareholders that was predicated on:

1. The DIP financing amendments and the NAP transfer agreement severely diluted their interest in the arbitral award by assigning all but a small percentage of the proceeds to the DIP Lender and the individual respondents [R. Fung and M. Oppenheimer],
2. The DIP financing amendments were entered in unfair disregard of and to the prejudice of the interests of the shareholders and the amending orders in 2013 and 2014 were granted without prior notice to the shareholders,
3. The Credit Agreement breached the Criminal Interest Rate statute.

Based on this, the Committee sought legal and equitable remedies by asking the Court to vary the orders that injured the shareholders' rights and interests in the Company.

The CCAA Judge dismissed the Committee's motion to lift the stay, thus precluding the it from commencing the oppression action. Justice Hainey concluded that the orders granted by Justice Newbould approving the DIP financing were final in nature and constituted a complete bar to the relief requested. Also, he stated that the claim regarding the criminal interest rate was bound to fail because the DIP financing agreements did not require, and in fact prohibited, the payment of interest at a criminal interest rate.

Notably, in reaching the Criminal Interest Rate decision above, Justice Hainey proclaimed the triumph of form over substance. Indeed, the Credit Agreement includes disclaimers to the effect that the parties do not want to breach Section 347 and that, to prevent this from happening, the DIP Lender will make sure it never receives interest above 59.9% p.a. To achieve this, they devised a mechanism whereby funds are kept in an escrow account owned by Applicant from which the DIP Lender can withdraw annual amounts for as long as necessary to deplete the account without breaching Section 347.

In *Pacific National Development v. Standard Trust,* 1991 CanLII 1644 (BC SC), Madam Justice Huddart's analysis regarding a Section 347 case is illuminating here:

> *What is important is the term of the debenture. To the actuary asked by Mr. Evans to give an opinion on the effective rate of interest, the term of this mortgage was two years. I think that would be the view of any person called upon to read the debenture who was not involved in the transaction. Yet any person involved in the transaction who was aware of the financing arrangements for the project would have known that the effective due date was July 1, 1990. Any other conclusion would make no commercial sense. On reading the debenture in the context of the prior charges listed on its Schedule A and the Commitment Letter, the terms of which were to survive the execution and registration of the Debenture, one can conclude only that the payment date was nominal, inserted for the sole purpose of attempting to ensure the legality of the loan arrangements.*

> *To enforce the payment of interest in excess of the maximum interest rate permitted by Parliament over the effective term of a mortgage merely because the parties had inserted a wholly meaningless payment date in the agreement for the sole purpose of ensuring that the effective interest rate did not appear to exceed the maximum rate permitted by Parliament would be to mock the provisions of the Criminal Code.*

> *It is not for the courts either to strain to find ways in which to avoid the application of the Criminal Code, or to assist those who strain to do so, although it is for the courts to interpret strictly penal provisions of statutes.*

As was the case with the Pacific National financing transaction, the KRY Credit Agreement set a nominal payment date for the sole purpose of ensuring that the interest rate did not appear to breach Section 347. The Agreement purports to set yet-to-be-determined installment payment dates, when in fact the payment is effective the moment KRY deposits the DIP Loan and the NAP payments in the escrow account opened for the exclusive benefit of the DIP Lender.

The Committee appealed the CCAA Court ruling to the Ontario Court of Appeals, who affirmed Justice Hainey's decision based on the reasons below:

> *[24]   In essence, this is a case of too little too late. Potentially interested stakeholders cannot sit idle and await the outcome of realization proceedings. They must act to protect their interests or suffer the attendant consequences.*
>
> *[25]   In closing, we note that DIP financing was originally conceived as a means to fund operations while a company under CCAA protection restructured. The disposition of this motion should not be interpreted as an endorsement or a rejection of the amendments approved by Newbould J.*

The Appeals Court did not address directly the Shareholders' Committee claim that the Credit Agreement breached the Criminal Interest rate statute.

As a sidebar, shareholders attempted to fill the legal void created by the CCAA proceedings by looking for forum with a level playing field. The first thought was to pursue legal remedies in the U.S. courts. The lawyers that reviewed the case concluded that a U.S. Court would decline to review it based on the *forum non conveniens Doctrine*. This despite the fact that KRY filed for Chapter 15 protection in Delaware and that one of its main purposes is" to *provide fair and efficient administration of cross-border insolvencies that protects the interests of all creditors and other interested parties, including the debtor".*

Also, Canadian lawyers reviewed the outcome of Gowling's legal actions - as well as other acts and omissions by the Interested Directors not included in the oppression claim - and concluded that, while there were legitimate and actionable basis to pursue legal remedies, these depended on the goodwill of a legal system that had long decided that none was due to the shareholders.

In closing, the following quote is fitting...

> *It will be observed that I have cited no cases in support of this opinion - not that I have not read and considered and puzzled myself with the multitude that were commented on in argument - but because, finding myself like the Swiss troops, fighting on both sides, I have laid them aside and gone upon what seems to be the true spirit of the law.*

> Justice Carr, Watkins v Crouch, 5 Leigh 530

I thank you in advance for your time and consideration.


Yours truly,

Adelso Adrianza


cc:  The Honorable Judge Laurie Selber Silverstein



CERTIFIED MAIL®

Adelso Adrianza
113 Washington Street
Newton, MA 02458

7018 1830 0000 1985 7006



1000



19801



U.S. POSTAGE PAID
FCM LG ENV
CHELMSFORD, MA
01824
FEB 19, 19
AMOUNT

$7.75
R2304H108350-02

FEB 2 5 2019

DISTRICT OF DELAWARE

The Honorable Chief Judge Leonard Stark
United States District Court
J. Caleb Boggs Federal Building
844 N. King Street
Unit 26, Room 6124
Wilmington, DE 19801-3555