**ADELSO ADRIANZA**

113 Washington Street – Newton, MA 02458 – U.S.A.

M: (859) 803-2279 | aaadrianza@gmail.com

**VIA REGISTERED LETTER**

May 28, 2020

The Honorable Judge L. Selber Silverstein
U.S. Bankruptcy Court – District of Delaware
824 North Market Street, 6th Floor
Wilmington, DE 19801

Dear Judge Silverstein,

This communication is in reference to Crystallex International Corporation (the Company) and addresses the future confirmation by the U.S. Bankruptcy Court – District of Delaware (the U.S. Court) of a plan arrangement, liquidation or wind up under terms that contravene U.S. and Canadian law and injure hundreds of U.S. persons with a minority equity stake in the Company for the reasons explained below.

For over two years, I endeavored unsuccessfully to make the Company (through Mr. R. Fung, CEO and Chairman of the Board of Directors), the Canadian CCAA Court (the Canadian Court), and the Monitor aware of several acts and omissions in the CCAA proceeding (the CA Proceeding) that ignored the rights and grossly diminished the interests of the Company's shareholders (the Shareholders). I summarized these acts and omissions in my letter to Chief Judge Stark at the U.S. District Court of Delaware, in which I copied Justice Hainey and your Honor (Case 1:17-mc-00151-LPS, Document 134, filed on 02/25/19), and, more recently, in my letter to Justice Hainey, in which I copied you Honor (U.S. Court Case 11-14074-LSS Doc 311 Filed 04/14/20). The lack of success in my endeavor compelled me to write this letter in pursuit of the duty I wrote about to Justice Hainey at the Canadian Court In my letter dated December 23, 2017:

> *"Your Honor, having lived in places where the rule of law is selective, subjective or delayed and, therefore, denied for economic or political reasons, as it is currently the case in Venezuela, I have learned to appreciate greatly the justice systems in countries such as the United States and Canada. It is often said that death and taxes are the only two certainties in life. I believe that having access to a justice system that pursues fair and equitable treatment as a rule is a third certainty for the citizens in these countries. My trust in the American and the Canadian justice systems is based on the knowledge that their strength arises from their citizenry's determination to protect their rights. I will not fail to do my part in this essential duty."*

**ACTIONS AND OMMISSION CONTRARY TO U.S. AND CANADIAN LAW AND POLICY**

As described in detail in my letters to Chief Judge Stark and Justice Hainey referred to above, the CA Proceeding is marred by breaches of law and policy that have been and continue to be ignored by the Canadian Court, and the fiduciaries involved: the Board of Directors and the Monitor (the Fiduciaries). Three of these breaches are:

1. Misappropriation of assets: Canada's CCAA s. 36.1(1), 18 U.S. Code § 152(7),
2. Tax Avoidance: General Anti-avoidance Rule, GAAR (s. 245) in Canada, and 26 U.S. Code § 7201,
3. The Interest Stops rule: Canada's BIA s. 122(2) and s. 143, U.S. Bankruptcy Code section 502(b)(2),

The overarching breach of U.S. law and policy ever present in the CA Proceeding is the actions and omissions against the goals of the bankruptcy statute in general and the disregard for the Shareholders' rights and interests in particular. This derives from the silence of the Canadian bankruptcy laws about shareholders' rights and interest post-filing. Three of several examples that demonstrate this disregard are the use of the mining data, the tax loss carryforward benefit and the use of the estate's surplus for the benefit of the DIP Lender and the Interested Directors. As detailed in my letter to Justice Hainey dated April 14, 2020 referenced above, the mining data and the tax benefits are two assets not subject to the Credit Agreement that are included in its Mechanics of Distribution in violation of the Canadian and American laws and policies.

Likewise, the DIP Lender and the Interested Directors use the estate's surplus to advance their own interests by freely spending these in disregard of the law. This is clearly demonstrated by the interest payment on the unsecure noteholders debt at a 20%+ rate p.a., despite the fact that Canadian and American Bankruptcy laws only allow such interest at the legal rate (5% in Canada; 5% over the Federal Reserve discount rate in Delaware, which is currently 0.25% p.a.), but only upon the confirmation of a plan. The reason for this is well settled: the pari passu principle applies in insolvency proceedings to ensure the fair treatment of creditors and the orderly administration of an insolvent debtor's estate.

In *Re Nortel Networks Corporation et al, 2014 ONSC 4777*, with reference to *Century Services Inc. v. Canada (Attorney General), 2010 SCC 60*, the Ontario Court of Appeals (ONCA) opined at para. 35 that:

> "First, the CCAA is part of an integrated insolvency regime, which also includes the BIA. The Supreme Court of Canada in *Century Services* considered the CCAA regime and opined, at para. 24, that "[w]ith parallel CCAA and BIA restructuring schemes now an accepted feature of the insolvency landscape, the contemporary thrust of legislative reform has been towards harmonizing aspects of insolvency law common to the two statutory schemes to the extent possible and encouraging reorganization over liquidation". The court went on to explain, at para. 78, that the CCAA and BIA are related and "no 'gap' exists between the two statutes which would allow the enforcement of property interests at the conclusion of CCAA proceedings that would be lost in bankruptcy".

The ONCA thus established that when the CCAA statute does not address creditor's entitlement to a claim or forecloses the underpinning common law rule, the interest stops rule in this case, it should be interpreted in a harmonious manner with the BIA to fill the gap in the statute to the extent possible. The SSC denied leave to appeal the ONCA ruling.

