# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| CRYSTALLEX INTERNATIONAL CORP., <br><br> Plaintiff, <br><br> v. <br><br> BOLIVARIAN REPUBLIC OF VENEZUELA, <br><br> Defendant. | Case No. 1:17-mc-00151-LPS |

## BRIEF OF THE BOLIVARIAN REPUBLIC OF VENEZUELA
## AND PETRÓLEOS DE VENEZUELA, S.A., AND PDV HOLDING, INC.
## REGARDING POTENTIAL FUTURE PROCEDURES

OF COUNSEL:

Donald B. Verrilli, Jr.
MUNGER, TOLLES & OLSON LLP
1155 F Street NW, 7th Floor
Washington, D.C. 20004
(202) 220-1100

George M. Garvey
Seth Goldman
MUNGER, TOLLES & OLSON LLP
350 South Grand Avenue, 50th Floor
Los Angeles, CA 90071
(213) 683-9100

Nathan P. Eimer
Lisa S. Meyer
EIMER STAHL LLP
224 S. Michigan Avenue, Suite 1100
Chicago, IL 60604
(312) 660-7600

A. Thompson Bayliss (#4379)
Stephen C. Childs (#6711)
ABRAMS & BAYLISS LLP
20 Montchanin Road, Suite 200
Wilmington, DE 19807
(302) 778-1000
bayliss@abramsbayliss.com
*Attorney for Defendant*
*Bolivarian Republic of Venezuela*

Samuel T. Hirzel, II (# 4415)
Aaron M. Nelson (# 5941)
HEYMAN ENERIO GATTUSO &
 HIRZEL LLP
300 Delaware Avenue, Suite 200
Wilmington, DE 19801
(302) 472-7300
shirzel@hegh.law
anelson@hegh.law

*Attorney for Intervenor*
*Petróleos de Venezuela, S.A.*

Kenneth Nachbar
MORRIS, NICHOLS, ARSHT &
 TUNNELL LLP
1201 N. Market Street, 16th Floor
P. O. Box 1347
Wilmington, DE 19899
(302) 658-9200
knachbar@mnat.com

*Attorney for Intervenor PDVH Holding, Inc.*

Dated:  June 17, 2020

## <u>TABLE OF CONTENTS</u>

<u>PAGE</u>

NATURE AND STAGE OF PROCEEDINGS ...............................................................................1

SUMMARY OF ARGUMENT ..................................................................................................1

ARGUMENT ..............................................................................................................................4

I.      EVEN ASSUMING THAT CRYSTALLEX HAS VALIDLY
ATTACHED THE PDVH SHARES (WHICH IT HAS NOT), THE
COURT SHOULD DEFER DETERMINING THE PROCEDURES FOR
THE SALE OF SUCH SHARES..........................................................................................4

        A.      The Balance of Competing Interests Weighs in Favor of Deferring
the Court's Determination of Any Sale Procedures...................................................4

        B.      Unless and Until OFAC Grants Crystallex's License Application,
Any Proceeding to Determine Sale Mechanics Would Be
Inappropriate. ........................................................................................................8

II.     NO REASONABLE SALE PROCESS CAN BEGIN UNLESS AND
UNTIL CRYSTALLEX OBTAINS AN OFAC LICENSE AND THE
MARKET RECOVERS FROM THE CURRENT DEPRESSED AND
VOLATILE CONDITIONS. ..............................................................................................9

        A.      Until OFAC Provides a License to "Prepare for and Hold" a Sale
of the PDVH Shares, It Will Not Be Possible to Conduct a Value-
Maximizing Sale Process...........................................................................................9

        B.      The Court Should Not Attempt to Design a Process to Sell a Major
Oil Asset in the Current Depressed and Volatile Market
Conditions. ...........................................................................................................11

III.    ANY SALE PROCEDURES MUST COMPLY WITH MINIMUM
LEGAL AND COMMERCIAL MANDATES THAT ARE ESSENTIAL
TO A FAIR OUTCOME. ...................................................................................................12

        A.      Delaware Law Requires That the Court Establish a Fair and Robust
Sale Process That Does Not Deprive the Debtor of Value in Excess
of the Judgment Amount..........................................................................................12

        B.      To Be Fair and Commercially Reasonable, the Sale Process Should
Adequately Account for the Significant Challenges Arising from a
Sale of PDVH Shares, Including the OFAC License Requirements. ....................16

CONCLUSION........................................................................................................................19

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Atl. Props. Grp., Inc.* v. *Deibler*,
  1994 WL 45433 (Del. Super. Ct. Jan. 6, 1994) ....................................................................13

*Aurelius Capital Master, Ltd., et al. v. Republic of Argentina*,
  2016 WL 1267524 (2d Cir Mar. 23, 2016)..............................................................................7

*Burge* v. *Fidelity Bond & Mortg. Co.*,
  648 A.2d 414 (Del. 1994) .....................................................................................................12

*Crystallex Int'l Corp. v. Bolivarian Republic of Venezuela*,
  333 F. Supp. 3d 380 (D. Del. 2018)..................................................................................3, 16

*Crystallex Int'l Corp.* v. *Bolivarian Republic of Venezuela*,
  C.A. No. 1:16-cv-00661-RC (D.D.C. 2016), D.I. 31............................................................8

*Official Comm. of Unsecured Creditors of Cybergenics Corp. ex rel. Cybergenics
Corp.* v. *Chinery*,
  330 F.3d 548 (3d Cir. 2003)..................................................................................................14

*Deibler* v. *Atl. Props. Grp., Inc.*,
  652 A.2d 553 (Del. 1995) ..........................................................................................12, 13, 14

