**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

|  |  |
|---|---|
| CRYSTALLEX INTERNATIONAL CORP., <br><br> Plaintiff, <br><br> v. <br><br> BOLIVARIAN REPUBLIC OF VENEZUELA, <br><br> Defendant. | Case No. 1:17-mc-00151-LPS |

**ANSWERING BRIEF OF THE BOLIVARIAN REPUBLIC OF VENEZUELA,
PETRÓLEOS DE VENEZUELA, S.A., AND PDV HOLDING, INC.
<u>REGARDING POTENTIAL FUTURE PROCEDURES</u>**

OF COUNSEL:
Donald B. Verrilli, Jr.
MUNGER, TOLLES & OLSON LLP
1155 F Street NW, 7th Floor
Washington, D.C.  20004
(202) 220-1100

George M. Garvey
Seth Goldman
MUNGER, TOLLES & OLSON LLP
350 South Grand Avenue, 50th Floor
Los Angeles, California  90071
(213) 683-9100

Nathan P. Eimer
Lisa S. Meyer
EIMER STAHL LLP
224 S. Michigan Avenue, Suite 1100
Chicago, Illinois  60604
(312) 660-7600

A. Thompson Bayliss (#4379)
Stephen C. Childs (#6711)
ABRAMS BAYLISS LLP
20 Montchanin Road, Suite 200
Wilmington, Delaware  19807
(302) 778-1000
bayliss@abramsbayliss.com
childs@abramsbayliss.com

*Attorneys for Defendant
Bolivarian Republic of Venezuela*

Samuel T. Hirzel, II (# 4415)
Aaron M. Nelson (# 5941)
HEYMAN ENERIO
GATTUSO & HIRZEL LLP
 300 Delaware Avenue, Suite 200
Wilmington, Delaware  19801
(302) 472-7300
shirzel@hegh.law
anelson@hegh.law

*Attorneys for Intervenor
Petróleos de Venezuela, S.A.*

Kenneth J. Nachbar (#2067)
Alexandra M. Cumings (#6146)
MORRIS, NICHOLS, ARSHT & TUNNELL LLP
1201 N. Market Street, 16th Floor
P. O. Box 1347
Wilmington, Delaware  19899
(302) 658-9200
knachbar@mnat.com
acumings@mnat.com

*Attorneys for Garnishee PDV Holding, Inc.*

# TABLE OF CONTENTS

**Page**

NATURE AND STAGE OF PROCEEDINGS .................................................................1

SUMMARY OF ARGUMENT ....................................................................................1

STATEMENT OF FACTS ..........................................................................................3

ARGUMENT ...........................................................................................................3

I.     UNLESS AND UNTIL CRYSTALLEX RECEIVES A LICENSE FROM
OFAC AND CRYSTALLEX'S WRIT OF ATTACHMENT SURVIVES
THE PENDING MOTIONS, NO SALE PROCESS SHOULD BE ES-
TABLISHED. ....................................................................................................3

II.    SHOULD A SALE OF THE PDVH SHARES BE ORDERED, THE
PROCESS MUST BE DESIGNED TO PRESERVE THE VALUE OF
THE SHARES AND ENSURE THAT NO MORE SHARES ARE SOLD
THAN NECESSARY TO SATISFY THE UNPAID AMOUNT OF THE
JUDGMENT. ....................................................................................................8

     A.     The Proposed Execution Sale Is Unprecedented. .....................................8

     B.     Crystallex's Alternative Proposal Is Legally And Practically Im-
permissible. ............................................................................................9

          1.     The Marshals Cannot Conduct the Sale.....................................10

          2.     Crystallex's Proposed Auction Rules and Procedures Are
Flawed. ...................................................................................11

          3.     Crystallex's Proposal Would Suppress Bids and Minimize
the Value of the PDVH Shares. .................................................13

     C.     ConocoPhillips' Proposal For A Receiver Should Be Rejected. ............15

III.    SHOULD A SALE OF THE PDVH SHARES BE ORDERED, THE
PROCEDURES DESCRIBED IN RESPONDENTS' OPENING BRIEF
WOULD BEST ADDRESS THE UNIQUE CHALLENGES PRE-
SENTED BY THE SIZE AND COMPLEXITY OF THE CONTEM-
PLATED SALE. ...............................................................................................19

CONCLUSION .......................................................................................................20

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*In re Aloha Airlines, Inc.*,
    2009 WL 1371950 (Bankr. D. Haw. May 14, 2009) ............................................................15

*BFP v. Resolution Trust Corp.*,
    511 U.S. 531 (1994) ............................................................................................................13

*Burge v. Fid. Bond & Mortg. Co.*,
    648 A.2d 414 (Del. 1994) .................................................................................................9, 13

*Bush v. Hillman Land Co.*,
    2 A.2d 133 (Del. Ch. 1938) ...................................................................................................6

*Official Comm. of Unsecured Creditors of Cybergenics Corp. ex rel. Cybergenics Corp. v. Chinery*,
    330 F.3d 548 (3d Cir. 2003) ................................................................................................20

*Deibler v. Atl. Props. Grp., Inc.*,
    652 A.2d 553 (Del. 1995) ..........................................................................................9, 10, 11

*Del. State Hous. Auth. v. Hillside Ass'n, L.P.*,
    1992 WL 127503 (Del. Ch. June 9, 1992) ..........................................................................16

*Eller Indus., Inc. v. Indian Motorcycle Mfg., Inc.*,
    929 F. Supp. 369 (D. Colo. 1995) .......................................................................................18

*Fed. Rep. of Yugoslavia v. Park-71st Corp.*,
    913 F. Supp. 191 (S.D.N.Y. 1995) ......................................................................................18

*In re Fisker Auto. Hldgs., Inc.*,
    510 B.R. 55 (D. Del. 2014) ................................................................................................14

*Fleet Nat'l Bank v. H&D Entm't, Inc.*,
    926 F. Supp. 226 (D. Mass. 1996) ......................................................................................17

*Fowler v. Fitzgerald*,
    570 A.2d 866 (Md. Ct. App. 1990) .....................................................................................15

*Girard Trust Bank v. Castle Apartments, Inc.*,
    379 A.2d 1144 (Del. Super. 1977) ......................................................................................13

*Ho v. Hsieh*,
    181 Cal. App. 4th 337 (2010) ...............................................................................................7

*Huntington Nat'l Bank v. Bywood, Inc.*,
  2017 WL 2241537 (Ohio Ct. App. May 16, 2017)...............................................................7

*Janvey v. Romero*,
  883 F.3d 406 (4th Cir. 2018) ...................................................................................18

*Lawsky v. Condor Capital Corp.*,
  154 F. Supp. 3d 9 (S.D.N.Y. 2015)..........................................................................17

