# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| CRYSTALLEX INTERNATIONAL CORPORATION, | |
| Plaintiff, | |
| v. | C.A. No. 17-151-LPS |
| BOLIVARIAN REPUBLIC OF VENEZUELA, | |
| Defendant. | |

**CRYSTALLEX INTERNATIONAL CORPORATION'S RESPONSE TO THE BRIEF OF THE BOLIVARIAN REPUBLIC OF VENEZUELA, PETRÓLEOS DE VENEZUELA S.A. AND PDV HOLDING, INC. REGARDING POTENTIAL FUTURE PROCEEDINGS AND NON-PARTIES PHILLIPS PETROLEUM COMPANY VENEZUELA AND CONOCOPHILLIPS PETROZUATA B.V.'S BRIEF REGARDING CONDUCT OF PDV HOLDING, INC. SHARE SALE**

OF COUNSEL:

Robert L. Weigel
Jason W. Myatt
Rahim Moloo
GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue
New York, New York 10166
Tel: (212) 351-4000
Fax: (212) 351-4035

Miguel A. Estrada
Lucas C. Townsend
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, D.C. 20036
Tel: (202) 955-8500
Fax: (202) 467-0539

Dated: July 7, 2020

Raymond J. DiCamillo (#3188)
Jeffrey L. Moyer (#3309)
Travis S. Hunter (#5350)
RICHARDS, LAYTON & FINGER, P.A.
One Rodney Square
920 North King Street
Wilmington, Delaware  19801
Tel:  (302) 651-7700
Fax:  (302) 651-7701

*Attorneys for Plaintiff*

## TABLE OF CONTENTS

Page

NATURE AND STAGE OF THE PROCEEDINGS ................................................................. 1

SUMMARY OF ARGUMENT ............................................................................................... 2

ARGUMENT ......................................................................................................................... 4

    I.    Venezuela Asks For More Delay And Proposes No Meaningful Sale Process. .... 5

        A.    Venezuela Cannot Invoke Its Own Policy Goals To Avoid Its Liability. . 5

        B.    The Pendency Of Crystallex's Application For An OFAC License Does Not Warrant Further Delay. ...................................................................... 9

        C.    Current Conditions Do Not Preclude This Court From Determining How A Sale Should Be Conducted. .............................................................. 11

        D.    A Statutory Sale Of The Shares Of PDVH Is Required. ........................ 12

    II.    Non-Party ConocoPhillips Fails To Offer a Viable Sales Plan ......................... 15

        A.    The Sale Of The Shares Of PDVH Is An Execution Sale, Not A Judicial Sale. ..................................................................................................... 16

        B.    A Receivership Sale Is Unwarranted. .................................................... 18

CONCLUSION .................................................................................................................... 20

# TABLE OF AUTHORITIES

Page(s)

*In re Adobe Trucking, Inc.*,
2011 WL 6258233 (Bankr. W.D. Tex. Dec. 15, 2011)...........................................................12

*Bankers Trust Co. v. J.V. Dowler & Co.*,
47 N.Y.2d 128 (1979) ...........................................................................................................12

*Burge v. Fidelity Bond & Mortg. Co.*,
648 A.2d 414 (Del. 1994) ......................................................................................................14

*Crystallex Int'l Corp. v. Bolivarian Republic of Venezuela*,
932 F.3d 126 (3d Cir. 2019)......................................................................................................8

*Deibler v. Atl. Props. Grp., Inc.*,
652 A.2d 553 (Del. 1995) ...............................................................................13, 14, 15, 17

*Federal Home Loan Mortg. Corp. v. Dutch Lane Assocs.*,
810 F. Supp. 86 (S.D.N.Y. 1992) .........................................................................................18

*GSS Grp. Ltd. v. Nat'l Port Authority*,
680 F.3d 805 (D.D.C. 2012) ..................................................................................................13

*Koontz v. N. Bank of Ky.*,
83 U.S. 196 (1872)..................................................................................................................18

*In re Marvel Entm't Grp., Inc.*,
140 F.3d 463 (3d Cir. 1998)...................................................................................................14

*Matos v. O'Neill*,
220 F. Supp. 2d 99 (D.P.R. 2002)....................................................................................10, 11

*In re Netsmart Techs., Inc. S'holders Litig.*,
924 A.2d 171 (Del. Ch. 2007)................................................................................................15

*Noble v. Delaware*,
2017 WL 5163355 (D. Del. Nov. 7, 2017) ..........................................................................5, 6

*Pittsburgh Equitable Meter Co. v. Paul C. Loeber & Co.*,
160 F.2d 721 (7th Cir. 1947) .................................................................................................19

*Price v. Socialist People's Libyan Arab Jamahiriya*,
294 F.3d 82 (D.C. Cir. 2002)..................................................................................................13

*Republic of Iraq v. ABB AG*,
768 F.3d 145 (2d Cir. 2014)......................................................................................................8

*Santibanez v. Weir McMahon & Co.*,
105 F.3d 234 (5th Cir. 1997) .................................................................................................19

*S.E.C. v. Hardy*,
   803 F.2d 1034 (9th Cir. 1986) ...................................................................................19

*Socialist Republic of Romania v. Wildenstein & Co. Inc.*,
   147 F.R.D. 62 (S.D.N.Y. 1993) ....................................................................................8

*In re TransPerfect Global, Inc.*,
   2006 WL 3949840 (D. Del. July 18. 2016) ...............................................................15

*United States v. Branch Coal Corp.*,
   390 F.2d 7 (3d Cir. 1967), *cert. denied*, 391 U.S. 966 (1968)................................17

*View Crest Garden Apartments, Inc. v. United States*,
   281 F.2d 844 (9th Cir. 1960) .....................................................................................20

*Yazoo & M.V.R. Co. v. City of Clarksdale*,
   257 U.S. 10 (1921).....................................................................................................17

*Zacarias v. Stanford International Bank, Ltd.*,
   945 F.3d 883 (5th Cir. 2019) .....................................................................................20

