IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| CRYSTALLEX INTERNATIONAL CORPORATION,<br><br>              Plaintiff,<br><br>   v.<br><br>BOLIVARIAN REPUBLIC OF VENEZUELA,<br><br>              Defendant. | C.A. No. 17-151-LPS |

### CRYSTALLEX INTERNATIONAL CORPORATION'S REPLY BRIEF IN FURTHER SUPPORT OF ITS MOTION FOR AN ORDER <u>APPROVING THE PROCESS OF SALE OF SHARES OF PDV HOLDING, INC.</u>

OF COUNSEL:

Robert L. Weigel
Jason W. Myatt
Rahim Moloo
GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue
New York, New York 10166
Tel: (212) 351-4000
Fax: (212) 351-4035

Miguel A. Estrada
Lucas C. Townsend
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, D.C. 20036
Tel: (202) 955-8500
Fax: (202) 467-0539

Raymond J. DiCamillo (#3188)
Jeffrey L. Moyer (#3309)
Travis S. Hunter (#5350)
RICHARDS, LAYTON & FINGER, P.A.
One Rodney Square
920 North King Street
Wilmington, Delaware 19801
Tel: (302) 651-7700
Fax: (302) 651-7701

*Attorneys for Plaintiff*

Dated: July 13, 2020

# TABLE OF CONTENTS

Page

INTRODUCTION ............................................................................................................................. 1

ARGUMENT ................................................................................................................................... 2

    I.     Delaware Law Mandates a Public Auction of the Shares of PDVH....................... 2

    II.    Crystallex's Sale Proposal Is Consistent With Delaware Law. ............................. 3

    III.   There Is No Legitimate Reason to Preclude Crystallex From Credit Bidding. ..... 5

    IV.   The Shares of PDVH Are Validly Attached. ......................................................... 7

CONCLUSION.............................................................................................................................. 10

# TABLE OF AUTHORITIES

Page(s)

## Cases

*Burge v. Fid. Bond and Mortg. Co.*,
  648 A.2d 414 (Del. 1994) ..................................................................................................3

*Bush v. Hillman Land Co.*,
  2 A.2d 133 (Del. Ch. 1938) ...............................................................................................8

*Chambers v. NASCO, Inc.*,
  501 U.S. 32 (1991) ..........................................................................................................10

*Chevron Corp. v. Donzinger*,
  2020 WL 3643043 (S.D. Fla. July 6, 2020) ....................................................................10

*Deibler v. Atl. Props. Grp., Inc.*,
  652 A.2d 553 (Del. 1995) .........................................................................................3, 5, 6

*In re Fisker Auto. Holdings, Inc.*,
  510 BR. 55 (D. Del. 2014) .............................................................................................5, 6

*Girard Trust Bank v. Castle Apartments, Inc.*,
  379 A.2d 1144 (Del. Super. Ct. 1977) ..............................................................................6

*Ho. v. Hseih*,
  181 Cal. App. 4th 337 (2010) .........................................................................................10

*House v. Williams*,
  573 So. 2d 1012 (Fla. Ct. App. 1991), *review denied*, 581 So. 2d 1307 (Fla.
  1991) ...............................................................................................................................10

*Huntington National Bank v. Bywood, Inc.*,
  2017 WL 2241537 (Ohio Ct. App. May 16, 2017) .........................................................10

*Nehmer v. U.S. Dep't of Veterans Affairs*,
  494 F.3d 846 (9th Cir. 2007) ..........................................................................................10

*Peacock v. Thomas*,
  516 U.S. 349 (1996) ........................................................................................................10

*In re SubMicron Sys. Corp.*,
  432 F.3d 448 (3d Cir. 2006) ..............................................................................................5

*In re The Free Lance-Star Publ'g Co.*,
  512 B.R. 798 (E.D. Va. 2014) ......................................................................................5, 6

*Wolverine Flagship Fund Trading Ltd. v. Am. Oriental Bioengineering, Inc.*,
  134 A.3d 992 (N.J. Super. Ct. App. Div. 2016) .............................................................10

**Statutes**

6 *Del. C.* § 8-112(a) ...........................................................................................................7, 8

6 *Del. C.* § 8-112(d) ..............................................................................................................8

6 *Del. C.* § 8-112(e) ............................................................................................................10

8 *Del. C.* § 168 .....................................................................................................................9

8 *Del. C.* § 169 .....................................................................................................................8

8 *Del. C.* § 202 (1953 Delaware Code Archive) ..................................................................7

8 *Del. C.* § 324(a) .................................................................................................................8

8 *Del. C.* § 324(b) .................................................................................................................8

8 *Del. C.* § 324(c) .................................................................................................................9

# INTRODUCTION

There is no dispute that Crystallex has a final, unappealable judgment against Venezuela. And all avenues for appealing this Court's August 2018 Orders finding that PDVSA is Venezuela's alter ego and authorizing the issuance of a writ of attachment *fieri facias* against the Delaware shares of PDVH to obtain satisfaction of Crystallex's judgment have been exhausted.

