# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF DELAWARE

CRYSTALLEX INTERNATIONAL CORPORATION,

          *Plaintiff,*

v.

BOLIVARIAN REPUBLIC OF VENEZUELA,

          *Defendant.*

C.A. No. 17-mc-00151-LPS

## STATEMENT OF INTEREST OF THE UNITED STATES

OF COUNSEL:

ETHAN P. DAVIS
Acting Assistant Attorney General

DAVID M. MORRELL
Deputy Assistant Attorney General

DIANE KELLEHER
Assistant Branch Director
Federal Programs Branch

JOSEPH E. BORSON (Va. Bar No. 85519)
JOSEPH J. DEMOTT (Va. Bar No. 93981)
Trial Attorneys
United States Department of Justice
Civil Division, Federal Programs Branch
1100 L St. NW
Washington, DC 20530
Phone: (202) 514-1944
Fax: (202) 616-8470
Email: joseph.borson@usdoj.gov

*Attorneys for the United States*

Dated: July 16, 2020

**TABLE OF CONTENTS**

INTRODUCTION ................................................................................................................. 1

I. The Current Situation in Venezuela Implicates Important U.S. Foreign Policy and National Security Interests................................................................................. 2

II. Changed Circumstances Could Justify Granting Venezuela's Motion. ........................... 4

III. If the Court Denies the Pending Motions to Dissolve or Quash the Writ of Attachment, It Should Not Authorize Crystallex to Proceed Toward a Sale at This Time................................................................................................................. 8

   A. OFAC is currently reviewing Crystallex's license application and is not yet in a position to issue a decision. ....................................................................................... 9

   B. Proceeding toward a sale at this time would imperil the United States' foreign policy and national security interests, and would serve no purpose if OFAC ultimately denies Crystallex's license application. ......................................................... 11

CONCLUSION................................................................................................................... 13

# **TABLE OF AUTHORITIES**

**Cases**

*Austria v. Altmann*,
    541 U.S. 677 (2004) .................................................................................................................. 6

*Banco Nacional de Cuba v. Sabbatino*,
    376 U.S. 398 (1964) .................................................................................................................. 8

*Crystallex Int'l Corp. v Bolivarian Rep. of Venezuela*,
    333 F. Supp. 3d 380 (D. Del. 2018) ................................................................................. 5, 6, 8

*Crystallex Int'l Corp. v Bolivarian Rep. of Venezuela*,
    932 F.3d 126 (3d Cir. 2019) ............................................................................................ 5, 8, 13

*First National City Bank v. Banco Para El Comercio Exterior de Cuba, ("Bancec")*,
    462 U.S. 611 (1983) .............................................................................................................. 4, 5

*Hunton & Williams v. U.S. Dep't of Justice*,
    590 F.3d 272 (4th Cir. 2010) .................................................................................................... 1

*Jama v. Immigration & Customs Enforcement*,
    543 U.S. 335 (2005) ................................................................................................................ 12

*Jimenez v. Palacios*,
    C.A. No. 2019-0490-KSJM, 2019 WL 3526479 (Del. Ch. Aug. 2, 2019) ................................ 8

*Landis v. N. Am. Co.*,
    299 U.S. 248 (1936) .................................................................................................................. 8

*Regan v. Wald*,
    468 U.S. 222 (1984) ................................................................................................................ 12

*United States v. Pink*,
    315 U.S. 203 (1942) .................................................................................................................. 8

*Zarmach Oil Servs., Inc. v. U.S. Dep't of the Treasury*,
    750 F. Supp. 2d 150 (D.D.C. 2010) ........................................................................................ 12

*Zivotofsky v. Kerry*,
    576 U.S. 1 (2015) ...................................................................................................................... 7

**Statutes**

28 U.S.C. § 517 ................................................................................................................................ 1

50 U.S.C. § 1702(a)(1)(B) ................................................................................................ 12

**Rules and Regulations**

31 C.F.R. § 591.201 ........................................................................................................... 9

31 C.F.R. § 591.407 ........................................................................................................... 9

31 C.F.R. § 591.506(c) ....................................................................................................... 9

**Other Authorities**

84 Fed. Reg. 3282 (Feb. 11, 2019) .................................................................................... 9

"Democratic Transition Framework for Venezuela – Fact Sheet" (Mar. 31, 2020),
   https://www.state.gov/democratic-transition-framework-for-venezuela .................................... 3

