IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

CRYSTALLEX INTERNATIONAL
CORPORATION,

          Plaintiff,

    v.

BOLIVARIAN REPUBLIC OF
VENEZUELA,

          Defendant.

C.A. No. 17-mc-00151-LPS

## CRYSTALLEX'S SUPPLEMENTAL BRIEF IN OPPOSITION TO MOTION FOR RELIEF UNDER FEDERAL RULE OF CIVIL PROCEDURE 60(b) AND MOTION TO QUASH THE WRIT OF ATTACHMENT

OF COUNSEL:

Robert L. Weigel
Jason W. Myatt
Rahim Moloo
GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue
New York, New York 10166
Tel: (212) 351-4000
Fax: (212) 351-4035

Miguel A. Estrada
Lucas C. Townsend
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, D.C. 20036
Tel: (202) 955-8500
Fax: (202) 467-0539


Dated: August 14, 2020

Raymond J. DiCamillo (#3188)
Jeffrey L. Moyer (#3309)
Travis S. Hunter (#5350)
RICHARDS, LAYTON & FINGER, P.A.
One Rodney Square
920 North King Street
Wilmington, Delaware 19801
Tel: (302) 651-7700
Fax: (302) 651-7701

*Attorneys for Plaintiff*

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ......................................................................................... ii

INTRODUCTION ..................................................................................................... 1

ARGUMENT .......................................................................................................... 2

    I.       The United States' Stated Grounds Are Not A Proper Basis To Grant Relief Under Rule 60(b)(5) Or (6) ........................................................... 3

    II.     The Relevant Time Period For The Alter-Ego Analysis Was Before The Writ Of Attachment Issued, So The Current Conditions In Venezuela Are Irrelevant ........................................................................................... 5

    III.    The United States' Foreign-Policy Goals Are Not Material To The Standards This Court Must Apply ....................................................... 7

CONCLUSION ...................................................................................................... 15

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**CASES**

*Am. Int'l Grp., Inc. v. Islamic Republic of Iran*,
   657 F.2d 430 (D.C. Cir. 1981) ................................................................................................10

*Crystallex Int'l Corp. v. Bolivarian Republic of Venezuela*,
   932 F.3d 126 (3d Cir. 2019) ........................................................................................... passim

*Crystallex Int'l Corp. v. Bolivarian Republic of Venezuela*,
   No. 18-2797, Doc. 3113174932 (3d Cir. Mar. 1, 2019) ..........................................................13

*First National City Bank v. Banco Para El Comercio Exterior de Cuba*,
   462 U.S. 611 (1983) ................................................................................................2, 3, 8, 11

*Khulumani v. Barclay Nat'l Bank Ltd.*,
   504 F.3d 254 (2d Cir. 2007) (per curiam), *aff'd without quorum sub nom. Am. Isuzu
   Motors, Inc. v. Ntsebeza*, 553 U.S. 1028 (2008) ..............................................................10, 11

*Landgraf v. USI Film Products*,
   511 U.S. 244 (1994) ................................................................................................................5

*Mayberry v. Maroney*,
   558 F.2d 1159 (3d Cir. 1977) ................................................................................................14

*Medellín v. Texas*,
   552 U.S. 491 (2008) ........................................................................................................8, 9, 11

*NML Capital, Ltd. v. Republic of Argentina*,
   699 F.3d 246 (2d Cir. 2012), *cert. denied*, 571 U.S. 941 (2013) .......................................9, 10

*Permanent Mission of India to the United Nations v. City of New York*,
   551 U.S. 193 (2007) ................................................................................................................9

*Republic of Argentina v. NML Capital, Ltd.*,
   573 U.S. 134 (2014) ........................................................................................................2, 8, 10

*Republic of Austria v. Altmann*,
   541 U.S. 677 (2004) ........................................................................................................5, 6, 9

*Rubin v. Islamic Republic of Iran*,
   138 S. Ct. 816 (2018) ........................................................................................................2, 8

*Socialist Republic of Romania v. Wildenstein & Co.*,
   147 F.R.D. 62 (S.D.N.Y. 1993) ................................................................................................4

*Taylor v. Sturgell*,
   553 U.S. 880 (2008)...................................................................................11

*Ungaro-Benages v. Dresdner Bank AG*,
   379 F.3d 1227 (11th Cir. 2004) .............................................................10, 11

**STATUTES & RULES**

8 *Del. C.* § 324 ............................................................................................7

10 *Del. C.* § 5031 ........................................................................................7

28 U.S.C. § 1602 ..........................................................................................2

28 U.S.C. § 1605(a)(1)..................................................................................6

Fed. R. Civ. Pro. 60.........................................................................3, 7, 8, 14

