**ADELSO ADRIANZA**

113 Washington Street – Newton, MA 02458 – U.S.A.
M: (859) 803-2279 | aaadrianza@gmail.com

November 6, 2020

The Honorable
George R. Strathy,
Chief Justice of Ontario
Court of Appeal for Ontario
Osgoode Hall
60 Queen Street W.
Toronto, ON M5H 2M3
Canada

Dear Chief Justice Strathy,

I am a shareholder of and writing to you in reference to Crystallex International Corporation (the Company) and its appeal to the Ontario Superior Court of Justice – Commercial List regarding the CCAA Court's order denying the Company's request to continue sealing case documents as confidential. In several communications to the CCAA Court, the Monitor and the Company, I have decried the excessive secrecy in this CCAA case since the beginning because of the unwarranted vulnerability it imposed on the Company's stakeholders and the distorted incentives it provided to a Board of Directors (BOD) dominated by self-interested members. I have also repeatedly denounced the lack of adequate legal representation afforded to the Company's shareholders to ensure their interests are protected; this especially considering the self-evident conflict of interest of four of the five Directors.

It is perilous to underestimate the harm self-interested Directors in control of a company can cause to its stakeholders when enabled to pursue their self-interest in a legal vacuum that prevents the stakeholders from making sure their fiduciaries are kept up to their duties. The list of actions and omissions by the Interested Directors detrimental to the Company is long and have been discussed in detail in my previous communications to the CCAA Court, the Company, the Monitor, and the Delaware District and Bankruptcy Courts. Therefore, I will limit the discussion that follows to the most relevant points in relation to the unwarranted secrecy in the Company's CCAA proceedings and the resulting harm to the interests of the Company in general and the shareholders in particular.

## THE FACTS

### The CCAA Filing

The Board of Directors filed for bankruptcy purportedly to protect the Company from being taken over by the Noteholders and to pursue a $3.4 billion arbitration award against Venezuela for the illegal cancellation of the Las Cristinas mining operating agreement (MOA). The CCAA filing was predicated and approved on the grounds that:

    a) The Company needed to stay all legal proceedings while pursuing the ICSID arbitration award and reorganizing its operations to protect the company for the benefit of its stakeholders,

b) The Company's conviction that an arbitration award for as low as $US 500 million would suffice to pay fully all the Company's debt, the arbitration and operating costs involved, and allowed it to return a significant amount to its shareholders. Importantly, the distribution waterfall in the Credit Agreement between the DIP Lender and the Company provided for the residual value of the Net Arbitration Award (NAP) – the net amount of the arbitration award remaining after paying:

  I. the taxes owed
  II. the Directors' and Administration charges,
  III. 100% of the financing debt (including the DIP loan, the unsecure notes and all other verified claims) and the interest owed,
  IV. the projected arbitration, restructuring and operating expenses,
  V. the Management Incentive Plan (MIP),
  VI. the DIP Lender's entitlement to the NAP (35%).

The residual NAP (65%) accrued to the Company as a going concern, i.e., liquidation was not explicitly planned for then, and was only disclosed in the recent appeal to the Ontario Court of Appeals - ONCA. The Company is required to use fund from the residual NAP to pay the cost of:

  I. the CCAA and the Chapter 15 proceedings, and
  II. the pre- and post-filing legal fees incurred by the noteholders' Trustee to protect their rights in the Ontario courts. The Company defeated the Trustee's legal actions, yet it agreed to cover the Trustee's costs.

c) The pursuit of the arbitration award was warranted by the strong legal case against Venezuela and the Republic's past willingness to settle and pay arbitration awards,

d) The $3.4 billion claim against Venezuela for a gold mine with close to 17 million ounces of proven and probable gold reserves worth $US 20 billion was not guaranteed, but highly probable,

e) The high probability of a successful arbitration award worth as low as $US 500 million and the Company's $US 160 million total debt at the end of 2012 made it appropriate to consider the interest of the shareholders in the initial order,

f) The ultimate objectives of the CCAA filing approval was to:

