# **Exhibit A**



DEPARTMENT OF THE TREASURY
WASHINGTON, D.C. 20220

Case No.  VENEZUELA-EO13850-2020-366869-1

Adam M. Smith
Gibson, Dunn & Crutcher LLP
1050 Connecticut Avenue, N.W.
Washington, D.C. 20036

Dear Mr. Smith:

This letter responds to your request, on behalf of Crystallex International Corporation (Crystallex), dated April 9, 2020, and subsequent related correspondence, to the Office of Foreign Assets Control (OFAC), requesting authorization for all activities necessary and ordinarily incident to organizing and conducting a judicial sale of shares in CITGO Petroleum Corp.'s (CITGO) indirect parent holding company, PDV Holding, Inc. (PDVH), that are held by Petróleos de Venezuela, S.A. (PdVSA).

Absent a license from OFAC, any sale of the PDVH shares is prohibited pursuant to OFAC's Venezuela-related sanctions authorities, including Executive Order (E.O) 13808 of August 24, 2017, "Imposing Additional Sanctions with Respect to the Situation in Venezuela" (as amended by E.O. 13857 of January 25, 2019, "Taking Additional Steps To Address the National Emergency With Respect to Venezuela"); E.O. 13835 of May 21, 2018, "Prohibiting Certain Additional Transactions With Respect to Venezuela" (as amended by E.O. 13857); E.O. 13850 of November 1, 2018, "Blocking Property of Additional Persons Contributing to the Situation in Venezuela" (as amended by E.O. 13857); and E.O. 13884 of August 5, 2019, "Blocking Property of the Government of Venezuela."

OFAC has consulted with the U.S. Department of State regarding this license request, and the State Department has considered the request in light of the current situation in Venezuela.  As explained in the State Department's foreign policy guidance, denying the license at present and continuing the blocking of these shares is particularly important at this time.  After careful consideration, the State Department has determined that authorizing the sale of the PDVH shares at this time would be inconsistent with United States foreign policy interests and therefore recommends that the license request be denied without prejudice to reconsideration in the future should these foreign policy considerations change.  While the State Department advises that the situation is particularly sensitive at this time, the State Department has also noted that the National Assembly's mandate ends in January 2022, when the term of the 2015 National Assembly, Venezuela's last democratically elected body, expires following a 12-month extension.  A request for a specific license for the sale of the PDVH shares is therefore denied without prejudice to reconsideration at a later time if the foreign policy considerations change.  The United States will reassess whether the sale of the PDVH shares is consistent with United States foreign policy, as the situation in Venezuela evolves.  The United States anticipates doing so during the first half of 2022 as warranted by changed circumstances.

In reaching a determination to deny the license for the sale at this time, the United States thoroughly reviewed and considered the information and arguments Crystallex provided in written submissions to OFAC on April 9, 2020, April 17, 2020, and May 29, 2020. We summarize below the primary reasons why Crystallex's submissions do not alter our view that a license for the sale of the PDVH shares should be denied at this time.

1. **Alleged "preferential treatment"**

Crystallex claims that the PdVSA 2020 8.5 Percent bondholders, who have a lien in the shares of CITGO's parent, CITGO Holding, are receiving "preferential treatment." The bondholders claimed to be entitled to seek the sale or purchase of their collateral under the terms of their note, and on July 19, 2018, OFAC issued General License (GL) 5 authorizing, with certain exceptions, all transactions related to, the provision of financing for, and other dealings in the 2020 8.5 Percent Bond that would be prohibited by subsection 1(a)(iii) of E.O. 13835. That authorization ended on October 24, 2019, when GL 5 was replaced and superseded by another GL that delayed the effectiveness of the authorization in GL 5. Subsequent GLs have continued to delay the date upon which the action by the bondholders would be authorized,[1] and the current GL 5H issued on September 10, 2021, further delays that date until January 21, 2022.

Accordingly, since October 24, 2019, there has been no authorization in effect permitting holders of the PdVSA 2020 8.5 Percent Bond to take otherwise prohibited actions with respect to the CITGO Holding collateral. And like Crystallex, the bondholders are not authorized to take any such actions at this time, consistent with the State Department's assessment that a forced sale of Venezuela's U.S.-based assets (particularly the CITGO assets) at this time would be inconsistent with U.S. foreign policy interests. OFAC therefore disagrees that the bondholders are receiving preferential treatment.

