## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

------------------------------------------------------------------------------------------------

| | | |
|---|---|---|
| CRYSTALLEX INTERNATIONAL CORPORATION, | : | |
| | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | Misc. No. 17-151-LPS |
| | : | |
| BOLIVARIAN REPUBLIC OF VENEZUELA, | : | PUBLIC VERSION |
| | : | |
| Defendant. | : | |
| | : | |
| | : | |
| | : | |

------------------------------------------------------------------------------------------------

### SPECIAL MASTER'S REPORT AND RECOMMENDATION
### REGARDING PROPOSED SALE PROCEDURES ORDER

OF COUNSEL:

Ray C. Schrock, P.C. (*pro hac vice* pending)
Alexander W. Welch (*pro hac vice* pending)
Jason L. Hufendick (*pro hac vice* pending)
WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
Ray.Schrock@weil.com
Alexander.Welch@weil.com
Jason.Hufendick@weil.com

Myron T. Steele (#000002)
Matthew F. Davis (#4696)
Alan R. Silverstein (#5066)
Abraham Schneider (#6696)
POTTER ANDERSON & CORROON LLP
Hercules Plaza, 6th Floor
1313 North Market Street
P.O. Box 951
Wilmington, DE 19801
Telephone: (302) 984-6000
Facsimile: (302) 658-1192
msteele@potteranderson.com
mdavis@potteranderson.com
asilverstein@potteranderson.com
aschneider@potteranderson.com

*Counsel for Special Master Robert B. Pincus*

Dated:  August 9, 2021
Public Version Dated:  September 15, 2021

**TABLE OF CONTENTS**

**Page**

I.     Preliminary Statement.................................................................................1

II.    Overview of the Special Master's Process................................................4

       A.    Appointment of Special Master ...................................................4

       B.    Retention of Advisors ..................................................................5

       C.    Entry of Protective Order ...........................................................16

       D.    Proposed Sale Process Party Engagement ................................18

       E.    United States Government Outreach ..........................................20

       F.    Due Diligence of PDVH and CITGO .........................................22

       G.    Relevant Claims and Interests ...................................................23

             1.    Crystallex's Judgment.....................................................24

             2.    ConocoPhillips' Judgment ..............................................26

             3.    PDVSA 2020 Bondholders & CITGO Holding Pledge.............28

             4.    RTSA Loan & RTSA Pledge ...........................................29

             5.    Additional Judgment Creditors of Venezuela and PDVSA .....31

III.   CITGO and Sale Process Design Considerations ...................................31

       A.    CITGO'S Complex Corporate and Capital Structure ...............32

       B.    CITGO Sale Process Design Considerations .............................34

             1.    OFAC Considerations......................................................35

             2.    Illustrative Clearing Price ...............................................35

             3.    Structurally Senior Liens ................................................36

             4.    COVID-19's Impact on CITGO's Business and Operations...........37

             5.    Management and CITGO's Cooperation ...........................38

             6.    Ability to Purchase A Controlling Stake in CITGO ...............39

             7.    Broader Powers and Process May Ultimately Be Required .........40

IV.    Sale Procedures Order and Bidding Procedures Summary..................42

V.     Recommendation ....................................................................................71

**EXHIBITS**

**EXHIBIT A**   Hiltz Declaration

**EXHIBIT B**   Recommended Voluntary Settlement Process Timeline

I, Robert B. Pincus, solely in my capacity as special master (the "**Special Master**") for the United States District Court for the District of Delaware (the "**Court**") in *Crystallex International Corp. v. Bolivarian Republic of Venezuela* (D. Del. Case. No. 17-151-LPS) ("the "**Crystallex Case**"), hereby submit this report  and recommendation ( "**Report**")[1] to the Court in connection with the proposed sale procedures order filed contemporaneously herewith [D.I. No. 302] (the "**Sale Procedures Order**"):[2]

## I.     Preliminary Statement

1.      Each of the interested parties in the Crystallex Case has argued that, if a sale of the PDVH Shares is to occur, the procedures for such sale should be designed to achieve a sale transaction that is fair, open, and maximizes the value of the PDVH Shares to be sold.  Although parties may ultimately disagree on the method to achieve a value-maximizing transaction, I believe that all interested parties are, and remain, committed to the fundamental goal of designing a sale and marketing process that provides the best opportunity of achieving a value maximizing result.

2.      With that guiding principle and the input of the Sale Process Parties (as defined below), my Advisors (as defined below) and I have designed the proposed Sale Procedures Order that strikes the balance between  many competing interests in a dynamic and internationally sensitive set of circumstances to provide the best opportunity of achieving a value-maximizing Sale Transaction, while achieving fairness to all involved.  I am submitting this Report to assist

---

[1] This Report has been filed under seal pursuant to paragraph ¶3 of the *Special Master Confidentiality Order* [D.I. 291] (the "**Protective Order**").  As discussed further in paragraph ¶32 of this Report, the Special Master anticipates that the Sale Process Parties (as defined below) will jointly submit proposed redactions to this Report no later than five calendar days after the date hereof for the Special Master to file publicly on the docket in the Crystallex Case. Further, as this Report contains or reflects certain information that has been marked "highly confidential" by the Venezuela Parties and Crystallex, the Special Master will serve appropriate redacted version on each Sale Process Party that is specific to them.

[2] Capitalized terms used but not defined shall have the meaning ascribed to such terms below or, if not defined below, the meaning ascribed to such terms in the Sale Procedures Order.

the Court and other parties in interest in understanding the Special Master's process and the facts and circumstances considered in connection with proposing the Sale Procedures Order and the rationale for the provisions therein.

3.      The focal point of discussion among the Sale Process Parties in preparation of the proposed Sale Procedures Order has been and remains when to ultimately launch the Marketing Process following entry of the order by the Court.  Given that current public guidance from the Department of the Treasury's Office of Foreign Assets Control ("**OFAC**") at FAQ 809 states that a specific license from OFAC is required "prior to conducting an auction or other sale… or taking other concrete steps in furtherance of a sale" of shares of a Government of Venezuela entity (such as the PDVH Shares), barring a change in circumstances, my recommendation is to launch the Marketing Process only once I am confident that I am able to provide Potential Bidders with comfort that they can participate in the process without subjecting themselves to the risk of violating U.S. sanctions.  If we were to proceed based on OFAC's public guidance as of today, I do not believe that Potential Bidders will participate in the process for fear of violating such sanctions.

4.      In the  proposed Sale Procedures Order, I have proposed what I believe to be the most reasonable and workable solution: following entry of the Sale Procedures Order, unless otherwise directed by the Court, I intend to hold off on preparing for launch of the Marketing Process until I am comfortable that OFAC's posture will not impair a successful or value maximizing Sale Process.  In the meantime, I will continue to take a proactive approach with respect to engagement with the United States Government regarding the OFAC decision-making process and obtaining assurances for Potential Bidders that they can participate in the sale process.

CONTAINS REDACTIONS IN ACCORDANCE WITH D.I. 345

5.      Notwithstanding OFAC-related temporary delay, I do not believe this time should be wasted by the Sale Process Parties.  Based on my review of the facts, circumstances, and following numerous discussions with the Sale Process Parties, my assessment of the situation is that all interested stakeholders could benefit – and that substantial value could be unlocked – if the Sale Process Parties, in addition to the PDVSA 2020 Bondholders, were able to reach a voluntary negotiated outcome on a claims waterfall (such a resolution, a "**Negotiated Outcome**").  Based on my discussions with the Sale Process Parties, I believe this would be a welcome development for those parties and will make the best use of time prior to launching the Marketing Process. Of course, facilitating such discussions around a Negotiated Outcome is not an express component of my current mandate, however, it is a step that is likely to aid my mandate and, if the Sale Process Parties consent or the Court otherwise deems it appropriate in exchange for a short delay to implement the proposed Sale Procedures Order, as discussed more fully below, I have proposed and recommended a process for the parties to engage in such discussions with my assistance.

6.      Except as otherwise indicated herein, this Report and the findings herein are based on the facts as presented, identified, and determined by me, with the assistance of my Advisors, and the circumstances relating to the Crystallex Case, PDVH, CITGO, my review of relevant pleadings and documents, information provided to me by the Sale Process Parties, publicly available information, or my opinion based upon my experience and knowledge. Contemporaneously herewith,  William O. Hiltz of Evercore Group L.L.C. ("**Evercore**") has submitted the *Declaration of William O. Hiltz in Support of Special Master's Report and Recommendation Regarding Proposed Sale Procedures Order* in Support of this Report (the "**Hiltz Declaration**"), attached hereto as **Exhibit A**.

## II.   Overview of the Special Master's Process

**A.   Appointment of Special Master**

7.     On January 14, 2021, the Court issued an opinion and corresponding order [D.I. 234, 235] (the "**January 2021 Ruling**") following pleadings filed by Plaintiff Crystallex International Corporation ("**Crystallex**"), Defendant Bolivarian Republic of Venezuela (the "**Republic**"), Intervenor Petróleos de Venezuela, S.A. ("**PDVSA**"), Garnishee PDV Holding, Inc. ("**PDVH**"), Intervenor CITGO Petroleum Corporation ("**CITGO Petroleum**," and collectively with the Republic, PDVSA, and PDVH, the "**Venezuela Parties**"), non-parties Phillips Petroleum Company Venezuela Limited and ConocoPhillips Petrozuata B.V. (together, **ConocoPhillips**," and collectively with Crystallex and the Venezuela Parties, the "**Sale Process Parties**") and the United States.

8.     The January 2021 Ruling set out "some contours of the sale procedures that [the Court would] follow in conducting a sale of PDVSA's shares in PDVH," including the appointment of a special master to "oversee the day-to-day and detailed implementation of the sales procedures" and to "prepare for and conduct the sale." [D.I. 234 at 34-35]. The Court further explained that "the Venezuela Parties will have a fair and reasonable opportunity to be involved in the prefatory procedures, the sale, and any negotiations, but the Court will retain control of the sale. The Venezuela Parties will have a seat at the table, but they will not be running the process."[3]

9.     Consistent with the January 2021 Ruling, on April 13, 2021, the Court appointed me as Special Master to assist the Court with the sale of PDVSA's shares in PDVH [D.I. No. 258]. On May 27, 2021, the Court entered the *Order Regarding Special Master* [D.I. No. 277] (the "**May**

---

[3] [D.I. 234 at 36.  *See also id.* at 37 ("Importantly, it would be inequitable to permit PDVSA to conduct the sale at this point . . . the Court is not going to permit a highly-recalcitrant judgment debtor to conduct its own sale process over the objection of its repeatedly-victorious judgment creditor").]

**2021 Order**") formalizing my appointment as Special Master and directing me to, among other things:

    a.    devise a plan for the sale of shares of PDVH (the "**PDVH Shares**") as necessary to satisfy the outstanding judgment of Crystallex and the judgment of any other judgment creditor added to the sale by the Court and/or devise such other transaction as would satisfy such outstanding judgment(s) while maximizing the sale price of any assets to be sold (collectively, the "**Sale Transaction**");

    b.    oversee the execution of a protective order;

    c.    work to become knowledgeable about the business operations and assets of CITGO and PDVH; and

    d.    ascertain the total amounts of the outstanding judgment owed to Crystallex by the Republic and the total amount of the outstanding judgment owed to ConocoPhillips by PDVSA.

10.    The May 2021 Order further authorized me to retain, after consultation with the Sale Process Parties, counsel, financial advisors, and other professionals (collectively, including those already retained by the Special Master, the "**Advisors**") to assist and advise me with respect to the performance of my duties as Special Master.

**B.    Retention of Advisors**

11.    Immediately upon my appointment as Special Master, it was clear that retaining skilled counsel and advisors that have the resources, experience, and expertise in the sale of complex and large assets, particularly in a Court supervised process and distressed situation, would be critical to maximizing the value of the PDVH Shares.  Accordingly, I immediately took steps to retain counsel and advisors that are subject matter experts with relevant experience and expertise.

12.    In retaining counsel, I interviewed and met with several leading law firms with the relevant experience, expertise and reputation.  In consultation with the Sale Process Parties,

I selected, in each case based on their excellent reputation and strong track record of relevant experience, Weil, Gotshal & Manges LLP to serve as lead transaction counsel, Potter Anderson & Corroon LLP to serve as Delaware counsel, and Jenner and Block LLP to serve as OFAC counsel.  Each law firm has been retained on an hourly basis and performs work at my direction.

13.     In consultation with my counsel, I determined that engaging a highly qualified investment banker to advise me in fulfilling my mandate—familiarizing myself with the CITGO business and designing and overseeing a sale process for the PDVH Shares—was critical in accomplishing the Court's goals.  Undertaking a sale of this complexity and magnitude without engaging an investment banker on whose advice and experience I would be entitled to rely upon would be essentially impossible and, in my opinion, result in a chaotic, inefficient process, and ultimately would not reach the goal of generating a value maximizing outcome.  Further, I believe foregoing the engagement of an investment banker would likely increase the risk of litigation, appeal and challenge to any eventual outcome of the Sale Procedures.

14.     Accordingly, following my retention of counsel and upon their input and guidance, I solicited proposals from several market-leading investment banking advisory firms and conducted an interview of each firm that submitted a proposal.  After a round of interviews and several follow-up discussions, I selected Evercore based on their extensive experience and excellent reputation in providing high quality investment banking services in (a) complex and financially distressed situations, including their extensive experience in advising debtors, creditors, and other constituents in court-supervised sale processes and restructurings; and (b) applicable subject matter investment banking advisory roles in a variety of downstream oil and gas transactions.  The resources, capabilities, and experience of Evercore in advising me in connection with the tasks identified above is critical to obtaining a value-maximizing Sale

CONTAINS REDACTIONS IN ACCORDANCE WITH D.I. 345

Transaction (as explained in greater detail below).  In accordance with the Court's mandate to conduct the sale, as discussed further below, I have proposed to engage Evercore now for the implementation of the Sale Procedures Order but would not direct Evercore to begin any work for that process until I am satisfied that I am able to provide Potential Bidders with comfort that they can participate in the process without subjecting themselves to the risk of violating U.S. sanctions.

15.     Since being engaged, my Advisors have acquired significant knowledge of the Crystallex Case and have conducted the requisite due diligence review of the businesses of PDVH and CITGO, including their business operations, capital structure, key stakeholders, financing documents and other related material information, necessary for the design of the Sale Procedures Order, but have not completed all diligence required for launching the Marketing Process.  My Advisors have advised me in all aspects of preparing and designing the proposed Sale Procedures Order, including analyzing and evaluating potential sale structures, analyzing the proposals from each of the Sale Process Parties, and assisting me with various other activities related to the Special Master process.  On my instructions, my Advisors have been actively involved in discussions and outreach to the Sale Process Parties and in coordinating with the United States Government, including representatives from the Department of Justice, Department of the Treasury and Department of State (collectively, the "**USG**").

16.     As a result of the work performed in connection with designing the proposed Sale Procedures Order and the significant knowledge gained therefrom, I believe that my Advisors are in the best position to advise me and the Court in connection with entry of the Sale Procedures Order and the ultimate implementation thereof.  Since I expect that the Sale Process Parties will be focused on monitoring the expenses of my Advisors in connection with such implementation, the proposed Sale Procedure Order provides for the provision of a rolling 13-week Budget (with

applicable revisions) to the Sale Process Parties of my anticipated expenses immediately following entry of the Sale Procedures Order.  I anticipate providing such a Budget to the Sale Process Parties each month.  *See* Sale Procedures Order at ¶48.

