CONTAINS REDACTIONS IN ACCORDANCE WITH D.I. 345

## EXHIBIT A

**Hiltz Declaration**

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

-------------------------------------------------------------------------------------------------------

CRYSTALLEX INTERNATIONAL     :
CORPORATION,     :
    :
    Plaintiff,     :
    :
    v.     :     Misc. No. 17-151-LPS
    :
BOLIVARIAN REPUBLIC OF     :     FILED UNDER SEAL
VENEZUELA,     :
    :     HIGHLY CONFIDENTIAL
    Defendant.     :     PURSUANT TO SPECIAL
    :     MASTER CONFIDENTIALITY
    :     ORDER (D.I. 291)
    :

-------------------------------------------------------------------------------------------------------

## DECLARATION OF WILLIAM O. HILTZ
## IN SUPPORT OF SPECIAL MASTER'S REPORT AND
## RECOMMENDATION REGARDING PROPOSED SALE PROCEDURES ORDER

I, William O. Hiltz, pursuant to section 1746 of title 28 of the United States Code, hereby declare that the following is true to the best of my knowledge, information, and belief:

1.  I am a Senior Managing Director at Evercore Group L.L.C. ("**Evercore**"), a financial advisory and investment banking firm with offices around the world and investment banker to the Special Master in the above-captioned case.

2.  On June 2, 2021, Evercore was engaged to provide investment banking and advisory services in connection with the Special Master's design of a plan for the sale of shares (the "**PDVH Shares**") of PDV Holding, Inc. ("**PDVH**") held by Petróleos de Venezuela, S.A ("**PDVSA**") as necessary to satisfy the outstanding judgment of Crystallex International Corporation ("**Crystallex**") and the judgment of any other judgment creditor added to the sale by the Court (each, an "**Attached Judgment**") and/or devise such other transaction as would satisfy

such outstanding judgment(s) while maximizing the sale price of any assets to be sold (collectively, the "**Sale Transaction**").

3.     On August 9, 2021, the Special Master filed the *Proposed Order (A) Establishing Sale and Bidding Procedures, (B) Approving Special Master's Report and Recommendation Regarding Proposed Sale Procedures Order, (C) Affirming Retention of Evercore as Investment Banker by Special Master and (D) Regarding Related Matters* (the "**Proposed Sale Procedures Order**") (D.I. 302) and *Special Master's Report and Recommendation Regarding Proposed Sale Procedures Order* (the "**Report**").[1]

4.     I submit this declaration (the "**Declaration**") to the Special Master in support of the Report.  I am authorized by the Special Master to submit this Declaration and, unless otherwise indicated, all facts set forth in this Declaration are based upon my personal knowledge, my experience, my review of relevant documents, information provided to me by Evercore employees working under my supervision, or information provided to me by the Special Master or his advisors or the Company or their advisors.  If called upon to testify, I could and would testify to the facts and opinions set forth herein.

## Qualifications

5.     I am a Senior Managing Director of Evercore's corporate advisory business and head of the General Advisory Group.  I am also Chairman of Evercore's Special Committee Execution Group, which oversees all of Evercore's Special Committee transactions.  I joined Evercore in 2000 and have 44 years of experience in investment banking.  Prior to joining Evercore, I was Head of the Global Energy Group at UBS Warburg and, prior to UBS' acquisition

---

[1]  Capitalized terms used but not otherwise defined herein shall have the meaning ascribed to such terms in the Proposed Sale Procedures Order or the Report, as applicable.

of Dillon Read & Co. Inc., Head of the Energy Group at Dillon Read since 1995.  From 1982 to 1995, I was a Managing Director at Smith Barney where at various times I headed the Energy Group, the High Yield and Merchant Banking Group, the Transportation Group, and the General Industrial Group.  I received an A.B. in History and Government from Dartmouth College and an M.B.A. from The Wharton School at the University of Pennsylvania.  A copy of my curriculum vitae is attached hereto as **Exhibit A** and incorporated herein by reference.

