# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

-------------------------------------------------------------------------------------------------------

| | | |
|---|---|---|
| **CRYSTALLEX INTERNATIONAL CORPORATION,** | : | |
| | : | |
| | : | |
| **Plaintiff,** | : | |
| | : | |
| **v.** | : | **Misc. No. 17-151-LPS** |
| | : | |
| **BOLIVARIAN REPUBLIC OF VENEZUELA,** | : | **PUBLIC VERSION** |
| | : | |
| **Defendant.** | : | |
| | : | |
| | : | |
| | : | |

-------------------------------------------------------------------------------------------------------

## RESPONSE OF SPECIAL MASTER TO
## <u>OBJECTIONS TO PROPOSED SALE PROCEDURES ORDER</u>

OF COUNSEL:

Ray C. Schrock, P.C. (Admitted *pro hac vice*)
Alexander W. Welch (Admitted *pro hac vice*)
Jason L. Hufendick (Admitted *pro hac vice*)
WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
Ray.Schrock@weil.com
Alexander.Welch@weil.com
Jason.Hufendick@weil.com

Myron T. Steele (#000002)
Matthew F. Davis (#4696)
Alan R. Silverstein (#5066)
Abraham Schneider (#6696)
POTTER ANDERSON & CORROON LLP
Hercules Plaza, 6th Floor
1313 North Market Street
P.O. Box 951
Wilmington, DE 19801
Telephone: (302) 984-6000
Facsimile: (302) 658-1192
msteele@potteranderson.com
mdavis@potteranderson.com
asilverstein@potteranderson.com
aschneider@potteranderson.com

*Counsel for Special Master Robert B. Pincus*

Dated:   September 10, 2021
Public Version Dated:  September 21, 2021

WEIL:\98131099\9\67816.0003

# TABLE OF CONTENTS

I.    Preliminary Statement ................................................................................................ 1

II.   Special Master's Recommendations ......................................................................... 3

     A.    Timing for Launch of the Marketing Process .......................................... 3

     B.    Settlement Discussions and Proposed Negotiated Outcome ................... 6

     C.    Structure of Sale Process Considerations ................................................ 7

         1.    Good Faith Deposit ..................................................................... 7

         2.    Stalking Horse Bid Protections ................................................... 8

         3.    The Role of The Venezuela Parties and CITGO's Management Team ........................................................................................... 9

         4.    Sharing of Information with Potential Bidders .......................... 11

         5.    Venezuela Parties' Additional Structure and Alternative Process Arguments .................................................................... 13

         6.    Right to Seek Additional Guidance from the Court .................. 17

         7.    Provisions Regarding Attached Judgments .............................. 18

     D.    Reimbursement of Reasonable Expenses and Proposed Budget ........... 18

     E.    Proposed Retention of Evercore as Investment Banker .......................... 19

III.   Conclusion .............................................................................................................. 23

# EXHIBITS

**EXHIBIT A-1** Revised Sale Procedures Order

**EXHIBIT A-2** Revised Sale Procedures Order Redline

**EXHIBIT B**    Investment Banker Fees in Comparable Transactions

I, Robert B. Pincus, solely in my capacity as special master (the "**Special Master**") for the United States District Court for the District of Delaware (the "**Court**") in *Crystallex International Corp. v. Bolivarian Republic of Venezuela* (D. Del. Case. No. 17-151-LPS) ("the "**Crystallex Case**"), hereby submit this response ( "**Reply**")[1] to the Court in response to the objections to the *Proposed Order (A) Establishing Sale and Bidding Procedures, (B) Approving Special Master's Report and Recommendation Regarding Proposed Sale Procedures Order, (C) Affirming Retention of Evercore as Investment Banker by Special Master and (D) Regarding Related Matters* [D.I. 302] (the "**Proposed Sale Procedures Order**") filed by Crystallex [D.I. 317] (the "**Crystallex's Objection**"), the Venezuela Parties [D.I. 318] (the "**Venezuela Parties' Objection**"), and ConocoPhillips [D.I. 319] (the "**ConocoPhillips' Objection**" and, collectively, the "**Objections**"):[2]

## I.     Preliminary Statement

1.     Since my appointment as Special Master, my Advisors and I have endeavored to develop a sale process for the PDVH Shares with two guiding objectives (i) to design a process that will result in a sale transaction that is fair, open, and maximizes the value of the PDVH Shares to be sold, and (ii) to ensure the diverse, and frequently conflicting, views of the Sale Process Parties are solicited and considered in the development and implementation of such a process. I believe that striving to achieve these two objectives will ultimately result in the most appropriate process for the sale of the PDVH Shares – one that is fair, value-maximizing, and can be

---

[1]    This Reply has been filed under seal pursuant to paragraph 3 of the *Special Master Confidentiality Order* [D.I. 291].

[2] Capitalized terms used but not defined shall have the meaning ascribed to such terms below or, if not defined below, the meaning ascribed to such terms in the Proposed Sale Procedures Order or the *Special Master's Report and Recommendation Regarding Proposed Sale Procedures Order* filed August 9, 2021 [D.I. 303] (the "**Report**").

implemented in accordance with the Court's orders regarding such a sale.  This was the basis upon which I designed and ultimately recommended the Proposed Sale Procedures Order to the Court.

2.        Although my team and I have tried to have a collaborative and open dialogue with the Sale Process Parties, it is very clear that each of the Sale Process Parties has very different objectives and, accordingly, that affects our ability to reach consensus on a number of important issues.  However, respectfully, each of the Objections to the Proposed Sale Procedures Order must be interpreted through the lens of the clear objectives and interests of its proponents, they are not unexpected when considered in context of each proponents' goals for this process:

- Crystallex seeks a sale as soon as possible – hence the proposed single step auction.
- The Venezuela Parties prefer no sale at all – and the record in these proceedings speaks for itself in this regard.
- ConocoPhillips, a junior creditor to Crystallex, wants a sale only after the Court has ordered and OFAC has consented to the attachment of their own judgment and has expressed a desire to tie everything to receipt of approval from OFAC.  Further, as a junior creditor, given the current economic environment for the shares of an oil and gas refinery business (and the financial implications thereof), ConocoPhillips also prefers delays until the value of PDVH has recovered to pre-pandemic levels.

