## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| CRYSTALLEX INTERNATIONAL CORP., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 1:17-mc-00151-LPS |
| | ) | |
| BOLIVARIAN REPUBLIC OF VENEZUELA, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |
| _____ | ) | |

## VENEZUELA PARTIES' SUPPLEMENTAL RESPONSE TO
## THE SPECIAL MASTER'S REVISED PROPOSED SALE PROCEDURES ORDER

The Bolivarian Republic of Venezuela, Petróleos de Venezuela, S.A., PDV Holding, Inc., and CITGO Petroleum Corporation (together, the "Venezuela Parties") respectfully submit this supplemental response to the Special Master's Revised Proposed Sale Procedures Order, D.I. 356-1. The Venezuela Parties have delayed this filing because the Special Master has, for the past several weeks, repeatedly advised them that he intended to submit a revised proposed Evercore retention agreement before the November 8, 2021 hearing, but to date none has been submitted. Given that the hearing date is fast approaching, the Venezuela Parties submit this response now rather than waiting any longer for the filing of the revised proposed Evercore agreement.

As explained below, the Special Master's revised proposed order suffers from almost all of the same flaws as his original proposal. It does not solve Evercore's conflict of interest. In addition, it has been intended since its first draft to structure—and continues to structure—the sale process in a way that makes it likely that 100% of the PDVH shares will be sold, rather than to sell the fewest shares necessary to satisfy the judgment(s). And these flaws, serious as they are,

1

would be increased exponentially were the Court to adopt Crystallex's proposal that the sale process begin in the face of OFAC's unequivocal denial of Crystallex's requested OFAC license. Accordingly, the Venezuela Parties respectfully submit that this Court should reject the Special Master's Revised Proposed Sale Procedures Order and direct him to conduct a new process, consistent with the steps described in the Venezuela Parties' Objections of August 25, 2021, to determine proposed procedures.

## I.   The Revised Proposed Sale Procedures Order Does Not Cure the Special Master's Conflicted Process and Resulting Tainted Work Product.

The minor revisions proposed by the Special Master do not attempt to (and cannot) cure the fundamental problem that the process he used to develop the proposed procedures, and his resulting work product, are tainted by Evercore's blatant conflict of interest and admitted bias towards selling 100% of the PDVH stock. *See* D.I. 354 at 1, 3–4, 9, 17–18; D.I. 348-1 ¶ 21; *see also In re Kensington Int'l, Ltd.*, 368 F.3d 289, 308 (3d Cir. 2004) (explaining that when advisors to a judicial officer are conflicted, "there is an almost irrebuttable presumption" that the judicial officer is conflicted); *In re Kempthorne*, 449 F.3d 1265, 1270 (D.C. Cir. 2006) (A special master's work product should be suppressed where his advisor "st[ands] to gain financially from" the special master's findings, because such a conflict "color[s] the way in which he approache[s] his task, and ultimately his . . . recommendations to the district court."); *see also* Fed. R. Civ. P. 53(a)(2) (applying judicial impartiality requirements of 28 U.S.C. § 455 to special masters). As explained in greater detail in the Venezuela Parties' Objections, D.I. 354 at 17–18, Evercore advised the Special Master's design of a proposed sale procedures order while anticipating that it would receive a contingency fee based on the total amount sold.[1] That conflict is particularly

---

[1] This contingency fee was initially proposed by the Special Master on June 1, 2021, at the outset of Evercore's engagement, after the Special Master agreed to such a fee in negotiations with Evercore. *See* Exs. A & B to Decl. of Daniel D. Birk ("Birk Decl."). As soon as it was proposed, the Venezuela Parties objected to the Special Master that

