IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

---------------------------------------------------------------- x

CRYSTALLEX INTERNATIONAL
CORPORATION,

        Plaintiff,

        v.

BOLIVARIAN REPUBLIC OF VENEZUELA,

        Defendant.

---------------------------------------------------------------- x

Case No.: Misc. No. 17-151-LPS

Ref. D.I. Nos. 348, 368 and 391.

## MOTION TO INTERVENE AND FOR AN ORDER REQUIRING AN INDEPENDENT DETERMINATION OF THE AMOUNT THAT NEEDS TO BE COLLECTED TO SATISFY CRYSTALLEX'S JUDGMENT

Adelso Adrianza (the "Movant"), a shareholder of Crystallex International Corporation (the "Company"), Pro Se and on behalf of similarly situated U.S. shareholders (the "Shareholders"), respectfully moves this Court for an order…

    a)    Permitting the Movant to intervene in this action and to be heard regarding the collection in full of the judgement issued by this Court for the arbitration award (the "Award") against Venezuela (the "Republic"), and

    b)    Requiring an independent determination of the amount that needs to be collected to satisfy the Award in full as required by the ICSID Arbitration Panel decision as confirmed by the District Court for the District of Columbia,

pursuant to the Federal Rule of Civil Procedure 24 and 11 U.S.C. §§ 1501, 1507 and 1522.

### PRELIMINARY STATEMENT

1. In a letter to this Court (D.I. 368), the Movant pointed out that the Special Master's Report and Recommendation with regards to the proposal to collect and satisfy the Company's judgement

- 1 -

against Venezuela (D.I. 348 at para. 47. – 50.) included an erroneous assessment as to the amount that remains outstanding. The Special Masters' Second Revised Proposed Order establishing the sale and bidding procedures (D.I. 391.1) repeats the same error, despite an adjustment for $ 33 million, but nonetheless indicates the continued failure to undertake the due diligence required to fulfill the responsibilities involved.

2. The letter in reference clearly pointed out the reasons why the indicated remaining balance on the Judgement was in error. It also pointed out the fact that the Company is in bankruptcy proceedings (CCAA in Ontario, Canada and Chapter 15 in Delaware) and, as a result, its estate (the "Estate") and its property is under the protection of the U.S. Bankruptcy Code and the Delaware Bankruptcy Court. In this regard, the Movant filed a motion at the Delaware Bankruptcy Court requesting the appointment of an examiner to investigate several alleged acts and omissions by the self-interested board of directors and debtor in possession (the "Self-interested" BOD/DIP") and the DIP lender (the "DIP Lender") that resulted in harm to the Estate and the Shareholders, as its residual owners, estimated at over of US$ 500 million. The appointment of an examiner is an indispensable step for the Bankruptcy Court to fulfill its fact-finding requirement through an independent and objective party.

3. The harm suffered by the Estate was caused by alleged actions and omissions particularized in the Motion (see DE Bankruptcy Court Case 1:11-bk-14074 (LSS), D.I. Nos. 328 and 357), which involved:

    a.    Fraudulent Transfer of Tax Benefits,

    b.    Misappropriation, Misuse and Waste of Estate Property,

    c.    Illegal Post-petition Interest Payment on Unsecured Debt,

    d.    Breach of The Loyalty and Care Duties by a Self-interested BOD,

    e.    Fraudulent Misrepresentations,

      f.     Distributing the Estate's property using the Mechanics of Distribution (MOD), which is in essence a structured dismissal that is not permissible under precedential U.S. case law (See Krzyzewski v. Jevic Holding Corp., No. 15-649, S. Ct., 2017 WL 1066259) and the Model Law.

The Motion was heard on August 20, 2021, and the Court's request for supplemental information and the Movant's response was met by October 7, 2021. The Court will next determine the need for a second hearing or issue its decision.

    4. The facts behind the actions and omissions by the Self-interested BOD/DIP with the approval of the Controlling DIP Lender disclosed in the letter to the Court (D.I. No. 368) are reiterated and further elaborated here below.

