IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| CRYSTALLEX INTERNATIONAL CORPORATION,<br><br>　　　　　　Plaintiff,<br><br>　　v.<br><br>BOLIVARIAN REPUBLIC OF VENEZUELA,<br><br>　　　　　　Defendant. | C.A. No. 17-151-LPS |

## CRYSTALLEX INTERNATIONAL CORPORATION'S
## SUPPLEMENTAL BRIEF REGARDING SALES PROCEDURES

OF COUNSEL:

Robert L. Weigel
Jason W. Myatt
Rahim Moloo
GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue
New York, New York 10166
Tel: (212) 351-4000
Fax: (212) 351-4035

Miguel A. Estrada
Lucas C. Townsend
Adam M. Smith
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, D.C. 20036
Tel: (202) 955-8500
Fax: (202) 467-0539

Dated: November 22, 2021

Raymond J. DiCamillo (#3188)
Jeffrey L. Moyer (#3309)
Travis S. Hunter (#5350)
RICHARDS, LAYTON & FINGER, P.A.
One Rodney Square
920 North King Street
Wilmington, Delaware 19801
Tel: (302) 651-7700
Fax: (302) 651-7701

*Attorneys for Plaintiff*

**TABLE OF CONTENTS**

Page

INTRODUCTION ................................................................................................................. 1

BACKGROUND ................................................................................................................... 3

    I.    OFAC Regulations Prohibit Only Transfers Of Blocked Property Without A License ......................................................................................................... 3

    II.    This Court Has Recognized The Need To Proceed With The Sale Process And Has Rejected Venezuela's Dilatory Arguments Based On The OFAC Regulations .................................................................................................... 4

ARGUMENT ......................................................................................................................... 6

    I.    OFAC's Regulations Allow The Proposed Sale Procedures ............................. 6

    II.    OFAC's Letter Does Not Change The Analysis ............................................. 12

    III.    The Court Should Evaluate The Adequacy Of The Winning Bid Once It Is Made ................................................................................................................ 13

CONCLUSION .................................................................................................................... 15

## TABLE OF AUTHORITIES

Page(s)

### Cases

*Crystallex Int'l Corp. v. Bolivarian Republic of Venezuela*
    932 F.3d 126 (3d Cir. 2019)..................................................................................................4

*United States ex rel. Accardi v. Shaughnessy*,
    347 U.S. 260 (1954)............................................................................................................13

*Cent. Laborers' Pension Fund v. Heinz*,
    541 U.S. 739 (2004)............................................................................................................13

*Consarc Corp. v. Iraqi Ministry*,
    27 F.3d 695 (D.C. Cir. 1994)................................................................................................8

*Eash v. Riggins Trucking Inc.*,
    757 F.2d 557 (3d Cir. 1985)................................................................................................11

*Joseph E. Seagram & Sons, Inc. v. Conoco, Inc.*,
    519 F. Supp. 506 (D. Del. 1981).........................................................................................11

*Kisor v. Wilkie*,
    139 S. Ct. 2400 (2019)..................................................................................................1, 12

*Nehmer v. U.S. Dep't of Veterans Affairs*,
    494 F.3d 846 (9th Cir. 2007) .............................................................................................12

*Peacock v. Thomas*,
    516 U.S. 349 (1996)............................................................................................................11

*United States v. Quinn*,
    403 F. Supp. 2d 57 (D.D.C. 2005).....................................................................................15

### Statutes

15 U.S.C. § 18a................................................................................................................................14

50 U.S.C. § 1702..............................................................................................................................15

50 U.S.C. § 1705..............................................................................................................................15

50 U.S.C. § 4565..............................................................................................................................14

### Regulations

31 C.F.R. Part 591..............................................................................................................................1

## TABLE OF AUTHORITIES (*continued*)

Page(s)

31 C.F.R. Part 800 .................................................................................................................. 14

31 C.F.R. § 591.201 ............................................................................................................. 3, 7

31 C.F.R. § 591.202 ..................................................................................................... 2, 3, 6, 8

31 C.F.R. § 591.309 .................................................................................................................. 7

31 C.F.R. § 591.310 ........................................................................................ 2, 3, 7, 8, 9, 11, 13

31 C.F.R. § 591.407 .................................................................................................................. 7

E.O. 13850 ......................................................................................................................... 3, 7, 9

## INTRODUCTION

Pursuant to this Court's November 12, 2021 order, D.I. 403, Plaintiff and Judgment Creditor Crystallex International Corp. ("Crystallex") respectfully submits this supplemental brief addressing arguments made by counsel for PDV Holding, Inc. and CITGO Petroleum Corp. (collectively, "PDVH") at the November 8, 2021 oral argument, with respect to the Venezuela sanctions regulations issued by the Office of Foreign Assets Control ("OFAC"), 31 C.F.R. Part 591.

