# UNITED STATES DISTRICT COURT
## DISTRICT OF DELAWARE

CRYSTALLEX INTERNATIONAL CORP.,  )
                                    )
          Plaintiff,          )
                                      )
v.                                      )    Case No. 1:17-mc-00151-LPS
                                      )
                                      )
BOLIVARIAN REPUBLIC OF VENEZUELA,  )
                                      )
          Defendant.       )
_____ )

## <u>VENEZUELA PARTIES' SUPPLEMENTAL OPENING BRIEF REGARDING SANCTIONS ISSUES RAISED BY THE SPECIAL MASTER'S PROPOSED ORDER</u>

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ........................................................................................................... ii

INTRODUCTION .......................................................................................................................... 1

ARGUMENT .................................................................................................................................. 2

I.      Crystallex Stands Alone In Its Belief That The Sale Process May Proceed Before
        OFAC Grants Authorization ...................................................................................... 2

II.     Launching a Sale Process Without a Specific License Would Violate Federal Law ......... 6

III.    Without a Specific License, Sanctions Concerns Will Cause the Sale to Fail ................. 12

CONCLUSION .............................................................................................................................. 15

i

## TABLE OF AUTHORITIES

**Cases**                                                                                      **Page(s)**

*Allied Tube & Conduit Corp. v. Indian Head, Inc.,*
    486 U.S. 492 (1988)....................................................................................................15

*Bank Markazi v. Peterson,*
    136 S. Ct. 1310 (2016)...............................................................................................11

*Behring Int'l, Inc. v. Imperial Iranian Air Force,*
    699 F.2d 657 (3d Cir. 1983).......................................................................................11

*Burge v. Fidelity Bond,*
    648 A.2d 414 (Del. 1994) ..........................................................................................12

*Dames & Moore v. Regan,*
    453 U.S. 654 (1981)....................................................................................................11

*Kisor v. Wilkie,*
    139 S. Ct. 2400 (2019).........................................................................................11, 12

*United States v. Curtiss-Wright Exp. Corp.,*
    299 U.S. 304 (1936)....................................................................................................12

**Statutes**

8 Del. C. § 324 ...................................................................................................................12

50 U.S.C. § 1701 ...............................................................................................................11

50 U.S.C. § 1702 ...............................................................................................................11

**Other Authorities**

31 C.F.R. § 591.202 .......................................................................................................5, 8

31 C.F.R. § 591.302 ...........................................................................................................7

31 C.F.R. § 591.305 ...........................................................................................................7

31 C.F.R. § 591.310 ......................................................................................................8, 10

31 C.F.R. § 591.404 .........................................................................................................14

31 C.F.R. § 591.407 ............................................................................................8, 9, 10, 14

31 C.F.R. § 591.509 ...........................................................................................................9

Exec. Order No. 13808, 82 Fed. Reg. 41155 (Aug. 24, 2017) ......................................................7

Exec. Order No. 13835, 83 Fed. Reg. 24,001 (May 21, 2018)..................................................6, 7

Exec. Order No. 13850, 83 Fed. Reg. 55243 (Nov. 1, 2018) ..................................................7, 10

Exec. Order No. 13857, 84 Fed. Reg. 509 (Jan. 25, 2019)..........................................................7

## INTRODUCTION

As the "Venezuela Parties"[1] have argued for well over a year now, federal law precludes this Court from taking preparatory steps towards any sale of the shares of PDV Holding, Inc. ("PDVH") unless and until a specific license is granted by the Treasury Department's Office of Foreign Assets Control ("OFAC").[2]   Whatever might be said about the steps taken to date, launching the Proposed Sale and Bidding Procedures, D.I. 391-1 (the "Sale Process"), now would violate federal law, undermine the clearly expressed policy interests of the Executive Branch, and almost certainly result in a fire sale of the PDVH shares in violation of Delaware law.

Although this Court decided that OFAC sanctions did not prevent it from establishing sale procedures to be implemented at a later date, it has never adjudicated whether the acts, transactions, or agreements contemplated in the Sale Process may move forward before an OFAC license is granted, and OFAC has now expressly denied Crystallex's application for "formal approval of the commencement of the sales process."   D.I. 182 at 7.   This Court's January 14, 2021 Order acknowledged that the Executive Branch has the authority to reject or delay steps necessary to effectuate the Sale Process by exercising its licensing authority.   D.I. 234 at 34.   The Executive Branch has now done that by denying Crystallex's license request for "all activities necessary and ordinarily incident to organizing and conducting" such a sale, D.I. 346-1 at 2.   It is not a given that at some future point, U.S. foreign policy or licensing practices will change.   It is of course possible that that will occur, but until one of those two events in fact occurs, there is no question that the acts, transactions, and agreements contemplated by the Sale Process would violate the text of numerous executive orders and federal regulations, subject private parties involved to potential

---

[1] Capitalized terms used but not defined herein have the meaning ascribed to them in the Special Master's revised Proposed Order, D.I. 391, and in the Venezuela Parties' submissions, D.I. 317, and D.I. 340.

