FILED
CLERK U.S. DISTRICT C...
DIS...
2021 DEC -7  AM I...

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

------------------------------------------------------------- x -----------------------------------------------------------
                                            :

**CRYSTALLEX INTERNATIONAL**
**CORPORATION,**  :

                  **Plaintiff,**  :

                  **v.**  :  **Case No.: Misc. No. 17-151-LPS**

**BOLIVARIAN REPUBLIC OF VENEZUELA,**  :

               **Defendant.**  :  **Ref. D.I. Nos. 404 and 414**

------------------------------------------------------------- x -----------------------------------------------------------

**REPLY TO CRYSTALLEX'S OPPOSITION TO THE MOTION TO INTERVENE AND**
**FOR AN ORDER REQUIRING AN INDEPENDENT DETERMINATION OF THE**
**AMOUNT THAT NEEDS TO BE COLLECTED TO SATISFY ITS JUDGMENT**

Adelso Adrianza ("Movant"), a shareholder of Crystallex International Corporation (the Company), Pro Se and on behalf of similarly situated U.S. shareholders (the "Shareholders") in the above-captioned case, respectfully submit this reply (the "Reply") to the objections (the "Objections") filed by the Company at D.I. No. 414 to the Movant's Motion To Intervene And For An Order Requiring An Independent Determination Of The Amount That Needs To Be Collected To Satisfy Its Judgement (the "Judgement") against Venezuela (the "Republic") pursuant to the Federal Rule of Civil Procedure 24 and 11 U.S.C. §§ 1501, 1507 and 1522.

**PRELIMINARY STATEMENT**

The Movant's request for relief to this Court in the Motion (D.I. 391) was predicated on three facts:

      I.     The Special Master's reliance on the Company's calculation of the outstanding balance of the Judgement despite the Movant's letter to the Court indicating that the Proposed Order Establishing the Sale and Bidding Procedure (the "Proposal," D.I. 337) was in error,

      II.    The Company is in bankruptcy proceedings, the proceeds from the Judgement are property of its estate (the "Estate"), which is under the protection of the Bankruptcy Code and the

Delaware Bankruptcy Court (the "DEBKE Court"). The Bankruptcy statute requires the protection and maximization of the Estate's property.

   III. The Movant is pursuing redress to harm inflicted on the Estate and the Shareholders by the Company's Self-interested Board of Director (the "Self-interested BOD/DIP") and the Controlling DIP Lender (the "Controlling DIP Lender"). The DEBKE Court heard the parties' argument, requested, and received additional information and will decide about the need for a second hearing or issue its decision in due course.

   In the meantime, the proceeding at the Delaware District Court (the "DEDCE Court" continues to move forward and appears to be at a stage leading to the approval and the start of the process to execute the Judgment. It is unlike the decisions by the two Courts will overlap, given the early stage of the proceeding at the DEBKE Court, which poses the risk of an untimely action that would prevent the Movant and the Shareholders from protecting their interests based on the equitable mootness doctrine. The Motion was and is the means to avoid this risk. Put simply, it is pointless to close the door of the barn in the next farm over once the horse is out of your barn.

   It is essential to point out that the Motion's objective is not to relitigate the issues under review at the DEBKE Court and the merits of the parties' position. This would be pointless, given the fact that the Court is pursuing its fact-finding process and evaluating the legal arguments presented.

### THE COMPANY'S OBJECTION TO THE MOTION

   1. The Company's objection to the Motion follows a familiar template: it fails to deal with and pursues to deflect attention away from the true issues involved. And it does so by repeating falsehoods and misrepresentations to misguide the Court. The foregoing statement is not made lightly, as it will be made clear here below. The modus operandi involved relies on misinformation, people's unfamiliarity with the true facts involved and their willingness to take the Company's word for it. And, just in case someone is doubtful and decides to verify and validate facts, a great effort to keep

everything under great secrecy; ergo the wholesale sealing of court filings over the last ten years to this day.

