IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

CRYSTALLEX INTERNATIONAL
CORPORATION,

                          Plaintiff,

            v.

BOLIVARIAN REPUBLIC OF
VENEZUELA,

                          Defendant.

C.A. No. 17-151-LPS

**CRYSTALLEX INTERNATIONAL CORPORATION'S**
**SUPPLEMENTAL RESPONSE BRIEF REGARDING SALES PROCEDURES**

OF COUNSEL:

Robert L. Weigel
Jason W. Myatt
Rahim Moloo
GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue
New York, New York 10166
Tel: (212) 351-4000
Fax: (212) 351-4035

Miguel A. Estrada
Lucas C. Townsend
Adam M. Smith
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, D.C. 20036
Tel: (202) 955-8500
Fax: (202) 467-0539

Dated: December 8, 2021

Raymond J. DiCamillo (#3188)
Jeffrey L. Moyer (#3309)
Travis S. Hunter (#5350)
RICHARDS, LAYTON & FINGER, P.A.
One Rodney Square
920 North King Street
Wilmington, Delaware 19801
Tel: (302) 651-7700
Fax: (302) 651-7701

*Attorneys for Plaintiff*

## TABLE OF CONTENTS

Page

INTRODUCTION ............................................................................................................... 1

ARGUMENT ...................................................................................................................... 2

    I.     The United States' Foreign-Policy Goals Do Not Provide A Reason To
          Delay The Sale .................................................................................................... 2

    II.    The Views Of Others Do Not Provide A Reason To Delay The Sale ................... 4

    III.   Federal Law Does Not Prohibit The Proposed Sale Procedures ........................... 5

    IV.   The Court Should Evaluate The Adequacy Of The Bids After They Exist ........... 9

CONCLUSION .................................................................................................................. 10

i

## TABLE OF AUTHORITIES

Page(s)

### Cases

*Bank Markazi v. Peterson*,
    136 S. Ct. 1310 (2016) ................................................................................................7

*Bond v. United States*,
    572 U.S. 844 (2014) ...................................................................................................8

*Crystallex Int'l Corp. v. Bolivarian Republic of Venezuela*,
    932 F.3d 126 (3d Cir. 2019) ....................................................................................10

*Kisor v. Wilkie*,
    139 S. Ct. 2400 (2019) ..............................................................................................9

*Medellín v. Texas*,
    552 U.S. 491 (2008) ...................................................................................................4

*Republic of Argentina v. NML Capital, Ltd.*,
    573 U.S. 134 (2014) ...................................................................................................4

*State Farm Mut. Auto. Ins. Co. v. Am. Rehab & Physical Therapy, Inc.*,
    376 F. App'x 182 (3d Cir. 2010) ..............................................................................4

### Regulations

31 C.F.R. § 591.310 ...........................................................................................................9

31 C.F.R. § 591.407 ......................................................................................................6, 8

31 C.F.R. § 591.509 ......................................................................................................6, 8

E.O. 13808 ...........................................................................................................1, 6, 7, 8

E.O. 13835 .................................................................................................................6, 7, 8

### Other Authorities

Kejal Vyas, *Venezuela's U.S-Backed Opposition Movement in Danger of
    Breaking Up*, WALL ST. J. (Dec. 5, 2021) ...............................................................3

Klein/Johnson Group LLC, FARA Reg. Ex. B (Nov. 30, 2021),
    https://tinyurl.com/3tuhja3n ...................................................................................10

## INTRODUCTION

The Court should enter a sale procedures order that immediately commences the process of preparing for, advertising, and conducting a contingent bidding process for the shares of PDVH to finally satisfy Crystallex's affirmed judgment.  Because the process would only transfer Venezuela's property after OFAC's approval, none of the proposed procedures would violate federal sanctions regarding foreign property.  Nothing in Venezuela's latest submission changes that fact.

