## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| CRYSTALLEX INTERNATIONAL CORPORATION,<br><br>    Plaintiff,<br><br>    v.<br><br>BOLIVARIAN REPUBLIC OF VENEZUELA,<br><br>    Defendant. | Misc. No. 17-151-LPS |

Raymond J. DiCamillo, Jeffrey L. Moyer, and Travis S. Hunter, RICHARDS, LAYTON & FINGER, P.A., Wilmington, DE

Robert L. Weigel, Jason W. Myatt, and Rahim Moloo, GIBSON, DUNN & CRUTCHER LLP, New York, NY

Miguel A. Estrada, Lucas C. Townsend, and Adam M. Smith, GIBSON, DUNN & CRUTCHER LLP, Washington, DC

     Attorneys for Crystallex International Corporation


Kenneth J. Nachbar and Alexandra M. Cumings, MORRIS, NICHOLS, ARSHT & TUNNELL LLP, Wilmington, DE

Michael J. Gottlieb, David J. L. Mortlock, and Samuel G. Hall, WILLKIE FARR & GALLAGHER LLP, Washington, DC

Nathan P. Eimer, Lisa S. Meyer, Daniel D. Birk, and Gregory M. Schweizer, EIMER STAHL LLP, Chicago, IL

     Attorneys for PDV Holding, Inc. and CITGO Petroleum Corp.


Samuel Taylor Hirzel, II, HEYMAN ENERIO GATTUSO & HIRZEL LLP, Wilmington, DE

Joseph D. Pizzurro, Julia B. Mosse, Kevin A. Meehan, and Juan O. Perla, CURTIS, MALLET-PROVOST, COLT & MOSSE LLP, New York, NY

     Attorneys for Petróleos de Venezuela, S.A.

A. Thompson Bayliss and Stephen C. Childs, ABRAMS & BAYLISS LLP, Wilmington, DE

Donald B. Verrilli, Jr., Elaine J. Goldberg, Ginger D. Anders, Brendan B. Gants, and Jacobus P. van der Ven, MUNGER, TOLLES & OLSON LLP, Washington, DC

George M. Garvey, MUNGER, TOLLES & OLSON LLP, Los Angeles, CA

     Attorneys for Bolivarian Republic of Venezuela


Garrett B. Moritz, ROSS ARONSTAM & MORITZ LLP, Wilmington, DE

Michael S. Kim, Marcus J. Green, and Josef M. Klazen, KOBRE & KIM LLP, New York, NY

Richard G. Mason, Amy R. Wolf, and Michael H. Cassel, WACHTELL, LIPTON, ROSEN & KATZ, New York, NY

     Attorneys for Phillips Petroleum Co. Venezuela Ltd. and ConocoPhillips Petrozuata B.V.


Myron T. Steele, Matthew F. Davis, and Abraham Schneider, POTTER ANDERSON & CORROON LLP, Wilmington, DE

Ray Schrock, Alexander W. Welch, and Jason L. Hufendick, WEIL, GOTSHAL & MANGES LLP, New York, NY

     Attorneys for Special Master Robert B. Pincus

---

## OPINION

March 2, 2022
Wilmington, Delaware

**STARK, U.S. District Judge:**

Much has happened in this long-running litigation.[1]  Much more remains to be done. As the Third Circuit expressly stated just weeks ago, "the District Court's judicial role in this civil action is far from over." *Crystallex Int'l Corp. v. Bolivarian Republic of Venezuela*, 24 F.4th 242, 255 (3d Cir. 2022) ("*Crystallex II*").[2]

In this Opinion, the Court addresses, and rejects, what the Bolivarian Republic of Venezuela, Petróleos de Venezuela, S.A. ("PDVSA"), PDV Holding, Inc. ("PDVH"), and CITGO Petroleum Corporation (collectively, the "Venezuela Parties") describe as "the

---

[1] For example, on August 9, 2018, this Court authorized the issuance of a writ of attachment. *See generally Crystallex Int'l Corp. v. Bolivarian Republic of Venezuela*, 333 F. Supp. 3d 380 (D. Del. 2018) (D.I. 79).  The Third Circuit affirmed that decision. *See generally Crystallex Int'l Corp. v. Bolivarian Republic of Venezuela*, 932 F.3d 126 (3d Cir. 2019) ("*Crystallex I*").  The Supreme Court subsequently denied a petition for a writ of certiorari. *Bolivarian Republic of Venezuela v. Crystallex Int'l Corp.*, 140 S. Ct. 2762 (2020) (mem.).

[2] On January 14, 2021, this Court issued an opinion denying a motion to quash a writ of attachment and a motion for relief from final judgment. *See generally Crystallex Int'l Corp. v. Bolivarian Republic of Venezuela*, 2021 WL 129803 (D. Del. Jan. 14. 2021) (D.I. 234).  The Court also announced at that time that it would appoint a Special Master to design and implement the sale process. *See id.* at *17.

In *Crystallex II*, the most recent appeal to be generated by this litigation, the Third Circuit dismissed the Venezuela Parties' appellate challenge to this Court's denial of the motion to quash and the Court's decision to begin developing sale procedures.  Applying a "practical test" – which, in this post-judgment context, asks whether "all that remains is for a non-judicial officer to take and dispose of the defendant's property" – the Third Circuit concluded that this Court had not yet reached a final, appealable decision. *Crystallex II*, 24 F.4th at 249 (internal quotation marks omitted).  The Third Circuit explained: "The District Court must, at the very least, still rule on pending legal objections to the special master's recommended judicial sale procedures. The District Court's judicial involvement is ongoing . . . [and] there is no practical finality." *Id.* The Third Circuit additionally held that this Court's "decision to determine sale procedures in the future with the advice of a special master" was non-final and unappealable. *Id.* at 256.

fundamental problems" with the Proposed Sale Procedures Order ("Proposed Order")[3] submitted

by the Special Master.   (D.I. 423 at 1)   These objections have been the subject of extensive

briefing (*see, e.g.*, D.I. 316, 317, 319, 339, 340, 341, 343, 385, 406, 408, 418, 419, 421, 423) and

nearly a full day of oral argument on November 8, 2021 (*see* D.I. 409) ("Tr.").[4]

## I.   Neither Evercore Nor The Special Master Has A Disqualifying Conflict Of Interest

The Venezuela Parties contend that the role played to date by the Special Master's

investment bank advisor, Evercore Group L.L.C. ("Evercore"), and the Special Master's

proposed role for Evercore in implementing the Proposed Order, create a nonwaivable, incurable

conflict of interest for Evercore (and perhaps also for the Special Master).   In particular, the

Venezuela Parties point to the Proposed Order's inclusion of a contingency fee, or success fee,

that could result in payments in excess of $30 million to Evercore.   (*See* D.I. 303 at 11-12)[5]   In

---

[3] The most recently-filed version of the Proposed Order is the Third Revised Proposed Sale Procedures Order.   (D.I. 411-1; *see also* Tr. at 20 (Special Master describing Proposed Order as "quite lengthy," which is unsurprising given that it involves "a multi-billion dollar enterprise" and reflects input from multiple parties having their own competing "parochial interest[s]"))   In response, the Venezuela Parties filed an Updated Summary and Status of the Sales Process Parties' Objections to Sale Procedures Order.   (D.I. 423-2)   With respect to the "fundamental" issues addressed by the Court in the instant Opinion, the differences between the multiple versions of the Proposed Order and the various iterations of the Venezuela Parties' objections are largely immaterial.

[4] The Court reviews all objections involving factual or legal issues *de novo*.   (D.I. 277 at 7; *see also* Fed. R. Civ. P. 53(f)(3))

[5] More specifically, the Venezuela Parties contend:

> Evercore advised the Special Master's design of a proposed sale procedures order while anticipating that it would receive a contingency fee based on the total amount sold.   That conflict is particularly acute given that Evercore's fee will also include 0.35% of all of the debt of PDVH and its direct and indirect subsidiaries if

2

the Venezuela Parties' view, Evercore has an interest that could be substantially affected by the outcome of the instant proceedings, resulting in Evercore's impartiality being reasonably questioned.   (*See* D.I. 317 at 16-18)   The Venezuela Parties reason that, if the Proposed Order is adopted and implemented, "Evercore will, for [its] own personal gain, encourage [the Special Master] to recommend to the Court a process that ensures the sale of 100% of the PDVH Shares."   (D.I. 303 at 12; *see also* D.I. 317 at 16-18)   According to the Venezuela Parties, then, Evercore (and possibly the Special Master) must be disqualified under 28 U.S.C. § 455(a) and (b)(4), and the effort to craft a Proposed Order must begin again.   (*See* Tr. at 47; *see also* D.I. 385 at 6 ("The only way to cure Evercore's conflict of interest is to reject the Special Master's recommendation and instruct him to conduct a new process after retaining an unconflicted financial advisor."); D.I. 423 at 7)

The Court concludes that neither Evercore nor the Special Master suffers from a conflict of interest.   The Venezuela Parties' requests that Evercore be disqualified and that the Proposed Order be discarded due to a conflict of interest are rejected.   Their objections on these points are overruled.

The judicial impartiality requirements of 28 U.S.C. § 455 extend to special masters.   *See* Fed. R. Civ. P. 53(a)(2).   A special master must be disqualified if he has "any . . . interest that could be substantially affected by the outcome of the proceeding."   28 U.S.C. § 455(b)(4). Additionally, a special master must be disqualified if "his impartiality might reasonably be

---

100% of the shares are sold – a powerful incentive for Evercore to structure and implement a process designed to achieve that result – even for a fire sale price – rather than a sale of a minority stake of PDVH.

(D.I. 385 at 2-3) (footnote omitted)

questioned." *Id.* § 455(a).   The relevant inquiry is whether an "objective, reasonable layperson," who is aware of all the facts, would determine that the judicial officer's impartiality might reasonably be questioned.   *In re Kensington Int'l Ltd.*, 368 F.3d 289, 301-03 (3d Cir. 2004).

