# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| CRYSTALLEX INTERNATIONAL CORP., )<br>)<br>Plaintiff, )<br>)<br>v. )<br>)<br>BOLIVARIAN REPUBLIC OF VENEZUELA, )<br>)<br>Defendant. )<br>)<br>_____ ) | Case No. 1:17-mc-00151-LPS |

### VENEZUELA PARTIES' RESPONSE TO THE SPECIAL MASTER'S
### <u>FOURTH REVISED PROPOSED SALE PROCEDURES ORDER</u>

OF COUNSEL:
Nathan P. Eimer
Lisa S. Meyer
Daniel D. Birk
Gregory M. Schweizer
EIMER STAHL LLP
224 South Michigan Avenue
Suite 1100
Chicago, IL 60604
(312) 660-7600
NEimer@eimerstahl.com
LMeyer@eimerstahl.com
DBirk@eimerstahl.com
GSchweizer@eimerstahl.com

OF COUNSEL:
Joseph D. Pizzurro
Julia B. Mosse
Kevin A. Meehan
Juan O. Perla
CURTIS, MALLET-PREVOST,
COLT & MOSLE LLP
101 Park Avenue
New York, NY 10178
(212) 696-6000
jpizzurro@curtis.com
jmosse@curtis.com
kmeehan@curtis.com
jperla@curtis.com

Kenneth J. Nachbar (#2067)
Alexandra M. Cumings (#6146)
MORRIS, NICHOLS, ARSHT & TUNNELL LLP
1201 North Market Street
Wilmington, DE 19801
(302) 658-9200
KNachbar@mnat.com
ACumings@mnat.com

*Attorneys for PDV Holding, Inc., and CITGO Petroleum Corporation*

Samuel Taylor Hirzel, II (#4415)
HEYMAN ENERIO GATTUSO & HIRZEL LLP
300 Delaware Avenue, Suite 200
Wilmington, DE 19801
(302) 472-7300
shirzel@hegh.law

*Attorney for Petróleos de Venezuela, S.A.*

OF COUNSEL:
Donald B. Verrilli, Jr.
Elaine J. Goldenberg
Ginger D. Anders
Brendan B. Gants
Jacobus P. van der Ven
Munger, Tolles & Olson LLP
601 Massachusetts Avenue NW
Suite 500 E
Washington, D.C. 20001
(202) 220-1100
Donald.Verrilli@mto.com

George M. Garvey
Munger, Tolles & Olson LLP
350 South Grand Avenue, 50th Floor
Los Angeles, CA 90071
(213) 683-9100
George.Garvey@mto.com

A. Thompson Bayliss (#4379)
Stephen C. Childs (#6711)
ABRAMS & BAYLISS LLP
20 Montchanin Road, Suite 200
Wilmington, DE 19807
(302) 778-1000
bayliss@abramsbayliss.com
childs@abramsbayliss.com

*Attorneys for Bolivarian Republic of Venezuela*

Many of the Venezuela Parties' objections to the Proposed Sales Procedures Order and the Evercore agreement remain outstanding after the Court's March 2, 2022 Opinion and Order (D.I. 443, 444) ("March 2 Order"). They are summarized here with reference to prior filings that contain a complete explanation. The Venezuela Parties also suggest additional revisions to three new provisions of the March 31, 2022 Proposed Sale Procedures Order (D.I. 451-1, Ex. A) ("PSPO"). Finally, the new proposed Evercore agreement is still flawed.

I.  **The Fundamental Design of the PSPO Is Contrary to Delaware Law and the Court's Directive to Maximize Value and Sell as Few Shares as Necessary.**

Nothing has changed: the PSPO still offers a bankruptcy-style process likely to sell 100% of the PDVH shares at a severely discounted price, destroying value and contravening Delaware law and the Court's orders.[1] The Venezuela Parties have presented uncontroverted evidence to support this assessment, and they supplement that record further with a declaration from Mr. Randall Weisenburger attached as Exhibit 1. *See also* D.I. 354-1; D.I. 355-1; D.I. 423-1. The PSPO fails to meet the requirements of Delaware law that only "[s]o many of the shares… as shall be sufficient to satisfy the debt" be sold. 8 Del. C. § 324(a); *accord* D.I. 234 at 36. It must be remembered, PDVH is *not* a distressed company that needs to be liquidated. In the current market, the most viable means to sell fewer than 100% of the PDVH shares at a value-maximizing price is to encourage minority-stake offers from the sorts of investors who would otherwise pursue a private placement transaction—not a bankruptcy auction in which speculators ordinarily seek to buy 100% of the company at steep discounts, which is especially likely to occur here given conditions in the refining industry. Ex. 1 ¶¶ 3–12.

