IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

CRYSTALLEX INTERNATIONAL
CORPORATION,

              Plaintiff,

    v.

BOLIVARIAN REPUBLIC OF
VENEZUELA,

              Defendant.

C.A. No. 17-151-LPS

**CRYSTALLEX'S RESPONSE TO THE VENEZUELA PARTIES' RESPONSE TO THE SPECIAL MASTER'S FOURTH PROPOSED SALE PROCEDURES**

Plaintiff and Judgment Creditor Crystallex International Corporation respectfully submits this response to the Venezuela Parties' Response to the Special Master's Fourth Revised Proposed Sale Procedures Order. D.I. 457.[1]

The Special Master's Fourth Revised Proposed Sale Procedures Order—which proposes a sale process that far exceeds the minimal requirements of Delaware law—addresses many of the issues raised by the Venezuela Parties (and others) at the November 8, 2021 hearing before this Court and also implements this Court's directives in its March 2, 2022 Opinion and Order. D.I. 443; D.I. 444. While not perfect, the efforts of the Special Master and his advisors should be commended. Instead, the Venezuela Parties continue to object to any sale of the PDVH Shares at public auction and ask this Court to reject the Special Master's proposals aimed at implementing a robust sale process. The arguments advanced by the Venezuela Parties are largely makeweight intended to delay the long overdue satisfaction of Crystallex's outstanding judgment. But

---

[1] To the extent not otherwise defined herein, capitalized terms have the same meaning ascribed to them in the Special Master's Fourth Revised Proposed Sale Procedures Order. D.I. 451-1.

Venezuela has already had more than five years to pay Crystallex's $1.4 billion judgment, including interest. It refuses to do so. Even today, Venezuela could simply pay Crystallex's outstanding judgment and stop all efforts to sell the PDVH Shares, saving time and expense for all involved. Rather than pay what is owed, the Venezuela Parties offer no path to payment and instead seek nothing more than further delay. Respectfully, the Venezuela Parties' objections should be overruled so that the sale process may commence forthwith.

I.  **An Auction Of The PDVH Shares Is Appropriate And Wholly Consistent With Delaware Law.**

The Venezuela Parties begin their latest attack on the Special Master's proposed sale process by renewing their arguments that an auction of the PDVH Shares is improper and that the Special Master failed to consider alternative procedures for selling less than 100% of the PDVH Shares. As an initial matter, the allegation is wrong; the Special Master did consider alternatives—he and his advisors simply found them wanting. *See, e.g.*, D.I. 409 at 160:23-161:15.

While the Venezuela Parties suggest that there may be a number of alternative sale processes that would result in greater value for the PDVH Shares than the Special Master's proposed auction, they focus their challenge on the Special Master's purported failure to explore a non-statutory sale of a minority interest in PDVH before designing the current sale procedures. D.I. 457 at 2-3. Specifically, the Venezuela Parties contend that the Special Master's failure to discuss potential minority protections with PDVSA before submitting the first proposed sale procedures order fatally and irreversibly contaminated the design of the auction. *Id*. Leaving aside the obvious point that the Venezuela Parties could simply have told the Special Master what minority rights they were willing to offer but apparently chose not to share that information proactively, the Venezuela Parties can point to nothing in Delaware law that requires the Special

2

Master or this Court to jump through hoops created by the judgment debtor in order to conduct an execution sale to satisfy a final and fully affirmed judgment.[2]

Of course, the Venezuela Parties should be permitted to seek out minority investors and to offer them whatever minority rights and protections they wish. They can do that before the execution sale and, if successful, can then pay over the sale proceeds in satisfaction of Crystallex's judgment. Or, the Venezuela Parties can encourage such potential minority investors that they are able to locate to bid for the shares at the judicial auction. That is Venezuela's right under Delaware law. *Diebler v. Atl. Props. Grp., Inc.*, 652 A.2d 553, 557-58 (Del. 1995). Delaware law, however, does not require the elaborate procedures sought by the Venezuela Parties here—procedures that merely introduce complexity that Venezuela can leverage for further delay. Rather, it requires nothing more than a noticed auction of the PDVH Shares. 8 *Del. Code* § 324; *Diebler*, 652 A.2d at 555, 558. The Fourth Revised Proposed Sale Procedures Order goes well beyond the limited statutory requirements.

