# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| CRYSTALLEX INTERNATIONAL CORP., | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | )  Case No. 1:17-mc-00151-LPS |
| | ) |
| BOLIVARIAN REPUBLIC OF VENEZUELA, | ) |
| | ) |
| Defendant. | ) |
| | ) |

## PDVSA, PDVH, AND CITGO'S MOTION
## TO DISQUALIFY THE SPECIAL MASTER

PDVSA, PDVH, and CITGO[1] ("Movants") respectfully move to disqualify Special Master Robert B. Pincus, based on his improper *ex parte* communication and advocacy in a January 12, 2022, meeting with OFAC, and to suppress or vacate his tainted work product and any orders relying on the same. Movants are aware that the Court has already effectively rejected this objection in denying their Motion for an Order Directing the Special Master to Permit Counsel's Attendance at Meetings with the United States Government and Reply in support of the same. *See* D.I. 499; D.I. 505. Nevertheless, now that the improper meeting has occurred, Movants have legitimate grounds for seeking the Special Master's disqualification and wish to preserve their rights in that regard.[2]

## NATURE AND STAGE OF PROCEEDINGS

This is a post-judgment execution proceeding brought in 2017 by Plaintiff Crystallex International Corp., a judgment creditor of the Republic. In 2018, Crystallex attached the shares of stock in PDV Holding, Inc. ("PDVH") owned by the Republic's state-owned oil company, PDVSA to satisfy its judgment, and has unsuccessfully sought—and presumably is again seeking—to obtain a license from the United States Department of the Treasury's Office of Foreign Assets Control ("OFAC") to initiate and conclude an execution sale of the shares. The Venezuela Parties oppose the issuance of a license to both initiate and conclude an execution sale. And the United States Government has already stated—in this Court—that "moving

---

[1] Capitalized terms used by not defined herein have the meaning ascribed to them in the Court's January 14, 2021, Order, D.I. 234, and the Sale Procedures Order, D.I. 481.

[2] The Court also previously rejected the Venezuela Parties' argument that the Special Master's reliance on an adviser that has a financial conflict of interest, Evercore, creates a disqualifying appearance of partiality, in violation of 28 U.S.C. § 455(a), and triggers 28 U.S.C. § 455(b)(4), which provides that a judicial officer must be disqualified if he "has a financial interest in the subject matter in controversy or in a party to the proceeding, or any other interest that could be substantially affected by the outcome of the proceeding." *See* D.I. 443 at 2–12. To the extent the Court deems it appropriate to refer the recusal request to the Special Master in the first instance, Movants respectfully request that this motion be treated as addressed to the Special Master.

forward" with a sale "could imperil U.S. foreign policy and national security interests." D.I. 212 at 5.

On April 13, 2021, the Court appointed Mr. Pincus as a special master to assist in the design and implementation of an execution Sale Procedures Order ("SPO"). D.I. 234 at 36; D.I. 258 (order appointing Special Master). On October 11, 2022, this Court entered an SPO proposed by the Special Master. *See* D.I. 481. The SPO provides for a period of up to six months after the date of the SPO, during which "the Special Master and his Advisors shall solicit and attempt to gain clarity or guidance from the United States Department of the Treasury's Office of Foreign Assets Control ('OFAC') of its support for (or non-opposition to), the launch of the Marketing Process by the Special Master, the viability of the Marketing Process, and any additional feedback or guidance that the Special Master believes will more likely result in a value-maximizing Sale Transaction." *Id*. ¶ 3. After the Special Master submits his recommendation and the Sale Process Parties have an opportunity to object, this Court will "make a determination regarding when to trigger the Preparation Launch Date and subsequent Launch Date with or without a license from OFAC." *Id.* ¶ 4.

On January 9, 2023, the Venezuela Parties moved for an order directing the Special Master to permit their counsel's attendance at a January 12 meeting with the U.S. Government. D.I. 499. This Court denied that motion on January 11, 2023. D.I. 506. Upon information and belief, the Special Master met with OFAC *ex parte* on January 12, 2023.

