**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

CRYSTALLEX INTERNATIONAL CORP.,

Plaintiff,

v.

BOLIVARIAN REPUBLIC OF VENEZUELA,

Defendant.

Misc. No. 17-151-LPS

**MEMORANDUM ORDER**

At Wilmington, this **11th** day of **April, 2023**:

The Venezuela Parties[1] moved to disqualify the Special Master (D.I. 509), relying on 28 U.S.C. § 455, Canons 2 and 3 of the Code of Conduct for United States Judges, and the Due Process Clause of the Fifth Amendment to the United States Constitution, based on his *ex parte* communications with OFAC on January 12, 2023[2] and based on his purported "advocacy" to the United States Government. The Court considered the parties' respective briefs and related filings and heard oral argument on the motion on March 30, 2023. At the conclusion of the hearing, the Court denied the motion. (D.I. 538) The Court's reasoning, which it endeavored to

[1] Capitalized terms that are not defined herein are defined in the Sale Procedures Order (D.I. 481).

[2] The Venezuela Parties had, on Monday, January 9, 2023, moved for an order directing the Special Master to permit counsel for the Venezuela Parties to attend the Thursday, January 12, 2023 meeting. (D.I. 499) On January 10, 2023, the Court issued an expedited briefing schedule. (D.I. 500) On January 11, the Court denied the motion, based on considerations including untimeliness and that the *ex parte* interactions challenged by the Venezuela Parties were explicitly contemplated and permitted by the Sale Procedures Order. (*See* D.I. 506)

explain from the bench (*see* D.I. 542 at 103-21), and all of which is incorporated herein by reference, is essentially as follows:

> . . . [A]s all parties recognize in their extensive briefing, the motion is largely a rehash of the Venezuela parties' motion to be included in the special master's January 12th meeting with OFAC, a motion I denied . . . . I will refer to that [meeting] as the OFAC meeting or January 12th meeting, even though we learned today that OFAC was apparently not present at the meeting.
>
> My denial of the motion for disqualification today is based on, essentially, the same reasoning that I gave in denying the meeting-related motion, but I do want to expound on that reasoning. The first basis for denying the motion is that the burden to prevail on it is on the moving party[, which must] . . . show bias or some other reason for disqualification, and it is a substantial burden, and the Venezuela parties simply have not met it.[[3]] There is no evidence before the Court that the special master engaged in advocacy in the OFAC meeting. There's no evidence, in particular, that he advocated for a change in U.S. foreign policy or advocated for Crystallex to be granted a license.
>
> So one, but not the sole, ground on which I'm denying the motion is the failure of proof by the Venezuela parties. In my mind, that is a denial on the merits, and I will have a little more to say on the merits, but I now want to say something about some of the procedural bases on which I'm denying the motion as well.
>
> The first one is that [the] motion to disqualify, in my view, is untimely. This is a basis to deny the motion on all the grounds on which it is asserted; that is, section 455(a), [s]ection 455(b), Canons 2 and 3 of the Code of Judicial Conduct, and the due process clause of the Fifth Amendment.
>
> I don't think it's disputed that there is a timeliness requirement for filing such a motion. The Third Circuit said as much in . . . Kensington.[[4]] Parties seeking disqualification [pursuant to] Section 455(a) should do so in a timely manner. And then in a case called Stone [H]e[d]ge Properties, the Third Circuit also noted that there is a timeliness requirement for a disqualification motion under section 455(b).[[5]]

[3] *See, e.g.*, *Schweiker v. McClure*, 456 U.S. 188, 196 (1982) ("[T]he burden of establishing a disqualifying interest rests on the party making the assertion."); *see also United States v. Microsoft Corp.*, 253 F.3d 34, 108 (D.C. Cir. 2001) ("Disqualification is never taken lightly. In the wrong hands, a disqualification motion is a procedural weapon to harass opponents and delay proceedings.").

[4] *In re Kensington Int'l Ltd.*, 368 F.3d 289, 312 (3d Cir. 2004).

[5] *Stone Hedge Props. v. Phoenix Cap. Corp.*, 71 F. App'x 138, 141 (3d Cir. 2003).

Here the motion is untimely because the grounds for it were known to the moving parties for at least many months prior to the filing of their motion. A good summary of the relevant timeline showing that all the parties have known since approximately May of 2021 that the special master had engaged OFAC counsel and was in ex parte communication with OFAC is set out in Crystallex's response to the motion, DI 513 at pages 3 to 5. The ex parte meetings, including what the Venezuela parties now refer to as advocacy, to the extent those are two different grounds for the motion, ex parte meetings and advocacy, both of these things, as properly understood, were contemplated throughout the process of negotiating and litigating the sales procedures order, which was adopted in October 2022. And this gave rise to the notice, actual notice, to the moving parties that the concerns they belatedly raised could and should have been raised much sooner.

