# EXHIBIT A

No. 23-

---

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE THIRD CIRCUIT

---

IN RE BOLIVARIAN REPUBLIC OF VENEZUELA;
PETRÓLEOS DE VENEZUELA, S.A.; CITGO PETROLEUM
CORPORATION; and PDV HOLDING, INC.,

*Petitioners*.

---

# PETITION FOR A WRIT OF MANDAMUS TO THE UNITED STATES
# DISTRICT COURT FOR THE DISTRICT OF DELAWARE

---

Donald B. Verrilli, Jr.
Elaine J. Goldenberg
Ginger D. Anders
Brendan B. Gants
MUNGER, TOLLES & OLSON LLP
601 Massachusetts Ave. NW
Suite 500E
Washington, DC 20001
(202) 220-1100

*Counsel for Bolivarian Republic of Venezuela*

Hashim M. Mooppan
  *Counsel of Record*
Gregory M. Shumaker
Brinton Lucas
JONES DAY
51 Louisiana Ave. NW
Washington, DC 20001
(202) 879-3939
hmmooppan@jonesday.com

*Counsel for CITGO Petroleum Corporation and PDV Holding, Inc.*

(additional counsel listed on inside cover)

Joseph D. Pizzurro
Kevin A. Meehan
Juan O. Perla
CURTIS, MALLET-PREVOST,
COLT & MOSLE LLP
101 Park Ave.
New York, NY  10178
(212) 696-6000

*Counsel for Petróleos de Venezuela, S.A.*

Nathan P. Eimer
Daniel D. Birk
Gregory M. Schweizer
Emily Sullivan
EIMER STAHL LLP
224 South Michigan Ave., Suite 1100
Chicago, IL  60605
(312) 660-7600

Michael J. Gottlieb
Samuel G. Hall
WILKIE FARR & GALLAGHER LLP
1875 K St. NW
Washington, DC  20006
(202) 303-1000

*Counsel for CITGO Petroleum Corporation and PDV Holding, Inc.*

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1 and Third Circuit L.A.R. 26.1, Petitioners Petróleos de Venezuela, S.A. (PDVSA), PDV Holding, Inc. (PDVH), and CITGO Petroleum Corporation (CITGO) hereby disclose as follows:

PDVSA is a Venezuelan corporation that is wholly owned by the Venezuelan government, Petitioner Bolivarian Republic of Venezuela (the Republic). PDVH is a wholly owned subsidiary of PDVSA. CITGO is a wholly owned subsidiary of CITGO Holding, Inc., which is a wholly owned subsidiary of PDVH.

## TABLE OF CONTENTS

Page

CORPORATE DISCLOSURE STATEMENT .........................................................i

TABLE OF AUTHORITIES ...................................................................... iii

INTRODUCTION ............................................................................1

QUESTION PRESENTED.....................................................................6

BACKGROUND ...........................................................................6

ARGUMENT ..............................................................................13

I. THE SPECIAL MASTER'S *EX PARTE* ADVOCACY REQUIRES DISQUALIFICATION ..............................................................13

    A. The Special Master's Advocacy That The Executive Branch Cooperate With The Sale Process Is Disqualifying ................................14

    B. The Special Master's Having Met *Ex Parte* With The Executive Branch To Discuss Material Facts Is Disqualifying...............................20

    C. The Disqualification Motion Was Neither Waived Nor Untimely ........24

II. MANDAMUS RELIEF IS WARRANTED ...................................................29

CONCLUSION ...........................................................................32

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Abdulrahman v. Ashcroft*,
   330 F.3d 587 (3d Cir. 2003) ...............................................................14

*Alexander v. Primerica Holdings, Inc.*,
   10 F.3d 155 (3d Cir. 1993) ...............................................................15

*Cheney v. U.S. Dist. Ct.*,
   542 U.S. 367 (2004)...............................................................4, 13, 29

*Cobell v. Norton*,
   334 F.3d 1128 (D.C. Cir. 2003)...................................................5, 31

*Crystallex Int'l Corp. v. Bolivarian Republic of Venezuela*,
   24 F.4th 242 (3d Cir. 2022) .................................................1, 7, 8, 15

*Crystallex Int'l Corp. v. Bolivarian Republic of Venezuela*,
   932 F.3d 126 (3d Cir. 2019) ..............................................................6

*Department of Commerce v. New York*,
   139 S. Ct. 2551 (2019).....................................................................18

*Dietz v. Bouldin*,
   579 U.S. 40 (2016).............................................................................22

*Edgar v. K.L.*,
   93 F.3d 256 (7th Cir. 1996) .......................................................27, 28

*In re Al-Nashiri*,
   921 F.3d 224 (D.C. Cir. 2019)......................................................29, 30

*In re Brooks*,
   383 F.3d 1036 (D.C. Cir. 2004)......................................4, 21, 22, 24

*In re Kellogg Brown & Root, Inc.*,
   756 F.3d 754 (D.C. Cir. 2014).........................................................13

*In re Kensington Int'l Ltd.*,
   368 F.3d 289 (3d Cir. 2004) ....................................................*passim*

*In re Rhone-Poulenc Rorer, Inc.*,
   51 F.3d 1293 (7th Cir. 1995) ...........................................................30

*In re School Asbestos Litig.*,
   977 F.2d 764 (3d Cir. 1992) .............................................5, 19, 29, 31

*In re United States*,
   572 F.3d 301 (7th Cir. 2009) .............................................................. 14

*Mohawk Indus., Inc. v. Carpenter*,
   558 U.S. 100 (2009) ............................................................................ 31

*Newton v. Consol. Gas Co.*,
   259 U.S. 101 (1922) ............................................................................ 15

*Price Bros. Co. v. Phila. Gear Corp.*,
   629 F.2d 444 (6th Cir. 1980) ........................................................ 23, 26

*Rosen v. Sugarman*,
   357 F.2d 794 (2d Cir. 1966) ............................................................... 31

*United States v. Antar*,
   53 F.3d 568 (3d Cir. 1995) ................................................................. 15

*United States v. Furst*,
   886 F.2d 558 (3d Cir. 1989) ..................................................... 14, 19, 27

*United States v. Washington*,
   549 F.3d 905 (3d Cir. 2008) ............................................................... 13

**STATUTES**

28 U.S.C. § 455 ........................................................................... *passim*

28 U.S.C. § 1291 ................................................................................... 8

28 U.S.C. § 1292 ................................................................................. 10

**OTHER AUTHORITIES**

31 C.F.R. § 591.305 ............................................................................... 7

31 C.F.R. § 591.309 ............................................................................... 7

31 C.F.R. § 591.310 ............................................................................... 7

31 C.F.R. § 591.407 ............................................................................... 7

Fed. R. Civ. P. 53 .......................................................................... 13, 22

Fed. R. Civ. P. 69 ................................................................................. 8

U.S. Dep't of Treasury, *OFAC FAQs: General Questions, FAQ No. 809*
   (Dec. 9, 2019) ............................................................................... 7, 18

## INTRODUCTION

This mandamus petition presents the question whether a judicial officer must be disqualified when he engages in an *ex parte* meeting with Executive Branch officials to advocate that the Executive Branch articulate a position that favors one side of the dispute before a court.  In the underlying case, Crystallex International Corporation seeks to execute on a judgment against the Republic through a forced sale of the shares of PDVH.  Those shares are wholly owned by PDVSA, Venezuela's state oil company, and are the means through which the Republic indirectly owns CITGO.  *See Crystallex Int'l Corp. v. Bolivarian Republic of Venezuela*, 24 F.4th 242, 246-47 (3d Cir. 2022) (*Crystallex II*).

The shares, however, are blocked property under regulatory sanctions imposed by the Executive Branch to safeguard the shares for the benefit of the Venezuelan people until the Republic is able to hold free and fair elections.  *See id.* at 247-48.  Thus, pursuant to Executive Orders and regulations issued by the U.S. Treasury Department's Office of Foreign Assets Control (OFAC), an OFAC license is required to attach, execute upon, or transfer the shares.  *Id.*  Crystallex obtained an attachment before these restrictions took effect, but has been denied a license to conduct or consummate an execution sale at this time.  *Id.* at 247-48 & n.3.

Despite OFAC's regulations that expressly require a license to sell the PDVH shares, and official guidance that makes clear this requirement extends to preparing

for or conducting a contingent auction, the district court has held that it *can* launch a sale process to market the shares, conduct a public auction, and select a winning bidder so long as the sale does not close without a license. That court, however, has *not* resolved whether it *should* do so now in light of the potential chilling effect of OFAC pronouncements on the bidding process. To resolve this hotly disputed question, the court directed a special master first to "attempt to gain clarity or guidance" from OFAC regarding "its support for (or non-opposition to)[] the launch" and then to provide a recommendation to the court "as to whether (and when)" the sale process should be launched. App. 267a.

Yet rather than simply solicit OFAC's views to prepare a neutral recommendation for the district court, the special master arranged for and participated in an *ex parte* meeting, in his own words, not only "to solicit OFAC's unencumbered views on the sale process," but also to tell the Executive Branch "why OFAC cooperation with the Court's order is appropriate and necessary." App. 237a. In urging OFAC's "cooperation" with the sale process order, the special master necessarily advocated that the Executive Branch abandon its regulatory guidance that even a contingent auction cannot proceed without a license. As soon as the Republic, PDVSA, PDVH, and CITGO—collectively, the Venezuela Parties (VPs)—learned of the special master's plans, they objected to his lobbying the Executive Branch and asked to attend the meeting to have a record of what was said.

But the special master refused because—again, in his own words—the VPs' "mere presence" would "chill discussion" and "impair [his] efforts," as his meeting would have an "advocacy component[]" and the VPs, who want to preserve the protection afforded to the PDVH shares by the Executive Branch, "have a different agenda." App. 166a, 237a.

The district court then denied the VPs' motion to attend the meeting, App. 218a-20a, and subsequent motion to disqualify the special master under 28 U.S.C. § 455, App. 104a-23a, 502a-10a.  The court interpreted the special master's use of the term "advocacy" as meaning merely that he urged the Executive Branch to clarify "whether it will or will not or may exercise its sole authority at the end of the process to grant a specific license."  App. 110a.  But in doing so, the court ignored the special master's own account of what he did, including his self-described plan to push for "OFAC cooperation" with the sale process, his assertion that "the mere presence" of the VPs would "chill discussion" of the intended "advocacy component[]" of his presentation given their "different agenda," and his steadfast refusal to deny in any of his post-meeting briefs that he had lobbied the Executive Branch to announce its support for the sale process.  App. 166a, 237a.  And to top it all off, the court held that it had the "power" to "authorize ex parte communications" to obtain information bearing on a disputed issue before it.  App. 122a.

The court further insisted that the VPs' disqualification motion, filed eight days after the meeting, was untimely and waived in light of the special master's prior *ex parte* meetings with the Executive Branch. But the court ignored that the special master previously had promised that he would *not* engage in advocacy before the Executive Branch; that the prior meetings were not for the purpose of advocacy, or even for obtaining facts bearing on a pending judicial decision; and that as to *this* meeting, the VPs objected immediately and in advance of the meeting, filing a motion seeking to stop the *ex parte* factfinding and advocacy just four business days after learning that the special master intended to do so. On these facts, the district court's procedural holdings are both implausible and foreclosed by precedent. *See In re Kensington Int'l Ltd.*, 368 F.3d 289, 311-17 (3d Cir. 2004).

The special master's conduct warrants a writ of mandamus because the VPs' "right to issuance of the writ is clear and indisputable," they "have no other adequate means to attain the relief" of disqualifying the special master, and "the writ is appropriate under the circumstances." *Cheney v. U.S. Dist. Ct.*, 542 U.S. 367, 380-81 (2004) (cleaned up). A party has "a clear and indisputable right to relief" whenever a "judicial officer's impartiality might reasonably be questioned," including when he "has personal knowledge of disputed evidentiary facts," and the special master's *ex parte* advocacy here has led to *both* harms. *In re Brooks*, 383 F.3d 1036, 1041 (D.C. Cir. 2004) (cleaned up); *see* 28 U.S.C. § 455(a), (b)(1). The

special master's public statements, which reveal that he lobbied the Executive Branch to "cooperat[e] with" the immediate launch of the sale process—a result that Crystallex seeks and the VPs oppose—would cause any reasonable observer to doubt his impartiality.  App. 237a.  That problem is magnified by the impossibility of knowing what he and Executive Branch officials discussed in private.

Given the nature of the error here, withholding appellate review until the district court enters a final sale order would deprive the VPs of adequate relief.  The damage to the parties and the public perception of the judiciary—both here and abroad—could not be undone at that point, *see In re School Asbestos Litig.*, 977 F.2d 764, 776 (3d Cir. 1992); *Cobell v. Norton*, 334 F.3d 1128, 1139 (D.C. Cir. 2003), especially as this Court would be forced to either grant an emergency stay of the sale order or unwind the consummated sale.  At that point, the Venezuelan people will have already witnessed a U.S. judicial officer preside over the forced sale of their state oil company's crown jewel after he lobbied the U.S. Executive Branch behind closed doors to take a position on a disputed issue to the detriment of the Republic. This Court should therefore issue a writ of mandamus ordering the district court to disqualify the special master and to vacate any recommendations or orders based on his recent meeting with the Executive Branch.

## QUESTION PRESENTED

Whether 28 U.S.C. § 455 requires the special master's disqualification after he advocated to the Executive Branch, in an *ex parte* meeting the VPs asked to attend and objected to in advance, that OFAC should cooperate with a process to sell the PDVH shares to satisfy Crystallex's judgment by articulating a position that would benefit Crystallex vis-à-vis the VPs on a hotly disputed issue currently before the district court.

## BACKGROUND

1. In 2016, Crystallex obtained a $1.4 billion judgment (including interest) against the Republic in the D.C. District Court based on the expropriation of its property by the Venezuelan government in 2011. Following substantial payments by the Republic, that judgment stands at roughly $1 billion. App. 265a.

In 2017, Crystallex registered its judgment in the Delaware District Court and asked the court to execute on the judgment by attaching and selling PDVSA's shares in PDVH. The district court issued a writ of attachment, which was served on PDVH in 2018, and this Court affirmed the threshold ruling that, under the Foreign Sovereign Immunities Act, the PDVH shares were not immune from attachment. *Crystallex Int'l Corp. v. Bolivarian Republic of Venezuela*, 932 F.3d 126, 150-51 (3d Cir. 2019).

6

In 2019, after the appeal was decided, the President of the United States "blocked any transfer or dealing in PDVSA's property" to protect the assets pending free and fair elections, and OFAC prohibited "'the enforcement of any … order through … judicial process purporting to transfer or otherwise alter or affect [blocked] property or interests in [blocked] property,'" absent "'a specific license issued by OFAC.'" *Crystallex II*, 24 F.4th at 247 (quoting 31 C.F.R. § 591.407). OFAC's regulations further define a prohibited "transfer" to include any "act or transaction," "the purpose, intent, or effect" of which is to "create" or "alter," either "directly or indirectly," any "right" or "interest" "with respect to" the PDVH shares. 31 C.F.R. § 591.310. The covered property interests include any "interest of any nature whatsoever, direct or indirect," *id.* § 591.305—whether "present, future, or contingent," *id.* § 591.309. And to remove any doubt as to its understanding of these regulations, OFAC issued guidance confirming that private parties may not take any "concrete steps in furtherance of an auction or sale" of the PDVH shares that is "contingent upon the winning bidder obtaining a license from OFAC." U.S. Dep't of Treasury, *OFAC FAQs: General Questions, FAQ No. 809* (Dec. 9, 2019) (FAQ 809), https://bit.ly/3B0cqhJ. OFAC has since denied Crystallex's application for a "license to effect the sale of the PDVH shares," including "authorization for all activities necessary and ordinarily incident to organizing and conducting a judicial sale." App. 484a, 491a.

On remand, the VPs moved to quash the writ on the merits, but the district court denied the motion as procedurally barred. Dist. Ct. Docket Entry (D.E.) 234 at 18-33. The court also held that OFAC's regulations did not prohibit it from taking preparatory steps to determine the contours of a process for selling the PDVH shares, and that it would proceed despite a request by the Executive Branch to postpone such steps. *Id.* at 34-40. The VPs appealed, but this Court held that it lacked jurisdiction under 28 U.S.C. § 1291 at that time. *Crystallex II*, 24 F.4th at 246.

**2.** In May 2021, the district court appointed a special master to design and implement a process to sell the PDVH shares pursuant to Delaware law as incorporated by Federal Rule of Civil Procedure 69(a)(1). App. 492a-96a; *see* App. 261a. The special master recognized early on, however, that OFAC's regulations and guidance, which provide that "a specific license from OFAC is required 'prior to conducting an auction or other sale,'" threaten to "materially chill bidding." App. 413a, 446a. Given "OFAC's public guidance," the special master did "not believe that Potential Bidders will participate in the process for fear of violating such sanctions" and due to the "[u]ncertainty surrounding what, if any, transaction OFAC will ultimately license." App. 413a, 446a.

To address this concern, the special master proposed to "seek explicit guidance or authorization from OFAC with respect to a potential Sale Transaction" following the court's entry of its sale procedures order. App. 446a. The VPs

immediately objected to the extent this meant that the special master planned "to lobby OFAC," explaining that judicial officers "do not advocate to the Government on behalf of particular parties or for particular outcomes in regulatory determinations affecting those parties—here, to authorize a sale that Crystallex desires but that the Republic opposes." App. 404a (capitalization omitted). In response, the special master clarified that he had no such intent: "I have not proposed to, nor have I ever, lobbied on behalf of any particular party in this case." App. 359a. Instead, he proposed that the district court merely prompt the Executive Branch "to clarify its position" by inviting the views of the United States. *Id.*

In March 2022, the district court denied the VPs' objection that the sale process could not launch unless and until OFAC granted Crystallex a license, and instead held it could "proceed[] with a sale process, up to and including the selection of a winning bidder, provided that legal title to the PDVH Shares is not transferred until after the winning bidder obtains a specific license." App. 317a. The court nevertheless reserved judgment on what was "the best time to start the sale process" given "'the likelihood that Potential Bidders would be unwilling to participate'" under OFAC's sanctions regime. App. 339a (emphasis omitted). It therefore invited "the Special Master's assessment as to the opportune time to launch the sale process, including, in particular, his view on whether OFAC has provided or will provide a statement that could give potential bidders sufficient confidence." *Id.*

The district court certified its order for appeal under 28 U.S.C. § 1292(b), D.E. 463, but this Court denied a petition to appeal without explanation, No. 22-8024 (July 26, 2022). This Court later held that the order also was not appealable under the collateral-order doctrine. No. 22-1606 Order 2 (Aug. 3, 2022).

On October 7, 2022, the district court entered a sale procedures order, which directs the special master to "attempt to gain clarity" from OFAC regarding "its support for (or non-opposition to)[] the launch" of the sale process. App. 267a. After the special master does so and submits a recommendation to the court "as to whether (and when)" to launch, the parties will have an opportunity to object, and the court will then "make a determination regarding when to trigger" the launch, "with or without a license from OFAC." App. 267a-68a. If the district court ultimately were to decide to launch the sale process, it would trigger a foreclosure-style auction that would be advertised in newspapers and invite bidders to offer bids for up to 100% of the PDVH shares to satisfy the outstanding balance of the Crystallex judgment. *See* App. 263a-65a, 272a-73a.

**3.** On the evening of December 28, 2022, the VPs learned that the special master had planned a meeting with the Executive Branch "to take place in January." App. 255a. They asked him for details on Friday, December 30, and the special master replied late that afternoon that his "meeting with OFAC" was "currently scheduled" for January 12, 2023. App. 169a-70a.

10

The next business day, Tuesday, January 3, the VPs' counsel asked the special master for permission to attend the meeting to "only observe" so that the VPs could "be aware of exactly what was said by each attendee."  App. 166a.  The special master refused, explaining that the "meeting with OFAC would have both informational and advocacy components" and "that as a result it would be inappropriate" for the VPs' counsel to attend because they "have a different agenda." *Id.*  This was "the first time" the special master had ever informed the VPs' counsel that "he intended to engage in advocacy," contrary to his prior promise.  App. 167a.

On Monday, January 9, the VPs objected that any advocacy by the special master would be improper and asked the district court to allow their counsel to attend the meeting solely in a listening capacity.  App. 240a-51a.  The special master opposed the motion, insisting that the VPs' "presence will only chill discussion and further impair [my] efforts."  App. 237a.  According to the special master, "the mere presence of the Venezuela Parties would influence the discussions and would undermine the core purpose of the meeting," which—again, in his words—was for the Executive Branch to "hear the Special Master's perspective on why OFAC cooperation with the Court's order is appropriate and necessary."  *Id.*  To that end, he contended (incorrectly) that the court had previously "overruled" the VPs' objection that "'federal courts do not advocate to the Government on behalf of

particular parties or for particular outcomes in regulatory determinations affecting those parties.'"  App. 236a.

The district court denied the motion on January 11, primarily on the theory that it was filed "too late."  App. 219a.  The special master then "met *ex parte* with [the] U.S. Government on January 12"—specifically, with representatives from the Justice, Treasury, and State Departments.  App. 191a; *see* App. 75a.  As the special master's counsel later revealed, the special master's presentation to the Executive Branch included materials highlighting "the benefits of the orderly process designed by [him]."  App. 12a.

On January 20, the VPs moved to disqualify the special master under 28 U.S.C. § 455, App. 204a-17a, but the district court denied relief in an oral ruling, App. 104a-23a, which it later memorialized in a written order, App. 502a-10a.  It dismissed the VPs' objections to the special master's advocacy on the premise that there "is no evidence" that he had "advocated for a change in U.S. foreign policy or advocated for Crystallex to be granted a license."  App. 106a.  The court further ruled that it could authorize the special master to engage in *ex parte* factfinding, and presumed that, whatever had been said at the *ex parte* meeting, OFAC would eventually disclose its position on the record.  App. 121a-23a.  The court also held that the VPs' objections were both waived and untimely.  App. 106a-21a.

## ARGUMENT

Mandamus relief is warranted when the petitioner's (1) "right to issuance of the writ is clear and indisputable," (2) he has "no other adequate means to attain the relief he desires," and (3) "the writ is appropriate under the circumstances." *Cheney v. U.S. Dist. Ct.*, 542 U.S. 367, 380-81 (2004) (cleaned up). The district court's erroneous refusal to disqualify the special master meets that standard. *See In re Kellogg Brown & Root, Inc.*, 756 F.3d 754, 756-57 (D.C. Cir. 2014) (Kavanaugh, J.) (explaining that the "threshold question is whether" the "ruling constituted legal error," and that if the "ruling was erroneous, the remaining question is whether that error is the kind that justifies mandamus"); *United States v. Washington*, 549 F.3d 905, 917 (3d Cir. 2008) (similar).

## I.   THE SPECIAL MASTER'S *EX PARTE* ADVOCACY REQUIRES DISQUALIFICATION

A special master must be disqualified when "his impartiality might reasonably be questioned," including because he has "personal knowledge of disputed evidentiary facts concerning the proceeding." 28 U.S.C. § 455(a), (b)(1); *see* Fed. R. Civ. P. 53(a)(2). Both occurred here, by the special master's own admission. The critical issue before the district court now is whether the sale process should commence in light of the potential chilling effect of OFAC sanctions. Crystallex says yes. The VPs say no. To help resolve that dispute, the district court directed the special master to seek clarity from the Executive Branch on its position and

prepare a neutral recommendation based on that report. Yet instead of doing that—by, for example, sending OFAC a public letter requesting its views—the special master arranged an *ex parte* meeting in order to provide his "perspective on why OFAC cooperation with the Court's order is appropriate and necessary" and "solicit OFAC's unencumbered views" for his subsequent recommendation to the court. App. 237a. That obviously exceeded his proper role.

### A. The Special Master's Advocacy That The Executive Branch Cooperate With The Sale Process Is Disqualifying

1. As members "of the judicial family," "special masters" must "'observe the same standards of fidelity and diligence applicable to the judge,'" *In re Kensington Int'l Ltd.*, 368 F.3d 289, 312 n.20 (3d Cir. 2004), including the duty to "'refrain from becoming advocates for either party,'" *Abdulrahman v. Ashcroft*, 330 F.3d 587, 596 (3d Cir. 2003). Courts, including this one, have therefore found a disqualifying appearance of partiality under § 455(a) when a judicial officer's conduct, such as urging the adoption of "a particular plea bargain," could cause a reasonable observer to think that he "was no longer acting as a neutral arbiter, but was advocating for his desired result." *In re United States*, 572 F.3d 301, 311 (7th Cir. 2009); *see, e.g.*, *United States v. Furst*, 886 F.2d 558, 565 (3d Cir. 1989) (disqualifying judge who "had attempted to encourage a plea bargain").

The same is true when it comes to the enforcement of judicial decrees. For instance, this Court disqualified a judge under § 455(a) who "told the parties that his

14

goal from the beginning of the criminal proceeding was to enforce a repatriation order and final judgment issued during a concurrent civil proceeding." *United States v. Antar*, 53 F.3d 568, 576 (3d Cir. 1995). By the same token, when a "court looks to" a special master "to execute its decrees," that execution must be done "impartially." *Newton v. Consol. Gas Co.*, 259 U.S. 101, 105 (1922).

Accordingly, it plainly would be improper for the district court, for example, to meet with OFAC and press that agency to cooperate with the sale process by stating that participation in the process would be lawful and that the winning bidder would ultimately receive a license to close the sale. While *Crystallex* may petition the Executive Branch for that result, *the court* itself cannot. To the contrary, "a judge's participation in a case must never reach the point where it appears, or is even perceived to appear, that the judge is aligned with any party in the pending litigation." *Alexander v. Primerica Holdings, Inc.*, 10 F.3d 155, 166 (3d Cir. 1993).

The special master nevertheless engaged in just that impermissible conduct. In his own words, "the core purpose of the meeting" on January 12 was to attempt to convince the Executive Branch to "cooperat[e] with" the sale process. App. 237a. Indeed, that was *why* he excluded the VPs from the meeting in the first place. As the special master told the district court, doing so was necessary because the VPs' "mere presence" would "only chill discussion and further impair [his] efforts." *Id.* He put it even more bluntly to the VPs, telling them that because his meeting would

15

have an "advocacy component[]," it would be "inappropriate for [their] counsel to attend given that [they] have a different agenda." App. 166a. But what could the special master possibly say to Executive Branch officials *in private* that could not be *appropriately* said before the VPs *in public*? The answer is nothing.

Indeed, as late as the hearing on the disqualification motion, the special master's counsel admitted that his client extolled "the benefits" of the sale process to the Executive Branch at the January 12 meeting. App. 12a. And for months after that meeting, the special master never disputed that he urged the Executive Branch to articulate a position that would "support the launch of the sale process"—despite multiple filings accusing him of doing so. App. 208a; *see* App. 145a, 160a, 181a. In filing after filing, the special master not only refused to deny that he engaged in such advocacy, but vigorously defended his right to "advocate for the enforcement of judgments." App. 196a; *see* App. 150a-59a, 185a-203a. In fact, the special master made quite clear that he has no patience for "[t]he Venezuela Parties' apparent belief that [he] must sit on the sidelines while the Court's judgment goes unexecuted for years on end," and accused the VPs of being "absurd" and willing to "do anything to delay enforcement." App. 155a-56a, 196a-97a; *see* App. 153a (alleging the VPs are filing "motion after motion clearly intended to delay"). While such language may be expected in a filing from Crystallex, it is startling in one from a judicial officer designated "an arm of the Court." App. 500a. All of this conduct

at a minimum calls into "question[]" the special master's "impartiality."  28 U.S.C.
§ 455(a).

2.  The district court offered no colorable merits defense of this advocacy
by a judicial officer.  At most, the court asserted that there was "no evidence" that
the special master had "advocated for a change in U.S. foreign policy or advocated
for Crystallex to be granted a license" in the closed-door meeting.  App. 106a.
Instead, based on unsupported suggestions made by the special master's counsel for
the first time at the disqualification-motion hearing, the court characterized the
special master's use of the term "advocacy" as merely asking the Executive Branch
to clarify "whether it will or will not or may exercise its sole authority at the end of
the process to grant a specific license" to the winning bidder.  App. 110a; *see* App.
39a-40a, 76a.  That theory is doubly flawed.

a.  To start, the district court's characterization is irreconcilable with the
special master's own repeated admissions as to what he intended to do and in fact
did.  From the beginning, the special master recognized that OFAC's sanctions
regime would "chill bidding" both because of the "[u]ncertainty surrounding what,
if any transaction OFAC will ultimately license" and because potential bidders
would not even "participate in the process for fear of violating such sanctions."  App.
413a, 446a; *see supra* at 8-9.  Accordingly, the only plausible understanding of the
special master's decision to offer his "perspective on why OFAC cooperation with

the Court's order is appropriate and necessary" is that he urged the Executive Branch to *eliminate both* sources of the "chill." App. 237a. And in fact, that *is* "advocat[ing] for a change in U.S. foreign policy," App. 106a, because OFAC's existing guidance unequivocally explains that private parties may not engage in any "concrete steps in furtherance of an auction or sale" of the PDVH shares that is "contingent upon the winning bidder obtaining a license from OFAC," FAQ 809.

Indeed, if all the special master "meant by 'advocacy'" was merely asking the Executive Branch for "clarity," App. 110a, it is inexplicable why the VPs' "mere presence" would have "chill[ed]" or "impair[ed]" that discussion, App. 237a, or why the special master never made this straightforward assertion in any of his various briefs, *see supra* at 16. Rather, the only colorable explanation for the special master's insistence on excluding the VPs is the one he gave them originally: His meeting with the Executive Branch would have "both informational and advocacy components, and that as a result it would be inappropriate for the [VPs'] counsel to attend given that [they] have a different agenda." App. 166a. The special master plainly understood the "advocacy component[]" of the meeting would be distinct from the "informational" one, and the "chill" only makes sense when applied to the former. This Court is "not required to exhibit a naiveté from which ordinary citizens are free." *Department of Commerce v. New York*, 139 S. Ct. 2551, 2575 (2019).

**b.**      Indeed, § 455(a) does not permit it to do so.  Whether the district court believed its appointed judicial officer acted impartially behind closed doors is not the relevant question. Rather, § 455(a) asks whether, in light of the special master's own statements and conduct, a "reasonable person might suspect" that he lobbied OFAC to support the launch of the sale process by articulating a position that would reassure bidders—with the recognition that "'people who have not served on the bench are often all too willing to indulge suspicions and doubts concerning the integrity of judges,'" "especially" in "high profile cases such as this one." *In re School Asbestos Litig.*, 977 F.2d 764, 782 (3d Cir. 1992).

Here, those suspicions will only be "heightened by the *ex parte* nature of the communications," as any "reasonable observer … would be concerned by the absence of any mechanism to police" the special master's conduct, *Kensington*, 368 F.3d at 305, especially after he excluded the VPs because they had a "different agenda" that would purportedly "chill" his "advocacy," App. 166a, 237a.  Given this dynamic, it is obvious that a "reasonable person would be troubled by" the *ex parte* nature of the meeting, making "disqualification under § 455(a)" necessary. *Kensington*, 368 F.3d at 309, 312; *see Furst*, 886 F.2d at 583.  The district court therefore missed the point when it accused the VPs of providing "no evidence" that the special master had "advocated for a change in U.S. foreign policy" at the January 12 meeting, App. 106a, after it *excluded* them from attending that discussion.

Having been shut out of the meeting, "there was no way for [the VPs] to adequately respond" to the special master's self-serving account on that issue.  *Kensington*, 368 F.3d at 310.

###  B.   The Special Master's Having Met *Ex Parte* With The Executive Branch To Discuss Material Facts Is Disqualifying

**1.**     Even apart from the special master's advocacy, the fact that he conducted the January 12 meeting on an *ex parte* basis itself compels his disqualification, for two reasons.

*First*, the special master's insistence on meeting with the Executive Branch on an *ex parte* basis even after the VPs asked to attend in a merely observational capacity would cause a reasonable observer to question his impartiality under 28 U.S.C. § 455(a).  At the very least, the public could reasonably perceive this decision as an attempt to ensure that "no official record of what was said" existed so that the special master's recommendation to the court could "'characteriz[e]'" the meeting in a manner most favorable to the immediate launch of the sale process, *Kensington*, 368 F.3d at 309.

Thus, the special master's inexplicable refusal to allow the VPs to observe the January 12 meeting at the very least raises questions about whether he intended to be a neutral reporter of the Executive Branch's position.  Indeed, if the "special master" here "could properly … advis[e] the district court whether to initiate" the sale process after his *ex parte* meeting, "then it would seem equally permissible for

a judge presiding over a criminal proceeding to dispatch his law clerk to visit the scene of the crime, take fingerprints, interview witnesses, and report back to the judge about his findings."  *In re Brooks*, 383 F.3d 1036, 1046 (D.C. Cir. 2004).

*Second*, the special master should be disqualified because the *ex parte* meeting gave him "personal knowledge of disputed evidentiary facts concerning the proceeding."  28 U.S.C. § 455(b)(1).  As this Court has explained, "off-the-record discussions on substantive issues" qualify as "'personal' or 'extrajudicial' knowledge in the sense that the information conveyed to the [judicial officer] leaves no trace in the record and cannot 'be controverted or tested by the tools of the adversary process.'"  *Kensington*, 368 F.3d at 308 n.18.  Accordingly, "*ex parte* communications" by a "special master" with "third parties likely to have information relevant" to his "advising the district court" require disqualification under § 455(b)(1).  *Brooks*, 383 F.3d at 1045-46.

That is the case here.  The special master's "*ex parte* meeting[]" with the Executive Branch on January 12 "went to the very heart of the proceedings," *Kensington*, 368 F.3d at 311—namely, whether the district court should launch an auction of the PDVH shares in the absence of an OFAC license.  That makes "exactly what was said by" the Executive Branch concerning the sale process critical evidence bearing on the key open question at this stage.  App. 166a.  Yet due to the *ex parte* nature of the meeting, any "information conveyed" by the Executive Branch

21

to the special master (and vice versa) cannot be fully "'controverted or tested by the tools of the adversary process.'"  *Kensington*, 368 F.3d at 308 n.18.   And the "advocacy" component of the special master's presentation only exacerbates the problem, because it confirms that he was trying not only to engage in private factfinding, but to shape those facts by providing the Executive Branch with his "perspective," including about the "benefits of" the sale process. App. 12a, 237a.

The *ex parte* nature of the January 12 meeting therefore compels the disqualification of the special master under both "§ 455(b)(1)" and "§ 455(a)." *Brooks*, 383 F.3d at 1046.   And any "reports, recommendations, or other work product" the special master prepared based on that "*ex parte*" meeting—or judicial orders based on that work product—must be "vacate[d]" as well.  *Id.* at 1038, 1046.

**2.**      The district court's defenses of this *ex parte* meeting fail.

The court briefly opined that both Rule 53 and inherent judicial power allowed it to authorize the special master to engage in *ex parte* factfinding.  App. 121a-22a. But Rule 53 addresses only "the circumstances, if any, in which the master may communicate ex parte with *the court or a party*," not a third party with information on a critical—and disputed—issue of fact.   Fed. R. Civ. P. 53(b)(2)(B) (emphasis added).   And any "exercise of an inherent power cannot be contrary to any express grant of or limitation on the district court's power contained in a rule or statute"— Rule 53 and § 455 included.  *Dietz v. Bouldin*, 579 U.S. 40, 45 (2016).

More fundamentally, a violation of § 455 cannot be cured through judicial *ipse dixit*.  "[A] judge may not direct his [subordinate] to do that which is prohibited to the judge," and no one reasonably contends that the district court could have itself met with the Executive Branch in private to gather information for the court's decision on whether to launch the sale process without a license—much less to advocate that the Executive Branch support such a process.  *Price Bros. Co. v. Phila. Gear Corp.*, 629 F.2d 444, 447 (6th Cir. 1980) ("Unquestionably, it would be impermissible for a trial judge to deliberately set about gathering facts outside the record of a bench trial over which he was to preside.").

The court also observed that the Executive Branch apparently expressed an intent—to the special master *ex parte*—to make an on-the-record filing.  App. 123a; *see* App. 13a-14a.  But nothing in § 455 permits a court to deny a disqualification motion on the theory that the *ex parte* factfinding of a judicial officer may be cured through later in-court corroboration.  Otherwise, a judge could send his law clerk to conduct an *ex parte* interview of a key witness at a bench trial merely because the witness was scheduled to testify the next day.  Even if a special master's report is "'not based on any information derived from'" his "*ex parte* communications," those discussions "may reasonably be expected to color the way in which he approaches his task, and ultimately his reports and recommendations to the district court."

*Brooks*, 383 F.3d at 1046.  And in all events, none of this would possibly justify the special master's "advocacy."

### C.    The Disqualification Motion Was Neither Waived Nor Untimely

The district court also held that the VPs' disqualification motion—made merely eight days after the January 12 meeting—was untimely and waived.  App. 106a-21a.  Those procedural rulings similarly lack merit.

**1.**    As to the advocacy ground for disqualification, not even the district court suggested that the VPs had any reason to suspect that the special master would engage in advocacy prior to January 3, 2023.   Indeed, the special master had previously promised *not* to "lobb[y]" the Executive Branch, App. 359a, and he never even suggested an intention to go back on that commitment until January 3, when, as the court acknowledged, "the first use of the word 'advocate' came up," App. 116a.  Instead, the court suggested that the VPs' objection was untimely and waived on the assumption that the special master's "'advocacy'" in the January 12 meeting was not "materially different" from his conduct in "earlier *ex parte* meetings with OFAC," in that in each instance, he was merely "inquiring" as to the Executive Branch's views. App. 110a-11a.  But that premise is clearly wrong, *see supra* Pt. I.A.2, and once it falls away, this procedural ruling collapses as well.

The district court alternatively held that once the special master made clear on January 3 that he was going to engage in *ex parte* advocacy at the January 12

meeting, the VPs had engaged in "substantial" and "strategic" delay by not objecting "until January 9th," as opposed to, say, January 6. App. 116a-18a; *see* App. 115a (asserting that the VPs had "three days at most" to try to stop the meeting from occurring). In other words, taking six calendar days (four business days)—rather than three calendar days (three business days)—to consult internally among several parties and prepare a motion to stop disqualifying conduct *before* it occurred was too long. That cannot be right. Indeed, even the district court acknowledged that there was no "case law" to support that result. App. 117a.

The district court also offered no meaningful explanation for how this timing could possibly be strategic or prejudicial. Rather than allow the January 12 meeting to occur without notifying the court, the VPs objected to the intended advocacy and moved to attend the meeting days before it occurred. The court could have easily just allowed the VPs to attend (and reminded the special master to refrain from lobbying), in which case the meeting would have proceeded as scheduled. As discussed above, neither the special master nor the court has yet to articulate why it would have been problematic for the VPs to attend, apart from the fear that they would "chill" discussions. App. 237a. And when the court insisted on forging ahead with the meeting, the VPs quickly sought disqualification on January 20 before the special master could submit his tainted report. The VPs' prompt response to the special master's actions therefore cannot possibly be dismissed as strategic delay.

**2.**     As to the *ex parte* nature of the meeting—a separate basis for disqualification—the district court emphasized that, prior to January 3, 2023, various orders contemplated that the special master would meet with the Executive Branch and that the VPs knew several such meetings had previously occurred on an *ex parte* basis.  App. 107a-10a.  But none of the district court's orders authorized the special master to meet with the Executive Branch *ex parte*.  *See* App. 267a-68a, 316a; *see also* App. 349a-52a (discussion at a hearing).   And regardless, none of those meetings involved the special master "deliberately set[ting] about gathering facts outside the record" that would drive his recommendation as to a pending judicial decision.  *Price Bros.*, 629 F.2d at 447.

Faced with this problem, the district court observed that in an October 4, 2022 status report, "the special master confirmed he does not intend to include" the VPs at the meeting in question.  App. 109a.  But the court ignored that the special master said only that he "d[id] not intend to include" the VPs "at this time," and that his "position may change in the future," App. 296a n.2.  Thus, if the VPs had tried to disqualify the special master in October 2022, their effort would have been dismissed as premature, as he had not even made up his mind as to whether the VPs could attend.

Given all that, the VPs' conduct does not come close to satisfying the requirements for untimeliness, much less for waiver, which this Court has squarely

held requires "*affirmative consent*."  *Kensington*, 368 F.3d at 311.  As this Court observed, the Seventh Circuit properly disqualified a judge even when the movants had long been "aware that [a panel of experts] had *ex parte* meetings with the judge from time to time to discuss administrative matters," because they "only discovered later that one of the meetings involved a discussion of the merits."  *Id.* at 307; *see Edgar v. K.L.*, 93 F.3d 256, 257-58 (7th Cir. 1996) (holding the disqualification request was "timely" even though the movants had "known for at least a year" about the *ex parte* meetings more generally).  Moreover, even if the district court were correct that the VPs "should have known" before January 3 that the special master would exclude them from his meeting, App. 116a, "constructive knowledge" is not enough; only "actual knowledge" suffices, *Kensington*, 368 F.3d at 314-15.  And even in cases of "'actual knowledge,'" this Court has refused to let "the issue of timeliness trump … the principles of § 455(a)" where there is no indication of an "abuse of § 455(a) procedure," and the absence of a disqualification motion in October 2022 in no way suggests the VPs were seeking a strategic advantage then.  *Id.* at 316-17 (20-month delay); *see Furst*, 886 F.2d at 581 (three-month delay).

In all events, whatever happened in the past, the VPs vigorously objected to *this ex parte* meeting, and did so immediately upon learning of it.  Consequently, even if the VPs had somehow consented to prior *ex parte* meetings—and they did

not—that would not change the fact that the VPs timely objected to *this* one. *See Edgar*, 93 F.3d at 257-58.

Finally, the district court accused the VPs of holding a disqualification argument "in reserve" by not specifying before the January 12 meeting took place that the special master's *ex parte* factfinding would violate § 455(b)(1) in addition to § 455(a). App. 118a-19a. That allegation of sandbagging—like the more general suggestion that the VPs are engaging in obstructionist "delay[]," App. 118a—is baseless and, more importantly, cannot be invoked as an excuse for approving the special master's conduct. There is no dispute that the VPs cited § 455(b)(1) in their post-meeting disqualification motion. *See* App. 207a-12a. There also is no dispute that in their pre-meeting briefing, the VPs clearly put the court on notice that the special master would have to be "disqualif[ied]" based on "personal or extrajudicial knowledge obtained in *ex parte* communications with third parties" if the meeting went forward as planned. *E.g.*, App. 224a (cleaned up). The district court offered no support for its insistence that the VPs had to cite the specific subsection of § 455 confirming that common-sense proposition as well. Nor did the court identify anything it would have done differently if the VPs' pre-January 12 briefing had cited § 455(b)(1) specifically, which is unsurprising given that "Section 455(b)(1) is embraced within the perception that a reasonable person might entertain that the judge's impartiality might reasonably be questioned" under § 455(a). *Kensington*,

368 F.3d at 316.  And in all events, § 455(b)(1) is not the basis for challenging the special master's impermissible advocacy.  *See supra* Pt. I.A.  Instead, that objection is based on § 455(a), which all agree the VPs explicitly cited before January 12.  *See* App. 249a.

## II.  MANDAMUS RELIEF IS WARRANTED

This district court's erroneous refusal to disqualify the special master justifies mandamus relief.  For the reasons given in Part I, the district court's refusal to disqualify the special master is "'a clear legal error'" justifying mandamus.  *Kensington*, 368 F.3d at 301.  And as demonstrated below, the other two mandamus requirements are also satisfied.

A.  To start, the VPs lack "'other adequate means to attain the relief [they] desire[].'"  *Cheney*, 542 U.S. at 380.  Courts, including this one, have held that mandamus is warranted to review judicial-impartiality objections under § 455, both because "the injury suffered by a party required to complete judicial proceedings overseen by" a "disqualified judicial officer" is "by its nature irreparable" and "because public confidence is irreparably dampened once a case is allowed to proceed before a [judicial officer] who appears to be tainted."  *In re Al-Nashiri*, 921 F.3d 224, 238 (D.C. Cir. 2019) (cleaned up); *see, e.g.*, *School Asbestos*, 977 F.2d at 776 (emphasizing that "review after final judgment … cannot cure the … harm to public confidence" in the courts if the "tainted" proceedings continue).  Here, by the

time the district court enters a final sale order, the damage to the VPs and the public perception of the judiciary will have been done. At that point, the world will have witnessed a foreign sovereign's forced participation in a public auction for its state-owned oil company's most valuable asset in a process overseen by a judicial officer who will be reasonably viewed—both here and in Venezuela—as lacking impartiality given his prior *ex parte* advocacy. By then, "no amount of appellate review can remove completely the stain of judicial bias" from these proceedings. *Al-Nashiri*, 921 F.3d at 238.

In addition, there would be significant obstacles to deciding these issues in the context of an appeal from a final sale order. At that stage, this Court likely would need to grant an emergency stay of the sale order or unwind the consummated sale. Especially given the gravity of the error here, each of these alternatives would be inadequate. *Cf. In re Rhone-Poulenc Rorer, Inc.*, 51 F.3d 1293, 1297 (7th Cir. 1995) (concluding that review of a final judgment would not "provide effective relief to the defendants" given "the sheer *magnitude* of the risk to which" a class-certification order "exposes them").

To be sure, in dismissing the VPs' collateral-order appeal of a March 2022 order rejecting a conflict-of-interest objection to the special master's financial advisor, this Court held that the order was not "'effectively unreviewable on appeal from a final judgment.'" 22-1606 Order 2. There is a critical difference, though,

30

between collateral-order appeals and mandamus petitions.  As this Court emphasized, the collateral-order inquiry focuses on the general "category" of order at issue, rather than the "case-by-case" circumstances.  *Id.*  But that is precisely because "mandamus" remains as the "safety valve" for cases where "some litigants may experience severe hardship."  *Mohawk Indus., Inc. v. Carpenter*, 558 U.S. 100, 109, 111-12 (2009) (cleaned up).  Indeed, the D.C. Circuit case this Court cited for the proposition that an "objection to [a judicial officer's] impartiality under § 455 was concededly not appealable" under the collateral-order doctrine, 22-1606 Order 2, went on to cite this Court's decision in *School Asbestos* and hold that "[w]hen the relief sought is recusal of a disqualified judicial officer, … the injury suffered by a party required to complete judicial proceedings overseen by that officer is by its nature irreparable" and so justifies "a writ of mandamus compelling recusal," *Cobell v. Norton*, 334 F.3d 1128, 1139 (D.C. Cir. 2003).

  **B.** Mandamus is "appropriate" here for similar reasons.  *School Asbestos*, 977 F.2d at 778.  Indeed, there are "few situations more appropriate for mandamus" than a "'charge of partiality in the administration of justice'" given "'the interest of public confidence in the courts.'" *Rosen v. Sugarman*, 357 F.2d 794, 797 (2d Cir. 1966) (Friendly, J.).  And that is especially true here, where the cloud cast over the special master's ongoing role in this case will undermine the standing of U.S. courts not only in this country, but internationally as well.

## CONCLUSION

This Court should issue a writ of mandamus ordering the district court to disqualify the special master and to vacate any recommendations or orders based on his January 12, 2023 meeting with the Executive Branch.

Dated:  April 11, 2023

Respectfully submitted,

*/s/* Hashim M. Mooppan

Donald B. Verrilli, Jr.
Elaine J. Goldenberg
Ginger D. Anders
Brendan B. Gants
MUNGER, TOLLES & OLSON LLP
601 Massachusetts Ave. NW
Suite 500E
Washington, DC  20001
(202) 220-1100

*Counsel for Bolivarian Republic of Venezuela*

Joseph D. Pizzurro
Kevin A. Meehan
Juan O. Perla
CURTIS, MALLET-PREVOST,
COLT & MOSLE LLP
101 Park Ave.
New York, NY  10178
(212) 696-6000

*Counsel for Petróleos de Venezuela, S.A.*

Hashim M. Mooppan
  *Counsel of Record*
Gregory M. Shumaker
Brinton Lucas
JONES DAY
51 Louisiana Ave. NW
Washington, DC  20001
(202) 879-3939
hmmooppan@jonesday.com

Nathan P. Eimer
Daniel D. Birk
Gregory M. Schweizer
Emily Sullivan
EIMER STAHL LLP
224 South Michigan Ave., Suite 1100
Chicago, IL  60605
(312) 660-7600

Michael J. Gottlieb
Samuel G. Hall
WILKIE FARR & GALLAGHER LLP
1875 K St. NW
Washington, DC  20006
(202) 303-1000

*Counsel for CITGO Petroleum Corporation and PDV Holding, Inc.*

## COMBINED CERTIFICATIONS

1.     Pursuant to Third Circuit L.A.R. 28.3(d), at least one of the attorneys whose names appear on this petition, including the undersigned, is a member in good standing of the bar of this Court.

2.     This petition complies with the word limit of Fed. R. App. P. 21(d)(1)(1) because, excluding the parts of the document exempted by Fed. R. App. P. 21(a)(2)(C) and 32(f), this document contains 7773 words.  This petition complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this petition has been prepared in a proportionally spaced 14-point serif font (Times New Roman), using Microsoft Word.

3.     Pursuant to Third Circuit L.A.R. 31.1(c), the text of the electronic version of this document is identical to the text of the paper copies filed with the Court.

4.     Pursuant to Third Circuit L.A.R. 31.1(c), Microsoft Safety Scanner version 1.387.711.0 has been run on this electronic file and no virus was detected.


Dated: April 11, 2023                              */s/* Hashim M. Mooppan
                                                   Hashim M. Mooppan
                                                   *Counsel for CITGO Petroleum*
                                                   *Corporation and PDV Holding, Inc.*

## CERTIFICATE OF SERVICE

I hereby certify that on April 11, 2023, this petition and appendix were electronically filed with the Clerk of Court using the appellate CM/ECF system. Service on counsel for all parties in the district court has been accomplished via notice filed through the district court's CM/ECF system attaching a copy of this filing.  The district court has also been provided with a paper copy of this filing by United Parcel Service overnight delivery to United States District Court District of Delaware, 844 North King Street, Wilmington, Delaware 19801.

I further certify that four hard copies of this petition and appendix will be sent to the Clerk of Court by United Parcel Service overnight delivery.

Dated: April 11, 2023

*/s/* Hashim M. Mooppan
Hashim M. Mooppan
*Counsel for CITGO Petroleum*
*Corporation and PDV Holding, Inc.*

EXHIBIT B

No. 23-

---

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE THIRD CIRCUIT

---

IN RE BOLIVARIAN REPUBLIC OF VENEZUELA;
PETRÓLEOS DE VENEZUELA, S.A.; CITGO PETROLEUM
CORPORATION; and PDV HOLDING, INC.,

*Petitioners.*

---

**Petition for a Writ of Mandamus to the United States District Court for
the District of Delaware**

---

**APPENDIX**

---

Donald B. Verrilli, Jr.
Elaine J. Goldenberg
Ginger D. Anders
Brendan B. Gants
MUNGER, TOLLES & OLSON LLP
601 Massachusetts Ave. NW
Suite 500E
Washington, DC  20001
(202) 220-1100

*Counsel for Bolivarian Republic of
Venezuela*

Hashim M. Mooppan
  *Counsel of Record*
Gregory M. Shumaker
Brinton Lucas
JONES DAY
51 Louisiana Ave. NW
Washington, DC  20001
(202) 879-3939
hmmooppan@jonesday.com

*Counsel for CITGO Petroleum
Corporation and PDV Holding, Inc.*

(additional counsel listed on inside cover)

Joseph D. Pizzurro
Kevin A. Meehan
Juan O. Perla
CURTIS, MALLET-PREVOST,
COLT & MOSLE LLP
101 Park Ave.
New York, NY 10178
(212) 696-6000

*Counsel for Petróleos de Venezuela, S.A.*

Nathan P. Eimer
Daniel D. Birk
Gregory M. Schweizer
Emily Sullivan
EIMER STAHL LLP
224 South Michigan Ave., Suite 1100
Chicago, IL 60605
(312) 660-7600

Michael J. Gottlieb
Samuel G. Hall
WILKIE FARR & GALLAGHER LLP
1875 K St. NW
Washington, DC 20006
(202) 303-1000

*Counsel for CITGO Petroleum Corporation and PDV Holding, Inc.*

# TABLE OF CONTENTS

Page

District Court Docket (Excerpted) ............................................................ 1a

Transcript of Motion to Disqualify (Mar. 30, 2023) ............................... 3a

Letter from Venezuela Parties Responding to Letter Briefs (D.E. 533)
    (Mar. 3, 2023) ...................................................................... 145a

Letter from Special Master Responding to Letter Briefs (D.E. 532)
    (Mar. 3, 2023) ...................................................................... 150a

Letter from Special Master Responding to Letter Objecting to the Special
    Master's Monthly Report for the Period Ended January 31, 2023
    (D.E. 530) (Feb. 28, 2023) ................................................. 153a

Letter from Special Master Responding to Questions Set Forth in the
    Memorandum Order of February 17, 2023 (D.E. 526) (Feb. 24, 2023) ..... 155a

Letter from Venezuela Parties Responding to Questions Set Forth in the
    Memorandum Order of February 17, 2023 (D.E. 524) (Feb. 24, 2023) ..... 160a

Declaration of Nathan P. Eimer in Support of Venezuela Parties' Reply
    in Support of Their Motion to Disqualify the Special Master
    (D.E. 516) (Feb. 10, 2023) ................................................. 165a

Exhibit A: Emails Between Nathan P. Eimer Special Master Between
    December 29 and December 30, 2022, Regarding the Special
    Master's Scheduled January 12, 2023 Meeting with OFAC
    (D.E. 516-1) (Feb. 10, 2023) .............................................. 168a

Venezuela Parties' Reply in Support of Their Motion to Disqualify
    the Special Master (D.E. 515) (Feb. 10, 2023) .................... 171a

Special Master's Opposition to Venezuela Parties' Motion to
    Disqualify the Special Master (D.E. 512) (Feb. 3, 2023) .......... 185a

PDVSA, PDVH, and CITGO's Motion to Disqualify the Special Master
    (D.E. 509) (Jan. 20, 2023) ................................................. 204a

Memorandum Order (D.E. 506) (Jan. 11, 2023) ................................... 218a

Venezuela Parties' Reply in Support of Their Motion for an Order
    Directing the Special Master to Permit Counsel's Attendance
    at Meetings with the United States Government (D.E. 505)
    (Jan. 11, 2023) .................................................................. 221a

Response to Venezuela Parties' Motion for an Order Directing the
    Special Master to Permit Counsel's Attendance at Meetings
    with the United States Government (D.E. 503) (Jan. 10, 2023) ................ 233a

Venezuela Parties' Motion for an Order Directing the Special Master
   to Permit Counsel's Attendance at Meetings with the United
   States Government (D.E. 499) (Jan. 9, 2023)...........................................240a

Special Master's Monthly Report For The Period Ended
   November 30, 2022 (D.E. 496) (Jan. 4, 2023)..........................................253a

Sixth Revised Proposed Order (A) Establishing Sale and Bidding
   Procedures, (B) Approving Special Master's Report and
   Recommendation Regarding Proposed Sale Procedures Order,
   (C) Affirming Retention of Evercore as Investment Banker by
   Special Master and (D) Regarding Related Matters (D.E. 481)
   (signed Oct. 7, 2022)...................................................................................257a

Joint Status Report (D.E. 480) (Oct. 4, 2022)....................................................295a

Opinion (D.E. 443) (Mar. 2, 2022).....................................................................298a

Oral Argument Hearing Transcript (D.E. 409) (Nov. 23, 2021)
   (Excerpted)..................................................................................................348a

Response of Special Master to Objections to Proposed Sale
   Procedures Order (D.E. 356) (Sept. 21, 2021)..........................................353a

Venezuela Parties' Objections to the Special Master's Proposed
   Order (A) Establishing Sale and Bidding Procedures,
   (B) Approving Special Master's Report and Recommendation
   Regarding Proposed Sale Procedures Order, (C) Affirming
   Retention of Evercore as Investment Banker by Special Master
   and (D) Regarding Related Matters (D.E. 354) (Sept. 20, 2021) ...............379a

Special Master's Report and Recommendation Regarding
   Proposed Sale Procedures Order (D.E. 348)
   (originally filed under seal on Aug. 9, 2021)............................................410a

Exhibit A: Letter from OFAC Responding to the Request, on Behalf of
   Crystallex International Corporation, Dated April 9, 2020, and
   Subsequent Related Correspondence, Requesting Authorization for
   All Activities Necessary and Ordinarily Incident to Organizing and
   Conducting a Judicial Sale of Shares in CITGO Petroleum Corp.'s
   Indirect Parent Holding Company, PDV Holding, Inc. That Are
   Held by Petróleos de Venezuela, S.A. (D.E. 346-1) (Sept. 15, 2021)........483a

Order Regarding Special Master (D.E. 277) (May 27, 2021) ............................492a

Memorandum Order (D.E. 544) (Apr. 11, 2023)................................................502a

Case 1:23-1687 Document 54-12 Date Filed: 04/13/2023

APPEAL,SPECIALMASTER

# U.S. District Court
## District of Delaware (Wilmington)
## CIVIL DOCKET FOR CASE #: 1:17−mc−00151−LPS

Crystallex International Corporation v. Bolivarian Republic of Venezuela
Assigned to: Judge Leonard P. Stark
Related Cases:  1:18−mc−00343−LPS
                1:19−cv−00290−LPS
                1:19−mc−00290−LPS
                1:18−cv−01963−LPS
                1:21−mc−00481−LPS
                1:22−mc−00347−LPS
                1:22−mc−00156−LPS
                1:22−cv−01315−LPS
                1:22−mc−00453−LPS
Case in other court:  USDC/DC, 16cv661 RC
                Third Circuit, 18−02797
                Third Circuit, 18−03124
                Third Circuit, 21−01276
                Third Circuit, 21−01277
                Third Circuit, 21−01289
                Third Circuit, 22−01606
                Third Circuit, 23−01117
Cause: Registration of Foreign Judgment

Date Filed: 06/19/2017
Jury Demand: None
Nature of Suit: 890 Other Statutory Actions
Jurisdiction: Federal Question

**Special Master**

**Robert B. Pincus, Esq.**                    represented by  **Myron T. Steele**
                                                Potter Anderson & Corroon, LLP
                                                1313 N. Market St., Hercules Plaza, 6th Flr.
                                                P.O. Box 951
                                                Wilmington, DE 19899−0951
                                                (302) 964−6030
                                                Email: msteele@potteranderson.com
                                                *LEAD ATTORNEY*
                                                *ATTORNEY TO BE NOTICED*

                                                **Abraham C. Schneider**
                                                Court of Chancery
                                                34 The Circle
                                                Georgetown, DE 19947
                                                302−856−5777
                                                *ATTORNEY TO BE NOTICED*

                                                **Alan Richard Silverstein**
                                                Connolly Gallagher LLP
                                                1201 N. Market St.
                                                20th Floor
                                                Wilmington, DE 19801
                                                302−757−7322
                                                Email: asilverstein@connollygallagher.com
                                                *TERMINATED: 11/11/2021*
                                                *ATTORNEY TO BE NOTICED*

                                                **Alexander W. Welch**
                                                Email: alexander.welch@weil.com
                                                *PRO HAC VICE*

**1a**

| | | (Entered: 03/03/2023) |
|---|---|---|
| 03/03/2023 | 534 | Letter to The Honorable Leonard P. Stark from Travis S. Hunter regarding Responsive Supplemental Letter Brief on Motion to Disqualify Special Master – re 526 Letter, 522 Letter, 524 Letter. (Hunter, Travis) (Entered: 03/03/2023) |
| 03/20/2023 | 535 | ORAL ORDER: IT IS HEREBY ORDERED that the March 30, 2023 hearing will begin at 10:00 a.m. in Courtroom 4A. In addition to presenting argument on the pending motion to disqualify the Court's Special Master, the Sale Process Parties and the Special Master shall be prepared to address (in addition to anything else they wish to raise): (i) the Venezuela Parties' objection to the Special Master's fee requests; (ii) whether the Court should order the Itemized Statements supporting the Special Master's invoices to be unsealed; and (iii) how this case should now proceed. ORDERED by Judge Leonard P. Stark on 3/20/23. (ntl) (Entered: 03/20/2023) |
| 03/24/2023 | 536 | Letter to The Honorable Leonard P. Stark from Alexandra M. Cumings regarding permission to set up a public dial–in line for the in–person hearing scheduled for March 30, 2023 at 10:00 a.m. in Wilmington, Delaware. (Cumings, Alexandra) (Entered: 03/24/2023) |
| 03/28/2023 | 537 | Letter to The Honorable Leonard P. Stark from Alexandra M. Cumings regarding public dial–in line for members of the public to listen into the in–person hearing scheduled for March 30, 2023 at 10:00 a.m. – re 535 Order,,, Set Hearings,,. (Cumings, Alexandra) (Entered: 03/28/2023) |
| 03/30/2023 | | Minute Entry for proceedings held before Judge Leonard P. Stark – Motion Hearing held on 3/30/2023. (Court Reporter: Deanna Warner). (twk) (Entered: 03/31/2023) |
| 04/04/2023 | 538 | ORAL ORDER: For the reasons provided in court on March 30, 2023, PDVSA, PDVH, and CITGO's motion to disqualify the Special Master (D.I. 509) is DENIED. It is FURTHER ORDERED that the deadline for the Special Master to file the Supplemental Report is extended to April 30, 2023. ORDERED by Judge Leonard P. Stark on 4/4/23. (ntl) (Entered: 04/04/2023) |
| 04/04/2023 | 539 | ORAL ORDER: Having further considered the Special Master's report for the period ending January 31, 2023 (D.I. 518), including the attached Itemized Statement (D.I. 518–1), and having considered the letter from CITGO and PDVH (D.I. 528), IT IS FURTHER ORDERED that: (i) given that no party seeks additional briefing on the December 2022 and January 2023 fees, and for many of the reasons that the Court has previously articulated (see, e.g., D.I. 337 at 1–3; D.I. 428), the Court finds that the fees and expenses in the Itemized Statement are regular and reasonable, so the Itemized Statement is approved; (ii) each of Crystallex, ConocoPhillips, and the Venezuela Parties shall make payment of one–third of the amounts set forth in the Itemized Statement within 30 days; and (iii) the fee cap referenced in the Court's May 27 order (D.I. 277 para. 15) is increased accordingly. ORDERED by Judge Leonard P. Stark on 4/4/23. (ntl) (Entered: 04/04/2023) |

```
1              IN THE UNITED STATES DISTRICT COURT

2             IN AND FOR THE DISTRICT OF DELAWARE

3

       CRYSTALLEX INTERNATIONAL CORP.,)
4                                     )
       --------------------Plaintiff, )
5                                     )Case No.
               vs.                    )17-151-LPS
6                                     )
       BOLIVARIAN REPUBLIC OF         )
7      VENEZUELA,                     )
                                      )
8      --------------------Defendant. )

9
              TRANSCRIPT OF MOTION TO DISQUALIFY
10

11            MOTION TO DISQUALIFY had before the

12     Honorable Leonard P. Stark, U.S.C.A.J., in

13     Courtroom 4A on the 30th of March, 2023.

14

15                    APPEARANCES

16        POTTER ANDERSON & CORROON LLP
                BY: MYRON STEELE, ESQ.
17                   ABRAHAM SCHNEIDER, ESQ.

18                     -and-

19        WEIL GOTSHAL & MANGES LLP
                BY: RAY SCHROCK, ESQ.
20                   ALEX WELCH, ESQ.
                     CHASE BENTLEY, ESQ.
21
                             Counsel for the
22                           Special Master

23

24

25
```

```
 1          (Appearances continued.)

 2
               RICHARDS, LAYTON & FINGER, P.A.
 3                  BY:  JEFF MOYER, ESQ.

 4                         -and-

 5          GIBSON DUNN & CRUTCHER
                    BY:  MIGUEL ESTRADA, ESQ.
 6                       LUCAS TOWNSEND, ESQ.
                         MAX SCHULMAN, ESQ.
 7
                              Counsel for Crystallex
 8
               ABRAMS & BAYLISS LLP
 9                  BY:  STEPHEN CHILDS, ESQ.

10                         -and-

11          MUNGER TOLLES & OLSON LLP
                    BY:  DONALD VERRILLI, ESQ.
12                       GINGER ANDERS, ESQ.

13                            Counsel for the
                              Republic of Venezuela
14
               HEYMAN ENERIO GATTUSO & HIRZEL LLP
15                  BY:  SAM HIRZEL, ESQ.

16                         -and-

17          CURTIS MALLET-PREVOST COLT & MOSLE LLP
                    BY:  JUAN PERLA, ESQ.
18                       KEVIN MEEHAN, ESQ.
                         AUBRE DEAN
19
                              Counsel for PDVSA
20
               MORRIS NICHOLS ARSHT & TUNELL
21                  BY:  ALEXANDRA CUMINGS, ESQ.

22                         -and-

23          EIMER STAHL LLP
                    BY:  NATHAN EIMER, ESQ.
24                       DANIEL BIRK, ESQ

25                            Counsel for Citgo
                              and PDVH
```

```
 1          (Appearances continued.)

 2              ROSS ARONSTAM & MORITZ LLP
                    BY:  GARRET MORITZ,ESQ.
 3
                          -and-
 4
                WACHTELL LIPTON ROSEN & KATZ
 5                  BY:  RICHARD MASON, ESQ.
                         AMY WOLF, ESQ.
 6                       MICHAEL CASSEL, ESQ.

 7                        -and-

 8              KOBRE & KIM
                    BY:  MARCUS GREEN, ESQ.
 9
                                Counsel for
10                              ConocoPhillips

11              LANDIS RATH & COBB
                    BY:  JENNIFER CREE, ESQ.
12
                          -and-
13
                MOLOLAMKEN LLP
14                  BY:  STEVEN MOLO, ESQ.
                         JUSTIN ELLIS, ESQ.
15
                                Counsel for Red Tree
16
                WOMBLE BOND DICKINSON LLP
17                  BY:  KEVIN MANGAN, ESQ.

18                              Counsel for Gold
                                Reserve, Inc.
19
                WILLKIE FARR & GALLAGHER LLP
20                  BY:  SAM HALL, ESQ.

21                              Counsel for Citgo/PDVH

22

23

24

25
```

```
 1              THE COURT:  It's nice to see you all

 2      and be in court again with you.  It's been some

 3      time, I believe, since we've been in court

 4      together.  I do want to start by having you all

 5      put your appearances on the record for us, and

 6      there are so many of you, so please be careful

 7      as we go through the proceedings today to

 8      identify yourselves for the court reporter.

 9          Right side of the room.  We'll start

10      there.

11              MR. MOYER:  Good morning, Your Honor.

12      Jeff Moyer of Richards, Layton, and Finger on

13      behalf of Crystallex.  Your Honor, I'm joined

14      this morning by Miguel Estrada and Lucas

15      Townsend of the Gibson Dunn firm.

16              THE COURT:  Good morning.

17              MR. STEELE:  Good morning, Your

18      Honor.  May it please the Court.  I'm Myron

19      Steele from Potter Anderson.  I have the

20      privilege of representing the special master,

21      Robert Pincus, who is here.  Also appearing,

22      from Weil Gotshal, Ray Schrock, who will

23      address the Court; Alex Welch; and Chase

24      Bentley.  Thank you, Your Honor.

25              THE COURT:  That's everyone on that
```

1     side of the room, so we'll turn to the other

2     side of the room, please.

3          MR. CHILDS:  Good morning, Your

4     Honor.  Stephen Childs of Abrams and Bayliss on

5     behalf of the Republic.  I'm joined this

6     morning by my co-counsel from Munger, Tolles,

7     and Olson Mr. Donald Verrilli and Ms. Ginger

8     Anders, and with Your Honor's permission,

9     Mr. Verrilli will address the Court.

10         THE COURT:  Permission is granted.

11    Good morning to you both.

12         MS. CUMINGS:  Good morning, Your

13    Honor.  Ali Cummings of Morris, Nichols, Arsht,

14    and Tunnell on behalf of PDV Holding and Citgo

15    Petroleum, and with me at counsel table is

16    Nathan Eimer of Eimer Stahl, and he'll be

17    presenting this morning.

18         THE COURT:  Thank you for that.

19         MR. HIRZEL:  Good morning, Your

20    Honor.  Sam Hirzel from Heyman Enerio on behalf

21    of PDVSA.  With me in the back I have Juan

22    Perla, Kevin Meehan, and Aubre Dean from the

23    Curtis Mallet firm.

24         THE COURT:  Welcome to you all.  Good

25    morning.

1     MR. MORITZ:  Good morning, Your

2  Honor.  Garrett Moritz from Ross Aronstam on

3  behalf of ConocoPhillips.  I'm joined today by

4  co-counsel from Wachtell Lipton Richard Mason,

5  Amy Wolf, and Michael Cassel, and also, from

6  Kobre and Kim, Marcus Green.  And our

7  expectation is Ms. Wolf will be speaking today,

8  although if some issue comes up that may

9  requires someone else, we may have one of the

10  others.  Thank you.

11     THE COURT:  Anybody else here this

12  morning that wants to enter an appearance?

13  Thank you.

14    There is one more.  Good morning.

15     MS. CREE:  Good morning, Your Honor.

16  Jennifer Cree from Landis, Rath, and Cobb on

17  behalf of the creditor Red Tree.  With me today

18  I have co-counsel Steven Molo and Justin Ellis

19  of MoloLamken.

20     THE COURT:  Thank you very much.

21    Again, good morning to all of you.

22    So I want to start by telling you my

23  agenda for the morning and then give you all a

24  chance to tell me if you have any questions

25  about that agenda or any objections or any

1    suggestions as to another way to proceed.

2         We're principally here on the

3    still-pending motion to disqualify the special

4    master.  I do not need to conduct an

5    evidentiary hearing after the extensive

6    briefing.  That was the position of all

7    parties, and I do not believe that there is any

8    material factual dispute in the record.

9         But here's how I plan to proceed:  I'd

10   like to start by hearing from the special

11   master, particularly to see if there's anything

12   he wants to put on the record to supplement the

13   record.  One of the issues that particularly

14   became apparent in the letters that I ordered

15   you all to submit is the Venezuela parties'

16   position that they are not seeking my

17   disqualification on the assumption that there

18   has been no ex parte communication of anything

19   substantive that happened in the January 12th

20   meeting and any discussion between me and the

21   special master, there has not been.  But I do

22   want to see if the special master wants to make

23   a record on that point and also if he's

24   prepared to make any record as to what happened

25   at the January 12th meeting in case that became

```
 1          pertinent to the Venezuela parties' position,
 2          so my thought is I would start with the special
 3          master, not necessarily hear argument or ask
 4          him a lot of questions, but just see if he
 5          wants to supplement the record then turn to the
 6          moving parties and hear their argument, and
 7          I'll certainly have some questions, and then go
 8          back to the special master, and if he wants to
 9          make argument at that point, I may have some
10          questions related to motion.  I would turn to
11          him after hearing from the moving parties, and
12          then I would give Crystallex a chance to weigh
13          in, ConocoPhillips if they wish, and ultimately
14          give rebuttal to the moving parties.  That was
15          my thought.
16               Would there be any objection,
17          Mr. Verrilli, or any suggestion as to another
18          way to proceed?
19                    MR. VERRILLI:  No, that sounds ideal.
20                    THE COURT:  Mr. Schrock, any thoughts
21          about that?  Any objection?
22                    MR. SCHROCK:  No objection, Your
23          Honor.
24                    THE COURT:  Anybody else object to
25          Mr. Schrock beginning?
```

```
 1              Let me tell you about the rest of the
 2      day.  After that -- you can have a seat for a
 3      minute.  After we go through all of that on the
 4      motion to disqualify, I do want to talk to you
 5      about whether I should be ordering the billing
 6      records of the special master to be unsealed.
 7      I do want to give the Venezuela parties any
 8      chance to talk about their possible objections
 9      to the expenditures of the special master, and
10      I do want to, before we leave our time together
11      today, see what you all think about where this
12      case is and how we should proceed and anything
13      else that you might wish to raise.
14              So I'll just pause briefly.  Any
15      questions about that from anybody?
16              No.  Okay.
17              All right.  Mr. Schrock, we'll have you
18      come back and get us started in the manner that
19      I've indicated.
20              MR. SCHROCK:  Thank you very much,
21      Your Honor.  Again.  Ray Schrock, Weil, Gotshal
22      and Manges, for the special master.  May it
23      please the Court.
24              In terms of supplementing the record, we
25      can note for the Court and the parties that
```

1      since we were last before the Court, we have

2      reached out through counsel to the DOJ to

3      solicit guidance and feedback from the U.S.

4      government, including OFAC, pursuant to the

5      sale procedures order.  We did arrange for the

6      January 12th meeting, as the Court is aware,

7      and we did -- we did attend that meeting.

8           I would note that present at the meeting

9      was only the DOJ at that meeting.  The U.S.

10     government -- in light of the motion, OFAC

11     decided not to attend, just, I believe, out of

12     an abundance of caution.

13          At the January 12th meeting, the special

14     master and his advisors presented materials

15     distributed via the DOJ out of the meeting.

16     The materials outline the sale process to date

17     and the intended timeline of the process going

18     forward as well as the benefits of the orderly

19     process designed by the special master and

20     approved by this Court.  The materials also set

21     out for the DOJ the elements of the proposed

22     sale process, which may need specific U.S.

23     government approval, and the importance of

24     receiving guidance and clarity on the U.S.

25     government's position with respect to the sale

1     process generally.  This is so that prospective

2     sale process participants, including potential

3     bidders, could make preparations.  And,

4     frankly, as we always make clear to the Court,

5     we need this guidance from OFAC and from the

6     U.S. government, in our view, to maximize

7     value.

8           We have not yet received the U.S.

9     government's position, but we expect to receive

10    it on or prior to April 7th.  So what's been

11    discussed are merely process issues, so we

12    don't know what the U.S. government's position

13    is.

14          THE COURT:  Let me just interrupt

15    you.  I think April 7th would be the end of the

16    six-month window; is that correct?

17          MR. SCHROCK:  That's right, Your

18    Honor.  When we solicited feedback from the

19    U.S. government, we said, listen, we'd like to

20    hear from you by April 7th.  We outlined for

21    you the process, all the specifics in the sale

22    process order, but we simply don't know what

23    their position is at this point.

24          I would note that to the extent we're

25    expected to submit the supplemental report by

1      April 7th, I think in light of the fact that we

2      expect to receive some feedback from the U.S.

3      government on or prior to that date, it would

4      make sense to push out the supplemental report

5      date.  The back-end date was May 3rd, I

6      believe, in the sale procedure order.  If we

7      could have until the end of the month,

8      April 30th, I think that would give us time to,

9      one, consider whatever the U.S. government's

10     position has been or is with respect to moving

11     forward, and I think it will make for a better

12     supplemental report for the Court and the

13     parties.  I think, also, we can interact with

14     the sale process parties and, you know, frankly

15     solicit some limited feedback as to, you know,

16     our thoughts on moving forward before we

17     present that to the Court.

18           THE COURT:  Is the request to extend

19     the deadline to April 30th, is that something

20     you've had a chance to talk to the sale

21     process --

22           MR. SCHROCK:  It's not, Your Honor,

23     generally, but we wanted to mention that.

24           THE COURT:  I'm sure over the course

25     of the morning, we'll find out.

```
 1            MR. SCHROCK:  In terms of
 2    supplementing the record, Your Honor, I think
 3    that's really -- for purposes of the instant
 4    motion, that's all we wanted to note.
 5            THE COURT:  Of course, as you know,
 6    we had a very brief conversation.  I'm prepared
 7    to make a quick record on that unless you
 8    wanted to do it.
 9            MR. SCHROCK:  No, please go ahead.
10            THE COURT:  Let me put this in record
11    and you tell me if your recollection was any
12    different.  You were on that call; correct?
13            MR. SCHROCK:  I was.
14            THE COURT:  According to my notes and
15    recollection, on March 8th, we had a brief
16    conversation at the special master's request.
17    It was by phone.  The special master attended
18    and some -- his advisors, including
19    Mr. Schrock, myself, and several of my law
20    clerks.
21            After introductions, because it had been
22    some time since we'd all been in touch, I asked
23    the special master to tell me what the agenda
24    was, since I had no idea what he was going to
25    want to talk about.  He said about one
```

1   sentence, something to the effect of he

2   expected some kind of follow-up with OFAC maybe

3   in late February and maybe expected a letter

4   but had not yet seen it.

5       At that point, I interrupted and reminded

6   everybody on the call that the disqualification

7   motion was still pending, that the Venezuela

8   parties had noted that they were not seeking my

9   disqualification, and that that was in part

10  because they had no reason to believe that I

11  had any ex parte communication with the special

12  master about what had occurred at the January

13  12th meeting.  And after reminding everyone of

14  that, the discussion turned, pretty much, to

15  whether we should continue the call, and a

16  question was asked whether this hearing on

17  March 30, which had already been scheduled,

18  whether I intended to go forward with it, and I

19  indicated I did.  And we ended the call, and

20  later, I think, that day I got an e-mail from

21  the special master indicating that in light of

22  all that, he would wait to further communicate

23  anything until this hearing.

24      Anything you want to add to that or

25  anything I got wrong?

1           MR. SCHROCK:  No, I think that sounds

2     like an accurate summary.

3           THE COURT:  All right.  I will give

4     you a chance for argument on the motion, but is

5     there anything else in the nature of

6     supplementing the record you wanted to say at

7     this point?

8           MR. SCHROCK:  No, Your Honor.

9           THE COURT:  Thanks very much.

10          We will turn to the moving parties, and I

11    believe Mr. Verrilli is to make argument.

12          Would you start by indicating, do you

13    have an objection to an April 30th deadline for

14    the supplemental report?

15          MR. VERRILLI:  I do not on behalf of

16    the Republic.  We do not, Venezuela.

17          THE COURT:  Thank you very much.  You

18    may proceed.

19          MR. VERRILLI:  Good morning.  May it

20    please the Court.  I'm Don Verrilli for the

21    Venezuela parties.  I'll focus on the

22    disqualification issue and later in the day,

23    Mr. Eimer will handle the rest of the issues.

24          On the disqualification issue, we're

25    cognizant of what the Court said in its prior

1    ruling about the special master's ex parte

2    meeting with OFAC, which we now learned was

3    with DOJ.  And I'll address the timeliness and

4    waiver questions that came up in this Court's

5    order on and that the my friends on the other

6    side have raised.

7         I do want to start, though, with what we

8    perceive as the core problem here.  It does

9    relate to, but I don't think was answered by,

10   what we just heard from counsel for the special

11   master.  And I think if I may, Your Honor, just

12   to sort of preface what our understanding of

13   the purpose of that meeting and our inference

14   about what occurred at that meeting, in

15   addition to what was just described by counsel

16   for the special master.

17        Our understanding of the purpose of that

18   meeting was, in addition to the providing

19   information that counsel just described, that

20   the special master would advocate that OFAC

21   change its position and give a green light to

22   the sale process going forward.  In fact, the

23   reason for that was an exchange between --

24   between the special master and counsel for our

25   side in which our understanding was that the

1     reason the special master gave for not being

2     comfortable with the Venezuela parties

3     observing the meeting was that the special

4     master was going to engage in advocacy and that

5     that advocacy would be chilled.

6          We raised that in our papers.  The

7     special master, counsel for special master,

8     said what he said this morning, said what he

9     said in his papers.  As we read the papers, the

10    special master hasn't disagreed that that was

11    the purpose of the meeting, and from that,

12    we're inferring that that happened at the

13    meeting.

14         If that's wrong, then that would change

15    the complexion of this motion, certainly, but

16    we're proceeding on the assumption that that

17    did occur at the meeting, given that it was --

18    that we were informed that was the reason that

19    we were -- that the special master did not want

20    us to observe the meeting and wanted it to be

21    ex parte.

22         With that in mind, I think that gets to

23    our -- that is, really, our core concern here,

24    the idea that the special master would engage

25    in advocacy with the executive branch to try to

1    get it to change its position.  In that

2    situation, what you have is the special master

3    acting in a judicial capacity, engaging in

4    activity that we consider to be advocacy that

5    is not consistent with the impartial portion of

6    the law.

7              THE COURT:  So you clearly consider

8    it advocacy, but I think that's sort of loading

9    the situation.  Where is the line between

10   advocacy and the Court, through its special

11   master, just taking reasonable steps to enforce

12   its judgment and execute its judicial duty?

13   After all, I mean, you well know I'm acting

14   under a mandate from the Third Circuit that I

15   need to proceed by.  So where is the line

16   between advocacy and simply doing my job?

17             MR. VERRILLI:  I think that gets to

18   the heart of it, Your Honor, and it's precisely

19   what I want to address, that very question.

20        Now, we understand that the Court has an

21   interest, an important interest, in executing

22   its judgment consistent with the requirements

23   of the law.  But I think the key point here is

24   that the OFAC sanctions regime is part of the

25   law that applies here, and that law gives the

1    executive the authority to prioritize foreign
2    policy considerations over the enforcement of
3    judicial judgments, and we know that the
4    executive has done that through a lawful
5    exercise of its authority.  And we know that,
6    as of now, the position of the United States
7    expressed to this Court by the Justice
8    Department is that, considering that proceeding
9    with the sale process could jeopardize the
10   foreign policy, of the United States -- maybe
11   they'll say something different on April 7th,
12   but as of now, that's the position.
13         The other thing we know with respect to
14   that exercise is that Crystallex applied to
15   OFAC for a license and OFAC denied that
16   license.  It did it without prejudice so they
17   could come back in the future, but those are
18   the two things we know, and we know right now
19   what the foreign policy of the United States
20   is.  And so our understanding of the situation
21   is when the special master goes to OFAC and
22   says, "We want you to approve the sale
23   process," if indeed that's what happened, "We
24   want you to give Crystallex a license to close
25   the sale," if indeed that's what happened, then

```
 1    what the special master is doing is advocating

 2    that the executive branch change its foreign

 3    policy calculus to prioritize enforcement of

 4    the Court's judgment over the foreign policy

 5    considerations that would subordinate that.

 6    And I think it's fine for a party to do that.

 7    It's fine for Crystallex to do it.  We

 8    understand that, of course.

 9             THE COURT:  What about for me?  Let's

10    say, I don't know, on or about April 30th, I

11    make a determination that it's time to go

12    forward and I say something in effect of it

13    would be really nice to know we're not wasting

14    our time and it would be nice to know that the

15    executive branch is going to let this

16    transaction go forward, if in fact we

17    ultimately come up with a bidder and I approve

18    the bid.

19         As you well know, I've already said my

20    interpretation of the sanctions, which is

21    governing for now because the Third Circuit

22    decided not to look at it, is I can go forward

23    up until the last step of sort of consummating

24    the transaction.

25             So I if I decide in April or May it's
```

1    time to go forward and it would be really nice

2    if the executive branch gave some indication

3    that it's a fair process and a reasonable

4    bidder that they're going to allow that to

5    happen, am I advocating or doing something

6    consistent with my judicial role at that point?

7              MR. VERRILLI:  I think it would

8    depend, Your Honor, on how far that statement

9    went.  If the statement was it would be helpful

10   for the Court to know what DOJ's view is, that

11   seems to me on the side of the line that

12   doesn't raise an issue.  But if the statement

13   is we think you've got your priorities wrong

14   and we want you to subordinate the foreign

15   policy, I do think that's over the line, and

16   that's where we think the line is.  That's

17   trying to address Your Honor's question

18   earlier, that that's where we think the line is

19   because in that situation, this is a judgment

20   that Congress has given to the executive branch

21   via OFAC to decide whether foreign policy

22   considerations should predominate or

23   enforcement of the judgment should predominate.

24   And what we understand the special master to

25   have done in subject clarification is to have

1    advocated DOJ that OFAC and the executive

2    branch, that it change its priorities.

3         To us, that is not impartial

4    administrations or enforcement of the law.

5    That is advocacy of a change in executive

6    branch policy.  That seems, to us, to be

7    inconsistent with the judicial function and to

8    raise the question of does it provide a

9    reasonable grounds to question impartiality.

10        THE COURT:  Is the key, then, whether

11   the special master or me -- I don't think you

12   make a distinction on this point.  If it's

13   advocacy, the line is the same for him and me?

14        MR. VERRILLI:  Yes.

15        THE COURT:  Okay.  So if he or I ask

16   for the executive branch to change foreign

17   policy, you would say that crosses the line;

18   right?

19        MR. VERRILLI:  Yes, and I think

20   asking for issuance of a license in particular

21   and then asking for DOJ to -- for the executive

22   branch, expressed through DOJ, to change its

23   view about whether continuation of the sale

24   process would jeopardize foreign policy and

25   national security interests, that the request

```
 1        to change either of those things is, for us,

 2        over the line.  That's where we think the line

 3        is.

 4              THE COURT:  What if the ask is merely

 5        please tell us what your position is?  Your

 6        position now -- this is hypothetical.  If their

 7        position now is we're not going to tell you

 8        what our position is and he or I ask in one

 9        form or another would you please change that

10        position and at least tell us what your

11        position is, is that -- that's asking for a

12        change.  Is that crossing the line?

13              MR. VERRILLI:  Putting aside the

14        question of whether it's ex parte or on the

15        record --

16              THE COURT:  It's separate.  I

17        understand.

18              MR. VERRILLI:  -- but the substance

19        of that, that does not seem, to me, on the

20        wrong side of the line.  That seems to be no

21        different in substance than what the Court did

22        previously when is asked DOJ to enter a

23        statement of interest.  That's effectively

24        doing the same thing, and that gets to the

25        point.  I think that's the appropriate way to
```

```
 1     do it.  The Court can ask the DOJ for a
 2     statement of interest.  That seems like an
 3     appropriate way to do it.  That's a recognized,
 4     on-the-record process to ascertain the views of
 5     the United States with respect to the questions
 6     that Your Honor has posed.  The other way to do
 7     it, of course, is for Crystallex to apply for a
 8     license and have OFAC make a judgment.  Those
 9     are appropriate.  They're governed by
10     regulations.  They're on the record.  They're
11     transparent.  Those are the ways this process
12     should unfold.
13              THE COURT:  How much of this is due
14     to the sanctions?  And by that I mean, the fact
15     that we're in a post-judgment, we're not
16     dealing with merits in the normal sense of how
17     we think of it, and Courts always have an
18     interest, I think, in effectuating judgments,
19     especially ones that have affirmed already.
20     How much -- is that a problem?  Is your
21     argument that simply -- I'll take your word --
22     advocating for enforcement of a judgment is
23     itself a problem, or is the problem that it
24     implicates foreign policy here and matters left
25     to the executive branch?
```

```
 1              MR. VERRILLI:  We're making a point
 2         that's specific to the circumstances before the
 3         Court here, which is you've got OFAC having
 4         exercised the authority conferred by Congress
 5         on behalf of the executive branch to block the
 6         transfer of the assets for foreign policy
 7         reasons, so it's -- given that step by the
 8         executive branch, it's -- if the judiciary
 9         itself, as opposed to a party, were to go to
10         the executive branch and say we want you to
11         change your position on that, that seems not
12         consistent with the judicial role to us.  That
13         seems like not impartial enforcement and
14         administration of the law as entrusted to the
15         judicial branch but advocacy that the executive
16         branch change the enforcement of the law
17         entrusted to it.  That seems like a key
18         difference to us, and that's our concern.
19              Again, given what we heard this morning,
20         I want to be careful.  We don't know actually
21         exactly what the facts are, but if the facts
22         are what we're inferring they are, we think
23         that is over the line.
24              THE COURT:  I think we'll move on to
25         something in a moment.  Let me try once more
```

1     asking you the way Crystallex wrote it in one
2     of their briefs at page 17.  What they say is
3     taking a position on a fully litigated issue
4     cannot create the appearance of partiality
5     because that is precisely the role of the
6     judiciary.  I can read it again if you like.
7                  MR. VERRILLI:  No, I understand that.
8                  THE COURT:  What's your response to
9     that?
10                 MR. VERRILLI:  My response to that is
11    that the -- try to -- apologize.  I may repeat
12    something I said a few minutes ago.
13                 THE COURT:  I've probably done that
14    already.
15                 MR. VERRILLI:  Seems to me that the
16    right way to think about -- respectfully, the
17    way to think about what the interest of
18    judiciary here is, that is has an interest in
19    enforcing its judgments in a matter that is
20    consistent with applicable law.  And I think
21    what that statement by Crystallex leaves out of
22    the equation is that the OFAC sanctions regime,
23    the power that Congress gave the executive
24    branch, there is applicable law that applies to
25    the process by which this judgment will be

```
 1   executed.
 2              THE COURT:  Of course, here, I've
 3   already decided for purposes of this case how
 4   those sanctions interact with this case.  Some
 5   other Court may ultimately disagree with that,
 6   but that's where we are.  Does that have any
 7   implications for whether this is advocacy or
 8   not?
 9              MR. VERRILLI:  I don't think so, Your
10   Honor.  The Court has decided, in the exercise
11   of the judicial power, that you read the
12   regulations in a certain way and that -- while
13   we don't agree with them, you read the
14   regulations that way.  We're not here to
15   contest that today -- to allow the sale process
16   to go forward up to the point of consummation
17   when a license is needed.  You exercised your
18   judicial power to come to that view, and that
19   view can be implemented in the exercise of your
20   judicial power.
21        But that seems to me to be categorically
22   different from going to the executive branch
23   and saying we want you to exercise your
24   executive power differently to remove any
25   impediments to our exercise of judicial power.
```

1    That's what we are concerned happened here, and

2    that's what we think can't happen, consistent

3    with the law as we understand it.

4              THE COURT:  Unless you have more to

5    say on this, I would like to hear your

6    position on timeliness.  I know your position

7    on the timeliness of the motion, but why would

8    it be wrong for me to say it was untimely?

9              MR. VERRILLI:  A couple of reasons.

10   And I don't want to -- we've made a second

11   argument, which I have, on the merits, which I

12   haven't spent any time on so far about the ex

13   parte fact gathering.

14             THE COURT:  And I don't mean to stop

15   you from that.

16             MR. VERRILLI:  I'll go to timeliness

17   now, but for purposes of timeliness, I think

18   it's important to separate the two.  We can

19   have a discussion about the process that led to

20   the interchange in January with respect to ex

21   parte fact gathering and the timeliness of it.

22             With respect to the advocacy point, I

23   think, really, the salient facts are these:

24   When the sale process order was being

25   contemplated, we raised an objection to the

1   possibility that the special master's authority

2   to interact with OFAC would include advocacy on

3   behalf of any party or advocacy for change in

4   the applicable legal requirements.  The special

5   master responded by saying he had no intention

6   to engage in advocacy on behalf of any parties.

7        Now, those facts occurred, and any

8   reasonable observer, I would think, seeing that

9   response to our objection would come to the

10  conclusion that the special master had

11  foresworn advocacy, and so that was what we

12  were operating on, that understanding.

13       Then when this Court issued the sale

14  process order, it does have language in it.

15  The special master referred to that language,

16  but looking at that language, Your Honor, I'm

17  going to -- you know well, but I'll quote it if

18  I could.  This is -- the March 22nd order says

19  that the special master shall use best efforts

20  to obtain guidance from OFAC expressing OFAC's

21  view of the process and the likelihood it will

22  issue a specific license for the sale to close.

23       In our judgment, going back to what I

24  said earlier, we think there's a categorical

25  difference between seeking guidance from OFAC

1     and engaging in advocacy to OFAC to change its

2     position. So we don't think that that language

3     from the March order resolved the objection or

4     put us on notice that the special master was

5     going to engage in advocacy to change OFAC's

6     position. We don't think it would be

7     reasonable to read it that way or to hold us to

8     an understanding of that based on that. With

9     respect to the subsequent actions of the

10     special master interacting with OFAC, they were

11     reported as just providing OFAC with updates

12     and status updates, essentially.

13          Then we get to December 30, 2022, and we

14     learn for the first time that the special

15     master is planning to have a meeting with OFAC.

16     That meeting was planned for January 12th. On

17     January 3rd, we learn for the first time that

18     it is the intention, as we said earlier, as we

19     understand it, of the special master to engage

20     in advocacy that OFAC change its position. And

21     that is why the presence of the Venezuela

22     parties as observers would chill the

23     discussion. So the first time we think that we

24     are in a position to know that the special

25     master is planning to do something that we

1  understood the special master had foresworn

2  earlier was January 3rd.

3      Now, we then moved for an order allowing

4  us to observe the meeting on January 9th.  This

5  Court ruled that that motion was untimely, but

6  whether that motion was untimely because the

7  meeting was just a few days hence is a

8  different question from the question of whether

9  we made an untimely objection to the -- to what

10  we believe would be improper advocacy.  Our

11  moving papers on that, in that proceeding, made

12  very clear that we thought it would violate the

13  operable requirements of Section 455 of the

14  special master to engage in that advocacy.

15      And given that, I just don't think

16  there's a basis for saying that we acted in a

17  dilatory way, and certainly no basis for

18  thinking that we did anything like what the

19  Third Circuit, as we understand it, has said is

20  the basis for an untimeliness objection, namely

21  engage in strategic behavior.  We moved as soon

22  as we knew that there was a problem with the

23  special master engaging in advocacy.  We don't

24  think there's a timeliness problem there.

25      And we also said in our papers we don't

1     think that we can waive -- that an objection to

2     that kind of lack of impartiality is not

3     something we can waive.  We can consent in

4     advance to that kind of discussion occurring,

5     but we don't think we can engage in waiver by

6     inaction, even if we hadn't taken the actions

7     we took, which we think should definitely be

8     sufficient to preserve that objection.

9          THE COURT:  So in the recitation, you

10    say we moved as soon as we could, meaning

11    January 9th.  But you admit you knew

12    everything, including to the extent it's fair

13    to distinguish between advocacy and ex parte

14    meetings, you knew by January 3rd.

15         Now, I understand it's not a lot of time

16    between January 3rd and January 9th.  My

17    problem is the time between January 9th and

18    January 11th is even shorter.  I give full

19    credit to my staff and my law clerk.  We moved

20    heaven and earth in 48 hours to get briefing on

21    your motion and get you a decision on it before

22    January 12th, but I think the timeliness

23    analysis has to be -- has to factor in how much

24    notice you gave to the Court.

25         It's unclear to me, and I guess this is

1    my question, what a litigant can reasonably

2    expect a Court to do with a motion on

3    January 9th about a meeting that's been in the

4    works for a long time that's 48 to 72 hours

5    later when it's a motion that, if credited,

6    threatens a process that's been laboriously

7    litigated and expensively litigated for five or

8    six years.  Seems to me, by all rights, I may

9    not have even noticed your motion, much less

10   entered a briefing schedule and resolved it in

11   that limited time frame.  So taking six of the

12   eight or nine available days seems to me too

13   much under these extraordinary circumstances.

14   Could you respond to that.

15          MR. VERRILLI:  Well, again,

16   respectfully, we would disagree, even with

17   respect to question of the motion itself, which

18   was a motion that the meeting not occur ex

19   parte, that we be able to observe.  That was

20   the motion before the Court, and we very much

21   appreciated the Court's effort to resolve that

22   motion.  We have tried to explain in the papers

23   why it was four business days, why it took us

24   four business days, given the coordination that

25   needed to occur on our side.  The Court can

```
 1          find that problematic if it wants with respect
 2          to the timeliness of the motion to participate
 3          in the meeting.  But that is a different thing
 4          than whether the conduct that occurred at the
 5          meeting is disqualifying.  If our surmise is
 6          correct and our position on the law is correct,
 7          which we think it is, it's disqualifying.
 8                    THE COURT:  If so, it seems logical
 9          to me that your January 23rd motion to
10          disqualify is even more untimely because it was
11          not clear to me -- there was one citation, I
12          think, to 455 in the papers relating to the
13          meeting, but it was not clear to me that by
14          denying your motion relating to the meeting
15          that what I was going to end up with was, you
16          know, the contention by your side that now I
17          have to disqualify the special master and
18          potentially myself.  So to the extent that was
19          not clear -- you may think -- you said it's
20          clear.  I don't know that it's clear in your
21          initial motion.  Hypothetically, if you accept
22          the assumption that it was not clear in your
23          January 9th motion, isn't the January 23rd
24          motion even more untimely?
25                    MR. VERRILLI:  No.  Respectfully,
```

1       it's not, and a couple of things, if I could,

2       going back to the sequence of the briefing.

3            The way the briefing unfolded in that

4       compressed period of time there is we filed an

5       opening brief, an opening motion, and we were

6       trying to be circumspect about what the

7       intentions of the special master were with

8       respect to advocacy.  We mentioned it in the

9       opening papers.  We were trying to be

10      circumspect about it because we didn't want to

11      be accusatory in a situation that we thought

12      remained somewhat ambiguous, despite the

13      conversation that occurred earlier.

14           The response of the special master left

15      us with a high degree of concern that, in fact,

16      the special master planned to engage in the

17      kind of advocacy that we thought was

18      inappropriate.  And I think our reply papers

19      were quite clear that we thought it was not

20      something that could happen at all, much less

21      ex parte, so that's why things unfolded the way

22      they did then.

23           And I do not -- and, again, Your Honor,

24      if this was conduct in which the special master

25      should not have engaged, we never consented to

```
 1    it.  And given that we didn't consent to it, we
 2    can't have waived our objection to it, and I
 3    just think that's the law of the circuit.
 4    That's the law generally, that if this is
 5    disqualifying conduct, then it is something
 6    that we are entitled to object to on
 7    January 23rd, so that is our position on waiver
 8    and timeliness.
 9              THE COURT:  Okay.  Anything else you
10    want to --
11              MR. VERRILLI:  I'd be happy to wait
12    for rebuttal and clarify more then.  Thank you.
13              THE COURT:  We'll get you back on
14    rebuttal.  Thank you very much.
15         While it's on my mind, Mr. Eimer, any
16    objection to April 30th for the report?
17              MR. EIMER:  No, Your Honor, no
18    objections for Citgo or PDV Holdings.
19              THE COURT:  Anybody else?  Anybody
20    have objections to April 30th?
21         I'll note for the record no objections,
22    so the April 30th granted.
23         Lets get Mr. Schrock on what you just
24    heard for the motion to disqualify.
25              MR. SCHROCK:  Good morning again,
```

1    Your Honor.  Again, Ray Schrock, Weil Gotshal
2    on behalf of the special master.
3         So I tried to listen very carefully to
4    counsel's argument around disqualification, and
5    I think what I heard was that if the special
6    master were arguing for a change in position,
7    that that would be disqualifying conduct.  Or
8    change in policy.  And I can certainly confirm
9    for the Court and the parties we're not
10   arguing, certainly, for a change in policy or
11   to subordinate foreign policy to the Court's
12   judgment.
13        At our meeting, in the more than
14   23 months since the special master was
15   appointed in these cases, we have dutifully
16   tried to carry out the direction by this Court,
17   which included carrying out the specific
18   process that, you know, the Court -- we've
19   litigated and now the Court has actually
20   approved.  And pursuant to the sale process to
21   the sale procedures order, we solicited OFAC
22   guidance and clarity in a manner that's
23   consistent with all of our arguments at -- you
24   know, in support of the sale process sale
25   procedures order that we needed clarity about

```
 1    what the U.S. government's position would be.
 2    That is in no way disqualifying conduct.  It is
 3    completely consistent with everything that
 4    we've been doing since Mr. Pincus was appointed
 5    in this matter, and it certainly is not
 6    inappropriate, and there's no disputed fact
 7    before the Court on which to disqualify the
 8    special master.
 9          Your Honor, I do think it's relevant that
10    you've already -- the Court's already somewhat
11    addressed this issue.  In the January order, I
12    believe in the footnote, you noted that if the
13    Court -- to the extent this could even be
14    framed as advocacy, and, frankly, I regret that
15    we even used that word -- that in trying to
16    enforce the Court's order, that is not
17    inappropriate conduct.  There's been nothing
18    new that has been raised here.  We don't even
19    know the position of the U.S. government.  We
20    are specifically authorized to have ex parte
21    communications, and, frankly, I don't think any
22    party could reasonably argue that having those
23    ex parte communications does not help further
24    the enforcement of the Court's order.
25          I don't think that, you know, we are
```

1     asking even for a change in position as well

2     with the U.S. government.  We were seeking

3     clarity and guidance about what their position

4     is.  We certainly have a view that the sale

5     process would be maximized for the benefit of

6     all of the creditors, as well as the Venezuela

7     parties, if we had guidance from OFAC and we

8     have clarity, as we outlined, for purposes of

9     enforcing the Court's order, but I don't

10    understand.  I don't think there's been any

11    record made how that would even be

12    inappropriate.

13         We won't -- I won't go through chapter

14    and verse how many times we've been authorized

15    to communicate ex parte with parties.  I don't

16    think that is seriously in dispute.  But, Your

17    Honor, you know, having been involved in this

18    matter now for a couple of years, it's clear

19    that as we get closer to the possibility of the

20    sale process potentially being implemented,

21    there's going to be more objection to, you

22    know, it moving forward.  That has been --

23    that's certainly -- you know, we would expect

24    that because that's -- you know, I think the

25    Venezuela parties would admit they don't want

1    the process to move forward.

2         So we don't begrudge them for making any

3    arguments today.  We don't call balls and

4    strikes.  We are trying hard to implement the

5    Court's order, but I do think it's noteworthy

6    that it's already been decided by the Court.

7    There's no disputed factual issue here for the

8    Court that would call for the disqualification

9    of the special master, and I think that it's --

10   I don't really understand this line that

11   counsel is trying to draw around advocacy

12   versus trying to enforce the Court's order.

13        In order to get this guidance, we were

14   directed to go get guidance from OFAC.  We have

15   a view that the process will be enhanced if we

16   get clarity and guidance from OFAC.  OFAC

17   hadn't refused to give guidance in the past,

18   but they simply will speak for themselves about

19   what their position is.  Our job was to get

20   that clarity and guidance so we could make an

21   informed decision for purposes of the

22   supplemental report, decide whether or not to

23   recommend to the Court and the parties to

24   prepare for the preparation launch date and the

25   launch date of the marketing process, and

|    |                                                      |
|----|------------------------------------------------------|
| 1  | otherwise move these proceedings forward.  We        |
| 2  | have billions of dollars in judgments that are       |
| 3  | unsatisfied and that have been unsatisfied for       |
| 4  | years.  There are new judgments that have been       |
| 5  | recently -- conditional writ of attachments,         |
| 6  | writs of attachment, that have been considered       |
| 7  | by the Court, and we simply want to move this        |
| 8  | process forward in a fair and expeditious            |
| 9  | manner.                                              |
| 10 | On the waiver issue, Your Honor, I do                |
| 11 | think that we make the point in our papers,          |
| 12 | listen, we believe there was some strategic          |
| 13 | delay around this and bringing this up a mere        |
| 14 | three days before the meeting before the Court,      |
| 15 | we think, is simply too late, and especially         |
| 16 | given that I know personally that these              |
| 17 | meetings with the U.S. government have been          |
| 18 | taking place for, you know, since 2021, and,         |
| 19 | you know, that is that -- since that summer, we      |
| 20 | have always met with the U.S. government on an       |
| 21 | ex parte basis, consistent with the directions       |
| 22 | from this Court.                                     |
| 23 | I think the Venezuela parties clearly                |
| 24 | have failed to meet their substantial burden of      |
| 25 | a disqualifying basis.  I think that the motion      |

1    is untimely.  I think the Court's already ruled

2    on this issue, and given there's no disputed

3    evidentiary fact, I think the motion should be

4    denied.

5            THE COURT:  Thank you.  I've got a

6    few questions for you.

7            MR. SCHROCK:  Sure.

8            THE COURT:  I don't know if I'm going

9    to have to draw with clarity the line between

10    advocacy and non-advocacy, but I wanted to go

11    over some of that a little bit with you as I

12    did with Mr. Verrilli.

13        The Venezuela parties write in one of

14    their briefs at page ten, they say, "Advocacy

15    by a judge to the U.S. government can create

16    undue influence and cause separation of powers

17    concerns."  Of course, they're not suggesting

18    that I've done that, but I think they're saying

19    perhaps Mr. Pincus has done it, and they want

20    to illustrate that I couldn't do that.

21        "Advocacy by a judge to the U.S.

22    government can create undue influence and cause

23    separation of powers concerns."  Do you agree

24    with that as a principle but say it's not

25    applicable here, or do you disagree with that

1        as a principle?

2                MR. SCHROCK:  I just don't think it's

3        applicable here, Your Honor, for purposes of

4        this case.  Again, we were not arguing for a

5        change in foreign policy.  We were not arguing

6        for a change in priorities.  We were not

7        arguing that the U.S. government change its

8        position.  What we were trying to impress upon

9        the U.S. government is that we needed guidance,

10       and we think that the guidance would be helpful

11       in order to allow the sale process to move

12       forward.  And I don't see how, especially under

13       these facts, where the Court's already entered

14       an order, we're in the remedy enforcement phase

15       of these proceedings, and seeking this guidance

16       when you've got these particular facts, I don't

17       understand how that would be implicating

18       separation of powers issues, but in any event,

19       I don't think those are the facts before the

20       Court.

21               THE COURT:  Here's how the Venezuela

22       parties put, I think, the same issue, so it's

23       probably the same response.  It's in the reply,

24       and I recognize you have a former chief justice

25       of our Supreme Court on your litigation team,

1    but they write, "Surely this Court could not

2    walk into Delaware Supreme Court and urge them

3    to issue an opinion agreeing with Crystallex's

4    view of what the Delaware code requires."

5         Again, do you agree with that as a

6    principle and say it's not applicable?

7              MR. SCHROCK:  I would say it's not

8    applicable here, Your Honor.  And, again, we --

9    I don't think that those are the facts,

10   certainly, before the Court, Your Honor, but

11   when a Court is -- I think we've made the case

12   pretty persuasively the Court has an inherent

13   power to enforce its own judgments.  We've laid

14   out a process to do that.  We believe that

15   input from the executive branch is necessary in

16   order to maximize value.  The Court can either

17   decide that that is necessary or that isn't

18   necessary, but that certainly wasn't -- those

19   aren't the facts before the Court.

20             THE COURT:  Are the Venezuela parties

21   telling on January 3rd something new was

22   disclosed to them, this advocacy point?  I'm

23   now understanding your position seems to be

24   whatever word we used, it was not any change in

25   the special master's approach.

```
 1              MR. SCHROCK:  It was not at all.
 2         And we weren't advocating on behalf of
 3    any party, and we won't.  We were simply
 4    advocating -- or we were simply -- I'll restate
 5    this.  We were simply making the point that in
 6    order to have the Court's order enforced, for
 7    the sale process to move forward, that we
 8    believed further guidance from the executive
 9    branch was absolutely critical to do that.
10              THE COURT:  I think there was a
11    suggestion that we should read into your
12    opposition to having the Venezuela parties and
13    perhaps other sales parties in the room at the
14    meeting on January 12th should indicate that,
15    perhaps before the motion but who knows, that
16    you did have some sort of intent at some point
17    to advocate or do something different than
18    you've done in earlier meetings.  Otherwise,
19    why would you oppose them observing?  Could you
20    respond to that suggestion.
21              MR. SCHROCK:  I think we haven't
22    wanted them present at, certainly, at other
23    meetings.  We thought that particularly here,
24    when we're dealing with sensitive issues like,
25    you know, getting clarity and guidance from the
```

```
1    executive branch about the proposed sale
2    procedure, that it's important that that
3    dialogue be allowed to be conducted
4    confidentially without having the litigants
5    from either side present and kind of weigh in
6    because I don't think we get a full and frank
7    dialogue around it.
8         Certainly, Your Honor, I won't be
9    disclosing anything confidential to say we
10   don't know.  We do not know what the U.S.
11   government's position is at this point.  We
12   know that they're going to issue guidance, and,
13   you know, we'll await when that comes.
14              THE COURT:  Okay.  Anything else?
15              MR. SCHROCK:  That's it, Your Honor.
16              THE COURT:  Thank you very much.
17   We'll hear now from Crystallex.
18         Good morning.
19              MR. ESTRADA:  Good morning, Your
20   Honor.  Miguel Estrada -- for the benefit of
21   the court reporter, E-s-t-r-a-d-a -- with
22   Gibson, Dunn, and Crutcher in Washington on
23   behalf of Crystallex.
24         I will start by saying that someone once
25   said that Mark Twain supposedly said that
```

1    Wagner's music is not as bad as it sounds, and

2    I think we have the flip side here, in that I

3    have the greatest admiration for Mr. Verrilli,

4    counsel for the Republic, and his extremely

5    gifted advocacy, but his mellifluous tone

6    cannot hide the unreasonable of his client's

7    position on these motions.

8         Let me start with timing.  And there's

9    this question about what this issue is that the

10   Republic and its advocating entities are really

11   complaining about, and they shift back and

12   forth depending on the convenience of the

13   situation, but let's keep firmly in mind that

14   the recusal motion is supposedly based on

15   Section 455(b)(1) and the assertion that by

16   meeting ex parte with OFAC, the special master

17   has supposedly acquired knowledge of disputed

18   evidentiary facts, and that is the key to the

19   recusal motion.  And the position of OFAC is a

20   disputed evidentiary fact in the action.

21        Now, there are problems on the merits of

22   that that I'll get to presently, but for

23   purposes of waiver, I think it bears noting two

24   things:  That the notion that the special

25   master was meeting ex parte with OFAC has been

1    clear for years.  It was clear when the draft

2    sales order was in front of the Court.  It was

3    clear when we had an all-day hearing on

4    November 8, 2021.  It was the subject of

5    colloquy.  It was told to the Court.  The Court

6    had a colloquy with Mr. Covney (phonetic)

7    which we put in the papers about whether going

8    to OFAC was going to be a problem, and the

9    response was -- I will emphasize again -- it

10   will not give clarity to the market.  It's not

11   a license.  If it's not a license, it's

12   worthless.  It's a license or bust.  But it was

13   never it would be unethical for the special

14   master to go speak to OFAC or have a

15   conversation with OFAC.

16        And in the ensuing years, we have the

17   special master submitting reports and bills to

18   the Court which we know for a fact Venezuela

19   has fly-specked to the last penny in which

20   there was disclosed to the Court there had been

21   meetings between the special master and OFAC,

22   and there was never a peep out of the Republic

23   or its satellites saying isn't that unethical,

24   isn't that a basis for disqualification.

25        We get to the fire drill earlier this

1    year, January 9th, on one of the most

2    astounding facts about the case on timeliness.

3    And I think the smoking gun on how this is just

4    tactical behavior on the behalf of the Republic

5    is the fact that the Republican satellites came

6    to you on an emergency basis to be permitted to

7    attend the meeting.  Never once did they say to

8    Your Honor, "And if the meeting happens without

9    our attendance, there will be a basis for

10   mandatory disqualification."

11        455(b)(1) is not mentioned at all.  You

12   can look word by word in their pleadings.  Not

13   mentioned at all.

14        Now, it is not the case that the

15   Republican satellites are in a lack of, like, a

16   squadron of talented lawyers.  If they cited at

17   some level 455(a) for a general proposition of

18   due process, it's inconceivable that they have

19   not thought of the fact that weeks later they

20   would be coming to the Court saying, "A-ha, got

21   you now."  That is clear evidence of tactical

22   behavior on the part of the Republic.

23        And the fact that they could not think of

24   mentioning this, their grounds for mandatory

25   disqualification that formed the centerpiece of

1    this motion could not be mentioned then and

2    only be sprung on the Court a couple of weeks

3    later as if it had never occurred to anybody or

4    they just found the statute, it's just

5    incredible on its face.

6         THE COURT:  There was -- I think

7    Mr. Verrilli sort of pre-rebutted that by

8    saying they were trying to be circumspect in

9    their papers.  Any response to that?

10        MR. ESTRADA:  Yes, of course.  That's

11   called forfeiture and waiver.  If I'm

12   circumspect by not speaking out reasonably,

13   that's called forfeiture and waiver.  I can be

14   as circumspect and respectful as I like, but I

15   think you are -- if you are going to stand on

16   your rights and say to a Court this is what

17   will happen as a consequence of the actions if

18   you don't rule in my favor, you are required to

19   assert that reasonably and not later when you

20   have seen what technical advantage you can get

21   out of the first try.  That's not how legal

22   rulings work.

23        But I think more fundamentally, on the

24   merits, the fundamental problem with this

25   motion is, first, is that it is based on the

```
 1          notion that the position of OFAC is a "disputed
 2          evidentiary fact concerning the proceeding," to
 3          use the language of 455(b)(1), and that's just
 4          not so.  This Court is not going to rule on
 5          what the position of OFAC is.  The position of
 6          OFAC is an input, and a legal one, in the
 7          decision-making by this Honor, by Your Honor.
 8          I mean, it's not like, you know, was the light
 9          red or was it green when I ran through it and
10          Your Honor was picking up his cleaning across
11          the street and is in possession of disputed
12          evidentiary facts as to whether the light was
13          green or red, or it's not as if OFAC, if it
14          were to come through its own attorneys to the
15          Court saying this is our position, would be
16          subjected to you saying no, I find that's not
17          your position.  That's not a disputed
18          evidentiary fact in the proceeding.  It's not
19          like you're going to find the opposite of what
20          the decision really is.  It's a legal input in
21          the decision-making.  And so the whole
22          applicability of 455 and 455(b)(1) and the
23          whole notion that the special master is going
24          to acquire knowledge over disputed facts is a
25          false premise for the entire recusal motion.
```

1         Having said that, there's a next fallacy

2 in the position, which is that to the extent

3 this was an input that had a factual component

4 to it, the ship has sailed. DI 453, March 2nd,

5 last year, you issued a very lengthy order

6 taking into account what every party was saying

7 about how the OFAC regime applies to this case,

8 and you made clear -- and as we saw it, OFAC

9 agreed with you on this -- that the sale

10 process would go forward short of a sale, and

11 that for prudential reasons, you might delay

12 the start of the sales process and seek the

13 views of OFAC just to see how the market would

14 react. That, again, is not a disputed

15 evidentiary fact on anything you found. You

16 already made all the findings.

17         And in fact, you say at page 29 of DI 443

18 in footnote 22, "OFAC appears to recognize that

19 it can make this request. That is to say, they

20 do not go forward with the prefatory sales

21 process short of a sale, but cannot compel the

22 Court to grant it." So these issues have been

23 fully adjudicated. They're no longer open.

24         If OFAC were to express the view "I

25 rather you wouldn't," it would still be open to

1    you to say I've already ruled that.  I'll go

2    forward anyway.  I was just trying to get their

3    views to see if it would help the market

4    process as the special master said it might.

5    Again, their legal position is a legal input in

6    your decision-making, and in the

7    decision-making that you've already ruled on.

8    That's point one.

9        The next point is that there is this

10   sleight of hand about how anything that the

11   special master is doing or anything that may be

12   happening is lobbying the executive branch for

13   a change in the foreign policy position of the

14   United States.  That is false, and there's no

15   evidence for that.

16       We have two data points on this.  We have

17   a statement of interest that was admitted to

18   Your Honor in the Trump Administration -- I

19   think it was July 2020 -- in which the

20   administration was very careful to say, "At

21   this time we have the following view" while

22   telling Your Honor that they did not see a

23   legal impediment to you going forward with the

24   prefatory steps as you later did.

25       And the second input we have on that is

1    the denial without prejudice of our license
2    application in 2021 where, again, OFAC said,
3    and you can go look at the document, again and
4    again, "Now, at this time, at this present
5    moment, this is our view right now."  In fact,
6    it went so far as to say "If you come back to
7    us in early 2022, we may have a different view
8    of these things because we're basing this on
9    the fact that there are ongoing talks in Mexico
10   City, that it's an especially sensitive time,
11   and we're not saying how we're going to rule in
12   the future."
13         Significantly, in that same letter, OFAC
14   recognizes and reauthorized the prefatory steps
15   and expressed no disagreement with it and also
16   said the Court has recognized that the ultimate
17   blocking of the transaction is something that
18   is up to the executive and may require a small
19   delay in the sale.  Now, this is years later
20   now.  So the notion that there is some lobbying
21   for a change in some established foreign policy
22   position, when at present we don't actually
23   know who our government actually recognizes as
24   the government of Venezuela or if there is a
25   government of Venezuela other than the de facto

1    government of the dictatorship, is sort of

2    fallacious on its own terms.  There is no

3    advocacy for a change.  There is, at most, a

4    question being asked as to what your current

5    position is.

6           THE COURT:  I want to make sure I

7    understand your position.  I recognize that

8    it's at least in part that there's no evidence

9    that the special master has asked for a change

10    in foreign policy or a change in how to handle

11    a license request.  Should I assume you agree

12    that if the special master or I did ask OFAC to

13    change foreign policy or please grant a

14    license, something to that effect, that you

15    agree that would be improper?

16           MR. ESTRADA:  No, I don't agree with

17    that at all.

18           THE COURT:  Help me on that.

19           MR. ESTRADA:  I think there are two

20    points to that.  I think Your Honor has agreed

21    that OFAC has the legal authority to issue or

22    not to issue a license.  And OFAC, for its own

23    internal consideration, may take foreign policy

24    into consideration as to whether the answer on

25    the license would be yea or nay.  I think for a

1       Court to say I have a preference for my

2       judgments to be executed and, therefore, you

3       should, having made the execution of the

4       judgment, wait this long, you should weigh your

5       policy preferences differently, it's not

6       inappropriate at all because I think it's

7       appropriate for the Court always to advocate

8       for their own institutional interest and the

9       importance of their own judgments.

10          Now, it's not the case, as was intimated

11      by counsel for the Republic, that it is

12      categorically improper for a Court to take a

13      view of foreign policy interests that are

14      different from those of the executive.  I'll

15      give you one example.  The executive is a

16      litigant in the courts of the United States

17      every day, and every day or every other day the

18      executive will come to the Courts of the United

19      States and make some argument based on some

20      foreign policy interest, say, for example, to

21      take a notable example, *Trump versus Hawaii*,

22      when Trump had the so-called Muslim ban.  There

23      was some question about whether he had some --

24      he, the president, had his own foreign policy

25      judgment that will delay that.  And the Courts

1 are always there to say, okay, that may be

2 correct, but I weigh that in executing my job

3 for the value that it is worth.  I will not

4 defer blindly to it in all circumstances.

5   You have to apply the licensing law,

6 which recognizes that the ultimate sale will

7 not take place absent the license, but the

8 considerations expressed by the executive one

9 way or the other are those of a kind the U.S.

10 courts see every day in a number of contexts

11 and sometimes are weighty and sometimes are not

12 weighty.  And it's not categorically the case

13 that U.S. district judges or appeals judges or

14 the U.S. Supreme Court are meant by separation

15 of powers to fall to the ground prostrate every

16 time there is an executive claim that foreign

17 policy would be served by X, Y, or Z.  That's

18 not the case.  So I don't agree with that

19 proposition.

20   If the Court is saying there is an

21 institutional interest in the enforcement of

22 foreign judgments, and you therefore consider

23 whether you have -- there would be nothing

24 inappropriate with that, I disagree with the

25 Republic on that.  I don't think they're

1  correct.

2      More fundamentally, though, I think that

3  what we have now here is enforcement of a

4  judgment that has already been adjudicated by

5  this Court, and, you know, the irony of this

6  situation is that we have an attachment, which

7  is a species of a property right, and the

8  Republic is acting as if they have a property

9  right in the continuance in the foreign policy

10 views that were expressed years ago, and if --

11 property right in blocking everybody from

12 finding out whether that same view subsists

13 today.

14     And to be in the room like the cousin

15 from *The Godfather* who was brought from Italy.

16 He glared down the civil servants who have to

17 meet with the special master who say two years

18 ago your foreign policy said that, the U.S.

19 government is perfectly capable of speaking

20 through its own mouth.  It doesn't need tin-pot

21 dictators in other countries, it doesn't need

22 foreign countries to say what the foreign

23 policy of the United States is.  The executive

24 branch speaks as to what its interest are every

25 day in federal courts.  If the special master

1    were to have a conversation with OFAC or DOJ or
2    whoever the case may be in which -- which
3    caused the special master to make a
4    recommendation to the Court that the executive
5    felt was not in accord with what happened,
6    everybody can be assured that there would be a
7    filing with the Court saying that's not our
8    position.  The executive has whatever position
9    it will have.  And as I said, it's not a fact
10   to be adjudicated.  It is what it is, and the
11   Court will give it whatever legal weight it has
12   in the legal analysis.
13        But it's not up for grabs for
14   adjudication.  It's not a disputed fact.  To
15   the extent disputed facts were relevant, they
16   were long ago adjudicated, and all that
17   remains, as the Third Circuit, said is
18   executing the judgment.
19        Under the theory of this motion, if you
20   were to go to the U.S. government and you said,
21   quoting the Third Circuit, that every day
22   Crystallex is not paid is an affront to the
23   justice system, that doesn't mean that you
24   should be recused and the Third Circuit be
25   recused because God forbid they're expressing a

1    view that's somehow hectoring the executive

2    branch into the notion that the judgments of

3    our courts are not optional and that they

4    should be obeyed.  And that is not the law, has

5    never been the law, and it is, frankly, an

6    absurd conception of how 455, the canons, work

7    and how the enforcement of the judgment work.

8         And I think I pretty much covered the

9    subject of the motion, but I'm open to

10   questions.

11        THE COURT:  Just one last.  On the

12   waiver, to the extent you see it as you do, as

13   a separate ground from timing, per se, help me

14   out on how I can say their right to seek

15   disqualification is waived since their argument

16   seems to be, basically, you can never waive

17   that.  A judge or a special master might do

18   something that mandates their disqualification.

19        MR. ESTRADA:  That are two aspects to

20   that, and one of them is the waiver.  They

21   affirmatively agreed to that process in the

22   context of the adoption and then the execution

23   of the sales order up until January, so that's

24   waiver in the old common law sense, the

25   affirmative embracement of that course of

1     conduct.

2         I think the point they're making, and

3     this is why I started with 455(b)(1), is that

4     the acquisition of knowledge of disputed

5     evidentiary facts is a non-waivable basis for

6     disqualification.  As we pointed out in our

7     papers, that doesn't mean the timing of the

8     motion and the fact that it is revealed to be

9     tactical is not relevant on whether you have

10     asserted your rights on a timely basis.  Now, I

11     covered already why this is not a disputed fact

12     and it fails on the merits, but on the timing

13     it seems to me it would be impossible to

14     conclude, based on the conduct of the Republic

15     since this was in draft form, through the

16     submission of the master of all the bills, and

17     then the fact that they filed a motion in early

18     January in which they could not be bothered to

19     cite the same statute which they were going to

20     cite two weeks later, that this is not tactical

21     conduct.  And I think tactical conduct does

22     bear on the timeliness question that is

23     separate from waiver.

24         They may not have agreed, in fact, they

25     might have the affirmative intention of not

1    agreeing and using this as a tactical weapon,

2    but the Courts are not -- are not required

3    merely -- merely because they have no

4    subjective intention in January to agree to

5    this to accept that they didn't have a tactical

6    reason in playing this sort of game with the

7    Court and in holding the motion untimely on

8    that basis.

9          The lack of timeliness, seems to me, has

10   nothing to do whether they consciously agreed

11   to this course of action, which I think they

12   did earlier and throughout, but if they were

13   saving this as a weapon in reserve.  They had

14   it in the back pocket, which seems to me

15   clearly tactical behavior that is relevant to

16   the timing of the motion because it is beggars

17   comprehension how a fleet of the most expensive

18   lawyers in the United States other than me

19   could have failed to think that this subsection

20   of the statute would be useful to cite in

21   January 9th as something the Court should

22   consider.  And the conclusion is unavoidable

23   that it was purely tactical behavior on the

24   part of the Republic, as Venezuela has always

25   tried to do to throw sand in the gears of the

1     enforcement process.

2              THE COURT:  Does ConocoPhillips wish

3     to be heard?

4              MS. WOLF:  Very briefly, Your Honor.

5              THE COURT:  Good morning.

6              MS. WOLF:  Good morning.  Amy Wolf

7     from Wachtell, Lipton, Rosen, and Katz on

8     behalf of ConocoPhillips.

9              Your Honor, we submitted a letter.  We

10    think that the motion merely -- no disrespect

11    intended -- has no merit.  The special master

12    was charged with the mandate of devising a plan

13    to sell the shares, to sell the PDVH shares.

14    That's his job, and he was also given

15    permission and the mandate to collectively

16    engage with the executive branch.  That's all

17    that's happened here.  Framing this as somehow

18    the special master thinking that he could

19    convince the federal government to change its

20    foreign policy it seems to me to be rather a

21    stretch to try to frame what he has done as

22    trying to get the United States to change its

23    foreign policy.  His job is to try to get the

24    sale to happen, and he's allowed to talk to the

25    executive branch to do that.

1          And I similarly can't understand how he

2    could be disqualified for doing his job.

3          THE COURT:  Okay.  Thank you very

4    much.

5          Mr. Verrilli.

6          MR. VERRILLI:  Thank you, Your Honor.

7    There are four points I'd like to make.  The

8    first one goes to the question that you and

9    Mr. Estrada were discussing about timeliness,

10   waiver, sandbagging, et cetera.  Mr. Estrada is

11   a superb lawyer, and he's a good friend.

12         THE COURT:  Apparently expensive too.

13         MR. VERRILLI:  And more expensive

14   than me.  And he's often right, but he just has

15   the basic facts wrong with regard to what

16   happened in the briefing of the timeliness

17   motion, and with Your Honor's indulgence, I'm

18   going to read the sentences from the motion --

19   from the response to the special master and

20   from our reply.

21        In our opening motion on page seven,

22   after we first discussed what would be

23   455(b)(1), as Mr. Estrada says, we then said --

24   this is where we were trying to be circumspect.

25   We were circumspect but not unclear.  We said,

1   "Indeed, it obviously would be improper for the
2   special master to contact OFAC unilaterally to
3   urge that the government take any position on
4   way or the other, particularly on an ex parte
5   basis."  We cite a number of authorities, and
6   then we cite 28 U.S.C. 455(a) and we quote it.
7        Then in response, the special master
8   said -- and this is what gave us particular
9   cause for concern -- and this is at page five
10  of the special master's response, that "It is
11  undeniable that the mere presence of the
12  Venezuela parties would influence the
13  discussions and would undermine the core
14  purpose of the meeting, namely, to solicit
15  OFAC's unencumbered views on the sales process,
16  hear the special master's perspective on why
17  OFAC cooperation with the Court's order is
18  appropriate and necessary."  And then it goes
19  on.
20       That's what the special master said he
21  was doing and it's why he said we needed to be
22  excluded from the meeting, because we would, in
23  the words of the special master this morning,
24  it would discourage full and frank conversation
25  between the special master and the executive

1    branch on the question of why OFAC cooperation

2    with the Court's order is appropriate and

3    necessary.

4          Then in our reply, and this is on page

5    seven of the reply, we say that the special

6    master does not respond to the Venezuela

7    parties' authority, establishing that it would

8    be a violation of judicial ethics and grounds

9    for disqualification if the special master were

10    to advocate for OFAC to take a particular

11    position, other than to compound the problem by

12    admitting an advocacy plan and engaging in such

13    advocacy and wrongly claiming that this Court

14    has already authorized him to engage.

15          We specifically raised 455(a).  We

16    specifically said that the conduct about which

17    we were complaining is a ground for

18    disqualification in that motion.  It's

19    something we held in reserve.

20          THE COURT:  Any reference to 455(b)?

21          MR. VERRILLI:  Yes.  We also

22    discussed 455(b)(1) because we made two

23    arguments.  455(b)(1) is about the extra-record

24    fact gathering.  455(a) is about the items.

25          THE COURT:  But there is a citation

1          to 455(b), you're saying?

2                    MR. VERRILLI:  Yes, but here 455(a)

3          is what we're saying.

4                    THE COURT:  I got that.  And you said

5          you quoted (a) if I got you correctly in your

6          initial motion.  I'm asking where's the

7          citation to (b).

8                    MR. VERRILLI:  We also cited (b) in

9          the motion multiple times, and we cited (a)

10         multiple times in reply.

11               With respect to the specifics here, the

12         idea that we were holding something in our

13         pockets is completely wrong.  We said it would

14         be grounds for disqualification in the papers

15         we filed once it was clear to us that the

16         special master was indeed asserting he was

17         going to advocate in the matter that we thought

18         was inappropriate.  We did that.  It's clear

19         and unambiguous.  It's right there on the page.

20               That gets to a broader problem here,

21         which is we're having the discussions we're

22         having because these things occurred ex parte,

23         and that's what we objected to, of course, was

24         them occurring ex parte.  We understood that

25         the special master was going to engage with

1    OFAC.  Of course we understood that.  But we

2    didn't understand that the special master was

3    going to engage in OFAC ex parte at all, and

4    that's when we tried to document that in our

5    papers until we got definitive word December

6    30th that was going to happen.

7         That's the difference.  The special

8    master's papers themselves acknowledge that the

9    sales process order doesn't authorize ex parte

10   communication.  It authorizes communication.

11   The question of whether that would be ex parte

12   was not discussed or described, and the things

13   that we supposedly consented to were in the

14   special master's reports where he says he's

15   providing updates to OFAC about the status of

16   the development of the sale process.  That's

17   it.

18        And I do think, if I may just step back,

19   again, there's unclarity about the facts here,

20   and I recognize that, so I'm trying to be

21   careful.  But the idea that a judicial officer

22   could go into the executive branch and have a

23   secret meeting -- that's what an ex parte

24   communication is, a secret meeting -- and urge

25   the executive branch to change its position on

1  OFAC sanctions and then that could be perceived
2  as something that is consistent with the
3  judicial role just seems completely wrong.
4  It's a secret meeting.
5       And I guess the problem we're having here
6  is we don't know -- precisely because this was
7  ex parte, we don't know what was said at that
8  meeting.  The -- of course, I take counsel for
9  the special master at his word here, but what
10  he said, if you'll bear with me -- at one
11  point, he said that they wanted to give
12  guidance that would allow the process to move
13  forward.  If you marry that up with what --
14  with the quote I read from their papers filed
15  in January, there's reason to think that what
16  they did is going to say you need to prioritize
17  enforcement of this judgment, and that -- to do
18  that at all, as I said, we think is on the
19  wrong side of the line.  To do it ex parte --
20  and the discussion we're having here today
21  demonstrates why that's such a problem because
22  we don't know what happened in that meeting.
23       And my friend Mr. Estrada says it's
24  perfectly fine for the judicial branch to
25  advocate in that way.  I'll say a couple of

1    things about that if I could.

2         The first is that they don't cite any

3    example ever of anyone doing it with respect to

4    asking the federal government to lift sanctions

5    to allow a judicial order to be enforced, any

6    judicial officer ever doing it.  They don't

7    cite a single example, and they certainly don't

8    cite any case providing any support for the

9    proposition that that would be appropriate

10   exercise of judicial power.

11        Instead, what Mr. Estrada said was Courts

12   all the time hear about foreign policy and they

13   don't have to assume a prostrate position with

14   respect to the executive, and that's true, of

15   course, in the exercise of the judicial power.

16   But we're not talking about that here.  What

17   we're talking about is an effort to influence

18   the exercise of the executive power.  Congress

19   gave this power to the executive, and it's just

20   undeniably advocacy to the executive that it

21   change its position.  That's what it was.  If

22   we're indeed correct in our assumption, that's

23   what it was.

24        And the last point I'd make in terms of

25   all the discussion we've had about frustration

1    over delay, the delay is because of the

2    executive branch at this point.  They -- it's

3    the executive branch that's not given its okay

4    for this process to go forward.  It certainly

5    hasn't given license to Crystallex to allow the

6    deal to be consummated.  Maybe they'll change

7    their position on April 7th, and if they do,

8    the parties can adjust to that.  But that's the

9    essence of the problem here.

10        I do want to say we did not -- just to

11    conclude, a step like the one we've taken in

12    this motion is not one that we would take

13    lightly, but we really genuinely and deeply

14    believe that if indeed that type of advocacy

15    occurred, it's not right.  It's just not right.

16    It's not what a Court should be doing, and

17    that's why we filed the motion, and that's why

18    we made the arguments we have made.

19        THE COURT:  I certainly take you at

20    your word as well, and I know you didn't file

21    it lightly and you think it's a serious issue.

22    It does seem to be clear on the record, though,

23    and I don't think your side has been shy about

24    it, that you have a position that you do not

25    want this to go forward.  You want the

1    position -- the statement of interest from 2020

2    to be maintained.  You want the licenses to

3    continue being denied.  Those things are clear

4    on the record.  I'm asking as a question for

5    you to confirm that.  And seems to me I can't

6    ignore that and it's for me to decide if that

7    has any impact on how to resolve the motion.

8    Your response.

9           MR. VERRILLI:  Of course, that's

10    true, Your Honor.  As I think Your Honor knows,

11    we believe there's still unresolved legal

12    questions with respect to the underlying order

13    that the Third Circuit presumably has to

14    resolve at some point.  Our interests are in

15    alignment with the foreign policy judgments of

16    the United States, but that's because, as we

17    see it, the United States understands, as we

18    do, the damage that could be done to the

19    prospect of the government in Venezuela if

20    Citgo and its shares are cannibalized.  Yes,

21    that's our position, of course.

22        We would hope that the fact that the

23    United States, through two administrations now

24    so far, is agreeing with the legitimacy of that

25    view, that that should have some effect on Your

1    Honor's thinking about the position we've
2    taken.
3              THE COURT:  I will give the other
4    parties a brief chance to add anything they
5    like and then you'll the last word if they have
6    anything to say.
7              MR. VERRILLI:  Thank you.
8              THE COURT:  Mr. Schrock, anything you
9    want to add on this motion?
10             MR. SCHROCK:  Just very briefly.
11    Again, Ray Schrock from  Weil, Gotshal, and
12    Manges for the special master.
13             Your Honor, just one correction.  I was
14    notified by special master's OFAC counsel that
15    present at that meeting were not just the DOJ
16    attorneys but also Treasury and State were also
17    present but not OFAC, so I wasn't aware of
18    that.  I wanted to clarify that.
19             And, Your Honor, I do want to make sure
20    we're clear to distinguish for -- we're using
21    this word of "advocacy."  The special master
22    does have a view on what we need from OFAC in
23    order to have a value-maximizing process.  We
24    need, you know, FAQs, as we said on the record.
25    We need the ability to give guidance of when

1    the executive branch would consider granting

2    licenses, and those are views that we have.

3    And it's perfectly appropriate for -- and

4    consistent with the mandate that we've had.

5    We've always had those views with OFAC.  Did we

6    make those clear in the January 12th meeting?

7    Yes.  Did we make them clear in prior meetings?

8    Yes.  Did we tell parties previously that, of

9    course, we have views around how this process

10   should proceed?  Yes.  Have we put that on the

11   record?  Yes.

12        But we weren't advocating for a policy

13   change.  As far as I recall, the executive

14   branch hasn't said anything in response to the

15   Court's orders around the sale of anything of

16   substance.  That's what we really needed, was

17   some guidance from them to take a position so

18   at least we know and can move forward on an

19   informed basis, and we think that's perfectly

20   appropriate and consistent with the inherent

21   power of the Court to enforce its own orders.

22        Your Honor, we haven't done anything

23   different than we have done previously.  We are

24   being fair, open, and we're always attempting

25   to be fair to all parties.  We're not

1    advocating on behalf of any party, but we

2    certainly have a position about what we think

3    is necessary from the U.S. government in order

4    to allow the Court's order to be implemented,

5    and we think that's consistent with our mandate

6    as well as see any separation of powers issues

7    or any other problems with doing that.  And we

8    certainly don't think that knowledge gained

9    during that is a disputed evidentiary fact, in

10    just performing the role of a judicial officer.

11         That's all we have.

12         THE COURT:  Mr. Estrada, anything

13    you'd like to add?

14         MR. ESTRADA:  A couple of things,

15    Your Honor.

16         Just to clarify, our position is, and we

17    are correct, that before the meeting occurred,

18    the Venezuela parties did not file any request

19    for relief from this Court that was based on

20    455(b)(1).  And you can search all day their

21    motion to this Court to be permitted to attend

22    the meeting for citation to 455(b)(1) and I

23    don't believe you'll find it.  So I believe

24    when counsel was referring to the citation of

25    that provision, he was actually referring to

1    the current motion that he says he was raising

2    with circumspection, not to the point I made

3    about the tactical behavior that this would be

4    dawning on them a couple of weeks later after

5    filing the motion.

6        The second point I'll make is there's

7    amoeba-like nature to the arguments here.  When

8    you talk about timeliness, we keep point out

9    that the the ex parte contacts with the

10   government by the special master have been

11   plain on the record for a very long time, and

12   that therefore, to the extent the motion is

13   based as it is on the fact that the special

14   master has acquired knowledge ex parte of

15   disputed evidentiary facts, that's waived and

16   untimely.

17       Every time the issue gets asked

18   point-blank, they shift to this question of

19   advocacy and when they learned that and whether

20   that's the issue, but that's not really any of

21   the statutory provisions that they're citing.

22   The statutory provisions they're citing are

23   based on the acquisition of disputed

24   evidentiary facts by the ex parte nature of the

25   hearing, so let's not confuse what their

1   complaint actually is.

2          On the advocacy point, I think we have

3   said what we have said, which is that the Court

4   has institutional interest.  The Court

5   ultimately recognizes that OFAC will rule yea

6   or nay on the sale and whatever consideration

7   OFAC may take into consideration on that, which

8   may include foreign policy, are not beyond the

9   ken of the Court to address as it does in other

10  cases.

11         THE COURT:  Thank you very much.

12      Special master, anything?

13         MR. SCHROCK:  No, Your Honor.  Thank

14  you.

15         THE COURT:  Mr. Verrilli, you can

16  have the last word on this motion.

17         MR. VERRILLI:  Just to make sure

18  we're clear about the citations to 455, I think

19  it's not open to dispute, if one reads our

20  opening and reply papers, that they make two

21  points.  The first one is that the special

22  master is engaged in ex parte gathering of

23  extra-record information, and the second is the

24  advocacy point, and they're separate.  They're

25  made in both the opening and in the reply.

1    I take it that in terms of the idea and

2    thought that this is strategic behavior on our

3    part, that my friends on the other side are

4    suggesting that we held something back.  Both

5    arguments are right there in the papers both

6    times, and I had thought my friend in the

7    opening argument was saying that thing we held

8    back was the advocacy argument, but I hope I've

9    demonstrated to Your Honor that that's clearly

10   not the case from what I read before.

11   And then with respect to holding back the

12   argument about extra-record judicial facts,

13   again, the papers will speak for themselves.

14   Your Honor can make a judgment about that, but

15   it's right there in black and white.

16   THE COURT:  Thank you very much.  So

17   I will have something more to say about the

18   disqualification motion sometime today, but

19   right now I've got nothing else to say on it.

20   I've heard the arguments.  They're very

21   helpful, very thorough.  I'm taking it under

22   advisement, maybe just a little while, but I'm

23   taking under advisement a little while.

24   But I do want to come to the other issues

25   I asked you to be prepared to address.  I'll

1    just run through these in the order that I

2    think I had listed them.

3         First, whether to unseal the billing

4    records of the special master.  We'll hear if

5    the special master has any objection to that.

6         MR. SCHROCK:  Your Honor, Ray

7    Schrock, Weil Gotshal, for the special master.

8         Fundamentally, we don't have any issue

9    unsealing the fee records.  We'll always -- we

10   may have to redact them for privilege in

11   certain circumstances, but we're fine if the

12   billing records are public.  No issues.

13        THE COURT:  Okay.  Anybody on

14   Mr. Schrock's side of the room have any

15   objection to that?

16        THE ATTORNEY:  No, Your Honor.

17        THE COURT:  Okay.  Any objection from

18   the other side of the room?

19        MR. EIMER:  Nate Eimer for the

20   Venezuela parties on this one.  We have no

21   objection to the unsealing of the records.

22        THE COURT:  This was, as you may have

23   gathered, a further inquiry from a media

24   representative.  I think after we found out

25   there was no objection to the first request, we

1          then got a second request, so now that I

2          understand there's no objection, I'm going to

3          order you in a timely fashion to go ahead and

4          unseal the billing records.  You may make

5          proper redactions.  And going forward, to the

6          extent there are additional bills, do the same

7          thing in terms of making public at least a

8          redacted version.  Understood?

9                    MR. SCHROCK:  Will do Your Honor.

10                   THE COURT:  We'll turn to probably

11         Mr. Eimer, but the next issue is the objections

12         to the ongoing expenditures.  I recognize

13         there's still a motion to quash, but on the

14         assumption that he's going to continue to spend

15         money, I know we've gotten into this pattern of

16         you write the letter and you don't seek further

17         briefing, but is there something else you would

18         like me to do?  Do you have any requests for

19         relief at this point?

20                   MR. EIMER:  No.  I think Your Honor

21         denied, I think, our objections initially to

22         exceeding the $2 million cap, and we've just

23         continued the objection just to preserve it.

24         That's why we didn't ask for any further

25         briefing, so I think we're just trying to

1     preserve, and we can stop trying to preserve it

2     if Your Honor acknowledges that, that we're

3     just continuing the objection to exceeding the

4     $2 million cap at that point.  Your Honor is

5     approving that as we go forward, if we have

6     specific objections to new petitions, we will

7     make those, and we did with respect to the

8     January 12th meeting, but that will rise or

9     fall with Your Honor's ruling on

10    disqualification.  I think that's where we are

11    on the fees.

12          THE COURT:  I don't want to do

13    anything that makes you think you're incurring

14    any greater risk of being found to have waived

15    an objection.  In my new life, I hear a lot of

16    arguments now about whether things are

17    preserved or not.  I'm content if you want to

18    continue to do what you've done.  If there's a

19    way to short-circuit that, I'm also prepared to

20    say for the record that you have a standing

21    objection to every bill that comes in from this

22    point forward and you'll only write me a letter

23    if you see something that's really new, but so

24    doing is not a problem for me.  So any response

25    to that?

1           MR. EIMER:  I think I'm fine with a

2     standing objection going forward.  If there's

3     something specific we need to object to, we

4     will and raise that with Your Honor, as we did

5     with respect to the fees regarding the

6     January 12th meeting.  I think that's fine as

7     long as the other parties are content with our

8     standing objection being preserved to the fees.

9           THE COURT:  We're going to find out

10    now.  Thank you.

11        Mr. Schrock.

12        MR. SCHROCK:  Your Honor, if

13    Mr. Eimer wants to have a standing objection, I

14    suppose that's fine.  I would like to note for

15    the record, of course, that, consistent with

16    the Court's order, the $2 million cap only

17    applied to getting to the initial work for the

18    special master.  If there are other objections

19    that they have, certainly, we'd like to hear

20    them, you know, if there are other substantive

21    issues that they have, and they can certainly

22    make those at that time.  With regard to that

23    if it's the standing $2 million

24    exceeding-the-cap issue, that sounds fine to

25    me.

1          THE COURT:  That's fine.  Let me be

2     clear and talk with the other process parties.

3          Mr. Estrada, any position on that?

4          MR. ESTRADA:  We don't have any

5     position on the objections that the Venezuela

6     parties have.  You will not be surprised to

7     learn that my client, like any client, doesn't

8     like to pay large bills if they're unnecessary,

9     though I will note that the bills might be

10    lower if the Venezuela parties would cease

11    filing all these motions that have no merit.

12         THE COURT:  Thank you.

13         And Ms. Wolf for Conoco?

14         MS. WOLF:  I second Mr. Estrada's

15    point that we're all spending a lot of money

16    because of a lot of motions being made by the

17    Venezuela parties.  With that said, in terms of

18    their having a standing objection on the $2

19    million cap, we, of course, have no problem

20    with that.

21         THE COURT:  Mr. Elmer, anything you

22    want to add in light of all of that?

23         MR. EIMER:  No, Your Honor.  We're

24    fine.

25         THE COURT:  All right.  The next on

1    my list is a status report and how to proceed.

2         Mr. Schrock, I know you're at the podium.

3    I know we've covered a lot, but if there are

4    other things you think we have to cover or any

5    requests for what I should be doing or anything

6    else, now would be the time to put that out

7    there.

8         THE ATTORNEY:  Thanks, Your Honor.  I

9    think that we have covered, I think, ad nauseam

10   the meeting from January 12th, and that was

11   certainly part of the update.  We are in the

12   process of doing the initial steps to prepare

13   the supplemental report consistent with the

14   sale procedures order, and to do that, we've

15   activated Evercore because some of the issues

16   that bear on the supplemental report and

17   whether or not to move forward are things that,

18   frankly, we couldn't do as just between

19   Mr. Pincus and his legal advisors, and we

20   needed their input to do that.

21        We are mindful not to take material steps

22   to move forward with, as that term the used in

23   the sale procedures order, without getting

24   further guidance from the Court, but simply

25   preparing the supplemental report, being

1     informed, thinking about all of the issues that

2     would go along with whether or not to move

3     forward with the preparation launch date and

4     the launch date itself is something that we

5     felt we very much needed Evercore's guidance on

6     so we have done that.

7          You know, again, the key piece for us, I

8     think, is really the U.S. government guidance

9     on -- and, you know, we're looking forward,

10    certainly, to learning what that is.  I think

11    having this additional time to look at that

12    guidance, weigh in on -- with our thoughts and,

13    frankly, also have some dialogue with the sale

14    process parties, it's going to be in

15    everybody's interest so that we're best

16    informed about putting recommendations in front

17    of the Court.  It's really all about, for us at

18    this point, the preparation of the supplemental

19    report, and we'll continue to work with the

20    parties.

21          THE COURT:  Okay.  I'll just put this

22    out there.  As you may know, I'm having a

23    status conference later today with several

24    other creditors, and, of course, all of you are

25    welcome to be there if you like.  And I don't

1       want to get into any real substantive

2       discussion because they're at least not here

3       officially at the moment, but one issue that is

4       front and center in their status report is the

5       question of whether additional judgments will

6       be added.  Is that an issue that you would

7       expect to address in your supplemental report,

8       or have you started thinking about when and how

9       the special master may like that issue

10      addressed, or is this just completely

11      premature, from your perspective?

12           MR. SCHROCK:  Your Honor, I do

13      believe we have that process laid out in the

14      sales procedures order, that we would have to

15      designate what those additional judgments are

16      not later than close to the launch date.  I

17      think, certainly, understanding how much is at

18      issue, it does bear on how much in judgments.

19      It could bear on some of the recommendations

20      that we make.  For instance, if there's a

21      dollar of judgments versus 6 or 8 billion, it's

22      going to weigh in on the types of

23      recommendations that we would make moving

24      forward.  So knowing -- getting clarity on

25      that, I think, is helpful for all parties.  And

 1      I do know Your Honor has issued additional
 2      writs of attachment on a number of additional
 3      judgments, and we've been keeping track.  I
 4      think that whenever Your Honor is prepared to
 5      act on that, we'll be ready, but we do have
 6      this outlined as kind of a drop-dead date in
 7      the Court's process.
 8              THE COURT:  Is there anything else
 9      you wanted to raise at this time?
10              MR. SCHROCK:  Nothing else, Your
11      Honor.
12              THE COURT:  Okay.  All right.
13          Mr. Estrada, why don't you come up next
14      in the nature of a status report, if there is
15      anything you want to report or raise with the
16      Court.
17              MR. ESTRADA:  I don't think we have
18      anything, Your Honor, in substance about this.
19      I think we're looking forward to what the
20      report will be now in late April, and as was
21      our position all along, we have always thought
22      that we should get going with it.  We have a
23      position with respect to the sales parties and
24      all of that, which I think is based on my
25      understanding as to what the purpose of that

1  provision is, which I'm happy to give you now

2  or later if you like.

3    But it seems to me that for purposes of a

4  judicial execution sale, if one were to go

5  forward, people who have a claim to participate

6  in the process should be those that have an

7  attachment.  We have an attachment.  Nobody

8  else does.  Your Honor has issued a number of

9  orders that are labeled conditional attachment

10  I think are legally, in fact, issuing tickets

11  for people for a place in line should

12  attachments ever be permitted again.  And at

13  least as I see it, if there is a judicial sale

14  and there is more than is needed to pay our

15  judgment, there will be a leftover.  And in

16  ordinary circumstances, people may seek to

17  attach that or it would go to the debtor.

18    It would not ordinarily be the case that

19  people who have no attachments are, in effect,

20  general creditors of the debtor of whom, for

21  all we know, there might be millions around the

22  world.  All get to share on whatever is

23  leftover.  It's not really a fight, but it does

24  seem to me in terms of keeping the process

25  manageable and whether you're going to add the

1    sales process parties, I think it is mindful

2    that it is a judicial sale of attached assets

3    and that people who might have a claim to the

4    remainder, as it were, should be those who have

5    a property right that is secondary to ours and

6    rather than simply being a general creditor who

7    may some time get an attachment I can give

8    someone.

9         And I say that not because, necessarily,

10   it bears on the pecuniary interest of my client

11   because we're first in place but merely because

12   it may bear on the manageability of the process

13   if people get added who actually have no

14   attachment and no property right but who want

15   to have a voice in process.  And we saw that

16   and we have some of our objections when we

17   dealt with recent motions to intervene, and

18   that has been part of our concern, that we keep

19   the process manageable for the execution of

20   judgment that we've been fighting all these

21   years.  That's my view on that.

22             THE COURT:  Okay.  Thank you.

23        I'm going to let any other creditors

24   speaks and then we'll turn to the Venezuela

25   parties.

```
 1              MS. WOLF:  Amy Wolf on behalf of
 2      ConocoPhillips.
 3              Your Honor, I think the likelihood that
 4      Mr. Estrada's client will see this asset sold
 5      and proceeds to go to Crystallex before OFAC
 6      has addressed ConocoPhillips' longstanding
 7      request to be able to attach -- ConocoPhillips
 8      is the only creditor here which is actually a
 9      creditor of PDVSA.  We are a general creditor,
10      and we've been in this process.  We're paying
11      for this process.  We would like to be added
12      sooner rather than later just for clarity.
13              If the Court the going to consider adding
14      other additional judgments, I do think
15      ConocoPhillips stands in a somewhat different
16      position.  It received the first conditional
17      writ and is a PDVSA creditor directly.  But if
18      other parties who are receiving alter ego
19      judgments are going to be added as additional
20      judgment creditors, we might need to think
21      about how the Court is going to rank what is
22      now becoming a very significant number of very
23      substantial claims.  So that's our one
24      suggestion, first of all, to deal with who is
25      going to be in the judicial judgment and
```

1    ConocoPhillips thinks it should be the first of

2    those and then how it would deal be priority

3    ranking termed among those creditors.

4            THE COURT:  Thank you.

5            MR. ELLIS:  Thank you.  Justin Ellis,

6    MoloLamken for Red Tree Investments.

7        I'm mindful, of course, that Your Honor

8    has denied our request to intervene.  We, of

9    course, respectfully disagree with that and

10   have taken appeal to the Third Circuit.  We

11   will see what the court of appeals says, but we

12   also understand in your order denying

13   intervention you still reiterated that we would

14   be free to offer input in your suggestions, and

15   we're offering a few points in that spirit.

16       First, I do understand from Mr. Schrock

17   that the United States will provide its views

18   as to the applicability of sanctions here and

19   provide that guidance by the 7th of April and

20   that he will then provide his supplemental

21   report, if possible, by the 30th.  We would

22   just ask if possible that we would have access

23   to that letter and have some opportunity to

24   participate in that discussion with the special

25   master and the sale process parties if we

```
 1       could.

 2                    THE COURT:  To the extent you're

 3       asking for -- let me ask Mr. Schrock.

 4             I suppose I just assumed that the

 5       supplemental report would be filed on the

 6       docket.  Is that what you would anticipate?

 7                    MR. SCHROCK:  Yes, Your Honor.

 8                    THE COURT:  Thank you.

 9             So you're going to have access to the

10       supplemental report just as everyone will.  To

11       the extent you're asking for something further,

12       and it sounds like the intervention that I

13       denied, you're free to call up Mr. Schrock any

14       time you want, but I'm certainly not here to

15       grant the motion with all the rights that would

16       attach to it that I've already denied.

17                    MR. ELLIS:  Understood, Your Honor,

18       and we have been in consultation with the

19       special master and will continue to do so.

20             I'd also like to make a point about the

21       launch process.  We generally agree that the

22       launch that the sales process should move

23       forward as far as it can in accordance with

24       applicable sanctions.  We think there are steps

25       that the Court and special master could take
```

```
1         that are not going to be a transfer of property

2         in a meaningful sense and would be broadly

3         supportive of that.

4              In that vein, we do think it would be

5         appropriate to try to sort out when we can

6         which judgments are going to be additional

7         judgments.  I know briefly Mr. Estrada

8         suggested that what judgments should be

9         additional judgments is a matter of property

10        law.  We don't think that's correct.  We note

11        that the sales procedure order simply says it

12        will be decided in accordance with applicable

13        law, and we look forward to briefing that

14        issue.

15             Finally, I note on the priority issue,

16        because Ms. Wolf raised it, certainly that will

17        be an important issue.  Given the number of

18        creditors that are going to come in the door

19        and already have on an alter ego basis, I would

20        be concerned at this point.  It may be in the

21        nature of an advisory opinion to try to sort

22        out priority which people have objected

23        strenuously on the precise number of judgments

24        we may have and which judgments may be

25        enforceable is still an open question, but,
```

```
 1        again, we can address that at an appropriate
 2        time.
 3                   THE COURT:  Anybody other than the
 4        Venezuela parties in the room that wants to be
 5        heard in the nature of status?
 6             Okay.  I don't see anybody.  So we'll
 7        hear now from Mr. Eimer.
 8                   MR. EIMER:  Nate Eimer for the
 9        Venezuela parties.
10             I'm not sure, Your Honor, who's going to
11        be more surprised, Your Honor or Mr. Estrada,
12        when I say that I pretty much agree with
13        Mr. Estrada's view on these conditional
14        attachments.  This is a judicial sale.  We're
15        inevitably going to need briefing on these
16        issues, I think.  This is a judicial sale under
17        324.  There's only one attachment that's
18        recognized by law.  The Court has authority
19        only to sell property to satisfies the judgment
20        that resulted in the attachment.  And it makes
21        a huge difference.  According to Bloomberg,
22        Citgo was valued last week at $13-some billion
23        dollars.  Section 324 only allows the Court to
24        sell sufficient assets to satisfy their
25        $1 billion, $900 million attachment.  That's
```

1      it.  You can't sell the whole company to

2      satisfy 10 percent or 8 percent of the value of

3      the company.  That would be a significant

4      discussion.  I assume we're going to need

5      briefing on this issue, and it will probably

6      come up this afternoon in the same way, but

7      that's our argument on that.

8           I did want to comment on one other thing,

9      unless Your Honor has a question to me about

10     that.

11          THE COURT:  No.  My only question is

12     going to be do you have other things you want

13     to talk about.

14          MR. EIMER:  Just one other.  I think

15     there's a gap in the authorization papers, and

16     I mentioned this to Mr. Schrock.  When he said

17     that the special master was activating

18     Evercore, the Evercore agreement only allows

19     them to be paid once the sales process was

20     launched and they get a monthly allowance.

21     There is no provision to pay them now because

22     the sales process is not launched, at least

23     that's the way we understand it.  So I'm fine

24     to have Evercore working without compensation.

25     I doubt if they want to.  They're probably more

1       expensive than Mr. Estrada, but I think there

2       needs to be some provision if they expect to

3       get paid because there is none now.  I don't

4       think it's appropriate, given the fee

5       arrangement that the Court approved, which

6       doesn't allow the monthly compensation they're

7       entitled to once the launch happens to start

8       before that point.  So I just wanted to clarify

9       that.

10              THE COURT:  Thank you for flagging

11      that.

12        Mr. Schrock, I don't know if you had a

13      chance to think about that or represent whether

14      they're willing to work for free or where we

15      are.

16              MR. SCHROCK:  Thanks, Your Honor.

17      So, yes, we did see Mr. Eimer's latest

18      correspondence to us in another objection to

19      fees relating to Evercore.  I believe that the

20      Evercore letter -- certainly, whatever

21      objections he has to Evercore being paid, we'll

22      deal with.  I don't think there is a gap in the

23      engagement letter or the Court's order.  Once

24      we notify parties that we're making

25      preparations -- and certainly we are -- for the

```
 1    supplemental report, the sales procedures order
 2    contemplates that we may weigh in on certain
 3    issues relating to whether or not to launch the
 4    process, how -- we're certainly interested to
 5    know, for instance, about the market, you know,
 6    thoughts that, you know, would be within the
 7    purview of an investment banking professional
 8    related to that process.  We're not taking
 9    material steps, but we certainly are taking
10    preparations.  We think we are complying with
11    the letter of Evercore's engagement, if they
12    have an objection on that.
13         I don't think Evercore is planning on
14    incurring monthly fees.  I think they were
15    planning on being paid monthly fees, and that's
16    certainly our expectation that while they're
17    activated and working, they're going to get
18    paid a monthly fee.  Of course, to remind
19    everybody, we can certainly deactivate Evercore
20    as well, and there's a process for doing that
21    if we're not moving forward with the process,
22    but we saw this, as for the moment, making the
23    supplemental report.
24              THE COURT:  If I understand
25    correctly, your view is that you're already
```

1   authorized to have them incur the monthly

2   expenses.

3          MR. SCHROCK:  Once we give notice,

4   yes, Your Honor.

5          THE COURT:  You've given notice, I

6   think you've told us.

7          MR. SCHROCK:  Yes.

8          THE COURT:  They're expecting to get

9   paid on that monthly rate.

10          MR. SCHROCK:  Correct.

11          THE COURT:  But presumably, and I

12   guess confirm this, if your recommendation is

13   not to go forward and/or I decide not to go

14   forward, you will deactivate them and then they

15   stop incurring any fees.

16          MR. SCHROCK:  That's correct, Your

17   Honor.

18          THE COURT:  Thank you for making

19   clear that position.  Sounds like you had a

20   different position.  I'm not going to be

21   prepared to probably resolve it now if you want

22   to say any more you can.

23          MR. EIMER:  I think our understanding

24   of the fee agreement is different.  I'm not

25   saying they shouldn't get paid.  I don't think

1    there's an authorization to pay them.  I don't

2    think their monthly fees should start at this

3    point.  I don't think we want to pay for that.

4    If they're working for a few hours, they should

5    get paid.  I agree with that.

6              THE COURT:  I suggest you all

7    continue to confer on this and, obviously,

8    include Evercore.  If you don't, I anticipate I

9    may get one of the materially different

10   objections the next time I see a bill.

11             MR. SCHROCK:  Ray Schrock for the

12   special master.

13        We're happy to confer on it.

14   Respectfully, my experience on trying to

15   resolve fee issues with the Venezuela parties

16   doesn't result in an agreement, but we need

17   Evercore for the supplemental report.  We've

18   activated them.  We want them to be paid.  If

19   Venezuela -- if the Venezuela parties have an

20   objection to that or we need to clarify it,

21   we'll certainly do that.

22             THE COURT:  Okay.  Thank you.  I will

23   tell you what my plan is and give you all a

24   chance to weigh in with anything further if you

25   want to.  I have another hearing at 1:00 and

1  then the status conference at 2:30.  I may be

2  able to rule on the motion to disqualify later

3  today, but I'm going to need time to think

4  about what I heard and to gather my thoughts,

5  so I'm going to reconvene this Crystallex sales

6  process parties proceeding at 3:30 today.  If

7  folks can't stay, that's fine, just to have at

8  least one of you for each party, please, to be

9  here.  I don't anticipate anymore argument or

10  questions.  I anticipate giving you a ruling or

11  telling you I don't have a ruling, but that

12  will be at 3:30 today.

13       In light of that, anything else?  I'll

14  run through you all one more time.

15       Mr. Schrock, anything further?

16            MR. SCHROCK:  Nothing further.  Thank

17  you.

18            THE COURT:  Mr. Estrada?

19            MR. ESTRADA:  Nothing further at this

20  time, Your Honor.

21            THE COURT:  Ms. Wolf?

22            MS. WOLF:  No, Your Honor, thank you.

23            THE COURT:  Anybody else over here?

24  Mr. Eimer?

25            MR. EIMER:  No, Your Honor.

```
 1              THE COURT:  Mr. Verrilli, anything
 2       else?
 3              MR. VERRILLI:  No, Your Honor.
 4              THE COURT:  Thank you all very much.
 5              (A recess was taken, after which the
 6       following proceedings were had:)
 7              THE COURT:  We're back here in the
 8       Crystallex action, and in an abundance of
 9       caution, I want to make sure you put your
10       appearances on the record to make sure you're
11       all present.
12              MR. MOYER:  Good afternoon, Your
13       Honor.  Jeff Moyer from Richards, Layton, and
14       Finger on behalf of Crystallex, and I'm joined
15       this afternoon by Miguel Estrada from Gibson
16       Dunn.
17              THE COURT:  Thank you.
18              MR. SCHNEIDER:  Good afternoon, Your
19       Honor.  Abraham Schneider from Potter,
20       Anderson, and Caroon on behalf of Special
21       Master Pincus.  With us again is Ray Schrock
22       and Chase Bentley from Weil Gotshal.
23              THE COURT:  Okay.
24              MR. SCHROCK:  Good afternoon.
25              MS. CUMINGS:  Hello again, Your
```

1       Honor.  Ali Cumings of Morris Nichols on behalf

2       of PDV Holdings and Citgo, and with me is Nate

3       Eimer from Eimer Stahl.

4            THE COURT:  Good afternoon.

5            MR. HIRZEL:  Good late afternoon,

6       Your Honor.  Sam Hirzel from Heyman Enerio.

7       With me in the courtroom are Juan Perla, Kevin

8       Meehan, and Aubre Dean from the Curtis Mallet

9       firm.

10           MR. MORITZ:  Good afternoon, Your

11      Honor.  Garrett Moritz from Ross Aronstam on

12      behalf of ConocoPhillips, and I'm joined in the

13      courtroom by from Wachtell Lipton Amy Wolf,

14      Ricky Mason, and Michael Cassell and also from

15      Kobre and Kim, Marcus Green.

16           THE COURT:  All right.  Good

17      afternoon again to all of you.  Thank you all

18      for sticking around and returning.  It's late

19      afternoon.  I am going to give you my ruling on

20      the pending motion to disqualify, and it will

21      be somewhat later in the afternoon by the time

22      I'm done telling you my reasoning.  I have a

23      little bit to say to explain, but let me get to

24      it.

25           I will add, as I think I did this

1    morning, the argument was extremely helpful and

2    I was very pleased to have it. I had a lot of

3    questions that were all very thoroughly

4    answered, which has helped me get to this point

5    where I can rule on the motion.

6        The motion, again, is the Venezuela

7    parties' motion to disqualify the special

8    master. For the reasons I will explain at some

9    length, the motion is denied.

10        First, as all parties recognize in their

11    extensive briefing, the motion is largely a

12    rehash of the Venezuela parties' motion to be

13    included in the special master's January 12th

14    meeting with OFAC, a motion I denied, and I

15    should say I will refer to that as the OFAC

16    meeting or January 12th meeting, even though we

17    learned today that OFAC was apparently not

18    present at the meeting.

19        My denial of the motion for

20    disqualification today is based on,

21    essentially, the same reasoning that I gave in

22    denying the meeting-related motion, but I do

23    want to expound on that reasoning. The first

24    basis for denying the motion is that the burden

25    to prevail on it is on the moving party to show

1    bias or some other reason for disqualification,
2    and it is a substantial burden, and the
3    Venezuela parties simply have not met it.
4    There is no evidence before the Court that the
5    special master engaged in advocacy in the OFAC
6    meeting.  There's no evidence, in particular,
7    that he advocated for a change in U.S. foreign
8    policy or advocated for Crystallex to be
9    granted a license.

10        So one, but not the sole, ground on which
11   I'm denying the motion is the failure of proof
12   by the Venezuela parties.  In my mind, that is
13   a denial on the merits, and I will have a
14   little more to say on the merits, but I now
15   want to say something about some of the
16   procedural bases on which I'm denying the
17   motion as well.

18        The first one is that to motion to
19   disqualify, in my view, is untimely.  This is a
20   basis to deny the motion on all the grounds on
21   which it is asserted; that is, section 455(a),
22   Section 455(b), Canons 2 and 3 of the Code of
23   Judicial Conduct, and the due process clause of
24   the Fifth Amendment.

25        I don't think it's disputed that there is

1     a timeliness requirement for filing such a

2     motion.  The Third Circuit said as much in

3     common *Kensington*.  Parties seeking

4     disqualification in Section 455(a) should do so

5     in a timely manner.  And then in a case called

6     *Stonehenge Properties*, the Third Circuit also

7     noted that there is a timeliness requirement

8     for a disqualification motion under section

9     455(b).

10         Here the motion is untimely because the

11    grounds for it were known to the moving parties

12    for at least many months prior to the filing of

13    their motion.  A good summary of the relevant

14    timeline showing that all the parties have

15    known since approximately May of 2021 that the

16    special master had engaged OFAC counsel and was

17    in ex parte communication with OFAC is set out

18    in Crystallex's response to the motion, DI 513

19    at pages 3 to 5.  The ex parte meetings,

20    including what the Venezuela parties now refer

21    to as advocacy, to the extent those are two

22    different grounds for the motion, ex parte

23    meetings and advocacy, both of these things, as

24    properly understood, were contemplated

25    throughout the process of negotiating and

1    litigating the sales procedures order, which

2    was adopted in October 2022.  And this gave

3    rise to the notice, actual notice, to the

4    moving parties that the concerns they belatedly

5    raised could and should have been raised much

6    sooner.

7         So for example, the special master met

8    with OFAC ex parte three times in the summer of

9    2021.  There's support for that at DI 348

10    paragraphs 39 and 40.  On November 8, 2021, we

11    had, I think, a hearing that was longer than

12    today's hearing, and among other things we

13    discussed that the special master would

14    communicate with OFAC ex parte, as he

15    previously had done.  There was no reference to

16    potential disqualification of the special

17    master or grounds for seeking his

18    disqualification, even though also on the

19    agenda that day was a motion to disqualify one

20    of the advisors to the special master.  The

21    transcript of that ruling -- or I'm sorry that

22    whole proceeding, I think, is at DI 409.

23         In my March 2022 opinion, DI 443

24    particularly at page 17, I noted that the sale

25    procedure order I would adopt would include a

1    six-month window and during the six-month
2    window, the special master will be directed to
3    use his best efforts to obtain guidance from
4    OFAC, making no mention that such meetings
5    would be anything other than ex parte, as all
6    such meetings up to that point had been.
7        I then entered the sale procedure order
8    on October 2022 and expressly contemplated the
9    special master proactively engaging with OFAC
10   and included that six-month window. "Within
11   six months" -- I'm adding some words to the
12   quote -- "he shall solicit and attempt to gain
13   clarity and guidance from OFAC in support for
14   or not -- of its support for or not opposition
15   to the launch of the marketing process." You
16   can see these provisions at DI 481, Exhibit 1,
17   paragraphs 3 and 4.
18       In the status report of October 4, 2022,
19   the special master confirmed he does not intend
20   to include the Venezuela parties at such a
21   meeting. That's DI 480 at two, note two.
22   There's no indication anywhere in the sale
23   procedure order that the special master's
24   communications with OFAC needed to include any
25   other parties, and there was no reason for any

1      sales process party to believe that they would

2      be involved or invited to attend the meeting.

3           Let me say something about advocacy.  I

4      think when the special master used this word in

5      this context, I think he meant, as his counsel

6      explained today, that he conveyed to OFAC his

7      view that in order to conduct a

8      value-maximizing transaction, which in his view

9      is in the interest of all parties, he, the

10     special master, and ultimately the Court needs

11     clarity from the U.S. government as to whether

12     it will or will not or may exercise its sole

13     authority at the end of the process to grant a

14     specific license, a license which will be

15     required under the current sanctions regime

16     before a sale transaction can be consummated.

17     That's what I think he meant by "advocacy."

18          I don't think "advocacy" is really the

19     right word for that, but whatever word he used,

20     the moving parties have not proven that it was

21     materially different than the types of things

22     the special master did at the earlier ex parte

23     meetings with OFAC, nor have the moving parties

24     persuaded me that there's anything wrong with

25     what the special master did, whether we call it

1 advocacy or something else.  Which, by the way,

2 everything he did, he did at my express

3 direction.  I think it's important to keep in

4 mind the context here.

5   As Crystallex emphasized in argument

6 today, while we do have certain views of the

7 United States government on what's going on in

8 this process, they're somewhat outdated, and

9 they're expressly time bound.  So in July 2020,

10 we received the statement of interest on behalf

11 of the United States government stating a

12 preference that the Court halt the prefatory

13 steps it was taking towards the sale.  As is

14 entirely understandable and reasonable, that

15 position was the position of the United States

16 government, quote, at that time.  It may well

17 still be the position of the United States

18 government, but in my view, there's absolutely

19 nothing improper about inquiring as to whether

20 it's still their view.  It's not advocacy.

21 There's nothing improper about it.

22   Similarly, the denial without prejudice

23 that Crystallex requests for a specific license

24 was based on, as it had to be, circumstances at

25 that time, and I believe the letter expressly

1      notes that it's a denial without prejudice to

2      ask again and a denial at this time or at that

3      time.

4            The government's position could change at

5      any time, and, very importantly, this is

6      another important part of the context I think I

7      made repeatedly clear, I entirely respect and

8      understand that unless the current sanctions

9      regime is changed, it will be for the executive

10     branch and only the executive branch to

11     ultimately decide whether to grant the license

12     or licenses necessary for a sales transaction

13     to be completed and for the Court's judgment to

14     eventually be enforced.  That is up to them.

15     Nothing a special master says or anything I say

16     or do will change that.  And I think everything

17     that the special master does or says or has

18     done or said has to be understood in that

19     context.

20           We well understand and respect that the

21     last call, ultimately, will be for the

22     executive branch and so, of course, nothing he

23     says and nothing I say will be intended to try

24     to suggest anything to the contrary.  There is

25     no evidence that the special master engaged in

 1          the type of advocacy the moving parties contend

 2          would be inappropriate, and because of that, I

 3          need not resolve today the dispute which -- I

 4          think there is a dispute in the room as to

 5          whether it would be inappropriate for the

 6          special master to have engaged in the kinds of

 7          advocacy that were alleged.  At least

 8          Crystallex, I think, argues that it would not

 9          be.  I don't need to decide that dispute today.

10          There's no evidence that he did anything that

11          would be improper.

12               So that was a lengthy side note on what

13          are we talking about when we say "advocacy,"

14          but I still am trying to articulate why I think

15          the motion to disqualify the special master was

16          untimely.  And the first point for that is I do

17          think everything that occurred since at least

18          May of 2021 is relevant to understanding the

19          timing.

20               But I now want to say in the alternative,

21          if you wipe all of that away and only look at

22          what happened from December 28, 2022, to the

23          filing of the motion in front of me today on

24          January 23, 2023, if you only look at that time

25          frame, I still think the motion, as an

1       alternative basis for my ruling, is untimely

2       and sufficiently untimely that it is denied on

3       that basis as well.  I do view the facts of

4       what happened in late December and early

5       January of this year as, essentially,

6       undisputed at this point.  By December 28th of

7       last year, the Venezuela parties knew that the

8       special master would meet with OFAC sometime in

9       January and knew that the special master had

10      not coordinated with them, asked about their

11      schedule, to figure out what day in January

12      they should meet.

13            As best as the record can tell, you

14      didn't even contact them about setting up the

15      meeting with OFAC, and so by December 28th,

16      particularly given the pattern of the special

17      master's meetings with OFAC being ex parte and

18      the sale procedures order not doing anything to

19      change that, I think by December 28th, the

20      Venezuela parties had actual knowledge that

21      there would be a meeting in January and it

22      would be ex parte between the special master

23      and the Venezuela parties.  If the Venezuela

24      parties really believed that that was going to

25      be grounds, ultimately, for disqualification of

1    the special master, a special master on whom,

2    as we've heard today, they spent a lot of money

3    on and I, of course, spent a lot of time giving

4    assignments to and having vested my authority

5    in, if they really thought that was going to be

6    meritorious grounds for disqualifying the

7    special master, I think that's an emergency

8    that requires contacting the Court or doing

9    your level best to contact the Court within a

10   day, two days maybe, three days at most.

11        I'm not saying that you necessarily have

12   to have fully coordinated amongst all

13   yourselves and have written a nice brief, but

14   if you think you're in good faith sitting on an

15   issue that could mandatorily require me to

16   disqualify the special master, I don't think

17   you can wait from December 28th until

18   January 9th without even contacting the Court

19   and giving it a hint that there is this kind of

20   emergency.

21        Of course, at that point, January was

22   undefined.  There was no specific date, or at

23   least the parties had no knowledge at that

24   point as to January and January 12th, so could

25   have meant presumably not January 1st but maybe

1    January 3rd.  I just don't think you can sit on

2    that kind of an issue for that many days

3    without even contacting the Court.

4         Time went on.  On December 30th, the

5    special master let the Venezuela parties know a

6    meeting was scheduled for January 12th

7    specifically.  Again, they knew or absolutely

8    should have known, based on the pattern and

9    practice and sale procedures order, that that

10   meeting would be ex parte, and that was

11   expressly confirmed on January 3rd, and it was

12   also on January 3rd, evidently, that the first

13   use of the word "advocate" came up, although I

14   think that should have been understood from at

15   least December 28th, if not well before that.

16        Anyway, even if -- and I don't think this

17   is the best way to see it -- even if the clock

18   started ticking only on January 3rd, you can't

19   wait from January 3rd until January 9th to

20   contact the Court if you want to seek relief

21   that becomes moot on January 11th or the

22   morning of January 12th, particularly when the

23   stakes are this high and this much money has

24   been spent on the special master, this much

25   litigation has gone into directing the special

1   master what to do.

2       At best for the Venezuela parties, they

3   knew a meeting was scheduled to occur 13 --

4   they knew for 13 days and they let 10 of those

5   days lapse before contacting the Court or

6   seeking any relief.  They took up 10 of

7   13 days, which by my calculation is 77 percent

8   of the potential time I had to hear about the

9   dispute, get briefing on it, review the

10  briefing, analyze the issue, make a decision,

11  and articulate the decision.

12      I recognize there's not a lot of case

13  law, if any, that says waiting a matter of days

14  makes a motion to disqualify untimely, but I do

15  think the circumstances here are, perhaps,

16  unique and extreme enough that the pace at

17  which the Venezuela parties moved, even if I

18  don't start the clock until December 28th, was

19  simply too slow, and I would say substantially

20  too slow.  I certainly don't believe that the

21  Venezuela parties moved as swiftly as was

22  reasonably practical.  And I do think in this

23  context, the delay was substantial, as the

24  Third Circuit cases require for all the reasons

25  I've just explained.

1          And I also have reluctantly concluded

2     that the delay was strategic; that is, I think

3     the way the Venezuela parties have handled the

4     issues relating to the OFAC meeting, the relief

5     that they've sought, first with respect to the

6     meeting itself and now to disqualify the

7     special master, I do believe it has a -- at

8     least a substantial element of being tactical

9     and designed with at least a partial goal of

10    further delaying these proceedings.

11         As Mr. Estrada observed this morning --

12    and I've had occasion to go back, of course,

13    and review the briefing again on the original

14    motion directed to the January 12th meeting --

15    the argument that after the meeting the special

16    master must mandatorily be disqualified because

17    he is in possession of some otherwise

18    undisclosed information, factual information on

19    a disputed issue, is at best -- and being

20    generous to the Venezuela parties -- at best

21    hinted at in the briefing on the first motion.

22    There's no explicit reference to Section

23    455(b)(1), which is one of the significant

24    bases for the disqualification motion.

25        And I think no persuasive basis has been

 1     given for why the moving parties did not make a

 2     455(b)(1) argument in their efforts to modify

 3     the meeting parameters, which leads me, again,

 4     reluctantly, to the conclusion that at least

 5     part of their motivation was to hold an

 6     argument in reserve to throw at the Court weeks

 7     after the meeting as a potential basis to

 8     compel the Court to disqualify his special

 9     master.

10          And it probably goes without saying, but

11     if I disqualify the special master, it will set

12     back and further delay these already delayed

13     proceedings, perhaps by quite a lot, and so it

14     may also lead and it may also have led, had I

15     been persuaded to do that, to an argument that

16     I should be disqualified.  And while I'm

17     confident other judges could effectively, of

18     course, preside over these actions, I have the

19     years of experience invested in it now, and it

20     would no doubt delay things substantially if we

21     needed to resign these matter to another judge.

22          So I think that all of that, that

23     potential to really substantially slow down

24     these proceedings even further by going after

25     the special master, potentially asking to

1    remove me, was at least part of what was going

2    on in the timing, the very, in my mind, unduly

3    delayed timing of these motions.

4         All of the reasons that the motion

5    directed to the meeting was untimely apply

6    equally, if not more so, to the motion to

7    disqualify, which, of course, was not filed

8    until January 23rd after the meeting.  It is,

9    at least, as I say, as untimely as the motions

10   meeting itself.  That's all I had to say about

11   timeliness.

12        As a further reason for denying -- for

13   granting -- as a further ground for denying the

14   motion to disqualify, I do believe that the

15   bases on which the Venezuela parties seek

16   disqualification of the special master are

17   waived.  Really, the same analysis as to the

18   timeliness.  Because the moving parties have no

19   evidence that the ex parte meeting on

20   January 12th was materially different than all

21   of the prior meetings given the course of how

22   we got to January 12th, I conclude that the

23   Venezuela parties' long-time acquiescence in

24   the special master's ex parte engagement with

25   OFAC, which was materially similar to what he

1    had done repeatedly before, I find that that

2    also constitutes a waiver of their right to

3    seek disqualification of the special master

4    based on that meeting.

5         Further, just a little bit more on why

6    the motion fails on the merits.  If the timing

7    argument and the waiver are not enough, I find

8    that as, I've already said, there's no

9    sufficient evidence to grant the motion.  Let

10   me add to that.  Specifically under 455(a), I

11   find the special master's and my impartiality

12   cannot be reasonably questioned.  A reasonable

13   person with knowledge of all the facts would

14   not conclude that his or my impartiality might

15   be reasonably questioned.  The Court has

16   authorized the ex parte meetings which the law

17   permits me to do.  The special master's opening

18   brief opposing this motion at pages 9 to 11 and

19   the letter filed by ConocoPhillips, DI 522 at

20   pages 3 to 4, set out how Federal Rule of Civil

21   Procedure 53 and various cases applying that

22   rule approve of judges authorizing ex parte

23   communications by a special master with the

24   Court or a party.  That's the express language

25   of Rule 53, and that language has been -- as

1    explained in those filings and in the cases

2    cited, that language has been interpreted to

3    include the Court's ability to authorize ex

4    parte communications with third parties.

5        I am persuaded that these authorities

6    make my order lawful and that the challenging

7    facts and circumstances I am confronting in

8    this case make my order reasonable and

9    necessary.  There is nothing improper or

10   anything a reasonable person would think

11   improper in the special master assisting the

12   Court in its efforts to enforce judgments that

13   have been entered and affirmed, and no

14   reasonable person would think that there is

15   anything improper or giving rise to a

16   reasonable basis to question impartiality in

17   using the special master in this way and in him

18   following my direction to do so.

19       In addition to Rule 53, the Court does

20   have an inherent power to enforce its own

21   judgment and to issue orders as necessary to

22   make its judgments effective.  That proposition

23   is supported in many places, but among others,

24   in the *Peacock* decision of the Supreme Court

25   516 U.S. at 356.

```
 1              As for the 455(b) grounds, the special
 2       master does not, nor do I, have any personal
 3       knowledge of disputed evidentiary facts
 4       concerning the proceeding, which is what must
 5       be shown and has not been shown for
 6       disqualification under 455(b).
 7              There is not and will not be any dispute
 8       as to what OFAC's position is.  We're not going
 9       to litigate that.  OFAC will tell us its
10       position or it won't tell us its position, and
11       we will all accept that is their position or
12       they're not going to tell us what their
13       position is.  That's not the kind of issue.
14       It's not a factual dispute over an evidentiary
15       fact concerning this proceeding that the rule
16       is concerned with.
17              So for all of those reasons, my decision
18       is to deny the motion to disqualify.  I will
19       give you a chance to tell me if you have any
20       questions about my rulings, but I want to say
21       one further thing before you do.  I would like
22       to set up, though I do want to get your views
23       on this, I would like to set up a regular
24       meeting with the special master, ex parte
25       meeting for myself, perhaps on a monthly or
```

1          every-two-month basis.  I don't want them to be

2          secret meetings.  I don't think there have been

3          any secret meetings, but I don't want there to

4          be any doubts that, you know, every month,

5          every two months, whatever it is, on a schedule

6          that I would propose be shared with the

7          parties, he and I and potentially his advisors

8          are going to meet.

9               I am open to suggestions that perhaps I

10         need to have a court reporter there to take

11         down a confidential record that would be sealed

12         until some further order, presumably from an

13         appellate court, saying this needs to be

14         unsealed.  I would consider doing that.  I

15         would consider doing either alternatively or in

16         addition that the special master gives you all

17         an agenda of what he plans to talk to me about

18         and maybe writes a short summary of what was

19         discussed, but I do think -- and this is not

20         meant to suggest that I already know we're

21         going forward.  I don't know we're going

22         forward.  I don't know what OFAC is going to

23         say.  I don't know what the special master is

24         going to say.  I don't know what positions

25         you're all going to take.

1          But I can say it's challenging not

2     knowing when this case or these cases are going

3     to need my attention, and I know that's

4     inherent in litigation.  You all don't probably

5     know either, but it will be helpful to me to

6     know that I have a sort of regular opportunity

7     to check in with the special master and

8     hopefully not be surprised by emergency motions

9     and things that really require my attention

10    when it may not be the most opportune time.

11          I'm going to give you all time to talk

12    amongst yourselves on that and get back to me

13    with your views on it, but that is something

14    I'm interested in setting up.

15          With that -- and I don't want anymore

16    argument.  We had a lot of argument today.  If

17    you have any questions about anything I said

18    and particularly my ruling, I'm happy to hear

19    it.  Let me start with Mr. Schrock.

20          MR. SCHROCK:  Thanks very much, Your

21    Honor.  No questions.

22          THE COURT:  Mr. Estrada?

23          MR. ESTRADA:  No questions on your

24    ruling, Your Honor.

25          THE COURT:  Ms. Wolf back there?

```
 1              MS. WOLF:  None thank you.
 2              THE COURT:  Mr. Eimer?
 3              MR. EIMER:  None for us, Your Honor.
 4              THE COURT:  Anybody else?
 5         So let's do this.  Let me have the sales
 6    process parties meet-and-confer and get me a
 7    status report.  Let's make it April 6th.  It's
 8    a week from today, I think.  Perhaps a day
 9    before, maybe we'll hear from OFAC, but the
10    only thing I for sure need you to put in the
11    status report is have you had a chance to talk
12    about my idea of a regular, recurring meeting
13    with the special master ex parte and do you
14    want any limitations or precautions on that.
15    Of course, you can add anything else you want,
16    but that's what I will be looking for.
17         Thank you.  It's been an enjoyable day.
18    I appreciate all the help, and I will be in
19    recess.
20
21
22
23
24
25
```

```
 1                 C E R T I F I C A T E

 2   STATE OF DELAWARE        )
                              ) ss:
 3   COUNTY OF NEW CASTLE     )

 4          I, Deanna L. Warner, a Certified

 5   Shorthand Reporter, do hereby certify that as

 6   such Certified Shorthand Reporter, I was

 7   present at and reported in Stenotype shorthand

 8   the above and foregoing proceedings in Case

 9   Number 17-151-LPS, CRYSTALLEX INTERNATIONAL

10   CORP. Vs. BOLIVARIAN REPUBLIC OF VENEZUELA,

11   heard on March 30, 2023.

12          I further certify that a transcript of

13   my shorthand notes was typed and that the

14   foregoing transcript, consisting of 125

15   typewritten pages, is a true copy of said

16   MOTION TO DISQUALIFY.

17          SIGNED, OFFICIALLY SEALED, and FILED

18   with the Clerk of the District Court, NEW

19   CASTLE County, Delaware, this 31st day of

20   March, 2023.

21

22                        _____

23                        Deanna L. Warner, CSR, #1687
                          Speedbudget Enterprises, LLC
24

25
```

# #

**#1687** [1] - 125:22

# $

**$900** [1] - 94:25

# 1

**1** [2] - 94:25, 107:16
**10** [3] - 95:2, 115:4, 115:6
**11** [1] - 119:18
**11th** [2] - 32:18, 114:21
**125** [1] - 125:14
**12th** [20] - 7:19, 7:25, 10:6, 10:13, 14:13, 30:16, 32:22, 45:14, 74:6, 81:8, 82:6, 84:10, 103:13, 103:16, 113:24, 114:6, 114:22, 116:14, 118:20, 118:22
**13** [3] - 115:3, 115:4, 115:7
**13-some** [1] - 94:22
**17** [1] - 26:2, 106:24
**17-151-LPS** [2] - 1:5, 125:9
**1:00** [1] - 99:25
**1st** [1] - 113:25

# 2

**2** [6] - 80:22, 81:4, 82:16, 82:23, 83:18, 104:22
**2020** [3] - 53:19, 72:1, 109:9
**2021** [7] - 41:18, 48:4, 54:2, 105:15, 106:9, 106:10, 111:18
**2022** [7] - 30:13, 54:7, 106:2, 106:23, 107:8, 107:18, 111:22
**2023** [4] - 1:13, 111:24, 125:11, 125:20
**22** [1] - 52:18
**22nd** [1] - 29:18
**23** [2] - 37:14, 111:24
**23rd** [4] - 34:9, 34:23, 36:7, 118:8

**28** [2] - 65:6, 111:22
**28th** [6] - 112:6, 112:15, 112:19, 113:17, 114:15, 115:18
**29** [1] - 52:17
**2:30** [1] - 100:1
**2nd** [1] - 52:4

# 3

**3** [4] - 104:22, 105:19, 107:17, 119:20
**30** [3] - 14:17, 30:13, 125:11
**30th** [10] - 1:13, 12:8, 12:19, 15:13, 20:10, 36:16, 36:20, 36:22, 68:6, 91:21, 114:4
**31st** [1] - 125:19
**324** [2] - 94:17, 94:23
**348** [1] - 106:9
**356** [1] - 120:25
**39** [1] - 106:10
**3:30** [2] - 100:6, 100:12
**3rd** [11] - 12:5, 30:17, 31:2, 32:14, 32:16, 44:21, 114:1, 114:11, 114:12, 114:18, 114:19

# 4

**4** [3] - 107:17, 107:18, 119:20
**40** [1] - 106:10
**409** [1] - 106:22
**443** [2] - 52:17, 106:23
**453** [1] - 52:4
**455** [5] - 31:13, 34:12, 51:22, 60:6, 77:18
**455(a** [7] - 49:17, 65:6, 66:24, 67:2, 104:21, 105:4, 119:10
**455(a)** [1] - 66:15
**455(b** [4] - 66:20, 67:1, 104:22, 121:1
**455(b)** [2] - 105:9, 121:6
**455(b)(1** [11] - 47:15, 49:11, 51:3, 51:22, 61:3, 64:23, 66:22, 66:23, 75:22, 116:23, 117:2
**455(b)(1)** [1] - 75:20
**48** [2] - 32:20, 33:4
**480** [1] - 107:21

**481** [1] - 107:16
**4A** [1] - 1:13

# 5

**5** [1] - 105:19
**513** [1] - 105:18
**516** [1] - 120:25
**522** [1] - 119:19
**53** [3] - 119:21, 119:25, 120:19

# 6

**6** [1] - 86:21
**6th** [1] - 124:7

# 7

**72** [1] - 33:4
**77** [1] - 115:7
**7th** [7] - 11:10, 11:15, 11:20, 12:1, 19:11, 71:7, 91:19

# 8

**8** [4] - 48:4, 86:21, 95:2, 106:10
**8th** [1] - 13:15

# 9

**9** [1] - 119:18
**9th** [10] - 31:4, 32:11, 32:16, 32:17, 33:3, 34:23, 49:1, 62:21, 113:18, 114:19

# A

**a-ha** [1] - 49:20
**ability** [2] - 73:25, 120:3
**able** [3] - 33:19, 90:7, 100:2
**Abraham** [1] - 101:19
**ABRAHAM** [1] - 1:17
**Abrams** [1] - 5:4
**ABRAMS** [1] - 2:8
**absent** [1] - 57:7
**absolutely** [2] - 45:9, 109:18, 114:7
**absurd** [1] - 60:6
**abundance** [2] - 10:12, 101:8

**accept** [3] - 34:21, 62:5, 121:11
**access** [2] - 91:22, 92:9
**accord** [1] - 59:5
**accordance** [2] - 92:23, 93:12
**according** [2] - 13:14, 94:21
**account** [1] - 52:6
**accurate** [1] - 15:2
**accusatory** [1] - 35:11
**acknowledge** [1] - 68:8
**acknowledges** [1] - 81:2
**acquiescence** [1] - 118:23
**acquire** [1] - 51:24
**acquired** [2] - 47:17, 76:14
**acquisition** [2] - 61:4, 76:23
**act** [1] - 87:5
**acted** [1] - 31:16
**acting** [3] - 18:3, 18:13, 58:8
**action** [2] - 47:20, 62:11, 101:8
**actions** [4] - 30:9, 32:6, 50:17, 117:18
**activated** [3] - 84:15, 97:17, 99:18
**activating** [1] - 95:17
**activity** [1] - 18:4
**actual** [2] - 106:3, 112:20
**ad** [1] - 84:9
**add** [9] - 14:24, 73:4, 73:9, 75:13, 83:22, 88:25, 102:25, 119:10, 124:15
**added** [4] - 86:6, 89:13, 90:11, 90:19
**adding** [2] - 90:13, 107:11
**addition** [4] - 16:15, 16:18, 120:19, 122:16
**additional** [10] - 80:6, 85:11, 86:5, 86:15, 87:1, 87:2, 90:14, 90:19, 93:6, 93:9
**address** [9] - 4:23, 5:9, 16:3, 18:19, 21:17, 77:9, 78:25, 86:7, 94:1
**addressed** [2] - 38:11, 86:10, 90:6
**adjudicated** [4] -

52:23, 58:4, 59:10, 59:16
**adjudication** [1] - 59:14
**adjust** [1] - 71:8
**administration** [3] - 25:14, 53:18, 53:20
**administrations** [2] - 22:4, 72:23
**admiration** [1] - 47:3
**admit** [2] - 32:11, 39:25
**admitted** [1] - 53:17
**admitting** [1] - 66:12
**adopt** [1] - 106:25
**adopted** [1] - 106:2
**adoption** [1] - 60:22
**advance** [1] - 32:4
**advantage** [1] - 50:20
**advisement** [2] - 78:22, 78:23
**advisors** [5] - 10:14, 13:18, 84:19, 106:20, 122:7
**advisory** [1] - 93:21
**advocacy** [54] - 17:4, 17:5, 17:25, 18:4, 18:8, 18:10, 18:16, 22:5, 22:13, 25:15, 27:7, 28:22, 29:2, 29:3, 29:6, 29:11, 30:1, 30:5, 30:20, 31:10, 31:14, 31:23, 32:13, 35:8, 35:17, 38:14, 40:11, 42:10, 42:14, 42:21, 44:22, 47:5, 55:3, 66:12, 66:13, 70:20, 71:14, 73:21, 76:19, 77:2, 77:24, 78:8, 104:5, 105:21, 105:23, 108:3, 108:17, 108:18, 109:1, 109:20, 111:1, 111:7, 111:13
**advocate** [7] - 16:20, 45:17, 56:7, 66:10, 67:17, 69:25, 114:13
**advocated** [3] - 22:1, 104:7, 104:8
**advocating** [8] - 20:1, 21:5, 24:22, 45:2, 45:4, 47:10, 74:12, 75:1
**affirmatively** [1] - 60:21
**affirmed** [2] - 24:19, 120:13
**affront** [1] - 59:22
**afternoon** [11] - 95:6,

101:12, 101:15, 101:18, 101:24, 102:4, 102:5, 102:10, 102:17, 102:19, 102:21
**agenda** [5] - 6:23, 6:25, 13:23, 106:19, 122:17
**ago** [4] - 26:12, 58:10, 58:18, 59:16
**agree** [11] - 27:13, 42:23, 44:5, 55:11, 55:15, 55:16, 57:18, 62:4, 92:21, 94:12, 99:5
**agreed** [5] - 52:9, 55:20, 60:21, 61:24, 62:10
**agreeing** [3] - 44:3, 62:1, 72:24
**agreement** [3] - 95:18, 98:24, 99:16
**ahead** [2] - 13:9, 80:3
**ALEX** [1] - 1:20
**Alex** [1] - 4:23
**ALEXANDRA** [1] - 2:21
**Ali** [1] - 5:13
**ali** [1] - 102:1
**alignment** [1] - 72:15
**all-day** [1] - 48:3
**alleged** [1] - 111:7
**allow** [8] - 21:4, 27:15, 43:11, 69:12, 70:5, 71:5, 75:4, 96:6
**allowance** [1] - 95:20
**allowed** [2] - 46:3, 63:24
**allowing** [1] - 31:3
**allows** [2] - 94:23, 95:18
**alter** [2] - 90:18, 93:19
**alternative** [2] - 111:20, 112:1
**alternatively** [1] - 122:15
**ambiguous** [1] - 35:12
**amendment** [1] - 104:24
**amoeba** [1] - 76:7
**amoeba-like** [1] - 76:7
**amy** [3] - 6:5, 63:6, 90:1
**Amy** [1] - 102:13
**AMY** [1] - 3:5
**analysis** [3] - 32:23, 59:12, 118:17
**analyze** [1] - 115:10
**AND** [1] - 1:2
**ANDERS** [1] - 2:12

**Anders** [1] - 5:8
**ANDERSON** [1] - 1:16
**anderson** [2] - 4:19, 101:20
**answer** [1] - 55:24
**answered** [2] - 16:9, 103:4
**anticipate** [4] - 92:6, 99:8, 100:9, 100:10
**anyway** [2] - 53:2, 114:16
**apologize** [1] - 26:11
**apparent** [1] - 7:14
**appeal** [1] - 91:10
**appeals** [2] - 57:13, 91:11
**appearance** [2] - 6:12, 26:4
**appearances** [2] - 4:5, 101:10
**APPEARANCES** [1] - 1:15
**Appearances** [2] - 2:1, 3:1
**appearing** [1] - 4:21
**appellate** [1] - 122:13
**applicability** [2] - 51:22, 91:18
**applicable** [9] - 26:20, 26:24, 29:4, 42:25, 43:3, 44:6, 44:8, 92:24, 93:12
**application** [1] - 54:2
**applied** [2] - 19:14, 82:17
**applies** [3] - 18:25, 26:24, 52:7
**apply** [3] - 24:7, 57:5, 118:5
**applying** [1] - 119:21
**appointed** [2] - 37:15, 38:4
**appreciate** [1] - 124:18
**appreciated** [1] - 33:21
**approach** [1] - 44:25
**appropriate** [12] - 23:25, 24:3, 24:9, 56:7, 65:18, 66:2, 70:9, 74:3, 74:20, 93:5, 94:1, 96:4
**approval** [1] - 10:23
**approve** [3] - 19:22, 20:17, 119:22
**approved** [3] - 10:20, 37:20, 96:5
**approving** [1] - 81:5
**April** [17] - 11:10, 11:15, 11:20, 12:1,

12:8, 12:19, 15:13, 19:11, 20:10, 20:25, 36:16, 36:20, 36:22, 71:7, 87:20, 91:19, 124:7
**argue** [1] - 38:22
**argues** [1] - 111:8
**arguing** [5] - 37:6, 37:10, 43:4, 43:5, 43:7
**argument** [24] - 8:3, 8:6, 8:9, 15:4, 15:11, 24:21, 28:11, 37:4, 56:19, 60:15, 78:7, 78:8, 78:12, 95:7, 100:9, 103:1, 109:5, 116:15, 117:2, 117:6, 117:15, 119:7, 123:16
**arguments** [8] - 37:23, 40:3, 66:23, 71:18, 76:7, 78:5, 78:20, 81:16
**Aronstam** [2] - 6:2, 102:11
**ARONSTAM** [1] - 3:2
**arrange** [1] - 10:5
**arrangement** [1] - 96:5
**Arsht** [1] - 5:13
**ARSHT** [1] - 2:20
**articulate** [2] - 111:14, 115:11
**ascertain** [1] - 24:4
**aside** [1] - 23:13
**aspects** [1] - 60:19
**assert** [1] - 50:19
**asserted** [2] - 61:10, 104:21
**asserting** [1] - 67:16
**assertion** [1] - 47:15
**asset** [1] - 90:4
**assets** [3] - 25:6, 89:2, 94:24
**assignments** [1] - 113:4
**assisting** [1] - 120:11
**assume** [3] - 55:11, 70:13, 95:4
**assumed** [1] - 92:4
**assumption** [5] - 7:17, 17:16, 34:22, 70:22, 80:14
**assured** [1] - 59:6
**astounding** [1] - 49:2
**attach** [3] - 88:17, 90:7, 92:16
**attached** [1] - 89:2
**attachment** [11] - 41:6, 58:6, 87:2,

88:7, 88:9, 89:7, 89:14, 94:17, 94:20, 94:25
**attachments** [4] - 41:5, 88:12, 88:19, 94:14
**attempt** [1] - 107:12
**attempting** [1] - 74:24
**attend** [5] - 10:7, 10:11, 49:7, 75:21, 108:2
**attendance** [1] - 49:9
**attended** [1] - 13:17
**attention** [2] - 123:3, 123:9
**ATTORNEY** [2] - 79:16, 84:8
**attorneys** [2] - 51:14, 73:16
**AUBRE** [1] - 2:18
**Aubre** [2] - 5:22, 102:8
**authorities** [2] - 65:5, 120:5
**authority** [9] - 19:1, 19:5, 25:4, 29:1, 55:21, 66:7, 94:18, 108:13, 113:4
**authorization** [2] - 95:15, 99:1
**authorize** [2] - 68:9, 120:3
**authorized** [5] - 38:20, 39:14, 66:14, 98:1, 119:16
**authorizes** [1] - 68:10
**authorizing** [1] - 119:22
**available** [1] - 33:12
**await** [1] - 46:13
**aware** [2] - 10:6, 73:17

## B

**b)** [1] - 67:7
**back-end** [1] - 12:5
**bad** [1] - 47:1
**balls** [1] - 40:3
**ban** [1] - 56:22
**banking** [1] - 97:7
**based** [13] - 30:8, 47:14, 50:25, 56:19, 61:14, 75:19, 76:13, 76:23, 87:24, 103:20, 109:24, 114:8, 119:4
**bases** [3] - 104:16, 116:24, 118:15
**basic** [1] - 64:15
**basing** [1] - 54:8

**basis** [22] - 31:16, 31:17, 31:20, 41:21, 41:25, 48:24, 49:6, 49:9, 61:5, 61:10, 62:8, 65:5, 74:19, 93:19, 103:24, 104:20, 112:1, 112:3, 116:25, 117:7, 120:16, 122:1
**Bayliss** [1] - 5:4
**BAYLISS** [1] - 2:8
**bear** [6] - 61:22, 69:10, 84:16, 86:18, 86:19, 89:12
**bears** [2] - 47:23, 89:10
**became** [2] - 7:14, 7:25
**becomes** [1] - 114:21
**becoming** [1] - 90:22
**beggars** [1] - 62:16
**beginning** [1] - 8:25
**begrudge** [1] - 40:2
**behalf** [22] - 4:13, 5:5, 5:14, 5:20, 6:3, 6:17, 15:15, 25:5, 29:3, 29:6, 37:2, 45:2, 46:23, 49:4, 63:8, 75:1, 90:1, 101:14, 101:20, 102:1, 102:12, 109:10
**behavior** [7] - 31:21, 49:4, 49:22, 62:15, 62:23, 76:3, 78:2
**belatedly** [1] - 106:4
**benefit** [2] - 39:5, 46:20
**benefits** [1] - 10:18
**BENTLEY** [1] - 1:20
**Bentley** [2] - 4:24, 101:22
**best** [9] - 29:19, 85:15, 107:3, 112:13, 113:9, 114:17, 115:2, 116:19, 116:20
**better** [1] - 12:11
**between** [14] - 7:20, 16:23, 16:24, 18:9, 18:16, 29:25, 32:13, 32:16, 32:17, 42:9, 48:21, 65:25, 84:18, 112:22
**beyond** [1] - 77:8
**bias** [1] - 104:1
**bid** [1] - 20:18
**bidder** [2] - 20:17, 21:4
**bidders** [1] - 11:3
**bill** [2] - 81:21, 99:10

**billing** [4] - 9:5, 79:3, 79:12, 80:4
**billion** [3] - 86:21, 94:22, 94:25
**billions** [1] - 41:2
**bills** [5] - 48:17, 61:16, 80:6, 83:8, 83:9
**BIRK** [1] - 2:24
**bit** [3] - 42:11, 102:23, 119:5
**black** [1] - 78:15
**blank** [1] - 76:18
**blindly** [1] - 57:4
**block** [1] - 25:5
**blocking** [2] - 54:17, 58:11
**Bloomberg** [1] - 94:21
**BOLIVARIAN** [2] - 1:6, 125:10
**BOND** [1] - 3:16
**bothered** [1] - 61:18
**bound** [1] - 109:9
**branch** [36] - 17:25, 20:2, 20:15, 21:2, 21:20, 22:2, 22:6, 22:16, 22:22, 24:25, 25:5, 25:8, 25:10, 25:15, 25:16, 26:24, 27:22, 44:15, 45:9, 46:1, 53:12, 58:24, 60:2, 63:16, 63:25, 66:1, 68:22, 68:25, 69:24, 71:2, 71:3, 74:1, 74:14, 110:10, 110:22
**brief** [6] - 13:6, 13:15, 35:5, 73:4, 113:13, 119:18
**briefing** [16] - 7:6, 32:20, 33:10, 35:2, 35:3, 64:16, 80:17, 80:25, 93:13, 94:15, 95:5, 103:11, 115:9, 115:10, 116:13, 116:21
**briefly** [4] - 9:14, 63:4, 73:10, 93:7
**briefs** [2] - 26:2, 42:14
**bringing** [1] - 41:13
**broader** [1] - 67:20
**broadly** [1] - 93:2
**brought** [1] - 58:15
**burden** [3] - 41:24, 103:24, 104:2
**business** [2] - 33:23, 33:24
**bust** [1] - 48:12
**BY** [14] - 1:16, 2:9, 2:11, 2:15, 2:17, 2:21, 2:23, 3:2, 3:5,

3:8, 3:11, 3:14, 3:17, 3:20

**C**

**calculation** [1] - 115:7
**calculus** [1] - 20:3
**cannibalized** [1] - 72:20
**cannot** [4] - 26:4, 47:6, 52:21, 119:12
**canons** [2] - 60:6, 104:22
**cap** [5] - 80:22, 81:4, 82:16, 82:24, 83:19
**capable** [1] - 58:19
**capacity** [1] - 18:3
**careful** [4] - 4:6, 25:20, 53:20, 68:21
**carefully** [1] - 37:3
**Caroon** [1] - 101:20
**carry** [1] - 37:16
**carrying** [1] - 37:17
**Case** [2] - 1:5, 125:8
**case** [20] - 7:25, 9:12, 27:3, 27:4, 43:4, 44:11, 49:2, 49:14, 52:7, 56:10, 57:12, 57:18, 59:2, 70:8, 78:10, 88:18, 105:5, 115:12, 120:8, 123:2
**cases** [6] - 37:15, 77:10, 115:24, 119:21, 120:1, 123:2
**CASSEL** [1] - 3:6
**Cassel** [1] - 6:5
**Cassell** [1] - 102:14
**CASTLE** [2] - 125:3, 125:19
**categorical** [1] - 29:24
**categorically** [3] - 27:21, 56:12, 57:12
**caused** [1] - 59:3
**caution** [2] - 10:12, 101:9
**cease** [1] - 83:10
**center** [1] - 86:4
**centerpiece** [1] - 49:25
**certain** [4] - 27:12, 79:11, 97:2, 109:6
**certainly** [32] - 8:7, 17:15, 31:17, 37:8, 37:10, 38:5, 39:4, 39:23, 44:10, 44:18, 45:22, 46:8, 70:7, 71:4, 71:19, 75:2, 75:8, 82:19, 82:21, 84:11, 85:10, 86:17,

92:14, 93:16, 96:20, 96:25, 97:4, 97:9, 97:16, 97:19, 99:21, 115:20
**Certified** [2] - 125:4, 125:6
**certify** [1] - 125:5, 125:12
**cetera** [1] - 64:10
**challenging** [2] - 120:6, 123:1
**chance** [10] - 6:24, 8:12, 9:8, 12:20, 15:4, 73:4, 96:13, 99:24, 121:19, 124:11
**change** [41] - 16:21, 17:14, 18:1, 20:2, 22:2, 22:5, 22:16, 22:22, 23:1, 23:9, 23:12, 25:11, 25:16, 29:3, 30:1, 30:5, 30:20, 37:6, 37:8, 37:10, 39:1, 43:5, 43:6, 43:7, 44:24, 53:13, 54:21, 55:3, 55:9, 55:10, 55:13, 63:19, 63:22, 68:25, 70:21, 71:6, 74:13, 104:7, 110:4, 110:16, 112:19
**changed** [1] - 110:9
**chapter** [1] - 39:13
**charged** [1] - 63:12
**chase** [1] - 101:22
**CHASE** [1] - 1:20
**Chase** [1] - 4:23
**check** [1] - 123:7
**chief** [1] - 43:24
**CHILDS** [2] - 2:9, 5:3
**Childs** [1] - 5:4
**chill** [1] - 30:22
**chilled** [1] - 17:5
**Circuit** [1] - 59:17
**circuit** [12] - 18:14, 20:21, 31:19, 36:3, 59:21, 59:24, 72:13, 81:19, 91:10, 105:2, 105:6, 115:24
**circumspect** [7] - 35:6, 35:10, 50:8, 50:12, 50:14, 64:24, 64:25
**circumspection** [1] - 76:2
**circumstances** [8] - 25:2, 33:13, 57:4, 79:11, 88:16, 109:24, 115:15, 120:7

**citation** [5] - 34:11, 66:25, 67:7, 75:22, 75:24
**citations** [1] - 77:18
**cite** [8] - 61:19, 61:20, 62:20, 65:5, 65:6, 70:2, 70:7, 70:8
**cited** [4] - 49:16, 67:8, 67:9, 120:2
**Citgo** [6] - 2:25, 5:14, 36:18, 72:20, 94:22, 102:2
**Citgo/PDVH** [1] - 3:21
**citing** [2] - 76:21, 76:22
**city** [1] - 54:10
**civil** [2] - 58:16, 119:20
**claim** [3] - 57:16, 88:5, 89:3
**claiming** [1] - 66:13
**claims** [1] - 90:23
**clarification** [1] - 21:25
**clarify** [5] - 36:12, 73:18, 75:16, 96:8, 99:20
**clarity** [14] - 10:24, 37:22, 37:25, 39:3, 39:8, 40:16, 40:20, 42:9, 45:25, 48:10, 86:24, 90:12, 107:13, 108:11
**clause** [1] - 104:23
**cleaning** [1] - 51:10
**clear** [26] - 11:4, 31:12, 34:11, 34:13, 34:19, 34:20, 34:22, 35:19, 39:18, 48:1, 48:3, 49:21, 52:8, 67:15, 67:18, 71:22, 72:3, 73:20, 74:6, 74:7, 77:18, 83:2, 98:19, 110:7
**clearly** [4] - 18:7, 41:23, 62:15, 78:9
**clerk** [1] - 32:19
**Clerk** [1] - 125:18
**clerks** [1] - 13:20
**client** [4] - 83:7, 89:10, 90:4
**client's** [1] - 47:6
**clock** [2] - 114:17, 115:18
**close** [3] - 19:24, 29:22, 86:16
**closer** [1] - 39:19
**co** [3] - 5:6, 6:4, 6:18
**co-counsel** [3] - 5:6, 6:4, 6:18

**Cobb** [1] - 6:16
**COBB** [1] - 3:11
**code** [2] - 44:4, 104:22
**cognizant** [1] - 15:25
**collectively** [1] - 63:15
**colloquy** [2] - 48:5, 48:6
**COLT** [1] - 2:17
**comfortable** [1] - 17:2
**coming** [1] - 49:20
**comment** [1] - 95:8
**common** [2] - 60:24, 105:3
**communicate** [3] - 14:22, 39:15, 106:14
**communication** [6] - 7:18, 14:11, 68:10, 68:24, 105:17
**communications** [5] - 38:21, 38:23, 107:24, 119:23, 120:4
**company** [2] - 95:1, 95:3
**compel** [1] - 52:21, 117:8
**compensation** [2] - 95:24, 96:6
**complaining** [2] - 47:11, 66:17
**complaint** [1] - 77:1
**completed** [1] - 110:13
**completely** [4] - 38:3, 67:13, 69:3, 86:10
**complexion** [1] - 17:15
**complying** [1] - 97:10
**component** [1] - 52:3
**compound** [1] - 66:11
**comprehension** [1] - 62:17
**compressed** [1] - 35:4
**conception** [1] - 60:6
**concern** [5] - 17:23, 25:18, 35:15, 65:9, 89:18
**concerned** [3] - 28:1, 93:20, 121:16
**concerning** [3] - 51:2, 121:4, 121:15
**concerns** [3] - 42:17, 42:23, 106:4
**conclude** [4] - 61:14, 71:11, 118:22, 119:14
**concluded** [1] - 116:1
**conclusion** [3] - 29:10, 62:22, 117:4
**conditional** [4] - 41:5,

88:9, 90:16, 94:13
**conduct** [14] - 7:4, 34:4, 35:24, 36:5, 37:7, 38:2, 38:17, 61:1, 61:14, 61:21, 66:16, 104:23, 108:7
**conducted** [1] - 46:3
**confer** [3] - 99:7, 99:13, 124:6
**conference** [2] - 85:23, 100:1
**conferred** [1] - 25:4
**confident** [1] - 117:17
**confidential** [2] - 46:9, 122:11
**confidentially** [1] - 46:4
**confirm** [3] - 37:8, 72:5, 98:12
**confirmed** [2] - 107:19, 114:11
**confronting** [1] - 120:7
**confuse** [1] - 76:25
**Congress** [4] - 21:20, 25:4, 26:23, 70:18
**Conoco** [1] - 83:13
**ConocoPhillips** [11] - 3:10, 6:3, 8:13, 63:2, 63:8, 90:2, 90:7, 90:15, 91:1, 102:12, 119:19
**ConocoPhillips'** [1] - 90:6
**consciously** [1] - 62:10
**consent** [2] - 32:3, 36:1
**consented** [2] - 35:25, 68:13
**consequence** [1] - 50:17
**consider** [9] - 12:9, 18:4, 18:7, 57:22, 62:22, 74:1, 90:13, 122:14, 122:15
**consideration** [4] - 55:23, 55:24, 77:6, 77:7
**considerations** [4] - 19:2, 20:5, 21:22, 57:8
**considered** [1] - 41:6
**considering** [1] - 19:8
**consistent** [15] - 18:5, 18:22, 21:6, 25:12, 26:20, 28:2, 37:23, 38:3, 41:21, 69:2, 74:4, 74:20, 75:5, 82:15, 84:13

**consisting** [1] - 125:14
**constitutes** [1] - 119:2
**consultation** [1] - 92:18
**consummated** [2] - 71:6, 108:16
**consummating** [1] - 20:23
**consummation** [1] - 27:16
**contact** [4] - 65:2, 112:14, 113:9, 114:20
**contacting** [4] - 113:8, 113:18, 114:3, 115:5
**contacts** [1] - 76:9
**contemplated** [3] - 28:25, 105:24, 107:8
**contemplates** [1] - 97:2
**contend** [1] - 111:1
**content** [2] - 81:17, 82:7
**contention** [1] - 34:16
**contest** [1] - 27:15
**context** [6] - 60:22, 108:5, 109:4, 110:6, 110:19, 115:23
**contexts** [1] - 57:10
**continuance** [1] - 58:9
**continuation** [1] - 22:23
**continue** [7] - 14:15, 72:3, 80:14, 81:18, 85:19, 92:19, 99:7
**continued** [3] - 2:1, 3:1, 80:23
**continuing** [1] - 81:3
**contrary** [1] - 110:24
**convenience** [1] - 47:12
**conversation** [6] - 13:6, 13:16, 35:13, 48:15, 59:1, 65:24
**conveyed** [1] - 108:6
**convince** [1] - 63:19
**cooperation** [2] - 65:17, 66:1
**coordinated** [2] - 112:10, 113:12
**coordination** [1] - 33:24
**copy** [1] - 125:15
**core** [3] - 16:8, 17:23, 65:13
**CORP** [2] - 1:3, 125:10
**correct** [11] - 11:16, 13:12, 34:6, 57:2, 58:1, 70:22, 75:17,

93:10, 98:10, 98:16
**correction** [1] - 73:13
**correctly** [2] - 67:5, 97:25
**correspondence** [1] - 96:18
**CORROON** [1] - 1:16
**Counsel** [8] - 2:7, 2:13, 2:19, 2:25, 3:9, 3:15, 3:18, 3:21
**counsel** [19] - 1:21, 5:6, 5:15, 6:4, 6:18, 10:2, 16:10, 16:15, 16:19, 16:24, 17:7, 40:11, 47:4, 56:11, 69:8, 73:14, 75:24, 105:16, 108:5
**counsel's** [1] - 37:4
**countries** [2] - 58:21, 58:22
**COUNTY** [1] - 125:3
**County** [1] - 125:19
**couple** [7] - 28:9, 35:1, 39:18, 50:2, 69:25, 75:14, 76:4
**course** [30] - 12:24, 13:5, 20:8, 24:7, 27:2, 42:17, 50:10, 60:25, 62:11, 67:23, 68:1, 69:8, 70:15, 72:9, 72:21, 74:9, 82:15, 83:19, 85:24, 91:7, 91:9, 97:18, 110:22, 113:3, 113:21, 116:12, 117:18, 118:7, 118:21, 124:15
**COURT** [104] - 1:1, 4:1, 4:16, 4:25, 5:10, 5:18, 5:24, 6:11, 6:20, 8:20, 8:24, 11:14, 12:18, 12:24, 13:5, 13:10, 13:14, 15:3, 15:9, 15:17, 18:7, 20:9, 22:10, 22:15, 23:4, 23:16, 24:13, 25:24, 26:8, 26:13, 27:2, 28:4, 28:14, 32:9, 34:8, 36:9, 36:13, 36:19, 42:5, 42:8, 43:21, 44:20, 45:10, 46:14, 46:16, 50:6, 55:6, 55:18, 60:11, 63:2, 63:5, 64:3, 64:12, 66:20, 66:25, 67:4, 71:19, 73:3, 73:8, 75:12, 77:11, 77:15, 78:16, 79:13, 79:17, 79:22, 80:10, 81:12,

82:9, 83:1, 83:12, 83:21, 83:25, 85:21, 87:8, 87:12, 89:22, 91:4, 92:2, 92:8, 94:3, 95:11, 96:10, 97:24, 98:5, 98:8, 98:11, 98:18, 99:6, 99:22, 100:18, 100:21, 100:23, 101:1, 101:4, 101:7, 101:17, 101:23, 102:4, 102:16, 123:22, 123:25, 124:2, 124:4
**court** [14] - 4:2, 4:3, 4:8, 46:21, 50:2, 51:4, 71:16, 74:21, 77:4, 77:9, 91:11, 113:8, 122:10, 122:13
**Court** [99] - 4:18, 4:23, 5:9, 9:23, 9:25, 10:1, 10:6, 10:20, 11:4, 12:12, 12:17, 15:20, 15:25, 18:10, 18:20, 19:7, 21:10, 23:21, 24:1, 25:3, 27:5, 27:10, 29:13, 31:5, 32:24, 33:2, 33:20, 33:25, 37:9, 37:16, 37:18, 37:19, 38:7, 38:13, 40:6, 40:8, 40:23, 41:7, 41:14, 41:22, 43:20, 43:25, 44:1, 44:2, 44:10, 44:11, 44:12, 44:16, 44:19, 48:2, 48:5, 48:18, 48:20, 49:20, 50:16, 51:15, 52:22, 54:16, 56:1, 56:7, 56:12, 57:14, 57:20, 58:5, 59:4, 59:7, 59:11, 62:7, 62:21, 66:13, 75:19, 75:21, 77:3, 84:24, 85:17, 87:16, 90:13, 90:21, 92:25, 94:18, 94:23, 96:5, 104:4, 108:10, 109:12, 113:9, 113:18, 114:3, 114:20, 115:5, 117:6, 117:8, 119:15, 119:24, 120:12, 120:19, 120:24, 125:18
**Court's** [21] - 16:4, 20:4, 33:21, 37:11, 38:10, 38:16, 38:24, 39:9, 40:5, 40:12, 42:1, 43:13, 45:6, 66:2, 74:15, 75:4,

82:16, 87:7, 96:23, 110:13, 120:3
**court's** [1] - 65:17
**courtroom** [2] - 102:7, 102:13
**Courtroom** [1] - 1:13
**courts** [4] - 56:16, 57:10, 58:25, 60:3
**Courts** [5] - 24:17, 56:18, 56:25, 62:2, 70:11
**cousin** [1] - 58:14
**cover** [1] - 84:4
**covered** [4] - 60:8, 61:11, 84:3, 84:9
**Covney** [1] - 48:6
**create** [3] - 26:4, 42:15, 42:22
**credit** [1] - 32:19
**credited** [1] - 33:5
**creditor** [6] - 6:17, 89:6, 90:8, 90:9, 90:17
**creditors** [7] - 39:6, 85:24, 88:20, 89:23, 90:20, 91:3, 93:18
**CREE** [2] - 3:11, 6:15
**Cree** [1] - 6:16
**critical** [1] - 45:9
**crosses** [1] - 22:17
**crossing** [1] - 23:12
**CRUTCHER** [1] - 2:5
**crutcher** [1] - 46:22
**CRYSTALLEX** [2] - 1:3, 125:9
**Crystallex** [21] - 2:7, 4:13, 8:12, 19:14, 19:24, 20:7, 24:7, 26:1, 26:21, 46:17, 46:23, 59:22, 71:5, 90:5, 100:5, 101:8, 101:14, 104:8, 109:5, 109:23, 111:8
**Crystallex's** [2] - 44:3, 105:18
**CSR** [1] - 125:22
**Cumings** [1] - 102:1
**CUMINGS** [3] - 2:21, 5:12, 101:25
**Cummings** [1] - 5:13
**current** [4] - 55:4, 76:1, 108:15, 110:8
**Curtis** [1] - 5:23
**CURTIS** [1] - 2:17
**curtis** [1] - 102:8

---

**D**

---

**damage** [1] - 72:18

**DANIEL** [1] - 2:24
**data** [1] - 53:16
**date** [11] - 10:16, 12:3, 12:5, 40:24, 40:25, 85:3, 85:4, 86:16, 87:6, 113:22
**dawning** [1] - 76:4
**days** [12] - 31:7, 33:12, 33:23, 33:24, 41:14, 113:10, 114:2, 115:4, 115:5, 115:7, 115:13
**de** [1] - 54:25
**deactivate** [2] - 97:19, 98:14
**dead** [1] - 87:6
**deadline** [2] - 12:19, 15:13
**deal** [4] - 71:6, 90:24, 91:2, 96:22
**dealing** [2] - 24:16, 45:24
**dealt** [1] - 89:17
**Dean** [2] - 5:22, 102:8
**DEAN** [1] - 2:18
**Deanna** [2] - 125:4, 125:22
**debtor** [2] - 88:17, 88:20
**December** [11] - 30:13, 68:5, 111:22, 112:4, 112:6, 112:15, 112:19, 113:17, 114:4, 114:15, 115:18
**decide** [8] - 20:25, 21:21, 40:22, 44:17, 72:6, 98:13, 110:11, 111:9
**decided** [6] - 10:11, 20:22, 27:3, 27:10, 40:6, 93:12
**decision** [11] - 32:21, 40:21, 51:7, 51:20, 51:21, 53:6, 53:7, 115:10, 115:11, 120:24, 121:17
**decision-making** [4] - 51:7, 51:21, 53:6, 53:7
**deeply** [1] - 71:13
**Defendant** [1] - 1:8
**defer** [1] - 57:4
**definitely** [1] - 32:7
**definitive** [1] - 68:5
**degree** [1] - 35:15
**Delaware** [3] - 44:2, 44:4, 125:19
**DELAWARE** [2] - 1:2, 125:2

**delay** [10] - 41:13, 52:11, 54:19, 56:25, 71:1, 115:23, 116:2, 117:12, 117:20
**delayed** [2] - 117:12, 118:3
**delaying** [1] - 116:10
**demonstrated** [1] - 78:9
**demonstrates** [1] - 69:21
**denial** [6] - 54:1, 103:19, 104:13, 109:22, 110:1, 110:2
**denied** [10] - 19:15, 42:4, 72:3, 80:21, 91:8, 92:13, 92:16, 103:9, 103:14, 112:2
**deny** [2] - 104:20, 121:18
**denying** [8] - 34:14, 91:12, 103:22, 103:24, 104:11, 104:16, 118:12, 118:13
**Department** [1] - 19:8
**described** [3] - 16:15, 16:19, 68:12
**designate** [1] - 86:15
**designed** [2] - 10:19, 116:9
**despite** [1] - 35:12
**determination** [1] - 20:11
**development** [1] - 68:16
**devising** [1] - 63:12
**DI** [9] - 52:4, 52:17, 105:18, 106:9, 106:22, 106:23, 107:16, 107:21, 119:19
**dialogue** [3] - 46:3, 46:7, 85:13
**DICKINSON** [1] - 3:16
**dictators** [1] - 58:21
**dictatorship** [1] - 55:1
**difference** [4] - 25:18, 29:25, 68:7, 94:21
**different** [17] - 13:12, 19:11, 23:21, 27:22, 31:8, 34:3, 45:17, 54:7, 56:14, 74:23, 90:15, 98:20, 98:24, 99:9, 105:22, 108:21, 118:20
**differently** [2] - 27:24, 56:5
**dilatory** [1] - 31:17
**directed** [4] - 40:14,

107:2, 116:14, 118:5
**directing** [1] - 114:25
**direction** [3] - 37:16, 109:3, 120:18
**directions** [1] - 41:21
**directly** [1] - 90:17
**disagree** [5] - 27:5, 33:16, 42:25, 57:24, 91:9
**disagreed** [1] - 17:10
**disagreement** [1] - 54:15
**disclosed** [2] - 44:22, 48:20
**disclosing** [1] - 46:9
**discourage** [1] - 65:24
**discussed** [6] - 11:11, 64:22, 66:22, 68:12, 106:13, 122:19
**discussing** [1] - 64:9
**discussion** [10] - 7:20, 14:14, 28:19, 30:23, 32:4, 69:20, 70:25, 86:2, 91:24, 95:4
**discussions** [2] - 65:13, 67:21
**dispute** [9] - 7:8, 39:16, 77:19, 111:3, 111:4, 111:9, 115:9, 121:7, 121:14
**disputed** [20] - 38:6, 40:7, 42:2, 47:17, 47:20, 51:1, 51:11, 51:17, 51:24, 52:14, 59:14, 59:15, 61:4, 61:11, 75:9, 76:15, 76:23, 104:25, 116:19, 121:3
**disqualification** [29] - 7:17, 14:6, 14:9, 15:22, 15:24, 37:4, 40:8, 48:24, 49:10, 49:25, 60:15, 60:18, 61:6, 66:9, 66:18, 67:14, 78:18, 81:10, 103:20, 104:1, 105:4, 105:8, 106:16, 106:18, 112:25, 116:24, 118:16, 119:3, 121:6
**disqualified** [3] - 64:2, 116:16, 117:16
**disqualify** [20] - 7:3, 9:4, 34:10, 34:17, 36:24, 38:7, 100:2, 102:20, 103:7, 104:19, 106:19, 111:15, 113:16, 115:14, 116:6, 117:8, 117:11,

118:7, 118:14, 121:18
**DISQUALIFY** [3] - 1:9, 1:11, 125:16
**disqualifying** [7] - 34:5, 34:7, 36:5, 37:7, 38:2, 41:25, 113:6
**disrespect** [1] - 63:10
**distinction** [1] - 22:12
**distinguish** [2] - 32:13, 73:20
**distributed** [1] - 10:15
**district** [1] - 57:13
**District** [1] - 125:18
**DISTRICT** [2] - 1:1, 1:2
**docket** [1] - 92:6
**document** [2] - 54:3, 68:4
**DOJ** [12] - 10:2, 10:9, 10:15, 10:21, 16:3, 22:1, 22:21, 22:22, 23:22, 24:1, 59:1, 73:15
**DOJ's** [1] - 21:10
**dollar** [1] - 86:21
**dollars** [2] - 41:2, 94:23
**Don** [1] - 15:20
**Donald** [1] - 5:7
**DONALD** [1] - 2:11
**done** [16] - 19:4, 21:25, 26:13, 42:18, 42:19, 45:18, 63:21, 72:18, 74:22, 74:23, 81:18, 85:6, 102:22, 106:15, 110:18, 119:1
**door** [1] - 93:18
**doubt** [2] - 95:25, 117:20
**doubts** [1] - 122:4
**down** [3] - 58:16, 117:23, 122:11
**draft** [2] - 48:1, 61:15
**draw** [2] - 40:11, 42:9
**drill** [1] - 48:25
**drop** [1] - 87:6
**drop-dead** [1] - 87:6
**due** [3] - 24:13, 49:18, 104:23
**DUNN** [1] - 2:5
**Dunn** [3] - 4:15, 46:22, 101:16
**during** [2] - 75:9, 107:1
**dutifully** [1] - 37:15
**duty** [1] - 18:12

**E**

**e-mail** [1] - 14:20
**early** [3] - 54:7, 61:17, 112:4
**earth** [1] - 32:20
**effect** [5] - 14:1, 20:12, 55:14, 72:25, 88:19
**effective** [1] - 120:22
**effectively** [2] - 23:23, 117:17
**effectuating** [1] - 24:18
**effort** [2] - 33:21, 70:17
**efforts** [4] - 29:19, 107:3, 117:2, 120:12
**ego** [2] - 90:18, 93:19
**eight** [1] - 33:12
**eimer** [1] - 100:24
**Eimer** [12] - 5:16, 15:23, 36:15, 79:19, 80:11, 82:13, 94:7, 94:8, 102:3, 124:2
**EIMER** [12] - 2:23, 2:23, 36:17, 79:19, 80:20, 82:1, 83:23, 94:8, 95:14, 98:23, 100:25, 124:3
**Eimer's** [1] - 96:17
**either** [5] - 23:1, 44:16, 46:5, 122:15, 123:5
**element** [1] - 116:8
**elements** [1] - 10:21
**ELLIS** [3] - 3:14, 91:5, 92:17
**Ellis** [2] - 6:18, 91:5
**Elmer** [1] - 83:21
**embracement** [1] - 60:25
**emergency** [4] - 49:6, 113:7, 113:20, 123:8
**emphasize** [1] - 48:9
**emphasized** [1] - 109:5
**end** [5] - 11:15, 12:5, 12:7, 34:15, 108:13
**ended** [1] - 14:19
**ENERIO** [1] - 2:14
**Enerio** [2] - 5:20, 102:6
**enforce** [7] - 18:11, 38:16, 40:12, 44:13, 74:21, 120:12, 120:20
**enforceable** [1] - 93:25

enforced [3] - 45:6, 70:5, 110:14
enforcement [14] - 19:2, 20:3, 21:23, 22:4, 24:22, 25:13, 25:16, 38:24, 43:14, 57:21, 58:3, 60:7, 63:1, 69:17
enforcing [2] - 26:19, 39:9
engage [13] - 17:4, 17:24, 29:6, 30:5, 30:19, 31:14, 31:21, 32:5, 35:16, 63:16, 66:14, 67:25, 68:3
engaged [6] - 35:25, 77:22, 104:5, 105:16, 110:25, 111:6
engagement [3] - 96:23, 97:11, 118:24
engaging [5] - 18:3, 30:1, 31:23, 66:12, 107:9
enhanced [1] - 40:15
enjoyable [1] - 124:17
ensuing [1] - 48:16
enter [2] - 6:12, 23:22
entered [4] - 33:10, 43:13, 107:7, 120:13
Enterprises [1] - 125:23
entire [1] - 51:25
entirely [2] - 109:14, 110:7
entities [1] - 47:10
entitled [2] - 36:6, 96:7
entrusted [2] - 25:14, 25:17
equally [1] - 118:6
equation [1] - 26:22
especially [4] - 24:19, 41:15, 43:12, 54:10
ESQ [27] - 1:16, 1:17, 1:19, 1:20, 1:20, 2:3, 2:5, 2:6, 2:6, 2:9, 2:11, 2:12, 2:15, 2:17, 2:18, 2:21, 2:23, 2:24, 3:5, 3:5, 3:6, 3:8, 3:11, 3:14, 3:14, 3:17, 3:20
essence [1] - 71:9
essentially [3] - 30:12, 103:21, 112:5
established [1] - 54:21
establishing [1] - 66:7
estrada [1] - 93:7
ESTRADA [12] - 2:5,

46:19, 46:21, 50:10, 55:16, 55:19, 60:19, 75:14, 83:4, 87:17, 100:19, 123:23
Estrada [16] - 4:14, 46:20, 64:9, 64:10, 64:23, 69:23, 70:11, 75:12, 83:3, 87:13, 94:11, 96:1, 100:18, 101:15, 116:11, 123:22
Estrada's [3] - 83:14, 90:4, 94:13
et [1] - 64:10
ethics [1] - 66:8
event [1] - 43:18
eventually [1] - 110:14
Evercore [9] - 84:15, 95:24, 96:19, 96:20, 96:21, 97:13, 97:19, 99:8, 99:17
evercore [1] - 95:18
Evercore's [1] - 85:5
evercore's [1] - 97:11
every-two-month [1] - 122:1
evidence [9] - 49:21, 53:15, 55:8, 104:4, 104:6, 110:25, 111:10, 118:19, 119:9
evidentiary [14] - 7:5, 42:3, 47:18, 47:20, 51:2, 51:12, 51:18, 52:15, 61:5, 75:9, 76:15, 76:24, 121:3, 121:14
evidently [1] - 114:12
ex [46] - 7:18, 14:11, 16:1, 17:21, 23:14, 28:12, 28:20, 32:13, 33:18, 35:21, 38:20, 38:23, 39:15, 41:21, 47:16, 47:25, 65:4, 67:22, 67:24, 68:3, 68:9, 68:11, 68:23, 69:7, 69:19, 76:9, 76:14, 76:24, 77:22, 105:17, 105:19, 105:22, 106:8, 106:14, 107:5, 108:22, 112:17, 112:22, 114:10, 118:19, 118:24, 119:16, 119:22, 120:3, 121:24, 124:13
exactly [1] - 25:21
example [6] - 56:15, 56:20, 56:21, 70:3,

70:7, 106:7
exceeding [3] - 80:22, 81:3, 82:24
exceeding-the-cap [1] - 82:24
exchange [1] - 16:23
excluded [1] - 65:22
execute [1] - 18:12
executed [2] - 27:1, 56:2
executing [3] - 18:21, 57:2, 59:18
execution [4] - 56:3, 60:22, 88:4, 89:19
executive [49] - 17:25, 19:1, 19:4, 20:2, 20:15, 21:2, 21:20, 22:1, 22:5, 22:16, 22:21, 24:25, 25:5, 25:8, 25:10, 25:15, 26:23, 27:22, 27:24, 44:15, 45:8, 46:1, 53:12, 54:18, 56:14, 56:15, 56:18, 57:8, 57:16, 58:23, 59:4, 59:8, 60:1, 63:16, 63:25, 65:25, 68:22, 68:25, 70:14, 70:18, 70:19, 70:20, 71:2, 71:3, 74:1, 74:13, 110:9, 110:10, 110:22
exercise [10] - 19:5, 19:14, 27:10, 27:19, 27:23, 27:25, 70:10, 70:15, 70:18, 108:12
exercised [2] - 25:4, 27:17
Exhibit [1] - 107:16
expect [6] - 11:9, 12:2, 33:2, 39:23, 86:7, 96:2
expectation [2] - 6:7, 97:16
expected [3] - 11:25, 14:2, 14:3
expecting [1] - 98:8
expeditious [1] - 41:8
expenditures [2] - 9:9, 80:12
expenses [1] - 98:2
expensive [4] - 62:17, 64:12, 64:13, 96:1
expensively [1] - 33:7
experience [2] - 99:14, 117:19
explain [3] - 33:22, 102:23, 103:8
explained [3] - 108:6, 115:25, 120:1

explicit [1] - 116:22
expound [1] - 103:23
express [3] - 52:24, 109:2, 119:24
expressed [5] - 19:7, 22:22, 54:15, 57:8, 58:10
expressing [2] - 29:20, 59:25
expressly [4] - 107:8, 109:9, 109:25, 114:11
extend [1] - 12:18
extensive [2] - 7:5, 103:11
extent [12] - 11:24, 32:12, 34:18, 38:13, 52:2, 59:15, 60:12, 76:12, 80:6, 92:2, 92:11, 105:21
extra [3] - 66:23, 77:23, 78:12
extra-record [3] - 66:23, 77:23, 78:12
extraordinary [1] - 33:13
extreme [1] - 115:16
extremely [2] - 47:4, 103:1

**F**

face [1] - 50:5
fact [32] - 12:1, 16:22, 20:16, 24:14, 28:13, 28:21, 35:15, 38:6, 42:3, 47:20, 48:18, 49:5, 49:19, 49:23, 51:2, 51:18, 52:15, 52:17, 54:5, 54:9, 59:9, 59:14, 61:8, 61:11, 61:17, 61:24, 66:24, 72:22, 75:9, 76:13, 88:10, 121:15
facto [1] - 54:25
factor [1] - 32:23
facts [24] - 25:21, 28:23, 29:7, 43:13, 43:16, 43:19, 44:9, 44:19, 47:18, 49:2, 51:12, 51:24, 59:5, 61:5, 64:15, 68:19, 76:15, 76:24, 78:12, 112:3, 119:13, 120:7, 121:3
factual [5] - 7:8, 40:7, 52:3, 116:18, 121:14
failed [2] - 41:24, 62:19

fails [2] - 61:12, 119:6
failure [1] - 104:11
fair [5] - 21:3, 32:12, 41:8, 74:24, 74:25
faith [1] - 113:14
fall [2] - 57:15, 81:9
fallacious [1] - 55:2
fallacy [1] - 52:1
false [2] - 51:25, 53:14
FAQs [1] - 73:24
far [2] - 21:8, 28:12, 54:6, 72:24, 74:13, 92:23
FARR [1] - 3:19
fashion [1] - 80:3
favor [1] - 50:18
February [1] - 14:3
federal [4] - 58:25, 63:19, 70:4, 119:20
fee [5] - 79:9, 96:4, 97:18, 98:24, 99:15
feedback [4] - 10:3, 11:18, 12:2, 12:15
fees [8] - 81:11, 82:5, 82:8, 96:19, 97:14, 97:15, 98:15, 99:2
felt [2] - 59:5, 85:5
few [5] - 26:12, 31:7, 42:6, 91:15, 99:4
fifth [1] - 104:24
fight [1] - 88:23
fighting [1] - 89:20
figure [1] - 112:11
file [2] - 71:20, 75:18
FILED [1] - 125:17
filed [8] - 35:4, 61:17, 67:15, 69:14, 71:17, 92:5, 118:7, 119:19
filing [6] - 59:7, 76:5, 83:11, 105:1, 105:12, 111:23
filings [1] - 120:1
finally [1] - 93:15
findings [1] - 52:16
fine [12] - 20:6, 20:7, 69:24, 79:11, 82:1, 82:6, 82:14, 82:24, 83:1, 83:24, 95:23, 100:7
finger [1] - 101:14
FINGER [1] - 2:2
Finger [1] - 4:12
fire [1] - 48:25
firm [3] - 4:15, 5:23, 102:9
firmly [1] - 47:13
first [22] - 30:14, 30:17, 30:23, 50:21, 50:25, 64:8, 64:22, 70:2, 77:21, 79:3,

79:25, 89:11, 90:16, 90:24, 91:1, 91:16, 103:23, 104:18, 111:16, 114:12, 116:5, 116:21
**First** [1] - 103:10
**five** [2] - 33:7, 65:9
**flagging** [1] - 96:10
**fleet** [1] - 62:17
**flip** [1] - 47:2
**fly** [1] - 48:19
**fly-specked** [1] - 48:19
**focus** [1] - 15:21
**folks** [1] - 100:7
**follow** [1] - 14:2
**follow-up** [1] - 14:2
**following** [3] - 53:21, 101:6, 120:18
**footnote** [2] - 38:12, 52:18
**FOR** [1] - 1:2
**forbid** [1] - 59:25
**foregoing** [2] - 125:8, 125:14
**foreign** [33] - 19:1, 19:10, 19:19, 20:2, 20:4, 21:14, 21:21, 22:16, 22:24, 24:24, 25:6, 37:11, 43:5, 53:13, 54:21, 55:10, 55:13, 55:23, 56:13, 56:20, 56:24, 57:16, 57:22, 58:9, 58:18, 58:22, 63:20, 63:23, 70:12, 72:15, 77:8, 104:7
**foresworn** [2] - 29:11, 31:1
**forfeiture** [2] - 50:11, 50:13
**form** [2] - 23:9, 61:15
**formed** [1] - 49:25
**former** [1] - 43:24
**forth** [1] - 47:12
**forward** [42] - 10:18, 12:11, 12:16, 14:18, 16:22, 20:12, 20:16, 20:22, 21:1, 27:16, 39:22, 40:1, 41:1, 41:8, 43:12, 45:7, 52:10, 52:20, 53:2, 53:23, 69:13, 71:4, 71:25, 74:18, 80:5, 81:5, 81:22, 82:2, 84:17, 84:22, 85:3, 85:9, 86:24, 87:19, 88:5, 92:23, 93:13, 97:21, 98:13, 98:14, 122:21, 122:22

**four** [3] - 33:23, 33:24, 64:7
**frame** [1] - 33:11, 63:21, 111:25
**framed** [1] - 38:14
**framing** [1] - 63:17
**frank** [2] - 46:6, 65:24
**frankly** [7] - 11:4, 12:14, 38:14, 38:21, 60:5, 84:18, 85:13
**free** [3] - 91:14, 92:13, 96:14
**friend** [3] - 64:11, 69:23, 78:6
**friends** [2] - 16:5, 78:3
**front** [4] - 48:2, 85:16, 86:4, 111:23
**frustration** [1] - 70:25
**full** [3] - 32:18, 46:6, 65:24
**fully** [3] - 26:3, 52:23, 113:12
**function** [1] - 22:7
**fundamental** [1] - 50:24
**fundamentally** [3] - 50:23, 58:2, 79:8
**future** [2] - 19:17, 54:12

## G

**gain** [1] - 107:12
**gained** [1] - 75:8
**GALLAGHER** [1] - 3:19
**game** [1] - 62:6
**gap** [2] - 95:15, 96:22
**GARRET** [1] - 3:2
**Garrett** [2] - 6:2, 102:11
**gather** [1] - 100:4
**gathered** [1] - 79:23
**gathering** [4] - 28:13, 28:21, 66:24, 77:22
**GATTUSO** [1] - 2:14
**gears** [1] - 62:17
**general** [4] - 49:17, 88:20, 89:6, 90:9
**generally** [4] - 11:1, 12:23, 36:4, 92:21
**generous** [1] - 116:20
**genuinely** [1] - 71:13
**GIBSON** [1] - 2:5
**Gibson** [3] - 4:15, 46:22, 101:15
**gifted** [1] - 47:5
**Ginger** [1] - 5:7
**GINGER** [1] - 2:12

**given** [18] - 17:17, 21:20, 25:7, 25:19, 31:15, 33:24, 36:1, 41:16, 42:2, 63:14, 71:3, 71:5, 93:17, 96:4, 98:5, 112:16, 117:1, 118:21
**glared** [1] - 58:16
**goal** [1] - 116:9
**god** [1] - 59:25
**godfather** [1] - 58:15
**Gold** [1] - 3:18
**Gotshal** [6] - 4:22, 9:21, 37:1, 73:11, 79:7, 101:22
**GOTSHAL** [1] - 1:19
**governed** [1] - 24:9
**governing** [1] - 20:21
**government** [32] - 10:4, 10:10, 10:23, 11:6, 11:19, 12:3, 38:19, 39:2, 41:17, 41:20, 42:15, 42:22, 43:7, 43:9, 54:23, 54:24, 54:25, 55:1, 58:19, 59:20, 63:19, 65:3, 70:4, 72:19, 75:3, 76:10, 85:8, 108:11, 109:7, 109:11, 109:16, 109:18
**government's** [7] - 10:25, 11:9, 11:12, 12:9, 38:1, 46:11, 110:4
**grabs** [1] - 59:13
**grant** [6] - 52:22, 55:13, 92:15, 108:13, 110:11, 119:9
**granted** [3] - 5:10, 36:22, 104:9
**granting** [2] - 74:1, 118:13
**greater** [1] - 81:14
**greatest** [1] - 47:3
**green** [4] - 6:6, 16:21, 51:9, 51:13
**Green** [1] - 102:15
**GREEN** [1] - 3:8
**ground** [5] - 57:15, 60:13, 66:17, 104:10, 118:13
**grounds** [1] - 22:9, 49:24, 66:8, 67:14, 104:20, 105:11, 105:22, 106:17, 112:25, 113:6, 121:1
**guess** [3] - 32:25, 69:5, 98:12

**guidance** [29] - 10:3, 10:24, 11:5, 29:20, 29:25, 37:22, 39:3, 39:7, 40:13, 40:14, 40:16, 40:17, 40:20, 43:9, 43:10, 43:15, 45:8, 45:25, 46:12, 69:12, 73:25, 74:17, 84:24, 85:5, 85:8, 85:12, 91:19, 107:3, 107:13
**gun** [1] - 49:3

## H

**HALL** [1] - 3:20
**halt** [1] - 109:12
**hand** [1] - 53:10
**handle** [2] - 15:23, 55:10
**handled** [1] - 116:3
**happy** [4] - 36:11, 88:1, 99:13, 123:18
**hard** [1] - 40:4
**Hawaii** [1] - 56:21
**hear** [14] - 8:3, 8:6, 11:20, 28:5, 46:17, 65:16, 70:12, 79:4, 81:15, 82:19, 94:7, 115:8, 123:18, 124:9
**heard** [10] - 16:10, 25:19, 36:24, 37:5, 63:3, 78:20, 94:5, 100:4, 113:2, 125:11
**hearing** [10] - 7:5, 7:10, 8:11, 14:16, 14:23, 48:3, 76:25, 99:25, 106:11, 106:12
**heart** [1] - 18:18
**heaven** [1] - 32:20
**hectoring** [1] - 60:1
**held** [3] - 66:19, 78:4, 78:7
**hello** [1] - 101:25
**help** [5] - 38:23, 53:3, 55:18, 60:13, 124:18
**helped** [1] - 103:4
**helpful** [6] - 21:9, 43:10, 78:21, 86:25, 103:1, 123:5
**hence** [1] - 31:7
**hereby** [1] - 125:5
**HEYMAN** [1] - 2:14
**Heyman** [2] - 5:20, 102:6
**hide** [1] - 47:6
**high** [2] - 35:15, 114:23

**hint** [1] - 113:19
**hinted** [1] - 116:21
**HIRZEL** [4] - 2:14, 2:15, 5:19, 102:5
**Hirzel** [2] - 5:20, 102:6
**hold** [2] - 30:7, 117:5
**holding** [4] - 5:14, 62:7, 67:12, 78:11
**holdings** [1] - 102:2
**Holdings** [1] - 36:18
**honor** [1] - 51:7
**Honor** [89] - 4:11, 4:13, 4:18, 4:24, 5:4, 5:13, 5:20, 6:2, 6:15, 8:23, 9:21, 11:18, 12:22, 13:2, 15:8, 16:11, 18:18, 21:8, 24:6, 27:10, 29:16, 35:23, 36:17, 37:1, 38:9, 39:17, 41:10, 43:3, 44:8, 44:10, 46:8, 46:15, 46:20, 49:8, 51:7, 51:10, 53:18, 53:22, 55:20, 63:4, 63:9, 64:6, 72:10, 73:13, 73:19, 74:22, 75:15, 77:13, 78:9, 78:14, 79:6, 79:16, 80:9, 80:20, 81:2, 81:4, 82:4, 82:12, 83:23, 84:8, 86:12, 87:1, 87:4, 87:11, 87:18, 88:8, 90:3, 91:7, 92:7, 92:17, 94:10, 94:11, 95:9, 96:16, 98:4, 98:17, 100:20, 100:22, 100:25, 101:3, 101:13, 101:19, 102:1, 102:6, 102:11, 123:21, 123:24, 124:3
**Honor's** [5] - 5:8, 21:17, 64:17, 73:1, 81:9
**Honorable** [1] - 1:12
**hope** [2] - 72:22, 78:8
**hopefully** [1] - 123:8
**hours** [3] - 32:20, 33:4, 99:4
**huge** [1] - 94:21
**hypothetical** [1] - 23:6
**hypothetically** [1] - 34:21

## I

**idea** [6] - 13:24, 17:24,

67:12, 68:21, 78:1, 124:12
**ideal** [1] - 8:19
**identify** [1] - 4:8
**ignore** [1] - 72:6
**illustrate** [1] - 42:20
**impact** [1] - 72:7
**impartial** [3] - 18:5, 22:3, 25:13
**impartiality** [5] - 22:9, 32:2, 119:11, 119:14, 120:16
**impediment** [1] - 53:23
**impediments** [1] - 27:25
**implement** [1] - 40:4
**implemented** [3] - 27:19, 39:20, 75:4
**implicates** [1] - 24:24
**implicating** [1] - 43:17
**implications** [1] - 27:7
**importance** [2] - 10:23, 56:9
**important** [6] - 18:21, 28:18, 46:2, 93:17, 109:3, 110:6
**importantly** [1] - 110:5
**impossible** [1] - 61:13
**impress** [1] - 43:8
**improper** [10] - 31:10, 55:15, 56:12, 65:1, 109:19, 109:21, 111:11, 120:9, 120:11, 120:15
**IN** [2] - 1:1, 1:2
**inaction** [1] - 32:6
**inappropriate** [9] - 35:18, 38:6, 38:17, 39:12, 56:6, 57:24, 67:18, 111:2, 111:5
**Inc** [1] - 3:18
**include** [7] - 29:2, 77:8, 99:8, 106:25, 107:20, 107:24, 120:3
**included** [3] - 37:17, 103:13, 107:10
**including** [5] - 10:4, 11:2, 13:18, 32:12, 105:20
**inconceivable** [1] - 49:18
**inconsistent** [1] - 22:7
**incredible** [1] - 50:5
**incur** [1] - 98:1
**incurring** [3] - 81:13, 97:14, 98:15
**indeed** [6] - 19:23, 19:25, 65:1, 67:16,

70:22, 71:14
**indicate** [1] - 45:14
**indicated** [2] - 9:19, 14:19
**indicating** [2] - 14:21, 15:12
**indication** [2] - 21:2, 107:22
**indulgence** [1] - 64:17
**inevitably** [1] - 94:15
**inference** [1] - 16:13
**inferring** [2] - 17:12, 25:22
**influence** [4] - 42:16, 42:22, 65:12, 70:17
**information** [4] - 16:19, 77:23, 116:18
**informed** [5] - 17:18, 40:21, 74:19, 85:1, 85:16
**inherent** [4] - 44:12, 74:20, 120:20, 123:4
**initial** [4] - 34:21, 67:6, 82:17, 84:12
**input** [8] - 44:15, 51:6, 51:20, 52:3, 53:5, 53:25, 84:20, 91:14
**inquiring** [1] - 109:19
**inquiry** [1] - 79:23
**instance** [2] - 86:20, 97:5
**instant** [1] - 13:3
**instead** [1] - 70:11
**institutional** [2] - 56:8, 57:21, 77:4
**intend** [1] - 107:19
**intended** [4] - 10:17, 14:18, 63:11, 110:23
**intent** [1] - 45:16
**intention** [4] - 29:5, 30:18, 61:25, 62:4
**intentions** [1] - 35:7
**interact** [3] - 12:13, 27:4, 29:2
**interacting** [1] - 30:10
**interchange** [1] - 28:20
**interest** [18] - 18:21, 23:23, 24:2, 24:18, 26:17, 26:18, 53:17, 56:8, 56:20, 57:21, 58:24, 72:1, 77:4, 85:15, 89:10, 108:9, 109:10
**interested** [2] - 97:4, 123:14
**interests** [3] - 22:25, 56:13, 72:14
**internal** [1] - 55:23
**INTERNATIONAL** [2] -

1:3, 125:9
**interpretation** [1] - 20:20
**interpreted** [1] - 120:2
**interrupt** [1] - 11:14
**interrupted** [1] - 14:5
**intervene** [2] - 89:17, 91:8
**intervention** [2] - 91:13, 92:12
**intimated** [1] - 56:10
**introductions** [1] - 13:21
**invested** [1] - 117:19
**investment** [1] - 97:7
**Investments** [1] - 91:6
**invited** [1] - 108:2
**involved** [2] - 39:17, 108:2
**irony** [1] - 58:5
**issuance** [1] - 22:20
**issue** [36] - 6:8, 15:22, 15:24, 21:12, 26:3, 29:22, 38:11, 40:7, 41:10, 42:2, 43:22, 44:3, 46:12, 47:9, 55:21, 55:22, 71:21, 76:17, 76:20, 79:8, 80:11, 82:24, 86:3, 86:6, 86:9, 86:18, 93:14, 93:15, 93:17, 95:5, 113:15, 114:2, 115:10, 116:19, 120:21, 121:13
**issued** [4] - 29:13, 52:5, 87:1, 88:8
**issues** [16] - 7:13, 11:11, 15:23, 43:18, 45:24, 52:22, 75:6, 78:24, 79:12, 82:21, 84:15, 85:1, 94:16, 97:3, 99:15, 116:4
**issuing** [1] - 88:10
**Italy** [1] - 58:15
**items** [1] - 66:24
**itself** [6] - 24:23, 25:9, 33:17, 85:4, 116:6, 118:10

**J**

**January** [60] - 7:19, 7:25, 10:6, 10:13, 14:12, 28:20, 30:16, 30:17, 31:2, 31:4, 32:11, 32:14, 32:16, 32:17, 32:18, 32:22, 33:3, 34:9, 34:23, 36:7, 38:11, 44:21,

45:14, 49:1, 60:23, 61:18, 62:4, 62:21, 69:15, 74:6, 81:8, 82:6, 84:10, 103:13, 103:16, 111:24, 112:5, 112:9, 112:11, 112:21, 113:18, 113:21, 113:24, 113:25, 114:1, 114:6, 114:11, 114:12, 114:18, 114:19, 114:21, 114:22, 116:14, 118:8, 118:20, 118:22
**JEFF** [1] - 2:3
**Jeff** [2] - 4:12, 101:13
**Jennifer** [1] - 6:16
**JENNIFER** [1] - 3:11
**jeopardize** [2] - 19:9, 22:24
**job** [6] - 18:16, 40:19, 57:2, 63:14, 63:23, 64:2
**joined** [5] - 4:13, 5:5, 6:3, 101:14, 102:12
**Juan** [2] - 5:21, 102:7
**JUAN** [1] - 2:17
**judge** [4] - 42:15, 42:21, 60:17, 117:21
**judges** [4] - 57:13, 117:17, 119:22
**judgment** [25] - 18:12, 18:22, 20:4, 21:19, 21:23, 24:8, 24:15, 24:22, 26:25, 29:23, 37:12, 56:4, 56:25, 58:4, 59:18, 60:7, 69:17, 78:14, 88:15, 89:20, 90:20, 90:25, 94:19, 110:13, 120:21
**judgments** [26] - 19:3, 24:18, 26:19, 41:2, 41:4, 44:13, 56:2, 56:9, 57:22, 60:2, 72:15, 86:5, 86:15, 86:18, 86:21, 87:3, 90:14, 90:19, 93:6, 93:7, 93:8, 93:9, 93:23, 93:24, 120:12, 120:22
**judicial** [28] - 18:3, 18:12, 19:3, 21:6, 22:7, 25:12, 25:15, 27:11, 27:18, 27:20, 27:25, 66:8, 68:21, 69:3, 69:24, 70:5, 70:6, 70:10, 70:15, 75:10, 78:12, 88:4,

88:13, 89:2, 90:25, 94:14, 94:16, 104:23
**judiciary** [3] - 25:8, 26:6, 26:18
**July** [2] - 53:19, 109:9
**justice** [2] - 43:24, 59:23
**Justice** [1] - 19:7
**JUSTIN** [1] - 3:14
**Justin** [2] - 6:18, 91:5

**K**

**Katz** [1] - 63:7
**KATZ** [1] - 3:4
**keep** [4] - 47:13, 76:8, 89:18, 109:3
**keeping** [2] - 87:3, 88:24
**ken** [1] - 77:9
**Kensington** [1] - 105:3
**Kevin** [2] - 5:22, 102:7
**KEVIN** [2] - 2:18, 3:17
**key** [5] - 18:23, 22:10, 25:17, 47:18, 85:7
**KIM** [1] - 3:8
**Kim** [2] - 6:6, 102:15
**kind** [10] - 14:2, 32:2, 32:4, 35:17, 46:5, 57:9, 87:6, 113:19, 114:2, 121:13
**kinds** [1] - 111:6
**knowing** [2] - 86:24, 123:2
**knowledge** [9] - 47:17, 51:24, 61:4, 75:8, 76:14, 112:20, 113:23, 119:13, 121:3
**known** [3] - 105:11, 105:15, 114:8
**knows** [2] - 45:15, 72:10
**Kobre** [2] - 6:6, 102:15
**KOBRE** [1] - 3:8

**L**

**labeled** [1] - 88:9
**laboriously** [1] - 33:6
**lack** [3] - 32:2, 49:15, 62:9
**laid** [2] - 44:13, 86:13
**LANDIS** [1] - 3:11
**Landis** [1] - 6:16
**language** [8] - 29:14, 29:15, 29:16, 30:2,

51:3, 119:24,
119:25, 120:2
**lapse** [1] - 115:5
**large** [1] - 83:8
**largely** [1] - 103:11
**last** [11] - 10:1, 20:23,
48:19, 52:5, 60:11,
70:24, 73:5, 77:16,
94:22, 110:21, 112:7
**late** [6] - 14:3, 41:15,
87:20, 102:5,
102:18, 112:4
**latest** [1] - 96:17
**launch** [10] - 40:24,
40:25, 85:3, 85:4,
86:16, 92:21, 92:22,
96:7, 97:3, 107:15
**launched** [2] - 95:20,
95:22
**law** [24] - 13:19, 18:6,
18:23, 18:25, 22:4,
25:14, 25:16, 26:20,
26:24, 28:3, 32:19,
34:6, 36:3, 36:4,
57:5, 60:4, 60:5,
60:24, 93:10, 93:13,
94:18, 115:13,
119:16
**lawful** [2] - 19:4, 120:6
**lawyer** [1] - 64:11
**lawyers** [2] - 49:16,
62:18
**layton** [1] - 101:13
**Layton** [1] - 4:12
**LAYTON** [1] - 2:2
**lead** [1] - 117:14
**leads** [1] - 117:3
**learn** [3] - 30:14,
30:17, 83:7
**learned** [3] - 16:2,
76:19, 103:17
**learning** [1] - 85:10
**least** [18] - 23:10,
55:8, 74:18, 80:7,
86:2, 88:13, 95:22,
100:8, 105:12,
111:7, 111:17,
113:23, 114:15,
116:8, 116:9, 117:4,
118:1, 118:9
**leave** [1] - 9:10
**leaves** [1] - 26:21
**led** [2] - 28:19, 117:14
**left** [2] - 24:24, 35:14
**leftover** [2] - 88:15,
88:23
**legal** [12] - 29:4,
50:21, 51:6, 51:20,
53:5, 53:23, 55:21,
59:11, 59:12, 72:11,

84:19
**legally** [1] - 88:10
**legitimacy** [1] - 72:24
**length** [1] - 103:9
**lengthy** [2] - 52:5,
111:12
**Leonard** [1] - 1:12
**less** [2] - 33:9, 35:20
**letter** [11] - 14:3,
54:13, 63:9, 80:16,
81:22, 91:23, 96:20,
96:23, 97:11,
109:25, 119:19
**letters** [1] - 7:14
**level** [2] - 49:17, 113:9
**license** [22] - 19:15,
19:16, 19:24, 22:20,
24:8, 27:17, 29:22,
48:11, 48:12, 54:1,
55:11, 55:14, 55:22,
55:25, 57:7, 71:5,
104:9, 108:14,
109:23, 110:11
**licenses** [3] - 72:2,
74:2, 110:12
**licensing** [1] - 57:5
**life** [1] - 81:15
**lift** [1] - 70:4
**light** [8] - 10:10, 12:1,
14:21, 16:21, 51:8,
51:12, 83:22, 100:13
**lightly** [2] - 71:13,
71:21
**likelihood** [2] - 29:21,
90:3
**limitations** [1] -
124:14
**limited** [2] - 12:15,
33:11
**line** [17] - 18:9, 18:15,
21:11, 21:15, 21:16,
21:18, 22:13, 22:17,
23:2, 23:12, 23:20,
25:23, 40:10, 42:9,
69:19, 88:11
**LIPTON** [1] - 3:4
**Lipton** [3] - 6:4, 63:7,
102:13
**list** [1] - 84:1
**listed** [1] - 79:2
**listen** [3] - 11:19, 37:3,
41:12
**litigant** [2] - 33:1,
56:16
**litigants** [1] - 46:4
**litigate** [1] - 121:9
**litigated** [4] - 26:3,
33:7, 37:19
**litigating** [1] - 106:1
**litigation** [3] - 43:25,

114:25, 123:4
**LLC** [1] - 125:23
**LLP** [11] - 1:16, 1:19,
2:8, 2:11, 2:14, 2:17,
2:23, 3:2, 3:13, 3:16,
3:19
**loading** [1] - 18:8
**lobbying** [2] - 53:12,
54:20
**logical** [1] - 34:8
**long-time** [1] - 118:23
**longstanding** [1] -
90:6
**look** [7] - 20:22, 49:12,
54:3, 85:11, 93:13,
111:21, 111:24
**looking** [4] - 29:16,
85:9, 87:19, 124:16
**lower** [1] - 83:10
**Lucas** [1] - 4:14
**LUCAS** [1] - 2:6

## M

**mail** [1] - 14:20
**maintained** [1] - 72:2
**MALLET** [1] - 2:17
**Mallet** [2] - 5:23, 102:8
**MALLET-PREVOST**
[1] - 2:17
**manageability** [1] -
89:12
**manageable** [2] -
88:25, 89:19
**mandate** [5] - 18:14,
63:12, 63:15, 74:4,
75:5
**mandates** [1] - 60:18
**mandatorily** [2] -
113:15, 116:16
**mandatory** [2] - 49:10,
49:24
**MANGAN** [1] - 3:17
**MANGES** [1] - 1:19
**Manges** [2] - 9:22,
73:12
**manner** [4] - 9:18,
37:22, 41:9, 105:5
**March** [9] - 1:13,
13:15, 14:17, 29:18,
30:3, 52:4, 106:23,
125:11, 125:20
**Marcus** [2] - 6:6,
102:15
**MARCUS** [1] - 3:8
**Mark** [1] - 46:25
**market** [4] - 48:10,
52:13, 53:3, 97:5
**marketing** [2] - 40:25,

107:15
**marry** [1] - 69:13
**mason** [1] - 6:4
**MASON** [1] - 3:5
**Mason** [1] - 102:14
**Master** [1] - 1:22
**master** [146] - 4:20,
7:4, 7:11, 7:21, 7:22,
8:3, 8:8, 9:6, 9:9,
9:22, 10:14, 10:19,
13:17, 13:23, 14:12,
14:21, 16:11, 16:16,
16:20, 16:24, 17:1,
17:4, 17:7, 17:10,
17:19, 17:24, 18:2,
18:11, 19:21, 20:1,
21:24, 22:11, 29:5,
29:10, 29:15, 29:19,
30:4, 30:10, 30:15,
30:19, 30:25, 31:1,
31:14, 31:23, 34:17,
35:7, 35:14, 35:16,
35:24, 37:2, 37:6,
37:14, 38:8, 40:9,
47:16, 47:25, 48:14,
48:17, 48:21, 51:23,
53:4, 53:11, 55:9,
55:12, 58:17, 58:25,
59:3, 60:17, 61:16,
63:11, 63:18, 64:19,
65:2, 65:7, 65:20,
65:23, 65:25, 66:6,
66:9, 67:16, 67:25,
68:2, 69:9, 73:12,
73:21, 76:10, 76:14,
77:12, 77:22, 79:4,
79:5, 79:7, 82:18,
86:9, 91:25, 92:19,
92:25, 95:17, 99:12,
101:21, 103:8,
104:5, 105:16,
106:7, 106:13,
106:17, 106:20,
107:2, 107:9,
107:19, 108:4,
108:10, 108:22,
108:25, 110:15,
110:17, 110:25,
111:6, 111:15,
112:8, 112:9,
112:22, 113:1,
113:7, 113:16,
114:5, 114:24,
115:1, 116:7,
116:16, 117:9,
117:11, 117:25,
118:16, 119:3,
119:23, 120:11,
120:17, 121:2,
121:24, 122:16,

122:23, 123:7,
124:13
**master's** [15] - 13:16,
16:1, 29:1, 44:25,
65:10, 65:16, 68:8,
68:14, 73:14,
103:13, 107:23,
112:17, 118:24,
119:11, 119:17
**material** [3] - 7:8,
84:21, 97:9
**materially** [4] - 99:9,
108:21, 118:20,
118:25
**materials** [3] - 10:14,
10:16, 10:20
**matter** [7] - 26:19,
38:5, 39:18, 67:17,
93:9, 115:13, 117:21
**matters** [1] - 24:24
**MAX** [1] - 2:6
**maximize** [1] - 11:6,
44:16
**maximized** [1] - 39:5
**maximizing** [2] -
73:23, 108:8
**mean** [6] - 18:13,
24:14, 28:14, 51:8,
59:23, 61:7
**meaning** [1] - 32:10
**meaningful** [1] - 93:2
**meant** [5] - 57:14,
108:5, 108:17,
113:25, 122:20
**media** [1] - 79:23
**MEEHAN** [1] - 2:18
**Meehan** [2] - 5:22,
102:8
**meet** [6] - 41:24,
58:17, 112:8,
112:12, 122:8, 124:6
**meet-and-confer** [1] -
124:6
**meeting** [76] - 7:20,
7:25, 10:6, 10:7,
10:8, 10:9, 10:13,
10:15, 14:13, 16:2,
16:13, 16:14, 16:18,
17:3, 17:11, 17:13,
17:17, 17:20, 30:15,
30:16, 31:4, 31:7,
33:3, 33:18, 34:3,
34:5, 34:13, 34:14,
37:13, 41:14, 45:14,
47:16, 47:25, 49:7,
49:8, 65:14, 65:22,
68:23, 68:24, 69:4,
69:8, 69:22, 73:15,
74:6, 75:17, 75:22,
81:8, 82:6, 84:10,

103:14, 103:16, 103:18, 103:22, 104:6, 107:21, 108:2, 112:15, 112:21, 114:6, 114:10, 115:3, 116:4, 116:6, 116:14, 116:15, 117:3, 117:7, 118:5, 118:8, 118:10, 118:19, 119:4, 121:24, 121:25, 124:12
**meeting-related** [1] - 103:22
**meetings** [16] - 32:14, 41:17, 45:18, 45:23, 48:21, 74:7, 105:19, 105:23, 107:4, 107:6, 108:23, 112:17, 118:21, 119:16, 122:2, 122:3
**mellifluous** [1] - 47:5
**mention** [2] - 12:23, 107:4
**mentioned** [5] - 35:8, 49:11, 49:13, 50:1, 95:16
**mentioning** [1] - 49:24
**mere** [2] - 41:13, 65:11
**merely** [6] - 11:11, 23:4, 62:3, 63:10, 89:11
**merit** [2] - 63:11, 83:11
**meritorious** [1] - 113:6
**merits** [8] - 24:16, 28:11, 47:21, 50:24, 61:12, 104:13, 104:14, 119:6
**met** [3] - 41:20, 104:3, 106:7
**Mexico** [1] - 54:9
**Michael** [2] - 6:5, 102:14
**MICHAEL** [1] - 3:6
**might** [10] - 9:13, 52:11, 53:4, 60:17, 61:25, 83:9, 88:21, 89:3, 90:20, 119:14
**Miguel** [3] - 4:14, 46:20, 101:15
**MIGUEL** [1] - 2:5
**million** [6] - 80:22, 81:4, 82:16, 82:23, 83:19, 94:25
**millions** [1] - 88:21
**mind** [6] - 17:22, 36:15, 47:13,

104:12, 109:4, 118:2
**mindful** [3] - 84:21, 89:1, 91:7
**minute** [1] - 9:3
**minutes** [1] - 26:12
**modify** [1] - 117:2
**Molo** [1] - 6:18
**MOLO** [1] - 3:14
**MoloLamken** [2] - 6:19, 91:6
**MOLOLAMKEN** [1] - 3:13
**moment** [4] - 25:25, 54:5, 86:3, 97:22
**money** [4] - 80:15, 83:15, 113:2, 114:23
**month** [7] - 11:16, 12:7, 107:1, 107:10, 122:1, 122:4
**monthly** [9] - 95:20, 96:6, 97:14, 97:15, 97:18, 98:1, 98:9, 99:2, 121:25
**months** [4] - 37:14, 105:12, 107:11, 122:5
**moot** [1] - 114:21
**MORITZ** [3] - 3:2, 6:1, 102:10
**Moritz** [2] - 6:2, 102:11
**MORITZ,ESQ** [1] - 3:2
**morning** [30] - 4:11, 4:14, 4:16, 4:17, 5:3, 5:6, 5:11, 5:12, 5:17, 5:19, 5:25, 6:1, 6:12, 6:14, 6:15, 6:21, 6:23, 12:25, 15:19, 17:8, 25:19, 36:25, 46:18, 46:19, 63:5, 63:6, 65:23, 103:1, 114:22, 116:11
**Morris** [2] - 5:13, 102:1
**MORRIS** [1] - 2:20
**MOSLE** [1] - 2:17
**most** [5] - 49:1, 55:3, 62:17, 113:10, 123:10
**motion** [97] - 7:3, 8:10, 9:4, 10:10, 13:4, 14:7, 15:4, 17:15, 28:7, 31:5, 31:6, 32:21, 33:2, 33:5, 33:9, 33:17, 33:18, 33:20, 33:22, 34:2, 34:9, 34:14, 34:21, 34:23, 34:24, 35:5, 36:24, 41:25, 42:3, 45:15, 47:14,

47:19, 50:1, 50:25, 51:25, 59:19, 60:9, 61:8, 61:17, 62:7, 62:16, 63:10, 64:17, 64:18, 64:21, 66:18, 67:6, 67:9, 71:12, 71:17, 72:7, 73:9, 75:21, 76:1, 76:5, 76:12, 77:16, 78:18, 80:13, 92:15, 100:2, 102:20, 103:5, 103:6, 103:7, 103:9, 103:11, 103:12, 103:14, 103:19, 103:22, 103:24, 104:11, 104:17, 104:18, 104:20, 105:2, 105:8, 105:10, 105:13, 105:18, 105:22, 106:19, 111:15, 111:23, 111:25, 115:14, 116:14, 116:21, 116:24, 118:4, 118:6, 118:14, 119:6, 119:9, 119:18, 121:18
**MOTION** [3] - 1:9, 1:11, 125:16
**motions** [7] - 47:7, 83:11, 83:16, 89:17, 118:3, 118:9, 123:8
**motivation** [1] - 117:5
**mouth** [1] - 58:20
**move** [12] - 25:24, 40:1, 41:1, 41:7, 43:11, 45:7, 69:12, 74:18, 84:17, 84:22, 85:2, 92:22
**moved** [6] - 31:3, 31:21, 32:10, 32:19, 115:17, 115:21
**moving** [18] - 8:6, 8:11, 8:14, 12:10, 12:16, 15:10, 31:11, 39:22, 86:23, 97:21, 103:25, 105:11, 106:4, 108:20, 108:23, 111:1, 117:1, 118:18
**MOYER** [2] - 2:3, 4:11, 101:12
**Moyer** [2] - 4:12, 101:13
**MR** [92] - 4:11, 4:17, 5:3, 5:19, 6:1, 8:19, 8:22, 9:20, 11:17, 12:22, 13:1, 13:9, 13:13, 15:1, 15:8,

15:15, 15:19, 18:17, 21:7, 22:14, 22:19, 23:13, 23:18, 25:1, 26:7, 26:10, 26:15, 27:9, 28:9, 28:16, 33:15, 34:25, 36:11, 36:17, 36:25, 42:7, 43:2, 44:7, 45:1, 45:21, 46:15, 46:19, 50:10, 55:16, 55:19, 60:19, 64:6, 64:13, 66:21, 67:2, 67:8, 72:9, 73:7, 73:10, 75:14, 77:13, 77:17, 79:6, 79:19, 80:9, 80:20, 82:1, 82:12, 83:4, 83:23, 86:12, 87:10, 87:17, 91:5, 92:7, 92:17, 94:8, 95:14, 96:16, 98:3, 98:7, 98:10, 98:16, 98:23, 99:11, 100:16, 100:19, 100:25, 101:3, 101:12, 101:18, 101:24, 102:5, 102:10, 123:20, 123:23, 124:3
**MS** [9] - 5:12, 6:15, 63:4, 63:6, 83:14, 90:1, 100:22, 101:25, 124:1
**multiple** [2] - 67:9, 67:10
**Munger** [1] - 5:6
**MUNGER** [2] - 2:11
**music** [1] - 47:1
**Muslim** [1] - 56:22
**must** [2] - 116:16, 121:4
**MYRON** [1] - 1:16
**Myron** [1] - 4:18

---

## N

**namely** [2] - 31:20, 65:14
**Nate** [3] - 79:19, 94:8, 102:2
**Nathan** [1] - 5:16
**NATHAN** [1] - 2:23
**national** [1] - 22:25
**nature** [6] - 15:5, 76:7, 76:24, 87:14, 93:21, 94:5
**nauseam** [1] - 84:9
**nay** [2] - 55:25, 77:6
**necessarily** [3] - 8:3, 89:9, 113:11

**necessary** [9] - 44:15, 44:17, 44:18, 65:18, 66:3, 75:3, 110:12, 120:9, 120:21
**need** [22] - 7:4, 10:22, 11:5, 18:15, 58:20, 58:21, 69:16, 73:22, 73:24, 73:25, 82:3, 90:20, 94:15, 95:4, 99:16, 99:20, 100:3, 111:3, 111:9, 122:10, 123:3, 124:10
**needed** [11] - 27:17, 33:25, 37:25, 43:9, 65:21, 74:16, 84:20, 85:5, 88:14, 107:24, 117:21
**needs** [3] - 96:2, 108:10, 122:13
**negotiating** [1] - 105:25
**never** [7] - 35:25, 48:13, 48:22, 49:7, 50:3, 60:5, 60:16
**NEW** [2] - 125:3, 125:18
**new** [6] - 38:18, 41:4, 44:21, 81:6, 81:15, 81:23
**next** [6] - 52:1, 53:9, 80:11, 83:25, 87:13, 99:10
**nice** [5] - 4:1, 20:13, 20:14, 21:1, 113:13
**NICHOLS** [1] - 2:20
**Nichols** [2] - 5:13, 102:1
**nine** [1] - 33:12
**nobody** [1] - 88:7
**non** [2] - 42:10, 61:5
**non-advocacy** [1] - 42:10
**non-waivable** [1] - 61:5
**none** [3] - 96:3, 124:1, 124:3
**normal** [1] - 24:16
**notable** [1] - 56:21
**note** [1] - 9:25, 10:8, 11:24, 13:4, 36:21, 82:14, 83:9, 93:10, 93:15, 107:21, 111:12
**noted** [4] - 14:8, 38:12, 105:7, 106:24
**notes** [3] - 13:14, 110:1, 125:13
**noteworthy** [1] - 40:5
**nothing** [13] - 38:17,

57:23, 62:10, 78:19, 87:10, 100:16, 100:19, 109:19, 109:21, 110:15, 110:22, 110:23, 120:9

**notice** [6] - 30:4, 32:24, 98:3, 98:5, 106:3

**noticed** [1] - 33:9

**notified** [1] - 73:14

**notify** [1] - 96:24

**noting** [1] - 47:23

**notion** [5] - 47:24, 51:1, 51:23, 54:20, 60:2

**November** [2] - 48:4, 106:10

**number** [7] - 57:10, 65:5, 87:2, 88:8, 90:22, 93:17, 93:23

**Number** [1] - 125:9

## O

**obeyed** [1] - 60:4

**object** [3] - 8:24, 36:6, 82:3

**objected** [2] - 67:23, 93:22

**objection** [31] - 8:16, 8:21, 8:22, 15:13, 28:25, 29:9, 30:3, 31:9, 31:20, 32:1, 32:8, 36:2, 36:16, 39:21, 79:5, 79:15, 79:17, 79:21, 79:25, 80:2, 80:23, 81:3, 81:15, 81:21, 82:2, 82:8, 82:13, 83:18, 96:18, 97:12, 99:20

**objections** [13] - 6:25, 9:8, 36:18, 36:20, 36:21, 80:11, 80:21, 81:6, 82:18, 83:5, 89:16, 96:21, 99:10

**observe** [3] - 17:20, 31:4, 33:19

**observed** [1] - 116:11

**observer** [1] - 29:8

**observers** [1] - 30:22

**observing** [2] - 17:3, 45:19

**obtain** [2] - 29:20, 107:3

**obviously** [2] - 65:1, 99:7

**occasion** [1] - 116:12

**occur** [4] - 17:17,

33:18, 33:25, 115:3

**occurred** [10] - 14:12, 16:14, 29:7, 34:4, 35:13, 50:3, 67:22, 71:15, 75:17, 111:17

**occurring** [2] - 32:4, 67:24

**October** [3] - 106:2, 107:8, 107:18

**OF** [6] - 1:2, 1:6, 1:9, 125:2, 125:3, 125:10

**OFAC** [87] - 10:4, 10:10, 11:5, 14:2, 16:2, 16:20, 18:24, 19:15, 19:21, 21:21, 22:1, 24:8, 25:3, 26:22, 29:2, 29:20, 29:25, 30:1, 30:10, 30:11, 30:15, 30:20, 37:21, 39:7, 40:14, 40:16, 47:16, 47:19, 47:25, 48:8, 48:14, 48:15, 48:21, 51:1, 51:5, 51:6, 51:13, 52:7, 52:8, 52:13, 52:18, 52:24, 54:2, 54:13, 55:12, 55:21, 55:22, 59:1, 65:2, 65:17, 66:1, 66:10, 68:1, 68:3, 68:15, 69:1, 73:14, 73:17, 73:22, 74:5, 77:5, 77:7, 90:5, 103:14, 103:15, 103:17, 104:5, 105:16, 105:17, 106:8, 106:14, 107:4, 107:9, 107:13, 107:24, 108:6, 108:23, 112:8, 112:15, 112:17, 116:4, 118:25, 121:9, 122:22, 124:9

**OFAC's** [4] - 29:20, 30:5, 65:15, 121:8

**offer** [1] - 91:14

**offering** [1] - 91:15

**officer** [3] - 68:21, 70:6, 75:10

**OFFICIALLY** [1] - 125:17

**officially** [1] - 86:3

**often** [1] - 64:14

**old** [1] - 60:24

**Olson** [1] - 5:7

**OLSON** [1] - 2:11

**on-the-record** [1] - 24:4

**once** [8] - 25:25, 46:24, 49:7, 67:15,

95:19, 96:7, 96:23, 98:3

**one** [38] - 6:9, 6:14, 7:13, 12:9, 13:25, 23:8, 26:1, 34:11, 42:13, 49:1, 51:6, 53:8, 56:15, 57:8, 60:11, 60:20, 64:8, 69:10, 71:11, 71:12, 73:13, 77:19, 77:21, 79:20, 86:3, 88:4, 90:23, 94:17, 95:8, 95:14, 99:9, 100:8, 100:14, 104:10, 104:18, 106:19, 116:23, 121:21

**ones** [1] - 24:19

**ongoing** [2] - 54:9, 80:12

**open** [7] - 52:23, 52:25, 60:9, 74:24, 77:19, 93:25, 122:9

**opening** [8] - 35:5, 35:9, 64:21, 77:20, 77:25, 78:7, 119:17

**operable** [1] - 31:13

**operating** [1] - 29:12

**opinion** [3] - 44:3, 93:21, 106:23

**opportune** [1] - 123:10

**opportunity** [2] - 91:23, 123:6

**oppose** [1] - 45:19

**opposed** [1] - 25:9

**opposing** [1] - 119:18

**opposite** [1] - 51:19

**opposition** [2] - 45:12, 107:14

**optional** [1] - 60:3

**order** [54] - 10:5, 11:22, 12:6, 16:5, 28:24, 29:14, 29:18, 30:3, 31:3, 37:21, 37:25, 38:11, 38:16, 38:24, 39:9, 40:5, 40:12, 40:13, 43:11, 43:14, 44:16, 45:6, 48:2, 52:5, 60:23, 65:17, 66:2, 68:9, 70:5, 72:12, 73:23, 75:3, 75:4, 79:1, 80:3, 82:16, 84:14, 84:23, 86:14, 91:12, 93:11, 96:23, 97:1, 106:1, 106:25, 107:7, 107:23, 108:7, 112:18, 114:9, 120:6, 120:8, 122:12

**ordered** [1] - 7:14

**ordering** [1] - 9:5

**orderly** [1] - 10:18

**orders** [4] - 74:15, 74:21, 88:9, 120:21

**ordinarily** [1] - 88:18

**ordinary** [1] - 88:16

**original** [1] - 116:13

**otherwise** [3] - 41:1, 45:18, 116:17

**outdated** [1] - 109:8

**outline** [1] - 10:16

**outlined** [3] - 11:20, 39:8, 87:6

**own** [10] - 44:13, 51:14, 55:2, 55:22, 56:8, 56:9, 56:24, 58:20, 74:21, 120:20

## P

**P.A** [1] - 2:2

**pace** [1] - 115:16

**page** [8] - 26:2, 42:14, 52:17, 64:21, 65:9, 66:4, 67:19, 106:24

**pages** [4] - 105:19, 119:18, 119:20, 125:15

**paid** [10] - 59:22, 95:19, 96:3, 96:21, 97:15, 97:18, 98:9, 98:25, 99:5, 99:18

**papers** [21] - 17:6, 17:9, 31:11, 31:25, 33:22, 34:12, 35:9, 35:18, 41:11, 48:7, 50:9, 61:7, 67:14, 68:5, 68:8, 69:14, 77:20, 78:5, 78:13, 95:15

**paragraphs** [2] - 106:10, 107:17

**parameters** [1] - 117:3

**part** [11] - 14:9, 18:24, 49:22, 55:8, 62:24, 78:3, 84:11, 89:18, 110:6, 117:5, 118:1

**parte** [46] - 7:18, 14:11, 16:1, 17:21, 23:14, 28:13, 28:21, 32:13, 33:19, 35:21, 38:20, 38:23, 39:15, 41:21, 47:16, 47:25, 65:4, 67:22, 67:24, 68:3, 68:9, 68:11, 68:23, 69:7, 69:19, 76:9, 76:14, 76:24, 77:22, 105:17,

105:19, 105:22, 106:8, 106:14, 107:5, 108:22, 112:17, 112:22, 114:10, 118:19, 118:24, 119:16, 119:22, 120:4, 121:24, 124:13

**partial** [1] - 116:9

**partiality** [1] - 26:4

**participants** [1] - 11:2

**participate** [3] - 34:2, 88:5, 91:24

**particular** [5] - 22:20, 43:16, 65:8, 66:10, 104:6

**particularly** [8] - 7:11, 7:13, 45:23, 65:4, 106:24, 112:16, 114:22, 123:18

**parties** [82] - 7:7, 8:6, 8:11, 8:14, 9:7, 9:25, 12:13, 12:14, 14:8, 15:10, 15:21, 17:2, 29:6, 30:22, 37:9, 39:7, 39:15, 39:25, 40:23, 41:23, 42:13, 43:22, 44:20, 45:12, 45:13, 65:12, 71:8, 73:4, 74:8, 74:25, 75:18, 79:20, 82:7, 83:2, 83:6, 83:10, 83:17, 85:14, 85:20, 86:25, 87:23, 89:1, 89:25, 90:18, 91:25, 94:4, 94:9, 96:24, 99:15, 99:19, 100:6, 103:10, 104:3, 104:12, 105:3, 105:11, 105:14, 105:20, 106:4, 107:20, 107:25, 108:9, 108:20, 108:23, 111:1, 112:7, 112:20, 112:23, 112:24, 113:23, 114:5, 115:2, 115:17, 115:21, 116:3, 116:20, 117:1, 118:15, 118:18, 120:4, 122:7, 124:6

**parties'** [6] - 7:15, 8:1, 66:7, 103:7, 103:12, 118:23

**party** [11] - 20:6, 25:9, 29:3, 38:22, 45:3, 52:6, 75:1, 100:8, 103:25, 108:1, 119:24

**past** [1] - 40:17
**pattern** [3] - 80:15, 112:16, 114:8
**pause** [1] - 9:14
**pay** [5] - 83:8, 88:14, 95:21, 99:1, 99:3
**paying** [1] - 90:10
**PDV** [3] - 5:14, 36:18, 102:2
**PDVH** [2] - 2:25, 63:13
**PDVSA** [4] - 2:19, 5:21, 90:9, 90:17
**peacock** [1] - 120:24
**pecuniary** [1] - 89:10
**peep** [1] - 48:22
**pending** [3] - 7:3, 14:7, 102:20
**penny** [1] - 48:19
**people** [7] - 88:5, 88:11, 88:16, 88:19, 89:3, 89:13, 93:22
**per** [1] - 60:13
**perceive** [1] - 16:8
**perceived** [1] - 69:1
**percent** [3] - 95:2, 115:7
**perfectly** [4] - 58:19, 69:24, 74:3, 74:19
**performing** [1] - 75:10
**perhaps** [8] - 42:19, 45:13, 45:15, 115:15, 117:13, 121:25, 122:9, 124:8
**period** [1] - 35:4
**Perla** [2] - 5:22, 102:7
**PERLA** [1] - 2:17
**permission** [3] - 5:8, 5:10, 63:15
**permits** [1] - 119:17
**permitted** [3] - 49:6, 75:21, 88:12
**person** [3] - 119:13, 120:10, 120:14
**personal** [1] - 121:2
**personally** [1] - 41:16
**perspective** [2] - 65:16, 86:11
**persuaded** [3] - 108:24, 117:15, 120:5
**persuasive** [1] - 116:25
**persuasively** [1] - 44:12
**pertinent** [1] - 8:1
**petitions** [1] - 81:6
**Petroleum** [1] - 5:15
**phase** [1] - 43:14
**phone** [1] - 13:17
**phonetic** [1] - 48:6

**picking** [1] - 51:10
**piece** [1] - 85:7
**Pincus** [5] - 4:21, 38:4, 42:19, 84:19, 101:21
**place** [4] - 41:18, 57:7, 88:11, 89:11
**places** [1] - 120:23
**plain** [1] - 76:11
**Plaintiff** [1] - 1:4
**plan** [4] - 7:9, 63:12, 66:12, 99:23
**planned** [2] - 30:16, 35:16
**planning** [4] - 30:15, 30:25, 97:13, 97:15
**plans** [1] - 122:17
**playing** [1] - 62:6
**pleadings** [1] - 49:12
**pleased** [1] - 103:2
**pocket** [1] - 62:14
**pockets** [1] - 67:13
**podium** [1] - 84:2
**point** [45] - 7:23, 8:9, 11:23, 14:5, 15:7, 18:23, 21:6, 22:12, 23:25, 25:1, 27:16, 28:22, 41:11, 44:22, 45:5, 45:16, 46:11, 53:8, 53:9, 61:2, 69:11, 70:24, 71:2, 72:14, 76:2, 76:6, 76:8, 76:18, 77:2, 77:24, 80:19, 81:4, 81:22, 83:15, 85:18, 92:20, 93:20, 96:8, 99:3, 103:4, 107:6, 111:16, 112:6, 113:21, 113:24
**point-blank** [1] - 76:18
**pointed** [1] - 61:6
**points** [5] - 53:16, 55:20, 64:7, 77:21, 91:15
**policy** [36] - 19:2, 19:10, 19:19, 20:3, 20:4, 21:15, 21:21, 22:6, 22:17, 22:24, 24:24, 25:6, 37:8, 37:10, 37:11, 43:5, 53:13, 54:21, 55:10, 55:13, 55:23, 56:5, 56:13, 56:20, 56:24, 57:17, 58:9, 58:18, 58:23, 63:20, 63:23, 70:12, 72:15, 74:12, 77:8, 104:8
**portion** [1] - 18:5
**posed** [1] - 24:6
**position** [81] - 7:6,

**7:16, 8:1, 10:25, 11:9, 11:12, 11:23, 12:10, 16:21, 18:1, 19:6, 19:12, 23:5, 23:6, 23:7, 23:8, 23:10, 23:11, 25:11, 26:3, 28:6, 30:2, 30:6, 30:20, 30:24, 34:6, 36:7, 37:6, 38:1, 38:19, 39:1, 39:3, 40:19, 43:8, 44:23, 46:11, 47:7, 47:19, 51:1, 51:5, 51:15, 51:17, 52:2, 53:5, 53:13, 54:22, 55:5, 55:7, 59:8, 65:3, 66:11, 68:25, 70:13, 70:21, 71:7, 71:24, 72:1, 72:21, 73:1, 74:17, 75:2, 75:16, 83:3, 83:5, 87:21, 87:23, 90:16, 98:19, 98:20, 109:15, 109:17, 110:4, 121:8, 121:10, 121:11, 121:13**
**positions** [1] - 122:24
**possession** [2] - 51:11, 116:17
**possibility** [2] - 29:1, 39:19
**possible** [3] - 9:8, 91:21, 91:22
**post** [1] - 24:15
**post-judgment** [1] - 24:15
**pot** [1] - 58:20
**potential** [5] - 11:2, 106:16, 115:8, 117:7, 117:23
**potentially** [4] - 34:18, 39:20, 117:25, 122:7
**POTTER** [1] - 1:16
**potter** [1] - 4:19
**Potter** [1] - 101:19
**power** [13] - 26:23, 27:11, 27:18, 27:20, 27:24, 27:25, 44:13, 70:10, 70:15, 70:18, 70:19, 74:21, 120:20
**powers** [5] - 42:16, 42:23, 43:18, 57:15, 75:6
**practical** [1] - 115:22
**practice** [1] - 114:9
**pre** [1] - 50:7
**pre-rebutted** [1] - 50:7
**precautions** [1] - 124:14

**precise** [1] - 93:23
**precisely** [3] - 18:18, 26:5, 69:6
**predominate** [2] - 21:22, 21:23
**preface** [1] - 16:12
**prefatory** [4] - 52:20, 53:24, 54:14, 109:12
**preference** [2] - 56:1, 109:12
**preferences** [1] - 56:5
**prejudice** [4] - 19:16, 54:1, 109:22, 110:1
**premature** [1] - 86:11
**premise** [1] - 51:25
**preparation** [3] - 40:24, 85:3, 85:18
**preparations** [3] - 11:3, 96:25, 97:10
**prepare** [2] - 40:24, 84:12
**prepared** [6] - 7:24, 13:6, 78:25, 81:19, 87:4, 98:21
**preparing** [1] - 84:25
**presence** [2] - 30:21, 65:11
**present** [11] - 10:8, 12:17, 45:22, 46:5, 54:4, 54:22, 73:15, 73:17, 101:11, 103:18, 125:7
**presented** [1] - 10:14
**presenting** [1] - 5:17
**presently** [1] - 47:22
**preserve** [4] - 32:8, 80:23, 81:1
**preserved** [2] - 81:17, 82:8
**preside** [1] - 117:18
**president** [1] - 56:24
**presumably** [4] - 72:13, 98:11, 113:25, 122:12
**pretty** [4] - 14:14, 44:12, 60:8, 94:12
**prevail** [1] - 103:25
**previously** [4] - 23:22, 74:8, 74:23, 106:15
**PREVOST** [1] - 2:17
**principally** [1] - 7:2
**principle** [3] - 42:24, 43:1, 44:6
**priorities** [3] - 21:13, 22:2, 43:6
**prioritize** [3] - 19:1, 20:3, 69:16
**priority** [3] - 91:2, 93:15, 93:22
**privilege** [2] - 4:20,

**79:10
**proactively** [1] - 107:9
**problem** [16] - 16:8, 24:20, 24:23, 31:22, 31:24, 32:17, 48:8, 50:24, 66:11, 67:20, 69:5, 69:21, 71:9, 81:24, 83:19
**problematic** [1] - 34:1
**problems** [2] - 47:21, 75:7
**procedural** [1] - 104:16
**procedure** [7] - 12:6, 46:2, 93:11, 106:25, 107:7, 107:23, 119:21
**procedures** [10] - 10:5, 37:21, 37:25, 84:14, 84:23, 86:14, 97:1, 106:1, 112:18, 114:9
**proceed** [6] - 7:1, 7:9, 8:18, 9:12, 15:18, 18:15, 74:10, 84:1
**proceeding** [9] - 17:16, 19:8, 31:11, 51:2, 51:18, 100:6, 106:22, 121:4, 121:15
**proceedings** [8] - 4:7, 41:1, 43:15, 101:6, 116:10, 117:13, 117:24, 125:8
**proceeds** [1] - 90:5
**process** [81] - 10:16, 10:17, 10:19, 10:22, 11:1, 11:2, 11:11, 11:21, 11:22, 12:14, 12:21, 16:22, 19:9, 19:23, 21:3, 22:24, 24:4, 24:11, 26:25, 27:15, 28:19, 28:24, 29:14, 29:21, 33:6, 37:18, 37:20, 37:24, 39:5, 39:20, 40:1, 40:15, 40:25, 41:8, 43:11, 44:14, 45:7, 49:18, 52:10, 52:12, 52:21, 53:4, 60:21, 63:1, 65:15, 68:9, 68:16, 69:12, 71:4, 73:23, 74:9, 83:2, 84:12, 85:14, 86:13, 87:7, 88:6, 88:24, 89:1, 89:12, 89:15, 89:19, 90:10, 90:11, 91:25, 92:21, 92:22, 95:19, 95:22, 97:4, 97:8, 97:20, 97:21,

100:6, 104:23, 105:25, 107:15, 108:1, 108:13, 109:8, 124:6
**professional** [1] - 97:7
**proof** [1] - 104:11
**proper** [2] - 80:5
**properly** [1] - 105:24
**properties** [1] - 105:6
**property** [8] - 58:7, 58:8, 58:11, 89:5, 89:14, 93:1, 93:9, 94:19
**propose** [1] - 122:6
**proposed** [2] - 10:21, 46:1
**proposition** [4] - 49:17, 57:19, 70:9, 120:22
**prospect** [1] - 72:19
**prospective** [1] - 11:1
**prostrate** [2] - 57:15, 70:13
**proven** [1] - 108:20
**provide** [4] - 22:8, 91:17, 91:19, 91:20
**providing** [4] - 16:18, 30:11, 68:15, 70:8
**provision** [4] - 75:25, 88:1, 95:21, 96:2
**provisions** [3] - 76:21, 76:22, 107:16
**prudential** [1] - 52:11
**public** [2] - 79:12, 80:7
**purely** [1] - 62:23
**purpose** [5] - 16:13, 16:17, 17:11, 65:14, 87:25
**purposes** [8] - 13:3, 27:3, 28:17, 39:8, 40:21, 43:3, 47:23, 88:3
**pursuant** [2] - 10:4, 37:20
**purview** [1] - 97:7
**push** [1] - 12:4
**put** [11] - 4:5, 7:12, 13:10, 30:4, 43:22, 48:7, 74:10, 84:6, 85:21, 101:9, 124:10
**putting** [2] - 23:13, 85:16

## Q

**quash** [1] - 80:13
**questioned** [2] - 119:12, 119:15

**questions** [16] - 6:24, 8:4, 8:7, 8:10, 9:15, 16:4, 24:5, 42:6, 60:10, 72:12, 100:10, 103:3, 121:20, 123:17, 123:21, 123:23
**quick** [1] - 13:7
**quite** [2] - 35:19, 117:13
**quote** [5] - 29:17, 65:6, 69:14, 107:12, 109:16
**quoted** [1] - 67:5
**quoting** [1] - 59:21

## R

**raise** [6] - 9:13, 21:12, 22:8, 82:4, 87:9, 87:15
**raised** [8] - 16:6, 17:6, 28:25, 38:18, 66:15, 93:16, 106:5
**raising** [1] - 76:1
**ran** [1] - 51:9
**rank** [1] - 90:21
**ranking** [1] - 91:3
**rate** [1] - 98:9
**RATH** [1] - 3:11
**Rath** [1] - 6:16
**rather** [4] - 52:25, 63:20, 89:6, 90:12
**Ray** [5] - 4:22, 9:21, 37:1, 73:11, 79:6
**ray** [2] - 99:11, 101:21
**RAY** [1] - 1:19
**reached** [1] - 10:2
**react** [1] - 52:14
**read** [9] - 17:9, 26:6, 27:11, 27:13, 30:7, 45:11, 64:18, 69:14, 78:10
**reads** [1] - 77:19
**ready** [1] - 87:5
**real** [1] - 86:1
**really** [21] - 13:3, 17:23, 20:13, 21:1, 28:23, 40:10, 47:10, 51:20, 71:13, 74:16, 76:20, 81:23, 85:8, 85:17, 88:23, 108:18, 112:24, 113:5, 117:23, 118:17, 123:9
**reason** [9] - 14:10, 16:23, 17:1, 17:18, 62:6, 69:15, 104:1, 107:25, 118:12

**reasonable** [11] - 18:11, 21:3, 22:9, 29:8, 30:7, 109:14, 119:12, 120:8, 120:10, 120:14, 120:16
**reasonably** [7] - 33:1, 38:22, 50:12, 50:19, 115:22, 119:12, 119:15
**reasoning** [3] - 102:22, 103:21, 103:23
**reasons** [7] - 25:7, 28:9, 52:11, 103:8, 115:24, 118:4, 121:17
**reauthorized** [1] - 54:14
**rebuttal** [3] - 8:14, 36:12, 36:14
**rebutted** [1] - 50:7
**receive** [2] - 11:9, 12:2
**received** [3] - 11:8, 90:16, 109:10
**receiving** [2] - 10:24, 90:18
**recent** [1] - 89:17
**recently** [1] - 41:5
**recess** [2] - 101:5, 124:19
**recitation** [1] - 32:9
**recognize** [7] - 43:24, 52:18, 55:7, 68:20, 80:12, 103:10, 115:12
**recognized** [3] - 24:3, 54:16, 94:18
**recognizes** [4] - 54:14, 54:23, 57:6, 77:5
**recollection** [2] - 13:11, 13:15
**recommend** [1] - 40:23
**recommendation** [2] - 59:4, 98:12
**recommendations** [3] - 85:16, 86:19, 86:23
**reconvene** [1] - 100:5
**record** [30] - 4:5, 7:8, 7:12, 7:13, 7:23, 7:24, 8:5, 9:24, 13:2, 13:7, 13:10, 15:6, 23:15, 24:4, 24:10, 36:21, 39:11, 66:23, 71:22, 72:4, 73:24, 74:11, 76:11, 77:23, 78:12, 81:20, 82:15, 101:10, 112:13,

122:11
**records** [6] - 9:6, 79:4, 79:9, 79:12, 79:21, 80:4
**recurring** [1] - 124:12
**recusal** [2] - 47:14, 47:19, 51:25
**recused** [2] - 59:24, 59:25
**red** [2] - 51:9, 51:13
**Red** [3] - 3:15, 6:17, 91:6
**redact** [1] - 79:10
**redacted** [1] - 80:8
**redactions** [1] - 80:5
**refer** [2] - 103:15, 105:20
**reference** [3] - 66:20, 106:15, 116:22
**referred** [1] - 29:15
**referring** [2] - 75:24, 75:25
**refused** [1] - 40:17
**regard** [2] - 64:15, 82:22
**regarding** [1] - 82:5
**regime** [5] - 18:24, 26:22, 52:7, 108:15, 110:9
**regret** [1] - 38:14
**regular** [3] - 121:23, 123:6, 124:12
**regulations** [3] - 24:10, 27:12, 27:14
**rehash** [1] - 103:12
**reiterated** [1] - 91:13
**relate** [1] - 16:9
**related** [3] - 8:10, 97:8, 103:22
**relating** [5] - 34:12, 34:14, 96:19, 97:3, 116:4
**relevant** [6] - 38:9, 59:15, 61:9, 62:15, 105:13, 111:18
**relief** [5] - 75:19, 80:19, 114:20, 115:6, 116:4
**reluctantly** [2] - 116:1, 117:4
**remainder** [1] - 89:4
**remained** [1] - 35:12
**remains** [1] - 59:17
**remedy** [1] - 43:14
**remind** [1] - 97:18
**reminded** [1] - 14:5
**reminding** [1] - 14:13
**remove** [2] - 27:24, 118:1
**repeat** [1] - 26:11

**repeatedly** [2] - 110:7, 119:1
**reply** [8] - 35:18, 43:23, 64:20, 66:4, 66:5, 67:10, 77:20, 77:25
**report** [25] - 11:25, 12:4, 12:12, 15:14, 36:16, 40:22, 84:1, 84:13, 84:16, 84:25, 85:19, 86:4, 86:7, 87:14, 87:15, 87:20, 91:21, 92:5, 92:10, 97:1, 97:23, 99:17, 107:18, 124:7, 124:11
**reported** [2] - 30:11, 125:7
**Reporter** [2] - 125:5, 125:6
**reporter** [3] - 4:8, 46:21, 122:10
**reports** [2] - 48:17, 68:14
**represent** [1] - 96:13
**representative** [1] - 79:24
**representing** [1] - 4:20
**REPUBLIC** [2] - 1:6, 125:10
**Republic** [7] - 2:13, 5:5, 47:10, 49:4, 49:22, 57:25, 58:8
**republic** [6] - 15:16, 47:4, 48:22, 56:11, 61:14, 62:24
**Republican** [2] - 49:5, 49:15
**request** [12] - 12:18, 13:16, 22:25, 52:19, 55:11, 75:18, 79:25, 80:1, 90:7, 91:8
**requests** [3] - 80:18, 84:5, 109:23
**require** [4] - 54:18, 113:15, 115:24, 123:9
**required** [3] - 50:18, 62:2, 108:15
**requirement** [2] - 105:1, 105:7
**requirements** [3] - 18:22, 29:4, 31:13
**requires** [3] - 6:9, 44:4, 113:8
**reserve** [2] - 62:13, 66:19, 117:6
**Reserve** [1] - 3:18
**resign** [1] - 117:21

resolve [6] - 33:21, 72:7, 72:14, 98:21, 99:15, 111:3
resolved [2] - 30:3, 33:10
respect [21] - 10:25, 12:10, 19:13, 24:5, 28:20, 28:22, 30:9, 33:17, 34:1, 35:8, 67:11, 70:3, 70:14, 72:12, 78:11, 81:7, 82:5, 87:23, 110:7, 110:20, 116:5
respectful [1] - 50:14
respectfully [5] - 26:16, 33:16, 34:25, 91:9, 99:14
respond [3] - 33:14, 45:20, 66:6
responded [1] - 29:5
response [14] - 26:8, 26:10, 29:9, 35:14, 43:23, 48:9, 50:9, 64:19, 65:7, 65:10, 72:8, 74:14, 81:24, 105:18
rest [2] - 9:1, 15:23
restate [1] - 45:4
result [1] - 99:16
resulted [1] - 94:20
returning [1] - 102:18
revealed [1] - 61:8
review [2] - 115:9, 116:13
Richard [1] - 6:4
RICHARD [1] - 3:5
RICHARDS [1] - 2:2
Richards [2] - 4:12, 101:13
Ricky [1] - 102:14
rights [4] - 33:8, 50:16, 61:10, 92:15
rise [3] - 81:8, 106:3, 120:15
risk [1] - 81:14
Robert [1] - 4:21
role [5] - 21:6, 25:12, 26:5, 69:3, 75:10
room [9] - 4:9, 5:1, 5:2, 45:13, 58:14, 79:14, 79:18, 94:4, 111:4
rosen [1] - 63:7
ROSEN [1] - 3:4
Ross [2] - 6:2, 102:11
ROSS [1] - 3:2
Rule [1] - 120:19
rule [10] - 50:18, 51:4, 54:11, 77:5, 100:2, 103:5, 119:20,

119:22, 119:25, 121:15
ruled [4] - 31:5, 42:1, 53:1, 53:7
ruling [9] - 16:1, 81:9, 100:10, 100:11, 102:19, 106:21, 112:1, 123:18, 123:24
rulings [2] - 50:22, 121:20
run [1] - 79:1, 100:14

## S

sailed [1] - 52:4
sale [52] - 10:5, 10:16, 10:22, 10:25, 11:2, 11:21, 12:6, 12:14, 12:20, 16:22, 19:9, 19:22, 19:25, 22:23, 27:15, 28:24, 29:13, 29:22, 37:20, 37:21, 37:24, 39:4, 39:20, 43:11, 45:7, 46:1, 52:9, 52:10, 52:21, 54:19, 57:6, 63:24, 68:16, 74:15, 77:6, 84:14, 84:23, 85:13, 88:4, 88:13, 89:2, 91:25, 94:14, 94:16, 106:24, 107:7, 107:22, 108:16, 109:13, 112:18, 114:9
sales [20] - 45:13, 48:2, 52:12, 52:20, 60:23, 65:15, 68:9, 86:14, 87:23, 89:1, 92:22, 93:11, 95:19, 95:22, 97:1, 100:5, 106:1, 108:1, 110:12, 124:5
salient [1] - 28:23
Sam [2] - 5:20, 102:6
SAM [2] - 2:15, 3:20
sanctions [1] - 18:24, 20:20, 24:14, 26:22, 27:4, 69:1, 70:4, 91:18, 92:24, 108:15, 110:8
sand [1] - 62:25
sandbagging [1] - 64:10
satellites [1] - 48:23, 49:5, 49:15
satisfies [1] - 94:19
satisfy [2] - 94:24, 95:2

saving [1] - 62:13
saw [3] - 52:8, 89:15, 97:22
schedule [3] - 33:10, 112:11, 122:5
scheduled [3] - 14:17, 114:6, 115:3
SCHNEIDER [2] - 1:17, 101:18
Schneider [1] - 101:19
Schrock [22] - 4:22, 8:20, 8:25, 9:17, 9:21, 13:19, 36:23, 37:1, 73:8, 73:11, 79:7, 82:11, 84:2, 91:16, 92:3, 92:13, 95:16, 96:12, 99:11, 100:15, 101:21, 123:19
SCHROCK [34] - 1:19, 8:22, 9:20, 11:17, 12:22, 13:1, 13:9, 13:13, 15:1, 15:8, 36:25, 42:7, 43:2, 44:7, 45:1, 45:21, 46:15, 73:10, 77:13, 79:6, 80:9, 82:12, 86:12, 87:10, 92:7, 96:16, 98:3, 98:7, 98:10, 98:16, 99:11, 100:16, 101:24, 123:20
Schrock's [1] - 79:14
SCHULMAN [1] - 2:6
se [1] - 60:13
SEALED [1] - 125:17
sealed [1] - 122:11
search [1] - 75:20
seat [1] - 9:2
second [6] - 28:10, 53:25, 76:6, 77:23, 80:1, 83:14
secondary [1] - 89:5
secret [5] - 68:23, 68:24, 69:4, 122:2, 122:3
section [8] - 31:13, 47:15, 94:23, 104:21, 104:22, 105:4, 105:8, 116:22
security [1] - 22:25
see [22] - 4:1, 7:11, 7:22, 8:4, 9:11, 43:12, 52:13, 53:3, 53:22, 57:10, 62:10, 72:17, 75:6, 81:23, 88:13, 90:4, 91:11, 94:6, 96:17, 99:10, 107:16, 114:17
seeing [1] - 29:8

seek [7] - 52:12, 60:14, 80:16, 88:16, 114:20, 118:15, 119:3
seeking [8] - 7:16, 14:8, 29:25, 39:2, 43:15, 105:3, 106:17, 115:6
seem [1] - 23:19, 71:22, 88:24
sell [2] - 63:13, 94:19, 94:24, 95:1
sense [4] - 12:4, 24:16, 60:24, 93:2
sensitive [2] - 45:24, 54:10
sentence [1] - 14:1
sentences [1] - 64:18
separate [5] - 23:16, 28:18, 60:13, 61:23, 77:24
separation [5] - 42:16, 42:23, 43:18, 57:14, 75:6
sequence [1] - 35:2
serious [1] - 71:21
seriously [1] - 39:16
servants [1] - 58:16
served [1] - 57:17
set [6] - 10:20, 105:17, 117:11, 119:20, 121:22, 121:23
setting [2] - 112:14, 123:14
seven [2] - 64:21, 66:5
several [2] - 13:19, 85:23
shall [2] - 29:19, 107:12
share [1] - 88:22
shared [1] - 122:6
shares [3] - 63:13, 72:20
shift [2] - 47:11, 76:18
ship [1] - 52:4
short [4] - 52:10, 52:21, 81:19, 122:18
short-circuit [1] - 81:19
shorter [1] - 32:18
Shorthand [2] - 125:5, 125:6
shorthand [2] - 125:7, 125:13
show [1] - 103:25
showing [1] - 105:14
shown [2] - 121:5
shy [1] - 71:23
side [17] - 4:9, 5:1, 5:2, 16:6, 16:25,

seek — 21:11, 23:20, 33:25, 34:16, 46:5, 47:2, 69:19, 71:23, 78:3, 79:14, 79:18, 111:12
SIGNED [1] - 125:17
significant [3] - 90:22, 95:3, 116:23
significantly [1] - 54:13
similar [1] - 118:25
similarly [2] - 64:1, 109:22
simply [11] - 11:22, 18:16, 24:21, 40:18, 41:7, 41:15, 45:3, 45:4, 45:5, 84:24, 89:6, 93:11, 104:3, 115:19
single [1] - 70:7
sit [1] - 114:1
sitting [1] - 113:14
situation [7] - 18:2, 18:9, 19:20, 21:19, 35:11, 47:13, 58:6
six [7] - 11:16, 33:8, 33:11, 107:1, 107:10, 107:11
six-month [4] - 11:16, 107:1, 107:10
sleight [1] - 53:10
slow [3] - 115:19, 115:20, 117:23
small [1] - 54:18
smoking [1] - 49:3
so-called [1] - 56:22
sold [1] - 90:4
sole [2] - 104:10, 108:12
solicit [4] - 10:3, 12:15, 65:14, 107:12
solicited [2] - 11:18, 37:21
someone [2] - 6:9, 46:24, 89:8
sometime [2] - 78:18, 112:8
sometimes [2] - 57:11
somewhat [5] - 35:12, 38:10, 90:15, 102:21, 109:8
soon [2] - 31:21, 32:10
sooner [2] - 90:12, 106:6
sorry [1] - 106:21
sort [10] - 16:12, 18:8, 20:23, 45:16, 50:7, 55:1, 62:6, 93:5, 93:21, 123:6
sought [1] - 116:5

**sounds** [6] - 8:19, 15:1, 47:1, 82:24, 92:12, 98:19
**speaking** [3] - 6:7, 50:12, 58:19
**speaks** [2] - 58:24, 89:24
**Special** [1] - 1:22
**special** [160] - 4:20, 7:3, 7:10, 7:21, 7:22, 8:2, 8:8, 9:6, 9:9, 9:22, 10:13, 10:19, 13:16, 13:17, 13:23, 14:11, 14:21, 16:1, 16:10, 16:16, 16:20, 16:24, 17:1, 17:3, 17:7, 17:10, 17:19, 17:24, 18:2, 18:10, 19:21, 20:1, 21:24, 22:11, 29:1, 29:4, 29:10, 29:15, 29:19, 30:4, 30:10, 30:14, 30:19, 30:24, 31:1, 31:14, 31:23, 34:17, 35:7, 35:14, 35:16, 35:24, 37:2, 37:5, 37:14, 38:8, 40:9, 44:25, 47:16, 47:24, 48:13, 48:17, 48:21, 51:23, 53:4, 53:11, 55:9, 55:12, 58:17, 58:25, 59:3, 60:17, 63:11, 63:18, 64:19, 65:2, 65:7, 65:10, 65:16, 65:20, 65:23, 65:25, 66:5, 66:9, 67:16, 67:25, 68:2, 68:7, 68:14, 69:9, 73:12, 73:14, 73:21, 76:10, 76:13, 77:12, 77:21, 79:4, 79:5, 79:7, 82:18, 86:9, 91:24, 92:19, 92:25, 95:17, 99:12, 101:20, 103:7, 103:13, 104:5, 105:16, 106:7, 106:13, 106:16, 106:20, 107:2, 107:9, 107:19, 107:23, 108:4, 108:10, 108:22, 108:25, 110:15, 110:17, 110:25, 111:6, 111:15, 112:8, 112:9, 112:16, 112:22, 113:1, 113:7, 113:16, 114:5, 114:24, 114:25,

116:7, 116:15, 117:8, 117:11, 117:25, 118:16, 118:24, 119:3, 119:11, 119:17, 119:23, 120:11, 120:17, 121:1, 121:24, 122:16, 122:23, 123:7, 124:13
**species** [1] - 58:7
**specific** [9] - 10:22, 25:2, 29:22, 37:17, 81:6, 82:3, 108:14, 109:23, 113:22
**specifically** [5] - 38:20, 66:15, 66:16, 114:7, 119:10
**specifics** [2] - 11:21, 67:11
**specked** [1] - 48:19
**Speedbudget** [1] - 125:23
**spend** [1] - 80:14
**spending** [1] - 83:15
**spent** [4] - 28:12, 113:2, 113:3, 114:24
**spirit** [1] - 91:15
**sprung** [1] - 50:2
**squadron** [1] - 49:16
**ss** [1] - 125:2
**staff** [1] - 32:19
**Stahl** [2] - 5:16, 102:3
**STAHL** [1] - 2:23
**stakes** [1] - 114:23
**stand** [1] - 50:15
**standing** [6] - 81:20, 82:2, 82:8, 82:13, 82:23, 83:18
**stands** [1] - 90:15
**Stark** [1] - 1:12
**start** [14] - 4:4, 4:9, 6:22, 7:10, 8:2, 15:12, 16:7, 46:24, 47:8, 52:12, 96:7, 99:2, 115:18, 123:19
**started** [4] - 9:18, 61:3, 86:8, 114:18
**STATE** [1] - 125:2
**state** [1] - 73:16
**statement** [9] - 21:8, 21:9, 21:12, 23:23, 24:2, 26:21, 53:17, 72:1, 109:10
**States** [18] - 19:6, 19:10, 19:19, 24:5, 53:14, 56:16, 56:19, 58:23, 62:18, 63:22, 72:16, 72:17, 72:23, 91:17, 109:7,

109:11, 109:15, 109:17
**STATES** [1] - 1:1
**stating** [1] - 109:11
**status** [11] - 30:12, 68:15, 84:1, 85:23, 86:4, 87:14, 94:5, 100:1, 107:18, 124:7, 124:11
**statute** [3] - 50:4, 61:19, 62:20
**statutory** [2] - 76:21, 76:22
**stay** [1] - 100:7
**STEELE** [2] - 1:16, 4:17
**Steele** [1] - 4:19
**Stenotype** [1] - 125:7
**step** [4] - 20:23, 25:7, 68:18, 71:11
**STEPHEN** [1] - 2:9
**Stephen** [1] - 5:4
**steps** [8] - 18:11, 53:24, 54:14, 84:12, 84:21, 92:24, 97:9, 109:13
**STEVEN** [1] - 3:14
**Steven** [1] - 6:18
**sticking** [1] - 102:18
**still** [11] - 7:3, 14:7, 52:25, 72:11, 80:13, 91:13, 93:25, 109:17, 109:20, 111:14, 111:25
**still-pending** [1] - 7:3
**Stonehenge** [1] - 105:6
**stop** [3] - 28:14, 81:1, 98:15
**strategic** [4] - 31:21, 41:12, 78:2, 116:2
**street** [1] - 51:11
**strenuously** [1] - 93:23
**stretch** [1] - 63:21
**strikes** [1] - 40:4
**subject** [3] - 21:25, 48:4, 60:9
**subjected** [1] - 51:16
**subjective** [1] - 62:4
**submission** [1] - 61:16
**submit** [2] - 7:15, 11:25
**submitted** [1] - 63:9
**submitting** [1] - 48:17
**subordinate** [3] - 20:5, 21:14, 37:11
**subsection** [1] - 62:19
**subsequent** [1] - 30:9

**subsists** [1] - 58:12
**substance** [4] - 23:18, 23:21, 74:16, 87:18
**substantial** [5] - 41:24, 90:23, 104:2, 115:23, 116:8
**substantially** [3] - 115:19, 117:20, 117:23
**substantive** [3] - 7:19, 82:20, 86:1
**sufficient** [3] - 32:8, 94:24, 119:9
**sufficiently** [1] - 112:2
**suggest** [3] - 99:6, 110:24, 122:20
**suggested** [1] - 93:8
**suggesting** [2] - 42:17, 78:4
**suggestion** [4] - 8:17, 45:11, 45:20, 90:24
**suggestions** [3] - 7:1, 91:14, 122:9
**summary** [3] - 15:2, 105:13, 122:18
**summer** [2] - 41:19, 106:8
**superb** [1] - 64:11
**supplement** [2] - 7:12, 8:5
**supplemental** [16] - 11:25, 12:4, 12:12, 15:14, 40:22, 84:13, 84:16, 84:25, 85:18, 86:7, 91:20, 92:5, 92:10, 97:1, 97:23, 99:17
**supplementing** [3] - 9:24, 13:2, 15:6
**support** [5] - 37:24, 70:8, 106:9, 107:13, 107:14
**supported** [1] - 120:23
**supportive** [1] - 93:3
**suppose** [2] - 82:14, 92:4
**supposedly** [4] - 46:25, 47:14, 47:17, 68:13
**Supreme** [4] - 43:25, 44:2, 57:14, 120:24
**surely** [1] - 44:1
**surmise** [1] - 34:5
**surprised** [3] - 83:6, 94:11, 123:8
**swiftly** [1] - 115:21
**system** [1] - 59:23

**T**

**table** [1] - 5:15
**tactical** [11] - 49:4, 49:21, 61:9, 61:20, 61:21, 62:1, 62:5, 62:15, 62:23, 76:3, 116:8
**talented** [1] - 49:16
**talks** [1] - 54:9
**team** [1] - 43:25
**technical** [1] - 50:20
**ten** [1] - 42:14
**term** [1] - 84:22
**termed** [1] - 91:3
**terms** [8] - 9:24, 13:1, 55:2, 70:24, 78:1, 80:7, 83:17, 88:24
**THE** [107] - 1:1, 1:2, 4:1, 4:16, 4:25, 5:10, 5:18, 5:24, 6:11, 6:20, 8:20, 8:24, 11:14, 12:18, 12:24, 13:5, 13:10, 13:14, 15:3, 15:9, 15:17, 18:7, 20:9, 22:10, 22:15, 23:4, 23:16, 24:13, 25:24, 26:8, 26:13, 27:2, 28:4, 28:14, 32:9, 34:8, 36:9, 36:13, 36:19, 42:5, 42:8, 43:21, 44:20, 45:10, 46:14, 46:16, 50:6, 55:6, 55:18, 60:11, 63:2, 63:5, 64:3, 64:12, 66:20, 66:25, 67:4, 71:19, 73:3, 73:8, 75:12, 77:11, 77:15, 78:16, 79:13, 79:16, 79:17, 79:22, 80:10, 81:12, 82:9, 83:1, 83:12, 83:21, 83:25, 84:8, 85:21, 87:8, 87:12, 89:22, 91:4, 92:2, 92:8, 94:3, 95:11, 96:10, 97:24, 98:5, 98:8, 98:11, 98:18, 99:6, 99:22, 100:18, 100:21, 100:23, 101:1, 101:4, 101:7, 101:17, 101:23, 102:4, 102:16, 123:22, 123:25, 124:2, 124:4
**themselves** [3] - 40:18, 68:8, 78:13
**theory** [1] - 59:19

**therefore** [3] - 56:2, 57:22, 76:12
**they've** [1] - 116:5
**thinking** [5] - 31:18, 63:18, 73:1, 85:1, 86:8
**thinks** [1] - 91:1
**third** [12] - 18:14, 20:21, 31:19, 59:17, 59:21, 59:24, 72:13, 91:10, 105:2, 105:6, 115:24, 120:4
**thorough** [1] - 78:21
**thoroughly** [1] - 103:3
**thoughts** [5] - 8:20, 12:16, 85:12, 97:6, 100:4
**threatens** [1] - 33:6
**three** [3] - 41:14, 106:8, 113:10
**throughout** [2] - 62:12, 105:25
**throw** [2] - 62:25, 117:6
**tickets** [1] - 88:10
**ticking** [1] - 114:18
**timeline** [2] - 10:17, 105:14
**timeliness** [20] - 16:3, 28:6, 28:7, 28:16, 28:17, 28:21, 31:24, 32:22, 34:2, 36:8, 49:2, 61:22, 62:9, 64:9, 64:16, 76:8, 105:1, 105:7, 118:11, 118:18
**timely** [3] - 61:10, 80:3, 105:5
**timing** [9] - 47:8, 60:13, 61:7, 61:12, 62:16, 111:19, 118:2, 118:3, 119:6
**tin** [1] - 58:20
**tin-pot** [1] - 58:20
**TO** [3] - 1:9, 1:11, 125:16
**today** [24] - 4:7, 6:3, 6:7, 6:17, 9:11, 27:15, 40:3, 58:13, 69:20, 78:18, 85:23, 100:3, 100:6, 100:12, 103:17, 103:20, 108:6, 109:6, 111:3, 111:9, 111:23, 113:2, 123:16, 124:8
**today's** [1] - 106:12
**together** [2] - 4:4, 9:10
**Tolles** [1] - 5:6
**TOLLES** [1] - 2:11

**tone** [1] - 47:5
**took** [3] - 32:7, 33:23, 115:6
**touch** [1] - 13:22
**towards** [1] - 109:13
**TOWNSEND** [1] - 2:6
**Townsend** [1] - 4:15
**track** [1] - 87:3
**transaction** [6] - 20:16, 20:24, 54:17, 108:8, 108:16, 110:12
**transcript** [3] - 106:21, 125:12, 125:14
**TRANSCRIPT** [1] - 1:9
**transfer** [2] - 25:6, 93:1
**transparent** [1] - 24:11
**treasury** [1] - 73:16
**Tree** [3] - 3:15, 6:17, 91:6
**tried** [5] - 33:22, 37:3, 37:16, 62:25, 68:4
**true** [3] - 70:14, 72:10, 125:15
**trump** [3] - 53:18, 56:21, 56:22
**try** [9] - 17:25, 25:25, 26:11, 50:21, 63:21, 63:23, 93:5, 93:21, 110:23
**trying** [7] - 21:17, 35:6, 35:9, 38:15, 40:4, 40:11, 40:12, 43:8, 50:8, 53:2, 63:22, 64:24, 68:20, 80:25, 81:1, 99:14, 111:14
**TUNELL** [1] - 2:20
**Tunnell** [1] - 5:14
**turn** [6] - 5:1, 8:5, 8:10, 15:10, 80:10, 89:24
**turned** [1] - 14:14
**twain** [1] - 46:25
**two** [17] - 19:18, 28:18, 47:23, 53:16, 55:19, 58:17, 60:19, 61:20, 66:22, 72:23, 77:20, 105:21, 107:21, 113:10, 122:1, 122:5
**type** [2] - 71:14, 111:1
**typed** [1] - 125:13
**types** [2] - 86:22, 108:21
**typewritten** [1] - 125:15

# U

**U.S** [30] - 10:3, 10:9, 10:22, 10:24, 11:6, 11:8, 11:12, 11:19, 12:2, 12:9, 38:1, 38:19, 39:2, 41:17, 41:20, 42:15, 42:21, 43:7, 43:9, 46:10, 57:9, 57:13, 57:14, 58:18, 59:20, 75:3, 85:8, 104:7, 108:11, 120:25
**U.S.C** [1] - 65:6
**U.S.C.A.J** [1] - 1:12
**ultimate** [2] - 54:16, 57:6
**ultimately** [8] - 8:13, 20:17, 27:5, 77:5, 108:10, 110:11, 110:21, 112:25
**unambiguous** [1] - 67:19
**unavoidable** [1] - 62:22
**unclarity** [1] - 68:19
**unclear** [2] - 32:25, 64:25
**undefined** [1] - 113:22
**undeniable** [1] - 65:11
**undeniably** [1] - 70:20
**under** [11] - 18:14, 33:13, 43:12, 59:19, 78:21, 78:23, 94:16, 105:8, 108:15, 119:10, 121:6
**underlying** [1] - 72:12
**undermine** [1] - 65:13
**understandable** [1] - 109:14
**understood** [8] - 31:1, 67:24, 68:1, 80:8, 92:17, 105:24, 110:18, 114:14
**undisclosed** [1] - 116:18
**undisputed** [1] - 112:6
**undue** [2] - 42:16, 42:22
**unduly** [1] - 118:2
**unencumbered** [1] - 65:15
**unethical** [2] - 48:13, 48:23
**unfold** [1] - 24:12
**unfolded** [2] - 35:3, 35:21
**unilaterally** [1] - 65:2
**unique** [1] - 115:16

**UNITED** [1] - 1:1
**United** [18] - 19:6, 19:10, 19:19, 24:5, 53:14, 56:16, 56:18, 58:23, 62:18, 63:22, 72:16, 72:17, 72:23, 91:17, 109:7, 109:11, 109:15, 109:17
**unless** [4] - 13:7, 28:4, 95:9, 110:8
**unnecessary** [1] - 83:8
**unreasonable** [1] - 47:6
**unresolved** [1] - 72:11
**unsatisfied** [2] - 41:3
**unseal** [2] - 79:3, 80:4
**unsealed** [2] - 9:6, 122:14
**unsealing** [2] - 79:9, 79:21
**untimeliness** [1] - 31:20
**untimely** [17] - 28:8, 31:5, 31:6, 31:9, 34:10, 34:24, 42:1, 62:7, 76:16, 104:19, 105:10, 111:16, 112:1, 112:2, 115:14, 118:5, 118:9
**up** [24] - 6:8, 14:2, 16:4, 20:17, 20:23, 27:16, 34:15, 41:13, 51:10, 54:18, 59:13, 60:23, 69:13, 87:13, 92:13, 95:6, 107:6, 110:14, 112:14, 114:13, 115:6, 121:22, 121:23, 123:14
**update** [1] - 84:11
**updates** [3] - 30:11, 30:12, 68:15
**urge** [3] - 44:2, 65:3, 68:24
**useful** [1] - 62:20

# V

**value** [6] - 11:7, 44:16, 57:3, 73:23, 95:2, 108:8
**value-maximizing** [2] - 73:23, 108:8
**valued** [1] - 94:22
**various** [1] - 119:21
**vein** [1] - 93:4
**VENEZUELA** [2] - 1:7,

125:10
**Venezuela** [52] - 2:13, 7:15, 8:1, 9:7, 14:7, 15:16, 15:21, 17:2, 30:21, 39:6, 39:25, 41:23, 42:13, 43:21, 44:20, 45:12, 48:18, 54:24, 54:25, 62:24, 65:12, 66:6, 72:19, 75:18, 79:20, 83:5, 83:10, 83:17, 89:24, 94:4, 94:9, 99:15, 99:19, 103:6, 103:12, 104:3, 104:12, 105:20, 107:20, 112:7, 112:20, 112:23, 114:5, 115:2, 115:17, 115:21, 116:3, 116:20, 118:15, 118:23
**Verrilli** [11] - 5:7, 5:9, 8:17, 15:11, 15:20, 42:12, 47:3, 50:7, 64:5, 77:15, 101:1
**VERRILLI** [29] - 2:11, 8:19, 15:15, 15:19, 18:17, 21:7, 22:14, 22:19, 23:13, 23:18, 25:1, 26:7, 26:10, 26:15, 27:9, 28:9, 28:16, 33:15, 34:25, 36:11, 64:6, 64:13, 66:21, 67:2, 67:8, 72:9, 73:7, 77:17, 101:3
**verse** [1] - 39:14
**version** [1] - 80:8
**versus** [3] - 40:12, 56:21, 86:21
**vested** [1] - 113:4
**via** [2] - 10:15, 21:21
**view** [27] - 11:6, 21:10, 22:23, 27:18, 27:19, 29:21, 39:4, 40:15, 44:4, 52:24, 53:21, 54:5, 54:7, 56:13, 58:12, 60:1, 72:25, 73:22, 89:21, 94:13, 97:25, 104:19, 108:7, 108:8, 109:18, 109:20, 112:3
**views** [12] - 24:4, 52:13, 53:3, 58:10, 65:15, 74:2, 74:5, 74:9, 91:17, 109:6, 121:22, 123:13
**violate** [1] - 31:12
**violation** [1] - 66:8

**voice** [1] - 89:15
**vs** [2] - 1:5, 125:10

## W

**WACHTELL** [1] - 3:4
**Wachtell** [3] - 6:4, 63:7, 102:13
**Wagner's** [1] - 47:1
**wait** [5] - 14:22, 36:11, 56:4, 113:17, 114:19
**waiting** [1] - 115:13
**waivable** [1] - 61:5
**waive** [3] - 32:1, 32:3, 60:16
**waived** [5] - 36:2, 60:15, 76:15, 81:14, 118:17
**waiver** [14] - 16:4, 32:5, 36:7, 41:10, 47:23, 50:11, 50:13, 60:12, 60:20, 60:24, 61:23, 64:10, 119:2, 119:7
**walk** [1] - 44:2
**wants** [8] - 6:12, 7:12, 7:22, 8:5, 8:8, 34:1, 82:13, 94:4
**Warner** [1] - 125:22
**warner** [1] - 125:4
**Washington** [1] - 46:22
**wasting** [1] - 20:13
**ways** [1] - 24:11
**weapon** [2] - 62:1, 62:13
**week** [2] - 94:22, 124:8
**weeks** [5] - 49:19, 50:2, 61:20, 76:4, 117:6
**weigh** [8] - 8:12, 46:5, 56:4, 57:2, 85:12, 86:22, 97:2, 99:24
**weight** [1] - 59:11
**weighty** [2] - 57:11, 57:12
**WEIL** [1] - 1:19
**Weil** [6] - 4:22, 9:21, 37:1, 73:11, 79:7, 101:22
**WELCH** [1] - 1:20
**Welch** [1] - 4:23
**welcome** [2] - 5:24, 85:25
**white** [1] - 78:15
**whole** [4] - 51:21, 51:23, 95:1, 106:22
**willing** [1] - 96:14

**WILLKIE** [1] - 3:19
**window** [4] - 11:16, 107:1, 107:2, 107:10
**wipe** [1] - 111:21
**wish** [3] - 8:13, 9:13, 63:2
**WOLF** [7] - 3:5, 63:4, 63:6, 83:14, 90:1, 100:22, 124:1
**wolf** [5] - 6:5, 6:7, 63:6, 90:1, 123:25
**Wolf** [4] - 83:13, 93:16, 100:21, 102:13
**WOMBLE** [1] - 3:16
**word** [15] - 24:21, 38:15, 44:24, 49:12, 68:5, 69:9, 71:20, 73:5, 73:21, 77:16, 108:4, 108:19, 114:13
**words** [2] - 65:23, 107:11
**works** [1] - 33:4
**world** [1] - 88:22
**worth** [1] - 57:3
**worthless** [1] - 48:12
**writ** [2] - 41:5, 90:17
**write** [4] - 42:13, 44:1, 80:16, 81:22
**writes** [1] - 122:18
**writs** [2] - 41:6, 87:2
**written** [1] - 113:13
**wrongly** [1] - 66:13
**wrote** [1] - 26:1

## Y

**year** [4] - 49:1, 52:5, 112:5, 112:7
**years** [10] - 33:8, 39:18, 41:4, 48:1, 48:16, 54:19, 58:10, 58:17, 89:21, 117:19
**yourselves** [3] - 4:8, 113:13, 123:12

## MORRIS, NICHOLS, ARSHT & TUNNELL LLP

1201 NORTH MARKET STREET
P.O. BOX 1347
WILMINGTON, DELAWARE 19899-1347
(302) 658-9200
(302) 658-3989 FAX

KENNETH J. NACHBAR
(302) 351-9294
(302) 425-3013 FAX
KNachbar@morrisnichols.com

March 3, 2023

**VIA ELECTRONIC FILING**

The Honorable Leonard P. Stark
U.S. Court of Appeals for the Federal Circuit
717 Madison Place, NW
Washington, D.C. 20439

Re:     Crystallex International Corp. v. Bolivarian Republic of Venezuela
No. 1:17-mc-00151-LPS

Dear Judge Stark:

I write on behalf of the Venezuela Parties in response to the opening letter briefs of ConocoPhillips (D.I. 522), Crystallex (D.I. 523), and the Special Master (D.I. 526) (collectively, the "Responding Parties") responding to questions posed by the Court in connection with the Venezuela Parties' motion to disqualify the Special Master (D.I. 509). Instead of simply answering the Court's questions, the Responding Parties use their briefs primarily to repeat misguided arguments made in previous briefs on whether the Special Master should be disqualified. (ConocoPhillips did not even submit a response to the Venezuela Parties' motion to disqualify). On the questions posed by the Court, there are only a few areas of disagreement.

**Question A. If the Venezuela Parties are correct that the Court must disqualify the Special Master, would the same reasoning require Judge Stark to recuse himself as well?**

ConocoPhillips and Crystallex agree with the Venezuela Parties that, "without more," the reasons the Special Master is disqualified do not require the Court's recusal, at least on the facts as currently understood. *See* D.I. 522 at 1–2; D.I. 523 at 1–2. The Special Master alone disagrees, arguing that "if the Special Master's *ex parte* meeting with representatives of the U.S. Government created a disqualifying appearance of partiality … , then the Court's express authorization of that meeting created the same appearance of partiality and is therefore likewise disqualifying." D.I. 526 at 1. The Special Master's conclusion is incorrect, for two reasons.

***First,*** although the Venezuela Parties believe the Court erred in authorizing the Special Master to engage in *ex parte* communications with representatives of the Executive Branch, the Special Master is wrong that such an erroneous order, by itself, creates an appearance of partiality. As the Venezuela Parties previously explained, the Special Master must be disqualified under § 455(a)—as well as § 455(b), which the Special Master does not argue applies to the Court in

145a

The Honorable Leonard P. Stark
March 3, 2023
Page 2

these circumstances—because the "*information* he learned through his *ex parte* contacts, which leave[s] no trace in the record, may reasonably be expected to color his reports and recommendations to the district court," not merely because he engaged in *ex parte* communications in violation of his ethical obligations under the Code of Conduct. D.I. 524 at 2 (quoting *In re Brooks*, 383 F.3d 1036, 1046 (D.C. Cir. 2004) (cleaned up)). Contrary to the Special Master's unsupported assertion that "[t]he only conclusion that can be drawn from the Venezuela Parties' [ ] belief that the Court had no power to authorize the Special Master's *ex parte* communications is that the Court has engaged in some disqualifying conduct," D.I. 526 at 2, both law and logic make clear that merely authorizing *ex parte* communications, while erroneous, does not by itself create an appearance of partiality. *See* D.I. 524 at 2.

**Second,** while it would be disqualifying for the Court to authorize the Special Master to lobby the U.S. Government (USG) to change its expressed foreign policy position, authorize the launch of the sale process, or grant Crystallex's renewed application for a license to execute on its judgment and close a sale of the PDVH Shares, that is not—subject to further clarification from the Court—how the Venezuela Parties understand the Court's orders or instructions to the Special Master, *see* D.I. 524 at 3–4, and the Special Master does not argue that the Court authorized such conduct. (Notably, despite multiple opportunities to do so, the Special Master has not denied that he lobbied the USG in this manner at the January 12 Meeting.)

Instead, the Special Master argues that "[i]f it is disqualifying for the Special Master to take a position on whether a court's judgment should be enforced on its terms, then the Venezuela Parties appear to be arguing that it was disqualifying for the Court to appoint the Special Master for that purpose in the first place." D.I. 526 at 1. This mischaracterizes the problem with the Special Master's conduct. No one contends that it would be disqualifying for the Court to instruct the Special Master to carry out an order to execute on the PDVH Shares in satisfaction of Crystallex's judgment, including implementing a sale process, should the Court order such a process to begin. The Special Master conflates *whether* Crystallex has an enforceable judgment—a question that has been resolved by the Court—with *how* and *when* an execution sale in satisfaction of that judgment will be conducted. Those latter questions have not been decided by the Court, as ConocoPhillips recognizes, *see* D.I. 522 at 4 ("The pertinent issue that may be in actual dispute is whether a Launch Date should be set in light of OFAC's already expressed positions and any subsequent clarifications to OFAC's guidance"). And resolution of those hotly disputed questions will turn on the positions taken or not taken by the Executive Branch, which is one of the reasons the Special Master's lobbying on behalf of Crystallex's desired position is so improper.

Moreover, the law and this Court's orders are clear that, at the very least, no sale can close—and the Special Master cannot complete execution upon Crystallex's judgment or pay any proceeds to Crystallex—without a license from OFAC, an application for which OFAC already denied without prejudice. In its prior opinions, the Court agreed with the Special Master and the Venezuela Parties that it would be improvident for the sale process to begin because of market uncertainty about OFAC's position on the sale process and about the likelihood that it would grant Crystallex a license to close an execution sale resulting from such a process. D.I. 443 at 40–41.

The Honorable Leonard P. Stark
March 3, 2023
Page 3

The Court therefore ordered the Special Master to attempt to obtain guidance from OFAC on those questions that he could share with the market. *See id.* at 40; D.I. 481 ¶¶ 3–4. Instead of just asking OFAC for its position, the Special Master evidently attempted to change OFAC's position by arguing that OFAC should make clear that it supports (or at least does not oppose) the launch of the sale process and/or the closing of the sale. The Special Master does not argue that the Court authorized such a clear lack of impartiality.

ConocoPhillips, which did not submit a response to the Venezuela Parties' motion to disqualify, argues for the first time here that Fed. R. Civ. P. 53 allows the Special Master to engage in *ex parte* fact-gathering from third parties in an "investigative" role. That argument—which is not responsive to this Court's question whether the Venezuela Parties' arguments for disqualifying the Special Master also apply to the Court itself—is forfeited, and the Court should disregard it. *Cf. Teleconference Sys. v. Proctor & Gamble Pharms., Inc.*, 676 F. Supp. 2d 321, 331 n.13 (D. Del. 2009) ("Issues raised for the first time in a reply brief should not be heard."). The argument is also incorrect. In the out-of-circuit district court case on which ConocoPhillips principally relies, the parties were not even challenging any *ex parte* investigations by the special master. *See Ark. Teacher Ret. Sys. v. State Street Bank & Trust Co.*, C.A. No. 11-10230, 2017 WL 1712516, at *1 (D. Mass. May 2, 2017) (the parties "agreed" that the special master "was not disqualified from serving under the standards established by 28 U.S.C. § 455"). Rather, that case merely addressed an objection to the special master's retention of a technical advisor, who was *not* "ask[ed] or allow[ed] … to provide *any* evidence" (through *ex parte* investigations or otherwise). *Id.* at *5 (emphasis added).[1] In any event, *this* Court is bound by the Third Circuit's decision in *In re Kensington International Ltd*, 368 F.3d 289 (3d Cir. 2004), which confirms that a special master who takes it upon himself to become an *ex parte* investigator in connection with his adjudicative functions must be disqualified under § 455.[2]

---

[1]    ConocoPhillips also cites *In re Oil Spill by Oil Rig "Deepwater Horizon" in Gulf of Mexico, on April 20, 2010*, but that case did not even involve a special master engaging in *ex parte* communications. *See* MDL No. 2179, 2014 WL 12788985, at *5 (E.D. La. Apr. 29, 2014).

[2]    This is true regardless of ConocoPhillips' academic theory that there is a particular need for an investigation here because execution on Crystallex's judgment is prohibited by federal law unless the Executive Branch authorizes a transfer of the shares (which it already once refused to do). The Special Master could and should have requested OFAC's views in writing, as courts frequently do, or in a meeting at which all parties were present. In any event, ConocoPhillips mischaracterizes *Muskrat v. United States*, 219 U.S. 346, 355 (1911), as holding that it is "unconstitutional for [a] court judgment to be enforceable only upon [a] subsequent administrative decision by [the] executive branch." D.I. 522 at 3. The cited page in *Muskrat* discussed a case holding that *a court* lacked the power to "enforce its judgment" when "whether [the judgment was] to be paid or not depended on the future action of the Secretary of the Treasury and of Congress." 219 U.S. at 355. In other words, if *Muskrat* applies here, it would require the Court to dismiss Crystallex's judgment enforcement proceeding for lack of Article III jurisdiction.

The Honorable Leonard P. Stark
March 3, 2023
Page 4

**Question B. Are the Venezuela Parties moving to recuse Judge Stark?**

As stated in their previous letter brief, the Venezuela Parties are not aware of a basis to move to recuse the Court at this time. *See* D.I. 524 at 4. Crystallex's preemptive effort to argue that a motion to recuse directed to the Court would be untimely or waived, *see* D.I. 523 at 2, does not warrant consideration now, because no such motion has been made and the propriety of any hypothetical motion would need to be assessed based on whatever additional circumstances supported it.

**Question C. Is any party seeking an evidentiary proceeding to resolve the fact dispute as to when the Venezuela Parties were told that the Special Master would not permit them to attend his meeting with OFAC (*compare* D.I. 515 at 1-3 *with* D.I. 512 at 6) and, if not, how do you propose the Court resolve this dispute?**

The Venezuela Parties agree with ConocoPhillips and Crystallex, *see* D.I. 522 at 2; D.I. 523 at 3, that the Court can and should resolve the above-referenced fact dispute on the basis of the affidavits and other evidence submitted to the Court. The Special Master still has not presented any actual evidence to substantiate his assertion that he rejected the Venezuela Parties' request to attend his meeting with the USG on December 30, 2022, rather than on January 3, 2023, as Mr. Eimer attested in his declarations, and as Mr. Eimer's email and phone records confirm, *see* D.I. 516, 516.1, 525, 525.1, 527, 527.1. Nor does the Special Master argue, or cite to any authority showing, that the four-day difference would change the timeliness analysis. *See* D.I. 526 at 3.

Instead of answering whether an evidentiary hearing is needed, the Special Master and Crystallex include unauthorized, improper surreply briefing to support their claims of untimeliness and waiver. The Court should disregard these improper arguments, which are also wrong and irrelevant for the reasons explained in the Venezuela Parties' briefs. *See, e.g.*, D.I. 509 at 8–10; D.I. 515 at 2–6. To the extent the Special Master argues that the Venezuela Parties should have guessed that the PSPO authorized a substantive *ex parte* meeting with OFAC without actually so stating (*i.e.*, that they had "*constructive* knowledge"), *Kensington* makes clear that "*actual* knowledge" (or "its undeniable equivalent") is required. 368 F.3d at 313–15 (emphasis added). Although the Special Master uses the buzzwords "strategic delay," he does not (as with his unexplained invocation of "unclean hands") point to any strategic reason for the Venezuela Parties to delay filing the motion.[3]

---

[3] Because he cannot come close to satisfying *Kensington*, the Special Master cites instead—and for the first time—a Second Circuit case, *United States v. Yonkers Board of Education*, 946 F.2d 180, 183 (2d Cir. 1991). To the extent *Yonkers* sets forth additional or different requirements for showing timeliness, this Court must follow *Kensington*, which granted relief under § 455 even when the parties actually "knew of" the disqualifying circumstances "for over 20 months" before filing, 368 F.3d at 327 (Fuentes, J., dissenting); *see also id.* at 317 (majority) ("We are not disposed to have the issue of timeliness trump what we have concluded are the principles of § 455(a) ….").

The Honorable Leonard P. Stark
March 3, 2023
Page 5

The Responding Parties' procedural objections are especially misplaced as to the argument that the Special Master should be disqualified for engaging in *improper advocacy* at the January 12 Meeting. There is no evidence that the Special Master disclosed his intention to advocate before the Executive Branch until shortly before the meeting occurred. ConocoPhillips argues that the Venezuela Parties should have objected to the Special Master's inclusion of a provision in the Proposed Sale Procedures Order authorizing the Special Master to "proactively engage with the Executive Branch," *see* D.I. 522 at 2–4 & n.3 (quoting SPO ¶ 4). But the Venezuela Parties *did* object to that provision, and on the very ground that the Special Master cannot "advocate to the Government on behalf of particular parties or for particular outcomes in regulatory determinations affecting those parties." D.I. 354 at 21. As the Venezuela Parties have repeatedly pointed out, the Special Master responded to this objection by telling the Court and the parties before entry of the SPO that he did *not* intend to "lobb[y] on behalf of any particular party in this case." D.I. 356 ¶ 8. In urging the Executive Branch, however, to change its established foreign policy position and say that it supports (or at least does not oppose) the launch of the sale process and/or the closing of the sale, the Special Master breached that promise to the Court and the Venezuela Parties by lobbying the Executive Branch for exactly the position taken by Crystallex. And the strident tone of the Special Master's letter brief towards the Venezuela Parties strongly suggests he did so with vigor. *See, e.g.*, D.I. 526 at 1–2 (calling the Venezuela Parties' position "absurd" and alleging that they "will do anything to delay enforcement"). Given that the Special Master's public filings evince open hostility to the Venezuela Parties, one can only imagine that he lobbied even more vehemently against their interests in privately urging the Executive Branch to support the launch of the sale process, which is the reason he wanted them excluded from the meeting. Thus, while this Court appears to have mistakenly assumed before the January 12 Meeting that the Special Master would abide by his commitment to remain impartial, his unapologetic defenses of his lobbying "efforts to enforce Crystallex's judgment" have since eliminated any doubt. *Id.* at 1; *see* D.I. 524 at 3–4; D.I. 506 at 2 n.2.

Respectfully submitted,

*/s/ Kenneth J. Nachbar*

Kenneth J. Nachbar (#2067)

cc: All Counsel of Record (Via E-Filing)

---

In any event, *Yonkers* agreed that the timeliness requirement exists "to ensure that a movant does not hedge its bets against the eventual outcome of a proceeding" and held that "recusal [was] not warranted" in any event. 946 F.2d at 183 (cleaned up). It thus offers no guidance where, as here, "the justification for disqualification is compelling" and the movants have not "abuse[d the] § 455(a) procedure." *Kensington*, 368 F.3d at 317 & n.28.

ROBERT B. PINCUS in his capacity as
Special Master for the United States District Court for the District of Delaware
PO Box 4570
Wilmington, DE 19807

March 3, 2023

**BY HAND DELIVERY & CM/ECF**

The Honorable Leonard P. Stark
United States District Court for the District of Delaware
J. Caleb Boggs Federal Building
844 North King Street
Wilmington, DE 19801-3570

Re:     *Crystallex International Corp. v. Bolivarian Republic of Venezuela,*
        D. Del. C.A. No. 1:17-mc-00151-LPS; Memorandum Order [D.I. 517]

Dear Judge Stark:

I hereby submit this letter brief in my capacity as Special Master appointed in this matter in response to letter briefs filed by the Venezuela Parties [D.I. 524], Crystallex [D.I. 523], and ConocoPhillips [D.I. 522].[1]

**1.     If the Venezuela Parties are correct that the Court must disqualify the Special Master, would the same reasoning require Judge Stark to recuse himself as well?**

In response to this question, Crystallex and ConocoPhillips assert that the disqualification of a special master does not, without more, require disqualification of the appointing judge.  *See* D.I. 523 at 1; D.I. 522 at 1.  I agree with that proposition as a matter of law but note that it is not responsive to the Court's question, which was addressed to whether the *reasoning* espoused by the Venezuela Parties would require recusal of the Court if accepted.[2]  On this question, the facts of this dispute plainly indicate that the answer is yes.  This case is unlike those in which a special master was disqualified for conduct undertaken independent of and without approval of the court.  *See, e.g.*, *In re Kempthrone*, 449 F.3d 1265, 1269-71 (D.C. Cir. 2006) (disqualifying special master for unilaterally hiring and relying upon conflicted third party).  Here, the Court expressly directed and authorized the conduct that the Venezuela Parties allege to be disqualifying.  *See* D.I. 506 at 1 (explaining that "the Court has contemplated for many months that the Special Master would pursue an *ex parte* meeting with representatives of the United States Government").  Under these circumstances, it is not possible to separate the alleged disqualifying conduct from the Court itself, even if the Court "did not personally communicate *ex parte* with the Executive Branch."  D.I. 524.

---

[1] Capitalized terms used and not otherwise defined herein shall have the meanings ascribed to such terms in the Sale Procedures Order [D.I. 481].

[2] For the same reason, Crystallex's argument that any request to recuse Judge Stark would be untimely and waived, although true, is not responsive to the Court's question.  *See* D.I. 523 at 2.

The Honorable Leonard P. Stark
March 3, 2023
Page 2

**2.      Are the Venezuela Parties moving to recuse Judge Stark?**

The Venezuela Parties have stated that they are not at this time moving to recuse Judge Stark, so this question need not be addressed further.

**3.      Is any party seeking an evidentiary proceeding to resolve the fact dispute as to when the Venezuela Parties were told that the Special Master would not permit them to attend his meeting with OFAC (*compare* D.I. 515 at 1-3 *with* D.I. 512 at 6) and, if not, how do you propose the court resolve this dispute?**

An evidentiary hearing is not necessary because there is no longer any fact dispute with respect to the specific date (*i.e.*, December 30, 2022 or January 3, 2023) on which I directly communicated to the Venezuela Parties' counsel that he would not be permitted to attend the meeting with the United States Government. Upon review of the phone records submitted by the Venezuela Parties, D.I. 527, and reconciliation of those records with my own phone and email records, I have concluded that I must have misremembered the mode and content of my communications with the Venezuela Parties on December 30. I sincerely apologize to the Court and the Venezuela Parties for this mistake and any distraction caused by this error.

Nevertheless, for the reasons I state in my previous letter, the Venezuela Parties' attempt to disqualify me remains untimely because the Venezuela Parties knew by no later than October 4, 2022 that I planned imminently to have *ex parte* communications with the U.S. Government. *See* D.I. 526 at 3-5. A motion to enjoin such *ex parte* communications should have been brought as soon as possible following October 4, 2022, yet the Venezuela Parties did not actually seek such relief until January 9, 2023. Even if the Venezuela Parties somehow had doubt as to whether the meeting would be conducted *ex parte* notwithstanding that (i) the Sale Procedures Order did not require the Venezuela Parties (or any Sale Process Parties) to be present, (ii) all of my prior communications with the Executive Branch had been *ex parte*, and (iii) I indicated that I "d[id] not intend to include the Venezuela Parties at such meeting," D.I. 480 at 2 n.2, such doubt must have been dispelled by the report I filed on December 28—two days *before* December 30—from which the Venezuela Parties learned that I had scheduled a meeting with representatives of the U.S. Government to take place in January *without contacting or coordinating with the Venezuela Parties at all*. *See* D.I. 509 at 3-4. It is implausible for the Venezuela Parties to claim, in light of these facts, that they were unaware that the meeting would be conducted *ex parte* until I personally informed the Venezuela Parties of that on January 3.

For these reasons, as well as the reasons set forth in the submissions of Crystallex and ConocoPhillips, the Court should deny the Venezuela Parties' motion to disqualify the Special Master.

The Honorable Leonard P. Stark
March 3, 2023
Page 3

Respectfully Yours,

*/s/ Robert B. Pincus*

Robert B. Pincus, in my capacity as
Special Master for the United States
District Court for the District of
Delaware

cc: All Counsel of Record (via CM/ECF and E-Mail)

ROBERT B. PINCUS in his capacity as
Special Master for the United States District Court for the District of Delaware
PO Box 4570
Wilmington, DE 19807

February 28, 2023

**BY HAND DELIVERY & CM/ECF**

The Honorable Leonard P. Stark
United States District Court for the District of Delaware
J. Caleb Boggs Federal Building
844 North King Street
Wilmington, DE 19801-3570

      Re:    *Crystallex International Corp. v. Bolivarian Republic of Venezuela,*
               D. Del. C.A. No. 1:17-mc-00151-LPS

Dear Judge Stark:

      I submit this letter in my capacity as the Special Master appointed by the Court in this case by order dated April 13, 2021 (D.I. 258) in response to the letter of the Venezuela Parties filed in objection to the *Special Master's Monthly Report for the Period Ended January 31, 2023* (D.I. 528, the "***Objection***").[1]

      As an initial matter, all of the fees and expenses described in the *Special Master's Monthly Report for the Period Ended January 31, 2023* were incurred in furtherance of my duties as Special Master, as provided by this Court in its order of May 27, 2021.  *See* D.I. 277 ¶ 14 (providing that "[t]he Special Master shall be compensated at his usual rate . . . and shall also be reimbursed for . . . expenses incurred in the performance of his duties" and directing the Sale Process Parties to "bear the cost of the Special Master and his Advisors' compensation").  In particular, I note that the Court expressly authorized the *ex parte* meeting with the U.S. Government over the last-minute objection of the Venezuela Parties.  *See* D.I. 506.  The Venezuela Parties have no basis to object to fees and expenses incurred in connection with activities authorized by the Court or in defending myself in my capacity as Special Master in respect thereof.[2]

      Moreover, the notion that the Venezuela Parties should be permitted to file motion after motion clearly intended to delay and frustrate the sale process while imposing the cost of responding to those motions on myself and my Advisors is absurd.  The Venezuela Parties should not be heard to complain about the fees I have charged when a substantial portion of those fees

---

[1] Capitalized term used but not otherwise defined herein have the meanings ascribed to such terms in the Sale Procedures Order (D.I. 481).

[2] The Special Master agrees with the Venezuela Parties that this issue need not be briefed at this time because its resolution largely (if not entirely) depends upon how the Court resolves the Venezuela Parties' motion to disqualify the Special Master.  However, should the Court request additional briefing on this subject, the Special Master will respond accordingly.

The Honorable Leonard P. Stark
February 28, 2023
Page 2

were incurred as a direct consequence of the Venezuela Parties' deliberate efforts to delay these proceedings and, absent such tactics, would not have been incurred at all.

The Objection also recycles the Venezuela Parties' rote assertion that "the Special Master and his Advisors have not provided sufficient justification for [their] expenses." But my and my Advisors' fees and expenses have been incurred in furtherance of the Court's mandate to design and implement a value-maximizing sale process for PDVSA's shares in PDVH. To the extent any fees have been incurred in connection with other activities, it is only because of the Venezuela Parties' own actions.

Finally, the Objection refers to an agreed $2 million cap on my fees, which only applied to "the fees and expenses of the Special Master, Counsel, and Advisors in connection with submitting to the Court the Proposed Sales Procedures Order." D.I. 277 ¶ 15. I filed the Proposed Sale Procedures Order on August 9, 2021. *See* D.I. 302. Accordingly, the fee cap is not, and has not been, applicable since that date. The Venezuela Parties' continued invocation of the purported $2 million cap is therefore inaccurate and misleading.

I appreciate that the Venezuela Parties have not requested further briefing on the Objection. Accordingly, I submit this response only to note for the Court that my Advisors and I have only sought reimbursement for such fees and expenses as have been required to perform my duties as expressly authorized and directed by the Court—fees which the Venezuela Parties, together with Crystallex and ConocoPhillips, are obligated to pay by order of the Court.

Respectfully Yours,

*/s/ Robert B. Pincus*

Robert B. Pincus, in my capacity as Special Master for the United States District Court for the District of Delaware

cc: All Counsel of Record (via CM/ECF and E-Mail)

ROBERT B. PINCUS in his capacity as
Special Master for the United States District Court for the District of Delaware
PO Box 4570
Wilmington, DE 19807

February 24, 2023

**BY HAND DELIVERY & CM/ECF**

The Honorable Leonard P. Stark
United States District Court for the District of Delaware
J. Caleb Boggs Federal Building
844 North King Street
Wilmington, DE 19801-3570

Re:     *Crystallex International Corp. v. Bolivarian Republic of Venezuela,*
        D. Del. C.A. No. 1:17-mc-00151-LPS; Memorandum Order [D.I. 517]

Dear Judge Stark:

I hereby submit this letter brief in response to the questions set forth in your Memorandum Order of February 17, 2023 [D.I. 517].[1]

**1.      If the Venezuela Parties are correct that the Court must disqualify the Special Master, would the same reasoning require Judge Stark to recuse himself as well?**

If the Venezuela Parties are correct that the Court must disqualify the Special Master, then presumably the same flawed reasoning would require Judge Stark to recuse himself as well.

The underlying premise of the Venezuela Parties' Motion to Disqualify the Special Master [D.I. 509] (the "**Disqualification Motion**") and Reply in Support of the Disqualification Motion [D.I. 515] (the "**Reply**") is that the Special Master's efforts to enforce Crystallex's judgment through the sale process is disqualifying "advocacy" in favor of one party. The Venezuela Parties fail to consider that the context for this entire proceeding is enforcement of a judgment—the merits have already been decided. The Special Master was appointed to enforce the Court's judgment, and this entire inquiry is misplaced when any reasonable party properly looks at the Court's actions in that context. It is clear that the Venezuela Parties will do anything to delay enforcement, and it is in that vein in which the Venezuela Parties have filed all of these motions—to delay enforcement of a Court-ordered judgment that has already been decided on the merits. If it is disqualifying for the Special Master to take a position on whether a court's judgment should be enforced on its terms, then the Venezuela Parties appear to be arguing that it was disqualifying for the Court to appoint the Special Master for that purpose in the first place. Similarly, if the Special Master's *ex parte* meeting with representatives of the U.S. Government created a disqualifying appearance of partiality in violation of 28 U.S.C. § 455(a), then the Court's express authorization of that meeting created the same appearance of partiality and is therefore likewise disqualifying. For the avoidance

---

[1] Capitalized terms used and not otherwise defined herein shall have the meanings ascribed to such terms in the Sale Procedures Order [D.I. 481].

The Honorable Leonard P. Stark
February 24, 2023
Page 2

of doubt, it cannot be overstated that the Special Master vehemently disagrees with the absurd outcome and positions espoused by the Venezuela Parties.

Although the Venezuela Parties putatively seek to disqualify the Special Master based on his *ex parte* meeting with representatives of the U.S. Government, the principal reason why such meeting was objectionable, per the Venezuela Parties, is that the execution of Crystallex's judgment through the sale process remains a contested issue. *See, e.g.*, Disqualification Motion at 6 ("Whether the Court should direct the Special Master to initiate the sale process is a critical, disputed issue in these proceedings."); *id.* at 9 ("Crystallex's attempt to enforce its judgment by moving forward with the sale process at this time is a hotly disputed issue in this case."); Reply at 9 ("By advocating that the USG publicly support the launch of the sale process, the Special Master . . . is engaging in advocacy regarding issues that are hotly disputed before this Court."). The Venezuela Parties thus contend that because the Venezuela Parties oppose the enforcement of Crystallex's judgment through the sale process, the Special Master's alleged actions in furtherance of the sale process are disqualifying. *See* Disqualification Motion at 12 (arguing that "[i]t is simply not proper under our system of government for a federal judicial or quasi-judicial officer to . . . assist a private litigant in executing on its judgment").

That view is simply misguided and factually inaccurate. It also ignores the fact that the Sale Procedures Order was litigated, briefed, and entered—it is no longer a disputed issue. What remains is its due enforcement. The Court appointed the Special Master "to assist with the sale of PDVSA's shares of PDVH to satisfy Crystallex's judgment," Memorandum Order at 2 (D.I. 258), and specifically directed the Special Master to "devise a plan for the sale of shares of PDVH as necessary to satisfy the outstanding judgment of Crystallex," Order Regarding Special Master at 3 (D.I. 277). The Special Master's mandate is therefore—indisputably—to assist the Court with enforcing its judgment. Disqualification Motion at 12.

The Venezuela Parties further argue that the Special Master "must be disqualified" because the Special Master's "ex parte communications with the U.S. Government have created an appearance of partiality in contravention of 28 U.S.C. § 455(a)." Disqualification Motion at 2. First, the Venezuela Parties know that the Special Master has contacted the U.S. Government numerous times throughout these proceedings—the process contemplated by the Sale Procedures Order was designed, with input from the Venezuela Parties, to expressly provide for direct communication to the U.S. Government by the Special Master. To now complain about the same actions it has consented to throughout this process is to come before the Court with unclean hands and is simply inappropriate. Moreover, it is untenable to hold, on the one hand, that the Special Master's *ex parte* communications evidence disqualifying partiality, but on the other, that the Court's express authorization of those very same *ex parte* communications do not even "create[] an appearance of partiality." Disqualification Motion at 3. That is especially so in light of the Venezuela Parties' suggestion that the Court had no authority to permit those communications because "a judge cannot authorize a Special Master to engage in *ex parte* communications the judge himself could not engage in without being subject to mandatory recusal." Reply at 7. The only conclusion that can be drawn from the Venezuela Parties' (mistaken) belief that the Court had no power to authorize the Special Master's *ex parte* communications is that the Court has engaged in some disqualifying conduct.

The Honorable Leonard P. Stark
February 24, 2023
Page 3

## 2.    Are the Venezuela Parties moving to recuse Judge Stark?

This question is addressed to the Venezuela Parties and need not be answered by the Special Master.

## 3.    Is any party seeking an evidentiary proceeding to resolve the fact dispute as to when the Venezuela Parties were told that the Special Master would not permit them to attend his meeting with OFAC (*compare* D.I. 515 at 1-3 *with* D.I. 512 at 6) and, if not, how do you propose the court resolve this dispute?

The Special Master is not seeking an evidentiary proceeding to resolve any fact dispute. The timeliness of the Venezuela Parties' motion to disqualify the Special Master does not turn on whether the Venezuela Parties learned of their exclusion from the meeting on December 30, 2022, as the Special Master claims, or four days later, on January 3, 2023, as the Venezuela Parties claim. The motion was untimely in any event because the undisputed facts already in the record establish that the Venezuela Parties knew by October 4, 2022—well before December 30, 2022—that the Special Master planned to meet *ex parte* with the U.S. Government.  The motion is untimely and the Venezuela Parties come before the Court with unclean hands given their longstanding knowledge of the Special Master's *ex parte* communications with the U.S. Government and participation in the design of the process that contemplated such communications.

It should be uncontroverted that "[a] motion to disqualify must be made at *the earliest possible moment* after obtaining information of possible bias."  *United States v. Yonkers Bd. of Educ.*, 946 F.2d 180, 183 (2d Cir. 1991) (emphasis added).  Here, there can be no reasonable dispute as to whether the Venezuela Parties failed to bring their motion to disqualify the Special Master at the "earliest possible moment after obtaining information of possible bias," making the Venezuela Parties' motion untimely.  *Id.*

First, the final proposed Sale Procedures Order filed by the Special Master on October 4, 2022 provided that "[w]ithin the period of six (6) months after the date of this Order . . . the Special Master and his Advisors shall solicit and attempt to gain clarity or guidance from [OFAC] of its support for (or non-opposition to), the launch of the Marketing Process by the Special Master, the viability of the Marketing Process, and any additional feedback or guidance that the Special Master believes will more likely result in a value-maximizing Sale Transaction."  Sale Procedures Order ¶ 3 [D.I. 481].  By its plain terms, the Sale Procedures Order thus contemplated that the Special Master and his Advisors would engage in direct communications with the U.S. Government— nowhere does the Sale Procedures Order indicate or imply that the Venezuela Parties, or any other Sale Process Party, need be included.  And to the extent that there was any doubt about whether those discussions would be *ex parte*, the Special Master dispelled that doubt in the status update filed contemporaneously with the procedures, which stated plainly that the Special Master "does not intend to include the Venezuela Parties at such meeting."  Status Update at 2 n.2 [D.I. 480].

The evidence already in the record thus decisively establishes that the Venezuela Parties knew by no later than October 4, 2022 that the Special Master imminently planned to hold an *ex parte* meeting with the U.S. Government.  Yet the Venezuela Parties took no action whatsoever with respect to that meeting, notwithstanding their professed belief that if the Special Master were

The Honorable Leonard P. Stark
February 24, 2023
Page 4

to conduct the meeting *ex parte*—as the Special Master publicly declared was his intention—then the Special Master would need to be disqualified. The Court therefore need look no further than the facts already in the record to hold that the motion is untimely.[2]

The Venezuela Parties insist that their motion was timely because the Special Master indicated in the October 4, 2022 status update that his position on whether the meeting would be conducted *ex parte* "may change in the future." *Id.* But it is a truism that the Special Master could change his mind as to whether or not to conduct the meeting *ex parte*. That the Special Master acknowledged the mere possibility that the Venezuela Parties *might* be included at the meeting, while stating unambiguously that the Special Master "does not intend to include the Venezuela Parties at such meeting," does not render the Venezuela Parties' motion timely. If the Venezuela Parties truly believed that it would be disqualifying for the Special Master to follow through on his expressed intention to meet with the U.S. Government *ex parte*, they easily could have filed a letter or objection voicing that concern shortly after the status report was filed. Instead the Venezuela Parties sat back and did nothing for nearly fourteen weeks, knowing full well the entire time that the Special Master planned to imminently engage in conduct that they now allege is disqualifying. Far from filing their motion "at the earliest possible moment after obtaining information of possible bias," *Yonkers*, 946 F.2d at 183, the Venezuela Parties waited until the last possible moment—after the meeting had already occurred—to seek the extreme remedy of disqualification. The Court should not reward such inexcusable and strategic delay. *See In re Kensington Int'l Ltd.*, 368 F.3d 289, 312 (3rd Cir. 2004) ("[T]he judicial process can hardly tolerate the practice of a litigant with knowledge of circumstances suggesting possible bias or prejudice holding back, while calling upon the court for hopefully favorable rulings, and then seeking recusal when they are not forthcoming.").

The Venezuela Parties' motion to disqualify the Special Master is even more untimely in light of the record of these proceedings, which are replete with instances in which the Special Master communicated *ex parte* with the U.S. Government. *See, e.g.*, Special Master's Report and Recommendation Regarding Proposed Sale Procedures Order ¶¶ 39-40 (D.I. 348) (describing three *ex parte* meetings between the Special Master and the U.S. Government held in the summer of 2021). Until the Venezuela Parties moved to disqualify the Special Master on January 20, 2023, the Venezuela Parties never once suggested that any *ex parte* communications between the Special Master and the U.S. Government were disqualifying. While the Venezuela Parties misleadingly argue that their motion to disqualify is nevertheless timely because the Special Master "did not disclose his intention to take sides and advocate in favor of Crystallex enforcing its judgment until January 3, 2023," Reply at 5, that claim ignores the plain import of the Special Master's prior disclosures concerning his *ex parte* meetings with the U.S. Government, in which the Special

---

[2] It should also be noted that the Venezuela Parties acknowledge that they learned on December 28, 2022 that the Special Master had scheduled a meeting with the U.S. Government to take place in January. *See* Disqualification Motion at 3-4. Given that the Special Master did not involve the Venezuela Parties in the scheduling of that meeting, and given that the Special Master had previously met with the U.S. Government *ex parte*, it should have been obvious to the Venezuela Parties by no later than December 28 that the Special Master's position had not changed since the October 4 status report.

The Honorable Leonard P. Stark
February 24, 2023
Page 5

Master explained that he discussed "the timeline and mechanics *for implementing the Proposed Sale Procedures Order*" with representatives of the U.S. Government, Special Master Report of October 2021 at 3 (D.I. 381) (emphasis added). The implementation of the Sale Procedures Order can only be accomplished through the initiation and consummation of the sale process contemplated thereby. The Venezuela Parties have therefore long known that the Special Master's *ex parte* meetings with the U.S. Government were aimed towards the eventual launch of the sale process, notwithstanding their implausible protest to the contrary. As noted, these proceedings are in the post-judgment enforcement stage, and the Special Master was expressly appointed to for the purpose of enforcing the Court's judgment. It should have long been obvious to the Venezuela Parties that the Special Master's conduct—including his *ex parte* meetings with the U.S. Government—were directed towards this end. That conduct is not disqualifying merely because the Venezuela Parties do not wish for the Court's judgment to be enforced.

In light of the undisputed facts already in the record, the Court does not need to hold an evidentiary hearing to determine precisely when the Venezuela Parties "finally and definitively" learned of their exclusion from the Special Master's meeting with the U.S. Government. Reply at 3. The Venezuela Parties knew that the Special Master planned to meet *ex parte* with the U.S. Government no later than October 4, 2022. And well before even then, the Venezuela Parties knew that the Special Master had met with representatives of the U.S. Government *ex parte* on several occasions regarding the implementation of the sale process that the Venezuela Parties oppose. The Venezuela Parties' motion is therefore untimely and brought with unclean hands, regardless of how the Court resolves the fact dispute between the Special Master and the Venezuela Parties. Accordingly, the Special Master respectfully submits that the Court should deny the Disqualification Motion without conducting an evidentiary hearing.[3]

Respectfully Yours,

*/s/ Robert B. Pincus*

Robert B. Pincus, in my capacity as Special Master for the United States District Court for the District of Delaware

cc: All Counsel of Record (via CM/ECF and E-Mail)

---

[3] Of course, if for whatever reason the Court decides that an evidentiary hearing is necessary or appropriate, the Special Master will gladly appear before the Court and submit his testimony before the Court and otherwise submit to any evidentiary proceedings and discovery that the Court deems appropriate.

# Morris, Nichols, Arsht & Tunnell llp

1201 North Market Street
P.O. Box 1347
Wilmington, Delaware  19899-1347
(302) 658-9200
(302) 658-3989 FAX

Kenneth J. Nachbar
(302) 351-9294
(302) 425-3013 FAX
KNachbar@morrisnichols.com

February 24, 2023

**VIA ELECTRONIC FILING**

The Honorable Leonard P. Stark
U.S. Court of Appeals for the Federal Circuit
717 Madison Place, NW
Washington, D.C. 20439

      Re:    Crystallex International Corp. v. Bolivarian Republic of Venezuela
              No. 1:17-mc-00151-LPS

Dear Judge Stark:

I write on behalf of the Venezuela Parties in response to the Court's Memorandum Order (D.I. 517) requiring the Venezuela Parties, Crystallex, and the Special Master to submit additional briefing addressing certain questions in connection with the Venezuela Parties' motion to disqualify the Special Master (D.I. 509).

**Question A. If the Venezuela Parties are correct that the Court must disqualify the Special Master, would the same reasoning require Judge Stark to recuse himself as well?**

Not on the facts as the Venezuela Parties currently understand them. In their motion to disqualify, the Venezuela Parties explained that the Special Master must be disqualified under 28 U.S.C. § 455 and the Due Process Clause because he personally engaged in *ex parte* fact gathering and personally advocated against the Venezuela Parties' interests on a disputed issue in the case at a January 12, 2023 meeting with representatives of the Executive Branch (the "January 12 Meeting"). *See* D.I. 509 at 2–3.

As far as the Venezuela Parties are aware, the Court itself neither has had *ex parte* communications with representatives of the Executive Branch nor has had off-the-record discussions with the Special Master regarding what occurred at the January 12 Meeting. Absent such communications, recusal of the Court is not required under 28 U.S.C. § 455(b)(1), which provides that a justice, judge, or magistrate judge of the United States "shall also disqualify himself … [w]here he has … personal knowledge of disputed evidentiary facts concerning the

The Honorable Leonard P. Stark
February 24, 2023
Page 2

proceeding." *Cf. In re Kensington Int'l, Inc.*, 368 F.3d 289, 308 n.18 (3d Cir. 2004) (stating that "*off-the-record* discussions on substantive issues in chambers constitute 'personal' or 'extrajudicial' knowledge in the sense that the information conveyed to the judge leaves no trace in the record and cannot 'be controverted or tested by the tools of the adversary process'" (quoting *In re Edgar*, 93 F.3d 256, 259 (7th Cir. 1996) (per curiam)) (emphasis added)). Nor would the Court gain such "personal knowledge" if the Special Master were to reference facts purportedly learned in the *ex parte* January 12 Meeting in his forthcoming on-the-record recommendation, pursuant to the Sale Procedure Order, whether to launch the sale process. To be sure, it would be clear legal error for the Court to rely on a tainted recommendation in deciding whether to order the launch of the sale process. But the mere receipt of or reliance on a public filing containing such tainted information would not, by itself, give the Court personal knowledge of disputed evidentiary facts. *See In re Kempthorne*, 449 F.3d 1265, 1268, 1271–72 (D.C. Cir. 2006) (suppressing special master's tainted reports and striking them from the record without disqualifying district judge); *cf. United States v. Wecht*, 484 F.3d 194, 219 (3d Cir. 2007) (review of evidence subject to a suppression motion did not give district judge "'personal'" knowledge because the evidence was "available to all parties at the time the Judge reviewed them"); *Pittsburgh Press Club v. United States*, 579 F.2d 751, 760 (3d Cir. 1978) (remanding to district judge after reversing his reliance on inadmissible hearsay).[1]

Nor, based on the facts as the Venezuela Parties currently understand them, is recusal of the Court required under 28 U.S.C. § 455(a), which provides that "[a]ny justice, judge, or magistrate judge of the United States shall disqualify himself in any proceeding in which his impartiality might reasonably be questioned," or under the Due Process Clause of the Fifth Amendment to the United States Constitution, which "mandate[s] neutrality in civil proceedings, both in reality and in appearance." *Guenther v. C.I.R.*, 939 F.2d 758, 760, 762 (9th Cir. 1991). On January 11, 2023, the Court authorized—for the first time and, in the Venezuela Parties' view, erroneously, *see* D.I. 509 at 7—the Special Master to engage in *ex parte* communications with the Executive Branch for the purpose of gathering factual information to be used in formulating a recommendation on a substantive issue. D.I. 506. Again, however, as far as the Venezuela Parties are aware, the Court did not personally communicate *ex parte* with the Executive Branch and has not received a private report regarding those communications. The Court thus is differently situated from the Special Master, whose impartiality would reasonably be questioned because the "information" he learned through his "*ex parte* contacts," which "leave[] no trace in the record, … may reasonably be expected to color … his reports and recommendations to the district court" and

---

[1] The Venezuela Parties do not address here whether this Court's disqualification would be required *if* the Special Master were to share information about the *ex parte* January 12 meeting through an *off-the-record* discussion with the Court, because the Venezuela Parties are not aware of any such off-the-record discussions, and the details concerning any such hypothetical discussions may be relevant to the analysis. *See Liteky v. United States*, 510 U.S. 540, 548 (1994) (explaining that § 455 "placed the obligation to identify the existence of … grounds [for recusal] upon the judge himself, rather than requiring recusal only in response to a party affidavit").

The Honorable Leonard P. Stark
February 24, 2023
Page 3

cannot "be controverted or tested by the tools of the adversary process," *In re Brooks*, 383 F.3d 1036, 1046 (D.C. Cir. 2004). *Cf. Wecht*, 484 F.3d at 219 (even if district judge committed appealable error in looking at certain exhibits in connection with a suppression motion, any such error did not, by itself, "create an appearance of bias").[2]

This Court is also unlike the Special Master because the Court did not personally advocate against the interests of the Venezuela Parties at the January 12 Meeting on the disputed issue of whether the Executive Branch should support (or at least not oppose) the sale process. And given the gravity of a contrary inference, the Venezuela Parties are assuming that footnote 2 to the January 11 Order was not intended to order, authorize, or condone the Special Master's advocacy as he actually intended and as it actually occurred, or to convey that the Court wants OFAC to authorize the sale process or to grant (or to state that it will grant) Crystallex a license to close a sale. If the Court did so intend, then the reasoning in the Venezuela Parties' motion would, regrettably, apply to the Court as well, because in such a case, the Court would not be or appear impartial. *See In re Kensington*, 368 F.3d at 301 (explaining that "[t]he test for recusal under § 455(a) is whether a reasonable person, with knowledge of all the facts, would conclude that the judge's impartiality might reasonably be questioned"). But the Venezuela Parties believe that, respectfully, the Court may have either misapprehended the Special Master's statements, *see* D.I. 506 at 2 n.2 (stating that "[t]he Venezuela Parties take issue with what *they characterize* as the Special Master's intention to engage in ex parte 'advocacy' before government officials" (emphasis added)), or believed the Special Master intended to engage with the Executive Branch in a manner that was "consistent with his previous efforts," *id*. In those "previous efforts," the Special Master merely "provided" the Executive Branch "with an overview of the … process," invited "input," and "solicited … feedback," D.I. 348 ¶¶ 39–41 (public version of D.I. 303). Indeed, in 2021, the Special Master promised this Court and the parties: "I have not proposed to, nor have I ever, lobbied on behalf of any particular party in this case." D.I. 356 ¶ 8. While the Special Master suddenly abandoned that promise in January 2023, this Court appears to have understandably (albeit wrongly) assumed that he would continue to abide by it.

At this point, however, there is no mistaking the Special Master's statements or conduct. In their motion to disqualify, which was filed after the January 11 Order, the Venezuela Parties explained that "the Special Master's expressed intent to advocate to the United States Government to revise its foreign policy positions and authorize a sale process designed to satisfy Crystallex's judgment has created (at the very least) an appearance of partiality." D.I. 509 at 3. In his response, the Special Master never denied that this was his intent or that he and his advisors did in fact

---

[2] As with their § 455(b)(1) analysis, the Venezuela Parties do not address here whether this Court's disqualification would be required under § 455(a) or due process if the Court received information about the January 12 meeting off the record. *See Pearson v. Prison Health Serv.*, 850 F.3d 526, 544 n.10 (3d Cir. 2017) ("[W]henever a judge's impartiality might reasonably be questioned in a proceeding, 28 U.S.C. § 455(a) commands the judge to disqualify himself *sua sponte* in that proceeding." (internal quotation marks omitted)).

The Honorable Leonard P. Stark
February 24, 2023
Page 4

advocate at the January 12 Meeting that OFAC should support, or at least not oppose, the sale process. To the contrary, he made quite clear that he had no patience for "[t]he Venezuela Parties' apparent belief that the Special Master must sit on the sidelines while the Court's judgment goes unexecuted for years on end." D.I. 512 at 12–13. Such language is expected in a filing from Crystallex. It is startling in one from an officer of this Court, who should not be taking sides between Crystallex and the Venezuela Parties on the hotly disputed issue as to whether the Executive Branch should support (or not oppose) the sale process.

**Question B. Are the Venezuela Parties moving to recuse Judge Stark?**

The Venezuela Parties are not currently aware of a basis to move to recuse Your Honor at this time given the factual record and assumptions discussed above. That position may change if, based on future events or further disclosure or clarification, it becomes clear that disqualification is required under applicable law.

**Question C. Is any party seeking an evidentiary proceeding to resolve the fact dispute as to when the Venezuela Parties were told that the Special Master would not permit them to attend his meeting with OFAC (*compare* D.I. 515 at 1-3 *with* D.I. 512 at 6) and, if not, how do you propose the Court resolve this dispute?**

The Special Master's unsubstantiated assertion that he told counsel for the Venezuela Parties on December 30, 2022, that he would not permit them to attend his meeting with OFAC is clearly mistaken. In their reply brief, the Venezuela Parties submitted an affidavit and accompanying evidence showing that the Special Master did not tell counsel for the Venezuela Parties that they could not attend the meeting until the afternoon of January 3, 2023. *See* D.I. 516 ¶ 9 ("On January 3, 2023, the next business day, at 5:26 p.m. EST, I spoke with the Special Master by telephone and requested that the Venezuela Parties' counsel be permitted to attend his January 12 meeting with OFAC."). The Special Master did not support his mistaken assertion with an affidavit or other evidence, nor do the Venezuela Parties believe he can. In further support of their position, the Venezuela Parties submit the attached Supplemental Declaration of Nathan P. Eimer and the Declaration of Thomas Paukovitz in Support of the Venezuela Parties' Supplemental Letter Brief in Support of Their Motion to Disqualify the Special Master. These declarations include Mr. Eimer's office and cell phone records, which further demonstrate that Mr. Eimer did not speak with the Special Master by phone on December 30, 2022, but he did speak with him by phone on January 3, 2023.

In light of the previously submitted evidence, the phone records, and the lack of any contrary evidence submitted by the Special Master, the Venezuela Parties believe that there can be no genuine factual issue on this question. Accordingly, the Court can resolve the dispute without an evidentiary hearing. If the Special Master does submit or point to evidence in the record that he argues creates a material factual issue, however, then the Venezuela Parties respectfully request an evidentiary hearing.

The Honorable Leonard P. Stark
February 24, 2023
Page 5

To be clear, whether the Special Master refused the request on the afternoon of Friday, December 30, 2022, or the next business day, Tuesday, January 3, 2023, does not materially affect the timeliness analysis. As the Venezuela Parties explained in more detail in their motion to disqualify and reply in support, taking even ten days (rather than six) to prepare, coordinate among multiple parties, and file a challenge to a planned *ex parte* advocacy meeting before it occurred is not a ground for untimeliness under governing precedent. Moreover, some of the grounds for disqualification did not arise until the meeting occurred, and the timing of the Venezuela Parties' request to observe but not participate in the January 12 Meeting would not have disrupted the meeting or caused any other cognizable prejudice. *See* D.I. 509 at 8–9; D.I. 515 at 1–5.

Respectfully submitted,

*/s/ Kenneth J. Nachbar*

Kenneth J. Nachbar (#2067)

cc: All Counsel of Record (Via E-Filing)

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

CRYSTALLEX INTERNATIONAL CORP.,

               Plaintiff,

v.

BOLIVARIAN REPUBLIC OF VENEZUELA,

               Defendant.

Case No. 1:17-mc-00151-LPS

## DECLARATION OF NATHAN P. EIMER IN SUPPORT OF VENEZUELA PARTIES' REPLY IN SUPPORT OF THEIR MOTION TO DISQUALIFY THE SPECIAL MASTER

I, Nathan P. Eimer, declare as follows:

1.      I am a partner at the law firm of Eimer Stahl LLP, and I am one of the counsel for PDV Holding, Inc. and CITGO Petroleum Corporation in the above-captioned action.

2.      I make this declaration in connection with the Venezuela Parties' Reply in Support of Their Motion to Disqualify the Special Master based upon personal knowledge.

3.      Attached as <u>Exhibit A</u> to this declaration is a true and correct copy of emails sent between myself and the Special Master between December 29 and December 30, 2022 regarding the Special Master's scheduled January 12, 2023 meeting with OFAC.

4.      In his Opposition to the Venezuela Parties' Motion to Disqualify, the Special Master claims that I called him on December 30, 2022 and that, on that day, he informed me that I would not be permitted to attend his upcoming January 12, 2023 meeting with the Office of Foreign Assets Control ("OFAC"). D.I. 512 at 6. That is incorrect in all respects.

5.      I first learned that the Special Master had scheduled a January 2023 meeting with the U.S. Government on December 28, 2022 from the Special Master's Monthly Report for the

1

**165a**

Period Ended November 30, 2022 ("Monthly Report"), filed at 6:55 p.m. EST that day. D.I. 495 (publicly filed as D.I. 496). In the Monthly Report, the Special Master informed the Court that, between September 1, 2022 and November 30, 2022, he "[m]et with [his] Advisors regarding outreach to and negotiations with OFAC" and "[c]oordinated [ ] a meeting with representatives of the United States Department of the Treasury and the United States Department of Justice to take place in January." *Id.* at 3.

6.      On December 29, 2022 at 10:32 p.m. EST, I emailed the Special Master requesting that he share any recent communications between himself and OFAC. Ex. A. The Special Master replied on Friday, December 30 at 7:20 a.m. EST, stating that he set up a meeting with OFAC in "early January" and that "[a]ll communications thus far have been related to summarizing the status of the case and logistics for the meeting." Ex. A.

7.      I did not speak to the Special Master by telephone on December 30, 2022. Instead, on December 30, 2022 at 4:13 p.m. EST, I requested via email that the Special Master disclose the precise date on which the meeting was scheduled. Ex. A.

8.      At 4:34 p.m. EST on Friday, December 30, 2022, the Special Master sent me an email stating that the meeting was to take place on January 12, 2023. Ex. A.

9.      On January 3, 2023, the next business day, at 5:26 p.m. EST, I spoke with the Special Master by telephone and requested that the Venezuela Parties' counsel be permitted to attend his January 12 meeting with OFAC. I told the Special Master that we would agree to not speak at the meeting but only observe so that we would be aware of exactly what was said by each attendee. The Special Master refused. The Special Master stated that his meeting with OFAC would have both informational and advocacy components, and that as a result it would be inappropriate for the Venezuela Parties' counsel to attend given that we have a different agenda.

10.    Our January 3, 2023 call was the first time the Special Master informed me that he intended to engage in advocacy.

I declare under penalty of perjury under the law of the United States of America that the foregoing is true and correct.

Executed this 10th day of February, 2023, in Chicago, Illinois.

/s/  Nathan P. Eimer
Nathan P. Eimer

# Exhibit A

| | |
|---|---|
| **From:** | Robert Pincus |
| **To:** | Eimer, Nate |
| **Subject:** | Re: OFAC |
| **Date:** | Friday, December 30, 2022 3:34:41 PM |

Nate. Our meeting is currently scheduled for January 12th. Best, Bob

Sent from my iPhone

On Dec 30, 2022, at 4:13 PM, Eimer, Nate <neimer@eimerstahl.com> wrote:

BTW, can you let me know what date the meeting is scheduled?

Thanks again.

Nate

---

**Nathan P. Eimer**

Eimer Stahl LLP
224 South Michigan Avenue, Suite 1100
Chicago, Illinois 60604
Phone: 312-660-7601 Fax: 312-692-1718
neimer@EimerStahl.com



www.eimerstahl.com

NOTICE: This e-mail message and any attachments transmitted with it may contain legally privileged and confidential information. It is not intended for transmission to, or receipt by, any unauthorized persons. If you have received this message in error, please (i) do not read it, (ii) reply to the sender that you received the message in error, and (iii) erase or destroy the message and all attachments. Legal advice contained in the preceding message is solely for the benefit of the Eimer Stahl LLP client(s) represented by the Firm in the particular matter that is the subject of this message, and may not be relied upon by any other party.

On Dec 30, 2022, at 11:20 PM, Robert Pincus <rbpincus@gmail.com> wrote:

**WARNING: External Email.**

Hi Nate. Happy, healthy new year to you and yours. As directed by the Court, we have set up a meeting with OFAC for early January. All communications thus far have been related to summarizing the status of the case and logistics for the meeting. Best, Bob

Sent from my iPad

On Dec 29, 2022, at 10:32 PM, Eimer, Nate <neimer@eimerstahl.com> wrote:

Hi Bob

Happy New Year.   Best wishes to you and your family for a happy and healthy year.

We noticed from your recent submission of accounts to the parties and the court that there have been some communications with OFAC.  I would appreciate it if you could share them with us.

Best regards

Nate

---

**Nathan P. Eimer**

Eimer Stahl LLP
224 South Michigan Avenue, Suite 1100
Chicago, Illinois 60604
Phone: 312-660-7601 Fax: 312-692-1718
neimer@EimerStahl.com

www.eimerstahl.com

NOTICE: This e-mail message and any attachments transmitted with it may contain legally privileged and confidential information. It is not intended for transmission to, or receipt by, any unauthorized persons. If you have received this message in error, please (i) do not read it, (ii) reply to the sender that you received the message in error, and (iii) erase or destroy the message and all attachments. Legal advice contained in the preceding message is solely for the benefit of the Eimer Stahl LLP client(s) represented by the Firm in the particular matter that is the subject of this message, and may not be relied upon by any other party.

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| CRYSTALLEX INTERNATIONAL CORP., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 1:17-mc-00151-LPS |
| | ) | |
| BOLIVARIAN REPUBLIC OF VENEZUELA, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |
| _____ | ) | |

## VENEZUELA PARTIES' REPLY IN SUPPORT OF THEIR
## MOTION TO DISQUALIFY THE SPECIAL MASTER

OF COUNSEL:
Nathan P. Eimer
Lisa S. Meyer
Daniel D. Birk
Gregory M. Schweizer
Emily E. Sullivan
EIMER STAHL LLP
224 South Michigan Avenue
Suite 1100
Chicago, IL 60604
(312) 660-7600
NEimer@eimerstahl.com
LMeyer@eimerstahl.com
DBirk@eimerstahl.com
GSchweizer@eimerstahl.com
ESullivan@eimerstahl.com

Kenneth J. Nachbar (#2067)
Alexandra M. Cumings (#6146)
MORRIS, NICHOLS, ARSHT & TUNNELL LLP
1201 North Market Street
Wilmington, DE 19801
(302) 658-9200
KNachbar@morrisnichols.com
ACumings@morrisnichols.com

*Attorneys for PDV Holding, Inc., and
CITGO Petroleum Corporation*

OF COUNSEL:
Joseph D. Pizzurro
Kevin A. Meehan
Juan O. Perla
CURTIS, MALLET-PREVOST,
COLT & MOSLE LLP
101 Park Avenue
New York, NY 10178
(212) 696-6000
jpizzurro@curtis.com
kmeehan@curtis.com
jperla@curtis.com

Samuel Taylor Hirzel, II (#4415)
HEYMAN ENERIO GATTUSO & HIRZEL LLP
300 Delaware Avenue, Suite 200
Wilmington, DE 19801
(302) 472-7300
shirzel@hegh.law

*Attorney for Petróleos de Venezuela, S.A.*

Case 1:17-cv-00151-RP Document 145-2 Filed 01/06/23 Page 64 of 487 PageID 1303578

OF COUNSEL:

Donald B. Verrilli, Jr.
Elaine J. Goldenberg
Ginger D. Anders
Brendan B. Gants
Munger, Tolles & Olson LLP
601 Massachusetts Avenue NW
Suite 500 E
Washington, D.C. 20001
(202) 220-1100
Donald.Verrilli@mto.com

George M. Garvey
Munger, Tolles & Olson LLP
350 South Grand Avenue, 50th Floor
Los Angeles, CA 90071
(213) 683-9100
George.Garvey@mto.com

A. Thompson Bayliss (#4379)
Stephen C. Childs (#6711)
ABRAMS & BAYLISS LLP
20 Montchanin Road, Suite 200
Wilmington, DE 19807
(302) 778-1000
bayliss@abramsbayliss.com
childs@abramsbayliss.com

*Attorneys for Bolivarian Republic of Venezuela*

In the remarkable view proffered by the Special Master and Crystallex, it would be entirely proper for this Court to privately call OFAC and other agencies of the United States Government ("USG"), learn new, non-public information about their current position on the sale process, urge OFAC and the USG to support or authorize the process by changing their established foreign policy position, issue an opinion based on that phone call, and file an amicus brief in the Court of Appeals defending its purportedly "neutral interest" in ensuring that Crystallex is able to enforce its judgment. Such a position is legally baseless and profoundly dangerous. Established precedent on judicial ethics, due process, and the separation of powers make clear that neither the Court nor the judicial officer to whom the Court has delegated certain powers can engage in such conduct.

Because they cannot cite a single case or muster any colorable argument to avoid the consequences of the Special Master's conduct, the Special Master and Crystallex fall back on the untenable defenses that the Venezuela Parties' motion to disqualify is untimely or waived. Neither argument can apply to the Special Master's deeply improper advocacy to the USG at the January 12 Meeting, as his intention to engage in such advocacy had not even arguably been disclosed until less than 10 days before the meeting occurred. Nathan P. Eimer Decl. ¶¶ 9–10. And as to *ex parte* communications, the timeliness and waiver defenses lack any basis in fact or law. Neither the SPO nor any other order entered before January 2023 authorized the Special Master to engage in substantive *ex parte* communications with OFAC, and the Special Master did not finally decide to proceed *ex parte* until four business days before the Venezuela Parties filed their motion requesting to attend. *Id.* ¶ 9. The Venezuela Parties promptly objected when the Special Master finally decided to proceed in that improper way, and they gave the Special Master a simple solution that would have obviated the problem without delaying the meeting—namely, allowing the parties to observe but not participate, while restricting the Special Master to gathering information without

1

**173a**

advocating in favor of the result desired by Crystallex. He rejected that solution, and the Venezuela Parties promptly moved to disqualify him after he engaged in the improper conduct.

## ARGUMENT

**I.     The Venezuela Parties' Motion to Disqualify the Special Master Is Timely.**

The Special Master and Crystallex do not respond to the Venezuela Parties' explanation that untimeliness under § 455(a) requires significant and strategic delay, such as when a party "is aware of the grounds supporting recusal, but fails to act until the judge issues an adverse ruling." *In re Kensington Int'l Ltd.*, 368 F.3d 289, 314–15 (3d Cir. 2004). That is not the case here. The Venezuela Parties both timely tried to prevent the disqualifying conduct from occurring and moved to disqualify before the Special Master recommended whether a sale should proceed. And any timeliness requirement under § 455(b)—if there is one—would require a strategic delay of an "unexplained" and "unreasonable" length, neither of which exist here. *See Stone Hedge Props. v. Phoenix Cap. Corp.*, 71 F. App'x 138, 141 (3d Cir. 2003) (five-year delay held unreasonable).

Apart from having no legal support, the Special Master and Crystallex also mischaracterize the underlying facts. Until his January 3, 2023 phone call with counsel for the Venezuela Parties, the Special Master had never stated that he intended to press OFAC and the USG to change their established policy and authorize the sale process in support of Crystallex's position and in opposition to the position of the Venezuela Parties. Eimer Decl. ¶¶ 9–10. In fact, the Special Master explicitly told this Court and the parties before entry of the SPO that he did *not* intend to "lobb[y] on behalf of any particular party in this case." D.I. 356 ¶ 8.

And as to *ex parte* communications, the Venezuela Parties did not learn until January 3, 2023, that the Special Master had finally decided not to hold his substantive meeting *ex parte*. *See* D.I. 509 at 4; Eimer Decl. ¶ 9. The Special Master's Opposition incorrectly states that counsel for

2

the Venezuela Parties learned that they could not attend the meeting in a December 30, 2022 phone call. D.I. 512 at 6. There was no phone call on December 30, just an afternoon email exchange, and the Special Master did not state in his email that the Venezuela Parties could not attend the meeting. Eimer Decl. ¶¶ 7–8. He stated only (and for the first time) that the meeting was scheduled for January 12, 2023. It was not until the next business day, January 3, 2023, that the Special Master finally and definitively refused to allow the parties to attend the meeting. *Id.* ¶ 9.

Crystallex and the Special Master also incorrectly suggest that the record demonstrates the Venezuela Parties knew the Special Master was committed to excluding them from this meeting before it was scheduled. Crystallex points to the transcript from a November 2021 hearing where the parties discussed the Special Master potentially communicating with OFAC in the future, D.I. 513 at 8, but nowhere in that record do any of the parties, the Special Master, or the Court say that any of these communications would be *ex parte*. It is plainly wrong to say that a reference to a "conversation," D.I. 513 at 8 (citing D.I. 409 at 87:25–90:2), must be interpreted to mean a "conversation from which the parties will be excluded." And in pointing to the October 4, 2022 status report as evidence that the Special Master had concluded the Venezuela Parties would never attend his meetings with the USG, *see* D.I. 512 at 16–17; D.I. 513 at 9, Crystallex and the Special Master misleadingly omit that, while the Special Master stated that it was his present intention to exclude the Venezuela Parties from his meetings with OFAC, in the same sentence, he also stated that his "position may change in the future," D.I. 480 at 2 n.2, as the Venezuela Parties emphasized in their opening brief, D.I. 509 at 8. The Venezuela Parties were under no duty to guess that the Special Master had already resolved to advocate *ex parte* over their objections: "if there is to be a burden of disclosure, that burden is to be placed on the [judicial officer] to disclose possible grounds for disqualification." *Kensington*, 368 F.3d at 313.

Moreover, neither the Court's May 27, 2021 order appointing the Special Master nor the SPO itself authorize the Special Master to communicate with the USG *ex parte*, and certainly not for the purpose of advocating in support of the enforcement of Crystallex's judgment. *See* D.I. 277 ¶ 8; D.I. 481. The Special Master concedes as much, admitting that the SPO "is silent about the need to consult the Sale Process Parties regarding the conversations with" the USG. D.I. 512 at 2. The SPO cannot plausibly be read to have implicitly authorized private meetings between the Special Master and the USG over a party's objection, and the Venezuela Parties certainly cannot be faulted for reading it not to do such an obviously improper thing.

Had the Venezuela Parties moved to attend any meeting with OFAC in October 2022, the motion would have been denied as premature. No meeting had yet been scheduled, and the Venezuela Parties had not been definitively excluded from such meetings. The Venezuela Parties' argument under § 455(b) would have been especially unripe, because the Special Master would not have obtained extrajudicial knowledge requiring his disqualification until he met with OFAC on January 12. *See* 28 U.S.C. § 455(b)(1) (requiring disqualification where a judicial officer "*has …* personal knowledge of disputed evidentiary facts concerning the proceeding") (emphasis added).

Crystallex also makes the implausible and unsupported suggestion that, before the Special Master met with the USG on January 12, the Venezuela Parties should have made all arguments relevant to disqualification in its January 9 motion (or earlier), disclosed to Crystallex that they intended to move to disqualify the Special Master, and then sought mandamus relief from the Third Circuit. D.I. 513 at 7, 11. These imagined requirements do not exist, as is clear from Crystallex's failure to cite any authority for them.[1] The January 9 motion put the Special Master and this Court

---

[1] Faulting the Venezuela Parties for not seeking appellate relief is particularly disingenuous. Given that the Court denied the Venezuela Parties' motion on January 11, 2023, D.I. 506, and

on clear notice that the Special Master's proposed course of action violated 28 U.S.C. § 455 and judicial ethics—the implication that disqualification would be required if the Special Master followed through with his plan was obvious, and the suggestion that the Special Master or this Court would have done anything differently if the point were even more explicit is nonsensical. D.I. 499 at 1–2; *see also* D.I. 505 at 4, 7–8. Further, that the Venezuela Parties moved to attend the meeting before it occurred puts the lie to the tired refrain that the purpose of this motion is to cause delay: If the parties had been allowed to attend the January 12 Meeting as requested, there would have been no delay to the meeting or these proceedings. Tellingly, Special Master does not respond to the point that there was no prejudice from the timing of the motion to attend, D.I. 509 at 9, and Crystallex's only response is to mischaracterize the motion as one "to scuttle the meeting," when all the Venezuela Parties asked for was to let their counsel attend and observe, D.I. 513 at 2. Especially given that the Third Circuit is "not disposed to have the issue of timeliness trump … the principles of § 455(a)," these baseless arguments should be rejected. *Kensington*, 368 F.3d at 317.

## II.     The Venezuela Parties Have Not Waived Their Objections.

The Special Master also offers a meritless waiver defense based on the Venezuela Parties' purportedly implicitly consenting to his prior *ex parte* communications. As an initial matter, this would not cure the Special Master's disqualifying advocacy, as he did not disclose his intention to take sides and advocate in favor of Crystallex enforcing its judgment until January 3, 2023. As to *ex parte* communications, the Third Circuit has held that the requirement for a judicial or quasi-judicial officer not to engage in *ex parte* communications can be dispensed with only upon "affirmative consent," and that such consent cannot be implied through waiver. *Kensington*, 368 F.3d

---

the Special Master's meeting with the USG occurred the next day, there was clearly no time for the Venezuela Parties to seek appellate relief and for the Third Circuit to rule.

at 311. The Special Master and Crystallex tellingly do not respond to the motion's showing that the Venezuela Parties never provided such affirmative consent. *See* D.I. 509 at 7. And even if the Venezuela Parties had consented to certain prior substantive *ex parte* communications—which they did not—consenting to any meetings in the *past* does not mean they forever waived their right to oppose any *future* meeting, particularly where they objected to the meeting before it happened.

The Special Master's prior communications with the USG occurred during a different stage of the proceedings, and for a different purpose. Never before had he held an *ex parte* meeting with the USG to gather facts that would form the basis of his recommendation to the Court as to whether or not to direct the launch of the sale process, and never before had he advocated that the USG should support the launch. *See* D.I. 505 at 6, 8. As the Special Master confirmed on December 30, 2022, "All communications [with the USG] thus far have been related to summarizing the status of the case and logistics for the meeting." Eimer Decl. Ex. A. Crystallex also contends the Venezuela Parties waived their objections by purportedly "consent[ing] to the" initial "appointment" of the Special Master, D.I. 513 at 11 & n.2, but that cannot possibly be true. At the time he was appointed in May 2021, the Special Master did not disclose (and, of course, the Venezuela Parties could not have known) that he would engage in *ex parte* advocacy to the USG in January 2023, and the Venezuela Parties did not consent to the appointment notwithstanding such a disclosure. *See* D.I. 278.

### III. The Court Did Not and Could Not Authorize the Special Master to Engage in *Ex Parte* Communications with the USG.

The Special Master and Crystallex argue, without support, that the Court has boundless authority under Fed. R. Civ. P. 53 and its inherent powers to allow *ex parte* communications with third parties in an effort to enforce court-issued judgments. Aside from being contrary to the plain text of Rule 53—as the Special Master and Crystallex concede, D.I. 512 at 9–10; D.I. 513 at 14–

6

15—a judge cannot authorize a Special Master to engage in *ex parte* communications the judge himself could not engage in without being subject to mandatory recusal. *See* Fed. R. Civ. P. 53(a)(2); Code of Conduct for United States Judges ("Code of Conduct"), Canon 3B(2), *in* 2 Guide to Judiciary Policy, Ch. 2. And whatever inherent authority the Court might possess, that authority "cannot be contrary to any express grant of or limitation on the district court's power contained in a rule or statute," *Dietz v. Bouldin*, 579 U.S. 40, 45 (2016)—such as § 455 and Rule 53.

In arguing that "[i]t is not a violation of judicial ethics or a ground for recusal for a court or an officer of the court to express to another government entity views on legal issues," Crystallex falsely equates the Special Master's off-the-record solicitation of information and affirmative advocacy in favor of one party with federal court opinions "certifying questions of state or territorial law to state or territorial courts" that "often discuss the legal issues." D.I. 513 at 18–19. Surely this Court could not phone the Delaware Supreme Court and urge it to issue an opinion agreeing with Crystallex's view of what the Delaware Code requires. Regardless, the question of OFAC's "support for (or non-opposition to), the launch" of the sale process, D.I. 481 ¶ 3, is not a *legal* matter, but a *factual* question of what OFAC intends to do. *Ex parte* fact-gathering is obviously improper, and trying to influence what those facts will be is even worse. As for Crystallex's invocation of Canon 3(A)(4)(c), the Venezuela Parties have explained why it is inapposite. *See* D.I. 505 at 5–6.

The cases cited by the Special Master, D.I. 512 at 10 n.6, further demonstrate that courts must appropriately limit special masters' ability to communicate with third parties *ex parte*, specifying what topics can be discussed and limiting how any information gathered can be used. *See NORML v. Mullen*, 828 F.2d 536, 539, 544–46 (9th Cir. 1987) (order specifying that the special master "shall not base any findings or legal conclusions in any subsequent [ ] hearing on statements received" from confidential interviews "or on statements received informally from citizens and

witnesses"); *In re Search Warrant Dated Nov. 5, 2021*, No. 21-msc-813 *et al.*, 2021 WL 5845146, at *2 (S.D.N.Y. Dec. 8, 2021) (permitting a special master to hire support staff to assist him, but not otherwise authorizing the special master to engage in *ex parte* communications); *Maine People's All. v. Holtrachem Mfg. Co.*, No. CV–00–69–B–W, 2009 WL 1844990, at *4 (D. Me. June 25, 2009) (permitting a panel of court-appointed experts to engage in *ex parte* communications where all parties were to have access to data considered by the panel and where the special master overseeing the panel's activities was to limit her *ex parte* "contacts to necessary logistical matters"); *see also Cobell v. Norton*, 334 F.3d 1128, 1143–44 (D.C. Cir. 2003) (disqualifying special master from carrying out judicial functions where, in the same proceeding, he had previously engaged in *ex parte* communications with USG officials in an administrative role).[2]

## IV. The Special Master Is Subject to Mandatory Disqualification.

The Special Master and Crystallex ignore the key reasons why the Special Master must be disqualified under § 455(a) and (b), the Code of Conduct, and the Due Process Clause. *See* D.I. 509 at 9–12. By advocating that the USG publicly support the launch of the sale process, the Special Master is not "taking a position on a fully litigated issue" to enforce the letter of this Court's order, D.I. 513 at 17, or merely "tak[ing] such steps as are needed to inform the court about when to launch the sale process," D.I. 512 at 11. He is engaging in advocacy regarding issues that are hotly disputed both before this Court and in OFAC's licensing process. With respect to those issues, the Court must remain *neutral* about which side is correct, and it certainly cannot *lobby* the USG to support one of the parties. Put differently, disqualifying *this* Special Master would not "prohibit the appointment of any special master," D.I. 512 at 11; it would just mean this Court

---

[2] The Special Master also cites *Thompson v. Enomoto*, *see* D.I. 512 at 10 n. 6, which does not address a master's authority to communicate *ex parte* at all. 815 F.2d 1323 (9th Cir. 1987).

would need to use one who does not engage in *ex parte* advocacy to the Executive Branch. More-over, to encourage OFAC to issue new guidance, change its regulations, or issue a license is to encourage the Executive Branch to change its foreign policy. Thus, even if the Court had ordered the sales process to go forward, the Special Master could not advocate that the USG support the process or issue a license. *See United States v. Cooley*, 1 F.3d 985, 995 (10th Cir. 1993) (a judge's out-of-court statements advocating "to see his order … enforced" against protesters "unavoidably created the appearance" of partiality). The Special Master and Crystallex have not, and cannot, cite any authority allowing the Judiciary to urge the Executive Branch to change its policies in favor of one party. Nor do they respond to the authority cited in the opening motion that such conduct violates due process and the separation of powers. Whether or not the USG will in fact have the fortitude to "resist encroachments" of pressure from a judicial officer in this case, D.I. 513 at 19, the law bars such pressure from being brought to bear in the first place.

Though the Special Master admitted he was going to engage in advocacy, Eimer Decl. ¶ 9, which could only have been to obtain a green light to begin the sale process and allow the sale to close so Crystallex could be paid, *see* D.I. 503 at 3, Crystallex chastises the Venezuela Parties for not citing to evidence that the Special Master engaged in advocacy at the January 12 Meeting, D.I. 513 at 17. But, of course, the lack of evidence of what was said and done at the January 12 Meeting is precisely the problem with *ex parte* communications. *See Kensington*, 368 F.3d at 318. Moreover, the Special Master stated that he *would* engage in advocacy at the meeting, and his latest response never claims that he did not. The parties and the Court should take him at his word.

Further, by meeting with the USG *ex parte*, the Special Master has learned new, non-public information that will inform his recommendation as to whether and when the Court should direct the launch of the sale process, in violation of § 455(a) and (b). Despite Crystallex's hopes to the

contrary, D.I. 513 at 17–19, this issue is unresolved. The Court has not yet received evidence regarding whether OFAC will support or at least not oppose the sale process, what information could be shared with the market, or the likelihood that it would allow a sale to close, all of which may inform the judicial decision as to whether to launch the process. D.I. 443 at 17; D.I. 481 ¶ 3. Again, these are *factual* issues—not *legal* issues related to regulatory interpretation. Because the Venezuela Parties have been excluded from the Special Master's communications with the USG, "there [is] no way for them to adequately respond to or counter facts presented" about those "unrecorded meetings" in the Special Master's ultimate recommendation to the Court. *See Kensington*, 368 F.3d at 310–11. This harm to the adversarial process cannot be remedied by "disclos[ing] such facts to the parties and the court in the Supplemental Report" or by the possibility that the USG may, at some point, release a public statement, D.I. 512 at 14–15; D.I. 513 at 16. *See In re Brooks*, 383 F.3d 1036, 1046 (D.C. Cir. 2004) (a special master's impartiality would reasonably be questioned where "information that 'leaves no trace in the record'—such as [the special master's] *ex parte* contacts…— [ ] may reasonably be expected to color … his reports and recommendations to the district court" and cannot "be controverted or tested by the tools of the adversary process").

Finally, the Special Master incorrectly argues that information obtained while working as a judicial officer is not "personal knowledge" under § 455(b). The difference "between 'personal knowledge' and knowledge gained in a judicial capacity is that information from the latter source enters the record and may be controverted or tested by the tools of the adversary process. Knowledge received in other ways, which can be neither accurately stated nor fully tested, is 'extrajudicial.'" *Edgar v. K.L.*, 93 F.3d 256, 259 (7th Cir. 1996); *see also Liteky v. United States*, 510 U.S. 540, 550 (1994) ("interpreting the term 'personal' to create a complete dichotomy between court-acquired and extrinsically-acquired bias produces results so intolerable as to be absurd").

RESPECTFULLY SUBMITTED,

February 10, 2023

MORRIS, NICHOLS, ARSHT & TUNNELL LLP

OF COUNSEL:
Nathan P. Eimer
Lisa S. Meyer
Daniel D. Birk
Gregory M. Schweizer
Emily E. Sullivan
EIMER STAHL LLP
224 South Michigan Avenue
Suite 1100
Chicago, IL 60604
(312) 660-7600
NEimer@eimerstahl.com
LMeyer@eimerstahl.com
DBirk@eimerstahl.com
GSchweizer@eimerstahl.com
ESullivan@eimerstahl.com

*/s/ Kenneth J. Nachbar*
Kenneth J. Nachbar (#2067)
Alexandra M. Cumings (#6146)
1201 North Market Street
Wilmington, DE 19801
(302) 658-9200
KNachbar@morrisnichols.com
ACumings@morrisnichols.com

*Attorneys for PDV Holding, Inc., and*
*CITGO Petroleum Corporation*

HEYMAN ENERIO GATTUSO & HIRZEL LLP

OF COUNSEL:
Joseph D. Pizzurro
Kevin A. Meehan
Juan O. Perla
CURTIS, MALLET-PREVOST,
COLT & MOSLE LLP
101 Park Avenue
New York, NY 10178
(212) 696-6000
jpizzurro@curtis.com
kmeehan@curtis.com
jperla@curtis.com

*/s/ Samuel Taylor Hirzel, II*
Samuel Taylor Hirzel, II (#4415)
300 Delaware Avenue, Suite 200
Wilmington, DE 19801
(302) 472-7300
shirzel@hegh.law

*Attorney for Petróleos de Venezuela, S.A.*

OF COUNSEL:
Donald B. Verrilli, Jr.
Elaine J. Goldenberg
Ginger D. Anders
Brendan B. Gants
Munger, Tolles & Olson LLP
601 Massachusetts Avenue NW
Suite 500 E
Washington, D.C. 20001
(202) 220-1100
Donald.Verrilli@mto.com

George M. Garvey
Munger, Tolles & Olson LLP
350 South Grand Avenue, 50th Floor
Los Angeles, CA 90071
(213) 683-9100
George.Garvey@mto.com

ABRAMS & BAYLISS LLP

*/s/ Stephen C. Childs*
A. Thompson Bayliss (#4379)
Stephen C. Childs (#6711)
20 Montchanin Road, Suite 200
Wilmington, DE 19807
(302) 778-1000
bayliss@abramsbayliss.com
childs@abramsbayliss.com

*Attorneys for Bolivarian Republic of Venezuela*

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

```
----------------------------------------------------------
CRYSTALLEX INTERNATIONAL CORP.,      )
                                     )
              Plaintiff,             )
                                     )
        v.                           )        Misc. No. 17-151-LPS
                                     )
BOLIVARIAN REPUBLIC OF VENEZUELA,    )
                                     )
              Defendant.             )
----------------------------------------------------------
```

## SPECIAL MASTER'S OPPOSITION TO
## <u>VENEZUELA PARTIES' MOTION TO DISQUALIFY THE SPECIAL MASTER</u>

The Special Master hereby submits his Opposition to *PDVSA, PDVH, and Citgo's Motion to Disqualify the Special Master* (D.I. 509) (the "**Motion**").[1]

### PRELIMINARY STATEMENT

The Venezuela Parties' Motion to Disqualify the Special Master is just the latest turn in the Venezuela Parties' years-long effort to delay the court-authorized sale of PDVSA's shares in PDVH. The ultimate aim of these efforts, it appears, is to avoid paying the lawful judgments entered against the Republic and its instrumentalities. At bottom, the Venezuela Parties ask the Court to disqualify the Special Master not for engaging in any conduct that could reasonably be characterized as improper, but rather for merely complying with an order of the Court itself.

The Venezuela Parties readily admit that the Court "has already effectively rejected this objection" by denying their Motion for an Order Directing the Special Master to Permit Counsel's Attendance at Meetings with the United States Government (D.I. 499) (the "**January 9 Motion**")

---

[1] Capitalized terms used and not otherwise defined herein shall bear the meanings ascribed to such terms by the Sale Procedures Order (D.I. 481). Because the Bolivarian Republic of Venezuela submitted a Joinder to the Motion (D.I. 511), this Opposition refers to the Motion as the Venezuela Parties' Motion.

and allowing the Special Master's *ex parte* meeting with the U.S. Government to proceed. Motion at 1. Nevertheless, the Venezuela Parties persist with their Motion, knowing full well that the claims raised therein—much like the claims that the Venezuela Parties raised in the January 9 Motion—have already been considered and rejected by the Court. Having already thoroughly considered and resolved these issues in the Special Master's favor, there is no legitimate reason for the Court to have to revisit these issues now.

For this reason and others set forth below, the Venezuela Parties' Motion is wholly unconvincing and should be denied.

*First*, the Court expressly authorized the Special Master to engage in *ex parte* communications with the U.S. Government over the Venezuela Parties' objection. In instances where the engagement with the Sale Process Parties is necessary to protect their rights, the Court has made it clear that the Special Master needs to consult with the Sale Process Parties. *See, e.g.*, Sale Procedures Order ¶ 4 (providing that "the Sale Process Parties and their advisors shall be consulted as to the identity of, and the scope of inquiry to, any such potential bidders"). Yet the Sale Procedures Order is silent about the need to consult the Sale Process Parties regarding the conversations with the U.S. Government, and the Special Master, by meeting with representatives of the U.S. Government *ex parte*, merely complied with the Court's orders. Accordingly, the Motion is nothing more than a retread of the same arguments that the Court considered and rejected in connection with the January 9 Motion.

*Second*, even if the Court had not already considered and rejected the Venezuela Parties' position, it should do so now because the Special Master's *ex parte* communications were entirely proper and lawful. Contrary to the Venezuela Parties' assertion that the Special Master "must be disqualified due to his January 12 meeting with OFAC," Motion at 2, the Federal Rules of Civil

2

**186a**

Procedure indisputably authorize courts to permit special masters to engage in *ex parte* communications. The Court's exercise of that lawful authority—and the Special Master's compliance with it—is not a valid basis for disqualification.

*Third*, the Venezuela Parties' arguments, if accepted, would require not only disqualification of the Special Master, but also would bar the Court from appointing any special master to implement the sale process. According to the Venezuela Parties, "[w]hether the Court should direct the Special Master to initiate the sale process is a critical, disputed issue in these proceedings." Motion at 6. To be clear, pursuant to the Sale Procedures Order, the Special Master's engagement with the U.S. Government is expressly *not* an initiation of the sale process— it is an authorized exercise of the Special Master's duties. *See* Sale Procedures Order ¶ 4. Therefore, if the Special Master is not permitted to take steps clearly authorized by the Court, then the Venezuela Parties' complaints of disqualifying partiality would apply not only to the Special Master's *ex parte* meeting with the U.S. Government, but also to *any action* taken by the Special Master (and, for that matter, the Court) in furtherance of the sale process. Such result is contrary to the Court's prior orders authorizing the sale process and directing the Special Master to execute it and, if accepted, would frustrate enforcement of the Court's judgment.

*Fourth*, the Venezuela Parties' apparent belief that Courts (and special masters acting on their behalf) must remain neutral with respect to the enforcement of their own judgments is incorrect as a matter of law. The Court has the inherent power to enforce its own judgments and to issue such orders as are necessary to make its judgments effective. The Court's appointment of the Special Master to conduct the sale process was a valid exercise of that power, and the Special Master's actions in furtherance of the sale process—including his *ex parte* meeting with the U.S. Government —are in no way disqualifying.

3

**187a**

*Fifth*, the Venezuela Parties have failed to meet their heavy burden of demonstrating disqualifying partiality under any of the authorities they cite.

*Finally*, the Motion is untimely. The Venezuela Parties have shown substantial and strategic delay with respect to both the instant Motion and the January 9 Motion. The Court should recognize the Venezuela Parties' tactics for what they are and exercise its discretion to deny the Motion as untimely.

## FACTUAL BACKGROUND

In 2016, Crystallex won a foreign arbitration award against the Republic in the amount of $1.202 billion. *Crystallex Int'l Corp. v. Bolivarian Republic of Venezuela*, 244 F. Supp. 3d 100, 107 (D.D.C. 2017). Crystallex subsequently petitioned the District Court for the District of Columbia to confirm the arbitral award. *Id.* at 108. The district court entered a judgment granting Crystallex's petition and denying the Republic's motion to vacate the award, *id.* at 123, which was affirmed on appeal, 760 F. App'x 1, 2 (D.C. Cir. Feb. 14, 2019) (per curiam).

Crystallex registered the district court's judgment with this Court and moved for a writ of attachment *fieri facias*, seeking to attach shares of PDVH owned by PDVSA to satisfy its judgment. *Crystallex Int'l Corp. v. Bolivarian Republic of Venezuela*, 333 F. Supp. 3d 380, 386-87 (D. Del. 2018). Finding that PDVSA is an alter ego of the Republic and that PDVSA's shares in PDVH were property of the Republic available to satisfy Crystallex's judgment, the Court entered an order authorizing issuance of the writ, and formally issued the writ on August 23, 2018. Memorandum Order (D.I. 95). That judgment was also affirmed on appeal, *Crystallex Int'l Corp. v. Bolivarian Republic of Venezuela*, 932 F.3d 126 (3d Cir. 2019), and the Supreme Court denied the Republic's petition for certiorari, 140 S. Ct. 2762 (2020).

Crystallex moved for an order establishing procedures for the execution sale of PDVSA's shares of PDVH. (D.I. 181). The Court granted that motion in part and stated its intention to "appoint a special master to oversee the day-to-day and detailed implementation of the sale procedures." Opinion at 34 (D.I. 234). In so doing, the Court noted that "[t]he parties agree that the Court can appoint a special master, who will have the time and expertise to fulfill the Court's and the U.S. Marshal's duties to prepare for and conduct the sale." *Id.* at 35; *see* Answering Br. of the Venezuela Parties Regarding Potential Future Procedures at 10 (D.I. 196) (recognizing the Court's "discretion to design a process (including who manages the sale) that comports with Delaware law's twin commands").

On April 13, 2021, the Court appointed Robert B. Pincus as special master "to assist with the sale of PDVSA's shares of PDVH to satisfy Crystallex's judgment." Memorandum Order at 2 (D.I. 258). The Court later expounded on the Special Master's role, explaining that he "shall devise a plan for the sale of shares of PDVH as necessary to satisfy the outstanding judgment of Crystallex and the judgment of any other judgment creditor added to the Sale by the Court and/or devise such other transaction as would satisfy such outstanding judgment(s) while maximizing the sale price of any assets to be sold." Order Regarding Special Master at 3 (D.I. 277).

Pursuant to that directive, on August 9, 2021, the Special Master submitted a proposed order establishing procedures for the sale of the PDVH shares. (D.I. 302). After several rounds of revision based on input from the parties and the Court, a revised sale procedures order (D.I. 481) (the "**Sale Procedures Order**") was approved by the Court on October 7, 2022.

Pursuant to the Sale Procedures Order, the Court directed the Special Master and his Advisors "[w]ithin the period of six (6) months after the date of this Order . . . [to] solicit and attempt to gain clarity or guidance from [OFAC] of its support for (or non-opposition to), the

launch of the Marketing Process by the Special Master, the viability of the Marketing Process, and any additional feedback or guidance that the Special Master believes will more likely result in a value-maximizing Sale Transaction." Sale Procedures Order ¶ 3. Nothing in the Sale Procedures Order provides that the Sale Process Parties would be permitted to attend the Special Master's discussions with the U.S. Government, *see id.*, and in a status update submitted contemporaneously with the proposed sale procedures, the Special Master confirmed that he "does not intend to include the Venezuela Parties at such meeting," Status Update of October 4, 2022 at 2 n.2 (D.I. 480).

The Special Master and his advisors scheduled a meeting with the U.S. Government for January 12, 2023. On December 30, 2022, the Special Master received a phone call directly from counsel to the Venezuela Parties, who was seeking information concerning the upcoming meeting. The Special Master confirmed that the meeting was scheduled for January 12, 2023. When the Venezuela Parties' counsel asked whether he would be permitted to attend the meeting, the Special Master informed him that he would not.

On January 9, 2023—three days before the meeting with the U.S. Government was scheduled to take place and ten days after receiving a definitive answer from the Special Master— the Venezuela Parties filed the January 9 Motion seeking an order from the Court compelling their attendance at the meeting. (D.I. 499). ConocoPhillips, Crystallex and the Special Master submitted responses. (D.I. 502, 503, 504). On January 11, 2023, the Court issued an order denying the January 9 Motion, explaining that, among other things, the motion "was filed far too late" because "the Court has contemplated for many months that the Special Master would pursue an *ex parte* meeting with representatives of the United States Government, for reasons that are well-known to . . . the Venezuela Parties." Memorandum Order at 1 (D.I. 506). Consistent with the

Court's order, the Special Master and his Advisors met *ex parte* with U.S. Government on January 12, 2023.

The Venezuela Parties subsequently filed the instant Motion to disqualify the Special Master based on that meeting.  (D.I. 509).

## LEGAL STANDARD

"In considering questions of disqualification in situations where a special master's impartiality is called into question, . . . the special master must hold himself to the same high standards applicable to the conduct of judges." *Jenkins v. Sterlacci*, 849 F.2d 627, 632 (D.C. Cir. 1988).  Courts presume that "judicial [and] quasi-judicial officers" are "not biased," and accordingly, "it is the moving party's burden to show bias or some other reason for disqualification." *Cates v. Comm'r of Soc. Sec.*, 752 F. App'x 917, 923 (11th Cir. 2018) (citing *Schweiker v. McClure*, 456 U.S. 188, 196 (1982)); *see also Proctor v. Engstrom*, 95 F. App'x 192, 194 (8th Cir. 2004) ("[D]istrict judges are presumed impartial and [the] movant bears [a] substantial burden of proving otherwise."); *In re Hawsawi*, 955 F.3d 152, 158 (D.C. Cir. 2020) ("Disqualification is never taken lightly. In the wrong hands, a disqualification motion is a procedural weapon to . . . delay proceedings.").

## ARGUMENT

The Venezuela Parties have not met their "substantial burden" of proving disqualifying partiality.  *Proctor*, 95 F. App'x at 194.  For that reason and the others set forth below, the Court should deny the Motion.

**A. The Court expressly authorized the Special Master to engage in *ex parte* communications with the U.S. Government over the Venezuela Parties' objection and therefore has already considered—and rejected—the Motion**

As the Venezuela Parties themselves acknowledge, the Court has already considered and rejected their position on the merits. The Venezuela Parties openly concede at the outset of their Motion that "the Court has already effectively rejected this objection in denying their Motion for an Order Directing the Special Master to Permit Counsel's Attendance at Meetings with the United States Government and Reply in support of the same." Motion at 1. The Special Master agrees.

The sole basis for disqualification cited by the Venezuela Parties in the Motion is the Special Master's *ex parte* meeting with the U.S. Government.[2] The Motion does not attempt to put forward any other evidence of disqualifying partiality. Accordingly, the Motion is nothing more than a rehashing of the same arguments that the Court considered—and rejected—in ruling on the January 9 Motion. Further, given that the Sale Procedures Order did not require the Special Master to include the Venezuela Parties in discussions with the U.S. Government while requiring consultation with the Venezuela Parties (and other Sale Process Parties) in other contexts, *see* Sale Procedures Order ¶¶ 3-4, the Motion effectively attempts to relitigate not only the January 9 Motion, but the Sale Procedures Order itself. The Court should not countenance the Venezuela Parties' attempt to take a second bite of the apple, which is emblematic of the obstructionist tactics that the Venezuela Parties have deployed throughout this litigation. Having already considered and rejected the Venezuela Parties' position, there is no reason for the Court to revisit it now. *See, e.g.*, *Gordon v. Monoson*, 239 F. App'x 710, 714 (3d Cir. 2007) (holding that "[b]ecause the

---

[2] The Venezuela Parties make passing reference to their contention that the Special Master's retention of Evercore also "creates a disqualifying appearance of partiality," while acknowledging that the Court "previously rejected [this] argument" as well. Motion at 1 n.2.

District Court had already rejected [movant's] arguments," the court "was not required to consider those arguments anew . . . where no new circumstances had arisen").[3]

## B. The Special Master's *ex parte* meeting with the U.S. Government was entirely proper and lawful

Even if the Court had not already considered and rejected the Venezuela Parties' position, it should do so now because the Special Master's *ex parte* meeting with the U.S. Government was entirely proper and lawful. While the Venezuela Parties assert without qualification that "[e]ngaging in *ex parte* communications is grounds for disqualification under 28 U.S.C. § 455(a) and § 455(b)(1)," it simply is not the case that *ex parte* communications—regardless of the nature, extent, or context of such communications—warrant disqualification. As the Special Master explained in his response to the January 9 Motion, Federal Rule of Civil Procedure 53 expressly authorizes courts to dictate "the circumstances, if any, in which the master may communicate ex parte with the court or a party." Fed. R. Civ. P. 53(b)(2)(B). The Court's authorization of the Special Master's *ex parte* communications with the U.S. Government fell squarely within the scope of that authority.[4] Although the Venezuela Parties have argued that the authority provided by Rule 53(b)(2)(B) is limited only to "*ex parte* communications with *the court or a party*," January 9 Motion at 4-5, that hyper-literal reading of the Rule defies logic and is inconsistent with

---

[3] To the extent that the Venezuela Parties argue that the occurrence of the Special Master's *ex parte* meeting with the U.S. Government provides grounds for the Court to reconsider their previously rejected arguments, *see* Motion at 1, the Court should reject that position. The January 9 Motion objected to the *ex parte* meeting. The occurrence of the very meeting that the Venezuela Parties already unsuccessfully objected to is not a "new circumstance[]" warranting reconsideration of previously raised (and rejected) arguments. *Monoson*, 239 F. App'x at 714.

[4] It bears repeating here that the Federal Rules of Civil Procedure are law. *See* 28 U.S.C. § 2072(a). The Venezuela Parties' strained interpretation of 28 U.S.C. §§ 455(a) and 455(b)(1) as even prohibiting *ex parte* communications otherwise authorized pursuant to federal law puts those statutes in tension with other provisions of the U.S. Code and provides yet another reason to reject the Venezuela Parties' position.

how Rule 53 is applied in practice. The power to authorize *ex parte* communications with the court or the parties necessarily includes the lesser power to authorize *ex parte* communications with third parties who are not even parties to the litigation.[5] And when the circumstances of the case are such that *ex parte* communications between the Special Master and third parties are critical to the fulfillment of the Special Master's particular duties, courts have exercised that power by permitting such communications.[6]

### C. The Venezuela Parties' arguments, if accepted, would require not only disqualification of the Special Master, but also would bar the Court from appointing any special master to implement the sale process

The Court should deny the Motion because the Venezuela Parties' arguments, if accepted, would require not only disqualification of the Special Master (and possibly the Court itself), but would also prohibit the appointment of any special master to implement the sale process, thus frustrating the Court's judgment. Although the Venezuela Parties' purport to be concerned by the Special Master's "advocacy," it is clear that the ultimate basis of the Venezuela Parties' complaint is the sale process itself. *See* Motion at 6 ("Whether the Court should direct the Special Master to initiate the sale process is a critical, disputed issue in these proceedings."); *id.* at 9 ("Crystallex's attempt to enforce its judgment by moving forward with the sale process at this time is a hotly

---

[5] *See* Crystallex Response to January 9 Motion (D.I. 504) at 3.

[6] *See, e.g.*, *Thompson v. Enomoto*, 815 F.2d 1323, 1326 n.7 (9th Cir. 1987) (discussing district court's order authorizing special master "[t]o interview, on a confidential basis or otherwise, any person, including any correctional staff member or inmate, affected by the Consent Decree"); *Nat'l Org. for the Reform of Marijuana Laws v. Mullen*, 828 F.2d 536, 539 (9th Cir. 1987) (discussing district court's order authorizing special master to "interview, on a confidential basis or otherwise, any . . . director, supervisor, or team member, or any person assisting in the implementation of the . . . program"); *In re Search Warrant dated Nov. 5, 2021*, 2021 WL 5845146, at *2 (S.D.N.Y. Dec. 8, 2021) (authorizing special master to confer with "additional professionals, support staff, or expert consultants"); *Maine People's All. v. Holtrachem Mfg. Co.*, 2009 WL 1844990, at *4-5 (D. Maine June 25, 2009) (denying motion "to prevent [special masters] from freely gathering relevant information from outside sources not subject to any Court Order on *ex parte* contacts").

disputed issue in this case.").  But the satisfaction of Crystallex's judgment through the sale of PDVSA's shares of PDVH is *not* a disputed matter.  The Court retained the Special Master to design the process for selling the PDVH shares or to devise a different transaction to satisfy the judgments.  *See* Sale Procedures Order ¶ 2; Order Regarding Special Master at 3 (D.I. 277).  There may only be a dispute as to the date of the launch.  *See* Sale Procedures Order ¶ 3 ("The Court shall consider the Supplemental Report, all Launch Date Objections thereto, and any responses, after which the Court shall make a determination regarding when to trigger the Preparation Launch Date and subsequent Launch Date with or without a license from OFAC.").

If the Special Master cannot take such steps as are needed to inform the court about when to launch the sale process, then the Special Master plainly cannot carry out his mandate.  *See* Memorandum Order at 2 (D.I. 258) (appointing the Special Master "to assist with the sale of PDVSA's shares of PDVH to satisfy Crystallex's judgment"); Order Regarding Special Master at 3 (D.I. 277) (directing the Special Master to "devise a plan for the sale of shares of PDVH as necessary to satisfy the outstanding judgment of Crystallex . . . while maximizing the sale price of any assets to be sold").  By the same token, every allegation of partiality that the Venezuela Parties make with regard to the Special Master's *ex parte* meeting with the U.S. Government could just as easily be said of anything done by the Special Master in furtherance of the sale process, as well as the Court's appointment of the Special Master to implement the sale process in the first instance. The consequence of the Venezuela Parties' arguments, if taken seriously, is that the Special Master cannot assist in the execution of the Court's judgment, which clearly must not be the proper outcome.

**D. The Motion's underlying premise that judicial officers may not advocate for the enforcement of judgments is incorrect as a matter of law**

The Court should deny the Motion because its foundational premise is incorrect as a matter of law. The Venezuela Parties argue that there is no "exception for the prohibition on judicial advocacy for situations in which a Court is advocating for the enforcement of orders or judgments that it has issued" and accordingly conclude that "the Special Master must be disqualified because he has acted as an advocate." Motion at 9-11 (capitalization altered). But the Special Master's "advocacy" in this context, as the Court has observed, is only "for the enforcement of the Court's orders, consistent with his previous efforts . . . and as the Court expressly contemplated and authorized him to do in aid of allowing the Court to fulfill its judicial duties." Memorandum Order at 2 n.2 (D.I. 506). The Special Master's efforts in this regard are indisputably legitimate, as any actions taken by the Special Master in aid of execution are derivative of the Court's own "inherent power to enforce its judgments." *Peacock v. Thomas*, 516 U.S. 349, 356 (1996). Indeed, it is black-letter law that "[t]he jurisdiction of a court is not exhausted by the rendition of judgment, but continues until that judgment shall be satisfied." *Cent. of Ga. R.R. Co. v. United States*, 410 F. Supp. 354, 357 (D.D.C. 1976) (quoting *Riggs v. Johnson Cnty.*, 73 U.S. (6 Wall.) 166 (1867)). As a consequence, "the court rendering judgment has [the] inherent power to enforce it and to make such orders and issue such process as may be necessary to make it effective." *Abbot Labs. v. Novopharm Ltd.*, 104 F.3d 1305, 1309 (Fed. Cir. 1997). The Special Master's efforts to enforce the Court's judgment—including by meeting *ex parte* with representatives of the U.S. Government—are therefore not disqualifying acts of judicial advocacy, but rather are acts in furtherance of the Court's own inherent powers. The Venezuela Parties' apparent belief that the Special Master must sit on the sidelines while the Court's judgment goes unexecuted for

years on end subverts these well-established principles and the power of the Court to enforce its judgment.

## E. The Venezuela Parties have failed to meet their substantial burden of establishing disqualifying partiality

The Court should deny the Motion because the Venezuela Parties have failed to meet their substantial burden of establishing disqualifying partiality. The Venezuela Parties' arguments for disqualification boil down to three simple points, none of which meet the substantial burden. First, the Venezuela Parties argue that the Special Master's *ex parte* communications themselves are "grounds for disqualification under 28 U.S.C. § 455(a) and § 455(b)(1)."[7] Motion at 6. As noted above, *ex parte* communications do not automatically constitute grounds for disqualification, and cannot provide grounds for disqualification where, as here, the communications were authorized by the Court pursuant to its lawful authority. To hold otherwise would, in effect, disqualify the Special Master merely for complying with an order of the Court. But as the Supreme Court has explained, "judicial rulings"—and, by extension, compliance with judicial rulings—"almost never constitute a valid basis for a bias or partiality motion." *Liteky v. United States*, 510 U.S. 540, 555 (1994). Rather, "[a]lmost invariably, they are proper grounds for appeal, not recusal" and "can only in the rarest circumstances evidence the degree of favoritism or antagonism required" for recusal. *Id.* The Venezuela Parties have not shown that the Special Master's conduct falls within the "rarest circumstances"—or even conduct in its vicinity—required to justify disqualification in this context.

---

[7] 28 U.S.C. § 455(a) provides that a judicial officer "shall disqualify himself in any proceeding in which his impartiality might reasonably be questioned." 28 U.S.C. § 455(b)(1) provides that a judicial officer "shall also disqualify himself . . . [w]here he has a personal bias or prejudice concerning a party, or personal knowledge of disputed evidentiary facts concerning the proceeding."

The Venezuela Parties next argue that the Special Master's *ex parte* communications require disqualification under 28 U.S.C. § 455(b)(1) because those communications "have given him 'personal knowledge of disputed evidentiary facts concerning the proceeding.'" Motion at 2-3 (quoting 28 U.S.C. § 455(b)(1)). Here, the Venezuela Parties allege that the relevant "disputed evidentiary facts" that the Special Master supposedly obtained "personal knowledge of" are the U.S. Government's position on the launch of the sale process and whether it will issue a license in connection therewith. *See id.* at 7. But the U.S. Government's policy positions towards the sale process are obviously not "disputed evidentiary facts" of the kind captured by § 455(b)(1). The parties have not litigated, and will not litigate, the issue of whether the U.S. Government supports the sale process. Ultimately, the U.S. Government may decide to support the sale of PDVSA's shares in PDVH or not. Moreover, "[k]nowledge gained from [a judicial officer's] discharge of his judicial function is not a ground for disqualification under 28 U.S.C. § 455(b)(1)." *Omega Eng'g, Inc. v. Omega, S.A.*, 432 F.3d 437, 447-48 (2d Cir. 2005). Here, to the extent the Special Master obtained any knowledge, it was "solely from his judicial duty" to meet with the U.S. Government pursuant to the Sale Procedures Order. *Id.* Such knowledge, to the extent it exists, therefore cannot support his disqualification as a matter of law. *See Ndoromo v. Barr*, 486 F. Supp. 3d 388, 394 (D.D.C. 2020) ("[F]acts learned by a judge in his judicial capacity cannot be the basis for disqualification.") (quoting *United States v. Patrick*, 542 F.2d 381, 390 (7th Cir. 1976)); *see also Omega*, 432 F.3d at 447-48 (declining to recuse magistrate judge who had personal knowledge of settlement agreement based on judicial duty to oversee settlement conference).

Even if the U.S. Government's position on the sale process were a "disputed evidentiary fact" for the purposes of § 455(b)(1), disqualification on that basis would still be unwarranted because the Special Master will disclose such facts to the parties and the Court in the Supplemental

Report, or it may be that the U.S. Government elects to make its own position clear directly, through a public release or filing with this Court.  *See* Sale Procedures Order ¶ 3.  To the extent that the Venezuela Parties are concerned that the Special Master might misrepresent the U.S. Government's views, that concern is baseless because the U.S. Government is free to clarify its position on the sale process at any time, or to decline to issue a license in connection with the sale.  The Venezuela Parties therefore cannot show any prejudice resulting from the Special Master's knowledge of the U.S. Government's position, even if such knowledge fell within the ambit of § 455(b)(1).

Finally, the Venezuela Parties argue that the Special Master must be disqualified pursuant to 28 U.S.C. § 455(a) and the Due Process Clause of the Fifth Amendment to the U.S. Constitution because he advocated in support of a particular position.  *See* Motion at 9-12.  As explained above, the Special Master's "advocacy"—if carrying out an order amounts to advocacy at all—in this context is only advocacy for enforcement of the Court's judgment, which is entirely legitimate and not a basis for disqualification.  Notwithstanding that it has not occurred, any advocacy for or against the pecuniary interest of a Sale Process Party, to the detriment of another, would be moot— the Court has already decided those substantive issues.  The Special Master concerns himself only with execution of his duties and enforcement of the Court's judgment, pursuant to the express authority granted to him by the Court in its various orders entered to date.

Accordingly, each of the Venezuela Parties' arguments for disqualification of the Special Master fails, and the Venezuela Parties have failed to meet their substantial burden of demonstrating disqualifying partiality.[8]

---

[8] The Venezuela Parties' arguments under the Canons 2 and 3 of the Code of Conduct for United States Judges are duplicative of their statutory and constitutional arguments and need not be addressed separately.

### F. The Motion is untimely and the Venezuela Parties have shown substantial and strategic delay with respect to both the instant Motion and the January 9 Motion

Motions for disqualification "must be brought 'at the earliest possible moment after obtaining knowledge of facts demonstrating the basis for such claim.'" *Omega*, 432 F.3d at 448. Rather than file the Motion at the "earliest possible moment," the Venezuela Parties have shown substantial and strategic delay. *Id.* The Court should accordingly deny the motion as untimely.

As the Venezuela Parties acknowledge, the Third Circuit has held that courts may consider the timeliness of a disqualification motion in deciding whether to grant it. *See* Motion at 8-9; *In re Kensington Int'l Ltd.*, 368 F.3d 289, 312 (3d Cir. 2004). Considerations of timeliness are important when assessing disqualification motions because, as the Third Circuit explained in *Kensington*, "the judicial process can hardly tolerate the practice of a litigant with knowledge of circumstances suggesting possible bias or prejudice holding back, while calling upon the court for hopefully favorable rulings, and then seeking recusal when they are not forthcoming." *Kensington*, 368 F.3d at 312. While the Motion devotes considerable space to defending the timeliness of the Venezuela Parties' request for disqualification, the Venezuela Parties' protestations on this front do not withstand even the slightest scrutiny.

It is not disputed that the Sale Procedures Order, for months before it was formally entered in October 2022, contemplated that the Special Master would solicit the U.S. Government's views on the sale process within the six-month period following entry of the Sale Procedures Order. Nothing in the Sale Procedures Order suggested or even implied that any of the Sale Process Parties would be permitted to attend the Special Master's discussions with the U.S. Government, and the Special Master made clear in the status report filed contemporaneously with the final proposed sale procedures that he "does not intend to include the Venezuela Parties at such meeting." Status Report of October 4, 2022 at 2 n.2. (D.I. 480). Thus, when the Special Master filed the Status

16

**200a**

Report of October 4, 2022 (if not before), the Venezuela Parties knew that the Special Master planned to conduct an *ex parte* meeting with the U.S. Government relating to the sale process within the next six months. At any time from that point forward, the Venezuela Parties could have filed a motion or letter with the Court requesting that the Court mandate their attendance at the meeting. Yet the Venezuela Parties instead waited nearly three months to take such action—a fact that is difficult to square with the Venezuela Parties' professed belief that any such *ex parte* meeting would so severely prejudice their rights as to require disqualification.

By waiting until just three days before the long-planned *ex parte* meeting was scheduled to occur to file the January 9 Motion, and then waiting until after the meeting had already transpired to seek disqualification of the Special Master, the Venezuela Parties have shown inexcusable delay. If the Venezuela Parties truly believed that an *ex parte* meeting between the U.S. Government and the Special Master would be disqualifying, the Venezuela Parties should have said so upon entry of the Sale Procedures Order, if not sooner. Instead, the Venezuela Parties waited until the last minute to object to the U.S. Government meeting and now, having lost, seek to disqualify the Special Master based on nothing more than his attendance at that very meeting. This kind of gamesmanship is exactly what the Third Circuit pointed to in explaining why timeliness is a factor that informs whether to grant a disqualification motion, and provides a sufficient basis for denying the Motion. *See Cirba Inc. v. VMware, Inc.*, No. 19-742-LPS, 2022 WL 606655, at *5 (D. Del. Jan. 7, 2022) (holding that party's "concerns about [a special master's] impartiality" were "waived" because the party "substantially delayed" raising those concerns).

Indeed, one need look no further than the Venezuela Parties' prior stance on (and participation in) *ex parte* meetings to conclude that the Motion is a tactic intended to delay the sale process rather than a bona fide expression of concern. As the Venezuela Parties (and the Court)

are aware, January 12, 2023 was not the first time that the Special Master met *ex parte* with the U.S. Government. The Special Master has had several such meetings—with the knowledge of all of the Sale Process Parties, including the Venezuela Parties. While the Venezuela Parties desperately try to distinguish these prior *ex parte* meetings from the one they now allege is disqualifying, and even claim that they never consented to *ex parte* communications between the Special Master and the U.S. Government, *see* Motion at 7-8 & n.6, nothing should distract from the fact that the Venezuela Parties never once cited those prior meetings as grounds for disqualification. Not only that, but the Venezuela Parties have themselves sought to meet *ex parte* with the Special Master on numerous occasions, far beyond the consultation mandated by the Court's orders and certainly with more frequency than the other Sale Process Parties. Having participated in such extensive *ex parte* communications themselves, the Venezuela Parties should not be heard to disqualify the Special Master on the basis of an *ex parte* meeting with a third party that is not even party to this litigation.

## CONCLUSION

For the reasons set forth above, the Court should deny the Motion.

POTTER ANDERSON & CORROON LLP

OF COUNSEL:

*/s/ Myron T. Steele*
Myron T. Steele (#00002)

Ray C. Schrock, P.C. (Admitted *pro hac vice*)
Alexander W. Welch (Admitted *pro hac vice*)
Chase A. Bentley (Admitted *pro hac vice*)
WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
Ray.Schrock@weil.com
Alexander.Welch@weil.com
Chase.Bentley@weil.com

Dated: February 3, 2023

Matthew F. Davis (#4696)
Bindu A. Palapura (#5370)
Abraham Schneider (#6696)
Hercules Plaza, 6th Floor
1313 North Market Street
P.O. Box 951
Wilmington, DE 19801
Telephone: (302) 984-6000
Facsimile: (302) 658-1192
msteele@potteranderson.com
mdavis@potteranderson.com
bpalapura@potteranderson.com
aschneider@potteranderson.com

*Counsel for Special Master Robert B. Pincus*

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

CRYSTALLEX INTERNATIONAL CORP., )
                                       )
                  Plaintiff, )
                                        )
           v. )           Case No. 1:17-mc-00151-LPS
                                        )
BOLIVARIAN REPUBLIC OF VENEZUELA, )
                                        )
                Defendant. )
                                        )
_____ )

## PDVSA, PDVH, AND CITGO'S MOTION
## <u>TO DISQUALIFY THE SPECIAL MASTER</u>

PDVSA, PDVH, and CITGO[1] ("Movants") respectfully move to disqualify Special Master Robert B. Pincus, based on his improper *ex parte* communication and advocacy in a January 12, 2022, meeting with OFAC, and to suppress or vacate his tainted work product and any orders relying on the same. Movants are aware that the Court has already effectively rejected this objection in denying their Motion for an Order Directing the Special Master to Permit Counsel's Attendance at Meetings with the United States Government and Reply in support of the same. *See* D.I. 499; D.I. 505. Nevertheless, now that the improper meeting has occurred, Movants have legitimate grounds for seeking the Special Master's disqualification and wish to preserve their rights in that regard.[2]

## NATURE AND STAGE OF PROCEEDINGS

This is a post-judgment execution proceeding brought in 2017 by Plaintiff Crystallex International Corp., a judgment creditor of the Republic. In 2018, Crystallex attached the shares of stock in PDV Holding, Inc. ("PDVH") owned by the Republic's state-owned oil company, PDVSA to satisfy its judgment, and has unsuccessfully sought—and presumably is again seeking—to obtain a license from the United States Department of the Treasury's Office of Foreign Assets Control ("OFAC") to initiate and conclude an execution sale of the shares. The Venezuela Parties oppose the issuance of a license to both initiate and conclude an execution sale. And the United States Government has already stated—in this Court—that "moving

---

[1] Capitalized terms used by not defined herein have the meaning ascribed to them in the Court's January 14, 2021, Order, D.I. 234, and the Sale Procedures Order, D.I. 481.

[2] The Court also previously rejected the Venezuela Parties' argument that the Special Master's reliance on an adviser that has a financial conflict of interest, Evercore, creates a disqualifying appearance of partiality, in violation of 28 U.S.C. § 455(a), and triggers 28 U.S.C. § 455(b)(4), which provides that a judicial officer must be disqualified if he "has a financial interest in the subject matter in controversy or in a party to the proceeding, or any other interest that could be substantially affected by the outcome of the proceeding." *See* D.I. 443 at 2–12. To the extent the Court deems it appropriate to refer the recusal request to the Special Master in the first instance, Movants respectfully request that this motion be treated as addressed to the Special Master.

forward" with a sale "could imperil U.S. foreign policy and national security interests." D.I. 212 at 5.

On April 13, 2021, the Court appointed Mr. Pincus as a special master to assist in the design and implementation of an execution Sale Procedures Order ("SPO"). D.I. 234 at 36; D.I. 258 (order appointing Special Master). On October 11, 2022, this Court entered an SPO proposed by the Special Master. *See* D.I. 481. The SPO provides for a period of up to six months after the date of the SPO, during which "the Special Master and his Advisors shall solicit and attempt to gain clarity or guidance from the United States Department of the Treasury's Office of Foreign Assets Control ('OFAC') of its support for (or non-opposition to), the launch of the Marketing Process by the Special Master, the viability of the Marketing Process, and any additional feedback or guidance that the Special Master believes will more likely result in a value-maximizing Sale Transaction." *Id.* ¶ 3. After the Special Master submits his recommendation and the Sale Process Parties have an opportunity to object, this Court will "make a determination regarding when to trigger the Preparation Launch Date and subsequent Launch Date with or without a license from OFAC." *Id.* ¶ 4.

On January 9, 2023, the Venezuela Parties moved for an order directing the Special Master to permit their counsel's attendance at a January 12 meeting with the U.S. Government. D.I. 499. This Court denied that motion on January 11, 2023. D.I. 506. Upon information and belief, the Special Master met with OFAC *ex parte* on January 12, 2023.

**SUMMARY OF ARGUMENT**

1.      The Special Master must be disqualified due to his January 12 meeting with OFAC, and his tainted work product and any orders relying on that work product must be suppressed or vacated. The Special Master's *ex parte* communications with the U.S. Government

have created an appearance of partiality in contravention of 28 U.S.C. § 455(a), have given him

"personal knowledge of disputed evidentiary facts concerning the proceeding" under 28 U.S.C.

§ 455(b)(1), and violate Canons 2 and 3 of the Code of Conduct for United States Judges.

      2.     In addition, the Special Master's expressed intent to advocate to the United States

Government to revise its foreign policy positions and authorize a sale process designed to satisfy

Crystallex's judgment has created (at the very least) an appearance of partiality in contravention

of 28 U.S.C. § 455(a) and violates Canons 2 and 3 of the Code of Conduct and the Due Process

Clause of the Fifth Amendment to the United States Constitution.

<h3 style="text-align:center">STATEMENT OF FACTS</h3>

      The August 9, 2021, PSPO submitted by the Special Master proposed to authorize the

Special Master to "proactively engage with representatives from the Executive Branch … and to

take all steps or actions reasonably in furtherance of the issuance of OFAC guidance and/or

authorization." D.I. 347, ¶ 4. The Venezuela Parties objected to this provision, stating that the

Special Master cannot "advocate to the Government on behalf of particular parties or for

particular outcomes in regulatory determinations affecting those parties." D.I. 354 at 21. In

response to this objection, the Special Master clarified that he did "not propose[] to" include a

provision in the SPO allowing him to "lobb[y] on behalf of any particular party in this case" as

part of the sale process. D.I. 356 ¶ 8. Neither the Court's May 27, 2021, order appointing the

Special Master nor the SPO entered on October 7, 2022, expressly authorized the Special Master

to engage in *ex parte* communications with the U.S. Government.

      On December 28, 2022, the Special Master submitted a report advising the Court of his

recent activities and fees incurred, which included meeting with his "Advisors regarding

outreach to and negotiations with OFAC." D.I. 496 at 3. The Special Master stated that he had

3

**207a**

scheduled "a meeting with representatives of the United States Department of the Treasury and the United States Department of Justice to take place [sometime] in January." *Id.* Following inquiry from the Venezuela Parties, the Special Master disclosed at 4:30 p.m. Eastern Standard Time on Friday, December 30, 2022, that the meeting was to take place on January 12, 2023 ("January 12 Meeting"). On January 3, 2022, the next business day after the New Year's Day holiday weekend, the Venezuela Parties requested that the parties be allowed to attend the meeting, but the Special Master rejected that request.

On January 9, 2023 (four business days after January 3), as soon as reasonably practicable given the need for internal decision making and approvals, to coordinate among counsel for the separate Venezuela Parties, and to draft the motion, the Venezuela Parties filed a motion requesting that they be allowed to attend the January 12 Meeting. D.I. 499. The Court set an expedited briefing schedule. D.I. 500. In response to the Venezuela Parties' motion, the Special Master stated that he intended to advocate for OFAC to support the launch of the sale process at this meeting and that allowing the Venezuela Parties to attend would "chill" his ability to advocate and to obtain *ex parte* statements from the Government. D.I. 503 ¶ 5; *see also id.* ¶ 5 (stating that the purpose of the January 12th Meeting was "to solicit OFAC's unencumbered views on the sale process, hear the Special Master's perspective on why OFAC *cooperation* with the Court's order is appropriate and necessary, and ascertain whether OFAC will issue a license or otherwise authorize the sale of the PDVH shares" (emphasis added)); D.I. 503 ¶ 3 ("There is no principle of judicial ethics requiring the Court's Special Master to not take actions, or even *advocate*, to enforce the Court's own judgment and those of other courts, of which the Special Master's engagement with OFAC is a part." (emphasis added)). To the best of Movants'

knowledge, the Special Master met with the U.S. Government on January 12, 2023, as scheduled, on an *ex parte* basis.

## LEGAL STANDARD

Under Federal Rule of Civil Procedure 53, a special master "must not have a relationship to the parties, attorneys, action, or court that would require disqualification of a judge under 28 U.S.C. § 455, unless the parties, with the court's approval, consent to the appointment after the master discloses any potential grounds for disqualification." Fed. R. Civ. P. 52(a)(2). Section 455(a) provides that a judicial officer "shall disqualify himself in any proceeding in which his impartiality might reasonably be questioned." 28 U.S.C. § 455(a). "The test for recusal under § 455(a) is whether a reasonable person, with knowledge of all the facts, would conclude that the judge's impartiality might reasonably be questioned." *In re Kensington Int'l Ltd.*, 368 F.3d 289, 301 (3d Cir. 2004) ("*Kensington I*"). In addition, the Due Process Clause of the Fifth Amendment to the United States Constitution "demands impartiality on the part of those who function in judicial or quasi-judicial capacities" and requires such persons to "assiduously refrain from becoming advocates for either party." *Abdulrahman v. Ashcroft*, 330 F.3d 587, 596 (3d Cir. 2003) (internal quotation marks omitted).

In addition, a judicial officer "shall" be disqualified under 28 U.S.C. § 455(b)(1) where he has "personal knowledge of disputed evidentiary facts concerning the proceeding." Information obtained during a proceeding is considered "personal knowledge" if that information does not "enter[] the record" and cannot be "controverted or tested by the tools of the adversary process." *In re Edgar*, 93 F.3d 256, 259 (7th Cir. 1996). "Section 455(b)(1) is embraced within the perception that a reasonable person might entertain that the judge's impartiality might reasonably be questioned." *Kensington I*, 368 F.3d at 316.

## ARGUMENT

I.  **The Special Master Must Be Disqualified for Engaging in *Ex Parte* Communications with the U.S. Government**

The Special Master has deliberately, and over the objection of the Venezuela Parties, engaged in *ex parte* communications with the U.S. Government regarding the substance of this action. Judicial officers are generally prohibited from engaging in *ex parte* communications with third parties regarding the substance of a matter. *See Kensington I*, 368 F.3d at 309–10; *see also* Code of Conduct for United States Judges ("Code of Conduct"), Canon 3(A)(4), *in* 2 Guide to Judiciary Policy, Ch. 2 3(C).[3] Engaging in *ex parte* communications is grounds for disqualification under 28 U.S.C. § 455(a) and § 455(b)(1).[4] *See Kensington I*, 368 F.3d at 309–15; *In re Edgar*, 93 F.3d at 258–61.[5]

Whether the Court should direct the Special Master to initiate the sale process is a critical, disputed issue in these proceedings. As the Special Master met with OFAC *ex parte* to discuss this issue, the Venezuela Parties will have no firsthand knowledge of any statements that are included in (or are omitted from) the Special Master's report. Thus, the Venezuela Parties will be unable "to adequately respond to or counter facts presented" and protect their interests, which requires disqualification under § 455(a) at a minimum. *Kensington I*, 368 F.3d at 310–11.

The Special Master's *ex parte* communications with the U.S. Government also require disqualification under 28 U.S.C. § 455(b)(1). "Mandatory disqualification under § 455(b)(1)" occurs when a judicial officer learns information relevant to the proceedings through "[o]ff-the-

---

[3] The Code of Conduct applies to special masters, with the exceptions of Canons 4A(3), 4B, 4C, 4D(4), and 5. *See* Code of Conduct at 2, 19.

[4] There is no question that § 455 applies in post-judgment enforcement proceedings. *See* 28 U.S.C. § 455(d)(1) (defining "proceeding" to include "pretrial, trial, appellate review, or other stages of litigation").

[5] *See also* Code of Conduct Canon 3(C) (stating that "[a] judge should disqualify himself or herself in a proceeding in which the judge's impartiality might reasonably be questioned").

record briefings." *Edgar*, 93 F.3d at 259. Here, the Special Master has been ordered to recommend to the Court whether or not the sale process should be launched, based in large part on what OFAC may or may not say regarding its "support for (or non-opposition to), the launch of the Marketing Process by the Special Master," D.I. 481 ¶ 3, and "the likelihood that [OFAC] will issue a specific license for a sale to close," D.I. 443 at 17. As the Special Master's meeting with OFAC on these subjects was entirely off-the-record, he now has personal knowledge of substantive information relevant to the proceedings that cannot be effectively tested or controverted.

In denying the Venezuela Parties' motion to attend the January 12 Meeting, the Court held that the Venezuela Parties waived any objection to the meeting by not objecting to the Special Master's prior *ex parte* communications with OFAC. *See* D.I. 506 at 2. Respectfully, that conclusion is incorrect for at least three reasons. *First*, unlike the communications here, the Special Master's previous communications with OFAC—at least to the best of Movants' knowledge—were not made for the purpose of obtaining factual information to be used in formulating a recommendation to the Court on a substantive issue in the case. *Second*, and regardless, even if the Venezuela Parties had somehow implicitly consented to these different *ex parte* communications *in the past*, that would provide no basis for concluding they had consented to *this one now*, especially when they had previously objected to the PSPO's proposal for the Special Master to engage with OFAC on the question of whether to launch the sale process (as opposed to a request for a Statement of Interest from the Court), D.I. 354 at 21, and vociferously objected to the January 12, 2023 meeting *before* it occurred, D.I. 499; D.I. 505. *Third*, and in all events, even if the Venezuela Parties' lack of prior objections were indicative of some sort of implied waiver for all *ex parte* communications with the Government—and they are not—

grounds for disqualification under § 455(b)(1) are not waivable, *see* § 455(e) ("No justice, judge, or magistrate judge shall accept from the parties to the proceeding a waiver of any ground for disqualification enumerated in subsection (b)); *In re Kensington Int'l Ltd.* ("*Kensington II*"), 353 F.3d 211, 221 (3d Cir. 2003), and grounds for disqualification under § 455(a) "may be accepted" *only* "if it is preceded by a full disclosure on the record of the basis for disqualification," 28 U.S.C. § 455(e); *see Kensington I*, 368 F.3d at 311. No such full disclosure on the record occurred here, much less a disclosure preceding an affirmative waiver by the Venezuela Parties.[6]

The Court also held that the Venezuela Parties' request to attend the January 12 Meeting was untimely. D.I. 506 at 1–2. Respectfully, the Venezuela Parties moved as swiftly as was reasonably practicable given that the date of the meeting was not disclosed until 4:30 p.m. on the Friday afternoon before the New Year's holiday weekend, and the Court's expedited briefing and hearing schedule allowed for all parties to be heard and for the Court to rule before the meeting was to occur. The Special Master had previously indicated that he had not yet made a final decision about whether to permit the parties to attend any future meeting with OFAC, *see* D.I. 480 at 2 n.2, and it was not until January 3, 2023, that he definitively rejected the parties' ability to attend.

In addition, a delay of ten days in bringing a challenge to a planned *ex parte* meeting before it occurred is not a ground for finding untimeliness under governing precedent. Section 455 imposes a mandatory duty on the judge to disqualify himself when enumerated circumstances occur, and it does not contain a timeliness requirement. While the Third Circuit

---

[6] The Court's order observes that the parties consented to *ex parte* communications between the Special Master and the parties and between the Special Master and the Court. D.I. 506 at 2–3. As the Venezuela Parties explained in their reply in support of their motion, however, no such consent was given to *ex parte* communications between the Special Master and the U.S. Government. D.I. 505 at 4–5.

has previously considered timeliness as "one of the factors which engages a court's discretion in determining whether a judge" who has refused to disqualify in compliance with the statute "shall be relieved from its assignment," it has made clear that any delay must be substantial and strategic, such as where "a litigant with knowledge of circumstances suggesting possible bias or prejudice hold[s] back, while calling upon the court for hopefully favorable rulings, and then seek[s] recusal when they are not forthcoming." *See Kensington I*, 368 F.3d at 312. (internal quotation marks omitted); *United States v. Furst*, 886 F.2d 558, 579, 581 (3d Cir. 1989) (holding that a motion for disqualification was timely because "[a]lthough it could have been presented sooner, the motion was presented to the district court prior to a proceeding over which the judge would preside" and the movant had not strategically delayed the motion to obtain favorable rulings). There is no such contention—and could not be any such contention—here.

Nor was there any prejudice from the timing of the request. The Court could have issued an order allowing a limited number of counsel for the parties to attend, and since the Venezuela Parties merely wanted to observe, not participate, there was no reason the meeting could not have proceeded as scheduled. Moreover, any fear of a "chilling effect" from the Venezuela Parties' presence would not have been a legitimate consideration, since anything that could not be said in the Venezuela Parties' presence is something that should not be said at all. Finally, even if the meeting could not have proceeded as scheduled, which is not the case, it would have been far better for the Special Master and all parties to have a short postponement or devise a different way to request OFAC's position than to proceed with an improper *ex parte* meeting.

## II.   The Special Master Must Be Disqualified Because He Has Acted as an Advocate

Crystallex's attempt to enforce its judgment by moving forward with the sale process at this time is a hotly disputed issue in this case, and inconsistent with the substance and import of the U.S. Government's position regarding the sale process. The Special Master's stated intent to

9

**213a**

advocate to OFAC (essentially on behalf of Crystallex) renders the need for disqualification still more acute. The requirement that a judge remain an impartial arbiter and not an advocate for a particular party or a particular position is deeply engrained in the U.S. judicial system and is a clear ground for disqualification under 28 U.S.C. § 455(a) and the Due Process Clause. *See Abdulrahman*, 330 F.3d at 596 (stating that "due process demands impartiality on the part of those who function in judicial or quasi-judicial capacities" and that such persons "must assiduously refrain from becoming advocates for either party" (internal quotation marks omitted)); *Logue v. Dore*, 103 F.3d 1040, 1045 (1st Cir. 1997) ("[T]here are lines which a trial judge should not cross. For example, … he cannot become an advocate or otherwise use his judicial powers to advantage or disadvantage a party unfairly.").

Moreover, advocacy by a judge to the U.S. Government can create undue influence and cause separation of powers concerns. Thus, for example, judges are prohibited from participating in plea bargain negotiations and making parole recommendations. *See, e.g.*, *In re United States*, 572 F.3d 301, 311 (7th Cir. 2009) ("The judge who advocates a particular plea bargain may resent the government for disagreeing."); *United States v. Miles*, 10 F.3d 1135, 1139 (5th Cir. 1993) (stating that, a judge who "suggests or encourages a particular plea bargain may feel a personal stake in the agreement" and that, "[a]s a result of his participation, the judge is no longer a judicial officer or a neutral arbiter," but instead "becomes or seems to become an advocate for the resolution he has suggested to the defendant" (internal quotation marks omitted)); Committee on Codes of Conduct Adv. Op. No. 65 (stating that "[t]he responsibility for making commutation, pardon, and parole decisions falls to the executive branch" and that "because the [Justice] department is a frequent litigant in the federal courts, the potential exists that undue influence would be felt").

The Court rejected the Venezuela Parties' advocacy challenge on the ground that "[t]he Court understands the Special Master to mean he will 'advocate' (if that word even has applicability here) for the enforcement of the Court's orders, consistent with his previous efforts, and as the Court expressly contemplated and authorized him to do in aid of allowing the Court to fulfill its judicial duties." D.I. 506 at 2 n.2. Respectfully, nothing in the Special Master's prior statements, or the Court's prior orders, expressly contemplated the Special Master advocating that the U.S. Government support the launch of the sale process. In fact, the Venezuela Parties specifically objected to the Special Master engaging in this type of advocacy in August 2021, D.I. 354 at 21, and the Special Master assured them and this Court at that time that he had no intentions to do so, D.I. 356 ¶ 8.

 Nor is there an exception for the prohibition on judicial advocacy for situations in which a Court is advocating for the enforcement of orders or judgments that it has issued. *See, e.g.*, *In re Boston's Children First*, 244 F.3d 164, 170 (1st Cir. 2001) (disqualifying judge whose ambiguous comments could be viewed "as an affirmative effort to enforce the law" and thus give the appearance of a lack of impartiality); *United States v. Cooley*, 1 F.3d 985, 995 (10th Cir. 1993) (a judge's out-of-court statements advocating "to see his order … enforced" against protesters "unavoidably created the appearance that the judge had become an active participant in bringing law and order to bear on the protesters, rather than remaining as a detached adjudicator"); *Broadman v. Comm'n on Judicial Performance*, 18 Cal. 4th 1079, 1104 (Cal. 1998) ("[b]y making public comments in an attempt to justify and defend his decisions while those decisions were pending on appeal," a judge "adopted the role of an advocate" in violation of state ethics rules).

Indeed, given that the United States Government has already stated—in this Court—that "moving forward" with a sale "could imperil U.S. foreign policy and national security interests," D.I. 212 at 5, advocacy to the Government to change its position was particularly egregious, since OFAC's determinations are rooted in Executive Branch evaluations of U.S. foreign policy and national security interests, involving "sensitive and inherently discretionary judgment call[s] … committed by law to the appropriate agency of the Executive Branch." *Dep't of Navy v. Egan*, 484 U.S. 518, 527 (1988). It simply is not proper under our system of government for a federal judicial or quasi-judicial officer to lobby the Executive Branch regarding U.S. foreign policy to assist a private litigant in executing on its judgment. *See Hernandez v. Mesa*, 140 S. Ct. 735, 744 (2020) (stating that "matters relating to the conduct of foreign relations ... are so exclusively entrusted to the political branches of government as to be largely immune from judicial inquiry or interference" (cleaned up)). D.I. 212 at 5; *cf. Chicago & So. Air Lines v. Waterman S. S. Corp.*, 333 U.S. 103, 113 (1948) (stating that a judicial ruling that would serve as a "recommendation the President" regarding foreign policy determinations "would be to render an advisory opinion in its most obnoxious form—advice that the President has not asked, tendered at the demand of a private litigant, on a subject concededly within the President's exclusive, ultimate control").

## CONCLUSION

For the foregoing reasons, Movants respectfully request that the Court disqualify the Special Master and suppress his tainted work product and any orders relying on the same.

RESPECTFULLY SUBMITTED,

January 20, 2023

MORRIS, NICHOLS, ARSHT & TUNNELL LLP

*/s/ Kenneth J. Nachbar*

OF COUNSEL:                         Kenneth J. Nachbar (#2067)
Nathan P. Eimer                    Alexandra M. Cumings (#6146)
Lisa S. Meyer                      1201 North Market Street
Daniel D. Birk                    Wilmington, DE 19801
Gregory M. Schweizer         (302) 658-9200
Emily E. Sullivan                KNachbar@mnat.com
EIMER STAHL LLP            ACumings@mnat.com
224 South Michigan Avenue
Suite 1100                      *Attorneys for PDV Holding, Inc., and*
Chicago, IL 60604              *CITGO Petroleum Corporation*
(312) 660-7600
NEimer@eimerstahl.com
LMeyer@eimerstahl.com
DBirk@eimerstahl.com
GSchweizer@eimerstahl.com
ESullivan@eimerstahl.com       HEYMAN ENERIO GATTUSO & HIRZEL LLP

*/s/ Samuel Taylor Hirzel, II*
Samuel Taylor Hirzel, II (#4415)
300 Delaware Avenue, Suite 200
OF COUNSEL:                         Wilmington, DE 19801
Joseph D. Pizzurro            (302) 472-7300
Kevin A. Meehan              shirzel@hegh.law
Juan O. Perla
CURTIS, MALLET-PREVOST,    *Attorney for Petróleos de Venezuela, S.A.*
COLT & MOSLE LLP
101 Park Avenue
New York, NY 10178
(212) 696-6000
jpizzurro@curtis.com
kmeehan@curtis.com
jperla@curtis.com

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

CRYSTALLEX INTERNATIONAL CORP.,    :
    :
    Plaintiff,    :
    :
    v.    :    Misc. No. 17-151-LPS
    :
BOLIVARIAN REPUBLIC OF VENEZUELA,    :
    :
    Defendant.    :

---

**MEMORANDUM ORDER**

Having reviewed the Venezuela Parties' Motion for an Order Directing the Special

Master to Permit Counsel's Attendance at Meetings with the United States Government (D.I.

499), as well as the filings associated with the motion (D.I. 502, 503, 504, 505), IT IS HEREBY

ORDERED that the motion (D.I. 499) is **DENIED**.[1]

1.    The Court agrees with essentially all of the reasons for denying the motion set out

in the opposition briefs filed by the Special Master (D.I. 503) and Crystallex (D.I. 504).  In

particular, the Venezuela Parties' motion was filed far too late.  As the Special Master explains,

the Court has contemplated for many months that the Special Master would pursue an *ex parte*

meeting with representatives of the United States Government, for reasons that are well-known

to the Sale Process Parties, including the Venezuela Parties.  The Court considered the

Venezuela Parties' objections to such interactions between the Special Master and the United

States and overruled them.  To the extent any of the Venezuela Parties' arguments and

---

[1] As used throughout this Order, any capitalized terms not defined herein have the meaning set
out in the Sale Procedures Order (D.I. 481).

authorities have not previously been presented to and considered by the Court, the Venezuela Parties' reliance on them now – in an effort to interfere with a meeting that they have known about for 10 days, and which they asked the Court to rearrange just three days before it was to occur – simply comes too late.

2.        Additionally, the Special Master has had previous *ex parte* interactions with OFAC, as the Venezuela Parties have known, since at least the time of the first meeting in or around June 2021, more than 18 months ago.  (*See* D.I. 297 at 3)  The Venezuela Parties have not raised any concerns with the Court about these specific *ex parte* interactions.  They provide no persuasive basis for the Court to suddenly find such efforts by the Special Master – taken pursuant to an express direction the Court provided in the Sale Procedures Order – are now improper.[2]

3.        The Court also emphasizes that since it appointed the Special Master, by order dated May 27, 2021, *ex parte* interactions have been expressly permitted and contemplated, and **consented to**, in the unusual and highly challenging post-judgment circumstances presented by this long-running and enormously contentious litigation.  This includes, but is not limited to, *ex parte* interactions between the Special Master and OFAC, which have occurred on multiple occasions, as Crystallex (D.I. 504 at 2) and the Special Master (D.I. 503 at 5) point out.  It also includes *ex parte* interactions between the Special Master and the Sale Process Parties and between the Special Master and the Court.  (*See* D.I. 277 (May 27 Order) ¶ 8 ("The Special

---

[2] The Venezuela Parties take issue with what they characterize as the Special Master's intention to engage in *ex parte* "'advocacy'" before government officials.  (D.I. 505 at 3) (citing D.I. 503 at 3)  The Court understands the Special Master to mean he will "advocate" (if that word even has applicability here) for the enforcement of the Court's orders, consistent with his previous efforts (*see, e.g.*, D.I. 303 ¶¶ 39-41), and as the Court expressly contemplated and authorized him to do in aid of allowing the Court to fulfill its judicial duties (*see, e.g.*, D.I. 481 ¶ 4).

Master may communicate *ex parte* with the Court, any Party, any Party's attorneys, ConocoPhillips, and ConocoPhillips' attorneys at the Special Master's discretion as necessary to carry out his duties."); D.I. 409 at 263-64 ("I further want to reiterate, we all know this, but the May 27th order contemplates and permits *ex parte* discussions with the Special Master. I have had *ex parte* discussions with the Special Master, and I expect I may have more after today."); D.I. 443 at 4 n.7 ("The parties are reminded that the Court may meet, has met, and expects to continue to meet *ex parte* with the Special Master.") (citing D.I. 277 ¶ 8))

      IT IS FURTHER ORDERED that the teleconference scheduled for today at 3:30 p.m. is CANCELLED.

January 11, 2023  
Wilmington, Delaware

HONORABLE LEONARD P. STARK  
UNITED STATES DISTRICT COURT

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| CRYSTALLEX INTERNATIONAL CORP., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 1:17-mc-00151-LPS |
| | ) | |
| BOLIVARIAN REPUBLIC OF VENEZUELA, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |
| _____ | ) | |

## VENEZUELA PARTIES' REPLY IN SUPPORT OF THEIR MOTION FOR AN ORDER DIRECTING THE SPECIAL MASTER TO PERMIT COUNSEL'S ATTENDANCE AT MEETINGS WITH THE UNITED STATES GOVERNMENT

OF COUNSEL:
Nathan P. Eimer
Lisa S. Meyer
Daniel D. Birk
Gregory M. Schweizer
Emily E. Sullivan
EIMER STAHL LLP
224 South Michigan Avenue
Suite 1100
Chicago, IL 60604
(312) 660-7600
NEimer@eimerstahl.com
LMeyer@eimerstahl.com
DBirk@eimerstahl.com
GSchweizer@eimerstahl.com
ESullivan@eimerstahl.com

Kenneth J. Nachbar (#2067)
Alexandra M. Cumings (#6146)
MORRIS, NICHOLS, ARSHT & TUNNELL LLP
1201 North Market Street
Wilmington, DE 19801
(302) 658-9200
KNachbar@mnat.com
ACumings@mnat.com

*Attorneys for PDV Holding, Inc., and
CITGO Petroleum Corporation*

OF COUNSEL:
Joseph D. Pizzurro
Kevin A. Meehan
Juan O. Perla
CURTIS, MALLET-PREVOST,
COLT & MOSLE LLP
101 Park Avenue
New York, NY 10178
(212) 696-6000
jpizzurro@curtis.com
kmeehan@curtis.com
jperla@curtis.com

Samuel Taylor Hirzel, II (#4415)
HEYMAN ENERIO GATTUSO & HIRZEL LLP
300 Delaware Avenue, Suite 200
Wilmington, DE 19801
(302) 472-7300
shirzel@hegh.law

*Attorney for Petróleos de Venezuela, S.A.*

1

OF COUNSEL:
Donald B. Verrilli, Jr.
Elaine J. Goldenberg
Ginger D. Anders
Brendan B. Gants
Jacobus P. van der Ven
Munger, Tolles & Olson LLP
601 Massachusetts Avenue NW
Suite 500 E
Washington, D.C. 20001
(202) 220-1100
Donald.Verrilli@mto.com

George M. Garvey
Munger, Tolles & Olson LLP
350 South Grand Avenue, 50th Floor
Los Angeles, CA 90071
(213) 683-9100
George.Garvey@mto.com

A. Thompson Bayliss (#4379)
Stephen C. Childs (#6711)
ABRAMS & BAYLISS LLP
20 Montchanin Road, Suite 200
Wilmington, DE 19807
(302) 778-1000
bayliss@abramsbayliss.com
childs@abramsbayliss.com

*Attorneys for Bolivarian Republic of Venezuela*

2

## PRELIMINARY STATEMENT

In responding to the Venezuela Parties' request that the Special Master not be allowed to solicit and receive information from the United States Government on an *ex parte* basis, the Special Master makes the extraordinary statement that he believes he not only can hold such a meeting *ex parte* but also that he intends to actually advocate that the Executive Branch take particular positions and actions with respect to sensitive issues of foreign policy and national security that are opposed by parties to this case. *See* D.I. 503 at 3 ("There is no principle of judicial ethics requiring the Court's Special Master to not take actions, or even advocate, to enforce the Court's own judgment and those of other courts, of which the Special Master's engagement with OFAC is a part."), 5 (stating that "the core purpose of the meeting" includes providing OFAC with "the Special Master's perspective on why OFAC cooperation with the Court's order is appropriate and necessary, and ascertain[ing] whether OFAC will issue a license or otherwise authorize the sale of the PDVH shares").

The Special Master's excuse for excluding the parties from his meeting is that the parties' mere presence at such a meeting will "chill" his advocacy efforts, *see id.* at 5, but that only exacerbates the problem with the Special Master's meeting being *ex parte*. It is clear now that every aspect of the meeting the Special Master envisions is a violation of judicial norms under 28 U.S.C. § 455 and the Code of Conduct. It would be unthinkable for a judge to contact the Government on an *ex parte* basis to request that the government provide off-the-record input on contested matters relevant to a pending case, and it would be even more unthinkable for a judge to contact OFAC to argue that it should "cooperate with" or authorize conduct that the government has previously said would cause irreparable harm to U.S. foreign policy and national security interests. Moreover, the Special Master's intentions are not even consistent with the task

given to him by the Court, which was simply "to obtain guidance from OFAC that may be shared with the market expressing OFAC's view of the process and the likelihood that it will issue a specific license for a sale to close." D.I. 443 at 17. At no time did, or could, the Court authorize the Special Master to advocate for any position to the Government.

## ARGUMENT

1.    Third Circuit precedent is clear that, under Canon 3A(4) and 28 U.S.C. § 455, a judge would be absolutely prohibited from engaging in the sort of *ex parte* communications contemplated by the Special Master here. *See In re Kensington Int'l Ltd.*, 368 F.3d 289, 309–11 (3d Cir. 2004). Judges cannot base their decisions on "'personal' or 'extrajudicial' knowledge" obtained in *ex parte* communications with third parties "that leave[] no trace in the record and cannot be controverted or tested by the tools of the adversary process." *Id.* at 308 n.18 (internal quotation marks omitted); *accord In re Edgar*, 93 F.3d 256, 259 (7th Cir. 1996) (per curiam) (disqualifying district judge who received off-the-record information from fact-gathering panel in chambers under 28 U.S.C. § 455); *Knop v. Johnson*, 977 F.2d 996, 1011 (6th Cir. 1992) (stating that "it is impermissible for a trial judge to deliberately set about gathering facts outside the record" and that this principle was violated where the judge's law clerk made *ex parte* telephone calls to witnesses).

The Special Master and Crystallex are wrong that Rule 53(b)(2)(B) creates an implied exception from Canon 3A(4) for special masters allowing them to engage in *ex parte* communications over the objection of the parties that a judge could not engage in without violating judicial ethics rules if such communications are authorized in the master's appointing order. D.I. 503 at 2–3; D.I. 504 at 2–3. The argument does not work even on its own terms, because the appointing order in this case permits the Special Master to communicate *ex parte*

4

224a

only with the Court and the Sale Process Parties or their counsel (a provision to which the Sale

Process Parties all consented). *See* D.I. 277 at 5, ¶ 8. Likewise, the plain language of Rule

53(b)(2)(B) refers only to "the circumstances, if any, in which the master may communicate ex

parte with *the court or a party*." Fed. R. Civ. P. 53(b)(2) (emphasis added).

More fundamentally, Rule 53(b)(2) obviously does not authorize special masters to

engage in *prohibited ex parte* communications that the *court itself could not do*, and it certainly

does not give the Special Master the authority either to engage in extrajudicial fact-finding

discussions with third parties or to advocate that the Government take a particular position in a

pending case. As the Venezuela Parties explained in their opening brief, the Special Master is

acting as the judge's representative here, in an attempt to solicit information relevant to the

Court's decision on whether to launch the sale process. *See* D.I. 499 at 5. Canon 3B(2) provides

that "[a] judge should not direct court personnel to engage in conduct on the judge's behalf or as

the judge's representative when that conduct would contravene the Code if undertaken by the

judge." *See also Price Bros. Co. v. Phila. Gear Corp.*, 629 F.2d 444, 447 (6th Cir. 1980) ("[A]

judge may not direct his law clerk to do that which is prohibited to the judge."); D.I. 469 at 5 (the

Court stating that "all actions taken by the Special Master must … be within the powers the

Court is authorized to exercise").

Crystallex's invocation of Canon 3(A)(4)(c), which permits a judge to "obtain the written

advice of a disinterested expert on the law," D.I. 504 at 3, is even less applicable. The United

States government is not a disinterested expert on the law, and the Special Master is not seeking

*written* advice, but conducting an *in-person* meeting to solicit the government's *in-person*

comments (and, apparently, advocating for what those comments should be). In fact, the written

advice exception makes all the clearer how improper it would be to allow the Special Master to conduct off-the-record oral discussions with the government without the parties present.

  2. The Special Master's argument that "judicial norms of impartiality" are "misplaced" here because this is a post-judgment enforcement proceeding, D.I. 503 at 3, is unsupported and contrary to the plain language of Canon 3A(4) and appellate precedent. *See* Canon 3A(4) (prohibiting *ex parte* communications "concerning a pending or impending *matter*" (emphasis added)); *Cobell v. Norton*, 334 F.3d 1128, 1144 (D.C. Cir. 2003) (disqualifying special master in post-judgment remedial proceeding because his impartiality could reasonably be questioned on the basis of facts he received through *ex parte* communications).

  Both the Court and the Special Master have ongoing obligations under applicable ethics rules, including 28 U.S.C. § 455, and the Due Process Clause to remain neutral and impartial in the exercise of their judicial duties. *See, e.g.*, *Guenther v. C.I.R.*, 939 F.2d 758, 760 (9th Cir. 1991) (stating that due process "mandate[s] neutrality in civil proceedings, both in reality and in appearance" and invalidating decision made on the basis of an *ex parte* submission as a violation of the due process neutrality principle). While some of the Special Master's duties involve ministerial actions to implement the mechanics of the sale, with respect to the OFAC outreach, the Special Master is charged by this Court with "finding the facts in the first instance and making a report and recommendation" based on those facts, a "plainly … adjudicative" function. *In re Kempthorne*, 449 F.3d 1265, 1269 (D.C. Cir. 2006) (internal quotation marks omitted); *see also* D.I. 234 at 35 (stating that the Court would "appoint a special master, who will have the time and expertise to fulfill the *Court's* and the U.S. Marshal's duties to prepare for and conduct the sale" (emphasis added)).

Courts frequently make judicial decisions in the post-judgment context, such as the decision here as to whether to launch the sale process. If the Court bases such a decision on a recommendation from the Special Master that in turn is based on information obtained from *ex parte* communications, then the precise harms that the Third Circuit identified in *In re Kensington* will occur—namely, the heightened "risk of an incorrect result" and deprivation of the parties' rights "to adequately respond to or counter facts presented." *See* 368 F.3d at 310–11.[1] A judicial or quasi-judicial officer thus cannot engage in *ex parte* communications—and especially not in *ex parte* advocacy—in judgment-enforcement proceedings any more than in any other setting.

3.      The Special Master does not respond to the Venezuela Parties' authority establishing that it would be a violation of judicial ethics and grounds for disqualification if the Special Master were to advocate for OFAC to take a particular position, other than to compound the problem by admitting that he actually plans to engage in such advocacy, and wrongly claiming that this Court has already authorized him to engage in it. The Special Master claims that the Court has already overruled the Venezuela Parties' objection that the Special Master cannot "advocate to the Government on behalf of particular parties or for particular outcomes," D.I. 503 at 4 (quoting D.I. 354 at 21), but the Court has never held that the Special Master may lobby OFAC and has not directed him to do so. In fact, previously, the Special Master responded to the Venezuela Parties' objections by clarifying that he did "not propose[] to" include a

---

[1] Crystallex's suggestion that any prejudice to the Venezuela Parties can be avoided because they can request their own meeting with OFAC, D.I. 504 at 2, misses the point. In the words of the Third Circuit, which rejected essentially the same argument in a different context, "even if all parties met for the same amount of time with [OFAC], there [would be] no way for them to adequately respond to or counter facts presented by their adversaries because they [would have] no way of knowing what was said during those unrecorded meetings. Thus, the risk of an incorrect result was still present." *In re Kensington*, 368 F.3d at 310–11.

provision in the SPO allowing him to "lobb[y] on behalf of any particular party in this case" as part of the sale process. D.I. 356 ¶ 8. The fact that he now claims that the Court has authorized him to "advocate to the Government on behalf of particular parties or for particular outcomes," D.I. 503 at 4 (quoting D.I. 354 at 21), is deeply troubling. *Ex parte* discussions are not necessary to solicit OFAC's views; the Special Master could solicit OFAC's input via a letter on which all parties are copied, as noted in the Venezuela Parties' opening brief. And the SPO is also clear that the Special Master is only supposed to *solicit* OFAC's position, not argue that OFAC should take a particular position or offer his "perspective on why OFAC cooperation with the Court's order is appropriate." D.I. 503 at 5.

4. The Special Master implies that the Venezuela Parties have waived their right to object to his *ex parte* meeting, D.I. 503 at 5–6, but the Third Circuit has expressly held that the requirement for a judicial or quasi-judicial officer not to engage in *ex parte* communications without the consent of the parties requires "affirmative consent" and that such consent cannot be implied through waiver. *See In re Kensington International Ltd.*, 368 F.3d at 311. The Special Master chides the Venezuela Parties for not objecting to certain of the Special Master's previous communications with OFAC prior to entry of the Sale Procedures Order, D.I. 503 at 5–6, but before entry of the SPO, the Court had never ordered the Special Master to engage in any fact-finding outreach to the Government and then, based on that outreach, make a recommendation to the Court as to how to proceed on an issue that will be contested by at least some of the parties. The Venezuela Parties had understood the Special Master's previous communications with OFAC to be an effort (undertaken without a court request or authorization) to keep the government apprised of the proceedings in this case, provide information, and explain the anticipated mechanics of the sale process. By contrast, this meeting is the first in response to the

Court's direction in the SPO for the Special Master to gather facts related to a central, substantive issue in this case and will form the basis of the Special Master's recommendation.

Nor did the Venezuela Parties unduly delay in presenting this motion. While the Special Master had indicated in October that he was not inclined to allow the parties to join in his discussions with OFAC, his last statement on the matter before January 3, 2023 was that his position about whether to include the parties in his planned discussions with OFAC "may change in the future." D.I. 480 at 2 n.2. It was only in the Special Master's report to the Court on December 28, 2022, that the Venezuela Parties learned that the Special Master had arranged a meeting with OFAC, but the date was not reported. *See* D.I. 496 at 2. The Special Master first disclosed to the Venezuela Parties the planned meeting date in response to an inquiry from counsel for the Venezuela Parties on December 30, 2022. Counsel for the Venezuela Parties then promptly requested on January 3, 2023 that the parties be allowed to attend, and it was at that time that the Special Master made it clear that he had finally decided to have an *ex parte* meeting at which he intended to argue to OFAC why it should allow the sale process to proceed notwithstanding outstanding OFAC regulations to the contrary.

5.     No legitimate prejudice can result from the parties' attendance, solely for observational purposes, at the Special Master's scheduled meeting with the Government.[2] The Government is well aware that the Special Master has been instructed to report the Government's position to the Court. To the extent the Special Master is suggesting that he will be told something by the Government that it does not want reported to the parties, D.I. 503 at 5, it proves exactly why he cannot be allowed to have an *ex parte* meeting. The parties are entitled to know

---

[2] The Court can overcome Crystallex's apparent concern that attorneys attending the meeting will not have sufficient restraint to contain themselves, D.I. 504 at 1–2, by ordering the parties not to participate in or interrupt the meeting with questions, comments, or argument.

what the Government tells the Special Master at the meeting, if anything, so that they are in a position to respond to the Special Master's recommendation. The Special Master mischaracterizes the letter he received from the Justice Department, which says nothing about affecting the Government's willingness to speak, only that, depending on "clarity provided by the Court on meeting parameters (and attendees), it may be necessary to revise the meeting parameters or participants." D.I. 503-1. It would hardly be surprising, for example, if attendance by counsel for the Republic would prompt additional persons from the State Department to attend the meeting, or that if this Court were to limit the "meeting parameters" the Government would, in response to the Court's order, change the "parameters" of the meeting. Indeed, this skewed interpretation of the Justice Department letter demonstrates precisely why the parties should be permitted to attend the upcoming meeting so they can hear precisely what is said at the meeting and provide the Court with their understanding of the Government's intentions.

Similarly, the fact that the Special Master contends that his own advocacy will be "chill[ed]," D.I. 503 at 5, demonstrates precisely why what he is proposing violates judicial norms of impartiality and why it is crucial that the parties be allowed to attend. Anything that the Special Master or his advisors are not willing to say in the parties' presence is by definition something that should not be said at all.

RESPECTFULLY SUBMITTED,

January 11, 2023

MORRIS, NICHOLS, ARSHT & TUNNELL LLP

OF COUNSEL:                              */s/ Kenneth J. Nachbar*
Nathan P. Eimer                          Kenneth J. Nachbar (#2067)
Lisa S. Meyer                            Alexandra M. Cumings (#6146)
Daniel D. Birk                           1201 North Market Street
Gregory M. Schweizer                     Wilmington, DE 19801
Emily E. Sullivan                        (302) 658-9200
EIMER STAHL LLP                          KNachbar@mnat.com
224 South Michigan Avenue                ACumings@mnat.com
Suite 1100
Chicago, IL 60604                        *Attorneys for PDV Holding, Inc., and*
(312) 660-7600                           *CITGO Petroleum Corporation*
NEimer@eimerstahl.com
LMeyer@eimerstahl.com
DBirk@eimerstahl.com
GSchweizer@eimerstahl.com
ESullivan@eimerstahl.com


                                         HEYMAN ENERIO GATTUSO & HIRZEL LLP

OF COUNSEL:                              */s/ Samuel Taylor Hirzel, II*
Joseph D. Pizzurro                       Samuel Taylor Hirzel, II (#4415)
Kevin A. Meehan                          300 Delaware Avenue, Suite 200
Juan O. Perla                            Wilmington, DE 19801
CURTIS, MALLET-PREVOST,                  (302) 472-7300
COLT & MOSLE LLP                         shirzel@hegh.law
101 Park Avenue
New York, NY 10178                       *Attorney for Petróleos de Venezuela, S.A.*
(212) 696-6000
jpizzurro@curtis.com
kmeehan@curtis.com
jperla@curtis.com

11

**231a**

OF COUNSEL:
Donald B. Verrilli, Jr.
Elaine J. Goldenberg
Ginger D. Anders
Brendan B. Gants
Jacobus P. van der Ven
Munger, Tolles & Olson LLP
601 Massachusetts Avenue NW
Suite 500 E
Washington, D.C. 20001
(202) 220-1100
Donald.Verrilli@mto.com

George M. Garvey
Munger, Tolles & Olson LLP
350 South Grand Avenue, 50th Floor
Los Angeles, CA 90071
(213) 683-9100
George.Garvey@mto.com

ABRAMS & BAYLISS LLP

*/s/ Stephen C. Childs*
A. Thompson Bayliss (#4379)
Stephen C. Childs (#6711)
20 Montchanin Road, Suite 200
Wilmington, DE 19807
(302) 778-1000
bayliss@abramsbayliss.com
childs@abramsbayliss.com

*Attorneys for Bolivarian Republic of Venezuela*

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

------------------------------------------------------------
CRYSTALLEX INTERNATIONAL CORP.,   )
                                                 )

             Plaintiff,                )

                                                 )

        v.                       )     Misc. No. 17-151-LPS

                                                 )

BOLIVARIAN REPUBLIC OF VENEZUELA,   )

                                               )

             Defendant.            )
------------------------------------------------------------

## RESPONSE TO VENEZUELA PARTIES' MOTION FOR AN ORDER DIRECTING THE SPECIAL MASTER TO PERMIT COUNSEL'S ATTENDANCE AT MEETINGS WITH THE UNITED STATES GOVERNMENT

       Pursuant to the Court's Oral Order (D.I. 500), the Special Master hereby submits this Response to Venezuela Parties' Motion For An Order Directing The Special Master To Permit Counsel's Attendance At Meetings With The United States Government (D.I. 499) (the "***Motion***").

### PRELIMINARY STATEMENT

       1.      On October 7, 2022, this Court entered an order (D.I. 480-1) (the "***Sale Procedures Order***") directing the Special Master to, among other things, "solicit and attempt to gain clarity or guidance from [OFAC] of its support for (or non-opposition to), the launch of the Marketing Process by the Special Master, the viability of the Marketing Process, and any additional feedback or guidance that the Special Master believes will more likely result in a value-maximizing Sale Transaction."  Sale Procedures Order ¶ 3.[1]  Nothing in the Sale Procedures Order, which was litigated by the parties for more than a year and entered by the Court more than three months ago, requires or even implies that any Sale Process Party be permitted to attend such discussions.  In

---

[1] Capitalized terms used and not defined herein shall bear the meanings ascribed to such terms in the Sale Procedures Order.

fact, the Special Master has previously had several meetings with parties, including OFAC, on an *ex parte* basis in its role to enforce the Court's judgment—as opposed to making a determination on the merits—all with the support of, and without any objection by, the Sale Process Parties. Nevertheless, on the eve of the Special Master's meeting with OFAC, the Venezuela Parties now demand that the Special Master permit them to attend the meeting, raising inapposite ethics concerns that this Court has already considered and rejected. This last-minute demand is yet another effort by the Venezuela Parties to delay the Court's process. The Court should deny the Motion for the reasons set forth below.[2]

**ARGUMENT**

2.      As an initial matter, the Venezuela Parties' objection rests entirely on the premise that any *ex parte* communications between the Special Master and OFAC would violate Canon 3A(4) of the Code of Conduct for United States Judges (the "***Code of Conduct***"). That premise is unfounded. Canon 3A(4) contains several enumerated exceptions, one of which is that a judge (or a special master, as applicable) may "initiate, permit, or consider ex parte communications as authorized by law." Code of Conduct Canon 3A(4)(a). That exception applies here because the Federal Rules of Civil Procedure, which "are binding upon the court and parties alike, with fully the force of law," *In re Nat'l Prescription Opiate Litig.*, 956 F.3d 838, 844 (6th Cir. 2020); *see* 28 U.S.C. § 2072(a), permit courts to dictate "the circumstances, if any, in which [a] master may communicate ex parte with the court or a party," Fed. R. Civ. P. 53(b)(2)(B). The Court already

---

[2] The Special Master advises the Court that he and his Advisors fully intend to meet with representatives of the Executive Branch, including OFAC, on January 12, 2023 as currently planned and, barring an order from this Court to the contrary, do not intend to invite the Venezuela Parties or any other Sale Process Party to the meeting. The Special Master will comply with his obligations as set forth in the Sale Procedures Order unless and until those obligations are modified by the Court.

2

**234a**

exercised that authority in its order of May 27, 2021 regarding the Special Master (D.I. 277) (the "**May 27 Order**") and, pursuant to the Sale Procedures Order, has further directed the Special Master to engage in discussions with OFAC regarding the sale process without requiring that any party be present. *See* May 27 Order ¶ 8; Sale Procedures Order ¶ 3. Accordingly, such communications are "authorized by law" and hence are entirely consistent with the Code of Conduct.

3. Even if that exception to Canon 3A(4) did not apply (it does), the Venezuela Parties' invocation of "judicial norms of impartiality," Motion at 2, is entirely misplaced in the context of these proceedings. Unlike *In re Kensington International Ltd.*, 368 F.3d 289 (3d Cir. 2004), on which the Venezuela Parties heavily rely, this is not a case in which there is a risk that *ex parte* communications may improperly influence the Court as it resolves issues on the merits. Rather, this is a case in which a judgment (indeed, several judgments) have already been entered against the Republic, and the Court has appointed the Special Master "to assist the Court with the sale of PDVSA's shares in PDVH . . . as necessary to satisfy the outstanding judgment of Crystallex and the judgment of any other judgment creditor added to the sale by the Court." Sale Procedures Order at 2. There is no principle of judicial ethics requiring the Court's Special Master to not take actions, or even advocate, to enforce the Court's own judgment and those of other courts, of which the Special Master's engagement with OFAC is a part. Simply put, the Special Master's role in this matter is to assist the Court in overseeing and implementing the sale process so that the outstanding judgments against the Republic may be satisfied to the greatest extent possible. The Court has already decided the merits of the claims against the Republic, entered an order approving the process by which those judgments are to be satisfied, and directed the Special Master to execute the implementation of that process. Taking such steps as are necessary to

achieve that result is not a breach of any purported duty of judicial impartiality. Furthermore, the Special Master's task, per the Sale Procedures Order, is to implement the Court's decisions with respect to execution on judgments against the Republic as a defaulting judgment-debtor. Engaging with OFAC is how the Special Master accomplishes that express direction of the Court.

4.      Moreover, the Sale Procedures Order was extensively litigated by the parties and the Special Master over more than a year and has long contemplated that the Special Master would directly engage OFAC. Indeed, the Venezuela Parties already objected to the Special Master's proposed outreach to OFAC, arguing that "federal courts do not advocate to the Government on behalf of particular parties or for particular outcomes in regulatory determinations affecting those parties—here, to authorize a sale that Crystallex desires but that the Republic opposes." Venezuela Parties' Objections to Special Master's Proposed Order at 21 (D.I. 354). The Special Master's understanding is that the Court considered and overruled that objection. *See* Opinion of March 2, 2022 at 17 (D.I. 443) ("After carefully considering the positions of the Sale Process Parties and the Special Master, which have been thoroughly briefed and argued, the Court has concluded that . . . the Special Master [shall] use his best efforts to obtain guidance from OFAC . . . expressing OFAC's view of the process and the likelihood that it will issue a specific license for a sale to close."). In the Special Master's judgment, the Court approved the Sale Procedures Order to authorize direct correspondence with OFAC without any express requirement to involve the Sale Process Parties in every engagement. Therefore, the Court should not permit the Venezuela Parties to revive this long-overruled objection under the guise of an ethics concern, and least of all on the eve of a long-scheduled meeting and under the false pretenses of a self-created emergency.

5.      In the Special Master's judgment, having interacted with the Venezuela Parties over the last year and a half, this Motion represents another attempt by the Venezuela Parties to interfere

with and delay the sale process. Although the Venezuela Parties make much of their request "only to observe and listen" to the Special Master's meeting with OFAC, Motion at 4, it is undeniable that the mere presence of the Venezuela Parties would influence the discussions and would undermine the core purpose of the meeting—namely, to solicit OFAC's unencumbered views on the sale process, hear the Special Master's perspective on why OFAC cooperation with the Court's order is appropriate and necessary, and ascertain whether OFAC will issue a license or otherwise authorize the sale of the PDVH shares. Representatives of OFAC can hardly be expected to engage in frank, unguarded discussions with the Special Master regarding their thoughts on the sale process with representatives of a foreign government-debtor listening in on the conversation. And in fact, the Special Master is already in receipt of a letter from the Department of Justice, attached hereto as **Exhibit A**, noting that "depending on how the pending motion is resolved . . . it may be necessary to revise the meeting parameters or participants for our planned meeting." As this letter demonstrates, the Venezuela Parties' presence will only chill discussion and further impair the Special Master's efforts to carry out his duties in accordance with the Sale Procedures Order.

6. Indeed, for this very reason, it has been the Special Master's practice to meet with representatives of the Executive Branch and other parties involved in this matter without any of the Sale Process Parties present. As the Venezuela Parties are aware, such meetings have been held on several occasions, including on June 10, July 12, and September 17, 2021. The Venezuela Parties were informed of these meetings and their substance, yet they never once objected to their occurrence nor demanded an order from the Court compelling their attendance. The Venezuela Parties' current opposition to *ex parte* conversations between the Special Master and the Executive Branch is therefore belied by the position that the Venezuela Parties have taken to date, which has

been that it suffices for the Special Master to keep the Venezuela Parties informed of any such discussions.

7.     Finally, notwithstanding that the upcoming meeting between the Special Master and OFAC has been anticipated by the parties for well over a year, that the Sale Procedures Order was entered more than three months ago, and that on Friday, December 30, 2022 (not "last week," as the Venezuela Parties suggest, Motion at 4), the Special Master personally informed counsel to the Venezuela Parties of the date of the meeting and rejected counsel's request to attend the meeting, the Venezuela Parties waited until January 9, 2023—just three days before the meeting was scheduled to take place—to file their Motion demanding that they be permitted to attend. The Court should not reward this self-created emergency and derail the Special Master's meeting with OFAC at the eleventh hour. Rather, the Court should permit the meeting to proceed as contemplated by the Sale Procedures Order.

## CONCLUSION

8.     For the reasons set forth above, the Court should deny the Motion.

POTTER ANDERSON & CORROON LLP

*/s/ Myron T. Steele*

OF COUNSEL:

Ray C. Schrock, P.C. (Admitted *pro hac vice*)
Alexander W. Welch (Admitted *pro hac vice*)
Chase A. Bentley (Admitted *pro hac vice*)
WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
Ray.Schrock@weil.com
Alexander.Welch@weil.com
Chase.Bentley@weil.com

Dated: January 10, 2023
10541097

Myron T. Steele (#00002)
Matthew F. Davis (#4696)
Bindu A. Palapura (#5370)
Abraham Schneider (#6696)
Hercules Plaza, 6th Floor
1313 North Market Street
P.O. Box 951
Wilmington, DE 19801
Telephone: (302) 984-6000
Facsimile: (302) 658-1192
msteele@potteranderson.com
mdavis@potteranderson.com
bpalapura@potteranderson.com
aschneider@potteranderson.com

*Counsel for Special Master Robert B. Pincus*

7

**239a**

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| CRYSTALLEX INTERNATIONAL CORP., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 1:17-mc-00151-LPS |
| | ) | |
| BOLIVARIAN REPUBLIC OF VENEZUELA, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |
| _____ | ) | |

## VENEZUELA PARTIES' MOTION FOR AN ORDER DIRECTING THE SPECIAL MASTER TO PERMIT COUNSEL'S ATTENDANCE AT MEETINGS WITH THE UNITED STATES GOVERNMENT

OF COUNSEL:
Nathan P. Eimer
Lisa S. Meyer
Daniel D. Birk
Gregory M. Schweizer
Emily E. Sullivan
EIMER STAHL LLP
224 South Michigan Avenue
Suite 1100
Chicago, IL 60604
(312) 660-7600
NEimer@eimerstahl.com
LMeyer@eimerstahl.com
DBirk@eimerstahl.com
GSchweizer@eimerstahl.com
ESullivan@eimerstahl.com

Kenneth J. Nachbar (#2067)
Alexandra M. Cumings (#6146)
MORRIS, NICHOLS, ARSHT & TUNNELL LLP
1201 North Market Street
Wilmington, DE 19801
(302) 658-9200
KNachbar@mnat.com
ACumings@mnat.com

*Attorneys for PDV Holding, Inc., and CITGO Petroleum Corporation*

OF COUNSEL:
Joseph D. Pizzurro
Kevin A. Meehan
Juan O. Perla
CURTIS, MALLET-PREVOST,
COLT & MOSLE LLP
101 Park Avenue
New York, NY 10178
(212) 696-6000
jpizzurro@curtis.com
kmeehan@curtis.com
jperla@curtis.com

Samuel Taylor Hirzel, II (#4415)
HEYMAN ENERIO GATTUSO & HIRZEL LLP
300 Delaware Avenue, Suite 200
Wilmington, DE 19801
(302) 472-7300
shirzel@hegh.law

*Attorney for Petróleos de Venezuela, S.A.*

OF COUNSEL:
Donald B. Verrilli, Jr.
Elaine J. Goldenberg
Ginger D. Anders
Brendan B. Gants
Jacobus P. van der Ven
Munger, Tolles & Olson LLP
601 Massachusetts Avenue NW
Suite 500 E
Washington, D.C. 20001
(202) 220-1100
Donald.Verrilli@mto.com

George M. Garvey
Munger, Tolles & Olson LLP
350 South Grand Avenue, 50th Floor
Los Angeles, CA 90071
(213) 683-9100
George.Garvey@mto.com

A. Thompson Bayliss (#4379)
Stephen C. Childs (#6711)
ABRAMS & BAYLISS LLP
20 Montchanin Road, Suite 200
Wilmington, DE 19807
(302) 778-1000
bayliss@abramsbayliss.com
childs@abramsbayliss.com

*Attorneys for Bolivarian Republic of Venezuela*

The Venezuela Parties[1] respectfully move for an order requiring that counsel for all parties be allowed to attend, for purposes of observing but not participating in, any substantive meetings or other communications between Special Master Robert Pincus (and/or his counsel or advisors) and the United States Government related to this matter.

## NATURE AND STAGE OF PROCEEDINGS

This is a post-judgment execution proceeding brought in 2017 by Plaintiff Crystallex, a judgment creditor of the Republic. Crystallex has now attached and is seeking to execute upon shares of stock in PDVH owned by the Republic's state-owned oil company, PDVSA. On October 11, 2022, this Court entered a Sale Procedures Order ("SPO") proposed by Special Master Pincus. *See* D.I. 481. The SPO provides for a period of up to six months after the date of the SPO, during which "the Special Master and his Advisors shall solicit and attempt to gain clarity or guidance from the United States Department of the Treasury's Office of Foreign Assets Control ("OFAC") of its support for (or non-opposition to), the launch of the Marketing Process by the Special Master, the viability of the Marketing Process, and any additional feedback or guidance that the Special Master believes will more likely result in a value-maximizing Sale Transaction." *Id*. ¶ 3. The Special Master has rejected the Venezuela Parties' request to allow their counsel to attend the Special Master's meetings with OFAC and now intends to hold an *ex parte* meeting on January 12, 2023, with OFAC and other representatives of the Executive Branch.

## SUMMARY OF ARGUMENT

1.      The Court should not allow the Special Master to engage in substantive *ex parte* communications with OFAC or the Executive Branch regarding this matter. Canon 3A(4) of the

---

[1] Capitalized terms used but not defined herein have the meaning ascribed to them in the Court's January 14, 2021 Order, D.I. 234, and the Sale Procedures Order, D.I. 481.

Code of Conduct for United States Judges prohibits federal judges and special masters from engaging in *ex parte* communications with third parties regarding the substance of any matter over which they are presiding, both to protect the parties' ability to know and contest what was said and to protect the integrity of the adversarial process. The authorized purpose of the Special Master's outreach to OFAC is to obtain information from OFAC and to provide that information to the Court in order to facilitate the Special Master's recommendation and the Court's decision about whether the sale should launch. *See* D.I. 481 ¶ 3. Under the Code of Conduct and Third Circuit precedent, such communications cannot occur in the absence of the parties.

2. Although it would be natural for Crystallex or the Venezuela Parties to seek an *ex parte* meeting with the Executive Branch as private parties advocating a particular result, that is not the Special Master's role. He is not authorized by this Court to advocate for any particular course of action by the Executive Branch, and it would violate judicial norms of impartiality if this Court were to authorize him to do so. As an arm of the Court and a judicial officer, the Special Master has an obligation to appear and remain impartial (particularly here, where such advocacy would directly implicate U.S. foreign policy). *See* Fed. R. Civ. P. 53(a)(2); 28 U.S.C. § 455(a); Code of Conduct for United States Judges ("Code of Conduct"), Canon 2A, *in* 2 Guide to Judiciary Policy, Ch. 2. Barring a party from what amounts to a judicial fact-gathering proceeding is improper in itself, but that impropriety is heightened to the extent that the meeting may include, or give the appearance of including, advocacy for a position.

## STATEMENT OF FACTS

This Court issued a writ of attachment *fieri facias* to attach PDVSA's shares of stock in PDVH in satisfaction of Crystallex's judgment on August 23, 2018. D.I. 95. On November 1, 2018, the President of the United States issued Executive Order No. 13850, which provides that

2

**243a**

interests in property of the Government of Venezuela—defined in such a way as to include the PDVH shares—"may not be transferred, paid, exported, withdrawn, or otherwise dealt in" unless permitted by OFAC. Exec. Order No. 13850 § 1, 83 Fed. Reg. 55243 (Nov. 1, 2018). Regulations promulgated by OFAC pursuant to this order make clear that the executive order prohibits any sale of the PDVH shares, including in an execution sale or pursuant to other judicial process, without a specific license. *See* 31 C.F.R. §§ 591.302, 591.305, 591.310, 591.407. OFAC has also issued official guidance stating that U.S. persons with a writ of attachment in the PDVH shares may not "prepare for and hold an auction or other sale of the shares" without a specific license. OFAC FAQ No. 809. Violation of the regulations may result in criminal penalties. *See* 31 C.F.R. § 501, App'x A. The Executive Branch implemented these prohibitions in part to prevent the PDVH shares and other property of PDVSA from being seized and sold by creditors. *See* D.I. 212-1 at 3. On September 10, 2021, OFAC denied Crystallex's request for "authorization for all activities necessary and ordinarily incident to organizing and conducting a judicial sale of shares" in PDVH, "without prejudice to reconsideration at a later time if [U.S.] foreign policy considerations change." D.I. 346-1 at 1.

On May 27, 2021, the Court appointed Special Master Pincus to "devise a plan for the sale of shares of PDVH as necessary to satisfy the outstanding judgment of Crystallex and the judgment of any other judgment creditor added to the Sale by the Court and/or devise such other transaction as would satisfy such outstanding judgment(s)." D.I. 277 ¶ 2. "[T]o reduce the risk that uncertainty" surrounding OFAC's "sanctions regime [that] will deter value maximizing bids," the Court ordered that the SPO contain a provision giving the Special Master up to six months "to recommend that implementation [of the SPO] begin (or not)" and requiring him to "use his best efforts to obtain guidance from OFAC that may be shared with the market

expressing OFAC's view of the process and the likelihood that it will issue a specific license for a sale to close." D.I. 443 at 17; *see* D.I. 481 ¶ 3. After the Sale Process Parties have an opportunity to object to the Special Master's recommendation, this Court will "make a determination regarding when to trigger the Preparation Launch Date and subsequent Launch Date with or without a license from OFAC." *Id.* The Court has not yet determined whether to direct the start of the sale process.

The Venezuela Parties learned last week that the Special Master has scheduled a meeting with OFAC and other representatives of the Executive Branch on January 12, 2023. The Venezuela Parties requested that their counsel be allowed to attend the meeting, making clear that they intended only to observe and listen and would not participate. The Special Master rejected this request and apparently intends to hold this meeting on an *ex parte* basis.

## ARGUMENT

1. The Court should not allow the Special Master to engage in *ex parte* communications with the U.S. Government. The Code of Conduct for United States Judges provides that judicial officers generally are not permitted to "initiate, permit, or consider ex parte communications or consider other communications concerning a pending or impending matter that are made outside the presence of the parties or their lawyers." Code of Conduct Canon 3A(4); *see also In re Kensington Int'l Ltd.*, 368 F.3d 289, 309 (3d Cir. 2004) ("We have previously described *ex parte* communications as 'anathema in our system of justice.'") (internal citations omitted). As the Code of Conduct's phrasing suggests, the prohibition on *ex parte* communications include not only communications with a party to the litigation, but also communications with third parties "concerning a pending or impending matter that are made outside the presence of the parties or their lawyers." *See In re Kensington Int'l*

4

**245a**

*Ltd.*, 368 F.3d at 309–10 (treating a judge's communications with non-party advisors as "*ex parte*" communications because they occurred outside the presence of the parties); Code of Conduct Canon 3A(4)(c) (providing a limited exception to the prohibition for a judge to "obtain the written advice of a disinterested expert on the law"). And this prohibition applies to the Special Master, who is acting as a judicial officer and "arm of the Court," D.I. 277 ¶ 20, and pursuant to the Court's direction. *See* Code of Conduct at 2, 19 (stating that the Code of Conduct applies to special masters, with the exceptions of Canons 4A(3), 4B, 4C, 4D(4), or 5); *see also* Code of Conduct Canon 3B(2) ("A judge should not direct court personnel to engage in conduct on the judge's behalf or as the judge's representative when that conduct would contravene the Code if undertaken by the judge.").

The prohibition on *ex parte* communications "is designed to prevent … bias, prejudice, coercion, and exploitation," and also to maintain the integrity of the adversarial system. *See In re Kensington Int'l Ltd.*, 368 F.3d at 310. Specifically, if a judicial officer engages in *ex parte* communications, "there [is] no way for" the parties "to adequately respond to or counter facts presented" about those "unrecorded meetings" because they have "no way of knowing what was said." *Id.* at 310–11; *see also id.* at 310 ("If judges engage in *ex parte* conversations with the parties or outside experts, the adversary process is not allowed to function properly and there is an increased risk of an incorrect result."); *id.* at 311 (explaining that *ex parte* meetings prevent parties from knowing "precisely what was said, when it was said, by whom, and what effect could be drawn from their offerings.").[2]

---

[2] The Code of Conduct contains an exception for *ex parte* communications conducted with the parties' express consent. *See* Code of Conduct Canon 3A(4)(d); *In re Kensington Int'l Ltd.*, 368 F.3d at 311 (holding that such consent cannot be implied through waiver). Here, however, the Venezuela Parties have not consented to the planned *ex parte* conversations.

The Court ordered the Special Master to engage with OFAC in order to (1) solicit OFAC's views on such matters as "[OFAC's] support for (or non-opposition to), the launch of the Marketing Process by the Special Master," D.I. 481 ¶ 3, and "the likelihood that [OFAC] will issue a specific license for a sale to close," D.I. 443 at 17, and (2) submit a Supplemental Report that includes "a recommendation … to the Court as to whether (and when) the Court should direct the Special Master" to initiate the sale process, D.I. 481 ¶ 3. The SPO also states that "[t]he Court shall consider the Supplemental Report" and any objections to that recommendation filed by the Sale Process Parties, "after which the Court shall make a determination regarding when to trigger the Preparation Launch Date and subsequent Launch Date with or without a license from OFAC." *Id.*

Whether the Court should direct the Special Master to initiate the sale process is a disputed issue in this case. The Venezuela Parties believe—and have previously asserted—that conducting the sale process without a specific license would chill bidder participation and that a fair, value-maximizing sale cannot occur without OFAC authorization. The Special Master has also voiced such concerns to the Court. *See*, *e.g.*, D.I. 348 ¶ 3; D.I. 356 ¶ 6. Crystallex disagrees. The authorized purpose of the Special Master's outreach to OFAC is, as directed by the Court, to obtain OFAC's views and intentions regarding "its support for (or non-opposition to), the launch of the Marketing Process by the Special Master" and for the Special Master to provide those views to the Court and potential bidders in order to facilitate the Court's decision. *Id.* Such communications cannot occur in the absence of the parties. *See Cobell v. Norton*, 334 F.3d 1128, 1144 (D.C. Cir. 2003) (holding that a special master could not base his opinion in part on information learned through *ex parte* communications).

6

The SPO authorizes the parties to object to the Special Master's eventual recommendation as to whether the Court should direct the launch of the sale process. D.I. 481 ¶ 3. If the parties or their counsel cannot attend the Special Master's meetings with OFAC, then they will have no contemporaneous record of the discussions and no knowledge of what occurred beyond what may be represented by the Special Master or his advisors. That not only will interfere with their ability to protect their interests and to dispute or supplement any characterizations or information provided by the Special Master in his Supplemental Report, it also will prevent the adversary process from functioning properly. *See In re Kensington Int'l Ltd.*, 368 F.3d at 311 (noting that *ex parte* meetings interfere with the truth-seeking process and with appellate review because "no one could know what had been said or proffered").

Simply put, it would be unthinkable for this Court itself to have an *ex parte* phone call with Executive Branch officials and then base its decision on whether to launch the sale process on facts or representations made outside the presence of the parties. It is no more appropriate for the Court to permit the Special Master to engage in such *ex parte* communications and then base its decision on facts and representations the Special Master provides to the Court about such *ex parte* communications.

2. Although it would be natural for Crystallex or the Venezuela Parties to seek an *ex parte* meeting with the Executive Branch as private parties advocating a particular result, that is not the Special Master's role. The SPO contemplates that the purpose of the Special Master's outreach to OFAC is to solicit information, such as its "view of the process" and "the likelihood that [OFAC] will issue a specific license for a sale to close," D.I. 443 at 17, not to advocate that OFAC take a position on those issues one way or the other. Indeed, it obviously would be improper for the Special Master to contact OFAC unilaterally to urge that the government take

7

any position one way or the other, particularly on an *ex parte* basis. *See Abdulrahman v. Ashcroft*, 330 F.3d 587, 596 (3d Cir. 2003) (stating that "due process demands impartiality on the part of those who function in judicial or quasi-judicial capacities" and that such persons "must assiduously refrain from becoming advocates for either party" (internal quotation marks omitted)); *Logue v. Dore*, 103 F.3d 1040, 1045 (1st Cir. 1997) ("[T]here are lines which a trial judge should not cross. For example, … he cannot become an advocate or otherwise use his judicial powers to advantage or disadvantage a party unfairly."); *see also* 28 U.S.C. § 455(a) ("Any justice, judge, or magistrate judge of the United States shall disqualify himself in any proceeding in which his impartiality might reasonably be questioned."); Code of Conduct Canon 2A ("A judge should respect and comply with the law and should act at all times in a manner that promotes public confidence in the integrity and impartiality of the judiciary."); Fed. R. Civ. P. 53(a)(2) (applying 28 U.S.C. § 455 to special masters).[3]

Thus, it is difficult to think of any reason that the Court and the Special Master would want to prevent the parties from observing, without participating in, an information gathering meeting with the Executive Branch that will be used to make to judicial decision to launch the sales process. If the Special Master is for any reason uncomfortable communicating with the government in the presence of the parties, then the proper approach would be for him to send a written inquiry to OFAC (with the parties copied) and then file the actual response. Or he could

---

[3] The impropriety of such outreach would be exacerbated in this case, given that OFAC's determinations are rooted in Executive Branch evaluations of U.S. foreign policy interests. *See Hernandez v. Mesa*, 140 S. Ct. 735, 744 (2020) (stating that "matters relating to the conduct of foreign relations ... are so exclusively entrusted to the political branches of government as to be largely immune from judicial inquiry or interference" (cleaned up)). The United States Government has already stated—in this Court—that "moving forward" with a sale "could imperil U.S. foreign policy and national security interests." D.I. 212 at 5. Additionally, federal law currently prohibits—at the very least—closing on any execution sale of the PDVH shares, and indeed OFAC already denied Crystallex's request for a specific license that would remove that legal prohibition.

recommend that the Court formally request another statement of interest from the United States, as the SPO contemplates. In no circumstance, though, is there any legitimate reason for the Special Master to gather information relevant to a judicial decision in an *ex parte* communication with the Executive Branch, thereby depriving the parties of their right to an opportunity to adequately respond. *See In re Kensington Int'l Ltd.*, 368 F.3d at 310–11.

## CONCLUSION

For the foregoing reasons, the Venezuela Parties respectfully request that the Court issue an order that counsel for all parties be allowed to attend, for purposes of observing but not participating in, any substantive meetings or other communications between Special Master Pincus (and/or his counsel or advisors) and the United States Government related to this matter. The Venezuela Parties reserve all rights if the Special Master proceeds in a manner inconsistent with law.

MORRIS, NICHOLS, ARSHT & TUNNELL LLP

/s/ Kenneth J. Nachbar

OF COUNSEL:
Nathan P. Eimer
Lisa S. Meyer
Daniel D. Birk
Gregory M. Schweizer
Emily E. Sullivan
EIMER STAHL LLP
224 South Michigan Avenue
Suite 1100
Chicago, IL 60604
(312) 660-7600
NEimer@eimerstahl.com
LMeyer@eimerstahl.com
DBirk@eimerstahl.com
GSchweizer@eimerstahl.com
ESullivan@eimerstahl.com

Kenneth J. Nachbar (#2067)
Alexandra M. Cumings (#6146)
1201 North Market Street
Wilmington, DE 19801
(302) 658-9200
KNachbar@mnat.com
ACumings@mnat.com

*Attorneys for PDV Holding, Inc., and
CITGO Petroleum Corporation*

HEYMAN ENERIO GATTUSO & HIRZEL LLP

/s/ Samuel Taylor Hirzel, II

OF COUNSEL:
Joseph D. Pizzurro
Kevin A. Meehan
Juan O. Perla
CURTIS, MALLET-PREVOST,
COLT & MOSLE LLP
101 Park Avenue
New York, NY 10178
(212) 696-6000
jpizzurro@curtis.com
kmeehan@curtis.com
jperla@curtis.com

Samuel Taylor Hirzel, II (#4415)
300 Delaware Avenue, Suite 200
Wilmington, DE 19801
(302) 472-7300
shirzel@hegh.law

*Attorney for Petróleos de Venezuela, S.A.*

10

ABRAMS & BAYLISS LLP

OF COUNSEL:
Donald B. Verrilli, Jr.
Elaine J. Goldenberg
Ginger D. Anders
Brendan B. Gants
Jacobus P. van der Ven
Munger, Tolles & Olson LLP
601 Massachusetts Avenue NW
Suite 500 E
Washington, D.C. 20001
(202) 220-1100
Donald.Verrilli@mto.com

George M. Garvey
Munger, Tolles & Olson LLP
350 South Grand Avenue, 50th Floor
Los Angeles, CA 90071
(213) 683-9100
George.Garvey@mto.com

January 9, 2023

*/s/ Stephen C. Childs*
A. Thompson Bayliss (#4379)
Stephen C. Childs (#6711)
20 Montchanin Road, Suite 200
Wilmington, DE 19807
(302) 778-1000
bayliss@abramsbayliss.com
childs@abramsbayliss.com

*Attorneys for Bolivarian Republic of Venezuela*

11

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

```
------------------------------------------------------------
CRYSTALLEX INTERNATIONAL CORP.,          )
                                         )
                    Plaintiff,           )
                                         )
          v.                             )        Misc. No. 17-151-LPS
                                         )
BOLIVARIAN REPUBLIC OF VENEZUELA,        )        PUBLIC VERSION
                                         )
                    Defendant.           )
------------------------------------------------------------
```

## SPECIAL MASTER'S MONTHLY REPORT
## <u>FOR THE PERIOD ENDED NOVEMBER 30, 2022</u>

Dated: December 28, 2022
Public Version
Dated:  January 4, 2023

ROBERT B. PINCUS in his capacity as
Special Master for the United States District Court for the District of Delaware
PO Box 4570
Wilmington, DE 19807

December 28, 2022

**PUBLIC VERSION JANUARY 4, 2023**

**BY HAND DELIVERY & CM/ECF**

The Honorable Leonard P. Stark
United States District Court for the District of Delaware
J. Caleb Boggs Federal Building
844 North King Street
Wilmington, DE 19801-3570

Re: *Crystallex International Corp. v. Bolivarian Republic of Venezuela,* D. Del. C.A. No. 1:17-mc-00151-LPS; Special Master's Status Report for the Period Ended November 30, 2022 (this "***Report***")

Dear Judge Stark:

By order dated April 13, 2021 [D.I. 258], Your Honor appointed me as Special Master in this case to design, oversee, and implement the sale of Petroleos de Venezuela, S.A.'s ("***PDVSA***") shares of PDV Holding Inc. On May 27, 2021, Your Honor issued the *Order Regarding Special Master* [D.I. 277] (the "***May 27 Order***")[1] setting forth, among other things, various obligations and duties applicable to the Special Master, the Parties, and ConocoPhillips (together with the Parties, the "***Sale Process Parties***"), including my obligation to provide the Court with a periodic status report concerning my progress and efforts. The last report that I submitted to the Court was for the period ended August 31, 2022 [D.I. 475] (the "***August 2022 Report***"). I hereby write to provide this Report for the period since the August 2022 Report through November 30, 2022.

**Summary of Events Taking Place this Period**

During this period, I have undertaken the following actions, with the assistance of my advisors (collectively, the "***Advisors***"), in accordance with my duties and obligations set forth in the May 27 Order:

- Reviewed and analyzed Your Honor's *Oral Order* [D.I. 479] entered on September 29, 2022 ("***September 2022 Order***").

---

[1] All capitalized terms used but not otherwise defined herein, have the meanings ascribed to such terms in the May 27 Order.

The Honorable Leonard P. Stark
December 28, 2022  PUBLIC VERSION January 4, 2023
Page 2

- Met and conferred with the Sale Process Parties as directed by the September 2022 Order in connection with preparation of a joint status report to be filed by the Special Master.

- Coordinated work streams to address Your Honor's rulings in the September 2022 Order relating to the Proposed Sale Procedures Order and met and conferred with the Sale Process Parties regarding preparation of a revised form of such order consistent with the September 2022 Order.

- Prepared and filed the aforementioned Joint Status Report [D.I. 480] detailing the Special Master's and the Sale Process Parties' respective positions with respect to next steps in the sale process.

- Prepared and filed a revised Proposed Sale Procedures Order [D.I. 480-1] to account for the passage of time as per the September 2022 Order.

- Met with my Advisors regarding outreach to and negotiations with OFAC.

- Coordinated regarding a meeting with representatives of the United States Department of the Treasury and the United States Department of Justice to take place in January.

- Discussed Red Tree Investments, LLC's Motion to Intervene and to Modify the Sale Procedures Order [D.I. 483] (the "***Red Tree Motion***") and related pleadings with my Advisors.

- Prepared and filed a letter with the Court setting forth the Special Master's position on the Red Tree Motion [D.I. 493].

- Prepared and filed the August 2022 Report [D.I. 475].

**Statement of Fees and Expenses**

The May 27 Order requires that I submit an Itemized Statement of my fees and expenses to the Court. During the period September 1, 2022 through November 30, 2022, my Advisors and I have incurred an aggregate of ▮▮▮▮▮▮ of fees and expenses in connection with carrying out my duties as Special Master, as shown in the table below.

| Special Master | | |
|---|---|---|
| Weil, Gotshal & Manges LLP | | ▮▮▮▮ |
| Jenner & Block LLP | | ▮▮▮▮ |
| Potter Anderson & Corroon LLP | | ▮▮▮ |
| Total | | ▮▮▮▮ |

The Honorable Leonard P. Stark
December 28, 2022  PUBLIC VERSION January 4, 2023
Page 3

 This amount includes the monthly fees and expenses of counsel in connection with the matters described above. The Itemized Statement, attached as Annex L hereto, contains a breakdown of such fees and expenses among my Advisors and myself.  I respectfully request that Your Honor determine that such fees and expenses are regular and reasonable.  A proposed form of order is enclosed for Your Honor's consideration.

 I am available at the convenience of the Court, should Your Honor have any questions.


        Respectfully Yours,

        */s/ Robert B. Pincus*

        Robert  B. Pincus, in my capacity as Special Master for the United States District Court for the District of Delaware


Enclosures

 cc: All Counsel of Record (via CM/ECF and E-Mail)

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| **CRYSTALLEX INTERNATIONAL CORPORATION,** : | |
| : | |
| **Plaintiff,** : | |
| : | |
| v. : | **Misc. No. 17-151-LPS** |
| : | |
| **BOLIVARIAN REPUBLIC OF VENEZUELA,** : | |
| : | |
| **Defendant.** : | |

## SIXTH REVISED PROPOSED ORDER (A) ESTABLISHING SALE AND BIDDING PROCEDURES, (B) APPROVING SPECIAL MASTER'S REPORT AND RECOMMENDATION REGARDING PROPOSED SALE PROCEDURES ORDER, (C) AFFIRMING RETENTION OF EVERCORE AS INVESTMENT BANKER BY SPECIAL MASTER AND (D) REGARDING RELATED MATTERS

On January 14, 2021, the Court issued an opinion and corresponding order (D.I. 234, 235) (the "**January Ruling**") following pleadings filed by Plaintiff Crystallex International Corporation ("**Crystallex**"), Defendant Bolivarian Republic of Venezuela (the "**Republic**"), Intervenor Petróleos de Venezuela, S.A. ("**PDVSA**"), Garnishee PDV Holding, Inc. ("**PDVH**"), Intervenor CITGO Petroleum Corp. ("**CITGO Petroleum**," and together with the Republic, PDVSA, and PDVH, the "**Venezuela Parties**"), non-parties Phillips Petroleum Company Venezuela Limited and ConocoPhillips Petrozuata B.V. (together, "**ConocoPhillips**," and collectively with Crystallex and the Venezuela Parties, the "**Sale Process Parties**") and the United States, which set out "some contours of the sale procedures that [the Court] will follow in conducting a sale of PDVSA's shares in PDVH," including appointment of a special master to "oversee the day-to-day and detailed implementation of the sales procedures." (D.I. 234 at 34).

Consistent with the January Ruling, on April 13, 2021, the Court appointed Robert B. Pincus as a special master (the "**Special Master**") to assist the Court with the sale of PDVSA's shares in PDVH (D.I. No. 258). On May 27, 2021, the Court entered the *Order Regarding Special Master* (D.I. No. 277) (the "**May Order**") directing the Special Master to, among other things, devise a plan (the "**Proposed Sale Procedures Order**") for the sale of shares of PDVH (the "**PDVH Shares**") as necessary to satisfy the outstanding judgment of Crystallex and the judgment of any other judgment creditor added to the sale by the Court and/or devise such other transaction as would satisfy such outstanding judgment(s) while maximizing the sale price of any assets to be sold (collectively, the "**Sale Transaction**").

On August 9, 2021, the Special Master filed the *Proposed Order (A) Establishing Sale and Bidding Procedures, (B) Approving Special Master's Report and Recommendation Regarding Proposed Sale Procedures Order, (C) Affirming Retention of Evercore as Investment Banker by Special Master and (D) Regarding Related Matters* (D.I. 302) (the "**Initial Proposed Sale Procedures Order**") and the *Special Master's Report and Recommendation Regarding Proposed Sale Procedures Order* (D.I. 303) (the "**Report**").

On August 25, 2021, objections to the Initial Proposed Sale Procedures Order were filed by Crystallex (D.I. 317), the Venezuela Parties (D.I. 318), and ConocoPhillips (D.I. 319) (collectively, the "**August 25 Objections**").

On September 10, 2021, the Special Master filed the *Response of Special Master to Objections to Proposed Sale Procedures Order* (D.I 341) (the "**Reply**") and the *Revised Proposed Order (A) Establishing Sale and Bidding Procedures, (B) Approving Special Master's Report and Recommendation Regarding Proposed Sale Procedures Order, (C) Affirming Retention of*

2

*Evercore as Investment Banker by Special Master and (D) Regarding Related Matters*, attached as Exhibit A.1 to the Reply (the "**First Revised Proposed Sale Procedures Order**").

On November 5, 2021, the Special Master filed the *Second Revised Proposed Order (A) Establishing Sale and Bidding Procedures, (B) Approving Special Master's Report and Recommendation Regarding Proposed Sale Procedures Order, (C) Affirming Retention of Evercore as Investment Banker by Special Master and (D) Regarding Related Matters* at (D.I. 391) (the "**Second Revised Proposed Sale Procedures Order**").

On November 8, 2021, the Court held a hearing to consider the relief contemplated by the Proposed Sale Procedures Order and heard oral arguments with respect thereto (the "**Hearing**").

On November 24, 2021, the Special Master filed the *Third Revised Proposed Order (A) Establishing Sale and Bidding Procedures, (B) Approving Special Master's Report and Recommendation Regarding Proposed Sale Procedures Order, (C) Affirming Retention of Evercore as Investment Banker by Special Master and (D) Regarding Related Matters* at (D.I. 411-1) (the "**Third Revised Proposed Sale Procedures Order**").

On March 2, 2022, the Court issued an *Opinion* [D.I. 443] (the "**March 2022 Opinion**") in which the Court, among other things, (i) ruled on certain Objections (as defined herein) to the Proposed Sale Procedures Order and (ii) directed the Special Master to submit a revised Proposed Sale Procedures Order consistent with the March 2022 Opinion.

On March 31, 2022, consistent with the March 2022 Opinion, the Special Master filed the *Fourth Revised Proposed Order (A) Establishing Sale and Bidding Procedures, (B) Approving Special Master's Report and Recommendation Regarding Proposed Sale Procedures Order, (C) Affirming Retention of Evercore as Investment Banker by Special Master and (D) Regarding Related Matters* at (D.I. 451-1 Ex. A) (the "**Fourth Revised Proposed Sale Procedures Order**").

3

WEIL:\98747427\4\67816.0003

**259a**

On April 11, 2022, objections to the Fourth Revised Proposed Sale Procedures Order were filed by ConocoPhillips (D.I. 455), Crystallex (D.I. 456), and the Venezuela Parties (D.I. 457), (collectively, the "**April 11 Objections**"). The April 11 Objections filed by ConocoPhillips and Crystallex were resolved. (*See* D.I. 458).

On July 27, 2022, the Court issued a *Memorandum Order* [D.I. 469] (the "**July 2022 Order**") in which the Court, among other things, (i) ruled on the April 11 Objections and (ii) directed the Special Master to submit a revised Proposed Sale Procedures Order consistent with the July 2022 Order.

On August 5, 2022, consistent with the July 2022 Order, the Special Master filed the *Fifth Revised Proposed Order (A) Establishing Sale and Bidding Procedures, (B) Approving Special Master's Report and Recommendation Regarding Proposed Sale Procedures Order, (C) Affirming Retention of Evercore as Investment Banker by Special Master and (D) Regarding Related Matters* at (D.I. 472-1 Ex. A) (the "**Fifth Revised Proposed Sale Procedures Order**").

On September 29, 2022, the Court issued an *Oral Order* [D.I. 479] (the "**September 2022 Order**") in which the Court, among other things, directed the Special Master to submit a revised Proposed Sale Procedure Order reflecting the passage of time since the Fifth Revised Proposed Sale Procedures Order.

On October 4, 2022, consistent with the September 2022 Order, the Special Master filed the *Sixth Revised Proposed Order (A) Establishing Sale and Bidding Procedures, (B) Approving Special Master's Report and Recommendation Regarding Proposed Sale Procedures Order, (C) Affirming Retention of Evercore as Investment Banker by Special Master and (D) Regarding Related Matters* at (D.I. [●]) (the "**Sixth Revised Proposed Sale Procedures Order**").

4

The Court, having reviewed and considered the Initial Proposed Sale Procedures Order, the Reply, the First Revised Proposed Sale Procedures Order, the Second Revised Proposed Sale Procedures Order, the Third Revised Proposed Sale Procedures Order, the Fourth Revised Proposed Sale Procedures Order, the Fifth Revised Proposed Sale Procedures Order, the Sixth Revised Proposed Sale Procedures Order, the Report, and the proposed sale procedures contemplated thereby, and having reviewed the August 25 Objections, the April 11 Objections and all other objections filed with the Court (collectively, with the August 25 Objections and the April 11 Objections, the "**Objections**"); and the Court having held the Hearing to consider the relief contemplated by the Proposed Sale Procedures Order; and upon the record of the Hearing; and the Court having issued the March 2022 Opinion; and the Court having issued the July 2022 Order; and the Court having issued the September 2022 Order; and the Court having determined that the legal and factual bases set forth in this Order and the Report establish just cause for the relief contemplated herein; and upon all of the proceedings had before the Court in the above captioned case; and after due deliberation and sufficient cause appearing therefor,

## IT IS HEREBY FOUND AND DETERMINED THAT:[1]

A.      **Jurisdiction and Venue**.   The Court has jurisdiction to grant the relief requested herein pursuant to 28 U.S.C. § 1605(a)(6).   Venue is proper before the Court pursuant to 28 U.S.C. § 1963.

B.      **Statutory and Legal Predicates**.   The statutory and legal predicates for the relief granted herein include (a) Rule 69(a) of the Federal Rules of Civil Procedure (the "**Federal Rules**"), (b) Section 324 of Title 8 of the Delaware Code (the "**Delaware General Corporation**

---

[1] The findings and conclusions set forth herein constitute the Court's findings of fact and conclusions of law.  To the extent any of the following findings of fact constitute conclusions of law, they are adopted as such.  To the extent any of the following conclusions of law constitute findings of fact, they are adopted as such.

5

**Law**"), (c) Rule 53 of the Federal Rules ("**Rule 53**"), (d) the Court's general equitable powers to enforce its orders and judgments (*See Chambers v. NASCO, Inc.*, 501 U.S. 32, 43 (1991) (quoting *Link v. Wabash R. Co.*, 370 U.S. 626, 630–631 (1962)) and (e) the All Writs Act (*See United States v. New York Tel. Co.*, 434 U.S. 159, 172 (1977) ("This Court has repeatedly recognized the power of a federal court to issue such commands under the All Writs Act as may be necessary or appropriate to effectuate and prevent the frustration of orders it has previously issued in its exercise of jurisdiction otherwise obtained.").

      C.    **Sale Procedures**. As set out in his Report delivered in accordance with Rule 53 contemporaneously with this Order, the Special Master has articulated good and sufficient reasons for the Court to approve the procedures set forth herein (the "**Sale Procedures**"), including the bidding procedures and accompanying notices, substantially in the form attached hereto as **Exhibit 1** (the "**Bidding Procedures**").[2] For the reasons outlined in the Report, the Sale Procedures, including the Bidding Procedures, are (a) fair, (b) reasonable, (c) appropriate, (d) designed to promote a competitive and robust bidding process to generate the greatest level of interest in the PDVH Shares and result in the highest offer in connection with any Sale Transaction at least sufficient to satisfy the Attached Judgments (as defined below), and (e) reasonably calculated to balance the many competing interests in a dynamic and internationally sensitive set of circumstances. The Bidding Procedures are substantively and procedurally fair to all parties and potential bidders and they afford notice and a full, fair and reasonable opportunity for any person or entity to make a higher or otherwise better offer to purchase the PDVH Shares. The

---

[2] Capitalized terms used but not otherwise defined herein shall have the respective meanings ascribed to such terms in the Bidding Procedures (as defined herein).

6

procedures and requirements set forth in the Bidding Procedures, including those associated with submitting deposits and Qualified Bids, are fair, reasonable, and appropriate.

    D. **Timeline and Marketing Process**. Beginning on the Launch Date (as defined below), the Special Master, directly or through the assistance of his Advisors (as defined below), shall market the PDVH Shares pursuant to the procedures set forth in the Bidding Procedures (the "**Marketing Process**"). The Special Master has articulated good and sufficient reasons for the Marketing Process and the timeline contemplated by the Bidding Procedures, including the procedures for modifying deadlines or postponing implementation thereof. The Marketing Process and the timeline for implementation of the Sale Procedures is (a) fair, open, comprehensive, and a public process, (b) adequate, (c) reasonable, (d) appropriate, (e) consistent with applicable law, (f) sufficient to promote a competitive and robust bidding and auction process to generate competitive interest in the PDVH Shares, (g) reasonably calculated to maximize value and result in the highest offer in connection with any Sale Transaction at least sufficient to satisfy the Attached Judgments, and (h) reasonably calculated to balance the many competing interests in a dynamic and internationally sensitive set of circumstances.

    E. **Notice Procedures**. After the Launch Date, in addition to conducting the Marketing Process, the Special Master shall cause a notice, substantially in the form attached hereto as **Exhibit 2** (the "**Sale Notice**"), to be published (i) following the launch of the sale process, and (ii) prior to any Auction or designation of any Stalking Horse Bidder as the Successful Bidder, in *The News Journal*, the *Delaware State News*, the *Wall Street Journal* (national edition), the *USA Today* (national edition), and, if practicable, a regional or local newspaper published or circulated in Venezuela selected by the Special Master in consultation with the Sale Process Parties, in each case for two successive weeks. A copy of this Order shall be served by e-mail on counsel to the

7

**263a**

Venezuela Parties.[3] If any Sale Process Party believes that further service of this order, the Sale Notice or any additional publication or notice is necessary or appropriate, such Sale Process Party shall, within 10 calendar days of entry of this Order, provide the Special Master with a specific list of specific actions or service that the Sale Process Party believes should be undertaken, subject to order of the Court or with the consent of the Special Master. The foregoing notice procedures (the "**Notice Procedures**") are appropriate and reasonably calculated to provide interested parties and Potential Bidders with timely and proper notice of the Sale Procedures and any Sale Transaction.

F. **Sufficient Notice**. The Marketing Process and Notice Procedures are appropriate and reasonably calculated to provide all interested parties with timely and proper notice of the Sale Procedures, the opportunity to bid pursuant to the Bidding Procedures, the Auction, the Sale Hearing, and any proposed Sale Transaction, and any and all objection deadlines related thereto, and no other or further notice shall be required for this Order and any Sale Transaction, except as expressly required herein. The Sale Process Parties have had an adequate opportunity to review and provide input on the Sale Notice and Notice Procedures.

G. **Public Sale**. The process contemplated by the Sale Procedures, including the Marketing Process, Bidding Procedures, and Notice Procedures, shall constitute a "public sale to the highest bidder" within the meaning of Section 324 of the Delaware General Corporation Law.

H. **Designation of Stalking Horse Bid**. The Special Master has articulated good and sufficient reasons for the Court to authorize the Special Master to seek authority from

---

[3] The Court takes notice and accepts that the Venezuela Parties have voluntarily waived any requirement under the Delaware General Corporation Law or otherwise regarding publication of notice in Venezuela. (*See* D.I. 318 at ¶ 24) The Special Master and the other Sale Process Parties are entitled to rely on this waiver.

8

this Court to designate a Stalking Horse Bidder and enter into a Stalking Horse Agreement with (or without) the Stalking Horse Bid Protections (as defined below), at the Special Master's sole discretion and in accordance with the Bidding Procedures and this Order, if he determines that it would be in furtherance of a value maximizing Sale Transaction. The Stalking Horse Bid Protections are (a) fair, (b) appropriate, (c) reasonably calculated to incentivize potential bidders to participate in a competitive bidding process, (d) designed to encourage robust bidding by compensating a bidder whose definitive agreement in connection with a Sale Transaction is terminated for the risks and costs incurred in signing and announcing an agreement for a transaction that may not ultimately be completed, and (e) reasonably calculated so as to not unreasonably deter Qualified Bidders from submitting a Qualified Bid.

I.      **Crystallex's Judgment**. Subject to paragraphs 31 and 32 of this Order, Crystallex's alleged outstanding judgment is $969,999,752.93 as of August 9, 2021 ("**Crystallex's Judgment**").[4] The amount of Crystallex's Judgment for the purpose of any satisfaction of payment shall be finalized pursuant to the procedures set forth in this Order and any further order of the Court.

J.      **ConocoPhillips' Judgment**. Subject to paragraphs 31 and 32 of this Order, ConocoPhillips' alleged outstanding judgment against PDVSA is $1,289,365,299.91 as of August 9, 2021 ("**ConocoPhillips' Judgment**"). To the extent that ConocoPhillips' Judgment becomes an Attached Judgment (as defined below), the amount of ConocoPhillips' Judgment for the purpose of any satisfaction of payment shall be finalized pursuant to the procedures set forth in this Order and any further order of the Court.

---

[4] In paragraph 50 of the Report, the Special Master identified what appears to be a clerical error in judgment entered by the Clerk for the United States District Court for the District of Columbia. The figure set forth here is the amount of Crystallex's Judgment if the clerical error is rectified or if the Court otherwise determines that such rectification is unnecessary.

9

**265a**

K. **Retention of Advisors.** The Special Master has articulated good and sufficient reasons and has retained, as approved by the May Order and as affirmed by this Order, Weil, Gotshal & Manges LLP, Potter Anderson & Corroon LLP, Jenner & Block LLP, Evercore Group L.L.C. ("**Evercore**"), and any additional advisors engaged by the Special Master pursuant to the May Order (collectively, the "**Advisors**"). The terms of the proposed Engagement Letter between the Special Master and Evercore, the form of which is annexed to this Order as **Exhibit 3** (the "**Proposed Evercore Engagement Letter**"), are (a) fair, (b) reasonable, and (c) appropriate and are hereby approved in all respects. All obligations owed to Evercore set forth in the Proposed Evercore Engagement Letter, including the fees and reimbursement of reasonable expenses, are approved, and Evercore shall be compensated and reimbursed in accordance with the terms of the Proposed Evercore Engagement Letter, in each case subject to the procedures set forth herein and any other applicable orders of the Court. For avoidance of doubt, all obligations owed to Evercore pursuant to the Proposed Evercore Engagement Letter shall constitute and be included within the definition of "Transaction Expenses" (as defined below); *provided* that, as set forth below, any Sale Fee other than the Upfront Amount (each as defined in the Proposed Evercore Engagement Letter) shall be paid by the purchaser directly or from any proceeds from a Sale Transaction.

**IT IS HEREBY ORDERED, ADJUDGED AND DECREED THAT**:

1. All Objections to the relief granted herein that have not been withdrawn with prejudice, waived, or settled, and all reservations of rights included in such objections, are hereby overruled and denied on the merits with prejudice.

2. Following the Launch Date, a hearing to consider approval of any Sale Transaction resulting from implementation of the Sale Procedures shall be scheduled for approximately 270 calendar days after the Launch Date and noticed on the docket of the Crystallex

10

Case (the "**Sale Hearing**"), and may be adjourned or rescheduled by the Court upon notice by the Special Master. At the Sale Hearing, the Court will consider approval of the Successful Bid(s) (as defined below) and Back-up Bid(s), if applicable. Unless the Court orders otherwise, the Sale Hearing shall be an evidentiary hearing on matters relating to the applicable Sale Transaction(s) and there will be no further bidding at such hearing.

        3.      Within the period of six (6) months after the date of this Order (the "**Six-Month Window**"), the Special Master and his Advisors shall solicit and attempt to gain clarity or guidance from the United States Department of the Treasury's Office of Foreign Assets Control ("**OFAC**") of its support for (or non-opposition to), the launch of the Marketing Process by the Special Master, the viability of the Marketing Process, and any additional feedback or guidance that the Special Master believes will more likely result in a value-maximizing Sale Transaction. During the Six-Month Window, but by no later than the expiration thereof or May 2, 2023 (whichever comes first), the Special Master shall make a recommendation (such recommendation, the "**Supplemental Report**") to the Court as to whether (and when) the Court should direct the Special Master to begin to make preparations for launch of the Marketing Process (the date on which preparation for the Marketing Process is launched, the "**Preparation Launch Date**") and the ultimate launch of the Marketing Process (the date on which the Marketing Process is launched, the "**Launch Date**"). The Supplemental Report shall, in the Special Master's sole discretion, address significant factors and considerations that the Special Master and his Advisors believe relevant to the Court's decision as to when Preparation Launch Date and the Launch Date should occur. The Sales Process Parties shall have the opportunity to object to the Special Master's recommendations in the Supplemental Report regarding the Preparation Launch Date and the Launch Date ("**Launch Date Objections**"), which Launch Date Objections shall be filed with the

11

Court no later than 15 business days after the Supplemental Report is filed (the "**Launch Date Objection Deadline**"). Any response to a Launch Date Objection from the Special Master or a Sale Process Party shall be filed no later than 10 business days after the Launch Date Objection Deadline. The Court shall consider the Supplemental Report, all Launch Date Objections thereto, and any responses, after which the Court shall make a determination regarding when to trigger the Preparation Launch Date and subsequent Launch Date with or without a license from OFAC.

        4.      Prior to the Preparation Launch Date, unless otherwise ordered by the Court, the Special Master shall not prepare in a material way for the Marketing Process or take material steps toward implementation of the Sale Procedures; *provided* that, notwithstanding the foregoing, the Special Master shall be authorized to (i) proactively engage with representatives from the Executive Branch (as defined below) and to take all steps or actions reasonably in furtherance of the issuance of OFAC guidance and/or authorization, including, but not limited to, making market inquiries into potential bidders with respect to the impact of OFAC's position (or their lack thereof) on their willingness to participate in a sale process that is conditioned on OFAC's final approval of any sale transaction; *provided* that the Sale Process Parties and their advisors shall be consulted as to the identity of, and the scope of inquiry to, any such potential bidders, (ii) proactively engage with the Sale Process Parties and their advisors, (iii) prepare for and participate in any discussions with the Court and/or any hearing held by the Court, including the Initial Status Conference (as defined below), (iv) participate in any settlement discussions with parties regarding a global claims waterfall or related issues if so directed by the Court, and (v) direct his Advisors to assist him in all actions contemplated in (i) to (iv) of this paragraph 4 and in furtherance of all actions authorized or contemplated by this Order. On and after the Preparation Launch Date, the Special Master and the Special Master's Advisors are hereby directed to prepare for the Marketing Process and take

WEIL:\98747427\4\67816.0003

all such preliminary actions in connection therewith, including conducting or performing appropriate due diligence and related analysis. Without limiting the foregoing, in preparation for the Marketing Process following the Preparation Launch Date, the Special Master shall prepare a customary "teaser" and a "confidential information memorandum" ("**CIM**") to be shared with Potential Bidders and such other materials that the Special Master reasonably determines to be necessary or appropriate. Subject to the Protective Order, the Special Master shall share a draft of the "teaser" and CIM with counsel to the Sale Process Parties no later than seven (7) calendar days prior to launch of the Marketing Process and shall consult in good faith with the Sale Process Parties regarding the same. Further, the Special Master shall (a) no later than 10 business days after the Preparation Launch Date, meet and confer with PDVSA regarding any minority shareholder rights or other protections that could facilitate a sale of minority shares and (b) as soon as reasonably practicable after any Potential Bidder submits a Non-Binding Indication of Interest that contemplates the provision of minority shareholder rights and protections. *See* Bidding Procedures at item (iii) on page 4 (requesting Potential Bidders to identify "any minority shareholder rights, protections, or other desired terms in connection with any bid for less than 100% of the PDVH Shares").

5. **Status Conferences**. Unless otherwise ordered by the Court, the Court shall hold a status conference approximately every thirty days commencing after the Preparation Launch Date for the Special Master to provide an update to the Court and other interested parties regarding implementation of the Sale Procedures Order; *provided* that subject to the Court's availability, the Special Master or the Sale Process Parties may request that such status conferences occur more or less frequently or on an as-needed basis; *provided further* that nothing shall impede the Special Master's right to meet *in camera* or share information with the Court to provide updates

13

**269a**

on the sale process. The initial status conference shall be held approximately 30 days after the
Preparation Launch Date at a date and time to be set by the Court by separate order (the "**Initial
Status Conference**"). At the Initial Status Conference, the Special Master shall provide the Court
and interested parties with an update on his progress and the Special Master's current estimate, if
any, regarding launch of the Marketing Process. For the avoidance of doubt, the Special Master
shall not launch the Marketing Process until otherwise ordered by the Court.

      6.     The Special Master shall deliver a copy of this Order to the United States
Attorney for the District of Delaware ("**USAO**"). The Court hereby requests that, upon receipt,
the USAO take reasonable efforts to ensure that copies of the Order are received by the pertinent
offices within the Executive Branch of the United States Government, including the United States
Department of Justice, Department of State, and Department of the Treasury (including OFAC)
(collectively, the "**Executive Branch**"). Consistent with the Court's prior orders, the Court invites
input from the Executive Branch regarding implementation of this Order and the Bidding
Procedures at any time and further requests that the representatives from the USAO voluntarily
provide an update regarding the Executive Branch's decision-making process related to the
Marketing Process and consummation of a Sale Transaction, including, but not limited to, whether,
in a sale process overseen and directed by this Court in connection with the enforcement of the
judgment(s) of this Court, (i) the Special Master, acting as an arm of this Court, requires an OFAC
specific license to launch and conduct the Marketing Process; (ii) potential bidders participating
in any or all aspect of the Marketing Process require an OFAC specific license; or (iii) an order of
this Court approving the sale, cancellation and reissue, or transfer of property subject of its prior
order, requires a specific OFAC license. If the Special Master determines that it is necessary as a
precondition to launching the Marketing Process he may request that the Court issue an order for

14

**270a**

the Executive Branch to show (i) cause as to why the launch and participation of prospective bidders in the Marketing Process is not authorized and (ii) the facts and circumstances that would be necessary for OFAC to provide approval for any transfer of the PDVH Shares pursuant to the process contemplated by these Sale Procedures.

**The Bidding Procedures**

7.  The Sale Procedures, including the Bidding Procedures, substantially in the form attached hereto as **Exhibit 1**, are hereby approved. The Bidding Procedures are incorporated herein by reference, and shall govern the bids and proceedings related to any sale of PDVH Shares in connection with a Sale Transaction. The failure to specifically include or reference any particular provision of the Bidding Procedures in this Order shall not diminish or otherwise impair the effectiveness of such procedures, it being the Court's intent that the Bidding Procedures are approved in their entirety, as if fully set forth in this Order.

8.  The Special Master is authorized and directed to take all reasonable actions necessary or desirable to implement this Order, including the Sale Procedures and the Bidding Procedures.

9.  Subject to the Bidding Procedures and this Order, the Special Master shall be authorized, as he may reasonably determine is necessary or desirable, to carry out the Bidding Procedures, including, without limitation, to: (a) designate a Stalking Horse Bid, if any, pursuant to the Bidding Procedures; (b) determine which bidders are Qualified Bidders; (c) determine which bids are Qualified Bids; (d) determine which Qualified Bid is the highest purchase price received prior to the Auction; (e) determine which Qualified Bid is the Successful Bid; (f) reject any bid that is (i) inadequate or insufficient, (ii) not a Qualified Bid or otherwise not in conformity with the requirements of the Bidding Procedures, or (iii) not a bid that provides for a value maximizing

WEIL:\98747427\4\67816.0003

Sale Transaction; (g) adjourn the Auction and/or the Sale Hearing by filing a notice on the Court's docket without need for further notice; and (h) modify the Bidding Procedures upon notice to and consultation with the Sale Process Parties in a manner consistent with his duties and applicable law.

         10.    The Special Master shall be authorized to, in his reasonable judgment, upon notice to and consultation with the Sale Process Parties, modify the Bidding Procedures, including (a) waive terms and conditions with respect to any Potential Bidder, (b) extend the deadlines set forth in the Bidding Procedures, (c) announce at the Auction modified or additional procedures for conducting the Auction, and (d) provide reasonable accommodations to a Stalking Horse Bidder with respect to such terms, conditions, and deadlines set forth in the Bidding Procedures to promote further bids by bidders, in each case, to the extent not materially inconsistent with the Bidding Procedures and this Order; *provided* that a Sale Process Party may, within five (5) calendar days, file an objection to any modification, upon which time the Court shall set a briefing schedule for any reply and a hearing, if applicable, to adjudicate such objection.

         11.    All Potential Bidders submitting bids determined by the Special Master to be "Qualified Bids" in accordance with the Bidding Procedures are deemed to have submitted to the exclusive jurisdiction of this Court with respect to all matters related to the Bidding Procedures, the Auction, and any Sale Transaction. Except as provided in an executed definitive Stalking Horse Agreement, and then subject to the terms thereof, nothing in this Order or the Bidding Procedures shall obligate the Special Master to pursue any transaction with a Qualified Bidder.

         12.    The Special Master may, in the exercise of his judgment, identify the highest Qualified Bid(s) that the Special Master reasonably believes to be capable of being timely consummated after taking into account the factors set forth in the Bidding Procedures as the

16

**272a**

successful bid(s) (a "**Successful Bid**" and, the bidder(s) submitting such bid(s), a "**Successful Bidder**"); *provided*, that if the Special Master receives multiple competing Qualified Bids that would satisfy the Attached Judgments in full and which the Special Master reasonably believes to be capable of being timely consummated as set forth above, then the Special Master must designate such Qualified Bid that (i) satisfies the Attached Judgments and (ii) provides for the sale of the fewest PDVH Shares, unless PDVSA consents to the Special Master designating the Qualified Bid for more of the PDVH Shares. As soon as reasonably practicable following selection of a Successful Bid, the Special Master shall file with the Court a notice containing information about the Successful Bidder with the proposed definitive agreement attached thereto (without exhibits or schedules that the Special Master elects to omit) (the "**Notice of Successful Bidder**"). Notwithstanding anything to the contrary in this Order (including the Bidding Procedures), the Special Master shall not designate a Qualified Bid as the Successful Bid if it provides for the sale of more shares than are necessary to satisfy the Attached Judgments; *provided* that if PDVSA informs the Special Master that they wish to sell more of the PDVSA Shares, then the Special Master may consider that view.

13. Upon the selection of a Successful Bidder and as soon as reasonably practicable after the Special Master files the Notice of Successful Bidder (and in no event later than seven (7) days prior to the Sale Objection Deadline), the Special Master shall file a report under seal (and serve a copy to the Sale Process Parties) that provides a summary of the Bids, including their cash and non-cash consideration components. Further, if, pursuant to the Bidding Procedures, the Special Master, in the exercise of his judgment, does not select a Successful Bid following the Bid Deadline, the Special Master shall file a report with the Court under seal (and serve a copy to the Sale Process Parties) explaining the basis and rationale for not selecting any of

17

**273a**

the Bids (if any) as a Successful Bid. In the event the Special Master fails to select a Successful Bid, the Sales Process Parties shall have the right to move the Court to select a Successful Bid from among those presented to the Special Master. In connection with any of the foregoing reports filed under seal, the Special Master shall disclose to the Court (with a copy to the Sale Process Parties) a copy of any Bid(s) received that were not selected by the Special Master as a Successful Bid. Any unsealed version of such reports or Bids filed on the Court's docket shall retain redactions to the names of any bidders or other identifying information and any other redactions to be determined by the Special Master.

14.     For the avoidance of doubt, subject to approval of any Sale Transaction by the Court, the Special Master shall have authority to select a Qualified Bid as the Successful Bid that provides for a transfer of PDVH Shares free and clear of any claims, encumbrances, and liabilities, which, for the avoidance of doubt, upon entry of an order by this Court approving any Sale Transaction and upon the consummation of any such Sale Transaction, may constitute a full and complete general assignment, conveyance, and transfer of all of PDVSA's or any other person's right, title, and interest in the PDVH Shares and may provide for the valid transfer under applicable law of good and marketable title to the PDVH Shares to the Successful Bidder free and clear of all claims, encumbrances, and liabilities; *provided* that such transfer shall be without prejudice to any such claims, encumbrances, and liabilities attaching to the proceeds of any Sale Transaction with the same nature, validity, priority, extent, perfection, and force and effect that such claims, encumbrances, and liabilities encumbered the PDVH Shares immediately prior to the consummation of any Sale Transaction.

15.     The Sale Notice, substantially in the form attached hereto as **Exhibit 2**, is approved, and no other or further notice of the Sale Transaction, the Auction, the Sale Hearing or

18

the Sale Objection Deadline shall be required if the Special Master publishes such notice in accordance with the Notice Procedures. The Sale Notice and publication thereof complies in all respects with and satisfies the requirements of Section 324 of the Delaware General Corporation Law. The Special Master may file on the Court's docket, publish, or otherwise distribute any supplemental notice that he, in his sole discretion, deems appropriate or desirable; *provided* that no such supplemental notice shall be required. All expenses and fees related to implementation of the Marketing Process and Notice Procedures shall constitute "Transaction Expenses" and shall be payable by the Sale Process Parties and holders of any Additional Judgments (as defined below) (the "**Additional Judgment Creditors**"). The Special Master may request that the Sale Process Parties and any Additional Judgment Creditors, collectively, reimburse the Special Master in advance in an amount equal to the amount of any quote received in connection with publication required by the Notice Procedures and, upon any such request, the Sale Process Parties shall each promptly pay their respective share; *provided* that, in the event any Additional Judgment Creditor becomes obligated to pay a portion of the Transaction Expenses pursuant to this Order, the Special Master shall meet and confer with the Sale Process Parties to determine such Additional Judgment Creditor's share of the reimbursement obligation.

## **Objections to Sale Transaction**

16.     The deadline to object to any Sale Transaction to be approved at the Sale Hearing will be **4:00 p.m. (prevailing eastern time) on the fourteenth day after the Special Master files the Notice of Successful Bid** (the "Sale Objection Deadline," and any such objection, a "**Sale Objection**"); *provided* that, the Special Master may extend such deadline, as the Special Master deems appropriate in the exercise of his reasonable judgment. If a timely Sale Objection cannot otherwise be resolved by the parties, such objection shall be heard by the Court

WEIL:\98747427\4\67816.0003

at the Sale Hearing. The Notice of Successful Bid shall state the specific date and time of the Sale Objection Deadline.

17. The Successful Bidder(s) shall appear at the Sale Hearing and be prepared, if necessary, to have a representative(s) testify in support of the Successful Bid and the Successful Bidder's ability to close the Sale Transaction contemplated therein in a timely manner.

18. Any party who fails to timely file with the Court and serve a Sale Objection (including any Sale Process Party) on the Special Master may be forever barred from asserting any Sale Objection to the applicable sale, or to the consummation of any Sale Transaction.

19. For the avoidance of doubt, the Sale Process Parties shall have the opportunity to object to the Special Master's recommendation as to which bid is best and whether the Court should accept or reject such bid. Upon hearing all Sale Objections, the Court will make the final decision as to whether to accept or reject any bid. Nothing in this Order shall affect the rights of any party to appeal such a decision by the Court.

## Designation of Stalking Horse Bidder

20. **Selection of Stalking Horse Bidder**. The Special Master is authorized to, in the exercise of his judgment and at his sole discretion, designate a Stalking Horse Bidder for the PDVH Shares and following such designation, subject to approval by the Court, enter into a Stalking Horse Agreement for the sale of any such PDVH Shares, in accordance with the terms of this Order and the Bidding Procedures.

21. **Stalking Horse Bid Protections**. Subject to the Bidding Procedures and approval by this Court, the Special Master may: (a) establish an initial overbid minimum and subsequent bidding increment requirements not to exceed 5.00% of the Stalking Horse Bid Implied Value, subject to adjustment for any Bids for a lesser percentage of the PDVH Shares than the Stalking Horse Bid (the "**Initial Minimum Overbid Amount**"); (b) offer any Stalking Horse

20

Bidder a break-up fee in an amount agreed to by the Special Master in consultation with the Sale Process Parties, but not to exceed 3.00% of the Stalking Horse Bid Implied Value (a "**Termination Payment**") payable either (i) in the event that an overbid is consummated, out of the proceeds from the consummation of such overbid or (ii) by PDVH, CITGO Holding, Inc. ("**CITGO Holding**," and collectively with CITGO Petroleum, "**CITGO**") and CITGO Petroleum in circumstances where any of PDVH, CITGO Holding, and/or CITGO Petroleum is materially responsible for the events that give rise to termination of the Stalking Horse Agreement; (c) provide that, if the Stalking Horse Bidder bids on PDVH Shares at the Auction, the Stalking Horse Bidder will be entitled to a credit up to the amount of its Termination Payment against the increased purchase price for the PDVH Shares; (d) provide for the reimbursement of reasonable and documented fees and expenses actually incurred by the Stalking Horse Bidder by PDVH, CITGO Holding and CITGO Petroleum solely under certain circumstances in which the transactions contemplated by the Stalking Horse Agreement are not consummated; (e) provide that any sale order shall seek to transfer the PDVH Shares free and clear of any claims upon them; and (f) in consultation with the Sale Process Parties, provide other appropriate and customary protections to a Stalking Horse Bidder (the Termination Payment and the other bid protections described in this paragraph collectively are referred to as the "**Stalking Horse Bid Protections**"). The Special Master is authorized to offer the Stalking Horse Bid Protections at his sole discretion if he determines that such Stalking Horse Bid Protections would be in furtherance of a value maximizing transaction; *provided* that, (a) absent further order of the Court, the Special Master shall not enter into a Stalking Horse Agreement and (b) any Stalking Horse Bid Protections offered shall not be effective until entry by the Court of an order approving such Stalking Horse Bid Protections and subsequent execution by the Special Master of the Stalking Horse Agreement.

21

22. To the extent the Special Master designates a Stalking Horse Bidder with respect to any Sale Transaction, the Special Master shall, as soon as reasonably practicable following the execution of a Stalking Horse Agreement, file with the Court a notice containing information about the Stalking Horse Bidder with the proposed Stalking Horse Agreement attached thereto (without exhibits or schedules that the Special Master elects to omit) (the "**Notice of Stalking Horse Bidder**"). Any Stalking Horse Bid Protections shall be described in reasonable detail, including the amount and calculation of such Stalking Horse Bid Protections and the amount of the Stalking Horse Bid Implied Value, in the Notice of Stalking Horse Bidder. Contemporaneously with the filing of the Notice of Stalking Horse Bidder, the Special Master shall file a proposed order approving the Special Master's entry into the Stalking Horse Agreement.

23. Objections to the Special Master's entry into a Stalking Horse Agreement, including any provision of Stalking Horse Bid Protections in connection therewith (each a "**Stalking Horse Objection**"), must be in writing, state with particularity the basis and nature of any objection, and be filed with the Court no later than 10 calendar days after the filing of the Notice of Stalking Horse Bidder (the "**Stalking Horse Objection Deadline**"), upon which time the Court shall set a briefing schedule for any reply and a hearing, if applicable, to adjudicate such objection.

24. If a timely Stalking Horse Objection is filed and served with respect to a Stalking Horse Agreement, the proposed Stalking Horse Bid Protections provided for under that agreement shall not be approved until the objection is resolved by agreement of the objecting party or by entry of an order by the Court resolving such objection. If no timely Stalking Horse Objection is filed and served with respect to a particular Stalking Horse Agreement, then the Court

22

**278a**

may enter an Order approving the Stalking Horse Bid Protections provided for under such agreement upon the expiration of the Stalking Horse Objection Deadline.

25. For all purposes under the Bidding Procedures, any Stalking Horse Bidder approved as such pursuant to this Order shall be considered a Qualified Bidder, and the Stalking Horse Bid shall be considered a Qualified Bid. In the event that the Stalking Horse Bid is the only Qualified Bid received by the Special Master by the Bid Deadline, the Stalking Horse Bidder shall be deemed the Successful Bidder with respect to the assets set forth in the Stalking Horse Agreement.

## Credit Bids

26. Crystallex, and any other holder of an Attached Judgment, may submit a "credit bid" pursuant to the Bidding Procedures (each, a "**Credit Bid**"); *provided* that such Credit Bid shall comply with the Bidding Procedures, including the requirement that any credit bid include a cash component or other funding mechanism sufficient to pay (or otherwise contemplate payment in full in cash in a manner acceptable to the Special Master; *provided*, that, with respect to any reimbursement of Transaction Expenses owed to a Sale Process Party pursuant to the May Order, such Sale Process Party's consent shall be required if such Sale Process Party is not to be reimbursed in cash) (a) any applicable Termination Payment, (b) all Transaction Expenses, and (c) all obligations secured by senior liens on the PDVH Shares (if any). If any Credit Bidder withdraws its Credit Bid or in any other way fails to consummate its Credit Bid in a manner that would cause any other Bidder to lose its Good Faith Deposit, then the lesser of ten percent (10%) of the portion of the judgment that was Credit Bid or $50 million of the judgment shall be forever waived and the Court shall enter an order reducing the judgment in accordance therewith, provided however that no such forfeiture shall occur if the reason for the withdrawal or failure to consummate the Credit Bid is a settlement or other satisfaction of the judgment. For the avoidance

23

of doubt, a Credit Bid must be submitted by the deadlines set forth in the Bidding Procedures applicable to all other Bids.

27. Except as otherwise agreed by the Special Master, in connection with the submission of any Credit Bid (including a Credit Bid by Crystallex), any party seeking to submit a Credit Bid shall cause two of its representatives to each submit a sworn statement and affidavit that unequivocally and unconditionally states (a) the then outstanding and unpaid amount of such party's judgment as of the date the Credit Bid is submitted and (b) that such representative submits to the personal jurisdiction of this Court in connection with making such statement and affidavit. Except as otherwise agreed by the Special Master, in connection with the consummation of any Credit Bid that becomes the Successful Bid, the same two representatives shall each submit a supplemental statement and affidavit stating that all payments or consideration received by the person or entity in connection with or in respect of the applicable judgment that served as the basis for the Credit Bid have been disclosed to the Court and the Special Master.

28. Any person or entity that submits a Credit Bid shall promptly (but in no event later than within 2 business days) notify the Special Master if such person or entity receives (or otherwise becomes entitled to receive) any payment or consideration in connection with or in respect of the judgment that served as the basis for the Credit Bid.

**Attached Judgments**

29. **Satisfaction of All Attached Judgments.** Nothing in this Order prohibits or in any way impairs the rights of the Venezuela Parties to satisfy Crystallex's Judgment (or any other Attached Judgment) in full prior to consummation of a Sale Transaction. If at any time all Attached Judgments become satisfied in full (or otherwise are consensually resolved), then the Special Master shall cease implementation of the Sale Procedures and seek further direction from the Court. The Sale Process Parties and any Additional Judgment Creditors shall remain liable for

24

any Transaction Expenses incurred through the date that is two business days after the Special Master receives notice of satisfaction of all Attached Judgments. In the event that the Special Master selects a Successful Bid, the value of which implies satisfaction of less than all Attached Judgments, then any holder of an Attached Judgment that receives no proceeds in satisfaction of any part of their Attached Judgment shall be excused from contributing to the payment of any Transaction Expenses incurred after the date thereof. The Sale Process Parties shall be reimbursed for any paid Transaction Expenses as set forth in the May Order; *provided* that if the process is terminated due to satisfaction or resolution of all Attached Judgments by the Venezuela Parties, then, solely in such circumstance (and unless otherwise agreed to by Crystallex and ConocoPhillips), the Venezuela Parties shall pay and reimburse Crystallex and ConocoPhillips for the full amount of all Transaction Expenses paid by Crystallex and ConocoPhillips.

30.     **Additional Judgment Deadline**. By no later than ten calendar days after the Launch Date (the "**Additional Judgment Deadline**"), the Court will decide in accordance with applicable law which, if any, additional judgments (the "**Additional Judgments**," and with the Crystallex Judgment, the "**Attached Judgments**") are to be considered by the Special Master for purposes of the Sale Transaction. Except as otherwise ordered by the Court, following the Additional Judgment Deadline, the Special Master shall implement the Sale Procedures, based on the Attached Judgments as of the Additional Judgment Deadline. For purposes of implementing this Order, the Special Master shall only consider judgments that are determined to be Attached Judgments by the Court by the Additional Judgment Deadline. For the avoidance of doubt, unless otherwise ordered by the Court, (i) the Additional Judgment Deadline does not impair or in any way limit any person's or entity's right to seek attachment to any proceeds following consummation of the Sale Transaction and (ii) no PDVH Shares shall be sold, nor proceeds from

25

**281a**

any sale thereof distributed, to satisfy any judgments that are not Attached Judgments. If ConocoPhillips' Judgment is not made an Attached Judgment following the Additional Judgment Deadline or the Launch Date, whichever is earlier, ConocoPhillips shall be excused from contributing to the payment of any Transaction Expenses incurred thereafter, *provided* that should ConocoPhillips decline to contribute to the funding of the sale process it shall no longer be treated as a Sale Process Party for purposes of this Order. ConocoPhillips' excuse from further funding obligations shall not affect its entitlement to reimbursement for all payments previously advanced, as provided in the May Order.

31. **Final Calculation of Attached Judgments**. Thirty days prior to the designation of a Stalking Horse Bidder, the Special Master will file under seal a notice or recommendation with the Court seeking final determination of any Attached Judgment, including the rate at which interest continues to accrue and serve such notice or recommendation on the holder of the Attached Judgment and the Sale Process Parties. No later than seven calendar days after service, the holder of the Attached Judgment and the Sale Process Parties shall file any objection to the Special Master's notice or recommendation. If no objection is filed, the amount set forth in the Special Master's notice or recommendation shall become the amount of the Attached Judgment for purposes of the Sale Procedures. If an objection is filed, a hearing will be scheduled and the Court shall determine the amount of the Attached Judgment.

32. By no later than 21 calendar days following the Preparation Launch Date, any holder of an Attached Judgment or holder of a judgment seeking to be an Attached Judgment shall deliver to the Special Master and to counsel for the Venezuela Parties a statement indicating the amount such creditor contends remains outstanding with respect to their Attached Judgment or judgment. Such creditor shall provide reasonably sufficient supporting documentation regarding

26

**282a**

any alleged outstanding balance and all amounts and assets received by reason of the Attached

Judgment or judgment and any other information pertinent to understanding the outstanding

balance of the applicable Attached Judgment or judgment.

## Amendments & Additional Powers of the Special Master

33.  **Additional Guidance from the Court**. If the Special Master, in his sole

discretion, but after consultation with the Sale Process Parties, determines that (a) a material

modification or amendment of this Order or the Sale Procedures (including the Bidding

Procedures) that is not otherwise permitted (each a "**Proposed Amendment**") or (b) additional

powers or guidance from the Court, is reasonably necessary or desirable for any reason, including

to (i) ensure a value maximizing sale process or (ii) effectuate a value maximizing sale process

through a Sale Transaction, the Special Master may seek such Proposed Amendment or additional

powers or guidance, as applicable, by filing a request or recommendation with the Court with

notice to the Sale Process Parties.

34.  **Requests of the Special Master**. In addition to the cooperation provisions

in the May Order, the Sale Process Parties, including CITGO and PDVH, and each of their

subsidiaries, including their directors, officers, managers, employees, agents, and advisors, shall

promptly cooperate and comply with the requests of the Special Master. If the Special Master

specifically invokes this paragraph 34 in connection with any such request, then the person or

entity that is the subject or recipient of such request shall comply no later than five (5) business

days after the date upon which the request was made, unless the Special Master sets a different

deadline for which a response is due. If any person objects to a request by the Special Master that

specifically invokes this paragraph 34, including objections based on a belief that such request is

unreasonable, such person shall file a motion with the Court seeking relief from the Special

Master's request. Absent a motion seeking relief from the Court, the Special Master may (but

27

shall have no obligation to) explain the basis of his request to the subject or recipient; *provided* that, if requested by the subject or recipient, the Special Master shall meet and confer with such person at least one business day before such person's deadline to file a motion seeking relief from the Special Master's request. The Special Master may, in his sole discretion, recommend to the Court appropriate sanctions with respect to any person or entity that fails to promptly comply with a request absent a timely request for relief from the Court. For the avoidance of doubt, the terms of this paragraph are in addition to the terms of the May Order; *provided* that the scope of the May Order shall in no way be read to limit the effect of this paragraph.

35. **CITGO Management Team**. Without limiting paragraph 34, if requested by the Special Master, CITGO shall use reasonable efforts to make members of the CITGO management team available for meetings with bidders or potential bidders, which may include, in the Special Master's sole discretion, the most senior members of the CITGO management team. CITGO shall further use reasonable efforts to timely respond to the Special Master's diligence requests or bidder-specific questions, including, if applicable, by providing accurate and complete due diligence materials, documentation, and backup support requested by the Special Master.

36. **Additional Powers of the Special Master**. In addition to the duties and powers set forth in this Order, the Special Master shall have all of the powers and duties set forth in prior orders of the Court, including the May Order. Without limiting the foregoing, the Special Master may issue, without limitation, orders, subpoenas and interrogatories to any person in the course of performing his duties. Further, the Special Master may, in his sole discretion and consistent with Rule 53 of the Federal Rules, issue orders to compel delivery of information from any person or entity in connection with implementing the Sale Procedures, including to ensure a comprehensive and value-maximizing sale process, to ensure that property that is directly or

28

indirectly the subject of this Order is not transferred or otherwise encumbered by the Venezuela Parties or to determine the amount of claims against the Venezuela Parties. Following consultation with the Sale Process Parties, the Special Master may by order impose on a party any non-contempt sanction provided by Rule 37 or Rule 45 of the Federal Rules, and may recommend a contempt sanction against a party and sanctions against a nonparty, consistent with Rule 53(c) of the Federal Rules.

### Additional Provisions

37. **Rosneft Trading S.A.** The *Consent Order Regarding Disclosure by Rosneft Trading S.A. and Petróleos de Venezuela, S.A. Regarding CITGO Holding Pledge* (D.I. 396) (the "**Rosneft Consent Order**") is incorporated herein by reference as if fully set forth herein.

38. **Dispute Resolution**. All bidders that participate in the sale and bidding process shall be deemed to have (a) consented to the jurisdiction of the Court to enter any order or orders, which shall be binding in all respects, in any way related to the Sale Procedures or Bidding Procedures, bid process, the Auction, the Sale Hearing, or the construction, interpretation, and enforcement of any agreement or any other document relating to a Sale Transaction; (b) waived any right to a jury trial in connection with any disputes relating to the Sale Procedures or Bidding Procedures, the bid process, the Auction, the Sale Hearing, or the construction, interpretation, and enforcement of any agreement or any other document relating to a Sale Transaction; and (c) consented to the entry of a final order or judgment in any way related to the Sale Procedures or Bidding Procedures, the bid process, the Auction, the Sale Hearing, or the construction, interpretation, and enforcement of any agreement or any other document relating to a Sale Transaction if it is determined that the Court would lack jurisdiction to enter such a final order or judgment absent the consent of the parties.

29

39. **Communications & Negotiations with Third Parties**. The Special Master is authorized and empowered, in his sole discretion and at any time, to communicate and, as applicable, negotiate with any bidder, potential bidder, or governmental or regulatory body. Further, in consultation with the Sale Process Parties, the Special Master is authorized and empowered, in his sole discretion and at any time, to communicate and, as applicable, negotiate with any other person or entity, including any contract counterparty, any indenture trustee, administrative agent, or collateral agent, any holders of that certain series of bonds issued by PDVSA due in 2020 (the "**PDVSA 2020 Bondholders**") or other person related to PDVH, CITGO, and their affiliates to the extent reasonably necessary or desirable in connection with preparation of the Supplemental Report and implementation of the Sale Procedures and any Sale Transaction. If the Special Master determines it is reasonably necessary or desirable to negotiate a change, modification, or amendment to, or seek a consent or waiver under, any contract of PDVH, CITGO, or any of their subsidiaries in connection with any Bid or Potential Bid or implementation of the Sale Procedures or any Sale Transaction, including with respect to any "change-of-control" provisions in any contract, the Special Master shall work with PDVH and CITGO, as applicable, to negotiate such change, modification, amendment, consent, or waiver. If either PDVH or CITGO, as applicable, do not cooperate with or otherwise consent to any particular negotiation, change, modification, amendment, consent, or waiver, the Special Master shall seek additional guidance from the Court and shall not proceed absent further order from the Court.

40. **Communications with Potential Bidders**. The Sale Process Parties (other than the Venezuela Parties) shall not, directly or indirectly, contact or otherwise communicate with any Potential Bidders regarding this Order, the Sale Procedures, any bid or potential bid, or any

30

Sale Transaction, other than as expressly permitted in writing by the Special Master or otherwise authorized by this Court. Subject in all cases to the *Special Master Confidentiality Order* (D.I. 291) (the "**Protective Order**"), nothing herein restricts the Venezuela Parties' ability to communicate with Potential Bidders or any other third-party, including by placing public advertisements regarding the Marketing Process and the Sale Transaction, *provided* that (a) the Venezuela Parties shall not disclose any nonpublic terms regarding the Bids of any Potential Bidder that the Venezuela Parties have learned as a Consultation Party or by any other means, (b) the Venezuela Parties shall provide the Special Master and his Advisors with advance notice prior to engaging in any form of communication with Potential Bidders, and (c) any information provided to the Potential Bidders by the Venezuela Parties shall be made available to the Special Master and all other Potential Bidders. If the Venezuela Parties communicate with any Potential Bidders, the Special Master may (in his sole discretion) disclose the identity of such Potential Bidders to the Sale Process Parties. If, during the course of implementing this Order, the Special Master believes that any of the Venezuela Parties is communicating with Potential Bidders in a manner that will impair or inhibit the ability of the Special Master to obtain value-maximizing Bids, the Special Master may inform the Court and the Court will consider appropriate amendments to this Order. For the avoidance of doubt, this paragraph 40 does not prevent or prohibit contact or communications in the ordinary course of business consistent with past practice on matters unrelated to this Order, the Sale Procedures, any bid or potential bid, or any Sale Transaction.

41.     The Sale Process Parties may propose a list of Potential Bidders for the Special Master to solicit Bids from in connection with the Marketing Process and the Special Master shall consider in good faith inclusion of such Potential Bidders. If the Special Master elects

31

to exclude or declines to solicit a Bid from a Potential Bidder identified by a Sale Process Party, the Special Master shall notify the applicable Sale Process Party of such decision as soon as reasonably practicable thereafter and, if appropriate, explain his rationale for the decision. If the applicable Sale Process Party reasonably believes that the Special Master inappropriately or unfairly excluded or declined to solicit a Bid from a Potential Bidder identified by such Sale Process Party, then such Sale Process Party shall file a letter that shall not exceed three pages with the Court and serve such letter on the Special Master and the other Sale Process Parties. The Special Master shall have two business days following service to respond by letter not to exceed three pages. After considering the parties' submissions, the Court will issue an appropriate order.

42. **Communications among Sale Process Parties.** Subject in all cases to the *Special Master Confidentiality Order* (D.I. 291) (the "**Protective Order**"), nothing in this Order prohibits the Sale Process Parties from communicating with each other; *provided* that such communications do not involve or relate to colluding in connection with a Bid that has been submitted or may be submitted by the applicable Sale Process Party or a Bid by any Potential Bidder. For the avoidance of doubt, this provision is not intended to limit in any way the ability of some or all of the Sale Process Parties to discuss settlement or satisfaction of any Attached Judgment or to discuss the terms, content, or grounds of any potential objection to be filed with the Court. The Special Master shall consult with the Sale Process Parties periodically and as appropriate in implementing the Sale Procedures.

43. **Sharing of Information with Potential Bidders**. Upon giving notice to the applicable Sale Process Party, the Special Master shall be permitted, in his sole discretion, to share any and all information obtained related to the Sale Process Parties, regardless of whether marked or designated "confidential" or "highly confidential" pursuant to the Protective Order, with

32

any bidder or potential bidder that has entered into a confidentiality arrangement in the form attached hereto as **Exhibit 4** (the "**Confidentiality Agreement**"); *provided* that the Special Master shall be authorized to make reasonable changes to the extent requested by a Potential Bidder. The Special Master shall file each executed Confidentiality Agreement under seal with the Court and shall provide notice of execution of such Confidentiality Agreement to the Sale Process Parties. The Special Master shall exercise reasonable care in providing confidential information to bidders and Potential Bidders and, if applicable, shall use reasonable efforts to consult any Sale Process Party that marks or designates any information as "confidential" or "highly confidential" prior to its disclosure to any Potential Bidder. The Special Master shall use reasonable efforts to consult PDVH and CITGO in connection with sharing competitively sensitive information and, if determined to be appropriate by the Special Master, to establish firewall protections or "clean team" protocols with respect to any Potential Bidder that is a competitor, customer or supplier or under such other circumstances as the Special Master determines to be appropriate. Notwithstanding the foregoing, solely with respect to information designated as "highly confidential" by ConocoPhillips, unless the Court orders otherwise, the Special Master shall seek the reasonable consent of ConocoPhillips, which consent shall not be unreasonably withheld, prior to disclosing any such information to any Potential Bidder. Notwithstanding the foregoing, unless otherwise ordered by the Court, the Special Master shall not disclose to any Potential Bidders the limited set of documents that the Special Master and the Venezuela Parties have agreed in writing (email shall suffice) shall not be disclosable pursuant to this paragraph 43.

    44. **Sharing of Information with the United States**. The Special Master shall be authorized to share with the United States information obtained related to the Sale Process Parties and any bidder or potential bidder that the Special Master determines, in his sole discretion,

33

**289a**

is reasonably necessary or desirable in connection with the issuance of any regulatory approval or is reasonably necessary or desirable in connection with implementation of the Sale Procedures and any Sale Transaction, including any guidance or license from OFAC, *provided* that the Special Master shall request confidential treatment of information shared with the United States that has been designated as confidential or highly confidential by a Sale Process Party.

45. **Engagement of Advisors**. The Special Master has retained, as approved by the May Order and as affirmed by this Order, the Advisors. The Special Master's engagement of Evercore, pursuant to the Proposed Evercore Engagement Letter, is hereby approved and the terms of the Engagement Letter in all respects shall be binding on the Special Master, including with respect to payment of the Upfront Amount of the Sale Fee by the Sale Process Parties. Any amounts owed to Evercore under the Proposed Evercore Engagement Letter shall be payable to Evercore pursuant to the terms of the May Order, including the Sale Fee and the Upfront Amount of the Sale Fee; *provided* that in no circumstance absent further order of the Court, shall any Sale Fee (other than the Upfront Amount) be payable directly by the Sale Process Parties and any such amount shall, in each circumstance, be payable out of any proceeds or other cash consideration provided in connection with a Sale Transaction after the Sale Process Parties have been reimbursed pursuant to the terms of the May Order.

46. **Judicial Immunity & Exculpation**. The Special Master is entitled to judicial immunity in performing his duties pursuant to this Order, including all actions taken to implement the Sale Procedures, and all other orders of the Court. The Special Master's Advisors are entitled to judicial immunity in connection with all actions taken at the direction of, on behalf of, or otherwise in connection with representation of or advising the Special Master. No person or entity shall be permitted to pursue any cause of action or commence or prosecute any suit or

34

proceeding against the Special Master or the Advisors, or their respective employees, officers, directors, attorneys, auditors, representatives, agents, successors or assigns, for any reason whatsoever relating to the Crystallex Case, implementation of the Sale Procedures, or in connection with any Sale Transaction, or the performance of the Special Master's and his Advisors' duties pursuant to this Order or any other orders of the Court, or any act or omission by the Special Master or any Advisor in connection with the foregoing. All interested persons and entities, including but not limited to the Sale Process Parties, any purchaser or prospective purchaser of the PDVH Shares, and all persons acting in concert with them, are hereby enjoined and restrained from pursuing any such cause of action or commencing any such action or proceeding. If any person or entity attempts to pursue any such cause of action or commence any suit or proceeding against the Special Master or any of the Advisors with knowledge of this Order (or continues to pursue or prosecute any cause of action, suit or proceeding after having received notice of this Order), the Court shall issue an order to show cause to such person or entity and a hearing will be scheduled to consider appropriate relief, which may include payment of fees and expenses incurred by the Special Master or any of the Advisors in connection therewith. To the maximum extent permitted by applicable law, neither the Special Master nor his Advisors nor their respective employees, officers, directors, attorneys, auditors, representatives, agents, successors and assigns will have or incur, and are hereby released and exculpated from, any claim, obligation, suit, judgment, damage, demand, debt, right, cause of action, remedy, loss, and liability for any claim in connection with or arising out of all actions taken to implement the Marketing Process, Sale Procedures, Bidding Procedures, or Sale Transaction, or the performance of the Special Master's and his Advisors' duties pursuant to this Order and all other orders of the Court.

35

47. **Payment of Transaction Expenses**. The Special Master shall be compensated and reimbursed for all expenses (including fees and expenses of his Advisors) on a monthly basis by the Sale Process Parties pursuant to the procedures set forth in the May Order (collectively, such compensation and expenses, the "**Transaction Expenses**"), which Transaction Expenses shall be shared by the Sale Process Parties and any Additional Judgment Creditors, pursuant to this Order; *provided* that the Special Master shall have the discretion to seek from the Court authorization to reallocate payment of any Transaction Expenses if the circumstances require (*e.g.*, if any single Sale Process Party generates an inordinate number of disputes or if a Sale Process Party's position in a dispute is found to be unreasonable); *provided, further*, that any Additional Judgment Creditor shall be obligated to reimburse its share of the Transaction Expenses pursuant to the May Order (as if such Additional Judgment Creditor were a Sale Process Party) and this Order (for purposes of determining such Additional Judgment Creditor's share of the reimbursement obligation) . The Special Master shall comply with the procedures established pursuant to the Court's *Memorandum Order* (D.I. 338) and any subsequent order of the Court regarding the provision of a budget to the Sale Process Parties.

48. **Location of PDVH Shares**. By no later than 30 calendar days after entry of this Order, the Venezuela Parties, including PDVSA, shall inform the Special Master as to the specific and precise physical location of the PDVH Shares held by PDVSA or any other facts relevant for determining the physical location of the PDVH Shares held by PDVSA and the custodian of the shares. If the applicable Venezuela Party is unaware of the location of the PDVH Shares, such party shall inform the Special Master as such in writing. If at any point thereafter the applicable Venezuela Party becomes aware of any change in circumstance regarding the location of the PDVH Shares, then such party shall update the Special Master in writing.

36

**292a**

49.     If the location of the PDVH Shares cannot be located with reasonable precision or if the Special Master reasonably determines that the custodian of the PDVH Shares is unlikely to cooperate in connection with an order compelling the person or entity to transfer the PDVH Shares in connection with any Sale Transaction, the Special Master shall file a recommendation with the Court in advance of the Sale Hearing regarding the appropriate steps to be taken to ensure that the Successful Bidder is able to actually purchase the applicable PDVH Shares in connection with the applicable Sale Transaction.  The Special Master's recommendation may include, if appropriate, an order compelling PDVH to issue new certificates or uncertificated shares to the applicable Successful Bidder and cancel the registration of the shares attached to the books of PDVH.

50.     **Delaware Code, Title 10, Section 5072.**  For the avoidance of doubt, the 5-year period for execution upon a judgment in a civil action set forth in 10 *Del C.* § 5072 is satisfied or otherwise tolled with respect to the PDVH Shares.

51.     **Other Provisions**.  All provisions of the May Order shall remain in full force and effect, except for any that directly and irreconcilably conflict with an express provision of this Order; *provided* that nothing in the May Order shall in any way be used to limit the scope of the terms and provisions of this Order.

52.     The Special Master is authorized to make non-substantive changes to the Bidding Procedures, the Sale Notice, and any related documents without further order of the Court, including, without limitation, changes to correct typographical and grammatical errors.

53.     The terms and conditions of this Order shall be immediately effective and enforceable upon its entry.

37

54.     In addition to and without limiting any of the provisions set forth herein, the

Special Master is authorized to take all reasonable steps necessary or appropriate to carry out this

Order.

55.     This Court shall retain jurisdiction to hear and determine all matters arising

from or related to the implementation, interpretation, or enforcement of this Order.

Dated: _____, 2022
     Wilmington, Delaware

 

_____
HONORABLE LEONARD P. STARK
UNITED STATES ~~DISTRICT~~ JUDGE
        CIRCUIT

WEIL:\98747427\4\67816.0003



800 N. State Street, Suite 304
Dover, DE 19901
302 984 6000
www.potteranderson.com

Myron T. Steele
Partner
Attorney at Law
msteele@potteranderson.com
302 984-6030 Direct Phone

October 4, 2022

**BY HAND DELIVERY & CM/ECF**

The Honorable Leonard P. Stark
United States District Court for the District of Delaware
J. Caleb Boggs Federal Building
844 North King Street
Wilmington, DE 19801-3570

Re:     *Crystallex International Corp. v. Bolivarian Republic of Venezuela*,
        D. Del. C.A. No. 1:17-mc-00151-LPS

Dear Judge Stark:

Pursuant to the Court's Order dated September 29, 2022, I write to submit this joint status report ("**Joint Status Report**") on behalf of Special Master Robert B. Pincus (the "**Special Master**"), as well as Crystallex, the Venezuela Parties, and ConocoPhillips (collectively, the "**Sale Process Parties**," and each a "**Sale Process Party**") in the above-referenced matter. Consistent with the Order, the Special Master consulted with the Sale Process Parties regarding the contents of this Joint Status Report.[1]

**Joint Statement**

On September 29, 2022, the Court issued an *Oral Order* [D.I. 479] (the "**Order**") in which the Court (i) authorized the Special Master to engage in discussions with the PDVSA 2020 Bondholders regarding the sale process, (ii) directed the Special Master and the Sale Process Parties to meet and confer, and (iii) directed the Special Master to submit, no later than by 2:00 PM on Tuesday, October 4, 2022, an updated Proposed Sale Procedures Order reflecting the passage of time since the Fifth Revised Proposed Sale Procedures Order [D.I. 472-1 Ex. A] and this Joint Status Report setting out the Special Master's and the Sale Process Parties' positions, if any, as to next steps.

On October 3, 2022, the Special Master and the Sale Process Parties met and conferred to discuss the Court's instructions as set forth in the Order.  Following such discussions, the Special Master

---

[1] Capitalized terms used but not defined shall have the meaning ascribed to such terms below or, if not defined below, the meaning ascribed to such terms in the Sixth Revised Proposed Sale Procedures Order.

The Honorable Leonard P. Stark
October 4, 2022
Page 2

and the Sale Process Parties have agreed to submit this Joint Status Report. Per the Court's instructions in the Order, a final proposed sale procedures order (the "**Sixth Revised Proposed Sale Procedures Order**") is attached as **Exhibit A** hereto. As per the Order, the Sixth Revised Proposed Sale Procedures Order modifies the dates and deadlines set forth in the Fifth Revised Proposed Sale Procedures Order to account for the passage of time, as reflected in the redline attached as **Exhibit B** hereto.

With respect to next steps that the Court should take, the Special Master respectfully submits as follows.

The Special Master intends to carry out his duties and tasks as described in the Sixth Revised Proposed Sale Procedures Order as promptly as possible according to the timeline set forth therein. Accordingly, upon entry of the Sixth Revised Proposed Sale Procedures Order, the Special Master intends to (i) engage with the Executive Branch, including OFAC, to seek clarity or guidance on its support for (or non-opposition to) the launch of the Marketing Process,[2] (ii) execute the original Proposed Evercore Engagement Letter,[3] and (iii) thereafter, carry out his duties in preparation for

---

[2] The Venezuela Parties have requested that the Special Master include the Sale Process Parties in discussions with OFAC; however, at this time, the Special Master does not intend to include the Venezuela Parties at such meeting, but such position may change in the future.

[3] While the Special Master plans to activate Evercore's services (and, by extension, its monthly fees for such services) shortly after submission of the Supplemental Report to facilitate initial communications with Potential Bidders before the Preparation Launch Date, the Special Master reserves the right to activate Evercore's services on an earlier date if he deems such services necessary to perform his duties. The Special Master will keep the Sale Process Parties apprised of any change in the timing of his decision to activate Evercore's services. (The Venezuela Parties object to the Special Master's discretion to activate Evercore prior to the Preparation Launch Date without further leave of Court and to Evercore's entitlement to a monthly fee prior to the Preparation Launch Date. The Venezuela Parties submit that (i) under the Proposed Evercore Engagement Letter, Evercore's monthly fees do not begin to accrue until "the Special Master provides Evercore with . . . written notice of his determination to begin preparations for the Marketing Process," Proposed Evercore Engagement Letter ¶ 2(a), and (ii) under the Proposed Sale Procedures Order, the Special Master cannot begin such preparations until the "Preparation Launch Date," which is defined as "the date on which preparation for the Marketing Process is launched" and which will not occur until after order of the Court following submission of the Supplemental Report from the Special Master and briefing by the parties, D.I. 472-1 ¶ 3. The Special Master does not agree with the foregoing interpretation of the Proposed Sale Procedures Order or the Proposed Evercore Engagement Letter and has advised the Venezuela Parties of his position and the basis for it. Nevertheless, the Special Master, of course, has not and will not incur professional fees unless necessary to perform his duties and has been very circumspect on these issues throughout his engagement with the Court; however, the Special Master must reserve the

The Honorable Leonard P. Stark
October 4, 2022
Page 3

the Marketing Process as provided in the Sixth Revised Proposed Sale Procedures Order.

The Special Master further notes that he intends to commence discussions with the advisors to the PDVSA 2020 Bondholders in furtherance of a value-maximizing transaction, subject to the limitations set forth in the Order.[4]

The Special Master is not aware of any positions contrary to the positions stated in this Joint Status Report that have not already been ruled on by the Court. The Venezuela Parties maintain all of their previous objections.

The Special Master has informed the Sale Process Parties that if they have any views different from those stated in this Joint Status Report, they should make the Court aware.

Respectfully,

*/s/ Myron T. Steele*

Myron T. Steele (#00002)

*Counsel for Special Master*
*Robert B. Pincus*

MTS/mas/10362624
cc:     All Counsel (via CM/ECF)

---

right, if necessary, to have Evercore assist the Special Master to perform his duties in advance of the Preparation Launch Date.)

[4] The Venezuela Parties maintain their objection to the Special Master's intended discussions with the PDVSA 2020 Bondholders.

Case 1:17-mc-00151-LPS Document 543-23 Filed 03/22/22 Page 344 of 587 PageID #: 13704

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

---

CRYSTALLEX INTERNATIONAL
CORPORATION,

       Plaintiff,

     v.

BOLIVARIAN REPUBLIC OF VENEZUELA,

       Defendant.

Misc. No. 17-151-LPS

---

Raymond J. DiCamillo, Jeffrey L. Moyer, and Travis S. Hunter, RICHARDS, LAYTON & FINGER, P.A., Wilmington, DE

Robert L. Weigel, Jason W. Myatt, and Rahim Moloo, GIBSON, DUNN & CRUTCHER LLP, New York, NY

Miguel A. Estrada, Lucas C. Townsend, and Adam M. Smith, GIBSON, DUNN & CRUTCHER LLP, Washington, DC

     Attorneys for Crystallex International Corporation

Kenneth J. Nachbar and Alexandra M. Cumings, MORRIS, NICHOLS, ARSHT & TUNNELL LLP, Wilmington, DE

Michael J. Gottlieb, David J. L. Mortlock, and Samuel G. Hall, WILLKIE FARR & GALLAGHER LLP, Washington, DC

Nathan P. Eimer, Lisa S. Meyer, Daniel D. Birk, and Gregory M. Schweizer, EIMER STAHL LLP, Chicago, IL

     Attorneys for PDV Holding, Inc. and CITGO Petroleum Corp.

Samuel Taylor Hirzel, II, HEYMAN ENERIO GATTUSO & HIRZEL LLP, Wilmington, DE

Joseph D. Pizzurro, Julia B. Mosse, Kevin A. Meehan, and Juan O. Perla, CURTIS, MALLET-PROVOST, COLT & MOSSE LLP, New York, NY

     Attorneys for Petróleos de Venezuela, S.A.

**298a**

A. Thompson Bayliss and Stephen C. Childs, ABRAMS & BAYLISS LLP, Wilmington, DE

Donald B. Verrilli, Jr., Elaine J. Goldberg, Ginger D. Anders, Brendan B. Gants, and Jacobus P. van der Ven, MUNGER, TOLLES & OLSON LLP, Washington, DC

George M. Garvey, MUNGER, TOLLES & OLSON LLP, Los Angeles, CA

      Attorneys for Bolivarian Republic of Venezuela


Garrett B. Moritz, ROSS ARONSTAM & MORITZ LLP, Wilmington, DE

Michael S. Kim, Marcus J. Green, and Josef M. Klazen, KOBRE & KIM LLP, New York, NY

Richard G. Mason, Amy R. Wolf, and Michael H. Cassel, WACHTELL, LIPTON, ROSEN & KATZ, New York, NY

      Attorneys for Phillips Petroleum Co. Venezuela Ltd. and ConocoPhillips Petrozuata B.V.


Myron T. Steele, Matthew F. Davis, and Abraham Schneider, POTTER ANDERSON & CORROON LLP, Wilmington, DE

Ray Schrock, Alexander W. Welch, and Jason L. Hufendick, WEIL, GOTSHAL & MANGES LLP, New York, NY

      Attorneys for Special Master Robert B. Pincus

---

## OPINION

March 2, 2022
Wilmington, Delaware

STARK, U.S. District Judge:

Much has happened in this long-running litigation.[1]  Much more remains to be done. As the Third Circuit expressly stated just weeks ago, "the District Court's judicial role in this civil action is far from over."  *Crystallex Int'l Corp. v. Bolivarian Republic of Venezuela*, 24 F.4th 242, 255 (3d Cir. 2022) ("*Crystallex II*").[2]

In this Opinion, the Court addresses, and rejects, what the Bolivarian Republic of Venezuela, Petróleos de Venezuela, S.A. ("PDVSA"), PDV Holding, Inc. ("PDVH"), and CITGO Petroleum Corporation (collectively, the "Venezuela Parties") describe as "the

---

[1] For example, on August 9, 2018, this Court authorized the issuance of a writ of attachment.  *See generally Crystallex Int'l Corp. v. Bolivarian Republic of Venezuela*, 333 F. Supp. 3d 380 (D. Del. 2018) (D.I. 79).  The Third Circuit affirmed that decision.  *See generally Crystallex Int'l Corp. v. Bolivarian Republic of Venezuela*, 932 F.3d 126 (3d Cir. 2019) ("*Crystallex I*").  The Supreme Court subsequently denied a petition for a writ of certiorari. *Bolivarian Republic of Venezuela v. Crystallex Int'l Corp.*, 140 S. Ct. 2762 (2020) (mem.).

[2] On January 14, 2021, this Court issued an opinion denying a motion to quash a writ of attachment and a motion for relief from final judgment.  *See generally Crystallex Int'l Corp. v. Bolivarian Republic of Venezuela*, 2021 WL 129803 (D. Del. Jan. 14. 2021) (D.I. 234).  The Court also announced at that time that it would appoint a Special Master to design and implement the sale process.  *See id.* at *17.

In *Crystallex II*, the most recent appeal to be generated by this litigation, the Third Circuit dismissed the Venezuela Parties' appellate challenge to this Court's denial of the motion to quash and the Court's decision to begin developing sale procedures.  Applying a "practical test" – which, in this post-judgment context, asks whether "all that remains is for a non-judicial officer to take and dispose of the defendant's property" – the Third Circuit concluded that this Court had not yet reached a final, appealable decision.  *Crystallex II*, 24 F.4th at 249 (internal quotation marks omitted).  The Third Circuit explained: "The District Court must, at the very least, still rule on pending legal objections to the special master's recommended judicial sale procedures. The District Court's judicial involvement is ongoing . . . [and] there is no practical finality."  *Id.* The Third Circuit additionally held that this Court's "decision to determine sale procedures in the future with the advice of a special master" was non-final and unappealable.  *Id.* at 256.

1

**300a**

fundamental problems" with the Proposed Sale Procedures Order ("Proposed Order")[3] submitted by the Special Master. (D.I. 423 at 1) These objections have been the subject of extensive briefing (*see, e.g.*, D.I. 316, 317, 319, 339, 340, 341, 343, 385, 406, 408, 418, 419, 421, 423) and nearly a full day of oral argument on November 8, 2021 (*see* D.I. 409) ("Tr.").[4]

## I.   Neither Evercore Nor The Special Master Has A Disqualifying Conflict Of Interest

The Venezuela Parties contend that the role played to date by the Special Master's investment bank advisor, Evercore Group L.L.C. ("Evercore"), and the Special Master's proposed role for Evercore in implementing the Proposed Order, create a nonwaivable, incurable conflict of interest for Evercore (and perhaps also for the Special Master). In particular, the Venezuela Parties point to the Proposed Order's inclusion of a contingency fee, or success fee, that could result in payments in excess of $30 million to Evercore. (*See* D.I. 303 at 11-12)[5] In

---

[3] The most recently-filed version of the Proposed Order is the Third Revised Proposed Sale Procedures Order. (D.I. 411-1; *see also* Tr. at 20 (Special Master describing Proposed Order as "quite lengthy," which is unsurprising given that it involves "a multi-billion dollar enterprise" and reflects input from multiple parties having their own competing "parochial interest[s]")) In response, the Venezuela Parties filed an Updated Summary and Status of the Sales Process Parties' Objections to Sale Procedures Order. (D.I. 423-2) With respect to the "fundamental" issues addressed by the Court in the instant Opinion, the differences between the multiple versions of the Proposed Order and the various iterations of the Venezuela Parties' objections are largely immaterial.

[4] The Court reviews all objections involving factual or legal issues *de novo*. (D.I. 277 at 7; *see also* Fed. R. Civ. P. 53(f)(3))

[5] More specifically, the Venezuela Parties contend:

> Evercore advised the Special Master's design of a proposed sale procedures order while anticipating that it would receive a contingency fee based on the total amount sold. That conflict is particularly acute given that Evercore's fee will also include 0.35% of all of the debt of PDVH and its direct and indirect subsidiaries if

2

the Venezuela Parties' view, Evercore has an interest that could be substantially affected by the outcome of the instant proceedings, resulting in Evercore's impartiality being reasonably questioned. (*See* D.I. 317 at 16-18) The Venezuela Parties reason that, if the Proposed Order is adopted and implemented, "Evercore will, for [its] own personal gain, encourage [the Special Master] to recommend to the Court a process that ensures the sale of 100% of the PDVH Shares." (D.I. 303 at 12; *see also* D.I. 317 at 16-18) According to the Venezuela Parties, then, Evercore (and possibly the Special Master) must be disqualified under 28 U.S.C. § 455(a) and (b)(4), and the effort to craft a Proposed Order must begin again. (*See* Tr. at 47; *see also* D.I. 385 at 6 ("The only way to cure Evercore's conflict of interest is to reject the Special Master's recommendation and instruct him to conduct a new process after retaining an unconflicted financial advisor."); D.I. 423 at 7)

The Court concludes that neither Evercore nor the Special Master suffers from a conflict of interest. The Venezuela Parties' requests that Evercore be disqualified and that the Proposed Order be discarded due to a conflict of interest are rejected. Their objections on these points are overruled.

The judicial impartiality requirements of 28 U.S.C. § 455 extend to special masters. *See* Fed. R. Civ. P. 53(a)(2). A special master must be disqualified if he has "any . . . interest that could be substantially affected by the outcome of the proceeding." 28 U.S.C. § 455(b)(4). Additionally, a special master must be disqualified if "his impartiality might reasonably be

––––––––––––––––––––––––
> 100% of the shares are sold – a powerful incentive for Evercore to structure and implement a process designed to achieve that result – even for a fire sale price – rather than a sale of a minority stake of PDVH.

(D.I. 385 at 2-3) (footnote omitted)

questioned." *Id.* § 455(a).   The relevant inquiry is whether an "objective, reasonable

layperson," who is aware of all the facts, would determine that the judicial officer's impartiality

might reasonably be questioned.   *In re Kensington Int'l Ltd.*, 368 F.3d 289, 301-03 (3d Cir.

2004).

As an initial matter, a key factual premise underlying the Venezuela Parties' objection is

not correct.   For the alleged conflict to exist, it is necessary that Evercore be retained not just at

the first stage of the Court's process (the design of the Proposed Order) but also at the second

stage (the implementation of the sale process).   (*See* Tr. at 142, 145, 157-58)   Although the

Venezuela Parties and their financial advisor assert that Evercore has been retained for (or at

least promised) the second-stage assignment,[6] the record does not support this contention.

Instead, the Special Master has proven by a preponderance of the evidence, and the Court finds,

that Evercore has *not* been promised a contingency fee at the implementation stage as partial

compensation for work that it has already performed at the design stage.   (*See, e.g.*, Tr. at 161-

62)[7]

_____

[6] The Venezuela Parties allege that "Evercore assumed the roles of advisor, proposer, and
***implementer*** of the process, even ***granting itself a 'success' fee*** based on the size of the
transaction." (D.I. 317 at 4) (emphasis added)   That is inaccurate, as explained in this section
of the Opinion.   The Venezuela Parties' declarant, Randall J. Weisenburger, has the same
misunderstanding.   (*See, e.g.*, D.I. 317-1 at 6) ("Where the Special Master's process went astray
was in tasking Evercore with assisting with due diligence ***and*** with designing a transaction
process that ***Evercore itself would eventually run and collect enormous fees for completing***.")
(second emphasis added)

[7] The Court's conclusion is based on and entirely supported by the record.   (*See, e.g.*, Tr.
at 142 (Venezuela Parties agreeing that Evercore performed work during design stage for ***fixed***
fee); *see also id.* at 161-62 (Special Master confirming that Evercore was not paid contingency
fee for work to date))   In an abundance of caution, the Court conferred with the Special Master
on this point.   (The parties are reminded that the Court may meet, has met, and expects to

4

**303a**

For example, the record includes a declaration from William O. Hiltz, a Senior Managing

Director at Evercore.  Mr. Hiltz states:

> On June 2, 2021, Evercore was engaged to provide investment
> banking and advisory services in connection with the Special
> Master's ***design of a plan*** for the sale of shares . . . as necessary to

———————————

continue to meet *ex parte* with the Special Master.  *See generally* D.I. 277 at 5 ("The Special
Master may communicate *ex parte* with the Court, any Party, any Party's attorneys,
ConocoPhillips, and ConocoPhillips' attorneys at the Special Master's discretion as necessary to
carry out his duties."))  The Special Master provided a copy of the June 2, 2021 engagement
letter between himself, in his capacity as Special Master, and Evercore.  (The Court understands
that this document was previously provided to all the Sale Process Parties.  For the
completeness of the record, the Court will be docketing the engagement letter under seal.)  It
confirms the Court's finding that Evercore has, to date, been retained to perform only the first-
stage work of designing the Proposed Order and not also the second-stage work of implementing
it.

The engagement letter provides:

> The Special Master acknowledges that the scope of Evercore's
> services pursuant to this engagement is ***solely limited to*** all actions
> reasonably requested by the Special Master in connection with
> obtaining entry of the Sale Procedures Order, including (i) the
> design of the Sale Procedures Order, (ii) any testimony or related
> services to be provided in connection with obtaining entry of the
> Sale Procedures Order, and (iii) assisting the Special Master and
> his counsel to ascertain, pursuant to the *Order Regarding Special
> Master of the Court* entered on May 27, 2021 [Docket No. 277],
> the total amounts of the outstanding judgment owed to Crystallex
> International Corp. by the Republic of Venezuela and the total
> amount of the outstanding judgment owed to Phillips Petroleum
> Company Venezuela Limited and ConocoPhillips Petrozuata B.V.
> by PDVSA, it being understood that, absent prior agreement by
> Evercore, Evercore's services hereunder ***shall not include***
> conducting or facilitating due diligence, contacting or otherwise
> communicating with potential buyers, preparing marketing
> materials, creating or maintaining a data room or any other
> substantive services customarily rendered by a financial advisor in
> a sale process.

(D.I. 442 at 1-2) (emphasis added; abbreviations omitted)  The engagement letter goes on to set
the fixed "work fee" that Evercore earned for the design stage.

5

**304a**

> satisfy the outstanding judgment of Crystallex . . . and/or devise
> such other transaction as would satisfy such outstanding
> judgment(s) while maximizing the sale price of any assets to be
> sold . . . .

(D.I. 303-1 Ex. A at 1-2 (emphasis added); *see also id.* at 4 ("I have worked closely with the Special Master and his other Advisors to assist him with, among other things, ***designing a sale process*** in accordance with his mandate and which balances many competing interests while seeking to provide the best opportunity for achieving a value-maximizing Sale Transaction.") (emphasis added))

It is clear that Mr. Hiltz ***hopes*** Evercore will obtain the implementation assignment as well. For instance, he notes, "Evercore has developed relevant experience and expertise regarding the Crystallex Case, PDVH, and CITGO that makes it well-suited to advise the Special Master and the Court in connection with entry of the Sale Procedures Order and the ultimate implementation thereof." (*Id.* at 5) But touting Evercore's experience and reputation – which the Venezuela Parties acknowledge (*see* D.I. 341 at 20) – is not nearly the same as believing (or knowing) that the job has already been won.

While the Special Master has recommended that the Court permit him to retain Evercore to implement the Proposed Order, and while he has negotiated several drafts of a retention agreement with Evercore, he needs the Court's approval to hire Evercore for this assignment. Like the Sale Process Parties,[8] he knows that the Court will not grant such approval until after considering any objections.

---

[8] The Sale Process Parties are Crystallex and the Venezuela Parties as well as Phillips Petroleum Company Venezuela Limited and ConocoPhillips Petrozuata B.V. (together, "ConocoPhillips"). The Sale Process Parties have all contributed to funding the Special Master's work.

6

Relatedly, in designing the Proposed Order, *Evercore* knew that the Special Master's proposal would be heavily scrutinized and subject to an objections process, after which the Court would decide what to include in the Sale Procedures Order. Accordingly, Evercore knew that if Evercore included a provision in the Proposed Order that was based on its self-interest, rather than on what Evercore genuinely believed to be appropriate to the process the Special Master will undertake, one or more of the Sale Process Parties would object, and the Court would likely be persuaded to strike any such provision. At that point, Evercore would also have reasonably (and rightly) expected that the Court would disqualify it from any further participation in this process. The scenario of self-interest posited by the Venezuela Parties is simply implausible.

While the Special Master is subject to 28 U.S.C. § 455, the parties have not directed the Court to any cases applying the statute to a special master who has been tasked with implementing a judicial sale to satisfy a judgment. Nor has the Court found any such case. Thus, there appears to be no case law directly supporting the Venezuela Parties' position.

The Venezuela Parties' efforts to analogize the circumstances presented here to those in cases in which courts have found conflicts of interest are unavailing. For example, in *Kensington*, 368 F.3d at 303-04, the Third Circuit determined that supposedly neutral advisors appointed to assist a District Judge in asbestos-related matters operated under a "structural conflict of interests" because they were simultaneously serving as advocates for asbestos claimants in a separate, related bankruptcy case. Because that conflict tainted the District Judge, he was disqualified under § 455. By contrast, here, neither the Special Master nor Evercore owes competing fiduciary duties to any person or entity. Evercore's sole job is to maximize the value of the assets being sold (the PDVH Shares). Moreover, while in *Kensington* the District

7

**306a**

Judge was continuing to rule on the merits of applicable disputes, the merits of the dispute between Crystallex and the Venezuela Parties were long ago reduced to a final judgment. In this posture, the Court is engaged in a post-judgment enforcement proceeding; the Special Master and his advisors – like the Court itself – have no occasion to adjudicate the merits of claims against the Venezuela Parties.

Similarly, in *In re Kempthorne*, 449 F.3d 1265, 1270 (D.C. Cir. 2006), the D.C. Circuit rejected a special master's work product because his advisor "stood to gain financially from" the special master reaching a particular result. *Kempthorne* is not binding on this Court and, more importantly, is inapposite. In that case, the special master hired an advisor who worked for one of the players in the underlying dispute against the Department of the Interior. *See id.* at 1267. In fact, the advisor and his company had accused the Department of wrongdoing, and the company had unsuccessfully moved to intervene to pursue its own claims against the Department. *See id.* Given his employment, the advisor was not impartial in his view of the underlying dispute. Therefore, the D.C. Circuit ordered the suppression of the special master's reports, noting that his advisor "colored the way in which [the special master] approached his task, and ultimately his . . . recommendations to the district court." *Id.* at 1270 (internal quotation marks and brackets omitted). The relationships among the players in the instant case are entirely different. No party has suggested that when Evercore was retained, it had reason to favor one of the Sale Process Parties over the others. Evercore does not stand "to gain financially from" the sale of the PDVH Shares in the way that the *Kempthorne* advisor would have benefitted from a ruling for his own employer.

The Court's procedures provide additional protections against purported conflicts or

8

misguided incentives tainting the sale process. Those procedures include both those that the Court has followed to date, such as extensive briefing and argument on the Sale Process Parties' objections to the Proposed Order, and those the Court will follow during a similar period of objections and argument after the bidding process has concluded and the Special Master has made whatever recommendations he will make regarding which bid (if any) the Court should accept. The Venezuela Parties insist that "[t]he mere fact that a party may object to tainted recommendations stemming from a conflicted advisor does nothing to obviate the structural problem of having a conflicted advisor in the first place." (D.I. 385 at 4) (citing *In re Brooks*, 383 F.3d 1036, 1045-46 (D.C. Cir. 2004))[9] Whether or not this Court agrees with this proposition, the important point is that the Venezuela Parties' argument presupposes that the Special Master's advisor is conflicted – yet, as explained above, there is no such conflict.

The Court agrees with the Special Master that these proceedings have not been tainted by a proposed contingency fee that has been disclosed and is still being vetted, subject to the parties' objections, and to which all parties other than the judgment debtor have agreed. (*See* Tr. at 150) In preparing the Proposed Order, the Special Master conducted an open and transparent process, engaging repeatedly with the Sale Process Parties and iteratively modifying his proposal in an effort to accommodate as many competing concerns as possible while still fulfilling the mandate given to him by the Court. (*See, e.g.*, D.I. 303 at 18-19) (describing initial engagement with

---

[9] In *Brooks*, 383 F.3d at 1046, the D.C. Circuit suppressed the special master's work product because his advisor "had personal knowledge of the parties . . . from prior dealings with them." Here, by contrast, there is no record of any prior dealings between Evercore and the Sale Process Parties. Nor does the Court discern any basis to believe that Evercore's recommendations may have been tainted by "selection bias" that might leave "no trace in the record." *Id.* (internal quotation marks omitted).

9

Sale Process Parties)   As the Special Master has explained, he and his advisors "have

endeavored to develop a sale process for the PDVH Shares with two guiding objectives": "(i) to

design a process that will result in a sale transaction that is fair, open, and maximizes the value of

the PDVH Shares to be sold, and (ii) to ensure the diverse, and frequently conflicting, views of

the Sale Process Parties are solicited and considered in the development and implementation of

such a process."   (D.I. 341 at 1)   The challenges of this process are heightened by the fact that

this case arises, as the Special Master accurately states, "in a dynamic and internationally

sensitive set of circumstances."   (D.I. 303 at 1)   In other words, the Special Master's task is a

monumental and challenging one, as even the Venezuela Parties observe.   (*See, e.g.*, D.I. 317 at

1) ("The size and complexity of the assets to be sold in this Delaware execution sale are . . .

unprecedented.")[10]   It is one that the Court would not be able to undertake successfully without

the Special Master's assistance.   This context is important and would be known to a reasonable

layperson evaluating the Special Master's (and Evercore's) process.

It is notable, as well, that everything Evercore has done is consistent with industry

standards.   (*See, e.g.*, Tr. at 149, 151)   Importantly, nothing Evercore has done to date would, in

the Court's view, cause a reasonable layperson, armed with the facts, to question Evercore's (or

the Special Master's) impartiality.   Instead, the Court agrees with Crystallex: "[T]here is nothing

improper with compensating the Special Master's financial advisors by paying a properly

calibrated Sale Fee based on the outcome of the auction as such a fee can incentivize the

---

[10] The Venezuela Parties' declarant, Mr. Weisenburger, likewise recognizes that the
Special Master has been given "an extraordinarily difficult and unprecedented assignment."
(D.I. 317-1 at 9; *see also* D.I. 339 at 5 (ConocoPhillips noting that these proceedings are
"occurring in an extraordinary legal and foreign policy landscape"))

10

**309a**

financial advisors to obtain the maximum price possible from the sale of a complicated asset."
(D.I. 343 at 6)

The Court will order the Special Master to continue his negotiations regarding Evercore's possible retention for the implementation of the Court's Sale Procedures Order.[11]   As part of that effort, the Special Master will be instructed to try to obtain an agreement that Evercore's compensation will not be contingent on the successful sale of the PDVH Shares.   (*See* D.I. 303 at 16 n.11; *see also* Tr. at 148, 152)   The realistic prospect of eliminating that provision further undermines the Venezuela Parties' claim of a disqualifying conflict of interest.

As a final protection, if the Venezuela Parties (or any of the other Sale Process Parties) believe that they have a good-faith basis to do so, they may object to the retention of the investment bank that the Special Master recommends for the implementation stage following his negotiations.   To be clear, the Court has overruled the Venezuela Parties' objection that the process to date has been tainted by an incurable conflict of interest, and the Court does not intend to hear additional argument on that issue.   Nonetheless, the Sale Process Parties will have an opportunity to object to the execution of whatever final retention agreement, with whichever investment bank, the Special Master recommends after his forthcoming negotiations.

In sum, the Venezuela Parties' argument that the process to date is already so tainted by conflict that the Court must scrap the Special Master's work and begin again lacks merit.   The Venezuela Parties acknowledge that Evercore has not yet been paid a contingency fee.   (*See* Tr.

---

[11]  The Court additionally agrees with Crystallex that the Court can "mitigate [any] potential conflict by requiring that any engagement agreement with a financial advisor contain provisions requiring the financial advisor to justify the reasonableness of their fees before they are paid."  (D.I. 343 at 19 n.6)  The Special Master will be directed to use his best efforts to include such a provision in the next version of the retention agreement negotiated with Evercore.

11

at 142-43)   The Venezuela Parties also concede that payment of a contingency fee to an investment bank that runs the second-stage implementation of the sale is not, per se, a problem. (*Id.* at 144)   The problem that the Venezuela Parties are concerned about could be eliminated by the Special Master retaining, for the second stage, an investment bank other than Evercore, or retaining Evercore on a non-contingency basis.[12]   The Special Master will attempt to negotiate a non-contingency retention with Evercore and will thereafter make an updated recommendation to the Court as to which investment bank to retain for the implementation stage – and on what terms.   The Venezuela Parties will have an opportunity at that point to object to that recommendation if they feel that they have a new, meritorious basis to do so.

Accordingly, for the reasons stated above, nothing that has occurred to date creates either a disqualifying conflict of interest or even the appearance of partiality for either Evercore or the Special Master.   The Venezuela Parties' objection on this point is overruled.

## II.   An OFAC License Is Not Necessary To Continue With The Sale Process, And The Court Will Not Wait For One

As the Special Master writes, one thing all the Sale Process Parties appear to agree on is that "the most crucial and most polarizing issue for the Court to decide at this stage is when the Marketing Process should be launched in relation to obtaining approval or guidance from the United States Government."   (D.I. 341 at 3)   The parties vehemently disagree with one another as to when the Court may, or should, adopt a Sale Procedures Order and begin implementing it.

---

[12] To the extent the Venezuela Parties argue that the problem cannot be completely eliminated because Evercore designed the sale process while it was expecting a contingency fee for work performed during the second stage, that argument rests on the faulty premise that the Special Master already promised to retain Evercore to implement the sale process.   As explained above, the Court rejects that premise.

12

Crystallex requests that the Court adopt a Sale Procedures Order immediately and begin

the sale process as soon as possible.   In Crystallex's view, the law – and in particular, the

sanctions regime imposed by the United States on Venezuela – does not preclude the Court from

adopting a Sale Procedures Order and taking steps in accordance with it, short of executing a

sale.   Crystallex has always agreed that the execution of the sale (but *only* that last step of the

sale process) requires a specific license from the U.S. Treasury Department's Office of Foreign

Assets Control ("OFAC").[13]   As Crystallex writes:

> The Court should enter a sale procedures order that immediately
> commences the process of preparing for, advertising, and
> conducting a contingent bidding process for the shares of PDVH to
> finally satisfy Crystallex's affirmed judgment.   Because the
> process would only transfer Venezuela's property after OFAC's
> approval, none of the proposed procedures would violate federal
> sanctions regarding foreign property.

(D.I. 421 at 1; *see also* D.I. 343 at 5 ("OFAC regulations do not prohibit the development of a

sale process, merely its completion."))

---

[13] Throughout this lengthy litigation, Crystallex has maintained that the completion of
any sale process (i.e., the transfer of the PDVH Shares) cannot occur unless and until OFAC
issues a specific license.   (*See, e.g.*, D.I. 343 at 14 ("To be clear Crystallex recognizes that no
sale can take place without an OFAC license."); *see also* D.I. 234 at 15 ("All involved in this
litigation, including Crystallex, recognize that (under current law and policy) a specific license
will be required from OFAC before a sale of PDVSA's shares of PDVH can close.")) Given
Crystallex's repeated recognition of this reality, the Court reads Crystallex's most recent
acknowledgement that "it will *likely* need a specific license from OFAC before the PDVH shares
can be transferred" as a clumsy reiteration of its consistent position, not as a first step in a retreat
from it.   (D.I. 406 at 4) (emphasis added)

The Third Circuit shares the Court's understanding of Crystallex's position.   As that
Court recently wrote, "Crystallex . . . [has] moved for a contingent auction of PDVSA's shares
pending a license from OFAC."   *Crystallex II*, 24 F.4th at 248; *see also id.* at 255-57 (containing
additional references to Crystallex's request for "contingent auction").

13

Crystallex further believes that initiating the sale process without a license and without any further guidance from OFAC will not necessarily lead to a lack of robust participation or the deflation of the PDVH Shares' value.   In any event, even if Crystallex is wrong with respect to this prediction, it still believes the process must begin now, given that Crystallex is an affirmed judgment creditor who has been waiting to get paid for a decade.   (*See, e.g.*, Tr. at 25) ("We have been waiting for ten years . . . .   We're trying to finally get what is due to us.")

The Venezuela Parties see things much differently.   In their view, "launching the Proposed Sale and Bidding Procedures now would violate federal law, undermine the clearly expressed policy interests of the Executive Branch, and almost certainly result in a fire sale of the PDVH shares in violation of Delaware law."   (D.I. 408 at 1 (internal citation omitted); *see also id.* at 3 (suggesting that Proposed Order "would authorize steps by private parties that are unambiguously prohibited under the regulations") (emphasis omitted); *id.* at 6 ("Without a specific license from OFAC, the Sale Process contemplated by the Special Master cannot be launched consistent with federal law."); D.I. 340 at 2 ("[C]ommencing the sale process proposed by the Special Master without an OFAC specific license is unequivocally barred by OFAC regulations at this time, and any participation by bidders, Sale Process Parties, or any third parties needed for support in a sale process now would be unlawful."))

The Venezuela Parties object to adopting a Sale Procedures Order because, in their view, the Court cannot, as a matter of law, take any further steps toward effectuating a sale of the PDVH Shares while those shares are blocked property under the current U.S. sanctions regime. (*See, e.g.*, D.I. 408 at 11 ("[T]he Sale Process is barred by the plain meaning of the text of the executive orders and published regulations . . . ."); Tr. at 58 ("[O]ur fundamental position with

14

**313a**

respect to whether the process should go forward is it shouldn't go forward because the sanctions regime bars it.")) According to the Venezuela Parties, the sanctions prohibit not only the final transfer of blocked property, but also all steps that are in any way related to, or undertaken for the purpose of, transferring such property.

Second, the Venezuela Parties argue that even if a specific license were not necessary to launch the sale process, without such a license the market will have so much uncertainty as to whether OFAC will approve an eventual sale that any sale process will be doomed to fail. That is, "moving forward with the Sale Process now would chill bidding and sabotage the ultimate sale." (D.I. 419 at 9) In other words, proceeding without an OFAC license will result in a winning bid that so undervalues the PDVH Shares that the Court will be required, under Delaware law, to reject it. Hence, the Venezuela Parties believe that launching the sale process without an OFAC license "would at best be wasteful and unnecessary, and at worst result in a violation of Delaware law." (*Id.* at 10)

For his part, the Special Master agrees with Crystallex that the sanctions regime does not necessarily preclude the Court from adopting a Sale Procedures Order and beginning to implement it. (*See* Tr. at 15) The Special Master does not believe a specific license from OFAC is required to launch the sale process. (*See, e.g.*, D.I. 411-1 at 9-10) (proposing launch upon receipt of additional "guidance" from OFAC) However, the Special Master also believes, as an empirical matter, that if the sale process were to begin without more guidance from OFAC, the result is unlikely to be a value-maximizing transaction.

More particularly, the Special Master proposes that the Court not launch the sale process until OFAC provides at least some additional guidance on whether OFAC believes that the sale

15

process is permissible under current law or whether a specific license to effectuate an eventual sale is likely to be granted. "The Special Master believes that a written statement, or otherwise publishable or disclosable information, from OFAC, reflecting authorization or its non-objection, with proceeding with the Marketing Process will be necessary before Potential Bidders will be willing to participate in the Marketing Process." (D.I. 411-3 at 8) He adds: "Uncertainty surrounding what, if any, transaction OFAC will ultimately license creates an overhang that . . . will materially chill bidding." (D.I. 303 at 35) On this point, the Special Master is supported by his financial advisor, Mr. Hiltz of Evercore. (D.I. 303-1 Ex. A at 8) The Special Master recommends that the Proposed Order be adopted and that it include a "trigger" such that implementation of the sale process will begin only when the Special Master receives additional assurance from OFAC that he can share with the market. (*See, e.g.*, Tr. at 14) (Special Master proposing that sale process be launched "once we get publishable information or guidance from OFAC regarding their support [or] non-objection")

The Court has also heard from ConocoPhillips, which does not take a position on the legality of adopting a Sale Procedures Order and implementing it. (*See generally* D.I. 418; *see also* Tr. at 62 (ConocoPhillips noting that it successfully "worked through [its] issues with the Special Master")) ConocoPhillips insists, however, that the parties' disputes on these legal issues "amply demonstrate that launching the sales process without written guidance from OFAC would be a waste of the Court's time and the Sale Process Parties' money." (D.I. 418 at 1) ConocoPhillips supports the Special Master's "thoughtful compromise," which would defer launch of the sale process until OFAC issues additional guidance (if it ever chooses to do so). (*See id.*)

16

**315a**

After carefully considering the positions of the Sale Process Parties and the Special Master, which have been thoroughly briefed and argued, the Court has concluded that: (i) the law, including the current sanctions regime, does not prevent the Court from taking prefatory steps toward a sale of the PDVH Shares, including the adoption a Sale Procedures Order and its implementation; (ii) to reduce the risk that uncertainty about the sanctions regime will deter value-maximizing bids, the Court will provide the Special Master with a period of up to six months after entry of the Sale Procedures Order to recommend that implementation begin (or not); (iii) during that six-month window, the Special Master will be directed to use his best efforts to obtain guidance from OFAC that may be shared with the market expressing OFAC's view of the process and the likelihood that it will issue a specific license for a sale to close; and (iv) once the Special Master has had an opportunity to seek OFAC input, and after the Special Master makes a recommendation as to whether the sale process should begin, the Sale Process Parties will have a final opportunity to provide their views on whether the Court should proceed – and then the Court will decide whether to do so.[14]

### A.    Current Law Does Not Prohibit The Court From Launching A Sale Process Even Without A Specific License From OFAC For Any Participant

In January 2021, the Court stated, as a general matter, that the time had come "to set up the sales procedures and then to follow them to the maximum extent that can be accomplished

---

[14] The Court does not believe that proceeding in this manner is likely to be wasteful, notwithstanding the contrary views of the Venezuela Parties and ConocoPhillips. Even if the Court lacked confidence on this point (and it does not), it would still proceed in this manner for the reasons stated throughout this Opinion. Moreover, the Third Circuit recently rejected the notion that the potential for wasteful proceedings should stop this litigation at this point. *See Crystallex II*, 24 F.4th at 255 (enforcing finality requirement despite possibility of wasteful proceedings).

17

without a specific license from OFAC." (D.I. 234 at 32-33) Nonetheless, the Venezuela Parties are correct that the Court has "never adjudicated whether the acts, transactions, or agreements [specifically] contemplated in the [Special Master's proposed] Sale Process may move forward before an OFAC license is granted." (D.I. 408 at 1) Now that the Special Master has presented the Court with a detailed Proposed Order, and now that the parties have made their objections, the time has come for the Court to address whether the current sanctions regime prohibits adoption of a Sale Procedures Order and the launch of the sale process. The Court concludes that nothing prohibits it from taking such actions, even if no party has obtained a specific license from OFAC. The Court has not been pointed to any legal authority or any other aspect of the sanctions regime that bars the Court from proceeding with a sale process, up to and including the selection of a winning bidder, provided that legal title to the PDVH Shares is not transferred until after the winning bidder obtains a specific license.

To explain the Court's conclusion, it is necessary to first describe the current sanctions regime. In March 2015, the President issued an executive order ("E.O.") declaring a national emergency under the International Emergency Economic Powers Act ("IEEPA"), 50 U.S.C. § 1701 *et seq.*, regarding the humanitarian crisis in Venezuela. *See generally* E.O. 13,692, 80 Fed. Reg. 12,747 (Mar. 8, 2015). OFAC later promulgated a regulation under which "[a]ll transactions prohibited pursuant to" that executive order or any subsequent, related executive orders "are prohibited." 31 C.F.R. § 591.201. A related regulation similarly prohibits "the enforcement of any lien, judgment, arbitral award, decree, or other order through execution,

18

garnishment, or other judicial process purporting to transfer or otherwise alter or affect property or interests in property blocked pursuant to § 591.201." *Id.* § 591.407.[15]

From this starting point, several additional executive orders are potentially relevant. The first, E.O. 13,808, 82 Fed. Reg. 41,155 (Aug. 24, 2017), provides that "[t]he purchase, directly or indirectly, by a United States person or within the United States, of securities from the Government of Venezuela . . . is prohibited." § 1(b). The Court agrees with Crystallex that this provision "merely prohibits the actual, complete 'purchase' of securities, and no purchase will be complete here without an OFAC license." (D.I. 421 at 7) Moreover, it is not clear in this case that securities would be purchased "from the Government of Venezuela,"[16] as the executive order requires, because arguably the PDVH Shares will be purchased from this Court in a forced judicial sale. (*See* D.I. 421 at 6) Regardless, the Venezuela Parties have withdrawn their reliance on E.O. 13,808. (*See generally* D.I. 422) Thus, E.O. 13,808 poses no impediment to the procedures outlined in the Proposed Order.

The next potentially relevant executive orders are E.O. 13,850, 83 Fed. Reg. 55,243 (Nov. 1, 2018), and E.O. 13,884, 84 Fed. Reg. 38,843 (Aug. 5, 2019). These orders provide that certain property and interests in property related to Venezuela in the United States "are blocked and may not be transferred, paid, exported, withdrawn, or otherwise dealt in." E.O. 13,850

---

[15] For reasons more fully explained below, the Court agrees with Crystallex that, "[s]ince no transfer of blocked property will occur without a license," § 591.407 is "not implicated." (D.I. 406 at 7 n.1)

[16] The executive order defines the "Government of Venezuela" to include any "instrumentality thereof, including . . . PdVSA, and any person owned or controlled by, or acting for or on behalf of, the Government of Venezuela." E.O. 13,808 § 3(d); *see also* E.O. 13,857 § 1, 84 Fed. Reg. 509 (Jan. 30, 2019) (broadening definition to include members of Maduro regime).

19

§ 1(a); E.O. 13,884 § 1(a).   These prohibitions do not apply "to the extent provided by statutes, or in regulations, orders, directives, or licenses that may be issued."   E.O. 13,850 § 1(b); E.O. 13,884 § 1(c).   In relation to these executive orders (as well as E.O. 13,835, as described below), the Court agrees with Crystallex's logic (D.I. 406 at 7): "the regulations only prohibit 'transfers' that are 'prohibited pursuant to' an Executive Order" (quoting 31 C.F.R. § 591.201), and "the relevant Executive Order allows any transfer 'to the extent provided by' a 'licens[e]'" (quoting E.O. 13,850 § 1(b)).   The Proposed Order presented by the Special Master expressly contemplates that no transfer will occur unless and until OFAC provides a specific license to the winning bidder.   Accordingly, the Proposed Order does not contemplate any prohibited transfer. The Court, therefore, reaches the same conclusion as Crystallex: "If OFAC ultimately denies the winning bidder a license at the end of the process, Venezuela retains full ownership of PDVH subject to Crystallex's existing lien, and no payment flows to Venezuela or any other entity blocked by the sanctions – so no violation occurs."   (D.I. 406 at 7)

Another potentially relevant executive order is E.O. 13,835, 83 Fed. Reg. 24,001 (May 21, 2018), which prohibits transactions related to "the *sale*, *transfer*, assignment, or pledging as collateral by the Government of Venezuela of any equity interest in any entity in which the Government of Venezuela has a 50 percent or greater ownership interest."   § 1(a)(iii) (emphasis added).[17]   As in E.O. 13,850 and E.O. 13,884, the prohibition in E.O. 13,835 does not apply "to the extent provided by statutes, or in regulations, orders, directives, or licenses that may be issued."   § 1(b).   In the Venezuela Parties' view, E.O. 13,835 must be read to reach, and

---

[17] Like E.O. 13,808, the definition for "Government of Venezuela" in § 3(d) of E.O. 13,835 explicitly includes PDVSA.   *See also* E.O. 13,857 § 1.

20

**319a**

therefore prohibit, much of what is contained in the Proposed Order because § 1 prohibits "[a]ll transactions **related to**" any "sale" or "transfer" of the PDVH Shares. (*See, e.g.*, D.I. 408 at 7 ("[T]he Sale Process would violate federal law because it includes numerous transactions '**related to** the sale [or] transfer . . . of any equity interest in' PDVH.") (quoting E.O. 13,835 § 1(a)(iii)); *see also id.* at 8 (discussing regulatory definition of "transfer")) On this view, the Proposed Order involves "untold numbers of transactions and interactions by unknown third parties that will be related to the eventual sale of blocked property" that "require authorization from OFAC." (D.I. 408 at 14) The Venezuela Parties suggest, for example, that a bank performing a wire transfer to effectuate the Venezuela Parties' payment to the Special Master's financial advisor, without a specific license, might violate the sanctions because that payment would be "related to" the eventual "transfer" of PDVH Shares. (*See* Tr. at 60)

The Court disagrees with the Venezuela Parties' overly broad interpretation. The Venezuela Parties' readings of the terms "transfer" and "related to" are not required by the plain language of any regulation and have never been formally adopted by OFAC.

An OFAC regulation defines "transfer" to mean an "act or transaction" having the "purpose, intent, or effect" to "create, surrender, release, convey, transfer, or alter, directly or indirectly, any right, remedy, power, privilege, or interest" with respect to blocked property. 31 C.F.R. § 591.310.[18] The Court agrees with Crystallex that entering and implementing the Proposed Order does not involve any "transfer" meeting this regulatory definition. Rather, it is

---

[18] The regulation expressly identifies certain acts and transactions as transfers, including "the appointment of any agent," "the fulfillment of any condition," "the making, execution, or delivery of any . . . agreement," and "the making of any payment," provided that the definition's other criteria are met. 31 C.F.R. § 591.310.

21

the last step of the sale process – i.e., the actual transfer of ownership of the PDVH Shares – that would "create, surrender, release, convey, transfer, or alter" any right or interest in the PDVH Shares, so it is this last step that cannot be taken without the issuance of a specific license from OFAC. As Crystallex writes: "The proposed procedures do not have th[e] prohibited purpose, intent, or effect" required to meet the regulatory definition of "transfer" because "they would only affect rights in blocked property after that property becomes un-blocked." (D.I. 421 at 9)

The regulations need not, and should not, be read to sweep as broadly as the Venezuela Parties advocate. Importantly, OFAC has not (at least to date) adopted the broad reading espoused by the Venezuela Parties. Instead, in the Court's view, the sanctions regime bars only "agreements," "payments," and other acts called out in § 591.310 that have the imminent or actual "purpose, intent, or effect" of altering blocked property rights without a license. The Venezuela Parties have pointed to no regulatory language that requires their broader interpretation.

Hence, as suggested above, the Court does not agree with the Venezuela Parties that the "Sale Process is replete with acts, agreements, and transactions that meet the regulatory definition of a 'transfer' of an interest in blocked property, as defined in 31 C.F.R. § 591.310 and in violation of Executive Order 13850." (D.I. 408 at 10; *see also* D.I. 317 at 15 ("The concrete steps set out in the Proposed Order have the purpose of creating rights or interests in blocked property, and many of those steps actually have the effect of creating contingent interests in that property, all of which are contrary to the text of OFAC regulations.")) Instead, the Court agrees with Crystallex that none of the specific acts the Court has taken – and none of the specific acts the Proposed Order contemplates being taken, short of executing the sale – "provide for" or

22

**321a**

"have the purpose or effect" of "altering any interest in blocked property."  (D.I. 406 at 8)

These past and future acts which are permissible absent a specific license include appointing a

special master, retaining an investment bank to implement the sale, advertising the sale, allowing

Crystallex to credit bid, executing or delivering agreements, and making deposits.  (*See id.* at 8-

11)[19]

As Crystallex argues, "the regulation is clear that only acts with the 'purpose, intent, or

effect' of actually altering blocked property rights without a license are prohibited."  (D.I. 406 at

2) (quoting § 591.310)  Moreover, "the subsequent granting of a license can validate even an

otherwise unlawful transaction."  (*Id.*) (citing § 591.202(c))  Under the Proposed Order, as even

Crystallex agrees, "no rights would change hands unless and until a license is ultimately granted"

by OFAC.  (*Id.*)  Thus, as Crystallex writes: "What matters, therefore, is **whether** a license is

ultimately obtained, not **when**."  (*Id.* at 8)[20]

The breadth of the Venezuela Parties' interpretation of the sanctions might, if correct,

prevent the Court from proceeding with this litigation.  For example, according to the logic of

the Venezuela Parties, all of the following acts could not occur without a specific OFAC license,

because all are intended to eventually lead to the sale of the presently blocked PDVH Shares:

---

[19] As noted by ConocoPhillips, the issuance of new certificates for the PDVH Shares would potentially raise additional issues.  (*See* D.I. 418 at 2-3)  The Court agrees with ConocoPhillips that it need not resolve any such potential issues now.  (*See id.*)

[20] A "transfer . . . in violation of" the regulations is "null and void," but "a license . . . issued by OFAC before, during, or **after** a transfer shall validate such transfer or make it enforceable."  31 C.F.R. § 591.202(a), (c) (emphasis added).  Contrary to the Venezuela Parties' contention, this regulation does not "make[] clear that you need a license to move forward." (Tr. at 52)  Instead, by allowing for a license to authorize a transfer even after the fact, the regulations contemplate that a process intended to lead ultimately to a transfer can be undertaken without a license.

23

- the Court's appointment of a Special Master;

- the Special Master answering inquiries from potential bidders
for the PDVH Shares;

- Crystallex's filing of a motion or brief or presentation of oral
argument by in the course of this litigation; and

- the issuance of this Opinion by the Court.

OFAC has given no indication that it reads the regulations as preventing the Court from proceeding as it deems fit with the instant case and other related litigation. As Crystallex rightly emphasizes, to give the regulations the broad reach sought by the Venezuela Parties would unnecessarily implicate serious separation-of-powers concerns. (*See, e.g.*, D.I. 406 at 11) (citing *Peacock v. Thomas*, 516 U.S. 349, 356 (1996) (noting courts' "inherent power to enforce [their] judgments") Again, the Court perceives no reason to read the regulations nearly as expansively as the Venezuela Parties would have the Court do.

Another argument made by the Venezuela Parties is that the regulations establish that a "grant of a contingent interest in property 'alters' and 'creates' a property interest as soon as it is executed." (D.I. 419 at 3) (brackets omitted) (quoting 31 C.F.R. § 591.310) They base this contention on 31 C.F.R. § 591.305, which defines "interests" to include interests "of any nature whatsoever, direct or indirect," as well as 31 C.F.R. § 591.309, which defines "property" to include "future[] or contingent" property interests. The Court agrees with Crystallex, however, that these definitions are "meant to capture transfers of interests that could ripen into a present property interest *without an OFAC license* – for example, a 'contingent reversionary interest' in funds that would revert to [a foreign] government unless its contractor proved performance." (D.I. 406 at 7-8) (emphasis added) (citing *Consarc Corp. v. Iraqi Ministry*, 27 F.3d 695, 702 (D.C. Cir. 1994)) "The definition thus prohibits a class of transactions that would otherwise

24

escape OFAC oversight." (*Id.* at 8) The Proposed Order does not create, or envision the creation of, any such interests.

The Venezuela Parties point to a regulation that permits OFAC to "otherwise provide[]" prospective authorization for a transaction while still maintaining that the transaction was null and void before a license issued. (*See* D.I. 419 at 2-3) (citing 31 C.F.R. § 591.202(c)) According to the Venezuela Parties, "Crystallex's interpretation would rob OFAC of its power to 'otherwise provide[]' for such a determination – and render this regulatory text meaningless – because [Crystallex] considers *all transactions* lawful if they are contingent on an OFAC license." (*Id.* at 3) The Court is not persuaded by this criticism of Crystallex's position. There is no guarantee that OFAC will *retroactively* authorize any transaction undertaken without a license (even though the Court agrees with Crystallex that the regulations empower OFAC to do so if it chooses). By contrast, a *prospective* authorization by OFAC would provide near-certainty that the transaction could close. In other words, the interpretation the Court is adopting, which permits the sale process to proceed at the risk that OFAC will never permit the sale to close, does not deprive OFAC of its power to preapprove a process that is highly likely to close.

In sum, the sanctions regime does not require a specific license from OFAC before the Court may adopt a Sale Procedures Order. The Sale Procedures Order that the Court adopts will include a provision that could allow the sale process to be launched even without a license.

**B.    FAQ 809 Does Not Alter The Court's Conclusion**

Frequently Asked Question ("FAQ") 809, which the Venezuela Parties have sometimes relied on (*see, e.g.*, D.I. 408 at 9-10; D.I. 419 at 4-5; *id.* at 5 n.3), does not alter the Court's conclusion. Issued by OFAC on December 9, 2019, FAQ 809 asks whether a U.S. entity with a

25

writ of attachment for blocked shares is "authorized to prepare for and hold an auction or other

sale of the shares, contingent upon the winning bidder obtaining a license." (D.I. 150-1 at 2)

OFAC answers that question as follows:

> No. Parties who have attached shares of an entity whose property
> and interests in property are blocked pursuant to the Venezuela
> Sanctions Regulations (31 C.F.R. Part 591) must obtain a specific
> license from OFAC prior to conducting an auction or other sale,
> including a contingent auction or other sale, or taking other
> concrete steps in furtherance of an auction or sale. More
> generally, OFAC urges caution in proceeding with any step in
> furtherance of measures which might alter or affect blocked
> property or interests in blocked property. OFAC would consider
> license applications seeking to authorize such activities on a case-
> by-case basis.

(*Id.*)

At the most recent hearing, the Venezuela Parties expressly told the Court that they "are

not asking this Court to defer to FAQ 809." (Tr. at 97) This representation, alone, is sufficient

for the Court to hold that FAQ 809 poses no impediment to proceeding even in the absence of

any specific license authorizing the sale process. The Venezuela Parties offer no persuasive

reason why, after waiving their reliance on deference to FAQ 809, the Court should now feel

bound to read FAQ 809 as imposing any hindrance to proceeding as the Court deems warranted.

In any event, even if the Venezuela Parties are still advocating for deference to FAQ 809,

as it appears they may be (*see* D.I. 419 at 5 n.3), the Court would not defer to this informal

OFAC statement. Instead, the Court agrees with Crystallex that, under *Kisor v. Wilkie*, 139 S.

Ct. 2400 (2019), FAQ 809 lacks the force of law and is not entitled to deference, as "the relevant

terms of the regulations, such as 'transfer or otherwise alter or affect property,' are clear by

themselves and do not require OFAC's guidance, nor implicate its substantive expertise." (D.I.

26

**325a**

421 at 9)   Agencies cannot use interpretive guidance to expand the scope of an unambiguous

regulation and thereby "create *de facto* a new regulation."   *Kisor*, 139 S. Ct. at 2415 (internal

quotation marks omitted).   *Kisor* requires courts to "give[] agencies their due, while also

allowing – indeed, obligating – courts to perform their reviewing and restraining functions."   *Id.*

The Court has performed its reviewing function, disagrees with FAQ 809, and finds no basis to

accord any deference to FAQ 809.

      Guidance that does not implicate an agency's "substantive expertise" is entitled to little, if

any, deference.   *See id.* at 2417.   FAQ 809 is addressing whether an Article III court can move

forward with a process that may ultimately lead to a transfer of blocked property.   This subject,

and the litigation process in general, is outside the "substantive expertise" of OFAC and the U.S.

Treasury Department.   By contrast, the power to enforce judgments is among the core functions

of the federal judiciary.   As the Supreme Court has stated, "[a]bsent the clearest command to the

contrary from Congress," courts retain power to enforce their judgments.   *See Califano v.*

*Yamasaki*, 442 U.S. 682, 705 (1979); *see also Peacock*, 516 U.S. at 356 ("Without jurisdiction to

enforce a judgment entered by a federal court, the judicial power would be incomplete and

entirely inadequate for the purposes for which it was conferred by the Constitution.") (internal

quotation marks omitted).

      Finally, agency statements are not entitled to significant deference when they do not

reflect the "fair and considered judgment" of the agency.   *Kisor*, 139 S. Ct. at 2417.   As OFAC

has explained, its FAQs "are intended only as general information to assist persons subject to

United States jurisdiction to comply with legal requirements and to facilitate an understanding of

the scope and purposes of sanctions programs."   *Note on Frequently Asked Questions*, OFAC,

27

**326a**

https://home.treasury.gov/policy-issues/financial-sanctions/frequently-asked-questions/note-on-frequently-asked-questions (last visited Feb. 28, 2022). Moreover, the Court has the benefit of OFAC's "fair and considered judgment" about this very litigation, as discussed below.

For all these reasons, OFAC's FAQ 809 does not prevent the Court from moving forward with the sale process.[21]

## C. OFAC's Denial Of Crystallex's License Application Does Not Alter The Court's Conclusion

OFAC's September 10, 2021 decision to deny Crystallex's application for a specific license does not alter the Court's conclusion. To the contrary, OFAC's view, as expressed in the denial letter, is entirely consistent with the Court's view. In particular, OFAC appears to agree that, as long as the Court continues to ensure that no actual transfer of the PDVH Shares will occur unless and until OFAC issues a specific license permitting such a transaction, OFAC cannot stop the Court from taking prefatory steps that are necessary and helpful to selecting a winning bidder for the PDVH Shares so that Crystallex's judgment may be satisfied.[22] As the

---

[21] The Venezuela Parties assert that many additional published FAQs "and other authorities predating this litigation" state that "prohibited transactions cannot be made legal by making them contingent on an OFAC license." (D.I. 419 at 4; *see also id.* at 4 n.2 (citing other FAQs); D.I. 420-1 (Hall Decl.) at 1) The Court has reviewed the other cited sources, and they do not alter the Court's analysis. In particular, the Venezuela Parties point to an enforcement action in which OFAC concluded that Aero Sky violated the Iranian sanctions regime when it entered into a memorandum of understanding with Mahan Air, an Iranian commercial airline company, even though the agreement was "contingent, in part, upon Mahan Air being removed" from OFAC's list of specially designated nationals and blocked persons. (D.I. 420-1) The Court will not defer to OFAC's interpretation of different sanctions in an unrelated case, particularly when the accused violator in that case never had a chance to defend itself before the agency. *See generally Kisor*, 139 S. Ct. at 2415-17.

[22] In the summer of 2020, the United States submitted a statement of interest and a supplemental brief in support of that statement, asking the Court not to proceed with a sale

Court previously recognized, OFAC has "not taken the position that the Court is blocked from moving forward."  (D.I. 234 at 34 (internal quotation marks omitted); *see also* D.I. 226 at 105 (U.S. stating "the Court can do whatever it wants"); *see also Crystallex II*, 24 F.4th at 248 (quoting same government statement))[23]  As evidenced by the recent OFAC letter denying Crystallex's license application, OFAC continues to adhere to this view.

While Crystallex's application for a specific license is not in the record, Crystallex and the Venezuela Parties agree that Crystallex sought express OFAC approval for not only the execution of a final sale, but also the initiation and undertaking of the sale process.  (*See, e.g.*,

---

process, due to concerns of foreign policy and national security.  (*See generally* D.I. 212, 220) The Court chose to proceed, notwithstanding these policy concerns.  (*See* D.I. 234 at 14-15) Although the United States has opted not to submit any additional filings, the Court presumes that the Executive Branch still prefers that the Court cease its progress toward a sale, unless and until OFAC issues a specific license.  OFAC appears to recognize that it can make this request, but cannot compel the Court to grant it.

[23] The Venezuela Parties are wrong to suggest that the Executive Branch has advocated before this Court that a specific license is required for the Court to proceed with the sale process. For example, the Venezuela Parties write:

> When the United States Government appeared before this Court in September 2020, it clarified that a license was necessary before moving forward with a sale process, and that "setting a sales date" for the PDVH shares "is exactly the kind of thing Special Representative Abrams has said, speaking for the United States, would imperil U.S. foreign policy interests."

(D.I. 408 at 2) (quoting D.I. 226 at 103-04)  While the second part of this statement is correct and the Executive Branch has espoused the view that the Court ***should not*** move forward (because of U.S. foreign policy and national security interests), the Court is not aware of the Executive Branch telling this Court that it ***cannot*** proceed with a sale process unless and until OFAC issues a specific license (i.e., that a license is "necessary").  The Venezuela Parties conflate purported legal constraints (a position OFAC has not advocated in this Court) with policy considerations (which fall squarely within the Executive Branch's discretion and which the Court continues to recognize as vitally important).

29

D.I. 182 at 7 (Venezuela Parties characterizing Crystallex's application as being for "formal approval of the commencement of the sale process"); Tr. at 48 (Venezuela Parties: "That license request was not just to sell the shares.   It was to effect the sale of the shares, and in Crystallex's own words, it was to launch the sales process."); D.I. 212-2 at 1 (OFAC Director: "Crystallex submitted a specific license application requesting OFAC 'to provide Crystallex [with] a Specific License to allow [this Court] . . . to pursue all activities necessary and ordinarily incident to organizing and conducting a judicial sale of the [PDVH] shares . . . .'"))[24]   In other words, Crystallex filed a two-part license application, seeking approval for both (i) the initiation and conducting of the sale process and (ii) the actual sale of the PDVH Shares.   OFAC's rejection of the requested two-part license tells the Court essentially nothing about whether OFAC would have rejected a narrower application seeking approval for only the initiation and conducting of the sale process.

This conclusion is fully supported by a careful analysis of the OFAC letter, the overwhelming majority of which is devoted to addressing Crystallex's request for approval to sell the PDVH Shares (as opposed to its request merely to initiate and conduct the sale process). By the Court's count, the OFAC letter contains at least 23 references to a "sale" of the PDVH Shares.[25]   These references confirm that OFAC was focused on the portion of Crystallex's

---

[24] *But see* D.I. 406 at 13 (Crystallex explaining that it "was merely asking for permission for activities necessary to *effectuate* the final sale – not permission to even *prepare* for a sale").

[25] For example, the letter contains the following statements:

- "Absent a license from OFAC, any *sale* of the PDVH shares is prohibited pursuant to OFAC's Venezuela-related sanctions authorities," including E.O. 13808, E.O. 13835, E.O. 13850, and

30

application seeking approval for the transfer of ownership of the PDVH Shares; at no point in the

letter did OFAC express any concern about the Court undertaking a process that could ultimately

---

E.O. 13,884.   (D.I. 346-1 at 1) (emphasis added)

- "[A]uthorizing the *sale* of the PDVH shares at this time would be inconsistent with United States foreign policy interests . . . ."   (*Id.*) (emphasis added)

- "A request for a specific license for the *sale* of the PDVH shares is therefore denied without prejudice to reconsideration at a later time if the foreign policy considerations change."   (*Id.*) (emphasis added)

- "The United States will reassess whether the *sale* of the PDVH shares is consistent with United States foreign policy, as the situation in Venezuela evolves."   (*Id.* (emphasis added); *see also id.* at 5 (similar))

- The "State Department's assessment" was that "a *forced sale* of Venezuela's U.S.-based assets (particularly the CITGO assets) at this time would be inconsistent with U.S. foreign policy interests." (*Id.* at 2) (emphasis added)

- "Crystallex's license request here is not for a similar negotiated agreement with the Government of Venezuela, but instead for a *forced sale* . . . ."   (*Id.*) (emphasis added)

- The letter announces OFAC's "determination to deny the license for the *sale* at this time."   (*Id.* (emphasis added); *see also id.* ("[O]ur view [is] that a license for the *sale* of the PDVH shares should be denied at this time.") (emphasis added)

- "Crystallex's proposed *sale* is prohibited under U.S. law, unless authorized by an OFAC license."   (*Id.* at 5) (emphasis added)

- "[D]enying Crystallex's request to *sell* the PDVH shares will [not] necessarily have the consequences Crystallex predicts . . . ."   (*Id.*) (emphasis added)

31

lead to executing a sale.[26]  (*See, e.g.*, D.I. 346-1 at 1) ("[D]enying the license at present and continuing the ***blocking of these shares*** is particularly important at this time.") (emphasis added)

_____

[26] The Court perceives an argument (which no party has made) that the letter's many references to "sale" are intended to refer to the "sale process," not just "execution of the sale" (i.e., the actual transfer of the shares).   The word "sale" has more than one meaning.   For instance, a "sale" of shares could refer to (a) the process of trying to reach the point at which actual transfer of ownership and title in the shares passes from one entity to another, or (b) the actual transfer of ownership and title in the shares from one entity to another.   The first usage encompasses the "sale process," while the second usage refers to a "transaction."   A popular dictionary recognizes both usages of the word "sale" as proper:

1   : the act of selling

*specifically* : the transfer of ownership of and title to property from one person to another for a price [usage (b) above]

2   a   : opportunity of selling or being sold [usage (a) above]

. . . .

*Sale*, Merriam-Webster, Inc., https://www.merriam-webster.com/dictionary/sale (last visited Feb. 28, 2022).

In context, it is clear that the many instances of the word "sale" in the OFAC letter are directed to the "transaction," not the "sale process."   In addition to what the Court has already said on this point, it is noteworthy that the letter references Crystallex's contention that "'significant benefits'" will flow to Venezuela if Crystallex's license application were granted, including that "'[a] sale of PDVH would generate funds for Venezuela.'"   (D.I. 346-1 at 7)   This instance of the word "sale" indisputably refers to a transaction involving the exchange of money and not just the sale process.   While OFAC rejected as "not persuasive" Crystallex's list of other purported benefits for Venezuela if a license were granted, those benefits could flow only from a completed transaction, not from the process of trying to find a winning bidder.   (*Id.*)

OFAC's letter uses "sale" only once to refer to the "sale process," and in context, that usage is also clear.   (*See id.* at 1) (referring to "all activities necessary and ordinarily incident to ***organizing and conducting a judicial sale*** of shares") (emphasis added)   This one instance illustrates that OFAC's denial was about Crystallex's request to execute a sale transaction and not about conducting a sale process.

32

Most pertinently, the OFAC letter contains a section with the heading "U.S. court judgments." (*Id.* at 4-5)   Like the rest of the letter, this section is entirely consistent with the Court's view that it may proceed with prefatory steps toward a sale, as long as the sale does not close.   In this part of the letter, OFAC's Director, Andrea M. Gacki, notes Crystallex's complaint that denying its license "'will render the legitimate judicial orders of several federal courts ineffectual.'"   (*Id.* at 4)   OFAC "disagree[s] with Crystallex's characterization," suggesting that its denial of Crystallex's application does not conflict with this Court's decision to proceed. (*Id.*)   Director Gacki goes on to explain: "we are mindful of the Judicial Branch's interest in enforcing its judgments, and we have carefully weighed that consideration in making our licensing decision.   At the same time, we have also considered the Executive Branch's foreign policy and national security interests."   (*Id.*)   This explanation balances, on one hand, the role of this Court to proceed so that it may, eventually, enforce its judgment and, on the other hand, the role of OFAC to evaluate policy considerations and bring them to bear on the timing of any enforcement involving the sale of blocked property.   That balance is entirely consistent with the approach that this Court has taken and will continue to take.

The harmonious relationship between OFAC's view and the Court's view is confirmed by the next paragraph of Director Gacki's letter, which quotes this Court ***without any suggestion of a disagreement***:

> On July 16, 2020, the U.S. government filed a Statement of Interest in the Crystallex litigation before the U.S. District Court for the District of Delaware, explaining the U.S. government's current foreign policy and national security view.   After considering that statement, the Court elected to proceed with

33

> *prefatory steps toward a judicial sale*,[27] but the Court made clear that "the OFAC licensing process provides the [appropriate] mechanism through which the Executive Branch can bring to bear the foreign policy and national security interests on which Crystallex's collection efforts might have an impact." *Crystallex*, 2021 WL 129803, at *16. The Court further stated that all parties to the litigation "recognize that (under current law and policy) a specific license will be required from OFAC before a ***sale*** of PdVSA's shares of PDVH can close." *Id.* Thus, it appears to us that the Court recognized that the Executive Branch's foreign policy and national security interests, if asserted through the OFAC licensing process, ***could properly necessitate a delay in effectuating court judgments***. Accordingly, OFAC has considered the foreign policy and national security interests in connection with Crystallex's license request, and OFAC's denial of ***a license for the sale*** reflects those interests at this time.

(*Id.* at 5) (emphasis added) The letter demonstrates that OFAC clearly understands that the Court has been undertaking – and will continue to undertake – prefatory steps toward a sale, but it does not go on to say anything else about those prefatory steps. Instead, the letter expresses OFAC's seeming contentment with the Court's recognition that a specific license will be required to execute a sale and that OFAC has discretion to consider foreign policy and national security in deciding whether to grant such a license. The best reading of Director Gacki's letter is that OFAC does not view any law or other authority as precluding the Court from proceeding with the sale process. As Crystallex correctly observes: "Despite expressly acknowledging the Court's decision to proceed with prefatory steps toward a sale, OFAC lodged no policy or legal objections to any steps the Court is currently taking or considering to prepare for a sale once a license is granted." (D.I. 406 at 2; *see also id.* at 12 ("OFAC expressed no concern on policy or

---

[27] Here, OFAC seems to agree with the distinction the Court has made between "steps in a sale process" and the final "sale" itself.

34

sanctions grounds with any of the steps the Court is taking or considering at this time to prepare for an eventual sale once a license is granted."))

The OFAC letter concludes: "Accordingly, your request for a ***specific license to effect the sale of the PDVH shares*** is denied at this time." (D.I. 346-1 at 8) (emphasis added) The Court reads this conclusion as limited to the portion of Crystallex's request for a specific license to effectuate the transfer of the PDVH Shares to a winning bidder. OFAC's conclusion does not deny (or even substantially address) Crystallex's related request merely to initiate the process that would ultimately result in effectuating the sale of the PDVH Shares. Indeed, OFAC writes: "In light of this denial, we are not addressing the other aspects of your request at this time, which OFAC will continue to consider" under the same application number. (*Id.*)

The OFAC letter also states repeatedly that the license denial is "without prejudice" and may be reconsidered if the foreign policy considerations change. (*Id.* at 1, 5, 8) Indeed, the letter concludes: "OFAC emphasizes that this determination is made without prejudice to reconsideration of a specific license request to ***sell*** the PDVH shares at a later time if the foreign policy considerations change. . . . The United States will reassess whether the ***sale*** of the PDVH shares is consistent with United States foreign policy, as the situation in Venezuela evolves." (*Id.* at 8) (emphasis added)

As a final indication of OFAC's and the Court's harmonious views, the Court will now quote Director Gacki's use of a quotation from the Court's January 14, 2021 Opinion, which evidently accurately describes ***OFAC's own apparent view of its own discretion***:

> OFAC's discretionary authority to issue or withhold licenses is essential to the U.S. government's ability to tailor sanctions to evolving foreign policy and national security needs. As the Court has noted, "the OFAC licensing process provides the [appropriate]

35

> mechanism through which the Executive Branch can bring to bear
> the foreign policy and national security interests on which
> Crystallex's collection efforts might have an impact."

(D.I. 346-1 at 3) (quoting D.I. 234 at 34)   Again, the Court discerns no disagreement between it

and OFAC.   The Court has received no indication from OFAC that it believes the Court lacks

the authority to proceed with a sale process (excluding the execution of an actual sale

transaction) in the absence of a specific OFAC license.   (*See* D.I. 341 at 5) (Special Master

stating that, in his interactions with government personnel, "they have at no point . . . asked

[him] to or suggested that [he] should delay the process")[28]

In light of OFAC's discretionary authority, and the absence of any indication from any

U.S. governmental entity (including OFAC) that this Court cannot proceed, the Court will

proceed with the sale process, up to and including selecting a winning bid.[29]   The Court will not,

however, permit the sale to be executed unless and until OFAC grants a specific license (or

unless and until the sanctions regime is materially changed).

### D.     The Current Sanctions Regime Does Not Prohibit The Sale Process

The Court's interpretation of the sanctions regulations as set out in this Opinion is

consistent with what the Court previously stated: the interests of the Executive Branch (including

the President's power to determine foreign policy and to protect national security) are fully and

---

[28] Just as OFAC seems to acknowledge, the Third Circuit also recognizes that this Court "agree[s] that OFAC's approval would be necessary to complete the transaction and transfer title."   *Crystallex II*, 24 F.4th at 256; *see also id.* at 257 ("The District Court said it would go only as far as OFAC's regulations allow and acknowledged that OFAC's approval will be needed to complete a sale.").

[29] As always, the Court's current plan may change if there are material developments in this case.

36

**335a**

adequately implemented through the OFAC licensing process, which will determine when – if ever – the sale of the PDVH Shares can actually close. (*See, e.g.*, D.I. 234 at 34 ("[T]he OFAC licensing process provides the better mechanism through which the Executive Branch can bring to bear the foreign policy and national security interests on which Crystallex's collection efforts might have an impact."); D.I. 408 at 2 (Venezuela Parties: "In its January 14, 2021 Order, this Court found that OFAC's licensing process was the appropriate method for the Executive Branch to effectuate its policy interests . . . .") The Court understands the Third Circuit to hold the same position. *See Crystallex I*, 932 F.3d at 151 ("Though the U.S. State Department has not sought to provide a statement of interest, it is nonetheless conceivable that short- or long-term U.S. foreign policy interests may be affected by attachment and execution of PDVSA's assets. The [OFAC] sanctions provide an explicit mechanism to account for these.").

The Court presumes that OFAC remains free to say that it will ***never*** issue a specific license to allow the PDVH Shares to be sold. If that is the case, it would be helpful for all involved in this case (and in related litigation) for OFAC to say so. Without an express indication that this is OFAC's view, the Court has an obligation to work toward execution of Crystallex's judgment, and it will continue do so.

The Venezuela Parties warn: "Marching forward in the absence of an OFAC license will not just risk potential civil and criminal liability for those private parties [who participate in the sale process], it could also prompt further litigation over the validity of the acts and transactions executed, here and perhaps in other courts." (D.I. 408 at 9)[30] The Court agrees with

_____

[30] *See, e.g.*, 31 C.F.R. § 591.202(a), (e) (declaring "null and void" certain actions with respect to blocked property taken in contravention of sanctions regime).

37

Crystallex, however, that liability requires a "willful" violation of the sanctions and, given the

Court's view of the sanctions, the participation of private parties in a judicially ordered process

cannot constitute a willful violation of the law. (*See* D.I. 406 at 14-15) While the Court is not

eager to embrace the prospect of "further litigation" about the validity of this same litigation,

there is plainly no lack of litigation related to Venezuela's debts. This Court cannot, and will

not, be deterred from fulfilling its judicial function by the threat or risk of further litigation.

The Venezuela Parties are correct that, under IEEPA, "the political branches have

constitutional authority to stop courts from attaching, or disposing of attached, foreign-owned

property in the United States." (D.I. 408 at 11) (citing *Bank Markazi v. Peterson*, 136 S. Ct.

1310, 1328 (2016); *Dames & Moore v. Regan*, 453 U.S. 654, 674, 686 (1981); *Behring Int'l, Inc.*

*v. Imperial Iranian Air Force*, 699 F.2d 657, 660 (3d Cir. 1983)) To date, the Executive Branch

has not, however, stopped this Court from undertaking the sale process (short of executing the

sale) for property that was attached before it became blocked. That is, the Executive Branch has

not exercised any authority it may have under the Constitution and/or IEEPA to stop something

that this Court has done or is doing. Unless the Executive Branch takes such an explicit action

(which the Court would then evaluate), or unless an appellate court directs this Court otherwise,

the Court will continue to understand that the Executive Branch will act through the OFAC

licensing process.[31] The Court agrees with Crystallex: "Given the significant separation-of-

---

[31] The Venezuela Parties write: "If the Executive Branch may block, nullify, and void a sale of blocked property in a judicial proceeding, it plainly can require Crystallex to obtain a license from OFAC before proceeding with such a sale process." (D.I. 419 at 8) Even assuming this legal analysis is correct, the fact remains that OFAC has not expressly required Crystallex to obtain such a license at this time (i.e., just to proceed with a sale process), notwithstanding that it had an opportunity to say so when it denied Crystallex's license

38

powers implications of curbing the judiciary's ability to enforce its judgments, the President would at least need to speak clearly before his executive orders could have th[e] effect" of stopping this Court's sale process.   (D.I. 421 at 7; *see also Bond v. United States*, 572 U.S. 844, 857-58 (2014) (explaining that, absent "a clear indication," courts generally avoid reading federal statutes as "dramatically intrud[ing]" on other entities' jurisdiction) (internal quotation marks omitted).

Finally, the Venezuela Parties contend that "[a]llowing PDVH shares to be sold at a fire-sale for a fraction of [their] value would sap the Guaidó government of its economic power, deal a serious blow to its goal of repaying its predecessors' global debts . . . and undermine its legitimacy."   (D.I. 340 at 5)   All that may be so (and would be regrettable), but those concerns are not properly before this Court.   The Executive Branch has the power to prioritize foreign policy and national security interests over the property interests of an affirmed judgment creditor in the U.S. courts.   If that is how the Executive Branch weighs those considerations, it may make its decision known, and no sale of the PDVH Shares will close.   In the meantime, this litigation proceeds, and the Court will continue with its work.

The Court reiterates the view it announced approximately a year ago: the "most reasonable" course of action is to establish the sale procedures and then "follow them to the maximum extent that can be accomplished without a specific license from OFAC."   (D.I. 234 at 32-33; *see also* D.I. 406 at 13 (Crystallex: "The regulation has not changed since January 2021 when this Court recognized that preparatory steps were allowed.")) Today, the Court adds that

---

application.   Moreover, OFAC has never indicated that this Court may not proceed in the absence of any party having a license.

the "maximum extent" includes all necessary and helpful steps in the process for selling the PDVH Shares, short of execution of the sale.

## III.    The Proposed Sale Procedures Order Will Include A Six-Month Window Trigger

Based on his expertise and the recommendations of his advisors, the Special Master has stated he "would not recommend nor . . . intend to launch the Marketing Process until [he is] satisfied with the posture of OFAC *because of the likelihood that Potential Bidders would be unwilling to participate in the process*."   (D.I. 341 at 4) (emphasis added)[32]   The Court welcomes the Special Master's assessment as to the opportune time to launch the sale process, including, in particular, his view on whether OFAC has provided or will provide a statement that could give potential bidders sufficient confidence to expend the time and money necessary to participate in the process.   The Court is not agreeable, however, to an indefinite delay of the start of the process without (a) requiring the Special Master to make a recommendation on whether and when to start and (b) providing the Sale Process Parties with an opportunity to object to that recommendation.

Accordingly, the Sale Procedures Order the Court will enter will include a Six-Month Window Trigger.   That is, the Sale Procedures Order will provide for a period, of no more than six months from the date of the order's entry, for the Special Master to: (i) attempt to obtain greater clarity from OFAC, in a form he can share with the market, of its support for (or at least non-opposition to), the sale process; and (ii) make a recommendation to the Court as to when, and whether, the Court should launch the sale process.

---

[32] There is no inconsistency between the Special Master's position on this empirical point (regarding the best time to start the sale process) and the Court's holding that it has the legal authority to begin the process at any time the Court chooses.

All parties will have an opportunity to object to whatever recommendation the Special Master makes, at whatever point within (and no later than at the end of) the Six-Month Window, to launch (or not launch) the sale process. The Court will carefully evaluate any objections and make an independent determination of how to proceed. Any outcome is possible: the Special Master may recommend that the Court launch the sale process and the Court may do so or not, or the Special Master may recommend that the Court not launch the sale process and, again, the Court may or may not launch it.

The Court expects there will be many beneficial consequences from the Six-Month Window Trigger. First, as noted, it will give the Special Master time to communicate with OFAC – and for OFAC to review further, if it wishes, the status of this (and related) litigation – which will hopefully provide greater clarity to the market as to the risks and likely licensing outcome of the sale process, thereby encouraging more participation and making a value-maximizing bid more likely.[33] Second, it puts the Sale Process Parties on notice that the Court will be making a determination as to whether to start the sale process later this year – not immediately, as Crystallex wishes, but not never (or at some distantly indeterminate date), as the Venezuela Parties appear to prefer. Third, the Six-Month Window will inform others holding judgments against the Venezuela Parties that this Court is on the cusp of launching the sale process, which may inform their litigation activities. Fourth, the Court is hopeful that during the Six-Month Window the parties will engage with the Special Master (or any other individual they

---

[33] The Special Master reports that "as things stand today, there is enough uncertainty that Potential Bidders will likely discount their bids in light of such uncertainty or not even participate in the process at all." (D.I. 341 at 4)

41

prefer) in a good faith attempt to resolve this case through mediation. Fifth, as further described below, the Court may use the six-month period to certify an interlocutory appeal to the U.S. Court of Appeals for the Third Circuit in hopes of obtaining a definitive, binding legal determination as to the impact of the current sanctions regime on the sale process. Sixth, it is always possible that there will be developments in Venezuela, or an evolution in U.S. foreign policy and/or the sanctions regime, that could have a material impact on how the Court should proceed.[34]

Notwithstanding these benefits, the Court recognizes that the pace at which the Court foresees moving will likely disappoint the parties. It is quite possible that the Special Master will determine, at the end of the Six-Month Window, that conditions are not auspicious for

---

[34] OFAC itself has observed: "As the situation in Venezuela has continued to evolve, U.S. foreign policy has also evolved." (D.I. 346-1 at 4) The Court is aware that in January 2022, the U.S. government reiterated its recognition of "the authority of the democratically elected 2015 National Assembly as the last remaining democratic institution and Juan Guaidó as Venezuela's interim president." Ned Price, *U.S. Recognition of Venezuela's 2015 National Assembly and Interim President Guaidó*, U.S. Department of State (Jan. 4, 2022), https://www.state.gov/u-s-recognition-of-venezuelas-2015-national-assembly-and-interim-president-guaido/ (last visited Feb. 28, 2022). The Court further understands that on January 20, 2022, OFAC issued General License 51 and, according to the Venezuela Parties, extended a prohibition on "transactions related to the sale or transfer of" the CITGO Holding, Inc. shares serving as collateral for certain 2020 Bondholders. (D.I. 434) (internal quotation marks omitted) The parties have provided the Court with competing prognostications as to how U.S. foreign policy may or may not change, and as to whether the political situation in Venezuela (e.g., as between the Guaidó administration and Maduro regime) will imminently change. (*Compare, e.g.*, D.I. 429 ("U.S. foreign policy towards Venezuela has not changed, and is unlikely to do so in the foreseeable future.") *with* D.I. 406 at 13 (Crystallex predicting that "the government anticipates more than routine reevaluation" early in 2022, which "could be an inflection point for a policy change") *and* D.I. 431 at 1 ("[T]he situation in Venezuela undoubtedly will continue to evolve [through] the coming year and there is no reasonable basis on which to speculate that OFAC is unlikely to change its position.")) The Court's decisions are made with an understanding of current policy and not based on any predictions of what may or may not happen in the future.

proceeding (for reasons that may or may not include a lack of progress in his interactions with OFAC). In that event, it is also quite possible that Crystallex will object to his recommendation that the Court not launch the sale process, and it would take additional time for the Court to evaluate and resolve such an objection.

On the other hand, the Court has also squarely rejected the view of the Venezuela Parties (and ConocoPhillips) that the sale process may not be launched until after OFAC issues a specific license. The Court's legal holding sets up the very real possibility that the Court will launch the sale process without a specific license – even if the Special Master recommends that the Court not do so. In other words, even if it turns out that OFAC will not provide an indication of non-objection to the sale procedures, and if it appears that the market may not fairly value PDVH, the Court may nonetheless proceed with initiating the sale process.

The litigation before the Court simply cannot be permitted to continue forever. The Court is not persuaded today, and it is unlikely to be persuaded, that any set of circumstances will *necessarily and inevitably* doom the sale process to conclude with a result that cannot satisfy Crystallex's judgment in full and/or will yield such an inequitable result that the Court will have to reject it. Moreover, as Crystallex persuasively points out, "any such risk" is "a risk of Venezuela's own making, given its stout refusal to pay its lawful debt or cooperate in the OFAC licensing process." (D.I. 406 at 2; *see also* D.I. 421 at 10 ("[I]f the OFAC sanctions they seek depress the value of the shares, their own efforts will be the source of their asserted injury."))

Accordingly, the Special Master is directed to include in the final version of the Sale Procedures Order provisions setting out a Six-Month Window Trigger and a brief opportunity for

43

**342a**

the Sale Process Parties to object to whatever recommendation the Special Master makes pursuant to such provisions.

## IV. The Court Is Inclined To Certify An Interlocutory Appeal

The Third Circuit's most recent opinion in this case does nothing to alter this Court's view that, for all the reasons explained throughout this Opinion, it can and should proceed with the sale process to the maximum extent permissible under the current sanctions regime. However, the Third Circuit's recent opinion also suggests to the Court that it might now be an appropriate time to seek the Third Circuit's view on whether this Court's analysis of the sanctions is correct. In other words, it seems to the Court that it might be wise to certify one or more questions to the Third Circuit for an interlocutory appeal.

As the Third Circuit observed in *Crystallex II*, "OFAC's rule looms large in this case." 24 F.4th at 247. While the Court of Appeals was expressly referencing 31 C.F.R. § 591.407 (discussed above), this Court also understands the Third Circuit to be making a general observation that the sanctions regime has enormous implications for how (and whether) this litigation should proceed, and how the market is likely to react once a sale process is launched.

Having presided over this litigation and related cases for more than six years, *see generally Crystallex Int'l Corp. v. Petróleos de Venezuela, S.A.*, C.A. No. 15-1082-LPS (D. Del.) (filed Nov. 23, 2015), the undersigned Judge believes that the most appropriate next step might be to certify an interlocutory appeal, seeking appellate guidance as to the impact of the sanctions regime on the Court's ability to launch the sale process, as envisioned in this Opinion.[35] This

_____

[35] In a separate opinion being issued today in related actions, the Court is raising the same suggestion of an interlocutory appeal relating to the impact of the sanctions regime on the

Court has done its best to evaluate the parties' competing arguments and to explain its reasoning for concluding that it has the authority, consistent with the sanctions, to adopt a Sale Procedures Order and to implement that order to the point at which a winning bidder for the PDVH Shares is selected, while also not permitting execution of the sale until OFAC issues a license (or the sanctions regime is materially changed). As explained above, the Court is prepared, subject to the Six-Month Window Trigger provisions, to launch its sale procedures, perhaps before the end of 2022. Rather than doing so without knowing whether the Court of Appeals agrees with this Court's analysis of the sanctions regime, it might be preferable – while the Six-Month Window period is running – to ask the Third Circuit to review this crucial legal issue. If the Court of Appeals disagrees with this Court, it could prevent this Court from undertaking a costly, unnecessary, and legally invalid sale process. Alternatively, if it agrees with this Court, the Court of Appeals could provide greater comfort to market participants that this Court's process is lawful, thereby improving the chances of obtaining a fair value for the PDVH Shares to be sold.

The Court is not suggesting that today's decision constitutes a final judgment. As the Third Circuit has explained, "a post-judgment order is final when it leaves nothing to be done in the cause save to superintend, ministerially, the execution of the decree." *Crystallex II*, 24 F.4th at 255 (internal quotation marks and emphasis omitted); *see also id.* at 254-55 ("Generally, the dispositive question, then, is whether there is anything left for the district court to do with respect to execution of the judgment.") (internal quotation marks omitted)). This case has not reached such a stage; it is not even close. Nor does this Court wish to invite "piecemeal review of every

---

Court's ability to authorize the issuance of writs of attachment to other judgment creditors of Venezuela or other entities of the Venezuelan government. *See, e.g.*, *OI Eur. Grp. B.V. v. Bolivarian Republic of Venezuela*, Misc. No. 19-290-LPS D.I. 109 (D. Del. Mar. 2, 2022).

45

post-judgment order en route to a final sale." *Id.* Instead, it welcomes the "room to manage complex litigation" that comes from the final judgment rule. *Id.* at 250. All that said, the Court perceives a possibility that this case (and the related litigation) may have reached a point at which a detour to the Court of Appeals would be beneficial to all involved.

The Court recognizes that just about six weeks ago, the Third Circuit explained: "Venezuela's assertion that a contingent auction would violate OFAC's regulations is . . . unripe for resolution in this appeal. We reject Venezuela's attempt to inject this premature issue into this appeal." *Id.* at 257 (citation omitted). Much has changed, however, in the intervening time. Most importantly, when the Third Circuit issued its opinion, this Court "ha[d] not approved a contingent auction," *id.*, but now, in this Opinion, it has. When the Third Circuit issued *Crystallex II*, it understood that this Court had not yet decided "how far [it] can go toward a final sale" and rightly predicted that this Court would "decide how far is too far in the forthcoming order on sale procedures." *Id.* at 258. Now, the Court has made these decisions, having exercised its "judgment" and resolved the "legal objection[s]" relating to the impact of the sanctions. *Id.* at 255. While not constituting a final order, the Court's decision may well make these important, formerly "unripe" issues no longer premature for appeal.

Additionally, unlike an appeal from a recalcitrant judgment debtor, which the Court of Appeals confronted in *Crystallex II*, a certified interlocutory appeal would come with this Court's backing. If the Court proceeds in this manner, it would, as required by 28 U.S.C. § 1292(b), express in an order its view that "such order involves a controlling question of law as to which there is substantial ground for difference of opinion and that an immediate appeal from the order may materially advance the ultimate termination of the litigation." Such an order

46

might then lead the Third Circuit to exercise its discretion to permit an interlocutory appeal. During such appeal, the proceedings in this Court, including the opening (and potential closing) of the Six-Month Window, would not be stayed.

The Court is inclined to certify an interlocutory appeal. Before deciding whether to do so, the Court will solicit and carefully consider the views of the Special Master and the Sale Process Parties on this point.

## CONCLUSION

As the Court noted at the outset of this Opinion, while all involved with this case have undertaken a tremendous amount of work to date, much additional work lies ahead. The immediate next steps will include the Sale Process Parties – and the Special Master, if he wishes – providing their positions on whether the Court should certify an interlocutory appeal to the Third Circuit relating to the impact of the sanctions regime on the Court's ability to undertake a sale process (but not execute an actual sale) in the absence of a specific license from OFAC. The Sale Process Parties and the Special Master will also be directed to attempt to resolve any remaining ripe objections to the Proposed Order that are not expressly resolved in this Opinion – and, in the event they cannot do so, to file briefs (preferably short briefs) to allow the Court to rule on any such objections. The Special Master will also be required to work with the Sale Process Parties to prepare a version of the Proposed Sale Procedures Order consistent with the Court's rulings in this Opinion and on any objections to be briefed, as just explained.

47

Thereafter, the Court anticipates signing a version of the Proposed Order that is consistent with today's and any forthcoming decisions, thereby opening the Six-Month Window.[36]

An appropriate Order follows.

---

[36] The Third Circuit further anticipates that "[m]ore appeals will likely follow the final order on sale procedures." *Crystallex II*, 24 F.4th at 255.

48

```
 1                   IN THE UNITED STATES DISTRICT COURT

 2                   IN AND FOR THE DISTRICT OF DELAWARE

 3                             - - -
       CRYSTALLEX INTERNATIONAL
 4     CORPORATION,                    :   MISCELLANEOUS ACTION
                                       :
 5              Plaintiff,             :
       v                               :
 6                                     :
       BOLIVARIAN REPUBLIC OF          :
 7     VENEZUELA,                      :
                                       :   NO. 17-151-LPS
 8              Defendant.             
                                          - - -
 9
                             Wilmington, Delaware
10                      Monday, November 8, 2021
                            Oral Argument Hearing
11
                                - - -
12
       BEFORE:      HONORABLE LEONARD P. STARK, Chief Judge
13
       APPEARANCES:                     - - -
14
                    RICHARDS LAYTON & FINGER, P.A.
15                  BY:  JEFFREY L. MOYER, ESQ., and
                         TRAVIS S. HUNTER, ESQ.
16
                         and
17
                    GIBSON, DUNN & CRUTCHER, LLP
18                  BY:  ROBERT L. WEIGEL, ESQ., and
                         JASON W. MYATT, ESQ.
19                       (New York, New York)

20                       and

21                  GIBSON, DUNN & CRUTCHER, LLP
                    BY:  MIGUEL A. ESTRADA, ESQ.
22                       (Washington, District of Columbia)

23                       Counsel for Crystallex
                         International Corp.
24

25     Valerie J. Gunning              Brian P. Gaffigan
       Official Court Reporter         Official Court Reporter
```

348a

1    point of the sale.

2              That submissions that were made both by Director

3    Gacki previously in writing to this Court, but also at the

4    transfer -- at the hearing with the Assistant U.S. Attorney

5    Demott, who was speaking for the U.S. Government, emphasized

6    that OFAC has considerable discretion in its licensing

7    determination and can decide to sequence its approval so it

8    can decide not to grant the full extent of the request for

9    somebody seeking a license, but it can do so sort of step by

10   step, piece by piece.

11             It didn't do that here.  It didn't authorize

12   taking initial steps.  It didn't authorize the marketing

13   process.  It didn't authorize accepting a credit bid.  It is

14   Crystallex's burden to request that authority.  It is not

15   our burden to request that authority for them.

16             They did request it and OFAC has denied it.  And

17   then --

18             THE COURT:  Let me ask you.  If I am going to go

19   forward, do you object to the latest proposal from the

20   Special Master that you would ask for some sort of informal

21   guidance in writing that he could provide to the market?

22             MR. GOTTLIEB:  We do, Your Honor.  We think a

23   license is necessary before a process can go forward.

24             THE COURT:  I understand, but let's say I don't

25   agree with that.  Do you, do you object to me directing the

1    Special Master to see if we can get some sort of written

2    guidance from OFAC short of a license?

3              MR. GOTTLIEB:  Well, a written guidance and a

4    license -- written guidance and informal guidance perhaps

5    held in conversation are different things.  So OFAC enacted

6    a license, which is our argument of what is necessary here

7    currently.

8              OFAC can also change the sanctions regime.  So

9    it can repeal certain regulations, and the President can

10   rescind certain Executive Orders, and OFAC can issue general

11   licenses and FAQs.  So there is a lot of ways that OFAC can

12   communicate formally through its processes what is lawful

13   and what is not and what is permitted.

14             I think the answer to Your Honor's question is

15   it really depends what that writing is.  I mean there are

16   certain forms of writing that I don't think we would have

17   any objection to relying on to authorize the sales process.

18   The license is one of those.  There may be certain forms of

19   general license that OFAC could issue that would satisfy it.

20   There may be forms of an FAQ that would satisfy objections

21   with respect to certain aspects of the sales or bidding

22   process, depending on how it is written.

23             I think the difficulty for us is in just sort

24   of having an ill-defined conception of what that kind of

25   guidance might be.  And I think one of the ways in which we

1    find the process unsatisfactory is it can't be that if a

2    conversation takes place or a phone call takes place and

3    OFAC simply says we are not currently stating an objection

4    to what you are telling us, and then the Special Master

5    communicates this to that Court, in our view that type of

6    communication doesn't resolve any of the legal obstacles to

7    moving forward with the agreement.

8              THE COURT:  What about the market obstacles?  Do

9    you disagree that that would help with the market?

10             MR. GOTTLIEB:  We think it would not help -- I

11   mean substantially help.  Obviously, it's impossible to

12   predict the amount that it might help a particular bidder.

13   We don't speak for those people.

14             But the notion that you can, just by saying I

15   had a conversation with OFAC and they say they're not

16   objecting at this time; the notion that you can calm

17   individuals that are looking at the sanctions regime

18   that says this property is blocked; people who deal in

19   transacting it are violating the law; when they do so, the

20   transactions they enter into are null and void, and there

21   are civil and criminal penalties for that; the notion that

22   you can solve that by a conversation that has taken place

23   that is not an on-the-record adjudication of a license

24   request for a grant of general license seems farfetched to

25   us.

1          So we think you need something, something more

2      than that.

3          It is important that OFAC has reiterated

4      its United States foreign policy objections, the same

5      objections that were raised to this Court in the hearing in

6      2020 and in the papers submitted by Ambassador Abrams and

7      Director Gacki.  The denial that OFAC has issued in writing

8      to Crystallex reiterates all of those same foreign policy

9      objectives.

10         So this Court said that OFAC exercises its

11     authority properly through the licensing process that it

12     runs.  OFAC has run that licensing process and has

13     reiterated these same foreign policy objections.

14         And it seems to us to be improper to sort of

15     force a conflict in a game of chicken with the executive

16     branch that OFAC, you know, might back down essentially if

17     the Court continues to exceed Crystallex's demands to move

18     forward.  We think Crystallex may characterize OFAC's

19     response in a number of ways.  We talked about one of those

20     previously, but most importantly, OFAC nowhere in its letter

21     says that it is given approval of or walking back its prior

22     guidance with respect to the prefatory steps towards the

23     judicial sale.

24         OFAC referenced the prior decision, but only to

25     provide the appropriate contact.  And OFAC sort of responded

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

CRYSTALLE INTERNATIONAL
CORPORATION

P

|  |  |
|---|---|
| M   N | LPS |

OLIVARIAN REPU LIC OF
VENEZUELA

PU LIC VERSION

D    d

## RESPONSE OF SPECIAL MASTER TO
## O   ECTIONS TO PROPOSED SALE PROCEDURES ORDER

OF COUNSEL:

Ray C. Schrock, P.C. (Admitted *pro hac vice*)
Alexander W. Welch (Admitted *pro hac vice*)
Jason L. Hufendick (Admitted *pro hac vice*)
WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
Ray.Schrock@weil.com
Alexander.Welch@weil.com
Jason.Hufendick@weil.com

Myron T. Steele (#000002)
Matthew F. Davis (#4696)
Alan R. Silverstein (#5066)
Abraham Schneider (#6696)
POTTER ANDERSON & CORROON LLP
Hercules Plaza, 6th Floor
1313 North Market Street
P.O. Box 951
Wilmington, DE 19801
Telephone: (302) 984-6000
Facsimile: (302) 658-1192
msteele@potteranderson.com
mdavis@potteranderson.com
asilverstein@potteranderson.com
aschneider@potteranderson.com

*Counsel for Special Master Robert B. Pincus*

Dated:   September 10, 2021
Public Version Dated:  September 21, 2021

## TA LE OF CONTENTS

I.    Preliminary Statement .................................................................................1

II.   Special Master's Recommendations .............................................................3

      A.    Timing for Launch of the Marketing Process .........................................3

      B.    Settlement Discussions and Proposed Negotiated Outcome ...................6

      C.    Structure of Sale Process Considerations ...............................................7

            1.    Good Faith Deposit...........................................................................7

            2.    Stalking Horse Bid Protections.................................................8

            3.    The Role of The Venezuela Parties and CITGO's Management
                  Team ......................................................................................9

            4.    Sharing of Information with Potential Bidders.........................11

            5.    Venezuela Parties' Additional Structure and Alternative Process
                  Arguments.............................................................................13

            6.    Right to Seek Additional Guidance from the Court....................17

            7.    Provisions Regarding Attached Judgments .............................18

      D.    Reimbursement of Reasonable Expenses and Proposed Budget ...........18

      E.    Proposed Retention of Evercore as Investment Banker........................19

III.  Conclusion ...............................................................................................23

## E HI ITS

**E HI IT A**    Revised Sale Procedures Order

**E HI IT A**    Revised Sale Procedures Order Redline

**E HI IT**      Investment Banker Fees in Comparable Transactions

i

**354a**

I, Robert B. Pincus, solely in my capacity as special master (the "S      M    r") for the United States District Court for the District of Delaware (the "C   r ") in *Crystallex International Corp. v. Bolivarian Republic of Venezuela* (D. Del. Case. No. 17-151-LPS) ("the "Cr

C    "), hereby submit this response ( "R      ")[1] to the Court in response to the objections to the *Proposed Order (A) Establishing Sale and Bidding Procedures, (B) Approving Special Master's Report and Recommendation Regarding Proposed Sale Procedures Order, C Affirming Retention of  vercore as Investment Ban  er by Special Master and  D  Regarding Related Matters* [D.I. 302] (the "Pr      d S     Pr    d r    Ord r") filed by Crystallex [D.I. 317] (the "Cr          's O        "), the Venezuela Parties [D.I. 318] (the "V          P  r   '

O          "), and ConocoPhillips [D.I. 319] (the "C        P      ' O          " and, collectively, the "O          "):[2]

## I.      <u>Pr          r S          </u>

1. Since my appointment as Special Master, my Advisors and I have endeavored to develop a sale process for the PDVH Shares with two guiding objectives (i) to design a process that will result in a sale transaction that is fair, open, and maximizes the value of the PDVH Shares to be sold, and (ii) to ensure the diverse, and frequently conflicting, views of the Sale Process Parties are solicited and considered in the development and implementation of such a process. I believe that striving to achieve these two objectives will ultimately result in the most appropriate process for the sale of the PDVH Shares – one that is fair, value-maximizing, and can be

---

[1] This Reply has been filed under seal pursuant to paragraph 3 of the *Special Master Confidentiality Order* [D.I. 291].

[2] Capitalized terms used but not defined shall have the meaning ascribed to such terms below or, if not defined below, the meaning ascribed to such terms in the Proposed Sale Procedures Order or the *Special Master's Report and Recommendation Regarding Proposed Sale Procedures Order* filed August 9, 2021 [D.I. 303] (the "R      r ").

implemented in accordance with the Court's orders regarding such a sale. This was the basis upon which I designed and ultimately recommended the Proposed Sale Procedures Order to the Court.

2.      Although my team and I have tried to have a collaborative and open dialogue with the Sale Process Parties, it is very clear that each of the Sale Process Parties has very different objectives and, accordingly, that affects our ability to reach consensus on a number of important issues. However, respectfully, each of the Objections to the Proposed Sale Procedures Order must be interpreted through the lens of the clear objectives and interests of its proponents, they are not unexpected when considered in context of each proponents' goals for this process:

- Crystallex seeks a sale as soon as possible – hence the proposed single step auction.
- The Venezuela Parties prefer no sale at all – and the record in these proceedings speaks for itself in this regard.
- ConocoPhillips, a junior creditor to Crystallex, wants a sale only after the Court has ordered and OFAC has consented to the attachment of their own judgment and has expressed a desire to tie everything to receipt of approval from OFAC. Further, as a junior creditor, given the current economic environment for the shares of an oil and gas refinery business (and the financial implications thereof), ConocoPhillips also prefers delays until the value of PDVH has recovered to pre-pandemic levels.

3.      Given these irreconcilable points of view and each Sale Process Parties' motivations, it is not surprising that each party raised objections to the Proposed Sale Procedures Order and they now seek a determination from the Court. This is not to say that any Objection is *per se* unwarranted, that is for the Court to decide – but it is fair and appropriate for the Court to understand that in this process the Special Master has seen the particular views and objectives of the Sale Process Parties during his interactions and consultations with each of the parties, and these views underlie their Objections.

4.      To maintain the transparency of this process for the benefit of the Court and the Sale Process Parties, I am filing this Reply to supplement my recommendations set forth in the Proposed Sale Procedures Order and my Report, particularly with respect to issues where no Sale

Process Party may be adequately incentivized to provide a fair or reasoned proposal to the Court.[3] Further, having reviewed the Objections in detail, I have also prepared a revised form of the Sale Procedures Order, which is attached as **E        A** hereto, to reflect certain of the modifications to the Sale Procedures Order proposed in the Objections (the "**R        d Pr        d S    Pr    d r Ord r**").[4] A redline showing the changes is attached hereto as **E        A**.

## II.        Special Master's Recommendations

### A.        T        r L            M r        Pr

5.        I believe that the Sale Process Parties will agree that the most crucial and most polarizing issue for the Court to decide at this stage is when the Marketing Process should be launched in relation to obtaining approval or guidance from the United States Government (the "**USG**"), particularly with respect to obtaining a license or other guidance from the Department of the Treasury's Office of Foreign Assets Control ("**OFAC**"). Although there could be benefits to the Court establishing a firm Launch Date (as it may increase the likelihood of OFAC taking action),[5] I continue to recommend that the Court adopt a more nuanced proposal: the Marketing Process should be launched when I am satisfied with the authorization, FAQs, or other applicable guidance issued by OFAC regarding the launch and viability of the Marketing Process *or* such other time as ordered by the Court. *See* Proposed Sale Procedures Order at ¶ 3. Given Crystallex's goal for this process, it is understandable that they would want a date certain for

---

[3] To preserve costs, I have not submitted any additional evidence, but should the Court require evidence to decide any of these issues, I will make myself and my Advisors available at the request of the Court.

[4] The Revised Proposed Sale Procedures Order assumes that ConocoPhillips will elect to continue to participate in the Special Master process. Should they elect to withdraw, additional revisions may be necessary.

[5] There are also notable drawbacks, including that Potential Bidders may not participate in such process.

launch upon entry of the Proposed Sale Procedures Order, but the Proposed Sale Procedures Order has always provided (and it should provide) that the Court can direct me to launch (or delay launch) at an alternative time. In the first instance, it is my recommendation that we continue the dialogue with OFAC as set forth in the Proposed Sale Procedures Order and my Report, including, if appropriate, this Court issuing an order to show cause if progress is not timely made following entry of the Proposed Sale Procedures Order.

6. As things stand today (and as I said repeatedly in the Report), I would not recommend nor would I intend to launch the Marketing Process until I am satisfied with the posture of OFAC because of the likelihood that Potential Bidders would be unwilling to participate in the process.[6] *See* Report at ¶¶ 3-4. In reaching this conclusion, I am not taking a position on the parties' particular arguments regarding what the OFAC FAQs or regulations ultimately permit at this time. What's important from my perspective is that, as things stand today, there is enough uncertainty that Potential Bidders will likely discount their bids in light of such uncertainty or not even participate in the process at all. Of course, a number of scenarios could develop after entry of the Proposed Sale Procedures Order that could change this perception – for example, such as a change to the U.S. sanctions on Venezuela, affirmative guidance from OFAC and updated FAQs, a general or specific license from OFAC, or subsequent pleadings filed by the USG in this case – but sitting here today, it is not possible to predict every permutation of feedback or input that we may receive from OFAC and for this reason I believe the proposed discretion is warranted. I further believe that the flexibility will allow us to tailor the course of action to the situation as it develops and will serve to prompt the USG to act rather than remain silent.

---

[6] *See also* OFAC FAQ 809 (stating that a specific license from OFAC is required "prior to conducting an auction or other sale… or taking other concrete steps in furtherance of a sale" of shares of a Government of Venezuela entity (such as the PDVH Shares).

7.      I would caution the Court from attempting to infer the USG's views from the Trump administrations' August 28, 2020 statement [D.I. 220] that the Venezuela Parties recite in many of the pleadings they file in this and other courts.  The USG (including OFAC) is very aware of the Special Master process.  They've requested copies of pleadings (which the Court approved at D.I. 314) and in a series of meetings, the USG's representatives asked thoughtful questions and have shown other signs of engagement as detailed more fully in my Report.  Presumably, the USG knows how to protect the interests of the Executive Branch and, in accordance with their subsequent public statements made at the September 17, 2020 hearing that the Court can "do whatever it wants," they have at no point in any of my interactions with them, as an arm of this Court, asked me to or suggested that I should delay the process.

8.      Nor do I believe that it would be impermissible or inappropriate for the Court to prompt the USG to act through entry of the Proposed Sale Procedures Order or a subsequent order to show cause as the Venezuela Parties argue.  *See* Venezuela Parties' Objection at ¶ 21 (arguing that "federal courts do not advocate to the Government on behalf of particular parties or for particular outcomes in regulatory determinations affecting those parties.").  I have not proposed to, nor have I ever, lobbied on behalf of any particular party in this case, despite assertions to the contrary in the Venezuela Parties' Objection.  *See id.*  Moreover, federal courts frequently prompt the USG to clarify its position on issues relevant to matters before the Court and have done so in connection with the USG's policy regarding Venezuela as well.[7]

---

[7] *See e.g.*, *Petroleos De Venezuela S.A. v. M  G  nion Ban , N.A.*, Case No. 19-10023 (KPF) (S.D.N.Y. June 25, 2020) [D.I. 144] ("The Court orders the parties to notify the Civil Division of the U.S. Attorney's Office for the Southern District of New York that the Court invites the views of the United States Government as to the following question: Is recognition of the Venezuelan National Assembly's denunciation and invalidation of the 2020 Bond Indenture consistent with the law and policy of the United States? The parties' notification should be brought specifically to the attention of Jeffrey Oestericher, Chief of the Civil Division. The Court further ORDERS the

5

**359a**

9. In sum, it is my view that the proposed discretion afforded to the Special Master in the Proposed Sale Procedures Order with respect to the Launch Date appropriately balances the conflicting views of Crystallex, on one hand, and the Venezuela Parties and ConocoPhillips, on the other. Flexibility in the procedures will allow the Court to ensure the Marketing Process is initiated in a manner that will enable all parties, including Potential Bidders, to have confidence in the viability of the process without facing unnecessary or undue delays. Accordingly, notwithstanding Crystallex's request to establish an affirmative launch of the Marketing Process, I have not adopted that request, but defer to the Court if it is of the view a specific Launch Date would be appropriate at this time.

**B.** **S** **D** **d Pr** **d N** **d O**

10. In the Objections, each of the Venezuela Parties, Crystallex, and ConocoPhillips expressed a desire for settlement discussions to occur, with certain modifications to the proposal I included in my Report. My purpose for proposing the framework for the Sale Process Parties and the PDVSA 2020 Bondholders to engage in settlement discussions was simply to propose

---

parties, in their notification to the U.S. Attorney's Office, to request that the Government provide its views to the Court no later than August 5, 2020."). It is particularly appropriate here where the USG has already appeared in the Crystallex Case and further in the context of a sale of "blocked property" where applicable law charges the Court and its judicial officers with the obligation to actually conduct the sale of the blocked property itself (acting in the role typically fulfilled by the Sheriff's Department or the U.S. Marshal Service). Frequent communication between the Department of Justice and the U.S. Marshals is indeed the norm in connection with sales undertaken by the United States Marshals Service. *See e.g.*, Department of Justice's *Justice Manual* at 9-115.110 (Management and Disposal of Seized Assets, https://www.justice.gov/jm/jm-9-115000-use-and-disposition-seized-and-forfeited-property) ("[T]he United States Attorney or agent in charge of the field office responsible for an administrative forfeiture case should consult with the United States Marshals Service in cases involving Department of Justice seizing agencies, or Treasury in cases involving Treasury seizing agencies, to discuss management or disposition issues. Such discussions shall address the impact that such proposed action may have on the United States Marshals Service or other custodial agency in undertaking, continuing, or terminating custody of the property.").

what I believe to be in the best interest of the interested parties. The parties are, of course, free to accept or reject my offer. *See* Fed. R. Civ. P. 53(1)(A) (masters may "perform duties consented to by the parties."). I continue to believe it makes sense and would be in each party's interest for the Sale Process Parties and the PDVSA 2020 Bondholders to settle on a negotiated resolution of certain, or all, relevant claims held by Crystallex, ConocoPhillips, and/or the PDVSA 2020 Bondholders. At a minimum, the parties should agree on a claims waterfall. I offered my assistance primarily because I believe that my involvement would bring structure to the process. I continue to encourage the Sale Process Parties to engage with each other and, if my involvement is desired, to send a proposal regarding the terms upon which they would participate in such discussions either to me or to the other Sale Process Parties (or both).

11.    Of course, we need not wait until the Proposed Sale Procedures Order is entered to do so. Now that the hearing to consider approval of the Proposed Sale Procedures Order has been scheduled for November 8, 2021 – two months from now – I encourage the Sale Process Parties to use this opportunity to narrow the issues. There is sufficient time to make real progress.

**C.    S r    r    S   Pr      C    d r**

      **1.    <u>G    d F      D</u>**

12.    The Venezuela Parties ask the Court to "revisit its prior determination that bidders be required to submit a 'substantial good faith deposit.'" *See* Venezuela Parties' Objection at ¶ 12. ConocoPhillips raises similar concerns regarding the proposed size of the proposed good faith deposit. Although I attempted to incorporate all of the Sale Process Parties' comments to the good faith deposit mechanism that I received to the draft of the Proposed Sale Procedures Order, I welcome the further revisions proposed by the Venezuela Parties and ConocoPhillips in their objections to reduce the amount of the good faith deposit or to establish a cap on the maximum amount of any good faith deposit. Upon review of the Objections, I have revised the Proposed

Sale Procedures Order to recommend that a good faith deposit shall in no circumstance exceed 50 million. Of course, the Bidding Procedures should continue to provide that the amount of the good faith deposit can be decreased in consultation with the Sale Process Parties to encourage a Potential Bidder to participate if it appears that this requirement ultimately chills bidding in practice. *See* Bidding Procedures at ¶ 12 (providing that the good faith deposit is 10% "unless otherwise agreed to by the Special Master, in consultation with the Sale Process Parties.").

**2.      S        H   r      d Pr        **

13.     The Venezuela Parties and ConocoPhillips, for different reasons, take issue with the provision of the Stalking Horse Bid Protections contemplated in the Sale Procedures Order and the Bidding Procedures.[8]   However, both parties assume in their Objections that such relief is requested in the Sale Procedures Order with respect to the Stalking Horse Bid Protections. Instead, such relief is contemplated to be granted only by further Court order if requested by me.

14.     As set forth in Section 19 of the Sale Procedures Order, the Special Master's authority to grant any of the Stalking Horse Bid Protections described therein is subject to approval of the Court and "shall not be effective until entry by the Court of an order approving such Stalking Horse Bid Protections and subsequent execution by the Special Master of the Stalking Horse Agreement."[9]   Accordingly, I do not believe that the Court needs to rule on the Objections related to the Stalking Horse Bid Protections until, and only if, such Stalking Horse Bid Protections are submitted and recommended to the Court.  If, following receipt of any Stalking Horse Bids and any subsequent negotiation, I determine that it is appropriate to grant a potential Stalking Horse Bidder certain protections, then I will seek the requisite authority from this Court to do so.  In such

---

[8] *See* Venezuela Parties Objection at 10-11; *see also* ConocoPhillips Objection at 14.

[9] *See* Sale Procedures Order at ¶ 19.

event, the Sale Process Parties will have the opportunity to raise objections to the proposed Stalking Horse Bid Protections and to be heard by the Court with respect thereto. No such authority has been requested in the Proposed Sale Procedures Order at this time (other than keeping open the option for the Special Master to designate and seek approval of such a Stalking Horse Agreement in the future with all parties rights reserved until such time) and I therefore believe the Objections raised to the Stalking Horse Bid Protections are not yet (and may never be) applicable.

15.     I would be remiss, however, if I did not note that I do understand each of the Sale Process Parties concerns regarding the potential Stalking Horse Bid Protections (particularly their Objections to granting Stalking Horse Bid Protections to a credit bidder) and I will certainly take them into account before submitting any such proposal to the Court, and all such rights to object are intended to be reserved. At this stage, it is impossible to predict the bids that may be received and/or to guess at the context in which the Stalking Horse Bid Protections should be considered and, accordingly, I do not believe it is appropriate to foreclose seeking Stalking Horse Bid Protections for a bid at this time. Each parties' rights are fully preserved. *See* Proposed Sale Procedures Order at ¶ 22 ("If a timely Stalking Horse Objection is filed and served with respect to a Stalking Horse Agreement, the proposed Stalking Horse Bid Protections provided for under that agreement shall not be approved until the objection is resolved").

### 3.     The Role of The Venezuela Parties and CITGO's Management Team

16.     I agreed and continue to agree with much of what the Venezuela Parties have said regarding the ways in which their participation in the process could enhance the likelihood of the process resulting in a value-maximizing bid. However, the Court has ordered the development of this process for a judgment debtor that has not yet shown its willingness to proceed with the sale of the PDVH Shares. That cannot be ignored. From my perspective, I believe the scope of the disagreement is actually very narrow: who should control and direct the communications with

Potential Bidders   The question is not whether the Venezuela Parties, and particularly CITGO management, should be involved.  We all agree that the CITGO management team is most familiar with the assets represented by the PDVH Shares and that their good faith involvement will be value enhancing.  *See* Report at ¶ 78 ("Guiding bidders through CITGO's recent financial performance and future projections will require substantial work and time on both the part of myself and my Advisors, and the CITGO management team.").

17.      Given the importance of maintaining clear and consistent messaging to Potential Bidders (and because the Venezuela Parties themselves have expressed an interest in maintaining the option to submit a bid after they have received copies of other bids), it is critically important that I, as an arm of the Court, control the forum and timing of any communications between the CITGO management team and Potential Bidders so that I can oversee the competitive bidding process.  It is for this reason that I proposed the limited restriction that the Sale Process Parties should seek my consent before sending any communications to a Potential Bidder.  *See* Proposed Sale Procedures Order at 40-41; *see* also Bidding Procedures at ¶ 4 ("Each of the Sale Process Parties may recommend to the Special Master documents or additional information to be included in the Data Room").  This, of course, does not prohibit the Venezuela Parties from reviewing and providing input on any marketing materials, which I have proposed.  *See* Proposed Sale Procedures Order at ¶ 4 ("the Special Master shall share a draft of the "teaser" and CIM with counsel to the Sale Process Parties no later than seven (7) calendar days prior to launch of the Marketing Process and shall consult in good faith with the Sale Process Parties regarding the same.").  In addition to maintaining the competitive environment, the prohibition will signal to Potential Bidders that the process is fair and that the Sale Process Parties – each of which has not ruled out that it will be a Potential Bidder – will not be attempting to use their engagement in the case to pursue ulterior

**364a**

motives.  *See* Venezuela Parties' Objection at ¶ 21 (stating that the Venezuela Parties oppose any sale).

18.    With respect to ConocoPhillips' request to remove the prohibition on communications that are "intended to frustrate the Marketing Process or the Sale Procedures," I continue to believe it is very important for this Court to maintain the integrity of the sale process and to take appropriate precautions to ensure that parties (including potential bidders) do not collude in connection with submitting any bid (or in discouraging any party from submitting a bid).  *See* 11 U.S.C. 363(n) (codifying a similar requirement in the Bankruptcy Code).  The Proposed Sale Procedures Order does not purport to limit the types of discussions that ConocoPhillips seeks to undertake regarding any objections to the implementation of the Proposed Sale Procedures Order.  *See* Proposed Sale Procedures Order at ¶ 42 ("For the avoidance of doubt, this provision is not intended to limit in any way the ability of some or all of the Sale Process Parties to discuss . . . the terms, content, or grounds of any potential objection to be filed with the Court.").  Nonetheless, because I believe that a party will not knowingly interfere with or obstruct an order of the Court regardless of whether an order expressly prohibits it, and because of my ability to seek guidance from the Court if a Sale Process Party acts inappropriately during the process, I have proposed to remove the explicit prohibition from the Revised Proposed Sale Procedures Order that I have filed with this Reply to avoid an unnecessary determination from the Court at this time.  I trust that each party will act appropriately and, if necessary, I will seek guidance or input from the Court at a later time.

**4.     S   r    I   r              P          dd r**

19.    Relatedly and equally as important as controlling communications with Potential Bidders, I believe it would inhibit the process if the Venezuela Parties were able to control communications with Potential Bidders through the designation of information as "highly

confidential." *See* Venezuela Parties Objection at 22 (arguing that the Special Master should only be able to share information "with the consent of the producing party"). As the Venezuela Parties have marked the vast majority of the most important information that will need to be shared with Potential Bidders as "highly confidential," granting this request would effectively provide the Venezuela Parties with control over the process.

20. The protections in the Proposed Sale Procedures Order afforded to the Venezuela Parties with respect to confidential information are more than sufficient to protect their interests. The Proposed Sale Procedures Order provides that, before I disclose any confidential information to a Potential Bidder, I must first give notice to the applicable Sale Process Party and then, only after notice has been provided, it can be shared only if the Potential Bidder has entered into a market standard confidentiality agreement, a copy of which is attached as Exhibit 4 to the Proposed Sale Procedures Order (the "**C    d      A r      **").[10] Further, all potential bidders that participate in this process must consent to the Court's jurisdiction (see Proposed Sale Procedures Order at ⁋ 38) and each party must contractually agree that the Court will be able to enforce any breaches of the Confidentiality Agreement. *See* Confidentiality Agreement ⁋ 10. Finally, the Proposed Sale Procedures Order provides that I will consult with PDVH and CITGO in connection with sharing competitively sensitive information and, if appropriate, will establish firewall protections or "clean team" protocols. *See* Proposed Sale Procedures Order ⁋ 44. In light of these protections, I do not believe that the information sharing provisions with Potential Bidders are insufficient to protect the Venezuela Parties' interests. In any event, by requiring me to provide them with notice before I share any confidential or highly confidential information, the Venezuela

---

[10] To further increase transparency, in the Revised Proposed Sale Procedure Order I have added a mechanism for any executed Confidentiality Agreement to be filed with the Court under seal and shared with the Sale Process Parties.

Parties will always have the option to seek the Court's input if any issues arise during the course of implementing the Proposed Sale Procedures Order.

21.     With respect to ConocoPhillips objection to the information sharing provision, I do not have any objection to modifying the Proposed Sale Procedures Order to require their reasonable consent before sharing any information that they have marked "highly confidential" pursuant to the Protective Order.  As of the date hereof, ConocoPhillips has not marked any information "highly confidential" and, unlike the information of CITGO that will be of primary interest to Potential Bidders, I do not anticipate there being much information, if any, that Potential Bidders will need from ConocoPhillips.     Accordingly, I have modified the Proposed Sale Procedures Order to require ConocoPhillips' reasonable consent before I share any information that ConocoPhillips has marked "highly confidential."

**5.     Venezuela Parties' Additional Structure and Alternative Process Arguments**

22.     The Venezuela Parties raise a number of issues that they believe result in the process being intentionally structured to sell 100   of the PDVH Shares at a discount, including because of the potential Stalking Horse Bid Protections, the Good Faith deposit, and the proposed limitations on the ability of the CITGO management team to communicate unsupervised with Potential Bidders.  I have addressed most of these issues above and, like the remaining arguments, I believe they all fall away upon an examination of the process that I have recommended and, respectfully, the likely motivations of the Venezuela Parties in making such arguments.  *See e.g.*, Bidding Procedures at ¶ 5 (asking Potential Bidders to identify any minority shareholder rights, protections, or other desired terms in connection with any bid for less than 100   of the PDVH Shares); *id.* at ¶ 6 (permitting Special Master to designate as a stalking horse bid a bid for less than 100   of the PDVH Shares); *Id.* at ¶ 8 (permitting bids for less than 100   of the PDVH Shares); *id.* at ¶ 9 (requiring bidders to specify any minority shareholder rights in connection with their

13

bid); *id.* at ¶ 14-15 (requiring the Special Master to select the highest bid that pays off the most of the Attached Judgments for the fewest PDVH Shares). Ultimately, these procedures are solely to provide clarity regarding the procedure for the Special Master to select which bid should be submitted to the Court for approval. The Venezuela Parties' rights to object at the Sale Hearing (or any hearing in connection with designation of a Stalking Horse Bidder), if they believe I did not accept a bid for fewer PDVH Shares that could have satisfied the same amount of the Attached Judgments, are fully preserved.

23. However, I have no issue with the Venezuela Parties' proposal that, when selecting between two competing bids that, *ceteris paribus,* have sufficient proceeds to satisfy all Attached Judgments, I may select a value-maximizing Bid that provides for the sale of more PDVH Shares solely with the consent of PDVSA. *See* Venezuela Parties' Objection at 6 and 11. Otherwise and absent PDVSA's consent, the Bidding Procedures require the lower bid – even if it is not value maximizing – to be accepted because it has sufficient proceeds to satisfy all Attached Judgments for the sale of fewer PDVH Shares. I have proposed revisions to clarify this point. *See* Revised Sale Procedures Order, Ex. 1 at 17.

24. The Venezuela Parties' other line of argument that I did not consider other value maximizing alternatives is simply incorrect. With the assistance of my Advisors, I considered a number of alternatives, none of which appear feasible based on the diligence provided to me to date by the Venezuela Parties and the Illustrative Clearing Price set forth in my Report.[11] Because

---

[11] *See* Report at ¶¶ 69-70. The criticism of the Illustrative Clearing Price contained in Declaration of Randall J. Weisenburger, a copy of which is attached as Exhibit A to the Venezuela Parties' Objection (the "**Weisenburger Declaration**"), fails to take into account the purported 50.1% pledge in favor of the PDVSA 2020 Bondholders. *See* Weisenburger Declaration at ¶ 14 (alleging a "significant mathematical error" in the calculating the Illustrative Clearing Price). Due to the pledge, if value is distributed pursuant to a waterfall, Crystallex's Judgment would be satisfied before the PDVSA 2020 Bondholders are satisfied in full. Any Attached Judgment after

14

**368a**

I did not ultimately recommend a traditional initial public offering or an IPO via a SPAC (both of which would likely require a sale of such equity at a customary discount) does not mean that I did not consider such proposals. In several of my conversations with counsel to the Venezuela Parties, they suggested that the process be delayed for months so that they could consider alternative structures. Respectfully, these are alternative transactions that the Venezuela Parties should have considered before having a lien attached to the PDVH Shares or recognition of the Crystallex Judgment. They are free to pay off the Crystallex Judgment (and any other judgments that become Attached Judgments) at any time. And yet, when I asked for additional details on such proposals, they declined to provide specifics or otherwise engage in further discussions regarding these proposals. The Venezuela Parties provided no specifics on the alternatives they wished that I would consider in lieu of a sale of PDVH Shares.[12] I ultimately recommended the Proposed Sale Procedures Order because I believe it to be the most feasible available alternative, it provides for the best opportunity of a value maximizing result, and other alternatives that I did not recommend were unlikely to generate proceeds necessary to pay off the Crystallex Judgment (and most certainly any additional Attached Judgments).

25. It bears repeating: nothing in the Proposed Sale Procedures Order today prohibits the Venezuela Parties from evaluating and proposing such alternative structures to Crystallex (or any other holder of an Attached Judgment). Based on each of the parties statements to welcoming

---

Crystallex's Judgment (such as ConocoPhillips' Judgment) would take 49.9% of the remaining value until the PDVSA 2020 Bondholders are paid in full.

[12] The limited specifics now provided in their objection are substantially more detailed than were provided in our private discussions. *See* Weisenburger Declaration at ¶ 12 (suggesting that the Special Master should have considered, among other things, a "private placement transaction" or a "joint venture with a strategic partner looking to expand its refining infrastructure"). Unless Crystallex were to consent, none of these appear to be able to plausibly comply with Section 324 of the Delaware General Corporation Law nor do the Venezuela Parties even attempt to explain how they could comply.

a Negotiated Outcome, I suspect that Crystallex would welcome a tangible and feasible proposal from the Venezuela Parties that would result in payment of their Attached Judgment. I continue to believe it would be helpful if the Venezuela Parties would provide more specifics around their proposal and the potential "pockets of value" alluded to in the Weisenburger Declaration.

26.     I believe that the Venezuela Parties' further arguments that my recommendation is flawed because I did not conduct a formal "valuation analysis" or that the Proposed Sale Procedures Order "deviates from the way that corporations normally raise capital" are red herrings. Although it may be customary for a board of directors to ask its advisors to prepare an informal valuation – customarily referred to as a "desktop valuation" in connection with evaluating the *decision* to launch a sale process, that decision was already made in the Crystallex Case well before I was appointed as Special Master. *See* January 2021 Opinion (directing the sale of the PDVH Shares). In the forced-sale context, I do not believe that commissioning a formal valuation – which will result in additional cost, timing, and expense – would bring any real value to the process. Indeed, in the most applicable context to the Court-supervised sale at hand – Section 363 of the Bankruptcy Code, the Third Circuit has rejected arguments that it would be appropriate for courts to value assets prior to a marketing process. *See In re SubMicron Sys. Corp.*, 432 F.3d 448, 461 (3d Cir. 2006) ("Section 363 attempts to avoid the complexities and inefficiencies of valuing collateral altogether by substituting the theoretically preferable mechanism of a free market sale to set the price. The provision is premised on the notion that the market's reaction to a sale best reflects the economic realities of assets' worth. Naturally, then, courts are not required first to determine the assets' worth before approving such a market sale. This would contravene the basis for the provision's very existence"). Like Section 363 of the Bankruptcy Code, Section 324 of the Delaware General Corporation Law does not require a valuation to occur prior to conducting any

sale process.  Consistent with long-standing precedent, I believe that the marketing process and ultimate auction to the highest bidder will be the best way to determine the true value of the PDVH Shares.  *See D C Glob. Corp. v. Muirfield Value Partners, L.P.*, 172 A.3d 346, 368–69 (Del. 2017) ("In economics, the value of something is what it will fetch in the market. That is true of corporations, just as it is true of gold.  Thus, an economist would find that the fair market value of a company is what it would sell for when there is a willing buyer and willing seller without any compulsion to buy."); *In re  nergy Coop., Inc.*, 109 B.R. 822, 830 (N.D. Ill. 1989) ("There is simply no substitute in measuring value than to analyze what informed buyers are willing to accept, informed sellers are willing to pay, and with neither group under a compulsion to act . . . [A]ll sophisticated valuation methods must yield to the realities of the marketplace."); *In re Granite Broad. Corp.*, 369 B.R. 120, 140, 143 (S.D.N.Y. 2007) ("[T]he best evidence of value is what a third party is willing to pay in an arm's length transaction . . . [p]eople who must back their beliefs with their purses are more likely to assess the value of the [asset] accurately than are people who simply seek to make an argument.").  In the context of a court-ordered sale, moreover, such an outcome appears fair to all concerned.

**6.  R    S    Add    G d    r    C r**

27.  Crystallex argues that regardless of how the Marketing Process goes, I should be obligated to select and recommend to the Court a Sale Transaction.  As I explained in the Report at ¶ 83, it may be necessary for the Court to address unforeseen contingencies or impediments that may arise during my implementation of the Proposed Sale Procedures Order.  Accordingly, the Proposed Sale Procedures Order and corresponding Bidding Procedures contain a customary reservation that I am not *necessarily* obligated to recommend a Sale Transaction to the Court.  If all goes as planned, I, of course, have every intention of selecting a Successful Bid in accordance with the proposed Bidding Procedures.  I do not believe, however, that it is in the best interest of

the Sale Process Parties for me to be compelled to recommend a Sale Transaction under all circumstances, including if such a Sale Transaction would not comply with applicable law. *See Burge v. idelity Bond Mortg. Co.*, 648 A.2d 414, 419 (Del. 1994) ("Delaware courts may, in their discretion, set aside a sale where inadequacy of price will result in unfairness or work an injustice on any party having an interest in the outcome of the sale. Fraud, mistake, accident, impropriety, misconduct, surprise or irregularity in the sale process will support judicial invalidation of the sale").

### 7. Pr R rd A d d

28. The Venezuela Parties seek clarifying language that an Attached Judgment must be a valid attachment for PDVH Shares to be sold to satisfy such judgment. This was always the intention and I have no objection to adding additional language to the Proposed Sale Procedures Order clarifying this point. I have proposed revised language in the Revised Proposed Sale Procedures Order at ¶ 29.

### D. R r R E d Pr d d

29. I believe that the Court's *Memorandum Order* dated September 8, 2021 [D.I. 337] and the procedures to be adopted pursuant thereto resolve the objections to the proposed language contained in the initial Proposed Sale Procedures Order regarding the reimbursement of my fees and expenses and the provision of a budget. Accordingly, I have revised the Proposed Sale Procedures Order to incorporate the provisions to be established in the coming weeks pursuant thereto. *See Revised Proposed Sale Procedures Order* at ¶ 23.

### E. d I

30. The Venezuela Parties further object to the provisions in the Proposed Sale Procedures Order regarding judicial immunity and the procedures for any violation of the Court's order. These provisions go to the core of my ability to retain qualified professionals. As a special

18

**372a**

master, I am unable to offer such professionals customary indemnification or other contractual arrangements that they would be accustomed to in the private context and would be required by each institution in a traditional engagement. However, I have been able to retain them on the basis that they would be entitled to judicial immunity in acting as my advisor. I respectfully submit that these provisions are appropriate, consistent with applicable law, and do not unfairly impair the interests of any Sale Process Party.

**F.     Pr     d R          E  r  r    I                      r**

31.     Each of the Objections challenge the retention of Evercore at this time and/or on the proposed terms of Evercore's engagement as set forth in the Proposed Evercore Engagement Letter (which is attached as Exhibit 3 to the Sale Procedures Order).

32.     As further addressed in my Report, Evercore will play a vital role in the implementation and success of the Marketing Process.[13] My proposed retention of Evercore as investment banker was the result of a competitive solicitation process from several market-leading investment banking advisory firms and, after a round of interviews and several follow-up discussions, I selected Evercore based on their extensive experience and excellent reputation in providing high quality investment banking services. *Id.* I believed at the time, and continue to believe, Evercore's experience and reputation uniquely positions them to handle the complex mandate associated with implementation of the Proposed Sale Procedures Order. Thereafter, Evercore's fee structure was competitively negotiated (and repeatedly renegotiated) in consultation with each of the Sale Process Parties (all as explained in great detail in the Report).[14]

---

[13] *See* Report at ¶¶ 11-30 for detailed discussion regarding Evercore's retention, the terms thereof, and the necessary role Evercore will play in implementing the Sale Procedures Order.

[14] Notwithstanding that under the May 27 Order I have the authority and do not require the consent of any Sale Process Party to retain an investment banker, I have proposed to submit the Proposed Evercore Engagement Letter to the Court for confirmation because the consultation process with

33.     No Sale Process Party objects on the basis that I do not need the assistance of an investment banker to perform my duties pursuant to the Proposed Sale Procedures Order.   Nor does any party even attempt to dispute the retention of Evercore based on its qualifications.  *See e.g.*, ConocoPhillips' Objection at ¶ 8 ("To be clear, ConocoPhillips has no objection to the choice of Evercore or its qualifications"); Weisenburger Declaration at ¶ 3, attached as Exhibit A to Venezuela Parties' Objection ("Evercore is an excellent, highly respected financial advisory firm").

34.     Instead, the Objections lodge a series of attacks that completely miss the mark on the standard set by the Court in the May 27 Order [D.I. 277].  **T   C   r       r d d   r     d** that the "fees of any Counsel or Advisors retained to assist the Special Master in carrying out his duties shall be calculated based on the rates charged by such Counsel or Advisor to other clients of their firms."  *See* May 27 Order at ¶ 17; *accord* Fed. R. Civ. P. 53(a)(3); (g) (permitting the Court to impose fair and reasonable fees and expenses).  Remarkably, not a single Sale Process Party has even alleged that the Proposed Evercore Engagement Letter contemplates fees or expenses that are different than fees that Evercore normally charges its other clients.

35.     As set forth in my Report, I believe the proposed terms of Evercore's engagement are fair, reasonable, and reflective of industry standards and certainly comparable to terms Evercore would charge to any other client.  Of course, as the Court and each Sale Process Party has repeatedly recognized, this engagement is novel and unprecedented and, accordingly, no direct comparison is perfect.  While novel, the mandate and contemplated work that Evercore will perform is in many ways akin to a traditional M&A mandate and in other ways akin to a

---

the Sale Process Parties revealed that certain of the Sale Process Parties would seek to litigate the compensation structure at the end of the sale process.  It would be unfair to ask any investment banker run a sale process on such an uncertain basis.

restructuring mandate (such as a Section 363 sale supervised by a bankruptcy court). If analyzed from either of these angles, the compensation structure contemplated by the Proposed Evercore Engagement Letter is reasonable and in line with standard industry practice. Indeed, in each case, it is on the lower end of the spectrum.[15]

36.    Nonetheless, prior to filing my Report, I went to great lengths to obtain the concessions from Evercore requested by the Sale Process Parties. I have detailed a number of these concessions in my Report already, including (i) protections to ensure that Evercore does not receive unnecessary Monthly Fees (as the accrual of such fees can be "shut-off" at my discretion and that they will not begin until the "Preparation Launch Date" as defined in the Proposed Sale Procedures Order), (ii) reducing the Sale Fee in the event the only bona fide Bid generated by the Marketing Process is a credit bid from Crystallex, (iii) substantially reducing the Upfront Amount, and (iv) excusing ConocoPhillips from having to pay the Upfront Amount if they are not expected to receive proceeds from any Sale Transaction. *See* Report ¶ 11.

37.    After reviewing the Objections, I once again sought to renegotiate even further concessions. In an effort to reconcile as many of the issues raised in the Objections, Evercore has made the below proposal in discussions with Crystallex in an effort to reach an agreement. I am optimistic that we will be able to resolve Crystallex's objections prior to the hearing. The most recent proposal conveyed to Crystallex is as follows:

- The Sale Fee will be reduced further if the Successful Bid is a credit bid from Crystallex in an amount equal to or less than 500 million (the "**Cr d      d T r      d**"). Solely for purposes of calculating whether the Credit Bid Threshold has been satisfied and the Sale Fee, the amount of Crystallex's credit bid shall be increased by 50  of the outstanding amount of any amount that remains secured

---

[15] For the Court's benefit, I have attached as <u>Exhibit B</u> hereto a chart showing the fees paid investment bankers in comparable M&A transactions and also in restructuring transactions. Based on this analysis, I am confident the fee structure ultimately agreed upon in the Proposed Evercore Engagement Letter is reflective of market standards.

by a purported pledge of the stock of CITGO Holding in favor of Rosneft Trading, S.A., if any (the "**Cr d         d Ad            **").  If this is the case, then the Sale Fee will be the higher of   7 million or 2    of the credit bid (after taking into account the Credit Bid Adjustment and subject to appropriate crediting of monthly fees, discussed below).   The entire Sale Fee in this scenario would be paid at consummation of the Sale Transaction (*i.e.*, no Upfront Amount in this scenario)

   o   In this scenario, 50    of the first twelve Monthly Fees actually paid will be credited against the Sale Fee due at consummation of the Sale Transaction.

- If the Marketing Process results in Crystallex submitting a credit bid in excess of the Credit Bid Threshold (after taking into account any Credit Bid Adjustment), then the Sale Fee would be 0.25% of the "Aggregate Consideration" (as defined in the prior Proposed Evercore Engagement Letter) of the Successful Bid (subject to appropriate crediting of Monthly Fees, discussed below).   In this scenario   3.5 million of the Sale Fee will be payable as an Upfront Amount.  The remaining will be paid at consummation of the Sale Transaction.

   o   Further, with respect to the portion of the Sale Fee payable at consummation of the Sale Transaction, 50    of the first twelve Monthly Fees actually paid and the Upfront Amount actually paid will be credited against the Sale Fee due at consummation of the Sale Transaction.

- With respect to any other bid that is selected as the Successful Bid, the provisions in the Proposed Evercore Engagement Letter will remain the same, except that the Upfront Amount will be reduced to   3.5 million (not subject to crediting) and 50   of the first twelve Monthly Fees will be credited against the portion of the Sale Fee paid at consummation of the Sale Transaction.

I believe these additional concessions further underscore the reasonableness of the proposed terms upon which I seek to retain Evercore.  I will file a revised Proposed Evercore Engagement Letter reflecting these terms on the Court's docket in the near term.  We are hopeful that the revised proposal will garner the support of the other Sale Process Parties.

38.    To the extent any Objections remain outstanding following these concessions, I respectfully ask the Court to overrule such Objections.[16]  Should the Court elect to hold a hearing on my proposed retention of Evercore, I am prepared to put on an affirmative case in support of

---

[16] I believe that I have thoroughly addressed the Venezuela Parties' arguments regarding the alleged "conflict of interest" created by the proposed Sale Fee in my Report.   *See* Report at ¶23-30.  They have not responded to the clear distinctions between the precedent they cite and my proposed retention of Evercore in this case.

their retention. It is worth noting that, if such a hearing were to be held, the question before the Court would be whether the proposed terms of Evercore's engagement are reasonable and consistent with the terms entered into by Evercore and its other clients. It is not the industry standard, nor is it fair to professional advisors, to question whether any other advisory firm could be retained for a lower amount once those firms failed to win the engagement in the first instance. Nor is it appropriate to continually pressure an advisory firm to unreasonably adjust its standard compensation mechanics. As Evercore's proposed fee is at the lower end of the range of fees paid to investment bankers in comparable transactions, I respectfully submit that my proposed retention of Evercore is reasonable under the circumstances of the Crystallex Case.

### III. C

39.     The Special Master process to date and the history of litigation and complexity of disputes in the Crystallex Case and the differing objectives of the Sale Process Parties suggest that there are a number of critical issues in the design of the Sale Procedures Order that I do not believe the Sale Process Parties will ever come to an agreement on and must ultimately be decided by the Court. As detailed in my Report, I have endeavored to build as much consensus as could be done under the circumstances. Each of the unresolved Objections should be considered in light of the applicable Sale Process Parties' goals and objectives for the Crystallex Case and the ultimate sale of the PDVH Shares. Notwithstanding these remaining objections, I continue to recommend the Proposed Sale Procedures Order, as revised by this Reply, to the Court. I reserve the right to clarify or supplement any statements made in this Reply at any time. Of course, should the Court require evidence to decide any of these issues, I will make myself and my Advisors available at the Court's convenience.

40.     We welcome the opportunity to discuss open issues with any of the Sale Process Parties following submissions of the replies in an effort to narrow the issues prior to the further expenditure of judicial resources at the November 8, 2021 hearing.

*/s/ Robert B. Pincus*
Robert B. Pincus
Special Master for the United States District Court
for the District of Delaware

Case 1:17-mc-00151-LPS Document 345 Filed 09/20/21 Page 1 of 47 PageID #: 9785

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| CRYSTALLEX INTERNATIONAL CORP., | ) | |
| | ) | |
| Plaintiff, | ) | **PUBLIC VERSION FILED** |
| | ) | **SEPTEMBER 20, 2021** |
| v. | ) | |
| | ) | |
| BOLIVARIAN REPUBLIC OF VENEZUELA, | ) | Case No. 1:17-mc-00151-LPS |
| | ) | |
| Defendant. | ) | |
| | ) | |
| _____ | ) | |

## VENEZUELA PARTIES' OBJECTIONS TO THE SPECIAL MASTER'S PROPOSED ORDER (A) ESTABLISHING SALE AND BIDDING PROCEDURES, (B) APPROVING SPECIAL MASTER'S REPORT AND RECOMMENDATION REGARDING PROPOSED SALE PROCEDURES ORDER, (C) AFFIRMING RETENTION OF EVERCORE AS INVESTMENT BANKER BY SPECIAL MASTER <u>AND (D) REGARDING RELATED MATTERS</u>

# TABLE OF CONTENTS

INTRODUCTION ............................................................................................ 1

ARGUMENT ................................................................................................... 2

I.  The Special Master's Process for Developing the Proposed Sale and Bidding
    Procedures Was Flawed, Resulting in a Value-Destroying Recommendation .................. 2

    A.  The Special Master's Process Skipped a Comprehensive Valuation, Relied
    on a Conflicted Advisor, and Failed to Consider Alternative Transactions ................ 3

    B.  The Resulting Process Is Structured to Sell 100% of PDVH at a Discount .................. 4

    C.  The Special Master's Assumptions Justifying His Proposal Are Incorrect ................. 7

    D.  The Venezuela Parties' Proposed Solutions: Restructure the Process
    Correctly and Engage in Settlement Discussions in the Interim .................................. 9

    E.  Necessary Revisions to the Existing Proposal If It Remains in Place ........................ 10

II.  Implementing the Proposed Order Without a Specific License or Change to
     the Sanctions Regime Is Unlawful and Would Chill Bidding ......................................... 13

III.  Evercore's Retention Agreement and Contingency Fee Should Be Disallowed ............. 16

    A.  Evercore's Fee Arrangement Creates a Conflict of Interest and Has Tainted
    the Special Master's Proposal ................................................................................. 16

    B.  Evercore's Fee Must Be Disallowed or Restructured for Additional Reasons ........... 18

IV.  Additional Objections to the Proposed Order and Bidding Procedures ......................... 20

    A.  Special Master's Additional Powers ........................................................................ 20

    B.  The Special Master's Proposals to Lobby OFAC ...................................................... 21

    C.  Disclosure of Highly Confidential Information ......................................................... 21

    D.  The Special Master's Fees Should Be Limited and Approved in Advance ................. 22

    E.  Communications with Other Sale Process Parties ..................................................... 23

    F.  Crystallex's Judgment .......................................................................................... 23

    G.  Attached Judgments .............................................................................................. 24

    H.  Publication of the Sale Notice in Venezuela ............................................................ 24

i

**380a**

I. Judicial Immunity ............................................................................ 24

J. "Free and Clear" Provisions .......................................................... 25

**381a**

# TABLE OF AUTHORITIES

Page(s)

## CASES

*Abourezk v. Reagan*,
   785 F.2d 1043 (D.C. Cir. 1986) ................................................................. 23

*Bailey v. Sys. Innovation, Inc.*,
   852 F.2d 93 (3d Cir. 1988) ...................................................................... 23

*Berger v. Zeghibe*,
   666 F. App'x 119 (3d Cir. 2016) ........................................................... 23, 24

*Burge v. Fidelity Bond & Mortg. Co.*,
   648 A.2d 414 (Del. 1994) ......................................................................... 4

*Caliste v. Cantrell*,
   937 F.3d 525 (5th Cir. 2019) ................................................................... 18

*Caperton v. A.T. Massey Coal Co.*,
   556 U.S. 868 (2009) ............................................................................... 18

*Deibler v. Atlantic Props. Grp.*,
   652 A.2d 553 (Del. 1995) ........................................................................ 24

*Hernandez v. Mesa*,
   140 S. Ct. 735 (2020) ............................................................................. 21

*Hofmann v. EMI Resorts, Inc.*,
   689 F. Supp. 2d 1361 (S.D. Fla. 2010) .................................................... 17

*In re Gilbert*,
   276 U.S. 6 (1928) .................................................................................. 17

*In re Kempthorne*,
   449 F.3d 1265 (D.C. Cir. 2006) .............................................................. 17

*In re Kensington Int'l, Ltd.*,
   368 F.3d 289 (3d Cir. 2004) ................................................................... 17

*Kisor v. Wilkie*,
   139 S. Ct. 2400 (2019) ........................................................................... 16

*Prima Paint Corp. v. Flood & Conklin Mfg. Co.*,
   388 U.S. 395 (1967) ............................................................................... 16

iii

*Pulliam v. Allen,*
  466 U.S. 522 (1984) ................................................................ 24

*Russell v. Richardson,*
  905 F.3d 239 (3d Cir. 2018) .................................................... 24

## **STATUTES**

28 U.S.C. § 455 ............................................................................ 17

8 Del. C. § 324 ................................................................... 1, 10, 24

10 Del. C. § 2110 ........................................................................ 24

10 Del. C. § 4975 ........................................................................ 24

10 Del. C. § 4986 ........................................................................ 24

10 Del. C. § 5093 ........................................................................ 24

## **REGULATIONS**

31 C.F.R. § 591.202 ..................................................................... 19

31 C.F.R. § 591.310 ............................................................... 14, 15

31 C.F.R. § 591.407 ..................................................................... 15

## INTRODUCTION

There is no precedent for this contemplated execution sale. As the Court, the Special Master, and all interested parties have recognized, OFAC sanctions restrict the sale process here in ways never before encountered by Delaware courts. The size and complexity of the assets to be sold in this Delaware execution sale are also unprecedented. The Court thus appointed the Special Master to design a sale process that takes into account these serious complexities so as to satisfy Delaware law's requirements to maximize value while selling "as many, but only as many, shares of PDVH as are necessary to satisfy the judgment of Crystallex" and perhaps others. D.I. 234 at 36; *accord* 8 Del. C. § 324(a). The Special Master's process, unfortunately, has not adhered to this Court's directives. He now proposes procedures that will almost definitely result in a sale of 100% of the PDVH shares at a vastly discounted price. Nor is this surprising, given that the Special Master's proposed agreement with his financial advisor, Evercore, created an improper conflict of interest for Evercore to recommend a process that would favor a 100% sale over alternative methods for raising the cash needed to pay the judgment(s), by according Evercore a contingency fee that increases with the overall purchase price.[1]

Fortunately, there is sufficient time to remedy these defects within the schedule the Special Master has proposed. The sale process cannot begin unless OFAC provides clear affirmative authorization to prospective bidders (not just sufficient assurances to "satisfy" the Special Master). And the Venezuela Parties[2] welcome the Special Master's proposal to facilitate a negotiated

---

[1] The foregoing objections are not new to the Special Master, as they were submitted in response to an earlier draft of some of his proposals well in advance of their filing with the Court.

[2] On August 9, 2021, the Special Master filed (under seal) a series of submissions, including a proposed sale procedures order ("Proposed Order" or "P.O."), proposed bidding procedures ("Bidding Procedures" or "B.P."), a proposed notice of sale ("Notice of Sale"), a proposed retention agreement with Evercore Group, L.L.C. ("Evercore Agreement"), and a proposed confidentiality agreement for potential bidders. D.I. 302. He also filed a report describing his process and rationale for developing the Proposed Order ("Report" or "Rpt."), along with a declaration from William Hiltz of Evercore ("Hiltz Decl.") and proposed settlement negotiation procedures. D.I. 303. Capitalized terms used but not defined herein have the meaning ascribed to them in the Proposed Order.

1

settlement with Crystallex and ConocoPhillips (though with certain modifications). While such negotiations are pending, the Special Master should be directed to work with PDVH and CITGO to (1) conduct a valuation to identify sources of value in PDVH that could be exploited to generate sufficient cash to pay the judgment(s) (a threshold requirement for *any* serious corporate transaction), which the Special Master's financial advisors admit they did not do, (2) solicit proposals for alternative, value-maximizing transactions to raise the necessary capital (as contemplated by the Court's May 27 Order, D.I. 277 ¶ 2), and (3) consult about minority shareholder rights that could be paired with such transactions to enhance value (as contemplated by the Court's January 14 Order, D.I. 234 at 36 n.16). The Special Master then should evaluate whether any alternative transactions could be used to satisfy any Attached Judgment(s). Only if no other alternative is viable should he recommend implementing the auction he has proposed—and even that requires important modifications to sell the fewest shares necessary for the highest value. In short, the Special Master's proposed bankruptcy-style liquidation should be a last, not first, resort—particularly given the enormous foreign policy and national security implications and other complexities presented here. These and other objections are explained below.

## ARGUMENT

**I.**      **The Special Master's Process for Developing the Proposed Sale and Bidding Procedures Was Flawed, Resulting in a Value-Destroying Recommendation.**

The process used by the Special Master to generate his proposed procedures materially deviated from the way in which corporations ordinarily raise capital or assess strategic alternatives, including a potential sale of the company. Rather than consider a panoply of capital-raising methods, in consultation with a disinterested financial advisor, to identify a value-maximizing solution, he designed what is effectively a bankruptcy-style liquidation that will almost definitely result in a sale of 100% of the PDVH shares at a vastly discounted price and provide a financial

2

windfall to Evercore, whose fees increase with the overall size of the transaction. This defies the Court's directive that any sale process "result in the sale of as many, *but only as many*, shares of PDVH as are *necessary* to satisfy the judgment of Crystallex," D.I. 234 at 36 (emphasis added), fails to consider the ability of "negotiations of minority rights" to facilitate sale of a minority stake, D.I. 234 at 36 n.16, and disregards the Special Master's authority to forgo proposing an auction of the attached shares and instead "devise such other transaction as would satisfy" the Attached Judgment(s) "while maximizing the sale price of any assets to be sold," D.I. 277 ¶ 2. The process should be restructured consistent with industry standards and the Court's directives.

> A.   *The Special Master's Process Skipped a Comprehensive Valuation, Relied on a Conflicted Advisor, and Failed to Consider Alternative Transactions.*

The Court gave the Special Master a task that corporations in need of capital perform on a regular basis: identifying the most efficient mechanism to raise necessary funds while doing the least harm to the corporation (here, PDVH), its operating businesses (here, CITGO), its shareholders (here, PDVSA), and other relevant stakeholders (here, Venezuela and the United States, with its foreign policy interests)—*i.e.*, to propose a process that maximizes value while minimizing the number of shares sold. As private equity investment and mergers and acquisitions expert Randall Weisenburger explains in the attached Declaration, a corporation faced with this task ordinarily begins by hiring a financial advisor to conduct due diligence and a "comprehensive valuation" of the company and its assets to identify "pockets of value" that "could be explored to produce the needed cash." *See* Randall Weisenburger ("R.W.") Decl. ¶¶ 5(a), 7, 8, 11.[3] Such a valuation forms a baseline against which to evaluate whether proposals maximize value. *Id.*

---

[3] The Declaration of Randall J. Weisenburger (attached hereto as Exhibit A) explains in detail why the Proposed Order was developed improperly, is premised on erroneous assumptions, and is structured to destroy value. This brief summarizes many of those points, but does not include all the nuances and detail in the declaration.

**386a**

¶ 10.[4] The advisor then "solicit[s] proposals from an array of firms for alternative solutions to raise the capital needed in the most efficient way possible and with the least harm to the company long term" and "help[s] assess the viability of such proposals." R.W. Decl. ¶ 8; *see also id.* ¶¶ 10-13. Crucially, the advisor retained to solicit and evaluate proposals "should not also be the firm that will design, execute, and profit from the transaction, as this would create an incurable conflict of interest." R.W. Decl. ¶ 8.

The Special Master and his advisors failed to follow this course, and the result is a fatally flawed, value-destroying proposal. They did not conduct a comprehensive valuation to identify potential sources of capital. Rpt. at 36; Hiltz Decl. ¶ 36.[5] And, despite the Court authorizing the Special Master to consider "such other transaction as would satisfy" the judgment(s), D.I. 277 ¶ 2, he and his team also apparently did not solicit or even consider alternative transactions (no such considerations are reported, nor could they have seriously done so without a valuation, *see* R.W. Decl. ¶ 7). Instead, Evercore assumed the roles of advisor, proposer, and implementer of the process, even granting itself a "success" fee based on the size of the transaction. As detailed further below (*see* Part III, *infra*), that conflict of interest predictably led to a tainted recommendation of an auction that would maximize *Evercore*'s fees as well as the likelihood that *100%* of the PDVH stock would be sold at a highly discounted price.

> B.   *The Resulting Process Is Structured to Sell 100% of PDVH at a Discount.*

Ignoring any alternatives, the Special Master and Evercore propose what is essentially a bankruptcy-style liquidation laden with uncertainties and substantive provisions that will drive

---

[4] In Delaware, execution sales can be set aside where the auction price is "grossly inadequate" compared to the property's fair-market value. *Burge v. Fidelity Bond & Mortg. Co.*, 648 A.2d 414, 419 (Del. 1994). Assessing the adequacy of a transaction requires a valuation against which to measure a transaction's outcome.

[5] To properly conduct the due diligence necessary for such a valuation, the Special Master and his advisors not only would have had to review the paper records of CITGO and PDVH, but they also would have had to conduct "site visits or alternate means to understand the condition and value of key assets associated with CITGO's refineries" and explore alternative means to generate capital. R.W. Decl. ¶ 11. They did not do this.

4

any bidders to discount their offers, thus destroying value.

    1.    *The provisions for selection of the Stalking Horse and Successful Bids incentivize selling 100% of PDVH.*

First, the Proposed Order gives the Special Master complete discretion to designate a Stalking Horse Bidder. *See* P.O. ¶ 18. Bids will be evaluated based on "the equity value implied by the total enterprise value" of the bid rather than on which bid offers the most money for the fewest shares, and the Special Master and Evercore admit that under this process they believe the "value-maximizing" bid likely will be for 100% of the PDVH Shares. B.P. at 7; Hiltz Decl. ¶ 21; Rpt. at 47. Thus, "it is highly likely that 100% of the company will be sold," given that the Stalking Horse "is the de facto 'successful bidder' if no other bidder tops the stalking horse bidder's offer." R.W. Decl. ¶ 23.[6]

Second, the proposed procedure requires all second-round bids to have "a greater Implied Value than the Stalking Horse Bid Implied Value or be within a range of such Implied Value which, in the Special Master's judgment, is sufficient to meet the requirements of obtaining a value maximizing transaction." B.P. at 14. "This creates a real possibility that a bid for less than 100% of the shares that would otherwise satisfy the Crystallex judgment could be rejected in favor of a 100% bid by the Stalking Horse." R.W. Decl. ¶ 27. For example, if the Stalking Horse offers $5 billion in cash for 100% of PDVH, "a bidder that thereafter offers $2.3 billion in cash for 50% of the shares would lose to the Stalking Horse bidder despite having bid enough to satisfy the Crystallex (and ConocoPhillips's) judgment(s) for a smaller percentage of the shares, be-

---

[6] Contrary to the Special Master's suggestion, *see* Rpt. at 40, the Venezuela Parties did not propose a limit on bids for 100% of the shares. Instead, their objection is that the procedures are structured to encourage and reward bids for 100% of the shares in the first instance, and the procedures make it difficult—if not impossible—for a bid for less than 100% of the Shares to win (or even be made).

cause the 'implied equity value' would be only $4.6 billion." *Id.* This bidding regime will discourage second-round bidders and lock in a 100% offer. *Id.* ¶ 28.

2. *The deposit requirement discourages bidding, encourages discounts, and penalizes bids for under 100% of the shares.*

"Given the potential size of the transaction contemplated by the Special Master's proposed procedure and the uncertainty about whether (and when) it will ever close, the 10% deposit requirement will chill bidding if retained." R.W. Decl. ¶ 35; B.P. at 7, 12-13. Even a bid that merely satisfies Crystallex's judgment would likely be close to one billion dollars, which would require at least a $100 million deposit, and given Evercore's assumption that bidders will bid for 100% of PDVH, the deposits necessary are likely to be much higher. "Many potential bidders would be unwilling to submit such an enormous 'good faith' deposit for an uncertain, and yet-unauthorized, transaction. The only serious bidders who would consider making such a long-term, risky investment would, again, be opportunistic, non-strategic bidders whose goal . . . would be to purchase 100% of PDVH at a steep discount so that they could sell it at a profit, at a less uncertain time. Such a scenario would clearly not maximize value." R.W. Decl. ¶ 36. Even bidders willing to make a large deposit would likely discount their bids to minimize the onerous effect of the deposit, which would lock up significant capital for an unknown amount of time as bidders await OFAC and other regulatory approval. *See id.* ¶ 38.

Furthermore, the deposit requirement *discourages* bids for fewer than 100% of the shares by requiring a deposit of 10% of the implied equity value of the bid rather than the cash amount. "A bidder who offers $5 billion for 100% of PDVH would have to deposit a substantial sum of $500 million—10% of its bid. A bidder who offers $2.3 billion for 50% of the PDVH shares, however, would have to pay *20%* of the $2.3 billion because it would be obligated to pay 10% of the implied equity value—*i.e.*, $4.6 billion—of its bid." *Id.* ¶ 37. This contravenes the Court's

directive to design a process that will sell as few shares as necessary to satisfy the judgment(s).

        3.    *The proposed order prohibits adequate involvement of the Venezuela Parties, particularly PDVH and CITGO, in the sale process.*

The Proposed Order provides for unnecessary and improper negotiating powers for the Special Master and unnecessary and improper limits on the Venezuela Parties' right to have "a seat at the table," as the Court previously ruled. D.I. 234 at 36; *see, e.g.*, P.O. ¶¶ 5, 39-42. "Lack of unfettered access to management will likely further incentivize bidders to discount their bids, as they will lack the confidence that comes from discussing the company directly with the leaders who know it the best." R.W. Decl. ¶ 40. "CITGO management should be the default team responding to due diligence requests, formulating the CIM and marketing materials, and otherwise engaging in the activities any corporate management team would normally participate in during a sale of its corporate stock." *Id.* ¶ 39.

        4.    *Additional elements of the proposal would result in bidding discounts.*

All bidders—whether in the stalking horse phase or the second round—also will likely discount their bids due to the following elements and uncertainties of the proposed process:

- The uncertainty posed by OFAC not having authorized participation in the sale or possible closing of a sale, resulting in the need to hedge against the risk that the time and money spent in preparation for bidding will be for naught or—worse—found unlawful (R.W. Decl. ¶¶ 17-22), *see* Part II, *infra*;

- The potential changes in market conditions that could render an otherwise irrevocable bid foolish as time passes (R.W. Decl. ¶¶ 20, 24-25);

- The millions of dollars of transaction costs associated with a 100% sale of the PDVH shares, such as "break costs on the existing debt of CITGO, the cost of issuing new debt, Evercore's fee, banker and advisor fees, regulatory approval costs, and engineering and environmental studies necessary for due diligence" (*Id.* ¶ 26).

        C.    *The Special Master's Assumptions Justifying His Proposal Are Incorrect.*

The Special Master bases his deeply flawed proposal in part on the assumptions that (1) there is little or no equity value left in the PDVH shares once the judgment creditors are paid, (2)

investors and other potential purchasers would be unwilling to invest in a less-than-100% stake in PDVH, and (3) bidders would pay a premium for a controlling stake of the company. *See* Rpt. at 39-40; Hiltz Decl. ¶¶ 21-24. Respectfully, all three assumptions are erroneous.

The first assumption requires a comprehensive valuation, which the Special Master and Evercore admit they did not do. *See* R.W. Decl. ¶¶ 10-11. The Venezuela Parties believe such a valuation would show that equity value remains in the PDVH Shares even after accounting for liens, funded debt, and the judgments; that this value will only increase as the industry recovers from the pandemic-induced downturn; and that, in all events, there are other sources of value in the company that could be explored to satisfy the judgment(s).

The second assumption is unsupported speculation. PDVSA is run by the independent ad hoc board appointed by the democratically elected and U.S.-supported Interim Government, not the Maduro regime. Moreover, the Report does not consider that the sale of a minority share could, as the Court previously suggested, include minority protections—"such as rights to board seats, preferred dividends, or enhanced voting or veto powers"—that would "facilitate productive co-ownership." R.W. Decl. ¶¶ 14, 34. The Special Master did not attempt to consult "with PDVSA regarding what protections it would be willing to agree to if requested before determining whether such a partnership would be attractive to bidders." *Id.* ¶ 14.

And the third assumption, that strategic bidders will pay a "control premium," is fundamentally unsound, especially as compared to other alternatives for raising the necessary capital. "While a strategic bidder—such as another energy company that could obtain valuable synergies from purchasing 100% of PDVH—may… pay a premium for a controlling stake," the major energy companies are unlikely to bid, either because of antitrust barriers or because they are already turning away from refining to reduce their carbon footprints. R.W. Decl. ¶¶ 31-32. And

8

**391a**

"no other type of bidder—namely an investment firm, hedge fund, or private equity firm—would be willing to pay any such premium," as they instead would "be likely to demand a discount on 100% of the shares because they do not stand to gain any synergies, and their only reason for purchasing the asset would be to sell it later at a profit." *Id.* ¶ 31.

### D. The Venezuela Parties' Proposed Solutions: Restructure the Process Correctly and Engage in Settlement Discussions in the Interim.

There is a straightforward way to cure the deficiencies in the current process: The Proposed Order should be modified to provide that, while the parties await a decision from OFAC and while settlement negotiations proceed in the window proposed by the Special Master, the Special Master should "(1) retain a disinterested financial advisor to assist him in the development of a comprehensive valuation of PDVH and CITGO; (2) solicit alternative, creative solutions from experienced and knowledgeable financial firms; (3) discuss potentially agreeable minority shareholder rights with the Venezuela Parties," and "(4) evaluate possible transactions that would raise enough funds to satisfy Crystallex's judgment (without selling an unnecessarily large number of PDVH shares)." R.W. Decl. ¶¶ 6, 15. Possible alternative methods of raising the needed capital include, among others, "a traditional Initial Public Offering ('IPO'), supplemented, if necessary, by the sale of preferred stock or issuance of other securities"; "an IPO via a Special-Purpose Acquisition Company"; "a private placement transaction, selling the PDVH or other shares to institutional investors in a private offering, including possibly via preferred stock"; and a "joint venture with a strategic partner." R.W. Decl. ¶ 12. These alternatives would more readily maximize value than a simple auction and could be paired with other capital-raising transactions. *See id.* ¶¶ 12–13. Only if the Special Master can justifiably conclude that these and other alternatives are not viable should he propose a bankruptcy-style auction procedure (and even then, only as modified below).

9

These proposed steps will not cause delay. The process cannot commence now due to lack of OFAC approval, as the Special Master acknowledges. And the Special Master proposes an initial three-month period to explore settlement of Crystallex's and ConocoPhillips' claims. *See* Rpt. at 19–20, Ex. B. "[A] negotiated resolution has the potential to unlock substantial value and benefit all interested parties, particularly when compared to any sale of the PDVH shares under the present circumstances and in the current economic environment." R.W. Decl. ¶ 4.

However, the structure of the settlement, as well as the proposal that the Venezuela Parties pay unlimited fees and expenses of the Special Master's advisors, are not appropriate. Rpt. Ex. B. The Republic, Crystallex, and ConocoPhillips each can pay a one-third share of the Special Master's fees. The terms of the settlement and the resulting documentation will be handled by the parties to the negotiation. The Special Master can facilitate settlement discussions without dozens of advisors from Weil Gotshal and Evercore, and certainly without the need to give Evercore a percentage of the settlement consideration, as he now proposes, *see* Rpt. at 11 n.6.[7]

E.    *Necessary Revisions to the Existing Proposal If It Remains in Place.*

If the Special Master's proposal remains as the blueprint of the sale process, certain fundamental changes must be made to minimize its value-destroying effects and to ensure that only "[s]o many of the shares . . . as shall be *sufficient* to satisfy the debt" are ultimately sold, 8 Del. C. § 324(a) (emphasis added); *accord* D.I. 234 at 36.

***Stalking Horse Bidder Selection and Agreement.*** The Proposed Order and Bidding Procedures allow the Special Master to enter into an agreement with a Stalking Horse Bidder after

---

[7] PDVSA and PDVH also welcome the Special Master's assistance in negotiating a settlement with the 2020 Bondholders during the same time, though it is inappropriate to require that they pay the 2020 Bondholders' fees and expenses, as the Special Master proposes. *See* Rpt. Ex. B. There is no basis for the Court to issue such an order. The Venezuela Parties also oppose any order requiring them to post security for future fees, *see id.* at n.2, which would in any event violate sanctions regulations.

the first round of bidding. The Special Master's powers in this regard must be limited as follows:

- *First*, the Special Master must select as the Stalking Horse Bid the bid for the lowest percentage of shares that is sufficient to satisfy the Attached Judgment(s), unless PDVSA selects a different sufficient bid. *Contra* P.O. ¶ 18; B.P. at 6–8.

- *Second,* the Stalking Horse Bidder should not receive a "break-up fee," reimbursement of its expenses, or a credit in the amount of a break-up fee in the second round of bidding. *Contra* B.P. at 7. Delaware law does not provide for payments or reimbursements to disappointed bidders in an execution sale. Nor can PDVH and CITGO be required to pay the break-up fee or the Stalking Horse's expenses if there is a settlement. *Id.* Delaware law also does not provide unsuccessful bidders with damages from a garnishee (or its subsidiary) if a debtor pays off its judgment.

- *Third,* a credit bidder designated as the Stalking Horse should not receive a break-up fee. The Special Master has not proposed such a restriction. *See* B.P. at 7. A credit bidder is not taking any risks to bid and is being rewarded by having its judgment satisfied. In those circumstances, the break-up fee would merely be a windfall. A break-up fee also would give a credit bidder an unfair advantage, because the Stalking Horse can apply the amount of the break-up to its second-round bid, creating a further hurdle for cash bidders.

- *Fourth,* any credit bid submitted should be for, at a minimum, the full value of the bidder's judgment. The Special Master has not proposed such a requirement. *See* B.P. at 9.

- *Fifth,* the Stalking Horse Bid should not become the backup bid if there are two or more bids for a lesser number of shares or for more money, unless PDVSA consents. *Contra* B.P. at 7–8. For the reasons explained above, Delaware law requires that the shares be awarded to the bid for the lowest percentage of shares sufficient to satisfy the judgment.

 *Selection of Successful Bid.* The Special Master also must allow second-round bids for a lower percentage of shares than the Stalking Horse Bid sufficient to satisfy the Attached Judgment(s), and he must select as the Successful Bid the bid for the lowest percentage of shares sufficient to satisfy the Attached Judgment(s), unless PDVSA selects a different sufficient bid. The Special Master's proposal to evaluate bids based on their implied equity value violates Delaware law and "creates a real possibility that a bid for less than 100% of the shares that would otherwise satisfy the Crystallex judgment could be rejected in favor of a 100% bid." R.W. Decl. ¶ 27. And PDVSA "is in the best position to ultimately assess what bid *maximizes value*[.]" *Id.* ¶ 41. The Special Master has withdrawn that ability from PDVSA here. *See* B.P. at 16.

*Good Faith Deposit.* This Court should revisit its prior determination that bidders be required to submit a "substantial good faith deposit." D.I. 234 at 36. Such a deposit is unwarranted here because it will be a significant impediment to even good-faith bidders, and it is unnecessary given the ability of the Special Master and this Court to assess the good-faith and viability of the bid and also to exercise jurisdiction over a successful bidder who fails to follow through. At a minimum, if a deposit requirement remains in place, the Special Master's proposed 10% good faith deposit on the implied equity value of a bid, B.P. at 7, 12, should be reduced to a smaller percentage (5% or less) of the cash bid, provide a means to return the deposit based on OFAC-caused or other delays, and require Crystallex to submit the same cash deposit percentage as any other bidder rather than only 10% of the small cash component of its bid. *See* R.W. Decl. ¶ 38.

*Role for Management.* To provide the Venezuela Parties with the proper input into the sale process—and afford bidders the resulting confidence in the process—at least the following six changes should be made to the Special Master's current proposal:

- Strike the provisions enjoining the Venezuela Parties from conducting their own marketing and negotiations and limiting their access to information regarding bids and bidders. P.O. ¶¶ E, 40, 41; B.P. at 13. The Court previously ruled that "any interested entity may supplement or exceed" the "minimum requirements" for advertising and other bidder outreach and that the Venezuela Parties "will have a fair and reasonable opportunity to be involved in the prefatory procedures, the sale, and any negotiations." D.I. 234 at 35–36. Removing restrictions on the Venezuela Parties also is a practical necessity, including especially to facilitate negotiations over less-than-100% bids. As the Special Master and Evercore have recognized, preparing for and conducting an execution sale of this nature and complexity must be a collaborative effort between PDVSA, PDVH, and their affiliates, and the person conducting the sale. *See* Rpt. at 36-37; *id.* at 38-39; Hiltz Decl. ¶¶ 16, 29–30. And the Special Master has found that CITGO management has been fully cooperative over the past months regarding due diligence and creation and maintenance of a data room. Rpt. at 16 n.10, 22. Absent any wrongdoing, there is no basis to enjoin the Venezuela Parties from assisting in maximizing value.

- PDVH and CITGO, under the supervision of the Special Master, should prepare the "Teaser" and "Confidential Information Memorandum" disseminated to potential bidders, with input and additions from the Special Master. *Contra* P.O. ¶ 4. The information in these documents will be about PDVH's and CITGO's businesses, and they are in the best position to assemble

and draft the necessary information. Placing this task in the hands of the Special Master's advisors would merely cause unnecessary expense and result in an inferior product, as they are less familiar with the companies than the companies themselves, and any information the advisors possess will have to come from PDVH and CITGO in the first place. If the Special Master has any concerns about the content of these documents, he can revise or supplement them as appropriate.

- The Venezuela Parties should receive copies of bids as they are submitted—not all at once after their submission deadline, B.P. at 13—to enhance their ability to assist in maximizing value.

- CITGO—not the Special Master's Advisors, B.P. at 3–4—should respond to bidders' due diligence requests to promote efficiency and stave off unease among potential bidders. R.W. Decl. ¶ 39.

- The Special Master and his Advisors should consult with PDVSA regarding shareholder rights and protections that could facilitate sale of a minority of shares.

- The Venezuela Parties should work closely with the Special Master to evaluate bids and negotiate with bidders.

## II. Implementing the Proposed Order Without a Specific License or Change to the Sanctions Regime Is Unlawful and Would Chill Bidding.

OFAC authorization is required before taking any steps to implement a sale of the PDVH Shares under both OFAC's regulations and the Delaware-law duty to ensure value-maximizing participation in any sale process. Although the Special Master acknowledges this, he proposes that he be allowed to initiate the marketing process when he, in his sole discretion, "is satisfied" with whatever assurances he believes he has received or when he is "comfortable that OFAC's posture will not impair a successful or value maximizing Sale Process." P.O. ¶ 3; Rpt. ¶ 4. This is woefully insufficient. The Special Master's subjective view is not the issue. The Sale Procedures Order should provide that the marketing and preparation processes for Crystallex's requested execution sale will not launch until ordered by the Court upon clear affirmative authorization by OFAC—either by issuance of a specific license or through public amendment of its existing regulatory pronouncements—that permits a sale subject to regulatory approval of the purchaser, or at least permits the conduct of the marketing and bidding process.

*First,* proceeding without unequivocal OFAC approval will depress bidding. It is undisputed that the PDVH Shares are blocked property under the OFAC sanctions regime. It also is undisputed that no sale can occur unless and until OFAC grants the license application of Crystallex (or another attachment holder). D.I. 234 at 33. And there can be no reasonable dispute that even a contingent auction requires a license. *See* 31 C.F.R. § 591.310 ("transfer" includes the creation of "any right, remedy, power, privilege, or interest with respect to any property," including through "execution, or other judicial… process or order"); *id.* § 591.309 ("property interest" includes any "contingent" interest in property).

Until there is a license actually authorizing the Special Master to commence steps toward a sale and for the sale to occur (subject to OFAC approval of the winning bidder), the uncertainty created by the sanctions regime will inevitably depress bidding interest, as well as the value of the shares in the marketplace. "Uncertainty regarding (1) whether participation in a process is lawful, (2) whether the time and money spent in participating in a process will result in a transaction that will be permitted to close, and (3) how long it could take to obtain such approval will depress, chill, and/or eliminate participation by some would-be bidders and cause others to submit greatly discounted bids to account for such uncertainty." R.W. Decl. ¶ 18; *see also id.* ¶¶ 19, 21. The Special Master's financial advisor agrees. Hiltz Decl. ¶ 18 (OFAC uncertainty will "materially chill bidding"). And while the Special Master suggests that, once he is "comfortable," he could provide assurances to bidders, Rpt. at 2, with all respect, no responsible bidder would rely on such vague, hearsay assurances, given that OFAC's published guidance clearly prohibits the proposed actions. *See* R.W. Decl. ¶ 17.

*Second,* applicable law prohibits the Special Master and the parties from taking concrete

**397a**

steps to prepare for a sale or auction without a license. *See* OFAC FAQ 809, Dec. 9, 2019 (prohibiting "prepar[ation] for" an "auction or other sale of the shares, contingent upon the winning bidder obtaining a license from OFAC" and requiring creditors with attachments to "obtain a specific license from OFAC prior to conducting an auction or other sale, including a contingent auction or other sale, or taking *other concrete steps in furtherance of an auction or sale*" (emphasis added)). The FAQ correctly interprets the applicable regulations and the executive orders upon which they are based. OFAC regulations prohibit any "act or transaction… the *purpose*, intent, or effect of which is to create…convey, transfer, or alter, directly or indirectly, any right…or interest" in blocked "property," including *contingent* interests. 31 C.F.R. § 591.310 (emphasis added); *id.* § 591.309 (defining "property" to include contingent interests therein). The regulations also prohibit "enforcement" of a "judgment…through execution…or other judicial process" relating to blocked property without a specific license. *Id.* § 591.407.

The concrete steps set out in the Proposed Order have the purpose of creating rights or interests in blocked property, and many of those steps actually have the effect of creating contingent interests in that property, all of which are contrary to the text of OFAC regulations. For example, the Proposed Order permits the Special Master to enter an "agreement" with a Stalking Horse Bidder "for the sale of any such PDVH Shares," P.O. ¶ 18, *contingent* upon the second round of bidding and Court and regulatory approval. *See also* B.P. at 7–8 (establishing right to serve as "back-up bid"). Moreover, the entire process—even its first marketing steps—would be an effort to "enforce[]" Crystallex's "judgment…through execution…or other judicial process," the "purpose" of which is to ultimately "transfer" blocked property. 31 C.F.R. § 591.407. To the extent the regulations are ambiguous, OFAC's interpretation is entitled to deference under the

*Auer* doctrine. *See Kisor v. Wilkie*, 139 S. Ct. 2400, 2414 (2019).[8] A federal court's duty to fol-

low the law means that it should not grant, authorize, or order illegal relief or actions by private

parties. *See Prima Paint Corp. v. Flood & Conklin Mfg. Co.*, 388 U.S. 395, 406 (1967).

 *Third,* the need to wait for a specific OFAC license is underscored by the independent

foreign policy concerns raised by a sale. As the State Department explained last year, "[s]hould

these assets be advertised for public auction at this time, the Venezuelan people would seriously

question the interim government's ability to protect the nation's assets, thereby weakening it and

U.S. policy in Venezuela today." D.I. 212-1 at 4. The Court previously decided that "the OFAC

licensing process provides the better mechanism [than a complete stay] through which the Exec-

utive Branch can bring to bear the foreign policy and national security interests on which

Crystallex's collection efforts might have an impact." D.I. 234 at 34. Respecting OFAC's guid-

ance that concrete steps in furtherance of a sale—such as advertising it—are prohibited ensures

that the OFAC licensing process can protect the United States' interests.

### III. Evercore's Retention Agreement and Contingency Fee Should Be Disallowed.

  A. *Evercore's Fee Arrangement Creates a Conflict of Interest and Has Tainted the Special Master's Proposal.*

 The Evercore Agreement proposes that Evercore receive a "Sale Fee," the payment and

amount of which are contingent on consummation of the sale and the amount of consideration

paid. Specifically, the Agreement provides that Evercore will receive 0.35% of the "Aggregate

Consideration" paid. Staggeringly, "Aggregate Consideration" is defined to include not only the

cash paid for the PDVH Shares, but also the debt of PDVH's subsidiaries and affiliates assumed,

---

 [8] OFAC is charged with drafting the regulations implementing presidential blocking orders, adjudicating whether applicants receive a license, and enforcing sanctions regulations. While courts do not defer to "a merely 'convenient litigating position' or '*post hoc* rationalization advanced' to 'defend past agency action against attack,'" *Kisor*, 139 S. Ct. at 2417, OFAC is not a party to this litigation, nor are any of its prior actions challenged.

paid off by the purchaser, or even simply outstanding at closing. *See* Evercore Agreement at 3; R.W. Decl. ¶ 47. Depending on how many shares are sold, the Sale Fee to Evercore could amount to $30 million or more. This proposal creates a conflict of interest and, indeed, it already appears to have improperly influenced Evercore's advice.

Special masters are quasi-judicial officers subject to the same strict disqualification rules applicable to judges. Fed. R. Civ. P. 53(a)(2) (incorporating 28 U.S.C. § 455); *see also Hofmann v. EMI Resorts, Inc.*, 689 F. Supp. 2d 1361, 1374 (S.D. Fla. 2010) ("It is well-settled that when a special master accepts an appointment by the Court, the special master assumes the duties and obligations of a judicial officer." (citing *In re Gilbert*, 276 U.S. 6, 9 (1928))).

Section 455 requires disqualification where, in general, a judge's "impartiality might reasonably be questioned" or, in particular (as relevant here), where "[h]e knows that he, individually or as a fiduciary, . . . has a financial interest in the subject matter in controversy or in a party to the proceeding, or any other interest that could be substantially affected by the outcome of the proceeding." 28 U.S.C. § 455(a), (b)(4). This provision also applies where a retained advisor has such an interest. *See In re Kensington Int'l, Ltd.*, 368 F.3d 289, 303-04, 306-07 (3d Cir. 2004) (disqualifying district judge in asbestos bankruptcy proceeding due to appointment of advisors who "operate[d] under a structural conflict of interests" that caused their recommendations to taint the judge by undermining "the appearance of impartiality"); *In re Kempthorne*, 449 F.3d 1265, 1270 (D.C. Cir. 2006) (requiring recusal of special master and suppression of work product tainted by advisor with a conflict of interest that likely "colored the way in which he approached his task, and ultimately his . . . recommendations to the district court").

Here, the proposed Sale Fee likewise gave Evercore an incentive to advise the Special Master to design a process that makes a sale of 100% of the PDVH Shares more likely (which it

in fact did), as well as to implement those procedures to sell as many shares as possible. *See* R.W. Decl. ¶ 5(b); *see also* Hiltz Decl. ¶¶ 21-23 (declaration from Evercore advocating for a 100% sale and denigrating the prospects of a sale for fewer shares). Accordingly, at the very least, the Court must disallow the retention agreement and, as requested above, direct the Special Master to conduct a valuation and consider alternative transactions and bidding procedures with an unconflicted advisor.[9]

The conflict of interest created by the contingency fee also violates due process because it would result in a judicial process designed and run in part by an entity whose proposed compensation would vary based on decisions it makes as part of the proceeding. *See Caperton v. A.T. Massey Coal Co.*, 556 U.S. 868, 879 (2009) (explaining that due process prohibits a judge from receiving a financial benefit contingent on the outcome of a case); *Caliste v. Cantrell*, 937 F.3d 525, 530 (5th Cir. 2019) ("The incentives that most obviously violate the right to an impartial magistrate are those that . . . put money directly into a judge's pocket.").

B. *Evercore's Fee Must Be Disallowed or Restructured for Additional Reasons.*

Even setting aside the conflict of interest, this Court must disallow or restructure the proposed Sale Fee for several additional reasons:

*First*, the Sale Fee would immediately give Evercore an interest in blocked property—the PDVH Shares and the proceeds from the sale thereof—contingent upon a sale. OFAC regulations

---

[9] The Special Master attempts to justify Evercore's contingency fee by analogizing to the retention of a bankruptcy trustee's advisors, citing statutes and examples of Evercore's retention in such proceedings. Rpt. at 14-15; *see also* Rpt. at 13-14 (asserting that the contingency fee purportedly is "industry standard"). But this is not a bankruptcy proceeding, and the Special Master is not a Chapter 11 trustee; this is a judgment execution proceeding involving a quasi-judicial officer governed by the judicial disqualification standard described above, not the materially less strict standard for advisors in the bankruptcy context. In bankruptcy proceedings, the parties' interests generally are all aligned in a manner not relevant here: the goal is to raise the maximum amount of dollars to satisfy creditors who, by definition, will receive less than the full amount on their claims because the debtor is insolvent. The goal here, by contrast, is to sell the fewest shares needed to satisfy Crystallex's roughly $1 billion judgment, but Evercore's contingency fee incentivizes it to sell a greater number of shares to maximize the overall size of the transaction. In this context, that is a clear conflict of interest. *See* R.W. Decl. ¶ 5(c).

specifically prohibit the creation of such contingent interests without a license. *See* Part II, *supra*; 31 C.F.R. § 591.202(a).

    *Second*, the proposed fee is unreasonable and contrary to law. No provision of Delaware law authorizes a distribution of a percentage of execution sale proceeds to persons assisting with the sale. Surely the Special Master could find an advisor willing to identify potential bidders and evaluate bids for a monthly fee for nine months, instead of for tens of millions of dollars.

    *Third*, despite the fact that Evercore is only purporting to assist with raising the cash necessary to pay the Attached Judgment(s), the "aggregate consideration" upon which the Sale Fee is based is calculated to include the claims of the 2020 Bondholders and the outstanding debt of PDVH and its subsidiaries. That is completely unreasonable. *See* R.W. Decl. ¶ 47 ("Such a fee structure provides *no* value-maximizing incentives for Evercore. By analogy to an IPO, this structure would be like agreeing to pay an underwriter who raised $1 billion for a $20 billion company a percentage fee based on the *$20 billion enterprise value* rather than on the $1 billion he or she actually raised, which in essence is really the only purpose of this process."). If anything, a sale fee should be based on actual cash raised (and, in order to properly align Evercore's incentives with the Court's mandate to sell as few shares as possible, structured "to incentivize satisfying Crystallex's claim for minimum dilution of PDVH," *id.* ¶ 46).

    *Fourth,* the Sale Process Parties should not have to pay an "Upfront Fee" to Evercore. Under Delaware law, transaction fees come out of the sale proceeds. *See* 2 Victor B. Woolley, *Practice in Civil Actions and Proceedings in the Law Courts of the State of Delaware* § 1069, at 735 (1906) ("The fund, or so much thereof as may be necessary, is first applied to the costs of the judgment and execution under which the sale was held . . . ."). Moreover, a contingency fee

is just that: contingent. Evercore already is receiving a monthly fee. It should not receive additional compensation for a sale that does not happen (for instance because OFAC did not authorize it). If Evercore is demanding the Upfront Fee because of that risk, its concern underscores that the process should not begin without a license. *See* R.W. Decl. ¶ 48.

*Finally,* Evercore should not be entitled to reimbursement from the sale proceeds before the Sale Process Parties. *Contra* P.O. ¶ 45. Under the May Order, the Sale Process Parties are to be reimbursed for their payments to the Special Master and his Advisors before any other expenses are paid. D.I. 277 ¶ 16. The Court should not reconsider that order.

## IV. Additional Objections to the Proposed Order and Bidding Procedures

### A. Special Master's Additional Powers.

Various provisions of the Proposed Order purporting to grant the Special Master the powers to compel the Venezuela Parties to "cooperate" and "comply" with requests and to make their senior management available for meetings with bidders, P.O. ¶¶ 32-33; to issue undefined "orders," *id.* ¶ 34; and to take wide-ranging actions, including negotiating and interfering with contract counterparties and claimants of PDVH and its subsidiaries and affiliates, whenever he deems it "desirable", *id.* ¶¶ 8, 9, 14, 31, 39, 44; are unnecessary and improper.[10]

As acknowledged by the Special Master, *see* Rpt. at 39, PDVH and CITGO have been voluntarily and fully participating in this process and assisting the Special Master and his Advisors, including by providing documents and information, spending countless hours to respond to questions and requests, and making their senior management available for meetings with the Special Master. *Id.* There is no need—and no basis—for granting the Special Master the power

---

[10] Rule 53 allows a special master to "take all *appropriate* measures to perform the assigned duties fairly and efficiently," unless limited by the appointing order. Fed. R. Civ. P. 53(c)(1)(B) (emphasis added); *see id.* R. 53(b)(2)(A). The Special Master cannot take actions just because he believes they are "desirable," as he currently proposes. *See* P.O. ¶¶ 8, 9, 14, 31, 39, 44.

to compel their assistance. If the Special Master finds that he requires additional assistance that has not been voluntarily provided, he can come back to the Court for appropriate relief, but the Court's authority is not unlimited. In addition, PDVSA, PDVH, CITGO, and their affiliates have not generally consented to allow the Special Master to negotiate with the 2020 Bondholders or other persons regarding their relationships, contracts, or claims. *Contra* P.O. ¶ 39.

       B.    *The Special Master's Proposals to Lobby OFAC.*

The Special Master offers to "take a proactive approach with respect to engagement with the United States government regarding the OFAC decision-making process and obtaining assurances for Potential Bidders that they can participate in the sale process" and "seek explicit guidance or *authorization*" from OFAC. Rpt. ¶¶ 4, 67 (emphasis added); P.O. ¶ 4; *see also* Rpt. Ex. B. Respectfully, federal courts do not advocate to the Government on behalf of particular parties or for particular outcomes in regulatory determinations affecting those parties—here, to authorize a sale that Crystallex desires but that the Republic opposes.

Nor would it be necessary or proper for the Court to "prompt[] USG action" by issuing an order to show cause to the Government. Rpt. at 35. *See Hernandez v. Mesa*, 140 S. Ct. 735, 744 (2020) ("matters relating to the conduct of foreign relations ... are so exclusively entrusted to the political branches of government as to be largely immune from judicial inquiry or interference" (cleaned up)). The Government has appeared in this proceeding and expressed its firm opposition to Crystallex's request that the sale process move forward. In any event, the Government either has issued regulations and guidance answering, or already has explained its position with respect to, the questions on which the Special Master wants to seek input, *see* P.O. ¶ 6.

       C.    *Disclosure of Highly Confidential Information.*

Paragraphs 43 and 44, which propose to allow the Special Master to share Highly Confi-

dential Information (HCI) with potential bidders and the Government, should be revised to provide that the Special Master may do so only with the consent of the producing party. The Special Master's proposal is contrary to the May Order and the July Confidentiality Order, which prohibit the Special Master from sharing HCI with third parties. D.I. 277 ¶ 9; D.I. 291 ¶ 4 (requiring notice and opportunity to object before release). CITGO and PDVH provided sensitive information to the Special Master in good faith reliance on these orders.[11]

> ### D.    The Special Master's Fees Should Be Limited and Approved in Advance.

To control costs and prevent the depletion of the corpus (the surplus of which will revert to PDVSA), the Special Master should be required to agree to an advance limit for his and his Advisors' fees, which should be built into his proposed 13-week budgets, *see* P.O. ¶ 48, and he should have to seek prior approval from the paying parties and the Court to exceed the budget, and only based on unforeseeable, extraordinary events. Other than facilitating settlement discussions and conducting the valuation, discussions, and analysis of alternatives proposed in Part I.D, *supra* (if that modification is adopted by the Court), the Special Master and his Advisors should not conduct any activities after entry of this Order unless and until the Court holds that the sale process may be launched.[12] Finally, if any other judgments are added to the sale process, those judgment creditors should be required to pay a share of the Special Master's compensation.

---

[11] Although most of the HCI provided to the Special Master is appropriate for a data room for potential bidders (with firewall or clean team protections), certain documents are not. If the Court does decide to revisit its prior orders, CITGO and PDVH request that the Special Master be required to designate any HCI he wishes to disclose and give the producing party an opportunity to object.

[12] There is no reason to have other holders of judgments against the Republic submit proposed judgment amounts and supporting documentation to the Special Master 21 days after entry of the Sale Procedures Order and for the Special Master to review the documentation and calculate judgment amounts. *See* Proposed Order ¶ 30. That would be a waste of time and money unless and until the Court finds that they are entitled to a writ of attachment.

### E.  Communications with Other Sale Process Parties.

Paragraph 42 of the Proposed Order, which enjoins the Sale Process Parties from communicating with one another for certain purposes, should be stricken. No party has requested such an injunction, and the Special Master has not identified any prior conduct or threatened conduct by the Sale Process Parties that could warrant an injunction, much less conduct that would warrant a prior restraint on speech. *See Bailey v. Sys. Innovation, Inc.*, 852 F.2d 93, 101 (3d Cir. 1988); *Berger v. Zeghibe*, 666 F. App'x 119, 124 (3d Cir. 2016) (describing standard for injunctive relief).

### F.  Crystallex's Judgment.

The first sentence of Paragraph 1 of the Proposed Order should be stricken, as the proposed finding regarding Crystallex's outstanding judgment amount was made by the Special Master *ex parte* without allowing the Republic to review or contest the submissions upon which that recommendation was based. The Special Master proposes "finalizing" his determination, but even an initial determination of what Crystallex's judgment "is" should not be made *ex parte*. *See Abourezk v. Reagan*, 785 F.2d 1043, 1060–61 (D.C. Cir. 1986), *aff'd*, 484 U.S. 1 (1987).[13]

The Special Master also proposes that Crystallex provide only limited information to the Republic and PDVSA to finalize the judgment amount. P.O. ¶ 30. That is insufficient. The Republic and PDVSA are entitled to receive all information provided to the Special Master in order to meaningfully evaluate and, if necessary, contest the judgment calculation. *See Abourezk*, 785 F.2d at 1060–61 ("It is a hallmark of our adversary system that we safeguard party access to the evidence tendered in support of a requested court judgment."). Finally, the Special Master proposes that Crystallex's judgment be revised due to a purported clerical error. But the judgment

---

[13] The Republic has repeatedly requested the information upon which the determination was made from both Crystallex and the Special Master without success. *See* Exhibit B to these Objections.

was merely registered with this Court. If Crystallex believes there has been an error, it must petition the D.C. District Court and make the necessary showing.

### G. Attached Judgments.

Paragraphs 29-30 should be revised to provide that no shares can be sold to satisfy the judgment of any person who has not obtained a valid attachment. Before a writ of attachment can issue, the relevant judgment holder must obtain a license from OFAC, and the writ still must be served, returned, and found valid. Otherwise, there will not be a legal basis for execution.

### H. Publication of the Sale Notice in Venezuela.

Paragraph E of the Proposed Order provides for the publication, "if practicable," in "a regional or local newspaper published or circulated in Venezuela" consistent with the notice rules of 8 Del. C. § 324(a) for debtors who live outside the United States. The Republic and PDVSA waive this requirement. *See Deibler v. Atlantic Props. Grp.*, 652 A.2d 553, 557 (Del. 1995) (a debtor may waive objections to form of notice).

### I. Judicial Immunity.

Paragraph 46 of the Proposed Order and provisions regarding judicial immunity in the Bidding Procedures should be stricken. Whether the Special Master and his Advisors are entitled to quasi-judicial immunity in any subsequent suit is a matter to be determined in that suit. The Special Master does not attempt to satisfy the standard for injunctive relief, *see Berger*, 666 F. App'x at 123, and it is difficult to see how he could. Even where it applies, judicial immunity only applies to civil suits for damages, not from suits for declaratory or injunctive relief. *See Pulliam v. Allen*, 466 U.S. 522, 528 & n.6 (1984). And entitlement to immunity depends on the functions for which the officer is appointed and the nature of the acts taken. *Russell v. Richardson*, 905 F.3d 239, 248-51 (3d Cir. 2018). Delaware makes the person conducting a sale liable for damages in certain circumstances. *See, e.g.*, 10 Del. C. §§ 2110, 4975, 4986, 5093.

24

**407a**

J.    *"Free and Clear" Provisions.*

The proposed Order and accompanying documents provide, P.O. ¶¶ 13, 19; B.P. at 7, 18; Notice of Sale at 2-3, that a final sale order approving the sale will transfer the shares "free and clear" of all claims. Although the Venezuela Parties do not believe that this language restricts any party's rights to appeal the final sale order itself and to seek invalidation of the sale, the language should be revised to clarify this point, as this Court plainly lacks the power to shield its own orders from appellate review.

August 25, 2021

OF COUNSEL:

Nathan P. Eimer
Lisa S. Meyer
Gregory M. Schweizer
Daniel D. Birk
EIMER STAHL LLP
224 South Michigan Avenue
Suite 1100
Chicago, IL 60604
(312) 660-7600
NEimer@eimerstahl.com
LMeyer@eimerstahl.com
GSchweizer@eimerstahl.com
DBirk@eimerstahl.com

OF COUNSEL:

Joseph D. Pizzurro
Julia B. Mosse
Kevin A. Meehan
Juan O. Perla
CURTIS, MALLET-PREVOST,
COLT & MOSLE LLP
101 Park Avenue
New York, NY 10178
(212) 696-6000

Respectfully submitted,

MORRIS, NICHOLS, ARSHT & TUNNELL LLP

*/s/ Kenneth J. Nachbar*
Kenneth J. Nachbar (#2067)
Alexandra M. Cumings (#6146)
1201 North Market Street
Wilmington, DE 19801
(302) 658-9200
KNachbar@mnat.com
ACumings@mnat.com

*Attorneys for PDV Holding, Inc., and
CITGO Petroleum Corporation*

HEYMAN ENERIO GATTUSO & HIRZEL LLP

*/s/ Samuel Taylor Hirzel, II*
Samuel Taylor Hirzel, II (#4415)
300 Delaware Avenue, Suite 200
Wilmington, DE 19801
(302) 472-7300
shirzel@hegh.law

*Attorney for Petróleos de Venezuela, S.A.*

25

jpizzurro@curtis.com
jmosse@curtis.com
kmeehan@curtis.com
jperla@curtis.com

ABRAMS & BAYLISS LLP

OF COUNSEL:

*/s/ A. Thompson Bayliss*
A. Thompson Bayliss (#4379)
Stephen C. Childs (#6711)
20 Montchanin Road, Suite 200
Wilmington, DE 19807
(302) 778-1000
bayliss@abramsbayliss.com
childs@abramsbayliss.com

Donald B. Verrilli, Jr.
Elaine J. Goldenberg
Ginger D. Anders
Brendan B. Gants
Jacobus P. van der Ven
Munger, Tolles & Olson LLP
601 Massachusetts Avenue NW
Suite 500 E
Washington, D.C. 20001
(202) 220-1100
Donald.Verrilli@mto.com

*Attorneys for Bolivarian Republic of Venezuela*

George M. Garvey
Munger, Tolles & Olson LLP
350 South Grand Avenue, 50th Floor
Los Angeles, CA 90071
(213) 683-9100
George.Garvey@mto.com

26

**409a**

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

-------------------------------------------------------------------------------

|   |   |   |
|---|---|---|
| CRYSTALLEX INTERNATIONAL CORPORATION, | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | Misc. No. 17-151-LPS |
| | : | |
| BOLIVARIAN REPUBLIC OF VENEZUELA, | : | PUBLIC VERSION |
| | : | |
| Defendant. | : | |
| | : | |
| | : | |

-------------------------------------------------------------------------------

## SPECIAL MASTER'S REPORT AND RECOMMENDATION
## REGARDING PROPOSED SALE PROCEDURES ORDER

OF COUNSEL:

Ray C. Schrock, P.C. (*pro hac vice* pending)
Alexander W. Welch (*pro hac vice* pending)
Jason L. Hufendick (*pro hac vice* pending)
WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
Ray.Schrock@weil.com
Alexander.Welch@weil.com
Jason.Hufendick@weil.com

Myron T. Steele (#000002)
Matthew F. Davis (#4696)
Alan R. Silverstein (#5066)
Abraham Schneider (#6696)
POTTER ANDERSON & CORROON LLP
Hercules Plaza, 6th Floor
1313 North Market Street
P.O. Box 951
Wilmington, DE 19801
Telephone: (302) 984-6000
Facsimile: (302) 658-1192
msteele@potteranderson.com
mdavis@potteranderson.com
asilverstein@potteranderson.com
aschneider@potteranderson.com

*Counsel for Special Master Robert B. Pincus*

Dated: August 9, 2021
Public Version Dated: September 15, 2021

CONTAINS REDACTIONS IN ACCORDANCE WITH D.I. 345

# TABLE OF CONTENTS

**Page**

| | | |
|---|---|---|
| **I.** | Preliminary Statement | 1 |
| **II.** | Overview of the Special Master's Process | 4 |
| | **A.** Appointment of Special Master | 4 |
| | **B.** Retention of Advisors | 5 |
| | **C.** Entry of Protective Order | 16 |
| | **D.** Proposed Sale Process Party Engagement | 18 |
| | **E.** United States Government Outreach | 20 |
| | **F.** Due Diligence of PDVH and CITGO | 22 |
| | **G.** Relevant Claims and Interests | 23 |
| |     **1.** Crystallex's Judgment | 24 |
| |     **2.** ConocoPhillips' Judgment | 26 |
| |     **3.** PDVSA 2020 Bondholders & CITGO Holding Pledge | 28 |
| |     **4.** RTSA Loan & RTSA Pledge | 29 |
| |     **5.** Additional Judgment Creditors of Venezuela and PDVSA | 31 |
| **III.** | CITGO and Sale Process Design Considerations | 31 |
| | **A.** CITGO'S Complex Corporate and Capital Structure | 32 |
| | **B.** CITGO Sale Process Design Considerations | 34 |
| |     **1.** OFAC Considerations | 35 |
| |     **2.** Illustrative Clearing Price | 35 |
| |     **3.** Structurally Senior Liens | 36 |
| |     **4.** COVID-19's Impact on CITGO's Business and Operations | 37 |
| |     **5.** Management and CITGO's Cooperation | 38 |
| |     **6.** Ability to Purchase A Controlling Stake in CITGO | 39 |
| |     **7.** Broader Powers and Process May Ultimately Be Required | 40 |
| **IV.** | Sale Procedures Order and Bidding Procedures Summary | 42 |
| **V.** | Recommendation | 71 |

## EXHIBITS

**EXHIBIT A**   Hiltz Declaration

**EXHIBIT B**   Recommended Voluntary Settlement Process Timeline

I, Robert B. Pincus, solely in my capacity as special master (the "**Special Master**") for the United States District Court for the District of Delaware (the "**Court**") in *Crystallex International Corp. v. Bolivarian Republic of Venezuela* (D. Del. Case. No. 17-151-LPS) ("the **Crystallex Case**"), hereby submit this report  and recommendation ( "**Report**")[1] to the Court in connection with the proposed sale procedures order filed contemporaneously herewith [D.I. No. 302] (the "**Sale Procedures Order**"):[2]

**I.**    **Preliminary Statement**

1.       Each of the interested parties in the Crystallex Case has argued that, if a sale of the PDVH Shares is to occur, the procedures for such sale should be designed to achieve a sale transaction that is fair, open, and maximizes the value of the PDVH Shares to be sold.  Although parties may ultimately disagree on the method to achieve a value-maximizing transaction, I believe that all interested parties are, and remain, committed to the fundamental goal of designing a sale and marketing process that provides the best opportunity of achieving a value maximizing result.

2.       With that guiding principle and the input of the Sale Process Parties (as defined below), my Advisors (as defined below) and I have designed the proposed Sale Procedures Order that strikes the balance between  many competing interests in a dynamic and internationally sensitive set of circumstances to provide the best opportunity of achieving a value-maximizing Sale Transaction, while achieving fairness to all involved.  I am submitting this Report to assist

---

[1] This Report has been filed under seal pursuant to paragraph 3 of the *Special Master Confidentiality Order* [D.I. 291] (the "**Protective Order**").  As discussed further in paragraph 32 of this Report, the Special Master anticipates that the Sale Process Parties (as defined below) will jointly submit proposed redactions to this Report no later than five calendar days after the date hereof for the Special Master to file publicly on the docket in the Crystallex Case. Further, as this Report contains or reflects certain information that has been marked "highly confidential" by the Venezuela Parties and Crystallex, the Special Master will serve appropriate redacted version on each Sale Process Party that is specific to them.

[2] Capitalized terms used but not defined shall have the meaning ascribed to such terms below or, if not defined below, the meaning ascribed to such terms in the Sale Procedures Order.

CONTAINS REDACTIONS IN ACCORDANCE WITH D.I. 345

the Court and other parties in interest in understanding the Special Master's process and the facts and circumstances considered in connection with proposing the Sale Procedures Order and the rationale for the provisions therein.

3.      The focal point of discussion among the Sale Process Parties in preparation of the proposed Sale Procedures Order has been and remains when to ultimately launch the Marketing Process following entry of the order by the Court.  Given that current public guidance from the Department of the Treasury's Office of Foreign Assets Control ("**OFAC**") at FAQ 809 states that a specific license from OFAC is required "prior to conducting an auction or other sale… or taking other concrete steps in furtherance of a sale" of shares of a Government of Venezuela entity (such as the PDVH Shares), barring a change in circumstances, my recommendation is to launch the Marketing Process only once I am confident that I am able to provide Potential Bidders with comfort that they can participate in the process without subjecting themselves to the risk of violating U.S. sanctions.  If we were to proceed based on OFAC's public guidance as of today, I do not believe that Potential Bidders will participate in the process for fear of violating such sanctions.

4.      In  the  proposed Sale Procedures Order, I have proposed what I believe to be the most reasonable and workable solution: following entry of the Sale Procedures Order, unless otherwise directed by the Court, I intend to hold off on preparing for launch of the Marketing Process until I am comfortable that OFAC's posture will not impair a successful or value maximizing Sale Process.  In the meantime, I will continue to take a proactive approach with respect to engagement with the United States Government regarding the OFAC decision-making process and obtaining assurances for Potential Bidders that they can participate in the sale process.

5.      Notwithstanding OFAC-related temporary delay, I do not believe this time should be wasted by the Sale Process Parties.  Based on my review of the facts, circumstances, and following numerous discussions with the Sale Process Parties, my assessment of the situation is that all interested stakeholders could benefit – and that substantial value could be unlocked – if the Sale Process Parties, in addition to the PDVSA 2020 Bondholders, were able to reach a voluntary negotiated outcome on a claims waterfall (such a resolution, a "**Negotiated Outcome**").  Based on my discussions with the Sale Process Parties, I believe this would be a welcome development for those parties and will make the best use of time prior to launching the Marketing Process. Of course, facilitating such discussions around a Negotiated Outcome is not an express component of my current mandate, however, it is a step that is likely to aid my mandate and, if the Sale Process Parties consent or the Court otherwise deems it appropriate in exchange for a short delay to implement the proposed Sale Procedures Order, as discussed more fully below, I have proposed and recommended a process for the parties to engage in such discussions with my assistance.

6.      Except as otherwise indicated herein, this Report and the findings herein are based on the facts as presented, identified, and determined by me, with the assistance of my Advisors, and the circumstances relating to the Crystallex Case, PDVH, CITGO, my review of relevant pleadings and documents, information provided to me by the Sale Process Parties, publicly available information, or my opinion based upon my experience and knowledge. Contemporaneously herewith,  William O. Hiltz of Evercore Group L.L.C. ("**Evercore**") has submitted the *Declaration of William O. Hiltz in Support of Special Master's Report and Recommendation Regarding Proposed Sale Procedures Order* in Support of this Report (the "**Hiltz Declaration**"), attached hereto as **Exhibit A**.

3

CONTAINS REDACTIONS IN ACCORDANCE WITH D.I. 345

## II.    Overview of the Special Master's Process

**A.    Appointment of Special Master**

7.      On January 14, 2021, the Court issued an opinion and corresponding order [D.I. 234, 235] (the "**January 2021 Ruling**") following pleadings filed by Plaintiff Crystallex International Corporation ("**Crystallex**"), Defendant Bolivarian Republic of Venezuela (the "**Republic**"), Intervenor Petróleos de Venezuela, S.A. ("**PDVSA**"), Garnishee PDV Holding, Inc. ("**PDVH**"), Intervenor CITGO Petroleum Corporation ("**CITGO Petroleum,**" and collectively with the Republic, PDVSA, and PDVH, the "**Venezuela Parties**"), non-parties Phillips Petroleum Company Venezuela Limited and ConocoPhillips Petrozuata B.V. (together, **ConocoPhillips**," and collectively with Crystallex and the Venezuela Parties, the "**Sale Process Parties**") and the United States.

8.      The January 2021 Ruling set out "some contours of the sale procedures that [the Court would] follow in conducting a sale of PDVSA's shares in PDVH," including the appointment of a special master to "oversee the day-to-day and detailed implementation of the sales procedures" and to "prepare for and conduct the sale." [D.I. 234 at 34-35]. The Court further explained that "the Venezuela Parties will have a fair and reasonable opportunity to be involved in the prefatory procedures, the sale, and any negotiations, but the Court will retain control of the sale. The Venezuela Parties will have a seat at the table, but they will not be running the process."[3]

9.      Consistent with the January 2021 Ruling, on April 13, 2021, the Court appointed me as Special Master to assist the Court with the sale of PDVSA's shares in PDVH [D.I. No. 258]. On May 27, 2021, the Court entered the *Order Regarding Special Master* [D.I. No. 277] (the "**May**

---

[3] [D.I. 234 at 36. *See also id.* at 37 ("Importantly, it would be inequitable to permit PDVSA to conduct the sale at this point . . . the Court is not going to permit a highly-recalcitrant judgment debtor to conduct its own sale process over the objection of its repeatedly-victorious judgment creditor").]

**2021 Order**") formalizing my appointment as Special Master and directing me to, among other things:

>   a.  devise a plan for the sale of shares of PDVH (the "**PDVH Shares**") as necessary to satisfy the outstanding judgment of Crystallex and the judgment of any other judgment creditor added to the sale by the Court and/or devise such other transaction as would satisfy such outstanding judgment(s) while maximizing the sale price of any assets to be sold (collectively, the "**Sale Transaction**");
>
>   b.  oversee the execution of a protective order;
>
>   c.  work to become knowledgeable about the business operations and assets of CITGO and PDVH; and
>
>   d.  ascertain the total amounts of the outstanding judgment owed to Crystallex by the Republic and the total amount of the outstanding judgment owed to ConocoPhillips by PDVSA.

10.     The May 2021 Order further authorized me to retain, after consultation with the Sale Process Parties, counsel, financial advisors, and other professionals (collectively, including those already retained by the Special Master, the "**Advisors**") to assist and advise me with respect to the performance of my duties as Special Master.

**B.     Retention of Advisors**

11.     Immediately upon my appointment as Special Master, it was clear that retaining skilled counsel and advisors that have the resources, experience, and expertise in the sale of complex and large assets, particularly in a Court supervised process and distressed situation, would be critical to maximizing the value of the PDVH Shares.  Accordingly, I immediately took steps to retain counsel and advisors that are subject matter experts with relevant experience and expertise.

12.     In retaining counsel, I interviewed and met with several leading law firms with the relevant experience, expertise and reputation.  In consultation with the Sale Process Parties,

I selected, in each case based on their excellent reputation and strong track record of relevant experience, Weil, Gotshal & Manges LLP to serve as lead transaction counsel, Potter Anderson & Corroon LLP to serve as Delaware counsel, and Jenner and Block LLP to serve as OFAC counsel. Each law firm has been retained on an hourly basis and performs work at my direction.

13. In consultation with my counsel, I determined that engaging a highly qualified investment banker to advise me in fulfilling my mandate—familiarizing myself with the CITGO business and designing and overseeing a sale process for the PDVH Shares—was critical in accomplishing the Court's goals. Undertaking a sale of this complexity and magnitude without engaging an investment banker on whose advice and experience I would be entitled to rely upon would be essentially impossible and, in my opinion, result in a chaotic, inefficient process, and ultimately would not reach the goal of generating a value maximizing outcome. Further, I believe foregoing the engagement of an investment banker would likely increase the risk of litigation, appeal and challenge to any eventual outcome of the Sale Procedures.

14. Accordingly, following my retention of counsel and upon their input and guidance, I solicited proposals from several market-leading investment banking advisory firms and conducted an interview of each firm that submitted a proposal. After a round of interviews and several follow-up discussions, I selected Evercore based on their extensive experience and excellent reputation in providing high quality investment banking services in (a) complex and financially distressed situations, including their extensive experience in advising debtors, creditors, and other constituents in court-supervised sale processes and restructurings; and (b) applicable subject matter investment banking advisory roles in a variety of downstream oil and gas transactions. The resources, capabilities, and experience of Evercore in advising me in connection with the tasks identified above is critical to obtaining a value-maximizing Sale

CONTAINS REDACTIONS IN ACCORDANCE WITH D.I. 345

Transaction (as explained in greater detail below).  In accordance with the Court's mandate to conduct the sale, as discussed further below, I have proposed to engage Evercore now for the implementation of the Sale Procedures Order but would not direct Evercore to begin any work for that process until I am satisfied that I am able to provide Potential Bidders with comfort that they can participate in the process without subjecting themselves to the risk of violating U.S. sanctions.

15.     Since being engaged, my Advisors have acquired significant knowledge of the Crystallex Case and have conducted the requisite due diligence review of the businesses of PDVH and CITGO, including their business operations, capital structure, key stakeholders, financing documents and other related material information, necessary for the design of the Sale Procedures Order, but have not completed all diligence required for launching the Marketing Process.  My Advisors have advised me in all aspects of preparing and designing the proposed Sale Procedures Order, including analyzing and evaluating potential sale structures, analyzing the proposals from each of the Sale Process Parties, and assisting me with various other activities related to the Special Master process.  On my instructions, my Advisors have been actively involved in discussions and outreach to the Sale Process Parties and in coordinating with the United States Government, including representatives from the Department of Justice, Department of the Treasury and Department of State (collectively, the "**USG**").

16.     As a result of the work performed in connection with designing the proposed Sale Procedures Order and the significant knowledge gained therefrom, I believe that my Advisors are in the best position to advise me and the Court in connection with entry of the Sale Procedures Order and the ultimate implementation thereof.  Since I expect that the Sale Process Parties will be focused on monitoring the expenses of my Advisors in connection with such implementation, the proposed Sale Procedure Order provides for the provision of a rolling 13-week Budget (with

applicable revisions) to the Sale Process Parties of my anticipated expenses immediately following entry of the Sale Procedures Order. I anticipate providing such a Budget to the Sale Process Parties each month. *See* Sale Procedures Order at ¶48.

17. With respect to Evercore, their current engagement ends upon entry of the Sale Procedures Order. As previously mentioned, I will not be able to fulfill my duties under the January 2021 Ruling and May 2021 Order without a skilled and competent investment banker. Since their engagement, Evercore has become intimately familiar with the sale process, the Crystallex Case, PDVH, CITGO, and the other circumstances of the current situation. It would be damaging to the Special Master process if I were required to retain a new investment banker at this stage. In particular, Evercore will be critical in connection with, among other things:

- reviewing and analyzing PDVH and CITGO's business, operations, and financial projections;
- preparing for and implementing the Marketing Process;
- identifying interested parties and/or potential acquirers and, at my request, contacting such interested parties and/or potential acquirers;
- reviewing any Non-Binding Initial Indications of Interest, Stalking Horse Bids, or other Bids that are received pursuant to the Bidding Procedures;
- structuring and effectuating a Sale Transaction;
- advising my Advisors and I in connection with negotiations with potential interested parties and/or acquirers and aiding in the consummation of a Sale Transaction;
- if requested by the Court or the Sale Process Parties, facilitating discussions in furtherance of a Negotiated Outcome and advising my Advisors and I in connection with such a process;
- advising on tactics and strategies for negotiating with Bidders and Potential Bidders; and

- participating in discussions with and otherwise interacting with the Sale Process Parties and the United States Government (explained in more detail below).

18.     Accordingly, I propose to engage Evercore to advise me in connection with implementation of the Sale Procedures Order.  For the period following entry of the Sale Procedures Order, I negotiated a new engagement letter with Evercore (the "**Proposed Evercore Engagement letter**"), a copy of which is attached as <u>Exhibit 3</u> to the Sale Procedures Order, and am proposing that I be granted the authority to enter into that engagement letter under the proposed Sale Procedures Order.

19.      As is typical and customary for retention of an investment banker, the Proposed Evercore Engagement Letter contains a fee structure where the majority of Evercore's compensation is structured as a "success fee" that is payable based on the "Aggregate Consideration" provided by a buyer in connection with the applicable Sale Transaction (the "**Sale Fee**").[4]  As Evercore's primary compensation will be tied to the success of the sale process, I believe the Sale Fee properly incentives Evercore to facilitate a value-maximizing Sale Transaction.  Unsurprisingly, consistent with sale processes of this type and complexity where an investment banker is engaged, every investment banker that I interviewed insisted on such a construct as their primary form of compensation.

---

[4]  As used in the Proposed Evercore Engagement Letter, the term "Aggregate Consideration" means "the total fair market value (determined at the time of the closing of a Sale) of all consideration paid or payable, or otherwise to be distributed to, or received by, directly or indirectly, the Court (or the Special Master) in connection with the Sale Transaction or the Company, its bankruptcy estate (if any), its creditors and/or the security holders of the Company in connection with a Sale, including all (i) cash, securities and other property, (ii) Company debt assumed, satisfied, or paid by a purchaser or which remains outstanding at closing (including, without limitation, the amount of any indebtedness, securities or other property "credit bid" in any Sale) and any other indebtedness and obligations, including litigation claims and tax claims that will actually be paid, satisfied, or assumed by a purchaser from the Company or the security holders of the Company and (iii) amounts placed in escrow and deferred, contingent and installment payments."

20.     In addition to the Sale Fee, under the Proposed Evercore Engagement Letter, Evercore is entitled to a monthly fee of $200,000 (each, a "**Monthly Fee**"). The first nine (9) Monthly Fees actually paid are 50% creditable against any Sale Fee earned by Evercore in connection with a Sale Transaction.  The first Monthly Fee will be due and payable on the date that I instruct Evercore to begin assisting me in preparing for the Marketing Process or I otherwise request their services (such as in connection with facilitating discussions regarding a Negotiated Outcome).  Further, at any time after the Monthly Fees begin to accrue, if implementation or consummation of a Sale Transaction is stayed or otherwise delayed for any reason (other than a delay caused by a necessary regulatory approval unrelated to required OFAC authorization or guidance), I am entitled to send a notice that, three business days after it is received by Evercore, will have the effect of ending the accrual of Monthly Fees until such time as I rescind the notice. Finally, the Proposed Evercore Engagement Letter further provides for reimbursement of reasonable and customary out-of-pocket expenses incurred by Evercore in connection with their engagement thereunder.

21.     In light of this structure and following consultation with the Sale Process Parties, I have submitted a copy of the Proposed Evercore Engagement Letter for approval by the Court. I believe that my continued retention of Evercore is necessary and the terms on which I propose to engage them is consistent and comparative with market terms for an engagement of this nature.

22.     As required by the May 2021 Order, I have consulted with the Sale Process Parties regarding my proposed engagement of Evercore following entry of the proposed Sale Procedures Order.[5]  To varying degrees, each of the Sale Process Parties have raised concerns regarding the

---

[5] [*See* May 2021 Order at 13 ("The Special Master is authorized to enter into any agreements with such Advisors on terms that he, after consultation with the Parties and ConocoPhillips, believes are appropriate.")]

Proposed Evercore Engagement Letter. I have attempted to resolve each of their objections, including through further negotiation with Evercore. The Proposed Evercore Engagement Letter reflects these efforts, which are summarized as follows:

- Delaying the incurrence of any Monthly Fees owed to Evercore under the Proposed Evercore Engagement Letter until I provide Evercore with notice of my determination to begin preparations for the Marketing Process;[6]

- Reducing Evercore's Sale Fee in the event the only bona fide Bid generated by the Marketing Process is a credit bid by Crystallex;

- Modifying the timing of payment of the Sale Fee to be no more than $7,000,000 at announcement and signing of any Sale Transaction (the "**Upfront Amount**"); and

- Excusing Crystallex or ConocoPhillips from the obligation to pay the Upfront Amount if, based on the implied value of the Sale Transaction, they are "out of the money" and unlikely to receive any of the proceeds from the Sale Transaction.

I am hopeful that the foregoing amendments will resolve the objections of Crystallex and ConocoPhillips.[7] Nonetheless, I anticipate that certain objections of the Venezuela Parties may remain unresolved. As such, I will address the Venezuela Parties' objections briefly now, and will respond more fully to any objections with whatever evidence the Court deems appropriate, if any party prosecutes an objection.

23. The Venezuela Parties have ostensibly raised concern that the proposed Sale Fee (or any "success fee") paid to Evercore will create an "incurable" conflict of interest that taints

---

[6] The Proposed Evercore Engagement Letter further provides that if the Court or the Sale Process Parties request that I participate or otherwise assist with facilitating a Negotiated Outcome (as discussed more fully below), then, I may request Evercore's services and, in which case, Monthly Fees will be incurred in connection therewith. Depending on the proposed course of negotiations, it may also necessitate the need to negotiate a "Restructuring Fee" (as defined in the Proposed Evercore Engagement Letter) in consultation with the Sale Process Parties.

[7] If, prior to entry of the Sale Procedures Order, a Sale Process Party (other than the Venezuela Parties) does not wish to be involved in the process, either as a consultation party or otherwise, and elects to withdraw from inclusion in the Marketing Process, then such party presumably would request that the Court revisit the fee apportionment so that it is no longer required to pay for the expenses of the sale process.

11

CONTAINS REDACTIONS IN ACCORDANCE WITH D.I. 345

both me as Special Master and any advice or services rendered by Evercore. More specifically, they argue that by linking Evercore's compensation to the success of the Sale Transaction, Evercore will, for their own personal gain, encourage me to recommend to the Court a process that ensures the sale of 100% of the PDVH Shares.[8] On such basis, the Venezuela Parties have stated that if Evercore is retained I will be disqualified from serving as Special Master in the Crystallex Case because I have been tainted by Evercore's alleged conflict of interest. *See* Federal Rule 53(a)(2) (subjecting masters appointed under Federal Rule 53 to disqualification in the same circumstances as a judge would be disqualified under 28 U.S.C. § 455).

24.     In support of their proposition, the Venezuela Parties referred me to the Third Circuit Court of Appeals' decision in *In re Kensington Intern. Ltd.*, 368 F.3d 289 (2004) ("**Kensington Decision**"). My counsel and I have reviewed the Kensington Decision and believe there are fundamental differences between the facts of that case and the circumstances here, rendering the Kensington Decision's import regarding my retention of Evercore inapposite.

25.     In *Kensington*, the Bankruptcy Court had appointed consultants to assist him as neutral-advisors in the administration of five separate asbestos-related bankruptcy cases. Two such advisors simultaneously served as advocates—in a fiduciary capacity—on behalf of asbestos claimants in a separate, yet related, bankruptcy case. As a result, the Third Circuit in the Kensington Decision found that these two advisors faced competing fiduciary obligations that created a clear conflict of interest for both advisors, which arose primarily out of the close relationship between the future asbestos claimants and the issues in the five asbestos cases and the

---

[8] Tellingly, the Venezuela Parties' argument is premised on a gross mischaracterization of the sale process that I have recommended to the Court. The proposed Sale Procedures Order that I have recommended does not require 100% of the PDVH Shares to be sold. The proposed Bidding Procedures clearly require me to select a Bid for a lesser percentage of the PDVH Shares if, *ceteris paribus*, it satisfies at least as much of the Attached Judgments as a Bid for a greater percentage of the PDVH Shares.

CONTAINS REDACTIONS IN ACCORDANCE WITH D.I. 345

separate bankruptcy case. *See* Kensington Decision at 11. Because these two advisors were no longer disinterested parties, it was determined that the Bankruptcy Court was tainted by the appearance of a conflict because of the special position of trust and influence they had over the Bankruptcy Court. As a result, the Bankruptcy Court Judge was subject to disqualification from serving as judge in such cases by application of 28 U.S.C. § 455(a). *Ibid* at 14. Here, neither I nor Evercore face any competing fiduciary obligations in the design of the Sale Procedures Order or implementation of the Marketing Process.

26. Equally as important, the procedural posture of the Kensington Decision is categorically different than the Crystallex Case. At the time of the Kensington Decision, it was anticipated that the Bankruptcy Court would continue to rule on issues and the merits of disputes in the applicable bankruptcy cases. Here, as the Court noted in the January 2021 Ruling, the Third Circuit has left the Court with "***nothing left to do but execute***" the sale of the PDVH Shares. *See* January 2021 Ruling at 19. Neither Evercore nor I will be ruling on the merits of any dispute in the Crystallex Case.[9] Moreover, Evercore's retention on a "success fee" basis is occurring only once the Court has already approved the Sale Procedures Order and the Bidding Procedures pursuant to which Bids will be solicited from Potential Bidders.

27. The inapposite Kensington Decision aside, respectfully, it is not, in my view, credible for the Venezuela Parties to argue that retaining an investment banker that is compensated by a success fee for executing the Court's judgment after merits have been decided creates a conflict of interest in this case. The proposed compensation structure for Evercore is reflective of

---

[9] Moreover, as the Venezuela Parties insisted, the Court is required to review *de novo* all factual and legal positions contained in any recommendation I submit to the Court. *See* May Order at ¶ 12.] [*See In re Zenith Elecs. Corp.*, 241 B.R. 92, 102 (Bankr. D. Del. 1999) ("many retention agreements with investment bankers, financial advisors (and even counsel) contain such [success fee] arrangements. That does not, per se, disqualify such firm from testifying as an expert witness.")

industry standards for investment bankers serving in similar advisory roles both in and out of court supervised contexts. In addition to being the industry standard, the open and transparent manner of the proposed Court-approved engagement of Evercore pursuant to the Proposed Evercore Engagement Letter that the Sale Process Parties have all had an opportunity to provide input on further disavows the notion of a conflict of interest. Crystallex and ConocoPhillips have each argued that Evercore should not receive any Sale Fee unless the Marketing Process is ultimately successful in generating bona fide Bids. Tellingly, each Sale Process Party that desires a successful Sale Transaction to occur supports linking Evercore's compensation to the ultimate success of the Marketing Process. This is in stark contrast to the position of the Venezuela Parties.

28.    I also believe retention of Evercore on a "success fee" basis comports with applicable law and the practice of other Courts. Courts have appointed trustees, brokers, fiduciaries or liquidators that are paid on a success fee or contingency fee basis – particularly bankruptcy cases – to sell assets without finding that such a compensation structure creates a conflict of interest for such professionals. *See e.g.*, *In re: Caritas Health Care, Inc.*, *et al.*, 2011 WL 4442884 (Bankr. E.D.N.Y.) (Court-appointed broker retained pursuant to retention letter that provided for a 1.5% sale commission in connection with the sale of property). Indeed, this practice is further codified in the Bankruptcy Code that such persons must be found by the Court to be "disinterested persons" and that such disinterested persons may be paid on a percentage fee basis in an analogous context. *See* 11 U.S.C. § 327(a) ("Except as otherwise provided in this section, the trustee, with the court's approval, may employ one or more attorneys, accountants, appraisers, auctioneers, or other professional persons, that do not hold or represent an interest adverse to the estate, **and that are disinterested persons**, to represent or assist the trustee in carrying out the trustee's duties under this title"); 11 U.S.C. § 328(a) ("The trustee, or a committee appointed under

CONTAINS REDACTIONS IN ACCORDANCE WITH D.I. 345

section 1102 of this title, with the court's approval, may employ or authorize the employment of a professional person under section 327 or 1103 of this title, as the case may be, on any reasonable terms and conditions of employment, including on a retainer, on an hourly basis, on a fixed **or percentage fee basis, or on a contingent fee basis**") (emphasis added).  Of course, Evercore's retention by estate fiduciaries in such cases has frequently and routinely been approved by Delaware Courts.  *See, e.g.*, *In re: GNC Holdings, Inc., et al.*, Case No. 20-11662-KBO (Bankr. D. Del. 2020) [D.I. 467]; *In re: Chisholm Oil and Gas Operating, LLC*, *et al.*, Case No. 20-1159-BLS (Bankr. D. Del. 2020) [D.I. 203]; *In re: FAH Liquidating Corp. (f/k/a Fisker Automotive Holdings, Inc.)*, *et al.*, Case No. 13-13087 (KG) (Bankr. D. Del. 2013) [D.I. 756]; and *In re: Delta Petroleum Corporation*, *et al.*, Case No. 11-14006 (KJC) (Bankr. D. Del. 2011) [D.I. 185].

29.      I believe, as noted above, the heart of the Venezuela Parties' objections on this issue relate to the mistaken assumption that I have recommended to the Court to sell-off  100% of the PDVH Shares instead of only so many of those shares as are necessary.  However, as I make clear throughout this Report, I have recommended a process to only sell so many shares as are necessary to satisfy the judgment(s) attached in accordance with applicable law.  Thus, such contention is misplaced.

30.      Relatedly, in their feedback to the draft Sale Procedures Order, the Venezuela Parties argued that my role should be limited to overseeing CITGO's implementation of the sale process, similar to how a board of directors oversees a management team.  As the Court already rejected arguments that the Venezuela Parties should be the party conducting the sale process in the January 2021 Ruling, I do not know if they will continue to press these arguments again before the Court.   Regardless,  although I readily embrace that I will be working in close coordination

CONTAINS REDACTIONS IN ACCORDANCE WITH D.I. 345

with CITGO and its management team[10] in executing the sale, in the context here—executing on a judgment that it wants to stop through continuous litigation and appeals—I do not believe having CITGO execute the process with oversight from the Special Master would be a workable outcome and, as noted above, I believe Evercore fulfills a critical need that complements the services offered by my other Advisors.[11]

## C.    Entry of Protective Order

31.    On June 16, 2021, following consultation with the Sale Process Parties, I filed a proposed confidentiality order with the Court [D.I. 283], which was entered by the Court, with certain modifications, on July 6, 2021.  *See* Protective Order [D.I. 291].  The Protective Order provides for certain information to be marked as "Confidential" and "Highly Confidential."  I have relied on certain Confidential and Highly Confidential material in preparing this Report and, accordingly, have filed it under seal in accordance with the procedures set forth in the Protective Order.

32.    Although each of the Sale Process Parties should have access to this Report,[12] I anticipate certain Sale Process Parties will propose that certain (and minimal) aspects of this Report should remain under seal and should not be accessible to Potential Bidders in the sale

---

[10] Thus far, the members of CITGO's management team have been cooperative and helpful in connection with our initial due diligence requests.

[11] If the Court believes that Evercore should be retained on a fixed fee regardless of the outcome of the sale process, I understand that Evercore would consider working on a fix fee basis.  However, such fixed fee would presumably be based on assuming a successful outcome of the sale process.  Accordingly, I do not believe the other Sale Process Parties would support the payment of such a fee irrespective of the ultimate outcome.  Even in the fixed fee context, unless the Court orders the Sale Process Parties to pay the fixed fee in advance, Evercore's compensation would still be tied to an outcome regardless of whether it was value maximizing.  Indeed, other Sale Process Parties have proposed the exact opposite, that Evercore should be paid less if the outcome of the sale process results in a sale from a credit bid, which is feedback that I incorporated and successfully negotiated into the Proposed Evercore Engagement Letter.

[12] I believe each Sale Process Party should have full access to this Report.  I strongly encourage each Sale Process Party that has designated information contained in this report "highly confidential" to consent to the sharing of unredacted version of this Report with the other Sale Process Parties.

process, particularly the portions that include my commentary and the views of myself and my Advisors on the strategy underlying the sale process. In connection with the Marketing Process described more fully below, I believe it is important that Potential Bidders receive a clear and consistent message after my Advisors and I have had an opportunity to complete the due diligence and preparation stage. As such, I may also propose additional (and minimal) redactions after I receive the proposed redactions to this Report from the Sale Process Parties pursuant to paragraph ¶3 of the Protective Order.[13]

33. With respect to the entire proposed Sale Procedures Order, I have initially filed it under seal pursuant to paragraph ¶5 of the May Order solely out of an abundance of caution. I propose to file an unredacted version of the proposed Sale Procedure Order on Friday, August 13, 2021.[14] Although I have filed it initially under seal out of an abundance of caution, I do not believe that the Sale Procedures Order contains any information that is subject to paragraph 3 of the Protective Order. As such, following the filing of this Report, I intend to work with the Court regarding service of the Intervenor Bondholders (as defined in the Court's Memorandum Order dated July 6, 2021 [D.I. 290]) in light of their August 25, 2021 deadline to object to the proposed Sale Procedures Order.[15]

---

[13] I understand that there is a public interest in viewing the pleadings and am cognizant of the Court's prior rulings. *See Memorandum Order* dated July 6, 2021 [D.I. 290] ("All involved in the Special Master proceedings should understand, however, that the Intervenor Bondholders, the media, and the public have certain rights. Any or all of those entities may seek to effectuate those rights, which could eventually lead the Court to require disclosure (on a redacted or unredacted basis) of material marked 'Highly Confidential'").

[14] If any Sale Process Party believes that a portion of the proposed Sale Procedures Order should be redacted, they should be prepared to explain the legal basis for such redactions in writing in connection with proposing any such redactions.

[15] *See* Rule 5 of the Federal Rule of Civil Procedure ("Unless these rules provide otherwise . . . papers must be served on every party").

**D.      Proposed Sale Process Party Engagement**

34.      Since entry of the May 2021 Order, I have worked diligently with my Advisors to develop the Sale Procedures Order in accordance with the January 2021 Ruling and the May 2021 Order.  After retaining Advisors, my first steps taken in the process were to familiarize myself with the situation and review available information related to PDVH and CITGO, including prior pleadings filed by the Sale Process Parties in the Crystallex Case and other associated litigation. In connection therewith, I consulted and engaged with each of the Sale Process Parties on numerous occasions and, as a result, the proposed Sale Procedures Order is informed by my own and my Advisors' due diligence into PDVH and CITGO as well as discussions and other communications my Advisors and I have had with each of Sale Process Parties.  By way of example, since entry of the May 2021 Order, my Advisors and I have:

- held scheduled calls with counsel to the Venezuela Parties, in addition to numerous informal communications;
- held scheduled calls with counsel to Crystallex, in addition to numerous informal communications;
- held scheduled calls with counsel to ConocoPhillips, in addition to numerous informal communications;
- sent formal request letters to the Sale Process Parties; and
- directed numerous diligence related requests and questions to CITGO.

35.      After my Advisors and I familiarized ourselves with the relevant facts and circumstances of the current situation, my first formal step in the outreach process was to solicit informal input from the Sale Process Parties, which I did through a "listening tour" in the first two weeks of June 2021.  Over the course of the listening tour, I met and conferred with counsel to each Sale Process Party and solicited their views and input on my initial impressions regarding the potential structure of the process and any other considerations they thought relevant to design of

CONTAINS REDACTIONS IN ACCORDANCE WITH D.I. 345

the Sale Procedures Order.  Following those conversations, my Advisors and I considered the initial informal input of the Sale Process Parties, balanced against our collective analysis and understanding of the available information; I then began to formulate my own views with respect to the design of the Sale Procedures Order.

36.     To ensure that I fully understood each Sale Process Parties' position, I further solicited written proposals from each Sale Process Party to provide them with a thorough opportunity to outline their specific views regarding the Sale Procedures Order and any information they believed should be considered by me in relation to the development of the Sale Procedures Order.  I ultimately received a timely written response and proposal (the "**Alternative Proposals**") from each Sale Process Party (Crystallex's written proposal was received during my listening tour and Crystallex was offered an opportunity to supplement thereafter), which I have taken into account in designing the Sale Procedures Order.[16]  The Alternative Proposals were largely similar to the proposals made by the Sale Process Parties in the pleadings filed with the Court leading up to the January 2021 Ruling.  I sought to incorporate as many applicable comments into the Sale Procedures Order as I considered reasonable.

37.     Following my review of the Alternative Proposals, in particular, I support the pursuit of a Negotiated Outcome (prior to commencing the Marketing Process) whereby voluntary settlement discussions among the Parties, ConocoPhillips, and the PDVSA 2020 Bondholders are pursued with my assistance as Special Master.  I respectfully submit that, given the intractable nature of the dispute among all parties to date, the Court's enforcement of the Sale Procedures Order and the involvement of a third party, my assistance as Special Master may provide a fresh opportunity for all parties to maximize value.  Further, I anticipate that in any sale process, bidders

---

[16] I have retained copies of the Alternative Proposals and can share them with the Court, if requested.

may well propose compromises for various parties if value proves insufficient to satisfy all of CITGO's and its immediate parent companies' obligations, thus my involvement in these discussions as they affect the sale process will only prove useful to the Court, the Parties, and ConocoPhillips.

38.    I believe that having these negotiations may provide the best opportunity for Crystallex and ConocoPhillips to realize the greatest value of their judgments by reaching a negotiated claims waterfall, which my Advisors and I also believe should have the advantage of being more likely endorsed by OFAC.  *See* OFAC FAQ 595 ("To the extent an agreement may be reached on proposals to restructure or refinance payments due to the [PDVSA 2020 Bondholders] . . . OFAC would encourage parties to apply for a specific license and would have a favorable licensing policy toward such an agreement").  Although the Parties have been unable to reach a consensual resolution on their own following ten years of litigation, recent developments in the Crystallex Case and the opportunity for the settlement process with my oversight as Special Master provides an opportunity for consensual resolution.   Accordingly, attached as **Appendix B** hereto is my recommended approach for pursuit of a voluntary settlement process should the Court and the Parties, ConocoPhillips, and the PDVSA 2020 Bondholders wish to pursue such a path.

**E.    United States Government Outreach**

39.    In tandem with my consultation with the Sale Process Parties, my Advisors and I also met with representatives from the USG, including representatives from the Department of Justice, Department of the Treasury and the Department of State, on three separate occasions.

•    At the first meeting, on June 6, 2021, I introduced myself and my Advisors and we provided the USG with an overview of the Special Master process and outlined a number of considerations upon which their input would be welcomed.

- At the second meeting, on July 12, 2021, I provided the USG with an outline and overview of my preliminary conclusions with respect to the design of the Sale Procedures Order and, again, outlined a number of considerations for their specific input, including the timing and milestones contemplated by the Court's schedule and embedded in the Sale Procedures Order.

- Finally, at the third meeting on July 15, 2021, my Advisors and I answered follow-up questions the USG representatives had regarding the information presented at the prior meetings and specifically solicited any feedback regarding the USG's position with respect to the Special Master process. We also asked about the status of the USG decision-making processes, particularly as relevant to OFAC guidance or authorization. At the conclusion of the meeting, we agreed to schedule a follow-up meeting once I have filed the proposed Sale Procedures Order with the Court.

40. At each meeting, I provided the USG representatives with an opportunity to give input into the design of the Sale Procedures Order. At no point did the USG express any objection to the proposed process that my Advisors and I presented to them and, at the third meeting, they indicated they had no further questions and that they did not require any additional information at that time. Further, on July 14, 2021, I understand that OFAC advised the Venezuela Parties that they did not require an OFAC license to pay certain expenses in connection with the Special Master process incurred as of the date thereof.

41. Although I have not received formal USG feedback, the USG, including OFAC, is aware of the process being proposed and to be implemented pursuant to the Sale Procedures Order, including its specific terms and timetable. I have consistently, unambiguously, and proactively solicited their input. I understand that the USG's policy process remains ongoing and I will continue to proactively engage with the USG representatives with respect to the implementation of the Sale Procedures Order. I intend to schedule a fourth meeting with the USG representatives shortly after the filing of the proposed Sale Procedures Order and this Report.

**F.    Due Diligence of PDVH and CITGO**

42.    Consistent with the Court's mandate in the May 2021 Order, I have worked to become knowledgeable about the business operations and assets of PDVH, including CITGO, through a review of both publicly available information and information produced by PDVH and CITGO.

43.    On June 8, 2021, through my Advisors, I delivered a thorough due diligence request list to counsel to PDVH and CITGO. On June 23, 2021, PDVH and CITGO made a dataroom available to my Advisors, which they have since populated with certain responsive information on a rolling basis. In addition to the information produced in the dataroom, on July 1, 2021, my Advisors and I met with members of the CITGO management team, including its most senior members.

44.    To date, my Advisors and I have conducted a review of publicly available information and information provided to me by CITGO relevant to the design of the Sale Procedures Order, which has entailed a review of the Company's corporate and capital structure, historical and projected financial performance, a review and analysis of CITGO's business operations, other relevant business due diligence, and a review of certain of its material contracts, including its funded debt facilities. I further instructed my Advisors to conduct diligence on the competitive market and Potential Bidders to ensure that the procedures contemplated by the Sale Procedures Order best reflected a fair and optimal sale process given the market dynamic and most likely participants therein. At this stage, my Advisors and I focused on due diligence that was necessary for the design of the Sale Procedures Order; however, we have not yet conducted all of the due diligence and analysis necessary in preparation for launch of the sale process, including items such as preparing the "teaser," confidential information memorandum (or "**CIM**"), and other marketing materials to send to Potential Bidders. My Advisors and I will complete the due

diligence necessary to launch and implement the Sale and Marketing Process prior to launching any sale process. The Sale Procedures Order also provides for a period of "reverse-diligence" on Potential Bidders to ensure their wherewithal and ability to close on a winning bid from a regulatory perspective. I anticipate that the diligence and analysis necessary to prepare for launch of the Marketing Process will take at least 45 days and as much as 90 days to complete.

## G. Relevant Claims and Interests

45. Consistent with the Court's mandate in the May 2021 Order, I have begun work to "ascertain the total amounts of the outstanding judgment owed to Crystallex by the Republic of Venezuela and the total amount of the outstanding judgment owed to ConocoPhillips by PDVSA." I have also reviewed and analyzed certain other claims and interests relevant to design of the Sale Procedures Order, particularly the claims of those certain PDVSA 2020 Bondholders (as defined below) and Rosneft Trading S.A. ("**RTSA**") that purport to be secured by a pledge of the equity interests of CITGO Holding, Inc. ("**CITGO Holding**" and together with CITGO Petroleum, "**CITGO**," and the pledge of CITGO Holding's equity interests, the "**Structurally Senior Liens**").

46. On June 15, 2021, I sent a letter to both Crystallex and ConocoPhillips requesting they each provide a written statement of the amount that they assert remains outstanding with respect to their respective claims, together with relevant supporting documentation, as applicable. ConocoPhillips responded by written letter on June 25, 2021 (as further supplemented on July 20, 2021 and July 27, 2021) and Crystallex responded on July 9, 2021 (as further supplemented on August 6, 2021). Thereafter, my Advisors and I reviewed the information provided and compared it with publicly available information that I have obtained and, with respect to Crystallex, information received from the Venezuela Parties regarding the amount of their outstanding claims.

1.    Crystallex's Judgment

47.    Crystallex is a Canadian corporation, headquartered in Toronto, Canada, that engaged in gold mining and exploration in Venezuela.  As the Third Circuit observed, Crystallex spent hundreds of millions of dollars developing a gold mine at Las Cristinas, Venezuela, which Venezuela subsequently nationalized and seized.   In response, Crystallex successfully invoked a bilateral investment treaty between Canada and Venezuela and filed for arbitration before the International Centre for Settlement of Investment Disputes (the "**ICSID**").  The arbitration took place in Washington, D.C., following which the ICSID arbitration panel awarded Crystallex damages in the amount of $1,202,000,000 (plus interest) for Venezuela's expropriation of its investment (the "**Crystallex's ICSID Arbitral Award**").

48.    On March 25, 2017, the United States District Court for the District of Columbia confirmed Crystallex's ICSID Arbitral Award and directed entry of a judgment in the amount of $1,202,000,000, plus (i) pre-award interest from April 13, 2008 to April 4, 2016 (the date of the award) at a rate of 6-month average U.S. Dollar LIBOR plus 1%, compounded annually, (ii) post-award interest on the total amount awarded, inclusive of pre-award interest, at a rate of 6-month average U.S. Dollar LIBOR plus 1% compounded annually, from April 4, 2016 until April 7, 2017, (iii) post-judgment interest on the total amount awarded at the rate set forth in 28 U.S.C. § 1961 (the "**Federal Judgment Rate**"), from April 7, 2017 until the date of full payment, and (iv) the costs of the proceeding ("**D.C. Order Directing Judgment**").  On April 7, 2017, the Clerk of the Court for the United States District Court for the District of Columbia entered the judgment (the "**D.C. Judgment**") and, as noted below, appears to have unintentionally omitted items (ii)-(iv) noted above from the D.C. Order Directing Judgment.  Crystallex thereafter commenced the Crystallex Case and registered the D.C. Judgment with the Court on June 19, 2017 [D.I. 1].

49.     On August 6, 2021, I received a signed letter from counsel to Crystallex, which amended an earlier letter that I received from them that was dated July 9, 2021, asserting that the amount of the D.C. Judgment which remains outstanding totals $969,918,374.24 as of August 6, 2021.  Based on information provided to me by Crystallex and certain of the Venezuela Parties, Crystallex has received (or seized) at least $500,078,632.14 in payments or additional consideration from Venezuela on account of the D.C. Judgment (of which many such payments were reportedly made in Euros).  The following chart shows the reported payments and the applicable conversion rate to U.S. Dollars:

| Date received | EUR Amount Received | EUR/USD (BBG) | USD Amount Received/Seized | USD-equivalent Amount Received |
|---|---|---|---|---|
| 2/16/2018 | €4,218,393.72 | 1.24064 | | $5,233,507.98 |
| 3/5/2018 | €4,061,738.42 | 1.23359 | | $5,010,519.90 |
| 4/10/2018 | | | $20,832,165.50 | $20,832,165.50 |
| 4/13/2018 | €12,213,989.09 | 1.23307 | | $15,060,703.53 |
| 8/31/2018 | €4,255,681.33 | 1.16016 | | $4,937,271.25 |
| 8/31/2018 | €4,306,261.33 | 1.16016 | | $4,995,952.14 |
| 8/31/2018 | €17,041,967.91 | 1.16016 | | $19,771,409.49 |
| 10/2/2018 | | | $319,579,394.70 | $319,579,394.70 |
| 10/15/2018 | €45,685,716.75 | 1.15794 | | $52,901,318.85 |
| 11/23/2018 | €45,650,618.57 | 1.13375 | | $51,756,388.80 |
| | | | Total: | $500,078,632.14 |

50.     My Advisors and I have reviewed the information provided by Crystallex and certain other information provided by certain of the Venezuela Parties and, based on the information received, have determined that Crystallex has accurately accounted for the disclosed payments and the accrual of interest at the Federal Judgment Rate, although we have not checked the underlying security documents and, although I do not dispute with Crystallex's conclusions at this time, there are two nuances that I note for the Court's attention:

•     First, there appears to be a clerical error in the D.C. Judgment entered by the Clerk of the Court for the United States District Court for the District of Columbia in that the D.C.

CONTAINS REDACTIONS IN ACCORDANCE WITH D.I. 345

Judgment omits the post-award interest that is clearly provided for in the D.C. Order Directing Judgment. *Cf. D.C. Order Directing Judgment* with *D.C. Judgment*. This error was carried over into the judgment that the Court ultimately ordered to be attached to the PDVH Shares. If Crystallex's Judgment is calculated without including the post-award interest, Crystallex's outstanding judgment as of July 9, 2021 is $936,689,442.92, which is $33,3228,931.32 less than if the post-award interest were to be included. In light of the clear language of the D.C. Order Directing Judgment, I do not believe the D.C. Judgment intentionally omitted the post-award interest; and

- Second, approximately $319,579,394 of the disclosed consideration received by Crystallex was paid in the form of securities issued by either PDVSA or the Republic (the "**Transferred Securities**") pursuant to a settlement agreement between Crystallex and the Republic in 2018 (the "**2018 Crystallex Settlement**"). The Transferred Securities have a face amount of $1,347,195,942, but, due to the discount at which the Transferred Securities were trading at the time of the 2018 Crystallex Settlement, the parties agreed to a stipulated value of $319,579,394. My Advisors and I have reviewed publicly available information and believe that the stipulated value reasonably reflects the market price of the Transferred Securities at the time of the 2018 Crystallex Settlement. Further, counsel to Crystallex has informed my Advisors that Crystallex continues to hold the Transferred Securities as of the date hereof.

### 2. ConocoPhillips' Judgment

51.     ConocoPhillips has initiated arbitral proceedings against Venezuela, PDVSA, and several PDVSA subsidiaries. Relevant to the Sale Procedures Order, ConocoPhillips has obtained confirmation and recognition of the following arbitral awards in the United States District Court for the Southern District of New York[17] (collectively, the "**ConocoPhillips' Judgment**"):

---

[17]   *See* Phillips *Petroleum Company Venezuela Limited et al. v. Petróleos De Venezuela, S.A., et al.*, C.A. No. 1:18-cv-03716 (S.D.N.Y. 2018).

| Plaintiff(s) | Defendant(s)[18] | Confirmed Amount |
|---|---|---|
| Phillips Petroleum Company Venezuela Limited | Corpoguanipa, S.A. and PDVSA | $1,498,399,209, plus simple interest at a rate of 3-month LIBOR, running from April 26, 2018 to August 22, 2018 (and the Federal Judgment Rate thereafter) |
| ConocoPhillips Petrozuata B.V. | PDVSA Petroleo. S.A. and PDVSA | $434,884,356, plus simple interest at a rate of 12-month LIBOR, running from April 26, 2018 to August 22, 2018 (and the Federal Judgment Rate thereafter) |
| Phillips Petroleum Company Venezuela Limited and ConocoPhillips Petrozuata B.V. | PDVSA, PDVSA Petroleo. S.A, and Corpoguanipa, S.A. | $231,200, plus simple interest at a rate of 12-month LIBOR, running from April 26, 2018 to August 22, 2018 (and the Federal Judgment Rate thereafter) |

52.     On July 27, 2021, I received a signed letter from counsel to ConocoPhillips (which supplemented prior letters received from ConocoPhillips on June 25, 2021 and July 27, 2021) asserting that the amount of the ConocoPhillips' Judgment that remains outstanding totals $1,287,664,420 as of July 20, 2021.  Based on information provided to me by ConocoPhillips, ConocoPhillips has received (or seized) at least $753,998,726 in consideration from PDVSA on account of the ConocoPhillips' Judgment.  The following chart shows the reported payments and the applicable conversion rate to U.S. Dollars:

| Date received | Amount Received |
|---|---|
| 8/18/2018 | $288,337,707.33 |
| 9/25/2018 | $100,000,000.00 |
| 11/14/2018 | $100,000,000.00 |
| 2/8/2019 | $88,553,673.00 |
| 5/23/2019 | $88,553,673.00 |
| 8/23/2019 | $88,553,673.00 |
| Total: | $753,998,726.33 |

53.     My Advisors and I have reviewed the information provided by ConocoPhillips and, based on the information received, have determined that ConocoPhillips has accurately accounted for the disclosed payments and the accrual of interest at the Federal Judgment Rate.  Further, the

---

[18] Each defendant is jointly and severally liable for the full amount of the award.

CONTAINS REDACTIONS IN ACCORDANCE WITH D.I. 345

Venezuela Parties have indicated that they have reached an agreement with ConocoPhillips regarding the outstanding amount of ConocoPhillips' Judgment.

**3.**     PDVSA 2020 Bondholders & CITGO Holding Pledge

54.     In exercising my duties as set forth in the May 2021 Order, I am cognizant of the fact that the shares in CITGO Holding, which are 100% held by PDVH, are or may be subject to the Structurally Senior Liens.  Treatment and resolution of the Structurally Senior Liens may have a material impact on the sale process and the potential for a value-maximizing Sale Transaction as such liens create uncertainty for Potential Bidders as to their ability to acquire an interest in CITGO upon consummation of a Sale Transaction.  Accordingly, my Advisors and I have considered the Structurally Senior Liens in developing the Sale Procedures Order.  I summarize my findings below.

- As discussed in greater detail in *Petroleos de Venezuela S.A. v. MUFG Union Bank, N.A.*, 495 F.Supp.3d 257 (2020) (the "**PDVSA 2020 Bondholder Decision**), PDVSA issued two series of bonds due 2017 in the aggregate principal amount of $9,150,000,000 (the "**2017 Bonds**").  The 2017 Bonds were scheduled to mature in April and November of 2017.  In anticipation of an inability to repay the 2017 Bonds, and to avoid a potential default thereunder, Venezuela structured a bond-swap transaction (the "**Exchange Offer**") whereby the 2017 Bonds were exchanged for notes scheduled to come due in 2020 (the "**PDVSA 2020 Bonds**" and any such holder, the "**PDVSA 2020 Bondholders**").  In connection with the Exchange Offer, and as agreed to by the government of Venezuela at the time, the PDVSA 2020 Bonds were secured by a pledge of 50.1% of the equity in CITGO Holding held by PDVH (the "**CITGO Holding Pledge**").  *See* PDVSA 2020 Bondholder Decision at 1.

- According to the PDVSA 2020 Bondholder Decision, the District Court for the Southern District of New York found that PDVSA paid the first two installments of the principal payments on the PDVSA 2020 Bond in 2017 and 2018, and made interest payments in

CONTAINS REDACTIONS IN ACCORDANCE WITH D.I. 345

2017, 2018, and the first half of 2019.  However, PDVSA failed to make required payments on October 27, 2019, and thus defaulted on its obligations under the PDVSA 2020 Bonds.

- Thereafter, the Republic, PDVSA, and PDVSA Petróleo, S.A. sought a declaratory judgment finding that the PDVSA 2020 Bonds and related agreements (including the CITGO Holding Pledge) were null and void *ab initio* because they were entered without proper approval from Venezuela's National Assembly in violation of the Republic's constitution.  In response, MUFG Union Bank, N.A., as trustee for the PDVSA 2020 Bonds, and GLAS Americas LLC, as collateral agent, sought an order finding that PDVSA was in default under the PDVSA 2020 Bonds.

- The litigation culminated in the PDVSA 2020 Bondholder Decision that awarded the PDVSA Bondholders' a judgment in the amount of $1,924,126,058 as of December 1, 2020.  *See Judgment Pursuant to Fed. R. Civ. P. 54(b)*, Case 1:19-cv-10023-KPF, entered December 1, 2020 (D.I. 229).  However, as of the date hereof, the PDVSA 2020 Bondholders' ability to exercise the CITGO Holding Pledge remains stayed pending appeal of the PDVSA 2020 Bondholder Decision.

55.    As a result of the CITGO Holding Pledge, the PDVSA 2020 Bondholders may be able to exercise remedies with respect to the 50.1% interest in CITGO Holding stock secured thereunder should the current stay pending appeal of the PDVSA 2020 Bondholders Decision cease to remain in force. I believe that the impact of this potentiality on the viability of any sale process for the PDVH Shares is obvious and inevitable and will likely need to be addressed prior to or in conjunction with any actionable bids being received.

**4.**    RTSA Loan & RTSA Pledge

56.    Similar to the CITGO Holding Pledge, a purported pledge in favor of RTSA poses similar risk to Potential Bidders.  On August 31, 2018, RTSA filed a motion [D.I. 100] (the "**RTSA Motion**") seeking to intervene in these proceedings to protect its interest in a purported pledge from PDVH of 49.9% of the equity of CITGO Holding (the "**RTSA Pledge**")  pursuant to a pledge

agreement among PDVH, PDVSA, and RTSA. The Court granted RTSA's Motion to intervene on December 12, 2019 [D.I. 154].

57.     In RTSA's Motion, RTSA alleged that the RTSA Pledge secured "certain obligations owed by PDVSA and its affiliates", but did not specify the amount owed. Publicly available information suggests that, at the time, the RTSA Pledge secured a $1.5 billion loan (the "**RTSA Loan**") made in 2016. Since then, in March of 2020, RTSA announced it was ceasing operations in Venezuela and selling, closing, or liquidating all of its assets related to Venezuela.[19]

58.     According to the RTSA Motion, the RTSA Pledge provides RTSA with a number of remedies upon the occurrence of certain events, such as a bankruptcy or insolvency event in relation to PDVSA or PDVH, a change in the ownership chain including PDVH and the CITGO entities, and the occurrence of any event that has or is reasonably likely to have a material adverse effect on PDVSA's ability to perform under its commercial agreements. According to RTSA, in the event of such occurrences, the RTSA Pledge provides RTSA with certain remedies, including, (i) proceeding by suit to foreclose the agreement and sell the pledged CITGO Holding stock, (ii) triggering the sale of the pledged CITGO Holding stock at a public or private sale, and (iii) collecting all profits on the pledged CITGO Holding stock.

59.     As of the date hereof, neither my Advisors nor I have been able to ascertain the outstanding balance, if any, under the RTSA Loan or any other obligations purported to be secured by the RTSA Pledge. Publicly available information suggests that the RTSA Loan was repaid in full. Following discussions with CITGO's management team, I understand that the RTSA Loan was scheduled to mature in November of 2020 and that CITGO is not aware of any events of

---

[19]     *See https://www.spglobal.com/platts/en/market-insights/latest-news/oil/032820-rosneft-to-cease-venezuela-operations-sell-assets-to-russian-government.*

default or extensions thereunder, suggesting the RTSA Loan was repaid or otherwise satisfied in 2020. Further, following discussions with the Venezuela Parties, my Advisors and I understand that the RTSA's interest in the RTSA Pledge may have been assigned or otherwise transferred to a third-party. If such assignment occurred without OFAC's authorization and in violation of OFAC regulations, the lien on CITGO Holding's shares granted under the RTSA Pledge may be void or subject to avoidance. However, in light of RTSA's potential remedies, I believe that uncertainty as to the amount outstanding may unfairly chill bidding. Accordingly, the Sale Procedures Order provides a mechanism to assist me and the Sale Process Parties in obtaining information regarding any outstanding amounts that RTSA purports may still be secured by the RTSA Pledge by requiring that RTSA (and PDVSA) to declare any amounts owed or risk that the shares will be sold free and clear of the RTSA Pledge upon further entry of an order approving the Sale Transaction by the Court. *See* ¶¶ 35-37 of the Sale Procedures Order.

### 5. Additional Judgment Creditors of Venezuela and PDVSA

60. As the Court is aware, a number of other judgment creditors are seeking to attach their judgments against Venezuela and/or PDVSA to the PDVH Shares. The additional judgment creditors are at various stages in the attachment process, including two of which that are currently under consideration by the Court. *See e.g.*, *OI European Group B.V. v. Bolivarian Republic of Venezuela*, C.A. No. 19-mc-00290-LPS; *Northrop Grumman Ship Systems, Inc. v. The Ministry of Defense of the Republic of Venezuela*, C.A. No. 20-mc-00257-LPS. As of the date of this Report, only Crystallex has been granted an order attaching the applicable judgment to the PDVH Shares.

### III.   CITGO and Sale Process Design Considerations

61. As set out in more detail in the Hiltz Declaration, CITGO's complex corporate and capital structure poses a number of challenges to achieving a value-maximizing sale of the PDVH Shares, which I have worked to account for in the Sale Procedures Order and the procedures

CONTAINS REDACTIONS IN ACCORDANCE WITH D.I. 345

contemplated therein.  The following section describes, at a high level, CITGO's complex structure and these challenges as they relate to the proposed design of the Sale Procedures Order, which is based on information I have obtained from the Sale Process Parties or otherwise obtained through public sources.

A.        **CITGO'S Complex Corporate and Capital Structure**

62.        PDVH is the parent company of CITGO Holding, which in turn is the parent company of CITGO Petroleum.  CITGO Holding and CITGO Petroleum are incorporated in Delaware and both have headquarters in Houston, Texas.  PDVH and CITGO each have a number of their own direct and indirect subsidiaries organized in various jurisdictions (collectively, the "**Company**" or "**CITGO**").

63.        CITGO operates three complex large-scale petroleum refineries located in Lake Charles, Louisiana, Corpus Christi, Texas, and Lemont, Illinois.  CITGO's refining operations are supported by an extensive distribution network, which provides access to the Company's refined product end markets.  CITGO also has a recognized brand presence at the retail level in the United States through its network of locally owned and independently operated CITGO-branded retail outlet licensees.

CONTAINS REDACTIONS IN ACCORDANCE WITH D.I. 345

64.     The following chart shows, in abridged and annotated form, the corporate and capital structure of PDVH in the context of the relevant claims and interests described in the prior Section:



65. ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

33

**444a**

CONTAINS REDACTIONS IN ACCORDANCE WITH D.I. 345



**B.**           **CITGO Sale Process Design Considerations**

66.     The potential for a value-maximizing Sale Transaction is complicated by the corporate and capital structure of CITGO set out above, the number of interested parties in the Crystallex Case, and the other dynamic and internationally sensitive circumstances implicating a potential sale of the PDVH Shares. The combination of these factors create unique challenges to achieving a value-maximizing Sale Transaction. I believe the Sale Procedures Order strikes an appropriate balance between these challenges, which are described in greater detail below.



CONTAINS REDACTIONS IN ACCORDANCE WITH D.I. 345

### 1. OFAC Considerations

67.     As has been briefed in numerous pleadings before the Court in the Crystallex Case and other associated cases, the PDVH Shares and other CITGO assets are "blocked property" pursuant to applicable OFAC regulations. *See e.g.*, 31 CFR § 591.201, § 591.407, § 591.509.  Uncertainty surrounding what, if any, transaction OFAC will ultimately license creates an overhang that I believe will materially chill bidding.  Accordingly, my Advisors and I have worked extensively to coordinate with the USG, including OFAC, in developing the Sale Procedures Order.  While the USG's policy process and consideration of a potential Sale Transaction remains ongoing, I will continue to proactively engage with the USG's representatives following entry of the Sale Procedures Order and will seek explicit guidance or authorization from OFAC with respect to a potential Sale Transaction that is public or can be shared with Potential Bidders.

68.     Following my interactions with the USG, including OFAC, which are described in detail above, it is my belief and the belief of my Advisors that the Court's entry of the Sale Procedures Order would assist with prompting USG action.  In paragraph 6 of the proposed Sale Procedures Order, I have suggested a proposal for prompting the USG to provide their input into the process at the proposed Initial Status Conference.  Alternatively, the Court could, on a more expedited basis, consider issuing the USG an order to show cause as to why the Court should not enter a sale procedures order that directs the Special Master to immediately prepare for and launch the Marketing Process or why such order would not be vested with the authority to transfer such shares.

### 2. Illustrative Clearing Price

69.     Based on a review of information provided or otherwise available to me, a bidder will likely have to submit a bid with an implied total enterprise value of at least ████████ to

generate sufficient consideration for Crystallex's Judgment to be satisfied in full (subject to certain exclusions and potential working capital adjustments), and ultimately ███████████ if ConocoPhillips's judgment is added to the Sale Transaction by the Court (subject to certain exclusions and potential working capital adjustments). *See* Hiltz Declaration at ¶19. Any additional judgments added to the Sale Transaction by the Court will further increase the clearing price.

70.     Although neither my Advisors nor I have conducted a valuation of the PDVH Shares or CITGO, the illustrative clearing price is useful for the purposes of illustrating the importance of obtaining a Bid that results in sufficient proceeds to satisfy the relevant claims and interests described above. Bids with an implied enterprise value below the illustrative clearing price will likely require a compromise of claims for less than their face value before a Potential Bidder is willing to pay any material value for the PDVH Shares.

**3.**     <u>Structurally Senior Liens</u>

71.     As described above, resolution of the Structurally Senior Liens of the PDVSA 2020 Bondholders and RTSA will likely be necessary for minimizing uncertainty of the process and maximizing the value of any Sale Transaction. I do not believe that credible Potential Bidders will be willing to submit a bid for the PDVH Shares without an understanding as to how the Structurally Senior Liens will be resolved or otherwise addressed in connection with any Sale Transaction. For example, if the CITGO Holding Pledge of the PDVSA 2020 Bondholders remains outstanding following any Sale Transaction, the PDVSA 2020 Bondholders could at some point exercise remedies against 50.1% of the equity interests of CITGO Holding and ultimately seize a controlling stake in CITGO. The would-be purchaser of the PDVH Shares would then be relegated to an indirect owner of a minority stake in CITGO. Accordingly, Potential Bidders will either seek to have the uncertainty resolved or severely discount their Bids as a result.

72.    The purported 50.1% pledge to the PDVSA 2020 Bondholders is further complicated by a purported 49.9% pledge in favor of RTSA.  If both the PDVSA 2020 Bondholders and RTSA exercise remedies, then the buyer of the PDVH Shares will be left with no interest in CITGO.  In light of these risks, I do not believe that any credible bidder will invest their time and resources into submitting a Bid unless and until uncertainty around these Structurally Senior Liens is resolved or proposed to be resolved as part of the party's Bid.  *See* Hiltz Declaration at ¶¶ 15-16.

73.    Accordingly, I anticipate that Potential Bidders will either (i) propose a solution to addressing or resolving the claims secured by the Structurally Senior Liens in connection with their Bid, or (ii) condition their Bid on the resolution of these issues by the Special Master, each of which likely require a negotiation to take place with the PDVSA 2020 Bondholders (or RTSA, if applicable).  For this reason, the Sale Procedures Order is designed to provide my Advisors and I with the necessary flexibility to facilitate these discussions.

**4.    COVID-19's Impact on CITGO's Business and Operations**

74.    Any serious and credible bidder will need to invest substantial time and resources in understanding CITGO's business in order to formulate a credible Bid, which is complicated by the recent industry downturn and justifies a robust marketing process that provides Potential Bidders with sufficient time to perform the due diligence and analysis necessary to formulate a Bid.  *See* Hiltz Declaration at ¶ 29.  Based on information provided to my Advisors and I by CITGO, the novel coronavirus ("**COVID-19**") has had an adverse impact on CITGO's refinery utilization and operating margins since the outbreak developed into a pandemic in March of 2020.  As a result of governmental stay-at-home orders and other social distancing measures, there was a rapid and significant decline in the demand for the refined petroleum products that CITGO manufactures and sells.  Further, concerns over the negative effects of COVID-19 on global

CONTAINS REDACTIONS IN ACCORDANCE WITH D.I. 345

economic and business prospects have contributed to increased market and oil price volatility, both of which have had a negative impact on CITGO's business and operations.

75.     As a result of COVID-19, CITGO Petroleum's adjusted EBITDA dramatically declined from $1.92 billion and $1.18 billion in 2018 and 2019, respectively, to negative $432 million in 2020.  ██████████████████████████████████████████████████
████████████████████████████████

76.     █████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████

77.     Further,  in consultation with my Advisors, I expect Potential Bidders will be focused on CITGO's recovery from the recent downturn in the refining industry, with a particular focus on the impact of new variants of the COVID-19 virus, such as the Delta variant, which have been widely reported to spread more easily than previous strains of the virus.

78.     Guiding bidders through CITGO's recent financial performance and future projections will require substantial work and time on both the part of myself and my Advisors, and the CITGO management team.  The proposed Marketing Process is designed to address such requirements by providing ample time for Potential Bidders to perform necessary due diligence.

**5.**     Management and CITGO's Cooperation

79.     Given the size and complexity of any potential Sale Transaction, the cooperation of CITGO's management team will be critical to value maximization and the successful

implementation of the Sale Procedures. Further, it will be an expected component of any process by Potential Bidders and crucial to obtaining actionable bids that are not subject to ongoing "diligence outs." To date, my Advisors and I have engaged constructively with CITGO's counsel and representatives since my appointment as Special Master, including two productive meetings held with the most senior members of CITGO's management team on July 1, 2021. I am hopeful and optimistic that the CITGO management team will continue to support my Advisors and I in the exercise of my duties pursuant to the Sale Procedures Order.

80.     However, out of an abundance of caution, due to the potential for a negative impact on the sale process, the Sale Procedures Order contains cooperation provisions that would compel, if it becomes necessary, the cooperation of the CITGO management team. *See* ¶¶ 32-33 of the Sale Procedures Order. I believe that these provisions, which, hopefully, will never need to be enforced by the Court, are appropriate and send a positive message to Potential Bidders that, if they invest their time and resources into formulating a Bid, they will have access to and receive the necessary cooperation from the CITGO management team. For the avoidance of doubt, I do not intend to employ this relief at the whim of Potential Bidders. Instead I will rely heavily on the counsel of my Advisors to ensure that requests of Potential Bidders for information or access are measured and reasonable and not designed to frustrate the process, pursue ulterior motives, or unnecessarily burden CITGO or its employees.

**6.     Ability to Purchase A Controlling Stake in CITGO**

81.     In my discussions with the Venezuela Parties, they have sought to characterize my recommended process as one that is indubitably structured to ensure that 100% of the PDVH Shares are sold. This could not be farther from the truth. Based on my review and analysis of available information and discussions with my Advisors, I believe that Potential Bidders are much more likely to (a) participate in the process, and (b) pay more for a controlling stake in CITGO

than they would for a minority stake, particularly if PDVSA remains the majority shareholder of the Company.  *See* Hiltz Declaration at ¶¶ 22-23.  As a result, uncertainty around the ability of Bidders to submit Bids and ultimately consummate a transaction for a majority stake or full-company bid will discourage value-maximizing Bids from being submitted.  Accordingly, I have recommended Bidding Procedures that do not place a restriction or limitation at the outset of the Marketing Process as to the percentage of PDVH Shares that Potential Bidders could include in their Bid.  Instead, on the back-end, the Bidding Procedures contain specific procedures for the consideration and evaluation of Bids once they are received.

82.     I am also cognizant of the interests of the Venezuela Parties, and the Court's January 2021 Ruling which called for the design of sale procedures that result in the sale of only so many shares as are necessary to be sold.  *Cf.* May 2021 Order at ¶ 2 with section 324 of the Delaware General Corporation Law (permitting a "sufficient" amount of shares to satisfy the applicable debt to be sold) and 28 U.S.C. §§ 2001, 2004 (granting Federal District Courts broad power to order the sale of shares independent of section 324 of the Delaware General Corporation Law).  As further discussed in paragraphs 31 to 33 of the Hiltz Declaration, the Sale Procedures Order balances these competing considerations through the appointment of a Stalking Horse Bidder, an overbid process and related procedures for comparing Bids for varying percentages of the PDVH Shares based on the implied equity value of the applicable Bids.

**7.      Broader Powers and Process May Ultimately Be Required**

83.     I do not believe that entry of the proposed Sale Procedures Order (or the Court's January 2021 Ruling) will limit the Court's broad power and authority to enforce its judgment or otherwise supplement its prior orders, particularly in response to a change in circumstances or if implementation of the prior order becomes infeasible.  Federal courts have inherent authority "to manage their own affairs so as to achieve the orderly and expeditious disposition of cases." *See*

40

**451a**

*Chambers v. NASCO, Inc.*, 501 U.S. 32, 43 (1991) (quoting *Link v. Wabash R. Co.*, 370 U.S. 626, 630–631 (1962)); *Lemon v. Kurtzman*, 411 U.S. 192, 200 (1973) ("In shaping equity decrees, the trial court is vested with broad discretionary power."); *see also Swann v. Charlotte-Mecklenburg Bd. of Educ.*, 402 U.S. 1, 15 (1971) (Where "a right and a violation have been shown, the scope of a district court's equitable powers to remedy past wrongs is broad, for breadth and flexibility are inherent in equitable remedies."). The Court's inherent power to enforce its judgments is further bolstered by the All Writs Act. This authority includes the power to enforce and protect federal court orders, including against non-parties. *See United States v. New York Tel. Co.*, 434 U.S. 159, 172 (1977) ("This Court has repeatedly recognized the power of a federal court to issue such commands under the All Writs Act as may be necessary or appropriate to effectuate and prevent the frustration of orders it has previously issued in its exercise of jurisdiction otherwise obtained"); *See Berger v. Zeghibe*, 666 Fed.Appx. 119, 123 (3d Cir. 2016) ("The All Writs Act authorized the District Court to enjoin Jatinder, a nonparty, because, as demonstrated at the preliminary injunction hearing, she is in a position to frustrate Judgment Creditors' attempts to collect on their judgment by receiving income from Chawla family businesses in which Ravinder may have an interest."); *see also Catalytic, Inc. v. Monmouth & Ocean Cty. Bldg. Trades Council*, 829 F.2d 430, 434 (3d Cir. 1987) (holding that the All Writs Act empowers federal courts to enjoin nonparties to enforce orders in civil cases). The Court's broad authority takes on even greater significance where, as here, a judgment debtor has an established pattern or practice of delaying or attempting to avoid the judgment. *See Gregris v. Edberg*, 645 F. Supp. 1153, 1157 (W.D. Pa. 1986) ("The courts of the United States have inherent statutory power and authority to enter such orders as may be necessary to enforce and effectuate their lawful orders and judgments, and to prevent them from being thwarted and interfered with by force, guile, or otherwise, whether or not

CONTAINS REDACTIONS IN ACCORDANCE WITH D.I. 345

the person charged with the violation of the judgment or decree was originally a party defendant to the action").

84.     At this time, I am not asking the Court to approve the tools necessary to address the unforeseen contingencies or impediments that may arise in the sale process; however, the Sale Procedures Order includes a provision entitling the Special Master to, upon notice of the Sale Process Parties, seek to revisit the scope of the Sale Procedures Order and/or revisit the Special Master's mandate. If the circumstance presents itself, my Advisors and I will craft the appropriate request tailored to the particular circumstance necessitating any such request to the Court.

## IV.     Sale Procedures Order and Bidding Procedures Summary

85.     The Sale Procedures Order, including the bidding procedures and notices attached thereto as **<u>Exhibit 1</u>** (the "**Bidding Procedures**"), set forth the proposed procedures for the sale and marketing process to be conducted by the Special Master (the "**Marketing Process**"). As noted above, I have developed and designed these procedures, with the assistance of my Advisors, with the objective of providing for the best opportunity of achieving a value maximizing Sale Transaction. Accordingly, the Bidding Procedures are designed to promote a competitive and expedient bidding process and to generate the greatest level of interest in the PDVH Shares.

86.     The Sale Procedures Order and Bidding Procedures establish the following key dates and deadlines for the Marketing Process:

| Key Event | Deadline |
|---|---|
| Special Master to Launch Marketing Process and Establish Data Room in accordance with terms of the Sale Procedures Order | Launch ("**L**")[22] |
| Deadline to Submit Non-Binding Indications of Interest | L+ 45 days |

---

[22] Prior to launch of the marketing process, a notice will be filed on the docket of the Crystallex Case setting forth the specific date of each deadline.

CONTAINS REDACTIONS IN ACCORDANCE WITH D.I. 345

| Key Event | Deadline |
|---|---|
| Deadline to Submit Stalking Horse Bids | L+ 90 days |
| Deadline for Special Master to Designate Stalking Horse Bidder and Enter into Stalking Horse Agreement | L + 150 days |
| Deadline for Special Master to File Notice of Stalking Horse Bidder | As soon as reasonably practicable following designation by the Special Master |
| Deadline to Submit Bids | L + 210 days |
| Deadline for Special Master to Notify Bidders of Status as Qualified Bidders | L + 217 days |
| Auction to be conducted at the offices of Potter Anderson & Corroon LLP (1313 N. Market Street, 6th Floor, Wilmington, DE 19801-6108) or such other location as is mutually agreeable to the Special Master and each of the Sale Process Parties | L + 230 days |
| Deadline to File Notice of Successful Bid | As soon as reasonably practicable following conclusion of the Auction or, if no Auction, selection of the Successful Bid |
| Deadline to File Objections to Sale Transaction | L + 250 days |
| Deadline for Parties to Reply to Objections to Sale Transaction | L + 263 days |
| Sale Hearing | L + 270 days |

87.     In formulating the Marketing Process, in consultation with my Advisors, I balanced the need to provide adequate and appropriate notice to parties in interest and Potential Bidders with the need to quickly and efficiently run a value-maximizing sale process. The Bidding Procedures are tailored to account for the sale process design considerations described in the prior Section and are, at their core, designed to promote a competitive and expedient sale process for the PDVH Shares that encourages all prospective bidders to submit value-maximizing bids.

CONTAINS REDACTIONS IN ACCORDANCE WITH D.I. 345

88.     The material terms of the Sale Procedures Order and Bidding Procedures are summarized in the following chart along with an explanation of the rationale underlying certain of the provisions:

| | Summary of Sale Procedures Order and Bidding Procedures[1] | |
|---|---|---|
| **Term / Provision** | **Description** | **Primary Rationale and Considerations** |
| | **Overview of Sale Process** | |
| **Launch Date & Preparation Launch Date** | • The Special Master shall launch and conduct the Marketing Process at the earlier of (i) when (x) the Special Master determines, in his sole discretion but in consultation with the Sale Process Parties, (y) the Special Master and his Advisors have performed sufficient due diligence necessary or desirable to launch a value-maximizing sale process, and (z) the Special Master is satisfied with the authorization, FAQs, or other applicable guidance issued by OFAC regarding the launch and viability of the Marketing Process, including any lack of Executive Branch objection to a potential future order to show cause as to why the launch and participation of prospective bidders in the Marketing Process is not authorized; and (ii) such other time as ordered by the Court (the date on which the Marketing Process is launched, the "**Launch Date**"). | • As stated above, if we were to proceed based on OFAC's public guidance as of today, I do not believe that Potential Bidders will participate in the process for fear of violating such sanctions. *See* OFAC FAQ 809 (stating that a specific license from OFAC is required "prior to conducting an auction or other sale… or taking other concrete steps in furtherance of a sale" of shares of a Government of Venezuela entity (such as the PDVH Shares). Accordingly, the proposed Sale Procedures Order provides for launch of the Marketing Process to be delayed until I am satisfied that Potential Bidders will participate in the Marketing Process because of revised guidance or comfort gained from the Court's Order.<br><br>• In paragraph 6 of the proposed Sale Procedures Order, in consultation with my Advisors, I have proposed a mechanism for soliciting feedback and input from the USG with the Court's assistance, if it becomes necessary. |
| **Preparation Launch Date** | • Prior to the Launch Date, the Special Master shall not prepare in a material way for the Marketing Process or take material steps toward implementation of the Sale Procedures until the Special Master is satisfied with the | • For the same reason as above and following consultation with the Sale Process Parties, I do not believe that it makes practical sense for me incur the substantial fees and expenses that will be necessary to prepare for the |

[1] This summary is qualified by reference to the Sale Procedures Order (including the Bidding Procedures). To the extent there is an inconsistency between this summary and the Sale Procedures Order, the Sale Procedures Order shall govern.

| Summary of Sale Procedures Order and Bidding Procedures[1] | | |
|---|---|---|
| Term / Provision | Description | Primary Rationale and Considerations |
| | authorization, FAQs, or other applicable guidance issued by OFAC regarding preparation for launch of the Marketing Process or the launch and viability of the Marketing Process, including any lack of Executive Branch objection to a potential future order to show cause as to why the launch and participation of prospective bidders in the Marketing Process is not authorized (the date on which the Special Master is satisfied, the "**Preparation Launch Date**"); *provided*, that, notwithstanding the foregoing, the Special Master shall be authorized to (i) proactively engage with representatives from the Executive Branch (as defined below) and to take all steps or actions reasonably in furtherance of the issuance of OFAC guidance and/or authorization, (ii) proactively engage with the Sale Process Parties and their advisors, (iii) prepare for and participate in any discussions with the Court and/or any hearing held by the Court, including the Initial Status Conference, and (iv) participate in any settlement discussions with parties regarding a global claims waterfall or related issues is so directed by the Court. On and after the Preparation Launch Date, the Special Master and the Special Master's Advisors are hereby directed to prepare for the Marketing Process and take all such preliminary actions in connection therewith, including conducting or performing appropriate due diligence and related analysis. | ultimate launch of the Marketing Process until I am satisfied that Potential Bidders will participate in the Marketing Process. Thereafter, I anticipate that it will only take 45 to 90 days to prepare for and ultimately launch the Marketing Process or in connection with settlement discussions, as needed. As a result, delaying launch as set forth in the proposed Sale Procedures Order will not materially delay the process. |

CONTAINS REDACTIONS IN ACCORDANCE WITH D.I. 345

| Summary of Sale Procedures Order and Bidding Procedures[1] | | |
|---|---|---|
| **Term / Provision** | **Description** | **Primary Rationale and Considerations** |
| **Sale Process Phases** | The proposed Marketing Process includes two bidding phases and a call for overbids (and an Auction) pursuant to the Bidding Procedures and the Timeline described above:<br><br>• **Phase I**: The Special Master will seek Bids for the PDVH Shares and may designate a Stalking Horse Bidder based on the bids received on or prior to the Stalking Horse Bid Deadline.<br><br>• **Phase II**: The Special Master will conduct a second phase marketing process seeking Bids that have a greater equity value than the equity value implied by the total enterprise value of any Stalking Horse Bid. The Special Master will specifically market for any Bids for less than 100% of the shares of PDVH (and also any full-company overbids), *provided* that a Bid for less than 100% must match or falls within an acceptable deviation from the equity value implied by the Stalking Horse Bid Implied Value. Thereafter the Special Master will conduct an Auction with appropriate procedures matching the circumstances.<br><br>• Following the Bid Deadline (and Auction, if applicable), the Special Master will select the highest Qualified Bid(s) that the Special Master reasonably believes to be capable of being timely consummated after taking into account the factors set forth in the Bidding Procedures as the Successful Bid. | • The proposed two-phase process is intended solicit the best price for PDVH Shares on a per-share basis and subsequently market test any Stalking Horse Bid selected to ensure that any Sale Transaction will be value maximizing.<br><br>• The procedures for comparing Bids based on their implied equity value ensures that the Bid ultimately selected as the Successful Bid will be one that is value maximizing. In evaluating any Bid (including a Stalking Horse Bid), the Special Master will take into account, among other things, (i) the treatment of any assumed debt and/or treatment of any claims secured by Structurally Senior Liens in calculating the Stalking Horse Implied Value, and (ii) conditions or assumptions included the Bid regarding third parties or obligations owed by parties other than PDVH.<br><br>• Provides Potential Bidders with roughly 12 weeks from receiving initial information to conduct diligence to submit a Stalking Horse Bid and provides a second opportunity to Bid in the overbid process and ensures that only so many shares as are necessary to be sold are actually sold.<br><br>• Overbid process ensures a final market check for the highest bid prior to a Successful Bid being selected |

| Summary of Sale Procedures Order and Bidding Procedures[1] | | |
|---|---|---|
| **Term / Provision** | **Description** | **Primary Rationale and Considerations** |
| **Shares to be Sold** | • Interested parties may submit bids for the purchase and sale of up to 100% the PDVH Shares in accordance with the terms and conditions set forth in the Bidding Procedures. To avoid any ambiguity, parties may submit bids for less than 100% of the shares of PDVH so long as such bid satisfies the Attached Judgments. | • A value maximizing transaction is one that ensures the most suitable bidders participate in the process. Suitable bidders participate when the offer is enticing. The more enticing the offer the greater likelihood of participation. Accordingly, the Special Master wishes to make the most enticing offer available in the circumstances: an offer of 100% of the PDVH Shares. |
| | | • Notwithstanding the offer of 100% of the PDVH Shares, Potential Bidders are encouraged to submit any and all types of Bids consistent with the Bidding Procedures, which encourages value-maximizing Bids of any sort; however, foreclosing the option to purchase a controlling stake or Bids for less than 100% of the PDVH Shares will discourage bidding. |
| | | • As explained in greater detail in ¶ 81 of the Report and ¶¶ 21-23 of the Hiltz Declaration, a Bid for 100% of the PDVH Shares (or at least a controlling stake) is likely to achieve Bids with a higher implied equity value. Accordingly, such Bids should be encouraged as value maximizing. |
| **Designation of Stalking Horse Bidder** | • At the conclusion of the first phase of the sale process, the Special Master may, in the exercise of his judgment and at his sole discretion, designate a Stalking Horse Bidder and enter into a Stalking | • Designation of a Stalking Horse Bid will promote a competitive and robust bidding process and will facilitate a final market check and overbid process before a Successful Bid is ultimately selected. |

| Summary of Sale Procedures Order and Bidding Procedures[1] | | |
|---|---|---|
| Term / Provision | Description | Primary Rationale and Considerations |
| | Horse Agreement in accordance with the terms of the Sale Procedures Order and Bidding Procedures.<br><br>• The Special Master will consider all Stalking Horse Bids received, including any bid that contemplates a Credit Bid, for designation as a Stalking Horse Bid, but shall not be required to designate any bid as a Stalking Horse Bid.<br><br>• The Special Master may, subject to the Bidding Procedures and approval of the Court:<br><br>• establish an initial overbid minimum and subsequent bidding increment requirements not to exceed 5.00% of the Stalking Horse Bid Implied Value, subject to adjustment for any Bids for a lesser percentage of the PDVH Shares than the Stalking Horse Bid;<br><br>• offer any Stalking Horse Bidder a break-up fee in an amount agreed to by the Special Master in consultation with the Sale Process Parties but not to exceed 3.0% of the Stalking Horse Bid Implied Value (a "**Termination Payment**") payable either (a) in the event that an overbid is consummated, out of the proceeds from the consummation of such overbid and (b) by PDVH, CITGO Holding, and CITGO Petroleum in circumstances where any of PDVH, CITGO Holding, and/or CITGO Petroleum | • More specifically, designation of a Stalking Horse Bid early in the process, will, among other things, provide transparency and foster competitive bidding by exposing the highest bid to a subsequent round of bidding, set an easily identifiable bid floor for the remainder of the sale process, and facilitate the form of definitive sale agreement that other bidders can utilize in submitting their Bids.<br><br>• The Stalking Horse Bid Protections are reasonably calculated to incentivize Potential Bidders to participate in a competitive bidding process, designed to encourage robust bidding by compensating a bidder whose definitive agreement in connection with a Sale Transaction is terminated for the risks and costs incurred in signing and announcing an agreement for a transaction that may not ultimately be completed, and reasonably calculated so as to not unreasonably deter Qualified Bidders from submitting a Qualified Bid.<br><br>• Finally, selection of a Stalking Horse Bid will provide certainty that a Sale Transaction will take place, meeting the expectations of certain parties that relief granted by the Court with respect to their Attached Judgment claims will be honored through to remedy. |

49

**460a**

CONTAINS REDACTIONS IN ACCORDANCE WITH D.I. 345

| Summary of Sale Procedures Order and Bidding Procedures[1] | | |
|---|---|---|
| Term / Provision | Description | Primary Rationale and Considerations |
| | is materially responsible for the events that give rise to a Termination Payment; | |
| | • provide that, if the Stalking Horse Bidder bids on PDVH Shares at the Auction, the Stalking Horse Bidder will be entitled to a credit in the amount of its Termination Payment against the increased purchase price for the PDVH Shares; | |
| | • provide for the reimbursement of reasonable and documented fees and expenses actually incurred by the Stalking Horse Bidder by PDVH, CITGO Holding and CITGO Petroleum solely under certain circumstances in which the transactions contemplated by the Stalking Horse Agreement are not consummated; | |
| | • provide that any sale order will seek to transfer the PDVH Shares free and clear of any claims upon them; and | |
| | • in consultation with the Sale Process Parties, provide other appropriate and customary protections to a Stalking Horse Bidder. | |
| | • The Special Master is authorized to offer the Stalking Horse Bid Protections at his sole discretion if he determines that such Stalking Horse Bid Protections would be in furtherance of a value maximizing transaction and argue that any sale order | |

| | Summary of Sale Procedures Order and Bidding Procedures[1] | |
|---|---|---|
| **Term / Provision** | **Description** | **Primary Rationale and Considerations** |
| | shall seek to transfer the PDVH Shares free and clear of any claims upon them. | |
| **Credit Bidding** | • Crystallex and any other party holding an attached judgment may submit a Credit Bid under the following conditions:<br>   • Any Credit Bid must include a cash component or other funding mechanism sufficient to pay (or otherwise contemplate payment in full in cash in a manner acceptable to the Special Master): (i) any applicable Termination Payment, (ii) all Transaction Expenses, and (iii) all obligations secured by senior liens on the PDVH Shares (if any); and<br>   • Any party seeking to submit a Credit Bid must cause two of its representatives to each submit a sworn statement and affidavit unequivocally and unconditionally stating (i) the amount of such party's judgment as of the date of the Credit Bid and (ii) that such representative submits to the personal jurisdiction of the Court in connection with making such statement and affidavit. | • The Court has authorized Crystallex to credit bid the D.C. Judgment. *See* May 27th Order.<br>• The conditions imposed for submitting a Credit Bid ensures that the Sale Transaction selected as the Successful Bid will ultimately be feasible.<br>• The Sale Procedures Order authorizes parties with Attached Judgments, including Crystallex, to Credit Bid in a way that does not deter bidding and will provide certainty in the implementation of the sale process. |
| **Criteria for Selecting Successful Bid** | • The Special Master may select, in the exercise of his judgment, and recommend to the Court for confirmation the highest bid resulting from the public process described above that the Special Master reasonably believes to be capable of being timely consummated | • The Bidding Procedures provide parties with notice of the clear framework that the Special Master will utilize to ultimately select the Successful Bid. I believe that an open and transparent process is important for all |

CONTAINS REDACTIONS IN ACCORDANCE WITH D.I. 345

| Summary of Sale Procedures Order and Bidding Procedures[1] | | |
|---|---|---|
| **Term / Provision** | **Description** | **Primary Rationale and Considerations** |
| | after taking into account the factors set forth in the Bidding Procedures.<br><br>• The Special Master may, in consultation with the Sale Process Parties and in accordance with the Bidding Procedures, identify the highest Qualified Bid capable of being timely consummated, other than the Stalking Horse Bid, if any, as the Successful Bid. If a Stalking Horse Bid was designated in such a case, the Special Master will designate the Stalking Horse Bid as a Back-Up Bid. If a Sale Transaction with a Successful Bidder is terminated prior to the Back-Up Bid Expiration Date, the Back-Up Bidder shall be deemed a Successful Bidder and shall be obligated to consummate the Back-Up Bid as if it were a Successful Bid. | participants, including Potential Bidders and the Sale Process Parties.<br><br>• The flexibility in selecting the highest bid capable of being timely consummated after taking into account the factors set forth in the Bidding Procedures ensures that I, in consultation with the Sale Process Parties, may select the best overall bid and am not forced to select a bid that is not feasible. Common reasons that a Bid may not be feasible include risks associated with Qualified Bidders' financing source(s) (particularly if it is contingent) or regulatory risks, such as antitrust, OFAC, or CFIUS concerns. Upon receipt of any such Bids, my Advisors and I will review and evaluate these such Bids in consultation with the Sale Process Parties. |
| **Court Approval of Sale Transaction** | • Following selection of the Successful Bid, the Special Master will submit the proposed Sale Transaction to the Court for approval. | • Although the Special Master is granted flexibility to conduct and implement the Sale Procedures Order, any Sale Transaction is subject to approval by the Court. |
| **Mechanics of Sale Process** | | |
| **Non-Binding Indications of Interest** | • Parties wishing to participate in the sale of PDVH Shares are encouraged to submit a Non-Binding Indication of Interest that identifies the percentage of PDVH shares they are seeking to purchase. The Special Master requests (and strongly encourages) Potential Bidders to include in their Non-Binding Indication of | • To maximize participation of credible and eligible bidders, I believe it makes sense to implement certain procedural characteristics of a traditional sale process. The proposed requirements of a Non-Binding Indication of Interest are intended to collect information necessary to ensure that a Potential Bidder will be able to |

| Summary of Sale Procedures Order and Bidding Procedures[1] | | |
|---|---|---|
| **Term / Provision** | **Description** | **Primary Rationale and Considerations** |
| | Interest, at a minimum, the items enumerated in the Bidding Procedures. | successfully close a Sale Transaction if selected as the Successful Bidder. The information requested is customary of a traditional sale process and/or may become necessary in light of the regulatory approvals required to consummate a Sale Transaction in light of the circumstances. |
| **Form and Content of a Bid** | • To be considered for selection as a Stalking Horse Bid and/or to constitute a "Qualified Bid," a Bid must include, at a minimum, the items enumerated in the Bidding Procedures. | • Implementation of these procedural characteristics of a traditional sale process will ensure that my Advisors and I have adequate information with respect to all Bids.<br><br>• These procedures further encourages participation of credible and eligible bidders |
| **Mandatory Requirements of Qualified Bid** | • Solely if the Court has approved of the Special Master entering into a Stalking Horse Agreement and such Stalking Horse Agreement has been executed, no other Bid shall be considered a Qualified Bid unless such Bid meets the following "Mandatory Requirements" set forth in the Bidding Procedures:<br><br>   • The Bid must have a greater Implied Value than the Stalking Horse Bid Implied Value or be within a range of such Implied Value which, in the Special Master's judgment, is sufficient to meet the requirements of obtaining a value maximizing Sale Transaction; | • If a Stalking Horse Bid has been selected, the Mandatory Requirements are intended to provide for a true market-test of such Stalking Horse Bid.<br><br>• The Mandatory Requirements further encourage Potential Bidders to submit topping bids that satisfy as much or more of the Attached Judgments than the Stalking Horse Bid (or the same amount of the Attached Judgments for less of the PDVH Shares). |

CONTAINS REDACTIONS IN ACCORDANCE WITH D.I. 345

| Term / Provision | Description | Primary Rationale and Considerations |
|---|---|---|
| | • In addition to the minimum amount of consideration necessary to satisfy the foregoing requirement, the Bid must provide for additional consideration sufficient to pay in full in cash all Stalking Horse Bid Protections, including any Termination Payment and Expense Reimbursement amounts payable; <br><br> • The Bid must provide for either (i) sufficient proceeds to pay no less of the Attached Judgments than the Stalking Horse Bid or (ii) proceeds in excess of the proceeds provided for in the Stalking Horse Bid after payment of all Stalking Horse Bid Protections. | |
| **Sale Notice Procedures and Requirements** | • The Special Master will cause a notice of the sale process and Bidding Procedures, substantially in the form attached to the Sale Procedures Order, to be published (i) following the launch of the sale process, and (ii) prior to any Auction or designation of any Stalking Horse Bidder as the Successful Bidder, in each case for two successive weeks. <br><br> • A copy of the Sale Procedures Order shall be served by e-mail on counsel to the Venezuela Parties. If any Sale Process Party believes that further service of the Sale Procedures Order, the Sale Notice or any additional publication or notice is necessary or appropriate, such Sale Process Party shall, within 10 calendar days of entry thereof, provide the Special Master with a specific list of specific actions or service that the Sale Process | • The Notice Procedures in the proposed Sale Procedures Order are designed to ensure that each Sale Process Party has ample opportunity to provide input on the form of service and publication notice that I ultimately employ. For example, the proposed form of Sale Notice, which each Sale Process Party has had an opportunity to comment on and provide input on, is attached as <u>Exhibit 2</u> to the proposed Sale Procedures Order. I believe it makes sense for the Court to approve the form in advance, with input from the Sale Process Parties, to mitigate "foot fault" arguments that may be raised later. <br><br> • Section 324 of the Delaware Corporation Law proscribes certain notice and service requirements for notice of any Auction, which I have incorporated into the Proposed Sale Procedures Order to the extent set forth therein. Due |

CONTAINS REDACTIONS IN ACCORDANCE WITH D.I. 345

| Term / Provision | Description | Primary Rationale and Considerations |
|---|---|---|
| | Party believes should be undertaken, subject to order of the Court or with the consent of the Special Master. | to the judgment debtor's (the Republic's and PDVSA's) active participation in the Crystallex Case and the other unique circumstances and sensitive political issues at play, I believe it is prudent to obtain their input on the specific notice procedures to be incorporated into the proposed Sale Procedures Order with respect to service on and notice in Venezuela (particularly with respect to any required publication notice in Venezuela). |
| **Good Faith Deposit** | • A cash deposit (that is refundable under the circumstances described in the Bidding Procedures) in the amount of 10% of the Implied Value of the applicable Bid will be paid by:<br>• the Stalking Horse Bidder upon entry into a Stalking Horse Agreement, unless otherwise agreed to by the Special Master, in consultation with the Sale Process Parties and the Stalking Horse Bidder; and<br>• any other Potential Bidder, unless otherwise agreed to by the Special Master, in consultation with the Sale Process Parties and a Potential Bidder; *provided* that, a Potential Bidder submitting a Credit Bid shall only be required to provide a deposit in the amount of 10% of the cash component of such Bid. | • The Court previously held that "bidders will be required to make a substantial good faith deposit, which will be refundable to all but the winning bidder. The winning bidder may be required to make an additional non-refundable deposit to provide adequate incentive to close the deal." The Good Faith Deposit limits the execution risk and ensures that only credible bids that can ultimately be consummated are taken into consideration. (*See* ¶37 of the Hiltz Declaration). |
| **Sale Process Parties** | • At all times during the bidding process, the Special Master will consult with the Court and the Sale Process Parties and may do so on an *ex parte* basis *in camera*. In | • Consistent with the Court's mandate, my Advisors and I intend to consult with various parties in interest |

| Summary of Sale Procedures Order and Bidding Procedures[1] | | |
|---|---|---|
| Term / Provision | Description | Primary Rationale and Considerations |
| | addition, throughout the bidding process, the Special Master and his Advisors will regularly and timely consult with the following parties (through their applicable advisors): (i) the Venezuela Parties, including PDVH and CITGO; (ii) Crystallex; and (iii) ConocoPhillips.<br><br>• The Special Master shall use reasonable efforts to timely provide copies of any Non-Binding Indications of Interest, Bids, Stalking Horse Bids, and other relevant documents to the Sale Process Parties, *provided* that the Special Master shall not consult with or provide copies of any Non-Binding Indications of Interest, Bids, or Stalking Horse Bids to any Sale Process Party pursuant to the terms of these Bidding Procedures if such Sale Process Party has a Bid pending, or has expressed any written interest in bidding for the PDVH Shares.<br><br>• If a Sale Process Party chooses not to submit any Bid, then such party may receive copies of all Bids following expiration of the latest possible Bid Deadline (as such Bid Deadline may be extended by the Special Master pursuant to the terms of these Bidding Procedures); *provided,* that (i) such Sale Process Party shall be required to hold any Bids or other documents received in strict confidence in accordance with the terms of the *Special Master Confidentiality Order* [D.I. 291], and (ii) upon a Sale Process Party's receipt of a copy of any Bid, such Sale Process Party shall thereafter be | throughout the sale process and balance competing interests.<br><br>• To maintain the integrity of the sale process and to facilitate a competitive, fair and value-maximizing Sale Transaction, I do not believe it is prudent to consult with any Sale Process Party regarding Bids or strategies with respect to Potential Bidders if that Sale Process Party has also submitted a Bid or expressed any written interest in bidding for any of the assets. For this reason, the Bidding Procedures contain a customary and typical limitation on my obligation to consult with any such Sale Process Party that intends to or has submitted a Bid. |

CONTAINS REDACTIONS IN ACCORDANCE WITH D.I. 345

| Summary of Sale Procedures Order and Bidding Procedures[1] | | |
|---|---|---|
| **Term / Provision** | **Description** | **Primary Rationale and Considerations** |
| | precluded from submitting any bid or other offer for the PDVH Shares. For the avoidance of doubt, if the only Bid that a Sale Process Party receives is a copy of the Stalking Horse Bid designated by the Special Master, such Sale Process Party may submit a Bid like any other Potential Bidder pursuant to the terms of the Bidding Procedures. | |
| **Auction** | • If the Special Master receives more than one Qualified Bid (inclusive of any Stalking Horse Bid) for the PDVH Shares, the Special Master will conduct the Auction.<br><br>• Only a Qualified Bidder will be eligible to participate at the Auction, subject to such limitations as the Special Master may impose in good faith.<br><br>• The Special Master may, in consultation with the Sale Process Parties, adopt rules for the Auction, subject to the limitations set forth in the Bidding Procedures, at any time that the Special Master reasonably determines to be appropriate to promote a spirited and robust Auction. | • To facilitate a value-maximizing Sale Transaction through the proposed two-phase sale process, the Special Master will hold an Auction consistent with customary sale procedures if he receives one or more Qualified Bids (including any Stalking Horse Bid). The procedures and forum of such Auction shall be determined by the Special Master to suit the circumstances and ensure a value maximizing Sale Transaction. |
| **Data Room Access** | • As soon as reasonably practicable, the Special Master will provide each Potential Bidder access to the Data Room; provided that, such Data Room access and access to any other due diligence materials and information | • Consistent with the January 2021 Ruling, Potential Bidders will expect a robust data room to perform due diligence. |

CONTAINS REDACTIONS IN ACCORDANCE WITH D.I. 345

| Summary of Sale Procedures Order and Bidding Procedures[1] | | |
|---|---|---|
| **Term / Provision** | **Description** | **Primary Rationale and Considerations** |
| | may be terminated by the Special Master in his sole discretion at any time for any reason whatsoever. | |
| | • The Special Master may restrict or limit access of any Potential Bidder to the Data Room if the Special Master determines, based on his reasonable judgment (or after consultation with the Sale Process Parties), that certain information in the Data Room is sensitive, proprietary or otherwise not appropriate for disclosure to such Potential Bidder. | |
| | • Each of the Sale Process Parties may recommend to the Special Master documents or additional information to be included in the Data Room. | |
| **Attached Judgments** | | |
| **Satisfaction of All Attached Judgments** | • Nothing in the Sale Procedures Order prohibits or in any way impairs the rights of the Venezuela Parties to satisfy Crystallex's Judgment (or any other Attached Judgment) in full prior to consummation of a Sale Transaction. If at any time all Attached Judgments become satisfied in full (or otherwise are consensually resolved), then the Special Master shall cease implementation of the Sale Procedures and seek further orders from the Court. | • The proposed Sale Procedures Order and Bidding Procedures are designed to preserve the Venezuela Parties' right to end the sale process through satisfaction of all Attached Judgments at any time. |
| | • The Sale Process Parties shall remain liable for any Transaction Expenses through the date that is two | |

CONTAINS REDACTIONS IN ACCORDANCE WITH D.I. 345

| Summary of Sale Procedures Order and Bidding Procedures[1] | | |
|---|---|---|
| Term / Provision | Description | Primary Rationale and Considerations |
|  | business days after the Special Master receives notice of satisfaction of all Attached Judgments. |  |
| Attached Judgments | • By no later than a date established by the Court, the Court will decide which, if any, Additional Judgments are to be added to Sale Transaction. Except as otherwise ordered by the Court, following the Additional Judgment Deadline, the Special Master shall implement the Sale Procedures, based on the Attached Judgments as of the Additional Judgment Deadline.<br><br>• For the avoidance of doubt, the outside date will not impair or in any way limit a person's or entity's right to seek attachment to any proceeds following consummation of the Sale Transaction. | • Consistent with the Court's mandate, the Sale Procedures Order provides that the Special Master will implement the sale process in satisfaction of Crystallex's Judgment and any other judgment attached by the Court. In implementing the Additional Judgment Deadline, the Special Master will have the certainty required to appropriately implement the sale process in carrying out his duties. |
| **Amendments and Additional Powers of Special Master** | | |
| Additional Guidance from the Court | • If the Special Master, in his sole discretion, but after consultation with the Sale Process Parties, determines that (i) a material modification or amendment of the Sale Procedures Order or the Sale Procedures (including the Bidding Procedures) that is not otherwise permitted or (ii) additional powers or guidance from the Court, is reasonably necessary or desirable for any reason, including to (a) ensure a value maximizing sale process or (b) effectuate a value maximizing sale process through a Sale Transaction, the Special Master may seek | • Providing a streamlined process for the Special Master to seek additional guidance and/or an amendment to the Sale Procedures Order ensures that the Court will be apprised if an amendment of the Sale Procedures Order becomes warranted under the circumstances. |

CONTAINS REDACTIONS IN ACCORDANCE WITH D.I. 345

| | Summary of Sale Procedures Order and Bidding Procedures[1] | |
|---|---|---|
| **Term / Provision** | **Description** | **Primary Rationale and Considerations** |
| | such proposed amendment or additional powers or guidance, as applicable, by filing a request or recommendation with the Court with notice to the Sale Process Parties. | |
| **Requests of the Special Master** | • In addition to the cooperation provisions in the May 2021 Order, the Sale Process Parties, including CITGO and PDVH, and each of their subsidiaries, including their directors, officers, managers, employees, agents, and advisors, shall promptly cooperate and comply with the requests of the Special Master. If the Special Master specifically invokes paragraph 32 of the Sale Procedures Order in connection with any such request, then the person or entity that is the subject or recipient of such request shall comply no later than five business days after the date upon which the request was made, unless the Special Master sets a different deadline for which a response is due. <br><br> • If any person objects to a request by the Special Master that specifically invokes paragraph 32 of the Sale Procedures Order, including objections based on a belief that such request is unreasonable, such person shall file a motion with the Court seeking relief from the Special Master's request. Absent a motion seeking relief from the Court, the Special Master may (but shall have no obligation to) explain the basis of his request to the subject or recipient; *provided*, that, if requested by the | • In connection with carrying out his duties, the Special Master will likely need to request information or make other requests upon the Sale Process Parties or their representatives. Establishing a process to compel compliance with such requests will streamline the process for making any such requests and will mitigate the likelihood that potentially uncooperative parties can jeopardize the process by withholding necessary information (or otherwise). |

CONTAINS REDACTIONS IN ACCORDANCE WITH D.I. 345

| Summary of Sale Procedures Order and Bidding Procedures[1] | | |
|---|---|---|
| Term / Provision | Description | Primary Rationale and Considerations |
| | subject or recipient, the Special Master shall meet and confer with such person at least one business day before such person's deadline to file a motion seeking relief from the Special Master's request.<br>• The Special Master may, in his sole discretion, recommend to the Court appropriate sanctions with respect to any person or entity that fails to promptly comply with a request absent a timely request for relief from the Court. | |
| **CITGO Management Team** | • If requested by the Special Master, CITGO shall use reasonable efforts to make members of the CITGO management team available for meetings with bidders or potential bidders, which may include, in the Special Master's sole discretion, the most senior members of the CITGO management team. The CITGO shall further use reasonable efforts to timely respond to the Special Master's diligence requests or bidder-specific questions, including, if applicable, by providing accurate and complete due diligence materials, documentation, and backup support requested by the Special Master. | • As discussed above (*see supra* ¶¶ 79-80), the cooperation of the CITGO management team is critical to the value maximization of the PDVH Shares. |
| **Additional Powers of the Special Master** | • The Special Master shall have all of the powers and duties set forth in prior orders of the Court, including the May 2021 Order. Without limiting the foregoing, the Special Master may issue, without limitation, orders, subpoenas and interrogatories in the course of performing his duties. Further, the Special Master may, | • In connection with implementing the Sale Procedures Order, I may need to obtain or seek information from third-parties or address unforeseen situation. These additional powers will provide the flexibility and discretion necessary to address such situations in connection with carrying out his mandate under the Sale |

CONTAINS REDACTIONS IN ACCORDANCE WITH D.I. 345

| Summary of Sale Procedures Order and Bidding Procedures[1] | | |
|---|---|---|
| **Term / Provision** | **Description** | **Primary Rationale and Considerations** |
| | in his sole discretion and consistent with Rule 53 of the Federal Rules, issue orders to compel delivery of information from any person or entity in connection with implementing the Sale Procedures, including to ensure a comprehensive and value-maximizing sale process, to ensure that property that is directly or indirectly the subject of the Sale Procedures Order is not transferred or otherwise encumbered by the Venezuela Parties or to determine the amount of claims against the Venezuela Parties. Following consultation with the Sale Process Parties, the Special Master may by order impose on a party any non-contempt sanction provided by Rule 37 or Rule 45 of the Federal Rules, and may recommend a contempt sanction against a party and sanctions against a nonparty, consistent with Rule 53(c) of the Federal Rules. | Procedures Order and, ultimately, a value maximizing Sale Process. |
| **Additional Provisions** | | |
| **Rosneft Trading S.A.** | • By no later than twenty-one calendar days following entry of the Sale Procedures Order and service thereof by the Special Master on counsel of record for both (i) RTSA and PDVSA, each of RTSA and PDVSA shall deliver to the Special Master a separate Disclosure Statement indicating the amount of any outstanding balance of obligations, if any, purported to still be secured by a pledge of the equity of CITGO Holding as | • As discussed above (*see supra* ¶¶71-73), the uncertainty surrounding the outstanding obligations, if any, secured by the RTSA Pledge will likely deter bidding and materially hamper the sale process. Accordingly, the Special Master requires Court authority to confirm the outstanding obligations, if any, secured thereby. |

| Summary of Sale Procedures Order and Bidding Procedures[1] | | |
|---|---|---|
| **Term / Provision** | **Description** | **Primary Rationale and Considerations** |
| | well as copies of any documents evidencing any obligations whether now or previously owed.<br><br>• If RTSA or PDVSA fail to respond or otherwise provide sufficient documentation of any alleged obligations, the Special Master shall file a report and recommendation with the Court that includes a proposed order to be issued by the Court in response to the failure of either RTSA or PDVSA to comply with the Sale Procedures Order, which may include, with respect to RTSA, a permanent injunction enjoining RTSA and any entity or person directly or indirectly controlled by RTSA from enforcing any pledge or claim against the equity of CITGO Holding. | |
| **Status Conferences** | • Unless otherwise ordered by the Court, the Court will hold a status conference approximately every thirty days for the Special Master to provide an update to the Court and other interested parties regarding implementation of the Sale Procedures Order; *provided*, that, subject to the Court's availability, the Special Master or the Sale Process Parties may request that the status conference occur more or less frequently or on an as-needed basis; *provided* that nothing shall impede the Special Master's right to meet *in camera* or share information with the Court to provide updates on the process. | • Regular status conferences will permit interested parties, including the Sale Process Parties, to bring any issues to the attention of the Special Master and the Court so that they may resolve any dispute as early as possible in the process instead of waiting until the Sale Hearing.<br><br>• If, on the other hand a party does not bring its complaint or issue to the attention of the Court at a status conference (assuming it cannot be resolved between them and the Special Master in lieu of raising it), then the Court may make whatever inference it wishes regarding that party's decision to wait until the Sale Hearing to raise it. |

CONTAINS REDACTIONS IN ACCORDANCE WITH D.I. 345

| Summary of Sale Procedures Order and Bidding Procedures[1] | | |
|---|---|---|
| **Term / Provision** | **Description** | **Primary Rationale and Considerations** |
| **Dispute Resolution** | • All bidders that participate in the sale process shall be deemed to have (i) consented to the jurisdiction of the Court to enter any order or orders, which shall be binding in all respects, in any way related to the Sale Procedures or Bidding Procedures, the bid process, the Auction, the Sale Hearing, or the construction, interpretation, and enforcement of any agreement or any other document relating to a Sale Transaction; (ii) waived any right to a jury trial in connection with the same; and (iii) consented to the entry of a final order or judgment in any way related to the same if it is determined that the Court would lack jurisdiction to enter such a final order or judgment absent the consent of the parties. | • To implement a value maximizing Sale Process, Potential Bidders must have certainty in the outcome of that process, and the dispute resolution mechanics to be implemented in connection with the same, in order to generate the highest offer for PDVH Shares capable of being timely consummated after taking into account the factors set forth in the Bidding Procedures. |
| **Communication and Negotiation with Third Parties** | • The Special Master is authorized and empowered, in his sole discretion and at any time, to communicate and, as applicable, negotiate with any bidder, potential bidder, or governmental or regulatory body. Further, in consultation with the Sale Process Parties, the Special Master is authorized and empowered, in his sole discretion and at any time, to communicate and, as applicable, negotiate with any other person or entity, including any contract counterparty, any indenture trustee, administrative agent, or collateral agent, any PDVSA 2020 Bondholder. | • Communication of the Special Master with third parties, including contract counterparties of CITGO, will be necessary in connection with implementing the sale procedures and ensuring that any Sale Transaction is feasible, including with respect to negotiation of any "change-of-control" or other restrictions in any of CITGO's contracts.<br><br>• At this stage I propose to conduct any negotiations or discussions regarding the change, modification, or amendment of any contract of PDVH or CITGO in connection with any Bid in cooperation with and the consent of PDVH and CITGO (as applicable). If this |

| | Summary of Sale Procedures Order and Bidding Procedures[1] | |
|---|---|---|
| **Term / Provision** | **Description** | **Primary Rationale and Considerations** |
| | • If the Special Master determines it is reasonably necessary or desirable to negotiate a change, modification, or amendment to, or seek a consent or waiver under, any contract of PDVH, CITGO, or any of their subsidiaries in connection with any Bid or Potential Bid or implementation of the Sale Procedures or any Sale Transaction, including with respect to any "change-of-control" provisions in any contract, the Special Master shall work with PDVH and CITGO, as applicable, to negotiate such change, modification, amendment, consent, or waiver. If either PDVH or CITGO, as applicable, does not cooperate with or otherwise consent to any particular negotiation, change, modification, amendment, consent, or waiver, the Special Master shall seek additional guidance from the Court. | proves to be an unworkable construct, the proposed Sale Procedures Order provides that I will seek additional guidance or input from the Court at a later date. |
| **Communication with Potential Bidders** | • The Sale Process Parties shall not, directly or indirectly, contact or otherwise communicate with any potential bidders regarding the Sale Procedures Order, the Sale Procedures, any bid or potential bid or any Sale Transaction, other than as expressly permitted in writing by the Special Master. For the avoidance of doubt, the Sale Procedures Order will not prevent or prohibit contact or communications in the ordinary course of business or consistent with past practice on matters unrelated to the Sale Procedures Order, the Sale Procedures, any Bid or potential bid or any Sale | • For my Advisors and I to effectively oversee the sale process and ensure that all bids are properly and fairly evaluated, I must be authorized to oversee all communication with Potential Bidders. Providing Potential Bidders with a clear and consistent message will be critical to obtaining value-maximizing Bids. <br><br> • It is my strong preference that PDVH and CITGO work cooperatively and constructively with my Advisors and I with respect to communications with Potential Bidders, but, out of an abundance of caution I believe it is prudent |

65

| Summary of Sale Procedures Order and Bidding Procedures[1] | | |
|---|---|---|
| **Term / Provision** | **Description** | **Primary Rationale and Considerations** |
| | Transaction; *provided* that such communications (i) do not involve or relate to colluding in connection with a Bid that has been submitted or may be submitted by the applicable Sale Process Party or a Bid by any Potential Bidder; and (ii) are not intended to frustrate the Marketing Process or the Sale Procedures. | for the Court to channel all communications with Potential Bidders through myself and my Advisors. |
| **Sharing of Information with Potential Bidders** | • Upon giving notice to the applicable Sale Process Party, the Special Master shall be permitted, in his sole discretion, to share any and all information obtained related to the Sale Process Parties, regardless of whether marked "highly confidential" pursuant to the *Special Master Confidentiality Order* [D.I. 291], with any bidder or potential bidder that has entered into a confidentiality arrangement, a form of which will be attached to the Sale Procedures Order; *provided* that the Special Master shall be authorized to make reasonable changes to the extent requested by a Potential Bidder. The Special Master shall exercise reasonable care in providing confidential information to bidders and Potential Bidders and, if applicable, shall use reasonable efforts to consult any Sale Process Party that marks or designates any information as "Confidential" or "Highly Confidential" prior to its disclosure to any Potential Bidder. The Special Master shall use reasonable efforts to consult PDVH and CITGO in connection with sharing competitively sensitive information and, if determined to be appropriate by the Special Master, to establish | • My Advisors and I will need to have the discretion to share information related to CITGO with Potential Bidders in order facilitate their due diligence. I do not believe that permitting PDVH or CITGO to control what information may be shared through designations of information as "confidential" or "highly confidential" will be a workable construct and, accordingly, in the proposed Sale Procedures Order I have proposed a mechanic for sharing such information. As set forth in the order, I will exercise reasonable care and use reasonable efforts to consult with PDVH and CITGO in connection with sharing any competitively sensitive information. I am hopeful that none of these provisions will be necessary, particularly if the CITGO management team continues to cooperate with my process in connection with sharing due diligence information. As set forth above, it is my strong preference that we work together cooperatively and constructively with respect to communications with Potential Bidders, but, out of an abundance of caution, I believe it is prudent for the Court to authorize the sharing of information in my discretion |

| Term / Provision | Description | Primary Rationale and Considerations |
|---|---|---|
| **Summary of Sale Procedures Order and Bidding Procedures[1]** | | |
|  | firewall protections or "clean team" protocols with respect to any Potential Bidder that is a competitor, customer or supplier or under such other circumstances as the Special Master determines to be appropriate. | pursuant to the procedures set forth in the proposed Sale Procedures Order. |
| **Sharing of Information with the United States** | • The Special Master shall be authorized to share with the United States information obtained related to the Sale Process Parties and any bidder or potential bidder that the Special Master determines, in his sole discretion, is reasonably necessary or desirable in connection with the issuance of any regulatory approval or is reasonably necessary or desirable in connection with implementation of the Sale Procedures and any Sale Transaction, including any guidance or license from OFAC, *provided* that the Special Master shall request confidential treatment of information shared with the United States that has been designated as confidential or highly confidential by a Sale Process Party. | • As a result of the regulatory considerations and requirements that impact the Sale Procedures and potential consummation of a Sale Transactions, the Special Master requires authority to share information with regulators (including OFAC) regarding the same. |
| **Judicial Immunity & Exculpation** | • The Special Master is entitled to judicial immunity in performing his duties pursuant to the Sale Procedures Order, including all actions taken to implement the Sale Procedures, and all other orders of the Court. The Special Master's Advisors are entitled to judicial immunity in connection with all actions taken at the direction of, on behalf of, or otherwise in connection with representation of or advising the Special Master. | • Judicial Immunity is customary for special masters and essential for facilitating the retention of my Advisors.<br>• I believe the procedures for enforcing the judicial immunity and exculpation are also appropriate in light of my Court proscribed duties and mandate and the absence of customary identification that my Advisors would receive when advising on a typical transaction. |

CONTAINS REDACTIONS IN ACCORDANCE WITH D.I. 345

| Summary of Sale Procedures Order and Bidding Procedures[1] | | |
|---|---|---|
| Term / Provision | Description | Primary Rationale and Considerations |
| | • No person or entity shall be permitted to pursue any cause of action or commence or prosecute any suit or proceeding against the Special Master or the Advisors, or their respective employees, officers, directors, attorneys, auditors, representatives, agents, successors or assigns, for any reason whatsoever relating to the Crystallex Case, implementation of the Sale Procedures, or in connection with any Sale Transaction, or the performance of the Special Master's and his Advisors' duties pursuant to this Order or any other orders of the Court, or any act or omission by the Special Master or any Advisor in connection with the foregoing. All interested persons and entities, including but not limited to the Sale Process Parties, any purchaser or prospective purchaser of the shares, and all persons acting in concert with them, are hereby enjoined and restrained from pursuing any such cause of action or commencing any such action or proceeding. If any person or entity attempts to pursue any such cause of action or commence any suit or proceeding against the Special Master or any of the Advisors with knowledge of this Order (or continues to pursue or prosecute any cause of action, suit or proceeding after having received notice of this Order), the Court shall issue an order to show cause to such person or entity and a hearing will be scheduled to consider appropriate relief, which may include payment of fees and expenses incurred by the Special Master or any of the Advisors in connection therewith. | |

| Term / Provision | Description | Primary Rationale and Considerations |
|---|---|---|
| | **Summary of Sale Procedures Order and Bidding Procedures[1]** | |
| | To the maximum extent permitted by applicable law, neither the Special Master nor his Advisors nor their respective employees, officers, directors, attorneys, auditors, representatives, agents, successors and assigns will have or incur, and are hereby released and exculpated from, any claim, obligation, suit, judgment, damage, demand, debt, right, cause of action, remedy, loss, and liability for any claim in connection with or arising out of all actions taken to implement the Marketing Process, Sale Procedures, Bidding Procedures, or Sale Transaction, or the performance of the Special Master's and his Advisors' duties pursuant to this Order and all other orders of the Court. | |
| **Payment of Transaction Expenses** | • The Special Master shall be compensated and reimbursed for all Transaction Expenses.<br><br>• The Special Master shall have the discretion to seek from the Court to reallocate payment of any Transaction Expenses if the circumstances require (*e.g.*, if any single Sale Process Party generates an inordinate number of disputes or if a Sale Process Party's position in a dispute is found to be unreasonable). | • The payment of Transaction Expenses complies with the May 2021 Order, which set forth certain procedures for the compensation and reimbursement of expenses by the Sale Process Parties. |
| **Location of PDVH Shares** | • By no later than 30 calendar days after entry of Sale Procedures Order, the Venezuela Parties, including PDVSA, shall inform the Special Master as to the specific and precise physical location of the PDVH | • In its prior pleadings with the Court, PDVSA has stated that it does not know the location of the actual PDVH Shares. The purpose of this provision is to ensure that, when it comes time to sell the PDVH Shares, all parties |

| Summary of Sale Procedures Order and Bidding Procedures[1] | | |
|---|---|---|
| **Term / Provision** | **Description** | **Primary Rationale and Considerations** |
| | Shares held by PDVSA or any other facts relevant for determining the physical location of the PDVH Shares held by PDVSA and the custodian of the shares. If the applicable Venezuela Party is unaware of the location of the PDVH Shares, such party shall inform the Special Master as such in writing. If at any point thereafter the applicable Venezuela Party becomes aware of any change in circumstance regarding the location of the PDVH Shares, then such party shall update the Special Master in writing.<br><br>• If the location of the PDVH Shares cannot be located with reasonable precision or if the Special Master reasonably determines that the custodian of the PDVH Shares is unlikely to cooperate in connection with an order compelling the person or entity to transfer the PDVH Shares in connection with any Sale Transaction, the Special Master shall file a recommendation with the Court in advance of the Sale Hearing regarding the appropriate steps to be taken to ensure that the Successful Bidder is able to actually purchase the applicable PDVH Shares in connection with the applicable Sale Transaction. The Special Master's recommendation may include, if appropriate, an order compelling PDVH to issue new certificates or uncertificated shares to the applicable Successful Bidder and cancel the registration of the shares attached to the books of PDVH. | have the appropriate information and can ensure that an appropriate procedure is put in place for issuing new PDVH Shares, if necessary. |

CONTAINS REDACTIONS IN ACCORDANCE WITH D.I. 345

## V. Recommendation

89.     I believe that the proposed Sale Procedures Order strikes the appropriate balance among the many competing interests in a dynamic and internationally sensitive set of circumstances and provides for the best opportunity for achieving a value-maximizing Sale Transaction.  Accordingly, pursuant to the Court's May 2021 Order and based on the facts and circumstances as I currently understand them, I hereby submit and recommend the proposed Sale Procedures Order to the Court.  I reserve the right to clarify or supplement any statements made in this Report at any time or otherwise respond to any objections or pleadings filed in response to the proposed Sale Procedures Order or this Report.


/s/ Robert B. Pincus
Robert B. Pincus
Special Master for the United States District Court
for the District of Delaware

# **Exhibit A**



**DEPARTMENT OF THE TREASURY**
WASHINGTON, D.C. 20220

**Case No.  VENEZUELA-EO13850-2020-366869-1**

Adam M. Smith
Gibson, Dunn & Crutcher LLP
1050 Connecticut Avenue, N.W.
Washington, D.C. 20036

Dear Mr. Smith:

This letter responds to your request, on behalf of Crystallex International Corporation (Crystallex), dated April 9, 2020, and subsequent related correspondence, to the Office of Foreign Assets Control (OFAC), requesting authorization for all activities necessary and ordinarily incident to organizing and conducting a judicial sale of shares in CITGO Petroleum Corp.'s (CITGO) indirect parent holding company, PDV Holding, Inc. (PDVH), that are held by Petróleos de Venezuela, S.A. (PdVSA).

Absent a license from OFAC, any sale of the PDVH shares is prohibited pursuant to OFAC's Venezuela-related sanctions authorities, including Executive Order (E.O) 13808 of August 24, 2017, "Imposing Additional Sanctions with Respect to the Situation in Venezuela" (as amended by E.O. 13857 of January 25, 2019, "Taking Additional Steps To Address the National Emergency With Respect to Venezuela"); E.O. 13835 of May 21, 2018, "Prohibiting Certain Additional Transactions With Respect to Venezuela" (as amended by E.O. 13857); E.O. 13850 of November 1, 2018, "Blocking Property of Additional Persons Contributing to the Situation in Venezuela" (as amended by E.O. 13857); and E.O. 13884 of August 5, 2019, "Blocking Property of the Government of Venezuela."

OFAC has consulted with the U.S. Department of State regarding this license request, and the State Department has considered the request in light of the current situation in Venezuela.  As explained in the State Department's foreign policy guidance, denying the license at present and continuing the blocking of these shares is particularly important at this time.  After careful consideration, the State Department has determined that authorizing the sale of the PDVH shares at this time would be inconsistent with United States foreign policy interests and therefore recommends that the license request be denied without prejudice to reconsideration in the future should these foreign policy considerations change.  While the State Department advises that the situation is particularly sensitive at this time, the State Department has also noted that the National Assembly's mandate ends in January 2022, when the term of the 2015 National Assembly, Venezuela's last democratically elected body, expires following a 12-month extension.  A request for a specific license for the sale of the PDVH shares is therefore denied without prejudice to reconsideration at a later time if the foreign policy considerations change.  The United States will reassess whether the sale of the PDVH shares is consistent with United States foreign policy, as the situation in Venezuela evolves.  The United States anticipates doing so during the first half of 2022 as warranted by changed circumstances.

**484a**

In reaching a determination to deny the license for the sale at this time, the United States thoroughly reviewed and considered the information and arguments Crystallex provided in written submissions to OFAC on April 9, 2020, April 17, 2020, and May 29, 2020. We summarize below the primary reasons why Crystallex's submissions do not alter our view that a license for the sale of the PDVH shares should be denied at this time.

### 1. Alleged "preferential treatment"

Crystallex claims that the PdVSA 2020 8.5 Percent bondholders, who have a lien in the shares of CITGO's parent, CITGO Holding, are receiving "preferential treatment." The bondholders claimed to be entitled to seek the sale or purchase of their collateral under the terms of their note, and on July 19, 2018, OFAC issued General License (GL) 5 authorizing, with certain exceptions, all transactions related to, the provision of financing for, and other dealings in the 2020 8.5 Percent Bond that would be prohibited by subsection 1(a)(iii) of E.O. 13835. That authorization ended on October 24, 2019, when GL 5 was replaced and superseded by another GL that delayed the effectiveness of the authorization in GL 5. Subsequent GLs have continued to delay the date upon which the action by the bondholders would be authorized,[1] and the current GL 5H issued on September 10, 2021, further delays that date until January 21, 2022.

Accordingly, since October 24, 2019, there has been no authorization in effect permitting holders of the PdVSA 2020 8.5 Percent Bond to take otherwise prohibited actions with respect to the CITGO Holding collateral. And like Crystallex, the bondholders are not authorized to take any such actions at this time, consistent with the State Department's assessment that a forced sale of Venezuela's U.S.-based assets (particularly the CITGO assets) at this time would be inconsistent with U.S. foreign policy interests. OFAC therefore disagrees that the bondholders are receiving preferential treatment.

Crystallex points to FAQ 595, which states that OFAC "would have a favorable licensing policy" toward any "agreement on proposals to restructure or refinance" payments due to the 2020 bondholders. This statement, however, refers to a potential negotiated agreement between the Government of Venezuela and the bondholders to restructure or refinance the debt. Crystallex's license request here is not for a similar negotiated agreement with the Government of Venezuela, but instead for a forced sale—which entails different policy considerations.

### 2. Alleged "reliance"

Crystallex appears to indicate that it had initiated and continued legal actions "in reliance on its understanding" that its proposed sale could be engaged in despite OFAC's Venezuela-related

---

[1] Crystallex states in its submission dated April 17, 2020 that one such subsequent GL (GL 5C) "exacerbates Crystallex's situation while highlighting the Company's unfortunate conclusion concerning its unfair treatment" because it does not "allow Crystallex to benefit from the same authorizations." As explained, however, the purpose and effect of GL 5A and the subsequent GLs, including GL 5C, is to delay the effectiveness of the authorization in GL 5, with the result that neither the bondholders nor Crystallex are authorized to take otherwise prohibited actions at this time.

sanctions authorities. Specifically, Crystallex appears to indicate that it had derived "comfort that the Executive Branch would not stand in the way of" its proposed sale on the basis of "FAQs prior to FAQ 809," "General Licenses," "[t]he Executive Branch's public statements," and the fact that as of April 2020, "[t]he Administration ha[d] not sought to be heard before the Delaware District Court or the Third Circuit Court of Appeals." However, OFAC does not agree that parties can reasonably rely on an assumption that a discretionary license will necessarily be granted for action prohibited by U.S. sanctions, nor even that a license will be continued once initially granted. OFAC's regulations do not require OFAC to issue a license in any circumstances, and they make clear that licenses may be "amended, modified, or revoked at any time." 31 CFR §§ 501.801, 501.803. OFAC's discretionary authority to issue or withhold licenses is essential to the U.S. government's ability to tailor sanctions to evolving foreign policy and national security needs. As the Court has noted, "the OFAC licensing process provides the [appropriate] mechanism through which the Executive Branch can bring to bear the foreign policy and national security interests on which Crystallex's collection efforts might have an impact." *Crystallex Int'l Corp. v. Bolivarian Republic of Venezuela*, No. 17-MC-151-LPS, 2021 WL 129803, at *16 (D. Del. Jan. 14, 2021).

In any event, Crystallex does not clearly specify the particular public statements it claims to have relied upon or the particular actions it claims to have taken in reliance on such statements. Crystallex appears to indicate that it had relied upon "FAQs prior to FAQ 809"[2] and quotes the following portion of "the initial iteration of FAQ 595 [describing] the rationale for General License 5 [concerning the 2020 bondholders]":

> Authorizing Bondholders to enforce rights related to the PdVSA 2020 8.5 percent bond prevents the Maduro regime from using the E.O. to default on its bond obligations without consequence. . . . OFAC issued General License 5, which removed E.O. 13835 as an obstacle to holders of the PdVSA 2020 8.5 percent bond gaining access to their collateral, and keeps sanctions pressure where it belongs — on the Maduro regime. General License 5 continues in effect and remains operative despite OFAC's designation of PdVSA on January 28, 2019.

This iteration of FAQ 595 had no application to Crystallex. The FAQ simply explained the reason at that time for OFAC's issuance of GL 5, a general license that did not authorize Crystallex's proposed sale. And although Crystallex claims that it had "essentially identical rights" as the bondholders, at least part of the reason given in the FAQ — the need to prevent the Maduro regime from using the E.O. to default on its bond obligations without consequence — applied only to the circumstances of the bondholders at that time. Crystallex thus could not have reasonably relied on an FAQ addressing different transactions in a different context from its

---

[2] By contrast, Crystallex characterizes FAQ 809 as a "surprising promulgation" that "change[d] the rules[] with no notice and toward the hopeful end of a multi-year, expensive litigation effort" and "unjustly den[ied] [Crystallex] its rightful property that it acquired through [its litigation]" by "[freezing] longstanding judicial proceedings."

3

own. Nor could Crystallex have reasonably relied on GL 5 itself (or any superseding GL), which did not apply to Crystallex.[3]

Moreover, while this iteration of FAQ 595 was issued on July 19, 2018, OFAC amended FAQ 595 on October 24, 2019, in connection with the issuance of GL 5A. The amended version of FAQ 595 no longer contained the language on which Crystallex claims to rely. Accordingly, FAQ 595 could not have formed the basis for any reasonable reliance by Crystallex with respect to any actions taken prior to July 19, 2018 or after October 24, 2019.

In addition, any assumptions Crystallex may have made about OFAC's future licensing decisions could not ignore the fact that circumstances relating to the situation in Venezuela began to change dramatically in January 2019 when, in the wake of the fraudulent Venezuelan presidential elections, Nicolas Maduro attempted to install himself as president for a second term. Shortly afterwards, Juan Guaidó was sworn in as Interim President. The United States immediately issued public statements officially recognizing Guaidó as the Interim President of Venezuela. After Guaidó assumed office, his administration appointed a new ad hoc board of directors to govern PdVSA's overseas assets, and Guaidó's newly appointed directors then reconstituted, directly or indirectly, the boards of directors of PDVH, CITGO, and CITGO Holding. As the situation in Venezuela has continued to evolve, U.S. foreign policy has also evolved. As explained above, in October 2019, OFAC replaced GL 5 with a new GL delaying the effectiveness of the authorization contained in GL 5, which has continued to be delayed in subsequent GLs. OFAC also modified FAQ 595, removing the language Crystallex cites. To the extent Crystallex continued to rely upon the original version of FAQ 595 and assumed that it (and any U.S. foreign policy reflected therein) would remain unchanged, OFAC considers such reliance to have been unreasonable.

### 3. U.S. court judgments

Crystallex claims that "denying or delaying a Specific License will render the legitimate judicial orders of several federal courts ineffectual." While we disagree with Crystallex's characterization, we are mindful of the Judicial Branch's interest in enforcing its judgments, and we have carefully weighed that consideration in making our licensing decision. At the same time, we have also considered the Executive Branch's foreign policy and national security interests.

---

[3] In its submission dated April 9, 2020, Crystallex states that "General License 14 appears to have allowed [certain] official activity" and then claims that GL 14 was revoked. However, GL 14, which related to official business of the U.S. government, was incorporated into subpart E of the Venezuela Sanctions Regulations, 31 CFR part 591, as 31 CFR § 591.509. Indeed, in its submission dated May 29, 2020, Crystallex acknowledges as follows: "In the Application, we noted that OFAC, on November 22, 2019, revoked General License 14, which previously authorized such dealings. . . . We did not mention in the Application that OFAC on that same day added a general license to the Venezuela Sanctions Regulations that appears to cover much the same ground as General License 14." In light of Crystallex's acknowledgement, we focus our discussion in this section on General License 5.

4

On July 16, 2020, the U.S. government filed a Statement of Interest in the Crystallex litigation before the U.S. District Court for the District of Delaware, explaining the U.S. government's current foreign policy and national security view. After considering that statement, the Court elected to proceed with prefatory steps toward a judicial sale, but the Court made clear that "the OFAC licensing process provides the [appropriate] mechanism through which the Executive Branch can bring to bear the foreign policy and national security interests on which Crystallex's collection efforts might have an impact." *Crystallex*, 2021 WL 129803, at *16. The Court further stated that all parties to the litigation "recognize that (under current law and policy) a specific license will be required from OFAC before a sale of PdVSA's shares of PDVH can close." *Id.* Thus, it appears to us that the Court recognized that the Executive Branch's foreign policy and national security interests, if asserted through the OFAC licensing process, could properly necessitate a delay in effectuating court judgments. Accordingly, OFAC has considered the foreign policy and national security interests in connection with Crystallex's license request, and OFAC's denial of a license for the sale reflects those interests at this time.

### 4. International comity

Crystallex states that granting its request for a specific license would be "consistent with longstanding U.S. government and OFAC practice of avoiding conflicts of laws and taking into consideration the local legal requirements, policy goals, and judicial determinations articulated by the courts and governments of friendly nations." Crystallex also asserts that "OFAC's granting of the requested specific license would be consistent with [a] Canadian court's direct entreaty to the administrative organs of the U.S. government to assist in fully effectuating its judgment." Crystallex further states that not granting its request would result in Crystallex being "unable to make its creditors whole" and therefore "in breach of its obligations under Canadian law," which it claims "would be contrary to core rule of law principles in Canada and would allow the Government of Venezuela to escape Canadian justice."

Crystallex does not specify the provisions of Canadian law that would allegedly be breached by Crystallex in the event OFAC denies its license request. What is clear, however, is that Crystallex's proposed sale is prohibited under U.S. law, unless authorized by an OFAC license. OFAC further disagrees that denying Crystallex's request to sell the PDVH shares will necessarily have the consequences Crystallex predicts, as the denial is without prejudice to reconsideration at a later time if the foreign policy considerations change. As noted above, the United States anticipates that it will reassess whether the sale of the PDVH shares as requested by Crystallex is consistent with U.S. foreign policy as the situation in Venezuela evolves. The foreign policy and national security interests of the United States outweigh the comity concerns expressed by Crystallex at this time.

### 5. Takings Clause

In requesting authorization for a specific license to conduct transactions that would be prohibited by subsection 1(a)(iii) of E.O. 13835, Crystallex warns that "interfering with Crystallex's lien would risk incurring liability for the U.S. Government." In particular, Crystallex asserts that its "judgment lien is a vested property right protected by the Takings Clause of the U.S. Constitution," and it seems to claim support for this argument by seeking to distinguish its

situation (which involves a post-judgment attachment) from the one at issue in *Dames & Moore v. Regan*, 453 U.S. 654 (1981) (which involved a pre-judgment attachment). OFAC notes that, "[f]or any Fifth Amendment takings claim, the complaining party must show it owned a distinct property interest at the time it was allegedly taken." *Cienega Gardens v. United States*, 331 F.3d 1319, 1328 (Fed. Cir. 2003). Since the prohibition on Crystallex's proposed activities under E.O. 13835 entered into effect on May 21, 2018, almost three months before Crystallex was granted its writ of attachment, OFAC does not believe that prohibition could constitute a "taking" under the Fifth Amendment. Moreover, OFAC notes that U.S. sanctions actions imposing full blocking, a far broader restriction than the limited prohibitions contained in E.O. 13835, have not been viewed by courts as "takings" under the Fifth Amendment.[4] In addition, to the extent Crystallex is asserting that a denial of Crystallex's license request would constitute a violation of the Fifth Amendment's Takings Clause, OFAC disagrees. Even assuming that Crystallex's writ constitutes property in which Crystallex has a constitutionally protected interest under the Fifth Amendment, the mere existence of such an interest would not require OFAC to grant a license authorizing prohibited transactions with respect to such property. *See Paradissiotis v. United States*, 304 F. 3d 1271, 1276 (Fed. Cir. 2002) (holding that the denial of plaintiff's request for a license to exercise stock options that were frozen as a result of OFAC sanctions was not a compensable taking).

Accordingly, OFAC does not agree that its denial of Crystallex's requested license with respect to the PDVH shares constitutes a "taking" of property compensable under the Fifth Amendment.

### 6. NAFTA and the New York Convention

Crystallex also claims that "preventing [it] from freely enjoying its property rights," including by "any restrictions placed on[] Crystallex's writ of attachment," would violate the United States' international obligations and would give rise to claims under the North American Free Trade Agreement (NAFTA); that "allowing the PdVSA 2020 8.5 Percent bondholders to continue to enforce their rights to the CITGO shares . . . while restricting the ability of Crystallex from doing the same" would violate NAFTA; and that granting the authorization requested by Crystallex would be "an important and necessary step towards fulfilling" the United States' obligations under the New York Convention on the Recognition and Enforcement of Foreign Arbitral Awards.

The U.S. government assesses Crystallex's argument relating to potential claims under the NAFTA to be relatively weak. Even if Crystallex were to clear certain threshold jurisdictional

---

[4] *See, e.g., 767 Third Ave. Assocs. v. United States*, 48 F.3d 1575, 1581 (Fed. Cir. 1995) (holding that no regulatory taking occurred because plaintiff was "on notice that the government, pursuant to its statutory and constitutional authority, could close a foreign government's offices and freeze its assets"); *Chang v. United States*, 859 F.2d 893, 896 (Fed. Cir. 1988) ("The fact that the plaintiffs were frustrated in making the most beneficial use of their services does not lead to the unavoidable conclusion that the governmental action rises to the level of a taking."); *Zarmach Oil Servs., Inc. v. U.S. Dept. of the Treasury*, 750 F. Supp. 2d 150, 159 (D.D.C. 2010) ("It is well-established that the blocking of assets pursuant to an executive order is not a taking within the meaning of the Fifth Amendment.").

hurdles in asserting NAFTA claims, Crystallex is likely to have difficulty establishing its claims on the merits.

Finally, Crystallex's argument regarding the New York Convention misconstrues the United States' obligations under that Convention. The United States has fulfilled its obligation to recognize and enforce Crystallex's arbitral award, as evidenced by the fact that the U.S. District Court for the District of Columbia issued a judgment confirming the award, which the U.S. Court of Appeals for the D.C. Circuit later upheld.

These arguments therefore do not warrant a different decision on the license request, in light of the foreign policy interests of the United States.

### 7. Effects on Venezuela

Crystallex appears to claim that granting its request for a specific license would assist in "rebuilding, reestablishing, and supporting the rule of law" in Venezuela. In addition, Crystallex asserts that granting its request "would greatly encourage future private sector investment in Venezuela." Crystallex further claims that "the Delaware District Court process could facilitate a sale of PDVH assets without stripping Venezuelan influence over the aspects of CITGO that are actually relevant to the Venezuelan economy" and presents suggested approaches for selling only a portion of PDVH's assets. Crystallex also argues that, even if CITGO were sold as a whole, such a sale "would have significant benefits for the United States and the Venezuelan people," including: (1) "increase[d] third party private sector willingness to do business with CITGO"; (2) benefits to CITGO (including its employees, physical assets, creditors, investors, retirees, pensions), other parties, and the public, and an increase in the "overall strategic value of CITGO to the United States"; and (3) benefits to Venezuela's recovery. With respect to supposed benefits to Venezuela's recovery, Crystallex claims that "[a] sale of PDVH would generate funds for Venezuela." Crystallex states that denying its request for a specific license would "open the door for either unscrupulous investors willing to mortgage Venezuela's future on usurious investments or to competitors of the United States such as China or Russia who are already active in Venezuela and are both less interested in protecting international rule of law and the people of Venezuela, and are looking to undermine U.S. influence in the Americas" and have other deleterious effects.

Crystallex's argument that a forced sale of CITGO at this time to satisfy creditors would have such benefits for the United States or the Venezuelan people is not persuasive. The United States' current foreign policy regarding the ongoing situation in Venezuela includes, among other issues, supporting negotiations with participation from all stakeholders that will lead to credible presidential and parliamentary elections with a view towards a comprehensive negotiated solution to the Venezuelan crisis. As explained in the State Department's foreign policy guidance, denying the license at present and continuing the blocking of these shares is particularly important at this time. The U.S. government believes that such foreign policy considerations outweigh any potential countervailing benefits at this time.

### 8. International debt markets

Crystallex claims that denying its license request "is likely to have an adverse impact on both the international debt markets and the United States standing in those markets." The U.S. government finds this argument unconvincing and, in fact, has already heard from stakeholders and potential future investors who are interested in participating in rebuilding efforts. In any event, the U.S. foreign policy and national security interests associated with the license denial, without prejudice to the right to refile, outweighs any potential adverse impact to international debt markets.

* * *

Accordingly, your request for a specific license to effect the sale of the PDVH shares is denied at this time. In light of this denial, we are not addressing the other aspects of your request at this time, which OFAC will continue to consider under application number VENEZUELA-EO13850-2020-366869-2.

OFAC emphasizes that this determination is made without prejudice to reconsideration of a specific license request to sell the PDVH shares at a later time if the foreign policy considerations change. Negotiations between the unified democratic opposition led by Interim President Guaidó and the Maduro regime regarding the future of Venezuela are currently ongoing, and the National Assembly's mandate ends in January 2022. The United States will reassess whether the sale of the PDVH shares is consistent with United States foreign policy, as the situation in Venezuela evolves. The United States anticipates doing so during the first half of 2022 as warranted by changed circumstances.

If you have any questions about the sanctions programs administered by OFAC, you may refer to the OFAC website at *www.treasury.gov/ofac* or call our office at (202) 622-2480.

Sincerely,

Andrea M. Gacki
Digitally signed by Andrea M. Gacki
Date: 2021.09.10 13:00:08 -04'00'

September 10, 2021

Andrea Gacki                                              Date
Director
Office of Foreign Assets Control

8

**491a**

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| CRYSTALLEX INTERNATIONAL CORP., | : |
| | : |
| Plaintiff, | : |
| | : |
| v. | :    Misc. No. 17-151-LPS |
| | : |
| BOLIVARIAN REPUBLIC OF VENEZUELA, | : |
| | : |
| Defendant. | : |

### ORDER REGARDING SPECIAL MASTER

WHEREAS, on January 14, 2021, the Court issued an opinion and corresponding order (D.I. 234, 235) on several motions brought by Plaintiff Crystallex International Corp. ("Crystallex"), Defendant the Bolivarian Republic of Venezuela ("the Republic"), and Intervenors Petróleos de Venezuela, S.A. ("PDVSA"), PDV Holding, Inc. ("PDVH"), and CITGO Petroleum Corp. ("CITGO") (collectively with Venezuela, PDVSA, and PDVH, the "Venezuela Parties"), in which the Court "set out some of the contours of the sales procedures that it will follow" in conducting a sale of PDVSA's shares of PDVH (D.I. 234 at 34);

WHEREAS, by order dated April 13, 2021 (D.I. 258), the Court appointed Robert B. Pincus as a special master (the "Special Master") in this case "to assist with the sale of PDVSA's shares of PDVH" (the "Sale");

WHEREAS, U.S. persons are governed by certain regulations and, unless authorized pursuant to a specific license issued by the Office of Foreign Assets Control ("OFAC"), may not enforce any lien, judgment, arbitral award, decree, or other order through execution,

garnishment, or other judicial process purporting to transfer or otherwise alter or affect property or interests in blocked property, such as PDVSA's shares of PDVH;

WHEREAS, PDVH and CITGO have submitted a request for guidance or a specific license to OFAC regarding the obligations contemplated herein;

WHEREAS, this Court has previously found "the most reasonable and appropriate course of action, in light of the totality of the circumstances, is to set up the sales procedures and then to follow them to the maximum extent that can be accomplished without a specific license from OFAC" (D.I. 234 at 32-33);

WHEREAS, the Court directed the Parties[1] to work with the Special Master to enable him to submit a proposed order setting out "(a) arrangements for how [the Special Master] will be paid for his time and reimbursed for reasonable expenses incurred in fulfilling his responsibilities, including the retention of necessary professional and other services; (b) any other details required to effectuate the appointment; and (c) a deadline for [the Special Master], after meeting and conferring with the parties and obtaining whatever additional assistance he reasonably needs, to submit a Proposed Sales Procedures Order" (D.I. 258 ¶ 2) (internal citation omitted);

WHEREAS, the Special Master has met and conferred with the Parties and ConocoPhillips[2] and has submitted a Proposed Order Regarding Special Master (D.I. 265-1) ("Proposed Order");

---

[1]   The "Parties" refers to Crystallex and the Venezuela Parties.

[2]   "ConocoPhillips" refers collectively to Phillips Petroleum Company Venezuela Limited and ConocoPhillips Petrozuata B.V.

**493a**

WHEREAS, pursuant to the Court's oral order of May 11, 2021 (D.I. 264), the Parties and ConocoPhillips submitted letter briefs containing their objections and positions with respect to the Proposed Order (*see* D.I. 266-71, 273; *see also* D.I. 274-1 (position of Intervenors Blackrock Financial Management, Inc. and Contrarian Capital Management, L.L.C.); D.I. 276 (same));

WHEREAS, the Court issued a Memorandum Order on May 24, 2021, ruling on the objections to the Proposed Order (D.I. 275);

**NOW THEREFORE, this 27th day of May, 2021, IT IS HEREBY ORDERED that:**

1.　　The appointment of Robert B. Pincus as Special Master is made pursuant to Federal Rule of Civil Procedure 53 ("Rule 53").  The Court finds, based on the extensive consultations with the Special Master to this point (*see, e.g.*, D.I. 260, 265) (describing communications between Special Master and counsel for Parties and ConocoPhillips relating to Proposed Order) and opportunity to file objections, the Parties and ConocoPhillips all agree that the requirements and procedures set out in Rule 53 have been complied with in full.

2.　　***Special Master's Duties.*** The Special Master shall devise a plan for the sale of shares of PDVH as necessary to satisfy the outstanding judgment of Crystallex and the judgment of any other judgment creditor added to the Sale by the Court and/or devise such other transaction as would satisfy such outstanding judgment(s) while maximizing the sale price of any assets to be sold (the "Proposed Sales Procedures Order").  Consistent with these duties, the Special Master shall, among other things, oversee the execution of a protective order to ensure that confidential information provided or exchanged during the course of the Special Master's tenure is properly protected from disclosure that could cause competitive or other harm; work to become knowledgeable about the business operations and assets of CITGO and PDVH; and

**494a**

ascertain the total amounts of the outstanding judgment owed to Crystallex by the Republic of Venezuela and the total amount of the outstanding judgment owed to ConocoPhillips by PDVSA.

       3.    The Special Master shall provide the Parties and ConocoPhillips with a draft of his Proposed Sales Procedures Order in advance of submission to the Court, with reasonable time for the Parties and ConocoPhillips to provide comments and suggestions to the Special Master.

       4.    "[A]fter meeting and conferring with the [P]arties [and ConocoPhillips] and obtaining whatever additional assistance he reasonably needs" (D.I. 258 at 3), the Special Master will submit the Proposed Sales Procedures Order to the Court, the Parties, and ConocoPhillips.  The Proposed Sales Procedures Order shall be submitted no later than sixty (60) days after entry of this Order, unless such date is otherwise extended following a request by the Special Master (upon notice) granted by the Court, and shall be consistent with this Court's January 14, 2021 Order (*see* D.I. 234 at 34-36).

       5.    The Special Master may initially file the Proposed Sales Procedures Order under seal, should he reasonably believe it is necessary to do so in order to protect confidential information, which, if disclosed, could harm any Party or ConocoPhillips.  In that case, the Special Master shall further file a redacted version of the Proposed Sales Procedures Order no later than seven (7) days after filing the sealed original version.

       6.    After the Special Master submits a Proposed Sales Procedures Order, the Parties and ConocoPhillips will have an opportunity to make any objections and other positions known to the Court, as follows (subject to any further order of the Court):

(a) any of the Parties or ConocoPhillips may file objections (in the form of a letter brief not to exceed five pages) no later than *five calendar days* after the Special Master files the Proposed Sales Procedures Order; and

(b) any of the Parties or ConocoPhillips may respond to any letter briefs filed according to paragraph 6(a) by a single letter brief (not to exceed three pages) no later than *two calendar days* after the deadline set out in paragraph 6(a).

7. After considering any objections and letter briefs submitted pursuant to paragraph 6, the Court will adopt a form of the Order (hereinafter, the "Final Sales Procedures Order"), and thereafter the Parties and ConocoPhillips shall meet and confer and submit proposal(s) to the Court regarding steps to be taken by the Special Master with respect to execution of the Final Sales Procedures Order and the timing thereof.

8. ***Communications with the Parties, ConocoPhillips, and the Court.*** The Special Master may communicate *ex parte* with the Court, any Party, any Party's attorneys, ConocoPhillips, and ConocoPhillips' attorneys at the Special Master's discretion as necessary to carry out his duties.

9. ***Provision of Information***. The Venezuela Parties (including their directors, officers, employees, and agents) shall, to the extent available to them, use reasonable efforts to promptly provide the Special Master with any and all non-privileged information and documents (confidential or otherwise) concerning the Venezuela Parties that the Special Master requests in order to permit him to prepare and file the Proposed Sales Procedures Order and otherwise perform his duties as Special Master, including, without limitation, any and all financial information and documents about the Venezuela Parties' businesses (historic, existing, or potentially prospective), creditors, stockholders, directors, officers, employees, and agents.

Without limiting the foregoing, and for the avoidance of doubt, these informational rights of the Special Master extend to include, at a minimum, books and records of the Venezuela Parties (defined as broadly as possible), including electronic mail, and include information on the Venezuela Parties' or their subsidiaries' server(s) or located elsewhere (electronic or otherwise). While the Venezuela Parties are entitled to assert applicable privileges, the furnishing of information pursuant to the Order shall not waive any applicable attorney-client privilege or work product doctrine. As used in this Order, the phrases "information related to the Venezuela Parties," "information concerning the Venezuela Parties," "Venezuela Parties' confidential information," and "communications related to the Venezuela Parties" apply equally to the Venezuela Parties and their subsidiaries, provided, however, that the Special Master shall not share any written information provided to him by the Venezuela Parties that is marked highly confidential with Crystallex, ConocoPhillips, or any other third party.

          10.    ***The Record of the Special Master.*** The Special Master shall provide the Court with a status report under seal on a monthly basis informing the Court of his progress; provided, however, that the Special Master shall not be required to disclose any information that he, in his sole discretion, believes would have a negative impact on the performance of his duties under this Order or adversely affect the Parties or ConocoPhillips. The Special Master shall maintain normal billing records of his time spent on this matter, with reasonably detailed descriptions of his activities and matters worked on. The Special Master shall preserve copies of all materials received from the Parties and ConocoPhillips, and any notes or work product developed by the Special Master, until final resolution of these proceedings (including any and all appeals).

**497a**

11.     ***Judicial Review of the Special Master's Recommendations and
Submissions***.  The Special Master shall reduce any finding, report, recommendation, or plan
(including, but not limited to, the Proposed Sales Procedures Order) to writing and file it with the
Court.  With the exception of the regular status reports that the Special Master will file monthly,
any Party or ConocoPhillips may file an objection to a finding, report, recommendation, or plan
by the Special Master within 14 days of the date when it is submitted to the Court, ***unless the
Court sets a different deadline***.  *See, e.g.*, *supra* ¶ 6; *see also generally* Fed. R. Civ. P. 53(f)(1)
& (2).  The instant Order, in combination with notice that the Special Master shall take care to
provide to the Parties and ConocoPhillips along with the submission of any finding, report,
recommendation, or plan (including, but not limited to, the Proposed Sales Procedure Order),
shall constitute the required notice to the Parties and ConocoPhillips.  The required opportunity
to be heard shall be provided for pursuant to the procedures set out in the instant Order (*see, e.g.*,
*supra* ¶ 6) and any further Order of the Court.  *See generally* Fed. R. Civ. P. 53(f)(1).

12.     The Court reviews factual issues and legal issues *de novo* and procedural
issues for abuse of discretion.  *See* Fed. R. Civ. P. 53(f)(3)-(5).

12.     Following review, the Court may receive evidence, and it may adopt or
affirm, modify, wholly or partly reject or reverse, or resubmit the finding, report,
recommendation, or plan to the Special Master with instructions.  *See* Fed. R. Civ. P. 53(f)(1).

13.     ***Retention of Advisors***.  The Special Master is authorized to and has
retained the law firms of (i) Potter Anderson & Corroon LLP as Delaware counsel, (ii) Jenner &
Block LLP as OFAC counsel, and (iii) Weil, Gotshal & Manges LLP as transaction counsel (the
law firms collectively, "Counsel") to represent him in his role as Special Master and to assist him
in the performance of his duties as Special Master.  The Special Master is also authorized to

7

**498a**

retain one or more additional law firms and consultants or advisors, including financial advisors and other professionals (together, "Advisors"), as the Special Master, after consultation with the Parties and ConocoPhillips, deems appropriate for purposes of assisting him in performing his duties as Special Master. The Special Master will consult with the Parties and ConocoPhillips and solicit their input prior to hiring Advisors. The Special Master is authorized to enter into any agreements with such Advisors on terms that he, after consultation with the Parties and ConocoPhillips, believes are appropriate. The Court shall have the authority to rescind retention of Advisors or Counsel, or require modification of their retention, scope of work, and compensation.

14. ***Compensation of the Special Master***. The Special Master shall be compensated at his usual rate of $950 per hour and shall also be reimbursed for reasonable travel and other expenses incurred in the performance of his duties. Crystallex, ConocoPhillips, and the Venezuela Parties shall, upon approval by the Court, bear the cost of the Special Master and his Advisors' compensation equally, with each contributing one-third. One or more of the Venezuela Parties shall bear the cost for the Venezuela Parties' collective one-third share; however, in no event shall the Venezuela Parties' efforts to coordinate and cooperate amongst themselves be considered good cause for any delay in payment.

15. The Special Master shall incur only such fees and expenses as may be reasonably necessary to fulfill his duties under this Order, or such other Orders as the Court may issue in this proceeding. Unless authorized by a subsequent order of this Court, and with leave for the Special Master to seek additional funding as may be necessary, the fees and expenses of the Special Master, Counsel, and Advisors in connection with submitting to the Court the Proposed Sales Procedures Order shall not exceed $2 million in the aggregate.

**499a**

16.     Any payments made by Crystallex, the Venezuela Parties, and ConocoPhillips shall be reimbursed out of the first proceeds of any sale of shares of PDVH, notwithstanding any claim or attachment by any creditor of any of the Venezuela Parties.

17.     The Special Master shall submit to the Court an itemized statement of fees and expenses on a monthly basis (each an "Itemized Statement"), which the Court will inspect for regularity and reasonableness.  The fees of any Counsel or Advisors retained to assist the Special Master in carrying out his duties shall be calculated based on the rates charged by such Counsel or Advisor to other clients of their firms.

18.     If the Court determines, after considering any objections or comments from the Parties or ConocoPhillips, that the Itemized Statement is regular and reasonable, Crystallex, the Venezuela Parties, and ConocoPhillips shall remit to the Special Master their share of any amount the Court determines is regular and reasonable within thirty (30) calendar days of such determination by the Court.

19.     ***Cooperation of the Parties and ConocoPhillips***.  All Parties and ConocoPhillips, including their directors, officers, employees, consultants, and agents, shall reasonably cooperate with the Special Master in the performance of his duties under this Order. Subject to the other provisions of this Order, the Parties and ConocoPhillips will, to the extent available to them and to the extent it is required, make available to the Special Master any and all facilities and all files, databases, and documents that are necessary to fulfill the Special Master's functions under this Order, subject to confidentiality restrictions.

20.     ***Arm of the Court.***  The Court finds that the Special Master, in effectuating his Court-appointed duties, is acting pursuant to Federal Rule of Civil Procedure 53 and, thus, as an arm of the Court.

**500a**

21. ***Judicial Immunity***. The Special Master is entitled to judicial immunity in performing his duties as authorized by the orders of this Court. The Special Master's Counsel and Advisors are entitled to judicial immunity in performing services at the direction of the Special Master within the scope of this Order or a Court-approved engagement.

22. ***Fiduciary Duties***. The Special Master, as an appointee of the Court to undertake the duties hereunder, owes duties to the Court and does not owe fiduciary or other duties to any of the Parties, or to creditors of any Parties.

23. ***Parties and ConocoPhillips' Rights***. None of (1) the entry of this Order, (2) the participation by any Party or ConocoPhillips in its drafting, (3) the payment of the Special Master's fees and expenses, and/or (4) the process of developing the Proposed Sales Procedures Order, shall be a waiver of any rights or arguments with respect to the writ of attachment or the sales process, including any appellate rights or arguments. Specifically, the aforementioned actions shall not waive or otherwise affect the Venezuela Parties' appeal regarding this Court's January 14, 2021 Order, including, but not limited to, the current appeal pending before the United States Court of Appeals for the Third Circuit. Moreover, all Parties and ConocoPhillips retain their rights, if any, to seek appellate review arising from this Order, the Final Sales Procedures Order, any other order associated with the matters contemplated herein, and any ultimate order of sale, notwithstanding the entry of this Order or the aforementioned participation.

May 27, 2021
Wilmington, Delaware

HONORABLE LEONARD P. STARK
UNITED STATES DISTRICT JUDGE

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| CRYSTALLEX INTERNATIONAL CORP., | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | Misc. No. 17-151-LPS |
| | : | |
| BOLIVARIAN REPUBLIC OF VENEZUELA, | : | |
| | : | |
| Defendant. | : | |

### MEMORANDUM ORDER

At Wilmington, this **11th** day of **April, 2023**:

The Venezuela Parties[1] moved to disqualify the Special Master (D.I. 509), relying on 28 U.S.C. § 455, Canons 2 and 3 of the Code of Conduct for United States Judges, and the Due Process Clause of the Fifth Amendment to the United States Constitution, based on his *ex parte* communications with OFAC on January 12, 2023[2] and based on his purported "advocacy" to the United States Government.  The Court considered the parties' respective briefs and related filings and heard oral argument on the motion on March 30, 2023.  At the conclusion of the hearing, the Court denied the motion.  (D.I. 538)  The Court's reasoning, which it endeavored to

---

[1] Capitalized terms that are not defined herein are defined in the Sale Procedures Order (D.I. 481).

[2] The Venezuela Parties had, on Monday, January 9, 2023, moved for an order directing the Special Master to permit counsel for the Venezuela Parties to attend the Thursday, January 12, 2023 meeting.  (D.I. 499)  On January 10, 2023, the Court issued an expedited briefing schedule.  (D.I. 500)  On January 11, the Court denied the motion, based on considerations including untimeliness and that the *ex parte* interactions challenged by the Venezuela Parties were explicitly contemplated and permitted by the Sale Procedures Order.  (*See* D.I. 506)

1

Case 1:17-mc-00151-LPS   Document 445-24   Filed 04/22/23   Page 2 of 3 PageID #: 13909

explain from the bench (*see* D.I. 542 at 103-21), and all of which is incorporated herein by reference, is essentially as follows:

> . . . [A]s all parties recognize in their extensive briefing, the motion is largely a rehash of the Venezuela parties' motion to be included in the special master's January 12th meeting with OFAC, a motion I denied . . . . I will refer to that [meeting] as the OFAC meeting or January 12th meeting, even though we learned today that OFAC was apparently not present at the meeting.
>
> My denial of the motion for disqualification today is based on, essentially, the same reasoning that I gave in denying the meeting-related motion, but I do want to expound on that reasoning. The first basis for denying the motion is that the burden to prevail on it is on the moving party[, which must] . . . show bias or some other reason for disqualification, and it is a substantial burden, and the Venezuela parties simply have not met it.[3] There is no evidence before the Court that the special master engaged in advocacy in the OFAC meeting. There's no evidence, in particular, that he advocated for a change in U.S. foreign policy or advocated for Crystallex to be granted a license.
>
> So one, but not the sole, ground on which I'm denying the motion is the failure of proof by the Venezuela parties. In my mind, that is a denial on the merits, and I will have a little more to say on the merits, but I now want to say something about some of the procedural bases on which I'm denying the motion as well.
>
> The first one is that [the] motion to disqualify, in my view, is untimely. This is a basis to deny the motion on all the grounds on which it is asserted; that is, section 455(a), [s]ection 455(b), Canons 2 and 3 of the Code of Judicial Conduct, and the due process clause of the Fifth Amendment.
>
> I don't think it's disputed that there is a timeliness requirement for filing such a motion. The Third Circuit said as much in . . . Kensington.[4] Parties seeking disqualification [pursuant to] Section 455(a) should do so in a timely manner. And then in a case called Stone [H]e[d]ge Properties, the Third Circuit also noted that there is a timeliness requirement for a disqualification motion under section 455(b).[5]

---

[3] *See, e.g.*, *Schweiker v. McClure*, 456 U.S. 188, 196 (1982) ("[T]he burden of establishing a disqualifying interest rests on the party making the assertion."); *see also United States v. Microsoft Corp.*, 253 F.3d 34, 108 (D.C. Cir. 2001) ("Disqualification is never taken lightly. In the wrong hands, a disqualification motion is a procedural weapon to harass opponents and delay proceedings.").

[4] *In re Kensington Int'l Ltd.*, 368 F.3d 289, 312 (3d Cir. 2004).

[5] *Stone Hedge Props. v. Phoenix Cap. Corp.*, 71 F. App'x 138, 141 (3d Cir. 2003).

2

**503a**

Here the motion is untimely because the grounds for it were known to the moving parties for at least many months prior to the filing of their motion. A good summary of the relevant timeline showing that all the parties have known since approximately May of 2021 that the special master had engaged OFAC counsel and was in ex parte communication with OFAC is set out in Crystallex's response to the motion, DI 513 at pages 3 to 5. The ex parte meetings, including what the Venezuela parties now refer to as advocacy, to the extent those are two different grounds for the motion, ex parte meetings and advocacy, both of these things, as properly understood, were contemplated throughout the process of negotiating and litigating the sales procedures order, which was adopted in October 2022. And this gave rise to the notice, actual notice, to the moving parties that the concerns they belatedly raised could and should have been raised much sooner.

So for example, the special master met with OFAC ex parte three times in the summer of 2021. There's support for that at DI 348 paragraphs 39 and 40. On November 8, 2021, we had . . . a hearing that was longer than today's hearing, and among other things we discussed [was] that the special master would communicate with OFAC ex parte, as he previously had done. There was no reference to potential disqualification of the special master or grounds for seeking his disqualification, even though also on the agenda that day was a motion to disqualify one of the advisors to the special master. The transcript of . . . that whole proceeding . . . is at DI 409.

In my March 2022 opinion, DI 443 particularly at page 17, I noted that the sale procedure[s] order I would adopt would include a six-month window and during the six-month window, the special master w[ould] be directed to use his best efforts to obtain guidance from OFAC, making no mention that such meetings would be anything other than ex parte, as all such meetings up to that point had been.

I then entered the sale procedure[s] order [i]n October 2022 and expressly contemplated [that] the special master [would] proactively engag[e] with OFAC and included that six-month window. "Within six months" – I'm adding some words to the quote – "he shall solicit and attempt to gain clarity and guidance from OFAC . . . of its support for or not opposition to the launch of the marketing process." You can see these provisions at DI 481 . . . paragraphs 3 and 4.[6]

---

[6] The full quote (D.I. 481 ¶ 3) reads, "Within the period of six (6) months after the date of this Order (the 'Six-Month Window'), the Special Master and his Advisors shall solicit and attempt to gain clarity or guidance from the United States Department of the Treasury's Office of Foreign Assets Control ('OFAC') of its support for (or non-opposition to), the launch of the Marketing Process by the Special Master, the viability of the Marketing Process, and any additional feedback or guidance that the Special Master believes will more likely result in a value-maximizing Sale Transaction."

In the status report of October 4, 2022, the special master confirmed he d[id] not intend to include the Venezuela parties at such a meeting. That's DI 480 at [2], note [2]. There's no indication anywhere in the sale procedure[s] order that the special master's communications with OFAC needed to include any other parties, and there was no reason for any sales process party to believe that they would be involved or invited to attend the meeting.

Let me say something about advocacy. I think when the special master used this word in this context, . . . he meant, as his counsel explained today, that he conveyed to OFAC his view that in order to conduct a value-maximizing transaction, which in his view is in the interest of all parties, he, the special master, and ultimately the Court[,] needs clarity from the U.S. government as to whether it will or will not or may exercise its sole authority at the end of the process to grant a specific license, a license which will be required under the current sanctions regime before a sale transaction can be consummated. That's what I think he meant by "advocacy."

I don't think "advocacy" is really the right word for that, but whatever word he used, the moving parties have not proven that it was materially different than the types of things the special master did at the earlier ex parte meetings with OFAC, nor have the moving parties persuaded me that there's anything wrong with what the special master did, whether we call it advocacy or something else. Which, by the way, everything he did, he did at my express direction. I think it's important to keep in mind the context here.

As Crystallex emphasized in argument today, while we do have certain views of the United States government on what's going on in this process, they're somewhat outdated, and they're expressly time bound. So in July 2020,[7] we received the statement of interest on behalf of the United States government stating a preference that the Court halt the prefatory steps it was taking towards the sale. As is entirely understandable and reasonable, that position was the position of the United States government, quote, at that time. It may well still be the position of the United States government, but in my view, there's absolutely nothing improper about inquiring as to whether it's still their view. It's not advocacy. There's nothing improper about it.

Similarly, the denial without prejudice that Crystallex . . . [received] for a specific license was based on, as it had to be, circumstances at that time, and I believe the letter expressly notes that it's a denial without prejudice to ask again . . . .[8]

---

[7] *See* D.I. 212 at 9.

[8] D.I. 346 Ex. 1 at 5 ("[T]he denial is without prejudice to reconsideration at a later time if the foreign policy considerations change. As noted above, the United States anticipates that it will reassess whether the sale of the PDVH shares as requested by Crystallex is consistent with U.S. foreign policy as the situation in Venezuela evolves.").

The government's position could change at any time, and, very importantly, . . . I entirely respect and understand that unless the current sanctions regime is changed, it will be for the executive branch and only the executive branch to ultimately decide whether to grant the license or licenses necessary for a sales transaction to be completed and for the Court's judgment to eventually be enforced. That is up to them. Nothing a special master says or anything I say or do will change that. And I think everything that the special master does or says or has done or said has to be understood in that context.

. . .

So that was a lengthy side note on what are we talking about when we say "advocacy," but I still am trying to articulate why I think the motion to disqualify the special master was untimely. And the first point for that is I do think everything that occurred since at least May of 2021 is relevant to understanding the tim[eliness] [of the disqualification motion].

But I now want to say in the alternative, [that] if you wipe all of that away and only look at what happened from December 28, 2022,[9] to the filing of the motion in front of me today on January 23, 2023,[10] . . . I still think the motion, as an alternative basis for my ruling, is untimely and sufficiently untimely that it is denied on that basis as well. I do view the facts of what happened in late December and early January of this year as, essentially, undisputed at this point. By December 28th of last year, the Venezuela parties knew that the special master would meet with OFAC sometime in January and knew that the special master had not coordinated with them, [or] asked about their schedule, to figure out what day in January they should meet.

[The special master] . . . didn't even contact them about setting up the meeting with OFAC, and so by December 28th, particularly given the pattern of the special master's meetings with OFAC being ex parte and the sale procedures order not doing anything to change that, I think by December 28th, the Venezuela parties had actual knowledge that there would be a meeting in January and it would be ex parte between the special master and [OFAC]. If the Venezuela parties really believed that that was going to be grounds, ultimately, for disqualification of the special

---

[9] *See* D.I. 495 at 2 (Special Master's Monthly Report, filed December 28, 2022, stating that Special Master "[c]oordinated regarding a meeting with representatives of the United States Department of the Treasury and the United States Department of Justice to take place in January" and "[m]et with [his] Advisors regarding outreach to and negotiations with OFAC").

[10] The motion is timestamped as having been filed on Friday, January 20, 2023. However, as it was filed after 5:00 p.m. that day, it is not considered to have been filed until Monday, January 23, 2023, pursuant to this District's Revised Administrative Procedures Governing Filing and Service by Electronic Means § (F).

master, a special master on whom, as we've heard today, they [have] spent a lot of money on and I, of course, [have] spent a lot of time giving assignments to and hav[e] vested my authority in, if they really thought that was going to be meritorious grounds for disqualifying the special master, I think that's an emergency that requires contacting the Court or doing your level best to contact the Court within a day, two days maybe, three days at most.

I'm not saying that you necessarily have to have fully coordinated amongst . . . yourselves and have written a nice brief, but if you think you're in good faith sitting on an issue that could mandatorily require me to disqualify the special master, I don't think you can wait from December 28th until January 9th without even contacting the Court and giving it a hint that there is this kind of emergency.

Of course, at that point [December 28th], January was undefined.  There was no specific date, . . . so [January] could have meant . . . maybe January 3rd.  I just don't think you can sit on that kind of an issue for that many days without even contacting the Court.

Time went on.  On December 30th, the special master let the Venezuela parties know a meeting was scheduled for January 12th specifically.[11]  Again, they knew or absolutely should have known, based on the pattern and practice and sale procedures order, that that meeting would be ex parte, and that was expressly confirmed on January 3rd,[12] and it was also on January 3rd, evidently, that the first use of the word "advocate" came up, although I think that [it] should have been understood from at least December 28th, if not well before that.

Anyway, even if – and I don't think this is the best way to see it – even if the clock started ticking only on January 3rd, you can't wait from January 3rd until January 9th to contact the Court if you want to seek relief that becomes moot on January 11th or the morning of January 12th, particularly when the stakes are this high[,] . . . this much money has been spent on the special master, [and] this much litigation has gone into directing the special master [about] what to do.

At best for the Venezuela parties, they knew a meeting was scheduled to occur . . . for 13 days and they let 10 of those days lapse before contacting the Court or seeking any relief.  They took up 10 of 13 days, which by my calculation is 77 percent of the potential time I had to hear about the dispute, get briefing on it, review the briefing, analyze the issue, make a decision, and articulate the decision.

I recognize there's not a lot of case law, if any, that says waiting a matter of days makes a motion to disqualify untimely, but I do think the circumstances here are, perhaps, unique and extreme enough that the pace at which the Venezuela parties

---

[11] D.I. 516 Ex. 1 at 2-3.

[12] D.I. 516 ¶¶ 9-10.

moved, even if I don't start the clock until December 28th, was simply too slow, and I would say substantially too slow. I certainly don't believe that the Venezuela parties moved as swiftly as was reasonably practical. And I do think in this context, the delay was substantial, as the Third Circuit cases require[,] for all the reasons I've just explained.

And I also have reluctantly concluded that the delay was strategic; that is, I think the way the Venezuela parties have handled the issues relating to the OFAC meeting, the relief that they've sought, first with respect to the meeting itself and now to disqualify the special master, I do believe it has . . . at least a substantial element of being tactical and designed with at least a partial goal of further delaying these proceedings.

As [Crystallex's counsel] observed[,] . . . the argument that after the meeting the special master must mandatorily be disqualified because he is in possession of some otherwise undisclosed information, factual information on a disputed issue, is at best . . . hinted at in the briefing on the first motion. There's no explicit reference to Section 455(b)(1), which is one of the significant bases for the disqualification motion.

And I think no persuasive basis has been given for why the moving parties did not make a 455(b)(1) argument in their efforts to modify the meeting parameters, which leads me, again, reluctantly, to the conclusion that at least part of their motivation was to hold an argument in reserve to throw at the Court weeks after the meeting as a potential basis to compel the Court to disqualify [the] special master.

And it probably goes without saying, but if I disqualify the special master, it will set back and further delay these already delayed proceedings, perhaps by quite a lot, and . . . it may also lead and it may also have led, had I been persuaded to do that, to an argument that I should be disqualified. And while I'm confident other judges could effectively, of course, preside over these actions, I have . . . years of experience invested in [them] now, and it would no doubt delay things substantially if we needed to [reassign] these matter to another judge.

So I think that all of that, that potential to really substantially slow down these proceedings even further by going after the special master, [and] potentially asking to remove me, was at least part of what was going on in . . . the . . . duly delayed timing of these motions.

All of the reasons that the motion directed to the meeting was untimely apply equally, if not more so, to the motion to disqualify, which, of course, was not filed until January 23rd, after the [OFAC] meeting [had occurred]. It is, at least . . . as untimely as the motion[] [regarding the] meeting itself. That's all I ha[ve] to say about timeliness.

As a further reason for denying . . . the motion to disqualify, I do believe that the bases on which the Venezuela parties seek disqualification of the special master are waived. Really, the same analysis as to the timeliness [applies here]. Because the moving parties have no evidence that the ex parte meeting on January 12th was materially different than all of the prior meetings[,] given the course of how we got to January 12th, I conclude that the Venezuela parties' long-time acquiescence in the special master's ex parte engagement with OFAC, which was materially similar to what he had done repeatedly before, . . . also constitutes a waiver of their right to seek disqualification of the special master based on that meeting.[13]

Further, just a little bit more on why the motion fails on the merits. If the timing . . . and the waiver are not enough, I find that as, I've already said, there's no[t] sufficient evidence to grant the motion. Let me add to that. Specifically under 455(a), I find the special master's and my impartiality cannot be reasonably questioned. A reasonable person with knowledge of all the facts would not conclude that his or my impartiality might be reasonably questioned. The Court has authorized the ex parte meetings[,] which the law permits me to do. The special master's opening brief opposing this motion [D.I. 512] at pages 9 to 11 and the letter filed by ConocoPhillips, DI 522 at pages 3 to 4, set out how Federal Rule of Civil Procedure 53 and various cases applying that rule approve[d] of judges authorizing ex parte communications by a special master with the Court or a party. That's the express language of Rule 53,[14] and that language has been – as explained in those filings and in the cases cited[ –] . . . interpreted to include the Court's ability to authorize ex parte communications with third parties.

I am persuaded that these authorities make my order lawful and that the challenging facts and circumstances I am confronting in this case make my order reasonable and necessary. There is nothing improper or anything a reasonable person would think improper in the special master assisting the Court in its efforts to enforce judgments that have been entered and affirmed, and no reasonable person would think that there is anything improper or giving rise to a reasonable basis to question impartiality in using the special master in this way and in him following my direction to do so.

In addition to Rule 53, the Court does have . . . inherent power to enforce its own judgment[s] and to issue orders as necessary to make its judgments effective. That

---

[13] *See In re Kensington Int'l Ltd.*, 353 F.3d 211, 220-21 (3d Cir. 2003) (explaining that disqualification under 28 U.S.C. § 455(a) "may be waived by the parties" although "the grounds for disqualification under § 455(b)(1) generally cannot be waived").

[14] *See* Fed. R. Civ. P. 53(b)(2)(B) (providing that order appointing special master must state "the circumstances, if any, in which the master may communicate ex parte with the court or a party").

proposition is supported in many places, but among others, in the Peacock decision of the Supreme Court[,[15]] 516 U.S. at 356.

As for the 455(b) grounds, the special master does not, nor do I, have any personal knowledge of disputed evidentiary facts concerning the proceeding, which is what must be shown and has not been shown for disqualification under 455(b).

There is not and will not be any dispute as to what OFAC's position is. We're not going to litigate that. OFAC will tell us its position or it won't tell us its position, and we will all accept that [a]s their position or [that] they're not going to tell us what their position is. . . . It's not a factual dispute over an evidentiary fact concerning this proceeding that the rule is concerned with.

So for all of those reasons, my decision is to deny the motion to disqualify.

 

 

_____
HONORABLE LEONARD P. STARK
UNITED STATES DISTRICT COURT

---

[15] *Peacock v. Thomas*, 516 U.S. 349, 356 (1996).

EXHIBIT C

No. 23-1687

---

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE THIRD CIRCUIT

---

IN RE BOLIVARIAN REPUBLIC OF VENEZUELA;
PETRÓLEOS DE VENEZUELA, S.A.; CITGO PETROLEUM
CORPORATION; and PDV HOLDING, INC.,

*Petitioners.*

---

**Petition for a Writ of Mandamus to the United States District Court for
the District of Delaware**

---

## MOTION FOR A STAY PENDING RESOLUTION OF
## THE PETITION FOR A WRIT OF MANDAMUS

---

Donald B. Verrilli, Jr.
Elaine J. Goldenberg
Ginger D. Anders
Brendan B. Gants
MUNGER, TOLLES & OLSON LLP
601 Massachusetts Ave. NW
Suite 500E
Washington, DC 20001
(202) 220-1100

*Counsel for Bolivarian Republic of
Venezuela*

Hashim M. Mooppan
 *Counsel of Record*
Gregory M. Shumaker
Brinton Lucas
JONES DAY
51 Louisiana Ave. NW
Washington, DC 20001
(202) 879-3939
hmmooppan@jonesday.com

*Counsel for CITGO Petroleum
Corporation and PDV Holding, Inc.*

(additional counsel listed on inside cover)

Joseph D. Pizzurro
Kevin A. Meehan
Juan O. Perla
CURTIS, MALLET-PREVOST,
COLT & MOSLE LLP
101 Park Ave.
New York, NY  10178
(212) 696-6000

*Counsel for Petróleos de Venezuela, S.A.*

Nathan P. Eimer
Daniel D. Birk
Gregory M. Schweizer
Emily Sullivan
EIMER STAHL LLP
224 South Michigan Ave., Suite 1100
Chicago, IL  60605
(312) 660-7600

Michael J. Gottlieb
Samuel G. Hall
WILKIE FARR & GALLAGHER LLP
1875 K St. NW
Washington, DC  20006
(202) 303-1000

*Counsel for CITGO Petroleum Corporation and PDV Holding, Inc.*

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1 and Third Circuit L.A.R. 26.1, Petitioners Petróleos de Venezuela, S.A. (PDVSA), PDV Holding, Inc. (PDVH), and CITGO Petroleum Corporation (CITGO) hereby disclose as follows:

PDVSA is a Venezuelan corporation that is wholly owned by the Venezuelan government, Petitioner Bolivarian Republic of Venezuela (the Republic). PDVH is a wholly owned subsidiary of PDVSA. CITGO is a wholly owned subsidiary of CITGO Holding, Inc., which is a wholly owned subsidiary of PDVH.

# TABLE OF CONTENTS

**Page**

CORPORATE DISCLOSURE STATEMENT ......................................................... i

TABLE OF AUTHORITIES ..................................................................... iii

INTRODUCTION .................................................................................. 1

BACKGROUND .................................................................................. 4

ARGUMENT ..................................................................................... 8

I.    THE VPS HAVE AT LEAST A REASONABLE CHANCE
      OF OBTAINING MANDAMUS RELIEF ....................................... 9

      A.   The Special Master's *Ex Parte* Advocacy Requires
           Disqualification .............................................................. 9

      B.   Mandamus Relief Is Warranted ............................................ 18

II.   THE EQUITIES STRONGLY FAVOR A STAY ........................... 20

CONCLUSION ................................................................................. 22

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Abdulrahman v. Ashcroft*,
330 F.3d 587 (3d Cir. 2003) ...............................................................10

*Burge v. Fid. Bond & Mortg. Co.*,
648 A.2d 414 (Del. 1994) ....................................................................21

*Cheney v. U.S. Dist. Ct.*,
542 U.S. 367 (2004) .........................................................................9, 19

*Crystallex Int'l Corp. v. Bolivarian Republic of Venezuela*,
24 F.4th 242 (3d Cir. 2022) ...........................................................1, 4, 5

*Crystallex Int'l Corp. v. Bolivarian Republic of Venezuela*,
932 F.3d 126 (3d Cir. 2019) ...................................................................4

*Dietz v. Bouldin*,
579 U.S. 40 (2016) ...............................................................................14

*Edgar v. K.L.*,
93 F.3d 256 (7th Cir. 1996) ............................................................17, 18

*In re Al-Nashiri*,
921 F.3d 224 (D.C. Cir. 2019) .............................................................19

*In re Brooks*,
383 F.3d 1036 (D.C. Cir. 2004) .......................................................9, 20

*In re Citizens Bank, N.A.*,
15 F.4th 607 (3d Cir. 2021) ...........................................................*passim*

*In re Kensington Int'l Ltd.*,
368 F.3d 289 (3d Cir. 2004) ..........................................................*passim*

*In re School Asbestos Litig.*,
977 F.2d 764 (3d Cir. 1992) ...........................................................12, 19

*Price Bros. Co. v. Phila. Gear Corp.*,
629 F.2d 444 (6th Cir. 1980) ..........................................................14, 17

*Rosen v. Sugarman*,
357 F.2d 794 (2d Cir. 1966) ................................................................19

**STATUTES**

28 U.S.C. § 455 ................................................................................*passim*

28 U.S.C. § 1291 ......................................................................................5

**OTHER AUTHORITIES**

31 C.F.R. § 591.407 ................................................................................4

Fed. R. App. P. 8 ....................................................................................8

Fed. R. Civ. P. 53 ...............................................................................9, 14

Fed. R. Civ. P. 69 ....................................................................................5

U.S. Dep't of Treasury, *OFAC FAQs: General Questions, FAQ No. 809*
    (Dec. 9, 2019) ...............................................................................5, 12

## INTRODUCTION

This motion seeks to stay a special master's ongoing participation in district court proceedings pending this Court's resolution of a pending mandamus petition to disqualify him.  In the underlying case, Crystallex International Corporation seeks to execute on a judgment against the Republic through a forced sale of the shares of PDVH.  Those shares are wholly owned by PDVSA, Venezuela's state oil company, and are the means through which the Republic indirectly owns CITGO.  *See Crystallex Int'l Corp. v. Bolivarian Republic of Venezuela*, 24 F.4th 242, 246-47 (3d Cir. 2022) (*Crystallex II*).

The shares, however, are blocked property under regulatory sanctions imposed by the Executive Branch to safeguard the shares for the benefit of the Venezuelan people until the Republic is able to hold free and fair elections.  *See id.* at 247-48.  Thus, pursuant to Executive Orders and regulations issued by the U.S. Treasury Department's Office of Foreign Assets Control (OFAC), an OFAC license is required to attach, execute upon, or transfer the shares.  *Id.*  Crystallex obtained an attachment before these restrictions took effect, but has been denied a license to conduct or consummate an execution sale at this time.  *Id.* at 247-48 & n.3.

Despite OFAC's regulations that expressly require a license to sell the PDVH shares, and official guidance that makes clear this requirement extends to preparing for or conducting a contingent auction, the district court has held that it *can* launch

a sale process to market the shares, conduct a public auction, and select a winning bidder so long as the sale does not close without a license.  That court, however, has *not* resolved whether it *should* do so now in light of the potential chilling effect of OFAC pronouncements on the bidding process.  To resolve this hotly disputed question, the court directed a special master first to "attempt to gain clarity or guidance" from OFAC regarding "its support for (or non-opposition to)[] the launch" and then to provide a recommendation to the court "as to whether (and when)" the sale process should be launched.  App. 267a.

Yet rather than simply solicit OFAC's views to prepare a neutral recommendation for the district court, the special master arranged for and participated in an *ex parte* meeting, in his own words, not only "to solicit OFAC's unencumbered views on the sale process," but also to tell the Executive Branch "why OFAC cooperation with the Court's order is appropriate and necessary."  App. 237a. In urging OFAC's "cooperation" with the sale process order, the special master necessarily advocated that the Executive Branch abandon its regulatory guidance that even a contingent auction cannot proceed without a license.  As soon as the Republic, PDVSA, PDVH, and CITGO—collectively, the Venezuela Parties (VPs)—learned of the special master's plans, they objected to his lobbying the Executive Branch and asked to attend the meeting to have a record of what was said. But the special master refused because—again, in his own words—the VPs' "mere

presence" would "chill discussion" and "impair [his] efforts," as his meeting would have an "advocacy component[]" and the VPs, who want to preserve the protection afforded to the PDVH shares by the Executive Branch, "have a different agenda." App. 166a, 237a. The district court nevertheless denied the VPs' motion to attend the meeting, App. 218a-20a, and subsequent motion to disqualify the special master under 28 U.S.C. § 455, App. 104a-23a, 502a-10a.

As explained in detail in the accompanying petition, incorporated by reference, the special master's conduct warrants a writ of mandamus ordering his disqualification. Pet. 13-31. And most immediately, while that petition is pending, this Court should stay the special master's participation in the district court proceedings, including the decision whether to launch the sale process without an OFAC license and the implementation of that process if it is initiated. Absent a stay, both the VPs and public confidence in the courts will be irreparably injured by the compromised special master's participation in those proceedings. Importantly, the first materialization of those harms is imminent—the special master's recommendation, which will be based on, and tainted by, his *ex parte* meeting, is currently due on April 30, 2023. App. 38a. Crystallex, by contrast, will suffer no cognizable injury from any delay to the sale process, as post-judgment interest accrues and the shares remain attached by the court and their sale blocked by OFAC. A stay is warranted. *See In re Citizens Bank, N.A.*, 15 F.4th 607, 622 (3d Cir. 2021).

## BACKGROUND

**1.** In 2016, Crystallex obtained a $1.4 billion judgment (including interest) against the Republic in the D.C. District Court based on the expropriation of its property by the Venezuelan government in 2011. Following substantial payments by the Republic, that judgment stands at roughly $1 billion. App. 265a.

In 2017, Crystallex registered its judgment in the Delaware District Court and asked the court to execute on the judgment by attaching and selling PDVSA's shares in PDVH. The district court issued a writ of attachment, which was served on PDVH in 2018, and this Court affirmed the threshold ruling that, under the Foreign Sovereign Immunities Act, the PDVH shares were not immune from attachment. *Crystallex Int'l Corp. v. Bolivarian Republic of Venezuela*, 932 F.3d 126, 150-51 (3d Cir. 2019).

In 2019, after the appeal was decided, the President of the United States "blocked any transfer or dealing in PDVSA's property" to protect the assets pending free and fair elections, and OFAC prohibited "'the enforcement of any … order through … judicial process purporting to transfer or otherwise alter or affect [blocked] property or interests in [blocked] property,'" absent "'a specific license issued by OFAC.'" *Crystallex II*, 24 F.4th at 247 (quoting 31 C.F.R. § 591.407). And to remove any doubt as to its understanding of these regulations, OFAC issued guidance confirming that private parties may not take any "concrete steps in

furtherance of an auction or sale" of the PDVH shares that is "contingent upon the winning bidder obtaining a license."  U.S. Dep't of Treasury, *OFAC FAQs: General Questions, FAQ No. 809* (Dec. 9, 2019) (FAQ 809), https://bit.ly/3B0cqhJ.

On remand, the VPs moved to quash the writ on the merits, but the district court denied the motion as procedurally barred.  Dist. Ct. Docket Entry (D.E.) 234 at 18-33.  The VPs appealed, but this Court held that it lacked jurisdiction under 28 U.S.C. § 1291 at that time.  *Crystallex II*, 24 F.4th at 246.

**2.**     In May 2021, the district court appointed a special master to design and implement a process to sell the PDVH shares pursuant to Delaware law as incorporated by Federal Rule of Civil Procedure 69(a)(1).  App. 492a-96a; *see* App. 261a.  The special master recognized early on, however, that OFAC's current regulations and guidance threaten to "materially chill bidding."  App. 446a.  The special master did "not believe that Potential Bidders will participate in the process for fear of violating such sanctions" and due to the "[u]ncertainty surrounding what, if any, transaction OFAC will ultimately license."  App. 413a, 446a.

To address this concern, the special master proposed to "seek explicit guidance or authorization from OFAC with respect to a potential Sale Transaction" following the court's entry of its sale procedures order.  App. 446a.  The VPs immediately objected to the extent this meant that the special master planned "to lobby OFAC," explaining that judicial officers "do not advocate to the Government

5

on behalf of particular parties or for particular outcomes in regulatory determinations affecting those parties—here, to authorize a sale that Crystallex desires but that the Republic opposes." App. 404a (capitalization omitted). In response, the special master clarified that he had no such intent: "I have not proposed to, nor have I ever, lobbied on behalf of any particular party in this case." App. 359a. Instead, he proposed that the district court merely prompt the Executive Branch "to clarify its position" by inviting the views of the United States. *Id.*

In March 2022, the district court denied the VPs' objection that the sale process could not launch unless and until OFAC granted Crystallex a license. App. 317a. It then reserved judgment on "the best time to start the sale process" given "'the likelihood that Potential Bidders would be unwilling to participate'" under OFAC's sanctions regime. App. 339a (emphasis omitted).

On October 7, 2022, the district court entered a sale procedures order, which directs the special master to "attempt to gain clarity" from OFAC regarding "its support for (or non-opposition to)[] the launch" of the sale process. App. 267a. After the special master does so and submits a recommendation to the court "as to whether (and when)" to launch, the parties will have an opportunity to object, and the court will then "make a determination regarding when to trigger" the launch, "with or without a license from OFAC." App. 267a-68a. If the district court ultimately were to decide to launch the sale process, it would trigger a foreclosure-

style auction that would be advertised in newspapers and invite bidders to offer bids for up to 100% of the PDVH shares to satisfy the outstanding balance of the Crystallex judgment. *See* App. 263a-65a, 272a-73a.

**3.** On the evening of December 28, 2022, the VPs learned that the special master had planned a meeting with the Executive Branch "to take place in January." App. 255a. They asked him for details on Friday, December 30, and the special master replied late that afternoon that his "meeting with OFAC" was "currently scheduled" for January 12, 2023. App. 169a-70a.

The next business day, Tuesday, January 3, the VPs' counsel asked the special master for permission to attend the meeting to "only observe." App. 166a. The special master refused, explaining that the "meeting with OFAC would have both informational and advocacy components" and thus "it would be inappropriate" for the VPs' counsel to attend because they "have a different agenda." *Id.*

On Monday, January 9, the VPs objected that any advocacy by the special master would be improper and asked the district court to allow their counsel to attend the meeting solely in a listening capacity. App. 240a-51a. The special master opposed the motion, insisting that the VPs' "presence will only chill discussion and further impair [my] efforts." App. 237a. According to the special master, "the mere presence of the Venezuela Parties would influence the discussions and would undermine the core purpose of the meeting," which—again, in his words—was for

the Executive Branch to "hear the Special Master's perspective on why OFAC cooperation with the Court's order is appropriate and necessary." *Id.*

The district court denied the motion on January 11, primarily on the theory that it was filed "too late." App. 219a. The special master then "met *ex parte* with [the] U.S. Government on January 12"—specifically, with representatives from the Justice, Treasury, and State Departments. App. 191a; *see* App. 75a.

On January 20, the VPs moved to disqualify the special master under 28 U.S.C. § 455, App. 204a-17a, but the district court denied relief on March 30 in an oral ruling, App. 104a-23a, which it later memorialized in a written order, App. 502a-10a. The VPs sought a stay on April 4, but the district court has set a briefing schedule that will not conclude until April 21. D.E. 543. The VPs are seeking a stay from this Court now to ensure that it has a chance to act before the April 30 deadline for the special master's recommendation. *See* Fed. R. App. P. 8(a)(2)(A).

## ARGUMENT

This Court should stay the special master's participation in the underlying case pending resolution of the mandamus petition because (1) the VPs have at the very least "'a reasonable chance, or probability, of winning' mandamus relief"; (2) they "would suffer irreparable injury absent a stay"; (3) a stay would not "substantially injure" Crystallex; and (4) "the public interest" favors this relief. *In re Citizens Bank, N.A.*, 15 F.4th 607, 615-16 (3d Cir. 2021).

## I.   THE VPS HAVE AT LEAST A REASONABLE CHANCE OF OBTAINING MANDAMUS RELIEF

Mandamus relief is warranted when the petitioner's (1) "right to issuance of the writ is clear and indisputable," (2) he has "no other adequate means to attain the relief he desires," and (3) "the writ is appropriate under the circumstances." *Cheney v. U.S. Dist. Ct.*, 542 U.S. 367, 380-81 (2004) (cleaned up).  The district court's erroneous refusal to disqualify the special master meets that standard.  Pet. 13-31. For purposes of granting a stay, however, the VPs "need show only 'a reasonable chance, or probability, of winning' mandamus relief in order to prevail." *Citizens Bank*, 15 F.4th at 616.  "In other words, [this Court] may grant a stay even if the ultimate likelihood of granting the mandamus petition is below 50 percent, so long as it is 'significantly better than negligible.'" *Id.*  The VPs easily clear that low bar.

### A.   The Special Master's *Ex Parte* Advocacy Requires Disqualification

A party has "a clear and indisputable right to relief" whenever a "judicial officer's impartiality might reasonably be questioned," including because he has "personal knowledge of disputed evidentiary facts."  *In re Brooks*, 383 F.3d 1036, 1041 (D.C. Cir. 2004) (cleaned up); *see* 28 U.S.C. § 455(a), (b)(1); Fed. R. Civ. P. 53(a)(2).  As explained in detail in the accompanying petition and as summarized below, both occurred here.

**1.a.**   As members "of the judicial family," "special masters" must "'observe the same standards of fidelity and diligence applicable to the judge,'" *In re*

9

*Kensington Int'l Ltd.*, 368 F.3d 289, 312 n.20 (3d Cir. 2004), including the duty to "'refrain from becoming advocates for either party,'" *Abdulrahman v. Ashcroft*, 330 F.3d 587, 596 (3d Cir. 2003). Yet even though it plainly would be improper for the district court to meet with OFAC and press that agency to cooperate with the sale process by stating that participation in the process would be lawful and that the winning bidder would ultimately receive a license to close the sale, the special master engaged in just that impermissible conduct. In his own words, "the core purpose of the meeting" on January 12 was to attempt to convince the Executive Branch to "cooperat[e] with" the sale process. App. 237a. Indeed, that was *why* he excluded the VPs from the meeting in the first place. As the special master told the district court, doing so was necessary because the VPs' "mere presence" would "only chill discussion and further impair [his] efforts." *Id.* But what could the special master possibly say to Executive Branch officials *in private* that could not be *appropriately* said before the VPs *in public*? The answer is nothing.

Indeed, as late as the hearing on the disqualification motion, the special master's counsel admitted that his client extolled "the benefits" of the sale process to the Executive Branch at the January 12 meeting. App. 12a. And for months after that meeting, the special master never disputed that he urged the Executive Branch to articulate a position that would "support the launch of the sale process"—despite multiple filings accusing him of doing so. App. 208a; *see* App. 145a, 160a, 181a.

In filing after filing, the special master not only refused to deny that he engaged in such advocacy, but vigorously defended his right to "advocate for the enforcement of judgments."  App. 196a; *see* App. 150a-59a, 185a-203a.  All of this conduct at a minimum calls into "question[]" the special master's "impartiality."  28 U.S.C. § 455(a).

    **b.**    The district court offered no colorable merits defense of this advocacy by a judicial officer.  At most, the court asserted that there was "no evidence" that the special master had "advocated for a change in U.S. foreign policy or advocated for Crystallex to be granted a license" in the closed-door meeting.  App. 106a.  Instead, based on unsupported suggestions made by the special master's counsel for the first time at the disqualification-motion hearing, the court characterized the special master's use of the term "advocacy" as merely asking the Executive Branch to clarify "whether it will or will not or may exercise its sole authority at the end of the process to grant a specific license" to the winning bidder.  App. 110a; *see* App. 39a-40a, 76a.  That theory is doubly flawed.

    *First*, the district court's characterization is irreconcilable with the special master's own repeated admissions as to what he intended to do and in fact did.  From the beginning, the special master recognized that OFAC's sanctions regime would "chill bidding" both because of the "[u]ncertainty surrounding what, if any transaction OFAC will ultimately license" and because potential bidders would not

even "participate in the process for fear of violating such sanctions." App. 413a, 446a. Accordingly, the only plausible understanding of the special master's decision to offer his "perspective on why OFAC cooperation with the Court's order is appropriate and necessary" is that he urged the Executive Branch to *eliminate both* sources of the "chill." App. 237a. And in fact, that *is* "advocat[ing] for a change in U.S. foreign policy," App. 106a, because OFAC's existing guidance unequivocally explains that private parties may not engage in any "concrete steps in furtherance of an auction or sale" of the PDVH shares that is "contingent upon the winning bidder obtaining a license from OFAC," FAQ 809. Indeed, if all the special master "meant by 'advocacy'" was merely asking the Executive Branch for "clarity," App. 110a, it is inexplicable why the VPs' "mere presence" would have "chill[ed]" or "impair[ed]" that discussion, App. 237a, or why the special master never made this straightforward assertion in any of his various briefs, *see supra* at 10-11.

*Second*, and in any event, whether the district court believed its appointed judicial officer acted impartially behind closed doors is not the relevant question. Rather, § 455(a) asks whether, in light of the special master's own statements and conduct, a "reasonable person might suspect" that he lobbied OFAC to support the launch of the sale process by articulating a position that would reassure bidders— with the recognition that "'people who have not served on the bench are often all too willing to indulge suspicions and doubts concerning the integrity of judges.'" *In re*

*School Asbestos Litig.*, 977 F.2d 764, 782 (3d Cir. 1992).  Here, those suspicions will only be "heightened by the *ex parte* nature of the communications." *Kensington*, 368 F.3d at 305.  The district court therefore missed the point when it accused the VPs of providing "no evidence" that the special master had "advocated for a change in U.S. foreign policy" at the January 12 meeting, App. 106a, after it *excluded* them from attending that discussion.

**2.a.**  Even apart from the special master's advocacy, the fact that he conducted the January 12 meeting on an *ex parte* basis itself compels his disqualification, for two reasons.

*First*, the special master's insistence on meeting with the Executive Branch on an *ex parte* basis even after the VPs asked to attend in a merely observational capacity would cause a reasonable observer to question his impartiality under 28 U.S.C. § 455(a).  At the very least, the public could reasonably perceive this decision as an attempt to ensure that "no official record of what was said" existed so that the special master's recommendation to the court could "'characteriz[e]'" the meeting in a manner most favorable to the immediate launch of the sale process, *Kensington*, 368 F.3d at 309.

*Second*, the special master should be disqualified because the *ex parte* meeting gave him "personal knowledge of disputed evidentiary facts concerning the proceeding."  28 U.S.C. § 455(b)(1).  That meeting "went to the very heart of the

proceedings," *Kensington*, 368 F.3d at 311, making "exactly what was said by" the Executive Branch concerning the sale process critical evidence bearing on the key open question at this stage, App. 166a. Yet due to the *ex parte* nature of the meeting, any "information conveyed" by the Executive Branch to the special master (and vice versa) cannot be fully "'controverted or tested by the tools of the adversary process.'" *Kensington*, 368 F.3d at 308 n.18.

      **b.**    The district court's defenses of this *ex parte* meeting fail.

The court briefly opined that both Rule 53 and inherent judicial power allowed it to authorize the special master to engage in *ex parte* factfinding. App. 121a-22a. But Rule 53 addresses only "the circumstances, if any, in which the master may communicate ex parte with *the court or a party*," not a third party with information on a critical—and disputed—issue of fact. Fed. R. Civ. P. 53(b)(2)(B) (emphasis added). And any "exercise of an inherent power cannot be contrary to any express grant of or limitation on the district court's power contained in a rule or statute"— Rule 53 and § 455 included. *Dietz v. Bouldin*, 579 U.S. 40, 45 (2016). More fundamentally, "a judge may not direct his [subordinate] to do that which is prohibited to the judge," *Price Bros. Co. v. Phila. Gear Corp.*, 629 F.2d 444, 447 (6th Cir. 1980), and no one reasonably contends that the district court could have itself met with the Executive Branch in private to gather information for the court's decision on whether to launch the sale process without a license.

The court also observed that the Executive Branch apparently expressed an intent—to the special master *ex parte*—to make an on-the-record filing. App. 123a; *see* App. 13a-14a. But nothing in § 455 permits a court to deny a disqualification motion on the theory that the *ex parte* factfinding of a judicial officer may be cured through later in-court corroboration. Otherwise, a judge could send his law clerk to conduct an *ex parte* interview of a key witness at a bench trial merely because the witness was scheduled to testify the next day.

**3.** The district court also held that the VPs' disqualification motion— made merely eight days after the January 12 meeting—was untimely and waived. App. 106a-21a. Those procedural rulings similarly lack merit.

**a.** As to the advocacy ground for disqualification, not even the district court suggested that the VPs had any reason to suspect that the special master would engage in advocacy prior to January 3, 2023. Instead, the court suggested that the VPs' objection was untimely and waived on the assumption that the special master's "'advocacy'" in the January 12 meeting was not "materially different" from his conduct in "earlier *ex parte* meetings with OFAC," in that in each instance, he was merely "inquiring" as to the Executive Branch's views. App. 110a-11a. But that premise is clearly wrong, *see supra* Pt. I.A.1, and once it falls away, this procedural ruling collapses as well.

The district court alternatively held that once the special master made clear on January 3 that he was going to engage in *ex parte* advocacy at the January 12 meeting, the VPs had engaged in "substantial" and "strategic" delay by not objecting "until January 9th," as opposed to, say, January 6. App. 116a-18a. In other words, taking six calendar days (four business days)—rather than three calendar days (three business days)—to consult internally among several parties and prepare a motion to stop disqualifying conduct *before* it occurred was too long. That cannot be right.

The district court also offered no meaningful explanation for how this timing could be strategic or prejudicial. Rather than allow the January 12 meeting to occur without notifying the court, the VPs objected to the intended advocacy and moved to attend the meeting days before it occurred. The court could have easily just allowed the VPs to attend (and reminded the special master to refrain from lobbying), in which case the meeting would have proceeded as scheduled. And when the court insisted on forging ahead with the meeting, the VPs quickly sought disqualification on January 20 before the special master could submit his tainted report.

**b.** As to the *ex parte* nature of the meeting—a separate basis for disqualification—the district court emphasized that, prior to January 3, 2023, various orders contemplated that the special master would meet with the Executive Branch and that the VPs knew several such meetings had previously occurred on an *ex parte*

basis.  App. 107a-10a.  But none of the district court's orders authorized the special master to meet with the Executive Branch *ex parte*.  *See* App. 267a-68a, 316a.  And regardless, none of those meetings involved the special master "deliberately set[ting] about gathering facts outside the record" that would drive his recommendation as to a pending judicial decision.  *Price Bros.*, 629 F.2d at 447.

Given all that, the VPs' conduct does not come close to satisfying the requirements for untimeliness, much less for waiver, which this Court has squarely held requires "*affirmative consent*."  *Kensington*, 368 F.3d at 311.  As this Court observed, the Seventh Circuit properly disqualified a judge even when the movants had long been "aware that [a panel of experts] had *ex parte* meetings with the judge from time to time to discuss administrative matters," because they "only discovered later that one of the meetings involved a discussion of the merits."  *Id.* at 307; *see Edgar v. K.L.*, 93 F.3d 256, 257-58 (7th Cir. 1996).  Moreover, even if the district court were correct that the VPs "should have known" before January 3, 2023, that the special master would exclude them, App. 116a, only "actual knowledge" suffices, *Kensington*, 368 F.3d at 314-15.  And even in cases of "'actual knowledge,'" this Court has refused to let "the issue of timeliness trump … the principles of § 455(a)" where, as here, there is no indication of an "abuse of § 455(a) procedure."  *Id.* at 316-17 (20-month delay).  In all events, even if the VPs had somehow consented to prior *ex parte* meetings—and they did not—that would not

17

change the fact that the VPs timely objected to *this* one. *See Edgar*, 93 F.3d at 257-58.

Finally, the district court accused the VPs of holding a disqualification argument "in reserve" by not specifying before the January 12 meeting took place that the special master's *ex parte* factfinding would violate § 455(b)(1) in addition to § 455(a). App. 118a-19a. But there is no dispute that the VPs cited § 455(b)(1) in their post-meeting disqualification motion. *See* App. 207a-12a. There also is no dispute that in their pre-meeting briefing, the VPs clearly put the court on notice that the special master would have to be "disqualif[ied]" based on "personal or extrajudicial knowledge obtained in *ex parte* communications with third parties" if the meeting went forward as planned. *E.g.*, App. 224a (cleaned up). Nor did the court identify anything it would have done differently if the VPs' pre-January 12 briefing had cited § 455(b)(1) specifically, which is unsurprising given that "Section 455(b)(1) is embraced within the perception that a reasonable person might entertain that the judge's impartiality might reasonably be questioned" under § 455(a). *Kensington*, 368 F.3d at 316. And in all events, § 455(b)(1) is not the basis for challenging the special master's impermissible advocacy. *See supra* Pt. I.A.1.

## B.    Mandamus Relief Is Warranted

The district court's erroneous refusal to disqualify the special master justifies mandamus relief. For the reasons given in the petition and above, the district court's

refusal to disqualify the special master is "'a clear legal error'" justifying mandamus. *Kensington*, 368 F.3d at 301. And as demonstrated in the petition and below, the other two mandamus requirements are also satisfied. Pet. 29-31.

To start, the VPs lack "'other adequate means to attain the relief [they] desire[].'" *Cheney*, 542 U.S. at 380. Courts, including this one, have held that mandamus is warranted to review judicial-impartiality objections under § 455, both because "the injury suffered by a party required to complete judicial proceedings overseen by" a "disqualified judicial officer" is "by its nature irreparable" and "because public confidence is irreparably dampened once a case is allowed to proceed before a [judicial officer] who appears to be tainted." *In re Al-Nashiri*, 921 F.3d 224, 238 (D.C. Cir. 2019) (cleaned up); *see, e.g.*, *School Asbestos*, 977 F.2d at 776. Here, by the time the district court enters a final sale order, the world will have witnessed a foreign sovereign's forced participation in a public auction for its state-owned oil company's most valuable asset in a process overseen by a judicial officer who will be reasonably viewed—both here and in Venezuela—as lacking impartiality given his prior *ex parte* advocacy.

Mandamus is "appropriate" here for similar reasons. *School Asbestos*, 977 F.2d at 778. Indeed, there are "few situations more appropriate for mandamus" than a "'charge of partiality in the administration of justice.'" *Rosen v. Sugarman*, 357 F.2d 794, 797 (2d Cir. 1966) (Friendly, J.).

## II.  THE EQUITIES STRONGLY FAVOR A STAY

The remaining stay factors—irreparable injury to the VPs, the public interest, and any potential harm to Crystallex—all overwhelmingly weigh in favor of a stay.

**A.**  As explained, the imminent injuries to the VPs and the public perception of the judiciary from the special master's participation in the launch decision and any implementation of the sale process cannot be adequately remedied after a final sale.  *See supra* Pt. I.B.  And the first materialization of those harms will occur on April 30, 2023, when the special master provides the district court with his launch recommendation, which will be based on his *ex parte* meeting with the Executive Branch in which he advocated that "OFAC cooperat[e] with" the sale process.  App. 237a.  Given that this Court will likely need more time to consider the petition, it should enter a stay to "avoid[] the impending harm."  *Citizens Bank*, 15 F.4th at 622; *cf. Brooks*, 383 F.3d at 1040 (requiring the suppression of the reports of a later disqualified special master after having "ordered [the special master] to take no further actions with respect to the reports … he was going to issue").

In addition, the district court has indicated it would like to start regularly meeting with the special master on an *ex parte* basis.  App. 123a-26a.  A stay of the special master's participation in the proceedings below would therefore ensure that any mandamus relief the VPs ultimately obtain would not affect the district court.

**B.**     Conversely, preserving the status quo will cause no cognizable harm to Crystallex.   Because Crystallex's attachment, assuming it is ultimately upheld, ensures that the PDVH shares cannot be transferred, the only conceivable costs to Crystallex associated with a stay are a potential for delay in execution and a risk of fluctuation in the value of the PDVH shares.   Neither justifies denying a stay.

*First*, Crystallex will accrue post-judgment interest every day the order is stayed, thereby eliminating the cost of delay associated with the resolution of the mandamus petition.   *See Citizens Bank*, 15 F.4th at 622 (relying on "prejudgment interest" to stay trial).   *Second*, there is no realistic possibility that a valid sale of the PDVH shares following resolution of the mandamus petition will fail to satisfy Crystallex's nearly $1 billion judgment.   Under any fair estimate, those shares are worth billions of dollars and thus far "exceed the amount of the judgment still owed to Crystallex."   D.E. 257 at 3; *see Burge v. Fid. Bond & Mortg. Co.*, 648 A.2d 414, 419 (Del. 1994) (auction result may be set aside if sale price is "grossly inadequate").

# CONCLUSION

This Court should stay, pending the resolution of the mandamus petition, the special master's participation in the district court proceedings.

Dated: April 12, 2023      Respectfully submitted,

/s/ Hashim M. Mooppan

Donald B. Verrilli, Jr.      Hashim M. Mooppan
Elaine J. Goldenberg       *Counsel of Record*
Ginger D. Anders        Gregory M. Shumaker
Brendan B. Gants        Brinton Lucas
MUNGER, TOLLES & OLSON LLP   JONES DAY
601 Massachusetts Ave. NW    51 Louisiana Ave. NW
Suite 500E          Washington, DC 20001
Washington, DC 20001     (202) 879-3939
(202) 220-1100        hmmooppan@jonesday.com

*Counsel for Bolivarian Republic of*   Nathan P. Eimer
*Venezuela*           Daniel D. Birk
           Gregory M. Schweizer
           Emily Sullivan
Joseph D. Pizzurro      EIMER STAHL LLP
Kevin A. Meehan        224 South Michigan Ave., Suite 1100
Juan O. Perla          Chicago, IL 60605
CURTIS, MALLET-PREVOST,    (312) 660-7600
COLT & MOSLE LLP
101 Park Ave.          Michael J. Gottlieb
New York, NY 10178     Samuel G. Hall
(212) 696-6000        WILKIE FARR & GALLAGHER LLP
           1875 K St. NW
*Counsel for Petróleos de Venezuela,*   Washington, DC 20006
*S.A.*            (202) 303-1000

*Counsel for CITGO Petroleum Corporation and PDV Holding, Inc.*

## COMBINED CERTIFICATIONS

1.    Pursuant to Third Circuit L.A.R. 28.3(d), at least one of the attorneys whose names appear on this motion, including the undersigned, is a member in good standing of the bar of this Court.

2.    This brief complies with the word limit of Fed. R. App. P. 27(d)(2) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f), this document contains 5199 words.  This brief also complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this document has been prepared in a proportionally spaced 14-point serif font (Times New Roman), using Microsoft Word.

3.    Pursuant to Third Circuit L.A.R. 31.1(c), the text of the electronic version of this document is identical to the text of the paper copies filed with the Court.

4.    Pursuant to Third Circuit L.A.R. 31.1(c), Microsoft Safety Scanner version 1.387.711.0 has been run on this electronic file and no virus was detected.

Dated: April 12, 2023

/s/ Hashim M. Mooppan
Hashim M. Mooppan
*Counsel for CITGO Petroleum Corporation and PDV Holding, Inc.*

23

## CERTIFICATE OF SERVICE

I hereby certify that on April 12, 2023, this motion and appendix were electronically filed with the Clerk of Court using the appellate CM/ECF system. Service on counsel for all parties in the district court has been accomplished via notice filed through the district court's CM/ECF system attaching a copy of this filing. The district court has also been provided with a paper copy of this filing by United Parcel Service overnight delivery to United States District Court District of Delaware, 844 North King Street, Wilmington, Delaware 19801.

I further certify that four hard copies of this motion and appendix will be sent to the Clerk of Court by United Parcel Service overnight delivery.

Dated: April 12, 2023

*/s/* Hashim M. Mooppan
Hashim M. Mooppan
*Counsel for CITGO Petroleum*
*Corporation and PDV Holding, Inc.*