**ADELSO A. ADRIANZA**
113 Washington Street – Newton, MA 02458
M: (859) 803-2279 | aaadrianza@gmail.com

May 2, 2023

The Honorable
Judge Leonard Stark
U.S. Judge For The Third Circuit Court of Appeals
U.S. District Court - Delaware
844 N. King Street, Unit 26, Room 6124
Wilmington, DE 19801-3555

Dear Judge Stark,

    This communication is in reference to Crystallex International Corporation (the "Company," Case 1:17-mc-00151-LPS) and regarding the pending execution of its collection judgment against Venezuela (the "Republic"). Its objectives are threefold: first, to apprise this Court of the on-going action at the Delaware Bankruptcy Court by the undersigned (the "Movant") to redress harm caused to him and other similarly situated shareholders (the "Shareholders") through actions and omissions by the Board of Directors and Debtor in Possession (the "BOD/DIP"). Second, it pursues to prevent harm to the Company's estate (the "Estate") and the Shareholders as the residual owners of its property and rights. Third, it seeks to avoid unnecessary delay and waste of judicial and Company resources in this long-running case.

    In November 2021, the Movant filed the Motion To Intervene And For An Order Requiring An Independent Determination Of The Amount That Needs To Be Collected To Satisfy Crystallex's Judgment in this Court (the "DEDC Motion", D.I. No. 404). With it, the Movant sought the opportunity to protect the Shareholders' interests in the Company, given the failure of the BOD/DIP to fulfill their duty. Here it is important to note that the BOD/DIP and the DIP Lender (the "Colluding Parties") are one and the same, given that the BOD is the DIP, and the DIP Lender has de facto and de jure control over the self-interested BOD and the Company. In the DEDC Motion, the Movant indicated that the Estate and the Shareholders stood to be harmed by the BOD/DIP's failure to pursue the collection of full amounts of the ICSID arbitration award (the "Award") and the economic harm inflicted on the Estate by the Republic's failure to fulfill its obligation.

    Specifically, the Movant's pursuit was predicated on the BOD/DIP's abandonment Estate property and legally protected and enforceable interests and rights arising from the Award, and Federal and Delaware law. These include property and rights transfers for inadequate or no value, as well as post-award interest and costs and expenses incurred as a consequence of a recalcitrant judgment debtor's use of the U.S. Courts to avoid and delay meeting its debt obligation. Said obligation arose from a consensual agreement to arbitrate investment disputes under the World Bank's ICSID arbitration rules, the full recognition of the Award by the DC District Court, and this

Court's approval of a collection judgement, which was affirmed by the Third Circuit Court of Appeal and on which the Supreme Court of the United States denied a petition for certiorari.

This Court denied the DEDC Motion in the oral order dated January 3, 2022, (D.I. No. 426) based on its assessment that the Movant:

> ... had not demonstrated that his interests are "not adequately represented by an existing party in the litigation." *Harris v. Pernsley*, 820 F.2d 592, 596 (3d Cir. 1987). Adrianza has not shown that Crystallex does not adequately represent his interests. (See D.I. 416 at 9-10). Both Crystallex and Adrianza share the goal of "maximizing Crystallex's recovery" and promoting value for the shareholders, including Adrianza. (D.I. 414 at 10; see also id. at 11) ("Crystallex's dogged pursuit of Venezuela's assets in this case and other actions... speaks for itself."). Indeed, it is not even clear that Adrianza has any protectable interest in this litigation at all. See, e.g., *In re Cendant Corp. Sec. Litig.*, 109 F. Supp. 273, 277 (D.N.J. 2000) (explaining that permitting shareholder to intervene would improperly restrict corporate decision-making), aff'd, 264 F.3d 286 (3d Cir. 2001). [Emphasis added].

The Court's decision was based on precedent predicated on unique facts and circumstances seen through the Rule 24(a) of the Federal Rules of Civil Procedure quintessential prism. *Harris v. Pernsley* does not and cannot stand for the proposition that the interests of a company are invariably aligned with those of its shareholders based on prima facie evidence and presumption. Nor is Rule 24(a) a one-fits-all straitjacket rule. Thus, "The requirement of the Rule is satisfied if the applicant shows that representation of his interest "may be" inadequate; and the burden of making that showing should be treated as minimal (see *Trbovich v. United Mine Workers*, 404 U.S. 528, 538, n. 10, (1972)). And "Courts thus have found that an applicant has a sufficient interest to intervene when the action will have a significant stare decisis effect on the applicant's rights." (see *Smith v. Pangilinan*, 651 F.2d 1320 (9th Cir. 1981). Be that as it may, that was not the last opportunity for the Shareholders to protect their interests.

