# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| CRYSTALLEX INTERNATIONAL CORP., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 1:17-mc-00151-LPS |
| | ) | |
| BOLIVARIAN REPUBLIC OF VENEZUELA, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |
| _____ | ) | |

## THE VENEZUELA PARTIES' OBJECTIONS TO THE
## SPECIAL MASTER'S SUPPLEMENTAL REPORT

**TABLE OF CONTENTS**

ARGUMENT ................................................................................................................................... 4

    I.      OFAC's Current Non-Enforcement Intentions Create Uncertainty and Do Not
           Provide Adequate Assurance to Potential Bidders and Other Entities ......................... 4

    II.     If the Sale Moves Forward, the Preparation Launch Date Should Be Delayed
           Until the Pending Alter-Ego and 2020 Bondholders Appeals Are Concluded ........... 11

CONCLUSION ............................................................................................................................ 15

# TABLE OF AUTHORITIES

**Cases**

*Am. Mining Cong. v. Mine Safety & Health Admin.*,
  995 F.2d 1106 (D.C. Cir. 1993)................................................................... 9

*Baltimore & O. Ry. Co. v. Jackson*,
  353 U.S. 325 (1957) ...................................................................................... 7

*Berry v. Comm'r*,
  19 T.C.M. (CCH) 829 (T.C. 1960) .............................................................. 9

*Holder v. Humanitarian Law Project*,
  561 U.S. 1 (2010) ........................................................................................ 10

*Petróleos de Venezuela S.A. v. MUFG Union Bank, N.A.*,
  495 F. Supp. 3d 257 (S.D.N.Y. 2020) ....................................................... 13

*Petróleos de Venezuela, S.A. v. MUFG Union Bank, N.A.*,
  199 N.E.3d 897 (N.Y. 2022) ...................................................................... 14

*Petróleos de Venezuela, S.A. v. MUFG Union Bank, N.A.*,
  51 F.4th 456 (2d Cir. 2022) ........................................................................ 14

*United States v. Grinnell Corp.*,
  30 F.R.D. 358 (D.R.I. 1962)..................................................................... 2, 9

*United States v. Hurst*,
  951 F.2d 1490 (6th Cir. 1991) ..................................................................... 9

**Statutes**

50 U.S.C. § 1701 ............................................................................................... 4

50 U.S.C. § 1702 ............................................................................................... 4

50 U.S.C. § 1705 ............................................................................................... 4

8 Del. C. § 324(a).............................................................................................. 12

**Regulations**

31 C.F.R. § 591.202 ........................................................................................... 4

31 C.F.R. § 591.309 ........................................................................................ 4, 5

31 C.F.R. § 591.310 ........................................................................................ 4, 5

31 C.F.R. App'x A to Part 501 .......................................................................... 4

**Executive Orders**

Exec. Order No. 13850 .................................................................................................... 4

Exec. Order No. 13884 .................................................................................................... 4

**Other Authorities**

Jesse Van Genugten, *Conscripting the Global Banking Sector: Assessing the Importance and Impact of Private Policing in the Enforcement of U.S. Economic Sanctions*, 18 Berkeley Bus. L.J. 136 (2021) .......................................................................... 8

Michael W. Tankersley*, Implementing Attorney Ethics Policies in Law Firms and Corporate Law Departments After Sarbanes-Oxley (Part 2 with Hypotheticals and Forms)*, Prac. Law, June 2004 ..................................................................................................... 8

Richard J. Pierce, Jr., *Administrative Law Treatise* § 6.4 (4th ed. 2002) ....................... 9

U.S. Dep't of Justice, Introduction to Antitrust Division Business Reviews ................................ 9

US Treasury to allow auction of shares in Citgo Petroleum's parent," REUTERS (Apr. 30, 2023, 9:02 AM) ................................................................................ 12

Veronica Root, *Coordinating Compliance Incentives*, 102 Cornell L. Rev. 1003 (2017) ............. 8

The Venezuela Parties[1] respectfully submit the following objections to the Special Master's Supplemental Report and Recommendation Pursuant to Sale Procedures Order ("Report") (D.I. 553). In his Report, the Special Master recommends that, in light of updated guidance received from the U.S. Department of Justice, the Court should set a Preparation Launch Date for as soon as possible after June 5, 2023 and authorize him to set a Launch Date for the sale process once he determines adequate preparations have been made (which, based on a June 5, 2023 Preparation Launch Date, he estimates would result in a Launch Date on or before September 5, 2023).

