# Exhibit A

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| CRYSTALLEX INTERNATIONAL CORP., | ) |
| Plaintiff, | ) ) ) |
| v. | ) Case No. 1:17-mc-00151-LPS ) |
| BOLIVARIAN REPUBLIC OF VENEZUELA, | ) ) |
| Defendant. | ) ) ) |

**FOURTH SUPPLEMENTAL DECLARATION OF RANDALL J. WEISENBURGER**

I, Randall J. Weisenburger, pursuant to Section 1746 of Title 28 of the United States Code, declare as follows:

1. I submitted declarations in the above-captioned matter on August 25, 2021 (D.I. 354-1), September 10, 2021 (D.I. 355-1), December 17, 2021 (D.I. 423-1), and April 11, 2022 (D.I. 457-1) in support of the Venezuela Parties'[1] objections to the Special Master's proposed sale process, and I incorporate herein the statements made in those declarations. I have been further engaged by CITGO and PDVH to opine on the Special Master's Supplemental Report, filed on April 28, 2023, and, specifically, his recommendation to initiate the sale procedures approved by this Court as soon as possible after briefing on his Supplemental Report concludes. D.I. 553 ¶ 7.

2. My previous opinions remain unchanged. I continue to believe that the process proposed by the Special Master will fail to maximize value. I also continue to believe that the Special Master approached designing the sale incorrectly, due, in part, to his reliance on a conflicted advisor (Evercore), his failure to robustly consider alternatives to an auction, such as a

---
[1] Capitalized terms used but not defined herein have the meaning ascribed to them in D.I. 481 and as used in my first declaration (D.I. 354-1).

1

private placement or public offering, and his failure to engage the Venezuela Parties while designing the sale procedures on potential minority shareholder rights that could facilitate a value-maximizing sale of only as many of the PDVH shares as necessary to satisfy the Attached Judgment(s).

3.  I understand that the Court has entered the Sale Procedures Order ("SPO") designed by the Special Master, D.I. 481, and this declaration is not intended to repeat my previous observations on those sale procedures or the process that led to their design. This declaration accepts that the Sale Procedures Order is an order of this Court and focuses solely on whether initiating the sale process reflected in that Order at this point in time would accord with what I understand to be the Court's goal—and the relevant law's requirements—to maximize the value of the PDVH shares and minimize the number of shares sold. As noted above and in my previous declarations, the sale process designed by the Special Master is most likely to result in an unnecessary and value-destroying sale of 100% of the shares. Given the process as it stands, and accepting for purposes of this declaration that the Court has disagreed with my analysis on that front, my discussion in *this* declaration about the possibility of a sale of a minority stake of PDVH operates from the premise that the Court and Special Master will still attempt to sell the fewest PDVH shares possible in order to satisfy the Attached Judgment(s) within the constraints of the Court-authorized sale process. *See* D.I. 480-1 at 57 (Bidding Procedures at 17).

4.  I understand that, in addition to the Crystallex judgment, the District Court has held that other creditors of the Republic of Venezuela or PDVSA may be contingently entitled to the issuance of writs of attachments with respect to eleven judgments.[2] I also understand that the Court

---

[2] *OI European Group, B.V. v. Bolivarian Republic of Venez.*, Case No. 1:19-mc-00290-LPS (D. Del.); *Northrop Grumman Ship Sys., Inc. v. Ministry of Defense of the Republic of Venez.*, Case No. 1:20-mc-00257-LPS (D. Del.); *ACL1 Investments Ltd. v. Bolivarian Republic of Venez.*, Case No. 1:21-mc-00046-

has received a license from OFAC authorizing issuance of writs of attachment to judgment creditors that are lawfully added to the *Crystallex* sale process. D.I. 555 at 7–8. I understand that the sum total of these judgments (including Crystallex), excluding accrued interest, exceeds $6 billion (and that accrued interest is likely significant). I understand that the Court's order as to six of these judgments, totaling nearly $3 billion before interest, are the subject of a pending, expedited appeal in the U.S. Court of Appeals for the Third Circuit. I understand that if the Third Circuit reverses this Court's orders, that will eliminate those creditors' ability to attach the PDVH shares in order to execute on their judgments against the Republic.

