# **EXHIBIT B**

EXECUTION COPY

# UTILITIES SERVICES AGREEMENT

## BETWEEN

## CURAÇAO UTILITIES COMPANY N.V.

### AND

## REFINERÍA ISLA (CURAZAO) S.A.

Dated as of March 27, 1998

DOCSDC1 29915.33

## TABLE OF CONTENTS

Page

| | | |
|---|---|---|
| **Article 1** | DEFINITIONS | 2 |
| 1.1 | Definitions | 2 |
| 1.2 | Rules of Interpretation | 13 |
| **Article 2** | SUPPLY OF UTILITIES; THIRD PARTY SALES | 13 |
| 2.1 | Supply of Utilities | 13 |
| | 2.1.1 Supply of Utilities after Commercial Operation Date | 13 |
| | 2.1.2 Failure to Meet Quantity Requirements | 14 |
| | 2.1.3 Failure to Meet Quality Standards | 14 |
| 2.2 | Excess Utilities | 14 |
| 2.3 | Coordination | 14 |
| | 2.3.1 Scheduling | 14 |
| | 2.3.2 Excess Cycling by Buyer | 15 |
| | 2.3.3 Operating Committee | 15 |
| 2.4 | Third Party Sales | 15 |
| | 2.4.1 Sale of Utilities in Excess of Contract Capacities | 15 |
| | 2.4.2 Utilities Not Taken | 15 |
| **Article 3** | COMPLETION AND START OF OPERATIONS OF UTILITY PLANT; CERTAIN COVENANTS | 16 |
| 3.1 | Construction and Interconnection | 16 |
| | 3.1.1 Seller Construction of New Facilities | 16 |
| | 3.1.2 Interconnection of Existing Facilities | 16 |
| | 3.1.3 Seller's Rights | 16 |
| | 3.1.4 Start-up and Testing Period | 16 |
| | 3.1.5 Deliveries after Take-or-Pay Date | 16 |
| 3.2 | Guaranteed Completion Dates | 17 |
| | 3.2.1 Guaranteed Commercial Operation Date | 17 |
| | 3.2.2 Liquidated Delay Damages | 17 |
| 3.3 | Seller's Covenants | 17 |
| | 3.3.1 Duty to Operate | 17 |
| | 3.3.2 Supply of Materials and Services | 18 |
| | 3.3.3 Reporting | 18 |
| | 3.3.4 No Liens | 18 |

-i-

| 3.4 | | Buyer's Covenants | 18 |
|---|---|---|---|
| | 3.4.1 | Coordination During Construction | 18 |
| | 3.4.2 | Maintenance of Existing Facilities | 18 |
| | 3.4.3 | Implementation of Interconnection Plan | 19 |
| | 3.4.4 | Spare Parts for Existing Facilities | 19 |
| | 3.4.5 | Support During Construction of Utility Plant | 19 |
| | 3.4.6 | Refinery Matters | 20 |
| | 3.4.7 | No Resale | 20 |
| Article 4 | | TERM; CONDITIONS PRECEDENT | 20 |
| 4.1 | | Term of Agreement | 20 |
| 4.2 | | Conditions Precedent | 21 |
| | 4.2.1 | Delivery of Agreements | 21 |
| | 4.2.2 | Credit Support for Seller's Liquidated Damages Obligations | 21 |
| | 4.2.3 | PDVSA Guaranty | 21 |
| | 4.2.4 | Failure to Achieve Financial Closing | 21 |
| | 4.2.5 | Termination for Failure to Satisfy | 21 |
| | 4.2.6 | Best Efforts to Satisfy | 21 |
| Article 5 | | PRICES AND FORM OF PAYMENT | 21 |
| 5.1 | | Payment for Utilities | 21 |
| | 5.1.1 | Take-or-Pay Payment | 22 |
| | 5.1.2 | Committed Excess Electricity Payment | 22 |
| | 5.1.3 | Excess Utilities Payment | 23 |
| | 5.1.4 | Environmental Compliance Adjustment | 23 |
| | 5.1.5 | Scope Changes Requested by Buyer | 23 |
| | 5.1.6 | Bonus | 23 |
| 5.2 | | Taxes | 23 |
| 5.3 | | Units of Measurement | 23 |
| 5.4 | | Billing and Payment | 23 |
| | 5.4.1 | Fixed Amounts | 23 |
| | 5.4.2 | Invoices for Other Amounts | 24 |
| | 5.4.3 | Making of Payments | 24 |
| 5.5 | | Records | 24 |

## TABLE OF CONTENTS
### (continued)

|  |  |  | Page |
|---|---|---|---|
| Article 6 | | MEASUREMENT AND METERING | 25 |
| 6.1 | | Metering Equipment | 25 |
| 6.2 | | Measurements | 25 |
| 6.3 | | Testing and Correction | 26 |
| | 6.3.1 | Annual Testing | 26 |
| | 6.3.2 | Disputes | 26 |
| | 6.3.3 | Variances and Correction | 26 |
| | 6.3.4 | Payment Adjustments | 26 |
| 6.4 | | Maintenance and Records | 26 |
| | 6.4.1 | Monthly Reports | 26 |
| | 6.4.2 | Inspection Rights | 26 |
| | 6.4.3 | Verification | 27 |
| Article 7 | | INTERCONNECTION OF SUPPLIES | 27 |
| 7.1 | | Interconnection Facilities | 27 |
| | 7.1.1 | Access | 27 |
| | 7.1.2 | Installation | 27 |
| | 7.1.3 | Maintenance | 27 |
| 7.2 | | Delivery Points and Title | 28 |
| Article 8 | | PLANNED AND UNPLANNED SHUTDOWNS | 28 |
| 8.1 | | Planned Shutdowns | 28 |
| 8.2 | | Unplanned Shutdowns | 28 |
| Article 9 | | FAILURE TO DELIVER UTILITIES | 29 |
| 9.1 | | Consequence of Failure to Deliver Utilities | 29 |
| | 9.1.1 | Liability for Liquidated Damages | 29 |
| | 9.1.2 | Amounts and Payment of Liquidated Damages | 29 |
| | | 9.1.2.1 Level I Events | 29 |
| | | 9.1.2.2 Level II Events | 29 |
| | | 9.1.2.3 Level III Events, Steam Events and Air Events | 30 |
| | | 9.1.2.4 Blackouts | 30 |
| | 9.1.3 | Measurement of Liquidated Damages | 30 |
| | 9.1.4 | Amounts Reasonable | 30 |
| | 9.1.5 | Limitations on Damages | 31 |

# TABLE OF CONTENTS
## (continued)

|  |  | Page |
|---|---|---|
| | 9.1.6 Rebate. | 31 |
| | 9.1.7 Buyer's Right to Review | 31 |
| 9.2 | Buyer's Right to Operate Utility Plant | 31 |
| Article 10 | INDEMNITIES; LIMITATION OF LIABILITIES | 32 |
| 10.1 | Indemnification of Buyer | 32 |
| 10.2 | Indemnification of Seller | 32 |
| 10.3 | Indemnity Claim Procedures | 33 |
| | 10.3.1 Notice of Claim | 33 |
| | 10.3.2 Access to Records | 33 |
| | 10.3.3 Payment of Claims | 33 |
| 10.4 | Exclusion of Consequential Damages | 33 |
| Article 11 | REPRESENTATIONS AND WARRANTIES | 34 |
| 11.1 | Seller's Representations and Warranties | 34 |
| | 11.1.1 Organization | 34 |
| | 11.1.2 Authorization | 34 |
| | 11.1.3 No Defaults | 34 |
| 11.2 | Buyer's Representations and Warranties | 34 |
| | 11.2.1 Organization | 34 |
| | 11.2.2 Authorization | 34 |
| | 11.2.3 No Defaults | 35 |
| | 11.2.4 Existing Facilities | 35 |
| Article 12 | DEFAULT AND REMEDIES | 35 |
| 12.1 | Seller Event of Default | 35 |
| 12.2 | Buyer Event of Default | 36 |
| 12.3 | Remedies for Breach | 37 |
| 12.4 | Specific Performance and Injunctive Relief | 38 |
| 12.5 | Payments Upon Termination; Buyer's Purchase Right | 38 |
| | 12.5.1 Demobilization Costs | 38 |
| | 12.5.2 Seller's Termination Fee | 38 |
| | 12.5.3 Buyer's Right to Purchase | 38 |
| 12.6 | Waiver of Breach | 39 |
| 12.7 | Determination of Failure to Achieve Commercial Operation | 39 |

# TABLE OF CONTENTS
## (continued)

Page

| | | |
|---|---|---|
| **Article 13** | INSURANCE | 39 |
| 13.1 | Insurance | 39 |
| 13.2 | Coverage | 41 |
| 13.3 | Evidence of Coverage | 41 |
| 13.4 | Liability Notwithstanding Insurance Coverage | 41 |
| 13.5 | Buyer's Self-Insurance Policy | 41 |
| **Article 14** | FORCE MAJEURE | 42 |
| 14.1 | Effect of Force Majeure | 42 |
| 14.2 | Notice of Force Majeure | 42 |
| 14.3 | Mitigation of Force Majeure | 42 |
| 14.4 | Suspension or Reduction of Payment Obligations Due to Seller's Force Majeure | 42 |
| 14.5 | Termination Due to Force Majeure | 43 |
| **Article 15** | TERMINATION | 45 |
| 15.1 | Buyer's Right to Terminate and Purchase the Project | 45 |
| 15.2 | Discharge of Obligations Upon Termination | 46 |
| **Article 16** | GOVERNMENTAL APPROVALS | 47 |
| 16.1 | Seller's Obligation | 47 |
| 16.2 | Buyer's Assistance | 47 |
| **Article 17** | DISPUTE RESOLUTION | 47 |
| 17.1 | Arbitration | 47 |
| 17.2 | Arbitration Procedures | 47 |
| **Article 18** | AMENDMENT; ASSIGNMENT | 48 |
| 18.1 | Amendments | 48 |
| 18.2 | Assignment by Buyer and Seller | 48 |
| 18.3 | Binding Effect | 49 |
| **Article 19** | CREDIT SUPPORT; GUARANTY | 49 |
| 19.1 | Certain Credit Support Obligations | 49 |
| **Article 20** | MISCELLANEOUS | 50 |
| 20.1 | Notice | 50 |
| 20.2 | Cooperation | 51 |
| 20.3 | Confidentiality and Publicity | 51 |



## TABLE OF CONTENTS
(continued)

Page

| | | |
|---|---|---|
| 20.4 | Independent Contractor | 52 |
| 20.5 | No Approval | 52 |
| 20.6 | Choice of Law | 52 |
| 20.7 | Severability and Renegotiation | 52 |
| 20.8 | No Other Agreements | 53 |
| 20.9 | Cooperation with Financing | 53 |
| 20.10 | Third Party Beneficiaries | 53 |
| 20.11 | Captions | 53 |
| 20.12 | Survival | 53 |
| 20.13 | Further Assurances | 53 |
| 20.14 | Counterparts | 53 |



Schedule 1    Termination and Purchase Values

EXHIBIT A    Utility Plant Technical Parameters
EXHIBIT B    Interconnection Facilities
EXHIBIT C    Utilities Specifications
EXHIBIT D    Existing Facilities Description
EXHIBIT E    Excess Utilities Prices
EXHIBIT F    Maintenance of Existing Facilities; Spare Parts
EXHIBIT G    New Facilities Description
EXHIBIT H    Load Shedding Protocol
EXHIBIT I    Form of PDVSA Guaranty
EXHIBIT J    Examples of Adjustments Using Index
EXHIBIT K    Interconnection Plan
EXHIBIT L    Schedule for Removal of Existing Facilities and Cleaning of Site
EXHIBIT M    Flood, Earthquake and Hurricane Insurance Policy Limits
EXHIBIT N    Form of IUH Guaranty

Attachment A – Letters from B-O-O Committee to Isla



# UTILITIES SERVICES AGREEMENT

This UTILITIES SERVICES AGREEMENT (this "Agreement"), dated as of March 27, 1998, is made by and between Curaçao Utilities Company N.V., a limited liability company organized and existing under the laws of The Netherlands Antilles ("Seller"), and Refinería Isla (Curazao) S.A., a *sociedad anónima* organized and existing under the laws of the Republic of Venezuela, with a registered branch in Curaçao, The Netherlands Antilles ("Buyer").

## RECITALS:

A.  Refinería di Kòrsou N.V., a Netherlands Antilles limited liability company wholly owned by the Island Territory of Curaçao ("RDK"), owns an oil refinery and related facilities (the "Refinery") located in the Emmastad area of Curaçao, Netherlands Antilles.

B.  RDK leases the Refinery to Buyer as assignee of Petróleos de Venezuela S.A., a company organized and existing under the laws of the Republic of Venezuela and the corporate parent of Buyer ("PDVSA"), pursuant to the Lease Agreement dated September 14, 1994 (the "PDVSA Lease").

C.  Pursuant to Section 8.5 and Attachment "I" of the PDVSA Lease, and pursuant to the agreement dated February 12, 1997, between Buyer and the Committee of the Government of The Island Territory of Curaçao for the Build-Own-Operate Program, it was agreed that the needs of the Refinery for a reliable supply of steam, water, air and electricity sufficient to satisfy the Refinery's long-term requirements and the additional requirements of the IRUP Project (as hereinafter defined) would be met through an "Independent Utilities Producer Scheme."

D.  Buyer and Seller desire that Seller undertake the Independent Utilities Producer Scheme, and based thereon Seller intends to develop, finance, construct, lease, own, operate and maintain facilities and equipment for the production of the Utilities.

E.  The Project will be located on land leased by Seller from RDK, and the equipment and facilities associated therewith will be comprised of certain new equipment and facilities to be developed, constructed, owned and operated by Seller, all as more fully described on Exhibit G (the "New Facilities"), as well as certain existing utility equipment and facilities previously used by Buyer and leased from RDK, all as more fully described on Exhibit D (the "Existing Facilities").

F.  Seller and Buyer desire to set forth their agreement regarding the terms and conditions pursuant to which Seller will provide, and Buyer will receive and pay for, Utilities in furtherance of the Independent Utilities Producer Scheme.



1

F.     Seller and Buyer desire to set forth their agreement regarding the terms and conditions pursuant to which Seller will provide, and Buyer will receive and pay for, Utilities in furtherance of the Independent Utilities Producer Scheme.

NOW, THEREFORE, in consideration of the agreements and covenants hereinafter set forth, and intending to be legally bound hereby, Seller and Buyer hereby covenant and agree as follows:

## STATEMENT OF INTENT

Seller and Buyer agree that this Agreement sets forth their respective obligations with respect to the supply and purchase of Utilities required in connection with the operation of the Refinery, and with respect to the construction and operation of certain new and existing facilities required for the supply of such Utilities. On the terms and subject to the conditions set forth below in this Agreement, Seller has agreed to construct and operate the New Facilities and to assume control of and operate the Existing Facilities, and to perform certain other obligations, all for the purpose of providing a reliable supply of Utilities to the Refinery (as it may be expanded pursuant to the IRUP Project), and Buyer has agreed to make certain take-or-pay payments and perform certain other obligations that will enable Seller to make the investments (including obtaining long-term debt financing) necessary to construct the New Facilities and integrate the New Facilities and the Existing Facilities into an overall Utility Plant, as well as to enable Seller to operate and maintain the Utility Plant. Each of Seller and Buyer hereby acknowledge and agree to perform their respective obligations as hereafter set forth.

## Article 1
## DEFINITIONS

1.1     Definitions. Except as otherwise defined in this Agreement, capitalized terms used in this Agreement have the respective meanings assigned to them as follows:

"Affiliate" means, with respect to any Person, (i) each Person that directly or indirectly, controls or is controlled by or is under common control with such designated Person (ii) any Person that beneficially owns or holds more than fifty percent (50%) of any class of voting securities of such designated Person or holds more than fifty percent (50%) of the equity interest in such designated Person, and (iii) any Person of which such designated Person beneficially owns or holds more than fifty percent (50%) of any class of voting securities or in which such designated Person beneficially owns or holds more than fifty percent (50%) of the equity interest. For the purposes of this definition, "control" (including, with correlative meanings, the terms "controlled by" and "under common control with"), as used with respect to any Person, means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of such Person, whether through the ownership of voting securities or by contract or otherwise.

"Agreement" has the meaning set forth in the preamble hereof.



2

"Air Event" means an event identified as such on Exhibit H resulting from Seller's failure to deliver Compressed Air as required pursuant to Section 2.1.1 at a pressure of at least 3 barg, which failure causes Buyer's air load shedding system to be fully engaged.

"Applicable Law" means, with respect to any Person, all laws, statutes, codes, acts, treaties, ordinances, orders, judgments, writs, decrees, injunctions, rules, regulations, Governmental Approvals, directives and requirements of all Governmental Authorities, in each case applicable to or binding upon such Person or any of its properties.

"Assessment" means any tax, duty, levy, charge, dues, contribution or assessment imposed by any Governmental Authority.

"Blackout" means a complete failure on the part of Seller to deliver Utilities as required pursuant to Section 2.1.1 such that all consumption of Utilities at the Refinery ceases pursuant to the Load Shedding Protocol.

"Business Day" means any day other than a Saturday, Sunday, or official public holiday in The Island Territory of Curaçao.

"Buyer" has the meaning set forth in the first paragraph of this Agreement.

"Buyer Event of Default" has the meaning set forth in Section 12.2.

"Buyer's Indemnitee" has the meaning set forth in Section 10.1.

"Change in Law" means (i) the adoption, promulgation, modification or reinterpretation by an authority with jurisdiction after the Effective Date of any Applicable Law, (ii) the imposition after the Effective Date by a Governmental Authority of any term or condition in connection with the issuance, renewal, extension, replacement or modification of any Governmental Approval that establishes new requirements for the construction, operation or maintenance of the Project that are adverse to the affected Party, (iii) the non-approval or non-renewal of any Governmental Approval, or the renewal of the same on terms materially less favorable than as originally issued (in each case so long as due application for such Governmental Approval was properly and timely made), or (iv) any other materially adverse restrictions or restraints imposed by Applicable Law or by rule, regulation or order of a Governmental Authority, in each case, which affects the Project or the Parties; provided, however, that a "Change in Law" shall not include any of the above-identified events to the extent such event specifically applies only to Seller or the Project and not to a broader class of Persons or activities of which Seller or the Project is only a part.

