IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| CRYSTALLEX INTERNATIONAL CORP., | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | Misc. No. 17-151-LPS |
| | : | |
| BOLIVARIAN REPUBLIC OF VENEZUELA, | : | |
| | : | |
| Defendant. | : | |

## <u>MEMORANDUM ORDER</u>

On May 10, 2023, the Court solicited briefing from the Sale Process Parties[1] and any

other interested entities on (a) which judgments, if any, should be considered Additional

Judgments under the Sale Procedures Order ("SPO"); (b) whether the Court may issue full,

unconditional orders of attachment at this time to any creditors; and (c) how the Court should

determine the relative priority of any Additional Judgments.  (D.I. 559 ¶ 3)[2]  Over the ensuing

month, the Court received a total of 47 briefs, from the Special Master, the Sale Process Parties,

and numerous other creditors of the Republic of Venezuela or of PDVSA.  Then, on June 21,

2023, the Court invited still more briefing on six additional, related questions (D.I. 615), which

yielded an additional 13 (letter) briefs.  The Court heard oral argument on the various issues on

---

[1] All capitalized terms have the same meaning given to them in the Sale Procedures Order.
(Misc. No. 17-151 D.I. 481)

[2] Citations to the docket index ("D.I.") are to the docket in the above-captioned *Crystallex*
Action, Misc. No. 17-151, unless otherwise noted.  Many items cited to in this Order are
identically docketed in multiple related actions.  For simplicity, except where there is some
reason to do otherwise, the Court cites only to the entry in the *Crystallex* docket, but such
citations should be understood as also being citations to the identical documents filed in any
other actions on the Court's docket relating to debts of Venezuela or PDVSA.

June 26, 2023.  (D.I. 640)  The Venezuela Parties, judgment-debtors in this and other related actions, thereafter filed an additional letter on June 27, 2023 (D.I. 639), which creditors Crystallex and Red Tree responded to on June 30, 2023 (D.I. 641, 642).

After considering all of this same briefing, on July 19, 2023 the Court ordered PDVSA to produce the certificate showing its ownership of 100% of the shares of PDVH by no later than July 24, 2023, or to ask this Court to order PDVH to do so or, instead, to initiate an expedited action asking the Delaware Court of Chancery to do so.  (*See* D.I. 644 ¶¶ 1-2)  On July 21, 2023, PDVSA notified the Court that the share certificate is lost, stolen or destroyed, so, consistent with the Court's July 19 Order, it is filing an action in the Chancery Court asking that court to, on an expedited basis, order PDVH to issue a new share certificate.  (D.I. 645)

Pursuant to the SPO entered by the Court on October 11, 2022, the Court also recently announced that the sale process outlined by the SPO would be initiated imminently.  The following dates and deadlines are now governing in these proceedings:

| Event | Date |
|---|---|
| Preparation Launch Date | Monday, July 24, 2023 |
| Launch Date | Monday, October 23, 2023 |
| Additional Judgment Deadline | Thursday, November 2, 2023 |
| Tentative Sale Hearing Date | Monday, July 15, 2024 |

In the instant Order, the Court addresses many of the remaining issues that were the subject of the briefing identified above.  Accordingly, having reviewed the 60+ filings regarding

2

these issues,[3] **IT IS HEREBY ORDERED** that the Court will, pursuant to its "discretion in setting the terms and conditions for judicial sales," *United States v. Branch Coal Corp.*, 390 F.2d 7, 10 (3d Cir. 1968), use the following criteria to designate Additional Judgments and their relative priority to receive proceeds from the upcoming sale of shares of PDVH owned by PDVSA.

**Steps Leading To Participation In Sale**

As background, and to allow the Court to explain certain of its holdings, it will be helpful first to set out the numerous steps in the complex process that will culminate in the Court-ordered sale of as many shares of PDVH, owned by PDVSA, as is necessary to satisfy whatever amount of judgments will be involved in the sale. The steps are as follows:

1.      A creditor proves it is owed some debt by a Venezuela Party. This may happen, for instance, in an arbitration proceeding undertaken pursuant to a contract entered into between the creditor and the debtor. *See, e.g., Crystallex Int'l Corp. v. Bolivarian Republic of Venez.*, 932 F.3d 126, 133 (3d Cir. 2019) (explaining how Republic, under former President Hugo Chávez, entered into agreement with Crystallex to develop gold mine, then seized the mine after Crystallex had already invested hundreds of millions of dollars in it, and later, pursuant to the agreement, Crystallex won arbitration award in amount of $1.2 billion plus interest).

2.      The creditor enforces its award in a U.S. court and receives a judgment.[4] The

---

[3] *See, e.g.*, D.I. 564, 566-67, 569, 571-76, 585-97, 599-612, 626-27, 629-30, 639, 641-42; Misc. No. 19-79 D.I. 35, 38, 41, 48; Misc. No. 19-290 D.I. 154; Misc. No. 20-257 D.I. 95; Misc. No. 21-46 D.I. 72; Misc. No. 21-481 D.I. 60-62, 64; Misc. No. 22-156 D.I. 34; Misc. No. 22-347 D.I. 22.

[4] While the Court's outline focuses on the example of arbitration awards, which are common to many of the creditors before the Court, it should be understood that not all creditors received arbitral awards and needed to proceed in precisely the manner outlined in these steps. ACL, for example, received a final judgment from the Southern District of New York for breach of

Federal Arbitration Act ("FAA"), 9 U.S.C. §§ 201, 203, 207, authorizes a creditor to file an action in a U.S. district court to enforce its foreign arbitration award. *See also* 28 U.S.C. § 1605(a)(6) (providing that foreign states are not immune from jurisdiction of U.S. courts enforcing contractual arbitration agreements). Pursuant to procedures set out in the FAA, both sides have an opportunity to be heard on the creditor's request, which may result in a judgment order, thereby putting the authority of the federal court behind the requirement that the creditor be paid what it is owed by the debtor. *See* 9 U.S.C. § 207; *see also Crystallex Int'l Corp. v. Bolivarian Republic of Venez.*, C.A. No. 16-661 D.I. 31 (D.D.C. Mar. 31, 2017) (order granting Crystallex's petition to confirm arbitration award).

3.    The creditor registers its judgment in the District of Delaware. A creditor who obtains a final judgment holding a debtor liable for damages may register its judgment for enforcement in another federal district, typically one in which the judgment-debtor has property. *See* 28 U.S.C. § 1963 ("A judgment in an action for the recovery of money or property entered in any [federal court] may be registered . . . in any other district . . . ."); *see also* D.I. 1 (Crystallex registering judgment in Delaware); Misc. No. 21-46 D.I. 1 (ACL registering final judgment in Delaware).

4.    The creditor moves in Delaware for a writ of attachment *fieri facias* ("fi. fa."). Under Federal Rule of Civil Procedure 69(a), a creditor with a registered judgment may then move for a writ of execution, subject to state and federal procedural requirements. *See* Fed. R. Civ. P. 69(a)(1) ("A money judgment is enforced by a writ of execution, unless the court directs otherwise. The procedure on execution – and in proceedings supplementary to and in aid of

_____

contract and was awarded damages. *See ACL1 Invest. Ltd. v. Bolivarian Republic of Venez.*, C.A. No. 19-9014 D.I. 52 (S.D.N.Y. Dec. 12, 2020).

judgment or execution – must accord with the procedure of the state where the court is located, but a federal statute governs to the extent it applies."); *see also* 10 Del. C. §§ 3508, 5031; Del. Superior Ct. R. Civ. P.R. 4(b). In turn, Delaware law allows a judgment creditor to attach a debtor's shares in a Delaware corporation. *See* 8 Del. C. § 324(a) ("The shares of any person in any corporation with all the rights thereto belonging . . . may be attached under this section for debt, or other demands, if such person appears on the books of the corporation to hold or own such shares, option, right or interest."). Further, Delaware law makes "the appropriate form for attachment . . . a writ of attachment *fieri facias* ('fi. fa')." *LNC Investments, Inc. v. Democratic Republic of Congo*, 69 F. Supp. 2d 607, 611 (D. Del. 1999); *see also Wilmington Trust Co. v. Barron*, 470 A.2d 257, 262-63 (Del. 1983) ("Thus, when the property attached is not to be physically seized, but is in the possession or control of another, or if the thing to be attached is not such property as is susceptible of seizure, such as rights and credits, the sheriff must summon the person who has the goods, chattels, rights, credits, money or effects of the defendant in his possession, who is termed the garnishee, to appear at the court to which the writ is returnable, and declare what property of the defendant he has in his hands. Significantly, the writ of attachment fi. fa. is not served upon the defendant, but upon the garnishee."). The Court will refer to the "writ of attachment *fi. fa.*" either by that name or by the shorthand of "writ of attachment" or just "writ."

