# Exhibit A

The undersigned hereby certifies to the Special Master that:

1. the information contained in the Attached Judgment Statement is a true and accurate recitation of the initial and outstanding amounts of the judgments held by **TENARIS S.A.** and **TALTA-TRADING E MARKETING SOCIEDADE UNIPESSOAL LDA**; and

2. in the event the initial and outstanding amounts of the judgments described in the Attached Judgment Statement change, for any reason, I shall promptly, and in any event not less than three (3) business days following such change, notify the Special Master of the revised judgment amount.

By: _____
Name: Theodore A. Kittila (Bar No. 3963)
Halloran Farkas + Kittila LLP

Title: *Attorney for Tenaris S.A., Talta-Trading e Marketing Sociedade Unipessoal LDA, and Gramercy Distressed Opportunity Fund LLC*

# Exhibit B

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| |
|---|
| **TENARIS S.A. and TALTA-TRADING E MARKETING SOCIEDADE UNIPESSOAL LDA,** |
| Petitioners, |
| v. |
| **BOLIVARIAN REPUBLIC OF VENEZUELA,** |
| Respondent. |

Case No. 18-cv-1371 (CRC)

## ORDER AND JUDGMENT

For the reasons stated in the accompanying Memorandum Opinion, it is hereby

**ORDERED** that Judgment is entered in favor of Petitioners Tenaris S.A. and Talta-

Trading e Marketing Sociedade Unipessoal LDA against Bolivarian Republic of Venezuela in

the amount of $256,375,009.12 USD.  It is further

**ORDERED** that post-judgment interest shall begin to accrue from the date of this

judgment pursuant to 28 U.S.C. § 1961.

This is a final appealable Order.

**SO ORDERED**.

_____
CHRISTOPHER R. COOPER
United States District Judge

Date:  July 17, 2020

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

TENARIS S.A., et al.,

        *Petitioners*,

    v.

BOLIVARIAN REPUBLIC OF
VENEZUELA,

        *Respondent*.

Civil Action No. 1:18-cv-01373 (CJN)

### ORDER

The Court previously issued an Order, ECF No. 29, granting in part and denying in part Petitioners' Petition to Enforce Arbitration Award. In accordance with that Order, Petitioners filed a Proposed Order of Judgment, ECF No. 31, which Respondent did not oppose.

Accordingly, it is hereby

**ORDERED** that Judgment is entered in favor of Petitioners Tenaris S.A. and Talta-Trading e Marketing Sociedade Unipessoal LDA against Respondent Bolivarian Republic of Venezuela in the amount of $276,943,766.00 USD. It is further

**ORDERED** that post-judgment interest shall begin to accrue from the date of this judgment pursuant to 28 U.S.C. § 1961.

This is a final appealable Order

It is so **ORDERED**.

DATE: August 24, 2021

CARL J. NICHOLS
United States District Judge

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| TENARIS S.A. and TALTA-TRADING E MARKETING SOCIEDADE UNIPESSOAL LDA, <br><br>          Petitioners, <br><br>    v. <br><br> BOLIVARIAN REPUBLIC OF VENEZUELA, <br><br>          Respondent. | Civil Action No. 1:18-cv-01373 (CJN) |

## ORDER GRANTING PETITIONERS' MOTION TO ALTER OR AMEND THE JUDGMENT UNDER FEDERAL RULE OF CIVIL PROCEDURE 59(e)

Upon consideration of the Motion to Alter or Amend the Judgment under Federal Rule of Civil Procedure 59(e) filed by Petitioners Tenaris S.A. and Talta-Trading e Marketing Sociedade Unipessoal Lda (together, the "Petitioners"), the Declaration of Elliot Friedman, and the entire record of this case, it is hereby

**ORDERED** that the Petitioners' Motion to Alter or Amend the Judgment under Federal Rule of Civil Procedure 59(e) is **GRANTED**. It is further

**ORDERED** that the judgment entered on August 24, 2021 is hereby **ALTERED** and judgment is accordingly entered in favor of Petitioners Tenaris S.A. and Talta-Trading e Marketing Sociedade Unipessoal LDA against Respondent Bolivarian Republic of Venezuela in the amount of $280,667,040.00 USD. It is further

**ORDERED** that post-judgment interest shall begin to accrue from August 24, 2021 pursuant to 28 U.S.C. § 1961.

It is so **ORDERED**.

DATE:  November 5, 2021

_____
CARL J. NICHOLS
United States District Judge

# Exhibit C

**TENARIS & TALTA v. VENEZUELA (18-cv-1371 (CRC))**
Rate from 4/30/2008 to 7/17/2020 ------------------>   9.000%
Rate from 7/18/2020 ------------------------------------>   0.152%

| Date of Calculation | Days | Award | Interest | | Costs | Interest | | TOTAL |
|---|---|---|---|---|---|---|---|---|
| | | | Period | Accumulated | | Period | Accumulated | |
| 4/30/2008 | | 87,300,000.00 | | | | | | |
| | | 85,501,213.70 | | | | | | |
| 1/29/2016 | | 172,801,213.70 | | | 225,000.00 | | | 173,026,213.70 |
| 1/29/2017 | 366 | 188,703,245.39 | 15,902,031.69 | 101,403,245.39 | 245,705.63 | 20,705.62 | 20,705.62 | 188,948,951.02 |
| 1/29/2018 | 365 | 206,068,661.55 | 17,365,416.16 | 118,768,661.55 | 268,316.69 | 22,611.06 | 43,316.69 | 206,336,978.23 |
| 1/29/2019 | 365 | 225,032,130.13 | 18,963,468.58 | 137,732,130.13 | 293,008.53 | 24,691.84 | 47,302.90 | 225,325,138.65 |
| 1/29/2020 | 365 | 245,740,711.90 | 20,708,581.77 | 158,440,711.90 | 319,972.64 | 26,964.11 | 51,655.95 | 246,060,684.54 |
| 7/17/2020 | 170 | 256,041,623.93 | 10,300,912.03 | 168,741,623.93 | 333,385.19 | 13,412.55 | 65,068.50 | 256,375,009.12 |
| 7/17/2021 | 365 | 256,430,807.20 | 389,183.27 | 169,130,807.20 | 333,891.94 | 506.75 | 65,575.25 | 256,764,699.14 |
| 7/17/2022 | 365 | 256,820,582.03 | 389,774.83 | 169,520,582.03 | 334,399.45 | 507.52 | 66,082.77 | 257,154,981.48 |
| 7/17/2023 | 365 | 257,210,949.31 | 390,367.28 | 169,910,949.31 | 334,907.74 | 508.29 | 66,591.05 | 257,545,857.05 |
| 8/14/2023 | 28 | 257,240,940.82 | 29,991.50 | 169,940,940.82 | 334,946.79 | 39.05 | 66,630.10 | 257,575,887.61 |

**TENARIS & TALTA v. VENEZUELA (18-cv-01373 (CJN))**
Rate from 4/30/2008 to 8/24/2021: Libor + --------> 4.000%
Rate from 8/25/2021 -------------------------------> 0.068%

| Date of Calculation | Days | Award TAVSA | COMSIGUA | Libor 1YR | Interest TAVSA Period | Accumulated | Interest COMSIGUA Period | Accumulated | Costs | TOTAL | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 4/30/2008 | | 112,345,530.00 | 24,672,357.00 | 3.08% | | | | | 3,290,000.00 | 140,307,887.00 | 7.0787500% | 0.070788 | 0.0000000% |
| 4/30/2009 | 365 | 120,298,189.20 | 26,418,851.47 | 1.88% | 7,952,659.20 | 7,952,659.20 | 1,746,494.47 | 1,746,494.47 | 3,290,000.00 | 150,007,040.68 | 5.8768800% | 0.058769 | 0.0000000% |
| 4/30/2010 | 365 | 127,367,969.43 | 27,971,451.67 | 1.02% | 7,069,780.22 | 15,022,439.43 | 1,552,604.20 | 3,299,098.67 | 3,290,000.00 | 158,629,425.10 | 5.0156300% | 0.050156 | 0.0000000% |
| 4/30/2011 | 365 | 133,756,275.51 | 29,374,400.39 | 0.76% | 6,388,306.08 | 21,410,745.51 | 1,402,944.72 | 4,702,043.39 | 3,290,000.00 | 166,420,675.90 | 4.7610000% | 0.04761 | 0.0000000% |
| 4/30/2012 | 366 | 140,124,411.79 | 30,772,915.59 | 1.05% | 6,368,136.28 | 27,778,881.79 | 1,398,515.20 | 6,100,558.59 | 3,290,000.00 | 174,187,327.38 | 5.0472000% | 0.050472 | 0.0000000% |
| 4/30/2013 | 365 | 147,196,771.10 | 32,326,086.19 | 0.70% | 7,072,359.31 | 34,851,241.10 | 1,553,170.60 | 7,653,729.19 | 3,290,000.00 | 182,812,857.29 | 4.7045000% | 0.047045 | 0.0000000% |
| 4/30/2014 | 365 | 154,121,643.20 | 33,846,866.91 | 0.55% | 6,924,872.10 | 41,776,113.20 | 1,520,780.72 | 9,174,509.91 | 3,290,000.00 | 191,258,510.11 | 4.5490000% | 0.04549 | 0.0000000% |
| 4/30/2015 | 365 | 161,132,636.75 | 35,386,560.89 | 0.71% | 7,010,993.55 | 48,787,106.75 | 1,539,693.98 | 10,714,203.89 | 3,290,000.00 | 199,809,197.64 | 4.7052500% | 0.047053 | 0.0000000% |
| 4/30/2016 | 366 | 168,714,330.14 | 37,051,587.05 | 1.23% | 7,581,693.39 | 56,368,800.14 | 1,665,026.16 | 12,379,230.05 | 3,290,000.00 | 209,055,917.18 | 5.2295000% | 0.052295 | 0.0000000% |
| 11/12/2016 | 196 | 173,452,115.11 | 38,092,058.55 | 1.77% | 4,737,784.97 | 61,106,585.11 | 1,040,471.50 | 13,419,701.55 | 3,290,000.00 | 214,834,173.66 | 5.7740000% | 0.052295 | 0.5445000% |
| 11/12/2017 | 365 | 183,467,240.24 | 40,291,494.01 | 2.77% | 10,015,125.13 | 71,121,710.24 | 2,199,435.46 | 15,619,137.01 | 3,290,000.00 | 227,048,734.25 | 6.7700400% | 0.05774 | 0.9960400% |
| 11/12/2018 | 365 | 195,888,045.79 | 43,019,244.27 | 2.72% | 12,420,805.55 | 83,542,515.79 | 2,727,750.26 | 18,346,887.27 | 3,290,000.00 | 242,197,290.06 | 6.7168800% | 0.0677 | -0.0531600% |
| 11/13/2019 | 366 | 209,045,610.76 | 45,908,795.28 | 0.86% | 13,157,564.97 | 96,700,080.76 | 2,889,551.01 | 21,236,438.28 | 3,290,000.00 | 258,244,406.04 | 4.8646300% | 0.067169 | -1.8522500% |
| 11/12/2020 | 365 | 219,214,906.25 | 48,142,088.31 | 0.80% | 10,169,295.49 | 106,869,376.25 | 2,233,293.03 | 23,469,731.31 | 3,290,000.00 | 270,646,994.56 | 4.7998332% | 0.048646 | -0.0647968% |
| 8/24/2021 | 285 | 227,430,675.31 | 49,946,364.70 | - | 8,215,769.06 | 115,085,145.31 | 1,804,276.39 | 25,274,007.70 | 3,290,000.00 | 280,667,040.01 | | | |
| 8/24/2022 | 365 | 227,585,328.17 | 49,980,328.23 | - | 154,652.86 | 115,239,798.17 | 33,963.53 | 25,307,971.23 | 3,290,000.00 | 280,855,656.40 | | | |
| 8/14/2023 | 355 | 227,735,846.25 | 50,013,383.71 | - | 150,518.08 | 115,390,316.25 | 33,055.48 | 25,341,026.71 | 3,290,000.00 | 281,039,229.96 | | | |

# Exhibit D

CLOSED,TYPE-E

# U.S. District Court
## District of Columbia (Washington, DC)
## CIVIL DOCKET FOR CASE #: 1:18-cv-01371-CRC

TENARIS S.A. et al v. BOLIVARIAN REPUBLIC OF VENEZUELA
Assigned to: Judge Christopher R. Cooper
Demand: $213,000,000
Cause: 27:185 Enforcement of Arbitration Award

Date Filed: 06/08/2018
Date Terminated: 07/17/2020
Jury Demand: None
Nature of Suit: 896 Arbitration
Jurisdiction: Federal Question

**Petitioner**

**TENARIS S.A.**                          represented by    **Cameron Charles Russell**
FRESHFIELDS BRUCKHAUS
DERINGER US LLP
601 Lexington Avenue
New York, NY 10022
212-277-4000
Email: cameron.russell@freshfields.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**David Yury Livshiz**
FRESHFIELDS BRUCKHAUS
DERINGER US LLP
601 Lexington Avenue
New York, NY 10022
(212) 284-4979
Fax: (212) 277-4001
Email: David.LIVSHIZ@freshfields.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Robert J. McCallum**
FRESHFIELDS BRUCKHAUS
DERINGER US LLP
601 Lexington Avenue
31st Floor
New York, NY 10022
(212) 284-4910
Fax: (646) 521-5710
Email: rob.mccallum@freshfields.com
*TERMINATED: 12/23/2019*
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Elliot Friedman**

FRESHFIELDS BRUCKHAUS
DERINGER US LLP
601 Lexington Avenue
31st Floor
New York, NY 10022
(212) 230-4666
Fax: (646) 465-7466
Email: elliot.friedman@freshfields.com
*ATTORNEY TO BE NOTICED*

**Petitioner**

**TALTA-TRADING E MARKETING SOCIEDADE UNIPESSOAL LDA**

represented by **Cameron Charles Russell**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**David Yury Livshiz**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Robert J. McCallum**
(See above for address)
*TERMINATED: 12/23/2019*
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Elliot Friedman**
(See above for address)
*ATTORNEY TO BE NOTICED*

V.

**Respondent**

**BOLIVARIAN REPUBLIC OF VENEZUELA**

represented by **Joseph Dominic Pizzurro**
CURTIS, MALLET-PREVOST, COLT & MOSLE LLP
1717 Pennsylvania Avenue, NW
Washington, DC 20006
(202) 452-7373
Fax: (202) 452-7333
Email: jpizzurro@curtis.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Kevin Arthur Meehan**
CURTIS, MALLET-PREVOST, COLT & MOSLE LLP
1717 Pennsylvania Avenue, NW
Washington, DC 20006
(202) 452-7373
Fax: (202) 452-7333

Email: kmeehan@curtis.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 06/08/2018 | 1 | PETITION TO CONFIRM ARBITRATION AWARD against BOLIVARIAN REPUBLIC OF VENEZUELA ( Filing fee $ 400 receipt number 0090-5525296) filed by TENARIS S.A., TALTA-TRADING E MARKETING SOCIEDADE UNIPESSOAL LDA. (Attachments: # 1 Memorandum in Support, # 2 Declaration, # 3 Exhibit A: Part 1, # 4 Exhibit A: Part 2, # 5 Exhibit B, # 6 Exhibit C, # 7 Exhibit D, # 8 Exhibit E, # 9 Text of Proposed Order, # 10 Civil Cover Sheet, # 11 Summons)(Friedman, Elliot) (Entered: 06/08/2018) |
| 06/08/2018 | 2 | MOTION for Leave to Appear Pro Hac Vice :Attorney Name- Robert J. McCallum, :Firm-Freshfields Bruckhaus Deringer US LLP, :Address- 601 Lexington Avenue, 31st Floor, New York, NY 10022. Phone No. - 212-277-4000. Fax No. - 212-277-4001 Filing fee $ 100, receipt number 0090-5525354. Fee Status: Fee Paid. by TALTA-TRADING E MARKETING SOCIEDADE UNIPESSOAL LDA, TENARIS S.A. (Attachments: # 1 Declaration, # 2 Text of Proposed Order)(Friedman, Elliot) (Entered: 06/08/2018) |
| 06/08/2018 | 3 | Corporate Disclosure Statement by TALTA-TRADING E MARKETING SOCIEDADE UNIPESSOAL LDA. (Friedman, Elliot) (Entered: 06/08/2018) |
| 06/08/2018 | 4 | Corporate Disclosure Statement by TENARIS S.A.. (Friedman, Elliot) (Entered: 06/08/2018) |
| 06/08/2018 | | Case Assigned to Judge Christopher R. Cooper. (zsth) (Entered: 06/11/2018) |
| 06/11/2018 | 5 | SUMMONS (1) Issued Electronically as to BOLIVARIAN REPUBLIC OF VENEZUELA. (Attachments: # 1 Notice and Consent)(zsth) (Entered: 06/11/2018) |
| 08/24/2018 | | ORDER granting 2 Motion to Admit Robert J. McCallum Pro Hac Vice for Petitioners. Signed by Judge Christopher R. Cooper on 8/24/2018. (lccrc1) (Entered: 08/24/2018) |
| 03/28/2019 | 6 | AFFIDAVIT REQUESTING FOREIGN MAILING by TALTA-TRADING E MARKETING SOCIEDADE UNIPESSOAL LDA, TENARIS S.A.. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C)(Friedman, Elliot) (Entered: 03/28/2019) |
| 04/01/2019 | 7 | REQUEST from Plaintiffs for the Clerk to effect service of two copies of the summons, petition, and notice of suit, together with a translation of each into the official language of the foreign state, by certified mail, return receipt requested, to the U. S. Department of State, Director of Overseas Citizens Services, pursuant to 28 U.S.C. 1608(a)(4). (See Docket Entry 6 to view document) (jf) (Entered: 04/08/2019) |
| 04/01/2019 | 8 | CERTIFICATE OF CLERK of mailing two copies of the summons, petition, and notice of suit, together with a translation of each into the official language of the foreign state on BOLIVARIAN REPUBLIC OF VENEZUELA, by certified mail, return receipt requested, to the U. S. Department of State, pursuant to 28 U.S.C. 1608(a)(4). (jf) (Entered: 04/08/2019) |
| 08/01/2019 | 9 | RETURN OF SERVICE/AFFIDAVIT of Summons and Complaint Executed as to BOLIVARIAN REPUBLIC OF VENEZUELA served on 7/26/2019, answer due 9/24/2019. (ztd) (Entered: 08/02/2019) |
| 09/12/2019 | 10 | NOTICE of Appearance by David Yury Livshiz on behalf of TALTA-TRADING E MARKETING SOCIEDADE UNIPESSOAL LDA, TENARIS S.A. (Livshiz, David) |

| | | |
|---|---|---|
| | | (Entered: 09/12/2019) |
| 10/16/2019 | | MINUTE ORDER TO SHOW CAUSE: The deadline for Respondent to answer having passed and Petitioners having not moved for default judgment under Fed. R. Civ. P. 55(b)(2), it is hereby ORDERED that Petitioners SHOW CAUSE, in writing, by October 30, 2019, why the claims against Respondent should not be dismissed for lack of prosecution. Signed by Judge Christopher R. Cooper on 10/16/19. (lccrc1) (Entered: 10/16/2019) |
| 10/16/2019 | | Set/Reset Deadlines: Response to Show Cause due by 10/30/2019. (lsj) (Entered: 10/16/2019) |
| 10/29/2019 | 11 | AFFIDAVIT FOR DEFAULT *(Request for Clerk to Enter Default)* by TALTA-TRADING E MARKETING SOCIEDADE UNIPESSOAL LDA, TENARIS S.A.. (Attachments: # 1 Declaration of Elliot Friedman)(Friedman, Elliot) (Entered: 10/29/2019) |
| 10/29/2019 | 12 | RESPONSE TO ORDER TO SHOW CAUSE by TALTA-TRADING E MARKETING SOCIEDADE UNIPESSOAL LDA, TENARIS S.A. . (Friedman, Elliot) (Entered: 10/29/2019) |
| 10/30/2019 | 13 | Clerk's ENTRY OF DEFAULT as to BOLIVARIAN REPUBLIC OF VENEZUELA (ztd) (Entered: 10/30/2019) |
| 11/01/2019 | 14 | MOTION for Default Judgment as to *Respondent Bolivarian Republic of Venezuela* by TALTA-TRADING E MARKETING SOCIEDADE UNIPESSOAL LDA, TENARIS S.A. (Attachments: # 1 Declaration of Elliot Friedman, # 2 Exhibit A, # 3 Exhibit B, # 4 Exhibit C, # 5 Text of Proposed Judgment)(Friedman, Elliot) (Entered: 11/01/2019) |
| 11/06/2019 | | MINUTE ORDER: The Court will hold a telephonic conference on November 13, 2019 at 2:00PM. Petitioners should be prepared to address the following questions: (1) whether they were required to serve the Petition itself and/or the Motion for a Default Judgment on the government of Interim President of Venezuela Juan Guaido, given that the United States has formally recognized that government and such recognition has been held by the D.C. Circuit to be "conclusive on all domestic courts[.]" See Order, Rusoro Mining Ltd., et al. v. Bolivarian Rep. of Venezuela, No. 18-7044 (D.C. Cir.) (May 1, 2019) (quoting Guaranty Trust Co. v. United States , 304 U.S. 126, 137 (1938)); (2) whether the Guaido government has been served or otherwise made aware of the this action; and (3) in any case, whether the case should be stayed pending resolution of the ongoing political uncertainty in Venezuela over who controls the government, particularly the ability to direct litigation on its behalf. See, e.g., Plaintiff's Status Report, Helmerich & Payne Int'l. Drilling Co. v. Bolivarian Rep. of Venezuela, 11-cv-1735 (CRC) (ECF No. 135, Aug. 14, 2019) (requesting continuation of stay of long-running FSIA case due to political uncertainty in Venezuela). Signed by Judge Christopher R. Cooper on 11/6/19. (lccrc1) (Entered: 11/06/2019) |
| 11/06/2019 | | Set/Reset Hearings: Telephone Conference set for 11/13/2019 at 2:00 PM before Judge Christopher R. Cooper. (lsj) (Entered: 11/06/2019) |
| 11/14/2019 | | MINUTE ORDER: Petitioners are hereby ORDERED to file a statement notifying the Court of any cases in which representatives of Interim President of Venezuela Juan Guaido have represented Venezuela in U.S. courts. The statement shall be filed by the close of business on November 15, 2019. Signed by Judge Christopher R. Cooper on 11/14/19. (lccrc1) (Entered: 11/14/2019) |
| 11/15/2019 | 15 | NOTICE *(Statement Regarding Pending Litigation Against the Bolivarian Republic of Venezuela)* by TALTA-TRADING E MARKETING SOCIEDADE UNIPESSOAL LDA, TENARIS S.A. (Friedman, Elliot) (Entered: 11/15/2019) |

| | | |
|---|---|---|
| 12/23/2019 | 16 | NOTICE OF WITHDRAWAL OF APPEARANCE as to TALTA-TRADING E MARKETING SOCIEDADE UNIPESSOAL LDA, TENARIS S.A.. Attorney Robert J. McCallum terminated. (McCallum, Robert) (Entered: 12/23/2019) |
| 01/08/2020 | 17 | Notice of Correspondence from the Court to Special Attorney General of Venezuela Jose Ignacio Hernandez. Signed by Judge Christopher R. Cooper on 1/8/2020. (lccrc1) (Entered: 01/08/2020) |
| 01/22/2020 | 18 | Letter from Jose Ignacio Hernandez (ztd); ("Let this be filed" signed 1/22/20 by Judge Christopher R. Cooper) (Entered: 01/23/2020) |
| 01/24/2020 | 19 | NOTICE of Appearance by Joseph Dominic Pizzurro on behalf of BOLIVARIAN REPUBLIC OF VENEZUELA (Pizzurro, Joseph) (Entered: 01/24/2020) |
| 01/24/2020 | 20 | NOTICE of Appearance by Kevin Arthur Meehan on behalf of BOLIVARIAN REPUBLIC OF VENEZUELA (Meehan, Kevin) (Entered: 01/24/2020) |
| 02/10/2020 | 21 | NOTICE of Appearance by Cameron Charles Russell on behalf of TALTA-TRADING E MARKETING SOCIEDADE UNIPESSOAL LDA, TENARIS S.A. (Russell, Cameron) (Entered: 02/10/2020) |
| 02/14/2020 | 22 | STIPULATION re 14 MOTION for Default Judgment as to *Respondent Bolivarian Republic of Venezuela Extending Respondent's Deadline To Respond Until February 28, 2020* by BOLIVARIAN REPUBLIC OF VENEZUELA, TALTA-TRADING E MARKETING SOCIEDADE UNIPESSOAL LDA, TENARIS S.A.. (Pizzurro, Joseph) (Entered: 02/14/2020) |
| 02/18/2020 | | MINUTE ORDER: While the Court does not permit parties to extend deadlines by stipulation, the Court will adopt the parties' 22 Proposed Stipulated Order. Respondent shall respond to Tenaris's motion for entry of default judgment by February 28, 2020. Signed by Judge Christopher R. Cooper on 2/18/2020. (lccrc1) (Entered: 02/18/2020) |
| 02/18/2020 | | Set/Reset Deadlines: Responses due by 2/28/2020 (lsj) (Entered: 02/18/2020) |
| 02/28/2020 | 23 | Memorandum in opposition to re 14 MOTION for Default Judgment as to *Respondent Bolivarian Republic of Venezuela* filed by BOLIVARIAN REPUBLIC OF VENEZUELA. (Attachments: # 1 Exhibit -A, # 2 Text of Proposed Order, # 3 Certificate of Service) (Pizzurro, Joseph) (Entered: 02/28/2020) |
| 03/06/2020 | 24 | REPLY to opposition to motion re 14 MOTION for Default Judgment as to *Respondent Bolivarian Republic of Venezuela* filed by TALTA-TRADING E MARKETING SOCIEDADE UNIPESSOAL LDA, TENARIS S.A.. (Attachments: # 1 Text of Proposed Order, # 2 Certificate of Service)(Friedman, Elliot) (Entered: 03/06/2020) |
| 06/17/2020 | 25 | ORDER denying 14 Motion for Default Judgment; granting in part and denying in part 1 Petition to Enforce Arbitration Award. Signed by Judge Christopher R. Cooper on 6/17/20. (lccrc1) (Entered: 06/17/2020) |
| 06/17/2020 | 26 | MEMORANDUM OPINION re: 25 ORDER denying 14 Motion for Default Judgment; granting in part and denying in part 1 Petition to Enforce Arbitration Award. Signed by Judge Christopher R. Cooper on 6/17/20. (lccrc1) (Entered: 06/17/2020) |
| 06/18/2020 | | Set/Reset Deadlines: Proposed Order due by 7/1/2020. (lsj) (Entered: 06/18/2020) |
| 07/01/2020 | 27 | NOTICE of Proposed Order *of Judgment* by TALTA-TRADING E MARKETING SOCIEDADE UNIPESSOAL LDA, TENARIS S.A. (Attachments: # 1 Proposed Judgment)(Friedman, Elliot) (Entered: 07/01/2020) |

| 07/14/2020 | 28 | RESPONSE by BOLIVARIAN REPUBLIC OF VENEZUELA re 27 Notice of Proposed Order (Attachments: # 1 Certificate of Service)(Pizzurro, Joseph); Modified text and event on 7/15/2020 (ztth). (Entered: 07/14/2020) |
| 07/17/2020 | 29 | ORDER entering Judgment in favor of Petitioners Tenaris S.A. and Talta-Trading e Marketing Sociedade Unipessoal LDA. Signed by Judge Christopher R. Cooper on 7/17/20. (lccrc1) (Entered: 07/17/2020) |
| 07/17/2020 | 30 | MEMORANDUM OPINION re: 29 ORDER entering Judgment in favor of Petitioners Tenaris S.A. and Talta-Trading e Marketing Sociedade Unipessoal LDA. Signed by Judge Christopher R. Cooper on 7/17/20. (lccrc1) (Entered: 07/17/2020) |
| 07/17/2020 | | JUDGMENT entered in favor of Petitioners Tenaris S.A. and Talta-Trading e Marketing Sociedade Unipessoal LDA against Bolivarian Republic of Venezuela. Signed by Judge Christopher R. Cooper on 7/17/2020. (lsj) (Entered: 07/17/2020) |

## PACER Service Center

### Transaction Receipt

08/11/2023 10:24:28

| PACER Login: | dldl0349 | Client Code: | 24233-1060 |
| --- | --- | --- | --- |
| Description: | Docket Report | Search Criteria: | 1:18-cv-01371-CRC |
| Billable Pages: | 5 | Cost: | 0.50 |

CLOSED,TYPE-E

# U.S. District Court
## District of Columbia (Washington, DC)
## CIVIL DOCKET FOR CASE #: 1:18-cv-01373-CJN

TENARIS S.A. et al v. BOLIVARIAN REPUBLIC OF
VENEZUELA
Assigned to: Judge Carl J. Nichols
Demand: $234,000,000
Cause: 27:185 Enforcement of Arbitration Award

Date Filed: 06/08/2018
Date Terminated: 08/24/2021
Jury Demand: None
Nature of Suit: 896 Arbitration
Jurisdiction: Federal Question

**Petitioner**

**TENARIS S.A.**

represented by **Cameron Charles Russell**
FRESHFIELDS BRUCKHAUS
DERINGER US LLP
601 Lexington Avenue
New York, NY 10022
212-277-4000
Email: cameron.russell@freshfields.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**David Yury Livshiz**
FRESHFIELDS BRUCKHAUS
DERINGER US LLP
601 Lexington Avenue
New York, NY 10022
(212) 284-4979
Fax: (212) 277-4001
Email: David.LIVSHIZ@freshfields.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Robert J. McCallum**
FRESHFIELDS BRUCKHAUS
DERINGER US LLP
601 Lexington Avenue
31st Floor
New York, NY 10022
(212) 284-4910
Fax: (646) 521-5710
Email: rob.mccallum@freshfields.com
*TERMINATED: 12/23/2019*
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Elliot Friedman**

FRESHFIELDS BRUCKHAUS
DERINGER US LLP
601 Lexington Avenue
31st Floor
New York, NY 10022
(212) 230-4666
Fax: (646) 465-7466
Email: elliot.friedman@freshfields.com
*ATTORNEY TO BE NOTICED*

**Petitioner**

| | | |
|---|---|---|
| **TALTA-TRADING E MARKETING SOCIEDADE UNIPESSOAL LDA** | represented by | **Cameron Charles Russell**<br>(See above for address)<br>*LEAD ATTORNEY*<br>*ATTORNEY TO BE NOTICED* |
| | | **David Yury Livshiz**<br>(See above for address)<br>*LEAD ATTORNEY*<br>*ATTORNEY TO BE NOTICED* |
| | | **Robert J. McCallum**<br>(See above for address)<br>*TERMINATED: 12/23/2019*<br>*LEAD ATTORNEY*<br>*PRO HAC VICE*<br>*ATTORNEY TO BE NOTICED* |
| | | **Elliot Friedman**<br>(See above for address)<br>*ATTORNEY TO BE NOTICED* |

V.

**Respondent**

| | | |
|---|---|---|
| **BOLIVARIAN REPUBLIC OF VENEZUELA** | represented by | **Joseph Dominic Pizzurro**<br>CURTIS, MALLET-PREVOST, COLT & MOSLE LLP<br>1717 Pennsylvania Avenue, NW<br>Washington, DC 20006<br>(202) 452-7373<br>Fax: (202) 452-7333<br>Email: jpizzurro@curtis.com<br>*LEAD ATTORNEY*<br>*ATTORNEY TO BE NOTICED* |
| | | **Kevin Arthur Meehan**<br>CURTIS, MALLET-PREVOST, COLT & MOSLE LLP<br>1717 Pennsylvania Avenue, NW<br>Washington, DC 20006<br>(202) 452-7373<br>Fax: (202) 452-7333 |

Email: kmeehan@curtis.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 06/08/2018 | 1 | PETITION TO CONFIRM ARBITRATION AWARD against BOLIVARIAN REPUBLIC OF VENEZUELA ( Filing fee $ 400 receipt number 0090-5525367) filed by TENARIS S.A., TALTA-TRADING E MARKETING SOCIEDADE UNIPESSOAL LDA. (Attachments: # 1 Memorandum in Support, # 2 Declaration, # 3 Exhibit A, # 4 Exhibit B, # 5 Exhibit C, # 6 Exhibit D, # 7 Exhibit E, # 8 Text of Proposed Order, # 9 Civil Cover Sheet, # 10 Summons)(Friedman, Elliot) (Entered: 06/08/2018) |
| 06/08/2018 | 2 | MOTION for Leave to Appear Pro Hac Vice :Attorney Name- Robert J. McCallum, :Firm-Freshfields Bruckhaus Deringer US LLP, :Address- 601 Lexington Avenue, 31st Floor, New York, NY 10022. Phone No. - 212-277-4000. Fax No. - 212-277-4001 Filing fee $ 100, receipt number 0090-5525393. Fee Status: Fee Paid. by TALTA-TRADING E MARKETING SOCIEDADE UNIPESSOAL LDA, TENARIS S.A. (Attachments: # 1 Declaration, # 2 Text of Proposed Order)(Friedman, Elliot) (Entered: 06/08/2018) |
| 06/08/2018 | 3 | Corporate Disclosure Statement by TALTA-TRADING E MARKETING SOCIEDADE UNIPESSOAL LDA. (Friedman, Elliot) (Entered: 06/08/2018) |
| 06/08/2018 | 4 | Corporate Disclosure Statement by TENARIS S.A.. (Friedman, Elliot) (Entered: 06/08/2018) |
| 06/08/2018 | | Case Assigned to Judge Paul L. Friedman. (zsth) (Entered: 06/11/2018) |
| 06/11/2018 | 5 | SUMMONS (1) Issued Electronically as to BOLIVARIAN REPUBLIC OF VENEZUELA. (Attachments: # 1 Notice and Consent)(zsth) (Entered: 06/11/2018) |
| 06/19/2018 | 6 | ORDER granting 2 motion for admission pro hac vice of Robert J. McCallum on behalf of petitioners. Signed by Judge Paul L. Friedman on June 19, 2018. (MA) (Entered: 06/19/2018) |
| 03/12/2019 | 7 | ORDER that petitioners shall file, on or before April 2, 2019, a status report apprising the Court of developments in the case. Signed by Judge Paul L. Friedman on March 12, 2019. (MA) (Entered: 03/12/2019) |
| 03/28/2019 | 8 | AFFIDAVIT REQUESTING FOREIGN MAILING by TALTA-TRADING E MARKETING SOCIEDADE UNIPESSOAL LDA, TENARIS S.A.. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C)(Friedman, Elliot) (Entered: 03/28/2019) |
| 04/01/2019 | 9 | STATUS REPORT *pursuant to the Court's March 12, 2019 Order* by TALTA-TRADING E MARKETING SOCIEDADE UNIPESSOAL LDA, TENARIS S.A.. (Attachments: # 1 Exhibit A)(Friedman, Elliot) (Entered: 04/01/2019) |
| 04/01/2019 | 10 | REQUEST from Plaintiffs for the Clerk to effect service of two copies of the summons, petition, and notice of suit, together with a translation of each into the official language of the foreign state, by certified mail, return receipt requested, to the U. S. Department of State, Director of Overseas Citizens Services, pursuant to 28 U.S.C. 1608(a)(4). (See Docket Entry 8 to view document) (jf) (Entered: 04/08/2019) |
| 04/01/2019 | 11 | CERTIFICATE OF CLERK of mailing two copies of the summons, petition, and notice of suit, together with a translation of each into the official language of the foreign state on BOLIVARIAN REPUBLIC OF VENEZUELA, by certified mail, return receipt requested, |

| | | |
|---|---|---|
| | | to the U. S. Department of State, pursuant to 28 U.S.C. 1608(a)(4). (jf) (Entered: 04/08/2019) |
| 06/26/2019 | | Case directly reassigned to Judge Carl J. Nichols. Judge Paul L. Friedman is no longer assigned to the case. (rj) (Entered: 06/26/2019) |
| 08/01/2019 | 12 | RETURN OF SERVICE/AFFIDAVIT of Summons and Complaint Executed as to BOLIVARIAN REPUBLIC OF VENEZUELA served on 7/26/2019, answer due 9/24/2019. (ztd) (Entered: 08/02/2019) |
| 09/12/2019 | 13 | NOTICE of Appearance by David Yury Livshiz on behalf of TALTA-TRADING E MARKETING SOCIEDADE UNIPESSOAL LDA, TENARIS S.A. (Livshiz, David) (Entered: 09/12/2019) |
| 10/30/2019 | 14 | AFFIDAVIT FOR DEFAULT *(Request for Clerk to Enter Default)* by TALTA-TRADING E MARKETING SOCIEDADE UNIPESSOAL LDA, TENARIS S.A.. (Attachments: # 1 Declaration of Elliot Friedman)(Friedman, Elliot) (Entered: 10/30/2019) |
| 10/31/2019 | 15 | Clerk's ENTRY OF DEFAULT as to BOLIVARIAN REPUBLIC OF VENEZUELA (ztd) (Entered: 10/31/2019) |
| 11/05/2019 | 16 | MOTION for Default Judgment as to *Respondent Bolivarian Republic of Venezuela* by TALTA-TRADING E MARKETING SOCIEDADE UNIPESSOAL LDA, TENARIS S.A. (Attachments: # 1 Declaration of Elliot Friedman, # 2 Exhibit A, # 3 Text of Proposed Judgment)(Friedman, Elliot) (Entered: 11/05/2019) |
| 12/23/2019 | 17 | NOTICE OF WITHDRAWAL OF APPEARANCE as to TALTA-TRADING E MARKETING SOCIEDADE UNIPESSOAL LDA, TENARIS S.A.. Attorney Robert J. McCallum terminated. (McCallum, Robert) (Entered: 12/23/2019) |
| 01/24/2020 | 18 | NOTICE of Appearance by Joseph Dominic Pizzurro on behalf of BOLIVARIAN REPUBLIC OF VENEZUELA (Pizzurro, Joseph) (Entered: 01/24/2020) |
| 01/24/2020 | 19 | NOTICE of Appearance by Kevin Arthur Meehan on behalf of BOLIVARIAN REPUBLIC OF VENEZUELA (Meehan, Kevin) (Entered: 01/24/2020) |
| 01/28/2020 | 20 | Letter from Judge Carl J. Nichols. "Let this be filed" Signed by Judge Carl J. Nichols on 1/28/2020. (eg) (Entered: 01/31/2020) |
| 01/28/2020 | 21 | Letter from Jose Ignacio Hernandez. "Let this be filed" Signed by Judge Carl J. Nichols on 1/28/2020. (eg) (Entered: 01/31/2020) |
| 02/10/2020 | 22 | NOTICE of Appearance by Cameron Charles Russell on behalf of TALTA-TRADING E MARKETING SOCIEDADE UNIPESSOAL LDA, TENARIS S.A. (Russell, Cameron) (Entered: 02/10/2020) |
| 02/14/2020 | 23 | STIPULATION re 16 MOTION for Default Judgment as to *Respondent Bolivarian Republic of Venezuela Extending Respondent's Deadline To Respond Until February 28, 2020* by BOLIVARIAN REPUBLIC OF VENEZUELA, TALTA-TRADING E MARKETING SOCIEDADE UNIPESSOAL LDA, TENARIS S.A.. (Pizzurro, Joseph) (Entered: 02/14/2020) |
| 02/18/2020 | 24 | STANDING ORDER. Signed by Judge Carl J. Nichols on February 18, 2020. (lccjn1) (Entered: 02/18/2020) |
| 02/18/2020 | | MINUTE ORDER. After review of the Parties' 23 Proposed Stipulated Order for Extension of Respondent's Deadline to Respond to Motion for Default Judgment, it is hereby ORDERED that Respondent shall file its response to Petitioners' 16 Motion for Entry of Default Judgment on or before February 28, 2020. The Court notes that further requests for extensions of time must be made by motion as outlined in section 9 of the Court's 24 |

| | | |
|---|---|---|
| | | Standing Order. Signed by Judge Carl J. Nichols on February 18, 2020. (lccjn1) (Entered: 02/18/2020) |
| 02/18/2020 | | Set/Reset Deadlines/Hearings: Response to 16 due by 2/28/2020. (zcdw) (Entered: 02/19/2020) |
| 02/28/2020 | 25 | Memorandum in opposition to re 16 MOTION for Default Judgment as to *Respondent Bolivarian Republic of Venezuela* filed by BOLIVARIAN REPUBLIC OF VENEZUELA. (Attachments: # 1 Exhibit -A, # 2 Text of Proposed Order, # 3 Certificate of Service) (Pizzurro, Joseph) (Entered: 02/28/2020) |
| 03/06/2020 | 26 | REPLY to opposition to motion re 16 MOTION for Default Judgment as to *Respondent Bolivarian Republic of Venezuela* filed by TALTA-TRADING E MARKETING SOCIEDADE UNIPESSOAL LDA, TENARIS S.A.. (Attachments: # 1 Text of Proposed Order, # 2 Certificate of Service)(Friedman, Elliot) (Entered: 03/06/2020) |
| 06/22/2020 | 27 | NOTICE OF SUPPLEMENTAL AUTHORITY by TALTA-TRADING E MARKETING SOCIEDADE UNIPESSOAL LDA, TENARIS S.A. (Attachments: # 1 Exhibit A, # 2 Certificate of Service)(Friedman, Elliot) (Entered: 06/22/2020) |
| 06/23/2020 | 28 | RESPONSE re 27 NOTICE OF SUPPLEMENTAL AUTHORITY filed by BOLIVARIAN REPUBLIC OF VENEZUELA. (Pizzurro, Joseph) Modified docket event/text on 6/24/2020 (eg). (Entered: 06/23/2020) |
| 03/29/2021 | 29 | ORDER. Signed by Judge Carl J. Nichols on March 29, 2021. (lccjn1) (Entered: 03/29/2021) |
| 03/29/2021 | 30 | MEMORANDUM AND OPINION. Signed by Judge Carl J. Nichols on March 29, 2021. (lccjn1) (Entered: 03/29/2021) |
| 04/12/2021 | 31 | NOTICE *of Proposed Order of Judgment* by TALTA-TRADING E MARKETING SOCIEDADE UNIPESSOAL LDA, TENARIS S.A. (Attachments: # 1 Exhibit 1 (Proposed Judgment))(Friedman, Elliot) (Entered: 04/12/2021) |
| 08/24/2021 | 32 | ORDER. Signed by Judge Carl J. Nichols on August 24, 2021. (lccjn1) (Entered: 08/24/2021) |
| 09/20/2021 | 33 | MOTION to Alter Judgment *under FRCP 59(e)* by TALTA-TRADING E MARKETING SOCIEDADE UNIPESSOAL LDA, TENARIS S.A.. (Attachments: # 1 Declaration of Elliot Friedman, # 2 Text of Proposed Order)(Friedman, Elliot) (Entered: 09/20/2021) |
| 11/05/2021 | 34 | ORDER. Signed by Judge Carl J. Nichols on November 5, 2021. (lccjn1) (Entered: 11/05/2021) |

| PACER Service Center | | | |
|---|---|---|---|
| **Transaction Receipt** | | | |
| 08/11/2023 10:24:33 | | | |
| PACER Login: | dldl0349 | Client Code: | 24233-1060 |
| Description: | Docket Report | Search Criteria: | 1:18-cv-01373-CJN |
| Billable Pages: | 4 | Cost: | 0.40 |

# Exhibit E

# Exhibit A

## Part 1 of 2



**INTERNATIONAL CENTRE FOR SETTLEMENT OF INVESTMENT DISPUTES**

1818 H STREET, NW   |   WASHINGTON, DC 20433   |   USA
TELEPHONE (202) 458 1534   |   FACSIMILE (202) 522 2615
WWW.WORLDBANK.ORG/ICSID

## CERTIFICATE

**TENARIS S.A. AND TALTA – TRADING E MARKETING SOCIEDADE UNIPESSOAL LDA**

**v.**

**BOLIVARIAN REPUBLIC OF VENEZUELA**

**(ICSID CASE NO. ARB/11/26)**

I hereby certify that the attached document is a true copy of the Arbitral Tribunal's Award rendered in English and Spanish on January 29, 2016.

Gonzalo Flores
Acting Secretary-General

Washington, D.C., January 29, 2016

**INTERNATIONAL CENTRE FOR SETTLEMENT OF INVESTMENT DISPUTES**
WASHINGTON, D.C.

In the arbitration proceedings between

**TENARIS S.A. AND**

**TALTA-TRADING E MARKETING SOCIEDADE UNIPESSOAL LDA**

(Claimants)

- and -

**BOLIVARIAN REPUBLIC OF VENEZUELA**

(Respondent)

**ICSID Case No. ARB/11/26**

---

# AWARD

---

*Members of the Tribunal*

Mr. John Beechey (President)
Mr. Judd L. Kessler
Mr. Toby T. Landau QC

*Secretary of the Tribunal*

Ms. Alicia Martín Blanco

Date of dispatch to the Parties:  29 January 2016

REPRESENTATION OF THE PARTIES

| Representing Claimants: | Representing Respondent: |
|---|---|
| Mr. Nigel Blackaby | Dr. Reinaldo Enrique Muñoz Pedroza |
| Mr. Alex Yanos | *Viceprocurador General de la República* |
| Ms. Caroline Richard | Dr. Felipe Daruiz |
| Mr. Jeffery Commission | *Coordinador Integral Legal del Despacho del* |
| Ms. Natalia Zibibbo | *Procurador* |
| Mr. James Freda | Dra. Erika Fernández |
| Mr. Ricardo Chirinos | *Coordinadora de Juicios Internacionales* |
| Ms. Guadalupe Lopez | *Procuraduría General de la República Bolivariana* |
| Freshfields Bruckhaus Deringer US LLP | *de Venezuela* |
| 700 13th Street, NW | Av. Los Ilustres , c/c calle Francisco Lazo Marti, |
| 10th Floor | Urb. Santa Mónica – Caracas |
| Washington, DC 20005-3960 | Venezuela |
| United States of America | |
| | and |
| and | |
| | Dr. Ronald E. M. Goodman |
| Mr. José Humberto Frías | Mr. Kenneth Juan Figueroa |
| D'Empaire Reyna Abogados | Mr. Alberto Wray |
| Edificio Bancaracas, P.H. | Ms. Janis Brennan |
| Plaza La Castellana, 1060 | Mr. Diego Cadena |
| Venezuela | Ms. Alexandra Kerr Meise |
| | Dr. Constantinos Salonidis |
| | Ms. Oonagh Sands |
| | Foley Hoag LLP |
| | 1717 K Street, NW |
| | Suite 1200 |
| | Washington, DC. 20006 |
| | United States of America |

# TABLE OF CONTENTS

Frequently Used Abbreviations and Acronyms .................................................................................5

A.   INTRODUCTION .......................................................................................................................6
    1.   *The Parties* ...............................................................................................................6
    2.   *Nature of the Dispute and Relevant Treaties* .........................................................6
    3.   *The Arbitration Agreements* ....................................................................................8

B.   PROCEDURAL HISTORY .......................................................................................................11
    1.   *Commencement of Arbitration* ..............................................................................11
    2.   *The Arbitral Tribunal* ............................................................................................11
    3.   *The First Session* ...................................................................................................12
    4.   *Request for Bifurcation* .........................................................................................12
    5.   *Written Submissions* ..............................................................................................13
    6.   *Witness Statements and Expert Reports* ................................................................13
    7.   *Procedural Orders* ................................................................................................14
    8.   *First Substantive Hearing* .....................................................................................14
    9.   *Second Substantive Hearing* .................................................................................15
    10.  *Post-Hearing Submissions* ....................................................................................15

C.   RELEVANT FACTS .................................................................................................................16
    1.   *The Privatisation of the Venezuelan Steel Industry* ..............................................16
    2.   *Presidential Decree No. 3895* ...............................................................................21
    3.   *The Nationalisation of SIDOR: Presidential Decree No. 6,058* .............................22
    4.   *The Nationalisation of Matesi* ..............................................................................24
    5.   *Decree No. 6,796* ..................................................................................................26
    6.   *The Expropriation of Matesi* .................................................................................29
    7.   *Decree No. 8,280* ..................................................................................................29

D.   SUMMARY OF THE PARTIES' POSITIONS .............................................................................31
    1.   *Claimants' Case* ....................................................................................................31
    2.   *Venezuela's Case* ..................................................................................................33
    3.   **Principal Treaty Provisions** ...................................................................................35
       a.   The Luxembourg Treaty ..............................................................................35
       b.   The Portuguese Treaty ................................................................................38

E.   JURISDICTION .......................................................................................................................40
    1.   *The Requirement of "Siège Social" / "Sede"* .......................................................40
       a.   Venezuela's Case ........................................................................................40
       b.   Claimants' Case ..........................................................................................43
       c.   Analysis ......................................................................................................47
          1.   The Meaning of *"Siège Social"* and *"Sede"* ..............................47
          2.   Other BITs ....................................................................................58

|   |   | 3. | Relevance of Municipal Law | 60 |
|---|---|---|---|---|
|   |   | 4. | Article 25 of the ICSID Convention | 69 |
|   |   | 5. | Nature and Application of the Test | 70 |
|   |   | 6. | Tenaris | 70 |
|   |   | 7. | Talta | 77 |
|   |   | 8. | Conclusion | 79 |
|   | 2. | | *Notification of Claimants' Claims* | *80* |
|   |   | a. | Venezuela's Case | 80 |
|   |   | b. | Claimants' Case | 82 |
|   |   | c. | Analysis | 83 |
|   | 3. | | *The Talta Loan and the Talta Off-Take Agreement* | *85* |
|   |   | a. | Venezuela's Case | 85 |
|   |   | b. | Claimants' Case | 90 |
|   |   | c. | Relevant Principles | 91 |
|   |   | d. | Analysis | 94 |
|   |   | e. | Conclusion | 98 |
|   | 4. | | *Alleged "Contractual Claims"* | *99* |
|   |   | a. | Venezuela's Case | 99 |
|   |   | b. | Claimants' Case | 100 |
|   |   | c. | Analysis | 100 |
|   | 5. | | *Conclusion on Jurisdiction Objections* | *104* |
| **F.** | | | **PRE-EXPROPRIATION CLAIMS** | **104** |
|   | 1. | | *Fair and Equitable Treatment / Discrimination Claim* | *105* |
|   |   | a. | The Matesi Plant | 105 |
|   |   | b. | The Complaint | 106 |
|   |   | c. | Terms of the Supply Contract | 107 |
|   |   | d. | Undisputed Facts | 109 |
|   |   | e. | Impact of the Pro-Rating | 110 |
|   |   | f. | Operation of the *Pro Rata* Mechanism | 111 |
|   |   | g. | Conclusions on Supply by CVG FMO | 124 |
|   |   | h. | Venezuela's Responsibility | 125 |
|   |   | i. | Conclusion | 138 |
|   | 2. | | *Protection and Security Claim* | *138* |
|   |   | a. | Claimants' Case | 138 |
|   |   | b. | Venezuela's Case | 139 |
|   |   | c. | Treaty Provisions | 142 |
|   |   | d. | Application of the Treaty Standard | 143 |
|   |   | e. | Conclusion | 146 |
| **G.** | | | **NATIONALIZATION AND EXPROPRIATION OF MATESI** | **146** |
|   | 1. | | *Claimants' Case* | *147* |
|   | 2. | | *Venezuela's Case* | *147* |
|   | 3. | | *Treaty Provisions* | *150* |
|   | 4. | | *The Procedure Leading to the Nationalisation of Matesi* | *151* |
|   | 5. | | *Failure to Comply with the Treaties* | *155* |
|   | 6. | | *Conclusion* | *160* |
| **H.** | | | **QUANTUM** | **162** |
|   | 1. | | *Claimants' Case* | *162* |

3

2. Respondent's Case .......................................................................................164

3. Treaty Provisions .......................................................................................165

4. Method of Valuation ....................................................................................167
    a. Discounted Cash Flow ("DCF") .....................................................168
    b. The "Market Multiples" Approach ...................................................170
    c. The Talta and Sidor Off-Take Agreements ......................................171
    d. Best Evidence of the Value of Talta's Interest in Matesi .................177

5. Actualisation of the Loss ..............................................................................182

I.   COSTS ..........................................................................................................**190**

1. Claimants' Application for Costs ...................................................................190

2. Venezuela's Application for Costs .................................................................194

3. Venezuela's Comments on Claimants' Submission on Costs ...........................195

4. Analysis ....................................................................................................197

J.   DECISION .....................................................................................................201

**ANNEX I  Guide to Relevant Entities**.............................................................................**204**

_____

## FREQUENTLY USED ABBREVIATIONS AND ACRONYMS

| | |
|---|---|
| ICSID Convention | Convention on the Settlement of Investment Disputes Between States and Nationals of Other States dated 18 March 1965 |
| ICSID Rules, or Arbitration Rules | ICSID Rules of Procedure for Arbitration Proceedings |
| ICSID, or the Centre | International Centre for Settlement of Investment Disputes |
| Luxembourg Treaty | Agreement between the Government of the Republic of Venezuela and the Belgium-Luxembourg Economic Union for the Reciprocal Promotion and Protection of Investments, signed on 17 March 1988, and in force as of 28 April 2004 |
| Portuguese Treaty | Agreement between the Government of the Republic of Venezuela and the Government of the Portuguese Republic for the Reciprocal Promotion and Protection of Investments, signed on 17 June 1994, and in force as of 11 May 1995 |
| The Treaties | The Luxembourg and Portuguese Treaties |
| Request or RFA | Request for Arbitration, 24 August 2011 |
| Claimants' Memorial | Claimants' Memorial, 24 August 2012 |
| Respondent's Counter-Memorial | Respondent's Counter-Memorial, 10 May 2013 |
| Claimants' Reply | Claimant's Reply Memorial, 27 August 2013 |
| Respondent's Rejoinder | Respondent's Rejoinder Memorial, 5 December 2013 |
| C- | Claimants' Exhibit |
| R- | Respondent's Exhibit |
| CLEX- | Claimants' Legal Authority |
| RLA- | Respondent's Legal Authority |
| Transcript | Transcript of the hearings in January/February 2014 and July 2014. |

## A.    INTRODUCTION

**1.    THE PARTIES**

1.    The Claimants in this arbitration are as follows

(a)    Tenaris S.A. ("**Tenaris**"), a company incorporated under the laws of the Grand Duchy of Luxembourg, the registered office of which is situated at:

> 29, avenue de la Porte-Neuve
> 3rd Floor
> L-1855, 2227
> Luxembourg

(b)    Talta – Trading e Marketing Sociedad Unipessoal Lda ("**Talta**"), a company incorporated under the laws of the Portuguese Republic, the registered office of which is situated at:

> Rua da Alfandega 74-76
> 2o andar, sala H
> Funchal, 9000-059
> Ilha da Madeira
> Portugal

2.    The Respondent is the Bolivarian Republic of Venezuela ("**Venezuela**").

3.    The Claimants and Respondent are hereinafter collectively referred to as the "**Parties**".

**2.    NATURE OF THE DISPUTE AND RELEVANT TREATIES**

4.    According to Claimants' Request for Arbitration, Tenaris is a global supplier of steel tubes and related services for the world's energy industry and certain other industrial applications. Talta is Venezuela's only producer of stainless steel pipes for the oil and gas industry.[1]   Talta is wholly owned by Tenaris Investments S.a.r.l, which, in turn, is 100% owned by Tenaris.

---

[1] Transcript (English) Day 1, p. 38

5.  Through Talta, Tenaris held a 50.1997% shareholding in Matesi Materiales Siderurgicos S.A. ("**Matesi**"), a company established under the laws of Venezuela. Matesi produces high quality hot briquetted iron ("**HBI**"), a component used in the production of steel. Further details of the corporate links between the Claimant entities, and their respective interests in entities which feature in this arbitration, are set out in **Section C**, and **Annex I** below.

6.  By way of broad summary, Claimants assert that their use and enjoyment of their investment has been lost as a result of the "*indirect expropriation of their investments in, and pre-nationalisation interference with, their investments in Matesi*".[2] The Claimants' complaints break down into two broad categories: (a) pre-expropriation interference with the investment, and in particular discrimination in the supply of pellets to Matesi; and (b) the subsequent assumption of full managerial and operational control of Matesi by Venezuela in breach of Venezuelan law and due process, and without the payment of compensation.

7.  It is Claimants' case that Respondent's actions constituted a breach of:

    (a)  the protections available to Claimant Tenaris under the Agreement between the Government of the Republic of Venezuela and the Belgium-Luxembourg Economic Union for the Reciprocal Promotion and Protection of Investments (the "**Luxembourg Treaty**")[3], and in particular Articles 3 and 4 thereof; and

    (b)  the protections available to Claimant Talta under both:

        i.  the Agreement between the Government of the Republic of Venezuela and the Government of the Portuguese Republic for the Reciprocal Promotion and Protection of Investments (the

---

[2] Claimants' Memorial, para. 2
[3] Exhibit C-1. The Luxembourg Treaty was signed on 17 March 1988 and entered into force on 28 April 2004

"**Portuguese Treaty**")[4], and in particular Articles 2, 3 and 4 thereof; and

  ii. the Luxembourg Treaty, by reason of Talta's status as an entity effectively controlled by Tenaris.

8. Claimants further assert that Respondent has been on notice of the dispute since 20 August 2009, when formal notice was given pursuant to the Treaties.[5] The Claimants maintain that attempts at amicable resolution within the periods stipulated by the Treaties have failed to result in a settlement. While it is accepted by Respondent that notice of dispute was given by Claimants on 20 August 2009, the extent to which the claims advanced in this arbitration were the subject of the notice is in issue (see **Section E** below).

**3. THE ARBITRATION AGREEMENTS**

9. Article 9 of the Luxembourg Treaty provides:

  "1. Any dispute between an investor and the other Contracting Party concerning the application of this Agreement shall be subject to written notification, accompanied by a sufficiently detailed memorandum, from the investor. As far as possible, the parties shall endeavor to settle the dispute amicably by negotiation, where necessary seeking expert advice from a third party or by conciliation.

  2. In the absence of an amicable settlement within six months from the date of notification, the dispute shall be submitted, at the investor's option, either to the competent jurisdiction of the State in which the investment was made or to international arbitration. Once made the choice shall be final.
   To this end, each Contracting State shall give in advance its irrevocable consent for the dispute to be submitted to this arbitration.

---

[4] Exhibit C-3. The Portuguese Treaty was signed on 17 June 1994 and entered into force on 11 May 1995
[5] Exhibit C-14: letter from Claimants to The Hon. Dr Rodolfo Sanz, Minister of Basic Industries and Mining

3.    In the event of recourse to international arbitration, the dispute shall be submitted to the International Centre for the Settlement of Investment Disputes (ICSID) established by the "Convention on the Settlement of Investment Disputes between States and Nationals of Other States", opened for signature in Washington on 18 March 1965.

If it is impossible to submit the dispute to ICSID, the investor shall have the option to submit the dispute to an ad hoc tribunal constituted under the arbitration rules of the United Nations Commission on International Trade Law (UNCITRAL).

……

5.    The arbitral tribunal will decide on the basis of the domestic law of the Contracting Party who is party to the dispute and in whose territory the investment is located, including its rules on conflicts of laws, the provisions of this Agreement, the terms of any specific agreement existing concerning the treatment of the investment, as well as the principles of international law.

6.    The award shall be determined solely on whether the Contracting Party concerned has breached an obligation under the present Agreement, and if there has been damage to the investor, shall fix the amount of compensation, which that Contracting Party shall pay to the investor.

7.    Arbitral awards shall be final and binding on the parties to the dispute. Each Contracting Party undertakes to execute the awards in accordance with their national law."

10.    Article 8 of the Portuguese Treaty provides:

"1.    Disputes regarding the application of this Agreement that arise between one of the Contracting Parties and an investor of another Contracting Party who has made investments in the territory of the former shall, to the extent possible, be resolved by means of amicable consultations.

2.    If the dispute cannot be resolved amicably within a period of six (6) months, starting from the date when consultations are commenced, the dispute may be submitted, at the choice of the investor:

a)    to local courts of the Contracting Party in whose territory the investment was made:

    b)    to arbitration at the International Centre for the Settlement of Investment Disputes (ICSID), established by the Washington Convention of 1965, in the event that both Contracting Parties are parties thereto, or, if it is the case, to the additional facility rules for the administration of conciliation proceedings, arbitration and fact-finding by the ICSID Secretariat. If for any reason neither ICSID nor the Additional Facility Rules are available, the arbitration shall be carried (sic) under the arbitration rules of the United Nations Commission on International Trade Law (UNCITRAL).

3.    The arbitral tribunal shall decide based on provisions of this Agreement, the relevant rules and principles of international law, the law of the Contracting Party in whose territory the investment was made and any specific agreements that refer to the investment.

4.    Arbitral awards shall be final and binding on the Parties to the dispute and shall be executed in accordance with the national law of the Contracting Party in whose territory the investment was made.

5.    In any event, the arbitral award shall only address whether the Contracting Party concerned has breached an obligation in this Agreement, and if such a breach has caused damage to the investor, and, if that is the case, the arbitral tribunal shall determine the amount of compensation that the Contracting Party shall pay to the investor for both damages.

6.    The Contracting Parties undertake to refrain from submitting, through diplomatic channels, disputes that have been submitted to judicial procedures or international arbitration until these procedures are concluded, unless one of the Contracting Parties has not complied with the judgment or award of the Arbitral Tribunal, under the terms established in the respective decision or award."

_____

## B. PROCEDURAL HISTORY

### 1. COMMENCEMENT OF ARBITRATION

11. On 24 August 2011, ICSID received a request for arbitration dated 24 August 2011 from Tenaris S.A. and Talta – Trading e Marketing Sociedad Unipessoal Lda against the Bolivarian Republic of Venezuela (the "**Request**" or "**RFA**").

12. On 30 September 2011, the Secretary-General of ICSID registered the Request in accordance with Article 36(3) of the ICSID Convention and notified the Parties of the registration. In the Notice of Registration, the Secretary-General invited the Parties to proceed to constitute an Arbitral Tribunal as soon as possible in accordance with Rule 7(d) of the Centre's Rules of Procedure for the Institution of Conciliation and Arbitration Proceedings.

### 2. THE ARBITRAL TRIBUNAL

13. On 13 December 2011, Claimants requested that the Tribunal be constituted pursuant to Article 37(2)(b) of the ICSID Convention. Pursuant to ICSID Arbitration Rule 3, Claimants informed the Centre that they had appointed Mr Judd L. Kessler, a national of the United States of America, as arbitrator and proposed the appointment of a President of the Tribunal. In accordance with ICSID Arbitration Rule 3(1)(b), Respondent was invited to appoint an arbitrator and to concur with the person proposed by Claimants or to propose another person as President of the Tribunal. On 29 November 2011, Claimants requested the appointment of the arbitrator not yet appointed and the designation of the President of the Tribunal pursuant to Article 38 of the ICSID Convention. On 18 January 2012, Respondent appointed Mr Toby T. Landau, QC, a national of the United Kingdom, as arbitrator. By letter dated 19 April 2012, the Parties agreed to the appointment of Mr John Beechey, a national of the United Kingdom, as President of the Tribunal.

14. On 26 April 2012, the Secretary-General, in accordance with ICSID Arbitration Rule 6(1), notified the Parties that all three arbitrators had accepted their appointments and that the Tribunal was therefore deemed to

have been constituted on that date. Ms Alicia Martin Blanco, ICSID Legal Counsel, was designated to serve as Secretary of the Tribunal.

### 3. THE FIRST SESSION

15. The Tribunal held a first session with the Parties on 27 June 2012, at which, the Parties confirmed that the Members of the Tribunal had been validly appointed. They further agreed, *inter alia*, that the applicable ICSID Arbitration Rules would be those in effect from 10 April 2006; that the procedural languages would be English and Spanish; and that the place of proceedings would be the seat of the Centre in Washington, D.C. The agreement of the Parties was embodied in Procedural Order No. 1, dated 14 August 2012.

### 4. REQUEST FOR BIFURCATION

16. Following the submission of the Claimants' Memorial on the Merits on 24 August 2012 (the "**Claimants' Memorial**"), Respondent sought a bifurcation of the proceedings, and a determination by the Tribunal as a preliminary matter of Respondent's objections to jurisdiction.

17. Pursuant to a timetable set out at paragraph 13(f) of Procedural Order No. 1, as amended by Procedural Order No. 2, dated 25 October 2012, the Parties exchanged the following submissions:

(a) Respondent's Request for Bifurcation dated 28 September 2012;

(b) Claimants' Response to Respondent's Request for Bifurcation, dated 19 October 2012;

(c) Respondent's Reply on Bifurcation dated 2 November 2012;

(d) Claimants' Rejoinder to Respondent's Request for Bifurcation dated 12 November 2012;

(e) Respondent's Counsel's letter dated 14 November 2012;

(f) Claimants' Counsel's letter dated 21 November 2012.

18. By its Procedural Order No.3 dated 5 December 2012, the Tribunal denied Respondent's request for bifurcation.

**5.    WRITTEN SUBMISSIONS**

19.    Thereafter, the Parties served the following submissions:

(a)    Respondent's Counter-Memorial on Jurisdiction and Merits, dated 10 May 2013 (the "**Respondent's Counter-Memorial**");

(b)    Claimants' Reply Memorial, dated 27 August 2013 (the "**Claimants' Reply**");

(c)    Respondent's Rejoinder, dated 5 December 2013 (the "**Respondent's Rejoinder**").

**6.    WITNESS STATEMENTS AND EXPERT REPORTS**

20.    Witness statements and Expert reports have been filed by the Parties as follows:

On behalf of the Claimants:

(a)    Witness statements of Marcelo Malvassora, dated 24 August 2012 and 26 August 2013;

(b)    Witness statements of Oscar Montero, dated 24 August 2012 and 22 August 2013;

(c)    Witness statement of Angel Mario Tamez, dated 27 August 2013;

(d)    Expert Valuation report by Compass Lexecon LLC (Manuel A. Abdala and Pablo T. Spiller), dated 24 August 2012, and a Supplemental Report dated 27 August 2013;

(e)    Legal Opinion by Professor Andre Pruem (Luxembourg law), dated 23 January 2014;

(f)    Legal Opinion by Professor Dr. Dario Moura Vicente (Portuguese law), dated 23 January 2014.

On behalf of the Respondent:

(a)    Witness statement of Ramon Cadenas, dated 23 April 2013;

(b)    Witness statement of Rawan Sabbagh, dated 2 May 2013;[6]

(c)    Witness statement of Marbeni Milagros Seijas Marcano, dated 4 May 2013;

(d)    Witness statement of Felix Luis Moya Bello, dated 22 November 2013;

(e)    Witness statement of Marilyn V. Bello Rodriguez, dated 3 December 2013;

(g)    Expert Valuation Report of Timothy H Hart, dated 8 May 2013; and a Supplemental Report, dated 3 December 2013;

(h)    Expert Technical Report of Dr Joseph J. Poveromo, dated 8 May 2013, and a Second Expert Technical Report, dated 3 December 2013;

(i)    Legal Opinion of Dr Henrique Iribarren Monteverde (Venezuelan Law), dated 25 March 2013;

(j)    Legal Opinion of Professors Pedro Maia and Tiago Duarte (Portuguese law), dated 28 November 2013;[7]

(k)    Legal Opinion of Professor Alain Steichen (Luxembourg law), dated 29 November 2013.

## 7.    PROCEDURAL ORDERS

21.    The Tribunal issued the following additional Procedural Orders:

(a)    Procedural Order No. 4, dated 17 April 2013;

(b)    Procedural Order No. 5, dated 9 January 2014;

(c)    Procedural Order No. 6, dated 22 January 2014;

(d)    Procedural Order No. 7, dated 30 January 2014.

## 8.    FIRST SUBSTANTIVE HEARING

22.    A Hearing was held at the premises of ICSID in Washington DC over six working days between Friday 31 January 2014 and Friday 7 February 2014.

---

[6] Mr Sabbagh's witness statement was subsequently withdrawn in circumstances described in correspondence dated 22 August 2013 and reflected in the Tribunal's Procedural Order of 16 September 2013.

[7] By its Procedural Order No. 5, the Tribunal admitted into the record the expert opinions of Professors Maia and Duarte and Professor Steichen and it further admitted into the record the witness statement of Ms Marilyn V. Bello Rodriguez, all of which had been the subject of objections raised by Claimants.

23. In the course of the Hearing, the Tribunal heard opening statements from the Parties, and testimony from the following witnesses and experts:

<u>On behalf of the Claimants</u>:

Mr Oscar Montero (Day 2)

Mr Angel Mario Tamez (Day 2)

Mr Marcelo Malvassora (Days 2 & 3)

Dr Manuel A. Abdala and Professor Pablo T. Spiller (Days 5 & 6)

<u>On behalf of the Respondent</u>:

Mr Ramon Cadenas (Day 3)

Ms Marilyn del Valle Bello Rodriguez (Day 3)

Ms Marbeni Milagros Seijas Marcano (Day 3)

Mr Felix Moya (Day 4)

Professor Iribarren Monteverde (Days 4 & 5)

Mr Joseph J. Poveromo (Day 5)

Mr Timothy Hart (Day 6)

24. By agreement of the Parties, the factual record of the proceedings was closed on 5 February 2014, save for liberty to make a reasoned application to admit new factual material.[8]

## 9. SECOND SUBSTANTIVE HEARING

25. Thereafter, a further hearing was held in London on 9 and 10 July 2014 to hear evidence from the Parties' respective experts on Portuguese and Luxembourg law.

## 10. POST-HEARING SUBMISSIONS

26. The Parties filed Post-Hearing Briefs on 8 August 2014 and Costs Submissions on 28 November 2014.

---

[8] Transcript (English), Day 4, pp. 1080-1081.

27. With leave of the Tribunal, Venezuela filed Comments on Claimants' Costs
    Submissions on 12 December 2014.

28. The proceeding was closed on 21 December 2015.

_____

## C.    RELEVANT FACTS

29. The Tribunal sets out below the basic facts that have led to this dispute.

30. Further issues of fact are elaborated in the course of the analysis of jurisdiction
    in **Section E.** below, and the analysis of the substantive claims in **Section F.**
    below.

31. Unless otherwise indicated, all statements of fact in each of these sections
    reflect the Tribunal's findings.

32. Given the number of entities referred to in the course of this narrative, and for
    ease of reference, a list of "Relevant Entities" with brief descriptions is included
    at **Annex I** to this Award.

## 1.    THE PRIVATISATION OF THE VENEZUELAN STEEL INDUSTRY

33. Between 1974 and 1993, the Venezuelan steel industry was primarily state
    owned. It was managed by CVG, a wholly state-owned entity, and its
    subsidiaries.[9] CVG is a dependency of the MIBAM, which, since 2011, has
    been known as the Ministry of Industry. One of CVG's subsidiaries was CVG
    Sidor, incorporated in 1964 by CVG and another state entity, CVG
    Electrificación del Caroni C.A., for the purpose of developing the Venezuelan
    iron and steel industry.

_____

[9] Request, para.11

34.  On 10 March 1992, the Venezuelan Congress enacted the Privatisation Law.[10]

35.  On 7 December 1994, by Decree No. 448, the Government of Venezuela provided for the *"initiation of the process for the privatisation of … Companies held by [CVG]"*, including CVG Sidor.[11]

36.  In March 1995, the Venezuelan State entity, Fondo de Inversiones de Venezuela, was charged with the task of privatising companies in the iron and steel sector, including CVG Sidor.

37.  In November 1997, the Venezuelan Congress approved the execution of the sale and purchase agreement for the shares of CVG Sidor to Consorcio Siderurgica Amazonia Ltd., which, in turn, became a subsidiary of Ternium S.A., an affiliate of Tenaris. The privatised company was named Siderurgica del Orinoco C.A. ("**SIDOR**"). SIDOR became one of the largest integrated steel producers in Latin America (and the largest in the Andean region) as well as the continent's main finished steel exporter, with an increasing need for basic inputs such as hot briquetted iron ("**HBI**").[12]

38.  In the early 2000s, Tenaris, which was already a significant investor in the privatised Venezuelan steel industry, held a controlling stake in Venezuela's sole producer of seamless pipes, TAVSA. It also had a minority shareholding in the HBI producer, Comsigua.[13] It was looking for extra sources of HBI. In 2003, the South Korean concern, POSCO, decided to sell its HBI producing assets in Venezuela, which included a decommissioned HBI plant within two kilometres of SIDOR's plant and within 20 kilometres of the port of Palua.  At that time, SIDOR was also looking for additional HBI in order to be able to produce at full capacity.

---

[10] Exhibit C-18
[11] Exhibit C-19
[12] In the steel-making process, lump ore and iron pellets are first transformed into direct reduced iron ("**DRI**"), which is then mechanically compressed into brick-shapes known as hot briquetted iron or HBI.
[13] Claimants' Memorial, para. 25

39. Built in the 1990s at a cost of over $370 million[14], PosVen was held out as the newest and most modern HBI plant in the world, and the plant with the third highest production capacity (1.5 million tons of HBI per year) world-wide.[15] It had been decommissioned in late 2001 following operational difficulties and a downturn in the steel market.

40. Also among the assets was PosVen's 29% shareholding in COPAL, the operator of the Port of Palua, through which HBI products, including those made by PosVen (and, in due course, by Matesi), were shipped and of the capacity of which, PosVen had an entitlement to use approximately one third.

41. In March 2004, SIDOR and Tenaris Global Services (B.V.I.) Limited ("**Tenaris Global**"), a wholly owned subsidiary of Tenaris, bid successfully for the assets of PosVen.[16]

42. In April 2004, Tenaris Global and SIDOR incorporated a company in Venezuela, which was called Materiales Siderurgicos Masisa S.A. ("**Masisa**") and through which they would acquire the PosVen assets. Tenaris Global's 55% shareholding in Masisa was transferred to Talta, which already held the remaining 45% of the shares.[17] In August 2004, Masisa's name was changed to Matesi.[18] Talta continued to hold 50.2% of the shares and SIDOR acquired 49.8%.[19] Hereafter Masisa/Matesi is referred to as "**Matesi**".

43. On 27 April 2004, an Asset and Sale Purchase Agreement was concluded between PosVen as Seller, Matesi as Purchaser, Tenaris Global Services S.A. (a company incorporated in Uruguay) and SIDOR, pursuant to the terms of which, the PosVen assets would be transferred to Matesi for US$120 million.[20]

---

[14] Exhibit C-68, p. 2
[15] Exhibit C-68, p. 5
[16] See Montero, para. 25
[17] Exhibit C-21, Articles of Incorporation of Matesi
[18] Exhibit C-22
[19] Exhibit C-13
[20] Exhibit C-23

44.     Among a number of conditions precedent to closing was a requirement that Matesi enter into contracts for the supply of raw materials crucial to the production of HBI with a number of state-owned entities on terms no less favourable than those enjoyed by PosVen. Among them was a long-term iron ore contract with a subsidiary of CVG, CVG Ferrominera del Orinoco, C.A. ("**CVG FMO**"), the monopoly supplier of iron ore. Matesi duly entered into a long-term (13 year) contract with CVG FMO for the supply of iron mineral and pellets on 17 June 2004.[21]

45.     On 8 July 2004, Matesi and PosVen executed a Sale and Purchase Agreement.[22] On the same day, SIDOR and Talta entered into an Investment Agreement. Pursuant to the terms of that agreement, SIDOR and Talta each confirmed that they would purchase the assets of PosVen, including its HBI plant, through Matesi. SIDOR and Talta also confirmed, first, the amount that each would invest in Matesi in order to permit it to commence operations and, second, that they would enter into Off-Take agreements under the terms of which, they would acquire Matesi's HBI.[23]

46.     The asset purchase and start-up costs of Matesi were financed in part by loans from Talta and SIDOR, including a loan for some US$60 million from Talta, which was the subject of a Loan Agreement between Matesi and Talta concluded that same day (the "**Talta Loan**").[24]

47.     On 9 July 2004, the Talta Off-Take Agreement was signed. Pursuant to its terms, Matesi undertook to sell 50.2% of its total output to Talta and Talta was obliged to purchase at least 30.12% of Matesi's production. In the case of the Off-Take agreement into which Matesi entered with SIDOR, Matesi was

---

[21] Exhibit C-25
[22] Exhibit C-24
[23] Exhibit C-73
[24] Exhibit C-74. The SIDOR Loan and Off-Take Agreements were entered into on or about the same day. Part of the Talta Loan was capitalised in 2004. The balance was reduced to some US$48 million (See Exhibits C-79 and C-67 at p. 6) The amount of the Loan now claimed to be outstanding is US$27.1 million

obliged to sell 49.8% of its total output to SIDOR and SIDOR was obliged to purchase at least 29.88% of Matesi's production.[25]

48.   On 21 July 2004, Matesi entered into a 15-year gas supply contract with PDVSA Gas, S.A.[26] Pursuant to an assignment, it had already entered into an existing 20-year agreement with EDELCA for the supply of electricity on 8 July 2004.[27]

49.   Matesi took possession of the HBI plant in August 2004. The plant was the subject of an initial US$7 million upgrade and refurbishment programme in order to render it operational, after having been 'mothballed' for three years. The upgrade included the acquisition and installation of a new transformer and the modification of the plant's cooling conveyor. Production at the Matesi HBI plant recommenced on 17 October 2004.[28]

50.   In September 2004, Venezuela implemented Disposition No. 58 of 2 September 2004.[29] Pursuant to the terms of the Disposition, the approval of the Comisión de Administración de Divisas ("**CADIVI**") was required before foreign currency could be applied to the repayment of a foreign loan. CADIVI's own approval was conditional upon receipt of a certificate from the Ministry of Planning that the loan in question constituted a "*productive financing*" falling within the economic and social policies of Venezuela. In the event, although Matesi requested such certificate, none was ever forthcoming. Claimants contend that in the absence of the Ministry's certificate, CADIVI would not register Matesi's debt to Talta with the result that Matesi could not effect repayment.[30]

---

[25] Exhibits C-26 and C-27
[26] Exhibit C-77
[27] Exhibit C-72
[28] It is asserted by Claimants that by February 2005, Matesi was producing at some 80% of production capacity; that it was running at some 75% of capacity on average between February and April 2005; that in the first full year of production, it produced approx. 1 million tons of HBI; and that it was expected to increase production over time, contingent on receiving sufficient iron pellets and lump ore from CVG FMO pursuant to the Supply Contact. (See Claimants' Memorial, paras. 51-53).
[29] Exhibit C-80
[30] Claimants' Memorial, paras. 62 and 63

2.    PRESIDENTIAL DECREE NO. 3895

51.   Presidential Decree No. 3895 of 12 September 2005 required the renegotiation of: "*Agreements to Ensure the Supply of Raw Materials and Inputs*" intended to "*guarantee the supply of raw materials and semi-finished products produced by basic industries*"[31] One such agreement was Matesi's Supply Contract with CVG FMO.

52.   SIDOR was required to renegotiate its contract within a week or face nationalisation.[32] The amendment to Matesi's own Supply Contract included a 50% increase in the price of iron ore.

53.   In October 2005, MIBAM, CVG FMO and others concluded an Agreement to Ensure the Supply of Raw Materials and Semi-Finished Products for the Iron and Steel Sector.[33] For its part, CVG FMO "*guarantee[d] the supply of iron mineral to producers of semi-elaborated products*". Pursuant to Clause 7 of the Agreement, existing supply contracts were to be renegotiated within two months in conformity with the Agreement. Companies in the iron and steel sector, which did not agree to the renegotiated terms faced the threat of expropriation.[34]

54.   Matesi entered into a Declaration of Adherence dated 6 December 2005.[35]  Its own renegotiated supply contract with CVG FMO was concluded on 18 January 2006.[36] CVG FMO maintained that a price increase was necessary to: "*suspend the unfairness and inequality that [CVG FMO had] sustained following the increase in international prices of iron and steel.*"[37] The effect of the renegotiation was that CVG FMO undertook to supply Matesi with the volume and quality of products that it required for a period of 12 years, subject to an increase of some 50% in the prices to be paid by Matesi. The renegotiated

---

[31] Exhibit C-28
[32] Claimants' opening presentation, Slide 24
[33] Exhibit C-29
[34] Exhibit C-32 and see also President Chavez's statement that SIDOR would be nationalised, if it did not adhere to the terms of the Steel Supply Agreement (Exhibit C-86).
[35] Exhibit C-30
[36] Exhibit C-31
[37] Exhibit C-24

contract also permitted CVG FMO to sell its own products to state ("Social Production") companies at lower prices than it offered to Matesi.

### 3.    THE NATIONALISATION OF SIDOR: PRESIDENTIAL DECREE NO. 6,058

55.    On 10 April 2008, pursuant to powers conferred on the President of Venezuela by the third Enabling Act approved by the National Assembly on 31 July 2007,[38] President Chavez announced that SIDOR was to be nationalised to: "*recuperate our steel industry in order to put it at the service of the development of our country.*"  By its Declaration of 10 April 2008, the National Assembly lent its support.[39] It did so in terms critical of international companies, including Ternium, a sister company of Claimants (which held a controlling stake in SIDOR), maintaining that it was necessary to:

> "defend the sovereignty of our basic industries against the attacks of transnational companies to take over our natural resources and to promote the recuperation of our strategic resources as a secure source of raw material for our national industries."[40]

56.    A Presidential Decree, No. 6,058, implementing the decision was issued on 30 April 2008 (the "**Nationalisation Decree**").[41] The Decree, which had the "*Rank, Value and Force of Organic Law*", recorded that:

> "Article 1. For reasons of national convenience and in light of its relation with activities that are strategic for the development of the Nation, the industry of the transformation of the iron ore in the Guayana region is hereby reserved for the State, being this region a zone in which the largest portion of the iron reserves are concentrated, whose extraction has been reserved for the State since 1975.
>
> Article 2. The transformation of the commercial company SIDOR C.A., its subsidiary and affiliated companies, into State corporations in accordance with the provisions of Article 100 of the Organic Law on Public Administration, with a State shareholding of not less than 60% of its capital stock, is hereby ordered."

---

[38] Respondent's Counter-Memorial, para. 345
[39] Exhibit C-35
[40] Exhibit C-35
[41] Exhibit C-36

57.  Pursuant to Article 5 of the Nationalisation Decree, Transition Commissions were to be established within seven days for each company subject to the Decree to ensure their transfer to state-controlled corporations by 30 June 2008. Private sector company shareholders, which were shareholders in the companies affected by the Decree, were required to: "*cooperate to achieve an orderly and safe operational transition*". The shareholders of SIDOR, its subsidiaries and affiliates (including Matesi in which SIDOR had a 49% shareholding) were afforded 60 days within which to agree terms and conditions upon "*their possible shareholding participation*" in those companies, which were to become state corporations with a State shareholding of not less than 60% (Article 6). The amount of compensation was to be fixed by a Technical Commission, composed of representatives of the State and of the shareholders, likewise within 60 days (Article 7). In fact, the Transition Commission of Matesi set up pursuant to the Nationalisation Decree was not established until 25 May 2009. (See paragraph 63 below).

58.  Article 8 of the Nationalisation Decree provided that if no agreement for the transformation of the entity into a State-owned company had been reached within 60 days, then the State:

> "through [MIBAM] or any of its operationally decentralized entities, shall assume the exclusive control and operation of the same, for purposes of preserving the continuity of the activities carried out by the companies to which Article 2 refers."

59.  Article 8 further provided that to the extent no such agreement had been reached:

> "the National Executive Branch shall decree the expropriation of the aforementioned shares in compliance with the provisions of the Law on Expropriation for Public and Social Utility. In no case shall lost profits or indirect damages be taken into account for the calculation of compensation or fair value for the aforementioned assets."

60.  A Technical Commission for SIDOR was set up in May 2008. A Transition Commission (of which the Minister of MIBAM, Mr Sanz, was a member) was

established pursuant to Presidential Decree No. 6,066 dated 13 May 2008.[42] By July 2008, SIDOR was under state control.[43] Negotiations concerning the compensation terms for the nationalisation of SIDOR broke down in August 2008. President Chavez was reported as saying that:

> "Techint has been arrogant, so I say, we have to take all the companies that Techint has here and that Techint leave the country."[44]

61.    Meantime, since November 2007, Matesi had been in negotiation with its union (SINTRAMATS) about the terms of a new collective bargaining agreement. Matesi entered into a collective bargaining agreement on 22 August 2008.[45] Claimants maintain that Matesi accepted terms demanded by Venezuela under threat of nationalisation.

62.    That same month, Matesi received, for the first time, an official request from MIBAM to produce detailed figures for the previous ten years of production, together with national and international sales figures.[46]

## 4.    THE NATIONALISATION OF MATESI

63.    On 21 May 2009, in the course of a speech delivered nationwide on TV and radio, President Chavez announced his intention to nationalise Matesi and other HBI producers in Venezuela:

> "the [HBI] sector, nationalise it. There is nothing to be discussed. The company Matesi shall be nationalised."[47]

64.    Formal confirmation of the nationalisation of Matesi, and of the transfer of its shares to the Venezuelan government pursuant to the Nationalisation Decree of 2008, was set out in a letter from MIBAM Minister Sanz, dated 25 May 2009.[48] The Minister confirmed his (unilateral) appointment of a Transition

---

[42] Exhibit C-37
[43] Exhibit C-122
[44] Exhibit C-128
[45] Exhibit C-126
[46] Exhibit C-124
[47] Exhibits C-38 and C-143
[48] Exhibit C-39

Commission established pursuant to the Nationalisation Decree, whose task was to:

> "[direct, execute and successfully carry] out the entire transition process that will conclude with the transfer of [Matesi's] **shareholding** to the Venezuelan State."    (Emphasis added).

65.    One of the members of the Transition Committee appointed by the State was Mr Daniel Rodriguez, the leader of SINTRAMATS, Matesi's labour union (see also paragraphs 75-77, 82, 245, 433, 435, 448 and 473 below).  The representatives of Matesi were required to:

> "provide all the information relating to [Matesi's] operations, as well as its economic, administrative, productive, financial and labour situation with the aim to fully carry out the granted allocation within a peremptory time."

66.    By letter dated 29 May 2009, Claimants noted the decisions to nationalise Matesi and to designate a Transition Commission, pursuant to the Nationalisation Decree. Article 7 of that Decree required the Commission to establish the compensation to be paid to Matesi's shareholders within 60 days. Reserving their rights pursuant to Venezuelan and international law, Claimants nominated their representatives to the Technical Commission to be set up pursuant to Article 7 of Decree No. 6,058 and to be charged with the task of fixing the compensation to be paid for the taking of Matesi. However, no government representatives were ever nominated and no Technical Commission was ever constituted.[49]

67.    In the meantime, by letter to COPAL dated 28 May 2009, CVG FMO announced the transfer of the operations and administration of the Port of Palua to the State, also pursuant to the announcement of President Chavez made on 21 May 2009.[50]

---

[49] Transcript (English), Day 1, p.72
[50] Exhibit C-40

**5.**     **DECREE NO. 6,796**

68.     In the event, that process (namely, the nationalisation of the shares in Matesi pursuant to the April 2008 Nationalisation Decree) was not followed. Instead, by Presidential Decree No. 6,796, enacted on 14 July 2009, an order was made, in reliance upon Article 1 of the Nationalisation Decree (which reserved the iron ore transformation industry in the Guayana Region for the State), for the:

> "… acquisition of the **assets** of … [VENPRECAR, COMSIGUA Matesi and TAVSA], their subsidiaries and affiliates … with the aim of transforming [them] into State corporations in accordance with the provisions of Article 102 of the Decree with Rank, Value and Force of Organic Law on Public Administration …."[51]     (Emphasis added)

69.     The Decree, which has the "*Rank, Status and Force of Law in those matters that are Delegated in the Council of Ministers*", also established separate Transition and Technical Commissions dedicated to Matesi, albeit that a Transition Commission, but not a Technical Commission, had already been constituted pursuant to the Nationalisation Decree.

70.     Article 3 of Decree 6,796 contemplated that, once constituted, the Transition Commission would become part of Matesi's current Board of Directors:

> "immediately assuming operational control in order to guarantee the transfer and continuity of the activities [it carries] out. The private sector companies that are shareholders of [Matesi] shall cooperate to achieve an orderly and secure operational transition."

71.     Article 4 of the Decree provided:

> "A Technical Commission, composed of representatives of the State and of the private sector involved shall be established for purposes of agreeing upon the fair value to be paid, which commission shall function for a period of sixty (60) calendar days that may be extended, by mutual agreement, for sixty (60) additional consecutive days."

72.     Article 5 of the Decree provided:

---

[51] Exhibit C-42

> "Upon the expiration of the period established in [Article 4] without an agreement for the transformation into a State company being reached, the Bolivarian Republic of Venezuela, through the agency of the Ministries or any of their operationally decentralized entities, indicated in Article 2 of this Decree, shall assume exclusive control and operation thereof in order to ensure the continuity of the activities carried out by the companies referenced in Article 1".

73. Further, the Decree provided that:

> "Should no agreement be reached in the negotiation of the **assets**, the National Executive shall decree the expropriation thereof in compliance with the provisions of the Law on Expropriation Due to public or Social Utility. The Technical Commission can not in any way take into account lost profits nor indirect damages when calculating indemnification or in the valuation of the aforementioned assets."   (Emphasis added)

74. Thus, while the Transition Commission was to become part of Matesi's existing Board of Directors in order immediately to assume operational control and to guarantee the transfer and continuity of the company's activities, the Technical Commission was tasked with agreeing the compensation to be paid within 60 days, subject to any mutually agreed extension of a further 60 days. Absent such agreement, the state would assume control over Matesi.

75. On 16 July 2009, the Transition Commission, headed by Mr Rodriguez and established pursuant to the Nationalisation Decree, rather than any Commission yet to be appointed pursuant to Decree No. 6,796, began to make a series of new appointments including that of a Maintenance Manager and an Industrial Plant Manager. It "*dismissed, violently expelled and replaced Matesi's management*".[52]

---

[52] Request, para. 49 and see Exhibits C-43 and C-44

76.   Matesi subsequently gave notice to the President of the Transition Commission that it was no longer responsible for the plant, because Mr Rodriguez had seized complete control on behalf of the Transition Commission on 22 July 2009.[53]

77.   Notification of the establishment of a Transition Commission, pursuant to Decree No. 6,796 was issued to Matesi by Vice-Minister Hernandez of MIBAM on 23 July 2009. Matesi was informed that the Transition Commission, which was identical in its membership to the Transition Commission set up pursuant to the Nationalisation Decree, had joined the Management Board of Matesi with effect from 15 July 2009.[54] On 28 July 2009, the Transition Commission notified Matesi of the appointment of a new Production Manager and a new Maintenance Manager.[55] However, no Technical Commission pursuant to Decree 6,796 was ever constituted to determine compensation.

78.   On 12 August 2009, Matesi wrote formally to the Minister, MIBAM, to inform him that it had sustained losses in excess of US$600 million.[56]

79.   The formal transfer of the plant to the government of Venezuela took place on 17 August 2009, evidenced by the signing of Extrajudicial Inspection Minutes by an official of the Court of the Municipality of Caroni.[57] On the face of the Minutes, the government recorded that in compliance with Decree No.6,796, the Transition Commission appointed by the President was:

> "assuming operational control only and exclusively **over the assets and other goods** owned by Matesi in order to repair and put into operation the briquette production plant and this declaration does not imply an acceptance by the Commission or the Republic of [Matesi's] shares, bank accounts, commercial or financial debts, labor liabilities, contractual or other obligations … environmental or tax contingencies as well as any other obligations [of Matesi]."       (Emphasis added)

---

[53] Exhibit C-44
[54] Exhibit C-45
[55] Exhibit C-46
[56] Exhibit C-33
[57] Exhibit C-47

80.     The government further:

> "recorded that [Venezuela], through the Transition Commission (representative of the Bolivarian Republic of Venezuela), does not assume the administration of [Matesi], in order to comply with [Decree No. 6,796], **it only and exclusively receives the assets of the aforementioned company**, given that its control and operation belong to its shareholders under the Commercial Code and therefore [Matesi] is responsible for its administration and control."     (Emphasis added)

81.     For its part, Matesi protested that:

> "[it] did not participate in and does not ratify the report presented by [Vice-Minister Hernandez for MIBAM]."

82.     Mr Rodriguez was subsequently appointed General Manager of Matesi. Although the company is now referred to as "Briqueteras de Venezuela" or "**BriqVen**", there has been no formal change of name, nor has a state corporation in that name been constituted to hold Matesi's assets.

## 6.     THE EXPROPRIATION OF MATESI

83.     On 15 May 2010, President Chavez announced that Matesi was to be expropriated, because it had not proved possible to reach an agreement with Matesi's shareholders.[58]

84.     The formal expropriation order was made pursuant to the Law for Expropriation in the Public or Social Interest of May 2002.[59]

## 7.     DECREE NO. 8,280

85.     On 7 October 2010, the Venezuelan National Assembly declared that the assets of Matesi were of "*social purpose and public interest*".[60]   That declaration was followed on 14 June 2011 by Decree No. 8,280.

---

[58] Exhibit C-52: "We have been unable to achieve an amicable agreement with [Matesi's] owners. Therefore, we will expropriate Matesi. We cannot continue to play cat and mouse. I expect the Decree to expropriate and take control of Matesi."
[59] Exhibit C-53
[60] Exhibit C-54

86. Pursuant to the terms of the Decree, an order was made for the "*forced acquisition*" of: "*all of the movable and immovable **assets** and improvements presumptively owned or in possession of Matesi*" which were required: "*for the execution of the "BRIQUETERA DE VENEZUELA C.A." ["BriqVen"] project.*" (Emphasis added).

87. The expropriated assets, which were the subject of, and which were listed specifically in, the Decree, comprised itemised land and buildings of Matesi, together with:

> "structures, equipment (plant, vehicles, tools, miscellaneous equipment computers and software), inventory (consumables, spare parts, raw materials) belonging to [Matesi] and that are needed for [the BriqVen project] as well as the investment securities that [Matesi] possesses from [COPAL]".

88. These were to:

> "pass free of encumbrances or limitations to become property of [Venezuela] in accordance with the provisions of article 11 of the Law on Expropriation Due to Public or Social Utility." [61]

89. Specifically, Article 8 of the Decree required the Attorney-General to proceed to implement the expropriation and to transfer the assets.

90. On 14 July 2011, the Attorney-General announced by way of a press notice that he was establishing a Valuation Commission to determine the compensation to be paid for the expropriation of the Matesi assets pursuant to Decree No. 8,280. [62] The Attorney-General invited Matesi's owners to nominate their representative to the Commission within 30 days, failing which the judicial expropriation of Matesi's assets would be undertaken pursuant to the Expropriation Law. In the event that did not happen, and the steps provided for in Decree 8,280 and the Expropriation Law were not completed.

---

[61] Exhibit C-55
[62] Exhibits C-57 and C-58

91.   Following the State's takeover of Matesi, operations continue under the name of Briquetera de Venezuela ("**BriqVen**"). But title to Matesi's assets and shares has never been transferred to the State, and BriqVen has never been registered as a company.

### D.   SUMMARY OF THE PARTIES' POSITIONS

92.   The Tribunal has had the benefit of extensive and detailed written memorials and submissions; a full evidential record; and extensive oral submissions. It has carefully considered every argument raised, and all materials and evidence adduced, by all Parties. The Tribunal has chosen, however, not to set out a lengthy recitation of each side's case in this Award, but instead simply to outline the broad positions of the Parties in this **Section D**, and then to summarise some of the more significant points made, in the course of its analysis of jurisdiction (**Section E**), the substantive claims (**Sections F** and **G**) and quantum (**Section H**).

93.   In so far as any argument or evidence has not been specifically identified or recorded in the body of this Award, this does not mean that it has not been taken into full consideration.

### 1.   CLAIMANTS' CASE

94.   *Jurisdiction:*    It is Claimants' position that they have fulfilled all criteria to establish jurisdiction in this case. They have a legal dispute with Venezuela within the meaning of Article 25(1) of the ICSID Convention; the dispute arises directly out of an investment within the definitions of the Luxembourg and the Portuguese Treaties; Claimants satisfy the relevant nationality criteria; and the Parties have consented to arbitrate their disputes.

95.   *Substantive Claims:*    Claimants maintain that they, as investors, and their qualifying investments in Venezuela, are protected by the terms of the Luxembourg and Portuguese Treaties, and that by virtue of its conduct, Venezuela is in breach of its obligations thereunder.

96.   In particular, it is the Claimants' case that Venezuela has breached:

(a)   **Articles 3** and **4** of the Luxembourg Treaty.

(b)   **Articles 2**, **3**, and **4** of the Portuguese Treaty.

97.   In terms of remedies, Claimants seek:

(a)   Declarations by the Tribunal with respect to Venezuela's alleged breaches; and

(b)   Damages from Venezuela in the principal sum of US$299.3 million, as at the Valuation Date of 30 April 2008, "*or such other sum as the Tribunal determines will ensure full reparation*".

98.   Claimants' principal damages claim of US$299.3 million comprises three elements:

(a)   US$235.9 million in compensation for the taking of Claimants' 50.2% equity stake in Matesi based on a Discounted Cash Flow valuation;

(b)   US$27.1 million in compensation for the taking of Talta's loan to Matesi; and

(c)   US$36.3 million in compensation for losses suffered by Matesi by reason of the alleged discriminatory supply of iron pellets by CVG FMO.

99.   Claimants further seek pre-award interest on the sum of US$299.3 million in the amount of US$489.8 million from the Valuation Date to 31 December 2011 at a rate of 17.12% (being the WACC of Talta), and at a rate of 16.27% from 1 January 2012 to 31 July 2014 (being the adjusted WACC of Talta following changes to corporate income tax applicable to Talta in Madeira, Portugal), and thereafter until the date of the Tribunal's Award, compounded annually, or at such other rate and compounding period as the Tribunal determines will ensure full reparation.

100.  An additional claim is made for post-Award interest to be paid by Venezuela on both of the claimed sums of principal and interest at a rate of 16.27%, compounded annually, until such time as payment has been made in full or at such other rate and compounding period as the Tribunal determines will ensure full reparation.

101.  Claimants seek further Declarations from the Tribunal to the effect that the awards of damages and interest are made net of applicable Venezuelan taxes and that Venezuela may not deduct taxes in respect of the payment of any such awards, together with an Order that Venezuela indemnify Claimants in respect of any double taxation liability that would arise in Luxembourg, Portugal or elsewhere that would not have arisen but for Venezuela's adverse measures.

102.  Finally, Claimants seek such other relief as the Tribunal considers appropriate and an Order that Venezuela pay all of the costs and expenses of the arbitration, including Claimants' legal and expert fees, the fees and expenses of the Tribunal and ICSID's other costs.[63]

## 2.   VENEZUELA'S CASE

103.  *Jurisdiction:*      Venezuela objects to the jurisdiction of the Tribunal to entertain the Claimants' claims. It maintains that:

  (a)   Claimants have failed to establish that they have standing as investors for the purposes of the Luxembourg and/or Portuguese Treaties, in that they have failed to establish that they meet the requirement of "*siège social*" and "*sede*";

  (b)   by their 20 August 2009 Notice of Dispute and accompanying memorandum, Claimants failed to give any, or any sufficient, notice of:

---

[63] Claimants also looked to Venezuela to pay for the fees and expenses of any experts appointed by the Tribunal, but no such expert has been appointed.

        i.    their Protection and Security Claims under the Luxembourg and Portuguese Treaties;

        ii.    their Fair and Equitable Treatment / Discrimination Claims under the Luxembourg and Portuguese Treaties;

(c)    even if Claimants had standing and proper notice had been given, the Tribunal lacks jurisdiction under the Luxembourg and Portuguese Treaties to entertain the Claims concerning the Supply Contract, the Off-Take Agreements and the Talta Loan, because Claimants have failed to prove that they qualified as investments for the purposes of the Luxembourg and Portuguese Treaties; and

(d)    the Tribunal lacks jurisdiction to entertain claims concerning pre-expropriation damages based upon any alleged breach of the CVG FMO Supply Contract.

104.    A further jurisdictional objection was raised by Venezuela in its letter to the Tribunal of 28 September 2012, to the effect that Claimants should not be permitted to proceed jointly in this arbitration. The objection was formally withdrawn in the course of Respondent's Opening submissions at the hearing.[64]

105.    *Substantive Claims:*   Without prejudice to its jurisdictional objections, Venezuela denies any breach on its part of the Fair and Equitable Treatment / Discrimination provisions of the Luxembourg and Portuguese Treaties, asserting that the acts of CVG FMO cannot be attributed to Venezuela; that CVG FMO did not, in any event, discriminate against Matesi in the distribution of pellets pursuant to the Supply Contract, whether by favouring other HBI producers or otherwise; and that Claimants have failed to meet the high threshold for establishing a breach of the international minimum standard of treatment.

106.    Venezuela likewise denies any failure on its part to accord protection and security under the Luxembourg and Portuguese Treaties. It points, first, to what

---

[64] Transcript (English), Day 1, pp. 211-212

it contends was a failure by Claimants to satisfy the high burden of establishing that Venezuela had colluded or conspired with SINTRAMATS to seize or harm the Matesi plant and, second, to the interventions of the State Judiciary, which carried out two Judicial Inspections and granted Matesi a Protection Order and to that of the National Guard to protect the Plant.

107. Venezuela further maintains that the expropriation of Matesi was carried out in the exercise of its sovereign authority; that it complied with the requirements of international law; and that it did not violate Treaty requirements in respect of the payment of compensation.

108. So far as the damages claimed in respect of Matesi are concerned, Venezuela contends that Claimants have failed to establish any such entitlement: the basis of the claim is flawed and the valuation defective and inflated - as is the claim for interest.  Nor is there any basis for the claimed tax indemnity.

109. In sum, Venezuela contends that the Tribunal has no jurisdiction over Claimants' claims, but to the extent that it determines that it does have jurisdiction, all of the claims should be rejected in their entirety.

110. Venezuela seeks compensation for all expenses and costs associated with its defence of the claims.

### 3.    PRINCIPAL TREATY PROVISIONS

111. For convenience, the Tribunal sets out below the principal provisions of each treaty that are relied upon by the Parties:[65]

#### a.    The Luxembourg Treaty[66]

"*Article 1: Definitions*

---

[65] The Tribunal has taken the English language text comprising part of RLA-113 (the Luxembourg Treaty) and RLA-114 (the Portuguese Treaty), both of which were used by both Parties for the purposes of the examination of the Legal Experts.
[66]  RLA-113

1.   The term "investors" means:

.....

(b)   "Companies", that is to say, any legal person constituted in accordance with the laws of the Republic of Venezuela, the Kingdom of Belgium or the Grand Duchy of Luxembourg, and having its 'siège social' in the territory of the Republic of Venezuela, the Kingdom of Belgium or the Grand Duchy of Luxembourg respectively, as well as any legal person effectively controlled by an investor covered by paragraphs 1, (a) or (b);

that has made an investment in the territory of the other Contracting Party.

2.   The term "investments" shall mean any kind of asset, or any direct or indirect contribution in cash, in kind or in services, invested or reinvested by an investor of one Contracting Party in the territory of the other Contracting Party in any sector of economic activity whatsoever" …

including

(b)   … shares, equity participations and any other form of participation, including minority or indirect participation in companies constituted in the territory of one of the Contracting Parties….

(c)   obligations, claims and rights to any benefit having an economic value linked to an investment.

*Article 2: Promotion of Investments*

1.   Each Contracting Party shall promote investments in its territory by investors of the other Contracting Party and shall admit such investments in accordance with its laws.

2.   In particular, each Contracting Party shall facilitate the conclusion and execution of licensing agreements and commercial, administrative or technical assistance agreements, to the extent that these activities are related to investments.

*Article 3: Protection of Investments*

1.   All investments, whether direct or indirect, made by investors of one Contracting Party enjoy in the territory of the other Contracting Party, fair and equitable treatment according to international law.

36

2. Except for measures required for the maintenance of public order, such investments shall enjoy constant protection, which precludes any arbitrary or discriminatory measure that could hinder, in fact or in law, their administration, maintenance, use, enjoyment or disposal.

3. For all matters governed by this Agreement, investors of each Contracting Party shall enjoy, in the territory of the other Contracting Party, treatment no less favorable than that accorded by the former Contracting Party to its own investors or to investors of the most-favored nation.

4. However, this treatment and protection will not cover the privileges that either Contracting Party accords to investors of any third State by virtue of its participation or association in a free trade area, customs union, common market or any other regional economic organization of a similar nature.

*Article 4: Measures Depriving or Restricting Property*

1. Each Contracting Party undertakes not to adopt any measure of expropriation or nationalization, nor any other measure whose effect is to directly or indirectly dispossess investors of the other Contracting Party of investments belonging to them in its territory, unless the following conditions are fulfilled:

   A) the measures are adopted for reasons of public purpose or national interest;

   B) the measures are adopted in accordance with legal procedures;

   C) they are neither discriminatory nor contrary to a specific commitment concerning the treatment of an investment;

   D) they are accompanied by provisions for the payment of adequate and effective compensation.

2. The amount of the compensation shall correspond to the real value of the investments concerned on the day prior to the adoption or publication of the measure.

   The compensation shall be paid in convertible currency. It shall be paid without undue delay and shall be freely transferable. Interest

shall be paid at the normal commercial rate from the date it is determined until the date of payment.

3.   Investors of one Contracting Party whose investments have suffered damage due to war or other armed conflict, revolution, a state of national emergency or revolt occurring within the territory of the other Contracting Party shall enjoy, from the other Party, treatment no less favorable than that accorded to its own investors or investors of the most favored nation as regards restitution, indemnification, compensation or other indemnification."

### b.   The Portuguese Treaty[67]

"*Article 1*

1:   The term "investor" means
…

   b)   Legal persons, including commercial companies and other companies or associations, that have their seat in one of the Contracting Parties and are constituted and function in accordance with the Laws of that Contracting Party.

(2):   The term 'investments' includes all types of assets and rights relating to investments made in accordance with the laws of the other Contracting Party, and specifically, but not exclusively including …

   (b)   Shares and other forms of participation in the capital or the economic results of companies;

   (c)   Credit rights related to money or any other obligation having an economic value …..

*Article 2*

1 –   Each Contracting Party shall promote, within its territory, investments made by the other Contracting Party and shall admit such investments in accordance with its legislation.

---

[67] RLA-114

2 –   Each Contracting Party shall protect, within its territory, investments made in conformity with its laws and regulations by the investors of the other Contracting Party and shall refrain from adopting arbitrary or discriminatory measures that prevent the administration, manufacturing, use, usufruct, extension, alienation and disposal of its investments.

*Article 3*

1 –   Each Contracting Party shall guarantee, within its territory, non-discriminatory, fair and equitable treatment, according to international law, to investments made by investors of the other Contracting Party.

2 –   On matters governed by this Agreement, the treatment referred in paragraph 1 of this Article shall not be less favorable than that granted by a Contracting Party to investments made in its territory, in similar conditions by its own investors or by those of a third country.

3 –   The provisions included in paragraphs 1 and 2 of this Article do not affect the current most favorable treatment or that granted in the future by a Contracting Party to investments by investors of third States by virtue of the following:

a)   Participation in customs unions, free trade areas or other similar forms of economic cooperation or regional integration;

b)   Agreements to avoid double taxation or any other tax instrument.

*Article 4*

Neither Contracting Party shall take measures that deprive, directly or indirectly, investors of the other Contracting Party of investments made by them, except if the following conditions are fulfilled:

a)   that the measures are adopted for reasons of public purpose or national interest, in accordance with the legislation in force;

b)   that the measures are non-discriminatory;

c)   that the measures are accompanied by provisions that guarantee the payment of immediate, adequate and effective

39

compensation; this compensation shall be based on the market value of the investment in question immediately prior to the moment when the measure was made public; compensation will accrue interest at the exchange rate applicable at the date on which the transaction becomes effective, in the territory where the investment is located; the lawfulness of the referenced measures and the amount of compensation may be submitted for review pursuant to the applicable legal procedure."

_____

## E.  JURISDICTION

112. Each of Venezuela's objections to jurisdiction is addressed in turn below.

113. As noted earlier, the Tribunal has considered carefully every argument advanced on behalf of each Party in the course of these proceedings, albeit not all points are set out in terms in the body of this Award.

### 1.  THE REQUIREMENT OF "*SIÈGE SOCIAL*" / "*SEDE*"

#### a.  Venezuela's Case

114. It is Venezuela's case that neither Tenaris nor Talta qualify as "*investors*" under the Luxembourg and Portuguese Treaties respectively, because Tenaris has no "*siège social*" in Luxembourg, and Talta has no "*sede*" in Portugal.

115. The relevant provisions of the two Treaties are as follows (with emphasis added):

The Luxembourg Treaty

"*Article 1: Definitions*

1.  The term "investors" means:
…..

(b)  "Companies", that is to say, any legal person constituted in accordance with the laws of the Kingdom of Belgium, the Grand Duchy of Luxembourg or the Republic of Venezuela, **and having**

> its 'siège social' in the territory of the Kingdom of Belgium, the **Grand Duchy of Luxembourg or the Republic of Venezuela respectively** and any legal person effectively controlled by an investor covered by paragraphs 1 (a) or (b)

that has made an investment in the territory of the other Contracting Party."

The Portuguese Treaty

> "*Article 1*
>
> 1: The term "investor" means
>
> … b) Legal persons, including commercial companies and other companies or associations, **that have their seat [*sede*] in one of the Contracting Parties** and are constituted pursuant to and function in accordance with the Laws of that Contracting Party."

116. Venezuela maintains that in order to have standing to access arbitral jurisdiction under these Treaties, Claimants must demonstrate not only their respective incorporation, but also that each has its place of effective management in the jurisdictions of Luxembourg and Portugal respectively.

117. Since the establishment of a registered office is central to the act of incorporation, any other interpretation of the additional requirement that Claimants have their "*siège social*" or "*sede*" in Luxembourg and Portugal respectively would render that further condition redundant.  This, in turn, would be contrary to the requirement that "*effet utile*" be given to all of the terms of a treaty. It is submitted by Venezuela that the addition of the "*siège social*" and "*sede*" condition, when added to that of incorporation, demonstrates an intention to limit a BIT's coverage by the inclusion of a genuine link between the individual putative claimant corporate entity and the national State – a link which could not be effected by formal requirements alone.

118. According to Venezuela, the concept of "*siège social*", a legal term of art, is "*fundamental*" to determining whether the Tribunal has jurisdiction over

Claimants' claims.[68] It contends, further, that on a proper interpretation in accordance with Article 31(1) of the Vienna Convention, and having regard to international law and investment treaty practice, consistent with the roots of the concept of "*siège reel*" in French civil law, the ordinary meaning of "*siège social*" connotes the place where the "*effective management*" of a company takes place. Venezuela says that neither Claimant has discharged its burden to prove that its place of effective management is in Luxembourg (in the case of Tenaris) or Portugal (in the case of Talta). Reliance on mere extracts from the Luxembourg and Portuguese Commercial Registries is insufficient. In particular, Venezuela contends that Claimants have failed the test set out in *Alps Finance v Slovak Republic*.[69]

119. With respect to the record in this case, Venezuela submits that there is no evidence that the Boards of the Claimant companies actually met in Luxembourg and Portugal respectively. Rather, industry analysis and other sources indicate that whilst Tenaris was constituted in Luxembourg, it was actually directed from Buenos Aires. Venezuela questions whether Tenaris even had an office in Luxembourg at all: it contends that such evidence as there is suggests a picture of two companies, neither of which has its effective management in Luxembourg or Portugal respectively.[70]

120. In its Rejoinder, in reliance on Tenaris S.A.'s Form 20-F, filed with the US Securities and Exchange Commission, Venezuela developed this submission further, asserting that Tenaris is an Argentine company, with 27,000 employees, billions of dollars of revenue and offices on the 26th and 30th floor of a 30-storey office block in Buenos Aires.

121. So far as Talta is concerned, Venezuela maintains that it, too, is an Argentine company, suggesting that Portuguese tax filings show income inconsistent with

---

[68] Respondent's Counter-Memorial, para. 131
[69] *Alps Finance and Trade AG v. Slovak Republic*, UNCITRAL, Decision on Jurisdiction, 5 March 2011, ("*Alps Finance*"); Respondent's Reply on Bifurcation, para. 15.
[70] Transcript (English), Day 1, pp. 251 and 252

a small office: Talta must, therefore, be managed by Tenaris and since that is an Argentine company, so must be Talta.

122. According to Venezuela, the reality is that Tenaris' connections with Luxembourg and those of Talta with Portugal are "*minimal*".[71]

123. On the basis that the criterion of "*siège social reel*" is controlling, argues Venezuela, it could not be right that a company constituted in Luxembourg, but having its central administration in a different country, which would not be governed by Luxembourg law and would not have Luxembourg nationality under Luxembourg law, would nonetheless be entitled to international law protections under the Luxembourg Treaty.[72] And similarly for Portugal.

### b.   Claimants' Case

124. Claimants contend that the Tribunal has jurisdiction *ratione personae* over both Tenaris and Talta.

125. Their approach to the interpretation of the terms "*siège social*" or "*sede*" is as follows:

(a)   the terms employed in the Treaties must be interpreted under international rules of treaty interpretation, and in particular Article 31(1) of the Vienna Convention;

(b)   Articles 31(2), (3) and (4) of the Vienna Convention provide exceptions to this general rule, but they make no reference to the domestic law of a party. If the treaty provision itself does not reference the domestic law of a party, then the interpreter cannot rely upon domestic law to construe that provision under Article 31;

---

[71] Respondent's Counter-Memorial, paras. 172 and 173
[72] *Idem*, para. 141

(c) if the interpreter wishes to confirm a meaning produced by Article 31(1), or if the application of Article 31(1) produces an ambiguous, obscure, manifestly absurd or unreasonable result, the interpreter may have recourse to:

> "supplementary means of interpretation, including the preparatory work of the treaty and the circumstances of its conclusion";

(d) although there is no express reference to the domestic law of the parties among the supplementary means of interpretation, it is not expressly excluded either;

(e) however recourse to domestic law would be inappropriate in this case. First, it is significant in the context in which the terms "*siège social*" and "*sede*" appear in the Treaties that they are the only terms in the definition of "investor" which are not expressly related to the State parties' domestic law. Second, there is no concept of "*siège social*" or "*sede*" in Venezuelan law and it would be wrong to interpret a Treaty provision by reference to the domestic law of only one of the parties to the Treaty.[73] Third, the governing law clauses at Articles 9(5) and 8(3) of the Luxembourg and Portuguese Treaties, respectively, constitute "*lex specialis*", which supersede the Vienna convention. And these provisions only allow for the application of the domestic law of the host State of the investment in addition to the terms of the Treaties and international law.

126. Be that as it may, even if recourse to domestic law were permissible, according to Claimants, the outcome would be the same: there is no notion of "*sede*" under Venezuelan law[74] and concepts such as "*domicile*" are irrelevant for the purposes of interpreting the term "*sede*" under the Treaties. But assuming for a moment that Professor Iribarren's suggestion that "*domicile*" should be treated as an equivalent term for the purpose of interpreting the concept of "*sede*" in the

---

[73] *Patrick H. Mitchell v. Democratic Republic of Congo*, ICSID Case No. ARB/99/7, Award, 9 February 2004, para. 50

[74] Professor Iribarren confirmed that such a concept does not exist under Venezuelan law. (Transcript (English), Day 4, p. 1084)

Portuguese Treaty were correct[75], then, contend Claimants, it would follow that the term means the company's domicile specified in its articles of incorporation, that is to say, its statutory domicile or registered office. And they say that confirmation for that proposition is to be found at Article 203 of the Venezuelan Commercial Code:

> "The domicile of a company shall be the place specified in the company's articles of incorporation; if no place is specified, the domicile shall be the company's principal establishment."[76]

127. Under Luxembourg and Portuguese law the term "*siège social*" or "*sede*" ordinarily means statutory seat. And even if it were to mean "*siège reel*", the presumption that the "*siège reel*" and the statutory seat of each of the Claimants coincided would apply, unless rebutted by Venezuela. This presumption was said to be express in Article 2 of the Luxembourg Law of 10 August 1915 on Commercial Companies, and implicit in Article 3(1) of the Portuguese Code on Commercial Companies of 2007. It is Claimants' case that Venezuela has failed to establish any facts, which would rebut this presumption.

128. Finally in terms of approach, Claimants contend that Article 25 of the ICSID Convention does not influence the interpretation of the terms "*siège socia*l" or "*sede*" in the Treaties.

129. Claimants say that upon the basis of an interpretative exercise conducted pursuant to Article 31(1) of the Vienna Convention, and to such supplementary means of interpretation to which regard might properly be had pursuant to Article 32 of the Vienna Convention, the term "*siège social*" or "*sede*" must be construed as "*registered office*" or "*statutory seat*", and that the documents that they have provided[77] are sufficient to prove that Claimants have their seats in Luxembourg and Portugal respectively.

---

[75] Transcript (English), Day 4, p. 1112
[76] Exhibit C-167
[77] See *e.g.* Extract of the Luxembourg Registry of Commerce and Corporations for Tenaris, 21 June 2011 (Exhibit C-6); Permanent Certificate of Talta, 11 July 2011 (Exhibit C-9) and Extract of the Luxembourg Registry of Commerce and Corporations for Tenaris Investments, 22 July 2011 (Exhibit C-10)

130. Claimants dismiss any suggestion that this case is analogous to *Alps Finance v Slovak Republic*: that was a very different case, which related to an entity which had been set up specifically in order to attempt to bring an abusive claim under a BIT. A Slovak company had assigned receivables to a Swiss corporation, which it had set up expressly for the purpose of bringing itself within the treaty. It was held to be neither an investor, nor to hold an investment.[78] In this case, there was a physical presence: there were offices, there were 'phone numbers, and there were people present. Tenaris and Talta had been established long before the investment in Matesi had been made, and they had had seats in Luxembourg and Portugal respectively from the dates of their respective incorporation.

131. Further, Claimants argue that their case is very similar to that considered by the ICJ in the *Barcelona Traction* case[79] and the basis upon which genuine links with a home state had been established in order to clear the way to bringing a claim. In that case, a company incorporated in Canada, carried on operations in Spain. It had Belgian shareholders. Belgium sought to initiate claims on behalf of its nationals in the ICJ. The ICJ denied the application, holding that only Canada had a right to exercise diplomatic protection on behalf of a Canadian incorporated company.

132. Claimants maintain that Venezuela's attempt to rely upon Tenaris' Form 20-F filing with the SEC[80] as evidence for its proposition that Tenaris is an Argentine corporation employing 27,000 people, 7,000 of them in Argentina, is misconceived. Quite apart from the fact that the Luxembourg Court of Appeal has ruled that the number and location of a company's employees are irrelevant considerations so far as the determination of the real seat of a company is concerned, [81] Form 20-F relates to Tenaris and all 25 of its "*consolidated*

---

[78] Claimants' opening statement, Slide 77
[79] *The Barcelona Traction, Light & Power Company Limited* (Belgium v. Spain), Second Phase: I.C.J. Reports 1970, Judgment, 5 February 1970 ("*Barcelona Traction*")
[80] Exhibit R-140
[81] Exhibit AP-27: Decision of the Court of Appeal of Luxembourg No. 37940 of 21 December 2011. Notwithstanding that the company in question had established a branch in Switzerland; that liability for payment of salaries, social security obligations and salary taxes existed in Switzerland; and that all of the equipment and property listed in the company's balance sheet were located at the Swiss branch, the

(Footnote continued on next page)

*subsidiaries*". Tenaris' sole function is to manage that portfolio of subsidiary companies. The addresses of its subsidiaries are set out in order to comply with listing requirements in the countries in which Tenaris is publicly traded, namely the United States, Italy, Mexico and Argentina. Tenaris' only office is its office in Luxembourg: it has no premises in Buenos Aires. Mr Malvassora's evidence to the Tribunal was that the Tenaris subsidiary, SIDERCA, was the only Tenaris entity to occupy space in Techint's 30-storey office block in Buenos Aires.[82]

133. As for Talta, Claimants dismiss the allegation that this is an Argentine company as:

> "Pure speculation and conjecture, not a single document has been submitted in support of such assertions."[83]

### c. Analysis

#### 1. The Meaning of "*Siège Social*" and "*Sede*"

134. It is common ground that the starting point for any interpretative exercise on the part of the Tribunal is Article 31(1) of the Vienna Convention on the Law of Treaties:

> "A treaty shall be interpreted in good faith in accordance with the ordinary meaning to be given to the terms of the treaty in their context and in the light of its object and purpose."

135. Venezuela asserts that the ordinary meaning of both "*siège social*" and "*sede*" must be taken to be "effective seat", or the location where "*the effective or principal or actual management of the company takes place*".[84] In contrast, the Claimants assert that the ordinary meaning of both terms must be taken to be "*registered office*" or "*statutory seat*", without any further requirement. Both sides have cited extensive materials in support of their position.

---

(Footnote continued from previous page)

real seat of the company was at its registered office in Luxembourg where it held shareholders' meetings and maintained its accounting records.

[82] Transcript (English), Day 3, p. 629.

[83] Transcript (English), Day 1, p. 103.

[84] Respondent's Reply on Bifurcation, para. 13.

136. The principal authorities relied upon by Claimants for the proposition that "*siège social*" and "*seat*" have been taken to mean no more than registered office or statutory seat are as follows:

(a) C. Schreuer, Nationality of Investors: Legitimate Restrictions vs. Business Interests, 24(2) ICSID Review–Foreign Investment L.J. (2009), p. 522, opining that the requirement of a seat is a "*formal requirement[]*" that does not require "*genuine economic activity*"; [85]

(b) *Tokios Tokelės*, in which the tribunal held that relevant evidence of corporate seat included a:

> "registration certificate, statute of incorporation, and notices of payment of foreign investment registered by the respondent state."

and that:

> "a nationality test of *siège social* leads to the same result as one based on state of incorporation"[86]

(c) The *Barcelona Traction* case,[87] in which the ICJ held that only Canada had a right to exercise diplomatic protection on behalf of a Canadian incorporated company. The ICJ noted that the company was incorporated in Canada; that it had its registered office,[88] maintained its accounts and share registers and held its board meetings there; and that it was listed with the Canadian tax authorities. The company was held to have a close and permanent connection with Canada, irrespective of its commercial activities outside Canada (akin, according to Claimants, to the position of Tenaris and Talta in this case).

(d) *Total v. Argentina*, at para 57, where the tribunal used "registered office" as a shorthand definition of the term "*siège social*":[89]

---

[85] CLA-25
[86] *Tokios Tokelės v Ukraine*, ICSID Case No. ARB/02/18, Decision on Jurisdiction, 29 April 2004, para. 43 ("*Tokios Tokeles*")
[87] See FN 81, *supra*
[88] "*Registered office*" and "*siège*" were used co-terminously by the ICJ.
[89] *Total SA v Argentine Republic*, ICSID Case No. ARB/04/1, Decision on Objections to Jurisdiction,

(Footnote continued on next page)

48

> "Total has submitted evidence that it was incorporated and constituted in accordance with the laws of France and maintains its registered office (*siège social*) in France."

137. Venezuela rebuts or distinguishes each of the authorities relied upon by the Claimants on this issue. For example, it has pointed out that:

(a) In *Barcelona Traction*, (as observed by Douglas[90]), the theoretical right of Canada to exercise diplomatic protection on behalf of the Barcelona Traction company was never actually disputed.

(b) As to *Tokios Tokelès*, in light of the wording of Article 1(2)(b) of the Ukraine-Lithuania BIT, the tribunal's analysis was *obiter dictum*. Nor is there any indication in the body of the tribunal's award of the arguments Ukraine raised to rebut the evidence submitted by Tokios or to establish that the *siège social* of the company was maintained in Ukraine.

(c) As to the jurisdictional award in *Total v. Argentina*, where the tribunal deemed the claimant company's maintenance of a registered office in France to be sufficient evidence that it had its *siège social* there, Venezuela points out that in that case, the point was actually conceded:

> "… Argentina **has not disputed** that the Claimant meets the requirement of being a French body corporate having its registered office in France in accordance with French law as required by Article 1.2(b) of the BIT.[283]".

138. Venezuela, for its part, has cited an extensive compilation of authorities and instances in international law and practice, which demonstrate that the terms "*siège social*" and "*seat*" may import a requirement of effective or actual management, or something more than simply the address of a registered office or statutory seat. By way of example:

---

(Footnote continued from previous page)
25 August 2006, para. 57.
[90] Z. Douglas, The International Law of Investment Claims (2009) at p. 22, at para. 44. (RLA-5)

(a)    UNCTAD, *Scope and Definition*, in UNCTAD Series on Issues in International Investment Agreements (1999), p. 39: [91]

> "Generally speaking, 'seat of a company' connotes the place where effective management takes place."

(b)    N. Rubins & S. Kinsella, International Investment, Political Risk and Dispute Resolution (2005), p. 409: [92]

> "… a juridical person may be considered a national of the State where it has its **effective** headquarters (or '*siège social*')" (emphasis added)

(c)    M. Sornarajah, The International Law of Foreign Investment (2nd ed., 2010), p. 324: [93]

> "…the *siège social* theory … determines nationality by looking for the place where the seat of its **effective** management is located" (emphasis added)

(d)    P. Sauvé, *Trade and Investment Rules: Latin American Perspectives*, United Nations (2006), p. 22: [94]

> "Some BITs combine the place of incorporation test with criteria focusing on a company's 'seat.' This test attributes the nationality of the place where the *siège social* is located. The 'seat of the company' often refers to the place of **effective** management decision-making, and as such, while more difficult to determine, reflects a more significant economic relationship between the corporation and the country granting nationality" (emphasis added)

(e)    A. Diehl, The Core Standard of International Investment Protection (2012) p. 63: [95]

> "Under th[e] concept [of *siège social*], the **actual** management of a company determines its nationality" (emphasis added)

---

[91] RLA-17
[92] RLA-12
[93] RLA-14
[94] RLA-13
[95] RLA-4

(f)　E. Z. Jaramillo & A. Saldarriaga, et al., *Treaty Planning: Current Trends in international Investment Disputes that Impact Foreign Investment Decisions and Treaty Drafting* [in:] M. Á. Fernández-Ballesteros & David Arias eds., Liber Amicorum Bernardo Cremades 1207 (2010), p. 1222: [96]

> "The place of incorporation and the entity's seat or **principal** seat of business (*siège social*) are the most commonly used requirements" (emphasis added)

(g)　R. Thorn & J. Doucleff, *Disregarding the Corporate Veil and Denial of Benefits Clauses: Testing Treaty Language and the Concept of Investor* in: M. Waibel et al eds., The Backlash Against Investment Arbitration (2010), pp. 6-7: [97]

> "**Siège social** … connotes the place of **effective** management, and therefore reflects a more genuine link between the entity and the home country than the place of incorporation" (emphasis added)

(h)　Professor Brownlie, Principles of Public International Law (7th ed., 2008), p. 484,[98] who observes (in the context of diplomatic protection[99]) that the *siège social* criterion is intended to provide a:

> "guarantee that the grant of personality is **reasonable** and not a device for limiting the **proper** sphere of protection of other governments."  (emphasis added)

(i)　Dolzer & Stevens (1995), pp. 35-38, [100] who opine that Belgium-Luxembourg bilateral investment treaties rely on the concept of "seat (or *siège social*)," which the authors define as the place of:

> "**actual management** of a company," (emphasis added)

(j)　*KT Asia Investment Group B.V. v. Republic of Kazakhstan*, at para 123:[101]

---

[96] RLA-9
[97] RLA-15
[98] RLA-3
[99] There is clearly a marked difference between diplomatic protection and investor-state treaty protection, and no basis to import the rules of one into the other (see, *e.g.*, Z. Douglas, The International Law of Investment Claims (2009), paras. 541 and 605-9).  But the references to materials here and below concerning diplomatic protection remain relevant simply in terms of the understanding of the term "*siège social*" itself.
[100] RLA-40

> "the Tribunal's reading of the treaty language is further strengthened if one bears in mind that in twenty-four Kazakh BITs the Respondent has agreed to the same test as in the present one, the place of incorporation, while in ten other BITs it has added a requirement that the *siège social* or place of business be placed or "real economic activities" be conducted there."

(k)  Z. Douglas, The International Law of Investment Claims (2009), at p. 22 (para. 45): [102]

> "… the practice of states …, in general, reveals that diplomatic protection is not exercised merely on the basis of incorporation. In deciding whether or not to take up claims based on the corporate interests of their nationals, states are naturally preoccupied with the extent to which their own economy has been affected by the alleged violation of the host state. Thus it is common for states to insist that the corporate interest comprises a dominant shareholding or beneficial ownership or a connection based on the *siège social* of the company. …"

139.  Venezuela also placed heavy reliance on the decision in *Alps Finance v Slovak Republic*,[103] which was the subject of extensive submissions by both sides. In that case, the Slovak Republic objected to the tribunal's jurisdiction under the Switzerland-Slovak Republic BIT, on the basis (*inter alia*) that the investor did not have a business seat in Switzerland, as required by the BIT in question. Venezuela cites the Slovak Republic's argument that "seat":

> "has a precise meaning under the BIT, namely the principal place of an actual business" [104]

and that to prove that the Swiss corporate address was the "*nerve center*," Alps Finance:

---

(Footnote continued from previous page)

[101] *KT Asia Investment Group B.V. v. Republic of Kazakhstan*, ICSID Case No. ARB/09/8, Award, 17 October 2013

[102] RLA-5

[103] *Alps Finance*, see FN 73, *supra*

[104] *Alps Finance*, para. 88.

> "had the burden to produce telephone records, rental agreements and rental payments, invoices, purchase orders, banking records, contracts for sale and services, utility bills or even witness statements."

Venezuela then notes that the investor (much like Claimants here), maintained that an extract from the commercial registry attached to its statement of claim sufficed to prove that it had a "seat" in Switzerland, from where it:

> "… administers its business, it holds its headquarters, keeps proper books, rents its office and opens a bank account …"[105]

140. Importantly for Venezuela, the tribunal in *Alps Finance v Slovak Republic* concluded that the indicia relied upon by the investor were insufficient to establish the existence of a Swiss seat. According to the tribunal:

> "Proof of a 'business seat', in the meaning of an effective center of administration of the business operations, requires additional elements, such as the proof that: the place where the company board of directors regularly meets or the shareholders' meetings are held is in [the home State's] territory; there is a management at the top of the company sitting in [the home State]; the company has a certain number of employees working at the seat; an address with phone and fax numbers are offered to third parties entering in contact with the company; certain general expenses or overhead costs are incurred for the maintenance of the physical location of the seat and related services …"[106]

141. But on a closer analysis, the *Alps* case provides no support at all for Venezuela's case. On the contrary, it appears to cut exactly the other way, and demonstrate that the terms in question are susceptible of different meanings in different contexts. Article 1(1)(b) of the Switzerland-Slovak Republic BIT (in issue in that case) provides as follows:

> "The term "investor" refers with regard to either Contracting Party to
> […]

---

[105] *Alps Finance*, para. 117(i).
[106] *Alps Finance*, para. 217.

> (b)　　　legal entities […] which are constituted or otherwise duly organized under the law of that Contracting Party and have their seat, together with real economic activities, in the territory of that same Contracting [P]arty."

142. It is immediately apparent that this is a differently worded provision to that in both the Luxembourg and Portuguese Treaties, and that – unlike here – the tribunal in the *Alps* case had to apply a "*real economic activities*" test, as specifically provided for in the treaty.

143. But more than this, the juxtaposition in Article 1(1)(b) of the Switzerland-Slovak Republic BIT of the two requirements of "*seat*" and "*real economic activities*", which are clearly expressed as separate and cumulative criteria, demonstrates that "*seat*" in this particular context must mean something other, and presumably less, than "*real economic activities*".

144. Having carefully considered the extensive submissions and voluminous materials provided by both sides on this issue, it is clear that neither term has been used in international law and practice as a consistent "legal term of art", with only one meaning.  On the contrary, the range of references upon which each side has relied indicates that these terms are susceptible of either a formal or substantive meaning.  As is well-established, a "*term may have a number of ordinary meanings*".[107] `In such circumstances, a tribunal must have regard to the "context" in which the terms appear, and the "object and purpose" of each Treaty, in order to determine which one of the possible ordinary meanings prevails.

145. Article 31(2) of the Vienna Convention provides that the "context" of a treaty includes its preamble, annexes and text. The latter includes:

> "the remaining terms of the sentence and of the paragraph; the entire article at issue; and remainder of the treaty".[108]

---

[107] Mark E. Villiger, *The Rules on Interpretation: Misgivings, Misunderstandings, Miscarriage? The 'Crucible' Intended by the International Law Commission*, in The Law of Treaties Beyond The Vienna Convention (Enzo Cannizzaro ed., 2011), p. 109.
[108] Mark E. Villiger, Commentary on the 1969 Vienna Convention on the Law of Treaties (2009), p. 427.

146. The "object and purpose" of a treaty :

    "include a treaty's aims, its nature and its end."[109]

147. The key distinguishing feature of both Treaties in this case – unlike the treaty in cases such as (for example) *Tokios Tokeles* – is that the terms "*siège social*" and "*sede*" are used alongside other criteria that would ordinarily be encompassed by the term itself, namely:

  --  "*… constituted in accordance with the laws of the Kingdom of Belgium, the Grand Duchy of Luxembourg or the Republic of Venezuela..*" in the Luxembourg Treaty, and

  --  "*… constituted pursuant to and function in accordance with the Laws of that Contracting Party ...*" in the Portuguese Treaty.

148. Given this context, it is immediately apparent – as Venezuela has argued – that neither "*siège social*" nor "*sede*" can mean simply "*registered office*" or "*statutory seat*" in a purely narrow and formal sense, since neither term would then have any effective meaning.  For a company to be "*constituted in accordance with the laws of … the Grand Duchy of Luxembourg*", it must have its registered office or statutory seat in Luxembourg.  And for a company to be "*constituted pursuant to and function in accordance with the Laws of*" Portugal, it must have its registered office or statutory seat in Portugal.

149. This point was put in terms to all experts on Luxembourg, Portuguese and Venezuelan law, and no other conclusion was forthcoming. Only Claimants' Expert on Portuguese law, Prof. Moura Vicente, initially took issue with this point, stating in his Opinion that Portuguese law allows for the possibility that the place of incorporation and place of statutory seat do not coincide.[110]  Indeed, this appeared to be the only substantive point, which Claimants advanced in

---

[109] per Villiger, *supra.*
[110] Legal Opinion of Professor Dr. Dário Moura Vicente, 23 January 2014, at paras. 37-40.

their response on this issue.[111] However, Prof. Vicente subsequently accepted that "*a company that is incorporated in Portugal must have its seat in Portugal.*"[112]  And on a proper analysis, as the Tribunal concludes, absent:

--        re-incorporation (*i.e.* in the case of an in-coming foreign company, per Article 3(2) of the Portuguese Code on Commercial Companies, in which case Portuguese law requires that the company be re-incorporated in Portugal, and establish a statutory seat in Portugal), or

--        accommodation by a foreign law (*i.e.* in the case of an out-going foreign company, per Article 3(4) of the Portuguese Code, which will depend upon the relevant foreign law allowing such a situation),

it is evident that Portuguese law does not accept that companies be incorporated in one place and have their statutory seat in another.

150. So if "*siège social*" and "*sede*" are to have any meaning, and not be entirely superfluous, each must connote something different to, or over and above, the purely formal matter of the address of a registered office or statutory seat.   And this leads one to apply the other well-accepted meaning of both terms, namely "effective management", or some sort of actual or genuine corporate activity.

151. This conclusion follows from the simple wording of each Treaty. But as articulated by Venezuela, it is also mandated by the well-established doctrine of "*effet utile*". According to this, the terms of a treaty must if possible be interpreted so that they do not become devoid of effect,[113] or as put by Venezuela:

---

[111] See *e.g.* Claimants' Post-Hearing Brief, para. 174.
[112] Transcript (English), Day 7, p. 2101:12-14 (Moura Vicente).
[113] See, *e.g.*, *Corfu Channel Case (Merits)*, Judgment, 9 April 1949, I.C.J. Reports 1949, p. 4 at p. 24 (RLA-24); *Case Concerning Application of the International Convention on the Elimination of all Forms of Racial Discrimination* (Georgia v. Russian Federation), Preliminary Objections, Judgment, 1 April 2011, para. 133. (RLA-22).

> "… tribunals and courts [must] interpret the provisions of treaties in a manner to give full weight and effect consistent with the normal sense of the words and with the other parts of the text, and in a manner such that reason and sense will be accorded as much as possible to each part of the text."[114]

152. This canon of interpretation has frequently been applied in investor-state arbitrations. For example, in 1990, the tribunal in *AAPL*, citing the *Cayuga Indians* case, observed that:

> "Nothing is better settled, as a canon of interpretation in all systems of law, than that a clause must be so interpreted as to give it a meaning rather than deprive it of meaning."[115]

153. As to "objects and purposes", the preamble to the Luxembourg Treaty notes that the Contracting Parties desire to "*strengthen their economic cooperation by creating favorable conditions for investments to be made by investors of [either] Contracting Party*" and that they consider the Treaty to have a "*beneficial influence*" on "*reinforcing confidence in the area of investment*". The Portuguese Treaty states that it is "*[m]otivated by the desire to intensify economic cooperation between the two States*" because "*the reciprocal promotion and protection of investments will contribute to […] economic prosperity*". There is clearly a policy decision to be made in the context of strengthening and promoting bilateral economic cooperation as to the class of investors that each Contracting State, acting as host, wishes to attract, and is willing to protect within the scope of each Treaty. Nothing in the evident objects and purposes of either Treaty suggests that a purely formal test of "registered office" or "statutory office" is required. And nothing suggests that a requirement of a genuine link would somehow undermine any object or purpose. On the contrary, if anything, requiring some genuine link with one Contracting

---

[114] Respondent's Counter-Memorial, para. 148.

[115] *Asian Agricultural Products*, at para. 40. See *also*, *Occidental Exploration and Production Company v. Republic of Ecuador*, LCIA Case No. UN3467, Final Award, 1 July 2004, para. 68 ("*The Tribunal agrees with both parties in that the proper interpretation of Article X must not result in rendering it meaningless. This is the conclusion that arises evidently from the Vienna Convention on the Law of Treaties in respect of interpretation*"); *Salini Construttori S.p.A. e Italstrade S.p.A. v. the Hashemite Kingdom of Jordan*, ICSID Case No. ARB/02/13, Decision on Jurisdiction, 9 November 2004, para. 95 ("*One is therefore hard pressed to see the usefulness of Article 9(2) as interpreted by the Claimants. Such an interpretation runs counter to the general principle of effectiveness ('effet utile') and for that reason also ought to be set aside*").

State would appear to be consistent with the bilateral / reciprocal nature of each Treaty. As the Tribunal explains at paras. 203-223 below, it has found, as a matter of fact, that incontrovertible evidence of such genuine links between Tenaris and Luxembourg and Talta and Portugal exists in this case.

154. *Conclusion:* In conclusion, in order to make sense of each provision, and ensure that each term is given meaning, the Tribunal determines that both "*siège social*" and "*sede*" in the Treaties in issue in this case mean the place of actual or effective management.

### 2. Other BITs

155. Claimants have submitted extensive materials charting the bilateral investment treaty practice of both Luxembourg (*i.e.* the Belgo-Luxembourg Economic Union) and Portugal, and emphasised that in the majority of cases, treaties have been concluded by Luxembourg with third states in which the term "*siège social*" has been used, and translated in an English version as "registered office", and treaties have been concluded by Portugal with third states in which the term "*sede*" has been used, and translated in an English version as simply "seat" or "main office".

156. Venezuela has maintained that the treaty practice adopted by the States of which Claimants assert nationality, far from being conclusive, is "*ultimately irrelevant,*"[116] and has invoked the *Guaracachi* case[117] as follows:

> "According to the Tribunal, the fact, invoked by the Respondent, that other BITs concluded by Bolivia explicitly exclude indirect investments is insufficient to support an a *contrario sensu* interpretation that only those BITs containing such an explicit reference cover indirect investments, since it is well accepted that this kind of argument is not on its own strong enough to justify a particular interpretation of a rule of law".

---

[116] Respondent's Post-Hearing Brief, para. 89.
[117] *Guaracachi America Inc. and Rurelec PLC v. The Plurinational State of Bolivia*, UNCITRAL PCA Case No 2011-137, Award, 31 January 2014.

157. Venezuela also argued, initially, that there is nothing in the Vienna Convention regime, which authorises an interpreter to construe the meaning of a treaty by reference to the provisions of other treaties concluded with third countries. But as the proceedings developed, it then accepted that investment treaties concluded between Luxembourg and Portugal with third parties were a relevant interpretative source under Article 32 of the Vienna Convention.[118]

158. The Tribunal considers that Luxembourg's and Portugal's respective treaty practice has potential relevance as a supplementary source only, under Article 32 of the Vienna Convention. It is not a primary source under Article 31, and it cannot be a starting point in the analysis.

159. In the Tribunal's view, there is nothing in the treaty practice of either Luxembourg or Portugal that is sufficiently conclusive as to undermine the analysis of "*siège social*" and "*sede*" set out above, and arrived at in the application of Article 31 of the Vienna Convention.

160. It is true that a proportion of Belgo-Luxembourg BITs translate "*siège social*" as "registered office."[119] But there are notable variations in this practice, such as (*e.g.*) Luxembourg's BITs with the Philippines (which was signed a mere two months before the signing of the Luxembourg-Venezuela BIT); the Czech Republic; and Rwanda, all of which translate "*siège social*" as "head office".[120]

161. Equally, Portugal's translation into English of "*sede*" as "main office" or "principal office" does not appear to assist the analysis (given that both "main office" and "principal office" may have a formal or substantive meaning). And

---

[118] Respondent's Rejoinder, para. 276: "The list of supplemental means in Article 32 is non-exhaustive; thus, it can include other treaties on the same subject matter (adopted before or after the treaty in question) that employ the same or similar terms").

[119] Claimants' Opening Statement, Slide 73. (And see also the Azerbaijan BIT at Slide 72).

[120] Agreement between the Government of the Republic of the Philippines and the Belgo-Luxemburg Economic Union, on the Reciprocal Promotion and Protection of Investments, signed on 14 January 1998, entered into force 19 December 2003, Art. I(1)(a)(ii)[,] (b) (RLA-143); Belgo-Luxembourg Economic Union and Rwanda, Convention concerning the reciprocal encouragement and protection of investments, signed on 2 November 1983, Art. 1(2)(a) (RLA-140); Agreement Between the Belgo-Luxembourg Economic Union and the Czechoslovak Socialist Republic Concerning the Reciprocal Promotion and Protection of Investments, signed on 1 August 1975, Art. 1(a)[,] (b) (RLA-138).

in any event, Portugal's treaty practice in this regard is inconsistent. For example, the BITs with Korea and Zimbabwe translate the same term as "principal place of business",[121] whereas Portugal's BIT with Bosnia Herzegovina uses the term "registered seat" ("*sede registrada*" in the Spanish version), instead of "*sede*".[122]

162. Ultimately, of course, each treaty has to be interpreted on its own account, on the basis of its own context and objects and purposes.[123]  Given the analysis under Article 31 of the Vienna Convention, the Tribunal has gleaned little assistance from this comparative exercise in this particular case.

### 3.  Relevance of Municipal Law

163. In interpreting the test in each Treaty, each side also took sharply different positions (as recorded above) as to whether the Tribunal should have regard to the way in which "*siège social*" and "*sede*" are understood as a matter of Luxembourg, Portuguese and Venezuelan law.

164. According to the Claimants, by Article 31(1) of the Vienna Convention, in interpreting the terms "*siège social*" or "*sede*", the Tribunal is restricted to the confines of each Treaty itself, as Article 31(1) admits of no other sources upon which reliance may be placed.  Articles 31(2), (3), and (4) provide exceptions to the general rule in Article 31(1), but these Articles make no reference to one party's domestic law. If the treaty provision itself does not reference the domestic law of a party, reliance cannot be placed upon domestic law to construe that provision under Article 31. It is only when an interpreter of a treaty wishes to confirm a meaning produced by Article 31, or if Article 31

---

[121] Agreement Between the Government of the Republic of Korea and the Government of the Portuguese Republic on the Mutual Promotion and Protection of Investments, signed on 3 May 1995, entered into force 11 August 1996, Art. 3(b) (RLA-142); Agreement Between the Government of the Portuguese Republic and the Government of the Republic of Zimbabwe for the Promotion and Mutual protection of Investments, signed on 5 May 1994, Art. 1(3)(b) (RLA-141).

[122] Agreement Between Bosnia and Herzegovina and the Portuguese Republic on the Mutual Promotion and Protection of Investments, signed in March 2002, entered into force 3 February 2009, Art. 2(a)(ii) (RLA-144).

[123] It might be noted in passing that, at the Hearing, Claimants' own Expert on Luxembourg law, Prof. Prüm, testified that he did not consider Claimants' treaty-practice argument as "*decisive as such*," but rather "*relevant*" only in terms of "*context*."  Transcript (English), Day 8, pgs. 2208:20-2209:1 (Prüm).

produces an ambiguous, obscure or manifestly absurd or unreasonable result, that reference may be made to supplementary materials, as provided in Article 32 of the Vienna Convention. No supplementary material can be used as a "first step" for interpretation. And even then, according to the Claimants, no recourse whatsoever ought to be made by the Tribunal under Article 32 of the Vienna Convention to Luxembourg, Portuguese or Venezuelan domestic law.

165. The Tribunal accepts that the interpretation of the terms "*siège social*" or "*sede*" is a matter of international, not domestic, law. Whereas the concepts of "*citizen*" and corporate "*constitution*" in the Luxembourg Treaty, and "*national*" and "*constitution and functioning*" in the Portuguese Treaty, contain a specific and express *renvoi* to the domestic laws of the parties to the Treaties, the terms "*siège social*" and "*sede*" in the respective Treaties do not.

166. The Tribunal also accepts that no supplementary material is to be used as a first step for interpretation.

167. Having said this, the requirements in question here are, in substance, nationality requirements. The criteria of "*siège social*" and "*sede*" are both mechanisms to determine the nationality of a company, and as such whether or not the company qualifies for coverage by a Treaty. And nationality requirements are frequently (though not exclusively) applied in light of relevant domestic law. As noted by Professor Douglas:

> "The tribunal's jurisdiction *ratione personae* extends … to an individual or legal entity … which has the nationality of another of the contracting state parties in accordance with the relevant provision in the investment treaty **and the municipal law of that contracting state party** and, where applicable, Article 25 of the ICSID Convention.[124] (Emphasis added).

168. The position has been summarised by Sasson as follows:

> "Once the treaty criteria have been established, they must be applied pursuant to the relevant municipal law. In certain circumstances, municipal law has to be disregarded if the investment treaty refers to

---

[124] Z. Douglas, The International Law of Investment Claims (2009), p. 284 (RLA-129).

specific criteria to determine corporate nationality (such as Article 17 of the ECT).

…

This does not mean that investment tribunals' decisions will affect the recognition of nationality at the domestic level. But it does mean that investment tribunals must determine nationality for investment treaty purposes. To make such determinations, tribunals may need to assess the evidence adduced by the parties on the application of the relevant municipal law. To the extent that municipal law (including a municipal law determination on the precise matter at issue) clashes with principles of international law, international law must prevail."[125]

169. To this end, whilst the interpretation of the terms "*siège social*" and "*sede*" remains a matter of international law alone (there being no express *renvoi* to municipal law for either term), the Tribunal considers it appropriate at least to consider the municipal law of (in particular) Luxembourg and Portugal, by way of background to its interpretation.

170. Put in terms of Article 32 of the Vienna Convention, the Tribunal considers that in order to confirm the interpretation at which it has arrived pursuant to Article 31, it may have regard to municipal law (*e.g.* in order to ensure that the interpretation under Article 31 is not impossible, or unworkable as a practical matter). Indeed, as the Claimants themselves accept:

"… it is commonly understood that the list of sources in VCLT Article 32 is not exhaustive. Therefore, domestic law is not excluded *per se* from consideration."[126]

171. The Tribunal has had the benefit of extensive evidence and submissions on Luxembourg, Portuguese and Venezuelan law, and has carefully considered all of this material. Given its supplementary nature, it is not necessary to recount here all submissions and evidence in any detail, or indeed for this Tribunal to resolve every disagreement on the detailed operation of municipal law. Overall, the Tribunal has arrived at the firm conclusion that there is nothing as a matter of Luxembourg, Portuguese or Venezuelan law that causes it to re-consider the interpretation of "*siège social*" and "*sede*" to which the application of Article 31

---

[125] M. Sasson, Substantive Law in Investment Treaty Arbitration (Kluwer, 2010), p. 64.
[126] Claimants' Post-Hearing Brief, para. 194.

of the Vienna Convention gives rise. In particular, the Tribunal notes that notions of "effective seat", and the use of a substantive test for corporate nationality in certain circumstances, are entirely familiar to both Luxembourg and Portuguese law (being the municipal systems of most relevance to the issues of nationality in this case).

172. *Luxembourg Law:* As Prof. Steichen testified, Luxembourg law has adopted the theory of "effective seat" for purposes of the law applicable to corporations and their nationality.[127] This proposition was agreed by Prof. Prüm,[128] who stated that although the theory primarily purports to "*avoid that certain companies [would/could] be able to avoid Luxembourg law in an abusive way*," it also covers situations where "*a company had its ... statutory seat in Luxembourg and would transfer its real seat abroad*."

173. Article 2 of the Luxembourg Company Law of 10 August 1915 (as amended) provides:

> Art. 2: "*Le domicile de toute societe commercial est situe au siège de l'administration centrale de la societe. L'administration central d'une societe est presume, jusqu'a preuve du contraire, coincider avec le lieu du siège statutaire de la societe.*"[129]

In English translation:

> "the domicile of a registered company is located at the seat of its central administration (head office).[130] Until evidence to the contrary shall have been finally brought, the central administration of the company is deemed to coincide with the place where its registered office is located."

174. Both Claimants' and Venezuela's Luxembourg legal experts agree that the unqualified term, "*siège social*" in the Company Law refers to the statutory seat or registered office.[131]

---

[127] Transcript (English), Day 8, p. 2126:9-2127:15 (Steichen).
[128] Transcript (English), Day 8, p. 2233:9-2234:19 (Prüm).
[129] Exhibit AP-6
[130] The footnote explains that the English language text of the amending EC Regulation 2157/2001 uses the term "head office", whereas the term "central administration" is used in a number of translations of laws of the financial sector and by the financial industry.
[131] Transcript (English), Day 8, p. 2123 (Steichen) and Transcript (English), Day 8, p. 2206 (Prüm); see also Steichen Legal Opinion, para. 21, and Prüm, paras. 11-15

175. Pursuant to Article 2 of the Company Law, a presumption is established that the "*real seat*" of a corporation coincides with its statutory seat, unless the contrary is proven.

176. It is common ground between the experts[132] that the "real seat" theory, as it is applied by the Luxembourg courts, is intended to preclude a company from seeking fraudulently to circumvent Luxembourg law. It is for that reason that the relevant provision of the Company Law is to be found within Section X of the Law, entitled "*Companies constituted in foreign jurisdiction*".

177. Article 159 provides:

> "Any company whose central administration (head office) is located in the Grand-Duchy shall be subject to Luxembourg law, even though the constitutive instrument may have been executed in a foreign jurisdiction.
> In case the domicile is located in the Grand-Duchy of Luxembourg, it is of Luxembourg nationality and Luxembourg law is fully applicable to it.
> In case the domicile of a company is located abroad but such company has in the Grand-Duchy of Luxembourg one or more locations where it conducts operations, the place of its most important establishment in the Grand-Duchy of Luxembourg, which it shall indicate for that purpose in the documents whose publication is required by law, shall constitute the secondary domicile of that company in the Grand-Duchy of Luxembourg. ……."

178. Both Prof. Steichen and Prof Prüm agreed that the test of "effective seat" was to be defined as:

> "the place where the company, in truth, operates in terms of its brains and its heart, …[w]here … the key decisions are being taken on a regular basis"

and that the elements indicative of the presence of an effective seat within the above meaning included: the places where the Directors meet; the place where

---

[132] Transcript (English), Day 8 p.2126 (Steichen), Legal Opinion of Prüm, para. 41

the Shareholders meet; and the place where the books and records of the company are being kept." [133]

179. Prof. Steichen also explained that interpreting Luxembourg law to require that a company have a "genuine link" with Luxembourg was consistent with Luxembourg's "open economy" policy. [134]

180. *Portuguese Law:* The only Portuguese legal provision defining the "*sede*" of a corporate entity is to be found at Article 159 of the Portuguese Civil Code as follows:

> "The seat of a corporate entity is the one designated in its bye-laws or, in the absence of such designation, the place in which its principal administration normally operates." [135]

181. The evidence before the Tribunal on behalf of both sides was that the interpretation of the unqualified term "*sede*" in this Code must be made with reference to Article 3(1) of the Commercial Companies Code, which adopts the qualified term "*sede efectiva*", and imports a concept of the principal and effective seat of the administration of a commercial corporation. [136]

182. Article 3(1) of the Commercial Companies Code provides as follows:

> "Commercial companies have as their personal law the law of the State where the main and effective seat of their administration is located. A company having its statutory seat in Portugal may, however, not oppose to third parties its submission to a law other than Portuguese law." [137]

183. In their Legal Opinion, Professors Maia and Duarte pointed to the following factual elements as being relevant to the determination of Talta's effective seat:

    (a)    the place where day-to-day management takes place or where those responsible for management act;

---

[133] Transcript (English), Day 8, p. 2129:5-8 and 2132:8-13 (Steichen). Transcript (English), Day 8, p. 2255:16-2256:8 (Prüm).
[134] Transcript (English), Day 8, p. 2136:1-2137:13 (Steichen).
[135] Exhibit DMV-26 and see Transcript (English), Day 7, p. 1977 (Maia)
[136] Maia/Duarte Opinion, paras. 7-12, 23, 25-26, 32; Transcript (English), Day 7, p. 1897:1-16 (Maia). Transcript (English), Day 7, p. 2057:17-20 (Moura Vicente).
[137] Exhibit DMV-19

(b)     the place where third parties have contact with the management of the company.[138]

184. Two further elements were added in the course of their evidence at the hearing, namely:

(c)     the place where the managers meet; and

(d)     the place where documents belonging to the management of the company are kept.[139]

185. For his part, Professor Vicente considered that the effective seat was determined by the place:

"in which the main deliberations of [the company's] managing bodies are transformed into acts of [ordinary] management"

– although that was not necessarily the place where the managing bodies met.[140]

186. *Venezuelan Law:*  The position with respect to Venezuelan law is less clear, albeit not such as to negate the interpretation to which Article 31 of the Vienna Convention gives rise.

187. Venezuela's presentation of Venezuelan law rested upon the expert testimony of Professor Iribarren.  The Tribunal has given careful consideration to this evidence, in light of Claimants' submission that to the extent that the notion of "*domicile*" is relevant to the interpretation of the Treaties then it is clear, on the basis of Article 203 of the Venezuelan Commercial Code, that if a company has a registered office identified in its articles of incorporation (as is the case here), that place is the company's domicile for the purposes of Venezuelan law.

188. The Tribunal notes Professor Iribarren's concession that he had not referenced Article 203 in his First Report[141] and his proposition that given the "*complexity*"

---

[138] Legal Opinion of Pedro Maia and Tiago Duarte, para. 32
[139] Transcript (English), Day 7, p. 1939
[140] Legal Opinion of Dario Mauro Vicente, para. 59 and see also Transcript (English), Day 7, pp. 2064-2065
[141] Transcript (English), Day 3, p. 1113

of the nature of the problem and the aspects of public law involved, there was, as he put it:

> "an interest to interpret the idea of domicile under Venezuelan law in a way that is not as straightforward or simple as stated under the Business Code."[142]

189. Professor Iribarren suggested that it was necessary to establish the "*real, actual reason underlying the activities of the company that has started [the] arbitration.*" To that end, he postulated a "*progressive interpretation of the law*" based upon the Constitution, such that the law was "*(a)dapt(ed) …. to the new times and to the interpretation under the Constitution*" and an application of the BITs in an "*abusive manner*" could be avoided.[143] That he achieved by an "*interpretative effort*" whereby Article 203 of the Commercial Code was interpreted jointly with Article 27 of the Civil Code.[144] Article 27 provides that the domicile of a natural person is their principal seat of business and interests. If the latter was not the seat designated in the act of incorporation, then applying a "*progressive interpretation of the Act*", "*we could conclude that the Claimants did not have any real reason in actual fact to bring forward this arbitration.*"[145]

190. For the reasons adumbrated by Claimants, the Tribunal has considerable difficulty with this proposition. First, it runs contrary to the clear terms of Article 203 in a manner contrary to Article 7 of the Venezuelan Civil Code:

> "Laws cannot be derogated from except by other laws and their disuse, custom or contradictory practice cannot be invoked against their observance, regardless how old and universal they are"[146]

Second, it contradicts Article 8 of the Venezuelan Commercial Code, which provides that the provisions of the Venezuelan Civil Code only apply to commercial companies where the Commercial Code is silent. Article 203 of the Commercial Code regulates the domicile of commercial companies and so

---

[142] *Idem,* p. 1086
[143] *Idem*, p. 1088
[144] Iribarren Second Legal Opinion, paras. 25 and 35
[145] *Idem*
[146] Exhibit HIM I-9

Article 27 of the Civil Code is inapplicable. Third, Article 203 is clear on its terms and so no "*interpretative effort*" is required – or appropriate.

191. The Tribunal has real difficulty, too, with the further suggestion, which emerged in the course of Professor Iribarren's cross-examination that the determination of the seat of a mercantile corporation could change depending upon whether the company was dealing with the State or with a private entity:

> "it could change if we apply the techniques and the interpretation under the Constitution and the progressive interpretation of the law to see the true economic reality underlying the legal matter at issue."[147]

192. In the course of an important and revealing exchange with a member of the Tribunal, Professor Iribarren confirmed that the starting point in his inquiry had been that:

> "… in arbitration …. one needs to go for the real reality, the underlying economic reality of the matter, and that is why it seems to me that perhaps some transnational companies that make investments in other countries might make abusive use of the form to the detriment of the underlying economic reality in its business existence." He confirmed, too, that that was also the end point of his inquiry.[148]

193. But the most telling point in terms of the weight to be attributed to his evidence, was Professor Iribarren's response to a series of questions focused upon his failure to draw attention to Article 28 of the Civil Code which, in contrast to Article 27, deals specifically with the domicile of partnerships, associations, foundations and corporations and provides that it shall be:

> "the place where its direction or management is located except otherwise provided by its Bylaws or special laws….."[149]

194. Professor Iribarren accepted that Article 28 referenced the specific issue of the domicile of civil companies by reference to the company's statutory domicile or

---

[147] Transcript (English), Day 4, p. 1109
[148] *Idem* at pp.1127-1129
[149] Exhibit HIM II-2

registered office, but he declined to accept that it was controlling as opposed to a complement to Article 27.[150] He continued:

> "I didn't mention it, because what I tried to clarify when I analyzed the case and the matter was, what is the underlying economic reality in the matter, and the underlying economic reality could make it such that neither Talta nor Tenaris had their main economic activity in Portugal or Luxembourg. The issue was how would a literal interpretation of these provisions we're discussing be prejudicial to the position of the Republic. That is what I tried to do in my first Report as well as in the second one on this issue."[151]

195. Beyond the inadequacies of Professor Iribarren's testimony, the Tribunal concludes that nothing in Venezuelan law undermines, impedes or renders unworkable the interpretation of the Treaties to which Article 31 of the Vienna Convention gives rise.

### 4. Article 25 of the ICSID Convention

196. Venezuela's assertion that the definitions of "*corporate investor*" in the Treaties should be interpreted in light of Article 25 of the ICSID Convention, which definition was to be understood to reflect domestic legal requirements for corporate nationality, was raised for the first time in the course of cross-examination of Professor Pruem.[152] The Tribunal does not consider that to be a point well taken. It takes the view, reflected in the decisions of other ICSID tribunals, notably in *Rompetrol v. Romania*[153] that the requirements and criteria to be fulfilled in order to qualify as a corporate investor shall be those set out in the applicable investment treaties and that there is no scope for importing additional conditions purporting to be based upon Article 25 of the ICSID Convention.

---

[150] Transcript (English), Day 4, p. 1119
[151] *Idem*, p. 1120
[152] Transcript (English), Day 8, pp. 2228-2229
[153] *Rompetrol v. Romania*, ICSID Case No. ARB/06/3, Decision on Respondent's Preliminary Objections on Jurisdiction and Admissibility, 18 April 2008, paras. 81-83. (RLA-137)

5.       Nature and Application of the Test

197. Having arrived at a meaning for both terms in the context in which they appear here, there is then a question as to the precise test that each imports.

198. In assessing whether Tenaris' and Talta's actual or effective management was located in Luxembourg and Portugal respectively, the Tribunal considers it critical to take into account the actual nature of each company, and its actual activities.

199. In so far as either entity is no more than a holding company, or a company with little or no day-to-day operational activities, its day-to-day "management" will necessarily be very limited, and so will its physical links with its corporate seat. Put another way, it would be entirely unreasonable to expect a mere holding company, or a company with little or no operational responsibility, to maintain extensive offices or workforce, or to be able to provide evidence of extensive activities, at its corporate location. And yet holding companies, and companies with little or no operational responsibility, have "management", and are certainly not excluded from the Treaties in this case. Indeed, countries such as Luxembourg and Portugal clearly consider it to their respective benefit to attract such companies, and to maintain a corporate regulatory regime that allows for them.

200. To this end, the Tribunal considers that the test of actual or effective management must be a flexible one, which takes into account the precise nature of the company in question and its actual activities. And it is with this in mind that the Tribunal has assessed the record in this case.

6.       Tenaris

201. Tenaris is no more than a holding company. And critically, by virtue of its Articles of Association, it is prohibited from engaging in industrial or commercial activities, which are undertaken by its operating subsidiaries. Its Articles of Association, dated 6 June 2007 provide as follows at page 002:

"[t]he company may not carry on directly any industrial activity or maintain a commercial establishment open to the public".[154]

202. Similarly, the Extract of the Luxembourg Registry of Commerce and Corporations for Tenaris, dated 21 June 2011, provides as follows, at page 0003:

"Description of Corporate Purpose: The purpose of the Company is to engage in all activities directly or indirectly associated with financial acquisitions, in any form whatsoever, in Luxembourg or foreign companies or in other commercial entities and in the administrative, management, control and development of activities thereof […]"[155]

203. As a holding company, Tenaris has over 25 subsidiaries. Its purpose is to engage in all activities directly or indirectly associated with financial acquisitions, in any form whatsoever, in Luxembourg or foreign companies or in other commercial entities in the administrative, management control and development of activities thereof. It has no operational activities of its own and its only function is to manage its portfolio of companies.

204. But Tenaris has a valid existence in Luxembourg in its own right as a holding company, and this is distinct from the existence and operation of its subsidiaries outside of Luxembourg. Accordingly, the Tribunal considers Venezuela's focus upon the extent of activity of, and net sales generated by, Tenaris' subsidiaries outside Luxembourg,[156] and the number of subsidiaries Tenaris has in countries other than Luxembourg,[157] is misconceived. It is Tenaris' own operation within Luxembourg that must be examined for the purposes of the Luxembourg Treaty.

205. With this in mind, the activity of "managing" Tenaris and its operations would necessarily be a relatively limited one. And on the evidence in this case, the "effective" centre for such activity was Luxembourg.

---

[154] Exhibit C-202
[155] Exhibit C-6
[156] See *e.g.* Respondent's Counter-Memorial, para. 172; Respondent's Rejoinder, paras. 15 and 197
[157] See *e.g.* Respondent's Rejoinder, para. 197

206. In terms of constitution and structure, the Tribunal notes, in particular, the following:

(a)    an extract dated 21 June 2011 from the Luxembourg Registry of Commerce and Corporations confirms that Tenaris was incorporated in 2002, with its "*corporate headquarters*" ("*siège social*")  located at 29 Avenue de la Porte-Neuve, L-2227 Luxembourg;[158]

(b)    Tenaris' Articles of Association dated 6 June 2007[159] record as follows:

    i.    Article 1:    Tenaris is a:

        "*societe anonyme* holding governed by these Articles of Association and by the laws and regulations of the Grand Duchy of Luxembourg governing business corporations and holding companies, and more specifically by the laws of August 10, 1915 and July 31, 1929, such as those laws were amended by subsequent laws and regulations."

    ii.    Article 3:

        "The registered office "siège social" is established in Luxembourg-City"

    iii.    Article 9:

        "The board of directors shall meet as often as required by the interests of the Company and at least four (4) times a year, upon notice by the chairman or by two (2) directors, either at the registered office or at any other place indicated in the notice …Board of directors meetings can be validly held by means of telephonic conference call, video conference or any other means genuinely allowing for the participation, interaction and intercommunication of the attending directors."

    iv.    Article 15:

---

[158] Exhibit C-6.  By 2008, the *siège social* of Tenaris had moved to 46a, avenue John F. Kennedy, but by the time of the June 2011 AGM, it had reverted to the former address at 29 ave de la Porte-Neuve. See para. 209 above.
[159] Exhibit C-202

"The annual general meeting shall meet each year *ipso jure* in the city of Luxembourg at the place indicated in the notices for meeting on the first Wednesday of June at 11.00 a.m. ….. The general meetings, including the annual general meeting, may be held in a foreign country whenever there occur circumstances of force majeure as determined by the board of directors in its discretion. In such event, the terms and conditions necessary to provide proper deliberations and publications will continue to be those provided for by the laws of Luxembourg."

v. Article 19:

"The nationality of the company may be changed and the commitments of its shareholders may be increased only with the unanimous consent of all the shareholders and bondholders, if any…."

vi. Article 20:

"Twenty (20) days before the general meeting, the shareholders may take cognizance at the registered office of the annual accounts and the report of the auditors."

vii. Article 25:

"All points not covered by the present Articles of Association shall be governed by Luxembourg law.";

(c) Tenaris' amended Articles of Association dated 2 May 2012[160] record that:

i. Article 1: Tenaris is:

"a *societe anonyme* governed by these Articles of Association and by the applicable laws and regulations of the Grand Duchy of Luxembourg."

ii. Its Registered Office remained unchanged (Art. 3) as did the provisions of Arts. 9, 19 and 25;

iii. Article 15:

---

[160] See Exhibit C-231. The Articles were amended pursuant to an EGM of the Company held in Luxembourg on 1 June 2011 the (incomplete) note of which is as Exhibit C-224.

> "The annual general meeting shall meet each year in Luxembourg at the place indicated in the notices of meeting on the first Wednesday of May at 9.30 a.m. ….. The general Meetings, including the annual general meeting, may be held in a foreign country whenever there occur circumstances of force majeure as determined by the board of directors in its discretion. In such event, the terms and conditions necessary to provide proper deliberations and publications will continue to be those provided for by the laws of Luxembourg."

    iv.    Article 20:

> "Copy of the annual accounts, the auditor's report on such annual accounts and such other documents required by law shall be made available to shareholders in compliance with applicable law."

207. Against this structure, and with respect to the actual management of Tenaris and its business in Luxembourg, there are a number of key points, as set out below.

208. The office in Luxembourg is the only office of Tenaris worldwide.[161]

209. Tenaris' annual general meetings of shareholders are convened at its Luxembourg "*siège social*".[162]

210. The Minutes of the AGM in June 2009 do indeed show that it was convened at 46A ave. John F Kennedy in Luxembourg, as was the June 2010 AGM, while the June 2011 AGM was convened at the "*siège social*" at 29, ave de la Porte-Neuve.[163]

---

[161] Transcript (English), Day 1, pp.97-98

[162] Transcript (English), Day 1, pp.97-98

[163] See Exhibit C-224. As noted by Prof. Prüm, and other Luxembourg legal commentators (*e.g.* J.P. Winandy, *Manuel de droit des sociétés*, 2011 ed., 2011, Exhibit AP-26, page EN 0003), the place where the shareholders' meetings take place is the "*most relevant criteri[on]*" and the "*really decisive factor*" for Luxembourg courts (Cross-Examination of Prof. Prüm, Transcript (English), Day 8, 2255:16-22; 2256:1-2). This is also apparent from the *Caldwell* case - Decision of the District Court of Luxembourg, no. 107,744, 18 April 2008, Exhibit AP-21, page EN 0003; Decision of the Court of Appeal of Luxembourg, No. 33908, 21 October 2009, Exhibit AP-23, page EN 0004; Dismissal of the appeal of the *Cour de Cassation* of Luxembourg, No. 2795, 9 December 2010, Exhibit AP-25, page EN 0004.

211. Tenaris holds Board of Directors meetings at its registered office in Luxembourg. This transpired in the course of oral testimony, as for example in the testimony of Mr Oscar Montero:[164]

> "Q:    […] did you have a moment in which you had to go to Tenaris's offices?
>
> A:    Yes. The last joint venture that we announced between Tenaris and Ternium is an investment in Mexico for a thermoelectric plant, a $1 billion dollar investment. In November, I had to participate – even though I am not a member of Ternium's board, I often attend – and in that opportunity that investment was going to be discussed at the board, and I had to go to Luxembourg to discuss this investment, and also at Ternium's board. Afterwards, the Tenaris board meeting took place, also in Luxembourg where it has its seat". [165]

212. In this regard, Claimants (rightly in the Tribunal's view) dismiss the criticism raised at the hearing by Venezuela that there are no minutes of Tenaris' Board minutes in the record. They point out that the matter had never been raised by Venezuela in its pleadings, nor had it sought their disclosure as being documents:

> "intrinsically relevant to the question of the 'siège social' of the Claimants and the jurisdiction of the Tribunal."[166]

213. It is also clear from Tenaris Shareholders' Meeting Minutes, 2009-2011,[167] pages 0001, 0016, 0032 and 0046 that Mr Roberto Bonatti, a member of the Tenaris' Board of Directors, was physically present at each of Tenaris' shareholders' meetings held in Luxembourg between 2009-2011. The Claimants observed that that was:

> "unsurprising, considering that it is typical in the corporate world for a company to hold a board meeting immediately after the Shareholders' annual meeting."[168]

---

[164] Cross-Examination of Oscar Montero, Transcript (English), Day 2, p. 399:6-17
[165] Transcript (English), Day 2, p.399.
[166] See Request No. 5 of Respondent's Request for Documents dated 25 January 2013.
[167] Exhibit C-224.
[168] Claimants' Post-Hearing Brief, FN 542.

214. Tenaris keeps its books and records at its registered office in Luxembourg. This is prescribed in Article 20 of the company's Articles of Association of 6 June 2007,[169] and also confirmed in Shareholders' Meeting Minutes.[170]

215. The Auditors of Tenaris were PricewaterhouseCoopers in Luxembourg.[171]

216. Further, the Tribunal notes that the Respondent has been singularly unable to identify and demonstrate any other corporate seat for Tenaris, outside of Luxembourg. It was not until its Rejoinder that it posited Argentina, but in the Tribunal's view this has no foundation. In particular, the Respondent has been unable to point to any consistent acts of management of Tenaris itself (as distinct from its subsidiaries) taking place elsewhere.

217. To the extent that other criteria have been raised by Venezuela by reference to Luxembourg law, Claimants maintain that they are irrelevant and/or inaccurate, and the Tribunal agrees. In particular, as set out above, the test to be applied in each Treaty here is ultimately one of international law, not Luxembourg law. The points are noted below for completeness.

218. First, as to domicile and nationality of Tenaris' directors and CEO as a matter of Luxembourg law, Claimants note that the *Caldwell* case[172] made clear that nationality and residence of senior management do not constitute valid criteria of attachment – a proposition accepted by the Luxembourg legal experts of both Parties at the hearing.[173]

219. Second, the (inaccurate) assertion that Tenaris S.A. had 27,000 employees of whom 7,000 were in Argentina is irrelevant: the Court of Appeal of

---

[169] Exhibit C-202.
[170] Meeting Minutes, 2009-2011, pp. 0002, 0017, and 0033. (Exhibit C-224)
[171] Tenaris Shareholders' Meeting Minutes, 2009-2011, pp. 0010, 0011, 0026, and 0042 (appointing PwC S.a.r.l. as Tenaris' auditor). (Exhibit C-224)
[172] *Caldwell S.a.r.l v. State of the Grand Duchy of Luxembourg*: see FN 165, *supra* and Exhibits AP-21, AP-23, and AP-25.
[173] Transcript (English), Day 8, p. 2167 (Steichen); Transcript (English), Day 8, pp. 2249-2251 and pp. 2264-2265. And see also Exhibit AP-10: Decision of the District Court of Luxembourg in *Focant v. Bacci*.

Luxembourg has held that the number and location of any employees of a company are not relevant criteria.

220. Third, the contention that Tenaris S.A. occupied two floors of a 30-storey office block in Buenos Aries has been refuted by the evidence of Mr Malvassora.

221. Fourth, contrary to the suggestion that (tested by Luxembourg law) it does not maintain an office, or any adequate office, in Luxembourg, as already noted there is irrefutable evidence in the record that Tenaris does have a physical presence in Luxembourg, albeit that under Luxembourg law, there is no need for a company to own or rent premises in Luxembourg.[174]

222. Fifth, and again as already noted, Tenaris is a holding company prohibited by its Articles of Association from undertaking industrial or commercial activities, which are the province of its subsidiaries. Even if it were not the subject of such a prohibition, the Luxembourg Court of Appeal has determined that:

> "the principal establishment is the place where the heart and brain of the company is (sic) located. It must be distinguished from the company's seat of operations which corresponds to the place where the company pursues its industrial and commercial activities."[175]

223. In light of the matters set out above, the Tribunal is satisfied that Tenaris has complied in good faith with the Treaty requirement that it be both "*constituted in accordance with the laws of … the Grand Duchy of Luxembourg*" and that it have its "*siège social*" in Luxembourg.

### 7. Talta

224. As for Talta, the Tribunal notes that:

---

[174] See Exhibit AP-16: Law of 31 May 1999 published in the Journal Officiel du Grand-Duche de Luxembourg dated 21 June 1999. And as to Belgian law: see Exhibit AP-7: Wauwermans: "Manuel pratique des societes anonymes"
[175] See Exhibit AP-27: Decision No. 37940, dated 21 December 2011. And see also Exhibit AP-10: Decision of the District Court of Luxembourg dated 21 April 1971.

(a) its Articles of Incorporation dated 5 June 2003 show that its first registered office was at Rua dos Murcas 88 3rd floor District of Se, Funchal[176];

(b) the Permanent Certificate issued by the Commercial Registry of the Free Zone of Madeira[177] records that its Head Office ("*sede*" in the Portuguese original) is at Rua Alfândega no.74-76-2o andar, sala H 9000 058 Funchal Madeira;

(c) Talta has no offices elsewhere in Portugal, or anywhere else outside Portugal;

(d) two of its four Managers are resident in Portugal. Importantly, the joint signatures of Group A managers (De Sousa and Gouvea) and one Group B Manager (both Argentines) or the single signature of a member of the Board of Directors, if so authorised by General Meeting, are required to bind the company. As the company was structured, the signature of a Portuguese resident manager was necessary for every management decision taken by the company;

(e) Talta holds out to third parties its Portuguese office contact details;

(f) Talta's management records are kept in Portugal where its financial statements are subject to audit, and it retains auditors in Lisbon;

(g) the Minutes of the Shareholders' meetings of 2010 and 2011 indicate that these meetings took place at an adjacent office in Funchal. [178] As pointed out by Claimants, Rua das Murças runs parallel to Rua da Alfândega. The address on Rua das Murças, indicated as the location of the shareholder meetings, is in the same building and a floor above the location of Talta's "*sede*" on Rua da Alfândega;

---

[176] See Exhibit C-170
[177] See Exhibit C-9
[178] Exhibit C-245 and see also Exhibit CLEX-66

(h) Talta has entered into a Sub-lease dated 27 May 2009 (entered into by Mr Sousa, the manager of Talta) of space in Rua da Alfandega, and an addendum sub-lease agreement of 20 October 2009 for an additional room "I" (for meetings) and a common entrance hall;

(i) Talta makes corporate filings at the Commercial Registry in Funchal;

(j) Talta files its tax returns with the Portuguese tax authorities in its capacity as a Portuguese resident (see *e.g.* Talta's tax filings for 2011 and 2012);

(k) Talta's managers have executed powers of attorney, including to their representatives in this arbitration, before a Portuguese Notary Public;[179]

(l) the SEC Filing 20-F for the year ended 2012,[180] which shows Talta as a "*trading and holding company*" incorporated in Funchal.

225. In light of the matters set out above, the Tribunal is satisfied that Talta has complied in good faith with the Treaty requirement that it be both "*constituted pursuant to and function in accordance with the Laws of*" Portugal, and that it have its "*sede*" in Portugal.

### 8. Conclusion

226. On the basis of the submissions and the evidence that it has received and reviewed above, and judged fairly against the nature of each company, the Tribunal concludes that it has jurisdiction *ratione personae* over Claimants: Tenaris has established that, in accordance with the terms of the Luxembourg Treaty, its "*siège social*" is in Luxembourg. Talta has likewise established that, in accordance with the terms of the Portugal Treaty, its "*sede*" is in Portugal.

---

[179] A number of these examples are the subject of the references collected at FN 627 of the Claimants' Post-Hearing Brief.
[180] Exhibit R-141

227. Tenaris is thus entitled to the protections afforded to an investor under the Luxembourg Treaty and Talta is both entitled to the protections afforded to an investor under the Portuguese Treaty and, by virtue of its standing as a wholly owned subsidiary of Tenaris, to those available to an investor under the Luxembourg Treaty, as well.

**2.    NOTIFICATION OF CLAIMANTS' CLAIMS**

a.    Venezuela's Case

228. Venezuela objects that it did not receive proper notice of all of the substantive claims that are now pursued by the Claimants in this arbitration, and in particular the Fair and Equitable Treatment / discrimination claims, and the Protection and Security claims. Venezuela argues that this constitutes a failure on Claimants' part to fulfil the jurisdictional requirements of the Treaties.

229. Article 9(1) of the Luxembourg Treaty provides that:

"Any dispute between an investor and the other Contracting Party concerning the application of this Agreement shall be the subject of a written notification, accompanied by a sufficiently detailed memorandum, from the investor. As far as possible, the parties shall endeavor to settle the dispute amicably by negotiation....."

Article 9(2) continues:

"In the absence of an amicable settlement within six months from the date of the notification of the dispute, the dispute shall be submitted, at the investor's option, either to the competent jurisdiction of the State in which the investment was made or to international arbitration. Once made, the choice shall be final."

230. There is no direct equivalent provision in Article 8 of the Portuguese Treaty to the express notification provision contained in Article 9 (1) of the Luxembourg Treaty, but Article 8(1) of the Portuguese Treaty does require an attempt to be made to resolve any disputes by "*means of amicable consultations*", and Article 8(2) provides for recourse to international arbitration (or the local courts of the Contracting Party in whose territory the investment was made):

> "[s]hould the dispute not be solved by amicable means within a period of six (6) months counting from the beginnings of these consultations….."[181]

231. While Claimants point out that the Portuguese Treaty does not require the submission of any formal notice of dispute, Venezuela suggests that there was implicit recognition on Claimants' part of the need to give details in the terms of the memorandum submitted with the Notice of Dispute of 20 August 2009.[182] In that memorandum, Claimants stated that its purpose was to:

> "provide detailed information on the dispute under the Luxembourg Treaty and the Portuguese Treaty concerning the nationalization of Matesi."

232. As a preliminary point, it is to be noted that there is no issue between the Parties that Claimants' Notice of Dispute of 20 August 2009 and the accompanying memorandum constituted sufficient notice of what Venezuela describes as Claimants' "*nationalization*" claims.

233. However, Venezuela objects that it did not receive notice of Claimants' Fair and Equitable Treatment / discrimination and Protection and Security claims.

234. First, and as to the former, it suggests that Claimants have resorted to an after-the-event re-characterisation of complaints raised in correspondence exchanged between Matesi and CVG FMO in 2006 in respect of alleged breaches of contractual obligations on the part of CVG FMO *vis-à-vis* Matesi, as the basis for a Treaty claim. In particular, Venezuela complains that prior to the filing of Claimants' Request for Arbitration, the issue of pellet allocation had been referred to as: "*contract disputes or questions of contract*".[183]

235. Second, it was a prerequisite to arbitration that the Parties should attempt to reach an amicable settlement. Such a pre-arbitration negotiation phase was a condition of Venezuela's consent to arbitral jurisdiction and Claimants failed to

---

[181] RLA-114
[182] Exhibit C-14
[183] Respondent's Post-Hearing Brief, para. 156

perfect that consent, so far as the Fair and Equitable Treatment / discrimination and Protection and Security claims are concerned. In particular, it was essential to any fulfilment of the requirement that the Parties seek to find an amicable solution of their disputes that the Parties should know what the matters were, which were said to give rise to the Treaty dispute(s). Venezuela referred to the holding of the Tribunal in *Burlington* that a claimant must "*articulate [its] disagreement with a reasonable degree of specificity*" in order to "*apprise Respondent of a dispute.*"[184]

236. Venezuela maintains, too, that were the Tribunal to deem the notice defective, as Venezuela contends is the case, it would be adhering to the "*recent trend*",[185] exemplified by the decision in the *Tulip* case, to interpret notice provisions strictly.

b. Claimants' Case

237. In answer, Claimants say that:

(a) Venezuela had notice of all three claims (*i.e.* the Fair and Equitable Treatment / discrimination and Protection and Security claims, as well as the Expropriation claim);

(b) even if it did not have specific and separate notice of the Fair and Equitable Treatment / discrimination and Protection and Security claims, they were sufficiently related to the Expropriation claim that no such notice was required in respect of these claims; and

(c) notice and amicable settlement provisions have been considered by many international tribunals not to be strict jurisdictional requirements, particularly where there was active engagement by a State in a settlement

---

[184] *Burlington Resources, Inc. v Republic of Ecuador*, ICSID Case No. ARB/08/5, Decision on Jurisdiction, 2 June 2010.
[185] Respondent's Post-Hearing Brief, para. 163. And see *Tulip Real Estate & Development Netherlands B.V. v. Republic of Turkey*, ICSID Case No. ARB/11/28 ("*Tulip*"), Award, 10 March 2014: "Neither the Vienna Convention nor principles of customary international law enable the terms of State consent to jurisdiction to be redefined as merely directory or subject to unexpressed qualifications.".

effort. Accordingly, a failure to comply would not divest a tribunal of jurisdiction. However, it has also been suggested that these clauses provide a procedural opportunity to settle, and if a State does not take advantage of that opportunity, there are no jurisdictional consequences arising from a defect in any notice.[186]

238. In this case the principal documents upon which Claimants rely are:

(a)  Claimants' letter dated 20 August 2009 addressed to MIBAM Minister Sanz;[187] and

(b)  Claimants' subsequent letter to Minister Sanz dated 20 November 2009.[188]

### c.      Analysis

239. The communications comprising notice of the two disputed claims have been described as "*woefully inadequate*".[189]  On analysis, the Tribunal is unable to agree.

240. Taking the letters in turn, the 20 August 2009 letter refers to interference in the normal administration of Matesi to the detriment of its business operations since the implementation of Decree no. 6,058, and to the fact that:

> "since 2004, **as detailed in our letter dated 12 August 2009**,[190] the Government has been obstructing Matesi's normal operation through various acts, including gross violations of its contractual obligations with respect to Matesi and accompanying this conduct with threats of nationalization".   (Emphasis added)

241. In the 20 November 2009 letter, Claimants referred to:

---

[186] Transcript (English), Day 1, p. 134
[187] Exhibit C-14
[188] Exhibit C-51
[189] Respondent's Rejoinder, para. 131
[190] Exhibit C-33: Claimants' letter to Minister Sanz of 12 August 2009 makes specific reference to the allegedly inequitable distribution of pellets by CVG FMO and to the impact of the collective labour agreement.

"losses … suffered before the issuance of Decree 6,058, due to the intervention measures of the Government in the transactions of Matesi that affected its economic situation. As an example, this included the suspension of the delivery of materials and the lack of action by the labor authorities of the Government regarding the abuses committed by members of the union organization, who instead were officially recognised by your Office by making them members of the Transition Committee for the taking over of control of Matesi."

242.  It is apparent from the manner in which these letters are framed that any settlement negotiations with Venezuela were intended to encompass the totality of what Claimants perceived as the effect of Venezuela's interventions upon Matesi's business over a period going back to 2004. They were matters of which Claimants provided adequate identification, and of which, in any event, Venezuela was well aware. In the opinion of the Tribunal, these letters do articulate the disagreement with a reasonable degree of specificity as envisaged in *Burlington* and as elaborated (*e.g.*) in *Tulip*.

243.  In *Tulip*, the relevant clause provided that a dispute could be referred to ICSID arbitration twelve months after it had arisen, having been the subject of attempts at amicable settlement in the meantime. The Tribunal found that:

"the applicable legal standard is as stated by the tribunal in *Burlington Resources v. Ecuador*. In this regard, Article 8(2) does not require the investor to spell out its legal case in detail during the initial negotiation process. Nor does Article 8(2) require the investor, on the giving of notice of a dispute arising, to invoke specific BIT provisions at that stage. Rather, what Article 8(2) requires is that the investor sufficiently informs the State party of allegations of breaches of the treaty made by a national of the other Contracting State that may later be invoked to engage the host State's international responsibility before an international tribunal."[191]

244.  In the Tribunal's view, this standard is satisfied here.

245.  If the Tribunal were wrong about that, it is in no doubt that, whether or not the claims prove ultimately to be well founded, Claimants' Fair and Equitable

---

[191] *Tulip*, Decision on Bifurcated Jurisdictional Issue, March 2013, para. 57.

Treatment / discrimination and Protection and Security claims are closely related to their Expropriation claim, and that they arise out of substantially the same subject matter. The Fair and Equitable Treatment / discrimination claims centre upon an alleged attempt by Venezuela to starve Matesi of a key input in favour of companies in which the State held an interest, prior to the expropriation. This was in order to try to decrease the value of Matesi. All of this coincided with, and was said to be closely related to, threats of expropriation directed against the Techint companies. The Protection and Security claim arises out of an alleged failure by Venezuela to stop both the violence perpetrated by the Matesi trade union, which, Claimants say, was directed against the company following the promulgation of the Nationalisation Decree, and the violent actions of the government appointed Transition Commission, exacerbated by the appointment to the Commission of the leader of Matesi's trade union.

246. Consistent with the findings of the Tribunals in *CMS Gas Transmission Co. v. Argentina* and *Teinver v. Argentina*, the Tribunal is of the opinion that no separate notice of these claims is called for, and that the initial notice satisfies the amicable settlement requirement for multiple measures.[192]

### 3. THE TALTA LOAN AND THE TALTA OFF-TAKE AGREEMENT

#### a. Venezuela's Case

247. Venezuela does not dispute that Claimants' shareholding in Matesi constituted an "investment" for the purposes of the Luxembourg and Portuguese Treaties. However, it takes issue with the characterisation of both the Talta Loan and the Talta Off-Take Agreement as "investments" under each Treaty.

---

[192] *CMS Gas Transmission Co. v. Argentina*, ICSID Case No. ARB01/8, Decision on Jurisdiction, 17 July 2003, para. 109: "As long as [the alleged measures] affect the investor in violation of its rights and cover the same subject matter, the fact that they may originate from different sources or emerge at different times does not necessarily mean that the disputes are separate and distinct." *("CMS Gas") Teinver v. Argentina*, ICSID Case No. ARB/09/1, Decision on Jurisdiction, 21 December 2012, para. 125: "Given that the formal expropriation alleged does appear to be closely related to … [Argentina's regulatory measures], it appears reasonable to conclude that these two core issues are related to the point that they share the same subject-matter."

248. *The Talta Loan:*     Pursuant to a Loan Agreement dated 8 July 2004,[193] Talta agreed to lend Matesi US$60,346,211:

> "to be applied for the payment of the purchase price for the acquisition of the assets located in Ciudad Guayana, Bolivarian Republic of Venezuela, which comprise the hot briquetting iron plant of Posven C.A. and for covering the cost necessary to cause such plant to restart operations."

249. Provision was made for 20 equal consecutive semi-annual repayments (Article 2.02) and, at Article 2.06 (c), Matesi was required to:

> "seek to obtain the registration of the Loan and this Agreement with the Venezuelan exchange control authority (CADIVI) and to obtain authorisations from such authority to purchase from the Venezuelan Central Bank the Dollars required to make the payments required under this Agreement and the Note on such dates set forth in this Agreement."

250. The loan was duly recognised in Matesi's books.[194]

251. Matesi was subsequently precluded from making the requisite dollar repayments by reason of the implementation of Disposition no. 58 on 2 September 2004. Pursuant to the terms of the Disposition, Matesi was required to obtain approval from CADIVI before it could apply foreign currency to the repayment of the loan that it had received from Talta. CADIVI conditioned its own approval upon receipt of a certificate from the Ministry of Planning that the debt constituted a "productive financing" falling within the economic and social policies of Venezuela. No such certificate was ever forthcoming. Matesi was obliged to extend the calendar of payments in order to avoid a default and part of the loan was capitalised.[195]  However, as of 30 April 2008, a sum of US$27.1 million remained unpaid.

---

[193] Exhibit C-74
[194] Claimants' Reply Memorial, para. 169, and Second Compass Lexecon Report, para. 58.
[195] Transcript (English), Day 3, p. 823 (Bello). See also Transcript (English), Day 3, pp. 826 and 827

252. Venezuela contends that the Talta Loan had no value independent of Matesi's business[196] - indeed it was a legal fiction, because there was no repayment and no interest was collected. In effect, argues Venezuela, Talta seeks a double recovery as both a shareholder in, and lender to, Matesi.[197] Moreover, if the Talta Loan was an independent asset, it carried no risk other than the normal commercial risk of default for which the agreement established its own remedies – for example at Clause 2.03:

> "The Borrower shall pay interest on the unpaid principal amount of the Loan outstanding from time to time at a rate per annum equal at all times during each Interest Period to Libor plus 5.00% per annum, payable in arrears on each Payment Date and on the date the Loan is paid in full."[198]

253. Moreover, lender risk was measurable by reference to the interest rate attributable to the loan and in the event of non-payment, Talta's exposure was limited: Clause 6.09 provided that:

> "Nothing herein [the loan] shall be deemed or construed to make the Lender a surety or a guarantor of the Borrower or of any other shareholder or Affiliate of the Borrower or liable to meet any obligation of the Borrower or of any other shareholder or Affiliate of the Borrower."[199]

254. In the event of a default, Talta was to rank *pari passu* with all other present and future senior and unsubordinated debt,[200] and it was protected in the event of an expropriation by a right to immediate repayment. Clause 5.01 established as an "*event of default*":

> "Any authority asserting or exercising governmental or police powers in Venezuela or any Person acting or purporting to act under such authority shall have taken, authorized or ratified any action or series of actions for or resulting in: (1) the appropriate, requisition, condemnation, seizure, confiscation, expropriation or nationalization of all or substantially all of the shares of the Borrower or all or substantially all of the properties or assets of the Borrower."

---

[196] Hart Report, para. 89
[197] Respondent's Rejoinder, paras. 220-222
[198] Talta-Matesi Loan Agreement, § 2.03(a). (Exhibit C-74)
[199] *Idem*, § 6.09.
[200] *Idem*, § 3.01(f).

And in the case of an event of default:

> "the Lender may declare the entire unpaid principal amount of the Loan, all accrued and unpaid interest and all other amounts payable under the Agreement and the Note to be forthwith due and payable."[201]

255. *The Talta Off-Take Agreement:* Pursuant to the Off-Take Agreement of 9 July 2004,[202] Matesi agreed, for a period of 10 years from the date of its acquisition of Posven's assets, to sell 50.2% of its Produced Volume to Talta, and Talta agreed to take up 30.12% of the Produced Volume at cost plus 10%.

256. It is contended by Venezuela that the Off-Take Agreement is no more than a straightforward sale and purchase agreement – a commercial agreement entered into between two private entities.[203] Claimants' assertions that the Off-Take Agreement amounted to a contribution to the State, because it was one of the reasons for Talta's investment in Venezuela in the first place[204] and that it provided for continued supply to Matesi to enable it to operate and employ workers in Venezuela and ensure local supply of HBI were dismissed by Venezuela as being: "*so vague as to be meaningless.*"[205] According to Venezuela, such evidence and argument were insufficient to demonstrate that the Off-Take Agreement involved a genuine contribution, namely a commitment of capital, made with the expectation of a commercial return, which was both in the future and uncertain.

257. Furthermore, according to Venezuela, the argument that it involved investment risk, because it was: "*subject to operational and competitive risk that may have decreased the value of Matesi to its shareholders*" was misconceived: that was the sort of operational and competitive risk inherent in any commercial contract

---

[201] Idem, §5.01(k) et seq
[202] Exhibit C-27
[203] Respondent's Counter-Memorial, para. 191
[204] Claimants' Reply Memorial, para. 268
[205] Transcript (English), Day 1, p. 262

- and in this case, there was a guaranteed seller and a guaranteed buyer within the same corporate family.[206]

258. In short, this was not a situation in which Talta was paying money or contributing a meaningful asset while any returns were uncertain or dependent upon future profitability. On the contrary, all risks were capable of being minimized by contractual agreement.

259. Venezuela placed reliance, *inter alia*, upon the holding in *Joy Mining Machinery v Arab Republic of Egypt* that:

> "If a distinction is not drawn between ordinary sales contracts even if complex, and an investment, the result would be that any sales or procurement contract involving a State agency would qualify as an investment …. Yet those contracts are not investment contracts except in exceptional circumstances and are to be kept separate and distinct for the sake of a stable legal order."[207]

And the holding in *Romak S.A. v. The Republic of Uzbekistan* that:

> "An investment risk entails a different kind of plea, a situation in which the investor cannot be sure of a return on his investment and may not know the amount he will end up spending even if all relevant counterparties discharge their contractual obligations. Where there is a 'risk' of this sort, the investor simply cannot predict the outcome of the transaction."[208]

260. Venezuela maintained that in the case of the Off-Take Agreement, there was no involvement of the Venezuelan State, which derived no benefit from a commercial arrangement, subject to normal commercial terms, including provision for ICC arbitration in Montevideo, Uruguay and an application of UNIDROIT principles.[209]

---

[206] Respondent's Rejoinder, paras. 216 and 217
[207] *Joy Mining v. Arab Republic of Egypt*, ICSID Case No. ARB/03/11, Award on Jurisdiction, 6 August 2004. (*"Joy Mining"*).
[208] *Romak v. Uzbekistan*, PCA Case No. AA 280, Award, 26 November 2009. (RLA-107)
[209] Exhibit C-27 at Art. 13.2.

261. Venezuela also dismissed Claimants' suggestion that the cover afforded by Article 1(2)(c) of the Luxembourg Treaty was "*automatic*"[210] and that, by application of Article 1 (2)(e), it extended to all "*contractual obligations*". In the submission of Venezuela, the protection of the Treaty extended to public law contractual concessions and this agreement was not such an instrument.

### b. Claimants' Case

262. Claimants' submission is that both the Talta Loan and the Off-Take Agreement fall squarely within the definitions of "investment" contained in the Treaties (specifically within Art. 1(2)(c) of the Luxembourg Treaty) and that even if the Tribunal were to hold that one or both agreements did not constitute an investment for treaty purposes, then they were elements of a transaction, which had to be considered as a whole and which itself was an "investment".

263. For their part, Claimants maintained that the long term nature (10 years) of the commitment to a supply of HBI at cost-plus pricing manifested by the Off-Take Agreement was one of the drivers behind Talta's investment in Venezuela in the first place. The arrangements put in place for a long-term continued supply constituted a contribution to the State in that it secured the operation of the facility, the hiring of local employees and a market for locally supplied HBI. In these respects the Off-Take Agreement satisfied the Portuguese Treaty's definition of a right relating to investments or an obligation with economic value.

264. If that were wrong, Claimants urged upon the Tribunal the need to step back and consider the overall transaction, namely their qualifying investment in Matesi, of which, it was contended, both the Talta Loan and the Off-Take Agreement were integral parts. They relied upon the decisions in *Ceskoslovenska Obchodni Banka AS v Slovak Republic*[211]; *Mytilineos Holdings SA v. State Union of Serbia and Montenegro*[212]; and *Inmaris Perestroika Sailing Maritime Services*

---

[210] Respondent's Counter-Memorial, para. 187.
[211] *Ceskoslovenska Obchodni Banka AS v Slovak Republic*, ICSID Case ARB/97/4, 24 May 1999.
[212] *Mytilineos Holdings*

*GmbH et al v. Ukraine.*[213] Venezuela's reliance upon *Romak* was inapposite: this was not a transaction akin to a one-off commercial transaction for the sale of wheat; and its reliance upon the *Joy Mining* case was equally misplaced:

> "…the *Joy Mining* tribunal counseled in favor of using a transaction-based approach to the definition of investment, holding that '*a given element of a complex operation should not be examined in isolation because what matters is to assess the operation globally or as a whole […]*.' None of these tribunals used the formalistic test advocated by Venezuela here."[214]

### c.    Relevant Principles

265. Before dealing with each of these disputed elements in turn, the Tribunal sets out the basis upon which it has conducted its analysis.

266. Article 25(1) of the ICSID Convention provides that:

> "The jurisdiction of the Centre shall extend to any legal dispute arising directly out of an investment, between a Contracting State … and a national of another Contracting State, which the Parties to the dispute consent in writing to submit to the Centre."

267. As is now routinely cited, in their Report on the ICSID Convention, the Executive Directors of the International Bank for Reconstruction and Development stated:

> "No attempt was made to define the term 'investment' given the essential requirement of consent by the parties, and the mechanism through which the Contracting States can make known in advance, if they so desire, the classes of dispute which they would or would not consider submitting to the Centre. (Article 25(4)."[215]

268. The relevant "mechanisms" in this case are the particular provisions of the applicable BITs in which "investments" are defined.

---

[213] *Inmaris Perestroika Sailing Maritime Services GmbH et al v. Ukraine*, ICSID Case No. ARB/8/08, Decision on Jurisdiction, 8 March 2010, para. 92.
[214] Claimants' Reply, paras. 174-175, citing *Joy Mining*, para 54.
[215] IBRD: Report of the Executive Directors on the Convention on the Settlement of Investment Disputes Between States and Nationals of Other States (1968), Sec V.27.

269. The Luxembourg Treaty provides, at Article 1(2), that:

> "The term 'investments' shall mean any kind of asset, or any direct or indirect contribution in cash, in kind or services, invested or reinvested by an investor of one Contracting Party in the territory of the other Contracting Party in any sector of economic activity whatsoever…"

270. Included within the definition are:

> "(b) … shares, equity participations and any other form of participation, including minority or indirect participation in companies constituted in the territory of one of the Contracting Parties….

> (c) obligations, claims and rights **to any benefit having an economic value linked to an investment.**" (Emphasis added).

271. Article 1(2) of the Portuguese Treaty provides that :

> "The term 'investments' includes all types of assets and rights relating to investments made in accordance with the laws of the other Contracting Party, and specifically, but not exclusively including …

> (b) Shares and other forms of participation in the capital or the economic results of companies;

> (c) Credit rights related to money or any other obligation having an economic value …"

272. These provisions are to be interpreted by reference to general principles of international law and Article 31 of the Vienna Convention (see para 134 above).

273. Venezuela emphasises the importance of the preambles to the Treaties, which, it contends:

> "[shed] light on the object and purpose of the contracting parties' respective obligations."[216]

The Preambles to the Luxembourg and the Portuguese Treaties (as quoted earlier in this Award) speak respectively to "*strengthen[ing] their economic*

---

[216] Respondent's Counter-Memorial, para. 181

*cooperation*" and "*intensify[ing] economic cooperation between the two States for their mutual benefit.*"

274. That does not seem to the Tribunal to be a controversial point, any more than is Venezuela's reliance upon Zachary Douglas' proposition that:

> "The notion of a *quid pro quo* between a foreign investor and the host state is the cornerstone for the system of investment treaty arbitration. In exchange for contributing to the flow of capital into the economy of the host contracting state, the nationals of the other contracting state … are given the right to bring international arbitration proceedings against the host contracting state and to invoke the international minimum standards of treatment contained in the applicable investment treaty."[217]

275. Venezuela takes the position that the mere fact that an asset or right, which is said to constitute an "investment", appears to meet the formal characteristics of an "'investment" prescribed in a BIT is insufficient; it must incorporate certain substantive features of an economic nature sufficient to distinguish it from a cross-border commercial transaction. As put by Douglas:

> "An investment in order to qualify for investment treaty protection must incorporate certain legal and economic characteristics. The economic characteristics derive from the common economic conception of foreign direct investment. In Rule 23 [of this Treatise], they are codified as the transfer of resources into the economy of the host state and the assumption of risk in expectation of a commercial return. The legal characteristics derive from the non-exhaustive examples of an 'asset' that constitute 'investment' in investment treaties and this forms the basis of Rule 22, which generalizes the requirement as the acquisition of property rights in the host state. It is essential that an investment have both the requisite legal and economic characteristics."[218]

276. That, too, is a proposition, which has informed the Tribunal's analysis in the context of the two disputed "investments". However, it is suggested by Claimants that what in fact Venezuela has sought to do is to elevate these general principles to a point that they somehow evolve into an overarching

---

[217] RLA-5, para. 335.
[218] *Idem*

concept of "investment", which purports to override the terms of the Treaties themselves. If that were the case, the Tribunal would have no difficulty in rejecting it. The express terms of Article 1(2) of both of the Treaties must be given due weight in accordance with Article 31 of the Vienna Convention, that is to say: "*in accordance with the ordinary meaning to be given to the terms of the treaty **in their context and in the light of its object and purpose***." That being the case, and while it accepts Claimants' submission that the listed examples in Articles 1(2) of the two Treaties are examples enumerating the different legal forms in which "investments" may manifest themselves, it would be equally inappropriate if the Tribunal were to seek to construe those terms without regard to the context in which they came to be made.

### d.   Analysis

277.   The question for the Tribunal, properly framed, is whether each of the Talta Loan and the Talta Off-Take Agreement qualifies as an "investment" under the terms of the Treaties and the Convention in its own right and/or whether they constitute:

> "… interrelated transactions, each element of which, standing alone, might not in all cases qualify as an investment."

278.   In particular, Claimants maintained that the test, as enunciated by the tribunal in *CSOB v Slovak Republic*, was as follows:

> " … a dispute that is brought before the Centre must be deemed to arise directly out of an investment even when it is based on a transaction, which, standing alone, would not qualify as an investment under the Convention, provided that the particular transaction forms part of an overall operation that qualifies as an investment."[219]

279.   Venezuela emphasises the application by ICSID tribunals of a two-prong test to establish the existence of an investment in investor-State disputes. While bilateral investment treaties may confirm or restrict the notion of investment in the ICSID Convention they

---

[219] *CSOB v. Slovak Republic*, ICSID Case No. ARB/97/4, Decision of the Tribunal on Objections to Jurisdiction, 24 May 1999, para. 72.

> "… cannot contradict the definition of the ICSID Convention … they cannot expand it in order to have access to ICSID… As long as it fits within the ICSID notion, the BIT definition is acceptable. It is not if it falls outside of such definition."[220]

280. In the opinion of the Tribunal, there is nothing in the language of the Luxembourg and Portuguese Treaties, which purports to deviate from the Convention notion of "investment".

281. Moreover, the Tribunal must consider whether or not the Talta Loan and the Talta Off-Take Agreement constitute "investments" in the context of a dispute in which Claimants' investment in Matesi is itself <u>acknowledged</u> to be an "investment" for the purposes of the Convention and the Treaties.

282. Notwithstanding that acknowledgement, Venezuela's attack upon the Talta Loan and the Off-Take Agreement is premised not least upon the contention that the acquisition of Matesi itself did not conform to what Venezuela suggested at the hearing was a "*key factor*", namely that "*the overarching plan [for the alleged investments taken as a whole] included a direct intentional benefit to the host State.*"[221] Rather than having any regard to the development of the economic or banking capacity of Venezuela, the objective of the purchase of the PosVen assets, including the Matesi plant, was the opportunity for Claimants to exploit in the open market a guaranteed supply of HBI produced by Matesi and purchased pursuant to the Off-Take Agreement on very favourable terms, which Claimants could then sell on at a considerable profit.  In short:

> "Rather than intending to invest in the host State to the direct benefit of the host State with the expectation of an investment level of return, the entire plan seems to be about engaging in commercial transactions for the purchase and sale of HBI through a corporate [family] structure."[222]

---

[220] *Phoenix Action Ltd. v. The Czech Republic*, ICSID Case No. ARB/06/5, Award, 15 April 2009.
[221] Transcript (English), Day 1, p. 268.
[222] *Idem*, p. 271.

283. The Tribunal considers that that proposition cannot be reconciled with the proposition that the acquisition of Matesi was an "investment" and, in any event, it begs the question as to the nature of the acquisition of Matesi.

284. In considering this issue, the Tribunal respectfully adopts the "combined effect" test referenced in the decisions in:

(a) *Mytilineos Holdings SA v. State Union of Serbia & Montenegro*,[223] in which the Tribunal had concluded that:

> "the combined effect of the [a]greements [was] clearly more than an ordinary commercial transaction";

(b) *Inmaris Perestroika Sailing Maritime Services GmbH et al v. Ukraine*[224] in which the Tribunal had held that:

> "It is not necessary to parse each component part of [an] overall transaction and examine whether each, standing alone, would satisfy the definitional requirements of the BIT and the ICSID Convention. For the purposes of this Tribunal's jurisdiction, it is sufficient that the transaction as a whole meets those requirements";

as well as the "integrality test" elaborated in the *CSOB* case.[225]

285. With these principles in mind, the Tribunal endorses the suggested "*holistic*" approach articulated by counsel for Claimants as follows:

> "… what was the investment of [Claimants]? Is there any element here, if you took it away, would have resulted in the investment not occurring? …[W]hat was the overall package that made [Claimants] invest in Venezuela? It was the ability to buy assets … They needed to finance that acquisition, so that was part of their ability to do that … [T]he business sense for it was to have a ready supply of what was essentially a raw material … the pellets which it could then export through the port. The combination of all that, together obviously with the Supply Agreement … all of these were linked together. If you took

---

[223] *Mytilineos Holdings.*
[224] *Inmaris Perestroika Sailing Maritime Services GmbH et al v. Ukraine,* ICSID Case No. ARB/08/8, Decision on Jurisdiction, 8 March 2010.
[225] See para. 277, *supra.*

one away, if there was no loan, then there would have been no money to bring these elements together and the Off-take agreement was essentially something that was of fundamental interest to them because that was then a market for what was occurring."

…

"… [W]e think the problem is if you start to looking in isolation of what specific links are you have to think what was the intention of the investor at the moment of the investment? And if they are all linked together in that way, is it an integrated investment undertaking? … It is not necessary to parse each component; it's [the] integrated investment, … [the] transaction as a whole."[226]

286. As to those submissions, the Tribunal notes Venezuela's contention that reliance on the cases cited by Claimants is misplaced, because they related to disputes in which a clear interest on the part of the respondent State could be identified. However, in this case, the investment in Matesi is a qualifying investment for the purposes of the Convention and the Treaties, and so that is not an objection that need detain the Tribunal.

287. *The Talta Loan:* As far as the Talta Loan is concerned, it is clear on the evidence before the Tribunal that, in the context of the Investment Agreement, the commitment by Talta to advance some US$60 million to finance the purchase of the PosVen assets and to contribute to the costs of their refurbishment was critical to the making of the investment in Matesi.

288. Mr Montero testified to the Tribunal that the Talta Loan was used to fund the start-up costs of the venture.[227] Mr Malvassora's evidence was that the Loan was a:

"productive financing which was necessary to reactivate the plant which for three years had been paralysed, would generate 300 jobs, pay taxes … an investment to reactivate an industry, which had been paralysed, which, … was within the strategic and social and economic plan of Venezuela."[228]

---

[226] Transcript (English), Day 1, pp.142-143.
[227] Transcript (English), Day 2, pp. 470-471.
[228] Transcript (English), Day 3, p.656.

289.  The Tribunal accepts that evidence. It is satisfied that the Talta Loan was more than a mere facilitation of Claimants' purchase of HBI from Matesi, as Venezuela contended.[229] Its purpose was to provide for the acquisition of the PosVen assets and to be applied to start-up costs. In the opinion of the Tribunal, the Talta Loan qualifies as an "investment" in its own right under the terms of Articles 1(2) of the Luxembourg and Portuguese Treaties. But even if that were wrong, the Tribunal is satisfied that it was an essential element of Claimants' "investment" in Matesi.

290.  *The Off-Take Agreement:*     So far as the Off-Take Agreement is concerned, Mr Montero emphasised the importance of the Off-Take Agreement to the Matesi "investment".  In answer to a question from a member of the Tribunal, he stated that it had been very important to the decision to acquire the plant. By avoiding a tie to a volatile market: "*one can remove a lot of problems and guarantee the financial continuity of the company.*"[230]

291.  The Tribunal accepts Venezuela's submission[231] that the Off-Take Agreement is not an "investment" in its own right. Nor does it consider that the Off-Take Agreement would constitute an investment, if an holistic approach were adopted: despite the context in which it was concluded, it remains, in essence, a commercial agreement in respect of the purchase and delivery of product at a known price, and in such a manner that Talta took off-shore Venezuela the benefit of the profit of the on-sale in the open market.  To this end, the Tribunal considers that the Off-Take Agreement must be treated differently to the Talta Loan.

### e.      Conclusion

292.  Accordingly, the Tribunal concludes that the Talta Loan constitutes an "investment" within the scope of the Luxembourg and Portuguese Treaties, and that accordingly it has jurisdiction to consider claims in respect of it.

---

[229] Respondent's Post-Hearing Brief, para. 121.
[230] Transcript (English), Day 2, p. 490.
[231] See Respondent's Post-Hearing Brief, paras. 192 – 199.

293. As for the Talta Off-Take Agreement, the Tribunal concludes that this was not an "investment" in its own right.

### 4.  ALLEGED "CONTRACTUAL CLAIMS"

      a.     Venezuela's Case

294. In this case the sole source of supply of raw material (iron ore in the form of pellets and lump ore) was CVG FMO, a Venezuelan State entity, which enjoyed a monopoly.  The Supply Contract was signed between Matesi and CVG FMO on 17 June 2004.[232]

295. It is Venezuela's case that Claimants' claims in respect of allegedly insufficient or discriminatory pellet supply by CVG FMO to Matesi constitute a contractual, rather than a treaty, dispute, which can only be resolved pursuant to the dispute resolution and forum selection clauses of the Supply Contract.  To this end, this Tribunal has no jurisdiction over the Claimants' claims in this regard.

296. Further, Venezuela contends that since CVG FMO acted in a commercial and private capacity as a seller of raw materials, the basis upon which it fulfilled its supply obligations was a matter of its exercise of the terms of the contract: it had not invoked sovereign prerogatives and hence, even if there had been a breach of CVG FMO's contractual obligations, Venezuela's liability under the Treaties could not have been implicated.

297. Venezuela emphasises in this regard that throughout the considerable correspondence in the record between Matesi and CVG FMO, the discussion was only ever of contractual obligations.  Indeed, even in its letter of 12 August 2009 to MIBAM, Tenaris alleged "*contractual violations*" on the part of CVG FMO. Furthermore, the valuation of loss and damage said to be attributable to

---

[232] Exhibit C-25

failures of adequate supply of pellets was based upon a contractual expectation.[233]

        b.    Claimants' Case

298. For their part, Claimants say that their claims – for discrimination arising out of breaches of the fair and equitable treatment and non-impairment clauses of the Treaties – are not claims for breach of the pro-rating provisions of the Supply Contract (a contract to which they are not party).

299. Rather, the underlying premise in the Claimants' case is that CVG FMO is a State entity with a sovereign monopoly over the supply of raw material; that Venezuela's responsibility is engaged in respect of the discriminatory treatment accorded by CVG FMO to Matesi, by operation of customary international law rules of attribution; that the conduct in question constituted a breach of Venezuela's obligations under the Treaties; and that Claimants' claim for damages for the diminution of the value of their shareholding is calculated based upon the customary international law rule of "full reparation", rather than any contractual measure.

        c.    Analysis

300. In assessing this objection, a clear distinction must be drawn between two enquiries:

(a)    Whether this Tribunal is entitled to hear and determine the Claimants' claims in respect of raw material supply.

(b)    Whether the Claimants' claims in respect of raw material supply actually constitute a breach of either Treaty, for which Venezuela is responsible.

301. As to (a), it is common ground that the Tribunal only has jurisdiction to hear and determine breach of treaty claims, not breach of contract claims.[234] And so the

---

[233] See Respondent's Post-Hearing Brief, paras. 213-230

sole determinative question at the jurisdictional stage is: on the <u>assumption</u> that the Claimants' allegations are true, could such allegations amount to a breach of treaty, as opposed to a breach of contract?

302. This is an enquiry on a *prima facie* basis, which does not require the Tribunal actually to assess the allegations themselves, or address (b) above - as this would obviously be a merits issue, to which the Tribunal would only turn if it had jurisdiction.[235]

303. Much of Venezuela's argument here was actually concerned with (b), not (a). Hence, whether or not CVG FMO was in fact acting in a commercial and private capacity as a seller of raw materials; and whether or not its conduct actually engages Venezuela's responsibility, are key issues in determining whether or not there has been a breach of treaty. But they are not questions that will delimit the Tribunal's ability to hear such claims in the first place – *i.e.* the only enquiry at this stage.

304. In this case, Claimants have been very careful and very clear in identifying all claims in respect of the supply of raw material as breaches of treaty – not breaches of the Supply Contract. As summarised (*e.g.*) in their Reply:

> "In their Memorial, the Claimants described how Venezuela discriminated against Matesi in the supply of iron pellets necessary for HBI production in favor of state-owned enterprises and how this contradicted the Treaties' fair and equitable treatment and 'non-impairment' provisions. In particular, the Claimants stated that CVG FMO, an organ of the Venezuelan State, had a sovereign monopoly over supply and it abused its authority to discriminate against Matesi, thus reducing the value of the Claimants' shareholding. The Claimants also cited the late President Hugo Chávez making threats of discriminatory conduct regarding supply against the Claimants' holdings at around the same period as the defects in supply occurred.

---

(Footnote continued from previous page)
[234] There are no "Umbrella Clause" claims in this case (albeit such claims might be properly characterised as breaches of treaty in any event).
[235] *Case Concerning Oil Platforms (Islamic Republic of Iran v United States of America)* (ICJ Reports 803) Judgment, 12 December 1996, Separate Opinion of Judge Rosalyn Higgins, para. 32.

> The Claimants also noted that Matesi entered into the CVG Supply Contract, which guaranteed a *pro rata* share of iron pellets based on its share of the total domestic annual pellet requirements. The Claimants, however, raised no claims of contractual breach at any point in their Memorial."[236]
>
> …
>
> "As stated in the Claimants' Memorial, the Venezuelan government had a *de jure* monopoly on Matesi's inputs of lump iron ore and iron pellets. CVG FMO, an organ of the Venezuelan state, controlled that monopoly. The Claimants noted that there was a state policy whose purpose was to effect the nationalization of the steel industry and reduce the value of Matesi at the time of the taking. Part of this policy, was the State's use of its monopoly over supply of iron pellets in a discriminatory fashion to favor state-owned companies, in contravention of the Treaties' provisions on fair and equitable treatment and non- discrimination."[237]

305. Indeed, Claimants could not have raised any claims for breach of contract in any event for the simple reason that they are not party to the Supply Contract.[238]

306. It follows that, since the only claims that are advanced are said to be breaches of the Treaties, such claims are properly brought before this Tribunal.

307. As to Venezuela's reliance on the existence of a contract dispute resolution provision in the Supply Contract, this takes matters no further. As confirmed by the *Vivendi I* Annulment Committee (and by numerous other tribunals):

> "where the 'fundamental basis of the claim' is a treaty laying down an independent standard by which the conduct of the parties is to be judged, the existence of an exclusive jurisdiction clause in a contract between the claimant and the respondent state or one of its subdivisions cannot operate as a bar to the application of the treaty standard."
>
> …

---

[236] Claimants' Reply, para. 176.
[237] Claimants' Reply, para. 178.
[238] CVG Supply Contract, 17 June 2004, p. 1. (Exhibit C-25)

# Exhibit A

## Part 2 of 2

"[a] state cannot rely on an exclusive jurisdiction clause in a contract to avoid the characterisation of its conduct as internationally unlawful under a treaty." [239]

308. Among the cases to reaffirm this approach, and by way of further example, in *Abaclat* the tribunal concluded that while there was a contractual obligation to bondholders to make payments on certain bonds, what had elevated the matter into a treaty claim was that Argentina's breach of that obligation had been brought about by the sovereign act of passing legislation, which "*had the effect of unilaterally modifying Argentina's payment obligations.*"[240]

309. But even aside from this basic proposition, there remains the simple point that, not being a party thereto, the Claimants could not have taken advantage of the dispute resolution provision in the Supply Contract in any event. In the course of their submissions, the Claimants observed that there was no basis to suggest that they might be able to avail themselves of any "group of companies" doctrine to trigger the dispute resolution provisions of the Supply Contract, and the application of such a doctrine to an arbitration clause governed by Venezuelan law was not developed at the Hearing.[241]

310. It follows that this Tribunal has jurisdiction to hear and determine Claimants' claims regarding supply of raw material, and that Venezuela's objections in this regard must be dismissed.

---

[239] *Compania de Aguas del Aconquija SA and Vivendi Univeral SA v Argentine Republic*, ICSID Case No. ARB/97/3, Decision on Annulment, 3 July 2002, paras. 101 and 103. See similarly: *SGS Société Générale de Surveillance SA v Republic of Paraguay*, ICSID Case No. ARB/07/29, Decision on Jurisdiction, 12 February 2010, paras. 125, 128, and 137–138; *Suez, Sociedad General de Aguas de Barcelona SA and Vivendi Universal SA v Argentine Republic*, ICSID Case No. ARB/03/19 and *AWG Group Ltd v Argentine Republic*, UNCITRAL, Decision on Jurisdiction, 3 August 2006, paras. 41–45; *Jan de Nul NV, Dredging International NV v Arab Republic of Egypt*, ICSID Case No. ARB/04/13, Decision on Jurisdiction, 16 June 2006, paras. 132–133; *Eureko BV v Republic of Poland*, Partial Award, 19 August 2005, paras. 92–114; *Impregilo SpA v Islamic Republic of Pakistan*, ICSID Case No. ARB/03/3 Decision on Jurisdiction, 22 April 2005, paras 286–290; *Azurix Corp. v Argentine Republic*, ICSID Case No. ARB/01/12, Decision on Jurisdiction, 8 December 2003, paras. 75–79; *SGS Société Générale de Surveillance SA v Islamic Republic of Pakistan*, ICSID Case No. ARB/01/13, Decision of the Tribunal on Objections to Jurisdiction, 6 August 2003, paras. 146–155; *CMS Gas Transmission Company v Republic of Argentina*, ICSID Case No. ARB/01/8, Decision of the Tribunal on Objections to Jurisdiction, 17 July 2003, paras. 70–76.
[240] *Abaclat et al v. Argentine Republic*, ICSID Case No. ARB/07/5, Decision on Jurisdiction and Admissibility 4 August 2011, para. 319
[241] Claimants' Post-Hearing Brief, para. 305, and Transcript (English), Day 1, p.276.

311. Having so concluded, in light of various arguments that were advanced on behalf of Venezuela in the course of the proceedings, the Tribunal also clarifies, in the words of the *Bayinder* tribunal, that while its jurisdiction is engaged here in respect of treaty claims only:

> "[The Tribunal] can and must [consider contract matters] to the extent necessary to rule on the treaty claims. It takes contract matters, including the contract's governing municipal law into account as facts as far as they are relevant to the outcome of the treaty claims. Doing so, it exercises treaty not contract jurisdiction. This approach is in conformity with international law and arbitral practice." [242]

312. Whether or not the Claimants are actually able to sustain their allegations with respect to the supply of raw materials is considered in **Section F.1** below.

### 5. CONCLUSION ON JURISDICTION OBJECTIONS

313. In light of the matters set out above, and save in respect of the Off-Take Agreement (see paragraph 291 above), the Tribunal finds that it has jurisdiction to hear and determine all of the Claimants' claims in this arbitration, and that each of Venezuela's objections in respect of the latter claims must be dismissed.

---

### F. PRE-EXPROPRIATION CLAIMS

314. The Claimants' substantive claims divide into two broad categories: claims arising out of conduct in the period up to the nationalisation of Matesi, and claims arising out of the nationalisation itself.

315. In this section, the Tribunal considers the former category, which comprises allegations of breach of the fair and equitable treatment / non-discrimination / non-impairment standard, and the protection and security standard.

---

[242] *Bayindir Insaat Turizm Ticaret ve Sanayi A.S. v. Islamic Republic of Pakistan*, ICSID Case No. ARB/03/29, Award, 27 August 2009, paras. 135-136.

316. Each set of claims is addressed in turn below.

## 1. FAIR AND EQUITABLE TREATMENT / DISCRIMINATION CLAIM

317. It is the Claimants' case that Venezuela is in breach of the fair and equitable treatment / non-discrimination / non-impairment standard in both Treaties, by virtue of the fact that Matesi was the subject of discrimination in the supply of raw material by CVG FMO.

### a. The Matesi Plant

318. The Matesi HBI plant comprised two reactors, which were designed to operate on a mix of lump ore and iron pellets. Each reactor was capable of producing 100 tons of HBI per hour, or 750,000 tons per year, giving a nominal capacity of 1.5 million tons a year.[243] The reactors used a mix of pellets (80%) and lump ore (20%), supplied through CVG FMO (TOPPCA).

319. Since the production of a ton of HBI requires approximately 1.6 million tons of pellets, lump ore and "fines", it would require some 2.4 million tons of iron ore, some 1.92 million tons (80%) of which comprised pellets, in order to achieve Matesi's nominal capacity of 1.5 million tons.

320. Were a reactor unable to operate at 50% capacity or more, Matesi would have to shut it down. It was essential therefore, that Matesi secure a reliable supply of feed materials for its reactors from one or both of the producers of pellets in Venezuela, CVG FMO and Sidor (its 49% shareholder). Sidor used much of its own production in its own steel production processes. To the extent that it had any excess pellets, it could release them to the market, but Matesi could not buy directly from Sidor: Sidor was obliged to sell to CVG FMO, which held a monopoly over sales of pellets to the four domestic HBI producers, Comsigua (in which Claimants held a minority shareholding)[244], Venprecar,

---

[243] Tamez Witness Statement, para. 12.
[244] Transcript (English), Day1, p. 39.

Minorca/OPCO (which was wholly owned by CVG and, since 2007, operated by CVG FMO), and Matesi.

321. CVG FMO was thus the sole source of supply to Matesi.

322. Claimants maintain that an agreement with CVG FMO was:

> "pivotal to [their] decision to invest in Matesi and was a condition precedent to [their] purchase of PosVen's assets."[245]

### b. The Complaint

323. The basis of Claimants' complaint is that CVG FMO discriminated against Matesi and in favour of other HBI producers in the supply of raw material. Claimants allege that State-owned Minorca/OPCO was the "*primary beneficiary*"[246] of CGV FMO's discriminatory conduct.

324. Venezuela maintains, first, that there was no discrimination against Matesi in the context of pellet distribution; and, second, that disputes over pellet distribution were commercial matters, which could, and should, have been handled through dispute resolution mechanisms in the contracts.

325. Further, according to Venezuela, Claimants have failed to show that CVG FMO was an organ or entity of the State exercising specific government authority when distributing pellets, or that it had had discriminatory intent.

326. Venezuela points out that it had an interest of its own in Matesi, which pre-dated nationalisation, as well as its interests in Comsigua, Venprecar and Minorca/OPCO, and that Claimants, through Tenaris, had a "*significant*" interest[247] in Comsigua.

327. Moreover, Venezuela contends that Matesi was reliant principally upon its own shareholders to take its supply. That dependency left it exposed, first because

---

[245] Claimants' Post-Hearing Brief, para. 18
[246] Claimants' Post-Hearing Brief, para. 69
[247] Respondent's Post-Hearing Brief, para. 219

SIDOR used its own direct reduced iron before turning to any other source, and financial difficulties had caused it to reduce its demand for Matesi-sourced HBI over the period 2005-2008. Second, because Matesi had been set up as a cost centre primarily to service the requirements of its corporate affiliates, such that it was not established in its own right in the export market, unlike Venprecar, Comsigua and Minorca/OPCO - all of which had had a long-term presence in the export market.

328. In any event, far from under-supplying Matesi, Venezuela maintains that the record at the Hearing demonstrated that Matesi had received an over-allocation of pellets between 2005 and 2008.[248]

### c. Terms of the Supply Contract

329. The Supply Contract provided, *inter alia*, as follows: [249]

> "**1.3:** Annual Basis for Nominal Capacity
>
> This is defined as the IRON ORE needs that the BUYER requires for Nominal Capacity of its REDUCTION PLANT, which amounts to 2,400,000 TONS of IRON ORE per year.
>
> …
>
> **2.1…** The volume to be supplied annually to the BUYER, except in the INITIAL YEAR and the following CALENDAR YEAR (corresponding to 2005), shall be fixed in accordance to the BUYER's requirements, the amount of the SELLER's annual availability of IRON ORE, and the annual availability of pellets for sale derived from the plant owned by Siderurgica del Orinoco (SIDOR) C.A. This total annual availability shall be distributed equitably and on a pro rata basis, when applicable, among the various HBI producers on the domestic market.
>
> The aforementioned pro rata distribution applies only when the sum of the total annual pellet requirements from all HBI producers on the

---

[248] *Idem*, paras. 221-225
[249] Exhibit C-25

domestic market exceeds the total annual availability of pellets for sale with such total annual availability of pellets being understood as the sum of the annual production of PELLETS by the SELLER plus the annual availability of pellets for sale from the plant owned by SIDOR and only in this case shall the proportional distribution take place **based on the estimated annual requirements for pellets of each of the HBI producers on the domestic market.**

A pro rata distribution in accordance with the above shall apply in the event of a shortage of LUMP IRON ORE.

**[CVG FMO] shall guarantee to [Matesi] the accuracy of the information provided by [CVG FMO] as well as compliance with equitable distribution among all of the HBI producers on the domestic market**. (Emphasis added)

2.2:      The guaranteed distribution of PELLETS and LUMP IRON ORE to be supplied under the CONTRACT shall be (a)during the first seven (7) calendar years (including the INITIAL DELIVERY YEAR) eighty percent (80%) PELLETS and twenty percent (20%) LUMP ORE and (b) for the remaining term of the CONTRACT (after the first seven (7) CALENDAR YEARS), ninety ercent (90%) PELLETS and ten percent (10%) LUMP IRON ORE….

2.3:      Before 1 October of each CALENDAR YEAR following the INITIAL DELIVERY YEAR, the BUYER shall notify the SELLER if it wishes to increase or decrease the volume of actual delivery for the following CALENDAR YEAR, by an amount that cannot exceed twenty percent (20%) of the volume for the year in progress such that the volume for the following CALENDAR YEAR shall not exceed 10% of the ANNUAL BASIS FOR NOMINAL CAPACITY (2,400,000 TONS). …..

2.4:      The monthly volume of IRON ORE for the INITIAL DELIVERY YEAR that the SELLER commits to supply and the Buyer commits to accept and pay for the volumes supplied shall be that indicated below (figures shown in tons)

| IRON ORE | SEPT 04 | OCT 04 | NOV 04 | DEC 04 | TOTAL |
|---|---|---|---|---|---|
| PELLETS | 48,000 | 70,000 | 80,000 | 90,000 | 288,000 |
| LUMP | 12,000 | 18,000 | 20,000 | 22,000 | 72,000 |

IRON
ORE

| TOTAL | 60,000 | 88,000 | 100,000 | 112,000 | 360,000 |

For the following CALENDAR YEAR (2005), the requirement in IRON ORE agreed between the BUYER and the SELLER is for 1,750,000 TONS, distributed as 1,400,000 TONS of PELLETS and 350,000 TONS of LUMP IRON ORE with the understanding between the PARTIES that in the event of a shortage in the specified quantities of IRON ORE to be supplied in the year 2005, the pro rata clause indicated in item 2.1 of this Clause shall apply.

**2.5:** In the event that the BUYER is able to increase the nominal capacity of the REDUCTION PLANT, it may request an increase in the ANNUAL BASIS FOR THE NOMINAL CAPACITY, notifying the SELLER in writing at least one (1) year in advance of the month in which the increase will occur. Within three (3) months, the SELLER shall inform the BUYER of its capacity to support the requested increase. In any event, the SELLER shall supply the requested increase only up to ten percent (10%) of the ANNUAL BASIS FOR THE NOMINAL CAPACITY."

330. Clause 3 set out the physical and chemical specifications for the Pellets.

### d. Undisputed Facts

331. It is not in dispute that:

(a) in order to produce at its full nominal capacity of 1,500,000 tons of HBI per year, Matesi required an annual supply of 2,400,000 tons of iron ore, 80% of which was to be in pellet form and the rest as lump iron ore.

(b) The initial annual quantities to be required and supplied would be limited to some 70% of Matesi's base capacity, increasing over four years until Matesi could call for 100% of the pellets it required to produce at full capacity in 2008. That entitlement, in terms of tons of pellets, was as follows, the second line showing the percentage of pellets required to produce at 100% capacity:

| | Sept 04 | Oct 04 | Nov 04 | Dec 04 | 2005 | 2006 | 2007 | 2008 |
|---|---|---|---|---|---|---|---|---|
| | 48,000 | 70,000 | 80,000 | 90,000 | 1.4 mill. | 1.592 mill. | 1.784 mill. | 1.920 mill. |
| | 30% | 40% | 50% | 56% | 73% | 83% | 93% | 100% |

(c)   As it was required to do from the second full year of the contract onwards, Matesi notified CVG FMO of its estimated pellet requirements for each calendar year three months before the start of the year in question. The annual requirements letters for 2006, 2007 and 2008 requested the full amounts to which Matesi was entitled as set out in the table above for those years.[250]

(d)   All of the pellet-using HBI producers had similar supply contracts with CVG FMO. And they included *pro-rata* provisions similar to Article 2.1 of the Matesi contract in their own agreements with CVG FMO.[251]

(e)   From May 2005 onwards, there was a shortage of pellets, which triggered the *pro-rata* provisions in the Supply Contract (and those of the supply contracts of the other producers).

## e.   Impact of the Pro-Rating

332. According to Matesi's Production Data, it had achieved approximately 80% of the plant's production capacity by February 2005 (some 100,000 tons). Between February and April 2005, monthly HBI production averaged approximately 75% of production capacity. In 2005, the plant's first full year of operation, it achieved just under 70% capacity, producing approximately one million tons of HBI,[252] notwithstanding a shortfall in the supply of iron pellets from CVG FMO in the second half of 2005. Claimants maintain that the shortfall, which began in

---

[250] The letters are in the record at C-179, C-196, and C-203 respectively
[251] See PVOI-1 (OPCO); PVOI-2 (Comsigua) and Amendment at PVOI-4; PVOI-3 (Venprecar) and Amendment at PVOI-5
[252] Claimants' Memorial, paras. 51 and 52

May 2005, was attributable to technical problems experienced at CVG FMO's plant.

333. In the course of 2007, the rate of supply from CVO FMG to Matesi was reduced to the point that it received 50% less iron pellets in 2007 than it had in 2006. It appears that Matesi was not receiving its *pro rata* share of available iron pellets either. On the basis of its own production data, Matesi's plant operated at less than 30% capacity in 2007.[253]

334. The situation deteriorated in 2008. Matesi maintains that in July 2008, it received no products at all from CVG FMO,[254] whereas it continued to supply HBI to SIDOR for which SIDOR failed to pay, incurring a debt of some US$ 5.9 million to Matesi.

f. **Operation of the *Pro Rata* Mechanism**

335. Article 2.1 of the Supply Contract provides that with effect from 1 January 2006, the volume of iron ore to be supplied to Matesi:

"…. shall be fixed in accordance to [Matesi's] requirements, the amount of [CVG FMO's] annual availability of IRON ORE, and the annual availability of pellets for sale derived from the plant owned by [SIDOR]. This total annual availability shall be distributed equitably and on a pro rata basis, when applicable, among the various HBI producers on the domestic market.

The aforementioned pro rata distribution applies only when the sum of the total annual pellet requirements from all HBI producers on the domestic market exceeds the total annual availability of pellets for sale with such total annual availability of pellets being understood as the sum of the annual production of PELLETS by [CVG FMO] plus the annual availability of pellets for sale from the plant owned by SIDOR and only in this case shall the proportional distribution take place based on the estimated annual requirements for pellets of each of the HBI producers on the domestic market." (Emphasis added)

---

[253] Claimants' Memorial, paras. 67-69 and Exhibit C-157
[254] Witness statement of Mr Malvassora, para. 65. And see Claimants' Memorial, para. 89

336. The clause continues:

> "[CVG FMO] shall guarantee to [Matesi] the accuracy of the information provided by [CVG FMO] as well as compliance with equitable distribution among all of the HBI producers on the domestic market." (Emphasis added)

337. The Parties differ in their interpretation of this provision, and specifically the operation of the *pro rata* mechanism. Claimants maintain that the entitlement should be calculated as follows:[255]

Matesi's *pro rata* % share of pellets = Matesi's annual pellet requirement + total annual HBI Producers' pellet requirements

Total national pellet availability = pellets produced by CVG FMO + excess produced by SIDOR

Matesi's *pro rata* pellet allotment = Matesi's *pro rata* % share of pellets x total national pellet availability

338. A number of competing interpretations were advanced by Venezuela's witnesses and experts, although, following the withdrawal of the evidence of Mr Sabbagh, the disgraced former President of CVG FMO, no one else from CVG FMO appeared to give evidence before the Tribunal.[256] None of the alternatives advanced by Venezuela withstood scrutiny.

339. Dr Poveromo initially suggested that the *pro rata* allocation was based upon proven or historical production capacity, on the basis that CVG FMO would use that as:

> "sort of a test of the annual requirements" … "they wouldn't allocate pellets to someone who was asking for more pellets than FMO knew they could actually use."

---

[255] See Montero 1, para. 35; Montero 2, paras. 14-16 and Transcript (English), Day 2, pp. 464-466
[256] The Tribunal was informed that Mr Amais, CVG FMO's Sales Manager, with whom Matesi had frequent dealings, remains at the company. See Transcript (English), Day 4, p. 997 (cross-examination of Moya)

But he backed away from that position when he was shown the actual terms of Article 2.1, and it was pointed out to him that in none of the other supply contracts that he himself had produced was there reference to "*proven or historical production capacity*".

340. Nor, as a matter of fact, could Matesi point to any production history at the time that it had entered into the Supply Contract, as the plant had only been re-commissioned a matter of months before. Indeed, nor could it point to an unimpaired production history, since it had never enjoyed a full year of production unaffected by shortages or supply limitations.

341. Finally, Dr Poveromo proffered the remarkable observation that:

> "In the world of iron ore, a contract is not a contract": [while it] "defines the price, sets the terms, lists the specifications, in terms of volumes, it expresses an intention of the iron ore company to supply 'X' tons of iron ore per year and it expresses the intention of the steel company to consume or receive the same 'X' tons of iron ore every year."[257]

The Tribunal is not persuaded by the proposition that the terms of a commercial contract, negotiated at arms' length, should not be given proper deference and effect.

342. Mr Hart's evidence was inconsistent in two principal respects. First, he had not compared "like with like" when calculating Matesi's *pro rata* share of pellets. He (and Dr Poveromo) had used best ever historical production figures by reference to years in which there had been no shortage of pellets in the case of Comsigua, Minorca/OPCO and Venprecar, whilst reflecting in the calculations Matesi's actual production capacity in years affected by shortages.[258] Second, he applied this methodology only to the pre-expropriation discrimination claim period. When it came to the valuation of Claimants' equity stake in Matesi at the date of expropriation, he adopted much lower production capacities for

---

[257] Transcript (English), Day 4, pp. 1436 and 1437
[258] Hart 2nd Report, paras. 20 & 21 (and see also, Poveromo 2nd Report at para. 12, Table 2)

Matesi's competitors, thereby increasing Matesi's *pro rata* share up from 23% (2007) to 31% (2008).[259]

343. Of the factual witnesses proffered by Venezuela, it was Mr Moya whom Venezuela called upon primarily to address the pro-rating issue. The Tribunal recalls that Mr Moya was a former PosVen and Matesi employee. He had been Head of Logistics for Matesi, reporting to Mr Tamez (the Industrial Manager). Post nationalisation, he assumed the role of Manager of Processes at BriqVen. He testified to the effect that, first, he had notified CVG FMO of Matesi's requirements by reference to the operational state of its plant in the course of meetings held with CVG FMO when the weight of deliveries of pellets to Matesi was reconciled; and second, he had attended weekly and monthly meetings with CVG FMO at which all of the HBI companies were present and at which the *pro rata* distribution of pellets was agreed. Much of his written testimony was hearsay and unsupported by the documentary record.[260] And at the oral hearing, neither of his key propositions survived cross-examination.

344. Faced with the monthly pellet delivery logs signed by CVG FMO representatives and Mr Moya himself, Mr Moya conceded that they did not reflect the operational status of the Matesi plant: rather, the comments reflected the operational status of the CVG FMO plant:

> "Q. My question was different. My question was whether any of the logs we just looked at mentioned in the observations box the operating conditions of Matesi's plant?
>
> A. The operating conditions at the Matesi plant – I'm sorry, is the question whether I would write anything about the operating conditions at the Matesi plant? No. I wrote here in the comments what was happening at the Ferrominera plant."[261]

---

[259] *Ibid* at Tables 4 and 7

[260] Witness Statement of Moya, para. 6: "It is my understanding that [CVG FMO] allocated the amount of product by taking into account not only the order placed by each briquette company, but also the production conditions at the plant, and especially considering the production capacity of each briquette company."

[261] Transcript (English), Day 4, pp. 974 and 975. And see also Exhibit Hart I-A E, at pp. EN0001-0002, 0004, 0006-0012. And see also Exhibit C-308 (Mr Moya's October 2009 press statement): "*In 2006 Matesi produced over 750,000 tons and in 2007 over 400,000 tons not because its capacity would not allow it but because it was restricted by the supply problems at the [CVG FMO] pellet plant.*"

345. It became apparent that none of the emails exchanged with CVG FMO's Sales Department referred to the operational status of the Matesi plant either: Matesi was told what quantities of pellets it would receive by reference to "*current pellet availability*" and the operational conditions at the relevant pellet production plants:[262]

> "Q. Do any (sic) of these two emails mention the operating conditions at Matesi's plant or Matesi's pellet requirements according to its production plan?
>
> A. No, no reference is made to the conditions in these emails of the Matesi plant, of course."[263]

346. It was apparent, too, from his answers to questions from the Tribunal,[264] that Mr Moya was unaware of the basis upon which CVG FMO distributed pellets to Matesi and the other HBI producers, but on any view, CVG FMO could not have allocated pellets by reference to the operational status of the Matesi plant, if that information had never been communicated to, or recorded by, CVG FMO.

347. To the extent that meetings were held between CVG FMO and the HBI producers, Mr Moya's evidence changed in the course of his cross-examination. He initially adopted the line, which had been taken by Mr Sabbagh (albeit a line unsupported by any documentary record) that the HBI producers had met CVG FMO in general meetings to agree upon the *pro rata* distribution of pellets between them.[265] Subsequently, he conceded that each of the HBI producers had met separately with CVG FMO while representatives of their competitors waited their turn in the hallway outside[266] and that, in fact, as he told a member of the Tribunal, he had no information in respect of the quantities requested by other plants and the quantities with which they were supplied:

---

[262] See Witness Statement Moya, paras. 5 & 6 and Exhibits C-192, C-193, and C-194
[263] Transcript (English), Day 4, pp. 996-999
[264] Transcript (English), Day 4, pp. 981 & 982 and pp. 1069-1071
[265] *Idem*, p. 962
[266] *Idem*, p. 968

"Q. What types of information were you being provided with at the time about the quantities that were being requested by the other plants and amounts that were being sent to other plants?

A: I didn't have information about how much was sent to OPCO or to Comsigua because I didn't have access to their records. I said that it was being sent to them, it wasn't being sent to us, but I cannot say how much. I don't have any information or any place to get such information from."[267]

348. Whether or not any such general meetings took place – and on the basis of the evidence that it has heard, the Tribunal concludes that they did not – it seems counter-intuitive that competing HBI producers, faced with a supply shortage, would entertain any such voluntary waiver of their *pro rata* contractual entitlements to pellets in order to accommodate their competitors rather than pressing for those entitlements in full. The Tribunal notes, and accepts as the more likely scenario, Mr Malvassora's explanation that, in circumstances in which pellets were in short supply, each producer would require the full amount of materials to which it was entitled, because any allocation would be determined by each producer's *pro rata* share of the total requirements of all of the producers.[268]

349. In order to calculate Matesi's *pro rata* pellet allotment, the two variables are:

(a) Matesi's *pro rata* % share of pellets (ascertained by dividing Matesi's annual pellet requirement by the total quantity of available domestically produced pellets); and

(b) the total domestic pellet availability (*i.e.*, pellets produced by CVG FMO and excess pellets produced by SIDOR).

The *pro rata* allocation to Matesi is the result of multiplying Matesi's *pro rata* % share and the total domestic pellet availability.

---

[267] *Idem*, pp. 981 and 982
[268] Malvassora First Witness Statement, para. 25 and Malvassora 2nd Statement, paras. 14 and 15

350. Article 2.1 requires that the volume of supply be fixed by reference to Matesi's requirements and:

> ".... the amount of [CVG FMO's] annual availability of IRON ORE, and the annual availability of pellets for sale derived from the plant owned by [SIDOR]."

The Tribunal notes that Claimants' experts' assessment of the quantity of available pellets was derived from contemporaneous information published by IVES, the Venezuelan Steel Institute, obtained from CVG FMO and SIDOR, and from SIDOR's records establishing its own consumption of pellets (only excess SIDOR pellets being made available for sale to domestic HBI producers). Those calculations were adopted by Mr Hart for the purposes of his own calculations.[269]

351. On the basis of the evidence before the Tribunal, however, Matesi was never informed of the annual requirements/entitlements of its competitors,[270] albeit that pursuant to Article 2.1 of the Supply Contract, it was incumbent upon CVG FMO to:

> " ... guarantee to [Matesi] the accuracy of the information provided by [CVG FMO] as well as compliance with equitable distribution among all of the HBI producers on the domestic market."

352. In this regard, it is pertinent to note that, save for certain very late disclosure, the accuracy of which is contested, Venezuela has declined to produce records of the other HBI producers' historic requirements, albeit that it conceded that there were records in CVG FMO's possession.[271]

353. Be that as it may, there is other evidence available to the Tribunal, which in Claimants' submission, is indicative of "*obvious*"[272] discrimination against Matesi. It includes statistics from IVES, the Venezuelan Steel Institute, from

---

[269] First Expert Report, Compass Lexecon, para.74 and Tables XII and XIV and Exhibit CLEX-85 and Exhibit Hart I-3
[270] Transcript (English), Day 2, p. 631 (Malvassora); Malvassora 1st Witness Statement, para. 25 and Malvassora 2nd Witness Statement, para. 13
[271] Claimants' Post-Hearing Brief, paras. 49 and 50
[272] Transcript (English), Day 1, p. 51

which it would appear that on the basis of figures for 2005 and 2006 in respect of the total local supply of pellets and the total demand, there were shortages of supply against demand of 10% and 25% respectively.[273] However, Matesi sustained a shortfall of 15% in 2005 and 46% in 2006.[274] In 2007, Matesi received half of its 2006 supply and it was reduced to a production level of a quarter of its capacity. No statistics from the Venezuelan Steel Institute are available in respect of pellet demand for 2007, but it is known that the reduction of supply in the market that year was of the order of 35%. In 2008, there was a 3% increase in the availability of pellets over 2007, but Matesi's allocation was 59% down on that of the previous year.[275]

354. Claimants further point to the fact that the cutback in supply in 2007 coincided with the resumption by CVG FMO of its role as operator of OPCO/Minorca, the plant which was located within CVG FMO's own facilities.

355. The contemporaneous documentary record, including correspondence between Mr Moya and CVG FMO in 2006 and monthly log reports for June 2007 and March 2008, supports the proposition that other HBI producers were receiving supplies at the expense of Matesi.[276] Mr Moya further confirmed in the course of his evidence that CVG FMO would deliver pellets to Comsigua via the conveyor belt, which passed Matesi's plant on days when it was said that there were no available supplies for Matesi,[277] a point corroborated by Mr Tamez and by Mr Malvassora.[278] Mr Moya confirmed that he had been critical of CVG FMO's unequal distribution of pellets as between Matesi and Comsigua[279] and that he had recorded his complaints in respect of a disproportionate supply in

---

[273] Compass Lexecon First Report, Table XII
[274] Claimants' Opening Presentation, Slide 25; Exhibit R-156, pp. 0056-0098; Exhibit CLEX-85
[275] See FN 165 and 166, Claimants' Post-Hearing Brief
[276] See Exhibits C-305, C-306, C-307 and see also Exhibit Hart I-A E pages EN 0002 and EN 0012
[277] Transcript (English), Day 4, pp. 983 and 984
[278] Tamez Witness Statement, para. 36 (b) and Second Witness Statement Malvassora, para. 24(b). See also the redirect examination of Mr Malvassora at Transcript (English), Day 3, pp.711 and 712, in which he confirmed that other plants continued to receive supplies of pellets when they were stopped for maintenance, but Matesi: "… *experienced difficulties in getting [CVG FMO] to continue to deliver pellets during the stoppages.*"
[279] Transcript (English), Day 4, pp. 1054 and 1055

favour of Minorca/OPCO, which was based in the facilities of, and since May 2007 operated by, CVG FMO.[280]

356. Claimants contend, too, that between 2006 and 2007, Matesi's production was reduced by 44%, whereas Minorca/OPCO's declined by 20% and in 2007-2008, Minorca/OPCO was the only HBI producer to see an increase in output, rising by 15% against Matesi's decline of 35%.[281] Claimants maintain that the only plausible explanation for Minorca OPCO's relative success is that it was the beneficiary of preferential supply by CVG FMO.[282]

357. Venezuela did not produce any documentary evidence to rebut the claim with its Counter-Memorial or its Rejoinder, nor did it produce documents pursuant to the Tribunal's Disclosure Order of 21 August 2013. On 22 January 2014, nine days before the hearing however, it produced certain documents purporting to show the annual requirements of the various HBI producers, which it appeared had been in its possession since at least November 2013.[283]

358. This document production was the subject of substantial criticism on the part of Claimants,[284] not least because it proved to be deficient in a number of material respects.

359. Claimants have demonstrated that Venezuela's Information Charts purporting to show actual pellet allocation to the HBI producers[285] cannot be reconciled with the invoices produced in January 2014 in that the amounts shown as having been allocated by CVG FMO to the HBI producers do not tally with the total tonnage invoiced. Although the Information Charts are blank as to iron ore deliveries to Minorca/OPCO for the years 2007-2009, invoices subsequently produced indicate that 326,000 tons of material was invoiced to Minorca/OPCO in the period January-May 2007. That, Claimants point out, would account for

---

[280] *Idem* at pp. 981 and 982, and see also Exhibit C-103
[281] Claimants' Post-Hearing Brief, para. 72
[282] Exhibit C-249: email Mr Amaiz (CVG FMO) to Mr Soler (SIDOR), 7 August 2007
[283] Exhibit R-156, p. 0012
[284] See, *e.g.* Transcript (English), Day 1, p. 55
[285] Exhibit C-243

much of the difference between the total amount of pellets allocated by CVG FMO in the Information Charts and the total amount of pellets invoiced by CVG FMO.

360. Moreover there is no correlation between the total amount of domestic pellets invoiced by CVG FMO and the amount of domestically available pellets calculated by Professor Spiller and Dr Abdala by reference to the contemporaneous documents, and whose figures were adopted by Mr Hart. It would seem that significant quantities were simply not invoiced by CVG FMO: 24.75% of available pellets in 2007 and 63.81% of available pellets in 2008 are unaccounted for – rather more than the total pellets supplied to Matesi in the two years in question. The inference that Claimants invite the Tribunal to draw in the absence of records of pellet deliveries to Minorca/OPCO for the years in question and the unexplained increase in Minorca/OPCO production is that Minorca/OPCO received these supplies directly from CVG FMO, such that it received 1.47 times more pellets than Matesi in 2007 and 6.36 times as many in 2008, for all that it had some 66% of Matesi's nominal production capacity.

361. Letters, which Venezuela represented to the Tribunal[286] evidenced annual pellet requirements notified by Matesi, Minorca/OPCO, Comsigua and Venprecar between 2005 and 2008 in fact contain nothing in respect of Minorca/OPCO's requirement for 2008. Nor do the quantities referenced in the letters in respect of the HBI producers other than Matesi match the contractual pellet entitlements pursuant to their supply contracts. To the contrary, Claimants maintain that they have established that all of the producers were requesting supplies significantly in excess of the iron ore that they required to produce at 100% capacity. To the extent that CVG FMO was predicating *pro rata* shares based upon annual requirements that exceeded the HBI producers' respective contractual requirements, it was not operating pursuant to the terms of the supply contracts and Matesi suffered a reduction in its *pro rata* share as a result. It is Claimants' contention that based upon the annual requirement letters, it should have

---

[286] Letter to the Tribunal dated 22 January 2014 at p.2, para.(c)

received a *pro rata* share of 33.4% in 2007 and 34.4% in 2008, whereas, in fact, it received far less.[287]

362. A further issue identified by Claimants is that the disclosed invoices do not relate to iron pellet imports by Comsigua and Venprecar, but only to those of Minorca/OPCO between 2005 and 2008. And there are significant discrepancies between the invoiced amounts and those stated on the certificates.[288]

363. Venezuela's answer to these complaints is that, first, Matesi's problems were attributable to technical shortcomings, rather than to any discrimination against it in terms of supply allocation and, second, and in any event, Matesi sought to over order. Thirdly, it was the beneficiary of an illicit supply of pellets from SIDOR. It was suggested that in 2006, SIDOR was receiving outsized pellets for further refining, but rather than returning them to CVG FMO as it was obliged to do, SIDOR was delivering them to Matesi.[289]

364. However, the only fact witness proffered to address the variety of technical issues said to have impacted on Matesi's performance was Mr Cadenas, who purported to identify some dozen technical and operational problems at the Matesi plant. Mr Cadenas had led Matesi's electromechanical technical group between 2004 and 2009. He had a reporting line to the Maintenance Manager, Mr Alberti, who, in turn, was one of four employees who reported to Matesi's Industrial Manager, Mr Tamez.[290] It became apparent that none of the issues to which he had drawn attention related to equipment or processes for which he was responsible.[291] Mr Cadenas' evidence was supplemented by that of Dr Poveromo, but he conducted no independent investigation of his own into the technical status of the Matesi plant – and he purported to rely on the evidence of Mr Tamez as opposed to that of Mr Cadenas.

---

[287] Damages Revision Based on Newly Disclosed Documents by Venezuela (Spiller and Abdala) 6 February 2014 at Table II
[288] Claimants' Post-Hearing Brief, para. 84
[289] Transcript (English), Day 1, pp. 303-304
[290] Transcript (English), Day 3, pp. 730-732
[291] *Idem*, pp. 743, 752-757, 759 & 760 and 772

365. The allegations of technical deficiencies at Matesi were addressed in comprehensive and compelling fashion by Claimants' witnesses.

366. *PosVen Construction Issues:*   It was pointed out that the issues which had led to the disputes between PosVen and its contractor, Raytheon, in 2001- 2002 had long been resolved by the time of the acquisition of the plant by Claimants,[292] and that, in any event, they were belied by the actual performance of the plant, which achieved 80% of capacity by February 2005 following an October 2004 start-up.

367. *Pellet Quality Issues:*   Out of spec. pellets, which gave rise to channelling in the reactor had had to be pre-sieved in the yard as well as being subject to screening, but the principal issue remained one of supply rather than quality.[293]

368. *Cooling Conveyors:*   Venezuela's witnesses (Messrs. Poveromo, Cadenas and Moya) maintained that the reason that Matesi had produced off-spec. briquettes (as Mr Malvassora conceded had been the case[294]) was because its cooling conveyors were defective. Prior to their replacement in July/August 2007, it was suggested that those quality problems would have limited Matesi's ability to market its products internationally. In fact, Mr Malvassora testified that the principal cause of Matesi's inability to produce briquettes to specification was the quality of the pellets that it received from CVG FMO.

369. *Heat Exchangers:*   The leakage problem affecting the heat exchangers was detected in 2006. It reduced Matesi's production levels to some 70% in 2007 and 2008, but it only received sufficient pellets to produce at 22% in 2007 and at less than 10% of capacity in 2008.[295] Mr Tamez told the Tribunal that Matesi had made some temporary repairs, whilst it took steps to replace the heat exchangers. That involved the ordering of bespoke equipment with a substantial

---

[292] Transcript (English), Day 2, pp. 425, 435 & 436
[293] See Tamez Witness Statement, para. 26(i), and paras. 49-54; and Transcript (English), Day 2, pp. 511-513
[294] Transcript (English), Day 3, p.722
[295] Exhibit C-246 and Transcript (English), Day 2, p.594 and Transcript (English), Day 3, p. 693 and 694 (Malvassora)

delivery lead-time. Had the plant not been expropriated, the necessary remedial work would have been completed.

370. *VS2 loading and discharge valves and seals:* Claimants confirmed that there had been an issue with the valves, exacerbated by the fact that Matesi could not import from Tenova because of CADIVI problems. It had had to use locally made seals, which had a service life of some 1-2 months as against 18 months for the products, which Claimants would have wished to use. While the shortcomings in the valves gave rise to a constant replacement problem, the Tribunal was told that that had not affected productivity.[296]

371. Mr Tamez testified that the only limit on production had been the supply constraint: none of the technical problems raised by Venezuela had impacted production.[297] The Tribunal notes that, in fact, Matesi's production had closely tracked the supply of pellets that it received[298] and it accepts that had there been operational problems, then there would be a lag between supply and production. Both Mr Tamez and Mr Malvassora confirmed that Matesi had been obliged consistently to operate at the limits of its inventory.[299]

372. In contrast, Mr Moya sought to persuade the Tribunal that CVG FMO had:

> "always sent material based on [Matesi's] request and also based on a monthly schedule and based on the operational condition of [Matesi]".[300]

373. However, the Tribunal is unable to reconcile that assertion with:

(a) Mr Moya's own statement to the press in October 2009 that:

> "in 2006, Matesi produced over 750,000 tonnes and in 2007, over 400,000, not because its capacity would not allow it, **but because it**

---

[296] Transcript (English), Day 2, p. 595
[297] Transcript (English), Day 2, pp. 542-543
[298] Claimants' Opening Presentation, Slide 33
[299] Transcript (English), Day 2, p. 497 (Tamez) and Transcript (English), Day 2, p. 594 (Malvassora)
[300] Transcript (English), Day 4, p. 953

was restricted by the pellet supply problems at the [CVG FMO] plant"[301] (emphasis added);

(b) documentary evidence in the record that Matesi had been obliged to reduce production levels or to stop one or both reactors for want of pellets;[302]

(c) his own internal and external correspondence;[303] and

(d) the Diagnostic Report submitted to the Matesi Transition Commission in July 2009, which he signed and which confirmed that:

"the operations of the Matesi plant have been halted since November 2008. The unavailability of raw material has forced the plant to operate at less than half its capacity since 2007."[304]

## g. Conclusions on Supply by CVG FMO

374. On the basis of the record available to it, and having considered the failure by Venezuela to produce materially relevant documentation as outlined above, the Tribunal concludes that:

(a) Matesi suffered a shortage of pellet supply in the course of its operations between 2005 and 2008;

(b) technical issues at CVG FMO were a significant contributing factor to the disruption of supply;

(c) such technical issues as Matesi might have faced were not material to its inability to produce to planned capacity; and

---

[301] Exhibit C-308 and see also Monthly Log for December 2007 at Exhibit Hart I-A E, p. E0005 and Exhibit C-211
[302] Exhibit C-211
[303] Exhibits C-304 and C-307
[304] Exhibit CLEX-78

(d)     there was a preferential supply by CVG FMO to other producers, notably Minorca/OPCO, at the expense of Matesi.

375. Further, the Tribunal considers that the assessment of the reductions in Matesi's *pro rata* share in 2006 put forward by Professor Spiller and Mr Abdala (27.8% to 25.8% in 2006; 33.4% to 25.6% in 2007 and 34.4% to 25.7% in 2008) is to be preferred.

376. On the basis of its findings set out above, the Tribunal concludes that Venezuela's submission that the evidence supports the contention that Matesi had received an over-allocation of pellets between 2005 and 2008 cannot be sustained.

377. Finally, while the Tribunal notes the exchanges of correspondence cited in Venezuela's Counter-Memorial in respect of an asserted additional supply of pellets to Matesi from SIDOR in 2004, 2005 and 2006, it notes, too, Claimants' explanation that, in fact, what SIDOR was doing was returning to Matesi substandard pellets that it had received from CVG FMO under its *pro rata* share and which Matesi had sent to SIDOR for processing – a process known as "*maquila de finos*" – while still retaining title.[305]

378. In the opinion of the Tribunal, the evidence points to a failure on the part of CVG FMO both properly to operate the pro-rating provisions of Article 2.1 of the Supply Agreement, and to meet its obligations to provide Matesi with information in respect of the status of supplies to other producers.

### h.     Venezuela's Responsibility

379. The question for the Tribunal, however, is whether these are breaches of a commercial contract in respect of which, as Venezuela contends, Matesi/Claimants should have looked to CVG FMO for redress or whether, as

---

[305] Respondent's Counter-Memorial, paras. 280-283 and Respondent's Reply, paras. 85-86

Claimants contend, the international responsibility of the Venezuelan State is engaged.

380. Claimants maintain that Venezuela has breached its international treaty obligations of fair and equitable treatment, non-discrimination and non-impairment. In particular, through the vehicle of CVG FMO,[306] it discriminated against Matesi in terms of pellet supply with the intent to diminish the value of Claimants' interest ahead of a nationalisation of Matesi and the steel industry generally, which was already on the Venezuelan Government's agenda.[307]

381. Claimants assert that only the Venezuelan State could use governmental authority to modify contracts with a private party and that even if CVG FMO was not an organ of the State, it was exercising elements of governmental authority in regulating the supply of iron ore to Matesi. Its actions are therefore attributed to Venezuela under Articles 4 or 5 of the ILC Articles on State Responsibility (the "ILC Articles").[308]

382. For its part, Venezuela insists that it is not in breach of its treaty obligations and that CVG FMO is neither an organ of the State, nor an entity whose acts might be attributed to Venezuela. The Supply Contract was simply a commercial purchase and sale agreement. In any event, Venezuela maintains that there was no logic in a suggestion that it would have sought to discriminate among the various HBI producers when it held ownership stakes in all of them, including Matesi - even before the nationalisation of SIDOR, which took Venezuela's stake in Matesi to 49.8% in April 2008.[309]

383. *Treaty Provisions:*      Article 3 of the Luxembourg Treaty provides that:

---

[306] In their notice letter of 20 August 2009, Claimants referenced alleged gross violations of contractual obligations on the part of Venezuela, which would suggest that Venezuela was regarded as one and the same as CVG FMO for these purposes.

[307] Claimants' Post-Hearing Brief, para. 332 (and see also Claimants' Reply, para. 217)

[308] *Idem*, para. 344. Exhibit CLEX-13: Draft articles on Responsibility of States for Internationally Wrongful Acts, with commentaries, Report of the International Law Commission on the work of its fifty-third session, 2001

[309] Respondent's Counter-Memorial, para. 261 and Respondent's Post-Hearing Brief, paras. 167 and 179

"1. All investments, whether direct or indirect, made by investors of one Contracting Party enjoy in the territory of the other Contracting Party, fair and equitable treatment according to international law.

2. Except for measures required for the maintenance of public order, such investments shall enjoy constant protection, which precludes any arbitrary or discriminatory measure that could hinder, in fact or law, their administration, maintenance, use, enjoyment or disposal.

3. For all matters governed by this Agreement, investors of each Contracting Party shall enjoy, in the territory of the other Contracting Party, treatment no less favourable than that accorded by the former Contracting Party to its own investors or to investors of the most favoured nation."

384. So far as the Portuguese Treaty is concerned, Article 3 provides:

"1. Each Contracting Party shall guarantee, within its territory, non-discriminatory, fair and equitable treatment, according to international law, to investments made by investors of the other Contracting Party.

2. On matters governed by this Agreement, the treatment referred [to] in paragraph 1 of this Article shall not be less favourable than that granted by a Contracting Party to investments made in its territory, in similar conditions by its own investors or by those of a third country."

385. *Discrimination Standard:* Venezuela maintains that the Luxembourg Treaty makes express reference to discriminatory measures only in the context of the constant protection provision. While it acknowledges that the Portuguese Treaty does include a specific guarantee of non-discriminatory, as well as fair and equitable, treatment of foreign investments, the fact that both Treaties reference such treatment as being "*in accordance with international law*" results in the applicable standard being that which derives from international law – namely the minimum standard of treatment of aliens and their property under customary international law. Venezuela suggests in its Rejoinder that it is "*well established that the ordinary meaning of the fair and equitable treatment standard clause worded this way*", *i.e.* by reference to the minimum standard, is a prohibition of intentional discrimination.[310]

---

[310] Respondent's Rejoinder, paras. 273 and 283

386. However, of the awards referenced by Venezuela and said to be "*worded this way*", (*i.e.*: "*fair and equitable treatment according to international law*"), Claimants pointed out that none, in fact, related to treaties with such a formulation.[311] The only relevant award referred to the Tribunal was in the *Tecmed* case, in which the tribunal held that the scope of the undertaking of fair and equitable treatment in the Spain – Mexico BIT resulted "*from an autonomous interpretation*" and not from the minimum standard of treatment.[312]

387. Claimants assert that language such as "'*under*' or '*according to*' international law" does not, of itself, convert a fair and equitable provision into one requiring only the international minimum standard, noting that in *Vivendi*, the tribunal found "*no basis for equating principles of international law with the minimum standard of treatment*".[313] Further, in the case of the Portuguese Treaty, non-discrimination is part and parcel of a fair and equitable treatment provision to be applied "*according to international law*".[314]

388. Notwithstanding the issue between the Parties as to whether or not the Treaty standard should be interpreted as an autonomous standard, both referenced the decision in the *Saluka* case as setting out the applicable test - namely:

> "any differential treatment of a foreign investor must not be based on unreasonable distinctions and demands, and must be justified by showing that it bears a reasonable relationship to rational policies not motivated by a preference for other investments over the foreign-owned investment."[315]

---

[311] *Idem*, para. 273

[312] *Tecnicas Medioambientales Tecmed S.A. v Mexico,* ICSID Case No. ARB(AF)/00/2, para. 155

[313] *Compania de Aguas del Aconquija SA and Vivendi Universal SA v Argentine Republic*, ICSID Case No. ARB/97/3, Award, 20 August 2007, para. 7.4.7 and citing, too: *Azurix Corp. v Argentine Republic*, ICSID Case No ARB/01/12, Award, 14 July 2006, para. 361 and *Suez, Sociedad General de Aguas de Barcelona SA and Vivendi Universal SA v. Argentine Republic*, ICSID Case No ARB/03/19, Decision on Liability, 30 July 2010, para. 185

[314] Claimants' Reply, paras. 210 and 211

[315] *Saluka Investments B.V. v The Czech Republic,* UNCITRAL, Partial Award, 17 March 2006, para. 307

In *Saluka,* it was held that the claimant bank had received markedly less fair treatment than other banks of similar size and market position without explanation or justification.

389. Both Claimants and Venezuela have also cited to the decision in *Unglaube* to support the proposition (Claimants) that:

> "in order to prevail regarding an allegation of discriminatory treatment a claimant must demonstrate that it has been subjected to unequal treatment in circumstances where there appears to be no reasonable basis for such differentiation"[316]

and (Venezuela) for the proposition that within that framework, decisions of a State will be afforded a "*considerable degree of deference*" and that it is necessary to establish behaviour:

> "sufficient to shock the conscience [or which is] improper or discreditable or which otherwise blatantly def[ies] logic or elemental fairness."[317]

390. In the opinion of the Tribunal, on the basis of the findings of fact that it has made in respect of the supply of pellets issue, there would be grounds for holding Venezuela in breach of its obligations to afford Claimants fair and equitable treatment **if** the actions of CVG FMO were properly to be imputed to Venezuela. Matesi was the subject of discriminatory treatment at the hands of CVG FMO and no reasonable justification has been advanced for the treatment that it received.

391. It would follow, too, that Venezuela would be in breach of its obligation not to impair Claimants' use and enjoyment of the investment pursuant to Article 3(2) of the Luxembourg Treaty (see above) and Article 2(2) of the Portuguese Treaty:

> "Each Party shall … refrain from adopting arbitrary or discriminatory measures that prevent the administration manufacturing use usufruct extension alienation and disposal of its investments."

---

[316] *Marion and Reinhard Unglaube v. Costa Rica*, ICSID Case Nos. ARB/08/1 and ARB/09/20, Award 16 May 2012, para. 262
[317] *Idem*, para. 258

392. But the critical question is one of attribution – *i.e.* whether the acts of CVG FMO in respect of the distribution of raw material can properly be attributed to the Venezuelan State, such as to engage the latter's international responsibility.

393. *Attribution:* Claimants argue that the liability of Venezuela is engaged because of the actions of CVG FMO, which they maintain is:

> "owned, directed and controlled by [Venezuela] and is not a State organ only by operation of law or formality alone".[318]

394. Claimants submit, first, that CVG FMO is an organ of the State for the purposes of Article 4 of the ILC Articles, and second, in the alternative, that its acts are attributable to Venezuela by reason of Article 5 of the ILC Articles.

395. Article 4 of the ILC Articles provides:

> "1. The conduct of any State organ shall be considered an act of that State under international law, whether the organ exercises legislative, executive, judicial or any other functions, whatever position it holds in the organization of the State, and whatever its character as an organ of the central Government or of a territorial unit of the State.
> 2. An organ includes any person or entity which has that status in accordance with the internal law of the State."

396. Professor James Crawford's commentary contains the following observations:

> "[A]rticle 4 covers organs, whether they exercise 'legislative, executive, judicial or any other functions'. This language allows for the fact that the principle of the separation of powers is not followed in any uniform way, and that many organs exercise some combination of public powers of a legislative, executive or judicial character. Moreover, the term is one of extension, not limitation, as is made clear by the words 'or any other functions'. It is irrelevant for the purposes of attribution that the conduct of a State organ may be classified as 'commercial' or as *acta iure gestionis*."[319]

397. Article 5 of the ILC Articles provides as follows:

> "Conduct of persons or entities exercising elements of governmental authority

---

[318] Claimants' Post-Hearing Brief, para. 339
[319] CLA-13, p. 41.

130

> The conduct of a person or entity which is not an organ of the State … but which is empowered by the law of that State to exercise elements of the governmental authority shall be considered an act of the State under international law, **provided the person or entity is acting in that capacity in the particular instance.**"   (Emphasis added).

398.  The Notes to Article 5 include, at 3, the following statement:

> "The fact that an entity can be classified as public or private according to the criteria of a given legal system, the existence of a greater or lesser State participation in its capital, or, more generally, in the ownership of its assets, the fact that it is not subject to executive control—these are not decisive criteria for the purpose of attribution of the entity's conduct to the State. Instead, article 5 refers to the true common feature, namely that these entities are empowered, if only to a limited extent or in a specific context, to exercise specified elements of governmental authority."

399.  Claimants maintain that the fact that CVG FMO is a "*decentralized state entity*" is sufficient of itself to meet the test of ILC Article 4.[320] The fact that CVG FMO was created as a commercial entity, that it is subject to private law and that it engages in commercial activity are not matters which go to its legal nature as an organ of the Venezuelan State under Venezuelan law – a proposition, which they say Professor Iribarren recognizes and which the Constitutional Chamber of the Venezuelan Supreme Court has confirmed.[321]

400.  Claimants maintain that CVG FMO holds a governmental monopoly over a critical natural resource and thereby exercises governmental authority. It "*likewise*" forms part of the "*functionally decentralized pubic administration*" of the Government of Venezuela and it is subject to the control of the Ministry of Industry by reason of CVG's shareholding. Claimants draw attention to the fact that CVG FMO's activities have been declared of public utility and public interest pursuant to Article 3 of Decree Law no. 1531.[322] They suggest, too, that Article 6 of its By-Laws requires it to implement its control of iron ore and

---

[320] Claimants' Rejoinder para. 259 and Iribarren Second Legal Opinion, para. 104
[321] Claimants' Post-Hearing Brief, para. 338
[322] Exhibit C-16

related products under the guidelines of the Ministry of Industry and pursuant to the directives of the President of Venezuela.[323]

401. For its part, Venezuela rejects any suggestion that CVG FMO is an organ of the State; that it exercises Governmental responsibility or authority; or that its actions are the result of State instructions or control.[324] It insists upon the fact that CVG FMO was established as a corporation. The (undisputed) fact that it is wholly owned by CVG does not make it an organ of the State any more, says Venezuela, than CVG itself. The powers of CVG over CVG FMO are no more than those of a shareholder.

402. Venezuela emphasises the fact that CVG FMO's relationship with Matesi was one born of contract - and the provision for *pro rata* distribution of pellets was intended to address the possibility of a pellet shortage which might otherwise interrupt the contractually agreed delivery arrangements.

403. Venezuela asserts that Claimants have produced no evidence to show how it is said that CVG influenced CVG FMO's performance of the Supply Contract, or to what extent, if at all, CVG supervised the performance of the Contract or acted on the instructions of the State.

404. In the submission of Venezuela, ILC Articles 4 and 5 are simply inapposite, because:

> "[t]he relationship between [CVG FMO] and the different briquette companies of the region was strictly contractual and commercial, consistent with the delivery of merchandise in return for payment."[325]

405. Claimants dismiss the suggestion that CVG was a mere shareholder, pointing out that under Decree No. 1531 it was responsible for formulating policies and guidelines for the commercialisation of CVG FMO's products and for setting prices. The Government was therefore "*intimately engaged in how the supply of*

---

[323] Claimants' Memorial, para. 192
[324] Respondent's Counter-Memorial, para. 233
[325] *Idem*, paras. 237-239

*pellets was priced on the market."*[326] Moreover, there was evidence of direct involvement of the State in the activities and operations of CVG FMO, notably in the form of a direct grant of some US$2 billion and the direct payment by the Ministry of Industry of CVG FMO workers' salaries.

406. The Tribunal has carefully considered all arguments put forward by each side, and the totality of the evidence on this issue. There is no doubt that CVG FMO is an entity wholly owned by Venezuela. Its By-Laws (Clause 5)[327] confirm that its shares:

> "belong to [Venezuela] which exercises its ownership through [CVG] and may not be alienated except by another legal entity wholly owned by the State of Venezuela, if this is decided by the President of the Republic at a Council of Ministers."

407. Responsibility for iron ore exploitation in Venezuela was vested in CVG pursuant to Decree No. 580 of 26 November 1974.[328]

408. CVG FMO was incorporated in December 1975 with its domicile in Guayana City, Bolivar State.

409. At the Ordinary General Meeting of CVG FMO's Shareholders, meeting no 14 held on 1 November 2006, a modification to Article 6 of the CVG FMO By-Laws was approved:

> "**to expand the commercial purpose, which is centred on a purely commercial activity**, taking into consideration the guidelines issued by the National Executive Branch, in line with the commitments taken by the Ministry of Industry and of the CVG for the purposes of developing the projects which will promote the centres of endogenous industrializing development and the creation of companies for social production, through the reorientation of raw materials...." (Emphasis added)

410. CVG FMO's By-Laws record, at Article 6 that:

> "the Purpose of the Company is to engage in the iron ore industry within the National Territory, as well as, the administration, direction,

---

[326] Claimants' Reply, para. 226
[327] By-laws of CVG FMO: 1 November 2006 (Exhibit C-99)
[328] Exhibit C-15

industrialization and, in general, the exploitation of the assets which became the property of CVG due to the provisions of Decree No. 580 …. And in accordance with the guidelines from the Ministry of Industry, in the exercise of powers it has by the Partial Reform of the Decree on the Organisation and Operation of the Central Public Administration, published … [on] 22 June 2006, received through the CVG, and in furtherance of the directives of the national government and the President of the Republic, oriented towards the development of the chains of production and towards social responsibility **as a State company**." (Emphasis added)

411. Article 6 continues:

"To fulfil its corporate purpose, the Company may engage in all types of activities, and especially on the following: mining, industrialization, marketing, transportation, research, chartering, shipping agency, customs agency, temporary storage or In Bond, and in general the storage and warehouse of all types of goods to be imported. Additionally, the Company may perform all legal acts and business related to the purpose described in this clause without limitation."

412. The Tribunal has considered the standing of CVG FMO in the context of Article 4 of the ILC Articles with these matters in mind. In this regard, the Tribunal has also taken account of the fact that:

(a) the iron ore monopoly was enjoyed by CVG rather than CVG FMO;

(b) while Claimants complain that CVG FMO had "*authority to alter administrative contracts unilaterally…*",[329] what happened in this case was that a price increase, which resulted in Amendment No.1 to the Supply Contract, was imposed by Presidential Decree No. 3895, and not at the initiative of CVG FMO;[330] and

(c) the activities of CVG FMO, specifically those in respect of the Supply Contract, are of a commercial nature. They have no bearing upon the legislative, executive, judicial or other functions of the Venezuelan State:

---

[329] Claimants' Post-Hearing Brief, para. 344.
[330] Exhibit C-28

there is no evidence before the Tribunal of any vesting of a combination of public powers in, much less, any exercise of such powers by, CVG FMO.

413. On the basis of all the materials available to it, the Tribunal concludes that CVG FMO is not an organ of the State for the purposes of ILC Article 4 of the ILC Articles.

414. The question then is whether CVG FMO was empowered by Venezuela to exercise elements of governmental authority, and was so acting in the case of the Supply Contract, and, specifically, the discriminatory supply of pellets, such that its actions might be attributed to Venezuela pursuant to Article 5 of the ILC Articles.

415. The Tribunal is mindful of Note 3 of the commentary to Article 5, as quoted at para 397 above.

416. In the opinion of the Tribunal, the point here is susceptible of a short answer: there is no evidence that CVG FMO was exercising any element of government authority in respect of the allocation of pellets under the Supply Contract.[331] And Claimants' submission that CVG FMO exercises government authority in carrying out its monopoly over a natural resource is misconceived in that the monopoly is not that of CVG FMO but of CVG.  The submission, in any event, is far too widely drawn for the purposes of Article 5 of the ILC Articles.

417. The Tribunal accepts Venezuela's case that CVG FMO had not been specifically empowered by the law of the State of Venezuela to distribute pellets, and that its corporate purpose was the marketing of iron ore, pellets and fines, which are activities of a private and commercial nature. Moreover, its obligations in the context of Matesi were obligations entered into pursuant to the Supply Contract, which was a commercial contract. To the extent that the

---

[331] See in this regard, para. 201 of Respondent's Post-Hearing Brief and the citation from the *Tulip* case to which attention is drawn.

actions of its principal shareholder CVG might be said to be relevant, there is nothing in the evidence to suggest that its oversight of CVG FMO went beyond the exercise of general supervision of a kind which international tribunals have determined would be insufficient for the purposes of attribution. The Tribunal notes and adopts the conclusion of the tribunal in *Hamester* that:

> "It is not enough for an act of a public entity to have been performed in the general fulfillment of some general interest, mission or purpose to qualify as an attributable act. In this regard the Tribunal shares the view expressed by the tribunal in *Jan de Nul*, when it stated that: "[w]hat matters is not the '*service public*' element, but the use of '*prerogatives de puissance publique*' or governmental authority." [332]

418. Issues in respect of CVG FMO's pellet supply, therefore, were matters for CVG FMO's account, and not such as to engage Venezuela's responsibility, and any recourse in this regard ought to have been pursued against CVG FMO under the Supply Contract.

419. In fact, it is evident that Matesi made no attempt to seek redress under the terms of the Supply Agreement, which provided for arbitration.[333] It was put to Mr Malvassora that over a period of months in 2006, Matesi complained to CVG FMO that the contract was not being performed and that Matesi was being harmed, and yet no further recourse was ever actually taken:

> "Why, then, not take the step of initiating a dispute-resolution process under the Contract? If you're in effect threatening CVG FMO throughout by saying that you are acting in breach of contract, and we are suffering a loss as a result, I'm a little bit unclear as to why, then, you wouldn't just go that one small step further from a threat, which is to say, actually, let's now resolve this under the contract.
>
> A: …. Toward the end of 2004, October, we started the operation; and by the beginning of 2005, we were obliged to signing (sic) a modification, an amendment to the contract for the supply of mineral ore, and have an agreement for assuring the supply of raw material,

---

[332] See *Gustav F W Hamester GmbH & Co KG v. Republic of Ghana*, ICSID Case No. ARB/07/24, Award, 18 June 2010, para. 202; *Jan de Nul v. Egypt* Decision on Jurisdiction 16 June 2006; and *Bayindir v Pakistan*, ICSID Case No. ARB/03/29, Award, 27 August 2009, para. 122.

[333] See Exhibit C-25, Article 12: somewhat confusingly, at para. 209 of its Post-Hearing Brief, Venezuela suggests that the operative arbitration clause is that of the Talta-Matesi Off-Take Agreement (Exhibit C-27)

which implied an increase in the price, there was a raise in the price.[334] Our provider was not a regular provider. It was a provider that depended or hinged on the Venezuelan State, applied the Venezuelan jurisdiction as well as it depended from laws and courts of Venezuela, and we received this expression of, let's call it, 'power', power on behalf of the Venezuelan State. At the beginning of 2005, when we had very little time of operation, even with certain threats of nationalisation, we did not deem that that was the correct pathway to follow. We believed that it was preferable to establish this exchange of letters in order to try to comply with the terms of the Contract, but we were not very successful."

420. When pressed on the point that these exchanges had continued over a period of months without effect and that: *".... the next step would be to indicate a process under the Contract, even negotiations under the Contract"*, Mr Malvassora replied:

> "In keeping with the opinion of our legal counselors it seemed that it was not efficient to try to judicialize this claim, and this is why we followed the suggestions made by our legal counsels. The opportunities, the cases, where we were convened by the Executive Branch as a result of the decree which I mentioned, and which is part of the record, it was judged to be something worsening the conditions instead of improving them."[335]

421. But that evidence was given in the context of the price increase, which had been imposed in 2005. In contrast, on the issue of any failure properly to operate the *pro rata* supply provisions of the contract or to provide information as to the requirements of other producers, no persuasive evidence has been put before the Tribunal which might demonstrate an intervention into the management of CVG FMO by Venezuela. It was only the price increase that was imposed by Venezuela pursuant to Decree no. 3895, and it was then a matter for CVG FMO and the suppliers to amend their contracts to implement the legislative measure. Equally, there is no suggestion by Claimants that the price increase was unique to Matesi.

---

[334] See Exhibit C-28, Decree No. 3895 of 12 September 2005, and Amendment No.1 to the Supply Contract at Exhibit C-31
[335] Transcript (English), Day 3, pp. 717 & 718

422. In answer to further questions from the Tribunal, Mr Malvassora stated that Matesi had also raised complaints as to the chemical quality of the pellets supplied by CVG FMO, quite apart from issues about the level of supply itself. Matesi had also notified CVG FMO that it, Matesi, had received complaints from its own customers that briquettes that it had subsequently produced were off spec. Matesi had been obliged to settle a number of claims as a result. However neither the quality shortcomings in the pellets (in respect of which, Matesi had submitted a claim for compensation of some US$ 2.87 million),[336] nor reimbursement of any settlements made with its own customers, had ever been pursued with CVG FMO.

### i. Conclusion

423. Having considered all of the evidence before it, and all of the submissions of the Parties, the Tribunal concludes that the shortcomings in the pellet supply from CVG FMO to Matesi (as outlined earlier) were matters for which CVG FMO was contractually responsible, and which ought properly to have been resolved pursuant to the dispute resolution provisions of the Supply Contract. There is no persuasive evidence, as a matter of fact, that these were acts and omissions in supply that were instigated or in any way directed by or motivated on behalf of the government, and there is no basis to attribute any of these acts or omissions to the Venezuelan State as a matter of law.

424. For all of the above reasons, it follows that the Claimants' case as to the alleged breaches by Venezuela of its obligations pursuant to Article 3(1) of the Luxembourg Treaty and Article 3(1) of the Portuguese Treaty must be dismissed.

### 2. PROTECTION AND SECURITY CLAIM

### a. Claimants' Case

425. In their Memorial and Reply Memorial, Claimants rely on events, notably serious labour unrest in the form of industrial action in November 2008 (after

---

[336] Exhibit C-181

the Nationalisation Decree), which prevented access to the plant and the holding against their will of some 20 members of its administrative staff in December 2008.

426. While what is described as the "*dispossession*" of Matesi was underway in July 2009, Claimants say that there were numerous cases of assault against its staff including assaults perpetrated by Mr Rodriguez.[337] In that context, Claimants assert that an expropriation that occurs in the face of pleas for protection amounts to a breach of this standard. They sought to contrast the situation addressed by the Tribunal in *Tecmed* (in which it was held that a government had "*reacted reasonably, in accordance with the parameters inherent in a democratic state*"[338]) with one in which, as they alleged, "*... there [was] no doubt that the Government of Venezuela was in collusion with the union to seize Matesi*" such that the Government's conduct amounted to "*fomenting violence against the Claimants' investment.*"[339]

**b.    Venezuela's Case**

427. In its Counter-Memorial, Venezuela contended that these allegations amounted to a claim that Venezuela had actively colluded with Matesi's labour union, SINTRAMATS, to harm and dispossess Matesi.  It rejected the claim on the basis that:

(a)    freedom of association was a fundamental democratic right enshrined in Venezuelan and international law;

(b)    the labour unions and the State were wholly separate;

(c)    Claimants had failed to demonstrate that the Government of Venezuela had not exercised due diligence in protecting their investment;

---

[337] Claimants' Reply Memorial, para. 243
[338] *Tecnicas Medioamblientales Tecmed S.A. v Mexico*, ICSID Case No. ARB(AF)/00/2, Award, 29 May 2003, para. 177
[339] Claimants' Memorial, para. 214

(d)    conspiracy and collusion were criminal acts under Venezuelan law; and

(e)    no evidence whatever had been adduced by Claimants to support their allegations of collusion.[340]

428.    Venezuela pointed out that there had been widespread labour unrest throughout the Guyana Region, and pay rates offered by Claimants and the Techint Group were a particular source of grievance. In fact, Matesi's existing Collective Labour Agreement had come to an end in late 2007, when negotiations for a new agreement began. The meetings between Matesi and SINTRAMATS were chaired by the Labour Inspectorate. Following an hiatus in the negotiations of some six months, the new Collective Labour Agreement was signed in July 2008.

429.    Venezuela notes that there were tensions, before and after the signing of the July 2008 Agreement, not least:

(a)    in November 2008, Matesi had imposed a production stoppage, citing the impact of the financial crisis on demand for HBI, coupled with the fact that SIDOR no longer required HBI – a stoppage which SINTRAMATS considered a breach of the new Collective Labor Agreement;

(b)    of the three categories of workers at Matesi, the least well paid, the Collective Labor Agreement workers, went seven months without salary between October 2008 and April 2009;

(c)    workers' shifts were reduced from three to one in November 2008; and

(d)    all "outsourced workers" had been made redundant when the work stoppage was introduced.

---

[340] Respondent's Counter-Memorial, para. 288

430. Following a decision of SINTRAMATS to declare its formal opposition to the shift reduction and redundancies[341] and a notification by Matesi to the Labor Inspectorate in November 2008, the Inspectorate intervened in order to attempt to conciliate. Venezuela points out that neither Matesi's management nor SINTRAMATS could be sure of the outcome of the Labor Inspectorate's intervention.[342]

431. After further interventions by the Ministry of Labour, the Ministry of Industry, the CVG and the National Guard, an amendment to the 2008 Collective Labor Agreement was signed in May 2009.[343]

432. Venezuela points, too, to the judicial intervention in February 2009 following SINTRAMATS escalation of industrial action, which had led to workers being prevented from entering the plant. A judicial inspection in February 2009 was followed by another in March 2009. In addition, and over the objections of SINTRAMATS, a Protection Order was issued by the Fifth Court of First Instance of the Bolivar State Criminal Judicial Circuit in Puerto Ordaz ordering the National Guard to:

> "…. Assign officers to protect the facilities of said company, stationing themselves at said place until the investigation stage is completed….."[344]

433. So far as events in July 2009 were concerned, Venezuela acknowledges that in May 2009 the Government had decided to nationalise Matesi: "*a company clearly paralysed by worker conflict*". The inclusion in the Transition Commission of Mr Rodriguez of SINTRAMATS was not a "*reward*" and even if Mr Rodriguez had been involved in any of the claimed acts of assault, they were not attributable to Venezuela any more than the appointment of Mr Rodriguez to the Transition Commission was proof of a desire on the part of the Government to support labour unrest or to collude with SINTRAMATS.

---

[341] Exhibit C-129
[342] Exhibit R-074
[343] Exhibit C-141
[344] Exhibit C-139

434. In short, Venezuela maintains that it had taken multiple steps to protect Matesi; that it had not acted to protect the interests of SINTRAMAT; and that there was no evidence to demonstrate any collusion on the part of Venezuela with SINTRAMATS, much less that any such collusion reduced the value of Matesi.[345]

435. As to Venezuela's case, Claimants dismiss these measures as "*deliberately ineffectual*"[346] on the grounds that:

(a) the Labor Inspector was a former legal advisor to SINTRAMATS and therefore his impartiality was in doubt;

(b) only two National Guardsmen had been dispatched to try to restore order;

(c) one of the judges who had sought to enter the plant for the purpose of a judicial inspection had been unable to enter the premises and the other had been detained by the protestors whereupon he had refused to return to the site; and

(d) Mr Rodriguez's "*violent propensities*" were well known to Venezuela, but nonetheless he had subsequently been appointed General Manager of BriqVen.[347]

### c. Treaty Provisions

436. Article 3(2) of the Luxembourg Treaty provides that:

> "Except for measures required for the maintenance of public order, such investments shall enjoy constant protection, which precludes any arbitrary or discriminatory measure that could hinder, in fact or law, their administration, maintenance, use, enjoyment or disposal."

437. Article 2(2) of the Portuguese Treaty provides that:

---

[345] Respondent's Counter-Memorial, paras. 323-324
[346] Claimants' Post-Hearing Brief, para. 350
[347] Claimants' Reply, para. 244

"Each Party shall protect, within its territory, investments made in conformity with its laws and regulations by the investors of the other Contracting Party and shall refrain from adopting arbitrary or discriminatory measures that prevent the administration, manufacturing, use, usufruct, extension, alienation and disposal of its investments."

### d. Application of the Treaty Standard

438. It is common ground that the standard of constant protection relates principally to the physical protection of the investor and its assets. In a case in which a tribunal determined that a state could have taken precautionary measures, which fell within the normal exercise of the government's inherent powers and which could reasonably be expected to prevent the investor's loss, it was held that constant protection requires an "*objective standard of vigilance*" of which "*mere lack or want of diligence, without any need to establish malice or negligence*" can constitute a breach.[348]

439. The Tribunal accepts Claimants' submission that the obligation is not exclusively limited to physical protection from third parties. It has noted the decision of the Tribunal in *Biwater* that the obligation is not "*limited to a State's failure to prevent actions by third parties, but also extends to actions by organs and representatives of the State itself.*"[349] It has also noted the decision in *Frontier Petroleum* that: "*the host state is under an obligation to take active measures to protect the investment from adverse effects that stem from private parties or from the host state and its organs.*"[350]

440. While the underlying facts are also largely not in issue, there is a clear divergence of opinion between the Parties as to the efficacy of such measures as Venezuela took pursuant to its obligations of constant protection – a divergence manifest, too, in the accounts of Mr Malvassora and Ms Bello Rodriguez.

---

[348] *Asian Agricultural Products Ltd. v. Sri Lanka*, ICSID Case No. ARB/87/3, Final Award, 27 June 1990, para. 77
[349] *Biwater Gauff (Tanzania) Ltd. v United Republic of Tanzania*, ICSID Case No. ARB/05/22, Award 24 July 2008, paras. 718 and 730
[350] *Frontier Petroleum Services Ltd v Czech Republic*, UNCITRAL, Final Award, 12 November 2010

441. However a question arises as to the extent to which it is necessary for the Tribunal to consider these matters in detail and to seek to reach a conclusion as to the true facts. In their Reply Memorial, the four matters, which form the central planks of Claimants' claim are advanced as examples of a failure on the part of Venezuela to protect their interests "*during the nationalisation process.*"[351] And at the hearing, it emerged that Claimants were seeking declaratory relief only - and that for events before the date of the expropriation:

> "[T]here is no separate damage claim associated with this claim, and Claimants seek a declaration in light of the failure to protect Matesi's assets against attack **before the expropriation took place** in light of the seriousness of the conduct and as part of the overall context of this dispute."[352] (Emphasis added)

442. Both Parties have agreed that the date of the expropriation or taking in this case is 30 April 2008, whereas all of the incidents, which are prayed in aid of this claim fall much later in time and specifically in November–December 2008 and July 2009. On that basis, Venezuela's submission that Claimants' request for relief in respect of the alleged late 2008 and July 2009 violations has become moot seems to the Tribunal to be self-evident.

443. In any event, on the evidence that is before it, the Tribunal rejects Claimants' contention that Venezuela failed to fulfil its Treaty obligations in the respects set out above, or that it colluded with SINTRAMATS to seize Matesi, or that it fomented violence against Claimants' investment.

444. First, Mr Montero pointed to a history of difficult labour relations even in the days of PosVen,[353] and Mr Malvassora accepted that the trigger for the conflict in 2008 had been the decision of the company to reduce shifts with the loss of night time working. It had had nothing to do with the decision to nationalise.[354]

---

[351] Claimants' Reply, para. 97
[352] Transcript (English), Day 1, p.165-166
[353] Transcript (English), Day 2, p. 385
[354] Transcript (English), Day 3, p. 659

445. Second, the Labor Inspector against whom Claimants alleged bias, Mr Peña Guerra, had been appointed before the labour disputes at Matesi had arisen;[355] he had been the subject of a Motion for Recusal in November 2008, which had been accepted and the file had been transferred from Puerto Ordaz to Bolivar City;[356] and Mr Peña Guerra had, in fact, recused himself, as Mr Malvassora confirmed.[357]

446. Third, Ms Bello testified that because Matesi was a basic industry company, the National Guard was always at hand.[358] That evidence was not challenged in cross-examination. Further, Claimants did not challenge Venezuela's contention that none of the alleged attacks on personnel in 2009 was reported to the National Guard.[359]

447. Fourth, whether or not it is the case that SINTRAMATS "*spearheaded a radical and violent movement against Matesi's management*",[360] the evidentiary record supports the proposition that the Venezuelan authorities responded by organising two judicial inspections, by the intervention of the Ombudsman and subsequently by the making of a Protection Order which mandated the intervention of the National Guard. There is no persuasive evidence of any collusion between Venezuela and SINTRAMATS.

448. Finally, it is suggested that the appointment of Mr Rodriguez to the Matesi Transition Commission by Minister Sanz on 25 May 2009[361] was a "*provocative act*" and a "*reward*". There is no conclusive evidence before the Tribunal that confirms either allegation. As Ms Bello and Mr Malvassora confirmed,[362] Matesi was not unique in having trade union representation on its Transition Commission. Further, and so far as the subsequent appointment of Mr

---

[355] Transcript (English), Day 3, p. 660
[356] Transcript (English), Day 3, pp. 661 & 662 (and see Exhibit R-155)
[357] Transcript (English), Day 3, p. 663
[358] Bello Witness Statement, paras. 22-23
[359] Respondent's Counter-Memorial, para. 321
[360] Claimants' Reply, para. 90(b)
[361] Exhibit C-39
[362] Bello Witness Statement, paras 24-26; Transcript (English), Day 3, p. 678 (Malvassora) – and see Exhibit R-81

Rodriguez as a "stop-gap" President of BriqVen is concerned, it appears that that appointment was not made by Venezuela: Mr Rodriguez was appointed by the employees of the company[363] and subsequently replaced in September 2013 by Mr Pablo Mora Zoppi.

### e.  Conclusion

449. For these reasons, the Tribunal declines to make the declaration requested by Claimants, and its claims pursuant to Article 3(2) of the Luxembourg Treaty and Article 2(2) of the Portuguese Treaty must be dismissed.

---

## G.  NATIONALIZATION AND EXPROPRIATION OF MATESI

450. The second category of claims advanced by Claimants arise out of the actual nationalisation of Matesi.

451. There is in this case no question but that Matesi was the subject of an expropriation:

> "No doubt about it, Venezuela nationalized Matesi."[364]

452. The process was initiated by President Chavez on 10 April 2008, when he announced that Venezuela's steel industry was to be taken back and put at the service of the country. That announcement, and the subsequent ratification of the decision by the National Assembly, was followed on 30 April 2008 by the publication of Decree No. 6,058, the "*Nationalisation Decree*." Pursuant to its terms, SIDOR and its subsidiary and affiliated companies, of which Matesi was one, were to be transformed into State corporations.  There followed Decrees 6,796 (July 2009) and 8,280 (June 2011), which addressed the nationalisation and expropriation of Matesi itself. The relevant facts are set out at paras 67 to 90 above.

---

[363] Transcript (English), Day 1, p. 315 and see Bello Witness Statement, para. 24
[364] Transcript (English), Day 1, p. 230

1.    CLAIMANTS' CASE

453. Claimants contend that Venezuela's nationalisation of Sidor and its subsidiaries in April 2008, and subsequently Matesi in May-August 2009 (followed in June 2011 by Decree 8,280 pursuant to the Expropriation Law)[365], amounted to an indirect expropriation of Claimants' investments, the prejudicial effects of which were compounded by Venezuela's attempt to reduce the compensation which otherwise ought to have been payable.

454. One such effect of Venezuela's approach to the expropriation was that, having sought to take only the <u>assets</u> of Matesi, Venezuela avoided the debts of Matesi, and Claimants were left to deal with Matesi's creditors, among which was Talta.[366]

455. Further, Claimants contend that the effects of these measures rendered the shares in Matesi, which Claimants still held, valueless: the productive assets of Matesi had been expropriated and the Claimants were left with an empty shell with liabilities, and no ability to generate income to meet those liabilities.

456. Claimants contend, too, that Matesi's consequent inability to manufacture HBI and to generate income amounted to a further indirect expropriation of the Off-Take Agreement and the Talta Loan.

457. Claimants rely upon Articles 4(1) and (2) of the Luxembourg Treaty, and on Article 4 of the Portuguese Treaty.

2.    VENEZUELA'S CASE

458. Venezuela maintains that its expropriation of Claimants' investment was lawful and consistent with the framework that it had put in place - specifically, the special procedure established by the Nationalisation Decree (No. 6,058). That procedure posited either a negotiated transformation of SIDOR and its

---

[365] These events are described in more detail at paras. 54-81, *supra*.
[366] Exhibit C-47, p.5

subsidiaries into State enterprises within 60 days, or, failing that, the initiation of the expropriation procedure pursuant to the Expropriation Act.

459. In the opinion of its expert witness, Professor Iribarren, Venezuela had:

> "followed a strict procedure that was strictly in keeping with the law in this case." [367]

460. The process in his view was consistent with Article 115 of the Constitution, which provides that:

> "The right of ownership is guaranteed. All persons are entitled to the use, enjoyment, and disposition of their assets. Property shall be subject to any taxes, restrictions and obligations imposed by law for public benefit or in the public interest. Expropriation of any kind of property may only be declared for reasons of public benefit or public interest, through a final and conclusive judgment and timely payment of just compensation." [368]

461. According to Professor Iribarren, Decree No. 6,058 was in conformity with the limitations upon property rights set out in Article 115. It was also in conformity with Article 7 of the Law for Expropriation in the Public or Social Interest of 21 May 2002[369], which required that there be:

 (a)   a declaration of public utility;

 (b)   a declaration that the transfer of all or part of the property in question was essential to the pubic interest;

 (c)   a determination of compensation; and

 (d)   timely payment of compensation.[370]

---

[367] Transcript (English), Day 3, p. 1099
[368] Exhibit C-136
[369] Exhibit C-53
[370] Transcript (English), Day 3, p. 1095

462. Professor Iribarren suggested that there had been two statements of public utility (Decree No. 6,058, and the second in the form of the Declaration of the National Assembly in October 2010, which preceded Decree No. 8,280); the Attorney General had published notice of his intention to establish a Valuation Commission in July 2011; and but for the decision of Claimants not to participate in that procedure, an amicable settlement might have been reached.[371]

463. Venezuela dismisses Claimants' objections that, first, no Technical Commission was ever established within the prescribed 60 day deadline to agree upon the fair value to be paid for the shares in Matesi and, second, that the subsequent Decrees No. 6,796 and No. 8,280 anticipated the expropriation of the assets of Matesi, but not its shares.

464. As to the first point, Venezuela argues that Claimants never sought to remedy any alleged defect in the process by applying the terms of the Decrees themselves, or by means of such recourse as was available to them under Venezuelan law. Venezuela maintains that it has never denied Claimants' right to fair compensation: on the contrary, Claimants elected not to participate in the amicable settlement phase post-nationalisation, and instead made "*premature*" recourse to ICSID arbitration.[372]

465. As to the second point, Venezuela relies on Professor Iribarren's opinion that the distinction drawn between the shares of Matesi and its assets was, in reality, more apparent than real in the context of any eventual valuation of the investment:

> "But in any event, let me underscore that because of the general knowledge that I have regarding the expropriation practice within the Office of the Attorney General, even when a company is subject to the expropriation of the assets, when determining the fair value through the amicable settlement process at the Attorney General's Office, the liabilities of the company are taken into account for fair value."[373]

---

[371] Transcript (English), Day 3, p. 1096
[372] Respondent's Post-Hearing Brief, para. 354
[373] Transcript (English), Day 4, p. 1202

466. Further, the taking of control of the assets of Matesi prior to resolution of the fair price to be paid was to be regarded as an interim measure, intended to guarantee the continuation of the activity in the meantime. [374] According to Professor Iribarren, Article 8 of Decree No. 6,058, which was a "*special law*", which governed expropriation in Venezuela pursuant to Article 4 of the Expropriation Law ("*special loss*"), made it possible to take control of Matesi's assets in such a way prior to payment of a fair price, if:

> "administrative preventative measures in the context of an expropriation administrative process [were necessary] … to guarantee [the] continuation of the activity or the work which is being submitted to expropriation."[375]

3. **TREATY PROVISIONS**

467. Articles 4(1) and (2) of the Luxembourg Treaty provide as follows:

> "1. Each Contracting Party undertakes not to take any measure of expropriation or nationalization, nor any other measure whose effect is to directly or indirectly dispossess investors of the other Contracting Party of investments belonging to them in its territory, unless the following conditions are fulfilled:
>
> (a) the measures are adopted for reasons of public purpose or national interest;
>
> (b) the measures are adopted in accordance with legal procedures;
>
> (c) they are neither discriminatory nor contrary to a specific commitment concerning the treatment of an investment;
>
> (d) they are accompanied by provisions for the payment of adequate and effective compensation.
>
> 2.      The amount of the compensation shall correspond to the real value of the investments concerned on the day prior to the adoption or publication of the measure.

---

[374] See Iribarren at Transcript (English), Day 3 p. 1099 and Respondent's Post-Hearing Brief, paras. 348-349. And see also Exhibit C-47
[375] Transcript (English), Day 3, pp.1098 and 1099

The compensation shall be paid in convertible currency. It shall be paid without undue delay and shall be freely transferable. Interest shall be paid at the normal commercial rate from the date it is determined until the date of payment."

468. Article 4 of the Portuguese Treaty provides as follows:

"Neither Contracting Party shall take measures that deprive, directly or indirectly, investors of the other Contracting Party of investments made by them, except if the following conditions are fulfilled:

(a) that the measures are adopted for reasons of public purpose or national interest, in accordance with the legislation in force;

(b) that the measures are non-discriminatory;

(c) that the measures are accompanied by provisions that guarantee the payment of immediate, adequate and effective compensation … based on the market value of the investment in question immediately prior to the moment when the measure was made public; compensation will accrue interest at the exchange rate applicable at the date on which the transaction becomes effective in the territory where the investment is located; the lawfulness of the referenced measures and the amount of compensation may be submitted for review pursuant to the applicable legal procedure."

## 4. THE PROCEDURE LEADING TO THE NATIONALISATION OF MATESI

469. Under the terms of Decree No. 6,058, it was envisaged that:

(a) the activities of SIDOR and its subsidiaries, including Matesi, would be transferred to the State by 30 June 2008;

(b) Transition Commissions responsible for the transfer of each of the companies subject to Decree No. 6,058 would be constituted by the State within seven days of official publication of the Nationalisation Decree;

(c) Technical Commissions comprising representatives of both the State and the affected companies were to be set up and to seek to agree on the compensation to be paid within 60 days;

(d)  if no agreement was reached so far as the transformation of the companies into State-owned enterprises was concerned within the 60 day period then control and operation of the companies would pass to the State and the expropriation of their shares would be effected in accordance with the Expropriation Law.

470.  However, the Tribunal finds that it was not until 25 May 2009 that Matesi was notified of the appointment of a Transition Commission pursuant to the Nationalisation Decree of 30 April 2008. The function of the Transition Commission was to direct, execute and successfully carry out "*the entire transition process that will conclude with the transfer of [Matesi's] shareholding to the Venezuelan State.*"[376]

471.  As noted at paragraph 66 above, although Matesi nominated its representatives to serve on the Technical Commission on 2 May 2009, no such Commission was ever set up and Venezuela never nominated its representatives.

472.  Two months later came the promulgation of Decree No. 6,796 by which President Chavez ordered the forced acquisition of Matesi's assets. The Decree set out a new procedure, which, while virtually identical to that of the Nationalisation Decree, involved:

(a)  the constitution by the State of a Transition Commission to take immediate operational control of Matesi the day following publication of the Decree;

(b)  the establishment of a new Technical Commission comprised of representatives of the State and of Matesi to agree on the compensation to be paid within 60 days for the expropriation of the assets; and in the event that no such agreement was reached within 60 days;

---

[376] Exhibit C-39

(c)  the assumption of exclusive control and operation of Matesi and the expropriation of the company (not the assets) pursuant to the Expropriation Law.

473. But before any Transition Commission pursuant to Decree No. 6,796 had been put in place, the Decree No. 6,058 Transition Commission, which included among its members Mr Daniel Rodriguez, seized control of Matesi with what Matesi protested at the time was a demonstration of unnecessary violence and intimidation.[377] Notwithstanding those protests, the Ministry of Industry re-appointed the same individuals, including Mr Rodriguez, to a second Transition Commission established pursuant to Decree No. 6,796.[378]

474. Although the takeover of Matesi's operations and offices was completed by 22 July 2009, the formal handover of the plant did not occur until 17 August 2009 in the course of an extrajudicial inspection. It is noteworthy that the Minutes of Extrajudicial Inspection were made only a month and three days after the date of Decree No. 6,796, which had provided for a 60-day period within which to reach an agreement for the transformation of Matesi into a State company.

475. Although the takeover amounted to a complete takeover of Matesi's business, the Minutes of the inspection recorded that:

> "In compliance with Decree No. 6,796 ….. the Transition Commission assumes the operative control only and exclusively over the assets and other goods owned by [Matesi]…."

476. The Minutes expressly excluded any acceptance by the Commission or Venezuela of, *inter alia*, any commercial or financial debts, contractual or other obligations of Matesi.  The Minutes also confirmed that the Transition Commission had "*only and exclusively*" received the assets of Matesi, as its control and operation belonged to its Shareholders and Matesi remained responsible for its operation and control.[379]

---

[377] Exhibits C-43 and C-44
[378] Exhibit C-45
[379] Exhibit C-47

153

477. Matesi's plant has been under State control since 17 August 2009, operating as Briqueteras de Venezuela ("BriqVen") and initially under Mr Rodriguez as its General Manager, but there has been no attempt formally to change the name of the company and no State corporation has been constituted to hold Matesi's assets as Decree 6,796 envisaged.[380] That situation led to "*absurd results*".[381]

478. Nearly two years later, on 14 June 2011, President Chavez promulgated Decree No 8,280, ordering:

    (a)    the forced acquisition of Matesi's assets;

    (b)    the Attorney General to carry out the expropriation process prescribed by the Expropriation Law such that title to Matesi's assets was finally transferred to the State.

479. An appraisal commission was established by the Attorney General to determine the compensation to be paid for the expropriation of the assets of Matesi targeted by Decree No. 8,280. The notice published by the Attorney called upon the owners of those assets to appear within 30 days and to provide evidence of their entitlement as well as to nominate an expert to serve as a member of the appraisal commission in the context of the non-compulsory amicable agreement phase. The notice made clear that should interested parties fail to observe the 30-day deadline, then the amicable agreement phase would be deemed to be at an end and compulsory expropriation of Matesi's assets would follow pursuant to the Expropriation Law.[382] That 30-day deadline expired on 13 August 2011. To date, the State maintains exclusive control and operation of Matesi's plant; there has been no request for judicial expropriation of Matesi; and no compensation has been paid.

---

[380] Claimants' Memorial, para. 123
[381] Transcript (English), Day 1, p.76
[382] Exhibits C-57 & C-58

480. As put by the Claimants, it is clear to the Tribunal that Matesi has been: "*left an empty shell, in a perpetual state of legal limbo*."[383] Its productive assets have been taken and Claimants have been left with valueless shares.

## 5. FAILURE TO COMPLY WITH THE TREATIES

481. Having carefully considered all of the materials before it, the Tribunal is persuaded that the simple failure on the part of Venezuela to pay compensation is sufficient to render the expropriation unlawful as a matter of Venezuelan law.[384] It is noted that Article 115 of the Venezuelan Constitution requires expropriation to be carried out pursuant to a final and conclusive judgment and timely payment of just compensation, the latter being integral to and prior to the expropriation - according to Professor Araujo-Juarez upon whose opinion, Professor Iribarren himself relied.[385] Further, Article 2 of the Expropriation Law likewise contemplates expropriation by way of final judgment and timely payment of fair compensation. Further still, Article 11 of the Investment Law requires that the expropriation of investments, or measures having a similar effect may only be carried out after the applicable legal procedures have been followed and upon payment of prompt, just and adequate compensation.

482. The Tribunal notes Professor Iribarren's concessions that:

(a) if the State occupies an asset such as permanently to deprive the owner of the right to use, enjoy and dispose of it without title to the asset being transferred to the State, that amounts to a "*measure equivalent to an expropriation*" for the purposes of Article 11 of the Investment Law; and

(b) such occupation for three/four years without payment of compensation would constitute a breach of Article 11, since compensation had not been paid "*without delay*".[386]

---

[383] Claimants' Post-Hearing Brief, para.135
[384] *Burlington Resources Inc. v Republic of Ecuador*, ICSID Case ARB/08/5, Decision on Liability, 14 December 2012
[385] See Claimants' Post-Hearing Brief, FN. 349
[386] Transcript (English), Day 4, pp. 1140 and 1141

483. Professor Iribarren further confirmed that it was an imperative and non-discretionary requirement of Article 22 of the Expropriation Law that Matesi's assets should have been the subject of an expert appraisal even if the subject of the expropriation failed to participate in the amicable agreement process.[387]

484. The Tribunal also concludes that the taking over of Matesi's assets without the prior appraisal of the assets by the appraisal commission and the prior deposit with a court of the amount determined by the appraisal commission or a judicial order authorising the takeover, constituted a breach of Article 56 of the Expropriation Law. Although Professor Iribarren sought to suggest that those requirements could be ignored by reason of the terms of Article 8 of the Nationalisation Decree[388], he himself confirmed that the Expropriation Law was not supplanted by the Nationalisation Decree – to the contrary, the Nationalisation Decree specifically referenced the Expropriation Law, requiring the operation, use and utilisation of Matesi assets to be in conformity with Article 56.[389]

485. Importantly, the legal framework for the nationalisation of the steel industry was established by the Nationalisation Decree, which has the rank and force of law. It was superior to, and could not be contradicted by, Decrees No. 6,796 and No. 8,280, described by Professor Iribarren as decrees of sub-statute level.[390] Despite the fact that the Nationalistion Decree is controlling, it is clear on the facts set out above that critical aspects of the procedure set out in the Nationalisation Decree were not followed in the course of the nationalisation of Matesi, notably:

(a)   a Transition Commission was not set up within seven days of the publication of the Nationalisation Decree on 19 May 2008 in conformity

---

[387] Transcript (English), Day 4, pp. 1209 & 1210. And see also pp. 1212 & 1213, at which Professor Iribarren confirmed that pursuant to Article 19 of the Expropriation Law, provision is made for a default appointment procedure in the event that a party fails to appear or make an appointment
[388] Transcript (English), Day 4, p. 1147
[389] Transcript (English), Day 4, p. 1147
[390] Transcript (English), Day 4, p. 1185

with Article 5 of the Nationalisation Decree. It was not until 25 May 2009 that Venezuela appointed its members;

(b)    the Transition Commission did not transfer Matesi's activities to the State within the deadline of 30 June 2008 pursuant to Article 5 of the Nationalisation Decree – at that point, the Transition Commission had not even been constituted;

(c)    contrary to Article 7 of the Nationalisation Decree, Venezuela failed to establish a Technical Commission. It never appointed representatives, whereas Claimants did so on 29 May 2009;

(d)    contrary to Article 8 of the Nationalisation Decree, Venezuela did not order the expropriation of Matesi's shares, but pursuant to Decrees No. 6,796 and No. 8,280, it ordered the expropriation of Matesi's assets.

486.  Nor did Venezuela follow the provisions of Decrees No. 6,796 and No. 8,280. The requirement for a second Technical Commission required by Article 4 of Decree No. 6,796 was never complied with. Venezuela assumed control and operation of Matesi in July 2009 in contravention of the 60-day period within which the Parties were to seek to agree terms prescribed by Article 5 of Decree No. 6,796; expropriation of the company envisaged by Article 5 of Decree No. 6,796 was never ordered: instead, Venezuela issued Decree No. 8,280 ordering the expropriation of Matesi's assets; and the judicial expropriation process provided for in Article 8 of Decree No. 8,280 was not completed.

487.  It was suggested by Ms Seijas[391] and by Ms Marbeni, one of the highest ranking lawyers in MIBAM as of 2005 and Legal Consultant of MIBAM between May 2010 to December 2011, who had been one of those responsible for the legal aspects regarding the execution of Decrees No. 6,796 and No. 8,280, that the

---

[391] Seijas Witness Statement, para. 11 and see also Transcript (English), Day 3, p. 919

Matesi expropriation process was not yet over, but the initiation of the ICSID proceedings had "*paralysed*" it.[392]

488. Yet in April 2012, it appears from an internal document of the Attorney General's Office that the Ministry of Industry had instructed the Attorney General's Office to request the judicial expropriation of Matesi's assets, notwithstanding the fact of Claimants' notice of dispute and their intention to commence these arbitration proceedings.[393] Indeed, the Tribunal notes that in the *CEMEX* case, the fact that ICSID arbitration proceedings were on foot did not prevent Venezuela from pursuing the judicial expropriation process.[394] Professor Iribarren sought to suggest that the decision not to pursue the judicial process in Venezuela in this case was an exercise of discretion rather than a political decision:

> "the authorities in charge of conducting the expropriation deemed that they should not continue with the trial until this arbitration would be resolved. There was a discretional decision of [Venezuela] to avoid contradictory sentencing or decisions that might have a two-fold or double effect on the same issue."[395]

489. But having started from the position that Venezuela had "*followed a strict procedure that was strictly in keeping with the law in this case*", Professor Iribarren conceded in the course of his cross-examination that:

(a) he had little or no knowledge of the actual facts, and had made no enquiry to corroborate such facts as he relied upon;[396]

(b) the fact that Decree No. 6,796 had been promulgated in order to implement an expropriation of the assets rather than continuing to rely upon the Nationalisation Decree was the result of:

---

[392] Transcript (English), Day 2, p.85
[393] Exhibit R-147
[394] *CEMEX Caracas Investments B.V. and CEMEX Caracas II Investments B.V. v. Bolivarian Republic of Venezuela*, ICSID Case No. ARB/08/15. And see also Exhibit C-292: Decision of the Second Court of Administrative Litigation ("*CEMEX Case*") 30 November 2009
[395] Transcript (English), Day 4, p. 1230
[396] Transcript (English), Day 4, p. 1151 and pp. 1154-1157

> "a certain conceptual lack of order by different types of authorities, but in any event it all refers to the same procedure…
>
> I think the administration could have based itself on Decree 6,058, but it did not. It based itself on the other decree. That other decree applied in isolation and with the specific result that it had .. does not give it … strong enough coverage to the action taken by the administration. … It grounded its action on the Executive Decree and not the Decree Law, and so it did not apply things as I think it should have as per Decree 6,058. It did things otherwise, [which] in one way or another weakens or compromises the way in which the assets of this company were taken.";[397]

(c)     the Decrees upon which Venezuela relied had been drawn up in a "*somewhat disorderly way*";[398]

(d)     notwithstanding his suggestion that in the course of the negotiation process initiated by the Attorney General, the practice would be to consider the liabilities of Matesi and the value of the shares, that the Notice (a "*highly significant*" document[399]) was very narrowly drawn by reference to a valuation of the assets of Matesi set out in Decree No. 8,280, and that "*The Commission that was created based on that Notice can only refer to these assets, the assets referred to here*.";[400] and crucially,

(e)     that if the Technical Commission stage of Decree No. 6,058 were not implemented then, aside from the question of any remedies in Venezuela, had an administrative court been informed that Article 7 of the Decree had not been complied with then:

> "the Act would have to be annulled because of the procedural violation and according to … Article 259 of the Constitution, [the judge] could order restoration of the legal situation that had been harmed through an order issued to the Competent Authorities to carry out the Decree as formally established."[401]

---

[397] Transcript (English), Day 5, pp. 1280 and 1281
[398] Transcript (English), Day 4, p. 1272
[399] Transcript (English), Day 4, p. 1285
[400] Transcript (English), Day 4, p. 1290
[401] Transcript (English), Day 4, p.1172 and 1173

490. Venezuela urges the Tribunal to have in mind that it is not axiomatic that a violation of a provision of domestic law constitutes an international wrong, and that an investor cannot assume that a lack of diligence in pursuing local remedies will have no bearing upon the success of any eventual treaty claim that it might seek to bring.

491. But in the Tribunal's considered view, this is not a mere administrative fault of the kind which caused the tribunal in *Generation Ukraine* to determine that it should decline jurisdiction on the basis of a failure on the part of an investor to undertake a "*reasonable - not necessarily exhaustive - effort … to obtain correction.*"[402] Nor is it a dispute of which it might fairly be said that the investor: "*[has] intentionally ignore[d] the remedies available under local law to resolve and correct the violations alleged by the … investor.*"[403]

492. In this case, Venezuela had put in place a "tailor made" process, which Venezuela itself then chose not to follow. It is one thing for Venezuela to argue that:

> "When international law requires that the procedures of local law be respected, it is referring to local law in its entirety, *i.e.*, the requirement also includes procedural remedies that the legal system provides to remedy violations of substantive rules"[404],

but quite another for it to suggest that the obligation to observe those requirements lies solely on the investor's shoulders.

## 6. CONCLUSION

493. In light of the evidence before it, the Tribunal is in no doubt that Venezuela failed to implement the procedures that it had put in place to effect the nationalisation of SIDOR and its subsidiaries and, specifically, Matesi. In so doing, Venezuela manifestly failed to conform with the requirements of the

---

[402] *Generation Ukraine, Inc. v. Ukraine*, ICSID Case No. ARB/00/9, Award, 16 September 2003
[403] Respondent's Post-Hearing Brief, para. 365
[404] Respondent's Post-Hearing Brief, para. 365

Venezuelan Constitution, the Expropriation Law and the Investment Law, to the extent that they address the issue of expropriation, and it failed, too, to ensure that the provisions of the Nationalisation Decree and those of Decrees No. 6,796 and No. 8,280 were consistent with one another and susceptible to be given full and consistent effect.

494. The Tribunal further concludes that the failure of Venezuela to observe the requirements of its own nationalisation legislation is sufficient to constitute a breach of Article 4(a) of the Portuguese Treaty, which has an explicit *renvoi* to Venezuelan domestic law through the language: "*in accordance with the legislation in force.*"

495. It is satisfied, too, that Venezuela has breached the requirement of Article 4(1)(b) of the Luxembourg Treaty to the extent that its conduct was not: "*in accordance with legal procedures*".

496. In the opinion of the Tribunal, this is a case akin to the *ADC/Hungary* case, in that the affected investor has not had:

> "a reasonable chance within a reasonable time to claim its legitimate rights and have its claims heard."[405]

497. Further, Venezuela has acted in breach of both Treaties in effecting an expropriation without "*provisions for the payment of adequate and effective compensation*" (per Article 4(1)(d) of the Luxembourg Treaty) or "*provisions that guarantee the payment of immediate, adequate and effective compensation*" (*per* Article 4(c) of the Portuguese Treaty).

---

[405] *ADC Affiliate Limited and ADC & ADMC Management Limited v Hungary*, ICSID Case No. ARB/03/16, Award, 2 October 2006, para. 435

## H.  QUANTUM

498.  Having concluded that Venezuela has expropriated Tenaris' and Talta Trading's investments in violation of Venezuelan law as well as the Luxembourg and Portuguese Treaties, the Tribunal is required to determine what compensation is due.  In so doing the Tribunal must consider the Parties' very different positions as to which assets or rights should be valued; the appropriate method for valuing them; the applicable rate of interest; and a number of other related issues.

499.  The following analysis does not discuss claims related to the Talta Off-Take Agreement in its own right (as addressed in **Section E.3**), over which the Tribunal has declared it has no jurisdiction, or claims for pre-expropriation damages (as addressed in **Section F**), which the Tribunal has rejected.

## 1.  CLAIMANTS' CASE

500.  Claimants argue that the proper standard of compensation in a case of unlawful expropriation is full compensation of all losses resulting from Venezuela's conduct.  Claimants refer first to the *Chorzów Factory* case and the principles set forth in the ILC Articles on State Responsibility.[406]  Claimants emphasise that the appropriate standard for valuing such assets is Fair Market Value - meaning the price that a willing buyer would pay and a willing seller would accept.

501.  According to Claimants' experts, Messrs. Abdala and Spiller of Compass Lexecon, those values (with respect to only those claims recognised by the Tribunal) are:

(a)  US\$ 235.9 million as compensation for the taking of Claimants' 50.2% equity stake in Matesi based, principally, on their Discounted Cash Flow ("DCF") analysis; and

---

[406]  *See* Claimants' Post-Hearing Brief, para 353.

162

(b)    US$ 27.1 million for the taking of Talta's loan to Matesi.

502.  In their detailed report, Claimants' experts rely principally on the DCF method. In making their calculations, they analyse both the actual performance of the Matesi plant as well as projections of likely future performance and revenues. These projected cash flows are then discounted back to the date of expropriation to arrive at a valuation of US$ 235.9 million for Talta's 50.2% interest in Matesi.

503.  In addition to using the DCF approach to valuation of the Matesi Plant, Claimants' experts present an alternate approach making use of "market multiples" from comparable publicly-traded companies. In search of companies with substantial similarity to Matesi, they identified 29 companies, worldwide, whose main activity was HBI/DRI production. Of these, eight were publicly traded as of 30 April 2008.[407] This group was further winnowed down by Messrs Abdala and Spiller to five companies, and it is data relating to these entities, which are used for their market multiples analysis. Their study compared median market multiples on two separate bases: (1) market value to book value of equity and (2) market value to book value of assets. Finally, they adjusted the market value of shares in these companies upward by applying a "control premium." According to their report, experienced observers are in agreement that the *per unit* value of a single share or small group of shares is substantially less than the *per unit* value of an interest sufficiently large to control the company. Regarding the question of how much this "control premium" is worth, Abdala and Spiller argue, and provide support for the use of, a 27% control premium with respect to the valuation of Talta's interest in Matesi.

504.  The result of the "market multiples" approach, as adjusted by this control premium, is a valuation ranging between US$ 196.4 to US$ 259.7 million – figures which, the report finds, *grosso modo*, support the earlier described DCF value of US$ 235.9 million.

---

[407]  Compass Lexecon First Expert Report, p. 87, dated 24 August 2012.

505. Messrs Abdala and Spiller also find that the proper pre-award interest rate is 17.12% from April 2008 to December 2011 and 16.27% from January 2012 to July 2014, representing Talta's weighted average cost of capital (WACC).[408]

## 2. RESPONDENT'S CASE

506. Respondent's expert, Timothy Hart of Credibility International, reaches results, which are markedly different. Regarding the DCF approach, Mr Hart finds that with the assumed termination of the Off-Take Agreements, 100% of Matesi's historic sales are eliminated and that, as of 1 May 2008, Matesi starts with no customers, marketing and sales functions, or shipping contracts. Moreover, Matesi is 100% dependent upon CVG FMO/Sidor's pellet production, which has been in a multi-year decline. He further argues that Matesi has also had some of its own production problems – and that it is tied to the Off-Take Agreements with Talta and Sidor and is therefore limited to a sales margin of cost plus 7.5%.[409]

507. Mr Hart concludes that, taking a sober view of these realities, and building in an appropriate level of risk, the proper value of Claimants' shareholding interest in Matesi is US$ 0. Mr Hart finds that Matesi, in its brief period of operation, never established the positive free cash flow on which DCF valuation heavily depends. He also observes that Claimants also failed to demonstrate that Talta made a profit on the HBI.

508. Mr Hart then proceeds to perform two alternative DCF valuations. In so doing, he suggests, *inter alia*, that the forecasts used by Claimants' experts are largely speculative and unstable especially when they involve projections involving a period of more than five years. He further criticises the HBI prices used by Claimants, as well as Operating Expense assumptions and projected Capital Expenses. According to his two alternate DCF calculations, he finds support for his calculation of Matesi share value at US$ 0.

---

[408] Claimants' Post-Hearing Brief, para. 450.
[409] First Expert Report of Timothy H. Hart, February 2014.

509. With regard to the "market multiples" approach presented by Claimants' Experts, Mr Hart maintains that they did not use comparable companies – in part because the companies in question operate elsewhere in the world. Similarly, according to Mr Hart, the control premium adopted by Abdala and Spiller to create a putative value for Matesi may have theoretical validity, but is appropriate only in a very different country *e.g.*, India.

510. Finally, Respondent's expert is highly critical of the pre-award interest rate suggested by Abdala and Spiller. Mr Hart notes that the interest element, which Claimants seek actually exceeds their claimed damages for the value of the company. He points to what he believes to be a flawed weighted average cost of capital ("WACC") rate for both the pre- and post-award interest. The proper rate, according to Mr Hart is that of the 10-year U.S. Treasury bond, essentially a "no-risk" rate.

511. Mr Hart's bottom line is that Claimants' valuation of Matesi must assume the Off-Take Agreement's "in place" – as they were one day before the expropriation took effect. Therefore, he concludes that Claimants' shareholding in Matesi, with Off-Take Agreement prices in force, and accounting for an appropriate level of risk, is US$ 0.[410]

### 3. TREATY PROVISIONS

512. There can be no question concerning the right of Venezuela, pursuant to Article 4(1) of the Luxembourg Treaty and Article 4 of the Portuguese Treaty to expropriate the property of an Investor for a public or national purpose, in compliance with applicable legislative measures, in a non-discriminatory fashion, and accompanied by prompt and adequate compensation.

513. But where, as here, an expropriation is not carried out in accordance with these standards and others established in the Treaties and by customary international law, the responsible party shall be required to pay compensation.

---

[410] Second Expert Report of Timothy H. Hart, paras. 197-203 and Table 10.

514. Regarding the measurement and calculation of compensation, the language of the Treaties is as follows:

    (a)    Article 4.c of the Portuguese Treaty:

". . . this compensation shall be based on the market value of the investment in question immediately prior to the moment when the measure was made public; compensation will accrue interest at the exchange rate applicable at the date on which the transaction becomes effective, in the territory where the investment is located;"

    (b)    Article 4.2 of the Luxembourg Treaty:

"2. The amount of the compensation shall correspond to the real value of the investments concerned on the day prior to the adoption or publication of the measure.

The compensation shall be paid in convertible currency. It shall be paid without undue delay and shall be freely transferable. Interest shall be paid at the normal commercial rate from the date it is determined until the date of payment."

515. The above language from the treaties is very similar to that contained in the ILC Articles,[411] which are currently considered to be the most accurate reflection of customary international law.

516. Article 36 of the ILC Articles provides as follows:

"1. The State responsible for an internationally wrongful act is under an obligation to compensate for the damage caused thereby, insofar as such damage is not made good by restitution.

2. The compensation shall cover any financially assessable damage including loss of profits insofar as it is established."

---

[411] The Draft Articles on Responsibility of States for Internationally Wrongful Acts (2001) (CLA-13).

517. This Article relies, in turn, on the oft-quoted ruling of the PCIJ regarding reparation in the *Factory at Chorzów* case which reads, in relevant part, as follows:

> "The essential principle contained in the actual notion of an illegal act – a principle which seems to be established by international practice and in particular by the decisions of arbitral tribunals – is that reparation must, so far as possible, wipe out all the consequences of the illegal act and re-establish the situation which would, in all probability, have existed if that act had not been committed."[412]

### 4. METHOD OF VALUATION

518. There is no dispute that the correct date of expropriation is 30 April 2008.[413]

519. The Parties' experts are also in agreement that Fair Market Value means the price that a willing buyer would buy and a willing seller would sell.[414]

520. Regarding the most desirable methodology for valuing the plant, there is – at least superficially – also some measure of agreement:

> "The parties and their experts agree that where arm's length transactions are unavailable, the value of an asset generally is determined best by its ability to generate future cash flows. Thus the appropriate (and agreed) methodology for measuring future income is the DCF method."[415]

521. The devil, alas, is in the detail. As indicated above, the Fair Market Value of Talta's interest in Matesi as determined by the DCF method ranges from US\$ 239.0 million (Abdala / Spiller) to US\$ 0 (Hart).

522. The Tribunal appreciates the efforts of the experts and believes that this adversary crossfire on the valuation of Matesi – while perhaps not entirely

---

[412] *Factory at Chorzów*, Merits, PCIJ, Series A, No. 17, 1928, p. 47. (CLA-1)

[413] *See* Claimants' Memorial, para. 258; First Expert Report of Timothy H. Hart, Sec. 8.4 at p. 38.

[414] Claimants' Post-Hearing Brief, para. 358; Cross-examination of T. Hart, Transcript (English), Day 6, p. 1660: 6-22; *see also Starrett Housing Corp. v. Iran* (Iran U.S. Claims Tribunal) Award No. ITL 32-24-1, 19 December 1983 4 Iran Claims Tribunal Reporter 122, para 18. (CLA-05)

[415] Claimants' Post-Hearing Brief para. 359; Compass Lexecon First Expert Report, paras. 31-35; First Expert Report of Timothy H. Hart, paras. 66-69.

efficient – does assist the Tribunal in understanding some of the key issues in determining damages.

523. The valuation of the 50.2% equity interest of Talta in Matesi, located, as it was, in Venezuela, in the particular market circumstances there prevailing, presents a number of serious challenges. In that context, the Tribunal has carefully considered both the DCF and "market multiples" approaches, as put forth and then critiqued by the Parties' respective experts and counsel. The Tribunal recognises that parties in investment cases may be prone to adopt dramatically contrasting approaches to the presentation of quantum issues in order to maximise a position – or to minimise that of the opposing party. Such a conflict can result in little or no engagement between the methodological arguments and valuation theories advanced by the opposing parties. In consequence, tribunals have based their findings upon other evidence and argument in the record introduced by each party in an attempt to arrive at a quantum determination in which they consider that they can have the requisite degree of confidence.[416] In so doing tribunals have, per force, sometimes made use of valuation procedures, which are generally acknowledged to be sound, but which differ from the principal valuation theories advanced by the parties. That is the position in this case in that, for the reasons set out below, the Tribunal has concluded that in the circumstances of this case, there are major flaws in the principal approaches adopted by both Claimants and by Venezuela.

a. **Discounted Cash Flow ("DCF")**

524. The DCF approach is widely accepted and, where the circumstances for its use are appropriate, it has certain inherent advantages over other methods such as net book value or liquidation value. Rather than looking to more historical asset or accounting-based valuation methods, the DCF approach combines an established historical record of financial performance with the use of reasonable

---

[416] See, for example, *Tecnicas Medioambientales Tecmed, S.A. v. United Mexican States*, ICSID Case No. ARB(AF)/00/2, Award, dated 29 May 2003 at paras. 186 and 195; *Khan Resources Inc., et al. v. Government of Mongolia*, UNCITRAL, Award on the Merits dated 2 March 2015 at para. 390; *Gemplus S.A., SLP S.A., Gemplus Industrial S.A. de C.V. v, The United Mexican States*, ICSID Case No. ARB(AF)/04/3, Award dated 16 June 2010 at paras. 13-73 and paras. 13-75; and *National Grid P.L.C. v. Argentine Republic*, UNCITRAL, Award dated 3 November 2008 at paras. 284-290

and reliable projections of future free cash flows. One situation in which DCF would clearly be preferred might be where, after a number of years of successful performance, a long-term concession contract (*e.g.*, for operation of an airport), or where a long-term supply contract, has been terminated. In such cases, the variables are limited and the likely free cash flows are not difficult to estimate with reasonable certainty.[417]

525. In the present case, for a number of reasons, including some mentioned in Mr Hart's report, the Tribunal does not consider the use of the DCF approach to be appropriate. While the existence of the Off-Take Agreements adds a layer of complexity, Matesi's history of operations runs only from start-up on 6 October 2004 to the initial decree providing for expropriation of Matesi's shares on 30 April 2008, a total of approximately 42 months.

526. Given the normal need for adjustments during the start-up period, the ups and downs of pellet production and delivery, and the brevity of operation of the plant under its owners, serious questions are presented in using the available data from this short, initial period to construct a DCF model. Similarly, the prospects for future supplies of pellets and iron seem even more problematic. In addition, the sharp decline in CVG FMO pellet production adds another obstacle to the reliable projection of Matesi's future free cash flow – and therefore also for the application of the DCF approach.

527. Finally, these uncertainties are compounded by other government interventions in the market place, as well as unstable inventories and shortages of a wide range of products in the Venezuelan market. It is not appropriate for this Tribunal to express itself, either positively or negatively, on the policies of the government of Venezuela. It observes, simply that general economic conditions in Venezuela as well as the business situation at Matesi did not, at the time of expropriation – or later – give rise to the likelihood that Matesi's free cash flows could be projected with reasonable certainty.

---

[417] *See*, for example, *ADC v. Hungary*, First Award, 2 October 2006, paras. 506-07; *CMS v. Argentina*, Final Award of 12 May 2005; *see generally* Ripinsky, op. cit, Ch. 6, Sec. 6.2.2.

### b. The "Market Multiples" Approach

528. Turning to the "market multiples" approach, the Tribunal has studied carefully the alternate approach of Claimants' experts, in which they attempt to identify other companies dedicated principally to HBI/DRI production and which might readily be compared to Matesi, in terms of market value of publicly traded shares either to book value of equity or book value of assets. The Tribunal has also considered carefully the treatment of this approach by Respondent's expert – who, again, making use of the same approach, reaches strikingly different conclusions.

529. The methodology and logic of this "market multiples" analysis is certainly sound in principle, but the Tribunal considers that this approach, as applied to Matesi, does not adequately take account of the unique market circumstances of Matesi, or of Venezuela during the period in question. In broad terms, commentators have often commented on the difficulty of identifying genuinely similar companies for comparison.[418]

530. Thus while some arbitral tribunals have accepted the "market multiples" approach,[419] its acceptance by arbitral tribunals has been quite limited. For example, the tribunal in *CMS v. Republic of Argentina* rejected the proffered comparison between the value of TGN, a private company in which CMS owned shares, and several similar companies, which were publicly traded. In rejecting this comparison the tribunal endorsed an expert's opinion that:

> "Market capitalization in illiquid markets such as Argentina is not the most adequate method to value companies"

and it noted that there were

> "significant differences between TGN and those companies regarding asset levels, business segments, financing policy and other issues."[420]

---

[418] *See* S. Ripinsky and K. Williams, Damages in International Investment Law, (BIICL, 2008) at p. 215-6; *see also*, M. KANTOR, *Valuation for Arbitration: Compensation Standards, Valuation Methods and Expert Evidence* (Kluwer Law International, Aalphen aan den Rijn, 2008 pp. 119-30).

[419] *E.g.*, CME v. Czech Republic, Final Award of 14 March 2003 (*"CME"*).

[420] *CMS v. Argentina*, Final Award of 12 May 2005, para. 412.

531. This same line of argument has been developed in this case by Respondent's expert, Mr Hart.[421]

532. As the Tribunal has indicated above, in the context of the DCF method, the uncertainties presented in the Venezuelan market at the time of the expropriation presented complex circumstances which render comparisons of the value of Matesi with even ostensibly similar companies in other countries very difficult indeed. The Tribunal is not persuaded that the five companies selected by Claimants' experts as most comparable to Matesi (all of which operate in India and which make somewhat different products with different technologies) provide reliable guidance to the Tribunal on the basis of which it might proceed to achieve a satisfactory finding of value in this case.[422]

### c. The Talta and Sidor Off-Take Agreements

533. Before leaving the subject of the DCF and "market multiples" approaches to valuation, the Tribunal does not wish to pass over without comment the arguments of the Parties with respect to the Talta and SIDOR Off-Take Agreements and how, if at all, the Off-Take Agreements impact the fair market value of Matesi. The Tribunal has determined that the Talta Off-Take Agreement *per se*, does not constitute an "investment" for purposes of supporting an independent line item requiring compensation for expropriation, but the Talta Off-Take Agreement was obviously designed by Claimants with some care in relation to the corporate structure to which Matesi was affiliated. As indicated above, the Talta Off-Take Agreement appears to have been a crucial element in the decision to invest in Matesi, because without it (and the foreign currency revenues it assured), the financial viability of Matesi would have been called into question. Similarly, the Sidor Off-Take Agreement created a significant measure of stability in terms of sales within the Venezuelan market. The question then arises whether the Off-Take Agreements are a significant element in terms of valuation of Matesi – and, if so, how?

---

[421] First Expert Report of Timothy H. Hart, pp. 67-70
[422] *Op. cit.* paras. 162-164

534. Claimants have argued that the Off-Take Agreements made a significant contribution to lowering the level of risk associated with a volatile market. The Talta Off-Take Agreement assured the sale of much of the production for hard currency in markets considered less volatile.[423] According to Claimants, both Off-Take Agreements provided a readily identifiable cash flow which potential lenders – probably including Talta itself – found comforting.

535. Respondent, however, maintains that the Talta Off-Take Agreement is simply one of several features which demonstrate that Matesi was established as little more than a "cost centre" which, by virtue of transfer pricing, allowed its owners to shift much of the profit on its products to lower tax jurisdictions. The maximum revenue obtainable under these agreements was cost plus 10%, with each party responsible for paying whatever taxes accrued to it.[424] In addition, Respondent has argued, with strong support from its expert on valuation, Mr Hart, that when attempting to value Matesi's value to a willing buyer, language from both the Luxembourg and Portuguese Treaties requires that the amount of compensation shall correspond: "*to the real value of the investments concerned on the day prior to the adoption or publication of the measure,*"[425] or: "*the market value of the investment in question immediately prior to the moment when the measure was made public.*"[426]

536. Because the Off-Take Agreements were in place immediately prior to the expropriatory act, Venezuela insists that Matesi must be valued with the Off-Take Agreements in place, which would result in a significant negative drag on Matesi's potential market value. Respondent's expert points out that, due in part to the Off-Take Agreement pricing arrangements, Matesi actually incurred losses in its first three years of operation; that only the buyers (*i.e.* Talta and Sidor) had the right to terminate the Off-Take Agreements (except for very

---

[423] See paras. 246-263, *supra*, for more detail on the background and purpose of the Off-Take Agreements.
[424] For an earlier brief description of these arguments, see paras. 254-263, *supra*.
[425] Luxembourg Treaty, Article 4.2 (Exhibit C-01)
[426] Portuguese Treaty, Article 4 c) (Exhibit C-03)

limited exceptional situations which, it is argued, do not pertain here); and that Matesi had no record of sales outside the Off-Take Agreements – presumably a negative element which could not fail to be noticed and evaluated by a hypothetical buyer. [427]

537. On the basis of the approach to valuation adopted by the Tribunal in the following section, the Tribunal considers that this aspect of the dispute between the Parties has become essentially moot. Nevertheless, because the views of the Parties on this issue are widely disparate and have been argued with considerable intensity, the Tribunal considers that some further comment is appropriate.

538. The question presented is how the treaty language "*the day before*" or "*the date immediately prior*" is to be construed in the circumstances of this case. The starting point, once again, must be the (previously cited) rules set forth in Article 31(1) of the Vienna Convention, which reads, in relevant part as follows:

"A treaty shall be interpreted in good faith in accordance with the ordinary meaning to be given to the terms of the treaty in their context and in the light of its object and purpose."

539. Again as noted earlier, the preambles of the Treaties in this case state that their purpose is (respectively) to: "*...strengthen … economic cooperation by creating favorable conditions for investments …*" [428] and: "*... to intensify economic cooperation … and to maintain fair and equitable conditions for making investments by investors of each contracting party …*" [429] The Treaties also make reference to the reciprocal promotion of investments helping to contribute to the economic prosperity of the two states[430] and: "*… the beneficial influence that an agreement of this nature can have on improving business contacts and reinforcing confidence in the area of investment.*"[431] The Tribunal finds that

---

[427] Respondent's Post-Hearing Brief, paras 400-440.
[428] Luxembourg Treaty, preamble. (Exhibit C-01)
[429] Portuguese Treaty, preamble. (Exhibit C-03)
[430] Portuguese Treaty, preamble. (Exhibit C-03)
[431] Luxembourg Treaty, preamble. (Exhibit C-01)

these statements of purpose, while clear, are too broad and general to provide the needed guidance on the specific issue before it.

540.  The Parties themselves seem to be in agreement concerning the purpose of the language concerning "*the day before*" or "*the date immediately prior to the expropriation measure.*"  In its Counter-Memorial, the Respondent states the following:

> "… the Treaties establish that the investment value will be determined beginning from the date immediately prior to the expropriation measure.  This is logical from the perspective of compensation, as the objective is to compensate the investor for the net revenue it would have received in the absence of State measures.  Claimants themselves emphasize this basic theory,"[432]

541.  The Tribunal agrees fully with this general statement of the purpose of the treaty language.  Further, it is clear that the agreed date of expropriation in this case is 30 April 2008, and that "*the day before*" is 29 April 2008.

542.  But the specific question presented here is: what scope is to be given to the words "*the day before*" or "*the date immediately prior*" in the context of the situation here?  Do these words speak only to "*when*" the investment's value is to be determined *i.e.* as of what date?  Or must these words be construed, as Respondent suggests, also to import specific directions to the Tribunal as to "*how*" the expropriated entity should be valued *i.e.* in the present case, to require that Matesi be valued with the Off-Take Agreements in place?

543.  As is well known, fair market value may be determined in a number of different ways depending on the circumstances of each enterprise.  As a result, there can be no single standard for the fairness by which compensation is to be determined.[433]  To determine the market value of property in any particular case, an endless variety of different factual issues may be presented.  Each tribunal must, thus, attempt to give meaning both to the words of the treaty regarding the

---

[432] Claimants' Memorial, para. 228.
[433] The Guidelines On The Treatment of Foreign Direct Investment (Guidelines) including the report to the development committee on legal framework for the treatment of foreign investment, published in 7 ICSID Rev.-FILJ 295 (1992).

putative valuation date, as well as to the standard set forth in Article 36 of the ILC Articles,[434] and the ruling of the PCIJ in the *Chorzów* case, *i.e.*:

> "that reparation must, so far as possible, wipe out all the consequences of the illegal act and re-establish the situation which would, in all probability, have existed if that act had not been committed."[435]

544. Article 32 of the Vienna Convention provides that where the analysis of the treaty language pursuant to Article 31:

> "(a) leaves the meaning ambiguous or obscure, or (b) leads to a result which is manifestly absurd or unreasonable,"

recourse may be had to supplementary means of interpretation, including the preparatory work of the treaty (*travaux preparatoires)* and the circumstances of its conclusion. To this end, under Article 32, the Tribunal is free to examine further evidence from the Parties to clarify the intended scope of these phrases. However, neither Party has presented evidence indicating that this or a similar issue was raised during the preparatory work for the Treaties, or the circumstances under which they were concluded.

545. In the absence of such additional evidence, the Tribunal considers that the purposes of the Treaties are best served by construing the treaty language in question to allow the market value of the expropriated property to be determined, as far as possible, "*to compensate the investor for the net revenue it would have received in the absence of State measures.*"[436] This purpose, the Tribunal finds, is best served by construing the "*day before*" or the "*real value on the date immediately prior …*" to prescribe "*when*", but not "*how*", to determine the fair value of Talta's ownership interest in Matesi. Indeed, other than making its argument on the "*plain language*" of the Treaties, Respondent does not put forth any rationale in terms of policy or purpose to support its interpretation.

546. In addition, the Tribunal has examined the facts of the case before it in practical business terms. It notes that, prior to the expropriation, both Sidor and Matesi

---

[434] *See* FN 413, *supra* (CLA-13)
[435] *Factory at Chorzów*; *see* FN 414, *supra*.
[436] See para. 539, *supra*

had been controlled by Ternium S.A. and Talta, both affiliates of their parent and beneficial owner, the Techint Group.[437]   The Parties are in agreement that prior to the expropriation, the Off-Take Agreements with Sidor and Talta had two purposes:  (1) to guarantee that at least 60% of Matesi's production each year would be sold under the Off-Take Agreements and (2) that the Off-Take Agreement arrangement would allow the bulk of the economic profits from Matesi's HBI output to flow directly to Matesi's affiliates.  These profits were to be obtained, of course, by means of a further mark-up of Matesi's products when they were sold to unaffiliated purchasers in the international market place.[438]  Clearly, these Off-Take Agreement arrangements were made for the benefit of the owners of both Talta and Sidor, who would thereby ultimately reap additional profits.

547.  Venezuela has now nationalised both Matesi and Sidor.  It is, therefore, presumably, free to sell Matesi's products to whomever it wishes, at whatever price prevails in the world market, retaining all of the resulting profits for itself - as would be its right.[439]

548.  If this were to occur, while, at the same time, the Tribunal had substantially restricted the Market Value of Matesi by insisting that, for purposes of valuation, the Off-Take Agreements remain in force, the business reality would be to award a gratuitous and unwarranted bonus to Respondent for its unlawful act. The Tribunal, thus, cannot accept Respondent's argument that it is required to value Matesi as if the Off-Take Agreements remained in place.

549.  The Tribunal finds that there is, in any event, a more appropriate approach to the valuation of Talta's ownership interest in Matesi, which does not require that it consider further the alleged impact of the Off-Take Agreements.

---

[437] Claimants' Memorial, para. 22
[438] Normally allowing the final sale to be made from a lower-tax jurisdiction.
[439] Claimants' Post-Hearing Brief, para. 364.

### d. Best Evidence of the Value of Talta's Interest in Matesi

550. Having carefully examined the submissions and evidence presented in support of the proposed use of the DCF and the "market multiples" approaches to the valuation of Talta's interest in Matesi, and having concluded that both approaches are inappropriate in this case, the Tribunal notes that both Parties have made reference to another valuation method - albeit both have also expressed reservations about it.

551. Claimants, in their Post-Hearing Brief, indicate that there is agreement between the Parties that the Claimants are entitled to the Fair Market Value of the assets Venezuela has taken. Claimants state:

> "The test is market-based: The only question before this Tribunal is how much a willing buyer would pay for the asset if it was being sold on the open market in an unfettered sale … "[440]

552. A few paragraphs later, Claimants state:

> "As for the best method to determine Fair Market Value of the Claimants' equity interest in Matesi, the parties and their experts agree: where arm's-length transactions are unavailable, the value of an asset generally is determined best by its ability to generate future cash flows. Thus, the appropriate (and agreed) methodology for measuring future income is the DCF method. **But where the results of arms-length transactions between a willing buyer and a willing seller are available, leading commentators are in agreement that the agreed price deserves particular respect as evidence of the value of the asset in question**." (Emphasis added).

553. Similarly, Respondent's Expert, Mr Hart, fully concurs in the definition of Fair Market Value and the significance of the completion of an arm's length sale transaction.[441]

554. Ripinsky indicates in this regard:

---

[440] Claimants' Post-Hearing Brief, para 353; Claimants' Opening Presentation, Transcript (English), Day 1, pp. 182:14-22 and 183:1-14.
[441] First Expert Report of Timothy H. Hart, para. 62-63.

> "Where there is an active market for a particular asset, tribunals will generally have little difficulty in establishing its value.  Here no formal theory of value is needed.  We can take the market's word for it."[442]

555.  To the same effect Kantor's treatise on valuation for arbitration states:

> "The best evidence of a company's value, or course, may be the actual price received in an arm's-length transaction for the sale of an interest in that very business.  As the U.S. Tax Court has stated, while listed market prices are the benchmark in the case of publically traded stock, recent arm's-length transactions generally are the best evidence of fair market value in the case of an unlisted stock."[443]

556.  Numerous arbitration tribunals have endorsed this approach.[444]

557.  In examining the suitability of the agreed price as an adequate expression of Fair Market Value, the transaction must satisfy at least the following conditions:

   (a)  Both buyer and seller must be willing and able, neither acting under compulsion.

   (b)  The transaction must be at arm's length.

   (c)  The transaction must take place in an open and unrestricted market.

   (d)  Both buyer and seller must have reasonable knowledge of the relevant facts. [445]

---

[442] Ripinsky and Williams, Damages in International Investment Law (British Institute for International and Corporative Law, 2008) Sec. 6.2.1 at p. 189.

[443] M. Kantor, Valuation for Arbitration (Wolters Kluwer:  The Netherlands, 2008) at 17, 18 (citing *Estate of James Waldo Hendrickson v. Comm'r, T.C. Memo* 1999-278, 1999 Tax. G. Memo, LEXIS 318 at 42).

[444] See, *e.g.*, *Enron Corporation and Ponderosa Assets, L.P. v. Republic of Argentina*, ICSID Case No. ARB/01/3, Award, 22 May 2007, paras. 387-388.

[445]    Ripinsky and Williams, *op. cit.*, p. 184 (referring to the definition of Market Value in the Glossaries of the American Society of Appraisers and the Guidelines of the International Valuation Standards Committee.); Kantor *op. cit.*, at p. 18.

558. Sales of expropriated property, which satisfy these conditions have been accepted as adequate evidence of market value by numerous arbitral tribunals.[446]

559. In the present case, the Tribunal has examined the sale of the Matesi plant from the viewpoint of both the seller and the buyer.

560. The seller, Posven, with involvement of its parent and principal shareholder POSCO, appears to have made a painful business decision to dispose of an almost-new plant, built at considerable expense and employing the latest in HBI manufacturing technology. The plant had operated only from March to August of 2001, when Posven discontinued operations. The testimony and documentary evidence contain only a brief and superficial explanation of the reasoning of the owners in making this decision to sell. The reasons given were (1) that POSCO had made a change in strategy; (2) that Posven was experiencing "*certain operating difficulties*"; and (3) that the steel markets were going through a depression.[447]

561. At a meeting of Posven's shareholders on 23 December 2002, it was decided to liquidate Posven. Pursuant to that decision, Merrill Lynch was engaged as Financial Advisor. Consequently the Matesi plant was offered for sale in January 2004.[448]

562. The involvement of Merrill Lynch in the sale process provides significant assurance that sales information on the plant was made available, broadly, to potentially interested parties in the HBI and steel business worldwide. The record does not indicate how many offers were presented, but it appears clear that the offer from Tenaris and Sidor was the offer most favorable to Posven.

563. The buyers, Tenaris Global (later Talta) and Sidor, must certainly have been aware of the status of the Matesi plant prior to the official offer to sell in January

---

[446] Ripinsky citations from p. 184, FN 9.
[447] Posven Executive Summary, p. 1. (Exhibit C-68)
[448] *Ibid.*

of 2004. Given the involvement of Merrill Lynch in the process, they were surely aware of the likelihood of competing offers for the plant. In March 2004, they were, in fact, declared the successful bidders. Both Sidor and Tenaris Global were affiliates of the Techint Group, a large, successful and sophisticated investment group, heavily involved in the Latin America steel industry, and certainly capable of looking out for its own business interests.

564. A final consideration, which deserves comment is that both parties have mentioned, in passing, that the plant was sold as part of a liquidation, leaving open the possibility that this was a distress or "*fire*" sale. If so, under the criteria cited at para. 557(a) above, the transaction might be considered a sale "*under compulsion,*" rather than a sale reflecting Fair Market Value.

565. But a careful look at the evolution of the Matesi sale – and the time line involved – leads the Tribunal to conclude otherwise. Posven stopped its operations in Venezuela in August 2001. The decision to liquidate Posven was made in December 2002 – some 16 months later. This decision led to the engagement of Merrill Lynch as Financial Advisor for the sale, which, in turn, resulted in the solicitation of offers in January 2004, and the sale itself in March 2004. The Tribunal considers that the elapsed time from the cessation of Posven's operations in August 2001, to the eventual sale of the plant in March 2004, and each of the steps leading up to the sale, indicates a carefully considered business decision by Posven and its shareholders.

566. Having considered all of the evidence before it, the Tribunal is satisfied that the resulting transaction was freely entered into by the buyers and seller, at arm's length, in a reasonably open market, with both the seller and the buyers having reasonable knowledge of the relevant facts and other market circumstances. The Tribunal is, thus, satisfied that the agreed price of US$ 60.2 million for Talta's 50.2% interest in Matesi is an appropriate reflection of the Fair Market Value of Talta's interest in the Matesi plant.[449]

---

[449] The Tribunal is aware that, in appropriate circumstances, market transactions such as this one can be combined with DCF or other income-based approaches. It has considered making use of such a

(Footnote continued on next page)

180

567. The Tribunal recognises that the sale price reflects a transaction, which took place in 2004, and that a sale closer to the date of expropriation would likely be more fair and more reliable. Matesi, of course, operated the plant in rather complex business circumstances, from 17 October 2004[450] until 30 April 2008, receiving the financial benefit of those operations such as they were. The Tribunal has considered whether the agreed price should be adjusted, either upward for inflation or downward for depreciation. The evidence before it does not, however, provide a viable basis for making such an adjustment. The Tribunal, therefore, with some reluctance accepts the agreed price of US$ 60.2 million, without adjustment. The Tribunal does acknowledge, however, that the nationalization of the entire steel industry — as well as general market conditions affecting both the investment climate, and the availability of supplies and other aspects of HBI production — have contributed to an environment in which the traditional approaches to establishing fair market value confront serious difficulties. We have concluded, nevertheless, that Claimants have established with reasonable certainty, the value of their interest in the expropriated company. In these circumstances, the Tribunal does recognize, however, that, if we were to compare the determined value of $60.2 million (for Talta's interest) with the Fair Market Value of an interest in a genuinely similar facility elsewhere, the value we have determined in this case is probably quite depressed.

568. Turning briefly to the issue of the Talta Loan, the Tribunal has given careful consideration to the arguments of Respondent to the effect that this loan was non-performing, or was never intended to be repaid, or that the US$ 27.1 million remaining as unpaid on Matesi's books should not be considered an investment – or, if it is, it should be excluded from the calculation of compensation, because it amounts to double counting.

---

(Footnote continued from previous page)

hybrid approach, but in light of the data available in the record, has concluded that this method could not readily be adapted to the situation presented here.

[450] See para. 48, *supra*

569. As set out earlier, the Tribunal has concluded that, pursuant to the Investment Agreement, Talta had committed to advance an additional US$ 60 million partially to finance the purchase of the Posven assets and to contribute to the costs of refurbishment.[451]  It is thus satisfied that the outstanding balance of the Talta Loan – whether it is considered still to be a loan or, instead, a contribution to the equity of Matesi – represents a legitimate investment by Talta for which Talta must be compensated.

570. To calculate the total amount due as compensation for Claimants' loss, we must begin with the determined value of Talta's interest in Matesi (US$ 60.2 million) and add the value of the Talta loan (US$ 27.1 million) — which results in a total value of Claimants' loss of US$ 87.3 million.[452]

## 5.   ACTUALISATION OF THE LOSS

571. Because the expropriation took place on 30 April 2008, more than seven years ago, the next issue to be resolved is the method for actualising the loss, *i.e.*, adding interest at an appropriate rate *per annum* to reflect the time value of money, from the date of expropriation to the date of the award.  The positions of the Parties on this issue again differ greatly.

572. Claimants maintain that the appropriate rate of capitalisation for both pre- and post-award interest is the Claimants' opportunity cost.  This rate, according to Claimants, should be equal to Talta's weighted-average cost of capital ("WACC").  As calculated by Messrs Abdala and Spiller, that rate would be 17.12% from April 2008 to December 2011; and 16.27% thereafter. [453] Claimants also maintain that their opportunity cost is most appropriately reflected in an award of compound interest.  Alternatively, Claimants point to the Portuguese Treaty language which prescribes:

---

[451]  See para. 247, *supra*.

[452]  Coincidentally, Respondent's Expert, Mr Hart (though applying his own approach to valuation on the DCF method) arrives at a very similar figure of US$ 87,054,550 for Talta's share in Matesi.  *See* Second Hart Report (Exhibit 4); Hart Cross-Examination Transcript (English), Day 6, p. 1681.

[453]  Claimants' Post-Hearing Brief, para. 435.

> "interest at the exchange rate applicable at the date on which the transaction becomes effective in the territory where the investment is located".[454]

573. For its part, Venezuela maintains that the use of a WACC is not appropriate because it reflects an *ex ante* risk factor for an operating company, not a commercial measure of the time value of money. Respondent maintains that no investment tribunal has adopted a WACC for this purpose. Respondent, instead, favours a no-risk rate. Respondent also argues strongly against the application of compound interest.[455]

574. Consistent with the objective that:

> "reparation must, so far as possible, wipe out all the consequences of an illegal act and re-establish the situation which would, in all probability have existed if that act had not been committed,"[456]

arbitral tribunals have increasingly sought to adjust the calculation of pre-award interest to better reflect business reality.

575. As stated in the ILC Articles:

> "1. Interest on any sum payable under this chapter shall be payable when necessary in order to ensure full reparation. The interest rate and mode of calculation shall be set so as to achieve that result.
>
> 2. Interest runs from the date on which the principal sum should have been paid until the date that the obligation is fulfilled."[457]

576. The commentary to the ILC Articles explains:

> "There is no uniform approach, internationally, to questions of quantification and assessment of amounts of interest payable. In practice, the circumstances of each case and the conduct of the parties strongly affect the outcome. . ."[458]

---

[454] Portuguese Treaty Article 4, RLA-114; Claimants' Post-Hearing Brief, para 435.
[455] Respondent's Counter Memorial, para. 484-487; Respondent's Rejoinder, paras. 471-472.
[456] *Factory at Chorzów, see,* FN 414 *supra*; ILC Articles, Article 38(1) (CLA-13).
[457] ILC Articles, Article 38.
[458] Commentary to Article 38, para. 10, footnotes omitted; *see also* Ripinsky, *op. cit.* at p. 365.

577. While the rationale and rate of interest applied by investment tribunals has varied widely, a consensus appears to have evolved around the principle of the claimant's opportunity cost. In the words of the UNCC General Council, the rate of interest should be:

> "sufficient to compensate successful claimants for the loss of use of the principal amount of the award."[459]

This language, however, leaves much to be desired in terms of specific guidance.

578. One well-recognised approach in determining the applicable interest rate was established by the Iran-US Claims Tribunal in *Sylvania Technical Systems v. Iran*[460] where it focused on developing a rate:

> "based approximately on the amount that the successful claimant would have been in the position to have earned if it had been paid in time and thus had the funds available to invest in a form of commercial investment in common use in its own country."

579. Such an approach was also adopted in *Santa Elena*, though without specifying the rate used or the investment instrument from which the rate was to be derived.[461]

580. Other distinguished tribunals and authorities have favoured use of a "*borrowing rate*,"[462] or:

> "not the rate associated with corporate borrowing but the interest rate the amount of compensation would have earned had it been paid after the expropriation."[463]

581. As stated in other words by one distinguished investment arbitration tribunal:

> "The case law elaborated by international arbitral tribunals strongly suggests that in assessing the liability due for losses incurred, the interest becomes an integral part of the compensation itself."[464]

---

[459] Decision of the UNCC Governing Council, "Awards of Interest," 4 January 1993, S/AC.26/992/1b/para. 1.

[460] *Sylvania Technical Systems v. Iran*, Award, 27 June 1985, 8 Iran-US CTR 298.

[461] *Compañía del Desarrollo de Santa Elena v. Costa Rica*, ICSID Case No. ARB/96/1, Award, 17 February 2000, para. 104.

[462] J. Gotanda, "Awarding Interest in International Arbitration" (1996) 90 AJIL 40 at 59-61.

[463] *Siemens A.G. v. Argentina*, ICSID Case No. ARB/02/8, Award, 6 February 2007, para. 396.

582. If the rationale for the choice of interest rate were Claimants' opportunity cost, it would seem, logically, that Claimants should present – and the Tribunal consider – evidence on the rate of return on investment, which has been achieved by the Claimants over an extended period.[465] While the rationale for this approach may be appealing, the Tribunal will adopt a more conservative approach to this question, which relies on finding an interest rate which would reflect the cost to the Claimants to borrow (*i.e.*, replace) the amounts expropriated.

583. The Tribunal agrees with reasons indicated by Respondent that the use of the WACC, developed by Claimants' experts as part of its DCF analysis, is not appropriate. The Tribunal has also rejected the no-risk rate suggested by Respondent.

584. As indicated earlier, the Portuguese Treaty, in Article 4C, calls for:

> "interest at the exchange rate applicable at the date on which the transaction becomes effective, in the territory where the investment is located."[466]

The Luxembourg Treaty language simply refers to:

> "a reasonable commercial rate."[467]

585. The Tribunal takes note of this Treaty language, but considers that, in both Treaties, such language is directed to lawful expropriations rather than an unlawful expropriation with which the Tribunal is concerned in this case.

---

(Footnote continued from previous page)

[464] *Asian Agricultural Products Ltd. v. Republic of Sri Lanka*, ICSID Case No. ARB/87/3, Award, 27 June 1990.

[465] Though such evidence was not presented in this case, publicly available Annual Report data for Tenaris indicated that shareholders' equity increased from US$ 1.7 billion in 2002 to US$ 12.8 billion in 2012 – an impressive growth record; *see also National Grid v. Republic of Argentina*, UNCITRAL, Award of 3 November 2008, paras. 264-265.

[466] *See* para. 110, *supra*.

[467] *Ibid.*

586. In examining the use of an appropriate "*borrowing rate*," the Tribunal notes that Claimants (making reference to the language of the Portuguese Treaty) have argued that the interest rate should be equivalent:

> "to the rate Venezuela would have had to pay to borrow money in April 2008 (9.75%)."[468]

587. Taking a different approach, Respondent's expert, Mr Hart, compares the 6-month LIBOR and 10-year Treasury rates (in the neighbourhood of 4% in 2008). He discusses the use of such rates in other awards which are then supplemented by a factor covering political risk and other macroeconomic factors (Country Risk Premium).[469] Following the reasoning of Respondent's expert, the combination of a 4% "*no risk rate*" with a Country Risk Premium of 4.6% would yield an 8.6% "*borrowing rate*." Comparing this rate with the 9.75% borrowing rate for the government of Venezuela propounded by Claimants, the Tribunal concludes that 9% is a reasonable and fair rate for pre-award interest.

588. With regard to the simple interest *versus* compound interest issue (also disputed between the Parties in this case), arbitral tribunals have increasingly accepted the commercial realism of compound interest in approximating the value lost by an investor, and in ensuring "*full reparation for the injury suffered as a result of an internationally wrongful act*."[470]

589. Practice on this issue is still somewhat diverse. While many authorities rejecting the grant of compound interest are now somewhat dated (*e.g.* the *Norwegian Shipowners' Claims*,[471] and the *British Claims in the Spanish Zone of Morocco*[472]), or specific to the practice of the US-Iran Claims Tribunal[473],

---

[468] Claimants' Post-Hearing Brief, para. 435.

[469] Hart Supplementary Report, paras. 186-7.

[470] J. Crawford, The International Law Commission's Articles on State Responsibility. Introduction, Text and Commentaries (2002), p. 239; *National Grid v. Republic of Argentina*, UNCITRAL, Award, 3 November 2008 , para. 294, including FN 121; *see also PSEG Global v. Republic of Turkey*, ICSID Case No. ARB/02/5; *Siemens v. Republic of Argentina*, ICSID Case No. ARB/02/8; For a very thorough, though not exhaustive, review of ICSID precedents on this subject, *see*, *Compania de Aguas de Aconguija et al. v. Republic of Argentina*, ICSID Case No. ARB/97/3, para. 9.2.4 and especially FN 432.

[471] *Norwegian Shipowners' Claims* (*Norway v. United States of America*), R.I.A.A. Volume I (13 October 1922), p. 341 (RLA-076).

[472] *British Claims in the Spanish Zone of Morocco* (1925) 2 R.I.A.A. 616, 650 (RLA-077).

more recent authorities still reflect a degree of caution on this issue. For example, in his Third Report on State Responsibility, Professor Crawford summarised the practice of international courts and tribunals, and cautioned against the indiscriminate application of compound interest:

> "… although compound interest is not generally awarded under international law or by international tribunals, special circumstances may arise which justify some element of compounding as an aspect of full reparation. Care is however needed since allowing compound interest could result in an inflated and disproportionate award, with the amount of interest greatly exceeding the principal amount owed."[474]

590. Accordingly, a number of tribunals in recent years have determined that simple interest should be applied.[475]

---

(Footnote continued from previous page)

[473] *E.g. Starrett Housing Corp., Starrett System Inc., Starrett Housing Int'l Inc. v. The Government of the Islamic Republic of Iran Banck Markazi Iran, Bank Omran, Bank Mellat*, Award No. 314-24-1, (14 August 1987), para. 370 (RLA-095); *McCollough & Co. Inc. v. The Ministry of Post, Telegraph and Telephone, the National Iranian Oil Co., and Bank Markazi*, Case No. 89 (Award No. 225-89-3, 22 April 1986), para. 114 (RLA-092); *Sylvania Technical Systems Inc. v. The Government of the Islamic Republic of Iran*, Award No. 180-64-1 (27 June 1985), p. 15 (RLA-091) ("*the Tribunal has never awarded compounded interest*"); *R.J. Reynolds Tobacco Co. v. The Government of the Islamic Republic of Iran and the Iranian Tobacco Co. (ITC)*, Partial Award, Award No. 145-35-3 (6 August 1984), p. 8 (RLA-090); *Anaconda-Iran Inc. v. The Government of the Islamic Republic of Iran and the National Iranian Copper Industries Co.*, Interlocutory Award, Award No. ITL 65-167-3 (10 December 1986), para. 142 (RLA-094); *Int'l Systems & Controls Corp. v. National Iranian Gas Co., National Iranian Oil Co. and the Islamic Republic of Iran*, Award No. 464-494-3, 23 January 1990, para. 123 (RLA-097).

[474] ILC, Third Report on State Responsibility, p. 50 (RLA-046).

[475] *E.g. RosInvestCo.UK Ltd. v. Russian Federation*, SCC Case No. V079/2005, Final Award, 12 September 2010, para. 692 (RLA-108) (simple interest on the overnight interbank offered rates of London (LIBOR)); *Saipem Sp.A. v. The People's Republic of Bangladesh*, ICSID Case No. ARB/05/07, Award, 30 June 2009, para. 212 (simple interest at a rate of 3.375% *per annum*);
*Duke Energy Electroquil Partners & Electroquil S.A. v. Republic of Ecuador,* ICSID Case No. ARB/04/19, Award, 18 August 2008, para. 491 (the tribunal applied interest at the mere lending rate of the *Banco Central de Ecuador*); *Desert Line LLC v. The Republic of Yemen*, ICSID Case No. ARB/05/17, Award, 6 February 2008, para. 298 (simple interest of 5%); *Archer Daniels Midland Co. and Tate & Lyle Ingredients Americas Inc. v. United Mexican States*, ICSID Case No. ARB(AF)/04/05, Award, 21 November 2007, para. 300 (simple interest for U.S. Treasury bills; *CMS Gas*, para. 471 (simple interest on U.S. Treasury bills to those dated prior to the award date, and the arithmetic mean of the rate of the treasury bills of the U.S. for the last six months taken semi-annually); *Occidental v. Republic of Ecuador*, LCIA Case No. UN3467, para. 217 (pre-judgment simple interest at 2.75% and post-judgment simple interest at 4% beginning 30 days after the award until payment). *CME*, paras 641, 647 (simple interest at 10%); *Marvin Feldman v. Mexico*, ICSID Case No. ARB(AF)/99/1, Award, 16 December 2002, para. 211 (simple interest on the Mexican Treasury Certificates); *Autopista Concesionada de Venezuela CA (Aucoven) v. Venezuela*, ICSID Case No. ARB/00/5, Award, 23 September 2003, paras. 387, 397 (simple interest on the average lending rate of five principal banks in the country).

591.  But, as recognized by Prof. Dolzer and Schreuer, the practice of recent tribunals shows a trend toward compounding interest as more in accord with commercial reality.  In their words:

> "The practice of tribunals shows a trend toward compounding interest…While some tribunals have rejected compound interest, it has been accepted in the majority of recent decisions."[476]

592.  In addition, depending on the circumstances of the case and the conduct of the parties, tribunals have also, in many recent investment cases, determined that interest should be compounded annually, semi-annually, quarterly or monthly.[477]

---

[476]  Dolzer and Schreuer, *Principles of International Law (2d Ed.)*, Oxford University Press: New York 2008) citing: *Atlantic Triton v. Guinea*, Award, 21 April 1986, 3 ICSID Reports 13, at 33, 43; *Compania del Desarrollo de Santa Elena SA v. Costa Rica*, ICSID Case No. ARB/96/1, Award, 17 February 2000, paras. 104, 105; *Metalclad v. Mexico*, ICSID Case No. ARB(AF)/97/1, Award, 30 August 2000, para. 128; *Emilio Agustín Maffezini v. Kingdom of Spain*, ICSID Case No. ARB/97/7, Award, 13 November 2000, para. 96; *Wena Hotels Ltd v. Arab Republic of Egypt*, ICSID Case No. ARB/98/4, Award, 8 December 2000 *("Wena Hotels v. Egypt")*, para. 129; *Middle East Cement v. Egypt*, ICSID Case No. ARB/98/4, Award, 12 April 2002, para. 174; *Pope & Talbot Inc. v. Government of Canada*, UNCITRAL, Award in Respect to Damages, 31 May 2002, para. 90 *("Pope & Talbot")*; *Tecmed v. United Mexican States*, ICSID Case No. ARB(AF)/00/2, Award, 29 May 2003, para. 196; *MTD v. Chile*, ICSID Case No. ARB/01/7, Award, 25 May 2004, para 253(4); *Azurix v. Argentina*, ICSID Case No. ARB/01/12, Award, 14 July 2006, paras. 439-40 *("Azurix v. Argentina")*; *ADC v. Hungary*, ICSID Case No. ARB/03/16, Award, 2 October 2006, para. 522; *PSEG v. Turkey*, ICSID Case No. ARB/02/5, Award, 19 January 2007, para. 348; *Enron v. Argentina*, ICSID Case No. ARB/01/3, Award, 22 May, 2007, paras. 451-2; *Compañía de Aguas del Aconquija, SA & Vivendi Universal v. Argentina*, ICSID Case No. ARB/97/3, Award, 20 August 2007, paras. 9.1.1-9.2.8; *BG Group v. Argentina*, Final Award, 24 December 2007, paras. 456-7; *Sempra v. Argentina*, ICSID Case No. ARB/02/16, Award, 28 September 2007, paras. 483-6; *OKO Pankki v. Estonia*, ICSID Case No. ARB/04/6, Award, 19 November 2007, paras. 343-56; *Continental Casualty v. Argentina*, ICSID Case No. ARB/03/9, Award, 5 September 2008, paras. 306-16; *Bernardus Henricus Funnekotter and others v. Republic of Zimbabwe*, ICSID Case No. ARB/05/6, Award, 22 April 2009, paras. 141-6; *Waguih Elie George Siag and Clorinda Vecchi v. Arab Republic of Egypt*, ICSID Case No. ARB/05/15, Award, 1 June 2009, paras. 594-8; *Impregilo v. Argentina*, ICSID Case No. ARB/07/17, Award, 21 June 2011, paras. 382-4.

[477]  *Azurix v. Argentina*, Award, 14 July 2006, 43 ILM 262 (compounded semi-annually), *Pope & Talbot*, 7 ICSID Rep 143 (compounded quarterly), *PSEG Global Inc., The North American Coal Corporation and Konya Ilgin Elektrik Uretim ve. Ticaret Limited Sirketi v. Republic of Turkey*, ICSID Case No. ARB/02/5, Award, 19 January 2007 (compounded semi-annually); *Sempra Energy International v. Argentine Republic*, ICSID Case No. ARB/02/16, Award, 28 September 2007 *("Sempra Energy v. Argentina")* (compounded semi-annually); *Wena Hotels v. Egypt*, 6 ICSID Rep 67 (compounded quarterly); *Wena Hotels v. Egypt*, ICSID Case No. ARB/98/4, Decision on the Application for Annulment, 28 January 2002; *Marion Unglaube and Reinhard Unglaube v. Republic of Costa Rica*, ICSID Case Nos. ARB/08/1 and ARB/09/1, Award, 16 May 2012 (compounded semi-annually); *Bermardus Henricus Funnekotter and others v. Republic of Zimbabwe*, ICSID Case No. ARB/06/6 (compounded semi-annually); *Ioannis Kardassopoulos and Ron Fuchs v. The Republic of Georgia*, ICSID Case Nos. ARB/05/18 and ARB/07/15 (compounded semi-annually); *National Grid*

(Footnote continued on next page)

593. The circumstances of the present case indicate that, beginning in 2008, Venezuela put in place not one, but a series of inconsistent laws and decrees directed to the expropriation of Matesi but, as indicated at paras. 481-496 *supra,* failed to follow or implement them. From 30 April 2008 until 13 August 2011, no judicial or administrative process to establish a value for Talta's interest in Matesi was implemented.[478] Claimants have, therefore, as of the present date, been unlawfully deprived of their investment without compensation (or a viable process for determining compensation) for more than seven years.

594. Accordingly, the operative rate for actualising the damages to the date of the Award shall be 9% compounded semi-annually. On this basis the interest component, calculated on the loss of US$ 87.3 million, from 30 April 2008 to 29 January 2016, will be US$ 85,501,213.70, for a total compensation amount of US$ 172,801,213.70.

595. Similarly, Claimant has specifically requested[479] and is entitled to, post-award interest which the Tribunal recognizes as another important element of quantum in order to attempt to eliminate, as far as possible, the effects of the unlawful taking. While there are sometimes reason to calculate pre- and post-award interest differently, tribunals have also, in a number of cases chosen not to consider pre- and post-award interest separately but have instead awarded interest, for example, from the date of an expropriation or other key event, running until the payment in full of the award.[480] In the present case, based on the same reasoning indicated in paras. 571-594 supra regarding pre-award

---

(Footnote continued from previous page)

*P.L.C., v. Argentine Republic,* UNCITRAL, Award, 3 November 2008 (compounded semi-annually); *Railroad Development Corporation (RDC) v. Republic of Guatemala,* ICSID Case No. ARB/07/23, Award, 29 June 2012 (compounded semi-annually); *Rumeli Telekom A.S. and Telsim Mobil Telekomikasyon Hizmetleri A.S. v. Republic of Kazakhstan,* ICSID Case No. ARB/05/16, Award, 29 July 2008 (compounded semi-annually); See also *Phillips Petroleum Co. Venezuela Ltd (Bermuda) and ConocoPhillips Petrozuata B.V.(The Netherlands) v. Petroleos de Venezuela S.A. (Venezuela),* ICC Case No. 16848/JRF/CA (C-16849/JRF), Award, 17 September 2012 (compounded monthly)(**CLA-58**)

[478] para. 478, *supra*

[479] See para. 100 *supra*

[480] Ripinsky and Williams, *op.cit.* at 387; Tribunals adopting this approach include those in *Vivendi Universal v. Argentina,* ICSID Case No. ARB/97/3, Award, 20 August 2007, Section 9.2 *et. seq.*; *Tecmed v. United Mexican States,* ICSID Case No. ARB(AF)/00/2, Award, 29 May 2003, paras. 196-7; *PSEG v. Turkey,* ICSID Case No. ARB/02/5, Award, 19 January 2007, para.351

interest, the Tribunal concludes that post-award interest should continue to be paid at the same 9% rate compounded semi-annually, from the date of the award until payment in full of all sums due. The Tribunal has considered whether, in the circumstances of this case, it would be appropriate to afford Venezuela a short grace period within which payment of all sums found to be due to Claimants, including pre-Award interest, may be made without the addition of post-Award interest. The Tribunal decides that such a short grace period would be appropriate. Accordingly, provided payment of all sums due is made by Venezuela within six (6) months of the date of this Award, no post-Award interest shall be paid. For the avoidance of any doubt, the Tribunal emphasizes that the grace period is to be applied strictly and it is not subject to any extension. If no, or no full, payment is made within it, then post-Award interest on all sums remaining due to Claimants at the end of the grace period shall run from the date of this Award.

––––––––––––––––––––––––

## I.  COSTS

### 1.  CLAIMANTS' APPLICATION FOR COSTS

596. By their Costs Submissions dated 28 November 2014, Claimants sought the recovery of their costs "*in their entirety*"[481] from Venezuela, together with interest from the date on which such costs had been incurred until the date of their payment by Venezuela.

597.  Those costs amount to some US$ 7,971,727.39 and € 194,673.37, comprising:

   (a)  advances on the fees and expenses of the Tribunal and the administrative fees of ICSID made by Claimants amounting to US$ 925,000;

––––––––––––––––––

[481]  Claimants' Costs Submissions, 28 November 2014, para. 2

(b) the reasonable travel and other expenses incurred by Claimants' witnesses and representatives (US$ 43,080.21);

(c) the fees and disbursements of Freshfields Bruckhaus Deringer US LLP in the sum of US$ 5,219,291.57;

(d) US$ 137,254.14 for the fees and disbursements of Claimants' Venezuelan Counsel, D'Empaire Reyna Abogados and € 52,187.23 for the fees and disbursements of their Portuguese Counsel, Morais Leitao, Galvao Teles, Soares de Silva;

(e) the fees and expenses of Compass Lexecon, Claimants' valuation experts of US$ 1,381,526.36;

(f) the fees and expenses of Claimants' legal experts, Professors Prüm and Vicente of € 142,486.14; and

(g) the fees and disbursements of FTI, Claimants' graphics and technology consultant, of US$ 40,575.11.

598. Article 61(2) of the ICSID Convention provides that:

"In the case of arbitration proceedings, the Tribunal shall, except as the parties otherwise agree, assess the expenses incurred by the parties in connection with the proceedings, and shall decide how and by whom those expense, the fees and expenses of the members of the Tribunal and the charges for the use of the facilities of the Centre shall be paid. Such decision shall form part of the award."

599. Claimants maintain that in exercising its discretion in the discharge of its obligation to assess costs and in order to ensure that any award of costs reflects the circumstances of the case, the Tribunal should have regard, *inter alia*, to the merits of the claims, the length and complexity of the proceedings and the conduct of the parties – not least, whether a party has obstructed the proceedings or needlessly prolonged them. Claimants maintain that there is ample precedent

191

in investment arbitration cases, were the Tribunal to consider that a costs order should be made to sanction unlawful, dilatory or other improper conduct.[482]

600. In this case, Claimants submit that in circumstances in which:

(a)    they have been obliged to engage in lengthy and expensive proceedings by reason of an unlawful expropriation of their investments without any compensation; and

(b)    Venezuela has failed to comply with its international obligations,

an award of costs in their favour is not only appropriate but it would:

"serve the purpose of disincentivising the illegal conduct that gave rise to these proceedings."[483]

601. In addition, Claimants point to the following particular examples of conduct by Venezuela in the course of the arbitration, which they judge to be worthy of sanction in costs, namely:

(a)    bad faith production and withholding of documents, citing in particular: (i) the history of the disclosure of documentation in respect of the annual iron pellet requirements of the HBI producers, culminating in (ii) its production of 300 new documents on the eve of the January-February 2014 hearing;

(b)    the submission at the stage of the filing of Venezuela's Rejoinder Memorial of the witness statement of Ms Marilyn Bello Rodriguez and of the expert reports of Professors Steichen, Maia and Duarte. Claimants maintain that the filing of the experts' reports in particular at so late a stage in the proceedings required them to obtain further expert evidence

---

[482] Claimants have drawn attention to the decisions on costs by the Tribunals in *Liberian Eastern Timber Corporation v. Republic of Liberia*, ICSID Case No. ARB/83/2, Award, 31 March 1986, p. 378 and *Olguin v. Republic of Paraguay*, ICSID Case No. ARB/98/5, Award, 26 July 2001, para. 85
[483] Claimants' Costs Submissions, para. 7

and led directly to the need for a further unscheduled hearing to hear the Parties' legal experts. It was held in July 2014, six months after the conclusion of the final hearing and added to the cost of, and delay in, the proceedings;

(c)     the circumstances of the withdrawal of the evidence of Mr Sabbagh and its purported replacement by the evidence of Mr Moya; and

(d)     the "*untimely*" introduction of evidence, some of it after the closure of the record in the arbitration and without prior leave of the Tribunal in January and July 2014; the application made late on 8 August 2014, the date for the filing of Post-Hearing Briefs, to introduce into the record the Award in ICSID Case No. ARB(AF)11/1, *Nova Scotia Power Inc. v. Venezuela* and the subsequent supplemental briefing; and the submission with Venezuela's Post-Hearing Brief of further evidence in the form of additional Luxembourg and Portuguese investment treaties, which had not previously been on the record. The submission was said to have been made without prior leave of the Tribunal and notwithstanding that the issue of Luxembourg's and Portugal's investment treaty practice had been raised by Claimants in submissions in response to Venezuela's bifurcation request of September 2012. Claimants had been obliged to respond to each such intervention and, and in the case of the additional investment treaty material, to file additional documents in order to address what they regarded as an incomplete or misleading submission.

602. Claimants conclude that:

> "Venezuela's unlawful conduct has given rise to the significant costs of these proceedings and its tactics have needlessly added to the efforts and costs of the Tribunal and the Claimants. The Claimants should not be made to bear the cost of such conduct."[484]

---

[484] *Idem*, para. 9

## 2. VENEZUELA'S APPLICATION FOR COSTS

603. For its part, Venezuela maintains that if its objections to jurisdiction, which it believes to be "*dispositive of all claims asserted by Claimants*"[485], were upheld, it should be reimbursed for all costs related to the arbitration. But for Claimants' insistence that the proceedings not be bifurcated, such that the jurisdictional disputes and the merits were heard together in January 2014 with a subsequent hearing of the jurisdictional experts in July 2014, the costs and expenses attendant upon the preparation and defence of a joint proceeding on jurisdiction and merits would have been avoided.

604. Venezuela further maintains that if its jurisdictional objections were unsuccessful, it would still prevail on the merits. It would therefore be entitled to the recovery of "*all reasonable costs*"[486], amounting to US$ 6,870,028.82 and made up as follows:

   (a) US$ 5,154,811.60 in respect of the fees of Venezuela's Counsel, Foley Hoag LLP;

   (b) US$ 1,174,370.96 in respect of the fees of legal and other experts engaged by Venezuela in the arbitration; and

   (c) "*administrative costs*", including:

   "all costs and expenses related to document production, legal research, travel, translations and other miscellaneous administrative matters".[487]

605. The above costs of which Venezuela seeks recovery exclude administrative costs paid separately by Venezuela to the Centre.[488]

---

[485] Respondent's Costs Submission, 28 November 2014, para. 1
[486] *Idem*, para. 2
[487] *Idem*, para. 3(3)
[488] Certification of Marybeth Celorier dated 28 November 2014.

3.     VENEZUELA'S COMMENTS ON CLAIMANTS' SUBMISSION ON COSTS

606. Following the exchange of costs submissions, and pursuant to leave granted by the Tribunal on 2 December 2014, Venezuela submitted comments upon the Claimants' Submission by letter dated 12 December 2014.

607. Venezuela protested that Claimants had used their costs submissions as a vehicle to reargue both procedural points and matters going to the merits, "*many of which have already been rejected by the Tribunal*". Venezuela contended that any such attempt by Claimants to reargue their position "*should be rejected out of hand*".[489]

608. Venezuela rejected all of the complaints identified in the Claimants' submission (see para 595 above).  It maintained that far from constituting conduct worthy of sanction in an award on costs, Venezuela had:

> "acted in good faith and to the best of its ability to respond to Claimants' requests and the Tribunal's orders, while exercising its right to a full defense and preserving its fundamental right to be heard".

609. In Venezuela's submission, there was no basis for a departure from "*ICSID tradition*",[490] which, as explained by Venezuela, meant that ICSID tribunals customarily applied the "*international law tradition*" that costs lie where they fall:

> "absent egregious, unlawful or frivolous conduct by one of the parties". [491]

610. Venezuela submitted that no such conduct was evident in this case. The Tribunal had not found at any point in the proceedings that Venezuela had acted in bad faith or that its requests or submissions were frivolous.  To the contrary, every action, which Claimants sought to criticise had been an action "*taken in good faith in exercise of [Venezuela's] fundamental right to defense.*" Were Venezuela to be punished for undertaking a thorough and proper defence to the

---

[489] Foley Hoag LLP letter 12 December 2014, para.1
[490] *Idem*, para. 4
[491] *Idem*, para. 6

allegations made against it, the exercise of its fundamental right to a defence and its right to be heard would be put a risk.[492]

611. As to the specific complaints raised:

(a) Claimants had had ample opportunity to respond to documentation going to pellet production in their Reply Memorial and at the hearing: neither at the hearing itself, nor in their Post-Hearing Brief had Claimants demonstrated that the documents had been produced other than in good faith or that they were other than an "*accurate reflection*"[493] of pellet allocation and distribution. Venezuela rejected as "*specious*"[494] the suggestion that it had failed to produce evidence of the annual pellet requirements that all the HBI producers made to CVG FMO or evidence of CVG FMO's actual iron pellet deliveries to each of the HBI producers. Rather, Venezuela suggested that Claimants were seeking to have it both ways in that they complained, first, that Venezuela had failed to comply with their document requests and, second, when it did produce documents, after a great deal of time and effort had been devoted to obtaining them from CVG, it was criticised for making a "*clear effort … to prejudice the Claimants shortly before the hearing*";[495]

(b) there was no scope for further complaint, so far as the witness statement of Ms Bello and the expert reports of Professors Steichen, Maia and Duarte were concerned: they had been admitted by the Tribunal after it had afforded the Parties a full opportunity to explain their positions and it did so on the basis that it recognised the materials as being responsive "*to matters raised in Claimants' Reply Memorial*".[496] Claimants had been afforded ample opportunity through allowances for expanded cross-examination (Ms Bello), the filing of rebuttal expert reports after the

---

[492] *Idem*, para. 11
[493] *Idem*, para. 14
[494] *Idem*, para. 15
[495] *Idem*, para. 16
[496] *Idem*, para. 20

submission of Venezuela's Rejoinder and a separate hearing of the legal experts;

(c) the substitution of Mr Moya's evidence for that of Mr Sabbagh had caused the Claimants no prejudice. It was admittedly more limited in its scope, but it went to the substance of the pellet scarcity issue and the attempt to effect an equitable distribution of the locally produced pellets at the relevant time. That said;

> "the substitution … in accordance with the Tribunal's express authorisation and in keeping with [Venezuela's] right to be heard, in no way implied any delay in the arbitral proceeding nor did it prejudice Claimants".[497]

(d) Venezuela maintained that there were complete answers to all three discrete complaints. As to the first, the submission of documents made by Venezuela on 31 January 2014 was the subject of an agreement reached between the Parties and notified to the Tribunal on 2 February 2014 and the submission of 7 July 2014 had been the subject of a ruling by the Tribunal on 9 July when all but one of the documents proffered by Venezuela had been admitted onto the record. As to the second, the *Nova Scotia* decision had been admitted by the Tribunal pursuant to an application by Venezuela and its request that the Parties have an opportunity to comment upon it. And as to the third, the investment treaty materials were legal authorities submitted in direct response to an enquiry raised by a member of the Tribunal.[498]

## 4. ANALYSIS

612. The Tribunal accepts the proposition advanced by Claimants that generally in international arbitration, the term "*expenses*" is deemed to include the fees, disbursements (including travel expenses) of legal counsel and experts, together with the travel costs and disbursements of witnesses and representatives of the parties to the dispute. In light of the basis upon which the Parties to this

---

[497] *Idem*, para. 25
[498] *Idem*, paras. 27, 28 & 29

arbitration have framed their respective costs submissions, it is clear that that much is uncontroversial.

613. Venezuela's application for its costs is premised primarily upon the success of its jurisdictional objections. Alternatively, it says that even if, contrary to its expectations, those jurisdictional objections were not to be upheld by the Tribunal, it would succeed on the merits. In the event, the Tribunal has determined that it does have jurisdiction to hear most of the claims referred to arbitration by Claimants and, to a considerable extent, Claimants have prevailed on the merits, too. They have made good their principal claim – to which much of the arbitration was devoted – that Venezuela's expropriation of their investment was unlawful and that Venezuela has failed to make any, or any meaningful, attempt to compensate Claimants for that expropriation.

614. Accordingly the question of any entitlement on the part of Venezuela to look to Claimants for recovery of any of its costs is moot.

615. The question then arises whether the Tribunal should adopt what Venezuela has described as the "*international law tradition*"[499] (see para 607 above) and allow the costs to lie where they fall, or whether it should conclude that there has been conduct which might properly be described as "*egregious, unlawful or frivolous*" on the part of Venezuela sufficient to cause the Tribunal to depart from the usual rule.

616. The Tribunal has considered with care the complaints raised by Claimants as to the conduct of these proceedings by Venezuela and to the detailed responses set out in Venezuela's Comments on Claimants' Submission on Costs dated 12 December 2014.

---

[499] *See EDF Ltd. v. Romania*, ICSID Case No. ARB/05/13, Award, 8 October 2009, para. 322: "... *the traditional position in investment arbitration, in contrast to commercial arbitration, has been to follow the public international rule which does not apply the principle that the loser pays the costs of the arbitration and the costs of the prevailing party. Rather, the practice has been to split the costs evenly, whether the claimant or the respondent has prevailed.*"

617. It has done so, in particular, having regard to the approach of the tribunals in:

    (a)   *Oemer Debe and Serdar Elhueseyni v. Romania*:

        "[n]one of the factors that would clearly justify cost allocation (such as unreasonable argument, exaggerated claim, or obstructionist tactics) was present in this arbitration"[500];

    (b)   *AES Summit Generation Ltd and AES-Tisza Eroemu Kft v. Republic of Hungary*:

        "It is the view of the Tribunal that no frivolous claim was filed in the proceeding and that no bad faith was observed from the parties. … Consequently, the Tribunal concludes that each party should bear its own costs and expenses and share equally in the costs and charges of the Tribunal and the ICSID Secretariat."[501]

618. The Tribunal concludes that even if Claimants' objections were sustained, the conduct about which complaint is made would not reach the high bar set by previous ICSID tribunals and subject to which, a party might be sanctioned in costs.

619. Certainly this is not a case in respect of which any comparison with the *Liberian Eastern Timber* case is apposite. In that case, the tribunal concluded that a departure from the usual rule was justified, because:

        "This decision is based largely on Liberia's procedural bad faith. Not only did Liberia fail to partake in these arbitral proceedings, but it has also undertaken judicial proceedings in Liberia in order to nullify the results of this arbitration."[502]

620. Aside from the conduct of Venezuela in the course of the proceedings, the Tribunal has also considered whether there are other circumstances to which it should have regard in the exercise of its discretion, and which might warrant an allocation of costs as between the Parties.

---

[500] *Oemer Debe and Serdar Elhueseyni v. Romania,* ICSID Case No. ARB/10/22, Award, 5 September 2013, paras. 270-271
[501] *AES Summit Generation Ltd and AES-Tisza Eroemu Kft v. Republic of Hungary,* ICSID Case No. ARB/07/22, Award 23 September 2010 at para.15.3.3
[502] See FN 2 check *supra* and FN 11, Respondent's Comments on Claimants' Costs Submissions

621. There is ample authority for directing that a prevailing party should have been paid by the opposing party its costs and expenses (including legal and expert fees) as well as its share of the cost of the proceeding, on those issues on which it has prevailed.[503]  And there is also ample authority for directing that each party should pay its own expenses and that the fees and expenses of the members of the tribunal, as well as the costs of the Centre should be divided evenly.[504]

622. The Tribunal recalls that whilst the Claimants have succeeded in this case in establishing an illegal expropriation, and have secured a substantial award in their favour, they have not been entirely successful. The Tribunal has found against them in respect of all pre-expropriation claims.  These claims, including alleged breaches of the Fair and Equitable Treatment standard and discrimination, and alleged breaches of the Protection and Security standard, were the subject of extensive written and oral submissions, as well as factual and expert evidence and much time was spent on them at the main hearing.

623. Taking this into account, and in the circumstances of this case, the Tribunal concludes that the fairest disposition on costs is that they should lie where they fall.

624. Accordingly, the Tribunal determines that Claimants and Venezuela shall each bear 50% of the fees and expenses of the Tribunal and the Centre.  However, the Tribunal notes that in the absence of any payment by Venezuela, Claimants have paid in full the third advance on costs requested by the Centre on 20

---

[503] *E.g. EDF (Services) Ltd. v. Romania*, ICSID Case No. ARB/05/13, Award, 8 October 2009; *Waste Management Inc. v. United Mexican States*, ICSID Case No. ARB(AF)/00/3, Award, 30 April 2004, para. 183 ("*There is no rule in international arbitration that costs follow the event. Equally, however, the Tribunal does not accept that there is any practice in investment arbitration (as there may be, at lease de facto, in the International Court and in interstate arbitration) that each party should pay its own costs.  In the end the question of costs is a matter within the discretion of the Tribunal, having regard both to the outcome of the proceedings and to other relevant factors.*").
[504]  See *e.g. Methanex Corp. v. United States of America*, Ad hoc – UNCITRAL Arbitration Rules, Final Award of the Tribunal on Jurisdiction and Merits, 3 August 2005; *International Thunderbird Gaming Corp. v. United Mexican States*, Ad hoc – UNCITRAL Arbitration Rules, Award, 26 January 2006.

October 2015 in the amount of US$450,000. The Tribunal further notes that any balance in the account will be reimbursed by ICSID to the Parties in proportion to the payments advanced to ICSID. Consistent with its determination that Claimants and Venezuela shall bear the fees and expenses of the Tribunal and the Centre on an equal footing, the Tribunal orders Venezuela to pay Claimants such sum as shall represent half of the fees and expenses of the Tribunal and the Centre paid out of the third advance payment, which should have been paid by Venezuela, but was, in fact met in its entirety by Claimants. The amount of that payment shall be determined as soon as all invoices have been received and ICSID is in a position to issue a final financial statement. The Tribunal further considers that the Claimants are entitled to interest at the same 9% rate compounded semi-annually, from the date of the Award until payment in full of this sum, subject only to a grace period of six (6) months from the date of this Award, within which Venezuela may make payment in full of this sum without incurring post-Award interest. If no, or no full, payment is made within it, then post-Award interest on any portion of this sum that remains unpaid at the end of the grace period shall run from the date of this Award. There shall be no other order with respect to the Parties' legal fees, expenses and other claimed costs.

## J.    DECISION

625. Accordingly, having carefully considered all of the documentary evidence, testimony and submissions presented to the Tribunal, and having heard Counsel, the Tribunal **DECIDES, ORDERS, DIRECTS AND DECLARES** that:

1.   The Tribunal has jurisdiction to hear and determine all of the Claimants' claims in this arbitration, save in respect of the Off-Take Agreement.
2.   With the exception of claims submitted pursuant to the Off-Take Agreement, all of Venezuela's objections to jurisdiction are dismissed.
3.   Claimants' claims pursuant to Article 3(1) of the Luxembourg Treaty and Article 3(1) of the Portuguese Treaty are dismissed.

201

4. Claimants' claims pursuant to Article 3(2) of the Luxembourg Treaty and Article 2(2) of the Portuguese Treaty are dismissed.

5. Venezuela has breached its obligations pursuant to Articles 4(1)(b) and 4(1)(d) of the Luxembourg Treaty and Articles 4(a) and 4(c) of the Portuguese Treaty.

6. Venezuela shall pay Claimants the sum of US$87,300,000 (eighty-seven million, three hundred thousand US Dollars) for its breaches of the Treaties.

7. Venezuela shall pay pre-award interest on the sum of US$87,300,000 from the Valuation Date (30 April 2008) to the date of this Award at a rate of 9% per annum, compounded at six-monthly rests, in the sum of US$ 85,501,213.70 (eighty-five million, five hundred one thousand, two-hundred and thirteen US Dollars and seventy cents).

8. Subject only to a grace period of six (6) months from the date of this Award, within which Venezuela may make payment in full of all sums due to Claimants pursuant to this Award without incurring post-Award interest, Venezuela shall pay interest at the rate of 9% per annum, compounded at six-monthly rests from the date of this Award until payment in full, on all sums, including any sum payable by Venezuela under article 10 of this *Dispositif*, due to Claimants pursuant to this Award and remaining unpaid at the end of the said grace period.

9. Damages awarded pursuant to this Award and all accrued interest shall be paid to Claimants in full and net of any applicable Venezuelan tax, duty or other charge.

10. Save that the fees and expenses of the Tribunal and the costs attributable to the use of the services of the Centre shall be borne as to 50% by Claimants and as to 50% by Venezuela, and that pursuant to that determination, Venezuela shall pay Claimants half of the fees and expenses of the Tribunal and the Centre financed through the third advance payment, no Order for costs is made.

_____          _____
Mr. Judd L. Kessler                  Mr. Toby T. Landau QC
Arbitrator                           Arbitrator
Date: 12 January 2016                Date: 15 January 2016

_____
Mr. John Beechey
President of the Tribunal
Date: 19 January 2016

# ANNEX I

## GUIDE TO RELEVANT ENTITIES

| | |
|---|---|
| Compañía Operadora del Puerto de Palua C.A. ("**COPAL**") | The operator of the Port of Palua, through which, HBI products, including those made by PosVen (see below) and Matesi (see below) were shipped. |
| Consorcio Siderúrgica Amazonia Ltd ("**CSA**") | A subsidiary of Ternium S.A., an affiliate of Tenaris and Talta, to which shares in CVG Sidor (see below) were sold upon privatisation in November 1997. |
| Corporación Venezolana de Guayana ("**CVG**") | A dependency of MIBAM (see below). |
| CVG Ferrominera Orinoco CA ("**CVG FMO**") | A subsidiary of CVG, holding a monopoly in Venezuela over the production and sale of lump ore and iron pellets (the first stage in steel production). |
| CVG Siderúrgica del Orinoco C.A. ("**CVG Sidor**") | A subsidiary of CVG.  Re-named Siderurgica del Orinoco C.A ("**SIDOR**") upon privatisation (see CSA above), SIDOR is the largest producer of semi-finished and finished steel products in Venezuela. Venezuela continued to maintain a significant shareholding in SIDOR post-privatisation. |
| Electrificación del Caroni C.A. ("**EDELCA**") | The state supplier of electricity. |

| Materiales Siderúrgicos Masisi S.A. ("**Matesi**") | Incorporated on 23 April 2004.[505]  SIDOR held 45% of Matesi's shares and Tenaris Global (BVI) Ltd, a wholly owned subsidiary of Tenaris, the remaining 55%, which shareholding was transferred to Talta on 2 July 2004. As a result of share capital increases, the eventual shareholding participations in Matesi were 49.8003% (SIDOR) and 50.1997% (Talta). |
| --- | --- |
| MIBAM | The Venezuelan Ministry of People's Power for Basic Industries and Mining – since 2011, the Ministry of Industry. |
| Petróleos de Venezuela S.A. ("**PDVSA**") | The state-owned oil and gas company, which was responsible for the transformation of lump ore and iron pellets into direct reduced iron ("**DRI**") – the second stage in steel making. The DRI was then mechanically compressed into brick-shapes known as hot briquetted iron ("**HBI**") of which Venezuela was the leading producer world-wide. |
| PDVSA Gas S.A. | A wholly-owned subsidiary of PDVSA, which supplies gas to the steel industry |
| PosVen C.A. ("**PosVen**") | The Venezuelan subsidiary of the South Korean concern, POSCO, which was acquired by SIDOR, Talta and Matesi. PosVen owned a decommissioned HBI plant within two kilometers of SIDOR and was also a shareholder in COPAL (see above). |
| Techint Group | A major international conglomerate and one of the world's leading suppliers of steel pipe, used in the oil and gas industry. Claimants are members of the Techint Group. Tenaris S.A. is a holding company with subsidiaries and manufacturing centres worldwide. Talta, likewise a holding company, is wholly owned by Tenaris. |

---

[505] Exhibit C-21

# Exhibit A



**TRANSPERFECT**

City of New York, State of New York, County of New York

I, Aurora Landman, hereby certify that the document, "**Laudo**" is, to the best of my knowledge and belief, a true and accurate translation from Spanish into English (US).

_____
Aurora Landman

Sworn to before me this
May 21, 2018

_____
Signature, Notary Public

WENDY POON
NOTARY
NO. 01PO6356754
QUALIFIED IN
QUEENS COUNTY
COMM. EXP.
04-03-2021
PUBLIC
STATE OF NEW YORK

_____
Stamp, Notary Public

LANGUAGE AND TECHNOLOGY SOLUTIONS FOR GLOBAL BUSINESS

THREE PARK AVENUE, 39TH FLOOR, NEW YORK, NY 10016 | T 212.689.5555 | F 212.689.1059 | WWW.TRANSPERFECT.COM
OFFICES IN 90 CITIES WORLDWIDE

INTERNATIONAL CENTRE FOR SETTLEMENT OF
INVESTMENT DISPUTES

1818 H STREET, NW | WASHINGTON, DC 20433 | USA
TELEPHONE (202) 458 1534 | FACSIMILE (202) 522 2615
WWW.WORDLBANK.ORG/ICSID

## CERTIFICATE

### TENARIS S.A. AND TALTA - TRADING E MARKETING SOCIEDADE UNIPESSOAL LDA.

### V.

### BOLIVARIAN REPUBLIC OF VENEZUELA

### (ICSID CASE NO. ARB/12/23)

I hereby certify that the attached document is a true copy of the Arbitral Tribunal's Award rendered in Spanish on December 12, 2016.

[Signature.]

Meg Kinnear
Secretary General

Washington, D.C., May 1, 2018

**International Centre for Settlement of Investment Disputes**
Washington, D.C.

IN THE PROCEEDING BETWEEN

**TENARIS S.A.**

and

**TALTA - TRADING E MARKETING SOCIEDADE UNIPESSOAL LDA**

(Claimants)

-and-

**THE BOLIVARIAN REPUBLIC OF VENEZUELA**

(Respondent)

**ICSID Case No. ARB/12/23**

---

# AWARD

---

*Members of the Tribunal*
Prof. Juan Fernández-Armesto, President
Mr. Enrique Gómez Pinzón, Arbitrator
Prof. Brigitte Stern, Arbitrator

*Secretary of the Tribunal*
Ms. Alicia Martín Blanco

*Assistant to the Tribunal*
Ms. Mélanie Riofrio Piché

Date of dispatch to the Parties: December 12, 2016

## REPRESENTING THE PARTIES

Representing the Claimants:

Mr. Nigel Blackaby
Ms. Noiana Marigo
Ms. Caroline Richard
Mr. Jeffery Commission
Ms. Natalia Zibibbo
Ms. Maria Julia Milesi
Mr. Ricardo Chirinos
Ms. Guadalupe Lopez
Ms. Ankita Ritwik
Freshfields Bruckhaus
Deringer US LLP
700 13th Street, NW
10th Floor
Washington, DC 20005-3960
United States of America

Mr. José Humberto Frías
D´Empaire Reyna Abogados
Edificio Bancaracas, P.H.
Plaza La Castellana, 1060
Venezuela

Representing the Respondent:

Dr. Reinaldo Enrique Muñoz Pedroza,
*Attorney General of the Republic*
Dr. Felipe Daruiz
*Coordinator of International Trials of the Office
of the Attorney General of the Republic
Attorney General of the Republic*
Av. Los Ilustres c/c calle Francisco Lazo Martí
Urb. Santa Mónica, Caracas
Venezuela

Mr. Paul Reichler
Mr. Kenneth Figueroa
Ms. Mélida Hodgson
Ms. Janis Brennan
Mr. Alberto Wray
Mr. Diego Cadena
Mr. Constantinos Salonidis
Ms. Gisela Paris
Ms. Patricia Cruz Trabanino
Mr. Benjamin Guthrie
Ms. Madeleine Rodriguez
Ms. Manuela de la Helguera
Foley Hoag LLP
1717 K Street, N.W.
Washington, D.C. 20006
United States of America

**TABLE OF CONTENTS**

I.    INTRODUCTION ....................................................................................15
II.   PROCEDURAL HISTORY .....................................................................16
III.  RELIEF SOUGHT BY THE PARTIES ...................................................23
    1.   The Claimants' Requested Relief ......................................................23
    2.   The Respondent's Requested Relief ...................................................25
IV.  INTRODUCTION ...................................................................................26
V.   OBJECTIONS TO JURISDICTION .......................................................28
    1.   Lack of Consent ...............................................................................28
    1.1  Tenaris-Tavsa ..................................................................................29
        A.   Venezuela's Position ...............................................................29
           a.   Lack of Acceptance After the Required Negotiation ............29
           b.   Failure to Perfect Consent ...................................................29
        B.   Tenaris' Position ...................................................................30
           a.   Prior Negotiations ...............................................................30
           b.   Perfected Consent ...............................................................30
        C.   Decision of the Arbitral Tribunal ..........................................30
           a.   Prior Negotiations ...............................................................31
           b.   Matching Terms ...................................................................31
    1.2  Talta-Comsigua ...............................................................................33
    1.3  Tenaris-Comsigua ...........................................................................35
        A.   Venezuela's Position ...............................................................35
        B.   Tenaris' Position ...................................................................37
        C.   The Arbitral Tribunal's Decision ..........................................38
           a.   Context ................................................................................40
           b.   Object and Purpose .............................................................42
           c.   Good Faith ...........................................................................42
        D.   Coda .......................................................................................43
    2.   Lack of an Effective Seat ..................................................................45
    2.1  The Parties' Position .......................................................................45
    2.2  Decision of the Arbitral Tribunal ....................................................48
        A.   The BITs require an Effective Seat ..........................................50
           a.   "Seat," "Statutory Seat," and "Effective Seat" under International Law .......51
           b.   The Correct Interpretation of the BITs ................................52
        B.   Effective Seat Determining Factors .......................................54
        C.   The Claimants' Evidence .......................................................54
           a.   Meeting of Management Organs............................................54
           b.   Place of Business Management.............................................55
           c.   Book-Keeping ......................................................................56
        D.   The Respondent's Evidence....................................................56
        E.   Assessment of the Evidence ....................................................57
           a.   Meeting of Management Organs............................................57
           b.   Place of Business Management.............................................58

|        |      | (i)   | Offices ................................................................. | 59 |
|        |      | (ii)  | Employees .......................................................... | 60 |
|        |      | (iii) | Business Activities ........................................... | 60 |
|        |      | (iv)  | Management ......................................................... | 61 |
|        |      | (v)   | Contact information ......................................... | 62 |
|        | c.   | Company's Books ......................................................... | 61 |
| 3.     | Defects in the Tavsa Notice ....................................................... | 62 |

**VI.   EXPROPRIATION** .............................................................................. **63**

| 1.   | Factual Background ............................................................................. | 63 |
|      | A.   | The Claimants .......................................................................... | 63 |
|      | B.   | The Claimants' Investment .................................................. | 64 |
|      |      | a.   | Tavsa ........................................................................... | 64 |
|      |      | b.   | Comsigua .................................................................. | 66 |
|      | C.   | The Nationalization of the Guayana Iron and Steel Sector ......... | 67 |
|      |      | a.   | Decree 6058 ............................................................. | 67 |
|      |      | b.   | Decree 6796 ............................................................. | 69 |
|      | D.   | Takeover of the Expropriated Assets ............................... | 72 |
|      |      | a.   | Tavsa ........................................................................... | 72 |
|      |      | b.   | Comsigua .................................................................. | 72 |
| 2.   | The Parties' Positions regarding Tavsa ....................................... | 73 |
|      | A.   | The Claimants' Position ........................................................ | 73 |
|      |      | a.   | Breach of Venezuelan Law ................................. | 74 |
|      |      |      | (i)   | The Constitution and LECUPS ............... | 74 |
|      |      |      | (ii)  | Nationalization Decree ............................ | 74 |
|      |      |      | (iii) | Implementing Decree .............................. | 75 |
|      |      | b.   | Failure to Pay Compensation ............................ | 75 |
|      | B.   | The Respondent's Position .................................................. | 76 |
|      |      | a.   | Compliance with the Law .................................... | 76 |
|      |      |      | (i)   | Venezuelan Law ......................................... | 76 |
|      |      |      | (ii)  | International Law ....................................... | 77 |
|      |      | b.   | Fair Compensation under the BIT ..................... | 77 |
| 3.   | The Parties' Positions as regards Comsigua .............................. | 78 |
|      | A.   | The Claimants' Position ........................................................ | 78 |
|      |      | a.   | The Expropriation of the Investment in Comsigua ......... | 79 |
|      |      | b.   | Venezuela Did Not Pay Compensation for the Comsigua Expropriation ...... | 80 |
|      | B.   | The Respondent's Position .................................................. | 80 |
|      |      | a.   | There Was No Expropriation ............................. | 80 |
|      |      | b.   | The Failure to Pay Compensation is Justified ........ | 81 |
| 4.   | The Arbitral Tribunal's Decision .................................................. | 82 |
| 4.1  | The BITs ................................................................................................... | 82 |
| 4.2  | Tavsa and Comsigua have been the Subject of Expropriation ...... | 84 |
|      | A.   | Comsigua-Specific Features ............................................... | 86 |
|      |      | a.   | The Decision to Expropriate Comsigua ......... | 86 |
|      |      | b.   | The Forced Acquisition of the Expropriated Assets ...... | 87 |
|      | B.   | Compensation for the Expropriations ............................ | 88 |
|      | C.   | Conclusion ................................................................................ | 88 |
|      | D.   | The Respondent's Counter-Arguments ...................... | 88 |

        a.    Exclusion from the Scope of Application of the Implementing Decree ........ 88

        b.    Unchanged Value ................................................................................. 89

4.3   LACK OF PAYMENT ..................................................................................... 91

    A.    The Lack of a Judgment Ordering Payment ........................................... 92

    B.    The Claimants' Alleged Obstruction ...................................................... 94

        a.    Tavsa's Compensation ....................................................................... 94

        b.    Comsigua's Compensation ................................................................. 95

    C.    Payment as a BIT-Compliance Element for the Expropriation ..................... 95

**VII.  QUANTUM** .................................................................................................. **98**

**VII.1.**       **THE VALUATION DATE** ....................................................................... **102**

    1.    Tavsa ....................................................................................................... 102

**VII.2.**       **TAVSA'S VALUE** ................................................................................. **105**

1.       The Claimant's Valuation .............................................................................. 105

   1.1   DCF ...................................................................................................... 105

    A.    Revenue .......................................................................................... 105

        a.    Tube Production .............................................................................. 105

        b.    Projected Price ................................................................................ 106

    B.    Expenditures ................................................................................... 108

        a.    Opex .............................................................................................. 108

        b.    Taxes ............................................................................................. 109

        c.    Capex ............................................................................................. 109

        d.    Changes in Working Capital ............................................................. 110

    C.    Terminal Value ................................................................................ 110

    D.    Discount Rate .................................................................................. 110

        a.    Return on Equity ............................................................................. 111

            (i)    Rate of Return on Risk-Free Assets ................................................. 111

            (ii)   Market Risk Premium .................................................................... 111

            (iii)  No Need for a Size Premium ......................................................... 112

            (iv)  Beta ............................................................................................ 112

            (v)   Country Risk Premium ................................................................... 113

        b.    Cost of Debt Financing ..................................................................... 113

        c.    Capital Structure ............................................................................. 113

   1.2   Market Multiples Approach .................................................................... 114

2.       The Respondent's Valuation ........................................................................ 117

   2.1   The DCF Approach ............................................................................... 117

    A.    Revenue .......................................................................................... 118

        a.    Production ...................................................................................... 118

        b.    Price .............................................................................................. 119

    B.    Expenditures ................................................................................... 119

        a.    Costs of Goods Sold ......................................................................... 119

        b.    Sales, General, and Administrative Costs .......................................... 120

        c.    Capex ............................................................................................. 120

        d.    Changes in Working Capital ............................................................. 121

    C.    Discount Rate .................................................................................. 121

|                | a.  | Risk-Free Rate | 122 |
|                | b.  | Equity Risk Premium | 122 |
|                | c.  | Beta | 122 |
|                | d.  | Country Risk Premium | 123 |
|                | e.  | Size Premium | 123 |
| 2.2  | Market Multiples | | 124 |
| 2.3  | Other Value Indicators | | 125 |
| 3.  | The Arbitral Tribunal's Decision | | 126 |
| 3.1  | DCF | | 126 |
|      | A.  | Tube Production | 126 |
|                | a.  | Annual Production | 127 |
|                | b.  | Labor Cost Adjustment | 128 |
|      | B.  | The Price of Tubes | 129 |
|                | a.  | Pricing Formula | 129 |
|                | b.  | The International Price Reference | 130 |
|                     | (i)  | Management Forecasts | 131 |
|                     | (ii) | Commercial Contracts | 131 |
|      | C.  | Expenditures | 132 |
|                | a.  | Opex | 132 |
|                | b.  | Capex | 133 |
|                | c.  | Working Capital | 134 |
|                | d.  | Technical Assistance Contract | 135 |
|      | D.  | WACC | 136 |
|                | a.  | Risk-Free Rate | 136 |
|                | b.  | Market Premium | 137 |
|                | c.  | Beta | 137 |
|                | d.  | Country Risk Premium | 138 |
|                | e.  | Size Premium | 139 |
| 3.2  | COMPARISON: OTHER APPROACHES | | 141 |
|      | A.  | Return on Investment | 141 |
|      | B.  | Market Multiples | 142 |
|                | a.  | The Experts' Positions | 142 |
|                | b.  | The Arbitral Tribunal's Decision | 143 |
|      | C.  | Comparable Transactions | 145 |
|                | a.  | Construction of a Plant in Mexico | 145 |
|                | b.  | Purchase of a Plant in Indonesia | 146 |
| **VII.3.**  | **COMSIGUA'S VALUE** | | **147** |
| 1.  | The Claimant's Value Assessment | | 147 |
| 1.1  | DISCOUNTED CASH FLOWS | | 147 |
|      | A.  | Revenue | 147 |
|                | a.  | Iron Production | 147 |
|                | b.  | Projected Price | 148 |
|      | B.  | Expenditures | 148 |
|                | a.  | Opex | 148 |
|                | b.  | Capex | 149 |
|                | c.  | Others | 149 |
|      | C.  | Terminal Value | 149 |
|      | D.  | Discount | 149 |
| 1.2  | MARKET MULTIPLES APPROACH | | 151 |
| 1.3  | OTHER RELEVANT TRANSACTIONS | | 153 |
|      | A.  | Repurchase of Shares | 153 |

|  |  | B. | Comsigua's Management's Recommendation | 153 |
|  |  | C. | Expropriation of Venprecar and Orinoco Iron | 154 |
|  | 2. |  | The Respondent's Value Assessment | 154 |
|  | 2.1 |  | Discounted Cash Flows | 154 |
|  |  | A. | Price | 155 |
|  |  | B. | Discount Rate | 155 |
|  | 2.2 |  | Market Multiples Approach | 156 |
|  | 2.3 |  | Other Value Indications | 157 |
|  |  | A. | Comsigua's Management's Recommendation | 157 |
|  |  | B. | Share Repurchase | 158 |
|  |  | C. | Expropriation of Venprecar and Orinoco Iron | 158 |
|  | 3. |  | The Arbitral Tribunal's Decision | 159 |
|  | 3.1 |  | Discounted Cash Flows | 159 |
|  |  | A. | Discount Rate | 159 |
|  |  | | a. | WACC or Return on Equity | 159 |
|  |  | | b. | Rate | 160 |
|  |  | B. | Comsigua's Value | 162 |
|  | 3.2 |  | Other Approaches | 162 |
|  |  | A. | Market Multiples | 162 |
|  |  | B. | Comparable Transactions | 164 |
|  |  | | a. | The Purchase of IFC's Shares | 164 |
|  |  | | b. | The Value of Venprecar and Orinoco Iron | 165 |
|  |  | | c. | The Purchase of the Japanese Shareholders' Shares | 165 |
|  |  | | | (i) | Offered Price | 166 |
|  |  | | | (ii) | Interest | 167 |
|  |  | | | (iii) | Discount | 167 |
|  |  | | | (iv) | Bond | 168 |
|  |  | | | (v) | Minority Share Discount | 169 |
| **VIII.** | **INTEREST** | | | **172** |
|  | 1. |  | The Claimants | 172 |
|  | 2. |  | The Respondent | 173 |
|  | 3. |  | The Arbitral Tribunal's Decision | 174 |
| **IX.** | **TAXES** | | | **176** |
|  | 1. |  | The Parties' Positions | 176 |
|  | 2. |  | The Arbitral Tribunal's Decision | 177 |
|  |  | A. | The Claim for Venezuelan Taxes | 177 |
|  |  | B. | The Claim for Taxes in the Country of Residence | 178 |
|  | 3. |  | Article 5 of the Luxembourg BIT | 179 |
|  |  | A. | The Claimants' Position | 179 |
|  |  | B. | The Respondent's Position | 180 |
|  |  | C. | The Arbitral Tribunal's Decision | 181 |
|  |  | | a. | The Correct Version of Article 5.3 | 181 |
|  |  | | b. | Interpretation of Article 5.3 | 183 |
|  |  | | | (i) | Ordinary Meaning | 183 |

          (ii)   Context, Object and Purpose.............................................184  
      c.   Additional Argument ..............................................184  
**X.**    **COSTS**...........................................................................................**185**  
    1.   The Claimants' Position ..............................................185  
    2.   The Respondent's Position ...........................................185  
    3.   The Arbitral Tribunal's Decision ................................185  
      A.   Cost Awarding Criteria .........................................186  
      B.   Application of the Costs-Follow-The-Event Rule.......................187  
        a.   Costs of the Proceeding ....................................187  
        b.   Defense Expenses ..........................................188  
**XI.**   **SUMMARY** ..........................................................................**191**  
    1.   Jurisdiction ................................................................191  
      A.   Lack of Consent ..................................................191  
      B.   Lack of an Effective Seat ......................................193  
      C.   Notification Defects ............................................193  
    2.   Expropriation ............................................................193  
    3.   Compensation Due ....................................................194  
      A.   Tavsa's Value Assessment ....................................195  
      B.   Comsigua's Value Assessment ...............................195  
    4.   Other Decisions.........................................................196  
**XII.**  **DECISION** ...........................................................................**198**

## DEFINED TERMS

| | |
|---|---|
| **Abdala/Zadicoff** | Report by Messrs. Manuel A. Abdala and Pablo D. López Zadicoff of COMPASS LEXECON, LLC, of October 18, 2013. |
| **Abdala/Zadicoff II** | Report by Messrs. Manuel A. Abdala y Pablo D. López Zadicoff of COMPASS LEXECON, LLC, of January 27, 2015. |
| **Affected Companies** | The companies affected by the Nationalization Decree; specifically, Sidor and its subsidiaries and affiliates. |
| **Álvarez** | Witness statement of Javier Martínez Álvarez, of January 27, 2015. |
| **Arbitration Rules** | ICSID Rules of Procedure for Arbitration Proceedings |
| **BITs** | The Luxembourg BIT and the Portuguese BIT, collectively. |
| **CI** | The Claimants' Memorial on the Merits, submitted on October 21, 2013. |
| **CII** | Response to Bifurcation Request, submitted by the Claimants on December 16, 2013. |
| **CIII** | Counter-Memorial on Jurisdiction, submitted by the Claimants on June 16, 2014. |
| **CIV** | The Claimants' Reply, of January 27, 2015. |
| **Comsigua** | Complejo Siderúrgico de Guayana C.A. |
| **Comsigua Notice** | Notice from Tenaris and Talta to the Republic of Venezuela, of December 2, 2011, of the existence of a dispute under the Luxembourg BIT concerning their investment in Comsigua. |
| **Constitution** | The 1999 Constitution of the Bolivarian Republic of Venezuela. |
| **Costs of the Proceeding** | Costs of the proceeding related to the Centre and the arbitrators' fees. |
| **CPI** | Consumer price index. |
| **CV** | Post-hearing Brief, submitted by the Claimants on September 11, 2015. |
| **CVG** | Corporación Venezolana de Guayana |
| **CVG Sidor** | CVG Siderúrgica del Orinoco, C.A. |
| **CVG Tubos** | CVG Tubos Industriales y Petroleros, S.A. |
| **CVI** | Claimants' Brief of September 2, 2016. |
| **Defense Expenses** | Fees and expenses of attorneys, witnesses, expert witnesses, and other representatives. |
| **Denunciation** | The denunciation of the ICSID Convention by the Republic of Venezuela on January 24, 2012 |
| **Expropriated Assets** | Assets belonging to the Affected Companies. |
| **FET** | Fair and equitable treatment |
| **H 1** | Claimants' Opening Statement, Hearing held on June 15-22, 2015. |
| **H 2** | Respondent's Presentation, Hearing held on June 15-22, 2015. |
| **H 3** | Presentation of Report by Messrs. Manuel A. Abdala and Pablo D. López Zadicoff of COMPASS LEXECON, LLC, Hearing held on June 15-22, 2015 |
| **H 4** | Presentation of Report by Mr. Timothy H. Hart of CREDIBILITY INTERNATIONAL, Hearing held on June 15-22, 2015. |

| | |
|---|---|
| **Hart I** | Report by Mr. Timothy H. Hart of CREDIBILITY INTERNATIONAL, of October 21, 2014. |
| **Hart II** | Report by Mr. Timothy H. Hart of CREDIBILITY INTERNATIONAL, of April 13, 2015. |
| **HBI** | Hot-briquetted iron. |
| **Hearing** | The Hearing held on June 15 to June 22, 2015. |
| **ICJ** | International Court of Justice |
| **ICSID Convention** | Convention on the Settlement of Investment Disputes between States and Nationals of Other States, of March 18, 1965. |
| **ICSID or Centre** | International Centre for Settlement of Investment Disputes. |
| **Implementing Decree** | Decree No. 6796, issued by President Hugo Chávez on July 14, 2009, implementing the Nationalization Decree |
| **Japanese Shareholders** | Comsigua's Japanese Shareholder collectively holding a 73.37% shareholding. |
| **Joint Report** | Joint Report by both Parties' experts, of August 21, 2015. |
| **Larez** | Witness statement of Pedro José Larez, of January 15, 2014 |
| **LECUPS** | Law on Expropriation by Reason of Public or Social Interest, published in Official Gazette No. 37,475, of July 1, 2002. |
| **Luxembourg BIT** | Agreement between the Government of the Republic of Venezuela and the Belgium-Luxembourg Economic Union for the Reciprocal Promotion and Protection of Investments, signed on March 17, 1998 |
| **MEP** | The Ministry of the People's Power for Energy and Oil |
| **MIBAM** | The Ministry of the People's Power for Industry. |
| **Nationalization Decree** | Decree No. 6058 with the Rank, Value and Force of Organic Law on the Organization of Companies Operating in the Iron and Steel Sector in the Guayana Region, issued by President Hugo Chávez on April 30, 2008 |
| **Partnership Agreement** | Strategic partnership agreement between CVG and Tamsa of October 9, 1998. |
| **PDVSA** | PDVSA Industrial S.A. |
| **PDVSA Industrial** | PDVSA Industrial S.A. |
| **Portuguese BIT** | Agreement between the Government of the Republic of Venezuela and the Government of the Portuguese Republic for the Reciprocal Promotion and Protection of Investments, signed on June 17, 1994. |
| **PPI** | Producer price index. |
| **Pre-Condition** | Condition imposed upon the investor to negotiate for six months prior to submitting the dispute to the selected forum. |
| **Prosperi** | Witness Statement of Ricardo Prosperi, of January 26, 2015. |
| **Prüm** | Legal Opinion of Prof. André Prüm, of January 23, 2015. |
| **Reasonable Defense Expenses** | Expenses that are critical to a reasonable defense of the Claimants' case. |
| **Reinisch I** | Legal Opinion of Prof. August Reinisch of March 31, 2014 |
| **Reinisch II** | Legal Opinion of Prof. Reinisch of October 12, 2014. |
| **Request for Arbitration** | The Request for Arbitration registered by the Centre on August 21, 2012 |
| **RI** | Objections to Jurisdiction and Request for Bifurcation submitted by the Respondent on November 25, 2013 |
| **RII** | Memorial on Jurisdiction submitted by the Respondent on |

|  | April 1, 2014 |
| **RIII** | Counter-Memorial on Jurisdiction and the Merits submitted by the Respondent on October 21, 2014 |
| **RIV** | Rejoinder on Jurisdiction and the Merits submitted by the Respondent on April 14, 2015. |
| **RV** | Post-Hearing Brief submitted by the Respondent on September 11, 2015. |
| **RVI** | Respondent's Brief of September 30, 2016. |
| **Schreuer I** | Legal Opinion of Prof. Christoph Schreuer of June 10, 2014 |
| **Schreuer II** | Legal Opinion of Prof. Christoph Schreuer of January 19, 2015 |
| **Secretariat** | ICSID Secretariat-General |
| **Sidor** | Sidor C.A. |
| **T** | Hearing Transcript |
| **Takeover Commissions** | Commissions created under the Nationalization Decree, in charge of taking control of Tavsa and Comsigua and ensuring their transition into state-owned companies. |
| **Takeover Meeting** | Meeting held by Comsigua on June 17, 2011, formalizing the end of Comsigua's nationalization process, and whereby the State took and seized control of Comsigua's Expropriated Assets |
| **Talta or Claimant** | Talta-Trading e Marketing Sociedade Unipessoal LDA. |
| **Tamsa** | Tubos de Acero de México S.A. |
| **Tavsa** | Tubos de Acero de Venezuela S.A. |
| **Tavsa Notice** | Notice from Tenaris to the Republic of Venezuela, of November 20, 2009, of the existence of a dispute under the Luxembourg BIT concerning its investment in Tavsa. |
| **Tenaris or Claimant** | Tenaris S.A. |
| **Ternium** | Ternium S.A. |
| **USD** | Dollars of the United States of America |
| **VCLT** | Vienna Convention on the Law of Treaties, of May 23, 1969 |
| **Venezuela, the Republic or Respondent** | The Bolivarian Republic of Venezuela |
| **Villarroel I** | Witness Statement of Wilfredo J. Villarroel R., of October 15, 2014 |
| **Villarroel II** | Second Witness Statement of Wilfredo J. Villarroel R., of April 7, 2015 |

# CASE-LAW CITATIONS

| | |
|---|---|
| **ADF** | *ADF Group Inc. v. United States of America,* ICSID Case No. ARB/(AF)00/1, Award of January 9, 2003 |
| **AES** | *AES Summit Generation Ltd and AES-Tisza Erömü Kft v. The Republic of Hungary,* ICSID Case No. ARB/07/22, Award of September 23, 2010 |
| **Alpha** | *Alpha Projektholding v. Ukraine,* ICSID Case No. ARB/07/16, Award of November 8, 2010 |
| **Alps Finance** | *Alps Finance and Trade v. The Slovak Republic,* UNCITRAL, Award of March 5, 2011 |
| **Amoco** | *Amoco Int'l Finance Corp. v. Islamic Republic of Iran,* Partial Award No. 310-56-3 of July 14, 1987 |
| **Barcelona Traction** | *Barcelona Traction, Light and Power Co., Ltd. (Belgium v. Spain),* Merits, Second Phase, Judgment of February 5, 1970, I.C.J. Reports 1970 |
| **Burlington** | *Burlington Resources Inc. v. Republic of Ecuador,* ICSID Case No. ARB/08/5, Decision on Liability of December 14, 2012 |
| **ConocoPhillips** | *ConocoPhillips Petrozuata B.V., ConocoPhillips Hamaca B.V. and ConocoPhillips Gulf of Paria B.V. v. Bolivarian Republic of Venezuela,* ICSID Case No. ARB/07/30, Decision on Jurisdiction and Merits of September 3, 2013 |
| **EDF** | *EDF Ltd. v. Romania,* ICSID Case No. ARB/05/13, Award of October 8, 2009 |
| **Chorzów** | *Case concerning the Factory at Chorzów,* PCIJ, Series A, No. 17, p. 29, September 13, 1928 |
| **Kılıç** | *Kılıç İnşaat İthalat İhracat Sanayi Ve Ticaret Anonim Şirketi v. Turkmenistan,* ICSID Case No. ARB/10/1, Award of July 2, 2013 |
| **Liberian Eastern Timber** | *Liberian Eastern Timber Corporation v. Republic of Liberia,* ICSID Case No. ARB/83/2, Final Award of March 31, 1986 |
| **MCI Power** | *MCI Power Group L.C. & New Turbine Inc. v. Republic of Ecuador,* ICSID Case No. ARB/03/6, Award of July 31, 2007 |
| **Mondev** | *Mondev v. United States of America,* ICSID Case No. |

ARB(AF)/99/2, Award of October 11, 2002

| | |
|---|---|
| ***Montijo*** | *Montijo case,* (U.S.A. v. Colombia), Award of 1875 |
| ***Murphy*** | *Murphy Exploration and Production Company International v. Republic of Ecuador,* ICSID Case No. ARB/08/4, Award on Jurisdiction of December 15, 2010 |
| ***Noble Venture*** | *Noble Venture v. Romania,* ICSID Case No. ARB/01/11, Award of October 12, 2005 |
| ***OI European*** | *OI European Group B.V. v. Bolivarian Republic of Venezuela,* ICSID Case No. ARB/11/25, Award of March 10, 2015 |
| ***Olguín*** | *Olguín v. Republic of Paraguay,* ICSID Case No. ARB/98/5, Award of July 26, 2001 |
| ***Ömer Dede*** | *Ömer Dede and Serdar Elhüseyni v. Romania,* ICSID Case No. ARB/10/22, Award of September 5, 2003. |
| ***Phoenix*** | *Phoenix Action, Ltd. v. The Czech Republic,* ICSID Case No. ARB/06/5, Award of April 15, 2009. |
| ***Plama*** | *Plama Consortium Limited v. Republic of Bulgaria,* ICSID Case No. ARB/03/24, Award of August 27, 2008 |
| ***Roberts*** | *Harry Roberts v. United Mexican States (U.S.A. v. Mexico),* Decision of the Mexico / USA General Claims Commission of November 2, 1926. |
| ***Saluka*** | *Saluka Investments BV v. The Czech Republic,* UNCITRAL, Partial Award of March 17, 2006 |
| ***Saur*** | *SAUR International SA v. Republic of Argentina,* ICSID Case No. ARB/04/4, Award of May 22, 2014 |
| ***Siemens*** | *Siemens A.G. v. The Argentine Republic,* ICSID Case No. ARB/02/8, Award of January 17, 2007 |
| ***Sistem Mühendislik*** | *Sistem Mühendislik Insaat Sanayi ve Ticaret AS v. Kyrgyz Republic*, ICSID Case No. ARB/(AF)/06/1, Award of September 9, 2009 |
| ***Spyridon Roussalis*** | *Spyridon Roussalis v. Romania*, ICSID Case No. ARB/06/1, Award of December 7, 2011 |
| ***Tattler*** | *Tattler (U.S.A. v. Great Britain),* 6 R.I.A.A. 48, Award of December 18, 1920 |
| ***Tenaris*** | *Tenaris S.A. and Talta – Trading e Marketing Sociedade Unipessoal LDA v. Bolivarian Republic of Venezuela,* |

ICSID Case No. ARB/11/26, of January 29, 2016

***Tidewater***     *Tidewater Inc., Tidewater Investment SRL, Tidewater Caribe, C.A., et al. v. The Bolivarian Republic of Venezuela*, ICSID Case No. ARB/10/5, Award of March 13, 2015

***Tokios Tokelés***   *Tokios Tokelés v. Ukraine,* ICSID Case No. ARB/02/18, Decision on Jurisdiction, April 29, 2004

***Tulip***      *Tulip Real Estate and Development Netherlands B.V. v. Republic of Turkey*, ICSID Case No. ARB/11/28, Award of March 10, 2014

# I.   INTRODUCTION

1.   On August 21, 2012, the Secretariat-General ["**Secretariat**"] of the International Centre for Settlement of Investment Disputes ["**ICSID**" or "**Centre**"] registered a request for arbitration ["**Request for Arbitration**"] from Tenaris S.A. ["**Tenaris**"] and Talta-Trading e Marketing Sociedade Unipessoal LDA ["**Talta**"] [collectively, "**Claimants**"], against the Bolivarian Republic of Venezuela ["**Venezuela,**" "**Respondent,**" or "**Republic**"].

2.   This dispute concerns the alleged expropriation of the Claimants' investments in two iron and steel companies in Venezuela. In their Request for Arbitration, the Claimants relied on the provisions of the Agreement between the Government of the Republic of Venezuela and the Belgium-Luxembourg Economic Union for the Reciprocal Promotion and Protection of Investments, signed on March 17, 1998 ["**Luxembourg BIT**"], and the Agreement between the Government of the Republic of Venezuela and the Government of the Portuguese Republic for the Reciprocal Promotion and Protection of Investments, signed on June 17, 1994 ["**Portuguese BIT**"], collectively referred to as ["**BITs**"].

3.   The Claimants are represented in these proceedings by the Freshfields Bruckhaus Deringer US LLP law firm, with offices at 700 13th Street NW, 10th floor, Washington D.C. 20005, specifically by attorneys Nigel Blackaby, Caroline Richard, Noiana Marigo, Jeffery P. Commission, Natalia Zibibbo, Ricardo Chirinos, María Julia Milesi, Guadalupe López, and Ankita Ritwik. The Claimants are also represented here by José Humberto Frías, of the D'Empaire Reyna Abogados law firm, with offices at Edificio Bancaracas, P.H., Plaza La Castellana, 1060, Venezuela.

4.   The Respondent is represented by the Foley Hoag LLP law firm, with offices at 1717 K Street, N. W, Washington, D.C. 20006, specifically by attorneys Paul Reichler, Kenneth Figueroa, Mélida Hodgson, Janis Brennan, Alberto Wray, Diego Cadena, Constantinos Salonidis, Gisela Paris, Patricia Cruz Trabanino, Benjamin Guthrie, Madeleine Rodriguez, and Manuela de la Helguera.

5.   The Claimants and the Respondent shall be collectively referred to as "**Parties**." A full list of the Parties' representatives and their respective mailing addresses has been included in the cover page of this Award.

# II.  PROCEDURAL HISTORY

6.  The Centre received the Claimants' Request for Arbitration on July 20, 2012. The Secretary-General registered the Request for Arbitration on August 21, 2012, pursuant to Article 36(3) of the Convention on the Settlement of Investment Disputes between States and Nationals of Other States ["**ICSID Convention**" or "**Convention**"]. In the registration notice, the Secretary invited the Parties to proceed, as soon as possible, to constitute the Arbitral Tribunal in accordance with Rule 7(d) of the Rules of Procedure for the Institution of Conciliation and Arbitration Proceedings ["**Arbitration Rules**"].

<u>Constitution of the Tribunal and First Session</u>

7.  Through a letter dated February 19, 2013, the Claimants asked that the Tribunal consist of three arbitrators, one appointed by each party and the third one, set to preside over the Tribunal, appointed by mutual agreement of the Parties, pursuant to Article 37(2)(b) of the ICSID Convention. In that same letter, the Claimants appointed Mr. Enrique Gómez-Pinzón, a national of the Republic of Colombia. On February 22, 2013, the Parties were informed that Mr. Enrique Gómez-Pinzón had accepted his appointment.

8.  On March 15, 2013, the Respondent appointed Professor Brigitte Stern, a national of the French Republic. On March 22, 2013, the Parties were informed that Professor Stern had accepted her appointment.

9.  On July 16, 2013, the Parties notified the Centre they had agreed to appoint Professor Juan Fernández-Armesto, a national of the Kingdom of Spain, to act as President of the Tribunal. On July 18, 2013, the Parties were informed that Professor Fernández-Armesto had accepted his appointment.

10.  On July 18, 2013, the Secretary-General notified the Parties that the three members of the Tribunal had accepted their respective appointments and the Tribunal was thus deemed to be constituted, and the proceedings begun, on said date, pursuant to Arbitration Rule 6. Ms. Alicia Martín Blanco, Legal Counsel at ICSID, was appointed Secretary of the Tribunal.

11.  The Tribunal's first session and preliminary procedural consultation with the Parties took place on September 12, 2013, by telephone conference call. In addition to the three Members and the Secretary of the Tribunal, the following individuals participated in the call:

For the Claimants:

Ignacio Hellmund            Tenaris S.A.
Nigel Blackaby              Freshfields Bruckhaus Deringer US LLP
Caroline S Richard          Freshfields Bruckhaus Deringer US LLP
Jeffery P Commission        Freshfields Bruckhaus Deringer US LLP

For the Respondent:

16

| Manuel Enrique Galindo | *Office of the Attorney General of the Republic* |
| Magaly Gutierrez Viña | *Office of the Attorney General of the Republic* |
| Yarubith Escobar | *Office of the Attorney General of the Republic* |
| Ronald E.M. Goodman | Foley Hoag LLP |
| Ignacio Torterola | Foley Hoag LLP |
| Diego Cadena | Foley Hoag LLP |

12. The Parties' agreements and the Tribunal's decisions concerning the matters discussed at the first session and preliminary procedural consultation were recorded on Procedural Order No. 1, issued on October 2, 2013. Among other things, said Procedural Order provides that the Tribunal was constituted in accordance with the ICSID Convention and the Arbitration Rules, and that the members of the Tribunal submitted their respective signed declarations pursuant to Arbitration Rule 6(2); it also memorializes the Parties' agreement on the following subjects: that the Parties raised no objection to the appointment of any of the Tribunal's members and, therefore, the Tribunal was properly constituted; the application of the Arbitration Rules of April 2006; agreements as to the languages of the proceedings, including the Parties' agreement that the Award be issued in Spanish only; and the procedural schedule.

13. In accordance with the procedural schedule, as amended upon the Parties' agreement on October 15, 2013, the Claimants submitted their Memorial on the Merits on October 21, 2013.

Bifurcation and Subsequent Joining of the Proceedings

14. On November 25, 2013, the Respondent submitted a request seeking to have two objections to jurisdiction ruled upon as a preliminary issue. The Claimants submitted their comments on the Respondent's request for bifurcation on December 16, 2016.

15. On January 15, 2014, the Tribunal issued its Decision on the Request for Bifurcation. In its Decision, the Tribunal agreed to the bifurcation of the *ratione temporis* objection, and invited the Parties to agree on a procedural schedule for the bifurcated proceedings. Having received the Parties' proposals, on February 10, 2014 the Tribunal established a procedural schedule for the bifurcated proceedings.

16. On April 1, 2014, the Respondent filed its Memorial on Jurisdiction.

17. On June 16, 2014, the Claimants filed their Counter-Memorial on Objections to Jurisdiction.

18. After several exchanges of correspondence in connection with the hearing on jurisdiction that was initially scheduled to begin on July 14, 2014, on July 2, 2014 the Parties jointly asked the Tribunal to join the bifurcated objections to jurisdiction to the proceedings on the merits.

19. On July 10, 2016, the Tribunal notified the Parties that it had accepted, on a *pro tem* basis, their agreement to join the jurisdiction and merits stages, reserving, however, the right to revise its decision. Moreover, the Tribunal confirmed the new dates of the procedural schedule and the lifting of the stay of the merits proceedings since July 2, 2014, in accordance with the Parties' agreement. The procedural schedule dates were reviewed again, with the dates set for the hearing standing unchanged.

### The Pre-Hearing Joined Proceedings

20. After consultation with the Parties, the Tribunal confirmed the dates for the hearing on August 12, 2014.

21. In accordance with the revised procedural schedule, the Respondent submitted its Counter-Memorial on Jurisdiction and the Merits on October 21, 2014.

22. On November 5, 2014, the President proposed to the Parties that Ms. Mélanie Riofrio Piché, an associate at Armesto & Asociados, be appointed Assistant to the Tribunal, and requested their approval. On November 17, 2014, the Parties confirmed they had no objection to Ms. Riofrio Piché being appointed Assistant to the Tribunal.

23. On December 31, 2014, the Secretary of the Tribunal transmitted to the Parties an additional declaration by Mr. Gómez-Pinzón. The Parties confirmed they had no objections to the content of the additional declaration submitted by Mr. Gómez- Pinzón on December 31, 2014 and January 15, 2015, respectively.

24. On January 27, 2015, the Claimants submitted their Reply Memorial.

25. On April 14, 2015, the Respondent submitted its Rejoinder.

26. On May 18, 2015, the Parties submitted their respective lists of the opposing party's witnesses and experts they intended to examine at the hearing.

27. On May 22, 2015, the Parties submitted a draft procedural order including their points of agreement on the organization of the hearing, as well as those points on which no agreement had been reached. On the same date, through simultaneous separate communications, the Parties submitted their comments on the points on which no agreement had been reached.

28. On May 27, 2015, the Tribunal informed the Parties that, since they had reached an agreement on the majority of the relevant issues, a pre-hearing telephone conference call would not be necessary.

29. On May 27 and 28, 2015, the Parties notified the order in which their witnesses would be called at the hearing.

30. On June 2, 2015, the Tribunal issued Procedural Order No. 2, containing the Parties' procedural agreements and the Tribunal's decisions on the disputed issues in connection with the organization of the hearing.

31. On June 3, 2015, the Claimants requested that several new documents, as well as additional passages from documents already on the record, be placed on the case record.[1] On June 9, 2015, the Respondent submitted its observations on the Claimants' request, and requested leave to correct one of its own exhibits. On June 8, 2015, the Claimants requested permission to introduce a new document. The Respondent replied to the Claimants' request on June 10, 2015.

32. The Tribunal ruled on June 11, 2015. Given the approaching date of the hearing and considering the need for the Parties to be certain as to which documents had been allowed and which ones rejected prior to the hearing, in its ruling the Tribunal announced its decision without stating detailed reasons. Moreover, the Tribunal invited the Parties to state whether they wished to be provided with detailed reasoning for the Tribunal's ruling. The Respondent requested such statement of reasons on June 12, 2015. Moreover, on June 12 and 14, 2015, the Respondent requested leave to submit certain additional documents.

<u>The Hearing</u>

33. The hearing on jurisdiction and the merits was held on June 15 through 22, 2015, excluding June 20 and 21, 2015. In addition to the Tribunal, the Secretary of the Tribunal and the Assistant to the Tribunal, the following individuals were in attendance at the hearing:

Representing the Claimants:

| | |
|---|---|
| Ignacio Hellmund | Tenaris S.A. |
| Nigel Blackaby | Freshfields Bruckhaus Deringer US LLP |
| Noiana Marigo | Freshfields Bruckhaus Deringer US LLP |
| Caroline S Richard | Freshfields Bruckhaus Deringer US LLP |
| Jeffery P Commission | Freshfields Bruckhaus Deringer US LLP |
| Natalia Zibibbo | Freshfields Bruckhaus Deringer US LLP |
| Ricardo Chirinos | Freshfields Bruckhaus Deringer US LLP |
| Guadalupe López | Freshfields Bruckhaus Deringer US LLP |
| María Julia Milesi | Freshfields Bruckhaus Deringer US LLP |
| Ankita Ritwik | Freshfields Bruckhaus Deringer US LLP |
| Stephen Maurer | Freshfields Bruckhaus Deringer US LLP |
| Angelica Rodriguez | Freshfields Bruckhaus Deringer US LLP |
| Deborah Blake | Freshfields Bruckhaus Deringer US LLP |
| Amy Cattle | Freshfields Bruckhaus Deringer US LLP |
| Matthew Weybrecht | Freshfields Bruckhaus Deringer US LLP |
| José Humberto Frías | D'Empaire Reyna Abogados |

---

[1] In addition, on June 5, 2015, the Parties submitted simultaneous communications introducing new legal authorities into the case record.

19

| | |
|---|---|
| Filipe Vaz Pinto | Morais Leitão, Galvão Teles, Soares da Silva &Associados |

Representing the Respondent:

| | |
|---|---|
| Felipe Daruiz Ferro | *Procuraduría General de la República* |
| Ronald E.M. Goodman | Foley Hoag LLP |
| Kenneth Juan Figueroa | Foley Hoag LLP |
| Mélida Hodgson | Foley Hoag LLP |
| Luis Parada | Foley Hoag LLP |
| Alberto Wray | Foley Hoag LLP |
| Janis Brennan | Foley Hoag LLP |
| Gisela Paris | Foley Hoag LLP |
| Alexandra Kerr Meise | Foley Hoag LLP |
| Christina Beharry | Foley Hoag LLP |
| Diego Cadena | Foley Hoag LLP |
| Constantinos Salonidis | Foley Hoag LLP |
| Benjamin Guthrie | Foley Hoag LLP |
| Patricia Cruz Trabanino | Foley Hoag LLP |
| Madeleine Rodríguez | Foley Hoag LLP |
| Manuela de la Helguera | Foley Hoag LLP |
| Anna Toubiana | Foley Hoag LLP |
| Kathryn Kaninowski | Foley Hoag LLP |
| Anna Avilés-Alfaro | Foley Hoag LLP |
| Pedro Ramírez | Foley Hoag LLP |
| Oscar Norsworthy | Foley Hoag LLP |
| Jennipher Izurieta | Foley Hoag LLP |
| Carmen Roman | Foley Hoag LLP |
| Peter Hakim | Foley Hoag LLP |

Claimants' Witnesses and Experts:

| | |
|---|---|
| Javier Martínez Álvarez | Witness |
| Luis Francisco Roberts | Witness |
| Ricardo Prosperi | Witness |
| André Prüm | Expert |
| Dário Moura Vicente | Expert |
| Christoph Schreuer | Expert |
| Manuel A. Abdala | Expert |
| Pablo D. López Zadicoff | Expert |
| Andrés Casserly | Expert, Compass Lexecon |
| Daniela Repetto | Expert, Compass Lexecon |

Respondent's Witnesses and Experts:

| | |
|---|---|
| Pedro Larez | Witness |
| Wilfredo Villarroel | Witness |
| Alain Steichen | Expert |

| Pedro Maia | Expert |
| Tiago Duarte | Expert |
| August Reinisch | Expert |
| Timothy Hart | Expert, Credibility International |
| Ken Kratovil | Expert, Credibility International |
| Rebecca Vélez | Expert, Credibility International |

34. During the hearing, new exhibits and legal authorities were added to the record. Moreover, at the hearing and upon the Tribunal's invitation, the Parties agreed that their respective damages experts would submit joint damages models.

Post-Hearing Joined Proceedings

35. On June 29, 2015, the Parties sent in a schedule with the agreed-upon dates for the submissions concerning the models, post-hearing briefs, and costs submissions.

36. On June 30, 2015, the Claimants submitted a communication concerning certain questions asked and documents requested by the Tribunal at the hearing. The Respondent submitted observations on the Claimants' communication on July 14, 2015.

37. On July 17, 2015, the Tribunal transmitted to the Parties the reasons for its decision of June 11, and ruled on the outstanding requests. The Parties submitted the new documents allowed by the Tribunal on July 22, 2015.

38. On July 22, 2015, the Tribunal issued Procedural Order No. 3, concerning post-hearing procedural matters.

39. On July 30 and 31, 2015, the Parties proposed changing certain dates on the procedural schedule. On August 5, 2015, the Tribunal informed the Parties it had no objections to the proposed changes.

40. The Parties submitted corrected and agreed-upon versions of the transcripts on July 31, 2015.

41. On August 21, 2015, the quantum experts submitted the joint models requested by the Tribunal, as well as a memorandum explaining the different options and functionalities, including the experts' notes.

42. The Parties submitted their respective post-hearing briefs on September 11, 2015.

43. On October 2, 2015, the Parties filed their respective costs submissions.

Submissions and Evidence on the Seat and Taxes

44. On August 5, 2016, the Tribunal asked the Parties to submit new allegations and evidence regarding various issues identified by the Tribunal.

45. Pursuant to the schedule agreed-upon by the Parties for this purpose, the Claimants submitted their brief and exhibits in response to the Tribunal's request on September 2, 2016, the Respondent submitted its response on September 30, 2016, the Claimants submitted their reply on October 10, 2016, and the Respondent submitted its rejoinder on October 20, 2016.

Closing of the Proceedings

46. The Tribunal declared the proceedings closed on November 15, 2016.

# III.  RELIEF SOUGHT BY THE PARTIES

1.  **THE CLAIMANTS' REQUESTED RELIEF**

47.    In CI,[2] CIV[3] and CV,[4] the Claimants request that the Tribunal:

> "(a) DECLARE that Venezuela has breached Articles 3 and 4 of the Luxembourg Treaty;
>
> (b) DECLARE that Venezuela has breached Articles II, III and IV of the Portuguese Treaty;
>
> (c) ORDER Venezuela to pay the Claimants the sum of US$ 243.7 million (as of April 30, 2008)[5] for its breaches of the treaties, which includes the sum of US$ 213.2 million[6] in respect of Tenaris' investment in Tavsa and US$ 30.5 million in respect of Claimants' investment in Comsigua, or such other sum as the Tribunal determines will ensure full reparation;
>
> (d) ORDER Venezuela to pay pre-award interest on (c) above in the sum of US$ 471.1 million[7] from the Valuation Date to September 11, 2015[8] at a rate of 15.69% (being the WACC of Tavsa, amounting to US$ 410.77 million[9]) and 15.96% (being the WACC of Comsigua, amounting to US$ 60.35 million[10]) per annum and thereafter until the date of the Tribunal's Award, compounded annually, or at such other rate and compounding period as the Tribunal determines will ensure full reparation;
>
> (e) ORDER Venezuela to pay post-award interest on (c) and (d) at a rate of 15.69% (being the WACC of Tavsa) and 15.96% (being the WACC of Comsigua) per annum as at the date of the Tribunal's Award, compounded annually, or at such other rate and compounding period as the Tribunal determines will ensure full reparation;
>
> (f) DECLARE that: (i) The award of damages and interest in (c), (d) and (e) is made net of applicable Venezuelan taxes; and (ii) Venezuela may not deduct taxes in respect of the payment of the award of damages and interest in (c), (d) and (e);

---

[2] CI, para. 235.

[3] CIV, para. 321.

[4] CV, para. 319.

[5] In CI, the sum was USD 244.7 million. This item was subsequently changed to USD 243.7 million in CIV, and thus remained in CV.

[6] In CI, the sum was USD 214.2 million. This item was subsequently changed to USD 213.2 million in CIV and thus remained in CV.

[7] In CI, the sum was USD 298.2 million. This item was subsequently changed to USD 405.4 million in CIV and to USD 471.1 million in CV.

[8] In CI, the date was October 15, 2013. This date was subsequently changed to January 15, 2015 in CIV and to September 11 in CV.

[9] In CI, the sum was 260.2 million. This item was subsequently changed to USD 353.5 million in CIV and to USD 410.55 million in CV.

[10] In CI, the sum was USD 38 million. This item was subsequently changed to USD 51.9 million in CIV and to USD 60.35 million in CV.

(g) ORDER Venezuela to indemnify the Claimants in respect of any double taxation liability that would arise in Luxembourg, Portugal or elsewhere that would not have arisen but for Venezuela's adverse measures;

(h) AWARD such other relief as the Tribunal considers appropriate; and

(i) ORDER Venezuela to pay all of the costs and expenses of this arbitration, including the Claimants' legal and expert fees, the fees and expenses of any experts appointed by the Tribunal, the fees and expenses of the Tribunal and ICSID's other costs."

48.    The Claimants note that:[11]

"To the extent this Tribunal concludes that Tenaris's investments in Tavsa have been indirectly expropriated and the Tribunal awards compensation using a valuation date of April 30, 2008, then Tenaris will have been made whole and it will not be necessary for the Tribunal to consider whether Venezuela has breached the fair and equitable treatment provision of the Luxembourg Treaty. If, however, the Tribunal uses a 2009 valuation date, it will be necessary for the Tribunal to consider whether Venezuela's measures following the enactment of the Nationalization Decree 6058 breached the fair and equitable treatment clause of the Luxembourg Treaty and if so, establish compensation at a date prior to Venezuela's breaches of that Treaty."[12]

"To the extent this Tribunal concludes that Claimants' investments in Comsigua have been indirectly expropriated and the Tribunal awards compensation using a valuation date of April 30, 2008 in a principal amount not less than the *pro rata* sum attributed to each of the minority Japanese Shareholders (i.e. US$24.1 million), then it will not be necessary for the Tribunal to consider whether or not Venezuela has separately breached the fair and equitable treatment, non-discrimination and/or the most-favored-nation (MFN) clauses in the Treaties. If the Tribunal concludes that Claimants' investments in Comsigua have not been expropriated, or calculates compensation for expropriation in an amount less than the *pro rata* share attributed to the Japanese Shareholders, then it should proceed to address Claimants' claim under the non-discrimination and/or MFN clauses and order the payment of compensation to the Claimants for their shares in Comsigua at the *pro rata* sum attributed to each of the minority Japanese Shareholders. If the Tribunal concludes that the Claimants' investments in Comsigua have been expropriated but uses a 2009 valuation date, it will be necessary for the Tribunal to consider whether Venezuela's measures following the enactment of the Nationalization Decree 6058 breached the fair and equitable treatment clauses of the Treaties, and if so, establish compensation at a date prior to Venezuela's breaches of the Treaties."

---

[11] CV, para. 321.
[12] CV, para. 320.

49. The Claimants request that the Tribunal dismiss Venezuela's objections to the jurisdiction of the Centre and the competence of the Tribunal. In CIII,[13] they request that the Tribunal:[14]

> "(a) Reject Venezuela's *Ratione Temporis* jurisdictional objection and all other new objections advanced by Venezuela in its Memorial on Jurisdiction in their entirety [...];
>
> (b) Award such other relief as the Tribunal considers appropriate;
>
> (c) Order Venezuela to pay all of the costs and expenses associated with this jurisdictional round of submissions, including the Claimants' legal fees, the fees and expenses of the legal expert retained by the Claimants, and the fees and expenses of the Tribunal and ICSID's other costs."

## 2. THE RESPONDENT'S REQUESTED RELIEF

50. In RII,[15] the Respondent requests that the Tribunal rule that the Centre lacks competence and the Tribunal lacks jurisdiction over the Claimants' claims. Subsequently, in RIII[16] and RIV,[17] the Respondent requests the Tribunal:

> "1) to find that the Tribunal has no jurisdiction over the Claimants' claims and that such claims are inadmissible;
>
> 2) if the Tribunal decides that it has jurisdiction to hear this dispute, to find that the Bolivarian Republic of Venezuela has not violated the commitments undertaken in the Bilateral Investment Treaties with Portugal and Luxembourg; and
>
> 3) to order the Claimants to pay the costs and expenses of this arbitral proceeding and to compensate the Republic for the expenses incurred in its defense."

51. In RV, the Respondent adds the following:[18]

> "In the unlikely event that the Tribunal considers that there is liability, [the Respondent asks] that it deny the claim for damages because Claimants have failed to prove their existence, grounds or amount in the terms required by International Law."

---

[13] CIII, para. 101.
[14] CIII, para. 101. [Irrelevant in English version.]
[15] RII, para. 103.
[16] RIII, para. 494.
[17] RIV, para. 458.
[18] RV, p. 130.

# IV.  INTRODUCTION

52.  The core dispute[19] arises from the alleged expropriations[20] of the Claimants'
investments in two Venezuelan companies: a steel tube manufacturer (Tubos de
Acero de Venezuela S.A. ["**Tavsa**"]) and an iron manufacturer (Complejo
Siderúrgico de Guayana C.A. ["**Comsigua**"]). In addition, these companies are
alleged to have suffered (as per the Claimant's claims) unfair and inequitable
treatment. This second argument is raised subsidiarily to the expropriation claim,
as the compensation sought for the expropriation would also cover the
compensation due on account of such unfair and inequitable treatment.

53.  The Claimants are members of the Techint Group, an international conglomerate
operating in the steel industry, consisting of several groups of companies,
including Tenaris (the first Claimant) and Ternium S.A. ["**Ternium**"].

54.  Tenaris is a Luxembourg holding company,[21] with 26 main subsidiaries, and it is
listed in the main stock exchanges in the United States, Italy, Argentina, and
Mexico.[22] It has two wholly-owned subsidiaries that are relevant to this
arbitration:

-  Talta:[23] the second Claimant and a Portuguese company.[24] Talta – and,
indirectly, Tenaris – holds 7.58% of Comsigua's stock – one of the two
allegedly expropriated companies.

-  Tubos de Acero de México S.A. ["**Tamsa**"]:[25] a Mexican company holding
70% of Tavsa's stock[26] – the second company the Claimants contend was
expropriated.

55.  The Respondent is the Bolivarian Republic of Venezuela; it denies having
breached the BITs, and it therefore rejects any damages claim. Venezuela also
raised as a preliminary objection the Tribunal's lack of jurisdiction over this
dispute.

---

[19] Subsidiarily, the Claimants also claim to have suffered other breaches of the BITs.
[20] Strictly speaking, Venezuela acknowledges Tavsa's expropriation and only challenges Comsigua's. For ease of
reference, the Arbitral Tribunal will jointly refer to the "alleged expropriations."
[21] Extract of the Luxembourg Registry of Commerce and Corporations for Tenaris, May 24, 2012, Exhibit C-6.
[22] Tenaris S.A., 2014 Annual Report, Exhibit R-116, p. 31.
[23] Talta, and indirectly Tenaris, also acquired a 50.2% shareholding in Orinoco Iron, Materiales Siderúrgicos S.A.
(Matesi), another Venezuelan HBI producer. Such investment and its alleged subsequent expropriation are the subject-
matter of a separate ICSID arbitration: *Tenaris S.A. y Talta – Trading e Marketing Sociedade Unipessoal LDA v.
Bolivarian Republic of Venezuela* (ICSID Case No. ARB/11/26).
[24] Permanent Certificate of Talta, May 18, 2012, Exhibit C-8.
[25] Shareholders Registry of Tamsa, July 6, 2012, Exhibit C-22.
[26] Certificate of Commercial Registry of Puerto Ordaz of CVG Tubos, November 23, 1998, Exhibit C-85, p. 8; Strategic
Partnership Agreement, October 9, 1998, Exhibit C-19, clause 2.1.

56. There is a significant portion of the factual background of this Award that is shared by both companies, Tavsa and Comsigua, as well as both investors, Tenaris and Talta, respectively. Where so, the Award will jointly refer to the companies or the "investment," as well as the "Claimants" in the plural. However, whenever the facts and/or arguments impact one or the other company differently, the Award will address Tavsa and Comsigua separately, and will refer to Tenaris and Talta, respectively, as the relevant Claimant.

57. The Arbitral Tribunal will approach its analysis of the case as follows: it will first examine the three jurisdictional objections asserted by Venezuela (**V.**); next, it will address the Claimants' main claim, namely the alleged expropriation of their investments by the Bolivarian Republic (**VI.**), and will make a decision on the compensation quantum (**VII.**). Finally, the Arbitral Tribunal will render its award on interest, taxes, and costs (**VIII-X.**) and will provide a summary of all previous findings (**XI.**). The final section will contain the Award's decision (**XII.**).

# V.  **OBJECTIONS TO JURISDICTION**

58.  Venezuela has raised three objections to the Arbitral Tribunal's jurisdiction:

-  The first one concerns a lack of consent (**1.**);

-  The second one, the lack of a corporate seat (**2.**); and

-  The third and final one, defects in the notice of the dispute (**3.**)

## 1.  LACK OF CONSENT

59.  In investment arbitrations under a bilateral investment treaty, consent to arbitration is expressed successively: first, the State formalizes an offer to submit to arbitration in the BIT; then, the investor accepts that offer – and such acceptance may take any one of several forms. Once the investor has expressed its acceptance, consent to arbitration has been perfected.

60.  Where the concerned State is Venezuela, the process whereby consent is perfected becomes complicated as a result of the fact that, on January 24, 2012, Venezuela denounced the Convention.

61.  Denunciation of the Convention is governed by Articles 71 and 72:

> "Article 71. Any Contracting State may denounce this Convention by written notice to the depositary of this Convention. The denunciation shall take effect six months after receipt of such notice."

> "Article 72. Notice by a Contracting State pursuant to Article[…] 71 shall not affect the rights or obligations under this Convention of that State or of any of its constituent subdivisions or agencies or of any national of that State arising out of consent to the jurisdiction of the Centre given by one of them before such notice was received by the depositary."

62.  Article 71 provides that a State's denunciation of the Convention does not take effect until six months after receipt thereof by the World Bank; this rule means that, until July 24, 2012 (six months after denunciation) the Convention remained in full force and effect with respect to Venezuela. The Claimants filed their Request for Arbitration on July 20, 2012 and, therefore, prior to the expiration of such term.

63.  Moreover, Article 72 contains a specific rule since, in order for the Convention to apply to a denouncing State, even within the six-month period mentioned in Article 71, "consent to the jurisdiction of the Centre" must have been given prior to the denunciation.

64.  There is a certain amount of debate as to whether "consent to jurisdiction" in Article 72 of the Convention refers to the consent perfected by the State and the investor (as argued by the Respondent) or rather it is to be read only as the

State's unilateral offer to arbitrate. The Claimants contend that such debate is moot, since, irrespective of the preferred interpretation, in any event they had already validly given their consent prior to the Denunciation.[27]

65.     The issue to determine here is then whether the Claimants accepted the offer to arbitrate made by Venezuela prior to its Denunciation. The case for each Claimant and its investment will be addressed separately.

## 1.1   TENARIS-TAVSA

### A.   **Venezuela's Position**

66.     Venezuela raises two arguments to have this Tribunal decline its jurisdiction:

-     As its main argument, it maintains that acceptance of arbitration could have taken place only after the pre-arbitration negotiation period (**a.**); and

-     In the alternative, it contends that consent to arbitration was never perfected due to the inconsistency between the terms of the offer and the terms of the acceptance (**b.**)

### a.   **Lack of Acceptance After the Required Negotiation**

67.     Pursuant to Article 9.1 and 9.2 of the Luxembourg BIT:

> "1. Any dispute between an investor and the other Contracting Party concerning the application of this Agreement shall be the subject of a written notification, accompanied by a sufficiently detailed memorandum, from the investor. As far as possible, the parties shall endeavor to settle the dispute amicably by negotiation, where necessary seeking expert advice from a third party by conciliation.
>
> 2. In the absence of an amicable settlement within six months from the date of notification of dispute, the dispute shall be submitted, at the investor's option, either to the competent jurisdiction of the State in which the investment was made or to international arbitration. Once made, the choice shall be final.
>
> To this end, each Contracting Party shall give its irrevocable consent in advance to the submission of any dispute to such arbitration."

68.     The Respondent argues that Tenaris should have issued its acceptance at the end of the six-month negotiation period, running as from the date of the notice of dispute, provided, however, that it had engaged in good-faith negotiations with Venezuela[28] – which did not happen.

### b.   **Failure to Perfect Consent**

69.     Venezuela also raises a subsidiary argument.

---

[27] CV, para. 145; T., p. 128:3–7.
[28] RIII, para. 188.

29

70. On November 20, 2009, Tenaris sent the Ministry of the People's Power for Energy and Oil ["**MEP**"] notice of the existence of a dispute under the Luxembourg BIT concerning the expropriation of its investment in Tavsa ["**Tavsa Notice**"].[29] In such notice, Tenaris reserved its right to institute arbitration proceedings upon the expiration of the six-month negotiation period beginning on the date of the notice or earlier, insofar as the negotiations were futile.[30]

71. According to the Bolivarian Republic, this reservation of rights causes the terms of the acceptance to arbitration not to be identical to those of the offer to arbitrate.[31] And this inconsistency in their terms would mean that consent to arbitration was not perfected,[32] as such consent would be flawed.[33]

### B.  Tenaris' Position

72. Tenaris denies the validity of the two arguments put forth by Venezuela.

#### a.  Prior Negotiations

73. Following the Tavsa Notice, Tenaris claims to have repeatedly expressed to Venezuela its desire to engage in negotiations, as evidenced by the discussions and meetings that took place, as well as the correspondence sent over that period.[34]

74. The Claimant maintains that, by the time Venezuela submitted its Denunciation, on January 24, 2012, Tenaris had more than observed the six-month negotiation period.

#### b.  Perfected Consent

75. Tenaris contends that the reservation in the Tavsa Notice merely reflects the language of Article 9.1 of the Luxembourg BIT, which requires that the parties, "as far as possible," endeavor to amicably settle their dispute, as well as extended arbitration practice, where it is established that negotiations need not be continued in the event of "futility."[35]

76. The Claimant further argues that it was not until this arbitration that Venezuela first brought the contents of the Tavsa Notice into question.[36]

### C.  Decision of the Arbitral Tribunal

---

[29] Notice of Dispute from Tenaris to Venezuela, November 20, 2009, Exhibit C-9. Venezuela received such Notice on November 26, 2009; attached to the notice was a detailed memorandum of the dispute.
[30] Tavsa Notice, Exhibit C-9, pp. 4, 5.
[31] Venezuela refers to the following paragraph of the Tavsa Notice: "In this context, Tenaris […] reserve[s] from now on [its] right to initiate an arbitration upon expiration of the six-month negotiations period following the date of this letter or even earlier to the extent that the conduct of the Government determines the exhaustion of such period would constitute a ritualism or formalism deprived of any usefulness." Exhibit C-9.
[32] RV, para. 40; T., p. 1593:5–7 (Reinisch).
[33] RIII, para. 189.
[34] CV, para. 122.
[35] T., pp. 113:14–114:5; pp. 1658:18–1660:1.
[36] CV, para. 121.

77. The Arbitral Tribunal agrees with Tenaris on the two points at issue.

### a. Prior Negotiations

78. Venezuela initially argued that acceptance was to take place after negotiating in good faith for six months, and that this requirement had not been satisfied here. After the evidence produced by the Claimant, showing its contacts with Venezuela through discussions, letters and meetings over the course of more than two years, the Respondent seems to have dropped this argument in its later pleadings.

79. In any event, the Arbitral Tribunal agrees with Tenaris: the Claimant did fulfill its duty to negotiate for six months before submitting the dispute to arbitration. And it did repeatedly bring the dispute before the Government, expressing its desire to reach an amicable settlement; so follows from the following evidence:

- The letters of May 29, 2009,[37] August 17, 2009,[38] February 26, 2010,[39] and May 3, 2010;[40]

- The Tavsa Notice, of November 20, 2009;[41]

- The meetings of March 25, 2010,[42] April 27, 2010,[43] May 27, 2010,[44] February 9, 2011,[45] September 27, 2011,[46] October 5, 2011, and November 29, 2011;[47]

80. The Bolivarian Republic has not disproven its opponent's evidence.

81. The Tribunal finds that, when Venezuela denounced the Convention on January 24, 2012, the six months of required conciliation attempts as from the Tavsa Notice of November 20, 2009 had more than elapsed.

### b. Matching Terms

82. Venezuela claims that, in the Tavsa Notice, Tenaris had changed the terms of Venezuela's offer to submit to arbitration, thereby creating an inconsistency between offer and acceptance that allegedly kept consent from being perfected.

83. The argument is unconvincing.

---

[37] Exhibit C-60.
[38] Exhibit C-70.
[39] In the letter from Mr. José Frías (Tenaris) to the Venezuelan Ministry of the People's Power for Energy and Oil, addressed to the attention of Mr. Ángel Núñez (PDVSA Industrial), of February 26, 2010, Tenaris invites PDVSA Industrial to meet in order to go over the value of the compensation for its Tavsa shareholding. Exhibit C-191; Prosperi, para. 13.
[40] In the letter from Mr. José Frías (Tenaris) to the Venezuelan Ministry of the People's Power for Energy and Oil, of May 3, 2010, the Claimants stated that in no way did the appointment of additional members to Tavsa's technical commission entail a modification, alteration, or interruption of the negotiations period provided for in the Luxembourg BIT. Exhibit C-150; Larez, para. 18, Prosperi, para. 13. CII, para. 91; Exhibit C-60; Exhibit C-70; Exhibit C-150
[41] Exhibit C-9.
[42] Prosperi, para. 13.; T., pp. 117:18–120:6.
[43] Exhibit C-149.
[44] Exhibit C-149; Prosperi, para. 13.
[45] Prosperi, para. 15.
[46] Prosperi, para. 20.
[47] Exhibit C-149.

84. In executing the Luxembourg BIT, Venezuela gave its consent for the dispute to be submitted to ICSID,[48] subject (as per its claim) to one condition: that the six-month period for prior negotiations be observed.

85. In the Tavsa Notice, Tenaris agreed to settle the dispute before ICSID:[49]

> "The Luxembourg Treaty states the consent of the State of Venezuela to have any such dispute resolved by means of international arbitration, in particular under the auspices of the International Centre for Settlement of Investment Disputes ("ICSID"), <u>which consent has also been hereby given by Tenaris and Tavsa LLC to resort to arbitration in the unfortunate event that the dispute cannot be amicably settled.</u>[50]

86. The terms of the offer to arbitrate and the terms of Tenaris' acceptance are thus perfectly consistent: Venezuela offered arbitration and Tenaris (and Tavsa) "also gave their consent to resort to arbitration."[51]

---

[48] Luxembourg BIT, Article 9.2 *in fine* and Article 9.3.
[49] Exhibit C-9, p. 5.
[50] Underlined by the Tribunal.
[51] The Tribunal is paraphrasing.

<u>Reservation of Rights</u>

87. However, Venezuela has focused on the final portion of the phrase following Tenaris' consent, where Tenaris makes a reservation of rights:

> "In this context, Tenaris and Tavsa LLC <u>hereby reserve their right to institute arbitration</u> once the period of six months from the date hereof has expired, or <u>even earlier</u> to the extent that the Government's conduct causes the exhaustion of such period to be a ritualism or formalistic requirement devoid of any use." [52]

88. Does this reservation of rights change the above conclusion that consent had been perfected?

89. It should first be noted that Tenaris never resorted to such reservation since, *de facto*, it did observe the six-month negotiation period.

90. Even if it had not observed that period, however, the inclusion of the above reservation would not have entailed a material modification of the offer, since, by including its reservation, Tenaris merely adhered to an accepted principle of investment arbitration, reflected in the Luxembourg BIT itself: negotiations are to take place "as far as possible,"[53] and, where any attempt at negotiating is futile, this period need not be exhausted.[54] It should be further noted that never had the Bolivarian Republic – until the commencement of this arbitration – called Tenaris' attention to the discrepancy it is now bringing up, which confirms that, *in tempore insuspecto,* Venezuela did not detect any irregularity in the Tavsa Notice.

* * *

91. <u>To conclude</u>, the Arbitral Tribunal rejects the first jurisdictional objection raised against Tenaris: by the date of the Denunciation, Tenaris had accepted the terms of Venezuela's offer to arbitrate, and had fulfilled its duty to negotiate for no less than six months.

## 1.2 TALTA-COMSIGUA

92. As regards Comsigua, Venezuela argues that consent to arbitrate was subject to one condition being satisfied: that Talta, the owner of the investment, negotiated in good faith for six months. Consent could not be perfected before that period ended.[55]

93. For its part, Talta claims to have satisfied this requirement, because the Portuguese BIT provides that the six-month negotiation period runs as from the first negotiation, which, in this case, took place in 2010.[56]

94. The Arbitral Tribunal agrees with Talta.

---

[52] Underlined by the Tribunal.
[53] Luxembourg BIT, Article 9.1.
[54] Schreuer I, para. 63.
[55] RIV, para. 191.
[56] CV, para. 125; Schreuer I, para. 49.

95.    The Portuguese BIT does not call for notification of the dispute, and it very clearly establishes that the six-month period for negotiations runs as from the commencement of the negotiations:[57]

> "Should the dispute not be solved by amicable means within a period of six (6) months, <u>counted from the beginning of these consultations</u>, it may be submitted, at the choice of the investor: [...]."[58]

96.    The timeline is as follows:

-    Talta made its first request to negotiate on June 28, 2010;[59]

-    One year and a half later, on December 2, 2011, Tenaris and Talta sent the Ministry of the People's Power for Industry ["**MIBAM**"] a notice of the existence of a dispute under the Luxembourg and Portuguese BITs with respect to their investment in Comsigua ["**Comsigua Notice**"].[60] In this Notice, Tenaris and Talta once again expressed their willingness to reach an amicable settlement of the dispute and stated their consent to submit the dispute to ICSID arbitration if no amicable solution was reached within the time period prescribed in the BITs;[61]

-    The Denunciation took place on January 24, 2012, effective July 24, 2012.

-    The Request for Arbitration was filed on July 20, 2012.

97.    Pursuant to the Portuguese BIT, the six-month negotiation period runs from "the beginning of these consultations." The facts leave no room for doubt: when Talta sent the Comsigua Notice, it had more than fulfilled its duty to negotiate for six months (and, at the time, Venezuela had not yet denounced the Convention). Accordingly, Talta did validly perfect its consent to arbitration when it sent the Comsigua Notice on December 2, 2011, before the Denunciation.

* * *

98.    The Arbitral Tribunal could end its analysis here, after having verified that Talta, which is the direct holder of Comsigua's shares, consented to arbitration in the required time period and manner.

99.    However, the Tribunal is aware that the Claimants' *petitum* as regards Comsigua is framed as compensation for the benefit of both Claimants (not just Talta),[62] which requires that the Arbitral Tribunal also verify consent by Tenaris as a co-

---

[57] Portuguese BIT, Article VIII.2.
[58] Underlined by the Tribunal.
[59] Prosperi, paras. 18-22; Villarroel II, para. 8.
[60] Venezuela received such Notice on December 5, 2011, and, as was the case with the Tavsa Notice, this Notice was also accompanied by a detailed memorandum of the dispute. Notice of Dispute from Tenaris and Talta to Venezuela, December 2, 2011. Exhibit C-10, Annex, sections 6(a), (b).
[61] Comsigua Notice, Exhibit C-10, p. 3.
[62] See para. 47 *supra*: The Claimants request that the Tribunal "(c) ORDER Venezuela to pay the Claimants the sum of US$ 243.7 million (as of April 30, 2008) for its breaches of the treaties, which includes the sum of US$ 213.2 million in respect of Tenaris' investment in Tavsa and US$ 30.5 million in respect of Claimants' investment in Comsigua, or such other sum as the Tribunal determines will ensure full reparation."

claimant.

**1.3  TENARIS-COMSIGUA**

100. The case of Tenaris, as an indirect owner of Comsigua, is more complex because the Luxembourg BIT differs from the Portuguese BIT (discussed in the preceding section).

101. Article 9 of the Luxembourg BIT provides as follows:[63]

> "1. Any dispute between an investor and the other Contracting Party concerning the application of this Agreement shall be the subject of a written notification, accompanied by a sufficiently detailed memorandum, from the investor. As far as possible, the parties shall endeavor to settle the dispute amicably by negotiation, where necessary seeking expert advice from a third party by conciliation.
>
> 2. In the absence of an amicable settlement <u>within six months from the date of notification of dispute</u>, the dispute shall be submitted, at the investor's option, either to the competent jurisdiction of the State in which the investment was made or to international arbitration. Once made, the choice shall be final."

102. *Pro memoria*: Tenaris and Talta sent the Comsigua Notice on December 2, 2011. The six-month period began (as required by the Luxembourg BIT) at the time of the Comsigua Notice and, therefore, it ended on June 2, 2012. By then, Venezuela had already denounced the Convention – its Denunciation took place on January 24, 2012.

103. Venezuela argues that consent to arbitration may not be perfected until the required negotiation period has expired, and that Tenaris never actually got to perfect consent to arbitration in connection with its investment in Comsigua.

104. For its part, Tenaris argues the opposite, and claims that consent was perfected by means of the Comsigua Notice, and that the negotiation period is merely a procedural requirement: until said period expires, the investor is prevented from filing a request for arbitration, but this waiting period does not affect the perfecting of consent given prior to that.

105. The Respondent and the Claimants have submitted expert opinions by two investment arbitration experts, namely Professors August Reinisch and Christoph Schreuer, respectively, who have provided their opinion in support of each Party's position, which will be summarized next (**A.** and **B.**). Then, the Arbitral Tribunal will reach a decision (**C.**).

**A.  <u>Venezuela's Position</u>**

106. The Respondent has relied on the opinion of Prof. Reinisch.[64]

---

[63] Underlined by the Tribunal.
[64] Opinion of March 31, 2014 ["**Reinisch I**"], and opinion of October 12, 2014 ["**Reinisch II**"].

107.  It is the expert's opinion that, once the Convention has been denounced, only those rights and obligations which have already arisen from previously-perfected mutual consent to ICSID arbitration escape the effects of such denunciation. Consent is perfected when the investor accepts the State's arbitration offer.[65] Because in this case the Denunciation took place on January 24, 2012, consent to arbitration should have been perfected prior to such date.[66]

108.  Prof. Reinisch analyzes the two actions through which Tenaris might have expressed its consent to arbitration: the Comsigua Notice and the Request for Arbitration; he then concludes that neither one perfected consent.

<u>The Comsigua Notice</u>

109.  Prof. Reinisch acknowledges that, as a general principle, the investor can accept an arbitration offer made by a State in a BIT at any time between that BIT's effective date and the State's Denunciation of the Convention.[67] The expert also accepts that the Luxembourg BIT contains no provision establishing when consent to arbitration is to be deemed perfected.[68]

110.  The above notwithstanding, in his opinion, in order for an acceptance of the offer to arbitrate to be valid and cause consent to be perfected, it must satisfy all of the requirements established in the offer itself.[69] In this case, it is the expert's opinion that the offer was conditional upon the satisfaction of one requirement: the Luxembourg BIT requires that a six-month negotiation period be observed after the notice before being able to choose an arbitration forum and submit the dispute to arbitration.[70] The expert maintains that, had consent been perfected via that notice, the investor would have been deprived of that right to elect a forum, once the required negotiations had ended.[71]

111.  The expert reaches this conclusion by performing a literal interpretation of the Luxembourg BIT,[72] from which he concludes that acceptance of the arbitration offer is subject to a process consisting of three successive steps:[73]

-   First, a notice of a dispute;

-   Second, a mandatory six-month negotiation period;

-   Third, the choice of submitting the dispute to either the appropriate courts of the State or international arbitration.

112.  For that reason, it is the expert's opinion that the consent to arbitration expressed by Tenaris in the Comsigua Notice could not be perfected until the negotiation

---

[65] Reinisch I, para. 40.
[66] Reinisch I, paras. 46, 47.
[67] Reinisch II, para. 75.
[68] Reinisch II, para. 48.
[69] Reinisch II, para. 75.
[70] Reinisch I, para. 55.
[71] Reinisch II, para. 69.
[72] Reinisch II, para. 52.
[73] Reinisch II, para. 55.

period had expired (second step).[74] According to the expert, the observance of the negotiation period is a true jurisdictional requirement, not a mere procedural obstacle affecting just the admissibility of the complaint.[75]

113. Because in this case Tenaris gave its consent to arbitration in the Comsigua Notice and such consent would not be effectively perfected until six months later, *i.e.* on June 2, 2012, Tenaris would be left without ICSID protection since, by then, Venezuela had already denounced the Convention.[76]

<u>The Request for Arbitration</u>

114. Tenaris filed its Request for Arbitration on July 20, 2012, more than six months after the Denunciation. The expert maintains that, had the Request perfected the investor's consent, such perfecting would have taken place after the Denunciation and would thus be ineffective.[77]

**B.** **<u>Tenaris' Position</u>**

115. The Claimant relies on the opinion of Prof. Schreuer.[78]

116. According to this expert, there is an ongoing debate as to whether the negotiation period is a jurisdictional requirement (because it affects consent) or a procedural one (because it affects the admissibility of the complaint).[79]

117. It is his view that, in this case, that discussion is moot: the debate is of consequence where the investor has ignored the prior negotiations requirement and skipped directly forward to arbitration.[80] Here, Tenaris has indeed observed the negotiation period. According to Prof. Schreuer, where this is the case, tribunals have found it unnecessary to rule on the legal nature of the requirement to negotiate[81].

118. In any event, it is Prof. Schreuer's opinion that, even though it is true that investors will often consent to arbitration in the request for arbitration, this does not mean that an investor cannot do so any earlier. Were it to decide to accept the State's offer at an earlier point in time, this would be the date on which consent would have been perfected.[82] Prof. Schreuer is not persuaded that the Luxembourg BIT is intended to preserve, at all costs, the investor right to choose the forum to which it will be submitting its complaint until after the six months of negotiations. Even more so when such right would disappear upon the State denouncing the Convention.[83]

119. The expert argues that Venezuela gave its consent to arbitration in the

---

[74] Reinisch I, para. 55.
[75] Reinisch I, para. 58.
[76] Reinisch I, para. 61.
[77] Reinisch I, paras. 50, 51.
[78] Opinion of June 10, 2014 ["**Schreuer I**"] and opinion of January 19, 2015 ["**Schreuer II**"].
[79] Schreuer I, para. 28.
[80] Schreuer I, para. 29.
[81] Schreuer I, para. 30.
[82] Schreuer I, para. 32.
[83] Schreuer II, para. 37.

Luxembourg BIT and that such offer could be accepted by the investor at any time;[84] the only thing that was subject to the observance of the negotiation period was the possibility of instituting arbitration[85] (the third step in Prof. Reinisch's terminology),[86] such that, if the negotiations ended in a settlement, the arbitration complaint could be avoided.[87]

120.   In this case, Tenaris accepted the arbitration offer by sending the Comsigua Notice on December 2, 2011, and it was then that consent to arbitration was perfected. Accordingly, by the time Venezuela denounced the Convention on January 24, 2012, consent had already been perfected. There is thus no obstacle to the Centre's jurisdiction.[88]

121.   Prof. Schreuer brings up one final argument: demanding that consent be perfected after the notice of dispute would do nothing but serve as an incentive for States to avoid being sued and thus sidestep the obligations they undertook upon executing the BIT by merely denouncing the Convention.[89]

### C.   The Arbitral Tribunal's Decision

122.   The jurisdiction of this Arbitral tribunal arises from the consent to ICSID arbitration expressed by both the State and the investor. Such consent is formalized via a two-phase process: the State first gives consent through the offer contained in the BIT, and it is the investor who then accepts that offer. The Parties are in disagreement as to whether the arbitration consent between the Venezuelan State and Tenaris was perfected before or after the State denounced the Convention.

The Bolivarian Republic

123.   Venezuela's consent is contained in Article 9.2 *in fine* of the Luxembourg BIT:

> "To this end, each Contracting Party shall give its irrevocable consent in advance to the submission of any dispute to such arbitration."

124.   Even though the word "*otorgará*" seems to point to consent being given in the future, the Parties have not brought into question the fact that, by ratifying the Luxembourg BIT, Venezuela actually gave its consent;[90] therefore, the above-quoted provision should be read in the present tense ("gives"). This conclusion is consistent with the French version of the Luxembourg BIT, which uses the term "*donne*"[91] (present tense). To avoid any doubts, it should be noted that, as per the final provision, negotiations were carried out in French.[92]

---

[84] Schreuer I, para. 50.
[85] Schreuer I, para. 51.
[86] Schreuer II, para. 38.
[87] Schreuer I, para. 50.
[88] Schreuer II, para. 95.
[89] Schreuer II, para. 42.
[90] CIII, para. 17; RII, para. 26.
[91] Art. 9.2 Luxembourg BIT (French version): "*À cette fin, chacune des Parties contractantes donne son consentement anticipé et irrévocable à ce que tout différend soit soumis à cet arbitrage.*"
[92] Final provision of the Luxembourg BIT: "Done in Brussels, on March 17, 1998, in three original copies, each one in the Spanish, French, and Dutch language, all three being equally authentic. In the event of discrepancies, there shall be taken into consideration the fact that negotiations were carried out in French."

Tenaris

125. In its Comsigua Notice of December 2, 2011, Tenaris accepted the State's arbitration offer and chose ICSID as the arbitration forum:[93]

> "To this end, the Applicants hereby express their consent to submit the Dispute to an international arbitration tribunal of the International Centre for Settlement of Investment Disputes (ICSID), pursuant to Article 9 of the Luxembourg Treaty [...]."

126. *Prima facie,* consent to arbitration was perfected on December 2, 2011: there was an offer by the State that was accepted by the investor, and such acceptance took place prior to the Denunciation.

Article 9.2 of the Luxembourg BIT

127. Prof. Reinisch, however, brings up a possible exception to this preliminary conclusion, which he bases upon the initial phrase of Article 9.2 of the Luxembourg BIT:

> "2. In the absence of an amicable settlement within six months from the date of notification of dispute, the dispute shall be submitted, at the investor's option, either to the competent jurisdiction of the State in which the investment was made or to international arbitration. [...]."

128. Both experts are in agreement that Article 9.2 sets a requirement: the investor must negotiate for six months as from the date of notice prior to submitting the dispute to the chosen forum ["**Pre-Condition**"].

129. The experts disagree as to the moment when the investor may choose an arbitration forum and thereby perfect consent to arbitration:

- According to Prof. Schreuer, the investor may opt at any moment, even before the Pre-Condition has been satisfied, because the Pre-Condition is merely a requirement for the admissibility of the complaint; this applied to the case at hand, it is Prof. Schreuer's opinion that the Comsigua Notice, where Tenaris chose arbitration, amounted to the valid perfection of consent to arbitration, as it took place prior to Denunciation.[94]

- Prof. Reinisch seems to acknowledge that Tenaris could not institute arbitration proceedings without first having attempted to negotiate for six months; but, according to the expert,[95] the Pre-Condition also affects consent to arbitration, since the investor may not opt for arbitration until the Pre-Condition has been met.[96]

130. This is about interpreting Article 9.2 of the Luxembourg BIT. Any BIT interpretation is governed by the Vienna Convention on the Law of Treaties

---

[93] Underlined by the Tribunal.
[94] Schreuer I, para. 95.
[95] Reinisch II, para. 46.
[96] Reinisch II, para. 9(e).

39

["**VCLT**"], whose relevance is accepted by both Parties, as its contents represent a compilation of customary international Law;[97] and, specifically, by Article 31 thereof. Said provision requires that any term of a treaty be interpreted in its context, in the light of its object and purpose, and in good faith:[98]

### a. Context

131. The Arbitral Tribunal must interpret the disputed paragraph of Article 9.2 within its context in the BIT.

The Requirements of Article 9

132. Article 9 of the Luxembourg BIT lays down four requirements to be met by an investor prior to filing a complaint:

- That the investor give notice of the existence of the dispute in writing, in a sufficiently detailed memorandum:

    "Any dispute between an investor and the other Contracting Party concerning the application of this Agreement shall be the subject of a written notification, accompanied by a sufficiently detailed memorandum, from the investor."

- That the Parties attempt to amicably resolve the dispute through negotiations:

    "As far as possible, the parties shall endeavor to settle the dispute amicably by negotiation, where necessary seeking expert advice from a third party by conciliation."

- That the investor chooses one of the two forums offered by the State – the ordinary jurisdiction of the host State or international arbitration – and that such choice be final:

    "the dispute shall be submitted, at the investor's option, either to the competent jurisdiction of the State in which the investment was made or to international arbitration. Once made, the choice shall be final." [

- That the investor not submit the dispute to the chosen forum before six months of negotiations, as from the date of the notice of dispute:

    "In the absence of an amicable settlement within six months from the date of notification of dispute, the dispute shall be submitted, at the investor's option, either to the competent jurisdiction of the State in which the investment was made or to international arbitration."

133. Prof. Reinisch is right in his statement that Article 9 of the Luxembourg BIT establishes the following *iter*:

---

[97] Reinisch I, para. 24; M. Villiger, "Commentary on the 1969 Vienna Convention on the Law of Treaties," (2009) 875; *Tokios Tokelés*, para. 27; *Noble Venture*, para. 50; *Mondev*, para. 43.
[98] "A treaty shall be interpreted in good faith in accordance with the ordinary meaning to be given to the terms of the treaty in their context and in the light of its object and purpose."

- First, notice of a dispute;

- Second, negotiations for at least six months (the "Pre-Condition");

- Third, submission of the dispute to arbitration, at the investor's discretion, once the Pre-Condition has been satisfied.

134. It is also true, however, that Article 9 of the Luxembourg BIT simplistically condenses into a mere three paragraphs a reality that is usually much more complex. And this was indeed so in the case at hand:

- The State did not first hear about the dispute upon receiving the Comsigua Notice in December 2011; in fact, Venezuela had already created a commission to negotiate the compensation owed to the Claimants back in October 2009,[99] and such negotiations had extended for the two years up to the Notice.

- In the Comsigua Notice, the investor did not just give its express consent, but it also exercised its option choosing ICSID arbitration.

- Following the Notice, negotiations extended for over six more months.[100]

- After that period, the investor filed the Request for Arbitration before its chosen forum.

135. Reality does not then track the normal *iter* provided for in Article 9 of the Luxembourg BIT. In the Comsigua Notice, Tenaris did not just give consent, but it also chose arbitration; and the question is then whether such was a valid choice or, on the contrary, the BIT only allows consent to be perfected and the choice made after the Pre-Condition has been satisfied.

The Correct Interpretation of Article 9.2

136. Article 9.2 of the BIT provides that, following the required notice that a dispute has arisen, a six-month period needs to elapse before the investor is allowed to submit the dispute to its forum of choice ("In the absence of an amicable settlement within six months from the date of notification of dispute, the dispute shall be submitted, at the investor's option, [to the courts or arbitration]"). However, the BIT does not include a prohibition keeping the investor from expressing its consent and choosing arbitration at the same time it gives notice of the dispute. There is no indication either that the negotiations are to be considered a condition precedent for consent to be effective. It is therefore preferable to read, by interpreting the BIT in its context, the investor as being authorized to simultaneously express its three statements of intention (notify the dispute, express its pure consent and choose ICSID arbitration).

137. Moreover, this interpretation is the only one that gives full meaning to the final phrase of Article 9.2: "once made, the choice shall be final." The phrase seems

---

[99] Exhibit R-46.
[100] See para. 96 *supra*.

41

to refer to an investor who decides to exercise its choice in advance, at the same time as it gives notice of the dispute: only in this case of advance exercise of the choice is it necessary for the provision to specify that the decision will be final.

### b.    Object and Purpose

138.  The second interpretation criterion proposed by Article 31 of the VCLT means that, when interpreting a treaty, the reading that is most consistent with the object and purpose the States had in mind when approving the treaty should prevail.

139.  Article 9 is intended to give investors a choice between two forums: the jurisdiction of the host State or international arbitration. The interpretation the Bolivarian Republic advocates for would mean that the investor could only make that choice and express its consent after giving notice of the existence of a dispute and negotiating for a period of six months – but not any earlier. Such an interpretation would hinder negotiations and foster surprising behavior: the State would be in the dark as to which forum has been selected by the investor until it is served with a complaint. On the other hand, the contrary interpretation serves the purpose of notifying the State of the selected forum and paving the way for subsequent negotiations.

### c.    Good Faith

140.  The third interpretation criterion gives prevalence to that treaty interpretation which best fits the requirements of good faith.

141.  The reading favored by Venezuela would postpone perfection of consent and incentivize the States' unfair behavior: it would allow them to, once they have been notified of a dispute and aware that the investor intends to submit the dispute to ICSID arbitration, denounce the Convention for the sole purpose of escaping their obligations.

142.  This last interpretation criterion also favors the treaty interpretation advocated for by the Claimants.

\* \* \*

143.  <u>To conclude</u>: by approving the Luxembourg BIT, the Bolivarian Republic expressed its "irrevocable consent in advance" to submit disputes with protected investors to international arbitration (including ICSID arbitration), provided, however, that such investors accepted the offer and chose arbitration. In the event of a dispute between an investor and Venezuela, Article 9 of the Luxembourg BIT (when correctly interpreted) allows the investor to express its consent in advance and, at the same time, opt for ICSID arbitration.

144.  On December 2, 2011, Tenaris sent Venezuela the Comsigua Notice, notifying it of the existence of a dispute, stating its consent to submit the dispute to arbitration, and choosing ICSID arbitration. This course of action was in line with Article 9 of the Luxembourg BIT and perfected the parties' intention to resolve their dispute through ICSID arbitration. Because the Notice predates the

Denunciation, which took place on January 24, 2012, consent was validly perfected before Venezuela decided to withdraw from the Treaty. After the Notice, Tenaris fulfilled its obligation to engage in negotiations for at least six months, and filed its Request for Arbitration once such period had expired.

### D.  Coda

145.  The experts for both Parties have cited many decisions discussing the pre-requirements to be satisfied by an investor prior to instituting arbitration proceedings. The issue debated in those decisions is whether their satisfaction is set up as an essential obligation the nonfulfillment of which entails the tribunal's lack of jurisdiction or, rather, it is framed as a mere procedural requirement that may be skipped by the investor.[101]

146.  The decisions in question are actually irrelevant because they do not address the issue that is fundamental in the case at hand: what is the effect of the Convention's denunciation during the negotiation period, when the investor, in notifying the dispute, had already given consent and exercised its choice, and, later on, observes the mandatory negotiation period and waits until it has expired to institute arbitration proceedings.

147.  The above notwithstanding, for the sake of an exhaustive discussion, the Arbitral Tribunal will analyze the main cases relied upon by the Respondent, which allegedly support its position that the State's consent to arbitration is subject to the observance of the negotiation period provided for in the treaty:[102]

148.  (i) The Respondent relies on two decisions (*Kılıç* and *Dede*), according to which the State's offer to arbitrate is conditional. In fact, they both refer to the requirement that, prior to filing an arbitration complaint, the investor exhaust its local remedies;[103] this conclusion cannot be extended to the prior negotiations requirement, as there are significant differences between the two: local courts are a forum alternative to and exclusive of arbitration, and it is understandable that a State should wish to ensure that its courts have been given a chance to resolve the dispute before giving its consent to international arbitration.

149.  (ii) The other two cases relied upon, which do indeed address the prior negotiations requirement (*Murphy* and *Burlington*), only mention that this requirement is not a procedural rule that may be sidestepped by the investor but, rather, it is an essential requirement that the claimant needs to satisfy before being allowed to file a request for arbitration with ICSID;[104] both decisions are

---

[101] By all, *Murphy*, para. 149.

[102] Reinisch I, paras. 56 *et seq.*

[103] *Kılıç*, para. 6.1.4. *Dede*, paras. 176, 188.

[104] *Murphy*, para. 149: "*This Tribunal finds the requirement that the parties should seek to resolve their dispute through consultation and negotiation for a six-month period does not constitute, as Claimant and some arbitral tribunals have stated, "a procedural rule" or a "directory and procedural" rule which can or cannot be satisfied by the concerned party. To the contrary, it constitutes a fundamental requirement that Claimant must comply with, compulsorily, before submitting a request for arbitration under the ICSID rules.*" *Burlington*, para. 49: "*[...] the requirement that the parties should seek for a six-month period does not constitute, as Claimant and some arbitral tribunals have stated, 'a procedural rule' or a 'directory and procedural' rule which can or cannot be satisfied by the concerned party. To the contrary, it constitutes a fundamental requirement that Claimant must comply with, compulsorily, before submitting a request for arbitration under the ICSID rules.*"

entirely irrelevant to the case at hand, where the investor did observe the six months of prior negotiations before instituting arbitration proceedings.

150. (iii) Lastly, Venezuela brings up a case (*Tulip*) where the tribunal finds that prior negotiations are an essential element of the Respondent State's consent to arbitration, and that observance of the negotiation period is a "pre-condition to the jurisdiction" of the tribunal.[105]

151. Even assuming that the interpretation in *Tulip* is the correct interpretation, it would lead to a conclusion that the Bolivarian Republic only agreed to submit disputes to arbitration subject to the condition precedent that, after notice of the dispute, the investor had negotiated for a period of six months. What the *Tulip* decision fails to address, however, is whether, if the condition precedent is satisfied (as was the case here, since the investor filed its request for arbitration once the negotiation period had expired), such fulfillment has *ex tunc* effects and, therefore, the effects of the State's consent should be deemed to apply as from the date it was originally given. Because this issue was not addressed in *Tulip*, that decision is not relevant to the instant case.

---

[105] *Tulip*, para. 72: "*a pre-condition to the jurisdiction of this Tribunal.*"

## 2. LACK OF AN EFFECTIVE SEAT

152. In order for a legal entity to qualify as an investor, the BITs impose certain requirements as to the location of its seat. Venezuela's second jurisdictional objection is that neither Tenaris nor Talta satisfy these requirements.

153. The issue is whether the BITs merely require that the investor have its "**Statutory Seat**" (meaning that its bylaws merely mention that the company's seat is in Luxembourg or Portugal) or they also require that it have its "**Effective Seat**" there (*i.e.* that its corporate organs *de facto* manage the company's business from the territory of Luxembourg or Portugal):

   - It is the Respondent's view that the BITs require an Effective Seat; it maintains that both companies have their effective seat in Argentina;

   - On the other hand, the Claimants argue that their Effective Seat is the same as their Statutory Seat and, in any event, it is located in Luxembourg and Portugal.

154. Article 1(b) of the Luxembourg BIT provides as follows:[106]

   "The term "investors" means:

   [...] b) companies, that is to say, any legal entity organized in accordance with the laws of the Republic of Venezuela, the Kingdom of Belgium or the Grand Duchy of Luxembourg and <u>having its seat</u> in the territory of the Republic of Venezuela, the Kingdom of Belgium or the Grand Duchy of <u>Luxembourg</u>, respectively [...]."

155. The case with the Portuguese BIT is similar. Article I(1)(b) reads:[107]

   "The term 'investor' means:

   [...] b) Legal entities, including commercial companies and other companies and associations that <u>have their seat</u> in one of the Contracting Parties and are organized and operate in accordance with the law of that Contracting Party."

## 2
### 2.1 THE PARTIES' POSITION

156. The parties have submitted reports by experts in both Luxembourg Law and Portuguese Law regarding the subject of the seat:

   - For Luxembourg Law, Tenaris has submitted a legal opinion by Prof. André Prüm, of the University of Luxembourg,[108] and the Bolivarian Republic has requested Prof. Alain Steichen, also of the University of Luxembourg, to prepare two legal opinions;[109]

---

[106] Underlined by the Tribunal.
[107] Underlined by the Tribunal.
[108] Opinion of January 23, 2015 ["**Prüm**"], para. 1.
[109] Opinion of October 17, 2014 ["**Steichen I**"], and opinion of April 13, 2015 ["**Steichen II**"].

45

- For Portuguese Law, the Claimants' expert is Prof. Dário Moura Vicente, of the University of Lisbon,[110] and the Respondent has submitted two opinions, by Profs. Pedro Maia and Tiago Duarte, of the University of Coimbra and the New University of Lisbon, respectively.[111]

Venezuela's Position

157. According to Venezuela and its expert's opinion, the term "*sede social*" in Spanish or "*siège social*" in French should be interpreted in accordance with domestic Law. As per the Law of Luxembourg, *sede social* is to be an Effective Seat (or real seat)[112] and it corresponds with the central administration of the company.[113] And, as per Portuguese Law, "*sede*" corresponds with the Effective Seat, which is the place where the "brains" of the company are located.[114]

158. The Respondent contends that Tenaris has failed to establish that, on the date when the dispute arose – November 2009 – it had its Effective Seat in Luxembourg,[115] which would disqualify it as a protected investor under the Luxembourg BIT; and that Talta has also failed to establish that it had its Effective Seat in Portugal,[116] and it would thus not be a protected investor under the Portuguese BIT.[117]

159. In Venezuela's opinion, the Effective Seat, or real seat, of Tenaris is located in Argentina:[118]

- A quick Internet search reveals that Tenaris is the holding company for the Italian-Argentine Techint group, which is managed from Argentina;[119]

- Several directors of Tenaris reside in Argentina, and it is thus impossible for them to be making actual shareholder and Board decisions from Luxembourg;[120]

- The Argentine Republic espoused Tenaris' interests in an anti-dumping case before the WTO.[121]

160. Talta is also alleged to have its Effective Seat in Argentina, as it is there that several of its board members reside.[122]

The Claimants' Position

---

[110] Opinion of January 27, 2015 ["**Moura Vicente**"], para. 3.
[111] Opinion of October 17, 2014 ["**Maia/Duarte I**"], and opinion of April 13, 2015 ["**Maia/Duarte II**"].
[112] RV, para. 56; T., p. 1275:3–9.
[113] RIV, para. 196. RII, para. 227.
[114] RIV, para. 196; RII, para. 225.
[115] RV, para. 62.
[116] RV, para. 81.
[117] RV, paras. 77 *et seq*.
[118] RI, para. 39; RIV, paras. 231-234; RV, paras. 93 *et seq*.; T., pp. 131–133. RV, para. 93.
[119] RI, p. 38.
[120] RV, para. 94; Exhibit R-113.
[121] The Respondent explains that, in order for the State of Argentina to decide to take up the claim and go to the WTO, there needs to exist a nationality connection between the private party and the State, RIV, paras. 231-234.
[122] RV, para. 94; Exhibit R-113.

161. Venezuela's argument that the term "*siège social*" or "*sede*" is to be interpreted in the light of domestic Law is, in the Claimants' opinion, entirely nonsensical. Because the terms are found in BITs, they are to be interpreted under international Law and the rules of the VCLT.[123] This interpretation leads to the conclusion that "*siège social*" and "*sede*" are synonymous with "Statutory Seat" or "registered office."[124] According to the articles of association of Tenaris and Talta, such seat is located in the cities of Luxembourg[125] and Funchal,[126] respectively.

162. But, even agreeing that the seat requirement is to be interpreted in the light of domestic Law, the answer would be the same:

163. (i) Under Luxembourg Law, "*siège social*" is equal to real seat, which is *iuris tantum* presumed to be the registered office, or Statutory Seat.[127] It is thus up to Venezuela to knock this presumption down and establish that Tenaris' effective seat is located elsewhere – which it has not managed to do because the real or Effective Seat of Tenaris is in Luxembourg:

- The only office Tenaris has anywhere in the world is a 905m$^2$ floor space at 29 on Avenue de la Porte-Neuve in Luxembourg,[128] as stated on Tenaris' official website;[129]

---

[123] T., p. 141:11–12; CIV, paras. 129, 155; CV, para. 148. RV, paras. 164-168.

[124] T., p. 141:13–15, CIV, paras. 136, 152-154; CV, para. 147.

[125] Tenaris S.A.'s Articles of Association, May 2, 2012, Exhibit C-197, pp. 2-1.

[126] CIV, para. 187.

[127] Luxembourg Company Law, Exhibit AP-6, Article 2(3); CIV, paras. 165-166; Prüm, paras. 35-41; T., p. 1358:1-4.

[128] The extract of the Luxembourg Registry of Commerce for Tenaris uses the same words as the Luxembourg BIT, stating that its "*siège social*" is located at 29 Avenue de la Porte-Neuve, Luxembourg. H 1, slide 114; CV, para. 150; Commercial Lease Agreement between Continental Real Estate Company and Ternium Investments S.à.r.l., October 1, 2010, Exhibit R-61, p. 2; Sublease Agreement between Ternium Investments Sàrl and Tenaris Investments Sàrl, December 6, 2010, Exhibit R-62, pp. 3, 8. Before 2011, Tenaris leased office space at its previous "*siège social*" in Luxembourg, at Avenue John F. Kennedy; Rent and Service Agreement between ATEAC Luxembourg and Tenaris, September 29, 2004, Exhibit C-159.

[129] Tenaris' website, Exhibit C-209; letter from Tenaris to the SEC, October 1, 2010, CRED-61; power of attorney granted by Tenaris, August 8, 2010, Exhibit C-121; Form 20-F for 2010 by Tenaris, Exhibit C-200.

-   Tenaris' shareholder meetings and board meetings are held at its Luxembourg office[130] and Tenaris' accounts are audited by PWC in Luxembourg.[131]

164. (ii) <u>Under Portuguese Law</u>, seat means "Effective Seat," which is the Statutory Seat, unless otherwise proven.[132] Venezuela has not established that Talta has its Effective Seat outside of Portugal, since, as a matter of fact, all relevant factors to determine its Effective Seat point to Portugal:[133]

-   Its managing bodies meet in Portugal;

-   Its ordinary day-to-day management takes place in Portugal;

-   Talta's contact data as provided by it to third parties feature Portugal;

-   Talta's corporate books are kept in Portugal.

## 2.2 DECISION OF THE ARBITRAL TRIBUNAL

165. In order for an ICSID tribunal to have *ratione personae* jurisdiction, it is necessary for the requirements laid down in Article 25 of the Convention and those established in the relevant BIT to be cumulatively satisfied. In the words of the *Phoenix* tribunal:[134]

> "*At the outset, it should be noted that BITs, which are bilateral arrangements between two States parties, cannot contradict the definition of the ICSID Convention. In other words, they can confirm the ICSID notion or restrict it, but they cannot expand it in order to have access to ICSID. A definition included in a BIT being based on a test agreed between two States cannot set aside the definition of the ICSID Convention, which is a multilateral agreement. As long as it fits within the ICSID notion, the BIT definition is acceptable, it is not if it falls outside of such definition.*"

<u>The ICSID Convention</u>

166. Article 25 of the ICSID Convention governs the jurisdiction of the Centre and provides as follows:

> "(1) The jurisdiction of the Centre shall extend to any legal dispute arising directly out of an investment, between a Contracting State [...] and a national of another Contracting State [...].
>
> (2) "National of another Contracting State" means:
>
> [...]

---

[130] Minutes of Tenaris S.A.'s Ordinary Board of Directors Meeting, Exhibit C-193; Minutes of Tenaris S.A.'s Annual Shareholders' Meeting, Exhibit C-196; T., pp. 503:14–504:15; 218:13–19; Exhibit C-208, T., pp. 2150:18–2150:20; 2152–2153; 2054:1–2054:20.

[131] Extract of the Luxembourg Registry of Commerce and Corporations for Tenaris, May 23, 2012, Exhibit C-6, p. 5; Minutes of Tenaris S.A.'s Annual Shareholders' Meeting, Exhibit C-196, pp. 6-7.

[132] Decision of the Court of Appeals of Porto, March 25, 2010, DMV-22.

[133] CIV, paras. 189, 191; RV, paras. 161-163; CV, p. 379.

[134] *Phoenix*, para. 96.

(b) Any juridical person which had the nationality of a Contracting State other than the State party to the dispute on the date on which the parties consented to submit such dispute to conciliation or arbitration […].

167. This provision thus bases the jurisdiction of ICSID tribunals on a <u>nationality</u> test: where the investor is a legal entity, as is the case here, its nationality needs to be different from that of the respondent State.[135] States are free to add additional requirements (not, however, to impose lesser requirements). The Convention thus uses nationality as a jurisdiction attribution factor.

168. In the instant case, neither Party has brought into question the fact that Tenaris and Talta have a nationality different from that of the Respondent and that Article 25 of the Convention has thus been complied with.

<u>The BITs</u>

169. Each of the BITs includes rules that are relevant to establish the Tribunal's *ratione personae* jurisdiction:

170. Article 1(b) of the Luxembourg BIT provides:

"The term 'investors' means: […]

b) companies, that is to say, any legal entity organized in accordance with the laws of the Republic of Venezuela, the Kingdom of Belgium or the Grand Duchy of Luxembourg and <u>having its seat</u> in the territory of the Republic of Venezuela, the Kingdom of Belgium or the Grand Duchy of <u>Luxembourg</u>, respectively […]."

171. And Article I(1)(b) of the Portuguese BIT confirms:

"The term 'investor' means: […]

b) Legal entities, including commercial companies and other companies and associations that <u>have their seat</u> in one of the Contracting Parties and are organized and operate in accordance with the law of that Contracting Party."

172. The Parties are in disagreement as to whether the BITS merely require that the investor companies have their Statutory Seat in Luxembourg or Portugal (a legal requirement: the mere mention in the bylaws that the company's domicile is in that country, which is very clearly satisfied) or that they have their Effective Seat there (a factual requirement: the company's organs must manage the company's business from the territory of Luxembourg or Portugal):

- It is the Respondent's view that the BITs require an Effective Seat, and it argues that both companies have theirs in Argentina (not Luxembourg or Portugal);[136]

- On the other hand, the Claimants argue that their Effective Seat matches

---

[135] With the exception, pursuant to Article 25(2)(b) *in fine*, that the contracting parties have extended jurisdiction to legal entities subject to "foreign control."
[136] RIV, paras. 231, 234.

49

their Statutory Seat and, in any event, they are located in Luxembourg and Portugal.[137]

173. From a theoretical standpoint, the Tribunal will side with the Bolivarian Republic: it will arrive at the conclusion that the BITs require that the companies' Effective Seat (rather than just their Statutory Seat) be located in Luxembourg or Portugal (**A.**).

174. This theoretical conclusion having been established, the Tribunal will next analyze and assess the evidence provided by the Parties, and will find for the Claimants: Tenaris and Talta actually have their respective Effective Seats in Luxembourg and Portugal, as required by the applicable rules (**B.-E.**).

## A.  **The BITs require an Effective Seat**

175. The BITs use terms different from those used in Article 25 of the Convention: instead of referring to different nationalities, they focus on the cumulative satisfaction of two requirements:

- The Luxembourg BIT requires that the claimant be a legal entity "organized in accordance with the laws of the Grand Duchy of Luxembourg" and "having its seat in the territory of the Grand Duchy of Luxembourg"; while

- The Portuguese BIT requires (in virtually identical terms) that the claimant be "organized and operate in accordance with the Law" of Portugal and "have its seat" in Portugal.

### The Organization Requirement

176. The first requirement is then that the claimant companies "be organized" in accordance with the domestic law.[138]

177. Neither Party has questioned that Tenaris is organized in accordance with the law of Luxembourg, and Talta is organized in accordance with the law of Portugal. The requirement is then considered satisfied.

### The Seat Requirement

178. However, the BITs do not just require that the Claimants be organized in accordance with the domestic Law; they add, *expressis verbis,* a second requirement: that the "*sede*" of the legal entity be located in Portugal or Luxembourg.

179. Tenaris' bylaws state that the company's "*siège social*" is located in Luxembourg, and Talta's state that its *sede social* is located in Funchal. The respective provisions read:

---

[137] CIV, paras. 126 *et seq.*
[138] The Portuguese BIT adds "and operate," but this additional specification is redundant, as a company's operation is governed by the same legal system as its organization.

> *"Le siège social est établi à Luxembourg-Ville."*[139]

> *"A sociedade tem a sede social na Rua da Alfândega, número setenta e quarto – setenta e seis, segundo andar, sala H, freguesia da Sé, concelho do Funchal."*[140]

180. However, the BITs require that the "seat" be located in Portugal or Luxembourg, which brings up the question whether the Treaty is referring to the Statutory Seat or the Effective Seat (**b.**). Before delving into this question, however, it is first necessary to clarify the concepts of "seat, "Statutory Seat," and "Effective Seat" under international Law (**a.**).

### a.  "Seat," "Statutory Seat," and "Effective Seat" under International Law

181. International Law does not have its own concept of "seat," let alone "Statutory Seat" or "Effective Seat." This terminology was developed within the various domestic Law systems, and it was only later on that it was brought into the realm of international Law. Therefore, in order to give the term some content, we need to resort to the generally-accepted rules under the different domestic legal systems (in the words of the International Court of Justice in *Barcelona Traction*)[141] or the "general principles of law recognized by civilized nations" (which are a source of international law under Article 38 of the Statute of the International Court of Justice).

182. In the Tribunal's opinion, these rules are not overly broad and come down to:

- The acknowledgment that there really is a difference between Statutory Seat and Effective Seat; domestic law systems generally distinguish the two concepts, even though they do not always attribute the same legal consequences to the existence of either one or the other type of Seat within their territory;

---

[139] Exhibit C-197.
[140] Exhibit C-186.
[141] *Barcelona Traction*, para. 50: *"It is to rules generally accepted by municipal legal systems which recognize the limited company whose capital is represented by shares, and not to the municipal law of a particular State, that international law refers."*

- The principle that, upon a company being organized, only its Statutory seat is known, as it is the one stated on the company's bylaws (since the company will not yet have started its business operations from its Effective Seat), and

- The conclusion that the Effective Seat matches the place where, in factual terms, the company's administration takes place.[142]

**b.    The Correct Interpretation of the BITs**

183.  The BITs refer to "seat," without specifying whether it means the investor's Statutory Seat or its Effective Seat.

184.  The practice when it comes to this issue in international investment treaties is varied. Certain treaties only require that the company that expects to enjoy the treaty's protection have been organized in accordance with the law of their national State.[143] On the contrary, other treaties establish additional requirements. An extreme case, for instance, is Article 1(1)(b) of the Treaty between Switzerland and the Slovak Republic,[144] which adds a two-fold requirement:

> *"legal entities [ ... ] which are constituted or otherwise duly organized under the law of that Contracting Party and have their seat, together with real economic activities, in the territory of that same Contracting Party."*

185.  The BITs between the Bolivarian Republic and Luxembourg and Portugal, respectively, take a middle-of-the-road position: they do not merely require that the companies be organized in accordance with domestic Law, but also require that the companies have their "seat" in that State. How is the concept of "seat" to be interpreted?

186.  The BITs are international treaties and are to be interpreted in accordance with the rules of international Law. Moreover, the BITs do not include a *renvoi* for the terms "*sede*" and "*siege social*" (as opposed to the organization requirement), which reinforces the conclusion that the applicable interpretation criteria should be those of international Law.

187.  Article 31 of the VCLT orders that a treaty

> "be interpreted in good faith in accordance with the ordinary meaning to be given to the terms of the treaty in their context and in the light of its object and purpose."

188.  The VCLT establishes three interpretation criteria:

---

[142] UNCTAD Series on issues in International Investment agreements, UNCTAD/ITE/IIT/11 (Vol. II), 1999, RLA 5 p. 39: *"The seat of a company may not be as easy to determine as the country of organization, but it does reflect a more significant economic relationship between the company and the country of nationality. Generally speaking, "seat of a company" connotes the place where effective management takes place."*
[143] For instance, the BITs signed by the Bolivarian Republic of Venezuela with the United Kingdom, of August 1, 1996 (Article 1(d)); with Canada, of July 1, 1996 (Article 1(g)), with Italy, of June 1990 (Article 1(2)(b)), among others.
[144] Which was the basis for the *Alps Finance* case, mentioned by the parties.

- The ordinary meaning of terms: the first interpretation criterion set forth in this provision is of little use here, since the concept of "seat" has several ordinary meanings, including, precisely, those of Statutory Seat and Effective Seat.

- Context: the "seat" requirement is preceded by a previous requirement, *i.e.* the "organization" requirement; a company intending to secure the BIT's protection must not just be organized in accordance with the relevant domestic Law but also have its seat in that State. The "seat" requirement is to be interpreted having regard to the fact that it is included in addition to the "organization" requirement.

- Object and purpose: this principle is closely connected to the *effet utile* principle,[145] the interpretation principle that requires that priority be given to that interpretation which gives meaning to each of the words used in the treaty over any other interpretation that would leave a word without application.[146]

189. Applying the last two interpretation principles, and in the light of the rules of international Law on the concept of seat – set out above, the necessary conclusion is that the concept of "seat" in the BITs cannot just refer to the Statutory Seat, in a formal sense, but must refer to the Effective Seat, the place where the company's corporate activity is really centralized. A failure to adopt this interpretation would render the BITs' requirement of a "seat" in addition to the place of "organization" superfluous: any company organized in Luxembourg or Portugal is legally required to have their bylaws state that its Statutory Seat is located in the respective territory. It is only by reading the BITs as referring the Effective Seat of the investor company that the term "seat" has its own meaning.

* * *

190. To sum up, the Tribunal concludes that, irrespective of the terminology used and the inaccuracies in the translation of these concepts, the references to *"sede"* (or *"siège social"*) in the BITs are to be read as references to the Effective Seats of the investor companies, the places where their corporate business is *de facto* managed.

---

[145] Which requires that Treaties be interpreted *"so as to give them their fullest weight and effect consistent with the normal sense of the words and with other parts of the text and in such a way that a reason and a meaning can be attributed to every part of the text."* Gardiner: *Treaty Interpretation*, Oxford University 2008, p. 149.
[146] Cassese, A.: *International Law*, Oxford University 2002, p. 143.

### B. **Effective Seat Determining Factors**

191. The conclusion that the reference to a "seat" in the BITs is a reference to their Effective Seat having been established, there is still the *quaestio vexata* to be answered: what does Effective Seat mean?

192. As already noted, international Law does not have its own concept of "Effective Seat." To give the term content, it is not the domestic Law of a given jurisdiction that must be resorted to but the generally-accepted rules under the various municipal legal systems that must be used.[147] To do this, the Tribunal must recognize special relevance to the municipal legal systems that are more closely related to the case at hand: Luxembourg and Portuguese Law.

193. The experts in Luxembourg and Portuguese Law brought in by both Parties are in agreement that there are three factors in the two legal systems that define a company's Effective Seat:[148]

- The place where shareholder meetings and board meetings are carried out;[149] the place where they are held is relevant;

- The place where management tasks take place, the place where the company has contact with its clients,[150] where it signs its main contracts, and where its financial activities are carried out;

- The place where the company's books are kept and deposited;

194. Next, the Arbitral Tribunal will analyze the evidence produced by each Party in support of the Effective Seat of each Claimant.

### C. **The Claimants' Evidence**

195. The Claimants have produced the following evidence to establish that the Effective Seats of Tenaris and Talta are located in Luxembourg and Portugal, respectively:

### a. **Meeting of Management Organs**

196. As per Tenaris' bylaws, its annual shareholders' meeting is to be held in Luxembourg.[151] It has been established that, at the time Tenaris consented to arbitration, in 2009, and filed its Request for Arbitration, in 2012, Tenaris held its annual shareholders' meeting in Luxembourg, which is also its registered office, and it was also there that all meetings were held in the interim period.[152]

---

[147] See para. 181 *supra*.
[148] Steichen I, para. 21; Prüm, para. 44.
[149] Moura Vicente, para. 21.
[150] Maia/Duarte I, para. 121.
[151] Exhibit C-197, Article 15.
[152] CVI, Annex D.

197. As to Talta, it has filed minutes and extracts of decisions made at the meetings of its sole member (Tenaris), all of them held at its statutory seat in Madeira.[153]

198. As regards Board meetings, between 2009 and 2012, Tenaris has established that:

- 22 meetings[154] were held by telephone, as allowed under the law of Luxembourg, pursuant to which they are deemed to have been held in Luxembourg, its statutory seat;[155]

- 14 meetings[156] were held in person, eight of which were held in Luxembourg, with the remainder held in Mexico, Argentina, the U.S. or Italy – which, as explained by the Claimants, were the countries were Tenaris' stock was listed and where most of its subsidiaries' business was concentrated.[157]

199. Talta has also submitted minutes of the meetings of its *Conselho de Gerência*, always held in Madeira.[158]

### b. Place of Business Management

200. As per the lease agreements, between 2004 and 2011, Tenaris leased office space in a business center on Avenue John F. Kennedy, Luxembourg;[159] since then, it has rented (and shares with another four subsidiaries) a 905 m$^2$ office space on Avenue de la Porte Neuve, in the City of Luxembourg, for close to EUR 34,000 in monthly rent.[160] Tenaris has stated it has no other office, other than its Luxembourg office, anywhere in the world.[161]

201. Talta has also demonstrated it leases space office[162] with the right to use a meeting room[163] for a monthly sum of EUR 875. It has also established that, of its four managers, two reside in Portugal and that binding Talta requires the signature of two managers, with at least one of them being Portuguese.[164]

---

[153] CVI, Annex B. Exhibit C-195.
[154] CVI, Annex C, pp. 5, 7, 9, 13, 17, 21, 25, 29, 31, 37, 41, 45, 49, 53, 55, 59, 61, 63, 65, 67, 69, 73.
[155] CVI, para. 22, Annex C. Prüm, para. 44.
[156] CVI, Annex C, pp. 1, 3, 11, 15, 19, 23, 27, 33, 35, 39, 43, 47, 51, 71.
[157] CVI, para. 22.
[158] CVI, Annex A, Exhibit C-194.
[159] Exhibit C-159.
[160] Exhibit R-61.
[161] CV, para. 150.
[162] Exhibit R-29.
[163] Exhibit R-49.
[164] Moura Vicente, para. 46. CIV, para. 191.

202. The letterhead on Tenaris' letters[165] and its website[166] use the statutory seat as contact information; the same is true of Talta.[167]

### c. Book-Keeping

203. Tenaris is on record with the Registry of Commerce of Luxembourg,[168] and its accounts are audited by PwC in Luxembourg.[169] Talta is registered with the *Registro Mercantil da Zona Franca de Madeira*, and the certificate issued by said registry's *Escriturário Superior* de la *Conservatória*[170] lists Talta's every entry from the time of its organization in 2003 up to the issue of the certificate in 2012, including appointments and removals of *gerentes*, the audit and deposit of its annual accounts, and the change of its physical seat to another site in Madeira.

### D. The Respondent's Evidence

204. On the other hand, the Respondent argues that the Claimants have their Effective Seat in Argentina, because:

- Argentina espoused the interests of Tenaris in an anti-dumping case before the WTO, which points to the existence of a significant connection between the Claimants and Argentina;[171]

- Most of Tenaris' employees are in Argentina;[172]

- Tenaris' President and CEO resides in Argentina, as do most members of its Executive Group and several members of its Board of Directors;[173]

- Two managers of Talta reside in Argentina.[174]

205. In Venezuela's opinion, the above facts point to the companies' Effective Seats being in Argentina; however, the Respondent has failed to submit any evidence that no activity at all is performed at the Statutory Seats.

206. As to the Claimants' evidence, the Bolivarian Republic argues that, far from proving that the members of Tenaris' Board physically met in Luxembourg,[175] such evidence rather establishes that most of the Board meetings took place outside of Luxembourg.[176]

---

[165] Exhibit C-121.
[166] Exhibit C-209.
[167] Exhibit C-120.
[168] Exhibit C-6.
[169] Exhibit C-6, p. 5.
[170] Exhibit C-8.
[171] RIV, para. 233.
[172] RIV, para. 249.
[173] RIV, para. 249.
[174] RV, para. 81.
[175] RVII, para. 28.
[176] RVII, para. 26.

E.    **Assessment of the Evidence**

207.  The Arbitral Tribunal has reviewed the evidence accompanying the experts' reports and is of the opinion that Portuguese Law does create a presumption that the Effective Seat matches the Statutory Seat. So is stated by Prof. Pinheiro,[177] whose opinion has been relied upon by both Parties' experts:[178]

> "Because the statutory seat is usually located in the country of organization, this means that, as regards these legal entities, the seat doctrine determines that, in principle, the place of the statutory seat and the place of the seat of administration match. This warrants a presumption that the company has the seat of its administration in the State of its statutory seat. Applying this presumption, in the absence of proof that the seat of administration is in a different State, the Law of the statutory seat applies."

208.  The above said, the Tribunal has carefully analyzed and assessed the evidence provided by the Parties and concludes that it is not persuaded that Tenaris and Talta have its Effective Seat in Argentina, and it is its view that their Effective Seats match their Statutory Seats:

a.    **Meeting of Management Organs**

209.  There is no evidence that Tenaris' and Talta's management organs run the companies from Argentina:

210.  Tenaris has submitted minutes that show that its shareholder meetings were held in Luxembourg,[179] and Talta, that its sole member held the meetings in Portugal; as to their Boards:

-     In the four years between consent to arbitration and the Request for Arbitration, Tenaris' Board met 22 times via teleconference, 14 times physically; of these 14, 8 meetings were held in Luxembourg, 2 in Mexico and 1 in Argentina and 1 in the U.S.;[180] the evidence that links Argentina to Tenaris' Board meetings is minimal; the preponderance of the evidence points to the meetings being held in Luxembourg.

-     Talta's Board always met in Portugal; there is no evidence pointing to a different place other than Portugal, as the effective seat of Talta's management.

211.  Even though the Respondent argues that the President and CEO of Tenaris, Paulo Rocca, and other members of Tenaris' Board reside in Argentina, there is no evidence that the Board's decisions are made there, given the evidence that the Board's meetings took place mostly in Luxembourg, and that Mr. Rocca was present at all such meetings; in fact, the only three members that have ever participated in a meeting by teleconference are Messrs. Serra Puche,[181] Vogel[182]

---

[177] MD-24. Luís de Lima Pinheiro, *Direito internacional privado*, vol. II, *Direito de conflitos. Parte especial* (3° ed., Almedina, Coimbra, 2009), p. 135.
[178] MD-24; Moura Vicente, footnote 20.
[179] CVI, Annex D.
[180] See para. 198 *supra*.
[181] CVI, Annex C, pp. 1, 15, 71.

and Monti,[182] the former two being Mexican nationals and holding relevant offices in other Mexican companies, and joining the conference from Mexico, and Mr. Monti, who joined in from Italy.

212. Venezuela has also stated that the holding of Board meetings in ways other than by physical presence would in itself be an indication that Tenaris' administration was not being run from Luxembourg. The Arbitral Tribunal disagrees. The Respondent's own legal expert has acknowledged the validity of meetings held via telecommunication, under the law of Luxembourg.[184] And such domestic legal system applies a presumption that meetings held by telecommunication are deemed to have been held at the statutory seat.[185]

213. Even if this were not so, however, there is no evidence that would link Tenaris' actual administration precisely to Argentina.

214. And, as far as Talta is concerned, its bylaws require that all decisions binding the company be made by at least one of its two Portuguese managers – there is then no indication either that its decisions were made in Argentina.

**b.    Place of Business Management**

(i)    Offices

215. There is no evidence that Tenaris or Talta occupy offices in Argentina, and there is evidence that they do so in Luxembourg and Portugal, respectively, as shown by the lease agreements.

216. However, Venezuela has called the relevance of the submitted evidence into question: the Republic notes that Tenaris' lease agreement was signed under the name of Ternium, with which Tenaris shares office space, and the 905 m$^2$ of leased space would be insufficient for a company the size of Tenaris.[186] As to Talta, Venezuela calls attention to the small size of the rented space and small number of hired staff.[187]

---

[182] CVI, Annex C, p. 15.
[183] CVI, Annex C, p. 35.
[184] Steichen II, p. 16.
[185] Article 64(bis)(3) of the Law of August 25, 2006 (AP-20): "A meeting held remotely by way of such means of communication shall be deemed to have been held at the seat of the company." [English translation.]
[186] RV, para. 64.
[187] RV, para. 81.

217. None of these arguments is persuasive:

   - Tenaris and Ternium are two related companies (as Tenaris holds a 11.46% interest in Ternium),[188] both share the same 905 m$^2$ office space, which Ternium has partially subleased to the Tenaris group;[189] that the lease agreement is formally in Ternium's name, and that Tenaris Investment S.à.r.l. – a wholly-owned subsidiary of Tenaris[190] - acts as the sub-lessee does not undermine the conclusion that Tenaris' effective seat is in Luxembourg and matches its statutory seat.

   - Talta is a holding company – as will be discussed below – and this is compatible with a small office space and a small number of staff.

   (ii)   Employees

218. The Respondent argues that most of Tenaris' employees are in Argentina.[191]

219. This argument is weak, as the (many) Argentine workers are hired by Siderca, an Argentine subsidiary of Tenaris, not by Tenaris itself.[192] The fact that a subsidiary with its own legal-entity standing, located in Argentina, has a large number of employees is irrelevant for the purposes of determining where its parent company's Effective Seat is located.

   (iii)   Business Activity

220. There is no evidence either that the business activity of Tenaris and Talta and their relations with their clients are run from Argentina. Both companies are holding companies and, as such, they manage their shareholding portfolio, but do not carry out business activities with clients. In their public information, both companies provide their Statutory Seat as contact information.

221. In particular, the Arbitral Tribunal disagrees with Respondent's expert Prof. Maia, who contends that Talta is not a holding company but a company engaged in iron trade. The expert bases his opinion on two incorrect arguments:[193]

222. (i) In the *relatório* of the business carried out in 2012, Talta states that its

---

[188] T., p. 603.
[189] Exhibit R-62.
[190] Exhibit C-200, p. 56.
[191] RIV, para. 249.
[192] CV, para. 157.
[193] T., pp. 1437 *et seq*.

"normal business is related to the trade of iron, residue, and hot-briquetted iron."[194]

223. However, the expert fails to take into consideration the fact that the *relatório* also states that Talta holds interests in eight companies[195] – all of them apparently related to the iron and steel industry – and that its sales are the result of brokerage in the purchase of goods between companies in the group.[196] This confirms that the company is a holding company engaged in iron trade through its investee companies.

224. (ii) In its registration certificate[197] Talta is categorized under the business code for purchase and trade of minerals and iron, whereas a holding company would appear under a different code; moreover, in order to be a holding company, it should be subject to the special regime of Decree-Law 2012/94.[198]

225. It is possible, as noted by the expert, that Talta does not meet the requirements set by Portuguese law in order to be registered as a holding company under Decree-Law 2012/94, but this is actually not the point: the point here is not to determine whether Talta has been formally registered as a holding company, but to verify whether it carries out business activities vis-à-vis third parties at a place other than its Statutory Seat. And the evidence on the record shows that Talta's business is limited to the holding of interests in other companies and a brokerage role in the purchase of goods between its investee companies, and there is no proof that these activities were performed outside its Statutory Seat.

(iv)  Management

226. Venezuela stresses the fact that two of Talta's managers reside in Argentina.[199]

227. This is true. Talta has a Board consisting of four *gerentes*, two of whom are registered as residing in Argentina, while the other two reside in Portugal.[200] Those residing in Argentina are Group A managers, and the Portuguese managers are Group B managers. In order to bind Talta, the joint signature of one Group A and one Group B manager is required.[201] Therefore, the Arbitral Tribunal finds no indication that would point to the Effective Seat being in Argentina, rather than Portugal.

---

[194] Exhibit C-202. [English translation.]
[195] Dalmine S.p.A., Filettature Attrezzature Speciali Tubolari (FAST) S.r.L, Siprofer AG, Silcotub S.A., Energy Network S.r.L, Tenaris Qingdao Steel Pipes, Ltd, and Tenaris Qingdao Trading Limited.
[196] "[...] brokerage in the purchase of goods is carried out with related companies [...]," "[...] more than 99% of its trade receivables come from related companies."
[197] Exhibit C-8.
[198] T., p. 1446 (Maia).
[199] RV, para. 81.
[200] Exhibit C-8.
[201] Exhibit C-8, p. 7: "Form of obligation: by joint signature of Group A Manager and one Group B Manager."

(v)    Underline{Contact Information}

228.   In addition, in their relations with third parties, both Tenaris and Talta provide their offices in Luxembourg and Portugal as contact information.[202] The Respondent has not provided any evidence that shows that contact with third parties takes place in Argentina.

**c.    Company's Books**

229.   It is undisputed that Tenaris' and Talta's accounts are audited by Luxembourg and Portuguese companies, respectively. As regards Talta's accounts, as per its registration certificate, they are published on and deposited with the *Registro Mercantil da Zona Franca de Madeira*.[203]

* * *

230.   The Arbitral Tribunal concludes that it has not been established that Tenaris and Talta have their Effective Seats in Argentina; rather, the evidence points to their Effective Seats being in Luxembourg and Portugal, respectively, and, therefore, the Tribunal dismisses the objection to its *ratione personae* jurisdiction raised by the Bolivarian Republic.

---

[202] Exhibits C-120, 121, 209.
[203] Exhibit C-8.

3. **DEFECTS IN THE TAVSA NOTICE**

231. Article 9.1 of the Luxembourg BIT requires that:

> "Any dispute between an investor and the other Contracting Party concerning the application of this Agreement shall be the subject of a written notification, accompanied by a sufficiently detailed memorandum, from the investor."

232. As its last objection, Venezuela contends that the Arbitral Tribunal has no jurisdiction over the claims for the alleged breaches of the obligation to confer fair and equitable treatment to investments in connection with Tavsa, as this claim was not included in the Tavsa Notice, as required by Article 9.1 of the Luxembourg BIT.[204]

233. This argument need not be analyzed by the Arbitral Tribunal. Tenaris asserts its claim for unfair and inequitable treatment as a subsidiary claim to its main claim, which is the claim for Tavsa's expropriation. The Claimant has expressed this in very clear terms:[205]

> "To the extent this Tribunal concludes that Tenaris's investments in Tavsa have been indirectly expropriated and the Tribunal awards compensation using a valuation date of 30 April 2008, then Tenaris will have been made whole and it will not be necessary for the Tribunal to consider whether Venezuela has breached the fair and equitable treatment provision of the Luxembourg Treaty. If, however, the Tribunal uses a 2009 valuation date, it will be necessary for the Tribunal to consider whether Venezuela's measures following the enactment of the Nationalization Decree 6058 breached the fair and equitable treatment clause of the Luxembourg Treaty and if so, establish compensation at a date prior to Venezuela's breaches of that Treaty."

234. The Arbitral Tribunal is already in a position to say that its analysis of the merits of the case will be that Venezuela did indeed indirectly expropriate Tenaris' ownership in Tavsa. The main claim having been allowed, there is no need to address the subsidiary one.

---

[204] RIV, paras. 267-273.
[205] CV, para. 320.

# VI.  EXPROPRIATION

235.  The Claimants' main claim is that Venezuela has unlawfully expropriated Tenaris' investment in Tavsa (**2.**) and Tenaris' and Talta's investment in Comsigua (**3.**), in breach of Articles 4 and IV of the Luxembourg and Portugal BITs, respectively.

236.  Prior to delving into the analysis of these claims, it is necessary to provide a detailed account of the facts of the case (**1.**).

## 1.  FACTUAL BACKGROUND

237.  The Arbitral Tribunal will now provide a brief summary on the Claimants (**A.**), their investment (**B.**), the allegedly expropriatory measures, (**C.**) and the takeover (**D.**).

### A.  The Claimants

238.  The Claimants are members of the Techint Group, an international conglomerate in the steel industry, consisting of several groups of companies, including Tenaris (the first Claimant) and Ternium S.A. ["**Ternium**"].

239.  Tenaris is a Luxembourg company[206] listed on the main stock exchanges in the United States, Italy, Argentina, and Mexico.[207] Its business consists in the manufacturing of pipes, which it handles indirectly through many subsidiaries created in different countries. Two wholly-owned subsidiaries are relevant to this arbitration:

- Talta:[208] the second Claimant, and a company organized under the laws of Portugal.[209] Talta and, indirectly, Tenaris, hold a 7.58% shareholding in Comsigua – one of the two allegedly-expropriated companies.

- Tubos de Acero de México S.A. ["**Tamsa**"]:[210] a Mexican company, it was acquired by Tenaris and has a 70% shareholding in Tavsa[211] – the second allegedly-expropriated company.

---

[206] Extract of the Luxembourg Registry of Commerce and Corporations for Tenaris, May 24, 2012, Exhibit C-6.
[207] Tenaris S.A., 2014 Annual Report, Exhibit R-116, p. 31.
[208] Talta and, indirectly, Tenaris, also acquired a 50.2% interest in the stock of Orinoco Iron, Materiales Siderúrgicos S.A. (Matesi), another Venezuelan HBI producer.
[209] Permanent Certificate of Talta, May 18, 2012, Exhibit C-8.
[210] Shareholders Registry of Tamsa, July 6, 2012, Exhibit C-22.
[211] Certificate of Commercial Registry of Puerto Ordaz of CVG Tubos, November 23, 1998, Exhibit C-85, p. 8; Strategic Partnership Agreement, October 9, 1998, Exhibit C-19. Clause 2.1.

240. Then, Ternium, another Luxembourg company in the Techint Group, engaged in the production of steel, holds 59.7% of the stock of Sidor C.A. ["**Sidor**"], one of the leading Venezuelan iron and steel companies.[212]

241. The Claimants' corporate structure is as follows:[213]



Source: CI, p. 11, 14; RIII, p. 22.

## B.    The Claimants' Investment

242. The Guayana region, in the south of Venezuela, is an area rich in natural resources, particularly iron ore.

### a.    Tavsa

243. Between the 1970s and 1990s, the Guayana steel industry was in the hands of the State, more specifically of Corporación Venezolana de Guayana ["**CVG**"] and its subsidiaries.[214] In the 1990s, the Government of Venezuela began the process of privatizing the steel industry in that region.[215]

---

[212] Ternium 2007 Annual Report, CRED-52, p. 5.
[213] H 1, slide 10; H 2, slide 16, Hart I, figure 3-1; Ternium 2007 Annual Report, CRED-52, p. 5; Tenaris 2008 Annual Report, CRED-26, pp. 137, 149; Exhibits C-22, C 28, C 30.
[214] CI, para. 11.
[215] CI, para. 13.

244.  The first companies to be privatized included a CVG subsidiary called CVG Siderúrgica del Orinoco, C.A. ["**CVG Sidor**"],[216] one of the largest iron and steel companies in Latin America.

245.  CVG Sidor had two production lines: one for steel, and another one for seamless steel tubes. Because the production and sale of seamless steel tubes is a business closely connected to the oil business and independent of the global market for iron and steel products, the Government decided to split up the two business lines and privatize them separately:[217]

    -   The steel business was placed in the hands of Sidor, where Ternium became a shareholder,[218] Ternium being, along with Tenaris, one of the two groups of companies in the Techint Group.

    -   The production of seamless steel tubes was transferred to a new CVG subsidiary by the name of Tubos Industriales y Petroleros, S.A. ["**CVG-Tubos**"],[219] which was also privatized, and where Tamsa (a subsidiary of Tenaris, one of the Claimants) became the holder of a 70% interest. Once privatized, the company's name was changed to Tubos de Acero de Venezuela S.A. (**Tavsa**).[220]

246.  Physically, Tavsa remained located within Sidor's premises, and Sidor provided it with all the necessary supplies in order for it to be able to manufacture the tubes, as done prior to the split.

247.  The privatization of CVG-Tubos took place through a strategic partnership agreement ["**Partnership Agreement**"][221] executed on October 9, 1998 between CVG and Tamsa. In addition to transferring control from CVG, the Partnership Agreement required Tamsa to devise a plan for investments in Tavsa, divided into two phases:

    -   The modernization program (Phase I): Phase I consisted in modernizing Tavsa's plant an increasing its production capacity to 65,000 tons per year in a period of 24 months.[222] Phase I investments were estimated at USD 25 to 30 million.[223] On October 18, 2000, Tavsa notified CVG that its plant capacity had increased to 65,000 tons, and it thus considered its Phase I obligations fulfilled.[224]

---

[216] Exhibit C-16.

[217] Strategic Partnership Agreement between CVG and TAMSA, October 9, 1998, Exhibit C-19, clause 1.1 (2).

[218] CI, para. 15.

[219] Exhibit C-18.

[220] Certificate of Commercial Registry of Puerto Ordáz of CVG Tubos, November 23, 1998, Exhibit C-85, pp. 3, 9, 26; Tavsa's Articles of Incorporation, Exhibit C-34.

[221] Strategic Partnership Agreement, October 9, 1998, Exhibit C-19, clause 2.1.

[222] The modernization program consisted in improving the efficiency of CVG-Tubos, increasing its production capacity up to 65,000 metric tons of finished tubes. See Exhibit C-19, clause 2.1 Definition of Modernization Program.

[223] Strategic Partnership Agreement, October 9, 1998, Exhibit C-19, clause 3.2.

[224] Letter from Tavsa to CVG, October 18, 2000, Exhibit C-157, p. 1; Tavsa 2000 Financial Statements, CLEX-8, p. 39; Minutes of Tavsa's Board of Directors' meeting, April 11, 2001, Exhibit C-221, p. 1; Exhibit R-12. H 1, slide 13.

-   The expansion program (Phase II): Phase II was set to commence after 18 months from the execution of the Partnership Agreement, provided that both parties reached an agreement within a period of 90 days; the failure to reach an agreement would result in its cancellation.[225] On April 11, 2001, CVG and Tamsa decided to cancel Phase II, as the conditions precedent had not been fulfilled and because the market conditions did not justify those investments.[226] Phase II was never implemented.[227]

248.  Between 2002 and 2005, Tenaris acquired 100% of Tamsa's stock,[228] and, therefore, Tamsa's 70% shareholding in Tavsa.

**b.    Comsigua**

249.  Comsigua is one of the leading Venezuelan producers of hot-briquetted iron ["**HBI**"], which is used as a supply in steel production. It was created in the late 1980s as a joint venture between a Japanese company (Kobe Steel Limited) and CVG Ferrominera Orinoco C.A., another CVG subsidiary. Initially, its shareholders also included other investing companies of various nationalities,[229] which would later on progressively leave the project.

250.  In 1995, Comsigua opened up to new investors, and this is how it was joined by Tamsa (a Tenaris subsidiary) with a 6.92% interest.[230] In 2007, Tamsa transferred to Talta (another Tenaris subsidiary and a co-claimant in this arbitration) its shares in Comsigua.[231]

251.  Almost at the same time as Tamsa acquired its interest in Comsigua, there were other inward and outward changes in its shareholding structure: two of its initial investors assigned their stock to Kobe Steel Limited and another three Japanese companies [collectively, "**Japanese Shareholders**"].[232] Two years later, another investor left. And, finally, in May 2007, the last one of those investors left.[233]

---

[225] Partnership Agreement, Exhibit C-19, clause 4.2.2.
[226] Minutes of Tavsa's Board of Directors' meeting, April 11, 2001, Exhibit C-221, p. 11; H 1, slide 18; CLEX-8, p. 57.
[227] Minutes of Board of Directors' meeting, April 11, 2001, Exhibit C-221, pp. 1, 11; Tavsa 2000 Financial Statements, Exhibit CLEX-8, p. 57.
[228] See Tenaris 2002 Annual Report, March 6, 2003, Exhibit C-20, p. 62; Tenaris 2003 Annual Report, March 2, 2004, Exhibit C-21, p. 120; Shareholders Registry of Tamsa, July 6, 2012, Exhibit C-22, p. 1.
[229] The other companies that participated in this agreement were: Oregon Steel Mills, with 13.84%; Hanbo Steel Co. Ltd., with 13.84%; Acciaierie e Ferriere Lombarde Falck S.p.A., with 6.92%; International Finance Corporation, with 8.70%; Comsigua Project Shareholders' Agreement, June 14, 1995, Exhibit C-40, Article 2.1(f); Addendum to the Comsigua Project Shareholders Agreement, Exhibit C-82.
[230] Comsigua Project Shareholders' Agreement, June 14, 1995, Exhibit C-40, Article 2.1(f); Addendum to the Comsigua Project Shareholders Agreement, Exhibit C-82.
[231] Acknowledgement and Consent to the Transfer of Shares and Assignment of Contracts from Tamsa to Talta, March 16, 2007, Exhibit C-41, Article 1(a). Tenaris had acquired 100% of Talta, see Tenaris 2004 Annual Report, CRED-20, p. 136.
[232] RIII, paras. 25, 26.
[233] See Comsigua Financial Statements as of December 31, 2007 and 2008, September 8, 2009, Exhibit C-42, pp. 46, 47. C-42Bis, pp. 46, 47.

252. Comsigua's shareholding structure was thus in the hands of:[234]

- Private investors: four Japanese Shareholders (who, in spite of not holding a majority position individually,[235] together added up to 73.37%) plus Talta, with its 7.58% interest.

- A State company: CVG Ferrominera Orinoco C.A., with its 19.05% interest.

## C. The Nationalization of the Guayana Iron and Steel Sector

253. The expropriation of Tavsa and Comsigua took place, according to the Claimants, through the takeover of the two companies as part of the process for the nationalization of the entire iron and steel sector in the Province of Guayana, formalized through two Decrees: No. 6058 (**a.**) and No. 6796 (**b.**).

### a. Decree 6058

254. On April 30, 2008, the then-President of the Republic, Hugo Chávez, issued "Decree No. 6058 with the rank, value and force of Organic Law on the Organization of Companies Operating in the Iron and Steel Sector in the Guayana Region,"[236] whereby the iron industry in the Guayana region was reserved to the State of Venezuela ["**Nationalization Decree**"]:

> "Article 1. For reasons of national convenience and in light of its relation to activities that are strategic for the development of this Nation, the iron ore transformation industry in the Guayana region is hereby reserved to the State, as this is an area holding the largest iron deposit, the exploitation of which has been reserved to the State since 1975."

255. In addition, the Nationalization Decree also transformed business company Sidor and its subsidiaries and affiliates ["**Affected Companies**"] into State-owned companies:

> "Article 2. There is hereby ordered the transformation of business company SIDOR C.A., its subsidiaries and affiliates into State-owned companies in accordance with the provisions of Article 100 of the Organic Law on the Public Administration, with a State shareholding of no less than 60% of its capital stock."

256. The activities of the Affected Companies were declared to be public-use and social-interest activities:

> "Article 3. As a consequence of the order in Article 1, there are hereby declared to be of public use and social interest the activities carried out by

---

[234] RIII, p. 17.

[235] The one with the largest interest was Kobe Steel Limited, at 35.48%.

[236] Decree No. 6058 with the rank, value and force of Organic Law on the Organization of Companies Operating in the Iron and Steel Sector in the Guayana Region, April 30, 2008, published in Official Gazette No. 38,928, May 12, 2008, Exhibit C-50.

business company SIDOR C.A. and its subsidiary and affiliate companies, as well as the works and services required to perform such activities."

257. The State declared itself the holder of the stock of the Affected Companies:

"Article 4. Through the Ministry of the People's Power for Basic Industries and Mining or any of its functionally-decentralized entities, the Republic shall hold the public sector's shareholding in the new State-Owned Companies created as a result of the transformation referred to in Article 2 […]."

258. Within a period of seven days, there would be created a commission to join the board of the Affected Companies:

"Article 5. The Republic […] shall establish, within the seven days following publication of this Decree […] a Transition Commission at the companies referred to […], which shall be incorporated into the current board of SIDOR C.A., for the purpose of guaranteeing the transfer of control of all of their activities to the State-owned companies. This transfer process shall conclude on June 30, 2008. […]."

259. And another commission would be established in order to agree on the fair price and the terms and conditions of the potential shareholding:

"Article 7. A Technical Commission shall be established, composed of representatives of the State and the private parties involved, for the purpose of agreeing upon the fair price to be paid, to operate for a period of sixty (60) consecutive days extendable by mutual agreement."

"Article 6. The private sector entities that are currently shareholders in the iron and steel sector corporations mentioned in article 2 shall be given a period of sixty (60) consecutive days, as from the date of publication of this Decree with the Rank, Value and Force of Organic Law in the Official Gazette of the Bolivarian Republic of Venezuela, in order to agree upon the terms and conditions of their possible shareholding in the new State-owned companies."

260. Following 60 days without an agreement being reached for the transformation of the Affected Companies into State-owned companies, the Republic would take over control and the exclusive operation of the Affected Companies, ordering the expropriation of their shares, pursuant to the Law on Expropriation by Reason of Public or Social Interest ["**LECUPS**"], providing for payment of compensation:

"Article 8. Upon expiry of the period established in Article 6 without an agreement for the transformation into a State-owned company having been reached, the Republic […] shall assume control and the exclusive operation of the companies, for the purpose of maintaining continuity in the activities carried out by the companies referred to in Article 2.

68

> In the event that no agreement is reached for the transformation into State-owned companies, the National Executive Branch shall decree the expropriation of the aforementioned shares, pursuant to the provisions of the Law on Expropriation by Reason of Public or Social Interest. For the calculation of compensation or the fair price of the abovementioned assets, in no event shall lost profits or indirect damages be taken into account."

261. On May 21, 2009, the President of the Republic explicitly announced the nationalization of Tavsa and Comsigua, in the following words:[237]

> "The hot briquetted-iron sector, nationalize it. There is nothing to be discussed. The company [...] Comsigua, [...] Tubos Tavsa – nationalize them."

262. The President's words were followed, on May 25, 2009, by the establishment of two commissions in charge of taking over control of Tavsa[238] and Comsigua[239] and guaranteeing their transition into state-owned companies ["**Takeover Commissions**"], which had been created under the Nationalization Decree.

263. On May 29, 2009, Tenaris expressed its opposition to Tavsa's nationalization, notwithstanding which it stated it would cooperate in the transition process, and appointed its representatives.[240]

### b. Decree 6796

264. On July 14, 2009, soon after the Takeover Commissions were set up, President Chávez issued Decree No. 6796 ["**Implementing Decree**"], completing the Nationalization Decree:[241]

> "Whereas,
>
> by means of Article 1 of the [Nationalization] Decree [...] the iron ore transformation industry in the Guayana Region was reserved to the State."

265. Even though the Nationalization Decree provided that the Affected Companies would become state-owned (Article 4), the Implementing Decree implemented this order in a slightly different manner: the State would not be acquiring title to the shares, but title to the assets of the Affected Companies [ "**Expropriated Assets**"] instead; the shareholders would thus remain the formal owners of the

---

[237] Aló Presidente video of May 21, 2009, *"Taller de trabajo hacia la transformación socialista de las empresas básicas Ciudad Guayana, estado Bolívar": "El sector briquetero, nacionalícese. No hay nada que discutir. La empresa [...] Comsigua, [...] Tubos Tavsa – nacionalícense,"* Exhibit C-218; *"Chávez nacionaliza varias empresas metalúrgicas,"* El Universal, May 22, 2009, Exhibit C-56; Witness Statement of Javier Martínez Álvarez, para. 44.
[238] Letter No. 230/09 from Minister of Industry Rodolfo Sanz to Tavsa, May 25, 2009, Exhibit C-58. [It was indeed based on Decree 6058 -Tavsa: "In my capacity as Minister [...] and on the basis of Decree No. 6058 [...] transition committee [...] Tavsa."
[239] See Letter No. 233/09 from the Minister of Industry, May 25, 2009, Exhibit C-57. "Based on Decree No. 6058 [...] and pursuant to the President's decision to proceed with the full statization of Complejo Siderúrgico de Guayana S.A. (Comsigua), I have appointed the following individuals to the transition Committee [...]."
[240] Letter from Tenaris to the Minister of Industry, May 29, 2009, Exhibit C-60; Martínez Álvarez, para. 50.
[241] First whereas clause: "Whereas, by means of Article 1 of the Decree with the Rank, Value and Force of Organic Law on the Organization of Companies Operating in the Iron and Steel Sector in the Guayana Region, the iron ore transformation industry in the Guayana Region was reserved to the State."

stock, while the Expropriated Assets, which are the underlying basis of the business activity, would be acquired by the State:

> "Article 1: Article 1: <u>There is hereby ordered the acquisition of the assets of business companies</u> [...] Complejo Siderúrgico de Guayana S.A. (Comsigua), [...] Tubos de Acero de Venezuela S.A. (Tavsa), their subsidiaries and affiliates domiciled in the national territory, whose purpose relates to the transformation of iron ore, with the aim of transforming them into State companies [...]."[242]

266. A commission would be created for each company, to join their Boards in order to immediately take over their operations:

> "Article 3. On the day following the date of publication of this Decree in the Official Gazette of the Bolivarian Republic of Venezuela, the Bolivarian Republic of Venezuela shall establish a Transition Commission for each of the companies referred to in Article 1, as applicable, to join the existing Boards of each such company, immediately taking over operational control, in order to guarantee the transfer and continuation of the company's activities [...]."

267. The forced acquisition of the Expropriated Assets entitled the shareholders of Tavsa and Comsigua to monetary compensation. In order to agree on such compensation – called the *justiprecio* – there would be created a specific commission for a period of 60 days (which could be extended for another 60 days), consisting of representatives of the State and the shareholders:

> "Article 4. There shall be created a Technical Commission, consisting of representatives of the State and the private parties involved, in order to agree on the fair price, set to work over a period of sixty (60) consecutive days, which period may be extended by mutual agreement for another sixty (60) consecutive days."

268. Once said period had expired without an agreement having been reached, the Republic would take over control and operation of the "companies" (consisting of the Expropriated Assets), under LECUPS, paying a fair price:

> "Article 5. Upon expiry of the period established in the preceding article without an agreement for the transformation into a State-owned company having been reached, the Bolivarian Republic of Venezuela, acting through the Ministries or any of its functionally-decentralized entities, referred to in Article 2 hereof, shall assume, as applicable, the exclusive control and operation of the companies, in order to maintain continuity in the activities carried out by the companies referred to in Article 1.
>
> In the event that no agreement is reached in the negotiations over the assets, the National Executive Branch shall decree the expropriation of said companies, pursuant to the provisions of the Law on Expropriation by Reason of Public or Social Interest. In no event shall lost profits or indirect

---

[242] Underlined by the Tribunal.

damage be taken into account for the calculation of compensation or the fair price of the aforementioned assets."

269. The entity that carried out the forced acquisition of the Expropriated Assets was PDVSA Industrial S.A. ["**PDVSA Industrial**"], a subsidiary of PDVSA.[243] This was done pursuant to the provisions of the Implementing Decree:

- <u>Takeover Commissions</u>: On July 27, 2009, a new Takeover Commission was set up at Comsigua,[244] and an identical commission was set up at Tavsa on August 7, in charge of taking control on behalf of Venezuela.[245]

- <u>TAVSA Compensation Commission</u>: On August 7, 2009, there was set up Tavsa's Technical Commission,[246] whose members were given a period of 60 days, which could be extended for another 60 days, to set the compensation. On August 17, 2009 Tenaris confirmed its representatives.[247] On October 28, 2009, PDVSA Industrial asked for a deadline extension to set compensation; the deadline was moved to December 29, 2009.[248]

- <u>Comsigua Compensation Commission</u>: For Comsigua, the Compensation Commission in charge of negotiating the amount of compensation was not appointed until October 8, 2009.[249] The following year, on June 18, 2010, there was created a new commission in charge of negotiating the acquisition of the interests in Comsigua and another three companies.[250]

---

[243] Larez, para. 3. Petróleos de Venezuela S.A (PDVSA) is a corporation created by the State of Venezuela in 1975.

[244] Comsigua Share Transfer Agreement, May 20, 2011, Exhibit C-72, Clause 9.1.

[245] Tavsa's transition commission consisted of the five members of the initial commission (see para. 258), along with additional members from PDVSA Industrial. See letter from PDVSA to Tavsa, August 7, 2009, Exhibit C-69; Exhibit R-58.

[246] Letter from PDVSA to Tavsa, August 7, 2009, Exhibit C-69. Tenaris ratified its representatives at the technical commission provided for in Article 7 and Article 4 of Decrees 6058 and 6796, respectively. See letter from Tenaris to PDVSA Industrial, August 17, 2009, Exhibit C-70, pp. 1-2; Álvarez, para. 58. Later on, on May 3, 2010, Tenaris added a number of members to the technical commission. See letter from Tenaris' José Frías to the Ministry of Industry, May 3, 2010, Exhibit C-150.

[247] Exhibit C-70.

[248] T., pp. 688:11–689:3 (Larez); CV, para. 63. Action Memorandum from L. Pulido (PDVSA Industrial) to R. Ramirez (PDVSA), October 28, 2009, Exhibit R-51.

[249] Minutes of meeting of Transition Commission, October 8, 2009, Exhibit R-46.

[250] H 1, slide 50; Exhibit R-105; T., p. 66, Letter No. 275/10 from Minister Khan Fernández (MIBAM) to Vice Minister I. Hernández, June 18, 2010, Exhibit R-105. In charge of negotiating the acquisition of commercial companies Venezolana de Prerreducidos del Caroní C.A (VENPRECAR), Comsigua and Matesi and their subsidiaries or affiliates, all companies related to the iron industry and relevant in the transformation process.

**D. Takeover of the Expropriated Assets**

270. In compliance with the Nationalization and Implementing Decrees, the Bolivarian Republic did take control of the Expropriated Assets whose forced acquisition had been decided upon. However, takeover took place differently at each of the two Affected Companies, Tavsa (**a.**) and Comsigua (**b.**)

**a. Tavsa**

271. On November 16, 2009, PDVSA Industrial (acting on behalf of the Republic) took control of Tavsa's management and operations, and all Expropriated Assets belonging to said company were handed over.[251] The State thus formally fulfilled the order in Article 1 of the Implementing Decree, for the forced acquisition of the Expropriated Assets.

272. It is undisputed that Venezuela has not paid any compensation at all for the expropriation of Tavsa's assets.

**b. Comsigua**

273. For Comsigua, the forced acquisition of the Expropriated Assets took place on June 17, 2011, when the State, through an administrative decision, appointed the company's new President, and Comsigua's management – which used to be in private hands – was now occupied by new managers appointed by the Government.[252] At that moment, Comsigua's Expropriated Assets were placed at the State's disposal, and the State then took control of the company's business activity.

274. As regards compensation, facts are a little more complicated than they are for Tavsa, as certain shareholders have actually been paid compensation.

275. *Pro memoria*, Comsigua's private shareholders were, basically, two: three Japanese Shareholders, on the one hand, and Talta, on the other.

276. The Compensation Commission created under the Nationalization and Implementing Decrees soon split up to negotiate with the Japanese Shareholders and Talta separately.[253] The outcome of those negotiations was mixed:

   - The Japanese Shareholders were successful in their negotiations, and reached a compensation agreement with the Venezuelan State, which the parties formalized in the form of a "share assignment agreement." The compensation reached USD 200 million.[254]

---

[251] Record of the Transfer of exclusive Control and Operation of Commercial Company Tavsa, Tubos de Acero de Venezuela S.A., November 16, 2009, Exhibit C-71, p. 4.
[252] Exhibit R-64.
[253] Exhibit R-41; Exhibit R-46; CRED-59.
[254] Comsigua Share and Asset Assignment Agreement, May 20, 2011, Exhibit C-72, clauses 1.1, 3. T., p. 65. H 1, slide 49.

- However, in spite of engaging in negotiations with the State, Talta/Tenaris did not reach an agreement and have been paid no compensation.

* * *

277. The factual background thus narrated, the Arbitral Tribunal will now analyze the parties' position as regards the expropriations of Tavsa (**2.**) and Comsigua (**3.**), and will then state its decision (**4.**).

## 2. THE PARTIES' POSITIONS REGARDING TAVSA

278. It is a fact that Venezuela expropriated Tavsa's assets. The only disputed issue between the Parties is whether such expropriation breached Article 4 of the Luxembourg BIT,[255] which provides as follows:

> "1. Each Contracting Party undertakes not to adopt any measure of expropriation or nationalization or any other measure with the effect of directly or indirectly dispossessing the investors of the other Contracting Party of the investments belonging to them in its territory, unless the following conditions are fulfilled:
>
> a) the measures are adopted for reasons for public purpose or national interest;
>
> b) the measures are adopted in accordance with legal procedures;
>
> c) they are neither discriminatory nor contrary to a specific commitment concerning the treatment of an investment;
>
> d) they are accompanied by provisions for the payment of adequate and effective compensation.
>
> 2. The amount of the compensation shall correspond to the real value of the investment concerned on the day prior to the adoption or publication of the measures.
>
> The compensation shall be paid in convertible currency. It shall be paid without undue delay and shall be freely transferable. Interest shall be paid at the normal commercial rate from the date of its determination to the date of payment.
>
> [...]."

### A. The Claimants' Position

279. The Claimants argue that, pursuant to Article 4.1(b) of the Luxembourg BIT, expropriation measures must be taken "in accordance with legal procedures;"[256] this obligation requires observing the domestic Law procedures (**a.**). [257] Article

---

[255] CIV, para. 194. The Parties are not in agreement either as to the compensation that is due; that, however, is a matter to be discussed in a specific section.
[256] Exhibit C-1bis, Article 4(1)(b).
[257] CV, paras. 204 *et seq.*

4.1(c) and 2 requires that the State pay compensation upon expropriation (**b.**). According to the Claimants, both requirements have been disregarded in this case.

### a.    Breach of Venezuelan Law

280.  In the Claimants' opinion, the Respondent's expropriation measures breached the following instruments of Venezuelan law:

-    The 1999 Constitution of the Bolivarian Republic of Venezuela ["**Constitution**"] and LECUPS (**i.**);

-    The Nationalization Decree (**ii.**); and

-    The Implementing Decree (**iii.**).

(i)    The Constitution and LECUPS

281.  The Claimants argue that Venezuela breached Article 115 of the Constitution and Article 2 of LECUPS,[258] as it physically took over Tavsa's assets without enforcing a final judgment and without paying fair compensation.[259] And it does not seem to intend to do so since, as of today, Venezuela has yet to complete the expropriation and compensation procedure, even though more than seven years have elapsed since the issue of the Nationalization Decree and the Forced Acquisition of Tavsa's Assets.[260]

(ii)    Nationalization Decree

282.  Venezuela did not follow the procedures provided for in the Nationalization Decree:[261]

-    It failed to set up the Takeover Commission for Tavsa within the period prescribed in Article 5 (May 19, 2008), only doing so a year later: May 25, 2009;[262]

-    It failed to transfer control of Tavsa's activities to the State on the date prescribed in Article 5, *i.e.* June 30, 2008;[263]

-    It failed to set up the Compensation Commission in charge of negotiating the fair price for Tavsa's nationalization provided for in Article 7;[264]

-    It failed to follow the expropriation procedure prescribed in LECUPS, as required in Article 8:[265] it did not order the formal expropriation of Tavsa's

---

[258] CIV, para. 220; CV, para. 209.
[259] CIV, para. 220; H 1, slides 73, 74.
[260] Exhibit C-71.
[261] CIV, para. 224.
[262] CI, para. 135; CIV, para. 224 (a); CV, paras. 52, 90, 211(a); Exhibit C-57 (Comsigua); Exhibit C-58 (Tavsa).
[263] Exhibit C-50, Article 5.
[264] CV, para. 211.
[265] Exhibit C-50, Article 8.

shares upon the failure to reach an agreement within a period of 60 days.[266]

(iii)    Underlined Implementing Decree

283.    According to the Claimants, the Respondent also failed to comply with the provisions of the Implementing Decree:

-    It failed to set up the Takeover Commission within the period prescribed in Article 3: July 15, 2009;[267]

-    The Government unilaterally extended the period for Tavsa's Compensation Commission to December 29, 2009, without Tenaris' agreement, and it formally took control of the assets prior to the expiration of such period (November 16, 2009);[268]

-    The period set for Tavsa's Compensation Commission having expired without an agreement having been reached on the subject of fair price, Venezuela failed to comply with Article 5, as it did not commence court expropriation proceedings.[269]

b.    **Failure to Pay Compensation**

284.    It is undisputed that Tenaris never received any compensation at all for the expropriation of Tavsa's assets.

285.    The Claimants contend that the mere constitution of a commission and the establishment of a negotiation process are not enough to discharge the obligations provided for in the Luxembourg BIT:

-    Venezuela is required to try to reach an agreement on the compensation due; in this case, PDVSA Industrial, which was appointed to represent Venezuela in the negotiations, refused to meet with Tenaris' legal representatives,[270] in spite of their attempts to reach an agreement;[271]

-    The BIT requires payment of compensation which, in addition, needs to be adequate; Venezuela never set out to pay adequate compensation, as it made no provision to cover lost profits.[272]

286.    Not only does the failure to pay compensation breach Venezuela's domestic rules on the subject; it also violates Articles 4.1(d) and 4.2 of the Luxembourg BIT, which require that the State pay "adequate and effective" compensation "without undue delay."[273]

287.    The Claimants bring up decisions by previous arbitral tribunals that found that

---

[266] Exhibit C-68, Article 1
[267] CV, para. 212 (a).
[268] CV, para. 212 (b).
[269] Exhibit C-68; CIV, para. 228.
[270] CV, para. 86.
[271] CIV, para. 213.
[272] CIV, para. 212.
[273] CV, para. 199.

the failure to pay compensation renders expropriation unlawful: *Burlington*,[274] *Siemens*,[275] and *ConocoPhillips*;[276] as well as *OI European*, where the tribunal found that, as there was no plausible explanation, a delay of over four years – in the case at hand almost eight years have elapsed – in paying compensation entails the nonfulfillment of the requirement to pay compensation without undue delay.[277]

## B. The Respondent's Position

288. Venezuela acknowledges having expropriated Tavsa's assets but contends no unlawful expropriation claims, as put forth by Tenaris, are in order.[278] According to the Respondent, the expropriation was done according to Law (**a.**) and, in addition, it also satisfied the requirements of the Luxembourg BIT as regards payment of fair compensation (**b.**).

### a. Compliance with the Law

289. The Respondent denies any violation of Venezuelan Law (**i.**) or international Law (**ii.**) in the course of the expropriation.

#### (i) Venezuelan Law

290. As per the Bolivarian Republic's claims, Tavsa's expropriation was done under the Nationalization Decree, as supplemented by the Implementing Decree:[279]

- The Nationalization Decree refers generally to Sidor's subsidiaries but, because it does not expressly mention Tavsa, it had no direct effects on it;

- By contrast, the Implementing Decree contains the supplementary provisions through which the nationalization of Sidor's subsidiaries could be carried out, including Tavsa, which is expressly mentioned in this second Decree.[280]

291. The Respondent denies that the Decrees violate any Venezuelan law provision: Article 8 of the Nationalization Decree allowed the occupation of Tavsa's assets prior to completion of the judicial expropriation proceedings, in order to ensure continuity in the companies' operations. It is the Bolivarian Republic's contention that Article 8 of the Nationalization Decree is valid, as its contents actually amount to an interim measure, as recognized by Venezuelan court decisions.[281] And such interim measure is compatible with:

---

[274] The tribunal found that Ecuador's failure to pay compensation to Burlington for its expropriatory actions did, by itself, render the expropriation unlawful, *Burlington*, paras. 543-45.
[275] The tribunal found that no compensation had been paid, and the expropriation did not satisfy the requirements of the applicable treaty and, therefore, it was unlawful, *Siemens*, para. 273.
[276] The tribunal found that a State's compensation offer that is inconsistent with the criterion laid down in the investment treaty renders the expropriation unlawful, *ConocoPhillips*, paras. 398-401.
[277] *OI European*, paras. 422-426.
[278] RV, para. 131.
[279] RIII, para. 283.
[280] RIII, para. 287.
[281] RV, para. 132; RIV, paras. 285-286.

- The constitutional guarantee, as the interim measure will end upon completion of the expropriation proceedings with the issue of a court judgment;[282] and, in any event, the alleged unconstitutionality of the interim measure should have been raised before the Venezuelan court system, which was not the case; therefore, as long as it is not ruled unconstitutional, the mechanism laid down by the Nationalization Decree stands fully valid and compliance with it is mandatory;[283]

- The LECUPS regime, as the regime established by the Nationalization Decree, which has the rank of an organic law and is more specific on the subject, prevails.[284]

(ii) <u>International Law</u>

292. The Respondent argues that Tavsa's nationalization procedure complied with the due process requirements under international Law:

- Tenaris was notified sufficiently in advance: the Government's intention to take control of Tavsa's assets was stated both in the Implementing Decree and, even earlier still, in Letters Nos. 233/09 and 230/09;[285]

- Tenaris was afforded the right to be heard: Tenaris itself acknowledges as much when claiming to have participated in Tavsa's Takeover and Compensation Commissions;[286]

- Even though Tenaris could have exercised the administrative and judicial remedies available to it under Venezuela's domestic law, it chose not to do so.[287]

293. Venezuela admits that the process extended beyond the time periods provided for in the Nationalization Decree, but explains that such extension was justified by the complexity of the matters at issue, in addition to delays attributable to Tenaris itself.[288] In any event, Venezuela argues that these minor violations of its domestic Law do not amount to an internationally wrongful act.[289]

**b. Fair Compensation under the BIT**

294. The Bolivarian Republic denies that the failure to pay compensation does, *per se*, render the expropriation unlawful,[290] as argued by Tenaris. From the

---

[282] RIV, para. 285-287; RV, para. 132.
[283] RIV, para. 287.
[284] RIII, para. 286.
[285] Letter from PDVSA Industrial to Tavsa, August 7, 2009, Exhibit C-69. RIII, para. 316.
[286] CI, paras. 90-92, cited in RIII, para. 318.
[287] RIII; paras. 319-321.
[288] RV, para. 133
[289] In support of its position, the Respondent brings up *ADF*, where the tribunal noted that something more than a mere illegality or lack of authority under domestic law is required in order to hold that a decision or measure is inconsistent with the requirements of customary international Law; *ADF*, para. 190. The Respondent also relies on *Saluka*, where the tribunal established that a bilateral investment treaty may not be interpreted as penalizing each and every violation of the multiple rules and regulations Government action is subject to that could normally be pursued by the investor before the local courts and tribunals, *Saluka*, para. 133.
[290] RIII, para. 309

Respondent's standpoint, what is required under Article 4.1(d) of the Luxembourg BIT is that the expropriatory measures be accompanied by appropriate mechanisms to ensure the payment of fair, effective, and timely compensation, with the commencement of a court proceeding to that end not being an essential requirement.[291]

295. Venezuela has indeed commenced expropriation proceedings under the Implementing Decree,[292] and those proceedings are still pending. When completed, there will be a court judgment ordering the decreed transfer of title and payment of fair compensation.[293] And this has not yet happened because Tenaris hindered the expropriation proceedings with its early filing of a Request for Arbitration,[294] which, according to the Bolivarian Republic, is one more demonstration of Tenaris' uncompromising attitude, devoid of good faith, as, at the time, it prevented an agreement on compensation from being reached.[295]

296. As to the specific allegation that Venezuela failed to provide for compensation for lost profits, without which compensation would not be "adequate" as required by the BIT, it is the Respondent's view that the fair price due for an expropriated asset is one thing, and compensation for a wrongful act is an entirely different matter.[296] According to the Respondent, expropriation is a State prerogative, not a wrongful act, and, in this regard, the Implementing Decree specifies that compensation will equal the real value of the expropriated asset, and nothing further.[297]

### 3. THE PARTIES' POSITIONS AS REGARDS COMSIGUA

297. The main item of relief sought by the Claimants is that the Tribunal rule that Venezuela breached Articles 4 and IV of the Luxembourg and Portugal BITs, respectively, both provisions having equivalent contents. In their opinion, Venezuela has unlawfully expropriated their investment in Comsigua.[298] The Respondent denies any such expropriation.[299]

298. The Parties' arguments are, for the most part, the same as put forth in connection with Tavsa. For this reason, the Tribunal refers back to paragraphs 279-296 *supra* and, in this section, it will only provide an account of the additional arguments the Parties have asserted specifically in connection with Comsigua.

### A. The Claimants' Position

299. The Claimants argue that Venezuela indirectly expropriated their investment in Comsigua, without paying compensation and in breach of its domestic Law.

---

[291] RIII, paras. 298-304.
[292] RIII, paras. 304 *et seq.*
[293] RV, para. 131.
[294] RIII, paras. 297, 311.
[295] RIII, para. 311.
[296] RIII, para. 308.
[297] RIII, para. 307.
[298] CI, paras. 125 *et seq.*
[299] RIII, para. 276.

### a. The Expropriation of the Investment in Comsigua

300. The Claimants argue that Venezuela expropriated their investment in Comsigua,[300] as a result of the Nationalization Decree and the Implementing Decree:

- The Nationalization Decree ordered the nationalization of the entire steel industry in the Guayana region, including all of Sidor's affiliates, Comsigua being one of them;[301] and, in spite of the fact that the Nationalization Decree provided for direct expropriation,[302] Venezuela subsequently issued the Implementing Decree, where, rather than ordering the acquisition of Comsigua's shares, it ordered an "acquisition of assets," thereby rendering the expropriation an indirect one;[303]

- Later on, pursuant to these two Decrees, Venezuela took Comsigua's assets as its own, and took control of its administration,[304] thereby interfering with the Claimants' property rights;[305]

- With the exception of the Japanese Shareholders, the Bolivarian State has not paid compensation to any shareholder of the four HBI manufacturing companies that were nationalized by virtue of those Decrees.[306]

301. The Claimants also argue that, since the Takeover Commission was tasked with transforming Comsigua into a socialist iron and steel corporation, their shares in Comsigua lost all value.[307] In their opinion, nobody would pay for a minority interest in a State-controlled company that remains "subject to nationalization through two Decrees."[308] However, prior to the nationalization, when Comsigua was privately managed and its aim was to maximize the investors' returns,[309] the Claimants could have easily transferred their interest to another minority shareholder or a third party.[310]

302. The Claimants maintain that case law is consistent that measures which actually destroy an investment or deprive the investor of the use or enjoyment of its investment, including a deprivation of all or a substantial portion of the economic benefit of its property, are as expropriatory as the formal taking of title to the investors' assets.[311] And, therefore, Venezuela should compensate the

---

[300] CIV, para. 195.
[301] CI, para. 127. CV, paras. 112 *et seq.*
[302] CI, para. 131.
[303] CI, para. 131.
[304] CV, para. 111.
[305] CV, para. 192
[306] CV, para. 110.
[307] CIV, para. 198.
[308] CIV, para. 70.
[309] CV, para. 191
[310] T., p. 569:4–22.
[311] In support of its position, Talta relies on the *Spyridon Roussalis* decision: "indirect expropriation may occur when measures result in the effective loss of management, use or control, or a significant depreciation of the value, of the assets of a foreign investor," *Spyridon Roussalis*, para. 327. Moreover, Talta also brings up *Alpha*: "it is recognized in international law that measures taken by a State can interfere with property rights to such an extent that these rights are rendered so useless that they must be deemed to have been expropriated, even though the State does not purport to have expropriated them and the legal title to the property formally remains with the original owner," *Alpha*, para. 408.

Claimants for the fair value of their investment.[312]

**b.    Venezuela Did Not Pay Compensation for the Comsigua Expropriation**

303.    The Claimants have not been paid any compensation for their investment in Comsigua, which renders the expropriation unlawful:

- Venezuela took over Comsigua without offering an immediate and prior payment, as required by the BIT. Even though certain discussions were had concerning some possible compensation, the investor was never presented with a formal offer.[313]

- In any event, that potential compensation expressly left lost profits out, and compensation was thus not adequate as required by the BIT:[314] the fair market value required by the BITs is the price a hypothetical "willing buyer" would pay; this buyer would have assessed the price based on the expected future profits.[315]

304.    In addition, the Claimants argue that Venezuela expropriated their investment in Comsigua in a discriminatory manner, as it did pay compensation to the Japanese Shareholders but not to Talta.[316] This would be another argument to label the expropriation unlawful.[317]

**B.    <u>The Respondent's Position</u>**

305.    Venezuela denies all of these allegations.

**a.    There Was No Expropriation**

306.    The Respondent acknowledges taking control of Comsigua; it does, however, contend that it did so without nationalizing, expropriating or in any way affecting Talta's shareholding.[318]

307.    <u>First</u>, neither of the two Decrees had expropriatory effects:

- The Nationalization Decree did not affect Comsigua, as the only companies that were nationalized were Sidor and its subsidiaries, and Comsigua does not qualify as such.[319]

- The sole purpose of the Implementing Decree was to transfer control of certain companies (including Comsigua) to the State; this goal was attained through the purchase, by CVG (a state-owned company), of 73% of

---

[312] CI, para. 132.
[313] CIV, para. 246.
[314] CV, para. 201.
[315] *Sistem Mühendislik*, para. 189.
[316] CI, paras. 143 *et seq.*
[317] CI, para. 144. In support of its position, Talta contends that the two BITs prohibit expropriation from being discriminatory. The Claimant believes that *Saluka* applies here, as the tribunal there stated that "non discrimination requires a rational justification of any differential treatment of a foreign investor," *Saluka*, para. 460.
[318] RIII, para. 275.
[319] RIV, para. 274.

Comsigua's stock from the Japanese Shareholders.[320] Once in control, there was no longer any need for the State to expropriate Comsigua,[321] or, therefore, affect Talta's shares; in consequence, the Implementing Decree ceased to apply to Comsigua.[322] The Respondent notes that neither Decree forces the Government to carry out the planned expropriation where, as was the case with Comsigua, the company can be transformed into a state-owned company through the acquisition of a majority share interest.[323]

308. <u>Second</u>, Talta's situation has not been affected: it had a 7.58% minority interest in Comsigua prior to the State's acquisition of the majority interest, and it continues to hold the same percentage shareholding today[324] in a company that remains in operation, generating cash flows,[325] and where Talta may exercise each and every right arising from its shareholding. There are then no reasons to assume, as expected by the Claimants, that their shares in Comsigua have no value at all[326] because no one would be willing to purchase them.[327]

309. <u>Third</u>, as regards the argument that Venezuela discriminated against Talta relative to the Japanese Shareholders, the Bolivarian Republic denies this allegation: nothing in the language of Article 6 of the Implementing Decree requires that an agreement be reached with all of a company's shareholders.[328] The Decree's only requirement is that every shareholder in Comsigua be afforded the opportunity to negotiate an agreement, an opportunity Talta was indeed given, but turned down.[329]

### b. The Failure to Pay Compensation is Justified

310. The Bolivarian Republic argues that Talta refused to engage in negotiations to sell its stock along with the other Japanese Shareholders.[330]

311. Later on, Venezuela offered the Claimants the same price per share of stock it had offered to the Japanese Shareholders.[331] However, the Claimants did not accept this proposal, as they expected to close a deal that would encompass all of their Venezuelan interests and, in particular, the compensation they were seeking in connection with Matesi's expropriation.[332]

312. And because, upon a failure to reach a global agreement for all of their interests, the Claimants felt they were covered by the BITs, which protected their investment (which was not the case with the Japanese Shareholders, who had no BIT in place with Venezuela).[333]

---

[320] RIV, para. 275. T., p. 252:4-13.
[321] R V, para. 116.
[322] RV, para. 119.
[323] RV, paras. 120, 121.
[324] RIII, para. 278.
[325] RIII, para. 276; Villarroel, para. 10; RIII, para. 279.
[326] RIV, para. 278.
[327] RV, para. 117.
[328] RV, para. 120.
[329] RV, para. 120.
[330] RIV, para. 276.
[331] Prosperi, para. 22.
[332] RIV, para. 276; Exhibit C-153; T., pp. 581:19–582:7 (Prosperi); RV, para. 124.
[333] The Respondent claims that this was established with the testimony of Mr. Prosperi, T., p. 581:10–18.

4.    **THE ARBITRAL TRIBUNAL'S DECISION**

313. First of all, the Tribunal will go over the rules established in the BITs on the subject of expropriation (**1.**). Then, it will summarize the circumstances in which Tavsa's and Comsigua's expropriations took place (**2.**), and will determine whether these two expropriations breached the provisions of the BITs (**3.**).


**4.1    The BITs**

314. The BITs forbid the State from adopting expropriation or nationalization measures, as well as measures tantamount to such, unless certain requirements are satisfied:

Luxembourg BIT

    Art. 4.1:


    "Each Contracting Party undertakes not to adopt any measure of expropriation or nationalization or any other measure with the effect of directly or indirectly dispossessing the investors of the other Contracting Party of the investments belonging to them in its territory, unless the following conditions are fulfilled:

    a) the measures are adopted for reasons for public purpose or national interest;

    b) the measures are adopted in accordance with legal procedures;

    c) they are neither discriminatory nor contrary to a specific commitment concerning the treatment of an investment;

    d) they are accompanied by provisions for the payment of adequate and effective compensation."

Portuguese BIT

    Article IV.1:


    "Neither Contracting Party shall take measures that deprive, directly or indirectly, the investors of the other Contracting Party of the investments made by them, except if the following conditions are fulfilled:

    a) that the measures are adopted for reasons of public purposes or national interest, in accordance with the legislation in force;

    b) that the measures are not discriminatory;

    c) that the measures are accompanied by provisions that guarantee the payment of immediate, adequate and effective compensation; this

compensation shall be based on the market value of the investment in question immediately prior to the moment at which the measures was made public; compensation will accrue interest at the exchange rate applicable at the date in which the transaction becomes effective, in the territory where the investment is located; the lawfulness of the referred measures and the amount of compensation may be submitted for review pursuant to the applicable legal procedure."

315. The term "*medida*," which is not defined in the BITs, should be interpreted in the broadest possible manner. So is inferred from the very language of the Treaties, which add the indefinite adjective "*ninguna*" and the generic plural "*medidas*" to highlight its broad scope.

316. Therefore, the term covers all kinds of administrative, legislative or judicial actions by any of the branches of the Bolivarian Republic, and prohibits any such actions resulting in expropriation, nationalization, or a tantamount measure.

317. "Expropriation" takes place when, exercising a sovereign power, the State takes a measure that deprives the investor of its investment, taking away control of or title to that investment. Therefore, loss of title to the goods or assets is not a requirement. It is sufficient for the investor to lose control of its investment.

318. "Nationalization" is a concept similar to expropriation, with the peculiarity that it usually affects entire sectors of an economy, whose exploitation the State has decided to reserve to itself.

319. Each BIT refers to tantamount measures in different but synonymous terms ("any other [measure] whose effect is to dispossess the investors directly or indirectly" or any "measure which indirectly denies… the investors… the investments").

320. These are legislative, judicial or administrative actions of a State that significantly interfere with the use and enjoyment of the investment, to an extent such that its value is destroyed, without, however, depriving the investor of title and control.

321. The prohibition to take measures of expropriation or nationalization or tantamount measures is not an absolute one. The BITs do allow them, provided that the State fulfills certain requirements:

- That they serve a public purpose;

- That they are taken in accordance with legal procedures;

- That they are not discriminatory; and

- That they are accompanied by provisions for the payment of compensation, which must be adequate and effective, and be based on the market value of the investments prior to their becoming public, and the payment of which must be effected without undue delay, in a freely transferrable currency, accruing interest.

**4.2    TAVSA AND COMSIGUA HAVE BEEN THE SUBJECT OF EXPROPRIATION**

322. Venezuela acknowledges it indirectly expropriated Tenaris' investment in Tavsa:[334] indeed, all of Tavsa's assets have become the property of the Bolivarian Republic, even though Tenaris still holds title to Tavsa's shares, with Tavsa having become a mere shell company, deprived of all of its assets and its business activities.[335]

---

[334] RV, para. 131.
[335] See para. 271 *supra.*

### A. **Comsigua-Specific Features**

323. The Bolivarian Republic, however, denies having expropriated the Claimants' assets in Comsigua.[336]

324. The Arbitral Tribunal does not agree.

325. The facts prove otherwise: the Venezuelan State made a decision to nationalize all of Comsigua's assets (**a.**), and it did indeed carry out its decision, depriving the Claimants of their investment in Venezuela (**b.**).

### a. **The Decision to Expropriate Comsigua**

326. In issuing the Nationalization Decree in 2008, President Chávez formalized the decision to nationalize the iron and steel sector in Guayana – which Comsigua was a part of:

> "Article 1. For reasons of national convenience and in light of its relation to activities that are strategic for the development of this Nation, the iron ore transformation industry in the Guayana region is hereby reserved to the State, as this is an area holding the largest iron deposit, the exploitation of which has been reserved to the State since 1975."

327. One year later, President Chávez publicly confirmed Comsigua's nationalization in a speech broadcast on television on May 21, 2009 before a group of workers of the iron and steel sector, who cheered their approval:[337]

> "The hot briquetted iron sector – nationalize it; there is nothing to be discussed. The company [...] Comsigua, [...] Tubos Tavsa, nationalize them."

328. The President's announcement was followed by another decree, the Implementing Decree, elaborating on the Nationalization Decree and ordering the acquisition of the assets of four iron and steel companies, including Tavsa and Comsigua:

> "Article 1. There is hereby ordered the acquisition of the assets of business companies [...] Complejo Siderúrgico de Guayana S.A. (Comsigua), [...] Tubos de Acero de Venezuela S.A. (Tavsa), their subsidiaries and affiliates [...] with the aim of transforming them into State companies [...]."

329. It should be noted that, pursuant to the Implementing Decree, the target of the expropriation was the set of assets owned by Comsigua ("Expropriated Assets"), which were necessary to carry out the company's business activity – not the shares held by the investors in this company.

---

[336] RV, para. 115.
[337] Exhibit C-56.

### b. The Forced Acquisition of the Expropriated Assets

330. *Pro memoria*: A few months after the Implementing Decree came into effect, and relying on it, Venezuela formally took control of the Expropriated Assets from Tavsa.[338] Such takeover was formalized via the so-called "Record of Transfer" of November 16, 2009.[339]

331. For Comsigua, control over the Expropriated Assets was transferred two years later, on June 17, 2011. On such date, the following decisions were made:[340]

-   <u>First</u>, Minister José Khan, who, in turn, served as President of the state-owned CVG (a shareholder of Comsigua), issued an executive decision in the form of resolution number 041- 11, whereby Iván Nicolás Hernández Rojas was appointed new President of Comsigua;[341]

-   <u>Second</u>, at the Shareholders' Meeting that was held on that very same day,[342] there was ratified the forced appointment of the new President of Comsigua;[343]

-   <u>Third</u>, those who had thus far occupied management positions at Comsigua resigned from their offices.[344]

332. The minutes of the Shareholders' Meeting expressly acknowledges that it is then that Comsigua's nationalization was completed, using language such as:

> "We are handing the Company's management over to those who are coming to take our place as a result of Comsigua's *Nationalization* […]."[345]

> "The natural consequence of the *Nationalization* of Comsigua was the termination of the contracts between the Company and its shareholders for the sale of HBI and technical support […]."[346]

333. The Tribunal thus finds that, on June 17, 2011, the State took the Expropriated Assets and took control of Comsigua's business activity.

---

[338] "consistently with Decree 6796 [...]."
[339] Exhibit C-71.
[340] Exhibit R-64.
[341] Exhibit R-64, p. 1.
[342] Exhibit R-64.
[343] Exhibit R-64, p. 11: "It is hereby decided: To appoint Mr. Iván Hernández President of the Company and Chairman of the Board."
[344] Exhibit R-64, p. 11: "It is hereby decided: To acknowledge and record the resignation of those who, having been appointed, designated, proposed and/or elected by the [Japanese Shareholders], since the last shareholders' meeting, have been in charge of managing the assets of the Company up to June 17, 2011."
[345] Exhibit R-64, p. 9. Italics in original.
[346] Exhibit R-64, p. 10. Italics in original.

**B.** **Compensation for the Expropriations**

334. Venezuela has not paid any compensation for the expropriation of Tavsa's assets, nor does there seem to have been any serious negotiations on the subject.

335. The situation is somewhat different as regards Comsigua. In this case, the State did commence negotiations with the private shareholders in order to agree on the compensation due them:

- Negotiations with the Japanese Shareholders were successful and the compensation was formalized through the so-called "Share and Asset Assignment Agreement,"[347] pursuant to the Nationalization Decree and the Implementing Decree:

> "[...] an agreement has been reached to enter into this share sale contract, pursuant to Decrees Nos. 6058 and 6796 [...]."

- Talta was also made a compensation offer,[348] on terms similar to those of the compensation paid to the Japanese Shareholders, which, for the reasons discussed in paragraphs 377-380 *infra,* never actually became a reality.

**C.** **Conclusion**

336. The Arbitral Tribunal concludes that the Bolivarian Republic took for itself all of the assets of Tavsa and of Comsigua and took control of the business activity these companies had been engaged in so far, which resulted in the expropriation of Tenaris' and Talta's investment in Venezuela. Tavsa and Comsigua have been reduced to just two shell companies whose assets now belong to Venezuela and whose business activity is carried out by the State.

337. This expropriation may be labeled indirect (as done by the Claimants), because both investors continue to hold formal title to their shares in the two companies whose assets have been the subject of expropriation.

**D.** **The Respondent's Counter-Arguments**

338. In response to this conclusion, the Respondent has raised two counter-arguments:

**a.** **Exclusion from the Scope of Application of the Implementing Decree**

339. The Implementing Decree explicitly ordered the nationalization of Comsigua's assets – Venezuela does not deny this fact. However, Venezuela suggests that the Implementing Decree no longer applies to the Claimants' investment in Comsigua. The argument is somewhat complicated: the Bolivarian Republic suggests that the Decree will not apply to the Claimants' investment in Comsigua because Venezuela has already achieved its goal of converting Comsigua into a state-owned company. It did so by acquiring the majority shareholding that used to be held by the Japanese Shareholders. Venezuela

---

[347] Exhibit C-72.
[348] CRED-59.

88

argues that, once Comsigua's nationalization was achieved, it was no longer necessary to enforce the Nationalization Decree as against the Claimants to secure title to their shares in Comsigua.[349]

340. The argument might perhaps be relevant if expropriation or nationalization required that the State take title to the shares of the company that owns the assets that are used to carry out the business' activity.

341. But this is not the case.

342. What is relevant in order to determine whether an expropriation or nationalization took place is whether the State took control (the so-called "taking") of the company or the assets of the investor.[350] Where there is a taking, whether formal title to the stock is transferred to the State is irrelevant.[351]

343. In the instant case, the Implementing Decree provided that the target of the expropriation would be all assets of Comsigua – not the shares owned by its shareholders. On June 17, 2011, Venezuela completed the company's nationalization, appointing its new President and taking the Expropriated Assets via an administrative decision. Following this taking of all of its assets and its entire business activity, Comsigua became a mere empty shell, without any business or corporate activity of its own.

344. <u>To conclude</u>, in spite of formally retaining title to their shares, the Claimants have suffered an expropriation of their investment in Comsigua, as the assets and business activity of Comsigua have been taken by, and are now the property of, the State.

**b. Unchanged Value**

345. The Bolivarian Republic has put forth a second argument: the Claimants' investment in Comsigua has remained unchanged before and after the Decrees.[352] On the contrary, the Claimants deny this: in their view, after Comsigua's nationalization as a result of the Nationalization Decree and the Implementing Decree, the value of their investment[353] and rights[354] as shareholders has been destroyed.

---

[349] R III, para. 278.
[350] A. Reinisch, "The Oxford Handbook of International Investment Law" (Ed. C. Schreuer *et al.*), Oxford University Press, 2008, p. 421: "*As opposed to direct expropriation, which involves the taking of property, indirect expropriation may occur when measures short of an actual taking 'result in the effective loss of management, use or control, or a significant depreciation of the value of the assets of a foreign investor.'*"
[351] UNCTAD, Taking of Property, Series on issues in international investment agreements, New York, Geneva, United Nations, 2000, p. 4: "*The taking of property by Governments can result from legislative or administrative acts that transfer title and physical possession. Takings can also result from official acts that effectuate the loss of management, use or control, or a significant depreciation in the value, of assets.*"
[352] RIV, para. 278.
[353] CV, para. 194.
[354] CV, paras. 192, 193.

346. The Arbitral Tribunal agrees with the Claimants.

347. The value of a business investment channeled through a company set up in the host State is equal to the value of the investor's rights as a shareholder. The Tribunal has verified that the Claimants have lost the entire value of their investment in Comsigua, as they have been deprived of their shareholder rights since June 17, 2011:

- The President of the company has been appointed by an executive decision of a Minister, not the shareholders;

- Since then, no shareholders' meeting has been called and no annual financial statements have been prepared.[355]

348. The Claimants have thus been deprived of any possible involvement in the business activity or corporate life of Comsigua or the possibility of benefitting from them. Tenaris and Talta were the owners of an investment that consisted in them being shareholders in a Venezuelan company that carried out a business activity. As a result of the State's intervention, they have become shareholders in a shell company, which gives its owners no voting or monetary rights.

<u>The Value of their Interest in Comsigua</u>

349. The Arbitral Tribunal shares the Claimants' view that their shareholding in Comsigua is currently valueless.

350. The Claimants contend that, prior to the Decrees, they could have sold their shares to any of the other minority shareholders or a third party[356] (as done by minority shareholder IFC a year prior to the effective date of the Nationalization Decree).[357]

351. The former option is now off the table, as Talta is Comsigua's sole minority shareholder; and the latter option is virtually non-existent, given the evisceration of the shareholders' decision-making and monetary rights. The only possible buyer would be the State itself; however, in spite of having gotten to the point of making an offer, in the end the State decided not to proceed with the purchase of the Claimants' stock in Comsigua, which destroyed the only possibility that was *de facto* left to the Claimants in order to be redressed for the expropriation.

352. <u>In short</u>, the implementation of the Decrees had the effect of neutralizing the value of the Claimants' investment in Comsigua, by leaving their voting and monetary rights associated with the investment devoid of any content.

---

[355] T., pp. 568–570.
[356] T., p. 569:4–22.
[357] *Pro memoria*: IFC sold its 8.70% interest in Comsigua, Exhibit C-40; Exhibit C-82.

### 4.3 LACK OF PAYMENT

353. Having determined that Venezuela indirectly expropriated the Claimants' investment in Tavsa and Comsigua, the Arbitral Tribunal will need to determine whether such expropriations were lawful.

354. It is worth going over the content of the BITs at this point:

Article 4.1 of the Luxembourg BIT:

"Each Contracting Party undertakes not to adopt any measure of expropriation or nationalization or any other measure with the effect of directly or indirectly dispossessing the investors of the other Contracting Party of the investments belonging to them in its territory, unless the following conditions are fulfilled:

a) the measures are adopted for reasons for public purpose or national interest;

b) the measures are adopted in accordance with legal procedures;

c) they are neither discriminatory nor contrary to a specific commitment concerning the treatment of an investment;

d) they are accompanied by provisions for the payment of adequate and effective compensation."

Article IV.1 of the Portuguese BIT:

"Neither Contracting Party shall take measures that deprive, directly or indirectly, the investors of the other Contracting Party of the investments made by them, except if the following conditions are fulfilled:

a) that the measures are adopted for reasons of public purposes or national interest, in accordance with the legislation in force;

b) that the measures are not discriminatory;

c) that the measures are accompanied by provisions that guarantee the payment of immediate, adequate and effective compensation; this compensation shall be based on the market value of the investment in question immediately prior to the moment at which the measures was made public; compensation will accrue interest at the exchange rate applicable at the date in which the transaction becomes effective, in the territory where the investment is located; the lawfulness of the referred measures and the amount of compensation may be submitted for review pursuant to the applicable legal procedure."

355. In other words, the BITs provide, in equivalent terms, that a measure needs to be accompanied by provisions for the payment of adequate and effective compensation, to be made immediately, without undue delay.

356. One of the Claimants' core arguments is that, even though more than seven years have elapsed since the expropriation,[358] they have received no compensation at all,[359] in breach of Articles IV and 4 of the BITs.

357. *Prima facie,* the Arbitral Tribunal agrees with the Claimants: a delay of more than seven years in the payment of compensation does not constitute "immediate" payment, in the words of Article IV of the Portuguese BIT.[360] Article 4 of the Luxembourg BIT further requires that payment be made without "undue delay;" and, in this case, Venezuela has wielded two excuses for the delay, which the Tribunal will now analyze: the inexistence of a judgment ordering payment of the fair price (**A.**); and the Claimants' obstruction tactics (**B.**). Lastly, the Respondent also maintains, as a subsidiary argument, that the lack of payment does not render the expropriation unlawful (**C.**).

## A.    The Lack of a Judgment Ordering Payment

358. The Bolivarian Republic admits that every expropriation goes hand in hand with the obligation to pay compensation. It argues, however, that it has not paid any such compensation because no judgment has been issued by the court in charge of the expropriation proceedings ordering payment of the fair price.[361]

359. This argument must fail.

360. The judicial expropriation procedure is governed by Articles 23 *et seq.* of LECUPS. To sum up, the contentious proceedings in place for expropriation are as follows:

> The expropriating entity files an expropriation request with the judge or magistrates[362] (Article 23). The judicial authority sets a period for the interested parties (Article 26) to be able to file their answer to the request (Article 28), along with the relevant evidence (Article 30). Once the evidentiary stage is complete, the judge will open the stage for presentation of the case, to extend for no more than 60 days; the judge will then ask the parties to submit their reports, and after that, within a period no to exceed 30 days, the judge will render judgment (Article 32) ruling on the need to acquire all or a part of the property.
>
> Once it has been ruled that it is necessary to expropriate, the judge will summon the parties to a conciliation hearing (Article 34) and, should no settlement be reached, the judge will appoint a Valuation Commission to determine the asset's fair price (Article 35). Once such fair price has been set, the expropriating entity must deposit the sum with the court (Article 45). Once the fair price has been deposited, the judge will issue a copy of the expropriation judgment and order formal handover of the asset to the requesting entity (Article 46).

361. A judge may never order the expropriating entity to deposit the fair price value

---

[358] CV, para. 204.
[359] CV, paras. 201, 413.
[360] See also *OI European*, para. 425.
[361] RVI, para. 138.
[362] The Civil Trial Court in the jurisdiction where the asset is located or the First Contentious-Administrative Court when the Republic is the party seeking expropriation (Article 23).

unless a judicial proceeding has been instituted. And, pursuant to Article 23 of LECUPS, such proceeding is commenced by the expropriating entity. In this case, there is no evidence that the expropriating entity – the Bolivarian Republic – has commenced any such proceeding. Therefore, Venezuela has not done the bare minimum in order for a judgment to be rendered at some point ordering payment of the fair price.

362. The Bolivarian Republic may not escape its liability for an internationally wrongful act by relying on its own inaction.[363]

Venezuela's Counter-Arguments

363. The Bolivarian Republic has tried to sidestep the lack of a court proceeding by attributing it:

364. (i) Mainly, to the slow nature of the "administrative handling" of the issue.[364]

365. The Claimants maintain that Venezuela has not even commenced the judicial expropriation proceeding,[365] and Venezuela has produced no evidence that would refute such allegation. In order for a proceeding to be slow, it is necessary that, at the very least, it has been commenced; in this case, however, rather than slowness, there seems to be complete inaction on the part of Venezuela.

366. (ii) Subsidiarily, to the investors' inaction.[366]

367. Venezuela suggests it is the Claimants who should have initiated the expropriation proceeding, thereby making up for the inaction of the Administration. The Bolivarian Republic argues that the Claimants could have relied on Article 9 of the Organic Law on Administrative Litigation, under which the contentious-administrative judicial organs may act in the event that an authority fails to take a step they are statutorily required to take.[367]

368. The Respondent further notes that other tribunals have taken into consideration if the investors used the resources available to them under domestic law when determining whether the State committed an international wrong.[368]

369. The arguments are not convincing: Article 23 of LECUPS provides, without exception, that it is the State who must institute the judicial expropriation proceedings. Venezuela's suggestion that it should have been the Claimants who started the judicial expropriation action against themselves makes absolutely no sense: under Venezuelan law, every citizen is entitled to step in for the Administration in the event of the latter's inaction, and institute contentious-administrative proceedings, but is under no obligation to do so.

---

[363] *Nullus commodum capere de sua injuria propria,* which stems from the principle of good faith. This has been a well-established principle since the first relevant cases in Public International Law: *Montijo, Roberts, Tattler, Chorzów*.
[364] T., p. 274:8–13; RV para. 138.
[365] CV, para. 206.
[366] T., p. 274:8–13; RV para. 138.
[367] Article 9.1: "Contentious-Administrative organs shall have jurisdiction over the authorities' failure or refusal to produce an act they are by law required to produce."
[368] RV, para. 135.

## B. The Claimants' Alleged Obstruction

370. The State's second argument is that it was the Claimants who hindered each and every conciliation effort attempted by Venezuela in connection with the payment of compensation:

### a. Tavsa's Compensation

371. The Respondent argues that, by sending the Tavsa Notice and subsequently instituting this arbitration, Tenaris thwarted any negotiation attempt.[369]

372. Said argument is not reasonable.

373. Negotiating compensation was the only task entrusted to the Compensation Commission, which consisted of members appointed by the State and by Tenaris. The Compensation Commission was tasked with arriving at a compensation solution within a period of 60 days, which could be extended for another 60 days upon the parties' mutual agreement.[370] Until the negotiation period had ended, the State could not take over control and the exclusive operation of Tavsa, as per Article 5 of the Implementing Decree.[371]

374. In actuality, the State appointed its members on August 7, 2009,[372] and Tenaris did as much 10 days later.[373] With the first 60-day negotiation period having expired unsuccessfully, on October 28, 2009 the State requested that the period be extended to December 29, 2009.[374] However, well before this extension expired, and without waiting for a compensation agreement, the Government forcefully took over Tavsa.[375]

375. Four days after takeover, the Claimant sent the Tavsa Notice, making the Bolivarian Republic aware of the existence of a dispute between them.

376. Given the evidence on the record, it is the Arbitral Tribunal's view that the Tavsa Notice and the failure of the negotiations are a consequence of the Bolivarian Republic's decision to prematurely take over Tavsa.

---

[369] T., pp. 249:19–250:6.

[370] Article 5 of the Implementing Decree.

[371] "Upon expiry of the period established in the preceding article without an agreement for the transformation into a State-owned company having been reached, the Bolivarian Republic of Venezuela, acting through the Ministries or any of its functionally-decentralized entities, referred to in Article 2 hereof, shall assume, as applicable, the exclusive control and operation of the companies, in order to maintain continuity in the activities carried out by the companies referred to in Article 1. In the event that no agreement is reached in the negotiations over the assets, the National Executive Branch shall decree the expropriation of said companies, pursuant to the provisions of the Law on Expropriation by Reason of Public or Social Interest. In no event shall lost profits or indirect damage be taken into account for the calculation of compensation or the fair price of the aforementioned assets."

[372] Letter from PDVSA to Tavsa, August 7, 2009, Exhibit C-69. Tenaris ratified its representatives at the technical commission provided for in Article 7 and Article 4 of Decrees 6058 and 6796, respectively. See Letter from Tenaris to PDVSA Industrial, August 17, 2009, Exhibit C-70, pp. 1-2; Álvarez, para. 58. Later on, on May 3, 2010, Tenaris added a number of members to the technical commission. See Letter from José Frías of Tenaris to the Ministry of Industry, May 3, 2010, Exhibit C-150.

[373] Exhibit C-70.

[374] T., pp. 688:11–689:3 (Larez); CV, para. 63. Action Memorandum from L. Pulido (PDVSA Industrial) to R. Ramirez (PDVSA), October 28, 2009, Exhibit R-51.

[375] Record of the Transfer of exclusive Control and Operation of Commercial Company Tavsa, Tubos de Acero de Venezuela S.A., November 16, 2009, Exhibit C-71, p. 4.

### b. Comsigua's Compensation

377. The negotiations over Comsigua's compensation went on much further than Tavsa's. Indeed, the Bolivarian Republic even made the Claimants an offer on terms equal to those offered to the Japanese Shareholders.[376] This offer was even put down in writing, since its materialization required ministerial approval.[377]

378. Each Party has an entirely different recollection of why this offer did not succeed:

- Witness Wilfredo Villarroel, Comsigua's Coordinator of Administration starting June 2011,[378] claims that Tenaris suddenly made the possibility of an agreement regarding Comsigua conditional upon a global agreement covering compensation for Matesi[379] (another HBI manufacturer that was nationalized)[380] as well;

- For his part, Ricardo Prosperi, Tenaris' General Manager for the Andean Region since February 2010,[381] states that Tenaris was willing to accept the offer made in connection with Comsigua, and attributes the offer freeze to the change in the Ministry in charge of handling the negotiations (MIBAM to the Ministry of the People's Power for Energy) and a family tragedy suffered by a high Government official.[382]

379. Having carefully examined the testimony and expert evidence produced in this case, the Arbitral Tribunal is inclined to recognize greater probative value to the Claimants' witness, as it is not for nothing that he is the witness who was directly involved in the events.[383]

380. The Tribunal thus finds that the negotiations were frustrated due to reasons outside the Claimants' control.

* * *

381. The Respondent's excuses for its lack of payment having been rejected, there is still one subsidiary argument that remains to be analyzed: the mere lack of payment of compensation does not render the expropriation unlawful.

### C. Payment as a BIT-Compliance Element for the Expropriation

382. According to Venezuela, what is decisive for an international wrong is not whether the State paid compensation or instituted court proceedings to assess such compensation,[384] but whether provisions were in place in order for

---

[376] Exhibit R-68.
[377] CRED-59.
[378] Villarroel I, p. 1.
[379] Matesi Materiales Siderúrgicos S.A.
[380] Villarroel I, para. 1213.
[381] Prosperi, para. 5.
[382] Prosperi, paras. 22 – 25.
[383] Prosperi, paras. 22 *et seq.*; T., p. 764:18.
[384] RII, para. 304.

compensation to be promptly made,[385] which is what is required by Article 4.1(d) of the Luxembourg BIT.[386] The Respondent relies on *Amoco*[387] in support of its position.

383. The Luxembourg BIT distinguishes the requirement that provisions be included in the relevant law or decree that guarantee payment of compensation, on the one hand, from the obligation that payment of compensation be effected without undue delay, on the other:

- Provisions on the payment of compensation:

   Article 4.1.d) of the Luxembourg BIT: "[…] they are accompanied by provisions for the payment of adequate and effective compensation."

- Payment of compensation:

   Article 4.2 of the Luxembourg BIT: "… Compensations shall be paid without undue delay and shall be freely transferrable."

384. Accordingly, Venezuela's position is unacceptable: the Republic cannot avoid the consequences of its lack of payment by relying upon the mere existence of expropriation measures that did make provision for the payment of compensation. What is relevant here is not that the legislative measure provides for the right to compensation, but that it has been effectively satisfied.

385. Irrespective of the above, the Arbitral Tribunal has analyzed the *Amoco* case, which the Respondent relies on in support of its position, and finds that the facts of that case are entirely unrelated to the case at hand:

- In *Amoco,* the Iranian law that governed expropriation processes burdened the affected party with initiating the mandatory administrative proceedings to claim for compensation.[388] According to such law, there was no need to involve any judicial authority.[389] The Arbitral Tribunal found that the legal provisions that governed payment of compensation were adequate, with judicial involvement not being necessary,[390] and that the claimant had just elected not to be involved in that proceeding and not to claim compensation in the administrative proceedings.[391]

- This case is completely different: Venezuelan law provides that the expropriation proceedings are to take place before a judicial authority, instituted by the expropriating entity; therefore, the judge's involvement is a result of its own law, and it was the State (not the Claimants) who, disregarding its legal obligation to institute the judicial expropriation proceedings, frustrated the possibility that a judge would order payment of fair price.

---

[385] RII, para. 300.
[386] RII, para. 298.
[387] Exhibit RLA-84.
[388] *Amoco*, paras. 134, 137.
[389] *Amoco*, para. 137.
[390] *Amoco*, para. 137.
[391] *Amoco*, paras. 76, 134.

* * *

386.  <u>To sum up,</u> the Arbitral Tribunal concludes that the expropriation of Tavsa's and Comsigua's assets entailed a violation of Articles IV and 4 of the BITs, as Venezuela failed to fulfill its obligation to pay compensation without undue delay.

# VII. **QUANTUM**

387. Having concluded that Venezuela expropriated the Claimants' investments in Tavsa and Comsigua in violation of Article 4 of the Luxembourg BIT and Article IV of the Portuguese BIT, the Tribunal must now address the issue of *quantum*.

388. The decision, as regards the compensation quantum, is as follows: the Arbitral Tribunal will address the relevant valuation date as a preliminary issue (**VI.1.**); it will then determine the value of each of the expropriated companies: Tavsa (**VI.2.**) and Comsigua (**VI.3.**). Lastly, it will make a decision on the subject of interest (**VI.4.**).

389. Prior to that, however, a few paragraphs are in order as an introduction.

<u>The Parties' Positions</u>

390. The Claimants have requested the following relief:

> "[That the Tribunal]
>
> (c) ORDER Venezuela to pay the Claimants the sum of US$243.7 million (as of April 30, 2008) for its breaches of the Treaties, which includes the sum of US$213.2 million in respect of Tenaris's investment in Tavsa and US$30.5 million in respect of Claimants' investment in Comsigua, or such other sum as the Tribunal determines will ensure full reparation;
>
> (d) ORDER Venezuela to pay pre-award interest on (c) above in the sum of US$471.1 million from the Valuation Date to September 11, 2015 at a rate of 15.69% (being the WACC of Tavsa, amounting to US$410.77 million) and 15.96% (being the WACC of Comsigua, amounting to US$60.35 million) per annum and thereafter until the date of the Tribunal's Award, compounded annually, or at such other rate and compounding period as the Tribunal determines will ensure full reparation;
>
> (e) ORDER Venezuela to pay post-award interest on (c) and (d) at a rate of 15.69% (being the WACC of Tavsa) and 15.96% (being the WACC of Comsigua) per annum as at the date of the Tribunal's Award, compounded annually, or at such other rate and compounding period as the Tribunal determines will ensure full reparation."

391. In other words, the Claimants are seeking to be paid the value of their investments in Tavsa and Comsigua, plus pre- and post-Award interest.

392. Venezuela, on the other hand, argues that the Claimants have not satisfied their burden of proof as regards the quantum of the damages.[392]

Applicable Law

393. The consequences associated with a violation of Articles 4 of the Luxembourg BIT and IV of the Portuguese BIT are provided for in the articles themselves:

"The amount of the compensation shall correspond to the real value of the investment concerned on the day prior to the adoption or publication of the measures."[393]

"[...] [T]his compensation shall be based on the market value of the investment in question immediately prior to the moment at which the measures was made public."[394]

394. Thus, both BITs require that the quantum of compensation be equal to the "real value" and the "market value" of the expropriated asset, calculated on the date immediately preceding that on which the expropriation took place (or was made public). The Parties agree that the terms "real value" and "market value" are equivalent[395] and refer to the money price a hypothetical buyer would be willing to pay a hypothetical seller, where

- Both parties are interested in completing the transaction, but not required to do so;

- Both parties are acting in good faith, in accordance with market practices;

- In an open, unrestricted market; and

- Both parties have reasonable knowledge of the subject-matter of the contract and the market conditions.[396]

395. In addition, the Claimants have asserted their right to full reparation, which is the compensation standard under international Law.

396. It is an undisputed principle of customary international Law that the victim of a wrongful act of the State is entitled to receive full reparation, as if the wrongful act had never taken place.[397] In expropriation cases, full reparation equals the market value of the expropriated assets, taken to mean the value the owner of the assets could have obtained, had the assets been sold on a date immediately preceding that of the State's taking, or the date when the intention to expropriate became public knowledge (causing the assets' market value to fall).[398]

---

[392] RIV, para. 338.
[393] Luxembourg BIT, Article 4.2.
[394] Portuguese BIT, Article IV.1.c).
[395] CIV, para. 203, RIV, paras. 342 *et seq*.
[396] CI, para. 180.
[397] *Chorzów*, p. 47. In the same vein, the Draft Articles on the Responsibility of States for Internationally Wrongful Acts: Report of the International Law Commission, Fifty-Third Session, Chapter IV, commentary to Article 34, 5, U.N. GAOR, 56° Ses., Supplement No. 10, U.N. Doc A/56/10 (2001).
[398] World Bank (eds): "Legal Framework for the Treatment of Foreign Investment. Report to the Development Committee and Guidelines on the Treatment of Foreign Direct Investment," 31 I.L.M. (1992), 1382.

397. Therefore, in practical terms, the rules on compensation established in the BITs lead to the same results as the application of the general principles of international Law.[399]

Evidence of the Market Value of Tavsa and Comsigua

398. Evidence of the quantum of compensation has been very abundant: it covers close to 500 pages, more than 250 exhibits, along with spreadsheets, tables and charts and one day and a half of expert witness examinations. Of such evidence, the most important piece is, without question, the expert reports:

- The Claimants have hired the services of Messrs. Manuel A. Abdala and Pablo D. López Zadicoff of COMPASS LEXECON, LLC ["**Abdala/Zadicoff**"], who submitted two expert reports – one of October 18, 2013 ["**Abdala/Zadicoff I**"] and another one of January 27, 2015 ["**Abdala/Zadicoff II**"];

- Venezuela, on the other hand, entrusted Mr. Timothy H. Hart of CREDIBILITY INTERNATIONAL ["**Hart**"] with quantifying the damage; the expert also submitted two reports: one of October 21, 2014 ["**Hart I**"] and another one of April 13, 2015 ["**Hart II**"].

- Then, on August 21, 2015, both Parties' experts jointly prepared an additional report on the value of Tavsa, focusing on those aspects on which their positions diverged ["**Joint Report**"], which was submitted along with a spreadsheet containing several expandable interactive options to allow the Arbitral Tribunal to be able to opt between the suggestions of one or the other expert.

399. The Arbitral Tribunal warns that, given the scale of the allegation and evidence on the subject of damages, the Tribunal's summaries of the experts' positions are not intended to be exhaustive. In order to make this the easiest explanation to follow, the Arbitral Tribunal has elected to highlight here just those arguments it has found most significant, which does not mean it has not carefully analyzed everything that has been submitted to it by the experts.

---

[399] The Tribunal takes note of the fact that Venezuela argues that the applicable standard to calculate the compensation due is contained in the BITs themselves (RVI, paras. 162 *et seq.*), while it is the Claimants' contention that the applicable compensation standard is the one provided by customary international Law (CVI, para. 226). However, both Parties agree that, for the main damages quantum, the result would be the same irrespective of which standard is used. CVI, para. 232; RVI, para. 161.

### Allocation of Compensation between the Claimants

400.   The Claimants have submitted their *petitum* jointly: Venezuela must pay both Claimants the sum of USD 213.2 million for Tenaris' investment in Talta and USD 30.5 million for both Claimants' investment in Comsigua; it must also pay both Claimants the interest already accrued and to accrue on those amounts. However, the Claimants have not specified the proportion in which such award will be allocated between them.

401.   The Arbitral Tribunal has ruled out a 50%/50% allocation, since this would allow Talta, which is not an investor in Tavsa, to be paid compensation for the expropriation of an investment that is not its own. The appropriate solution is for each company's compensation to go to the respective investor.

402.   Tavsa's compensation is then to be paid in full to Tenaris. Comsigua's compensation, however, creates more serious doubts. Both Claimants are investors in Comsigua: Talta is the direct investor, and Tenaris is also an investor but only indirectly, as it is the 100% owner of Talta: the complaint could have been filed individually, either by Talta or by Tenaris. Because it was jointly filed, and no allegation has been made by a party, the Tribunal does not have a rule to determine how to allocate the compensation among them; therefore, the award will be paid to the direct investor in Comsigua, namely Talta. Tenaris, as Talta's sole owner, will then do as it sees fit with the money thus received.

VII.1.                                    **THE VALUATION DATE**

403.  Both BITs establish that compensation is to be set as of the day preceding that on which the expropriatory measure became public knowledge.[400]

404.  The Parties' experts have conflicting positions on the date of the expropriatory measure: the Claimants' experts argue that expropriation took place on the date of the Nationalization Decree, April 30, 2008; whereas the Respondent's expert advocates for May 20, 2009, which is the day prior to the public announcement of Tavsa's and Comsigua's nationalization by President Chávez.

1.   TAVSA

405.  As regards Tavsa, the Respondent itself has acknowledged that the expropriation was carried out pursuant to the Nationalization Decree, as supplemented by the Implementing Decree;[401] there is then no question that the expropriatory measure took place on April 30, 2008.

The Respondent's Counter-Argument

406.  The Respondent's expert has argued that Tenaris, in its filings with the U.S. Securities and Exchange Commission, suggested that the date on which, for accounting purposes, its investment in Venezuela was affected was May 2009.[402]

407.  Experts Abdala/Zadicoff, however, consider that the fact that Tenaris waited until May 2009 to have its financial statements reflect the situation of its investments in Venezuela is not significant in order to determine the valuation date, due to a number of reasons:[403]

-     Until the formal change of control of the company took place, there was no obligation to reclassify the investment;[404]

-     The book value of Tenaris' investments in Venezuela did not reflect their market value, and there was thus no need to reduce the book value of its investments; therefore, the fact that in May 2009 they decided to have their accounts reflect this impairment in value only shows that Tenaris is guided by prudence; it does not, however, rule out the fact that the investments had already been impaired earlier.

408.  The Arbitral Tribunal agrees with Tenaris:

---

[400] Luxembourg BIT, Article 4.2, and Portuguese BIT, Article IV.1(c).
[401] RIII, paras. 284 *et seq.*
[402] Hart I, para. 70.
[403] Abdala/Zadicoff II, para. 18.
[404] T., p. 827.

- First, because nowhere do the BITs link the determination of the date for compensation to the investors' accounting records; and

- Second, because the Claimants have supplied two plausible reasons for such accounting behavior, which is not incompatible with the fact that the expropriation took place a year earlier.

409. The Arbitral Tribunal confirms that the Nationalization Decree of April 30, 2008 was a measure with expropriatory effects on Tavsa and, therefore, in accordance with the literal meaning of the BITs, the valuation date for the compensation due is the day before the date of that measure, *i.e.* April 29, 2008.

410. However, because using full months for calculation purposes is more convenient, the Claimants' experts have used as the valuation date a day later, April 30, 2008, and the Arbitral Tribunal will allow this simplification (which results in a very slight reduction in value).

## 2. COMSIGUA

411. As regards Comsigua, conversely to the case with Tavsa, Venezuela has not explicitly acknowledged its expropriation. It has been this Arbitral Tribunal that determined that both companies shared a similar fate: their assets were expropriated as a result of the Nationalization Decree and the Implementing Decree.[405] Therefore, the date of publication of the expropriation measure is, just like for Tavsa, April 29, 2008 and, due to reasons of convenience, it will be April 30, 2008.

The Respondent's Counter-Argument

412. Venezuela argues that the Nationalization Decree does not apply to Comsigua, because it is not Comsigua, but Sidor instead, that it mentions explicitly.[406] This argument is not persuasive:

413. (i) The Nationalization Decree ordered the nationalization of the entire iron ore transformation industry in the Guayana region – the sector Comsigua operates in;

414. (ii) The Nationalization Decree ruled the activities of Sidor "and its subsidiaries and affiliates" to be of public use and social interest, and ordered its transformation into a State-Owned Company.

415. The Arbitral Tribunal has no doubt that Comsigua was an affiliate of Sidor because, as agreed by the Respondent itself, "affiliates" are those companies that are subject to common ownership,[407] and, in this case, Comsigua was an affiliate of Sidor, as it was owned by Tenaris and Sidor was owned by Ternium, and both Tenaris and Ternium are members of the Techint Group[408] – the ultimate parent of both was therefore the same.

---

[405] See para. 336 *supra*.
[406] RIII, para. 288.
[407] RIV, para. 355, and the reference to Exhibit R-109.
[408] CI, para. 58.

416. (iii) The Respondent itself acknowledged on several occasions that the Nationalization Decree applies to Comsigua:

- The MIBAM Minister appointed its representatives to the Compensation Commission, relying expressly on the Nationalization Decree:[409]

  "In my capacity as Minister of [MIBAM] and based on Decree No. 6058 [...] and pursuant to the President's decision to proceed with the full statization of Complejo Siderúrgico de Guayana S.A. (Comsigua) [...]."

- Respondent's witness Villarroel, an advisor to the Compensation Commission, acknowledged the following facts:[410]

  "In May 2009, following the decision to nationalize COMSIGUA and in accordance with Legal Decree 6.058 of April 30, 2008, a [...] transition commission was created [...]."

- The share sale agreement between the State and the Japanese Shareholders mentions both the Nationalization Decree and the Implementing Decree as the legislation under which the sale transaction was being carried out:[411]

  "[...] an agreement has been reached to enter into this share sale contract, pursuant to Decrees Nos. 6058 and 6796 [...]."

- In this arbitration, Venezuela has admitted that Tavsa's expropriation took place as a result of the Nationalization Decree,[412] even though, as regards the applicability of the Decree, Tavsa and Comsigua are similar companies: they are both companies in the Guayana iron and steel sector, they are both owned by Tenaris, and therefore affiliates of Sidor, and they both had their Takeover Commissions created based on the Nationalization Decree.[413] There is then no reason to accept the applicability of the Decree to Tavsa and – arbitrarily – deny such applicability to Comsigua.

417. Venezuela cannot now act in a manner inconsistent with its own previous actions[414] and claim that the Nationalization Decree does not apply to Comsigua. Therefore, the Arbitral Tribunal is reaffirmed that the valuation date for the purpose of Comsigua's compensation is set by the Nationalization Decree, *i.e.* April 30, 2008.

---

[409] Exhibit C-57.
[410] Villarroel I, para. 3.
[411] Exhibit C-72.
[412] RV, para. 132: "Venezuela has explained that the measure [occupation of Tavsa's premises] was authorized by Decree 6058 [...]."
[413] See para. 262 *supra*.
[414] The principle of *non venire contra factum proprium*, in Roman law tradition, or *estoppel*, in the common-law tradition.

|  |  |
|---|---|
| **VII.2.** | **TAVSA'S VALUE** |

418. The Arbitral Tribunal will now summarize the Claimant's position (**1.**), and the Respondent's position (**2.**), and, lastly, it will make a decision as to the value of Tavsa (**3.**).

## 1. THE CLAIMANT'S VALUATION

419. Experts Abdala/Zadicoff have estimated the value of Tavsa using a DCF approach (**1.**), and compared it using market multiples (**2.**). The experts prefer the former method, as it best reflects the income-generating capacity of the asset that is being valued.[415] In any event, the results arrived at by the two methods are similar and stand in the ballpark of USD 300 million,[416] valued as of April 30, 2008.

### 1.1 DCF

420. Basically, this valuation approach consists in:[417] estimating the future revenue stream (**A.**) and deducting expenses off it (**B.**). The experts assume that the net cash flows will be generated in perpetuity, increasing from 2017 onwards at a growth rate (**C.**). The cash flows are discounted at the appropriate discount rate (**D.**) to the valuation date.[418]

421. It should be noted here that the DCF method is not about estimating the cash flows actually received by Tavsa after being expropriated, but about estimating, with the knowledge available as of the valuation date (when the expropriation became public knowledge), the income to be obtained and costs to be incurred in coming years.

#### A. Revenue

422. Tavsa's revenue is determined by:[419] the expected volume of production of seamless steel tubes (**a.**) multiplied by their projected price (**b.**).

##### a. Tube Production

423. Abdala/Zadicoff state that, as of the expropriation date, Tavsa's annual production capacity was 80,000 tons of tubes,[420] and they estimate that, between 2008 and 2010, annual production would progressively increase to reach up to 72,000 tons; this maximum production level means that Tavsa would be producing at maximum capacity, at a utilization rate of 90% (80,000 * 90% = 72,000), as budgeted for 2008 – 2009.[421]

---

[415] Abdala/Zadicoff I, para. 8. Unless otherwise indicated, the Tribunal refers to the English language report.
[416] Abdala/Zadicoff I, Table I.
[417] Abdala/Zadicoff I, paras. 56, and 112.
[418] The determination of the valuation date is addressed in a separate section.
[419] Abdala/Zadicoff I, para. 118.
[420] Abdala/Zadicoff I, para. 123.
[421] Abdala/Zadicoff I, para. 124.

424. According to experts Abdala/Zadicoff, this estimate is completely reasonable: Tavsa's production constantly expanded between 2002 and 2007, with the company more than doubling its initial production levels. Once the 2006 and 2007 conflicts were over, the experts are convinced that the growth rate would have been greater still, in line with Tavsa's management's expectations.[422] A production level of 72,000 tons per year is what management expected for 2008 and 2009, and it matches the production level reached in the first quarter of 2007.[423]

425. Experts Abdala/Zadicoff start from the premise that Tavsa would obtain the necessary inputs to attain such production levels, and do not doubt the credibility of this hypothesis: Tavsa would require 91,000 tons of ingots per year, a quantity greater than provided for in the contract with Sidor by only 1%; this 1% could be obtained from the stock Tavsa had piled up as of the valuation date.[424]

426. Abdala/Zadicoff do not find it necessary to apply greater adjustments to these forecasts to reflect potential supervening production problems, as they contend it is a basic feature of the DCF method to predict the best cash flow scenario and reflect residual risks through the discount rate.[425]

427. Experts Abdala/Zadicoff assert that Tavsa would be able to sell 100% of its production since it was and continues to be the only seamless tube manufacturer in Venezuela – a country with significant demand for this product.[426] As of the valuation date, PDVSA would acquire basically 100% of production – in line with the nationalization of the oil and gas sector[427] – and there are no reasons to assume that this trend would change.[428]

**b. Projected Price**

(i) <u>May-December 2008</u>

428. For the period May-December 2008, experts Abdala/Zadicoff use real sale prices (USD 2,350 per ton), since there was a significant backlog of orders as of the valuation date.[429]

---

[422] Abdala/Zadicoff II, para. 25.
[423] Abdala/Zadicoff II, para. 27.
[424] Abdala/Zadicoff II, para. 28.
[425] Abdala/Zadicoff II, para. 29.
[426] Abdala/Zadicoff II, para. 30.
[427] Abdala/Zadicoff II, para. 33.
[428] Abdala/Zadicoff II, para. 32.
[429] Abdala/Zadicoff II, para. 38(a).

(ii)   2009 – 2013

429.   As of the time of the expropriation, Tavsa would sell almost its entire production to the state-owned PDVSA.

430.   The price agreement with PDVSA that was in place until 2008 provided that the sales price would be set on the basis of the price applied in the previous period, adjusted on a monthly basis per fluctuations in the international reference prices. However, given the upward trend in such international prices, in 2008 PDVSA and Tavsa started to negotiate a new pricing system that would cushion the impact of international price fluctuations.[430]

431.   The proposed pricing formula (which would end up being accepted that very same year) was as follows:[431]

$$P_t \;=\; 30\,\% \times P_{t-1} \;+70\% \times P_{t-1} \times \left[\frac{PPL_{t-1}}{PPL_{t-2}}\right]$$

where:

$P_t$         is the price in month $t$
$P_{t-1}$      is the price in month $t\text{-}1$
$PPL_{t-1}$ is the reference price published by Pipe Logix for month $t\text{-}1$
$PPL_{t-2}$ is the reference price published by Pipe Logix for month $t\text{-}2$

432.   This formula means that international prices ($PPL$) are weighed at 70%.

433.   Even though, as of the valuation date, the above formula was still in the process of being negotiated, the experts use the assumption that Tavsa would have introduced this pricing mechanisms in its new contracts with PDVSA (*de facto*, its sole customer[432]) starting in 2009;[433] and they thus apply said formula to estimate the future sales price.

434.   The difficulty in applying the formula to obtain a long-term estimate is that Pipe Logix (a provider of market information for pipes[434]) does not post price predictions for periods beyond one year ahead. Therefore, experts Abdala/Zadicoff chose to substitute the Pipe Logix prices with those posted by Metal Bulletin Research for hot rolled coils ["**HRC**"].[435] The experts highlight the fact that, historically, the seamless steel tube prices published by *Pipe Logix* and HRC prices have evolved at the same pace.[436]

(iii)   2013 – 2017

---

[430] Abdala/Zadicoff I, para. 119.
[431] Abdala/Zadicoff I, para. 120.
[432] Abdala/Zadicoff II, para. 40.
[433] Abdala/Zadicoff I, para. 121.
[434] Abdala/Zadicoff I, para. 119 and footnote 114.
[435] Abdala/Zadicoff I, para. 121.
[436] Abdala/Zadicoff II, para. 42.

435. From 2013 on, the experts estimate that prices will evolve in line with the U.S. producer price index ["**PPI**"].[437]

436. Abdala/Zadicoff do not accept the criticism (discussed further below) that their price forecasts do nothing but extend the pricing bubble that existed in late 2007 and early 2008. The experts' counter-argument is that their forecast (based on the projections by other analysts in this sector) estimates an initial price increase, followed by a fall, as was predictable as of the valuation date.[438]

## B. **Expenditures**

437. In order to derive a cash flow, the experts deduct operating expenses (opex) (**a.**), taxes (**b.**), and capital expenditures (capex) (**c.**) and apply adjustments to reflect changes in working capital (**d.**).

### a. **Opex**

438. Production costs consist of the materials required to manufacture the tubes, as well as the energy consumed in the production process.[439] Supplies (including electricity and gas)[440] came fully from Sidor, and the contract with this company established the applicable price, which was to be reviewed every two years. The experts estimated that the prices of these supplies would evolve as follows:

-   Steel billets and related supplies, based on the expected evolution of the HRC price;[441] the experts note that it is standard practice to provide for a certain decrease in the costs of steel, in line with the reduction in Tavsa's revenue;[442]

-   The costs of other materials, as well as the costs of energy, based on the 2007 costs in *bolívares,* adjusted as per the expected evolution of the Venezuelan PPI.[443]

439. As regards the costs of the production plant personnel, these evolve in line with the Venezuelan consumer price index ["**CPI**"].[444] The experts further note that, if tube production were estimated below 72,000 tons per year, there would be a lower number of personnel and labor costs should be reduced.[445]

[437] Abdala/Zadicoff I, footnote 117.
[438] Abdala/Zadicoff II, para. 43.
[439] Abdala/Zadicoff I, para. 127.
[440] Abdala/Zadicoff I, footnote 124.
[441] Abdala/Zadicoff I, para. 130.
[442] Abdala/Zadicoff II, para. 46.
[443] Abdala/Zadicoff I, para. 131.
[444] Abdala/Zadicoff I, para. 133.
[445] Joint Report, para. 8.

440. The commercial costs category covers a whole range of costs:

- Taxes: Tavsa's revenue is subject to two different taxes: a tax on invoicing and the so-called "social contribution;"[446]

- Freight and extraordinary expenses, which would evolve based on the Venezuelan PPI;[447]

- Administrative staff expenses, estimated at the 2007 sum, increased by the Venezuelan CPI.[448]

441. As to technical assistance costs, experts Abdala/Zadicoff found it reasonable to estimate that, in 2008, Tavsa would have no longer required this type of support services.[449] In the preceding 10 years, Tavsa and Tamsa had been bound by a technical assistance contract[450] that expired in 2008. Tavsa would have chosen not to renew that contract, thereby saving on this additional cost.

442. In the Joint Report, experts Abdala/Zadicoff introduce the following nuance: the technical assistance contract would have generated a revenue stream for Tamsa (and, therefore, for Tenaris), which it was deprived of as a result of the expropriation. Therefore, if the hypothesis that the contract was cancelled is rejected, the contract would remain in force and Tamsa would have been deprived of such revenue and, therefore, they would be seeking separate compensation for Tenaris for the loss of such contract.[451]

**b. Taxes**

443. Tavsa's income is subject to three different taxes: on science and technology (0.5% of gross income), anti-drug tax (1% of EBIT minus interest) and corporate income tax (34% net of the anti-drug tax).[452]

**c. Capex**

444. The estimation of capital expenditures is marked by the hypothesis that Tavsa will not be increasing its production capacity. Hence, the only costs that are expected are those related to the depreciation of fixed assets, to maintain the pre-established maximum capacity.[453] The experts note that they have had the cost items include extraordinary repairs, totaling USD 3.1 million per year, thus keeping Tavsa from having to invest additional amounts.[454]

---

[446] Abdala/Zadicoff I, para. 134.
[447] Abdala/Zadicoff I, para. 134.
[448] Abdala/Zadicoff I, para. 136.
[449] Abdala/Zadicoff I, para. 137.
[450] CLEX-56.
[451] Joint Report, para. 14 and footnote 5.
[452] Abdala/Zadicoff I, para. 140.
[453] Abdala/Zadicoff I, para. 139.
[454] Abdala/Zadicoff II, para. 57.

445. In their second report, following the criticisms of expert Hart, the experts decided to introduce a change to increase depreciation levels from 2017 onwards, such that these have now changed from USD 0.6 to 1.5 million.[455]

### d. Changes in Working Capital

446. The Claimants' experts have looked at the 2005 – 2007 period, and determined that trade receivables amount, on average, to 70 days' revenue, while accounts payable are estimated as 70 days over total yearly expenses. Inventory is calculated as 100 days of costs of goods sold.[456]

447. Applying the above estimates, working capital stands at 10 days of annual revenue.[457]

### C. Terminal Value

448. Terminal value is estimated as the value of the 2017 revenue stream, increased at 2.4% in perpetuity. The 2.4% growth rate is consistent with U.S. inflation expectations.[458] Non-discounted terminal value is almost USD 350 million.[459] This means 30% of the total enterprise value.[460]

### D. Discount Rate

449. The discount rate used by the experts is the WACC, as per the following formula:[461]

$$WACC = W_D \cdot k_D \cdot (1 - t) + W_E \cdot k_E$$

where:
$W_D$    is the weight of debt financing in the capital structure
$k_D$    is the cost of debt
$W_E$    is the weight of equity in the capital structure
$k_E$    is the cost of equity

---

[455] Abdala/Zadicoff II, para. 58.
[456] Abdala/Zadicoff I, para. 142.
[457] Abdala/Zadicoff I, para. 143.
[458] Abdala/Zadicoff I, para. 144.
[459] CLEX-2, FCF, Terminal Value without the discount factor.
[460] T., p. 974:12–13.
[461] Abdala/Zadicoff I, para. 170.

450. Next is a summary of the experts' estimates for each one of the above parameters:

### a. Return on Equity

451. This cost is calculated, per the CAPM,[462] as the sum of the rate of return on risk-free assets (**i.**), the country-risk rate (**ii.**) and the product of the beta factor (**iv.**) by the market risk premium (**v.**).[463] According to the Claimants' experts, no size premium is to be included (**iii.**). The return on equity is, as per the experts, 17.8%.[464] Each component will be addressed separately:

### (i) Rate of Return on Risk-Free Assets

452. In practice, this rate is measured based on the yield of either 10-year or 30-year U.S. bonds. The experts used 10-year bonds, as these represent a long-term investment and are less sensitive to unexpected inflation changes.[465]

453. The average yield of these bonds, calculated on the basis of bonds maturing in the 12 months up to April 30, 2008, is 4.29%.[466]

### (ii) Market Risk Premium

454. The goal is to measure the additional returns an investment needs to yield as a result of the investor taking on a risk higher than the risk entailed by a risk-free investment.[467]

455. The experts have estimated this premium based on the historical 1928 – 2007 indexes published by Prof. Damodaran[468] and calculating the geometric average, which is 4.79%.[469] Abdala/Zadicoff advocate for the use of a geometric average over an arithmetic average, as the latter is normally used only for short-term projects.[470]

456. The experts contend that the premium calculated in this manner is in the range of, or even slightly above, what experts recommend (about 3.5%).[471]

---

[462] Capital Asset Pricing Model.
[463] Abdala/Zadicoff I, para. 173.
[464] Abdala/Zadicoff I, para. 191.
[465] Abdala/Zadicoff I, para. 176.
[466] Abdala/Zadicoff I, para. 176.
[467] Abdala/Zadicoff I, para. 177.
[468] Abdala/Zadicoff II, para. 98.
[469] Abdala/Zadicoff I, para. 177.
[470] Abdala/Zadicoff II, para. 94.
[471] Abdala/Zadicoff II, paras. 95, 96.

(iii)   <u>No Need for a Size Premium</u>

457.   In the view of Abdala/Zadicoff, adding a premium to account for Tavsa's size is not advisable, for several reasons:[472]

-   First, there is disagreement amongst authors as to the need to apply a size premium, even for companies in the U.S., let alone for companies outside of that country;[473]

-   Second, Tavsa is a company that can be considered very large for the Venezuelan market; the fact that it is a small company relative to U.S. companies is something that is already reflected in the country-risk premium.

(iv)   <u>Beta</u>

458.   Beta is the coefficient that reflects the company's profits' volatility relative to market risk. Therefore, information on beta coefficients is obtained from a stock market analysis; however, in the experts' opinion, stock market information from emerging economies should not be used, as it tends to increase the beta as a consequence of its volatility and unreliability.[474] Therefore, the experts recommend estimating the beta based on data for comparable companies operating in a developed economy, as the U.S. economy, and applying the required adjustment to reflect that the investment in question is an investment in a developing economy, with higher economic and political volatility, and to reflect specific regulatory features.[475]

459.   The experts have chosen Morningstar SIC code 331, which includes companies in steel works, blast furnaces and rolling and finishing mills.[476] The beta that is derived through simple regression between the share return and the market return is a "raw" beta, to which the experts apply a "reversion-to-one" adjustment.[477] This adjustment is due to the belief that, in the long term, all projects should tend to behave like the market, with, therefore, a beta of one;[478] and the applicable formula is as follows:[479]

$$\textit{Adjusted Beta} = 0.67 \; x \; \textit{Raw Beta} + 0.33$$

460.   A second adjustment also needs to be applied, to unleverage the betas of companies in the sample and releverage them,[480] using an optimal capital structure for the relevant industries and the tax rate applicable in Venezuela (34%).[481] The result is a beta of 1.86.[482]

---

[472] Abdala/Zadicoff II, para. 101.
[473] Abdala/Zadicoff II, para. 102.
[474] Abdala/Zadicoff I, para. 178.
[475] Abdala/Zadicoff I, para. 179.
[476] Abdala/Zadicoff I, para. 180.
[477] Abdala/Zadicoff I, para. 181.
[478] Abdala/Zadicoff I, footnote 157.
[479] Abdala/Zadicoff I, para. 181.
[480] Abdala/Zadicoff I, para. 182.
[481] Abdala/Zadicoff I, para. 183.
[482] Abdala/Zadicoff I, para. 183.

        (v)   Country Risk Premium

461. This premium represents the additional return an investor will ask for to invest in a company in Venezuela as compared to a company in a more stable economy like, for instance, the U.S.[483]

462. The approach used by the experts to calculate this premium is the sovereign debt approach. The experts thus compare the spread between the yield of 5-year USD-denominated Venezuelan bonds and that of U.S. Treasury bonds with a similar maturity period. Venezuelan data is obtained from J.P. Morgan's Emerging Markets Bond Index.[484] The resulting premium is thus 4.6%.[485]

**b.    Cost of Debt Financing**

463. This cost is calculated as the sum of the risk-free rate of return plus the country-risk premium, plus the industry-risk premium. The industry-risk premium is derived from the figure calculated by Prof. Damodaran for steel works in the U.S. in 2008, and stands at 1.5%.[486] Added to the above premiums and rate, this results in a before-tax cost of debt of 10.4% and an after-tax cost of debt of 6.9%.[487]

**c.    Capital Structure**

464. There is no information on the capital structure of Venezuelan companies with a risk profile like Tavsa's. Faced with this situation, the Claimant's experts elect to use the capital structure of comparable SIC 331 companies, which is the code used in calculating the beta. The experts thus arrive at a debt-to-equity ratio of 23.9%.[488]

* * *

465. Once the above factors are input into the formula, the resulting WACC is 15.69%.[489]

466. After discounting annual cash flows between May 2008 and December 2017 to the valuation date, the experts initially arrive at a value of USD 214 million; there is then added to this value the discounted terminal value, which is USD 91.9 million; the total is USD 305.9 million.[490] After the capex change introduced by the experts in their second report, that values goes down to USD 304.6 million.[491] As of the valuation date, Tavsa had no outstanding financial liabilities,[492] and the experts thus made no additional calculations to assess that

---

[483] Abdala/Zadicoff I, para. 184.
[484] Abdala/Zadicoff I, para. 185.
[485] Abdala/Zadicoff I, para. 187.
[486] Abdala/Zadicoff I, para. 189.
[487] Abdala/Zadicoff I, para. 189
[488] Abdala/Zadicoff I, para. 190.
[489] Abdala/Zadicoff I, para. 191.
[490] Abdala/Zadicoff I, Table III, p. 28.
[491] Abdala/Zadicoff II, para. 59.
[492] Abdala/Zadicoff I, para. 145.

value.

467. Because Tenaris held a 70% interest in Tavsa, that percentage needs to be applied to the total value, thus arriving at the value of its investment: USD 213.2 million.[493]

## 1.2 MARKET MULTIPLES APPROACH

468. This approach consists in identifying companies comparable to Tavsa and calculating the average of the EV[494]/EBITDA,[495] EV/Sales and EV/BVA[496] multiples as of April 30, 2008.[497]

469. The experts used two sources for their comparable data: the list of steel tube manufacturers compiled by Lloyd's Register Group Limited and companies listed under SIC code 3317 (steel pipe and tubes), provided that they were engaged in the manufacturing of seamless tubes and were publicly traded. The sample came down to seven companies.[498] Abdala/Zadicoff find no conceptual difficulty in using companies located outside of Venezuela, as what the market multiples approach requires is that the reference companies' economic characteristics be reasonably similar to those of the company that is being valued, and that they are exposed to similar risks.[499]

470. The data obtained for the above parameters were as follows:[500]

---

[493] Abdala/Zadicoff II, para. 59.
[494] Enterprise Value.
[495] Earnings Before Interest, Taxes, Depreciation and Amortization.
[496] Book Value of Assets.
[497] Abdala/Zadicoff I, para. 65.
[498] Abdala/Zadicoff I, para. 193.
[499] Abdala/Zadicoff II, para. 109.
[500] Abdala/Zadicoff I, Table V.

| Name | Location | EV / EBITDA | EV / Sales | EV / BVA |
|------|----------|-------------|------------|----------|
| Multiples as of April 30, 2008 | | | | |
| Anhul Tianda Oil Pipe Co. | Hong Kong | 9.47 | 1.43 | 1.58 |
| Sanyo Special Steel Co. | Japan | 5.84 | 0.74 | 0.84 |
| SC TMK-ARTROM S.A. | Romania | 14.08 | 1.51 | 1.04 |
| Tubos Reunidos S.A. | Spain | 8.14 | 1.76 | 1.43 |
| Vallourec S.A. | France | 6.48 | 1.81 | 1.95 |
| Tenaris S.A. | Argentina | 10.27 | 3.47 | 2.28 |
| Gandhi Special | India | 4.43 | 1.80 | 2.20 |
| Median | | 8.14x | 1.76x | 1.58x |
| Average | | 8.39x | 1.79x | 1.62x |

471.  The above multiples are applied to Tavsa's EBITDA and sales as of December 31, 2007, and its BVA as of April 30, 2008.[501]

Control Premium

472.  In addition, the experts apply a correction to the above value to reflect the control premium for the Claimant's controlling interest in Tavsa. With a 70% stake, the Claimant had the capacity to influence the future of the company, and that control has a price. According to the experts, it is sufficiently documented in the literature that, when a buyer obtains a control position in a company, that buyer pays a price above market price for that position.[502]

473.  In the following table, the experts have summed up the control premium figures mentioned by the most reputed authors:[503]

---

[501] Abdala/Zadicoff I, para. 66.
[502] Abdala/Zadicoff I, para. 195.
[503] Abdala/Zadicoff I, para. 201.

| Author | Control Premium | | |
|---|---|---|---|
| Rudenno (2009) | 15% | - | 30% |
| Damodaran (2005) | 15% | - | 20% |
| Hanouna, Sarin and Shapiro (2001) on Damodaran (2005) | 20% | - | 30% |
| Barclay and Holderness (1989, 1991) on Damodaran (2005) | 10% | | |
| Nicodano and Sembenelli (2000) | 27% | | |
| Mikkelson and Regassa (1991) on Holderness (2003) | 9.2% | | |
| Chang and Mayers (1995) on Holderness (2003) | 13.6% | | |
| Dyck and Zingales (2004) | | | |
| *Argentina* | 27% | | |
| *Brazil* | 65% | | |
| *Chile* | 18% | | |
| *Colombia* | 27% | | |
| *Mexico* | 34% | | |
| *Peru* | 14% | | |
| *Venezuela* | 27% | | |

474. The experts have added empirical data for control premiums in Latin American countries. They thus arrive at the conclusion that the appropriate control premium in this case is 27%. Accordingly, the data derived through the multiples approach is to be multiplied by 1.27.[504]

475. The following tables summarize the results obtained:[505]

| Valuation as of April 30, 2008 (US$ millions) | | |
|---|---|---|
| EV to Sales | | |
| Tavsa's Sales Revenue | [a] | 141.5 |
| EV/Sales Ratio | [b] | 1.8x |
| Tavsa's Enterprise Value | [c] = [a] x [b] | 249.4 |
| *less* Financial Debt | [d] | - |
| Tavsa's Implied Value of Equity | [e] = [c] - [d] | 249.4 |
| Control Premium | [f] | 27% |
| Value of Equity for Controlling Stakes | [g] = [e] x [f] | 316.8 |
| Market Value of Equity to Claimants | [h] = [g] x 70% | 221.8 |

| Valuation as of April 30, 2008 (US$ millions) | | |
|---|---|---|
| EV to EBITDA | | |
| Tavsa's EBITDA | [a] | 31.3 |
| EV/EBITDA Ratio | [b] | 8.1x |
| Tavsa's Enterprise Value | [c] = [a] x [b] | 254.9 |
| *less* Financial Debt | [d] | - |
| Tavsa's Implied Value of Equity | [e] = [c] - [d] | 254.9 |
| Control Premium | [f] | 27% |
| Value of Equity for Controlling Stakes | [g] = [e] x [f] | 323.8 |
| Market Value of Equity to Claimants | [h] = [g] x 70% | 226.6 |

---

[504] Abdala/Zadicoff I, para. 202.
[505] Abdala/Zadicoff I, Tables VI, VII, and VIII on pp. 34 and 35.

116

| Valuation as of April 30, 2008 (US$ millions) | | |
|---|---|---|
| **EV to Book Value of Assets** | | |
| Tavsa's BV of Assets | [a] | 158.5 |
| EV/Book Value of Assets Ratio | [b] | 1.6x |
| Tavsa's Enterprise Value | [c] = [a] x [b] | 251.0 |
| *less* Financial Debt | [d] | - |
| Tavsa's Implied Value of Equity | [e] = [c] - [d] | 251.0 |
| *Control Premium* | [f] | 27% |
| **Value of Equity Adjusted for Control** | [g] = [e] x [f] | 318.8 |
| **Market Value of Equity to Claimants** | [h] = [g] x 70% | 223.2 |

476. The value of Tenaris' investment in Tavsa is estimated at USD 226.6 million (EV/EBITDA),[506] USD 221.8 million (EV/Sales)[507] and USD 223.2 million (EV/BVA)[508] – on average, USD 223.8 million as of April 30, 2008.[509]

## 2. THE RESPONDENT'S VALUATION

477. Expert Hart takes issue with the fact that the opposing party's experts consistently chose the most optimistic possible scenario, instead of looking for a more balanced approach that would represent the viewpoints of a hypothetical buyer and a hypothetical seller.

478. Hart criticizes the calculations of Abdala/Zadicoff under the two approaches: the DCF methodology (**1.**) and the market multiples methodology (**2.**). In his second report, the expert adds the construction of a new plant and the purchase of stock in a different company as references to estimate Tavsa's value (**3.**).

### 2.1 THE DCF APPROACH

479. The expert accepts the discounted cash flows approach as a valid methodology to assess the value of a company, but disagrees on certain assumptions used by Abdala/Zadicoff.

480. The first assumption he takes issue with is the valuation date; however, the Arbitral Tribunal has already ruled on this issue, agreeing with the Claimant: the valuation date is April 30, 2008.

481. Even though in his first reports Hart framed his criticism from the perspective of a valuation as of May 2009, he also ran an alternative calculation as of April 2008, estimating the discount rate as of such date. Moreover, both at the Hearing and in the Joint Report, he elaborated on his position regarding the value of Tavsa as of April 2008. His main points of disagreement with Abdala/Zadicoff are summarized next:

---

[506] Abdala/Zadicoff I, Table VI, p. 34
[507] Abdala/Zadicoff I, Table VII, p. 34.
[508] Abdala/Zadicoff I, Table VIII, p. 35.
[509] Abdala/Zadicoff I, para. 68.

117

## A. **Revenue**

482. Hart rejects the assumptions underlying the revenue estimates of the opposing experts: he is critical of the production estimates, and also disagrees on the price estimated by Abdala/Zadicoff.

### a. **Production**

483. Hart is surprised that his colleagues assumed that Tavsa would produce at 90% of its capacity in perpetuity, and that it would never run into constraints in the availability of the supplies needed to reach such capacity level, since:

- In 1999, the company's utilization rate was 25%,[510] standing at 50% on average until 2007;[511]

- In his opinion, blaming labor conflicts for the historical failure to reach a 90% productivity rate and expecting that such conflicts will disappear in the future is very naive,[512] because any hypothetical buyer would have taken into consideration potential labor conflicts and their impact on production:[513] labor problems and technical and operating failures have been a frequent occurrence in the Venezuelan steel industry;[514] indeed, the contract between Tavsa and Sidor mentioned possible delays, failures and omissions caused by strikes, lockouts and energy shortages.[515]

- Under the Tavsa-Sidor contract, Sidor was required to supply up to 90,000 tons of steel per year – assuming a sales level requiring larger quantities would be entirely unsupported.[516]

484. However, expert Hart acknowledges that, in 2005, Tavsa increased its capacity from 65,000 to 80,000 tons, but explains that it did so by increasing work shifts, which went from 12 to 15, and adds that an increase in the number of shifts intended to increase capacity is not a feasible solution that is sustainable in the long term, as it causes excessive wear and tear in the company's resources[517] – in fact, the effects of such wear and tear began to be felt in 2007, as Tavsa had to invest millions of dollars in mechanical repairs.[518]

---

[510] Hart I, Figure 8.1.
[511] Hart I, para. 164.
[512] Hart II, para. 131.
[513] Hart II, para. 129.
[514] Hart I, para. 165.
[515] Hart I, para. 165.
[516] Hart I, para. 169.
[517] Hart II, para. 129.
[518] Hart II, para. 130.

485. In the Joint Report, the expert suggests an annual production level of 50,748 tons of tubes.[519]

   **b.   Price**

486. Expert Hart reveals irregularities in Abdala/Zadicoff's calculations:

   -   They apply a pricing formula that never got to be agreed upon;[520]

   -   Then, they deviate from the formula, and use a different reference for international prices;[521]

   -   However, they only use this alternative reference up to 2013, after which they raise the prices based on the inflation forecasts, but there is no reason to keep the international pricing bubble in place.[522]

487. Hart believes that Abdala/Zadicoff took advantage of the fact that the 2007 price was part of a bubble to derive an inflated future projection. However, any hypothetical buyer would have understood that every long-term project is subject to ups and downs, and would have allowed for the possibility of a price decrease;[523] and, in any event, the buyer would have taken into consideration the price's past history.[524]

488. In the Joint Report, Hart provides an estimation as of April 2008 using the Canaccord Adams projections weighted at 70/30 (as negotiated between PDVSA and Tavsa), in order to facilitate a comparison to Abdala/Zadicoff's proposal.[525]

   **B.   Expenditures**

489. The expert structures his criticism into the following major groups.

   **a.   Costs of Goods Sold**

490. The expert criticizes the opposing experts' estimates. It is his view that the data observation period is too short, as it covers little more than one year (January 2007 – May 2008), when the acceptable choice would have been to use a period of five years.[526] He further notes that, for certain expenses, the experts decided on shorter periods for the sole purpose of reducing costs and thus inflating the damages amount.[527] Finally, he takes issue with the opposing experts having altogether neglected to account for certain costs, such as maintenance and repair costs, which got to be somewhat significant in 2007.[528]

---

[519] Joint Report, para. 7.
[520] Hart I, para. 178.
[521] Hart I, para. 182.
[522] Hart I, para. 183.
[523] Hart II, para. 141.
[524] Hart II, para. 152.
[525] Joint Report, para. 23.
[526] Hart I, para. 187.
[527] Hart I, para. 188.
[528] Hart I, para. 189.

491. In his second report, Hart reviewed the data for the costs incurred in the period 2006 – 2008 and found a correlation between the cost of ingots (input) and the sales price;[529] and was thus able to estimate Tavsa's gross margin at 34% from 2009 onwards.[530]

**b. Sales, General, and Administrative Costs**

492. Tavsa also incurs fixed and semi-fixed costs associated with:[531]

- Technical Assistance: Hart sees no reason to reject an extension of the technical assistance contract between Tavsa and Tamsa after the expiration of its original duration in 2008; if such contract were not extended, then it is possible that Tavsa would also incur costs as a result of taking over the service itself or finding another third-party provider.[532]

- Sales Expenses: these include social fund provisions, invoicing tax and transportation costs, but should not include extraordinary expenses, as these are already reflected in the direct production costs. Transportation costs are also included; however, the expert is unable to verify the figures used by Abdala/Zadicoff, as they have not proven that these are the rates actually paid for transportation.[533] In his second report, Hart estimates that, on average, social fund provisions and commissions between 2006 and 2008 stood at 5.37% and 2%, respectively.[534]

- Administrative Expenses: Abdala/Zadicoff took the 2007 costs and projected them, increasing them by the Venezuelan CPI; however, the expert fails to understand why they did not engage in a more exhaustive analysis, covering a longer period of time, and why they have not justified that these expenses are tied to the CPI.[535] In his second report, Hart estimates the average for these expenses between 2006 and 2008 at USD 1.3 million.[536]

**c. Capex**

493. It is Hart's view that Abdala/Zadicoff's assumptions are not realistic: it is not possible for a plant producing at maximum capacity not to need additional investments[537] beyond the depreciation of its fixed assets;[538] in addition, it is a fact that an industrial plant's maintenance costs will tend to grow (not decrease) over time.[539]

---

[529] Hart II, para. 166.
[530] Hart II, para. 168.
[531] Hart I, para. 193.
[532] Hart I, para. 194.
[533] Hart I, para. 195.
[534] Hart II, paras. 171, 172.
[535] Hart I, para. 196.
[536] Hart II, para. 174.
[537] Hart I, para. 202.
[538] Hart I, para. 201.
[539] Hart I, para. 202.

494. The expert believes that, given the USD 7 million in extraordinary repair costs,[540] a hypothetical buyer would have increased investments to the amount necessary to maintain the desired production level (which, according to Abdala/Zadicoff, is 80,000 tons per year[541]), with no need to resort to additional extraordinary repairs.[542] Hart has estimated investments based on the average for 2006 – 2008, increased by the inflation rate up to 2013.[543]

### d. Changes in Working Capital

495. The expert does not seem to find the data estimated by Abdala/Zadicoff reliable, as they set operating cash as 10 days of revenue. Considering the time required to convert inputs into cash and the credit problems in 2008, Hart argues that the opposing experts' suggestion is aggressive.[544]

496. Hart also points out that 10 days of revenue in 2007 would equal almost USD 4 million. Since Tavsa had almost USD 15 million as operating cash, this would mean it would have USD 14 million in excess cash. The expert is not sure how to reconcile this assumption with the fact that, in 2008, Tavsa owed Sidor close to USD 9 million.[545]

497. In his second report, Hart estimates the average working capital in 2006 – 2008 at 34%, and finds this figure to be a reasonable estimate up to 2013.[546]

### C. Discount Rate

498. Hart arrives at the following WACC of Tavsa as of April 30, 2008:

|  | As of April 30, 2008[547] |
|---|---|
| Risk-free rate | 4.5% |
| Market risk premium | 6.2% |
| Beta | 2.2 |
| Country risk premium | 4.6% |
| Size premium | 2.73% |

[540] Hart II, para. 178.
[541] Hart II, para. 177.
[542] Hart II, para. 178.
[543] Hart II, para. 179.
[544] Hart I, para. 203.
[545] Hart I, para. 204.
[546] Hart II, para. 180.
[547] Hart I, Annex 7.

| Cost of equity | 25.45% |
|---|---|
| Cost of debt | 10.4% |
| Tax rate | 34% |
| After-tax cost of debt | 6.86% |
| Debt/Enterprise value | 19.27% |
| Equity/Enterprise value | 80.73% |
| WACC | 21.87% |

499. The expert slightly disagrees on some of Abdala/Zadicoff's assumptions, such as the capital structure, but agrees to perform his alternative WACC calculation in line with the opposing experts' proposal; in other cases, he categorically disagrees and chooses new assumptions and new calculations. Only the latter cases will be summarized in this section:

### a. Risk-Free Rate

500. Abdala/Zadicoff choose to equate the risk-free rate to the yield of 10-year U.S. Treasury bonds (not 30-year bonds), as 10-year bonds are more liquid and less sensitive to inflation changes, a view that is supported by other authors. However, Hart claims to have checked the sources cited by the opposing experts and found that, in a more recent edition of such sources, they change their view and go for bonds with a longer maturity period.[548]

501. In any event, Hart shows his preference for 20-year bonds, which, he claims, are the bonds which are commonly used in valuation exercises and are the ones used by Morningstar to determine the long-term risk-free rate[549] which, thus calculated, as of April 30, 2008, was 4.5%.[550]

### b. Equity Risk Premium

502. The opposing parties have calculated the geometric average of historical data, based on the opinion of two well-respected authors. Hart contends that the newer editions of those authors' works show that they have preferred arithmetic averages.[551] Using the arithmetic average, the equity risk premium goes up to 6.2%.[552]

### c. Beta

503. Abdala/Zadicoff apply Bloomberg's "reversion-to-one" adjustment to the beta. Hart, however, disagrees. The expert explains that this adjustment is recommended only when it can be reasonably accepted that, in the long term, the company's products and clients will diversify and, therefore, the company's risk will tend to converge with the market risk. However, for Tavsa, this is not a reasonable assumption, as there is no indication that its products will change, or its client mix expand: rather, it

---

[548] Hart I, para. 247.
[549] Hart I, para. 248.
[550] Hart I, para. 249.
[551] Hart I, paras. 251, 252, 253.
[552] Hart I, para. 255.

seems everything will remain as is.[553]

504.  The above does not mean that Hart is not advocating for an adjustment to the beta coefficient; he prefers the adjustment performed by Morningstar for SIC 331 companies in March 2008,[554] under the hypothesis that, in the long run, a company's beta will move towards the beta of the peer group:[555]

| | |
|---|---|
| Leveraged beta | 2.25 |
| Adjusted leverage beta | 2.17 |
| U.S. debt/equity | 0.239 |
| U.S. tax rate | 40% |
| Unleveraged beta | 1.9 |
| Optimal debt/equity structure | 23.9% |
| Venezuelan tax rate | 34% |
| Beta | 2.2 |

### d.   Country Risk Premium

505.  In the Joint Report, expert Hart mentions that 4.6%, which is the premium over the "pure discount bond," does not necessarily reflect the full country risk. The expert would be willing to accept any value between the premium over the pure discount bond up to 14.75%, which is the country risk premium used in the *Tidewater* award.[556]

### e.   Size Premium

506.  Expert Hart finds it necessary to perform a size adjustment, as the comparable companies used to estimate the beta were larger than Tavsa;[557] specifically, they were mid-cap companies, where Tavsa is viewed as "micro-cap."[558] The difference between the mid-cap size premium and the micro-cap size premium is 2.73%.[559]

* * *

---

[553] Hart I, para. 257.
[554] Hart I, para. 259.
[555] Hart I, para. 258.
[556] Joint Report, para. 22.
[557] Hart I, para. 261.
[558] Hart I, para. 264.
[559] Hart I, para. 264.

507. With the above corrections applied to the discounted cash flows model, the resulting value for Tenaris' stake in Tavsa as of April 30, 2008 is USD 36.9 million, which is the result of adding to the USD 44.8 million cash flows a terminal value of almost USD 8 million, and applying the 70% factor.[560]

## 2.2 MARKET MULTIPLES

508. The expert also provided his opinion on the subsidiary method to assess Tavsa's value, which he calls the "guideline public company analysis."[561]

509. Abdala/Zadicoff selected seven comparable companies, but Hart does not believe that all seven are comparable, as they include Vallourec S.A. – a company with worldwide operations and sales 6,000 times higher than Tavsa's, which disqualifies it as a comparable.[562]

510. In addition, the opposing experts did not use homogenous data. For some companies, they used the twelve months up to March 31, 2008; for others, they used the data on their yearly statements as of December 31, 2007. To assess the debt level, they used data as of June 30, 2008.[563]

511. The next step, as per this method, should have been a normalization of the financial statements of both the comparable companies and the target company. However, Hart contends that the opposing experts did not perform such normalization, which is completely inappropriate, as a hypothetical buyer would not have just assessed a single year of sales, let alone 2007, which had very high sales.[564]

512. Regarding the four ratios selected by the opposing experts, Hart made the following observations:[565]

- The use of the EV/sales ratio is not recommended, except for companies with little to no history and without the capacity to generate positive cash flows;

- The EV/BVA ratio is usually measured using the firm's book value, not the book value of the assets.

513. Lastly, the expert disagrees on the 27% control premium. First, Hart argues that, for an adequately-managed company, there should not be a difference in the value of majority interests vis-à-vis minority interests.[566] Second, the expert asserts that a generic control premium should not be used; instead, the premium should be quantified based on facts and circumstances specific to the company that is being valued, its industry, its country and the global economy;[567]

---

[560] Joint Report, Tavsa 2008 Spreadsheet, selecting all values as suggested by Credibility, applying the *Tidewater* country risk premium; application of the rate in the *Tidewater* award would push the value down to USD 29.5 million.
[561] Hart I, para. 208
[562] Hart I, para. 211.
[563] Hart I, para. 212.
[564] Hart I, para. 213.
[565] Hart I, para. 214.
[566] Hart I, para. 240.
[567] Hart I, para. 242.

however, in this case the opposing experts simply took the control premium mentioned in a study based on four acquisitions in unspecified sectors in Venezuela.[568]

## 2.3 OTHER VALUE INDICATORS

514. Hart refers to the new plant built by Tenaris in Mexico and the purchase of a majority stake in a plant in Indonesia. He claims both transactions show that Hart's proposed value of USD 43.3 million is in line with reality.[569]

### New Plant in Mexico

515. In September 2008, Tenaris announced the construction of a seamless tube plant in Mexico, with a capacity of 450,000 tons per year (Tavsa has 14% of that capacity) at a cost of USD 850 million.[570] Applying these figures to Tavsa, 70% of its value, built anew, would be USD 85.9 million. However, it would still be necessary to apply a correction factor to reflect Tavsa's current status, which can be between 25% and 50%, and, therefore, its value would be USD 43 to 64.5 million.[571]

### Transaction in Indonesia

516. In February 2009, Tenaris acquired a 77.45% shareholding in a seamless tube manufacturer in Indonesia. The company's annual capacity is 12,000 tons, and the price paid for it was USD 93.6 million. Extrapolating these figures to Tavsa, the 70% interest would be worth USD 35.5 million.[572]

\* \* \*

517. Lastly, Hart brings up the following point: Tamsa paid USD 11.7 million for a 70% interest in Tavsa in 1999, and spent USD 41.9 million in capital expenditures and maintenance. Moreover, it received USD 32 million from the technical assistance contract and commissions.[573] In other words, were the Arbitral Tribunal to award compensation in a sum around the ones suggested by the Claimants, the Claimants would be earning a return of 400% to 500% on their investment.[574]

---

[568] Hart I, para. 241.
[569] Hart II, para. 197.
[570] Hart II, para. 195.
[571] Hart II, para. 195.
[572] Hart II, para. 196.
[573] Hart II, para. 217.
[574] Hart II, para. 218.

### 3.    THE ARBITRAL TRIBUNAL'S DECISION

518.   Even though both experts agree that Tavsa's value is to be calculated through a DCF methodology (**1.**), the Arbitral Tribunal will also rule on other proposed approaches, for comparison purposes (**2.**).

### 3.1   DCF

519.   As regards the compensation due for Tavsa's expropriation, the experts are in agreement that the best way to calculate such compensation is through the discounted cash flows method.

520.   It was made clear at the Hearing that the points of disagreement between the experts as regards the value assessment were really four[575] – even though all four are major points: tube production (**A.**), tube price (**B.**), certain costs (**C.**) and WACC (**D.**).

521.   At the end of the Hearing, the Arbitral Tribunal asked both Parties' experts to engage in the following joint exercise, to the extent possible:[576] they were to prepare a spreadsheet where the Arbitral Tribunal would be able to choose, from drop-down options, between the two opposite positions for each conflicting assumption (or even choose a third option) and where, as per the options selected by the Tribunal, Tavsa's value would be automatically recalculated.[577] The Arbitral Tribunal also invited the experts to summarize the reasons for their disagreement in a brief report. The experts complied with the request through the so-called Joint Report.[578]

522.   Next, the Arbitral Tribunal will rule on each of the four points of disagreement.

### A.    <u>Tube Production</u>

523.   The goal here is to determine, from the perspective of a hypothetical buyer in April 2008, the estimated quantity of tubes Tavsa could produce in the future, from the two options proposed by the experts (**a.**). And, should the Tribunal choose the lower quantity, whether labor costs need to be adjusted (**b.**).

---

[575] The Arbitral Tribunal is aware that there are more points of disagreement between the experts; however, the ones that account for virtually the entire difference in value are four, and these are the only ones which, for efficiency concerns, the Arbitral Tribunal will address next.
[576] T., pp. 1228:13–1229:13.
[577] The exercise was two-fold: for a valuation date as of April 2008, and also as of May 2009. Because the Arbitral Tribunal has already decided that the valuation date will be April 2008, in this section of the Award it will only refer to those calculations which are relevant to said valuation date.
[578] Joint Report.

### a. Annual Production

524. The two options proposed by the experts are 72,000 or 50,748 tons of tubes per year:

- The 72,000 figure the Claimant advocates for is based on the assumption that, in the future, Tavsa would operate at its maximum production capacity (80,000 tons of tubes per year), at a utilization rate of 90%, which results in 72,000 tons per year. These had been the production estimates used by Tavsa's management for 2008/2009.[579]

- The 50,748 figure estimated by the Respondent is the result of averaging production in the last three years.[580]

525. It is the Arbitral Tribunal's view that it is more likely that a hypothetical buyer would have rejected the Claimant's estimate and chosen the Respondent's estimate instead:

526. The projected 72,000 tons per year find support only in Tavsa's management's budget for 2008/2009. The Arbitral Tribunal does not think a hypothetical buyer would have recognized that much creditability to this estimate, since:

- Tavsa's management's estimates were not usually too on point; for instance, in their 2007/2008 budget, they made provision for 80,860 tons per year, of which only one half were actually produced (43,250 tons).[581]

- Even though the company's production level had been on the rise since 2002, historical production peaked in 2007, at 55,189 tons[582] – thus, far from the 72,000 tons that are now being projected; Abdala/Zadicoff have stated that, at the time of expropriation, Tavsa produced 80,000 tons of pipes per year,[583] while expert Hart has claimed that that level was never actually reached.[584] Abdala/Zadicoff have referred to the 2007 financial statements as evidence; the Tribunal has reviewed those statements and found that 2007 production was 55,189 tons,[585] a figure that, far from proving the reliability of the estimated 72,000 tons, refutes it.

- Tavsa never managed to reach a utilization rate of 90% either; in fact, its historical utilization peaked at 75% in 2005.[586]

[579] CLEX-36.
[580] Joint Report. Tavsa 2008 Joint Model, Revenues, Credibility.
[581] CLEX-36, p. 47.
[582] H 3, slide 11. Abdala/Zadicoff I, para. 91.
[583] Abdala/Zadicoff I, para. 123.
[584] H 4, slide 16.
[585] CLEX-8, p. 201.
[586] Abdala/Zadicoff I, p. 49.

527. In contrast, the proposed 50,748 annual tons have a very solid basis: it is the average real production over the last three years. A hypothetical buyer would have chosen to project a production level in line with historical production, and would have dismissed the Claimant's estimates as pure speculation.

<u>The Claimant's Counter-Arguments</u>

528. (i) The Claimant has pointed to labor conflicts in the past as the cause of the company's low production level; these conflicts went away in 2008, when Tavsa came to an agreement with the unions.[587]

529. The argument is not convincing, because the problems with the workers marked 2006 and they might have been the reason why production was limited to 56,700 tons that year;[588] this does not, however, explain the fall in production in all other years, with production far from the yearly 72,000 tons projected by Tavsa's management for the future. And the experts have not identified any production improvement introduced in 2008 that could justify the sudden increase in production.

530. (ii) The Claimant's experts have also mentioned that PDVSA had publicly announced its intention to substitute tube imports with domestically-manufactured tubes.[589] Indeed, in a presentation dated October 2007,[590] PDVSA had stated its intention to double the consumption of supplies in the oil sector and cut down imports to favor local supplies, which would increase up to 70% (as compared to the 41% existing at the time).[591]

531. PDVSA's statement is recorded in a slide presentation, where the increase in domestic procurement from 41% to 70% is described as a "challenge" and a "goal to be reached through adequate public policies." The presentation does not define what these policies will be and does not constitute a firm supply commitment. PDVSA's presentation is too generic to convince a hypothetical buyer that the production increase projected by the Claimant was feasible and that any increased production would have PDVSA as a buyer.

**b.    Labor Cost Adjustment**

532. Lastly, the Claimant argues that, if a yearly production level below 72.000 tons was used as an assumption, this would call for a reduction in labor costs, readjusting labor to the new estimated production level.[592] Specifically, were production set at 50,748 tons, as suggested by the Respondent, labor costs should go down, proportionately, by 30%.[593]

---

[587] Abdala/Zadicoff II, para. 26.
[588] Abdala/Zadicoff II, para. 26.
[589] H 3, slide 7.
[590] CLEX-84.
[591] CLEX-84, p. 26. T., p. 920.
[592] Joint Report, para. 8.
[593] Joint Report, para. 8. Tavsa 2008 Joint Model, Summary Table, Labor Size Reduction.

533. The Arbitral Tribunal has verified that the proposed adjustment is correct,[594] that the adjustment to the cash flows model should only apply to the variable portion of labor costs (a function of production), and that the Claimant has considered that 50% of labor costs are variable; all hypotheses seem reasonable.

534. Accordingly, the Arbitral Tribunal has decided to apply the 30% adjustment to variable labor costs.

* * *

535. <u>To conclude</u>, the Arbitral Tribunal has agreed that the reasonable estimate of future annual production be set at 50,748 tons, as suggested by the Respondent; it has also agreed, however, that variable labor costs should be proportionately reduced, as requested by the Claimant.

## B. The Price of Tubes

536. The next aspect to be determined is how to estimate the price of the tubes (**a.**) and, once a calculation formula has been decided on, what a specific parameter should be within that formula (**b.**).

### a. Pricing Formula

537. The Parties' experts disagree as to the manner in which the future price is to be estimated:

- It is the Claimant's view that the formula Tavsa was in the course of negotiating with PDVSA when the expropriation took place should apply;

- On the contrary, the Respondent believes that, because no agreement had yet been reached regarding that formula, it should be disregarded, and suggests using the historical price average, increased by the CPI, instead.

538. It is the Tribunal's opinion that the issue is not so much whether the formula that was being negotiated with PDVSA had or had not been actually agreed upon as what the best indication of the future price of the tubes would be, in the eyes of a hypothetical buyer. Because PDVSA was Tavsa's only customer at the time of the expropriation and none of the experts has identified any reasons to believe this was bound to change, the reasonable solution would be to assume that the future price would be the one agreed upon with PDVSA.

539. Again, the most sensible solution is to assume that, in the future, PDVSA and Tavsa would apply the pricing formula they were then negotiating, because, as the sole customer, PDVSA had significant bargaining power, and the negotiated formula was beneficial to it as it mitigated its concern that the price would be driven up by the upward trend observed in international markets (in fact, a few months after the expropriation, Tavsa and PDVSA agreed on the new formula).

---

[594] (72,000 − 50,748)/72,000.

540. In contrast, there is no basis at all to assume that, in the future, Tavsa and PDVSA would be completely altering the price calculation formula and agreeing on a formula based on the average price paid between 2006 and 2008, increased by inflation, as suggested by the Respondent.[595]

**b. The International Price Reference**

541. Therefore, the Arbitral Tribunal has decided that the formula to set the future price will be the one Tavsa was negotiating with PDVSA at the time of its expropriation. *Pro memoria*, the formula is as follows:

$$P_t = 30\% \times P_{t-1} + 70\% \times P_{t-1} \times \left[\frac{PPL_{t-1}}{PPL_{t-2}}\right]$$

$P_t$    is the price in month $t$
$P_{t-1}$   is the price in month t-1
$PPL_{t-1}$   is the reference price published by Pipe Logix for month t-1
$PPL_{t-2}$   is the reference price published by Pipe Logix for month t-2

542. As per the formula, the international reference price (weighted at 70%) is the price published by Pipe Logix; however, Pipe Logix is an index that tracks global sales of seamless tubes,[596] and only projects prices one year ahead, which is why it is not valid for longer-term projections.

543. It is then necessary to substitute the international reference to Pipe Logix with a different index. Here, the experts engage in debate as to the best substitute:

- The Claimant suggest projecting the prices of HRC (the main component of seamless tubes) published by Metal Bulletin Research; whereas

- The Respondent[597] finds it better to use the HRC prices published by Canaccord.

544. To choose between these two price forecasts, the Respondent's expert has relied on the recommendations issued by the Society for Mining, Metallurgy and Exploration, contained in a letter addressed to the United States Securities and Exchange Commission.[598] In that letter, the Society recommends that the prices of raw materials be estimated based on the short- and long-term projections issued by the company's management (**i.**), and requires that a "competent person" verify that such projections are in line with historical prices or commercial contracts (**ii.**).[599]

---

[595] Hart II, para. 158.
[596] T., p. 834.
[597] In its subsidiary claim, as its primary position is that the price is to be determined as the historical average, increased by the CPI.
[598] CRED-44.
[599] Hart I, para. 125: "Commodity prices used for the determination of Mineral Reserves should be based on forward-looking estimates reflecting management's reasonable short- and long-term expectations as supported by available evidence. The basis for the selected prices must be justified and supported by appropriate documentation. The Competent Person must ascertain that these prices are consistent with historical prices or with sales agreements and marketing determinations."

(i)    Management Forecasts

545.    In this case, both Parties agree that Tavsa used the Metal Bulletin Research price forecasts as basis for its own future price estimations.[600]

546.    There is no evidence that Tavsa's management ever used the prices published by Canaccord to derive their future price estimates.[601]

(ii)    Commercial Contracts

547.    The Society for Mining, Metallurgy and Exploration's assessment guideline also points to the prices provided for in commercial agreements, as indicative of the adequacy of the future estimates.

548.    The Claimant has produced a historical contract (from 1997) between Sidor and CVG Tubos (Tavsa's predecessor)[602] where Metal Bulletin is defined as follows:

> "A prestigious U.S. weekly publication specializing in the behavior of the global market for iron and steel products. Metal Bulletin is widely used as a valid reference to determine and project the prices of iron and steel products."

549.    And in the long-term HBI supply contract between Comsigua and Tamsa,[603] the price reference is the change in the prices of three raw materials, as per Metal Bulletin.[604]

550.    The Respondent, however, has not produced any commercial contract mentioning Canaccord Adams.[605]

---

[600] T., p. 1171.
[601] T., pp. 1176, 1177.
[602] CLEX-12.
[603] CLEX-16.
[604] Article 3.1 on the fixed per-ton price.
[605] T., pp. 1176, 1177.

* * *

551. Basically, both the forecasts of Tavsa's management and the historical commercial agreements support the reliability of the Metal Bulletin Research price estimates.

<u>The Respondent's Counter-Argument</u>

552. Expert Hart has argued that Canaccord Adams's forecasts are more consistent with historical prices and, therefore, should be preferred.

553. The Arbitral Tribunal disagrees.

554. The premise to be validated is to be framed as follows: would a hypothetical buyer deciding to project future prices based on historical prices consider the Canaccord Adams forecasts or the Metal Bulletin Research ones to be more reliable?

555. In the Arbitral Tribunal's opinion, the answer favors Metal Bulletin Research, as it has already been established in the above paragraphs that this is a reference publication in the industry, whereas Canaccord Adams is an investment bank that publishes prices for the iron and steel industry, as well as for other sectors,[606] and was chosen by expert Hart because he had knowledge of past reports and considered them to be "good and informative."[607] Expert Hart has not persuaded the Arbitral Tribunal that, irrespective of its predictive reliability, Canaccord Adams would be a price reference publication for a hypothetical buyer.

## C.   **Expenditures**

556. Under this heading, the Tribunal must determine which one is the more reliable projection of opex (**a.**), capex and depreciation (**b.**), working capital (**c.**) and the existence or inexistence of a technical assistance contract (**d.**).

### a.   **Opex**[608]

557. The Claimant's experts estimate the opex based on the 2007 costs,[609] adjusted as per the expected inflation.

558. Expert Hart disagrees because, as compared to the historical average, the costs projected by Abdala/Zadicoff are significantly lower. At the Hearing, Hart argued that Tavsa's gross margin between 2002 and 2008 stood at around 20% in 2002, grew year after year and peaked at 45% in 2006, thereafter declining to 20% in 2008; the average would be 35%, while the margin arrived at based on Abdala/Zadicoff's cost projections exceeds 45%.[610] Hart suggests using the opex

---

[606] T., pp. 1175, 1176.
[607] T., p. 1176.
[608] The cost of steel is not included.
[609] Tavsa 2008, Joint Model, Compass Lexicon.
[610] H 4, slide 18. Figures are estimates.

average between 2005 and 2007,[611] increasing it every year based on the expected U.S. PPI.[612]

559. The methodology used by the experts is similar, as they both increase the previous year's costs by inflation. The difference lies in the starting point – the 2008 costs:

  - The Claimant derives such costs by increasing the previous year's costs by inflation, while

  - The Respondent calculates the average for the last three years.

560. If the projection consists in increasing the previous year's costs, the Arbitral Tribunal sees no reason to deviate from this (since Tavsa's costs are stable over time)[613] for 2008: that year's costs are also to be calculated by increasing the 2007 costs to account for inflation.

561. The Arbitral Tribunal thus accepts the opex calculation as proposed by the Claimant.

**b. Capex**

562. The experts' positions are as follows:

  - Abdala/Zadicoff calculate 2008 depreciation based on the 2007 depreciable assets[614] and the following year's depreciation based on the preceding year's; lastly, they equate capex to each year's depreciation,[615] consistently with the assumption that Tavsa will not be making additional investments.

  - Hart, however, calculates the historical average for 2006 and 2007 capex, applies the PPI and thus arrives at the capex for 2008, based on which he calculates depreciation.[616]

563. The Arbitral Tribunal considers both hypotheses to be plausible, and neither one incorrect. However, the Arbitral Tribunal must choose one (it will, however, note at this point that its decision will not have a significant impact on Tavsa's value).

564. The Tribunal will use the approach used by the Claimant, which finds support in the opinion of Prof. Damodaran – who is a highly-respected asset valuation expert and whose opinion is constantly referred to by both Parties' experts. Prof. Damodaran states that, for projects of indefinite duration (as is the case here), capex should approach depreciation.[617] The Claimant's proposal perfectly fits

---

[611] Tavsa 2008 Joint Model, Credibility Opex.
[612] Tavsa 2008 Joint Model, Production and Commercial Costs, Credibility.
[613] T, p. 1008 (in reference to stable margins).
[614] Even though 2007 was a year with extraordinary results, this does not have an impact on depreciation.
[615] Tavsa 2008 Joint Model, Capex & Depreciations, FCF.
[616] Tavsa 2008 Joint Model, Capex & Depreciations, FCF.
[617] "As a simple rule of thumb, when projects have infinite life, the capital maintenance expenditures should approach depreciation." *Cf.* Damodaran, Aswath: Supporting Material to "*Corporate Finance: Theory and Practice,*" Wiley, 2nd ed., 2001, available at http://pages.stern.nyu.edu/ ~adamodar/New_Home_Page/CF2E.htm (*Cf.* section "3.

this rule; the Respondent's however, does not: from 2008 to 2010, depreciation exceeds capex, even though the two progressively approach and the opposite is true from 2011 onwards: capex are increasingly higher than depreciation.[618]

565. To sum up, the Arbitral Tribunal has opted for the Claimant's suggestion.

### c. Working Capital

566. Both Parties' experts have adopted very different approaches to calculate working capital:

- Abdala/Zadicoff determined what the reasonable ratios (measured in days) should be for the variables making up the working capital; then, they applied such ratios to the estimated revenue and cost figures, thus arriving at the final working capital figures;[619]

- Hart has not used the reasonable ratio in his valuation exercise; instead, he calculated the average ratio of working capital to revenue for 2005 to 2007, which is 31%, and applied this 31% to the revenue estimated for each year, thus arriving at the working capital.[620]

567. The Arbitral Tribunal believes Abdala/Zadicoff's hypotheses are risky and historical data show that Tavsa's working capital was more conservative. Next is a comparison of the Claimant's proposal to historical data for the basic variables[621] in the working capital determination:[622]

- Cash and equivalents: the average ratio of cash and cash equivalents to revenue (measured in days), based on all historical data, is 35 days;[623] however, the Claimant used 10 days as reference for its working capital calculation;[624]

---

Derivations and Discussion" of "Chapter 9: Estimating Earnings and Cashflows on Projects").
[618] Tavsa 2008 Joint Model, Capex & Depreciations, FCF.
[619] Tavsa 2008 Joint Model, Working Capital, Compass Lexecon.
[620] Tavsa 2008 Joint Model, Working Capital, Credibility.
[621] As per the traditional accounting denomination.
[622] Tavsa 2008 Joint Model, Working Capital.
[623] = [64.6 (1999) + 14.4 (2000) + 20.3 (2001) + 34.9 (2002) + 83.1 (2003) + 9.7 (2004) + 5.5 (2005) + 44.5 (2006) + 39.6 (2007) / 9 years].
[624] Tavsa 2008 Joint Model. Working Capital.

- Accounts receivable: similarly, the average accounts receivable/revenue ratio is 95 days,[625] while the Claimant used 70 days;

- Inventories: here, the average inventories to cost of goods sold ratio is 140,[626] and the Claimant used 100 as reference;

- Prepaid expenses in other current assets: the average ratio of these expenses to the cost of goods sold is 4,[627] while the Claimant used 1;

- Accounts payable: the average accounts payable/total costs ratio is 109 days,[628] while the Claimant chose to use 70;

- Debts to staff: the average debts to staff/total costs ratio is 6.1 days,[629] while the Claimant used 5.

568. The Arbitral Tribunal believes a hypothetical buyer would have analyzed Tavsa's historical behavior and ruled out the Claimant's hypotheses in calculating the working capital on account of these being overly risky.

569. Therefore, the Arbitral Tribunal will choose the option proposed by expert Hart in the working capital calculation, which is consistent with historical data.

### d. Technical Assistance Contract

570. The Claimant suggests that, at the end of the technical assistance contract between Tavsa and Tamsa, the parties would not have renewed said contract because, after a period of 10 years, Tavsa would be in a position to be able to handle its own technical management.[630]

571. On the contrary, Hart believes this cost would continue to apply always, as someone would have to take over technical assistance and be paid for it.[631]

572. The Respondent's position seems to be more convincing and consistent with other assumptions in the model, such as the indefinite duration for Tavsa: in order to validate the assumption that Tavsa is a company of indefinite duration, the Arbitral Tribunal needs to be convinced that it will not become technically obsolete. Up to 2008, technical innovation was provided by Tamsa and, from that date onwards, either Tavsa would have to outsource it from a different company or it would have to devote its own resources to R+D work.

---

[625] = [213 (1999) + 69.4 (2000) + 63.8 (2001) + 65.9 (2002) + 131.2 (2003) + 105.8 (2004) + 80.1 (2005) + 60.7 (2006) + 64.1 (2007) / 9 years].

[626] = [223.2 (1999) + 124.9 (2000) + 155.5 (2001) + 216.2 (2002) + 136.2 (2003) + 100.7 (2004) + 90.5 (2005) + 104.9 (2006) + 112.1 (2007) / 9 years].

[627] = [0.8 (1999) + 25.9 (2000) + 1.7 (2001) + 3.7 (2002) + 0.2 (2003) + 0.8 (2004) + 0.8 (2005) + 0.1 (2006) + 0.8 (2007) / 9 years].

[628] = [193.4 (1999) + 175.7 (2000) + 76.6 (2001) + 117.3 (2002) + 174.5 (2003) + 56.6 (2004) + 35.7 (2005) + 75 (2006) + 77 (2007) / 9 years].

[629] = [6.2 (1999) + 8.4 (2000) + 6 (2001) + 9.4 (2002) + 8.1 (2003) + 5.4 (2004) + 4.8 (2005) + 3.3 (2006) + 3.3 (2007) / 9 years].

[630] Abdala/Zadicoff II, para. 50.

[631] Hart I, para. 194.

135

573. What the Claimant suggests, however, is that Tavsa would be technically competitive without assuming any cost on account of technological innovation, which is an assumption the Arbitral Tribunal cannot validate.

574. Therefore, the Arbitral Tribunal accepts the Respondent's assumption that, from 2009 onwards, Tavsa would devote to technical assistance a sum equivalent to the one it used to pay Tamsa under the contract: 3% of revenue.

<u>Subsidiary Claim</u>

575. As a subsidiary position for the event the Arbitral Tribunal should include a technical assistance expense, experts Abdala/Zadicoff have raised a separate claim in Tamsa's name.

576. The experts' argument seems to be as follows: if the assumption that Tavsa continued to pay for technical assistance is accepted, then its cash flows would be reduced; on the other hand, Tamsa would cease to receive income from the technical assistance contract. The conclusion would then be that Tamsa must be entitled to be paid compensation for such lost income.

577. The argument is a *non sequitur*: the exercise here consists in assessing Tavsa's value and, in the course of that exercise, the Arbitral Tribunal will validate realistic hypotheses – the fate of other companies, such as Tamsa, has no bearing on this exercise. Moreover, the Arbitral Tribunal is bound to rule based on the parties' cases and claims only, and in this case the Claimants' *petitum* refers to compensation for their investments in Tavsa and Comsigua,[632] but no mention is made at all to an investment in or of Tamsa.

## D. **WACC**

578. There are three WACC parameters the Arbitral Tribunal must rule on:

### a. **Risk-Free Rate**

579. The proposed alternatives are: 4.29%, in the opinion of the Claimant' experts, and 4.5%, in the opinion of the Respondent's expert. The difference is due mostly to the bonds' maturity period: 10-year bonds, as proposed by the Claimant, or 20-year bonds, as proposed by the Respondent.

580. The Arbitral Tribunal will use a 10-year maturity period, as this is the period that is closer to the valuation horizon, *i.e.* nine years (2008 – 2017) and, therefore, the one that is more representative.

---

[632] CI, para. 235 (c); CIV, para. 321(c); CV, para. 319 (c).

**b.    Market Premium**

581.    The choice here is between 4.79%, as per the Claimant's experts, and 6.2%, as per the Respondent's expert, depending on whether a geometric average or an arithmetic average is used, respectively.

582.    The use of a geometric or an arithmetic average is still the subject of open debate in the valuation literature, as acknowledged by the experts, with pros and cons for one or the other average.

583.    The Arbitral Tribunal is unable to solve this issue and rule on a preferred choice on absolute terms. However, in this case, it has to choose one of the two averages, and must then go for the arithmetic average, due to reasons of simple internal consistency: because the market premium is the difference between the market return and the risk-free rate, then consistency requires that the calculation method be in line with the calculation of the risk-free rate.

584.    The Arbitral Tribunal has already decided that the appropriate risk-free rate is the one calculated by the Claimant and, in accordance with exhibit CLEX 69, produced by experts Abdala/Zadicoff, they have used a simple arithmetic average both to derive the monthly average risk free rate and to derive the annual average.

585.    However, the same experts suggest applying a geometric average to determine the market premium, and this course of action is inconsistent and should be ruled out.

586.    The market premium will then be calculated as an arithmetic average, as suggested by expert Hart.

**c.    Beta**

587.    The difference is between the 1.86 proposed by Abdala/Zadicoff and the 2.2 suggested by Hart, and is the result of the different adjustments applied to the beta coefficient by each expert:

-    Abdala/Zadicoff apply the reversion-to-one adjustment, which is based on the empirical verification that every company's beta moves towards the average beta, which is one, over time; the experts rely on the opinion of Prof. Damodaran.[633]

-    Hart, for his part, finds that the premises to apply the reversion-to-one are not satisfied, and advocates for applying the Morningstar adjustment, which suggests that a company's beta will approach the average beta of its peer group.[634]

---

[633] CLEX-62.
[634] CRED-6, p. 15.

588. The Arbitral Tribunal is not convinced that the reversion-to-one adjustment is applicable here. According to Prof. Damodaran's opinion, relied upon by the Claimant, the premise for this adjustment is that the company's product mix and its client base usually diversify as the company grows.[635] However, as regards Tavsa, it is a manufacturer of seamless tubes, with a single client in the local market and with no growth forecasts. The premise to apply the adjustment does not seem to be satisfied.

589. As to the adjustment proposed by the Respondent, the Arbitral Tribunal takes note that it has not been the subject of criticism and, therefore, between the two proposed options, the Arbitral Tribunal will choose the adjustment suggested by the Respondent.

### d. Country Risk Premium

590. Abdala/Zadicoff suggest a premium of 4.6%. The Respondent's expert has changed his position as to the country risk premium:

591. (i) In his first report, Hart accepted the country risk premium suggested by the Claimant: 4.6%.[636]

592. (ii) In his second report, the expert first brought up the *Tidewater* award. Hart explained that the risk premium could also reflect other risks in addition to those which have traditionally been included. He noted that the 4.6% rate only reflects the risk of the Venezuelan Government's default on its USD-denominated bonds, but not the additional risk of doing business in Venezuela as opposed to the U.S., which would be a much higher rate.[637] In support of this position, he relied on the *Tidewater* award as an example of an arbitral tribunal that had elected to include other additional risks.[638] But in his second report, Hart continued to advocate for a 4.6% premium.[639] Consequently, it looks like both Parties' experts were in agreement on this figure.

593. (iii) Everything changed at the Evidentiary Hearing. There, Hart's position takes a radical turn for the first time, and he openly suggests that the country risk premium be set at 14.75%,[640] which is the rate accepted as country risk by the tribunal in *Tidewater*.[641]

---

[635] CLEX-62, p. 200: "This may be explained by the fact that firms' product mix and client base become more diversified as they get larger."
[636] Hart I, p. 96.
[637] Hart II, para. 245.
[638] Hart II, para. 244.
[639] Hart II, para. 250: "the country risk premia [...] is an input that is not disputed between the experts."
[640] T, p. 1018, and H 4, slide 26.
[641] "As a simple rule of thumb, when projects have infinite life, the capital maintenance expenditures should approach depreciation." Cf. Damodaran, Aswath: Supporting Material to "Corporate Finance: Theory and Practice," Wiley, 2nd ed., 2001, available at http://pages.stern.nyu.edu/~adamodar/New_Home_Page/CF2E.htm (*Cf.* section "3. Derivations and Discussion" of "Chapter 9: Estimating Earnings and Cashflows on Projects").

594. (iv) <u>In the Joint Report,</u> expert Hart set forth in writing that the country risk premium could be any value between 4.6% and 14.75%, depending on how many additional risks the Arbitral Tribunal decided to factor in.[642]

595. The Arbitral Tribunal is not in agreement or disagreement on Hart's suggested increase of the country risk rate to have that value reflect the risk of doing business in Venezuela. The Arbitral Tribunal will merely have this award reflect that expert Hart has failed to identify the components and amount of such additional risk. Without this, the Arbitral Tribunal is unable to determine whether such additional risk is or is not already accounted for in the beta or the size premium.

596. Thus, the Arbitral Tribunal will use 4.6% as the country risk premium, as this is a figure both experts have accepted as reasonable.

**e.    Size Premium**

597. The Claimants' experts do not find it necessary to include a size premium, whereas the Respondent's expert does indeed suggest adding a 2.73% premium. The reason provided by expert Hart is that Tavsa is smaller than the average company in the sample used to calculate the beta.

598. The Claimants' experts do not categorically object to the use of size premiums, but do question the contention that Tavsa is a small company since, as compared to other companies operating in the same industry in Venezuela, it would not be considered so.

599. On this aspect, the Respondent is more convincing: the smaller the size, the greater the investment's liquidity risk. If the companies used in the sample to calculate the beta are, on average, larger or smaller than the company whose WACC is being calculated, it seems reasonable to apply a size premium.

*  *  *

600. <u>To sum up</u>, the Arbitral Tribunal has decided as follows:

-    The risk free rate is to be calculated based on a 10-year bond, as suggested by the Claimant: 4.29%;

-    The market risk premium is to be obtained through an arithmetic average, as suggested by the Respondent: 6.2%;

-    The appropriate beta is the Morningstar-adjusted beta, as recommended by the Respondent: 2.2;

-    The country risk premium is 4.6%, as accepted by both parties' experts; and, lastly,

-    A size premium is to be applied, as suggested by the Respondent: 2.73%.

---

[642] Joint Report, para. 22.

601. Once the above parameters have been input into the WACC calculation formula,[643] the result is a rate of 21.7%.

* * *

602. Next, the Arbitral Tribunal will list each of the decisions arrived at in the preceding paragraphs for the above-discussed variables:

- <u>Production</u>: defined at 50,748 tons of tubes per year, as suggested by Venezuela;

- <u>Labor Cost Adjustment</u>: the variable labor cost is reduced by 30% to account for the above-set production level;

- <u>Price</u>: projected using the 30/70 formula negotiated with PDVSA, with the international reference price estimated based on the Metal Bulletin Research prices, as advocated for by the Claimant;

- <u>Opex</u>: as calculated by the Claimant, based on the 2007 cost as increased per the expected inflation;

- <u>Technical Assistance Contract</u>: the cost associated with this contract is to be included, as suggested by the Respondent, as this service can be expected to continue to be needed;

- <u>Capex</u>: calculated as suggested by the Claimant, as this approach is consistent with the standard valuation practice;

- <u>Working Capital</u>: using the Respondent's figures, as the opposing assumptions are excessively risky;

- <u>WACC</u>: 21.7%, with the Arbitral Tribunal choosing some parameters as suggested by the Claimants and others as suggested by the Respondent.

603. The Arbitral Tribunal has incorporated these decisions into the spreadsheet prepared by both experts, thus obtaining for the cash flows from May 2008 to December 2017 a present value, as of April 30, 2008, of USD 132,342,506; added to the present value of the terminal value of USD 28,151,108, this results in a value for Tavsa of USD 160,493,614. After applying a 70% factor to reflect the Claimant's interest, the result is **USD 112,345,530**.

604. This is the market value of Tenaris' shareholding interest in Tavsa and the amount the State of Venezuela is to pay it as compensation for its expropriation.

---

[643] For convenience reasons, the Arbitral Tribunal has input them into the spreadsheet jointly prepared by both experts.

## 3.2 COMPARISON: OTHER APPROACHES

605. In order to verify the value arrived at through the DCF method, each expert has suggested applying other additional approaches.

### A. <u>Return on Investment</u>

606. Both Parties' experts have brought attention to the rate of return on the investment, which is implied in the compensation due to Tavsa: Hart asserts that the rate of return is 485%,[644] while Abdala/Zadicoff reduce it to 32.6%.[645]

607. The Claimant's experts' approach is very valid, as it is interesting to measure the relationship between what Tenaris invested and the value that is recognized to its interest; however, the experts' calculations may not be taken into consideration because they are based on the value estimated by Abdala/Zadicoff for Tavsa, which the Tribunal has reduced significantly. Therefore, the Arbitral Tribunal will perform its own calculation of the investment's internal rate of return ["**IRR**"].

608. It is undisputed that Tenaris' investments in Tavsa amounted to USD 11.7 million in 1999 for the purchase of stock and a total of USD 30.2 million spent between 1999 and 2008 on capex and maintenance expenses.[646]

609. Moreover, there were other companies in the Tenaris group that also received income from Tavsa, as commission fees. According to expert Hart, such commissions totaled 5% of Tavsa's annual revenue,[647] and equal some USD 32 million between 1999 and 2008. In Hart's view, such commission fees are to be accounted for as part of the return on the investment,[648] while Abdala/Zadicoff object to this, as they are not Tenaris' income from its investment in Tavsa.[649] Given the circumstances of this case and considering that the companies that received the commission fees were subsidiaries of Tenaris, the Arbitral Tribunal agrees to have such income accounted for as part of the return on the investment.

610. The investment's IRR is calculated including:

- The price paid by Tenaris in 1999 to acquire its interests in Tavsa;

- The investments made (assumed to be evenly distributed over time between 1999 and 2008);

- The commission fees (which the Tribunal also assumes evenly spread over time between 1999 and 2008); and

---

[644] Hart II, para. 24.
[645] H 3, slide 24.
[646] Hart II, para. 217.
[647] Hart II, para. 217.
[648] Hart II, para. 217.
[649] H 3, slide 24.

141

- In 2008, a stream equal to Tenaris' stake in Tavsa, calculated via the DCF model (*i.e.*, USD 112.3 million):

|      | Stream in million USD |
|------|-----------------------|
| 1999 | -11.52[650]           |
| 2000 | 0.18[651]             |
| 2001 | 0.18                  |
| 2002 | 0.18                  |
| 2003 | 0.18                  |
| 2004 | 0.18                  |
| 2005 | 0.18                  |
| 2006 | 0.18                  |
| 2007 | 0.18                  |
| 2008 | 112.48[652]           |
| TIR  | 29%                   |

611. The IRR on an investment with these features stands at about 29%.[653] This rate is to be compared with the return on equity included in the calculation of Tavsa's WACC. The Arbitral Tribunal has used 25.26% (excluding the cost of debt),[654] which is reasonably close to the ratio of Tenaris' investment to the returns earned.

## B. **Market Multiples**

612. This approach was proposed by the Claimant. It is about identifying ratios that link the enterprise value to an accounting value (for instance, EBITDA); the next step is calculating the average of such ratios at comparable companies, stated as a multiple; that multiple is finally applied to the accounting value of the company whose value is being assessed.

### a. The Experts' Positions

613. Experts Abdala/Zadicoff identified three market ratios (EV/EBITDA, EV/Sales and EV/BVA), and then selected five companies as comparables. The experts calculated the ratios for each company and then obtained a median, which was, respectively, multiples of 8.1, 1.8 and 1.6 for each ratio. Applied to the value of EBITDA, Sales and BVA of Tavsa in fiscal year 2007, these result in a value of USD 226.6, 221.8 and 223.2 million, respectively;[655] or USD 223.8 million on average.

---

[650] -11.7 from the share purchase – 30.2/10 years of capex + 32/10 years of commission fees.
[651] - 30.2/10 years of capex + 32/10 years of commission fees.
[652] 112.3 million from the compensation for expropriation – 30.2/10 years of capex + 30.2/10 years of commission fees.
[653] Calculated through the automated function on the Excel spreadsheet.
[654] Tavsa 2008 Joint Model, WACC. The Claimant has estimated the return on equity at 17.79%, and the Respondent at 25.45%. Because the Arbitral Tribunal has accepted some of the Claimant's assumptions and some of the Respondent's, the final estimate is 25.26%.
[655] CLEX-3.

614. The Respondent is not opposed to the idea of using market multiples for comparison purposes, but notes that this needs to be done properly, and identifies two major flaws in the Claimant's calculations:

- The selected companies are not really comparable, as they are much larger than Tavsa, and cover markets very different from Tavsa's;

- The ratio calculations were based on a single year – 2007 – instead of using several years and finding the average; in addition, the selected year was an extraordinary year, based on results, and, in any event, the financial statements have not been normalized to ensure a comparison of homogenous magnitudes.

**b. The Arbitral Tribunal's Decision**

615. These are the comparable companies selected by the Claimant's experts:[656]

| | Enterprise Value | Market Capitalization | Financial Debt | EBITDA | Sales | Book Value of Assets |
|---|---|---|---|---|---|---|
| *As at April 2008* | *US$ Million* | *US$ Million* | *US$ Million* | *US$ Million* | *US$ Million* | *US$ Million* |
| **Anhui Tianda Oil pipe Company Limited** | 296.66 | 187.40 | 109.26 | 31.31 | 207.18 | 187.30 |
| **Gandhi Special Tubes Limited** | 34.14 | 34.00 | 0.14 | 7.71 | 18.93 | 15.54 |
| **Sanyo Special Steel** | 1,094.72 | 767.01 | 327.72 | 187.52 | 1,478.76 | 1,298.66 |
| **S.C. T.M.K. - ARTROM S.A.** | 330.02 | 143.39 | 186.62 | 23.44 | 218.61 | 318.71 |
| **Tubos Reunidos S.A** | 1,588.57 | 1,223.98 | 364.59 | 195.05 | 901.09 | 1,111.83 |
| **Tenaris S.A.** | 35,531.78 | 31,814.57 | 3,717.21 | 3,459.36 | 10,242.90 | 15,617.07 |
| **Vallourec S.A** | 15,550.39 | 14,473.30 | 1,077.09 | 2,399.97 | 8,598.06 | 7,988.77 |

616. In contrast, Tavsa's figures are as follows: EBITDA: USD 31.3 million,[657] Sales: USD 141.5 million,[658] and BVA: USD 135.3 million.[659] And the value of Tavsa as arrived at through the DCF method stands at USD 160.5 million.[660]

617. Tavsa's value, as derived by the Tribunal through the DCF approach, fits the sample selected by the Claimant, as shown in the following charts, prepared by the Arbitral Tribunal based on information supplied by the Parties:[661]

---

[656] CLEX-3, Financial Data.
[657] Tavsa 2008 Joint Model, FCF.
[658] Tavsa 2008 Joint Model, FCF.
[659] Tavsa 2008 Joint Model, Historical Data – Tavsa.
[660] This is the full value of Tavsa, not just the Claimant' share.
[661] The information was taken from H 3, slides 18, 19, and 20, and the data on the Tavsa 2008 Joint Model. All data are for 2007.



618. This first figure measures the value of Tavsa's equity as obtained through the DCF method, expressed as a multiple of the book value of its assets. The multiple thus obtained is 1.2x.[662] Tavsa ranks between comparables Tubos Reunidos (1.4x) and Artrom S.A. (1x). In the eight-company sample – itself included – it ranks sixth.



619. This second chart measures the value of Tavsa's equity as arrived at through the DCF method, expressed as a multiple of its EBITDA. The resulting multiple is 5.1x.[663] Tavsa ranks between comparables Sanyo Special Steel (5.8x) and Gandhi Special Tubes (4.4x). In the eight-company sample, it takes seventh place.

---

[662] 160.5/135.3
[663] 160.5/31.3

144



620. This third chart shows the value of Tavsa's equity as arrived at through the DCF method, expressed as a [multiple] of its sales revenue. This yields a multiple of 1.1x.[664] This multiple places Tavsa between comparables Anhui Tianda (1.4x) and Sanyo Special Steel (0.7x). In the eight-company sample, it takes seventh place once again.

\* \* \*

621. <u>To conclude,</u> Tavsa's value, as calculated by the Tribunal, ranks closer to the end as compared to the reference companies, which shows that it is relatively low but still within the limits set by these companies.

622. The market multiples methodology thus confirms the reasonableness of Tavsa's value as calculated through the DCF approach.

### C.    Comparable Transactions

623. The Respondent has identified as comparable transactions the construction of a plant in Mexico (**a.**) and the purchase of a plant in Indonesia (**b.**).

### a.    Construction of a Plant in Mexico

624. In the first case, this is a construction project from 2008 that cost USD 850 million, with a capacity of 450,000 tons per year. Based on his belief that this is 14% of Tavsa's size, expert Hart estimates that building Tavsa anew would require an outlay of USD 122.8 million, and 70% of that figure is USD 85.9 million.[665]

625. The Claimant's experts have completed the information on this project, explaining that it was completed in May 2011 and the investment reached USD 1 billion, and, therefore, even accepting the relevance of the costs approach, the replacement value for a 70% interest in Tavsa would be USD 124.4 million.[666]

---

[664] 160.5/141.5.
[665] Hart II, para. 195.
[666] T., p. 868.

626. This replacement cost is a mere 10%[667] below Tavsa's DCF value, which corroborates the reasonableness of the figure arrived at through the latter methodology.

**b.    Purchase of a Plant in Indonesia**

627. In the second case, in April 2009 Tenaris purchased a majority stake in an Indonesian company with a production capacity of 120,000 tons per year, for USD 72.5 million. Expert Hart believes the implied price of a company with Tavsa's capacity would be USD 50.7 million.[668]

628. The little information that has been supplied does not make it easy to ascertain how comparable to Tavsa the Indonesian company really is.[669] And the Arbitral Tribunal does not know either whether Tenaris undertook to make additional investments in the Indonesian company, in addition to the purchase price.

* * *

629. In sum, the Arbitral Tribunal confirms that the value of Tenaris' shares in Tavsa totals USD 112,345,530.

---

[667] (112.3 − 124.4)/124.4 = 9.73%.
[668] Hart II, para. 196.
[669] T., p. 868.

# VII.3.                    COMSIGUA'S VALUE

630. Before determining the value of Comsigua (**3.**), the Arbitral Tribunal will first set forth the position of the Claimant (**1.**) and, then, the position of the Respondent (**2.**).

## 1.    THE CLAIMANT'S VALUE ASSESSMENT

631. The Claimant's experts have calculated Comsigua's value based on the discounted cash flows method (**1.**); but also using market multiples (**2.**). Lastly, they have provided their opinion on Comsigua's value as implied by other transactions (**3.**).

### 1.1    DISCOUNTED CASH FLOWS

632. As already discussed in connection with Tavsa, this valuation approach consists in estimating the future revenue stream (**A.**) and deducting outgoing cash flows (**B.**). These net cash flows are generated in perpetuity at a growth rate, which translates into a terminal value calculated as of 2017 (**C.**). The cash flows are discounted at the appropriate discount rate to the valuation date, which is April 30, 2008 (**D.**).

### A.    **Revenue**

633. Tavsa's revenue is determined by:[670] the expected sales of HBI (hot briquetted iron) (**a.**) multiplied by the projected price (**b.**).

### a.    **Iron Production**

634. Comsigua's Hot Briquetted Iron (HBI) production was entirely dependent upon the availability of iron ore pellets in the market, with CVG FMO and Sidor being its only suppliers:[671]

-    CVG FMO: experts Abdala/Zadicoff estimate that its production would have remained at its 2007 levels, to begin recovering in 2009 and then reach its historical 3.08 million tons peak in 2015;[672]

-    Sidor: the experts have estimated production based on the five-year business plan prepared by Sidor itself in April 2008,[673] deducting Sidor's internal consumption of pellets.[674]

635. The experts start from the assumption that the entire production of CVG FMO and Sidor would be distributed on a *pro rata* basis (based on capacity) among the four HBI producers,[675] and that all of them would demand the amount of iron

---

[670] Abdala/Zadicoff I, para. 147.
[671] Abdala/Zadicoff I, para. 149.
[672] Abdala/Zadicoff I, para. 150.
[673] CLEX-37.
[674] Abdala/Zadicoff I, para. 151.
[675] Abdala/Zadicoff I, para. 152. HBI: hot briquetted iron.

ore pellets required to reach maximum production capacity.[676]

636. The experts' forecast is that Comsigua's production for 2008 would have been 400,000 tons, growing at an annual average rate of 12% for the following eight years, reaching a maximum production level of 870,000 tons in 2015, which would be sustainable over time.[677] This forecast assumes that Comsigua would be producing at maximum capacity (one million tons per year), but would not be investing to increase its production capacity.[678]

### b. Projected Price

637. The experts used the HBI price projections published for Venezuela by Metal Bulletin Research as of the valuation date.[679]

638. The experts' response to the criticism that they should have used historical HBI prices is that the valuation of companies is a looking-forward exercise, and that using projected future prices is a basic, standard principle in valuation practice.[680]

### B. **Expenditures**

639. Expenditures consist of operating expenses (opex) (**a.**), capital expenditures (capex) (**b.**) and others (**c.**).

### a. Opex

640. Operating expenses consist of two categories:

- Costs of Goods Sold: the materials needed to produce HBI and other associated costs like, primarily, energy expenses.[681] The future costs estimation follows the following pattern: the experts take the cost on the day preceding the valuation date and adjust that cost based on the expected evolution of the international price of pellets, as well as the Venezuelan PPI.[682]

---

[676] Abdala/Zadicoff I, para. 153.
[677] Abdala/Zadicoff I, para. 155.
[678] Abdala/Zadicoff I, para. 156.
[679] Abdala/Zadicoff I, para. 147.
[680] Abdala/Zadicoff II, para. 785.
[681] Abdala/Zadicoff I, para. 159.
[682] Abdala/Zadicoff I, para. 160.

- <u>Selling, General and Administrative Expenses</u>: these are variable (depending on production[683]), semi-fixed, and fixed costs, and include labor costs.[684] They are expected to evolve in line with the Venezuelan CPI.[685]

**b.    Capex**

641.  The experts base the capex on the historical average (2004–2007) capital investments, which are, primarily, maintenance expenses, and adjust these looking forward based on the U.S. PPI.[686]

**c.    Others**

642.  As regards taxes, the assumptions are identical to those used for Tavsa:[687] the science and technology tax (0.5% of gross income), anti-drug tax (1% of EBIT minus interest) and corporate income tax (34% net of the anti-drug tax).[688]

643.  As to changes in working capital, experts Abdala/Zadicoff based their calculations on the observed behavior for 2005– 2007, such that accounts receivable were estimated at 70 days of revenue, inventory at 65 days of costs of goods sold, and accounts payable at 100 days of total yearly costs.[689] Applying these estimates, they arrive at a working capital equal to 10 days of yearly revenue.[690]

**C.    <u>Terminal Value</u>**

644.  Terminal value is estimated as the value of the 2017 stream growing at a rate of 2.4% in perpetuity. The 2.4% growth rate is consistent with the U.S. inflation expectations.[691] Terminal value is above USD 627 million[692] –once discounted, terminal value will be almost 40%[693] of the total enterprise value.

**D.    <u>Discount</u>**

645.  Many of the component elements of the WACC (as of April 30, 2008) are the same as Tavsa's. Hence, the risk-free rate (4.29%), the market risk premium (4.79%), the country risk premium (4.6%) and the cost of debt (10.4% before taxes and 6.9% after taxes).

---

[683] Abdala/Zadicoff I, para. 162.
[684] Abdala/Zadicoff I, para. 161.
[685] Abdala/Zadicoff I, para. 162.
[686] Abdala/Zadicoff I, para. 164.
[687] Abdala/Zadicoff I, para. 165.
[688] Abdala/Zadicoff I, para. 140.
[689] Abdala/Zadicoff I, para. 166.
[690] Abdala/Zadicoff I, para. 143.
[691] Abdala/Zadicoff I, para. 167.
[692] CLEX-4, FCF, Terminal value leaving the discount factor out.
[693] See para. 648 *infra*. USD 161.2 million / 402.5 million = 40%.

646. The differences concern:

- The beta calculation, due to the use of a different reference index, which, for Comsigua, is code SIC 3312, covering U.S. steel works, blast furnaces and rolling mills;[694] the beta arrived at is 1.91.[695]

- The optimal capital structure, which is based on that of companies listed under SIC 3312 – which is a debt-to-equity ratio of 22.8%;[696] as of the valuation date, Comsigua had no outstanding financial liabilities,[697] but this would not affect the optimal capital structure used to calculate the WACC: in the experts' opinion, what is relevant is that the fair market value approach assumes that the buyer would have valued the company on the assumption that management would use an efficient capital structure.[698]

647. In sum, Comsigua's resulting WACC is 15.96%:[699]

| WACC as of Apr-08 | Comsigua |
|---|---|
| **Cost of Equity** | |
| **US Risk Free** | **4.29%** |
| **Market Risk Premium** | **4.79%** |
| **VZ Beta** | **1.91** |
| *Levered Raw Beta* | *2.33* |
| *Beta Levered (Adjusted)* | *1.89* |
| *D/E US* | *0.23* |
| *US Tax Rate* | *40%* |
| *Unlevered Beta* | *1.66* |
| *Optimal D/E* | *22.8%* |
| *VZ Tax Rate* | *34%* |
| **Country Risk Premium** | **460** |
| **Cost of Equity** | **18.0%** |
| **Cost of Debt** | |
| Pre Tax CoD (RF + CRP + Industry Premium) | 10.4% |
| *Industry Premium* | *1.5%* |
| *VZ Tax Rate* | *34%* |
| **After Tax Cost of Debt** | **6.9%** |
| **WACC** | **15.96%** |
| Debt to Firm Value | 19% |
| Equity to Firm Value | 81% |

\* \* \*

---

[694] Abdala/Zadicoff I, para. 180.
[695] Abdala/Zadicoff I, para. 183.
[696] Abdala/Zadicoff I, para. 190.
[697] Abdala/Zadicoff I, para. 168.
[698] Abdala/Zadicoff II, para. 106.
[699] Abdala/Zadicoff I, para. 191.

648. After discounting the annual cash flows between May 2008 and December 2017 to the valuation date, the experts arrive at a value of USD 241.3 million, and to be added to this is the discounted terminal value, which is USD 161.2 million; in total, USD 402.5 million.[700] After applying Talta's 7.58% interest, the value of its share in Comsigua is USD 30.5 million.[701]

## 1.2 MARKET MULTIPLES APPROACH

649. This approach consists in identifying companies that are comparable to Comsigua and deriving an average of the price/book value and EV/BVA multiples as of April 30, 2008.[702] The experts explain that, even though another two ratios were used for Tavsa, which were related to EBITDA and sales, they ruled these out for Comsigua. Due to exogenous factors not attributable to them, such as the shortage of pellets in the domestic market, these ratios did not reflect Comsigua's true production capacity.[703]

650. Experts Abdala/Zadicoff resorted Midrex, which is the supplier of the technology used in the process of iron oxide conversion into pellets (the stage before HBI production), as Midrex publishes information on HBI plants worldwide.[704] Having determined which companies owned the plants, the experts ruled out any companies that were not publicly listed and those whose main business was not the production and sale of HBI.[705] The sample came down to five companies, from which the experts used data for the twelve months up to March 31, 2008, or, where this was not possible, the information for the fiscal year ended December 31, 2007.[706]

| | Price to Book Value | Enterprise Value to Book Value of Assets |
|---|---|---|
| Multiples as of April 2008 | | |
| Bihar Sponge Iron Ltd | 1.9x | 1.3x |
| Monnet Ispat & Energy Ltd | 2.3x | 1.3x |
| Tata Sponge Iron, Ltd. | 1.8x | 1.1x |
| Lloyds Metals & Energy Limited | 4.4x | 2.0x |
| Orissa Sponge Iron & Steel | 3.0x | 1.6x |
| Median | 2.3x | 1.3x |
| Average | 2.7x | 1.4x |

651. Next, the experts calculated the median for these companies' multiples, and multiplied it by Comsigua's book value of assets and book value of equity. However, the values that were used are not the ones disclosed on Comsigua's financial statements, but other values that were calculated by the experts. The reason underlying the decision to deviate from the accounting values is that the experts do not trust the accounting methodology used by Comsigua.

---

[700] Abdala/Zadicoff I, Table IV, p. 31.
[701] Abdala/Zadicoff I, Table IV, p. 31.
[702] Abdala/Zadicoff I, para. 65.
[703] Abdala/Zadicoff I, para. 49.
[704] Abdala/Zadicoff I, para. 203.
[705] Abdala/Zadicoff I, paras. 204, 205.
[706] Abdala/Zadicoff I, para. 205.

The experts explain that, up to 2002, indexing was based on the Venezuelan CPI (the so called *"método del nivel general de precios"*). However, starting in 2003, Comsigua shifted to the *"método integral mixto"* method, whereby non-monetary holdings were valued by independent experts. In 2003, and once again in 2006, Comsigua restated the value of its non-monetary assets, thereby increasing the book value of its assets, as reflected in the "unrealized profits" item – as of December 31, 2007, this item represented almost one half of the company's equity.[707] The experts decided to perform their own calculation of the value of non-monetary assets for the period 2003 – 2008, using the general price level method:[708] based on data from the 2002 financial statements, the experts updated each asset using Venezuela's official CPI, and deducted depreciation.[709]

652.   The following tables summarize the above exercise:

| Valuation as of April 30, 2008 | | |
|---|---|---|
| **Price to Book Value of Equity** | | |
| **Comsigua's BV of Equity** | [a] | 424.2 |
| Adjustment to Comsigua's BV of Equity | [b] | 252.2 |
| Comsigua's adjusted BV of Equity | [c]=[a]-[b] | 172.0 |
| P/BV Ratio | [d] | 2.3x |
| Comsigua's Implied Value of Equity | [e] = [c] x [d] | 389.8 |
| **Market Value of Equity to Claimants** | [f] = [d] x 7.58% | 29.5 |

| Valuation as of April 30, 2008 | | |
|---|---|---|
| **EV to Book Value of Assets** | | |
| **Comsigua's BV of Assets** | [a] | 506.1 |
| Adjustment to Comsigua's BV of Assets | [b] | 252.2 |
| Comsigua's adjusted BV of Assets | [c]=[a]-[b] | 253.9 |
| EV/Book Value of Assets Ratio | [d] | 1.3x |
| Comsigua's Enterprise Value | [e] = [c] x [d] | 323.9 |
| *less* Financial Debt | [f] | - |
| Comsigua's Implied Value of Equity | [g] = [e] - [f] | 323.9 |
| **Market Value of Equity to Claimants** | [h] = [g] x 7.58% | 24.6 |

653.   The value of Comsigua totals USD 389.8 million by applying the price/book value multiple, and USD 323.9 million by applying the EV/BVA multiple; on average, USD 356.9 million.[710] After applying 7.58% to account for Talta's stake, this results in a value of USD 29.5 and 24.6 million for its investment.

---

[707] Abdala/Zadicoff I, para. 206.
[708] Abdala/Zadicoff I, para. 207.
[709] Abdala/Zadicoff I, para. 207.
[710] Abdala/Zadicoff I, para. 71.

### 1.3 OTHER RELEVANT TRANSACTIONS

654. There are three transactions which are of interest and could be used as a reference to determine Comsigua's value.

### A. Repurchase of Shares

655. In May 2007, Comsigua and IFC (until then, a shareholder of Comsigua) signed a share repurchase agreement. The implicit value of a 7.58% shareholding interest would be USD 16.6 million.[711]

656. This value is lower than the value arrived at by experts Abdala/Zadicoff through the DCF approach; however, the experts attribute this difference to the improvement in market conditions between the date of the share repurchase (May 2007) and the valuation date (April 2008).[712] In fact, companies saw an appreciation in value across the industry.[713]

657. To verify the above assertions, the Claimant's experts engaged in the following exercise: they performed a new DCF valuation of Comsigua as of May 2007, but based on the price and cost estimates available on that date,[714] and the result they arrived at is USD 18.6 million; this figure is reasonably close to the USD 16.6 million value implicit in the share repurchase transaction.[715]

### B. Comsigua's Management's Recommendation

658. Experts Abdala/Zadicoff have not overlooked the agreement reached between the State of Venezuela and the Japanese Shareholders who jointly held a 73.37% stake in Comsigua. The State paid USD 209.6 million for these shares in 2011.

659. Following the Japanese Shareholders' sale, the only private capital remaining at Comsigua was the Claimant's. Comsigua's President had been negotiating with Talta to purchase the latter's shares on terms equivalent to those underlying the transaction with the Japanese Shareholders:

> USD 24,058,737, with an initial payment of slightly over USD 8 million, and 10 half-yearly installments of USD 1,600,174 each, plus interest at 3% p.m., even though Talta was required to provide a bond of 10% of the total price to secure payment of the outstanding liabilities.

---

[711] Abdala/Zadicoff II, para. 64.
[712] Abdala/Zadicoff II, para. 67.
[713] Abdala/Zadicoff II, para. 69.
[714] HRC prices at USD 305 per ton, growing at the 2% inflation rate; iron ore prices evolving in line with HRC; and WACC and macroeconomic expectations as of May 2007.
[715] Abdala/Zadicoff II, para. 67.

153

660. However, in order to be able to formalize the offer, Comsigua needed to secure approval from higher authorities and it is for this reason that, on April 17, 2012, Comsigua's President sent a letter to the President of CVG asking for authorization to submit the proposal to the Minister of the People's Power for Industry.[716]

661. It is the view of experts Abdala/Zadicoff that this offer, which is framed on terms similar to those of the transaction with the Japanese Shareholders, has the same flaws as the latter does.[717] The only aspect of note here is that Venezuela was proposing compensation on a pro-rata basis, at the same price per share as offered to each Japanese Shareholder; *i.e.* Venezuela failed to distinguish between minority and majority shareholders and, therefore, it would be wrong to apply a discount to the offered price, as this is a minority interest.[718]

## C. Expropriation of Venprecar and Orinoco Iron

662. According to the financial statements of International Briquettes Holding, the sole shareholder of Venezolana de Prerreducidos Caroní, C.A. ["**Venprecar**"] and of Orinoco Iron S.C.S. ["**Orinoco Iron**"], the value of these two competitors of Comsigua in June 2009 (before their expropriation) was USD 1,200 million, or USD 382 per ton of production capacity per year.[719]

663. Comsigua's historical capacity was close to 1.2 million tons per year; in their discounted cash flows valuation, experts Abdala/Zadicoff assumed a production capacity of 1 million. Comsigua's value as assessed by the experts through the discounted cash flows approach is USD 402 per ton of capacity, or USD 335 considering the company's historical capacity – which figures are close to the implicit value of the company as per the assessed value of Venprecar and Orinoco Iron.[720]

## 2. THE RESPONDENT'S VALUE ASSESSMENT

664. Expert Hart does not object to the use of the DCF (**1.**) or market ratios (**2.**) as methods to assess Comsigua's value; he does, however, bring into question certain assumptions or parameters used by the opposing experts. Even so, he still prefers[721] other methods to calculate the value (**3.**); specifically, the expert analyzes the transaction with the Japanese Shareholders and the purchase price recommended by Comsigua's management, but has also found other indications of Comsigua's value.

## 2.1 DISCOUNTED CASH FLOWS

665. There are three parameters Hart disagrees on:

---

[716] CRED-59.
[717] Abdala/Zadicoff II, paras. 73, 76.
[718] Abdala/Zadicoff II, para. 74.
[719] Abdala/Zadicoff II, para. 77.
[720] Abdala/Zadicoff II, para. 77.
[721] Hart II, para. 68.

## A.    Price

666.    The expert criticizes the fact that Abdala/Zadicoff's price estimations are based solely on the Metal Bulletin Research forecasts and, more specifically, that they failed to take into consideration the historical evolution of HBI prices.[722]

667.    Hart takes issue with the fact that his colleagues failed to perform a historical analysis of the HBI prices and also failed to provide evidence of the price expectations used by Comsigua's management.[723] This is particularly relevant in highly volatile periods or bubble periods,[724] as was the case here: in 2008, which is the starting point for the value assessment, future price projections showed an upward trend, as HBI hit a historical peak in 2008. Using a very high price as the starting point has caused the price estimations to be very high – even higher than the historical average, and higher still than the actual prices from 2008 onwards.[725]

668.    In spite of this criticism, the expert has not provided the Arbitral Tribunal with his best price estimates as of April 30, 2008, which is the valuation date.

## B.    Discount Rate

669.    As already discussed in connection with Tavsa, Hart raises the same reservations in connection with the calculation of Comsigua's discount rate:

-        The risk-free rate will be 4.5%;[726]

-        The equity risk premium is set at 6.2%;[727]

-        The size premium is 2.73%;[728]

-        The beta is to be adjusted by the Morningstar methodology, which takes into consideration the beta coefficients and capital structure of SIC 3312 companies.[729]

670.    This leads to a beta of:[730]

| Leveraged beta | 2.33 |
| Adjusted leveraged beta | 2.2 |
| U.S. Debt/Equity | 0.228 |

---

[722] Hart I, para. 123.
[723] Hart I, para. 126.
[724] Hart I, para. 127.
[725] Hart II, para. 104.
[726] Hart I, para. 249.
[727] Hart I, para. 255.
[728] Hart I, para. 264.
[729] Hart I, para. 259.
[730] Hart I, para. 259.

| U.S. tax rate | 40% |
|---|---|
| **Beta** | **1.94** |

671. The expert raises one additional important criticism: he rejects the proposed capital structure consisting of 81% equity and 19% debt, for two reasons:

- As a minority shareholder, it is not reasonable to assume that the Claimant could have altered the structure existing at the time, which was 100% equity;[731]

- The opposing experts' proposal is not acceptable either, considering that Abdala/Zadicoff claim that there is no outstanding financial debt.[732]

672. According to Hart, the capital structure should be 100% equity, and, therefore, the discount rate should be calculated as follows:[733]

| | | |
|---|---|---|
| Cost of equity = **23.83%** | Risk-free rate | 4.5% |
| | Market premium | 6.2% |
| | Beta | 1.94 |
| | Country risk premium | 4.6% |
| | Size premium | 2.73% |

## 2.2 MARKET MULTIPLES APPROACH

673. According to theory, when there are comparable companies, the value of these companies – stated as multiples of certain ratios – can be used to assess the value of the company in question.[734] The Claimants' experts, Abdala/Zadicoff, have applied this approach, using a five-company sample. Expert Hart does not agree that all five companies selected by the opposing experts are truly comparable:[735]

- The five companies operate in India, a market with business risks different from those in Venezuela;

- The selected companies produce sponge iron, while Comsigua produces HBI, which is the compressed variant of sponge iron, with higher production and capital costs;

- The reference companies use rotary kiln technology, while Comsigua has natural gas furnaces using Midrex technology;

---

[731] Hart I, para. 128.
[732] Hart I, para. 129.
[733] Hart I, Annex 5.
[734] Hart I, para. 134.
[735] Hart I, paras. 140, 142.

156

- The selected companies use local iron ore and coal, controlled by them for the most part, whereas Comsigua obtains its raw materials under supply agreements with other Venezuelan companies.

## 2.3 OTHER VALUE INDICATIONS

674. Hart identifies three alternative indicators of Comsigua's value and provides his opinion on a fourth alternative suggested by Abdala/Zadicoff.

### A. Comsigua's Management's Recommendation

675. More than three years after the issue of the Nationalization Decree, on May 20, 2011, the State signed a share purchase agreement with the Japanese Shareholders, who held 73.37% of the company in total. The price paid for those shares was USD 232.9 million:[736]

> The USD 232.9 million price was to be paid as follows: an initial payment of USD 78 million upon execution, with 10 subsequent installments of USD 15 million each every six months, plus interest at 3%; in turn, the sellers were to contribute 10% of the price as a bond due to potential outstanding liabilities.[737]

676. On April 17, 2012, Comsigua's President sent a letter to the President of CVG[738] recommending the purchase of Talta's shares in Comsigua on terms equivalent to those agreed upon with the Japanese Shareholders:[739]

> The price was USD 24 million, with an initial payment of USD 8 million and ten successive installments of USD 1.6 million plus interest at 3%; also, Talta was required to set up a bond for 10% of the price to compensate for potential liabilities of Comsigua.

677. The Claimants' experts find this transaction not to be comparable, as it does not reflect the market value. In any event, they have calculated the implicit value of Talta's shares: in their first report, they estimated a value of USD 17.1 million (considering only the transaction with the Japanese Shareholders);[740] and in their second report, they raised that figure to USD 24.1 million (considering Talta's offer).[741]

678. Hart disagrees: he does find the transaction to be comparable, but does not agree on the price estimate. In his opinion, the appropriate thing to do would be discount the installments at 11.44%, which is the yield on the 4-year Venezuelan State bonds[742] (four years being the maturity period that best approximates the five-year payment stream), and adjust the value to reflect the contribution towards liabilities and the discount for Talta's minority position. He thus arrives at a value of USD 14.8 million.[743]

---

[736] Hart I, para. 120.
[737] Hart I, para. 108.
[738] CRED-59.
[739] Hart I, para. 113.
[740] Abdala/Zadicoff I, para. 72.
[741] Abdala/Zadicoff II, para. 73.
[742] Note that, later on, at the Hearing, the expert will refer to a seven-year bond (T., p. 1030:20).
[743] Hart I, para. 110.

**B.** **Share Repurchase**

679. In May 2007, Comsigua and IFC (one of Comsigua's private investors) signed a share purchase agreement whereby the former would repurchase the latter's stake in it. The price was USD 19 million for 4.75 million shares, or a price of USD 4 per share. Applying this price to the Claimant's 4,140,055 shares, the resulting figure is USD 16.6 million.[744]

680. Abdala/Zadicoff argue that the difference between the value shown by this share repurchase and the value arrived at through the DCF approach is due to the increase in HBI prices. But Hart is reluctant to accept this explanation without having an exhaustive analysis showing that Comsigua's costs did not also increase in line with the prices.[745]

681. Hart further points out that Abdala/Zadicoff rely on the price increases of five reference companies. But four of these companies are the ones already used under the market ratios method and, as already discussed, Hart has reservations regarding their comparable status.[746]

**C.** **Expropriation of Venprecar and Orinoco Iron**

682. Hart does not believe that the expropriation of Venprecar and Orinoco Iron can serve as an indicator of the compensation due to Comsigua.[747]

683. Hart argues that the opposing experts have based their calculations of the value of the companies on their capacity, but that equating capacity to value is oversimplifying. First of all, because these calculations do not account for the disparity in the capacities of the two companies (Venprecar 820,000 tons, as compared to the 2.2 million tons of Orinoco Iron); second, because there are other estimation parameters as production and profitability, which are preferable to capacity.[748]

---

[744] Hart I, para. 104.
[745] Hart II, para. 76.
[746] Hart II, para. 79.
[747] Hart II, para. 91.
[748] Hart II, para. 91.

3.    **THE ARBITRAL TRIBUNAL'S DECISION**

684.   For Comsigua's valuation, the Arbitral Tribunal must preliminary decide on the applicable valuation method, as the experts disagree on which method is the most adequate one:

-       Talta advocates for a DCF methodology, whereas

-       The Respondent prefers extrapolating a value from other transactions.

685.   The Arbitral Tribunal sees no reason to deviate from the traditional DCF method (**1.**), which has become a standard in the valuation of companies: in this case, the company has a past history and future cash flows were predictable and can be estimated in a reasonably accurate manner.

686.   That said, there is no reason keeping the Arbitral Tribunal from comparing the value thus arrived at to the result obtained through other methods (**2.**).

**3.1    DISCOUNTED CASH FLOWS**

687.   The Claimant's experts have assessed Comsigua's value by discounting its future cash flows to valuation date, which is April 30, 2008. Their exercise is similar to the one discussed in connection with Tavsa. The value they arrive at is USD 30.5 million.

688.   The Respondent has maintained that the correct valuation date is May 20, 2009. However, in contrast with its position regarding Tavsa's valuation, it has not subsidiarily provided an alternative valuation of Comsigua.

689.   In fact, the only parameter affecting Comsigua's value as of April 30, 2008 for which expert Hart has supplied an alternative figure is the discount rate. Next, the Arbitral Tribunal will make a decision on the adequate rate, taking Hart's criticism into consideration.

**A.    Discount Rate**

690.   The Claimant's experts have discounted the cash flows at Comsigua's WACC, which, in their opinion, is 15.96%. The Respondent's expert has taken issue with the use of the WACC as a discount rate as, in his opinion, using the return on equity is more appropriate.

691.   The Arbitral Tribunal will then decide which of these two is the more appropriate rate (**a.**) and it will then decide what the value of that rate is (**b.**).

**a.    WACC or Return on Equity**

692.   The Claimant's experts have calculated Comsigua's WACC to determine the discount rate. That WACC is the weighted addition of the cost of debt and the return on equity. The Claimant weights these two costs following an optimal capital structure (19/81 debt/equity).[749]

---

[749] Abdala/Zadicoff I, p. 92.

693. The reason why the Respondent's expert does not think it best to use the WACC as a discount rate is that Comsigua has no financial debt outstanding[750] and, accordingly, he suggests leaving the cost of debt out and considering only the return on equity.

694. Abdala/Zadicoff's counterargument is that the actual capital structure is irrelevant in determining the market value, as the only decisive factor is the structure a hypothetical buyer would have applied to assess a value estimate, and that buyer would have always applied an optimal structure.[751]

695. The Arbitral Tribunal agrees with the Claimant's experts: the goal here is to asses Comsigua's value by applying valuation standards, which include the hypothesis that WACC is calculated based on an optimal capital structure. That Comsigua has no debt outstanding and is financed 100% with equity capital does not change this hypothesis.

696. The same conclusion follows from mere internal consistency considerations: in valuing Tavsa, which also had no financial debt, the Respondent agreed to have its WACC include the company's cost of debt. The Respondent has argued that Tavsa's case is distinguishable, as Tenaris held a majority interest and, therefore, it could have imposed a change in the capital structure. This argument is unpersuasive: each company should be applied its own WACC, irrespective of whether the shareholder holds a minority or a controlling interest in it.

**b.   Rate**

697. In line with the preceding decision, the Arbitral Tribunal must now determine what Comsigua's WACC is.

698. This WACC is derived from the following parameters:

-   Risk-free rate;

-   Market premium;

-   Beta;

-   Country risk premium; and, if applicable,

-   Size premium;

---

[750] Note that Tavsa holds no financial debt either; Hart does not object to using the WACC for Tavsa as, in his view, because Tenaris had a control position in Tavsa, it could impose the capital structure it found most appropriate, as just another strategic decision – which would not be possible at Comsigua, where Talta holds a minority interest.
[751] Abdala/Zadicoff II, para. 106.

- Cost of debt;

- Optimal capital structure.

699. The Parties' experts are in disagreement as to the amount of each of the above parameters, and their points of disagreement are identical to those that were discussed for Tavsa's valuation. Consequently, the decisions made in that connection[752] are fully applicable here:

- Risk-free rate: the Tribunal has elected the 10-year bonds, as suggested by the Claimant, at a rate of 4.29%;[753]

- Market premium: the Tribunal has opted to use the arithmetic average, as suggested by the Respondent, which results in 6.2%;[754]

- Beta: the Tribunal has preferred the Morningstar-adjusted beta, as suggested by the Respondent, which is 1.94;[755]

- Country risk premium: the Tribunal has used a premium of 4.6%, which is the rate accepted by both experts;

- Size premium: the Tribunal has accepted the application of this 2.73% premium, as suggested by the Respondent.[756]

700. The above parameters are the inputs in the return on equity formula:

$$K_e = r_f + \beta \, (r_m - r_f) + p_c + p_s$$

Where $r_f$ is the risk-free rate, $\beta$ is the beta coefficient, y $r_m - r_f$ is the market risk premium, $pc$ is the country risk premium, and $ps$ is the size premium.

This results in a return on equity of:
4.29% + 1.94 x 6.2% + 4.6% + 2.73%; *i.e.*, 23.65%.

701. As to the net cost of debt, it stands at 6.9%.[757]

702. The optimal capital structure is 19/81 debt/equity.[758] And this leads to a WACC of 20.47%.[759]

---

[752] See para. 600 *supra.*
[753] Abdala/Zadicoff I, para. 176.
[754] Hart I, Annex 5.
[755] Hart I, Annex 5.
[756] Hart I, Annex 5.
[757] Abdala/Zadicoff I, p. 92.
[758] Abdala/Zadicoff I, p. 92.
[759] 23.65% * 0.81 + 6.9% + 0.19.

**B.   Comsigua's Value**

703.   The Arbitral Tribunal has used the Comsigua cash flows spreadsheet submitted as Exhibit CLEX-4 as basis, and substituted the discount rate proposed in that spreadsheet with a rate of 20.47%, as per the above decision.

704.   This leads to a present value of the cash flows generated between 2008 and 2017 of USD 208.7 million, and a terminal value of USD 85.3 million; in total, a value of USD 294 million for Comsigua as of April 30, 2008. Applying 7.58% to this value to account for the Claimant's shareholding, we arrive at **USD 22.3 million**.

**3.2   OTHER APPROACHES**

705.   The Arbitral Tribunal has decided to assess Comsigua's value by applying the DCF methodology. This, however, does not exclude the need to use other approaches to compare the value thus arrived at. The Tribunal will analyze these next.

**A.   Market Multiples**

706.   This approach was proposed by the Claimant.

707.   Its experts selected the following comparable companies:[760]

| | Enterprise Value | Market Capitalization | Book Value of Equity | Book Value of Assets |
|---|---|---|---|---|
| *As of April 2008* | *US$ Million* | *US$ Million* | *US$ Million* | *US$ Million* |
| Bihar Sponge Iron Ltd | 95.30 | 65.15 | 33.65 | 74.81 |
| Monnet Ispat & Energy Ltd | 803.25 | 622.76 | 274.76 | 629.51 |
| Tata Sponge Iron, Ltd. | 125.82 | 109.31 | 60.88 | 118.45 |
| Lloyds Metals & Energy Limited | 239.32 | 191.47 | 43.96 | 121.23 |
| Orissa Sponge Iron & Steel | 181.44 | 118.50 | 39.73 | 110.03 |

708.   As per their own calculations, as of April 30, 2008, the adjusted book value of Comsigua's equity was USD 172 million[761] and the adjusted book value of its assets was USD 253.9 million.[762]

709.   The following charts, prepared by the Arbitral Tribunal based on the data supplied by the Claimants, compare the EV/BVA and Price/BVE ratios (provided by the Claimant) to Comsigua's ratio, calculated by dividing the DCF value (USD 294 million) by the adjusted book value of equity (USD 172 million) and the adjusted book value of assets (USD 253.9 million):

---

[760] CLEX-5, Financial Data.
[761] Abdala/Zadicoff I, p. 37.
[762] Abdala/Zadicoff I, p. 38.

162



710. The first chart shows the value of Comsigua's equity, as arrived at through the DCF, stated as a multiple of the book value of its assets. The multiple is 1.1x.[763] Comsigua ranks last, as it has the lowest multiple among the five comparables.



711. The second chart features the value of Comsigua's equity, as arrived at through the DCF approach, stated as a multiple of the book value of its equity. The multiple is 1.7x.[764] Again, Comsigua ranks last relative to its comparable companies.

\* \* \*

712. <u>To conclude</u>, the charts show that Comsigua ranks at the bottom, even though not far from the reference companies. The Arbitral Tribunal would have expected its value to place it on a more central position, as would have been the case with a multiplier of 1.25x for the BVA and 2x for the BVE.

---

[763] 294/253.9.
[764] 294/172.

713. Applying a BVA multiplier of 1.25x and a BVE multiplier of 2x, the value of Talta's interest in Comsigua is USD 24.06 million[765] and USD 26.08 million.[766]

## B. Comparable Transactions

714. The Parties have referred to three potentially-comparable transactions: the purchase of IFC's shares, the valuation of Venprecar and Orinoco Iron, and, lastly, the one the Parties have paid the most attention to: the compensation paid to the Japanese Shareholders.

### a. The Purchase of IFC's Shares

715. Hart, the Respondent's expert, has addressed the May 2007 transaction whereby Comsigua repurchased a shareholder's (IFC) 4.75 million shares for a price of USD 19 million. Applying the same price, the value of the Claimant's 7.58% shareholding would be USD 16.6 million.

716. The Claimant's experts have pointed out that the market circumstances in May 2007 and April 2008 are not comparable: because the price of HBI (Comsigua's product) increased by 40% that year,[767] companies in this sector experienced a marked appreciation in their value, which the experts have estimated at 74% to 140%.[768]

717. The Arbitral Tribunal accepts the Claimant's experts' criticism, and it is its view that Comsigua's implicit value as per the May 2007 IFC transaction cannot per se be used as indicative of the company's value in April 2008, without applying the necessary adjustments:

- By the mere lapse of time: if the May 2007 value is capitalized at the discount rate used in the DCF exercise, the value goes from USD 16.6 million to 20 million.[769]

- By the increased price of HBI: using the comparable company that showed the least appreciation as per the experts' calculation (74%) as reference, and applying that figure to the May 2007 value, the value as of April 2008 is USD 28.88 million.[770]

---

[765] USD 253.9 million x 1.25 * 7.58%. For its calculations, the Arbitral Tribunal has used the full figures in the data provided by the experts, even though the Award only shows rounded-up amounts.
[766] USD 172 million x 2 * 7.58%. For its calculations, the Arbitral Tribunal has used the full figures in the data provided by the experts, even though the Award only shows rounded-up amounts.
[767] Abdala/Zadicoff II, para. 65.
[768] Abdala/Zadicoff II, para. 69.
[769] 16.6 * (1+20-47%).
[770] 16.6 * (1+74%).

718. The Arbitral Tribunal considers the IFC transaction to be an indicator of the value of the Claimant's investment in Comsigua as of April 30, 2008 between USD 20 million and 29 million.

**b.    The Value of Venprecar and Orinoco Iron**

719. Experts Abdala/Zadicoff referred to the valuation of Venprecar and Orinoco Iron which, as per their parent's financial statements, was USD 1.2 billion in June 2009. To find a point of comparison, the Claimant decides to translate that value into a price per ton produced. Applying this price per ton produced to Comsigua's production, the value of Tavsa's interest in Comsigua would be USD 29 million.[771]

720. The Respondent finds the notion of stating the value in terms of capacity overly simplistic, particularly considering the differences between each company's plants' capacity.

721. The Arbitral Tribunal agrees that tying value to production capacity is a simplification and, therefore, it will give prevalence to other comparable transactions in setting Comsigua's value.

**c.    The Purchase of the Japanese Shareholders' Shares**

722. In May 2011, CVG purchased the shares of a group of Japanese Shareholders, who held 73.37% of Comsigua's shares, in the aggregate, for USD 232.9 million.[772] The same economic terms of the transaction with the Japanese Shareholders are the terms underlying the recommendation made by CVG's management on April 17, 2012 for the purchase of Talta's shares for USD 24 million, with an initial payment of USD 8 million and the remaining USD 16 million payable in ten half-yearly installments, at 3% interest, and the furnishing of a bond by Talta.

723. In expert Hart's view, this transaction[773] is a good indication of Comsigua's value, which would be USD 14.76 million in April 2012:[774]

- USD 21.15 million for the offered price, with each installment discounted at the yield on Venezuelan bonds (11.44%), plus 3% interest;
- Minus USD 2.4 million to account for the fact that Talta was required to set up a bond for 10% of the offered price in order to cover potential liabilities of Comsigua;

---

[771] H 3, slide 28.
[772] Hart I, para. 105.
[773] Because the terms were identical, both Parties' experts have considered only one transaction.
[774] Hart I, Annex 4.

-    Minus 21.26% as a minority interest discount.

724.    Experts Abdala/Zadicoff refuse to recognize any reliability at all to this approach as, in their view, it is a forced sale to the State that cannot be indicative of the fair market value, which is the value we are trying to determine. Moreover, they bring the Respondent's calculations into question.[775]

The Arbitral Tribunal's Position

725.    The Tribunal will first determine what the correct value of the compensation proposed by the State is.

726.    The starting point must be the calculation performed by expert Hart, who is the expert who has performed a more in-depth analysis of this purchase as indicative of Comsigua's value:[776]



727.    The Arbitral Tribunal will now analyze the criticisms raised by Abdala/Zadicoff:

(i)    Offered Price

728.    The Claimant notes that the price considered by Hart is USD 10 million lower than the price offered.

729.    The Arbitral Tribunal believes the criticism might stem from the fact that the final price discounted and adjusted by Hart is USD 14,759,605, when the nominal offer was for USD 24,058,737.

730.    The criticism is not acceptable. The exercise consists, precisely, in finding out what the price the State was willing to pay for Talta's shares in Comsigua in a single payment back in April 2012 was. And, in any event, to clear any doubts, the figure in the last column, which is the undiscounted principal sum, is USD 24,058,737.

---

[775] Abdala/Zadicoff II, para. 74.
[776] Hart I, Annex 4.

(ii)  Underline: Interest

731.  Abdala/Zadicoff complain that expert Hart did not include interest, even though the offer provided for the accrual of interest.

732.  Indeed, the offer provided as follows:[777]

> "Ten (10) half-yearly, consecutive installments, represented by 10 promissory notes for the sum of USD 1,600,174.00 each. In addition to each installment, there shall be added the interest accrued on each promissory note at the time of effective payment, accrued at a rate of 3% p.a."

733.  The Arbitral Tribunal fails to fully comprehend Abdala/Zadicoff's criticism, as expert Hart has clearly included the accrued interest in his calculations. And he calculated interest as follows:

-  He used, as principal, the outstanding amount of the full agreed-upon price;

-  He applied a simple interest calculation method;

-  The accrual period is always six months.

734.  This method is correct.

(iii)  Underline: Discount

735.  The next step is to discount each interest payment and the payment of the USD 1,600,174 installment to the initial date.

736.  Expert Hart used a rate of 11.44%, which is the equivalent of the yield of the 7-year Venezuelan bonds.[778] The Claimant questions the suggestion that the discount rate needs to be adjusted to reflect a collection risk from Venezuela.[779]

737.  The Arbitral Tribunal does not agree with either Party:

-  It disagrees with the Claimant, because payments by the State must be discounted at a rate that represents the risk of the transaction, *i.e.* the rate applied to State bonds with a similar maturity period, which, in this case, is five years.

-  But it does not agree with the Respondent that its suggested 11.44% reflects the sovereign debt yield on a five-year investment. To begin with, expert Hart claims to have used the yield on seven-year bonds,[780] even though the transaction had a period of five years (up to 2017); moreover, there were sovereign debt bonds in the market –TICC042017 (6.25% coupon) and PDVSA 2017 – October 2010 (5.25% coupon) and PDVSA 2017N – October 2011 (8.5% coupon) – which matured, precisely, in 2017

---

[777] CRED-59, p. 4
[778] T., p. 1030:20.
[779] T., p. 872:18–21.
[780] T., p. 1030; even though in Hart I, para. 110, he refers to a four-year bond.

and which, therefore, seem to be more adequate to calculate the discount rate. Lastly, the Arbitral Tribunal has doubts as to whether the suggested 11.44% has been correctly calculated.[781]

738. The Arbitral Tribunal believes that a discount rate of 6.25% adequately reflects the risk of a sale of shares in 2012, where the price of the securities would be paid over a period of five years.

739. The amount of the installment payments and the interest, discounted to the initial date at 6.25%, is USD 14,768,469.[782]

740. To be added to this sum is still the agreed-upon initial payment of USD 8,056,993. In total, USD 22,825,462. This was the price offered by the State, for a single payment (rather than installments).

(iv)  Bond

741. Expert Hart deducts, off the discounted price, 10% of the offered price, to account for the bond to be furnished by Talta.

742. The Claimant does not deny that the bond was a requirement of the offer; its argument is that the Japanese Shareholders got full compensation, without a deduction on account of the bond,[783] and that Talta should be applied the same terms. It further notes that, at the time when the offer was made, it was uncertain that the bond would have to be enforced due to any liabilities materializing.[784]

743. The Arbitral Tribunal takes note of the fact that the offer provides as follows:[785]

> "TALTA – Trading e Marketing, Lda. is to furnish CVG with a Bond in a sum equal to 10% of the full price amount (USD 2,405,873.74), to guarantee the effective payment of all liabilities that arise or may arise on a date after the execution of the Share Assignment Agreement, in connection with its management."

744. The offer also mentions that the purchase of Talta's shares is done:[786]

> "[…] on the same conditions on which the Japanese companies' shares were negotiated."

---

[781] Hart I, para. 110 refers to CRED-32, which seems to be a printout of a webpage (which the expert claims is investing.com, even though this is not shown in the printout) showing the yields of Venezuelan bonds with two, four (11.435% yield), six, 15 and 20 year maturity periods; however, it does not show the date on which those yields were calculated. The Arbitral Tribunal visited investing.com (the same source used by the expert) and checked the yields of Venezuelan bonds a year ago (as the page does not provide data further back in time), and the figure shown for five-year bonds is exactly 11.435%; which raises the suspicion that expert Hart, who prepared his report in October 2014, used the yield on 2014 bonds, not 2012 bonds.
[782] The Arbitral Tribunal has discounted each payment calculated by expert Hart via the formula $(1+6\%)$ ^- $n$, where $n$ is the time elapsed from May 15, 2012 to the date of payment.
[783] T., pp. 1208, 1209.
[784] T., p. 1209.
[785] CRED-59, p. 5.
[786] CRED-59, p. 4.

745. The Arbitral Tribunal has analyzed the language of the offer and the Parties' arguments and, once again, partially agrees with each Party:

- The Claimant is right to reject a price deduction for 100% of the amount of the bond: the offer did not provide for a price reduction, but for a bond, which might or might not be enforced, based on the materialization of hidden liabilities; however, the fact that the Japanese Shareholders did or did not have their bond enforced is irrelevant as those are subsequent events that were unknown at the time.

- The Respondent is right that the provision of a bond has the effect of reducing the value of the offer, as there is a risk that the bond will, in fact, be enforced – what needs to be determined is how probable it was that hidden liabilities would materialize over the four years of the bond's effective period. At the Hearing, the Arbitral Tribunal raised this issue to expert Hart, suggesting the application of a 50% reduction factor;[787] the expert replied that it is very difficult to make this sort of assessment, but did not rule out the suggested percentage as being absurd. This will then be the percentage the Tribunal will apply.

746. Thus, the Arbitral Tribunal has estimated that, if the amount covered by the bond was USD 2,405,874, its effect on the price will then be a reduction by one half of its value (USD 1,202,937). The offered price is then assessed at USD 21,622,525.[788]

(v)  Minority Share Discount

747. The next adjustment applied by Hart is a price reduction to reflect the fact that Comsigua is a minority shareholder. Talta objects, basically arguing that compensation should be paid to all shareholders alike, irrespective of whether they are majority or minority shareholders and, in fact, so was done with the Japanese Shareholders (who, individually, were minority shareholders).

748. The Arbitral Tribunal agrees with Talta. The State's offer did not mention any discount and, therefore, there is no reason to believe that there was one implied: the offer was what it was. Moreover, the Claimant is completely right to point out that the Japanese Shareholders were paid a single price, without discriminating between those who were selling a larger or a smaller shareholding, as all of them were individually minority shareholders, just like Comsigua.

749. It is thus incorrect to apply any additional adjustment to the price. The value of Talta's interest in Comsigua, as implicit in the Government's purchase offer, is USD 21,622,525 USD.

* * *

---

[787] T., pp. 1210–1212.
[788] USD 22,825,462 – 1,202,937.

750. The Arbitral Tribunal has before it different calculations which are, more or less reliably, indicative of Comsigua's value:

- Market multiples: between USD 24.06 million and 26.07 million, or USD 25.065 million on average;

- Purchase of IFC's shares: between USD 20 million and 29 million, or USD 24.5 million on average;

- Value of Venprecar Orinoco Iron: USD 29 million;

- Compensation paid to the Japanese Shareholders: USD 21.62 million.

751. The above approaches show that the value arrived at through the discounted cash flows method (USD 22.3 million) is on the low end and, therefore, needs to be increased.

752. In order to determine the amount of that increase, the Arbitral Tribunal has decided to set an order of priority for the above discussed indicators:

- (i) topmost is the compensation paid to the Japanese Shareholders, which represents the value the State attributed to their shareholdings. However, the Arbitral Tribunal also accepts the criticism that this is not indicative of a fair market value, but the price of a forced sale and, therefore, it will treat this price as an indication of the minimum value of Talta's share in Comsigua, assigning it a weight of 0.3;

- (ii) next is the purchase of IFC's shares, as it is indicative of the value of Comsigua at a time prior to the expropriation, but under market circumstances that were less favorable than those at the time of the expropriation; therefore, the Tribunal will assign it a weight of 0.26;

- (iii) the reliability of market multiples is more limited, as there is no evidence that the experts have normalized the data, and their weight is thus 0.24; and

- (iv) lastly, the value of Venprecar and Orinoco Iron, because the Arbitral Tribunal believes that expressing value in terms of production capacity is an exercise of questionable reliability, and therefore assigns it a weight of 0.2.

753. Using the above order of priority, the Arbitral Tribunal has applied the weight factors to the relevant value:

- Compensation paid to the Japanese Shareholders: 0.3 x USD 21.62 million;

- Purchase of IFC's shares: 0.26 x USD 24.5 million;

- Market multiples: 0.24 x USD 25.065 million;

- Value of Venprecar and Orinoco Iron: 0.2 x USD 29 million.

170

754. The result of the above weighting exercise is that the value of Talta's share in Comsigua is **USD 24,672,357**.

\* \* \*

755. The Arbitral Tribunal notes that the market value of the Claimants' shareholding in Comsigua (USD 24,672,357) is higher than the USD 24.1 million offered by the Republic. Therefore, as pointed out by the Claimants, there is no need for the Arbitral Tribunal to rule on the subsidiary claims based on the unfair and inequitable treatment, discriminatory treatment, and breach of the most-favored nation clause allegations.[789]

---

[789] CV, para. 321.

# VIII.     INTEREST

756. The Claimants have requested an interest award.

757. Interest accrual is an issue addressed in the BITs:

- The Portuguese BIT provides that "compensation will accrue interest at the exchange rate applicable at the date in which the transaction becomes effective, in the territory where the investment is located".[790]

- Pursuant to the Luxembourg BIT, "interest [on compensation] shall be paid at the normal commercial rate from the date of its determination to the date of payment".[791]

758. The Parties disagree on the applicable interest rate.

## 1.    THE CLAIMANTS

759. The Claimants argue that, whatever the applicable interest rate is, it must guarantee full compensation; in other words, the Claimants are to be placed in a position equal to the position they would be in had the wrong not taken place.[792]

760. It is the Claimants' view that the rate that provides full compensation is the one reflecting the cost of opportunity lost by not having had the funds due them available, *i.e.* the WACC,[793] not a risk-free rate:

- The BITs do not mention a risk-free rate;[794]

- The Claimants have *de facto* lent money to Venezuela and, therefore, there is no reason to apply a risk-free rate to that loan, as the cost of Venezuela's debt has been much higher (9.8% in April 2008);[795]

- Arbitral awards have repeatedly held that a risk-free rate does not apply; rather, the applicable rate is one that compensates for the loss of investment opportunities during the time over which the compensation was due but not paid;[796]

- Hart himself applied a rate of 11.44% to discount the installment payments in the transaction with the Japanese Shareholders.[797]

761. The Claimants have also requested that interest be compounded,[798] as compound

---

[790] Portuguese BIT, Article IV.1(c).
[791] Luxembourg BIT, Article 4.2.
[792] CV, para. 297.
[793] CV, para. 297.
[794] CV, para. 300.
[795] CV, para. 301.
[796] CV, paras. 298, 299.
[797] CV, para. 302.
[798] CV, para. 303.

interest is the computation method that best provides full reparation for the loss, as has been acknowledged in previous awards.[799] The BITs' mention of a "normal commercial rate" means that they are referring to compound interest.[800] Compounding should be annual, since the cost of equity is measured using the expected annual returns as basis.[801]

## 2. THE RESPONDENT

762. The quantum expert hired by Venezuela objects to the Claimants' proposals.

763. Hart notes that he agrees that the Claimants be paid interest if the Award orders compensation, but granting interest at the WACC is entirely inappropriate.[802]

764. Hart analyzed the provisions of the BITs on the subject of interest and found that the "normal commercial" rate means the late interest rate applicable on trade transactions.[803] The expert advocates for the use of the interest rate used in Comsigua's shareholder agreements (six-month LIBOR + 2% p.a.) as the reference rate.[804]

765. However, the expert is also for applying a different alternative interest rate, as it is the one most frequently used in ICSID awards: the yield on 10-year U.S. Treasury Bonds.[805]

766. Faced with the opposing experts' suggestion to apply the WACC as the interest rate, the expert is surprised and claims to know of no awards granting interest at such rate;[806] the expert argues that, in *Saur,* the arbitral tribunal did not use the WACC as the interest rate but applied the rate the parties had agreed upon as the guaranteed rate of return.[807]

---

[799] CV, paras. 304, 305.
[800] CV, para. 306.
[801] CV, para. 308.
[802] Hart II, para. 199.
[803] Hart II, para. 202.
[804] Hart II, para. 203.
[805] Hart II, para. 204.
[806] Hart II, para. 181.
[807] Hart II, para. 207.

767. As to whether interest is to be compounded, Venezuela argues that neither the BITs[808] nor well-established practice provide for this possibility,[809] and further claims that simple interest does provide full reparation.[810]

### 3. THE ARBITRAL TRIBUNAL'S DECISION

768. The BITs contain a generic agreement as to the applicable interest rate. Such rate must be:

- A normal commercial rate,

- And, as specified in the Portuguese BIT, it must be the rate applicable in Venezuela.

769. However, within that framework, the Arbitral Tribunal has discretion to determine the interest rate. In this case, the experts' proposals range between:

- The WACC for the compensation due for Tavsa's expropriation and the cost of equity for Comsigua's case;

- LIBOR for six-month USD deposits + 2%;

- The yield on 10-year U.S. Treasury Bonds.

770. The Tribunal is not of the opinion that WACC and the yield on U.S. Treasury Bonds are "normal commercial rates" "applicable in Venezuela," as required by the BITs and, therefore, it rejects their application. However, the Tribunal believes that LIBOR plus a margin would indeed satisfy these requirements:

- It is a normal commercial rate: LIBOR is the interest rate applied in the London interbank market, and is set on a daily basis by the British Bankers' Association for interbank deposits with different maturity periods, denominated in various currencies; it is universally accepted as the reference rate to set interest rates on loans, deposits and other financial instruments and, in financial practice, bank loans to customers accrue interest at the interbank LIBOR plus a margin.

- It is a rate applicable in Venezuela: economic players in Venezuela frequently use LIBOR, as shown by the fact that clause 9 of Addendum No. 5 to Comsigua's Shareholders' Agreement[811] uses LIBOR for the interest accrued on the sums owed by the shareholders to Comsigua or vice versa.

771. Accordingly, the Arbitral Tribunal decides that the late interest to be paid by Venezuela accrue based on the LIBOR rate for dollar-denominated one-year deposits, with the rate adjusted to reflect market changes, yearly in arrears.

---

[808] RV, para. 268.
[809] RV, para. 270.
[810] RV, para. 269.
[811] CLEX-19.

772. Still to be defined is the appropriate margin above LIBOR. Expert Hart proposes 2%. The Arbitral Tribunal finds that this figure, which may very well have been appropriate under different economic circumstances, is not so in the light of current circumstances, where interest rates are typically extremely low (even negative). Therefore, the Tribunal considers a 4% margin to adequately compensate the investor for the unavailability of the funds and the financial risks faced.

773. Lastly, the Tribunal must determine whether interest is to be compounded after a given period. The BITs are silent on the matter. It is the Tribunal's view that in a LIBOR-based interest calculation, compounding is financially essential to compensate the investor. Indeed: the goal of interest is to compensate for the outside financial cost the Claimant would hypothetically have incurred to cover the deficit caused by the delayed compensation payment. Had the Claimant borrowed on normal market conditions at LIBOR for one year, it would have had to pay interest annually from the *dies a quo;* otherwise, such interest would have been added to the principal, thereafter accruing interest in turn. Therefore, in order to fully compensate the Claimant, the award must allow the annual compounding of interest.

774. Finally, the Tribunal has verified that the Claimants have simultaneously asked for compensatory and late interest.[812]

775. To conclude, the Arbitral Tribunal's decision is as follows:

- Interest accruing on a principal of USD 112,345,530 ["**Tavsa Interest**"] and USD 24,672,357 ["**Comsigua Interest**"];

- Tavsa Interest and Comsigua Interest will accrue at a rate equal to LIBOR for one-year USD deposits + 4% p.a.;

- Tavsa Interest and Comsigua Interest will accrue from April 30, 2008 to the date of actual payment, with the interest rate redefined yearly as from such date;

- Accrued Tavsa Interest and Comsigua Interest will be compounded annually, at the same time as the new interest rate is set for the upcoming period;

- Tavsa Interest will be paid to Tenaris, and Comsigua Interest will be paid to Talta, in line with the Arbitral Tribunal's decision in paragraph 402 *supra.*

---

[812] CI, para. 231.

# IX. TAXES

776. The Parties debate whether the Award should include an express declaration that the Claimants are to be indemnified in respect of taxes the Venezuelan Republic or other States might apply to the awarded payments. The Tribunal will explain the Parties' positions (**1.**) and make a decision (**2.**) to, then, move on to a specific issue: the potential impact of Article 5 of the Luxembourg BIT (**3.**).

## 1. THE PARTIES' POSITIONS

777. The Claimants argue that Abdala/Zadicoff's value assessments were made net of Venezuelan taxes. Consequently, any tax Venezuela might claim on the compensation would amount to double taxation.[813] Therefore, to secure full reparation, the Claimants have requested that the Tribunal declare that:

  - The Award is made net of Venezuelan taxes;[814] and

  - Venezuela may not claim taxes of any kind on the Award.[815]

778. They are also seeking to have Venezuela indemnify them in respect of any tax liability that might arise in Luxembourg, Portugal or any other jurisdiction. The underlying rationale for this claim is that such liabilities would also be a result of the wrong committed by Venezuela: had Venezuela not breached the BITs, no compensation would have been paid, and there would thus be no taxable income on that account.[816]

779. Expert Hart, appointed by the Bolivarian Republic, notes that the Claimants have failed to specify what the tax risk they claim to be facing is, and, therefore, contends this claim is speculation and advocates for its dismissal.[817]

780. Venezuela adds that the language of the BITs restricts the Tribunal's role to determining whether or not there was a breach of the obligations therein established and, as the case may be, setting the amount of compensation due; however, the BITs do not vest the Tribunal with the additional power to issue a purely declaratory opinion, let alone concerning an issue as important to sovereignty as the matter of taxation powers.[818]

781. As to the claim for indemnity from tax liabilities arising abroad, Venezuela finds this constitutes an unjustified benefit. The Claimants have failed to explain what these taxes are, how they would be damaging to them, or the causal link between the taxes and the wrongful acts.[819]

---

[813] CV, para. 309.
[814] CV, para. 309.
[815] CV, para. 309.
[816] CV, para. 319(g).
[817] Hart II, para. 208.
[818] RV, para. 273.
[819] RV, para. 274.

## 2. THE ARBITRAL TRIBUNAL'S DECISION

782. The Claimants have asserted two very distinct requests:

- As to the taxes that might apply in Venezuela (**A.**), they ask that the Arbitral Tribunal order Venezuela not to claim taxes on the Award or, in the alternative, that it declare that the Award is rendered net of Venezuelan taxes; and

- As to the taxes that might apply in other jurisdictions (**B.**), they ask that the Arbitral Tribunal order Venezuela to indemnify the Claimants with respect to any such taxes.

### A. The Claim for Venezuelan Taxes

783. The Claimants' first request is that the Arbitral Tribunal order the Venezuelan State to refrain from taxing any awarded compensation. This request must fail.

784. The Claimants have not explained the legal basis upon which this Arbitral Tribunal would be able to rule as requested. Obviously enough, the BITs and the Washington Convention offer no such basis, as these sources of law only authorize the Arbitral Tribunal to rule on whether Venezuela has breached its obligations under the BITs and, if so, set the appropriate compensation to provide reparation for the damage thus caused; however, they do not allow it to order a sovereign State like the Bolivarian Republic of Venezuela to refrain from applying taxes as it sees fit on any tax event.

785. The issue raised by the Claimants' in their second request is an entirely different matter: that the Arbitral Tribunal declare that the amount of the award is set net of taxes.

786. The starting point is as follows: the Claimants are a Luxembourg company and a Portuguese company and, therefore, their domicile for tax purposes is outside of Venezuela. The Claimants are looking for a guarantee that, whatever the amount they are awarded, such amount will not be reduced by potential taxes applied in Venezuela, but will remain equal to what is ordered in this Award.

787. The BITs require this of the State:

"[…] the payment of immediate, adequate and effective compensation […]."[820]

"The compensation […] shall be paid without undue delay and shall be freely transferrable."[821]

788. The Arbitral Tribunal is of the opinion that the BITs support the Claimants' request: in this case, adequate compensation amounts to USD 137,017,887[822] plus interest accrued until effective payment. The USD 137,017,887 plus interest are to be paid effectively and be freely transferrable. This means that such

---

[820] Portuguese BIT, Article IV(c), and Luxembourg BIT, Article 4(c).
[821] Portuguese BIT, Article V.1(c) (in virtually identical terms) and Luxembourg BIT, Article 4.2.
[822] USD 112,345,530 for Tavsa's expropriation, and USD 24,672,357 for Comsigua's expropriation.

amounts are the ones that are really to become an asset of the Claimants, who are legal entities with no tax domicile in Venezuela.

789. If compensation could be subjected to Venezuelan taxes and Venezuela tried to apply an offset between the compensation and the tax, the compensation effectively paid would be lower than set in this Award, and the Bolivarian Republic would thereby be defaulting on its obligations under the BITs. The succession of causal links is satisfied: the monetary reduction suffered by the Claimants would be attributable to actions of Venezuela exclusively, as Venezuela would be the beneficiary of the tax whose application is reducing the compensation amount.

790. Otherwise, *reductio ad absurdum*, Venezuela could tax any compensation due under an international award at 99%, thus reducing effective payment to 1% of the amount of the award. The Award would be thus left without any content.

791. In sum, if Venezuela were to subject the compensation to a tax which, once paid, would cause the Claimant's incoming money stream to be decreased, Venezuela would then be under an obligation to raise the amount of compensation, such that the net sum after tax payment (or an offset) would reach USD 137,017,887 plus accrued interest and costs.

792. To conclude, the Arbitral Tribunal will allow the Claimants' claim: the compensation ordered in the Award will be net of Venezuelan taxes.

## B. <u>The Claim for Taxes in the Country of Residence</u>

793. The Claimants go one step further and ask that Venezuela indemnify them from any tax liabilities that might accrue in Portugal and Luxembourg (the Claimants' tax domiciles) or in any other jurisdiction as a result of being paid the awarded compensation.

794. On this point, the Arbitral Tribunal concurs with the Respondent: Venezuela should not be made liable for taxes applied outside of its territory, as the causal link is broken when Venezuela satisfies the award and pays compensation to the Claimants. From then on, any taxation affecting the Claimants' assets will be attributable to the taxing State, not Venezuela. Venezuela cannot take responsibility for the sovereign decisions of another jurisdiction, which are beyond its control.

<u>Additional Argument</u>

795. Lastly, the Claimants have argued that the DCF model that was used as basis to calculate the compensation due already made provision for taxes. Consequently, the Claimants suggest, the compensation had already been reduced to reflect the tax impact and, if the Arbitral Tribunal were not to keep the Claimants indemnified from a tax perspective, it would be allowing double taxation.

796. This argument is a *non sequitur*:[823] the DCF methodology is an approach to assess the value of a company consisting in estimating the net cash flows the company will be generating in the future. However, the tax on the income of the target company is one thing, and the tax that will apply to a company's owner upon the company's sale or expropriation is an entirely different matter: corporate income tax and tax on the owner's profits upon a sale or expropriation are radically different concepts.

**3.   ARTICLE 5 OF THE LUXEMBOURG BIT**

797. Article 5 of the Luxembourg BIT, entitled *"Transferencias"* [Transfers] includes the following provision:

> "1. Each Contracting Party shall grant investors of the other Contracting Party the free transfer, to or from its territory, of all payments related to an investment and, in particular: […]
>
> (c) compensation paid under Article 4. […]
>
> 3. Each Contracting Party shall issue the necessary authorizations to ensure that such transfers are completed without undue delay and without charges other than the usual taxes and expenses."

798. The French version of Article 5.3 reads:

> "*Chacune des Parties contractantes, délivrera les autorisations nécessaires pour assurer sans délai injustifié l'exécution des transfers, et ce, sans d'autres charges que les taxes et frais usuels.*"

799. The Arbitral Tribunal asked the Parties[824] to comment on the potential impact of Article 5 of the Luxembourg BIT on their positions on the subject of tax indemnity.

**A.   <u>The Claimants' Position</u>**

800. It is the Claimants' view that Article 5 of the Luxembourg BIT does not relate to taxes applied on the compensation due for expropriation, as it only refers to the

---

[823] *ConocoPhillips*, Exhibit CLA 78: in a very unpersuasive manner, this award argued that there was a link between the taxes factored into the cash flows model and the debtor's obligation to cover the creditor's tax liabilities. An agreement whereby seller and buyer set the price for the purchase of a company via a discounted cash flows calculation including the tax effect (both positive and negative) the company will experience in the future does not mean that the buyer has to pay the seller, in addition to the purchase price, the corporate tax that will apply to the seller for the profits earned upon the sale of the company.
[824] Letter of August 5, 2016.

usual taxes and expenses that apply on the issue of the authorizations required in order to make transfer of the payment possible.[825] The French version of the BIT, which includes the words *"et ce,"* more clearly denotes that the fiscal assessment in question relates to the authorizations.[826] Moreover, paragraph 1 of that Article ensures the free transfer of compensation; if such compensation were taxed, it would no longer be a free transfer.[827]

801. Moreover, the relevant legislation on the subject of taxation of the compensation due for expropriation is the Nationalization Decree, No. 6058, itself, Article 10 of which clearly enshrines the tax-exempt status of such compensation:[828]

> "Any acts, transactions and agreements done or executed for the purpose of the transformation to a State-Owned Company referred to in this Decree, as well as any assignments, transfers of assets, and any other transaction that entails an enrichment or the disposal, conveyance or sale of assets intended to become assets of such companies shall be exempt from the payment of any taxes, fees, special contributions or any other fiscal obligation."

802. According to the Claimants, the above conclusion is reinforced by the fact that the compensation paid to the Japanese Shareholders was free of taxes, pursuant to said Article 10:[829]

[830]

> "Pursuant to the [Nationalization] Decree […] any transactions hereunder are free of any and all taxes and, therefore, any moneys to be paid by [Venezuela] shall be so payable without deducting any amount whatsoever on account of taxes. […] In the event that any of the Sellers is required to pay taxes to the Republic or to any division and organization of the State of Venezuela, [Venezuela] shall indemnify the Seller for such payment and any other payment."

## B. **The Respondent's Position**

803. The Respondent's reading of Article 5 of the Luxembourg BIT is different. In its view, this Article allows the State to levy the usual taxes and fees on the compensation due for expropriatory measures.[831]

804. It further notes that the Claimants have no standing to rely on the Nationalization Decree to seek tax indemnity as the Nationalization Decree only applies to lawful expropriations and, in the case at hand, the Claimants contend they suffered an unlawful expropriation. The applicable legal instrument is then the Luxembourg BIT, which draws no distinction between lawful and unlawful expropriations.[832]

---

[825] CVI, para. 11.
[826] CVII, para. 6.
[827] CVII, para. 8.
[828] CVI, para. 9.
[829] CVI, para. 10.
[830] Exhibit C-72.
[831] RVI, para. 6.
[832] RVI, para. 17.

805. As to whether the French version of the BIT sheds some light on its correct interpretation, the Respondent doubts it. According to the Bolivarian Republic, the expression "*et ce*" may refer to both the authorizations and the transfers.[833]

806. The Respondent also denies that its obligation under the BIT to allow "free transfer" entails unrestricted freedom.[834]

### C. The Arbitral Tribunal's Decision

807. Article 5.3 of the Luxembourg BIT allows the application of certain "usual taxes and expenses:"

> "*Each Party to the Contract shall issue the necessary authorizations to ensure that the transfers will be made without undue delay and without other charges other than habitual taxes and expenditures.*"

808. The Parties' positions conflict as regards the correct interpretation of Article 5.3 of the Luxembourg BIT, and whether this provision might undermine the conclusion on tax indemnity reached by the Arbitral Tribunal in the preceding section:

- It is the Claimants' view that the expression "*sin otros cargos que no sean los impuestos y gastos usuales*" refers to the fiscal assessments related to the issue of authorizations;

- The Respondent contends these are assessments concerning the transfers.

809. The Arbitral Tribunal finds the Claimants' position to be more persuasive, for the following reasons.

810. The Arbitral Tribunal will first determine what the correct text of Article 5.3 is (**a.**) and will then interpret it in the light of the relevant criteria (**b.**)

### a. The Correct Version of Article 5.3

811. Tenaris has brought to the Arbitral Tribunal's attention the semantic discrepancies between the French and Spanish versions of the BIT. Correctly translated from its French version, Article 5.3 reads as follows:[835]

> "Each Contracting Party shall issue the necessary authorizations to ensure that such transfers are completed without undue delay, **and this** without any charges other than the usual **fees** and expenses."

812. There are thus significant differences between the correct translation from

---

[833] RVII, para. 4.
[834] RVII, para. 5.
[835] Free translation of the original by the Arbitral Tribunal: "*Chacune des Parties contractantes, délivrera les autorisations nécessaires pour assurer sans délai injustifié l'exécution des transfers, et ce, sans d'autres charges que les taxes et frais usuels.*" Bold and underlined emphasis is the Arbitral Tribunal's.

French into Spanish and the Spanish version of the BIT:

- The first one is a clear translation error: the Spanish version leaves out two words ("*et ce*") which do appear in the French version;

- The second one is terminological in nature: the correct translation of the French word "*taxes*" is the specific concept of "*tasas*" [fees], not the generic "*impuestos*" [taxes], as both "*taxes*" and "*tasas*" refer to charges applied by a State for the provision of a public service.[836]

813. Which version should prevail?

814. The BIT itself provides the answer: pursuant to its final provision, even though the Spanish, French and Dutch versions are equally authentic, in the event of discrepancies consideration is to be had to the fact that the negotiations took place in French. Therefore, since there are indeed discrepancies between the Spanish and French versions of Article 5.3, the Arbitral Tribunal will take into consideration the fact that the contracting States negotiated these provisions in French and it is based on this version that they projected their consent.

815. Article 5.3 is not an isolated instance of inconsistencies between the French and the Spanish versions:

- Article 1.1(b) substitutes "*and*" with "*or*";[837]

- There are words left out of Articles 5.1(b) and 10.3;[838]

- Article 9.2 changes tenses from present to future;[839]

- Article 10.1 adds words.[840]

816. Without question, the Contracting Parties were aware of the potential differences between the French-negotiated original and the two versions translated into Spanish and Dutch, and it is for this reason that they included a closing provision giving prevalence to the original language in which the negotiations were carried

---

[836] 'Taxe' is defined in the Larousse dictionary as "a fiscal assessment intended to increase the treasury of the State, a local collective or a public administrative entity as consideration for a service provided to private parties." Likewise, 'tasa' is defined in the *Diccionario de la Real Academia de la Lengua* dictionary as follows: "*A charge applied on the enjoyment of certain services or the performance of certain activities.*"

[837] "*[...], ainsi que toute personne moral effectivement contrôlée par un investisseur compris dans le paragraphe 1, a) **et** b).*" "*[...], así como toda persona jurídica controlada efectivamente por un inversor comprendido en el párrafo 1.a) **o** b) [...].*"

[838] "*des sommes destinées au règlement d'obligations contractuelles, y compris les sommes nécessaires au remboursement d'emprunts, **les redevances** et autres paiements découlant de licences, franchises, **concessions** et autres droits similaires, ....*" "*las sumas destinadas al pago de obligaciones contractuales inclusive las sumas necesarias para el pago de préstamos, **de regalías**, de todos los pagos referentes a licencias, franquicias, **concesiones** y otros derechos similares.*"
"*Si le Vice-Président de la Cour **est ressortissant** de l'une ou l'autre Partie contractante ....*" "*Si el Vicepresidente de la Corte Internacional de cualquiera de las Partes Contratantes.*"

[839] "*[...]le différend **est soumis** [...]*"; "*Á cette fin, chacune des Parties contractantes **donne** son consentement [...].*" "*[...] la controversia **se someterá** [...]*"; "*A este fin cada una de las Partes Contratantes **otorgará** su consentimiento[...].*"

[840] "*Tout différend relatif à l'interprétation [...].*" "*Cualquier controversia **entre las Partes Contratantes** relativa a la interpretación [...].*"

182

out.

**b.    Interpretation of Article 5.3**

817.    Having established what the relevant language of Article 5.3 is, the Arbitral Tribunal must now interpret whether the levy thereby authorized affects the issue of authorizations or the transfer of the compensation payment.

818.    The rules of interpretation of any treaty are enshrined in Article 31 of the VCLT: ordinary meaning, (**i.**), context, and object and purpose (**ii.**)

(i)    Ordinary Meaning

819.    Article 5.3 allows the application of fees (and other expenses). The goal here is to determine whether, from the standpoint of the provision's ordinary meaning, the correct reading is that such fees apply to the issue of authorizations (as advocated for by the Claimants) or what they actually apply to is capital transfers (according to the Respondent).

820.    The Tribunal leans toward the interpretation proposed by the Claimants: each Contracting Party is to issue the necessary authorizations to ensure that transfers take place without undue delay and without any other charges other than the usual taxes and expenses.

821.    In its French version, Article 5.3 reads as follows:

> "*Chacune des Parties contractantes, délivrera les authorisations nécessaires pour assurer sans délai injustifié l'exécution des transfers, et ce, sans d'autres charges que les taxes et frais usuels.*"

822.    By means of Article 5.3, each Contracting Party assumes an obligation: it will issue the authorizations required to ensure that transfers are made without undue delay. Then the BIT includes the expression *"y esto, sin otros cargos [ ... ]"* ("*et ce, sans d'autres charges*"). A textual reading of those words supports the Claimants' interpretation: *"Esto"* ("*ce*") [this] can only refer to the obligation undertaken by the State in Article 5.3, *i.e.* the issue of the authorization, not the transfers themselves.

823.    This textual interpretation is reinforced by the use of the notion of *"tasas"* ("*taxes*") [fees]. There are different kinds of fiscal burdens, and fees are one of them.[841] A fee is a levy paid by a party as consideration for a service provided by the Administration. This is the usual meaning of the term *'tasa.'* There is only one taxable event the *tasas* mentioned in Article 5.3 can apply to: the issue, by the Authorities, of the administrative authorizations required to allow the transfer of an investment or the returns on an investment abroad. The issue of an authorization is indeed a public service, whereas the existence of a transfer cannot be the subject of a fee, as a transfer is not in itself a service provided by the Administration.

---

[841] Venezuelan Law distinguishes between fees and other fiscal burdens, such as taxes. *Cf.* Articles 31 and 136 of the 1961 Venezuelan Constitution and Article 13 of the 1994 Venezuelan Organic Tax Code, as they were in force when the BITs were negotiated.

(ii)    Context, Object and Purpose

824.    The object and purpose of the BIT is to attract investments by creating favorable economic conditions.[842]

825.    Such favorable economic conditions include the States' obligations to pay adequate and effective compensation in the event of expropriation (Article 4.1(d) and to allow the free transfer of such compensation (Articles 4.2 and 5.1(e)) – all in accordance with Article 5.3.

826.    Between a scenario where the State is allowed to levy fiscal amounts on the transfer of compensation and another where the State is only allowed to levy assessments on the issue of the authorization required to make the transfer, the Tribunal will choose the latter scenario, as it is the one that best fits the purpose of the BIT and its context.

c.    Additional Argument

827.    The Claimants have pointed out that Article 10 of the Nationalization Decree provided that the compensation for expropriation would be exempt of the payment of taxes, fees, special contributions or any other fiscal obligation.[843] And the compensation to the Japanese Shareholders[844] expressly acknowledged the fact that, pursuant to the Nationalization Decree, such transaction was free of any and all taxes; therefore, were Venezuela to apply an assessment on the compensation, the Bolivarian Republic should gross the amount due up to a net amount which, after deducting such taxes, would be equal to the agreed upon compensation.[845] This would reinforce the conclusion that the correct interpretation of Article 5.3 of the Luxembourg BIT prevents the application of taxes on the compensation.

828.    The Respondent refuses to recognize any relevance to the tax-related provisions of the Nationalization Decree, as they only apply to voluntary settlements between the State and an investor, as was the case with the compensation paid to the Japanese Shareholders.[846]

829.    The Arbitral Tribunal disagrees with the Respondent: the tax indemnity that is expressly recognized in the Nationalization Decree and was granted to the Japanese Shareholders is relevant, because it evidences State behavior that is consistent with the manner in which the Arbitral Tribunal has interpreted Article 5.3 of the BIT in this Award.

---

[842] First desiring clause.
[843] Article 10: "Any acts, transactions and agreements done or executed for the purpose of the transformation to a State-Owned Company referred to in this Decree, as well as any assignments, transfers of assets, and any other transaction that entails an enrichment or the disposal, conveyance or sale of assets intended to become assets of such companies shall be exempt from the payment of any taxes, fees, special contributions or any other fiscal obligation."
[844] Exhibit C-72.
[845] Clause 10.1.
[846] RVII, para. 19.

# X.   COSTS

830.   Arbitration Rule 47(1)(j) provides that

> "the award shall be in writing and shall contain […] any decision of the Tribunal regarding the cost of the proceeding."

831.   The Tribunal requested that the Parties submit a breakdown of the sums they are seeking as costs.[847] The following sections recount the Parties' claims regarding the costs of the proceedings in connection with the Centre and the arbitrators' fees ["**Costs of the Proceeding**"] and the fees and expenses of their attorneys, witnesses, experts and other representatives ["**Defense Expenses**"]. The Tribunal notes that neither Party has challenged the cost items claimed by the opposing Party or the accuracy of the amounts sought.

## 1.   THE CLAIMANTS' POSITION

832.   The Claimants are seeking the following amounts:

-   Costs of the Proceeding: USD 1,050,000;[848]

-   Defense Expenses: USD 5,721,236,[849] EUR 256,892, COP 487,000, ARP 58,882 and MXN 76,852.

833.   The sum of the above figures totals USD 6,771,236, EUR 256,892, COP 487,000, ARP 58,882 and MXN 76,852.

834.   The Claimants have requested that the Tribunal order Venezuela to pay all of the above sums.

## 2.   THE RESPONDENT'S POSITION

835.   The Respondent, who has not contributed to the Costs of the Proceeding, is only seeking Defense Expenses in the sum of USD 7,974,674.[850]

836.   The Respondent trusts that the Tribunal will find that it lacks jurisdiction and argues that, in any event, Venezuela has not failed to fulfill its obligations under the BITs.[851] It therefore requests that the Claimants be ordered to pay all of the costs of this arbitration.[852]

## 3.   THE ARBITRAL TRIBUNAL'S DECISION

837.   Article 61(2) of the ICSID Convention provides as follows:

---

[847] T., p. 1716:1–21.
[848] CVI, p. 6; Letter from the Claimants, October 7, 2016.
[849] CVI, pp.6-8.
[850] RVI, p. 6.
[851] RIV, para. 458.
[852] RIV, para. 458.

> "the Tribunal shall, except as the parties otherwise agree, assess the expenses incurred by the parties in connection with the proceedings, and shall decide how and by whom those expenses, the fees and expenses of the members of the Tribunal and the charges for the use of the facilities of the Centre shall be paid."

### A. Cost Awarding Criteria

838. Neither the ICSID Convention nor the Arbitration Rules offer any sort of guidance for the allocation of costs and, therefore, the Tribunal has discretion to rule on their allocation.

839. The Claimants have asked that the Arbitral Tribunal apply the costs-follow-the-event standard,[853] while the Respondent suggests the procedural recklessness standard, which, in its opinion, applies to the Claimants, who therefore should be made to bear the costs of this arbitration.[854] The Arbitral Tribunal will analyze each standard separately, starting with the recklessness standard.

The Claimants' Alleged Recklessness

840. The Respondent maintains that, throughout the arbitration, the Claimants engaged in bad faith behavior that caused delays and unnecessary complications, and mentions the following as examples:[855]

- Objecting to the bifurcation of the proceedings.

- Filing 16 exhibits with its counter-memorial, which should have been filed earlier, instead of one month before the Hearing on jurisdiction; the work required to analyze this new evidence made it necessary to cancel the Hearing.

- Making incomplete submissions of the evidence requested by the Respondent's expert.

- Refusing to examine the Respondent's expert after his presentation, so that they would have all night to better prepare for his examination the next day.

- Requesting the incorporation of new documents a few days prior to the Evidentiary Hearing, thus forcing the Republic to use up time that had been set aside to prepare for the Hearing to respond to this untimely evidence.

841. According to repeated decisions, in order for a tribunal to be able to rule that a party committed procedural recklessness, it is necessary that the opposing party establish:

---

[853] CV, para. 314.
[854] RV, para. 276.
[855] RV, para. 276.

- Frivolous, irrational, or unlawful behavior,[856] or

- Obstructionist behavior that causes an unnecessary extension of the proceedings.[857]

842. None of the Claimant's behaviors pointed out by the Bolivarian Republic warrants being labeled as reckless.

<u>The Costs-Follow-The-Event Criterion</u>

843. The Claimants have asked the Tribunal to apply the costs-follow-the-event criterion, ordering the losing party to pay the expenses incurred by the prevailing party. The Arbitral Tribunal agrees on applying this principle, as it is commonly used in arbitration practice.[858]

844. In this case, the Claimants are the prevailing parties as they have had the jurisdictional objections rejected and their main expropriation claim accepted by the Arbitral Tribunal. However, the Respondent has also prevailed to a certain extent, as it has managed to persuade the Arbitral Tribunal that the amount of compensation due was lower than sought.

**B.     Application of the Costs-Follow-The-Event Rule**

845. The Arbitral Tribunal will apply the rule that costs follow the event to the two major cost categories: on the one hand, the Costs of the Proceeding and, on the other Defense Expenses.

**a.     Costs of the Proceeding**

846. The first expense category the Claimants seek to be reimbursed for is USD 1,050,000 as Costs of the Proceeding, for the advances paid to ICSID. The Arbitral Tribunal finds that these Costs of the Proceeding are to be borne by the Respondent in full, for the following reasons:

- Pursuant to Regulation 14(3)(d) of the Administrative and Financial Regulations of the Centre, the Costs of the Proceeding are to be borne by the parties by half; however, in this case, the Respondent chose not to pay its half, such that the Claimants were forced to cover Venezuela's portion.

- The Arbitral Tribunal has rejected the Respondent's jurisdictional objections and granted the Claimants' main *petitum*.

847. In the absence of an allegation or evidence, it is the Arbitral Tribunal's understanding that the Claimants covered the Costs of the Proceeding in equal portions and, therefore, Venezuela is to reimburse:

- Tenaris: for USD 525,000; and

---

[856] *Ömer Dede,* para. 6; *MCI Power,* para. 372; *AES*, para. 15.3.3; *EDF*, para. 322.
[857] *Liberian Eastern Timber; Olguín*.
[858] *EDF*, para. 327; *Plama*, para. 316, *Phoenix*, para. 151, *OI European*, para. 964.

- Talta: for USD 525,000.

**b. Defense Expenses**

848. The Claimants seek close to USD 6 million[859] in Defense Expenses, which cover various different costs. It is the Arbitral Tribunal's view that, of such Defense Expenses, the Claimants can only seek from the Respondent those which are essential to reasonably defend their claim ["**Reasonable Defense Expenses**"].

849. Considering the complexity of the case at hand, the quantum of the claims and the work performed by counsel and experts, the Arbitral Tribunal finds that Reasonable Defense Expenses total USD 2.8 million.

850. Of such USD 2.8 million, Venezuela will bear the portion arrived at by applying the rule that costs follow the event. In order to assess the sum due, the Arbitral Tribunal will proceed as follows:

- <u>First</u>, it will determine what the major issues to be ruled upon have been;

- <u>Second</u>, because the Claimants have failed to break down their legal Defense Expenses, the Arbitral Tribunal will attribute a weight to each issue; moreover, it will determine the proportion in which these are to be allocated among the two Claimants, who made their costs request jointly, without specifying the allocation percentage;

- <u>Third</u>, it will determine a success percentage for the Claimants' claims concerning each matter, and will apply that percentage to the relevant Reasonable Defense Expenses.

851. In this arbitration, the Arbitral Tribunal has had to make three major decisions: whether it had jurisdiction, whether Venezuela had engaged in wrongful conduct that engaged its responsibility, and the compensation due to the Claimants by Venezuela on account of such wrongful conduct.

852. Weighing the complexity of each such issue and the attention given it by the attorneys and itself, the Arbitral Tribunal has concluded that:

- Jurisdictional issues have a weight of 20%;

- Responsibility issues have a weight of 30%; and

---

[859] As well as much lower additional amounts in other currencies.

- Quantum issues have a weight of 50%.

853. Accordingly, Reasonable Defense Expenses are divided as follows:

- Jurisdiction: 20% of USD 2,800,000, *i.e.* USD 560,000; because the jurisdictional objections were asserted as against both Claimants, the Arbitral Tribunal finds that the cost is to be allocated to Tenaris and Talta in equal portions.

- Responsibility: 30% of USD 2,800,000, *i.e.* USD 840,000; again, because the Respondent denied having unlawfully expropriated the two companies, the Tribunal rules that this cost is to be allocated to Tenaris and Talta on a 50% basis.

- Damages quantum: 50% of USD 2,800,000, *i.e.* USD 1,400,000. The Arbitral Tribunal finds that the Reasonable Defense Expenses covering the assessment of the compensation amount due for the expropriation of Tavsa and Comsigua are to be allocated, based on complexity considerations, 75% to Tavsa and 25% to Comsigua, *i.e.* USD 1,050,000 to Tavsa (Tenaris) and USD 350,000 to Comsigua (Talta).

854. The next step is to determine the degree to which the Claimants have succeeded as regards each such issue:

- Jurisdiction: because the Arbitral Tribunal has rejected all jurisdictional objections raised by the Respondent, the Claimant's success percentage here is 100%;

- Merits: the Claimants' main cause of action was the expropriation by Venezuela, and the Arbitral Tribunal has agreed with them and, therefore, their success percentage is, yet again, 100%;

- Quantum: the Claimants were seeking USD 213.2 million for Tavsa's expropriation, and USD 30.5 million for Comsigua's expropriation; here, the Tribunal has respectively granted the sums of USD 112.3 million and USD 24.67 million. In other words, Tenaris' claim concerning Tavsa has been 53% successful, and Talta's claim in connection with Comsigua has been 81% successful.

855. The Arbitral Tribunal will apply the above success percentages to the Reasonable Defense Expenses for each legal issue:

- Jurisdiction: 100% of USD 560,000, *i.e.* USD 560,000, due to Tenaris and Talta in equal portions (USD 280,000);

- Responsibility: 100% of USD 840,000, *i.e.* USD 840,000, due to Tenaris and Talta in equal portions (USD 420,000), and

- Quantum: 53% of USD 1.05 million for Tavsa, and 81% of USD 350,000 for Comsigua, *i.e.* USD 556,500 for Tavsa (Tenaris) and USD 283,500 for

189

Comsigua (Talta).

856. <u>To conclude</u>, the above means that Venezuela will be required to reimburse to:

- Tenaris: USD 1,256.500 on account of Reasonable Defense Expenses, determined based on the success of its claims for Talta's expropriation;

- Talta: USD 983,500 on account of Reasonable Defense Expenses, determined based on the success of its claims for Comsigua's expropriation.

# XI.  SUMMARY

857.  In this Award, the Tribunal addresses three major issues:

-   Whether it has jurisdiction (**1.**)

-   Whether the Bolivarian Republic expropriated Tenaris' and Talta's investment in Venezuela, in violation of Article 4 of the Luxembourg BIT and Article IV of the Portuguese BIT (**2.**)

-   What the sum due on account of compensation for that expropriation is (**3.**).

858.  The Arbitral Tribunal also rules on lesser issues (**4.**), like the interest, Claimants' tax indemnity, and costs claims.

## 1.  JURISDICTION

859.  Venezuela raised three jurisdictional objections, all of which have failed.

### A.  **Lack of Consent**

860.  In investment arbitration proceedings arising from a BIT, consent to arbitration is perfected successively: the State's offer is formalized first, and it is then accepted by the investor.

861.  Venezuela contends that the Claimants did not timely accept the Republic's arbitration offer.

862.  The timing of acceptance is relevant, as the Bolivarian Republic has denounced the Convention.[860]

863.  (i) The Respondent raised two objections to Tenaris' consent to submit disputes arising in connection with Tavsa to arbitration, which the Tribunal has dismissed:

-   Following the Tavsa Notice and before Venezuela submitted its Denunciation, Tenaris tried for more than six months to settle the Tavsa-related dispute;[861]

-   The terms of Venezuela's arbitration offer were perfectly consistent with those of Tenaris' acceptance;[862] even if the inclusion of a reservation of rights by Tenaris were viewed as having entailed an alteration to the terms of the offer, it would not be a material change[863] and, in any event, it would be irrelevant, as Tenaris never actually enforced that reservation.[864]

---

[860] See para. 62 *supra*.
[861] See para. 81 *supra*.
[862] See para. 86 *supra*.
[863] See para. 90 *supra*.
[864] See para. 89 *supra*.

864. (ii) The Arbitral Tribunal concludes that Talta had validly accepted Venezuela's offer to submit any disputes related to Comsigua to arbitration: the six-month negotiation period started, as per the Portuguese BIT, with the first negotiation consultation – June 28, 2010[865] – and thus expired before Talta sent the Comsigua Notice on December 2, 2011, accepting Venezuela's arbitration offer; this Notice also predates the Denunciation.[866]

865. (iii) The case of Tenaris as an indirect investor in Comsigua is more complicated as, pursuant to the Luxembourg BIT, the six-month negotiation period starts as from the Comsigua Notice (December 2, 2011), such that, by the time it expired, Venezuela had already denounced the Convention.

866. Venezuela argues as follows:

- Tenaris' acceptance of the offer to arbitrate, stated in the Comsigua Notice, does not perfect consent to arbitration as the six months of prior negotiations– a jurisdictional requirement, not a procedural one – had not yet expired;[867]

- The acceptance stated in the Request of Arbitration does not perfect consent either because, even though it was filed after the mandatory negotiation period, this took place after the Denunciation.[868]

867. Tenaris disagrees: the prior negotiations requirement is said to be procedural in nature and would only determine the time at which the request for arbitration can actually be filed, but would not affect consent to arbitration, which could be stated (and perfected) prior to the expiration of the negotiation period.[869]

868. The Arbitral Tribunal finds that the Luxembourg BIT allowed Tenaris to choose a forum for dispute resolution and thus accept the State's arbitration offer as early as the Comsigua Notice.[870]

---

[865] See para. 95 *supra*.
[866] See para. 96 *supra*.
[867] See para. 112 *supra*.
[868] See para. 114 *supra*.
[869] See para. 119 *supra*.
[870] See para. 122 *supra*.

### B.   <u>Lack of an Effective Seat</u>

869. The second jurisdictional objection focuses on the lack of an Effective Seat in Luxembourg and Portugal. According to Venezuela, the BITs require that the investors have their Effective Seat (not just a Statutory Seat) in Luxembourg and Portugal;[871] neither Tenaris nor Talta satisfy this requirement,[872] as their Effective Seat is said to be in Argentina.[873]

870. On the other hand, the Claimants contend that their Effective Seats are the same as their Statutory Seats and, in any event, are located in Luxembourg and Portugal.[874]

871. In theory, the Tribunal agrees with the Bolivarian Republic: the BITs do require that the Effective Seat (not just the Statutory Seat) of the companies be located in Luxembourg or Portugal.[875]

872. Having defined what the relevant factors to determine the Effective Seat are[876] and having assessed the evidence produced by the parties, the Arbitral Tribunal finds that it has not been established that Tenaris' and Talta's Effective Seats are located in Argentina; instead, the evidence points to their Effective Seats being respectively located in Luxembourg and Portugal and, therefore, the Arbitral Tribunal has rejected the Bolivarian Republic's objection to its *ratione personae* jurisdiction.[877]

### C.   <u>Notification Defects</u>

873. The third and final objection to jurisdiction focuses on certain flaws in the Tavsa Notice: allegedly, it did not make reference to a dispute concerning unfair and inequitable treatment, and Tenaris is now asserting such a claim.[878] Because Tenaris' claim for unfair and inequitable treatment is framed as a subsidiary petition relative to its main claim, which is an expropriation claim, and the Arbitral Tribunal will allow its main claim, there is no need to analyze this final objection to jurisdiction.[879]

### 2.   <u>EXPROPRIATION</u>

874. The Arbitral Tribunal concludes that, in carrying out the orders in its Nationalization Decree and Implementing Decree, Venezuela forcefully acquired the assets of Tavsa and Comsigua and took over their business activity. Such forced acquisition materialized:

---

[871] See para. 152 *supra.*
[872] See para. 153 *supra.*
[873] See para. 153 *supra.*
[874] See para. 153 *supra.*
[875] See para. 189 *supra.*
[876] See para. 230 *supra.*
[877] See para. 230 *supra.*
[878] See para. 232 *supra.*
[879] See para. 234 *supra.*

- For Tavsa, through the transfer record of November 16, 2009;[880]

- For Comsigua, on June 17, 2011, through the administrative appointment of the company's new President and the power handover that was formalized at the Takeover Meeting.[881]

875. Because both Tenaris and Talta still hold title to their shares in Tavsa and Comsigua, the Arbitral Tribunal has defined this expropriation as an indirect expropriation: both investors keep title to their shares in shell companies whose assets and business activity are under the control of the State of Venezuela.[882]

876. The Arbitral Tribunal has verified that Venezuela has not yet paid any compensation at all to the investors, in spite of the fact that more than seven years have elapsed since the issue of the Nationalization Decree and the Implementing Decree. This delay does not constitute "immediate payment" as required by Article 4 of the Luxembourg BIT and Article IV of the Portuguese BIT.[883]

877. Venezuela tries to justify the delay, but the Tribunal does not agree on its argument: no judgment has been rendered ordering payment of the fair price because the State, who is the party required to institute the judicial expropriation proceedings in its capacity as the expropriating entity, has not done so;[884] the Arbitral Tribunal also fails to see any obstructing behavior on the part of the Claimants that could be the reason for a delay in the payment of compensation.[885]

## 3. COMPENSATION DUE

878. The BITs require that the amount of compensation for expropriation be equal to the fair value of the investments on the date before that on which the measure was taken.[886]

879. Therefore, prior to determining the value of Tenaris' and Talta's investment in Tavsa and Comsigua, the Arbitral Tribunal had to determine what the valuation date would be. It is the Arbitral Tribunal's view that the expropriations took place by virtue of the Nationalization Decree, as supplemented by the Implementing Decree.[887] Therefore, the date of the expropriatory measure is April 30, 2008, and the day before that is April 29, 2008.[888] To allow for easier calculations, the experts have used April 30, 2008 as the reference date, and the Arbitral Tribunal accepts this simplification.[889]

---

[880] See para. 271 *supra*.
[881] See para. 273 *supra*.
[882] See para. 337 *supra*.
[883] See para. 357 *supra*.
[884] See para. 358 *supra*.
[885] See paras. 372, 377 *supra*.
[886] See para. 393 *supra*.
[887] See paras. 405, 411 *supra*.
[888] See para. 409 *supra*.
[889] See para. 410 *supra*.

## A. Tavsa's Value Assessment

880. The decision on Tavsa's value assessment has been made as follows:

881. (i) The Arbitral Tribunal first applies a DCF methodology to value Tavsa.[890] The discount rate used in this exercise is the company's WACC, set at 21.7%.[891] The value thus arrived at for Tenaris' 70% stake in Tavsa is **USD 112,345,530**.[892]

882. (ii) Second, the Tribunal has compared that value by applying other methodologies: the return on investment approach, which results in a rate similar to the return on equity used in the WACC calculation;[893] the market multiples approach, as per which Tavsa's value is within the range set by the reference companies;[894] and, lastly, the comparable transactions approach, which also confirms the assessed value.[895]

## B. Comsigua's Value Assessment

883. The Tribunal has assessed Comsigua's value also by applying a DCF methodology. The Tribunal has applied a WACC of 20.47%,[896] and estimated that Talta's 7.58% share in Comsigua is worth USD 22.3 million.[897]

884. Next, the Arbitral Tribunal compares this value by applying other methodologies: the market multiples approach yields a higher value,[898] as does the comparable transactions approach;[899] the Tribunal also considers the offer Venezuela had made to Talta;[900] and finds that the DCF value is low as compared to the values from the other approaches; to arrive at the correct value, it weighs the various assessments[901] and sets a value of **USD 24,672,357.**

\* \* \*

885. Lastly, given that there is no specific request by the Claimants, the Arbitral Tribunal rules that the compensation due for expropriation should be paid to the direct investor in each expropriated company: Tenaris is to be paid compensation for Tavsa, and Talta is to be paid compensation for Comsigua.[902]

---

[890] See para. 518 *supra.*
[891] See para. 601 *supra.*
[892] See para. 603 *supra.*
[893] See para. 612 *supra.*
[894] See para. 623 *supra.*
[895] See para. 703 *supra.*
[896] See para. 704 *supra.*
[897] See para. 704 *supra.*
[898] See para. 706 *supra.*
[899] See para. 714 *supra.*
[900] See paras. 725 *et seq. supra.*
[901] See para. 755 *supra.*
[902] See para. 775 *supra.*

### 4. OTHER DECISIONS

886. The Arbitral Tribunal has made three additional decisions.

887. (i) The first one concerns interest. The Tribunal has been called upon to determine, in accordance with the BITs, the "normal commercial" rate "applicable in Venezuela."[903] The Tribunal's ruling is that the rate that best fits this description is LIBOR for one-year USD deposits plus 4% p.a.[904] Accrued interest is to be compounded every year in arrears. The accrual period started on April 30, 2008 and will end upon actual payment.

888. (ii) The second one concerns taxation. The Claimants requested that the Arbitral Tribunal order Venezuela not to claim taxes on the award and, subsidiarily, that the Award be rendered net of Venezuelan taxes; they also asked that Venezuela indemnify the Claimants for any tax levied on the sums of the Award outside of Venezuela.[905]

889. The Arbitral Tribunal rejects all such requests,[906] except for the subsidiary one: the monetary award will be net of Venezuelan taxes, such that, should Venezuela levy taxes on the amount of the Award, it will gross up the compensation paid in order that the amount paid to the Claimants, net of Venezuelan taxes, is the amount set forth in the Award.[907]

890. (iii) Lastly, the Arbitral Tribunal applies the rule that costs follow the event[908] to the two major expense categories comprising the costs:

- Costs of the Proceeding: the Arbitral Tribunal rules that Venezuela will fully bear these Costs;[909] therefore, Venezuela will reimburse each Claimant for USD 525,000.[910]

- Reasonable Defense Expenses: the Arbitral Tribunal takes consideration of the complexity of each issue debated here and the Claimants' degree of success;[911] it finds that Venezuela is to reimburse Tenaris for USD 1,256,500 and Talta for USD 983,500[912] on this account.

---

[903] See para. 757 *supra.*
[904] See para. 771 *supra.*
[905] See para. 777 *supra.*
[906] See para. 842 *supra.*
[907] See para. 843 *supra.*
[908] See para. 845 *supra.*
[909] See para. 846 *supra.*
[910] See para. 847 *supra.*
[911] See para. 849 *supra.*
[912] See para. 856 *supra.*

891. The Claimants have made other subsidiary requests in the event that the Tribunal chose not to use April 30, 2008 as the valuation date or that the compensation awarded for Comsigua fell short of a certain threshold amount. Because the Tribunal has accepted that date and awarded compensation above the threshold amount, these subsidiary claims do not apply.[913]

---

[913] CV, paras. 320, 321.

# XII. **DECISION**

892. For the reasons stated above, the Arbitral Tribunal has unanimously reached the following decisions:

   1.   To declare that it has jurisdiction to determine the Claimants' claims.

   2.   To declare that the Bolivarian Republic of Venezuela breached Article 4 of the Luxembourg BIT and Article IV of the Portuguese BIT.

   3.   To order the Bolivarian Republic of Venezuela to pay Tenaris the sum of USD 112,345,530 as compensation for its investment in Tavsa, and to pay Talta the sum of USD 24,672,357 as compensation for its investment in Comsigua.

   4.   To order the Bolivarian Republic of Venezuela to pay Tenaris interest on the sum of USD 112,345,530, accruing from April 30, 2008 up to the date of actual payment at a rate equal to the LIBOR for one-year USD deposits plus 4% p.a., with the interest rate redefined every year from April 30, 2008 onwards, and interest compounded on a year-in-arrears basis.

   5.   To order the Bolivarian Republic of Venezuela to pay Talta interest on the sum of USD 24,672,357, accruing from April 30, 2008 up to the date of actual payment at a rate equal to the LIBOR for one-year USD deposits plus 4% p.a., with the interest rate redefined every year from April 30, 2008 onwards, and interest compounded on a year-in-arrears basis.

   6.   To order the Bolivarian Republic of Venezuela to reimburse Tenaris for the sums of USD 525,000 and USD 1,256,500 for the Costs of the Proceedings and Reasonable Defense Expenses, respectively, and Talta for USD 525,000 and USD 983,500 on account of those same cost items.

   7.   To declare that the monetary awards hereby ordered are stated net of taxes applied by the Bolivarian Republic of Venezuela and to order the Bolivarian Republic of Venezuela to indemnify the Claimants with respect to any tax that may apply to such awards.

   8.   To declare that the Claimants' subsidiary claims have been dismissed, as their main claims have been allowed and granted.

   9.   To dismiss any other claims.

[Signature]                                    [Signature]

Brigitte Stern, Arbitrator                     Enrique Gómez Pinzón, Arbitrator
Date: [handwritten]: *November 30,*            Date: [handwritten]: *November 24,*
*2016*                                         *2016*

[signature]

Juan Fernández-Armesto, President
Date: [handwritten]: *December 5, 2016*