**UNITED STATES DISTRICT COURT**
**DISTRICT OF DELAWARE**

| | |
|---|---|
| **CRYSTALLEX INTERNATIONAL CORP.,** | |
| **Plaintiff,** | |
| **v.** | **Case No.: 17-mc-151-LPS** |
| **BOLIVARIAN REPUBLIC OF VENEZUELA,** | |
| **Defendant.** | **Ref. D.I. Nos. 992 and 426.** |

FILED
MAR 12 2024
U.S. DISTRICT COURT
DISTRICT OF DELAWARE

**MOTION TO INTERVENE AND FOR AN ORDER TO ASSIGN PROPERTY RIGHTS ABANDONED BY CRYSTALLEX INTERNATIONAL CORPORATION TO ITS ESTATE AND SHAREHOLDERS**

Adelso Adrianza (the "Movant"), a shareholder of Crystallex International Corporation (the "Company"), pro se and on behalf of similarly situated U.S. shareholders (the "Shareholders"), respectfully moves this Court for an order (i) allowing the Movant to intervene in this action, (ii) for an order assigning the Company's abandoned property rights to its Estate and the Shareholders as residual owners, and (iii) alternatively, granting a stay pending appeal of the Court's denial of the relief requested pursuant to Federal Rule of Civil Procedure 24, 60, 61 and 69(a), 10 Del. C. § 5031 and § 5072, 8 Del. C. § 324, and 11 U.S.C. §§ 1501(4), 1507 and 1522.

**PRELIMINARY STATEMENT**

1. In a letter dated May 2, 2023 (D.I. 556), the Movant informed this Court about the Movant's action at the Delaware Bankruptcy Court (the "DEBK Court") seeking to redress harm by the Company to the Estate and the Shareholders. In that action, the Movant asked for and obtained relief predicated on 11 U.S.C. § 1522 - Protection of Creditors and Other Interested Persons. Per the ruling, the Court found that there are grounds for it to undertake review of the Movant's claims once the Company's judgement is collected / settled. Toward this end, the Court ordered that the proceeds

from the collection or the settlement shall not be transferred out of the United States, and that no further transfer / disposition of the Net Arbitration Proceeds (The "NAP")[1] can be made without permission of the Court. (*See* DEBK D.I. 372 and 373). In the letter to this Court, the Movant further stated his readiness to undertake the protection of property and rights by pursuing redress of the impending harm to the Estate and the Shareholders. This motion (the "Motion") is a necessary step toward this end, since at this point, failure to do this will result in provable harm that negates any presumption of aligned interests between the Company and the Shareholders.

2. The impending harm to the Estate and the Shareholders is the result of actions and omissions by the Company's Board of Directors and Debtor in Possession (the "BOD/DIP"), from the abandonment of Estate property and rights. These include the unclaimed:

a. Post-judgement interest at a commercial rate,

b. Legal expenses and costs incurred as a direct result of a recalcitrant judgement debtor's actions to delay paying its debt obligation,

c. Value of the mining data transferred to the Republic at undervalue as an incentive to the latter to pay the arbitration award that remains unpaid six years later,

d. Undervalue of the illiquid securities received as part of the initial payment on the Amended Settlement Agreement.

The abandoned entitlements were agreed upon by the Company and the Republic under the ICSID arbitration agreement and the Amended Settlement Agreement and are property and rights of the Estate recoverable under the FAA, the Amended Settlement Agreement and Delaware Law.

3. The Movant has made this Court aware of past and attendant irreparable harm to the Estate and the Shareholders in no uncertain terms (*see* D.I. 404, 556, 772 and 773). In the letter dated May

---

[1] Represents the remaining balance of the award amount collected after paying all the outstanding secured and unsecured debt plus interest at the contract rate. The remaining 12% is to be used by the Estate to pay a Management Incentive Plan (25% of the total) and the remaining 75% to cover the costs of the pursuit of the arbitration award and its collection, the bankruptcy proceedings and its own liquidation.

