IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| CRYSTALLEX INTERNATIONAL CORP., <br><br> Plaintiff, <br><br> v. <br><br> BOLIVARIAN REPUBLIC OF VENEZUELA, <br><br> Defendant. | C.A. No. 17-mc-00151-LPS |

**OBJECTION TO THE SPECIAL MASTER'S
MODIFICATION OF BIDDING PROCEDURES**

The Republic, PDVSA, PDVH and CITGO respectfully object, pursuant to Paragraph 10 of the SPO,[1] to the Special Master's proposed modification of the Bidding Procedures.

**PRELIMINARY STATEMENT**

1.      The Special Master proposes to send instructions (the "Round 2 Bid Procedures") to potential bidders that would improperly advantage the PDVSA 2020 Bondholders, to the detriment of the Venezuela Parties and creditors who hold Attached Judgments. The validity of the purported CITGO Holding Pledge[2] is the subject of pending litigation in New York.[3]

2.      The PDVSA 2020 Bondholders do not have an Attached Judgment. Nevertheless, the Round 2 Bid Procedures would require bidders to "assume that the CITGO [Holding] Pledge will be released in advance of, or in connection with, the implementation of" the sale of the PDVH shares (without any explanation of the mechanism or cost of obtaining such a release).[4] The

---

[1] "SPO" refers to the Sixth Revised Proposed Order (A) Establishing Sale and Bidding Procedures, (B) Approving Special Master's Report and Recommendation Regarding Proposed Sale Procedures Order, (C) Affirming Retention of Evercore as Investment Banker by Special Master and (D) Regarding Related Matters (D.I. 481). Capitalized terms not otherwise defined herein have the meanings given them in the SPO and its Bidding Procedures.
[2] The use of the term "CITGO Holding Pledge" should not be taken to imply that the purported pledge is valid.
[3] The Round 2 Bid Procedures, together with the cover letter from the Special Master's counsel declining to adopt revisions to them proposed by the Venezuela Parties, are attached as Exhibit A to the Declaration of Christopher Fitzpatrick Cannataro, filed herewith.  Except as otherwise stated, citations in the form of "Ex. __" refer to exhibits to that Declaration.
[4] Round 2 Bid Procedures, section A.iii.

Round 2 Bid Procedures would further instruct bidders that "[i]n the event you propose to address the CITGO Holding Pledge in a manner other than a release negotiated and implemented by the Special Master, please so indicate in your Proposal."[5] In addition, the Special Master would instruct anyone making a Credit Bid to "confirm that such Credit Bid will … provide sufficient cash to satisfy in full any obligations secured by a senior lien on the shares of PDVH, including (to the extent you are not proposing an alternative solution to account for the CITGO [Holding] Pledge …) the PDVSA 2020 Notes claim."[6] By instructing bidders to assume that the Special Master will "negotiate[] and implement[]" a release of the PDVSA 2020 Notes claim, the Special Master assumes the existence of authorities he does not have—namely, to divert proceeds from the Sales Process in order to satisfy a judgment or claim (that of the PDVSA 2020 Bondholders) that is not within this Court's jurisdiction, and further, to impose what would amount to a court-ordered resolution of pending litigation in the Second Circuit and the Southern District of New York over the validity of the CITGO Holding Pledge. Although the Round 2 Bid Procedures do not reveal how such a release is to be procured or funded, the Special Master appears to contemplate a payment from PDVH, CITGO, or the successful bidder (which would, if disclosed, depress the price a bidder would bid), or the improper diversion of sale proceeds to satisfy the PDVSA 2020 Bondholders' claim. In either case, such a payment would reduce the value received by holders of Attached Judgments and the judgment credit received by the Venezuela Parties. Either way, the use of such funds to pay holders of the PDVSA 2020 Notes would violate this Court's orders, and would fail to satisfy the Special Master's obligation to "maximize[] the sale price of any assets to be sold."  D.I. 277 at 3.

