# EXHIBIT A

**Weil, Gotshal & Manges LLP**

767 Fifth Avenue
New York, NY 10153-0119
+1 212 310 8000 tel
+1 212 310 8007 fax

**Ray C. Schrock**
+1 (212) 310-8210
Ray.Schrock@weil.com

BY E-MAIL

May 3, 2024

Nathan P. Eimer
EIMER STAHL LLP
224 South Michigan Avenue, Suite 1100
Chicago, IL 60604
Email: Neimer@eimerstahl.com

George M. Garvey
Joseph D. Pizzurro
CURTIS, MALLET-PREVOST, COLT & MOSLE LLP
101 Park Avenue678
New York, New York 10178-0061
Email: George.Garvey@mto.com
Email: jpizzurro@curtis.com

RE:       *Crystallex International Corporation v. Bolivarian Republic of Venezuela*
          (Misc. No. 17-151-LPS) – *The Special Master's Invocation of Paragraph 34 of the Sale*
          *Procedures Order* [D.I. 481].

Dear Counsel,

    I write to confirm receipt of your letter correspondence dated April 19, 2024 regarding the
"*Objection to Exclusion of the Republic and PDVSA from Information about the Sale Process*," your
letter correspondence dated April 23, 2024 regarding "*Second Round Bid Instructions*," as well as your
letter correspondence dated April 23, 2024 regarding "*The Republic and PDVSA's Objection to*
*Proposed Round 2 Bidding Instructions*" (collectively the "Letters").  Despite the assertions set forth in
your Letters, the Special Master's actions in furtherance of the Marketing Process and the Sale
Transaction have been, and continue to be, within the authority granted to him under the District Court's
myriad orders, including but not limited to the Sale Procedures Order and the May Order, and applicable
law in all respects.[1]

---

[1]  Capitalized terms used but not defined herein shall have the meanings ascribed to such terms in the *Sixth Revised Proposed*
*Order (A) Establishing Sale and Bidding Procedures, (B) Approving Special Master's Report and Recommendation*
*Regarding Proposed Sale Procedures Order, (C) Affirming Retention of Evercore as Investment Banker by Special Master*
*and (D) Regarding Related Matters* [D.I. 481] (the "Sale Procedures Order").

May 3, 2024                                                            **Weil, Gotshal & Manges LLP**
Page 2

As indicated in our email dated April 18, 2024, the Special Master is willing to make changes to the bid letter reflected in **<u>Exhibit A</u>** hereto.  Notwithstanding the Special Master's willingness to make such changes, we continue to maintain that the initial bid letter was in compliance with the terms of the Sale Procedures Order and the Special Master's authority to conduct the Marketing Process thereunder.

Your Letters raise significant questions regarding the Venezuela Parties' participation in the Marketing Process and Sale Transaction.  Accordingly, and pursuant to the authority vested in him under the Sale Procedure Order, the Special Master hereby invokes paragraph 34 of the Sale Procedures Order and requests each of the Venezuela Parties disclose its intention, or knowledge of the intention of any of the other Venezuela Parties' intent, to submit a proposal for a transaction that contemplates PDVSA's retention of the PDVH Shares, whether as part of or in competition with the Special Master's Marketing Process (the "<u>Request</u>").

The Republic and PDVSA are directed to comply with the Special Master's Request within five (5) business days of receipt of this request.  SPO, ¶ 34.  As set forth in the Sale Procedures Order, if the Republic or PDVSA take exception to the Request, they are directed to file a motion with the Court seeking relief from the Special Master's Request.  *Id.*

The Special Master reserves all rights, including those under paragraph 34 of the Sale Procedures Order, and waives none in connection with the Letters and the Request.

Best regards,

*/s/ Ray C. Schrock*

Ray C. Schrock
Counsel to the Special Master


cc:     Robert Profusek (*via email – raprofusek@jonesday.com*)
        Michael Aiello (*via email – michael.aiello@weil.com*)
        Alexander Welch (*via email – alexander.welch@weil.com*)
        Eoghan Keenan (*via email – eoghan.keenan@weil.com*)
        Luna Barrington (*via email – luna.barrington@weil.com*)
        Chase Bentley (*via email – chase.bentley@weil.com*)
        Daniel Birk (*via email – dbirk@eimerstahl.com*)
        Juan Perla (*via email – jperla@curtis.com*)
        Donald Verrilli (*via email – donald.verrilli@mto.com*)

May 3, 2024
Page 3

**Weil, Gotshal & Manges LLP**

## Exhibit A

Page 1

**Personal and Confidential**

April ~~10~~18, 2024

Participant:

On behalf of Robert B. Pincus in his capacity as Special Master for the United States District Court for the District of Delaware (the "Special Master") in the matter of *Crystallex International Corp. v. Bolivarian Republic of Venezuela*, D. Del. C.A. No. 1:17-mc-00151-LPS (the "Crystallex Case"), we would like to thank you for your consideration of a potential acquisition of all, or a portion, of the shares of PDV Holding Inc. ("PDVH"). CITGO Petroleum Corporation ("CITGO Petroleum") is a direct, wholly owned subsidiary of CITGO Holding, Inc. ("CITGO Holding" and together with CITGO Petroleum, "CITGO") which in turn is 100% owned by PDVH, which in turn is 100% owned by Petróleos de Venezuela, S.A. ("PDVSA"), a Venezuelan corporation 100% owned and controlled by the Bolivarian Republic of Venezuela. Evercore is assisting the Special Master in the implementation of a court-mandated sale of an amount of the shares of PDVH sufficient to satisfy Attached Judgments (as defined in the Sale Procedures Order (defined below))(the "Proposed Transaction").

This letter is being furnished to those persons who have been performing diligence as part of the second round of the Special Master's marketing process. To determine the Special Master's interest in pursuing the Proposed Transaction with you, we invite you to submit a final written, definitive and binding proposal with respect to the Proposed Transaction (your "Proposal"). If the Special Master deems your Proposal to be the bid most likely to satisfy the greatest amount of the Attached Judgments when considering value, certainty of closing and such other factors as the Special Master may determine, in his sole discretion, you may be contacted regarding the process to execute a definitive agreement.

This letter, and the procedures and timetable included herein, are confidential and are subject to the terms of the Confidentiality Agreement that you entered into with the Special Master (the "Confidentiality Agreement") in connection with the Proposed Transaction, the terms of which are not modified or varied by this letter. Unless otherwise defined herein, all capitalized terms used shall have their meaning set forth in the Confidentiality Agreement or the *Sixth Revised Proposed Order (A) Establishing Sale and Bidding Procedures, (B) Approving Special Master's Report and Recommendation Regarding Proposed Sale Procedures Order, (C) Affirming Retention of Evercore as Investment Banker by Special Master and (D) Regarding Related Matters* [D.I. 481] (the "Sale Procedures Order") filed in the Crystallex Case, as context may require.

I.   **PROPOSAL**

Please submit your Proposal in writing to Evercore at any time before **5:00 PM (Central Time) on Tuesday, June 11, 2024,** (the "Proposal Deadline") via email in care of:

| | | | |
|---|---|---|---|
| Evercore | Attention: | Ray Strong | William Hiltz |
| | | Senior Managing Director | Senior Managing Director |
| | Office: | (713) 427-5146 | (212) 857-3154 |
| | Cell: | (347) 549-2043 | (917) 992-3093 |
| | Email: | ray.strong@evercore.com | hiltz@evercore.com |

**E V E R C O R E**

Page 2

With a copy to:

| | | |
|---|---|---|
| Weil, Gotshal & Manges LLP | Attention: | Michael J. Aiello |
| | | Ray C. Schrock |
| | | Eoghan P. Keenan |
| | Email: | michael.aiello@weil.com |
| | | ray.schrock@weil.com |
| | | eoghan.keenan@weil.com |

Your Proposal should include, at a minimum, the following information:

**A. Proposed Transaction Structure.** Confirm that your Proposal is for all, or a portion, of the shares of PDVH, sold free and clear of all claims, encumbrances, and liabilities on or against the shares, in accordance with the terms of the Sale Procedures Order. If your Proposal is for a portion of the shares of PDVH, please indicate (i) the percentage of shares of PDVH proposed to be acquired and (ii) any minority shareholder rights, protections or other desired terms in connection with the Proposed Transaction and any definitive documentation related thereto.

Proposals should utilize the following key assumptions and notes with respect to structuring the Proposed Transaction:

i. <u>Treatment of Cash and Debt</u>: Your Proposal should assume that the available cash of PDVH and its subsidiaries will be equal in value to the aggregate debt of PDVH and its subsidiaries at the closing of the Proposed Transaction and that any cash in excess of the debt amount shall be for the benefit of the sellers.

ii. <u>Working Capital</u>: Your Proposal should assume a normalized amount of working capital, to be determined based upon a working capital calculation included as an exhibit to the definitive SPA, a draft of which will be posted to the data room (the "Target Net Working Capital"). The purchase price will be adjusted on a dollar-for-dollar basis to the extent that the net working capital delivered at closing is greater than or less than, as the case may be, the Target Net Working Capital.

iii. <u>PDVSA 2020 Bonds Share Pledge</u>: The Special Master is engaged in discussions with holders of notes issued pursuant to that certain Indenture, dated October 27, 2016 (the "Indenture"), by and among PDVSA, as issuer, PDVSA Petróleo, S.A., as guarantor, MUFG Union Bank, N.A., as trustee, GLAS Americas LLC, as collateral agent, Law Debenture Trust Company of New York, as registrar, transfer agent and principal agent, and Banque Internationale À Luxembourg, Société Anonyme, as Luxembourg paying agent, whereby PDVSA issued 8.50% senior secured notes due in 2020 in the aggregate principal amount of $3,367,529,000 (the "PDVSA 2020 Notes"), purportedly secured by a pledge of the equity of CITGO Holding (the "CITGO Equity Pledge"). The PDVSA 2020 Notes and the CITGO Equity Pledge are currently the subject of litigation in the matter of *Petróleos de Venezuela, S.A., PDVSA Petróleo, S.A., and PDV Holding, Inc., v. MUFG Union Bank, N.A. and GLAS Americas LLC*, Civ. Nos. 20-3858, 20-4127. For purposes of your Proposal, please assume that the CITGO Equity Pledge will be released in advance of, or in connection with, implementation of the Proposed Transaction. <u>In the event you propose to address the CITGO Equity Pledge in a manner other than a release negotiated and implemented by the Special Master, please so indicate in your Proposal.</u>

**B. Stock Purchase Agreement.** A draft Stock Purchase Agreement (the "Proposed SPA") that provides for the acquisition of all, or a portion, of the shares of PDVH, together with a redline

E V E R C O R E

Page 3

marked to show your proposed changes, if any, to the bid draft Stock Purchase Agreement (the "Bid Draft SPA"), which will be posted to the data room (including proposed changes and accompanying redlines for all exhibits and schedules included in the data room). Please provide such comments in Microsoft Word format and include both a clean Word version as well as a PDF comparison to the Bid Draft SPA posted to the data room. Do not submit an issues list or other summary comments instead of a Proposed SPA with a redline against the Bid Draft SPA to show all proposed comments. The Proposed SPA you submit should include all of your requested changes to the Bid Draft SPA and should include specific, in-line edits and not conceptual, non-specific or footnoted comments. Please note that the Special Master will consider the extent of any comments to the Bid Draft SPA in selecting a counterparty with which to proceed.

C.   **Identity of Purchaser or Counterparty.** A statement identifying the legal name, jurisdiction and type of organization/entity form of each entity that will act as purchaser or counterparty in the Proposed Transaction, including the identity of any controlling person(s), principal equityholders, whether current or anticipated, and each other entity that will be otherwise participating in your Proposal (if applicable), as well as a summary of such organization/entities' history, primary business and sufficient information to demonstrate that such organization/entity has the financial wherewithal to timely consummate the Proposed Transaction.

D.   **Purchase Price and Principal Economic Terms.** A statement setting forth (i) the total equity value you assign to the shares of PDVH ("Valuation") determined based upon the key assumptions described under paragraph A above, (ii) the amount and a detailed analysis of any non-cash components of the purchase price, including without limitation, a credit bid, stock and/or the assumption of liabilities, and the value of such components, any assumptions related thereto, and reasonable back-up documentation to support such value, (iii) a brief description of the methodology used to derive the Valuation, (iv) an identification of any underlying material assumptions regarding the business of PDVH and CITGO and your determination of the purchase price and (v) disclosure of any related transactions to be pursued or effectuated by you in connection with the Proposed Transaction.  The Special Master may consider alternative structures in the event that it maximizes value of the PDVH shares.

E.   **Sources of Financing.** A detailed description of the sources of funds that you intend to use to finance the Proposed Transaction. Please provide copies of the financing commitments and other similar documentation (as applicable) from all sources, such that your Proposal clearly and affirmatively demonstrates that it is not subject to any financing condition. Certainty of financing is critical and will factor into the Special Master's decision.

F.   **Credit Bid (if applicable)**. If you hold an Attached Judgment, you may seek to submit a credit bid (a "Credit Bid") for the shares of PDVH, to the extent permitted by applicable law. If you are submitting a Credit Bid, please state as such, and confirm that such Credit Bid will (i) provide sufficient cash consideration to pay in full all Transaction Expenses and (ii) provide sufficient cash to satisfy in full any obligations secured by a senior lien on the shares of PDVH, ~~as well as~~ including (to the extent you are not proposing an alternative solution to account for the CITGO Equity Pledge described in paragraph A(iii) above) the PDVSA 2020 Notes claim ~~(the latter of which may be placed into escrow subject to resolution of pending litigation or such other treatment as may be consensually agreed with holders of the PDVSA 2020 Notes)~~.

G.   **Purchaser Approvals.** Evidence of corporate or other organizational authorization and approval from your board of directors (or comparable governing body) or otherwise with respect to the submission, execution and delivery of the Proposal (including the execution of the Proposed SPA), participation in any auction and closing of the Proposed Transaction contemplated by the Proposed SPA in accordance with its terms and the terms of the Sale Procedures Order (including the Bidding Procedures contained therein), and an indication of any anticipated need, timeline and plan to obtain

Page 4

any further equityholder, board, organizational, partnership, investment committee or other approval, including governmental, regulatory and other third-party approvals, consents, notifications, waivers or other similar actions that you anticipate will be required to execute a definitive Stock Purchase Agreement (the "definitive SPA"). Please also include a statement or evidence that (i) you will make in a timely manner (1) all filings and disclosures necessary to comply with the regulations of the Department of Treasury's Office of Foreign Assets Control ("OFAC"), (2) all necessary filings under the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended, and any other antitrust laws, as applicable, and pay the fees associated with such filings and (3) all necessary filings in connection with any review by the Committee on Foreign Investment in the United States (CFIUS), if applicable and (ii) your Proposal is reasonably likely to be consummated, after taking into consideration antitrust and any other regulatory matters, your prior experience and any other relevant considerations, if selected as the Successful Bid, within a timeframe acceptable to the Special Master.

**H. Due Diligence Requirements.** Your Proposal should not be subject to any remaining due diligence. You may be permitted to conduct a confirmatory review of any specific and reasonable due diligence materials or activities that you have requested and received confirmation that such information will be available at a later date. If such outstanding confirmatory due diligence items exist, please specifically indicate and provide details regarding these items that you would require prior to execution of the definitive SPA, and include your expected dates of completion of such items.

**I. Advisors.** A list of the financial, accounting, legal, industry consultants and other advisors that you have retained or plan to retain in connection with the Proposed Transaction.

**J. Contacts.** A list of persons (including e-mail addresses and phone numbers) who should be contacted with respect to any questions regarding your Proposal.

**K. Special Master Consent.** Your consent for the Special Master, in his discretion, to share information with U.S. Government regulators, including OFAC, pertaining to you or your Proposal.

**L. Cooperation**. A statement that (i) you agree that your advisors will coordinate in good faith with the Special Master's advisors to discuss and explain your regulatory and other consent analysis, strategy and timeline for securing all such approvals and consents as soon as reasonably practicable and (ii) you agree to cooperate with the Special Master to provide pertinent factual information regarding your ownership and operations reasonably required to respond to, or otherwise analyze issues arising with respect to, U.S. sanctions laws and regulations, the Committee on Foreign Investment in the United States, any applicable antitrust laws and other relevant regulatory requirements or requests.

**M. No Entitlement to Reimbursement**. A statement that your Proposal does not entitle you to any break-up fee, termination fee, expense reimbursement or similar type of payment or reimbursement; provided, however, the definitive SPA will include a termination fee in connection with certain termination events.

**N. No Liability**. A statement that (i) you agree that in no circumstance shall the Special Master or his advisors be personally or otherwise liable for any amounts or obligations owed to you, (ii) the Special Master and his advisors are acting as an arm of the Court and are entitled to judicial immunity in the performance of their duties and (iii) PDVH, CITGO and their respective officers, directors and advisors will have no liability or obligation to you or your affiliates, except and only to the extent it is expressly provided for in the definitive SPA if, as and when executed.

**O. Representations and Warranties**. The following representations and warranties:

Page 5

    a.    a statement that you recognize and acknowledge that the Special Master, his advisors, PDVH, CITGO and their respective representatives make no representations, covenants or warranties (or any other promise) as to the accuracy or completeness of any information provided in the data room or otherwise made available by the Special Master and his advisors in connection with the bid process;

    b.    a statement that, other than with respect to your reliance on the representations and warranties provided in the definitive SPA if, as and when executed, you have relied solely upon your own independent review, investigation and/or inspection of any relevant documents regarding the assets to be purchased and did not rely on any written or oral statements, representations, promises, warranties or guaranties whatsoever, whether express or implied, by operation of law or otherwise, regarding PDVH and its subsidiaries or the completeness of any information made available in connection therewith;

    c.    a statement that you have not engaged in any collusion with respect to the submission of your Proposal; and

    d.    a statement that all proof of financial ability to consummate the Proposed Transaction in a timely manner and other information you submit is true and correct.

**P.  Bidding Procedures**. A statement that you agree to be bound by the terms and conditions of the Bidding Procedures set out in the Sale Procedures Order.

**Q.  Other Material Terms.**  A list of any additional terms or conditions the satisfaction of which you anticipate would be a material condition precedent to executing the definitive SPA with respect to the Proposed Transaction.

## II.  Conditional Selection of Prospective Purchaser

Based upon, among other things, an analysis of the purchase price and other terms presented in your Proposal, the Special Master, in his sole and absolute discretion, may elect to further pursue the Proposed Transaction with you.

Please note that the existence and terms of this letter and any related communications and/or information provided in connection therewith are subject to your Confidentiality Agreement with the Special Master and should be treated accordingly.

## III.  All Rights Reserved

All communications, inquiries and requests for information relating to the Proposed Transaction, including any materials in connection therewith, should be directed to Evercore. **Neither you nor your employees, representatives, agents, affiliates, partners, co-venturers or other related parties are permitted to contact the Special Master, PDVSA, PDVH, CITGO or its subsidiaries, or any of their direct or indirect affiliates, directors, managers, officers, employees, suppliers, vendors, customers, financiers, counterparties, partners, co-venturers or regulators, either directly or indirectly, in relation to any matter set forth in this letter or in relation to the Proposed Transaction.**

This letter does not constitute an offer to sell PDVH or its assets. You acknowledge and agree that the Special Master has the right, in his sole and absolute discretion, to reject any and all proposals regarding any Proposed Transaction and to negotiate with one or more parties simultaneously and terminate discussions and negotiations of any Proposed Transaction with any one or more parties at any time, for any reason or for no reason; that the procedures which the Special Master may employ in the pursuit of any Proposed

Page 6

Transaction, if any such pursuit is undertaken, are within his sole and absolute discretion; that any such procedures are subject to change at any time for any reason or for no reason and with or without prior notice; that determinations of compliance or noncompliance with such procedures will be solely and completely judged by the Special Master, and the sole remedy for any objection to such procedures, the application thereof or any judgment exercised by the Special Master with respect thereto will be withdrawal, without further recourse, from participation in further discussions with respect to the Proposed Transaction. No agreement or understanding regarding a Proposed Transaction shall be deemed to exist unless and until the definitive SPA regarding the Proposed Transaction has been executed and delivered by the parties thereto, and no prospective purchaser shall have any claim based upon any legal theory in connection with a Proposed Transaction unless and until the parties shall have entered into, executed and delivered the definitive SPA.

**By submitting your Proposal, you acknowledge that you have reviewed this letter and that you agree without reservation to all terms, restrictions and conditions contained herein.**

We encourage you to contact the following individuals with any questions regarding your Proposal or any other matter set forth in this letter:

|  |  |
|---|---|
| Ray Strong | William Hiltz |
| Senior Managing Director | Senior Managing Director |
| Office: (713) 427-5146 | Office: (212) 857-3154 |
| Cell: (347) 549-2043 | Cell: (917) 992-3093 |
| ray.strong@evercore.com | hiltz@evercore.com |

The Special Master and Evercore appreciate your interest in this process and look forward to working with you with respect to the Proposed Transaction.

Sincerely,

Ray Strong
Senior Managing Director
Evercore on behalf of the Special Master

| Summary report: Litera Compare for Word 11.5.0.74 Document comparison done on 4/18/2024 7:25:23 PM | |
|---|---|
| **Style name:** Default Style | |
| **Intelligent Table Comparison:** Active | |
| **Original DMS:** iw://weildms.weil.com/WEIL/99687382/1 | |
| **Modified DMS:** iw://weildms.weil.com/WEIL/99687382/3 | |
| **Changes:** | |
| Add | 5 |
| Delete | 9 |
| Move From | 0 |
| Move To | 0 |
| Table Insert | 0 |
| Table Delete | 0 |
| Table moves to | 0 |
| Table moves from | 0 |
| Embedded Graphics (Visio, ChemDraw, Images etc.) | 0 |
| Embedded Excel | 0 |
| Format changes | 0 |
| **Total Changes:** | 14 |

# EXHIBIT B

2021 WL 1118137 (C.A.2) (Appellate Brief)
United States Court of Appeals, Second Circuit.

PETRÓLEOS DE VENEZUELA S.A., PDV Holding, Inc., Pdvsa Petróleo S.A.,
Plaintiffs-Counter-Defendants-Appellants,
v.
MUFG UNION BANK, N.A. and Glas Americas LLC,
Defendants-Counter-Claimants-Appellees.

Nos. 20-3858-cv(L), 20-4127-cv(CON).
March 22, 2021.

On Appeal from the United States District Court
for the Southern District of New York

**Brief for the Bolivarian Republic of Venezuela as Amicus Curiae Supporting Appellants**

George M. Garvey, Munger, Tolles & Olson LLP, 350 South Grand Avenue, 50th Floor, Los Angeles, CA 90071, (213) 683-9100, George.Garvey@mto.com; Donald B. Verrilli, Jr., Elaine J. Goldenberg, Munger, Tolles & Olson LLP, 601 Massachusetts Ave. NW, Suite 500E, Washington, D.C. 20001, (202) 220-1100, Donald.Verrilli@mto.com, for Amicus Curiae.

*TABLE OF CONTENTS*

INTEREST OF *AMICUS CURIAE*
1
STATEMENT
3
SUMMARY OF ARGUMENT
13
ARGUMENT
15
I. The Exchange Offer Was Unauthorized and Void *Ab Initio* Under Articles 150 and 187 of Venezuela's Constitution
15
A. The Exchange Offer was a National Public Interest Contract with Companies Not Domiciled in Venezuela
15
B. Venezuelan Law Places the Burden on the Proponent of a National Public Interest Contract to Obtain National Assembly Authorization--Not on Its Opponents to Obtain National Assembly Disapproval
17
C. The Republic's Explanation of Venezuelan Law Should Be Given Force by This Court
18
D. United States Courts Should Enforce Venezuela's Laws Restricting the Authority of Its State Actors to Enter Contracts, Just As Those Courts Enforce Restrictions That Other States, Domestic or Foreign, Place on State Actors
23
II. The District Court Should Have Recognized the Republic's Acts Under the Act of State Doctrine
25
A. The May and September 2016 Resolutions Are Acts of State That the District Court's Decision Effectively Invalidated
26
B. The District Court's Interpretation of the May and September 2016 Resolutions Misconstrued the Resolutions' Text and Context as Well as the Views of the Special Attorney General
29
CONCLUSION

34
*TABLE OF AUTHORITIES*

**Federal Cases**

*Allied Bank International v. Banco Credito Agricola*, 757 F.2d 516 (2d Cir. 1985) ........................................   28

*Animal Science Products, Inc. v. Hebei Welcome Pharmaceutical Co. Ltd.*, 138 S. Ct. 1865 (2018) ........................   12, 18, 19

*Aquamar, S.A. v. Del Monte Fresh Produce N.A., Inc.*, 179 F.3d 1279 (11th Cir. 1999) ..................................   24

*Banco Nacional de Cuba v. Chem. Bank N.Y. Trust Co.*, 658 F.2d 903 (2d Cir. 1981) ....................................   26

*Banco Nacional de Cuba v. Sabbatino*, 376 U.S. 398 (1964) ................   26

*Braka v. Bancomer, S.N.C.*, 762 F.2d 222 (2d Cir. 1985) ....................   26, 27, 28

*Callejo v. Bancomer, S.A.*, 764 F.2d 1101 (5th Cir. 1985) ..................   27, 28

*D'Angelo v. Petróleos Mexicanos*, 422 F. Supp. 1280 (D. Del. 1976), aff'd, 564 F.2d 89 (3d Cir. 1977) ...................   21

*Federal Crop Insurance Corp. v. Merrill*, 332 U.S. 380 (1947) ............   23, 24

*Karaha Bodas Co., L.L.C. v. Perusahaan Pertambangan Minyak Dan Gas Bumi Negara*, 313 F.3d 70 (2d Cir. 2002) .....   21

*Northrop Grumman Ship Sys., Inc. v. Ministry of Def. of Republic of Venezuela*, 575 F.3d 491 (5th Cir. 2009) .........   23, 24

*Republic of Benin v. Mezei*, No. 06 Civ. 870 (JGK), 2010 WL 3564270 (S.D.N.Y. Sept. 9, 2010) .......................   24

*Velasco v. Gov't of Indonesia*, 370 F.3d 392 (4th Cir. 2004) ...............   24

*W.S. Kirkpatrick & Co. v. Env't Tectonics Corp., Int'l*, 493 U.S. 400 (1990) .......   26, 27

*Zivotofsky ex rel. Zivotofsky v. Kerry*, 576 U.S. 1 (2015) ................   21

**Federal Rules**

Fed. R. App. P. 29(a)(4)(E) ...................................................   1

Second Circuit Rule 29.1(b) ..................................................   1

**Constitutional Provisions**

U.S. Const., Article II, § 3 ..................................................   21

**Other Authorities**

Juan Cristóbal Carmona Borjas, 2 *Actividad Petrolera y Finanzas Públicas En Venezuela [Activity And Public Finance In Venezuela]* (2016) ................................... 9

Claudia Nikken, *Consideraciones sobre las fuentes del Derecho Constitucional y la interpretación de la Constitución* (Editorial Jurídica Venezolana ed., 2018) . 4

*Official Gazette* No. 6.154 (Nov. 19, 2014) ........................................................... 4

Supreme Tribunal of Justice, Constitutional Chamber, Ruling number 953 (Apr. 29, 2003) ......................................................................................................... 5

Supreme Tribunal of Justice, Constitutional Chamber, Ruling number 2241 (Sept. 24, 2002) ...................................................................................................... 6

Supreme Tribunal of Justice, Political-Administrative Chamber, Ruling number 847 (Jul. 16, 2013) ........................................................................................ 5

## INTEREST OF *AMICUS CURIAE*

The Bolivarian Republic of Venezuela (the "Republic") respectfully submits this brief as *amicus curiae* in support of Appellants.[1] The Republic submits this brief to address matters of vital importance to the future of the Republic and its legitimate government.

In January 2019, following illegitimate elections administered by then-President Nicolas Maduro--who, among other things, banned opposition parties from participating--the National Assembly invoked Article 233 of Venezuela's Constitution and named Juan Guaidó as Interim President of the Republic.

As a result of the machinations of the illegitimate Maduro regime, Venezuela's national oil company Petróleos de Venezuela, S.A. ("PDVSA") issued the 2020 Notes and pledged a controlling interest in CITGO--the foreign "crown jewel" of the Venezuelan national oil industry--in defiance of the National Assembly's constitutional authority. As explained below, that purported pledge was invalid and the notes were unauthorized and void *ab initio* because Venezuela's Constitution unambiguously prohibits national public interest contracts with foreign entities unless the National Assembly authorizes the contract prior to execution--an authorization that never took place here. Moreover, official acts of the National Assembly in 2016 reaffirmed the unconstitutional and unauthorized character of the pledge and the notes.

As a sovereign nation, the Republic has an interest in a correct understanding and application of Venezuela's Constitution and laws by the courts of the United States. The Republic also has a sovereign interest in United States courts' respectful deference to its acts of state.

The Republic also has an interest in this case because the decision below threatens to cripple the legitimate government's efforts--supported by the United States--to peacefully remove the illegitimate Maduro regime from power in Caracas, restore democracy in Venezuela, and bring desperately needed humanitarian relief to the Venezuelan people. Ensuring the recovery of the Venezuelan oil industry, in which CITGO plays a crucial strategic role, is indispensable to achieving these goals. While the Republic stands ready to resolve any legitimate claims of its creditors, it cannot recognize the unlawful Exchange Offer as creating valid obligations or pledging assets of public interest as collateral, and respectfully submits that the United States courts should not do so either.[2] This Court should reject the Maduro regime's attempt to prop up its unconstitutional dictatorship by alienating a crucial part of Venezuela's national patrimony through a pledge that lacked the constitutionally required authorization of the National Assembly.

## STATEMENT

Article 150 of Venezuela's Constitution provides that "[n]o municipal, state or national public interest contract shall be executed with foreign States or official entities, or with companies not domiciled in Venezuela, or shall be transferred to any of them without the approval of the National Assembly." JA2825.[3] Section 9 of Article 187 of the Constitution reiterates that "[i]t is the role of the National Assembly" to "[a]uthorize contracts of municipal, state and national public interest, with States or official foreign entities or with companies not domiciled in Venezuela." JA2825-26.[4] In Venezuela's civil law system, the National Assembly is the first-instance interpreter of the Constitution whenever it enacts laws, adopts resolutions, or performs other parliamentary acts in accordance with its constitutional authority. *See* Claudia Nikken, *Consideraciones sobre las fuentes del Derecho Constitucional y la interpretación de la Constitución* 85 (Editorial Jurídica Venezolana ed., 2018).

PDVSA was created shortly after Venezuela nationalized the oil industry in 1975. JA903. It is a "decentralized entity of the Public Administration" of Venezuela. JA905. The close relation of such entities with the State subjects them to the mandatory rules of public law in Venezuela, including those governing public contracting. *See Official Gazette* No. 6.154 (Nov. 19, 2014). The Republic's Constitution--adopted in 1999 to replace an earlier version-- includes, in addition to the Articles discussed above, Articles 302 and 303, which recognize the special importance of the petroleum industry, and of PDVSA in particular. Article 302 reserves to the Republic, "for reasons of national expediency, the control over the petroleum industry and other public interest industries, operations and goods and services of a strategic nature." JA2826. Article 303 provides that the Republic owns PDVSA for "reasons of economic and political sovereignty and national strategy." *Id*.

The Republic has long recognized that important contracts of PDVSA can constitute national public interest contracts. For example, in 2006, the National Assembly invoked its constitutional authority under Article 150 to authorize a joint venture agreement between a PDVSA subsidiary and foreign corporations. JA903 (Ambassador's letter citing Resolutions dated May 4, 2006, published in the Official Gazette No. 38430, May 5, 2006). Venezuela's Supreme Tribunal has also recognized that PDVSA is a state-owned enterprise in charge of national public interest activities. *Id*. (citing Supreme Tribunal of Justice, Political-Administrative Chamber, Ruling number 416 (May 4, 2004)).[5] The Supreme Tribunal has also recognized that contracts of state-owned enterprises can be national public interest contracts. *See, e.g.*, Supreme Tribunal of Justice, Constitutional Chamber, Ruling number 953 (Apr. 29, 2003) (contracts of C.V.G Electrificación del Caroní, C.A. (EDELCA) were national public interest contracts)); Supreme Tribunal of Justice, Political-Administrative Chamber, Ruling number 847 (Jul. 16, 2013) (same regarding contracts of Diques y Astilleros Nacionales (DIANCA)).[6] Until the pledge and issuance of the 2020 Notes that are at issue in this appeal, PDVSA had *never* attempted to pledge strategic assets without the prior authorization of the National Assembly. JA904.

PDVSA's ownership of CITGO Holding, the owner of the major oil refiner CITGO, is a "vital asset of Venezuela's most vital industry." *Id*. CITGO plays a key role in the marketing of Venezuelan crude. *See id*. Thus, the purported pledge of a controlling interest in CITGO "impacts *the economic and social life of the Nation*." CA1836. In the considered view of the Republic, discussed *infra*, the indenture and pledge at issue in this appeal and the 2020 Notes issued thereunder are national public interest contracts. JA904, JA911, CA1832.

Attempted usurpations of power by the Maduro regime in 2016 caused the National Assembly twice to assert its constitutional authority with respect to such contracts. In May 2016, Maduro issued a Presidential Decree claiming the power to enter into contracts of national public interest without the prior authorization of the National Assembly. JA904. The National Assembly promptly "rejected this authoritarian measure" in a Resolution enacted May 26, 2016 (the "May 2016 Resolution"). *Id*. That Resolution (a) stated that Article 150 "categorically mandates, without exception, the approval of the National Assembly" for contracts of national, state, or municipal public interest with companies not domiciled in Venezuela; (b) rejected the portions of Maduro's decree that claimed the authority to enter into such contracts "without the approval of the National Assembly"; (c) "warn[ed] that any activity carried out by an organ that usurps the constitutional functions of another public authority is null and void and shall be considered non-existent"; and (d) resolved to disseminate the Resolution so that foreign governments and companies would know "about the nullity of the contracts that are concluded in contravention of Article 150." JA3514-16.

Maduro's second attempted usurpation--the Exchange Offer at issue in this litigation--was announced in September 2016. PDVSA, whose then-President, Eulogio del Pino, also served as Maduro's Minister of Petroleum, announced its offer to issue

the 2020 Notes, secured by a first-priority lien on 50.1% of the capital stock of CITGO Holding, in exchange for previously issued unsecured notes (the "2017 Notes"). JA2848, JA2964-65. The National Assembly once again responded by asserting its constitutional authority as first-instance interpreter of the Constitution and as the only branch of government charged with authorizing national public interest contracts. The President of the National Assembly's Comptroller's Commission (the organ responsible for monitoring the use of public funds) announced that the Assembly "will not acknowledge any national interest contract that does not come before this National Assembly" and that creditors "will not be able to ask us to honor the commitments of the irresponsible individuals who destroyed PDVSA." JA3557.

