IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| CRYSTALLEX INTERNATIONAL CORPORATION,<br><br>            Plaintiff,<br><br>   v.<br><br>BOLIVARIAN REPUBLIC OF VENEZUELA,<br><br>            Defendant. | Case No. 1:17-mc-00151-LPS |

**CONOCOPHILLIPS' BRIEF IN SUPPORT OF
THE SPECIAL MASTER'S INJUNCTION MOTION**

# **TABLE OF CONTENTS**

Page

PRELIMINARY STATEMENT ................................................................................................1

ARGUMENT .................................................................................................................................3

    Question A:  Why isn't the relief sought by the Injunction Motion more appropriately obtained from the New York and Texas Courts where the Alter Ego Claimants' suits are pending? ................................................................. 3

    Question B:  What efforts, if any, has the Special Master and/or any Sale Process Party made, or intend to make, to advise the New York and Texas courts of this Court's proceedings and the impact those proceedings may have on these? ..................................................................................................... 8

    Question C:  On what basis did bidders for the PDVH Shares come to "expect to purchase those shares free and clear of claims or encumbrances from judgment creditors of PDVSA." (D.I. 1249 at 4)? ........................................ 8

    Question D:  The Injunction Motion seems to request of the Court something akin to an "automatic stay" that might be issued from a Bankruptcy Court.  Is this what the Special Master is seeking and, if so, are there any precedents for a non-bankruptcy court to grant such relief? ............ 9

    Question E:  If the Court determines that the Sale Process is an *in rem* or *quasi in rem* action, is the application of the *Princess Lida* doctrine "compulsory?"  *See Dailey* v. *Nat'l Hockey League*, 987 F.2d 172, 176 (3d Cir. 1993). ................................................................................................... 11

    Question F:  In evaluating the Injunction Motion, to what extent should the Court consider, and what weight should the Court give to, the fact that the Alter Ego Claimants previously participated in this Court's process and failed to obtain the relief they sought? ........................................................... 11

CONCLUSION ............................................................................................................................12

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Cascade Energy & Metals Corp.* v. *Banks*,
  896 F.2d 1557 (10th Cir. 1990) ...................................................................................7

*Comm'r of Env't Prot.* v. *State Five Indus. Park*,
  37 A.3d 724 (Conn. 2012) ..........................................................................................7

*Dailey* v. *Nat'l Hockey League*,
  987 F.2d 172 (3d Cir. 1993).......................................................................................11

*E. Sav. Bank, FSB* v. *CACH, LLC*,
  55 A.3d 344 (Del. 2012) ..............................................................................................9

*Grider* v. *Keystone Health Plan Cent., Inc.*,
  500 F.3d 322 (3d Cir. 2007).........................................................................................6

*In re Combustion Eng'g, Inc.*,
  391 F.3d 190 (3d Cir. 2004).......................................................................................10

*In re Crown Vantage, Inc.*,
  421 F.3d 963 (9th Cir. 2005) .....................................................................................10

*In re Diet Drugs*,
  282 F.3d 220 (3d Cir. 2002).....................................................................................5, 6

*In re Imperial "400" Nat., Inc.*,
  429 F.2d 671 (3d Cir. 1970)..................................................................................10, 11

*In re L&S Indus., Inc.*,
  989 F.2d 929 (7th Cir. 1993) .....................................................................................11

*In re Phillips*,
  139 P.3d 639 (Colo. 2006)...........................................................................................7

*In re Prudential Ins. Co. of Am. Sales Practices Litig.*,
  314 F.3d 99 (3d Cir. 2002)...........................................................................................6

*In re SCO Group, Inc.*,
  395 B.R. 852 (Bankr. D. Del. 2007) ..........................................................................10

*In re Sonnax Indus., Inc.*,
  907 F.2d 1280 (2d Cir. 1991).....................................................................................10

*In re Wedgewood Realty Grp., Ltd.*,
   878 F.2d 693 (3d Cir. 1989) ..................................................................................................10

*Manichean Cap., LLC* v. *Exela Techs., Inc.*,
   251 A.3d 694 (Del. Ch. 2021) ................................................................................................7

*Penn Terra Ltd.* v. *Dep't of Env't Res.*,
   733 F.2d 267 (3d Cir. 1984) ..................................................................................................10

*Riggs* v. *Johnson Cty.*,
   73 U.S. 166 (1867) ..................................................................................................................8

*Wick* v. *Ach*,
   139 N.E.3d 480 (Ohio Ct. App. 2019) ....................................................................................7

