IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

CRYSTALLEX INTERNATIONAL
CORPORATION,

               Plaintiff,

    v.

BOLIVARIAN REPUBLIC
OF VENEZUELA,

               Defendant.

C.A. No. 17-mc-151-LPS

## **CRYSTALLEX INTERNATIONAL CORPORATION'S OPPOSITION TO THE VENEZUELA PARTIES' MOTION TO STAY THE SALE PROCESS**

OF COUNSEL:

Robert L. Weigel
Jason W. Myatt
Rahim Moloo
GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue
New York, New York  10166
Tel:  (212) 351-4000
Fax:  (212) 351-4035

Miguel A. Estrada
Lucas C. Townsend
Adam M. Smith
GIBSON, DUNN & CRUTCHER LLP
1700 M Street, N.W.
Washington, D.C.  20036
Tel:  (202) 955-8500
Fax:  (202) 467-0539

Dated:  September 24, 2024

Raymond J. DiCamillo (#3188)
Jeffrey L. Moyer (#3309)
Travis S. Hunter (#5350)
RICHARDS, LAYTON & FINGER, P.A.
One Rodney Square
920 North King Street
Wilmington, Delaware  19801
Tel:  (302) 651-7700
Fax:  (302) 651-7701

*Attorneys for Plaintiff*

## TABLE OF CONTENTS

Page(s)

NATURE AND STAGE OF THE PROCEEDINGS ..................................................................... 1

BACKGROUND ....................................................................................................................... 4

ARGUMENT ........................................................................................................................... 11

    I.     Potential Developments In Venezuela Provide No Basis To Delay The Sale................................................................................................................................ 12

    II.    Other Pending Litigation Provides No Basis To Delay The Sale. ...................... 17

CONCLUSION ........................................................................................................................ 20

## TABLE OF AUTHORITIES

Page(s)

### Cases

*Crystallex Int'l Corp. v. Bolivarian Republic of Venezuela*,
    244 F. Supp. 3d 100 (D.D.C. 2017) ............................................................................4

*Crystallex Int'l Corp. v. Bolivarian Republic of Venezuela*,
    932 F.3d 126 (3d Cir. 2019) ..................................................................................4, 7

*Hamilton Reserve Bank Ltd. v. Democratic Socialist Republic of Sri Lanka*,
    2023 WL 7180683 (S.D.N.Y. 2023) .........................................................................15

*Landis v. N. Am. Co.*,
    299 U.S. 248 (1936) ......................................................................................12, 13, 14

*Pravin Banker Assocs., Ltd. v. Banco Popular Del Peru*,
    109 F.3d 850 (2d Cir. 1997) .....................................................................................15

### Statutes

28 U.S.C. § 455 ...................................................................................................................9

### Other Authorities

Jorge Rueda, Joshua Goodman, & Joseph Wilson, *Opposition Presidential
    Candidate González Flees Venezuela for Asylum in Spain*, Associated Press
    (Sept. 8, 2024, 4:51 PM), https://tinyurl.com/mr2u46e4 ...................................15, 16

Law 12/2009 of 30 October, Regulating the Right of Asylum and Subsidiary
    Protection, art. 3 (Spain) .........................................................................................16

## NATURE AND STAGE OF THE PROCEEDINGS

Two months before this Court's scheduled Sale Hearing, the Venezuela Parties have once again filed a motion seeking to postpone the already long-delayed sale of the PDVH Shares that this Court ordered to satisfy judgments the Venezuela Parties refuse to pay.  The Venezuela Parties have sought to stay or delay these proceedings over a dozen times.  They have attempted to derail the sale process by arguing that creditors failed to seize a physical share certificate they later conceded to be lost, stolen, or destroyed.  They also attempted to disqualify the Special Master and his financial advisor on three separate occasions, each time without any serious expectation of success.  When their attempts at obstruction and delay failed in this Court, they pursued no fewer than nine separate appeals and mandamus petitions in the Third Circuit, none of which has been successful.  Their patten of delay and disrespect for the judgments of our judicial system is well documented.  Now the Venezuela Parties come to this Court with yet another motion styled as a request for a "short pause."  In reality, the Venezuela Parties seek to stay these proceedings in hopes that the delay will eventually give them grounds to stop the sale altogether.  The sale has been delayed far too long already, and the longer it is extended the more spurious motions of this sort the Court will have to address.  The Court should deny the Venezuela Parties' motion and make clear that there will be no further extensions of the sale process or the November 19, 2024 Sale Hearing to approve the winning bidder of the auction of the PDVH Shares.

