**Potter Anderson & Corroon LLP**
1313 North Market Street, 6th Floor
Wilmington, Delaware 19801-6108
302.984.6000
potteranderson.com



Myron T. Steele
Senior Counsel
msteele@potteranderson.com
Direct 302.984.6030

October 18, 2024

**BY HAND DELIVERY & CM/ECF**

The Honorable Leonard P. Stark
United States District Court for the District of Delaware
J. Caleb Boggs Federal Building
844 North King Street
Wilmington, DE 19801-3570

      Re:   *Crystallex International Corp. v. Bolivarian Republic of Venezuela*,
               D. Del. C.A. No. 1:17-mc-00151-LPS

Dear Judge Stark:

Pursuant to the Court's October 2, 2024 *Oral Order* [D.I. 1339] (the "**October 2 Order**"), I write to submit this joint status report (this "**Joint Status Report**") on behalf of Special Master Robert B. Pincus (the "**Special Master**") in the above-referenced matter. Consistent with the Court's instructions, the Special Master met and conferred with the Venezuela Parties, Crystallex, and ConocoPhillips (collectively, the "**Sale Process Parties**," and each a "**Sale Process Party**"), and other interested parties, including the Additional Judgment Creditors and Amber Energy Inc. (the "**Proposed Buyer**"), among others, regarding the contents of this Joint Status Report.[1]

To the extent parties expressed a position different from that of the Special Master's described below in response to the questions outlined in the October 2 Order, such parties' positions are also included in response to the applicable question.

Since the last hearing on October 1, 2024, the Special Master and his Advisors have had several meetings with Crystallex, ConocoPhillips, and the Proposed Buyer to attempt to form consensus

---

[1] Capitalized terms used but not defined herein shall have the meanings ascribed to such terms in the *Sixth Revised Proposed Order (A) Establishing Sale and Bidding Procedures, (B) Approving Special Master's Report and Recommendation Regarding Proposed Sale Procedures Order, (C) Affirming Retention of Evercore as Investment Banker by Special Master and (D) Regarding Related Matters* (D.I. 481) (the "**Sale Procedures Order**") or in the SPA (as defined herein).

The Honorable Leonard P. Stark
October 18, 2024
Page 2

on the topics the Court requested this Joint Status Report address, and to understand each party's position on the Proposed Buyer's bid. The Sale Process Parties (other than the Republic) were provided unredacted copies of the SPA in advance of such discussions. Although to date those discussions have not yielded consensus, the Special Master appreciates the efforts and engagement of the parties in the discussions.

In light of the differing views proposed by the parties in this Joint Status Report, as well as the recent filings of the Complaint for Declaratory or Alternative Relief, *Conocophillips Petrozuata B.V. v. Girard St. Inv. Holdings*, No. 1:99-mc-09999 (D. Del. Oct. 14, 2024), D.I. 816 and Original Petition, *Siemens Energy, Inc. v. PDV Holding, Inc.,* No. 24-BC11B-0010 (Tex. Bus. Ct. Oct. 4, 2024), the Special Master respectfully proposes that the Court should hold a brief status conference for the Special Master and other parties to discuss the proposed schedule with the Court, especially in light of the recently filed alter-ego actions.

In addition to addressing each of the questions posed by the Court in the October 2 Order, the Special Master has prepared a proposed timeline for the proceedings described below, which is set forth on **Exhibit A** hereto (the "**Proposed Timeline**").[2] The Special Master has met and conferred with the above-referenced parties with respect to the Proposed Timeline.

Certain parties elected to submit statements that were unresponsive to the questions in the October 2 Order, or were otherwise submitted to the Special Master in a form or in such an untimely manner that the Special Master was not able to extract the responsive portions. The Special Master therefore has included those statements as **Exhibits B-1 to B-6** attached hereto. For the avoidance of doubt, the Special Master does not agree with a number of the statements made by other parties regarding the conduct of the sale process to date, the terms of the SPA, or suggested alternative paths, and will be prepared to address his position and reserves the right to respond to such statements in a more appropriate forum, including the proposed status conference or briefing on the applicable topics.

