*Crystallex Int'l Corp.* v. *Bolivarian Republic of Venezuela*
C.A. No. 1:17-mc-00151-LPS (D. Del.)

**The 2020 Bond Entities' Rider to the Joint Status Report Submitted Pursuant to the Court's October 2, 2024 Order**

**I.     Introduction**

We make this submission collectively on behalf of an ad hoc group of holders of 2020 Bonds (the "Bondholders") and the Trustee and the Collateral Agent in their respective capacities as such (collectively, the "2020 Bond Entities"), pursuant to this Court's Order of October 2, 2024, D.I. 1339.[1]  The Bondholders hold in excess of 66.7% of the 2020 Bonds outstanding.  The 2020 Bonds are governed by an Indenture and a Pledge Agreement between, among others, PDVSA, the Trustee, and the Collateral Agent.[2]  The 2020 Bond Entities are "interested entities" under the Court's Order because the transaction contemplated by the SPA in its current form will extinguish or otherwise impair their rights under the 2020 Bonds and their interest in enforcement of the Indenture and the Pledge Agreement.  *See, e.g.*, *Holsey* v. *Hynes*, No. 537, 2014, 2015 WL 2260114, at *3 (Del. May 11, 2015); *Burge* v. *Fid. Bond & Mortg. Co.*, 648 A.2d 414, 418 (Del. 1994).  The 2020 Bond Entities make this submission for the limited purpose of being heard on the matters addressed in the Court's Order, and without waiver of any objections they may have to the exercise of the Court's jurisdiction in any other respect.[3]

Even in the incomplete and heavily redacted form in which it has been made available to the 2020 Bond Entities, the SPA makes clear that the contemplated sale would violate the Pledge Agreement and unjustifiably impair the interests of the 2020 Bond Entities.  Among other things, the proposed SPA entails the following:

> (i)     Seeking to disregard the 2020 Bond Entities' structural seniority and their lien rights against the Collateral under the Pledge Agreement—a 50.1% interest in CITGO Holding (the "Collateral")—by stripping the 2020 Bond Entities of their rights to the Collateral and replacing it, without their consent, with claims

---

[1]  Except as otherwise indicated, capitalized terms herein are used as defined in the Stock Purchase Agreement, D.I. 1325-1, including the Trust Structure Term Sheet annexed thereto as Exhibit A (the "SPA").

[2]  The Indenture and the Pledge Agreement are available at Case No. 19-cv-10023-KPF, D.I. Nos. 87-4, 87-5, respectively.

[3]  The 2020 Bond Entities are open to a negotiated resolution of these issues that would be beneficial to all parties and the Sale Process.  But there are no ongoing or planned negotiations at this time, and none of the 2020 Bond Entities are party to any current nondisclosure agreement with the Special Master or the Buyer.  The Trustee and Collateral Agent each expressly reserve all rights and remedies under the Indenture, the Pledge Agreement and applicable law, including without limitation, the provisions of the governing documents for the 2020 Bonds that (i) provide for the representative role of the Trustee and Collateral Agent with respect to the rights and remedies of 2020 Bondholders, and/or (ii)  the rights, protections, exculpations and immunities of the Trustee and Collateral Agent.

        of uncertain value against a cash escrow that may not be sufficient to satisfy the 2020 Bond Entities' claims;

(ii)     Seeking to deprive the 2020 Bond Entities of their contractual right to the accrual of interest following an Event of Default and their legal right under New York law to prejudgment interest;

(iii)     Disregarding PDVH's obligations under the Pledge Agreement, and impairing the value of the Collateral, by allowing the Buyer to cause PDVH to upstream assets of CITGO Holding to PDVH and in some instances (including upon an "Unwind") to the Buyer;

(iv)     Allowing the Buyer to exercise control of CITGO Holding following a closing in disregard of the authority of the Collateral Agent following an Event of Default under the Indenture, at the direction of the Trustee, to direct PDVH to vote the pledged CITGO Holding shares and otherwise act as the owner thereof, as expressly provided in the Pledge Agreement; and