### BIA Rules Regarding Creditor's Claims and Estate Surplus

#### Assignment for general benefit of creditors
49 (1) An insolvent person or, if deceased, the executor or administrator of their estate or the liquidator of the succession, with the leave of the court, may make an assignment of all the insolvent person's property for the general benefit of the insolvent person's creditors.

#### Interest from date of bankruptcy
143 Where there is a surplus after payment of the claims as provided in sections 136 to 142, it shall be applied in payment of interest from the date of the bankruptcy at the rate of five per cent per annum on all claims proved in the bankruptcy and according to their priority.

*Right of bankrupt to surplus*

144 The bankrupt, or the legal personal representative or heirs of a deceased bankrupt, is entitled to any surplus remaining after payment in full of the bankrupt's creditors with interest as provided by this Act and of the costs, charges and expenses of the bankruptcy proceedings.

**THE AMBIGUITY OF THE CANADIAN BANKRUPTCY LAWS**

Both the BIA and the CCAA assume a priori that shareholders do not have any rights or interest in the bankruptcy proceedings. This allows that a company like Crystallex, with a $1.4 billion ironclad arbitration award from a sovereign that can be enforced in any country that subscribed to the New York Convention, less than $200 million of unsecured debt, and four interested Board of Directors members (two of whom are nominees of the DIP Lender) to hand over almost the entire net worth of the estate to the DIP Lender that provided a $76 million loan, and guaranteed a payoff to the Interested Directors worth tens of million dollars for obliging. Self-dealing by Board of Directors' members is in fact allowed by the Canada Business Corporation Act (CBCA):

*Disclosure of interest*

120 (1) A director or an officer of a corporation shall disclose to the corporation, in writing or by requesting to have it entered in the minutes of meetings of directors or of meetings of committees of directors, the nature and extent of any interest that he or she has in a material contract or material transaction, whether made or proposed, with the corporation, if the director or officer

(a) is a party to the contract or transaction;

(b) is a director or an officer, or an individual acting in a similar capacity, of a party to the contract or transaction; or

(c) has a material interest in a party to the contract or transaction.

In *Peoples Department Stores Inc. (Trustee of) v. Wise, [2004] 3 S.C.R. 461, 2004 SCC 68 at para. 35,* the Supreme Court of Canada (SCC) opined that...

"The statutory fiduciary duty requires directors and officers to act honestly and in good faith vis-à-vis the corporation. They must respect the trust and confidence that have been reposed in them to manage the assets of the corporation in pursuit of the realization of the objects of the corporation. They must avoid conflicts of interest with the corporation. They must avoid abusing their position to gain personal benefit. They must maintain the confidentiality of information they acquire by virtue of their position. Directors and officers must serve the corporation selflessly, honestly and loyally: see K. P. McGuinness, The Law and Practice of Canadian Business Corporations (1999), at p. 715."

Based on the *BCE Inc. v. 1976 Debentureholders, 2008 SCC 69, [2008] 3 SCR 560* opinion, in which the SCC reaffirmed its opinion in *Peoples Department Store, supra,* the Canadian Parliament amended the CBCA to emphasize that in pursuing the best interests of the corporation, directors need to consider the interests of its stakeholders.

**CBCA s. 122**

(1.1) When acting with a view to the best interests of the corporation under paragraph (1)(a), the directors and officers of the corporation may consider, but are not limited to, the following factors:

(a) the interests of
   (i) shareholders,
   (ii) employees,
   (iii) retirees and pensioners,
   (iv) creditors,
   (v) consumers, and
   (vi) governments;
(b) the environment; and
(c) the long-term interests of the corporation.

It is important to point out here that the Entire Fairness doctrine is non-existent and the Business Judgement doctrine reigns imperially in Canadian corporate law. An insider's view on the shareholders' utmost difficulty in prevailing in a Business Judgement action under Canadian law is provided by a former Justice of the Ontario Superior Court, the Honorable James Farley, in the article *The Canadian Courts' Perspective On The Business Judgment Rule*, mondaq.com, 20 September 2006.

The great deference to the Board of Directors' decision-making power under the CCAA regime is well illustrated by the Company's approach to the collection of the ICSID award. The award was set at close to US$ 1.2 billion plus roughly $US 200 million in interest through the award date (April 4, 2016), and post-award interest at 6-month average U.S. Dollar LIBOR + 1%, compounded annually, calculated from the date of the award until full payment. Post-award interest through Dec. 31, 2018 is estimated at US$ 120 million. The sum total of the award as of the end of 2018 added to $US 1.5 billion.

The Second settlement agreement between the Company and the Republic, at the end of 2018, was for $US 1.2 billion. It represented a US$ 620 million "haircut", once the value of mining data (US$ 300 million) is added to the award balance. Adding to the "haircut" the US$ 200 million interest granted to the unsecure creditors results in over US$ 820 million of the estate's assets given up by the Interested Directors and the DIP Lender in pursuit of their own interests.

### THE SCC REFRESHER ON THE CCAA

In *9354-9186 Québec Inc. v. Callidus Capital Corp., 2020 SCC 10*, the SCC issued an update on its understanding of the objectives, reach and limitations of the CCAA. Key findings are summarized below:

#### The Objective of The Insolvency Laws

[40] Together, Canada's insolvency statutes pursue an array of overarching remedial objectives that reflect the wide ranging and potentially "catastrophic" impacts insolvency can have (Sun Indalex Finance, LLC v. United Steelworkers, 2013 SCC 6, [2013] 1 S.C.R. 271, at para. 1). <u>These objectives include: providing for timely, efficient and impartial resolution of a debtor's insolvency; preserving and maximizing the value of a debtor's assets; ensuring fair and equitable treatment of the claims against a debtor; protecting the</u> public interest; and, in the

context of a commercial insolvency, *balancing the costs and benefits of restructuring or liquidating the company*...