*E. Sav. Bank, FSB* v. *CACH, LLC*,
  55 A.3d 344 (Del. 2012) .......................................................................................................13

*Fifth Ave. Bank of N.Y.* v. *Compson*,
  166 A. 86 (N.J. Chan. 1933) .................................................................................................11

*Girard Tr. Bank* v. *Castle Apartments, Inc.*,
  379 A.2d 1144 (Del. Super. Ct. 1977) ..................................................................................12

*Landis* v. *N. Am. Co.*,
  299 U.S. 248 ............................................................................................................................4

*In re Marvel Entm't Grp., Inc.*,
  140 F.3d 463 (3d Cir. 1998)...................................................................................................14

*Matos* v. *O'Neill*,
  220 F. Supp. 2d 99 (D.P.R. 2002)...........................................................................................9

*Md. Nat'l Bank* v. *Porter-Way Harvester Mfg. Co.*,
  300 A.2d 8 (Del. 1972) .........................................................................................................13

*In re Netsmart Techs., Inc. Shareholders Litig.*,
   924 A.2d 171 (Del. Ch. 2007)......................................................................................14, 15, 17

*Noble* v. *Delaware*,
   C.A. No. 17-353-LPS, 2017 WL 5163355 (D. Del. Nov. 7, 2017) ............................................4

*Preiser* v. *Newkirk*,
   422 U.S. 395 (1975)...................................................................................................................9

*Revlon, Inc.* v. *MacAndrews & Forbes Holdings, Inc.*,
   506 A.2d 173 (Del. 1986) ........................................................................................................14

*In re TransPerfect Global, Inc.*,
   Nos. 9700–CB, 10449–CB, 2016 WL 3949840 (Del. Ch. July 18, 2016) ..............................15

*In re TransPerfect Global, Inc.*,
   Nos. 9700–CB, 10449–CB, 2018 WL 904160 (Del. Ch. Feb. 15, 2018).........................15, 17

*In re V. Savino Oil & Heating Co.*,
   99 B.R. 518 (Bankr. E.D.N.Y. 1989)......................................................................................14

**Rules**

Fed. R. Civ. P. 60(b) ......................................................................................................................1, 6

Fed. R. Civ. P. 69(a)(1)....................................................................................................................12

**Statutes**

8 Del. C. § 226(b) ............................................................................................................................15

8 Del. C. § 324 ................................................................................................................................12

8 Del. C. § 324(a)............................................................................................................................12

**Other Authorities**

31 C.F.R. § 501, App. A (III)...........................................................................................................10

31 C.F.R. § 591.506(c).......................................................................................................................7

Defendant Bolivarian Republic of Venezuela (the "Republic" or "Venezuela") and Intervenor Petróleos de Venezuela, S.A. ("PDVSA") respectfully request the Court to defer further consideration of the sale procedures until (1) the Court rules on the motion of CITGO Petroleum Corp. ("CITGO"), PDVSA, and PDV Holding, Inc. ("PDVH") to quash the writ of attachment and the Republic's motion for relief under Federal Rule of Civil Procedure 60(b), and (2) the Office of Foreign Assets Control ("OFAC") issues a specific license authorizing Plaintiff Crystallex International Corp. ("Crystallex") to "tak[e] other concrete steps in furtherance of an auction or sale" of the PDVH shares.[1]

## NATURE AND STAGE OF PROCEEDINGS

The Court's Memorandum Order of May 22, 2020 directed the parties to submit "briefs on . . . the mechanics by which the sale of PDVH is to occur" and "any other issues."  D.I. 174.

## SUMMARY OF ARGUMENT

1.     The Guaidó Government is committed to a process for global restructuring of Venezuela's debt obligations.  The Executive Branch blocking order, under which steps toward any asset sale cannot occur without an OFAC license, has created the conditions that would allow for such a global restructuring.[2]

2.     Even assuming that Crystallex has validly attached the PDVH shares (which it has not),[3] publicly designing a process to sell even a part of Venezuela's most important strategic foreign asset for the benefit of Crystallex would undermine that restructuring effort and present a

---

[1] U.S. Dep't of Treasury, OFAC FAQs: General Questions, FAQ No. 809 (2019) ("FAQ 809"), Declaration of Stephen C. Childs, Ex. 1.  All references in this brief to "Ex. __ refer to exhibits to the Declaration of Stephen C. Childs.

[2] *See* Memorandum of Law in Support of the Republic's Motion for Relief Under Federal Rule of Civil Procedure 60(b), filed today.

[3] This is addressed in the pending motions to quash the writ of attachment and for relief under Federal Rule of Civil Procedure 60(b).

concrete and very substantial political threat to the Interim Government led by Juan Guaidó (the "Interim Government"), and thereby undermine the asset protection strategy of the Venezuelan National Assembly and U.S. foreign policy.  It would also undermine the interests of both the United States and Venezuela in an orderly and equitable resolution of all of Venezuela's legacy private claims.  In contrast, a decision not to determine the sale procedure at this juncture would not injure Crystallex, whose judgment is accruing interest, who is barred by OFAC sanctions from taking concrete steps in furtherance of a sale, and who admits a sale cannot close without such a license.  Crystallex has represented that it made an application to OFAC for a license to proceed to execute on its judgment.  The Court should allow the administrative process to play out before addressing (if a license is issued) the process by which any licensed sale should take place.