*Leone Indus. v. Associated Packaging, Inc.*,
  795 F. Supp. 117 (D.N.J. 1992) ...............................................................................16

*Liberte Capital Grp., LLC v. Capwill*,
  462 F.3d 543 (6th Cir. 2006) ....................................................................................17

*In re Marvel Entm't Grp., Inc.*,
  140 F.3d 463 (3d Cir. 1998) .....................................................................................19

*Maxwell v. Enter. Wall Paper Mfg. Co.*,
  131 F.2d 400 (3d Cir. 1942)......................................................................................16

*Mfrs. & Traders Trust Co. v. Minuteman Spill Response, Inc.*,
  999 F. Supp. 2d 805 (W. D. Pa. 2013)......................................................................16

*Mintzer v. Arthur L. Wright & Co.*,
  263 F.2d 823 (3d Cir. 1959).......................................................................................16

*O'Brien v. Kelly*,
  597 F. Supp. 17 (D. Alaska 1984) ............................................................................15

*Prod. Res. Grp., L.L.C. v. NCT Grp., Inc.*,
  863 A.2d 772 (Del. Ch. 2004)...................................................................................16

*Quilling v. Trade P'rs, Inc.*,
  2011 WL 4973870 (W.D. Mich. Sep. 30, 2011).......................................................18

*Ross Hldg. & Mgmt. Co. v. Advance Realty Grp., LLC*,
  2010 WL 3448227 (Del. Ch. Sept. 2, 2010) ............................................................16

*In re Sale of Certain Unmined Coal*,
  76 A.2d 194 (Pa. 1950)..............................................................................................15

*Santibanez v. Wier McMahon & Co.*,
  105 F.3d 234 (5th Cir. 1997) ....................................................................................17

*SEC v. Am. Capital Invs., Inc.*,
  98 F.3d 1133 (9th Cir. 1996) ....................................................................................17

*SEC v. Hardy*,
    803 F.2d 1034 (9th Cir. 1986) ............................................................17

*SEC v. Helms*,
    2015 WL 11255450 (W.D. Tex. July 2, 2015) ..................................17

*SEC v. W. L. Moody & Co.*,
    374 F. Supp. 465 (S.D. Tex. 1974) ....................................................17

*In re The Free Lance-Star Publ'g Co.*,
    512 B.R. 798 (E.D. Va. 2014)..............................................13, 14, 15

*United Indus. Corp. v. Nuclear Corp. of Am.*,
    237 F. Supp. 971 (D. Del. 1964)..........................................................6

*View Crest Garden Apartments, Inc. v. United States*,
    281 F.2d 844 (9th Cir. 1960) ............................................................17

*Westmoreland Human Opportunities, Inc. v. Walsh*,
    246 F.3d 233 (3d Cir. 2001)...............................................................18

*Wolverine Flagship Fund Trading Ltd. v. Am. Oriental Bioengineering, Inc.*,
    134 A.3d 992 (N.J. Super. Ct. App. Div., 2016).................................7

*Zacarias v. Stanford Int'l Bank, Ltd.*,
    945 F.3d 883 (5th Cir. 2019) ............................................................17

**Statutes**

6 *Del. C.* § 8-112(a) ...............................................................................5, 6, 7

6 *Del. C.* § 8-112(e) ..................................................................................6, 7

8 *Del. C.* § 167 ............................................................................................7

8 *Del. C.* § 168 ............................................................................................7

8 *Del. C.* § 169 ............................................................................................6

8 *Del. C.* § 324(a).............................................................................5, 6, 8, 9

10 *Del. C.* § 5031 .......................................................................................15

Bankruptcy Code section 363(m) ...............................................................18

Foreign Sovereign Immunities Act ...............................................................8

## Other Authorities

31 C.F.R. § 591.309 ................................................................................................6

31 C.F.R. § 591.407 ..............................................................................................18

FAQ 808, https://www.treasury.gov/resource-
center/faqs/sanctions/pages/faq_other.aspx#venezuela ................................6

https://www.citgo.com/press/news-room/news-room/2020/citgo-reports-first-
quarter-2020-results .......................................................................................8

Jreck Subs home page, https://www.jrecksubs.com/index.html ..............................11

Julie Wernau, *As Venezuela's Default Risk Rises, Battle Heats Up for Control of
Refiner Citgo*, The Wall Street Journal, May 14, 2017 ...............................14

"New Jreck Owner Says He Is Committed to Enhancing Brand" (Nov. 19, 2019),
https://www.nny360.com/news/stlawrencecounty/new-jreck-owner-says-he-
is-committed-to-enhancing-brand/article_39ce4759-cb6c-50af-8364-
e7d052089889.html ......................................................................................11

Restatement (Third) of Restitution and Unjust Enrichment § 18 (2011).....................15

Tom Hals, *INSIGHT-Want to Sue Venezuela for millions? These firms can help,
for a price*, Reuters (Dec. 21, 2018, 12:01am), https://af.reuters.com/arti-
cle/commoditiesNews/idAFL1N1Y823L ......................................................14

Defendant Bolivarian Republic of Venezuela (the "Republic" or "Venezuela"), Intervenor Petróleos de Venezuela, S.A. ("PDVSA"), and Garnishee PDV Holding, Inc. ("PDVH") submit this response to the motion of Plaintiff Crystallex International Corp. ("Crystallex") for an Order Approving the Process of Sale of Shares of PDV Holding, Inc. and the Opening Brief of Phillips Petroleum Company Venezuela Limited and ConocoPhillips Petrozuata B.V. (together, "ConocoPhillips") Regarding Conduct of PDV Holding, Inc. Share Sale.

## NATURE AND STAGE OF PROCEEDINGS

Crystallex acknowledges that no sale of PDVSA's shares in PDVH can occur unless and until it obtains a license from the Office of Foreign Assets Control ("OFAC"), which it has not to date secured. Nor has Crystallex provided any clarity on the scope of the license applied for (such as which, if any, steps in furtherance of an auction or sale the application proposes), the timing of OFAC's consideration or decision, or the likelihood that any authorization will issue. Nevertheless, Crystallex seeks to forge ahead not only with establishing sale procedures, but with actually having the U.S. Marshals Service conduct an auction of unprecedented size and complexity.

## SUMMARY OF ARGUMENT

1.      Venezuela, PDVSA, and PDVH (together, "Respondents") respectfully maintain that no sale of the PDVH shares should be permitted and that the Court should defer establishing a sale process at this time. Given that Crystallex does not have the required OFAC license for "an auction or other sale, including a contingent auction or sale," or to take "concrete steps in furtherance" of one, FAQ 809, designing or implementing a sale process would be premature and destructive to PDVH's fair market value. Moreover, pending motions to quash and for relief under Rule 60(b) would, if granted, vacate the attachment upon which the sale would be predicated.