## Statutes

8 *Del. C.* § 169 ..............................................................................................................4

8 *Del. C.* § 324 ....................................................................................................4, 14, 17, 18

10 *Del. C.* § 5031 .............................................................................................................18

28 U.S.C. § 1610...............................................................................................................17

28 U.S.C. § 2001...............................................................................................................18

28 U.S.C. § 2004...............................................................................................................18

## Other Authorities

12 Charles A. Wright & Arthur R. Miller, Federal Practice and Procedure § 2983
   (3d ed. 2020) .........................................................................................................19, 20

2 Woolley on Delaware Practice § 1066 ..........................................................................17

2 Woolley on Delaware Practice § 1185 ..........................................................................17

## Rules

Fed. R. Civ. P. 69.............................................................................................................16

Plaintiff and Judgment Creditor Crystallex International Corporation ("Crystallex"), respectfully submits this memorandum of law in response to the Brief Regarding Potential Future Procedures, D.I. 188, filed by the Bolivarian Republic of Venezuela ("Venezuela"), Petróleos de Venezuela, S.A. ("PDVSA") and PDV Holding, Inc. ("PDVH"), and the Opening Brief Regarding Conduct of PDV Holding, Inc. Share Sale, D.I. 180, filed by non-parties Phillips Petroleum Company Venezuela Limited and ConocoPhillips Petrozuata B.V. (collectively, "ConocoPhillips").

## NATURE AND STAGE OF THE PROCEEDINGS

In April 2017, the United States District Court for the District of Columbia confirmed an arbitral award of $1.4 billion, including pre-award interest, and entered judgment against Venezuela in Crystallex's favor.  The D.C. Circuit affirmed.  That judgment was registered in this District and, in August 2018, this Court entered orders finding PDVSA to be the alter ego of Venezuela and directing the Marshals to serve a writ of attachment *fieri facias* seizing the shares of PDVH to satisfy Crystallex's judgment.  The writ was served on August 24, 2018.  The United States Court of Appeals for the Third Circuit affirmed this Court's orders in July 2019, and denied Venezuela's and PDVSA's petitions for rehearing in November 2019.  In May 2020, the United States Supreme Court denied Venezuela and PDVSA's petition for certiorari.  Following the Supreme Court's denial of certiorari, on May 22, 2020, this Court lifted the stay, ordered PDVH to answer the writ of attachment, set a schedule for motions seeking relief from the writ, and ordered that "[t]he parties/intervenors shall file simultaneous briefs on . . . the mechanics by which the sale of PDVH is to occur."  D.I. 174, at 1.

In response to the May 22, 2020 Order, Crystallex filed a motion requesting that the shares of PDVH be sold at public auction as provided by Delaware state law, which applies to the enforcement of a money judgment, such as the judgment Crystallex has obtained against

1

Venezuela pursuant to Federal Rule of Civil Procedure 69.   D.I. 182.   Venezuela and its subsidiaries opted to file a brief that largely ignored the Court's question concerning sale mechanics, and instead argued that no sale should occur because such a sale would be politically inconvenient for the U.S.-recognized Interim President of Venezuela, Juan Guaidó.   To the extent it proposes a sale process at all, Venezuela suggests that it be allowed to sell the shares itself, using its own processes, on its own timeline, and with the "discretion" to choose the bidder it would most like to see win.   Non-party ConocoPhillips also filed a brief—without seeking leave or other authorization of the Court—that asks this Court to ignore execution process and the priority that the writ of attachment provides Crystallex and instead appoint a receiver to run a "judicial sale" for the benefit of non-parties such as itself, as opposed to the only creditor of Venezuela (or PDVSA) with a lien on the shares of PDVH.   Neither motion provides any legitimate legal basis for departing from the process that the Delaware legislature approved for the sale of shares of a Delaware corporation such as PDVH.

## SUMMARY OF ARGUMENT

1.      Now that the Third Circuit has affirmed this Court's findings that PDVSA is the alter ego of Venezuela and the shares of PDVH are subject to execution, and Venezuela's and PDVSA's motions for rehearing and petition for certiorari have been denied, the time has come to determine how the attached shares of PDVH will be sold.   Delaware law, and specifically 8 Del. C. § 324, sets the procedural rules for an execution sale of shares of a Delaware corporation:   the sheriff—or, pursuant to 28 U.S.C. § 564, the U.S. Marshals Service—publishes notice of the property to be sold and then conducts a public auction on the date set forth in the notice.   This law applies to all sales of corporate shares, regardless of the company's size or whether it is publicly traded or privately held.

2.      Venezuela's disinterest in paying Crystallex's judgment is not a reason to delay

entering an order on the share sale process.  According to Venezuela, a sales process order would hurt the popularity of Interim President Guaidó's administration (the "Interim Government") in Venezuela and any indication that Crystallex might be paid what it is owed would upset Venezuela's efforts at a "voluntary" restructuring of Venezuela's debts.  The fact that paying its debts is unpopular in Venezuela is not a reason to "interfere with the Court expeditiously proceeding to enforce its prior orders."  D.I. 174 at 1.  Nor is Venezuela's desire to force a "voluntary" restructuring on a creditor with a judicial lien, such as Crystallex, particularly after Venezuela twice walked away from prior settlement agreements aimed at preventing the sale of the shares of PDVH.  There is nothing improper in requiring Venezuela to pay the debt that it owes under U.S. law.

3.      Counterintuitively, Venezuela claims that determining how the shares will be sold would interfere with the Office of Foreign Assets Control's ("OFAC") consideration of Crystallex's pending application for a license and that, because of the purported regulatory complexities that an auction of the shares might involve, determining the sales procedures now could discourage participation in the future.  The argument makes little sense.  Providing advance notice of how the sale is to be conducted should enhance the sale process by giving potential bidders more time to determine whether and how to participate in the auction of the shares.  Further, establishing the sale procedures now could aid OFAC in its review of Crystallex's application for a specific license.