Faced with the prospect of having to pay what it owes, Venezuela resorts to baseless accusations of impropriety in the two settlements that it entered into with Crystallex and subsequently failed to honor. Without so much as a hint of logic or evidence, Venezuela now claims that there may have been something wrong with the settlements because they involved an upfront payment and additional payments over time in exchange for Crystallex's agreement to stay the sale of the attached shares of PDVH and, once final payment was received, release the writ of attachment and the judgment against Venezuela. Having repudiated the settlements and lost in the Third Circuit, Venezuela now faces the day it sought to avoid by entering into the settlements in the first place. Wild accusations cannot stop Crystallex's lawful execution.

Nor can Venezuela and PDVSA reverse course and claim that Crystallex does not have an attachment on the shares of PDVH after two years of repeatedly telling this Court that the attachment was sufficient security for Crystallex's judgment to obtain and extend stays pending appeal without posting a bond. Venezuela's newly-invented position is wrong as a matter of Delaware law and its belated attempt to render meaningless all of the litigation that took place in this Court, the Third Circuit, and the Supreme Court need not be tolerated.

As its willingness to enter into two settlements demonstrates, Crystallex is not looking to take control of PDVH as Venezuela now contends. Crystallex just wants to get paid what it is owed. At any time until the gavel comes down on the auction, Venezuela can tender payment in full to Crystallex and prevent the sale. Crystallex obtained its judgment in 2017. Venezuela has

had years to find its own buyer for the shares of PDVH to fund payment of the judgment. To the best of Crystallex's knowledge, Venezuela made no such efforts. The idea that Venezuela will now seriously look for a buyer for an asset that it desperately does not want to sell defies belief.

Crystallex proposes a sale pursuant to the statutory procedure set forth by the Delaware legislature in Section 324 of the General Corporation Law. Venezuela does not point to any other procedure authorized by statute to sell shares of a Delaware corporation. Of course, the procedures set forth in Section 324 are the statutory minimum and nothing prevents any party from conducting additional advertising, engaging an investment bank, or providing additional due diligence materials. Crystallex has proposed supplemental advertising, direct outreach to prospective bidders and the creation of a data room. It welcomes other timely measures any party wishes to engage in to promote the sale or increase the information available in advance of the sale.

Setting the sale procedures now will allow the parties to contact and educate potential buyers in advance of the eventual auction, which will benefit all involved.

## ARGUMENT

### I. Delaware Law Mandates a Public Auction of the Shares of PDVH.

Under Federal Rule of Civil Procedure 69(a)(1), Delaware law, and particularly Section 324, sets the process for selling shares of a Delaware corporation at an execution sale. Venezuela does not seriously contend otherwise. Nonetheless, because a sale of shares of a privately-held corporation the size of PDVH is purportedly "unprecedented," it contends that this Court is "faced with an essentially blank slate." D.I. 196 at 9. The fact that PDVH is a large asset—being sold to satisfy a large judgment—does not allow Venezuela to disregard Delaware's statutory procedure.

Venezuela fails to offer a single case in which a judgment debtor was allowed to sell assets itself in lieu of an execution sale. Instead, it relies on a case upholding a sheriff's sale of shares of privately-held companies after publication of a notice listing the names of the companies and the

2

number of shares to be sold, *Deibler v. Atl. Props. Grp., Inc.*, 652 A.2d 553 (Del. 1995), and a case setting aside a sheriff's sale based on an erroneous bid, "not [a] challenge [to] the correctness of the sale procedures," *Burge v. Fid. Bond and Mortg. Co.*, 648 A.2d 414, 418 (Del. 1994). Neither case suggests that a Marshals' sale is improper here.[1]

Venezuela, like any judgment debtor, can sell assets—such as the shares of PDVH, or some of its gold reserves around the world—to raise funds to satisfy the judgment. That remains true today. Crystallex would gladly accept payment in lieu of selling the shares. But having failed to avail itself of the opportunity to sell PDVH in the more than three years that have passed since the judgment first issued, Venezuela cannot now stop an execution sale of the shares of PDVH simply by claiming it might get a better price if it negotiated a sale itself.