Remarks by U.S. Commerce Sec. Wilbur L. Ross Brasilia, Brazil (Aug. 1, 2019)
   https://www.commerce.gov/ news/speeches/2019/08/remarks-us-commerce-
   secretary-wilbur-l-ross-venezuela-infrastructure) ........................................................ 3

Statement by Sec. Steven T. Mnuchin Meeting on Venezuela (Apr. 19, 2018),
   https://home.treasury.gov/news/press-releases/sm0353 ............................................. 2

## INTRODUCTION

The United States files this Statement of Interest[1] in response to the invitation of this Court,[2] *see* D.I. 154 at 23. The United States respectfully submits the following views: (1) the current situation in Venezuela implicates important U.S. foreign policy and national security interests, and has changed materially since this Court originally issued the writ of attachment in 2018; (2) these changed circumstances could justify granting the Bolivarian Republic of Venezuela's ("Venezuela") Rule 60(b) motion; and (3) even if this Court denies or defers the Rule 60(b) motion, and the motion to quash the writ of attachment, it should not authorize Crystallex International Corp. ("Crystallex") to proceed toward the contemplated sale of shares of PDV Holding, Inc. ("PDVH") owned by the Venezuelan national oil company, Petróleos de Venezuela, S.A. ("PDVSA") at this time. Such a sale is dependent on a license from Treasury's Office of Foreign Assets Control ("OFAC"), and moving forward in the manner Crystallex suggests could imperil U.S. foreign policy and national security interests.

---

[1] Congress has authorized the Attorney General to send "any officer of the Department . . . to any . . . district in the United States to attend to the interests of the United States in a suit pending in a court of the United States." 28 U.S.C. § 517. "A statement of interest, which is authorized by 28 U.S.C. § 517, is designed to explain to a court the interests of the United States in litigation between private parties." *Hunton & Williams v. U.S. Dep't of Justice*, 590 F.3d 272, 291 (4th Cir. 2010) (Michael, J., dissenting).

[2] The United States recognizes that this Statement of Interest is being filed the day before this Court's hearing on the pending motions. *See* D.I. 174. The United States sincerely apologizes to the Court and the parties for any inconvenience caused by filing so close to the hearing date.

1

## DISCUSSION

**I.     The Current Situation in Venezuela Implicates Important U.S. Foreign Policy and National Security Interests.**

As detailed in the attached letter from Elliott Abrams, Special Representative for Venezuela at the U.S. Department of State, Venezuela is currently in the midst of an unprecedented humanitarian, political, and economic crisis. *See* Letter from Elliott Abrams to Ethan Davis, dated July 16, 2020, attached hereto as Ex. 1, at 1.  The country is currently grappling with an illegitimate regime led by Nicolás Maduro and an inner circle of corrupt officials.  *Id.*  Over the past two decades, Maduro and his predecessor, Hugo Chávez, have destroyed democratic institutions, repressed free speech, committed serious human rights abuses, and ruined the prosperity Venezuela once enjoyed.  *Id.* at 1-2.  The Maduro regime has become a source of great instability in the entire region.  *Id.* at 1.  The regime's abuses have resulted in the greatest refugee crisis in Latin American history, with more than five million Venezuelans leaving their country seeking freedom, sustenance, or both.  *Id.*  As Secretary of the Treasury Mnuchin has stated, "[t]he policies of the regime of President Maduro have consequences that extend beyond Venezuela's borders, threatening regional stability and national security."  Statement by Sec. Steven T. Mnuchin Following Meeting on Venezuela (Apr. 19, 2018), https://home.treasury.gov/news/press-releases/sm0353.  Indeed, the Maduro regime has built a close relationship with foreign adversaries of the United States which, but for the regime's existence, would have little foothold in South America: Russia, China, and most recently Iran. Ex. 1, at 1.  That these relationships include military and intelligence aspects makes them even more worrying for U.S. national security.  *Id.*

Since January 23, 2019, the United States has recognized Juan Guaidó, the democratically elected President of the Venezuelan National Assembly, as the Interim President of Venezuela.  *Id*