Fed. R. Civ. Pro. 60(b)...................................................................1, 2, 4, 15

Fed. R. Civ. Pro. 60(b)(5) ...............................................................3, 4, 5

Fed. R. Civ. Pro. 60(b)(6) ...............................................................................4

FSIA ............................................................................................... passim

**OTHER AUTHORITIES**

Reuters, *Guaidó calculates the Central Bank of Venezuela has $2.5 billion abroad*,
   (Aug. 6, 2020) available at:
   https://tinyurl.com/yy9bjmhy ...................................................................15

Jonathan Swan, *Guaidó, Would Consider Meeting Maduro*, Axios
   (June 21, 2020) available at:
   https://tinyurl.com/y93z9or6...................................................................13

Guidelines for the Renegotiation of the Chavez/Maduro Era Legacy Public External
   Debt, Office of the Special Attorney General of the Bolivarian Republic of Venezuela
   (July 1, 2019) available at:
   https://tinyurl.com/y68b8mpx...................................................................3

Jonathan Swan, *Trump Cold on Guaidó, Would Consider Meeting Maduro*, Axios
   (June 21, 2020) available at:
   https://tinyurl.com/y93z9or6...................................................................13

U.S. News & World Report, *U.K. Court Recognises Guaido as Venezuela's President in
   Gold Dispute*, (July 2, 2020) available at:

https://tinyurl.com/y7r8uf8y ................................................................................................13

## **INTRODUCTION**

The Court should deny the last-ditch effort of the Bolivarian Republic of Venezuela ("Venezuela") to seek extraordinary postjudgment relief under Federal Rule of Civil Procedure 60(b), D.I. 183, for the reasons set forth in Crystallex's Consolidated Opposition, D.I. 199.  This Court's legal judgment—the issuance of the writ of attachment for the shares of PDV Holding, Inc. ("PDVH")—was affirmed in full by the Third Circuit, *Crystallex Int'l Corp. v. Bolivarian Republic of Venezuela*, 932 F.3d 126 (3d Cir. 2019), and the Supreme Court denied review.  Venezuela's motion offers no valid grounds to disturb that judgment now.

The United States' eleventh-hour Statement of Interest in tepid support of Venezuela's motion, D.I. 212, does not change things one bit.  Like Venezuela itself, the United States offers no legally cognizable grounds to alter this Court's judgment, much less authority for doing so under Rule 60(b).  Indeed, its Statement directly undermines the one *legal* ground that Venezuela put forward to justify Rule 60(b) relief—the assertion that maintaining the writ would violate current OFAC regulations.  The non-legal, foreign-policy grounds that the United States does assert— derived entirely from an unsworn letter from Special Representative Elliott Abrams arguing for foreign aid to "support" a struggling regime in "economic jeopardy," D.I. 212-1, at 2—are immaterial to the standards this Court must apply under Rule 60(b), the Foreign Sovereign Immunities Act ("FSIA"), and governing Supreme Court precedent.  The United States offers no additional facts or law to support Venezuela's motion.  Courts routinely rebuff similar attempts by the Executive Branch to inject foreign policy into legal questions.  And whatever the merits of Special Representative Abrams's foreign aid request, the Executive Branch, if it agrees with Mr. Abrams, must conduct that policy by persuading Congress to appropriate funds, not by using this Court to effectively seize Crystallex's affirmed property interest in PDVH and turn it (back) over to

Venezuela without compensation.  Crystallex already had its property expropriated by Venezuela once; to impose that fate again at the U.S. government's urging would be the height of injustice.

The Court should deny Venezuela's Rule 60(b) motion, and grant Crystallex's motion for an order approving the process of sale of the shares of PDVH, D.I. 181.[1]

## <u>ARGUMENT</u>

The FSIA was enacted with the specific purpose of abandoning the prior, "executive-driven, factor-intensive" approach to questions of the immunity of foreign states.  *Republic of Argentina v. NML Capital, Ltd.*, 573 U.S. 134, 141 (2014).  Under the FSIA, immunity is "decided by courts," 28 U.S.C. § 1602, not the "executive branch," H.R. Rep. No. 94-1487, at 7 (1976), *as reprinted in* 1976 U.S.C.C.A.N. 6604, 6605.  It therefore was and is the role of this Court to apply the FSIA (as interpreted by the United States Supreme Court and the United States Court of Appeals for the Third Circuit) and related doctrines of federal common law to the facts of this case in order to determine whether Crystallex was entitled to attach and now execute upon the shares of PDVH that were determined at the time of attachment to be the property of Crystallex's judgment-debtor Venezuela.  It is *not* this Court's role to discard these statutory and common-law doctrines in order to carry out the foreign-policy preferences of the Trump Administration; such preferences were eliminated from the immunity analysis by the FSIA, and they are irrelevant to the required alter-ego analysis set forth in *First National City Bank v. Banco Para El Comercio Exterior de Cuba*, 462 U.S. 611 (1983) ("*Bancec*"), and *Rubin v. Islamic Republic of Iran*, 138 S. Ct. 816 (2018), that this Court conducted and that the Third Circuit affirmed.