  I. Enable the Company's financial rehabilitation through the pursuit of the arbitration claim,

  II. Protect and maximize the Company's property,

  III. Ensure the equitable distribution of the Company's assets among its stakeholders.

In the Reasons re Initial Order, Dec. 27, 2011, Justice Newbould stated:

> [20] *The CCAA is intended to provide a structured environment for negotiation of compromises between a debtor company and its creditors for the benefit of both. Where a debtor company realistically plans to continue operating or to otherwise deal with its assets but it requires the protection of the court in order to do so and it is otherwise too early for the court to determine whether the debtor company will succeed, relief should be granted under the CCAA. See Re Lehndorff General Partner*

*Ltd, (1993), 17 C.B.R. (3d) 24, per Farley J, the benefit to a debtor company could, depending upon the circumstances, mean a benefit to its shareholders.*

### The DIP Financing

According to the case records, the DIP financing was meant to enable the pursuit of the arbitration claim to advance the objectives of the CCAA filing. The auction implemented for the DIP financing selection that favored Tenor Capital Management (the DIP Lender) was concluded under the following terms:

a) Total financing commitment for $US 36 million, which was purportedly estimated by the Company's arbitration counsel as the amount required to pursue and collect the claim against Venezuela over a three-year period,

b) 10% p.a. PIK interest and an entitlement to 35% of the NAP,

c) The Board of Directors was reduced from eight to five members and recomposed with two Tenor Management Capital nominee directors (Mr. R. Shah, and Mr. D. Kochav, Tenor's CEO and COO, respectively), two inside directors (Mr. R. Fung and Mr. M. Oppenheimer, the CEO and Chairman of the BOD and a former President and CEO, respectively), and an independent Director (Mr. H. Near until recently, following his resignation, and Mr. S. Marchi currently after being appointed recently to replace Mr. Near),

d) The DIP loan could not be paid off without the DIP Lender's consent and was to be deposited, together with the DIP Lender's share of the NAP, in a bank account in the Company's name for the exclusive benefit of the DIP Lender. Interest earned on the deposited funds accrue to the DIP Lender,

e) The payment of the DIP loan and the DIP Lender' share of the NAP is to be made over time per the DIP Lender's indications for it to avoid breaching the Canadian Criminal Interest Rate statute (Section 347 of the Canadian Criminal Code). Entering into financing arrangement or receiving interest compensation exceeding 60% per annum is deemed a criminal interest rate offence punishable by fine and imprisonment. When calculating breaches of Section 347, Canadian courts rely on actuarial calculations that by law must include all proceeds related to the loan, e.g. interest, any and all fees, fines and penalties, special or contingent compensation (e.g. CVRs) and the like.

f) The Preliminary and the final DIP Credit Agreements foreclosed any possibility for the Company to obtain financing from a source other than Tenor,

g) The Company spent the $US 36 million DIP loan in just over a year and obtained $40 million additional DIP financing from Tenor for an additional 53% share of the NAP, for a total $US 76 million loan and 88% share of the NAP. The latter is estimated at over $US 1 billion, assuming the collection of the full award and the pre- and post-award interest due ($US 1.6 billion),

The arbitration award was issued in April 2016, over four years after the Company filed its ICSID arbitration request.

### The Self-interested Actions & Omissions

The Director's self-interested acts and omissions are many, started before the CCAA filing and

continue to this date; some are publicly known, while others remain undisclosed. The list below is a partial list of those publicly known:

a) The terms of the DIP financing agreement were negotiated and agreed between Tenor and members of the Company's former and current BOD months before the CCAA filing. The Company had been exploring long-term financing opportunities for over a year prior to the CCAA filing to fund the pursuit of the arbitration award but chose to pursue Tenor's financing offer.