Crystallex points to FAQ 595, which states that OFAC "would have a favorable licensing policy" toward any "agreement on proposals to restructure or refinance" payments due to the 2020 bondholders. This statement, however, refers to a potential negotiated agreement between the Government of Venezuela and the bondholders to restructure or refinance the debt. Crystallex's license request here is not for a similar negotiated agreement with the Government of Venezuela, but instead for a forced sale—which entails different policy considerations.

2. **Alleged "reliance"**

Crystallex appears to indicate that it had initiated and continued legal actions "in reliance on its understanding" that its proposed sale could be engaged in despite OFAC's Venezuela-related

---

[1] Crystallex states in its submission dated April 17, 2020 that one such subsequent GL (GL 5C) "exacerbates Crystallex's situation while highlighting the Company's unfortunate conclusion concerning its unfair treatment" because it does not "allow Crystallex to benefit from the same authorizations." As explained, however, the purpose and effect of GL 5A and the subsequent GLs, including GL 5C, is to delay the effectiveness of the authorization in GL 5, with the result that neither the bondholders nor Crystallex are authorized to take otherwise prohibited actions at this time.

sanctions authorities. Specifically, Crystallex appears to indicate that it had derived "comfort that the Executive Branch would not stand in the way of" its proposed sale on the basis of "FAQs prior to FAQ 809," "General Licenses," "[t]he Executive Branch's public statements," and the fact that as of April 2020, "[t]he Administration ha[d] not sought to be heard before the Delaware District Court or the Third Circuit Court of Appeals." However, OFAC does not agree that parties can reasonably rely on an assumption that a discretionary license will necessarily be granted for action prohibited by U.S. sanctions, nor even that a license will be continued once initially granted. OFAC's regulations do not require OFAC to issue a license in any circumstances, and they make clear that licenses may be "amended, modified, or revoked at any time." 31 CFR §§ 501.801, 501.803. OFAC's discretionary authority to issue or withhold licenses is essential to the U.S. government's ability to tailor sanctions to evolving foreign policy and national security needs. As the Court has noted, "the OFAC licensing process provides the [appropriate] mechanism through which the Executive Branch can bring to bear the foreign policy and national security interests on which Crystallex's collection efforts might have an impact." *Crystallex Int'l Corp. v. Bolivarian Republic of Venezuela*, No. 17-MC-151-LPS, 2021 WL 129803, at *16 (D. Del. Jan. 14, 2021).

In any event, Crystallex does not clearly specify the particular public statements it claims to have relied upon or the particular actions it claims to have taken in reliance on such statements. Crystallex appears to indicate that it had relied upon "FAQs prior to FAQ 809"[2] and quotes the following portion of "the initial iteration of FAQ 595 [describing] the rationale for General License 5 [concerning the 2020 bondholders]":

> Authorizing Bondholders to enforce rights related to the PdVSA 2020 8.5 percent bond prevents the Maduro regime from using the E.O. to default on its bond obligations without consequence. . . . OFAC issued General License 5, which removed E.O. 13835 as an obstacle to holders of the PdVSA 2020 8.5 percent bond gaining access to their collateral, and keeps sanctions pressure where it belongs — on the Maduro regime. General License 5 continues in effect and remains operative despite OFAC's designation of PdVSA on January 28, 2019.

This iteration of FAQ 595 had no application to Crystallex. The FAQ simply explained the reason at that time for OFAC's issuance of GL 5, a general license that did not authorize Crystallex's proposed sale. And although Crystallex claims that it had "essentially identical rights" as the bondholders, at least part of the reason given in the FAQ — the need to prevent the Maduro regime from using the E.O. to default on its bond obligations without consequence — applied only to the circumstances of the bondholders at that time. Crystallex thus could not have reasonably relied on an FAQ addressing different transactions in a different context from its

---

[2] By contrast, Crystallex characterizes FAQ 809 as a "surprising promulgation" that "change[d] the rules[] with no notice and toward the hopeful end of a multi-year, expensive litigation effort" and "unjustly den[ied] [Crystallex] its rightful property that it acquired through [its litigation]" by "[freezing] longstanding judicial proceedings."