17.     With respect to Evercore, their current engagement ends upon entry of the Sale Procedures Order.  As previously mentioned, I will not be able to fulfill my duties under the January 2021 Ruling and May 2021 Order without a skilled and competent investment banker.  Since their engagement, Evercore has become intimately familiar with the sale process, the Crystallex Case, PDVH, CITGO, and the other circumstances of the current situation.  It would be damaging to the Special Master process if I were required to retain a new investment banker at this stage.  In particular, Evercore will be critical in connection with, among other things:

- reviewing and analyzing PDVH and CITGO's business, operations, and financial projections;

- preparing for and implementing the Marketing Process;

- identifying interested parties and/or potential acquirers and, at my request, contacting such interested parties and/or potential acquirers;

- reviewing any Non-Binding Initial Indications of Interest, Stalking Horse Bids, or other Bids that are received pursuant to the Bidding Procedures;

- structuring and effectuating a Sale Transaction;

- advising my Advisors and I in connection with negotiations with potential interested parties and/or acquirers and aiding in the consummation of a Sale Transaction;

- if requested by the Court or the Sale Process Parties, facilitating discussions in furtherance of a Negotiated Outcome and advising my Advisors and I in connection with such a process;

- advising on tactics and strategies for negotiating with Bidders and Potential Bidders; and

- participating in discussions with and otherwise interacting with the Sale Process Parties and the United States Government (explained in more detail below).

18.     Accordingly, I propose to engage Evercore to advise me in connection with implementation of the Sale Procedures Order.  For the period following entry of the Sale Procedures Order, I negotiated a new engagement letter with Evercore (the "**Proposed Evercore Engagement letter**"), a copy of which is attached as <u>Exhibit 3</u> to the Sale Procedures Order, and am proposing that I be granted the authority to enter into that engagement letter under the proposed Sale Procedures Order.

19.     As is typical and customary for retention of an investment banker, the Proposed Evercore Engagement Letter contains a fee structure where the majority of Evercore's compensation is structured as a "success fee" that is payable based on the "Aggregate Consideration" provided by a buyer in connection with the applicable Sale Transaction (the "**Sale Fee**").[4]  As Evercore's primary compensation will be tied to the success of the sale process, I believe the Sale Fee properly incentives Evercore to facilitate a value-maximizing Sale Transaction.  Unsurprisingly, consistent with sale processes of this type and complexity where an investment banker is engaged, every investment banker that I interviewed insisted on such a construct as their primary form of compensation.

---

[4] As used in the Proposed Evercore Engagement Letter, the term "Aggregate Consideration" means "the total fair market value (determined at the time of the closing of a Sale) of all consideration paid or payable, or otherwise to be distributed to, or received by, directly or indirectly, the Court (or the Special Master) in connection with the Sale Transaction or the Company, its bankruptcy estate (if any), its creditors and/or the security holders of the Company in connection with a Sale, including all (i) cash, securities and other property, (ii) Company debt assumed, satisfied, or paid by a purchaser or which remains outstanding at closing (including, without limitation, the amount of any indebtedness, securities or other property "credit bid" in any Sale) and any other indebtedness and obligations, including litigation claims and tax claims that will actually be paid, satisfied, or assumed by a purchaser from the Company or the security holders of the Company and (iii) amounts placed in escrow and deferred, contingent and installment payments."

20.     In addition to the Sale Fee, under the Proposed Evercore Engagement Letter, Evercore is entitled to a monthly fee of $200,000 (each, a "**Monthly Fee**"). The first nine (9) Monthly Fees actually paid are 50% creditable against any Sale Fee earned by Evercore in connection with a Sale Transaction.  The first Monthly Fee will be due and payable on the date that I instruct Evercore to begin assisting me in preparing for the Marketing Process or I otherwise request their services (such as in connection with facilitating discussions regarding a Negotiated Outcome).  Further, at any time after the Monthly Fees begin to accrue, if implementation or consummation of a Sale Transaction is stayed or otherwise delayed for any reason (other than a delay caused by a necessary regulatory approval unrelated to required OFAC authorization or guidance), I am entitled to send a notice that, three business days after it is received by Evercore, will have the effect of ending the accrual of Monthly Fees until such time as I rescind the notice. Finally, the Proposed Evercore Engagement Letter further provides for reimbursement of reasonable and customary out-of-pocket expenses incurred by Evercore in connection with their engagement thereunder.

21.     In light of this structure and following consultation with the Sale Process Parties, I have submitted a copy of the Proposed Evercore Engagement Letter for approval by the Court. I believe that my continued retention of Evercore is necessary and the terms on which I propose to engage them is consistent and comparative with market terms for an engagement of this nature.

22.     As required by the May 2021 Order, I have consulted with the Sale Process Parties regarding my proposed engagement of Evercore following entry of the proposed Sale Procedures Order.[5]  To varying degrees, each of the Sale Process Parties have raised concerns regarding the

---

[5] [*See* May 2021 Order at 13 ("The Special Master is authorized to enter into any agreements with such Advisors on terms that he, after consultation with the Parties and ConocoPhillips, believes are appropriate.")]

Proposed Evercore Engagement Letter.  I have attempted to resolve each of their objections, including through further negotiation with Evercore.  The Proposed Evercore Engagement Letter reflects these efforts, which are summarized as follows:

- Delaying the incurrence of any Monthly Fees owed to Evercore under the Proposed Evercore Engagement Letter until I provide Evercore with notice of my determination to begin preparations for the Marketing Process;[6]

- Reducing Evercore's Sale Fee in the event the only bona fide Bid generated by the Marketing Process is a credit bid by Crystallex;

- Modifying the timing of payment of the Sale Fee to be no more than $7,000,000 at announcement and signing of any Sale Transaction (the "**Upfront Amount**"); and

- Excusing Crystallex or ConocoPhillips from the obligation to pay the Upfront Amount if, based on the implied value of the Sale Transaction, they are "out of the money" and unlikely to receive any of the proceeds from the Sale Transaction.

I am hopeful that the foregoing amendments will resolve the objections of Crystallex and ConocoPhillips.[7]  Nonetheless, I anticipate that certain objections of the Venezuela Parties may remain unresolved.  As such, I will address the Venezuela Parties' objections briefly now, and will respond more fully to any objections with whatever evidence the Court deems appropriate, if any party prosecutes an objection.

23.     The Venezuela Parties have ostensibly raised concern that the proposed Sale Fee (or any "success fee") paid to Evercore will create an "incurable" conflict of interest that taints

---

[6] The Proposed Evercore Engagement Letter further provides that if the Court or the Sale Process Parties request that I participate or otherwise assist with facilitating a Negotiated Outcome (as discussed more fully below), then, I may request Evercore's services and, in which case, Monthly Fees will be incurred in connection therewith.  Depending on the proposed course of negotiations, it may also necessitate the need to negotiate a "Restructuring Fee" (as defined in the Proposed Evercore Engagement Letter) in consultation with the Sale Process Parties.

[7] If, prior to entry of the Sale Procedures Order, a Sale Process Party (other than the Venezuela Parties) does not wish to be involved in the process, either as a consultation party or otherwise, and elects to withdraw from inclusion in the Marketing Process, then such party presumably would request that the Court revisit the fee apportionment so that it is no longer required to pay for the expenses of the sale process.

both me as Special Master and any advice or services rendered by Evercore.  More specifically, they argue that by linking Evercore's compensation to the success of the Sale Transaction, Evercore will, for their own personal gain, encourage me to recommend to the Court a process that ensures the sale of 100% of the PDVH Shares.[8]  On such basis, the Venezuela Parties have stated that if Evercore is retained I will be disqualified from serving as Special Master in the Crystallex Case because I have been tainted by Evercore's alleged conflict of interest.  *See* Federal Rule 53(a)(2) (subjecting masters appointed under Federal Rule 53 to disqualification in the same circumstances as a judge would be disqualified under 28 U.S.C. § 455).

24.     In support of their proposition, the Venezuela Parties referred me to the Third Circuit Court of Appeals' decision in *In re Kensington Intern. Ltd*., 368 F.3d 289 (2004) ("**Kensington Decision**").  My counsel and I have reviewed the Kensington Decision and believe there are fundamental differences between the facts of that case and the circumstances here, rendering the Kensington Decision's import regarding my retention of Evercore inapposite.

25.     In *Kensington*, the Bankruptcy Court had appointed consultants to assist him as neutral-advisors in the administration of five separate asbestos-related bankruptcy cases.  Two such advisors simultaneously served as advocates—in a fiduciary capacity—on behalf of asbestos claimants in a separate, yet related, bankruptcy case.  As a result, the Third Circuit in the Kensington Decision found that these two advisors faced competing fiduciary obligations that created a clear conflict of interest for both advisors, which arose primarily out of the close relationship between the future asbestos claimants and the issues in the five asbestos cases and the

---

[8] Tellingly, the Venezuela Parties' argument is premised on a gross mischaracterization of the sale process that I have recommended to the Court.  The proposed Sale Procedures Order that I have recommended does not require 100% of the PDVH Shares to be sold.  The proposed Bidding Procedures clearly require me to select a Bid for a lesser percentage of the PDVH Shares if, *ceteris paribus*, it satisfies at least as much of the Attached Judgments as a Bid for a greater percentage of the PDVH Shares.

separate bankruptcy case. *See* Kensington Decision at 11. Because these two advisors were no longer disinterested parties, it was determined that the Bankruptcy Court was tainted by the appearance of a conflict because of the special position of trust and influence they had over the Bankruptcy Court. As a result, the Bankruptcy Court Judge was subject to disqualification from serving as judge in such cases by application of 28 U.S.C. § 455(a). *Ibid* at 14. Here, neither I nor Evercore face any competing fiduciary obligations in the design of the Sale Procedures Order or implementation of the Marketing Process.

26.     Equally as important, the procedural posture of the Kensington Decision is categorically different than the Crystallex Case. At the time of the Kensington Decision, it was anticipated that the Bankruptcy Court would continue to rule on issues and the merits of disputes in the applicable bankruptcy cases. Here, as the Court noted in the January 2021 Ruling, the Third Circuit has left the Court with "***nothing left to do but execute***" the sale of the PDVH Shares. *See* January 2021 Ruling at 19. Neither Evercore nor I will be ruling on the merits of any dispute in the Crystallex Case.[9]  Moreover, Evercore's retention on a "success fee" basis is occurring only once the Court has already approved the Sale Procedures Order and the Bidding Procedures pursuant to which Bids will be solicited from Potential Bidders.

27.     The inapposite Kensington Decision aside, respectfully, it is not, in my view, credible for the Venezuela Parties to argue that retaining an investment banker that is compensated by a success fee for executing the Court's judgment after merits have been decided creates a conflict of interest in this case. The proposed compensation structure for Evercore is reflective of

---

[9] Moreover, as the Venezuela Parties insisted, the Court is required to review *de novo* all factual and legal positions contained in any recommendation I submit to the Court. *See* May Order at ¶ 12.] [*See In re Zenith Elecs. Corp.*, 241 B.R. 92, 102 (Bankr. D. Del. 1999) ("many retention agreements with investment bankers, financial advisors (and even counsel) contain such [success fee] arrangements. That does not, per se, disqualify such firm from testifying as an expert witness.")

industry standards for investment bankers serving in similar advisory roles both in and out of court supervised contexts.  In addition to being the industry standard, the open and transparent manner of the proposed Court-approved engagement of Evercore pursuant to the Proposed Evercore Engagement Letter that the Sale Process Parties have all had an opportunity to provide input on further disavows the notion of a conflict of interest.  Crystallex and ConocoPhillips have each argued that Evercore should not receive any Sale Fee unless the Marketing Process is ultimately successful in generating bona fide Bids.  Tellingly, each Sale Process Party that desires a successful Sale Transaction to occur supports linking Evercore's compensation to the ultimate success of the Marketing Process.  This is in stark contrast to the position of the Venezuela Parties.

28.     I also believe retention of Evercore on a "success fee" basis comports with applicable law and the practice of other Courts.  Courts have appointed trustees, brokers, fiduciaries or liquidators that are paid on a success fee or contingency fee basis – particularly bankruptcy cases – to sell assets without finding that such a compensation structure creates a conflict of interest for such professionals.  *See e.g.*, *In re: Caritas Health Care, Inc.*, *et al.*, 2011 WL 4442884 (Bankr. E.D.N.Y.) (Court-appointed broker retained pursuant to retention letter that provided for a 1.5% sale commission in connection with the sale of property).  Indeed, this practice is further codified in the Bankruptcy Code that such persons must be found by the Court to be "disinterested persons" and that such disinterested persons may be paid on a percentage fee basis in an analogous context.  *See* 11 U.S.C. § 327(a) ("Except as otherwise provided in this section, the trustee, with the court's approval, may employ one or more attorneys, accountants, appraisers, auctioneers, or other professional persons, that do not hold or represent an interest adverse to the estate, **and that are disinterested persons**, to represent or assist the trustee in carrying out the trustee's duties under this title"); 11 U.S.C. § 328(a) ("The trustee, or a committee appointed under

section 1102 of this title, with the court's approval, may employ or authorize the employment of a professional person under section 327 or 1103 of this title, as the case may be, on any reasonable terms and conditions of employment, including on a retainer, on an hourly basis, on a fixed **or percentage fee basis, or on a contingent fee basis**") (emphasis added).  Of course, Evercore's retention by estate fiduciaries in such cases has frequently and routinely been approved by Delaware Courts.  *See, e.g.*, *In re: GNC Holdings, Inc., et al.*, Case No. 20-11662-KBO (Bankr. D. Del. 2020) [D.I. 467]; *In re: Chisholm Oil and Gas Operating, LLC*, *et al.*, Case No. 20-1159-BLS (Bankr. D. Del. 2020) [D.I. 203]; *In re: FAH Liquidating Corp. (f/k/a Fisker Automotive Holdings, Inc.)*, *et al.*, Case No. 13-13087 (KG) (Bankr. D. Del. 2013) [D.I. 756]; and *In re: Delta Petroleum Corporation*, *et al.*, Case No. 11-14006 (KJC) (Bankr. D. Del. 2011) [D.I. 185].

29.      I believe, as noted above, the heart of the Venezuela Parties' objections on this issue relate to the mistaken assumption that I have recommended to the Court to sell-off  100% of the PDVH Shares instead of only so many of those shares as are necessary.  However, as I make clear throughout this Report, I have recommended a process to only sell so many shares as are necessary to satisfy the judgment(s) attached in accordance with applicable law.  Thus, such contention is misplaced.

30.      Relatedly, in their feedback to the draft Sale Procedures Order, the Venezuela Parties argued that my role should be limited to overseeing CITGO's implementation of the sale process, similar to how a board of directors oversees a management team.  As the Court already rejected arguments that the Venezuela Parties should be the party conducting the sale process in the January 2021 Ruling, I do not know if they will continue to press these arguments again before the Court.   Regardless,  although I readily embrace that I will be working in close coordination

with CITGO and its management team[10] in executing the sale, in the context here—executing on

a judgment that it wants to stop through continuous litigation and appeals—I do not believe having

CITGO execute the process with oversight from the Special Master would be a workable outcome

and, as noted above, I believe Evercore fulfills a critical need that complements the services

offered by my other Advisors.[11]

## C.    Entry of Protective Order

31.    On June 16, 2021, following consultation with the Sale Process Parties, I filed a

proposed confidentiality order with the Court [D.I. 283], which was entered by the Court, with

certain modifications, on July 6, 2021.  *See* Protective Order [D.I. 291].  The Protective Order

provides for certain information to be marked as "Confidential" and "Highly Confidential."  I have

relied on certain Confidential and Highly Confidential material in preparing this Report and,

accordingly, have filed it under seal in accordance with the procedures set forth in the Protective

Order.