6.      I have worked on and been involved in the design of numerous mergers and acquisitions transactions, including the Chrysler and Fiat merger, the sale of Dell, the sale of McMoRan to Freeport-McMoRan, the sale of ACS to Xerox, the sale of EDS to Hewlett Packard, the CVS and Caremark merger, and the sale of Aquila to Great Plains.  I have further advised Aetna on its sale to CVS, T Mobile on its acquisition of Sprint, Whole Foods on its sale to Amazon, Takeda on its acquisition of Shire, and Energy Futures Holdings on the sale of ONCOR to Sempra Energy, among others.  In addition, I have worked on several restructurings, including Energy Future Holdings, General Motors, CIT, Northwest Airlines, Continental Airlines, and Eastern Airlines.

7.      Evercore is one of the world's leading independent investment banking groups that serves a diverse set of clients around the world with over 20 offices in North America, Europe, South America and Asia, including an office located at 55 East 52nd Street, New York, NY 10055.  Evercore has expertise in domestic and cross border restructurings, mergers and acquisitions, debt and equity capital markets transactions, and other financial advisory services. Evercore has served as an experienced bankruptcy and restructuring advisor to debtors, bondholders, creditors' committees, single creditor classes and secured creditors, shareholders,

and boards of directors in a variety of industries.  Evercore is a member of the Financial Industry Regulatory Authority and the Securities Investor Protection Corporation.

## Background

8.    Since June 2, 2021, I have worked closely with the Special Master and his other Advisors to assist him with, among other things, designing a sale process in accordance with his mandate and which balances many competing interests while seeking to provide the best opportunity for achieving a value-maximizing Sale Transaction.  This work has involved significant outreach to and numerous meetings with the stakeholders and their advisors in the Crystallex Case, including (a) Crystallex, (b) the Bolivarian Republic of Venezuela (the "**Republic**"), (c) Intervenor PDVSA, (d) Garnishee PDVH, (e) Intervenor CITGO Petroleum Corporation ("**CITGO Petroleum**," and together with the Republic, PDVSA, PDVH, and CITGO Holding, the "**Venezuela Parties**"), (f) non-parties Phillips Petroleum Company Venezuela Limited and ConocoPhillips Petrozuata B.V. (together, **ConocoPhillips**," and collectively with Crystallex and the Venezuela Parties, the "**Sale Process Parties**") and (g) the United States Government, including representatives from the Department of Justice, Department of the Treasury (including representatives from the Office of Foreign Assets Control ("**OFAC**")), and Department of State (collectively, the "**USG**").

9.    In rendering services to the Special Master in connection with the Crystallex Case and Evercore's involvement in the engagement with the foregoing parties, I and other members of the Evercore team have become knowledgeable about the Crystallex Case and the business operations and assets of PDVH, CITGO Holding, Inc. ("**CITGO Holding**," and together with CITGO Petroleum, "**CITGO**") and CITGO Petroleum.  To date, I, or other members from Evercore working at my direction, have conducted a detailed review of publicly

4

available information and information produced by CITGO relevant to the design of the Proposed Sale Procedures Order, which has entailed a review of the Company's corporate and capital structure, historical and projected financial performance, a review and analysis of CITGO's business operations other relevant business due diligence, and a review of CITGO's corporate and funded debt facilities and certain other relevant claims and interests.  Further, in connection with the Special Master's due diligence process, on July 1, 2021, I, along with the Special Master and his other advisors, met with a number of members of the CITGO management team, including its most senior members, during which CITGO provided a detailed overview of CITGO's business, including its strategic plan and projected financial performance.

10.     In addition to due diligence related to PDVH and CITGO, I, and other members of the Evercore team working at my direction, have conducted due diligence on the competitive market and potential bidders that may be interested in bidding on the PDVH Shares to ensure that the procedures contemplated by the Sale Procedures Order best reflect a fair and optimal sale process given the market dynamic and most likely bidding participants.

11.     As a result of this diligence and the work performed in connection with advising the Special Master in connection with designing the Proposed Sale Procedures Order, Evercore has developed relevant experience and expertise regarding the Crystallex Case, PDVH, and CITGO that makes it well-suited to advise the Special Master and the Court in connection with entry of the Sale Procedures Order and the ultimate implementation thereof.

### **PDVH and CITGO's Complex Corporate and Capital Structure**

12.     I and other members of the Evercore team have reviewed and analyzed publicly available information and information produced by PDVH and CITGO regarding their corporate and capital structure.  The corporate and capital structure of PDVH, in an abridged and

annotated form, in the context of the relevant claims and interests is shown in paragraph 64 of the Report.