3.        Given these irreconcilable points of view and each Sale Process Parties' motivations, it is not surprising that each party raised objections to the Proposed Sale Procedures Order and they now seek a determination from the Court.  This is not to say that any Objection is *per se* unwarranted, that is for the Court to decide – but it is fair and appropriate for the Court to understand that in this process the Special Master has seen the particular views and objectives of the Sale Process Parties during his interactions and consultations with each of the parties, and these views underlie their Objections.

4.        To maintain the transparency of this process for the benefit of the Court and the Sale Process Parties, I am filing this Reply to supplement my recommendations set forth in the Proposed Sale Procedures Order and my Report, particularly with respect to issues where no Sale

Process Party may be adequately incentivized to provide a fair or reasoned proposal to the Court.[3] Further, having reviewed the Objections in detail, I have also prepared a revised form of the Sale Procedures Order, which is attached as **Exhibit A-1** hereto, to reflect certain of the modifications to the Sale Procedures Order proposed in the Objections (the "**Revised Proposed Sale Procedures Order**").[4]  A redline showing the changes is attached hereto as **Exhibit A-2**.

## II.  Special Master's Recommendations

### A.  Timing for Launch of the Marketing Process

5.      I believe that the Sale Process Parties will agree that the most crucial and most polarizing issue for the Court to decide at this stage is when the Marketing Process should be launched in relation to obtaining approval or guidance from the United States Government (the "**USG**"), particularly with respect to obtaining a license or other guidance from the Department of the Treasury's Office of Foreign Assets Control ("**OFAC**").  Although there could be benefits to the Court establishing a firm Launch Date (as it may increase the likelihood of OFAC taking action),[5] I continue to recommend that the Court adopt a more nuanced proposal: the Marketing Process should be launched when I am satisfied with the authorization, FAQs, or other applicable guidance issued by OFAC regarding the launch and viability of the Marketing Process *or* such other time as ordered by the Court.  *See* Proposed Sale Procedures Order at ⁋ 3.   Given Crystallex's goal for this process, it is understandable that they would want a date certain for

---

[3] To preserve costs, I have not submitted any additional evidence, but should the Court require evidence to decide any of these issues, I will make myself and my Advisors available at the request of the Court.

[4] The Revised Proposed Sale Procedures Order assumes that ConocoPhillips will elect to continue to participate in the Special Master process.  Should they elect to withdraw, additional revisions may be necessary.

[5] There are also notable drawbacks, including that Potential Bidders may not participate in such process.

launch upon entry of the Proposed Sale Procedures Order, but the Proposed Sale Procedures Order has always provided (and it should provide) that the Court can direct me to launch (or delay launch) at an alternative time.  In the first instance, it is my recommendation that we continue the dialogue with OFAC as set forth in the Proposed Sale Procedures Order and my Report, including, if appropriate, this Court issuing an order to show cause if progress is not timely made following entry of the Proposed Sale Procedures Order.

6.      As things stand today (and as I said repeatedly in the Report), I would not recommend nor would I intend to launch the Marketing Process until I am satisfied with the posture of OFAC because of the likelihood that Potential Bidders would be unwilling to participate in the process.[6] *See* Report at ⁋ 3-4.  In reaching this conclusion, I am not taking a position on the parties' particular arguments regarding what the OFAC FAQs or regulations ultimately permit at this time.  What's important from my perspective is that, as things stand today, there is enough uncertainty that Potential Bidders will likely discount their bids in light of such uncertainty or not even participate in the process at all.  Of course, a number of scenarios could develop after entry of the Proposed Sale Procedures Order that could change this perception – for example, such as a change to the U.S. sanctions on Venezuela, affirmative guidance from OFAC and updated FAQs, a general or specific license from OFAC, or subsequent pleadings filed by the USG in this case – but sitting here today, it is not possible to predict every permutation of feedback or input that we may receive from OFAC and for this reason I believe the proposed discretion is warranted.  I further believe that the flexibility will allow us to tailor the course of action to the situation as it develops and will serve to prompt the USG to act rather than remain silent.

---

[6] *See also* OFAC FAQ 809 (stating that a specific license from OFAC is required "prior to conducting an auction or other sale… or taking other concrete steps in furtherance of a sale" of shares of a Government of Venezuela entity (such as the PDVH Shares).

7.      I would caution the Court from attempting to infer the USG's views from the Trump administrations' August 28, 2020 statement [D.I. 220] that the Venezuela Parties recite in many of the pleadings they file in this and other courts.  The USG (including OFAC) is very aware of the Special Master process.  They've requested copies of pleadings (which the Court approved at D.I. 314) and in a series of meetings, the USG's representatives asked thoughtful questions and have shown other signs of engagement as detailed more fully in my Report.  Presumably, the USG knows how to protect the interests of the Executive Branch and, in accordance with their subsequent public statements made at the September 17, 2020 hearing that the Court can "do whatever it wants," they have at no point in any of my interactions with them, as an arm of this Court, asked me to or suggested that I should delay the process.