acute given that Evercore's fee will also include 0.35% of all of the debt of PDVH and its direct and indirect subsidiaries if 100% of the shares are sold—a powerful incentive for Evercore to structure and implement a process designed to achieve that result—even for a fire sale price— rather than a sale of a minority stake of PDVH. D.I. 347 at 62. Thus, if a buyer were to pay one dollar for 100% of the shares, for example, and if PDVH and its subsidiaries had approximately $8 billion in debt, then Evercore would still receive 0.35% of the approximately $8 billion, or approximately $24.5 million. D.I. 366 at 10. By contrast, if a buyer were to pay $1 billion for 40% of the shares—and thus satisfy Crystallex's judgment—Evercore would net "only" $3.5 million (0.35% of $1 billion), as PDVH's debt would not be included as part of the "aggregate consideration." Moreover, the Hiltz Declaration makes clear that Evercore's intent as the financial advisor to the Special Master, and the entity that will be organizing and conducting the proposed sale process, is to sell 100% of the shares. D.I. 348-1 ¶ 21.

The Special Master attempts to defend his process, but 28 U.S.C. § 455 and *In re Kempthorne* make clear that there is no curing a fundamental conflict of interest of the sort on display here. The fact that advisors to bankruptcy trustees may receive contingency fees, *see* 11 U.S.C. § 328(a), is inapposite; the Special Master's advisors are subject to Rule 53 and Section 455, not the bankruptcy code, and the standard for impartiality in the bankruptcy code is materially lower than Section 455. *See* 11 U.S.C. § 327(a) (defining "disinterested person" as one that does "not hold or represent an interest adverse to the estate," rather than the broader prohibition of Section 455(b)(4) against one with "any other interest that could be substantially affected by

---

the proposed contingency fee gave Evercore an impermissible economic incentive to recommend the sale of 100% of the shares of PDVH. *See* Birk Decl. ¶ 5. Although the Special Master ultimately bifurcated Evercore's engagement, and the executed June engagement letter provided for Evercore to receive only a fixed monthly fee for the first portion of its work, *see id.* Exs. C, D, this was clearly just a matter of form. Evercore anticipated receiving—and in fact did receive—an agreement promising it a contingency fee while it was advising the Special Master in designing proposed sale procedures. *See id.* Exs. E (July 23, 2021 email transmitting draft proposed order to Sale Process Parties); *id.* Ex. F (July 26, 2021 email transmitting proposed Evercore engagement letter, in which file is dated "7.20").

the outcome of the proceeding"); *In re Marvel Ent. Grp.*, 140 F.3d 463, 476 (3d Cir. 1998) (limiting per se disqualification to "actual conflict of interest," as opposed to the broader categories of "potential conflict of interest" or "appearance of conflict," both of which are disqualifying events under Section 455). In bankruptcy proceedings, unlike here, the parties' interests are generally aligned because the goal is to raise the maximum amount of money to satisfy creditors rather than sell only as much of the asset necessary to satisfy a judgment. D.I. 354 at 18 n.9.

The fact that investment bankers often receive contingency fees, *see* D.I. 348 at 9, 13–14 (¶¶ 19, 27); D.I. 356 ¶ 35 & Ex. B, is also irrelevant; there is no "industry standard" exception to Section 455 conflicts. And the fact that the Venezuela Parties have had an opportunity to review—*and object*—to the proposed Evercore retention agreements, *see* D.I. 348 at 13–14 (¶ 27), is irrelevant. The mere fact that a party may object to tainted recommendations stemming from a conflicted advisor does nothing to obviate the structural problem of having a conflicted advisor in the first place. *Cf. In re Brooks*, 383 F.3d 1036, 1045–46 (D.C. Cir. 2004) (explaining that "[t]he district court's proposal in this case to review the Special Master's findings *de novo* does not solve the problem of 'unchecked and uncheckable' partiality," just as a "judge's undertaking to review [a compromised] clerk's findings *de novo* would not be assurance against the biases of the clerk affecting the judgment of the court").