## SUMMARY OF ARGUMENT

    5. The execution of a writ of attachment under Delaware law requires the exact determination of the outstanding amount that needs to be collected to satisfy a money judgement against a Delaware registered company. Yet, the Special Master decided to forgo the required due diligence and to rely on the amount provided by the Company. The need for an independent determination of the amount to be collected is also made necessary by the fact that the judgement creditor is in bankruptcy proceedings and the amount to be collected is property of the Estate and subject to the statutory requirements set forth in the Bankruptcy Code such as estate asset protection and maximization and compliance with the Absolute Priority Rule.

**Movant Is Entitled to Intervene as Of Right**

    6. Rule 24(a)(2) affords a non-party the right to intervene in litigation upon proof of four elements:

      (1) A timely application for leave to intervene,
      (2) A sufficient interest in the litigation,
      (3) A threat that the interest will be impaired or affected, as a practical matter, by the

>   disposition of the action, and
>
>   (4) Inadequate representation of the prospective intervenor's interest by existing parties to the litigation.
>
>   (Kleissler v. U.S. Forest Serv., 157 F.3d 964, 969 (3d Cir. 1998)).

As the Third Circuit has emphasized, intervention is driven by pragmatic considerations, and motions to intervene must be resolved *"with an eye toward the 'elasticity' and 'flexibility' that [Federal] Rule [of Civil Procedure] 24 contemplates."* (*Pennsylvania v. President of United States of Am.*, 888 F.3d 52, 59, 62 (3d Cir. 2018)). This approach is appropriate in the instant case to ensure that the Court considers the interest of the Company's Estate and its residual owners, the Shareholders, whose interests are not adequately represented in this proceeding.

**The Outcome of This Action Will Directly Affect the Movant's and the Shareholders' Rights**

7. The Company's liquidating bankruptcy proceedings under Canada's CCAA insolvency statute as the main proceeding and Chapter 15 as the ancillary proceeding seek to distribute a) close to US$ 1 billion to the Controlling DIP lender (including 88% of Net Arbitration Award or NAP[1]) for its US$ 76 million DIP loan; a portion of which is to be shared with the Self-interested Directors under their Net Arbitration Award (NAP) Sharing Agreement, and b) to pay the unsecured debt principal plus interest at the contract rate (9.375%) and an additional 10% for the Noteholders' agreement not to pursue a plan of arrangement. The Canadian and U.S. bankruptcy statutes limit interest payment on unsecured debt to 5% and 0.14% (the current federal judgment rate), respectively.

8. Not pursuing the full collection of the arbitration award under the terms of ICSID Arbitration Panel and the Delaware judgement execution rules harms the Estate and its residual

---

[1] Represents the remaining balance of the award amount collected after paying all the outstanding secured and unsecured debt plus interest at the contract rate. The remaining 12% is to be used by the Estate to pay a Management Incentive Plan (25%) and the remaining 75% to cover the costs of the pursuit of the arbitration award and its collection, the bankruptcy proceedings and its own liquidation.

owners. Both the Estate and the Shareholders have been and continue to be inadequately represented by a self-interested BOD controlled by two directors appointed by the DIP lender and two shareholder-elected directors beholden to the DIP Lender through the NAP Sharing Agreement. This situation is driving a company with a $1.6 billion judgement and less than US$ 200 million in debt, including the US$ 76 million DIP loan, to liquidation under conditions that violate the U.S. Bankruptcy Code, the Model Law and U.S. public policy. Unattended, this situation will result in irreparable harm to the Estate and the over 300 hundred U.S. citizens that are beneficial owners of close to 30% of the Company's outstanding shares.

## STATEMENT OF FACTS

7. The Company pursued an arbitration award following the unlawful cancellation of is Mining Operation Agreement (MOA) with the Republic. The International Center for Settlement of Investment Disputes (ICSID) arbitration panel awarded the Company US$ 1.2 billion, US$ 184 million for pre-award interest and Six-Month USD LIBOR + 1% post-award interest until the Republic pays the award in full. The post-award interest owed through June 2021 is estimated at US$ 184 million. See Exhibits I and II.

8.- The Company received payments from the Republic and from the execution of a writ of attachment on a U.S. bank account owned by the Ministry of Defense that together totaled US$ 500 million at the time, which included Venezuelan securities whose market value then was US$ 319 million. These securities were and remain subject to the U.S. sanctions on the Republic and could not and may not be monetized until the sanctions are lifted. Thus, the actual effective payment amount received was US$ 181 million.