Since December 2019, the Venezuela parties have relied on a nonbinding frequently asked question ("FAQ 809") posted on OFAC's website to argue that OFAC regulations bar this Court from holding a "contingent auction" or taking any "concrete steps" towards an execution sale of PDVH shares. D.I. 150 at 2. Crystallex has made clear, however, that under the Supreme Court's decision in *Kisor v. Wilkie*, 139 S. Ct. 2400 (2019), FAQ 809 lacks the force of law and is not entitled to any deference by this Court. D.I. 343 at 12-13. At the November 8 hearing, therefore, PDVH's counsel disavowed any reliance on deference to FAQ 809. *See* Nov. 2021 Tr. at 97:1-4 ("we are not asking this Court to defer to FAQ 809"); D.I. 397-1 at 21 ("The Venezuela Parties are not arguing that this Court is bound by the text of FAQ 809."). Instead, PDVH offered a host of new arguments for further delaying a sale, cobbled together from snippets of the OFAC regulations and OFAC's September 10, 2021 letter denying—for now—Crystallex's request for a specific license authorizing the sale. Nov. 2021 Tr. at 47:17-60:15, 84:9-89:7. Although PDVH's counsel initially accused Crystallex of having failed to respond, *id.* at 109:7-9, it quickly became apparent that PDVH had first raised these arguments in a reply brief, *id.* at 115:8-116:1; *see* D.I. 355 at 9-12, depriving Crystallex of any opportunity to respond. In light of PDVH's reimagined presentation, the Court requested this supplemental briefing. Nov. 2021 Tr. at 263:4-11.

PDVH's new arguments have never been advanced by the government itself, either in its appearance before this Court last year or in OFAC's most recent letter. At bottom, they are the

1

same meritless arguments this Court already rejected in January 2021 when it outlined the contours of a sale process that contemplated bidding, if necessary, prior to the submission of a license application. The OFAC regulations have not changed since then, and the fact that new counsel has invented new interpretations of the same language is no reason for this court to reconsider its prior decision. Nor is there any merit to PDVH's argument, based on cherry-picked phrases from OFAC's definition of a prohibited "transfer," 31 C.F.R. § 591.310, that OFAC regulations prohibit virtually any "agreement," "payment," or other act with any relation to blocked property. Instead, the regulation is clear that only acts with the "purpose, intent, or effect" of actually altering blocked property rights without a license are prohibited, *id.*, and the subsequent granting of a license can validate even an otherwise unlawful transaction, *id.* § 591.202(c). Although Crystallex and the Special Master are both proposing procedures that could result in *bidding* before the granting of an OFAC license, neither proposal implicates OFAC sanctions because no rights would change hands unless and until a license is ultimately granted. OFAC regulations thus pose no obstacle.

The OFAC letter temporarily denying Crystallex a license without prejudice likewise changes nothing in this Court's analysis. It leaves Crystallex precisely where it stood before—with no license for now, but with the possibility OFAC will grant one soon. Despite expressly acknowledging the Court's decision to proceed with prefatory steps toward a sale, OFAC lodged no policy or legal objections to any steps the Court is currently taking or considering to prepare for a sale once a license is granted. And the Court can address any hypothetical risk that proceeding without an OFAC license may depress PDVH's share value by simply evaluating the adequacy of the winning bid once there is a bid to evaluate. In any event, any such risk—a risk of Venezuela's own making, given its stout refusal to pay its lawful debt or cooperate in the OFAC licensing process—is amply outweighed by untoward incentives that would be created were this Court

to reward Venezuela's obstruction with the delay it seeks. This Court should not allow further delay. Crystallex respectfully requests that the Court enter a Sale Procedures Order promptly.