[2] The Venezuela Parties' position regarding the sanctions regime appears in D.I. 243 at 22-23; D.I. 269 at 3; D.I. 317 at 15, 19; D.I. 340 at 6, 9, 11, 13, 14, 17; D.I. 352 at 1,2; D.I. 385 at 8; D.I. 397-1.

civil and/or criminal liability, and invite further litigation given that any unlicensed transactions or agreements within the Sale Process will be "null and void" as a matter of federal law.  Such a process should not be allowed to commence at this time.

## ARGUMENT

### I.    Crystallex Stands Alone In Its Belief That The Sale Process May Proceed Before OFAC Grants Authorization

The U.S. Government, the Special Master, and all of the parties to this action except Crystallex agree that the Sale Process should not commence unless and until OFAC provides clear authority to do so.  This has been the position of the Executive Branch since at least 2020, and the Executive Branch has now formalized that position in its denial of Crystallex's license request for "formal approval of the commencement of the sales process."  D.I. 182 at 7.

In July 2020, the U.S. Department of State's Special Representative for Venezuela wrote that "efforts by creditors to enforce judgments against Venezuela by taking immediate steps toward a conditional sale of PdVSA's U.S.-based assets, including PDVH and CITGO, are detrimental to U.S. policy and the interim government's priorities."  D.I. 212-1.  Special Representative Abrams made clear that *even advertising the shares* of PDVH "for public auction at this time" would weaken "U.S. policy in Venezuela today."  *Id*.  When the United States Government appeared before this Court in September 2020, it clarified that a license was necessary before moving forward with a sale process, and that "setting a sales date" for the PDVH shares "is exactly the kind of thing Special Representative Abrams has said, speaking for the United States, would imperil U.S. foreign policy interests."  Sep. 17, 2020 Hr'g Tr., D.I. 226 at 103:3 – 104:6.

In its January 14, 2021 Order, this Court found that OFAC's licensing process was the appropriate method for the Executive Branch to effectuate its policy interests, and because OFAC had not yet adjudicated Crystallex's license application, limited initial steps to develop a sale

process would be appropriate in advance of OFAC action.  Specifically, the Court stated:

> [T]he Court has been provided no indication as to the timing of an OFAC decision and it seems possible that OFAC is waiting to make a decision until after this Court makes further progress. . . .  As the Court has also already stated . . . *the OFAC licensing process provides the better mechanism through which the Executive Branch can bring to bear the foreign policy and national security interests on which Crystallex's collection efforts might have an impact.*

D.I. 234 at 33-34 (emphasis added).  At no point did this Court determine that taking *any or all* steps up to a final sale would comply with OFAC's sanctions regime.  *See id*.  Whatever one thinks about whether OFAC's sanctions regime permitted *this Court and the Special Master* to take prefatory steps to develop the sale procedures, Crystallex's proposal would authorize steps by *private parties* that are unambiguously prohibited under the regulations, as detailed below.

On September 10, 2021, OFAC brought to bear "the foreign policy and national security interests" that this Court had identified when OFAC denied Crystallex's license request for authority to participate in "all activities necessary and ordinarily incident to organizing and conducting a judicial sale of [PDVH] shares."  D.I. 346-1 at 1.  OFAC's denial letter expressly exercised the authorities previously recognized by this Court:

> [I]t appears to us that the Court recognized that the Executive Branch's foreign policy and national security interests, if asserted through the OFAC licensing process, could properly necessitate a delay in effectuating court judgments. *Accordingly*, OFAC has considered the foreign policy and national security interests in connection with Crystallex's license request, and OFAC's denial of a license for the sale reflects those interests at this time.

*Id*. at 6 (emphasis added).  Crystallex counterfactually insists that the denial letter "expressly acknowledges this Court's 'elect[ion] to proceed with prefatory steps toward a judicial sale' that stop short of selling the PDVH Shares, without challenge or objection."  D.I. 346 at 1; *see* Nov. 8, 2021, Hr'g Tr. at 68:11-16.  By making this observation, OFAC—which had submitted a letter opposing that course of action, *see* D.I. 212-2—did not remotely suggest that it *approved* of the

3

Court's decision to move forward then, much less now.  Rather, the denial letter was referencing the Court's January Order to show that it was expressly utilizing the mechanism *the Court itself* acknowledged was the appropriate tool to "necessitate a delay in effectuating court judgments." D.I. 346-1 at 6.