2.      To separate the wheat from the chaff, the Reply will deal first with the true issues involved and then discuss the misrepresentations and falsehoods raised in it. The latter is necessary to allow this Court to make a well-informed decision and prevent it from being misguided. A necessary corollary here is that legal counsel is an officer of the court and as such owes it the duties of candor and meritorious claims.

### THE TRUE ISSUES INVOLVED (A.K.A. "THE WHEAT")

3.- The true issues involved in this case are:

I.      Ensuring the protection and maximization of the Estate's property as mandated by the Bankruptcy Code,

II.      Protecting the interests of the Movant and the Shareholders because these are not aligned with those of the Company, which is managed by a Self-interested BOD/DIP beholden to the Controlling DIP Lender.

4.      One particularly important question in this case remains unanswered and is the reason for the Movant's action at the DEBKE Court: how it is possible for the DIP lender to turn a $US 76 million DIP loan in to $US 164 million principal plus interest and $US 800 million in a special compensation, while gifting hundreds of millions of Estate property and making the Estate pay for expenses for the sole benefit of the DIP Lender? The arguments by the Self-interested BOD/DIP and the Controlling DIP Lender that a) but for the DIP Lender' s DIP loan the Debtor would not have been able to pursue the arbitration award and its collection is disingenuous. First, there would not have been an arbitration award and collection to pursue if the Shareholders had not invested over USS 500 million to fund the Las Cristinas mine development project. Second the DIP /BOD had other means to fund the arbitration and the award collection but chose to do so with the Controlling

DIP Lender to share the windfall via the NAP Sharing Agreement that remains secret to this day by court order based on an argument that is so implausible that would be laughable but for the fact the CCAA Court took the bait, line and sinker. It can be summarized as follows:

      a.  The lives of Messrs. Fung and Oppenheimer would be as risk if the NAP Sharing Agreement is disclosed.

      b.  This is the case because they may need to go to Venezuela to negotiate a third settlement agreement and would be exposed to criminal activity by making public the fact that they are entitled to receive over $US 100 million from the DIP Lender based on the NAP Sharing Agreement.

    5.      The foregoing negates well-know and indisputable facts:

      a.  The Company has and is in the process of collecting an ironclad Judgement that has the blessing of US Courts all the way up to the Supreme Court,

      b.  The Republic has twice reneged on settlement agreements and continues to refuse to pay the Judgement even after exhausting all the available means to reverse it and having the means to meet its obligation,

      c.  The Company has repeatedly argued in this Court that i) there is no possibility of a negotiated solution, ii) the political situation in Venezuela is such that there can be no agreement while there are two the facto governments keen to put the blame for the loss of the Republic's most important foreign asset on the other,

      d.  The government faction recognized by the U.S. government has long argued that either negotiating or paying the Judgement will cause it to lose legitimacy in the eyes of the Venezuelan people, a position that has been and continues to be endorsed by the U.S. Government. The other government faction is controlled by officials that are on OFAC's Specially Designated Nationals and Blocked Persons List (the "SDN List") and the Canadian Government for corruption,

human rights violations, and drug trafficking, and subject to U.S. Executive Orders that makes it a crime to deal with them. As a result, the Company hired and paid Venezuelan lawyers US$ 30 million to pursue and negotiate the two failed settlement agreements with the Republic. The SDN List and the U.S. sanctions are not going away anytime soon.

### THE COMPANY'S OBJECTIONS AND ARGUMENTS

6.      The Company's Objections against the Motion are based on arguments devoid of legal and factual basis, as it is demonstrated here below. Therefore, they fail in their purpose. The Objections are grounded on three main arguments:

A.  The Movant's demands are duplicative of the legal action pending at the DEBKE Court.

B.  The Movant is not entitled to intervene as of right:

   1)  He has not demonstrated a protectable interest in the litigation (i.e., "he has no skin in the game") that would be affected or impaired (i.e., "diminished or eliminated") by it,

   2)  His interests are adequately represented by the Company (i.e., "the Company has his back"),

   3)  His motion to intervene is untimely (i.e., "he is late to the party").