Venezuela continues to cast about for any arguments that might delay the sale, but instead manages only to contradict itself and misrepresent the relevant authorities.  Having conceded in open court that it was "not asking this Court to defer to FAQ 809," D.I. 409 ("Nov. 2021 Tr.") at 97:1-4; *see also* D.I. 397-1 at 21, Venezuela now attempts to revive the argument in a footnote, stating that "FAQ No. 809 is indeed a reasonable interpretation to which deference would be due," D.I. 408 at 12 n.6.  Venezuela relies on the Special Master to argue that any further progress requires OFAC authorization, *id.* at 2, even as it challenges the Special Master's assertion of authority to commence the process *without* a license, *id.* at 13-14.  Venezuela also misquotes Executive Order 13808, wrongly claiming that § 1(b) of that order restricts "[a]ll transactions related to" the purchase of securities from Venezuela, when in fact that language comes from a separate, inapplicable section of the order, § 1(a), that Venezuela fails to cite.  *Id.* at 7.

The common theme is simply that Venezuela is desperate to avoid paying Crystallex's judgment.  But courts do not defer to the objections of recalcitrant debtors.  The sale procedures proposed by the Special Master, as modified by Crystallex's objections, do more than enough to accommodate the federal government's interest in approving, through the OFAC licensing process, any final transfer of Venezuela's property.  And there is no reason to delay the sale process based on the miniscule and speculative risk that the winning bid for the assets of a major refining company could hypothetically be found inadequate at a later date—especially when Venezuela could

solve that problem by cooperating with the licensing process, or avoid it by paying the judgment.

As the Court recognized nearly a year ago, "[e]ach day that Crystallex does not recover on its judgment is arguably something of an affront to the United States judicial system," and "[t]hose days must soon come to an end." D.I. 234 at 38. Much has been done since then to craft a process consistent with OFAC's regulations to maximize PDVH's share value and ensure Crystallex's judgment will be satisfied. "[T]he time has arrived for the sales process to proceed." *Id.* at 34.

### ARGUMENT

Venezuela's latest brief offers four main arguments for postponing progress towards a sale of PDVH shares. Venezuela claims: (1) the United States opposes further sale procedures; (2) the Special Master (despite proposing the sale process himself) and Crystallex's litigation opponents (not surprisingly) purportedly share that position; (3) the relevant executive orders and OFAC regulations prohibit a sale; and (4) uncertainty about OFAC regulations will depress bidding. But the answers to these arguments are straightforward: Neither the United States nor the Special Master support Venezuela's position. The views of Venezuela and other creditors are irrelevant to the Court's inquiry. The relevant executive orders and regulations allow the proposed sale procedures. And the Court should evaluate the adequacy of any winning bid once such a bid exists, rather than indulging in Venezuela's speculation and rewarding Venezuela's obstruction.

## I.   The United States' Foreign-Policy Goals Do Not Provide A Reason To Delay The Sale

The U.S. government agrees with Crystallex that the Court can take further steps toward the sale. *See* D.I. 226 ("Sept. 2020 Tr.") at 105. Contrary to Venezuela's assertion that the government believes that "the Sale Process should not commence unless and until OFAC provides clear authority to do so," D.I. 408 at 2, the government expressly told this Court that it "hasn't taken the position that Your Honor is blocked from moving forward," and in fact, "the Court can do whatever it wants." Sept. 2020 Tr. at 105. Otherwise, all the government has definitively said

about the *law*—*i.e.*, the current sanctions regime—is that, as all agree, an OFAC license would be required before the sale is *completed*. *See* D.I. 212 at 9. As for foreign *policy*—an issue irrelevant to this Court's obligation to enforce its judgments—this Court has already considered the government's views and concluded that they do not preclude further progress to "the maximum extent that can be accomplished without a specific license from OFAC." D.I. 234 at 32-33.

Venezuela's attempt to relitigate these issues is meritless. If anything, Venezuela's foreign policy arguments have gotten weaker since the Court ruled on the impact of the unsworn letter submitted by Special Representative for Venezuela Elliott Abrams, a single official of the *previous* administration. The *current* administration has not endorsed Abrams's position, except in the insignificant sense that it continues to endorse the Guaidó regime—*for now*—as the legitimate government of Venezuela. And even that much may change, since "the National Assembly's mandate ends in January 2022," D.I. 346-1 at 1, as OFAC went out of its way to point out, *id.* Indeed, it was recently reported that Guaidó's fragile coalition "is on the verge of breaking up."[1]

Nowhere in the letter denying a license did OFAC endorse former Special Representative Abrams's position on advertising a sale or in any way suggest that steps to merely prepare for the sale would impact U.S. foreign policy. OFAC's letter said nothing about Abrams's concerns for protecting the perceived "legitimacy" of the interim government. D.I. 212-1 at 3. Nor does the letter suggest that any procedure short of closing a sale would undermine U.S. efforts regarding Venezuela. *See* D.I. 346-1 at 1-8. To the contrary, OFAC acknowledged—without objection—that this Court had "elected to proceed with prefatory steps toward a judicial sale," in recognition that, ultimately, "'a specific license will be required'" before the sale "'can close.'" *Id.* at 5.