As an initial matter, a key factual premise underlying the Venezuela Parties' objection is not correct.   For the alleged conflict to exist, it is necessary that Evercore be retained not just at the first stage of the Court's process (the design of the Proposed Order) but also at the second stage (the implementation of the sale process).   (*See* Tr. at 142, 145, 157-58)   Although the Venezuela Parties and their financial advisor assert that Evercore has been retained for (or at least promised) the second-stage assignment,[6] the record does not support this contention. Instead, the Special Master has proven by a preponderance of the evidence, and the Court finds, that Evercore has ***not*** been promised a contingency fee at the implementation stage as partial compensation for work that it has already performed at the design stage.   (*See, e.g.*, Tr. at 161-62)[7]

---

[6] The Venezuela Parties allege that "Evercore assumed the roles of advisor, proposer, and ***implementer*** of the process, even ***granting itself a 'success' fee*** based on the size of the transaction." (D.I. 317 at 4) (emphasis added)   That is inaccurate, as explained in this section of the Opinion.   The Venezuela Parties' declarant, Randall J. Weisenburger, has the same misunderstanding.   (*See, e.g.*, D.I. 317-1 at 6) ("Where the Special Master's process went astray was in tasking Evercore with assisting with due diligence ***and*** with designing a transaction process that ***Evercore itself would eventually run and collect enormous fees for completing***.") (second emphasis added)

[7] The Court's conclusion is based on and entirely supported by the record.   (*See, e.g.*, Tr. at 142 (Venezuela Parties agreeing that Evercore performed work during design stage for ***fixed*** fee); *see also id.* at 161-62 (Special Master confirming that Evercore was not paid contingency fee for work to date))   In an abundance of caution, the Court conferred with the Special Master on this point.   (The parties are reminded that the Court may meet, has met, and expects to

For example, the record includes a declaration from William O. Hiltz, a Senior Managing

Director at Evercore.   Mr. Hiltz states:

> On June 2, 2021, Evercore was engaged to provide investment
> banking and advisory services in connection with the Special
> Master's ***design of a plan*** for the sale of shares . . . as necessary to

_____

continue to meet *ex parte* with the Special Master.   *See generally* D.I. 277 at 5 ("The Special
Master may communicate *ex parte* with the Court, any Party, any Party's attorneys,
ConocoPhillips, and ConocoPhillips' attorneys at the Special Master's discretion as necessary to
carry out his duties."))   The Special Master provided a copy of the June 2, 2021 engagement
letter between himself, in his capacity as Special Master, and Evercore.   (The Court understands
that this document was previously provided to all the Sale Process Parties.   For the
completeness of the record, the Court will be docketing the engagement letter under seal.)   It
confirms the Court's finding that Evercore has, to date, been retained to perform only the first-
stage work of designing the Proposed Order and not also the second-stage work of implementing
it.

The engagement letter provides:

> The Special Master acknowledges that the scope of Evercore's
> services pursuant to this engagement is ***solely limited to*** all actions
> reasonably requested by the Special Master in connection with
> obtaining entry of the Sale Procedures Order, including (i) the
> design of the Sale Procedures Order, (ii) any testimony or related
> services to be provided in connection with obtaining entry of the
> Sale Procedures Order, and (iii) assisting the Special Master and
> his counsel to ascertain, pursuant to the *Order Regarding Special
> Master of the Court* entered on May 27, 2021 [Docket No. 277],
> the total amounts of the outstanding judgment owed to Crystallex
> International Corp. by the Republic of Venezuela and the total
> amount of the outstanding judgment owed to Phillips Petroleum
> Company Venezuela Limited and ConocoPhillips Petrozuata B.V.
> by PDVSA, it being understood that, absent prior agreement by
> Evercore, Evercore's services hereunder ***shall not include***
> conducting or facilitating due diligence, contacting or otherwise
> communicating with potential buyers, preparing marketing
> materials, creating or maintaining a data room or any other
> substantive services customarily rendered by a financial advisor in
> a sale process.

(D.I. 442 at 1-2) (emphasis added; abbreviations omitted)   The engagement letter goes on to set
the fixed "work fee" that Evercore earned for the design stage.

> satisfy the outstanding judgment of Crystallex . . . and/or devise
> such other transaction as would satisfy such outstanding
> judgment(s) while maximizing the sale price of any assets to be
> sold . . . .

(D.I. 303-1 Ex. A at 1-2 (emphasis added); *see also id.* at 4 ("I have worked closely with the

Special Master and his other Advisors to assist him with, among other things, ***designing a sale***

***process*** in accordance with his mandate and which balances many competing interests while

seeking to provide the best opportunity for achieving a value-maximizing Sale Transaction.")

(emphasis added))

It is clear that Mr. Hiltz ***hopes*** Evercore will obtain the implementation assignment as

well.   For instance, he notes, "Evercore has developed relevant experience and expertise

regarding the Crystallex Case, PDVH, and CITGO that makes it well-suited to advise the Special

Master and the Court in connection with entry of the Sale Procedures Order and the ultimate

implementation thereof."   (*Id.* at 5)   But touting Evercore's experience and reputation – which

the Venezuela Parties acknowledge (*see* D.I. 341 at 20) – is not nearly the same as believing (or

knowing) that the job has already been won.

While the Special Master has recommended that the Court permit him to retain Evercore

to implement the Proposed Order, and while he has negotiated several drafts of a retention

agreement with Evercore, he needs the Court's approval to hire Evercore for this assignment.

Like the Sale Process Parties,[8] he knows that the Court will not grant such approval until after

considering any objections.

---

[8] The Sale Process Parties are Crystallex and the Venezuela Parties as well as Phillips
Petroleum Company Venezuela Limited and ConocoPhillips Petrozuata B.V. (together,
"ConocoPhillips").   The Sale Process Parties have all contributed to funding the Special
Master's work.

Relatedly, in designing the Proposed Order, *Evercore* knew that the Special Master's proposal would be heavily scrutinized and subject to an objections process, after which the Court would decide what to include in the Sale Procedures Order.   Accordingly, Evercore knew that if Evercore included a provision in the Proposed Order that was based on its self-interest, rather than on what Evercore genuinely believed to be appropriate to the process the Special Master will undertake, one or more of the Sale Process Parties would object, and the Court would likely be persuaded to strike any such provision.   At that point, Evercore would also have reasonably (and rightly) expected that the Court would disqualify it from any further participation in this process.   The scenario of self-interest posited by the Venezuela Parties is simply implausible.

While the Special Master is subject to 28 U.S.C. § 455, the parties have not directed the Court to any cases applying the statute to a special master who has been tasked with implementing a judicial sale to satisfy a judgment.   Nor has the Court found any such case. Thus, there appears to be no case law directly supporting the Venezuela Parties' position.

The Venezuela Parties' efforts to analogize the circumstances presented here to those in cases in which courts have found conflicts of interest are unavailing.   For example, in *Kensington*, 368 F.3d at 303-04, the Third Circuit determined that supposedly neutral advisors appointed to assist a District Judge in asbestos-related matters operated under a "structural conflict of interests" because they were simultaneously serving as advocates for asbestos claimants in a separate, related bankruptcy case.   Because that conflict tainted the District Judge, he was disqualified under § 455.   By contrast, here, neither the Special Master nor Evercore owes competing fiduciary duties to any person or entity.   Evercore's sole job is to maximize the value of the assets being sold (the PDVH Shares).   Moreover, while in *Kensington* the District

7

Judge was continuing to rule on the merits of applicable disputes, the merits of the dispute between Crystallex and the Venezuela Parties were long ago reduced to a final judgment.   In this posture, the Court is engaged in a post-judgment enforcement proceeding; the Special Master and his advisors – like the Court itself – have no occasion to adjudicate the merits of claims against the Venezuela Parties.

Similarly, in *In re Kempthorne*, 449 F.3d 1265, 1270 (D.C. Cir. 2006), the D.C. Circuit rejected a special master's work product because his advisor "stood to gain financially from" the special master reaching a particular result.   *Kempthorne* is not binding on this Court and, more importantly, is inapposite.   In that case, the special master hired an advisor who worked for one of the players in the underlying dispute against the Department of the Interior.   *See id.* at 1267. In fact, the advisor and his company had accused the Department of wrongdoing, and the company had unsuccessfully moved to intervene to pursue its own claims against the Department.   *See id.*   Given his employment, the advisor was not impartial in his view of the underlying dispute.   Therefore, the D.C. Circuit ordered the suppression of the special master's reports, noting that his advisor "colored the way in which [the special master] approached his task, and ultimately his . . . recommendations to the district court."   *Id.* at 1270 (internal quotation marks and brackets omitted).   The relationships among the players in the instant case are entirely different.   No party has suggested that when Evercore was retained, it had reason to favor one of the Sale Process Parties over the others.   Evercore does not stand "to gain financially from" the sale of the PDVH Shares in the way that the *Kempthorne* advisor would have benefitted from a ruling for his own employer.

The Court's procedures provide additional protections against purported conflicts or

misguided incentives tainting the sale process.   Those procedures include both those that the

Court has followed to date, such as extensive briefing and argument on the Sale Process Parties'

objections to the Proposed Order, and those the Court will follow during a similar period of

objections and argument after the bidding process has concluded and the Special Master has

made whatever recommendations he will make regarding which bid (if any) the Court should

accept.   The Venezuela Parties insist that "[t]he mere fact that a party may object to tainted

recommendations stemming from a conflicted advisor does nothing to obviate the structural

problem of having a conflicted advisor in the first place."   (D.I. 385 at 4) (citing *In re Brooks*,

383 F.3d 1036, 1045-46 (D.C. Cir. 2004))[9]   Whether or not this Court agrees with this

proposition, the important point is that the Venezuela Parties' argument presupposes that the

Special Master's advisor is conflicted – yet, as explained above, there is no such conflict.

The Court agrees with the Special Master that these proceedings have not been tainted by

a proposed contingency fee that has been disclosed and is still being vetted, subject to the parties'

objections, and to which all parties other than the judgment debtor have agreed.   (*See* Tr. at 150)

In preparing the Proposed Order, the Special Master conducted an open and transparent process,

engaging repeatedly with the Sale Process Parties and iteratively modifying his proposal in an

effort to accommodate as many competing concerns as possible while still fulfilling the mandate

given to him by the Court.   (*See, e.g.*, D.I. 303 at 18-19) (describing initial engagement with

---

[9] In *Brooks*, 383 F.3d at 1046, the D.C. Circuit suppressed the special master's work product because his advisor "had personal knowledge of the parties . . . from prior dealings with them."   Here, by contrast, there is no record of any prior dealings between Evercore and the Sale Process Parties.   Nor does the Court discern any basis to believe that Evercore's recommendations may have been tainted by "selection bias" that might leave "no trace in the record."   *Id.* (internal quotation marks omitted).

Sale Process Parties)   As the Special Master has explained, he and his advisors "have endeavored to develop a sale process for the PDVH Shares with two guiding objectives": "(i) to design a process that will result in a sale transaction that is fair, open, and maximizes the value of the PDVH Shares to be sold, and (ii) to ensure the diverse, and frequently conflicting, views of the Sale Process Parties are solicited and considered in the development and implementation of such a process."   (D.I. 341 at 1)   The challenges of this process are heightened by the fact that this case arises, as the Special Master accurately states, "in a dynamic and internationally sensitive set of circumstances."   (D.I. 303 at 1)   In other words, the Special Master's task is a monumental and challenging one, as even the Venezuela Parties observe.   (*See, e.g.*, D.I. 317 at 1) ("The size and complexity of the assets to be sold in this Delaware execution sale are . . . unprecedented.")[10]   It is one that the Court would not be able to undertake successfully without the Special Master's assistance.   This context is important and would be known to a reasonable layperson evaluating the Special Master's (and Evercore's) process.