Unfortunately, the Special Master has failed to take the steps necessary to explore or facilitate such minority-stake offers—or *any* alternative, value-maximizing transaction (separate

---

[1] *E.g.*, D.I. 354 at 2, 4–7, 14, 17; D.I. 354-1 ¶ 5(b) & II; D.I. 355 at 16; D.I. 385 at 4–6; D.I. 423 at 4; D.I. 423-1 ¶ 11.

and apart from the OFAC and Evercore problems addressed in the March 2 Order). *See* T.O. 2–5, 15, 45.[2] First, in failing to conduct a comprehensive valuation of PDVH,[3] the Special Master could not have determined what percentage of shares would need to be sold to satisfy Crystallex's judgment or determined which type of transaction would be most likely to attain a value-maximizing result. A comprehensive valuation would have informed the types of minority shareholder rights and the types of potential bidders necessary for a value-maximizing process. D.I. 423 at 2; D.I. 423-1 ¶¶ 8–9; Ex. 1 ¶¶ 6, 11. Second, without meaningful exploration of potential minority shareholder protections[4] with PDVSA during the *design* phase (rather than, as proposed, *after* the launch of the sale process), *see* T.O. 15, 45, the Special Master could not incorporate into his proposal any procedures that would facilitate a minority stake being sold. *See, e.g.*, D.I. 423 at 2 (citing D.I. 423-1 ¶ 4); D.I. 385 at 5. Third, in failing to identify and approach potential minority-stake investors[5]—such as sovereign wealth funds or large family offices—in advance to present detailed information and discuss potential minority shareholder rights and corporate governance mechanisms, the Special Master—along with his Advisors, who specialize in selling an entire asset in distressed bankruptcy sales rather than a minority stake in a company in an orderly process—"failed to meaningfully evaluate potential bidders and transactions that would better maximize value and reduce the number of shares sold." D.I. 423 at 3 (citing D.I. 423-1 ¶ 4). Pursuing such bidders is the most logical means to accomplish the Court's and Delaware law's objectives. Ex. 1 ¶¶ 5–7. Completing these three threshold tasks was *essential* to meaningfully considering or pursuing a value-maximizing transaction. *Id.* ¶ 6. In conjunction with

---

[2] References in this brief to objections listed in D.I. 423-2 are referred to by the number assigned to them in that table (*e.g.*, "Table Objection 1" or "T.O. 1"). For the Court's convenience, Exhibit 2 to this brief summarizes the Venezuela Parties' position as to each Table Objection.
[3] *E.g.*, D.I. 354 at 2–4, 8–9; D.I. 354-1 ¶¶ 10–11; D.I. 355 at 25; D.I. 385 at 6–7; D.I. 397-2 at 17–18; D.I. 423 at 2.
[4] *E.g.*, D.I. 354 at 2–3, 8–9, 13; D.I. 354-1 ¶ 14; D.I. 385 at 5–7; D.I. 397-2 at 17, 19; D.I. 423 at 2–4; D.I. 423-1 at I.
[5] *E.g.*, D.I. 423 at 2–3; D.I. 423-1 ¶ 5.

these steps, myriad alternative transactions could have—and under the Court's May 27, 2021 order, should have—been explored,[6] such as a traditional initial public offering ("IPO"), an IPO via a special purpose acquisition company, a joint venture, or a direct private placement sale. D.I. 354 at 9; D.I. 354-1 ¶ 12; *see also* D.I. 277 ¶ 2 (directing the Special Master to consider, in addition to an auction, "such other transaction as would satisfy such outstanding judgment(s) while maximizing the sale price of any assets to be sold").

Undisputed evidence demonstrates the Special Master and his Advisors did not engage in a design process consistent with Delaware law, corporate norms, or the size and complexity of their assignment. Instead, in large measure because the Special Master selected outside lawyers and advisers who are most familiar and comfortable with bankruptcy processes, they adopted a proposal replete with the hallmarks of a bankruptcy sale of a distressed company, such as use of a stalking horse bidder and affording the Special Master the power to interfere with CITGO's and PDVH's contractual obligations.[7] The PSPO should be rejected in its entirety and the Special Master should be directed to redesign the process correctly.