In any event, having hired JPMorgan, a founding member of Wasserstein Perella, and scores of sophisticated counsel, the Venezuela Parties have no shortage of experts and advisers with experience in asset sales.[3] Although the Venezuela Parties' papers do not identify any particular potential minority investors, there is no reason to doubt that JPMorgan and the Venezuela Parties' other advisors can find any potential minority investors that may exist. And, in the Venezuela Parties' imagined scenario, they will still be in control of PDVH post-sale and can offer hypothetical investors whatever minority investor rights they believe necessary and

---

[2] Crystallex addresses an earlier iteration of the Venezuela Parties' arguments in detail in its response to the Venezuela Parties' objections to a prior version of the proposed sale procedures. *See* D.I. 360 at 7-8.

[3] "Citgo Hires JPMorgan to Deal with Creditors Trying to Take Over," BLOOMBERG, September 24, 2021, available at https://www.bloomberg.com/news/articles/2021-09-24/jpmorgan-hired-in-venezuela-opposition-s-bid-to-keep-citgo; D.I. 354-1 at 1.

appropriate. The Venezuela Parties also can design whatever minority investor rights they think will be attractive to the hypothetical investors without this Court sending the Special Master back to the drawing board to design a new sale process as requested by the Venezuela Parties.

To be clear, Crystallex agrees that if its judgment can be satisfied through the sale of less than all of the PDVH Shares to a bidder with the ability to perform and close the sale, then such a sale should be approved by the Court. And, there is nothing in the Fourth Revised Proposed Sale Procedures Order that prevents Venezuela from paying Crystallex's judgment prior to the completion of the sale process, thereby terminating the auction before it even begins. If interest in potential minority shareholdings does, in fact, exist, then the Venezuela Parties are welcome to attempt to negotiate a private sale. Crystallex's objective is to recover what it is owed on its judgment, and if the Venezuela Parties can effectuate that recovery without selling all of the PDVH shares, Crystallex would be delighted. Crystallex would also gladly accept payment from any of Venezuela's other assets, including, Venezuela's substantial gold reserves at the Bank of England, which would avoid the time and expense associated with an execution sale of the PDVH Shares.[4] What Crystallex does object to is the Venezuela Parties' blatant attempt to further delay the sale process. Any prejudice to the Venezuela Parties as result of a forced sale of the PDVH Shares is of the Venezuela Parties' own making. Consistent with this Court's March 2, 2022 Opinion and Order, a sale procedures order should be entered and implemented to the fullest extent possible.

**II.     The Venezuela Parties' Objections To The Good Faith Deposit Provisions Of The Fourth Revised Proposed Sale Procedures Order Should Be Rejected.**

The Fourth Revised Proposed Sale Procedures Order provides for a good faith deposit of 10% of the winning bid or $50 million, whichever is less, which would be surrendered should the

---

[4] "Top Court Allows Venezuela's Juan Guaido to Assert Control of $1 billion Gold," BLOOMBERG, December 20, 2021, available at https://www.bloomberg.com/news/articles/2021-12-20/supreme-court-allows-guaido-to-assert-control-of-1-billion-gold.

winning bidder fail to close an approved Sale Transaction. D.I. 451-1, Ex. 1 at 12-13. In the case of a cash bid, the deposit would be in cash. *Id*. at 12. And, in the case of a credit bid, the 10% good faith deposit would come in the form of an agreement to surrender an amount of the bidder's judgment if it walks away from the winning bid. *Id*. Astonishingly, the Venezuela Parties object to both of these provisions—simultaneously arguing that little to no cash deposit should be required of any cash bidder and that the amount surrendered in the case of credit bid should be 10% of the total judgment, regardless of the amount of the credit bid. Both positions are absurd.