## SUMMARY OF ARGUMENT

1. The Special Master must be disqualified due to his January 12 meeting with OFAC, and his tainted work product and any orders relying on that work product must be suppressed or vacated. The Special Master's *ex parte* communications with the U.S. Government

have created an appearance of partiality in contravention of 28 U.S.C. § 455(a), have given him "personal knowledge of disputed evidentiary facts concerning the proceeding" under 28 U.S.C. § 455(b)(1), and violate Canons 2 and 3 of the Code of Conduct for United States Judges.

2. In addition, the Special Master's expressed intent to advocate to the United States Government to revise its foreign policy positions and authorize a sale process designed to satisfy Crystallex's judgment has created (at the very least) an appearance of partiality in contravention of 28 U.S.C. § 455(a) and violates Canons 2 and 3 of the Code of Conduct and the Due Process Clause of the Fifth Amendment to the United States Constitution.

## STATEMENT OF FACTS

The August 9, 2021, PSPO submitted by the Special Master proposed to authorize the Special Master to "proactively engage with representatives from the Executive Branch … and to take all steps or actions reasonably in furtherance of the issuance of OFAC guidance and/or authorization." D.I. 347, ¶ 4. The Venezuela Parties objected to this provision, stating that the Special Master cannot "advocate to the Government on behalf of particular parties or for particular outcomes in regulatory determinations affecting those parties." D.I. 354 at 21. In response to this objection, the Special Master clarified that he did "not propose[] to" include a provision in the SPO allowing him to "lobb[y] on behalf of any particular party in this case" as part of the sale process. D.I. 356 ¶ 8. Neither the Court's May 27, 2021, order appointing the Special Master nor the SPO entered on October 7, 2022, expressly authorized the Special Master to engage in *ex parte* communications with the U.S. Government.

On December 28, 2022, the Special Master submitted a report advising the Court of his recent activities and fees incurred, which included meeting with his "Advisors regarding outreach to and negotiations with OFAC." D.I. 496 at 3. The Special Master stated that he had

scheduled "a meeting with representatives of the United States Department of the Treasury and the United States Department of Justice to take place [sometime] in January." *Id.* Following inquiry from the Venezuela Parties, the Special Master disclosed at 4:30 p.m. Eastern Standard Time on Friday, December 30, 2022, that the meeting was to take place on January 12, 2023 ("January 12 Meeting"). On January 3, 2022, the next business day after the New Year's Day holiday weekend, the Venezuela Parties requested that the parties be allowed to attend the meeting, but the Special Master rejected that request.

On January 9, 2023 (four business days after January 3), as soon as reasonably practicable given the need for internal decision making and approvals, to coordinate among counsel for the separate Venezuela Parties, and to draft the motion, the Venezuela Parties filed a motion requesting that they be allowed to attend the January 12 Meeting. D.I. 499. The Court set an expedited briefing schedule. D.I. 500. In response to the Venezuela Parties' motion, the Special Master stated that he intended to advocate for OFAC to support the launch of the sale process at this meeting and that allowing the Venezuela Parties to attend would "chill" his ability to advocate and to obtain *ex parte* statements from the Government. D.I. 503 ¶ 5; *see also id.* ¶ 5 (stating that the purpose of the January 12th Meeting was "to solicit OFAC's unencumbered views on the sale process, hear the Special Master's perspective on why OFAC *cooperation* with the Court's order is appropriate and necessary, and ascertain whether OFAC will issue a license or otherwise authorize the sale of the PDVH shares" (emphasis added)); D.I. 503 ¶ 3 ("There is no principle of judicial ethics requiring the Court's Special Master to not take actions, or even *advocate*, to enforce the Court's own judgment and those of other courts, of which the Special Master's engagement with OFAC is a part." (emphasis added)). To the best of Movants'

4

knowledge, the Special Master met with the U.S. Government on January 12, 2023, as scheduled, on an *ex parte* basis.