So for example, the special master met with OFAC ex parte three times in the summer of 2021. There's support for that at DI 348 paragraphs 39 and 40. On November 8, 2021, we had . . . a hearing that was longer than today's hearing, and among other things we discussed [was] that the special master would communicate with OFAC ex parte, as he previously had done. There was no reference to potential disqualification of the special master or grounds for seeking his disqualification, even though also on the agenda that day was a motion to disqualify one of the advisors to the special master. The transcript of . . . that whole proceeding . . . is at DI 409.

In my March 2022 opinion, DI 443 particularly at page 17, I noted that the sale procedure[s] order I would adopt would include a six-month window and during the six-month window, the special master w[ould] be directed to use his best efforts to obtain guidance from OFAC, making no mention that such meetings would be anything other than ex parte, as all such meetings up to that point had been.

I then entered the sale procedure[s] order [i]n October 2022 and expressly contemplated [that] the special master [would] proactively engag[e] with OFAC and included that six-month window. "Within six months" – I'm adding some words to the quote – "he shall solicit and attempt to gain clarity and guidance from OFAC . . . of its support for or not opposition to the launch of the marketing process." You can see these provisions at DI 481 . . . paragraphs 3 and 4.[[6]]

[6] The full quote (D.I. 481 ¶ 3) reads, "Within the period of six (6) months after the date of this Order (the 'Six-Month Window'), the Special Master and his Advisors shall solicit and attempt to gain clarity or guidance from the United States Department of the Treasury's Office of Foreign Assets Control ('OFAC') of its support for (or non-opposition to), the launch of the Marketing Process by the Special Master, the viability of the Marketing Process, and any additional feedback or guidance that the Special Master believes will more likely result in a value-maximizing Sale Transaction."

In the status report of October 4, 2022, the special master confirmed he d[id] not intend to include the Venezuela parties at such a meeting. That's DI 480 at [2], note [2]. There's no indication anywhere in the sale procedure[s] order that the special master's communications with OFAC needed to include any other parties, and there was no reason for any sales process party to believe that they would be involved or invited to attend the meeting.

Let me say something about advocacy. I think when the special master used this word in this context, . . . he meant, as his counsel explained today, that he conveyed to OFAC his view that in order to conduct a value-maximizing transaction, which in his view is in the interest of all parties, he, the special master, and ultimately the Court[,] needs clarity from the U.S. government as to whether it will or will not or may exercise its sole authority at the end of the process to grant a specific license, a license which will be required under the current sanctions regime before a sale transaction can be consummated. That's what I think he meant by "advocacy."

I don't think "advocacy" is really the right word for that, but whatever word he used, the moving parties have not proven that it was materially different than the types of things the special master did at the earlier ex parte meetings with OFAC, nor have the moving parties persuaded me that there's anything wrong with what the special master did, whether we call it advocacy or something else. Which, by the way, everything he did, he did at my express direction. I think it's important to keep in mind the context here.

As Crystallex emphasized in argument today, while we do have certain views of the United States government on what's going on in this process, they're somewhat outdated, and they're expressly time bound. So in July 2020,[[7]] we received the statement of interest on behalf of the United States government stating a preference that the Court halt the prefatory steps it was taking towards the sale. As is entirely understandable and reasonable, that position was the position of the United States government, quote, at that time. It may well still be the position of the United States government, but in my view, there's absolutely nothing improper about inquiring as to whether it's still their view. It's not advocacy. There's nothing improper about it.

Similarly, the denial without prejudice that Crystallex . . . [received] for a specific license was based on, as it had to be, circumstances at that time, and I believe the letter expressly notes that it's a denial without prejudice to ask again . . . .[[8]]

---

[7] *See* D.I. 212 at 9.

[8] D.I. 346 Ex. 1 at 5 ("[T]he denial is without prejudice to reconsideration at a later time if the foreign policy considerations change. As noted above, the United States anticipates that it will reassess whether the sale of the PDVH shares as requested by Crystallex is consistent with U.S. foreign policy as the situation in Venezuela evolves.").