In July 2021, the Movant filed a motion at the Delaware District Bankruptcy Court (the "DEBK Court", case 11-14074-LSS) for an Order Directing the Appointment of An Examiner and Independent Counsel for The Shareholders (the "DEBK Motion", D.I. No. 328) in which he alleged harm to the Shareholders as a result of actions and omissions particularized in the Motion as well as in subsequent filings in that case (see D.I. Nos. 340, 357, 361 and 364). The Movant's Pro Se intervention in the chapter 15 proceedings sought relief under §1522(a) ("The court may grant relief under section 1519 or 1521, or may modify or terminate relief under subsection (c), only if the interests of the creditors and other interested entities, including the debtor, are sufficiently protected." The actions and omissions articulated in these filings included:

I. Self-enrichment,
II. Breach of the loyalty and care duties by a self-interested BOD,
III. Constructive fraud,
IV. Distribution of Estate property by means of a structured dismissal / sub-rosa plan,

- V. Fraudulent misrepresentations,
- VI. Fraudulent transfer of tax benefits,
- VII. Illegal post-petition interest payment on unsecured debt,
- VIII. Misappropriation, misuse, waste, gifting and hiding of estate property,
- IX. Violation of constitutional and personal rights.

The DEBK Motion put forward a two-pronged request for relief: first, the appointment of an examiner to independently investigate the allegations in the DEBK Motion and fulfill the Court's fact-finding requirements. Second, the appointment of Legal Counsel to represent and protect the interests of the Shareholders; over one hundred U.S. citizens and individual investors.

The DEBK Motion was heard in August 2021 and the Court took it under advisement and issued the Declaratory Judgement Order and Memorandum (the "Declaratory Judgement", D.I. Nos. 372 - 373) in November 2022. In it, the Court:

I. Denied the Movant's motion without prejudice, until the Award is collected, and the action is ripe for judicial review,

II. Acknowledged that it had no evidence that the interests of Crystallex and its shareholders were not aligned at the time in respect of maximizing recoveries in the collection of the judgement against PDVSA, but identified at least two issues it deemed appropriate to address once the Award is collected:

1. The breach of the Canadian criminal interest rate statute,
2. The distribution of the Estate's property in the U.S. based on the distribution plan set forth in the DIP financing agreement.

III. Ordered that no transfer / disposition of the Net Arbitration Proceeds (NAP) be made without the permission of the Court.

Additional harm will accrue to the Shareholders through actions and omissions by the BOD/DIP that would make necessary further legal action to pursue redress. These include the abandonment of Estate property and rights that are accretive for the Shareholders in the planned liquidation:

I. The Las Cristina mine mining data,
II. The costs and expenses imposed on the Company to collect the Award from a recalcitrant judgement debtor,
III. Uncollected and inadequate interest on the Award to offset the loss of value caused by the protracted default.

The Las Cristinas mining data, worth over $US 300 million based on valuations agreed upon between the Republic and two other expropriated companies, Gold Reserve and Rusoro Mining, was transferred by the BOD/DIP to the Republic without equivalent value as an incentive for full and prompt payment of the Award. The Republic reneged on the agreement a few weeks later by refusing to post the agreed upon security to ensure full collection of the balance due through an installment

payment plan. Having transferred 90% of the rights of the NAP to themselves, the BOD/DIP deemed it expedient to give up over $300 million of Estate property they now consider worthless. This is the case because the mining data was excluded from the property subject to the DIP Financing Agreement and its sub-rosa distribution plan and, therefore, recovering its value would not yield any benefit to them.

The BOD/DIP has spent close to $100 million over the last seven years pursuing the collection of an arbitration award based on an investment protection treaty the Republic agreed to, which it has steadfastly refused to honor even after exhausting all the available legal recourses. The judgement collection process undertaken through this Court is governed by Delaware State law, which establishes the plaintiff's right to be made whole for costs[1] and the loss of value of the judgement through interest at a market-based rate from the date the debt is due until the judgement date.[2] Annex B - the Settlement Term Sheet - of the Amended Settlement Agreement[3] explicitly provided for payment of interest and out-of-pocket expense incurred in the event of default by the Republic:

> Interest.
> Obligations under the Settlement Note will not generate interest, except all amounts with respect to the Settlement Note not paid when due (including an acceleration) and will accrue interest at a monthly rate of 0.5%, compounded monthly, until all are paid in full. Said default interest will be paid on demand.
>
> Remedies, Pari Passu Treatment; Enforcement Expenses.
> The Issuer will be required to pay or reimburse the Holder upon demand for all out-of-pocket costs and expenses, including attorneys' fees and expenses, incurred by Holder in connection with (a) the collection of sums payable under the Final Settlement Documentation and (b) the exercise or enforcement of any of Holder's rights, powers and remedies under the final settlement documentation or applicable law.