The Venezuela Parties have two objections to the Special Master's recommendation: First, the U.S. Government's representations that OFAC does not, at this time, intend to take "enforcement action against individuals or entities for participating in or complying with" the process set out in the Sale Procedures Order (SPO) and that OFAC currently "intends to implement a favorable licensing policy for license applications in connection with the execution of a sale," D.I. 553-1, do not provide adequate assurance to potential bidders and other entities who will be asked to facilitate the sale process, such as lenders and financial institutions. The Government conspicuously declined to agree with this Court's view that current executive orders and OFAC sanctions regulations do not prohibit implementation of the sale procedures without a specific license, which OFAC has not issued. Indeed, OFAC has previously stated that it believes its regulations prohibit holding or conducting a contingent auction and taking the other steps contemplated in the SPO without a specific license. And OFAC notably did not issue such a license, as it did to allow additional creditors potentially to obtain an attachment, or repudiate that interpretation. As the Fourth Supplemental Declaration of Randall Weisenburger explains, it is likely that many bidders (and, by extension, service providers, like banks) will be deterred from participating in a process that

---

[1] Capitalized terms used but not defined herein have the meaning ascribed to them in the Court's January 14, 2021, Order, D.I. 234, and the Sale Procedures Order, D.I. 481.

the Government has indicated is illegal, regardless of whether those entities believe they will be prosecuted for engaging in the illegal conduct. 4th Supp. Weisenburger Decl. ¶¶ 12–15, *attached as* Exhibit A. The Government's current enforcement intentions are non-binding. *See, e.g.*, *United States v. Grinnell Corp.*, 30 F.R.D. 358, 363 (D.R.I. 1962). Thus, a future—or even the current—Administration could change its enforcement policy and bring civil or even criminal prosecutions against entities who participate in the sale process. In addition, OFAC might change its mind about its intended favorable licensing policy "if U.S. foreign policy and national security interests materially change," as they often do. D.I. 553-1 at 2. As Mr. Weisenburger explains, these uncertainties could significantly chill bidding, resulting in an artificially low sale price. 4th Supp. Weisenburger Decl. ¶¶ 12–15. And the Special Master stated that neither he nor his Advisors consulted with potential bidders, as contemplated by the SPO, to determine what guidance from OFAC would be necessary to provide them with adequate assurances to participate in the process, meaning that his view that the guidance is sufficient is merely speculative. D.I. 553 ¶ 15.

Second, if the Court does decide to launch the sale process, it should set a Preparation Launch Date for after both (1) final resolution of the appeals in the Appealed Cases—unless the Court decides that the judgments of the Contingent Writ Creditors should not be added to the sale process regardless, as the Venezuela Parties will urge in their forthcoming brief on that issue—and (2) final resolution of the appeal in the 2020 Bondholders Case.[2] The Special Master and his

---

[2] The Appealed Cases are *OI European Group, B.V. v. Bolivarian Republic of Venez.*, Case No. 1:19-mc-00290-LPS (D. Del.); *Northrop Grumman Ship Sys., Inc. v. Ministry of Defense of the Republic of Venez.*, Case No. 1:20-mc-00257-LPS (D. Del.); *ACL1 Investments Ltd. v. Bolivarian Republic of Venez.*, Case No. 1:21-mc-00046-LPS (D. Del.); *Rusoro Mining Limited v. Bolivarian Republic of Venez.*, Case No. 1:21-mc-00481-LPS (D. Del.); *Gold Reserve Inc. v. Bolivarian Republic of Venez.*, Case No. 1:22-mc-00453-LPS (D. Del.); *Koch Minerals Sàrl v. Bolivarian Republic of Venez.*, Case No. 1:22-mc-00156-LPS (D. Del.). The term "Contingent Writ Creditors" collectively refers to the plaintiffs in the Appealed Cases, as well as the plaintiffs in *Phillips Petroleum Co. Venezuela Ltd. v. Petróleos de Venezuela, S.A.*, Case No. 1:19-mc-00342-LPS (D.