5.    I understand that a violation of OFAC sanctions is subject to civil and/or criminal penalties. 50 U.S.C. § 1705. I understand that OFAC and the Department of Justice have issued certain guidance indicating that, even if current OFAC sanctions would—by their terms—bar participation[3] in the sale procedures by bidders, banks, or others without a special license, the U.S. Government does not, at this time, intend to take enforcement action against participants in the sale process (should it launch). D.I. 553-1.[4] However, it is my understanding that OFAC has not issued a special license actually authorizing the sale process. Moreover, I understand that OFAC has indicated that it currently intends to adopt a favorable licensing policy towards the approval of a final sale transaction that results from the sale process, but has expressly retained the right to deny clearance to the winning bidder, without providing any specific criteria by which it will make

---

LPS (D. Del.); *Rusoro Mining Limited v. Bolivarian Republic of Venez.*, Case No. 1:21-mc-00481-LPS (D. Del.); *Gold Reserve Inc. v. Bolivarian Republic of Venez.*, Case No. 1:22-mc-00453-LPS (D. Del.); *Koch Minerals Sàrl v. Bolivarian Republic of Venez.*, Case No. 1:22-mc-00156-LPS (D. Del.).

[3] I understand that OFAC previously issued an FAQ saying that a special license would be required to participate in the sale process, OFAC FAQ No. 809, that OFAC has never repudiated that interpretation of its regulations, *see* D.I. 553-1 at 1, and that on May 1, 2023, OFAC licensed the issuance of attachments to creditors added to the sale process but still did not license participation in the sale process, D.I. 555 at 7–8.

[4] OFAC, FAQ 1123 (May 1, 2023), https://ofac.treasury.gov/faqs/1123.

that assessment, and noted that its policy is subject to change, in its discretion, based on U.S. foreign policy considerations.[5]

6. I understand that briefing is underway regarding whether and when the creditors described in the preceding paragraph may be issued unconditional writs of attachment and added to the sale procedures as holders of Attached Judgments.

7. I understand that litigation is ongoing regarding certain PDVSA bonds that are structurally senior to any attachments of the PDVH shares.[6]

\* \* \*

8. Based on my forty years of experience in corporate finance,[7] I believe that initiating the sale process while uncertainty remains about the legality of the process, about the durability of OFAC's nonenforcement policy, about the likelihood of a winning bidder's ability to close on a final transaction, and about which judgments may or may not be included in the process will make it difficult for the Special Master to complete the prefatory steps contemplated by the SPO, will deter bidding, and will, ultimately, destroy value in any sale that occurs.

9. An auction's ability to maximize the value of an asset is premised on casting a wide net that maximizes the size of the pool of potential bidders willing to participate. As the pool of bidders shrinks, the ability of an auction to generate fair value—much less to maximize value—decreases. I have previously explained that the current market environment is exceptionally unfavorable towards companies in the traditional fossil fuels industry. Investors in fossil fuels companies do not support management teams who make further investments in traditional fossil fuels, as opposed to renewable fuels. Companies' focus on environmental, social, and governance

---

[5] OFAC, FAQ 1123.
[6] *Petróleos de Venezuela, S.A. v. MUFG Union Bank, N.A.*, Nos. 20-3858, 20-4127 (2d. Cir.).
[7] *See* D.I. 354-1 ¶ 1 (describing my professional experience with mergers and acquisitions, private investments, and service on boards of publicly-traded companies).