"Commercial Operation Date" means the date Seller designates to Buyer in writing as the date the Utility Plant is capable of delivering to Buyer the Utilities to be supplied in accordance with Section 2.1.1.

3

DOCSDC1:259925.33

"Committed Excess Electricity" means, in any Operating Year, up to 2,400,000 kWh of Electricity delivered to Buyer when Seller is providing to Buyer at any time more than 60,000 kW of Electricity (measured instantaneously), but not more than 64,000 kW of Electricity at any time (measured instantaneously).

"Committed Excess Electricity Payment" has the meaning set forth in Section 5.1.2.

"Common Facilities Agreement" means the Common Facilities Agreement by and between Seller and Buyer with respect to the provision by Buyer and the use by Seller, in connection with the construction and operation of the Project, of certain utilities, facilities and services produced, owned or controlled by Buyer and used in the operation of both the Refinery and the Project.

"Compressed Air" means compressed plant and instrument air meeting the specifications set forth in Exhibit C delivered by Seller to Buyer pursuant to this Agreement at the Compressed Air Interconnection Point.

"Compressed Air Contract Capacity" has the meaning set forth in Section 2.1.1.

"Compressed Air Interconnection Facilities" means those facilities required to connect the Utility Plant with the existing compressed air distribution system of the Refinery in order to effectuate the purpose of this Agreement, as set forth in Exhibit B.

"Compressed Air Interconnection Point" means the physical point described in Exhibit B at which interconnection is made between the compressed air systems of the Utility Plant and the Refinery pursuant to Article 7.

"Contract Capacity" means any or all of the Electricity Contract Capacity, the Compressed Air Contract Capacity, the Steam Contract Capacity and the Water Contract Capacity, as the context requires.

"Curaçao CPI Index" means, at any time, the "Consumer Price Index" (end of year, entire population) as published by the Netherlands Antilles Central Bureau of Statistics (Centraal Bureau voor de Statistiek) for the December preceding the date for which the determination based on such Curaçao CPI Index is then being made. Such index shall be calibrated with reference to the base index set by the Netherlands Antilles Central Bureau of Statistics for February 1996 (which base index as of the date hereof is 100).

"Damages" has the meaning set forth in Section 10.1.

"Demobilization Costs" has the meaning set forth in Section 12.5.1.



"Determination Date" has the meaning set forth in Section 12.1(ii).

"Dollars," "$" or "US$" means the lawful tender of the United States of America.

"Effective Date" means the date this Agreement is executed and delivered.

"Electricity" means electrical energy meeting the specifications set forth in Exhibit C delivered by Seller to Buyer at the Electricity Interconnection Point pursuant to this Agreement.

"Electricity Contract Capacity" has the meaning set forth in Section 2.1.1.

"Electricity Interconnection Facilities" means those facilities required to connect the Utility Plant with the existing electricity distribution system of the Refinery in order to effectuate the purpose of this Agreement, as set forth in Exhibit B.

"Electricity Interconnection Points" means the physical point described in Exhibit B at which interconnection is made between the electrical systems of the Utility Plant and the Refinery pursuant to Article 7.

"Environmental Compliance Charges" has the meaning set forth in Section 5.1.4.

"EPC Contract" means the Agreement for Engineering, Procurement and Construction Services to be negotiated and entered into by and between Seller and EPC Contractor in respect of the engineering, procurement, construction, commissioning, testing, start-up and initial operation of the Utility Plant on a fixed-price basis.

"EPC Contractor" means the counterparty to the EPC Contract.

"Event" has the meaning set forth in Section 9.1.1.

"Event of Default" means a Buyer Event of Default or a Seller Event of Default, collectively or individually, as the context requires.

"Excess Cycling Fee" has the meaning set forth in Section 2.3.2.

"Excess Utilities" means (a) with respect to Electricity, (i) all Electricity above the level of 64,000 kW delivered to Buyer, when Seller is providing to Buyer at any time (measured instantaneously) more than 64,000 kW, and (ii) after Seller has delivered the Committed Excess Electricity in any Operating Year, all Electricity above the level of 60,000 kW delivered to Buyer when Seller is providing to Buyer at any time (measured instantaneously) more than 60,000 kW; and (b) with respect to each other Utility, the excess quantity of such Utility delivered to Buyer above the level of the applicable Contract Capacity, when Seller is providing



DOCSDC1:29925.33

to Buyer at any time (measured instantaneously) more than the respective Contract Capacity for such Utility.

"Excess Utilities Payment" has the meaning set forth in Section 5.1.3.

"Excess Utilities Price(s)" means the price(s) applicable to all Excess Utilities delivered hereunder from and after the Commercial Operation Date (or, if earlier, the Take-or-Pay Date), in each case as set forth on and determined in accordance with Exhibit E.

"Existing Facilities" has the meaning set forth in the Recitals.

"Existing Facilities Lease" means the lease agreement to be negotiated and entered into by and between Seller and RDK pursuant to which RDK will lease to Seller the Existing Facilities for use as part of the Project.

"Final Interconnection Date" means the date on which the Interconnection Facilities are completed and the New Facilities and the Existing Facilities are interconnected for all purposes hereunder such that the Utility Plant is able to be operated as an integrated whole.

"Financial Closing Date" means the date upon which Seller first has access, but for conditions to continued funding contained in the Financing Documents, to funds provided by the Financing Parties and other entities sufficient for the construction and completion of the New Facilities and the Interconnection Facilities.

"Financing Documents" means any and all loan agreements, notes, indentures, swap and hedging agreements, security agreements, deeds of transfers, pledge agreements or deeds, letters of comfort, subordination agreements, mortgages, deeds of trust, participation agreements and other documents relating to the construction, interim and long-term financing of the Utility Plant and any refinancing thereof provided by the Financing Parties, including any and all modifications, extensions, renewals and replacements of any such financing or refinancing.

"Financing Parties" means any and all lenders providing senior or subordinated construction, interim or long-term debt financing or refinancing of the Project, and any trustee or agent acting on their behalf.

"Fixed Take-or-Pay Component" has the meaning set forth in Section 5.1.1.1.

"Force Majeure Event" means any event which wholly or partly prevents or delays the performance of any obligation arising under this Agreement, but only if and to the extent (i) such event is not within the reasonable control, directly or indirectly, of the Party affected, (ii) such event, despite the exercise of reasonable diligence, cannot be or be caused to be prevented, avoided or removed by such Party, (iii) the Party affected has taken all reasonable precautions and measures in order to avoid the effect of such event on such Party's ability to

6

perform its obligations under this Agreement and to mitigate the consequences thereof, and (iv) such event is not the direct or indirect result of a Party's negligence or the failure of such Party to perform any of its obligations under this Agreement. A "Force Majeure Event" shall include, but not be limited to, any of the following:

(a)     acts of God or the public enemy, war, whether declared or not, blockade, insurrection, riot, civil disturbance, public disorder, rebellion, violent demonstration, revolution, or sabotage;

(b)     expropriation, requisition, confiscation, nationalization or other compulsory acquisition by a government or agency, export or import restriction or other restrictions, rationing or allocations imposed by any Governmental Authority, other than any thereof that applies only to Seller or the Project and not to a broader class of Persons or activities of which Seller or the Project is only a part;

(c)     any effect of unusual natural elements, including fire, volcanic eruption, landslide, earthquake, flood, tsunami, lightning, hurricane, unusually severe storm, perils of sea, or similar cataclysmic occurrence or other unusual natural calamity;

(d)     environmental and other contamination at or affecting the Site;

(e)     explosion, accident or epidemic;

(f)     general strikes, lockouts or other collective or industrial action by workers or employees, or other labor difficulties not directed exclusively at Buyer or Seller, or the Project or the Refinery;

(g)     the unavailability of labor, fuel, power or raw materials, the breakdown of the Utility Plant or other plant breakdown or equipment failure, and any event affecting the ability of any supplier (including under any fuel supply agreement) to the Project to fulfill its obligations to Seller and the Project so long as, in each case, the cause thereof otherwise would qualify under this Agreement as a Force Majeure Event;

(h)     accidents of navigation or breakdown or injury of vessels, accidents to harbors, docks, bridges, canals or other assistances to or adjuncts of shipping or navigation, epidemic or quarantine;

(i)     any Change in Law;

(j)     nuclear emergency, radioactive contamination or ionizing radiation or the release of any hazardous waste or materials; and



DOCSDC1:29925.33

7

(k)    air crash, shipwreck, train wreck, or any other failures or delays of transportation if the cause of such other failure or delay otherwise would qualify under this Agreement as a Force Majeure Event;

provided, however, that neither the lack of money nor changes in market conditions shall constitute force majeure.

"Fuel" means the fuel in the required quality and quantity to be supplied to Seller by Buyer pursuant to the Fuel Supply Agreement and all other fuel necessary for the operation of the Utility Plant in accordance with the terms of this Agreement.

"Fuel Supply Agreement" means the Fuel Supply Agreement by and between Buyer, as fuel supplier, and Seller, as purchaser, with respect to the supply of refinery gas, diesel, #6 fuel oil, pitch and other fuels to be utilized in the Project.

"Governmental Approval" means any authorization, approval, consent, license, franchise, lease, ruling, permit, tariff, rate, certification, exemption, filing or registration by or with any Governmental Authority.

"Governmental Authority" means any legislative, administrative, judicial or other governmental authority, agency, court, municipal body or entity in or of the Island Territory of Curaçao, The Netherlands Antilles or The Kingdom of The Netherlands having legal jurisdiction over the Person in question or the Project, including The Governments, any Person or entity controlled by or a part of either of The Governments, and any Person or entity in which either of The Governments participates.

"Ground Lease" means the agreement between RDK and Seller with regard to the Site and easements appurtenant thereto necessary to effectuate the purposes of this Agreement.

"Guaranteed Commercial Operation Date" means the date that is thirty (30) months after the Financial Closing Date, as such date may be adjusted, if applicable, pursuant to Section 3.2.1.

"Indemnity Claim Notice" has the meaning set forth in Section 10.3.1.

"Index" means, at any time, the weighted average achieved by adding (i) the product of forty percent (40%) times the change in the US CPI Index as compared to the applicable base index for the US CPI Index as set forth on Exhibit J, and (ii) the product of sixty percent (60%) times the change in the Curaçao CPI Index as compared to the applicable base index for the Curaçao CPI Index as set forth on Exhibit J.

"Indexed Take-or-Pay Component" has the meaning set forth in Section 5.1.1.2.

8

"Interconnection Facilities" means the Water Interconnection Facilities, the Compressed Air Interconnection Facilities, the Steam Interconnection Facilities, and the Electricity Interconnection Facilities, collectively or individually, as the context requires.

"Interconnection Period" has the meaning set forth in Section 3.4.3.

"Interconnection Plan" means the plan and protocol further described in Exhibit K pursuant to which Buyer will provide Seller, EPC Contractor and other subcontractors with access to the Existing Facilities and other areas of the Refinery such that the New Facilities and the Existing Facilities may be interconnected for all purposes in order to allow the Utility Plant to be operated as an integrated whole and be capable of delivering to Buyer the Utilities to be supplied in accordance with Section 2.1.1.

"Interconnection Point" means the Water Interconnection Point, the Compressed Air Interconnection Point, the Steam Interconnection Points and the Electricity Interconnection Point, collectively or individually, as the context requires.

"IUH" means Integrated Utilities Holdings N.V., a company organized and existing under the laws of The Netherlands Antilles that is wholly-owned by the government of The Island Territory of Curaçao.

"IRUP Project" means the Isla Refinery Upgrade Project described in the PDVSA Lease, which is to be implemented by Buyer.

"KAE" means Kompania di Awa i Elektrisidat di Kòrsou N.V., a company organized and existing under the laws of The Netherlands Antilles and its successors and permitted assigns.

"KODELA" means Kompania di Distribushon di Elektrisidat i Awa di Kòrsou N.V., a company organized and existing under the laws of The Netherlands Antilles and its successors and permitted assigns.

"KODELA Power Purchase Agreement" means an agreement to be negotiated and entered into by and between Seller and KODELA with respect to the sale by Seller and purchase by KODELA of electrical capacity and energy to be produced by the Project.

"kW" and "kWh" mean kilowatt and kilowatt-hour, respectively.

"Level I Event," "Level II Event" and "Level III Event" mean the events described as such on Exhibit H resulting from Seller's failure to deliver Electricity as required pursuant to Section 2.1.1 that cause Buyer to implement its Load Shedding Protocol.

"Load Shedding Protocol" means the automated load shedding system in place at the Refinery that takes specified Utilities distribution circuits and lines out of service if there is



an insufficient supply of Electricity, Steam or Compressed Air, all as further described on Exhibit H.

"Meter" means an instrument or instruments and associated measuring equipment meeting applicable utility industry standards used to measure, or to measure and record, the volume and other required delivery characteristics of each Utility.

"MW" and "MWh" mean megawatt and megawatt-hour, respectively.

"New Facilities" has the meaning set forth in the Recitals.

"O&M Agreement" means the Operation and Maintenance Agreement by and between Seller and O&M Contractor with respect to the operation and maintenance of the Project.

"O&M Contractor" means the Person entering into a definitive agreement with Seller for the operation and maintenance of the Utility Plant.

"Operating Committee" has the meaning set forth in Section 2.3.3.

"Operating Year" means a twelve-month period beginning on the Commercial Operation Date and on each anniversary thereof.

"Party" or "Parties" means a signatory or the signatories to this Agreement.

"PDVSA" has the meaning set forth in the Recitals.

"PDVSA Lease" has the meaning set forth in the Recitals.

"Permitted Variance" has the meaning set forth in Section 6.3.3.

"Person" means an individual, partnership, corporation, business trust, joint stock company, trust, unincorporated association, *stichting*, joint venture, Governmental Authority, limited liability company or any other entity of whatever nature.

"Prime Rate" means the interest rate (sometimes referred to as the "base rate") for large commercial loans to creditworthy entities announced from time to time by Citibank, N.A. (New York), or its successor bank, or, if such rate is not announced, the rate published in The Wall Street Journal as the "prime rate" from time to time (or, if more than one rate is published, the arithmetic mean of such rates), in either case determined as of the date the obligation to pay interest arises, but in no event more than the maximum rate permitted by Applicable Law.

"Project" means the Utility Plant, the Site and all assets, contracts, Governmental Approvals and documents related thereto.

10

DOCSDC1:29925.33

"Project Book Value" means the cost of the Project less accumulated depreciation, all as determined according to generally accepted accounting principles in effect in the United States.

"Project Contracts" means (i) this Agreement, (ii) the KODELA Power Purchase Agreement, (iii) the Fuel Supply Agreement, (iv) the Ground Lease, (v) the Existing Facilities Lease, (vi) the Common Facilities Agreement, (vii) the EPC Contract, and (viii) the O&M Agreement.

"Prudent Operating Practices" means, with respect to any Utility, practices, methods and standards of professional care, skill and diligence engaged in or approved by a significant portion of the utility industry for facilities of similar size, type, and design, that, in the exercise of reasonable judgment, in light of the facts known at the time, would have been expected to accomplish results consistent with law, regulation, reliability, safety, environmental protection, applicable codes, and standards of economy and expedition.

"Purchase Date" has the meaning set forth in Section 15.1.

"Purchase Notice" has the meaning set forth in Section 15.1.

"RDK" has the meaning set forth in the Recitals.

"Refinery" has the meaning set forth in the Recitals.

"Scheduled Shutdown" has the meaning set forth in Section 8.1.

"Seller" has the meaning set forth in the first paragraph of this Agreement.

"Seller Event of Default" has the meaning set forth in Section 12.1.

"Seller's Indemnitee" has the meaning set forth in Section 10.2.

"Site" means all those parcels of real property now or hereafter leased by RDK to Seller pursuant to the Ground Lease on which the Utility Plant is to be located.

"Steam" means steam meeting the specifications set forth in Exhibit C delivered by Seller to Buyer at the Steam Interconnection Point pursuant to this Agreement.

"Steam Contract Capacity" has the meaning set forth in Section 2.1.1.

"Steam Event" means an event described as such on Exhibit H resulting from Seller's failure to deliver Steam as required pursuant to Section 2.1.1 at a pressure of at least 14 barg, which failure causes Buyer's steam load shedding system to be fully engaged.

"Steam Interconnection Facilities" means those facilities required to connect the Utility Plant with the existing steam distribution system of the Refinery in order to effectuate the purposes of this Agreement, as set forth in Exhibit B.

"Steam Interconnection Points" means the physical points described in Exhibit B at which interconnection is made between the steam systems of the Utility Plant and the Refinery pursuant to Article 7.

"Take-or-Pay Date" has the meaning set forth in Section 5.1.

"Take-or-Pay Payment" means the sum of the Fixed Take-or-Pay Component and the Indexed Take-or-Pay Component.

"Term" has the meaning set forth in Section 4.1.

"The Governments" means, collectively, the governments of The Netherlands Antilles and The Island Territory of Curaçao.

"Turnover Date" has the meaning set forth in Section 3.4.2.

"Uncommitted Construction Amount" has the meaning set forth in Section 14.5.2.

"US CPI Index" means, at any time, the "Consumer Price Index, All Urban Consumers, All Items," as published by the U.S. Department of Labor, Bureau of Labor Statistics, in the publication CPI Detailed Report for the December preceding the date for which the determination based on such US CPI Index is then being made. Such index shall be calibrated with reference to the base index set by the U.S. Department of Labor, Bureau of Labor Statistics for 1982-84 (which base index as of the date hereof is 100).

"Utilities" means, collectively, Electricity, Compressed Air, Steam and Water, and "Utility" means any thereof individually.

"Utility Plant" means all of the assets, facilities and real property owned or controlled by Seller and associated with the Project, including the New Facilities, as well as, upon their transfer to Seller pursuant to the Existing Facilities Lease, the Existing Facilities.

"Water" means desalinated sea water meeting the specifications set forth in Exhibit C produced by the Utility Plant and delivered by Seller to Buyer at the Water Interconnection Point pursuant to this Agreement.

"Water Contract Capacity" has the meaning set forth in Section 2.1.1.