5.      The creditor obtains a writ of attachment *fi. fa.*, which may be conditioned on subsequent events. The creditor's motion for a writ of attachment *fi. fa.* is then litigated. Such litigation typically involves full briefing, although the motion may alternatively be resolved by stipulation. Sometimes an evidentiary hearing is required to allow the Court to make factual findings on its way to deciding whether to grant the motion. *See, e.g., OI European Group B.V.*

*v. Bolivarian Republic of* Venezuela, -- F. Supp. 3d --, 2023 WL 2609248, at *1 (D. Del. Mar. 23, 2023), *aff'd*, -- F.4th --, 2023 WL 4385930 (3d Cir. July 7, 2023).

In conjunction with the current proceedings, Crystallex was the first creditor to obtain a writ of attachment, when the Court granted its motion on August 9, 2018.  (D.I. 78)  Soon thereafter, the United States expanded sanctions on Venezuela's property in the U.S., hampering other creditors' efforts to obtain such writs.  The Court has, however, awarded some creditors conditional writs of attachment, which cannot be formally issued and served until some future event (usually a condition outside the control of the Court or the creditor) occurs.  For example, in *OI European Group B.V. v. Bolivarian Republic of Venez.*, 2022 WL 611563, at *1 (D. Del. Mar. 2, 2022), the Court agreed with certain judgment creditors that "any writ of attachment for the PDVH Shares should not be served until either OFAC grants it a specific license to obtain an interest in the PDVH Shares or the sanctions regime changes and the PDVH Shares are no longer blocked." *See also id.* ("For the reasons explained below, the Court concludes that the OFAC sanctions do not prevent it from authorizing the eventual issuance of a writ attachment, conditioned on some form of approval by the Executive Branch."); Misc. No. 19-290 D.I. 132 (granting each of OIEG's, Huntington's, ACL's, and Rusoro's motions for order authorizing writ of attachment while directing Clerk of Court "*not* to issue the writ of attachment until the Court has received evidence that [OFAC] has authorized the issuance and service of such writ or removed the prohibition and sanctions currently in place that prevent the issuance and service of such a writ, or until some further order with different instructions issues from this Court").

As will be further explained below, the Court will, by separate order, set a deadline ("the *Step 5 (Writ) Deadline"*) by which any creditor wishing to participate in the forthcoming sale as an Additional Judgment Creditor must obtain a writ, which may be conditional or unconditional.

6.     <u>The Clerk issues to the United States Marshals Service ("Marshals") the writ of</u> <u>attachment *fi. fa*.</u>  This is accomplished either when any conditions imposed on a conditional writ are fulfilled or at the Court's direction upon the issuance of an unconditional writ,  *See* Del. Super. Ct. Civ. P. 4(c); *see also* D.I. 95 at 6 (Crystallex's Praecipe directing Clerk to issue to writ to Marshals).

7.     <u>The U.S. Marshals Service serves the creditor's writ of attachment, perfecting the</u> <u>writ and attaching the shares of PDVH owned by PDVSA.</u>  Under Delaware law, a writ of attachment *fi. fa.* may be perfected by service. *See* 10 Del. C. § 5081 ("An execution shall not bind goods and chattels until it is delivered to the sheriff or other proper officer to be executed.").  As used in this Order, a writ issued by this Court is considered perfected when it is served by the Marshals on the judgment-debtor, the Republic or PDVSA, or served on PDVH, which is the property being attached.[5]  As will be further explained below, the Court will, by separate order, set a deadline ("the ***Step 7 (Perfected Writ) Deadline***") by which any creditor wishing to participate in the forthcoming sale as an Additional Judgment Creditor must have had its writ issued and served.

As of today, only one creditor, Crystallex, has completed all of these steps and reached Step 7. On August 24, 2018, pursuant to orders of this Court, the U.S. Marshal for the District of Delaware served a writ of attachment on PDVH, effectively seizing property (shares of PDVH) owned by PDVSA (the alter ego of the Republic of Venezuela, at least as of that date) for eventual sale, in order to satisfy the debt owed by Venezuela to Crystallex. (D.I. 95, 96)[6]

---

[5] The Court need not determine whether Delaware law might consider some other act to be sufficient to "perfect" a writ. *See also OIEG*, 2022 WL 611563 at *8 ("[T]he Court need not determine at precisely which point a lien is perfected under Delaware law.").

[6] Refineria Di Korsou N.V. ("RDK") contends that it has registered a judgment in Delaware, a valid and perfected writ of attachment from the Delaware Superior Court, and that it should be

7

Subsequently, more than a dozen other creditors, collectively purporting to hold judgments of more than $5 billion, have followed Crystallex into this Court.[7] The collection efforts of these other creditors are currently at different points in the seven-step process outlined above, with none having proceeded past Step 5. (*See, e.g., Banco San Juan Internacional Inc. v. Petróleos de Venezuela S.A.*, C.A. No. 23-1263 D.I. 1 (D.D.C. Oct. 5, 2022) (Banco seeking recognition of its foreign judgment, i.e., Step 2); Misc. No. 23-298 D.I. 1 (Valores registering its final judgment from District Court for the District of Columbia in Delaware, i.e., Step 3); *id.* D.I. 8 (Valores moving for order authorizing writ of attachment, i.e., Step 4); Misc. No. 19-290 D.I. 132 ¶ 1 (conditionally granting OIEG's motion for order authorizing writ of attachment, i.e., Step 5)) The creditors who have appeared in this Court and whose judgments are currently at some stage between Steps 2 and 5 are asking the Court to permit them to reach Steps 6 and 7 and join Crystallex in the forthcoming sale by being named an Additional Judgment Creditor pursuant to the SPO (D.I. 481).

---

recognized as an Additional Judgment Creditor. (*See, e.g.*, D.I. 564 at 4-5)  Others appearing before the Court dispute the validity of RDK's writ. (*See, e.g.*, D.I. 609)  It cannot be disputed that RDK has not, to date, obtained a writ from this Court.  Additionally, the bases for RDK's claim to becoming an Additional Judgment Creditor are currently being litigated in other courts. (*See, e.g.*, D.I. 640 at 169-71)

[7] *See* Misc. No. 18-343 D.I. 1 (Saint-Gobain attempting to recover over $42 million); Misc. No. 19-79 D.I. 1 (Tidewater registering $36 million judgment); Misc. No. 19-290 D.I. 1 (OIEG registering $382 million judgment); Misc. No. 19-342 D.I. 1 (ConocoPhillips registering $1.2 billion judgment); Misc. No. 20-257 D.I. 1 (Huntington registering $137 million judgment); Misc. No. 21-46 D.I. 33 at 4 (ACL registering judgment of $118 million); Misc. No. 21-481 D.I. 1 (Rusoro registering $967 million judgment); Misc. Nos. 22-68 & 22-69 D.I. 1 (Red Tree registering $88 million and $157 million judgments); Misc. No. 22-156 D.I. 1 (Koch registering $387 million judgment); Misc. No. 22-264 D.I. 1 (ConocoPhillips registering $48 million judgment); Misc. No. 22-347 D.I. 1 (Siemens registering $166 million judgment); Misc. No. 22-453 D.I. 1 (Gold Reserve registering $713 million judgment); C.A. No. 22-1315 D.I. 1 (Banco seeking to register judgments totaling over $122 million); Misc. Nos. 21-18, 22-131 & 22-263 D.I. 1(Contrarian registering three judgments totaling more than $393 million); Misc. No. 23-298 D.I. 1 (Valores registering $618 million judgment).