2, 2023, the Movant underscored the need for prompt and public disclosure of court actions and decisions with detrimental impact on his rights and interests:

> The Movant respectfully asks this Court to be cognizant of his intent to pursue available remedies at law and in equity to protect his interests and rights. Towards this end, it is necessary that the Court require prompt and full public disclosure of the filings and decisions in the instant case. In addition, by expressly retaining jurisdiction over the case by court order before its disposition, the Court would allow the Shareholders to pursue legal redress for the abandoned property and rights at the DEBK Court, if necessary, in the interest of justice.[2]

4. This Court correctly rejected the sealing of court documents in this case when such action contravened well-established thresholds set forth by both the U.S. Supreme Court (The "SCOTUS") and the Third Circuit Court of Appeal (the "Third Circuit"). *See* D.I. 337, p. 5. The sealing of the Special Master's report with the results of the first round of bids failed to meet the minimum thresholds necessary to overcome the First Amendment right of access. First, the sealing was approved and implemented without any party in interest requesting and justifying it. And second, the Special Master already disclosed the judgement amounts in Report And Recommendation Regarding Proposed Sale Procedures Order (D.I. 348 and 870.1). The sealed document left interested parties grasping at straws for vital information to protect their interests. And while the judgement creditors may be afforded a timely opportunity to have access to the essential information to seek necessary redress, parties such as the Shareholders have been left surmising latent harm, and expecting and planning for the worse to avoid irreparable harm.

5. Now as before, (*See* D.I. 404), by filing this Motion the Movant seeks primarily to preserve rights and protect the Estate's, the Shareholders' and his own interests from misrepresentation and/or misapprehension of the facts regarding adequate representation. This pursuit has not been undertaken in a vacuum. The case records in this Court, The Companies' Creditors

[2] *See* D.I. # 556, p. 7.

Arrangement Act Court (the "CCAA Court") and the DEBK Court dockets[3] attest to actions and omissions by the BOD/DIP undertaken to advance the interests of the DIP Lender and BOD members - very often behind closed doors and under court-approved document sealing orders, while predicating they were the best option to protect the Estate and the Shareholders (*See* D.I 279 and 404, and DEBK Court D.I. 328). Yet, the records show that a $76 million DIP loan turned into a one billion dollar windfall for the DIP lender, tens of million dollars in payoffs to BOD members and a penniless, to-be-liquidated Estate.

## SUMMARY OF ARGUMENT

6. The execution of a writ of attachment under Delaware law requires the determination of the outstanding amount that needs to be collected to satisfy a money judgement against a Delaware registered company. *See* DCGL Title 8 § 324(a). The Special Master's Motion for Final Determination of the Attached Judgment (D.I. 992) seeks this Court's approval on the amount of the judgement owed to Crystallex by the Republic to be collected from the CITGO shares auction. For the reasons elaborated below, the pending collection amount as determined by the Special Master is in error and failure to correct it in a timely manner will cause irreparable harm to the Estate and the Shareholders. First, Delaware law sets forth as a condition sine que non that the amount to be obtained through an auction to settle a collection judgement not only be final, but also strictly correct (*see* DCGL Title 8 § 324(a)). Therefore, once executed, there is not a second chance to correct or redo the auction. Per FRCP 60, a court, on its own motion or the motion of any party, with or without notice as the court orders, may correct mistakes in judgments in the nature of clerical mistakes or errors arising from oversight or omission. However, a court may not make changes that affect the substantive rights of the parties. Further, courts may not modify a judgement that has been rendered

[3] The CCAA Court case refers to Ontario Superior Court Of Justice (Commercial List) case # CV-11-9532-00CL. The CCAA docket refers to the Canadian Monitor's (Ernst & Young) Document Center where the case docket is maintained. This can be accessed on the internet under https://documentcentre.ey.com/#/detail-engmt?eid =166. The DEBK Court case docket refers to case # 1:11-bk-14074 (LSS).

moot by a settlement. Therefore, the Estate, the Shareholders and the Movant will be prevented from seeking redress at the Third Circuit Court of Appeal (the "Third Circuit") and the DEBK Court once this Court a) approves the incorrect judgement amount, executes the auction and thereby settles the collection judgement, or b) approves a settlement agreement for any amount that short-changes the amount due under the ICSID award, the Amended Settlement Agreement and Delaware law.