3. Even apart from the absence of any authority for the Special Master to settle the PDVSA 2020 Notes litigation, to require bidders to provide "an alternative solution to account for the CITGO Holding Pledge," or to require credit bidders to arrange for payment of the PDVSA 2020 Notes, the Special Master's proposal directly contradicts the representations that he, his

---

[5] *Id.*
[6] Round 2 Bid Procedures, section F.

financial advisor, and Crystallex made to this Court, and on which this Court relied, when it directed the sale process to proceed in July 2023. In particular, in response to the Venezuela Parties' concern that uncertainty regarding the 2020 Bondholder litigation could interfere with bidding, the Special Master insisted that "Potential Bidders will be *fully capable* of valuing the PDVH Shares and the CITGO operations *agnostic to capital structure, including whether claims held by the PDVSA 2020 Bondholders … will need to be satisfied by the Sale Transaction proceeds*." D.I. 583[7] at ¶ 10 (emphasis added). This Court credited the Special Master's "*insistence* that the ongoing 2020 Bondholders' Litigation will be no impediment to his efforts," *id.* (emphasis added); *see also,* D.I. 643 at 10-11, as well as Crystallex's view that "bidders will simply price their view of the risk associated with currently pending litigation when formulating their bids," *id.* at 10 (internal quotation marks and citation omitted). *Id.* (hereinafter the "July 2023 Order") at 10-11.

4.  The Round 2 Bid Procedures' focus on the discharge of the PDVSA 2020 Bondholders' claims demonstrates that the Special Master now believes, contrary to his prior representations, that uncertainty surrounding the CITGO Holding Pledge will chill bids and endanger the sale process. The July 2023 Order describes the appropriate alternatives to consider when (as now) such a concern has materialized: (1) rejecting all bids; (2) adjourning the auction or the sale hearing; or (3) choosing not to select a successful bid. *Id.* at 10. An adjustment to the auction schedule would be a far better way to address the uncertainty that appears to be animating the Special Master's reversed course. Indeed, given the decision recently rendered by the New York Court of Appeals on a central issue (described below) in the PDVSA 2020 Notes litigation, and the fact that briefing has been completed in the Second Circuit in that litigation, the proceedings in New York are closer than ever to resolving that uncertainty in a manner that would ultimately enhance the value of the PDVH stock. In any event, what the Special Master cannot do, as this Court has previously explained, is to "take any role in disposing of the PDVSA 2020

---

[7] D.I. citations are to filings in ECF No. 17-mc-151, unless otherwise stated.

Bondholders' claim," D.I. 479, or to use any "proceeds from any sale . . . to satisfy" the PDVSA 2020 Bondholders' judgment, because it is not an "Attached Judgment." SPO Paragraph 30. Indeed, due to the recent New York Court of Appeals decision, the PDVSA Bondholders' judgment should be vacated soon.

5.  In addition to the Bidding Procedures modifications discussed throughout this objection, the Special Master has recently denied the Republic and PDVSA access to bid information to which those parties are entitled under the Bidding Procedures, p. 13. Representatives of the Republic and PDVSA remain engaged with representatives of the Special Master on that issue, and believe they will obtain relief that obviates the need for the intervention of the Court. But for avoidance of doubt, to the extent that the denial of information might be construed as a modification of the Bidding Procedures, the Republic and PDVSA object to such a modification, because (1) no cause exists to justify it; and (2) the Special Master cut off information without notice to or consultation with the Republic and PDVSA, in violation of Paragraphs 9 and 10 of the SPO. The Republic and PDVSA reserve all rights concerning their access to information.

## BACKGROUND

6.  ***The PDVSA 2020 Notes***.[8] Article 150 of Venezuela's Constitution provides that "[n]o municipal, state or national public interest contract shall be executed with foreign States or official entities, or with companies not domiciled in Venezuela, or shall be transferred to any of them without the approval of the National Assembly." Article 187 of the Constitution contains a similar provision. Disregarding these provisions, the Maduro regime issued a Presidential Decree claiming the power to enter into contracts of national public interest without the prior authorization of the National Assembly. The National Assembly promptly "rejected this authoritarian measure" in a Resolution enacted May 26, 2016 (the "May 2016 Resolution"). Among other things, that

---

[8] This paragraph's summary of the PDVSA 2020 Notes controversy is derived from the Brief of the Republic as Amicus Curiae Supporting Appellants in *Petróleos de Venezuela, S.A. v. MUFG Union Bank N.A,* Nos. 20-3858-cv(L), 20-4127-cv(CON), 2021 WL 1118137 (2d Cir. March 22, 2021), to which the Venezuela Parties refer the Court for a more complete description of the background. That brief is reproduced in Ex. B.