In a Resolution enacted September 27, 2016 (the "September 2016 Resolution"), the National Assembly expressly invoked Article 187, section 9--the constitutional provision that gives the National Assembly the exclusive power to "[a]uthorize contracts of . . . national public interest" with foreign companies, JA2826--as well as Articles 302 and 303, the provisions that emphasize the national importance of the petroleum industry and PDVSA. JA111. The September 2016 Resolution "reject[ed] categorically that, within the swap transaction, 50.1% of the shares . . . of Citgo Holding . . . are offered as a guarantee with priority, or that a guarantee is constituted over any other property of the Nation." *Id*. It summoned oil minister/PDVSA President Del Pino "to appear before this National Assembly to explain the terms of this bond swap transaction, based on offering the majority of Citgo Holding Inc. shares as collateral." *Id*. It demanded an investigation "to determine if the current transaction protects the National Property." *Id*. And it urged PDVSA "to present the Country with a plan for the refinancing of its financial commitments." *Id*.

The National Assembly requested the opinion of the distinguished law professor Juan Cristóbal Carmona Borjas regarding the legality of the 2020 Notes, the Indenture, and the Pledge. On October 7, 2016, Professor Carmona opined that the Exchange Offer could not be effective without the National Assembly's approval under Article 150. JA2615-16. As he explained, the Exchange Offer was "without doubt . . . a national public interest contract" and "a type of contract [that] will always require the authorization of the National Assembly." Juan Cristóbal Carmona Borjas, 2 *Actividad Petrolera y Finanzas Públicas En Venezuela [Activity And Public Finance In Venezuela]* 425, 429 (2016).

Maduro defied the National Assembly's Resolutions and ignored the National Assembly's invocation of its constitutional authority and refusal to authorize the proposed transaction as structured. Instead, Maduro, working through the Minister of Petroleum he had installed as head of PDVSA, proceeded with the pledge and the Exchange Offer. With the publication of the news that the Maduro regime was making the Exchange Offer "without the consent of the opposition-controlled National Assembly," JA1730, the holders of over 60% of the 2017 Notes elected to retain their unsecured notes rather than accept collateral offered without National Assembly authorization.

The 2020 Notes were issued on October 28, 2016, in exchange for the 39.43% of the 2017 Notes that were tendered by investors willing to take their chances on the Maduro regime's scheme. JA1937. The National Assembly never approved the issuance of the 2020 Notes or the pledge--not before, not during, and not after the Exchange Offer.

In 2019, after Interim President Guaidó became the Republic's legitimate chief executive, he received from Special Attorney General José Ignacio Hernandez an analysis of whether the indenture for the 2020 Notes was valid. In a thorough analysis filling 55 single-spaced pages, the Special Attorney General "*concluded that the indenture is a national public interest agreement that, as such, should have been previously authorized by the National Assembly pursuant to article 150 of the Constitution*. Owing to the lack of authorization, Petróleos de Venezuela, S.A. (PDVSA) did not have the legal capacity to sign that agreement, which is invalid under Venezuelan Law." CA1800 (emphasis in original). The Special Attorney General reported that "the defect is the violation of article 150 of the Constitution, since PDVSA signed the issuing contract without prior authorization from the National Assembly." CA1848. In a section of his opinion devoted to whether bondholders were on notice of that defect, the Special Attorney General noted that the September 2016 Resolution had "questioned the issuance of the 2020 Bond and in particular, the establishment of the pledge agreement," and that although the National Assembly "did not declare the unlawfulness of that Bond," it had announced "the start of an investigation based on the questioning of the operation." Therefore, he wrote, "a conclusion that the Bond was invalid, is not a decision that can surprise those bond-holders in good faith." CA1847.

By resolution dated October 15, 2019 (the "October 2019 Resolution"), the National Assembly "ratif[ied] that the 2020 Bond indenture violated Article 150 of the Constitution . . ., since it concerned a national public contract, executed with foreign companies, which was not authorized by the National Assembly." JA120.

Case 1:17-mc-00151-LPS   Document 1145-1   Filed 05/08/24   Page 18 of 159 PageID #: 28922

PETROLEOS DE VENEZUELA S.A., PDV Holding, Inc.,..., 2021 WL 1118137...

In June 2020, the Republic's Ambassador to the United States provided the district court with a letter setting forth the Venezuelan constitutional, legislative, and judicial authorities and principles summarized above. The Ambassador's Letter explained that the May 2016 Resolution rejected Maduro's claim to have power to enter national public interest contracts without National Assembly authorization. JA904. The Letter also explained that "the absence of [the] National Assembly's authorization of the CITGO pledge," as well as the existence of the September 2016 Resolution and the October 2019 Resolution, meant that no such authorization ever occurred. JA911. The Letter asked the court to defer to those "official acts taken wholly within Venezuela by the National Assembly," which "vitiate the consent necessary for the Indenture and the Pledge to have come into valid legal existence in the first instance and therefore render these contracts and the 2020 Notes invalid, illegal, and null and void *ab initio*." *Id.*

The district court acknowledged its obligation under *Animal Science Products, Inc. v. Hebei Welcome Pharmaceutical Co. Ltd.*, 138 S. Ct. 1865 (2018), to "accord respectful consideration" to the Ambassador's Letter as a foreign government's official statement on the interpretation and meaning of its own domestic law. SPA39. But the court rejected the Republic's view that the September 2016 Resolution "characterized the Exchange Offer as a contract of national public interest or declared the Exchange Offer as null and void." SPA40. In reaching that conclusion, the court did not engage in any analysis of Venezuelan law or of materials provided by the Ambassador and the parties' Venezuelan law experts. The court also failed to address other aspects of the Ambassador's Letter, including the Republic's considered view that the absence of National Assembly authorization rendered the pledge and the 2020 Notes null and void *ab initio*. Instead, the district court opined that Venezuelan law is "ultimately irrelevant to this action." SPA65.


## SUMMARY OF ARGUMENT

Under Articles 150 and 187 of the Republic's Constitution, any national public interest contract with any foreign company requires the approval and authorization of the Republic's National Assembly. The Exchange Offer, including the purported pledge by PDVSA of a controlling interest in CITGO, was a national public interest contract with foreign companies. The National Assembly did not authorize the 2020 Notes. To the contrary, it invoked its authority as the branch of government whose role is to authorize national public interest contracts, called for an investigation of the proposed Exchange Offer, and categorically rejected a pledge of the CITGO interest or "any other property of the Nation." The Exchange Offer was therefore unauthorized, unconstitutional, and void under Venezuelan law.

The district court ruled that Venezuelan law was "ultimately irrelevant" to this action. That was error. When determining whether a state-owned enterprise exceeded its authority to enter into a contract, a court must look to the laws of the jurisdiction under which the enterprise was created and governed--in this case, Venezuela. The decision below, which gave effect to the unconstitutional acts of PDVSA under the Maduro regime, should be reversed for this reason.

The act of state doctrine provides a second and independent reason to reverse. The resolutions of the National Assembly in May and September 2016 asserted the Assembly's constitutional authority as the branch of government responsible for authorizing national public interest contracts, invoked that authority with respect to the proposed Exchange Offer, and categorically rejected the pledge of strategic national property on which the proposed Exchange Offer depended. The National Assembly thus considered and declined to authorize the proposed Exchange Offer. The district court erred by not recognizing that the National Assembly's Resolutions and decision not to authorize the Exchange Offer prevented the 2020 Notes from being validly issued, and by assuming (contrary to Venezuela's Constitution) that the burden was on the National Assembly to invalidate the Exchange Offer, rather than on the proponents of the Exchange Offer to obtain National Assembly authorization prior to execution of that offer. The court also erred by disregarding or rejecting the views of the Republic regarding its own laws as expressed in a submission to the district court from the Republic's Ambassador to the United States.


## ARGUMENT

## I. The Exchange Offer Was Unauthorized and Void *Ab Initio* Under Articles 150 and 187 of Venezuela's Constitution.

### A. The Exchange Offer was a National Public Interest Contract with Companies Not Domiciled in Venezuela.

Article 150 unambiguously provides that "[n]o municipal, state or national public interest contract shall be executed . . . with companies not domiciled in Venezuela, . . . without the approval of the National Assembly." JA2825. Article 187, section 9, reiterates that it is the National Assembly's role to authorize such contracts.

In September 2016, the National Assembly concluded that the documents that created the 2020 Notes, including the purported pledge, constituted a national public interest contract. That remains the Republic's considered view today. PDVSA is "a state-owned enterprise in charge of national public interest economic activities," and CITGO is "PDVSA's greatest strategic asset abroad." JA903-04. The National Assembly--which the district court rightly recognized as the "sovereign" for purposes of this action, SPA23--has consistently treated important contracts of PDVSA as national public interest contracts. JA903-05. The Maduro regime's attempt to pledge 50.1% of PDVSA's interest in CITGO, together with its purported pledge of the remaining 49.9% to the Russian oil company Rosneft, have rightly been described by the National Assembly as an "attempt to conduct a *de facto* privatization of PDVSA." JA905. As the Republic's Ambassador puts it, the Indenture and Pledge for the 2020 Notes "are national public interest contracts under any possible definition." JA904.

Nor can there be any doubt that the contracts at issue were with companies not domiciled in Venezuela. The parties to the Indenture were PDVSA; its subsidiary PDV Petróleo, S.A.; Defendant MUFG Union Bank, N.A. ("MUFG"), a United States national banking association; Defendant GLAS Americas LLC ("GLAS"), a New York limited liability company; and other entities formed under the laws of New York and Luxembourg. JA3375. The Pledge and Security Agreement was entered among PDVSA, PDV Holding, Inc., MUFG, and GLAS. JA3479.

Because the Indenture and Pledge were national public interest contracts with companies domiciled outside Venezuela, under Article 150 those contracts could not be executed without the authorization of the National Assembly.

### B. Venezuelan Law Places the Burden on the Proponent of a National Public Interest Contract to Obtain National Assembly Authorization--Not on Its Opponents to Obtain National Assembly Disapproval.

Because the district court believed questions of Venezuelan law to be "irrelevant," its opinion contains no explicit analysis of Venezuelan law. But the district court's decision nevertheless rests on the assumption that the notes and pledge must be considered presumptively valid unless the National Assembly took express actions "to affirmatively invalidate the Exchange Offer." SPA36. The law of Venezuela is precisely the opposite.

The plain language of Article 150 of the Constitution provides that "[n]o . . . contract . . . shall be executed . . . without the approval of the National Assembly." JA2825. That language places the burden on the proponent of a national public interest contract to obtain the National Assembly's approval prior to execution of the contract--not on the opponent of such a contract to have the National Assembly "affirmatively invalidate" it.

The National Assembly itself has affirmed this interpretation repeatedly. The Assembly's May 2016 Resolution, enacted in response to Maduro's announced intention to enter national public interest contracts without National Assembly authorization, "rejected" Maduro's claim to the authority to do so, "remind [ed]" the world of the need for National Assembly approval, and "inform [ed]" foreign governments and companies "about the nullity of the contracts that are concluded in contravention of Article 150." JA3515-16. The September 2016 Resolution invoked Article 187, section 9, the provision that assigns to the National Assembly the authority to authorize national public interest contracts, and "reject[ed] categorically" PDVSA's attempted pledge of the CITGO Holding shares. JA111. The National Assembly reiterated the same understanding in its October 2019 Resolution.

### C. The Republic's Explanation of Venezuelan Law Should Be Given Force by This Court.

When a foreign government submits a statement interpreting its own laws, a federal court must accord that interpretation "careful[]" and "respectful," though not "conclusive," consideration. *Animal Science Products*, 138 S. Ct. at 1869, 1873. That deferential approach honors "the spirit of 'international comity.' " *Id.* at 1873 (citations omitted).

In this case, the Republic confirmed, through a letter from the Republic's Ambassador, that the "2020 Notes were issued as a result of an illegal and unconstitutional transaction aimed to circumvent the political control of the National Assembly over the public national interest contract." JA907. The Republic also confirmed that the "2020 Notes, including the Pledge and Indenture, were therefore void *ab initio*." *Id.*

Those conclusions follow directly from the plain text of Venezuela's Constitution as discussed above--but in all events, the district court should have followed the Republic's official interpretation of Venezuelan law. Indeed, each of the considerations the Supreme Court identified in *Animal Science Products* supports deferring to the views of the Republic:

*The statement's clarity, thoroughness, and support.* The Ambassador's Letter clearly sets forth Venezuela's interpretation of its applicable law, discusses the reasoning underlying that interpretation thoroughly, and supports the interpretation by citing provisions of Venezuela's Constitution, resolutions of the National Assembly, and other authoritative sources.

*The transparency of the foreign legal system.* The authorities cited by the Ambassador are readily available for review, as the extensive discussions by the parties' expert witnesses below demonstrate.

*The context and purpose of the statement.* The Ambassador's Letter is transparent about its context and purpose: to vindicate the National Assembly's constitutional role in authorizing contracts in the national public interest, and to explain why the Maduro regime's pledge of a controlling interest in a strategic national asset, in defiance of the Venezuelan Constitution and the resolutions of the National Assembly, was void under Venezuelan law. It is difficult to imagine an interest more deserving of comity than a sovereign's desire to enforce its Constitution and to ensure respect for the separation of powers that the Constitution reflects.

The district court discounted the Ambassador's Letter on the ground that it was offered specifically for purposes of this litigation. SPA41. But the relevant question is not whether the letter was offered to influence this litigation. That will always be the case when a foreign sovereign makes such a submission. What matters is whether the position expressed in such a submission was invented in order to influence the litigation. That is plainly not the case here. The legal principles set forth in the Ambassador's Letter are long-standing. They are unambiguously enshrined in Venezuela's Constitution; they were articulated and applied in the May and September 2016 Resolutions; and they were ratified in the October 2019 Resolution. Moreover, the National Assembly has applied the same principles to condemn other usurpations by the Maduro regime, such as the attempt to pledge 49.9% of CITGO to Rosneft and the purported creation of a PDVSA "litigation trust." JA905.

That the Republic and its citizens have an important economic and political interest in this litigation--as the Ambassador's Letter clearly disclosed-- hardly makes the Republic's interpretation of its own laws less worthy of respectful consideration. *See, e.g., Karaha Bodas Co., L.L.C. v. Perusahaan Pertambangan Minyak Dan Gas Bumi Negara*, 313 F.3d 70, 92 (2d Cir. 2002) (that Indonesia was "a party to the case does not blunt this comity concern"); *D'Angelo v. Petróleos Mexicanos*, 422 F. Supp. 1280, 1284 (D. Del. 1976) (deferring to Mexico's interpretation of its expropriation decree where a party was Mexico's national oil company), *aff'd*, 564 F.2d 89 (3d Cir. 1977) (Table).

*The role and authority of the entity or official offering the statement.* The U.S. Executive Branch, in the exercise of its exclusive power to "receive Ambassadors," U.S. Const., art. II, § 3, has accepted Carlos Vecchio as Venezuelan ambassador to the United States. "The 'political department ['s] . . . action in recognizing a foreign government and in receiving its diplomatic representatives is conclusive on all domestic courts.' " *Zivotofsky ex rel. Zivotofsky v. Kerry*, 576 U.S. 1, 18-19 (2015) (citation omitted).

*The consistency of the foreign government's positions.* The Ambassador's Letter relies on long-standing provisions of Venezuela's Constitution, a decision of the Republic's Supreme Tribunal dating from 2003, and numerous resolutions of the Venezuelan National Assembly from 2006 to 2020. These include the May 2016 Resolution and the September 2016 Resolution, both of which issued before the Exchange Offer was consummated and had sharply in focus Maduro's attempted usurpations of the National Assembly's constitutional authority. Indeed, the Exchange Offer's unlawful character was public

knowledge when investors made their decisions whether to take up the offer. That is doubtless why investors holding over 60% of the 2017 Notes declined to do so, notwithstanding the offer's pro-creditor purported pledge of the CITGO shares to secure a previously unsecured obligation.

### D. United States Courts Should Enforce Venezuela's Laws Restricting the Authority of Its State Actors to Enter Contracts, Just As Those Courts Enforce Restrictions That Other States, Domestic or Foreign, Place on State Actors.

Whether state enterprises have constitutional authority to enter into contracts is determined by reference to the applicable law of the relevant state, whether domestic or foreign. In *Federal Crop Insurance Corp. v. Merrill*, 332 U.S. 380 (1947), the Supreme Court held that federal law and regulations expressly limited the authority of the Federal Crop Insurance Corporation to enter into contracts and that such a limitation precludes liability under state law, even under circumstances in which a private corporation would be bound. *See id.* at 383-84. It made no difference that the federal government was doing business through a corporation: "Whatever the form in which the Government functions, anyone entering into an arrangement with the Government takes the risk of having accurately ascertained that he who purports to act for the Government stays within the bounds of his authority." *Id.* at 384 (citation omitted).

"The same concerns that animate the public-contracts doctrine in the context of state and federal entities . . . apply with equal force to foreign sovereigns." *Northrop Grumman Ship Sys., Inc. v. Ministry of Def. of Republic of Venezuela*, 575 F.3d 491, 501 (5th Cir. 2009). Thus, a foreign government "entity has the power to define how and when it enters a contract, and, by extension, how and when its agents have authority to create contracts on its behalf." *Id.* at 500; *see also Velasco v. Gov't of Indonesia*, 370 F.3d 392, 395-96 & n.2 (4th Cir. 2004) (looking to Indonesian law to determine authority of agents of governmental entity to issue notes in foreign trade); *Aquamar, S.A. v. Del Monte Fresh Produce N.A., Inc.*, 179 F.3d 1279, 1292 (11th Cir. 1999) (looking to Ecuadorian law to determine ability of government instrumentality to waive sovereign immunity in U.S. courts).

Courts applying New York law are in accord with that rule. For example, in *Republic of Benin v. Mezei*, No. 06 Civ. 870 (JGK), 2010 WL 3564270 (S.D.N.Y. Sept. 9, 2010), the court cited *Merrill* and declined to enforce a contract executed by a Benin foreign ministry official without the approval of Benin's Council of Ministers. *See id.* at \*5-6. As the court explained, "New York law does not speak to the question of which officials have the actual authority to act on behalf of Benin." *Id.* Similarly, New York law sheds no light on the actual authority of PDVSA to consummate the Exchange Offer and pledge strategic assets. Only Venezuela's law can determine what branch of the Venezuelan government must authorize such a contract before PDVSA can execute it. *See also* Appellants' Br. 54-57 (citing cases).

Any contrary approach would seriously undermine international comity, including respect for other nations' constitutional allocation of powers. It would be equivalent to a foreign court enforcing a United States President's unconstitutional pledge to spend funds never appropriated by Congress--even after Congress had expressly registered its disapproval--and declaring that the United States Constitution was "ultimately irrelevant." The district court's decision in this case was no less inappropriate.

### II. The District Court Should Have Recognized the Republic's Acts Under the Act of State Doctrine.

The district court also failed to accord appropriate respect to the sovereign acts of Venezuela's government in a second way that independently requires reversal. Specifically, the district court violated the act of state doctrine when it refused to give effect to the National Assembly's May and September 2016 Resolutions. Through those Resolutions, the National Assembly asserted its authority over national public interest contracts, categorically rejected the pledge on which the proposed Exchange Offer depended, and made clear that the transaction as structured was unauthorized and therefore void *ab initio*. The district court's misconceived interpretation of the Resolutions--and of the opinion of Special Attorney General Hernandez--nullified those acts of state.

### A. The May and September 2016 Resolutions Are Acts of State That the District Court's Decision Effectively

**Invalidated.**

Under the act of state doctrine, United States courts refrain from declaring invalid the public acts of a foreign sovereign power. *Banco Nacional de Cuba v. Sabbatino*, 376 U.S. 398, 401 (1964). The doctrine requires U.S. courts to give effect to a foreign sovereign's official acts if they occurred within its territory or are aligned with the policy aims of the United States. *See, e.g.*, *Banco Nacional de Cuba v. Chem. Bank N.Y. Trust Co.*, 658 F.2d 903, 908 (2d Cir. 1981); *see also W.S. Kirkpatrick & Co. v. Env't Tectonics Corp., Int'l*, 493 U.S. 400, 406 (1990) (act of state doctrine is "a principle of decision binding on federal and state courts alike" (citation omitted)).

The National Assembly's May and September 2016 Resolutions confirming that the Exchange Offer was a national public interest contract requiring National Assembly authorization, refusing to authorize that contract, and categorically rejecting the pledge were all official acts of a foreign sovereign within its territory. If a foreign sovereign's promulgation of regulations may constitute an official act for purposes of the act of state doctrine, as this Court has held, *see Braka v. Bancomer, S.N.C.*, 762 F.2d 222, 225 (2d Cir. 1985), then *a fortiori* the duly enacted resolutions of the National Assembly also qualify.

If those acts of state are given effect here as they should be, the 2020 Notes are void and the purported pledge of PDVSA's shares is invalid. "[T]he outcome of the case turns upon . . . the effect of official action by a foreign sovereign," which is precisely the circumstance in which the act of state doctrine applies. *W.S. Kirkpatrick & Co.*, 493 U.S. at 406. The entire purpose and effect of the May and September 2016 Resolutions was to assert the National Assembly's constitutional authority to ensure that the Exchange Offer, including the pledge, could not validly be made without the Assembly's prior authorization. To refuse to give effect to those Resolutions is to "render nugatory the attempts by [Venezuela] to protect" its important national assets. *Callejo v. Bancomer, S.A.*, 764 F.2d 1101, 1116 (5th Cir. 1985).

The National Assembly's exercise, in the May and September 2016 Resolutions, of its constitutional power to review and refuse to authorize the Exchange Offer under Article 150, like the exchange control regulations at issue in *Braka* and *Callejo*, govern the conduct and obligations of a state-owned entity subject to foreign law, which cannot give its contractual counterparties what they seek without running afoul of that law. *See Braka*, 762 F.2d at 225; *Callejo*, 764 F.2d at 1116. Appellees here, like the counterparties in those cases, argue that they seek only an order honoring contractual commitments--but the very point is that honoring those commitments would violate Venezuelan law because the contract at issue is void *ab initio* as per the May and September 2016 Resolutions. The act of state doctrine therefore dictates that the district court's enforcement of the contract be reversed.

The district court necessarily engaged in what this Court has called an "impermissible inquiry" into whether the Resolutions validly apply to void the contracts. *Braka*, 762 F.2d at 225; *see also Callejo*, 764 F.2d at 1115-16 ("Here, although the specific act complained of by the Callejos was Bancomer's breach of contract, not Mexico's promulgation of the exchange control regulations, adjudication of the breach of contract claim would necessarily call into question the Mexican regulations."). Because courts may require the terms of the contract to be honored "only by discarding" the May and September 2016 Resolutions, the act of state doctrine prohibits such relief. *Callejo*, 764 F.2d at 1116.

This case is unlike *Allied Bank International v. Banco Credito Agricola*, 757 F.2d 516, 521 (2d Cir. 1985), because at the time of the National Assembly's acts of state, the 2020 Notes did not yet exist. "The test . . . adopted in *Allied* was whether the [act of state] was 'able to come to complete fruition within the dominion of the [foreign] government.' " *Braka*, 762 F.2d at 224 (citation omitted). The May and September 2016 Resolutions established, all within Venezuela, that without prior National Assembly authorization the pledge could not be made and the notes could not issue. The bondholders who chose to accept the unauthorized Exchange Offer never acquired valid property rights. To respect the Resolutions as acts of state does not bless an after-the-fact expropriation of foreign assets--it simply gives effect to the National Assembly's *ex ante* assertion of its constitutional authority to prevent the Maduro regime's usurpation.

**B. The District Court's Interpretation of the May and September 2016 Resolutions Misconstrued the Resolutions' Text and Context as Well as the Views of the Special Attorney General.**

The district court viewed the May 2016 Resolution as "very clearly cabin[ed]" to contracts " 'concluded by and between the National Executive,' " and therefore inapplicable to "contracts entered into by PDVSA." SPA34-35. But the district court

misread the Resolutions because it failed to take into account the context in which they were enacted. The May 2016 Resolution responded directly to a Maduro decree claiming unilateral authority to enter into national public interest contracts. The May 2016 resolution declares that Article 150 "categorically mandates, *without exception*," the Assembly's approval of such contracts with foreign companies, and warns that this constitutional responsibility "cannot be relaxed by conventions, decrees or other legal acts." JA3514-15 (emphasis added).

The district court also overlooked the provisions of the Resolution that were *not* limited to contracts entered by the National Executive. Provision Two "warn [ed] that *any* activity carried out by an organ that usurps the constitutional functions of another public authority is null and void," and Provision Four informed foreign governments and companies "about the nullity of the contracts that are concluded in contravention of Article 150." *Id*. at 9 (emphasis added). Neither provision limited itself to contracts signed by the National Executive. As the Ambassador explained, the May 2016 Resolution "reiterate[d] that any national interest contract entered with foreign companies must be previously authorized by the National Assembly." JA904.

The district court's parsing of the September 2016 Resolution was similarly misconceived. The district court, in a footnote, dismissed the National Assembly's decision to withhold authorization of the Exchange Offer as irrelevant to the act-of-state analysis on the ground that a "simple failure to act" was unworthy of treatment "as the act of a foreign sovereign." SPA33. But the decision to withhold an authorization that the Venezuelan Constitution requires is not merely a "simple failure to act." By "reject[ing] categorically" the pledge of 50.1% of the shares of CITGO Holding or "any other property of the nation," by demanding an investigation and summoning the President of PDVSA to appear before it, and by urging PDVSA to come up with a new plan for refinancing its debt, the National Assembly in the September 2016 Resolution confirmed that it was refusing to authorize the Exchange Offer. JA111. That was not a failure to act. It was an affirmative choice to withhold the constitutionally required approval of the Exchange Offer, including its Pledge. As the authorities cited in Appellants' Brief at 27-28 establish, that sovereign act deserves deference under the act of state doctrine.

Equally to the point, the district court misconceived Venezuelan law when it declined to treat the Resolutions as acts of state on the ground that they did not expressly reject the Exchange Offer. As an initial matter, that characterization is simply wrong: the National Assembly expressly "reject[ed] categorically" the pledge of collateral that was the most damaging aspect of the Exchange Offer, and called upon PDVSA to come up with a new plan for "the refinancing of its financial commitments." JA111. Even if the National Assembly were required to affirmatively express disapproval, it unmistakably did so. More fundamentally, however, the district court's failure to treat the resolutions as acts of state rested on its assumption that the Exchange Offer should be presumed valid unless the National Assembly expressly repudiated it. As discussed above (pp. 17-18, *supra*), that gets Venezuelan law backwards. At the time the National Assembly passed the Resolutions, the transaction itself was not final, but rather a proposal that could yet be withdrawn or modified. The National Assembly could scarcely have done more to make clear that the proposed transaction as structured, including the pledge, was unconstitutional, unauthorized, and void as a matter of Venezuelan law. As the Ambassador's Letter explains, by operation of Venezuelan law "the September 2016 Resolution should have prevented PDVSA from advancing the Exchange Offer and issuing the 2020 Notes." JA906.

Moreover, the National Assembly's explicit invocation of Article 187, section 9--the provision that allocated to the National Assembly the role of authorizing national public interest contracts--made clear the determination that the Exchange Offer could not be consummated without National Assembly authorization. That determination plainly qualifies as an act of state.

Also erroneous was the district court's statement that the Republic's views were "undermined by the Opinion . . . produced by Special Attorney General Juan [sic] Ignacio Hernández [that] expressly stated that, through the September 2016 Resolution, 'the National Assembly did not declare the unlawfulness' of the 2020 Notes." SPA40-41. The district court relied on an out-of-context quotation of a fragment of a single sentence in the Special Attorney General's opinion. CA1847. That sentence appeared near the end of the opinion, in a section addressing whether investors were on notice of the invalidity of the 2020 Notes. The sentence continued, "but it did announce the start of an investigation based on the questioning of the operation." *Id*. The Special Attorney General concluded that investors "*should have been aware that the Bond was questioned by the National Assembly before being issued*." *Id*. (emphasis in original). Therefore, he continued, "the fact that the National Assembly finishe[d] the investigation and concluded that the Bond was invalid, is not a decision that can surprise those bond-holders in good faith." *Id*. Earlier in his opinion, the Special Attorney General analyzed at length the validity of the Exchange Offer and concluded that the absence of National Assembly authorization rendered the indenture and

PETROLEOS DE VENEZUELA S.A., PDV Holding, Inc.,..., 2021 WL 1118137...

pledge invalid. CA1800 (quoted at p. 10 *supra*); *see also* CA1831-43 (establishing that the "issuing contract" was a national public interest contract because it entailed the pledge of the CITGO shares, and was invalid because not authorized by the National Assembly); CA1848 ("[T]he defect is the violation of article 150 of the Constitution, since PDVSA signed the issuing contract without prior authorization from the National Assembly."). A fair reading of the Special Attorney General's opinion leaves no doubt about his conclusion that the 2020 Notes were void *ab initio* because the indenture and pledge were never authorized by the National Assembly. The contrary inference drawn by the district court is simply unwarranted.

## CONCLUSION

The judgment of the district court should be reversed.

DATED: March 22, 2021

MUNGER, TOLLES & OLSON LLP

By: */s/ Donald B. Verrilli, Jr.*

DONALD B. VERRILLI, JR.

Footnotes

1     Pursuant to Federal Rule of Appellate Procedure 29(a)(4)(E) and Circuit Rule 29.1(b), the Republic states that its counsel authored this brief in its entirety and that no party or its counsel, or any other person or entity other than the *amicus* or its counsel, has made a monetary contribution that was intended to fund the preparation or submission of this brief. Counsel for all parties consented in writing to the filing of this brief.

2     Except as otherwise stated, capitalized terms have the definitions set forth in Appellants' Brief.

3     This brief quotes the English translations the parties provided the district court, which in some instances differ (but not materially) from the translations in a letter submitted to the district court by Venezuela's Ambassador to the United States.

4     These absolute provisions are in contrast to provisions in the same Articles concerning public interest contracts with companies domiciled in Venezuela, as to which National Assembly approval or authorization is required only as "determined by law." JA2825.

5     The Ambassador's Letter erroneously stated that the decision issued in 2003 rather than in 2004.

6     Defendants argued below that the decision *Andrés Velásquez* (Supreme Tribunal of Justice, Constitutional Chamber, Ruling number 2241 (Sept. 24, 2002)), supported the view that only contracts to which the Republic is a party can be national public interest contracts. That interpretation of *Andrés Velásquez* is incorrect, and is inconsistent with the later decisions involving EDELCA, DIANCA and other state-owned enterprises, and with the resolutions of the National Assembly regarding PDVSA.

**End of Document**

© 2024 Thomson Reuters. No claim to original U.S. Government Works.

# EXHIBIT C

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

PETROLEOS DE VENEZUELA S.A.; PDVSA
PETROLEO S.A.; and PDV HOLDING, INC.,

                        Plaintiffs,

                -v.-

MUFG UNION BANK, N.A. and GLAS
AMERICAS LLC,

                        Defendants.

19 Civ. 10023 (KPF)

**ORDER**

KATHERINE POLK FAILLA, District Judge:

On December 11, 2020, Plaintiff PDV Holding, Inc. ("PDVH") filed a
motion for a partial stay of the execution of enforcement of the Court's
December 1, 2020 Final Judgment (the "Final Judgment" (Dkt. #229)) during
the pendency of PDVH's appeal (Dkt. #233). Defendants submitted their
opposition to PDVH's motion on December 18, 2020 (Dkt. #237, 238), and
PDVH submitted its reply on December 22, 2020 (Dkt. #239). For the reasons
set forth in the remainder of this Order, PDVH's motion is granted.[1]

The Court has carefully considered the parties' submissions on this
issue. And the Court sympathizes with Defendants' position that the Indenture
and Pledge Agreement contemplate an immediate nonjudicial foreclosure and
eventual sale of the Collateral in case of an Event of Default. However, it is for
this very reason that the Court thinks it necessary to grant PDVH the relief to

---

[1]     Unless otherwise defined herein, capitalized terms shall have the meanings assigned to
        them in this Court's Opinion and Order dated October 16, 2020. (Dkt. #215).

which it is entitled under Rule 62(b) of the Federal Rules of Civil Procedure. Defendants have made clear their intent to exercise this remedy if sanctions are lifted during the pendency of PDVH's appeal,[2] which would effectively moot the appeal. While the Court maintains the positions set forth in its October 16, 2020 Opinion and Order on the issues presented by the parties' cross-motions for summary judgment (Dkt. #215), it agrees with PDVH that a partial stay is warranted to allow PDVH the opportunity to pursue its appeal.

PDVH has requested a stay of the Court's judgment authorizing the sale of its majority stake in CITGO (the "Pledged Shares") on the grounds that such relief is warranted under Rule 62(b) of the Federal Rules of Civil Procedure, and in the alternative, that it is entitled to a partial stay pursuant to Rule 62(f) of the Federal Rules of Civil Procedure. The Court agrees with Defendants that Rule 62(f) does not provide PDVH with grounds to seek a partial stay under the requirements set forth in *Fed. Deposit Ins. Corp.* v. *Ann-High Assocs.*, No. 97-6095, 1997 WL 1877195, at *4 (2d Cir. 1997) (per curiam), in particular, the requirement that PDVH establish that state law entitles it to appeal without a bond. In its briefing, PDVH cites to New York law creating a right to a stay where "the judgment or order directs the assignment or delivery of personal property, and the property is placed in the custody of an officer designated by the court." N.Y. C.P.L.R. 5519(a)(4). The scope of such a stay "is restricted to

---

[2]     The Court acknowledges the Trustee and Collateral Agent's letter of December 23, 2020, informing the Court of OFAC's issuance of General License 5F. (Dkt. #240). The Court understands that General License 5F continues to restrict Defendants' ability to take action with respect to the Pledged Shares through July 21, 2021.

the executory directions of the judgment or order appealed from which command a person to do an act, and [] the stay does not extend to matters which are not commanded but which are the sequelae of granting or denying relief." *Pokoik* v. *Dep't of Health Servs.*, 641 N.Y.S.2d 881, 884 (2d Dep't 1996) (per curiam). The provisions of the Final Judgment that PDVH seeks to stay "contain no direction that a party perform an act," are "not executory," and accordingly, are not stayed pursuant to N.Y. C.P.L.R. 5519(a)(4). *Id.*

However, PDVH has established that it is entitled to a partial stay pursuant to Rule 62(b) of the Federal Rules of Civil Procedure. Rule 62(b) provides that "[a]t any time after judgment is entered, a party may obtain a stay by providing a bond or other security." Fed. R. Civ. P. 62(b). The Pledge Agreement suffices to satisfy the "other security" requirement of Rule 62(b), as it assures that the Pledged Shares will be maintained in their current form for the duration of the appeal. The Court agrees with *Deutsche Bank National Trust Co.* v. *Cornish*, 759 F. App'x 503, 509 (7th Cir. 2019), in which decision the Seventh Circuit observed that Rule 62(b) made "explicit the opportunity to post security in a form other than a bond." There, the Court determined that given the "explicit flexibility" in Rule 62(b), "continuing an existing security interest in the property that a lender required as a condition of the loan should provide adequate security in most cases" where the "property is cared for and protected." *Id.* at 509-10. Here, the Pledged Shares similarly provide the Defendants with adequate security. Having considered the factors set forth by the Second Circuit in *In re Nassau County Strip Search*, 783 F.3d 414, 417-18

3

(2d Cir. 2015) (per curiam),[3] the Court's view is that no additional security is necessary. *See generally In re Bakery & Confectionary Union & Indus. Int'l Pension Fund Pension Plan*, No. 11 Civ. 1471 (VB), 2013 WL 12444540, at *2 (S.D.N.Y. Jan. 29, 2013) (determining that a bond was "unnecessary" where the movant's assets were held in trust, most of the movant's assets were "invested in readily marketable securities," and the beneficiaries "who would receive payments if the judgment is affirmed will be paid within thirty to ninety days thereafter").[4]

Moreover, the Court may exercise its equitable powers to stay proceedings to protect the status quo during the pendency of PDVH's appeal. *See Nken* v. *Holder*, 556 U.S. 418, 421 (2009) ("[I]t 'has always been held, … that as part of its traditional equipment for the administration of justice a

---

[3]　While Rule 62 was amended in 2018, courts continue to rely on the *Nassau County* factors in determining whether to waive the bond or other security requirements of Rule 62(b). *See, e.g., Xerox Corp.* v. *JCTB Inc.*, No. 18 Civ. 6154 (MAT), 2019 WL 6000997, at *3 (W.D.N.Y. Nov. 14, 2019).