**Statutes and Rules**

11 U.S.C. § 105(a) ...........................................................................................................................9, 10

11 U.S.C. § 362(a) .................................................................................................................................10

11 U.S.C. § 362(d) .................................................................................................................................10

28 U.S.C. § 1651 .....................................................................................................................................5

28 U.S.C. § 2283 .....................................................................................................................................5

6 *Del. C.* § 9-617 .....................................................................................................................................9

Sale Process Parties Phillips Petroleum Company Venezuela Limited, ConocoPhillips Petrozuata B.V., ConocoPhillips Gulf of Paria B.V., and ConocoPhillips Hamaca B.V. (Plaintiffs in Cases No. 19-mc-00342-LPS, No. 22-mc-00264-LPS, and No. 22-mc-00464-LPS) ("ConocoPhillips") respectfully submit this brief in support of the Special Master's Injunction Motion [D.I. 1247] and in response to the Court's September 11, 2024 Memorandum Order [D.I. 1259], and state as follows:[1]

## PRELIMINARY STATEMENT

After presiding over years of litigation, coordinating dozens of related actions, making many difficult and novel rulings, and supervising the expenditure of millions of dollars in fees, all of this Court's efforts are at risk because of the actions of three related entities (the "Gramercy Parties") that have purchased claims against the Republic of Venezuela and PDVSA. Unhappy with their place in the priority order established by this Court, the Gramercy Parties have gone to other courts seeking rulings that would undermine and render the sale process in this Court effectively a nullity.

The Court has asked the Sale Process Parties for their views as to whether the Court should await the decisions of those other courts or enjoin the commencement or continuation of those other proceedings in order to protect the sale process, which is nearing its conclusion, but could be placed effectively on hold until the Alter Ego Claims are finally disposed of in other courts.

This situation is simply a new version of a fact pattern courts have seen many times before, generally in *in rem* and certain other types of complex litigation matters. In addressing similar cases, the Third Circuit has held that the lead court has the power to issue injunctions to protect its

---

[1] Capitalized terms not otherwise defined have the same meanings as in the Memorandum Order.

proceedings from being frustrated by litigants running to other courts in an attempt to defeat its decisions. *See infra* at Question A.

The reverse-veil piercing actions brought by the Gramercy Parties are a classic example of collateral litigation in other courts which threatens to destroy a judgment-enforcement proceeding. Reverse veil-piercing claims have generally been treated with grave skepticism by courts precisely because they often constitute precisely what the Gramercy Parties are attempting here: bypassing the traditional judgment-collection process and jumping to the front of the collection line, to the prejudice of innocent creditors.

Importantly, the threat of competing litigations aimed at interfering with the Sale Process will not end with the Gramercy Parties. In addition to the multiple Attached Judgment Creditors who are unlikely to receive a recovery from the Sale Process (and who therefore have little to lose from following in the Gramercy Parties' footsteps), nothing is preventing the countless other creditors of PDVSA or the Republic from attempting the same gambit in whatever forum is available. The mere prospect of any one of those creditors succeeding in persuading some court, likely without any knowledge of the long history of these proceedings, to entertain a reverse veil-piercing claim, could render the PDVH Shares unsaleable. The injunction sought by the Special Master is therefore both crucial to the success of the Sale Process, and narrowly tailored to the particular type of proceeding brought by the Gramercy Parties: Attempts to circumvent this Court's decision on priority that would effectively destroy the Sale Process.

To state the obvious, no bidder can responsibly deploy billions of dollars to purchase the PDVH Shares if almost any court anywhere in the country could at any time enter a ruling that would have the effect of imposing on the acquired company the entirety of PDVSA and Venezuela's debts. As a practical matter, there has to be a single court in which the reverse veil-

piercing theories can be fully, finally, and exclusively determined. Given the Court's pending in rem or quasi in rem proceeding to sell the PDVH Shares, this Court has both the power and the responsibility to decide those issues itself, and to prevent other courts from doing so. The purpose of the injunction is to prevent attempts to defeat this Court's judgment-collection proceeding by trying to find a *different* court to determine that PDVH is subject to reverse veil-piercing. The Gramercy Parties, or any other litigant, should be free to pursue a reverse veil piercing-theory, but they should have to do so in this Court.

## ARGUMENT

ConocoPhillips agrees with the Special Master's Opening Brief, and joins in its statement of the background and its legal theories. ConocoPhillips submits this brief to respond to the Court's questions, and to supplement the Special Master's submissions in particular respects.