Little needs to be said to refute tired arguments that this Court has repeatedly rejected, but it suffices to say that the Venezuela Parties' motion presents nothing new or remotely meritorious. The Venezuela Parties' primary argument is that this Court should put the imminent Sale Hearing on ice due to the uncertain political situation in Venezuela.  They claim that, despite proclaiming victory in the July 2024 election, Nicolás Maduro *might* cede power to opposition candidate Edmundo González Urrutia (who has fled Venezuela and been granted asylum in Spain after penning

1

a letter recognizing Maduro as President-elect), who in turn *might* be in a position to negotiate an equitable resolution to the Venezuela Parties' debts. They also assert the familiar refrain that the sale of the PDVH Shares at this moment might be inconsistent with U.S. foreign-policy interests— for which they offer only outdated government statements that pre-date the most recent Venezuelan elections that form the basis for their request. In other words, the Venezuela Parties ask this Court to stay the sale because of the *possibility* that a series of contingent events *might* materialize, which the Venezuela Parties hope they could then use as a basis to derail the sale altogether. The Venezuela Parties' wishful thinking about how the future might unfold is hardly grounds for this Court to grant their requested stay, particularly when the stay is transparently aimed at stopping the auction from ever concluding.

Regardless, the political situation in Venezuela is not a basis for this Court to delay the sale of the PDVH Shares and thus the enforcement of federal-court judgments that the Venezuela Parties continue to willfully defy. The enforceability of federal judgments against Venezuela does not depend on who is governing that country. Indeed, when the Venezuela Parties raised similar concerns in support of a request to delay the sale (and allow PDVSA to conduct the sale itself) over three years ago, this Court explained that "the time has arrived for the sales process to proceed" and "the OFAC licensing process provides the better mechanism through which the Executive Branch can bring to bear the foreign policy and national security interests on which Crystallex's collection efforts might have an impact." D.I. 234, at 34. This Court also explained that it would not allow the Venezuela Parties to avoid the Court-ordered sale process and devise their own solution for paying their long-overdue debts: "[H]aving made Crystallex undertake a decade's worth of extensive and expensive efforts to collect on its judgment, the Court is not going

to permit a highly-recalcitrant judgment debtor to conduct its own sales process over the objection of its repeatedly-victorious judgment creditor." *Id.* at 37.

Crystallex and the Venezuela Parties' other creditors have waited far too long for their judgments to be satisfied. And bidders for the PDVH Shares reasonably expect to learn in the near future which bid is successful and will be approved by this Court. The uncertain political situation in Venezuela—which could remain uncertain for months or years to come—provides no reason to delay the satisfaction of the various judgments against the Venezuela Parties or to upset these reasonable expectations of bidders at the eleventh hour.

The Venezuela Parties also assert that the actions of the Alter Ego Claimants and the 2020 Bondholders might reduce the value of the proceeds derived from the sale of the PDVH Shares. But "a judgment debtor has no right to demand, or expect, that a Court will delay a sale needed to effectuate its judgment until market conditions are most favorable to the debtor." D.I. 643, at 7. In any event, the Venezuela Parties have not shown that these actions will prevent the Special Master or this Court from completing the sale process consistent with Delaware law. This Court has granted expedited consideration of the Special Master's motion to enjoin the Alter Ego Claimants and scheduled a hearing on the motion for October 1, 2024. D.I. 1259. Accordingly, the extent to which the Alter Ego Claimants' actions might affect the sale process will likely be determined in advance of the Sale Hearing, thus negating any alleged basis for delay. As for the 2020 Bondholders litigation, the Sale Procedures Order explicitly accounts for that pending litigation, and this Court has already held that it is "persuaded by the Special Master's insistence that the ongoing 2020 Bondholders' litigation will be no impediment to his efforts." D.I. 643, at 11. Regardless, further delay will only undermine public confidence in the auction and increase the like-

lihood that the Venezuela Parties' numerous creditors grow impatient and take new actions designed to impact the value of the PDVH Shares and the integrity of the sale process.  Respectfully, this Court should not condone the Venezuela Parties' attempt to set the stage for endless delays.

There is therefore no basis for staying the sale process.  If anything, the Court should make clear that the November 19, 2024 hearing to select a winning bidder will not be adjourned further. This Court should reject the Venezuela Parties' last-minute attempt to avoid their obligations and deny their frivolous motion.

## BACKGROUND

This Court is conducting a judicial auction of PDVSA's shares in PDVH to satisfy a judgment Crystallex obtained more than seven years ago against Venezuela, *Crystallex Int'l Corp. v. Bolivarian Republic of Venezuela*, 244 F. Supp. 3d 100 (D.D.C. 2017), a judgment that "was preceded by over five years of arbitration," D.I. 1180, at 13.  This Court granted Crystallex's motion for a writ of attachment of the PDVH Shares in 2018.  D.I. 79.  The Third Circuit affirmed that decision in 2019 and "told the world—and, from a more parochial perspective, instructed this Court—that '*[a]ny outcome where Crystallex is not paid means that Venezuela has avoided its obligations.*'"  D.I. 1180, at 13 (quoting *Crystallex Int'l Corp. v. Bolivarian Republic of Venezuela*, 932 F.3d 126, 149 (3d Cir. 2019)).