## Joint Statement

1) **What, if any, obligations has the Special Master assumed, either on a legally-binding basis or in the exercise of his discretion, as a result of the Proposed Buyer's execution of the Sale Purchase Agreement ("SPA")?**

No obligations in the SPA are legally binding unless and until the Court enters an order approving the proposed SPA. The terms of the SPA itself clearly state as much. *See* D.I. 1325, Ex. A at §4.1(c). ("This Agreement…[,] subject to the Sale Order Entry, … shall constitute, a legal, valid and binding obligation of the Special Master[.]"). Upon approval by the Court, the SPA will be legally binding and enforceable. The Special Master has discussed this point expressly with the Proposed Buyer, both before and after execution of the SPA, and the Proposed Buyer does not disagree.

---

[2] This Joint Status Report does not address the "Alter Ego" Injunction Motion, which is addressed in a separate cover letter and proposed order filed with the Court.

The Honorable Leonard P. Stark
October 18, 2024
Page 3

However, in furtherance of a value-maximizing transaction, and to maintain the positive momentum in this sale process, the Special Master has elected to exercise his discretion to respect certain provisions set forth in the SPA on a voluntary basis. The nature of these provisions include terms related to confidentiality, exclusivity and non-solicitation of alternative proposals, and cooperation covenants intended to facilitate finalization of the SPA terms and ensure the parties work collaboratively to obtain approvals (including approval by the Court) necessary to consummate the transactions contemplated by the SPA. The specific terms of the SPA the Special Master has elected to observe on a voluntary basis include: (i) Section 3.3 (Good Faith Deposit); (ii) Section 6.2 (Access to Information); (iii) Section 6.5 (Confidentiality); (iv) Section 6.7 (Public Announcements); (v) Section 6.17 (No Solicitation); (vi) Section 6.18(b) (Court Action); (vii) Section 6.26 (Trust Structure Effective Date Matters); (viii) Section 6.27 (Supplements to Company Disclosure Schedules); (ix) Exhibit A (Trust Structure Term Sheet); and (x) Exhibit B (Earn-Out Term Sheet).

In the context of a transaction of the nature of the sale of the PDVH Shares, it is customary for a seller to grant a lead bidder exclusivity. In fact, the Special Master granted exclusivity to the Proposed Buyer for a period of time prior to execution of the SPA—an exercise of his discretion that the Sale Process Parties and other bidders were fully aware of. The Special Master proposes to remain exclusive with the Proposed Buyer until the commencement of the Topping Period (as defined herein).

In light of the foregoing, the positions put forward by the Sale Process Parties at the hearing on October 1, 2024, and subsequent conferral between the Special Master, the Proposed Buyer, and the Sale Process Parties, the Special Master intends to file a motion seeking the Court's approval for granting customary bid protections in favor of the Proposed Buyer (the "**Bidder Protection Motion**"). The protections, which are already contained in the SPA filed at D.I. 1325, are analogous to the Stalking Horse Bid Protections set forth in the Sale Procedures Order and Bidding Procedures, and include terms such as (i) non-solicitation obligations on the Special Master until the commencement of the Topping Period, (ii) information and notice rights in favor of the Proposed Buyer, (iii) the ability for the Proposed Buyer to respond to a superior proposal, and (iv) the provision of a break-fee payable to the Proposed Buyer if the Special Master elects to pursue a superior transaction. The relief requested will be set forth in further detail in the Bidder Protection Motion.

The following parties expressed a position different from that of the Special Master:

a) **ConocoPhillips**: The Special Master indicates that, although not bound to do so, he has elected to voluntarily comply with various provisions of the SPA in order to "maintain momentum." Unfortunately, the bidder's requirements of the Special Master have had the effect of precluding any competing bids since mid-August, when the bidder was afforded exclusivity, and the Special Master has stated that he intends to continue the bidder's exclusivity. While the Sale Process Parties were aware that Elliott had been granted exclusivity early on, they were not consulted before the repeated extensions of exclusivity. ConocoPhillips believes that granting Elliott a lengthy period of exclusivity has been detrimental to the sale process. With the data room closed and the Special Master, although

The Honorable Leonard P. Stark
October 18, 2024
Page 4

    not bound to do so, unwilling to entertain any competing offers, ConocoPhillips believes that the Special Master has restricted his ability to obtain a value-maximizing transaction. The process would benefit from the reopening of the data room for a discrete period of time to ascertain whether there are better bids available. ConocoPhillips does not believe that the Special Master should move forward on the Bidder Protection Motion to lock in a substantial breakup fee on a transaction that is as problematic as the current bid unless and until it has been modified in ways that garner meaningful creditor support.