(v)     Imposing unwarranted and irrelevant conditions on the ability of the 2020 Bond Entities to enforce any judgment in their favor in the *PDVSA v. MUFG* Action against the escrowed funds, and the ability of the court in that action to enter an enforceable judgment.[4]

        In addition, as the SPA recognizes, integral elements of the transaction cannot be resolved by this Court at all. Instead, they can be litigated and resolved only in the Southern District of New York in the *PDVSA v. MUFG* Action, where the validity of the Collateral and the amount owed by PDVSA on the 2020 Bonds are squarely at issue. Thus, approval of the SPA in its current form by this Court would lead only to further litigation in that court.

        Because the SPA contemplates a transaction that cannot be implemented in a manner that is consistent with the legal and contractual rights of the 2020 Bond Entities, and because critical elements of the proposed transaction cannot even be litigated in this Court, establishing a schedule for further proceedings regarding the SPA in its current form would be fruitless. The 2020 Bond Entities accordingly submit that the Court should direct the Special Master to negotiate a new SPA that respects their rights.

        With respect to the specific issues identified in the Order, the 2020 Bond Entities respectfully request that (a) the Court direct that an unredacted version of the

---

[4] To the extent any provisions in the redacted portions of the SPA or other operative agreements purport to impair (or permit the Buyer or PDVH to impair) any other rights or interests of the 2020 Bond Entities, the 2020 Bond Entities reserve the right to object to the proposed transaction on those grounds as well. Likewise, to the extent any bidder protection provisions in the SPA would require upstreaming of assets from PDVH, those provisions would violate the Pledge Agreement and should not be approved for that reason. The 2020 Bond Entities reserve the right to object to any such provisions on that ground upon disclosure of the full SPA.

SPA be promptly shared with the 2020 Bond Entities (item (iii)); and (b) any schedule for objections and a Sale Hearing (items (vi) and (vii)) should await a restructured SPA, and should provide sufficient time for the 2020 Bond Entities and other interested entities to conduct necessary discovery, submit briefing, and present argument and evidence in opposition to approval of any proposed transaction the Special Master may ultimately recommend. The 2020 Bond Entities take no position with respect to items (i), (ii), (iv), and (v) of the Order.

## II.     Factual and Procedural Background

We provide here a brief summary of the 2020 Bonds and the *PDVSA v. MUFG* Action.

The 2020 Bonds were issued in connection with an exchange offer, first announced on September 16, 2016, by which PDVSA offered to exchange newly issued 2020 Bonds for earlier-issued notes due in 2017 (the "2017 Bonds"). *Petróleos de Venezuela S.A. v. MUFG Union Bank, N.A.*, 495 F. Supp. 3d 257, 264 (S.D.N.Y. 2020) ("*MUFG*"), *vacated and remanded*, 106 F.4th 263 (2d Cir. 2024). To induce investors to participate, the 2020 Bonds were secured by a pledge from PDVH of 50.1% of the equity in CITGO Holding. *Id.* at 261. It was widely understood, and has been acknowledged by PDVSA itself both at the time and in the *PDVSA v. MUFG* Action, that PDVSA was likely to default on the 2017 Bonds unless the exchange was effective. Had a default occurred, holders of the existing 2017 Bonds, most of which were held in the United States and in other jurisdictions outside of Venezuela, would likely have pursued repayment by seizing PDVSA's interest in CITGO Holding and thereby taking control of CITGO Petroleum, PDVSA's only material U.S. asset.