[46] Ultimately, the relative weight that the different objectives of the CCAA take on in a particular case may vary based on the factual circumstances, the stage of the proceedings, or the proposed solutions that are presented to the court for approval. Here, a parallel may be drawn with the BIA context. In Orphan Well Association v. Grant Thornton Ltd., 2019 SCC 5, [2019] 1 S.C.R. 150, at para. 67, this Court explained that, as a general matter, *the BIA serves two purposes: (1) the bankrupt's financial rehabilitation and (2) the equitable distribution of the bankrupt's assets among creditors. However, in circumstances where a debtor corporation will never emerge from bankruptcy, only the latter purpose is relevant* (see para. 67). Similarly, *under the CCAA, when a reorganization of the pre-filing debtor company is not a possibility, a liquidation that preserves going-concern value and the ongoing business operations of the pre-filing company may become the predominant remedial focus.* Moreover, *where a reorganization or liquidation is complete and the court is dealing with residual assets, the objective of maximizing creditor recovery from those assets may take centre stage.* As we will explain, the architecture of the CCAA leaves the case-specific assessment and balancing of these remedial objectives to the supervising judge.

### *The Role of a Supervising Judge in CCAA Proceedings*

[49] *The discretionary authority conferred by the CCAA, while broad in nature, is not boundless. This authority must be exercised in furtherance of the remedial objectives of the CCAA*, which we have explained above (see Century Services, at para. 59). Additionally, the court must keep in mind three "baseline considerations" (at para. 70), which the applicant bears the burden of demonstrating: (1) that the order sought is appropriate in the circumstances, and (2) that the applicant has been acting in good faith and (3) with due diligence (para. 69).

[51] The third consideration of due diligence requires some elaboration. Consistent with the CCAA regime generally, *the due diligence consideration discourages parties from sitting on their rights and ensures that creditors do not strategically manoeuver or position themselves to gain an advantage* (Lehndorff General Partner Ltd., Re (1993), 17 C.B.R. (3d) 24 (Ont. C.J. (Gen. Div.)), at p. 31). *The procedures set out in the CCAA rely on negotiations and compromise between the debtor and its stakeholders, as overseen by the supervising judge and the monitor. This necessarily requires that, to the extent possible, those involved in the proceedings be on equal footing and have a clear understanding of their respective rights* (see McElcheran, at p. 262). *A party's failure to participate in CCAA proceedings in a diligent and timely fashion can undermine these procedures and, more generally, the effective functioning of the CCAA regime (see, e.g., North American Tungsten Corp. v. Global Tungsten and Powders Corp., 2015 BCCA 390, 377 B.C.A.C. 6, at paras. 21-23*; Re BA Energy Inc., 2010 ABQB 507, 70 C.B.R. (5th) 24; HSBC Bank Canada v. Bear Mountain Master Partnership, 2010 BCSC 1563, 72 C.B.R. (5th) 276, at para. 11; Caterpillar Financial Services Ltd. v. 360networks Corp., 2007 BCCA 14, 279 D.L.R. (4th) 701, at paras. 51-52, *in which the courts seized on a party's failure to act diligently).*

[52] We pause to note that *supervising judges are assisted in their oversight role by a court appointed monitor* whose qualifications and duties are set out in the CCAA (see ss. 11.7, 11.8

and 23 to 25). *The monitor is an independent and impartial expert, acting as "the eyes and the ears of the court" throughout the proceedings* (Essar, at para. 109). *The core of the monitor's role includes providing an advisory opinion to the court as to the fairness of any proposed plan of arrangement and on orders sought by parties, including the sale of assets and requests for interim financing (see CCAA,* s. 23(1)(d) and (i); Sarra, Rescue! The Companies' Creditors Arrangement Act, at pp- 566 and 569).

### *Related Parties & Conflict of Interests*

[63]   Our view is further supported by Industry Canada's explanation of *the rationale for s. 22(3) as being to "reduce the ability of debtor companies to organize a restructuring plan that confers additional benefits to related parties"* (Office of the Superintendent of Bankruptcy Canada, Bill C-12: Clause by Clause Analysis, developed by Industry Canada, last updated March 24, 2015 (online), cl. 71, s. 22 (emphasis added); see also Standing Senate Committee on Banking, Trade and Commerce, at p. 151).

[75] *We also observe that the recognition of this discretion under the CCAA advances the basic fairness that "permeates Canadian insolvency law and practice"* (Sarra, "The Oscillating Pendulum: Canada's Sesquicentennial and Finding the Equilibrium for Insolvency Law", at p. 27; see also Century Services, at paras. 70 and 77). As Professor Sarra observes, *fairness demands that supervising judges be in a position to recognize and meaningfully address circumstances in which parties are working against the goals of the statute*:

> The Canadian insolvency regime is based on the assumption that creditors and the debtor share a common goal of maximizing recoveries. The substantive aspect of fairness in the insolvency regime is based on the assumption that all involved parties face real economic risks. Unfairness resides where only some face these risks, while others actually benefit from the situation . . . If the CCAA is to be interpreted in a purposive way, the courts must be able to recognize when people have conflicting interests and are working actively against the goals of the statute.
>
> "The Oscillating Pendulum: Canada's Sesquicentennial and Finding the Equilibrium for Insolvency Law", at p. 30 (emphasis added))

[Emphasis added.]