       3.      If the Court decides to proceed to determine a process for how to sell shares of PDVH, the Court should not begin that process until Crystallex obtains an OFAC license to allow it to move forward with the sale and the market recovers from the current anomalously depressed and volatile conditions.  Because each phase of a competitive share sale process involves "prepar[ation] for" and "concrete steps in furtherance of an auction or sale," FAQ 809, an OFAC license will be needed from the outset of the process.  Even if OFAC issues a specific license authorizing certain preliminary steps in preparation for a sale—e.g., hiring advisors, preparing marketing materials and creating and populating a data room—no bids should be solicited unless and until Crystallex has obtained the OFAC license required to complete a sale.  Without reasonable certainty that OFAC will permit a sale, and at what time and under what limitations a sale would be permitted, any auction will not produce a value-maximizing price.  Potential buyers either will not expend the considerable effort to determine the true value of CITGO and all its components, or will not participate at all.  And with the oil industry in virtual collapse because of

low oil prices and the effects of the worldwide pandemic shutdown, numerous industry participants have delayed asset sales; the Court should do the same.

4.     In short, contrary to the Court's expectations at the time it issued the writ of attachment in 2018, under the current circumstances it is not possible to implement an "appropriate commercially reasonable procedure by which to effectuate the sale of the PDVH shares, in order to maximize the likelihood of a fair and reasonable recovery."[4]

5.     For all those reasons, now is not the time to determine sale procedures.  But if the Court decides to address the procedures for a sale at this time (contingent on OFAC eventually licensing the transaction),[5] any sale procedures would have to comply with certain minimum legal and commercial mandates that are essential to a fair outcome in a highly complex context like this. The first procedure should be to determine the amount of Crystallex's judgment that remains unpaid, which will require Crystallex to provide a full accounting of the amounts, dates and circumstances of the payments it has already received at the Republic's expense from the illegitimate Maduro regime (which total, at least, approximately $500 million).  Then, for a multibillion-dollar privately-held company like PDVH (where there have been no transactions in its stock since its certificate was issued in 2000), the owner must conduct a robust and professional sale process to determine the fair value of the shares and to ensure that no more shares than necessary are sold.

6.     While the Delaware courts have never had an occasion to address an execution sale of stock of such a corporation, Delaware cases scrutinizing M&A transactions and liquidations in

---

[4] *Crystallex Int'l Corp. v. Bolivarian Republic of Venezuela*, 333 F. Supp. 3d 380, 425 (D. Del. 2018).

[5] Crystallex does not dispute that "any final sale of the shares of PDVH remains subject to OFAC approval under the current sanctions regime."  D.I. 167 at 1.

connection with corporate deadlocks are instructive as to the minimum steps required to maximize value in connection with stock sales.  Such cases support the proposition that any appropriate commercially reasonable sale procedure would need to include, at a minimum, the primary customary phases of a competitive share sale process involving a large private corporation.  Any sale should be managed by the owner, which (unlike a judgment creditor like Crystallex) knows the asset best, would continue to own most of the shares following a sale, and owes responsibilities to other creditors and its stockholder—all of whom have interests in preserving and maximizing value.

## ARGUMENT

I.    **EVEN ASSUMING THAT CRYSTALLEX HAS VALIDLY ATTACHED THE PDVH SHARES (WHICH IT HAS NOT), THE COURT SHOULD DEFER DETERMINING THE PROCEDURES FOR THE SALE OF SUCH SHARES.**

Assuming the Court concludes that the PDVH shares have been validly attached and that the writ should not be quashed, the Court should defer determining the procedures for a sale at this time.  A public process of determining such procedures presents a serious destabilizing risk to the Interim Government and is inconsistent with U.S. foreign policy as expressed in OFAC guidance.  Nor does it delay any sale for the satisfaction of Crystallex's judgment because all parties agree that no sale can occur without a license.

### A.    The Balance of Competing Interests Weighs in Favor of Deferring the Court's Determination of Any Sale Procedures.

The Court "has the inherent authority to manage the cases on its docket 'with economy of time and effort for itself, for counsel, and for litigants.  How this can best be done calls for the exercise of judgment, which must weigh competing interests and maintain an even balance.'" *Noble* v. *Delaware*, C.A. No. 17-353-LPS, 2017 WL 5163355, at *5-6 (D. Del. Nov. 7, 2017) (quoting *Landis* v. *N. Am. Co.*, 299 U.S. 248, 254-55(1936))(internal quotation marks omitted)

4

(Stark, J.).  Here, the balance of competing interests weighs in favor of deferring the Court's determination of the procedures for the sale of the PDVH shares until OFAC issues a specific license.

A decision determining the procedures to sell the PDVH shares—Venezuela's most valuable and strategic foreign asset—would have serious political and legal consequences for the Interim Government.  In particular, it would allow the illegitimate Maduro regime, which illegally controls the major media outlets in Venezuela, to destabilize the Interim Government by suggesting that Interim President Guaidó is about to lose CITGO, when, in fact, the PDVH shares are blocked property and OFAC has taken no action on Crystallex's application for a license permitting a sale.  The Republic has publicly committed to a voluntary restructuring on "equal terms" of all its legacy debt, including claims, like Crystallex's, "resulting from the expropriations and nationalizations carried out by the Chavez/Maduro regimes."[6]  The CITGO assets are the largest and most strategic foreign asset in the Venezuelan people's patrimony.  So important are those assets that the Venezuelan Constitution recognized the authority of the National Assembly to oversee any transfer of interests in them to a foreign entity.[7]  Any steps taken at this time toward a forced sale of a stake in those assets, at the insistence of a single creditor, would hand the Maduro regime an opportunity (however misleadingly) to question the sincerity of the United States' support for the Interim Government and the National Assembly.  In normal times, considerations of comity should counsel against such steps; with the extraordinary challenges facing the

---

[6] Ex. 2.