2.      If the Court decides to establish procedures now or to allow a sale to proceed notwithstanding these impediments, the best and fairest course is to adopt the procedure proposed

in the Respondents' opening brief. That procedure is designed to attract sophisticated bidders in order to maximize the value of the PDVH shares. It would result in a sale of only enough shares to satisfy Crystallex's unpaid judgment, consistent with Delaware law and due process, thereby preserving the remaining shares for the ultimate benefit of the Venezuelan people. It proposes that PDVSA manage the sale process in light of its superior knowledge and incentives and the need for PDVSA to negotiate the terms of the post-sale relationship between it and the purchaser.

3.      Crystallex's proposed process is completely detached from established market practice for selling large, complex, privately held businesses. Indeed, other than the addition of an incomplete list of potential bidders and the creation of a data room, it hardly differs from the paltry "process" it proposed in 2018. Crystallex's proposal is transparently designed to depress the bidding for the PDVH shares and to maximize its own chances of owning PDVH—a company worth billions of dollars—for a fraction of its real value, at the expense of PDVSA, the people of Venezuela, and U.S. foreign policy objectives. The Court should not—and, under applicable Delaware law, cannot—allow such a procedure.

4.      Nor should the Court appoint a receiver or adopt bankruptcy procedures, as ConocoPhillips suggests. This is not a bankruptcy, PDVH is not insolvent, and PDVSA would have greater knowledge, ability, and incentives in managing the sale than any receiver, whose appointment is—in any event—not authorized by federal or Delaware law. There is no basis for ConocoPhillips' assertion that PDVSA will not cooperate with the process ordered by this Court. Quite the contrary: PDVSA has the strongest interest of anyone in ensuring a sale on the best

possible terms. Moreover, because under any fair process PDVSA will remain PDVH's majority owner after the sale, it should be permitted to choose its co-owner and the terms of the sale.[1]

## STATEMENT OF FACTS

Crystallex's assertion that "Venezuela refuses to honor its debts voluntarily," D.I. 182 at 2, must be emphatically and unequivocally rejected. The Republic has publicly committed to "an orderly and consensual renegotiation of legacy private claims," expressly including claims like Crystallex's. D.I. 191-2. The Republic proposes to do so based on the "equal treatment" of similarly situated creditors, and with the assistance of the International Monetary Fund and other multilateral institutions, "as soon as practicable" after the usurpation of the Maduro regime is ended and the related U.S. sanctions are lifted. *Id.*; *see also* D.I. 184 at 2 ("The Guaidó Government recognizes that the judgment obtained by Crystallex confirming its arbitration award creates a valid obligation on the part of Venezuela to Crystallex . . . [and] is committed to a process for global restructuring of Venezuela's debt obligations.").

## ARGUMENT

I.   **UNLESS AND UNTIL CRYSTALLEX RECEIVES A LICENSE FROM OFAC AND CRYSTALLEX'S WRIT OF ATTACHMENT SURVIVES THE PENDING MOTIONS, NO SALE PROCESS SHOULD BE ESTABLISHED.**

Crystallex acknowledges that no sale can occur unless (and until) OFAC grants its license application, and if OFAC denies Crystallex's application, then no sale can proceed.[2] It would be

---

[1] Nonparty Adélso Adrianza has submitted a letter proposing that the Court order Crystallex's judgment be satisfied out of other assets of PDVSA or its affiliates. D.I. 193. If the Court considers Adrianza's letter (which it should not), it should reject Adrianza's proposal, which impermissibly proposes the disposition of assets that have not been attached and are not available for attachment.

[2] As Crystallex has tacitly conceded by applying for an OFAC license for "the commencement of the sale process," D.I. 182 at 7, under the current sanctions regime, Crystallex may not even "prepare for and hold an auction" or "tak[e] other concrete steps in furtherance of an auction or sale" without a license. FAQ 809. Crystallex hints that it might challenge the enforceability of

more economical for the Court and for all parties to defer establishing sale procedures until it becomes clear that there will even be a sale. Even if OFAC grants a specific license, the particular contours of that license would likely include provisions that directly affect the design of a sale process—for example, language defining precisely what acts the license permits (and what, if any, conditions are imposed on those acts) or specifying what further steps in the sale process would require additional specific licenses. As ConocoPhillips notes, any sale would "need to be conditioned, carefully, on authorization from OFAC or the lifting of sanctions regulations." D.I. 180 at 2. It makes little sense for the Court to rule on a hypothetical sale procedure that may have to be changed—or even redesigned completely—once OFAC has acted (if it acts at all).

In addition to being more economical, deferring establishment of a sale process is the most equitable course at this time. Deferring the establishment of sale procedures until after OFAC decides whether to issue a license—by which time pandemic-related demand shifts may have abated and the sale process could be conducted under more normal conditions—would maximize value without adversely affecting Crystallex. *See* D.I. 188 at 11.

Respondents' opening brief described the unnecessary harm that could befall the Venezuelan people, their Interim Government, and the foreign policy of the United States if the Court were to publicly design a process for the forced sale of the Republic's most strategic foreign asset when such a sale has not been licensed by OFAC. These harms include the propaganda opportunity that an order defining a sale process would present to the illegitimate Maduro regime to defame the Interim Government. D.I. 188 at 4–9. Crystallex's brief, which proposes auctioning off (to itself) PDVSA assets worth billions of dollars for as little as $300 million, shows that this danger is all

---

OFAC's requirements if it does not get the license it wants. D.I. 182 at 7, 15. But it has made no such challenge, and it has cited no authority that would support one.

too real. Crystallex asserts that PDVH would be more valuable if it were "unburdened with baggage of the sort that surrounds PDVH as a result of its Venezuelan ownership." D.I. 182 at 18. That is, perhaps, an acknowledgment that Crystallex sees a chance for significant upside, in excess of its unpaid judgment, if it can take control of PDVH through these proceedings. In any event, speculation of this sort is helpful only to the Maduro regime. And it is entirely unnecessary when OFAC has not determined that a sale can or should happen.

That is particularly so given that Crystallex's writ of attachment is defective for the reasons explained in CITGO, PDVSA, and PDVH's motion to quash, *see* D.I. 179, and the Republic's motion for relief under Rule 60(b), *see* D.I. 184. If the Court grants either motion, then the writ of attachment must be quashed or dissolved, no execution sale can proceed, and there would be no need to engage with a sale process or issues related to the sanctions regime.