4.      Now that it is faced with not only a final and unappealable judgment, but a final and unappealable order that the shares of PDVH are available to satisfy Crystallex's judgment, Venezuela cannot ask this Court to decline to order an execution sale so that Venezuela can run its own sale process to identify its preferred buyer.  Venezuela has had more than a decade to sell

assets to satisfy its obligations to Crystallex through a negotiated sale of some or all of PDVH or its subsidiaries. It refused, instead gambling that it could avoid liability altogether. Venezuela remains free to satisfy Crystallex's judgment at any time. But, what it cannot do is impose sale procedures that would allow it to avoid selling the shares of PDVH except on terms that Venezuela deems acceptable in its "discretion," D.I. 188 at 17, thereby allowing Venezuela a veto right on whether the shares of PDVH are sold at all.

5.      Similarly, non-party ConocoPhillips—an unsecured creditor that is seeking, but does not have, an attachment—cannot dictate the terms of the sale. Claiming (incorrectly) that Delaware law does not determine the process for selling shares of a Delaware corporation to satisfy a judgment, ConocoPhillips asks this Court to appoint a receiver to run a sale process akin to a sale under the Bankruptcy Code. ConocoPhillips offers no authority for ignoring Delaware's statutory process for execution sales, incorporated here by Federal Rule of Civil Procedure 69. ConocoPhillips can take whatever steps it wishes to advertise and promote the sale of the shares of PDVH beyond the statutory requirements. Nothing prevents ConocoPhillips from engaging advisors to find additional bidders or from bidding itself. However, ConocoPhillips should not be allowed to jeopardize the legitimacy of the execution sale by requesting the Court implement a procedure that differs from the public auction on notice that is mandated by the Delaware Code.

## ARGUMENT

As discussed in detail in Crystallex's brief in support of a sale process order, Delaware law sets out a simple and straightforward statutory process for selling shares of corporate stock that have been attached in aid of execution, such as the shares of PDVH. D.I. 182 at 9–10; *see also* 8 *Del. C.* §§ 169, 324. None of the movants, Venezuela, PDVSA, PDVH nor non-party ConocoPhillips can contend otherwise. Instead, they argue that this Court should craft new processes that have never been used in connection with an execution sale of Delaware shares.

These arguments are not founded on any relevant legal authority. Rather, they are based on nothing more than a desire to delay execution (in the case of Venezuela) or to displace Crystallex's priority over Venezuela's countless unsecured creditors (in the case of ConocoPhillips). Such blatant self-interest cannot and does not justify ignoring governing Delaware law.

## I.       Venezuela Asks For More Delay And Proposes No Meaningful Sale Process.

In response to the Court's request for briefing on "the mechanics by which the sale of PDVH is to occur," D.I. 174 at 1, Venezuela offers no meaningful execution process at all—it simply asks the Court to allow Venezuela to sell the shares of PDVH at the time, place and manner of Venezuela's choosing and with the winning bidder to be selected at Venezuela's own "discretion," D.I. 188 at 17. The bulk of Venezuela's brief is dedicated to arguing that even considering how to conduct a sale of the shares of PDVH would be improper at this time. But Venezuela offers no legitimate reason to "interfere with the Court expeditiously proceeding to enforce its prior orders." D.I. 174 at 1.

### A.       Venezuela Cannot Invoke Its Own Policy Goals To Avoid Its Liability.

This Court has already found that it can issue an order on how to conduct the sale of the shares of PDVH. D.I. 154 at 9 n.13. Nonetheless, Venezuela asks this Court to delay a decision on sale procedures because a "decision determining the procedures to sell the PDVH shares—Venezuela's most valuable and strategic foreign asset—would have serious political and legal consequences for the Interim Government." D.I. 188 at 5. Venezuela's request is not based in law, but rather the Interim Government's own political interests in the country that it hopes one day to govern.[1] That a sale of the shares may be unpopular in Venezuela does not alter Venezuela's

---

[1]  The only case Venezuela cites in support of its request that this Court delay execution is the decision in *Noble v. Delaware*, in which this Court exercised its inherent power to dismiss a *pro se* plaintiff's complaint as "completely devoid of merit." 2017 WL 5163355, at *3 (D. Del. Nov.

obligations to satisfy a lawful, final and unappealable judgment of the U.S. courts.

Illustrating the political rather than legal nature of its arguments, Venezuela contends that a sale procedures order should not be entered because the Maduro regime would exploit the entry of such an order to diminish the Interim Government's influence on the ground in Venezuela.  But the fact that the Maduro regime "is monitoring this litigation closely," D.I. 188 at 6, is legally irrelevant.  According to Venezuela, the Maduro regime has misrepresented the truth about this litigation in government press releases and public appearances by accusing the Interim Government of undertaking "fraudulent representation of the republic and PDVSA" and of being a "phantom government."  *Id*.  But even if statements made by the Maduro regime in Venezuela could be relevant to this Court's decision—and they are not—there is nothing this Court can do to stop the Maduro regime from making "inaccurate[] assert[ions]," *id.*, if it deems it politically expedient to do so.

Moreover, while Venezuela asks this Court to avoid issuing any order that might be seen as harmful to the Interim Government because the Maduro regime might "misuse and distort developments in this litigation to undermine the authority of the Interim Government," *id.*, some of the most politically damaging statements about this litigation have come from the Interim Government itself.  For example, less than three weeks ago news broke that, when speaking to the National Assembly, then Special Attorney General José Ignacio Hernández warned that "Citgo is close to falling into creditors' hands."[2]  During that same speech, Dr. Hernández admitted that, "I

---

7, 2017).  The case sheds no light on whether this Court can or should decline to determine the process for an execution sale to enforce a final and unappealable money judgment.

  [2]  Patricia Garip, *Guaido team favoring ConocoPhillips in Citgo fight*, Argus Media (June 19, 2020),  https://www.argusmedia.com/en/news/2116168-guaido-team-favoring-conocophillips-in-citgo-fight.

am surprised at how long these walls of defense that I built have lasted.  Sooner or later . . . and no one knows the walls of the legal defense better than me, these walls are weak and fractured and they will collapse."[3]   These admissions are far more damaging to the political standing of the Interim Government than anything that could flow from a decision of this Court establishing the procedure for the eventual sale of the shares of PDVH.