## II. Crystallex's Sale Proposal Is Consistent With Delaware Law.

Assets such as the shares of PDVH do not often come to auction. And as the Delaware Supreme Court has recognized, the owner of a privately-held corporation, such as PDVH, has "the fullest (and cheapest) access to relevant information" concerning the company. *Deibler*, 652 A.2d at 558. Venezuela undoubtedly has non-public information that potential bidders might find useful in determining what to bid for the shares of PDVH. That is not a reason, however, to deviate from the sale procedures of Section 324. It is a reason to invite Venezuela to make additional information available to potential bidders to facilitate the auction process. *See* D.I. 182 at 10–12.

As the Delaware Supreme Court explained in *Deibler*, a party to an execution sale is "free to supplement such notice as the sheriff may disseminate." *Id.* at 557. Venezuela contends it is best suited to "identify and assemble voluminous due diligence materials." D.I. 196 at 10.

---

[1] Venezuela makes much of the fact that the word "sheriff" does not appear in the text of Section 324, but that is simply a reflection of the fact that a writ of attachment *fieri facias* is directed to the sheriff or, in federal court, the Marshals. *See* D.I. 95 at 2, 7.

Crystallex agrees. That is why it proposed that any and all relevant information that Venezuela is willing to provide be made available in a data room for potential bidders. Venezuela believes that it can identify "a well-chosen group of likely bidders" to engage as part of the sale process. *Id.* And it should. Venezuela is free to contact potential bidders, and it can conduct as much "meaningful pre-sale marketing" as it sees fit. *Id.* at 12. A Marshals' sale does not preclude Venezuela from publicizing the auction or providing information to potential bidders. It simply ensures that a sale of the shares will in fact take place on a date certain and without Venezuela's subjective views on who should win interfering with the auction process.[2]

Venezuela argues to no avail that bidders will not participate in the auction without a license from the Office of Foreign Assets Control ("OFAC"). Putting aside the fact that, from a licensing perspective, the process proposed by Venezuela is not materially different than that proposed by Crystallex, a license is not required to participate in the auction or to conduct pre-auction diligence. *See* D.I. 198 at 10–11. OFAC might require a license to close the sale, which is why Crystallex proposes that the winning bid may be conditioned upon obtaining necessary regulatory approvals. Not requiring the bidder to close if it fails to get any necessary licenses will likely encourage bidding by reducing regulatory risk. However, the winning bidder may need an incentive to complete the sale. This is why Crystallex proposes that the winner be required to post $50 million (or 10% of the winning bid, if less) as security.[3] The proposed deposit will help to

---

[2] Venezuela argues that selling PDVH is "far too complex to be conducted by the Marshals" because, among other things "[t]he sales manager must work closely with management." *Id.* at 10. The argument assumes that a statutory auction is improper. In any event, the Marshals have a long history of managing and selling assets. In fact, the Marshals had nearly $2.9 billion dollars' worth of assets under management as of September 30, 2019. U.S. Marshals Service, 2020 Asset Forfeiture Fact Sheet, https://tinyurl.com/ycwbtqmc.

[3] Delaware state auctions require a 10% deposit. *See The Newcastle County Sheriff's Office Bidder Auction Rules*, https://tinyurl.com/y76vsngy. And breakup fees are not uncommon in corporate transactions where regulatory approval is required to close. *See, e.g.*, Anton Troianovski

discourage the winner from deliberately tanking the deal if the economics change before closing is complete. This provision would serve to protect both Crystallex and Venezuela.

Ultimately, Venezuela's arguments fail because they posit the wrong question. The issue before the Court is not how to structure a sale between a willing buyer and a willing seller. It is how to best conduct an execution sale to satisfy Crystallex's judgment. As the *Deibler* Court noted, a valid sale requires only that "a reasonable process be employed to give notice to the public of the sale so that a reasonable price, *considering the forced sale nature of the transaction*, might be obtained." *Deibler*, 652 A.2d at 557 (emphasis added). The statutory process is simple. Venezuela may not like Delaware execution law, but it offers no legal basis for deviating from it.