2

at 2.  U.S. policy toward Venezuela is to support the full restoration of democracy, beginning with free, fair, and transparent presidential elections in which the Venezuelan people choose their leaders.  *Id.*  To achieve this, Secretary of State Pompeo recently proposed a "Democratic Transition Framework" to resolve Venezuela's crisis that is rooted in a peaceful, democratic transition that calls for Maduro to step aside and the establishment of a broadly acceptable, transitional government to administer free and fair presidential elections.  *Id.*  This framework also sets forth a viable pathway for lifting Venezuela-related U.S. sanctions.  *Id.*; *see also* U.S. Department of State, Office of the Spokesperson, "Democratic Transition Framework for Venezuela – Fact Sheet" (Mar. 31, 2020), https://www.state.gov/democratic-transition-framework-for-venezuela.  In fact, U.S. government agencies are planning for exactly this, as Secretary of Commerce Ross outlined: "The U.S. will ease sanctions, promote domestic and international trade credit, deploy technical advisors, and engage international financial institutions to build confidence in Venezuela's new economic policies.  [It will also work to] [o]verhaul Venezuela's central bank, tax system, fiscal institutions, debt, and banking sector in the context of a long-term [International Monetary Fund] deal and the need for economic stability and free elections."  Remarks by U.S. Commerce Sec. Wilbur L. Ross at the Venezuelan Infrastructure Breakfast in Brasilia, Brazil (Aug. 1, 2019), https://www.commerce.gov/news/speeches/2019/08/remarks-us-commerce-secretary-wilbur-l-ross-venezuela-infrastructure.

The United States has strong foreign policy and national security interests in supporting the interim government's efforts to reconstruct the Venezuelan economy following the departure of Maduro.  *See* Ex. 1.  In the words of Special Representative Abrams:

> Since recognizing the Guaidó government on January 23, 2019, the U.S. government has taken steps, including through additional

3

> economic sanctions, to ensure Maduro is not able to liquidate in fire sales the financial assets of Venezuela that are located in United States jurisdictions (and especially CITGO, the crown jewel of PdVSA.) . . . . CITGO, as part of the U.S.-based assets of PDVH and its parent company PdVSA, is one such example of a national resource that has been placed in legal and economic jeopardy as a result of the actions of former Venezuelan governments. Critical to U.S. foreign policy, the United States assesses that the domestic legitimacy of the interim government under Guaidó would be severely eroded were a forced sale of CITGO to take place while the illegitimate Maduro regime still attempts to cling to de facto power in Caracas. The efforts by creditors to enforce judgments against Venezuela by taking immediate steps toward a conditional sale of PdVSA's U.S.-based assets, including PDVH and CITGO, are detrimental to U.S. policy and the interim government's priorities. Should these assets be advertised for public auction at this time, the Venezuelan people would seriously question the interim government's ability to protect the nation's assets, thereby weakening it and U.S. policy in Venezuela today.

Ex. 1, at 2-3.

Thus, assets such as PDVH's shares, which provide indirect ownership of CITGO, are at the heart of the United States' current foreign policy efforts with respect to Venezuela. "It is clear that its loss through a forced sale in a U.S. court would be a great political victory for the Maduro regime, which has already claimed that the United States and Guaidó are conspiring to 'steal' CITGO. The impact on Guaidó, the interim government, and U.S. foreign policy goals in Venezuela, would be greatly damaging and perhaps beyond recuperation." *Id.* at 3.

## II. Changed Circumstances Could Justify Granting Venezuela's Motion.

In August 2018, this Court concluded that PDVSA was an alter ego of Venezuela pursuant to the Supreme Court's decision in *First National City Bank v. Banco Para El Comercio Exterior de Cuba* ("*Bancec*"), 462 U.S. 611 (1983). In *Bancec*, the Supreme Court recognized that duly created instrumentalities of a foreign state are to be accorded a presumption of independent status.

4

*See id.* at 626-27. The Court noted that freely ignoring the separate status of government instrumentalities would frustrate "the efforts of sovereign nations to structure their governmental activities in a manner deemed necessary to promote economic development and efficient administration." *Id.* at 626. As a result, *Bancec* affords a strong presumption that an independent instrumentality of a foreign state should be treated as such by U.S. courts, unless (a) that instrumentality is "so extensively controlled by its owner that a relationship of principal and agent is created" or (b) doing so "would work fraud or injustice." *Id.* at 629.