In asking the Court to consider Venezuela's purported "changed circumstances" now, the

---

[1]  The Court also should deny the motion of Petróleos de Venezuela, S.A. ("PDVSA"), PDVH, and CITGO Petroleum Corp. ("CITGO") to quash the writ of attachment, D.I. 178, which is not addressed or affected by the Statement of Interest.

United States is improperly attempting to deputize the judiciary in carrying out the Executive Branch's foreign-policy objectives; indeed, the Executive Branch seeks to enlist the judiciary in foreign-aid efforts that are ordinarily and more properly accomplished through the congressional appropriations process.  Its request fails for at least three reasons: *first*, the stated grounds are not a proper basis to grant relief under Rule 60(b)(5) or (6); *second*, the relevant time period for the alter-ego analysis was before the writ of attachment issued, so even if there had been a change in the operational control that Venezuela actually exercises over PDVSA—and neither Venezuela nor the United States points to any[2]—the current conditions in Venezuela are irrelevant; and *third*, the United States' foreign-policy goals are not material to the standards this Court must apply.

## I.    The United States' Stated Grounds Are Not A Proper Basis To Grant Relief Under Rule 60(b)(5) Or (6)

Although the United States suggests weakly that the Court "could" revisit the attachment under Rule 60(b)(5) or (6), D.I. 212, at 1, the United States does not actually cite a single case applying Rule 60, much less granting relief, *see id.* at 4-8.  In fact, the United States does not put forward a *legal* argument in support of Venezuela's motion at all; rather, it merely offers its views

---

[2] For good reason.  Apart from the fact that Maduro continues to exercise much of the power that underlay this Court's findings, even outside of Venezuela, the Guaidó regime has failed to offer any compelling evidence of changed circumstances, beyond general legislative declarations of future good intentions.  In practice, the Guaidó regime's debt restructuring plan recognizes no distinction between the assets and liabilities of Venezuela and PDVSA, instead calling for "equal treatment" no matter whether "the public sector obligor" is "the Republic, PDVSA or another public sector entity."  Guidelines for the Renegotiation of the Chavez/Maduro Era Legacy Public External Debt, Office of the Special Attorney General of the Bolivarian Republic of Venezuela (July 1, 2019), *available at* https://tinyurl.com/y68b8mpx.  In litigation seeking to invalidate the 2020 bonds, the Guaidó administration contends that every single PDVSA contract with a foreign national—including presumably every oil sale to a foreign national, the bulk of what the company does—must be approved by the legislature, a degree of governmental control over PDVSA's day-to-day business that exceeds even what the Maduro regime contemplated.  *See* PDVSA Memorandum of Law in Support of Motion for Summary Judgment, No. 1:19-cv-10023 (S.D.N.Y. June 15, 2020), D.I. 117, at 30 & n.84 (seeking to avoid obligations to PDVSA bondholders by arguing that all of PDVSA's contracts required prior approval by Venezuela's National Assembly).  It would not appear that Guaidó intends to treat PDVSA as truly separate when it matters.

on the current conditions in Venezuela and the Trump Administration's strategy with respect to Venezuela.  But as Crystallex has explained, reconsideration of a final legal remedy such as the attachment is never appropriate under Rule 60(b)(5), and only rarely under (b)(6) when facts that were *material to the decision* have changed "extraordinarily," unexpectedly, and not as the result of the moving party's own choices—a far cry from the political changes put forward by the United States here.  *See generally* Crystallex's Consolidated Opposition, D.I. 199, at 7-19 (citing, *e.g.*, *Kock v. Gov't of Virgin Islands*, 811 F.2d 240, 244 (3d Cir. 1987), and *Marshall v. Bd. of Educ.*, 575 F.2d 417, 425 (3d Cir. 1978)).  "[T]hroughout history, governments change when political systems are altered or when the regime in power falls out of favor," and "a change in government . . . does not constitute an extraordinary event sufficient to support a Rule 60(b)(6) motion." *Socialist Republic of Romania v. Wildenstein & Co.*, 147 F.R.D. 62, 66 (S.D.N.Y. 1993).