b) A Management Incentive Plan (MIP) proposed by the Interested Directors potentially worth $US 80 to 100 million was approved to benefit a selected number of the Company's officers and Directors. The MIP was originally tied to the shareholders' share of the NAP and set at 25% of the residual NAP to be distributed to the Company. The dilution of the shareholders' NAP share through the subsequent DIP Loan increases and the resulting increase of the DIP Lender's NAP share from 35% to 88% resulted in a NAP Transfer agreement between the Interested Directors and the DIP Lender geared to make the former whole,

c) The Company passed on the opportunity to execute a writ of attachment it obtained from a New York court in June 2017 on $US 710 million worth of Nomura Bank notes owned by Venezuela and held for sale by Nomura Securities in New York, which would have enable it to a) pay off all the outstanding debt at the time, b) emerge from Insolvency as a going concern and d) continue the arbitration award collection efforts. However, the execution of the attachment was not in the best interest of the DIP Lender and the Interested Directors, given that it would have triggered breaches of Canadian laws by an earlier-than-anticipated execution of the NAP distribution scheme in the Credit Agreement. The Nomura notes attachment was set aside to pursue the first settlement agreement with Venezuela that was announced in mid-September 2017, and which Venezuela did not honor by failing to make an initial $US 25 million payment due the same month.

d) The BOD and the Noteholders entered into a standstill agreement geared to avoid the implementation of a Plan of Arrangement, which involved paying post-petition interest on the unsecured notes at a rate over 20% p.a. versus the 10% contracted rate. Post-petition interest is disallowed by the Canadian bankruptcy laws unless included in a court-approved Plan of Arrangement and limited to the higher of the contracted rate or 7% p.a.,

e) The Company filed for CCAA protection purportedly to pursue the arbitration award and collection to enable it to pay back its debt and the interest due on a dollar for dollar basis, and to emerge from insolvency. However, the terms of the Credit Agreement with Tenor inexorably lead to the liquidation of the Company following the collection and distribution of the arbitration award. This realization seemingly compelled the Ontario Court of Appeals (ONCA) to include the following statement in its shareholders oppression case decision:

> "[25] *In closing, we note that DIP financing was originally conceived to fund operations while a company under CCAA protection restructured. The disposition of this motion should not be interpreted as an endorsement or a rejection of the amendments approved by Newbould J.*"

f) The BOD opposed the approval of and funding for adequate shareholder legal representation in the CCAA proceedings in spite of the fact that four of its five members had conflicting interests as a result of the their self-interested goals as the CEO (R. Shah) and the COO (D. Kovach) of Tenor, and the NAP transfer agreement between R. Fung and M. Oppenheimer and Tenor.

Here is important to note that a Shareholders Committee (the Committee) was formed in March 2018 by several investors concerned by the lack of adequate representation in the CCAA proceedings. The Committee represented over 30% of the outstanding shares through an opt-in process and managed to get legal representation on a contingent basis seeking to redress the harm suffered by the shareholders. The Committee's legal counsel, Gowling WLG LLP, pursued a shareholders' oppression claim before the ONCA in June 2018 that was unsuccessful since, in the Court's opinion, it could not reversed the CCAA Court orders deemed to have caused the harm to the shareholders because the legal action was "too little too late". Gowling's legal representation agreement with the Committee ended after the shareholder oppression decision and, according to a member of the Company's legal counsel team, they withdrew from the case in January 2019.

### Other Important Facts

The once probable arbitration award is today a legal certainty. The U.S. Supreme Court's decision to deny certiorari and to review the rulings by the Delaware District Court and the Third Circuit Court of Appeals made these final. In addition, the U.S. Justice Department acknowledged the validity of the Company's claim against Venezuela; while asking the Delaware District Court to delay the execution of a writ of attachment on Venezuela's CITGO shares to avoid conflict with "U.S. interests". While the Company's right to the award is certain, the timing of its collection in full is an open question and depends on the Delaware District Court's decision on the execution of the writ of attachment.

In 2018 – 2019 the Company received cash payments for close to $US 100 million from Venezuela and a portion of Huntington Ingalls' attachment of a Venezuelan Defense Ministry account at the Bank of New York Mellon. Prudently managed, these funds should be enough to fund the company's collection efforts for several years. In addition, the $US 350 million in bonds received from Venezuela and the over $US one billion outstanding award balance to be collected provide the balance sheet strength to secure regular financing if needed.

### The Harm to the Shareholders Caused by Excessive and Unwarranted Confidentiality

The ongoing and unprecedented number of sealing orders in the Company's CCAA case have injured and continues to harm the shareholders' interests. The CCAA proceedings have been cloaked in secrecy from the outset, which has prevented the shareholders from protecting their interests. Consequently, the shareholders' interests have been made vulnerable to acts and omission by the BOD that resulted in the shareholders' legitimate expectation being oppressed and their interests being disregarded.