3

own.  Nor could Crystallex have reasonably relied on GL 5 itself (or any superseding GL), which did not apply to Crystallex.[3]

Moreover, while this iteration of FAQ 595 was issued on July 19, 2018, OFAC amended FAQ 595 on October 24, 2019, in connection with the issuance of GL 5A.  The amended version of FAQ 595 no longer contained the language on which Crystallex claims to rely.  Accordingly, FAQ 595 could not have formed the basis for any reasonable reliance by Crystallex with respect to any actions taken prior to July 19, 2018 or after October 24, 2019.

In addition, any assumptions Crystallex may have made about OFAC's future licensing decisions could not ignore the fact that circumstances relating to the situation in Venezuela began to change dramatically in January 2019 when, in the wake of the fraudulent Venezuelan presidential elections, Nicolas Maduro attempted to install himself as president for a second term.  Shortly afterwards, Juan Guaidó was sworn in as Interim President.  The United States immediately issued public statements officially recognizing Guaidó as the Interim President of Venezuela.  After Guaidó assumed office, his administration appointed a new ad hoc board of directors to govern PdVSA's overseas assets, and Guaidó's newly appointed directors then reconstituted, directly or indirectly, the boards of directors of PDVH, CITGO, and CITGO Holding.  As the situation in Venezuela has continued to evolve, U.S. foreign policy has also evolved.  As explained above, in October 2019, OFAC replaced GL 5 with a new GL delaying the effectiveness of the authorization contained in GL 5, which has continued to be delayed in subsequent GLs.  OFAC also modified FAQ 595, removing the language Crystallex cites.  To the extent Crystallex continued to rely upon the original version of FAQ 595 and assumed that it (and any U.S. foreign policy reflected therein) would remain unchanged, OFAC considers such reliance to have been unreasonable.

### 3.  U.S. court judgments

Crystallex claims that "denying or delaying a Specific License will render the legitimate judicial orders of several federal courts ineffectual."  While we disagree with Crystallex's characterization, we are mindful of the Judicial Branch's interest in enforcing its judgments, and we have carefully weighed that consideration in making our licensing decision.  At the same time, we have also considered the Executive Branch's foreign policy and national security interests.

---

[3] In its submission dated April 9, 2020, Crystallex states that "General License 14 appears to have allowed [certain] official activity" and then claims that GL 14 was revoked.  However, GL 14, which relates to official business of the U.S. government, was incorporated into subpart E of the Venezuela Sanctions Regulations, 31 CFR part 591, as 31 CFR § 591.509.  Indeed, in its submission dated May 29, 2020, Crystallex acknowledges as follows: "In the Application, we noted that OFAC, on November 22, 2019, revoked General License 14, which previously authorized such dealings. . . .  We did not mention in the Application that OFAC on that same day added a general license to the Venezuela Sanctions Regulations that appears to cover much the same ground as General License 14."  In light of Crystallex's acknowledgement, we focus our discussion in this section on General License 5.

On July 16, 2020, the U.S. government filed a Statement of Interest in the Crystallex litigation before the U.S. District Court for the District of Delaware, explaining the U.S. government's current foreign policy and national security view.  After considering that statement, the Court elected to proceed with prefatory steps toward a judicial sale, but the Court made clear that "the OFAC licensing process provides the [appropriate] mechanism through which the Executive Branch can bring to bear the foreign policy and national security interests on which Crystallex's collection efforts might have an impact." *Crystallex*, 2021 WL 129803, at *16.  The Court further stated that all parties to the litigation "recognize that (under current law and policy) a specific license will be required from OFAC before a sale of PdVSA's shares of PDVH can close."  *Id.*  Thus, it appears to us that the Court recognized that the Executive Branch's foreign policy and national security interests, if asserted through the OFAC licensing process, could properly necessitate a delay in effectuating court judgments.  Accordingly, OFAC has considered the foreign policy and national security interests in connection with Crystallex's license request, and OFAC's denial of a license for the sale reflects those interests at this time.

### 4. International comity

Crystallex states that granting its request for a specific license would be "consistent with longstanding U.S. government and OFAC practice of avoiding conflicts of laws and taking into consideration the local legal requirements, policy goals, and judicial determinations articulated by the courts and governments of friendly nations."  Crystallex also asserts that "OFAC's granting of the requested specific license would be consistent with [a] Canadian court's direct entreaty to the administrative organs of the U.S. government to assist in fully effectuating its judgment."  Crystallex further states that not granting its request would result in Crystallex being "unable to make its creditors whole" and therefore "in breach of its obligations under Canadian law," which it claims "would be contrary to core rule of law principles in Canada and would allow the Government of Venezuela to escape Canadian justice."