32.    Although each of the Sale Process Parties should have access to this Report,[12]

I anticipate certain Sale Process Parties will propose that certain (and minimal) aspects of this

Report should remain under seal and should not be accessible to Potential Bidders in the sale

---

[10] Thus far, the members of CITGO's management team have been cooperative and helpful in connection with our initial due diligence requests.

[11] If the Court believes that Evercore should be retained on a fixed fee regardless of the outcome of the sale process, I understand that Evercore would consider working on a fix fee basis.  However, such fixed fee would presumably be based on assuming a successful outcome of the sale process.  Accordingly, I do not believe the other Sale Process Parties would support the payment of such a fee irrespective of the ultimate outcome.  Even in the fixed fee context, unless the Court orders the Sale Process Parties to pay the fixed fee in advance, Evercore's compensation would still be tied to an outcome regardless of whether it was value maximizing.  Indeed, other Sale Process Parties have proposed the exact opposite, that Evercore should be paid less if the outcome of the sale process results in a sale from a credit bid, which is feedback that I incorporated and successfully negotiated into the Proposed Evercore Engagement Letter.

[12] I believe each Sale Process Party should have full access to this Report.  I strongly encourage each Sale Process Party that has designated information contained in this report "highly confidential" to consent to the sharing of unredacted version of this Report with the other Sale Process Parties.

process, particularly the portions that include my commentary and the views of myself and my Advisors on the strategy underlying the sale process. In connection with the Marketing Process described more fully below, I believe it is important that Potential Bidders receive a clear and consistent message after my Advisors and I have had an opportunity to complete the due diligence and preparation stage. As such, I may also propose additional (and minimal) redactions after I receive the proposed redactions to this Report from the Sale Process Parties pursuant to paragraph ¶3 of the Protective Order.[13]

33.     With respect to the entire proposed Sale Procedures Order, I have initially filed it under seal pursuant to paragraph ¶5 of the May Order solely out of an abundance of caution. I propose to file an unredacted version of the proposed Sale Procedure Order on Friday, August 13, 2021.[14] Although I have filed it initially under seal out of an abundance of caution,  I do not believe that the Sale Procedures Order contains any information that is subject to paragraph 3 of the Protective Order. As such, following the filing of this Report, I intend to work with the Court regarding service of the Intervenor Bondholders (as defined in the Court's Memorandum Order dated July 6, 2021 [D.I. 290]) in light of their August 25, 2021 deadline to object to the proposed Sale Procedures Order.[15]

---

[13] I understand that there is a public interest in viewing the pleadings and am cognizant of the Court's prior rulings. *See Memorandum Order* dated July 6, 2021 [D.I. 290] ("All involved in the Special Master proceedings should understand, however, that the Intervenor Bondholders, the media, and the public have certain rights. Any or all of those entities may seek to effectuate those rights, which could eventually lead the Court to require disclosure (on a redacted or unredacted basis) of material marked 'Highly Confidential'").

[14] If any Sale Process Party believes that a portion of the proposed Sale Procedures Order should be redacted, they should be prepared to explain the legal basis for such redactions in writing in connection with proposing any such redactions.

[15] *See* Rule 5 of the Federal Rule of Civil Procedure ("Unless these rules provide otherwise . . . papers must be served on every party").

**D.**     **Proposed Sale Process Party Engagement**

34.     Since entry of the May 2021 Order, I have worked diligently with my Advisors to develop the Sale Procedures Order in accordance with the January 2021 Ruling and the May 2021 Order.  After retaining Advisors, my first steps taken in the process were to familiarize myself with the situation and review available information related to PDVH and CITGO, including prior pleadings filed by the Sale Process Parties in the Crystallex Case and other associated litigation. In connection therewith, I consulted and engaged with each of the Sale Process Parties on numerous occasions and, as a result, the proposed Sale Procedures Order is informed by my own and my Advisors' due diligence into PDVH and CITGO as well as discussions and other communications my Advisors and I have had with each of Sale Process Parties.  By way of example, since entry of the May 2021 Order, my Advisors and I have:

- held scheduled calls with counsel to the Venezuela Parties, in addition to numerous informal communications;
- held scheduled calls with counsel to Crystallex, in addition to numerous informal communications;
- held scheduled calls with counsel to ConocoPhillips, in addition to numerous informal communications;
- sent formal request letters to the Sale Process Parties; and
- directed numerous diligence related requests and questions to CITGO.

35.     After my Advisors and I familiarized ourselves with the relevant facts and circumstances of the current situation, my first formal step in the outreach process was to solicit informal input from the Sale Process Parties, which I did through a "listening tour" in the first two weeks of June 2021.  Over the course of the listening tour, I met and conferred with counsel to each Sale Process Party and solicited their views and input on my initial impressions regarding the potential structure of the process and any other considerations they thought relevant to design of

the Sale Procedures Order.  Following those conversations, my Advisors and I considered the initial informal input of the Sale Process Parties, balanced against our collective analysis and understanding of the available information; I then began to formulate my own views with respect to the design of the Sale Procedures Order.

36.     To ensure that I fully understood each Sale Process Parties' position, I further solicited written proposals from each Sale Process Party to provide them with a thorough opportunity to outline their specific views regarding the Sale Procedures Order and any information they believed should be considered by me in relation to the development of the Sale Procedures Order.  I ultimately received a timely written response and proposal (the "**Alternative Proposals**") from each Sale Process Party (Crystallex's written proposal was received during my listening tour and Crystallex was offered an opportunity to supplement thereafter), which I have taken into account in designing the Sale Procedures Order.[16]  The Alternative Proposals were largely similar to the proposals made by the Sale Process Parties in the pleadings filed with the Court leading up to the January 2021 Ruling.  I sought to incorporate as many applicable comments into the Sale Procedures Order as I considered reasonable.

37.     Following my review of the Alternative Proposals, in particular, I support the pursuit of a Negotiated Outcome (prior to commencing the Marketing Process) whereby voluntary settlement discussions among the Parties, ConocoPhillips, and the PDVSA 2020 Bondholders are pursued with my assistance as Special Master.  I respectfully submit that, given the intractable nature of the dispute among all parties to date, the Court's enforcement of the Sale Procedures Order and the involvement of a third party, my assistance as Special Master may provide a fresh opportunity for all parties to maximize value.  Further, I anticipate that in any sale process, bidders

---

[16] I have retained copies of the Alternative Proposals and can share them with the Court, if requested.

may well propose compromises for various parties if value proves insufficient to satisfy all of CITGO's and its immediate parent companies' obligations, thus my involvement in these discussions as they affect the sale process will only prove useful to the Court, the Parties, and ConocoPhillips.

38.    I believe that having these negotiations may provide the best opportunity for Crystallex and ConocoPhillips to realize the greatest value of their judgments by reaching a negotiated claims waterfall, which my Advisors and I also believe should have the advantage of being more likely endorsed by OFAC. *See* OFAC FAQ 595 ("To the extent an agreement may be reached on proposals to restructure or refinance payments due to the [PDVSA 2020 Bondholders] . . . OFAC would encourage parties to apply for a specific license and would have a favorable licensing policy toward such an agreement").  Although the Parties have been unable to reach a consensual resolution on their own following ten years of litigation, recent developments in the Crystallex Case and the opportunity for the settlement process with my oversight as Special Master provides an opportunity for consensual resolution.   Accordingly, attached as **Appendix B** hereto is my recommended approach for pursuit of a voluntary settlement process should the Court and the Parties, ConocoPhillips, and the PDVSA 2020 Bondholders wish to pursue such a path.

E.    **United States Government Outreach**

39.    In tandem with my consultation with the Sale Process Parties, my Advisors and I also met with representatives from the USG, including representatives from the Department of Justice, Department of the Treasury and the Department of State, on three separate occasions.

•    At the first meeting, on June 6, 2021, I introduced myself and my Advisors and we provided the USG with an overview of the Special Master process and outlined a number of considerations upon which their input would be welcomed.

- At the second meeting, on July 12, 2021, I provided the USG with an outline and overview of my preliminary conclusions with respect to the design of the Sale Procedures Order and, again, outlined a number of considerations for their specific input, including the timing and milestones contemplated by the Court's schedule and embedded in the Sale Procedures Order.

- Finally, at the third meeting on July 15, 2021, my Advisors and I answered follow-up questions the USG representatives had regarding the information presented at the prior meetings and specifically solicited any feedback regarding the USG's position with respect to the Special Master process. We also asked about the status of the USG decision-making processes, particularly as relevant to OFAC guidance or authorization. At the conclusion of the meeting, we agreed to schedule a follow-up meeting once I have filed the proposed Sale Procedures Order with the Court.

40.     At each meeting, I provided the USG representatives with an opportunity to give input into the design of the Sale Procedures Order. At no point did the USG express any objection to the proposed process that my Advisors and I presented to them and, at the third meeting, they indicated they had no further questions and that they did not require any additional information at that time. Further, on July 14, 2021, I understand that OFAC advised the Venezuela Parties that they did not require an OFAC license to pay certain expenses in connection with the Special Master process incurred as of the date thereof.

41.     Although I have not received formal USG feedback, the USG, including OFAC, is aware of the process being proposed and to be implemented pursuant to the Sale Procedures Order, including its specific terms and timetable. I have consistently, unambiguously, and proactively solicited their input. I understand that the USG's policy process remains ongoing and I will continue to proactively engage with the USG representatives with respect to the implementation of the Sale Procedures Order. I intend to schedule a fourth meeting with the USG representatives shortly after the filing of the proposed Sale Procedures Order and this Report.

**F.      Due Diligence of PDVH and CITGO**

42.      Consistent with the Court's mandate in the May 2021 Order, I have worked to become knowledgeable about the business operations and assets of PDVH, including CITGO, through a review of both publicly available information and information produced by PDVH and CITGO.

43.      On June 8, 2021, through my Advisors, I delivered a thorough due diligence request list to counsel to PDVH and CITGO.  On June 23, 2021, PDVH and CITGO made a dataroom available to my Advisors, which they have since populated with certain responsive information on a rolling basis.  In addition to the information produced in the dataroom, on July 1, 2021, my Advisors and I met with members of the CITGO management team, including its most senior members.

44.      To date, my Advisors and I have conducted a review of publicly available information and information provided to me by CITGO relevant to the design of the Sale Procedures Order, which has entailed a review of the Company's corporate and capital structure, historical and projected financial performance, a review and analysis of CITGO's business operations, other relevant business due diligence, and a review of certain of its material contracts, including its funded debt facilities.  I further instructed my Advisors to conduct diligence on the competitive market and Potential Bidders to ensure that the procedures contemplated by the Sale Procedures Order best reflected a fair and optimal sale process given the market dynamic and most likely participants therein.  At this stage, my Advisors and I focused on due diligence that was necessary for the design of the Sale Procedures Order; however, we have not yet conducted all of the due diligence and analysis necessary in preparation for launch of the sale process, including items such as preparing the "teaser,"  confidential information memorandum (or "**CIM**"), and other marketing materials to send to Potential Bidders.  My Advisors and I will complete the due

diligence necessary to launch and implement the Sale and Marketing Process prior to launching any sale process.  The Sale Procedures Order also provides for a period of "reverse-diligence" on Potential Bidders to ensure their wherewithal and ability to close on a winning bid from a regulatory perspective.  I anticipate that the diligence and analysis necessary to prepare for launch of the Marketing Process will take at least 45 days and as much as 90 days to complete.

## G.    Relevant Claims and Interests

45.    Consistent with the Court's mandate in the May 2021 Order, I have begun work to "ascertain the total amounts of the outstanding judgment owed to Crystallex by the Republic of Venezuela and the total amount of the outstanding judgment owed to ConocoPhillips by PDVSA." I have also reviewed and analyzed certain other claims and interests relevant to design of the Sale Procedures Order, particularly the claims of those certain PDVSA 2020 Bondholders (as defined below) and Rosneft Trading S.A. ("**RTSA**") that purport to be secured by a pledge of the equity interests of CITGO Holding, Inc. ("**CITGO Holding**" and together with CITGO Petroleum, "**CITGO**," and the pledge of CITGO Holding's equity interests, the "**Structurally Senior Liens**").

46.    On June 15, 2021, I sent a letter to both Crystallex and ConocoPhillips requesting they each provide a written statement of the amount that they assert remains outstanding with respect to their respective claims, together with relevant supporting documentation, as applicable. ConocoPhillips responded by written letter on June 25, 2021 (as further supplemented on July 20, 2021 and July 27, 2021) and Crystallex responded on July 9, 2021 (as further supplemented on August 6, 2021).  Thereafter, my Advisors and I reviewed the information provided and compared it with publicly available information that I have obtained and, with respect to Crystallex, information received from the Venezuela Parties regarding the amount of their outstanding claims.

1.    Crystallex's Judgment

47.    Crystallex is a Canadian corporation, headquartered in Toronto, Canada, that engaged in gold mining and exploration in Venezuela. As the Third Circuit observed, Crystallex spent hundreds of millions of dollars developing a gold mine at Las Cristinas, Venezuela, which Venezuela subsequently nationalized and seized. In response, Crystallex successfully invoked a bilateral investment treaty between Canada and Venezuela and filed for arbitration before the International Centre for Settlement of Investment Disputes (the "**ICSID**"). The arbitration took place in Washington, D.C., following which the ICSID arbitration panel awarded Crystallex damages in the amount of $1,202,000,000 (plus interest) for Venezuela's expropriation of its investment (the "**Crystallex's ICSID Arbitral Award**").

48.    On March 25, 2017, the United States District Court for the District of Columbia confirmed Crystallex's ICSID Arbitral Award and directed entry of a judgment in the amount of $1,202,000,000, plus (i) pre-award interest from April 13, 2008 to April 4, 2016 (the date of the award) at a rate of 6-month average U.S. Dollar LIBOR plus 1%, compounded annually, (ii) post-award interest on the total amount awarded, inclusive of pre-award interest, at a rate of 6-month average U.S. Dollar LIBOR plus 1% compounded annually, from April 4, 2016 until April 7, 2017, (iii) post-judgment interest on the total amount awarded at the rate set forth in 28 U.S.C. § 1961 (the "**Federal Judgment Rate**"), from April 7, 2017 until the date of full payment, and (iv) the costs of the proceeding ("**D.C. Order Directing Judgment**"). On April 7, 2017, the Clerk of the Court for the United States District Court for the District of Columbia entered the judgment (the "**D.C. Judgment**") and, as noted below, appears to have unintentionally omitted items (ii)-(iv) noted above from the D.C. Order Directing Judgment. Crystallex thereafter commenced the Crystallex Case and registered the D.C. Judgment with the Court on June 19, 2017 [D.I. 1].