13.     PDVH is the parent company of CITGO Holding, which in turn is the parent company of CITGO Petroleum (collectively, PDVH, CITGO, and each of their subsidiaries, the "**Company**"). CITGO operates three complex large-scale petroleum refineries located in Lake Charles, Louisiana, Corpus Christi, Texas, and Lemont, Illinois. CITGO's refining operations are supported by an extensive distribution network, which provides access to the Company's refined product end markets. CITGO also has a recognized brand presence at the retail level in the United States through its network of locally owned and independently operated CITGO-branded retail outlet licensees.

14.     ██████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████████



15.     I, and other members of the Evercore team have further reviewed, among other things, available information related to the claims of those certain PDVSA 2020 Bondholders and Rosneft Trading S.A. ("**RTSA**") that purport to be secured by a 50.1% and 49.9% pledge of the equity interests of CITGO Holding, respectively (the "**Structurally Senior Liens**").  I offer no view regarding whether such liens are legally enforceable or avoidable and I am advised by counsel to the Special Master that the PDVSA 2020 Bondholders have obtained a judgment against PDVSA in the amount of $1,924,126,058 as of December 1, 2020  that is secured by a Structurally Senior Lien on 50.1% of the equity interests of CITGO Holding (the "**CITGO Holding Pledge**"). *See Judgment Pursuant to Fed. R. Civ. P. 54(b)*, Case 1:19-cv-10023-KPF, entered December 1, 2020 (D.I. 229).  However, I understand that, as of the date hereof, the PDVSA 2020 Bondholders' ability to exercise the CITGO Holding Pledge remains stayed pending appeal.  Neither I nor any other members of Evercore have been able to discern the amount outstanding, if any, that may be secured by a Structurally Senior Lien in favor of RTSA and inquiries to the Company and its advisors regarding the obligations, if any, owed to RTSA have not clarified this point.

16.      I believe that resolution of the Structurally Senior Liens, and particularly the CITGO Holding Pledge, will be critical for minimizing uncertainty of the sale process and obtaining a value maximizing Sale Transaction.  If, for example, both the PDVSA 2020 Bondholders and RTSA were able to exercise remedies with respect to their purported pledges, the buyer of the PDVH Shares may be left with no interest in CITGO.  In light of this significant risk, and based on my own experience, I do not believe that Potential Bidders will be willing to invest their time and resources into submitting a bid for the PDVH Shares without an understanding as to how the Structurally Senior Liens will be resolved or otherwise addressed in connection with any Sale Transaction, or at the very least, the extent of their valid and enforceable obligations.

### Sale Process Design Considerations

17.      The complex corporate and capital structure of CITGO, combined with the number of interested parties in the Crystallex Case and the other dynamic and internationally sensitive circumstances, poses a number of unique challenges to achieving a value-maximizing Sale Transaction.  I have identified certain of these considerations below that I believe are relevant to design of the Proposed Sale Procedures.

### A.    OFAC Considerations

18.      Based on discussions with counsel to the Special Master regarding the U.S. sanctions-related prohibitions and associated authorizations and guidance (and the associated ambiguity of such guidance) issued by OFAC related to the sale process, I believe that uncertainty surrounding what, if any, transaction OFAC will ultimately approve creates an overhang that may materially chill bidding.  For this reason, over the past several months, the Special Master and his Advisors, including myself, have met with representatives from the USG, including OFAC, on

three (3) separate occasions to outline certain considerations of the proposed sale process and solicit feedback.   I believe that obtaining explicit, or at the very least tacit, guidance or authorization from OFAC prior to launching the Marketing Process will be critical for fostering a competitive bidding environment and to ultimately obtain value-maximizing Bids.   I anticipate that potential bidders will inquire as to the status of OFAC authorization for the process and any ultimate transaction.   Accordingly, it will be crucial to ensuring participation that potential bidders can be given necessary comfort to participate in the sale process knowing it is not futile and without risk of penalty.