8.      Nor do I believe that it would be impermissible or inappropriate for the Court to prompt the USG to act through entry of the Proposed Sale Procedures Order or a subsequent order to show cause as the Venezuela Parties argue.  *See* Venezuela Parties' Objection at ¶ 21 (arguing that "federal courts do not advocate to the Government on behalf of particular parties or for particular outcomes in regulatory determinations affecting those parties.").  I have not proposed to, nor have I ever, lobbied on behalf of any particular party in this case, despite assertions to the contrary in the Venezuela Parties' Objection. *See id.*  Moreover, federal courts frequently prompt the USG to clarify its position on issues relevant to matters before the Court and have done so in connection with the USG's policy regarding Venezuela as well.[7]

---

[7] *See e.g.*, *Petroleos De Venezuela S.A. v. MUFG Union Bank, N.A.*, Case No. 19-10023 (KPF) (S.D.N.Y. June 25, 2020) [D.I. 144] ("The Court orders the parties to notify the Civil Division of the U.S. Attorney's Office for the Southern District of New York that the Court invites the views of the United States Government as to the following question: Is recognition of the Venezuelan National Assembly's denunciation and invalidation of the 2020 Bond Indenture consistent with the law and policy of the United States? The parties' notification should be brought specifically to the attention of Jeffrey Oestericher, Chief of the Civil Division. The Court further ORDERS the

9.     In sum, it is my view that the proposed discretion afforded to the Special Master in the Proposed Sale Procedures Order with respect to the Launch Date appropriately balances the conflicting views of Crystallex, on one hand, and the Venezuela Parties and ConocoPhillips, on the other.  Flexibility in the procedures will allow the Court to ensure the Marketing Process is initiated in a manner that will enable all parties, including Potential Bidders, to have confidence in the viability of the process without facing unnecessary or undue delays.   Accordingly, notwithstanding Crystallex's request to establish an affirmative launch of the Marketing Process, I have not adopted that request, but defer to the Court if it is of the view a specific Launch Date would be appropriate at this time.

## B.     Settlement Discussions and Proposed Negotiated Outcome

10.     In the Objections, each of the Venezuela Parties, Crystallex, and ConocoPhillips expressed a desire for settlement discussions to occur, with certain modifications to the proposal I included in my Report.  My purpose for proposing the framework for the Sale Process Parties and the PDVSA 2020 Bondholders to engage in settlement discussions was simply to propose

---

parties, in their notification to the U.S. Attorney's Office, to request that the Government provide its views to the Court no later than August 5, 2020.")  It is particularly appropriate here where the USG has already appeared in the Crystallex Case and further in the context of a sale of "blocked property" where applicable law charges the Court and its judicial officers with the obligation to actually conduct the sale of the blocked property itself (acting in the role typically fulfilled by the Sheriff's Department or the U.S. Marshal Service).   Frequent communication between the Department of Justice and the U.S. Marshals is indeed the norm in connection with sales undertaken by the United States Marshals Service.   *See e.g.*, Department of Justice's *Justice Manual*   at   9-115.110   (Management   and   Disposal   of   Seized   Assets, https://www.justice.gov/jm/jm-9-115000-use-and-disposition-seized-and-forfeited-property) ("[T]he United States Attorney or agent in charge of the field office responsible for an administrative forfeiture case should consult with the United States Marshals Service in cases involving Department of Justice seizing agencies, or Treasury in cases involving Treasury seizing agencies, to discuss management or disposition issues. Such discussions shall address the impact that such proposed action may have on the United States Marshals Service or other custodial agency in undertaking, continuing, or terminating custody of the property.").

what I believe to be in the best interest of the interested parties.  The parties are, of course, free to accept or reject my offer.  *See* Fed. R. Civ. P. 53(1)(A) (masters may "perform duties consented to by the parties.").  I continue to believe it makes sense and would be in each party's interest for the Sale Process Parties and the PDVSA 2020 Bondholders to settle on a negotiated resolution of certain, or all, relevant claims held by Crystallex, ConocoPhillips, and/or the PDVSA 2020 Bondholders.  At a minimum, the parties should agree on a claims waterfall.  I offered my assistance primarily because I believe that my involvement would bring structure to the process. I continue to encourage the Sale Process Parties to engage with each other and, if my involvement is desired, to send a proposal regarding the terms upon which they would participate in such discussions either to me or to the other Sale Process Parties (or both).

11.    Of course, we need not wait until the Proposed Sale Procedures Order is entered to do so.  Now that the hearing to consider approval of the Proposed Sale Procedures Order has been scheduled for November 8, 2021 – two months from now – I encourage the Sale Process Parties to use this opportunity to narrow the issues.  There is sufficient time to make real progress.

## C.    Structure of Sale Process Considerations

### 1.    Good Faith Deposit

12.    The Venezuela Parties ask the Court to "revisit its prior determination that bidders be required to submit a 'substantial good faith deposit.'" *See* Venezuela Parties' Objection at ¶ 12. ConocoPhillips raises similar concerns regarding the proposed size of the proposed good faith deposit.  Although I attempted to incorporate all of the Sale Process Parties' comments to the good faith deposit mechanism that I received to the draft of the Proposed Sale Procedures Order, I welcome the further revisions proposed by the Venezuela Parties and ConocoPhillips in their objections to reduce the amount of the good faith deposit or to establish a cap on the maximum amount of any good faith deposit.  Upon review of the Objections, I have revised the Proposed

Sale Procedures Order to recommend that a good faith deposit shall in no circumstance exceed $50 million.  Of course, the Bidding Procedures should continue to provide that the amount of the good faith deposit can be decreased in consultation with the Sale Process Parties to encourage a Potential Bidder to participate if it appears that this requirement ultimately chills bidding in practice.  *See* Bidding Procedures at ¶ 12 (providing that the good faith deposit is 10% "unless otherwise agreed to by the Special Master, in consultation with the Sale Process Parties.").

### 2. <u>Stalking Horse Bid Protections</u>

13.     The Venezuela Parties and ConocoPhillips, for different reasons, take issue with the provision of the Stalking Horse Bid Protections contemplated in the Sale Procedures Order and the Bidding Procedures.[8]  However, both parties assume in their Objections that such relief is requested in the Sale Procedures Order with respect to the Stalking Horse Bid Protections.  Instead, such relief is contemplated to be granted only by further Court order if requested by me.