## II.    The Proposed Procedures Are Predicated on a Sale of 100% of PDVH in Violation of 8 Del. C. § 324.

Moreover, the effect of the conflict of interest is readily apparent, as it resulted in the proposal of procedures clearly designed to conduct a bankruptcy-style liquidation of 100% of the shares of PDVH—a result that also would violate both Delaware law and this Court's orders. D.I. 234 at 36; 8 Del. C. § 324(a). For instance, Evercore advised the Special Master, without even conducting an initial (much less comprehensive) valuation, that "the approach most likely

4

to result in a value maximizing Sale Transaction … is to make the most enticing offer available"—in its view, "100% of the PDVH Shares." D.I. 348-1 ¶ 21. The Revised Proposed Sale Procedures Order still is aimed at achieving such a result. It provides the Special Master with discretion to select any Stalking Horse Bid he likes and to require that any qualified overbid exceed the Stalking Horse Bid by 5% of the "implied value" of the Stalking Horse Bid. *Id.* ¶¶ 18, 19. This could result in the rejection of bids for fewer shares than the Stalking Horse Bid that are sufficient to satisfy the judgment(s) but that have a lower "implied value" than the Stalking Horse Bid.

Nor did Evercore advise the Special Master to discuss potentially agreeable minority rights that PDVSA could offer to "entic[e]" bids for a minority stake, such as rights to board seats, enhanced voting powers, and dividends rights, and indeed advised the Special Master that a sale of a minority stake would be impracticable. *See* D.I. 348-1 ¶¶ 23–24. Although the Special Master now proposes to ask bidders, *once the bidding process has already commenced*, to identify any minority-shareholder rights they might desire, *see* D.I. 356 at 13–14 (¶ 22), that is a far cry from working with the Venezuela Parties to make a compelling offer of a minority stake in PDVH *before the bidding process begins* so that putative minority-stake bidders will be more likely to participate. *See* D.I. 354-1 at 8–9 (¶ 14); *cf.* D.I. 234 at 236 n.16 (recognizing that "'complex negotiations of minority rights in any stock that is sold'" would be a "necessity" here). Moreover, although the Special Master's current proposal contemplates that he and his advisors will market the sale to potential buyers if OFAC authorization is eventually obtained, *see, e.g.*, D.I. 356-1 at 4–5 (¶ D), it does not require him to proactively seek out buyers who would actually be interested in becoming minority stakeholders in PDVH, such as sovereign wealth funds, large family offices, or other major private investors.  *See* D.I. 354-1at 5, 8–9, 22.

5

Evercore's conflict and bias are particularly problematic because its focus on a sale of 100% of the shares precluded the Special Master from considering, as he should have, feasible alternatives—as contemplated by this Court's order. D.I. 277 at 3 (directing Special Master to devise plan for sale or "other transaction"). As the Venezuela Parties explained, there are many alternatives to the bankruptcy-style auction proposed by the Special Master that can satisfy the judgment(s) without selling 100% of the PDVH shares. *See* D.I. 354-1 at 6–9. Nevertheless, the Special Master and Evercore rejected anything but a bankruptcy-style process that was designed to sell 100% of the shares. *See* D.I. 348-1 ¶¶ 19–21. The Special Master claims in his Response Brief that he considered but rejected alternatives to an auction because they would be unlikely to satisfy the judgment(s). *See* D.I. 356 at 16–17. But that determination cannot reasonably have been made without first conducting a valuation of the PDVH Shares or CITGO to determine what bidders would be likely to offer, which the Special Master and Evercore both admitted they did not do. D.I. 348 ¶ 70; D.I. 348-1 ¶ 20; *see* D.I. 354-1 at 6. Instead, it appears that the Special Master simply presumed (or was advised by his conflicted financial advisor) that a bankruptcy-style auction would be the best course.[2]

The only way to cure Evercore's conflict of interest is to reject the Special Master's recommendation and instruct him to conduct a new process after retaining an unconflicted financial advisor. *See In re Kempthorne*, 449 F.3d at 1271–72 (suppressing a special master's tainted reports); D.I. 354 at 4 (explaining that Evercore's conflict of interest "predictably led to a tainted recommendation"). That process should include retaining an unconflicted advisor to assist him in conducting a valuation, considering alternative transactions that could satisfy the judgment(s),