9.- The Canada - Venezuela Bilateral Investment Treaty sets forth the following expropriation and compensation rules:

> **Article VII - Expropriation**
> 1. Investments or returns of investors of either Contracting Party shall not be

nationalized, expropriated or subjected to measures having an effect equivalent to nationalization or expropriation (hereinafter referred to as "expropriation") in the territory of the other Contracting Party, except for a public purpose, under due process of law, in a non-discriminatory manner ***and against prompt, adequate and effective compensation***. Such compensation shall be based on the genuine value of the investment or returns expropriated immediately before the expropriation or at the time the proposed expropriation became public knowledge, whichever is the earlier, shall be payable from the date of expropriation with interest at a normal commercial rate. shall be paid without delay and shall be effectively realizable and freely transferable. [Emphasis added].

The US$ 319 million payment to the Company with Venezuelan securities was not adequate and effective compensation, given that the securities could not be monetized then and to this date due to the U.S. sanctions. Further, these securities are currently worth a fraction of their market value at the time of the transfer to the Company and are highly likely to sell for pennies on a dollar when these can be sold, if ever, given the remaining open question about their provenance. The Amended Settlement Agreement (the "Agreement") included a make-whole clause that protected the Company for any loss in value of the Venezuelan securities until the it was finalized.

10. The Republic reneged on the Agreement when it failed to provide the agreed upon security to guarantee the installment payments that had to be made over several years. Therefore, the Agreement became non-binding on the Company once the Republic failed to complete the transaction for which it had bargained. Furthermore, the payment made with Venezuelan securities was made ineffective by the terms of the Settlement Agreement. Exhibit III contains an excerpt of the Settlement Agreement with the following entry from its Section 1, which deals with terms and conditions:

> 1.    Initial Payment. On the date hereof as a condition precedent to the effectiveness of the provisions of this Agreement, Venezuela shall deliver (or cause to be delivered) to Crystallex (or its designee) cash in U.S. dollars in immediately available funds and / or Liquid Securities (as defined below) in an amount, in the case of cash, or with a Market Value (as defined below) in the case of Liquid Securities of at least U.S. $425,000,000 (the "Initial Payment")...

    (i) "Liquid Securities" means public debt securities in U.S. dollar freely tradeable in the United States and subject to publicly available pricing quotations.

[Emphasis added].

11. Based on the foregoing, the Republic owes the Company at least US$ 1.376 billion for the arbitration award, as follows:

| ICSID AWARD - BALANCE DUE (USD Millions) | |
|---|---|
| AWARD | $ 1,202.0 |
| PRE-AWARD INTEREST (THROUGH MARCH 2016) | $ 184.0 |
| **AWARD + PRE-AWARD INTEREST** | **$ 1,386.0** |
| POST-AWARD INTEREST (THROUGH JUNE 2021) | $ 184.2 |
| EFFECTIVE PAYMENTS + INTEREST CREDIT (SEE EXHIBIT 2) | $ (194.5) |
| **NET AWARD + INTEREST DUE** | **$ 1,375.8** |

However, the Special Masters' Second Revised Proposed Order reflects a significantly lower outstanding judgement amount:

    I. Crystallex's Judgment. Subject to paragraph 29 of this Order, Crystallex's outstanding judgment is $969,999,752.93 as of August 9, 2021 ("Crystallex's Judgment").4 The amount of Crystallex's Judgment for the purpose of any satisfaction of payment shall be finalized pursuant to the procedures set forth in this Order and any further order of the Court. [Emphasis added.]

12. The Republic is further indebted to the Company for a) the costs it forced upon the Company to execute a judgment confirmed by every court the Republic took the case seeking to reverse it or delay its payment. And b) the gifts it obtained from the Company for entering into settlement agreements it reneged on just weeks after they were signed. In pursuit of a quick US$ 800 million windfall, the Self-interested Directors and the Controlling DIP Lender gifted non-distributable property of the Estate. Conveniently, this property was never listed as Estate property when the CCAA filing was done and was offered to the Republic on the side, for no consideration and bundled in the failed settlement agreements without disclosing it. In contrast, Gold Reserve and Rusoro Mining, two other companies whose gold mines were expropriated by the Republic, required and obtained additional compensation worth hundreds of millions of dollars for their mining data in

settlement agreements they entered with the Republic before the Company did.