## BACKGROUND

### I. OFAC Regulations Prohibit Only Transfers Of Blocked Property Without A License

The core prohibition of OFAC's Venezuela sanctions regulations is found in § 201, which provides that "[a]ll transactions prohibited pursuant to" certain Executive Orders "are prohibited pursuant to this part." 31 C.F.R. § 591.201. The relevant Executive Order states that "[a]ll property and interests in property" in the United States of certain entities—including Venezuela's oil sector—are "blocked and may not be transferred, paid, exported, withdrawn, or otherwise dealt in." E.O. 13850 § 1(a). This prohibition applies "except to the extent provided by statutes, or in regulations, orders, directives, or licenses" issued pursuant to the Order. *Id.* § 1(b). As a result, Venezuela's property may be "transferred," but only "to the extent provided by" a "licens[e]." *Id.*

Section 310 in turn defines "transfer" as any "act or transaction" with the "purpose, intent, or effect" to "create, surrender, release, convey, transfer, or alter" any "right, remedy, power, privilege, or interest" with respect to blocked property. 31 C.F.R. § 591.310. The provision then lists acts and transactions—including the "appointment of any agent," "fulfillment of any condition," "making, execution, or delivery of any . . . agreement," and "making of any payment"—that can qualify as "transfer[s]" when they satisfy this definition. *Id.* The regulations thus prohibit only acts or transactions that purport to alter rights in Venezuela's property without a license.

Section 202—titled "Effect of transfers violating the provisions of this part"—sets forth the consequences of engaging in a prohibited transaction: A "transfer . . . in violation of" the regulations is "null and void." 31 C.F.R. § 591.202(a). But "a license . . . issued by OFAC before, during, or after a transfer shall validate such transfer." *Id.* § 591.202(c). A transfer of blocked property thus takes effect if and only if licensed by OFAC, regardless of *when* that occurs.

3

## II. This Court Has Recognized The Need To Proceed With The Sale Process And Has Rejected Venezuela's Dilatory Arguments Based On The OFAC Regulations

More than two years ago, the Third Circuit affirmed the attachment of Venezuela's shares of PDVH, emphasizing that "Venezuela owes Crystallex from a judgment that has been affirmed in our courts," and "[a]ny outcome where Crystallex is not paid means that Venezuela has avoided its obligations." 932 F.3d 126, 149 (3d Cir. 2019). Three months later, that court lifted its stay of proceedings in this Court. D.I. 136. Ever since, the Venezuela parties have relied on OFAC sanctions as part of their concerted effort to delay progress towards a sale. *E.g.*, D.I. 139 at 12-17; D.I. 146 at 1-4; D.I. 150 at 1-3; D.I. 188 at 4-11; D.I. 196 at 3-8; D.I. 317 at 13-16; D.I. 340 at 9-15.

Crystallex acknowledges that in light of the sanctions regime that was imposed after it obtained its writ of attachment, as a practical matter, it will likely need a specific license from OFAC before the PDVH shares can be transferred. But as long as no property rights actually change hands before OFAC grants a license, Crystallex maintains that "[n]othing in OFAC regulations prohibits this Court from conducting a sale process to identify and rank bidders." D.I. 147 at 3. Crystallex thus supports a sale process that "allow[s] for bids for the shares" to be "made subject to the bidder receiving necessary government approvals." D.I. 182 at 15-16.

OFAC, for its part—as this Court has recognized—has "not taken the position that the Court is 'blocked from moving forward.'" D.I. 234 at 34 (quoting D.I. 226 ("Sept. 2020 Tr.") at 105). In September 2020, the government submitted a statement of interest—based on a letter from then-Special Representative for Venezuela Elliott Abrams—asserting that certain aspects of a sale process could be contrary to the Trump Administration's foreign-policy objectives. *See* D.I. 212; D.I. 212-1. Just two weeks later, however, government counsel conceded at oral argument before this Court that "the Court can do whatever it wants." Sept. 2020 Tr. at 105.

In light of that concession and the manifest injustice of Venezuela's years-long refusal to

4

honor the judgment against it, this Court entered an order in January 2021 granting in part Crystallex's motion to approve certain sale procedures. The Court explained that "the time has arrived for the sales process to proceed," and "the most reasonable" course of action was thus "to set up the sales procedures and then to follow them to the maximum extent that can be accomplished without a specific license from OFAC." D.I. 234 at 32-34. "The alternative," the Court recognized, "would be to make Crystallex wait for an indefinite additional period, which cannot be justified given the decade and resources that Crystallex has already spent trying to collect on its judgment and given its uninterrupted string of litigation victories." *Id.* at 33. The Court thus set out "the contours of the sales procedures that it will follow," *id.* at 34, and appointed the Special Master to work out the details, D.I. 258. The procedures outlined by the Court expressly contemplated the contingent bidding approach proposed by Crystallex, in which bidding could proceed even without a license from OFAC, and the "winning bidder" would then "be given a reasonable amount of time to pursue any necessary and desirable regulatory approvals." D.I. 234 at 36.