Recognizing the Executive Branch's clear position, the Special Master, ConocoPhillips, and the Venezuela Parties agree that the Sale Process must await clear authorization from OFAC. D.I. 341 at 4, ¶ 6 (the Special Master noted he "would not recommend nor would [he] intend to launch the Marketing Process until [he is] satisfied with the posture of OFAC because of the likelihood that Potential Bidders would be unwilling to participate in the process"); D.I. 319 at 3; *see also* D.I. 339 at 2-3.  Crystallex alone urges this Court to enter into a conflict with binding regulations and the Executive Branch's exercise of its delegated foreign policy authorities.

Attempting to justify its position, Crystallex repeatedly distorts the plain meaning of OFAC's denial letter.  The most obvious example is Crystallex's baseless insistence that the denial letter only denied a final sale and, therefore, by implication granted Crystallex authority to engage in all steps prior to that sale.  D.I. 346 at 1.  This distorted interpretation of OFAC's letter ignores Crystallex's prior description of its own license request, *supra* at 1, 2 (citing D.I. 182 at 7);  and the Government's prior statements to this Court, *supra* at 2, 3.  More importantly, Crystallex's argument is belied by the text of the denial letter itself, which explains that OFAC was denying Crystallex's request for "authorization for all activities necessary and ordinarily incident to organizing and conducting a judicial sale of [PDVH] shares," D.I. 346-1 at 1; and that Crystallex may not "*effect* the sale of the PDVH shares," *id.* at 8 (emphasis added).  OFAC's previous statements make clear that the prohibition on effecting an auction or sale without a license includes *all preparatory steps* toward that sale.  *See* A. Gacki Letter, D.I. 212-2 ("On April 9, 2020,

Crystallex submitted a license application requesting OFAC 'to provide Crystallex a Specific License. . . to pursue all activities necessary and ordinarily incident to organizing and conducting a judicial sale of the shares as provided for by U.S. federal and Delaware law, regulations, and precedents.' *In other words, Crystallex seeks OFAC authorization for an auction and sale of the shares of PDV Holding, Inc[.]"*) (emphasis added); FAQ No. 809 (noting that a "specific license" is required for any "concrete steps" toward a sale of blocked property and that U.S persons may not otherwise "prepare for and hold an auction or other sale of the shares"). OFAC, therefore, has unambiguously rejected the prefatory steps Crystallex now asks the Court to direct.

Even ignoring OFAC's explicit denial of authorization to engage in preparatory steps toward a sale, Crystallex could not rely on OFAC's silence as implicit authorization. Crystallex ignores that OFAC does not (as a matter of practice) and cannot (as a matter of law) authorize via implication or inaction "judicial process . . . with respect to any property and interests in property blocked" by the sanctions regime—instead, such process is legally "null and void" unless it is affirmatively "licensed pursuant to this part[.]" 31 C.F.R. § 591.202(e). Among the reasons that OFAC's transactional licenses are called "specific licenses" is that they adjudicate requests to engage in *specific* transactions identified in a particular license application. When OFAC adjudicates such a request by issuing a denial letter, it does not by implication authorize *other* proposed actions that the denial letter fails to address. *See* A. Gacki Letter, D.I. 212-2 at 2 ("OFAC uses its substantial discretion to evaluate a range of options when considering any specific licensing request, from a decision to deny the license in its entirety, to grant the license in its entirety, to grant the license subject to certain conditions, or even to bifurcate the license request and sequence the authorization of actions in the future."). Had OFAC intended to authorize private parties to engage in *any* specific steps leading up to a sale, it would have issued a license to do so.

Crystallex is also wrong to assert that OFAC's denial letter suggests that this Court should take actions in anticipation of an imminent change in OFAC's position.  OFAC's letter clearly states that the U.S. Government's July 16, 2020 Statement of Interest, D.I. 212, continues to represent the Government's "current foreign policy and national security view[.]"  D.I. 346-1 at 5.  From there, OFAC's denial only states the obvious: the Executive Branch *may* reassess its policies in the first half of 2022 if, and only if, "warranted by changed circumstances[.]"  *Id.*  That, of course, is an apt description of virtually every Executive Branch foreign policy in this ever-changing world.  It plainly provides no basis for this Court to commence new actions that OFAC has (now repeatedly) made clear violate OFAC regulations and undermine U.S. foreign policy.