C.   The Movant's request for an independent determination of the amount to be collected has no merit ("he doesn't know what he is talking about; we are on top of this").

### REBUTTAL

#### 10. **The Movant's Demands Are Duplicative of The Legal Action Pending at The DEBKE Court**

8.      The legal action at the DEBKE Court (*Crystallex International Corporation*, debke-11-14074, D.I. 328, 339 and 357) seeks...

   a)  the appointment of an Examiner as an officer of the Court to investigate and report on actions and omission by the Self-interested BOD/DIP and the Controlling DIP Lender

and the consequential harm to the Estate and the Shareholders as its residual owners, and

b) The appointment of Legal Counsel to represent the Shareholders and protect their interests, which has not and cannot be done by a Self-interested BOD/DIP controlled by the DIP Lender.

The relief requested was made necessary by based on several irrefutable facts:

I.    The DIP/BOD is composed of i) two directors appointed by the shareholders over ten years ago (Mr. Fung and Mr. Oppenheimer), ii) two directors appointed by the DIP Lender (Mr. Shah, Managing Partner, and Mr. Kochav, Partner and COO of Tenor Capital ("Tenor"), a hedge fund manager that manages and controls the DIP Lender. The DIP Lender is partly owned by the Tenor partners, and iii) a would-be independent director whose appointment requires Tenor's approval as a condition sine qua non.

II.   The agreement between Mr. Fung, Mr. Oppenheimer, and Tenor to share a portion of the US$ 800 million windfall that accrued to the latter through the Self-interested BOD/DIP approved dilution of the Estate's share of the NAP from 65% to 12%. Messrs. Fung's and Oppenheimer's incentive compensation (the "MIP Plan") was originally tied to the Estate's share of the NAP (75% for the Estate and 25% for the MIP) to align their interests with those of the Estate and the Shareholders; and

III.  The use and misuse of Estate property worth hundreds of millions of U.S. dollars to advance the interests of the DIP Lender at the Estate's expense.

9.    The foregoing goes to show the complexity, extend of the fact-finding, and time requirements of the legal action at the DEBKE Court. As indicated in the Preliminary Statement, the DEBKE and the DEDCE Courts' proceedings are at significantly different stages and will end with significant time gaps between them. Therefore, not pursuing the relief requested in the Motion will

most likely result in the Movant foregoing altogether the relief sought through the onset of equitable mootness.

**B.  The Movant is not entitled to intervene as of right**

> **Rule 24. Intervention**
> (a) Intervention of Right. On timely motion, the court must permit anyone to intervene who:
> (1) is given an unconditional right to intervene by a federal statute; or
> (2) claims an interest relating to the property or transaction that is the subject of the action and is so situated that disposing of the action may as a practical matter impair impede the movant's ability to protect its interest, unless existing parties adequately represent that interest.

10.     Intervention as of right serves the public policy of minimizing injustice to nonparties.

(See *Hodgson v. UMW*, 473 F.2d US, 130 (D.C. Cir. 1972) ("*Rule 24 right to intervene implements basic jurisprudential assumption that interest of justice best served when all parties with real stake in controversy are afforded opportunity to be heard*"). However, expanding the size of the litigation through intervention can prejudice the parties already before the court and interfere with the efficient conduct of court proceedings. Therefore, courts are called upon to undertake a balance of equities in deciding whether to grant a non-party the right to intervene in ongoing litigation by requiring proof of four elements:

> (1) A timely application for leave to intervene,
>
> (2) A sufficient interest in the litigation,
>
> (3) A threat that the interest will be impaired or affected, as a practical matter, by the disposition of the action, and
>
> (4) Inadequate representation of the prospective intervenor's interest by existing parties to the litigation.
>
> (See *Kleissler v. U.S. Forest Serv.*, 157 F.3d 964, 969 (3d Cir. 1998)).