Venezuela argues that OFAC expressed its objection by denying Crystallex's license. It

---

[1] Kejal Vyas, *Venezuela's U.S-Backed Opposition Movement in Danger of Breaking Up*, WALL ST. J. (Dec. 5, 2021), https://tinyurl.com/3khw9hvp.

highlights OFAC's statement that this Court viewed the licensing process as the route for OFAC to express policy views that might "'necessitate a delay in effectuating court judgments.'" D.I. 408 at 3-4 (quoting D.I. 346-1 at 5). But the only activity that OFAC suggested delaying was the "close" of the sale. D.I. 346-1 at 5; *see also id.* at 8. If OFAC actually wanted to stop all steps to prepare for the sale, it surely would have done so in much less cryptic language. D.I. 406 at 12.

In any event, OFAC's letter made clear that "[t]he United States will reassess" whether the sale might be consistent with foreign policy, and that it "anticipates doing so during the first half of 2022." D.I. 346-1 at 8. Crystallex has already rebutted Venezuela's argument that these statements do not suggest an "imminent change in OFAC's position." D.I. 408 at 6. As Crystallex explained, it is unheard of for OFAC to provide such a clear invitation to re-apply for a license within a specific, near-term timeframe. D.I. 406 at 13.

Even if OFAC did prefer to wait, the Court need not defer to the policy preferences of the Executive Branch—especially when doing so would compromise the Court's ability to perform its own core duties. *See Republic of Argentina v. NML Capital, Ltd.*, 573 U.S. 134, 141, 146 (2014); *Medellín v. Texas*, 552 U.S. 491, 524 (2008). Consistent with the strong "public . . . interest in the enforcement of judgments," *State Farm Mut. Auto. Ins. Co. v. Am. Rehab & Physical Therapy, Inc.*, 376 F. App'x 182, 184 (3d Cir. 2010), the Court should reaffirm its January 2021 ruling and proceed as far as possible without an OFAC license—*i.e.*, up to the final sale. *See* D.I. 406 at 6.

## II.    The Views Of Others Do Not Provide A Reason To Delay The Sale

There is likewise no merit to Venezuela's attempt to portray Crystallex as standing alone in advocating for the Court to commence the proposed sale procedures, while everyone else is united in their opposition to taking any further steps. *See* D.I. 408 at 2, 4. The Special Master does *not* agree with Venezuela that all proceedings should stop now, and the views of ConocoPhillips and Venezuela itself—a competing creditor and the judgment debtor—should carry no weight

in the Court's analysis of whether to approve procedures and take further steps toward the sale.

Venezuela's depiction of the Special Master as agreeing with Venezuela is sheer fiction. The Special Master agreed with Crystallex that it is appropriate to take further steps to prepare for the sale now, recognizing the need to keep moving forward. Nov. 2021 Tr. at 76:5-14. And the procedures the Special Master proposed contemplate that he might decide to move forward without a formal specific license. D.I. 411-1 at 9. Indeed, Venezuela is actively challenging this aspect of the proposed procedures, D.I. 408 at 13-14, giving the lie to its claim in the same brief that the Special Master agrees with it. The Special Master has made clear, moreover, that his proposal to seek additional guidance from OFAC is motivated not by a view that OFAC's approval is required to launch the process, but rather by the goal of maximizing share value, Nov. 2021 Tr. at 15:6-23—and Crystallex has explained why such guidance is not needed to protect share value, *see infra* at 9-10. Thus while Crystallex and the Special Master may disagree about how quickly to move forward, both agree that neither law nor foreign policy require an OFAC license to proceed.