It is notable, as well, that everything Evercore has done is consistent with industry standards.   (*See, e.g.*, Tr. at 149, 151)   Importantly, nothing Evercore has done to date would, in the Court's view, cause a reasonable layperson, armed with the facts, to question Evercore's (or the Special Master's) impartiality.   Instead, the Court agrees with Crystallex: "[T]here is nothing improper with compensating the Special Master's financial advisors by paying a properly calibrated Sale Fee based on the outcome of the auction as such a fee can incentivize the

---

[10] The Venezuela Parties' declarant, Mr. Weisenburger, likewise recognizes that the Special Master has been given "an extraordinarily difficult and unprecedented assignment." (D.I. 317-1 at 9; *see also* D.I. 339 at 5 (ConocoPhillips noting that these proceedings are "occurring in an extraordinary legal and foreign policy landscape"))

financial advisors to obtain the maximum price possible from the sale of a complicated asset."
(D.I. 343 at 6)

The Court will order the Special Master to continue his negotiations regarding Evercore's possible retention for the implementation of the Court's Sale Procedures Order.[11]   As part of that effort, the Special Master will be instructed to try to obtain an agreement that Evercore's compensation will not be contingent on the successful sale of the PDVH Shares.   (*See* D.I. 303 at 16 n.11; *see also* Tr. at 148, 152)   The realistic prospect of eliminating that provision further undermines the Venezuela Parties' claim of a disqualifying conflict of interest.

As a final protection, if the Venezuela Parties (or any of the other Sale Process Parties) believe that they have a good-faith basis to do so, they may object to the retention of the investment bank that the Special Master recommends for the implementation stage following his negotiations.   To be clear, the Court has overruled the Venezuela Parties' objection that the process to date has been tainted by an incurable conflict of interest, and the Court does not intend to hear additional argument on that issue.   Nonetheless, the Sale Process Parties will have an opportunity to object to the execution of whatever final retention agreement, with whichever investment bank, the Special Master recommends after his forthcoming negotiations.

In sum, the Venezuela Parties' argument that the process to date is already so tainted by conflict that the Court must scrap the Special Master's work and begin again lacks merit.   The Venezuela Parties acknowledge that Evercore has not yet been paid a contingency fee.   (*See* Tr.

_____

[11]  The Court additionally agrees with Crystallex that the Court can "mitigate [any] potential conflict by requiring that any engagement agreement with a financial advisor contain provisions requiring the financial advisor to justify the reasonableness of their fees before they are paid."   (D.I. 343 at 19 n.6)   The Special Master will be directed to use his best efforts to include such a provision in the next version of the retention agreement negotiated with Evercore.

at 142-43)   The Venezuela Parties also concede that payment of a contingency fee to an investment bank that runs the second-stage implementation of the sale is not, per se, a problem. (*Id.* at 144)   The problem that the Venezuela Parties are concerned about could be eliminated by the Special Master retaining, for the second stage, an investment bank other than Evercore, or retaining Evercore on a non-contingency basis.[12]   The Special Master will attempt to negotiate a non-contingency retention with Evercore and will thereafter make an updated recommendation to the Court as to which investment bank to retain for the implementation stage – and on what terms.   The Venezuela Parties will have an opportunity at that point to object to that recommendation if they feel that they have a new, meritorious basis to do so.

Accordingly, for the reasons stated above, nothing that has occurred to date creates either a disqualifying conflict of interest or even the appearance of partiality for either Evercore or the Special Master.   The Venezuela Parties' objection on this point is overruled.

## II.   An OFAC License Is Not Necessary To Continue With The Sale Process, And The Court Will Not Wait For One

As the Special Master writes, one thing all the Sale Process Parties appear to agree on is that "the most crucial and most polarizing issue for the Court to decide at this stage is when the Marketing Process should be launched in relation to obtaining approval or guidance from the United States Government."   (D.I. 341 at 3)   The parties vehemently disagree with one another as to when the Court may, or should, adopt a Sale Procedures Order and begin implementing it.

---

[12] To the extent the Venezuela Parties argue that the problem cannot be completely eliminated because Evercore designed the sale process while it was expecting a contingency fee for work performed during the second stage, that argument rests on the faulty premise that the Special Master already promised to retain Evercore to implement the sale process.   As explained above, the Court rejects that premise.

Crystallex requests that the Court adopt a Sale Procedures Order immediately and begin the sale process as soon as possible. In Crystallex's view, the law – and in particular, the sanctions regime imposed by the United States on Venezuela – does not preclude the Court from adopting a Sale Procedures Order and taking steps in accordance with it, short of executing a sale. Crystallex has always agreed that the execution of the sale (but *only* that last step of the sale process) requires a specific license from the U.S. Treasury Department's Office of Foreign Assets Control ("OFAC").[13]   As Crystallex writes:

> The Court should enter a sale procedures order that immediately commences the process of preparing for, advertising, and conducting a contingent bidding process for the shares of PDVH to finally satisfy Crystallex's affirmed judgment. Because the process would only transfer Venezuela's property after OFAC's approval, none of the proposed procedures would violate federal sanctions regarding foreign property.

(D.I. 421 at 1; *see also* D.I. 343 at 5 ("OFAC regulations do not prohibit the development of a sale process, merely its completion."))

---

[13] Throughout this lengthy litigation, Crystallex has maintained that the completion of any sale process (i.e., the transfer of the PDVH Shares) cannot occur unless and until OFAC issues a specific license. (*See, e.g.*, D.I. 343 at 14 ("To be clear Crystallex recognizes that no sale can take place without an OFAC license."); *see also* D.I. 234 at 15 ("All involved in this litigation, including Crystallex, recognize that (under current law and policy) a specific license will be required from OFAC before a sale of PDVSA's shares of PDVH can close.")) Given Crystallex's repeated recognition of this reality, the Court reads Crystallex's most recent acknowledgement that "it will *likely* need a specific license from OFAC before the PDVH shares can be transferred" as a clumsy reiteration of its consistent position, not as a first step in a retreat from it. (D.I. 406 at 4) (emphasis added)

The Third Circuit shares the Court's understanding of Crystallex's position. As that Court recently wrote, "Crystallex . . . [has] moved for a contingent auction of PDVSA's shares pending a license from OFAC." *Crystallex II*, 24 F.4th at 248; *see also id.* at 255-57 (containing additional references to Crystallex's request for "contingent auction").

13

Crystallex further believes that initiating the sale process without a license and without any further guidance from OFAC will not necessarily lead to a lack of robust participation or the deflation of the PDVH Shares' value.   In any event, even if Crystallex is wrong with respect to this prediction, it still believes the process must begin now, given that Crystallex is an affirmed judgment creditor who has been waiting to get paid for a decade.   (*See, e.g.*, Tr. at 25) ("We have been waiting for ten years . . . .   We're trying to finally get what is due to us.")

The Venezuela Parties see things much differently.   In their view, "launching the Proposed Sale and Bidding Procedures now would violate federal law, undermine the clearly expressed policy interests of the Executive Branch, and almost certainly result in a fire sale of the PDVH shares in violation of Delaware law."   (D.I. 408 at 1 (internal citation omitted); *see also id.* at 3 (suggesting that Proposed Order "would authorize steps by private parties that are unambiguously prohibited under the regulations") (emphasis omitted); *id.* at 6 ("Without a specific license from OFAC, the Sale Process contemplated by the Special Master cannot be launched consistent with federal law."); D.I. 340 at 2 ("[C]ommencing the sale process proposed by the Special Master without an OFAC specific license is unequivocally barred by OFAC regulations at this time, and any participation by bidders, Sale Process Parties, or any third parties needed for support in a sale process now would be unlawful."))

The Venezuela Parties object to adopting a Sale Procedures Order because, in their view, the Court cannot, as a matter of law, take any further steps toward effectuating a sale of the PDVH Shares while those shares are blocked property under the current U.S. sanctions regime. (*See, e.g.*, D.I. 408 at 11 ("[T]he Sale Process is barred by the plain meaning of the text of the executive orders and published regulations . . . ."); Tr. at 58 ("[O]ur fundamental position with

respect to whether the process should go forward is it shouldn't go forward because the sanctions regime bars it.")) According to the Venezuela Parties, the sanctions prohibit not only the final transfer of blocked property, but also all steps that are in any way related to, or undertaken for the purpose of, transferring such property.

Second, the Venezuela Parties argue that even if a specific license were not necessary to launch the sale process, without such a license the market will have so much uncertainty as to whether OFAC will approve an eventual sale that any sale process will be doomed to fail. That is, "moving forward with the Sale Process now would chill bidding and sabotage the ultimate sale." (D.I. 419 at 9) In other words, proceeding without an OFAC license will result in a winning bid that so undervalues the PDVH Shares that the Court will be required, under Delaware law, to reject it. Hence, the Venezuela Parties believe that launching the sale process without an OFAC license "would at best be wasteful and unnecessary, and at worst result in a violation of Delaware law." (*Id.* at 10)

For his part, the Special Master agrees with Crystallex that the sanctions regime does not necessarily preclude the Court from adopting a Sale Procedures Order and beginning to implement it. (*See* Tr. at 15) The Special Master does not believe a specific license from OFAC is required to launch the sale process. (*See, e.g.*, D.I. 411-1 at 9-10) (proposing launch upon receipt of additional "guidance" from OFAC) However, the Special Master also believes, as an empirical matter, that if the sale process were to begin without more guidance from OFAC, the result is unlikely to be a value-maximizing transaction.

More particularly, the Special Master proposes that the Court not launch the sale process until OFAC provides at least some additional guidance on whether OFAC believes that the sale

15

process is permissible under current law or whether a specific license to effectuate an eventual sale is likely to be granted. "The Special Master believes that a written statement, or otherwise publishable or disclosable information, from OFAC, reflecting authorization or its non-objection, with proceeding with the Marketing Process will be necessary before Potential Bidders will be willing to participate in the Marketing Process." (D.I. 411-3 at 8) He adds: "Uncertainty surrounding what, if any, transaction OFAC will ultimately license creates an overhang that . . . will materially chill bidding." (D.I. 303 at 35) On this point, the Special Master is supported by his financial advisor, Mr. Hiltz of Evercore. (D.I. 303-1 Ex. A at 8) The Special Master recommends that the Proposed Order be adopted and that it include a "trigger" such that implementation of the sale process will begin only when the Special Master receives additional assurance from OFAC that he can share with the market. (*See, e.g.*, Tr. at 14) (Special Master proposing that sale process be launched "once we get publishable information or guidance from OFAC regarding their support [or] non-objection")

The Court has also heard from ConocoPhillips, which does not take a position on the legality of adopting a Sale Procedures Order and implementing it. (*See generally* D.I. 418; *see also* Tr. at 62 (ConocoPhillips noting that it successfully "worked through [its] issues with the Special Master")) ConocoPhillips insists, however, that the parties' disputes on these legal issues "amply demonstrate that launching the sales process without written guidance from OFAC would be a waste of the Court's time and the Sale Process Parties' money." (D.I. 418 at 1) ConocoPhillips supports the Special Master's "thoughtful compromise," which would defer launch of the sale process until OFAC issues additional guidance (if it ever chooses to do so). (*See id.*)