## II. The Court Should Sustain the Venezuela Parties' Remaining Objections.[8]

Absent rejection of the PSPO, it should at least be revamped by sustaining the Venezuela Parties' objections to certain provisions, which may lessen the PSPO's value-destroying effects.[9]

---

[6] *E.g.*, D.I. 354 at 2–4, 9; D.I. 354-1 ¶¶ 12–13; D.I. 355 at 24; D.I. 385 at 6–7; D.I. 397.2 at 17–18; D.I. 423 at 2, 4.
[7] In fact, the only evidence the Special Master has offered is a declaration from Evercore's senior managing director admitting that "neither Evercore nor the Special Master conducted a valuation of the PDVH Shares or CITGO," yet asserting that "a value-maximizing sale will likely require an offer to sell 100% of the PDVH Shares." D.I. 348-1 ¶¶ 20-21.
[8] The Venezuela Parties view Table Objections 18(a–b), 20, 28, and 39 to have been addressed by the March 2 Order, with one exception. The Venezuela Parties reserve all rights and arguments regarding these Table Objections and all other objections and arguments regarding OFAC regulations and Evercore's conflict. The exception is Table Objection 20: The portion of the objection regarding proactive steps the Special Master intends to take to seek guidance from the United States regarding OFAC regulations was addressed by the Court's March 2 Order, but the Venezuela Parties' objection to the Court potentially taking action to prompt a response from the United States remains outstanding.
[9] Sustaining the Venezuela Parties' specific objections will improve the Special Master's proposal, and they request that the Court do so. The Venezuela Parties maintain, however, that the procedures proposed are incurably tainted by

3

### A. Stalking Horse Bidder Process and Good Faith Deposit

The Special Master has urged the Court to ignore objections regarding the Stalking Horse ("S.H.") Bidding process, on the basis that no S.H. Bidder or agreement has yet been proposed. D.I. 356 at 8–9. But resolving the Venezuela Parties' objections to the improper *mechanics* of the S.H. Bidder process and circumscribing the options available to the Special Master as he solicits potential S.H. Bidders may reduce the likelihood that selecting a S.H. Bid generates a value-destroying sale. Specifically, the Court should: (1) require a S.H. Bid to be the bid for the lowest percentage of shares sufficient to satisfy the judgment(s); (2) eliminate a break-up fee for a S.H. Bidder if it is outbid or if the Venezuela Parties settle; (3) eliminate any minimum overbid protection[10] for a S.H. Bidder; and (4) eliminate the break-up fee for a S.H. Bidder if it is a credit bidder. T.O. 5–8; D.I. 354 at 11; D.I. 385 at 5; D.I. 397-2 at 22.[11] In no event should any of the Venezuela Parties be required to pay a break-up fee. D.I. 354 at 11; D.I. 397-2 at 22.

The Venezuela Parties remain opposed to calculating a bidder's 10% good faith deposit based on the implied equity value of *all* of PDVH, as this would force bidders who submit a bid for less than 100% of the PDVH shares to deposit a *higher* percentage of their cash bid than a less desirable 100% bidder.[12] T.O. 5; D.I. 354 at 6–7, 12. Moreover, the PSPO continues to confuse the amount of cash being raised with the implied equity value of PDVH, thus unnecessarily raising the deposit requirements for all bidders compared to the funds actually being raised.

---

the Evercore conflict and the Special Master's threshold failures to follow the four steps described in Section I. *See* Ex. 1 ¶¶ 4, 21. Thus, even if all of the requested improvements are made, the Venezuela Parties preserve their objection to the procedures' overall propriety on these and other grounds expressed in previous filings.

[10] The Venezuela Parties have demonstrated how an overbid minimum could result in a bid for 100% of the shares defeating a bid for as little as 10% of the PDVH shares. *See* D.I. 397.2 at 20. This illustrates that certain provisions of the PSPO contravene Delaware law's requirement that only as few shares as necessary be sold and that the proposal is laced with provisions geared toward a 100% sale. The Bidding Procedures do provide that the Special Master may "adjust[]" an overbid minimum requirement "for any Bids for a lesser percentage of the PDVH shares than the Stalking Horse Bid," but this "adjustment" is not defined and appears purely discretionary. D.I. 451-1 Ex. A, Ex. 1 at 7.