The purpose of requiring a good faith deposit is "[t]o ensure that only serious bidders participate, and that only a bidder seriously interested in completing the transaction wins the auction." D.I. 234 at 36. This Court has already held that a substantial deposit shall be required "to provide an adequate incentive to close the deal." *Id*. Even the Venezuela Parties seem to appreciate the value of a bidder having "real 'skin in the game'" in the form of some financial loss should they walk away from a winning bid and subsequent approved Sale Transaction. D.I. 457 at 5. Whatever legitimate concerns the Venezuela Parties may have concerning the potential size of the required good faith deposit are addressed by the $50 million cap that applies to such deposits under the proposed Bidding Procedures. D.I. 451-1, Ex. 1 at 12-13. This cap, which the Venezuela Parties' papers conveniently ignore, ensures that the winning bidder has an incentive to see the sale process to the end, particularly given the potentially lengthy time between the selection of the best bid and the closing of the sale of the PDVH Shares, while not discouraging potential bidders who might otherwise be concerned about tying up substantial amounts of cash for an indeterminate period of time.[5] *See* D.I. 356 at 8.

---

[5] Crystallex has no objection to the Venezuela Parties' proposal that the good faith deposit be calculated as percentage of the amount of a cash bid, rather than as a percentage of the implied equity value of the bid. D.I. 457 at 4 n.12.

The Venezuela Parties' position that 10% of a credit bidder's judgment should be surrendered in the event that it fails to close on a winning credit bid, regardless of the amount of such credit bid, is both nonsensical and without precedent. As an initial matter, the Venezuela Parties' argument turns on the idea that, absent the possibility of a substantial penalty, the credit bidder—*i.e.* Crystallex—could walk away from a winning credit bid and that the Venezuela Parties would be harmed as a result. The very notion ignores the fact that the whole point of the auction is to satisfy Crystallex's judgment. If, as the Venezuela Parties suppose, Crystallex abandons the auction to pursue other, unspecified assets of Venezuela, it would not, as Venezuela suggests, leave "in its wake an auction in which all bids are depressed." D.I. 457 at 5. Rather it would be the end of the auction, as Crystallex's judgment would have been satisfied and there would be no need to sell the PDVH Shares. Notwithstanding the absurdity of the Venezuela Parties' position, Crystallex has agreed to surrender a portion of its judgment, in an amount up to 10% of its credit bid or $50 million, whichever is less, should it fail to close a winning credit bid.[6] But there is certainly no merit to the argument that Crystallex should be penalized more than any other winning bidder in the event it declines to close on a winning credit bid.[7] *See also* D.I. 360 at 14-16 (discussing Crystallex's incentives to close on any winning credit bid).

---

[6] The Venezuela Parties contend that the Special Master and Crystallex agreed at the November 8, 2021 hearing to a judgment reduction amount equal to 10% of Crystallex's judgment without regard to the amount of Crystallex's credit bid. The transcript does not support this claim. Rather, the Special Master proposed a reduction of "ten percent of the judgment *or something*" in the event that Crystallex failed to close a winning credit bid, D.I. 409 at 188:16-17 (emphasis added), and Crystallex later indicated a willingness to "reduce [its] judgment by some amount." *Id.* at 189:6-8. Nowhere did Crystallex agree to a 10% reduction of its judgment.

[7] Crystallex has previously argued that the Special Master should not have the unilateral power to reject all bids and declare a failed auction. D.I. 357 at 15-17. In their papers, the Venezuela Parties make a passing reference to their continued disagreement on this point. Whatever the power this Court may have to reject any and all bids, it remains Crystallex's view that the best bid may be presented to the Court. It may be that the Special Master will recommend that no bid be selected as the winner. If any of the Sale Process Parties disagree, they should be allowed to put the issue to the Court. Depending on the terms of the best bid obtained, this Court may or

### III. The Venezuela Parties' Requests To Further Modify The Fourth Revised Proposed Sale Procedures Order Should Be Rejected.

As the Court is aware, the Fourth Revised Proposed Sale Process Order seeks to implement this Court's Six Month Trigger Window for seeking further insights from OFAC, while simultaneously permitting market inquiries by the Special Master as to the "impact of OFAC's position (or lack thereof) on [potential bidders] willingness to participate in a sale process that is conditioned on OFAC's final approval of any sale transaction." D.I. 451-1 at 11. The purpose of this provision is not to solicit bids for the PDVH Shares, but rather to determine how, if at all, the absence of detailed OFAC guidance at this time or the possibility that a specific license may not issue prior to the commencement of the auction might affect engagement with the Special Master's proposed sale process. Crystallex has a deeply vested interest in participating in this market testing, particularly if the Special Master intends to rely on the responses to his inquiries in formulating his further recommendations to the Court regarding the time for initiating the formal auction process.