## LEGAL STANDARD

Under Federal Rule of Civil Procedure 53, a special master "must not have a relationship to the parties, attorneys, action, or court that would require disqualification of a judge under 28 U.S.C. § 455, unless the parties, with the court's approval, consent to the appointment after the master discloses any potential grounds for disqualification." Fed. R. Civ. P. 52(a)(2). Section 455(a) provides that a judicial officer "shall disqualify himself in any proceeding in which his impartiality might reasonably be questioned." 28 U.S.C. § 455(a). "The test for recusal under § 455(a) is whether a reasonable person, with knowledge of all the facts, would conclude that the judge's impartiality might reasonably be questioned." *In re Kensington Int'l Ltd.*, 368 F.3d 289, 301 (3d Cir. 2004) ("*Kensington I*"). In addition, the Due Process Clause of the Fifth Amendment to the United States Constitution "demands impartiality on the part of those who function in judicial or quasi-judicial capacities" and requires such persons to "assiduously refrain from becoming advocates for either party." *Abdulrahman v. Ashcroft*, 330 F.3d 587, 596 (3d Cir. 2003) (internal quotation marks omitted).

In addition, a judicial officer "shall" be disqualified under 28 U.S.C. § 455(b)(1) where he has "personal knowledge of disputed evidentiary facts concerning the proceeding." Information obtained during a proceeding is considered "personal knowledge" if that information does not "enter[] the record" and cannot be "controverted or tested by the tools of the adversary process." *In re Edgar*, 93 F.3d 256, 259 (7th Cir. 1996). "Section 455(b)(1) is embraced within the perception that a reasonable person might entertain that the judge's impartiality might reasonably be questioned." *Kensington I*, 368 F.3d at 316.

5

**ARGUMENT**

I. **The Special Master Must Be Disqualified for Engaging in *Ex Parte* Communications with the U.S. Government**

The Special Master has deliberately, and over the objection of the Venezuela Parties, engaged in *ex parte* communications with the U.S. Government regarding the substance of this action. Judicial officers are generally prohibited from engaging in *ex parte* communications with third parties regarding the substance of a matter. *See Kensington I*, 368 F.3d at 309–10; *see also* Code of Conduct for United States Judges ("Code of Conduct"), Canon 3(A)(4), *in* 2 Guide to Judiciary Policy, Ch. 2 3(C).[3] Engaging in *ex parte* communications is grounds for disqualification under 28 U.S.C. § 455(a) and § 455(b)(1).[4] *See Kensington I*, 368 F.3d at 309–15; *In re Edgar*, 93 F.3d at 258–61.[5]

Whether the Court should direct the Special Master to initiate the sale process is a critical, disputed issue in these proceedings. As the Special Master met with OFAC *ex parte* to discuss this issue, the Venezuela Parties will have no firsthand knowledge of any statements that are included in (or are omitted from) the Special Master's report. Thus, the Venezuela Parties will be unable "to adequately respond to or counter facts presented" and protect their interests, which requires disqualification under § 455(a) at a minimum. *Kensington I*, 368 F.3d at 310–11.

The Special Master's *ex parte* communications with the U.S. Government also require disqualification under 28 U.S.C. § 455(b)(1). "Mandatory disqualification under § 455(b)(1)" occurs when a judicial officer learns information relevant to the proceedings through "[o]ff-the-

---

[3] The Code of Conduct applies to special masters, with the exceptions of Canons 4A(3), 4B, 4C, 4D(4), and 5. *See* Code of Conduct at 2, 19.

[4] There is no question that § 455 applies in post-judgment enforcement proceedings. *See* 28 U.S.C. § 455(d)(1) (defining "proceeding" to include "pretrial, trial, appellate review, or other stages of litigation").

[5] *See also* Code of Conduct Canon 3(C) (stating that "[a] judge should disqualify himself or herself in a proceeding in which the judge's impartiality might reasonably be questioned").

6

record briefings." *Edgar*, 93 F.3d at 259. Here, the Special Master has been ordered to recommend to the Court whether or not the sale process should be launched, based in large part on what OFAC may or may not say regarding its "support for (or non-opposition to), the launch of the Marketing Process by the Special Master," D.I. 481 ¶ 3, and "the likelihood that [OFAC] will issue a specific license for a sale to close," D.I. 443 at 17. As the Special Master's meeting with OFAC on these subjects was entirely off-the-record, he now has personal knowledge of substantive information relevant to the proceedings that cannot be effectively tested or controverted.