> The government's position could change at any time, and, very importantly, . . . I entirely respect and understand that unless the current sanctions regime is changed, it will be for the executive branch and only the executive branch to ultimately decide whether to grant the license or licenses necessary for a sales transaction to be completed and for the Court's judgment to eventually be enforced. That is up to them. Nothing a special master says or anything I say or do will change that. And I think everything that the special master does or says or has done or said has to be understood in that context.
>
> . . .
>
> So that was a lengthy side note on what are we talking about when we say "advocacy," but I still am trying to articulate why I think the motion to disqualify the special master was untimely. And the first point for that is I do think everything that occurred since at least May of 2021 is relevant to understanding the tim[eliness] [of the disqualification motion].
>
> But I now want to say in the alternative, [that] if you wipe all of that away and only look at what happened from December 28, 2022,[[9]] to the filing of the motion in front of me today on January 23, 2023,[[10]] . . . I still think the motion, as an alternative basis for my ruling, is untimely and sufficiently untimely that it is denied on that basis as well. I do view the facts of what happened in late December and early January of this year as, essentially, undisputed at this point. By December 28th of last year, the Venezuela parties knew that the special master would meet with OFAC sometime in January and knew that the special master had not coordinated with them, [or] asked about their schedule, to figure out what day in January they should meet.
>
> [The special master] . . . didn't even contact them about setting up the meeting with OFAC, and so by December 28th, particularly given the pattern of the special master's meetings with OFAC being ex parte and the sale procedures order not doing anything to change that, I think by December 28th, the Venezuela parties had actual knowledge that there would be a meeting in January and it would be ex parte between the special master and [OFAC]. If the Venezuela parties really believed that that was going to be grounds, ultimately, for disqualification of the special

---

[9] *See* D.I. 495 at 2 (Special Master's Monthly Report, filed December 28, 2022, stating that Special Master "[c]oordinated regarding a meeting with representatives of the United States Department of the Treasury and the United States Department of Justice to take place in January" and "[m]et with [his] Advisors regarding outreach to and negotiations with OFAC").

[10] The motion is timestamped as having been filed on Friday, January 20, 2023. However, as it was filed after 5:00 p.m. that day, it is not considered to have been filed until Monday, January 23, 2023, pursuant to this District's Revised Administrative Procedures Governing Filing and Service by Electronic Means § (F).

master, a special master on whom, as we've heard today, they [have] spent a lot of money on and I, of course, [have] spent a lot of time giving assignments to and hav[e] vested my authority in, if they really thought that was going to be meritorious grounds for disqualifying the special master, I think that's an emergency that requires contacting the Court or doing your level best to contact the Court within a day, two days maybe, three days at most.

I'm not saying that you necessarily have to have fully coordinated amongst . . . yourselves and have written a nice brief, but if you think you're in good faith sitting on an issue that could mandatorily require me to disqualify the special master, I don't think you can wait from December 28th until January 9th without even contacting the Court and giving it a hint that there is this kind of emergency.

Of course, at that point [December 28th], January was undefined. There was no specific date, . . . so [January] could have meant . . . maybe January 3rd. I just don't think you can sit on that kind of an issue for that many days without even contacting the Court.

Time went on. On December 30th, the special master let the Venezuela parties know a meeting was scheduled for January 12th specifically.[[11]] Again, they knew or absolutely should have known, based on the pattern and practice and sale procedures order, that that meeting would be ex parte, and that was expressly confirmed on January 3rd,[[12]] and it was also on January 3rd, evidently, that the first use of the word "advocate" came up, although I think that [it] should have been understood from at least December 28th, if not well before that.

Anyway, even if – and I don't think this is the best way to see it – even if the clock started ticking only on January 3rd, you can't wait from January 3rd until January 9th to contact the Court if you want to seek relief that becomes moot on January 11th or the morning of January 12th, particularly when the stakes are this high[,] . . . this much money has been spent on the special master, [and] this much litigation has gone into directing the special master [about] what to do.

At best for the Venezuela parties, they knew a meeting was scheduled to occur . . . for 13 days and they let 10 of those days lapse before contacting the Court or seeking any relief. They took up 10 of 13 days, which by my calculation is 77 percent of the potential time I had to hear about the dispute, get briefing on it, review the briefing, analyze the issue, make a decision, and articulate the decision.

I recognize there's not a lot of case law, if any, that says waiting a matter of days makes a motion to disqualify untimely, but I do think the circumstances here are, perhaps, unique and extreme enough that the pace at which the Venezuela parties

---

[11] D.I. 516 Ex. 1 at 2-3.

[12] D.I. 516 ¶¶ 9-10.

moved, even if I don't start the clock until December 28th, was simply too slow, and I would say substantially too slow. I certainly don't believe that the Venezuela parties moved as swiftly as was reasonably practical. And I do think in this context, the delay was substantial, as the Third Circuit cases require[,] for all the reasons I've just explained.

And I also have reluctantly concluded that the delay was strategic; that is, I think the way the Venezuela parties have handled the issues relating to the OFAC meeting, the relief that they've sought, first with respect to the meeting itself and now to disqualify the special master, I do believe it has . . . at least a substantial element of being tactical and designed with at least a partial goal of further delaying these proceedings.

As [Crystallex's counsel] observed[,] . . . the argument that after the meeting the special master must mandatorily be disqualified because he is in possession of some otherwise undisclosed information, factual information on a disputed issue, is at best . . . hinted at in the briefing on the first motion. There's no explicit reference to Section 455(b)(1), which is one of the significant bases for the disqualification motion.