The ICSID Arbitration Panel based the Award on long-standing international law predicated on the Chorzów Factory decision by the Permanent Court of International Justice that established that ...

> The essential principle contained in the actual notion of an illegal act – a principle which seems to be established by international practice and in particular by the decisions of arbitral tribunals – is that reparation must, as far as possible, wipe out all the consequences of the illegal act and re-establish the situation which would, in all probability, have existed if that act had not been committed. Restitution in

---

[1] *See* DE Title 10, §3512, §3912, and §5101.
[2] *Well Thrive Ltd. v. SemiLEDS Corp.*, C.A. No. 17-794 (MN) (D. Del. Nov. 30, 2020), Pp. 2-4.
[33] See the CCAA Docket: E&Y Document Center (https://documentcentre.ey.com/#/detail-engmt?eid=166) Motion Materials / CCAA / 027. Motion Records, Returnable September 17, 2018 / The Amended Settlement Agreement – 09 September 2018.

kind, or, if this is not possible, payment of a sum corresponding to the value which a restitution in kind would bear; the award, if need be, of damages for loss sustained which would not be covered by restitution in kind or payment in place of it - such are the principles which should serve to determine the amount of compensation due for an act contrary to international law.[4]

As decided by the United States Supreme Court in Alberto-Culver Co.[5]:

*Held*: The arbitration clause is to be respected and enforced by federal courts in accord with the explicit provisions of the United States Arbitration Act that an arbitration agreement, such as is here involved, "shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. §§ 1, 2. *Wilko v. Swan*, supra, distinguished. Pp. 417 U. S. 510-520.

(c) An agreement to arbitrate before a specified tribunal is, in effect, a specialized kind of forum selection clause that posits not only the situs of suit, but also the procedure to be used in resolving the dispute, and the invalidation of the arbitration clause in this case would not only allow respondent to repudiate its solemn promise but would, as well, reflect a "parochial concept that all disputes must be resolved under our laws and in our courts." *The Bremen v. Zapata Off-Shore Co.*, 407 U. S. 1, 407 U. S. 9. P. 417 U. S. 519.

The ICSID arbitration award, which is binding on Federal Courts, requires pre- and post-award interest at *"the rate of the 6-month average U.S. Dollar LIBOR + 1%, compounded annually, calculated from the date of the Award until full payment."*[6] Per 22 U.S. Code § 1650a - Arbitration awards under the [ICSID] Convention ...

(a) Treaty rights; enforcement; full faith and credit; nonapplication of Federal Arbitration Act

An award of an arbitral tribunal rendered pursuant to chapter IV of the convention shall create a right arising under a treaty of the United States. The pecuniary obligations imposed by such an award shall be enforced and shall be given the same full faith and credit as if the award were a final judgment of a court of general jurisdiction of one of the several States. The Federal Arbitration Act (9 U.S.C. 1 et seq.) shall not apply to enforcement of awards rendered pursuant to the convention.

As part of the second settlement agreement, the Company received a $US 425 million initial payment comprised of Venezuelan securities then valued at $320 million, which represented $US

---

[4] *The Factory at Chorzow (Germany v. Poland)*, 13 September 1928, PCIJ, Merits, P. 47.

[5] *Scherk v. Alberto-Culver Co.*, 417 U.S. 506 (1974), P. 417.

[6] *Award Decision*, ICSID Case No. ARB(AF)/11/2, 4 April 2016.

0.24 per dollar of their face value, and a $105 million cash payment. The terms of the agreement established that a) the payment was to be made with liquid securities and b) the Republic would absorb the cost of the decline in market value within the first six months from the date the agreement was entered into. Therefore, the Republic walked away from a binding and enforceable settlement agreement. The securities involved are subject to the economic sanctions implemented against the Republic by the U.S. government and cannot be legally transacted under any circumstances without a license from The Office of Foreign Assets Control ("OFAC") of the U.S. Department of the Treasury. These securities have been and continue to be traded in markets outside the reach of the U.S. sanctions for as low as $US 0.07-0.09 in December 2022. Yet, the BOD/DIP decided to abandon the legitimate claim for a full and liquid payment as agreed in the second settlement agreement and required by the ICSID arbitration award; and disregarding Delaware State law.