Advisors cannot properly prepare for the sale process—much less launch it—without knowing which judgments will be part of the process and without knowing whether the purported pledge of a majority of the shares of PDVH's most valuable subsidiary, CITGO Holding, Inc., will be upheld. The Special Master previously assumed that the pledge at issue in the 2020 Bondholders Case was valid and that the winning bidder in this case would have to factor the pledge into the price that it would be willing to pay, but the Second Circuit recently certified several questions to the New York Court of Appeals in that case. The New York Court of Appeals' answers to those questions could result in the pledge being invalidated. If the Court nevertheless decides to set the Preparation Launch Date before resolution of the alter-ego appeals, then that is all the more reason why, as Crystallex has also recognized, the judgments of the alter-ego creditors in the Appealed Cases should be excluded.

As Mr. Weisenburger has explained, maximizing value requires a broad pool of potential bidders. 4th Supp. Weisenburger Decl. ¶ 9. The uncertainties posed by the legal risks associated with potential OFAC enforcement, the unsettled nature of which judgments may be included in the sale process, and the validity of the pledge at issue in the 2020 Bondholders Case will serve both to impede the Special Master's prefatory tasks and reduce the pool of potential bidders, to the detriment of the Court's (and the law's) goals of maximizing value. *E.g.*, *id.* ¶ 11. The most prudent course is to await greater clarity before launching the sale process (which, as the Court knows, the Venezuela Parties believe is already inherently flawed). *Id.* ¶ 26.

---

Del.); *ConocoPhillips Gulf of Paria B.V. v. Petróleos de Venezuela, S.A.*, Case No. 1:22-mc-00264-LPS (D. Del.); and *Red Tree Investments, LLC v. Petróleos de Venezuela, S.A.*, Case Nos. 1:22-mc-00068-LPS & 1:22-mc-00069-LPS (D. Del.). The 2020 Bondholder Case is *Petróleos de Venezuela, S.A. v. MUFG Union Bank, N.A.*, No. 20-3858 (2d Cir.), *questions certified*, D.I. 325 (2d Cir. Oct. 13, 2022).

## ARGUMENT

**I.     OFAC's Current Non-Enforcement Intentions Create Uncertainty and Do Not Provide Adequate Assurance to Potential Bidders and Other Entities**

In 2019, acting pursuant to his authority under the International Emergency Economic Powers Act, *see* 50 U.S.C. §§ 1701, 1702, President Trump issued executive orders providing that property of the Government of Venezuela within the United States, including the PDVH shares, may not be "transferred" or "otherwise dealt in" except to the extent permitted by "regulations, orders, directives, or licenses that may be issued pursuant to [the] order," that no person may receive "any contribution or provision of funds, goods, or services" from "any person whose property and interests in property are blocked," and that "any transaction that . . . causes a violation of or attempts to violate [these] prohibitions" is itself prohibited. Exec. Order No. 13850 §§ 1(a), 1(b), 4, 5(a); Exec. Order No. 13884 §§ 1(a), 1(c), 3, 4(a) (cleaned up). Regulations promulgated to implement these orders prohibit the transfer of the PDVH shares and define "transfer" to mean "any actual or purported act or transaction, whether or not evidenced by writing, and whether or not done or performed within the United States, the purpose, intent, or effect of which is to create, surrender, release, convey, transfer, or alter, directly or indirectly, any right, remedy, power, privilege, or interest with respect to any property," whether "present, future, or contingent." 31 C.F.R. §§ 591.309, 591.310. Any violation of these restrictions carries significant civil and criminal penalties. *See* 50 U.S.C. § 1705; 31 C.F.R. App'x A to Part 501. OFAC regulations also make clear that the unlicensed "transfer" of any interest in blocked property is "null and void," 31 C.F.R. § 591.202(a), even where such transfer is executed via "attachment, judgment, decree, lien, execution, garnishment, or other judicial process," *id.* § 591.202(e).

OFAC has previously taken the position that its regulations prohibit U.S. persons with a writ of attachment from "prepar[ing] for and hold[ing] an auction or other sale of the [PDVH]

shares, contingent upon the winning bidder obtaining a license from OFAC, …. or taking other concrete steps in furtherance of an auction or sale." OFAC FAQ No. 809 (citing 31 C.F.R. §§ 591.309, 591.310, 591.407); *see* D.I. 212-2 ("[A] license is required before a public auction or contingent sale could occur."). While OFAC recently removed this FAQ from its website in connection with the guidance discussed below, OFAC has not stated that it has changed its interpretation of its regulations. Rather, it has left the orders and the regulations, which require a license to, among other things, create a "contingent" interest in the shares, to speak for themselves. 31 C.F.R. § 591.309.