4

investing ("ESG") and on satisfying investors' desire for investments in renewable fuels will have reduced the interest of many of the historically-most-likely bidders on the PDVH shares, such as other major refiners. *See, e.g.*, D.I. 354-1 ¶ 32; D.I. 457-1 ¶ 9. That remains true despite the recent uptick in refining companies' performance and corresponding increase in their public market valuations, which are materially different circumstances than those that existed when the Special Master was appointed in May of 2021.[8] The general reduction in interest in refining assets will inevitably shrink the pool of potential bidders in a process like that contemplated by the SPO, threatening to destroy value. In order to maximize the value of the PDVH shares to the extent possible given the current state of the refining market and the design flaws in the Special Master's process, any additional uncertainties need to be resolved in order to maximize the pool of potential bidders to the greatest extent possible given market conditions and the flaws in the sale process as designed.

10. This opinion is consistent with my previous submissions, as well as with some recommendations by the Special Master and actions taken by this Court. I have previously explained—and the Special Master agreed—that a cloud of uncertainty hanging over the (then-proposed) sale procedure would chill bidding and destroy value. D.I. 348 ¶¶ 3–4, 67; D.I. 356 ¶ 6; D.I. 354-1 ¶¶ 17–22; D.I. 355-1 ¶¶ 4–17. In the past, that uncertainty stemmed in part from the absence of a specific license from OFAC. *See* D.I. 354-1 ¶ 18. The Special Master's recognition of the deleterious effects of material uncertainty caused this Court to order the Six-Month Window, D.I. 443 at 40, during which the Special Master sought (and received) some guidance from OFAC,

---

[8] The COVID-19 pandemic resulted in a demand downturn, which led to a reduction in refining capacity. That reduction, along with some firm-specific infrastructure issues (*e.g.*, a fire leading to capacity shutdown), has led to increased profitability—not increased demand—for fossil fuels.

D.I. 553-1. Yet significant uncertainty remains that warrants delaying initiation of the SPO procedures.

11.  In particular, at least four forms of uncertainty will hover over starting the sale process now. First, some bidders will decline to participate because of the risk that doing so remains unlawful, even if OFAC and the DOJ have expressed a non-enforcement policy. Second, additional bidders will decline to participate because OFAC has retained authority to block a final transaction, making the investment of time and resources in due diligence a potential waste of resources. Third, still more bidders will shy away from participating because the precise judgment amount remains uncertain, in part due to the pending appeal, meaning that bidders cannot know for certain whether a bid for a minority share would be seriously considered. Indeed, without certainty as to the judgments included in the sale process, the Special Master himself will be unable to effectively accomplish all of the prefatory steps contemplated in the SPO. Fourth, as the Special Master recognized from the outset of this process, D.I. 348 ¶ 71, potential bidders will also be unlikely to participate while uncertainty remains about structurally senior claims, which currently remain the subject of ongoing litigation. As each of these filters further shrinks the pool of bidders, the discount imposed on the value of the PDVH shares becomes greater and greater.

I.  **Legal Uncertainty**: The U.S. Government's Guidance Regarding Non-Enforcement of Violations of OFAC Sanctions Is Insufficient to Eliminate the Chill on Bidding.

12.  Many potential bidders would be deterred from participating in a sale process that, despite the U.S. Government's recent pronouncements, remains prohibited by OFAC sanctions. Nonbinding, changeable guidance regarding nonenforcement of the OFAC regulatory regime will be insufficient to assuage many potential bidders.

13. Private equity firms and, especially, public companies with robust compliance programs may view potential illegality as an unacceptable risk in itself, separate from the possibility of enforcement. Such firms may balk at engaging in conduct that the U.S. Government appears to consider illegal, even if the Government has said that it does not—at least at this time—intend to take enforcement action. Indeed, for some potential bidders, engaging in a process that is—or arguably is—unlawful could be a violation of their fiduciary duties to their investors or shareholders, which would prevent them from being able to execute certifications of compliance with the law and may otherwise expose them to legal risk. For a fiduciary bidder (such as one investing *others*' capital), there is a material difference between a nonenforcement policy and specific *assurance* that its participation is *not* illegal.