DOCSDC1:29925.33

FILED: NEW YORK COUNTY CLERK 08/26/2020 01:39 PM

NYSCEF DOC. NO.: 3    Case 1:17-mc-00151-LPS   Document 564-2   Filed 05/24/23   Page 22 of 63 PageID #: 14747    RECEIVED NYSCEF: 08/26/2020

"Water Interconnection Facilities" means those facilities required to connect the Utility Plant with the existing water system of the Refinery in order to effectuate the purposes of this Agreement, as set forth in Exhibit B.

"Water Interconnection Point" means the physical point described in Exhibit B at which interconnection is made between the water systems of the Utility Plant and the Refinery pursuant to Article 7.

1.2   Rules of Interpretation. Unless otherwise required by the context in which any term appears: (a) capitalized terms used in this Agreement shall have the meanings specified in this Article 1; (b) the singular shall include the plural; (c) references to "Articles," "Sections," "Schedules," "Annexes," "Appendices" or "Exhibits" (if any) shall be to articles, sections, schedules, annexes, appendices or exhibits (if any) of this Agreement; (d) all references to a particular entity shall include a reference to such entity's successors and permitted assigns; (e) the words "herein," "hereof" and "hereunder" shall refer to this Agreement as a whole and not to any particular section or subsection of this Agreement; (f) all accounting terms not specifically defined herein shall be construed in accordance with generally accepted accounting principles in the United States of America, consistently applied; (g) references to this Agreement shall include a reference to all appendices, annexes, schedules and exhibits hereto, as the same may be amended, modified, supplemented or replaced from time to time; and (h) references to any agreement, document or instrument shall mean a reference to such agreement, document or instrument as the same may be amended, modified, supplemented or replaced from time to time. The Parties collectively have prepared this Agreement, and none of the provisions hereof shall be construed against one Party on the ground that such Party is the author of this Agreement or any part hereof.

## Article 2
## SUPPLY OF UTILITIES; THIRD PARTY SALES

2.1   Supply of Utilities. Subject, in each case, to Seller's receiving Fuel and to the other terms and conditions of this Agreement:

2.1.1   Supply of Utilities after Commercial Operation Date. From and after the Commercial Operation Date, Seller shall make available to Buyer such quantities of Utilities as Buyer may request from time to time, not to exceed the following amounts:

(i)   560 normal cubic meters of Compressed Air per minute (the "Compressed Air Contract Capacity");

(ii)   60,000 kW of Electricity (the "Electricity Contract Capacity");

(iii)   380 metric tons of Steam per hour (the "Steam Contract Capacity"); and

(iv)   260 cubic meters of Water per hour (the "Water Contract Capacity");



and, in addition, in the case of Electricity, the Committed Excess Electricity. Changes in load and operating levels shall be coordinated by the Operating Committee, or by designated representatives of Buyer and Seller pursuant to procedures developed by the Operating Committee, taking into account the technical parameters of the Utility Plant (such as, for example, ramp rates, time required to implement load changes and start-up times of equipment, all as more fully described in Exhibit A).

2.1.2    Failure to Meet Quantity Requirements. Except to the extent an Event of Default occurs under Section 12.1(iii), the consequences of Seller's failure to deliver to Buyer the quantities of Utilities required pursuant to Section 2.1.1 shall be governed solely by Article 9.

2.1.3    Failure to Meet Quality Standards. If Utilities delivered by Seller are not taken by Buyer because of their failure to meet the quality specifications set forth on Exhibit C, Seller shall be deemed to have failed to deliver such out-of-specification Utilities for purposes of Section 2.1.1, the consequences of which shall be governed solely by Article 9.

2.2    Excess Utilities. Except with respect to Committed Excess Electricity, Seller shall have no obligation to make available or deliver to Buyer any quantity of Utilities in excess of the applicable Contract Capacities for such Utilities, and there shall be no penalty or other consequence to Seller for failing to make available or deliver to Buyer any Excess Utilities. To the extent Seller in its sole discretion elects to make available to Buyer from time to time such quantities of Excess Utilities as Buyer may request from time to time, Buyer shall take and pay for at the applicable Excess Utilities Price (set forth on Exhibit E) such quantities of Excess Utilities that Seller makes available to Buyer. Buyer shall not take or attempt to take any Excess Utilities except with the consent of Seller. At Buyer's request, Seller shall meet with Buyer to discuss providing to Buyer Excess Utilities in connection with any expansions of or modifications to the Refinery; provided, however, that neither Seller nor Buyer shall be obligated to supply or purchase, as the case may be, any Excess Utilities in connection with any such modification or expansion unless such obligation is reflected in a definitive agreement executed by each Party acting in its sole discretion.

2.3    Coordination.

2.3.1    Scheduling. Buyer shall provide Seller with Buyer's best estimate (which estimate shall not be binding on Buyer) of its expected requirements for each of the Utilities during the Term:

(i)    for each calendar year, at least ninety (90) days prior to the start of such year (or, in the case of the calendar year in which the Commercial Operation Date occurs, forty-five (45) days prior to the projected Commercial Operation Date);

(ii)    for each month, at least ten (10) days prior to the end of the preceding month; and

(iii)    for each week (beginning Monday), by Friday of the preceding week.



14

Subject to the other terms and conditions of this Agreement, Seller shall supply and control the delivery of all Utilities to satisfy Buyer's requirements up to the limits provided in this Agreement. Buyer shall advise Seller of any significant changes in its expected requirements for Utilities and purchases hereunder as soon as practicable, and, through the Operating Committee, shall coordinate changes in its actual requirements through the respective control rooms of Buyer and Seller, taking into account the technical parameters set forth in Exhibit A.

2.3.2  Excess Cycling by Buyer. Buyer agrees that it shall pay a fee of US$4,000 (the "Excess Cycling Fee") each time (after the first ten (10) such events in each Operating Year) that Buyer experiences an unscheduled drop in load of more than twenty percent (20%), other than for causes attributable to Seller or as a result of a Force Majeure Event.

2.3.3  Operating Committee. Seller and Buyer agree promptly to establish an operating committee (the "Operating Committee") consisting of two representatives each of Seller and Buyer. The Operating Committee shall act by mutual agreement. Seller and Buyer shall designate their respective representatives on the Operating Committee, and any alternate, by written notice delivered in accordance with Section 20.1. The Operating Committee shall develop and implement a program to provide continuous communications between Seller and Buyer regarding Buyer's load and other requirements for Utilities, as well as other suitable operating, maintenance, outage and capability reporting, accounting, and record-keeping policies and procedures to coordinate the operation of the New Facilities and the Existing Facilities and the interconnection between the Utility Plant and the Refinery, and to facilitate the coordination and interaction between the Parties with respect to their performance of the duties and obligations imposed hereunder. The Operating Committee shall develop and implement a procedure and protocol for implementing changes in load and operating levels pursuant to the technical parameters set forth in Exhibit A.

2.4  Third Party Sales.

2.4.1  Sale of Utilities in Excess of Contract Capacities. Buyer acknowledges that Seller will enter into certain obligations to deliver electricity to KODELA pursuant to the KODELA Power Purchase Agreement, and agrees that so long as Seller is satisfying its obligations to deliver Electricity to Buyer as required under Section 2.1.1, Seller may deliver up to 22,000 kW of Electricity at any time to KODELA without restriction. Buyer further agrees that so long as Seller is satisfying its obligations to Buyer under Section 2.1.1, Seller shall have the right to sell any and all quantities of Excess Utilities to KODELA and other alternative purchasers. Buyer shall supply, and Seller shall pay for, all fuel required for such deliveries of Electricity to KODELA and other alternative purchasers pursuant to the Fuel Supply Agreement.

2.4.2  Utilities Not Taken. If Buyer does not take any quantity of Utilities committed to it under this Agreement, Seller shall have the right to deliver the quantity of such Utilities not taken by Buyer to KODELA and to other alternative purchasers until such time as Buyer again requires such quantity of Utilities. Notwithstanding the foregoing, nothing in this Section 2.4 shall in any way reduce Buyer's obligation to make the Take-or-Pay Payment and to make the Committed Excess Electricity Payment as provided in this Agreement.



15

## Article 3
## COMPLETION AND START OF OPERATIONS OF UTILITY PLANT; CERTAIN COVENANTS

### 3.1 Construction and Interconnection.

3.1.1 Seller Construction of New Facilities. Seller shall cause the New Facilities to be developed, designed, engineered, procured, constructed and placed into commercial operation at no expense to Buyer except as otherwise provided in this Agreement or in the Fuel Supply Agreement or the Common Facilities Agreement.

3.1.2 Interconnection of Existing Facilities. Subject to Buyer's compliance with Section 3.4, Seller shall cause the Existing Facilities to be interconnected with the New Facilities such that the overall Utility Plant is capable of operation as an integrated facility that can satisfy Seller's obligations to deliver Utilities to Buyer as required under this Agreement. Such interconnection shall be undertaken at no expense to Buyer except as otherwise provided in this Agreement or in the Fuel Supply Agreement or the Common Facilities Agreement.

3.1.3 Seller's Rights. In connection with its responsibilities in Section 3.1.1 and 3.1.2 above, Seller shall have the right, in its sole discretion and for its sole account: (i) to call for tenders and award contracts with or without tender; (ii) to arrange for the preparation of detailed designs and approve or reject the same; (iii) to appoint and remove consultants and professional advisers; (iv) to purchase equipment; (v) to appoint and remove, organize and direct, staff, and otherwise manage and supervise the Utility Plant; (vi) to obtain real property as necessary or desirable; (vii) to enter into contracts for the supply of materials and services; (viii) to provide or cause to be provided all financing for the construction of the Utility Plant (other than the Existing Facilities), the interconnection of the Existing Facilities with the New Facilities, and the development of the Project, including all debt servicing arrangements in respect of all capital requirements and other costs of Seller arising in respect therewith or out of this Agreement; and (ix) to do all other things necessary or desirable for the completion of the Utility Plant in order to achieve the Commercial Operation Date in a timely manner.

3.1.4 Start-up and Testing Period. Seller may, in its discretion, make available to Buyer any Utilities generated during start-up, testing and commissioning of the Project. Buyer shall cooperate with Seller and use all reasonable efforts to accept (at no charge) such Utilities; provided, however, that Buyer shall have no obligation to accept any Utility prior to the Commercial Operation Date (or, if earlier, the Take-or-Pay Date) if doing so would, in Buyer's opinion, endanger persons or property or unreasonably interfere with Buyer's operations. Seller shall provide Buyer with not less than seven (7) days' notice prior to delivering any Utilities under this Section 3.1.4.

3.1.5 Deliveries after Take-or-Pay Date. If Seller establishes a Take-or-Pay Date pursuant to Section 5.1, then from and after such date until the Commercial Operation Date, Seller shall use its commercially reasonable efforts to make available to Buyer from the New Facilities (and any portion of the Existing Facilities then under Seller's control) such quantities

DOCSDC1:29915.33

16

of Utilities (up to the Contract Capacities) that Seller can safely produce in accordance with Prudent Operating Practices. After the Commercial Operation Date, Seller shall be obligated to provide Utilities as set forth in Section 2.1.1.

### 3.2    Guaranteed Completion Dates.

3.2.1    Guaranteed Commercial Operation Date. Seller undertakes and guarantees to Buyer that, subject to the terms and conditions of this Agreement, the Commercial Operation Date shall be achieved on or before the Guaranteed Commercial Operation Date; provided, however, that (i) the Guaranteed Commercial Operation Date shall be extended on a day-for-day basis by the number of days during which a Force Majeure Event has occurred and is continuing, and (ii) the Guaranteed Commercial Operation Date shall be equitably extended if other delays result from the action or inaction of Buyer including, without limitation, Buyer's failure to comply with Section 3.4.3.

3.2.2    Liquidated Delay Damages. If Seller fails to achieve the Commercial Operation Date by the Guaranteed Commercial Operation Date, then for each full 7-day period (or part thereof, in which case the amounts below shall be pro rated) thereafter until the Commercial Operation Date is achieved, Seller shall pay to Buyer liquidated damages as follows: (i) during the first twenty-four (24) weeks of delay, $100,000 (or, if less, the amount of actual damages Buyer reasonably determines it has suffered as a result of such delay, Buyer and Seller hereby agreeing that solely for purposes of this subclause (i), and notwithstanding the exclusions set forth in Section 10.4, Buyer's actual damages shall include loss of production from the IRUP Project for such period), (ii) during the next sixteen (16) such weeks, $150,000, (iii) during the next twelve (12) such weeks, $200,000, and (iv) during the next thirteen (13) such weeks, $250,000; provided, however, that the aggregate amount of all damages payable by Seller under this Section 3.2.2 shall not exceed $10,450,000. Payments of liquidated damages under this Section 3.2.2 shall be due within five (5) Business Days after each full 7-day period of delay (or, if the delay period is less than seven (7) days, within five (5) Business Days thereafter). Except as provided in Section 12.5.2, the payment of liquidated damages as set forth in this Section 3.2.2 shall be Buyer's sole remedy for Seller's failure to achieve the Commercial Operation Date by the Guaranteed Commercial Operation Date. The Parties agree that it would be difficult or impossible to determine the actual damages suffered by Buyer as a result of Seller's breach of Section 3.2.1; consequently, the amounts specified in this Section 3.2.2 are reasonable as liquidated damages for such failures by Seller, and the amounts so fixed are reasonable estimates of just compensation for the harm that would actually be sustained by Buyer upon such failure by Seller.

### 3.3    Seller's Covenants.

3.3.1    Duty to Operate. Except as set forth in Section 9.2, as between Seller and Buyer, Seller shall at all times have the sole right and obligation to operate and maintain, or cause to be operated and maintained, the New Facilities and the balance of the Utility Plant other than the Existing Facilities, and from and after the Turnover Date, the Existing Facilities,



substantially in accordance with Prudent Operating Practices and all Governmental Approvals applicable to Seller.

3.3.2  Supply of Materials and Services. Seller shall provide all materials, equipment, and utilities necessary to operate the Utility Plant, except for any Fuel required to be supplied under the Fuel Supply Agreement and any utilities, services and facilities required to be provided by Buyer under the Common Facilities Agreement. Seller shall also provide, or cause to be provided, properly trained personnel and services necessary for it to operate the Utility Plant or cause the same to be operated in accordance with this Agreement.

3.3.3  Reporting. Seller shall provide to Buyer, on a monthly basis during the period from the commencement of construction up to the Commercial Operation Date, status reports on the progress of construction of the New Facilities, and shall, at Buyer's request, meet to discuss such construction reports after receipt thereof by Buyer. On or prior to the fifteenth (15th) day of each month after the occurrence of the Commercial Operation Date, Seller shall deliver to Buyer a written operating report for the prior month in such form as may be agreed upon by the Parties.

3.3.4  No Liens. Seller shall deliver Utilities to Buyer hereunder free of any lien, charge or other encumbrance.

3.4     Buyer's Covenants.

3.4.1  Coordination During Construction. During the period of construction of the New Facilities and the Interconnection Facilities, Buyer shall cooperate with Seller to coordinate Seller's access to the Existing Facilities for purposes of inspecting, planning the use and maintenance of, and otherwise becoming familiar with, the Existing Facilities, and to arrange for the transition of operational responsibility for the Existing Facilities from Buyer to Seller.

3.4.2  Maintenance of Existing Facilities. During the period from the date hereof until the date the Existing Facilities are turned over to Seller pursuant to the Existing Facilities Lease (such date, the "Turnover Date"), which date is expected to occur immediately prior to the Commercial Operation Date, Buyer shall continue to maintain the Existing Facilities in accordance with manufacturers' recommended maintenance standards and the requirements of the PDVSA Lease. In addition, Buyer shall perform scheduled maintenance on the Existing Facilities in accordance with Exhibit F. If, on or before the Turnover Date, any of the Existing Facilities requires repair, Buyer promptly shall undertake such repair (or if repair is not feasible, replacement) at no cost to Seller such that the Existing Facilities may be utilized by Seller as contemplated in this Agreement. Seller shall have the right to inspect the Existing Facilities during any outage or scheduled maintenance of the Existing Facilities occurring prior to the Turnover Date and to obtain copies of reports and tests relating to such outage or maintenance. Buyer promptly shall notify Seller of any such occurrence such that Seller may undertake such inspection. Seller shall also have the right to inspect the Existing Facilities at any other time upon reasonable notice to Buyer and so long as such inspection does not interfere with Buyer's operations.

18

DOCSDC1:29925.33

3.4.3  Implementation of Interconnection Plan.  Buyer shall comply with the Interconnection Plan to support Seller's obligation under Section 3.1.1 to place the New Facilities into commercial operation and its obligation to cause the Final Interconnection Date to occur contemporaneously with the date Seller is prepared to place the New Facilities into commercial operation.  In particular, but without limitation, Buyer agrees that: (a) it shall coordinate turn-arounds or other scheduled shut-downs of the Existing Facilities in advance with Seller such that during such turn-arounds or shut-downs Seller and its EPC Contractor (and other contractors and subcontractors) may install appropriate control and other systems so the Existing Facilities may be operated on an integrated basis with the New Facilities; and (b) during a two hundred and thirty (230)-day period commencing not earlier than 365 days after the Financial Closing Date and not later than 230 days prior to the estimated Final Interconnection Date (such 230-day period, the "Interconnection Period"), Buyer shall provide such access to the Existing Facilities and other areas of the Refinery as Seller may request for the purpose of interconnecting the New Facilities with the Existing Facilities and the Refinery and testing the integrated operation of the overall Utility Plant.  Buyer acknowledges and agrees that although Seller will use commercially reasonable efforts to minimize the effects of its interconnection activities on the Refinery's operations, during the Interconnection Period Seller may require Buyer to curtail operation of one or more individual components of the Existing Facilities in order to implement and complete such interconnection.

3.4.4  Spare Parts for Existing Facilities.  During the period from the date hereof through the Turnover Date, Buyer shall obtain and maintain (and replace, if utilized) the spare parts specified in Exhibit F required for the Existing Facilities.  On the Turnover Date, Buyer shall deliver to Seller all such spare parts at no cost to Seller.  In consultation with Seller, Buyer shall also order appropriate parts and components required for regular overhauls scheduled to occur within the first eighteen (18) months after the Turnover Date as specified on Exhibit F.  The costs of such overhaul parts and components which are turned over to Seller on the Turnover Date shall be paid by Seller on the Turnover Date (or within thirty (30) days after presentation by Buyer of invoices for which payment is due with respect to parts or components ordered but not yet received by the Turnover Date which Seller shall transfer to Buyer upon receipt).