**The Court Has Authority To Issue Full, Unconditional Writs Of Attachment**

On May 1, 2023, OFAC issued a license (the "License") to the Clerk of the Court for the U.S. District Court for the District of Delaware ("Clerk"), authorizing the Clerk, this Court, agents and/or contractors of the Court, and any named Additional Judgment Creditors "to engage in transactions and activities ordinarily incident and necessary to the issuance and service of a writ of attachment *fieri facias* for any party named an 'Additional Judgment Creditor' by the Court pursuant to the [SPO] related to *Crystallex Int'l Corp.*, Case No. 1:17-mc-00151-LPS (D. Del.)." (D.I. 555 at 8)  OFAC's License refers to the entities it listed as being able to engage in such activities as, collectively, the "Licensees." (*Id.*)

The Court understands the License to permit the Clerk to issue, and the U.S. Marshals Service to serve, writs of attachment attaching the PDVH shares, without violating the Venezuela sanctions regime, in order to satisfy the judgments the Court names as Additional Judgments under the SPO.  It follows, in the Court's view, that no provision of the sanctions regime prevents the Court from directing the Clerk to issue full, unconditional writs of attachment to judgment creditors of Venezuela or of PDVSA – just as the Court did with respect to Crystallex's judgment back in August 2018. (*See* D.I. 95 ¶ 2)  Specifically, any party who the Court names an Additional Judgment Creditor can, and will, in time, be issued a full, unconditional writ of attachment from the Clerk, and thereafter the Marshal will – if served with the writ by the creditor, at the time and in the order of priority to be determined by the Court – be directed to serve that writ.  The Venezuela Parties do not appear to dispute this reasoning. (*See, e.g.*, D.I. 589, 610)

9

**To Become An Additional Judgment Creditor, A Creditor Must Obtain A Conditional (Or Unconditional) Writ Of Attachment (Step 5) By The Step 5 (Writ) Deadline**

The numerous non-Crystallex creditors before the Court are seeking to be named Additional Judgment Creditors, so their judgments may be part of the forthcoming sale, potentially resulting in these creditors collecting on their judgments.  There are open questions about what a creditor must do, and by when, in order to be named an Additional Judgment Creditor.  The Court turns to these issues now.

Delaware law does not dictate who can become an Additional Judgment Creditor or the date by which it must occur.  Delaware law does make clear that, in order for the Court to conduct a sale of the PDVH Shares, it is necessary that at least one judgment creditor have obtained and perfected its writ of attachment.  *See* 8 Del. C. § 324(a); 6 Del. C. § 8-112(a).  But Delaware law is silent on other issues the Court is confronting in the unique circumstances presented here.

Nor does the SPO, which was entered by the Court in October 2022, answer these questions.  While the SPO provides that no "proceeds from any sale" of PDVH shares can be used to satisfy judgments that are not Attached Judgments (D.I. 481 ¶ 30), thereby requiring that creditors become Additional Judgment Creditors before they can obtain any proceeds, the SPO does not define the term "Additional Judgments," nor what qualifications make a creditor an Additional Judgment Creditor, or the timing by which a creditor must meet these qualifications.  Instead, the SPO merely provides: "[T]he Court will decide in accordance with applicable law which, if any, additional judgments . . . are to be considered by the Special Master for purposes of the Sale Transaction."  (D.I. 481 ¶ 30)[8]

---

[8] Even if a judgment is not designated as an Additional Judgment, the SPO expressly recognizes that the "Additional Judgment Deadline does not impair or in any way limit any person's or

The Court has received a variety of proposals as to what it should set as the qualifications for a creditor to be named an Additional Judgment Creditor and as the deadline for meeting those qualifications. Crystallex and the Venezuela Parties argue that in order to become an Additional Judgment Creditor, a creditor should be required to have a perfected attachment of the PDVH shares – and to have done so by the Additional Judgment Deadline set out in the SPO. (*See, e.g.*, D.I. 573 at 1, 6 (Crystallex); D.I. 571 at 5, 7 (Venezuela Parties)) That is, Crystallex and the Venezuela Parties would have the Court require that to be an Additional Judgment Creditor, a creditor must reach Step 7 by on or before November 2, 2023. As support for this view, these parties note that the SPO defines Crystallex's Judgment and the Additional Judgments collectively as "Attached Judgments," and requires that the Special Master "shall only consider judgments that are determined to be Attached Judgments by the Court by the Additional Judgment Deadline." (D.I. 481 ¶ 30) The Court does not agree with this interpretation of the SPO.

Other creditors – such as Red Tree, Contrarian, Gold Reserve, ConocoPhillips, OIEG, Huntington, ACL, Rusoro, Koch, and Siemens – argue, more persuasively, that Additional Judgment Creditors need only have obtained conditional (or unconditional) writs of attachment in order to have their judgments recognized as Additional Judgments under the SPO. (*See, e.g.*, D.I. 566 at 1-2 (Red Tree); D.I. 567 at 1 (Contrarian); D.I. 572 at 2 (Gold Reserve); D.I. 574 at 6-7 (ConocoPhillips); Misc. No. 19-290 D.I. 154 at 4 (OIEG); Misc. No. 20-257 D.I. 95 at 3 (Huntington); Misc. No. 21-46 D.I. 72 at 1 (ACL); Misc. No. 21-481 D.I. 60 at 1 (Rusoro); Misc. No. 22-156 D.I. 34 at 4 (Koch); Misc. No. 22-347 D.I. 20 at 7-8 (Siemens)) In other words,

---

entity's right to seek attachment to any proceeds following consummation of the Sale Transaction." (D.I. 481 ¶ 30)

these creditors advocate for a holding that reaching Step 5 is a sufficient accomplishment to be named an Additional Judgment Creditor. It is not entirely clear as to what date these creditors would have the Court set as the date by which a creditor must obtain its writ of attachment.

Still other creditors would have the Court require even less necessarily have been accomplished by a creditor in order to remain eligible to become an Additional Judgment Creditor. Valores and Tidewater ask the Court to treat their judgments as Additional Judgments simply on the basis that they have each registered their judgments in Delaware, i.e., they have reached Step 3. (*See, e.g.*, D.I. 587 at 2 (Valores); Misc. No. 19-79 D.I. 35 at 1-2 (Tidewater)) One other creditor, Banco San Juan Internacional ("Banco"), requests that its judgment be considered an Additional Judgment because it "intends to return to this Court to register its converted judgments and pursue enforcement in this District." (D.I. 575 at 2) That is, Banco is at Step 2 in the process outlined by the Court, which Banco proposes should be sufficient.

Having considered the various positions and arguments made in the extensive briefing, and cognizant of the federal judiciary's strong interest in enforcement of the judgments of federal courts while also promoting judicial economy, and recognizing the rights of all entities who have appeared before the Court, the Court has determined that *a creditor wishing to be made an Additional Judgment Creditor under the SPO must obtain at least a conditional writ of attachment by the Step 5 (Writ) Deadline*, a date which will be determined by the Court after further consultation. The Step 5 (Writ) Deadline may turn out to be the same date as the Additional Judgment Deadline or it may be set for sometime thereafter.