7. The protection and maximization of estate property is one of the cornerstones of the Bankruptcy Code without which it cannot fulfil the public interest and policy objective Congress set out to accomplish with its enactment. Importantly, this Court's decision may impact the *res* of the Estate in a way that will pre-empt the DEBK Court's authority to protect it. The abandonment and waiver of property rights and claims that result in harm to the Estate and its stakeholders is redressable by an injured party under the third-party beneficiary doctrine. This doctrine provides that, as intended beneficiaries, the Estate and the Shareholders are identified third-parties with enforceable rights to benefit from the promised performance by the contracting parties. Per this doctrine, the beneficiaries may not be a named party with specific rights in a contract; and it is not necessary for them to be identifiable at the time the contract is formed. Although the contractual rights commitment is not made to them directly, the third-party beneficiaries can enforce the contract.

8. The rights of the intended beneficiaries are predicated on fiduciary and trust rules and principles, and contract law. An agent's failure to advance and protect the rights and interests of the principals (the "Intended Beneficiaries") lays the groundwork for their legal claim on property and rights abandoned by their agent. Likewise, an arbitration award issued and executed under the ICSID rules and its enabling statute, 9 U.S. Code §§ 201-206 ("FAA Chapter 2"), binds the parties under federal and state law to what they bargained for on behalf of the Intended Beneficiaries. On this basis:

**I. The Movant Is Entitled to Intervene as of Right**

9. Rule 24(a)(2) affords a non-party the right to intervene in litigation upon proof of four

elements:

(1) A timely application for leave to intervene,

(2) A sufficient interest in the litigation,

(3) A threat that the interest will be impaired or affected, as a practical matter, by the disposition of the action, and

(4) Inadequate representation of the prospective intervenor's interest by existing parties to the litigation.

(*Kleissler v. U.S. Forest Serv.*, 157 F.3d 964, 969 (3d Cir. 1998)).

As the Third Circuit has emphasized, intervention is driven by pragmatic considerations, and motions to intervene must be resolved "with an eye toward the 'elasticity' and 'flexibility' that [Federal] Rule [of Civil Procedure] 24 contemplates." (*Pennsylvania v. President of United States of Am.*, 888 F.3d 52, 59, 62 (3d Cir. 2018)). Controlling and persuasive caselaw underscore the Third Circuit's interpretation of Rule 24(a)(2): "The requirement of the Rule is satisfied if the applicant shows that representation of his interest "may be" inadequate; and the burden of making that showing should be treated as minimal (see *Trbovich v. United Mine Workers*, 404 U.S. 528, 538, n. 10, (1972)). And "Courts thus have found that an applicant has a sufficient interest to intervene when the action will have a significant stare decisis effect on the applicant's rights." (see *Smith v. Pangilinan*, 651 F.2d 1320 (9th Cir. 1981). Intervention is appropriate in the instant case to ensure that the Court considers the interest of the Company's Estate and its residual owners, the Shareholders, whose interests are in fact and at law not adequately represented in this proceeding. The Supreme Court established in *Taylor v. Sturgell*, 553 U.S. 880 (2008), that "[a] party's representation of a nonparty is adequate for preclusion purposes only if, at a minimum: (1) [t]he interests of the nonparty and her representative are aligned . . . and (2) either the party understood herself to be acting in a representative capacity or the original court took care to protect the interests of the nonparty." *Id.* at 900 (internal quotation marks and citations omitted).

**II. Failure to Undertake This Action Shall Result in Irreparable Harm to the Company's**

**Estate and, Consequently, the Shareholders.**

10. The Company's liquidating bankruptcy proceedings under Canada's CCAA insolvency statute as the main proceeding seeks to distribute a) close to US$ 1 billion to the Controlling DIP lender (including 88% of Net Arbitration Award or NAP) for its US$ 76 million DIP loan; a portion of which is to be shared with the Self-interested Directors under their Net Arbitration Award (NAP) Sharing Agreement, and b) to pay the unsecured debt principal plus interest at 20% p.a. (i.e., the contract rate, 9.375% p.a., plus an additional 10.625% p.a. for the Noteholders' agreement not to pursue a plan of arrangement that put at risk the DIP Lender's and the Self-interested Directors self-awarded entitlements). For a company in liquidation, the Canadian and U.S. bankruptcy statutes limit interest payment on unsecured debt to 5% p.a. and the federal judgment rate, currently 4-5% p.a., respectively. Despite the misuse and waste of Estate property, the Company will get enough money from the arbitration award judgement to pay all obligations. Therefore, the value of the abandoned property shall accrue entirely to the Shareholders as residual owners of the Estate.