Resolution rejected Maduro's claim and "warn[ed] that any activity carried out by an organ that usurps the constitutional functions of another public authority is null and void and shall be considered non-existent"; and resolved to disseminate the Resolution so that foreign governments and companies would know "about the nullity of the contracts that are concluded in contravention of Article 150." In September 2016, the Maduro regime announced an exchange offer, in which it proposed to issue the PDVSA 2020 Notes in exchange for previously issued unsecured debt of PDVSA. The National Assembly again asserted its constitutional authority, and Maduro again defied the National Assembly. With the publication of the news that the Maduro regime was making the Exchange Offer "without the consent of the opposition-controlled National Assembly," the holders of more than 60% of the 2017 Notes elected to retain their unsecured notes rather than accept collateral offered without National Assembly authorization. The PDVSA 2020 Notes were issued in exchange for the 39.43% of the old notes that were tendered by investors willing to take their chances on the Maduro regime's scheme.

7.  **The PDVSA 2020 Notes Litigation**. PDVSA, PDVH and an affiliated entity sued in the Southern District of New York, seeking a declaration that the PDVSA 2020 Notes, the Indenture, and the CITGO Holding Pledge were null and void. On cross-motions for summary judgment, the district court ruled for the defendants, holding that New York law, not Venezuelan law, governed the validity of the notes. *Petróleos de Venezuela, S.A. v. MUFG Union Bank N.A.,* 495 F. Supp. 3d 257 (S.D.N.Y. 2020). However, the district court entered a partial stay of its judgment pending appeal, mandating that the PDVSA 2020 Bondholders "*shall not attempt* to enforce the Pledge Agreement or otherwise to exercise any rights, remedies, or privileges purportedly arising from a default or Event of Default under the Pledge Agreement." Order, *Petróleos de Venezuela, S.A. v. MUFG Union Bank N.A.,* 19 Civ. 10023 (KPF) (Dec. 29, 2020), D.I. 241 (the "SDNY Stay Order") (emphasis added).[9] On appeal, the Second Circuit heard argument and then certified choice of law questions to the New York Court of Appeals. This

---

[9] Ex. C.

February, the New York Court of Appeals held that Venezuelan law, not New York law, governs whether, as the Venezuela Parties argue, the PDVSA 2020 Notes are invalid "because their issuance contravened constitutional provisions requiring National Assembly approval." *Petróleos de Venezuela, S.A. v. MUFG Union Bank N.A.,*, --- N.E.3d ---, 2024 WL 674251, at *4 (N.Y. Feb. 20, 2024). On March 19, 2024, both sides submitted supplemental briefs to the Second Circuit discussing the effect of the New York Court of Appeals decision, and the parties are now awaiting a decision from the Second Circuit.[10]

8. ***The SPO and Its Bidding Procedures.*** The SPO and its Bidding Procedures, approved by the Court in October 2022 (D.I. 481, 480-1), followed shortly after the Court's resolution of PDVH's and CITGO's objection to the Special Master's announced intention to have "discussions" with advisors to the holders of the PDVSA 2020 Notes. In particular, they objected that the Special Master lacked authority to "settle, resolve, transact in, or otherwise affect any property other than the attached shares of PDVH"—including the PDVSA 2020 Bondholders' claim. D.I. 472-1. In resolving that objection, the Court authorized the Special Master to "engage in discussions with the advisors to the PDVSA 2020 Bondholders," but emphasized that "[n]either the instant order, nor any action taken by the Court to date, authorizes the PDVSA 2020 Bondholders to be a Sale Process Party, as that term has been used in this action, or authorizes the Special Master to take *any role* in disposing of the PDVSA 2020 Bondholders' claim." D.I. 479 (emphasis added). Further, the SPO itself expressly prohibited the use of sale proceeds to satisfy any claim other than the Attached Judgments: "[f]or the avoidance of doubt, unless otherwise ordered by the Court … no PDVH Shares shall be sold, nor proceeds from any sale thereof distributed, to satisfy any judgments that are not Attached Judgments." SPO, Paragraph 30. Consistent with these orders, the Bidding Procedures adopted in the SPO did not refer to any resolution of the PDVSA 2020 Notes litigation to be negotiated or implemented by the Special Master. Neither did they require bidders to set aside or provide cash for the payment of the PDVSA