[4]　Defendants argue that Rule 62(b) does not apply here because it is limited to money judgments rather than declaratory judgments. (*See* Dkt. #237 at 9-11). Defendants also characterize PDVH's application as seeking injunctive relief, and argue that Rule 62(b) does not apply on that basis as well. (*Id.* at 12-17). With respect to the former argument, the Court agrees with PDVH that the Final Judgment is, in effect, monetary, inasmuch as it awards Defendants monetary damages amounting to approximately $1.924 billion. (Final Judgment at 2). And as to Defendants' argument that PDVH is seeking an injunction, the Court does not understand PDVH to have requested that the Court enjoin the Trustee and Collateral Agent from exercising contractual rights that exist independent of the Final Judgment, as the rights at issue are dependent on the Final Judgment's determination as to the validity of the Pledge Agreement. Rather, the Court understands PDVH to have requested to stay those provisions of the Final Judgment authorizing the Trustee and Collateral Agent to take conduct that would alter the status quo — such application falls within the bounds of Rule 62(b). *See Nken* v. *Holder*, 556 U.S. 418, 428-29 (2009) (observing that while "in a general sense, every order of a court which commands or forbids is an injunction," a stay "operates upon the judicial proceeding itself … either by halting or postponing some portion of the proceeding, or by temporarily divesting an order of enforceability" (citations, quotation marks and alterations omitted)).

4

federal court can stay the enforcement of a judgment pending the outcome of an appeal.'" (quoting *Scripps-Howard Radio, Inc.* v. *Fed. Commc'ns Comm'n,* 316 U.S. 4, 9-10 (1942))).[5]

Therefore, having considered PDVH's motion to issue a partial stay of execution of the Final Judgment pending final resolution of Plaintiffs' appeal by the United States Court of Appeals for the Second Circuit, this Court hereby ORDERS that:

1.    PDVH's motion is GRANTED;

2.    From the date hereof through the issuance of a mandate by the United States Court of Appeals for the Second Circuit resolving Plaintiffs' appeal, execution of the Court's Final Judgment is STAYED with respect to all portions of the Final Judgment pertaining to the Pledge Agreement, including but not limited to:

    a.    The grant of judgment in favor of Defendants and Counterclaim Plaintiffs the Trustee and the Collateral Agent

---

[5]    Application of this power to stay an order is guided by a "well-established" four-factor test. *In re A2P SMS Antitrust Litig.*, No. 12 Civ. 2656 (AJN), 2014 WL 4247744, at *2 (S.D.N.Y. Aug. 27, 2014). The factors include: "[i] whether the stay applicant has made a strong showing that he is likely to succeed on the merits; [ii] whether the applicant will be irreparably injured absent a stay; [iii] whether issuance of the stay will substantially injure the other parties interested in the proceeding; and [iv] where the public interest lies." *Id.* (citing *Nken*, 556 U.S. at 434). While PDVH and Defendants have not submitted briefing on the application of this test to the instant matter, given PDVH's representations as to the potential consequences of the execution of the Final Judgment on PDVH and the CITGO Entities, not to mention the potential collateral political consequences (*see* Dkt. #237 at 7-8), the Court easily concludes that PDVH has established irreparable injury, one of the most "critical" factors in this analysis. *Nken*, 556 U.S. at 434; *see also Crystallex Int'l Corp.* v. *PDV Holding Inc.*, No. 15 Civ. 1082 (LPS), 2019 WL 67785504, at *3 (D. Del. Dec. 12, 2019) (granting application for a stay where the Court was "persuaded that the Republic and PDVSA could be irreparably injured in the absence of a stay, yet a stay will not substantially injure the other parties … interested in the proceeding").

on the Third and Fifth Counterclaims asserted by the Trustee and Collateral Agent in Defendants' Answer and Counterclaims (Dkt. #40);

b.      The order, judgment, decree, and declaration that (i) the Pledge Agreement is "valid and enforceable;" (ii) the "Trustee and Collateral Agent are permitted to exercise the remedies for default set forth" in the Pledge Agreement; (iii) "the Trustee is entitled to direct the Collateral Agent to sell the collateral securing the 2020 Notes;" and (iv) "the Collateral Agent is entitled to so sell;" and

c.      The statement that nothing in the Final Judgment shall preclude the Trustee or the Collateral Agent from (i) "recovering any amounts in addition to the foregoing amounts that may be due or may become due" under the Pledge Agreement; or (ii) enforcing the Pledge Agreement or "seeking to remedy any subsequent or continuing breaches" of the Pledge Agreement.

3.      PDVH is not required to post a bond or additional security;

4.      During the Stay Period, Defendants, including their officers, agents, servants, employees, and attorneys, and those persons in active concert or participation with them who receive actual notice of this Order by personal service or otherwise, including any owners or holders of the 2020 Notes or beneficial interests therein,

and any other parties claiming an interest in the 2020 Notes or a security interest in the Pledged Shares, shall not take any action to execute on or enforce the portions of the Final Judgment that are so stayed;

5.    Defendants MUFG Union Bank, N.A. and GLAS Americas LLC, any owners or holders of the 2020 Notes or beneficial interests therein, and any other parties claiming an interest in the 2020 Notes or a security interest in the Pledged Shares, shall not attempt to enforce the Pledge Agreement or otherwise to exercise any rights, remedies, or privileges purportedly arising from a default or Event of Default under the Pledge Agreement, including by attempting to sell the collateral securing the 2020 Notes; and

6.    This Court's Order shall remain in effect unless and until the final disposition of the Plaintiffs' appeal before the Second Circuit; or until it is superseded by another order of this Court or a higher court.

SO ORDERED.

Dated:    December 29, 2020
          New York, New York

_____
KATHERINE POLK FAILLA
United States District Judge

# EXHIBIT D

# 20-3858-cv(L),

## 20-4127-cv(CON)

## In the United States Court of Appeals
## for the Second Circuit

PETRÓLEOS DE VENEZUELA S.A., PDV HOLDING, INC.,
PDVSA PETRÓLEO S.A.,

*Plaintiffs-Counter-Defendants-Appellants*,

– v. –

MUFG UNION BANK, N.A., GLAS AMERICAS LLC,

*Defendants-Counter-Plaintiffs-Appellees.*

On Appeal from the United States District Court
for the Southern District of New York

### SUPPLEMENTAL BRIEF OF DEFENDANTS-COUNTER-CLAIMANTS-APPELLEES MUFG UNION BANK, N.A. AND GLAS AMERICAS LLC

PAUL, WEISS, RIFKIND,
  WHARTON & GARRISON LLP
1285 Avenue of the Americas
New York, NY 10019-6064
Telephone: 212-373-3000
Facsimile: 212-757-3990

PAUL, WEISS, RIFKIND,
  WHARTON & GARRISON LLP
2001 K Street, NW
Washington, DC 20006-1047
Telephone: 202-223-7300

*Attorneys for Defendants-Counter-Claimants-Appellees*
*(as to issues of U.S. law only)*

LATHAM & WATKINS LLP
1271 Avenue of the Americas
New York, New York 10020
Telephone: 212-906-1200
Facsimile: 212-751-4864

*Attorneys for Defendants-Counter-Claimants-Appellees*

## TABLE OF CONTENTS

**Page**

Table of Authorities .................................................................................ii

Glossary ..................................................................................................iv

Preliminary Statement ...........................................................................1

Factual Background ................................................................................3

    A.    The Exchange Offer ........................................................3

    B.    This Case ...........................................................................6

    C.    The District Court's Summary Judgment Decision ........7

    D.    This Court's Prior Decision ..............................................9

    E.    The New York Court of Appeals Decision.....................12

Argument ..............................................................................................15

I.    This Court Should Vacate the Judgment and Remand for
Consideration of Issues of Venezuelan Law Unaddressed by
the District Court....................................................................15

II.    No Further Consideration of the Act-of-State Doctrine Is
Warranted Before It Is Determined Whether the Governing
Documents Are Valid Under Venezuelan Law and
Enforceable Under the Law of New York...............................22

Conclusion............................................................................................27

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Agudath Israel of America* v. *Cuomo*,
   983 F.3d 620 (2d Cir. 2020) ...............................................................16

*Allied Bank International* v. *Banco Credito Agricola
   de Cartago*,
   757 F.2d 516 (2d Cir. 1985) ..................................................................7

*Belleri* v. *United States*,
   712 F.3d 543 (11th Cir. 2013) .............................................................16

*Bugliotti* v. *Republic of Argentina*,
   952 F.3d 410 (2d Cir. 2020) ................................................................15

*Celestin* v. *Caribbean Air Mail, Inc.*,
   30 F.4th 133 (2d Cir. 2022) .................................................................25

*Korea Life Insurance Co.* v. *Morgan Guaranty
   Trust Co. of N.Y.*,
   269 F. Supp. 2d 424 (S.D.N.Y. 2003) ...................................................20

*Petróleos de Venezuela S.A.* v. *MUFG Union Bank, N.A.*,
   51 F.4th 456 (2d Cir. 2022) ..........................................................*passim*

*Petróleos de Venezuela S.A.* v. *MUFG Union Bank, N.A.*,
   _ N.Y. _, 2024 WL 674251 (N.Y. Feb. 20, 2024) ...................................*passim*

*Ramos* v. *City of New York*,
   298 F. App'x 84 (2d Cir. 2008) ............................................................16

*Schonfeld* v. *Hilliard*,
   218 F.3d 164 (2d Cir. 2000) ................................................................16

*Spiegel* v. *Schulman*,
   604 F.3d 72 (2d Cir. 2010) ..................................................................16

*Vosse* v. *City of New York*,
   594 F. App'x 52 (2d Cir. 2015) ............................................................16

**Statutes**

N.Y. U.C.C. § 8-110..................................................................11, 12, 14, 19

N.Y. U.C.C. § 8-202.................................................................................20

Venezuela's Organic Law of Financial Administration of the
    Public Sector .........................................................................4, 13, 18

**Other Authorities**

Fed. R. Civ. P. 44.1 ...............................................................................15

## GLOSSARY

| | |
|---|---|
| 2017 Notes | The 5.25% Senior Notes due 2017 and the 8.5% Senior Notes due 2017, both issued by PDVSA. |
| 2020 Notes or Notes | The 8.5% Senior Secured Notes due 2020 issued by PDVSA pursuant to the Indenture. |
| Collateral | PDVH's pledge of a 50.1% interest in CITGO Holding under the Pledge Agreement. |
| Collateral Agent | GLAS Americas LLC, the collateral agent of the 2020 Notes. |
| Exchange Offer | The tender offer announced by PDVSA on September 17, 2016, and closed on October 21, 2016, to exchange 2017 Notes for 2020 Notes. |
| Governing Documents | The Global Note, Indenture, and Pledge Agreement for the 2020 Notes. |
| Indenture | The Indenture dated October 27, 2016, between PDVSA as issuer, PDVSA Petróleo as guarantor, the Trustee, the Collateral Agent, the Law Debenture Trust Company of New York as registrar, transfer agent, and principal paying agent, and Banque Internationale à Luxembourg, Société Anonyme as Luxembourg paying agent. |
| PDVH | PDV Holding, Inc. |
| PDVSA | Petróleos de Venezuela, S.A. |

iv

| | |
|---|---|
| PDVSA Parties | PDVSA, PDVSA Petróleo, and PDVH. |
| PDVSA Petróleo | PDVSA Petróleo S.A. |
| Pledge Agreement or Pledge | The Pledge and Security Agreement dated October 28, 2019, between PDVH as pledgor, PDVSA as issuer, PDVSA Petróleo as guarantor, the Collateral Agent, and the Trustee. |
| Trustee | MUFG Union Bank, N.A., the trustee of the 2020 Notes. |
| Republic | The Bolivarian Republic of Venezuela. |

PRELIMINARY STATEMENT

This Court stated in its prior opinion that if the Court of Appeals deems Venezuelan law relevant to the PDVSA Parties' claims, this Court "would likely remand for an assessment of Venezuelan law on that question, and, if necessary, for consideration of the Creditors' equitable and warranty claims." *Petróleos de Venez. S.A.* v. *MUFG Union Bank, N.A.*, 51 F.4th 456, 475 (2d Cir. 2022) ("*PDVSA II*").

This Court should follow that roadmap, vacate the judgment, and remand to the district court. Should the district court conclude that the Governing Documents are valid under Venezuelan law—consistent with the legal opinions PDVSA's Venezuelan counsel at Hogan Lovells provided to the parties to the Exchange Offer and to PDVSA—it should enter a new judgment for the Trustee and the Collateral Agent. Should the district court conclude otherwise, it would then have to consider a range of other issues it has not previously resolved and that neither this Court nor the Court of Appeals has addressed. Those additional issues include (i) the consequences under New York law of the alleged invalidity, taking account of relevant provisions of the U.C.C. and a range of affirmative defenses presented by the pleadings; (ii) the applicability of the act-of-state doctrine, if any; and, if necessary, (iii) the counterclaims asserted by the Trustee and the Collateral Agent for unjust enrichment, quantum meruit, and breach of warranty.

Remand to the district court to resolve disputed issues of Venezuelan law in the first instance would further judicial efficiency and is

consistent with what the parties have previously agreed is the appropriate course and with this Court's ordinary practice. The Court of Appeals emphasized that its ruling left for the federal courts to determine "whether . . . the notes are invalid under Venezuelan law," *Petróleos de Venezuela S.A.* v. *MUFG Union Bank, N.A.*, _ N.Y. _, 2024 WL 674251, at *9 (N.Y. Feb. 20, 2024) ("*PDVSA III*"). That issue and other relevant issues of Venezuelan law were briefed and argued at length in the district court, and Judge Failla is accordingly best positioned to grapple with them in the first instance. The parties have agreed that "'this Court need not and should not' reach the merits of the Venezuelan legal questions unaddressed below." Appellants' Reply Br. 7 n.4 (quoting Appellees' Br. 13). And remand to the district court to determine Venezuelan law in the first instance, and, if necessary, the other issues that the district court did not reach, is consistent with this Court's normal practice.

   No further consideration of the act-of-state doctrine by this Court is warranted before the district court determines whether the Governing Documents are valid under Venezuelan law. The Court concluded in its prior decision that the act-of-state doctrine does not "require a departure from ordinary choice-of-law analysis in determining the legal consequences in the United States of a foreign sovereign act." *PDVSA II*, 51 F.4th at 467. The approach the Court set forth thus requires a twofold analysis of: (i) whether, as the PDVSA Parties contend, the 2015 National Assembly engaged in a sovereign act "that had the legal effect under

2

Venezuelan law of rendering the Governing Documents void from the beginning," and if so (ii) "the legal consequences in the United States" of such an act, *id.*—an issue that the Court of Appeals held must be determined under the law of New York, *see PDVSA III*, 2024 WL 674251, at *9. Any further assessment of the act-of-state doctrine should await determinations by the district court of these unaddressed questions.

## FACTUAL BACKGROUND

The Court is familiar with the facts of this case as reflected in its opinion in *PDVSA II*. We set forth here only an outline of the facts most relevant to the Court's assessment of the next steps in this action.

### A.     The Exchange Offer

As the Court is aware, this action arises from an exchange by PDVSA in 2016 of unsecured notes coming due the following year for new notes not due until 2020. The 2020 Notes were secured by a pledge made by PDVH of 50.1% of the shares of CITGO Holding. Both PDVH and CITGO Holding are Delaware corporations with their principal places of business in Texas. SPA-5; SPA-10; JA-4853-54 ¶¶ 16, 21. PDVSA told investors, and has since reaffirmed, that if the Exchange Offer failed it would default on the 2017 Notes, with calamitous consequences for PDVSA and the Republic. *See* JA-4694; Appellants' Br. 2.

In September 2016, after the Exchange Offer was announced but before it closed, the 2015 National Assembly adopted a resolution criticizing the Exchange Offer and "reject[ing]" the collateral pledge. JA-110. As the

3

district court found, the September 2016 resolution did not declare the 2020 Notes or the Pledge invalid, illegal, or unenforceable, or (as the PDVSA Parties have argued in this litigation) that they were "contract[s] of national public interest" requiring prior legislative approval under Article 150 of the Venezuelan constitution. SPA-35. The Guaidó administration's Special Attorney General José Ignacio Hernández, a senior member of the PDVSA Parties' litigation team during the district court proceedings, acknowledged that the September 2016 resolution did "not declare[] [the Governing Documents] 'contracts in the national public interest'" and stated that PDVSA debt issuances do not require National Assembly debt approval under Venezuelan statutory law because they are "excluded from the controls provided for in the Organic Law of the Financial Administration of the Public Sector." JA-4931-32¶¶250-51.

The Exchange Offer closed in October 2016, JA-4903¶164, and PDVSA was accordingly able to avoid default. *Cf.* JA-4694. For nearly three years, the PDVSA Parties performed their obligations under the Governing Documents and otherwise acknowledged the validity and enforceability of the Notes and the Pledge. PDVH deposited the Collateral with the Collateral Agent, JA-4906¶176; publicly acknowledged the debt as a valid, secured debt in its published financial statements, JA-4925-27¶¶233-44; and made all interest and principal payments as they came due, JA-4918-19¶¶213-17.

The PDVSA Parties continued to perform under the Governing Documents after the United States recognized the government of Juan Guaidó in January 2019. JA-4962¶¶306-08; JA-4918¶216. In April 2019, members of PDVSA's ad hoc board appointed by the Guaidó government concluded they could not find a "legal loophole" to avoid payment on the Notes, and the ad hoc board and the 2015 National Assembly voted to continue making interest payments while they lobbied for changes in the U.S. sanctions regime that would suspend the ability of the Trustee and the Collateral Agent to enforce their rights to payment under the Governing Agreements. JA-4919-25¶¶218-32. Former Special Attorney General Hernández stated publicly that making the April 2019 interest payment was part of the government's "strategy for renegotiating the public debt" and acknowledged that "the truth is that the Bond issue contract is still valid and binding in accordance with New York Law, which is the applicable law." JA-4933-34¶254.

On October 24, 2019, the U.S. Office of Foreign Asset Control ("OFAC") issued a directive suspending the ability of the Trustee and the Collateral Agent to foreclose on the Collateral in case of a default. JA-4924¶229. Almost immediately thereafter, PDVSA defaulted on the 2020 Notes in October 2019 by failing to make a payment of principal and interest when due. JA-4939-¶¶259-62. The Notes remain in default.

### B. This Case

The PDVSA Parties commenced this action in October 2019, seeking a declaratory judgment that the 2020 Notes and the Governing Documents were "invalid, illegal, null and void *ab initio*, and thus unenforceable."  JA-49¶1.  That is so, they contend, because the Governing Documents were allegedly "contracts in the national public interest" requiring approval by the Venezuelan National Assembly pursuant to Article 150 of the Venezuelan Constitution.  JA-74¶¶74-79.

The Trustee and the Collateral Agent asserted counterclaims for a declaratory judgment that the Notes and the Governing Documents are legal and enforceable; a declaratory judgment that Events of Default (as defined in the Indenture, JA-736, JA-762) have occurred and that the Collateral Agent is entitled to sell the Collateral, subject to OFAC approval; and for unpaid principal, interest, and fees and expenses.  SPA-15; JA-143-44; JA-160-68.

The Trustee and the Collateral Agent also asserted additional counterclaims based on inequitable conduct by the PDVSA Parties and for breach of warranty.  In particular, they asserted counterclaims against each of the PDVSA Parties for unjust enrichment; a claim against PDVSA and PDVSA Petróleo for quantum meruit; and claims against PDVSA Petróleo and PDVH for breach of their representations in the Indenture and the Pledge Agreement that they were authorized to execute and perform those

6

agreements and that no additional government approval was required.  JA-168-73.

### C.    The District Court's Summary Judgment Decision

The district court granted summary judgment to the Trustee and the Collateral Agent and denied summary judgment to the PDVSA Parties.

The district court rejected the PDVSA Parties' argument that it should hold the Notes unenforceable under the act-of-state doctrine.  The court held that under *Allied Bank International* v. *Banco Credito Agricola de Cartago*, 757 F.2d 516 (2d Cir. 1985), and its progeny, the act-of-state doctrine does not require U.S. courts to recognize an effort by a sovereign to disavow debt obligations, such as the Notes, located outside of the sovereign's territory.  SPA-27-32.

The district court further rejected the PDVSA Parties' argument that the September 2016 National Assembly resolution and an earlier National Assembly resolution in May 2016 precluded the Governing Documents from coming into existence.  Although it viewed these resolutions as "official acts of a foreign sovereign" for purposes of the act-of-state doctrine, SPA-23, it found that the PDVSA Parties' argument "lacks support in the plain language of the Resolutions."  SPA-33.  The court noted that the "rejection" of the pledge in the Resolution

> is not accompanied by any recognition of the Exchange Offer as a contract of national public interest; nor does [the Resolution] state that the Exchange Offer would, if executed without National Assembly approval, violate Article 150 of the Venezuelan Constitution; nor does it

> deem the Exchange Offer to be illegal, invalid, or void in
> any manner.

SPA-35. The court further rejected the PDVSA Parties' argument that the mere failure by the National Assembly to approve the Exchange Offer should be viewed as a sovereign act under the act-of-state doctrine because sovereign "acts require some degree of formality, . . . and there is no formality in a simple failure to act." SPA-33 n.6 (citation omitted).

The district court concluded that New York law, not the law of Venezuela, governs this action under New York choice-of-law rules. SPA-47-65. The court noted that "Plaintiffs have not asserted, and the Court has not identified, any infirmity grounded in New York law in the 2020 Notes and Governing Documents." Accordingly, it concluded, the application of New York law rather than Venezuelan law "vitiates [the PDVSA Parties'] claim." SPA-65.

In light of its holdings, the district court elected not to address "the intricacies of Venezuelan law," and in particular whether, as the PDVSA Parties have argued, the Exchange Offer was invalid under Article 150 of the Venezuelan Constitution. SPA-65; *see also* SPA-6 n.3. As the district court noted, the parties had "devoted substantial resources, including expert witness submissions," to Venezuelan law, and those issues were addressed at length in the parties' briefs; in more than 400 pages of expert witness submissions and thousands of pages of accompanying exhibits; and at oral argument. SPA-6 n.3. The court "acknowledge[d] that substantial

arguments can be advanced by both sides," but, in light of "the pitfalls that can inhere in interpreting another country's laws," it was unwilling to make determinations of Venezuelan law when doing so was "not necessary." SPA-6 n.3; SPA-65.

The district court also did not reach a range of other issues presented by the parties' pleadings and summary judgment motions. Because the court held that the Trustee and the Collateral Agent were entitled to summary judgment on their counterclaims for breach of contract, it did not grant summary judgment on their counterclaims for unjust enrichment and quantum meruit. SPA-66. The court likewise did not address the counterclaims asserted by Trustee and the Collateral Agent against PDVSA Petróleo and PDVH for breach of warranty. SPA-66 n.16; SPA-70. The court also did not address "whether Defendants could have reasonably relied on Plaintiffs' past statements regarding the Exchange Offer and 2020 Notes," SPA-66, or any other issues regarding the enforceability of the Notes or the Pledge if Venezuelan law were relevant, including affirmative defenses asserted by the Trustee and the Collateral Agent based upon apparent authority, ratification, estoppel, laches, and *in pari delicto*. *See* JA-138-141 ¶¶98-104; Dist. Ct. ECF 99 at 26-28; Dist. Ct. ECF 158 at 22-23, 40-44; Dist. Ct. ECF 182 at 9, 12-13.

## D. This Court's Prior Decision

On appeal, this Court rejected the PDVSA Parties' contention that the Governing Documents should be declared invalid under the act-of-

state doctrine regardless of New York's choice-of-law rules, and certified questions about New York choice-of-law to the State's Court of Appeals. The Court, like the district court, did not reach any issues of Venezuelan law. Indeed, the parties agreed that "[i]f the Court concludes that Venezuelan law is relevant to this case, it should remand to the district court to assess that law in the first instance." Appellees' Br. 51; *see also* Appellants' Reply Br. 7 n.4 (PDVSA Parties "agree with Appellees (at 13) that 'this Court need not and should not' reach the merits of the Venezuelan legal questions unaddressed below.").

Addressing the act-of-state doctrine, the Court reasoned that "New York choice-of-law issues" need to be resolved before determining the potential applicability of the doctrine, because the doctrine "applies only when resolution of a claim or defense under applicable law requires adjudication of the validity of a foreign sovereign act." *PDVSA II*, 51 F.4th at 466. The Court emphasized that the act-of-state doctrine "does not alter our obligation to evaluate the parties' claims and defenses in this action under governing law." *Id.* Citing the Restatement (Fourth) of Foreign Relations § 441 cmt. d, the Court noted that the act-of-state doctrine

> does not preclude courts from imposing extraterritorial legal consequences arising from [a foreign state's sovereign] act in accordance with applicable law. For that reason, we do not understand the act-of-state doctrine to require a departure from ordinary choice-of-law analysis in determining the legal consequences in the United States of a foreign sovereign act.

10

*PDVSA II*, 51 F.4th at 467 (citation omitted); *see also id.* at 467 n.7 (emphasizing that the act-of-state doctrine focuses on "the choice of law with respect to the validity of foreign sovereign acts" and not "the extraterritorial *consequences* of the foreign sovereign acts under the substantive law applied in a particular case") (emphasis in original). Accordingly, the Court "reserve[d] judgment on the act-of-state argument pending resolution of the choice-of-law issues." *Id.* at 467.

Turning to the choice-of-law issues presented by the case, the Court concluded that it was unable "to predict with confidence" how New York law would resolve those issues. *Id.* at 472. Accordingly, pursuant to Local Rule 27.2, it certified three questions pertaining to choice-of-law to the Court of Appeals. The first certified question focused on whether the validity of the Governing Documents must be determined under the law of Venezuela pursuant to N.Y. U.C.C. § 8-110.[1] *Id.* at 475-76. The other two questions focused on principles of New York common law choice-of-law that the PDVSA Parties had argued precluded enforcement of the Governing Documents. *Id.* The Court invited the Court of Appeals "to expand upon or

---

[1] The question as formulated by this Court read: "Given PDVSA's argument that the Governing Documents are invalid and unenforceable for lack of approval by the National Assembly, does New York Uniform Commercial Code section 8-110(a)(1) require that the validity of the Governing Documents be determined under the Law of Venezuela, 'the local law of the issuer's jurisdiction'?" *Id.* at 475.

alter these questions as it should deem appropriate." *Id.* at 476 (quoting

*Nguyen* v. *Holder*, 743 F.3d 311, 317 (2d Cir. 2014)).

In assessing whether to certify these questions to the Court of

Appeals, the Court concluded, among other things, that the questions were

potentially dispositive. That is because, the Court reasoned, if New York

choice-of-law principles required the application of New York law to the

validity of the 2020 Notes and deemed Article 150 and the National Assembly

resolutions to have no effect on the validity of the Governing Documents,

then this Court "would affirm the district court's decision to apply New York

law and uphold the validity of the bonds." *Id.* at 475. On the other hand, the

Court explained,

> if the [C]ourt [of Appeals] concludes Venezuelan law
> applies to the particular issue of PDVSA's legal authority
> to execute the Exchange Offer, then we would likely
> remand for an assessment of Venezuelan law on that
> question and, if necessary, for consideration of the
> Creditors' equitable and warranty claims.

*Id.*

### E. The New York Court of Appeals Decision

In its opinion, issued on February 20, 2024, the Court of Appeals

held that "Venezuelan law governs the validity of the notes under Uniform

Commercial Code § 8-110(a)(1)" and that the term "validity" "encompasses

within its scope plaintiffs' arguments concerning whether the issuance of the

notes was duly authorized by the Venezuelan National Assembly under the

Venezuelan Constitution—i.e., whether there is a defect in the notes

occasioned by the application of a constitutional provision bearing on the procedure through which the notes were issued." *PDVSA III*, 2024 WL 674251, at *1. Thus, the court concluded, Article 150 and related provisions of the Venezuelan Constitution "may govern" the validity of "securities issued by the Venezuelan entities in this transaction." *Id*. at *6.

The Court of Appeals recognized that neither this Court nor the district court had reached any determination of the substance of Venezuelan law. Thus, the court noted, following its decision,

> [t]he question remains whether, under those constitutional provisions, failure to receive authorization from the National Assembly prior to issuing the 2020 Notes means that the notes were invalid under the law of Venezuela at the time of their issuance.

*Id.* at *9. The court did not address that issue of Venezuelan law, instead recognizing that the validity of the 2020 Notes under that law "is an issue that we must leave for the federal courts to determine." *Id*.[2]

---

[2] The Guaidó government's former Special Attorney General Hernández recently suggested that the Court of Appeals' decision restricts the range of Venezuelan law issues that the district court may consider—and, in particular, that the district court may not consider Venezuela's Organic Law of Financial Administration of the Public Sector, which provides that PDVSA may issue debt without obtaining National Assembly approval. *See, e.g.*, Dist. Ct. ECF 99 at 38; Dist. Ct. ECF 158 at 34; Dist. Ct. ECF 159 at 20-21, 24. There is no basis for that suggestion in the court's opinion, in the certified questions (either as presented by this Court or as reformulated by the Court of Appeals), or in the parties' briefs (even assuming, contrary to fact, that the Court of Appeals could properly limit the district court's review of Venezuelan law). The Court of Appeals

13

The Court of Appeals repeatedly emphasized the narrowness of its holding. It reformulated the first certified question "in order to highlight the limited nature of the 'validity' inquiry" under section 8-110. *Id.* at 4.[3] Likewise, the court stressed "that New York Law governs the transaction in all other respects, including the consequences if a security was 'issued with a defect going to its validity.'" *Id.* at *1 (citation omitted); *see also id.* at *6 ("[W]e emphasize that generally, in every other respect, the Governing Documents are governed by New York law."). The court also noted that Venezuelan law was relevant only to securities issued by "Venezuelan entities." *Id.* at *9.

The court further held that the "effect" or "consequences" of any alleged invalidity on the enforceability of the Governing Documents is a matter of New York law. Thus, it explained, "[e]ven if a security issued by a Venezuelan entity is invalid under Venezuelan law, the effect of that invalidity is nonetheless governed by New York law." *Id.* at *6; *see also id.*

---

naturally focused on the claim that the Notes were invalid under the Venezuelan Constitution because that is the claim the PDVSA Parties have asserted. But there is nothing in the opinion purporting to restrict the Venezuelan legal materials the district court may consider.

[3] As reformulated, the question reads: "Given the presence of New York choice-of-law clauses in the Governing Documents, does UCC 8-110(a)(1), which provides that the validity of securities is determined by the local law of the issuer's jurisdiction, require the application of Venezuela's law to determine whether the 2020 Notes are invalid due to a defect in the process by which the securities were issued?" *Id.* at *4.

at *9 ("[E]ven if it is determined that the securities were 'issued with a defect going to [their] validity' under Venezuelan law, New York law nonetheless governs the consequences of that defect." (citations omitted)).

While the Court of Appeals did not reach this Court's second and third certified questions relating to common law, it expressly "reaffirm[ed] the principle" established in its earlier cases "that when the parties have chosen New York Law, a court may not contravene that choice through a common-law conflicts analysis." *Id.* at *6 (citing *IRB-Brasil Resseguros, S.A.* v. *Inepar Invs., S.A.*, 20 N.Y.3d 310 (2012) and *Ministers & Missionaries Benefit Bd.* v. *Snow*, 26 N.Y.3d 466 (2015)).

ARGUMENT

I. **This Court Should Vacate the Judgment and Remand for Consideration of Issues of Venezuelan Law Unaddressed by the District Court.**

The Court's statement in its prior opinion that it would likely remand to the district court to assess Venezuelan law in the first instance is consistent with this Court's past practice. As this Court has recognized, remand is appropriate course of action when an appellate court identifies an issue of foreign law that was not addressed below. As the Court has noted, pursuant to Federal Rule of Civil Procedure 44.1, foreign law "determinations frequently call for fact-like procedures that a district court is better situated to implement," and thus "judicial economy" favors remand. *Bugliotti* v. *Republic of Argentina*, 952 F.3d 410, 414 (2d Cir. 2020). In *Bugliotti*, this Court remanded when its holding required consideration of a

15

matter of foreign law not addressed below, just as the Court of Appeals' decision has occasioned such analysis here. *See id.*; *accord Belleri* v. *United States*, 712 F.3d 543, 548 (11th Cir. 2013) ("disagree[ing]" that court of appeals should decide question of foreign law and remanding because, under Rule 44.1, "the court may consider any relevant material or source"). Consistent with this practice, as noted, the PDVSA Parties have agreed that this Court "'need not and should not' reach the merits of the Venezuelan legal questions unaddressed below." Appellants' Reply Br. 7 n.4 (quoting Appellees' Br. 13).

More broadly, this Court's "distinctly preferred practice [is] to remand [] issues for consideration by the district court in the first instance" when, as in this case, they were "briefed by the parties below, but the district court elected not to address them." *Schonfeld* v. *Hilliard*, 218 F.3d 164, 184 (2d Cir. 2000). This Court likewise routinely remands cases raising novel questions of law for consideration by the district court, particularly following intervening decisions of other courts. *See, e.g.*, *Agudath Israel of Am.* v. *Cuomo*, 983 F.3d 620, 634 n.19 (2d Cir. 2020) (remanding for district court to consider constitutional matter following intervening Supreme Court decision); *Vosse* v. *City of New York*, 594 F. App'x 52, 53 (2d Cir. 2015) (same); *Spiegel* v. *Schulman*, 604 F.3d 72, 83 (2d Cir. 2010) (remanding for district court to interpret New York City Human Rights Law and Restoration Act); *Ramos* v. *City of New York*, 298 F. App'x 84, 86 (2d Cir.