**Question A: Why isn't the relief sought by the Injunction Motion more appropriately obtained from the New York and Texas Courts where the Alter Ego Claimants' suits are pending?**

Both practical and doctrinal considerations make clear that this Court is the only appropriate venue to consider the relief requested by the Injunction Motion.

The main practical issue is that there is no way to know whether the filing of reverse veil-piercing actions by the Gramercy Parties will stop with them. Any one of the Attached Judgment Creditors that is unlikely to receive a recovery from the Sale Process, or other creditors of the Republic or PDVSA not participating in this process, could bring copycat claims. Even if the Texas or New York courts were to grant relief similar to the relief sought by the Injunction Motion, that decision would bind only the Gramercy Parties. Other litigants would be free to relitigate the same question in other courts. There is no practically available procedural vehicle, other than an injunction issued by this Court to protect its proceedings, that can give potential bidders and other

participants in the Sale Process confidence that the risk of reverse veil-piercing liability has been eliminated.

A second practical issue is that the defendants in the Texas and New York actions are PDVH and PDVSA. While at present PDVH and PDVSA appear to be adequately responding to those cases, there is no assurance that they will continue to believe that it is in their interests to do so, or to seek an ultimate expeditious resolution of those proceedings given their long-standing opposition to the Sale Process. By contrast, if the Injunction Motion were granted and the reverse veil-piercing issue litigated in this Court, the parties most interested in opposing that relief – the holders of Attached Judgments subject to being prejudiced by a reverse alter-ego finding – could be heard without being required to intervene in other cases around the country.

Yet another practical consideration is that, in order to protect themselves from any determination that might place the Gramercy Parties ahead of them as against PDVH and its subsidiaries, other Attached Judgment Creditors, including ConocoPhillips, might be compelled to file copycat reverse veil piercing actions themselves, thereby spawning even more litigation and potential chaos. The only way to protect the existing priority scheme is for this Court to maintain control of the enforcement of judgments against PDVSA or the Republic in respect of the PDVH Shares and the assets controlled by those shares.

The doctrinal answer is that the *Princess Lida* doctrine and the other authorities cited by the Special Master and herein give this Court the power and the responsibility to enjoin competing proceedings that could have the effect of defeating proceedings already well-advanced in this Court. The Anti-Injunction Act provides that "[a] court of the United States may not grant an injunction to stay proceedings in a State court except as expressly authorized by Act of Congress, or where necessary in aid of its jurisdiction, or to protect or effectuate its judgments." 28 U.S.C.

§ 2283. Likewise, the All Writs Act provides that a court "may issue all writs necessary or appropriate in aid of their respective jurisdictions and agreeable to the usages and principles of law." 28 U.S.C. § 1651.

The Third Circuit's decision in *In re Diet Drugs*, 282 F.3d 220, 234 (3d Cir. 2002), makes clear that an injunction is appropriate under the circumstances of this case. The Court held that while the "'necessary in aid of jurisdiction' exception to the Anti-Injunction Act does not ordinarily permit injunctions merely to prevent duplicative actions in personam, federal courts are permitted to stay later-initiated state court proceedings over the same res in actions in rem, because 'the exercise by the state court of jurisdiction over the same res necessarily impairs, and may defeat, the jurisdiction of the federal court already attached.'" 282 F.3d at 234 (quoting *Kline* v. *Burke Constr. Co.*, 260 U.S. 226, 229 (1922)).

The decision in *Diet Drugs* further holds that the "in aid of its jurisdiction" prong of the Anti-Injunction Act exception extends beyond cases involving the precisely same *res*. Rather, as the Court stated, it has also "recognized another category of federal cases for which state court actions present a special threat to the jurisdiction of the federal court." *Id.* at 235. *Diet Drugs* involved a multi-district litigation addressing the harmful effects of a pharmaceutical product manufactured by and distributed by American Home Products. After "two years of exhaustive work by the parties and the District Court, and after a conditional class certification and preliminary settlement had been negotiated and approved by the District Court," a Texas state court granted an order purporting to opt-out an entire class in the Texas action from the MDL settlement. *Id.* at 236. The MDL court then issued an injunction against class counsel pursuing the mass opt-out. The Third Circuit upheld the injunction, finding that the state court action "was a serious threat to the District Court's ability to manage the final stages of this complex litigation."