Consistent with the Third Circuit's mandate and this Court's resulting duty to "take all reasonable and lawful steps to avoid an outcome in which Venezuela succeeds in not living up to its obligations to pay its debts," D.I. 1180, at 13, this Court appointed the Special Master to "devise a plan for the sale of shares of PDVH as necessary to satisfy the outstanding judgment of Crystallex and the judgment of any other judgment creditor added to the Sale by the Court … while maximizing the sale price of any assets to be sold" within the context of a forced sale.  D.I. 277, at 3.  The Special Master accordingly submitted several proposed sale procedures and repeatedly revised

4

them based on feedback from the parties and the Court, including amendments to the Sale Process designed specifically to account for objections and observations raised by the Venezuela Parties. This Court adopted the sixth proposed sale procedures order in October 2022.  D.I. 481.  In accord with this Sale Procedures Order, this Court set key deadlines for the marketing and sale of the PDVH Shares on July 27, 2023, D.I. 646, the Special Master launched the marketing process on October 23, 2023, D.I. 771, this Court adopted the Special Master's final determination of the judgments in addition to Crystallex's to be satisfied in the sale on April 25, 2024, D.I. 1136, and final binding bids on the PDVH Shares were submitted to the Special Master on June 11, 2024, D.I. 1201, at 2.  The Sale Hearing at which the winning bidder will be determined by this Court is currently scheduled for November 19, 2024, D.I. 1283.  The Special Master, whom the Venezuela Parties nominated as "uniquely qualified" with experience working in the petroleum industry and "expertise necessary to oversee a value-maximizing sale," thanks to his "experience crafting and running multi-million dollar corporate auctions," D.I. 643, at 6-7 (cleaned up), has worked diligently alongside the Court and the Sale Process Parties to prepare for the sale and advertise the assets since his appointment in 2021.

To start, the Sale Procedures Order requires notice of the sale process in several major U.S. newspapers for two successive weeks and, if practicable in coordination with the Venezuela Parties, in regional newspapers in Venezuela as well.  D.I. 481, at 7-8.  At the Venezuela Parties' request, *see* D.I. 457, at 2, 6, the Sale Procedures Order also permits the Special Master to engage in negotiations with bidders and creditors to negotiate a deal that will obtain the best price possible for the PDVH Shares, D.I. 481, at 31.  The Special Master has done exactly that.  D.I. 1250, ¶ 5 ("The Special Master and his Advisors have engaged in robust discussions with potential bidders and with CITGO for months.").

The Special Master also ensured the Sale Procedures Order accounts for the establishment of a secure data room where the Venezuela Parties and CITGO could provide detailed information about PDVH and its assets to potential bidders, with the Special Master empowered to further coordinate with bidders and the Venezuela Parties to provide bidders with any additional information necessary to the formulation of their bids for the PDVH Shares.  *See* D.I. 480-1, at 43 (Bidding Procedures).  Again, the Special Master and his team of advisors did exactly what they were expected to do.  D.I. 1250, ¶ 5 ("[P]otential bidders signed non-disclosure agreements with CITGO and the Special Master, were granted access to CITGO's virtual data room, and examined detailed financial information belonging to CITGO.").

The Special Master's status reports confirm the extensive efforts so far undertaken to engage with the Sale Process Parties, CITGO, and potential bidders to execute a sale of the PDVH Shares in accordance with Delaware law.  For example, in his most recent update to the Court, the Special Master reports that he "[r]egularly me[t] with CITGO's management team regarding outstanding diligence, review[ed] and respond[ed] to diligence requests from Potential Bidders, and analyz[ed] documents in connection therewith."  D.I. 1246, at 2.  The Special Master further explained that he and his advisors have evaluated different "potential transaction structures," "conferr[ed] with CITGO's management team … to address legal diligence requests," coordinated the "sharing of confidential information," and prepared the Stock Purchase Agreement and other documentation necessary for the potential sale, among other things.  *See id.*  In short, the Special Master has run a robust sale process in which he and his team have done all that could be expected of them to notify the market of the impending sale and to ensure the PDVH Sales are sold in a manner consistent with Delaware law.

While this Court and the Special Master have diligently worked to implement this sale process, the Venezuela Parties have consistently attempted to delay and undermine the sale process in the hope that they will avoid paying their lawful obligations.  The Venezuela Parties have pursued no fewer than nine appeals and mandamus petitions in the Third Circuit challenging this Court's orders, only one of which resulted in a published decision on the merits, *see Crystallex Int'l Corp. v. Bolivarian Republic of Venezuela*, 932 F.3d 126 (3d Cir. 2019), and *none* of which was successful.  *See* 3d Cir. Nos. 18-2797, 18-2889, 18-3124, 21-1276, 21-1277, 21-1289, 22-1606, 22-8024, 23-1687.  The Venezuela Parties have also sought to stay or delay this already lengthy litigation over a dozen times.  D.I. 250, at 3-5 (collecting examples).