b) **CITGO Parties and PDVSA**: *See* Preliminary Statement of the CITGO Parties and PDVSA, below. As stated by the Special Master and affirmed by the Court during the status hearing held on October 1, 2024, the execution of the proposed SPA cannot have imposed any legally binding obligations on the Special Master or any other person, including but not limited to the CITGO Parties, who are not parties to the proposed SPA. Under Paragraph 12 of the Sale Procedures Order, the Special Master has authority to enter only into a "*proposed* definitive agreement," not a legally binding or enforceable one. An SPA can have effect only upon the entry of a final sale order by this Court, as the Court held in overruling PDVH and CITGO's objection to the Special Master's intention to sign the proposed SPA. *See* D.I. 1321.

    When the Special Master informed the CITGO Parties and PDVSA in August that he intended to enter a period of exclusivity with the Proposed Buyer, the CITGO Parties and PDVSA objected, stating that it was directly contrary to "customary" practice to grant exclusivity to a party that had conducted only very preliminary due diligence and had indicated a grossly inadequate price as that party would, without competition, use the due diligence process to cut the value even more. This is exactly what happened [REMAINDER FILED UNDER SEAL].[3] The entity that signed the proposed SPA is a shell company, has not demonstrated committed financing, or even identified the shell company's owners. The only thing that makes less sense than granting exclusivity is awarding "customary bid protections" to a party that has offered a grossly inadequate bid, is not committed to participating in the sale process, and has not even stopped negotiating the supposed "agreement." All this to say nothing of the fact that the numerous contingencies and deductions baked into the SPA potentially provide for zero distributions to the Attached Judgment Creditors—the very parties who are supposed to be the beneficiaries of the sales process.

    The suggestion that the Proposed Buyer has provided any value in the context of the sales process and should therefore be rewarded with bidder protections is at odds with the very terms of the proposed SPA, and this Court should not approve any bidder protections that could have the effect of discouraging other bidders or degrading the value of another bidder's proposal.

---

[3] The CITGO Parties and PDVSA are responsible for filing any motion to seal required under applicable law.

The Honorable Leonard P. Stark
October 18, 2024
Page 5

**2) When will the escrow-related documentation and deposits be made?**

The escrow-related documentation—referred to the in SPA as the Definitive Trust Documents—will be executed on the Trust Structure Effective Date. Similarly, pursuant to Section 3.3 of the SPA (Good Faith Deposit), the Proposed Buyer shall transfer a deposit to an escrow agent on the Trust Structure Effective Date. Section 3.3 of the SPA filed at D.I. 1325 is currently redacted, but the terms, including the amount of the Good Faith Deposit, will be made public as described in the Special Master's response to question 3 below.

The Trust Structure Effective Date must occur "prior to the date that is the later of (i) October 25, 2024 and (ii) the tenth (10th) Business Day following the granting of the Injunction Motion by the Court." D.I. 1325, Ex. A at § 7.1(f). Given the status of the Injunction Motion, the timing of the Trust Structure Effective Date will effectively be based upon the Court's decision with respect to the Injunction Motion.

The following parties expressed a position different from that of the Special Master:

a) **ConocoPhillips**: As ConocoPhillips informed the Court at the October 1 hearing and has made clear to the Special Master, ConocoPhillips, along with other creditors, is concerned by the current proposal, which would allow the bidder to close the sale and take control of CITGO, while the proceeds of the sale are held in escrow and not distributed to creditors for an indeterminate but potentially years-long period of time. Accordingly, ConocoPhillips respectfully suggests that the timing of the escrow-related documentation should not be an issue for consideration by the Court.

Moreover, and notwithstanding that the bidder has had exclusivity for approximately two months, which the Special Master proposes to continue and for whom he will seek bid protections, it is concerning that the bidder has not been required to make a good faith deposit as required by the Sale Procedures Order, and that the Special Master does not intend to require the deposit to be made until 10 days after such time that the Court enters an alter ego injunction order. It is even more troubling that the Special Master proposes to file the Bidder Protection Motion when, to ConocoPhillips' knowledge, the bidder has still not provided executed financing commitments.

b) **CITGO Parties and PDVSA**: *See* Preliminary Statement of the CITGO Parties and PDVSA, below. No part of the Special Master's proposed process reasonably can move forward without disclosure of the full, final SPA, including its escrow-related provisions and, apparently, an agreement with the 2020 Noteholders as to its terms. The Special Master and the Proposed Buyer do not, however, intend to finalize these provisions until the Court rules on the Special Master's pending injunction motion. If the Court decides to advance the Special Master's proposed schedule notwithstanding this issue, then the Special Master should be required to submit the current, working draft of the escrow documentation on the same date as the unredacted proposed SPA so that the parties briefing the bidder protection motion can evaluate the full terms of the escrow arrangements. The CITGO Parties and PDVSA reserve all rights to object to the terms of the escrow-related documents and the proposed SPA.