The documents governing the exchange offer and the Collateral, including the Indenture and Pledge Agreement, provide the Trustee and the Collateral Agent with critical protections following an Event of Default. Among other things, the Pledge Agreement authorizes the Collateral Agent, as instructed by the Trustee in writing, to foreclose on and sell the Collateral without the need to commence any judicial process. Pledge Agreement § 5.02(a). In the event the Collateral is not sold immediately following an Event of Default, the Pledge Agreement provides that all profits and other distributions from the Collateral must be paid directly to the Collateral Agent—not to PDVH—and that if PDVH receives any assets or other consideration in breach of that provision, it must hold the consideration in trust for the Collateral Agent. Pledge Agreement §§ 2.05(c), (f).[5] The Pledge Agreement further authorizes the Collateral

---

[5]    Section 2.05 of the Pledge Agreement states in relevant part:

If any Event of Default has occurred and is continuing, and whether or not the Collateral Agent, as directed in writing by the Trustee, or the requisite Holders seek or pursue any right, remedy, power or privilege available to them under Applicable Law, this Agreement or any other Transaction Document, all profits and other distributions on the Securities [i.e., the CITGO Holding shares that constitute the Collateral] shall be paid directly to the Collateral Agent and retained by it as part of the Collateral, subject to the terms of this Agreement. . . .

All payments, proceeds, dividends, distributions, monies, compensation, property, assets, instruments

3

Agent, following an Event of Default, at the written direction of the Trustee, to direct PDVH "to vote the Securities representing the Pledged Shares [i.e., the Collateral]" (and obligates PDVH to vote the Securities as directed), and otherwise authorizes the Collateral Agent "to act with respect to the Collateral as outright owner thereof." *Id.* §§ 2.05(c), (d). The Indenture provides that interest is payable on the 2020 Bonds at a rate of 8.5% annually until the principal is fully paid or duly provided for. Indenture §§ 2.08(b), 5.01(b). While the Indenture permits PDVSA to defease the 2020 Bonds by "irrevocably" depositing sufficient amounts to pay all principal and interest due in trust with the Trustee or its designee for the benefit of the 2020 Bondholders and satisfying certain other conditions, *id*. § 8.12, the Indenture provides no similar option to PDVH or a buyer of PDVH, and the proposed SPA does not otherwise satisfy the Indenture's conditions for an effective defeasance.

The documents governing the exchange offer and the Collateral contain customary New York choice of forum and choice of law provisions. *See MUFG*, 495 F. Supp. 3d at 265.

After making payments of principal and interest through April 2019, PDVSA failed to make a required payment of principal and interest due on October 27, 2019. *Id.* at 261, 267. PDVSA's failure to pay principal when due gave rise to an Event of Default under the Indenture. *Id*. On December 18, 2019, holders of the requisite amount of 2020 Bonds sent an Acceleration Notice (as defined in the Indenture) stating that Events of Default had occurred and were continuing, and declaring, pursuant to Section 5.01(b) of the Indenture, that the principal of, premium, if any, and accrued interest and additional amounts, if any, on the 2020 Bonds were "immediately due and payable." Case No. 1:19-cv-10023-KPF, D.I. 100 ¶ 271.

Those Events of Default continue. There is currently approximately $1.68 billion in unpaid principal on the 2020 Bonds, together with accrued contractual and prejudgment interest of nearly $960 million and additional amounts owed including fees and costs. Case No. 19-cv-10023-KPF, D.I. 229 at 2-3 (Dec. 12, 2020). The district court in the *PDVSA v. MUFG* Action determined that the amount owed by PDVSA was increasing at by more than $450,000 per day, or approximately $164 million annually. *Id*. at 2.

On October 29, 2019, two days after defaulting on the payment due, PDVSA, PDVSA Petróleo (a PDVSA subsidiary and the guarantor of the 2020 Bonds), and PDVH filed suit in the Southern District of New York against the Trustee and the Collateral Agent seeking a declaration that the 2020 Bonds were invalid and unenforceable under Venezuelan law. *MUFG*, 495 F. Supp. 3d at 267. The Trustee and the Collateral Agent filed an answer and counterclaims seeking a declaratory judgment that the 2020 Bonds were valid and enforceable; that an Event of Default had occurred;

---

or rights that are received by the Pledgor contrary to the provisions of this Section 2.05 shall be received and held in trust for the benefit of the Collateral Agent for the benefit of the Secured Parties, shall be segregated by the Pledgor from other funds of the Pledgor and shall be forthwith paid over to the Collateral Agent in the same form as so received.

that the Trustee and Collateral Agent were entitled to exercise their contractual rights upon an Event of Default (subject to any necessary approvals by the United States government), and that they are entitled to damages for breach of contract, breach of warranty, and a range of equitable claims. *Id.*; Case No. 1:19-cv-10023-KPF, D.I. 40 at 20-21, 37-50.