### THE SHAREHOLDERS' RIGHTS AND INTERESTS

Widely recognized and authoritative Canadian bankruptcy experts and editors of The Annotated Bankruptcy and Insolvency Act, L.W. Houlden and C.H. Morawetz, were referenced in the SCC case *Holt Cargo Systems Inc. v. ABC Containerline N.V. (Trustees of), [2001] 3 S.C.R. 907, 2001 SCC 90* asserting that…

52 … As Gonthier J. said in Husky Oil Operations Ltd. v. Minister of National Revenue, 1995 CanLII 69 (SCC), [1995] 3 S.C.R. 453, at para. 9, "the entire scheme of distribution is '[s]ubject to the rights of secured creditors'". The opening words of s. 136 (under the heading "Scheme of Distribution") establish the priority of claims against the bankrupt's estate subject always "to the rights of secured creditors". L. W. Houlden and G. B. Morawetz state that "[t]he policy of the Act in the case of bankruptcy is not to interfere with secured creditors *except in so far as*

*may be necessary to protect the estate as to any surplus on the assets covered by the security*" (The 2001 Annotated Bankruptcy and Insolvency Act (2000), at p. 346).

In the Initial Order reasons of the CA Proceeding dated December 28, 2011, Justice Newbould stated…

> [21] It is clear that the CCAA serves the interests of a broad constituency of investors, creditors and employees. See Hong Kong Bank of Canada v. Chef Ready Foods Ltd. (1990), 4 C.B.R. (3d0 311 (B.C.C.A.). See also Janis P. Sarra, Rescue! The Companies' Creditors Arrangement Act (Thomson Carswell) at p.60. Thus, it is appropriate at this stage to consider the interests of the shareholders of Crystallex.
>
> [22] In my view, to cancel the shares of the existing shareholders at this stage is premature. The value of the gold at Las Cristinas is staggering. Las Cristinas contains at least 20,000,000 ounces of gold. At today's gold prices, the gold has increased in value by approximately $20 billion since Crystallex acquired its rights under the MOC. Crystallex's damage claim is for $3.8 billion.
>
> [24] Crystallex has spent over $500 million on the project. In the event that Crystallex only recovered that amount without interest and without any compensation for the loss of the ability to develop the project, Crystallex would still have more than enough to pay all of its debts and have substantial value left over for its shareholders.

[Emphasis added.]

As a result, the Shareholders were "assigned" a 35% of the Net Award Proceeds (the NAP) in the initial order because not doing so was legally offensive, given the high value of the arbitration claim versus creditors' claims, which amounted to less than $150 million, including the $36 million DIP loan. This, however, did not stop the Interested Directors and the DIP Lender, with the approval of the Monitor and the Canadian Court, to pursue their best interest at the expense of the estate, by going after the estate's surplus and its residual value beyond the debt and entitlements covered by the original Credit Agreement. The subsequent dilution of the Shareholders' share" of the NAP to 9% (less the costs of the U.S. and Canadian bankruptcy proceedings) elicited the following statement from the ONCA in its decision regarding the Shareholders' oppression motion (*Crystallex international Corporation (Re), 2018 ONCA 778*):

> [25] In closing, we note that DIP financing was originally conceived as a means to fund operations while a company under CCAA protection restructured. The disposition of this motion should not be interpreted as an endorsement or a rejection of the amendments approved by Newbould J.

**THE SHAREHOLDERS' ROAD TO NOWHERE**

The CCAA differs from the BIA in its approach to a common objective. The SCC summarized this difference in its *Century Services* opinion as follows:

> "The history of the CCAA distinguishes it from the BIA because although these statutes share the same remedial purpose of avoiding the social and economic costs of liquidating a debtor's assets, the CCAA offers more flexibility and greater judicial discretion than the rules-based mechanism under the BIA, making the former more responsive to complex reorganizations. Because the CCAA is silent on what happens if reorganization fails, the BIA

<u>scheme of liquidation and distribution necessarily provides the backdrop against which creditors assess their priority in the event of bankruptcy. The contemporary thrust of legislative reform has been towards harmonizing aspects of insolvency law common to the CCAA and the BIA</u>, and one of its important features has been a cutback in Crown priorities."

[Emphasis added.]

This difference, however, is more form than substance, given that a CCAA proceeding:

- Is meant to allow insolvent companies to reorganize and emerge from insolvency to avoid the social costs of bankruptcy,
- Is not intended and, therefore, does not have a process for liquidation or winding up.
- Requires a Plan of Arrangement that must be approved by the CCAA court as fair, reasonable and ensures an orderly reorganization process,
- The purpose of the CCAA mutated over time to allow liquidation or implementation of pre-packaged business agreements under a plan, or indeed, without a plan, as it is the case with the Company, that would not be possible under a regimes such as the BIA and the CBCA. As a result, most CCAA filings in recent years pursued liquidations.

Eight years after requesting CCAA protection, the Company continues to avoid filing a plan of arrangement and, in its absence, the DIP Lender provided for a distribution plan (the Mechanics of Distribution) in the Credit Agreement that inexorable leads the Company to becoming an empty shell and leads to liquidation or wind up by design.