[7] Litigation is currently pending in the Southern District of New York challenging a purported security interest in those assets given in 2016 to noteholders, in defiance of the National Assembly, by PDVSA when it was controlled by the Maduro regime.  That litigation invokes Articles 150 and 187 of the Venezuelan Constitution, which require National Assembly approval for "contracts in the national public interest" with "entities . . . not domiciled in Venezuela."  *See* Ex. 3.

Republic's legitimate government and the United States' efforts to support it, those considerations of comity are particularly compelling.

The Maduro regime has demonstrated that it is monitoring this litigation closely, and it is attempting to misuse and distort developments in this litigation to undermine the authority of the Interim Government. For example, after this Court lifted the stay of this action on May 22, 2020, Maduro spokesman Jorge Arreaza accused the United States of using "lawmaker Juan Guaidó and his accomplices" to undertake "a fraudulent representation of the republic and PDVSA, which is not only illegal but acts to the detriment of the national interest," in order to illegally seize Venezuelan assets in the United States.[8] More recently, following the entry of this Court's Memorandum Order of May 22, 2020, Carlos Ron—the Maduro regime's purported Vice-Minister for North America—inaccurately asserted on national television that, after the United States "gave control of Citgo to the phantom government that they recognize headed by Guaidó," the Court decided to "give the go-ahead to begin the process of selling Citgo."[9] While the current crisis in Venezuela is the result of the recklessness and corruption of the Chávez and Maduro regimes, the political ramifications of a misperception of the imminent loss of a critical asset such as CITGO will fall directly on the shoulders of the Interim Government.

A decision deferring determination of the sale mechanics until such time as OFAC issues a specific license in favor of Crystallex also comports with U.S. foreign policy, which strongly supports the Interim Government's plans to alleviate the humanitarian emergency in Venezuela, restore the country's democracy, and promote an orderly consensual sovereign debt

---

[8] *See* Declaration of Allan R. Brewer-Carías, filed concurrently herewith, ¶ 20.
[9] *Id.* Mr. Ron's message is, of course, materially incorrect: the Court's Memorandum Order of May 22, 2020 scheduled briefing on the mechanics of a sale and any Rule 60(b) motion or motion to quash or to reconsider (D.I. 174); it did not "give the go-ahead" to begin a sale process.

restructuring.[10]   In support of this foreign policy goal, the U.S. government has put in place a sanctions regime designed to help "preserve [Venezuela's] assets for the people of Venezuela"[11] and expressly reserved to the U.S. Government the power to decide whether and which dispositions of Venezuela's assets in the United States—whether by settlements or enforcement of court judgments—should go forward and under what circumstances.[12]   In light of the sensitivity of such asset dispositions, OFAC has published guidance expressly "*urg[ing] caution* in proceeding with *any step* in furtherance of measures which might alter or affect blocked property or interests in blocked property."   FAQ 809 (emphasis added).   OFAC has further explained that under its regulations creditors claiming under writs of attachment (1) are *not* "authorized to *prepare for* and hold an auction or other *sale of the [PDVH] shares*, contingent upon the winning bidder obtaining a license from OFAC" and (2) "pursuant to the Venezuela Sanctions Regulations (31 C.F.R. Part 591), must obtain a specific license from OFAC *prior to . . . taking . . . concrete steps* in furtherance of an auction or sale."   *Id.* (emphasis added).

---

[10] *See, e.g.*, Ex. 4 ("The United States fully supports the efforts of Interim President Juan Guaidó to address the endemic corruption, human rights abuses, and violent repression that has become the hallmark of the illegitimate Maduro regime . . . ."); Ex. 5 (noting that the United States has committed itself to "rebuilding Venezuela's infrastructure and economy" and "supporting the effort to restore democracy and stability in Venezuela"); Ex. 6 (reaffirming the U.S. commitment to the people of Venezuela); *see also* Brief of the United States, *Aurelius Capital Master, Ltd., et al. v. Republic of Argentina*, 2016 WL 1267524, at *4 (2d Cir Mar. 23, 2016) (United States has "a significant interest in the orderly and cooperative resolution of sovereign debt defaults").

[11] Ex. 7.

[12] In August 2019, President Trump blocked "all property and interests in property of the Government of Venezuela that are in the United States," meaning that such property may not be "transferred, paid, exported, withdrawn, or otherwise dealt in" without a license from OFAC.  Ex. 8.   The implementing OFAC Venezuela Sanctions Regulations provide that "entry into a settlement agreement or the enforcement of any lien, judgment, . . . order through execution, garnishment, or other judicial process purporting to transfer or otherwise alter or affect property or interests in [blocked property] is prohibited unless licensed pursuant to this part."   31 C.F.R. § 591.506(c).

Crystallex, on the other hand, will not be injured by a decision of the Court to defer further consideration of the sale procedures, because Crystallex has failed thus far to obtain an OFAC license authorizing it to prepare for, or take concrete steps in furtherance of, a sale of the PDVH shares.  Until Crystallex obtains such a license, Crystallex will not be able to move forward with any sale.  In the meantime, Crystallex's judgment is accruing interest.  *Crystallex Int'l Corp.* v. *Bolivarian Republic of Venezuela*, C.A. No. 1:16-cv-00661-RC (D.D.C. 2016), D.I. 31, ¶ 5.  While Crystallex has previously expressed concerns that "[f]urther staying the sale of PDVH's shares would substantially injure Crystallex by giving PDVSA and Venezuela the opportunity to dissipate those assets,"  (D.I. 112 at 21) those concerns now have no basis in light of the current OFAC sanctions regime blocking Venezuela's U.S. assets.