In its opening brief, Crystallex appears to recognize that the writ of attachment has failed because the PDVH shares are certificated and the physical certificate representing PDVSA's shares is not in PDVH's possession. *See* D.I. 182 at 9–10 n.4. As CITGO, PDVSA, and PDVH explained in their motion to quash, without seizure of the physical share certificate, as required by 6 Delaware Code section 8-112(a), "the attachment is not laid and no order of sale shall issue." 8 *Del. C.* § 324(a). Instead of acknowledging that it has no valid attachment and that it makes little sense to establish a sale procedure for assets it has not attached,[3] Crystallex suggests that its failure to satisfy the seizure requirement can be remedied by an order from this Court "direct[ing] the

---

[3] As explained in the motion to quash, *see* D.I. 179 at 2–3, even if Crystallex had seized the share certificate, Delaware law would not permit Crystallex to attach shares owned by PDVSA to satisfy a judgment against Venezuela on an alter ego theory without a showing of fraud. This Court has already determined that Crystallex cannot show fraud. This fundamental failure makes it all the more appropriate to refrain from establishing a sale procedure.

immediate turnover of the shares to the Marshals or compel[ling] PDVH to reissue the share certificates so that they can be transferred to the successful bidder at the appropriate time." D.I. 182 at 9–10 n.4. For support, Crystallex cites a jumble of statutes, but none allows a creditor to evade the requirement that the garnishee possess share certificates to effect an attachment.

As an initial matter, Crystallex cannot solve the problem by asking the Court to "direct the immediate turnover of the shares to the Marshals." D.I. 182, at 9 n.4. Section 8-112(a) requires seizure of the physical certificate to effect an attachment, and PDVH does not have the certificate. Crystallex apparently contemplates that 8 Delaware Code section 169, which states that the "situs of the ownership of the capital stock" of Delaware corporations is in Delaware, trumps section 8-112(a), but section 169 speaks of *stock*, not *certificates*.[4] And even if the "situs" of the certificate were Delaware, that would not help Crystallex. The 1998 amendment to section 324(a), described in detail in the motion to quash, was specifically enacted to give effect to section 8-112(a)'s requirement of physical seizure notwithstanding section 169. D.I. 179 at 14–16.[5]

Crystallex also cites to 6 Delaware Code section 8-112(e), which permits a creditor to seek "aid from a court of competent jurisdiction, by injunction or otherwise, in reaching the certificated security . . . by means allowed at law or in equity in regard to property that cannot readily be

---

[4] Delaware case law makes clear that shares of capital stock are distinct from the certificates representing them. *See, e.g.*, *United Indus. Corp. v. Nuclear Corp. of Am.*, 237 F. Supp. 971, 977 (D. Del. 1964); *Bush v. Hillman Land Co.*, 2 A.2d 133, 136 (Del. Ch. 1938).

[5] Crystallex would also require an OFAC license before seeking such a turnover order. *See* FAQ 808, https://www.treasury.gov/resource-center/faqs/sanctions/pages/faq_other.aspx#venezuela (explaining that "a specific license from OFAC is required for . . . the enforcement of any lien, judgment, or other order through execution, garnishment, or other judicial process purporting to transfer or otherwise alter or affect property or interests in [blocked] property" and that "a specific license from OFAC would be required for measures such as: Taking Possession (Actual or Constructive) . . . Seizing . . . [and] Assuming or Maintaining Custody" of blocked property); *see also* 31 C.F.R. § 591.309 (defining "property and property interest" to include " stocks [and] . . . any other evidences of title, ownership or indebtedness").

reached by other legal process." Crystallex erroneously suggests that this Court may direct PDVH to reissue the stock certificate so that it can then be attached. Jurisprudence analyzing the analogous UCC provisions is clear: Section 8-112(e) does *not* permit a court itself to reissue certificated shares of stock or to order the issuer of a certificated security to reissue a certificate where the physical certificate has not been seized pursuant to section 8-112(a). *See, e.g.*, *Huntington Nat'l Bank v. Bywood, Inc.*, 2017 WL 2241537, at *4–6 (Ohio Ct. App. May 16, 2017) (court cannot use equivalent of section 8-112(e) to order issuance of new certificates).

Indeed, allowing such a workaround would swallow up the physical-seizure requirement of section 8-112(a) altogether. *See Wolverine Flagship Fund Trading Ltd. v. Am. Oriental Bioengineering, Inc.*, 134 A.3d 992, 995 (N.J. Super. Ct. App. Div., 2016) (holding section 8-112(e) remedies "should stop short of any remedy that circumvents the actual seizure requirement of subsection (a)"); *Ho v. Hsieh*, 181 Cal. App. 4th 337, 347 (2010) (noting "[a] court cannot compel a corporation to issue new stock certificates to a judgment creditor").

Nor do Crystallex's other suggested workarounds defeat section 8-112(a)'s physical seizure requirement. Crystallex identifies provisions in the Delaware code allowing for the *owner* of stock to seek a court order compelling the issuer to reissue certificated shares of stock where the court is satisfied, after a hearing, that the certificates "have been lost, stolen or destroyed" and the issuer has refused to reissue them upon request. 8 *Del. C.* §§ 167, 168. By its terms, Delaware law does not give the Court authority to undertake such proceedings *sua sponte* or on the request of a *creditor* of the owner of the relevant certificated shares. Even if it did, "lost, stolen or destroyed" is not synonymous with "needed for purposes of a writ of attachment."

Finally, Crystallex contends that section 324(c) permits the Court to order reissuance of share certificates, but section 324(c) applies only to the issuance of a certificate "to the purchaser"

*after* the Court has "confirmed the sale." It is clearly designed to finalize paperwork after a proper sale has concluded. Here, no sale has occurred, there is no successful bidder, and there cannot be one until section 324(a) is satisfied.

If Crystallex wishes to attach the certificate, then it can initiate appropriate process against PDVSA, the shares' owner, to the extent doing so is consistent with the Foreign Sovereign Immunities Act, Delaware law, and applicable OFAC sanctions. (Under the current sanctions regime, Crystallex would require a license before obtaining a court order attaching or seizing the certificate, *see supra* note 4.) But that does not salvage the fact that Crystallex's current writ of attachment has failed and, under Delaware law, has not attached anything. Given that Crystallex has nothing to sell, and may never have anything to sell, devising sale procedures is premature.

## II. SHOULD A SALE OF THE PDVH SHARES BE ORDERED, THE PROCESS MUST BE DESIGNED TO PRESERVE THE VALUE OF THE SHARES AND ENSURE THAT NO MORE SHARES ARE SOLD THAN NECESSARY TO SATISFY THE UNPAID AMOUNT OF THE JUDGMENT.

### A.  The Proposed Execution Sale Is Unprecedented.

PDVH indirectly owns CITGO, one of the largest refiners, transporters, and marketers of motor fuels and other petroleum products in the country, with approximately 3400 employees, three complex deep-conversion refineries, a network of forty-eight petroleum product terminals and ten pipelines, and franchise supply contracts with more than 4700 branded retail outlets. *See* https://www.citgo.com/press/news-room/news-room/2020/citgo-reports-first-quarter-2020-results. PDVH is, under any valuation, worth multiple billions of dollars. ConocoPhillips, for example, points to valuations of CITGO's enterprise value at $9 billion. D.I. 180 at 3.