The truth is that Venezuela does not want to pay Crystallex what it is owed.  According to Venezuela, a sale will undercut its "commit[ment] to a voluntary restructuring on 'equal terms' of all of its legacy debt, including claims, like Crystallex's."  D.I. 188 at 5.  But, stripping Crystallex of its right to execute on its valid attachment is hardly a means of facilitating a "voluntary" restructuring.  Rather, it is an attempt to force Crystallex to accept—at some unknown time in the future—a settlement in which it would get paid pennies on the dollar.  As this Court knows, Crystallex has already reached two voluntary settlements with Venezuela, neither of which Venezuela saw fit to honor.  *See* D.I. 139 at 1.  Now Venezuela regrets making any payment at all, stating that the approximately $500 million in cash and securities received in partial payment of the settlements (and that Crystallex has applied against its judgment) were received by Crystallex "at the Republic's expense," D.I. 188 at 3, and describing the (partial) payment of the settlement as providing "little if anything . . . [to Venezuela] in return," *id.* at 17 n.21.[4]   These characterizations of its prior payments make plain that Venezuela has no interest in paying its

---

[3]  *Id.*

[4]  Venezuela did get something in return—a reduction in the amount owed under Crystallex's judgment and an agreement that Crystallex would not execute on the shares of PDVH and that the attachment would be released upon final payment.  Rejecting the fundamental concept that a debtor receives value when it pays off its debts, Venezuela demands an accounting into what Crystallex received from Venezuela prior to the recognition of Interim President Guaidó before any sale of the shares of PDVH is commenced.  But, Crystallex has previously reported the outstanding amount of the judgment and will provide updated figures once the time of the sale of the shares has been determined.  D.I. 182 at 3 n.1.

lawful debts and instead hopes to "avoid[] its obligations" by hook or by crook.  *Crystallex Int'l Corp. v. Bolivarian Republic of Venezuela*, 932 F.3d 126, 149 (3d Cir. 2019), *cert. denied*, 2020 WL 2515508 (May 18, 2020).  Crystallex cannot be forced to abandon its attachment and accept a third settlement, on far worse terms than those previously reached, simply because Venezuela would prefer to pay other creditors instead.

In an attempt to cloak its aims as something more than mere domestic policy objectives, the Interim Government spins the Executive Branch's recognition of Interim President Guaidó as evidence that issuing an order on the sale process to the Interim Government's alleged detriment will interfere with U.S. foreign policy goals.  The argument is misguided.  "[T]he obligations of a foreign state are unimpaired by a change in that state's government." *Republic of Iraq v. ABB AG*, 768 F.3d 145, 164 (2d Cir. 2014).  Venezuela is "not relieved of responsibility" for its conduct "merely because it is a nation-state whose government has changed."  *Socialist Republic of Romania v. Wildenstein & Co. Inc.*, 147 F.R.D. 62, 65 (S.D.N.Y. 1993).  "'Venezuela owes Crystallex from a judgment that has been affirmed in our courts.  Any outcome where Crystallex is not paid means that Venezuela has avoided its obligations.'"  D.I. 174 at 3 (quoting *Crystallex Int'l Corp.*, 932 F.3d at 149).  Regardless of whether Guaidó or Maduro is its President, Venezuela, like all parties, must honor our courts' judgments.  No action by the Executive Branch proves otherwise.

In any event, there is no reason for this Court to wade into political waters or attempt to divine U.S. foreign policy goals based on months-old statements.[5]  As this Court has already

---

[5]  Press reports demonstrate the importance of looking to more recent statements for evidence of the extent of the Executive Branch's current support of the Interim Government.  *See, e.g.*, Graig Graziosi, *Trump says he's open to meeting Maduro then quickly backtracks on Twitter*, Independent (June 22, 2020), https://www.independent.co.uk/news/world/americas/us-politics/donald-trump-nicolas-maduro-twitter-juan-guaido-meeting-a9580101.html.

recognized, "it has the discretion to move forward in the manner Crystallex requests," and the current U.S. sanctions regime does not foreclose "briefing how an eventual sale will be conducted." D.I. 154 at 9 n.13. The United States government is aware of this action. It has already stated that "[i]t will advise this Court if it determines it appropriate to file a Statement of Interest." Notice by the United States, *Crystallex v. PDV Holding*, No. 15-cv-1082-LPS (D. Del. Dec. 30, 2019), D.I. 122 at 3. It has not done so. Speculation about what the Executive Branch might do in the future is not a reason to delay moving this case towards execution today.

**B.     The Pendency Of Crystallex's Application For An OFAC License Does Not Warrant Further Delay.**

While the application and enforceability of OFAC guidance to an attachment such as Crystallex's, which predates the imposition of blocking sanctions on the shares of PDVH, is questionable—particularly to the extent that such guidance purports to limit this Court's power to exercise its inherent powers and enforce its prior orders—in an abundance of caution, on April 9, 2020, Crystallex filed an application for a specific license authorizing an auction of the shares of PDVH. Treating the current pendency of Crystallex's application as a rejection, Venezuela asks this Court to reject any attempt to determine sales procedures "because Crystallex has failed thus far to obtain an OFAC license." D.I. 188 at 8. But, there has been no denial of Crystallex's application. Rather, Crystallex is simply awaiting a response.

PDVH is a sizeable asset. In light of this, Venezuela predicts that the sale process will be challenging and present numerous uncertainties. According to Venezuela, these complications may serve to discourage some potential bidders. Venezuela's theory is pure speculation, but even if true, it would not be a reason to decline determining how the sale process will proceed. Indeed, providing potential bidders time to evaluate the mechanics of the sales process before it commences could well be beneficial. Certainly, if the regulatory landscape is as complicated as

Venezuela contends, the better course is to provide potential bidders more time, not less, to evaluate the sale procedures in order to decide whether to participate in the auction of the shares.