### III. There Is No Legitimate Reason to Preclude Crystallex From Credit Bidding.

Crystallex has a valid lien on the shares of PDVH and nearly $1 billion outstanding on its judgment. "It is well settled . . . that creditors can bid the full face value of their secured claims." *In re SubMicron Sys. Corp.*, 432 F.3d 448, 459–60 (3d Cir. 2006) (affirming decision to allow credit bidding); *see also In re The Free Lance-Star Publ'g Co.*, 512 B.R. 798, 805 (Bankr. E.D. Va. 2014) ("[I]t is beyond peradventure that a secured creditor is entitled to credit bid its [judgment]." (quoting *In re Fisker Auto. Holdings, Inc.*, 510 B.R. 55, 59 (Bankr. D. Del. 2014))). While the right to credit bid is not absolute, it is not lightly cast aside. Here, there is no need to limit credit bidding to foster a competitive auction. Crystallex has a substantial judgment, but its participation is unlikely to discourage bidders with a serious interest in PDVH. Indeed, if Venezuela is correct that only a portion of PDVH will need to be sold, Crystallex lacks sufficient judgment dollars to be the winning bidder. Thus, this case presents a very different situation than *Fisker Auto. Holdings*, where the secured claim greatly exceeded the anticipated bids. 510 B.R.

---

*et al.*, *AT&T's T-Mobile Deal Teeters,* Wall St. J. (Nov. 25, 2011), https://tinyurl.com/ybqf23bc ($4 billion breakup fee for deal that was contingent on antitrust approval).

at 60–61 (limiting credit bid to amount bidder paid to acquire the claim).

Faced with the absence of any legal or economic reason to bar credit bidding, Venezuela attempts to tar Crystallex with imagined inequitable conduct. To that end, Venezuela strains to spin the auction of the shares of PDVH into a "loan to own" case—where the credit bidder acquires an interest in a debtor for the purpose of forcing a sale and taking control of the debtor's business or assets. D.I. 196 at 14 (citing *Free Lance-Star*, 512 B.R. at 806). Here, Crystallex's right to credit bid was not acquired from some third party; it comes from an affirmed $1.4 billion judgment confirming an arbitral tribunal's finding that Venezuela expropriated Crystallex's assets without compensation. But for Venezuela's theft, Crystallex would still have its mining rights, and the parties would not be before this Court. And there is nothing untoward in Crystallex—which as a result of Venezuela's illegal expropriation has been in insolvency proceedings in Canada since 2011—having obtained debtor-in-possession financing nearly 8 years ago. Without that financing, Crystallex would have been without the means to vindicate its rights, leaving its own creditors, which include pension funds and individual investors, without any recovery at all.

Perversely, Venezuela argues that Crystallex's prior efforts to settle this matter without a forced sale of the shares of PDVH are a reason to disqualify Crystallex from credit bidding now. There is nothing improper in Crystallex receiving what it is owed, and "it is universally recognized that a valid debt paid or released constitutes a financial benefit to the debtor." *Deibler*, 652 A.2d at 559–60 (citing *Girard Trust Bank v. Castle Apartments, Inc.*, 379 A.2d 1144, 1146–47 (Del. Super. Ct. 1977)). Venezuela expresses amazement that the prior administration was willing to pay (some of) what is owed to forestall the sale of PDVH, but there is nothing "extraordinarily generous" in the terms of the court-approved settlement agreement. D.I. 196 at 15. Crystallex agreed to accept partial payment over time and to release its judgment, lift the writ and provide

6

Venezuela with mining data for the *Las Cristinas* site once the final payment was made. Rather than continue to make payments and obtain the negotiated release, however, Venezuela chose to walk away after the Third Circuit issued its summary decision staying further proceedings in this Court pending appeal. The fact that a voluntary settlement is shocking to Venezuela is not a reason to preclude Crystallex from credit bidding at the auction.

### IV. The Shares of PDVH Are Validly Attached.

Venezuela veers well outside the scope of sale procedure briefing by echoing arguments in PDVSA's motion to quash the writ, but those arguments are meritless. Delaware law has long provided for the attachment of shares of Delaware corporations by service on the issuer of those shares. For nearly 70 years, the Delaware legislature has acted to maintain the ability to attach shares in this manner even as other states moved away from this approach. *See* 8 *Del. C.* § 202 (1953 Delaware Code Archive) (repealed 1967) ("Nothing contained in this subchapter shall repeal, amend, or in any way affect the provisions of section 324 of this title . . ."). Today, the current version of Delaware's Uniform Commercial Code preserves the ability to attach shares by delivery of a writ to the issuer of those shares, by providing that "*[e]xcept to the extent otherwise provided or permitted by §§ 169 and 324 of Title 8, §§ 365, 366 and Chapter 35 of Title 10*," a debtor's interest in certificated shares of corporation "may be reached . . . only by actual seizure of the security certificate by the officer making the attachment or levy." 6 *Del. C.* § 8-112(a).