Following *Bancec*'s guidance, this Court concluded that Crystallex had "rebutt[ed] the presumption of separateness between Venezuela and PDVSA," and had sufficiently established that the "sovereign state exercises significant and repeated control over the instrumentality's day-to-day operations." *Crystallex Int'l Corp. v Bolivarian Rep. of Venezuela*, 333 F. Supp. 3d 380, 401, 403 (D. Del. 2018) (also concluding that Crystallex had not established that giving effect to the separateness of Venezuela and PDVSA would "work a fraud or injustice" as that term is used in *Bancec*). This Court also noted that Venezuela and PDVSA could seek to supplement the factual record and attempt to demonstrate that the additional evidence "materially alters the Court's findings." *Id.* at 425. The Third Circuit, in reviewing this Court's decision, also noted that on remand, "Venezuela may direct to the District Court credible arguments to expand the record with later events." *Crystallex Int'l Corp. v Bolivarian Rep. of Venezuela*, 932 F.3d 126, 144 (3d Cir. 2019). The United States respectfully submits that the circumstances underlying that determination have changed in such a manner that the Court should review its earlier finding

concerning PDVSA's independence from Venezuela.³

This Court originally concluded that PDVSA was the alter ego of the Venezuelan government because "Venezuela extensively control[led] PDVSA," *Crystallex*, 333 F. Supp. 3d at 406, based on Venezuela's practices of (1) "us[ing] PDVSA's property as its own," (2) "[i]gnoring PDVSA's separate status," (3) "[d]epriving PDVSA of independence from close political control," (4) "[r]equiring PDVSA to obtain approvals for ordinary business decisions," and (5) "[i]ssuing policies causing PDVSA to act directly on behalf of Venezuela." *Id.* at 406-09.

Since issuing that ruling, circumstances in Venezuela have materially changed. As detailed in the attached letter from Special Representative Abrams, there have been significant developments within Venezuela since 2018 that have precipitated a fundamental shift in U.S. foreign policy. In January 2019, in the wake of the fraudulent Venezuelan presidential elections, Maduro attempted to install himself as president for a second term. Ex. 1, at 2. Shortly afterwards,

---

³ The specific posture of this case makes it appropriate for this Court to take into account changed circumstances in considering the *current* relationship between PDVSA and Venezuela. While courts have routinely examined the historical relationship between a foreign state and its instrumentalities in determining whether to pierce the corporate veil for purposes of imposing liability, this Court was clear that it did not seek to impose Venezuela's primary liability on PDVSA. *Crystallex*, 333 F. Supp. 3d. at 391-94. Instead, the question before the Court was whether the specific property at issue was really the property of Venezuela and only nominally held by PDVSA. *Id.* at 392. This Court determined "it is appropriate – if it finds PDVSA is Venezuela's alter ego – to view the instant case as *not* involving a demand that PDVSA use *its* 'legitimately held assets' to satisfy Venezuela's judgment. Rather, the issue here is whether PDVSA's assets are, in effect, *Venezuela's* assets . . . ." *Id.* at 393. Given that inquiry, it is appropriate for the Court to consider whether the changed circumstances would result in attachment of PDVSA's legitimately held assets now. *See, e.g.*, *Rep. of Austria v. Altmann*, 541 U.S. 677, 696 (2004) ("[Foreign sovereign] immunity reflects current political realities and relationships, and aims to give foreign states and their instrumentalities some *present* protection from the inconvenience of suit as a gesture of comity." (alteration in original, quotation marks omitted)).

the National Assembly, in its role as the only legitimate branch of government duly elected by the Venezuelan people, responded by invoking the Venezuelan Constitution to declare the office of the presidency vacant, upon which Juan Guaidó, President of the National Assembly, was sworn in as Interim President. *Id.* President Trump immediately issued a public statement officially recognizing Guaidó as the Interim President of Venezuela, and Secretary of State Pompeo similarly issued a statement concerning the United States' recognition of the "new Venezuelan government." *Id.* On January 5, 2020, following Guaidó's re-election as president of the National Assembly despite an "unlawful, violent, and despicable campaign of arrests, intimidation, and bribery" led by Maduro regime officials, the State Department issued a congratulatory statement, noting that "[t]he United States and 57 other countries continue to regard [Guaidó] as the legitimate . . . interim president of Venezuela." The United States Congratulates Interim President Juan Guaido on His Re-Election as President of the National Assembly (Jan. 5, 2020), https://ve.usembassy.gov/the-united-states-congratulates-interim-president-juan-guaido-on-his-re-election-as-president-of-the-national-assembly; Ex. 1, at 2.