Indeed, the United States did not support the sole legal ground that Venezuela put forward to justify relief under Rule 60(b): the assertion that maintaining the writ would violate the current OFAC sanctions regime.  *See* D.I. 212, at 8-13.  Rather, the Director of OFAC asserted that "[i]t is well within OFAC's licensing discretion to evaluate and determine whether to issue Crystallex's requested license" and that "OFAC's internal review of Crystallex's license application . . . remain[s] ongoing."  D.I. 212-2, at 2; *cf.* D.I. 199, at 16 (explaining Crystallex's position that "nothing pertinent has changed" in the OFAC regulations).  As a result, at the July 17 hearing, counsel for Venezuela rightly conceded in response to the Court's questioning that this argument "is no longer on the table after the submission from OFAC," because "OFAC did not take that position, and in view of the fact that OFAC didn't take it," Venezuela did not have any "basis for continuing to press that reading of the reg[ulation]."  July 17, 2020 Tr., D.I. 214, at 21:19-25.  And

4

Venezuela's remaining arguments likewise fail to meet the standard for extraordinary post-judg-

ment relief under Rule 60(b)(5) or (6).  *See* D.I. 199, at 7-19.

## II.     The Relevant Time Period For The Alter-Ego Analysis Was Before The Writ Of Attachment Issued, So The Current Conditions In Venezuela Are Irrelevant

The purported changed circumstances offered by the United States also are not material to

PDVSA's status as Venezuela's alter ego.  Nothing in the United States' brief changes the fact that

PDVSA was Venezuela's alter ego when it received Crystallex's expropriated assets for no con-

sideration, when it paid Venezuela's fees in the underlying arbitration with Crystallex, when Ven-

ezuela used it to access U.S. credit markets, when Crystallex filed its attachment motion, and when

this Court ruled on that motion.  The Third Circuit already recognized that Venezuela's attempt to

fix the relevant time at some later point is devoid of authority in support.  *Crystallex Int'l Corp. v.*

*Bolivarian Republic of Venezuela*, 932 F.3d 126, 144 (3d Cir. 2019).

The United States fails to supply the missing authority.  Notably, the United States is so

unsure of the proposition that this Court should consider PDVSA's "*current* relationship" with

Venezuela that it buries it in a short footnote and nowhere suggests that any authority cited in

*Venezuela*'s brief supports that proposition.  D.I. 212, at 6 n.3.  Instead, the only case the United

States offers—*Republic of Austria v. Altmann*, 541 U.S. 677 (2004)—is so far afield from this

issue as to confirm the complete lack of support for the proposition.  *Altmann* did not concern an

alter-ego relationship between a foreign sovereign and its instrumentality; rather, that case was

about the temporal scope of subject-matter jurisdiction under the FSIA.  *Id.* at 707.  The Court held

that the FSIA applies to conduct that occurred before the statute was enacted, so that foreign states

may be subjected to suit for such conduct when a statutory exception to immunity applies.  *Id.* at

700.  In the passage quoted by the government, the Court explained why its decision was not

controlled by the rule, articulated in *Landgraf v. USI Film Products*, 511 U.S. 244 (1994), that

"congressional enactments . . . will not be construed to have retroactive effect unless their language requires this result."  541 U.S. at 692 (internal quotation marks omitted).  The Court reasoned that applying the FSIA's waiver of immunity to suits involving pre-enactment conduct was not a "retroactive" effect because "the principal purpose of foreign sovereign immunity has never been to permit foreign states and their instrumentalities to shape their conduct in reliance on the promise of future immunity from suit in United States courts."  *Id.* at 696.  Instead, the issue was one of present effect—"aim[ed]" at "current political realities and relationships"—because immunity is about "giv[ing] foreign states and their instrumentalities some present 'protection from the inconvenience of suit.'"  *Id.* (emphasis omitted).  The United States seizes on *Altmann*'s reference to "current political realities," but in context it has nothing to do with the issues in this case.

*Altmann*—which, again, was not about alter ego at all—did not say that the *test* for immunity is based entirely on "current political realities," but rather that sovereign immunity is "aim[ed]" at "current political realities and relationships."  541 U.S. at 696.  In other words, the *purpose* of immunity, where it applies, is to protect foreign states in the present and thus to benefit the United States' "current . . . relationships."  *Id.*  It is not meant to immunize past conduct.  *Altmann* could not have meant that the test for immunity (or, for that matter, the merits of an FSIA action) must always be adjusted to account for "current political realities"—much less after final judgment.  That would be inconsistent with the plain text of the FSIA, under which past conduct is clearly relevant to both immunity and liability.  To take one example, the FSIA's waiver provision looks to whether "the foreign state *has waived* its immunity either explicitly or by implication"—past participle.  28 U.S.C. § 1605(a)(1) (emphasis added).  And the provision makes clear that a subsequent change in conduct is irrelevant because a waiver is effective "notwithstanding any withdrawal of the waiver which the foreign state may purport to effect."  *Id.*  Likewise, the FSIA's

commercial activity exception applies whenever a suit is "based upon a commercial activity carried on in the United States by the foreign state," among other circumstances. *Id.* § 1605(a)(2). The test clearly turns on the *past* conduct by the foreign state that is the basis for the suit.