When shareholders decide to invest their retirement funds, college education savings and the like, they hold several expectations that underscore their decision. And if the reasonableness of such expectations is in doubt, rational shareholders who depend on their savings for retirement or their children's education purposes will refrain from exposing their savings to undue risk. It is for good reason that small individual investors hold dear several fundamental expectations:

1.- The right to:

    a. Having proportionate participation in earnings,
    b. Sharing in the Stock's appreciation,
    c. Receiving ongoing honest and transparent communications from the company,
    d. Getting and exercising their voting rights,
    e. Being able to sell the stock when their legitimate expectations are not met.

2. The reliance on the shareholders' ability to appoint a board of directors fully committed and dedicated to charting the company's future and living up to their duty as fiduciaries to:

    a. Protect and advance the company's and its stakeholders' best interest,
    b. Act loyally and with care in discharging their responsibilities,
    c. Abide by the company's bylaws and governance policies,
    d. Plan and chart the long-term viability of the business,
    e. Keep the shareholders adequately informed about the affairs of and decisions affecting the company and the shareholders' interests,
    f. Protect and use the company's property to advance the long-term operations and viability of the business,
    g. Inform and obtain the shareholders' approval for fundamental changes to the company's equity structure.

The CCAA filing and the continued secrecy in the CCAA proceedings have allowed a self-interested BOD to set aside their duties as fiduciaries towards both the company and its shareholders despite two inescapable facts: 1) the Company has had all along the undisputable right to receive compensation potentially worth billions of dollars for the illegal cancellation of the Mining Operation Contract (MOA), and 2) the Company's liabilities at the time of filing for CCAA protection amounted to $US 160 million.

The undisputable right to the arbitration compensation worth at least $US 1.6 billion (the final amount can only be determined once full payment is received and the post-award interest due is calculated) was sealed and delivered by the U.S. Supreme Court's certiorari denial and the U.S. Department of Justice acknowledging the Company's right to collect the award (although the DOJ would rather delay the collection to protect current "U.S. Interests"). Hence, the validity of the award and the right to the corresponding compensation are indisputable; and its full and effective collection is only a question of the efforts and time required to execute it.

### The Fiduciary's Duties

"The basic function of the fiduciary concept is well-known: fiduciaries are obliged to abnegate all self-interest, as well as those of third parties, and focus solely on the best interests of their beneficiaries. This requires that fiduciaries not benefit themselves or third parties, whether financially or otherwise, from their positions as fiduciaries, nor confer a benefit upon third parties at the expense of their beneficiaries' interests if the latter are tangibly related to the fiduciary nature of the parties' interaction. These prohibitions are enforced by the fiduciary rules against conflicts of interest. The rule against conflicts includes both conflicts of interest and conflicts of duty, such that any combination of these two can give rise to the prohibition. The correlation to the strict duties imposed on fiduciaries is that their beneficiaries are entitled to rely upon the fiduciaries' good faith in discharging their duties without the need for this performance to be monitored."

Source: Understanding Fiduciary Duties and Relationship Fiduciarity, Leonard I. Rotman, McGill Law Journal, Volume 62:2 Jun. 2017 p. 984.

While well-known, the proper discharge of a fiduciary's duties is not guaranteed. Holding a fiduciary such as BOD members up to their duties requires ongoing scrutiny by its beneficiaries and the entities entrusted with the protection of the public interest and the enforcement of the applicable laws. Unrestricted ongoing secrecy runs counter to the accountability and transparency required towards this end. Only under such conditions can a fiduciary carry out detrimental actions and omissions against the interests of his beneficiaries, which in the instant case are the Company, its estate and its shareholders. This is made self-evident by the BOD's known acts and omissions listed below:

1. Freezing out of and depriving the shareholders of their proportionate rights to share the fruits of their US$ 500 million investment in the company to finance the development of the Venezuelan mining operation, while
   a. Making misrepresentations about the DIP financing process not being allowed to exceed more than half of equity participation by the selected DIP lender,
   b. Not allowing the shareholders to participate in the DIP financing process to enable them to maintain their proportionate rights despite the DIP Lender's commitment to do so.
2. Implementing a total and continued shareholder black-out that started right before the CCAA filing. The Company:
   a. Provided no notice to shareholders of the impending and the executed CCAA filing. It purportedly published a notice ex-post in two journals and on its website that neither I nor hundreds of individual investors ever saw or heard about,
   b. Requested and obtained a court order to discontinue the annual shareholders' meeting and reporting the Company's state of affairs,
   c. Issued no information to the shareholders regarding the BOD's plans and the Company's financial status neither prior nor after the CCAA filing,
   d. Allowed the delisting of the Company's shares from all stock exchanges even though listing could be transferred and maintained on the Pink Sheets and OTC markets. This prevented the shareholders from exercising the last option they have to extricate themselves from a BOD that disregards their interests,
   e. Allowed and enabled the disproportionate dilution of the shareholder's equity holdings that reduced their $US 500 million investment in the Company from 100% to less than a 10% minority interest for a $US 76 million DIP loan and by allowing the DIP Lender to convert its CVR to 88% of the common stock.
   f. Granted the DIP Lender stock voting rights prior to exercising the CVR conversion to common stock and diluted the shareholders' pecuniary rights without any consideration for Company property not covered by the Credit Agreement (the mining data) and the tax benefits available only for the benefit of the shareholders that incurred the loss (the tax loss carry-forward), which by Canadian tax law expire upon a change of control,
   g. Approved the gifting of estate property worth hundreds of millions of dollars by giving away the mining data to Venezuela (over US$ 300 million), paying

excessive post-petition interest ($US 50 million), giving up the pre- and post-award interest on the arbitration award (US$ 340 million), allowing the DIP Lender to benefit from the available tax loss carry-forward deductions ($US 120 million) and risking the disallowance of this tax benefit upon a change in control at the expense of the legacy shareholder,

3. Failed to discharge its responsibility to adequately manage the financial and operating risks involved with the gold mining investment in Venezuela:

   a. The expropriation thread was made public by high-ranking Venezuelan government officials years prior to its execution,

   b. The BOD failed to prepare the company to deal with and provide for the resources needed to protect its rights. BODs of companies in similar situations (e.g. Gold Reserve and Rusoro Mining) planned and executed measures to protect the companies' interest and those of their stakeholders. Thus, these companies:

      i. Were adequately financed to pursue the arbitration award and collection,

      ii. Maintained their stock listing on the U.S. and Canadian stock markets,

      iii. Continue to provide timely reports on the status of the company's efforts to collect the arbitration award.

   c. The BOD failed to take action to protect the Company's property and rights after Venezuela rejected the approval of the environmental permit required to operate the mine, which effectively cancelled the MOA. The BOD waited two years to file for ICSID arbitration, three times longer than Rusoro and twice longer than Gold Reserve, which filed the arbitration claims as soon as the required six-month arbitration notice waiting period expired,

According to the CBCA, the directors' duty of care requires a director to "exercise the care, diligence and skill that a reasonably prudent individual would exercise in comparable circumstances." The failure to prepare the company to deal with the impending expropriation is a clear breach of the duty of care.

4. Enabled the DIP Lender's de facto control over the Company through the DIP loans and the NAP sharing agreement with two non-independent Company Directors:

   a. The interim and final DIP loan terms precluded any DIP financing from a source other than Tenor and thereby gave Tenor de facto control over the company from that point onwards through the no-cancellation clause, the CVR conversion to common stock, the four interested directors on a five-directors BOD,

   b. The NAP sharing agreement provides for over US$ 80 million to R. Fung (CEO and Chairman) and M. Oppenheimer to compensate them for the diminished Management Incentive Plan (MIP) as a result of the dilution of the estate's residual NAP share from 65% to 12%. The MIP share was set at up to 25% of the residual NAP share,

- c. The NAP sharing agreement made the two non-independent Company Directors beholden to Tenor's interests. This resulted in four of the five BOD members becoming Interested Directors,

- d. Contrary to well-established corporate governance practice, the Company's by-laws allow BOD members to pursue their own self-interest if they a) disclose their self-interest and b) comply with the CBCA rules in that regard. However, the CBCA Director abdicates his duty to enforce the mandate to regulate Canadian business corporations and protect the integrity of the business environment in the public interest once a company files for bankruptcy protection. The Ontario Securities Commission (ONSC) does the same. The CBCA and the ONSC Directors do so by transferring their responsibilities to the CCAA/BIA courts, whose function and mandate is not necessarily to protect the shareholders' interests. This is one of the reasons why the U.S. Bankruptcy Code requires the appointment of a Trustee to protect the estate's interests.