Crystallex does not specify the provisions of Canadian law that would allegedly be breached by Crystallex in the event OFAC denies its license request.  What is clear, however, is that Crystallex's proposed sale is prohibited under U.S. law, unless authorized by an OFAC license.  OFAC further disagrees that denying Crystallex's request to sell the PDVH shares will necessarily have the consequences Crystallex predicts, as the denial is without prejudice to reconsideration at a later time if the foreign policy considerations change.  As noted above, the United States anticipates that it will reassess whether the sale of the PDVH shares as requested by Crystallex is consistent with U.S. foreign policy as the situation in Venezuela evolves.  The foreign policy and national security interests of the United States outweigh the comity concerns expressed by Crystallex at this time.

### 5. Takings Clause

In requesting authorization for a specific license to conduct transactions that would be prohibited by subsection 1(a)(iii) of E.O. 13835, Crystallex warns that "interfering with Crystallex's lien would risk incurring liability for the U.S. Government."  In particular, Crystallex asserts that its "judgment lien is a vested property right protected by the Takings Clause of the U.S. Constitution," and it seems to claim support for this argument by seeking to distinguish its

situation (which involves a post-judgment attachment) from the one at issue in *Dames & Moore v. Regan*, 453 U.S. 654 (1981) (which involved a pre-judgment attachment).  OFAC notes that, "[f]or any Fifth Amendment takings claim, the complaining party must show it owned a distinct property interest at the time it was allegedly taken." *Cienega Gardens v. United States*, 331 F.3d 1319, 1328 (Fed. Cir. 2003).  Since the prohibition on Crystallex's proposed activities under E.O. 13835 entered into effect on May 21, 2018, almost three months before Crystallex was granted its writ of attachment, OFAC does not believe that prohibition could constitute a "taking" under the Fifth Amendment.  Moreover, OFAC notes that U.S. sanctions actions imposing full blocking, a far broader restriction than the limited prohibitions contained in E.O. 13835, have not been viewed by courts as "takings" under the Fifth Amendment.[4]  In addition, to the extent Crystallex is asserting that a denial of Crystallex's license request would constitute a violation of the Fifth Amendment's Takings Clause, OFAC disagrees.  Even assuming that Crystallex's writ constitutes property in which Crystallex has a constitutionally protected interest under the Fifth Amendment, the mere existence of such an interest would not require OFAC to grant a license authorizing prohibited transactions with respect to such property.  *See Paradissiotis v. United States*, 304 F. 3d 1271, 1276 (Fed. Cir. 2002) (holding that the denial of plaintiff's request for a license to exercise stock options that were frozen as a result of OFAC sanctions was not a compensable taking).

Accordingly, OFAC does not agree that its denial of Crystallex's requested license with respect to the PDVH shares constitutes a "taking" of property compensable under the Fifth Amendment.

6. **NAFTA and the New York Convention**

Crystallex also claims that "preventing [it] from freely enjoying its property rights," including by "any restrictions placed on[] Crystallex's writ of attachment," would violate the United States' international obligations and would give rise to claims under the North American Free Trade Agreement (NAFTA); that "allowing the PdVSA 2020 8.5 Percent bondholders to continue to enforce their rights to the CITGO shares . . . while restricting the ability of Crystallex from doing the same" would violate NAFTA; and that granting the authorization requested by Crystallex would be "an important and necessary step towards fulfilling" the United States' obligations under the New York Convention on the Recognition and Enforcement of Foreign Arbitral Awards.

The U.S. government assesses Crystallex's argument relating to potential claims under the NAFTA to be relatively weak.  Even if Crystallex were to clear certain threshold jurisdictional

---

[4] *See, e.g.*, *767 Third Ave. Assocs. v. United States*, 48 F.3d 1575, 1581 (Fed. Cir. 1995) (holding that no regulatory taking occurred because plaintiff was "on notice that the government, pursuant to its statutory and constitutional authority, could close a foreign government's offices and freeze its assets"); *Chang v. United States*, 859 F.2d 893, 896 (Fed. Cir. 1988) ("The fact that the plaintiffs were frustrated in making the most beneficial use of their services does not lead to the unavoidable conclusion that the governmental action rises to the level of a taking."); *Zarmach Oil Servs., Inc. v. U.S. Dept. of the Treasury*, 750 F. Supp. 2d 150, 159 (D.D.C. 2010) ("It is well-established that the blocking of assets pursuant to an executive order is not a taking within the meaning of the Fifth Amendment.").

hurdles in asserting NAFTA claims, Crystallex is likely to have difficulty establishing its claims on the merits.