49.    On August 6, 2021, I received a signed letter from counsel to Crystallex, which amended an earlier letter that I received from them that was dated July 9, 2021, asserting that the amount of the D.C. Judgment which remains outstanding totals $969,918,374.24 as of August 6, 2021.  Based on information provided to me by Crystallex and certain of the Venezuela Parties, Crystallex has received (or seized) at least $500,078,632.14 in payments or additional consideration from Venezuela on account of the D.C. Judgment (of which many such payments were reportedly made in Euros).  The following chart shows the reported payments and the applicable conversion rate to U.S. Dollars:

| Date received | EUR Amount Received | EUR/USD (BBG) | USD Amount Received/Seized | USD-equivalent Amount Received |
|---|---|---|---|---|
| 2/16/2018 | €4,218,393.72 | 1.24064 | | $5,233,507.98 |
| 3/5/2018 | €4,061,738.42 | 1.23359 | | $5,010,519.90 |
| 4/10/2018 | | | $20,832,165.50 | $20,832,165.50 |
| 4/13/2018 | €12,213,989.09 | 1.23307 | | $15,060,703.53 |
| 8/31/2018 | €4,255,681.33 | 1.16016 | | $4,937,271.25 |
| 8/31/2018 | €4,306,261.33 | 1.16016 | | $4,995,952.14 |
| 8/31/2018 | €17,041,967.91 | 1.16016 | | $19,771,409.49 |
| 10/2/2018 | | | $319,579,394.70 | $319,579,394.70 |
| 10/15/2018 | €45,685,716.75 | 1.15794 | | $52,901,318.85 |
| 11/23/2018 | €45,650,618.57 | 1.13375 | | $51,756,388.80 |
| | | | Total: | $500,078,632.14 |

50.    My Advisors and I have reviewed the information provided by Crystallex and certain other information provided by certain of the Venezuela Parties and, based on the information received, have determined that Crystallex has accurately accounted for the disclosed payments and the accrual of interest at the Federal Judgment Rate, although we have not checked the underlying security documents and, although I do not dispute with Crystallex's conclusions at this time, there are two nuances that I note for the Court's attention:

- First, there appears to be a clerical error in the D.C. Judgment entered by the Clerk of the Court for the United States District Court for the District of Columbia in that the D.C.

Judgment omits the post-award interest that is clearly provided for in the D.C. Order Directing Judgment. *Cf. D.C. Order Directing Judgment* with *D.C. Judgment*. This error was carried over into the judgment that the Court ultimately ordered to be attached to the PDVH Shares. If Crystallex's Judgment is calculated without including the post-award interest, Crystallex's outstanding judgment as of July 9, 2021 is $936,689,442.92, which is $33,3228,931.32 less than if the post-award interest were to be included. In light of the clear language of the D.C. Order Directing Judgment, I do not believe the D.C. Judgment intentionally omitted the post-award interest; and

- Second, approximately $319,579,394 of the disclosed consideration received by Crystallex was paid in the form of securities issued by either PDVSA or the Republic (the "**Transferred Securities**") pursuant to a settlement agreement between Crystallex and the Republic in 2018 (the "**2018 Crystallex Settlement**"). The Transferred Securities have a face amount of $1,347,195,942, but, due to the discount at which the Transferred Securities were trading at the time of the 2018 Crystallex Settlement, the parties agreed to a stipulated value of $319,579,394. My Advisors and I have reviewed publicly available information and believe that the stipulated value reasonably reflects the market price of the Transferred Securities at the time of the 2018 Crystallex Settlement. Further, counsel to Crystallex has informed my Advisors that Crystallex continues to hold the Transferred Securities as of the date hereof.

**2.    ConocoPhillips' Judgment**

51.    ConocoPhillips has initiated arbitral proceedings against Venezuela, PDVSA, and several PDVSA subsidiaries. Relevant to the Sale Procedures Order, ConocoPhillips has obtained confirmation and recognition of the following arbitral awards in the United States District Court for the Southern District of New York[17] (collectively, the "**ConocoPhillips' Judgment**"):

---

[17] *See* Phillips *Petroleum Company Venezuela Limited et al. v. Petróleos De Venezuela, S.A., et al.*, C.A. No. 1:18-cv-03716 (S.D.N.Y. 2018).

| Plaintiff(s) | Defendant(s)[18] | Confirmed Amount |
|---|---|---|
| Phillips Petroleum Company Venezuela Limited | Corpoguanipa, S.A. and PDVSA | $1,498,399,209, plus simple interest at a rate of 3-month LIBOR, running from April 26, 2018 to August 22, 2018 (and the Federal Judgment Rate thereafter) |
| ConocoPhillips Petrozuata B.V. | PDVSA Petroleo. S.A. and PDVSA | $434,884,356, plus simple interest at a rate of 12-month LIBOR, running from April 26, 2018 to August 22, 2018 (and the Federal Judgment Rate thereafter) |
| Phillips Petroleum Company Venezuela Limited and ConocoPhillips Petrozuata B.V. | PDVSA, PDVSA Petroleo. S.A, and Corpoguanipa, S.A. | $231,200, plus simple interest at a rate of 12-month LIBOR, running from April 26, 2018 to August 22, 2018 (and the Federal Judgment Rate thereafter) |

52.    On July 27, 2021, I received a signed letter from counsel to ConocoPhillips (which supplemented prior letters received from ConocoPhillips on June 25, 2021 and July 27, 2021) asserting that the amount of the ConocoPhillips' Judgment that remains outstanding totals $1,287,664,420 as of July 20, 2021. Based on information provided to me by ConocoPhillips, ConocoPhillips has received (or seized) at least $753,998,726 in consideration from PDVSA on account of the ConocoPhillips' Judgment. The following chart shows the reported payments and the applicable conversion rate to U.S. Dollars:

| Date received | Amount Received |
|---|---|
| 8/18/2018 | $288,337,707.33 |
| 9/25/2018 | $100,000,000.00 |
| 11/14/2018 | $100,000,000.00 |
| 2/8/2019 | $88,553,673.00 |
| 5/23/2019 | $88,553,673.00 |
| 8/23/2019 | $88,553,673.00 |
| Total: | $753,998,726.33 |

53.    My Advisors and I have reviewed the information provided by ConocoPhillips and, based on the information received, have determined that ConocoPhillips has accurately accounted for the disclosed payments and the accrual of interest at the Federal Judgment Rate. Further, the

---

[18] Each defendant is jointly and severally liable for the full amount of the award.

Venezuela Parties have indicated that they have reached an agreement with ConocoPhillips regarding the outstanding amount of ConocoPhillips' Judgment.

**3.** PDVSA 2020 Bondholders & CITGO Holding Pledge

54. In exercising my duties as set forth in the May 2021 Order, I am cognizant of the fact that the shares in CITGO Holding, which are 100% held by PDVH, are or may be subject to the Structurally Senior Liens. Treatment and resolution of the Structurally Senior Liens may have a material impact on the sale process and the potential for a value-maximizing Sale Transaction as such liens create uncertainty for Potential Bidders as to their ability to acquire an interest in CITGO upon consummation of a Sale Transaction. Accordingly, my Advisors and I have considered the Structurally Senior Liens in developing the Sale Procedures Order. I summarize my findings below.

- As discussed in greater detail in *Petroleos de Venezuela S.A. v. MUFG Union Bank, N.A.*, 495 F.Supp.3d 257 (2020) (the "**PDVSA 2020 Bondholder Decision**), PDVSA issued two series of bonds due 2017 in the aggregate principal amount of $9,150,000,000 (the "**2017 Bonds**"). The 2017 Bonds were scheduled to mature in April and November of 2017. In anticipation of an inability to repay the 2017 Bonds, and to avoid a potential default thereunder, Venezuela structured a bond-swap transaction (the "**Exchange Offer**") whereby the 2017 Bonds were exchanged for notes scheduled to come due in 2020 (the "**PDVSA 2020 Bonds**" and any such holder, the "**PDVSA 2020 Bondholders**"). In connection with the Exchange Offer, and as agreed to by the government of Venezuela at the time, the PDVSA 2020 Bonds were secured by a pledge of 50.1% of the equity in CITGO Holding held by PDVH (the "**CITGO Holding Pledge**"). *See* PDVSA 2020 Bondholder Decision at 1.

- According to the PDVSA 2020 Bondholder Decision, the District Court for the Southern District of New York found that PDVSA paid the first two installments of the principal payments on the PDVSA 2020 Bond in 2017 and 2018, and made interest payments in

2017, 2018, and the first half of 2019.  However, PDVSA failed to make required payments on October 27, 2019, and thus defaulted on its obligations under the PDVSA 2020 Bonds.

- Thereafter, the Republic, PDVSA, and PDVSA Petróleo, S.A. sought a declaratory judgment finding that the PDVSA 2020 Bonds and related agreements (including the CITGO Holding Pledge) were null and void *ab initio* because they were entered without proper approval from Venezuela's National Assembly in violation of the Republic's constitution.  In response, MUFG Union Bank, N.A., as trustee for the PDVSA 2020 Bonds, and GLAS Americas LLC, as collateral agent, sought an order finding that PDVSA was in default under the PDVSA 2020 Bonds.

- The litigation culminated in the PDVSA 2020 Bondholder Decision that awarded the PDVSA Bondholders' a judgment in the amount of $1,924,126,058 as of December 1, 2020.  *See Judgment Pursuant to Fed. R. Civ. P. 54(b)*, Case 1:19-cv-10023-KPF, entered December 1, 2020 (D.I. 229).  However, as of the date hereof, the PDVSA 2020 Bondholders' ability to exercise the CITGO Holding Pledge remains stayed pending appeal of the PDVSA 2020 Bondholder Decision.

55.     As a result of the CITGO Holding Pledge, the PDVSA 2020 Bondholders may be able to exercise remedies with respect to the 50.1% interest in CITGO Holding stock secured thereunder should the current stay pending appeal of the PDVSA 2020 Bondholders Decision cease to remain in force. I believe that the impact of this potentiality on the viability of any sale process for the PDVH Shares is obvious and inevitable and will likely need to be addressed prior to or in conjunction with any actionable bids being received.

**4.**     RTSA Loan & RTSA Pledge

56.     Similar to the CITGO Holding Pledge, a purported pledge in favor of RTSA poses similar risk to Potential Bidders.  On August 31, 2018, RTSA filed a motion [D.I. 100] (the "**RTSA Motion**") seeking to intervene in these proceedings to protect its interest in a purported pledge from PDVH of 49.9% of the equity of CITGO Holding (the "**RTSA Pledge**")  pursuant to a pledge

agreement among PDVH, PDVSA, and RTSA.  The Court granted RTSA's Motion to intervene on December 12, 2019 [D.I. 154].

57.    In RTSA's Motion, RTSA alleged that the RTSA Pledge secured "certain obligations owed by PDVSA and its affiliates", but did not specify the amount owed.  Publicly available information suggests that, at the time, the RTSA Pledge secured a $1.5 billion loan (the "**RTSA Loan**") made in 2016.  Since then, in March of 2020, RTSA announced it was ceasing operations in Venezuela and selling, closing, or liquidating all of its assets related to Venezuela.[19]

58.    According to the RTSA Motion, the RTSA Pledge provides RTSA with a number of remedies upon the occurrence of certain events, such as a bankruptcy or insolvency event in relation to PDVSA or PDVH, a change in the ownership chain including PDVH and the CITGO entities, and the occurrence of any event that has or is reasonably likely to have a material adverse effect on PDVSA's ability to perform under its commercial agreements.  According to RTSA, in the event of such occurrences, the RTSA Pledge provides RTSA with certain remedies, including, (i) proceeding by suit to foreclose the agreement and sell the pledged CITGO Holding stock, (ii) triggering the sale of the pledged CITGO Holding stock at a public or private sale, and (iii) collecting all profits on the pledged CITGO Holding stock.

59.    As of the date hereof, neither my Advisors nor I have been able to ascertain the outstanding balance, if any, under the RTSA Loan or any other obligations purported to be secured by the RTSA Pledge.  Publicly available information suggests that the RTSA Loan was repaid in full.  Following discussions with CITGO's management team, I understand that the RTSA Loan was scheduled to mature in November of 2020 and that CITGO is not aware of any events of

---

[19]    *See    https://www.spglobal.com/platts/en/market-insights/latest-news/oil/032820-rosneft-to-cease-venezuela-operations-sell-assets-to-russian-government*.

default or extensions thereunder, suggesting the RTSA Loan was repaid or otherwise satisfied in

2020.  Further, following discussions with the Venezuela Parties, my Advisors and I understand

that the RTSA's interest in the RTSA Pledge may have been assigned or otherwise transferred to

a third-party.  If such assignment occurred without OFAC's authorization and in violation of

OFAC regulations, the lien on CITGO Holding's shares granted under the RTSA Pledge may be

void or subject to avoidance.  However, in light of RTSA's potential remedies, I believe that

uncertainty as to the amount outstanding may unfairly chill bidding.  Accordingly, the Sale

Procedures Order provides a mechanism to assist me and the Sale Process Parties in obtaining

information regarding any outstanding amounts that RTSA purports may still be secured by the

RTSA Pledge by requiring that RTSA (and PDVSA) to declare any amounts owed or risk that the

shares will be sold free and clear of the RTSA Pledge upon further entry of an order approving the

Sale Transaction by the Court.  *See* ¶¶ 35-37 of the Sale Procedures Order.

> **5.** **Additional Judgment Creditors of Venezuela and PDVSA**

60.     As the Court is aware, a number of other judgment creditors are seeking to attach

their judgments against Venezuela and/or PDVSA to the PDVH Shares.  The additional judgment

creditors are at various stages in the attachment process, including two of which that are currently

under consideration by the Court.  *See e.g.*, *OI European Group B.V. v. Bolivarian Republic of

Venezuela*, C.A. No. 19-mc-00290-LPS; *Northrop Grumman Ship Systems, Inc. v. The Ministry of

Defense of the Republic of Venezuela*, C.A. No. 20-mc-00257-LPS.  As of the date of this Report,

only Crystallex has been granted an order attaching the applicable judgment to the PDVH Shares.

> **III.** **CITGO and Sale Process Design Considerations**

61.     As set out in more detail in the Hiltz Declaration, CITGO's complex corporate and

capital structure poses a number of challenges to achieving a value-maximizing sale of the PDVH

Shares, which I have worked to account for in the Sale Procedures Order and the procedures

contemplated therein.  The following section describes, at a high level, CITGO's complex structure and these challenges as they relate to the proposed design of the Sale Procedures Order, which is based on information I have obtained from the Sale Process Parties or otherwise obtained through public sources.

A.        **CITGO'S Complex Corporate and Capital Structure**

62.        PDVH is the parent company of CITGO Holding, which in turn is the parent company of CITGO Petroleum.  CITGO Holding and CITGO Petroleum are incorporated in Delaware and both have headquarters in Houston, Texas.  PDVH and CITGO each have a number of their own direct and indirect subsidiaries organized in various jurisdictions (collectively, the "**Company**" or "**CITGO**").

63.        CITGO operates three complex large-scale petroleum refineries located in Lake Charles, Louisiana, Corpus Christi, Texas, and Lemont, Illinois.  CITGO's refining operations are supported by an extensive distribution network, which provides access to the Company's refined product end markets.  CITGO also has a recognized brand presence at the retail level in the United States through its network of locally owned and independently operated CITGO-branded retail outlet licensees.

64.    The following chart shows, in abridged and annotated form, the corporate and capital structure of PDVH in the context of the relevant claims and interests described in the prior Section:



65.    ███████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████



**B.**          **CITGO Sale Process Design Considerations**

66.      The potential for a value-maximizing Sale Transaction is complicated by the corporate and capital structure of CITGO set out above, the number of interested parties in the Crystallex Case, and the other dynamic and internationally sensitive circumstances implicating a potential sale of the PDVH Shares. The combination of these factors create unique challenges to achieving a value-maximizing Sale Transaction.  I believe the Sale Procedures Order strikes an appropriate balance between these challenges, which are described in greater detail below.