**B.      Illustrative Clearing Price**

19.      Based on a review of information available related to the CITGO Funded Debt Facilities and the Structurally Senior Liens, absent a negotiated compromise with any other CITGO stakeholders, a bidder will likely have to submit a Bid with an implied total enterprise value of at least ███████ to generate sufficient consideration for Crystallex's Judgment to be satisfied in full, and ultimately ███████ to satisfy both Crystallex and ConocoPhillips's judgment, if ConocoPhillips' judgment is ultimately added to the Sale Transaction by the Court (the "**Illustrative Clearing Price**").   Any additional judgments added to the Sale Transaction by the Court will further increase the Illustrative Clearing Price.   The Illustrative Clearing Price may further be increased by any accrued interest on relevant claims or other contractual obligations of CITGO or certain potential working capital adjustments.

20.      In calculating the Illustrative Clearing Price, neither Evercore nor the Special Master conducted a valuation of the PDVH Shares or CITGO.   The Illustrative Clearing Price is useful solely for the purposes of illustrating the importance of obtaining a Bid that results in sufficient proceeds to satisfy the relevant claims and interests described above, including

judgments attached by the Court and any claims secured by the Structurally Senior Liens.  Bids

with an implied enterprise value below the Illustrative Clearing Price will likely require a

compromise of outstanding claims for less than their face value before a Potential Bidder is willing

to pay any material value for the PDVH Shares.

**C.     Ability to Purchase A Controlling Stake in CITGO**

21.     Based on my review of the facts and circumstances, a value-maximizing

sale will likely require an offer to sell 100% of the PDVH Shares, at least in the first instance.

In my experience, a value maximizing sale process is one that ensures the most suitable bidders

participate in the process.  In my experience, suitable bidders participate when the offer is enticing.

The more enticing the offer, the greater likelihood of participation by potential bidders.  Based on

the circumstances of the situation, I believe the approach most likely to result in a value

maximizing Sale Transaction in this case is to make the most enticing offer available to Potential

Bidders: an offer of 100% of the PDVH Shares.  I believe that restricting the percentage of PDVH

Shares that Potential Bidders may submit a Bid for will severely curtail the universe of Potential

Bidders and would be unlikely to result in value-maximizing Bids, for several important reasons.

22.     First, I believe that Potential Bidders are likely to pay more for a

controlling stake in CITGO than they would for a minority stake, particularly if PDVSA remains

the majority shareholder.  The universe of bidders for an asset such as CITGO is already

necessarily limited to large U.S. and international strategic buyers and select investment firms,

who will be most likely to engage on a traditional M&A process structure with a clear path to

100% ownership.  As a result, I believe the ability to purchase a controlling stake in the Company

increases the market of Potential Bidders, as the potential for a controlling stake will be critical for

attracting strategic buyers seeking to take advantage of synergies from a combination.  Further, in

my experience, buyers are typically willing to pay a premium for control.  Historically, control

transactions in the public space have commanded a premium of between fifteen and twenty-five

percent, while sales of minority stakes have commanded up to a ten percent discount.  Finally,

Potential Bidders may place value on the ability to optimize and improve the Company's financial

debt capital structure without the perceived credit risk resulting from PDVSA's ownership.

23.    Second, a sale of less than 100% of PDVH Shares would require a

Potential Bidder to partner with the Republic as a co-owner, which, in my belief and based on my

understanding of the competitive market, drastically limits the universe of potential buyers who

may be interested in acquiring the PDVH Shares.  As this case demonstrates, the Republic has a

history of difficult relationships with international companies and foreign investors that will likely

discourage Potential Bidders from submitting Bids that results in a new partnership.  In addition,

I believe that the reported political and economic instability in Venezuela and ongoing United

States sanctions limits the ability of United States persons from engaging in business dealings with

entities affiliated with the Venezuelan government.

24.    Third, a partial sale provides less flexibility to address the Structurally

Senior Liens in connection with any Bid.  A sale of the full Company provides the best opportunity

of generating sufficient proceeds or some other negotiated outcome with respect to the claims

purported to be secured by Structurally Senior Liens.  A refinancing or other restructuring of

CITGO's balance sheet will be more difficult in the context of a partial sale compared to a

comprehensive sale of the Company.