14.     As set forth in Section 19 of the Sale Procedures Order, the Special Master's authority to grant any of the Stalking Horse Bid Protections described therein is subject to approval of the Court and "shall not be effective until entry by the Court of an order approving such Stalking Horse Bid Protections and subsequent execution by the Special Master of the Stalking Horse Agreement."[9]  Accordingly, I do not believe that the Court needs to rule on the Objections related to the Stalking Horse Bid Protections until, and only if, such Stalking Horse Bid Protections are submitted and recommended to the Court.  If, following receipt of any Stalking Horse Bids and any subsequent negotiation, I determine that it is appropriate to grant a potential Stalking Horse Bidder certain protections, then I will seek the requisite authority from this Court to do so.  In such

---

[8] *See* Venezuela Parties Objection at 10-11; *see also* ConocoPhillips Objection at 14.

[9] *See* Sale Procedures Order at ¶ 19.

event, the Sale Process Parties will have the opportunity to raise objections to the proposed Stalking Horse Bid Protections and to be heard by the Court with respect thereto. No such authority has been requested in the Proposed Sale Procedures Order at this time (other than keeping open the option for the Special Master to designate and seek approval of such a Stalking Horse Agreement in the future with all parties rights reserved until such time) and I therefore believe the Objections raised to the Stalking Horse Bid Protections are not yet (and may never be) applicable.

15.     I would be remiss, however, if I did not note that I do understand each of the Sale Process Parties concerns regarding the potential Stalking Horse Bid Protections (particularly their Objections to granting Stalking Horse Bid Protections to a credit bidder) and I will certainly take them into account before submitting any such proposal to the Court, and all such rights to object are intended to be reserved. At this stage, it is impossible to predict the bids that may be received and/or to guess at the context in which the Stalking Horse Bid Protections should be considered and, accordingly, I do not believe it is appropriate to foreclose seeking Stalking Horse Bid Protections for a bid at this time. Each parties' rights are fully preserved. *See* Proposed Sale Procedures Order at ¶ 22 ("If a timely Stalking Horse Objection is filed and served with respect to a Stalking Horse Agreement, the proposed Stalking Horse Bid Protections provided for under that agreement shall not be approved until the objection is resolved").

### 3.     The Role of The Venezuela Parties and CITGO's Management Team

16.     I agreed and continue to agree with much of what the Venezuela Parties have said regarding the ways in which their participation in the process could enhance the likelihood of the process resulting in a value-maximizing bid. However, the Court has ordered the development of this process for a judgment debtor that has not yet shown its willingness to proceed with the sale of the PDVH Shares. That cannot be ignored. From my perspective, I believe the scope of the disagreement is actually very narrow: who should control and direct the communications with

Potential Bidders?  The question is not whether the Venezuela Parties, and particularly CITGO management, should be involved.  We all agree that the CITGO management team is most familiar with the assets represented by the PDVH Shares and that their good faith involvement will be value enhancing.  *See* Report at ¶ 78 ("Guiding bidders through CITGO's recent financial performance and future projections will require substantial work and time on both the part of myself and my Advisors, and the CITGO management team.").

17.     Given the importance of maintaining clear and consistent messaging to Potential Bidders (and because the Venezuela Parties themselves have expressed an interest in maintaining the option to submit a bid after they have received copies of other bids), it is critically important that I, as an arm of the Court, control the forum and timing of any communications between the CITGO management team and Potential Bidders so that I can oversee the competitive bidding process.  It is for this reason that I proposed the limited restriction that the Sale Process Parties should seek my consent before sending any communications to a Potential Bidder.  *See* Proposed Sale Procedures Order at 40-41; *see* also Bidding Procedures at ¶ 4 ("Each of the Sale Process Parties may recommend to the Special Master documents or additional information to be included in the Data Room").  This, of course, does not prohibit the Venezuela Parties from reviewing and providing input on any marketing materials, which I have proposed.  *See* Proposed Sale Procedures Order at ¶ 4 ("the Special Master shall share a draft of the "teaser" and CIM with counsel to the Sale Process Parties no later than seven (7) calendar days prior to launch of the Marketing Process and shall consult in good faith with the Sale Process Parties regarding the same."). In addition to maintaining the competitive environment, the prohibition will signal to Potential Bidders that the process is fair and that the Sale Process Parties – each of which has not ruled out that it will be a Potential Bidder – will not be attempting to use their engagement in the case to pursue ulterior

motives.  *See* Venezuela Parties' Objection at ⁋ 21 (stating that the Venezuela Parties oppose any sale).

18.     With respect to ConocoPhillips' request to remove the prohibition on communications that are "intended to frustrate the Marketing Process or the Sale Procedures," I continue to believe it is very important for this Court to maintain the integrity of the sale process and to take appropriate precautions to ensure that parties (including potential bidders) do not collude in connection with submitting any bid (or in discouraging any party from submitting a bid).  *See* 11 U.S.C. 363(n) (codifying a similar requirement in the Bankruptcy Code).  The Proposed Sale Procedures Order does not purport to limit the types of discussions that ConocoPhillips seeks to undertake regarding any objections to the implementation of the Proposed Sale Procedures Order.  *See* Proposed Sale Procedures Order at ⁋ 42 ("For the avoidance of doubt, this provision is not intended to limit in any way the ability of some or all of the Sale Process Parties to discuss . . . the terms, content, or grounds of any potential objection to be filed with the Court.").  Nonetheless, because I believe that a party will not knowingly interfere with or obstruct an order of the Court regardless of whether an order expressly prohibits it, and because of my ability to seek guidance from the Court if a Sale Process Party acts inappropriately during the process, I have proposed to remove the explicit prohibition from the Revised Proposed Sale Procedures Order that I have filed with this Reply to avoid an unnecessary determination from the Court at this time.  I trust that each party will act appropriately and, if necessary, I will seek guidance or input from the Court at a later time.