---

[2] This is perhaps not surprising given that the Special Master's principal advisors are a bankruptcy lawyer and an investment banker who specialize in bankruptcies. *See* D.I. 348 ¶ 14; D.I. 348-1 at 20 (listing notable bankruptcy transactions of Evercore's Senior Managing Director).

and discussing with PDVSA potentially agreeable minority shareholder rights that could be offered to attract bids. *Id.* at 9 (asking the Court to "cure the deficiencies in the current process" by requiring the Special Master to conduct a proper process); *id.* at 18 ("[A]t the very least, the Court must disallow the [Evercore] retention agreement and . . . direct the Special Master to conduct a valuation and consider alternative transactions and bidding procedures with an unconflicted advisor.").[3] Although the Special Master has suggested that Section 324 would not permit these alternatives, D.I. 356 at 15 n.12, that overlooks the provision of the Court's May 27, 2021 order, which the Special Master proposed, and to which all Sale Process Parties agreed, that expressly allows the Special Master to "devise such other transaction as would satisfy such outstanding judgment(s)." D.I. 277 ¶ 2. Moreover, Delaware law allows a person carrying out a judicial sale the broad discretion to delay or even reject a sale where, as here, forging ahead with the transaction would lead to a grossly inadequate price. *See* D.I. 355 at 18–21. Given that discretion, the Special Master could easily have considered these superior alternatives before proposing a bankruptcy-style auction. At a minimum, the Special Master unquestionably has the authority (and duty) to conduct a valuation, consider reasonable transaction structures, and, if necessary, conduct a sale of the fewest number of shares necessary to satisfy the judgment(s), including by ensuring minority shareholder protections and soliciting plausible minority stakeholder bidders.

---

[3] Contrary to the Special Master's assertion, the examples of potential transaction structures described by the Venezuela Parties' expert Randall Weisenburger, *see* D.I. 354-1 ¶ 12, are not "substantially more detailed," D.I. 356 at 15 n.12, than what the Venezuela Parties previously provided to the Special Master on August 2, 2021. In that submission, the Venezuela Parties identified alternative transactions that could be considered, including "an initial public offering, private placements of equity securities or other capital markets transactions that could generate proceeds sufficient to satisfy the claims of Crystallex and the other judgment creditors, and a reverse auction, in which bidders offer to buy the fewest percentage of shares for the judgment amount, while working with the Venezuela Parties to offer a package of rights in return for an acceptable minority bid." Birk Decl. Ex. G. Moreover, it was the *Special Master's* task pursuant to this Court's order of May 27, 2021, *see* D.I. 277 ¶ 2, to consider and develop transaction procedures, not the *Venezuela Parties'*.

### III.     The Sale Process Should Not Begin Without Clear OFAC Authorization.

The Special Master's Response Brief reflects substantial agreement with the Venezuela Parties and ConocoPhillips that the proposed sale procedures should not be implemented until OFAC issues a specific license, changes its applicable guidance, or provides other clear authorization for a sale. *See* D.I. 356 ¶ 5; *see also* D.I. 354 at 13–16 (Venezuela Parties' Objections); D.I. 355 at 8–18 (Venezuela Parties' Resp. Br.); D.I. 366 at 2–4 (ConocoPhillips's Objections); D.I. 367 at 2–3 (ConocoPhillips's Resp. Br.). Now that OFAC has expressly denied Crystallex's application for a specific license authorizing "all activities necessary and ordinarily incident to organizing and conducting a judicial sale" of the PDVH shares, D.I. 346-1 at 1, that consensus should be unquestionable.