13. To date, the Company continues to obviate the existence of the non-distributable Estate property worth over US$ 300 million it gifted for the sole purpose of advancing the interests of the Self-interested BOD/DIP and the DIP Lender. In the Factum filed in the CCAA proceeding on November 10, 2021, the Company included the following statement:

> 6. *This is a unique liquidating CCAA proceeding, in which the only asset is the approximately USD $1.4 billion Award against the government of Venezuela and the proceeds Crystallex has received in respect of the Award to date.*[10]
>
> (See https://documentcentre.ey.com/api/Document/download?docId=34485&language=EN),

There is another glaring omission in the above statement: the post-award interest due, worth US$ 184 million through June 2021 (see Exhibit I), which the Company also had given up in the failed settlement agreements.

14. In rendering the award, the arbitration panel based its decision on the principle of full reparation provided by the Permanent Court of International Justice ("PCIJ") in *Chorzów* in the following terms:

> "*The essential principle contained in the actual notion of an illegal act—a principle which seems to be established by international practice and in particular by the decisions of arbitral tribunals—is that reparation must, as far as possible, wipe out all the consequences of the illegal act and re-establish the situation which would, in all probability, have existed if that act had not been committed.*"
>
> *(*See Crystallex International Corporation v. Bolivarian Republic of Venezuela, ICSID Case No. ARB(AF)/11/2 at 847).

The arbitration award was rendered in April 2016 and the Republic has yet to honor it despite having exhausted all legal efforts to first nullify it and then delay its enforcement. In the process, the Company has been forced to spend tens of millions of dollars defending and collecting the Award in U.S. Courts. Yet, for reasons unknown, the Company has given up its right and responsibility to seek the recovery of the expense forced upon it by the Republic through bad faith litigation under 105. Ch. Ct. R. 54(d) ("*[e]xcept when express provision*

*therefor is made either in a statute or these Rules, costs shall be allowed as of course to the prevailing party unless the Court otherwise directs*"). (See *Lynch v. Gonzalez*, 2020 WL 5587716 (Del. Ch. Sept. 18, 2020)).

## ARGUMENT

15. The maxim "*No one can take advantage of his own wrong*" embodies the authority and responsibility of a court of law and equity to redress the harm inflicted on a party and to nullify the benefit obtained by the wrongdoer as a matter of law, justice and equity. In the instant case, both parties must bear their share of responsibility for their actions and omissions.

16. On the Company's side, the Self-interested BOD/DIP and the Controlling DIP Lender bent over backwards to reach settlement agreements in pursuit of their own interests at the expense of the Estate and its residual owners. The history and the facts supporting this assertion are well documented in the case docket (see for example D.I. Nos. 134 and 279). Actions such as the abandonment of restraining order approved by the NY Southern District Court on the Nomura Notes (worth US$ 710 million), paying the DIP lender close to US$ 1 billion for a 76 million DIP loan, the agreement between the Self-Interested Directors and the DIP Lender to share the windfall and their pre-filing agreement to propose and support the approval by the CCAA Court of the DIP Lender's loan under confiscatory terms underscore the issues involved.

17. On the Republic's side, not only did it cancel the MOA illegally, but it has since then allowed and benefited from gold production and export sales from the expropriated gold mine operations worth an undisclosed amount of money, given that Venezuelan gold exports are also subject to the U.S. sanctions. Furthermore, the Republic undertook an unyielding legal pursuit to delay meeting its obligations despite losing every action it pursued in the U.S. Courts all the way to the Supreme Court.

## JURISDICTION

18.- This Court has jurisdiction to consider this Motion pursuant to 28 U.S.C. §§ 157 and 1334 and the Amended Standing Order of Reference from the United States District Court for the District of Delaware, dated February 29, 2012. This matter is a core proceeding pursuant to 28 U.S.C. § 157 (b). Venue is proper in this Court and in this District pursuant to 28 U.S.C. § 1410. The statutory predicates for the relief requested herein are the Bankruptcy Code sections 105(a), 1501(a)(3), (a)(4) and (a)(5), 1507(b)(3) and (b)(4).