The Special Master's Proposed Sale Procedures Order, D.I. 302, *as amended*, D.I. 391-1, sets up a lengthy, multistep marketing and contingent bidding process for an eventual sale upon licensing by OFAC. The proposal permits the Special Master to appoint Evercore Group L.L.C. to help execute the sale, D.I. 391-1 at 32; *id.* Ex. 3; allows Crystallex to credit bid, D.I. 391-1 at 20; requires each bidder to submit a "Proposed Agreement" for the acquisition of PDVH shares and a "Good Faith Deposit," D.I. 302, Ex. 1 at 7-8, 12; and contemplates that the Court might need to compel PDVH to issue new stock certificates, D.I. 391-1 at 34. The order also postpones the Launch Date for the auction until the Special Master is "satisfied" that OFAC affirmatively approves of the process, whether through "authorization, FAQs, or other applicable guidance." *Id.* at 9. Crystallex objects to this last aspect and maintains that the Launch Date should occur as soon

5

as practicable days after this Court approves the sale process—and should not depend on the Special Master's subjective comfort with OFAC's level of approval. D.I. 316 at 9, 14.

## ARGUMENT

This Court has soundly rejected the Venezuela parties' efforts to indefinitely postpone a sale of PDVH by invoking OFAC's sanctions regulations. The Court already determined in January 2021 that the sale process should proceed to the "maximum extent" allowed without a specific license, including through submission of bids subject to the "winning bidder" later obtaining the "necessary . . . regulatory approvals" from OFAC. D.I. 234 at 34, 36. PDVH's latest twist on its long-rejected sanctions arguments provide no basis to revisit that decision. This Court should thus launch the sales process, including bidding, without the delay of seeking further OFAC guidance.

**I.      OFAC's Regulations Allow The Proposed Sale Procedures**

PDVH's new challenges to the proposed sale process rest on a fundamental misreading of the OFAC regulations. Nothing in those regulations remotely prohibits the Court or any party from facilitating an eventual OFAC license application by preparing for and conducting a contingent bidding process to identify a buyer and set the terms of a proposed transaction. To the contrary, the regulations expressly provide flexibility to seek a license "before, during, or after" arranging the terms of the transfer. 31 C.F.R. § 591.202(c). Because no rights in blocked property would change hands unless and until OFAC grants a license, a contingent bidding process would not contravene the regulations. The Court should therefore enter an order directing the parties and the Special Master to prepare for and hold a contingent bidding process as soon as possible.

The centerpiece of PDVH's new arguments is that several parts of the sales procedure—*e.g.*, the Evercore agreement, advertising the sale, allowing Crystallex to credit bid, and requiring bidders' to execute agreements and submit bids—violate the OFAC regulations because they involve the type of act listed in OFAC's definition of "transfer," *e.g.*, "the appointment of any agent,"

6

"the fulfillment of any condition," "the making, execution, or delivery of any . . . agreement," and "the making of any payment," 31 C.F.R. § 591.310.  D.I. 340 at 11-12; D.I. 397-1 at 14-20.

The obvious problem for PDVH is that OFAC plainly has not categorically prohibited "*any* agreement" or "*any* payment," etc.  The lists of acts must be read in concert with § 310's definition of "transfer" as an "act or transaction" with the "purpose, intent, or effect" to "create, surrender, release, convey, transfer, or alter" any "right, remedy, power, privilege, or interest with respect to" blocked property.  Further, the regulations only prohibit "transfers" that are "prohibited pursuant to" an Executive Order.  31 C.F.R. § 591.201.  And the relevant Executive Order allows any transfer "to the extent provided by" a "licens[e]."  E.O. 13850 § 1(b).  Contrary to PDVH's broad assertion that "the sanctions regime prohibits virtually all transactions relating to blocked property," D.I. 397-1 at 10 (heading), OFAC bars only "agreements," "payments," and other acts that have the "purpose, intent, or effect" to *alter* blocked property rights without a license.