## II.     Launching a Sale Process Without a Specific License Would Violate Federal Law

**A.** Without a specific license from OFAC, the Sale Process contemplated by the Special Master cannot be launched consistent with federal law.  The Supreme Court has affirmed the Executive Branch's constitutional authority to restrict the transfer of foreign-owned property, even where doing so delays or blocks the enforcement of otherwise valid judgments.  Here, executive orders and OFAC regulations mandate that prefatory steps towards a sale of blocked property may not occur without a specific license from OFAC or a change in the sanctions themselves.  Thus far, Crystallex has failed to offer any interpretation of the text of the governing executive orders and regulations that would permit the Sale Process to proceed.[3]

The current U.S. sanctions prohibit virtually all transactions related to the PDVH shares.  Executive Order 13835 bars "[a]ll transactions related to . . . the sale, transfer, assignment, or

---

[3] At the November 8 hearing, Crystallex's counsel asserted that the regulations discussed in this section had never been raised by the Venezuela Parties or the U.S. Government as an obstacle to the Sale Process.  Nov. 8, 2021, Hr'g Tr. at 101:11-20.  That claim is demonstrably false.  *See, e.g.*, D.I. 243 at 22-23; D.I. 269 at 3; D.I. 317 (public version D.I. 354) at 15, 19; D.I. 340 (public version D.I. 355) at 6, 9, 11, 13, 14, 17; D.I. 352 at 1, 2; *see also* Sept. 17, 2020 Hr'g Tr., D.I. 226 at 114, 118; D.I. 212 at 13; D.I. 212-1 at 3; D.I. 212-2 at 3; D.I. 346-1 at 2, 4.

pledging as collateral by the Government of Venezuela of any equity interest in" PDVH, Exec. Order No. 13835 §1(a)(iii), 83 Fed. Reg. 24,001 (May 21, 2018); and Executive Order 13808 bars "[a]ll transactions related to . . . [t]he purchase, directly or indirectly, by a United States person or within the United States, of securities from the Government of Venezuela," Exec. Order No. 13808 §1(b), 82 Fed. Reg. 41155 (Aug. 24, 2017).[4]   In addition, Executive Order 13850 requires that interests in blocked property—including PDVH shares—"may not be transferred, paid, exported, withdrawn, or otherwise dealt in."  Exec. Order No. 13850 § 1, 83 Fed. Reg. 55243 (Nov. 1, 2018). Such blocked interests include any interest—"of any nature whatsoever, direct or indirect"—in PDVH shares "whether present, future, or contingent."   31 C.F.R. §§ 591.305, 591.302.   Any violation of these restrictions carries civil and criminal penalties.  31 C.F.R. App'x A to Part 501.

Absent a license, the Sale Process would violate federal law because it includes numerous transactions "***related to*** the sale [or] transfer . . . of any equity interest in" PDVH,  Exec. Order No. 13835 §1(a)(iii) (emphasis added), as well as the "purchase . . . of securities from the Government of Venezuela," Exec. Order No. 13808 §1(b).  These provisions of the executive orders prohibit more than an ultimate sale of the shares—they clearly bar transactions such as agreements and payments that must occur prior to a final sale, because those actions are indisputably "related to" the ultimate transfer of property.  Exec. Order No. 13835 §1(a)(iii); *accord* Exec. Order No. 13808 §1(b).

Further, the Sale Process also contemplates the "transfer" of blocked property in violation of Executive Order 13850.  Contrary to Crystallex's view, a "transfer" includes far more than the ultimate disposition of property in a sale transaction—instead, federal regulations define "transfer"

---

[4] Government of Venezuela is defined within the sanctions regime to include any entity "owned or controlled, directly or indirectly, by" that government, such as PDVH.  *See* Exec. Order No. 13857 §1(a), 84 Fed. Reg. 509 (Jan. 25, 2019).

to include any "actual or purported" action that has the "purpose [or] intent" of facilitating,

advancing, or resulting in a transfer of property, including "any interest" in such property:

> The term transfer means *any actual or purported act or transaction*, whether or not evidenced by writing, and whether or not done or performed within the United States, *the purpose, intent, or effect of which is to create, surrender, release, convey, transfer, or alter, directly or indirectly, any right, remedy, power, privilege, or interest with respect to any property*. Without limitation on the foregoing, it shall include the making, execution, or delivery of any assignment, power, conveyance, check, declaration, deed, deed of trust, power of attorney, power of appointment, bill of sale, mortgage, receipt, agreement, contract, certificate, gift, sale, affidavit, or statement; the making of any payment; the setting off of any obligation or credit; the appointment of any agent, trustee, or fiduciary; the creation or transfer of any lien; the issuance, docketing, or filing of, or levy of or under, any judgment, decree, attachment, injunction, execution, or other judicial or administrative process or order, or the service of any garnishment; the acquisition of any interest of any nature whatsoever by reason of a judgment or decree of any foreign country; the fulfillment of any condition; the exercise of any power of appointment, power of attorney, or other power; or the acquisition, disposition, transportation, importation, exportation, or withdrawal of any security.