The Company's attempt to disprove the Movant's right to intervene is a double-edged sword, since it provides the opportunity to prove the contrary, as shown below.

**B. 1) He has not demonstrated a protectable interest in the litigation (i.e., "he has no skin in the game") that would be affected or impaired (i.e., "diminished or eliminated") by it.**

11.     A legally protectable interest is an interest that derives from a legal right. The common shareholder has a claim on the assets of the firm. It is an undifferentiated or general claim which does not apply to any specific asset. The claim cannot be exercised except at the breakup of the firm. The firm may be dissolved by a vote of the shareholders, or by bankruptcy. In either case, there is a well-defined priority in which the liabilities of the firm will be met. The common stockholders have the lowest priority and receive a distribution only if prior claims are paid in full. For this reason, the common shareholder is referred to as the residual owner of the firm.

12.     The Company's Bankruptcy proceeding is a liquidation:

6. *This is a unique liquidating CCAA proceeding, in which the only asset is the approximately USD $1.4 billion Award against the government of Venezuela and the proceeds Crystallex has received in respect of the Award to date.* (See https://documentcentre.ey.com/api/Document/download?docId=34485&language =EN)

13.     An estate's residual property is that which remains after liquidating its assets, paying its liabilities, and covering the expenses incurred in its bankruptcy and liquidation proceedings. Failure to protect and maximize and the use or misuse the estate's property will impair its residual property and the shareholders' rights protected by the Bankruptcy Code. The Code protects these rights by mandating the protection and maximization of the estate's property, the strict enforcement of the Absolute Priority Rule and putting limits on what expenses can be charged against the estate.

14.     The Movant and his spouse are the beneficial owners of 2.6 million shares issued by the Company on the New Stock Exchange. The investment in the Company was made over ten years with savings earmarked to provide for retirement and the children's college education. The similar situated Shareholders are beneficial owners of close to 20% of the shares issued by the Company (365 million). Most of the Shareholders are retail investors like Mr. Sisca (see D.I. 133) and shared a

common goal in investing in the Company: providing for retirement and the family's well-being. Therefore, the Shareholders face a common and imminent risk of being deprived of the retirement means they invested their savings for.

### B. 2) His interests are adequately represented by the Company (i.e., "the Company has his back").

15.     The Company's filing for protection under the Canadian CCAA was predicated on it being "the most fair and equitable way to obtain maximum value for all Crystallex's shareholders". (See DEBKE D.l. 2, Exh. B). In addition, the BOD represented in the DIP loan auction term-sheet that:

> 16.     *In no circumstance shall the Lender Back-End Entitlement involve, or contemplate directly or indirectly, either (i) an acquisition of control of Crystallex, (ii) an acquisition of any interest in the Arbitration Proceeding, or (iii) a receipt of value exceeding a minority of the Arbitration Proceeds.*

17.     The US$ 35 million DIP Loan, which entitled the DIP Lender to a 35% share of the Net Arbitration Proceeds (NAP), was purportedly the amount required to fund the arbitration proceeding from beginning to end. The full US$ 35 million was spent in just over a year, which required US $41 million in additional funding from the DIP Lender and increased its share of the NAP to 88%. Statistical studies by specialized publications such as Global Arbitration Review (GAR) have established that i) an ICSID arbitration proceeding takes over four years on average (over five years if a party requests the review or annulment of an award by a second panel), and ii) costs US$ five million per annum. The Company's ICSID arbitration proceeding started in December 2011 and ended with an award in April 2016.

18.     Per the structured dismissal and distribution plan built into the DIP financing agreement (the Mechanics of Distribution or "MOD"), the Estate's share of the NAP is to be used to pay for the MIP (25%). The remaining seventy five percent (75%) is to pay the costs of the

bankruptcy proceedings, the arbitration award proceeding, the award / Judgement collection actions, the legal costs the Noteholders incurred in legal actions against the Company in Canada and the Estate's liquidation. The Estate's NAP share is also charged for expenses incurred by the DIP Lender for its sole benefit, in contravention of Section 506(c) of the Bankruptcy Code.