As for Venezuela and ConocoPhillips, it is of course unsurprising that a judgment debtor and a competing creditor would argue that federal regulations prohibit any further steps toward Crystallex collecting on its judgment. But courts do not typically defer to the views of adjudicated debtors. And ConocoPhillips is not even a party to these proceedings; it has not intervened, and it has no legal right to shape the Special Master sale process. That ConocoPhillips has voluntarily appeared, contributed to the Special Master's payments, and voiced its opinions does not mean that those opinions are entitled to any weight—especially compared to those of Crystallex, the actual adjudicated judgment creditor in these proceedings. The Court should see Venezuela and ConocoPhillips' "agreement" for what it clearly is: A litigation position that aims to protect both.

## III.   Federal Law Does Not Prohibit The Proposed Sale Procedures

As Crystallex has explained, OFAC's sanctions regulations allow the proposed sale. D.I.

406 at 6-12.  Venezuela's latest arguments do not change that conclusion one bit.[2]  The executive orders underlying the regulations do not prohibit the judicially administered steps short of the final sale.  Even if they did, the regulations' authorization of official government business would allow all necessary activities to prepare for the judicial sale up to the actual "transfer" of blocked property.  31 C.F.R. §§ 591.407, 509.  Thus, the regulations permit each of the specific terms of the proposed sale procedures order.  And Venezuela cannot avoid this result by walking back its concession at oral argument, Nov. 2021 Tr. at 97, that the Court need not defer to OFAC FAQ 809.

Given the defects in Venezuela's argument that the proposed sale procedures entail a prohibited "transfer" of blocked property, Venezuela's latest tactic is to argue that two of the executive orders underlying the OFAC sanctions—Orders 13835 and 13808—sweep more broadly than prohibiting "transfers," to include transactions "related to" a sale.  D.I. 408 at 6-7.  That is incorrect.

Executive Order 13835, issued in May 2018, prohibits "[a]ll transactions related to" the "sale . . . *by the Government of Venezuela* of any equity interest" in certain entities.  E.O. 13835 § 1(a)(iii) (emphasis added).  But under the proposed sale procedures, Venezuela is not selling anything; rather, the procedures call for a forced *judicial* sale.

Executive Order 13808, issued in August 2017, likewise prohibits, in § 1(b), the "purchase" of securities "*from the Government of Venezuela*" (emphasis added), not from the Court.  In any event, § 1(b) does *not* prohibit transactions merely "related to" such purchases, as Venezuela

---

[2]  Venezuela erroneously claims that Crystallex's counsel asserted at oral argument that "the regulations . . . had never been raised . . . as an obstacle to the Sale Process."  D.I. 408 at 6 n.3.  To the contrary, Crystallex acknowledged that the regulations had been *cited* before, Nov. 2021 Tr. at 111:23 to 112:12—indeed, Crystallex has addressed them many times in these proceedings, *see, e.g.*, D.I. 147 at 3; D.I. 153 at 2; D.I. 198 at 9-11; D.I. 199 at 16-19; D.I. 201 at 4; D.I. 219 at 4; D.I. 250 at 16; D.I. 268 at 2-3; D.I. 316 at 11-14; D.I. 346 at 1; *see also* Sept. 2020 Tr. at 73:16-19, 114:10-22.  Crystallex's point at argument was that the "full-blown argument . . . about what this language does and what it doesn't do" was raised for the first time in Venezuela's reply briefing and at the November 8 hearing.  Nov. 2021 Tr. at 116:12-20.

claims.  Instead, § 1(a)—a separate provision that Venezuela does not cite—prohibits transactions "related to" *different* activities (*e.g.*, new debt) not relevant here.  In nonetheless suggesting that § 1(b) prohibits transactions "related to" the "purchase" of securities, Venezuela is simply mixing and matching from different provisions, blatantly distorting the language of the order.  *See* D.I. 408 at 7.  Since § 1(b) merely prohibits the actual, complete "purchase" of securities, and no purchase will be complete here without an OFAC license, Order 13808 is simply irrelevant.

The timing of these orders confirms that they do not restrain a judicial sale.  Both orders were issued long before Guaidó entered the picture in January 2019, and long before OFAC or the federal government began to meaningfully engage with the possibility that any court would order the judicial sale of shares of PDVH.  By all accounts, these executive orders were intended to limit the Maduro regime's ability to liquidate state assets to retain power, not to protect Venezuela's assets from legitimate creditors.  *See, e.g.*, E.O. 13835 (explaining that the Order was intended to address "the recent activities of the Maduro regime, including endemic economic mismanagement and public corruption at the expense of the Venezuelan people").