16

After carefully considering the positions of the Sale Process Parties and the Special Master, which have been thoroughly briefed and argued, the Court has concluded that: (i) the law, including the current sanctions regime, does not prevent the Court from taking prefatory steps toward a sale of the PDVH Shares, including the adoption a Sale Procedures Order and its implementation; (ii) to reduce the risk that uncertainty about the sanctions regime will deter value-maximizing bids, the Court will provide the Special Master with a period of up to six months after entry of the Sale Procedures Order to recommend that implementation begin (or not); (iii) during that six-month window, the Special Master will be directed to use his best efforts to obtain guidance from OFAC that may be shared with the market expressing OFAC's view of the process and the likelihood that it will issue a specific license for a sale to close; and (iv) once the Special Master has had an opportunity to seek OFAC input, and after the Special Master makes a recommendation as to whether the sale process should begin, the Sale Process Parties will have a final opportunity to provide their views on whether the Court should proceed – and then the Court will decide whether to do so.[14]

### A.   Current Law Does Not Prohibit The Court From Launching A Sale Process Even Without A Specific License From OFAC For Any Participant

In January 2021, the Court stated, as a general matter, that the time had come "to set up the sales procedures and then to follow them to the maximum extent that can be accomplished

---

[14] The Court does not believe that proceeding in this manner is likely to be wasteful, notwithstanding the contrary views of the Venezuela Parties and ConocoPhillips. Even if the Court lacked confidence on this point (and it does not), it would still proceed in this manner for the reasons stated throughout this Opinion. Moreover, the Third Circuit recently rejected the notion that the potential for wasteful proceedings should stop this litigation at this point. *See Crystallex II*, 24 F.4th at 255 (enforcing finality requirement despite possibility of wasteful proceedings).

without a specific license from OFAC." (D.I. 234 at 32-33)   Nonetheless, the Venezuela Parties are correct that the Court has "never adjudicated whether the acts, transactions, or agreements [specifically] contemplated in the [Special Master's proposed] Sale Process may move forward before an OFAC license is granted." (D.I. 408 at 1)   Now that the Special Master has presented the Court with a detailed Proposed Order, and now that the parties have made their objections, the time has come for the Court to address whether the current sanctions regime prohibits adoption of a Sale Procedures Order and the launch of the sale process.   The Court concludes that nothing prohibits it from taking such actions, even if no party has obtained a specific license from OFAC.   The Court has not been pointed to any legal authority or any other aspect of the sanctions regime that bars the Court from proceeding with a sale process, up to and including the selection of a winning bidder, provided that legal title to the PDVH Shares is not transferred until after the winning bidder obtains a specific license.

To explain the Court's conclusion, it is necessary to first describe the current sanctions regime.   In March 2015, the President issued an executive order ("E.O.") declaring a national emergency under the International Emergency Economic Powers Act ("IEEPA"), 50 U.S.C. § 1701 *et seq.*, regarding the humanitarian crisis in Venezuela.   *See generally* E.O. 13,692, 80 Fed. Reg. 12,747 (Mar. 8, 2015).   OFAC later promulgated a regulation under which "[a]ll transactions prohibited pursuant to" that executive order or any subsequent, related executive orders "are prohibited."   31 C.F.R. § 591.201.   A related regulation similarly prohibits "the enforcement of any lien, judgment, arbitral award, decree, or other order through execution,

18

garnishment, or other judicial process purporting to transfer or otherwise alter or affect property or interests in property blocked pursuant to § 591.201." *Id.* § 591.407.[15]

From this starting point, several additional executive orders are potentially relevant. The first, E.O. 13,808, 82 Fed. Reg. 41,155 (Aug. 24, 2017), provides that "[t]he purchase, directly or indirectly, by a United States person or within the United States, of securities from the Government of Venezuela . . . is prohibited." § 1(b). The Court agrees with Crystallex that this provision "merely prohibits the actual, complete 'purchase' of securities, and no purchase will be complete here without an OFAC license." (D.I. 421 at 7) Moreover, it is not clear in this case that securities would be purchased "from the Government of Venezuela,"[16] as the executive order requires, because arguably the PDVH Shares will be purchased from this Court in a forced judicial sale. (*See* D.I. 421 at 6) Regardless, the Venezuela Parties have withdrawn their reliance on E.O. 13,808. (*See generally* D.I. 422) Thus, E.O. 13,808 poses no impediment to the procedures outlined in the Proposed Order.

The next potentially relevant executive orders are E.O. 13,850, 83 Fed. Reg. 55,243 (Nov. 1, 2018), and E.O. 13,884, 84 Fed. Reg. 38,843 (Aug. 5, 2019). These orders provide that certain property and interests in property related to Venezuela in the United States "are blocked and may not be transferred, paid, exported, withdrawn, or otherwise dealt in." E.O. 13,850

---

[15] For reasons more fully explained below, the Court agrees with Crystallex that, "[s]ince no transfer of blocked property will occur without a license," § 591.407 is "not implicated." (D.I. 406 at 7 n.1)

[16] The executive order defines the "Government of Venezuela" to include any "instrumentality thereof, including . . . PdVSA, and any person owned or controlled by, or acting for or on behalf of, the Government of Venezuela." E.O. 13,808 § 3(d); *see also* E.O. 13,857 § 1, 84 Fed. Reg. 509 (Jan. 30, 2019) (broadening definition to include members of Maduro regime).

19

§ 1(a); E.O. 13,884 § 1(a). These prohibitions do not apply "to the extent provided by statutes, or in regulations, orders, directives, or licenses that may be issued." E.O. 13,850 § 1(b); E.O. 13,884 § 1(c). In relation to these executive orders (as well as E.O. 13,835, as described below), the Court agrees with Crystallex's logic (D.I. 406 at 7): "the regulations only prohibit 'transfers' that are 'prohibited pursuant to' an Executive Order" (quoting 31 C.F.R. § 591.201), and "the relevant Executive Order allows any transfer 'to the extent provided by' a 'licens[e]'" (quoting E.O. 13,850 § 1(b)). The Proposed Order presented by the Special Master expressly contemplates that no transfer will occur unless and until OFAC provides a specific license to the winning bidder. Accordingly, the Proposed Order does not contemplate any prohibited transfer. The Court, therefore, reaches the same conclusion as Crystallex: "If OFAC ultimately denies the winning bidder a license at the end of the process, Venezuela retains full ownership of PDVH subject to Crystallex's existing lien, and no payment flows to Venezuela or any other entity blocked by the sanctions – so no violation occurs." (D.I. 406 at 7)

Another potentially relevant executive order is E.O. 13,835, 83 Fed. Reg. 24,001 (May 21, 2018), which prohibits transactions related to "the *sale*, *transfer*, assignment, or pledging as collateral by the Government of Venezuela of any equity interest in any entity in which the Government of Venezuela has a 50 percent or greater ownership interest." § 1(a)(iii) (emphasis added).[17] As in E.O. 13,850 and E.O. 13,884, the prohibition in E.O. 13,835 does not apply "to the extent provided by statutes, or in regulations, orders, directives, or licenses that may be issued." § 1(b). In the Venezuela Parties' view, E.O. 13,835 must be read to reach, and

---

[17] Like E.O. 13,808, the definition for "Government of Venezuela" in § 3(d) of E.O. 13,835 explicitly includes PDVSA. *See also* E.O. 13,857 § 1.

therefore prohibit, much of what is contained in the Proposed Order because § 1 prohibits "[a]ll transactions ***related to***" any "sale" or "transfer" of the PDVH Shares.   (*See, e.g.*, D.I. 408 at 7 ("[T]he Sale Process would violate federal law because it includes numerous transactions '***related to*** the sale [or] transfer . . . of any equity interest in' PDVH.") (quoting E.O. 13,835 § 1(a)(iii)); *see also id.* at 8 (discussing regulatory definition of "transfer"))   On this view, the Proposed Order involves "untold numbers of transactions and interactions by unknown third parties that will be related to the eventual sale of blocked property" that "require authorization from OFAC."   (D.I. 408 at 14)   The Venezuela Parties suggest, for example, that a bank performing a wire transfer to effectuate the Venezuela Parties' payment to the Special Master's financial advisor, without a specific license, might violate the sanctions because that payment would be "related to" the eventual "transfer" of PDVH Shares.   (*See* Tr. at 60)

The Court disagrees with the Venezuela Parties' overly broad interpretation.   The Venezuela Parties' readings of the terms "transfer" and "related to" are not required by the plain language of any regulation and have never been formally adopted by OFAC.

An OFAC regulation defines "transfer" to mean an "act or transaction" having the "purpose, intent, or effect" to "create, surrender, release, convey, transfer, or alter, directly or indirectly, any right, remedy, power, privilege, or interest" with respect to blocked property.   31 C.F.R. § 591.310.[18]   The Court agrees with Crystallex that entering and implementing the Proposed Order does not involve any "transfer" meeting this regulatory definition.   Rather, it is

---

[18] The regulation expressly identifies certain acts and transactions as transfers, including "the appointment of any agent," "the fulfillment of any condition," "the making, execution, or delivery of any . . . agreement," and "the making of any payment," provided that the definition's other criteria are met.   31 C.F.R. § 591.310.

the last step of the sale process – i.e., the actual transfer of ownership of the PDVH Shares – that would "create, surrender, release, convey, transfer, or alter" any right or interest in the PDVH Shares, so it is this last step that cannot be taken without the issuance of a specific license from OFAC.   As Crystallex writes: "The proposed procedures do not have th[e] prohibited purpose, intent, or effect" required to meet the regulatory definition of "transfer" because "they would only affect rights in blocked property after that property becomes un-blocked."   (D.I. 421 at 9)

The regulations need not, and should not, be read to sweep as broadly as the Venezuela Parties advocate.   Importantly, OFAC has not (at least to date) adopted the broad reading espoused by the Venezuela Parties.   Instead, in the Court's view, the sanctions regime bars only "agreements," "payments," and other acts called out in § 591.310 that have the imminent or actual "purpose, intent, or effect" of altering blocked property rights without a license.   The Venezuela Parties have pointed to no regulatory language that requires their broader interpretation.