[11] Pin cites for D.I. 397-2 used throughout this brief refer to the slide number, not the ECF page number.

[12] The Venezuela Parties have previously proposed that, if a deposit remains in the sale procedures, it should be reduced to 5% or less of the *cash* bid (not the implied equity value of the bid). D.I. 354 at 12.

4

The Venezuela Parties also believe that a 10% deposit will discourage bidders, who may be unwilling to tie up capital in a sale that may never be permitted to close. D.I. 354 at 6 (citing D.I. 354-1 ¶ 36). To account for the chilling effect caused by the uncertainties surrounding the proposed sale procedure, any good faith deposit should have a means to be reduced or returned to bidders who withdraw or modify their bids upon the occurrence of significant delays or if material changes in the market or in OFAC's position occur. T.O. 37; D.I. 354 at 12; D.I. 397-2 at 23.

The Venezuela Parties object that the PSPO's good faith deposit requirement for credit bidders, D.I. 451-1, Ex. A ¶ 25, Ex. 1 at 12–13, will give Crystallex's credit bid an unfair advantage. *See* D.I. 354 at 12; D.I. 354-1 ¶ 36; D.I. 397-2 at 23; T.O. 11 (Venezuela Parties' Response column). On November 8, 2021, the Special Master's counsel proposed an alternative, non-cash mechanism whereby Crystallex would agree to waive 10% of its *entire judgment*—not 10% of its bid—if it walked away from an auction. D.I. 409 at 188:14–18. Crystallex agreed. *Id.* at 189:1–6. But the language in the PSPO instead would require a credit bidder to waive 10% of the *portion* of its judgment that it credit bids, capped at $50 million (*i.e.*, the deposit on only $500 million of its potential $1 billion credit bid based on its outstanding judgment). D.I. 451-1 Ex. A, Ex. 1 at 12. This exacerbates the misaligned incentives associated with the credit bidder deposit requirement, nor is there any explanation as to why the 10% requirement would not apply to credit bids above $500 million. The credit bidder would still be able to walk away from the auction (*e.g.*, to pursue other assets) with very minor consequences, leaving in its wake an auction in which all bids are depressed. A credit bidder should have real "skin in the game"—such as the Special Master's proposal that it waive a *full 10%* of its judgment. Unlike a non-credit bidder, a credit bidder does not have to come up with a cash deposit to bid, so there is no reason to cap the non-cash penalty upon failing to follow through with its bid.

### B. The Venezuela Parties' Role in the Process

The Venezuela Parties object to provisions that limit their access to and participation in a sale process.[13] Such participation would be essential to maximizing value. *See* T.O. 12 (remove limits on ability to market, negotiate with bidders, review bids, and respond to bidders' requests); T.O. 13 (PDVH and CITGO should draft the CIM and Teaser); T.O. 14 (require receipt of bids as they are submitted); T.O. 16 (permit negotiation with bidders and evaluation of bids); D.I. 397-2 at 24 (permit soliciting bidders, communicating with bidders without preapproval, and CITGO administration of due diligence and responses to bidders' questions); D.I. 354 at 12–13; *see also* D.I. 234 at 35 (citing *Deibler v. Atl. Props. Grp., Inc.*, 652 A.2d 553, 557–58 (Del. 1995)). The Venezuela Parties understand that Crystallex agrees that there should be no restrictions on their ability to market the PDVH shares.

### C. Improper and Counterproductive Authority for the Special Master

The Venezuela Parties reiterate that the Special Master should not be given power, without further order of court, to compel their assistance, T.O. 19, and should not be permitted to materially alter the sale procedures after they are entered by the Court in the manner suggested by the Special Master's counsel on November 8, T.O. 46 (citing D.I. 409 at 167:23–169:8, 170:21-171:10); D.I. 423 at 5; D.I. 423-1 at II (describing value-destroying effects of such uncertainty).