Apparently recognizing the value of participating in the market test process and the effect the process might have on how this Court proceeds towards the ultimate sale of the PDVH Shares, the Venezuela Parties demand that the identity and extent of any communications with market participants or potential bidders be provided to the Venezuela Parties but withheld from Crystallex. This proposal is untenable. Feedback received by the Special Master during this pre-marketing phase may and likely will inform this Court's evaluation of when to trigger the sale process. The Special Master will not be soliciting bids, but rather collecting information as to the conditions under which potential bidders might participate in the auction of the PDVH Shares. D.I. 451 at 11.

may not agree to select that bid as the winning bid. But, as provided in the Fourth Revised Proposed Sale Procedures Order, the ultimate decision should be that of the Court, not the Special Master. *See* D.I. 151-1 at 16-17.

Putting that information into its proper context will be critical in any subsequent briefing over when to commence the sale process.  Thus, all Sale Process Parties must be afforded the same access to the Special Master's market testing procedures and communications.[8]

The Venezuela Parties also request that the Fourth Revised Proposed Sale Process Order include language directing the Special Master to seek OFAC guidance "that may be shared with the market." D.I. 457 at 8 (quoting D.I. 447 at 17).  Crystallex does not believe that such language is necessary or that the absence of OFAC guidance can or should delay the initiation of the sale process after the Six Month Trigger Window.  However, to the extent that the sale process order is to include specific directions to the Special Master with respect to his efforts to engage OFAC during the Six Month Trigger Window, Crystallex believes the better formulation is found elsewhere in the Court's March 2, 2022 Order—specifically, the Court's direction that the Special Master "attempt to gain greater clarity from OFAC, in a form he can share with the market, of its support for (or at least non-opposition to), the sale process." D.I. 447 at 40.

Lastly, the Venezuela Parties propose that CITGO and PDVH be permitted to communicate with potential bidders in the same manner as Venezuela and PDVSA.  Crystallex is amenable to such communications, provided that (i) the Special Master is given advance notice of all communications and attempted communications with potential bidders, and (ii) any information provided to potential bidders by CITGO or PDVH (or any other Venezuela Party) be made available to the Special Master and all other potential bidders.  The Venezuela Parties may be one of the best sources of information regarding the value of the PDVH Shares and the operations of PDVH's downstream subsidiaries, but they also have no interest in allowing the PDVH Shares to

---

[8] To the extent the Special Master's conversations unexpectedly elicit detailed proposals or potential bids, those bids might properly be withheld from other potential bidders, but, at a minimum, which entities are contacted and what information is sought from each potential bidder should be shared with all Sale Process Parties.

be sold.  Moreover, the Venezuela Parties have amply demonstrated their willingness to deploy every delay tactic in the book to avoid satisfying Crystallex's judgment.  Accordingly, they should not be permitted to impede the auction of the PDVH Shares through unsupervised communications with potential bidders.  *See, e.g.*, D.I. 360 at 9-11 (addressing dangers of giving Venezuela too much influence over the sale process).

## CONCLUSION

For the reasons set forth above and in its prior submissions, Crystallex respectfully requests that this Court reject the Venezuela Parties' objections to the entry of a sale procedures order.

|  |  |
|---|---|
| OF COUNSEL:<br><br>Robert L. Weigel<br>Jason W. Myatt<br>Rahim Moloo<br>GIBSON, DUNN & CRUTCHER LLP<br>200 Park Avenue<br>New York, New York 10166<br>(212) 351-4000<br><br>Miguel A. Estrada<br>Lucas C. Townsend<br>GIBSON, DUNN & CRUTCHER LLP<br>1050 Connecticut Avenue, N.W.<br>Washington, D.C. 20036<br>Tel: (202) 955-8500<br>Fax: (202) 467-0539<br><br>Dated:  April 21, 2022 | */s/ Jeffrey L. Moyer*<br>Raymond J. DiCamillo (#3188)<br>Jeffrey L. Moyer (#3309)<br>Travis S. Hunter (#5350)<br>RICHARDS, LAYTON & FINGER, P.A.<br>One Rodney Square<br>920 North King Street<br>Wilmington, Delaware 19801<br>(302) 651-7700<br>dicamillo@rlf.com<br>moyer@rlf.com<br>hunter@rlf.com<br><br>*Attorneys for Plaintiff* |