In denying the Venezuela Parties' motion to attend the January 12 Meeting, the Court held that the Venezuela Parties waived any objection to the meeting by not objecting to the Special Master's prior *ex parte* communications with OFAC. *See* D.I. 506 at 2. Respectfully, that conclusion is incorrect for at least three reasons. *First*, unlike the communications here, the Special Master's previous communications with OFAC—at least to the best of Movants' knowledge—were not made for the purpose of obtaining factual information to be used in formulating a recommendation to the Court on a substantive issue in the case. *Second*, and regardless, even if the Venezuela Parties had somehow implicitly consented to these different *ex parte* communications *in the past*, that would provide no basis for concluding they had consented to *this one now*, especially when they had previously objected to the PSPO's proposal for the Special Master to engage with OFAC on the question of whether to launch the sale process (as opposed to a request for a Statement of Interest from the Court), D.I. 354 at 21, and vociferously objected to the January 12, 2023 meeting *before* it occurred, D.I. 499; D.I. 505. *Third*, and in all events, even if the Venezuela Parties' lack of prior objections were indicative of some sort of implied waiver for all *ex parte* communications with the Government—and they are not—

7

grounds for disqualification under § 455(b)(1) are not waivable, *see* § 455(e) ("No justice, judge, or magistrate judge shall accept from the parties to the proceeding a waiver of any ground for disqualification enumerated in subsection (b)); *In re Kensington Int'l Ltd.* ("*Kensington II*"), 353 F.3d 211, 221 (3d Cir. 2003), and grounds for disqualification under § 455(a) "may be accepted" *only* "if it is preceded by a full disclosure on the record of the basis for disqualification," 28 U.S.C. § 455(e); *see Kensington I*, 368 F.3d at 311. No such full disclosure on the record occurred here, much less a disclosure preceding an affirmative waiver by the Venezuela Parties.[6]

The Court also held that the Venezuela Parties' request to attend the January 12 Meeting was untimely. D.I. 506 at 1–2. Respectfully, the Venezuela Parties moved as swiftly as was reasonably practicable given that the date of the meeting was not disclosed until 4:30 p.m. on the Friday afternoon before the New Year's holiday weekend, and the Court's expedited briefing and hearing schedule allowed for all parties to be heard and for the Court to rule before the meeting was to occur. The Special Master had previously indicated that he had not yet made a final decision about whether to permit the parties to attend any future meeting with OFAC, *see* D.I. 480 at 2 n.2, and it was not until January 3, 2023, that he definitively rejected the parties' ability to attend.

In addition, a delay of ten days in bringing a challenge to a planned *ex parte* meeting before it occurred is not a ground for finding untimeliness under governing precedent. Section 455 imposes a mandatory duty on the judge to disqualify himself when enumerated circumstances occur, and it does not contain a timeliness requirement. While the Third Circuit

---

[6] The Court's order observes that the parties consented to *ex parte* communications between the Special Master and the parties and between the Special Master and the Court. D.I. 506 at 2–3. As the Venezuela Parties explained in their reply in support of their motion, however, no such consent was given to *ex parte* communications between the Special Master and the U.S. Government. D.I. 505 at 4–5.

8

has previously considered timeliness as "one of the factors which engages a court's discretion in determining whether a judge" who has refused to disqualify in compliance with the statute "shall be relieved from its assignment," it has made clear that any delay must be substantial and strategic, such as where "a litigant with knowledge of circumstances suggesting possible bias or prejudice hold[s] back, while calling upon the court for hopefully favorable rulings, and then seek[s] recusal when they are not forthcoming." *See Kensington I*, 368 F.3d at 312. (internal quotation marks omitted); *United States v. Furst*, 886 F.2d 558, 579, 581 (3d Cir. 1989) (holding that a motion for disqualification was timely because "[a]lthough it could have been presented sooner, the motion was presented to the district court prior to a proceeding over which the judge would preside" and the movant had not strategically delayed the motion to obtain favorable rulings). There is no such contention—and could not be any such contention—here.