And I think no persuasive basis has been given for why the moving parties did not make a 455(b)(1) argument in their efforts to modify the meeting parameters, which leads me, again, reluctantly, to the conclusion that at least part of their motivation was to hold an argument in reserve to throw at the Court weeks after the meeting as a potential basis to compel the Court to disqualify [the] special master.

And it probably goes without saying, but if I disqualify the special master, it will set back and further delay these already delayed proceedings, perhaps by quite a lot, and . . . it may also lead and it may also have led, had I been persuaded to do that, to an argument that I should be disqualified. And while I'm confident other judges could effectively, of course, preside over these actions, I have . . . years of experience invested in [them] now, and it would no doubt delay things substantially if we needed to [reassign] these matter to another judge.

So I think that all of that, that potential to really substantially slow down these proceedings even further by going after the special master, [and] potentially asking to remove me, was at least part of what was going on in . . . the . . . duly delayed timing of these motions.

All of the reasons that the motion directed to the meeting was untimely apply equally, if not more so, to the motion to disqualify, which, of course, was not filed until January 23rd, after the [OFAC] meeting [had occurred]. It is, at least . . . as untimely as the motion[] [regarding the] meeting itself. That's all I ha[ve] to say about timeliness.

As a further reason for denying . . . the motion to disqualify, I do believe that the bases on which the Venezuela parties seek disqualification of the special master are waived. Really, the same analysis as to the timeliness [applies here]. Because the moving parties have no evidence that the ex parte meeting on January 12th was materially different than all of the prior meetings[,] given the course of how we got to January 12th, I conclude that the Venezuela parties' long-time acquiescence in the special master's ex parte engagement with OFAC, which was materially similar to what he had done repeatedly before, . . . also constitutes a waiver of their right to seek disqualification of the special master based on that meeting.[[13]]

Further, just a little bit more on why the motion fails on the merits. If the timing . . . and the waiver are not enough, I find that as, I've already said, there's no[t] sufficient evidence to grant the motion. Let me add to that. Specifically under 455(a), I find the special master's and my impartiality cannot be reasonably questioned. A reasonable person with knowledge of all the facts would not conclude that his or my impartiality might be reasonably questioned. The Court has authorized the ex parte meetings[,] which the law permits me to do. The special master's opening brief opposing this motion [D.I. 512] at pages 9 to 11 and the letter filed by ConocoPhillips, DI 522 at pages 3 to 4, set out how Federal Rule of Civil Procedure 53 and various cases applying that rule approve[d] of judges authorizing ex parte communications by a special master with the Court or a party. That's the express language of Rule 53,[[14]] and that language has been – as explained in those filings and in the cases cited[ –] . . . interpreted to include the Court's ability to authorize ex parte communications with third parties.

I am persuaded that these authorities make my order lawful and that the challenging facts and circumstances I am confronting in this case make my order reasonable and necessary. There is nothing improper or anything a reasonable person would think improper in the special master assisting the Court in its efforts to enforce judgments that have been entered and affirmed, and no reasonable person would think that there is anything improper or giving rise to a reasonable basis to question impartiality in using the special master in this way and in him following my direction to do so.

In addition to Rule 53, the Court does have . . . inherent power to enforce its own judgment[s] and to issue orders as necessary to make its judgments effective. That

---

[13] *See In re Kensington Int'l Ltd.*, 353 F.3d 211, 220-21 (3d Cir. 2003) (explaining that disqualification under 28 U.S.C. § 455(a) "may be waived by the parties" although "the grounds for disqualification under § 455(b)(1) generally cannot be waived").

[14] *See* Fed. R. Civ. P. 53(b)(2)(B) (providing that order appointing special master must state "the circumstances, if any, in which the master may communicate ex parte with the court or a party").

proposition is supported in many places, but among others, in the Peacock decision of the Supreme Court[,[15]] 516 U.S. at 356.

As for the 455(b) grounds, the special master does not, nor do I, have any personal knowledge of disputed evidentiary facts concerning the proceeding, which is what must be shown and has not been shown for disqualification under 455(b).

There is not and will not be any dispute as to what OFAC's position is. We're not going to litigate that. OFAC will tell us its position or it won't tell us its position, and we will all accept that [a]s their position or [that] they're not going to tell us what their position is. . . . It's not a factual dispute over an evidentiary fact concerning this proceeding that the rule is concerned with.

So for all of those reasons, my decision is to deny the motion to disqualify.

HONORABLE LEONARD P. STARK
UNITED STATES DISTRICT COURT

[15] *Peacock v. Thomas*, 516 U.S. 349, 356 (1996).