Per the Third Circuit Court of Appeal's precedential decision in Wilton Armetale,[7]

> An abandoned claim, like abandoned property in general, flows to someone else. The abandoned property can flow back "to any party with a possessory interest in it." *Collier, supra*, ¶ 554.02[3]; accord *Dewsnup v. Timm (In re Dewsnup)*, 908 F.2d 588, 590 (10th Cir. 1990) (per curiam) ("Following abandonment, whoever had the possessory right to the property at the filing of the bankruptcy again reacquires that right." (internal quotation marks omitted)), *aff'd*, 502 U.S. 410 (1992). If the bankruptcy has ended, abandonment sends the property back to the debtor. See 11 U.S.C. § 554(c). Otherwise, the property reverts to "some other party," like "a secured creditor who has possession of the property when the trustee abandons the estate's interest." *Collier, supra*, ¶ 554.02[3].

> When, as here, the abandoned property is a cause of action, the right to assert it "revert[s] back to the prior holder." *Id.* ¶ 548.02[5][a]. Thus, if a trustee abandons a cause of action, the "creditor's right to pursue" it "spring[s] back to life." *Id.*: accord *St. Paul Fire & Marine Ins. Co.*, 884 F.2d at 698 (noting that "a trustee could choose to abandon a claim, and allow creditors to pursue it independently").

As holders of the Company's equity securities and residual owners of the Estate, the Shareholders can and will pursue the protection of their property and rights in the U.S. Courts if compelled to do so. Failure to do that would result in provable harm that negates any presumption of aligned interests between the Company and the Shareholders. Ultimately, the Company's Board of Directors and the DIP Lender will be called to account for the harm resulting from their actions, or lack thereof, and omissions and to provide full restitution.

The Colluding Parties transferred to themselves 90% of the Estate's and the Shareholders' property rights by means of pervasive court-approved secrecy that prevented the latter from

---

[7] *In re: Wilton Armetale Inc.*, No. 19-2907 (3d Cir. 2020)

becoming aware of their actions and omission in pursuit of a self-enrichment scheme. The remaining 10% was set aside in the structured dismissal plan in the DIP Financing Agreement to pay for a Management Incentive Plan (the "MIP") and administrative costs, which include the costs incurred in the arbitration and the collection of the Award (including the legal expenses of the DIP Lender, the Board of Directors and even those of the unsecured creditors), and the Company's inexorable liquidation. The implementation of the loan-to-own stratagem negotiated and agreed upon prior to the bankruptcy filing enabled the conversion a $US 76 million DIP loan into a $US 1 billion payout to the DIP Lender and the self-interested Board of Directors. This feat is planned to be concluded with a full and prompt distribution of the Estate's assets to the Colluding Parties and the unsecured creditors (including post-petition interest at 20% p.a.), and the liquidation of the Company. The objective is to leave all the issues behind through the onset of res judicata and equitable mootness.

The two-year Canadian statute of limitations combined with the pervasive court-approved secrecy resulted in the Ontario Court of Appeal's rejection of the Shareholders' prayer for relief as being "too little, too late." In its decision, the Court declined to deal with core issues of the complaint, such as no adequate notice to the Shareholders (in violation of due process of law) and a self-interested Board of Directors, by making the following statement:

> [25] In closing, we note that DIP financing was originally conceived as a means to fund operations while a company under CCAA protection restructured. The disposition of this motion should not be interpreted as an endorsement, or a rejection of the amendments approved by Newbould J.[8]

The Movant respectfully asks this Court to be cognizant of his intent to pursue available remedies at law and in equity to protect his interests and rights. Towards this end, it is necessary that the Court require prompt and full public disclosure of the filings and decisions in the instant case. In addition, by expressly retaining jurisdiction over the case by court order before its disposition, the Court would allow the Shareholders to pursue legal redress for the abandoned property and rights at the DEBK Court, if necessary, in the interest of justice.

I thank your Honor for your time and consideration.

Respectfully,

*[signature]*

Adelso A. Adrianza

cc: The Honorable Chief Judge Laurie Selber Silverstein
    Mr. Jeffrey L. Moyer, Richards, Layton & Finger, P.A.
    Mr. Mathew B. Lunn, Richards, Layton & Finger, P.A.

---

[8] *Crystallex International Corporation (Re)*, 2018 ONCA 778.