In 2022, this Court issued an opinion disagreeing with OFAC's interpretation of its regulations and holding that the above-referenced provisions do not prevent the Court and the Special Master from moving forward with preparing for and holding an auction of the PDVH shares, contingent upon the winning bidder obtaining a license from OFAC. (D.I. 443.)[3] However, this Court accepted the Special Master's recommendation that uncertainty surrounding OFAC's view of the sale process and the likelihood that it ultimately would license the closing of any contingent sale counseled in favor of delaying the launch of the process while the Special Master attempted to obtain further guidance from OFAC and to "mak[e] market inquiries into potential bidders with respect to the impact of OFAC's position (or the[] lack thereof) on their willingness to participate in a sale process that is conditioned on OFAC's final approval of any sale transaction." (D.I. 443 at 19; D.I. 481 ¶¶ 3–4.)

On April 7, 2023, the Special Master received a letter from the DOJ, stating that, although "the United States Government does not necessarily agree with the Court's construction of

---

[3] Although the Court, recognizing that "there is substantial ground for difference of opinion regarding" the "novel" question of interpretation that it decided, certified its decision for interlocutory appeal (D.I. 463), the Third Circuit declined to accept the interlocutory appeal and has not expressed any view on the merits of the question.

OFAC's regulations and authorities with respect to Prefatory Steps, nevertheless the United States Government is not seeking to contest that construction in this case and considers the Court to have resolved this issue as to the parties' claims." D.I. 553-1 at 1. DOJ stated, "[t]he United States Government will accordingly issue public guidance that, under these circumstances, OFAC will not take enforcement action against individuals or entities for participating in or complying with the Prefatory Steps set out in the Sales Order, as well as those who engage in transactions that are ordinarily incident and necessary to participation in and compliance with such steps, e.g., potential or actual credit counterparties." *Id.* at 1–2. On May 1, 2023, OFAC issued public guidance to the same effect. OFAC FAQ No. 1123.

Based on this guidance, the Special Master has recommended that the Executive Branch's statements "provide clarity and assurance to the Court, the Special Master, the Sale Process Parties, and other parties-in-interest, including Potential Bidders and associated service providers, that all parties can participate in the Marketing Process without risk of penalty under the Venezuela sanctions." D.I. 553 ¶ 23. The Special Master admits, however, that he did not consult potential bidders or anyone else "in formulating [his] recommendation." *Id.* ¶ 15. Thus, he is engaging in pure speculation when he asserts that potential bidders and service providers will feel assured that they can participate in the sale process "without risk of penalty" and that "the likelihood of 'chilled bidding' or lack of participation … is significantly diminished." *Id.* ¶¶ 23, 25.

If OFAC had actually issued a license authorizing the sale process, then the Special Master's speculation might be warranted and might not harm the sale process. But OFAC did not do so. To the contrary, the Executive Branch took pains to make clear that it was not agreeing with this Court's determination that preparing for and holding a contingent auction under the SPO would not violate the applicable executive orders and regulations or that the implementation of the

sale procedures could not result in sanctions violations. (Nor, as noted above, has OFAC changed its prior interpretation holding that such an auction would require a specific license by removing an FAQ from its website and leaving its regulations in place.) Regardless of whether the U.S. Government has disclaimed an intent to enforce binding law, the executive orders and the regulations remain on the books. *See Baltimore & O. Ry. Co. v. Jackson*, 353 U.S. 325, 330–31 (1957) (warning against "elevating negative action to positive administrative decision" and holding that "the failure of the [Federal Trade Commission] to act is not a binding administrative interpretation"). Not only did OFAC decline to issue a license to authorize holding or participating in a contingent auction, but it separately issued a license for additional attachments to any creditors who this Court includes as Additional Judgment holders under the SPO. While OFAC thus took action to allow creditors to potentially move to the same procedural position as Crystallex, it conspicuously refused to authorize bidders to participate in the process, providing for them only a mere non-enforcement statement. The distinction will not be lost on careful observers.

In the attached declaration, Mr. Weisenburger, who has spent decades in corporate finance, been involved in hundreds of mergers and acquisitions, and currently sits on the boards of directors of four public companies, states that "[m]any potential bidders would be deterred from participating in a sale process that … remains prohibited by OFAC sanctions" based solely on the U.S. Government's "[n]onbinding, changeable guidance regarding nonenforcement of the OFAC regulatory regime." 4th Supp. Weisenburger Decl. ¶ 12. As Mr. Weisenburger explains, "[p]rivate equity firms and, especially, public companies with robust compliance programs may view potential illegality as an unacceptable risk in itself, separate from the possibility of enforcement. Such firms may balk at engaging in conduct that the U.S. Government appears to consider illegal, even if the Government has said that it does not—at least at this time—intend to take enforcement action."