14. In addition to the deterrent effect of violating the letter of the regulations, many potential bidders may be deterred by the risk that the U.S. Government's nonenforcement policy may change, exposing them to the risk of potential future enforcement actions as well. A possibly temporary government nonenforcement policy is likely to be cold comfort to potential bidders that are concerned their participation may violate the law. To convince potentially Qualified Bidders to participate, bidders may require from OFAC and/or the Department of Justice a specific, formal, written, and irrevocable waiver or non-prosecution and nonenforcement agreement that promises the entity will not be prosecuted for participating in the sale procedures. Obtaining such assurances would likely require potential bidders to retain OFAC counsel (potentially at significant expense) and engage directly with the U.S. Government before responding to any potential overtures from the Special Master, visiting the data room, responding to a teaser or CIM—much less actually submitting nonbinding indications of interest, stalking horse bids, or bids. In short, no meaningful potential-bidder outreach or engagement can begin until this issue is resolved. Initiating the sale

process based on the current, potentially ephemeral guidance would thus chill bidding, destroy value, and likely prevent a viable auction.

15.     In expressing these views, I understand that the Special Master has not, at this point, approached potential bidders[9] to gauge their reaction to the Department of Justice's guidance regarding nonenforcement of OFAC sanctions or to inquire whether such guidance would be sufficient for potential bidders to participate in the sale process. In order to maximize the value of the PDVH shares under the current circumstances, the Special Master needs to ensure that the maximum number of potential bidders will participate in the process. Had the Special Master conducted outreach, a number of potential bidders would likely have informed him that they would not participate in the sale process based on the U.S. Government's guidance that OFAC would not enforce certain regulations.

## II.    Financial Uncertainty: OFAC's Residual Authority to Block a Final Transaction Will Deter Potential Bidders.

16.     The two most important aspects of a major M&A transaction are price (financial terms) and closing certainty. Some bidders will remain hesitant or unwilling to invest the significant time and expense into due diligence (such as hiring engineers to assess the refining assets owned by CITGO, reviewing liabilities, assessing the financial health of PDVH and its subsidiaries, etc.), *see* D.I. 354-1 ¶ 19, without more concrete assurance from OFAC that, if such bidder wins the Auction, the transaction will be permitted to close. To that end, potential bidders would likely seek from OFAC some reassurance that the bidder is likely to obtain approval from OFAC if the bidder is named the winning bidder. Potential bidders are unlikely to be placated by OFAC's statement that it "intends to implement a favorable licensing policy toward such license applications in connection with the execution of a sale" that "would be without prejudice to

---

[9] *E.g.*, D.I. 481 ¶ 39 (permitting communication with potential bidders at any time).

8

reconsideration if U.S. foreign policy and national security interests materially change."[10] Before spending resources on due diligence, a potential bidder will want the chance that OFAC will bar a final transaction to be exceedingly low.

### III. <u>Asset Uncertainty:</u> Initiating the Sale Procedures Before Resolution of Pending Legal Questions Regarding Potential Attached Judgments Will Undermine the Sale Process.

17. The emergence of additional creditors who are seeking to join the sale process gives rise to material uncertainty that would impede the Special Master's ability to perform all of the prefatory procedures contemplated during the time period between the Preparation Launch Date and Launch Date and, if it persists past the Launch Date, could deter bidders or alter their behavior in a way that destroys value.

18. I understand that, in light of unresolved legal questions—both on appeal in the Third Circuit and subject to briefing in this Court—there is significant uncertainty as to which judgments may be added to the sale process and, accordingly, the amount of judgments that the Special Master will seek to satisfy. In particular, I understand that, depending on the results of unresolved questions regarding (a) the Court's March 23 alter ego finding in the *OIEG* matter, (b) the Court's decisions regarding disputes over whether and when attachments may issue, and (c) the Court's resolution of disputed questions over whether certain judgments are ripe for addition under the SPO, the sale process could:

    a. include only Crystallex's judgment;

    b. include Crystallex's judgment and some or all of the judgments held by creditors of PDVSA;

---

[10] OFAC, FAQ 1123.

    c. include Crystallex's judgment and some or all of the judgments held by creditors of PDVSA *and* the Republic;

    d. initially include Crystallex's judgment and judgments held by other creditors of PDVSA and or the Republic, only for some of those judgments to be removed from the sale process after the Additional Judgment Deadline if this Court's March 23 Order is reversed on appeal.