3.4.5  Support During Construction of Utility Plant.  During the engineering and construction of the Utility Plant, Buyer shall provide to Seller all reasonable support possible, including, where available, providing copies of documentation, such as drawings, for the proper siting, design and engineering of the New Facilities.  Within nine (9) months after the Effective Date, Buyer shall relocate or remove, as applicable, at no cost to Seller, pipes, lines and other equipment and facilities at the Site that will not be part of the Existing Facilities in accordance with Exhibit L.  Within six (6) months after the Final Interconnection Date, Buyer shall relocate or remove, as applicable, at no cost to Seller, the equipment and facilities at the Site that are not then part of the Existing Facilities in accordance with Exhibit L.  Equipment and facilities not described on Exhibit L shall not be removed or relocated by Buyer except upon consultation with and consent of Seller.  After consultation with Buyer, Seller shall have the right to add or delete items from Exhibit L during the period from the date hereof up to and including the Final Interconnection Date.

19

3.4.6  Refinery Matters. Buyer agrees that it shall not amend, modify or supplement the Load Shedding Protocol without the prior written consent of Seller (which consent shall not be unreasonably withheld) unless such amendment, modification or supplement is not reasonably likely to result in a material adverse effect on Seller or its obligations under this Agreement.

3.4.7  No Resale. Buyer agrees that it shall not sell Utilities to any Person without the prior written consent of Seller, which may be granted or withheld in Seller's sole discretion; provided, however, that nothing herein shall prevent Buyer from providing Utilities at no cost to contractors performing services at the Refinery.

## Article 4
## TERM; CONDITIONS PRECEDENT

4.1  Term of Agreement. This Agreement shall be effective as of the Effective Date, and, unless earlier terminated in accordance with the terms hereof, shall continue in effect for a term that will end at 11:59 p.m. on December 31, 2014 (the "Term"). At the written request of Buyer or Seller made between eighteen (18) and twenty-four (24) months prior to the end of the initial Term, Buyer and Seller shall discuss in good faith whether the Term of the Agreement should be extended and, if so, under what terms and conditions (including, without limitation, the price of Utilities, the standards applicable to Seller's obligation to deliver Utilities, and the amount of liquidated damages, if any, applicable to Seller's failure to deliver Utilities in accordance with such standards). In discussing the price of Utilities in any extension of the Term, Seller and Buyer shall take into account, among other things, the fifteen (15) year, four (4) month period Seller projected would be the duration of the original Term during which Seller would receive the Take-or-Pay Payment, Seller's invested capital in the Project as represented by the residual value of the Project as of the end of the original Term, any additional capital investments in the Project made by Seller during the Term, projected operating costs of the Project, profit, and any additional capital investments to be made by Seller during any extension term; provided, however, that neither Buyer nor Seller shall have any obligation to agree to any extension of the term of this Agreement or any terms or conditions under which such extension would be made except in the exercise of such Party's sole discretion. If, by not later than June 30, 2014, Buyer and Seller have not executed an amendment to this Agreement extending the Term and setting forth the terms and conditions applicable to such extension, then Buyer may either (A) exercise its right to purchase under Section 15.1, or (B) submit to Seller a binding written offer setting forth the all-cash price it would pay to purchase the Utility Plant on an as-is, where-is basis (and subject to any rights of any Affiliate of The Island Territory of Curaçao to purchase the Project, as such rights are generally described in certain letters from the B-O-O Committee Curaçao, to Refinería Isla (Curazao) S.A., copies of which appear as Attachment A to this Agreement solely for convenience of reference; all subsequent references in this Agreement to such rights shall be deemed to include a reference to such letters) upon the expiration of the Term, which offer may not be withdrawn by Buyer for at least thirty (30) days after its submission. Within thirty (30) days after its receipt of the offer, Seller shall notify Buyer whether it has elected to accept or reject such offer. If Seller rejects such offer, Buyer may request to meet with Seller to discuss proposed adjustments to such offer, but Buyer shall have

**FILED: NEW YORK COUNTY CLERK 08/26/2020 01:39 PM** INDEX NO. 654058/2020

NYSCEF DOC. NO. 3     Case 1:17-mc-00151-LPS   Document 564-2   Filed 05/24/23   Page 30 of 63 PageID #: 14755   RECEIVED NYSCEF: 08/26/2020

no obligation to make any adjusted offer, and Seller shall have no obligation to accept any such adjusted offer.

    4.2    Conditions Precedent.

        4.2.1  Delivery of Agreements. The obligations of each of Seller and Buyer hereunder shall be subject to the execution of and delivery by Buyer and Seller of the Common Facilities Agreement and the Fuel Supply Agreement by not later than December 31, 1998.

        4.2.2  Credit Support for Seller's Liquidated Damages Obligations. The obligations of Buyer hereunder shall be subject to the delivery to Buyer, within thirty (30) days after execution of this Agreement, of credit support satisfying the criteria set forth in Section 19.1.

        4.2.3  PDVSA Guaranty. The obligations of Seller hereunder shall be subject to execution and delivery to Seller, within thirty (30) days after execution of this Agreement by Buyer, of an executed guaranty of Buyer's obligations hereunder from PDVSA in the form of Exhibit I.

        4.2.4  Failure to Achieve Financial Closing. The obligations of each of the Parties shall be subject to the occurrence of the Financial Closing Date by no later than the date that is nine (9) months after the latest to occur of (i) the Effective Date, (ii) the date of execution of the Fuel Supply Agreement, and (iii) the date of execution of the Common Facilities Agreement.

        4.2.5  Termination for Failure to Satisfy. If the conditions precedent set forth in this Section 4.2 are not satisfied or waived by the applicable Party on or before the date specified, then the other Party may terminate this Agreement upon thirty (30) days' written notice to the other Party, whereupon neither Party shall have any further obligations to the other. If this Agreement is terminated due to a failure to satisfy the condition set forth in Section 4.2.4 (unless such failure is attributable to Buyer or its Affiliates or to conditions at or affecting the Refinery), Seller shall reimburse Buyer, up to an amount not to exceed US$200,000, for one-half of the penalties actually paid by Buyer to the contractor for Buyer's IRUP Project as a result of the termination of the IRUP Project.

        4.2.6  Best Efforts to Satisfy. Each of the Parties diligently shall seek to satisfy the conditions precedent set forth in this Section 4.2 that are within its control.

## Article 5
## PRICES AND FORM OF PAYMENT

    5.1    Payment for Utilities. Commencing with the Commercial Operation Date (or the date Seller notifies Buyer that Seller is prepared to declare that the Commercial Operation Date has occurred, but cannot do so because the Final Interconnection Date has been delayed due to Buyer's failure to comply with Section 3.4.2 or 3.4.3; such date is hereinafter referred to as the

"Take-or-Pay Date") and continuing throughout the Term, each calendar month Buyer shall make the following payments to Seller in respect of Utilities provided under this Agreement:

5.1.1    Take-or-Pay Payment. The initial annual aggregate Take-or-Pay Payment shall be equal to US$37,500,000 (price level first quarter 1996). Each annual Take-or-Pay Payment shall be paid in equal monthly installments over each Operating Year and the first monthly installment of the Take-or-Pay Payment shall be prorated for the actual number of days remaining in the month in which the Commercial Operation Date (or the Take-or-Pay Date, if earlier) occurs. All Take-or-Pay Payments shall consist of two components, one fixed and one variable, as follows:

5.1.1.1    The fixed monthly component of the Take-or-Pay Payment (the "Fixed Take-or-Pay Component") shall equal US$2,187,500. The Fixed Take-or-Pay Component shall not be adjusted, except (i) pursuant to Sections 5.1.4 and 14.4, and (ii) by mutual agreement of the Parties.

5.1.1.2    The variable monthly component of the Take-or-Pay Payment (the "Indexed Take-or-Pay Component") initially shall equal US$937,500 (price level first quarter 1996), and such amount shall be subject to upward adjustment as of January 1 of each year, commencing January 1, 1997, by the increase in the Index then in effect. The formula for and an example of such adjustment is set forth on Exhibit J.

5.1.1.3    Notwithstanding any other provision hereof to the contrary, the obligation of Buyer to make the Take-or-Pay Payment in each calendar month is a "take-or-pay" obligation that is absolute and unconditional and each Take-or-Pay Payment shall be paid free and clear of any and all claims, demands or set-offs of whatever nature other than any costs incurred by Buyer in operating the Project pursuant to its exercise of rights under Section 9.2 or other than as provided in Section 14.4.

5.1.2    Committed Excess Electricity Payment. The initial annual aggregate payment for Committed Excess Electricity (the "Committed Excess Electricity Payment") shall be equal to US$168,000 (price level third quarter 1997) and such amount shall be subject to upward adjustment as of January 1 of each year, commencing January 1, 1998, by the increase in the Index then in effect. The formula for such adjustment is set forth on Exhibit J. Each annual Committed Excess Electricity Payment shall be payable in equal monthly installments over each Operating Year and the first monthly installment of the Committed Excess Electricity Payment shall be prorated for the actual number of days remaining in the month in which the Commercial Operation Date (or the Take-or-Pay Date, if earlier) occurs. Notwithstanding any other provision in this Agreement to the contrary, the obligation of Buyer to make the Committed Excess Electricity Payment in each calendar month is a "take-or-pay" obligation that is absolute and unconditional and each Committed Excess Electricity Payment shall be paid free and clear of any and all claims, demands or set-offs of whatever nature other than any costs incurred by Buyer in operating the Project pursuant to its exercise of rights under Section 9.2 or other than as provided in Section 14.4.

FILED: NEW YORK COUNTY CLERK 08/26/2020 01:39 PM       INDEX NO. 654058/2020

NYSCEF DOC. NO. 3       Case 1:17-mc-00151-LPS   Document 564-2   Filed 05/24/23   Page 32 of 63 PageID #: 14757       RECEIVED NYSCEF: 08/26/2020

5.1.3   Excess Utilities Payment. The payment with respect to any Excess Utilities sold to Buyer in any month (the "Excess Utilities Payment") shall be calculated in accordance with, and at the prices set forth in, Exhibit E (which prices shall be subject to annual upward adjustment as of January 1 of each year, commencing January 1, 1998, by the increase in the Index then in effect). Buyer agrees to make an Excess Utilities Payment for each month in which it takes Excess Utilities. The formula for such adjustment is set forth on Exhibit J.

5.1.4   Environmental Compliance Adjustment. Buyer agrees to pay to Seller 36.6% of the aggregate of all costs and expenses incurred by or on behalf of Seller as a result of undertaking any modifications or improvements to the Utility Plant or the Site required by changes after the Effective Date in Applicable Laws relating to the protection of the environment (such amounts, the "Environmental Compliance Charges"). The Parties agree to cooperate to minimize increased costs and expenses resulting from any such circumstance. If Buyer and Seller agree, Buyer may pay the amount of any Environmental Compliance Charges over the Term through an adjustment to the Fixed Take-or-Pay Component; otherwise, Buyer shall pay such costs in one lump-sum amount billed pursuant to Section 5.4.2 and due and payable at the time specified thereunder.

5.1.5   Scope Changes Requested by Buyer. Buyer agrees to pay to Seller on either a monthly basis or as a one-time, lump-sum fee, as the Parties may agree, the full amount of any costs and expenses incurred by Seller as a result of or in connection with, any increase in the scope of work of the Project requested by Buyer and agreed to by Seller.

5.1.6   Bonus. If in any Operating Year the Project experiences no Level II Events, no Level III Events, and no Blackouts, Steam Events or Air Events, Seller shall be entitled to receive, and Buyer shall pay to Seller no later than thirty (30) days following the end of such Operating Year, a bonus of US$150,000.

5.2   Taxes. Each Party shall use all reasonable efforts to secure and maintain all exemptions, allowances and credits from taxes and other Assessments available to it under Applicable Law, and cooperate with the other Party to secure all such exemptions, allowances and credits available to such other Party under Applicable Laws, that would reduce or eliminate any payment of such Assessments required to be made by such other Party.

5.3   Units of Measurement. For the purposes of billing under this Agreement, Steam shall be measured in units of metric tons (1000 kilograms), Compressed Air shall be measured in units of normal cubic meters, Electricity shall be measured in units of kilowatt-hours, and Water shall be measured in units of cubic meters.

5.4   Billing and Payment.

5.4.1   Fixed Amounts. Seller shall invoice Buyer for the Take-or-Pay Payment and the Committed Excess Electricity Payment for each month on the first Business Day of such month. Payments of the Take-or-Pay Payment and the Committed Excess Electricity Payment shall be made no later than the thirtieth (30th) day of each month. In the case of the month in

which the Commercial Operation Date (or the Take-or-Pay Date, if earlier) occurs, Seller shall invoice Buyer for the pro-rated Take-or-Pay Payment and the pro-rated Committed Excess Electricity Payment on the Commercial Operation Date (or the Take-or-Pay Date, if earlier), and Buyer shall pay the invoiced amount within thirty (30) days.

5.4.2   Invoices for Other Amounts. Seller shall invoice Buyer for all other amounts due from Buyer to Seller hereunder for each month, including any Excess Utilities Payments, Environmental Compliance Charges and Excess Cycling Fees, by the fifteenth Business Day of the following month. For purposes of invoicing Buyer for Excess Utilities, Seller shall read its Meters at the end of each month or at such other more frequent interval as may be necessary to obtain the information required for the billing and pricing provisions set forth in this Agreement. Following the month for which the reading was taken, Seller shall deliver an invoice showing the quantities, purchase prices and the payment due for Excess Utility deliveries made in the preceding month. Any statement delivered to Buyer pursuant to this Section 5.4.2 shall set forth in detail Seller's calculation of the components of amounts then due and shall be accompanied by information reasonably sufficient for Buyer to determine the accuracy of such statement. Payments in respect of invoices under this Section 5.4.2 shall be made within thirty (30) days after Buyer's receipt thereof.

5.4.3   Making of Payments. All payments under this Agreement shall be made in Dollars. Buyer shall pay to Seller, in immediately available funds by wire transfer to a local and/or foreign bank account or accounts to be specified by Seller in writing, the payments due as set forth in the invoices provided to Buyer by Seller pursuant to this Section 5.4. All payments hereunder shall be made without set-off or deduction except as expressly provided in Sections 5.1.1.3 and 5.1.2. Any payment not made within the time limits specified in this Section 5.4 shall bear interest from the date on which payment was required to have been made through and including the date such payment is actually received by or on behalf of Seller, and such interest shall accrue at an annual rate equal to the Prime Rate plus 500 basis points, but in no event more than the maximum rate permitted by Applicable Law. If Buyer in good faith disputes a bill for Excess Utilities or Excess Cycling Fees prepared by Seller, and if the Parties are unable to resolve their dispute with respect to such bill within the thirty-day period following receipt of such bill by Buyer, Buyer may withhold the disputed portions of such bill and such disputed amounts shall be submitted to arbitration pursuant to Article 17; provided, however, that such withheld amounts which are determined to be payable pursuant to any arbitral decision shall bear interest at the Prime Rate plus 500 basis points (but in no event more than the maximum rate permitted by Applicable Law) from the date such amounts would have been due under Section 5.4.2 through and including the date actually paid. Any billing adjustment subsequently determined to be necessary in respect of the disputed portion of such bill shall be made in the regularly prepared billing statement next following such determination either in the form of a credit to Buyer against amounts otherwise due or as an additional charge to Buyer, as the case may be.

5.5   Records. Each of Seller and Buyer will maintain and preserve for a period of at least five (5) years (or such longer period as required by Applicable Law) from the date of the preparation thereof complete and accurate records of all data and information (a) reflecting the

24

amount of all Utilities delivered in each year during the Term, and (b) necessary to calculate the payments as provided in this Agreement, including invoices, receipts, charts, printouts and other materials and documents. Each Party shall make all such records available for inspection by the other Party or its representatives upon reasonable advance notice.

## Article 6
## MEASUREMENT AND METERING

6.1     Metering Equipment. Unless otherwise specified on Exhibit C, Seller shall (i) as part of the Utility Plant, provide and install, at no cost to Buyer, appropriate Meters necessary to permit an accurate determination of the quantities (and, as appropriate, quality characteristics) of each of the Utilities delivered under this Agreement, and (ii) exercise reasonable care in the maintenance and operation of such Meters so as to assure to the maximum extent reasonably practicable an accurate determination of such quantities (and, as appropriate, quality characteristics). Seller's Meters shall be located at the several Interconnection Points. Except as provided in Section 6.2, Seller's Meters shall be used for quantity and quality measurements under this Agreement. Buyer, at its sole expense, may install and maintain check Meters necessary to permit an accurate determination of the quantities (and, as appropriate, quality characteristics) of each of the Utilities delivered under this Agreement; provided, however, that such equipment shall be operated and maintained in a manner that does not interfere with the installation, maintenance and operation of Seller's Meters.

6.2     Measurements. Readings of Seller's Meters shall be conclusive as to the amount of Utilities delivered to Buyer hereunder; provided, however, that in the event any of Seller's Meters is out of service or is determined, pursuant to Section 6.3, to be registering inaccurately, measurement of Utilities delivered hereunder shall be determined by:

(i)     Buyer's check Meter, if installed and registering accurately; or

(ii)    in the absence of an installed and accurately registering check Meter belonging to Buyer, making a mathematical calculation if upon a calibration test of Seller's Meter a percentage error is ascertainable; or

(iii)   in the absence of both an installed and properly registering check Meter belonging to Buyer and an ascertainable percentage of error, estimating by reference to quantities measured during periods of similar conditions when Seller's Meter was registering accurately; or

(iv)    if no reliable information exists as to the period over which such Meter was registering inaccurately, it shall be assumed for correction purposes hereunder that such inaccuracy began at a point in time midway between the testing date and the last previous date on which such Meter was tested and found to be accurate, but not to exceed six months prior to the testing date.



25   -

### 6.3    Testing and Correction.

6.3.1    Annual Testing. The accuracy of each of Seller's Meters shall be tested and verified by Seller at least annually. If Buyer has installed check Meters in accordance with Section 6.1, Buyer shall test and verify each such Meter at least annually. Each Party shall bear the cost of the annual testing of its own Meters.