The Court understands that at least the following creditors have obtained conditional writs, on or about the dates listed: (a) ConocoPhillips – March 2, 2022 (Misc. No. 19-342 D.I. 43 at 2); (b) Red Tree – April 28, 2022 (Misc. Nos. 22-68 & 22-69 D.I. 15); (c) ConocoPhillips –

12

October 24, 2022 (Misc. No. 22-264 D.I. 20); (d) Siemens – December 12, 2022 (Misc. No. 22-

347 D.I. 14); (e) OIEG, Huntington, ACL, Rusoro – March 23, 2023 (Misc. No. 19-290 D.I. 132

¶¶ 1-4); (f) Koch and Gold Reserve – March 31, 2023 (Misc. No. 22-156 D.I. 21 (Koch); Misc.

No. 22-453 D.I. 27 (Gold Reserve).  Plainly, notwithstanding the Venezuela sanctions regime,

and notwithstanding that much litigation has been required, it has been and remains possible for

other creditors, acting diligently, to obtain at least a conditional writ and reach Step 5.  These

creditors should be eligible to be named Additional Judgment Creditors and potentially be

participants in the forthcoming sale, in hopes of collecting on their judgments.

      Setting a Step 5 (Writ) Deadline, likely some days or weeks or even months after the

Additional Judgment Deadline, will promote the interests of including as many creditors as

possible in the forthcoming sale while still providing the Special Master with enough

information "to discuss the universe of judgments to be satisfied by the Sale Transaction and the

required amount of net proceeds to be provided" with potential bidders.  (D.I. 633 at 2)  The

Special Master will know, by the Additional Judgment Deadline, the maximum universe of all

judgments that could *potentially* be made part of the Sale.  He will then know by the Step 5

(Writ) Deadline (which will be a date to be determined by the Court after obtaining further input)

precisely the amount of all Additional Judgments based on how many creditors have reached

Step 5 by that time and the amounts of their judgments.  Allowing creditors with conditional

writs of attachment to have their judgments recognized as Additional Judgments vindicates those

creditors' diligence in preserving their rights, an important principle embodied in Delaware law.

*See Stockley v. Horsey*, 9 Del. (4 Houst.) 603, 608 (1874) ("Our law recognizes . . . the policy of

giving to a creditor the benefit of his diligence as against other creditors.").  Further, by requiring

creditors to obtain conditional writs of attachment by the Step 5 (Writ) Deadline, the Court can

minimize the Venezuela Parties' lingering concerns that more shares will be sold than are necessary to satisfy the Attached Judgments, as all will know by a date certain – well in advance of the actual sale date – the amount of judgments that the Special Master will attempt to satisfy through the sale. (*See, e.g.*, D.I. 469 ¶ 3; D.I. 561 at 11-12)

It would be inconsistent with the intent of the SPO, and undermine judicial economy, for the Court to impose the requirement that creditors must have made it to the last stage of the process, Step 7, too early in the sale process, in order to become Additional Judgment Creditors. The SPO does not limit Additional Judgment Creditors to only those creditors who have obtained perfected writs of attachment by the Additional Judgment Date. In fact, as ConocoPhillips explains (*see* D.I. 595 at 3), an early draft of the SPO would have provided that only "[p]ersons or entities holding a perfected security interest in the shares of PDVH . . . [could] seek to submit a credit bid" (D.I. 411 Ex. A at 46), but ConocoPhillips negotiated with the Special Master to remove this language. The version of the SPO adopted by the Court provides, instead, that "[p]ersons or entities holding an Attached Judgment may seek to submit a credit bid," striking the requirement that the attachment be perfected. (D.I. 480 Ex. 1 at 49). This implies, and the Court now confirms, that the term "Attached Judgments" as used in the SPO is broader than the term "perfected security interest," and contemplates – as the Court now holds – that a creditor may hope to become an Additional Judgment Creditor even if it has not yet perfected its attachment by the (to-be-determined) Step 5 (Writ) Deadline.

This conclusion has practical benefits. It gives creditors some additional time after the Step 5 (Writ) Deadline to perfect their attachments, and such time may be helpful due to the currently unsettled status of the share certificate establishing PDVSA's ownership of PDVH. As already noted, pursuant to the Court's Order of July 17, 2023 (D.I. 644), PDVSA declared that

the whereabouts of this share certificate are unknown, so PDVSA will imminently be filing an expedited action asking the Delaware Court of Chancery to order PDVH to issue a replacement share certificate (*see* D.I. 645). Until the new share certificate is issued, it is arguable whether any creditor (other than Crystallex) can perfect its writ of attachment[9] and reach Step 7. *See* 10 Del. C. § 5081 ("An execution shall not bind goods and chattels until it is delivered to the sheriff or other proper officer to be executed."); *OI European Group B.V.*, 2022 WL 611563, at *8 ("In some cases, Delaware courts have explained that a lien on attached property is not actually perfected upon delivery (as the statute might suggest) but upon levy by the sheriff."); *see also* D.I. 571 at 5 (Venezuela Parties arguing: "[N]o other creditors can currently obtain valid attachments against the PDVH shares, because the physical certificate is not in PDVH's possession and thus cannot be seized by the marshal through service of the writ on PDVH. Instead, it presumably is in the hands of the Maduro regime."). As the Venezuela Parties point out (*see, e.g.*, D.I. 571 at 9-10), the Delaware Superior Court recently interpreted Delaware law (and in particular, 6 Del. C. § 8-112(a)) to "require[] physical seizure of a stock certificate before certificated shares may be attached and sold." *Deng v. HK Ding Co.*, 2023 WL 3318322, at *1 (Del. Super. Ct. May 8, 2023), *on appeal in* C.A. No. N21J-04630 (Del. Super. Ct. June 8, 2023). While the Court has not determined for itself that the PDVH share certificate must necessarily be physically seized in order for the sale to be completed, or even for additional creditors to be made Additional Judgment Creditors – and neither has the Court determined that it lacks

---

[9] In January 2021, the Court held with respect to Crystallex that "PDVSA is judicially estopped from pressing its new contention based on lack of physical possession of shares certificating PDVSA's holdings because it contradicts numerous representations PDVSA made to this Court and the Court of Appeals to obtain relief (such as stays and not having to post a bond)." *Crystallex Int'l Corp. v. Bolivarian Republic of Venez.*, 2021 WL 129803, at *8 (D. Del. Jan. 14, 2021). On this basis (at least), Crystallex's writ of attachment has been issued and served by the Marshals on PDVH and is perfected.

authority to order PDVH to issue a new share certificate[10] – the currently unresolved status of these issues weighs in favor of providing some additional time for non-Crystallex creditors to perfect their attachments, before (potentially) deeming them ineligible to participate in the sale process.

Just as requiring a creditor to have reached Step 7 in order to be eligible to be an Additional Judgment Creditor is too burdensome, under the circumstances, the suggestions that a creditor need not even have obtained a conditional writ, reaching Step 5, would be too lenient. Doing nothing more than the ministerial act of registering a judgment in Delaware (Step 2), and not also litigating a motion in an effort to perfect an attachment on property of the debtor in this District does not, in the context of these proceedings, provide a sufficient indication of creditor diligence to allow such a creditor to impact the sale. *See generally see* 11 Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 2787 (3d ed. 2023).

The Court will be ordering the Special Master to consult with the Sale Process Parties, and to solicit input from any other interested entity, and then provide his and others' views on what date the Court should set as the Step 5 (Writ) Deadline.