11. Not pursuing the full collection of the arbitration award under the terms of ICSID Arbitration Panel and the Second Settlement Agreement violates federal and Delaware law and constitutional rights with attendant injury to the Estate and the Shareholders; its residual owners. Both the Estate and the Shareholders have been and continue to be inadequately represented by a self-interested BOD/DIP controlled by two directors appointed by the DIP Lender and two shareholder-elected directors beholden to the DIP Lender through the NAP Sharing Agreement.[4] This arrangement is driving a company with a $1.4 billion judgement and less than US$ 200 million in pre-filing debt and the US$ 76 million DIP loan to liquidation under conditions that violate the U.S. Bankruptcy Code and inalienable constitutional rights. Unattended, this situation will result in irreparable harm to the Estate and the over 300 hundred U.S. citizens that are beneficial owners of

[4] *See* DEBK Case D.I. 372 (Order) and 373 (Memorandum).

close to 30% of the Company's outstanding shares.

12. The abandoned estate property rights and claims, represent value accretive to the Estate and the Shareholders as its residual owners, whose monetization is not in the best interest of the self-interested DIP/BOD and the Controlling DIP Lender. This is the case for two reasons: first, it exposes the Controlling DIP Lender to the breach of the Canadian Criminal Interest Rate statute (the "CCIRS" by bringing the total compensation on the US$ 76 million loan over the 60% annual interest rate threshold. And second, a solvent debtor with liquid funds and a court-appointed trustee in charge of the liquidation exposes the self-interested DIP/BOD and the Controlling DIP Lender to legal action in pursuit of restitution for misappropriation, misuse and waste of estate property worth hundreds of million U.S. dollars. Hence, the prompt distribution of the Estate's property and the liquidation of a penniless Estate is an expeditious way to avoid future legal exposure through res judicata and equitable mootness. It is noteworthy that the CCIRS requires that any and all direct or indirect compensation to the lender be included in the interest rate calculation. Thus, expenses incurred by the debtor on behalf or for benefit of the lender such as legal fees and gifts (e.g., the mining data, and the interest to the unsecured Noteholders above the legal rate to get them to support the DIP Lender's plan) must be included to determine if the 60% p.a. threshold is violated.

13. The rules governing civil practice and procedure in Delaware's state courts are largely based on the Federal Rules of Civil Procedure and mirror federal rules. Thus, per Del. R. Ch. Ct. 61, the Court cannot disregard an error or defect in the proceeding which affects the substantial rights of the parties. Further, Del. R. Civ. P. Super. Ct. 60(5)-(6) instructs courts not to modify a judgment that has been rendered moot by a settlement. Consequently, the Court's issuance of an order that enables a settlement agreement that obviates the Estate's and the Shareholders' interest will result in irreparable harm to both.

## III. **No Intended Delay For the Sale Process or Prejudice to the Judgement Creditors.**

14. The Movant aims to preserve and exercise the appellate review right as the means to protect interests and rights protected by the Constitution. As aptly put by the SCOTUS, "A person who was not a party to a suit generally has not had a "full and fair opportunity to litigate" the claims and issues settled in that suit. The application of claim and issue preclusion to nonparties thus runs up against the "deep-rooted historic tradition that everyone should have his own day in court." *Richards*, 517 U. S., at 798 (internal quotation marks omitted). The Movant would prefer that this Court grant the relief requested or preserve otherwise the right to seek redress at the DEBK Court by preventing claim preclusion. Should appellate review be necessary, the stay of proceeding will not delay the auction process and prejudice the judgement creditors. This Court is working on a schedule that presumptively leads to the execution of the CITGO shares auction by the end of the Summer 2024. The history behind, the parties in and the complexity of this case point to the auction this Summer as being a signpost rather than the finish line. The Republic has arrows in its quiver and there should be no doubt that it will use these to avoid or pre-empt the loss of CITGO as long as it can. The political and economic consequences involved are too great a burden to bear without exhausting all available options.