---

[10] Exs. D, E, Supplemental Briefs, D.I. 347, 348 in *Petróleos de Venezuela, S.A. v. MUFG Union Bank N.A.*, 20-4127-CV(CON) (Mar. 19, 1024).

noteholders, or otherwise to propose a solution to the dispute over the validity of the CITGO Holding Pledge.

9. **The July 2023 Order.** In mid-2023, the Venezuela Parties raised the concern that apparently now motivates the Special Master's Round 2 Bid Procedures: that uncertainties related to the PDVSA 2020 Notes litigation threatened to impede the sale process. *See* July 2023 Order at 8-9. In response, the Special Master (relying on his advisor Evercore) represented that "Potential Bidders will be fully capable of valuing the PDVH Shares and the CITGO operations agnostic to capital structure, *including whether claims held by the PDVSA 2020 Bondholders ... will need to be satisfied by the Sale Transaction proceeds*." July 2023 Order at 10 (emphasis added). The Court expressly relied on that representation, and on "the Special Master's insistence that the ongoing 2020 Bondholders' Litigation will be no impediment to his efforts," in allowing the sale process to begin prior to the resolution of the PDVSA 2020 Notes litigation. *Id*. at 11. The Court also found "credibl[e]" the assertion of Crystallex that "bidders will simply price their view of the risk associated with currently pending litigation when formulating their bids." *Id*. at 10 (internal quotation marks and citation omitted).

10. But the Court did not forever foreclose the possibility that it would be prudent to pause the sale process to await the outcome of that litigation. The Court outlined a range of options available in the event the concern that "bids will be chilled actually materializes." *Id.* The Special Master could "reject inadequate or insufficient bids" or bids that did not provide for "a value maximizing sale transaction"; he could "adjourn the Auction and/or the Sale Hearing"; or he could "choose not to select a Successful Bid," all subject to the Court's ultimate decisions. *Id.* (citations and internal quotation marks omitted). But that range of options notably did not include causing the PDVSA 2020 Bondholders to be paid, at the expense of the Venezuela Parties and/or holders of Attached Judgments.

11. **The Modified Bidding Procedures.** Counsel for the Special Master circulated to some parties (but not the Republic or PDVSA) drafts on April 8 and April 18, 2024 of a letter of instruction to be distributed to potential bidders for the bids currently due on June 11. On April

16, 2024, counsel for PDVH and CITGO provided comments and proposed revisions to the proposed Round 2 Bid Procedures.[11] The Special Master provided a written response on April 18 with some revisions, but not those that were requested by PDVH and CITGO.[12] On April 23, 2024, counsel for all Venezuela Parties[13] provided comments and jointly proposed revisions to the Special Master's April 18 amended Round 2 Bid Procedures.[14] On May 2, 2024, counsel for the Special Master declined to discuss those proposals and promised to "respond in due course."[15] On May 3, 2024, counsel for the Special Master rejected the proposals of the Venezuela Parties, and endorsed Round 2 Bid Procedures identical to the Special Master's April 18 amended draft.[16] These Round 2 Bid Procedures differ from the Bidding Procedures attached to the SPO in two material respects to which the Venezuela Parties object. *First*, the Round 2 Bid Procedures adopt as their default assumption that the Special Master would dispose of the CITGO Holding Pledge: they instruct bidders to "assume that the CITGO [Holding] Pledge will be released in advance of, or in connection with, the implementation of" the sale of PDVH shares, and "[i]n the event you propose to address the CITGO [Holding] Pledge in a manner other than a release negotiated and implemented by the Special Master, please so indicate in your Proposal." Round 2 Bid Procedures, section A.iii. *Second*, the Round 2 Bid Procedures instruct anyone making a credit bid to "confirm that such Credit Bid will … provide sufficient cash to satisfy in full any obligations secured by a senior lien on the shares of PDVH, *including (to the extent you are not proposing an alternative solution to account for the CITGO [Holding] Pledge …) the PDVSA 2020 Notes claim.*" *Id.*, section H (emphasis added).