2008) (remanding for district court to consider statute of limitations following intervening Supreme Court decision).

The considerations of judicial economy animating these decisions carry particular weight here in light of the fact that the district court has already considered extensive briefing and expert reports and heard lengthy oral argument about relevant issues of Venezuelan law. Before the district court, the parties collectively submitted 67 pages of briefing and nine expert submissions, covering in excess of 400 pages and nearly 4,000 pages of exhibits, on issues of Venezuelan law. The transcript of oral argument on issues of Venezuelan law covers approximately 30 pages. The district court may well choose to rule on Venezuelan law without need for additional briefing or expert submissions.

The range and complexity of the Venezuelan legal issues in dispute also weigh in favor of remand. As the briefs and expert submissions presented to the district court reflect, a determination of whether National Assembly approval was required under Article 150 of the Venezuelan Constitution and whether the Governing Documents are nevertheless enforceable under the Venezuelan doctrines of legality and legitimate expectations encompasses a wide range of issues. Among other relevant issues addressed in the materials before the district court, these include:

- the significance of the *Andrés Velásquez* decision by Venezuela's highest constitutional court, including whether—as the PDVSA Parties' Venezuelan law expert repeatedly stated in published academic works over more than a

17

decade—that decision is a binding statement of Venezuelan constitutional law that contracts involving PDVSA are not as a matter of law contracts of national public interest requiring National Assembly approval;

- the relevance of the long history of contracts, including debt issuances, by PDVSA and its subsidiaries without seeking or obtaining National Assembly approval and without complaint by the National Assembly. Among other things, CITGO Holding has repeatedly incurred debt secured by its ownership interest in CITGO Petroleum, and CITGO Petroleum has repeatedly incurred debt secured by substantially all of its assets. *See* JA-5040-43¶¶471-77; JA-5048-49¶497-99. This practice has continued (again, with no objection by the National Assembly) under the ad hoc boards appointed by the Guaidó government and while this litigation was pending, including CITGO Petroleum's June 2020 issuance of $1.125 billion in notes secured by all of its principal assets;[4]

- the significance of the Organic Law of Financial Administration of the Public Sector, which (as former Special Attorney General Hernández acknowledged) exempts PDVSA's debt from any purported requirement for approval by the National Assembly; and

---

[4] Likewise, in October 2016, PDVSA granted a lien on 49.9% of the shares of CITGO Holding—all of the shares of that company not pledged in the Exchange Offer—to Rosneft Trading S.A. without seeking National Assembly approval. JA-5041¶474. The National Assembly did not object or purport to declare that transaction unlawful until 2020, while this litigation was pending, and just before the deposition of a PDVSA corporate representative for which the Trustee and the Collateral Agent had identified the Rosneft transaction as a topic. JA-4965-66¶¶314-15.

- whether Venezuelan law permitted PDVSA to elect to be bound by New York law with respect to the Governing Documents.[5]

*See* Dist. Ct. ECF 99 at 37-44; Dist. Ct. ECF 158, 23-24, 27-40; Dist. Ct. ECF 182 at 13-20.  The district court should also consider the unqualified legal opinions provided by PDVSA's counsel at Hogan Lovells to the Trustee, the Collateral Agent, and other parties to the Exchange Offer and the separate legal opinion Hogan Lovells provided to PDVSA, all of which concluded that the Exchange Offer and the Governing Documents were valid, binding, and

---

[5] As the Court is aware, U.C.C. section 8-110(a) provides that the validity of a security is governed by "the local law of the issuer's jurisdiction," and section 8-110(d), in turn, defines "issuer's jurisdiction" to mean *either* the law of the jurisdiction of incorporation (here, as to PDVSA, Venezuela) "or, if permitted by the law of that jurisdiction, the law of another jurisdiction specified by the issuer."  N.Y. U.C.C. § 8-110(a), (d). Appellees' Venezuelan law expert has explained that Venezuelan law permits PDVSA to select New York law in these circumstances. Venezuelan law liberally permits choice-of-law agreements, absent an express proscription—and there is no such proscription here.  *See* CA-96-97¶¶40-42; CA-1512-13¶¶43-45.  Appellees' Venezuelan law expert has explained that Article 151 of the Venezuelan Constitution permits the parties to contracts of national public interest to select foreign law if the application of Venezuelan law is inconsistent with the contracts' "nature." CA-1506-09¶¶ 29-35; CA-229.  While this Court and the Court of Appeals assumed that the "law of the issuer's jurisdiction" was that of Venezuela, *see PDVSA II*, 51 F.4th at 468; *PDVSA III*, 2024 WL 674251, at *4, neither court purported to address any issues of Venezuelan law, including whether Venezuelan law permits PDVSA as an issuer to specify the law of "another jurisdiction."  That issue, too, should be addressed by the district court on remand.

enforceable.  JA-1760; JA-1768; JA-1779; JA-1791; JA-4975¶335; JA-4984-87¶¶349-55; CA-507¶356; ECF 314.

Judicial efficiency would also be furthered by remand even if the district court determines that the PDVSA Parties executed the Governing Documents in violation of Article 150.  As the Court of Appeals noted, there are numerous unresolved issues relating to the consequences under New York law of alleged invalidity under Venezuelan law.  The Court of Appeals noted, for example, that the provisions of U.C.C. section 8-202 may render the 2020 Notes enforceable despite their alleged invalidity under Venezuelan law.  *PDVSA III*, 2024 WL 674251, at *4.  Additionally, the district court has yet to decide whether the Governing Documents may be enforceable under a range of other New York legal doctrines, including (i) New York public policy against enforcing discriminatory laws, (ii) New York law that alleged illegality is not a defense to an unconditional guaranty, (iii) the equitable defenses asserted by the Trustee and the Collateral Agent, including laches, estoppel, apparent authority, and ratification, (iv) the doctrine of *in pari delicto*, or (v) cases such as *Korea Life Insurance Co.* v. *Morgan Guaranty Trust Co. of N.Y.*, 269 F. Supp. 2d 424, 440-42 (S.D.N.Y. 2003), holding that courts applying New York law may enforce contracts that are alleged to be illegal under foreign law.  *See* SPA-66; JA-138-141¶¶98-104; Dist. Ct. ECF 99 at 26-28, 34-36; Dist. Ct. ECF 158 at 22-23, 40-44; Dist. Ct. ECF 182 at 9-10, 12-13.  The district court would also be asked to consider whether the Notes are nevertheless enforceable under the Venezuelan law doctrines of legality

and legitimate expectations.  *See* CA-58-64¶¶76-90; CA-144-62¶¶178-232; CA-219-20¶¶158-63.  And, as the Court noted in its prior opinion, the district court may well in that circumstance need to address the counterclaims asserted by the Trustee and the Collateral Agent for unjust enrichment, quantum meruit, and breach of warranty.  *PDVSA II*, 51 F.4th at 465 n.5.

Since the Court of Appeals rendered its decision, at least one commenter has suggested that this Court might vacate the judgment only to the extent that it authorizes the Trustee and the Collateral Agent to enforce the Pledge Agreement and leave in place the money judgment against PDVSA and the guarantor.[6]  The import of this suggestion is apparently that the Trustee and the Collateral Agent cannot as a practical matter enforce a money judgment against any assets or entities in Venezuela, and that a partial vacatur might somehow minimize the amount of prejudgment interest payable by the PDVSA Parties if the Court ultimately rules that the Notes and the Pledge are enforceable.  (Prejudgment interest has been accruing at an annual rate of approximately 0.1% since the entry of judgment by the district court, a level that is far below current market rates.)

If the PDVSA Parties argue for that disposition, the Court should reject it out of hand.  The PDVSA Parties appealed from the entire judgment, and they have consistently argued, including in this Court and in

---

[6]  *Clauses & Consequences*, Episode 129 (Mar. 11, 2025) https://podcasts.apple.com/us/podcast/clauses-controversies/id1528208049?i=1000648758306.

21

the Court of Appeals, that the Venezuelan Constitution rendered all of the Governing Documents—including the Notes and the Pledge—invalid. See, e.g., JA-5247-48; Appellants' Br. 14-19; Appellants' Br. 59, PDVSA III (No. CTQ-2022-00003). If the PDVSA Parties concede or the Court concludes that the Notes are valid and enforceable, then of course the Court should rule accordingly. And in that event, there would be no basis for invalidating the Pledge under Venezuelan law, because, as discussed above p. 3, the pledgor, PDVH, is not a Venezuelan entity and did not issue securities, and thus is not subject to Venezuelan law. But the Court should not countenance efforts by the PDVSA Parties to pursue claims that the Notes are invalid while at the same time gaming the procedures of this Court to minimize their downside risk if they do not prevail.

This Court's practice and the interests of judicial efficiency would be best served by vacating the judgment and remanding this case to the district court, as this Court stated it was likely to do, for the resolution of a range of issues it has not previously addressed.

## II.    No Further Consideration of the Act-of-State Doctrine Is Warranted Before It Is Determined Whether the Governing Documents Are Valid Under Venezuelan Law and Enforceable Under the Law of New York.

The Court need not and should not revisit the act-of-state doctrine until the district court has had an opportunity to address whether the Governing Documents are valid under Venezuelan law and, if they are not, the consequences of any such defect of validity under New York law.

22

This conclusion is clear from the Court's prior decision and the decision by the Court of Appeals. This Court concluded that the act-of-state doctrine does not "require a departure from ordinary choice-of-law analysis in determining *the legal consequences in the United States of a foreign sovereign act*." *PDVSA II*, 51 F.4th at 467 (emphasis added). As the Court explained, the act-of-state doctrine requires the courts to "accept as valid the acts of foreign sovereigns taken within their own jurisdictions." *Id.* at 466. But the doctrine "does not preclude courts from imposing extraterritorial legal consequences arising from that act in accordance with applicable law." *Id.* at 467. Accordingly, it concluded, "the choice-of-law analysis [is] a necessary antecedent to the act-of-state analysis in this case." *Id.*

As the Court also explained, the choice-of-law analysis encompasses two distinct issues. *First*, it must be determined whether, as the PDVSA Parties contend, the 2015 National Assembly engaged in a sovereign act "that had the legal effect under Venezuelan law of rendering the Governing Documents void from the beginning." *Id. Second*, if so, the courts must apply "ordinary choice-of-law analysis" to determine "the legal consequences in the United States" of such an act. *Id.* As the Court of Appeals decision makes clear, New York choice-of-law doctrine requires that the "legal consequences" of any alleged invalidity of the Governing Documents under Venezuelan law be determined by the law of New York. *PDVSA III*, 2024 WL 674251, at *9.

23

Thus, no court must adjudicate the validity of any sovereign act by the Republic, and the act-of-state doctrine is accordingly not implicated, if *either* the Exchange Offer was not invalid under Venezuelan law *or* the Governing Documents are nevertheless enforceable under New York choice-of-law. Neither of these issues has yet been addressed by the district court (or any other court in this case), and the district court should be permitted to consider them in the first instance.

The PDVSA Parties' challenge to the enforceability of the Pledge does not implicate the act-of-state doctrine for the additional, independent reason that the pledgor, PDVH, is not a Venezuelan entity. As this Court recognized in this case, and consistent with its decision in *Allied Bank*, the act-of-state doctrine applies only to acts of foreign sovereigns "taken within their own jurisdictions." *PDVSA II*, 51 F.4th at 466. PDVH is not located within Venezuela. It is a Delaware corporation with its principal place of business in Texas. Its only material asset is its ownership interest in CITGO Holding and its indirect ownership interest in CITGO Petroleum, both of which, like PDVH, are Delaware corporations with their principal places of business in Texas. SPA-5; SPA-10; JA-4853¶¶16, 21, 23. The act-of-state doctrine does not require the Court to defer to any alleged act by the Republic purporting to bind PDVH outside Venezuela.The same result follows under New York choice-of-law doctrine. The Court of Appeals emphasized that "Venezuelan law applies here only as to the validity of the securities issued by a Venezuelan entity, not as to the other actions arising

24

from or related to the transaction," which are governed by New York law. *PDVSA III*, 2024 WL 674251, at *6. Thus, under this New York choice-of-law principle, the Pledge by PDVH is governed by New York law as provided in the Pledge Agreement, not by Venezuelan law.

The PDVSA Parties argued in their principal brief that the district court was required by the act-of-state doctrine to rule that the Exchange Offer was rendered invalid by the National Assembly's September 2016 resolution notwithstanding New York choice-of-law principles. Appellants' Br. 16-18, 21-30. That argument, however, is now foreclosed by the Court's decision that the act-of-state doctrine does not require any "departure from ordinary choice-of-law analysis in determining the legal consequences in the United States of a foreign sovereign act." *PDVSA II*, 51 F.4th at 456.

The act-of-state doctrine does not apply for the additional reason that, as explained more fully in Appellees' principal brief, the district court correctly determined that neither the September 2016 Resolution nor any official act of the Republic predating the Exchange Offer purported to invalidate the 2020 Notes or the Pledge. Appellees' Br. 31-40. Thus, because the Resolution does not "purport to have" the "legal effect[]" of invalidating the Exchange Offer, the act-of state doctrine does not justify invalidating the Governing Documents. *Celestin* v. *Caribbean Air Mail, Inc.*, 30 F.4th 133, 140 (2d Cir. 2022) (noting that, "[w]hen applicable," the act-of-state doctrine

25

requires the court to assume that a foreign state's official acts within that state's territory "have the legal effects . . . that they purport to have").[7]

The PDVSA Parties also argued that the act-of-state doctrine requires the Court to hold that the Governing Documents are invalid based upon the National Assembly's "decision to withhold authorization" from the Exchange Offer. Appellants' Br. 26. But that argument is bootstrapping. It rests on the assumption that National Assembly authorization was required by Venezuelan law. If Venezuelan law required no such authorization, then the absence of authorization has no legal effect under Venezuelan law and is not a sovereign act of the Republic. For the reasons discussed above, the district court should determine that issue of Venezuelan law in the first instance. In any event, the district court correctly held that mere inaction lacks the "formality" required to constitute an act of state—particularly inaction that has no consequence under the Republic's own law. *See* Appellees' Br. 36-37.

Finally, as discussed in Appellees' principal brief, the act-of-state doctrine does not apply here for the further reason that the September 2016

---

[7]  In contrast to the September 2016 Resolution, the National Assembly's October 2019 Resolution, JA-118—issued some three years after the Exchange Offer closed—expressly declared the Exchange Offer void and invalid under Article 150. But as this Court recognized, "[o]ur decision in *Allied Bank* forecloses any argument that the October 2019 Resolution could operate on its own to retroactively void the 2020 Notes, Indenture, and Pledge Agreement." *PDVSA II*, 51 F.4th at 466 n.6.

Resolution was not the act of a sovereign. Appellees' Br. 48-51. At the time of the Exchange Offer, the United States recognized the Maduro government as the legitimate government of Venezuela. The National Assembly's Resolution criticizing the Maduro government's actions in authorizing the Exchange Offer does not change that fact. The district court concluded that the recognition by the United States of the Guaidó administration in 2019 retroactively rendered the National Assembly the sovereign in 2016. SPA-26. But U.S. recognition of a new government in a constitutional transition such as occurred in 2019 does not render actions by the prior government invalid.[8] By analogy, it would be absurd to argue that when the U.S. recognizes a new government in France following a national election, that recognition operates retroactively to invalidate actions taken by the prior government. The district court's rationale was erroneous, and the Court can determine that the act-of-state doctrine does not apply for that reason as well.

### CONCLUSION

This Court should vacate the judgment and remand this case to the district court for determination of whether the Governing Documents are invalid under Venezuelan law and, if necessary, to assess other relevant issues discussed above.

---

[8] The same logic would call into question actions by the Guaidó government itself, which the National Assembly dissolved more than a year ago. *See* Respondents' Limited Opposition to Motion of the 2015 National Assembly at 9-14, *PDVSA III* (No. CTQ-2022-00003).

Dated:     New York, New York
           March 19, 2024

Respectfully submitted,

PAUL, WEISS, RIFKIND,
   WHARTON & GARRISON LLP

By: _____
       Jonathan H. Hurwitz
1285 Avenue of the Americas
New York, New York 10019-6064
Telephone: 212-373-3000
Facsimile: 212-757-3990
jhurwitz@paulweiss.com

PAUL, WEISS, RIFKIND,
   WHARTON & GARRISON LLP
Roberto J. Gonzalez
2001 K Street, NW
Washington, DC 20006-1047
Telephone: 202-223-7300
rgonzalez@paulweiss.com

*Attorneys for Defendants-Counter-
Claimants-Appellees MUFG Union
Bank, N.A. and GLAS Americas
LLC in their respective capacities as
Trustee and Collateral Agent under
the Indenture dated October 27, 2016,
and the Pledge and Security
Agreement dated October 28, 2016,
governing PDVSA's Senior Secured
Notes due 2020
(as to issues of U.S. law only)*

LATHAM & WATKINS LLP
Matthew S. Salerno
1271 Avenue of the Americas
New York, New York 10020
Telephone: 212-906-1200
Facsimile: 212-751-4864
matthew.salerno@lw.com

*Attorneys for Defendants-Counter-
Claimants-Appellees MUFG Union
Bank, N.A. and GLAS Americas
LLC in their respective capacities as
Trustee and Collateral Agent under
the Indenture dated October 27,
2016, and the Pledge and Security
Agreement dated October 28, 2016,
governing PDVSA's Senior Secured
Notes due 2020*

28

## Certificate of Compliance

I, Jonathan H. Hurwitz, attorney for the Defendants-Counter-Claimants-Appellees, hereby certify that this brief conforms to the type-volume requirements of Fed. R. App. P. 32(a)(7) and Local Rule 32.1(a)(4), because this brief contains 6,994 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f). This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in Century Expanded BT 14-point font.

Dated:   New York, New York
          March 19, 2024

Jonathan H. Hurwitz

# EXHIBIT E

# 20-3858-cv(L), 20-4127-cv(CON)

## United States Court of Appeals

*for the*

## Second Circuit

PETRÓLEOS DE VENEZUELA S.A., PDV HOLDING, INC.,
PDVSA PETRÓLEO S.A.,

*Plaintiffs-Counter-Defendants-Appellants,*

– v. –

MUFG UNION BANK, N.A., GLAS AMERICAS LLC,

*Defendants-Counter-Claimants-Appellees.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

### SUPPLEMENTAL BRIEF OF PLAINTIFFS-COUNTER-DEFENDANTS-APPELLANTS PETRÓLEOS DE VENEZUELA, S.A., PDVSA PETRÓLEO, S.A., AND PDV HOLDING, INC.

NICHOLAS REDDICK
WILLKIE FARR & GALLAGHER LLP
333 Bush Street
San Francisco, California 94104
(415) 858-7400

MICHAEL J. GOTTLIEB
KRISTIN E. BENDER
WILLKIE FARR & GALLAGHER LLP
1875 K Street, NW
Washington, DC 20006
(202) 303-1000

JEFFREY B. KORN
WILLKIE FARR & GALLAGHER LLP
787 Seventh Avenue
New York, New York 10019
(212) 728-8000

*Counsel for Plaintiff-Counter-Defendant-Appellant PDV Holding, Inc.*

KURT W. HANSSON
JAMES FERGUSON
PAUL HASTINGS LLP
200 Park Avenue
New York, New York 10166
(212) 318-6000

IGOR V. TIMOFEYEV
PAUL HASTINGS LLP
2050 M Street, NW
Washington, DC 20036
(202) 551-1700

*Counsel for Plaintiffs-Counter-Defendants-Appellants Petróleos De Venezuela S.A. and PDVSA Petróleo S.A.*

# **TABLE OF CONTENTS**

Page

INTRODUCTION ............................................................................1

    A.    THE PROCEEDINGS BELOW ........................................3

    B.    THIS COURT'S CERTIFICATION DECISION ................................4

    C.    THE NEW YORK COURT OF APPEALS' DECISION ...................5

ARGUMENT .................................................................................6

I.    THIS COURT SHOULD REVERSE THE LOWER COURT'S MISAPPLICATION OF THE ACT-OF-STATE DOCTRINE AND GIVE LEGAL EFFECT TO THE NATIONAL ASSEMBLY'S DISAPPROVAL OF THE EXCHANGE........................................6

    A.    The Applicability of the Act-of-State Doctrine Is Ripe for This Court's Decision.............................................................7

    B.    The District Court's Refusal to Accept the Validity of the National Assembly's Sovereign Acts Violates the Act-of-State Doctrine. ..............................................................8

        1.    The May 2016 Resolution........................................10

        2.    The September 2016 Resolution.............................12

    C.    The Republic's Official Interpretation of Venezuelan Law Removes Any Doubt as to the Legal Effect of the National Assembly's Sovereign Acts. .............................................19

    D.    The National Assembly Remains the Recognized Sovereign Government of Venezuela.................................................22

II.    ALTERNATIVELY, THE COURT SHOULD REMAND FOR CONSIDERATION OF THE NOTES' VALIDITY UNDER VENEZUELAN LAW....................................................25

CONCLUSION .................................................................................30

ii

# TABLE OF AUTHORITIES

**Cases**                                                                 **Page(s)**

*Allied Bank International v. Banco Credito Agricola de Cartago,*
   757 F.2d 516 (2d Cir. 1985) ...............................................9

*Animal Sci. Prod. Inc. v. Hebei Welcome Pharm. Co.,*
   585 U.S. 33 (2018)................................................8, 19, 27

*Bigio v. Coca-Cola Co.,*
   239 F.3d 440 (2d Cir. 2000) ...............................................24

*Bogle-Assegai v. Connecticut,*
   470 F.3d 498 (2d Cir. 2006) ...............................................28

*Branch of Citibank, N.A. v. De Nevares,*
   74 F.4th 8 (2d Cir. 2023) ...............................................26

*Celestin v. Caribbean Air Mail, Inc.,*
   30 F.4th 133 (2d Cir. 2022) ...............................9, 10, 16, 17

*Fed. Treasury Enter. Sojuzplodoimport v. Spirits Int'l B.V.,*
   809 F.3d 737 (2d Cir. 2016) ...............................................17

*Karaha Bodas Co. v. Perusahaan Pertambangan Minyak Dan Gas
   Bumi Negara,*
   313 F.3d 70 (2d Cir. 2002) ...............................................21

*Konowaloff v. Metro. Museum of Art,*
   702 F.3d 140 (2d Cir. 2012) ...............................................16

*McCulloch Orthopaedic Surgical Servs., PLLC v. Aetna Inc.,*
   857 F.3d 141 (2d Cir. 2017) ...............................................20

*Oetjen v. Cent. Leather Co.,*
   246 U.S. 297 (1918)................................................24

*Parmalat Cap. Fin. Ltd. v. Bank of Am. Corp.,*
   671 F.3d 261 (2d Cir. 2012) ...............................................17, 29

*Petróleos de Venezuela S.A. v. MUFG Union Bank, N.A.*,
 --- N.E.3d ---, 2024 WL 674251 (N.Y. Feb. 20, 2024) ..............................*passim*

*Petróleos de Venezuela S.A. v. MUFG Union Bank, N.A.*,
 51 F.4th 456 (2d Cir. 2022) ...................................................................*passim*

*Porter v. Potter*,
 366 F. App'x 195 (2d Cir. 2010) .......................................................26

*Roldan v. Racette*,
 984 F.2d 85 (2d Cir. 1993) ...............................................................29

*Roswell Cap. Partners LLC. v. Beshara*,
 436 F. App'x 34 (2d Cir. 2011) .........................................................18

*Sompo Japan Ins. Co. of Am. v. Norfolk S. Ry. Co.*,
 762 F.3d 165 (2d Cir. 2014) .............................................................28

*Underhill v. Hernandez*,
 168 U.S. 250 (1897)...........................................................................24

*Unisys Fin. Corp. v. Resolution Trust Corp.*,
 979 F.2d 609 (7th Cir. 1992) ............................................................18

*United States v. Trabelsi*,
 28 F.4th 1291 (D.C. Cir. 2022)..........................................................16

*In re: Vitamin C Antitrust Litigation*,
 8 F.4th 136 (2d Cir. 2021) ................................................................27

**Statutes**

UCC § 8-202(b)(1)..................................................................................29

UCC § 8-202(b)(2)..................................................................................30

**Other Authorities**

U.S. Dep't of State, Press Briefing by Spokesperson Ned Price (Jan. 3,
 2023) ..................................................................................................23

U.S. Dep't of State, *U.S. Relations with Venezuela*, Bilateral Relations
 Fact Sheet (June 27, 2023).................................................................23

U.S. Dep't of State, *Venezuela's Interim Government and the 2015 National Assembly* (Jan. 3, 2023) ....................................................23

## INTRODUCTION

When this appeal was last before it, this Court certified to the New York Court of Appeals "determinative questions of New York law," including whether UCC § 8-110 required that the validity of the Exchange Offer and the Governing Documents at issue be determined under the law of Venezuela, "the local law of the issuer's jurisdiction." *Petróleos de Venezuela S.A. v. MUFG Union Bank, N.A.*, 51 F.4th 456, 474-76 (2d Cir. 2022). The Court noted that these questions were "a necessary antecedent to the potential application of the act-of-state doctrine in this case," and reserved judgment on that question "pending resolution of the choice-of-law issues." *Id.* at 466-67. The Court further observed that if the New York Court of Appeals "concludes Venezuelan law applies to the particular issue of PDVSA's legal authority to execute the Exchange Offer," then this Court "would likely remand for an assessment of Venezuelan law on that question." *Id.* at 475.

The New York Court of Appeals has now resolved the pertinent choice-of-law question, holding that "Venezuelan law governs the validity of the notes under Uniform Commercial Code § 8-110(a)(1)," including "whether the issuance of the notes was duly authorized by the Venezuelan National Assembly under the Venezuelan Constitution." *Petróleos de Venezuela S.A. v. MUFG Union Bank, N.A.*, --- N.E.3d ---, 2024 WL 674251, at *1 (N.Y. Feb. 20, 2024). Following that holding, this Court should resolve the "reserve[d]" question of whether the Exchange Offer

(and the 2020 Notes) are invalid under the act-of-state doctrine, under which federal courts must "accept as valid the acts of foreign sovereigns taken within their own jurisdictions." 51 F.4th at 466-67 (quoting *W.S. Kirkpatrick & Co. v. Env't Tectonics Corp., Int'l*, 493 U.S. 400, 409 (1990)). In this case, the act-of-state doctrine mandates a conclusion that the National Assembly's disapproval of the Exchange Offer in 2016 rendered that transaction invalid under Venezuela law.

The district court erred in speculating as to the legal effects of the National Assembly's sovereign acts. Under the act-of-state doctrine, the lower court was required to give effect to the National Assembly's resolutions, which sought to "assert its constitutional authority over national public interest contracts—including explicitly rejecting the plan to pledge control of CITGO." *Id.* at 459. Accepting that premise, this Court need not remand for a determination of Venezuelan law; instead, it should remand for consideration of the Creditors' various equitable defenses. If this Court affirms the district court's act-of-state holding, it should remand the case for the lower court to determine, in the first instance, whether the issuance of the 2020 Notes was valid under Venezuelan law. If the Court orders a remand, it should provide the district court with guidance regarding the reopening of the summary judgment record, the proper weight to be given to the Republic of Venezuela's views concerning its own laws, and the potential applicability of defenses to invalidity under UCC § 8-202.

2

## PROCEDURAL HISTORY

### A.    THE PROCEEDINGS BELOW

The PDV Entities brought this action in October 2019, seeking a judgment declaring the 2020 Notes invalid because of the National Assembly's refusal to authorize the Exchange. In response, the Creditors asserted various defenses and counterclaims. The parties cross-moved for summary judgment. The district court denied summary judgment to the PDV Entities and granted partial summary judgment to the Creditors. SPA-67-68.

The district court acknowledged that the National Assembly's resolutions rejecting the Exchange constituted official acts of a foreign sovereign. SPA-23-27. The court refused, however, to give effect to those resolutions under the act-of-state doctrine, SPA-20-47, declining to defer to the Republic of Venezuela's formal interpretation of its legislature's resolutions, SPA-38-42, and relying entirely on its own textual analysis of those enactments. SPA-33-38.

The district court also held that New York law—rather than Venezuelan law—governed the Notes' validity. SPA-47-49. The court asserted that the requirements of Article 150 of the Venezuelan Constitution were irrelevant to the "validity of a security" under UCC § 8-110, because that provision "has a far narrower understanding" that excludes "illegality, or incapacity, or lack of authority." SPA-49-55. The court also rejected the relevance of Venezuelan law

3

under New York's common law choice-of-law rules. SPA-60-65.

The district court entered final judgment but stayed its enforcement in part pending appeal. *See* SPA-69-72.

### B.   THIS COURT'S CERTIFICATION DECISION

On appeal, this Court found that this case raises "determinative questions of New York law" that "have not been addressed by the New York Court of Appeals." 51 F.4th at 474-75. The Court accordingly certified three questions to the New York Court of Appeals (the "NYCOA"): (*i*) whether New York's UCC § 8-110(a)(1) required that the Governing Documents' validity be determined under the law of Venezuela, "the local law of the issuer's jurisdiction"; (*ii*) whether other New York common law choice-of-law principles mandated application of Venezuelan law to that question; and (*iii*) whether New York law nonetheless rendered the Governing Documents valid. *Id.* at 475-76.

The Court observed that "resolution of the New York choice-of-law issues is a necessary antecedent to the potential application of the act-of-state doctrine in this case." *Id.* at 466. As the Court explained, the PDV Entities argued that "the absence of National Assembly approval, the 2016 resolutions, or some combination thereof, were sovereign acts that had the legal effect under Venezuelan law of rendering the Governing Documents void from the beginning. But if the PDV Entities' contractual obligations (or lack thereof) do not turn on the status of the Exchange Offer *under*

4

*Venezuelan law*, the act-of-state doctrine is not implicated." *Id.* at 466-67 (footnote omitted). For that reason, the Court "reserve[d] judgment on the act-of-state argument pending resolution of the choice-of-law issues." *Id.* at 467.

### C.    THE NEW YORK COURT OF APPEALS' DECISION

In answering this Court's first certified question, the NYCOA held that "[m]atters going to the 'validity of [the] security' at issue here, that is the 2020 Notes, are governed by the law of Venezuela—i.e., [ ] 'the local law of the issuer's jurisdiction' under UCC 8-110(a)(1)." 2024 WL 674251, at *4. Given its answer, the court did not reach the second and third certified questions. *Id.*

The NYCOA first noted that, under New York law, UCC § 8-110(a)(1)'s requirement that "[t]he local law of the issuer's jurisdiction, as specified in subsection (d), governs … the validity of a security" is "a mandatory rule." *Id.* at *5 (alterations in original). Then, the court explained that "while determining a security's validity generally involves inquiring into whether corporate formalities were observed, it also implicates constitutional provisions of the issuer's jurisdiction that speak to whether a security is duly authorized." *Id.* at *8. Applying that principle to this case, the court reasoned that "Article 150 and its related constitutional provisions" could render the 2020 Notes invalid under the UCC because "they speak to whether an entity has the power or authority to issue a security, and relatedly, what *procedures* are required to exercise such authority." *Id.* at *6, *8 (citing UCC

§ 8-202, Official Comment 3). As the court observed,

> Article 150 requires "approval of the National Assembly" before certain "national public interest contract[s]" "shall be executed." Section 9 of Article 187 states that "[i]t is the role of the National Assembly to ... [a]uthorize" such contracts. By their terms, these provisions may address the procedural requirements and approvals necessary for— and present a discrete limitation on—the authority of certain public entities to enter into "national public interest contracts."

*Id.* at *8. Thus, "Article 150 specifically references the actual authority and process required for due authorization of national public interest contracts, which may include an issuance of securities under Venezuelan Law." *Id.* (citation omitted). The court "le[ft] for the federal courts to determine" "whether, under those constitutional provisions, failure to receive authorization from the National Assembly prior to issuing the 2020 Notes means that the notes were invalid under the law of Venezuela at the time of their issuance." *Id.* at *9.

## **ARGUMENT**

## I. **THIS COURT SHOULD REVERSE THE LOWER COURT'S MISAPPLICATION OF THE ACT-OF-STATE DOCTRINE AND GIVE LEGAL EFFECT TO THE NATIONAL ASSEMBLY'S DISAPPROVAL OF THE EXCHANGE.**

The NYCOA's choice-of-law holding means that this Court can and should adjudicate the district court's resolution of the act-of-state and comity issues. Under the NYCOA's interpretation of "validity," there is no way for the district court to proceed without resolving "a claim or defense" in a manner that "requires

6

adjudication of the validity of a foreign sovereign act." 51 F.4th at 466. And, under this Court's precedents, that analysis must begin with the assumption "that a foreign state's official acts executed within that state's territory are valid in that they have the legal effects … that they purport to have." *Id.* (quoting *Celestin v. Caribbean Air Mail, Inc.*, 30 F.4th 133, 140 (2d Cir. 2022)).

This Court should reverse the district court's determination that the National Assembly's resolutions had no legal effect on the Exchange. SPA-33-38. That holding misread the text of the National Assembly's 2016 resolutions and cast aside the Republic of Venezuela's contrary interpretation, in violation of the act-of-state doctrine's bar against "questioning the validity of the foreign act on the ground that it did not comply with that sovereign's own legal requirements … or U.S. law or policy." 51 F.4th at 467 (quoting Restatement (Fourth) of Foreign Relations Law § 441 cmt. (a)). This Court should reverse and hold that the National Assembly's "assert[ion of] its constitutional authority over national public interest contracts— including explicitly rejecting the plan to pledge control of CITGO," *id.* at 459, was a rule of decision establishing the *ab initio* invalidity of the Exchange under Venezuelan law.

### A. The Applicability of the Act-of-State Doctrine Is Ripe for This Court's Decision.

Whether the Notes were validly issued under Venezuelan law requires a determination of what legal effect the "failure to receive authorization from the

7

National Assembly prior to issuing the 2020 Notes" had under Venezuelan law. 2024 WL 674251, at *9. The National Assembly's rejection of the Exchange Offer is not only relevant to that inquiry on the merits, but also implicates the act-of-state doctrine. *See* 51 F.4th at 466 (citing *Kirkpatrick*, 493 U.S. at 409).

The district court has adjudicated the applicability of the act-of-state doctrine and the weight due to the Republic's position. *See* SPA-20-47; *see also* 51 F.4th at 464-65. In so holding, the court made two distinct errors. First, it improperly held that the National Assembly's resolutions had no legal effect on the Exchange. SPA-33-35. Second, the court erred in rejecting the Republic's interpretation of the intent and legal effect of those resolutions under Venezuelan law, *see* SPA-37-42, violating the principle that a foreign government's views on the meaning of its own laws be accorded "substantial … weight," *Animal Sci. Prod. Inc. v. Hebei Welcome Pharm. Co.*, 585 U.S. 33, 46 (2018).

This Court should now adjudicate what it earlier reserved. Indeed, the act-of-state and comity questions are potentially dispositive: accepting the National Assembly's resolutions as the rule of decision regarding the validity of the Governing Documents would foreclose further inquiry into the merits of Venezuelan law.