5

*Id.* at 237.  It therefore held that "[u]nder an appropriate set of facts, a federal court entertaining complex litigation, especially when it involves a substantial class of persons from multiple states, or represents a consolidation of cases from multiple districts, may appropriately enjoin state court proceedings in order to protect its jurisdiction."  *Id.* at 235 (citing *Carlough* v. *Amchem Prods., Inc.*, 10 F.3d 189, 202-04 (3d Cir. 1993)); *accord Grider* v. *Keystone Health Plan Cent., Inc.*, 500 F.3d 322, 329 & n.3 (3d Cir. 2007); *In re Prudential Ins. Co. of Am. Sales Practices Litig.*, 314 F.3d 99, 104-105 (3d Cir. 2002).  "[W]here complex cases are sufficiently developed, mere exercise of parallel jurisdiction by the state court may present enough of a threat to the jurisdiction of the federal court to justify issuance of an injunction."  228 F.3d at 235 n.12.  As the Court held, the core similarity between *in rem* litigation and nationwide complex litigation is that "in both kinds of cases state [court] actions over the same subject matter have the potential to 'so interfer[e] with a federal court's consideration or disposition of a case as to seriously impair the federal court's flexibility and authority to decide the case.'"  *Id.* (quoting *Atlantic Coast Line R. Co.* v. *Brotherhood of Locomotive Engineers*, 398 U.S. 281, 295 (1970)).

The parallels to the situation here are plain.  The *Crystallex* proceeding now has more than 20 Attached Judgments effectively coordinated within it, and this Court has spent years presiding over it, ruled on countless motions and objections, and painstakingly worked with the parties and its appointed Special Master to craft a fair and effective sale of the PDVH Shares.  After so much work and expense, practically on the eve of a sale confirmation hearing, the Gramercy Parties have initiated actions in other courts seeking rulings that would undermine this carefully constructed sale process by collaterally attacking the priority order that itself was the product of much thought and deliberate action on the part of this Court with the assistance of the U.S. Marshal Service.  This is *precisely* the type of situation in which the All Writs Act and the Anti-Injunction Act permit

courts to effectuate their jurisdiction and protect their proceedings by preventing other courts from entertaining collateral litigation aimed at destroying the lead court's efforts, both by effectively destroying the *res* that this Court is supervising, and by asking for rulings that would make this proceeding meaningless.

While the merits of the reverse veil-piercing theories are not yet before the Court, the nature of such a claim is highly relevant to understanding the potential for interference that a reverse veil-piercing claim can pose for a traditional judgment-collection effort. As the Tenth Circuit has explained, "[t]he reverse-pierce theory presents many problems. It bypasses normal judgment-collection procedures, whereby judgment creditors attach the judgment debtor's shares in the corporation and not the corporation's assets." *Cascade Energy & Metals Corp.* v. *Banks*, 896 F.2d 1557, 1577 (10th Cir. 1990). Many other courts are in accord. *See Comm'r of Env't Prot.* v. *State Five Indus. Park*, 37 A.3d 724 (Conn. 2012) (same); *Wick* v. *Ach*, 139 N.E.3d 480, 484 (Ohio Ct. App. 2019) ("reverse veil piercing is distinguishable from traditional veil piercing, principally the potential harm inherent to both innocent shareholders and corporate creditors by allowing judgment creditors to bypass normal collection processes and jump to the front of the collection line"); *In re Phillips*, 139 P.3d 639, 645 (Colo. 2006) ("when inartfully performed, outside reverse piercing has the potential to prejudice innocent shareholders and creditors, and to bypass normal judgment procedures"); *Manichean Cap., LLC* v. *Exela Techs., Inc.*, 251 A.3d 694, 718 n.148 (Del. Ch. 2021) (citing *Cascade* with approval for "expressing concerns about using reverse veil-piercing to bypass normal judgment-collection procedures") (internal quotation omitted).

The reason for the widespread judicial concern about entertaining reverse veil-piercing actions is in fact exactly what the Gramercy Parties are seeking to accomplish here: They are attempting to bypass the existing, traditional judgment-collection mechanism and move to the front

of the collection line. If courts conducting judicial sales of corporate shares were powerless to stop that type of collateral litigation, then almost no "normal judgment-collection procedure" to sell corporate shares could ever go forward without the threat of interference from other proceedings. Establishing the appropriate order for distribution of proceeds among competing creditors is an essential element of conducting the sale itself, as it is an inherent fact of judicial sales that the price realized often will not satisfy all potential claimants. If litigants low in the priority order were free to launch reverse veil-piercing actions that essentially amount to attempted line-jumping, both the sale itself and the setting of an order of distribution would often be ineffectual.