Over three years ago, the Venezuela Parties argued that the sale process should not proceed because (1) OFAC had not yet issued a "specific license allowing the sale" and (2) taking steps toward a sale could be damaging to the Guaidó regime and U.S. foreign policy.  D.I. 234, at 32-34.  This Court rejected both asserted bases for delay.  It declined to wait for a specific license from OFAC because "the Court has been provided no indication as to the timing of an OFAC decision and it seems possible that OFAC is waiting to make a decision until after this Court makes further progress."  *Id.* at 33.  This decision proved prescient because the U.S. Government ultimately informed the Special Master in 2023 that OFAC would not take any enforcement action against persons participating in the prefatory steps in this Court's Sale Procedures Order and "intends to implement a favorable licensing policy for license applications in connection with the execution of a sale."  D.I. 553-1, at 1-2.

As for potential damage to the Guaidó regime and U.S. foreign-policy interests, this Court also rejected those rationales for delay with reasoning that is as sound today as it was three years ago: "[T]he OFAC licensing process provides the better mechanism through which the Executive

7

Branch can bring to bear the foreign policy and national security interests on which Crystallex's collection efforts might have an impact"; "[t]he government has not taken the position that the Court is 'blocked from moving forward' … and, in the Court's view, the time has arrived for the sales process to proceed." D.I. 234, at 34.

Indeed, the Court explained in pellucid language that it would not permit the Venezuela Parties to delay a sale that is only occurring because they have obstinately refused to comply with a federal-court judgment. "Venezuela, through PDVSA and otherwise, has had every opportunity to pay its legitimate, Court-recognized debt to Crystallex, including before, during, and after the arbitration, and throughout the extensive litigation in this Court, the Court of Appeals, and the Supreme Court. Even today, the Republic could pay Crystallex what it owes and avoid the sales process altogether. But, having made Crystallex undertake a decade's worth of extensive and expensive efforts to collect on its judgment, the Court is not going to permit a highly-recalcitrant judgment debtor" to conduct a sale process on its own terms "over the objection of its repeatedly-victorious judgment creditor." D.I. 234, at 37. As this Court noted, "Each day that Crystallex does not recover on its judgment is arguably something of an affront to the United States judicial system. Those days must soon come to an end." *Id.* at 38.

Yet the Venezuela Parties were not deterred by this Court's emphatic statement that it would not countenance further efforts to delay or undermine the sale process. After this Court held that the Venezuela Parties were judicially estopped from seeking to quash Crystallex's writ of attachment on the ground that Crystallex had not seized the lost, stolen, or destroyed PDVH share certificate, D.I. 234, at 21-26, the Venezuela Parties renewed their missing-certificate argument against all creditors other than Crystallex in an attempt to exclude them from the sale process. D.I. 571, at 7-12. Then, after this Court ordered the Venezuela Parties to institute proceedings for

8

the reissuance of the certificate, D.I. 644, PDVH unsuccessfully sought to prevent reissuance by asking the Delaware Court of Chancery to condition reissuance on the posting of a "bond in the range of $30-40 billion." D.I. 792-2, at 32.

The Venezuela Parties also sought to disrupt the sale process by moving to disqualify the Special Master and his advisors *on three separate occasions*. First, they claimed that the Special Master's proposed fee arrangement with the financial advisor Evercore required disqualification under 28 U.S.C. § 455, but this Court rejected this argument, holding that "neither Evercore nor the Special Master suffers from a conflict of interest." D.I. 443, at 3. Second, the Venezuela Parties asked this Court to disqualify the Special Master based on his supposedly improper *ex parte* communications and "advocacy" in a January 12, 2023 meeting with the Executive Branch. D.I. 509. This Court denied this second disqualification motion on the ground that the Venezuela Parties' arguments were untimely, waived, and meritless. D.I. 544. Third, the Venezuela Parties renewed these same untimely, waived, and meritless arguments in yet another disqualification motion. D.I. 1138. Unsurprisingly, this Court (again) rejected the arguments in the Venezuela Parties' third disqualification motion because they were untimely, waived, and meritless. D.I. 1180. In doing so, this Court emphasized that it "will proceed with implementing the Sale Procedures Order" and that "[t]he Venezuela Parties will not upend" its efforts to do so "with frivolous motions." *Id.* at 13.

When the Special Master recommended in April 2023 that the Court begin preparations to launch the marketing process for bidding on the PDVH Shares, the Venezuela Parties objected, asserting several reasons why this Court should delay the sale process. First, the Venezuela Parties claimed that this Court should wait to obtain a license from OFAC specifically authorizing a contingent auction, but this Court found that objection "utterly unpersuasive, particularly in view of

the lengthy history of this case." D.I. 643, at 2. Instead, the Court was "persuaded that the Special Master should proceed promptly with the sale process" because "there is far greater certainty now that this process may proceed than there has been at any prior point in this lengthy litigation. The sale process will proceed." *Id.* at 7-8. The Court emphasized that "a judgment debtor has no right to demand, or expect, that a Court will delay a sale needed to effectuate its judgment until market conditions are most favorable to the debtor" and "[t]he Court is completely convinced that the current moment is an auspicious one in which to initiate the sale process." *Id.* at 7.