The Honorable Leonard P. Stark
October 18, 2024
Page 6

### 3) When, and with what (if any) restrictions, will an unredacted version of the SPA be shared with the Sale Process Parties, Additional Judgment Creditors, and the public?

The Special Master has already shared an unredacted version of the SPA with all of the Sale Process Parties other than the Republic.[4] With respect to all other parties, the Special Master proposes to file an unredacted version of the SPA in connection with the Bidder Protection Motion.

The unredacted version of the SPA that the Special Master proposes to file will continue to omit or redact certain provisions and schedules deemed to be confidential information of CITGO, or information that would otherwise be damaging to the pecuniary interest of CITGO, as determined by the Special Master in consultation with CITGO and the Proposed Buyer. This includes information about CITGO and PDVH's business, financial, and legal affairs, including, for example, information about commercial contracts, legal exposure, and nonpublic financial statements. Such information would—if made public—threaten to harm CITGO and an ultimate buyer of the PDVH Shares.

The following parties expressed a position different from that of the Special Master:

a) **ACL and OIEG**: ACL1 Investments Ltd., ACL2 Investments Ltd., and LDO (Cayman) XVIII Ltd. (together, "**ACL**"), which are Additional Judgment Creditors and plaintiffs in Misc. No. 21-46-LPS, and OI European Group B.V. ("**OIEG**"), which is an Additional Judgment Creditor and plaintiff in Misc. No. 19-290-LPS, respectfully submit that the unredacted version of the SPA should be accompanied by the complete and unredacted Definitive Trust Documents (as defined in the SPA). The Definitive Trust Documents, no less than the SPA, are necessary for interested parties to develop informed positions on the Bidder Protection Motion. Whether and to what extent the Bidder Protection Motion should be granted turns in part on the likelihood that there will be a Superior Proposal. *See* SPA, D.I. 1325-1, § 6.17(e) (Termination Fee paid upon Superior Proposal). And the likelihood that there will be a Superior Proposal turns in part on the terms of the Definitive Trust Documents. *See id.* § 6.17(f)(ii) (definition of Superior Proposal depends on "terms, conditions," and "timing," among other things, relative to current proposal). While the material terms of the Definitive Trust Documents are represented to be indicated in the Trust Structure Term Sheet annexed to the SPA, that term sheet is qualified in its entirety by the Definitive Trust Documents. Moreover, it should be feasible to draft the Definitive Trust Documents in time to disclose them with the unredacted SPA, as the SPA contemplates that the Definitive Trust Documents could be executed as early as October 25. *Id.* § 7.1(f).

   One particular issue as to which the Definitive Trust Documents are necessary is the treatment of the CITGO Holding Pledge. The Trust Structure Term Sheet contemplates that the CITGO Holding Pledge will be released before funds are distributed to holders of

---

[4] The Republic elected not to receive any drafts of the SPA or information regarding the identity of potential bidders.

    Attached Judgments. However, the Trust Structure Term Sheet lacks meaningful information about how the release would be obtained and what would occur were the release not to be obtained. Such information is necessary to ascertain the likelihood of a Superior Proposal (and hence to take an informed position on the Bidder Protection Motion).