The *PDVSA v. MUFG* Action is ongoing. The court has established a schedule for briefs and the submissions of supplemental expert reports on Venezuelan law and other topics. The parties' opening submissions are due January 17, 2025, and responsive submissions are due March 18, 2025. Case No. 1:19-cv-10023-KPF, D.I. 320 (Aug. 20, 2024).

### III. The SPA Violates the Rights of the 2020 Bond Entities and Cannot Be Approved

The proposed SPA would violate the rights of the 2020 Bond Entities in multiple respects and cannot be approved by the Court. We summarize below only the primary ways in which it does so based upon the limited information available to the 2020 Bond Entities to date; the 2020 Bond Entities have no way of knowing whether their rights are further violated by redacted provisions of the SPA, by provisions of the SPA that apparently do not yet exist, including the Definitive Documents purporting to govern the 2020s Escrow Account, or by a range of TBD provisions in the SPA itself (*e.g.*, Section 6.1 [sic], at 77).

#### A. Release of Collateral Without the 2020 Bond Entities' Consent (Term Sheet, p. 3)

A core economic element of the transaction contemplated by the SPA is a nonconsensual substitution of the Collateral. The Term Sheet provides that, at an unspecified time, the Escrow Trustee or the Buyer will move to intervene in the *PDVSA v. MUFG* Action to seek two forms of relief: *first*, permission "to deposit the 2020s Escrow Amount into the registry of the court, and *second*, "to seek the release of the CITGO Holding Pledge." Term Sheet at 3.

As the Special Master and the Buyer appear to recognize, any claim to release the Collateral cannot be adjudicated in this Court and must instead be adjudicated only in the Southern District of New York in the *PDVSA v. MUFG* Action. *Id*. Thus, approval of the SPA by this Court will not itself authorize the release of the Collateral but only set the stage for further litigation in that court.

While the 2020 Bond Entities do not ask this Court to rule on the propriety of any nonconsensual release of the Collateral, any such release without the consent of holders of at least two-thirds of the 2020 Bonds would violate the express terms of the Indenture and Pledge Agreement. *See* Pledge Agreement § 7.03 (permitting release of Collateral upon the Termination Date or the application of the purchase price of collateral purchased by the Collateral Agent, or requiring the consent of "at least 66 2/3% aggregate in principal amount of the outstanding Notes" in connection with any other

5

proposed release); *id*. § 1.01 (defining "Termination Date" as the date on which all of the 2020 Bonds and all other obligations secured by the Collateral "have been repaid in full in cash"); Indenture § 9.02(b) ("no amendment, supplement or wavier may release any Lien on Collateral" without the consent of holders of at least 66-2/3% of the outstanding Bonds).[6] We are aware of no precedent for a court, outside of bankruptcy, to direct the release of collateral held for the benefit of a secured creditor in violation of the governing documents and without the consent of the lenders for the sole purpose of facilitating a sale by the pledgor.

### B. Non-Accrual of Interest (Term Sheet, p. 2)

The Term Sheet also contemplates that Special Master and the Buyer will seek to halt the accrual of interest owed to the 2020 Bond Entities once the 2020s Escrow Account is established—another issue that can be litigated only in the Southern District of New York in the *PDVSA v. MUFG* Action and that would violate the express terms of the Indenture.