This explains the procrastination strategy used by the DIP Lender and the Interested Directors that is clearly expressed by the pervasive use of motions and orders made meaningless by the unlimited use of the confidentiality privilege, endless interlocutory orders, agreements with corrupt government officers, deals with unsecured creditors, and other legal and financial contortions aimed at maintaining a legal vacuum to protect their interest to the exclusion and at the cost of hundreds of individual U.S. and Canadian Shareholders. The Shareholders did not stand a chance under the CCAA and the approved Canadian Court rules nor could they afford to protect their rights before the Canadian Court in the endless CA Proceeding. Two of these legal and financial contortions stand out: The Company's Non-Disclosure Agreement (NDA) and the Nomura Notes.

Access to the CA Proceedings' unredacted motions and orders depended on signing an NDA that required the Company's approval, without which the Monitor would not issue it. But even if individual Shareholders were willing to sign the NDA, they could not do so, since it required him/her to appoint legal counsel for the duration of the CA Proceedings, currently in its eighth year, to be able to do so. Per the NDA:

> *(iii) Access to any Confidential Information shall only be granted to Designated Counsel once the Recipient Party has delivered an executed copy of this agreement to Crystallex. By receiving access to the Confidential information, the Recipient Party is not warranting that he will in fact access such Confidential Information, and nothing in this Confidentiality Agreement requires the Recipient Party to access the Confidential Information.*

A clear indication of the concerted effort by the Interested Directors and the DIP Lender to delay the Company's exit from the insolvency proceedings is their actions and omissions with $710 million worth of Nomura credit-linked notes (the Notes) owned by Venezuela and in Nomura Bank- New York possession for sale on behalf of the Republic. The Company obtained an ex parte restraining notice (the Notice) from the Southern District of NY Court in June 2017 after it learned through a Reuters report that Nomura had been given the Notes for sale. This initiative was geared to put pressure on the Republic to agree to settlement proposals issued by the Company.

The Company's lawyers filed an Order Withdrawal request on April 9, 2018 that was justified by "in consideration for payments received by Plaintiff from the Defendant, Crystallex deems the restraining notice to Nomura withdrawn), which was subsequently approved by the SDNY Court. The withdrawal request and approval implied that:

a. The Notes were in Nomura's possession, otherwise the Notice issued by the NY court would have become void as unenforceable,

b. The Notes were in Nomura's possession and attachable as of the withdrawal request date, otherwise the Order would not have had to be withdrawn with the Company's approval,

c. Since the Notice was issued on June 30, 2017 and was lifted at the Company's request ten months later, legal actions, if any, undertaken by Nomura or Venezuela against the Order were either unsuccessful or simply not undertaken due to lack of merit. Ergo, the Company had the upper hand in the legal action and decided to give it up in pursuit of ulterior motives.

The ulterior motives were, according to information and belief, a) the pleas from the Venezuelan Government to release the much needed hard currency funds and the promise of a second settlement agreement with better terms than the first agreement, which Venezuela had failed to honor, and b) the risk of breaching the Canadian Criminal Interest Rate statute by paying off the debt before the right time. A second, short-lived settlement agreement was indeed reached in November 2018, which provided for the same US$ 1.2 billion payment, with an upfront payment and the balance paid in installments over several years.

I wrote to the Company's CEO & Chairman and the Independent Director, and the Monitor to denounce this action. The Monitor was compelled to address it in his Report Number 26 dated August 27, 2018. In it, the Monitor communicated another misrepresentation by the Company by indicating that...

> *"The Applicant agreed to withdraw the restraining notice in conjunction with the Ingalls Settlement Agreement (defined below). The Monitor has also been advised by the Applicant that Nomura did not raise any cash from restructuring fixed-income securities and therefore the Applicant would not have been able to seize any Venezuela assets by pursuing this restraining notice."*

This justification was false on two counts: First, the Ingalls Settlement Agreement entered between the shipbuilder and the Company to share Venezuelan funds in a bank account at the New York Mellon Bank on which Ingalls had a restraining order issued by a Mississippi Federal Court for a frigate repair contract cost dispute with the Venezuelan Defense Ministry. Ingalls and the Company agreed to attach and share the frozen funds in the bank account. As a result, the Company received $19 million in

payment towards the ICSID Award. Venezuela opposed the attachment of the funds and never agreed to release the funds voluntarily as payment towards the settlement agreement with the Company. Second, the Nomura Notes were securities issued by Nomura Finance, an international financial organization with a AAA credit rating, that had maturities in Oct. 2018 and Dec. 2023. Venezuela had acquired the Notes from Nomura when the country was "swimming in money", after crude oil hit record high prices for an extended time period. The Notes could be sold on the secondary market or held to maturity, when Nomura was required to redeem the notes. The Oct. 2018 Notes had a $390 million face value and their maturity date was only six months away from the date the restraining order was withdrawn. The Dec. 2023 had a $320 million face value.

Neither the Monitor nor any other fiduciary took the initiative to request the aid of the Canadian Court, and the Delaware and/or the Southern District of New York courts to require Nomura – New York to disclose the final destination of its own notes.

### THE U.S. AND CANADIAN COMITY RULES AND LIMITATIONS

The pervasive disregard of the Company's Shareholders rights and interests and the impermissible stripping of the estate's surplus are contrary to U.S. law and policy and negate the otherwise respectful consideration due to a foreign proceeding under the international comity doctrine. In *Hilton v. Guyot, 159 U.S. 113*, 163-64 *(1895),* the U.S. Supreme Court (the SCOTUS) indicated that...