The Republic therefore respectfully submits that, in view of the potentially destabilizing effect determining the sale procedures would have on the Interim Government, the inconsistency of such a process with the Venezuelan public policies and announced United States foreign policy, and the absence of any real-world harm to Crystallex, the Court should defer determining the procedures for a sale process until OFAC has determined that such a process is in the foreign policy interests of the United States.

**B.      Unless and Until OFAC Grants Crystallex's License Application, Any Proceeding to Determine Sale Mechanics Would Be Inappropriate.**

Appropriate consideration of the respective roles of the Executive and Judiciary branches counsels deferring any effort to predict how a sale process—if licensed by OFAC—might proceed. On May 18, 2020, Crystallex represented that it had "submitted its application for a specific license authorizing the sale of the shares of PDVH and is awaiting OFAC's decision."  D.I. 167 at 1. OFAC has not granted the license Crystallex requested.  The Republic and PDVSA believe OFAC should deny Crystallex a license for the sale of these blocked assets.  Proceeding to design a sale

process on the assumption that OFAC will license it, and with hypothetical assumptions about what a specific license might permit or forbid, would violate the principle that a court "must resolve a real and substantial controversy admitting of specific relief through a decree of a conclusive character, as distinguished from an opinion advising what the law would be upon a hypothetical state of facts." *Preiser* v. *Newkirk*, 422 U.S. 395, 401 (1975) (internal quotation marks omitted).

By asking the Court to "resolve . . . the mechanics by which the sale of PDVH is to occur" before OFAC has decided what kind of sale, if any, it would license (D.I. 167 at 1-2), Crystallex is improperly inviting the Court to interpose itself into OFAC's deliberations. "OFAC must be allowed to apply its expertise and decide whether [an applicant] should be issued a specific license . . . . [T]he Court cannot take on the agency's job, before they have a chance to do it themselves." *Matos* v. *O'Neill*, 220 F. Supp. 2d 99, 103 (D.P.R. 2002).

## II.   NO REASONABLE SALE PROCESS CAN BEGIN UNLESS AND UNTIL CRYSTALLEX OBTAINS AN OFAC LICENSE AND THE MARKET RECOVERS FROM THE CURRENT DEPRESSED AND VOLATILE CONDITIONS.

If, despite the concerns set forth above, the Court decides to outline a sale process at this time, the Court should not have the process begin until OFAC has issued the necessary licenses to provide certainty as to when such a sale would occur, and should not proceed with any sale in the current historically depressed economic conditions. Commencing the process sooner would depress the value of any sale and unreasonably erode other stakeholders' interests in PDVH.

### A.   Until OFAC Provides a License to "Prepare for and Hold" a Sale of the PDVH Shares, It Will Not Be Possible to Conduct a Value-Maximizing Sale Process.

The Court should defer any sale process until Crystallex obtains a license because a sale process conducted when a buyer cannot know whether or when, or under what limitations, a sale

may actually occur, will not maximize value, as required by Delaware law.[13]  At this juncture, there is no clarity (let alone certainty) as to if, when or under which conditions OFAC will be willing to authorize Crystallex to "prepare for" or "conduct[] an auction or other sale, including a contingent auction or other sale."  FAQ 809.  Such an extraordinarily high level of uncertainty with respect to a material regulatory condition will inevitably have a substantial chilling effect on the appetite of the already limited pool of candidates eligible to acquire some share ownership of PDVH.  Buyers who are capable of undertaking a multi-billion transaction have other investment options and may be unwilling to spend a significant amount of time attempting to close a transaction that could be indefinitely blocked by regulatory hurdles.  As a result, undergoing a sale process prior to licensure risks a miniscule or nonexistent bidding pool and the significant undervaluation of PDVH shares.  Further, bidders may also be discouraged from participating in a sale process due to the risk of civil penalties for actions taken in violation of the OFAC sanctions regime.  As noted, OFAC has urged "caution in proceeding with any step in furtherance of measures which might alter or affect blocked property" and stated that participation in "prepar[ation] for . . . an auction or other sale of the shares" would require prior authorization from OFAC.  FAQ 809.  Credible bidders are likely to be particularly sensitive to this risk in light of, among other things, the strong U.S. Government support of the Interim Government, the potential for political ramifications associated with the beginning of a sale process involving the PDVH shares, and the complex and high-profile nature of such process.  *See* 31 C.F.R. § 501, App. A (III) (stating that, when determining whether to issue a civil penalty, OFAC may consider, among other factors, the "actual or potential harm to sanctions program objectives caused by the conduct giving

---

[13] We address the requirements of Delaware law with respect to a sale process in Part III *infra*.

rise to the apparent violation," "the commercial sophistication and experience of the Subject

Person," and the "size of a Subject Person's business operations and overall financial condition").

**B.    The Court Should Not Attempt to Design a Process to Sell a Major Oil Asset in the Current Depressed and Volatile Market Conditions.**

The Court should exercise its discretion to delay the implementation of a share sale process

given the current abnormally negative market conditions.[14]  Current conditions are "the worst crisis

the oil industry has faced" due to fuel demand falling "roughly 30% worldwide."[15]  As a result,

knowledgeable industry participants have pulled back from asset sales.  For example, the *Wall

Street Journal* reported on May 4, 2020, that "most of the world's biggest energy companies had

planned to sell billions in assets to help pay down debt and maintain dividends" but that, as of that

date, most "have had major asset sales restructured or delayed indefinitely as coronavirus

lockdown restrictions decimated energy demand and oil prices fell by two-thirds."[16]  The Court

should not undertake a sale process in conditions in which the relevant industry, the members of

which would include many of the most likely potential bidders for the PDVH stock, recognizes

that no sale will be value-maximizing.