Neither Crystallex nor ConocoPhillips has presented any examples of an execution sale of comparable scope or complexity—in Delaware or any other jurisdiction. *Cf.* D.I. 102-1 at 12 (listing readily ascertainable judgments for which attachments under section 324 issued or was sought,

all of which were below $600,000). The only reported Delaware case addressing procedures for the execution sale of corporate stock involved two small holding companies whose principal asset was a restaurant in Rehoboth Beach known as the "Olde Dinner Bell Inn." *See Deibler v. Atl. Props. Grp., Inc.*, 652 A.2d 553, 554, 559 (Del. 1995).

This Court therefore is faced with an essentially blank slate. In crafting procedures on this blank slate, the Court is guided by the twin commands of Delaware law (1) that only "[s]o many of the shares" of attached stock "as shall be sufficient to satisfy the debt" may be sold, *see 8 Del. C.* § 324(a), and (2) to respect the due process rights of the owner of the shares throughout the proceedings, *see Deibler*, 652 A.2d at 557. These commands require a process that maximizes value to avoid depriving the owner of property in excess of the judgment. The Court should also consider that its decision will have significant effects on PDVSA, the American subsidiaries, their employees, partners, and customers, and the long-suffering people of Venezuela, as well as for U.S. foreign policy objectives. *See Burge v. Fid. Bond & Mortg. Co.*, 648 A.2d 414, 417, 419–20 (Del. 1994) (a court has "inherent equitable power to control the execution process and functions to protect the affected parties from injury or injustice," including to prevent a "grossly inadequate" price or where "the rights of parties to, or interested in the sale are, or may have been, prejudiced").

**B.      Crystallex's Alternative Proposal Is Legally And Practically Impermissible.**

If a sale of the PDVH shares were to be ordered, Respondents' opening brief outlines a reasonable sale procedure for shares of a large, complex company that would vindicate the requirements and purposes described above while also heeding the fact that, as the Delaware Supreme Court has recognized, the owner of the shares has "the superior access to information" and "superior incentives" to maximize the shares' value at a public sale. *See Deibler*, 652 A.2d at 558. The alternative process proposed by Crystallex—a one-day Marshals' auction—would violate Delaware law and is manifestly inferior to the process outlined by Respondents.

9

## 1.     __The Marshals Cannot Conduct the Sale.__

Crystallex assumes the Marshals will manage the sale process, but that is not required. Crystallex asserts that "Section 324 . . . provides that shares of a Delaware corporation shall be sold by the sheriff at public auction," requiring by analogy that the Marshals conduct an auction here. D.I. 182 at 9. In fact, section 324 does not contain the word "sheriff" or any variant thereof. Instead, it requires that the shares "be sold at public sale to the highest bidder," and that its notice requirements be followed. This leaves the Court with discretion to design a process (including who manages the sale) that comports with Delaware law's twin commands.

Additionally, as a practical matter, the contemplated sale is far too complex to be conducted by the Marshals. The sale manager must work closely with management to, among other things:

- Assess market conditions;
- Market the asset to a well-chosen group of likely bidders;
- Identify and assemble voluminous due diligence materials and respond to due diligence questions;
- Negotiate data access, confidentiality, and privacy protection provisions (including by managing difficult competitive concerns);
- Negotiate protections for minority stockholders;
- Identify and seek any required consents from third parties and governments;
- Negotiate complex sale documentation; and
- Coordinate the sale effort alongside all the activities necessary to keeping a major energy company running.

*See* D.I. 188 at 14–18. Respectfully, the Marshals' office does not have the experience or resources required for a process of this nature. Even where a corporation's only assets were a few properties in Rehoboth Beach, the Delaware Supreme Court asked: "What did the sheriff know in this case concerning the value of this stock and how is any public official *reliably* to know such information in the next case involving a closely held business?" *Deibler*, 652 A.2d at 558 n.2.[6]

---

[6] Contrary to Crystallex's suggestion, *Deibler* did not endorse the process employed in the forced sale there as a model for all future sales of corporate stock. To the contrary, the court commented

Perhaps recognizing that the sale process it proposed in 2018 was woefully inadequate, Crystallex now proposes to contact a list of potential bidders, advertise the auction, and create a data room. Those steps are necessary, but not even remotely sufficient, to produce a sale at an adequate valuation. Sophisticated investors will be reluctant to participate in any process conducted in violation of OFAC guidance. Even after that, they will expect to conduct meaningful due diligence (well beyond reviewing documents in a data room) and a robust negotiation of terms. A one-day auction by the Marshals provides for no such familiar and necessary procedures.

Tellingly, the only precedent Crystallex can provide for an operating business whose competitive sale was managed by Marshals or sheriffs is the interlocutory sale in a criminal case of "Jreck Subs," the franchisor of an upstate New York chain of sandwich shops that the Marshals Service had been *operating* for two years following the sentencing of its owner.[7] *See also* D.I. 102-1 at 12 n.5 (explaining that "[a] representative from the U.S. Marshals Office for the District of Delaware has stated that she could not recall if her office had ever conducted a stock auction" and that a "representative from the New Castle County Sheriff's office in Wilmington has stated that her office had conducted a limited number of stock auctions, but only for a handful of shares at a time"). Crystallex's suggestion that the Court ignore the size and complexity of the business being sold in fact would likely result in a process that violates Delaware law by undervaluing the shares and ignoring the due process rights of the shares' owner.

## 2.     <u>Crystallex's Proposed Auction Rules and Procedures Are Flawed.</u>

---

that the notice of sale was "rather far from an ideal towards which we might strive," and that "the amounts realized here are such as to raise a concern that the process misfired." 652 A.2d at 555.

[7] *See* Jreck Subs home page, https://www.jrecksubs.com/index.html; "New Jreck Owner Says He Is Committed to Enhancing Brand" (Nov. 19, 2019), https://www.nny360.com/news/stlawrencecounty/new-jreck-owner-says-he-is-committed-to-enhancing-brand/article_39ce4759-cb6c-50af-8364-e7d052089889.html.

Crystallex's proposed ground rules for an auction are similarly ill-suited to a reasonable sale process. Crystallex proposes that a minimum of 10% of PDVH's shares be sold, and that the sale consist of 5% increments thereafter. This incremental approach threatens to sell more shares than necessary as compared to the reasonable procedure proposed by the Respondents, which, while maximizing the value of the shares, will aim to sell enough shares to satisfy the verified unpaid judgment in the most efficient manner, according to market conditions.