Evaluating whether to enter into a transaction that might require a license is not itself a violation of sanctions. Due diligence and negotiations often take place before a license is sought, let alone received—otherwise it would be impossible to submit an adequate, ripe license application, as the details of the prospective transaction, including the transacting parties and the ultimate flow of funds, would be unknown, and any application to OFAC would be speculative and subject to denial for being untimely. *See Matos v. O'Neill*, 220 F. Supp. 2d 99, 102 (D.P.R. 2002) (denying challenge to OFAC decision not to grant prospective licenses). This is not a case where conducting due diligence would require discussions or negotiations that are prohibited by sanctions. General licenses affirmatively allow transactions with the Venezuelan National Assembly, Interim President Guaidó, the Special Attorney General, the *ad hoc* board of PDVSA that controls PDVH, PDVH, CITGO Holding, and CITGO Petroleum, as well as their respective representatives and agents. *See, e.g.*, OFAC, General License No. 7C ("Authorizing Certain Activities Involving PDV Holding, Inc. and CITGO Holding, Inc."); General License No. 31 ("Certain Transactions Involving the Venezuelan National Assembly, the Interim President of Venezuela, and Certain Other Persons Authorized"). Whatever concerns a potential bidder might have about when and how to make a binding offer for the shares, there is little reason to think that they would refuse to consider engaging in the process simply because a license has not yet issued.

Finally, there is no merit to the contention that deciding the sale process motion would cause the Court "to interpose itself into OFAC's deliberations."[6] D.I. 188 at 9. A decision on how

---

[6] The decision in *Matos*, does not, as Venezuela contends, stand for the proposition that a court should decline from resolving matters that might be relevant to OFAC's consideration of a pending

the sale process is to proceed will not undercut OFAC's authority, and it may well enhance the deliberative process.  The mechanics of the sale process may be relevant to OFAC's determination. One category of information that OFAC instructs license applicants to provide is the identity of "all parties involved, directly or tangentially, in the transaction(s) at issue."[7]  Determining the method by which the sale will be conducted, including who shall run the sale process—whether it be the U.S. Marshals or some other entity—could aid OFAC in making its decision.[8]

### C.   Current Conditions Do Not Preclude This Court From Determining How A Sale Should Be Conducted.

Demand for oil is down.  According to PDVSA this downturn in the market precludes any sale process at this time.  The argument is flawed.  Oil markets are cyclical.  It is impossible to know what the market will look like when this Court issues its order, when the sale process commences or when the winning bidder is selected.  If the sale takes place in conditions similar to

---

application.  220 F. Supp. 2d at 99.  The *Matos* court held only that it could not force OFAC to make a decision on a license that the agency deemed "untimely," particularly where doing so would require OFAC to "predict what the state of law" will be in the future.  *Id.* at 103.

[7]  OFAC, Instructions for Applicants, https://licensing.ofac.treas.gov (first screen after accepting Terms of Agreement for transactional applications) (last visited July 7, 2020).  Those same instructions also ask the applicant to "clearly identif[y] all transactions, and associated money flows, at issue."  *Id.*

[8]  According to Venezuela, absent a license, it will be impossible to conduct "a [v]alue [m]aximizing [s]ale [p]rocess."  D.I. 188 at 9.  While Crystallex believes that this Court has the authority to conduct an auction process without further OFAC licensing, it is not currently seeking such relief.  It remains Crystallex's belief that OFAC will not allow Venezuela to avoid its lawful debts or prevent the sale of assets that this Court found were subject to execution nearly two years ago.  Allowing Venezuela to skirt its obligations under final and unappealable U.S. judgments is not in Venezuela's long term interests, as it will serve to discourage the very foreign investment that will be critical to the rebuilding of the country generally and its oil and gold mining industries in particular.  Moreover, a decision by OFAC that allows Venezuela to avoid its obligations under lawful U.S. judgments would serve to undercut the United States' role as a global financial center and, barring compensation from the United States government itself, would violate the United States' obligations under international treaties and leave the United States itself liable for Venezuela's debts.

those that currently exist, fewer potential strategic buyers may decide to participate.  At the same time, possible financial buyers may see an increased opportunity, leading to their increased involvement in the process.  Just weeks ago CITGO Petroleum raised more than $1.15 billion through a debt offering—an offering that was oversubscribed and "was upsized due to demand" while yields "were reduced to 7%."[9]  Clearly not all investors are running away from the oil industry just because of "the currently abnormally negative market conditions."  D.I. 188 at 11.  In any event, execution sales are not prohibited simply because the debtor deems the timing to be unfavorable.  "[A] secured party is under no obligation to delay a[n asset] sale to indulge the debtor's 'hope that the [ ] market might recover[']  . . . when . . . faced with 'highly unsteady market conditions.'"  *In re Adobe Trucking, Inc.*, 2011 WL 6258233, at *13 (Bankr. W.D. Tex. Dec. 15, 2011) (quoting *Bankers Trust Co. v. J.V. Dowler & Co.*, 47 N.Y.2d 128 (1979)) (applying New York law to asset sale triggered by downturn in oil markets), *aff'd*, 551 F. App'x 167 (5th Cir. 2014).  Venezuela has had more than a decade to make Crystallex whole.  Having refused to do so voluntarily, it cannot now complain about the timing of the execution process.