Despite this history, and contrary to its prior arguments in this litigation, Venezuela now contends that there has been no attachment of the shares of PDVH. Venezuela ignores the first clause of Section 8-112(a), which, among other things, maintains traditional attachment practices under (i) Section 169, which provides that shares in a corporation are located in Delaware for "all

7

purposes of . . . attachment," 8 *Del. C.* § 169,[4] and (ii) Section 324, which provides for attachment of shares of a Delaware corporation by delivery of a writ of attachment to the issuer, 8 *Del. C.* § 324(b). The language of Section 8-112(a) makes plain that the 1998 amendment of Section 324(a), which provides that attachment of certificated shares shall comply with Section 8-112, was not, as Venezuela contends, "enacted to give effect to section 8-112(a)'s requirement of physical seizure *notwithstanding section 169*." D.I. 196 at 6 (emphasis added). If the legislature meant to require the application of section 8-112(a) "notwithstanding section 169," the legislature would have removed the portion of Section 8-112(a) that states that it applies "[e]xcept to the extent otherwise provided or permitted by §[] 169." 6 *Del. C.* § 8-112(a). It did not. Instead, the legislature amended Section 324(a) to cross-reference "Section 8-112 of Title 6." 8 *Del. C.* § 324(a). Section 8-112 contains multiple subparts, some of which, such as Section 8-112(a), have a carve-out for attachments "otherwise provided or permitted by §§ 169 and 324 of Title 8," and others, such as Section 8-112(d), which provides a method of attachment of "certificated securit[ies] for which the certificate is in the possession of a secured party," have no such carve-out. *Compare* 6 *Del. C.* § 8-112(a) *with id.* § 8-112(d). A far more logical reading of the 1998 amendment is that it was intended to protect innocent secured parties from having their collateral sold out from under them, and not, as Venezuela would have it, to allow debtors to avoid attachment by holding share certificates of a Delaware corporation in another jurisdiction.

Under Delaware law, as well as the law of this case, Crystallex has had a valid lien since the writ of attachment was delivered to the Marshals in August 2018. D.I. 96. As discussed in

---

[4] Venezuela argues that because Section 169 speaks of shares and not certificates, Section 169 does not provide for attachment of certificates. If a corporation's shares can be attached in Delaware, as Section 169 allows and this Court has ordered, then the reissuance of the certificates "which pretend to represent the[ shares]," *Bush v. Hillman Land Co.*, 2 A.2d 133, 136 (Del. Ch. 1938), is a ministerial act, nothing more, and the existence of certificated stock is not a barrier to attachment of the debtor's ownership of the shares.

detail in Crystallex's Opposition to Venezuela's Motion for Relief under Federal Rule of Civil Procedure 60(b) and Motion to Quash the Writ of Attachment, Venezuela's alter ego has argued repeatedly, and successfully, that Crystallex has an attachment of the shares to avoid posting a bond pending appeal and to continue this Court's stay pending the completion of proceedings before the Supreme Court. D.I. 199 at 32–35. And CITGO Petroleum acknowledged the attachment just weeks ago in its June 2, 2020 offering memorandum, which led to an issuance of $1.125 billion of new debt.[5] Ignoring these prior statements, Venezuela not only argues that there is no attachment, it argues that this Court is powerless to reach the shares. The idea is nonsense.

      Delaware law is clear that a court can direct an execution sale without physical seizure of the share certificates and then order reissuance once the sale is complete. *See* 8 *Del. C.* § 324(c) ("The court . . . shall have the power to make an order compelling the corporation, the shares of which were sold, to issue new certificates . . . to the purchaser at the sale and to cancel the registration of the shares attached on the books of the corporation."). The statute does not expressly provide for reissuance prior to sale, as Venezuela erroneously argues is necessary, because, under Section 324(c), no seizure is required. But, Section 324(c) demonstrates the Court's power to direct the reissuance of shares in connection with an execution sale. Other provisions of the General Corporation Law also authorize the reissuance of shares by court order. For example, Section 168 authorizes a court to order the reissuance of stock when a corporation refuses to do so at the request of the shareholder. 8 *Del. C.* § 168. Venezuela argues that Section 168 (as well as Section 167, which similarly authorizes a corporation to reissue certificated shares