"Recognition is a 'formal acknowledgement' that a particular 'entity possesses the qualifications for statehood' or 'that a particular regime is the effective government of a state.'" *1702tofsky v. Kerry*, 576 U.S. 1, 11 (2015) (quoting Restatement (Third) of Foreign Relations Law of the United States § 203, cmt. a, p. 84 (1986)). The Supreme Court has made clear that "[t]he text and structure of the Constitution grant the President the power to recognize foreign nations and governments" and that the power is "exclusive," *i.e.*, is vested solely in the President, rather than in the Courts or the Congress. *Id.* at 14. This exclusivity has wide-reaching legal ramifications. Because "[p]olitical recognition is exclusively a function of the Executive," *Banco*

7

*Nacional de Cuba v. Sabbatino*, 376 U.S. 398, 410 (1964), courts are bound by that judgment when determining what regime constitutes the government of a state. *See*, *e.g.*, *United States v. Pink*, 315 U.S. 203, 223 (1942) ("[R]ecognition of a foreign sovereign conclusively binds the courts."); *see also Crystallex*, 932 F.3d at 135 n.2 (recognizing the Guaidó interim government "as authorized to speak and act on behalf of Venezuela in these appeals"); *Jimenez v. Palacios*, C.A. No. 2019-0490-KSJM, 2019 WL 3526479, at *9-11 (Del. Ch. Aug. 2, 2019) (holding that under the political question doctrine, the U.S. President's recognition of the Guaidó government binds the Delaware Court of Chancery).

Accordingly, the U.S. government's recognition of the Guaidó government constitutes a substantial and material change in circumstances that is itself sufficient to merit reconsideration of this Court's earlier alter ego determination, which rested on the corrupt actions of the Maduro regime in connection with PDVSA, *e.g.*, *Crystallex*, 333 F. Supp. 3d at 407-08. In addition, Venezuela has stated that the Guaidó government has taken "concrete steps to confirm PDVSA's independence from Venezuela." D.I. 184 at 13. The State Department has indicated that it has no reason to doubt the veracity of these representations concerning the independence of the PDVSA, PDVH, and CITGO boards. Ex. 1, at 2. As a result, fundamental premises underlying the alter ego ruling no longer hold.

**III.    If the Court Denies the Pending Motions to Dissolve or Quash the Writ of Attachment, It Should Not Authorize Crystallex to Proceed Toward a Sale at This Time.**

This Court has recognized that it has discretion over whether, when, and in what manner it moves forward with the contemplated sale of shares of PDVH, to the extent otherwise consistent with U.S. sanctions law. *See* D.I. 154 at 9 n.13; *see also Landis v. N. Am. Co.*, 299 U.S. 248, 254-

55 (1936) (recognizing the "power inherent in every court to control the disposition of the causes on its docket"). Regardless of the disposition of the pending motions to eliminate the attachment, the United States respectfully submits that the Court should exercise any such discretion not to proceed toward a sale at this time. The prefatory steps that Crystallex proposes implicate significant U.S. foreign policy and national security interests that are rightly before the Executive Branch in the Crystallex license application, and taking action which advances toward a public auction and contingent sale would serve no purpose if OFAC ultimately denies Crystallex's license application.

    A.    <u>OFAC is currently reviewing Crystallex's license application and is not yet in a position to issue a decision.</u>

As this Court is aware, U.S. sanctions involving Venezuela require a license for any sale of PDVH shares. *See* 31 C.F.R. §§ 591.506(c), 591.407; 84 Fed. Reg. 3282 (Feb. 11, 2019); E.O. Nos. 13,884 (Aug. 5, 2019), 13,850 (Nov. 1, 2018), 13,835 (May 21, 2018), 13,808 (Aug. 24, 2017); *see also* OFAC FAQs 808 & 809. Crystallex has accordingly "submitted an application to OFAC for a specific license authorizing the sale of shares of PDVH," and "seeks formal approval of the commencement of the sale process, through and including the auction of the shares of PDVH." D.I. 182 at 7; *see also* Letter from Andrea Gacki to Ethan Davis, dated July 16, 2020, attached hereto as Ex. 2, at 1 (quoting Crystallex license application, which seeks authorization from OFAC "to provide Crystallex a Specific License to allow the federal court in the District of Delaware (which has jurisdiction over the shares in question and in whose constructive possession the shares are currently held) to pursue all activities necessary and ordinarily incident to organizing and conducting a judicial sale of the shares as provided for by U.S. federal and Delaware law, regulations, and precedents."). OFAC notes that this request is necessary under applicable law,