By contrast, Crystallex's position—that the relevant time period is when PDVSA and Venezuela acted *before* this Court made its dispositive alter-ego finding—is supported by decades of judicial decisions as well as the purpose and legal effect of the writ of attachment itself, which is to place a debtor's property in the court's possession so that it does not change hands before execution. *See* D.I. 199, at 14-15; 10 *Del. C.* § 5031; 8 *Del. C.* § 324. It would defeat the essential purpose of attachment if a debtor could effectively dispose of the property after it was attached, yet that is precisely what Venezuela (and the United States, implicitly) argues for here. Of course, it is easy to see *why* Venezuela prefers this incorrect rule—adopting it could vindicate Venezuela and its alter ego PDVSA's strategy of using a lengthy process of appellate review as an opportunity to wash its hands of its wrongdoing. Adopting such a rule would incentivize judgment debtors to engage in endless appeals, delay, and requests to reopen the record with "changed circumstances," effectively preventing courts from *ever* allowing execution or a sale. This cannot be the law.

## III.   The United States' Foreign-Policy Goals Are Not Material To The Standards This Court Must Apply

The United States falls back on Special Representative Abrams's letter asserting without support that authorizing a sale of the shares of PDVH could "greatly damag[e]" "U.S. foreign policy goals in Venezuela." D.I. 212, at 4, 12 (quoting Abrams Letter, D.I. 212-1, at 3). But foreign-policy grounds provide no basis to reopen this Court's affirmed judgment under Rule 60. And the policy grounds offered here—Mr. Abrams's desire to facilitate foreign aid to the Guaidó regime—in no way necessitates or warrants stripping Crystallex's lien on PDVH.

A.   As a general matter, "U.S. foreign policy goals," D.I. 212-1, at 3, are simply not a

factor in the *Bancec* alter-ego analysis, even if the Court could reopen its judgment under Rule 60 now, *see* 462 U.S. at 629, 633; *Crystallex*, 932 F.3d at 140-41 (summarizing factors in *Bancec* analysis as identified in *Rubin*, 138 S. Ct. at 823). And they certainly are not a factor in the inherently judicial act of enforcing the final and unappealable judgment of a federal court.

Indeed, while the United States often asks courts to consider the foreign-policy implications of their decisions, courts routinely refuse to do so when, as here, such goals are not material to the legal standards the courts are called on to apply. For example, in *Republic of Argentina v. NML Capital, Ltd.*, 573 U.S. 134 (2014), the Supreme Court was unmoved by the United States' protestations that broad discovery orders involving foreign sovereigns would cause "a substantial invasion of [foreign states'] sovereignty" on "acutely sensitive" matters and "strongly increase the possibility" of an "affront to foreign state[s]" that could provoke "reciprocal adverse treatment of the United States in foreign courts." Br. for U.S. as Amicus Curiae 18-20, 2014 WL 827994 (U.S. Mar. 3, 2014). The United States stressed that it was "gravely concerned" about the "extraordinarily sensitive foreign policy concerns" raised by the opposing party's position, which it asserted would "threaten harm to the United States' foreign relations more generally" and "reduc[e] [international] cooperation in a variety of areas." *Id.* at 21-22, 30. But as the Court explained in response: "These apprehensions are better directed to that branch of government with authority to amend the [FSIA]—which, as it happens, is the same branch that forced our retirement from the immunity-by-factor-balancing business nearly 40 years ago." *NML*, 573 U.S. at 146.

At the July 17 hearing, this Court inquired whether the United States has, in other cases, previously made similarly dire assertions that litigants' positions "could imperil U.S. foreign policy and national security interests." July 17, 2020 Tr., D.I. 214, at 44:12-23. The answer is yes. In *Medellín v. Texas*, 552 U.S. 491 (2008), for example, the United States warned that "[t]he

8

President's freedom of action would be sharply curtailed, and the Nation hamstrung," if the Court did not approve the President's assertion of authority in an area of "sensitive foreign policy issues" relating to "managing the multifarious considerations implicated by a critical bilateral relationship like that between the United States and Mexico."  Br. for U.S. as Amicus Curiae 6, 11-12, 2007 WL 1909462 (U.S. June 28, 2007).  But the Supreme Court rejected the United States' legal position, holding instead that the President "may not rely upon a non-self-executing treaty to 'establish binding rules of decision that preempt contrary state law.'"  *Medellín*, 552 U.S. at 530.  Though the Court "d[id] not question" the President's assertions of foreign-policy expertise, "[s]uch considerations" did "not allow [the Court] to set aside first principles" of law.  *Id.* at 524.