5. The Supreme Court of Canada noted in *Peoples Department Stores v. Wise* that the statutory fiduciary duty under the CBCA (and similar provincial statutes) requires that directors:

    I. Act honestly and in good faith vis-à-vis the corporation,

    II. Respect the trust and confidence that have been reposed in them to manage the assets of the corporation in pursuit of the realization of the objects of the corporation,

    III. Avoid conflicts of interest with the corporation,

    IV. Not abuse their position for personal benefit,

    V. Maintain the confidentiality of information they acquire by virtue of their position, and

    VI. Serve the corporation selflessly, honestly and loyally.

Section 122(1) of the CBCA provides that:
*Every director and officer of a corporation in exercising their powers and discharging their duties shall act honestly and in good faith with a view to the best interests of the corporation.*

a) At a minimum, in advancing the "best interests of the corporation" the directors' fiduciary duty requires that they:

    I. Advance the long-term interests of the corporation, i.e. protect its going-concern status,

    II. Ensure that the corporation meets its statutory obligations, e.g. the CBCA and the ONSC regulations,

    III. Protect and manage prudently the company's property,

    IV. Provide for adequate corporate governance and business oversight,

b) By advancing the DIP Lender's interests to the exclusion of the other stakeholders, the Interested Directors abdicated their duty of care and loyalty owed to the Company and, by extension, unfairly disregarded the interests of the shareholders and oppressed their legitimate and reasonable expectations as investors in the company,

c) Other salient acts and omissions by the BOD in disregard of their fiduciary duties, which started with the bankruptcy filing and continued to date, are several and well-documented:

   I. Replacing the shareholders' approved Rights plan with a BOD approved Rights plan tailor-made to facilitate the DIP Lender's takeover of the company,

   II. Failing to abide to the company's bylaws and Corporate Governance guidelines and thus exposing it to breaches of law and financial losses by:
   
   i. Hiring Venezuelan advisors to represent the company in settlement agreement negotiations with high ranking officials on the OFAC's Specially Designated Nationals and Blocked Persons List (SDN) for corruption and human rights violations,
   
   ii. Indebting the company for and paying US$ 30 million to the Advisors that negotiated the two failed settlement agreements that yielded US$ 75 million in effective payments. This even though the Company:
   
   1. had filed for bankruptcy protection,
   
   2. was neither authorized by the CCAA Court to spend limited resources on, nor had it secured the funds needed to cover the cost of pursuing a settlement with Venezuela long before the ICSID arbitration panel rendered its decision,
   
   3. made the payment as soon as the US$ 75 million cash payment from Venezuela was received, without any detailed documentation of the services provided and any certainty as to when the it would receive additional payments, and was incommensurate with the results obtained,
   
   4. raised the spectrum of Foreign Corrupt Practices Act (FCPA) violations in a country notorious for pay-for-play government corruption, which has earned it a distinctive 16/100 score on a declining scale (with 87/100 [Denmark] being the least and 9/100 [Somalia] the most corrupt country) that measures the perceived levels of public sector corruption in 180 countries / territories around the world in Transparency International's 2019 survey.