Finally, Crystallex's argument regarding the New York Convention misconstrues the United States' obligations under that Convention. The United States has fulfilled its obligation to recognize and enforce Crystallex's arbitral award, as evidenced by the fact that the U.S. District Court for the District of Columbia issued a judgment confirming the award, which the U.S. Court of Appeals for the D.C. Circuit later upheld.

These arguments therefore do not warrant a different decision on the license request, in light of the foreign policy interests of the United States.

## 7. Effects on Venezuela

Crystallex appears to claim that granting its request for a specific license would assist in "rebuilding, reestablishing, and supporting the rule of law" in Venezuela. In addition, Crystallex asserts that granting its request "would greatly encourage future private sector investment in Venezuela." Crystallex further claims that "the Delaware District Court process could facilitate a sale of PDVH assets without stripping Venezuelan influence over the aspects of CITGO that are actually relevant to the Venezuelan economy" and presents suggested approaches for selling only a portion of PDVH's assets. Crystallex also argues that, even if CITGO were sold as a whole, such a sale "would have significant benefits for the United States and the Venezuelan people," including: (1) "increase[d] third party private sector willingness to do business with CITGO"; (2) benefits to CITGO (including its employees, physical assets, creditors, investors, retirees, pensions), other parties, and the public, and an increase in the "overall strategic value of CITGO to the United States"; and (3) benefits to Venezuela's recovery. With respect to supposed benefits to Venezuela's recovery, Crystallex claims that "[a] sale of PDVH would generate funds for Venezuela." Crystallex states that denying its request for a specific license would "open the door for either unscrupulous investors willing to mortgage Venezuela's future on usurious investments or to competitors of the United States such as China or Russia who are already active in Venezuela and are both less interested in protecting international rule of law and the people of Venezuela, and are looking to undermine U.S. influence in the Americas" and have other deleterious effects.

Crystallex's argument that a forced sale of CITGO at this time to satisfy creditors would have such benefits for the United States or the Venezuelan people is not persuasive. The United States' current foreign policy regarding the ongoing situation in Venezuela includes, among other issues, supporting negotiations with participation from all stakeholders that will lead to credible presidential and parliamentary elections with a view towards a comprehensive negotiated solution to the Venezuelan crisis. As explained in the State Department's foreign policy guidance, denying the license at present and continuing the blocking of these shares is particularly important at this time. The U.S. government believes that such foreign policy considerations outweigh any potential countervailing benefits at this time.

8. **International debt markets**

Crystallex claims that denying its license request "is likely to have an adverse impact on both the international debt markets and the United States standing in those markets." The U.S. government finds this argument unconvincing and, in fact, has already heard from stakeholders and potential future investors who are interested in participating in rebuilding efforts. In any event, the U.S. foreign policy and national security interests associated with the license denial, without prejudice to the right to refile, outweighs any potential adverse impact to international debt markets.

* * *

Accordingly, your request for a specific license to effect the sale of the PDVH shares is denied at this time. In light of this denial, we are not addressing the other aspects of your request at this time, which OFAC will continue to consider under application number VENEZUELA-EO13850-2020-366869-2.

OFAC emphasizes that this determination is made without prejudice to reconsideration of a specific license request to sell the PDVH shares at a later time if the foreign policy considerations change. Negotiations between the unified democratic opposition led by Interim President Guaidó and the Maduro regime regarding the future of Venezuela are currently ongoing, and the National Assembly's mandate ends in January 2022. The United States will reassess whether the sale of the PDVH shares is consistent with United States foreign policy, as the situation in Venezuela evolves. The United States anticipates doing so during the first half of 2022 as warranted by changed circumstances.

If you have any questions about the sanctions programs administered by OFAC, you may refer to the OFAC website at *www.treasury.gov/ofac* or call our office at (202) 622-2480.

Sincerely,

Andrea M. Gacki
Digitally signed by Andrea M. Gacki
Date: 2021.09.10 13:00:08 -04'00'

September 10, 2021

Andrea Gacki              Date
Director
Office of Foreign Assets Control

8