1.     OFAC Considerations

67.     As has been briefed in numerous pleadings before the Court in the Crystallex Case and other associated cases, the PDVH Shares and other CITGO assets are "blocked property" pursuant to applicable OFAC regulations.   *See e.g.*, 31 CFR § 591.201, § 591.407, § 591.509.  Uncertainty surrounding what, if any, transaction OFAC will ultimately license creates an overhang that I believe will materially chill bidding.  Accordingly, my Advisors and I have worked extensively to coordinate with the USG, including OFAC, in developing the Sale Procedures Order.  While the USG's policy process and consideration of a potential Sale Transaction remains ongoing, I will continue to proactively engage with the USG's representatives following entry of the Sale Procedures Order and will seek explicit guidance or authorization from OFAC with respect to a potential Sale Transaction that is public or can be shared with Potential Bidders.

68.     Following my interactions with the USG, including OFAC, which are described in detail above, it is my belief and the belief of my Advisors that the Court's entry of the Sale Procedures Order would assist with prompting USG action.  In paragraph 6 of the proposed Sale Procedures Order, I have suggested a proposal for prompting the USG to provide their input into the process at the proposed Initial Status Conference.  Alternatively, the Court could, on a more expedited basis, consider issuing the USG an order to show cause as to why the Court should not enter a sale procedures order that directs the Special Master to immediately prepare for and launch the Marketing Process or why such order would not be vested with the authority to transfer such shares.

2.     Illustrative Clearing Price

69.     Based on a review of information provided or otherwise available to me, a bidder will likely have to submit a bid with an implied total enterprise value of at least ███████ to

generate sufficient consideration for Crystallex's Judgment to be satisfied in full (subject to certain exclusions and potential working capital adjustments), and ultimately ███████ if ConocoPhillips's judgment is added to the Sale Transaction by the Court (subject to certain exclusions and potential working capital adjustments).  *See* Hiltz Declaration at ¶19.  Any additional judgments added to the Sale Transaction by the Court will further increase the clearing price.

70.    Although neither my Advisors nor I have conducted a valuation of the PDVH Shares or CITGO, the illustrative clearing price is useful for the purposes of illustrating the importance of obtaining a Bid that results in sufficient proceeds to satisfy the relevant claims and interests described above.  Bids with an implied enterprise value below the illustrative clearing price will likely require a compromise of claims for less than their face value before a Potential Bidder is willing to pay any material value for the PDVH Shares.

**3.**    Structurally Senior Liens

71.    As described above, resolution of the Structurally Senior Liens of the PDVSA 2020 Bondholders and RTSA will likely be necessary for minimizing uncertainty of the process and maximizing the value of any Sale Transaction.  I do not believe that credible Potential Bidders will be willing to submit a bid for the PDVH Shares without an understanding as to how the Structurally Senior Liens will be resolved or otherwise addressed in connection with any Sale Transaction.  For example, if the CITGO Holding Pledge of the PDVSA 2020 Bondholders remains outstanding following any Sale Transaction, the PDVSA 2020 Bondholders could at some point exercise remedies against 50.1% of the equity interests of CITGO Holding and ultimately seize a controlling stake in CITGO.  The would-be purchaser of the PDVH Shares would then be relegated to an indirect owner of a minority stake in CITGO.  Accordingly, Potential Bidders will either seek to have the uncertainty resolved or severely discount their Bids as a result.

72.     The purported 50.1% pledge to the PDVSA 2020 Bondholders is further complicated by a purported 49.9% pledge in favor of RTSA.  If both the PDVSA 2020 Bondholders and RTSA exercise remedies, then the buyer of the PDVH Shares will be left with no interest in CITGO.  In light of these risks, I do not believe that any credible bidder will invest their time and resources into submitting a Bid unless and until uncertainty around these Structurally Senior Liens is resolved or proposed to be resolved as part of the party's Bid.  *See* Hiltz Declaration at ¶¶ 15-16.

73.     Accordingly, I anticipate that Potential Bidders will either (i) propose a solution to addressing or resolving the claims secured by the Structurally Senior Liens in connection with their Bid, or (ii) condition their Bid on the resolution of these issues by the Special Master, each of which likely require a negotiation to take place with the PDVSA 2020 Bondholders (or RTSA, if applicable).  For this reason, the Sale Procedures Order is designed to provide my Advisors and I with the necessary flexibility to facilitate these discussions.

**4.**     COVID-19's Impact on CITGO's Business and Operations

74.     Any serious and credible bidder will need to invest substantial time and resources in understanding CITGO's business in order to formulate a credible Bid, which is complicated by the recent industry downturn and justifies a robust marketing process that provides Potential Bidders with sufficient time to perform the due diligence and analysis necessary to formulate a Bid.  *See* Hiltz Declaration at ¶ 29.  Based on information provided to my Advisors and I by CITGO, the novel coronavirus ("**COVID-19**") has had an adverse impact on CITGO's refinery utilization and operating margins since the outbreak developed into a pandemic in March of 2020.  As a result of governmental stay-at-home orders and other social distancing measures, there was a rapid and significant decline in the demand for the refined petroleum products that CITGO manufactures and sells.  Further, concerns over the negative effects of COVID-19 on global

economic and business prospects have contributed to increased market and oil price volatility, both of which have had a negative impact on CITGO's business and operations.

75.     As a result of COVID-19, CITGO Petroleum's adjusted EBITDA dramatically declined from $1.92 billion and $1.18 billion in 2018 and 2019, respectively, to negative $432 million in 2020. ███████████████████████████████

███████████████████████████

76.     ███████████████████████████████

███████████████████████████████████

███████████████████████████████████

███████████████████████████████████

███████████████████████████████████

███████████████████████████████████

███████████████████████████████████

77.     Further,  in consultation with my Advisors, I expect Potential Bidders will be focused on CITGO's recovery from the recent downturn in the refining industry, with a particular focus on the impact of new variants of the COVID-19 virus, such as the Delta variant, which have been widely reported to spread more easily than previous strains of the virus.

78.     Guiding bidders through CITGO's recent financial performance and future projections will require substantial work and time on both the part of myself and my Advisors, and the CITGO management team.  The proposed Marketing Process is designed to address such requirements by providing ample time for Potential Bidders to perform necessary due diligence.

**5.**     Management and CITGO's Cooperation

79.     Given the size and complexity of any potential Sale Transaction, the cooperation of CITGO's management team will be critical to value maximization and the successful

implementation of the Sale Procedures.  Further, it will be an expected component of any process by Potential Bidders and crucial to obtaining actionable bids that are not subject to ongoing "diligence outs."  To date, my Advisors and I have engaged constructively with CITGO's counsel and representatives since my appointment as Special Master, including two productive meetings held with the most senior members of CITGO's management team on July 1, 2021.  I am hopeful and optimistic that the CITGO management team will continue to support my Advisors and I in the exercise of my duties pursuant to the Sale Procedures Order.

80.     However, out of an abundance of caution, due to the potential for a negative impact on the sale process, the Sale Procedures Order contains cooperation provisions that would compel, if it becomes necessary, the cooperation of the CITGO management team. *See* ¶¶ 32-33 of the Sale Procedures Order.  I believe that these provisions, which, hopefully, will never need to be enforced by the Court, are appropriate and send a positive message to Potential Bidders that, if they invest their time and resources into formulating a Bid, they will have access to and receive the necessary cooperation from the CITGO management team.  For the avoidance of doubt, I do not intend to employ this relief at the whim of Potential Bidders.  Instead I will rely heavily on the counsel of my Advisors to ensure that requests of Potential Bidders for information or access are measured and reasonable and not designed to frustrate the process, pursue ulterior motives, or unnecessarily burden CITGO or its employees.

**6.**     Ability to Purchase A Controlling Stake in CITGO

81.     In my discussions with the Venezuela Parties, they have sought to characterize my recommended process as one that is indubitably structured to ensure that 100% of the PDVH Shares are sold.  This could not be farther from the truth.  Based on my review and analysis of available information and discussions with my Advisors, I believe that Potential Bidders are much more likely to (a) participate in the process, and (b) pay more for a controlling stake in CITGO

than they would for a minority stake, particularly if PDVSA remains the majority shareholder of the Company.  *See* Hiltz Declaration at ¶¶ 22-23.  As a result, uncertainty around the ability of Bidders to submit Bids and ultimately consummate a transaction for a majority stake or full-company bid will discourage value-maximizing Bids from being submitted.  Accordingly, I have recommended Bidding Procedures that do not place a restriction or limitation at the outset of the Marketing Process as to the percentage of PDVH Shares that Potential Bidders could include in their Bid.  Instead, on the back-end, the Bidding Procedures contain specific procedures for the consideration and evaluation of Bids once they are received.

82.     I am also cognizant of the interests of the Venezuela Parties, and the Court's January 2021 Ruling which called for the design of sale procedures that result in the sale of only so many shares as are necessary to be sold.  *Cf.* May 2021 Order at ¶ 2 with section 324 of the Delaware General Corporation Law (permitting a "sufficient" amount of shares to satisfy the applicable debt to be sold) and 28 U.S.C. §§ 2001, 2004 (granting Federal District Courts broad power to order the sale of shares independent of section 324 of the Delaware General Corporation Law).  As further discussed in paragraphs 31 to 33 of the Hiltz Declaration, the Sale Procedures Order balances these competing considerations through the appointment of a Stalking Horse Bidder, an overbid process and related procedures for comparing Bids for varying percentages of the PDVH Shares based on the implied equity value of the applicable Bids.

**7.**     Broader Powers and Process May Ultimately Be Required

83.     I do not believe that entry of the proposed Sale Procedures Order (or the Court's January 2021 Ruling) will limit the Court's broad power and authority to enforce its judgment or otherwise supplement its prior orders, particularly in response to a change in circumstances or if implementation of the prior order becomes infeasible.  Federal courts have inherent authority "to manage their own affairs so as to achieve the orderly and expeditious disposition of cases." *See*

*Chambers v. NASCO, Inc.*, 501 U.S. 32, 43 (1991) (quoting *Link v. Wabash R. Co.*, 370 U.S. 626, 630–631 (1962)); *Lemon v. Kurtzman*, 411 U.S. 192, 200 (1973) ("In shaping equity decrees, the trial court is vested with broad discretionary power."); *see also Swann v. Charlotte-Mecklenburg Bd. of Educ.*, 402 U.S. 1, 15 (1971) (Where "a right and a violation have been shown, the scope of a district court's equitable powers to remedy past wrongs is broad, for breadth and flexibility are inherent in equitable remedies.").  The Court's inherent power to enforce its judgments is further bolstered by the All Writs Act.  This authority includes the power to enforce and protect federal court orders, including against non-parties.  *See United States v. New York Tel. Co.*, 434 U.S. 159, 172 (1977) ("This Court has repeatedly recognized the power of a federal court to issue such commands under the All Writs Act as may be necessary or appropriate to effectuate and prevent the frustration of orders it has previously issued in its exercise of jurisdiction otherwise obtained"); *See Berger v. Zeghibe*, 666 Fed.Appx. 119, 123 (3d Cir. 2016) ("The All Writs Act authorized the District Court to enjoin Jatinder, a nonparty, because, as demonstrated at the preliminary injunction hearing, she is in a position to frustrate Judgment Creditors' attempts to collect on their judgment by receiving income from Chawla family businesses in which Ravinder may have an interest."); *see also Catalytic, Inc. v. Monmouth & Ocean Cty. Bldg. Trades Council*, 829 F.2d 430, 434 (3d Cir. 1987) (holding that the All Writs Act empowers federal courts to enjoin nonparties to enforce orders in civil cases).  The Court's broad authority takes on even greater significance where, as here, a judgment debtor has an established pattern or practice of delaying or attempting to avoid the judgment.  *See Gregris v. Edberg*, 645 F. Supp. 1153, 1157 (W.D. Pa. 1986) ("The courts of the United States have inherent statutory power and authority to enter such orders as may be necessary to enforce and effectuate their lawful orders and judgments, and to prevent them from being thwarted and interfered with by force, guile, or otherwise, whether or not

the person charged with the violation of the judgment or decree was originally a party defendant to the action").

84.     At this time, I am not asking the Court to approve the tools necessary to address the unforeseen contingencies or impediments that may arise in the sale process;  however, the Sale Procedures Order includes a provision entitling the Special Master to, upon notice of the Sale Process Parties, seek to revisit the scope of the Sale Procedures Order and/or revisit the Special Master's mandate.  If the circumstance presents itself, my Advisors and I will craft the appropriate request tailored to the particular circumstance necessitating any such request to the Court.

**IV.     Sale Procedures Order and Bidding Procedures Summary**

85.     The Sale Procedures Order, including the bidding procedures and notices attached thereto as **Exhibit 1** (the "**Bidding Procedures**"), set forth the proposed procedures for the sale and marketing process to be conducted by the Special Master (the "**Marketing Process**").  As noted above, I have developed and designed these procedures, with the assistance of my Advisors, with the objective of providing for the best opportunity of achieving a value maximizing Sale Transaction.  Accordingly, the Bidding Procedures are designed to promote a competitive and expedient bidding process and to generate the greatest level of interest in the PDVH Shares.

86.     The Sale Procedures Order and Bidding Procedures establish the following key dates and deadlines for the Marketing Process:

| Key Event | Deadline |
|---|---|
| Special Master to Launch Marketing Process and Establish Data Room in accordance with terms of the Sale Procedures Order | Launch ("**L**")[22] |
| Deadline to Submit Non-Binding Indications of Interest | L+ 45 days |

[22]  Prior to launch of the marketing process, a notice will be filed on the docket of the Crystallex Case setting forth the specific date of each deadline.

| Key Event | Deadline |
|---|---|
| Deadline to Submit Stalking Horse Bids | L+ 90 days |
| Deadline for Special Master to Designate Stalking Horse Bidder and Enter into Stalking Horse Agreement | L + 150 days |
| Deadline for Special Master to File Notice of Stalking Horse Bidder | As soon as reasonably practicable following designation by the Special Master |
| Deadline to Submit Bids | L + 210 days |
| Deadline for Special Master to Notify Bidders of Status as Qualified Bidders | L + 217 days |
| Auction to be conducted at the offices of Potter Anderson & Corroon LLP (1313 N. Market Street, 6th Floor, Wilmington, DE 19801-6108) or such other location as is mutually agreeable to the Special Master and each of the Sale Process Parties | L + 230 days |
| Deadline to File Notice of Successful Bid | As soon as reasonably practicable following conclusion of the Auction or, if no Auction, selection of the Successful Bid |
| Deadline to File Objections to Sale Transaction | L + 250 days |
| Deadline for Parties to Reply to Objections to Sale Transaction | L + 263 days |
| Sale Hearing | L + 270 days |

87.     In formulating the Marketing Process, in consultation with my Advisors, I balanced the need to provide adequate and appropriate notice to parties in interest and Potential Bidders with the need to quickly and efficiently run a value-maximizing sale process. The Bidding Procedures are tailored to account for the sale process design considerations described in the prior Section and are, at their core, designed to promote a competitive and expedient sale process for the PDVH Shares that encourages all prospective bidders to submit value-maximizing bids.