25.    For these reasons, I believe offering Potential Bidders to specify the

percentage of shares of PDVH that they are interested in purchasing, including the option to Bid

on 100% of the PDVH Shares, provides for the best opportunity of obtaining value maximizing

Bids under the circumstances of the Crystallex Case.  For the avoidance of doubt, offering 100% of the PDVH Shares would not necessarily preclude scenarios where a Potential Bidder initially bids on 100% of the PDVH Shares but, following discussion or negotiation with the Special Master, ultimately decide to accept less than 100% of the PDVH Shares for a revised bid; it does however, enhance the chances that those bidders do not opt out of the sale process altogether.

### D.    COVID-19's Impact on CITGO's Business and Operations

26.    Any serious and credible bidder will need to invest substantial time and resources in understanding CITGO's business in order to formulate a credible Bid, which is complicated by the recent industry downturn.  Based on my review of information provided by CITGO and other publicly available information, the novel coronavirus ("**COVID-19**") has had an adverse impact on CITGO's refinery utilization and operating margins since the outbreak developed into a pandemic in March of 2020.  As a result of governmental stay-at-home orders and other social distancing measures, there was a rapid and significant decline in the demand for the refined petroleum products that CITGO manufactures and sells.  Further, concerns over the negative effects of COVID-19 on global economic and business prospects have contributed to increased market and oil price volatility, both of which have had a negative impact on CITGO's business and operations.

27.    As a result of COVID-19, CITGO Petroleum's adjusted EBITDA dramatically declined from $1.92 billion and $1.18 billion in 2018 and 2019, respectively, to negative $432 million in 2020.  ████████████████████████████████████

████████████████████████████████████

28.    ████████████████████████████████████████

████████████████████████████████████████████

29.      Further, I expect Potential Bidders will be focused on CITGO's recovery

from the recent downturn in the refining industry, with a particular focus on the impact of new

variants of the COVID-19 virus, such as the Delta variant, which have been widely reported to

spread more easily than previous versions of the virus.  Guiding bidders through CITGO's recent

financial performance and future projections will require substantial work and time on both the

part of the Special Master and his Advisors, including Evercore, and the CITGO management

team.  I believe that the foregoing justifies a robust marketing process that provides Potential

Bidders with sufficient time to perform the due diligence and analysis necessary to formulate a

Bid. The proposed two-staged Marketing Process (described in greater detail below) is designed

with this in mind by providing ample time for Potential Bidders to perform necessary due

diligence.

### E.      Management and CITGO's Cooperation

30.      Given the size and complexity of any potential Sale Transaction, the

cooperation of CITGO's management team will be critical to value maximization and the

successful implementation of the Sale Procedures.  Potential Bidders will expect input and

involvement from the most senior members of CITGO's management team.  Thus far in the

process, CITGO's management team has cooperated with all of our requests for meetings and

information.  However, if the management team were not to cooperate, I expect that Potential

Bidders will submit Bids that are subject to ongoing "diligence outs."  I believe that the provisions in the Proposed Sale Procedures Order that provide, if necessary, a mechanism for compelling cooperation from CITGO's management team (even if never used) will send a positive message to Potential Bidders that, if they invest their time and resources into formulating a Bid, they will have access to and receive the necessary cooperation from the CITGO management team.

### Proposed Sale Procedures

31.     I, and other members of the Evercore team, have been a part of formulating, and thus have reviewed, the Proposed Sale Procedures Order and Bidding Procedures. Based on  information known as of the date hereof and in light of the numerous competing interests and unique circumstances of the Crystallex Case and my experience outlined above in designing marketing and other sale processes, I believe that the Proposed Sale Procedures Order and Bidding Procedures (and the process contemplated thereby) reflect the best process, in the view of myself, the Evercore team, the Special Master's Advisors, and the Special Master, for both facilitating a value-maximizing Sale Transaction and minimizing potential risks as best can be done under the circumstances, including risks of delay, confusion, and the chilling of bidding.  The Proposed Sale Procedures Order balances these considerations and risks through a two-stage process that includes, among other things, the potential for appointment of a Stalking Horse Bidder, an overbid process, and related procedures for comparing Bids for varying percentages of the PDVH Shares based on the implied equity value of the applicable Bids.