4.     **Sharing of Information with Potential Bidders**

19.     Relatedly and equally as important as controlling communications with Potential Bidders, I believe it would inhibit the process if the Venezuela Parties were able to control communications with Potential Bidders through the designation of information as "highly

confidential."  *See* Venezuela Parties Objection at 22 (arguing that the Special Master should only be able to share information "with the consent of the producing party").  As the Venezuela Parties have marked the vast majority of the most important information that will need to be shared with Potential Bidders as "highly confidential," granting this request would effectively provide the Venezuela Parties with control over the process.

20.    The protections in the Proposed Sale Procedures Order afforded to the Venezuela Parties with respect to confidential information are more than sufficient to protect their interests. The Proposed Sale Procedures Order provides that, before I disclose any confidential information to a Potential Bidder, I must first give notice to the applicable Sale Process Party and then, only after notice has been provided, it can be shared only if the Potential Bidder has entered into a market standard confidentiality agreement, a copy of which is attached as Exhibit 4 to the Proposed Sale Procedures Order (the "**Confidentiality Agreement**").[10]  Further, all potential bidders that participate in this process must consent to the Court's jurisdiction (see Proposed Sale Procedures Order at ⁋ 38) and each party must contractually agree that the Court will be able to enforce any breaches of the Confidentiality Agreement.  *See* Confidentiality Agreement ⁋ 10. Finally, the Proposed Sale Procedures Order provides that I will consult with PDVH and CITGO in connection with sharing competitively sensitive information and, if appropriate, will establish firewall protections or "clean team" protocols.  *See* Proposed Sale Procedures Order ⁋ 44.  In light of these protections, I do not believe that the information sharing provisions with Potential Bidders are insufficient to protect the Venezuela Parties' interests.  In any event, by requiring me to provide them with notice before I share any confidential or highly confidential information, the Venezuela

---

[10] To further increase transparency, in the Revised Proposed Sale Procedure Order I have added a mechanism for any executed Confidentiality Agreement to be filed with the Court under seal and shared with the Sale Process Parties.

Parties will always have the option to seek the Court's input if any issues arise during the course of implementing the Proposed Sale Procedures Order.

21.     With respect to ConocoPhillips objection to the information sharing provision, I do not have any objection to modifying the Proposed Sale Procedures Order to require their reasonable consent before sharing any information that they have marked "highly confidential" pursuant to the Protective Order.  As of the date hereof, ConocoPhillips has not marked any information "highly confidential" and, unlike the information of CITGO that will be of primary interest to Potential Bidders, I do not anticipate there being much information, if any, that Potential Bidders will need from ConocoPhillips.     Accordingly, I have modified the Proposed Sale Procedures Order to require ConocoPhillips' reasonable consent before I share any information that ConocoPhillips has marked "highly confidential."

**5.     Venezuela Parties' Additional Structure and Alternative Process Arguments**

22.     The Venezuela Parties raise a number of issues that they believe result in the process being intentionally structured to sell 100% of the PDVH Shares at a discount, including because of the potential Stalking Horse Bid Protections, the Good Faith deposit, and the proposed limitations on the ability of the CITGO management team to communicate unsupervised with Potential Bidders.  I have addressed most of these issues above and, like the remaining arguments, I believe they all fall away upon an examination of the process that I have recommended and, respectfully, the likely motivations of the Venezuela Parties in making such arguments.  *See e.g.*, Bidding Procedures at ¶ 5 (asking Potential Bidders to identify any minority shareholder rights, protections, or other desired terms in connection with any bid for less than 100% of the PDVH Shares); *id.* at ¶ 6 (permitting Special Master to designate as a stalking horse bid a bid for less than 100% of the PDVH Shares); *Id.* at ¶ 8 (permitting bids for less than 100% of the PDVH Shares); *id.* at ¶ 9 (requiring bidders to specify any minority shareholder rights in connection with their

bid); *id.* at ¶ 14-15 (requiring the Special Master to select the highest bid that pays off the most of the Attached Judgments for the fewest PDVH Shares).   Ultimately, these procedures are solely to provide clarity regarding the procedure for the Special Master to select which bid should be submitted to the Court for approval.   The Venezuela Parties' rights to object at the Sale Hearing (or any hearing in connection with designation of a Stalking Horse Bidder), if they believe I did not accept a bid for fewer PDVH Shares that could have satisfied the same amount of the Attached Judgments, are fully preserved.

23.     However, I have no issue with the Venezuela Parties' proposal that, when selecting between two competing bids that, *ceteris paribus,* have sufficient proceeds to satisfy all Attached Judgments, I may select a value-maximizing Bid that provides for the sale of more PDVH Shares solely with the consent of PDVSA.   *See* Venezuela Parties' Objection at 6 and 11.   Otherwise and absent PDVSA's consent, the Bidding Procedures require the lower bid – even if it is not value maximizing – to be accepted because it has sufficient proceeds to satisfy all Attached Judgments for the sale of fewer PDVH Shares.   I have proposed revisions to clarify this point.   *See* Revised Sale Procedures Order, Ex. 1 at 17.