Moreover, it now should be unquestionable that the sale process should not launch except upon order of the Court after receipt of affirmative, *written* authorization from OFAC, not merely when the Special Master unilaterally decides that he is "satisfied" with OFAC's assurances, *see* D.I. 356-1 ¶ 4, a provision inconsistent with the Special Master's own acknowledgements. OFAC has already made clear through its regulations, FAQs, and denial of Crystallex's license application that any sale process would be unauthorized and in violation of applicable sanctions. *See* D.I. 352 at 1–3; D.I. 355 at 9–15; D.I. 354 at 13–16. Only unequivocal authorization of a sale from OFAC itself will provide potential bidders with enough certainty to ensure that any auction of the PDVH shares is a meaningful process, and therefore only such authorization will elicit full-value bids. *See* D.I. 352 at 4; D.I. 355 at 16–18; D.I. 354 at 14.

Crystallex alone urges this Court to launch the sale process in the face of OFAC's denial, presumably so that its $300 million credit bid for 100% of the PDVH shares will be the sole (and hence, winning) offer. *See* D.I. 346. For the reasons set forth in the Venezuela Parties' September 20, 2021 letter and their earlier briefs, this Court should reject that radical request and hew to

the consensus of the Special Master and the other parties. *See* D.I. 352; *see also* D.I. 355 at 8–15; D.I. 354 at 13–16.

## CONCLUSION

For the foregoing reasons, the Venezuela Parties respectfully request that the Court reject the Special Master's Revised Proposed Sale Procedures Order and direct the Special Master to conduct a new process, consistent with the steps described in the Venezuela Parties' Objections of August 25, 2021, to determine proposed procedures that would maximize value and result in the sale of as few shares of PDVH as necessary to satisfy the judgment(s), including by proactively targeting potential buyers who would actually be interested in becoming minority stakeholders in PDVH.

MORRIS, NICHOLS, ARSHT & TUNNELL LLP

OF COUNSEL:

Nathan P. Eimer
Lisa S. Meyer
Daniel D. Birk
Gregory M. Schweizer
EIMER STAHL LLP
224 South Michigan Avenue
Suite 1100
Chicago, IL 60604
(312) 660-7600
NEimer@eimerstahl.com
LMeyer@eimerstahl.com
DBirk@eimerstahl.com
GSchweizer@eimerstahl.com

/s/ Kenneth J. Nachbar
Kenneth J. Nachbar (#2067)
Alexandra M. Cumings (#6146)
1201 North Market Street
Wilmington, DE 19801
(302) 658-9200
KNachbar@mnat.com
ACumings@mnat.com

*Attorneys for PDV Holding, Inc., and CITGO Petroleum Corporation*

9

HEYMAN ENERIO GATTUSO & HIRZEL LLP

OF COUNSEL:

Joseph D. Pizzurro
Julia B. Mosse
Kevin A. Meehan
Juan O. Perla
CURTIS, MALLET-PREVOST,
COLT & MOSLE LLP
101 Park Avenue
New York, NY 10178
(212) 696-6000
jpizzurro@curtis.com
jmosse@curtis.com
kmeehan@curtis.com
jperla@curtis.com

*/s/ Samuel Taylor Hirzel II*
Samuel Taylor Hirzel, II (#4415)
300 Delaware Avenue, Suite 200
Wilmington, DE 19801
(302) 472-7300
shirzel@hegh.law

*Attorney for Petróleos de Venezuela, S.A.*


ABRAMS & BAYLISS LLP

OF COUNSEL:

Donald B. Verrilli, Jr.
Elaine J. Goldenberg
Ginger D. Anders
Brendan B. Gants
Jacobus P. van der Ven
Munger, Tolles & Olson LLP
601 Massachusetts Avenue NW
Suite 500 E
Washington, D.C. 20001
(202) 220-1100
Donald.Verrilli@mto.com

George M. Garvey
Munger, Tolles & Olson LLP
350 South Grand Avenue, 50th Floor
Los Angeles, CA 90071
(213) 683-9100
George.Garvey@mto.com

*/s/ Stephen C. Childs*
A. Thompson Bayliss (#4379)
Stephen C. Childs (#6711)
20 Montchanin Road, Suite 200
Wilmington, DE 19807
(302) 778-1000
bayliss@abramsbayliss.com
childs@abramsbayliss.com

*Attorneys for Bolivarian Republic of Venezuela*