## STANDING

19. As beneficial owners of the Company' shares and residual owners of the Estate, the Movant and the Shareholders have Article III standing under Lujan v. Defenders of Wildlife, 504 U.S. 555, 559 (1992), premised on a party having "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." Standing is reasserted by the U.S. Supreme Court decision in in Czyzewski v. Jevic Holding Corp., No. 15-649, S. Ct., 2017 WL 1066259):

> <u>Consequently, the Bankruptcy Court's approval of the structured dismissal cost petitioners something. They lost a chance to obtain a settlement that respected their priority.</u> Or, if not that, they lost the power to bring their own lawsuit on a claim that had a settlement value of $3.7 million. <u>For standing purposes, a loss of even a small amount of money is ordinarily an "injury."</u> See, e.g., McGowan v. Maryland, 366 U. S. 420, 430–431 (1961) (finding that appellants fined $5 plus costs had standing to assert an Establishment Clause challenge). <u>And the ruling before us could well have cost petitioners considerably more.</u> See Clinton v. City of New York, 524 U. S. 417, 430–431 (1998) (<u>imposition of a "substantial contingent liability" qualifies as an injury</u>). <u>A decision in petitioners' favor is likely to redress that loss. We accordingly conclude that petitioners have standing.</u> (p. 11), [Emphasis added].

## PRAYER FOR RELIEF

20. WHEREFORE the Movant prays that this Court:

I. Permit the Movant to intervene in this action and to be heard regarding the protection of the Movant and the Shareholders' interest as residual owners of the Estate,

II. Issue an order requiring an independent determination of the amount that needs to be

collected to satisfy in full the Company's judgement against the Republic and the protection and maximization of the value of the debtor's assets in accordance with § 1501, and

III. Grant such further and other relief as this Court deems just and proper.

## CONCLUSION

For all the reasons set forth herein, the Movant respectfully requests that the Court grant the relief sought in the Motion.

Respectfully submitted,

Dated:  November 15, 2021,
Newton, Massachusetts.

Adelso Adrianza, Pro Se
113 Washington Street
Newton, MA 02458
aaadrianza@gmail.com
(859) 803-2279

y Urgent

Visit UPS.com
Apply shipping documents on this side.

Scan QR code to
schedule a pickup



ADELSO ADRIANZA
859-803-2279
ADELSO ADRIANZA
113 WASHINGTON ST
NEWTON MA 02458-2249

0.6 LBS LTR    1 OF 1

SHIP TO:
OFFICE OF THE CLERK
US DISTRICT COURT - DELAWARE
844 N KING ST
WILMINGTON DE 19801-3519



DE 197 9-25

UPS 2ND DAY AIR A.M.    2A
TRACKING #: 1Z 5AR 130 07 9927 2348

BILLING: P/P

XOL 21.11.24    NV45 47.0A 11/2021*

r use with the following services:    **UPS Next Day Air®**
                                      **UPS Worldwide Express®**
                                      **UPS 2nd Day Air®**

Do not use this envelope for:    **UPS Ground**
                                  **UPS Standard**
                                  **UPS 3 Day Select®**
                                  **UPS Worldwide Expedited®**



RECEIVED
NOV 17 2021
U.S. DISTRICT COURT
DISTRICT OF DELAWARE

Serving you for more than 110 years
United Parcel Service.®



For information about UPS's privacy practices or to opt out from the sale of
personal information, please see the UPS Privacy Notice at www.ups.com
0101951033 04/21 PAC  United Parcel Service

r rate, UPS Express® envelopes may only contain
nt documents, and/or electronic media, and must weigh
ess envelopes containing items other than those listed
n 8oz. will be billed by weight.

ents
lope may be used only for documents of no commercial
s consider electronic media as documents. Visit
rt to verify if your shipment is classified as a document.

r rate, the UPS Express envelope must weigh 8 oz. or less.
s weighing more than 8 oz. will be billed by weight.

elopes are not recommended for shipments of
ning sensitive personal information or breakable items.
h equivalent.

**Envelope**
pe with shipping documents printed
inkjet printer on plain paper. Insert
ents under window from the top.

Notice — Carriage hereunder may be subject to the rules relating to liability and other terms and/or conditions established
he Unification of Certain Rules Relating to International Carriage by Air (the "Warsaw Convention") and/or the Convention on
ernational Carriage of Goods by Road (the "CMR Convention"). These commodities, technology or software were exported
nce with the Export Administration Regulations. Diversion contrary to U.S. law prohibited.