Here the proposed sale process is specifically designed *not* to transfer any property while that property is blocked, *e.g.*, D.I. 391-1 ¶ 6; *id.* Ex. 1 at 10, and to transfer property *only* once OFAC grants a license.  If OFAC ultimately denies the winning bidder a license at the end of the process, Venezuela retains full ownership of PDVH subject to Crystallex's existing lien, and no payment flows to Venezuela or any other entity blocked by the sanctions—so no violation occurs.[1]

PDVH tries to get around § 310's plain text by citing another provision that defines "property" to include "contingent" property interests.  31 C.F.R. § 591.309; *see* Nov. 2021 Tr. at 50:19-20.  This definition is plainly meant to capture transfers of interests that could ripen into a present property interest without an OFAC license—for example, a "contingent reversionary interest" in

---

[1] The same is true under § 407.  *See* D.I. 397-1 at 12.  That section prohibits using "judicial process" to "enforc[e]" any "lien, judgment, arbitral award, decree, or other order," but only to the extent it "purport[s] to transfer . . . property blocked pursuant to" § 201.  31 C.F.R. § 591.407.  Since no transfer of blocked property will occur without a license, § 407 is not implicated.

7

funds that would revert to the Iraqi government unless its contractor proved performance. *Consarc Corp. v. Iraqi Ministry*, 27 F.3d 695, 702 (D.C. Cir. 1994) (finding funds blocked under OFAC's similarly-worded Iraq sanctions regulations). The definition thus prohibits a class of transactions that would otherwise escape OFAC oversight. Here, by contrast, the only "contingency" is OFAC's approval, and there is no possibility of completing the transfer without it.

The regulations expressly contemplate that a property interest could lawfully be transferred through a transaction contingent on a future OFAC license. That is because the sole "[e]ffect" under the regulation of "violating" that regulation is that the transfer is "null and void," 31 C.F.R. § 591.202(a), and may not be relied upon as "the basis for the assertion or recognition of any right" in the blocked property, *id.* § 202(b).[2] But a license granted "after" an otherwise prohibited transfer can "validate" the transfer. *Id.* § 202(c). What matters, therefore, is *whether* a license is ultimately obtained, not *when*. It is sufficient to require the winning bidder to obtain regulatory approval.

PDVH does not challenge the provisions of the Proposed Sale Procedures Order governing the *closing* of the sale after all regulatory approvals are obtained, *e.g.*, D.I. 391-1, Ex. 1 at 17, since the closing will not occur until *after* a license is granted. And the provisions PDVH *does* challenge do not provide for (or have the purpose or effect) of altering any interest in blocked property:

*Appointment of the Special Master*: PDVH claims that merely appointing the Special Master is an "appointment of" an "agent"—one of the acts listed in § 310—and thus prohibited. D.I. 340 at 12. The remarkable assertion that OFAC is directly regulating the Court's administration of a controversy pending before it shows the untenable breadth of PDVH's argument, and directly conflicts with the government's concession that "the Court can do whatever it wants." Sept. 2020 Tr. at 105. The appointment itself did not and was not meant to alter blocked interests.

---

[2] Violations also carry the possibility of civil and criminal penalties, but Crystallex is aware of no such enforcement actions in similar circumstances in OFAC's 70-year history. *See infra* at 15.

8

And consistent with OFAC sanctions, the Court has granted the Special Master no power over the shares "except to the extent" ultimately provided by an OFAC "licens[e]." E.O. 13850 § 1(b).

*Advertisement of a sale*:  PDVH likewise claims that merely *advertising* a sale is a prohibited "transfer" because it "fulfil[s] . . . a condition' required to validly sell the shares." D.I. 340 at 12 (quoting 31 C.F.R. § 591.310).  But fulfilling a condition only violates the regulations if it has the "purpose, intent, or effect" of altering property interests—for example, where a preexisting contract provides for payment upon performance.  Otherwise, even *applying for an OFAC license* would violate the regulations since doing so is "required to validly sell the shares." *Id*.  Nothing in § 310 or elsewhere purports to prohibit mere preparatory steps towards a future lawful transfer.  If OFAC intended to prohibit preparatory steps, it easily could have said so in § 310.