31 C.F.R. § 591.310 (emphases added).

Federal regulations also make clear that the unlicensed "transfer" of any interest in blocked

property is "null and void," 31 C.F.R. § 591.202(a), even where such transfer is executed via

"attachment, judgment, decree, lien, execution, garnishment, or other judicial process," 31 C.F.R.

§ 591.202(e).  The application of these restrictions to judicial process is not ambiguous—it is clear

that a license is required to effectuate even a judicial "transfer" of an interest in blocked property:

> *Notwithstanding the existence of any general license* issued under this part, or issued under any Executive order issued pursuant to the national emergency declared in E.O. 13692 … any lien, judgment, arbitral award, decree, or other order through execution, garnishment, *or other judicial process purporting to transfer or otherwise alter or affect property or interests in property blocked pursuant to [the Venezuela sanctions regime] is prohibited unless authorized pursuant to a specific license issued by OFAC.*

31 C.F.R. § 591.407 (emphases added).  Crystallex has cited no authority, and the Venezuela

Parties are aware of none, challenging or undermining either the foregoing interpretation of these

regulations or the validity of the regulations as so interpreted.

Crystallex has previously relied upon general authorizations provided "for the conduct of the official business of the United States Government by employees, grantees, or contractors," detailed in 31 C.F.R. § 591.509, but it is clear that those authorities do not override the limitations described above.  Indeed, Note 1 to 31 C.F.R § 591.509 states that 31 C.F.R. § 591.407 still controls "transfers" within judicial proceedings:

> [f]or additional information regarding requirements relating to the entry into a settlement agreement or the enforcement of any lien, judgment, arbitral award, decree, or other order through execution, garnishment, or other judicial process purporting to transfer or otherwise alter or affect property or interests in property blocked pursuant to § 591.201, *see* § 591.407.

Thus, any transfers are "prohibited unless authorized pursuant *to a specific license* issued by OFAC."  31 C.F.R. § 591.407 (emphasis added).

Furthermore, the Sale Process contemplates numerous actions by private parties (including PDVH and CITGO, along with potential bidders and financial institutions), all of whom could face potential civil or criminal liability for participating in such acts without a license.  Marching forward in the absence of an OFAC license will not just risk potential civil and criminal liability for those private parties, it could also prompt further litigation over the validity of the acts and transactions executed, here and perhaps in other courts.  Any doubt regarding the application of these authorities to the Sale Process is answered by the text of OFAC's denial letter, *see supra* at 3-4, as well as OFAC's application of these regulations to an almost identical fact pattern in FAQ No. 809.  There, OFAC addressed whether U.S. persons with a writ of attachment are "authorized *to prepare for and hold an auction or other sale of the shares*, contingent upon the winning bidder obtaining a license from OFAC." (emphasis added).  In response, OFAC stated:

> *No*. Parties who have attached shares of an entity whose property and interests in property are blocked pursuant to the Venezuela Sanctions Regulations (31 C.F.R.

Part 591) *must obtain a specific license from OFAC prior to conducting an auction or other sale, including a contingent auction or other sale, **or taking other concrete steps in furtherance of an auction or sale***.

OFAC FAQ No. 809 (emphases added).  OFAC's response cited the regulations detailed *supra*—31 C.F.R. §§ 591.309, 591.310, and 591.407—making clear that the "concrete steps" OFAC described would include, at minimum, any actions that would satisfy the definition of a "transfer" of an interest in blocked property under those regulations.  *See id.*

**B.**  The Sale Process is replete with acts, agreements, and transactions that meet the regulatory definition of a "transfer" of an interest in blocked property, as defined in 31 C.F.R. § 591.310 and in violation of Executive Order 13850 (in addition to Executive Orders 13835 and 13808).  Those steps includes, but are not limited to: [5]

- Accepting Evercore's proposed retention **agreement**, including the **creation** of **interests** in blocked property and **rights** associated with blocked property.  *E.g.,* D.I. 347, Ex. C.

- The **fulfillment of a condition** required to validly sell the blocked property by providing statutorily required notice to potential bidders in the form of advertisements and outreach under the Marketing Process, *see* D.I. 391 ¶¶ E, F.

- The **making** of an **agreement** with the Stalking Horse Bidder "for the **sale**" of blocked property, including offering contingent **rights** and **interests** in the blocked property, such as offering the Stalking Horse Bidder a "break-up fee" and "reimbursement of reasonable and documented fees and expenses actually incurred," and providing "other appropriate and customary protections" to the bidder, *see* D.I. 391-1 ¶ 20.