19.     The DIP lender's continuously expanding share of the NAP has been at the expense of the Estate and was capped at 88%, given that a twice-bankrupt Estate was not in the best interest of the Self-interested BOD/DIP and the Controlling DIP Lender. The depletion of the Estate's residual property by the ongoing syphoning of assets for the benefit of a Self-interested BOD/DIP and a Controlling DIP Lender is self-evidently contrary to the purported adequate representation of the Movant's and the Shareholders' interests.

### B. 3) His motion to intervene is untimely (i.e., "he is late to the party").

20.     The first time ever that the Company's outstanding balance on the Judgment was made public was in the Special Master's Proposed Order Establishing the Sale and Bidding Procedure after this Court ordered its publication (D.I. 347, September 15, 2021). The Movant's letter to this Court pointing out the erroneous Judgement amount was put on the docket on September 27, 2021 (D.I. 368). The Special Master's Amended Proposed Order Establishing the Sale and Bidding Procedure was put on the docket on November 11, 2021 (D.I. 391.1). The Movant's Motion to Intervene and For an Order Requiring the Independent Determination of The Amount That Needs to Be Collected to Satisfy Crystallex's Judgement (D.I. 404) was put on the docket on November 17, 2021. It is not only impossible to anticipate the need to intervene in litigation as a non-party but also futile to do so without having a protectable right that warrants protection though intervention. This is especially true when an interested party bends over backwards to avoid making public such information, as the Company has done over the last ten years with the approval of the CCAA Court. That a bankrupt is allowed to seal its financial information and how it spends its available funds, and a compensation

agreement between a Self-interested BOD/DIP and a Controlling DIP Lender goes to show the extend of the unleveled playing field.

21.     A non-party's motion to intervene is deemed untimely when it is prejudicial to the parties in litigation. Such prejudice cannot be speculative and may arise when a non-party intervention will unduly delay the litigation and harm the interests of the parties involved without a justifiable reason. The Movant's motion to intervene is not prejudicial to the litigation. The Movant's request to intervene is solely for the purpose of ensuring that its judgement against the Republic is collected in full and is predicated on the demonstrable fact that the judgement amount the Company claims as outstanding is in error to the detriment of the Estate, and purposefully so for unexplained or invalid reasons.

22.     The Company bases it opposition to the Movant's intervention as being untimely on three groundless reasons. First, it adduces that there are no claims or defenses left for the Court to decide, thereby equating the Movant's intervention to a claim. In the instant case, the Court is presiding over claims and the execution of valid judgements against the Republic. The Movant has no claim or judgement against the Republic and has no reason nor standing to intervene in or interfere with the litigation. Second, the Company adduces the Movant's intervention is prejudicial by implying it will delay the sale process, which it claims "is well underway" even though the Court has yet to issue the order and that it will most likely be appealed. The hyperbole is best illustrated by an entry in a recent CCAA Court order extending the stay until November 2022:

> 7.     I am granting the 12 month extension. The evidence of Mr. Fung is that no material steps will be occurring in the U.S. until late 2022. There will be no distributions in the meantime. The Monitor confirms that the company has sufficient liquidity for 12 months. The company is acting in good faith and with due diligence, as supported by the Monitor's report.

(See https://documentcentre.ey.com/#/detail-engmt?eid=166)

23.     Third, the Company adduces that the Movant's intervention is tardy, given that the Judgement was registered four years ago. This obviates the fact that a) the Company's neglect to pursue the full collection of the Judgement was only discoverable after September 15, 2021, and only because this Court ordered its publication, and b) it has acknowledged that the collection of its judgement is nowhere near.