At a minimum, avoidance principles weigh heavily against reading these executive orders so broadly as to prohibit transfers related to a judicial sale when the President has not explicitly said so.  *See* D.I. 406 at 11-12.  Given the significant separation-of-powers implications of curbing the judiciary's ability to enforce its judgments, the President would at least need to speak clearly before his executive orders could have that effect.  *Id*.[3]

---

[3]  Citing *Bank Markazi v. Peterson*, 136 S. Ct. 1310 (2016), Venezuela argues that these separation-of-powers concerns are unfounded, because "[t]he Supreme Court has held that the political branches have constitutional authority to stop courts from attaching, or disposing of attached, foreign-owned property in the United States."  D.I. 408 at 11.  But *Bank Markazi* involved a congressional change in law—not an attempt to constrain the judiciary's exercise of its inherent authority.  *See* 136 S. Ct. at 1317.  In any event, principles of constitutional avoidance require this Court to

Even if the executive orders prohibited the broad range of conduct that Venezuela suggests—and they do not—the proposed sale procedures would be authorized because the regulations provide a general license for "[a]ll transactions that are for the conduct of the official business of the United States." 31 C.F.R. § 591.509. Venezuela asserts that § 407 exempts from this general license certain "transfer[s]" conducted pursuant to judicial process. D.I. 408 at 8-9. But § 407 does not sweep as broadly as Venezuela claims the executive orders sweep. Even if Executive Orders 13808 and 13835 could be construed as prohibiting activities "related to" a sale of PDVH, § 407 *cannot* be so construed, and on its face it applies only to the "transfer" itself. 31 C.F.R. § 591.407. Since none of the proposed sale procedures meet the definition of a "transfer," *see* D.I. 406 at 7-11 & n.1, § 407 is irrelevant, and the general license for official U.S. government business (§ 509) allows any additional activities that would otherwise violate the Executive Orders.

To the extent Venezuela simply rehashes its assertion at oral argument that virtually all steps in the sale process are unlawful transfers, D.I. 408 at 7-8, Crystallex has already explained why that is incorrect, D.I. 406 at 7. Venezuela argues, for example, that certain "agreements" contemplated by the sale procedures—"[t]he making of an agreement with the Stalking Horse Bidder 'for the sale' of blocked property" and "[t]he making of an escrow agreement with each Potential Bidder for the blocked property," D.I. 408 at 10-11—are "transfers" because OFAC's definition of transfers includes any of a range of steps that has the purpose of "facilitating, advancing, or resulting in a transfer," *id.* at 8. But, again, Crystallex has explained that these agreements do not qualify as transfers under the regulations. *See* D.I. 406 at 9-11. The regulations do not prohibit all transactions "facilitating, advancing, or resulting in a transfer"—language that does

---

avoid these weighty separation-of-powers issues in the absence of a clear statement from the Executive Branch, and instead adopt the narrower (and better supported) conclusion that the President has not surreptitiously prohibited all judicial activities related to the enforcement of judgments against Venezuela. *See Bond v. United States*, 572 U.S. 844, 857-58 (2014).

not appear in the regulations.  *See* 31 C.F.R. § 591.310.  Only certain transactions that have the "purpose, intent, or effect" of actually transferring blocked property are prohibited.  *Id.*; D.I. 406 at 7.  The proposed procedures do not have this prohibited purpose, intent, or effect because they would only affect rights in blocked property after that property becomes un-blocked.  *Id.* at 9-11.