Hence, as suggested above, the Court does not agree with the Venezuela Parties that the "Sale Process is replete with acts, agreements, and transactions that meet the regulatory definition of a 'transfer' of an interest in blocked property, as defined in 31 C.F.R. § 591.310 and in violation of Executive Order 13850."   (D.I. 408 at 10; *see also* D.I. 317 at 15 ("The concrete steps set out in the Proposed Order have the purpose of creating rights or interests in blocked property, and many of those steps actually have the effect of creating contingent interests in that property, all of which are contrary to the text of OFAC regulations."))   Instead, the Court agrees with Crystallex that none of the specific acts the Court has taken – and none of the specific acts the Proposed Order contemplates being taken, short of executing the sale – "provide for" or

22

"have the purpose or effect" of "altering any interest in blocked property."   (D.I. 406 at 8)

These past and future acts which are permissible absent a specific license include appointing a

special master, retaining an investment bank to implement the sale, advertising the sale, allowing

Crystallex to credit bid, executing or delivering agreements, and making deposits.   (*See id.* at 8-

11)[19]

      As Crystallex argues, "the regulation is clear that only acts with the 'purpose, intent, or

effect' of actually altering blocked property rights without a license are prohibited."   (D.I. 406 at

2) (quoting § 591.310)   Moreover, "the subsequent granting of a license can validate even an

otherwise unlawful transaction."   (*Id.*) (citing § 591.202(c))   Under the Proposed Order, as even

Crystallex agrees, "no rights would change hands unless and until a license is ultimately granted"

by OFAC.   (*Id.*)   Thus, as Crystallex writes: "What matters, therefore, is ***whether*** a license is

ultimately obtained, not ***when***."   (*Id.* at 8)[20]

      The breadth of the Venezuela Parties' interpretation of the sanctions might, if correct,

prevent the Court from proceeding with this litigation.   For example, according to the logic of

the Venezuela Parties, all of the following acts could not occur without a specific OFAC license,

because all are intended to eventually lead to the sale of the presently blocked PDVH Shares:

---

   [19] As noted by ConocoPhillips, the issuance of new certificates for the PDVH Shares
would potentially raise additional issues.   (*See* D.I. 418 at 2-3)   The Court agrees with
ConocoPhillips that it need not resolve any such potential issues now.   (*See id.*)

   [20] A "transfer . . . in violation of" the regulations is "null and void," but "a license . . .
issued by OFAC before, during, or ***after*** a transfer shall validate such transfer or make it
enforceable."   31 C.F.R. § 591.202(a), (c) (emphasis added).   Contrary to the Venezuela Parties'
contention, this regulation does not "make[] clear that you need a license to move forward."
(Tr. at 52)   Instead, by allowing for a license to authorize a transfer even after the fact, the
regulations contemplate that a process intended to lead ultimately to a transfer can be undertaken
without a license.

- the Court's appointment of a Special Master;

- the Special Master answering inquiries from potential bidders for the PDVH Shares;

- Crystallex's filing of a motion or brief or presentation of oral argument by in the course of this litigation; and

- the issuance of this Opinion by the Court.

OFAC has given no indication that it reads the regulations as preventing the Court from proceeding as it deems fit with the instant case and other related litigation.   As Crystallex rightly emphasizes, to give the regulations the broad reach sought by the Venezuela Parties would unnecessarily implicate serious separation-of-powers concerns.   (*See, e.g.*, D.I. 406 at 11) (citing *Peacock v. Thomas*, 516 U.S. 349, 356 (1996) (noting courts' "inherent power to enforce [their] judgments")   Again, the Court perceives no reason to read the regulations nearly as expansively as the Venezuela Parties would have the Court do.

Another argument made by the Venezuela Parties is that the regulations establish that a "grant of a contingent interest in property 'alters' and 'creates' a property interest as soon as it is executed."   (D.I. 419 at 3) (brackets omitted) (quoting 31 C.F.R. § 591.310)   They base this contention on 31 C.F.R. § 591.305, which defines "interests" to include interests "of any nature whatsoever, direct or indirect," as well as 31 C.F.R. § 591.309, which defines "property" to include "future[] or contingent" property interests.   The Court agrees with Crystallex, however, that these definitions are "meant to capture transfers of interests that could ripen into a present property interest ***without an OFAC license*** – for example, a 'contingent reversionary interest' in funds that would revert to [a foreign] government unless its contractor proved performance." (D.I. 406 at 7-8) (emphasis added) (citing *Consarc Corp. v. Iraqi Ministry*, 27 F.3d 695, 702 (D.C. Cir. 1994))   "The definition thus prohibits a class of transactions that would otherwise

24

escape OFAC oversight." (*Id.* at 8)   The Proposed Order does not create, or envision the creation of, any such interests.

The Venezuela Parties point to a regulation that permits OFAC to "otherwise provide[]" prospective authorization for a transaction while still maintaining that the transaction was null and void before a license issued.   (*See* D.I. 419 at 2-3) (citing 31 C.F.R. § 591.202(c)) According to the Venezuela Parties, "Crystallex's interpretation would rob OFAC of its power to 'otherwise provide[]' for such a determination – and render this regulatory text meaningless – because [Crystallex] considers *all transactions* lawful if they are contingent on an OFAC license." (*Id.* at 3)   The Court is not persuaded by this criticism of Crystallex's position. There is no guarantee that OFAC will *retroactively* authorize any transaction undertaken without a license (even though the Court agrees with Crystallex that the regulations empower OFAC to do so if it chooses).   By contrast, a *prospective* authorization by OFAC would provide near-certainty that the transaction could close.   In other words, the interpretation the Court is adopting, which permits the sale process to proceed at the risk that OFAC will never permit the sale to close, does not deprive OFAC of its power to preapprove a process that is highly likely to close.

In sum, the sanctions regime does not require a specific license from OFAC before the Court may adopt a Sale Procedures Order.   The Sale Procedures Order that the Court adopts will include a provision that could allow the sale process to be launched even without a license.

### B.      FAQ 809 Does Not Alter The Court's Conclusion

Frequently Asked Question ("FAQ") 809, which the Venezuela Parties have sometimes relied on (*see, e.g.*, D.I. 408 at 9-10; D.I. 419 at 4-5; *id.* at 5 n.3), does not alter the Court's conclusion.   Issued by OFAC on December 9, 2019, FAQ 809 asks whether a U.S. entity with a

writ of attachment for blocked shares is "authorized to prepare for and hold an auction or other sale of the shares, contingent upon the winning bidder obtaining a license." (D.I. 150-1 at 2) OFAC answers that question as follows:

> No. Parties who have attached shares of an entity whose property and interests in property are blocked pursuant to the Venezuela Sanctions Regulations (31 C.F.R. Part 591) must obtain a specific license from OFAC prior to conducting an auction or other sale, including a contingent auction or other sale, or taking other concrete steps in furtherance of an auction or sale. More generally, OFAC urges caution in proceeding with any step in furtherance of measures which might alter or affect blocked property or interests in blocked property. OFAC would consider license applications seeking to authorize such activities on a case-by-case basis.

(*Id.*)

At the most recent hearing, the Venezuela Parties expressly told the Court that they "are not asking this Court to defer to FAQ 809." (Tr. at 97) This representation, alone, is sufficient for the Court to hold that FAQ 809 poses no impediment to proceeding even in the absence of any specific license authorizing the sale process. The Venezuela Parties offer no persuasive reason why, after waiving their reliance on deference to FAQ 809, the Court should now feel bound to read FAQ 809 as imposing any hindrance to proceeding as the Court deems warranted.

In any event, even if the Venezuela Parties are still advocating for deference to FAQ 809, as it appears they may be (*see* D.I. 419 at 5 n.3), the Court would not defer to this informal OFAC statement. Instead, the Court agrees with Crystallex that, under *Kisor v. Wilkie*, 139 S. Ct. 2400 (2019), FAQ 809 lacks the force of law and is not entitled to deference, as "the relevant terms of the regulations, such as 'transfer or otherwise alter or affect property,' are clear by themselves and do not require OFAC's guidance, nor implicate its substantive expertise." (D.I.

421 at 9)   Agencies cannot use interpretive guidance to expand the scope of an unambiguous

regulation and thereby "create *de facto* a new regulation."   *Kisor*, 139 S. Ct. at 2415 (internal

quotation marks omitted).   *Kisor* requires courts to "give[] agencies their due, while also

allowing – indeed, obligating – courts to perform their reviewing and restraining functions."   *Id.*

The Court has performed its reviewing function, disagrees with FAQ 809, and finds no basis to

accord any deference to FAQ 809.

     Guidance that does not implicate an agency's "substantive expertise" is entitled to little, if

any, deference.   *See id.* at 2417.   FAQ 809 is addressing whether an Article III court can move

forward with a process that may ultimately lead to a transfer of blocked property.   This subject,

and the litigation process in general, is outside the "substantive expertise" of OFAC and the U.S.

Treasury Department.   By contrast, the power to enforce judgments is among the core functions

of the federal judiciary.   As the Supreme Court has stated, "[a]bsent the clearest command to the

contrary from Congress," courts retain power to enforce their judgments.   *See Califano v.*

*Yamasaki*, 442 U.S. 682, 705 (1979); *see also Peacock*, 516 U.S. at 356 ("Without jurisdiction to

enforce a judgment entered by a federal court, the judicial power would be incomplete and

entirely inadequate for the purposes for which it was conferred by the Constitution.") (internal

quotation marks omitted).

     Finally, agency statements are not entitled to significant deference when they do not

reflect the "fair and considered judgment" of the agency.   *Kisor*, 139 S. Ct. at 2417.   As OFAC

has explained, its FAQs "are intended only as general information to assist persons subject to

United States jurisdiction to comply with legal requirements and to facilitate an understanding of

the scope and purposes of sanctions programs."   *Note on Frequently Asked Questions*, OFAC,

https://home.treasury.gov/policy-issues/financial-sanctions/frequently-asked-questions/note-on-frequently-asked-questions (last visited Feb. 28, 2022).  Moreover, the Court has the benefit of OFAC's "fair and considered judgment" about this very litigation, as discussed below.

For all these reasons, OFAC's FAQ 809 does not prevent the Court from moving forward with the sale process.[21]

## C.  OFAC's Denial Of Crystallex's License Application Does Not Alter The Court's Conclusion

OFAC's September 10, 2021 decision to deny Crystallex's application for a specific license does not alter the Court's conclusion.  To the contrary, OFAC's view, as expressed in the denial letter, is entirely consistent with the Court's view.  In particular, OFAC appears to agree that, as long as the Court continues to ensure that no actual transfer of the PDVH Shares will occur unless and until OFAC issues a specific license permitting such a transaction, OFAC cannot stop the Court from taking prefatory steps that are necessary and helpful to selecting a winning bidder for the PDVH Shares so that Crystallex's judgment may be satisfied.[22]  As the

---

[21] The Venezuela Parties assert that many additional published FAQs "and other authorities predating this litigation" state that "prohibited transactions cannot be made legal by making them contingent on an OFAC license."  (D.I. 419 at 4; *see also id.* at 4 n.2 (citing other FAQs); D.I. 420-1 (Hall Decl.) at 1)  The Court has reviewed the other cited sources, and they do not alter the Court's analysis.  In particular, the Venezuela Parties point to an enforcement action in which OFAC concluded that Aero Sky violated the Iranian sanctions regime when it entered into a memorandum of understanding with Mahan Air, an Iranian commercial airline company, even though the agreement was "contingent, in part, upon Mahan Air being removed" from OFAC's list of specially designated nationals and blocked persons.  (D.I. 420-1)  The Court will not defer to OFAC's interpretation of different sanctions in an unrelated case, particularly when the accused violator in that case never had a chance to defend itself before the agency.  *See generally Kisor*, 139 S. Ct. at 2415-17.

[22] In the summer of 2020, the United States submitted a statement of interest and a supplemental brief in support of that statement, asking the Court not to proceed with a sale

28

Court previously recognized, OFAC has "not taken the position that the Court is blocked from moving forward."   (D.I. 234 at 34 (internal quotation marks omitted); *see also* D.I. 226 at 105 (U.S. stating "the Court can do whatever it wants"); *see also Crystallex II*, 24 F.4th at 248 (quoting same government statement))[23]   As evidenced by the recent OFAC letter denying Crystallex's license application, OFAC continues to adhere to this view.