Further, the Special Master should not have any authority to communicate or negotiate with "any contract counterparty, any indenture trustee, administrative agent, or collateral agent, any holders of that certain series of bonds issued by PDVSA due in 2020 … or other person related to PDVH, CITGO, and their affiliates," much less *renegotiate* PDVH's, CITGO's, or their affiliates' contracts. T.O. 38; D.I. 354 at 20–21. While a trustee in bankruptcy may enter into

---

[13] While revisions to the PSPO have afforded some of the Venezuela Parties some additional participation rights, there should be no limits on their access to bids, bidders, and the market. Thus, these objections remain outstanding.

transactions on a debtor's behalf, 11 U.S.C. § 363(a), this is not a bankruptcy proceeding and the Special Master is not a bankruptcy trustee—his powers are limited to selling PDVSA's stock in PDVH, so he has no power over PDVH or its subsidiaries *at all*. No statute or other authority grants the Special Master the power to interfere or even intervene in the commercial relations of those companies. The Special Master's and his Advisors' belief that they can proceed as if this were a bankruptcy proceeding only confirms that they view this as a bankruptcy liquidation sale of an entire company.

### D. Other Creditors' Participation

If other judgment creditors join the sale process, they should be required to pay their fair share of the fees and costs incurred by the Special Master and his Advisors, and there is no reason to have other holders of judgments against the Republic or PDVSA—but who do not have attachments—submit proposed judgment amounts at this time. T.O. 41, 43.[14]

### E. Crystallex's Objections

The Venezuela Parties *agree* with two Crystallex objections. T.O. 31 (Evercore deserves *no* success fee—now recast as a "completion fee"—if the auction results in a successful Crystallex credit bid); T.O. 36 (objection to non-cash consideration associated with bids). *See also* D.I. 397-2 at 25. The Venezuela Parties *disagree* with Crystallex's Table Objections 29, 32, 33, 34, and 35. Crystallex's objection seeking to withdraw the Special Master's authority to declare no winning

---

[14] As reflected in D.I. 423.2, Table Objections 9, 21, 23, 24, and 25 have been resolved. Table Objection 22 was mooted by the order establishing new budget procedures (D.I. 395), but the Venezuela Parties reserve the right to object to the size of and justification for the Special Master's fees. Table Objection 26 has not been addressed by the Court in writing (*see also* D.I. 397.2 at 25), but the Venezuela Parties understand from the November 8 hearing that the Court will protect their ability to appeal any final sale order and any objecting party will have an opportunity to seek a stay of such order pending appeal. Table Objection 44 was an unintentional duplicate of Table Objection 41.

    The Venezuela Parties have previously argued that the Special Master should be required—consistent with 8 Del. C. § 324(a)—to select as the Successful Bid the bid for the lowest percentage of shares sufficient to satisfy the Attached Judgment(s), unless PDVSA selects a different sufficient bid, and to permit second-round bids with a lower implied equity value than a Stalking Horse Bid if such bid offers to purchase less than 100% of the PDVH shares and is sufficient to satisfy the Attached Judgment(s). T.O. 10; D.I. 354 at 11. The PSPO appears to have resolved this objection in the Venezuela Parties' favor. D.I. 451-1 Ex. A, Ex. 1 at 14, 17.

bid (T.O 35)—is especially problematic (and contrary to law), for the reasons described in D.I. 355 at 18–24. *See also* D.I. 397-2 at 25. The Venezuela Parties express no view on Crystallex's Table Objection 30, and instead refer to their objections to the new proposed Evercore Agreement.

### III.  The Special Master's Newest Revisions to the PSPO Require Alteration.

The Venezuela Parties object to, and request revision of, three *new* changes to the PSPO, which were designed in response to the March 2 Order. First, the Court directed the Special Master to seek guidance from OFAC during the Six-Month Trigger Window "that may be shared with the market." D.I. 443 at 17. Paragraph 3 of the PSPO should expressly reflect this requirement, as proposed (and rejected) by the Venezuela Parties to the Special Master (*see* Exhibit 3). Guidance from OFAC can only reduce uncertainty that would discourage bidders if such guidance can be made public.

Second, CITGO and PDVH should be permitted to communicate with Potential Bidders—not just the Republic and PDVSA. *See* D.I. 451-1, Ex. A ¶ 39. The PDVH shares' value is based on CITGO's value. CITGO and PDVH know the most about CITGO's business and value and should not be excluded from communications with Potential Bidders. Ex. 1 ¶ 12.