Nor was there any prejudice from the timing of the request. The Court could have issued an order allowing a limited number of counsel for the parties to attend, and since the Venezuela Parties merely wanted to observe, not participate, there was no reason the meeting could not have proceeded as scheduled. Moreover, any fear of a "chilling effect" from the Venezuela Parties' presence would not have been a legitimate consideration, since anything that could not be said in the Venezuela Parties' presence is something that should not be said at all. Finally, even if the meeting could not have proceeded as scheduled, which is not the case, it would have been far better for the Special Master and all parties to have a short postponement or devise a different way to request OFAC's position than to proceed with an improper *ex parte* meeting.

## II.   The Special Master Must Be Disqualified Because He Has Acted as an Advocate

Crystallex's attempt to enforce its judgment by moving forward with the sale process at this time is a hotly disputed issue in this case, and inconsistent with the substance and import of the U.S. Government's position regarding the sale process. The Special Master's stated intent to

9

advocate to OFAC (essentially on behalf of Crystallex) renders the need for disqualification still more acute. The requirement that a judge remain an impartial arbiter and not an advocate for a particular party or a particular position is deeply engrained in the U.S. judicial system and is a clear ground for disqualification under 28 U.S.C. § 455(a) and the Due Process Clause. *See Abdulrahman*, 330 F.3d at 596 (stating that "due process demands impartiality on the part of those who function in judicial or quasi-judicial capacities" and that such persons "must assiduously refrain from becoming advocates for either party" (internal quotation marks omitted)); *Logue v. Dore*, 103 F.3d 1040, 1045 (1st Cir. 1997) ("[T]here are lines which a trial judge should not cross. For example, … he cannot become an advocate or otherwise use his judicial powers to advantage or disadvantage a party unfairly.").

Moreover, advocacy by a judge to the U.S. Government can create undue influence and cause separation of powers concerns. Thus, for example, judges are prohibited from participating in plea bargain negotiations and making parole recommendations. *See, e.g.*, *In re United States*, 572 F.3d 301, 311 (7th Cir. 2009) ("The judge who advocates a particular plea bargain may resent the government for disagreeing."); *United States v. Miles*, 10 F.3d 1135, 1139 (5th Cir. 1993) (stating that, a judge who "suggests or encourages a particular plea bargain may feel a personal stake in the agreement" and that, "[a]s a result of his participation, the judge is no longer a judicial officer or a neutral arbiter," but instead "becomes or seems to become an advocate for the resolution he has suggested to the defendant" (internal quotation marks omitted)); Committee on Codes of Conduct Adv. Op. No. 65 (stating that "[t]he responsibility for making commutation, pardon, and parole decisions falls to the executive branch" and that "because the [Justice] department is a frequent litigant in the federal courts, the potential exists that undue influence would be felt").

The Court rejected the Venezuela Parties' advocacy challenge on the ground that "[t]he Court understands the Special Master to mean he will 'advocate' (if that word even has applicability here) for the enforcement of the Court's orders, consistent with his previous efforts, and as the Court expressly contemplated and authorized him to do in aid of allowing the Court to fulfill its judicial duties." D.I. 506 at 2 n.2. Respectfully, nothing in the Special Master's prior statements, or the Court's prior orders, expressly contemplated the Special Master advocating that the U.S. Government support the launch of the sale process. In fact, the Venezuela Parties specifically objected to the Special Master engaging in this type of advocacy in August 2021, D.I. 354 at 21, and the Special Master assured them and this Court at that time that he had no intentions to do so, D.I. 356 ¶ 8.