*Id.* ¶ 13; *see also* Michael W. Tankersley, *Implementing Attorney Ethics Policies in Law Firms and Corporate Law Departments After Sarbanes-Oxley (Part 2 with Hypotheticals and Forms)*, Prac. Law, June 2004, at 39, 45 ("[M]ost corporate ethics policies, as well as less formally stated expectations of what attorneys are supposed to be doing for a corporate client, have required that any allegations that the corporation or its agents are violating the law be reported and addressed as a serious matter."). And that is to say nothing of credit counterparties and service providers, such as banks, who routinely engage in funds transfers and payment processing and have extremely heightened risk sensitivities around OFAC sanctions. *See* Jesse Van Genugten, *Conscripting the Global Banking Sector: Assessing the Importance and Impact of Private Policing in the Enforcement of U.S. Economic Sanctions*, 18 Berkeley Bus. L.J. 136, 136 (2021) ("In fear of, and in response to, … hefty financial penalties [for OFAC sanctions violations], LFIs [large financial institutions] have come to occupy an important role in complying with, and privately enforcing, U.S. economic sanctions"); Veronica Root, *Coordinating Compliance Incentives*, 102 Cornell L. Rev. 1003, 1017–18 (2017) (explaining that "corporate credit agreements and securities underwriting agreements commonly include additional representations and covenants that the borrower/issuer has implemented and maintains policies and procedures designed to ensure, and which are reasonably expected to continue to ensure, compliance with specified laws" (internal quotation marks omitted)). These providers very likely may refuse to lend money, process funds, or facilitate other necessary aspects of the sale procedures—or significantly hold up such actions—without a license or other affirmative authorization.

All the more so because they will be well aware that the current enforcement intentions of DOJ or OFAC are nonbinding and always subject to revision. Either agency could—under this Administration or a future one—change its mind and initiate civil or even criminal enforcement

actions. *See United States v. Grinnell Corp.*, 30 F.R.D. 358, 363 (D.R.I. 1962) (explaining that a statement from the Justice Department of a "present intention not to take action" cannot "be equated with future immunity"); *Berry v. Comm'r*, 19 T.C.M. (CCH) 829 (T.C. 1960) (stating that "reliance upon the possible, or probable, non-enforcement of [a] statute[] does not, in our opinion, constitute reasonable cause for the failure of the petitioner to [obey the law]"); U.S. Dep't of Justice, Introduction to Antitrust Division Business Reviews at 2[4] (explaining that an Antitrust Division business review letter "states only the Division's enforcement intentions as of the date of the letter, and the Division remains free to bring whatever action it subsequently comes to believe is required by the public interest"); *cf. United States v. Hurst*, 951 F.2d 1490, 1499 (6th Cir. 1991) (holding that a "fail[ure] to enforce the law" for a time does not preclude future enforcement and is not "tantamount to official approval of illegal acts [or] entrapment"); Richard J. Pierce, Jr., *Administrative Law Treatise* § 6.4 (4th ed. 2002) ("An attempt to prosecute and impose a sanction clearly inconsistent with a prior Interpretative Rule would likely be held to be legally proper, because the Agency can change its own interpretation at any time with a reasonable basis." (citing *Am. Mining Cong. v. Mine Safety & Health Admin.*, 995 F.2d 1106 (D.C. Cir. 1993)). While this Court's decision may receive some consideration in a future enforcement action, OFAC's prior FAQ 809 would be entitled to at least as much deference. And more to the point, no court would be bound by the Court's legal interpretation, especially as it remains subject to potential reversal on appeal from any final sale order.

Given these uncertainties, Mr. Weisenburger opines, "many potential bidders may be deterred by the risk that the U.S. Government's nonenforcement policy may change, exposing them to the risk of potential future enforcement actions as well." 4th Supp. Weisenburger Decl. ¶ 14.

---

[4] *Available at* https://www.justice.gov/sites/default/files/atr/legacy/2011/11/03/276833.pdf.