    19.    The sale process would inevitably play out materially differently under each of the above scenarios. A sale seeking to satisfy an approximately $1 billion judgment for Crystallex alone would be very different from a sale of enough shares of PDVH to satisfy more than $6 billion in judgments. The difference in the Special Master's targeted sale proceeds could alter numerous elements of the process, such as (1) the marketing strategy for the sale, (2) whether a minority interest in PDVH could plausibly be sold, and (3) the types of bidders interested in presenting bids sufficient to be competitive at Auction. As described below, the uncertainty surrounding the total amount of judgments included in the sale could impede the Special Master's tasks, waste court and company resources, and alter the composition of the sale process to the detriment of the Court's stated goals of maximizing value and minimizing the number of shares sold.

    20.    First, if the Court sets a Preparation Launch Date before pending uncertainty regarding the Attached Judgments is resolved, the Special Master cannot satisfactorily complete important tasks contemplated for the prefatory period, such as fully developing a Confidential Information Memorandum and teaser for the sale process. A teaser is meant to highlight key features of the proposed offering, encourage potential bidders to pay attention, and allow the Special Master to determine the types of investors that may be interested in bidding and what interests they may wish to obtain. But if one of the central tenets of the sale process—the target

transaction size—is not known, the teaser will lack key information necessary to achieve these aims. Likewise, the Special Master will be unable to tailor the CIM to likely prospective bidders or include the types of information investors expect in this type of document—*e.g.*, the Special Master will be unable to explain the type of transaction contemplated, the interest being sold, or why the PDVH shares are a reasonable investment for specific prospective bidders. Prospective bidders will remain in the dark as to what could constitute a winning bid. Given that the bidding procedures contemplate the satisfaction of the Attached Judgment(s) as a key criterion for identifying the Successful Bid,[11] a teaser and CIM that fail to accurately depict the amount of the Attached Judgment(s) simply cannot do their jobs.

21. Second, without a clear resolution of which judgments are included, the Special Master cannot meaningfully consult with the PDVSA regarding potential "minority shareholder rights or other protections that could facilitate a sale of minority shares." D.I. 481 ¶ 4. The SPO directs that such conversations take place only *ten days* after the Preparation Launch Date. *Id.* Without knowing the magnitude of the attached judgments, PDVSA will be unable to seriously engage on discussions about minority protections. The protections PDVSA may be willing to offer (or request as part of a sale of a majority interest) could easily vary based on its understanding of how many shares are likely to be necessary to sell to meet the Special Master's target. Likewise, the types of protections *bidders* may expect will vary widely based on whether the Special Master's process could plausibly end in a minority interest being sold. The Special Master cannot truly market the shares to potential bidders if the types of share rights are unknown due to the likely percentage of shares to be sold remaining clouded in uncertainty. The Special Master must be able to confidently describe the asset, including any share rights or protections, in order to attract

---

[11] D.I. 480-1 at 57 (Bidding Procedures at 17).

bidders. If the judgment amount is a moving target, conversations with PDVSA regarding minority shareholder rights will be inevitably speculative, impeding the Court's goal—and the Special Master's job: to identify a bid that "(i) satisfies the Attached Judgments and (ii) provides for the sale of the fewest PDVH Shares." D.I. 480-1 at 57.

22. Third, if the Court were to add judgments to the sale process (by the Additional Judgment Deadline) before resolution of these unsettled legal questions, some such judgments could be *removed* from the sale process later. For example, if the Court added the currently appealed judgments to the process only for the writs of attachment to be vacated because the District Court's alter ego finding is reversed on appeal, the total judgment amount to be satisfied through the sale process would change mid-stream. The uncertainty surrounding the amount of the judgments included in the sale could deter bidding or cause bidders to develop bids based on the wrong assumptions.