6.3.2    Disputes. If either Party disputes a Meter's accuracy or condition, it shall so advise the owner of the Meter in writing. The owner of the Meter shall, within fifteen (15) days after receiving such notice, advise the disputing Party in writing as to its position concerning the Meter's accuracy and reasons for taking such position. If the Parties are unable to resolve their disagreement through reasonable negotiations, then either Party may submit such dispute to an unaffiliated third party engineering company mutually acceptable to the Parties to test the Meter. Should the Meter be found to be registering within its Permitted Variance, the disputing Party shall bear the cost of inspection; otherwise, the cost shall be borne by the owner. Any repair or replacement shall be made at the owner's expense as soon as practicable, based on the third party's report.

6.3.3    Variances and Correction. Each Meter shall be accurate within the variances set forth on Exhibit C or, if not there set forth, as specified by its manufacturer (each, a "Permitted Variance"). If, upon testing, any Meter is found to be accurate or to be in error by not more than the Permitted Variance, previous recordings of such Meter shall be considered accurate in computing deliveries hereunder, but if in error, such Meter shall be promptly adjusted to record correctly. If, upon testing, any Meter shall be found to be in error by an amount exceeding the Permitted Variance, then such Meter shall be promptly adjusted to record properly and any previous recordings by such Meter shall be adjusted in accordance with Section 6.2.

6.3.4    Payment Adjustments. If, upon testing, any of Seller's Meters is found to be in error by more than the Permitted Variance, the payments for Excess Utilities made since the previous test of such Meter shall be adjusted to reflect the corrected measurements determined pursuant to Section 6.2. If the difference of the payments actually made by Buyer minus the adjusted payment is a positive number, Seller shall pay the difference to Buyer; if the difference is a negative number, Buyer shall pay the difference to Seller. In either case, the party paying such difference shall also pay interest at the Prime Rate and such payment (including such interest) shall be made within thirty (30) days of receipt of a corrected billing statement.

### 6.4    Maintenance and Records.

6.4.1    Monthly Reports. Seller shall provide Buyer on a monthly basis reports indicating Buyer's daily consumption of each of the Utilities.

6.4.2    Inspection Rights. Each Party shall have the right to be present whenever the other Party reads, cleans, changes, repairs, inspects, tests, calibrates, or adjusts the equipment used in measuring or checking the measurement of any of the Utilities delivered hereunder.

26

DOCSDC1:29925.33

Each Party shall give timely notice to the other Party in advance of taking any such actions such that such other Party may be present if it so desires.

6.4.3 Verification. The records from the measuring equipment shall remain the property of Seller or Buyer, respectively, but, upon request, each Party will submit to the other its records and charts, together with calculations therefrom, for inspection, verification and copying, subject to return within ten (10) days after receipt thereof.

## Article 7
## INTERCONNECTION OF SUPPLIES

### 7.1    Interconnection Facilities.

7.1.1 Access. For the mutual protection of Seller and Buyer, only Seller's and Buyer's authorized employees shall be allowed to make and energize their respective interconnections between the Refinery and the Utility Plant.

7.1.2 Installation. By not later than the date that is thirty (30) days prior to the date Seller proposes to commence testing of the New Facilities, Seller and Buyer shall each install or cause to be installed, at no expense to the other Party, the Interconnection Facilities on their respective sides of the Interconnection Points, which shall be of a quality and type necessary to accomplish appropriate interconnections between the respective Electricity, Steam, Water and Compressed Air systems of the Utility Plant to existing counterpart systems in the Refinery. The overall design of the necessary Interconnection Facilities shall be submitted by Seller for approval by Buyer, which approval shall not be unreasonably withheld so long as the design is consistent with Exhibit B. If Buyer does not notify Seller within thirty (30) days after receipt of any design material with respect to the Interconnection Facilities that modifications are necessary to conform the design to Prudent Operating Practices, Buyer's approval of such design material shall be deemed to have been given. If approval of the Electricity Interconnection Facilities by KAE or KODELA is required, Seller shall be responsible for securing such approval. The Parties shall cooperate to accommodate any change in the design of the Electricity Interconnection Facilities required by KAE or KODELA. Each of the Parties shall install the Interconnection Facilities for which it is responsible in accordance with Prudent Operating Practices and the design approved or deemed approved by Buyer, and shall not make any material changes thereto without the prior consent of the other Party, which consent shall not be unreasonably withheld. The Parties shall jointly determine which Party shall be responsible for making actual final interconnections between the Interconnection Facilities of Seller and the Interconnection Facilities of Buyer on either side of each Interconnection Point.

7.1.3 Maintenance. Each Party shall, at its own expense, maintain all of the Interconnection Facilities located on its side of each Interconnection Point in accordance with Prudent Operating Practices in order to receive or deliver, as the case may be, the Utilities up to the amount of the Contract Capacities and the Committed Excess Electricity. Each Party shall provide the other Party and its agents, employees, representatives and contractors with access at all reasonable times, upon reasonable advance notice, to such specific portions of the Utility

Plant and the Refinery, as the case may be, and all other locations owned or controlled by Buyer as are reasonably necessary for the construction, installation, operation and maintenance of the Interconnection Facilities. Each Party shall use all reasonable efforts to avoid any interference with the other's operations at the Refinery or the Utility Plant, as the case may be, and shall obey all rules, procedures and safety measures applicable to personnel at the Refinery or the Utility Plant, as the case may be.

7.2    Delivery Points and Title. Exhibit B describes the approximate locations of each of the Interconnection Points. Title to and risk of loss with respect to each and all of the Utilities shall pass from Seller to and rest in Buyer when the same is made available by Seller at the appropriate Interconnection Point. Until title passes, Seller shall be deemed in exclusive control of the same and shall be responsible for any damage or injury caused thereby. After title to a specific Utility passes, Buyer shall be deemed in exclusive control of such Utility and shall be responsible for any damage or injury caused thereby.

## Article 8
## PLANNED AND UNPLANNED SHUTDOWNS

8.1    Planned Shutdowns. Seller may, with Buyer's approval, schedule outages of components of the Utility Plant in connection with planned inspections, maintenance or repair of the Refinery. Buyer also shall be entitled to request Seller not to deliver Utilities during periods of planned inspections, maintenance or repair of the Refinery. Each such outage so scheduled with Buyer's approval or at Buyer's request shall be a "Scheduled Shutdown." During the period of any Scheduled Shutdown, Seller shall be relieved of its obligations under Section 2.1.1 to deliver that portion (if any) of the required quantities of Utilities that Seller is unable to provide because of such Scheduled Shutdown, but Seller shall use its commercially reasonable best efforts to minimize interruptions of Utilities to Buyer during Scheduled Shutdowns. Nothing in this Section 8.1 shall be deemed to restrict Seller's ability to shut down the Utility Plant or portions thereof for scheduled or unscheduled inspection, maintenance or repairs, but except as expressly provided in the preceding sentence, no such shutdown shall reduce Seller's obligations to make Utilities available to Buyer as required under Section 2.1.1.

8.2    Unplanned Shutdowns. The Utility Plant may be disconnected by Seller at any time in an emergency affecting the Project or if required by Buyer during an emergency affecting the Refinery. In addition, Buyer shall have the right to require that Seller shut down the Utility Plant, if, in Buyer's opinion, a hazardous condition exists and immediate action is necessary to protect persons, Buyer's property, or the property or facilities of third parties from damage or interference caused or likely to be caused by the Utility Plant, including by reason of improperly operating protective devices. In either case, the Party requesting the shutdown shall give as much notice as possible and reasonable under the circumstances to the other Party and shall keep such other Party informed of the probable length of the disconnection. Seller shall use all reasonable means to minimize any interruption in the supply of Utilities resulting from any shutdown of the Utility Plant pursuant to this Section 8.2. In the event of any unplanned shutdown of the Utility Plant, unless the party requiring such shutdown specifies that such shutdown shall last for a period that is less than twenty-four (24) hours, the Operating Committee

DOCSDC1:29925.33

shall convene (whether in person or by telephonic conference) as soon as practicable and determine the time that the Utility Plant shall come back on line and the procedures to achieve such re-start. Seller is relieved of its obligations under Section 2.1.1 to the extent unplanned shutdowns are caused by Buyer.

## Article 9
## FAILURE TO DELIVER UTILITIES

9.1   Consequence of Failure to Deliver Utilities.

9.1.1   Liability for Liquidated Damages. If at any time Seller (or its agent) is operating the Utility Plant and is obligated, but fails, to deliver Utilities to Buyer as required under Section 2.1.1 and such failure results in a Level I Event, a Level II Event, a Level III Event, a Blackout, a Steam Event or an Air Event (each such failure, an "Event"), then Seller shall pay liquidated damages to Buyer determined in accordance with this Section 9.1; provided, however, that all Events (regardless of number) occurring in a single twenty-four (24) hour period shall be considered a single Event, and an Event shall continue until Seller again is able to deliver Utilities as required under Section 2.1.1. The per diem and minimum rates of liquidated damages applicable to the various types of Events are set forth in Section 9.1.2. Liquidated damages shall be paid within thirty (30) days following the end of the month in which the Event giving rise to such damages occurs. The payment of liquidated damages under this Section 9.1 shall be Buyer's exclusive remedy for Seller's failure to deliver Utilities except as provided in Sections 9.2 and Section 12.1(iii).

9.1.2   Amounts and Payment of Liquidated Damages.

9.1.2.1   Level I Events. Liquidated damages shall be payable by Seller to Buyer for (a) each Level I Event resulting from human error on the part of Seller or any person operating the Project on behalf of Seller, and (b) each Level I Event occurring in any Operating Year (i) after the Project experiences more than four (4) Level I Events in such Operating Year, or (ii) that continues for more than eight (8) hours or occurs after one or more Level I Events in such Operating Year have continued for more than eight (8) hours in the aggregate. Such liquidated damages shall equal the lesser of (x) US$12,000 per day (pro rated as US$500 per hour) for the duration (in excess of the hourly period set forth in the preceding sentence) of such Level I Event for each ship unable to load or unload petroleum or Refinery products at the Refinery as a result of such Level I Event, and (y) the actual daily demurrage charges assessed against Buyer by each ship unable to load or unload petroleum or Refinery products at the Refinery as a result of such Level I Event; provided, however, that Seller's liability for liquidated damages under this Section 9.1.2.1 shall not exceed a maximum of US$24,000 per day.

9.1.2.2   Level II Events. Liquidated damages shall be payable by Seller to Buyer for (a) each Level II Event resulting from human error on the part of Seller or any person operating the Project on behalf of Seller, and (b) each Level II Event occurring in any Operating Year (i) after the Project experiences more than two (2) Level II Events (or more

29

DOCSDC1.29925.23

severe) in such Operating Year, or (ii) that continues for more than ten (10) hours or occurs after one or more Level II Events (or more severe) in such Operating Year have continued for more than ten (10) hours in the aggregate. Such liquidated damages shall be calculated at a rate of US$125,000 per day (pro rated as US$5,208.33 per hour) for the duration (in excess of the hourly period set forth in the preceding sentence) of such Level II Event, subject to a minimum payment equal to (x) if such Level II Event has a duration of one hour or less, US$35,000, or (y) if such Level II Event has a duration of more than one hour, US$70,000.

9.1.2.3    Level III Events, Steam Events and Air Events. Liquidated damages shall be payable by Seller to Buyer for (a) each Level III Event, Steam Event or Air Event occurring in any Operating Year resulting from human error on the part of Seller or any person operating the Project on behalf of Seller, and (b) each Level III Event, Steam Event or Air Event occurring in any Operating Year (i) after the Project experiences more than one (1) Level III Event (or more severe), Steam Event or Air Event in such Operating Year, or (ii) that continues for more than two (2) hours. Such liquidated damages shall be calculated at a rate of US$250,000 per day (pro rated as US$10,416.67 per hour) for the duration (in excess of the hourly period set forth in the preceding sentence) of such Level III Event, Steam Event or Air Event, subject to a minimum payment equal to (x) if such Level III Event, Steam Event or Air Event has a duration of one hour or less, US$70,000, or (y) if such Level III Event, Steam Event or Air Event has a duration of more than one hour, US$140,000.

9.1.2.4    Blackouts. For each Blackout, Seller shall pay to Buyer, as liquidated damages, US$300,000 per day (pro rated as US$12,500 per hour) for the duration of such Blackout, subject to a minimum payment equal to US$200,000.

9.1.3    Measurement of Liquidated Damages. The amount of liquidated damages payable in respect of any Event shall be based on the actual consequences under the Load Shedding Protocol that would result at any specific time during the duration of the Event given Seller's actual ability to deliver Utilities at such time. For example, if Seller's inability to deliver Utilities initially resulted in a Level III Event, but Seller subsequently regained the ability to deliver sufficient Utilities such that only a Level I Event would exist, liquidated damages initially would accrue at the rate applicable to Level III Events, and after Seller became able to deliver sufficient Utilities such that only a Level I Event would exist, liquidated damages would accrue at the rate applicable to Level I Events. Notwithstanding the preceding two sentences, the minimum amount of liquidated damages payable for any Event shall be based on the duration of the most severe level of load shedding resulting from such Event. For example, if an Event commences as a Level I Event but becomes a Level II Event of more than one hour, the minimum amount of liquidated damages shall be that specified for Level II Events of more than one hour. Any Level III Event, Steam Event or Air Event, as the case may be, occurring while an Air Event, Steam Event or Level III Event, as the case may be, exists shall be considered part of such pre-existing Event for all purposes of this Agreement.

9.1.4    Amounts Reasonable. The Parties agree that it would be difficult or impossible to determine the actual damages that would be incurred by Buyer as a result of Seller's failure to deliver Utilities as required under this Agreement. Therefore, the Parties agree

that the amounts specified in this Section 9.1 are reasonable as liquidated damages for such failures by Seller and that the amounts so fixed are reasonable estimates of just compensation for the harm that would actually be sustained by Buyer upon such failure by Seller.

9.1.5 Limitations on Damages. The maximum amount of liquidated damages Seller shall be obligated to pay under this Section 9.1 shall be US$6,000,000 for the first Operating Year, and US$4,000,000 during each subsequent Operating Year. In no event shall Seller be obligated to pay liquidated damages under this Section 9.1 that would cause the aggregate amount of liquidated damages paid under this Section 9.1 to exceed US$18,000,000 over the Term of this Agreement.

9.1.6 Rebate. Seller shall be entitled to a rebate (without interest) of any liquidated damages paid under this Section 9.1 (other than under Section 9.1.2.1) to the extent that Buyer is able to recover by the end of the calendar year in which such Event occurred the production lost as a result of the Event giving rise to the liquidated damage payment. Within sixty (60) days following the end of such calendar year Buyer in good faith shall prepare and send to Seller a report setting forth its determination as to whether any rebate of liquidated damages is due under the preceding sentence, and shall pay any rebate due by not later than ninety (90) days following the end of such calendar year. No later than thirty (30) days after a request therefor by Seller, Buyer shall supply evidence supporting its determination of the level of recovery of lost production for such preceding calendar year.

9.1.7 Buyer's Right to Review. If, after the Commercial Operation Date, the Utility Plant while under the control of Seller experiences more than four (4) Level I Events ( or more severe) in any full Operating Year, Seller, at Buyer's request, shall meet with Buyer to review Seller's operational procedures for the Utility Plant and Seller shall in good faith consider any recommendations or suggestions made by Buyer for any changes to Seller's operating procedures that would be expected to enhance reliability or improve operation of the Utility Plant.

9.2 Buyer's Right to Operate Utility Plant. If, while under the control of Seller, and commencing only after the Commercial Operation Date, (a) during the first Operating Year the Utility Plant experiences more than twelve (12) Level I (or more severe) Events or more than five (5) Level II (or more severe) Events, or (b) from and after the beginning of the second Operating Year the Project experiences during a period of any two (2) consecutive Operating Years more than (i) twelve (12) Level I (or more severe) Events, (ii) five (5) Level II (or more severe) Events, or (iii) two (2) Level III (or more severe) Events, or (c) from and after the beginning of the first Operating Year the Project experiences during a period of any five (5) consecutive Operating Years more than one (1) Blackout, then, in each case, Buyer shall have the right, which right must be exercised within sixty (60) days following the occurrence of the final Event giving rise to such right, to assume, or cause a qualified operator to assume, control and operation of the Utility Plant until such time as Seller demonstrates to the reasonable satisfaction of Buyer that Seller is again capable of performing its obligations under this Agreement. Buyer shall return control of the Utility Plant to Seller within fourteen (14) days after such demonstration. During the period that Buyer or Buyer's operator is operating the

31

Utility Plant, (x) Buyer shall be responsible for providing electricity to KODELA in accordance with the requirements of the KODELA Power Purchase Agreement, (y) Buyer shall continue to pay the Take-or-Pay Payment, the Committed Excess Electricity Payment and all other payments due and owing to Seller under this Agreement, but shall be entitled to reimbursement for its reasonable costs of operating the Project (including reasonable overhead), and (z) Buyer shall perform and comply with the obligations of Seller (other than any payment obligation, which shall remain the obligation of Seller) under the Existing Facilities Lease and the Ground Lease. Within thirty (30) days following each month in which Buyer or Buyer's operator is operating the Utility Plant under this Section, Buyer shall submit to Seller a detailed invoice specifying the costs for which reimbursement is being sought, together with such supporting documents that provide appropriate evidence of such costs. Buyer or Buyer's operator, as the case may be, shall be entitled to include in such invoice a profit component, not to exceed an amount per year equal to the annual fixed fee payable to the Operator under the O&M Agreement. Seller shall pay the amount requested within thirty (30) days after receipt of Buyer's invoice, and if Seller fails to make payment when due, Buyer may withhold the amount of any deficiency from any payments due Seller under this Agreement.

## Article 10
## INDEMNITIES; LIMITATION OF LIABILITIES

10.1    Indemnification of Buyer. Seller hereby indemnifies and holds harmless Buyer, its shareholders and Affiliates and each of their respective officers, directors, shareholders, agents, Affiliates and employees (collectively, "Buyer's Indemnitee") from and against all damages, claims, losses, liabilities, penalties, interest and expenses, including, without limitation, reasonable attorneys' fees, and expenses (collectively "Damages"), resulting from any claim, suit, action, judgment, cause of action or assessment (i) asserted by a third party against Buyer's Indemnitee which arises out of, is caused by or results from, the performance or non-performance of Seller under this Agreement except to the extent that such Damages arise from Buyer's willful misconduct, gross negligence or breach of this Agreement, and (ii) asserted by an employee, agent, subcontractor or Affiliate of Seller against Buyer's Indemnitee for any type of loss or damage excluded under Section 10.4.