---

[10] Certain creditors of Venezuela have presented theories as to how attachment of the PDVH shares could be perfected even in the absence of a physical share certificate. (*See, e.g.*, D.I. 590 at 2 ("[N]ow that Crystallex has attached the shares, the U.S. Marshals have constructive possession, and other creditors must attach them through writs served on Crystallex, not by seizing the certificate.") (citing 6 Del. C. § 8-112(d)); D.I. 594 at 3-4 (Gold Reserve arguing that "PDVH Shares are in *custodia legis* for the benefit of the to-be-determined Attached Judgments") (citing 6 Del. C. § 8-112(e))) The Court need not, at this time, determine if these theories are correct – although the Court has certainly not determined that they are incorrect.

**A Creditor Seeking To Obtain Proceeds From The Sale Must Have Perfected Its
Attachment Of The PDVH Shares (Step 7) By The Step 7 (Perfected Writ) Deadline**

It appears that all who have provided input in connection with the issues now pending

before the Court are in agreement on one point: by no later than the date of the sale (which is

tentatively scheduled for July 15, 2024), any creditor wishing to obtain some portion of the

proceeds of that sale must have an unconditional writ of attachment that has been provided to the

Marshals and served and attached to the property that has been sold. (*See, e.g.*, D.I. 589 at 2)

Thus, the Court will not permit the Special Master to sell shares to satisfy unattached judgments.

In dispute, however, is whether the Court should exercise its discretion to impose an

*earlier* deadline, in advance of the Sale Hearing, by which a creditor must reach Step 7 in order

to be and remain an Additional Judgment Creditor and potentially obtain proceeds from any sale.

The Court is answering this question in the affirmative and will be setting a Step 7 (Perfected

Writ) Deadline for some date *after the Step 5 (Writ) Deadline* and sometime *before the Sale
Hearing*.

The Step 7 (Perfected Writ) Deadline will balance, among other things: the Special

Master's need to know the amount of judgments he is attempting to satisfy with the sale at some

point during the Marketing Process (in hopes of maximizing the value of the transaction while

selling the smallest number of shares),[11] Crystallex's entitlement to prompt satisfaction of its

debt, and the Venezuela Parties' desire to know the total amount of any Additional Judgments

early enough to be in a position to negotiate minority shareholder rights, on the one hand, with

the Court's interest in judicial economy (which strongly favors concluding these proceedings and

---

[11] *Compare, e.g.*, D.I. 559 ¶ 3 (Special Master stating he need not know amount of Additional
Judgments "until well after the Launch Date"), *with* D.I. 633 at 2 (Special Master indicating he
does need to know pool of Attached Judgments, with certainty, at some point).

conducting the minimal number of sales),[12] the other creditors' interests in having their

judgments satisfied, and OFAC's apparent intent when it issued the License to the Clerk on May

1, 2023 (*see* D.I. 555 at 6).[13]

One option the Court will consider as the Step 7 (Perfected Writ) Deadline is the date

established by the SPO by which the Special Master is required to file a recommendation with

the Court seeking a final determination of the amount of any Attached Judgments. (*See* D.I. 481

¶ 31) The SPO sets this date as 30 days prior to the Special Master designating a stalking horse

bidder, which the Special Master must do within 150 days (D.I. 480 Ex. 1 at 2) after October 23,

2023 (the Launch Date) – that is, by March 21, 2024, under the now-governing schedule (*see*

D.I. 643). All of the stalking horse bids are presently due January 22, 2024, which is 90 days

after the Launch Date. (D.I. 480 Ex. 1 at 42) Therefore, a logical Step 7 (Perfected Writ)

Deadline may be halfway between the deadline to submit Stalking Horse Bids and the deadline

for the Special Master to designate a stalking horse bidder – which would be 120 days after the

Launch Date, or February 20, 2024. The Court will be ordering the Special Master to consult

with the Sale Process Parties, and to solicit input from any other interested entity, and then to

provide his and others' views on what date the Court should set as the Step 7 (Perfected Writ)

Deadline. The Special Master's report on this point should specifically include his and the

others' positions on the possibility of this date being February 20, 2024.

---

[12] *See generally* D.I. 593 ¶ 2 (Special Master rightly noting "general support for the notion that, in the name of judicial economy, the Court and the Special Master shall endeavor to include in a Sale Transaction as many judgments against the Venezuela Parties as possible in a manner that does not cause any further delay to the Crystallex Case").

[13] If the Court did not provide some reasonable amount of time for other creditors to have their judgments made Additional Judgments, it would risk rendering a key aspect of the License – which expressly contemplates this Court adding Additional Judgments to the forthcoming sale process – essentially a nullity.

**The Court Will Manage Priority Determinations Among Additional Judgment Creditors In An Orderly Manner And Consistent With The Principles Set Out In Delaware Law**

Assuming there will be Additional Judgment Creditors, it will also be necessary to determine the priority by which they will be paid, in the event the sale proceeds are not sufficient to pay 100% of all judgments that are made part of the sale. While the Court could defer decision on issues relating to priority, as some entities have suggested (*see, e.g.*, D.I. 571 at 15), the Court has received extensive briefing on the matter, heard detailed argument during the June 26 hearing, and is persuaded it will promote the Special Master's efforts to obtain a value-maximizing transaction to set out, at this time, how priority will be determined.

Delaware law provides principles the Court is factoring into its decision, but it does not decide the issues the Court is confronting. Delaware law concerning the enforcement of money judgments generally requires that that sale proceeds "be distributed according to a first in time, first in line priority of recording." *Eastern Sav. Bank, FSB v. CACH, LLC*, 55 A.3d 344, 350 (Del. 2012); *see also* 10 Del. C. § 4705 ("If several judgments are entered against the same person, on the same day, the first entered has priority."); 10 Del. C. § 5082 ("If several executions against the same defendant are delivered on the same day, the first delivered shall have priority. If several executions against the same defendant are delivered together, they shall have priority according to their respective numbers."); 10 Del. C. § 5084 ("The sheriff, or other officer, receiving an execution, shall, in a docket, set down the date of receiving it; and when several executions are delivered on the same day, the docket shall show the order in which they are received."). In this way, Delaware law rewards diligence by creditors to collect on their judgments, and to some extent encourages the proverbial "race to the courthouse steps." *See, e.g., Eastern Sav. Bank, FSB*, 55 A.3d at 350 (discussing how distribution of proceeds in foreclosure sale under Delaware law "follows a first in time priority consistent with Delaware's

19

'race to the courthouse' statute"). To adhere to Delaware law, then, the Court will construct a priority scheme that rewards diligence and attempts to recreate a "first in time, first in line" scheme, with appreciation for the perhaps unique factors that have arisen in connection with efforts to collect on Venezuela's debts.

The SPO does not resolve how priority disputes among Additional Judgment Creditors should be resolved. With respect to priority, about the only thing that has been determined is that Crystallex is first in line. This has been the apparent understanding of the Special Master, Sale Process Parties, and all of the other entities throughout this lengthy litigation. The priority criteria being established in this Order (and explained below) confirm that Crystallex is first: it filed a motion for writ of attachment (on which it eventually prevailed) on August 14, 2017 (D.I. 2), which is before any other creditor filed its own ultimately successful motion for a writ. Consequently, Crystallex will have top priority.