15. On the other hand, the denial of the relief requested in the Motion would cause irreparable harm to the Estate and the Shareholders, and runs counter to the public interest. This is the case because, first, not preserving the Movant's and the shareholders' rights and interests will foreclose any future remedy due to statutory preclusion of judicial review and the onset of equitable mootness. Second, pre-empting the DEBK Court's authority to determine the law and the equities involved in the Chapter 15 case undermines the public purpose and policy underlying the enactment of the Bankruptcy Code. And third, beyond the impact to the instant case, there are important questions of law that have been and will remain unresolved to the detriment of the public interest and justice by foreclosing the review by the appellate courts.

## STATEMENT OF FACTS

16. The Company pursued an arbitration award following the unlawful cancellation of is Mining Operation Agreement (MOA) with the Republic. The International Center for Settlement of Investment Disputes (ICSID) arbitration panel awarded the Company USD 1,202 million, USD 187 million for pre-award interest, and Six-Month USD LIBOR + 1% post-award interest until the Republic pays the award in full. In addition, in the Amended Settlement Agreement entered into on September 10, 2018, the Republic agreed to pay the Company interest on the outstanding debt balance at 0.5% per month and all out-of-pocket expenses, including legal fees and costs, on demand.[5] The post-award interest owed through December 2023 is estimated at US$ 645 million, as shown on Exhibit 1, Table 1 – Post-award Interest.

17. The ICSID arbitration award and the Second Settlement Agreement between the Company and the Republic requires compensation that is materially higher ($2.2 billion in total) than the amount to be sanctioned by the Court as the balance due to settle the collection judgement ($1.49 billion in total, which includes the $990 million judgement balance plus the $500 million prior payments), as shown on Exhibit 1 – ICSID Award Balance Due. This is the result of the BOD/DIP's failure to pursue full collection of arbitration award entitlements and contractually acquired rights, as described below.

I. **<u>Post-award interest And Out-of-Pocket Expenses</u>**

18. The ICSID arbitration award set forth the pecuniary obligations in a decision that is res judicata by operation of the U.S. Treaty codified into law by the Federal Arbitration Act and its enabling statute (9 USC Ch. 2). The FAA is controlling law and any misapprehension to the contrary leading to the District Courts' authority to impose common law Doctrine of Merger on judgements

[5] *See* CCAA docket: Motion Materials / CCAA / 027 Motion Records returnable September 17, 2018 / The Amended Settlement Agreement - 09 Sep 2018/ Annex B – Settlement Terms Sheet.

in pursuit of arbitration award collection actions is untenable. The applicability of the doctrine is negated by abundantly clear decisions by the SCOTUS and the unambiguous position by the U.S. Government that an award under 9 USC Ch. 2 is self-executing and, as a result, the arbitrations Panel's award being res judicata. *See* D.I. 722. The doctrine's applicability is also negated by the parties' Second Settlement Agreement contract. This is due to the fact that the District Court's decision, the first in time, was superseded by the Settlement Agreement with new terms and conditions negotiated and agreed upon by the parties.

19. In its function as res judicata, the effect of the Merger doctrine under § 1961 extends only to facts in issue as they existed at the time the judgment was rendered, and does not prevent a reexamination of the same question between the same parties, where, in the interval, the facts have changed, or new facts have occurred which may alter the legal rights or relations of the parties. A judgement is res judicata only of present and not of future conditions. As the Supreme Court concluded in *Lawlor v. National Screen Service Corp*., 349 U.S. 322 (1955), res judicata does not bar a suit, even if it involves the same course of wrongful conduct as alleged earlier, so long as the suit alleges new facts or a worsening of the earlier conditions. In Crystallex' case, the District of Columbia District Court (the "DC District Court") granted Crystallex recognition of the arbitration award and issued the corresponding judgement in March 2017. After the judgement was issued, the parties entered settlement agreements in November 2017 and September 2018. The Amended Settlement Agreement included the parties' agreement to pay Crystallex post-judgement interest at 0.5% per month and cost and expenses, including legal fees, upon demand. Therefore, assuming, *arguendo*, that the DC District Court's application of the Merger doctrine and § 1961 was within the court's authority – it was not, it had a short life span as a result of the parties' subsequent negotiated agreements to settle the arbitration award under revised terms. The breach of the agreement empowers the injured party to pursue the enforcement of specific performance for the contractually

agreed interest and out-of-pocket costs and expenses incurred, including attorneys' fees and expenses. Failure to do so will result in irreparable harm to the Company's Estate through the waiver and abandonment of legal rights and claims; with attendant harm to the Estate and the Shareholders as the residual owners.