## ARGUMENT

12. For at least five independent reasons, the Round 2 Bid Procedures would improperly modify the Bidding Procedures approved by the Court, threatening to disrupt an

---

[11] Ex. F.
[12] Ex. G.
[13] The Republic and PDVSA had learned of the letter and proposed revisions from counsel for PDVH and CITGO.
[14] Exs. H, I.
[15] Ex. J.
[16] Ex. A.

already challenging sale process and to foreordain that the Sales Process will not generate fair value for the PDVH shares.

13. **First,** the Round 2 Bid Procedures improperly assume that the Special Master has authority he does not have: to "negotiate and implement" a release of the CITGO Holding Pledge claimed by holders of the PDVSA 2020 Notes. The Court has previously correctly observed—in response to an objection presented by CITGO and PDVH (D.I. 472-1)—that nothing in its orders "authorizes the Special Master to take any role in disposing of the PDVSA 2020 Bondholders' claim." D.I. 479.  This Court has not empowered the Special Master to serve as a global mediator or bankruptcy judge to resolve all claims adjacent to PDVH.  And, because those noteholders would undoubtedly demand a massive payout in return for a release of a multi-billion dollar claim, however lacking in merit their claim may be, the agreement the Special Master apparently proposes to negotiate and implement would violate the Court's order that "no PDVH Shares shall be sold, nor proceeds from any sale thereof distributed, to satisfy any judgments that are not Attached Judgments." SPO Paragraph 30. Moreover, the Special Master's attempt to resolve the CITGO Holding Pledge in this proceeding trespasses upon the jurisdiction of the Southern District of New York and the Second Circuit, which retain jurisdiction over PDVSA, PDVH, and the PDVSA 2020 Bondholders' legal dispute regarding the validity of the CITGO Holding Pledge.

14. **Second,** the Round 2 Bid Procedures would set up a false and distorting choice for bidders—they must assume that the Special Master has negotiated a release of the CITGO Holding Pledge without any explanation of the price or conditions attached to that release, or in the alternative, the bidders may explain how *they* would resolve the PDVSA 2020 Bondholders' claims. But any bidder presented with the hypothetical possibility of simply having the Special Master eliminate the CITGO Holding Pledge by fiat,[17] without any cost or associated conditions, will surely select that option, resulting in distorted bids that do not accurately reflect CITGO's

---

[17] Another possible reading (noted in Paragraph 16 below) of the Round 2 Bid Procedures' reference to "a release negotiated and implemented by the Special Master" is that the Special Master would require the cost of the releases he proposes to implement to be borne by the winning bidder. Either way, the Special Master lacks authority to require anyone to pay the PDVSA 2020 Bondholders.

liabilities or capital structure, and which will effectively force the Special Master to agree to pay the PDVSA 2020 Bondholders whatever they demand in exchange for a release (without jurisdiction or authority to do so).  By contrast, under the Bidding Procedures this Court previously approved, "bidders will simply price their view of the risk associated with currently pending litigation when formulating their bids," July 2023 Order at 10-11, thereby maximizing the value delivered to the Attached Judgment Holders (rather than insisting that sales proceeds, or CITGO assets, must be used to secure a release of the CITGO Equity Pledge).  Indeed, even if one assumes (without evidence) that the Special Master's proposal might result in higher gross bids, the net proceeds available to Attached Judgment holders are certain to be depressed if most or all bids are predicated on the Special Master having promised *ex ante* to secure a release of the CITGO Equity Pledge, whatever the cost, from the sales proceeds. Further, the Bidding Procedures instruct credit bidders that their bids must "satisfy in full" the claims of PDVSA 2020 Bondholders as if their rights were "secured by a senior lien on the shares of PDVH" (which they are not)[18]—in effect, as if the noteholders prevailed on the merits in the action now pending before the Second Circuit *and* obtained sanctions relief from the U.S. Government—or that the bidders must propose an "alternative solution to account for the CITGO [Holding] Pledge." All this stands in stark contrast to the existing Bidding Procedures the Court approved, which leave bidders free to make their own assessments of the strength or weakness of the claims being litigated in New York, to discount the value of those claims accordingly, and to attempt to participate in that litigation or stay on the sidelines as they see fit. The Venezuela Parties proposed changes to the Round 2 Bid Procedures that would reflect the approach provided for in the Bidding Procedures approved by the Court,[19] and offered to confer with counsel for the Special Master to resolve the issue.[20]  The Special Master rejected those suggestions.[21]