**B.    The District Court's Refusal to Accept the Validity of the National Assembly's Sovereign Acts Violates the Act-of-State Doctrine.**

The district court correctly recognized that the National Assembly was

sovereign for purposes of the act-of-state doctrine in 2016, SPA-24, and that the National Assembly's resolutions constituted "official acts of a foreign sovereign," SPA-23; *see also* ECF No. 142 ("O.B.") 12. The court's next step should have been to accept those official sovereign acts as rules of decision—in other words, to "assume" they were "valid in that they have the legal effects … that they purport to have." *Celestin v. Caribbean Air Mail, Inc.*, 30 F.4th 133, 140 (2d Cir. 2022).

Instead, the district court ruled that this Court's decision in *Allied Bank International v. Banco Credito Agricola de Cartago*, 757 F.2d 516 (2d Cir. 1985), rendered the act-of-state doctrine inapplicable. SPA-30-31. Rather than accepting the resolutions at face value, the district court deconstructed them to discern whether, in the court's view, they amounted to "judicially enforceable takings" in Venezuela. SPA-27. As the PDV Entities have explained, that framing was backwards. *See* O.B. 16-17, 39-43; ECF No. 214 ("Reply") 10-13.

It is now established that Venezuelan law controls whether the 2020 Notes ever came into legal existence. As such, the court's assumption under *Allied Bank* that this case involves a debt sited in New York can no longer be justified, because no "valid" debt was ever created under the UCC absent satisfaction of the requirements of the Venezuelan Constitution. *See* SPA-27, 30-31; *Allied Bank*, 757 F.2d at 521-22; 2024 WL 674251, at *4, *6. The district court's discussion of *Allied Bank*, including its references to discouraging retroactive debt repudiation and

9

protecting New York's status as a commercial center, SPA-31, has no relevance to the "validity" of the Exchange under the UCC.

The district court's inverted framing colored its erroneous conclusions that the National Assembly's withholding of authorization lacked the necessary "degree of formality" SPA-33 n.6,[1] and that the National Assembly's resolutions suffered from "textual deficiencies," SPA-37, which precluded their recognition as "judicially enforceable takings." *See* SPA-27. In highlighting what it perceived as a "mismatch between the National Assembly's sovereign acts and *the putative legal significance of those acts*," SPA-27 (emphasis added), the district court refused to "assume" that the resolutions were "valid in that they have the legal effects … that *they purport to have*." *Celestin*, 30 F.4th at 140 (emphasis added).

### 1. The May 2016 Resolution

The National Assembly's May 2016 Resolution provides vital context regarding its intent when, just four months later, it enacted the September 2016 Resolution categorically rejecting the Exchange Offer. *See* O.B. 27-29. The district court, however, concluded that the May 2016 Resolution was irrelevant based on its mistaken view that the Resolution's "own terms … very clearly cabined" its reach

---

[1] A sovereign's act of withholding authorization warrants the same treatment as the grant of authorization because the act-of-state doctrine rests on the exercise of sovereign power rather than any particular form. *See* O.B. 26-27 & n.7. The exercise of sovereign power in this manner is recognized by and enshrined in constitutions of nations around the world. *See* ECF No. 147-2 at 12-17.

exclusively to "contracts of national … public interest concluded by and between the National Executive" (thereby excluding contracts concluded by state-owned entities such as PDVSA). SPA-34-35.

The district court misread the May 2016 Resolution. The resolution responded directly to the Maduro regime's issuance of an "emergency" decree intended to empower the "National Executive" to execute certain national public interest contracts without legislative authorization. JA-2612-13 ¶ 68; O.B. 28. But, as the Republic has explained, the resolution's pronouncements went well beyond contracts with the National Executive, consistent with both the text of Article 150 and the National Assembly's historical practice. *See* ECF No. 146 ("Republic *Amicus* Br.") 29-30; *see also* JA-3516 (declaring "*any* activity carried out by an organ that usurps the constitutional functions of another public authority is *null and void* and shall be considered *non-existent*") (emphasis added); JA-3514-16 (referencing "corresponding companies" implicated by Article 150); O.B. 28. Nothing in Article 150's text distinguishes between contracts executed by the "National Executive" versus contracts executed by other entities within Venezuela's National Public Administration, such as PDVSA—"a corporation anchored to state ownership by constitutional mandate." 51 F.4th at 468. Indeed, the National Assembly has historically exercised its Article 150 authority over PDVSA contracts. *See* Republic *Amicus* Br. 5 ("[I]n 2006, the National Assembly invoked its

11

constitutional authority under Article 150 to authorize a joint venture agreement between a PDVSA subsidiary and foreign corporations.") (citing JA-903).

In sum, the district court seemed to presume that, in its May 2016 Resolution, the National Assembly intended to interpret Article 150 to define national public interest contracts as arising *only* when the National Executive signs them. There is no support for that presumption in the resolution, and it is flatly inconsistent with the National Assembly's historical practice and contemporaneous acts, and the Republic's representations to this Court.

## 2. The September 2016 Resolution

The district court concluded that—notwithstanding the National Assembly's categorical rejection of the Exchange—the September 2016 Resolution did not invalidate the 2020 Notes. But the resolution explicitly invoked the National Assembly's authority under Article 187(9), which provides the National Assembly with the exclusive power to "[a]uthorize contracts of municipal, state[,] and national public interest, with States or official foreign entities or with companies not domiciled in Venezuela." Venezuelan Const., Art. 187(9), JA-86, *quoted in* 51 F.4th at 462. Article 187(9) contains a single authority—the authority to approve (or not) national public interest contracts; and the September 2016 Resolution was aimed at a single transaction—the Exchange Offer. Thus, it follows that the National Assembly invoked its Article 187(9) *approval* authority with respect to the

Exchange Offer, and went further by "reject[ing] categorically" the proposed Exchange Offer, summoning the President of PDVSA to testify about the transaction, and instructing PDVSA to provide the National Assembly with an alternative plan for addressing its indebtedness. JA-111.

The district court misinterpreted the September 2016 Resolution, reasoning that, because the resolution had referred to the National Assembly's "power to obtain information about … any transaction that commits PDVSA's assets as collateral" and had urged "the Public Ministry to open an investigation," the National Assembly's intent in invoking Article 187(9) must have been limited to "substantiat[ing] its desire to investigate the Exchange Offer." SPA-36. But the National Assembly's power to investigate and obtain information is contained within Article 187(3), whereas Article 187(9) is limited to the Assembly's exclusive approval authority. Given the Resolution's earlier citation of Article 187(3), it would have been superfluous and incoherent for the National Assembly to cite Article 187(9) to substantiate an investigation.

Article 187(9) does not contemplate that the National Assembly must enact a formal resolution of disapproval in order to exercise its approval authority. Instead, under Articles 150 and 187(9), unless the National Assembly *approves* a proposed national public interest contract, it may not be validly issued. *See* O.B. 26; Reply 5. Even if, *arguendo*, the Assembly had intended the September 2016 Resolution to

13

justify further investigation, that decision itself conveys the National Assembly's withholding of requisite approval. Here, though, the call for investigation was accompanied by a rejection of the key terms of the Exchange and a demand for an alternative plan. As the Republic has explained, the legal effect of the Assembly's resolution deprived the Maduro regime of legal authority to execute that transaction under Article 150. *See* Republic *Amicus* Br. at 17-18; *see also* O.B. 25; Reply 6-7.[2]

In the same vein, the Resolution's reference to whether the "current transaction protects the National Property, in accordance with articles 187, section 9, 302 and 303 of the Constitution" does not suggest that the National Assembly doubted Article 187(9)'s applicability to the Exchange. Whether the Exchange "protects the National Property" does not determine the transaction's status as a national public interest contract under Article 150 or 187(9) (neither of which references that concept), but is relevant to whether the proponents of the Exchange had complied with the constitutional requirement (established by Articles 302 and 303) to safeguard PDVSA and the Republic's related strategic assets. The September 2016 Resolution's invocation of the National Assembly's authority to approve the "current transaction," demand for testimony by PDVSA's President, and

---

[2] In calling for an investigation by the Public Ministry, *see* SPA-36, the National Assembly was not announcing an investigation into whether the Exchange constituted a national public interest contract. Instead, it asked the Public Ministry, an organ of the executive branch, to investigate the Maduro regime actors orchestrating what appeared to be a financially ruinous transaction. *See* O.B. 25.

14

requirement that PDVSA present a different plan—all exercised Article 187 *disapproval* authority in light of the Assembly's judgment that the Exchange failed to "protect the National Property" under Articles 302 and 303.

The September 2016 Resolution's plain meaning is consistent with the Republic's considered explanation set out in its submissions to this Court, *see* Republic *Amicus* Br. 17, and the National Assembly's October 2019 Resolution, *see* O.B. 29-30.[3] It is also consistent with contemporaneous floor statements by members of the National Assembly, as well as a contemporaneous legal opinion commissioned by the National Assembly. Republic *Amicus* Br. 9 (citing opinion of Professor Carmona Borjas that the Exchange was "without doubt … a national public interest contract" that "will always require the authorization of the National Assembly") (quoting JA-2616). This understanding is also evident in contemporaneous third-party assessments of the validity of the transaction. *See, e.g.,*

---

[3] At oral argument, the Creditors insisted that the October 2019 Resolution confirmed it was not until then that the National Assembly concluded its purportedly multiyear investigation into whether Article 150 governed the Exchange. Beyond misreading the September 2016 Resolution, *supra* at 13, and the fact that the National Assembly was entitled to reach (as it did) the same conclusion about the Exchange more than once, *see* JA-1831 ("Resolution that Reiterates the Invalidity of PDVSA's 2020 Bonds"), the Public Ministry investigation contemplated by the National Assembly in 2016 was *not* the investigation that the Guaidó Government's Special Prosecutor conducted in 2019. Instead, as the Resolution makes clear, the National Assembly requested the 2019 investigation on April 24, 2019, in anticipation of further legal disputes following the Maduro regime's anticipated default on the 2020 Notes, the Assembly's decision to make an interest payment on the same under protest, and more. JA-119-20.

O.B. 9 (citing JA-4403.4; JA-3570.3; JA-3560) (addressing market commentary warning of invalidity risk given absence of National Assembly authorization).

The district court also erroneously concluded that the National Assembly's acts had no legal effect simply because the *text* of the September 2016 Resolution does not "demonstrate[] an intent to affirmatively invalidate the Exchange Offer." SPA-36. At the time of the Resolution, the "transaction" was a mere proposal that the National Assembly was attempting to stop in its tracks (by denying approval). It is illogical and unmoored from the text of Venezuela's Constitution to insist that the legislature could *only* have exercised its Article 150 powers by expressly declaring the yet-to-be-executed deal "invalid." The National Assembly was required to *approve* the transaction for it to come into existence—Venezuelan law does not presume the opposite. The decision below, by declaring that the September 2016 Resolution did *not* effectively invoke the legislature's Article 187(9) approval power for failure to declare the Notes "invalid," undermined the National Assembly's sovereign authority and violated the act-of-state doctrine. *See Celestin*, 30 F.4th at 140; *Konowaloff v. Metro. Museum of Art*, 702 F.3d 140, 146 (2d Cir. 2012) (official sovereign acts "cannot be questioned but must be accepted" and "deemed valid") (quoting *Ricaud v. Am. Metal Co.,* 246 U.S. 304, 309 (1918), and *Kirkpatrick*, 493 U.S. at 409); *see also United States v. Trabelsi*, 28 F.4th 1291, 1299-1300 (D.C. Cir. 2022) (presuming validity of a Belgium extradition order under the act-of-state

16

doctrine).[4]

In sum, the district court was not free to speculate as to the legal effects (under Venezuelan law) of the National Assembly's resolutions. In enacting those resolutions the National Assembly sought to "assert its constitutional authority over national public interest contracts—including explicitly rejecting the plan to pledge control of CITGO," which the Maduro regime ignored by "execut[ing] the bond swap and issu[ing] the CITGO-secured debt." 51 F.4th at 459. The sum of the National Assembly's 2016 Resolutions leaves no doubt that the legislature sought to deny the Maduro regime the requisite legal authority to execute the Exchange. Thus, the official acts of the recognized sovereign in Venezuela "purport[ed] to" have the effect of prohibiting the Notes from validly coming into legal existence. *Celestin*, 30 F.4th at 140.

Finally, this Court should reject any argument that the act-of-state doctrine does not apply because the Pledgor, PDVH, is a U.S. company. For starters, any such argument is waived, because the Creditors did not raise this argument before the district court, or in their merits briefing here. *See Parmalat Cap. Fin. Ltd. v. Bank*

---

[4] Moreover, an inquiry into whether the National Assembly *effectively* invoked its Article 187(9) authority over the Exchange would be a breach of comity. *Fed. Treasury Enter. Sojuzplodoimport v. Spirits Int'l B.V.*, 809 F.3d 737, 743 (2d Cir. 2016) (reversing ruling that an official sovereign act failed to achieve its purported effect, because "[e]ven an inquiry into whether Russian law permitted the Assignment is a breach of comity").

17

*of Am. Corp.*, 671 F.3d 261, 270 (2d Cir. 2012). Even if it were preserved, this argument fails. As the NYCOA held, the "validity" of the Exchange is controlled by Venezuelan law. The extraterritorial acts of a U.S. company are irrelevant to whether the Exchange was "valid" under Venezuelan law. The National Assembly's resolutions deprived PDVSA of legal authority to execute the Exchange—the fact that in doing so, the Assembly's 2016 actions ultimately had collateral consequences on property that *subsequently* came to be located in the United States is irrelevant for act-of-state purposes. *See* O.B. 39-43. At most, the question whether the Pledge might be enforceable under New York law notwithstanding the Notes' *ab initio* invalidity could be considered on remand. But as Appellants have previously argued, under New York law, the Exchange was an integrated transaction that rises and falls collectively, and a security pledge cannot exist independent of the debt obligation it purportedly secures. *See Roswell Cap. Partners LLC. v. Beshara*, 436 F. App'x 34, 35 (2d Cir. 2011) ("It is black letter law that extinguishing a debt obligation terminates any accompanying security interest because '[a] security interest cannot exist independent of the obligation it secures.'") (quoting *In re Advanced Aviation, Inc.*, 101 B.R. 310, 313 (Bankr. M.D. Fla. 1989)); *Unisys Fin. Corp. v. Resolution Trust Corp.*, 979 F.2d 609, 611 (7th Cir. 1992) ("A lien is parasitic on a claim. If the claim disappears — poof! the lien is gone.").

## C. The Republic's Official Interpretation of Venezuelan Law Removes Any Doubt as to the Legal Effect of the National Assembly's Sovereign Acts.

A "federal court should accord respectful consideration" to a foreign government's "official statement on the meaning and interpretation of its domestic law." *Animal Sci.*, 585 U.S. at 36. The Republic of Venezuela provided its official interpretation of the legal effect of the National Assembly's refusal to authorize the transaction. In each of its submissions, and for more than half a decade, the Republic has consistently taken the position that the Exchange, a national public interest contract requiring National Assembly authorization, is void absent such authorization.

Before the district court, the Republic filed a formal statement of its position explaining why the National Assembly's resolutions had the legal effect of invalidating the Transaction Documents under Venezuelan law. *See* JA-905-07 ¶¶ 9, 15, 16; JA-907 ("2020 Notes were issued as a result of an illegal and unconstitutional transaction aimed to circumvent the political control of the National Assembly over the public national interest contract" and the "2020 Notes, including the Pledge and Indenture, were therefore void ab initio."). The Republic has since reiterated its consistent position on the meaning of Venezuelan law—specifically Articles 150 and 187 and their requirement for approval and authorization by the National Assembly—in *amicus* briefs before the district court, this Court, and the NYCOA.

19

JA-901-12; Republic *Amicus Brief*; CTQ-2022-00003, Br. for *Amicus Curiae*, the Bolivarian Republic of Venezuela.[5] The Republic could not have been clearer: "[t]he Exchange Offer was … unauthorized, unconstitutional, and void under Venezuelan law." Republic *Amicus* Br. 13.

With respect to the May 2016 Resolution, the Republic of Venezuela explained that the Resolution reaffirmed that "any national interest contract entered with foreign companies must be previously authorized by the National Assembly." JA-904 ¶ 5. The Republic's *amicus* brief before this Court further explained that "the May 2016 Resolution rejected Maduro's claim to have power to enter national public interest contracts without National Assembly authorization." Republic *Amicus* Br. 11-12; *see also id.* at 29-30 ("The district court also overlooked the provisions of the Resolution that were *not* limited to contracts entered by the National Executive.").

As to the September 2016 Resolution, the Republic made clear to the district court that the Assembly's invocation of Article 187.9 "challenged the Exchange Offer," and that "the categorical rejection of the Pledge" demonstrated that the Assembly had "refused" the constitutionally required approval for the transaction. JA-905-06 ¶¶ 9-11. Before this Court, the Republic again emphasized that "the National Assembly in the September 2016 Resolution confirmed that it was refusing

---

[5] *Available at* https://courtpass.nycourts.gov/Docket; *see also McCulloch Orthopaedic Surgical Servs., PLLC v. Aetna Inc.*, 857 F.3d 141, 147 n.4 (2d Cir. 2017) (taking judicial notice of *amicus* brief filed in companion case).

to authorize the Exchange Offer," and was making "an affirmative choice to withhold the constitutionally required approval." Republic *Amicus* Br. 31 (citation omitted).

The district court, however, refused to accord the Republic's formal interpretation of the National Assembly's resolutions (and relevant Venezuelan constitutional provisions) the "substantial" weight to which it was entitled. SPA-46-47. The district court summarily stated it was "not persuaded" by the Republic's formal construction of the National Assembly's acts. *See* SPA-41-42. This failed to give the Republic's construction *any* weight, let alone the requisite substantial weight. *See Karaha Bodas Co. v. Perusahaan Pertambangan Minyak Dan Gas Bumi Negara*, 313 F.3d 70, 92 (2d Cir. 2002). By expressly rejecting the Republic's formal submission, the court ignored the Republic's guidance and improperly substituted its own interpretation of the meaning of Venezuela's constitutional provisions and legislative enactments for that of the Republic. As the PDV Entities have explained, the Republic's position meets all the *Animal Science* requirements for "respectful consideration" and "substantial" weight. *See* O.B. 31-38; Reply 8-10.

In making its act-of-state determination, this Court should afford substantial deference to the Republic's interpretation of Venezuelan law. But, as explained further below, if the Court elects to remand to the district court for an evaluation of Venezuelan law in the first instance, it should do so with clear instructions to grant

21

respectful consideration to the Republic's interpretation of Venezuelan law, including the intent and legal effect of the National Assembly's sovereign acts.

## D. The National Assembly Remains the Recognized Sovereign Government of Venezuela.

The Creditors urged this Court to affirm the district court on the alternative ground that—contrary to the court's finding below—the National Assembly was not "sovereign" at the time of the September 2016 Resolution. ECF No. 187 ("R.B.") 48-51. That argument lacks merit. *See* Reply 18-22.

The Creditors have previously suggested that political developments in Venezuela, such as the National Assembly's amendment of the statute governing Venezuela's transition to democracy, should be interpreted as depriving the National Assembly of "sovereign" status. R.B. 58-64. On January 2, 2023, the National Assembly amended that law, terminating the National Assembly-led administration of Interim President Juan Guaidó and vesting its powers with respect to the PDVSA governance in a Delegate Commission of the National Assembly and the newly established Council for the Management and Protection of Assets. But as far as the U.S. Executive Branch is concerned, those changes did not alter the National Assembly's status as the recognized foreign sovereign. The U.S. State Department announced that "[t]he United States *continues to recognize* the democratically elected 2015 National Assembly as the last remaining democratic institution in Venezuela" and "welcome[s] the agreement reached to extend its authority." U.S.

Dep't of State, *Venezuela's Interim Government and the 2015 National Assembly* (Jan. 3, 2023) (emphasis added); *see also* U.S. Dep't of State, *U.S. Relations with Venezuela*, Bilateral Relations Fact Sheet (June 27, 2023) ("The United States *recognizes* the 2015 democratically elected Venezuelan National Assembly as the only legitimate branch *of the Government of Venezuela*.") (emphasis added); U.S. Dep't of State, Press Briefing by Spokesperson Ned Price (Jan. 3, 2023) ("[Maduro] is not the legitimate leader of Venezuela. *We recognize the 2015 National Assembly*.") (emphasis added).

Similar principles help answer the question, posed by this Court at oral argument, whether precedent exists for applying the act-of-state doctrine when a foreign sovereign's representations contradict earlier representations made by the same foreign sovereign. PDVSA's representations to foreign investors regarding the legality of the Exchange were "acts" beyond the reach of the act-of-state doctrine because PDVSA was acting beyond Venezuelan sovereign territory on a transaction that could not be completed within the same. Reply Br. 20. Nor is PDVSA *now* the "sovereign" at issue—while PDVSA is a Plaintiff in this action, the National Assembly speaks for the Republic in U.S. courts, and it is therefore the Assembly's acts that must be given effect. The question, then, is whether there is any precedent for a U.S. court to deny legal effect to a sovereign's official acts based on a non-

sovereign party's prior contradictory positions. Appellants are unaware of any such authority.

Recognition of a foreign government by the Executive Branch "validates all the actions and conduct of the government so recognized from the commencement of its existence." *Oetjen v. Cent. Leather Co.*, 246 U.S. 297, 302 (1918). Under this principle, U.S. recognition of the National Assembly treats that body, *not* PDVSA (which was then controlled by the Maduro regime), as the legitimate Government of Venezuela starting in 2015. Courts have long deferred to official *pre-recognition* acts of later-recognized governments, even when doing so effectively invalidates the positions taken by the de-recognized regime. *See, e.g., id.* (validating pre-recognition military acts of the revolutionary Carranza government); *Underhill v. Hernandez*, 168 U.S. 250, 253-54 (1897) (validating pre-recognition acts of a revolutionary military group in Venezuela). While a change in recognition *by itself* does not undermine the acts of a de-recognized regime, this Court has granted legal effect (following recognition) to successor governments' *repudiations* of the acts of prior regimes. *See Bigio v. Coca-Cola Co.*, 239 F.3d 440, 453 (2d Cir. 2000) (refusing to recognize former regime's prior conduct, where "the current government … has apparently repudiated the acts in question"). Here, the U.S. recognizes the National Assembly as the legitimate government dating back to 2015, and its acts may not be

disregarded based on contradictory representations made at that time by the Maduro regime or its instrumentalities.

## II. ALTERNATIVELY, THE COURT SHOULD REMAND FOR CONSIDERATION OF THE NOTES' VALIDITY UNDER VENEZUELAN LAW.

If this Court does not reverse the district court's refusal to apply the act-of-state doctrine, it should remand for the court to interpret Venezuelan law in the first instance, with deference to the Republic's considered position on the meaning of Venezuelan law. The Creditors have also conceded that, at a minimum, if any inquiry into Venezuelan law is necessary, this Court should "remand to the district court to assess that law in the first instance." R.B. 51.

The NYCOA has now unambiguously held that, in accordance with UCC § 8-110 and related New York law, the validity of the Notes (and the Governing Documents on which they issued) is governed by Venezuelan law. 2024 WL 674251, at *6. The NYCOA further held that this inquiry "requires analysis of Article 150 and related provisions of the Venezuelan Constitution." *Id.* Because the district court erroneously held Venezuelan law "inapplicable to this action," SPA-67, it did not conduct that analysis. This Court should accordingly remand this appeal to the district court with direction to analyze the validity of the Governing Documents under Venezuelan law.

The Court should also provide guidance to the district court on three aspects

25

of the remand:

*First*, the Court should make clear that the district court may reopen the summary judgment record or request supplemental briefing on the applicability of Venezuelan law. Although the parties had briefed the issue of Venezuelan law as part of the summary judgment briefing, that briefing was completed over three-and-a-half years ago, in July 2020. The district court may benefit from receiving additional academic commentary or supplemental expert reports addressing the Venezuelan constitutional and statutory provisions at issue in this case, particularly since the NYCOA's decision made clear that these issues are critical to the inquiry into the Notes' validity.

Reopening the record and accepting additional evidence or briefing is especially appropriate given the flexibility that courts have when faced with questions of foreign law. *See Branch of Citibank, N.A. v. De Nevares*, 74 F.4th 8, 14 (2d Cir. 2023) ("A court determining foreign law 'may consider any relevant material or source, including testimony, whether or not submitted by a party or admissible under the Federal Rules of Evidence.'") (quoting Fed. R. Civ. P. 44.1). Given the centrality of Venezuelan law on any remand, this Court should authorize the district court to consider any and all relevant materials on those issues notwithstanding any strictures of the mandate rule. *See, e.g.*, *Porter v. Potter*, 366 F. App'x 195, 198 (2d Cir. 2010) (authorizing the district court, on remand, "to reopen

26

the summary judgment record" in order to make a determination "in light of the record as supplemented").

*Second*, this Court should instruct the district court that any examination of Venezuelan law should give the proper "respectful consideration" and "substantial" weight to the views of the recognized Venezuelan government regarding the meaning of its laws. *Animal Sci.*, 585 U.S. at 36, 46. The National Assembly, as the recognized government of the Republic, submitted an *amicus* brief to the NYCOA (which the court accepted) regarding the meaning of the Venezuelan constitutional and statutory provisions at issue. The Republic, which has previously communicated its views to the district court in an ambassadorial letter, may wish to weigh in as an *amicus* on remand. The district court should accord any such views—whether expressed in prior submissions or any future brief—the consideration warranted under the Supreme Court's decision in *Animal Science* and this Court's decision in *In re: Vitamin C Antitrust Litigation*, 8 F.4th 136, 156-58 (2d Cir. 2021).

*Third*, this Court should provide the district court with guidance regarding any potential invocation by the Creditors of a UCC § 8-202(b) defense. The NYCOA held that even where foreign law governs a validity defect under UCC § 8-110, "New York law nonetheless governs the consequences of that defect." 2024 WL 674251, at *9 (citing UCC § 8-202(b)).

27

As an initial matter, the Creditors waived any UCC § 8-202(b) defense. While the Creditors asserted a general defense of "estoppel by recitals" in their Answer, *see* No. 1:19-cv-10023, Docket No. 40 at 17 (¶ 102) (Sixth Affirmative Defense), they did not mention UCC § 8-202(b) or the defenses specified in that provisions. Thus, there is a question whether the Creditors' general invocation of an "estoppel by recitals" defense sufficiently pleaded a defense to the 2020 Notes' invalidity under UCC § 8-202(b). *See Sompo Japan Ins. Co. of Am. v. Norfolk S. Ry. Co.*, 762 F.3d 165, 176 (2d Cir. 2014) ("generally, failure to plead an affirmative defense in the answer results in the waiver of that defense and its exclusion from the case") (internal quotation marks, alterations, and citation omitted).

In any event, the Creditors did not raise a UCC § 8-202(b) defense on summary judgment—whether in opposing the PDV Entities' summary judgment motion or in their own cross-motion. *See* No. 1:19-cv-10023, Dkt. Nos. 158 at 15-27, 99 at 23-37. The Creditors referred to UCC § 8-202(b) only once, in a reply brief in support of their summary judgment motion, for the question of whether a guarantor is bound by the limitations in UCC § 8-202(b) in the same way as an issuer. *See* No. 1:19-cv-10023, Dkt. No. 182 at 10 (citing UCC § 8-202(b)). Arguments not raised on summary judgment, despite "every incentive and opportunity" to do so, are waived. *Bogle-Assegai v. Connecticut*, 470 F.3d 498, 506-07 (2d Cir. 2006).

Because the waiver is clear on the record, this Court can make that determination itself, thereby simplifying issues on remand. *See Parmalat Cap. Fin. Ltd.*, 671 F.3d at 270. But even if this Court elects not to decide the waiver question, it should instruct the district court to consider whether interests of justice provide any basis for excusing the Creditors' waiver. *See Roldan v. Racette*, 984 F.2d 85, 89 (2d Cir. 1993).

Apart from the waiver issue, UCC § 8-202(b) defenses to a purchaser of an invalid security are subject to several restrictions. *First*, because the validity defect here "involves a violation of a constitutional provision," the 2020 Notes would be valid only "in the hands of a purchaser for value and without notice of the defect, other than one who takes by original issue." UCC § 8-202(b)(1). Thus, any Creditors who obtained the 2020 Notes as part of the illegal Exchange Offer may not avail themselves of this defense; only secondary purchasers could attempt to assert it. Even those secondary purchasers would have to establish that they had no "notice of the defect" in the 2020 Notes' issuance—an unlikely showing given the National Assembly's public rejection of the Exchange Offer, widespread market analyst commentary regarding the resulting risk that the Notes' are invalid, and this very lawsuit challenging the Notes' validity. In addition, because PDVSA is a "governmental … instrumentality," asserting a UCC § 8-202(b) defense would also require establishing that (*i*) "there has been substantial compliance with the legal

29

requirements governing the issue" *or* (*ii*) "the issuer has received a substantial consideration for the issue as a whole or for the particular security" *and* "a stated purpose of the issue is one for which the issuer has power to borrow money or issue the security." UCC § 8-202(b)(2). All of these requirements would likely require the district court to reopen the evidentiary record and permit additional discovery into the availability of UCC § 8-202(b) defenses to any of the Creditors.

## CONCLUSION

This Court should reverse or, at a minimum, vacate the district court's judgment.

Dated: March 19, 2024

Respectfully submitted,

WILLKIE FARR & GALLAGHER LLP

*/s/ Michael J. Gottlieb*

_____

Michael J. Gottlieb
Kristin E. Bender
Willkie Farr & Gallagher LLP
1875 K Street, N.W.
Washington, D.C. 20006
mgottlieb@willkie.com
kbender@willkie.com

Jeffrey B. Korn
787 Seventh Avenue
New York, New York 10019
jkorn@willkie.com

Nicholas Reddick
333 Bush Street

San Francisco, CA 94104

nreddick@willkie.com

*Counsel for Appellant PDV Holding, Inc.*

*/s/ Kurt W. Hansson*

_____

Kurt W. Hansson

James L. Ferguson

Paul Hastings LLP

200 Park Avenue

New York NY 10166

kurthansson@paulhastings.com

jamesferguson@paulhastings.com

Igor V. Timofeyev

Paul Hastings LLP

2050 M Street, N.W.

Washington, D.C. 20036

(202) 551-1700

igortimofeyev@paulhastings.com

*Counsel for Appellants Petróleos de*
*Venezuela, S.A., and PDVSA Petróleo, S.A.*

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMIT, TYPEFACE REQUIREMENTS, AND TYPE-STYLE REQUIREMENTS

Pursuant to FED. R. APP. P. 32(g)(1), I certify the following:

1.     This document complies with the type-volume limitation ordered by this Court at ECF No. 345 because, excluding the parts of the brief exempted by Fed. R. App. P. 32(f) and Local Rule 32(g), this document contains 6,955 words.

2.     This document complies with the typeface requirements of Rule 32(a)(5) of the Federal Rules of Appellate Procedure and the type-style requirements of Rule 32(a)(6) of the Federal Rules of Appellate Procedure because this document has been prepared in a proportionately spaced typeface using Microsoft Word in 14-point Times New Roman font.


Dated: March 19, 2024

*/s/ Michael J. Gottlieb*

Michael J. Gottlieb
Willkie Farr & Gallagher LLP
1875 K Street, N.W.
Washington, D.C. 20006

*Counsel for Appellant PDV Holding, Inc.*

# EXHIBIT F

**Eimer Stahl** LLP

224 South Michigan Avenue
Suite 1100
Chicago, Illinois 60604-2416
Tel  312 660 7600   Fax  312 692 1718

Nathan P. Eimer

(312) 660-7601
neimer@eimerstahl.com

April 16, 2024

**Via Email**
**Highly Confidential**

Re:     *Crystallex Sale Process: Bid Instruction Letter*

Bob,

We write to address concerns we have with respect to the Bid Instructions circulated at the end of last week, and to ask that the Special Master promptly revise the Bid Instructions to address these issues.  Putting aside for this purpose our prior objections to the sale process (as to which we of course reserve our rights), our chief concern is the manner in which the Bid Instructions propose to address the Pledge of CITGO Holding Inc. stock that remains in dispute in ongoing litigation regarding the PDVSA 2020 Bonds.

With respect to process, the contemplated requirement that Potential Bidders identify a purchase price that assumes the 2020 Bondholders' purported lien is released, if adopted, would qualify as a material modification to the Bidding Procedures approved by the Court.   The Procedures approved by the Court require those who submit a "Qualified Bid" to "identify the total purchase price to be paid" and to identify the material assumptions that factored into their proposed purchase price, including their "proposed treatment of the outstanding indebtedness of PDVH and its subsidiaries and the CITGO Holding Pledge."  Bidding Procedures at 8–9 (subsections (a) and (g)).  Thus, the Bidding Procedures currently allow a Potential Bidder to submit a bid based on the Potential Bidder's assessment of the contingent risk posed by the 2020 Bondholders' purported lien.  They also allow the Potential Bidder to decide whether it intends to continue the 2020 litigation, settle that litigation, or pursue some other strategy based on its own determination of the strengths and weaknesses of the Bondholders' case.  By contrast, the new Bid Instructions would direct Potential Bidders to identify a purchase price that assumes that the Pledge will be released, presumably by way of an escrow settlement or other resolution, although the specifics of this solution are not detailed.  Given the amount of the 2020 Bondholders' alleged claim, that directive, if adopted, would be a material change to the Bidding Procedures with a high likelihood of materially affecting identified purchase prices.

The letter's contemplated directive to credit bidders to confirm that their bid "provides sufficient cash to satisfy in full … the PDVSA 2020 Notes claim (the latter of which may be placed in escrow subject to resolution of pending litigation, or such other treatment as may be consensually agreed with holders of the PDVSA Notes)," would also, if adopted, constitute a



material modification to the Bidding Procedures.  As of now, the Bidding Procedures require only that a credit bidder supply enough cash to satisfy the first category: "obligations secured by a senior lien on the PDVH Shares."  Bidding Procedures at 9 (subsection (f)).

Paragraph 10 of the SPO requires you to provide all the Sale Process Parties with notice and an opportunity to consult with you before you make any modifications to the Bidding Procedures.  To our knowledge, the other Sale Process Parties (including the Republic and PDVSA) were not given notice of the changes before the Bid Instructions were transmitted to the potential bidders, which may give rise to objections by them in the future. This is especially true with respect to any modifications relating to the 2020 Bondholder litigation, which has been pursued by PDVH and PDVSA since 2019. In any event, we were given neither sufficient notice to assess them nor an opportunity to consult with you before the letter was transmitted to potential bidders.  Indeed, had we been provided with sufficient time to consult on these proposals, we would have explained our concern (laid out further below) that assuming away the 2020 Bondholder litigation could depress the value of some bids.  Given the lack of meaningful notice or an opportunity to consult, we assume that you did not mean to modify the Bidding Procedures and that these contemplated modifications are not final.  If your view is otherwise, please let us know immediately so that we may lodge formal objections to these Bidding Procedure modifications as contemplated by Paragraph 10 of the SPO.