For that reason, letting other courts proceed with deciding an issue so fundamental to the sale process that is under the supervision of this Court is in serious tension with the long-standing principle "that as between courts of concurrent jurisdiction, the court that first obtains possession of the controversy, or of the property in dispute, must be allowed to dispose of it without interference or interruption from the co-ordinate court." *Riggs* v. *Johnson Cty.*, 73 U.S. 166, 196 (1867).

**Question B: What efforts, if any, has the Special Master and/or any Sale Process Party made, or intend to make, to advise the New York and Texas courts of this Court's proceedings and the impact those proceedings may have on these?**

ConocoPhillips understands that the Special Master has notified the other courts of the Injunction Motion by letter, and otherwise defers to the Special Master to respond to this question.

**Question C: On what basis did bidders for the PDVH Shares come to "expect to purchase those shares free and clear of claims or encumbrances from judgment creditors of PDVSA." (D.I. 1249 at 4)?**

ConocoPhillips defers to the Special Master to supply any details of the negotiations, but notes that it is well-established that a valid execution sale discharges all junior judgment liens as

against the property. *See generally E. Sav. Bank, FSB* v. *CACH, LLC*, 55 A.3d 344 (Del. 2012) (junior real property liens discharged by execution sale); 6 *Del. C.* § 9-617 (in case of personal property, valid "disposition of collateral after default … discharges any subordinate security interest or other subordinate lien"). It could not be otherwise. If the assets sold at a judicial sale remained subject to all unsatisfied claims against the debtor, no execution sale of assets of a debtor with obligations exceeding the value of its assets could ever take place, as the purchaser would always be buying an inherently worthless asset.

To be clear, ConocoPhillips does not believe that bidders were led to understand that the purchase would be free and clear of claims or encumbrances to which PDVH or its subsidiaries are independently subject (that is, not on a basis deriving solely from their ownership by the Republic or PDVSA). Those liabilities will be effectively assumed by the buyer in the ordinary course. It is only claims or encumbrances deriving from liabilities of the Republic or PDVSA, which in the ordinary course would not be liabilities of PDVH or its subsidiaries, from which bidders would have expected to purchase the PDVH Shares free and clear.

**Question D: The Injunction Motion seems to request of the Court something akin to an "automatic stay" that might be issued from a Bankruptcy Court. Is this what the Special Master is seeking and, if so, are there any precedents for a non-bankruptcy court to grant such relief?**

The Injunction Motion is not requesting something akin to the automatic stay, but rather something akin to another power of a bankruptcy court: The power to enjoin litigation that would interfere with the bankruptcy proceeding under bankruptcy's version of the All Writs Act, 11 U.S.C. § 105(a).

The automatic stay is, as the name suggests, automatic – nothing about the initial imposition of the automatic stay turns on a determination that any particular litigation will actually impair the proper functioning of the bankruptcy proceeding. Instead, impairment of the

9

bankruptcy proceeding is presumed, but that presumption can be rebutted: the bankruptcy court has the power to lift the automatic stay and permit a non-bankruptcy action to move forward. *See* 11 U.S.C. § 362(a), (d). Bankruptcy courts often find cause to do so in circumstances where permitting a non-bankruptcy litigation to move forward would not "interfere with the bankruptcy case." *In re Sonnax Indus., Inc.*, 907 F.2d 1280, 1286 (2d Cir. 1991); *accord In re SCO Grp., Inc.*, 395 B.R. 852, 857 (Bankr. D. Del. 2007).

The automatic stay is not, however, the totality of a bankruptcy court's power to stay other proceedings. Section 105(a) of the Bankruptcy Code is the bankruptcy court version of the All Writs Act. *See In re Combustion Eng'g, Inc.*, 391 F.3d 190, 224 n.36 (3d Cir. 2004) ("Section 105 provides bankruptcy courts with powers of equity similar to those granted to federal courts under the All Writs Act, including writs of injunction."). As the Third Circuit has held, "Congress clearly envisioned that section 105(a) would be available to issue an injunction on a case-by-case basis in situations expressly excepted from the automatic stay under section 362(a)." *In re Wedgewood Realty Grp., Ltd.*, 878 F.2d 693, 701 (3d Cir. 1989). And Congress contemplated that, when considering requests for an injunction under section 105(a), bankruptcy courts would employ "the usual rules for issuance of injunctions" to "determine whether a particular action which may be harming the estate should be stayed." *Penn Terra Ltd.* v. *Dep't of Envt. Res.*, 733 F.2d 267, 273 (3d Cir. 1984). Among the circumstances in which a bankruptcy court will issue an injunction against another proceeding pursuant to section 105(a) is "when it is satisfied that such proceedings would defeat or impair its jurisdiction over the case before it." *In re L&S Indus., Inc.*, 989 F.2d 929, 932 (7th Cir. 1993); *accord In re Crown Vantage, Inc.*, 421 F.3d 963, 975-76 (9th Cir. 2005) (similar); *In re Imperial "400" Nat., Inc.*, 429 F.2d 680, 682 (3d Cir. 1970)