The Court was also "not persuaded" by the Venezuela Parties' objection that the Court should delay the sale process until "other litigation is concluded," specifically (1) the 2020 Bondholders litigation in New York and (2) the Venezuela Parties' (now-concluded) Third Circuit appeal in actions brought by six other creditors. D.I. 643, at 8-9. This Court made clear to the Venezuela Parties that even though the ultimate resolution of the 2020 Bondholders litigation "could impact the sale process, the Court will not await its outcome before moving forward." *Id.* at 9. The Court noted that "[t]he Special Master continues to express confidence that the schedule set out in the SPO will give him the best opportunity to conduct a value-maximizing transaction, selling only as many shares of PDVH as are necessary" and that it was "persuaded by the Special Master's insistence that the ongoing 2020 Bondholders' litigation will be no impediment to his efforts." *Id.* at 10-11. In sum, "there [was] no reason to further delay starting the sale process." *Id.* at 11.

On September 17, 2024, about two months before the Sale Hearing at which this Court will select the winning bidder for the PDVH Shares, the Venezuela Parties moved to stay the sale process based on political developments in Venezuela and the pendency of other litigation. D.I. 1273.

## ARGUMENT

The Venezuela Parties urge this Court to delay a long-anticipated judicial auction of the PDVH Shares, which this Court originally ordered to satisfy a judgment in favor of Crystallex that the Venezuela Parties have refused to comply with, and to which other attached judgments have subsequently been added by the Court. The Venezuela Parties request this relief on the flimsiest of grounds. *First*, they claim that there is some possibility that, despite claiming victory in a July 2024 election, Nicolás Maduro will yield to international pressure he has hitherto ignored and cede power to opposition candidate Edmundo González Urrutia, who *might* be in a position to negotiate the Venezuela Parties' debts should he take power. Venezuela's uncertain political future provides no basis for this Court to further delay these already lengthy judgment-enforcement proceedings. The Venezuela Parties have had every opportunity to voluntarily comply with the judgments against them and have consistently refused. They cannot avoid the sale process ordered by this Court to enforce federal-court judgments—thereby injuring the creditors and bidders that have invested time and resources in this process—by pointing to a highly uncertain (at best) possibility of a negotiated resolution. Indeed, there is nothing further for Venezuela to "negotiate" with Crystallex. These are judgment *enforcement* proceedings.

*Second*, the Venezuela Parties contend that opportunistic litigation recently commenced in other jurisdictions provides a basis for delay. They contend that the Alter Ego Claimants' attempts to levy on the assets of PDVH in New York and Texas justify a stay of the Sale Hearing. But the Special Master tasked with implementing the auction opposes such a delay, and this Court will address the question of how to respond to the Alter Ego Actions in advance of the Sale Hearing. And delaying the Sale Hearing would only provide an opportunity for other creditors of the Venezuela Parties to file additional actions that might seek to levy on assets of PDVH. Any threat that the Alter Ego Claimants' action might pose to the sale counsels in favor of expedition, not delay.

11

Nor does the 2020 Bondholders litigation provide any reason to delay the sale.  The parties, the Special Master, and the Court have long been aware of this litigation, and bidders are able to evaluate the risk that this litigation poses to the value of PDVH and price that into their bids.

In short, there is no basis for further delay of the sale process and the Venezuela Parties' request for that relief should be denied.

**I.   Potential Developments In Venezuela Provide No Basis To Delay The Sale.**

The Venezuela Parties assert that this Court should delay the long-anticipated sale of the PDVH Shares because, even though "[t]he Maduro-controlled National Electoral Council … has claimed that Maduro won the July 28 election," there is some possibility that "Mr. Maduro will cede power to the democratically-elected Mr. González," who "intends to negotiate a restructuring of Venezuela's debt."  D.I. 1273, at 3-6.  There is absolutely no basis for this Court to put the imminent Sale Hearing on hold just to wait and "see whether the new government takes power and is in a position to negotiate an equitable resolution of claims made by all the Republic's creditors." *Id.* at 7.  Venezuela's legal obligations to Crystallex and other aggrieved judgment creditors do not depend on what party governs Venezuela.  The Venezuela Parties have refused to comply with federal-court judgments against them for years, and potential political developments in Venezuela have no bearing on whether this Court should proceed expeditiously with enforcing those judgments (it should).