    While OIEG appreciates the many views included in this Joint Status Report, OIEG is also focused on ensuring that the existing sale process continues forward in a productive and efficient manner that prioritizes a value-maximizing sale for the benefit of the Additional Judgment Creditors. OIEG would welcome the opportunity to work with the Special Master, the Sale Process Parties and the Proposed Buyer with a view to making any necessary amendments to the Definitive Trust Documents and the SPA in a manner that is consistent with such a value-maximizing outcome, including amendments that would address concerns as to purchase price reductions and the escrow release provisions.

b) **ConocoPhillips**: As stated by the Special Master, ConocoPhillips has received an unredacted copy of the SPA. Given the importance and complexity of the proposed transaction, ConocoPhillips believes the additional judgment creditors should be provided with the fully unredacted copy of the SPA, not a partially unredacted copy as described by the Special Master. ConocoPhillips believes that some of the components the Special Master intends to redact are important to the judgment creditors' ability to ascertain the amount of potential deductions from the purchase price as well as the amount or terms under which the termination fee would be paid. The Special Master's limited description of the termination fee in response to Question 1 above omits several triggers for payment of the termination fee beyond receipt of a topping bid.

    Even the unredacted version of the SPA that was distributed to the Sale Process Parties omits the schedules that provide numbers critical to the calculation of how much will be paid to judgment creditors in the waterfall. While ConocoPhillips is cognizant of the need to protect CITGO's confidential information, all judgment creditors must be provided with the data and the tools to understand the workings of the highly complex SPA. ConocoPhillips further believes that there is no reason why the distribution of the unredacted SPA should await the filing of the Bidder Protection Motion. Indeed, this seems to put the cart before the horse, as the Special Master should wait to seek the Court's approval to grant significant bid protections until the additional judgment creditors have had the ability to evaluate the bid. Accordingly, unredacted versions should be distributed immediately to all additional judgment creditors who have entered into confidentiality agreements.

c) **2020 Bond Entities**:[5] The 2020 Bond Entities respectfully submit that a fully unredacted version of the SPA should be immediately made public. To the extent there are legitimate

---

[5] The 2020 Bond Entities are an ad hoc group that holds in excess of 66.7% of the outstanding 2020 Bonds and the Trustee and Collateral Agent in their respective capacities as such. The 2020 Bond Entities are "interested entities" pursuant to the October 2 Order because the

The Honorable Leonard P. Stark
October 18, 2024
Page 8

    concerns about publicly disclosing schedules or other provisions that would reveal sensitive information about CITGO's or PDVH's business, those schedules or provisions should be disclosed to any interested entity that agrees to be bound by the Special Master Confidentiality Order, D.I. 291, or other appropriate confidentiality agreement or order.

  d) **CITGO Parties and PDVSA**: *See* Preliminary Statement of the CITGO Parties and PDVSA, below. The CITGO Parties and PDVSA' position on Question 3 is consistent with the Special Master's position, particularly with respect to the need to continue to protect the CITGO Parties' proprietary and highly confidential information contained in the disclosure schedules and specific litigation indemnity escrow provisions, release of which could prejudice the CITGO Parties' ability to litigate or settle the subject litigation. Withholding the terms of the SPA hampers the ability of Additional Judgment Creditors to protect their rights and of potential bidders to prepare a superior proposal, but release of the CITGO Parties' highly confidential information is not required for either reason.

**4) When and on what terms will the topping period occur?**

The SPA provides for a forty-five (45) day period during which the Special Master may consider alternative proposals for the purchase of the PDVH Shares (the "**Topping Period**"). *See* D.I. 1325, Ex. A at § 6.17(c) (currently redacted). The Special Master intends to include the full set of terms of the proposed Topping Period as part of the relief requested in the Bidder Protection Motion.

As the Special Master described during the October 1, 2024 hearing, the Special Master and the Proposed Buyer originally sought a Topping Period that would run concurrently with the briefing period for the Special Master's Final Recommendation (as defined in the Notice of Special Master's Recommendation (D.I. 1325 at 2)), in an effort to drive the sale process to a conclusion in an expedient manner and for a Sale Hearing to be held as quickly as possible. However, the Proposed Buyer recognizes the benefits of offering parties the opportunity to make alternative proposals prior to the Special Master's Final Recommendation. Given that, and given the positions put forward by other parties-in-interest, the Special Master and the Proposed Buyer have agreed to hold the Topping Period prior to the filing of the Final Recommendation.

The following parties expressed a preference for the timing of the Topping Period from that of the Special Master:

  a) **ACL and OIEG**: ACL and OIEG respectfully submit that, before the Topping Period begins, the Special Master should be required to disclose a projection of the amount that would be received by the Judgment Creditors (as defined in the SPA) under the SPA. This projection will be significant to prospective bidders, as the criterion for selection of a topping bid is whether "the Judgment Creditors [would receive] value in excess of the value the Judgment Creditors would receive if the Transactions [contemplated by the SPA] were

---

    transaction contemplated by the SPA in its current form will extinguish or otherwise impair their rights under the 2020 Bonds and their interest in enforcement of the Indenture and the Pledge Agreement. *See* Case No. 19-cv-10023-KPF, D.I. Nos. 87-4, 87-5.