The Term Sheet appears to contemplate that the Special Master may seek a declaratory ruling from an unspecified "court of competent jurisdiction" that, upon the funding of the 2020s Escrow Account (or some other date determined by the Special Master), interest will cease to accrue on the 2020 Bondholders' claims. Term Sheet at 2 n.2.[7] In view of the fact that the amount owed by PDVSA and PDVH under the 2020 Bonds is squarely at issue in the *PDVSA v. MUFG* Action, there is no court other than the one overseeing that case that could properly address that issue.

While the 2020 Bond Entities do not ask this Court to rule on this issue, terminating the accrual of interest before the full amount owed on the 2020 Bonds is paid or duly provided for would squarely violate the Indenture. Separately, the 2020 Bond Entities are also entitled to prejudgment interest as a matter of right under New York law. N.Y. CPLR § 5001(a). Precluding the accrual of interest would be particularly prejudicial in view of the fact that proceedings in the *PDVSA v. MUFG* Action in the district court and on appeal could well continue into 2026 or later—potentially increasing the interest due until a final, enforceable judgment by hundreds of millions of dollars.

### C. Potential Insufficiency of 2020s Escrow Amount (Term Sheet, p. 2)

The Term Sheet creates a further material risk of violating the rights of the 2020 Bond Entities by failing to ensure that the funds in the 2020s Escrow Account are sufficient to pay all unpaid principal, interest (including interest that will accrue in the

---

[6] The release of Collateral may also include other requirements under the terms of the Indenture and the Pledge Agreement.

[7] The cited footnote in the Term Sheet reads in relevant part as follows: "In the event the Special Master seeks, but is not granted, a declaratory ruling from a court of competent jurisdiction that the 2020s Escrow Amount is not [*sic*] sufficient to stop the accrual of interest on the PDVSA 2020s Bondholders' claims as of the date of deposit of the 2020s Escrow Amount into the 2020s Escrow Account, or such other date requested by the Special Master, then the Special Master and the Buyer shall determine whether a revised 2020s Escrow Amount is necessary." The second "not" in the quoted sentence appears to be a typographical error by the Special Master and the Buyer.

6

future), and other amounts on the 2020 Bonds—including, as noted, nearly $960 million in interest that has already accrued since the Bonds defaulted in 2019.  While the Term Sheet provides that the funds in the 2020s Escrow Account shall equal "the accrued claim of the PDVSA 2020 Bondholders as of the date of the Closing," Term Sheet at 2, the SPA does not provide any method for determining that amount or any assurance that it will be sufficient.  On the contrary, the SPA expressly punts on that issue: in a Section erroneously labelled 6.1 (p. 77, immediately following Section 6.27), it provides only that the Special Master and the Buyer will "work in good faith to determine the appropriate path to seek a determination by a court of competent jurisdiction" as to the amount of the 2020 Bondholders' claim.

Although the SPA does not specify which court will make that determination, only the court in which the *PDVSA v. MUFG* Action is pending can properly do so.  As noted, the issues presented in that action include, among other things, the amounts owed by the PDVSA Parties under the 2020 Bonds.  Indeed, in entering judgment on its summary judgment ruling in favor of the Trustee and the Collateral Agent, the court in that case expressly determined the amount owed as of the date of the judgment.  Case No. 1:19-cv-10023-KPF, D.I. 229 at 2.  The Special Master and the Buyer should not be permitted to circumvent that court in determining the amount owed on the 2020 Bonds.

The Term Sheet also appears to invite the Special Master and the Buyer to impair the rights of the 2020 Bond Entities in other respects.  It provides that, if the Special Master seeks but is not granted a declaratory judgment regarding the accrual of interest on the 2020 Bond claims, "the Special Master and the Buyer shall determine whether a revised 2020s Escrow Amount is necessary" and shall "advise" this Court of any changes to the 2020s Escrow Amount.  Term Sheet at 2 n.2.  Thus, the Term Sheet appears to grant the Special Master and the Buyer the right unilaterally to "revise[]" the amount of funds needed for the 2020s Escrow Account, and merely to "advise" this Court (and not to seek approval from any other court) regarding the revised amount.  In conjunction with the provisions contemplating that the 2020s Escrow Account will be the only source of recovery available to the 2020 Bond Entities, discussed below, the absence of any means to ensure that the court in the *PDVSA v. MUFG* Action has approved that amount as representing the full claim under the 2020 Bonds risks gravely impairing the 2020 Bond Entities' rights.  This method of court approval (or lack thereof) of ascertaining the 2020s Escrow Amount is plainly insufficient.