> ""Comity" in the legal sense, is neither a matter of absolute obligation, on the one hand, nor of mere courtesy and good will, upon the other. But <u>it is the recognition which one nation allows within its territory to the legislative, executive or judicial acts of another nation, having due regard both to international duty and convenience, and to the rights of its own citizens or of other persons who are under the protection of its laws.</u>"

> "It is also contended that a part of the plaintiffs' claim is affected by one of the contracts between the parties having been made in violation of the revenue laws of the United States, requiring goods to be invoiced at their actual market value. Rev. Stat. § 2854. <u>It may be assumed that, as the courts of a country will not enforce contracts made abroad in evasion or fraud of its own laws, so they will not enforce a foreign judgment upon such a contract.</u> Armstrong v. Toler, 11 Wheat. 258; DeBrimont v. Penniman, 10 Blatchford, 436; Lang v.-Holbrook, Crabbe, 179; Story's Conflict of Laws, §§ 244, 246; Wharton's Conflict of Laws, § 656." at p. 205.

The SCC adopted a similar position in *Morguard Investments Ltd. v. De Savoye [1990] 3 S.C.R. 1077 at p. 1096*:

> "For my part, I much prefer the more complete formulation of the idea of comity adopted by the Supreme Court of the Unites States in Hilton v. Guyot, 159 U.S. 113 (1895), at pp. 163-64, in a passage cited by Estey J. in Spencer v. The Queen, 1985 CanLII 4 (SCC), [1985] 2 S.C.R. 278, at p. 283, as follows:
>
>> "Comity" in the legal sense, is neither a matter of absolute obligation, on the one hand, nor of mere courtesy and good will, upon the other. But it is the recognition which one nation allows within its territory to the legislative, executive or judicial acts of another nation, having due regard both to international duty and convenience, and to the rights of its own citizens or of other persons who are under the protection of its laws . . .""

And in *Holt Cargo Systems Inc. v. ABC Containerline N.V.*, *supra*, by asserting that:

> 80 In short, Canada has adhered to a middle position (dignified by the name "plurality approach") which recognizes that different jurisdictions may have a legitimate and concurrent interest in the conduct of an international bankruptcy, and that <u>the interests asserted in Canadian courts may, but not necessarily must, be subordinated in a particular case to a foreign bankruptcy regime. The general approach reflects a desire for coordination rather than subordination</u>, with deference being accorded only after due consideration of all the relevant circumstances rather than automatically accorded because of an abstract "universalist" principle. As pointed out by Professor Castel, supra, at pp. 554-55:
>
>> <u>Under the doctrine of plurality which prevails in Canada, each country has the right, if it deems it advisable, to allow bankruptcy proceedings to begin in its territory by virtue of its bankruptcy law. The court applies its own substantive law</u>. Thus, bankruptcies may be initiated in a number of countries with respect to the same debtor. In Canada, this rigid doctrine is partially tempered by close cooperation with foreign courts.
>
> [Emphasis added.]

Hence, both the SCC and the SCOTUS have ruled out the use of the adjudicatory abstention doctrine when it injures "the rights of its own citizens or of other persons who are under the protection of its laws . . ." and, by doing so, would work injustice.

### THE FORUM NON CONVENIENS DOCTRINE

The respectful consideration due to a foreign proceeding under the comity doctrine finds its ultimate expression through the forum non conveniens doctrine; a discretionary power that permits a federal district court to decline to accept jurisdiction over an action over which it has jurisdiction and venue, and to dismiss the case where another forum is better suited to hear the case. The appropriate applicability of the doctrine is predicated upon a balance between private and public interest factors in favor of dismissal. The SCOTUS set forth the relevant criteria to be considered in *Piper Aircraft Co. v. Reyno*, 454 U.S. 235 (1981) and *Gulf Oil Corp. v. Gilbert*, 330 U.S. 501 (1947):

Private Interest Factors
- The relative ease of access to sources of proof,
- Availability of compulsory process for attendance of unwilling, and cost of obtaining attendance of willing, witnesses,
- Possibility of view of premises, if view would be appropriate to the action, and
- All other practical problems that make trial of a case easy, expeditious and inexpensive.

Public Interest Factors
- The administrative difficulties of the court,
- The burden of jury duty,
- Local interest in the action, and
- The court's familiarity with the law to be applied.

Thus, the SCOTUS established a general framework whereby a federal court must first determine the existence and adequacy of an alternate forum and then assess its convenience versus the local forum

based on the private and public interest factors. With regard to forum convenience, in *Piper Aircraft Co. v. Reyno, supra,* the SCOTUS reaffirmed its opinion that:

> "Indeed, by holding that the central focus of the forum non conveniens inquiry is convenience, Gilbert implicitly recognized that dismissal may not be barred solely because of the possibility of an unfavorable change in law." *Id.* at 248-49 (quoting *Gulf Oil Corp. v. Gilbert, supra),*

> "We do not hold that the possibility of an unfavorable change in law should never be a relevant consideration in a forum non conveniens inquiry. Of course, if the remedy provided by the alternative forum is so clearly inadequate or unsatisfactory that it is no remedy at all, the unfavorable change in law may be given substantial weight; the district court may conclude that dismissal would not be in the interests of justice." *Id.* at 254.