---

[14] Courts have recognized that they have authority to delay forced sale processes due to the effects of an economic collapse.  *See*, *e.g., Fifth Ave. Bank of N.Y.* v. *Compson*, 166 A. 86, 87 (N.J. Chan. 1933) (noting that, in the context of a "financial emergency, world-wide in its scope and affecting all nations and peoples," courts may apply "legal and equitable rules and concepts . . . to render their judgments with more fidelity to economic facts, with more general utility and in partial or complete disregard of rules conceived in the past, upon the basis of totally different postulates and world conditions") (citations and internal quotation marks omitted).

[15] *See, e.g.*, Ex. 9.

[16] *See, e.g.*, Ex. 10; *see also* Ex. 11 (noting that "[t]he crash in oil price could further slow BP PLC's ability to wrap up what was initially planned to be a two-year $10 billion asset divestiture").

## III.   ANY SALE PROCEDURES MUST COMPLY WITH MINIMUM LEGAL AND COMMERCIAL MANDATES THAT ARE ESSENTIAL TO A FAIR OUTCOME.

### A.   Delaware Law Requires That the Court Establish a Fair and Robust Sale Process That Does Not Deprive the Debtor of Value in Excess of the Judgment Amount.

Delaware law applies here because the "procedure on execution . . .  must accord with the procedure of the state where the court is located." Fed. R. Civ. P. 69(a)(1).  While there is no precedent for the sale of stock in a complex, multibillion-dollar privately-held corporation in an execution sale,[17] Delaware law does provide several guiding principles.  The first principle is the statutory command to sell only "[s]o many of the shares" of attached stock "as shall be sufficient to satisfy the debt," 8 Del. C. § 324(a).  The second principle is that the Court should devise a process that comports with due process and does not result in a grossly inadequate price.  *See Burge* v. *Fidelity Bond & Mortg. Co.*, 648 A.2d 414, 417, 420 (Del. 1994) (court has "inherent equitable power to control the execution process . . . to protect the affected parties from injury or injustice"); *Deibler* v. *Atl. Props. Grp., Inc.*, 652 A.2d 553, 557 (Del. 1995) ("[A] person's right to due process of law continues throughout the execution process and that right impresses certain limitations upon that process."); *Girard Tr. Bank* v. *Castle Apartments, Inc.*, 379 A.2d 1144, 1146 (Del. Super. Ct. 1977) (allowing challenges to execution sales based solely on "gross inadequacy of price" even if there was "no impropriety, irregularity, or failure to meet statutory requirements").  The third principle is that the judgment debtor should lead the sale process given its superior access to information and incentive to preserve value and successful continuing operations.  *See Deibler*, 652 A.2d at 557–58 (noting that "the flexible requirements of due

---

[17] CITGO's unrebutted research shows that the largest stock sale ever managed by the Delaware authorities under 8 Del. C. § 324 was for $567,000 (i.e., 0.047% the size of the $1.2 billion judgment Crystallex seeks to enforce).  D.I. 102-1 at 12.  Moreover, CITGO's counsel spoke with representatives of the U.S. Marshal and the New Castle County Sheriff, both of which expressed a complete lack of familiarity or experience with large stock auctions.  D.I. 102-1 at 12 n.5.

process" allow courts to design sale processes for corporate stock that "can take into account (and rely upon) the superior access to information . . . of judgment debtors").

Application of these principles is particularly important in the context of a sale of shares of an enormous, complex, privately held company.  A forced sale of shares is a complex and infrequent exercise[18] that poses unique challenges and requires special attention.  As the Delaware Superior Court said in the decision affirmed in *Deibler,* the only case in which it has addressed the process for selling corporate stock in an execution sale, bidding on corporate stock "requires studious inquiry by the buyer into the assets, liabilities, and income potential" of the company. *Atl. Props. Grp., Inc.* v. *Deibler*, 1994 WL 45433, at *5 (Del. Super. Ct. Jan. 6, 1994).[19]  That is, in part, because a corporation's value is "intangible and not readily subject to inspection" and because, in contrast to real or personal property, the execution sale of corporate stock does not eliminate any "unknown or contingent liabilities" of the corporation. *Id.* at *2, *5. *Cf. Md. Nat'l Bank* v. *Porter-Way Harvester Mfg. Co.*, 300 A.2d 8, 11 (Del. 1972) ("[U]nder the established case law of this State, the title acquired by the purchaser [of chattel] at the sale is free and clear of all liens theretofore existing"); *E. Sav. Bank, FSB* v. *CACH, LLC*, 55 A.3d 344, 349 (Del. 2012) ("Longstanding statutory and common law precedent requires that land sold at a sheriff's sale be transferred free of all nonmortgage liens.").

---

[18] *See, e.g., Deibler*, 652 A.2d at 557 (noting that "the sale of corporate stock at an execution sale is a relatively unusual event").

[19] In *Atl. Props. Grp.,* the Superior Court confirmed a sheriff's sale of shares in a private company based on a significantly different set of facts.  In contrast to this case:  (1) the corporations whose stock was sold were small real estate holding companies that were much easier to value than a company whose underlying asset is a multibillion-dollar refining company with complex operations; (2) the judgment debtors were found to have forfeited their right to challenge the sale by their pre-sale misconduct; and (3) the judgment debtors had not objected to the sheriff's conducting the sale and declined the opportunity to participate in the process, but sought to overturn the result of a sheriff's sale on the basis of the inadequacy of the price.