Crystallex also proposes that would-be buyers submit their bids without OFAC licenses and that the winning bidder pay a non-refundable deposit of up to $50 million *before* OFAC grants a license authorizing it to bid. In addition to placing the participants in violation of the sanctions regime as described in FAQ 809, this proposal would limit the field of bidders to those who are willing to risk significant capital, and to assume the risk of a sanctions violation. In Crystallex's proposed process, the eventual "winner" will pay $50 million for nothing more than the possibility of obtaining a stake in PDVH at some indeterminate point in the future, *if* OFAC ever issues the required licenses and *if* OFAC considers the winner acceptable. It is difficult to imagine that many bidders would be interested in participating under these conditions.[8]

Finally, Crystallex's alternative proposal does not include any procedures or safeguards to maximize value, ensure that only as many shares as necessary are sold, or respect PDVSA's right to due process. It does not provide for any meaningful pre-sale marketing or due diligence, any negotiation of issues between buyer and seller including, most significantly, governance provisions that any holder of a minority stake would require, any development of price competition through multiple bidding rounds, or any credible process for obtaining required regulatory approvals.

---

[8] The $50 million "nonrefundable" deposit Crystallex proposes would give it still another advantage over other bidders. As the ultimate recipient of its own $50 million deposit, only Crystallex would keep the $50 million if necessary approvals are not obtained.

Crystallex contends that any price produced by a sale, no matter how low, is by definition an adequate price. D.I. 182 at 19–20. That ignores the fact that, under Delaware law, "any party" with "an interest in the outcome of the sale" may move to set aside the sale on the ground that the price was "grossly inadequate" or that the auction deprived them of due process, *Burge*, 648 A.2d at 418–19, and that "gross inadequacy of price" is a basis for setting aside an execution sale even if there was "no impropriety, irregularity, or failure to meet statutory requirements." *Girard Trust Bank v. Castle Apartments, Inc.*, 379 A.2d 1144, 1146 (Del. Super. 1977). [9]

### 3. Crystallex's Proposal Would Suppress Bids and Minimize the Value of the PDVH Shares.

Crystallex's own brief demonstrates that it knows how value-destructive its proposals would be. Crystallex proposes to open an auction with a "credit bid" of its own: $300 million for 100% of PDVH. D.I. 182 at 19. Credit bidding enables a creditor to bid far more than it has in cash, giving it an advantage over other bidders, and thus "can be employed to chill bidding prior to or during an auction, or to keep prospective bidders from participating in the sales process." *In re The Free Lance-Star Publ'g Co.*, 512 B.R. 798, 806–08 (E.D. Va. 2014). Prospective cash bidders will know that Crystallex in effect has a $962 million head start (assuming that the amount owed is what Crystallex says it has estimated). That, in combination with Crystallex's defective sale "process," would discourage cash bidders, reduce price competition, and increase Crystallex's chances of taking full ownership of PDVH in exchange for much less than its true value. Crystallex

---

[9] Crystallex erroneously cites to *BFP v. Resolution Trust Corp.*, 511 U.S. 531 (1994), for the proposition that any price received at a forced sale is fair. In *BFP*, the U.S. Supreme Court acknowledged that each state has its own standard for establishing a process for a forced sale. 511 U.S. at 540. In the case of a sale of stock to satisfy a judgment, Delaware law commands that only shares sufficient to satisfy the judgment may be sold, and it grants the Court discretion to adopt fair, value-maximizing procedures and to disapprove a sale with a grossly inadequate price.

has made no secret of its intention to take control of PDVH through these proceedings, at one point stating, "The prize here is Citgo and we are getting closer to it."[10]

The Eastern District of Virginia limited credit bidding in a case where the creditor "made no secret of the fact that it acquired the [debtor-in-possession] Loan in order to purchase the Company" and was "tr[ying] to depress the sales price of the Debtors' assets" to receive a hefty return on its investment. *Free Lance-Star*, 512 B.R. at 806. The investment fund that is the primary beneficiary of any recovery by Crystallex, Tenor Special Situation I, L.P. ("Tenor Special"),[11] appears to be employing such a "loan to own" investment strategy. Based on the public Canadian bankruptcy records, Tenor Special appears to have advanced Crystallex $62.5 million, at a 10% interest rate, in exchange for a first priority lien on at least 70% of any recovery against the Republic. *See* Ex. 3 at 7, 8, 77; Ex. 4 at 2–13, 16–17, 26–27. Crystallex's insistence on a rushed bidding process further suggests that it intends to use credit bidding as a tool to depress the price of the PDVH shares. *See Free Lance- Star*, 512 B.R. at 803–06 (stating that credit bidding was being employed to depress the asset price where the creditor pushed for an "expedited . . . sales process"); *In re Fisker Auto. Hldgs., Inc.*, 510 B.R. 55, 60–61 (D. Del. 2014) (stating that the creditor's push for a rapid sale process supported capping the creditor's ability to credit bid).

---

[10] Julie Wernau, *As Venezuela's Default Risk Rises, Battle Heats Up for Control of Refiner Citgo*, The Wall Street Journal, May 14, 2017.

[11] Tenor Special is the latest assignee (there have been at least three) of the debtor-in-possession loan advanced to Crystallex to finance this litigation. *See* Ex. 1 at 42. (Exhibits cited herein are to the Declaration of Stephen C. Childs, filed herewith.) It appears that Tenor Special is controlled by the individuals that control Tenor Capital Management Company, L.P., a hedge fund that specializes in investing in litigation against sovereign nations undergoing political turmoil. *See* Ex. 2 at 2, 3, 10; Tom Hals, *INSIGHT-Want to Sue Venezuela for millions? These firms can help, for a price*, Reuters (Dec. 21, 2018, 12:01am), https://af.reuters.com/article/commoditiesNews/idAFL1N1Y823L.

Moreover, as discussed in Respondents' opening brief, D. 188 at 17-18, Crystallex entered

into a settlement agreement with the Maduro regime, under which Crystallex was paid $500 mil-

lion, apparently without releasing its claim. The Court has almost no information about the cir-

cumstances of this extraordinarily generous settlement, or about whether Maduro insiders who

made the deal are getting a cut. In these circumstances, the Court should be wary of authorizing

Crystallex's proposed sale process. *See*, *e.g*., *Free Lance-Star*, 512 B.R. at 804 (creditor's failure

to provide evidence about how it came to be assigned the claim was inequitable); *In re Aloha

Airlines, Inc.*, 2009 WL 1371950, at *10 (Bankr. D. Haw. May 14, 2009) (rejecting credit bidding

where creditor entered agreement with competitor intended to force debtor out of business).

### C.   ConocoPhillips' Proposal For A Receiver Should Be Rejected.

ConocoPhillips' suggestion that the Court appoint a receiver to manage the sale process is

an unauthorized and unnecessary step given that PDVSA is well-positioned to manage the sale

itself. ConocoPhillips mistakenly contends that federal law governs the procedure for the contem-

plated sale, based on an argument that section 324 provides for a judicial rather than an execution

sale. ConocoPhillips is incorrect that this would be a judicial sale,[12] but little turns on that question,

because neither Delaware law nor federal law authorize appointment of a receiver.