### D.   A Statutory Sale Of The Shares Of PDVH Is Required.

On July 30, 2018, this Court posed the following question to the parties:  "Does Delaware law require that the only way to execute on shares of a Delaware corporation is to sell those shares?"  D.I. 68 at 2.  Venezuela's alter ego, PDVSA, did not equivocate in its answer:

> Yes.  Crystallex has moved for a writ of *fieri facias* to attach the shares of PDVH pursuant to 8 Del. C. § 324, which governs the attachment and execution of shares. Section 324 contemplates execution only by a "public sale."  8 Del. C. § 324(a).  It does not identify any other form of execution on shares.  Moreover, a writ of *fieri facias* "is an order issued to a sheriff, constable, or marshal authorizing **and requiring** such individual to enforce a judgment of the court against a debtor by the levy, seizure, **and sale** of the debtor's property to the extent needed to satisfy the

---

[9]   *See Venezuela's Citgo Issues $1.125 Billion of New 5 Year Bonds*, Latin American Herald Tribune, (June 3, 2020), http://www.laht.com/article.asp?CategoryId=10717&ArticleId=2492571.

judgment."   30 Am. Jur. 2d Executions, Etc. § 14 (internal footnotes omitted) (emphasis added); *see also Wallace v. Geckosystems Int'l Corp.*, No. CV K12A-08-004 (JTV), 2013 WL 3340535 (Del. Super. Ct. June 26, 2013) (permitting the sheriff to proceed with the sale of shares seized pursuant to a writ of *fi. fa.*); *see also Brennan v. Brennan*, 945 F. Supp. 2d 704, 717 (E.D. La.) (explaining that, under Louisiana law, a "writ of *fieri facias* directs the seizure and sale of property") (emphasis added), *vacated on other grounds*, 548 F. App'x 264 (5th Cir. 2013). Research has not revealed any statute or case law authorizing a Delaware court to execute on shares by any method other than public sale.

D.I. 71 at 8 (emphases in original).  Venezuela now takes a completely different position, claiming that a sheriff's (or Marshals') sale is not required and would, in fact, be improper.  Venezuela is wrong.

Faced with an involuntary sale of the shares, Venezuela argues, relying principally on the Delaware Supreme Court's decision in *Deibler v. Atlantic Properties Group, Inc.*, 652 A.2d 553 (Del. 1995), that the Court should permit Venezuela and its financial advisors to sell PDVH itself. Crystallex agrees that the decision in *Deibler* is instructive for all the reasons set forth in its opening brief in support of its motion for a sales procedure order.  *See* D.I. 182 at 10–12.  But the decision does not advance Venezuela's position.

*Deibler* involved a challenge to a sheriff's sale of the stock of a number of privately-held corporations.  The sheriff published a notice of sale identifying the names of the companies and the number of shares to be sold, and the sale took place at the noticed date and time.  *Deibler*, 652 A.2d at 554–55.  The judgment debtors admitted that the sale met the statutory requirements for a sale of stock, but argued that the sale nevertheless violated due process.  *Id*. at 555.[10]  The Delaware

---

[10]   Unlike the judgment debtors in *Deibler*, Venezuela has no due process rights to violate.  *See Price v. Socialist People's Libyan Arab Jamahiriya*, 294 F.3d 82, 97–99 (D.C. Cir. 2002).  While courts are split on the due process rights of sovereign instrumentalities such as PDVSA, even those courts that recognize a right to due process find that there is no such right when, as here, the instrumentality is the sovereign's alter ego.  *See, e.g.*, *GSS Grp. Ltd. v. Nat'l Port Authority*, 680 F.3d 805, 815 (D.D.C. 2012) ("Whenever a foreign sovereign controls an instrumentality to such

Supreme Court disagreed, finding that satisfying the statutory requirements for a public auction was sufficient for the sale process to be valid. *Id.* at 557–58. The Supreme Court did invite future judgment debtors to provide additional information that might assist potential bidders in similar execution sales of privately-held stock (an invitation that Crystallex has asked this Court to formally extend to Venezuela as well), *id.*, but nowhere did it suggest that a future share sale was to be conducted by anything other than an execution sale.[11] To the contrary, it offered its thoughts "for the next execution sale of this type of property." *Id.* at 557. And under Delaware law, an execution sale is a sale run by the sheriff, not the judgment debtor. *See* 8 *Del. C.* § 324; *see also Burge v. Fidelity Bond & Mortg. Co.*, 648 A.2d 414, 420 (Del. 1994) (finding court had "inherent equitable power" to supervise the conduct of a *sheriff's sale*).

Despite asking this Court to approve a process that is run by the debtor, PDVSA fails to offer a single case where a judgment debtor was allowed to run the execution sale of its own assets. Instead, Venezuela relies on a bankruptcy court case where the court found that the debtor-in-possession should not select or run its own reorganization plan and appointed a trustee to facilitate the selection of a reorganization plan. D.I. 188 at 14 (citing *In re Marvel Entm't Grp.*, Inc., 140 F.3d 463 (3d Cir. 1998)). This, of course, is not a bankruptcy proceeding. And while Venezuela invokes bankruptcy law as a guidepost, it makes no offer of adequate protection, such as that provided for under the Bankruptcy Code when a debtor-in-possession retains control of secured property. Venezuela also cites cases discussing the process for selling a corporation or its assets

---

a degree that a principal-agent relationship arises between them, the instrumentality receives the same due process protection as the sovereign: none.").

[11] Venezuela argues that, under 8 *Del. C.* § 324, the sale of the shares should be limited to no more than is necessary to satisfy the judgment, D.I. 188 at 12, but it refuses to accept that a sale should be conducted under the procedures set forth in Section 324, *see id.* at 13 n.19. Venezuela cannot have it both ways.

for the benefit of the company's shareholders, but such cases provide little guidance as to how to sell property to satisfy the judgment of a lien creditor.  *See, e.g.*, *In re TransPerfect Global, Inc.*, 2016 WL 3949840, at *1 (Del. Ch. July 18, 2016) (appointing custodian to oversee and undertake judicially ordered sale of company where owners were in deadlock); *In re Netsmart Techs., Inc. S'holders Litig.*, 924 A.2d 171, 196–99 (Del. Ch. 2007) (granting preliminary injunction where board of directors failed to conduct sale to maximize shareholder value).