---

[5] CITGO Petroleum June 2, 2020 Offering Memorandum, at 36, https://tinyurl.com/y9odteym; *CITGO Corporation Debt Refinancing Strengthens Balance Sheet, Adds Flexibility*, (June 9, 2020), https://tinyurl.com/y936kaam (noting offering was oversubscribed and that the ability to raise funds at "attractive pricing, despite the unprecedented economic environment surrounding COVID-19 and global oil supplies, demonstrates the markets' overall confidence in CITGO").

on request) is available only when the certificates are lost, stolen or destroyed. Even if this was a meaningful distinction (and it is not), Venezuela's papers are silent as to the current status or location of the certificates. In addition, the Court may compel the turnover of the certificates "by injunction or otherwise [to] reach[] the certificated security . . . by means allowed at law or in equity in regard to property that cannot readily be reached by other legal process."[6] 6 *Del. C.* § 8-112(e); *see also House v. Williams*, 573 So. 2d 1012 (Fla. Ct. App. 1991), *review denied*, 581 So. 2d 1308 (Fla. 1991) (ordering shares to be reissued and delivered to sheriff); *Chevron Corp. v. Donzinger*, 2020 WL 3643043, at *6 (S.D. Fla. July 6, 2020) (ordering reissuance for execution).

Accordingly, the Court can, and respectfully should, cause the stock certificates of PDVH to be delivered to the Marshals, who already have constructive possession of the shares.[7]

## CONCLUSION

Crystallex respectfully requests that this Court enter an order approving a public auction by Marshals of the shares of PDVH.

---

[6] Venezuela's out-of-state authorities fail to carry the weight asked of them. In *Huntington National Bank v. Bywood, Inc.*, the court held that a debtor can be ordered to request reissuance of certificated shares and that a court can compel the corporation to comply; what the court could not do was issue a new certificate directly. 2017 WL 2241537, at *6 (Ohio Ct. App. May 16, 2017). In *Ho. v. Hseih*, the court ruminated that "none of the statutory exceptions for issuing new certificates appl[ied]"—which acknowledges that reissuance is *possible*—but ultimately held, because the share certificate had been deposited with the trial court, that "no further aid was required from the court under section 8112, subdivision (e)." 181 Cal. App. 4th 337, 347 (2010). And even the court in *Wolverine Flagship Fund Trading Ltd. v. Am. Oriental Bioengineering, Inc.*, which erroneously applied New Jersey law to a Florida corporation, acknowledged that a debtor could be compelled to turnover shares. 134 A.3d 992, 996 (N.J. Super. Ct. App. Div. 2016).

[7] Venezuela acknowledges that some "appropriate process" is available to attach the shares, but claims the Court cannot issue it because of current U.S. sanctions. D.I. 196 at 8. This Court has the "inherent power to enforce its judgments." *Peacock v. Thomas*, 516 U.S. 349, 356 (1996). Sanctions cannot and do not change that. *Cf. Nehmer v. U.S. Dep't of Veterans Affairs*, 494 F.3d 846, 860–61 (9th Cir. 2007) ("While Congress has the [Constitutional] power . . . to define the jurisdiction of the lower federal courts . . . an executive agency does not have that same authority," and it cannot "unilaterally eliminate jurisdiction" by "enshrining" its views in a "regulation."); *see also Chambers v. NASCO, Inc.*, 501 U.S. 32, 46 (1991) (finding "no basis for holding that the sanctioning scheme of the statute and the rules displaces the inherent power to impose sanctions").

10

| | |
|---|---|
| OF COUNSEL:<br><br>Robert L. Weigel<br>Jason W. Myatt<br>Rahim Moloo<br>GIBSON, DUNN & CRUTCHER LLP<br>200 Park Avenue<br>New York, New York 10166<br>(212) 351-4000<br><br>Miguel A. Estrada<br>Lucas C. Townsend<br>GIBSON, DUNN & CRUTCHER LLP<br>1050 Connecticut Avenue, N.W.<br>Washington, D.C. 20036<br>Tel: (202) 955-8500<br>Fax: (202) 467-0539<br><br>Dated:  July 13, 2020 | */s/ Jeffrey L. Moyer*<br>Raymond J. DiCamillo (#3188)<br>Jeffrey L. Moyer (#3309)<br>Travis S. Hunter (#5350)<br>RICHARDS, LAYTON & FINGER, P.A.<br>One Rodney Square<br>920 North King Street<br>Wilmington, Delaware 19801<br>(302) 651-7700<br>dicamillo@rlf.com<br>moyer@rlf.com<br>hunter@rlf.com<br><br>*Attorneys for Plaintiff* |

11