9

not least because "a license is required before a public auction or contingent sale could occur." *See* Ex. 2, at 2 (citing E.O. Nos. 13,808, 13,835, 13,850, 13,884; 31 C.F.R. §§ 591.201, 591.506(c), 591.407; OFAC FAQs 808 & 809). OFAC is currently reviewing this application. *See id.* at 2.

OFAC is not yet in a position to issue a license decision to Crystallex, in part because of the complexity of Crystallex's application.[4] *Id.* at 2. "Unlike a routine OFAC license application, which may present a straightforward request to license a single transaction or limited set of transactions involving the applicant and a sanctioned person or a sanctioned jurisdiction, Crystallex's submission implicates a series of complicated legal and policy questions." *Id.* Relevant issues include the rapidly evolving situation in Venezuela, developments in the OFAC sanctions regime to address this situation, and the claims of other creditors against Venezuela—some of whom have also submitted license applications that implicate the PDVH shares. *Id.* Given the complex nature of these questions, the license request continues to undergo interagency review. *Id.*

Crystallex suggests that proceeding toward a sale of shares of PDVH "could aid OFAC in its review of Crystallex's application for a specific license," D.I. 198 at 3, by providing additional information about "[t]he mechanics of the sale process," *id.* at 9-11; *see also* D.I. 154 at 9 (noting "Crystallex's speculation . . . that OFAC will not issue a license until [a public auction takes place and] a winning bidder has been identified"). Contrary to this suggestion, proceeding toward a

---

[4] OFAC recognizes that if this Court grants either Venezuela's pending Rule 60(b) motion or PDVSA, PDVH, and CITGO's pending motion to quash the writ of attachment, and thus dissolves or quashes the writ of attachment, that would obviate the need for OFAC to rule on the license application. That might also forestall the need for the parties and the Court to address certain purported issues of constitutional and foreign relations law. *See, e.g.*, D.I. 198 at 9; D.I. 154 at 23.

10

public auction and contingent sale "would not in any way facilitate OFAC's license adjudication process with respect to Crystallex's instant license application." Ex. 2, at 2.  As Director Gacki further explains in her attached letter:

> It is well within OFAC's licensing discretion to evaluate and determine whether to issue Crystallex's requested license without needing to know the identity of the "winning bidder" in advance.  OFAC uses its substantial discretion to evaluate a range of options when considering any specific licensing request, from a decision to deny the license in its entirety, to grant the license in its entirety, to grant the license subject to certain conditions, or even to bifurcate the license request and sequence the authorization of actions in the future.  When evaluating a specific licensing request, OFAC could also separately determine that additional information or supplemental specific license requests are needed.

*Id.*

    B.    <u>Proceeding toward a sale at this time would imperil the United States' foreign policy and national security interests, and would serve no purpose if OFAC ultimately denies Crystallex's license application.</u>

Proceeding in the manner Crystallex proposes would imperil the United States' important foreign policy interest in supporting the Guaidó government.  As Special Representative Abrams has explained:

> The efforts by creditors to enforce judgments against Venezuela by taking immediate steps toward a conditional sale of PdVSA's U.S.-based assets, including PDVH and CITGO, are detrimental to U.S. policy and the interim government's priorities.  Should these assets be advertised for public auction at this time, the Venezuelan people would seriously question the interim government's ability to protect the nation's assets, thereby weakening it and U.S. policy in Venezuela today.
>
> Whatever the eventual settlement of Venezuela's debts or the fate of other accounts or assets, CITGO today is a special case.  Every Venezuelan knows of this company and it is viewed, as are Venezuela's oil reserves, as a central piece of the national patrimony.  It is clear that its loss through a forced sale in a U.S.