Likewise, in *Altmann*, the United States asserted a "particularly strong interest in questions respecting the FSIA's retroactive application, which carry the potential for serious adverse effects on our Nation's foreign relations," and argued that "[t]he court of appeals' contrary conclusion . . . depart[ed] from settled understandings in the international community" to create a risk of "serious consequences for the United States' conduct of its foreign relations, including reciprocal treatment of the United States in foreign courts."  Br. for U.S. as Amicus Curiae 1, 29, 2003 WL 22811828 (U.S. Nov. 14, 2003).  But the Supreme Court nonetheless affirmed the court of appeals' decision, explaining that "the United States' views" on the "interpretation of the FSIA's reach" "merit no special deference," because the question was one of "statutory construction" and therefore "well within the province of the Judiciary."  *Altmann*, 541 U.S. at 701 (internal quotation marks omitted).

Similar cases abound.  *See, e.g.*, *Permanent Mission of India to the United Nations v. City of New York*, 551 U.S. 193, 202 (2007) (holding India was subject to suit under the FSIA, despite the United States' amicus brief asserting that the government had a significant interest in India's immunity due to risk of foreign retaliation against U.S. property abroad); *NML Capital, Ltd. v.*

*Republic of Argentina*, 699 F.3d 246, 263-64 (2d Cir. 2012) (rejecting the United States' amicus argument that "the district court's judgment [would] have the practical effect of enabling 'a single creditor to thwart the implementation of an internationally supported restructuring plan'"), *cert. denied*, 571 U.S. 941 (2013); *Khulumani v. Barclay Nat'l Bank Ltd.*, 504 F.3d 254, 259, 263 (2d Cir. 2007) (per curiam) (explaining that the United States' assertion of the political question doctrine was not dispositive, notwithstanding the inherent foreign-relations issues), *aff'd without quorum sub nom. Am. Isuzu Motors, Inc. v. Ntsebeza*, 553 U.S. 1028 (2008); *Ungaro-Benages v. Dresdner Bank AG*, 379 F.3d 1227, 1232, 1236 (11th Cir. 2004) ("A statement of national interest alone, however, does not take the present litigation outside of the competence of the judiciary."); *Am. Int'l Grp., Inc. v. Islamic Republic of Iran*, 657 F.2d 430, 433, 435-36, 445 (D.C. Cir. 1981) (despite Statement of Interest asserting that, "should the judiciary refuse to free Iranian assets, 'the whole structure of the agreements [at issue] may begin to crumble, and there could be set in motion a series of actions and reactions that would have serious consequences both for the claimants and for the foreign policy of the United States,'" the court rejected the United States' argument and concluded that "this intrusion on the judicial process is not warranted").

At the July 17 hearing, counsel for Venezuela attempted to distinguish certain of these decisions by claiming that they "were all cases about statutory interpretation or treaty interpretation." July 17, 2020 Tr., D.I. 214, at 51:4-5. That is incorrect: The Second Circuit in *NML*, for example, rejected the United States' position on a "question of contract interpretation" under New York common law, 699 F.3d at 258 (internal quotation marks omitted), and also applied general equitable principles to reject an asserted laches defense and affirm the appropriateness of injunctive relief, *id.* at 260-62, in addition to separately addressing a statutory question under the FSIA, *id.* at 262. Other relevant cases have involved "prudential justiciability doctrine[s]" such as "the

10

'political question' doctrine" or "'international comity.'"  *Khulumani*, 504 F.3d at 261-62; *see also Ungaro-Benages*, 379 F.3d at 1236 (political question).  The Supreme Court in *Medellín* also rejected the United States' views on the interpretation of the Constitution.  552 U.S. at 525-32.  And more fundamentally, the views of the United States are no more relevant to the legal questions here—including the relevant time for determining whether PDVSA is Venezuela's alter ego, and the application of *Bancec* to the relevant facts—than they are to questions of statutory and treaty interpretation.  The Third Circuit and the Supreme Court have already recognized that the Executive Branch's views are neither relevant nor particularly useful in applying the *Bancec* standard by refusing to indulge Venezuela's repeated pleas to call for the views of the Executive Branch.  And it would intrude on the judicial process for the Court to elevate those views above the legal standard that the law requires it to apply.  If anything, the fact that the *Bancec* analysis developed under federal common law cuts *against* Venezuela, because that is a body of law that "federal courts," including the Supreme Court, have "ultimate authority to determine and declare," *Taylor v. Sturgell*, 553 U.S. 880, 891 (2008), in contrast to statutes and treaties, which are the product of—and reflect the policy views of—the political branches.