Sir John Dalberg-Acton once said that "*Power tends to corrupt, and absolute power corrupts absolutely.*" His conclusion is well-founded by world history and validated by the many laws and regulations put in place to curtail its often-nefarious effects. Unchecked power to pursue one's self-interests is a great incentive to advance them and to expose other parties to unwarranted vulnerability. Trust, but verify - a Russian proverb that became internationally known when used by President Reagan regarding the nuclear arms treaty with Russia,

encapsulates the reason why checks and balances are needed when conflicting interests are in play. Unwarranted ongoing secrecy in a court of law is in fact the antithesis of the open court principle. As noted by the Supreme Court of Canada in *Vancouver Sun (Re)*, this principle enhances the public's confidence in the justice system:

> *"Public access to the courts guarantees the integrity of judicial processes by demonstrating "that justice is administered in a non-arbitrary manner, according to the rule of law". Openness is necessary to maintain the independence and impartiality of courts. It is integral to public confidence in the justice system and the public's understanding of the administration of justice. Moreover, openness is a principal component of the legitimacy of the judicial process and why the parties and the public at large abide by the decisions of courts."*

The higher the secrecy in court proceedings, the bigger the potential for harm to the more vulnerable parties involved. The parties with a sizable stake in a legal proceeding and the wherewithal that allowed them to acquire that stake in the first place can and will protect their interests in court to the extent necessary. Individual shareholders that invest their retirement and the children's college funds cannot afford to do the same; and rely on the CBCA, the ONSC and other regulators appointed for that purpose. In the Company's CCAA proceeding, the harm befell the individual equity investors, who could not afford to have adequate legal representation in a proceeding currently in its eighth year, given the high entry barriers erected by the Interested Directors from the outset. The reason for this can be linked back to the successful efforts by the Interested Directors to foreclose all communications with the shareholders to keep them in the dark to advance their own interests, while running the statute of limitations clock out to scape responsibility.

Sincerely,

*[signature: Adrianza]*

Adelso Adrianza

cc: The Honorable Justice J. Hainey, Ontario Superior Court of Justice
    The Honorable Judge L. Selber Silverstein, Delaware U.S. District Bankruptcy Court
    The Honorable Judge L Stark, Delaware U.S. District Court
    Mr. David Byers - via e-mail (dbyers@stikeman.com)
    Mr. Robert Chadwick – via e-mail (rchadwick@goodmans.ca)
    Mr. Alexander Cobb – via e-mail (acobb@osler.com)
    Mr. Brian Denega – via e-mail (brian.m.denega@ca.ey.com)
    Mr. Robert Fung – via e-mail (rfung@crystallex.com)
    Mr. Sergio Marchi – via e-mail (mail@crystallex.com)
    Mr. Timothy Pinos – via e-mail (tpinos@casselsbrock.com)
    Mr. Clifton Prophet - via e-mail (Clifton.Prophet@Gowlings.com)
    Mr. Jay A. Swartz - via e-mail (JSwartz@DWPV.com)

**ADELSO ADRIANZA**

113 Washington Street – Newton, MA 02458 – U.S.A.
M: (859) 803-2279 |

## VIA CERTIFIED MAIL

**To:** The Honorable George R. Strathy, Chief Justice of Ontario

**cc:** Honorable Justice J. Hainey, Ontario Superior Court of Justice
The Honorable Judge L. Selber Silverstein, Delaware U.S. District Bankruptcy Court
The Honorable Judge L. Stark, Delaware U.S. District Court

## VIA E-MAIL

**cc:** Mr. David Byers - via e-mail (dbyers@stikeman.com)
Mr. Robert Chadwick – via e-mail (rchadwick@goodmans.ca)
Mr. Alexander Cobb – via e-mail (acobb@osler.com)
Mr. Brian Denega – via e-mail (brian.m.denega@ca.ey.com)
Mr. Robert Fung – via e-mail (rfung@crystallex.com)
Mr. Sergio Marchi – via e-mail (mail@crystallex.com)
Mr. Timothy Pinos – via e-mail (tpinos@casselsbrock.com)
Mr. Clifton Prophet - via e-mail (Clifton.Prophet@Gowlings.com)
Mr. Jay A. Swartz - via e-mail (JSwartz@DWPV.com)

Adelso Adrianza
113 Washington Street
Newton, MA 02458
U.S.A.

7019 2970 0001 7237 6386





U.S.M.S.
EX-RAY

The Honorable
Chief Judge Leonard Stark
U.S. District Court - Delaware
J. Caleb Boggs Federal Building
844 N. King Street
Unit 26, Room 6124
Wilmington, DE 19801-3555