88.     The material terms of the Sale Procedures Order and Bidding Procedures are summarized in the following chart along with an explanation of the rationale underlying certain of the provisions:

| Summary of Sale Procedures Order and Bidding Procedures[1] | | |
|---|---|---|
| Term / Provision | Description | Primary Rationale and Considerations |
| Overview of Sale Process | | |
| **Launch Date & Preparation Launch Date** | • The Special Master shall launch and conduct the Marketing Process at the earlier of (i) when (x) the Special Master determines, in his sole discretion but in consultation with the Sale Process Parties, (y) the Special Master and his Advisors have performed sufficient due diligence necessary or desirable to launch a value-maximizing sale process, and (z) the Special Master is satisfied with the authorization, FAQs, or other applicable guidance issued by OFAC regarding the launch and viability of the Marketing Process, including any lack of Executive Branch objection to a potential future order to show cause as to why the launch and participation of prospective bidders in the Marketing Process is not authorized; and (ii) such other time as ordered by the Court (the date on which the Marketing Process is launched, the "**Launch Date**"). | • As stated above, if we were to proceed based on OFAC's public guidance as of today, I do not believe that Potential Bidders will participate in the process for fear of violating such sanctions. *See* OFAC FAQ 809 (stating that a specific license from OFAC is required "prior to conducting an auction or other sale… or taking other concrete steps in furtherance of a sale" of shares of a Government of Venezuela entity (such as the PDVH Shares). Accordingly, the proposed Sale Procedures Order provides for launch of the Marketing Process to be delayed until I am satisfied that Potential Bidders will participate in the Marketing Process because of revised guidance or comfort gained from the Court's Order.<br><br>• In paragraph 6 of the proposed Sale Procedures Order, in consultation with my Advisors, I have proposed a mechanism for soliciting feedback and input from the USG with the Court's assistance, if it becomes necessary. |
| **Preparation Launch Date** | • Prior to the Launch Date, the Special Master shall not prepare in a material way for the Marketing Process or take material steps toward implementation of the Sale Procedures until the Special Master is satisfied with the | • For the same reason as above and following consultation with the Sale Process Parties, I do not believe that it makes practical sense for me incur the substantial fees and expenses that will be necessary to prepare for the |

---

[1] This summary is qualified by reference to the Sale Procedures Order (including the Bidding Procedures). To the extent there is an inconsistency between this summary and the Sale Procedures Order, the Sale Procedures Order shall govern.

| | Summary of Sale Procedures Order  and Bidding Procedures[1] | |
|---|---|---|
| **Term / Provision** | **Description** | **Primary Rationale and Considerations** |
| | authorization, FAQs, or other applicable guidance issued by OFAC regarding preparation for launch of the Marketing Process or the launch and viability of the Marketing Process, including any lack of Executive Branch objection to a potential future order to show cause as to why the launch and participation of prospective bidders in the Marketing Process is not authorized (the date on which the Special Master is satisfied, the "**Preparation Launch Date**"); *provided*, that, notwithstanding the foregoing, the Special Master shall be authorized to (i) proactively engage with representatives from the Executive Branch (as defined below) and to take all steps or actions reasonably in furtherance of the issuance of OFAC guidance and/or authorization, (ii) proactively engage with the Sale Process Parties and their advisors, (iii) prepare for and participate in any discussions with the Court and/or any hearing held by the Court, including the Initial Status Conference, and (iv) participate in any settlement discussions with parties regarding a global claims waterfall or related issues is so directed by the Court. On and after the Preparation Launch Date, the Special Master and the Special Master's Advisors are hereby directed to prepare for the Marketing Process and take all such preliminary actions in connection therewith, including conducting or performing appropriate due diligence and related analysis. | ultimate launch of the Marketing Process until I am satisfied that Potential Bidders will participate in the Marketing Process.  Thereafter, I anticipate that it will only take 45 to 90 days to prepare for and ultimately launch the Marketing Process or in connection with settlement discussions, as needed.  As a result, delaying launch as set forth in the proposed Sale Procedures Order will not materially delay the process. |

| Summary of Sale Procedures Order  and Bidding Procedures[1] | | |
|---|---|---|
| **Term / Provision** | **Description** | **Primary Rationale and Considerations** |
| **Sale Process Phases** | The proposed Marketing Process includes two bidding phases and a call for overbids (and an Auction) pursuant to the Bidding Procedures and the Timeline described above:<br><br>• **Phase I**: The Special Master will seek Bids for the PDVH Shares and may designate a Stalking Horse Bidder based on the bids received on or prior to the Stalking Horse Bid Deadline.<br><br>• **Phase II**: The Special Master will conduct a second phase marketing process seeking Bids that have a greater equity value than the equity value implied by the total enterprise value of any Stalking Horse Bid.  The Special Master will specifically market for any Bids for less than 100% of the shares of PDVH (and also any full-company overbids), *provided* that a Bid for less than 100% must match or falls within an acceptable deviation from the equity value implied by the Stalking Horse Bid Implied Value.   Thereafter the Special Master will conduct an Auction with appropriate procedures matching the circumstances.<br><br>• Following the Bid Deadline (and Auction, if applicable), the Special Master will select the highest Qualified Bid(s) that the Special Master reasonably believes to be capable of being timely consummated after taking into account the factors set forth in the Bidding Procedures as the Successful Bid. | • The proposed two-phase process is intended solicit the best price for PDVH Shares on a per-share basis and subsequently market test any Stalking Horse Bid selected to ensure that any Sale Transaction will be value maximizing.<br><br>• The procedures for comparing Bids based on their implied equity value ensures that the Bid  ultimately selected as the Successful Bid will be one that is value maximizing.  In evaluating any Bid (including a Stalking Horse Bid), the Special Master will take into account, among other things, (i) the treatment of any assumed debt and/or treatment of any claims secured by Structurally Senior Liens in calculating the Stalking Horse Implied Value, and (ii) conditions or assumptions included the Bid regarding third parties or obligations owed by parties other than PDVH.<br><br>• Provides Potential Bidders with roughly 12 weeks from receiving initial information to conduct diligence to submit a Stalking Horse Bid and provides a second opportunity to Bid in the overbid process and ensures that only so many shares as are necessary to be sold are actually sold.<br><br>• Overbid process ensures a final market check for the highest bid prior to a Successful Bid being selected |

| Summary of Sale Procedures Order  and Bidding Procedures[1] | | |
|---|---|---|
| **Term / Provision** | **Description** | **Primary Rationale and Considerations** |
| **Shares to be Sold** | • Interested parties may submit bids for the purchase and sale of up to 100% the PDVH Shares in accordance with the terms and conditions set forth in the Bidding Procedures.  To avoid any ambiguity, parties may submit bids for less than 100% of the shares of PDVH so long as such bid satisfies the Attached Judgments. | • A value maximizing transaction is one that ensures the most suitable bidders participate in the process.  Suitable bidders participate when the offer is enticing.  The more enticing the offer the greater likelihood of participation.  Accordingly, the Special Master wishes to make the most enticing offer available in the circumstances: an offer of 100% of the PDVH Shares.<br><br>• Notwithstanding the offer of 100% of the PDVH Shares, Potential Bidders are encouraged to submit any and all types of Bids consistent with the Bidding Procedures, which encourages value-maximizing Bids of any sort; however, foreclosing the option to purchase a controlling stake or Bids for less than 100% of the PDVH Shares will discourage bidding.<br><br>• As explained in greater detail in ¶ 81 of the Report and ¶¶ 21-23 of the Hiltz Declaration, a Bid for 100% of the PDVH Shares (or at least a controlling stake) is likely to achieve Bids with a higher implied equity value.  Accordingly, such Bids should be encouraged as value maximizing. |
| **Designation of Stalking Horse Bidder** | • At the conclusion of the first phase of the sale process, the Special Master may, in the exercise of his judgment and at his sole discretion, designate a Stalking Horse Bidder and enter into a Stalking | • Designation of a Stalking Horse Bid will promote a competitive and robust bidding process and will facilitate a final market check and overbid process before a Successful Bid is ultimately selected. |

| Summary of Sale Procedures Order and Bidding Procedures[1] | | |
|---|---|---|
| **Term / Provision** | **Description** | **Primary Rationale and Considerations** |
| | Horse Agreement in accordance with the terms of the Sale Procedures Order and Bidding Procedures.<br><br>• The Special Master will consider all Stalking Horse Bids received, including any bid that contemplates a Credit Bid, for designation as a Stalking Horse Bid, but shall not be required to designate any bid as a Stalking Horse Bid.<br><br>• The Special Master may, subject to the Bidding Procedures and approval of the Court:<br><br>• establish an initial overbid minimum and subsequent bidding increment requirements not to exceed 5.00% of the Stalking Horse Bid Implied Value, subject to adjustment for any Bids for a lesser percentage of the PDVH Shares than the Stalking Horse Bid;<br><br>• offer any Stalking Horse Bidder a break-up fee in an amount agreed to by the Special Master in consultation with the Sale Process Parties but not to exceed 3.0% of the Stalking Horse Bid Implied Value (a "**Termination Payment**") payable either (a) in the event that an overbid is consummated, out of the proceeds from the consummation of such overbid and (b) by PDVH, CITGO Holding, and CITGO Petroleum in circumstances where any of PDVH, CITGO Holding, and/or CITGO Petroleum | • More specifically, designation of a Stalking Horse Bid early in the process, will, among other things, provide transparency and foster competitive bidding by exposing the highest bid to a subsequent round of bidding, set an easily identifiable bid floor for the remainder of the sale process, and facilitate the form of definitive sale agreement that other bidders can utilize in submitting their Bids.<br><br>• The Stalking Horse Bid Protections are reasonably calculated to incentivize Potential Bidders to participate in a competitive bidding process, designed to encourage robust bidding by compensating a bidder whose definitive agreement in connection with a Sale Transaction is terminated for the risks and costs incurred in signing and announcing an agreement for a transaction that may not ultimately be completed, and reasonably calculated so as to not unreasonably deter Qualified Bidders from submitting a Qualified Bid.<br><br>• Finally, selection of a Stalking Horse Bid will provide certainty that a Sale Transaction will take place, meeting the expectations of certain parties that relief granted by the Court with respect to their Attached Judgment claims will be honored through to remedy. |

CONTAINS REDACTIONS IN ACCORDANCE WITH D.I. 345

| | Summary of Sale Procedures Order and Bidding Procedures[1] | |
|---|---|---|
| **Term / Provision** | **Description** | **Primary Rationale and Considerations** |
| | is materially responsible for the events that give rise to a Termination Payment;<br><br>• provide that, if the Stalking Horse Bidder bids on PDVH Shares at the Auction, the Stalking Horse Bidder will be entitled to a credit in the amount of its Termination Payment against the increased purchase price for the PDVH Shares;<br><br>• provide for the reimbursement of reasonable and documented fees and expenses actually incurred by the Stalking Horse Bidder by PDVH, CITGO Holding and CITGO Petroleum solely under certain circumstances in which the transactions contemplated by the Stalking Horse Agreement are not consummated;<br><br>• provide that any sale order will seek to transfer the PDVH Shares free and clear of any claims upon them; and<br><br>• in consultation with the Sale Process Parties, provide other appropriate and customary protections to a Stalking Horse Bidder.<br><br>• The Special Master is authorized to offer the Stalking Horse Bid Protections at his sole discretion if he determines that such Stalking Horse Bid Protections would be in furtherance of a value maximizing transaction and argue that any sale order | |

| Summary of Sale Procedures Order and Bidding Procedures[1] | | |
|---|---|---|
| **Term / Provision** | **Description** | **Primary Rationale and Considerations** |
| | shall seek to transfer the PDVH Shares free and clear of any claims upon them. | |
| **Credit Bidding** | • Crystallex and any other party holding an attached judgment may submit a Credit Bid under the following conditions:<br><br>  • Any Credit Bid must include a cash component or other funding mechanism sufficient to pay (or otherwise contemplate payment in full in cash in a manner acceptable to the Special Master): (i) any applicable Termination Payment, (ii) all Transaction Expenses, and (iii) all obligations secured by senior liens on the PDVH Shares (if any); and<br><br>  • Any party seeking to submit a Credit Bid must cause two of its representatives to each submit a sworn statement and affidavit unequivocally and unconditionally stating (i) the amount of such party's judgment as of the date of the Credit Bid and (ii) that such representative submits to the personal jurisdiction of the Court in connection with making such statement and affidavit. | • The Court has authorized Crystallex to credit bid the D.C. Judgment. *See* May 27th Order.<br><br>• The conditions imposed for submitting a Credit Bid ensures that the Sale Transaction selected as the Successful Bid will ultimately be feasible.<br><br>• The Sale Procedures Order authorizes parties with Attached Judgments, including Crystallex, to Credit Bid in a way that does not deter bidding and will provide certainty in the implementation of the sale process. |
| **Criteria for Selecting Successful Bid** | • The Special Master may select, in the exercise of his judgment, and recommend to the Court for confirmation the highest bid resulting from the public process described above that the Special Master reasonably believes to be capable of being timely consummated | • The Bidding Procedures provide parties with notice of the clear framework that the Special Master will utilize to ultimately select the Successful Bid. I believe that an open and transparent process is important for all |

| Summary of Sale Procedures Order and Bidding Procedures[1] | | |
|---|---|---|
| **Term / Provision** | **Description** | **Primary Rationale and Considerations** |
| | after taking into account the factors set forth in the Bidding Procedures. <br><br> • The Special Master may, in consultation with the Sale Process Parties and in accordance with the Bidding Procedures, identify the highest Qualified Bid capable of being timely consummated, other than the Stalking Horse Bid, if any, as the Successful Bid.  If a Stalking Horse Bid was designated in such a case, the Special Master will designate the Stalking Horse Bid as a Back-Up Bid.  If a Sale Transaction with a Successful Bidder is terminated prior to the Back-Up Bid Expiration Date, the Back-Up Bidder shall be deemed a Successful Bidder and shall be obligated to consummate the Back-Up Bid as if it were a Successful Bid. | participants, including Potential Bidders and the Sale Process Parties. <br><br> • The flexibility in selecting the highest bid capable of being timely consummated after taking into account the factors set forth in the Bidding Procedures ensures that I, in consultation with the Sale Process Parties, may select the best overall bid and am not forced to select a bid that is not feasible.  Common reasons that a Bid may not be feasible include risks associated with Qualified Bidders' financing source(s) (particularly if it is contingent) or regulatory risks, such as antitrust, OFAC, or CFIUS concerns.  Upon receipt of any such Bids, my Advisors and I will review and evaluate these such Bids in consultation with the Sale Process Parties. |
| **Court Approval of Sale Transaction** | • Following selection of the Successful Bid, the Special Master will submit the proposed Sale Transaction to the Court for approval. | • Although the Special Master is granted flexibility to conduct and implement the Sale Procedures Order, any Sale Transaction is subject to approval by the Court. |
| **Mechanics of Sale Process** | | |
| **Non-Binding Indications of Interest** | • Parties wishing to participate in the sale of PDVH Shares are encouraged to submit a Non-Binding Indication of Interest that identifies the percentage of PDVH shares they are seeking to purchase.  The Special Master requests (and strongly encourages) Potential Bidders to include in their Non-Binding Indication of | • To maximize participation of credible and eligible bidders, I believe it makes sense to implement certain procedural characteristics of a traditional sale process.  The proposed requirements of a Non-Binding Indication of Interest are intended to collect information necessary to ensure that a Potential Bidder will be able to |