32.     The Bidding Procedures prescribe, among other things, procedures for parties to access due diligence, the process for submitting a Non-Binding Indication of Interest, the requirements of a Qualified Bid (including the requirement to submit a good faith deposit), the receipt and negotiation of Bids received, the conduct of an Auction if the Special Master receives

more than one Qualified Bid (inclusive of any Stalking Horse Bid), the procedures for designation of a Stalking Horse Bid, the selection and approval of a Successful Bidders, and the deadlines in connection with the foregoing.

33.     The Bidding Procedures are designed to encourage Potential Bidders to submit value-maximizing Bids without placing untested advance restrictions on the type of Bids that may be submitted in the first instance.  Under the Bidding Procedures, Potential Bidders may submit Bids for the purchase of the PDVH Shares.  Importantly, Potential Bidders have flexibility to specify the exact percentage of PDVH Shares that the Potential Bidders desire to bid on, which may include a Bid of up to 100% of the PDVH Shares.  The overbid process will allow interested parties to bid on less than 100% of the PDVH Shares, both in connection with submitting a Stalking Horse Bid or after one is selected (if any).  Conversely, I believe structuring the process to market less than 100% of the PDVH Shares up front would be detrimental to obtaining value maximizing Bids as it will likely, among other things, drastically (and unnecessarily) limit the universe of Potential Bidders willing to participate in the process.

34.     The Bidding Procedures establish the following key dates and deadlines, which will be specifically tied to the date on which the Special Master elects to launch the Marketing Process:

| Key Event | Deadline |
|---|---|
| Special Master to Launch Marketing Process and Establish Data Room in accordance with terms of the Sale Procedures Order | Launch ("**L**") |
| Deadline to Submit Non-Binding Indications of Interest | L+ 45 days |
| Deadline to Submit Stalking Horse Bids | L+ 90 days |
| Deadline for Special Master to Designate Stalking Horse Bidder and Enter into Stalking Horse Agreement | L + 150 days |

| | |
|---|---|
| Deadline for Special Master to File Notice of Stalking Horse Bidder | As soon as reasonably practicable following designation by the Special Master |
| Deadline to Submit Bids | L + 210 days |
| Deadline for Special Master to Notify Bidders of Status as Qualified Bidders | L + 217 days |
| Auction to be conducted at the offices of Potter Anderson & Corroon LLP (1313 N. Market Street, 6th Floor, Wilmington, DE 19801-6108) or such other location as is mutually agreeable to the Special Master and each of the Sale Process Parties | L + 230 days |
| Deadline to File Notice of Successful Bid | As soon as reasonably practicable following conclusion of the Auction or, if no Auction, selection of the Successful Bid |
| Deadline to File Objections to Sale Transaction | L + 250 days |
| Deadline for Parties to Reply to Objections to Sale Transaction | L + 263 days |
| Sale Hearing | L + 270 days |

35.     The time periods set forth in the Bidding Procedures balance the need to provide adequate and appropriate notice to parties in interest and Potential Bidders with the need to efficiently run a sale process.  I believe the proposed timeline is reasonable and will provide Potential Bidders with ample time to access the datatroom set up by the Special Master, subject to execution of an appropriate confidentiality agreement, to conduct necessary diligence and develop credible Bids.

36.     The two-stage stalking horse process provides a number of benefits in the context of the Crystallex Case.  If a Stalking Horse Bid is selected, all Potential Bidders will have the opportunity to become a Qualified Bidder and participate in a formal Auction process thereafter.  The second stage of the marketing process will provide a final "market check" for the

16

highest or otherwise best bid prior to a Successful Bid being selected and, accordingly, ensures that any Sale Transaction will be value maximizing.  Further, through the requirement that parties first submit Non-Binding Indications of Interest during the first stage, the Bidding Procedures ensure that CITGO's management team will only have to spend meaningful time with each Potential Bidder that has shown credible interest.

37.     I believe that the Bidding Procedures strike the appropriate balance regarding the appropriate time to require Potential Bidders to submit a good faith deposit.  In my experience, bidders that submit deposits are most likely to be motivated and efficient in diligence and closing efforts and are also able to fund the acquisition.  At the same time, forcing a deposit to be placed too early can, in my experience, hurt the sale process by discouraging bidding.  Based on my review of the facts and circumstances, I believe the optional time for requiring a deposit is upon designation of a Stalking Horse Bid by the Special Master and any subsequent bid after such designation.