24.     The Venezuela Parties' other line of argument that I did not consider other value maximizing alternatives is simply incorrect.   With the assistance of my Advisors, I considered a number of alternatives, none of which appear feasible based on the diligence provided to me to date by the Venezuela Parties and the Illustrative Clearing Price set forth in my Report.[11]   Because

---

[11] *See* Report at ¶¶ 69-70.   The criticism of the Illustrative Clearing Price contained in Declaration of Randall J. Weisenburger, a copy of which is attached as Exhibit A to the Venezuela Parties' Objection (the "**Weisenburger Declaration**"), fails to take into account the purported 50.1% pledge in favor of the PDVSA 2020 Bondholders.   *See* Weisenburger Declaration at ¶ 14 (alleging a "significant mathematical error" in the calculating the Illustrative Clearing Price).   Due to the pledge, if value is distributed pursuant to a waterfall, Crystallex's Judgment would be satisfied before the PDVSA 2020 Bondholders are satisfied in full.   Any Attached Judgment after

I did not ultimately recommend a traditional initial public offering or an IPO via a SPAC (both of which would likely require a sale of such equity at a customary discount) does not mean that I did not consider such proposals.  In several of my conversations with counsel to the Venezuela Parties, they suggested that the process be delayed for months so that they could consider alternative structures.  Respectfully, these are alternative transactions that the Venezuela Parties should have considered before having a lien attached to the PDVH Shares or recognition of the Crystallex Judgment.  They are free to pay off the Crystallex Judgment (and any other judgments that become Attached Judgments) at any time.  And yet, when I asked for additional details on such proposals, they declined to provide specifics or otherwise engage in further discussions regarding these proposals.  The Venezuela Parties provided no specifics on the alternatives they wished that I would consider in lieu of a sale of PDVH Shares.[12]  I ultimately recommended the Proposed Sale Procedures Order because I believe it to be the most feasible available alternative, it provides for the best opportunity of a value maximizing result, and other alternatives that I did not recommend were unlikely to generate proceeds necessary to pay off the Crystallex Judgment (and most certainly any additional Attached Judgments).

25.     It bears repeating: nothing in the Proposed Sale Procedures Order today prohibits the Venezuela Parties from evaluating and proposing such alternative structures to Crystallex (or any other holder of an Attached Judgment).  Based on each of the parties statements to welcoming

---

Crystallex's Judgment (such as ConocoPhillips' Judgment) would take 49.9% of the remaining value until the PDVSA 2020 Bondholders are paid in full.

[12] The limited specifics now provided in their objection are substantially more detailed than were provided in our private discussions.  *See* Weisenburger Declaration at ¶ 12 (suggesting that the Special Master should have considered, among other things, a "private placement transaction" or a "joint venture with a strategic partner looking to expand its refining infrastructure").  Unless Crystallex were to consent, none of these appear to be able to plausibly comply with Section 324 of the Delaware General Corporation Law nor do the Venezuela Parties even attempt to explain how they could comply.

a Negotiated Outcome,  I suspect that Crystallex would welcome a tangible and feasible proposal from the Venezuela Parties that would result in payment of their Attached Judgment.  I continue to believe it would be helpful if the Venezuela Parties would provide more specifics around their proposal and the potential "pockets of value" alluded to in the Weisenburger Declaration.

26.     I believe that the Venezuela Parties' further arguments that my recommendation is flawed because I did not conduct a formal "valuation analysis" or that the Proposed Sale Procedures Order "deviates from the way that corporations normally raise capital" are red herrings. Although it may be customary for a board of directors to ask its advisors to prepare an informal valuation – customarily referred to as a "desktop valuation" in connection with evaluating the *decision* to launch a sale process, that decision was already made in the Crystallex Case well before I was appointed as Special Master.  *See* January 2021 Opinion (directing the sale of the PDVH Shares).   In the forced-sale context, I do not believe that commissioning a formal valuation – which will result in additional cost, timing, and expense – would bring any real value to the process.  Indeed, in the most applicable context to the Court-supervised sale at hand – Section 363 of the Bankruptcy Code, the Third Circuit has rejected arguments that it would be appropriate for courts to value assets prior to a marketing process.  *See In re SubMicron Sys. Corp.*, 432 F.3d 448, 461 (3d Cir. 2006) ("Section 363 attempts to avoid the complexities and inefficiencies of valuing collateral altogether by substituting the theoretically preferable mechanism of a free market sale to set the price. The provision is premised on the notion that the market's reaction to a sale best reflects the economic realities of assets' worth. Naturally, then, courts are not required first to determine the assets' worth before approving such a market sale. This would contravene the basis for the provision's very existence").  Like Section 363 of the Bankruptcy Code, Section 324 of the Delaware General Corporation Law does not require a valuation to occur prior to conducting any

sale process.  Consistent with long-standing precedent, I believe that the marketing process and ultimate auction to the highest bidder will be the best way to determine the true value of the PDVH Shares.  *See DFC Glob. Corp. v. Muirfield Value Partners, L.P.*, 172 A.3d 346, 368–69 (Del. 2017) ("In economics, the value of something is what it will fetch in the market. That is true of corporations, just as it is true of gold.  Thus, an economist would find that the fair market value of a company is what it would sell for when there is a willing buyer and willing seller without any compulsion to buy.");  *In re Energy Coop., Inc.*, 109 B.R. 822, 830 (N.D. Ill. 1989) ("There is simply no substitute in measuring value than to analyze what informed buyers are willing to accept, informed sellers are willing to pay, and with neither group under a compulsion to act . . . [A]ll sophisticated valuation methods must yield to the realities of the marketplace.");  *In re Granite Broad. Corp.*, 369 B.R. 120, 140, 143 (S.D.N.Y. 2007) ("[T]he best evidence of value is what a third party is willing to pay in an arm's length transaction . . . [p]eople who must back their beliefs with their purses are more likely to assess the value of the [asset] accurately than are people who simply seek to make an argument.").  In the context of a court-ordered sale, moreover, such an outcome appears fair to all concerned.

### 6.  Right to Seek Additional Guidance from the Court

27.     Crystallex argues that regardless of how the Marketing Process goes, I should be obligated to select and recommend to the Court a Sale Transaction.  As I explained in the Report at ¶ 83, it may be necessary for the Court to address unforeseen contingencies or impediments that may arise during my implementation of the Proposed Sale Procedures Order.  Accordingly, the Proposed Sale Procedures Order and corresponding Bidding Procedures contain a customary reservation that I am not *necessarily* obligated to recommend a Sale Transaction to the Court.  If all goes as planned, I, of course, have every intention of selecting a Successful Bid in accordance with the proposed Bidding Procedures.  I do not believe, however, that it is in the best interest of

the Sale Process Parties for me to be compelled to recommend a Sale Transaction under all circumstances, including if such a Sale Transaction would not comply with applicable law.  *See Burge v. Fidelity Bond & Mortg. Co.*, 648 A.2d 414, 419 (Del. 1994) ("Delaware courts may, in their discretion, set aside a sale where inadequacy of price will result in unfairness or work an injustice on any party having an interest in the outcome of the sale. Fraud, mistake, accident, impropriety, misconduct, surprise or irregularity in the sale process will support judicial invalidation of the sale").