*The Evercore agreement*:  The Proposed Evercore Engagement Letter is not a transfer of blocked property because it does not require that any blocked asset be used to make any payments. *See* D.I. 391-1, Ex. 3 at 2-5.  The proposal contemplates: (1) a Monthly Fee and other incidental costs to be paid by a group of parties, including Venezuela, *id.* Ex. 3 at 2-5; and (2) a Sale Fee that would only require Venezuela to advance a share of the Upfront Amount, if any, upon the announcement of a "Sales Transaction"—*i.e.*, after the selection of the winning bidder, *id.* Ex. 3 at 3. But neither payment—which are simply extensions of payments that the Venezuela Parties have been making to the Special Master and his advisors for months and which will be reimbursed out of any sale proceeds—need to be paid out of blocked property.  The proposed agreement further provides that, if Evercore believes any transaction described in the agreement require an OFAC license, that transaction need not occur until OFAC issues a license. *Id.* Ex. 3 at 7.  These terms carefully avoid transferring any interest in blocked property.  To the extent the Court is concerned about the payment structure in the Evercore agreement, it can modify that structure—but that is

9

not a reason to prevent the whole process from going forward.

*Allowing Crystallex to credit bid*: Crystallex's ability to credit bid is not an interest in blocked property at all; it is merely a procedure that may be used in the event the bidding process goes forward. *See* D.I. 391-1 at 20-21. Unless and until the auction actually takes place, any credit bid is purely hypothetical. And unless Crystallex is the winning bidder and OFAC *actually approves the sale*, the ability to credit bid would not give Crystallex an interest in anything at all.

*The bidders' execution or delivery of agreements*. The proposed Bidding Procedures state that each bidder must include a "Proposed Agreement" "that provides for the acquisition of all or some of the shares of PDVH, together with a redline comparing the Proposed Agreement to the form of agreement distributed by the Special Master to Potential Bidders." D.I. 391-1, Ex. 1 at 8. But these "Proposed Agreements" are just that—*proposals*. They serve as a systematic way for the Special Master to evaluate the proposed terms of each bid, and as a starting point for the agreements that would ultimately be needed to consummate the sale. None of these contracts will be effective as a final sale agreement unless and until approved by both the Court and OFAC. D.I. 391-1, Ex. 1 at 18. In fact, the proposal *also* specifically require bidders to submit evidence that they are trying to obtain OFAC approval for the sale. *Id.* Ex. 1 at 10. And this process facilitates the license application process because applications must "described in detail" the "underlying transaction" and provide copies of supporting documentation. OFAC FAQ 51 (Oct. 8, 2013).

*The bidders' deposits*: The proposed Bidding Procedures also require each bidder to make a "Good Faith Deposit." D.I. 391-1, Ex. 1 at 7, 12. But the Good Faith Deposit is deposited with an escrow agent, not Venezuela. *Id.* Ex. 1 at 12. The deposits of the unsuccessful bidders are refunded, and the winning bidder's deposit is only applied to the purchase upon the consummation of the sale (which, again, will only happen with OFAC's approval). *Id.* Ex. 1 at 17. Absent a

10

license, therefore, the deposit never becomes Venezuela's property, so no blocked transfer occurs.

*Issuing new certificates for the shares*:  The proposed Sale Procedures Order contemplates that in appropriate circumstances, the Special Master can recommend to the Court that it compel PDVH to issue new stock certificates.  D.I. 391-1 at 34.  It should go without saying that a mere recommendation to the Court would not be a "transfer" of property.  *See* 31 C.F.R. § 591.310.  Nor would any order by the Court that PDVH issue new certificates.  The issuance of new certificates would not create any *new* interest in blocked property, nor would it create "new equity" under section 1(a)(ii) of Executive Order 13808, or "transfer" any "equity interest" under section 1(a)(iii) of Executive Order 13835.  It would merely create new "evidence" of equity that already exists. *Joseph E. Seagram & Sons, Inc. v. Conoco, Inc.*, 519 F. Supp. 506, 513 (D. Del. 1981).

None of these proposed steps in the sale process violate OFAC's regulations or the relevant Executive Orders, because none of them actually have the "purpose, intent, or effect" of transferring property that is blocked by OFAC.  31 C.F.R. § 591.310.

A final reason to avoid PDVH's overbroad interpretation of OFAC's regulations is to avoid the serious constitutional issues that would result from reading an agency's rules—or worse, its interpretive guidance—as limiting the judicial power.  These proceedings to enforce the judgment of another federal court fall comfortably within the Court's "inherent power to enforce its judgments."  *Peacock v. Thomas*, 516 U.S. 349, 356 (1996).  Article III interests are thus at their zenith, and Executive efforts to restrict the proceedings here raise troubling separation-of-powers concerns.  *Eash v. Riggins Trucking Inc.*, 757 F.2d 557, 562-63 (3d Cir. 1985) (en banc) (recognizing both a "limited domain of judicial autonomy" where "courts may act notwithstanding contrary legislative direction" and a broader domain of inherent power that "arises from necessity" and may be regulated within limits but can "'neither be abrogated nor rendered practically inoperative'").