- The **conveyance** of a **right** to Crystallex, and other holders of the attachment, to submit a credit bid for blocked property, D.I. 391-1 ¶ 25.

- The recommendation of an order "compelling PDVH" to **make** and **deliver** "new certificates or uncertificated shares to the applicable Successful Bidder and cancel the registration of the shares attached to the books of PDVH," D.I. 391-1 ¶ 50.

- The **making of payments** by bidders submitting deposits for the blocked property, D.I. 391-1, B.P. at 7.

---

[5] In the list below, each bolded term matches the terms included in the definition of "transfer" under 31 C.F.R. § 591.310.

- The **execution** and **delivery** of **agreements** by each bidder for the blocked property to the Special Master, *see* D.I. 391-1, B.P. at 8 ("Each bid must include an agreement executed by the Potential Bidder" and delivered to the Special Master).

- The **making** of an escrow **agreement** with each Potential Bidder for the blocked property, D.I. 391-1, B.P. at 12.

Crystallex bemoans the unfairness of OFAC's ability to delay Crystallex's perfection of its judgment, but as this Court has previously recognized, federal law gives OFAC that precise power. D.I. 234 at 33-34; D.I. 346-1 at 6. The Supreme Court has held that the political branches have constitutional authority to stop courts from attaching, or disposing of attached, foreign-owned property in the United States. *See Bank Markazi v. Peterson*, 136 S. Ct. 1310, 1328 (2016). Congress clearly vested the Executive Branch with the authorities executed here: the International Emergency Economic Powers Act, 50 U.S.C. § 1701 et seq. ("IEEPA"), gives the President the power to "block"—or even "nullify" or "void"—Crystallex's attachment and to settle and terminate the claims of creditors of the Republic pending in United States courts. *See* 50 U.S.C. § 1702(a)(1)(B); *Dames & Moore v. Regan*, 453 U.S. 654, 674, 686 (1981); *Behring Int'l, Inc. v. Imperial Iranian Air Force*, 699 F.2d 657, 660, 664 (3d Cir. 1983). Crystallex cites no contrary authority. To the extent Crystallex believes the Executive Branch's exercise of these regulations has "taken" its property, the remedy for vindicating that interest lies elsewhere.

To date, Crystallex has failed to offer any interpretation of the regulations on which the Executive Branch has relied. Instead, Crystallex attacks a strawman, pretending that FAQ No. 809 is the only authority on which the Government has relied, and then arguing that FAQs are not entitled to judicial deference. Sept. 20, 2020, Hr'g Tr. at 114:1–115:22. But the Sale Process is barred by the plain meaning of the text of the executive orders and published regulations cited *supra*, at 7-9. FAQ No. 809 persuasively interprets those regulatory authorities as prohibiting "concrete steps" towards the disposition of blocked property. Crystallex has never offered a

11

contrary interpretation of the text of those regulations, or any source of law that conflicts with OFAC's legal position.  Accordingly, OFAC's interpretation of the regulations should be adopted wholly apart from whether FAQ No. 809 is entitled to deference under *Kisor v. Wilkie*, 139 S. Ct. 2400 (2019).  The regulations FAQ No. 809 interpreted are themselves sufficient and binding.[6]

## III.    Without a Specific License, Sanctions Concerns Will Cause the Sale to Fail

Delaware law requires a reasonable sale process designed to sell as few shares as possible to satisfy the judgement.  8 Del. C. § 324(a) (permitting sale of only "[s]o many of the shares…as shall be sufficient to satisfy the debt"); *Burge v. Fidelity Bond*, 648 A.2d 414, 419 (Del. 1994) ("irregularity in the sale process will support judicial invalidation of the sale"); *see also* D.I. 277 at 3 (ordering a process to "maximiz[e] the sale price of any assets to be sold").  Any Sale Process that moves forward without a specific license from OFAC will fail that standard.

The Special Master, ConocoPhillips, and the Venezuela Parties all agree—and Crystallex has never seriously disputed—that sanctions risks will chill bidding and that no sale process should commence absent further guidance from OFAC.  *See supra* at 4.  Potential bidders and third-parties necessary to facilitate the process face uncertainty as to the legality of *participation* in the Sale Process and the durability of any non-licensed transaction.  Potential bidders also face uncertainty as to the likelihood that any sale will ever be permitted to close—something entirely at the discretion of OFAC and based on shifting U.S. foreign policy toward Venezuela.