C.  **The Movant's request for an independent determination of the amount to be collected has no merit ("he doesn't know what he is talking about; we are on top of this").**

24.     The determination of merit is a fact-finding process and subjectivity is its antithesis. Its determination starts and ends with demonstrable proof of its existence. In the instant case, merit can be demonstrated with indubitable facts such as:

> a)
> *6. This is a unique liquidating CCAA proceeding, in which the only asset is the approximately USD $1.4 billion Award against the government of Venezuela and the proceeds Crystallex has received in respect of the Award to date.*

(See https://documentcentre.ey.com/api/Document/download?docId=34485&language=EN)

> b)
> 1.      Initial Payment. On the date hereof <u>as a condition precedent to the effectiveness of the provisions of this Agreement, Venezuela shall deliver (or cause to be delivered) to Crystallex (or its designee) cash in U.S. dollars in immediately available funds and / or Liquid Securities (as defined below)</u> in an amount, in the case of cash, or with a Market Value (as defined below) in the case of Liquid Securities of at least U.S. $425,000,000 (the "Initial Payment")...
>
> (i) <u>"Liquid Securities" means public debt securities in U.S. dollar freely tradeable in the United States and subject to publicly available pricing quotations.</u>
>
> [Emphasis added].

(The amended settlement Agreement, D.I. 368, Exh. C)

> c)
> *"<u>While that agreement later became ineffective following Venezuela's breach, there is no basis for Mr. Adrianza's apparent insistence that</u>*

> *Crystallex ignore the value it received from Venezuela's Initial Payment, a value which was agreed by the parties because of the substantial discount from par and lack of regular trade quotes applicable to the securities that Venezuela delivered to Crystallex."*

[Emphasis added].

(Crystallex International Corporation's Opposition to Adelso Adrianza's Motion to Intervene, D.I. 414)

> d)

> > 11.   ... *As will be discussed below, the Initial Payment Securities do not represent a good prospect of recovery for the Company's stakeholders at this time because they cannot be liquidated* [what follows is redacted].

> > [Emphasis added].

> CCAA Motion Dated May 4, 2021 – Robert Fung Affidavit (Page 11) (https://documentcentre.ey.com/#/detail-engmt?eid=166)

25.    The preceding statements in the Company's filings represent an incomplete picture of the issues involved with its reluctance to fully monetize its Judgement against the Republic. This is the case because, while they acknowledge the fact that the securities represent "dead money" and that the Company does not know when, if ever, it will be able to monetize the securities, they do not explain why it wants to or should hold on to the securities and deprive the Estate of valuable property.

In 25 c) above, the Company seems to imply that the securities' actual value at the time it received them (2018-2019) was higher than the reported value, which would offset or exceed the sizable decline in Venezuelan securities value since then. Any other option to avoid the securities loss of value was not permissible, since they were and remain blocked Venezuelan assets by OFAC and Executive Orders and cannot be sold, hedged, or traded without breaching the regulations in place and exposing the U.S. citizens on the BOD/DIP (Messrs. Shah, Kochav and Oppenheimer) to judicial process.

26.    The merit of the claim about the Company's failure to pursue the full collection of the interest it is owed and recover the costs incurred in defending bad faith litigation is straight

forward. There is not question that the Company is entitled to and must collect post-award interest. As shown below:

    a.  The ICSID award was issued on April 4, 2016.

    b.  The Judgement was issued on August 19, 2018

    c.   Interest at the ICSID Award rate is due from Apr. 4, 2016, though Aug. 18, 2018

    d.  Interest at Judgement rate is due from Aug. 19, 2018, though full payment.