Venezuela finally falls back on its tired argument that OFAC's "FAQ No. 809 persuasively interprets [the] regulatory authorities as prohibiting 'concrete steps' towards the disposition of blocked property."  D.I. 408 at 11.  Crystallex has explained—repeatedly—why FAQ 809 is not a correct or persuasive reading of the OFAC regulations and is not entitled to deference under *Kisor v. Wilkie*, 139 S. Ct. 2400 (2019).  *See, e.g.*, D.I. 406 at 1; D.I. 343 at 12-13.  Indeed, at the November 8 hearing, counsel for PDVH conceded that Venezuela was "not asking this Court to defer to FAQ 809."  Nov. 2021 Tr. at 97:1-4.  Now, however, Venezuela is trying to walk back that waiver, arguing in a footnote that "FAQ No. 809 is indeed a reasonable interpretation to which deference would be due under *Kisor*."  D.I. 408 at 12 n.6.  Even if this argument were not waived, it is meritless for the reasons Crystallex has explained:  The FAQs are not duly promulgated regulations; they do not reflect OFAC's authoritative, considered judgment; and the relevant terms of the regulations, such as "transfer or otherwise alter or affect property," are clear by themselves and do not require OFAC's guidance, nor implicate its substantive expertise.  *See* D.I. 343 at 12-13.

## IV.   The Court Should Evaluate The Adequacy Of The Bids After They Exist

Finally, the Court should reject Venezuela's argument against taking any further steps toward the sale now on the ground that the resulting bids might be inadequate.  *See* D.I. 408 at 12-15.  The Court can evaluate the bids when there are actual bids to evaluate.  Until then, Venezuela's speculation—again designed solely to delay—provides no basis to stop the parties and the Special Master from taking whatever steps that can be taken in order for Crystallex to finally collect its judgment.  *See* D.I. 406 at 13-15.  Indeed, Venezuela could cooperate with the OFAC licensing

process if it really wanted to maximize the value of its asset rather than cause delay. *Id.* at 15.

Venezuela argues that it has "legitimate reasons to oppose a piecemeal satisfaction of Crystallex's claim." D.I. 408 at 15. But Venezuela is an adjudicated debtor, liable to Crystallex for the expropriation of Crystallex's assets. Both the judgment against Venezuela, and the particular method of collection at issue in these enforcement proceedings, have been affirmed by the U.S. courts of appeals. Whatever "legitimate" interest Venezuela had in avoiding payment was lost when it lost its judgment. *See Crystallex Int'l Corp. v. Bolivarian Republic of Venezuela*, 932 F.3d 126, 149 (3d Cir. 2019). And contrary to Venezuela's desire for a "global resolution" of its debts, D.I. 408 at 15, this is not a bankruptcy proceeding; it is a judgment-collection proceeding. The federal courts are not in the habit of forestalling collection from adjudicated debtors simply because those debtors have other interests they would like to address.

PDVH and CITGO, for their part, have now hired a lobbying firm to "advocate" the federal government regarding "challenges brought by creditors" of Venezuela. Klein/Johnson Group LLC, FARA Reg. Ex. B (Nov. 30, 2021), https://tinyurl.com/3tuhja3n. They argue that they have the constitutional right to petition for protection against "the destabilizing effects of a forced sale of PDVH's stock," D.I. 408 at 15 n.7, but even if true, that does not change the fact that if the OFAC sanctions they seek depress the value of the shares, their own efforts will be the source of their asserted injury. In any event, PDVH and CITGO's interest is limited to preventing a change in control, *see* D.I. 154 at 12; they have no interest in the price of the shares. And if PDVSA believes the petitioning activity of its subsidiaries is harmful to the value of its asset, PDVSA can direct them to stop. None of this provides any reason to reward Venezuela for its obstruction.

## CONCLUSION

For the reasons set forth above and in Crystallex's briefing on the sale, Crystallex respectfully requests that this Court enter a Sale Procedures Order.

*/s/ Jeffrey L. Moyer*

Raymond J. DiCamillo (#3188)
Jeffrey L. Moyer (#3309)
Travis S. Hunter (#5350)
RICHARDS, LAYTON & FINGER, P.A.
One Rodney Square
920 North King Street
Wilmington, Delaware 19801
(302) 651-7700
dicamillo@rlf.com
moyer@rlf.com
hunter@rlf.com

*Attorneys for Plaintiff*

OF COUNSEL:

Robert L. Weigel
Jason W. Myatt
Rahim Moloo
GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue
New York, New York 10166
(212) 351-4000

Miguel A. Estrada
Lucas C. Townsend
Adam M. Smith
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, D.C. 20036
Tel: (202) 955-8500
Fax: (202) 467-0539

Dated:  December 8, 2021