While Crystallex's application for a specific license is not in the record, Crystallex and the Venezuela Parties agree that Crystallex sought express OFAC approval for not only the execution of a final sale, but also the initiation and undertaking of the sale process.   (*See, e.g.*,

─────────────────────

process, due to concerns of foreign policy and national security.   (*See generally* D.I. 212, 220) The Court chose to proceed, notwithstanding these policy concerns.   (*See* D.I. 234 at 14-15) Although the United States has opted not to submit any additional filings, the Court presumes that the Executive Branch still prefers that the Court cease its progress toward a sale, unless and until OFAC issues a specific license.   OFAC appears to recognize that it can make this request, but cannot compel the Court to grant it.

[23]   The Venezuela Parties are wrong to suggest that the Executive Branch has advocated before this Court that a specific license is required for the Court to proceed with the sale process. For example, the Venezuela Parties write:

> When the United States Government appeared before this Court in September 2020, it clarified that a license was necessary before moving forward with a sale process, and that "setting a sales date" for the PDVH shares "is exactly the kind of thing Special Representative Abrams has said, speaking for the United States, would imperil U.S. foreign policy interests."

(D.I. 408 at 2) (quoting D.I. 226 at 103-04)   While the second part of this statement is correct and the Executive Branch has espoused the view that the Court ***should not*** move forward (because of U.S. foreign policy and national security interests), the Court is not aware of the Executive Branch telling this Court that it ***cannot*** proceed with a sale process unless and until OFAC issues a specific license (i.e., that a license is "necessary").   The Venezuela Parties conflate purported legal constraints (a position OFAC has not advocated in this Court) with policy considerations (which fall squarely within the Executive Branch's discretion and which the Court continues to recognize as vitally important).

D.I. 182 at 7 (Venezuela Parties characterizing Crystallex's application as being for "formal approval of the commencement of the sale process"); Tr. at 48 (Venezuela Parties: "That license request was not just to sell the shares.   It was to effect the sale of the shares, and in Crystallex's own words, it was to launch the sales process."); D.I. 212-2 at 1 (OFAC Director: "Crystallex submitted a specific license application requesting OFAC 'to provide Crystallex [with] a Specific License to allow [this Court] . . . to pursue all activities necessary and ordinarily incident to organizing and conducting a judicial sale of the [PDVH] shares . . . .'"))[24]   In other words, Crystallex filed a two-part license application, seeking approval for both (i) the initiation and conducting of the sale process and (ii) the actual sale of the PDVH Shares.   OFAC's rejection of the requested two-part license tells the Court essentially nothing about whether OFAC would have rejected a narrower application seeking approval for only the initiation and conducting of the sale process.

This conclusion is fully supported by a careful analysis of the OFAC letter, the overwhelming majority of which is devoted to addressing Crystallex's request for approval to sell the PDVH Shares (as opposed to its request merely to initiate and conduct the sale process). By the Court's count, the OFAC letter contains at least 23 references to a "sale" of the PDVH Shares.[25]   These references confirm that OFAC was focused on the portion of Crystallex's

---

[24] *But see* D.I. 406 at 13 (Crystallex explaining that it "was merely asking for permission for activities necessary to *effectuate* the final sale – not permission to even *prepare* for a sale").

[25] For example, the letter contains the following statements:

- "Absent a license from OFAC, any *sale* of the PDVH shares is prohibited pursuant to OFAC's Venezuela-related sanctions authorities," including E.O. 13,808, E.O. 13,835, E.O. 13,850, and

application seeking approval for the transfer of ownership of the PDVH Shares; at no point in the

letter did OFAC express any concern about the Court undertaking a process that could ultimately

---

E.O. 13,884.   (D.I. 346-1 at 1) (emphasis added)

- "[A]uthorizing the *sale* of the PDVH shares at this time would be inconsistent with United States foreign policy interests . . . ."   (*Id.*) (emphasis added)

- "A request for a specific license for the *sale* of the PDVH shares is therefore denied without prejudice to reconsideration at a later time if the foreign policy considerations change."   (*Id.*) (emphasis added)

- "The United States will reassess whether the *sale* of the PDVH shares is consistent with United States foreign policy, as the situation in Venezuela evolves."   (*Id.* (emphasis added); *see also id.* at 5 (similar))

- The "State Department's assessment" was that "a *forced sale* of Venezuela's U.S.-based assets (particularly the CITGO assets) at this time would be inconsistent with U.S. foreign policy interests." (*Id.* at 2) (emphasis added)

- "Crystallex's license request here is not for a similar negotiated agreement with the Government of Venezuela, but instead for a *forced sale* . . . ."   (*Id.*) (emphasis added)

- The letter announces OFAC's "determination to deny the license for the *sale* at this time."   (*Id.* (emphasis added); *see also id.* ("[O]ur view [is] that a license for the *sale* of the PDVH shares should be denied at this time.") (emphasis added)

- "Crystallex's proposed *sale* is prohibited under U.S. law, unless authorized by an OFAC license."   (*Id.* at 5) (emphasis added)

- "[D]enying Crystallex's request to *sell* the PDVH shares will [not] necessarily have the consequences Crystallex predicts . . . ."   (*Id.*) (emphasis added)

31

lead to executing a sale.[26]   (*See, e.g.*, D.I. 346-1 at 1) ("[D]enying the license at present and

continuing the ***blocking of these shares*** is particularly important at this time.") (emphasis added)

_____

[26] The Court perceives an argument (which no party has made) that the letter's many references to "sale" are intended to refer to the "sale process," not just "execution of the sale" (i.e., the actual transfer of the shares).   The word "sale" has more than one meaning.   For instance, a "sale" of shares could refer to (a) the process of trying to reach the point at which actual transfer of ownership and title in the shares passes from one entity to another, or (b) the actual transfer of ownership and title in the shares from one entity to another.   The first usage encompasses the "sale process," while the second usage refers to a "transaction."   A popular dictionary recognizes both usages of the word "sale" as proper:

1   : the act of selling

   *specifically* : the transfer of ownership of and title to property from one person to another for a price [usage (b) above]

2   a   : opportunity of selling or being sold [usage (a) above]

. . . .

*Sale*, Merriam-Webster, Inc., https://www.merriam-webster.com/dictionary/sale (last visited Feb. 28, 2022).

In context, it is clear that the many instances of the word "sale" in the OFAC letter are directed to the "transaction," not the "sale process."   In addition to what the Court has already said on this point, it is noteworthy that the letter references Crystallex's contention that "'significant benefits'" will flow to Venezuela if Crystallex's license application were granted, including that "'[a] sale of PDVH would generate funds for Venezuela.'"   (D.I. 346-1 at 7)   This instance of the word "sale" indisputably refers to a transaction involving the exchange of money and not just the sale process.   While OFAC rejected as "not persuasive" Crystallex's list of other purported benefits for Venezuela if a license were granted, those benefits could flow only from a completed transaction, not from the process of trying to find a winning bidder.   (*Id.*)

OFAC's letter uses "sale" only once to refer to the "sale process," and in context, that usage is also clear.   (*See id.* at 1) (referring to "all activities necessary and ordinarily incident to ***organizing and conducting a judicial sale*** of shares") (emphasis added)   This one instance illustrates that OFAC's denial was about Crystallex's request to execute a sale transaction and not about conducting a sale process.

Most pertinently, the OFAC letter contains a section with the heading "U.S. court judgments." (*Id.* at 4-5)   Like the rest of the letter, this section is entirely consistent with the Court's view that it may proceed with prefatory steps toward a sale, as long as the sale does not close.   In this part of the letter, OFAC's Director, Andrea M. Gacki, notes Crystallex's complaint that denying its license "'will render the legitimate judicial orders of several federal courts ineffectual.'" (*Id.* at 4)   OFAC "disagree[s] with Crystallex's characterization," suggesting that its denial of Crystallex's application does not conflict with this Court's decision to proceed. (*Id.*)   Director Gacki goes on to explain: "we are mindful of the Judicial Branch's interest in enforcing its judgments, and we have carefully weighed that consideration in making our licensing decision.   At the same time, we have also considered the Executive Branch's foreign policy and national security interests." (*Id.*)   This explanation balances, on one hand, the role of this Court to proceed so that it may, eventually, enforce its judgment and, on the other hand, the role of OFAC to evaluate policy considerations and bring them to bear on the timing of any enforcement involving the sale of blocked property.   That balance is entirely consistent with the approach that this Court has taken and will continue to take.

The harmonious relationship between OFAC's view and the Court's view is confirmed by the next paragraph of Director Gacki's letter, which quotes this Court ***without any suggestion of a disagreement***:

> On July 16, 2020, the U.S. government filed a Statement of
> Interest in the Crystallex litigation before the U.S. District Court
> for the District of Delaware, explaining the U.S. government's
> current foreign policy and national security view.   After
> considering that statement, the Court elected to proceed with

> *prefatory steps toward a judicial sale*,[27] but the Court made clear
> that "the OFAC licensing process provides the [appropriate]
> mechanism through which the Executive Branch can bring to bear
> the foreign policy and national security interests on which
> Crystallex's collection efforts might have an impact." *Crystallex*,
> 2021 WL 129803, at *16.   The Court further stated that all parties
> to the litigation "recognize that (under current law and policy) a
> specific license will be required from OFAC before a *sale* of
> PdVSA's shares of PDVH can close." *Id.*   Thus, it appears to us
> that the Court recognized that the Executive Branch's foreign
> policy and national security interests, if asserted through the OFAC
> licensing process, *could properly necessitate a delay in
> effectuating court judgments*.   Accordingly, OFAC has
> considered the foreign policy and national security interests in
> connection with Crystallex's license request, and OFAC's denial of
> *a license for the sale* reflects those interests at this time.

(*Id.* at 5) (emphasis added)   The letter demonstrates that OFAC clearly understands that the

Court has been undertaking – and will continue to undertake – prefatory steps toward a sale, but

it does not go on to say anything else about those prefatory steps.   Instead, the letter expresses

OFAC's seeming contentment with the Court's recognition that a specific license will be required

to execute a sale and that OFAC has discretion to consider foreign policy and national security in

deciding whether to grant such a license.   The best reading of Director Gacki's letter is that

OFAC does not view any law or other authority as precluding the Court from proceeding with

the sale process.   As Crystallex correctly observes: "Despite expressly acknowledging the

Court's decision to proceed with prefatory steps toward a sale, OFAC lodged no policy or legal

objections to any steps the Court is currently taking or considering to prepare for a sale once a

license is granted."   (D.I. 406 at 2; *see also id.* at 12 ("OFAC expressed no concern on policy or

---

[27] Here, OFAC seems to agree with the distinction the Court has made between "steps in
a sale process" and the final "sale" itself.

sanctions grounds with any of the steps the Court is taking or considering at this time to prepare

for an eventual sale once a license is granted.”))