Third, the PSPO requires the Special Master to provide to Crystallex information regarding his market inquiries with potential bidders prior to launch, D.I. 451-1, Ex. A ¶ 4, which is inappropriate given that Crystallex has *announced* its intention to be one such bidder, *see, e.g.,* D.I. 357 at 14. Absent agreeing to forego a credit bid, Crystallex should not have access to such information because it could use that information to gain an unfair advantage when crafting its bid.

### IV.  The Revised Evercore Agreement Proposal Is Still Problematic.

Many of the Venezuela Parties' objections to the previous proposed Evercore agreement have not been addressed. *See, e.g.*, T.O. 18(c–d) (the fees are unreasonable; the Sale Process Parties

should not have to pay the Upfront Fee, but if they do, should pay no more than their share); T.O. 27 (Evercore should not have judicial immunity); T.O. 40 (Venezuela Parties should not be responsible for any fees for Evercore or the Special Master associated with settlement negotiations or the 2020 bonds); T.O. 42(a, c–e) (regarding the Sale Fee (now replaced with Completion Fee), upfront payments, restructuring fee, and ConocoPhillips's obligations to pay certain fees).[15] Table Objection 18(e) has been resolved by Paragraph 44 of the PSPO.

The revised proposed Evercore retention agreement also suffers from additional flaws. For example, ignoring suggestions from this Court to eliminate contingent fees, D.I. 443 at 11, the Special Master has again proposed that Evercore be retained for the second stage, but this time paid a fixed fee contingent on getting an "indication of interest" from a potential bidder and a further fixed fee contingent upon completing a sale. D.I. 451-1 Ex. A, Ex. 3.B at 3; *accord* D.I. 455 at 1-2. Nor did the Special Master follow the Court's suggestion to attempt to find another investment banker that would take on the assignment on a non-contingent basis, D.I. 443 at 12, making it all the more clear that Evercore running the sale process was never truly in doubt. Neither common sense nor industry practice supports compensating Evercore for the mere receipt of an indication of interest, as such indications alone do not suggest that any bid will be made, much less accepted. Ex. 1 ¶ 17; *accord* D.I. 455 at 2. Even worse, paying Evercore a Completion Fee "payable upon consummation of … a Financing," D.I. 451-1 Ex. A, Ex. 3.B at 3, is completely unreasonable. "As structured, Evercore could earn $20 million if CITGO or PDVH undertakes an internal financing that affords $1 to Crystallex's judgment. Evercore would also earn $20 million

---

[15] The Special Master has stated that the Court may choose to adopt the prior version of the proposed Evercore retention agreement (previously filed as D.I. 347 Ex. 3). D.I. 451-1 Ex. A ¶ K n.5. For the reasons stated in previous filings and at the November 8 hearing, the Court should not adopt the prior version. *See* T.O. 18(c–d), (f); T.O. 42. In particular, basing Evercore's compensation on "aggregate consideration," including all debt outstanding at the time a sale closes, D.I. 451-1 Ex. A, Ex. 3.A at 3–4, is inappropriate, as this compensation structure incentivizes Evercore to sell more than the fewest number of shares necessary to satisfy the Attached Judgment(s). T.O. 18(f), 42(b).

9

if PDVH resolves Crystallex's judgment on its own without Evercore's help. Evercore's fee should be tied to its work selling the shares in the manner prescribed by the Court, not a catchall 'Financing.'" Ex. 1 ¶ 18.

The flat Completion Fee for a successful third-party bid incentivizes Evercore to sell 100% of the shares for the minimum amount necessary to obtain its flat fee. It will be much easier—and profit-maximizing—for Evercore to craft a 100% sale at that amount than to spend the time and money to pursue minority-stake investors, explore minority shareholder rights, and run a sale for a minority share, or even to seek the highest value for 100% of the stock. Ex. 1 ¶¶ 13–16. In addition, Evercore's monthly fees are not tied to reaching any milestone—the retention agreement contemplates that they will be compensated regardless of the work they do. D.I. 451-1 Ex. A, Ex. 3.B at 2–3. At minimum, 100% of Evercore's monthly fees—rather than 50% or 75%—should be credited against Evercore's Completion Fee. *Id.* at 2. Further, if the winning bid is a Crystallex credit bid, there is no basis for Evercore to receive anything, much less the contingency fee proposed by the Special Master, because "providing a Completion Fee for a successful credit bid reduces any incentive for Evercore to drive value" by enabling it to "pursu[e] a $15 million payout for a quick-and-easy 100% credit bid" that requires "essentially no work." Ex. 1 ¶ 16. *Cf.* T.O. 31; D.I. 316 at 24–25 (Crystallex objecting to a sizeable proposed sale fee in the event of a successful credit bid). For all of these reasons, the revised Evercore proposal fails to respond to the Venezuela Parties' concerns and is unacceptable.[16]