Nor is there an exception for the prohibition on judicial advocacy for situations in which a Court is advocating for the enforcement of orders or judgments that it has issued. *See, e.g.*, *In re Boston's Children First*, 244 F.3d 164, 170 (1st Cir. 2001) (disqualifying judge whose ambiguous comments could be viewed "as an affirmative effort to enforce the law" and thus give the appearance of a lack of impartiality); *United States v. Cooley*, 1 F.3d 985, 995 (10th Cir. 1993) (a judge's out-of-court statements advocating "to see his order … enforced" against protesters "unavoidably created the appearance that the judge had become an active participant in bringing law and order to bear on the protesters, rather than remaining as a detached adjudicator"); *Broadman v. Comm'n on Judicial Performance*, 18 Cal. 4th 1079, 1104 (Cal. 1998) ("[b]y making public comments in an attempt to justify and defend his decisions while those decisions were pending on appeal," a judge "adopted the role of an advocate" in violation of state ethics rules).

Indeed, given that the United States Government has already stated—in this Court—that "moving forward" with a sale "could imperil U.S. foreign policy and national security interests," D.I. 212 at 5, advocacy to the Government to change its position was particularly egregious, since OFAC's determinations are rooted in Executive Branch evaluations of U.S. foreign policy and national security interests, involving "sensitive and inherently discretionary judgment call[s] … committed by law to the appropriate agency of the Executive Branch." *Dep't of Navy v. Egan*, 484 U.S. 518, 527 (1988). It simply is not proper under our system of government for a federal judicial or quasi-judicial officer to lobby the Executive Branch regarding U.S. foreign policy to assist a private litigant in executing on its judgment. *See Hernandez v. Mesa*, 140 S. Ct. 735, 744 (2020) (stating that "matters relating to the conduct of foreign relations ... are so exclusively entrusted to the political branches of government as to be largely immune from judicial inquiry or interference" (cleaned up)). D.I. 212 at 5; *cf. Chicago & So. Air Lines v. Waterman S. S. Corp.*, 333 U.S. 103, 113 (1948) (stating that a judicial ruling that would serve as a "recommendation the President" regarding foreign policy determinations "would be to render an advisory opinion in its most obnoxious form—advice that the President has not asked, tendered at the demand of a private litigant, on a subject concededly within the President's exclusive, ultimate control").

## CONCLUSION

For the foregoing reasons, Movants respectfully request that the Court disqualify the Special Master and suppress his tainted work product and any orders relying on the same.

RESPECTFULLY SUBMITTED,

January 20, 2023

|  |  |
|---|---|
|  | MORRIS, NICHOLS, ARSHT & TUNNELL LLP |
|  |  |
|  | */s/ Kenneth J. Nachbar* |
| OF COUNSEL: | Kenneth J. Nachbar (#2067) |
| Nathan P. Eimer | Alexandra M. Cumings (#6146) |
| Lisa S. Meyer | 1201 North Market Street |
| Daniel D. Birk | Wilmington, DE 19801 |
| Gregory M. Schweizer | (302) 658-9200 |
| Emily E. Sullivan | KNachbar@mnat.com |
| EIMER STAHL LLP | ACumings@mnat.com |
| 224 South Michigan Avenue |  |
| Suite 1100 | *Attorneys for PDV Holding, Inc., and* |
| Chicago, IL 60604 | *CITGO Petroleum Corporation* |
| (312) 660-7600 |  |
| NEimer@eimerstahl.com |  |
| LMeyer@eimerstahl.com |  |
| DBirk@eimerstahl.com |  |
| GSchweizer@eimerstahl.com |  |
| ESullivan@eimerstahl.com | HEYMAN ENERIO GATTUSO & HIRZEL LLP |
|  |  |
|  | */s/ Samuel Taylor Hirzel, II* |
|  | Samuel Taylor Hirzel, II (#4415) |
|  | 300 Delaware Avenue, Suite 200 |
| OF COUNSEL: | Wilmington, DE 19801 |
| Joseph D. Pizzurro | (302) 472-7300 |
| Kevin A. Meehan | shirzel@hegh.law |
| Juan O. Perla |  |
| CURTIS, MALLET-PREVOST, | *Attorney for Petróleos de Venezuela, S.A.* |
| COLT & MOSLE LLP |  |
| 101 Park Avenue |  |
| New York, NY 10178 |  |
| (212) 696-6000 |  |
| jpizzurro@curtis.com |  |
| kmeehan@curtis.com |  |
| jperla@curtis.com |  |