Thus, "to participate," these bidders "may require from OFAC and/or the Department of Justice a specific, formal, written, and irrevocable waiver or non-prosecution and nonenforcement agreement that promises the entity will not be prosecuted for participating in the sale procedures." *Id*. Mr. Weisenburger also notes that many bidders "are unlikely to be placated by OFAC's statement that it 'intends to implement a favorable licensing policy toward such license applications in connection with the execution of a sale' that 'would be without prejudice to reconsideration if U.S. foreign policy and national security interests materially change.'" *Id.* ¶ 16; *see also Holder v. Humanitarian Law Project*, 561 U.S. 1, 35 (2010) (noting "the changeable and explosive nature of contemporary international relations" (quotation marks omitted)); Corporate Counsel's Guide to Business Ethics Policies § 4:10 (observing that OFAC rules "often change as U.S. foreign policy changes").

Given the nature of the transaction and certain of the provisions of the sale procedures order, such as the good faith deposit requirement, participating in the sale procedures will require the expenditure of "significant time and expense into due diligence. … Before spending resources on due diligence, a potential bidder will want the chance that OFAC will bar a final transaction to be exceedingly low." 4th Supp. Weisenburger Decl. ¶ 16.

Again, the Special Master did not speak to any potential bidders or service providers about whether they would be willing to participate in or facilitate the sale process based on guidance of the sort issued by the U.S. Government here, D.I. 553 ¶ 15, even though he was encouraged to do so as part of his mandate during the Six-Month Window, *see* D.I. 481 ¶ 4. Nor has he pointed to any other evidence that the concerns raised by Mr. Weisenburger based on his knowledge of and extensive experience with the behavior of private and public companies contemplating a strategic acquisition would not be shared by others. Thus, there is a significant risk that bidding still would

be materially chilled and that moving forward based on OFAC's current posture will not maximize

value and could result in a depressed auction process and a grossly inadequate sale price.

## II.   If the Sale Moves Forward, the Preparation Launch Date Should Be Delayed Until the Pending Alter-Ego and 2020 Bondholders Appeals Are Concluded

If the Court nevertheless decides to move forward without more concrete authorization

from OFAC, the Venezuela Parties believe that the Preparation Launch Date should not be set until

after final resolution of the appeals in (1) the Appealed Cases (unless this Court decides, as the

Venezuela Parties will separately urge, that the judgments of the alter-ego creditors (and any other

creditors) should not be added to the sale regardless of the result of the appeal) and (2) the 2020

Bondholders Case.

This Court's order conditionally granting writs of attachment to six judgment creditors of

the Republic is currently on appeal to the Third Circuit. On May 5, 2023, the Third Circuit entered

an administrative stay of the Appealed Cases staying "additional proceedings in the six district-

court actions on appeal … pending further order of [the] Court" but expedited the appeals. *E.g.*,

*Bolivarian Republic of Venezuela v. OI European Group, B.V.*, No. 23-1647 ("*OIEG*"), D.I. 24, at

2 (3d Cir. May 5, 2023). Under the Third Circuit's expedited schedule, Appellants' opening briefs

were filed on May 17, 2023, Appellees' response briefs are due May 24, 2023, Appellants' reply

briefs are due May 30, 2023, and oral argument is scheduled for June 1, 2023. *OIEG*, D.I. 26 (3d

Cir. May 10, 2023). On May 17, 2023, the Third Circuit denied Appellees' Emergency Motion for

Reconsideration of the Administrative Stay. *OIEG*, D.I. 35 (3d Cir. May 17, 2023).

The pendency of these appeals creates an added layer of uncertainty about whether it would

be lawful to include these judgments within the sale and the total amount of judgments that the

Special Master will be seeking to satisfy. That matters because Delaware law permits the Court to

sell only "[s]o many of the shares … as shall be sufficient to satisfy the [attached judgments]." 8

11

Del. C. § 324(a). PDVH is a multi-billion dollar company, and a recent news report has stated that PDVH's indirect subsidiary CITGO "could be valued at $13 billion."[5] Conducting an auction of only enough shares to satisfy Crystallex's $1 billion judgment, for example, should result in a different number of shares being sold—at least in a properly designed sale process—than if the Special Master were to conduct an auction of enough shares to satisfy the judgments of Crystallex and all the Contingent Writ Creditors, which total more than $6 billion before interest. At a minimum, the two sales would involve different discussions regarding minority or majority rights, different marketing documents, a different marketing strategy, and a different set of potential bidders. *See* 4th Supp. Weisenburger Decl. ¶¶ 19–24.