23. Simply put: bidders need to know what they're buying. The type of bidder potentially interested in a minority interest in PDVH for roughly $1 billion to pay off Crystallex alone is different from the type of bidder interested in a majority interest. A bidder who is interested in obtaining a majority interest will not spend the time and money on due diligence if there is a possibility that the sale process will change mid-stream into one where a bid for a minority stake in PDVH has a reasonable chance of satisfying all the Attached Judgments. Likewise, a bidder interested in a minority share (likely with significant minority shareholder rights) may not be interested in a majority stake (or even a particularly large minority stake) or have the capital to competitively bid for it; if there is a risk that the sale process balloons to include all potential judgments, thus attracting more bidders who seek a majority interest (and making it more likely that the Successful Bid criteria will only be met by a majority interest), the bidder otherwise

interested in a minority stake may not participate *at all* to avoid expending the time and resources on due diligence and bid preparation. Indeed, because a winning bid is intended to be one that satisfies the Attached Judgments for the fewest number of PDVH shares, D.I. 480-1 at 57, no bidder can accurately craft a competitive bid when there is uncertainty as to the judgments included. If bids (or even bidder participation/interest) are premised on an inaccurate judgment amount, any resulting auction could be skewed, resulting in a sale that does not maximize value or sell as few shares as necessary.

24. In short, initiating the sale procedures—including some aspects of the prefatory phase—when significant uncertainty remains about which judgments can or will be added to the sale process could waste judicial resources, potentially require a do-over of certain prefatory steps if the judgment load changes, and chill bidding in the longer term, thus destroying value and depriving the Sale Process Parties of the most robust sale possible under the SPO. Until the Special Master knows with confidence what his charge is, he cannot prepare or run a sale process that has a meaningful chance of attracting a value-maximizing bidder.

### IV. **Senior Claims Uncertainty: Starting the Sale Procedures Before Resolution of Pending Claims by Structurally Senior Creditors Will Deter Bidders.**

25. Finally, as the Special Master has recognized from the outset, uncertainty regarding claims by creditors with liens that are structurally senior to any attachments of the PDVH shares will deter bidding. As the Special Master has stated: "I do not believe that credible Potential Bidders will be willing to submit a bid for the PDVH Shares without an understanding as to how the Structurally Senior Liens will be resolved or otherwise addressed in connection with any Sale Transaction." D.I. 348 ¶ 71; *id.* ¶ 55 ("I believe that the impact of this potentiality on the viability of any sale process for the PDVH Shares is obvious and inevitable and will likely need to be addressed prior to or in conjunction with any actionable bids being received."). I agree. I

13

understand that nearly $2 billion of such claims are the subject of ongoing litigation. Were the Court to initiate the sale procedures before that litigation has concluded, uncertainty regarding these claims would significantly discourage potential bidders from participating or, for any that do choose to bid, cause them to severely discount their bids to account for the bidder's assessment of the potential liability of the structurally senior claims.

*     *     *

26. For all the reasons described above, uncertainty is still a serious problem today. To achieve the Court's goal of maximizing value, the Special Master and the Court should strive to attract the largest possible pool of potential bidders to the sale process. Eliminating some or all of the uncertainty described in this declaration would help curtail the attrition of the pool that is already assured by the economic realities surrounding investors' attitudes regarding refining assets. At the very least, the Court should not initiate the sale procedures—including the prefatory phase—until the conclusion of appellate proceedings for the six currently-appealed judgments and until questions regarding whether and when additional creditors may be issued unconditional writs of attachment and added to the sale procedures as Attached Judgments. Moreover, the Court should not initiate sale proceedings until after the Special Master has consulted with potential bidders about what kind of assurance they may need from OFAC in order to participate, such as a change in the regulations to indicate that participation in the sale process is not illegal (rather than illegal, but not subject to enforcement at this time). And the Court should, consistent with the Special Master's own statements, not permit the sale process to start until uncertainty surrounding structurally senior claims has been resolved.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

Executed on May 22, 2023, at Greenwich, Connecticut.

_____
Randall J. Weisenburger