10.2    Indemnification of Seller. Buyer hereby indemnifies and holds harmless Seller, its shareholders and Affiliates and each of their respective officers, directors, shareholders, agents, Affiliates and employees (collectively, "Seller's Indemnitee") from and against all Damages resulting from any claim, suit, action, judgment, cause of action or assessment (i) asserted by a third party against Seller's Indemnitee which arises out of, is caused by or results from, the performance or non-performance of Buyer under this Agreement except to the extent that such Damages arise from Seller's willful misconduct, gross negligence or breach of this Agreement and (ii) asserted by an employee, agent, subcontractor or Affiliate of Buyer against Seller's Indemnitee for any type of loss or damage excluded under Section 10.4.



DOCSDC1:29925.33

32

### 10.3   Indemnity Claim Procedures.

10.3.1   Notice of Claim.  If any person or entity not a party to this Agreement shall make any demand or claim or file or threaten to file any lawsuit, which demand, claim or lawsuit may result in Damages to any Party Indemnified under Section 10.1 or 10.2, then, in any such event, within ten (10) Business Days after notice by the indemnified party (the "Indemnity Claim Notice") to the indemnifying party of such demand, claim or lawsuit, the indemnifying party shall have the option, at its sole cost and expense, to retain counsel for the indemnified party (which counsel shall be selected by or be reasonably satisfactory to the indemnified party), to defend any such demand, claim or lawsuit.  Thereafter, the indemnified party shall be permitted to participate in such defense at its own expense; provided, however, that, if the named parties to any such proceeding (including any impleaded parties) include both the indemnifying party and the indemnified party, or if the indemnifying party proposes that the same counsel represent both the indemnified party and the indemnifying party and representation of both parties by the same counsel would be inappropriate due to actual or potential differing interests between them, then the indemnified party shall have the right to retain its own counsel at the cost and expense of the indemnifying party.  If the indemnifying party shall fail to respond within ten (10) Business Days after receipt of the Indemnity Claim Notice, the indemnified party may retain counsel and conduct the defense of such demand, claim or lawsuit, as it may in its sole discretion deem proper, at the sole cost and expense of the indemnifying party.  The failure to give any Indemnity Claim Notice within the time period required therefor shall not relieve the indemnifying party of its obligations under this Agreement unless, and only to the extent that, such failure caused the Damages for which the indemnifying party is obligated to be greater than they would otherwise have been had the indemnified party given the Indemnity Claim Notice within the required time period.

10.3.2   Access to Records.  The indemnified party shall provide reasonable assistance to the indemnifying party and provide access to its books, records and personnel as the indemnifying party reasonably requests in connection with the investigation or defense of the indemnified Damages.  The indemnifying party shall promptly upon receipt of reasonable supporting documentation reimburse the indemnified party for out-of-pocket costs and expenses incurred by the latter in providing the requested assistance.

10.3.3   Payment of Claims.  With regard to claims for which indemnification is payable under Section 10.1 or 10.2, such indemnification shall be paid by the indemnifying party upon: (i) the entry of a judgment against the indemnified party and the expiration of any applicable appeal period; (ii) the entry of an unappealable judgment or final appellate decision against the indemnified party; or (iii) a settlement with the consent of the indemnifying party, which consent shall not be unreasonably withheld, provided that no such consent need be obtained if the indemnifying party fails to respond to the Indemnity Claim Notice as provided in Section 10.3.1.  Any consent required under the preceding clause (iii) shall be given or withheld only upon such Person's examination of the proposed settlement agreement.

10.4   Exclusion of Consequential Damages.  Neither Party, its Affiliates nor their respective employees, agents or subcontractors shall be liable to the other Party, its Affiliates or



33

**FILED: NEW YORK COUNTY CLERK 08/26/2020 01:39 PM** INDEX NO. 654058/2020

NYSCEF DOC. NO. 3   Case 1:17-mc-00151-LPS   Document 564-2   Filed 05/24/23   Page 43 of 63 PageID #: 14768   RECEIVED NYSCEF: 08/26/2020

their respective employees, agents or subcontractors, whether based in contract, in tort (including negligence and strict liability), under warranty, or otherwise, for any consequential, indirect, punitive, incidental, exemplary or special loss or damage whatsoever, including without limitation, loss of use, loss of productive resources, loss of opportunity or anticipated profits, damages to good will or reputation or punitive or speculative damages. The inclusion of this provision has been a material inducement for each of the Parties to enter into this Agreement.

## Article 11
## REPRESENTATIONS AND WARRANTIES

### 11.1   Seller's Representations and Warranties.

11.1.1 Organization. Seller represents and warrants that it is a limited liability company duly organized and validly existing under the laws of The Netherlands Antilles, that it is not currently the subject of any bankruptcy, insolvency or moratorium proceedings, that it is qualified to do business and is in good standing under the laws of each jurisdiction where its activities require such qualification (except where the failure to so qualify would not have a material adverse effect on its performance hereunder), and that it has full power, authority and legal right to enter into and perform its obligations under this Agreement.

11.1.2 Authorization. Seller represents and warrants that the execution, delivery and performance of this Agreement have been duly authorized and that this Agreement constitutes the legal, valid and binding obligation of Seller enforceable against it in accordance with its terms, except as enforceability may be limited by applicable bankruptcy, insolvency, moratorium or other similar laws affecting the enforcement of creditors' rights generally and by general principles of equity (regardless of whether such enforcement is considered in equity or at law).

11.1.3 No Defaults. Seller represents and warrants that the execution, delivery and performance by Seller of this Agreement do not conflict with, constitute a default under or result in a breach or violation of the deed of incorporation of Seller or any material agreement to which Seller is a party or by which it or any of its property is bound.

### 11.2   Buyer's Representations and Warranties.

11.2.1 Organization. Buyer represents and warrants that it is a *sociedad anónima* duly organized, validly existing and in good standing under the laws of the Republic of Venezuela and is properly registered as a branch under the laws of the Netherlands Antilles, that it is *solvente* and is not currently the subject of any bankruptcy, insolvency or moratorium proceedings, that it is qualified to do business and is in good standing under the laws of each jurisdiction where its activities require such qualification (except where the failure to so qualify would not have a material adverse effect on its performance hereunder), and that it has full power, authority and legal right to enter into and perform its obligations under this Agreement.

11.2.2 Authorization. Buyer represents and warrants that the execution, delivery and performance of this Agreement have been duly authorized and that this Agreement

34

DOCSDC1-29925.33

FILED: NEW YORK COUNTY CLERK 08/26/2020 01:59 PM

NYSCEF DOC. NO. 3    Case 1:17-mc-00151-LPS    Document 564-2    Filed 05/24/23    Page 44 of 63 PageID #: 14769    RECEIVED NYSCEF: 08/26/2020

constitutes the legal, valid and binding obligation of Buyer enforceable against it in accordance with its terms, except as enforceability may be limited by applicable bankruptcy, insolvency, moratorium or other similar laws affecting the enforcement of creditors' rights generally and by general principles of equity (regardless of whether such enforcement is considered in equity or at law).

11.2.3 No Defaults. Buyer represents and warrants that the execution, delivery and performance by Buyer of this Agreement do not conflict with, constitute a default under or result in a breach or violation of *documento constitutivo estatutario* of Buyer or any material agreement to which Buyer is a party or by which it or any of its properties is bound.

11.2.4 Existing Facilities. Buyer represents, warrants and covenants that on the Turnover Date the Existing Facilities will be in compliance with all Applicable Laws and other requirements of each Governmental Authority to which such Existing Facilities are subject.

## Article 12
## DEFAULT AND REMEDIES

12.1 Seller Event of Default. The occurrence of any one or more of the following events shall constitute an event of default by Seller hereunder ("Seller Event of Default"):

(i)    Failure by Seller to make payment of any amounts due to Buyer under this Agreement, which failure continues for a period of ten (10) days after written notice of such non-payment;

(ii)    Failure by Seller to achieve the Commercial Operation Date by (a) the date that is twelve (12) months after the Guaranteed Commercial Operation Date (such date, the "Determination Date") if it is determined pursuant to Section 12.7 that the Commercial Operation Date cannot reasonably be expected to be achieved within the 90-day period following the Determination Date, or otherwise (b) the date that is fifteen (15) months after the Guaranteed Commercial Operation Date;

(iii)    After the Commercial Operation Date, the occurrence while the Project is under the operational control of Seller during any one Operating Year of (A) more than twenty (20) Level I (or more severe) Events in which Seller delivers less than 60,000 kW of Electricity, (B) more than eight (8) Level II (or more severe) Events, or (C) more than four (4) Level III (or more severe) Events;

(iv)    Failure by Seller fully to perform any other material provision of this Agreement (other than the failure by Seller to deliver Utilities hereunder or any failure covered by the other subsections of this Section 12.1), and (A) such failure continues for a period of sixty (60) days after delivery to Seller of written notice of such non-performance, or (B) if Seller shall commence within such 60-day period and shall thereafter proceed with all due diligence to cure such failure, if such failure is not cured within such longer period as shall be reasonably necessary for Seller to cure the same with all due diligence;

(v)     If by order of a court of competent jurisdiction, a receiver or administrator or liquidator or trustee of Seller or of any of the property of Seller shall be appointed, and such receiver or administrator or liquidator shall not have been discharged within a period of sixty (60) days; or if by decree of such a court, a moratorium (whether provisional or not) shall be granted in respect of Seller, or Seller shall be adjudicated bankrupt or insolvent or any substantial part of the property of Seller shall have been sequestered, and such decree shall have continued undischarged and unstayed for a period of sixty (60) days after the entry thereof; or if a petition to grant a moratorium or to declare bankruptcy or to reorganize Seller in connection therewith pursuant to any of the provisions of applicable bankruptcy law, as it now exists or as it may hereafter be amended, modified or supplemented, shall be filed against Seller and shall not be dismissed within sixty (60) days after such filing; or

(vi)     If Seller shall file a voluntary petition for a moratorium or for bankruptcy under any provision of any moratorium or bankruptcy law of any applicable jurisdiction or shall consent to the filing of any moratorium, bankruptcy or reorganization petition against it under any similar law; or, without limitation of the generality of the foregoing, if Seller shall file a petition or answer or consent seeking relief or assisting in seeking relief in a proceeding under any of the moratorium or bankruptcy provisions of any Applicable Law, as now or hereafter in effect, or an answer admitting the material allegations of a petition filed against it in such a proceeding; or if Seller shall make a general assignment for the benefit of its creditors; or if Seller shall admit in writing its inability to pay its debts generally as they become due; or if Seller shall consent to the appointment of a receiver or receivers, administrator or administrators, or trustee or trustees, or liquidator or liquidators of it or of all or any part of its property.

12.2     Buyer Event of Default. The occurrence of any one or more of the following events shall constitute an event of default by Buyer hereunder ("Buyer Event of Default"):

(i)     Failure by Buyer to make payment of any amounts due to Seller under this Agreement, which failure continues for a period of ten (10) days after written notice of such non-payment;

(ii)     Failure by Buyer fully to perform any other material provision of this Agreement, and (A) such failure continues for a period of sixty (60) days after delivery to Buyer of written notice of such non-performance or (B) if Buyer shall commence within such sixty (60) days and shall thereafter proceed with all due diligence to cure such failure, such failure is not cured within such longer period as shall be reasonably necessary for Buyer to cure the same with all due diligence;

(iii)     If by order of a court of competent jurisdiction, a receiver or administrator or liquidator or trustee of Buyer or PDVSA or of any of the property of Buyer or of PDVSA shall be appointed, and such receiver or administrator or liquidator or trustee shall not have been discharged within a period of sixty (60) days; or if by decree of such a court, a moratorium (whether provisional or not) shall be granted in respect of Buyer or PDVSA, or Buyer or PDVSA shall be adjudicated bankrupt or insolvent or any substantial part of the property of Buyer or of PDVSA shall have been sequestered, and such decree shall have continued undischarged and

36

DOCSDC1:29925.33

unstayed for a period of sixty (60) days after the entry thereof; or if a petition to grant a moratorium or to declare bankruptcy or to reorganize Buyer or PDVSA in connection therewith pursuant to any of the provisions of applicable moratorium or bankruptcy law, as it now exists or as it may hereafter be amended, modified or supplemented, shall be filed against Buyer or PDVSA and shall not be dismissed within sixty (60) days after such filing; or

(iv)   If Buyer or PDVSA shall file a voluntary petition for a moratorium or for bankruptcy under any provision of any moratorium or bankruptcy law of any applicable jurisdiction or shall consent to the filing of any moratorium, bankruptcy or reorganization petition against it under any similar law; or, without limitation of the generality of the foregoing, if Buyer or PDVSA shall file a petition or answer or consent seeking relief or assisting in seeking relief in a proceeding under any of the moratorium or bankruptcy provisions of any Applicable Law, as now or hereafter in effect, or an answer admitting the material allegations of a petition filed against it in such a proceeding; or if Buyer or PDVSA shall make a general assignment for the benefit of its creditors; or if Buyer or PDVSA shall admit in writing its inability to pay its debts generally as they become due; or if Buyer or PDVSA shall consent to the appointment of a receiver or receivers, or administrator or administrators, or trustee or trustees, or liquidator or liquidators of it or of all or any part of its property.

12.3   Remedies for Breach.  Upon the occurrence and during the continuation of any Event of Default hereunder, the Party not in default shall have the right:

(i)   to suspend performance of its obligations and duties hereunder upon written notice to the defaulting Party;

(ii)   to terminate this Agreement upon thirty (30) days' written notice to the defaulting Party; and

(iii)   subject to the provisions of this Agreement setting forth liquidated damages as the exclusive remedy for any breach or default leading to termination, to pursue any other remedy given under this Agreement or now or hereafter existing at law or in equity or otherwise;

provided, however, that in the case of a Seller Event of Default, Buyer shall provide the Financing Parties with notice of such Seller Event of Default and the Financing Parties shall each have the right (but not the obligation) for thirty (30) days after receipt of such notice either to cure the Seller Event of Default on behalf of Seller, or, upon payment to Buyer of amounts due from Seller but not paid by Seller (if any), to assume, or cause its designee or a lessee or purchaser of the Utility Plant to assume, in writing, all of the rights and obligations of Seller under this Agreement arising after the date of such assumption (including any obligation to provide credit support under Section 19.1). In the event that any of the Financing Parties or its designee assumes this Agreement in accordance with this Section 12.3:

(i)   Seller shall be released and discharged from any obligations to Buyer arising or accruing hereunder from and after the date of such assumption;

37

(ii)    Buyer shall continue this Agreement with any of the Financing Parties or its designee, as the case may be, substituted in the place of Seller hereunder; and

(iii)   If the assuming party is any of the Financing Parties, such party shall be personally liable to Buyer for the performance of Seller's obligations hereunder solely to the extent of the total interest of the Financing Parties in the Project.

12.4   Specific Performance and Injunctive Relief. Each Party shall be entitled to seek a decree compelling specific performance with respect to, and shall be entitled, without the necessity of filing any bond, to seek the restraint by injunction of, any actual or threatened breach of any material obligation of the other Party under this Agreement. The Parties agree that with respect to any action for specific performance or restraint by injunction, all expenses incurred in such proceeding, including but not limited to reasonable counsel fees, shall be paid upon the final decision in such proceeding by the Party against whose position the court decided.

12.5   Payments Upon Termination: Buyer's Purchase Right.

12.5.1 Demobilization Costs . If Seller terminates this Agreement due to an uncured Buyer Event of Default, Buyer shall pay to Seller the actual amount of all costs of demobilization and repatriation of employees and personnel (such amount, "Demobilization Costs") up to US$5,000,000. Demobilization Costs payable by Buyer under this Section 12.5.1 shall be due and payable on the date incurred by Seller and shall be paid by Buyer upon Seller's request therefor. The obligation to pay any Demobilization Costs under this Agreement shall survive the termination hereof and shall be in addition to any obligation of Buyer to pay damages to Seller as a result of such termination.

12.5.2 Seller's Termination Fee. If Buyer terminates this Agreement due to an uncured Seller Event of Default under Section 12.1(ii), Seller shall pay to Buyer, as liquidated damages, an amount equal to US$4,550,000 (which shall be in addition to any amounts paid under Section 3.2.2). Such payment shall be due within ten (10) Business Days after Buyer's termination takes effect, and shall be the exclusive remedy for termination due to a Seller Event of Default under Section 12.1(ii).

12.5.3 Buyer's Right to Purchase. If Buyer terminates this Agreement due to any uncured Seller Event of Default occurring after the end of the second Operating Year, Buyer shall have the right to purchase all of Seller's right, title and interest in the Project free of liens (other than any rights of any Affiliate of The Island Territory of Curaçao to purchase the Project) for an amount equal to the higher of (a) Project Book Value on the date of such termination, and (b) the aggregate amount of principal, interest, premium (if any) and other amounts unpaid and outstanding under the Financing Documents; provided, however, that such right to purchase the Project pursuant to this Section 12.5.3 is conditioned on Buyer first expressly assuming in writing all of Seller's obligations and liabilities arising from and after the date of such purchase under the KODELA Power Purchase Agreement, the Existing Facilities Lease and the Ground Lease. Upon receipt of such purchase price and evidence of such express assumption, Seller shall turn the Project over to Buyer free of liens (other than any rights of any Affiliate of The

38

Island Territory of Curaçao to purchase the Project), and the Parties shall have the rights and obligations set forth in Section 15.2.

12.6    Waiver of Breach. Either Party may waive a breach by the other Party; provided, however, that no waiver by or on behalf of either Party of any breach of any of the covenants, provisions, conditions, restrictions or stipulations contained in this Agreement shall take effect or be binding on such Party unless the waiver is reduced to writing and executed by such Party, and any such waiver shall be deemed to extend only to the particular breach waived and shall not limit or otherwise affect any rights that such Party may have with respect to any other or future breach.

12.7    Determination of Failure to Achieve Commercial Operation. If the Commercial Operation Date does not occur by the Determination Date, the Parties shall meet to determine whether the Commercial Operation Date can reasonably be expected to be achieved within the ninety-day period following the Determination Date. If the Parties disagree as to whether the Commercial Operation Date can reasonably be expected to be achieved within such 90-day period, the matter shall be referred to an independent engineering company mutually acceptable to the Parties for such determination. Such independent engineering company shall be qualified, independent and neutral. The independent engineer shall be requested to make its determination as promptly as possible, but in any event within two (2) weeks after the matter is submitted to it, and the determination of the independent engineer shall be binding upon each Party.