In response to the Court's orders for briefing, the Sale Process Parties and other creditors proposed widely disparate schemes for determining what priority each Additional Judgment Creditor should be accorded. For instance, Tidewater suggests that an Additional Judgment Creditor's priority position should be determined by the date the creditor registered its judgment with the Court; that is, based on the date the creditor reached Step 3 in the process outlined earlier in this Order. (*See, e.g.*, Misc. No. 19-79 D.I. 35 at 3-5) Huntington, ACL, and Koch contend that an Additional Judgment Creditor's priority position should be set based, instead, on the date that the creditor filed its motion seeking a writ of attachment (i.e., when the creditor reached Step 4). (*See, e.g.*, Misc. No. 20-257 D.I. 95 at 8 (Huntington); Misc. No. 21-46 D.I. 72 (ACL); Misc. No. 22-156 D.I. 34 at 8 (Koch)) ConocoPhillips urges the Court to fix a creditor's priority position based on the date the creditor reached Step 5 and obtained a conditional (or

unconditional) writ of attachment. (*See, e.g.*, D.I. 574 at 8-9; *see also* Misc. No. 21-481 D.I. 60 at 9-10 (Rusoro advocating same position))

Several other creditors present more nuanced positions, taking account of the impact of the sanctions on creditors' efforts to obtain writs and to perfect them. For example, OIEG argues that the Court should hold that a creditor's priority position "is established as of (1) the timing of a judgment creditor's initial request for an attachment and/or when, but for OFAC sanctions, it could have obtained a conditional (or unconditional) writ of attachment, or, alternatively, (2) the date the Court approved the conditional (or unconditional) writ of attachment for a judgment creditor." (Misc. No. 19-290 D.I. 154 at 12) Similarly, Siemens asks that "the priority of the Additional Judgments [be] (1) based upon the date of the conditional attachment; or (2) on a *pari passu*[14] basis after Crystallex is paid in full." (Misc. No. 22-347 D.I. 20 at 12-13)

Gold Reserve proposes that any creditor who obtained a conditional writ of attachment prior to May 4, 2023, when the Court docketed the License (D.I. 555), should be given a higher priority position than any creditor who receives a conditional writ of attachment after May 4, 2023. (*See, e.g.*, D.I. 572 at 3, 9) In its view, all creditors who received conditional writs prior to May 4, 2023 should be accorded the same level of priority and receive a pro rata distribution of any sale proceeds. (*See, e.g., id.* D.I. 572 at 3) Gold Reserve's proposal adds that creditors who only obtain their writ after May 4 should be given a priority position based on the date they obtain "an order allowing [their] writ[s] and [then] deliver[] such writ to the Marshals in

---

[14] Siemens defines *pari passu* as "by an equal progress; equably; ratably; without preference. Used especially of creditors who, in marshalling assets, are entitled to receive out of the same fund without any precedence over each other." (Misc. No. 22-347 D.I. 20 at 14) (internal quotation marks omitted) Similar to Siemens, Rusoro suggests that creditors who received conditional writs of attachment on the same day would each receive pro rata distributions. (*See, e.g.*, Misc. No. 21-481 D.I. 60 at 9-10)

accordance with applicable Delaware law." (D.I. 572 at 9-10)

The Venezuela Parties assert that the Court need not resolve priority issues now, and express no position if the Court does choose to reach these questions at this time. (*See, e.g.*, D.I. 571 at 15) Crystallex likewise takes no position, but urges the Court not to allow "any proceedings on such issues . . . to delay the Sale Process timeline." (D.I. 573 at 15) The Special Master also declined to take a position. (D.I. 593 at 5)

Finally, Banco and Siemens throw in the contention that "judgments directly against PDVSA should be prioritized over judgments against Venezuela which rely on the alter ego theory to get PDVSA's assets in the United States." (D.I. 575 at 2 (Banco); *see also* Misc. No. 22-347 D.I. 20 at 14 (Siemens: "[N]one of the Alter Ego Creditors should be paid before Crystallex, SEI, ConocoPhillips, and Red Tree are paid in full.")) The Court has little difficulty rejecting this proposal. Creditors of the Republic are permitted to enforce their judgments by attaching property belonging to PDVSA only because the Court has found, for certain pertinent periods (at least), that PDVSA was (and maybe still is) the alter ego of the Republic. *See, e.g.*, *OI European Group B.V.*, 2023 WL 2609248, at *30. Essentially, then, Venezuela and PDVSA are one and the same – or, as PDVSA's website has from time to time put it, "PDVSA is Venezuela." *Id.* at 16 (¶ 142); *see also Crystallex Int'l Corp. v. Bolivarian Republic of Venez.*, 333 F. Supp. 3d 380, 402 (D. Del. 2018) ("PDVSA es Venezuela"). There is, then, no material distinction, for purposes of determining priority, between creditors holding judgments against PDVSA and those holding judgments against Venezuela.

Having considered all of the contentions and arguments made, the Court has determined that the priority of judgments which are made part of the forthcoming sale will be decided as follows:

### (a) Priority will be determined based on the date an Additional Judgment Creditor moved for a writ of attachment that was eventually issued.

The priority of any Additional Judgments will be based on the date on which a creditor moved for a writ of attachment (or a conditional writ of attachment) *fieri facias* that was eventually granted.[15]  For these purposes, then, the filing of a writ of attachment that was denied for any reason does not establish a creditor's priority.  Instead, the date the Court will use to determine an Additional Judgment Creditor's priority is the date of the filing of a motion for a writ of attachment that is eventually granted, regardless of the date on which such motion was granted.

The Court believes that this approach is most in line with Delaware law and is equitable under the circumstances.  It rewards creditors who acted diligently by registering their judgments in Delaware near the front of the line and by filing motions for writs of attachment early in the process, *provided* those motions were ultimately found to have merit.  In this way, the Court's priority scheme adheres to Delaware law's requirement that those creditors who are "first in time" be permitted to stand "first in line." *See generally Stockley*, 9 Del. (4 Houst.) at 608.

Basing priority on anything less than filing a motion for a writ of attachment and eventually succeeding on such motion would risk awarding creditors who did not actually act particularly diligently.  For instance, merely obtaining a judgment and registering it in Delaware

---

[15] For example, if OIEG is named an Additional Judgment Creditor, the date applicable to determining OIEG's priority position is February 19, 2021, which is when OIEG filed its renewed motion for a writ of attachment. (Misc. No. 19-290 D.I. 48)  The Court eventually granted OIEG's renewed motion on March 23, 2023, *see OI European Group B.V.*, 2023 WL 2609248, at *30, although that date is relevant only because it provides the proof that OIEG's renewed motion had merit.  The date OIEG first moved for a writ, which was November 4, 2019, is irrelevant to determining priority as that motion (which was based solely on collateral estoppel) was unsuccessful: the Court denied it on December 12, 2019 (Misc. No. 19-290 D.I. 26 at 13-19).

and then not actively litigating to enforce that judgment is not, in the context of this process, diligence. It is far more appropriate, in the Court's view, to base priority on a creditors' efforts to successfully reach Step 5. The Court's ruling has the added virtue of rewarding creditor diligence without rewarding the filing of non-meritorious motions.

It bears emphasis that the Court is *not* basing priority on the date that a creditor actually reaches Step 5 and obtains a writ. Doing so would place too much weight on the vagaries of the Court's docket and the undersigned Judge's other activities, which no litigant had the ability to impact, no matter how diligently it acted. Sometimes the Court was able to resolve a creditor's motion only after a long delay, which may have had nothing at all to do with the merits of the motion or the creditor's method of litigating.

Nor, under the circumstances, would it be appropriate to base priority on when creditors obtain a perfected writ of attachment, Step 7. Until OFAC issued the License on May 1, 2023, it was not realistically possible that any creditor would be able to obtain and then perfect a writ, regardless of the creditor's diligent efforts. Basing priority on reaching Step 7, then, would not appropriately distinguish among creditors based on their relevant diligence.