**II. <u>The Illiquid, Valueless Securities</u>**

20. The Company received payments from the Republic, worth US$ 500 million at the time, as initial compensation in two settlement agreements it subsequently reneged on. This amount included Venezuelan securities whose market value then was presumptively US$ 320 million. These securities were and remained subject to the U.S. sanctions on the Republic until recently and could not be monetized while the sanctions were in place. The Amended Settlement Agreement required an initial payment to be in cash or liquid securities and committed the Republic to make the Company whole for any value shortfall that occurred up to six months after the agreement was fully completed. In a CCAA Court filing, the BOD/DIP finally acknowledged the Movant's years long assertion that the illiquid securities are worth a fraction of their market value when received.[6] In it, the BOD/DIP indicated that "[t]he current market for the Initial Payment Securities remains very shallow with limited trading and at a discounted price"; and that "[t]he Company's informed view is that at this time it is not commercially reasonable or prudent for Crystallex to attempt to start to liquidate any portion of the Initial Payment Securities." Yet, the BOD/DIP has both the right and the obligation to demand specific performance under the terms of the Amended Settlement Agreement.[7]

**III. <u>The Las Cristinas Mining Data.</u>**

21. The Company invested over USD 500 million in the development of the Las Cristinas gold mine up to the time the Republic cancelled the MOA with the Corporation Venezolana de

[6] *See* CCAA Docket: Motion Materials / CCAA / 040 Motion Records returnable December 8, 2023 / Factum of the Applicant - 04 Dec 2023, para. 16.
[7] *Ibid*., Annex B

Guayana (the "CVG"), the government enterprise in charge of administering mineral resources in the Bolivar State. The MOA required it to pay the CVG USD 15 million for the mining data developed by the previous mining concession holder, Placer Dome Inc., and it subsequently invested hundreds of millions of dollars over several years to expand the gold deposit's reserves from 10 to 17 million ounces to make it economically viable. The mining data was not part of the ICSID arbitration proceedings since its ownership was never in dispute. In addition, it was not reported as property of the Estate in the CCAA protection petition and excluded from the DIP financing agreement by its terms and conditions, which was predicated on the Company's potential value recovery through the arbitration award. In a letter by R. Fung to E. Delpino, then president of PDVA, the BOD/DIP proposed to include and transfer the mining data to PDVSA in a bundled transaction as an incentive to reach a settlement agreement.[8] Both Gold Reserve Inc. and Rusoro Mining Ltd. entered into settlement agreements with the Republic that required and resulted in specific payments for their mining data. Gold Reserve, which reached and made public its settlement with the Republic before the Company's settlement agreement, required and obtained a USD 240 million for its mining data; with payments from the Republic to be applied against this amount first. Gold Reserve's proven and probable gold reserves were reported at 10 million ounces, compared to the Company's 17 million ounces. Rusoro's mining data payment in the settlement agreement with the Republic remains undisclosed to this date.

## LEGAL ARGUMENT

22. It is well-settled that property rights and claims abandoned by the bankruptcy trustee become the property of a party with possessory interest on it. *See*, *In re Wilton Armetale Inc.*, No. 19-2907 (3d Cir. 2020). In it, the Third Circuit concluded that "[a]n abandoned claim, like abandoned property in general, flows to someone else. The abandoned property can flow back 'to any party with

[8] *See* https://elplaneta.com/2019/10/12/internacional/las-propuestas-que-crystallex-presento-pdvsa-tras/

a possessory interest in it.'" (citation omitted). The instant case involves an eventual solvent debtor (i.e., after the collection of the award) that has committed to pay in full its provable debt and debt service due. Although the debtor's DIP/BOD claim in the collection proceeding at the District Court short-changes the estate's legal claims per the arbitration award decision, the Amended Settlement Agreement and the Estate's property maximization requirement of the Bankruptcy Code, it is sufficient to pay all that the Estate owes its creditors, including the DIP loan, interest and close to one billion dollars for a Contingent Value Right (CVR) granted to the DIP Lender, the expense and costs incurred in the arbitration and the award collection proceedings, and the company's liquidation.