---

[18] The Round 2 Bid Procedures' inclusion of the CITGO Holding Pledge in the definition of "senior lien[s] on the shares of PDVH" is plainly wrong.  Even if valid, the Pledge would be a lien on the CITGO Holding shares—not the PDVH shares.  The Special Master's miscategorization risks confusing bidders, leading to reductions in their bids and/or inaccurate assumptions about the Special Master's authority to resolve the 2020 Notes litigation.
[19] Exs. H, I.
[20] Ex. J.
[21] Ex. A.

15. **Third,** the Round 2 Bid Procedures would complicate the sale process by making it subject to additional contingencies. Any attempt to impose an agreement with the PDVSA 2020 Bondholders—particularly an agreement sought to be imposed without the consent of the Venezuela Parties—could require litigation in New York, including a motion to modify the Southern District's Partial Stay Order that remains in effect as of this date. In addition, a resolution with the PDVSA 2020 Bondholders would require approval from OFAC. On April 15, 2024, the Department of Treasury further suspended General License 5 until August 13, 2024.[22] The effect of the further suspension is to continue the sanctions against dealings in the PDVSA 2020 Notes, *including the entry into any settlement agreement* concerning those notes without first obtaining a specific license.

16. **Fourth,** the assumption embedded in the new provisions of the Round 2 Bid Procedures—that the uncertainties of the PDVSA 2020 Notes litigation are something to be resolved, at the expense of parties to the sale process yet to be determined—would erroneously convey to potential bidders the notion that the CITGO Holding Pledge is likely valid. That message would discourage bidders and suggest that any bid should be deeply discounted to give great weight to the CITGO Holding Pledge despite its highly questionable validity, as adopted in violation of the Venezuelan Constitution. The very uncertainty concerning who the Special Master has in mind to pay for the release he thinks he can obtain (setting aside his lack of authority to do so)—would it be cash paid by CITGO or shares of CITGO or an affiliated entity, and therefore at the expense of the winning bidder, or out of sale proceeds, and therefore at the expense of Attached Judgment holders (and at PDVSA's expense, too, by diminishing the judgment credit)—adds a further complication likely to discourage some from bidding, and cause others to lowball their bids.

17. It is particularly ill-advised that the Special Master would change course in this way at a time when holders of the PDVSA 2020 Notes appear less—not more—likely to succeed than

---

[22] Office of Foreign Assets Control, General License No. 5O (April 15, 2024), available at https://ofac.treasury.gov/media/932811/download?inline (downloaded May 8, 2024).

in July 2023. Back then (as noted above), Evercore and the Special Master assured the Court that uncertainties related to that litigation would not interfere with the bidding process. The only material development since then has been the New York Court of Appeals' holding that the validity of the PDVSA 2020 Notes is a matter determined under Venezuelan law, as the Venezuela Parties have contended all along. As even the PDVSA 2020 Bondholders have conceded in their Supplemental Brief before the Second Circuit, that development means that the Southern District's 2020 judgment in the Bondholders' favor will have to be vacated. Ex. H at 27. This is no time to modify the Bidding Procedures to accord more weight to the CITGO Holding Pledge than that purported pledge was accorded by the Special Master in 2023.