As to the substance of the Bid Instructions, we are concerned that, as drafted, the Instructions will reduce the ultimate value delivered to the creditors before Judge Stark.  We also believe there is a better way to ferret out the effect of the Pledge on bid values, and would encourage you to revise the Bid Instructions as such.  At a minimum, we urge you to solicit the input of the creditors currently before the Court on this question, as its resolution will materially affect their interests.

We understand that the objective of the Bid Instructions is to facilitate bids, and that the parties for whom value should be maximized are the creditors whose judgments (and attachments) have been recognized, approved, and granted priority by Judge Stark, as well as PDVSA and the Republic.  Of course, as you know, the 2020 bondholders are not among that group—not only have they never sought to have their judgment added to the Sales Process, but at some point in the coming months, they will ***have no judgment at all*** (as the bondholders themselves have argued to the U.S. Court of Appeals for the Second Circuit, the appropriate next step is for the court to vacate their judgment and remand the case to the district court for further proceedings).[1]  Thus, the 2020 bondholders should not be treated as a priority creditor, nor is it appropriate to insist in the first instance that their claim be funded by proceeds of the Sales Process.  Instead, the 2020 bondholders are at this point relevant to the Sales Process only to the extent that the Bid Instructions are capable of devising a "solution" to the Pledge that ***increases the total value paid to priority creditors*** (excluding whatever is paid to the 2020 bondholders) via the Sales Process.

---

[1] In this sense, the existence of the 2020 bondholders' claim is no different from any other contingent claim against PDVH, CITGO Holding, or CITGO Petroleum that are currently litigating—like all of those other claims, the 2020 bondholders have a claim that a new owner could decide to settle or litigate, and unlike many of those other claims, the estimated value of the 2020 bondholders' claim is well understood and can be easily factored into a bidder's estimate of PDVH's value.

**Eimer**Stahl LLP

As currently constructed, the Bid Instructions threaten to reduce value to the creditors based on an untested assumption.  Specifically, you appear to assume that the total value delivered to the creditors will be lower if the Pledge is *not* released than it will be if you negotiate an agreement with the 2020s that would use Sales Process funds to secure a release of the Pledge.  There are, however, numerous unknown details that make it impossible to test that assumption— for example, if Sales Process funds are to be escrowed such that a new owner could decide whether to settle or litigate, what party would be entitled to residual funds (if any) in the escrow if the claim ultimately settles or reaches judgment at a value less than the amount escrowed?  If the new owner is entitled to keep those funds, then the owner would realize a windfall at the expense of the priority creditors; if the funds are earmarked to return to the Special Master for distribution to creditors, then the new owner will have no incentive to take on the costs of litigation, and the 2020 bondholders would realize the windfall at the expense of the priority creditors.  In either scenario, the priority creditors' interests would be subordinated to third parties.

Moreover, we do not understand the rationale for organizing the Sales Process around the assumption described above.  While in the abstract we can stipulate that the existence of the Pledge introduces a measure of uncertainty, the value attached to that uncertainty cannot be known without understanding the alternative you are proposing (i.e., how much is being paid to the 2020 bondholders, under what terms and conditions, at what time, and what options would be available to the new owner under the relevant terms and conditions).  A potential bidder is likely to reach a different assessment of the value of the 2020 bondholders' claim than ultimately embodied by any settlement or other resolution you may reach—indeed, we expect that there may be significant variations in how the bidding group thinks of this particular contingent liability.  Notably, at least some bidders may agree with the Venezuela Parties that the 2020 pledge is unlawful and would therefore prefer to continue litigating the 2020 bondholders' claim rather than settle it as part of the sale process. Forcing them to bid on the assumption that this claim will be settled would consequently cause these bidders to offer a *lower* bid than they otherwise would have.  As such, making the estimation above as a single number to be applied to all bidders is virtually certain to result in bids that would generate fewer proceeds available for Attached Judgment Holders.  If so, that could reduce the amount of Attached Judgments satisfied for the benefit of the Republic and PDVSA.

Fortunately, we believe there is a simple way to revise the Bid Instructions to test the assumption about the Pledge rather than accepting it *ex ante.*  Namely, we propose that the treatment of the 2020 bondholders be uniform for all bidders, and that all bidders be asked to submit two alternative bids: one should assume that the Pledge has been released prior to or at the time of closing; and the second should assume that the Pledge (and its attendant litigation) is not released at the time of closing.  Moreover, the Bid Instructions *must* explain the details of what you are proposing for the release of the Pledge—namely, whether the money for the release of the Pledge will come out of the proceeds of the winning bid, whether that money will simply be transferred to the 2020s in exchange for a release of the Pledge or placed into escrow (and if so, what the terms and conditions of the escrow including which party would be entitled to any residual funds if any).  Without those details, none of the bidders or Venezuela Parties will be able to calculate the potential amount of proceeds available for Attached Judgment Holders.

**EimerStahl** LLP

*Crystallex* Sale Process: Bid Instruction Letter
Page 4

Sincerely,

/s/ Nathan P. Eimer

Nathan P. Eimer

# EVERCORE

**Personal and Confidential**

Weil Comments: April 8, 2024

April [ ], 2024

Participant:

On behalf of Robert B. Pincus in his capacity as Special Master for the United States District Court for the District of Delaware (the "Special Master") in the matter of *Crystallex International Corp. v. Bolivarian Republic of Venezuela*, D. Del. C.A. No. 1:17-mc-00151-LPS (the "Crystallex Case"), we would like to thank you for your consideration of a potential acquisition of all, or a portion, of the shares of PDV Holding Inc. ("PDVH"). CITGO Petroleum Corporation ("CITGO Petroleum") is a direct, wholly-owned subsidiary of CITGO Holding, Inc. ("CITGO Holding" and together with CITGO Petroleum, "CITGO") which in turn is 100% owned by PDVH, which in turn is 100% owned by Petróleos de Venezuela, S.A. ("PDVSA"), a Venezuelan corporation 100% owned and controlled by the Bolivarian Republic of Venezuela. Evercore is assisting the Special Master in the implementation of a court-mandated sale of an amount of the shares of PDVH sufficient to satisfy Attached Judgments (the "Proposed Transaction").

This letter is being furnished to those persons who have been performing diligence as part of the second round of the Special Master's marketing process. To determine the Special Master's interest in pursuing the Proposed Transaction with you, we invite you to submit a final written, definitive and binding proposal with respect to the Proposed Transaction (your "Proposal"). If the Special Master deems your Proposal to be the bid most likely to satisfy the greatest amount of the Attached Judgements when considering value, certainty of closing and such other factors as the Special Master may determine, in his sole discretion, you will be contacted regarding the process to execute a definitive agreement.

This letter, and the procedures and timetable included herein, are confidential and are subject to the terms of the Confidentiality Agreement that you entered into with the Special Master (the "Confidentiality Agreement") in connection with the Proposed Transaction, the terms of which are not modified or varied by this letter. Unless otherwise defined herein, all capitalized terms used shall have their meaning set forth in the Confidentiality Agreement or the *Sixth Revised Proposed Order (A) Establishing Sale and Bidding Procedures, (B) Approving Special Master's Report and Recommendation Regarding Proposed Sale Procedures Order, (C) Affirming Retention of Evercore as Investment Banker by Special Master and (D) Regarding Related Matters* [D.I. 481] (the "Sale Procedures Order") filed in the Crystallex Case, as context may require.

## I. PROPOSAL

Please submit your Proposal in writing to Evercore at any time before **[5:00 PM (Central Time) on Monday, June [ ], 2024,]** (the "Proposal Deadline") via email in care of:

| | | | |
|---|---|---|---|
| Evercore | Attention: | Ray Strong | William Hiltz |
| 909 Fannin, Suite 1800 | | Senior Managing Director | Senior Managing Director |
| Houston, TX 77010 | Office: | (713) 427-5146 | (212) 857-3154 |
| | Cell: | (347) 549-2043 | (917) 992-3093 |
| | Email: | ray.strong@evercore.com | hiltz@evercore.com |

**Field Code Changed**

Page 2

With a copy to:

| | | |
|---|---|---|
| Weil, Gotshal & Manges LLP | Attention: | Michael J. Aiello |
| 767 Fifth Avenue | | Ray C. Schrock |
| New York, NY 10153 | | Eoghan P. Keenan |
| | Email: | michael.aiello@weil.com |
| | | ray.schrock@weil.com |
| | | eoghan.keenan@weil.com |

Your Proposal should include, at a minimum, the following information:

**A. Proposed Transaction Structure.** Confirm that your Proposal is for all, or a portion, of the shares of PDVH, sold free and clear of all claims, encumbrances, and liabilities on or against the shares, in accordance with the terms of the Sale Procedures Order. If your Proposal is for a portion of the shares of PDVH, please indicate (i) the percentage of shares of PDVH proposed to be acquired, and (ii) any minority shareholder rights, protections, or other desired terms in connection with the Proposed Transaction and any definitive documentation related thereto.

Proposals should utilize the following key assumptions and notes with respect to structuring the Proposed Transaction:

    i.    <u>Treatment of Cash and Debt</u>: Your Proposal should assume that the available cash of PDVH and its subsidiaries will be equal in value to the aggregate debt of PDVH and its subsidiaries at the closing of the Proposed Transaction and that any cash in excess of the debt amount shall be for the benefit of the sellers.

    ii.    <u>Working Capital</u>: Your Proposal should assume a normalized amount of working capital, to be determined based upon a working capital calculation included as an exhibit to the definitive SPA, a draft of which will be posted to the data room (the "Target Net Working Capital"). The purchase price will be adjusted on a dollar-for-dollar basis to the extent that the net working capital delivered at closing is greater than or less than, as the case may be, the Target Net Working Capital.

    iii.    <u>Interim Operating Covenants</u>: The definitive SPA (as defined below) will include customary interim operating covenants with respect to the business, including with respect to limitations on capital expenditures and other matters.

    iv.    <u>PDVSA 2020 Bonds Share Pledge</u>: The Special Master is engaged in discussions with holders of notes issued pursuant to that certain Indenture, dated October 27, 2016 (the "Indenture"), by and among PDVSA, as issuer, PDVSA Petróleo, S.A., as guarantor, MUFG Union Bank, N.A., as trustee, GLAS Americas LLC, as collateral agent, Law Debenture Trust Company of New York, as registrar, transfer agent and principal agent, and Banque Internationale À Luxembourg, Société Anonyme, as Luxembourg paying agent, whereby PDVSA issued 8.50% senior secured notes due in 2020 in the aggregate principal amount of $3,367,529,000 (the "PDVSA 2020 Notes"), purportedly secured by a pledge of the equity of CITGO Holding (the "CITGO Equity Pledge"). The PDVSA 2020 Notes and the CITGO Equity Pledge are currently the subject of litigation in the matter of *Petróleos de Venezuela, S.A., PDVSA Petróleo, S.A., and PDV Holding, Inc., v. MUFG Union Bank, N.A. and GLAS Americas LLC*, Civ. Nos. 20-3858, 20-4127. [For purposes of your Proposal, please provide two alternative bids: the first should assume that the

<span style="float:right">E V E R C O R E</span>

| Field Code Changed |
|---|

Page 3

CITGO Equity Pledge will be released in advance of, or in connection with, implementation of the Proposed Transaction.[¹]; the second should assume that the CITGO Equity Pledge (and corresponding litigation) remains ongoing following the Proposed Transaction.]

**B.   Stock Purchase Agreement.** A draft Stock Purchase Agreement (the "Proposed SPA") that provides for the acquisition of all, or a portion, of the shares of PDVH, together with a redline marked to show your proposed changes, if any, to the bid draft Stock Purchase Agreement (the "Bid Draft SPA"), which will be posted to the data room (including proposed changes and accompanying redlines for all exhibits and schedules included in the data room). Please provide such comments in Microsoft Word format and include both a clean Word version as well as a PDF comparison to the Bid Draft SPA posted to the data room. Do not submit an issues list or other summary comments instead of a Proposed SPA with a redline against the Bid Draft SPA to show all proposed comments. The Proposed SPA you submit should include all of your requested changes to the Bid Draft SPA and should include specific, in-line edits and not conceptual, non-specific or footnoted comments. Please note that the Special Master will consider the extent of any comments to the Bid Draft SPA in selecting a counterparty with which to proceed.

**C.   Identity of Purchaser or Counterparty.** A statement identifying the legal name, jurisdiction and type of organization/entity form of each entity that will act as purchaser or counterparty in the Proposed Transaction, including the identity of any controlling person(s), principal equityholders, whether current or anticipated[, and each other entity that will be otherwise participating in your Proposal (if applicable)], as well as a summary of such organization/entities' history, primary business and sufficient information to demonstrate that such organization/entity has the financial wherewithal to timely consummate the Proposed Transaction.

**D.   Purchase Price and Principal Economic Terms.** A statement setting forth (i) the total equity value you assign to the shares of PDVH ("Valuation") determined based upon the key assumptions described under paragraph A above, (ii) the amount and a detailed analysis of any non-cash components of the purchase price, including without limitation, a credit bid, stock and/or the assumption of liabilities, and the value of such components, any assumptions related thereto, and reasonable back-up documentation to support such value, (iii) a brief description of the methodology used to derive the Valuation, (iv) an identification of any underlying material assumptions regarding the business of PDVH and CITGO and your determination of the purchase price, including your proposed treatment of outstanding indebtedness of PDVH and its subsidiaries and (v) disclosure of any related transactions to be pursued or effectuated by you in connection with the Proposed Transaction. The Special Master may consider alternative structures in the event that it maximizes value of the PDVH shares.

**E.   Sources of Financing.** A detailed description of the sources of funds that you intend to use to finance the Proposed Transaction. Please provide copies of the financing commitments and other similar documentation (as applicable) from all sources, such that your Proposal clearly and affirmatively demonstrates that it is not subject to any financing condition. Certainty of financing is critical and will factor into the Special Master's decision.

**F.   Credit Bid (if applicable)**. If you hold an Attached Judgment, you may seek to submit a credit bid (a "Credit Bid") for the shares of PDVH, to the extent permitted by applicable law. If you are submitting a Credit Bid, please state as such, and confirm that such Credit Bid will (i) provide sufficient cash consideration to pay in full all Transaction Expenses and (ii) provide sufficient cash to satisfy in full any obligations secured by aany senior lien on the shares of PDVH, as well as and

---

[¹] NTD: Language to be removed for credit bidders

Field Code Changed

Page 4

(ii) what, if anything, the Credit Bid proposes to do to address the PDVSA 2020 Notes claim (the latter of which may be placed into escrow subject to resolution of pending litigation, or such other treatment as may be consensually agreed with holders of the PDVSA 2020 Notes)..

G. **Purchaser Approvals.** Evidence of corporate or other organizational authorization and approval from your board of directors (or comparable governing body), committee or otherwise with respect to the submission, execution and delivery of the Proposal (including the execution of the Proposed SPA), participation in any auction and closing of the Proposed Transaction contemplated by the Proposed SPA in accordance with its terms and the terms of the Sale Procedures Order (including the Bidding Procedures contained therein), and an indication of any anticipated need, timeline and plan to obtain any further equityholder, board, organizational, partnership, investment committee, or other approval, including governmental, regulatory and other third-party approvals, consents, notifications, waivers or other similar actions that you anticipate will be required to execute a definitive Stock Purchase Agreement (the "definitive SPA"). Please also include a statement or evidence that (i) you will make in a timely manner (1) all filings and disclosures necessary to comply with the regulations of the Department of Treasury's Office of Foreign Assets Control ("OFAC"), (2) all necessary filings under the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended, and any other antitrust laws, as applicable, and pay the fees associated with such filings and (3) all necessary filings in connection with any review by the Committee on Foreign Investment in the United States (CFIUS), if applicable and (ii) your Proposal is reasonably likely, after taking into consideration antitrust and any other regulatory matters, your prior experience and any other relevant considerations, to be consummated, if selected as the Successful Bid, within a timeframe acceptable to the Special Master.

H. **Due Diligence Requirements.** Your Proposal should not be subject to any remaining material due diligence. You may be permitted to conduct a confirmatory review of any specific and reasonable due diligence materials or activities that you have requested and received confirmation that such information will be available at a later date. If such outstanding confirmatory due diligence items exist, please specifically indicate and provide details regarding these items that you would require prior to execution of a definitive SPA, and include your expected dates of completion of such items.

I. **Advisors.** A list of the financial, accounting, legal, industry consultants and other advisors that you have retained or plan to retain in connection with the Proposed Transaction.

J. **Contacts.** A list of persons (including e-mail addresses and phone numbers) who should be contacted with respect to any questions regarding your Proposal.

K. **Special Master Consent.** Your consent for the Special Master, in his discretion, to share information with U.S. Government regulators, including OFAC, pertaining to you or your Proposal.

L. **Cooperation**. A statement that (i) you agree that your Advisors will coordinate in good faith with the Special Master's Advisors to discuss and explain your regulatory and other consent analysis, strategy, and timeline for securing all such approvals and consents as soon as reasonably practicable and (ii) you agree to cooperate with the Special Master to provide pertinent factual information regarding your ownership and operations reasonably required to respond to, or otherwise analyze issues arising with respect to, U.S. sanctions laws and regulations, the Committee on Foreign Investment in the United States, any applicable antitrust laws, and other relevant regulatory requirements or requests.

E V E R C O R E

Field Code Changed

Page 5

**M. No Entitlement to Reimbursement**. A statement that your Proposal does not entitle you to any break-up fee, termination fee, expense reimbursement, or similar type of payment or reimbursement; provided, however, the definitive SPA will include a termination fee in connection with certain termination events.

**N. Special Master's Judicial Immunity**. A statement that (i) you agree that in no circumstance shall the Special Master or his Advisors be personally or otherwise liable for any amounts or obligations owed to you and (ii) the Special Master and his Advisors are acting as an arm of the Court and are entitled to judicial immunity in the performance of their duties.

**O. Representations and Warranties**. The following representations and warranties:

   a. a statement that you recognize and acknowledge that the Special Master, his Advisors, PDVH and CITGO make no representations, covenants, or warranties (or any other promise) as to the accuracy or completeness of any information provided in the data room or otherwise made available by the Special Master and his Advisors in connection with the bid process;

   b. a statement that, other than with respect to your reliance on the representations and warranties provided in the definitive SPA, you have relied solely upon your own independent review, investigation, and/or inspection of any relevant documents regarding the assets to be purchased and did not rely on any written or oral statements, representations, promises, warranties, or guaranties whatsoever, whether express or implied, by operation of law or otherwise, regarding PDVH and its subsidiaries or the completeness of any information made available in connection therewith;

   c. a statement that you have not engaged in any collusion with respect to the submission of your Proposal; and

   d. a statement that all proof of financial ability to consummate the Proposed Transaction in a timely manner is true and correct.

**P. Bidding Procedures**. A statement that you agree to be bound by the terms and conditions of the Bidding Procedures set out in the Sale Procedures Order.

**Q. Other Material Terms.** A list of any additional terms or conditions the satisfaction of which you anticipate would be a material condition precedent to executing a definitive SPA with respect to the Proposed Transaction.

## II. CONDITIONAL SELECTION OF PROSPECTIVE PURCHASER

Based upon, among other things, an analysis of the purchase price and other terms presented in your Proposal, the Special Master, in his sole and absolute discretion, may elect to further pursue the Proposed Transaction with you.

Please note that the existence and terms of this letter and any related communications and/or information provided in connection therewith are subject to your Confidentiality Agreement with the Special Master and should be treated accordingly.

EVERCORE

Field Code Changed

Page 6

### III.  ALL RIGHTS RESERVED

All communications, inquiries and requests for information relating to the Proposed Transaction, including any materials in connection therewith, should be directed to Evercore. **Neither you nor your employees, representatives, agents, affiliates, partners, co-venturers or other related parties are permitted to contact the Special Master, PDVSA, PDVH, CITGO or its subsidiaries, or any of their direct or indirect affiliates, directors, managers, officers, employees, suppliers, vendors, customers, financiers, counterparties, partners, co-venturers or regulators, either directly or indirectly, in relation to any matter set forth in this letter or in relation to the Proposed Transaction.**

This letter does not constitute an offer to sell PDVH or its assets. You acknowledge and agree that the Special Master has the right, in his sole and absolute discretion, to reject any and all proposals regarding any Proposed Transaction and to negotiate with one or more parties simultaneously and terminate discussions and negotiations of any Proposed Transaction with any one or more parties at any time, for any reason or for no reason; that the procedures which the Special Master may employ in the pursuit of any Proposed Transaction, if any such pursuit is undertaken, are within his sole and absolute discretion; that any such procedures are subject to change at any time for any reason or for no reason and with or without prior notice; that determinations of compliance or noncompliance with such procedures will be solely and completely judged by the Special Master, and the sole remedy for any objection to such procedures, the application thereof or any judgment exercised by the Special Master with respect thereto will be withdrawal, without further recourse, from participation in further discussions with respect to the Proposed Transaction. The Special Master, Evercore, PDVH and CITGO do not make any warranties or representations as to the accuracy or completeness of any document, written material or oral statement provided in connection with a Proposed Transaction. No agreement or understanding regarding a Proposed Transaction shall be deemed to exist unless and until a definitive written agreement regarding the Proposed Transaction has been executed and delivered by the parties thereto, and no prospective purchaser shall have any claim based upon any legal theory in connection with a Proposed Transaction unless and until the parties shall have entered into, executed and delivered such definitive written agreement.

**By submitting your Proposal, you acknowledge that you have reviewed this letter and that you agree without reservation to all terms, restrictions and conditions contained herein.**

We encourage you to contact the following individual with any questions regarding your Proposal or any other matter set forth in this letter:

|  |  |
|---|---|
| Ray Strong | William Hiltz |
| Senior Managing Director | Senior Managing Director |
| Office: (713) 427-5146 | Office: (212) 857-3154 |
| Cell: (347) 549-2043 | Cell: (917) 992-3093 |
| ray.strong@evercore.com | hiltz@evercore.com |

The Special Master and Evercore appreciate your interest in this process and look forward to working with you with respect to the Proposed Transaction.

Sincerely,

Ray Strong
Senior Managing Director

E VERCORE

Field Code Changed

Page 7

Evercore on behalf of the Special Master



E V E R C O R E

Field Code Changed

# EXHIBIT G

| **From:** | Bentley, Chase <Chase.Bentley@weil.com> |
|---|---|
| **Sent:** | Thursday, April 18, 2024 7:47 PM |
| **To:** | neimer@eimerstahl.com |
| **Cc:** | jpizzurro@curtis.com; Perla, Juan; Garvey, George; Verrilli, Donald; Timofeyev, Igor; Hansson, Kurt W.; Schrock, Ray; Robert Pincus; Strong, Ray; Project.Horizon.Weil; Project Horizon; Profusek, Robert A.; Feldman, Julia V. |
| **Subject:** | RE: [EXTERNAL] RE: Bid Instruction Letter |
| **Attachments:** | image001.jpg; Redline - Project Horizon - Updated Round 2 Bid Instruction Letter (4.18.24)-99687382-v1 and Project Horizon - Updated Round 2 Bid Instruction Letter (4.18.24)-.pdf; Project Horizon - Updated Round 2 Bid Instruction Letter (4.18.24)-v3.docx |

[Copying others from Weil, Evercore, and Jones Day.]

Nate,

I understand you spoke with Bob earlier this evening.  Please see attached for a revised bid letter, which we believe addresses the concerns you flagged, albeit not with the language you proposed.

We are happy to discuss the revised letter if necessary.

Thanks,
Chase



**Chase Bentley**
Counsel

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153
Chase.Bentley@weil.com
+1 212 310 8871 Direct
+1 401 258 8529 Mobile

---

**From:** Eimer, Nate <neimer@EimerStahl.com>
**Sent:** Thursday, April 18, 2024 3:49 PM
**To:** Robert Pincus <rbpincus@gmail.com>; Strong, Ray <Ray.Strong@evercore.com>
**Cc:** Bentley, Chase <Chase.Bentley@weil.com>; jpizzurro@curtis.com; Perla, Juan <jperla@curtis.com>; George.Garvey@mto.com; Donald B. Verrilli, Jr. (Donald.Verrilli@mto.com) <Donald.Verrilli@mto.com>; Timofeyev, Igor <igortimofeyev@paulhastings.com>; Hansson, Kurt W. <kurthansson@paulhastings.com>; Schrock, Ray <Ray.Schrock@weil.com>
**Subject:** RE: [EXTERNAL] RE: Bid Instruction Letter

Dear Bob:

I do not believe your email below was intended to be sent to me, but I feel I must respond because you clearly misunderstand the purpose of my letter to you. The issue raised in the letter and in our markup of the second-round bid instruction letter is not meant to delay the process. Rather, we have identified a serious issue with the process you appear to be proposing that can easily and quickly be remedied.

As an initial matter, it does not matter what bidders prefer in the abstract. Indeed, it is obvious that anyone would prefer that the 2020 bondholders have no claim against the CITGO Holding shares. However, ensuring that the CITGO Holding shares be free and clear will potentially deliver a windfall to the 2020 bondholders, which do not have an attachment and soon will not even have a judgment.

The goal of the process you are charged with running is to maximize value for the attached creditors, not to overpay the 2020 bondholders because of the purported preference of some bidders. Again, the 2020 bondholders may ultimately have no claim against the CITGO Holding shares.

The most important thing for the process you have been charged by the Court to run (and really, the only thing that matters) is how much money the creditors with attached judgments receive in the process. That might overlap entirely with what the bidders want in the abstract and it might not. That is why we have proposed the alternative bid process.

There simply is no rational basis for rejecting our proposal, which allows bidders to make clear their preferences with respect to addressing the 2020 bonds in their bids. The bids can then be properly assessed by everyone with the same information. In this regard, our proposal would not delay anything because it simply involves revisions to the bidding instructions, not an extension of the June 11 second-round bid deadline. And if some bidders conclude that the 2020 bondholders' claim has serious defects or should be significantly discounted, then better bids may come in "on the same timeline.*

We are available to further discuss this matter.

Best regards,

Nate

---

**Nathan P. Eimer**

Eimer Stahl LLP
224 South Michigan Avenue
Chicago, IL 60604
Phone: 312-660-7601 Fax: 312-692-1718
neimer@EimerStahl.com



www.eimerstahl.com

NOTICE: This e-mail message and any attachments transmitted with it may contain legally privileged and confidential information. It is not intended for transmission to, or receipt by, any unauthorized persons. If you have received this message in error, please (i) do not read it, (ii) reply to the sender that you received the message in error, and (iii) erase or destroy the message and all attachments. Legal advice contained in the preceding message is solely for the benefit of the Eimer Stahl LLP client(s) represented by the Firm in the particular matter that is the subject of this message, and may not be relied upon by any other party.

**From:** Robert Pincus <rbpincus@gmail.com>
**Sent:** Wednesday, April 17, 2024 3:07 PM
**To:** Strong, Ray <Ray.Strong@evercore.com>
**Cc:** Eimer, Nate <neimer@EimerStahl.com>; chase.bentley@weil.com; jpizzurro@curtis.com; Perla, Juan <jperla@curtis.com>; George.Garvey@mto.com; Donald B. Verrilli, Jr. (Donald.Verrilli@mto.com) <Donald.Verrilli@mto.com>; Timofeyev, Igor <igortimofeyev@paulhastings.com>; Hansson, Kurt W. <kurthansson@paulhastings.com>; Ray Schrock <Ray.Schrock@weil.com>
**Subject:** Re: [EXTERNAL] RE: Bid Instruction Letter

WARNING: External Email

That would be my position if I was putting on this company I think this is Nate. Just trying to delay here.
Sent from my iPhone

On Apr 17, 2024, at 3:23 PM, Strong, Ray <Ray.Strong@evercore.com> wrote:

Not weighing in, but just a point of clarification for all to consider:  ALL interested parties, except for one claimant bidder, have mentioned they do not want to have to take on/deal with the 2020 Notes issue and want the shares to be free and clear.

Get Outlook for iOS

**From:** Eimer, Nate <neimer@EimerStahl.com>
**Sent:** Wednesday, April 17, 2024 2:16:31 PM
**To:** 'Robert Pincus' <rbpincus@gmail.com>
**Cc:** Ray C. Schrock (ray.schrock@weil.com) <ray.schrock@weil.com>; chase.bentley@weil.com <chase.bentley@weil.com>; Strong, Ray <Ray.Strong@Evercore.com>; jpizzurro@curtis.com <jpizzurro@curtis.com>; Perla, Juan <jperla@curtis.com>; George.Garvey@mto.com <George.Garvey@mto.com>; Donald B. Verrilli, Jr. (Donald.Verrilli@mto.com) <Donald.Verrilli@mto.com>; Timofeyev, Igor <igortimofeyev@paulhastings.com>; Hansson, Kurt W. <kurthansson@paulhastings.com>
**Subject:** [EXTERNAL] RE: Bid Instruction Letter

**PLEASE BE CAUTIOUS: This email originated from outside of Evercore. Do not click links or open attachments unless you recognize the sender and know the content is safe.**

Dear Bob:

Following up on my letter yesterday regarding the bid instructions, attached is a redline implementing our proposed changes.

Best

Nate

---

**Nathan P. Eimer**
312-660-7601


www.eimerstahl.com

NOTICE: This e-mail message and any attachments transmitted with it may contain legally privileged and confidential information. It is not intended for transmission to, or receipt by, any unauthorized persons. If you have received this message in error, please (i) do not read it, (ii) reply to the sender that you received the message in error, and (iii) erase or destroy the message and all attachments. Legal advice contained in the preceding message is solely for the benefit of the Eimer Stahl LLP client(s) represented by the Firm in the particular matter that is the subject of this message, and may not be relied upon by any other party.

**From:** Eimer, Nate <neimer@EimerStahl.com>
**Sent:** Tuesday, April 16, 2024 6:55 PM
**To:** 'Robert Pincus' <rbpincus@gmail.com>

**Cc:** Ray C. Schrock ([ray.schrock@weil.com](mailto:ray.schrock@weil.com)) <[ray.schrock@weil.com](mailto:ray.schrock@weil.com)>; [chase.bentley@weil.com](mailto:chase.bentley@weil.com); Strong, Ray <[ray.strong@evercore.com](mailto:ray.strong@evercore.com)>; [jpizzurro@curtis.com](mailto:jpizzurro@curtis.com); Perla, Juan <[jperla@curtis.com](mailto:jperla@curtis.com)>; [George.Garvey@mto.com](mailto:George.Garvey@mto.com); Donald B. Verrilli, Jr. ([Donald.Verrilli@mto.com](mailto:Donald.Verrilli@mto.com)) <[Donald.Verrilli@mto.com](mailto:Donald.Verrilli@mto.com)>; Timofeyev, Igor <[igortimofeyev@paulhastings.com](mailto:igortimofeyev@paulhastings.com)>; Hansson, Kurt W. <[kurthansson@paulhastings.com](mailto:kurthansson@paulhastings.com)>

**Subject:** Bid Instruction Letter

Dear Bob:

Please see the attached letter.

Nate

---

**Nathan P. Eimer**

Eimer Stahl LLP
224 South Michigan Avenue
Chicago, IL 60604
Phone: 312-660-7601 Fax: 312-692-1718
[neimer@EimerStahl.com](mailto:neimer@EimerStahl.com)



**www.eimerstahl.com**

NOTICE: This e-mail message and any attachments transmitted with it may contain legally privileged and confidential information. It is not intended for transmission to, or receipt by, any unauthorized persons. If you have received this message in error, please (i) do not read it, (ii) reply to the sender that you received the message in error, and (iii) erase or destroy the message and all attachments. Legal advice contained in the preceding message is solely for the benefit of the Eimer Stahl LLP client(s) represented by the Firm in the particular matter that is the subject of this message, and may not be relied upon by any other party.

IMPORTANT INFORMATION: This email is from Evercore. For further information about the particular Evercore entity which has sent you this email, please click here. The information in this email (and any attachment) is confidential, is intended only for use of the intended recipient(s) and must not be used by any other person. If you have received this email in error, please inform Evercore immediately and delete the original. The security, accuracy and timeliness of electronic communications cannot be assured and Evercore does not accept any liability for any virus, malware or similar. If you do not wish to receive certain communications from which you are entitled to unsubscribe under applicable law, please contact the sender of this email to unsubscribe.

DISCLAIMER: Evercore does not provide tax advice and does not provide services to retail customers. Evercore reserves the right to monitor and record electronic and telephone communications made by or to its personnel for regulatory or operational purposes.

PRIVACY: The personal information contained in this email and any attachment, including the names and email address of any and all recipients, and any personal information provided in response to this email, is, to the extent applicable, handled by Evercore in accordance with its Privacy Notice which can be found here. Thank you.

The information contained in this email message is intended only for use of the individual or entity named above. If the reader of this message is not the intended recipient, or the employee or agent responsible to deliver it to the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited. If you have received this communication in error, please immediately notify us by email, postmaster@weil.com, and destroy the original message. Thank you.

Page 1

**Personal and Confidential**

April ~~10~~18, 2024

Participant:

On behalf of Robert B. Pincus in his capacity as Special Master for the United States District Court for the District of Delaware (the "Special Master") in the matter of *Crystallex International Corp. v. Bolivarian Republic of Venezuela*, D. Del. C.A. No. 1:17-mc-00151-LPS (the "Crystallex Case"), we would like to thank you for your consideration of a potential acquisition of all, or a portion, of the shares of PDV Holding Inc. ("PDVH"). CITGO Petroleum Corporation ("CITGO Petroleum") is a direct, wholly owned subsidiary of CITGO Holding, Inc. ("CITGO Holding" and together with CITGO Petroleum, "CITGO") which in turn is 100% owned by PDVH, which in turn is 100% owned by Petróleos de Venezuela, S.A. ("PDVSA"), a Venezuelan corporation 100% owned and controlled by the Bolivarian Republic of Venezuela. Evercore is assisting the Special Master in the implementation of a court-mandated sale of an amount of the shares of PDVH sufficient to satisfy Attached Judgments (as defined in the Sale Procedures Order (defined below))(the "Proposed Transaction").

This letter is being furnished to those persons who have been performing diligence as part of the second round of the Special Master's marketing process. To determine the Special Master's interest in pursuing the Proposed Transaction with you, we invite you to submit a final written, definitive and binding proposal with respect to the Proposed Transaction (your "Proposal"). If the Special Master deems your Proposal to be the bid most likely to satisfy the greatest amount of the Attached Judgments when considering value, certainty of closing and such other factors as the Special Master may determine, in his sole discretion, you may be contacted regarding the process to execute a definitive agreement.

This letter, and the procedures and timetable included herein, are confidential and are subject to the terms of the Confidentiality Agreement that you entered into with the Special Master (the "Confidentiality Agreement") in connection with the Proposed Transaction, the terms of which are not modified or varied by this letter. Unless otherwise defined herein, all capitalized terms used shall have their meaning set forth in the Confidentiality Agreement or the *Sixth Revised Proposed Order (A) Establishing Sale and Bidding Procedures, (B) Approving Special Master's Report and Recommendation Regarding Proposed Sale Procedures Order, (C) Affirming Retention of Evercore as Investment Banker by Special Master and (D) Regarding Related Matters* [D.I. 481] (the "Sale Procedures Order") filed in the Crystallex Case, as context may require.