10

("Courts of Bankruptcy are essentially courts of equity and have the power to issue an injunction when necessary to prevent the defeat or impairment of their jurisdiction.").

This analogy to bankruptcy proceedings thus supports the Injunction Motion. It demonstrates that courts presiding over *in rem* proceedings, which include (but obviously are not limited to) bankruptcy proceedings, may issue injunctions to prevent interference with matters under their jurisdiction, whether under the All Writs Act itself, or under the bankruptcy equivalent of the All Writs Act. The power to enjoin competing litigations that interfere with an *in rem* action does not derive from the automatic stay; it derives from the fundamental powers of courts hearing proceedings *in rem*, and is essentially the same whether exercised by a district court or a bankruptcy court.

**Question E: If the Court determines that the Sale Process is an *in rem* or *quasi in rem* action, is the application of the *Princess Lida* doctrine "compulsory?" See *Dailey* v. *Nat'l Hockey League*, 987 F.2d 172, 176 (3d Cir. 1993).**

Because the *Princess Lida* doctrine is designed to protect the first court to obtain possession of the *res* from interference by proceedings in other courts, presumably the first court has discretion to determine whether a particular competing action would actually interfere with its own proceeding. That potential caveat is academic here given that a successful reverse veil-piercing action would stop this proceeding in its tracks. The doctrine is otherwise compulsory. *See Dailey* v. *Nat'l Hockey League,* 987 F.2d 172, 176 (3d Cir. 1993).

**Question F: In evaluating the Injunction Motion, to what extent should the Court consider, and what weight should the Court give to, the fact that the Alter Ego Claimants previously participated in this Court's process and failed to obtain the relief they sought?**

The Gramercy Parties' transparent effort to run away from this Court to relitigate their loss on the priority dispute is significant but not dispositive. It is significant because it starkly demonstrates that they are mounting a collateral attack on this Court's orders. Nonetheless, it is

11

likely that other creditors not burdened by the Gramercy Parties' litigation history will eventually try the same gambit, and the need for those actions to be enjoined is just as great.  In fact, in the absence of an injunction, nearly every creditor of PDVSA or Venezuela, including participants in this proceeding, will need to file copycat claims to protect their rights.  The relief sought by the Injunction Motion is necessary to protect this Court's judgment enforcement proceeding from the prospect of interference from rulings by other courts regardless of the motivations or history of the particular litigants asserting those actions, and the Injunction Motion should therefore be decided on that basis.

## CONCLUSION

The Special Master's Injunction Motion should be granted.

*Of Counsel*:

Michael S. Kim
Marcus J. Green
Josef M. Klazen
Lydia L. Halpern
KOBRE & KIM LLP
800 Third Avenue
New York, New York 10022
(212) 488-1200
michael.kim@kobrekim.com
marcus.green@kobrekim.com
jef.klazen@kobrekim.com
lydia.halpern@kobrekim.com

Richard G. Mason
Amy R. Wolf
Michael H. Cassel
WACHTELL, LIPTON, ROSEN
 & KATZ
51 West 52nd Street
New York, New York 10019
(212) 403-1000
RGMason@wlrk.com
ARWolf@wlrk.com
MHCassel@wlrk.com

Dated: September 17, 2024

Respectfully submitted,

ROSS ARONSTAM & MORITZ LLP

*/s/ Garrett B. Moritz*
Garrett B. Moritz (Bar No. 5646)
Elizabeth M. Taylor (Bar No. 6468)
1313 North Market Street, Suite 1001
Wilmington, Delaware 19801
(302) 576-1600
gmoritz@ramllp.com
etaylor@ramllp.com

*Attorneys for Phillips Petroleum Company Venezuela Limited, ConocoPhillips Petrozuata B.V., ConocoPhillips Gulf of Paria B.V., and ConocoPhillips Hamaca B.V.*