The Venezuela Parties rely on *Landis v. North American Co.*, 299 U.S. 248 (1936), for the proposition that this Court has discretion to stay the proceedings before it, but they neglect to mention the key factors a court should consider when deciding whether to exercise this discretion. D.I. 1273, at 6.  Determining whether proceedings should be stayed "calls for the exercise of judgment, which must weigh competing interests and maintain an even balance."  *Landis*, 299 U.S. at 254-55.  "[T]he suppliant for a stay must make out a *clear case of hardship or inequity* in being

required to go forward, if there is even a *fair possibility* that the stay for which he prays will work damage to some one else." *Id.* at 255 (emphases added). And "[o]nly in rare circumstances will a litigant in one cause be compelled to stand aside while a litigant in another settles the rule of law that will define the rights of both." *Id.*

There is more than a "fair possibility"—indeed, it is a near certainty—that delaying the sale would work damage to others—and indeed that is precisely what the Venezuela Parties intend. *First*, additional delay would clearly harm Crystallex, which the Venezuela Parties have forced to "undertake a decade's worth of extensive and expensive efforts to collect on its judgment" when Venezuela could just "pay Crystallex what it owes and avoid the sales process altogether." D.I. 234, at 37. Delay would similarly harm the seventeen other creditors of Venezuela entitled to receive proceeds from the sale in satisfaction of their judgments. D.I. 1102, at 3-5. This Court should not further delay the satisfaction of these judgments because the Venezuela Parties have dangled out the possibility that they *might* be in a "position to negotiate an equitable resolution" of their debts in four months. D.I. 1273, at 7. Of course, Venezuela hopes that the delay will give it leverage to force its creditors to accept an *inequitable* result through these hypothetical future negotiations. The time for negotiations has long since passed. Venezuela "has had every opportunity to pay its legitimate, Court-recognized debt to Crystallex" and it has obstinately refused. D.I. 234, at 37. Just as this Court found three years ago, it should not "permit a highly-recalcitrant judgment debtor to conduct its own … process" for resolving its debts "over the objection of its repeatedly-victorious judgment creditor." *Id.*

*Second*, delaying the sale to see how the political situation in Venezuela might develop would cast a cloud of uncertainty over the sale process, which would plainly be injurious to the bidders on the PDVH Shares. In fact, the Venezuela Parties do not hide the fact that, in filing this

motion, they are attempting to avoid the sale process altogether and retain ownership of CITGO "since its operational, financial and corporate governance recovery represents the future for a new Venezuela." D.I. 1273, at 7. The Venezuela Parties' eleventh-hour attempt to avoid the sale process based on speculation on what might happen in Venezuela comes far too late. Potential buyers have conducted extensive diligence, including management meetings and site visits, and submitted multiple bids to purchase the PDVH shares, D.I. 1201, at 2, and this Court has scheduled the Sale Hearing on November 19, D.I. 1283. The time for the sale has come, as bidders' substantial diligence efforts could become stale and the Court should not undermine public confidence by pausing the process now.

Because the Venezuela Parties' requested stay would impose serious harm on the Venezuela Parties' creditors and on bidders on the PDVH Shares, the Venezuela Parties needed to "make out a clear case of hardship or inequity in being required to go forward" to show that they are entitled to a stay of proceedings. *Landis*, 299 U.S. at 255. The Venezuela Parties do not even attempt to make that showing, nor could they. The only reason that this sale is occurring at all is because Venezuela has been openly defying a federal-court judgment ordering it to pay Crystallex for years. D.I. 234, at 37. To the extent the Venezuela Parties genuinely believe that proceeding with the sale now would impose any hardship on them, "[t]his is a problem of their own creation that comes out of their own recalcitrance." D.I. 640, at 54:4-6. "[I]f they think that the conditions are not optimal for a compelled sale at the courthouse steps, the solution is in their hand. Pay the judgment." *Id.* at 54:6-9. As this Court explained just last year, "a judgment debtor has no right to demand, or expect, that a Court will delay a sale needed to effectuate its judgment until market

conditions are most favorable to the debtor." D.I. 643, at 7. Yet that is precisely what the Venezuela Parties request in their stay motion.[1]

Even if it were relevant (and it is not), the potential development that the Venezuela Parties assert as a basis to delay the sale—the potential accession to power of Mr. González as President of Venezuela—is extremely unlikely. Article 231 of the Constitution of Venezuela requires the candidate elected President to take an oath before the National Assembly or the Supreme Tribunal of Justice on January 10 of the first year of his term. And Article 153 of Venezuela's Ley Orgánica de Procesos Electorales provides that the CNE shall proclaim the candidates that have been elected and issue them their corresponding credentials. The Venezuela Parties concede that the CNE "has claimed that Maduro won the July 28 election." D.I. 1273, at 3-4. Nor does it appear likely that Mr. González will take an oath before either the National Assembly or the Supreme Tribunal of Justice on January 10 given that he has "join[ed] the swelling ranks of opposition stalwarts who once fought Maduro only to throw in the towel and seek asylum abroad in the face of a brutal crackdown." Jorge Rueda, Joshua Goodman, & Joseph Wilson, *Opposition Presidential Candidate González Flees Venezuela for Asylum in Spain*, Associated Press (Sept. 8, 2024, 4:51 PM), https://tinyurl.com/mr2u46e4. Mr. González has been granted asylum in Spain, which requires as a condition of granting asylum that the person "does not want to benefit from the protection" of

---

[1] The cases that the Venezuela Parties cite in support of their requested relief are entirely inapposite. *Hamilton Reserve Bank Ltd. v. Democratic Socialist Republic of Sri Lanka*, 2023 WL 7180683 (S.D.N.Y. 2023), involved a *pre-judgment* stay of summary judgment proceedings while Sri Lanka conducted sovereign debt restructuring negotiations. And in *Pravin Banker Associates, Ltd. v. Banco Popular Del Peru*, 109 F.3d 850 (2d Cir. 1997), the Second Circuit affirmed the *denial* of a stay of proceedings, notwithstanding Peru's ongoing negotiations with creditors. Neither case involved a "highly-recalcitrant judgment debtor" that had "had every opportunity to pay its legitimate, Court-recognized debt" yet consistently refused to do so over the course of several years. D.I. 234, at 37.