The Honorable Leonard P. Stark
October 18, 2024
Page 9

> consummated." SPA, D.I. 1325-1, § 6.17(f)(ii). In addition, the projection would facilitate comparison of the current bid with any credit bid that values the risk posed by the "alter ego" litigation and the litigation involving the PDVSA 2020 Bondholders.

  b) **ConocoPhillips**: ConocoPhillips does not believe it is appropriate for the Special Master to be launching a process designed to lock in the proposed bid by obtaining significant protections for the bidder until such time, if ever, that the proposed bid has meaningful creditor support. Pursuit of the Bidder Protection Motion will be time-consuming and costly to the creditors to litigate, as they are paying not only their own professionals but the Special Master's as well, in furtherance of a proposal that currently lacks meaningful creditor support. Consideration of the topping period should be deferred until there is a bid, whether a revised version of the current bid or a new bid, as to which there is at least some degree of consensus.

  c) **CITGO Parties and PDVSA**: *See* Preliminary Statement of the CITGO Parties and PDVSA, below. There are too many unknown factors pending to propose a meaningful schedule for the sale process at this time. Therefore, the CITGO Parties and PDVSA urge the Court to postpone creating a sale process schedule until after (1) the Court has entered a decision on the Special Master's pending injunction motion (D.I. 1248); (2) this Court issues a decision on the Special Master's bidder protection motion; and (3) until the proposed SPA has been finalized, which would include the final versions of the escrow related documentation.

  If, however, the Court determines that a sale process schedule should be developed at this time, then the terms of the topping period should be the subject of separate briefing by the parties. Subject to and without waiving the right to object or propose additional terms during the briefing period of the topping period, the CITGO Parties and PDVSA submit that a 60-day topping period should begin in accordance with the CITGO Parties and PDVSA's response to Question 6, below.

**5) When and on what terms will access be provided to the data room?**

As is customary for M&A transactions, the Special Master proposes that the data room remain closed to all parties other than the Proposed Buyer while the exclusivity period is in effect. Therefore, the data room will be opened during the Topping Period to parties who (i) submit a Competing Proposal to the Special Master that the Special Master determines in good faith constitutes or could reasonably be expected to lead to a Superior Proposal (each as defined in SPA Section 6.17(f)) and (ii) execute a confidentiality agreement on terms that are no less favorable to the Special Master than those contained in the confidentiality agreement between the Special Master and the Proposed Buyer. Upon approval of the Bidder Protection Motion, access to the data room will be subject in all respects to Section 6.17 of the SPA.

The following parties expressed a position different from that of the Special Master:

  a) **ConocoPhillips**: The data room has been closed since mid-July in accordance with the Special Master's decision to grant exclusivity to certain bidders. To facilitate the

    possibility of competing bids, the data room should be reopened before any decision is made as to whether the Bidder Protection Motion should be filed.

   b) **CITGO Parties and PDVSA**: *See* Preliminary Statement of the CITGO Parties and PDVSA, below. Access to the VDR should be provided immediately to any legitimate potential bidder that signs a non-disclosure agreement, not artificially restricted as the Special Master currently proposes. The CITGO Parties will be prepared to provide such access whenever the Special Master requests or as directed by the Court.

**6)   When will objections to the recommendation of the Special Master be due and briefed?**

As set forth in the Proposed Timeline, the Special Master proposes that a briefing period occur after the conclusion of the Topping Period and with objection and reply deadlines consistent with the Court's prior orders.