### D. Improper and Irrelevant Conditions on Release of 2020s Escrow Amount (Term Sheet, pp. 4-5)

The provisions of the Term Sheet governing the release of funds in the 2020s Escrow Account for the benefit of the 2020 Bondholders further impair the 2020 Bond Entities' rights, and they encroach upon the authority of the Southern District of New York in the *PDVSA v. MUFG* Action to render an enforceable judgment in that case.

7

The Term Sheet provides that, even if the Trustee and the Collateral Agent obtain a final, non-appealable judgment in the *PDVSA v. MUFG* Action (or another proceeding) entitling them to enforce the Collateral, the funds in the escrow cannot be distributed to the Trustee unless certain additional conditions are satisfied—conditions that are wholly irrelevant to the rights of the 2020 Bond Entities. These additional, irrelevant, and inappropriate conditions include: (i) the conditions for distributing the Attachment Judgment Creditor escrow funds are satisfied and (ii) the Buyer is not entitled to unwind the transaction. Term Sheet at 4-5.

There is no basis for imposing these additional conditions. As noted, the governing documents for the 2020 Bonds provide that, upon an Event of Default and acceleration, all amounts owed on the 2020 Bonds are due and payable immediately, and the Trustee and the Collateral Agent may foreclose on and sell the Collateral. The other obligations of PDVH or PDVSA under the contemplated transaction have no bearing on whether the 2020 Bond Entities should be permitted to exercise their contractual rights and should not serve as conditions upon the ability of the Trustee and the Collateral Agent to enforce a judgment in their favor.

### E. Disposition of CITGO Holding Assets and Upstreaming of Proceeds to PDVH and the Buyer (Term Sheet, p. 6)

The SPA permits PDVH and its subsidiaries to dispose of up to 50% of their aggregate assets (and potentially more, if the dispositions are made "in the ordinary course") at any time between the Closing and either the unwinding of the Sale or the satisfaction of the conditions to the release of the two escrows. Term Sheet at 6. The Term Sheet permits the proceeds of such dispositions to be transferred to the Buyer if done "in the ordinary course," imposes no restrictions on the ability of the Buyer to upstream the proceeds to PDVH, and expressly permits the proceeds to be invested in the business or used to pay third party debt of PDVH or other "Acquired Companies."[8]

These provisions squarely violate PDVH's obligations under the Pledge Agreement. As explained above, the Pledge Agreement prohibits upstreaming any "profits and other distributions" on the securities constituting the Collateral to PDVH

---

[8] The relevant provision of the Term Sheet provides:

During the period beginning on the Closing and ending on the earlier of (x) effectiveness of the Unwind and (y) the satisfaction of each of the Attached Judgment Creditor Release Conditions and either (A) the 2020 Notes Release Conditions or (B) the 2020 Notes Creditor Release Conditions, the Buyer shall not be permitted to take, or cause the Company to sell, transfer or dispose of, in a transaction or a series of transactions, more than 50% of (1) the aggregate assets of the Acquired Companies (taken as a whole; provided, that the foregoing shall not apply to dispositions in the ordinary course); or (2), a majority of voting stock of the Acquired Companies to an unaffiliated third party. The proceeds of any other sale of assets or the voting stock of any of the Acquired Companies, in each case, other than in the ordinary course of business and subject to customary exceptions (i) shall not constitute Net Operating Profits and Agreed Upon Permanent Working Capital Improvements, (ii) shall not be transferred, directly or indirectly, through dividend, distribution, or otherwise, to the Buyer or any other party that is not an Acquired Company, and (iii) may be reinvested into the business or used to pay *bona fide* third-party debt of the Acquired Companies.