> "[I]n any balancing of conveniences, a real showing of convenience by a plaintiff who has sued in his home forum will normally outweigh the inconvenience the defendant may have shown." Id. at 255, n.23 (quoting *Koster v. Lumbermens Mut. Cas. Co.,* 330 U.S. 518, 524 (1947)),

The forum non conveniens defense is underpinned by the congressional intent regarding the extraterritorial reach of U.S. law, and is tempered by constitutional law (e.g. Due Process Clause of the Fifth Amendment: "No person shall be … deprived of life, liberty and property without due process of law…"), in combination with the courts' jurisdiction. The comity doctrine is the fulcrum on which the forum non conveniens doctrine and justice pivot as counterweights.

In *Koster v. Lumbermens, supra,* the SCOTUS encapsulated this necessary balance as follows:

> 7. In applying the doctrine of forum non conveniens, the ultimate inquiry is where trial will best serve the convenience of the parties and the ends of justice.

### CHAPTER 15

Is the section in the U.S. Bankruptcy Code that fosters a cooperative environment in international insolvencies. Its primary goal is to allow foreign insolvent companies and foreign courts to avoid parallel bankruptcy proceedings under different regimes to make it more predictable and fairer for debtors and creditors. It also endeavors to protect the value of the debtor's assets and, if possible, to allow the financial rescue of the insolvent business. The Chapter's underlying objectives are efficiency and convenience and its main focus is on jurisdiction.

Recognition of a foreign proceeding under the comity doctrine does not necessarily lead to the recognition of the foreign judgement and its enforceability in the U.S. Section 1520 of the Bankruptcy Code provides for certain mandatory relief upon recognition of a foreign main proceeding, but any further relief is discretionary. The approval of a plan of reorganization or liquidation falls within the discretionary relief category, which is sometimes delimited by the Bankruptcy Code.

Chapter 15 provides two major sources of post-confirmation discretionary relief: sections 1507 and 1521. Section 1507 provides that 'consistent with principles of comity', <u>a court may also grant 'additional assistance', but before doing so must also consider whether granting such additional assistance would reasonably assure the 'just treatment of all holders of claims against or interests in</u>

the debtor's property' and a 'distribution of proceeds of the debtor's property substantially in accordance with the Bankruptcy Code. Section 1507 also requires that the Court consider whether such additional assistance will 'protect[] . . . claim holders in the United States against prejudice and inconvenience in the processing of claims in such foreign proceeding', 'prevent [. . .] preferential or fraudulent dispositions of property of the debtor' and 'if appropriate, . . . [provide] an opportunity for a fresh start for the individual that such foreign proceeding concerns'.

Section 1521 provides for certain enumerated relief, and also allows a court to grant 'any additional relief that may be available to a trustee', subject to certain exceptions. However, section 1521 is limited by section 1522, which provides that relief under section 1521 can only be granted 'if the interests of the creditors and other interested entities, including the debtor, are sufficiently protected'.

[Emphasis added.]

## THE U.S COURT'S JURISDICTION

An important fact in the individual Shareholders' case for the Company's and the Canadian Court's disregard of their rights and interests is the Company's minimum contacts with a U.S. forum in general and the Delaware District Court forum in particular. Some of these are:

- The Company's multiple legal actions against Venezuela and other parties in pursuit of remedies through arbitration and enforcement of the resulting ICSID award at several federal courts in Delaware, District of Columbia, Pennsylvania, New York, other states; and the SCOTUS.
- The DIP Lender, Tenor Capital Management Company LP and its assign in the Credit Agreement, Tenor Special Situation Fund I, LLC are Delaware Corporations with main offices In New York, NY,
- The Tenor nominee directors on the Company's Board of Directors, Mr. R. Shah, Mr. D. Kochav and Mr. M. Oppenheimer are U.S. citizens and residents in New York State, the first two directors, and Florida State, the latter,
- The Company is subject to the Treasury Department's Office of Foreign Assets Control (OFAC) regulations under the Venezuela-related Sanctions implemented by presidential executive orders. The main reasons for this being the Company's pursuit to collect the ICSID award by writ of attachment on CITGO shares, the US$ 350 million in Venezuelan bonds it received from the Republic as a partial payment against the second settlement agreement, and three of its five Board of Directors members being U.S. citizens subject to the OFAC regulations.

The main objective of the Company's legal proceedings in the U.S. courts is the enforcement of the ICSID award and the Delaware District Court's writ of attachment on the CITGO shares owned by the Republic through Petróleos de Venezuela (PDVSA). Since the Republic did not honor the second settlement agreement, the amount to be collected through the attachment of the CITGO shares is reset to the award amount (US $1.2 billion), the pre-award interest (US $200 million), the post-award interest (US$ 165 million as of Dec. 2019) and the value of the mining data (US$ 300 million), for an estimated US$ 1.9 billion total; less the partial payments received at around USD 300 million. The US$ 469 million received by the Company included the US$ 350 million in Venezuelan bonds at market value at the time of the payment were frozen by the OFAC regulations and are currently worth a fraction of this amount.

## THE WAY FORWARD FOR THE SHAREHOLDERS

The foregoing is testament to the slanted playing field individual U.S. shareholders have faced in trying to assert their rights in Canadian courts and the futility of reaching out to the Company's Board of Directors seeking the review of issues affecting them. The level playing field provided by the U.S. judicial system and the high barriers to entry erected by the Company and the Canadian judicial system clearly points to the former as the venue of last resort for the individual U.S. Shareholders to assert and protect their rights, once their legal options at the Canadian courts are exhausted.