In *Deibler,* the Supreme Court also observed that a process for sale of corporate stock should generally include significant participation by the judgment debtor. *See Deibler*, 652 A.2d at 557–58. Indeed, in most cases, the debtor has "the fullest (and cheapest) access to relevant information." *Id.* A similar principle applies to the sale of a debtor's assets in Chapter 11 bankruptcies. In that context, the debtor-in-possession is the presumptive manager of the sale of its own assets because "current management is generally best suited to orchestrate the process of rehabilitation for the benefit of creditors and other interests of the estate." *In re Marvel Entm't Grp.*, *Inc.*, 140 F.3d 463, 471 (3d Cir. 1998) (quoting *In re V. Savino Oil & Heating Co*., 99 B.R. 518, 524 (Bankr. E.D.N.Y. 1989)); *accord Official Comm. of Unsecured Creditors of Cybergenics Corp. ex rel. Cybergenics Corp.* v. *Chinery,* 330 F.3d 548, 577 (3d Cir. 2003).

Delaware law on the fiduciary duties of corporate directors also provides guidance on the proper process for selling shares in a complex business. The goal of a corporate sale is to "secure the highest price realistically achievable given the market for the company," and the directors' duties are measured against that goal. *In re Netsmart Techs., Inc. Shareholders Litig.*, 924 A.2d 171, 192 (Del. Ch. 2007); *see also Revlon, Inc.* v. *MacAndrews & Forbes Holdings, Inc.*, 506 A.2d 173 (Del. 1986). The quality of the process that the company and its directors engage in is important. In *Netsmart*, a case involving the sale of a "niche" healthcare software company, the Delaware Chancery Court preliminarily enjoined a going-private transaction where the record showed that the board failed to make "a material effort at salesmanship," for example, by "put[ting] together materials explaining Netsmart's business, why it had attractive growth potential, and how Netsmart's products and services fit within the broader healthcare IT space" in order to take advantage of "the potential utility of a sophisticated and targeted sales effort." 924 A.2d at 196–97. These shortcomings, combined with the board's "cursory and poorly documented" decision

to solicit bids only from financial buyers and not to attempt "a serious sifting of the strategic market to develop a core list," led the Chancery Court to conclude that the board may have breached its fiduciary duties.  *Id.* at 196.

Similarly, when a Delaware court appoints a custodian of a corporation to "liquidate its affairs and distribute its assets" due to irreconcilable corporate deadlock or abandonment under 8 Del. C. § 226(b), the custodian must develop a sale plan for court approval.  *See In re TransPerfect Global, Inc.*, Nos. 9700–CB, 10449–CB, 2016 WL 3949840, at *1 (Del. Ch. July 18, 2016).  Courts typically approve sale plans that are designed to maximize value for shareholders.  *See In re TransPerfect Global, Inc.*, Nos. 9700–CB, 10449–CB, 2018 WL 904160, at *1 (Del. Ch. Feb. 15, 2018) ("*TransPerfect II*") (custodian's sale process was designed to effectuate the court's "dual mandate[] 'to sell the Company with a view toward maintaining the business as a going concern and maximizing value for stockholders'").  A proper process may include: (1) hiring experts such as management advisors, accounting firms, and financial advisors to manage the sale and solicit bids; (2) distributing of marketing materials; (3) entering into confidentiality agreements preventing bidders from releasing confidential company information; (4) holding multiple rounds of bidding where bidders are evaluated based on, among other things, "price range, perceived ability to obtain financing sources, investment thesis and proven ability of the participant to consummate difficult transactions"; and (5) conducting extensive due diligence.  *TransPerfect II*, 2018 WL 904160, at *1–13.  Additional material steps are meetings with management and negotiation of transaction documents, which would have to account for the minority interest of a buyer of stock in a company with a controlling stockholder.

**B.     To Be Fair and Commercially Reasonable, the Sale Process Should Adequately Account for the Significant Challenges Arising from a Sale of PDVH Shares, Including the OFAC License Requirements.**

A sale of PDVH stock would present unprecedented challenges of uniquely complex proportions, requiring a customized and robust process.  In particular, any sale process should adequately address two critical issues in order to "maximize the likelihood of a fair and reasonable recovery." *Crystallex*, 333 F. Supp. 3d at 425.  *First*, because PDVH is a multibillion-dollar private company whose value is predicated on the value of CITGO's business (which is itself operationally and financially complex), any commercially reasonable sale process should provide buyers with sufficient access to information and time to understand and adequately value PDVH.

*Second*, any reasonable sale process should also take into account the fact that prospective buyers will be hesitant to commit time and resources to performing due diligence and undertaking other preliminary steps in a transaction that cannot be completed or even begin without a license. Accordingly, even if OFAC issued a specific license (which it has not) authorizing preliminary steps in preparation for a sale (i.e., Phase II of the process discussed below), no bids should be solicited unless and until Crystallex obtains the OFAC license required to complete a sale.  Any pre-license process requiring significant investments of time and resources from potential bidders could result in a drastic undervaluation of PDVH shares or a failure to find any interested bidders. In light of these challenges, a commercially reasonable sale procedure would, at a minimum, comply with the following basic mandates, which are customary in any competitive share sale process involving a large private corporation:

1.     Objective:  The objective of the sale process should be to identify the buyer that will pay the highest price per share (and thus will require the fewest number of shares to satisfy the unpaid portion Crystallex's judgment).  That objective needs to be balanced against the desire to offer the least restrictive package of minority protections.  Potential buyers need to understand

exactly how much money needs to be raised, and this requires the determination, at the outset, of exactly what the judgment creditor is owed and will be owed, including interest, as of a reasonable assumed closing date (which remains unknown).