---

[12] "A 'judicial sale,' as distinguished from a sale on execution, refers to a sale of property by court order in connection with proceedings such as judicial foreclosure, bankruptcy, and partition." Restatement (Third) of Restitution and Unjust Enrichment § 18 (2011). An execution sale is conducted upon a writ of execution, such as Crystallex's writ of attachment *fieri facias* under 10 Delaware Code section 5031. Section 324 merely imposes procedural safeguards when the property executed upon is corporate stock. The mere fact that a state statute requires a court to approve and confirm property sold on execution does not convert an execution into a judicial sale. *See O'Brien v. Kelly*, 597 F. Supp. 17, 19 (D. Alaska 1984); *See In re Sale of Certain Unmined Coal*, 76 A.2d 194, 196 (Pa. 1950) (distinguishing between a "*judicial sale[]*" and "*judicial assent* to a sale" because of a statutory requirement); *Fowler v. Fitzgerald*, 570 A.2d 866, 870 (Md. Ct. App. 1990) (explaining that "confirmation of the sale is the practice" in some execution sales).

The Delaware Court of Chancery is "extremely cautious about using its inherent equitable powers to appoint a receiver" over a solvent company. *Prod. Res. Grp., L.L.C. v. NCT Grp., Inc.*, 863 A.2d 772, 785 (Del. Ch. 2004); *see also Ross Hldg. & Mgmt. Co. v. Advance Realty Grp., LLC*, 2010 WL 3448227, at *6  (Del. Ch. Sept. 2, 2010) (explaining that the caution is even greater "where the entity continues to function actively"). It will do so only for "fraud, gross mismanagement or extreme circumstances causing imminent danger of great loss which cannot otherwise be prevented." *Del. State Hous. Auth. v. Hillside Ass'n, L.P.*, 1992 WL 127503, at *1 (Del. Ch. June 9, 1992). ConocoPhillips does not contend that any of these conditions is satisfied here. And aside from its unsupported and incorrect assumption that PDVSA will not cooperate in any sale process, ConocoPhillips merely suggests that a receiver would be helpful. That falls far short of the Delaware standard.

Federal authority is no more helpful to ConocoPhillips. "The appointment of a receiver is an equitable remedy of rather drastic nature." *Mintzer v. Arthur L. Wright & Co.*, 263 F.2d 823, 824 (3d Cir. 1959). "Because a receiver unquestionably interferes with an individual's right to otherwise control his or her property," such appointment should occur only "in cases of necessity" where "the plaintiff clearly and satisfactorily shows that an emergency exists and the receiver is needed to protect the property interests of the plaintiff." *Mfrs. & Traders Trust Co. v. Minuteman Spill Response, Inc.*, 999 F. Supp. 2d 805, 816 (W. D. Pa. 2013) (internal quotation marks and brackets omitted). Thus, "a district court can appoint a receiver only on a showing of fraud or the imminent danger of property being lost, injured, diminished in value or squandered, and where legal remedies are inadequate." *Leone Indus. v. Associated Packaging, Inc.*, 795 F. Supp. 117, 120 (D.N.J. 1992). A receivership is not appropriate "if milder measures will give the plaintiff, whether creditor or shareholder, adequate protection for his rights." *Maxwell v. Enter. Wall Paper Mfg.*

16

*Co.*, 131 F.2d 400, 403 (3d Cir. 1942). The authorities ConocoPhillips cites, *see* D.I. 180 at 7, are not to the contrary. For example, as ConocoPhillips itself notes, the court in *Santibanez v. Wier McMahon & Co.*, 105 F.3d 234 (5th Cir. 1997), appointed a receiver to collect and sell the judgment debtor's property only because it had already been shown that "usual remedies at law [had] proven inadequate." D.I. 180 at 7.[13]

ConocoPhillips claims only that appointing a receiver would be helpful, not that it is necessary or that an emergency exists. It does not allege fraud, any imminent danger of property being hidden or squandered, or that it lacks an adequate remedy at law. And this Court has ample supervisory power to ensure adherence to Respondents' outlined plan, should a sale be required.

In fact, rather than being "helpful," appointing a receiver in these circumstances would be impractical and costly given that PDVSA can conduct the sale itself. Unlike PDVSA, a receiver would lack the familiarity with PDVH's assets, liabilities, structure and operations necessary to manage the process, and getting it up to speed would merely incur needless expense. Unlike PDVSA, a receiver would not be able to directly negotiate the terms of the post-sale stockholder relationship. No receiver could manage the delicate task of preserving relationships with customers, employees, and other stakeholders during a sale process. And no receiver could match PDVSA's powerful incentive, as the owner, to maximize value.

---

[13] ConocoPhillips' other cases involve fraud or misconduct, *Zacarias v. Stanford Int'l Bank, Ltd.*, 945 F.3d 883, 889 (5th Cir. 2019); *Liberte Capital Grp., LLC v. Capwill*, 462 F.3d 543, 547 (6th Cir. 2006); *SEC v. Am. Capital Invs., Inc.*, 98 F.3d 1133, 1136 (9th Cir. 1996); *SEC v. Hardy*, 803 F.2d 1034, 1035 (9th Cir. 1986); *Lawsky v. Condor Capital Corp.*, 154 F. Supp. 3d 9, 11 (S.D.N.Y. 2015); *SEC v. Helms*, 2015 WL 11255450, at *1 (W.D. Tex. July 2, 2015), insolvency, *SEC v. W. L. Moody & Co.*, 374 F. Supp. 465, 467–68 (S.D. Tex. 1974), or appointment of a receiver pursuant to contract, *View Crest Garden Apartments, Inc. v. United States*, 281 F.2d 844, 845 (9th Cir. 1960); *Fleet Nat'l Bank v. H&D Entm't, Inc.*, 926 F. Supp. 226, 231 (D. Mass. 1996).