Venezuela's core complaint is that the price paid at a forced sale may be less than what might be obtained through an unforced sale between a willing buyer and a willing seller.  But, as the *Deibler* Court noted, any consideration of whether an execution sale has generated "a reasonable price, [must] consider[] the forced sale nature of the transaction, [in determining what] might be obtained."  652 A.2d at 557.  Venezuela can voluntarily pay its judgment or face an involuntary sale of the shares of PDVH.  No other options remain.  And yet, Venezuela suggests that it "should have discretion to select the buyer from among the parties who offer enough money to satisfy" Crystallex.  D.I. 188 at 17.  To allow a debtor to run its own execution sale, particularly one that is subject to the debtor's "discretion," *id.*, when that same debtor has refused to pay what it owes of its own accord and has no desire to sell the assets that are being marketed, is nothing more than a recipe for avoidance and delay.  It is unsurprising that Venezuela does not offer a single case authorizing such a sale process.

This Court can and should order a sale of the shares pursuant to Section 324, just as PDVSA told this Court was proper nearly two years ago.

## II.    Non-Party ConocoPhillips Fails To Offer a Viable Sales Plan

ConocoPhillips is not a party to this action.  Nor has it sought to intervene.  Nevertheless, it argues that it may file a brief on the process for selling the shares of PDVH because the parties to a *different* action—in which Crystallex is not a party—"agree that ConocoPhillips should be

permitted to participate in this briefing." D.I. 180 at 1.  That Venezuela and its alter ego PDVSA agree that ConocoPhillips should be heard in this case is unsurprising.  As noted above, recent press reports, which quote leaked audio of a recent presentation of Special Attorney General José Ignacio Hernández to the National Assembly's energy commission, indicate that the Interim Government has reached "an 'understanding' with ConocoPhillips" pursuant to which ConocoPhillips, which does not have an attachment or any other security interest in the shares of PDVH, "will seek equal rights to Citgo shares" before this Court.[12]  Venezuela and PDVSA are welcome to pay their debts to ConocoPhillips using their own, unencumbered funds.  But, they cannot do so at the expense of Crystallex's security.

Other than its apparent favor in the eyes of the Interim Government, ConocoPhillips is no different than any other unsecured creditor of PDVSA and Venezuela.  In any event, ConocoPhillips has offered no reason for why this Court should elevate the interests of unsecured creditors such as itself over those of Crystallex, the only party known to have obtained an attachment on the shares of PDVH.

### A.    The Sale Of The Shares Of PDVH Is An Execution Sale, Not A Judicial Sale.

Rule 69 provides that a money judgment, such as the one held by Crystallex, "is enforced by a writ of execution, unless the court directs otherwise."  Fed. R. Civ. P. 69(a)(1).  ConocoPhillips' entire motion is premised on the theory that a sale of shares of a Delaware corporation is not an execution sale, but rather a judicial sale, and that Delaware execution sales procedures do not apply to federal court judicial sales.  ConocoPhillips is wrong.

ConocoPhillips recognizes that the Third Circuit has held that "Rule 69(a) has been interpreted as precluding the application of federal procedures . . . to execution sales."  D.I. 180

---

[12]  *See, e.g.*, Garip, *supra* at 6 n.2.

at 5 (quoting *United States v. Branch Coal Corp.*, 390 F.2d 7, 9 (3d Cir. 1968), *cert. denied*, 391 U.S. 966 (1968)).  As explained by the United States Supreme Court, execution sales "issue by mere praecipe of the judgment creditor . . . and only come under judicial supervision on complaint of either party." *Yazoo & M.V.R. Co. v. City of Clarksdale*, 257 U.S. 10, 19 (1921).  That is exactly what Delaware procedure provides.  Because Venezuela is a foreign sovereign under the Foreign Sovereign Immunities Act, Crystallex's writ of attachment could issue only after "the court ha[d] ordered such attachment."  28 U.S.C. § 1610(c).  But that does not mean that the sale of the shares of PDVH is not an execution sale.  It was initiated by *praecipe*, which was executed by the Clerk of Court on August 23, 2018.  *See* D.I. 95 at 2 ("1. The Clerk of Court is now directed to ISSUE Crystallex's Praecipe. (D.I. 4-1 Ex. 2) (attached) [and] 2. The Clerk of Court shall, pursuant to the Praecipe, thereafter ISSUE to the U.S. Marshals Service the writ of attachment *fieri facias*. (D.I. 4-1 Ex. 1) (attached).").  PDVSA may have successfully stayed execution for nearly two years, thereby requiring additional motion practice before this Court to recommence the execution process, but that does not change underlying Delaware law, in which the motion for a sale is traditionally a ministerial motion made in open court after a judgment is entered.  2 Woolley on Delaware Practice § 1185 ("Th[e] application is made by the plaintiff's attorney in open court without petition[.]").  ConocoPhillips' brief makes much of the fact that one section of Section 324 refers to sales that have been "confirmed," but Section 324 also states that the share sale will be conducted by "execution process."  8 *Del. C.* § 324(a).  Moreover, while Delaware law does provide that a sale of stock is nominally subject to confirmation, there is no motion requirement for such confirmation to occur.  Rather, an asset sale shall "be confirmed as a matter of course." *Deibler*, 652 A.2d at 556 n.1; *see also* 2 Woolley on Delaware Practice § 1066 (explaining that if there is no application to set aside the sale for fraud, irregularity or other cause, the sale will be

confirmed "as a matter of course").  ConocoPhillips' argument that a statutory sale of the shares of a Delaware corporation is a judicial sale is little more than wishful thinking.

Even if the Court were to deem the sale of the shares of PDVH to be a judicial sale (and it should not), that would not prevent the Court from conducting a sale as outlined by Delaware law. Indeed, courts have recognized that judicial sales should comport with state law to the extent that such procedures are not in conflict with federal law.  *See Federal Home Loan Mortg. Corp. v. Dutch Lane Assocs.*, 810 F. Supp. 86, 90, 93 (S.D.N.Y. 1992) (vacating sale under Section 2001 that failed to comply with New York state notice requirements).  Delaware state law provides for a sale at public auction.  8 *Del. C.* § 324; 10 *Del. C.* § 5031.  Personal property sold through a federal court judicial sale is also to be sold by "public sale."  28 U.S.C. § 2001(a) (which applies to the sale of personal property by application of 28 U.S.C. § 2004).  Thus, there is no conflict between state and federal law.  It is true that the Court has discretion to order a private sale if certain circumstances are met, *see* 28 U.S.C. § 2001(b), but that is not a reason for this Court to deviate from Delaware process.