>court would be a great political victory for the Maduro regime, which has already claimed that the United States and Guaidó are conspiring to 'steal' CITGO. The impact on Guaidó, the interim government, and U.S. foreign policy goals in Venezuela, would be greatly damaging and perhaps beyond recuperation.

Ex. 1, at 3. The situation in Venezuela is fluid, but absent a change in the above foreign policy considerations, these factors will weigh heavily in OFAC's consideration of Crystallex's license application and could prove to be dispositive of OFAC's decision. *See* Ex. 2, at 2.

The United States respectfully submits that this Court should not authorize Crystallex to take further steps toward a forced sale of PDVH in light of the risk that such steps would harm U.S. foreign policy and national security interests in Venezuela. *See, e.g.*, *Zarmach Oil Servs., Inc. v. U.S. Dep't of the Treasury*, 750 F. Supp. 2d 150, 155 (D.D.C. 2010) ("[C]ourts owe a substantial measure of 'deference to the political branches in matters of foreign policy.'" (quoting *Regan v. Wald*, 468 U.S. 222, 242 (1984))); *see also Jama v. Immigration & Customs Enforcement*, 543 U.S. 335, 348 (2005) (noting Supreme Court's "customary policy of deference to the President in matters of foreign affairs"); 50 U.S.C. § 1702(a)(1)(B) (conferring on the President broad authority to "nullify, void, prevent or prohibit, any" transaction involving "any property in which any foreign country or a national thereof has any interest"). Here, the value of PDVH both numerically and strategically is clear; there is no comparable asset for Venezuela and its new government. *See* Ex. 1, at 3; *see also, e.g.*, D.I. 182 at 14 (estimating that "PDVH's subsidiaries . . . have assets in excess of $9.2 billion.").

Additionally, at a more practical level, the parties' submissions make clear that nothing comparable to the sale of the PDVH shares has ever been undertaken by a court in this manner. The sole example cited by Crystallex involved shares worth approximately $500,000, a far cry

from the PDVH valuations suggested by the parties. *See* D.I. 188 at 12 n.17 (citing "unrebutted research show[ing] that the largest stock sale ever managed by the Delaware authorities under 8 Del. C. § 324 was for $567,000"); D.I. 182 at 1-4 (seeking to sell enough shares of PDVH under 8 Del. C. § 324 to satisfy "an arbitral award of $1.4 billion"). While the concerns of the U.S. government are with the foreign policy implications of the contemplated auction and contingent sale, the lack of any comparable examples and experience are additional reasons for the Court to forego further action until after OFAC has issued a decision on Crystallex's pending license application.

## CONCLUSION

The United States recognizes that "Venezuela owes Crystallex from a judgment that has been affirmed in our courts," D.I. 174 at 3 (quoting *Crystallex*, 932 F.3d at 149), and is not suggesting that Venezuela should be permitted to avoid payment of its lawful obligations. But given the changed circumstances since the Court concluded that PDVSA was an alter ego of Venezuela in 2018, the United States respectfully submits that relief under Rule 60(b) may be appropriate. And given the delicate and evolving political situation in Venezuela, the U.S. foreign policy and national security interests that are implicated, and the related economic sanctions, the United States respectfully asks the Court to refrain from authorizing an auction and sale of Venezuela's largest and most important foreign asset while Crystallex's licensing application is pending before OFAC. Such an action would needlessly imperil U.S. interests, and matters of equity militate against providing such relief, particularly where the parties still dispute the validity of Crystallex's writ.

Dated: July 16, 2020                              Respectfully submitted,

                                                  ETHAN P. DAVIS
                                                  Acting Assistant Attorney General

                                                  DAVID M. MORRELL
                                                  Deputy Assistant Attorney General

                                                  DIANE KELLEHER
                                                  Assistant Branch Director
                                                  Federal Programs Branch

                                                  /s/ *Joseph E. Borson*
                                                  JOSEPH E. BORSON (Va. Bar No. 85519)
                                                  JOSEPH J. DEMOTT (Va. Bar No. 93981)
                                                  Trial Attorneys
                                                  United States Department of Justice
                                                  Civil Division, Federal Programs Branch
                                                  1100 L St. NW
                                                  Washington, DC 20530
                                                  Phone: (202) 514-1944
                                                  Fax: (202) 616-8470
                                                  Email: joseph.borson@usdoj.gov

                                                  *Attorneys for the United States*