There is a proper forum for the Executive Branch to consider the foreign-policy impact of the sale, but these judicial proceedings are not it.  As the Third Circuit already recognized in this case, "The Treasury sanctions provide an explicit mechanism to account for" the "short- or long-term U.S. foreign policy interests [that] may be affected by attachment and execution of PDVSA's assets."  *Crystallex*, 932 F.3d at 151.  Specifically, the OFAC licensing process allows the Executive Branch to consider whether transactions involving foreign property implicate the interests of the United States Government, and if so, what lawful restrictions should be placed on the transaction.  Indeed, OFAC's submission makes clear that any concerns related to the sale will be

11

considered in the Executive Branch's licensing process.  D.I. 212-2, at 2.  The United States acknowledges as much in its Statement of Interest, D.I. 212, at 9-13, but nevertheless urges the Court to vacate the attachment because that could relieve it of its obligation to consider Crystallex's detailed and thorough application for a specific license, *id.* at 10 & n.4, and, it hopes, avoid the takings and other liability risks associated with denying Crystallex's application for a license.  The Executive Branch presumably is aware that actions it might take to deprive Crystallex of its property rights could expose the United States itself to liability, including potential claims under NAFTA.  It hopes that this Court will relieve it of any need to decide by vacating the writ— though it proffers zero legal basis for that action—or by putting off indefinitely any decision on sale procedures.  But it has given this Court no good reason to do either.

B.      Even if consideration of foreign policy might be relevant in some cases, the policy grounds asserted here are neither supported nor persuasive.  The concerns in Special Representative Abrams's unsworn letter relate only to the "sale" of the property, not to maintenance of the writ.  D.I. 212-1, at 3.  They have no bearing on whether the existing writ issued by this Court should remain in place until a sale is ultimately allowed.  Circumstances in Venezuela remain fluid, and the Executive's policy views could change at any minute.  Guaidó has done little to solidify his rule, and if anything his claim to power has weakened over time.  *Compare Crystallex*, 932 F.3d at 135 n.2 (noting in July 2019 that "[a]s a practical matter, there is reason to believe that Guaidó's regime does not have meaningful control over Venezuela or its principal instrumentalities such as PDVSA"), *with* D.I. 212-1, at 1, 3 (noting in July 2020 that the Maduro regime "continues today" and still exercises "de facto power in Caracas").  Guaidó's efforts to replace Maduro could collapse at any time, and the United States could withdraw support.  In fact, recent reports suggest that President Trump's support for actively backing Guaidó has waned of late, now that

former National Security Advisor Bolton—a key backer of the existing policy—has left office and fallen out of favor with the President. *See, e.g.*, Jonathan Swan, *Trump Cold on Guaidó, Would Consider Meeting Maduro*, Axios (June 21, 2020), *available at* https://tinyurl.com/y93z9or6. Special Representative Abrams suggests that U.S. policy remains unchanged, D.I. 212-1, at 2, but the Secretary of State has submitted no statement, and it is ultimately the President who will decide whether the current sanctions are worth maintaining. The President's views could change with or without a change in circumstances, or a later administration could take a different approach altogether. Regardless of how Crystallex's current license application is decided—as to which the OFAC letter offers only speculation, D.I. 212-2, at 2—the writ should remain in place so that Crystallex will not be forced to start over after years of litigation and exhaustive appellate review.

Further, if the Executive Branch were concerned about *maintaining* the writ—in contrast to the irrelevant concerns regarding the ultimate sale asserted in Special Representative Abrams's letter—it could have raised those concerns at any time to this Court or the Third Circuit following the August 2018 order issuing the writ, or after Venezuela first invoked the Executive Branch's policy change regarding Guaidó in March 2019. Mot. for Leave to Intervene and to Stay Proceedings 2, *Crystallex Int'l Corp. v. Bolivarian Republic of Venezuela*, No. 18-2797, Doc. 3113174932 (3d Cir. Mar. 1, 2019) (citing "the Executive Branch's foreign policy objectives"); *cf. Crystallex*, 932 F.3d at 151 (noting that "the U.S. State Department has not sought to provide a statement of interest"). At the very least, the Executive Branch could have expressed those concerns before the parties incurred the expense of briefing Venezuela and PDVSA's petitions for rehearing and petition for certiorari, multiple rounds of stay briefing, and briefing on the sale process based on a Third Circuit decision that the government made no effort to stop or reverse until the eve of oral argument before this Court nearly one year later. The Executive Branch's long silence makes clear

13

that it did not view the writ as a threat to its interests.  The main alleged change in circumstances—Guaidó's ascendance as Interim President—happened more than a year and a half ago in January 2019.  *See* D.I. 212-1, at 2.  The government's belated assertion that the status quo that has existed for at least eighteen months is now intolerable to U.S. policy and requires extraordinary relief under Rule 60 thus rings hollow in the extreme.