| Summary of Sale Procedures Order and Bidding Procedures[1] | | |
|---|---|---|
| **Term / Provision** | **Description** | **Primary Rationale and Considerations** |
| | Interest, at a minimum, the items enumerated in the Bidding Procedures. | successfully close a Sale Transaction if selected as the Successful Bidder.   The information requested is customary of a traditional sale process and/or may become necessary in light of the regulatory approvals required to consummate a Sale Transaction in light of the circumstances. |
| **Form and Content of a Bid** | • To be considered for selection as a Stalking Horse Bid and/or to constitute a "Qualified Bid," a Bid must include, at a minimum, the items enumerated in the Bidding Procedures. | • Implementation of these procedural characteristics of a traditional sale process will ensure that my Advisors and I have adequate information with respect to all Bids.<br><br>• These procedures further encourages participation of credible and eligible bidders |
| **Mandatory Requirements of Qualified Bid** | • Solely if the Court has approved of the Special Master entering into a Stalking Horse Agreement and such Stalking Horse Agreement has been executed, no other Bid shall be considered a Qualified Bid unless such Bid meets the following "Mandatory Requirements" set forth in the Bidding Procedures:<br><br>   • The Bid must have a greater Implied Value than the Stalking Horse Bid Implied Value or be within a range of such Implied Value which, in the Special Master's judgment, is sufficient to meet the requirements of obtaining a value maximizing Sale Transaction; | • If a Stalking Horse Bid has been selected, the Mandatory Requirements are intended to provide for a true market-test of such Stalking Horse Bid.<br><br>• The Mandatory Requirements further encourage Potential Bidders to submit topping bids that satisfy as much or more of the Attached Judgments than the Stalking Horse Bid (or the same amount of the Attached Judgments for less of the PDVH Shares). |

| Summary of Sale Procedures Order and Bidding Procedures[1] | | |
|---|---|---|
| **Term / Provision** | **Description** | **Primary Rationale and Considerations** |
| | • In addition to the minimum amount of consideration necessary to satisfy the foregoing requirement, the Bid must provide for additional consideration sufficient to pay in full in cash all Stalking Horse Bid Protections, including any Termination Payment and Expense Reimbursement amounts payable;<br><br>• The Bid must provide for either (i) sufficient proceeds to pay no less of the Attached Judgments than the Stalking Horse Bid or (ii) proceeds in excess of the proceeds provided for in the Stalking Horse Bid after payment of all Stalking Horse Bid Protections. | |
| **Sale Notice Procedures and Requirements** | • The Special Master will cause a notice of the sale process and Bidding Procedures, substantially in the form attached to the Sale Procedures Order, to be published (i) following the launch of the sale process, and (ii) prior to any Auction or designation of any Stalking Horse Bidder as the Successful Bidder, in each case for two successive weeks.<br><br>• A copy of the Sale Procedures Order shall be served by e-mail on counsel to the Venezuela Parties. If any Sale Process Party believes that further service of the Sale Procedures Order, the Sale Notice or any additional publication or notice is necessary or appropriate, such Sale Process Party shall, within 10 calendar days of entry thereof, provide the Special Master with a specific list of specific actions or service that the Sale Process | • The Notice Procedures in the proposed Sale Procedures Order are designed to ensure that each Sale Process Party has ample opportunity to provide input on the form of service and publication notice that I ultimately employ. For example, the proposed form of Sale Notice, which each Sale Process Party has had an opportunity to comment on and provide input on, is attached as <u>Exhibit 2</u> to the proposed Sale Procedures Order. I believe it makes sense for the Court to approve the form in advance, with input from the Sale Process Parties, to mitigate "foot fault" arguments that may be raised later.<br><br>• Section 324 of the Delaware Corporation Law proscribes certain notice and service requirements for notice of any Auction, which I have incorporated into the Proposed Sale Procedures Order to the extent set forth therein. Due |

| Summary of Sale Procedures Order and Bidding Procedures[1] | | |
| --- | --- | --- |
| **Term / Provision** | **Description** | **Primary Rationale and Considerations** |
| | Party believes should be undertaken, subject to order of the Court or with the consent of the Special Master. | to the judgment debtor's (the Republic's and PDVSA's) active participation in the Crystallex Case and the other unique circumstances and sensitive political issues at play, I believe it is prudent to obtain their input on the specific notice procedures to be incorporated into the proposed Sale Procedures Order with respect to service on and notice in Venezuela (particularly with respect to any required publication notice in Venezuela). |
| **Good Faith Deposit** | • A cash deposit (that is refundable under the circumstances described in the Bidding Procedures) in the amount of 10% of the Implied Value of the applicable Bid will be paid by:<br>  • the Stalking Horse Bidder upon entry into a Stalking Horse Agreement, unless otherwise agreed to by the Special Master, in consultation with the Sale Process Parties and the Stalking Horse Bidder; and<br>  • any other Potential Bidder, unless otherwise agreed to by the Special Master, in consultation with the Sale Process Parties and a Potential Bidder; *provided* that, a Potential Bidder submitting a Credit Bid shall only be required to provide a deposit in the amount of 10% of the cash component of such Bid. | • The Court previously held that "bidders will be required to make a substantial good faith deposit, which will be refundable to all but the winning bidder. The winning bidder may be required to make an additional non-refundable deposit to provide adequate incentive to close the deal." The Good Faith Deposit limits the execution risk and ensures that only credible bids that can ultimately be consummated are taken into consideration. (*See* ¶37 of the Hiltz Declaration). |
| **Sale Process Parties** | • At all times during the bidding process, the Special Master will consult with the Court and the Sale Process Parties and may do so on an *ex parte* basis *in camera*. In | • Consistent with the Court's mandate, my Advisors and I intend to consult with various parties in interest |

| Summary of Sale Procedures Order and Bidding Procedures[1] | | |
|---|---|---|
| Term / Provision | Description | Primary Rationale and Considerations |
| | addition, throughout the bidding process, the Special Master and his Advisors will regularly and timely consult with the following parties (through their applicable advisors):  (i) the Venezuela Parties, including PDVH and CITGO; (ii) Crystallex; and (iii) ConocoPhillips.<br><br>• The Special Master shall use reasonable efforts to timely provide copies of any Non-Binding Indications of Interest, Bids, Stalking Horse Bids, and other relevant documents to the Sale Process Parties, *provided* that the Special Master shall not consult with or provide copies of any Non-Binding Indications of Interest, Bids, or Stalking Horse Bids to any Sale Process Party pursuant to the terms of these Bidding Procedures if such Sale Process Party has a Bid pending, or has expressed any written interest in bidding for the PDVH Shares.<br><br>• If a Sale Process Party chooses not to submit any Bid, then such party may receive copies of all Bids following expiration of the latest possible Bid Deadline (as such Bid Deadline may be extended by the Special Master pursuant to the terms of these Bidding Procedures); *provided,* that (i) such Sale Process Party shall be required to hold any Bids or other documents received in strict confidence in accordance with the terms of the *Special Master Confidentiality Order* [D.I. 291], and (ii) upon a Sale Process Party's receipt of a copy of any Bid, such Sale Process Party shall thereafter be | throughout the sale process and balance competing interests.<br><br>• To maintain the integrity of the sale process and to facilitate a competitive, fair and value-maximizing Sale Transaction, I do not believe it is prudent to consult with any Sale Process Party regarding Bids or strategies with respect to Potential Bidders if that Sale Process Party has also submitted a Bid or expressed any written interest in bidding for any of the assets.  For this reason, the Bidding Procedures contain a customary and typical limitation on my obligation to consult with any such Sale Process Party that intends to or has submitted a Bid. |

| | Summary of Sale Procedures Order  and Bidding Procedures[1] | |
|---|---|---|
| **Term / Provision** | **Description** | **Primary Rationale and Considerations** |
| | precluded from submitting any bid or other offer for the PDVH Shares.  For the avoidance of doubt, if the only Bid that a Sale Process Party receives is a copy of the Stalking Horse Bid designated by the Special Master, such Sale Process Party may submit a Bid like any other Potential Bidder pursuant to the terms of the Bidding Procedures. | |
| **Auction** | <ul><li>If the Special Master receives more than one Qualified Bid (inclusive of any Stalking Horse Bid) for the PDVH Shares, the Special Master will conduct the Auction.</li><li>Only a Qualified Bidder will be eligible to participate at the Auction, subject to such limitations as the Special Master may impose in good faith.</li><li>The Special Master may, in consultation with the Sale Process Parties, adopt rules for the Auction, subject to the limitations set forth in the Bidding Procedures, at any time that the Special Master reasonably determines to be appropriate to promote a spirited and robust Auction.</li></ul> | <ul><li>To facilitate a value-maximizing Sale Transaction through the proposed two-phase sale process, the Special Master will hold an Auction consistent with customary sale procedures if he receives one or more Qualified Bids (including any Stalking Horse Bid).  The procedures and forum of such Auction shall be determined by the Special Master to suit the circumstances and ensure a value maximizing Sale Transaction.</li></ul> |
| **Data Room Access** | <ul><li>As soon as reasonably practicable, the Special Master will provide each Potential Bidder access to the Data Room; <u>provided</u> <u>that</u>, such Data Room access and access to any other due diligence materials and information</li></ul> | <ul><li>Consistent with the January 2021 Ruling, Potential Bidders will expect a robust data room to perform due diligence.</li></ul> |

57

| Summary of Sale Procedures Order and Bidding Procedures[1] | | |
|---|---|---|
| **Term / Provision** | **Description** | **Primary Rationale and Considerations** |
| | may be terminated by the Special Master in his sole discretion at any time for any reason whatsoever. <br><br> • The Special Master may restrict or limit access of any Potential Bidder to the Data Room if the Special Master determines, based on his reasonable judgment (or after consultation with the Sale Process Parties), that certain information in the Data Room is sensitive, proprietary or otherwise not appropriate for disclosure to such Potential Bidder. <br><br> • Each of the Sale Process Parties may recommend to the Special Master documents or additional information to be included in the Data Room. | |
| **Attached Judgments** | | |
| **Satisfaction of All Attached Judgments** | • Nothing in the Sale Procedures Order prohibits or in any way impairs the rights of the Venezuela Parties to satisfy Crystallex's Judgment (or any other Attached Judgment) in full prior to consummation of a Sale Transaction. If at any time all Attached Judgments become satisfied in full (or otherwise are consensually resolved), then the Special Master shall cease implementation of the Sale Procedures and seek further orders from the Court. <br><br> • The Sale Process Parties shall remain liable for any Transaction Expenses through the date that is two | • The proposed Sale Procedures Order and Bidding Procedures are designed to preserve the Venezuela Parties' right to end the sale process through satisfaction of all Attached Judgments at any time. |

| | Summary of Sale Procedures Order and Bidding Procedures[1] | |
|---|---|---|
| **Term / Provision** | **Description** | **Primary Rationale and Considerations** |
| | business days after the Special Master receives notice of satisfaction of all Attached Judgments. | |
| **Attached Judgments** | • By no later than a date established by the Court, the Court will decide which, if any, Additional Judgments are to be added to Sale Transaction. Except as otherwise ordered by the Court, following the Additional Judgment Deadline, the Special Master shall implement the Sale Procedures, based on the Attached Judgments as of the Additional Judgment Deadline.<br><br>• For the avoidance of doubt, the outside date will not impair or in any way limit a person's or entity's right to seek attachment to any proceeds following consummation of the Sale Transaction. | • Consistent with the Court's mandate, the Sale Procedures Order provides that the Special Master will implement the sale process in satisfaction of Crystallex's Judgment and any other judgment attached by the Court. In implementing the Additional Judgment Deadline, the Special Master will have the certainty required to appropriately implement the sale process in carrying out his duties. |
| | **Amendments and Additional Powers of Special Master** | |
| **Additional Guidance from the Court** | • If the Special Master, in his sole discretion, but after consultation with the Sale Process Parties, determines that (i) a material modification or amendment of the Sale Procedures Order or the Sale Procedures (including the Bidding Procedures) that is not otherwise permitted or (ii) additional powers or guidance from the Court, is reasonably necessary or desirable for any reason, including to (a) ensure a value maximizing sale process or (b) effectuate a value maximizing sale process through a Sale Transaction, the Special Master may seek | • Providing a streamlined process for the Special Master to seek additional guidance and/or an amendment to the Sale Procedures Order ensures that the Court will be apprised if an amendment of the Sale Procedures Order becomes warranted under the circumstances. |

| Summary of Sale Procedures Order and Bidding Procedures[1] | | |
|---|---|---|
| **Term / Provision** | **Description** | **Primary Rationale and Considerations** |
| | such proposed amendment or additional powers or guidance, as applicable, by filing a request or recommendation with the Court with notice to the Sale Process Parties. | |
| **Requests of the Special Master** | • In addition to the cooperation provisions in the May 2021 Order, the Sale Process Parties, including CITGO and PDVH, and each of their subsidiaries, including their directors, officers, managers, employees, agents, and advisors, shall promptly cooperate and comply with the requests of the Special Master. If the Special Master specifically invokes paragraph 32 of the Sale Procedures Order in connection with any such request, then the person or entity that is the subject or recipient of such request shall comply no later than five business days after the date upon which the request was made, unless the Special Master sets a different deadline for which a response is due. | • In connection with carrying out his duties, the Special Master will likely need to request information or make other requests upon the Sale Process Parties or their representatives. Establishing a process to compel compliance with such requests will streamline the process for making any such requests and will mitigate the likelihood that potentially uncooperative parties can jeopardize the process by withholding necessary information (or otherwise). |
| | • If any person objects to a request by the Special Master that specifically invokes paragraph 32 of the Sale Procedures Order, including objections based on a belief that such request is unreasonable, such person shall file a motion with the Court seeking relief from the Special Master's request. Absent a motion seeking relief from the Court, the Special Master may (but shall have no obligation to) explain the basis of his request to the subject or recipient; *provided*, that, if requested by the | |

| Summary of Sale Procedures Order and Bidding Procedures[1] | | |
|---|---|---|
| **Term / Provision** | **Description** | **Primary Rationale and Considerations** |
| | subject or recipient, the Special Master shall meet and confer with such person at least one business day before such person's deadline to file a motion seeking relief from the Special Master's request.<br>• The Special Master may, in his sole discretion, recommend to the Court appropriate sanctions with respect to any person or entity that fails to promptly comply with a request absent a timely request for relief from the Court. | |
| **CITGO Management Team** | • If requested by the Special Master, CITGO shall use reasonable efforts to make members of the CITGO management team available for meetings with bidders or potential bidders, which may include, in the Special Master's sole discretion, the most senior members of the CITGO management team.  The CITGO shall further use reasonable efforts to timely respond to the Special Master's diligence requests or bidder-specific questions, including, if applicable, by providing accurate and complete due diligence materials, documentation, and backup support requested by the Special Master. | • As discussed above (*see supra* ¶¶ 79-80), the cooperation of the CITGO management team is critical to the value maximization of the PDVH Shares. |
| **Additional Powers of the Special Master** | • The Special Master shall have all of the powers and duties set forth in prior orders of the Court, including the May 2021 Order.  Without limiting the foregoing, the Special Master may issue, without limitation, orders, subpoenas and interrogatories in the course of performing his duties.  Further, the Special Master may, | • In connection with implementing the Sale Procedures Order, I may need to obtain or seek information from third-parties or address unforeseen situation.  These additional powers will provide the flexibility and discretion necessary to address such situations in connection with carrying out his mandate under the Sale |