38.     In light of the foregoing, based on my review and understanding of the facts and circumstances, I believe the Sale Procedures, including the Bidding Procedures, are fair, reasonable, appropriate, designed to promote a competitive and robust bidding process to generate the greatest level of interest in the PDVH Shares and result in the highest offer in connection with the Sale Transaction and reasonably calculated to balance the many competing interests in a dynamic and internationally sensitive set of circumstances.

39.     I declare under penalty of perjury that the foregoing is true and correct. Executed on August 9, 2021, in New York, NY.

*/s/ William O. Hiltz*_____
William O. Hiltz

CONTAINS REDACTIONS IN ACCORDANCE WITH D.I. 345

## Exhibit A

**Curriculum Vitae**

# William Hiltz Curriculum Vitae



**William Hiltz**
*Senior Managing Director*

William Hiltz is a Senior Managing Director of the firm's corporate advisory business and head of its General Advisory Group and its Special Committee practice.

Prior to joining Evercore, Mr. Hiltz was Head of the Global Energy Group at UBS Warburg and, prior to UBS' acquisition of Dillon Read & Co. Inc., Head of the Energy Group at Dillon Read since 1995. From 1982-1995, Mr. Hiltz was a Managing Director at Smith Barney where at various times he headed the Energy Group, the High Yield and Merchant Banking Group, the Transportation Group and the General Industrial Group. Mr. Hiltz has 44 years of experience in the investment banking business, beginning in 1976 when he first joined Dillon Read.

Mr. Hiltz is a former Director of Davis Petroleum Corp. and Energy Partners, Ltd.  He is a former Trustee of the Salisbury School and currently serves as a Trustee of Lenox Hill Hospital in New York where he served as Chairman from 2003-2014.  He also serves as a Trustee and member of the Executive Committee of the North Shore LIJ Health System.  He serves as Vice Chairman of the National Park Foundation.  He is a member of The Council on Foreign Relations. He received a B.A. in History and Government from Dartmouth College and an M.B.A. from The Wharton School at the University of Pennsylvania.

### Evercore Notable Transactions

- The Board of Aetna on the $78 billion sale to CVS Health
- The Special Committee of T-Mobile on the $59 billion merger with Sprint
- Takeda on the $80 billion acquisition of Shire
- The Special Committee of KKR on its conversion from a limited partnership to a C Corporation.
- General Mills on its acquisition of Pillsbury, the divestiture of its interest in Ice Cream Partners and the divestiture of its interest in SVE to PepsiCo
- CVS on its acquisition of Eckerd, its acquisition of Albertson's free standing drugstores and its $27 billion merger with Caremark
- EDS on the sale of UGS PLM and on its $14 billion sale to Hewlett-Packard
- Swiss Re on its acquisition of GE's reinsurance business
- Tyco on its split-up into three separately traded companies
- Credit Suisse on its sale of Winterthur
- Novelis on its sale to Hindalco and Aquila on its sale to Great Plains
- GM on its $173 billion restructuring and its $23.1 billion IPO
- Energy Futures Holdings on its $48 billion Chapter 11 reorganization and its sale of ONCOR to Sempra Energy for $18 billion
- CIT on its $54 billion restructuring

- The Special Committee of ACS on its $8.3 billion sale to Xerox
- BP in its negotiations with the U.S. Government concerning the creation and structure of the $20 billion trust fund related to the Gulf of Mexico oil spill
- Kraft on the spin-off of its $36 billion North American Grocery business
- The Special Committee of McMoRan Exploration on its $4 billion sale to Freeport McMoRan
- The Special Committee of Dell on its $24 billion LBO
- The Disinterested Directors of Chrysler Group LLC on the purchase by Fiat S.p.A of the VEBA's 41.5% member interests for $3.65 billion
- Oxy on its $14 billion spin off of California Resources, Corp
- CVS Health on its $13 billion acquisition of Omnicare
- Broadcom on its $37 billion sale to Avago Technologies
- FMC Technologies on its $13 billion merger with Technip
- The Special Committee of Facebook on its $300 billion recapitalization
- The Special Committee of Hilton on the sale of a 25% position to HNA
- The Special Committee of Fortress on the sale to Softbank
- The Special Committee of Pilgrim's Pride on its purchase of Moy Park
- Whole Foods on its $14 billion sale to Amazon