### 7.     Provisions Regarding Attached Judgments

28.     The Venezuela Parties seek clarifying language that an Attached Judgment must be a valid attachment for PDVH Shares to be sold to satisfy such judgment.  This was always the intention and I have no objection to adding additional language to the Proposed Sale Procedures Order clarifying this point.  I have proposed revised language in the Revised Proposed Sale Procedures Order at ⁋ 29.

### D.     Reimbursement of Reasonable Expenses and Proposed Budget

29.     I believe that the Court's *Memorandum Order* dated September 8, 2021 [D.I. 337] and the procedures to be adopted pursuant thereto resolve the objections to the proposed language contained in the initial Proposed Sale Procedures Order regarding the reimbursement of my fees and expenses and the provision of a budget.  Accordingly, I have revised the Proposed Sale Procedures Order to incorporate the provisions to be established in the coming weeks pursuant thereto.  *See Revised Proposed Sale Procedures Order* at ⁋ 23.

### E.     Judicial Immunity

30.     The Venezuela Parties further object to the provisions in the Proposed Sale Procedures Order regarding judicial immunity and the procedures for any violation of the Court's order.  These provisions go to the core of my ability to retain qualified professionals.  As a special

master, I am unable to offer such professionals customary indemnification or other contractual arrangements that they would be accustomed to in the private context and would be required by each institution in a traditional engagement.  However, I have been able to retain them on the basis that they would be entitled to judicial immunity in acting as my advisor.  I respectfully submit that these provisions are appropriate, consistent with applicable law, and do not unfairly impair the interests of any Sale Process Party.

### F.      Proposed Retention of Evercore as Investment Banker

31.      Each of the Objections challenge the retention of Evercore at this time and/or on the proposed terms of Evercore's engagement as set forth in the Proposed Evercore Engagement Letter (which is attached as Exhibit 3 to the Sale Procedures Order).

32.      As further addressed in my Report, Evercore will play a vital role in the implementation and success of the Marketing Process.[13]  My proposed retention of Evercore as investment banker was the result of a competitive solicitation process from several market-leading investment banking advisory firms and, after a round of interviews and several follow-up discussions, I selected Evercore based on their extensive experience and excellent reputation in providing high quality investment banking services.  *Id.*  I believed at the time, and continue to believe, Evercore's experience and reputation uniquely positions them to handle the complex mandate associated with implementation of the Proposed Sale Procedures Order.  Thereafter, Evercore's fee structure was competitively negotiated (and repeatedly renegotiated) in consultation with each of the Sale Process Parties (all as explained in great detail in the Report).[14]

---

[13] *See* Report at ¶¶ 11-30 for detailed discussion regarding Evercore's retention, the terms thereof, and the necessary role Evercore will play in implementing the Sale Procedures Order.

[14] Notwithstanding that under the May 27 Order I have the authority and do not require the consent of any Sale Process Party to retain an investment banker, I have proposed to submit the Proposed Evercore Engagement Letter to the Court for confirmation because the consultation process with

33.     No Sale Process Party objects on the basis that I do not need the assistance of an investment banker to perform my duties pursuant to the Proposed Sale Procedures Order.   Nor does any party even attempt to dispute the retention of Evercore based on its qualifications.   *See e.g.*, ConocoPhillips' Objection at ⁋ 8 ("To be clear, ConocoPhillips has no objection to the choice of Evercore or its qualifications"); Weisenburger Declaration at ⁋ 3, attached as Exhibit A to Venezuela Parties' Objection ("Evercore is an excellent, highly respected financial advisory firm").

34.     Instead, the Objections lodge a series of attacks that completely miss the mark on the standard set by the Court in the May 27 Order [D.I. 277].   **The Court has already determined in this case** that the "fees of any Counsel or Advisors retained to assist the Special Master in carrying out his duties shall be calculated based on the rates charged by such Counsel or Advisor to other clients of their firms."   *See* May 27 Order at ⁋ 17; *accord* Fed. R. Civ. P. 53(a)(3); (g) (permitting the Court to impose fair and reasonable fees and expenses).   Remarkably, not a single Sale Process Party has even alleged that the Proposed Evercore Engagement Letter contemplates fees or expenses that are different than fees that Evercore normally charges its other clients.

35.     As set forth in my Report, I believe the proposed terms of Evercore's engagement are fair, reasonable, and reflective of industry standards and certainly comparable to terms Evercore would charge to any other client.   Of course, as the Court and each Sale Process Party has repeatedly recognized, this engagement is novel and unprecedented and, accordingly, no direct comparison is perfect.   While novel, the mandate and contemplated work that Evercore will perform is in many ways akin to a traditional M&A mandate and in other ways akin to a

---

the Sale Process Parties revealed that certain of the Sale Process Parties would seek to litigate the compensation structure at the end of the sale process.   It would be unfair to ask any investment banker run a sale process on such an uncertain basis.

restructuring mandate (such as a Section 363 sale supervised by a bankruptcy court).  If analyzed from either of these angles, the compensation structure contemplated by the Proposed Evercore Engagement Letter is reasonable and in line with standard industry practice.  Indeed, in each case, it is on the lower end of the spectrum.[15]

36.     Nonetheless, prior to filing my Report, I went to great lengths to obtain the concessions from Evercore requested by the Sale Process Parties.  I have detailed a number of these concessions in my Report already, including (i) protections to ensure that Evercore does not receive unnecessary Monthly Fees (as the accrual of such fees can be "shut-off" at my discretion and that they will not begin until the "Preparation Launch Date" as defined in the Proposed Sale Procedures Order), (ii) reducing the Sale Fee in the event the only bona fide Bid generated by the Marketing Process is a credit bid from Crystallex, (iii) substantially reducing the Upfront Amount, and (iv) excusing ConocoPhillips from having to pay the Upfront Amount if they are not expected to receive proceeds from any Sale Transaction.  *See* Report ¶ 11.