11

"While Congress has the power under Article III" to "define the jurisdiction of the lower federal courts, an executive agency does not," and cannot "unilaterally eliminate [the] jurisdiction of a district court" by "regulation." *Nehmer v. U.S. Dep't of Veterans Affairs*, 494 F.3d 846, 860-61 (9th Cir. 2007) (citation omitted). The Court's inherent authority to enforce judgments counsels against giving OFAC's regulations (or nonbinding FAQs) the broad interpretation PDVH seeks.

## II. OFAC's Letter Does Not Change The Analysis

As Crystallex has previously explained, D.I. 346, OFAC denied without prejudice Crystallex's request for a license to effectuate the sale of the shares of PDVH in September. OFAC suggested that it may be appropriate for Crystallex to renew its application early next year, noting that "the [Venezuelan] National Assembly's mandate ends in January 2022," and so OFAC "anticipates" reassessing whether a sale of the shares of PDVH is consistent with U.S. foreign policy goals "during the first half of 2022." D.I. 346-1 at 8.

In its letter, OFAC expressed no concern on policy or sanctions grounds with any of the steps the Court is taking or considering at this time to prepare for an eventual sale once a license is granted. D.I. 346-1 at 1, 4-5. Indeed, the letter expressly acknowledged the Court's decision "to proceed with prefatory steps toward a judicial sale," without challenge or objection. *Id.* at 5.

OFAC's letter therefore does not change anything in this Court's analysis. Crystallex is in the same position as it was previously: without a license for now, but with the possibility that OFAC will grant one soon. To the extent OFAC's intentions are not yet clear, there is no point in spending time trying to interpret smoke signals. OFAC is a federal agency, not the Oracle of Delphi, and whatever inchoate implications PDVH claims to read between the lines of OFAC's denial letter lack the force of law. *See Kisor*, 139 S. Ct. at 2415. In the meantime, the Court should order the parties and the Special Master to prepare for the sale.

PDVH argues that OFAC's letter conclusively determined that any and all further steps

toward the sale are prohibited, Nov. 2021 Tr. at 48:10-19, because Crystallex had requested an authorization for "all activities necessary and ordinarily incident" to conducting a judicial sale, D.I. 346-1 at 1.  But Crystallex was merely asking for permission for activities necessary to *effectuate* the final sale—not permission to even *prepare* for a sale, which is not required and this Court already granted in January 2021.  OFAC limited its ruling to the issue of "a specific license to effect the sale," and did not address preparatory steps other than to acknowledge this Court already authorized them.  *Id.* at 8.  And even if OFAC wanted to prohibit all activities leading up to the sale, it could not do so by simply denying an application.  OFAC's regulations do not prohibit any and all activities related to blocked property—they only prohibit actions with the "purpose, intent, or effect" of transferring blocked property.  31 C.F.R. § 591.310.  Having promulgated this regulation, OFAC must follow it.  *See United States ex rel. Accardi v. Shaughnessy*, 347 U.S. 260, 267 (1954); *Cent. Laborers' Pension Fund v. Heinz*, 541 U.S. 739, 748 (2004).  The regulation has not changed since January 2021 when this Court recognized that preparatory steps were allowed.

      PDVH also trivializes OFAC's express invitation that Crystallex renew its application in early 2022, suggesting it "simply reflects the reality that foreign policy may change" because the government is "constantly re-evaluating U.S. foreign policy interest."  Nov. 2021 Tr. at 49:10-18.  But here OFAC has taken the extraordinary step—unprecedented, as far as Crystallex is aware—of inviting another application at a *specific date* based on *specific* near-term events: the expiration of the National Assembly's mandate in January and then ongoing government negotiations between Maduro and the opposition (since collapsed).  This suggests that the government anticipates more than routine reevalution, and instead believes that those developments are significant and could be an inflection point for a policy change.  D.I. 346-1 at 8.