---

[6]  That said, as the Venezuela Parties previously have argued, D.I. 317 at 15-16, FAQ No. 809 is indeed a reasonable interpretation to which deference would be due under *Kisor*, because it (1) represents OFAC's "authoritative" and "official position" and is not an ad hoc statement of the agency's views, 139 S. Ct. at 2415-16; (2) reflects a "fair and considered judgment" that was published outside the context of this litigation and is binding on the agency, rather than being a "post hoc rationalization" drafted to defend an agency action, *id.* at 2417-18; and (3) plainly implicates the agency's substantive expertise, which is the basis for deference, *id.* at 2417.  Deference is especially warranted here, where a federal agency is interpreting regulations that directly implicate U.S. foreign policy interests.  *See United States v. Curtiss-Wright Exp. Corp.*, 299 U.S. 304, 320 (1936) (explaining "the very delicate, plenary and exclusive power of the President as the sole organ of the federal government in the field of international relations").

The record before this Court includes uncontroverted expert testimony establishing that bids submitted under such uncertainty would be discounted, failing to maximize value. As Randall Weisenburger explained in detail, many bidders will not participate at all if there is OFAC uncertainty because they will be unwilling to risk liability, unwilling to tie up capital in a deposit for a sale that may never occur, and unwilling to spend the money on due diligence for a process that may never close or that may be so delayed that their due diligence would become stale. D.I. 317-1 ¶¶ 17-22. Any other bidders that would be willing to incur all the risks associated with OFAC uncertainty would severely discount their bids to account for such uncertainty. *Id.* ¶ 22. Those that do will also be opportunistic, non-strategic bidders—including credit bidders—looking to buy PDVH at a fire-sale price and resell it later. *Id.* ¶ 21; D.I. 340-1 ¶ 15.

It is unsurprising that Crystallex is the only party seeking to move forward in the teeth of OFAC sanctions. As the process currently stands, Crystallex's $300 million credit bid would likely be the *only* bid. Indeed, "Crystallex is in a unique position" in that it need not: "invest significant sums in due diligence[;]" "put up a large security deposit for its credit bid[;]" or "worry about whether there will ever be OFAC approval[.]" D.I. 340-1 ¶¶ 5, 10. "[S]etting an arbitrary, firm date for the sale process to begin—regardless of OFAC authorization—permits Crystallex to take advantage of every uncertainty and risk in the regulatory environment, maximizing the likelihood that no credible third-party bids will be submitted because Crystallex's credit bid will be the only one that can be justified from a risk assessment standpoint." *Id*. ¶ 15.

Thus, in order to accomplish this Court's goal of achieving a reasonable sale process, any OFAC authorization must be expressed clearly in the form of a specific license, the amendment of existing regulations and guidance, or the repeal of existing sanctions. For several reasons, the launch of the Sale Process cannot be based solely on the Special Master's "satisf[action] with the

authorization, FAQs, or other applicable guidance."  D.I. 391-1 ¶ 4.

First, OFAC regulations state specifically that transfers of blocked property under the Venezuela sanctions regime require a *specific* license, not some other form of authorization.  As detailed above, 31 C.F.R. § 591.407 restricts such transfers "[n]otwithstanding the existence of any general license"  and until  "authorized pursuant to a specific license issued by OFAC."  FAQ No. 809 likewise states that the transfer of blocked property requires "a specific license from OFAC prior to" participation.  OFAC FAQ No. 809.  In the face of these authorities, private parties without a license will lack confidence to participate in bidding even if the Special Master receives some form of informal guidance or non-objection from OFAC.

Second, both Crystallex and this Court have acknowledged that OFAC acts through its licensing process.  This Court acknowledged that OFAC's licensing process is the appropriate mechanism by which OFAC effectuates U.S. foreign policy interests.  *See supra* at 3.  Crystallex argues that OFAC is an agency that acts on the record—it does not deal in "smoke signals" or "hand signals," rather, they address "actual applications" for specific transactions and respond through a formal licensing process.  Nov. 8, 2021, Hr'g Tr. at 24:21-24,  70:1-5.  Especially given that OFAC has now utilized its licensing process, it must either revisit its prior determination and grant a license, or the Executive Branch must amend its existing sanctions.  Short of those steps, the Special Master's own satisfaction that OFAC has given him authority to proceed would fail to provide the clarity necessary to ensure a meaningful and effective bidding process.

Third, the steps involved in the proposed process, including the Marketing Process, require untold numbers of transactions and interactions by unknown third parties that will be related to the eventual sale of blocked property, and many of those transactions will require authorization from OFAC.  OFAC generally deals with such unknowns by issuing a specific license for a particular

transaction, which then allows for third parties to rely on the terms of 31 C.F.R. § 591.404, authorizing "[a]ny transaction ordinarily incident to a licensed transaction and necessary to give effect thereto[.]"  The Venezuela Parties are unaware of any similar authorities which would cover third-party participation in a transaction that OFAC has authorized through some means other than a license.  The absence of such authority will not only depress participation, but may subject any executed transaction to collateral litigation.  *See supra*, at 12-15.