       Yet, for reasons unknown, the Company continues to obviate the availability and obligation to pursue the collection of this sizeable Estate property:

> *6. This is a unique liquidating CCAA proceeding, in which the only asset is the approximately USD $1.4 billion Award against the government of Venezuela and the proceeds Crystallex has received in respect of the Award to date.*

(See https://documentcentre.ey.com/api/Document/download?docId=34485&language=EN)

The $1.4 billion "only asset" in the statement above refers to the award amount and the pre-award interest. It is public knowledge that the Company forgo the post-award interest rate (see the Amended Settlement Agreement) and that it gifted the Republic the Las Cristinas Mining data, worth at least US$ 340 million, (See https://www.maibortpetit.info/2019/10/serie-crystallex-1-conozca-las.html) to entice it to enter into the two failed settlement agreements. However, as the Company has acknowledged (see 24 (c) above) the settlement agreements became ineffective when the Republic reneged on them. Thus, not recovering their value harms the Estate and breaches the fiduciary duty the BOD/DIP owes the Company.

### THE DEFLECTING ISSUES (A.K.A. "THE CHAFF")

27.    In the Objections the Company made several statements geared to disqualify the Movant and the Motion that left unanswered would be a disservice to this Court and the Shareholders' plight. Responding fully to all these statements would require more pages than permissible and represent an abuse of this Court's time. Therefore, only the most egregiously misleading statements

are dealt with below. These are:

**I.      Crystallex has contested Mr. Adrianza's allegations in the Delaware Bankruptcy Proceedings and has done so in the strongest possible terms.**

28.      The Company's opposition to the motion for relief filed at the DEBKE Court was based on the legal hypothesis that the Court has no authority to grant the relief requested and that its role is that of rubber-stamping the decisions of the CCAA Court based on comity. Having failed to convince the Court of the validity of the hypothesis, the Court magnanimously afforded legal counsel the opportunity to further develop the hypothesis and to come back when they were ready to present it. Legal counsel chose not to take the opportunity to substantiate the legal merits of the hypothesis and continued to stress the deference the Court owed to the decisions of the CCAA Court.

**II.     Mr. Adrianza disagrees with the corporate governance and asset distribution procedures approved by the Canadian Court responsible for overseeing Crystallex's estate.**

29.      The reason for the Movant's legal action at the DEBKE Court is based on solid legal ground: Some of the orders approved by the CCAA Court are in flagrant violation of statutory rules that if waved based on comity would severely undermine the purpose and objectives of the Bankruptcy Court and the Model Law, disregard binding precedential Supreme Court decisions and impair the authority of the bankruptcy courts.

30.      Contrary to the Company's assertion, the Monitor is not appointed and authorized to undertake the function and responsibilities of an examiner and is not an independent officer of the court. The monitor is selected and paid by the applicant and the court appoints him/her to be the case administrator and its "eyes and ears." In Company's CCAA proceeding, the court ordered the Monitor to refrain from undertaking any action without the expressed authorization of the Company.

**III.    Mr. Adrianza also asked the Delaware Bankruptcy Court to provide him with independent legal counsel, noting that he was not capable of representing his own interests, the interests of the corporation, or the interests of Crystallex's shareholders on his own.**

31.     The Movant asked the DEBKE Court to appoint legal counsel *to represent the interests of the Shareholders,* given that the Self-interested BOD/DIP and the Controlling DIP Lender could not be expected to represent them as made self-evident by the total dilution of their interest to the benefit of the BOD/DIP and the DIP Lender. This fact was underscored by actions and omissions on their part such as the misappropriation of tax loss carry-forward benefits, which per the Canadian tax law can only be taken by those that suffered the corresponding loss (the Shareholders) and are forfeited upon the transfer of control, either de jure or de facto. The Movant advised the Company and its legal counsel of this fact, but nonetheless insisted on transferring 88% of the benefit to the Controlling DIP Lender through the execution of the MOD. The Monitor reported to the CCAA Court that the Company was trying to "settle" with the Canadian Revenue Service after it filed its 2019 tax return in which it tried to shield the taxable income generated by the payment from the Republic with the tax loss carry-forward.