The OFAC letter concludes: “Accordingly, your request for a ***specific license to effect the***

***sale of the PDVH shares*** is denied at this time.”   (D.I. 346-1 at 8) (emphasis added)   The Court

reads this conclusion as limited to the portion of Crystallex’s request for a specific license to

effectuate the transfer of the PDVH Shares to a winning bidder.   OFAC’s conclusion does not

deny (or even substantially address) Crystallex’s related request merely to initiate the process

that would ultimately result in effectuating the sale of the PDVH Shares.   Indeed, OFAC writes:

“In light of this denial, we are not addressing the other aspects of your request at this time, which

OFAC will continue to consider” under the same application number.   (*Id.*)

The OFAC letter also states repeatedly that the license denial is “without prejudice” and

may be reconsidered if the foreign policy considerations change.   (*Id.* at 1, 5, 8)   Indeed, the

letter concludes: “OFAC emphasizes that this determination is made without prejudice to

reconsideration of a specific license request to ***sell*** the PDVH shares at a later time if the foreign

policy considerations change. . . .   The United States will reassess whether the ***sale*** of the PDVH

shares is consistent with United States foreign policy, as the situation in Venezuela evolves.”

(*Id.* at 8) (emphasis added)

As a final indication of OFAC’s and the Court’s harmonious views, the Court will now

quote Director Gacki’s use of a quotation from the Court’s January 14, 2021 Opinion, which

evidently accurately describes ***OFAC’s own apparent view of its own discretion***:

> OFAC’s discretionary authority to issue or withhold licenses is
> essential to the U.S. government’s ability to tailor sanctions to
> evolving foreign policy and national security needs.   As the Court
> has noted, “the OFAC licensing process provides the [appropriate]

> mechanism through which the Executive Branch can bring to bear
> the foreign policy and national security interests on which
> Crystallex's collection efforts might have an impact."

(D.I. 346-1 at 3) (quoting D.I. 234 at 34)   Again, the Court discerns no disagreement between it

and OFAC.   The Court has received no indication from OFAC that it believes the Court lacks

the authority to proceed with a sale process (excluding the execution of an actual sale

transaction) in the absence of a specific OFAC license.   (*See* D.I. 341 at 5) (Special Master

stating that, in his interactions with government personnel, "they have at no point . . . asked

[him] to or suggested that [he] should delay the process")[28]

In light of OFAC's discretionary authority, and the absence of any indication from any

U.S. governmental entity (including OFAC) that this Court cannot proceed, the Court will

proceed with the sale process, up to and including selecting a winning bid.[29]   The Court will not,

however, permit the sale to be executed unless and until OFAC grants a specific license (or

unless and until the sanctions regime is materially changed).

### D.   The Current Sanctions Regime Does Not Prohibit The Sale Process

The Court's interpretation of the sanctions regulations as set out in this Opinion is

consistent with what the Court previously stated: the interests of the Executive Branch (including

the President's power to determine foreign policy and to protect national security) are fully and

---

[28] Just as OFAC seems to acknowledge, the Third Circuit also recognizes that this Court "agree[s] that OFAC's approval would be necessary to complete the transaction and transfer title."   *Crystallex II*, 24 F.4th at 256; *see also id.* at 257 ("The District Court said it would go only as far as OFAC's regulations allow and acknowledged that OFAC's approval will be needed to complete a sale.").

[29] As always, the Court's current plan may change if there are material developments in this case.

adequately implemented through the OFAC licensing process, which will determine when – if ever – the sale of the PDVH Shares can actually close.   (*See, e.g.*, D.I. 234 at 34 ("[T]he OFAC licensing process provides the better mechanism through which the Executive Branch can bring to bear the foreign policy and national security interests on which Crystallex's collection efforts might have an impact."); D.I. 408 at 2 (Venezuela Parties: "In its January 14, 2021 Order, this Court found that OFAC's licensing process was the appropriate method for the Executive Branch to effectuate its policy interests . . . .")   The Court understands the Third Circuit to hold the same position.   *See Crystallex I*, 932 F.3d at 151 ("Though the U.S. State Department has not sought to provide a statement of interest, it is nonetheless conceivable that short- or long-term U.S. foreign policy interests may be affected by attachment and execution of PDVSA's assets.   The [OFAC] sanctions provide an explicit mechanism to account for these.").

The Court presumes that OFAC remains free to say that it will ***never*** issue a specific license to allow the PDVH Shares to be sold.   If that is the case, it would be helpful for all involved in this case (and in related litigation) for OFAC to say so.   Without an express indication that this is OFAC's view, the Court has an obligation to work toward execution of Crystallex's judgment, and it will continue do so.

The Venezuela Parties warn: "Marching forward in the absence of an OFAC license will not just risk potential civil and criminal liability for those private parties [who participate in the sale process], it could also prompt further litigation over the validity of the acts and transactions executed, here and perhaps in other courts."   (D.I. 408 at 9)[30]   The Court agrees with

_____

[30] *See, e.g.*, 31 C.F.R. § 591.202(a), (e) (declaring "null and void" certain actions with respect to blocked property taken in contravention of sanctions regime).

Crystallex, however, that liability requires a "willful" violation of the sanctions and, given the

Court's view of the sanctions, the participation of private parties in a judicially ordered process

cannot constitute a willful violation of the law.   (*See* D.I. 406 at 14-15)   While the Court is not

eager to embrace the prospect of "further litigation" about the validity of this same litigation,

there is plainly no lack of litigation related to Venezuela's debts.   This Court cannot, and will

not, be deterred from fulfilling its judicial function by the threat or risk of further litigation.

The Venezuela Parties are correct that, under IEEPA, "the political branches have

constitutional authority to stop courts from attaching, or disposing of attached, foreign-owned

property in the United States."   (D.I. 408 at 11) (citing *Bank Markazi v. Peterson*, 136 S. Ct.

1310, 1328 (2016); *Dames & Moore v. Regan*, 453 U.S. 654, 674, 686 (1981); *Behring Int'l, Inc.*

*v. Imperial Iranian Air Force*, 699 F.2d 657, 660 (3d Cir. 1983))   To date, the Executive Branch

has not, however, stopped this Court from undertaking the sale process (short of executing the

sale) for property that was attached before it became blocked.   That is, the Executive Branch has

not exercised any authority it may have under the Constitution and/or IEEPA to stop something

that this Court has done or is doing.   Unless the Executive Branch takes such an explicit action

(which the Court would then evaluate), or unless an appellate court directs this Court otherwise,

the Court will continue to understand that the Executive Branch will act through the OFAC

licensing process.[31]   The Court agrees with Crystallex: "Given the significant separation-of-

_____

[31] The Venezuela Parties write: "If the Executive Branch may block, nullify, and void a
sale of blocked property in a judicial proceeding, it plainly can require Crystallex to obtain a
license from OFAC before proceeding with such a sale process."   (D.I. 419 at 8)   Even
assuming this legal analysis is correct, the fact remains that OFAC has not expressly required
Crystallex to obtain such a license at this time (i.e., just to proceed with a sale process),
notwithstanding that it had an opportunity to say so when it denied Crystallex's license

powers implications of curbing the judiciary's ability to enforce its judgments, the President

would at least need to speak clearly before his executive orders could have th[e] effect" of

stopping this Court's sale process.   (D.I. 421 at 7; *see also Bond v. United States*, 572 U.S. 844,

857-58 (2014) (explaining that, absent "a clear indication," courts generally avoid reading

federal statutes as "dramatically intrud[ing]" on other entities' jurisdiction) (internal quotation

marks omitted).

Finally, the Venezuela Parties contend that "[a]llowing PDVH shares to be sold at a fire-

sale for a fraction of [their] value would sap the Guaidó government of its economic power, deal

a serious blow to its goal of repaying its predecessors' global debts . . . and undermine its

legitimacy."   (D.I. 340 at 5)   All that may be so (and would be regrettable), but those concerns

are not properly before this Court.   The Executive Branch has the power to prioritize foreign

policy and national security interests over the property interests of an affirmed judgment creditor

in the U.S. courts.   If that is how the Executive Branch weighs those considerations, it may

make its decision known, and no sale of the PDVH Shares will close.   In the meantime, this

litigation proceeds, and the Court will continue with its work.

The Court reiterates the view it announced approximately a year ago: the "most

reasonable" course of action is to establish the sale procedures and then "follow them to the

maximum extent that can be accomplished without a specific license from OFAC."   (D.I. 234 at

32-33; *see also* D.I. 406 at 13 (Crystallex: "The regulation has not changed since January 2021

when this Court recognized that preparatory steps were allowed."))   Today, the Court adds that

_____

application.   Moreover, OFAC has never indicated that this Court may not proceed in the
absence of any party having a license.

the "maximum extent" includes all necessary and helpful steps in the process for selling the PDVH Shares, short of execution of the sale.

## III.     The Proposed Sale Procedures Order Will Include A Six-Month Window Trigger

Based on his expertise and the recommendations of his advisors, the Special Master has stated he "would not recommend nor . . . intend to launch the Marketing Process until [he is] satisfied with the posture of OFAC *because of the likelihood that Potential Bidders would be unwilling to participate in the process*."   (D.I. 341 at 4) (emphasis added)[32]   The Court welcomes the Special Master's assessment as to the opportune time to launch the sale process, including, in particular, his view on whether OFAC has provided or will provide a statement that could give potential bidders sufficient confidence to expend the time and money necessary to participate in the process.   The Court is not agreeable, however, to an indefinite delay of the start of the process without (a) requiring the Special Master to make a recommendation on whether and when to start and (b) providing the Sale Process Parties with an opportunity to object to that recommendation.

Accordingly, the Sale Procedures Order the Court will enter will include a Six-Month Window Trigger.   That is, the Sale Procedures Order will provide for a period, of no more than six months from the date of the order's entry, for the Special Master to: (i) attempt to obtain greater clarity from OFAC, in a form he can share with the market, of its support for (or at least non-opposition to), the sale process; and (ii) make a recommendation to the Court as to when, and whether, the Court should launch the sale process.

---

[32] There is no inconsistency between the Special Master's position on this empirical point (regarding the best time to start the sale process) and the Court's holding that it has the legal authority to begin the process at any time the Court chooses.

All parties will have an opportunity to object to whatever recommendation the Special Master makes, at whatever point within (and no later than at the end of) the Six-Month Window, to launch (or not launch) the sale process. The Court will carefully evaluate any objections and make an independent determination of how to proceed. Any outcome is possible: the Special Master may recommend that the Court launch the sale process and the Court may do so or not, or the Special Master may recommend that the Court not launch the sale process and, again, the Court may or may not launch it.