---

[16] Even if the Special Master had proposed different terms, no amendment to Evercore's fee structure would be satisfactory to the Venezuela Parties given that the work product generated under the prior proposed Evercore retention agreement is the product of the conflict. The Venezuela Parties understand that the Court has rejected that view but preserve all rights and arguments related to Evercore's expectation—or hope—of receiving a contingency fee to run the sale it designed, such that Evercore labored under a conflict of interest as it assisted the Special Master in designing the proposed sale process. No post-hoc revision of Evercore's fee structure can cure the taint—and the fundamentally flawed procedures geared toward a 100% sale—resulting from its conflicted advice. Ex. 1 ¶ 21.

RESPECTFULLY SUBMITTED,

April 11, 2022

|  |  |
|---|---|
|  | MORRIS, NICHOLS, ARSHT & TUNNELL LLP |
|  | |
|  | */s/ Kenneth J. Nachbar* |
| OF COUNSEL: | Kenneth J. Nachbar (#2067) |
| Nathan P. Eimer | Alexandra M. Cumings (#6146) |
| Lisa S. Meyer | 1201 North Market Street |
| Daniel D. Birk | Wilmington, DE 19801 |
| Gregory M. Schweizer | (302) 658-9200 |
| EIMER STAHL LLP | KNachbar@mnat.com |
| 224 South Michigan Avenue | ACumings@mnat.com |
| Suite 1100 |  |
| Chicago, IL 60604 | *Attorneys for PDV Holding, Inc., and* |
| (312) 660-7600 | *CITGO Petroleum Corporation* |
| NEimer@eimerstahl.com |  |
| LMeyer@eimerstahl.com |  |
| DBirk@eimerstahl.com |  |
| GSchweizer@eimerstahl.com |  |

|  |  |
|---|---|
|  | HEYMAN ENERIO GATTUSO & HIRZEL LLP |
|  |  |
|  | */s/ Samuel Taylor Hirzel, II* |
| OF COUNSEL: | Samuel Taylor Hirzel, II (#4415) |
| Joseph D. Pizzurro | 300 Delaware Avenue, Suite 200 |
| Julia B. Mosse | Wilmington, DE 19801 |
| Kevin A. Meehan | (302) 472-7300 |
| Juan O. Perla | shirzel@hegh.law |
| CURTIS, MALLET-PREVOST, |  |
| COLT & MOSLE LLP | *Attorney for Petróleos de Venezuela, S.A.* |
| 101 Park Avenue |  |
| New York, NY 10178 |  |
| (212) 696-6000 |  |
| jpizzurro@curtis.com |  |
| jmosse@curtis.com |  |
| kmeehan@curtis.com |  |
| jperla@curtis.com |  |

11

| | |
|---|---|
| | ABRAMS & BAYLISS LLP |
| | |
| | /s/ Stephen C. Childs |
| OF COUNSEL: | A. Thompson Bayliss (#4379) |
| Donald B. Verrilli, Jr. | Stephen C. Childs (#6711) |
| Elaine J. Goldenberg | 20 Montchanin Road, Suite 200 |
| Ginger D. Anders | Wilmington, DE 19807 |
| Brendan B. Gants | (302) 778-1000 |
| Jacobus P. van der Ven | bayliss@abramsbayliss.com |
| Munger, Tolles & Olson LLP | childs@abramsbayliss.com |
| 601 Massachusetts Avenue NW | |
| Suite 500 E | *Attorneys for Bolivarian Republic of Venezuela* |
| Washington, D.C. 20001 | |
| (202) 220-1100 | |
| Donald.Verrilli@mto.com | |

George M. Garvey
Munger, Tolles & Olson LLP
350 South Grand Avenue, 50th Floor
Los Angeles, CA 90071
(213) 683-9100
George.Garvey@mto.com