The Contingent Writ Creditors in the Appealed Cases alone hold over $2.7 billion in judgments, not including interest. That is a substantial amount, and its inclusion could result in a far different sale process. As Mr. Weisenburger explains, "[t]he difference in the Special Master's targeted sale proceeds could alter numerous elements of the process, such as (1) the marketing strategy for the sale, (2) whether a minority interest in PDVH could plausibly be sold, and (3) the types of bidders interested in presenting bids sufficient to be competitive at Auction." *Id.* ¶ 19. Without knowing which judgments will be included, "the Special Master cannot satisfactorily complete important tasks contemplated for the prefatory period, such as fully developing a Confidential Information Memorandum and teaser for the sale process." *Id.* ¶ 20.

Moreover, as Mr. Weisenburger states, "without a clear resolution of which judgments are included, the Special Master cannot meaningfully consult with the PDVSA regarding potential 'minority shareholder rights or other protections that could facilitate a sale of minority shares.'" *Id.* ¶ 21 (quoting D.I. 481 ¶ 4). "The protections PDVSA may be willing to offer (or request as

---

[5] *See* "US Treasury to allow auction of shares in Citgo Petroleum's parent," REUTERS (Apr. 30, 2023, 9:02 AM), https://www.reuters.com/article/venezuela-court-citgo-idTRNIKBN2WR07R.

part of a sale of a majority interest) could easily vary based on its understanding of how many shares are likely to be necessary to sell to meet the Special Master's target." *Id.*

If preparations for a sale process including the judgments in the Appealed Cases move forward and then the decisions in the Appealed Cases are reversed, the Special Master will have to reverse course and change strategies "mid-stream," resulting in a wasteful and inefficient process at best, or in an improperly designed and marketed process at worst. *Id.* ¶¶ 22–23; *see also id.* ¶ 19 (stating that "the uncertainty surrounding the total amount of judgments included in the sale could impede the Special Master's tasks, waste court and company resources, and alter the composition of the sale process to the detriment of the Court's stated goals of maximizing value and minimizing the number of shares sold"). While the Venezuela Parties do not believe that the judgments of any of the Contingent Writ Creditors can or should be added to the sale process, if the Court does decide to add them, postponing preparations until appeal proceedings have concluded will result in a more predictable and orderly process.

The other current major source of uncertainty is the 2020 Bondholders Case. As the Special Master previously has explained, that case involves PDVSA and PDVH's challenge to a purported pledge of 50.1% of the stock in CITGO Holding as part of a bond issuance by PDVSA executed by the Maduro regime in violation of the Venezuelan Constitution. D.I. 348 ¶ 54; *see Petróleos de Venezuela S.A. v. MUFG Union Bank, N.A.*, 495 F. Supp. 3d 257 (S.D.N.Y. 2020). A district court in the Southern District of New York initially rejected PDVSA and PDVH's challenge to the validity of the bonds and the pledge, on the ground that New York law applied to the question of the bonds' validity but stayed foreclosure pending appeal. *Id.* In his August 2021 Explanatory Report, the Special Master assumed that the pledge would be upheld and included the

value of the 2020 bonds in his "illustrative clearing price" for the PDVH shares. *See* D.I. 348 ¶¶ 69, 71.

Since that time, however, the Second Circuit has indicated that the challenge to the 2020 bonds' validity may ultimately prevail, observing that the plain language of the New York Uniform Commercial Code required the application of the law of the issuer's jurisdiction—here, Venezuela—to determine the validity of a security. *Petróleos de Venezuela, S.A. v. MUFG Union Bank, N.A.*, 51 F.4th 456, 469 (2d Cir. 2022). The court nevertheless was reluctant to interpret that provision in the first instance, given that the New York Court of Appeals had never done so. *Id.* at 470–72. Thus, the Second Circuit certified several questions to the Court of Appeals, *id.* at 475–76, and the Court of Appeals accepted certification, 199 N.E.3d 897 (N.Y. 2022). Briefing in the Court of Appeals is scheduled to be complete on June 20. As set forth in PDVH and PDVSA's opening brief, the District Court's choice-of-law ruling was almost certainly incorrect and is likely to be reversed on appeal. *See* Br. for Pls.-Counter-Defs.-Appellants, CTQ-2022-03 (N.Y. Mar. 27, 2023). As the Special Master himself has stated, "the impact of [the potential foreclosure] on the viability of any sale process for the PDVH Shares is obvious and inevitable and will likely need to be addressed prior to or in conjunction with any actionable bids being received." D.I. 348 ¶ 55. But, given the Second Circuit's conclusion regarding the plain language of the New York UCC, neither the Special Master nor potential bidders can simply assume that the pledge will be upheld on appeal. Under the Special Master's own logic, this uncertainty must be resolved before bids are submitted. *Id.* ¶ 71 ("I do not believe that credible Potential Bidders will be willing to submit a bid for the PDVH Shares without an understanding as to how the Structurally Senior Liens will be resolved or otherwise addressed in connection with any Sale Transaction."). Mr. Weisenburger agrees with the Special Master on this front and further explains that "[w]ere the Court to initiate