## Article 13
## INSURANCE

13.1    Insurance. Commencing on the Financial Closing Date, except as otherwise provided in this Agreement, each of Seller and Buyer shall, at its own expense, acquire and maintain, or cause to be acquired and maintained, the following minimum insurance coverage as long as such coverage or reasonably similar coverage are available on reasonable commercial terms, and each Party shall have the right (but not the obligation) to furnish or arrange at its own expense all or any part of the insurance required above that is not properly obtained by the other Party and to recover the premiums from sums due or which may become due from the other Party:

(i)    Comprehensive or commercial general liability insurance written on an occurrence basis with a combined single limit of $10,000,000 per occurrence, including premises/operations, explosion, blanket contractual liability, independent contractors, products and completed operations, personal injury, and sudden and accidental seepage and pollution (and, if such insurance is obtained as part of a Party's general insurance policy for all its projects and assets, such policy, or policies, shall be written on a project-specific basis so that the limits set forth apply solely to the ownership, construction, use, operation and maintenance of, in the case of Seller, Seller's interest in the Project, and, in the case of Buyer, Buyer's interest in the Refinery, with territorial limits set on a worldwide basis without exception);



39

DOCSDC1 29925 33

(ii) Worker's Compensation and basic Employer's Liability Insurance or similar social insurance for all employees (including expatriate personnel) in accordance with Applicable Laws;

(iii) Automobile liability insurance required by Applicable Law covering both personal and property damage, including all owned, non-owned and rented automotive equipment, and providing coverage for injury, death or property damage;

(iv) As respects Seller during any and all construction activities, Seller shall maintain all-risk builder's risk insurance coverage for physical loss or damage to the Utility Plant including fire, explosion, extended coverage, expediting expense, collapse, earthquake, hurricane and flood, provided that flood, earthquake and hurricane coverage shall be provided at maximum limits commercially available at a reasonable cost. The amounts of and the limits on the flood, hurricane, and earthquake policies in effect at any time shall be indicated on Exhibit M. Such insurance shall cover all work and property comprising the Utility Plant during construction, testing and commissioning, along with any and all materials, equipment and machinery intended for the Utility Plant during off-site storage and inland transit within Curaçao. Off-site storage and inland transit shall be written with limits commensurate with the respective values at risk. Such policy shall remain in full force and effect until the date upon which Seller's operating period policy under the following sentence comes into effect. Commencing as of the tenth day after the date Seller accepts the Utility Plant as complete under the terms of the EPC Contract, and continuing during the Term, Seller shall acquire and maintain, or cause to be acquired and maintained, as long as such coverage or reasonably similar coverage is available on reasonable commercial terms, all-risk property coverage and boiler and machinery coverage against damage to the Utility Plant in accordance with the amounts required under the Financing Documents and thereafter in amounts and with coverage customary in the electric utility industry at that time;

(v) As respects Buyer during the term of this Agreement, Buyer shall acquire and maintain, or cause to be acquired and maintained, all-risk property and boiler and machinery insurance on a replacement costs basis covering physical loss or damage to the Refinery including fire, explosion, extended coverage, expediting expense, collapse, earthquake, hurricane and flood. Flood, hurricane and earthquake coverage may be provided under a "fire and allied perils" policy that does not exclude such coverages. Such insurance shall cover all work and property comprising the Refinery in accordance with the amounts required under the PDVSA Lease, provided that flood, earthquake and hurricane coverage shall be provided at maximum limits commercially available at a reasonable cost. The amounts of and limits on the flood, earthquake and hurricane policies in effect at any time shall be indicated on Exhibit M; and

(vi) Each policy under the preceding Sections 13.1(iv) and (v) shall be endorsed to require that:

(A) The coverage afforded shall not be materially changed, canceled or reduced by the policy holder without at least thirty (30) days' prior written notice to the other Party (except ten (10) days for cancellation due to non-payment of premium);



DOCSDC1.29925.33

(B)   In the event of a loss, the insurance proceeds shall be applied to repair of the Utility Plant or the Refinery, as the case may be, unless (x) such proceeds are not sufficient to restore the Utility Plant or Refinery, as the case may be, to full or a substantial operating level, or (y) with respect to the Project, the Financing Documents require otherwise; and

(C)   The insurer shall waive any right of subrogation of the insurer to the rights of any insured party thereunder against the policy holder and any right of the insurer to any set-off or counterclaim or any other deduction, whether by attachment or otherwise, in respect of any liability of any such person insured under such policy.

13.2   Coverage. The insurance policies acquired and maintained, or caused to be acquired and maintained, by each Party pursuant to Sections 13.1(i), (iv) and (v) shall be endorsed naming the other Party, its employees, agents and affiliates, as their interests may appear, as additional insureds with respect to any and all third-party bodily injury or property damage claims arising from said primary insured's performance of this Agreement.

13.3   Evidence of Coverage. Evidence of insurance for the coverage specified in Sections 13.1(i), (ii), (iii), (iv) and (v) shall be provided by each Party to the other Party prior to the Financial Closing Date, except that Seller shall provide evidence of operating period coverage under Section 13.1(iv) within ten (10) days after such policy must be obtained. During the Term of this Agreement, each Party shall, upon each anniversary of obtaining such coverage, provide the other Party with evidence of insurance coverage in compliance with 13.1(i), (ii), (iii), (iv) and (v) above. At any time during this Agreement, and upon a reasonable written request, each Party shall provide the other certified copies of the insurance policies required by this Article 13.

13.4   Liability Notwithstanding Insurance Coverage. The insurance coverage described in Sections 13.1(i) through (v) shall be primary and not excess or contributing with respect to any other coverage available to the additional insured Party or to its affiliates and shall not be deemed to limit either Party's liability under this Agreement. Each Party shall indemnify and hold harmless the other Party from and against any loss or damage caused by such indemnifying Party to, in the case of Buyer, the Refinery, and, in the case of Seller, the Project up to the lesser of (i) the amount of such indemnified Party's deductible under the insurance policies required under this Article 13 then in effect on such property of such indemnified Party, (ii) US$1,000,000; provided, however, that such indemnity shall not apply to any self-insurance obtained in accordance with Section 13.5.

13.5   Buyer's Self-Insurance Policy. Buyer may operate under a policy of self insurance if, at the time it desires to do so, Buyer is able to provide evidence sufficient in the reasonable opinion of Seller to show that it possesses the financial resources necessary to do so. If Buyer does operate under a policy of self-insurance obtained pursuant to the preceding sentence, it shall not be required to maintain the insurance coverages described in this Article 13, and the Parties agree that Buyer need not satisfy the requirements of Article 13, as long as such self-insurance policy is consistent with prudent generally accepted business practices. The

41

Parties acknowledge that if Buyer had maintained such insurance coverages as are required under this Article 13, any insurance proceeds that would have been made available to Seller as a result of such coverages would have been paid when due without counterclaim, setoff, deduction or defense and without abatement, suspension, deferment, diminution or reduction. Therefore, any payments that would have been made to Seller, its employees, agents and Affiliates had such coverages been maintained shall be made as provided in this Article 13, regardless of Buyer's lack of such coverage by third-party insurers.

## Article 14

### FORCE MAJEURE

14.1    Effect of Force Majeure. Each Party shall be excused from performance and shall not be construed to be in default in respect of any obligation hereunder, for so long as failure to perform such obligation is due to a Force Majeure Event; provided, however, that notwithstanding anything in this Article to the contrary a Force Majeure Event shall not excuse the Buyer or Seller from the obligation to make payments for any obligation arising prior to the occurrence of such Force Majeure Event; and provided, further, that, except as otherwise provided under Section 14.4, the Take-or-Pay Payment and the Committed Excess Electricity Payment shall continue to be made by Buyer.

14.2    Notice of Force Majeure. If either Party desires to invoke a Force Majeure Event as a cause for delay in its performance of, or failure to perform, any obligation (other than the payment of money) hereunder, it shall, as soon as is practicable but in any event within five (5) Business Days after the occurrence of the inability to perform due to a Force Majeure Event, advise the other Party in writing of such date and the nature and expected duration and effect of such Force Majeure Event. Promptly, but in any event within ten (10) days, after a notice is given pursuant to the preceding sentence, the Parties shall meet to discuss the basis and terms upon which the arrangements set out in this Agreement shall be continued taking into account the effects of such Force Majeure Event.

14.3    Mitigation of Force Majeure. Each Party suffering a Force Majeure Event shall take, or cause to be taken, such action as may be necessary to void, or nullify, or otherwise to mitigate, in all material respects, the effects of such Force Majeure Event. The Parties shall take all reasonable steps to ensure resumption of normal performance under this Agreement after the cessation of any Force Majeure Event.

14.4    Suspension or Reduction of Payment Obligations Due to Seller's Force Majeure.

14.4.1  Subject to Section 14.5, in the event that Seller suffers a Force Majeure Event that reduces in part Seller's ability to deliver up to the Contract Capacities of the Utilities to be delivered hereunder, Seller shall provide Buyer with such amounts of Utilities as it can safely produce. In such circumstance, if there is any actual reduction in deliveries of Utilities to Buyer, the Take-or-Pay Payment and the Committed Excess Electricity Payment shall be reduced proportionately during the continuance of such Force Majeure Event to take into account

42

DOCSDC1:29925.33

(i) any such actual reduction, or (ii) Buyer's actual requirements for Utilities, if, as a result of any such reduction in Seller's deliveries, Buyer's requirements for Utilities are reduced to a level, as determined by Buyer in the exercise of prudent industry practice, below that which Seller is capable of safely and reliably producing. If Seller's partial inability to deliver up to the full amount of the Contract Capacities due to such Force Majeure Event continues for a period of more than six (6) months and Buyer has not exercised its right to terminate the Agreement pursuant to Section 14.5.1 within the period set forth therein, then Buyer and Seller shall in good faith seek to negotiate an amendment to this Agreement or other arrangements with respect to the effects of such Force Majeure Event taking into account the reduced delivery capacity of the Utility Plant and, if applicable, Buyer's reduced requirements for Utilities.

14.4.2  In the event that a Force Majeure Event suffered by Seller

(i) results in the complete cessation of deliveries of Utilities hereunder during the continuance of such Force Majeure Event, or

(ii) has a material adverse effect on Buyer's operations at the Refinery that results in Buyer's election to take no Utilities hereunder during the continuance of such Force Majeure Event,

then Buyer shall not be obligated to make payments of the Take-or-Pay Payment or the Committed Excess Electricity Payment accruing during the continuance of such Force Majeure Event.

14.5    Termination Due to Force Majeure.

14.5.1  Buyer may terminate this Agreement at no cost or penalty upon not less than thirty (30) days' prior written notice to Seller if Seller suffers a Force Majeure Event that actually reduces, in whole or in part, Seller's ability to deliver up to the Contract Capacities of Utilities hereunder for more than eighteen (18) consecutive months; provided that if Seller reasonably demonstrates that it will be able to resume deliveries of up to the Contract Capacities of Utilities by the end of twenty-four (24) months from the date it declared such Force Majeure Event, Buyer may not terminate this Agreement pursuant to this sentence. Buyer also may terminate this Agreement at no cost or penalty upon not less than thirty (30) days' prior written notice to Seller if Seller suffers a Force Majeure Event that actually reduces, in whole or in part, Seller's ability to deliver up to the Contract Capacities of Utilities hereunder for more than twenty-four (24) consecutive months.

14.5.2  If (i) Buyer suffers a Force Majeure Event that materially reduces or eliminates Buyer's requirements for Utilities hereunder for more than six (6) consecutive months, (ii) Buyer certifies to Seller that such Force Majeure Event has a material adverse effect on Buyer, and (iii) Buyer has ceased its activities at the Refinery as a result thereof for a period of twelve (12) consecutive months, then Buyer, so long as it has not commenced and is not then continuing efforts to resume operations at the Refinery, may either (A) terminate this Agreement

43

upon not less than thirty (30) days' prior written notice to Seller so long as Buyer pays to Seller on the termination date a termination fee equal to the following:

(1)     If such Force Majeure Event occurs during the period from the Financial Closing Date until the date that is thirty (30) months after the Financial Closing Date, the termination fee shall be equal to (a) the amount set forth in Column A of Schedule 1 which is applicable to such 30th month, discounted back to the date of termination at a monthly discount rate of 0.854%, minus (b) the positive difference (such positive difference, if any, the "Uncommitted Construction Amount") of (x) the then-effective contract price under the EPC Contract, minus (y) the total of all amounts paid or payable to the EPC Contractor up to the date of termination under the EPC Contract, plus all amounts payable by Seller in respect of termination of such EPC Contract and all other contracts and agreements to which Seller is a party;

(2)     If such Force Majeure Event occurs during the period from the thirtieth (30th) month after the Financial Closing Date until the earlier to occur of the Commercial Operation Date or the Take-or-Pay Date, the termination fee shall be equal to (a) the amount set forth in Column A of Schedule 1 which is applicable to the month in which the termination is effective, minus (b) the Uncommitted Construction Amount; or

(3)     If such Force Majeure Event occurs after the earlier to occur of the Commercial Operation Date and the Take-or-Pay Date, the termination fee shall be equal to the amount set forth in Column A of Schedule 1 which is applicable to the month in which the termination is effective; or

(B) purchase all of Seller's right, title and interest in the Project upon not less than thirty (30) days' prior written notice to Seller for an amount equal to the following:

(1)     If such Force Majeure Event occurs during the period from the Financial Closing Date until the date that is thirty (30) months after the Financial Closing Date, the purchase price shall be equal to the sum of (a) the amount set forth in Column B of Schedule 1 which is applicable to such 30th month, discounted back to the date of termination at a monthly discount rate of 0.854%, minus (b) the Uncommitted Construction Amount, plus (c) Demobilization Costs;

(2)     If such Force Majeure Event occurs during the period from the thirtieth (30th) month after the Financial Closing Date until the earlier to occur of the Commercial Operation Date or the Take-or-Pay Date, the purchase price shall be equal to the sum of (a) the amount set forth in Column B of Schedule 1 which is applicable to the month in which the termination is effective, minus (b) the Uncommitted Construction Amount, plus (c) Demobilization Costs; or

(3)     If such Force Majeure Event occurs after the earlier to occur of the Commercial Operation Date and the Take-or-Pay Date, the purchase price shall be equal to the

DOCSDC1.29925.33

44

sum of the amount set forth in Column B of Schedule 1 which is applicable to the month in which the termination is effective, plus Demobilization Costs;

provided, however, that such right to purchase the Project pursuant to this clause (B) is conditioned on Buyer first expressly assuming in writing all of Seller's obligations and liabilities arising from and after the date of such purchase under the KODELA Power Purchase Agreement, the Existing Facilities Lease and the Ground Lease; and provided, further, that following receipt of Buyer's purchase notice under this clause (B) Seller shall have the right, exercisable during such thirty-day notice period, to terminate this Agreement at no cost or penalty upon three (3) days' written notice and, upon delivery of such termination notice by Seller, Buyer's purchase right shall be terminated and each Party shall have no further obligation to the other hereunder. In the event that Seller does not exercise its termination right under the preceding proviso, upon receipt by Seller of the applicable purchase price and evidence of Buyer's express assumption under the first proviso to this clause (B), Seller shall turn the Project over to Buyer free of liens (other than any rights of any Affiliate of The Island Territory of Curaçao to purchase the Project), and the Parties shall have the rights and obligations set forth in Section 15.2. For the avoidance of doubt, nothing in this Section 14.5.2 is intended to interfere with Buyer's seeking to correct or mitigate the effects of any Force Majeure Event if so required by the PDVSA Lease under the circumstances.

## Article 15
## TERMINATION

15.1 Buyer's Right to Terminate and Purchase the Project. At any time after the end of the second Operating Year, and so long as no Buyer Event of Default has occurred and is then continuing, Buyer may provide written notice to Seller (the "Purchase Notice") of its irrevocable election to terminate this Agreement for its convenience (including, without limitation, as a result of the termination of the PDVSA Lease prior to the expiration of its stated term) and purchase all of Seller's right, title and interest in the Project for an amount equal to the sum of (i) the higher of (A) the amount set forth in Column C of Schedule 1 applicable to the month in which the termination and purchase would be effective, and (B) one hundred and forty percent (140%) of Project Book Value on the date of termination, plus (ii) Seller's Demobilization Costs, plus (iii) all fees and other amounts payable by Seller under or in connection with the Financing Documents with respect to termination of the financing arrangements thereunder prior to the expiration of their term, including, without limitation, breakage fees in respect of Seller's interest rate and currency hedging and swap arrangements, plus (iv) Seller's costs (including reasonable attorneys' fees) incurred in connection with effecting the purchase of the Project under this Section 15.1 and terminating Seller's financing, hedging and swap arrangements, plus (v) the net present value of seventy-five percent (75%) of the total amounts projected to be received by Seller under the then-remaining term of agreements with KODELA and other alternative purchasers of Excess Utilities, including under the KODELA Power Purchase Agreement with respect to electricity sold to KODELA in excess of 22 MW (in each case, exclusive of fuel costs), which net present value amount shall be determined based on 75% of the amounts payable by each third party purchaser (exclusive of fuel costs) in the twelve-month period prior to the month in which the Purchase Date (as defined below) occurs, each amount escalated at an

45

annual rate of three percent (3%) for the then-remaining term of the applicable power sales agreement, and the total of all such contract amounts discounted back to the Purchase Date using a discount rate of thirteen percent (13%). The Purchase Notice shall specify the date of the proposed termination and purchase (the "Purchase Date"), which date shall be not less than twelve (12) months nor more than twenty-four (24) months from the date of the Purchase Notice; provided, however, that if the Purchase Notice is given on June 30, 2014 after unsuccessful discussions between the Parties with respect to renewal of the Term under Section 4.1, the Purchase Date shall be December 31, 2014 (the scheduled expiration of the Term). During the period from the date the Purchase Notice is received by Seller to the Purchase Date, (i) Seller shall not, without the prior consent (which shall not be unreasonably withheld) of Buyer, make any capital improvements to the Utility Plant having a value in excess of $5,000,000 in the aggregate (excluding capital maintenance items and other items Seller reasonably determines are necessary for it to satisfy its obligations under this Agreement or the KODELA Power Purchase Agreement), and (ii) subject to the compliance with Section 20.3 by all parties to whom such information is to be provided, Seller shall make available to Buyer, for distribution to third parties proposing to provide financing for the purchase of the Project under this Section 15.1, such information in Seller's possession regarding the Utility Plant as is reasonably necessary for the purpose of obtaining such third-party financing. On the Purchase Date Buyer shall pay Seller the amount specified in this Section 15.1 and Seller shall convey to Buyer all of Seller's interest in the Project free and clear of liens (other than any rights of any Affiliate of The Island Territory of Curaçao to purchase the Project); provided, however, that on the Purchase Date Buyer must expressly assume in writing all of Seller's obligations and liabilities arising from and after the Purchase Date under the KODELA Power Purchase Agreement, the Existing Facilities Lease and the Ground Lease; and provided, further, that if a Buyer Event of Default has occurred and is continuing as of the Purchase Date, Seller may elect not to sell its interests in the Project to Buyer, whereupon the Parties shall have their respective rights and obligations as if no Purchase Notice had been issued. Buyer hereby agrees to indemnify and hold Seller harmless on an after-tax basis against all taxes, charges, and assessments imposed upon Seller under the laws of The Netherlands Antilles and The Island Territory of Curaçao that would not otherwise have been imposed but for the termination of this Agreement and the purchase of the Project under this Section 15.1. Upon the closing of the purchase under this Section 15.1, the Parties shall have the rights and obligations set forth in Section 15.2.