The Court's approach also avoids allowing creditors who moved later in time from receiving a windfall based on prior creditors' efforts. *See generally In re Millennium Lab Holdings II, LLC*, 945 F.3d 126, 143 (3d Cir. 2019) ("Equity abhors a windfall."). For example, OIEG and Huntington participated in a full-day evidentiary hearing in April 2021 (*see, e.g.*, Misc. No. 19-290 D.I. 92 (OIEG); Misc. No. 20-257 D.I. 47 (Huntington)), creating an extensive evidentiary record from which later-moving creditors benefitted (*see, e.g.*, Misc. No. 21-18 D.I. 44 at 2 ("The parties [that is, Contrarian and the Venezuela Parties] agree that the record in the evidentiary hearing held on April 30, 2021 may be considered here without the need to submit

24

the same exhibits and testimony here, with all parties reserving the right to object to the admission of specific items of evidence from that record.")).  The Court's approach to priority takes appropriate account of the relatively greater contributions of the earlier-moving parties.

The Court's decision also, appropriately, provides ConocoPhillips a position near the front of the line.  ConocoPhillips is a Sale Process Party and has participated in this litigation for years, providing valuable input for the Court to consider and, importantly, paying one-third of the Transaction Expenses to date.  ConocoPhillips has undertaken this role with no guarantee that it will ever be named an Additional Judgment Creditor.  (*See, e.g.*, D.I. 481 ¶ 30) (providing for situation in which ConocoPhillips' judgments are not made Attached Judgments) ConocoPhillips filed its first successful motion for writ of attachment on November 26, 2019 (Misc. No. 19-342 D.I. 2), which was granted on March 2, 2022 (*id.* D.I. 43 at 2).  Therefore, the relevant date to determine ConocoPhillips' priority with respect to one of its judgments is November 26, 2019.[16]

### (b) Where there are ties in priority, those entities with the same date of priority will be treated equally

For example, if two or more creditors moved for a writ of attachment *fieri facias* on the same day, and they both ultimately prevailed on those motions, their judgments will have the same priority dates.  If it turns out that the sale proceeds are insufficient to satisfy all judgments in full, creditors with identical priority dates will be treated equally (e.g., by having their judgments paid at the same pro rata percentage as one another).

---

[16] The Court's discussion on this point is limited to ConocoPhillips' judgment registered in Misc. No. 19-342 (its highest priority judgment).  ConocoPhillips later filed a separate action (Misc. No. 22-264), moving for a writ of attachment on June 6, 2022 (Misc. No. 22-264 D.I. 2), which was granted on October 24, 2022 (*id.* D.I. 20).

**(c) The Court will confer with the Special Master on how to implement this priority scheme and avoid an unseemly run on the U.S. Marshal's office**

As several creditors have pointed out (*see, e.g.,* D.I. 572 at 4-5 (Gold Reserve); Misc. No. 20-257 D.I. 95 at 8 (Huntington); Misc. No. 22-156 D.I. 34 at 8 (Koch); Misc. No. 19-290 D.I. 154 at 12 (OIEG)) Delaware law is not entirely clear as to whether, in the ordinary case involving certificated shares, perfection (and thus priority) is determined when a writ is placed in the hands of the sheriff (or of the Marshal or of the first judgment-creditor with a served and perfected writ), *see, e.g., PSC, Inc. v. Londergan,* 1985 WL 189266, at *1 (Del. Sup. Ct. Sept. 11, 1985), or, instead, is only established upon the service by the sheriff (or Marshal or judgment-creditor) on the property being attached, *see* 6 Del. C. § 8-112(a) ("[T]he interest of a debtor in a certificated security may be reached by a creditor only by ***actual seizure*** of the security certificate by the officer making the attachment or levy.") (emphasis added); 10 Del. C. § 5082 ("If several executions against the same defendant are ***delivered*** on the same day, the ***first delivered*** shall have priority.  If several executions against the same defendant are ***delivered together***, they shall have priority according to their respective numbers.") (emphasis added). This case does not require the Court to struggle with this ambiguity.  Instead – and to avoid what otherwise might be an unseemly, actual run on the U.S. Marshals office – the Court will, by separate Order and after consultation with the Special Master, apply the approach given above and then (a) announce the priority of the various Additional Judgments (behind Crystallex); (b) provide each Additional Judgment Creditor, by order of its priority, a limited amount of time to serve its writ on the Marshal (or on Crystallex, if the Court orders that to be appropriate), and if that creditor acts diligently within its allocated window of time it will preserve the priority placement identified for it by the Court; and (c) direct the Marshal at some point thereafter to serve all writs he has received and to do so in the order he received them.  The Special Master,

26

Sale Process Parties, and other entities may supply the Court with their suggestions as to how the

Court may best implement these arrangements in the status report being ordered by this Order.

**Each Additional Judgment Creditor Must Pay Transaction Expenses On A Per Capita, Prospective Basis**

In the event there are Additional Judgment Creditors, the Special Master needs to know what portion of his fees, expenses, and costs associated with implementation of the SPO (defined as "Transaction Expenses" in the SPO (D.I. 481 ¶ 15)) are to be paid by such creditors. To date, the Sale Process Parties are the only entities that have paid the Transaction Expenses. Each one – Crystallex, ConocoPhillips, and the Venezuela Parties – has paid a per capita one-third share. Now that the sale process has been launched, the Transaction Expenses are likely to be even more substantial than they have been to date. The SPO contemplates that Additional Judgment Creditors will help bear that load but does not specify their relative contributions. Instead, it generally sets out that "[a]ll expenses and fees related to implementation of the Marketing Process and Notice Procedures shall constitute 'Transaction Expenses' and shall be payable by the Sale Process Parties and holders of any Additional Judgments (as defined below) (the 'Additional Judgment Creditors');" the financial burden of the Transaction Expenses "shall be shared by the Sale Process Parties and any Additional Judgment Creditors;" and "any Additional Judgment Creditor shall be obligated to reimburse its share of the Transaction Expenses pursuant to the May Order[17] (as if such Additional Judgment Creditor were a Sale Process Party)." (D.I. 481 ¶¶ 15, 47)[18]

---

[17] The May Order is the order appointing the Special Master (D.I. 277 ¶ 14), which provides that "Crystallex, ConocoPhillips, and the Venezuela Parties shall, upon approval by the Court, bear the cost of the Special Master and his Advisors' compensation equally, with each contributing one-third."

[18] *See also* D.I. 481 ¶ 29 (discussing Additional Judgment Creditors' liability for Transaction Expenses incurred through date two business days after Special Master receives notice that all Attached Judgments have been satisfied); *id.* ("In the event that the Special Master selects a Successful Bid, the value of which implies satisfaction of less than all Attached Judgments, then any holder of an Attached Judgment that receives no proceeds in satisfaction of any part of their

In whatever manner the Transaction Expenses are initially paid, all entities who pay any portion of them will be reimbursed from the first proceeds that are recovered in the sale itself. (*See* D.I. 277 ¶ 16 ("Any payments made by Crystallex, the Venezuela Parties, and ConocoPhillips shall be reimbursed out of the first proceeds of any sale of shares of PDVH, notwithstanding any claim or attachment by any creditor of any of the Venezuela Parties."); D.I. 640 at 79 (counsel for Special Master confirming "intention" is for reimbursement of advanced Transaction Expenses to be "first in the priority waterfall")) Most creditors who have recently appeared before the Court have made clear that they will pay whatever amounts are required to participate in the sale, particularly given that they will be reimbursed from any sale proceeds. (*See, e.g.*, D.I. 599 at 4-5 (Red Tree); D.I. 601 at 1 (Contrarian); D.I. 627 at 3-4 (ACL))

Hence, the Court could defer deciding how payment obligations will be divvied up. (*See generally* D.I. 481 ¶ 15 ("[I]n the event any Additional Judgment Creditor becomes obligated to pay a portion of the Transaction Expenses pursuant to this Order, the Special Master shall meet and confer with the Sale Process Parties to determine such Additional Judgment Creditor's share of the reimbursement obligation.")) Nevertheless, having received extensive briefing and heard a great deal of argument on the matter, and believing that clarity on this point (as on the other issues discussed in this Order) will promote the efficient implementation of the SPO, the Court has decided it is appropriate at this time to set the payment conditions.