23. Under Delaware law, to qualify as a third party beneficiary of a contract:

(i) the contracting parties must have intended that the third party beneficiary benefit from the contract,

(ii) the benefit must have been intended as a gift or in satisfaction of a pre-existing obligation to that person, and

(iii) the intent to benefit the third party must be a material part of the parties' purpose in entering into the contract.

The Amended Settlement Agreement was entered into with the New York law as the choice of law. Under New York law, only the Company's Estate and the Shareholders may enforce the contract when the BOD/DIP abandons property rights and interest.

> A third party may sue as a beneficiary on a contract made for its benefit. However, an intent to benefit the third party must be shown, and, absent such intent, the third party is merely an incidental beneficiary with no right to enforce the particular contracts. <u>We have previously sanctioned a third party's right to enforce a contract in two situations: when the third party is the only one who could recover for the breach of contract</u> or when it is otherwise clear from the language of the contract that there was an intent to permit enforcement by the third party. (Citations, internal quotation marks and brackets omitted.)[9]

[9] Dormitory Auth. of N.Y. v. Samson Constr. Co., 30 N.Y.3d 704 (N.Y. 2018), at 710.

24. On the Company's side, the Self-interested BOD/DIP and the Controlling DIP Lender bent over backwards to reach settlement agreements in pursuit of their own interests at the expense of the Estate and its residual owners. The history and the facts supporting this assertion are well documented in the case docket. *See*, for example, D.I. Nos. 134 and 279. Actions such as a) the abandonment of restraining order approved by the NY Southern District Court on the Nomura Notes (worth US$ 710 million), b) paying the DIP lender close to US$ 1 billion for a 76 million DIP loan, c) the agreement between the Self-Interested Directors and the DIP Lender to share the windfall under their pre-filing agreement to propose and support the approval of the CCAA filing and the DIP Lender's loan under confiscatory terms, and the approval of 20% interest p.a. on USD 100 million unsecured debt underscore the issues involved.

25. On the Republic's side, the amount due and payable is in satisfaction of a pre-existing obligation to the Company and its Estate as determined by the ICSID arbitration panel based on rules accepted and commitments made by the parties. The Company went into bankruptcy protection after the Republic cancelled the MOA illegally. The bankruptcy filing was predicated on:

> 3. A settlement of the arbitration or enforcement of an arbitral award will provide Crystallex with sufficient funds to pay all of its creditors in full and retain a significant amount of value for its shareholders. Crystallex requires the protection of the CCAA in order to bring about that result.
>
> 27. Crystallex has spent over $500 million on the project. In the unlikely event that Crystallex got back only what it put into the project, without interest and without any compensation for the loss of the ability to develop the project, Crystallex would still have more than enough to pay all of its debts and have substantial value left over for shareholders.
>
> 41. ... Given that the bondholders' capital represents only a fraction of the capital raised by Crystallex over the years, and given that the arbitration is likely to result in substantial cash, far in excess of Crystallex's debt obligations, neither I nor the Crystallex Board believe that it would be consistent with our fiduciary duties to Crystallex to sacrifice the shareholders as the 2004 Noteholders demand.
>
> 79. Crystallex firmly believes that a CCAA is the most fair and equitable way to obtain maximum value for all of Crystallex's shareholders.

> 88. I believe that the issuance of an initial order under the provisions of the CCAA is necessary and desirable to facilitate the prosecution of arbitration, an orderly payment of Crystallex's debt and assurance of residual benefit to Crystallex shareholders.[10]
>
> [Emphasis added.]