18.     *Fifth,* and finally, if, as the Special Master now apparently believes, greater certainty surrounding the PDVSA 2020 Notes litigation would promote a better bidding process, the Court has laid out the options available to the Special Master to achieve that certainty: to "adjourn the Auction and/or the Sale Hearing".[23] With the matter fully briefed before the Second Circuit and informed by the New York Court of Appeals' recent answer to the certified question, clarity as to the CITGO Holding Pledge is closer than ever. A modest adjustment in the auction schedule to await that the resolution of the issue in New York would reduce uncertainty, enhance bidders' confidence, and address the Special Master's concern—all without exceeding the Special Master's authority, chilling bidding, and introducing new contingencies as the proposed modification of the Bidding Procedures would do.

## CONCLUSION

19.     The Venezuela Parties respectfully urge the Court to reject the modification of Bidding Procedures that the Round 2 Bid Procedures would effect. To the extent that there is now a concern that uncertainty surrounding the PDVSA 2020 Notes litigation may discourage bidding, a modest modification of the auction schedule would accommodate that concern without the chilling effect, complexity, and unauthorized actions on the Special Master's part that the Round

---

[23] July 2023 Order at 10.

2 Bid Procedures would introduce to the process. In addition, if the Special Master issues Round 2 Bid Procedures, the Court should order the Special Master to revise sections A.iii and H in the manner proposed in Ex. H.

OF COUNSEL:

Donald B. Verrilli, Jr.
Elaine J. Goldenberg
Ginger D. Anders
MUNGER, TOLLES & OLSON LLP
601 Massachusetts Avenue NW
Suite 500 E
Washington, DC  20001
(202) 220-1100
Donald.Verrilli@mto.com
Elaine.Goldenberg@mto.com
Ginger.Anders@mto.com

George M. Garvey
MUNGER, TOLLES & OLSON LLP
350 South Grand Avenue, 50th Floor
Los Angeles, CA  90071
(213) 683-9100
George.Garvey@mto.com

*/s/ Christopher Fitzpatrick Cannataro*
A. Thompson Bayliss (#4379)
Christopher Fitzpatrick Cannataro (#6621)
ABRAMS & BAYLISS LLP
20 Montchanin Road, Suite 200
Wilmington, DE  19807
(302) 778-1000
bayliss@abramsbayliss.com
cannataro@abramsbayliss.com

*Counsel for Bolivarian Republic of Venezuela*

| | |
|---|---|
| OF COUNSEL:<br><br>Nathan P. Eimer<br>Lisa S. Meyer<br>Daniel D. Birk<br>Gregory M. Schweizer<br>EIMER STAHL LLP<br>224 South Michigan Avenue Suite 1100<br>Chicago, IL 60604<br>(312) 660-7600<br>NEimer@eimerstahl.com<br>LMeyer@eimerstahl.com<br>DBirk@eimerstahl.com<br>GSchweizer@eimerstahl.com | /s/ Alexandra M. Cumings<br>Kenneth J. Nachbar (#2067)<br>Alexandra M. Cumings (#6146)<br>MORRIS, NICHOLS, ARSHT & TUNNELL LLP<br>1201 North Market Street Wilmington, DE 19801<br>(302) 658-9200<br>KNachbar@morrisnichols.com<br>ACumings@morrisnichols.com<br><br>*Attorneys for PDV Holding, Inc., and CITGO Petroleum Corporation* |
| OF COUNSEL:<br><br>Joseph D. Pizzurro<br>Kevin A. Meehan<br>Juan O. Perla<br>CURTIS, MALLET-PREVOST, COLT & MOSLE LLP<br>101 Park Avenue New York, NY 10178<br>(212) 696-6000<br>jpizzurro@curtis.com<br>kmeehan@curtis.com<br>jperla@curtis.com<br><br>May 8, 2024 | /s/ Samuel Taylor Hirzel, II<br>Samuel Taylor Hirzel, II (#4415)<br>HEYMAN ENERIO GATTUSO & HIRZEL LLP<br>300 Delaware Avenue, Suite 200<br>Wilmington, DE 19801<br>(302) 472-7300<br>shirzel@hegh.law<br><br>*Attorney for Petróleos de Venezuela, S.A.* |