I.   PROPOSAL

Please submit your Proposal in writing to Evercore at any time before **5:00 PM (Central Time) on Tuesday, June 11, 2024,** (the "Proposal Deadline") via email in care of:

| Evercore | Attention: | Ray Strong | William Hiltz |
|---|---|---|---|
| | | Senior Managing Director | Senior Managing Director |
| | Office: | (713) 427-5146 | (212) 857-3154 |
| | Cell: | (347) 549-2043 | (917) 992-3093 |
| | Email: | ray.strong@evercore.com | hiltz@evercore.com |

E V E R C O R E

Page 2

With a copy to:

| | | |
|---|---|---|
| Weil, Gotshal & Manges LLP | Attention: | Michael J. Aiello |
| | | Ray C. Schrock |
| | | Eoghan P. Keenan |
| | Email: | michael.aiello@weil.com |
| | | ray.schrock@weil.com |
| | | eoghan.keenan@weil.com |

Your Proposal should include, at a minimum, the following information:

**A. Proposed Transaction Structure.** Confirm that your Proposal is for all, or a portion, of the shares of PDVH, sold free and clear of all claims, encumbrances, and liabilities on or against the shares, in accordance with the terms of the Sale Procedures Order. If your Proposal is for a portion of the shares of PDVH, please indicate (i) the percentage of shares of PDVH proposed to be acquired and (ii) any minority shareholder rights, protections or other desired terms in connection with the Proposed Transaction and any definitive documentation related thereto.

Proposals should utilize the following key assumptions and notes with respect to structuring the Proposed Transaction:

    i.   <u>Treatment of Cash and Debt</u>: Your Proposal should assume that the available cash of PDVH and its subsidiaries will be equal in value to the aggregate debt of PDVH and its subsidiaries at the closing of the Proposed Transaction and that any cash in excess of the debt amount shall be for the benefit of the sellers.

    ii.   <u>Working Capital</u>: Your Proposal should assume a normalized amount of working capital, to be determined based upon a working capital calculation included as an exhibit to the definitive SPA, a draft of which will be posted to the data room (the "Target Net Working Capital"). The purchase price will be adjusted on a dollar-for-dollar basis to the extent that the net working capital delivered at closing is greater than or less than, as the case may be, the Target Net Working Capital.

    iii.   <u>PDVSA 2020 Bonds Share Pledge</u>: The Special Master is engaged in discussions with holders of notes issued pursuant to that certain Indenture, dated October 27, 2016 (the "Indenture"), by and among PDVSA, as issuer, PDVSA Petróleo, S.A., as guarantor, MUFG Union Bank, N.A., as trustee, GLAS Americas LLC, as collateral agent, Law Debenture Trust Company of New York, as registrar, transfer agent and principal agent, and Banque Internationale À Luxembourg, Société Anonyme, as Luxembourg paying agent, whereby PDVSA issued 8.50% senior secured notes due in 2020 in the aggregate principal amount of $3,367,529,000 (the "PDVSA 2020 Notes"), purportedly secured by a pledge of the equity of CITGO Holding (the "CITGO Equity Pledge"). The PDVSA 2020 Notes and the CITGO Equity Pledge are currently the subject of litigation in the matter of *Petróleos de Venezuela, S.A., PDVSA Petróleo, S.A., and PDV Holding, Inc., v. MUFG Union Bank, N.A. and GLAS Americas LLC*, Civ. Nos. 20-3858, 20-4127. For purposes of your Proposal, please assume that the CITGO Equity Pledge will be released in advance of, or in connection with, implementation of the Proposed Transaction. In the event you propose to address the CITGO Equity Pledge in a manner other than a release negotiated and implemented by the Special Master, please so indicate in your Proposal.

**B. Stock Purchase Agreement.** A draft Stock Purchase Agreement (the "Proposed SPA") that provides for the acquisition of all, or a portion, of the shares of PDVH, together with a redline

Page 3

marked to show your proposed changes, if any, to the bid draft Stock Purchase Agreement (the "Bid Draft SPA"), which will be posted to the data room (including proposed changes and accompanying redlines for all exhibits and schedules included in the data room). Please provide such comments in Microsoft Word format and include both a clean Word version as well as a PDF comparison to the Bid Draft SPA posted to the data room. Do not submit an issues list or other summary comments instead of a Proposed SPA with a redline against the Bid Draft SPA to show all proposed comments. The Proposed SPA you submit should include all of your requested changes to the Bid Draft SPA and should include specific, in-line edits and not conceptual, non-specific or footnoted comments. Please note that the Special Master will consider the extent of any comments to the Bid Draft SPA in selecting a counterparty with which to proceed.

C. **Identity of Purchaser or Counterparty.** A statement identifying the legal name, jurisdiction and type of organization/entity form of each entity that will act as purchaser or counterparty in the Proposed Transaction, including the identity of any controlling person(s), principal equityholders, whether current or anticipated, and each other entity that will be otherwise participating in your Proposal (if applicable), as well as a summary of such organization/entities' history, primary business and sufficient information to demonstrate that such organization/entity has the financial wherewithal to timely consummate the Proposed Transaction.

D. **Purchase Price and Principal Economic Terms.** A statement setting forth (i) the total equity value you assign to the shares of PDVH ("Valuation") determined based upon the key assumptions described under paragraph A above, (ii) the amount and a detailed analysis of any non-cash components of the purchase price, including without limitation, a credit bid, stock and/or the assumption of liabilities, and the value of such components, any assumptions related thereto, and reasonable back-up documentation to support such value, (iii) a brief description of the methodology used to derive the Valuation, (iv) an identification of any underlying material assumptions regarding the business of PDVH and CITGO and your determination of the purchase price and (v) disclosure of any related transactions to be pursued or effectuated by you in connection with the Proposed Transaction. The Special Master may consider alternative structures in the event that it maximizes value of the PDVH shares.

E. **Sources of Financing.** A detailed description of the sources of funds that you intend to use to finance the Proposed Transaction. Please provide copies of the financing commitments and other similar documentation (as applicable) from all sources, such that your Proposal clearly and affirmatively demonstrates that it is not subject to any financing condition. Certainty of financing is critical and will factor into the Special Master's decision.

F. **Credit Bid (if applicable).** If you hold an Attached Judgment, you may seek to submit a credit bid (a "Credit Bid") for the shares of PDVH, to the extent permitted by applicable law. If you are submitting a Credit Bid, please state as such, and confirm that such Credit Bid will (i) provide sufficient cash consideration to pay in full all Transaction Expenses and (ii) provide sufficient cash to satisfy in full any obligations secured by a senior lien on the shares of PDVH, ~~as well as~~including (to the extent you are not proposing an alternative solution to account for the CITGO Equity Pledge described in paragraph A(iii) above) the PDVSA 2020 Notes claim ~~(the latter of which may be placed into escrow subject to resolution of pending litigation or such other treatment as may be consensually agreed with holders of the PDVSA 2020 Notes)~~.

G. **Purchaser Approvals.** Evidence of corporate or other organizational authorization and approval from your board of directors (or comparable governing body) or otherwise with respect to the submission, execution and delivery of the Proposal (including the execution of the Proposed SPA), participation in any auction and closing of the Proposed Transaction contemplated by the Proposed SPA in accordance with its terms and the terms of the Sale Procedures Order (including the Bidding Procedures contained therein), and an indication of any anticipated need, timeline and plan to obtain

**E**VERCORE

Page 4

any further equityholder, board, organizational, partnership, investment committee or other approval, including governmental, regulatory and other third-party approvals, consents, notifications, waivers or other similar actions that you anticipate will be required to execute a definitive Stock Purchase Agreement (the "definitive SPA"). Please also include a statement or evidence that (i) you will make in a timely manner (1) all filings and disclosures necessary to comply with the regulations of the Department of Treasury's Office of Foreign Assets Control ("OFAC"), (2) all necessary filings under the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended, and any other antitrust laws, as applicable, and pay the fees associated with such filings and (3) all necessary filings in connection with any review by the Committee on Foreign Investment in the United States (CFIUS), if applicable and (ii) your Proposal is reasonably likely to be consummated, after taking into consideration antitrust and any other regulatory matters, your prior experience and any other relevant considerations, if selected as the Successful Bid, within a timeframe acceptable to the Special Master.

**H. Due Diligence Requirements.** Your Proposal should not be subject to any remaining due diligence. You may be permitted to conduct a confirmatory review of any specific and reasonable due diligence materials or activities that you have requested and received confirmation that such information will be available at a later date. If such outstanding confirmatory due diligence items exist, please specifically indicate and provide details regarding these items that you would require prior to execution of the definitive SPA, and include your expected dates of completion of such items.

**I. Advisors.** A list of the financial, accounting, legal, industry consultants and other advisors that you have retained or plan to retain in connection with the Proposed Transaction.

**J. Contacts.** A list of persons (including e-mail addresses and phone numbers) who should be contacted with respect to any questions regarding your Proposal.

**K. Special Master Consent.** Your consent for the Special Master, in his discretion, to share information with U.S. Government regulators, including OFAC, pertaining to you or your Proposal.

**L. Cooperation**. A statement that (i) you agree that your advisors will coordinate in good faith with the Special Master's advisors to discuss and explain your regulatory and other consent analysis, strategy and timeline for securing all such approvals and consents as soon as reasonably practicable and (ii) you agree to cooperate with the Special Master to provide pertinent factual information regarding your ownership and operations reasonably required to respond to, or otherwise analyze issues arising with respect to, U.S. sanctions laws and regulations, the Committee on Foreign Investment in the United States, any applicable antitrust laws and other relevant regulatory requirements or requests.

**M. No Entitlement to Reimbursement**. A statement that your Proposal does not entitle you to any break-up fee, termination fee, expense reimbursement or similar type of payment or reimbursement; provided, however, the definitive SPA will include a termination fee in connection with certain termination events.

**N. No Liability**. A statement that (i) you agree that in no circumstance shall the Special Master or his advisors be personally or otherwise liable for any amounts or obligations owed to you, (ii) the Special Master and his advisors are acting as an arm of the Court and are entitled to judicial immunity in the performance of their duties and (iii) PDVH, CITGO and their respective officers, directors and advisors will have no liability or obligation to you or your affiliates, except and only to the extent it is expressly provided for in the definitive SPA if, as and when executed.

**O. Representations and Warranties**. The following representations and warranties:

Page 5

    a.   a statement that you recognize and acknowledge that the Special Master, his advisors, PDVH, CITGO and their respective representatives make no representations, covenants or warranties (or any other promise) as to the accuracy or completeness of any information provided in the data room or otherwise made available by the Special Master and his advisors in connection with the bid process;

    b.   a statement that, other than with respect to your reliance on the representations and warranties provided in the definitive SPA if, as and when executed, you have relied solely upon your own independent review, investigation and/or inspection of any relevant documents regarding the assets to be purchased and did not rely on any written or oral statements, representations, promises, warranties or guaranties whatsoever, whether express or implied, by operation of law or otherwise, regarding PDVH and its subsidiaries or the completeness of any information made available in connection therewith;

    c.   a statement that you have not engaged in any collusion with respect to the submission of your Proposal; and

    d.   a statement that all proof of financial ability to consummate the Proposed Transaction in a timely manner and other information you submit is true and correct.

**P.**  **Bidding Procedures**. A statement that you agree to be bound by the terms and conditions of the Bidding Procedures set out in the Sale Procedures Order.

**Q.**  **Other Material Terms.**  A list of any additional terms or conditions the satisfaction of which you anticipate would be a material condition precedent to executing the definitive SPA with respect to the Proposed Transaction.

## II.  Conditional Selection of Prospective Purchaser

Based upon, among other things, an analysis of the purchase price and other terms presented in your Proposal, the Special Master, in his sole and absolute discretion, may elect to further pursue the Proposed Transaction with you.

Please note that the existence and terms of this letter and any related communications and/or information provided in connection therewith are subject to your Confidentiality Agreement with the Special Master and should be treated accordingly.

## III.  All Rights Reserved

All communications, inquiries and requests for information relating to the Proposed Transaction, including any materials in connection therewith, should be directed to Evercore. **Neither you nor your employees, representatives, agents, affiliates, partners, co-venturers or other related parties are permitted to contact the Special Master, PDVSA, PDVH, CITGO or its subsidiaries, or any of their direct or indirect affiliates, directors, managers, officers, employees, suppliers, vendors, customers, financiers, counterparties, partners, co-venturers or regulators, either directly or indirectly, in relation to any matter set forth in this letter or in relation to the Proposed Transaction.**

This letter does not constitute an offer to sell PDVH or its assets. You acknowledge and agree that the Special Master has the right, in his sole and absolute discretion, to reject any and all proposals regarding any Proposed Transaction and to negotiate with one or more parties simultaneously and terminate discussions and negotiations of any Proposed Transaction with any one or more parties at any time, for any reason or for no reason; that the procedures which the Special Master may employ in the pursuit of any Proposed

E V E R C O R E

Page 6

Transaction, if any such pursuit is undertaken, are within his sole and absolute discretion; that any such procedures are subject to change at any time for any reason or for no reason and with or without prior notice; that determinations of compliance or noncompliance with such procedures will be solely and completely judged by the Special Master, and the sole remedy for any objection to such procedures, the application thereof or any judgment exercised by the Special Master with respect thereto will be withdrawal, without further recourse, from participation in further discussions with respect to the Proposed Transaction. No agreement or understanding regarding a Proposed Transaction shall be deemed to exist unless and until the definitive SPA regarding the Proposed Transaction has been executed and delivered by the parties thereto, and no prospective purchaser shall have any claim based upon any legal theory in connection with a Proposed Transaction unless and until the parties shall have entered into, executed and delivered the definitive SPA.

**By submitting your Proposal, you acknowledge that you have reviewed this letter and that you agree without reservation to all terms, restrictions and conditions contained herein.**

We encourage you to contact the following individuals with any questions regarding your Proposal or any other matter set forth in this letter:

|  |  |
|---|---|
| Ray Strong | William Hiltz |
| Senior Managing Director | Senior Managing Director |
| Office: (713) 427-5146 | Office: (212) 857-3154 |
| Cell: (347) 549-2043 | Cell: (917) 992-3093 |
| ray.strong@evercore.com | hiltz@evercore.com |

The Special Master and Evercore appreciate your interest in this process and look forward to working with you with respect to the Proposed Transaction.

Sincerely,

Ray Strong
Senior Managing Director
Evercore on behalf of the Special Master

**E VERCORE**

| Summary report: Litera Compare for Word 11.5.0.74 Document comparison done on 4/18/2024 7:25:23 PM | |
|---|---|
| **Style name:** Default Style | |
| **Intelligent Table Comparison:** Active | |
| **Original DMS:** iw://weildms.weil.com/WEIL/99687382/1 | |
| **Modified DMS:** iw://weildms.weil.com/WEIL/99687382/3 | |
| **Changes:** | |
| Add | 5 |
| Delete | 9 |
| Move From | 0 |
| Move To | 0 |
| Table Insert | 0 |
| Table Delete | 0 |
| Table moves to | 0 |
| Table moves from | 0 |
| Embedded Graphics (Visio, ChemDraw, Images etc.) | 0 |
| Embedded Excel | 0 |
| Format changes | 0 |
| **Total Changes:** | 14 |

Page 1

**Personal and Confidential**

April 18, 2024

Participant:

On behalf of Robert B. Pincus in his capacity as Special Master for the United States District Court for the District of Delaware (the "Special Master") in the matter of *Crystallex International Corp. v. Bolivarian Republic of Venezuela*, D. Del. C.A. No. 1:17-mc-00151-LPS (the "Crystallex Case"), we would like to thank you for your consideration of a potential acquisition of all, or a portion, of the shares of PDV Holding Inc. ("PDVH"). CITGO Petroleum Corporation ("CITGO Petroleum") is a direct, wholly owned subsidiary of CITGO Holding, Inc. ("CITGO Holding" and together with CITGO Petroleum, "CITGO") which in turn is 100% owned by PDVH, which in turn is 100% owned by Petróleos de Venezuela, S.A. ("PDVSA"), a Venezuelan corporation 100% owned and controlled by the Bolivarian Republic of Venezuela. Evercore is assisting the Special Master in the implementation of a court-mandated sale of an amount of the shares of PDVH sufficient to satisfy Attached Judgments (as defined in the Sale Procedures Order (defined below))(the "Proposed Transaction").

This letter is being furnished to those persons who have been performing diligence as part of the second round of the Special Master's marketing process. To determine the Special Master's interest in pursuing the Proposed Transaction with you, we invite you to submit a final written, definitive and binding proposal with respect to the Proposed Transaction (your "Proposal"). If the Special Master deems your Proposal to be the bid most likely to satisfy the greatest amount of the Attached Judgments when considering value, certainty of closing and such other factors as the Special Master may determine, in his sole discretion, you may be contacted regarding the process to execute a definitive agreement.

This letter, and the procedures and timetable included herein, are confidential and are subject to the terms of the Confidentiality Agreement that you entered into with the Special Master (the "Confidentiality Agreement") in connection with the Proposed Transaction, the terms of which are not modified or varied by this letter. Unless otherwise defined herein, all capitalized terms used shall have their meaning set forth in the Confidentiality Agreement or the *Sixth Revised Proposed Order (A) Establishing Sale and Bidding Procedures, (B) Approving Special Master's Report and Recommendation Regarding Proposed Sale Procedures Order, (C) Affirming Retention of Evercore as Investment Banker by Special Master and (D) Regarding Related Matters* [D.I. 481] (the "Sale Procedures Order") filed in the Crystallex Case, as context may require.

I.   **PROPOSAL**

Please submit your Proposal in writing to Evercore at any time before **5:00 PM (Central Time) on Tuesday, June 11, 2024,** (the "Proposal Deadline") via email in care of:

| Evercore | Attention: | Ray Strong | William Hiltz |
|---|---|---|---|
| | | Senior Managing Director | Senior Managing Director |
| | Office: | (713) 427-5146 | (212) 857-3154 |
| | Cell: | (347) 549-2043 | (917) 992-3093 |
| | Email: | ray.strong@evercore.com | hiltz@evercore.com |

**E V E R C O R E**

Page 2

With a copy to:

| | | |
|---|---|---|
| Weil, Gotshal & Manges LLP | Attention: | Michael J. Aiello |
| | | Ray C. Schrock |
| | | Eoghan P. Keenan |
| | Email: | michael.aiello@weil.com |
| | | ray.schrock@weil.com |
| | | eoghan.keenan@weil.com |

Your Proposal should include, at a minimum, the following information:

**A.** **Proposed Transaction Structure.** Confirm that your Proposal is for all, or a portion, of the shares of PDVH, sold free and clear of all claims, encumbrances, and liabilities on or against the shares, in accordance with the terms of the Sale Procedures Order. If your Proposal is for a portion of the shares of PDVH, please indicate (i) the percentage of shares of PDVH proposed to be acquired and (ii) any minority shareholder rights, protections or other desired terms in connection with the Proposed Transaction and any definitive documentation related thereto.

Proposals should utilize the following key assumptions and notes with respect to structuring the Proposed Transaction:

   i.   <u>Treatment of Cash and Debt</u>: Your Proposal should assume that the available cash of PDVH and its subsidiaries will be equal in value to the aggregate debt of PDVH and its subsidiaries at the closing of the Proposed Transaction and that any cash in excess of the debt amount shall be for the benefit of the sellers.

   ii.  <u>Working Capital</u>: Your Proposal should assume a normalized amount of working capital, to be determined based upon a working capital calculation included as an exhibit to the definitive SPA, a draft of which will be posted to the data room (the "Target Net Working Capital"). The purchase price will be adjusted on a dollar-for-dollar basis to the extent that the net working capital delivered at closing is greater than or less than, as the case may be, the Target Net Working Capital.

   iii. <u>PDVSA 2020 Bonds Share Pledge</u>: The Special Master is engaged in discussions with holders of notes issued pursuant to that certain Indenture, dated October 27, 2016 (the "Indenture"), by and among PDVSA, as issuer, PDVSA Petróleo, S.A., as guarantor, MUFG Union Bank, N.A., as trustee, GLAS Americas LLC, as collateral agent, Law Debenture Trust Company of New York, as registrar, transfer agent and principal agent, and Banque Internationale À Luxembourg, Société Anonyme, as Luxembourg paying agent, whereby PDVSA issued 8.50% senior secured notes due in 2020 in the aggregate principal amount of $3,367,529,000 (the "PDVSA 2020 Notes"), purportedly secured by a pledge of the equity of CITGO Holding (the "CITGO Equity Pledge"). The PDVSA 2020 Notes and the CITGO Equity Pledge are currently the subject of litigation in the matter of *Petróleos de Venezuela, S.A., PDVSA Petróleo, S.A., and PDV Holding, Inc., v. MUFG Union Bank, N.A. and GLAS Americas LLC*, Civ. Nos. 20-3858, 20-4127. For purposes of your Proposal, please assume that the CITGO Equity Pledge will be released in advance of, or in connection with, implementation of the Proposed Transaction. In the event you propose to address the CITGO Equity Pledge in a manner other than a release negotiated and implemented by the Special Master, please so indicate in your Proposal.

E V E R C O R E

Page 3

**B. Stock Purchase Agreement.** A draft Stock Purchase Agreement (the "Proposed SPA") that provides for the acquisition of all, or a portion, of the shares of PDVH, together with a redline marked to show your proposed changes, if any, to the bid draft Stock Purchase Agreement (the "Bid Draft SPA"), which will be posted to the data room (including proposed changes and accompanying redlines for all exhibits and schedules included in the data room). Please provide such comments in Microsoft Word format and include both a clean Word version as well as a PDF comparison to the Bid Draft SPA posted to the data room. Do not submit an issues list or other summary comments instead of a Proposed SPA with a redline against the Bid Draft SPA to show all proposed comments. The Proposed SPA you submit should include all of your requested changes to the Bid Draft SPA and should include specific, in-line edits and not conceptual, non-specific or footnoted comments. Please note that the Special Master will consider the extent of any comments to the Bid Draft SPA in selecting a counterparty with which to proceed.

**C. Identity of Purchaser or Counterparty.** A statement identifying the legal name, jurisdiction and type of organization/entity form of each entity that will act as purchaser or counterparty in the Proposed Transaction, including the identity of any controlling person(s), principal equityholders, whether current or anticipated, and each other entity that will be otherwise participating in your Proposal (if applicable), as well as a summary of such organization/entities' history, primary business and sufficient information to demonstrate that such organization/entity has the financial wherewithal to timely consummate the Proposed Transaction.

**D. Purchase Price and Principal Economic Terms.** A statement setting forth (i) the total equity value you assign to the shares of PDVH ("Valuation") determined based upon the key assumptions described under paragraph A above, (ii) the amount and a detailed analysis of any non-cash components of the purchase price, including without limitation, a credit bid, stock and/or the assumption of liabilities, and the value of such components, any assumptions related thereto, and reasonable back-up documentation to support such value, (iii) a brief description of the methodology used to derive the Valuation, (iv) an identification of any underlying material assumptions regarding the business of PDVH and CITGO and your determination of the purchase price and (v) disclosure of any related transactions to be pursued or effectuated by you in connection with the Proposed Transaction.  The Special Master may consider alternative structures in the event that it maximizes value of the PDVH shares.

**E. Sources of Financing.** A detailed description of the sources of funds that you intend to use to finance the Proposed Transaction. Please provide copies of the financing commitments and other similar documentation (as applicable) from all sources, such that your Proposal clearly and affirmatively demonstrates that it is not subject to any financing condition. Certainty of financing is critical and will factor into the Special Master's decision.

**F. Credit Bid (if applicable)**. If you hold an Attached Judgment, you may seek to submit a credit bid (a "Credit Bid") for the shares of PDVH, to the extent permitted by applicable law. If you are submitting a Credit Bid, please state as such, and confirm that such Credit Bid will (i) provide sufficient cash consideration to pay in full all Transaction Expenses and (ii) provide sufficient cash to satisfy in full any obligations secured by a senior lien on the shares of PDVH, including (to the extent you are not proposing an alternative solution to account for the CITGO Equity Pledge described in paragraph A(iii) above) the PDVSA 2020 Notes claim.

**G. Purchaser Approvals.** Evidence of corporate or other organizational authorization and approval from your board of directors (or comparable governing body) or otherwise with respect to the submission, execution and delivery of the Proposal (including the execution of the Proposed SPA),

E V E R C O R E

Page 4

participation in any auction and closing of the Proposed Transaction contemplated by the Proposed SPA in accordance with its terms and the terms of the Sale Procedures Order (including the Bidding Procedures contained therein), and an indication of any anticipated need, timeline and plan to obtain any further equityholder, board, organizational, partnership, investment committee or other approval, including governmental, regulatory and other third-party approvals, consents, notifications, waivers or other similar actions that you anticipate will be required to execute a definitive Stock Purchase Agreement (the "definitive SPA"). Please also include a statement or evidence that (i) you will make in a timely manner (1) all filings and disclosures necessary to comply with the regulations of the Department of Treasury's Office of Foreign Assets Control ("OFAC"), (2) all necessary filings under the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended, and any other antitrust laws, as applicable, and pay the fees associated with such filings and (3) all necessary filings in connection with any review by the Committee on Foreign Investment in the United States (CFIUS), if applicable and (ii) your Proposal is reasonably likely to be consummated, after taking into consideration antitrust and any other regulatory matters, your prior experience and any other relevant considerations, if selected as the Successful Bid, within a timeframe acceptable to the Special Master.

H. **Due Diligence Requirements.** Your Proposal should not be subject to any remaining due diligence. You may be permitted to conduct a confirmatory review of any specific and reasonable due diligence materials or activities that you have requested and received confirmation that such information will be available at a later date. If such outstanding confirmatory due diligence items exist, please specifically indicate and provide details regarding these items that you would require prior to execution of the definitive SPA, and include your expected dates of completion of such items.

I. **Advisors.** A list of the financial, accounting, legal, industry consultants and other advisors that you have retained or plan to retain in connection with the Proposed Transaction.

J. **Contacts.** A list of persons (including e-mail addresses and phone numbers) who should be contacted with respect to any questions regarding your Proposal.

K. **Special Master Consent.** Your consent for the Special Master, in his discretion, to share information with U.S. Government regulators, including OFAC, pertaining to you or your Proposal.

L. **Cooperation**. A statement that (i) you agree that your advisors will coordinate in good faith with the Special Master's advisors to discuss and explain your regulatory and other consent analysis, strategy and timeline for securing all such approvals and consents as soon as reasonably practicable and (ii) you agree to cooperate with the Special Master to provide pertinent factual information regarding your ownership and operations reasonably required to respond to, or otherwise analyze issues arising with respect to, U.S. sanctions laws and regulations, the Committee on Foreign Investment in the United States, any applicable antitrust laws and other relevant regulatory requirements or requests.

M. **No Entitlement to Reimbursement**. A statement that your Proposal does not entitle you to any break-up fee, termination fee, expense reimbursement or similar type of payment or reimbursement; provided, however, the definitive SPA will include a termination fee in connection with certain termination events.

E V E R C O R E

Page 5

**N. No Liability**. A statement that (i) you agree that in no circumstance shall the Special Master or his advisors be personally or otherwise liable for any amounts or obligations owed to you, (ii) the Special Master and his advisors are acting as an arm of the Court and are entitled to judicial immunity in the performance of their duties and (iii) PDVH, CITGO and their respective officers, directors and advisors will have no liability or obligation to you or your affiliates, except and only to the extent it is expressly provided for in the definitive SPA if, as and when executed.

**O. Representations and Warranties**. The following representations and warranties:

    a.  a statement that you recognize and acknowledge that the Special Master, his advisors, PDVH, CITGO and their respective representatives make no representations, covenants or warranties (or any other promise) as to the accuracy or completeness of any information provided in the data room or otherwise made available by the Special Master and his advisors in connection with the bid process;

    b.  a statement that, other than with respect to your reliance on the representations and warranties provided in the definitive SPA if, as and when executed, you have relied solely upon your own independent review, investigation and/or inspection of any relevant documents regarding the assets to be purchased and did not rely on any written or oral statements, representations, promises, warranties or guaranties whatsoever, whether express or implied, by operation of law or otherwise, regarding PDVH and its subsidiaries or the completeness of any information made available in connection therewith;

    c.  a statement that you have not engaged in any collusion with respect to the submission of your Proposal; and

    d.  a statement that all proof of financial ability to consummate the Proposed Transaction in a timely manner and other information you submit is true and correct.

**P. Bidding Procedures**. A statement that you agree to be bound by the terms and conditions of the Bidding Procedures set out in the Sale Procedures Order.

**Q. Other Material Terms.** A list of any additional terms or conditions the satisfaction of which you anticipate would be a material condition precedent to executing the definitive SPA with respect to the Proposed Transaction.

## II. CONDITIONAL SELECTION OF PROSPECTIVE PURCHASER

Based upon, among other things, an analysis of the purchase price and other terms presented in your Proposal, the Special Master, in his sole and absolute discretion, may elect to further pursue the Proposed Transaction with you.

Please note that the existence and terms of this letter and any related communications and/or information provided in connection therewith are subject to your Confidentiality Agreement with the Special Master and should be treated accordingly.

EVERCORE

Page 6

### III.  ALL RIGHTS RESERVED

All communications, inquiries and requests for information relating to the Proposed Transaction, including any materials in connection therewith, should be directed to Evercore. **Neither you nor your employees, representatives, agents, affiliates, partners, co-venturers or other related parties are permitted to contact the Special Master, PDVSA, PDVH, CITGO or its subsidiaries, or any of their direct or indirect affiliates, directors, managers, officers, employees, suppliers, vendors, customers, financiers, counterparties, partners, co-venturers or regulators, either directly or indirectly, in relation to any matter set forth in this letter or in relation to the Proposed Transaction.**

This letter does not constitute an offer to sell PDVH or its assets. You acknowledge and agree that the Special Master has the right, in his sole and absolute discretion, to reject any and all proposals regarding any Proposed Transaction and to negotiate with one or more parties simultaneously and terminate discussions and negotiations of any Proposed Transaction with any one or more parties at any time, for any reason or for no reason; that the procedures which the Special Master may employ in the pursuit of any Proposed Transaction, if any such pursuit is undertaken, are within his sole and absolute discretion; that any such procedures are subject to change at any time for any reason or for no reason and with or without prior notice; that determinations of compliance or noncompliance with such procedures will be solely and completely judged by the Special Master, and the sole remedy for any objection to such procedures, the application thereof or any judgment exercised by the Special Master with respect thereto will be withdrawal, without further recourse, from participation in further discussions with respect to the Proposed Transaction. No agreement or understanding regarding a Proposed Transaction shall be deemed to exist unless and until the definitive SPA regarding the Proposed Transaction has been executed and delivered by the parties thereto, and no prospective purchaser shall have any claim based upon any legal theory in connection with a Proposed Transaction unless and until the parties shall have entered into, executed and delivered the definitive SPA.

**By submitting your Proposal, you acknowledge that you have reviewed this letter and that you agree without reservation to all terms, restrictions and conditions contained herein.**

We encourage you to contact the following individuals with any questions regarding your Proposal or any other matter set forth in this letter:

|  |  |
|---|---|
| Ray Strong | William Hiltz |
| Senior Managing Director | Senior Managing Director |
| Office: (713) 427-5146 | Office: (212) 857-3154 |
| Cell: (347) 549-2043 | Cell: (917) 992-3093 |
| ray.strong@evercore.com | hiltz@evercore.com |

The Special Master and Evercore appreciate your interest in this process and look forward to working with you with respect to the Proposed Transaction.

Sincerely,

Ray Strong

Page 7

Senior Managing Director
Evercore on behalf of the Special Master

# EXHIBIT H



## Curtis, Mallet-Prevost, Colt & Mosle LLP

| | | | |
|---|---|---|---|
| Almaty | Houston | | **Telephone  +1 212 696 6000** |
| Astana | London | | **Facsimile  +1 212 697 1559** |
| Beijing | Mexico City | 101 Park Avenue | www.curtis.com |
| Bogotá | Milan | New York, New York 10178-0061 | |
| Brussels | Muscat | | |
| Buenos Aires | Paris | | **Joseph D. Pizzurro** |
| Dubai | Riyadh | | Tel: +1 212 696 6196 |
| Frankfurt | Rome | | Fax: +1 917 368 8996 |
| Geneva | Washington, D.C. | | E-Mail: jpizzurro@curtis.com |

April 23, 2024

<u>**VIA EMAIL – HIGHLY CONFIDENTIAL**</u>
ROBERT B. PINCUS in his capacity as Special Master for
the United States District Court for the District of Delaware
PO Box 4570
Wilmington, DE 19807
rbpincus@gmail.com

> Re: *Crystallex International Corporation v. Bolivarian Republic of Venezuela*
> **(No. 17-mc-151-LPS) – The Republic and PDVSA's Objection to**
> **Proposed Round 2 Bidding Instructions**

Dear Special Master:

We write on behalf of the Bolivarian Republic of Venezuela (the "Republic") and Petróleos de Venezuela, S.A. (PDVSA) in response to your proposed Round 2 bidding instructions as amended on April 18, 2024 ("Bid Instructions"). The Republic and PDVSA have serious concerns with the Bid Instructions' treatment of the purported "PDVSA 2020 Notes Share Pledge." The current proposal instructs potential bidders to "assume that the CITGO Equity Pledge will be released in advance of, or in connection with, implementation of the Proposed Transaction," Bid Instructions ¶ A.iii, and directs any party submitting a credit bid to "confirm" that such bid will "provide sufficient cash to satisfy in full … the PDVSA 2020 Notes claim," *id.* ¶ F.[1] There is no legitimate basis either for this assumption or for the imposition of the requirement that any prospective credit bid be designed to compensate—particularly "in full"—the 2020 noteholders. This assumption, moreover, is contrary to your prior representations to the Court that potential bidders will be fully capable of factoring the 2020 noteholders' claim into their bidding

---

[1] While the Bid Instructions no longer contemplate placing this amount in escrow, PDVSA would object to the inclusion of any such provision, as it would not remedy the problem, particularly in the absence of any detail as to the escrow conditions or its subsequent disbursement.

**CURTIS**

**Curtis, Mallet-Prevost, Colt & Mosle LLP**

April 23, 2024
Page 2

decisions—representations on which the Court relied in approving the sales process. *See* Mem. Order, No. 17-mc-151, D.I. 643 at 10 (D. Del. July 17, 2023).

In a similar vein, the current proposal refers to "a release negotiated and implemented by the Special Master," Bid Instructions ¶ A.iii. The Special Master has no authority to negotiate and implement unilaterally a release of the claims being litigated before the Southern District of New York and U.S. Court of Appeals for the Second Circuit, nor do you have any authority (from this Court or otherwise) to enter into a settlement agreement unilaterally with holders of the 2020 Notes. To the contrary, the district court in that litigation has ordered that until the disposition of the appeal before the Second Circuit, the holders "shall not attempt to enforce the Pledge Agreement or otherwise to exercise any rights, remedies or privileges purportedly arising from a default or Event of Default under the Pledge Agreement, including by attempting to sell the collateral securing the 2020 Notes." *See* Order, , *Petróleos de Venezuela S.A. v. MUFG Union Bank,* 19 Civ. 10023 (KPF)  (S.D.N.Y. Dec. 29, 2020), D.I. 241 at 7.