"the country of his nationality" due to fears of persecution.  Law 12/2009 of 30 October, Regulating the Right of Asylum and Subsidiary Protection, art. 3 (Spain).  Given the fact that Mr. González has "fle[d] into exile … as part of a negotiated deal with Nicolás Maduro's government," it is exceedingly unlikely that Mr. González will take power as President of Venezuela on January 10, 2025, and there is no reason for this Court to wait for an eventuality that almost certainly will not occur.  Jorge Rueda et al., *supra*, https://tinyurl.com/mr2u46e4.

To the extent that the Venezuela Parties raise concerns that proceeding with the sale at this juncture could have adverse U.S. foreign-policy effects, the Venezuela Parties do not speak for the United States Government.  As this Court previously recognized, "the OFAC licensing process provides the better mechanism through which the Executive Branch can bring to bear the foreign policy and national security interests on which Crystallex's collection efforts might have an impact."  D.I. 234, at 34.  And the Venezuela Parties "may avail themselves of access to OFAC, and perhaps other policymakers, in their ongoing efforts to prevent the Court from carrying out its judicial responsibilities."  D.I. 1180, at 13.  The Venezuela Parties "will not," however, prevent this Court from "implementing the Sale Procedures Order" or from taking "all reasonable and lawful steps to avoid an outcome in which Venezuela succeeds in not living up to its obligations to pay its debts."  *Id.*

Because Venezuela has stubbornly refused to comply with a federal judgment ordering it to pay Crystallex, "[e]ach day that Crystallex does not recover on its judgment is arguably something of an affront to the United States judicial system."  D.I. 234, at 38.  "Those days must soon come to an end," not be prolonged to allow the Venezuela Parties to satisfy the judgments against them only on their terms (if at all).

16

## II.     Other Pending Litigation Provides No Basis To Delay The Sale.

The Venezuela Parties contend in the alternative that pending litigation in other jurisdictions provides another basis to delay the sale because, in their view, that litigation could impact the price at which the PDVH Shares are sold.  D.I. 1273, at 9-12.  The Venezuela Parties continue to ignore the fact that this Court's auction is a forced sale, and that "a judgment debtor has no right to demand, or expect, that a Court will delay a sale needed to effectuate its judgment until market conditions are most favorable to the debtor."  D.I. 643, at 7.

The Venezuela Parties first contend that the actions filed by the Alter Ego Claimants in New York and Texas seeking to execute on the assets of PDVH provide a basis to delay the sale to "allow time for the Special Master to address the recent impediments to a value-maximizing sale."  D.I. 1273, at 9-11.  But one of those actions has already been voluntarily stayed following the Southern District of New York's vacatur of G&A Strategic's default judgment against PDVSA.  *See* Joint Motion to Stay Enforcement, *G&A Strategic Invs. I LLC v. PDV Holding, Inc.*, No. 4:24-cv-02774 (S.D. Tex. Sept. 18, 2024), D.I. 52.  And the Special Master has already informed the Court that he "opposes and intends to object" to the Venezuela Parties' request to delay the sale process in any event.  D.I. 1279.  Instead, the Special Master has determined that the best way to respond to the Alter Ego Claimants' actions is to proceed expeditiously with the Sale Hearing, while requesting that this Court enjoin the Alter Ego Claimants from pursuing PDVH and its subsidiaries in other jurisdictions.  D.I. 1249.  The Special Master was recommended by the Venezuela Parties as "their preferred candidate to assist the Court."  D.I. 643, at 6.  His determination that the sale should *not* be delayed "comes with greater credibility" than the representations of "a long-time recalcitrant judgment debtor."  *Id.*

Furthermore, this Court has granted expedited consideration of the Special Master's motion to enjoin the Alter Ego Claimants given that "the Court will be holding a sale hearing on November

19," and "it is in no one's interest that resolution of the Injunction Motion be unnecessarily delayed." D.I. 1259, at 1-2. This Court has also scheduled a hearing on the Special Master's motion for October 1, 2024. *Id.* at 2. There is thus every reason to believe that this Court will resolve the Special Master's injunction motion in advance of the Sale Hearing, thereby providing clarity to bidders and creditors regarding the relevance of the Alter Ego Actions to this Court's sale of the PDVH Shares. With the issue of how to respond to the Alter Ego Actions likely to be resolved before the Sale Hearing, the Venezuela Parties cannot explain why the Alter Ego Actions require a four-month extension of the Sale Hearing date. They do not.