The following parties expressed a preference for the timing of a briefing period different from that of the Special Master:

   a) **ConocoPhillips**: ConocoPhillips believes that the sale process has not yet reached a point where the approval of the Special Master's recommendation is ripe for consideration. However, in the event that the Court permits the Special Master to move forward on the Bidder Protection Motion, the 14-day objection period from the filing of the motion with the unredacted SPA that the Special Master proposes is inadequate. Fourteen days is not enough time for creditors to understand this very complex document, which is difficult and time-consuming to parse, as well as to formulate and draft objections. When briefing on the sale motion goes forward, the 3-day period for replies is inadequate and should, at a minimum, be extended to 5 days. Further, all of these dates should be keyed off a reasonable period in which the data room is reopened and the Special Master may review competing proposals.

   b) **2020 Bond Entities**. The 2020 Bond Entities respectfully submit that any schedule for objections to the recommendation of the Special Master should await a restructured SPA that respects their rights under the 2020 Bonds and their interest in enforcement of the Indenture and the Pledge Agreement. In addition, objections to any Final Recommendation should be due no less than 60 days after the Final Recommendation is filed to provide interested entities sufficient time to review and analyze the proposed transaction and conduct any appropriate discovery.

   c) **CITGO Parties and PDVSA**: *See* Preliminary Statement of the CITGO Parties and PDVSA, below. Establishing a timeline for the objections briefing and the remainder of the sale process is premature at this time. No timeline can be established until there is a consensus as to what the process should be. The CITGO Parties and PDVSA believe that the Sale Process Parties, and other interested parties, are aligned in their position that the terms of the proposed SPA and granting the Proposed Buyer bidder protections are inappropriate. Therefore, a new process should be developed that reflects a fair consensus of the interested parties.

The Honorable Leonard P. Stark
October 18, 2024
Page 11

> If, however, the Court decides to set an objections briefing schedule at this time, the CITGO Parties and PDVSA propose the following process, mindful of the need to reflect the consensus of the parties, and in the interest of generating a robust bidding process for the PDVH shares.
>
> First, the virtual data room should be opened immediately to allow legitimate potential bidders to prepare new or revised bids. If the Court is going to consider the proposed bidder protection motion, then the CITGO Parties and PDVSA request 21 days to respond instead of the 14 days proposed by the Special Master. Following the Court's resolution of the Special Master's pending injunction motion and any appeal of that order is resolved, or the status of the alter ego claims is otherwise sufficiently clarified, the resolution of the Special Master's bidder protection motion, and the submission of a final SPA that includes the final escrow related documentation, potential bidders would have 45 days to prepare new or revised bids. After the submission of these new or revised bids, the Sale Process Parties, in coordination with the Special Master will review the bids received and submit a proposed recommendation to the Court within 21 days. After the Sale Process Parties and the Special Master submit their proposed recommendation, a 60-day topping period will commence to solicit superior bids. At the conclusion of the topping period, the Sale Process Parties and the Special Master will have 21 days to select and finalize a final bid to recommend to the Court. Once a final bid is recommended, any interested party may propound discovery upon the Special Master in a 90-day period for discovery. Following the discovery period, the parties will be allotted 21 days to prepare objections to the final bid, the Special Master will, in turn, have 14 days to respond to the parties' objections, and any replies to the Special Master's response will be due within 3 business days. The sale hearing will commence 21 days after the conclusion of the briefing schedule.

**7) When should a Sale Hearing be scheduled for, how long of a proceeding is envisioned, and whether it should be an evidentiary hearing?**

As set forth in the Proposed Timeline, the commencement of the Sale Hearing will depend on the timing and sequencing of the prior briefing steps and, in all cases, subject to the Court's availability. The Special Master expects the Sale Hearing to be an evidentiary hearing and estimates that two to three days will be required for hearing of all testimony and oral argument.

The following parties expressed a preference for the timing of the Sale Hearing different from that of the Special Master:

a) **2020 Bond Entities**: For the reasons set forth in paragraph 6 above, the 2020 Bond Entities submit that the Sale Hearing should be scheduled so as to allow for at least 60 days from the filing of the Final Recommendation for interested entities to submit objections.

b) **CITGO Parties and PDVSA**: *See* Preliminary Statement of the CITGO Parties and PDVSA, below. Scheduling the sale hearing, like objections briefing, is premature. If the Court does enter a schedule at this time, then there should be at least three weeks between the conclusion of briefing and the sale hearing to allow a reasonable period for the parties

The Honorable Leonard P. Stark
October 18, 2024
Page 12

and the Court to prepare. The Court should set aside at least three days for an evidentiary hearing to allow for the opportunity to present and cross examine witnesses and for the Court to hear argument.

Respectfully,

*/s/ Myron T. Steele*

Myron T. Steele (#00002)

*Counsel for Special Master Robert B. Pincus*

cc:   All Counsel (via CM/ECF)