8

following an Event of Default. It further requires that "[a]ll payments, proceeds, dividends, distributions, monies, compensation, property, assets, instruments or rights that are received by the Pledgor contrary to the provisions of this Section 2.05" be "held in trust for the benefit of the Collateral Agent for the benefit of the Secured Parties, . . . [and] forthwith paid over to the Collateral Agent." *See* n.5, above. These provisions are critical to protect the 2020 Bond Entities against the risk that the value of the Collateral is improperly diverted. By permitting the proceeds of dispositions of CITGO Holding assets to be used by PDVH, the Term Sheet invites the Buyer and PDVH to violate these provisions.

### F. Further Upstreaming of CITGO Holding Assets Upon "Unwind" (Term Sheet pp. 5-7)

The Term Sheet provides that the sale of PDVH to the Buyer may be unwound after Closing in identified circumstances. Term Sheet at 5-7. Among other things, the sale may be unwound if "[t]he accrued claim of the PDVSA 2020 Bondholders exceeds the remaining 2020s Escrow Amount." *Id.* at 6. It states that, in the event of an unwinding, "the entirety of the Escrow Amount (including all interest thereon) shall be returned to the Buyer," and the Buyer will "cooperate in good faith" to "transition" the operations of the Company and to return the CITGO Holding shares constituting the Collateral to the Escrow Trustee subject to further order of the Court. The Term Sheet further provides that upon an unwinding the Buyer "shall be entitled to retain all Net Operating Profits and Agreed Upon Permanent Working Capital Improvements from Closing until the date of implementation of the Unwind." *Id*.

These provisions violate the anti-upstreaming restrictions in the Pledge Agreement by permitting CITGO Holding's assets to be distributed to the Buyer in an unwinding. The unwind provisions further impose a one-sided risk on the 2020 Bond Entities: while the Buyer is entitled to recover any profits earned by CITGO in the period between Closing and an unwinding, the Buyer takes no risk of loss. Instead, any losses during that period must be borne by the 2020 Bond Entities and the other beneficial owners of CITGO Holding shares.

The proposed imposition of this risk to the 2020 Bond Entities is particularly objectionable because, as noted, an unwinding can be triggered if the accrued claim of the 2020 Bondholders exceeds the remaining 2020s Escrow Amount. In that circumstance, the 2020 Bond Entities could be faced with both an insufficient escrow and potentially inadequate Collateral whose value has been impaired by losses the Buyer has incurred.

### G. Violation of 2020 Bond Entities' Voting Rights in Collateralized CITGO Holding Shares (Term Sheet, p. 6)

As noted, the Term Sheet contemplates, both in the provision discussed above and as a whole, that the Buyer will take effective control of CITGO Holding and its subsidiaries immediately upon Closing.

Those provisions of the SPA violate the rights of the 2020 Bond Entities following an Event of Default to direct the vote of the pledged Collateral shares and otherwise to act "as outright owner thereof." Pledge Agreement § 2.05(d). *See* n.5, above. The SPA, by appearing to authorize the Buyer to take immediate control upon Closing of PDVH's subsidiaries, including CITGO Holding, seeks to authorize PDVH to violate these material provisions of the Pledge Agreement and to impair the interests of the 2020 Bond Entities in the Collateral.

### IV. Conclusion

For the foregoing reasons, the 2020 Bond Entities respectfully submit that (i) the Court should direct the Special Master to negotiate a new SPA that respects the 2020 Bond Entities' rights as expeditiously as possible; (ii) the Court should direct that an unredacted version of the SPA be shared with the 2020 Bond Entities promptly; and (iii) any schedule for objections and a Sale Hearing should await a restructured SPA, and should provide sufficient time for the 2020 Bond Entities and other interested entities to conduct necessary discovery, submit briefing, and present argument and evidence in opposition to approval of any proposed transaction the Special Master may ultimately recommend.