In *Ritzen Group, Inc. v. Jackson Masonry, LLC, 906 F. 3d 494 (2020)* the SCOTUS affirmed the opinion of the Six Circuit Court of Appeals that access to the U.S. bankruptcy courts is as of right once a bankruptcy court issues a final order. Delivering the opinion for a unanimous court, Justice Ginsburg stated that...

> "An appeal of right lies from "final judgments, orders, and decrees" entered by bankruptcy courts "in cases and proceedings." 28 U. S. C. §158(a). Bankruptcy court orders are considered final and immediately appealable if they "dispose of discrete disputes within the larger [bankruptcy] case." Bullard v. Blue Hills, 575 U. S. 496, 501."

> "A bankruptcy court's order unreservedly denying relief from the automatic stay constitutes a final, immediately appealable order under §158(a). Pp. 6–12."

Further, the Board of Directors' failure to protect the Company's interest may require the pursuit of legal remedies at the Delaware District Court based on Fed. R. Civ. P. 23.1:

### Derivative Actions

(a) Prerequisites. This rule applies when one or more shareholders or members of a corporation or an unincorporated association bring a derivative action to enforce a right that the corporation or association may properly assert but has failed to enforce. The derivative action may not be maintained if it appears that the plaintiff does not fairly and adequately represent the interests of shareholders or members who are similarly situated in enforcing the right of the corporation or association.

(b) Pleading Requirements. The complaint must be verified and must:

(1) allege that the plaintiff was a shareholder or member at the time of the transaction complained of, or that the plaintiff's share or membership later devolved on it by operation of law;

(2) allege that the action is not a collusive one to confer jurisdiction that the court would otherwise lack; and

(3) state with particularity:

(A) any effort by the plaintiff to obtain the desired action from the directors or comparable authority and, if necessary, from the shareholders or members; and

(B) the reasons for not obtaining the action or not making the effort.

(c) Settlement, Dismissal, and Compromise. A derivative action may be settled, voluntarily dismissed, or compromised only with the court's approval. Notice of a proposed settlement, voluntary dismissal, or compromise must be given to shareholders or members in the manner that the court orders.

Therefore, it is of paramount importance for the individual Shareholders to be cognizant of the steps taken by the Monitor as representative of the Company at the U.S. Court in a transparent and timely manner. The first casualty of the CA Proceeding was timely and transparent information. Salient characteristics of the CA Proceeding from the outset has been its secrecy, access constrains, short-dated motions and belated order publication. Some examples are helpful here: the Company a) never informed the Shareholders about the CA Proceeding - neither before, nor after, and ever since the filing; b) constrained access to full and timely information about the CA Proceeding through the terms of the NDA; c) made every effort to keep the creeping and grossly dilutive terms of the Credit Agreement from the Shareholders.

Given this state of affairs, hundreds of individual U.S. Shareholders like me will look towards the U.S. Court for assistance with timely and transparent release of motions and orders that afford them the opportunity to protect their rights as warranted under U.S. law.

Sincerely,

*[signature]*

Adelso A. Adrianza

cc: The Honorable Justice J. Hainey, Ontario Superior Court of Justice
    The Honorable Chief Judge L. Stark, U.S. District Court for the District of Delaware
    Mr. David Byers - via email (dbyers@stikeman.com)
    Mr. Robert Chadwick – via email (rchadwick@goodmans.ca)
    Mr. Alexander Cobb – via email (acobb@osler.com)
    Mr. Robert Fung – via email (rfung@crystallex.com)
    Mr. Harry J. Near - via email (info@earnscliffe.ca)
    Mr. Timothy Pinos – via email (tpinos@casselsbrock.com)
    Mr. Clifton Prophet - via email (Clifton.Prophet@Gowlings.com)
    Mr. Jay A. Swartz - via email (JSwartz@DWPV.com)

**ADELSO ADRIANZA**

113 Washington Street – Newton, MA 02458 – U.S.A.
M: (859) 803-2279 |

---

## VIA USPS CERTIFIED MAIL

To: The Honorable Judge L. Selber Silverstein, U.S. District Bankruptcy Court for the District of Delaware

cc: The Honorable Justice J. Hainey, Ontario Superior Court of Justice
    The Honorable Chief Judge L. Stark, U.S. District Court for the District of Delaware

## VIA E-MAIL

**cc:** Mr. David Byers - via email (dbyers@stikeman.com)
Mr. Robert Chadwick – via email (rchadwick@goodmans.ca)
Mr. Alexander Cobb – via email (acobb@osler.com)
Mr. Brian Denega – via email (brian.m.denega@ca.ey.com)
Mr. Robert Fung – via email (rfung@crystallex.com)
Mr. Harry J. Near - via email (info@earnscliffe.ca)
Mr. Timothy Pinos – via email (tpinos@casselsbrock.com)
Mr. Clifton Prophet - via email (Clifton.Prophet@Gowlings.com)
Mr. Jay A. Swartz - via email (JSwartz@DWPV.com)

Adelisa Adrime
81 Church Street
Newton, MA 02458
U.S.A.





CERTIFIED MAIL®

7020 0090 0002 0099 9995

U.S. POSTAGE PAID
FCM LG ENV
NEWTONVILLE, MA
02460
MAY 29, 20
AMOUNT
$8.20
R2304H109462-33

2020 JUN -1 PM 3: 55

The Honorable
Chief Judge Leonard Stark
U.S. District Court - Delaware
J. Caleb Boggs Federal Building
844 N. King Street
Unit 26, Room 6124
Wilmington, DE 19801-3555