      2.    <u>Leadership</u>:  The owner of the shares should be in control of the process, together with its advisors and with input from the managers of the underlying business. Only they can marshal the personnel and information necessary to market the shares to bidders, respond to due diligence requests, conduct negotiations, seek required regulatory and legislative approvals, and complete a transaction.  Moreover, where, as here, the business is far more valuable than whatever part of the judgment remains unpaid, the owner is almost certain to remain a shareholder, and likely the controlling shareholder, after a transaction. Therefore, the owner should have discretion to select the buyer from among the parties who offer enough money to satisfy the judgment creditor.   The owner would provide periodic status reports to the Court and conduct status conferences as requested by the Court, subject to preserving any necessary confidentiality for the sale process and bidders.

      3.    <u>Key Phases</u>:  At a minimum, the sale process should include the following phases:[20]

<u>Phase I</u>:    Determine how much the judgment creditor has already collected in satisfaction of its judgment.  In November 2018, Crystallex represented to the Court that Crystallex had received "upfront payment" of $425 million pursuant to a settlement agreement with the Republic (which was then under the control of the Maduro regime, and had not appeared in this action),[21] and had previously

---

[20] *See generally Netsmart*, 924 A.2d at 195–99; *TransPerfect II*, 2018 WL 904160, at *1–13.

[21] The reasons for these settlement payments remain obscure because the Republic and PDVSA appear to have received little if anything from Crystallex in return under the Settlement Agreement. The National Assembly has ordered an investigation into the circumstances surrounding the payments and the settlement itself.  *See* Ex. 12.

received "approximately $75 million in funds" from a source the representation did not identify.  D.I. 130 at 2.  Crystallex must provide complete disclosure to the Court, the Republic and PDVSA of all funds it has received, at what times, and under what circumstances.

Phase II:   Preliminary steps to elicit initial expressions of interest from qualified buyers, including hiring advisors to identify potential buyers, devising a marketing strategy, preparing marketing materials, preparing draft agreements (e.g., confidentiality agreements and form of sale documents), retaining a service provider to host a data room, and creating and populating a virtual data room.

Phase III:   Outreach to potential bidders, negotiating confidentiality agreements, and receiving nonbinding expressions of interest based on the marketing materials.

Phase IV:   Choosing qualified bidders who will be permitted to go on to the next round, providing them access to the data room, responding to their due diligence requests, updating the data room, holding management presentations, distributing drafts of the transaction agreements and receiving preliminary bids along with documents to confirm the bidders are qualified (e.g. financing commitments in draft form).

Phase V:   Selecting preferred and reserve bidders, negotiating transaction documents, receiving final bids, finalizing transaction documents, obtaining necessary approvals and signing.

Phase VI:   Seeking final government approvals and third-party consents and then closing.

4.   OFAC License Requirements and Timing:  The sale procedures should be designed in light of the current OFAC sanctions regime.  Because Phases II through VI set forth above

involve "prepar[ation] for" or "concrete steps in furtherance of" a sale, potential parties to the transaction will not be authorized to take further action until OFAC grants a specific license authorizing these steps.

The minimum mandates outlined above are consistent with Delaware law and due process requirements.  If these mandates are not observed, the stock will be undervalued, which will result in more shares being sold than necessary, contrary to Delaware law, and deprive the debtor and potentially its other creditors of value in excess of the unpaid portion of the judgment.

## **<u>CONCLUSION</u>**

The Court should not determine any sale procedures unless and until the Court rules on the motions to quash the writ of attachment and for reconsideration, and the time (if ever) when OFAC issues a specific license authorizing Crystallex to take concrete steps in furtherance of a sale. Unless and until Crystallex prevails on those motions and on its application to OFAC, no sale can occur.  If and when a time comes to determine the mechanics of a sale process, the Court should establish a process that does not commence at a value-destroying time, and that complies with Delaware law and minimum commercial mandates that are essential to a fair valuation of a privately held company of this size and complexity.

Respectfully submitted,

/s/ A. Thompson Bayliss

OF COUNSEL:

Donald B. Verrilli, Jr.
MUNGER, TOLLES & OLSON LLP
1155 F Street NW, 7th Floor
Washington, D.C. 20004
(202) 220-1100

George M. Garvey
Seth Goldman
MUNGER, TOLLES & OLSON LLP
350 South Grand Avenue, 50th Floor
Los Angeles, CA 90071
(213) 683-9100

A. Thompson Bayliss (#4379)
Stephen C. Childs (#6711)
ABRAMS & BAYLISS LLP
20 Montchanin Road, Suite 200
Wilmington, Delaware  19807
(302) 778-1000
bayliss@abramsbayliss.com

*Attorney for Defendant Bolivarian
Republic of Venezuela*

/s/ Samuel T. Hirzel

OF COUNSEL:

Nathan P. Eimer
Lisa S. Meyer
EIMER STAHL LLP
224 S. Michigan Avenue, Suite 1100
Chicago, IL 60604
(312) 660-7600

Samuel T. Hirzel, II (# 4415)
Aaron M. Nelson (# 5941)
HEYMAN ENERIO GATTUSO &
  HIRZEL LLP
300 Delaware Avenue, Suite 200
Wilmington, DE 19801
(302) 472-7300
shirzel@hegh.law
anelson@hegh.law

*Attorney for Intervenor
Petróleos de Venezuela, S.A.*

/s/ Kenneth Nachbar
Kenneth Nachbar
MORRIS, NICHOLS, ARSHT &
 TUNNELL LLP
1201 N. Market Street, 16th Floor
P. O. Box 1347
Wilmington, DE 19899
(302) 658-9200
knachbar@mnat.com

*Attorney for Intervenor PDV Holding, Inc.*

Dated:  June 17, 2020