Moreover, OFAC sanctions require a specific license before control of blocked property can be vested in a receiver. OFAC regulations prohibit any "judicial process purporting to transfer or otherwise alter or affect property or interests in [blocked] property" without a "specific license" authorizing it, 31 C.F.R. § 591.407, and define "transfer" to include "the appointment of any agent, trustee, or fiduciary." *Id.* § 591.310. Materially identical regulations have been held to require a license before appointing a receiver over blocked property. *Fed. Rep. of Yugoslavia v. Park-71st Corp.*, 913 F. Supp. 191, 192, 194 (S.D.N.Y. 1995); *see also Quilling v. Trade P'rs, Inc.,* 2011 WL 4973870, at *2 (W.D. Mich. Sep. 30, 2011) ("The receiver serves as the court's agent."); *Eller Indus., Inc. v. Indian Motorcycle Mfg., Inc.,* 929 F. Supp. 369, 372 (D. Colo. 1995) (a receiver "is a fiduciary"). ConocoPhillips does not represent that it has obtained or even applied for a license.[14]

ConocoPhillips also mistakenly urges the Court to adopt "certain principles and mechanics of bankruptcy proceedings." D.I. 180 at 9. The Bankruptcy Code, however, is a set of protections and burdens created for a specific set of circumstances: to provide a debtor with a fresh start while balancing and protecting the interests of creditors in an equitable distribution of assets. *See, e.g.*, *Janvey v. Romero*, 883 F.3d 406, 410–11 (4th Cir. 2018); *Westmoreland Human Opportunities, Inc. v. Walsh*, 246 F.3d 233, 251 (3d Cir. 2001). It does not apply here, and given that PDVH is not insolvent, its provisions are not even theoretically suited to these circumstances.[15]

---

[14]   ConocoPhillips suggests that the Court could appoint a "special master or special commissioner." *See* D.I. 180 at 2. Because ConocoPhillips does not develop this argument, point to any authority to support it, or even explain how such a party would differ in anything but name from a receiver, the argument is forfeited. Even if the argument were not forfeited, appointment of such an agent would also be subject to the OFAC license requirement.

[15]   Invoking section 363(m) of the Bankruptcy Code, 11 U.S.C § 363(m), ConocoPhillips erroneously contends that the validity of the sale of shares of PDVH should be immune from challenge on appeal. This is not a case to which the Bankruptcy Code applies, but ConocoPhillips' erroneous contention highlights that, to reconcile the parties' rights to appeal with any interest of bidders in finality, the appropriate time for any appeal would be before the sale occurs or before the sale becomes final.

III.   **SHOULD A SALE OF THE PDVH SHARES BE ORDERED, THE PROCEDURES DESCRIBED IN RESPONDENTS' OPENING BRIEF WOULD BEST ADDRESS THE UNIQUE CHALLENGES PRESENTED BY THE SIZE AND COMPLEXITY OF THE CONTEMPLATED SALE.**

Respondents' opening brief described some basic processes—common to commercial sales of other major operating businesses—that would be necessary should a sale be ordered. D.I. 188, at 16–20. It also explained why care must be exercised to ensure that no sale process gets ahead of the OFAC sanctions regime, a misstep that itself would likely destroy value. *Id*. at 9–11.

While ConocoPhillips' proposed receiver solution is misguided, the interests it seeks to protect can be vindicated by allowing PDVSA to manage the sale process. Unlike Crystallex, ConocoPhillips agrees that maximizing value is the proper objective of any reasonable sale process. *See* D.I. 180 at 4–5, 13 n.5. It acknowledges the need for experts (including an investment bank) and for the sale to be managed by a knowledgeable party capable of making complex and sophisticated business judgments, which would enable bidding rules to be designed and applied based on experience and business knowledge, rather than guesswork. Contrary to ConocoPhillips' unsupported assumption, if the Court orders a sale, PDVSA would be fully willing and able to cooperate with the process of managing the sale, assuming OFAC licenses it. The process need sell only enough shares to satisfy the unpaid portion of Crystallex's judgment. At the end of any process that fairly values PDVH, PDVSA would remain the majority stockholder in PDVH, and thus the partner of whoever purchases the shares here. It is only fair to allow PDVSA to manage the process of selecting that partner and negotiating the details of post-sale governance.

Even in the bankruptcy context, to which ConocoPhillips looks for guidance, D.I. 180 at 2, there is a "strong presumption" in favor of vesting control of any sale in the owner or possessor of the property. *See In re Marvel Entm't Grp., Inc.*, 140 F.3d 463, 471 (3d Cir. 1998) (explaining that "current management is generally best suited to orchestrate the process of rehabilitation for

19

the benefit of creditors and other interests of the estate"); *accord Official Comm. of Unsecured Creditors of Cybergenics Corp. ex rel. Cybergenics Corp. v. Chinery*, 330 F.3d 548, 577 (3d Cir. 2003). And here, where not only Crystallex's interests are at stake but also the interests of PDVSA, the Republic, and the Venezuelan people in maximizing the governance and equity value remaining after a sale, only the owner has the incentive to achieve the statutory objectives.

## **CONCLUSION**

Crystallex's motion (D.I. 181) should be denied. The Court should defer establishing a sale process until the Court rules on the motions to quash the writ of attachment and for reconsideration, and until the time (if ever) when OFAC issues a license. If the Court does determine the mechanics of a sale process, the Court should establish a process that does not destroy value and that complies with Delaware law. Crystallex's and ConocoPhillips' proposals would not satisfy these requirements, while the Respondent's proposed procedures would.

Dated: July 7, 2020

Respectfully submitted,

OF COUNSEL:
Donald B. Verrilli, Jr.
MUNGER, TOLLES & OLSON LLP
1155 F Street NW, 7th Floor
Washington, D.C. 20004
(202) 220-1100

George M. Garvey
Seth Goldman
MUNGER, TOLLES & OLSON LLP
350 South Grand Avenue, 50th Floor
Los Angeles, California  90071
(213) 683-9100


OF COUNSEL:
Nathan P. Eimer
Lisa S. Meyer
EIMER STAHL LLP
224 S. Michigan Avenue, Suite 1100

ABRAMS BAYLISS LLP

*/s/ A. Thompson Bayliss*
A. Thompson Bayliss (#4379)
Stephen C. Childs (#6711)
20 Montchanin Road, Suite 200
Wilmington, Delaware  19807
(302) 778-1000
bayliss@abramsbayliss.com
childs@abramsbayliss.com

*Attorneys for Defendant Bolivarian Republic of Venezuela*

HEYMAN ENERIO
GATTUSO & HIRZEL LLP

*/s/ Samuel T. Hirzel*
Samuel T. Hirzel, II (# 4415)
Aaron M. Nelson (# 5941)

Chicago, Illinois  60604
(312) 660-7600

300 Delaware Avenue, Suite 200
Wilmington, Delaware  19801
(302) 472-7300
shirzel@hegh.law
anelson@hegh.law

*Attorneys for Intervenor*
*Petróleos de Venezuela, S.A.*

MORRIS, NICHOLS, ARSHT & TUNNELL
LLP

*/s/ Kenneth Nachbar*
Kenneth J. Nachbar (#2067)
Alexandra M. Cumings (#6146)
MORRIS, NICHOLS, ARSHT &
TUNNELL LLP
1201 N. Market Street, 16th Floor
P. O. Box 1347
Wilmington, Delaware  19899
(302) 658-9200
knachbar@mnat.com
acumings@mnat.com

*Attorneys for Garnishee PDV Holding,*
*Inc.*