### B.      A Receivership Sale Is Unwarranted.

Based on the provision of Section 2001 that allows a court to conduct a public sale on such "terms and conditions as the court directs," 28 U.S.C. § 2001(a), ConocoPhillips argues that rather than a statutory auction, the Court should appoint an equity receiver to conduct a sale of the shares of PDVH.  The appointment of an equity receiver is a rare event, as ConocoPhillips admits. D.I. 180 at 6.  ConocoPhillips asserts that "[h]istorical and current practice" allows for the appointment of an equity receiver "to conduct an orderly sale of property attached pursuant to court process."  *Id.* at 7.  But neither case cited by ConocoPhillips in support of this position involved a judicial attachment.  *See Koontz v. N. Bank of Ky.*, 83 U.S. 196 (1872) (pre-bankruptcy code equity receiver tasked with liquidated assets of bank under proceeding for forfeiture of its

18

charter); *S.E.C. v. Hardy*, 803 F.2d 1034 (9th Cir. 1986) (equity receiver appointed to liquidate assets of debtor to satisfy defrauded investors). This is not a case where a judgment creditor has invoked the jurisdiction of the court to assemble assets of a debtor that is evading execution, *Santibanez v. Weir McMahon & Co.*, 105 F.3d 234 (5th Cir. 1997), or filed a complaint expressly seeking the appointment of a receiver over all of the assets of a judgment debtor after the execution was returned unsatisfied, *Pittsburgh Equitable Meter Co. v. Paul C. Loeber & Co.*, 160 F.2d 721, 726 (7th Cir. 1947). Crystallex obtained a writ of attachment and does not seek anything more than a sale of the assets that it has attached. And ConocoPhillips does not cite a single case where a receiver was appointed over the sale of a secured asset at the request of an unsecured creditor over the objection of the lienholder.

"The appointment of a receiver is considered to be an extraordinary remedy that should be employed with the utmost caution and granted only in cases of clear necessity to protect *plaintiff's* interests in the property." 12 Charles A. Wright & Arthur R. Miller, Federal Practice and Procedure § 2983 (3d ed. 2020) (emphasis added). Here execution process is available, rendering the appointment of a receiver to marshal or preserve the assets unnecessary.

ConocoPhillips argues without support that a "judgment against PDVSA will almost certainly not be satisfied through ordinary means." D.I. 180 at 7. But there is no reason to believe that a sale of the shares of PDVH could not satisfy the approximately $1 billion remaining on Crystallex's judgment. As noted above, just a month ago CITGO Petroleum, PDVH's main asset, raised $1.15 billion through a bond offering that was oversubscribed.[13] That would not have happened if market participants thought that CITGO Petroleum and its assets were worth less than the billion dollars that Crystallex is still owed.

---

[13]  *See Venezuela's Citgo Issues $1.125 Billion of New 5 Year Bonds*, *supra* at 12 n.9.

The real reason ConocoPhillips wants the appointment of the receiver is because it hopes that a receiver will be charged to act not to protect "plaintiff's [*i.e.*, Crystallex's] interests in the property," 12 Charles A. Wright & Arthur R. Miller, Federal Practice and Procedure § 2983, but rather for the benefit of unsecured creditors who are not parties to this litigation "such as ConocoPhillips," D.I. 180 at 8.   Ignoring Crystallex's priority, ConocoPhillips argues that receivers are often appointed to protect property "for the benefit of all parties concerned."  *Id.* (citation and emphasis omitted).  But ConocoPhillips offers no authority that permits a receiver to act for the benefit of unsecured parties over the interests of a lienholder.[14]  There is no legitimate reason at law or equity to subordinate Crystallex's interests as a secured creditor to those of unsecured creditors such as ConocoPhillips.  To do so now would subject Crystallex to a second expropriation in everything but name.

## CONCLUSION

For the reasons set forth above, Crystallex respectfully requests that this Court reject the proposals of Venezuela, PDVSA, PDVH and ConocoPhillips and enter an order approving the terms of a public sale by the U.S. Marshals Service of PDVH shares—to occur as soon as Crystallex's license for the auction is obtained or found to be unnecessary—in order to satisfy Crystallex's remaining judgment against Venezuela.

---

[14] ConocoPhillips' authority is inapposite.  *Zacarias v. Stanford International Bank, Ltd.*, 945 F.3d 883 (5th Cir. 2019), involved efforts to marshal assets for unsecured creditors who lost money in a Ponzi Scheme, but there is no mention of any lienholders, much less an analysis of how the presence of a lienholder would have affected the receiver's sale and distribution process, and the only parties involved in *View Crest Garden Apartments, Inc. v. United States*, 281 F.2d 844 (9th Cir. 1960), a dispute over the scope of a receiver's authority in a foreclosure action where the mortgage documents expressly allowed the appointment of a receiver, were the mortgagees and the mortgagor.

/s/ Travis S. Hunter
_____

OF COUNSEL:

Robert L. Weigel
Jason W. Myatt
Rahim Moloo
GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue
New York, New York 10166
(212) 351-4000

Miguel A. Estrada
Lucas C. Townsend
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, D.C. 20036
Tel: (202) 955-8500
Fax: (202) 467-0539

Dated:  July 7, 2020

Raymond J. DiCamillo (#3188)
Jeffrey L. Moyer (#3309)
Travis S. Hunter (#5350)
RICHARDS, LAYTON & FINGER, P.A.
One Rodney Square
920 North King Street
Wilmington, Delaware 19801
(302) 651-7700
dicamillo@rlf.com
moyer@rlf.com
hunter@rlf.com

*Attorneys for Plaintiff*

21