In any event, if the Executive Branch believes that the OFAC licensing process does not adequately advance its policy goals and that more is needed to support Guaidó or the people of Venezuela, it can take those concerns to Congress.  Crystallex already had one government—the Chávez regime—expropriate its property for the supposed interests of the Venezuelan people.  All Crystallex has left is a judgment and an attachment to enforce it (*i.e.*, a lien, which is a legal property interest).  Taking away that property—and leaving the judgment potentially unenforceable—to serve the policy interests of the U.S. government in providing aid and support to Venezuela would be no different than what Venezuela did to Crystallex's gold mine.  If the Executive Branch seeks to transfer assets to Guaidó to shore up his control of CITGO and ultimately of Venezuela, it should seek an appropriation from Congress through normal channels and use this country's own assets, not Crystallex's, to accomplish that goal.  It should not try to enlist the judiciary to do its dirty work by taking away the lien Crystallex fought for at great expense years after the fact.

**C.**     Finally, the United States fails to acknowledge the costs of reconsideration.  As the Third Circuit has said, there is an "overriding interest in the finality and repose of judgments," which only "extraordinary" and truly "exceptional circumstances" can "overcome."  *Mayberry v. Maroney*, 558 F.2d 1159, 1163-64 (3d Cir. 1977) (internal quotation marks omitted).  Indeed, the public has a strong interest in a functioning judiciary that will enforce the final and fully-affirmed judgments of its courts, without forcing creditors to endure endless and expensive re-litigation.

14

Venezuela is an adjudicated expropriator that indisputably owes Crystallex nearly one billion dollars, yet the Maduro regime and now the Guaidó regime have led Crystallex on a years-long chase through the courts, employing a variety of misleading tactics along the way in order to avoid paying what is long overdue.  Indeed, Venezuela could avoid a sale altogether—eliminating its and the United States' purported concerns—by repaying Crystallex *today* if it wanted to.[3]  But Venezuela prefers to withhold payment, in hopes that its delay will be rewarded with better terms.

Just as the Executive Branch can advance its interests within its proper sphere—the OFAC licensing process—this Court should uphold the strong judicial interest in finality and the voluntary payment of judgments.  As the Third Circuit recognized, "Venezuela owes Crystallex from a judgment that has been affirmed in our courts.  Any outcome where Crystallex is not paid means that Venezuela has avoided its obligations." *Crystallex*, 932 F.3d at 149.  The time for Venezuela to pay its obligations is now.

## CONCLUSION

For the foregoing reasons, the Statement of Interest submitted by the United States does not alter the Court's analysis of Venezuela's Rule 60(b) motion or Crystallex's motion to authorize a sale of the shares of PDVH, and should not change the outcome:  The Court should deny Venezuela's request for extraordinary post-judgment relief, and grant Crystallex's request to authorize the next steps in the process of executing on the judgment.

---

[3]  Recent economic reports confirm that Venezuela (and specifically the Guaidó regime) could satisfy its debt to Crystallex right now if it wanted to.  Even apart from the value of its CITGO holdings, the ad hoc administrative board of the Central Bank of Venezuela, appointed by the Guaidó government, has approximately $2.5 billion in available assets outside of Venezuela. *See Guaidó calculates the Central Bank of Venezuela has $2.5 billion abroad*, Reuters (Aug. 6, 2020), *available at* https://tinyurl.com/yy9bjmhy, *translated by* Google Translate.  Indeed, Venezuela's reply brief cited a report indicating that Guaidó has control of over $1 billion worth of gold in the United Kingdom.  D.I. 203 at 4 n.3 (citing *U.K. Court Recognises Guaido as Venezuela's President in Gold Dispute*, U.S. News & World Report (July 2, 2020), *available at* https://tinyurl.com/y7r8uf8y).

OF COUNSEL:

Robert L. Weigel
Jason W. Myatt
Rahim Moloo
GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue
New York, New York 10166
Tel: (212) 351-4000
Fax: (212) 351-4035

Miguel A. Estrada
Lucas C. Townsend
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, D.C. 20036
Tel: (202) 955-8500
Fax: (202) 467-0539

Dated:  August 14, 2020

*/s/ Jeffrey L. Moyer*
Raymond J. DiCamillo (#3188)
Jeffrey L. Moyer (#3309)
Travis S. Hunter (#5350)
RICHARDS, LAYTON & FINGER, P.A.
One Rodney Square
920 North King Street
Wilmington, Delaware 19801
Tel: (302) 651-7700
dicamillo@rlf.com
moyer@rlf.com
hunter@rlf.com

*Attorneys for Plaintiff*

16