| Summary of Sale Procedures Order and Bidding Procedures[1] | | |
|---|---|---|
| **Term / Provision** | **Description** | **Primary Rationale and Considerations** |
| | in his sole discretion and consistent with Rule 53 of the Federal Rules, issue orders to compel delivery of information from any person or entity in connection with implementing the Sale Procedures, including to ensure a comprehensive and value-maximizing sale process, to ensure that property that is directly or indirectly the subject of the Sale Procedures Order is not transferred or otherwise encumbered by the Venezuela Parties or to determine the amount of claims against the Venezuela Parties. Following consultation with the Sale Process Parties, the Special Master may by order impose on a party any non-contempt sanction provided by Rule 37 or Rule 45 of the Federal Rules, and may recommend a contempt sanction against a party and sanctions against a nonparty, consistent with Rule 53(c) of the Federal Rules. | Procedures Order and, ultimately, a value maximizing Sale Process. |
| **Additional Provisions** | | |
| **Rosneft Trading S.A.** | • By no later than twenty-one calendar days following entry of the Sale Procedures Order and service thereof by the Special Master on counsel of record for both (i) RTSA and PDVSA, each of RTSA and PDVSA shall deliver to the Special Master a separate Disclosure Statement indicating the amount of any outstanding balance of obligations, if any, purported to still be secured by a pledge of the equity of CITGO Holding as | • As discussed above (*see supra* ¶¶71-73), the uncertainty surrounding the outstanding obligations, if any, secured by the RTSA Pledge will likely deter bidding and materially hamper the sale process. Accordingly, the Special Master requires Court authority to confirm the outstanding obligations, if any, secured thereby. |

| Summary of Sale Procedures Order and Bidding Procedures[1] | | |
|---|---|---|
| **Term / Provision** | **Description** | **Primary Rationale and Considerations** |
| | well as copies of any documents evidencing any obligations whether now or previously owed.<br><br>• If RTSA or PDVSA fail to respond or otherwise provide sufficient documentation of any alleged obligations, the Special Master shall file a report and recommendation with the Court that includes a proposed order to be issued by the Court in response to the failure of either RTSA or PDVSA to comply with the Sale Procedures Order, which may include, with respect to RTSA, a permanent injunction enjoining RTSA and any entity or person directly or indirectly controlled by RTSA from enforcing any pledge or claim against the equity of CITGO Holding. | |
| **Status Conferences** | • Unless otherwise ordered by the Court, the Court will hold a status conference approximately every thirty days for the Special Master to provide an update to the Court and other interested parties regarding implementation of the Sale Procedures Order; *provided*, that, subject to the Court's availability, the Special Master or the Sale Process Parties may request that the status conference occur more or less frequently or on an as-needed basis; *provided* that nothing shall impede the Special Master's right to meet *in camera* or share information with the Court to provide updates on the process. | • Regular status conferences will permit interested parties, including the Sale Process Parties, to bring any issues to the attention of the Special Master and the Court so that they may resolve any dispute as early as possible in the process instead of waiting until the Sale Hearing.<br><br>• If, on the other hand a party does not bring its complaint or issue to the attention of the Court at a status conference (assuming it cannot be resolved between them and the Special Master in lieu of raising it), then the Court may make whatever inference it wishes regarding that party's decision to wait until the Sale Hearing to raise it. |

| Summary of Sale Procedures Order and Bidding Procedures[1] | | |
|---|---|---|
| **Term / Provision** | **Description** | **Primary Rationale and Considerations** |
| **Dispute Resolution** | • All bidders that participate in the sale process shall be deemed to have (i) consented to the jurisdiction of the Court to enter any order or orders, which shall be binding in all respects, in any way related to the Sale Procedures or Bidding Procedures, the bid process, the Auction, the Sale Hearing, or the construction, interpretation, and enforcement of any agreement or any other document relating to a Sale Transaction; (ii) waived any right to a jury trial in connection with the same; and (iii) consented to the entry of a final order or judgment in any way related to the same if it is determined that the Court would lack jurisdiction to enter such a final order or judgment absent the consent of the parties. | • To implement a value maximizing Sale Process, Potential Bidders must have certainty in the outcome of that process, and the dispute resolution mechanics to be implemented in connection with the same, in order to generate the highest offer for PDVH Shares capable of being timely consummated after taking into account the factors set forth in the Bidding Procedures. |
| **Communication and Negotiation with Third Parties** | • The Special Master is authorized and empowered, in his sole discretion and at any time, to communicate and, as applicable, negotiate with any bidder, potential bidder, or governmental or regulatory body.  Further, in consultation with the Sale Process Parties, the Special Master is authorized and empowered, in his sole discretion and at any time, to communicate and, as applicable, negotiate with any other person or entity, including any contract counterparty, any indenture trustee, administrative agent, or collateral agent, any PDVSA 2020 Bondholder. | • Communication of the Special Master with third parties, including contract counterparties of CITGO, will be necessary in connection with implementing the sale procedures and ensuring that any Sale Transaction is feasible, including with respect to negotiation of any "change-of-control" or other restrictions in any of CITGO's contracts.<br>• At this stage I propose to conduct any negotiations or discussions regarding the change, modification, or amendment of any contract of PDVH or CITGO in connection with any Bid in cooperation with and the consent of PDVH and CITGO (as applicable).  If this |

| Summary of Sale Procedures Order and Bidding Procedures[1] | | |
|---|---|---|
| **Term / Provision** | **Description** | **Primary Rationale and Considerations** |
| | • If the Special Master determines it is reasonably necessary or desirable to negotiate a change, modification, or amendment to, or seek a consent or waiver under, any contract of PDVH, CITGO, or any of their subsidiaries in connection with any Bid or Potential Bid or implementation of the Sale Procedures or any Sale Transaction, including with respect to any "change-of-control" provisions in any contract, the Special Master shall work with PDVH and CITGO, as applicable, to negotiate such change, modification, amendment, consent, or waiver. If either PDVH or CITGO, as applicable, does not cooperate with or otherwise consent to any particular negotiation, change, modification, amendment, consent, or waiver, the Special Master shall seek additional guidance from the Court. | proves to be an unworkable construct, the proposed Sale Procedures Order provides that I will seek additional guidance or input from the Court at a later date. |
| **Communication with Potential Bidders** | • The Sale Process Parties shall not, directly or indirectly, contact or otherwise communicate with any potential bidders regarding the Sale Procedures Order, the Sale Procedures, any bid or potential bid or any Sale Transaction, other than as expressly permitted in writing by the Special Master. For the avoidance of doubt, the Sale Procedures Order will not prevent or prohibit contact or communications in the ordinary course of business or consistent with past practice on matters unrelated to the Sale Procedures Order, the Sale Procedures, any Bid or potential bid or any Sale | • For my Advisors and I to effectively oversee the sale process and ensure that all bids are properly and fairly evaluated, I must be authorized to oversee all communication with Potential Bidders. Providing Potential Bidders with a clear and consistent message will be critical to obtaining value-maximizing Bids.<br><br>• It is my strong preference that PDVH and CITGO work cooperatively and constructively with my Advisors and I with respect to communications with Potential Bidders, but, out of an abundance of caution I believe it is prudent |

| Summary of Sale Procedures Order and Bidding Procedures[1] | | |
|---|---|---|
| **Term / Provision** | **Description** | **Primary Rationale and Considerations** |
| | Transaction; *provided* that such communications (i) do not involve or relate to colluding in connection with a Bid that has been submitted or may be submitted by the applicable Sale Process Party or a Bid by any Potential Bidder; and (ii) are not intended to frustrate the Marketing Process or the Sale Procedures. | for the Court to channel all communications with Potential Bidders through myself and my Advisors. |
| **Sharing of Information with Potential Bidders** | • Upon giving notice to the applicable Sale Process Party, the Special Master shall be permitted, in his sole discretion, to share any and all information obtained related to the Sale Process Parties, regardless of whether marked "highly confidential" pursuant to the *Special Master Confidentiality Order* [D.I. 291], with any bidder or potential bidder that has entered into a confidentiality arrangement, a form of which will be attached to the Sale Procedures Order; *provided* that the Special Master shall be authorized to make reasonable changes to the extent requested by a Potential Bidder. The Special Master shall exercise reasonable care in providing confidential information to bidders and Potential Bidders and, if applicable, shall use reasonable efforts to consult any Sale Process Party that marks or designates any information as "Confidential" or "Highly Confidential" prior to its disclosure to any Potential Bidder. The Special Master shall use reasonable efforts to consult PDVH and CITGO in connection with sharing competitively sensitive information and, if determined to be appropriate by the Special Master, to establish | • My Advisors and I will need to have the discretion to share information related to CITGO with Potential Bidders in order facilitate their due diligence. I do not believe that permitting PDVH or CITGO to control what information may be shared through designations of information as "confidential" or "highly confidential" will be a workable construct and, accordingly, in the proposed Sale Procedures Order I have proposed a mechanic for sharing such information. As set forth in the order, I will exercise reasonable care and use reasonable efforts to consult with PDVH and CITGO in connection with sharing any competitively sensitive information. I am hopeful that none of these provisions will be necessary, particularly if the CITGO management team continues to cooperate with my process in connection with sharing due diligence information. As set forth above, it is my strong preference that we work together cooperatively and constructively with respect to communications with Potential Bidders, but, out of an abundance of caution, I believe it is prudent for the Court to authorize the sharing of information in my discretion |

| | Summary of Sale Procedures Order and Bidding Procedures[1] | |
|---|---|---|
| **Term / Provision** | **Description** | **Primary Rationale and Considerations** |
| | firewall protections or "clean team" protocols with respect to any Potential Bidder that is a competitor, customer or supplier or under such other circumstances as the Special Master determines to be appropriate. | pursuant to the procedures set forth in the proposed Sale Procedures Order. |
| **Sharing of Information with the United States** | • The Special Master shall be authorized to share with the United States information obtained related to the Sale Process Parties and any bidder or potential bidder that the Special Master determines, in his sole discretion, is reasonably necessary or desirable in connection with the issuance of any regulatory approval or is reasonably necessary or desirable in connection with implementation of the Sale Procedures and any Sale Transaction, including any guidance or license from OFAC, *provided* that the Special Master shall request confidential treatment of information shared with the United States that has been designated as confidential or highly confidential by a Sale Process Party. | • As a result of the regulatory considerations and requirements that impact the Sale Procedures and potential consummation of a Sale Transactions, the Special Master requires authority to share information with regulators (including OFAC) regarding the same. |
| **Judicial Immunity & Exculpation** | • The Special Master is entitled to judicial immunity in performing his duties pursuant to the Sale Procedures Order, including all actions taken to implement the Sale Procedures, and all other orders of the Court. The Special Master's Advisors are entitled to judicial immunity in connection with all actions taken at the direction of, on behalf of, or otherwise in connection with representation of or advising the Special Master. | • Judicial Immunity is customary for special masters and essential for facilitating the retention of my Advisors.<br><br>• I believe the procedures for enforcing the judicial immunity and exculpation are also appropriate in light of my Court proscribed duties and mandate and the absence of customary identification that my Advisors would receive when advising on a typical transaction. |

| Summary of Sale Procedures Order and Bidding Procedures[1] | | |
|---|---|---|
| **Term / Provision** | **Description** | **Primary Rationale and Considerations** |
| | • No person or entity shall be permitted to pursue any cause of action or commence or prosecute any suit or proceeding against the Special Master or the Advisors, or their respective employees, officers, directors, attorneys, auditors, representatives, agents, successors or assigns, for any reason whatsoever relating to the Crystallex Case, implementation of the Sale Procedures, or in connection with any Sale Transaction, or the performance of the Special Master's and his Advisors' duties pursuant to this Order or any other orders of the Court, or any act or omission by the Special Master or any Advisor in connection with the foregoing. All interested persons and entities, including but not limited to the Sale Process Parties, any purchaser or prospective purchaser of the shares, and all persons acting in concert with them, are hereby enjoined and restrained from pursuing any such cause of action or commencing any such action or proceeding. If any person or entity attempts to pursue any such cause of action or commence any suit or proceeding against the Special Master or any of the Advisors with knowledge of this Order (or continues to pursue or prosecute any cause of action, suit or proceeding after having received notice of this Order), the Court shall issue an order to show cause to such person or entity and a hearing will be scheduled to consider appropriate relief, which may include payment of fees and expenses incurred by the Special Master or any of the Advisors in connection therewith. | |

| Summary of Sale Procedures Order and Bidding Procedures[1] | | |
|---|---|---|
| **Term / Provision** | **Description** | **Primary Rationale and Considerations** |
| | To the maximum extent permitted by applicable law, neither the Special Master nor his Advisors nor their respective employees, officers, directors, attorneys, auditors, representatives, agents, successors and assigns will have or incur, and are hereby released and exculpated from, any claim, obligation, suit, judgment, damage, demand, debt, right, cause of action, remedy, loss, and liability for any claim in connection with or arising out of all actions taken to implement the Marketing Process, Sale Procedures, Bidding Procedures, or Sale Transaction, or the performance of the Special Master's and his Advisors' duties pursuant to this Order and all other orders of the Court. | |
| **Payment of Transaction Expenses** | • The Special Master shall be compensated and reimbursed for all Transaction Expenses.<br><br>• The Special Master shall have the discretion to seek from the Court to reallocate payment of any Transaction Expenses if the circumstances require (*e.g.*, if any single Sale Process Party generates an inordinate number of disputes or if a Sale Process Party's position in a dispute is found to be unreasonable). | • The payment of Transaction Expenses complies with the May 2021 Order, which set forth certain procedures for the compensation and reimbursement of expenses by the Sale Process Parties. |
| **Location of PDVH Shares** | • By no later than 30 calendar days after entry of Sale Procedures Order, the Venezuela Parties, including PDVSA, shall inform the Special Master as to the specific and precise physical location of the PDVH | • In its prior pleadings with the Court, PDVSA has stated that it does not know the location of the actual PDVH Shares. The purpose of this provision is to ensure that, when it comes time to sell the PDVH Shares, all parties |

CONTAINS REDACTIONS IN ACCORDANCE WITH D.I. 345

| Summary of Sale Procedures Order and Bidding Procedures[1] | | |
|---|---|---|
| **Term / Provision** | **Description** | **Primary Rationale and Considerations** |
| | Shares held by PDVSA or any other facts relevant for determining the physical location of the PDVH Shares held by PDVSA and the custodian of the shares.  If the applicable Venezuela Party is unaware of the location of the PDVH Shares, such party shall inform the Special Master as such in writing.  If at any point thereafter the applicable Venezuela Party becomes aware of any change in circumstance regarding the location of the PDVH Shares, then such party shall update the Special Master in writing.<br><br>• If the location of the PDVH Shares cannot be located with reasonable precision or if the Special Master reasonably determines that the custodian of the PDVH Shares is unlikely to cooperate in connection with an order compelling the person or entity to transfer the PDVH Shares in connection with any Sale Transaction, the Special Master shall file a recommendation with the Court in advance of the Sale Hearing regarding the appropriate steps to be taken to ensure that the Successful Bidder is able to actually purchase the applicable PDVH Shares in connection with the applicable Sale Transaction.   The Special Master's recommendation may include, if appropriate, an order compelling PDVH to issue new certificates or uncertificated shares to the applicable Successful Bidder and cancel the registration of the shares attached to the books of PDVH. | have the appropriate information and can ensure that an appropriate procedure is put in place for issuing new PDVH Shares, if necessary. |

70

CONTAINS REDACTIONS IN ACCORDANCE WITH D.I. 345

## V.      Recommendation

89.     I believe that the proposed Sale Procedures Order strikes the appropriate balance among the many competing interests in a dynamic and internationally sensitive set of circumstances and provides for the best opportunity for achieving a value-maximizing Sale Transaction.  Accordingly, pursuant to the Court's May 2021 Order and based on the facts and circumstances as I currently understand them, I hereby submit and recommend the proposed Sale Procedures Order to the Court.  I reserve the right to clarify or supplement any statements made in this Report at any time or otherwise respond to any objections or pleadings filed in response to the proposed Sale Procedures Order or this Report.


/s/ Robert B. Pincus
Robert B. Pincus
Special Master for the United States District Court
for the District of Delaware