## EXHIBIT B

### Recommended Voluntary Settlement Process Timeline

For consideration by the Court and willing participants in the process, the settlement discussions could be evaluated and pursued initially in the three-month period that immediately follows entry of the Sale Procedures Order (the "**Settlement Period**"), with the tension of the imposition of the impending sale process serving as a catalyst for parties to settle and also providing a mechanism to maximize value depending on any Negotiated Outcome.[1] During the Settlement Period, the Special Master will continue to engage with the United States Government regarding obtaining appropriate regulatory approval, but the Marketing Process shall not be launched until the earlier of (a) expiration of the Settlement Period, (b) voluntary termination of the Settlement Period by each of the Parties and ConocoPhillips, or (c) a determination by the Special Master that further discussions would be futile.  In the event that following the initial three-month Settlement Period, the Parties and ConocoPhillips believe that it is beneficial to continue discussions, the Settlement Period will continue for an additional three months, if necessary.

### Reimbursement of Fees and Expenses During the Settlement Period

Recognizing that Crystallex and ConocoPhillips may view the Settlement Period as another attempt by the Venezuela Parties to delay or otherwise hinder or elude implementation of the Marketing Process, the Special Master recommends that all costs and expenses incurred by the Special Master during the Settlement Period be paid by the Venezuela Parties.[2]

In addition, if that certain ad hoc group of PDVSA 2020 Bondholders represented by Paul, Weiss, Rifkind, Wharton & Garrison LLP (the "**Ad Hoc Group**") elects to participate in the settlement process in good faith prior to the Bondholder Participation Deadline, the Special Master recommends that the Venezuela Parties reimburse the Ad Hoc Group for their reasonable fees and expenses incurred in connection with participating in good faith in the settlement discussions.

| Key Event | Deadline |
|---|---|
| Entry of the Sale Procedures Order. | ("T") |
| Special Master to provide budget for Settlement Period | T+5 |
| Settlement Procedures<br>• Special Master to propose voluntary settlement procedures for consideration by the Parties and ConocoPhillips, to be implemented during the Settlement Period (the "**Settlement Procedures**") | T+15 |

---

[1]  During the Settlement Period, the Special Master will continue to submit monthly reports to ensure that the Court is apprised of any progress.

[2] Further, the Special Master recommends that the Venezuela Parties provide security or some other form of assurance for the payment of such obligations, which may be in the form of an advance payment or an escrow account, established by the Special Master, in an amount equal to the amount to be set forth in the Special Master's initial Budget for first month of the Settlement Period (and thereafter on a go-forward basis in accordance with the updated Budget provided by the Special Master pursuant to the proposed Sale Procedures Order).

| Key Event | Deadline |
|---|---|
| • Parties and ConocoPhillips to schedule an initial settlement conference (the "**Initial Settlement Conference**") | |
| Occurrence of the Initial Settlement Conference and deadline to finalize the Settlement Procedures | T+25 |
| Joint Proposal<br>• Parties and ConocoPhillips prepare a joint proposal for delivery by the Special Master to counsel to the PDVSA 2020 Bondholders regarding resolution of the PDVSA 2020 Bondholders' purported lien on CITGO Holding in connection with any sale of the PDVH Shares and/or any Negotiated Outcome  (the "**Joint Proposal**")<br>• The Joint Proposal will include an invitation for the PDVSA 2020 Bondholders to participate in the settlement discussions pursuant to the Settlement Procedures | T+55 |
| Deadline for Ad Hoc Group of PDVSA 2020 Bondholders to indicate willingness to participate in settlement discussions in good faith and opt-in to fee reimbursement structure ("**Bondholder Participation Deadline**") | T+60 |
| Deadline to hold initial settlement conference with the Ad Hoc Group of PDVSA 2020 Bondholders | T+65 |
| • Deadline to reach either (a) an agreement regarding settlement of the judgments held by Crystallex and/or ConocoPhillips or (b) agreement on a three-month extension of the Settlement Period<br>• If the Parties and ConocoPhillips are unable to  reach a consensual arrangement regarding either scenario above, the Special Master will turn his sole focus toward the process contemplated by the Sale Procedures Order entered by the Court | T+90 |