37.     After reviewing the Objections, I once again sought to renegotiate even further concessions.  In an effort to reconcile as many of the issues raised in the Objections, Evercore has made the below proposal in discussions with Crystallex in an effort to reach an agreement.  I am optimistic that we will be able to resolve Crystallex's objections prior to the hearing.  The most recent proposal conveyed to Crystallex is as follows:

- The Sale Fee will be reduced further if the Successful Bid is a credit bid from Crystallex in an amount equal to or less than $500 million (the "**Credit Bid Threshold**"). Solely for purposes of calculating whether the Credit Bid Threshold has been satisfied and the Sale Fee, the amount of Crystallex's credit bid shall be increased by 50% of the outstanding amount of any amount that remains secured

---

[15] For the Court's benefit, I have attached as <u>Exhibit B</u> hereto a chart showing the fees paid investment bankers in comparable M&A transactions and also in restructuring transactions.  Based on this analysis, I am confident the fee structure ultimately agreed upon in the Proposed Evercore Engagement Letter is reflective of market standards.

by a purported pledge of the stock of CITGO Holding in favor of Rosneft Trading, S.A., if any (the "**Credit Bid Adjustment**").  If this is the case, then the Sale Fee will be the higher of $7 million or 2% of the credit bid (after taking into account the Credit Bid Adjustment and subject to appropriate crediting of monthly fees, discussed below).   The entire Sale Fee in this scenario would be paid at consummation of the Sale Transaction (*i.e.*, no Upfront Amount in this scenario)

- o   In this scenario, 50% of the first twelve Monthly Fees actually paid will be credited against the Sale Fee due at consummation of the Sale Transaction.

- If the Marketing Process results in Crystallex submitting a credit bid in excess of the Credit Bid Threshold (after taking into account any Credit Bid Adjustment), then the Sale Fee would be 0.25% of the "Aggregate Consideration" (as defined in the prior Proposed Evercore Engagement Letter) of the Successful Bid (subject to appropriate crediting of Monthly Fees, discussed below).   In this scenario $3.5 million of the Sale Fee will be payable as an Upfront Amount.  The remaining will be paid at consummation of the Sale Transaction.

- o   Further, with respect to the portion of the Sale Fee payable at consummation of the Sale Transaction, 50% of the first twelve Monthly Fees actually paid and the Upfront Amount actually paid will be credited against the Sale Fee due at consummation of the Sale Transaction.

- With respect to any other bid that is selected as the Successful Bid, the provisions in the Proposed Evercore Engagement Letter will remain the same, except that the Upfront Amount will be reduced to $3.5 million (not subject to crediting) and 50% of the first twelve Monthly Fees will be credited against the portion of the Sale Fee paid at consummation of the Sale Transaction.

I believe these additional concessions further underscore the reasonableness of the proposed terms upon which I seek to retain Evercore.  I will file a revised Proposed Evercore Engagement Letter reflecting these terms on the Court's docket in the near term.  We are hopeful that the revised proposal will garner the support of the other Sale Process Parties.

38.   To the extent any Objections remain outstanding following these concessions, I respectfully ask the Court to overrule such Objections.[16]  Should the Court elect to hold a hearing on my proposed retention of Evercore, I am prepared to put on an affirmative case in support of

---

[16] I believe that I have thoroughly addressed the Venezuela Parties' arguments regarding the alleged "conflict of interest" created by the proposed Sale Fee in my Report.   *See* Report at ¶ 23-30.  They have not responded to the clear distinctions between the precedent they cite and my proposed retention of Evercore in this case.

their retention. It is worth noting that, if such a hearing were to be held, the question before the Court would be whether the proposed terms of Evercore's engagement are reasonable and consistent with the terms entered into by Evercore and its other clients. It is not the industry standard, nor is it fair to professional advisors, to question whether any other advisory firm could be retained for a lower amount once those firms failed to win the engagement in the first instance. Nor is it appropriate to continually pressure an advisory firm to unreasonably adjust its standard compensation mechanics. As Evercore's proposed fee is at the lower end of the range of fees paid to investment bankers in comparable transactions, I respectfully submit that my proposed retention of Evercore is reasonable under the circumstances of the Crystallex Case.

### III.   Conclusion

39.    The Special Master process to date and the history of litigation and complexity of disputes in the Crystallex Case and the differing objectives of the Sale Process Parties suggest that there are a number of critical issues in the design of the Sale Procedures Order that I do not believe the Sale Process Parties will ever come to an agreement on and must ultimately be decided by the Court. As detailed in my Report, I have endeavored to build as much consensus as could be done under the circumstances. Each of the unresolved Objections should be considered in light of the applicable Sale Process Parties' goals and objectives for the Crystallex Case and the ultimate sale of the PDVH Shares. Notwithstanding these remaining objections, I continue to recommend the Proposed Sale Procedures Order, as revised by this Reply, to the Court. I reserve the right to clarify or supplement any statements made in this Reply at any time. Of course, should the Court require evidence to decide any of these issues, I will make myself and my Advisors available at the Court's convenience.

40.     We welcome the opportunity to discuss open issues with any of the Sale Process Parties following submissions of the replies in an effort to narrow the issues prior to the further expenditure of judicial resources at the November 8, 2021 hearing.


*/s/ Robert B. Pincus*
Robert B. Pincus
Special Master for the United States District Court
for the District of Delaware