**III.**    **The Court Should Evaluate The Adequacy Of The Winning Bid Once It Is Made**

      Finally, PDVH once again speculates that moving forward before final approval from

13

OFAC will depress the value of the shares. *E.g.*, Nov. 2021 Tr. at 54:5-6. But the answer to this is straightforward: The Court can evaluate the adequacy of the winning bid once there is a winning bid to evaluate. As Crystallex has previously explained, its long wait to collect on its judgment makes it necessary to continue these enforcement proceedings, rather than stall them based on speculation about the offers that might come in. *See id.* at 73:10-18; *see also* D.I. 316 at 17-20. All the more so due to the risk that OFAC could allow the holders of PDVSA 2020 bonds to execute on their claims in the near future. *See* D.I. 346 at 2.

PDVH should not be able to stall these proceedings any longer based on the miniscule risk that some resources might be wasted if the bids are ultimately inadequate. Such an outcome is extremely unlikely, given the asset at issue and the likely interest from sophisticated parties. Indeed, businesses often enter into complicated and resource-intensive transactions under the cloud of uncertainty in obtaining regulatory approval. *See, e.g.*, 15 U.S.C. § 18a (establishing the Federal Trade Commission's premerger notification program); 50 U.S.C. § 4565 & 31 C.F.R. Part 800 (establishing the Committee on Foreign Investment in the United States review process). But more importantly, Crystallex has already been forced to wait for years to collect its judgment; any risk of wasted resources would be a small price to pay to move things forward now. And the U.S. courts' interest in the enforcement of valid judgments further supports doing what can be done now, rather than allowing an adjudicated debtor to continue dodging its obligations scot-free.

PDVH argues that holding a contingent auction prior to obtaining OFAC's approval will depress bidding because participants would face the risk of "civil and criminal penalties" under the International Emergency Economic Powers Act. D.I. 340 at 14 n.13 (citing 50 U.S.C. § 1705). The claim is absurd, and shows how desperate Venezuela is to avoid paying this many-times af-

14

firmed judgment. The statute requires a "willfu[l]" violation of an Executive Order or implementing regulation for the imposition of criminal penalties. 50 U.S.C. § 1705(c). It provides a defense that "[n]o person shall be held liable in any court for or with respect to anything done or omitted *in good faith* in connection with the administration of, or pursuant to and in reliance on, this chapter, or any regulation, instruction, or direction issued under this chapter." *Id.* § 1702(a)(3) (emphasis added); *see also United States v. Quinn*, 403 F. Supp. 2d 57, 60 (D.D.C. 2005) ("IEEPA's criminal provision 'demands proof that a defendant acted with knowledge of the illegality of his actions[.]'"). It is inconceivable that the Department of Justice would initiate criminal proceedings, or that OFAC would seek civil penalties, against bidders in a public auction conducted by a federal court that was expressly conditioned on OFAC's ultimate approval. To Crystallex's knowledge, no prosecution or enforcement action has *ever* been brought under such circumstances.

In any event, any concern about the sanctions' effect on the value of the shares is a problem of Venezuela's own making. It is widely reported that Guaidó has actively courted the federal government's support for the OFAC sanctions, and that the government is trying to assist Guaidó by blocking CITGO. *See* Declaration of Matthew S. Rozen, filed contemporaneously herewith, ¶¶ 4-13 (citing sources). Meanwhile, Venezuela is exploring ways to insulate its assets. *Id.* ¶ 14 (citing source). Venezuela could instead work to maximize the share value by cooperating in the OFAC process and providing more certainty to bidders. In fact, its own expert testified that it could pay off the debt without selling the shares of PDVH, D.I. 317-1 §§ 7-12, yet Venezuela has not made any payments in years. That is because its primary goal is delay, rather than maximizing PDVH's value or satisfying Crystallex's judgment.

## CONCLUSION

For the reasons set forth above and in Crystallex's briefing on the sale, Crystallex respectfully requests that this Court enter a Sale Procedures Order.

OF COUNSEL:

Robert L. Weigel
Jason W. Myatt
Rahim Moloo
GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue
New York, New York 10166
(212) 351-4000

Miguel A. Estrada
Lucas C. Townsend
Adam M. Smith
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, D.C. 20036
Tel: (202) 955-8500
Fax: (202) 467-0539

Dated: November 22, 2021

*/s/ Jeffrey L. Moyer*
Raymond J. DiCamillo (#3188)
Jeffrey L. Moyer (#3309)
Travis S. Hunter (#5350)
RICHARDS, LAYTON & FINGER, P.A.
One Rodney Square
920 North King Street
Wilmington, Delaware 19801
(302) 651-7700
dicamillo@rlf.com
moyer@rlf.com
hunter@rlf.com

*Attorneys for Plaintiff*