Finally, Crystallex suggests that because the Venezuela Parties have not asked OFAC to grant Crystallex's license, they are somehow disingenuous in arguing that moving forward without a license would chill bidding.  Nov. 8, 2021, Hr'g Tr. at 66:24-67:6.  The Venezuela Parties are aligned with multiple other creditors of the Republic and PDVSA on this point.[7]  *Supra* at 4.  In any event, only OFAC can grant the legal authority to transact in property interests that are blocked by U.S. sanctions.  OFAC has decided that allowing Crystallex to move forward with executing on its judgment at this time would be inconsistent with U.S. foreign policy interests.  *Supra* at 3,4. The Republic has legitimate reasons to oppose a piecemeal satisfaction of Crystallex's claim at the expense of the Venezuelan people and the ability to facilitate a global resolution.  One of the central purposes of the U.S. sanctions regime is to protect the Interim Government's ability to use CITGO and other assets to help facilitate a global resolution of the claims of all creditors.

## CONCLUSION

For the foregoing reasons, and those in the Venezuela Parties' objections and reply briefs, D.I. 317, 340, 385, and 397, the Court should not enter the Proposed Order.

---

[7] Further, PDVH and CITGO are constitutionally entitled to petition—and cannot be penalized for petitioning—the U.S. Government for, *inter alia*, protections from the destabilizing effects of a forced sale of PDVH's stock.  *Allied Tube & Conduit Corp. v. Indian Head, Inc.*, 486 U.S. 492, 499, 510 (1988) (the First Amendment prohibits imposing liability on companies for attempting to influence "governments through direct lobbying, publicity campaigns, and other traditional avenues of political expression").

November 22, 2021

Respectfully submitted,

MORRIS, NICHOLS, ARSHT & TUNNELL LLP

OF COUNSEL:
Michael J. Gottlieb
David J. L. Mortlock
Samuel G. Hall
WILLKIE FARR & GALLAGHER LLP
1875 K Street, NW
Washington, DC 20006
 (202) 303-1000
mgottlieb@willkie.com
dmortlock@willkie.com
shall@willkie.com

/s/ Kenneth J. Nachbar
Kenneth J. Nachbar (#2067)
Alexandra M. Cumings (#6146)
1201 North Market Street
Wilmington, DE 19801
(302) 658-9200
KNachbar@mnat.com
ACumings@mnat.com

*Attorneys for PDV Holding, Inc. and*
*CITGO Petroleum Corporation*

Nathan P. Eimer
Lisa S. Meyer
Daniel D. Birk
Gregory M. Schweizer
EIMER STAHL LLP
224 South Michigan Avenue
Suite 1100
Chicago, IL 60604
(312) 660-7600
NEimer@eimerstahl.com
LMeyer@eimerstahl.com
DBirk@eimerstahl.com
GSchweizer@eimerstahl.com

HEYMAN ENERIO GATTUSO & HIRZEL LLP

/s/ Samuel Taylor Hirzel, II
Samuel Taylor Hirzel, II (#4415)
300 Delaware Avenue, Suite 200
Wilmington, DE 19801
(302) 472-7300
shirzel@hegh.law

OF COUNSEL:
Joseph D. Pizzurro
Julia B. Mosse
Kevin A. Meehan
Juan O. Perla
CURTIS, MALLET-PREVOST,
COLT & MOSLE LLP
101 Park Avenue
New York, NY 10178

*Attorney for Petróleos de Venezuela, S.A.*

16

(212) 696-6000
jpizzurro@curtis.com
jmosse@curtis.com
kmeehan@curtis.com
jperla@curtis.com

ABRAMS & BAYLISS LLP

OF COUNSEL:                                 */s/ Stephen C. Childs*
Donald B. Verrilli, Jr.                     A. Thompson Bayliss (#4379)
Elaine J. Goldenberg                        Stephen C. Childs (#6711)
Ginger D. Anders                            20 Montchanin Road, Suite 200
Brendan B. Gants                            Wilmington, DE 19807
Jacobus P. van der Ven                      (302) 778-1000
Munger, Tolles & Olson LLP                  bayliss@abramsbayliss.com
601 Massachusetts Avenue NW                 childs@abramsbayliss.com
Suite 500 E
Washington, D.C. 20001
(202) 220-1100                              *Attorneys for the Bolivarian Republic of Venezuela*
Donald.Verrilli@mto.com