**IV.   Mr. Adrianza's reliance on Chancery Court rules regarding the award of costs**
**V.    incurred in the face of bad faith litigation is misplaced. This is not a Chancery Court action. In any event, whether and when Crystallex seeks recovery of costs of enforcement is not a question before the Court in connection with the sale of the PDVH Shares.** [Footnote Nr. 5]

32.     This Court is presiding over the approval and implementation of a process to execute a judgement under Delaware law. The Movant's reference to the Delaware statute that allows for the recovery of legal costs served to point out the availability to such recovery in the Instant Case. In Federal Court, costs may be recoverable under Federal Rule of Civil Procedure 54(d) or a statute that expressly allows for recovery of costs. Rule 54(d) entitles a prevailing party to recover costs unless a federal statute dictates otherwise. (*See In Marx v. Gen. Revenue Corp.,* 133 S. Ct. 1166 (2013)), and *Buckhannon v. West Virginia Dep. of Health & Human Resources,* 532 U.S. 598 (2001):

*Held: The "catalyst theory" is not a permissible basis for the award of attorney's fees under the FHAA and ADA. Under the "American Rule," parties are ordinarily required to bear their own attorney's fees, and courts follow a general practice of not awarding fees to a prevailing party absent explicit statutory authority, Key Tronic Corp.*

33.     In Objections (D.I. 414 - The Nature and Stage of The Proceedings), the Company makes the following statement:

> *"But no amount of repetition can save Mr. Adrianza's claims, which all turn on the illogical notion that Crystallex is not acting to maximize its recovery on the judgment that is at the core of this multi-year action before this Court. Even a casual glance at the docket in this case puts the lie to Mr. Adrianza's assertions."*

And it does so with the usual arrogance and determination to make everybody take its word for it, even though it has not and cannot justify in good faith the impending irreparable harm to the Estate and its residual owners.

## CONCLUSION

For all the reasons set forth herein, the Movant respectfully requests that the Court grant the relief sought in the Motion and grant such other and further relief as the Court deems just and proper.

Respectfully submitted,

Dated:  December 6, 2021,
Newton, Massachusetts.

Adelso Adrianza, Pro Se
113 Washington Street
Newton, MA 02458
aaadrianza@gmail.com
(859) 803-2279

## CERTIFICATE OF SERVICE

I, Adelso Adrianza, hereby certify that on this 6th day of December 2021, a true and correct copy of the foregoing *Reply To Crystallex International Corporation's Opposition To The Motion To Intervene And For An Order Requiring An Independent Determination Of The Amount That Needs To Be Collected To Satisfy Crystallex's Judgment* was served upon Mr. Travis S. Hunter, Esq., legal counsel for Crystallex International Corporation, by the method listed below:

Via UPS

Mr. Travis S. Hunter, Esq.
Richards, Layton & Finger, PA
920 N King Street
Wilmington, DE 19801

*Attorneys for Plaintiff*
*Crystallex International Corporation*

Adelso A. Adrianza
aaadrianza@gmail.com

FILED
CLERK U.S. DISTRICT
DISTRICT OF DEL

2021 DEC -7  AM

Adelso Adrianza
113 Washington Street
Newton, MA 02458



Office of the Clerk
U.S. District Court - Delaware.
844 North King Street, Unit 18
Wilmington, DE 19801-3570

FILED
CLERK U.S. DISTRICT
DISTRICT OF

2021 DEC -7 AM

ADELSO ADRIANZA
859-803-2279
ADELSO ADRIANZA
113 WASHINGTON ST
NEWTON MA 02458-2248

0.4 LBS LTR          1 OF 1

SHIP TO:
OFFICE OF THE CLERK
U.S. DISTRICT COURT—DELAWARE
UNIT 18
844 N KING ST
WILMINGTON DE 19801-3519



DE 197 9-25

UPS NEXT DAY AIR          1

TRACKING #: 1Z V96 311 01 1522 3619



BILLING: P/P



Adelso Adrianza
113 Washington Street
Newton, MA 02458

Office of the Clerk
U.S. District Court - Delaware
844 North King Street, Unit 18
Wilmington, DE 19801-3570

XOL 21.11.24     NV46 60.0A 12/2021*

copy&print