The Court expects there will be many beneficial consequences from the Six-Month Window Trigger. First, as noted, it will give the Special Master time to communicate with OFAC – and for OFAC to review further, if it wishes, the status of this (and related) litigation – which will hopefully provide greater clarity to the market as to the risks and likely licensing outcome of the sale process, thereby encouraging more participation and making a value-maximizing bid more likely.[33] Second, it puts the Sale Process Parties on notice that the Court will be making a determination as to whether to start the sale process later this year – not immediately, as Crystallex wishes, but not never (or at some distantly indeterminate date), as the Venezuela Parties appear to prefer. Third, the Six-Month Window will inform others holding judgments against the Venezuela Parties that this Court is on the cusp of launching the sale process, which may inform their litigation activities. Fourth, the Court is hopeful that during the Six-Month Window the parties will engage with the Special Master (or any other individual they

---

[33] The Special Master reports that "as things stand today, there is enough uncertainty that Potential Bidders will likely discount their bids in light of such uncertainty or not even participate in the process at all." (D.I. 341 at 4)

41

prefer) in a good faith attempt to resolve this case through mediation. Fifth, as further described below, the Court may use the six-month period to certify an interlocutory appeal to the U.S. Court of Appeals for the Third Circuit in hopes of obtaining a definitive, binding legal determination as to the impact of the current sanctions regime on the sale process. Sixth, it is always possible that there will be developments in Venezuela, or an evolution in U.S. foreign policy and/or the sanctions regime, that could have a material impact on how the Court should proceed.[34]

Notwithstanding these benefits, the Court recognizes that the pace at which the Court foresees moving will likely disappoint the parties. It is quite possible that the Special Master will determine, at the end of the Six-Month Window, that conditions are not auspicious for

---

[34] OFAC itself has observed: "As the situation in Venezuela has continued to evolve, U.S. foreign policy has also evolved." (D.I. 346-1 at 4) The Court is aware that in January 2022, the U.S. government reiterated its recognition of "the authority of the democratically elected 2015 National Assembly as the last remaining democratic institution and Juan Guaidó as Venezuela's interim president." Ned Price, *U.S. Recognition of Venezuela's 2015 National Assembly and Interim President Guaidó*, U.S. Department of State (Jan. 4, 2022), https://www.state.gov/u-s-recognition-of-venezuelas-2015-national-assembly-and-interim-president-guaido/ (last visited Feb. 28, 2022). The Court further understands that on January 20, 2022, OFAC issued General License 51 and, according to the Venezuela Parties, extended a prohibition on "transactions related to the sale or transfer of" the CITGO Holding, Inc. shares serving as collateral for certain 2020 Bondholders. (D.I. 434) (internal quotation marks omitted) The parties have provided the Court with competing prognostications as to how U.S. foreign policy may or may not change, and as to whether the political situation in Venezuela (e.g., as between the Guaidó administration and Maduro regime) will imminently change. (*Compare, e.g.*, D.I. 429 ("U.S. foreign policy towards Venezuela has not changed, and is unlikely to do so in the foreseeable future.") *with* D.I. 406 at 13 (Crystallex predicting that "the government anticipates more than routine reevaluation" early in 2022, which "could be an inflection point for a policy change") *and* D.I. 431 at 1 ("[T]he situation in Venezuela undoubtedly will continue to evolve [through] the coming year and there is no reasonable basis on which to speculate that OFAC is unlikely to change its position.")) The Court's decisions are made with an understanding of current policy and not based on any predictions of what may or may not happen in the future.

proceeding (for reasons that may or may not include a lack of progress in his interactions with

OFAC). In that event, it is also quite possible that Crystallex will object to his recommendation

that the Court not launch the sale process, and it would take additional time for the Court to

evaluate and resolve such an objection.

On the other hand, the Court has also squarely rejected the view of the Venezuela Parties

(and ConocoPhillips) that the sale process may not be launched until after OFAC issues a

specific license. The Court's legal holding sets up the very real possibility that the Court will

launch the sale process without a specific license – even if the Special Master recommends that

the Court not do so. In other words, even if it turns out that OFAC will not provide an

indication of non-objection to the sale procedures, and if it appears that the market may not fairly

value PDVH, the Court may nonetheless proceed with initiating the sale process.

The litigation before the Court simply cannot be permitted to continue forever. The

Court is not persuaded today, and it is unlikely to be persuaded, that any set of circumstances

will *necessarily and inevitably* doom the sale process to conclude with a result that cannot

satisfy Crystallex's judgment in full and/or will yield such an inequitable result that the Court

will have to reject it. Moreover, as Crystallex persuasively points out, "any such risk" is "a risk

of Venezuela's own making, given its stout refusal to pay its lawful debt or cooperate in the

OFAC licensing process." (D.I. 406 at 2; *see also* D.I. 421 at 10 ("[I]f the OFAC sanctions they

seek depress the value of the shares, their own efforts will be the source of their asserted

injury."))

Accordingly, the Special Master is directed to include in the final version of the Sale

Procedures Order provisions setting out a Six-Month Window Trigger and a brief opportunity for

the Sale Process Parties to object to whatever recommendation the Special Master makes pursuant to such provisions.

## IV.     The Court Is Inclined To Certify An Interlocutory Appeal

The Third Circuit's most recent opinion in this case does nothing to alter this Court's view that, for all the reasons explained throughout this Opinion, it can and should proceed with the sale process to the maximum extent permissible under the current sanctions regime. However, the Third Circuit's recent opinion also suggests to the Court that it might now be an appropriate time to seek the Third Circuit's view on whether this Court's analysis of the sanctions is correct.   In other words, it seems to the Court that it might be wise to certify one or more questions to the Third Circuit for an interlocutory appeal.

As the Third Circuit observed in *Crystallex II*, "OFAC's rule looms large in this case." 24 F.4th at 247.   While the Court of Appeals was expressly referencing 31 C.F.R. § 591.407 (discussed above), this Court also understands the Third Circuit to be making a general observation that the sanctions regime has enormous implications for how (and whether) this litigation should proceed, and how the market is likely to react once a sale process is launched.

Having presided over this litigation and related cases for more than six years, *see generally Crystallex Int'l Corp. v. Petróleos de Venezuela, S.A.*, C.A. No. 15-1082-LPS (D. Del.) (filed Nov. 23, 2015), the undersigned Judge believes that the most appropriate next step might be to certify an interlocutory appeal, seeking appellate guidance as to the impact of the sanctions regime on the Court's ability to launch the sale process, as envisioned in this Opinion.[35]   This

---

[35] In a separate opinion being issued today in related actions, the Court is raising the same suggestion of an interlocutory appeal relating to the impact of the sanctions regime on the

Court has done its best to evaluate the parties' competing arguments and to explain its reasoning for concluding that it has the authority, consistent with the sanctions, to adopt a Sale Procedures Order and to implement that order to the point at which a winning bidder for the PDVH Shares is selected, while also not permitting execution of the sale until OFAC issues a license (or the sanctions regime is materially changed). As explained above, the Court is prepared, subject to the Six-Month Window Trigger provisions, to launch its sale procedures, perhaps before the end of 2022. Rather than doing so without knowing whether the Court of Appeals agrees with this Court's analysis of the sanctions regime, it might be preferable – while the Six-Month Window period is running – to ask the Third Circuit to review this crucial legal issue. If the Court of Appeals disagrees with this Court, it could prevent this Court from undertaking a costly, unnecessary, and legally invalid sale process. Alternatively, if it agrees with this Court, the Court of Appeals could provide greater comfort to market participants that this Court's process is lawful, thereby improving the chances of obtaining a fair value for the PDVH Shares to be sold.

The Court is not suggesting that today's decision constitutes a final judgment. As the Third Circuit has explained, "a post-judgment order is final when it leaves nothing to be done in the cause save to superintend, ministerially, the execution of the decree." *Crystallex II*, 24 F.4th at 255 (internal quotation marks and emphasis omitted); *see also id.* at 254-55 ("Generally, the dispositive question, then, is whether there is anything left for the district court to do with respect to execution of the judgment.") (internal quotation marks omitted)). This case has not reached such a stage; it is not even close. Nor does this Court wish to invite "piecemeal review of every

---

Court's ability to authorize the issuance of writs of attachment to other judgment creditors of Venezuela or other entities of the Venezuelan government. *See, e.g.*, *OI Eur. Grp. B.V. v. Bolivarian Republic of Venezuela*, Misc. No. 19-290-LPS D.I. 109 (D. Del. Mar. 2, 2022).

post-judgment order en route to a final sale." *Id.*   Instead, it welcomes the "room to manage complex litigation" that comes from the final judgment rule.   *Id.* at 250.   All that said, the Court perceives a possibility that this case (and the related litigation) may have reached a point at which a detour to the Court of Appeals would be beneficial to all involved.

The Court recognizes that just about six weeks ago, the Third Circuit explained: "Venezuela's assertion that a contingent auction would violate OFAC's regulations is . . . unripe for resolution in this appeal.   We reject Venezuela's attempt to inject this premature issue into this appeal." *Id.* at 257 (citation omitted).   Much has changed, however, in the intervening time.   Most importantly, when the Third Circuit issued its opinion, this Court "ha[d] not approved a contingent auction," *id.*, but now, in this Opinion, it has.   When the Third Circuit issued *Crystallex II*, it understood that this Court had not yet decided "how far [it] can go toward a final sale" and rightly predicted that this Court would "decide how far is too far in the forthcoming order on sale procedures." *Id.* at 258.   Now, the Court has made these decisions, having exercised its "judgment" and resolved the "legal objection[s]" relating to the impact of the sanctions. *Id.* at 255.   While not constituting a final order, the Court's decision may well make these important, formerly "unripe" issues no longer premature for appeal.

Additionally, unlike an appeal from a recalcitrant judgment debtor, which the Court of Appeals confronted in *Crystallex II*, a certified interlocutory appeal would come with this Court's backing.   If the Court proceeds in this manner, it would, as required by 28 U.S.C. § 1292(b), express in an order its view that "such order involves a controlling question of law as to which there is substantial ground for difference of opinion and that an immediate appeal from the order may materially advance the ultimate termination of the litigation."   Such an order

might then lead the Third Circuit to exercise its discretion to permit an interlocutory appeal. During such appeal, the proceedings in this Court, including the opening (and potential closing) of the Six-Month Window, would not be stayed.

The Court is inclined to certify an interlocutory appeal. Before deciding whether to do so, the Court will solicit and carefully consider the views of the Special Master and the Sale Process Parties on this point.

## CONCLUSION

As the Court noted at the outset of this Opinion, while all involved with this case have undertaken a tremendous amount of work to date, much additional work lies ahead. The immediate next steps will include the Sale Process Parties – and the Special Master, if he wishes – providing their positions on whether the Court should certify an interlocutory appeal to the Third Circuit relating to the impact of the sanctions regime on the Court's ability to undertake a sale process (but not execute an actual sale) in the absence of a specific license from OFAC. The Sale Process Parties and the Special Master will also be directed to attempt to resolve any remaining ripe objections to the Proposed Order that are not expressly resolved in this Opinion – and, in the event they cannot do so, to file briefs (preferably short briefs) to allow the Court to rule on any such objections. The Special Master will also be required to work with the Sale Process Parties to prepare a version of the Proposed Sale Procedures Order consistent with the Court's rulings in this Opinion and on any objections to be briefed, as just explained.

Thereafter, the Court anticipates signing a version of the Proposed Order that is consistent with today's and any forthcoming decisions, thereby opening the Six-Month Window.[36]

An appropriate Order follows.

---

[36] The Third Circuit further anticipates that "[m]ore appeals will likely follow the final order on sale procedures." *Crystallex II*, 24 F.4th at 255.