the sale procedures before [the 2020 Bondholder] litigation has concluded, uncertainty regarding these claims would significantly discourage potential bidders from participating or, for any that do choose to bid, cause them to severely discount their bids to account for the bidder's assessment of the potential liability of the structurally senior claims." 4th Supp. Weisenburger Decl. ¶ 25.

For the reasons explained above, it also would not be prudent to begin preparations for the launch of the sale process until the appeal is resolved. The pledge secures a $1.9 billion judgment, and the Special Master and his Advisors will need to know whether to factor that amount into their marketing documents and their plans for identifying and approaching potential bidders. *See* 4th Supp. Weisenburger Decl. ¶¶ 18–20.

Finally, if the Court decides to authorize preparations to begin now, then the Court should exclude the judgments of the creditors in the Appealed Cases, as Crystallex has argued. D.I. 557 at 4. Allowing those judgments into this sale process after preparations have gotten underway would undermine the integrity of the process and result in a significant waste of resources, for the same reasons just discussed.

## CONCLUSION

For the foregoing reasons, Movants respectfully request that the Court reject the Special Master's Supplemental Report and Recommendation.

15

May 23, 2023

OF COUNSEL:
Nathan P. Eimer
Lisa S. Meyer
Daniel D. Birk
Gregory M. Schweizer
Emily E. Sullivan
EIMER STAHL LLP
224 South Michigan Avenue
Suite 1100
Chicago, IL 60604
(312) 660-7600
NEimer@eimerstahl.com
LMeyer@eimerstahl.com
DBirk@eimerstahl.com
GSchweizer@eimerstahl.com
ESullivan@eimerstahl.com

OF COUNSEL:
Joseph D. Pizzurro
Kevin A. Meehan
Juan O. Perla
CURTIS, MALLET-PREVOST,
COLT & MOSLE LLP
101 Park Avenue
New York, NY 10178
(212) 696-6000
jpizzurro@curtis.com
kmeehan@curtis.com
jperla@curtis.com

OF COUNSEL:
Donald B. Verrilli, Jr.
Elaine J. Goldenberg
Ginger D. Anders
Brendan B. Gants
Munger, Tolles & Olson LLP
601 Massachusetts Avenue NW
Suite 500 E
Washington, D.C. 20001
(202) 220-1100
Donald.Verrilli@mto.com

Respectfully submitted,

MORRIS, NICHOLS, ARSHT & TUNNELL LLP

/s/ Kenneth J. Nachbar
Kenneth J. Nachbar (#2067)
Alexandra M. Cumings (#6146)
1201 North Market Street
Wilmington, DE 19801
(302) 658-9200
KNachbar@mnat.com
ACumings@mnat.com

*Attorneys for PDV Holding, Inc., and
CITGO Petroleum Corporation*

HEYMAN ENERIO GATTUSO & HIRZEL LLP

/s/ Samuel Taylor Hirzel, II
Samuel Taylor Hirzel, II (#4415)
300 Delaware Avenue, Suite 200
Wilmington, DE 19801
(302) 472-7300
shirzel@hegh.law

*Attorney for Petróleos de Venezuela, S.A.*

ABRAMS & BAYLISS LLP

/s/ Stephen C. Childs
A. Thompson Bayliss (#4379)
Stephen C. Childs (#6711)
20 Montchanin Road, Suite 200
Wilmington, DE 19807
(302) 778-1000
bayliss@abramsbayliss.com
childs@abramsbayliss.com

*Attorneys for Bolivarian Republic of Venezuela*

George M. Garvey
Munger, Tolles & Olson LLP
350 South Grand Avenue, 50th Floor
Los Angeles, CA 90071
(213) 683-9100
George.Garvey@mto.com