15.2    Discharge of Obligations Upon Termination. In the event of termination of this Agreement, and upon the payment of any past due amounts and any required termination or other fee, pursuant to Sections 4.2.5, 12.5, 14.5 or 15.1, as applicable, the Parties shall be released and discharged from any obligations arising or accruing hereunder from and after the date of such termination (other than the indemnity obligations under Article 10 and obligations arising upon termination, including, without limitation, the obligation to pay any amounts in respect of such termination or the transfer of the Project in connection therewith or otherwise hereunder, and any other obligation which survives the termination hereof). Termination of this Agreement shall not discharge or relieve either Party from any indemnity obligations under Article 10 with respect to any event occurring prior to the termination of this Agreement, and from their respective obligations under Section 20.1.

## Article 16
## GOVERNMENTAL APPROVALS

16.1    Seller's Obligation. Except with respect to Governmental Approvals which may be required to allow Buyer to perform its obligations hereunder or are required prior to the Turnover Date for the Existing Facilities (all of which shall be obtained and maintained by Buyer at its sole cost), Seller shall secure and retain at no cost to Buyer (except to the extent Buyer has agreed to bear costs under Section 5.1.4) all Governmental Approvals (including environmental permits), licenses, easements, rights-of-way, releases and other approvals necessary for the construction and operation of the Utility Plant.

16.2    Buyer's Assistance. At Seller's request, Buyer shall use best efforts to assist Seller in obtaining (at Seller's expense) and retaining such permits, licenses, easements, rights-of-way, releases and other approvals relating to the area of the Refinery site as are necessary for the construction, refurbishment and operation of the Utility Plant.

## Article 17
## DISPUTE RESOLUTION

17.1    Arbitration. Subject to Section 12.4, any dispute arising out of or in relation to the interpretation or performance of this Agreement which cannot be amicably resolved between the Parties shall be submitted to binding arbitration upon the written notice of either Party delivered to the other of such Party's intention to arbitrate, the nature of the dispute, the amount claimed and the decision sought. Within thirty (30) days of delivery of the notice of intent to arbitrate the Party submitting such notice shall specify to the other Party the name and address of an arbitrator selected by the Party requesting arbitration. The other Party shall within thirty (30) Business Days of receipt of the arbitration notice select its arbitrator and upon selection of such second arbitrator, the two arbitrators shall, within ten (10) Business Days of the selection of the second arbitrator, select a third arbitrator; provided, however, that if the second Party fails to select its arbitrator, or if the two arbitrators fail to select a third arbitrator, in each case, within the time period specified therefore, the additional arbitrators shall be appointed by the Chairman of the Court of Arbitration of the International Chamber of Commerce. All arbitrators shall be qualified, independent and neutral. The arbitration shall be conducted in accordance with the Rules of Conciliation and Arbitration of the International Chamber of Commerce, with proceedings to be held in The Island Territory of Curaçao in the English language.

17.2    Arbitration Procedures. The Parties shall proceed with any arbitration expeditiously. All conclusions and decisions of the arbitration shall be made consistent with the arbitrators' good faith interpretation of the terms and provisions of this Agreement. The arbitrators shall render their decision within six (6) months of the date of appointment of the third arbitrator, or in such longer time as the arbitrators indicate in writing to the Parties is necessary for their decision. The award of the arbitrators will be final and binding on both Parties and may be enforced in any court having jurisdiction over the Party against which enforcement is sought. Each Party shall bear its own expenses, including but not limited to counsel fees and witness fees. If the arbitrators determine that the claim or defense of either

47

Party was frivolous (i.e., without justifiable merit), they may require that such Party pay or reimburse the other Party for costs of the arbitration in whole or in part; all other expenses of the arbitration shall be apportioned in the award of the arbitrators based upon the respective merit of the positions of the Parties. Notwithstanding the foregoing, equitable remedies, including injunction and specific performance, shall be available to the Parties by judicial proceedings at any time and, for this purpose and for the purpose of enforcing any arbitral award or decision, the Parties hereby submit to the exclusive jurisdiction and venue of the courts in The Netherlands Antilles. The provisions of this Article 17 shall survive the termination or expiration of this Agreement.

## Article 18
## AMENDMENT; ASSIGNMENT

18.1    Amendments. No amendment or modification of this Agreement or the terms hereof shall be valid or binding on either Buyer or Seller unless evidenced by and reduced to writing and signed by duly authorized representatives of each of the Parties.

18.2    Assignment by Buyer and Seller. Except as specified below, the rights and obligations of the Parties to this Agreement may not be assigned by either Party except upon the express written consent of the other Party, which consent may be withheld by such Party in its sole discretion. Seller shall have the right, without the consent of Buyer but upon notice to Buyer, to assign this Agreement to any Affiliate of The Island Territory of Curaçao as to which The Island Territory of Curaçao has a greater than 80% interest or control that purchases the Project, or to the Financing Parties as collateral security for Seller's obligations under the Financing Documents. Buyer shall have the right, without the consent of Seller but upon notice to Seller, to assign this Agreement to any Affiliate of Buyer (i) which is a lessee of the Refinery, (ii) which assumes all of the obligations of Buyer and PDVSA under the PDVSA Lease, the Common Facilities Agreement, the Fuel Supply Agreement and each other agreement, document and instrument entered into by Buyer with or for the benefit of Seller, and (iii) which is a Person in which PDVSA has a greater than 80% interest or control. Buyer acknowledges that upon an event of default by Seller under the Financing Documents, any of the Financing Parties may (but shall not be obligated to) assume, or cause its designee or a new lessee or purchaser of the Utility Plant to assume, all of the interests, rights and obligations (including the obligation to provide credit support under Section 19.1) of Seller thereafter arising under this Agreement. If the rights and interests of Seller in this Agreement shall be assumed, sold or transferred as hereinbefore provided, and the assuming party shall agree in writing to be bound by and to assume, the terms and conditions of this Agreement and any and all obligations to Buyer arising or accruing thereunder from and after the date of such assumption, except with respect to obligations arising or accruing hereunder prior to the date of such transfer (as to which Seller shall remain obligated), Seller shall be released and discharged from the terms and conditions hereof and each such obligation hereunder, and Buyer shall continue this Agreement with the assuming party as if such person had been named as the Seller under this Agreement; provided, however, that if any of the Financing Parties assume this Agreement as provided hereinabove, such Persons shall be personally liable for the performance of such obligations hereunder, but only to the extent of the total interest of the Financing Parties in the Project. Notwithstanding any such assumption by

DOCSDC1:29925.33

48

any of the Financing Parties or a designee thereof, Seller shall not be released and discharged from and shall remain liable for any and all obligations to Buyer arising or accruing hereunder prior to such assumption. The provisions of Section 18.1 and this Section 18.2 are for the benefit of the Financing Parties as well as the Parties, and shall be enforceable by the Financing Parties as express third-party beneficiaries hereof. Any Financing Party, or any bondholder or participant acting on behalf of the Financing Parties, that actually becomes a party to this Agreement pursuant to this Section 18.2 shall have all of the rights, liabilities and obligations of Seller provided in this Agreement other than those arising or accruing prior to the date such Person became a party hereto pursuant to this Section 18.2.

18.3   Binding Effect. The terms and provisions of this Agreement and the respective rights and obligations hereunder of Buyer, Seller, and the Financing Parties shall be binding upon, and inure to the benefit of, their respective successors and permitted assigns.

## Article 19
## CREDIT SUPPORT; GUARANTY

19.1   Certain Credit Support Obligations. Unless Buyer agrees that Seller has the financial capacity to pay the liquidated damage amounts for which it is responsible under Sections 3.2.2, 9.1.2 and 12.5.2 of this Agreement, the obligation to pay such liquidated damage amounts shall be supported by a letter of credit reasonably acceptable in form and substance to Buyer and issued by a bank or financial institution with a credit rating of "A" or better. The maximum stated amount of such letter of credit shall be: (a) until the occurrence of the Commercial Operation Date (or, if earlier, the Take-or-Pay Date), $15,000,000; (b) commencing with the Commercial Operation Date (or, if earlier, the Take-or-Pay Date) and ending on the last day of the first Operating Year, $6,000,000; and (c) commencing on the first day of the second and each subsequent Operating Year during the Term, $4,000,000. Seller may, in its sole discretion, provide a guaranty substantially in the form of Exhibit N for up to forty-nine percent (49%) of such maximum amounts, in which case the amount of the letter of credit shall be reduced by the amount so guaranteed. Buyer agrees that such guaranty may be issued by IUH, so long as such entity amends its articles of association to permit the issuance of guaranties and holds the entire ownership interest in KAE and KODELA. If IUH does not undertake such actions, such guaranty shall be issued by the government of The Island Territory of Curaçao or an Affiliate thereof reasonably acceptable to Buyer. If, at any time during the period when such guaranty is to be provided, the value of IUH's assets is less than fifty percent (50%) of the value of its assets on the date of first issuance of such guaranty, then Seller shall provide a letter of credit or other substitute credit support reasonably acceptable to Buyer within fourteen (14) days of the determination of such decrease in value. Buyer agrees that if both a letter of credit and a guaranty are provided pursuant to this Section 19.1, Buyer will proceed against such separate instruments such that the amounts drawn or demanded thereunder reduce on a pro rata basis the separate security so provided. Buyer may proceed against the letter of credit and any guaranty provided under this Section 19.1 if Seller fails to pay liquidated damages when due within the applicable period specified in Section 3.2.2, 9.1.2 or 12.5.2, as applicable, and any such draw against such letter of credit and guaranty provided under this Section 19.1 shall be deemed to satisfy Seller's payment obligations with respect to such liquidated damages. Seller shall not be

(ii) Buyer:    Refinería Isla (Curazao) S.A.
Emmastad, P.O. Box 3843
Curaçao, Netherlands Antilles
Attn:  Managing Director
Tel:   599-9-466-2523
Fax:  599-9-466-2299

(iii) Financing Parties:

As provided by Seller from time to time.

From time to time Buyer, Seller and the Financing Parties each may designate a new address for itself or themselves, as the case may be, for purpose of notice hereunder by written notice to each of the others duly given as provided in this Section 20.1.

20.2  Cooperation. The Parties acknowledge that they are entering into a long-term arrangement in which the cooperation of both of them will be required. If, during the Term of this Agreement, changes in the operations, facilities or methods of either Party will materially benefit a Party without detriment to the other Party, the Parties commit to each other to make reasonable efforts to cooperate and assist each other in making such change.

20.3  Confidentiality and Publicity. Except as set forth in this Section 20.3, Buyer and Seller shall hold in confidence for the Term of this Agreement and for a period of either five (5) years from the date of termination, or two (2) years from the scheduled date of expiration hereof, as the case may be, any information supplied by either Party to the other. Each Party shall inform its subcontractors, suppliers, vendors and employees of its obligations under this Section 20.3. Notwithstanding the foregoing, Buyer and Seller may disclose the following categories of information or any combination thereof:

(i)  information which was in the public domain prior to receipt thereof by such Party or which subsequently becomes part of the public domain by publication or otherwise except by a wrongful act of such Party;

(ii)  information that such Party can show was lawfully in its possession prior to receipt thereof from the other Party through no breach of any confidentiality obligation;

(iii)  information received by such Party from a third party having no obligation of confidentiality with respect thereto;

(iv)  information at any time developed independently by such Party providing it is not developed from otherwise confidential information;

(v)  information disclosed pursuant to and in conformity with the law or a judicial order or in connection with any legal proceedings or under the arbitration procedure described in Article 17; and

51

DOCSDC1 29935.33

(vi)     information required to be disclosed under securities laws applicable to publicly traded companies and their subsidiaries.

In addition, Seller may disclose information to the Financing Parties and any other financial institutions expressing interest in providing debt financing or refinancing and/or other credit support to Seller, and the agent or trustee of any of them; provided, however, that such disclosures shall be subject to the agreement of such Persons to keep such information confidential pursuant to the terms of this Section 20.3 and to use such information solely in connection with their review or participation in such financing or credit support.

Notwithstanding the foregoing, either Seller or Buyer may publish information regarding this Agreement with the express written consent of the other Party, which consent shall not be unreasonably withheld. Neither Party shall issue any press or publicity release or otherwise release, distribute or disseminate any material information for publication concerning this Agreement or the participation of the other Party in the transactions contemplated hereby without the prior written consent of the other Party, which consent shall not be unreasonably withheld; provided, however, that such limitation on disclosure shall not apply to disclosures or reporting required by a Governmental Authority if the Party seeking disclosure informs the other Party of the need for such disclosure and, if reasonably requested by the other Party, seeks, through a protective order or other appropriate mechanism, to maintain the confidentiality of confidential information.

20.4     Independent Contractor. Seller shall be an independent contractor for the purposes of this Agreement. Nothing in this Agreement shall be deemed to constitute Seller, its subcontractors, suppliers, or any of their employees to be the agents, representatives, employees or servants of Buyer. Anything in this Agreement which may appear to give Buyer the right to direct Seller as to the details of its performance hereunder shall not be understood as reducing or waiving Seller's obligations hereunder.

20.5     No Approval. Any approval with respect thereto given by Buyer hereunder shall not be construed as a representation or warranty to Seller regarding the safety, durability, reliability, performance or fitness for purpose of the New Facilities or the design, procurement, construction, installation, operation or maintenance thereof.

20.6     Choice of Law. This Agreement shall be governed by and construed in accordance with the laws of The Netherlands Antilles.

20.7     Severability and Renegotiation. Should any provision of this Agreement for any reason be declared invalid or unenforceable by final and unappealable order of any Governmental Authority having jurisdiction thereover, such decision shall not affect the validity of the remaining portions, which remaining portions shall remain in full force and effect as if this Agreement had been executed with the invalid portion thereof eliminated. In the event any such provision of this Agreement is so declared invalid, the Parties shall promptly renegotiate in good faith new provisions to eliminate such invalidity and to restore this Agreement as near as possible to its original intent and effect.

52

20.8    No Other Agreements. This Agreement constitutes the entire agreement and understanding between the Parties relating to the subject matter hereof, there being no other agreements or understandings written or oral other than those contained in this Agreement and the attachments hereto. This Agreement supersedes any and all oral or written agreements and understandings heretofore made relating to the subject matters of this Agreement.

20.9    Cooperation with Financing. Buyer acknowledges that the development of the Project and the construction of the Utility Plant will require financing. Buyer agrees to cooperate with Seller in connection with such financing by providing such consents, agreements and other instruments and documents (including, without limitation, financial statements and, subject to their compliance with Section 20.3, other information about Buyer reasonably requested by the Financing Parties) as the Financing Parties may request.

20.10    Third Party Beneficiaries. This agreement is entered into for the benefit of the Parties and their successors and permitted assigns and no Person, other than the Financing Parties, which are third-party beneficiaries solely of Section 18.2 and of this Section 20.10, shall be a beneficiary of the terms and conditions hereof.

20.11    Captions. All indices, titles, subject headings, section titles and similar items are provided for the purpose of reference and convenience and are not intended to be inclusive, definitive or to affect the meaning, content or scope of this Agreement.

20.12    Survival. Any provisions of this Agreement that are expressly or by implication to come into or remain in force following the termination or expiration of this Agreement shall survive such termination or expiration.

20.13    Further Assurances. The Parties shall execute such additional documents including, without limitation, a consent to assignment, legal opinions, estoppel letters or similar documents, and shall cause such additional actions to be taken as may be required or, in the judgment of any Party or any of the Financing Parties, be necessary or desirable, to effect or evidence the provisions of this Agreement and the transactions contemplated hereby.

20.14    Counterparts. This Agreement may be executed in any number of counterparts, which together shall constitute but one and the same instrument and each counterpart shall have the same force and effect as if they were one original.



DOCSDC1.29925.33

53

FILED: NEW YORK COUNTY CLERK 08/26/2020 01:39 PM    INDEX NO. 654058/2020

NYSCEF DOC. NO. 3    Case 1:17-mc-00151-LPS    Document 564-2    Filed 05/24/23    Page 63 of 63 PageID #: 14788    RECEIVED NYSCEF: 08/26/2020

IN WITNESS WHEREOF, the Parties, intending to be legally bound hereby, have caused this Agreement to be signed by their respective officers thereunto duly authorized as of the day and year first set forth above.

WITNESSETH:

_____
Stanley Betrian, Lieutenant
Governor of The Island
Territory of Curaçao

**SELLER:**

Curaçao Utilities Company N.V., a
Netherlands Antilles limited liability company

By: Its Managing Director

_____
Henry Parisius

By: Its Managing Director

Curaçao Energy Company, Ltd., a Cayman
Islands limited liability company

By: _____
Name: Douglas S. ...

By: _____
Name: ROMANO SALVATORI

By: _____
Name: Andrius Vicmantas

**BUYER:**

Refinería Isla (Curazao) S.A.,
a Venezuelan *sociedad anónima*

By: _____
Name: JAVIER HERNANDEZ
Title: MANAGING DIRECTOR