As various proposals have been presented to the Court, two disputes have emerged. The first is whether Additional Judgment Creditors should pay a *per capita* share of the Transaction Expenses; that is, an amount equal to the total amount of Transaction Expenses divided by the

---

Attached Judgment shall be excused from contributing to the payment of any Transaction Expenses incurred after the date thereof.").

number of creditors plus one (representing the Venezuela Parties' share).  Payments to date have been required on a per capita basis, with the total amount being divided by three, for the two sets of creditors who are Sale Process Parties (Crystallex and ConocoPhillips) plus one (the Venezuela Parties).  The Special Master (*see* D.I. 593 ¶ 3), Crystallex (D.I. 611 at 3), Venezuela Parties (D.I. 631 at 4-5), and ConocoPhillips (D.I. 636 at 2-3), as well as at least one other creditor (*see* Misc. No. 21-481 D.I. 64 at 2-3 (Rusoro)), suggest that payments continue to be calculated per capita and, therefore, shared equally among each creditor and the Venezuela Parties.  By contrast, certain other creditors – including ACL (D.I. 600 at 4-5), Banco (D.I. 629 at 2-3), Gold Reserve (D.I. 632 at 3), Red Tree (D.I. 640 at 144-45), and Tidewater (Misc. No. 19-79 D.I. 48 at 2) – prefer that the Transaction Expenses be allocated on a *pro rata* basis, defined as the amount of any particular creditor's judgment amount divided by the total amount of judgments to be satisfied by the sale.

The second issue is whether Additional Judgment Creditors should be made to reimburse the Sale Process Parties *retroactively* for the share of Transaction Expenses the Additional Judgment Creditor would have paid had it been a Sale Process Party from the start, or whether, instead, Additional Judgment Creditors should only be required to pay their share of Transaction Expenses incurred on a *prospective* basis from the date they become Additional Judgment Creditors.  The Special Master (*see* D.I. 593 ¶ 3), joined again by the Sale Process Parties (*see* D.I. 611 at 3 (Crystallex); D.I. 631 at 4-5 (Venezuela Parties); D.I. 636 at 2-3 (ConocoPhillips), and at least Rusoro (Misc. No. 21-481 D.I. 64 at 2-3)), prefer the retroactive option.  Unsurprisingly, many of the other creditors urge the Court to order them to pay only the going-forward Transaction Expenses.  (*See, e.g.*, D.I. 629 at 2-3 (Banco); D.I. 632 at 3 (Gold Reserve); D.I. 640 at 144-45 (Red Tree))

Once more, Delaware law does not dictate the answers to these questions. Nor, as noted, does the SPO resolve them.[19] For the reasons given below, the Court has concluded that any Additional Judgment Creditor will be responsible for payment of the Transaction Expenses on a *per capita, prospective* basis, beginning on the date their judgment is declared an Additional Judgment under the SPO.

The Court has previously held that any newly added Sale Process Party would be required to pay an equal, per capita share of the Transaction Expenses, both prospectively and retroactively, including by reimbursing Crystallex, ConocoPhillips, and the Venezuela Parties for all of their prior payments. (D.I. 507 at 5-6; *see also* D.I. 275 at 5 ("If, like ConocoPhillips, the Intervenor Bondholders nonetheless wish to be included in the discussions with the Special Master, the Intervenor Bondholders, like ConocoPhillips, should pay a proportionate share of the fees incurred by the Special Master (including his counsel and other advisors).")) This precedent is helpful but not dispositive. As at least one creditor observes (*see* D.I. 600 at 5), under the SPO the Sale Process Parties receive – and historically have received – consultation rights that Additional Judgment Creditors are not guaranteed.[20] In the Court's view, because any Additional Judgment Creditors will not be entitled to all the same rights as the original Sale

---

[19] ConocoPhillips contends (D.I. 636 at 2-3) that the SPO and the Court's order appointing the Special Master (D.I. 277), in conjunction with the Court's denial of Red Tree's motion to intervene and be named a Sale Process Party (D.I. 507), establish that Additional Judgment Creditors must pay the Transaction Expenses both per capita and retroactively. This is incorrect. The SPO and May Order appointing the Special Master are silent on the two issues being resolved by the Court today, and the order denying the motion to intervene resolved Red Tree's request to be a Sale Process Party, *not* an Additional Judgment Creditor.

[20] *See, e.g.*, SPO at 8 (referencing Sale Process Parties' "adequate opportunity to review and provide input on the Sale Notice and Notice Procedures"), ¶ 4 ("[T]he Special Master shall share a draft of the 'teaser' and CIM with counsel to the Sale Process Parties no later than seven (7) calendar days prior to launch of the Marketing Process and shall consult in good faith with the Sale Process Parties regarding the same . . . ."), ¶ 13 (Sale Process Parties may move Court to select winning bid even if Special Master does not recommend doing so).

31

Process Parties, extending all such rights to them might make the process unwieldy,[21] and

because, obviously, the Court cannot turn back the clock and make it so the Additional Judgment

Creditors can be consulted on all that has occurred to date, the Court finds that Additional

Judgment Creditors should not be required to pay their share of the Transaction Expenses

retroactively. Instead, an Additional Judgment Creditor will only be required to pay its share of

the Transaction Expenses prospectively, starting on the day each is designated by the Court as an

Additional Judgment Creditor.

The share each Additional Judgment Creditor will have to pay will be based on a per

capita allocation of the Transaction Expenses going forward.[22] The per capita allocation is

consistent with the practice the Court has uniformly followed throughout this litigation and,

hence, is well-understood and easy to implement. Moreover, it avoids the otherwise thorny

question of how much, if any, of the Transaction Expenses the Venezuela Parties should have to

pay given that, as judgment debtors, their pro rata share of the judgments made part of the sale

process is, of course, zero.

To implement the Court's determinations with respect to payment of the Transaction

Expenses, the Special Master shall require any party seeking to be designated an Additional

Judgment Creditor to notify him, in writing, no later than ten (10) days after obtaining a

---

[21] This does not, however, preclude the Special Master from according whatever additional rights he wishes to the Additional Judgment Creditors. Moreover, any entity designated an Additional Judgment Creditor may petition the Court for additional rights, including consultation rights.

[22] The Court recognizes the possibility that ConocoPhillips could become an Additional Judgment Creditor, in which case it would be both a Sale Process Party and an Additional Judgment Creditor. In that event, ConocoPhillips would still only be responsible for a single per capita share of the Transaction Expenses (not two). Further, ConocoPhillips will then presumptively continue to enjoy all rights of a Sale Process Party, for which it has paid, unless it were to advise the Special Master it no longer wishes to have them. If, alternatively, ConocoPhillips does not become an Additional Judgment Creditor and does not wish to remain a Sale Process Party, it will be excused from making any further payments. (*See* D.I. 481 ¶ 30)

32

conditional or unconditional writ of attachment, that such party is prepared to and commits to pay its prospective, per capita share of such expenses.

       **IT IS FURTHER ORDERED** that the Special Master shall submit, no later than **August 24, 2023**, a joint status report, which shall include (in addition to anything else he wishes to report) the Special Master's recommendations as to (i) what date the Court should set as the Step 5 (Writ) Deadline, (ii) what date the Court should set as the Step 7 (Perfected Writ) Deadline, and (iii) how the Court may best implement its articulated priority arrangements in an orderly manner.  Such report shall include the Sale Process Parties' positions on these issues.  In preparing the report, the Special Master shall also make efforts to obtain and provide the Court with the views of other entities, including other creditors, on these same matters.

July 27, 2023
Wilmington, Delaware

               HONORABLE LEONARD P. STARK
               UNITED STATES DISTRICT COURT