26. The records show that the Company's BOD/DIP undertook the bankruptcy filing and the arbitration award claim and its collection with the Estate and the Shareholders as Intended Beneficiaries. Further, being the estate the primary Intended Beneficiary of a judgement creditor in bankruptcy proceedings, the Bankruptcy Code requires that the estate's property be protected and maximize for the benefit of its stakeholders. *See* 11 U.S.C. § 1501(4). In addition. As residual owners of an estate with indubitable surplus assets, the Shareholders have claims and rights protected by the Bankruptcy Code and the Constitution. *See* 11 U.S.C. § 1507 and the 14th Amendment. The use and misuse of the law to advance indiscriminate self-interests cannot be allowed without the infringement of the Shareholders' constitutional rights, the Bankruptcy Code and Delaware law.

27. This Motion seeks to address breaches of protected constitutional rights and statutory requirements, as well as to resolve fairness issues and preserve the public interest. Should a de novo review by the Third Circuit be required to resolve important conclusions of law at issue here, the Movant will not hesitate to undertake this pursuit in the Shareholders' particular interests and the general public interest.

## JURISDICTION

28. This Court has jurisdiction to consider this Motion pursuant to Federal Rule of Civil Procedure 24, 60, 61 and 69(a), and 10 Del. C. § 5031 and § 5072, 8 Del. C. § 324, 28 U.S.C. § 1610(c), and 11 U.S. Code § 1522.

## STANDING

[10] CCAA docket: Motion Materials / CCAA / 001. Initial Application - 22 Dec 2011 / Affidavit of Robert Fung sworn - 22 Dec 2011.

29. As beneficial owners of the Company' shares and residual owners of the Estate, the Movant and the Shareholders have Article III standing under *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 559 (1992), premised on a party having "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." Standing is reasserted by the U.S. Supreme Court decision in *Czyzewski v. Jevic Holding Corp.*, No. 15-649, S. Ct., 2017 WL 1066259):

> Consequently, the Bankruptcy Court's approval of the structured dismissal cost petitioners something. They lost a chance to obtain a settlement that respected their priority. Or, if not that, they lost the power to bring their own lawsuit on a claim that had a settlement value of $3.7 million. For standing purposes, a loss of even a small amount of money is ordinarily an "injury." *See*, e.g., *McGowan v. Maryland*, 366 U. S. 420, 430–431 (1961) (finding that appellants fined $5 plus costs had standing to assert an Establishment Clause challenge). And the ruling before us could well have cost petitioners considerably more. *See Clinton v. City of New York*, 524 U. S. 417, 430–431 (1998) (imposition of a "substantial contingent liability" qualifies as an injury). A decision in petitioners' favor is likely to redress that loss. We accordingly conclude that petitioners have standing. (p. 11).

**PRAYER FOR RELIEF**

30. WHEREFORE, the Movant prays that this Court:

I. Allow the Movant to intervene in this action and to be heard regarding the protection of the Estate's and the Shareholders' interests as the Company's bankruptcy estate, and the equity holders and residual owners of the Estate, respectively,

II. Issue an order that that assigns the abandoned property and rights to the Company's Estate and the Shareholders as the Intended Beneficiaries,

III. Alternatively, should the Court decline to grant the relief requested above, the Movant respectfully requests the Court to:

i. grant leave to appeal,

ii. stay the proceedings until the Court above resolves the controversy;

or

iii. protect otherwise the Estate's, the Shareholders and the Movant's interests and rights from harm through statutory preclusion of judicial review as a consequence of this Court's decisions,

and

iv. grant such further and other relief as the Court deems just and proper.

## CONCLUSION

For all the reasons set forth herein, the Movant requests that the Court grant the relief sought in the Motion.

Respectfully submitted,

March 8, 2024
Watertown, Massachusetts.

Adelso A. Adrianza
4 Repton Cir. Unit 4210
Watertown, MA. 02472
aaadrianza@gmail.com
(859) 803-2279

## ENCLOSURES

| Exhibit | |
|---|---|
| 1. | Post-award Interest & ICSID Award Balance Due. |
| 2. | Certificate Of Service. |
| 3. | [Proposed] Order Granting Adelso Adrianza's Motion To Intervene. |
| 4. | [Proposed] Order Assigning Property And Rights Abandoned By Crystallex International Corporation To Its Estate And Shareholders. |