As you are aware, the validity of the 2020 Notes—and of the associated Share Pledge— are subject to litigation that is now pending before the Second Circuit. In that litigation, PDVSA recently prevailed before the New York Court of Appeals, which held (on certification from the Second Circuit) that Venezuelan—not New York—law governs the validity of the 2020 Notes. *See Petróleos de Venezuela S.A. v. MUFG Union Bank, N.A.*, --- N.E.3d ---, 2024 N.Y. LEXIS 68 (N.Y. Feb. 20, 2024). As PDVSA has consistently argued, the 2020 Notes are invalid under Venezuelan law because their issuance (in an exchange offer under the Maduro regime) was never authorized by the Venezuelan National Assembly, as is required under the Venezuelan Constitution. After the publication of the news that the Maduro regime was issuing the 2020 Notes without the National Assembly's consent, the holders of 60% of the old notes declined to exchange them for 2020 Notes. Thus, as PDVSA has already argued, and as the district court may soon need to address on remand, those who participated in the exchange did so with notice of the constitutional infirmity of their purported pledge of CITGO shares. The Second Circuit previously observed—and the 2020 noteholders conceded—that the New York Court of Appeals' ruling would require a vacatur of the district court's judgment that the notes and the pledge are valid, and a remand for the application of Venezuelan law. *See Petróleos de Venezuela S.A. v. MUFG Union Bank, N.A.*, 51 F.4th 456, 474-76 (2d Cir. 2022); *id.*, Appellee's Br. 51, No. 20-3858 (2d Cir. May 14, 2021), Doc. No. 187. And the Second Circuit may even hold the 2020 Notes invalid outright under the act of state doctrine. *See id.*, Appellants' Suppl. Br. 6-25, No. 20-3858 (2d Cir. Mar. 19, 2024), Doc. No. 348.

In these circumstances, the 2020 noteholders' claim is, at best, of dubious legal merit, and its potential value should be discounted accordingly. To do otherwise would be to reward the 2020 noteholders *before* they have established the validity of their claim, to place PDVSA as the indirect owner of PDVH's assets at an unfair disadvantage, and to create a risk of destroying value and creating inequitable solutions toward creditors. This situation reveals that there is no basis for the Bid Instructions to prescribe provisions designed to "satisfy in full" the 2020 noteholders' claim.

**CURTIS**

**Curtis, Mallet-Prevost, Colt & Mosle LLP**

April 23, 2024
Page 3

Apart from the absence of any affirmative authority under which the Special Master could unilaterally negotiate "a release negotiated and implemented" by the Special Master, doing so would be contrary to material factual representations previously made to the Court by both the Special Master and the creditors. Specifically, your claim that the bidding process will not be successful unless the Special Master secures a release of the pledge is contrary to your representations to the Court (based on advice you received from Evercore) that "Potential Bidders *will be fully capable of valuing the PDVH Shares* and the CITGO operations agnostic to capital structure, *including whether claims held by the PDVSA 2020 Bondholders ... will need to be satisfied by the Sale Transaction proceeds*." No. 17-mc-151, D.I. 583 at ¶ 10 (emphasis added). The Court expressly relied on these representations in approving the sales process prior to the resolution of the PDVSA 2020 Notes litigation, including "the Special Master's insistence that the ongoing 2020 Bondholders' Litigation will be no impediment to his efforts." *See id.*, D.I. 643 at 10-11. The Court also found "credibl[e]" the assertion of Crystallex that "bidders will simply price their view of the risk associated with currently pending litigation when formulating their bids." *Id.* at 10 (internal quotation marks and citation omitted).

The Court outlined a range of options available in the event the concern that "bids will be chilled actually materializes." *Id*. The Special Master could reject the bids that were inadequate or insufficient, adjourn the auction and/or the sale hearing, or choose not to select a successful bid, all subject to the Court's ultimate decisions. *Id.* But that range of options notably does not include negotiating an agreement with the 2020 noteholders to eliminate, at the expense of PDVSA and/or holders of Attached Judgments, any uncertainty posed by their claim. In requiring that potential bidders provide sufficient cash to enable such negotiation and compensate the 2020 noteholders, the Bid Instructions stray beyond the Special Master's mandate.

PDVSA (supported by the Republic as *amicus*) has advanced powerful arguments in its multi-year challenge to the 2020 Notes' validity—litigation in which it has prevailed in the New York Court of Appeals, and that is now back before the Second Circuit. Like the Special Master, PDVSA would certainly prefer that the Pledge of the CITGO Holding shares did not exist, but given that it does, the Special Master cannot simply extinguish it by fiat, whatever the cost. A general desire to eliminate uncertainty regarding the value of the PDVH shares does not justify forcing PDVSA and other Sale Process Parties to accept setting aside funds from the Sales Process to retire the 2020 Notes, or a settlement negotiated without PDVSA's consent by the Special Master. The need to avoid such an overreach is particularly compelling given PDVSA's powerful arguments as to the 2020 Notes' invalidity, and the significant decision in PDVSA's favor in their litigation. PDVSA has recently prevailed before the Southern District of New York in *VR Global Partners, L.P v. Petróleos de Venezuela*, No. 23-cv-5604, 2024 U.S. Dist. LEXIS 64838 (S.D.N.Y. Apr. 8, 2024), against accusations of fraud in connection with the issuance of the 2020 Notes. In its dismissal, the district court correctly recognized VR Global's fraud allegations as illogical and implausible, which is further evidence of the legitimacy of PDVSA's defenses in this landmark litigation.

Finally, we would call to your attention that on April 15, 2024, the Department of Treasury further suspended General License 5 until August 13, 2024. The effect of this is to continue the

**CURTIS**

**Curtis, Mallet-Prevost, Colt & Mosle LLP**

April 23, 2024
Page 4

sanctions against dealings in the 2020 Notes, including the entry into any settlement agreement concerning the 2020 Notes without first obtaining a specific license. This recent extension highlights the importance of the 2020 Notes litigation to the foreign policy and the national interests of the United States, to which all parties involved in the Sale Process should pay due regard.

For the avoidance of doubt, PDVSA and the Republic reserve all of their rights and waive none in connection with the sale process and in connection with the 2020 Notes.

Very truly yours,

*s/ George M. Garvey*
George M. Garvey
Counsel for the Republic

*s/ Joseph D. Pizzurro*
Joseph D. Pizzurro
Counsel for PDVSA

Page 1

<u>**Personal and Confidential**</u>

April 18, 2024

Participant:

On behalf of Robert B. Pincus in his capacity as Special Master for the United States District Court for the District of Delaware (the "Special Master") in the matter of *Crystallex International Corp. v. Bolivarian Republic of Venezuela*, D. Del. C.A. No. 1:17-mc-00151-LPS (the "Crystallex Case"), we would like to thank you for your consideration of a potential acquisition of all, or a portion, of the shares of PDV Holding Inc. ("PDVH"). CITGO Petroleum Corporation ("CITGO Petroleum") is a direct, wholly owned subsidiary of CITGO Holding, Inc. ("CITGO Holding" and together with CITGO Petroleum, "CITGO") which in turn is 100% owned by PDVH, which in turn is 100% owned by Petróleos de Venezuela, S.A. ("PDVSA"), a Venezuelan corporation 100% owned and controlled by the Bolivarian Republic of Venezuela. Evercore is assisting the Special Master in the implementation of a court-mandated sale of an amount of the shares of PDVH sufficient to satisfy Attached Judgments (as defined in the Sale Procedures Order (defined below))(the "Proposed Transaction").

This letter is being furnished to those persons who have been performing diligence as part of the second round of the Special Master's marketing process. To determine the Special Master's interest in pursuing the Proposed Transaction with you, we invite you to submit a final written, definitive and binding proposal with respect to the Proposed Transaction (your "Proposal"). If the Special Master deems your Proposal to be the bid most likely to satisfy the greatest amount of the Attached Judgments when considering value, certainty of closing and such other factors as the Special Master may determine, in his sole discretion, you may be contacted regarding the process to execute a definitive agreement.

This letter, and the procedures and timetable included herein, are confidential and are subject to the terms of the Confidentiality Agreement that you entered into with the Special Master (the "Confidentiality Agreement") in connection with the Proposed Transaction, the terms of which are not modified or varied by this letter. Unless otherwise defined herein, all capitalized terms used shall have their meaning set forth in the Confidentiality Agreement or the *Sixth Revised Proposed Order (A) Establishing Sale and Bidding Procedures, (B) Approving Special Master's Report and Recommendation Regarding Proposed Sale Procedures Order, (C) Affirming Retention of Evercore as Investment Banker by Special Master and (D) Regarding Related Matters* [D.I. 481] (the "Sale Procedures Order") filed in the Crystallex Case, as context may require.

**I.   PROPOSAL**

Please submit your Proposal in writing to Evercore at any time before **5:00 PM (Central Time) on Tuesday, June 11, 2024,** (the "Proposal Deadline") via email in care of:

| Evercore | Attention: | Ray Strong | William Hiltz |
|---|---|---|---|
| | | Senior Managing Director | Senior Managing Director |
| | Office: | (713) 427-5146 | (212) 857-3154 |
| | Cell: | (347) 549-2043 | (917) 992-3093 |
| | Email: | ray.strong@evercore.com | hiltz@evercore.com |

**EVERCORE**

Page 2

With a copy to:

| | | |
|---|---|---|
| Weil, Gotshal & Manges LLP | Attention: | Michael J. Aiello |
| | | Ray C. Schrock |
| | | Eoghan P. Keenan |
| | Email: | michael.aiello@weil.com |
| | | ray.schrock@weil.com |
| | | eoghan.keenan@weil.com |

Your Proposal should include, at a minimum, the following information:

**A. Proposed Transaction Structure.** Confirm that your Proposal is for all, or a portion, of the shares of PDVH, sold free and clear of all claims, encumbrances, and liabilities on or against the shares, in accordance with the terms of the Sale Procedures Order. If your Proposal is for a portion of the shares of PDVH, please indicate (i) the percentage of shares of PDVH proposed to be acquired and (ii) any minority shareholder rights, protections or other desired terms in connection with the Proposed Transaction and any definitive documentation related thereto.

Proposals should utilize the following key assumptions and notes with respect to structuring the Proposed Transaction:

   i. Treatment of Cash and Debt: Your Proposal should assume that the available cash of PDVH and its subsidiaries will be equal in value to the aggregate debt of PDVH and its subsidiaries at the closing of the Proposed Transaction and that any cash in excess of the debt amount shall be for the benefit of the sellers.

   ii. Working Capital: Your Proposal should assume a normalized amount of working capital, to be determined based upon a working capital calculation included as an exhibit to the definitive SPA, a draft of which will be posted to the data room (the "Target Net Working Capital"). The purchase price will be adjusted on a dollar-for-dollar basis to the extent that the net working capital delivered at closing is greater than or less than, as the case may be, the Target Net Working Capital.

   iii. PDVSA 2020 Bonds Share Pledge: The Special Master is engaged in discussions with holders of notes issued pursuant to that certain Indenture, dated October 27, 2016 (the "Indenture"), by and among PDVSA, as issuer, PDVSA Petróleo, S.A., as guarantor, MUFG Union Bank, N.A., as trustee, GLAS Americas LLC, as collateral agent, Law Debenture Trust Company of New York, as registrar, transfer agent and principal agent, and Banque Internationale À Luxembourg, Société Anonyme, as Luxembourg paying agent, whereby PDVSA issued 8.50% senior secured notes due in 2020 in the aggregate principal amount of $3,367,529,000 (the "PDVSA 2020 Notes"), purportedly secured by a pledge of the equity of CITGO Holding (the "CITGO Equity Pledge"). The PDVSA 2020 Notes and the CITGO Equity Pledge are currently the subject of litigation in the matter of *Petróleos de Venezuela, S.A., PDVSA Petróleo, S.A., and PDV Holding, Inc., v. MUFG Union Bank, N.A. and GLAS Americas LLC*, Civ. Nos. 20-3858, 20-4127(the "2020 Notes Litigation"). The Court has previously explained its expectation that bidders "will simply price their view of the risks associated with pending litigation when formulating their bids," including the 2020 Notes Litigation referenced in this paragraph. D.I. 643, at 10 (Memorandum Order of July 17, 2023). If your bid, however, is predicated on a different

Page 3

assumption, please explain how you propose the CITGO Equity Pledge is to be addressed as part of your Proposed Transaction. ~~For purposes of your Proposal, please assume that the CITGO Equity Pledge will be released in advance of, or in connection with, implementation of the Proposed Transaction.  In the event you propose to address the CITGO Equity Pledge in a manner other than a release negotiated and implemented by the Special Master, please so indicate in your Proposal.~~

**B. Stock Purchase Agreement.** A draft Stock Purchase Agreement (the "Proposed SPA") that provides for the acquisition of all, or a portion, of the shares of PDVH, together with a redline marked to show your proposed changes, if any, to the bid draft Stock Purchase Agreement (the "Bid Draft SPA"), which will be posted to the data room (including proposed changes and accompanying redlines for all exhibits and schedules included in the data room). Please provide such comments in Microsoft Word format and include both a clean Word version as well as a PDF comparison to the Bid Draft SPA posted to the data room. Do not submit an issues list or other summary comments instead of a Proposed SPA with a redline against the Bid Draft SPA to show all proposed comments. The Proposed SPA you submit should include all of your requested changes to the Bid Draft SPA and should include specific, in-line edits and not conceptual, non-specific or footnoted comments. Please note that the Special Master will consider the extent of any comments to the Bid Draft SPA in selecting a counterparty with which to proceed.

**C. Identity of Purchaser or Counterparty.** A statement identifying the legal name, jurisdiction and type of organization/entity form of each entity that will act as purchaser or counterparty in the Proposed Transaction, including the identity of any controlling person(s), principal equityholders, whether current or anticipated, and each other entity that will be otherwise participating in your Proposal (if applicable), as well as a summary of such organization/entities' history, primary business and sufficient information to demonstrate that such organization/entity has the financial wherewithal to timely consummate the Proposed Transaction.

**D. Purchase Price and Principal Economic Terms.** A statement setting forth (i) the total equity value you assign to the shares of PDVH ("Valuation") determined based upon the key assumptions described under paragraph A above, (ii) the amount and a detailed analysis of any non-cash components of the purchase price, including without limitation, a credit bid, stock and/or the assumption of liabilities, and the value of such components, any assumptions related thereto, and reasonable back-up documentation to support such value, (iii) a brief description of the methodology used to derive the Valuation, (iv) an identification of any underlying material assumptions regarding the business of PDVH and CITGO and your determination of the purchase price and (v) disclosure of any related transactions to be pursued or effectuated by you in connection with the Proposed Transaction.  The Special Master may consider alternative structures in the event that it maximizes value of the PDVH shares.

**E. Sources of Financing.** A detailed description of the sources of funds that you intend to use to finance the Proposed Transaction. Please provide copies of the financing commitments and other similar documentation (as applicable) from all sources, such that your Proposal clearly and affirmatively demonstrates that it is not subject to any financing condition. Certainty of financing is critical and will factor into the Special Master's decision.

**F. Credit Bid (if applicable).** If you hold an Attached Judgment, you may seek to submit a credit bid (a "Credit Bid") for the shares of PDVH, to the extent permitted by applicable law. If you are submitting a Credit Bid, please state as such, and confirm that such Credit Bid will (i) provide sufficient cash consideration to pay in full all Transaction Expenses and (ii) provide sufficient cash to satisfy in full any obligations secured by a senior lien on the shares of PDVH~~, including (to the~~

Page 4

~~extent you are not proposing an alternative solution to account for the CITGO Equity Pledge described in paragraph A(iii) above) the PDVSA 2020 Notes claim~~.

**G.     Purchaser Approvals.** Evidence of corporate or other organizational authorization and approval from your board of directors (or comparable governing body) or otherwise with respect to the submission, execution and delivery of the Proposal (including the execution of the Proposed SPA), participation in any auction and closing of the Proposed Transaction contemplated by the Proposed SPA in accordance with its terms and the terms of the Sale Procedures Order (including the Bidding Procedures contained therein), and an indication of any anticipated need, timeline and plan to obtain any further equityholder, board, organizational, partnership, investment committee or other approval, including governmental, regulatory and other third-party approvals, consents, notifications, waivers or other similar actions that you anticipate will be required to execute a definitive Stock Purchase Agreement (the "definitive SPA"). Please also include a statement or evidence that (i) you will make in a timely manner (1) all filings and disclosures necessary to comply with the regulations of the Department of Treasury's Office of Foreign Assets Control ("OFAC"), (2) all necessary filings under the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended, and any other antitrust laws, as applicable, and pay the fees associated with such filings and (3) all necessary filings in connection with any review by the Committee on Foreign Investment in the United States (CFIUS), if applicable and (ii) your Proposal is reasonably likely to be consummated, after taking into consideration antitrust and any other regulatory matters, your prior experience and any other relevant considerations, if selected as the Successful Bid, within a timeframe acceptable to the Special Master.

**H.     Due Diligence Requirements.** Your Proposal should not be subject to any remaining due diligence. You may be permitted to conduct a confirmatory review of any specific and reasonable due diligence materials or activities that you have requested and received confirmation that such information will be available at a later date. If such outstanding confirmatory due diligence items exist, please specifically indicate and provide details regarding these items that you would require prior to execution of the definitive SPA, and include your expected dates of completion of such items.

**I.     Advisors.** A list of the financial, accounting, legal, industry consultants and other advisors that you have retained or plan to retain in connection with the Proposed Transaction.

**J.     Contacts.** A list of persons (including e-mail addresses and phone numbers) who should be contacted with respect to any questions regarding your Proposal.

**K.     Special Master Consent.** Your consent for the Special Master, in his discretion, to share information with U.S. Government regulators, including OFAC, pertaining to you or your Proposal.

**L.     Cooperation**. A statement that (i) you agree that your advisors will coordinate in good faith with the Special Master's advisors to discuss and explain your regulatory and other consent analysis, strategy and timeline for securing all such approvals and consents as soon as reasonably practicable and (ii) you agree to cooperate with the Special Master to provide pertinent factual information regarding your ownership and operations reasonably required to respond to, or otherwise analyze issues arising with respect to, U.S. sanctions laws and regulations, the Committee on Foreign Investment in the United States, any applicable antitrust laws and other relevant regulatory requirements or requests.

Page 5

**M. No Entitlement to Reimbursement**. A statement that your Proposal does not entitle you to any break-up fee, termination fee, expense reimbursement or similar type of payment or reimbursement; provided, however, the definitive SPA will include a termination fee in connection with certain termination events.

**N. No Liability**. A statement that (i) you agree that in no circumstance shall the Special Master or his advisors be personally or otherwise liable for any amounts or obligations owed to you, (ii) the Special Master and his advisors are acting as an arm of the Court and are entitled to judicial immunity in the performance of their duties and (iii) PDVH, CITGO and their respective officers, directors and advisors will have no liability or obligation to you or your affiliates, except and only to the extent it is expressly provided for in the definitive SPA if, as and when executed.

**O. Representations and Warranties**. The following representations and warranties:

   a. a statement that you recognize and acknowledge that the Special Master, his advisors, PDVH, CITGO and their respective representatives make no representations, covenants or warranties (or any other promise) as to the accuracy or completeness of any information provided in the data room or otherwise made available by the Special Master and his advisors in connection with the bid process;

   b. a statement that, other than with respect to your reliance on the representations and warranties provided in the definitive SPA if, as and when executed, you have relied solely upon your own independent review, investigation and/or inspection of any relevant documents regarding the assets to be purchased and did not rely on any written or oral statements, representations, promises, warranties or guaranties whatsoever, whether express or implied, by operation of law or otherwise, regarding PDVH and its subsidiaries or the completeness of any information made available in connection therewith;

   c. a statement that you have not engaged in any collusion with respect to the submission of your Proposal; and

   d. a statement that all proof of financial ability to consummate the Proposed Transaction in a timely manner and other information you submit is true and correct.

**P. Bidding Procedures**. A statement that you agree to be bound by the terms and conditions of the Bidding Procedures set out in the Sale Procedures Order.

**Q. Other Material Terms.** A list of any additional terms or conditions the satisfaction of which you anticipate would be a material condition precedent to executing the definitive SPA with respect to the Proposed Transaction.

## II. CONDITIONAL SELECTION OF PROSPECTIVE PURCHASER

Based upon, among other things, an analysis of the purchase price and other terms presented in your Proposal, the Special Master, in his sole and absolute discretion, may elect to further pursue the Proposed Transaction with you.

Page 6

Please note that the existence and terms of this letter and any related communications and/or information provided in connection therewith are subject to your Confidentiality Agreement with the Special Master and should be treated accordingly.

## III.  ALL RIGHTS RESERVED

All communications, inquiries and requests for information relating to the Proposed Transaction, including any materials in connection therewith, should be directed to Evercore. **Neither you nor your employees, representatives, agents, affiliates, partners, co-venturers or other related parties are permitted to contact the Special Master, PDVSA, PDVH, CITGO or its subsidiaries, or any of their direct or indirect affiliates, directors, managers, officers, employees, suppliers, vendors, customers, financiers, counterparties, partners, co-venturers or regulators, either directly or indirectly, in relation to any matter set forth in this letter or in relation to the Proposed Transaction.**

This letter does not constitute an offer to sell PDVH or its assets. You acknowledge and agree that the Special Master has the right, in his sole and absolute discretion, to reject any and all proposals regarding any Proposed Transaction and to negotiate with one or more parties simultaneously and terminate discussions and negotiations of any Proposed Transaction with any one or more parties at any time, for any reason or for no reason; that the procedures which the Special Master may employ in the pursuit of any Proposed Transaction, if any such pursuit is undertaken, are within his sole and absolute discretion; that any such procedures are subject to change at any time for any reason or for no reason and with or without prior notice; that determinations of compliance or noncompliance with such procedures will be solely and completely judged by the Special Master, and the sole remedy for any objection to such procedures, the application thereof or any judgment exercised by the Special Master with respect thereto will be withdrawal, without further recourse, from participation in further discussions with respect to the Proposed Transaction. No agreement or understanding regarding a Proposed Transaction shall be deemed to exist unless and until the definitive SPA regarding the Proposed Transaction has been executed and delivered by the parties thereto, and no prospective purchaser shall have any claim based upon any legal theory in connection with a Proposed Transaction unless and until the parties shall have entered into, executed and delivered the definitive SPA.

**By submitting your Proposal, you acknowledge that you have reviewed this letter and that you agree without reservation to all terms, restrictions and conditions contained herein.**

We encourage you to contact the following individuals with any questions regarding your Proposal or any other matter set forth in this letter:

<table>
<tr><td>Ray Strong</td><td>William Hiltz</td></tr>
<tr><td>Senior Managing Director</td><td>Senior Managing Director</td></tr>
<tr><td>Office: (713) 427-5146</td><td>Office: (212) 857-3154</td></tr>
<tr><td>Cell: (347) 549-2043</td><td>Cell: (917) 992-3093</td></tr>
<tr><td>ray.strong@evercore.com</td><td>hiltz@evercore.com</td></tr>
</table>

The Special Master and Evercore appreciate your interest in this process and look forward to working with you with respect to the Proposed Transaction.

Sincerely,

E V E R C O R E

Page 7

Ray Strong
Senior Managing Director
Evercore on behalf of the Special Master

48659107v2

# EXHIBIT I

**Eimer**Stahl LLP

224 South Michigan Avenue
Suite 1100
Chicago, Illinois 60604-2416
Tel  312 660 7600   Fax  312 692 1718

Nathan P. Eimer
(312) 660 7601
neimer@eimerstahl.com

April 23, 2024

*Via Email*

Mr. Robert Pincus
108 Rockford Grove Lane
Wilmington, DE 19806
rbpincus@gmail.com

Re: **Second Round Bid Instructions**

Dear Bob:

We agree with the Republic and PDVSA that the bids need to be made as contemplated by Judge Stark's July 17, 2023 order, directing that the sale process proceed (the "July 2023 Order"). As you will recall, you opposed our request to postpone the launch of the sale process because of the uncertainties surrounding the 2020 bondholder litigation by noting Evercore's advice to you that: "[p]otential Bidders will be fully capable of valuing the PDVH Shares and the CITGO operations agnostic to capital structure, including whether claims held by the PDVSA 2020 Bondholders or other judgment creditors will need to be satisfied by the Sale Transaction proceeds." Judge Stark adopted your view that the sales process could launch on that basis.

In his July 2023 Order, Judge Stark also referred to Crystallex's "credible explanation" that "bidders will simply price their view of the risk associated with currently pending litigation when formulating their bids," as well as  ConocoPhillips recognition that: "the potential validity of the pledge of the CITGO Holding stock will be taken into account by potential purchasers in formulating their bids. But they are free to craft bids that would address the various potential outcomes on that appeal, including the potential need to refinance or otherwise reach an accommodation with those bondholders if the judgment is affirmed." (D.I. 584.2).

EimerStahl LLP

Robert Pincus
April 23, 2024
Page 2

Accordingly, we concur with the revisions to the second-round bid instruction letter provided by the Republic and PDVSA. The procedures reflected by those revisions fully align with the July 2023 Order while also providing bidders with the ability to explain how they propose to deal with the 2020 bondholder litigation and the purported pledge of the CITGO Holding stock. The revisions represent the only way to fairly assess the bidders' views of the 2020 bondholder litigation and the purported pledge of the CITGO Holding stock.

You will recall that in the July 2023 Order Judge Stark went on to explain what the Special Master could do if it turned out that the bids would be chilled by the pendency of the 2020 bondholder litigation and the purported pledge of the CITGO Holding stock: (1) rejecting all bids; (2) adjourning the auction; or (3) choosing not to select a successful bid. The Special Master's negotiating an agreement with the 2020 bondholders or placing sale proceeds that should go to attached judgment creditors into escrow for the benefit of the 2020 bondholders were not among these alternatives.

Indeed, in 2022, the Venezuela Parties objected that the Special Master lacked authority to settle or otherwise resolve the 2020 bondholder litigation (D.I. 472.1). That objection stands today. While Judge Stark authorized the Special Master to "engage in discussions with the advisors of the PDVSA 2020 Bondholders," Judge Stark expressly did not "authorize[] the Special Master to take any role in disposing of the PDVSA 2020 Bondholders' claim." (D.I. 479).

Accordingly, we continue to believe that any approach other than that reflected in the proposed revisions to the bidder instructions is not authorized by the Sale Procedures Order and would be a modification requiring consultation with the Sale Process Parties.

We also continue to object to any proposal that asks bidders to assume away the purported pledge without explaining what that means. Further, we would like to understand how the Special Master intends to make all of the creditors with attached judgments – and specifically those whose judgments are unlikely to be satisfied as part of the sales process – aware of how the 2020 bondholders would be treated in the sales process, particularly if that treatment is different than the agnostic approach endorsed by Judge Stark in the July 2023 Order.

We reiterate that the Special Master has no authority to negotiate and implement unilaterally a release of the claims being litigated before the Southern District of New York and U.S. Court of Appeals for the Second Circuit, nor do you have any authority (from this Court or otherwise) to enter into a settlement agreement unilaterally with holders of the 2020 Notes. That said, each of the Venezuela Parties expects to be kept fully informed at all stages to the extent the Special Matter engages in any discussions with advisors or other representatives of the 2020 bondholders, or potential bidders with respect to the 2020 bondholders' claim.

EimerStahl LLP

Robert Pincus
April 23, 2024
Page 3

Sincerely,

Nathan P. Eimer

# EXHIBIT J

| | |
|---|---|
| **From:** | Bentley, Chase <Chase.Bentley@weil.com> |
| **Sent:** | Thursday, May 2, 2024 1:58 PM |
| **To:** | Garvey, George; neimer@eimerstahl.com; 'Michael J. Gottlieb (mgottlieb@willkie.com)'; dbirk@eimerstahl.com; Vera, Fernando; Profusek, Robert A.; Lynch, Jack; Holstein, Mark; Hall, Samuel |
| **Cc:** | Kadish, Amanda; Schrock, Ray; Welch, Alexander; Pincus, Robert (rbpincus@gmail.com); Keenan, Eoghan; Welch, Timothy; Basil, Nico; Barrington, Luna; Project.Horizon.Weil |
| **Subject:** | RE: CITGO / Special Master - Recurring Update re Settlement Discussions |

We received your letters and will respond in due course. A conference call is not necessary.



**Chase Bentley**
Counsel

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153
Chase.Bentley@weil.com
+1 212 310 8871 Direct
+1 401 258 8529 Mobile

---

**From:** Garvey, George <George.Garvey@mto.com>
**Sent:** Thursday, May 2, 2024 12:53 PM
**To:** Bentley, Chase <Chase.Bentley@weil.com>; neimer@eimerstahl.com; 'Michael J. Gottlieb (mgottlieb@willkie.com)' <mgottlieb@willkie.com>; dbirk@eimerstahl.com; Vera, Fernando <fvera@citgo.com>; Profusek, Robert A. <raprofusek@JonesDay.com>; Lynch, Jack <JLYNCH1@citgo.com>; Holstein, Mark <MHOLSTE@citgo.com>; Hall, Samuel <SHall@willkie.com>
**Cc:** Kadish, Amanda <Amanda.Kadish@weil.com>; Schrock, Ray <Ray.Schrock@weil.com>; Welch, Alexander <Alexander.Welch@weil.com>; Pincus, Robert (rbpincus@gmail.com) <rbpincus@gmail.com>; Keenan, Eoghan <eoghan.keenan@weil.com>; Welch, Timothy <Timothy.Welch@weil.com>; Basil, Nico <Nico.Basil@weil.com>; Barrington, Luna <Luna.Barrington@weil.com>
**Subject:** RE: CITGO / Special Master - Recurring Update re Settlement Discussions

Dear Chase—
Would you please let us know when we may expect the Special Master's response to our letter and proposal dated April 23 on behalf of the Republic and PDVSA, and Nate's letter of the same date, all concerning the updated proposed Round 2 bid instruction letter you circulated on April 18? Also, would you please let us know when we may expect a response to our letter dated April 19, concerning access to information? If you think a conference call would be more productive, we would be happy to participate, and suggest tomorrow at 11 am Eastern, the same time we've been having the usual update calls.  We think it's in all parties' interests to resolve the issues quickly if we can, and if we cannot, to tee them up for prompt resolution by Judge Stark.
Thank you for your cooperation.
Best,
George

PS--Out of caution, I should add that none of this should be taken to imply a waiver of any other pending matters, including without limitation the pending motion to disqualify.

**George M. Garvey (he/him/his)| Munger, Tolles & Olson LLP**
350 South Grand Avenue | Los Angeles, CA 90071
Tel:  213.683.9153 | Mobile: 310.890.8019 | george.garvey@mto.com | www.mto.com

---

**From:** Bentley, Chase <Chase.Bentley@weil.com>
**Sent:** Friday, April 26, 2024 6:03 AM
**To:** neimer@eimerstahl.com; 'Michael J. Gottlieb (mgottlieb@willkie.com)' <mgottlieb@willkie.com>; dbirk@eimerstahl.com; Vera, Fernando <fvera@citgo.com>; Profusek, Robert A. <raprofusek@JonesDay.com>; Lynch, Jack <JLYNCH1@citgo.com>; Holstein, Mark <MHOLSTE@citgo.com>; Hall, Samuel <SHall@willkie.com>; Garvey, George <George.Garvey@mto.com>
**Cc:** Kadish, Amanda <Amanda.Kadish@weil.com>; Schrock, Ray <Ray.Schrock@weil.com>; Welch, Alexander <Alexander.Welch@weil.com>; Pincus, Robert (rbpincus@gmail.com) <rbpincus@gmail.com>; Keenan, Eoghan <eoghan.keenan@weil.com>; Welch, Timothy <Timothy.Welch@weil.com>; Basil, Nico <Nico.Basil@weil.com>; Barrington, Luna <Luna.Barrington@weil.com>
**Subject:** RE: CITGO / Special Master - Recurring Update re Settlement Discussions

All,

We are going to cancel today's settlement update.  We are in receipt of your multiple letters and will be in touch with a response.

Thanks,
Chase



**Chase Bentley**
Counsel

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153
Chase.Bentley@weil.com
+1 212 310 8871 Direct
+1 401 258 8529 Mobile

-----Original Appointment-----
**From:** Bentley, Chase
**Sent:** Friday, February 9, 2024 8:31 AM
**To:** Bentley, Chase; 'Eimer, Nate'; 'Michael J. Gottlieb (mgottlieb@willkie.com)'; Schrock, Ray; Welch, Alexander; Pincus, Robert (rbpincus@gmail.com); Keenan, Eoghan; Welch, Timothy; Birk, Dan; Vera, Fernando; Profusek, Robert A.; Lynch, Jack; Holstein, Mark; Hall, Samuel; Basil, Nico; Barrington, Luna
**Cc:** Garvey, George; Kadish, Amanda
**Subject:** CITGO / Special Master - Recurring Update re Settlement Discussions

**When:** Friday, April 26, 2024 11:00 AM-11:30 AM (UTC-05:00) Eastern Time (US & Canada).

**Where:** https://weil.zoom.us/j/84596668682?pwd=yhALxpfEkV1vTBQHaILJFbbfFlAWTu.1

Meeting URL:
https://weil.zoom.us/j/84596668682?pwd=yhALxpfEkV1vTBQHaILJFbbfFlAWTu.1

Hi there,

Chase Bentley is inviting you to a scheduled Zoom meeting.

## Join Zoom Meeting

Phone one-tap:   US: +16465588656,,84596668682#,,,,*349151#

Meeting URL:   https://weil.zoom.us/j/84596668682?pwd=yhALxpfEkV1vTBQHaILJFbbfFlAWTu.1

Meeting ID:   845 9666 8682

Passcode:349151

### Join by Telephone

For higher quality, dial a number based on your current location.

Dial:
US: +1 646 558 8656
United Kingdom: +44 131 460 1196
France: +33 1 7037 2246
Germany: +49 69 3807 9883

Meeting ID:   845 9666 8682

Passcode:349151

International numbers

### Join from a SIP room system

Meeting ID:   845 9666 8682

Passcode:349151

SIP:   84596668682@zoomcrc.com

Passcode:349151

3



The information contained in this email message is intended only for use of the individual or entity named above. If the reader of this message is not the intended recipient, or the employee or agent responsible to deliver it to the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited. If you have received this communication in error, please immediately notify us by email, postmaster@weil.com, and destroy the original message. Thank you.

The information contained in this email message is intended only for use of the individual or entity named above. If the reader of this message is not the intended recipient, or the employee or agent responsible to deliver it to the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited. If you have received this communication in error, please immediately notify us by email, postmaster@weil.com, and destroy the original message. Thank you.