To the contrary, the concern raised by the existence of the Alter Ego Actions—that creditors dissatisfied with their place (or lack thereof) in this Court's priority queue will attempt to circumvent that priority order by filing actions in other jurisdictions—will most effectively be put to rest by proceeding expeditiously with the sale and conveying ownership of the PDVH Shares to the successful bidder. If the sale process were delayed, additional creditors of the Venezuela Parties may obtain judgments against them in the future; but they will not be entitled to receive proceeds from the sale of the PDVH Shares because they did not obtain a conditional writ of attachment by the deadline set by this Court. D.I. 646, at 12. Such creditors—like Girard Street and G&A Strategic, D.I. 1249, at 7-8—could improperly attempt to reach the res in this Court's custody in similar "alter ego" actions in other jurisdictions because their judgments are not entitled to satisfaction by this Court's sale of the PDVH Shares. While this Court has the inherent authority to enjoin such attempts to interfere with the enforcement of its orders and with the property within its custody, D.I. 1277, the most effective way to put a stop to creditors' attempts to cut the line is to continue moving forward with the sale of PDVH Shares—not delaying the sale while the number and amount of unsatisfied judgments against the Venezuela Parties grows larger.

18

The Venezuela Parties also contend that the ongoing 2020 Bondholders litigation justifies delaying the sale.  D.I. 1273, at 11-12.  They raised this same argument a year ago, and this Court conclusively rejected it.  Specifically, this Court held that the 2020 Bondholders litigation provides no basis to delay the sale process because the Sale Procedures Order "anticipated, and adequately addresses, all of the concerns now raised by the Venezuela Parties."  D.I. 643, at 10.  The Sale Procedures Order explicitly authorizes the Special Master to consult with the 2020 Bondholders throughout the sale process.  D.I. 481, ¶ 39.  The Special Master's financial advisor informed him that "Potential Bidders will be fully capable of valuing the PDVH Shares and the CITGO operations agnostic to capital structure, including whether claims held by the PDVSA 2020 Bondholders or other judgment creditors will need to be satisfied by the Sale Transaction proceeds."  D.I 583, ¶ 10.  And this Court found "credibl[e]" Crystallex's explanation that "bidders will simply price their view of the risk associated with currently pending litigation when formulating their bids."  D.I. 643, at 10 (quoting D.I. 582, at 7).  None of these facts have changed, and the Venezuela Parties have offered no reason to disturb this Court's conclusions that "the ongoing 2020 Bondholders' litigation will be no impediment to [the Special Master's] efforts" and "there is simply no reason to further delay."  *Id.* at 11.

What the Venezuela Parties euphemistically call a "modest pause" is in reality an invitation to start an endless series of delays, because the Venezuela Parties will always manufacture new reasons why the delay should be extended.  Respectfully, the Court should make clear that there will be no further delays.  It has been over a year since the Court set the sale in motion, D.I. 643, and the Special Master and his team—working together with the Sale Process Parties and CITGO—have diligently marketed the PDVH Shares such that multiple competitive bids have been submitted for the PDVH Shares.  The requirements for an execution sale under Delaware law

have been complied with in full (and then some).  Nothing more is required.  Indeed, based on the process conducted by the Special Master to date, the Court can, and if necessary, respectfully should, conduct an open auction of the PDVH Shares on an "as-is, where-is" basis.  Because the purpose of the sale of the PDVH Shares is to generate monetary proceeds to satisfy Crystallex's judgment, the "primary objective of the auction process" must be to "maximiz[e] cash consideration … until the bids provide sufficient cash consideration to satisfy Crystallex's judgment" and other judgments added to the sale by the Court.  D.I. 316, at 19-20.  Rather than delay the satisfaction of the judgments against the Venezuela Parties any further, the Court should conduct the auction of the PDVH Shares on November 19, 2024 as scheduled.  *See* D.I. 1283.

## CONCLUSION

The Venezuela Parties' motion to stay the sale process should be denied.

OF COUNSEL:

Robert L. Weigel
Jason W. Myatt
Rahim Moloo
GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue
New York, New York  10166
(212) 351-4000

Miguel A. Estrada
Lucas C. Townsend
Adam M. Smith
GIBSON, DUNN & CRUTCHER LLP
1700 M Street, N.W.
Washington, D.C.  20036
Tel:  (202) 955-8500
Fax:  (202) 467-0539

Dated:  September 24, 2024

*/s/ Jeffrey L. Moyer*

Raymond J. DiCamillo (#3188)
Jeffrey L. Moyer (#3309)
Travis S. Hunter (#5350)
RICHARDS, LAYTON & FINGER, P.A.
One Rodney Square
920 North King Street
Wilmington, Delaware  19801
(302) 651-7700
dicamillo@rlf.com
moyer@rlf.com
hunter@rlf.com

*Attorneys for Plaintiff*