# EXHIBIT 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| CRYSTALLEX INTERNATIONAL CORP., | ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | Misc. No. 17-151-LPS |
| BOLIVARIAN REPUBLIC OF VENEZUELA, | ) ) ) | |
| Defendant. | ) ) | |

### *AMICUS CURIAE* SUBMISSION OF
### PROSPECTIVE BUYER AMBER ENERGY INC.

Amber Energy Inc. ("Buyer") is a Delaware corporation formed by funds affiliated with investment management firm Elliott Investment Management L.P. (with its affiliates, "Elliott") to acquire the property before the Court—namely "all shares of stock and any other assets or rights incident to that stock ownership belonging or owing to [PDVSA]" (the "PDVH Shares"). D.I. 95. Pursuant to this Court's Sale Procedures Order (D.I. 481),[1] Buyer entered into a Stock Purchase Agreement with the Special Master, dated as of September 27, 2024 (the "SPA"), to acquire the PDVH Shares "free and clear" of claims, encumbrances, and liabilities.

Following the last hearing, Buyer believes it may assist the Court to hear Buyer's perspective directly. Accordingly, Buyer submits this Position Statement to:

(a) provide the Court and interested parties with the perspective of a sophisticated bidder that has devoted extensive effort and expense to study the PDVH Shares and sale process;

(b) express that Buyer's sole desire is to acquire ownership of and manage the CITGO operating business before value further deteriorates, without becoming entangled in Venezuela's legacy liabilities;

(c) convey that Buyer is ready, willing, and able to complete this transaction on the timetable requested by the Special Master; and

---

[1] Capitalized terms not defined herein shall have the meanings in the Sales Procedures Order.

(d) explain Buyer's concern that the Court's and Special Master's diligent efforts to maximize the sale price of the property are at risk if the Court does not address threshold issues impacting the value of the property being sold—issues that are critical to all stakeholders.

As described below (§ A), Buyer's SPA with the Special Master followed a lengthy and complex process in which Buyer has expended substantial human and economic resources towards acquiring the ongoing business ultimately represented by the PDVH Shares. As also described below (§ B), regardless of those efforts, neither the transaction contemplated by the SPA nor any other value-maximizing sale can proceed without addressing two fundamental issues: (1) the purported pledge to PDVSA 2020 bondholders of 50.1% of the equity of PDVH's direct wholly-owned subsidiary, CITGO Holding; and (2) attempts by creditors of the Republic or PDVSA to collect their debts by proceeding against PDVH or its subsidiaries on an alter ego or reverse veil-piercing theory. No reasonable purchaser would pay significant value for the PDVH Shares without reserving for the first risk and protecting against the second.

*Equity Pledge*. All stakeholders have known that the equity pledge would need to be reserved for or otherwise resolved as part of any sale transaction. Buyer's proposed transaction provides the needed certainty that Buyer is acquiring the PDVH Shares free and clear of the pledge by reserving a portion of the sale proceeds to address the PDVSA 2020 Bondholders. The proposed transaction structure also protects writholders by ensuring that if the underlying bonds are invalidated, the proceeds reserved for the bonds can instead be distributed to those writholders.

*Alter Ego Claims*. The second issue is an existential threat to the sale process. With tens of billions of dollars of creditor claims pending against PDVSA or the Republic, the possibility of reverse veil-piercing hangs like a sword of Damocles over the sale of the PDVH Shares, threatening to make them worthless unless there is protection against these claims. That protection can only realistically come in one of two forms: (1) judicial approval of a sale where protections

against post-closing claims are embedded in the transaction structure itself, as is the case for Buyer's proposed trust structure; or (2) an adjudication of the merits of the alter ego claims before the closing of a sale that results in a final judgment binding on all creditors of PDVSA or the Republic. The theoretical third alternative of an "as is, where is" sale with minimal protections would dissuade sophisticated bidders, including Buyer, and yield either low bids or no bids at all. Even if it were to yield a low bid, such a sale would at best compensate only the senior-most writholder at the expense of every other Additional Judgment Creditor in the waterfall, thus frustrating the Court's and Special Master's objective of maximizing the sale price for the benefit of creditors.

The second option of waiting to close a sale until after adjudication of the alter ego claims is also not value maximizing. The underlying CITGO companies represented by the PDVH Shares are deteriorating in value.[2] Litigating the merits of the alter ego claims, including any that might be imposed through judgment and exhaustion of all appeals, likely will take significant time and leave the creditors mired in endless litigation. Meanwhile, the underlying CITGO assets are degrading, thereby diminishing the value that Buyer or any other rational purchaser would pay in a sale.

Considering this economic reality, Buyer and the Special Master have worked for months to develop a transaction structure that will give Buyer appropriate protections. The proposed trust structure maximizes value in two primary ways. First, it protects against alter ego claims that could render the PDVH Shares worthless. Second, it allows the sale to close in a timely manner

---

2 [redacted]

3

to avoid the reduction in price that would be required to account for future deterioration of asset value.  Moreover, the process gives other bidders a chance to top the Buyer's proposal to ensure the highest and best value available to writholders.  Buyer respectfully submits that its proposed bid is value maximizing, providing the best and only realistic pathway for the largest number of creditors in the waterfall to recover.

### A. Buyer And Its Role In The Sale Process

#### 1. Buyer And Its Management Team

Buyer was formed by Elliott to participate in the sale process.  Elliott is a U.S. investment management firm that was founded in 1977, making it one of the oldest investment managers of its kind under continuous management.  As of June 2024, Elliott manages approximately $69.7 billion in assets.  Further, Elliott has significant expertise in oil and gas and has invested considerable capital (multiple billions) into natural resources opportunities globally since 2011.

Elliott has partnered with a U.S.-based group of accomplished energy executives with a track record of enhancing performance and accelerating growth at companies across the industry to help lead the proposed acquisition and ensure the safe operations of the CITGO group of companies after closing.  Buyer's management team is led by CEO Gregory Goff and President Jeff Stevens.  Mr. Goff previously served as Chairman, President, and CEO of Andeavor, a premier marketing, logistics, and refining company, where he spearheaded a successful financial transformation.  After the merger of Andeavor with Marathon Petroleum Corporation, one of the United States' largest refining companies, Mr. Goff served as Executive Vice Chairman of the combined company until 2019.  Prior to joining Andeavor, Mr. Goff had a nearly 30-year career with ConocoPhillips Company, where he held various leadership positions in exploration and production, as well as downstream and commercial operations.  Mr. Goff currently serves as CEO

of Claire Technologies, Inc., a technology company providing low-carbon solutions to transform the energy and transportation sectors, and as a director of Exxon Mobil Corporation.

Mr. Stevens is the President and Co-Founder of Franklin Mountain Energy, an energy company focused on acquisition and development of oil and gas properties. During his tenure at Franklin, Mr. Stevens championed the company's growth into one of the largest private U.S. oil producers. Mr. Stevens previously served as Co-Founder and CEO of Western Refining, Inc., a Fortune 200 refining and marketing company that was acquired by Andeavor in 2017.

### 2. Buyer's Efforts In The Sale Process

Recognizing that all creditors of the Republic—not only Crystallex—would look to the CITGO operating business (the Republic's only asset in the United States) to recover, the Court established processes to: (1) determine the priority of judgment creditors; and (2) sell the PDVH Shares representing ownership of the CITGO operating business. As to the first, the Court established a detailed priority scheme culminating in the Final Priority Order. D.I. 1102; *see also* D.I. 646; D.I. 738.

As to the second, the Court appointed the Special Master to conduct a sale process for the PDVH Shares, and entered the Sale Procedures Order to "maximiz[e] the sale price of any assets to be sold" for the benefit of all judgment creditors, through a sale of the PDVH Shares "free and clear of any claims, encumbrances, and liabilities." D.I. 481 at 2, 18. The Special Master has conducted a robust marketing process to achieve that goal. The Court found that the Marketing Process was "reasonably calculated to maximize value and result in the highest offer in connection with any Sale Transaction at least sufficient to satisfy the Attached Judgments." *Id.* at 7. The culmination of that process was the Special Master executing the SPA with Buyer.

Since the Special Master launched the marketing process in October 2023, Buyer has dedicated extraordinary resources to conduct due diligence, develop a competitive bid, and negotiate with the Special Master what both sides deem to be a value-maximizing transaction.

In conducting its diligence, Buyer and its advisors have, among other things, reviewed and analyzed over 37,500 documents provided by CITGO management in an electronic data room; participated in hundreds of hours of site tours and in-person meetings with the company's management and representatives; and submitted over 900 written due diligence questions, along with numerous other informal inquiries. Buyer dedicated over 20 of its own personnel; recruited a world-class 8-person refining management team to lead the asset due diligence, financing, and ultimately operation of the business; hired approximately 15 separate advisors in various fields, including: legal, financial, tax, accounting, technology and IT, engineering, pipelines and terminals, environmental, insurance and employee benefits; and incurred over $30 million in expenses. During the diligence process, Buyer also has faced atypical challenges procuring information from the company, given that the company is being sold involuntarily and has been actively opposing the sale, including through its counsel, Jones Day.

In accordance with the deadlines set by the Special Master pursuant to the Sale Procedures Order, Buyer submitted a first-round bid of approximately ▇▇▇▇ on January 22, 2024, submitted a second-round bid of approximately ▇▇▇▇ on June 11, 2024, and reaffirmed its second-round bid on June 27, 2024. On both June 11 and June 27, Buyer fully complied with the requirements of the Special Master's bid instruction letter, including by submitting a fully marked-up stock purchase agreement and proof of financing in the form of a debt commitment letter from Barclays and Citibank.

Buyer increased its bid on July 10 to approximately $7.286 billion ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆. On July 23, the Special Master's advisors informed Buyer that the Special Master would be focusing his negotiations with another bidder, but in early August, they informed Buyer that those negotiations with the other bidder had ceased and reengaged in discussions with Buyer. Thereafter, on August 8, the Special Master and Buyer entered into exclusive discussions to finalize documentation. These negotiations were successful, and the Special Master and Buyer ultimately executed the SPA on September 27.

### B. The Proposed Transaction Structure Addresses The Obstacles Presented By The Equity Pledge And Alter Ego Claims To Maximize Value

During its extensive diligence process, Buyer analyzed several issues that posed risks to any purchaser's willingness to consummate a purchase of the PDVH Shares at a value-maximizing price. Two of these issues in particular pose substantial risk of depressing—and indeed eliminating—the value of the PDVH Shares, premised on attempts to collect on liabilities of the Republic and PDVSA. As described below, the proposed transaction was carefully negotiated to allow the sale to proceed notwithstanding those two threshold risks, and maximizes value for writholders.

#### 1. The Equity Pledge

The first of these fundamental issues concerns the purported pledge (the "Equity Pledge") of a security interest in 50.1% of PDVH's equity in CITGO Holding in favor of PDVSA 2020 Bondholders to secure bonds issued by PDVSA. Those notes are currently in default, and if the PDVSA 2020 Bondholders are permitted to enforce the Equity Pledge, they will be able to exercise remedies and foreclose on a controlling interest in CITGO Holding. The validity and enforceability of the Equity Pledge is being challenged through litigation in New York that began

in October 2019.  Judgment was initially entered for the PDVSA 2020 Bondholders in December 2020.  In July 2024, however, the Second Circuit vacated that judgment.  The litigation has just returned to the District Court to be re-litigated and, with all appeals, is unlikely to be resolved for years.  In the meantime, resolution of the Equity Pledge is crucial to consummation of the sale transaction, because CITGO Holding is PDVH's only material asset and represents virtually all of the value of the PDVH Shares.  The possibility that a purchaser's ownership and control of CITGO Holding (through ownership of PDVH) could be stripped away post-closing through enforcement of the Equity Pledge makes resolution of the Equity Pledge a threshold issue for not just Buyer, but any other rational buyer, as well as any financing sources, of the PDVH Shares.

Buyer has understood from the outset of the sale process that for this very reason the Special Master was pursuing a resolution for the Equity Pledge, including through discussions with the PDVSA 2020 Bondholders, certain of which are also Additional Judgment Creditors in this proceeding.[3]  However, in August 2024, months after Buyer had submitted its bid and several weeks into its exclusive negotiations with the Special Master, Buyer learned that those discussions had failed, thus requiring an alternative resolution to the Equity Pledge.

To address the risks posed by the Equity Pledge, the proposed transaction reserves a portion of the sale proceeds in escrow for the benefit of the PDVSA 2020 Bondholders and/or the holders of writs of attachment before this Court, depending on whether the PDVSA 2020 Bondholders succeed in proving the validity and/or enforceability of the Equity Pledge.  Subject to other conditions of the trust, before the escrowed funds are distributed to the PDVSA 2020 Bondholders: (1) those bondholders must obtain a final, non-appealable order upholding the validity of their

---

[3]   Indeed, the Special Master issued a bid instruction letter that instructed bidders to assume a resolution of the equity pledge in connection with the implementation of a sale transaction.

8

bonds or otherwise establishing liability against PDVH in respect of the Equity Pledge; and (2) the Equity Pledge must be released.  These conditions maximize value of the PDVH Shares by giving Buyer certainty that it is acquiring ownership of the CITGO group of companies free and clear of the claims of the PDVSA 2020 Bondholders by paying cash in exchange for discharging their valid liens, if any.  Absent this mechanism, the Buyer would have to severely discount its purchase price due to the encumbrance of the Equity Pledge.  The escrow mechanism negotiated between the Buyer and the Special Master also protects the judgment creditors here by ensuring that if the PDVSA 2020 bonds (and therefore the Equity Pledge) are invalidated, the sale proceeds reserved for such bonds can instead be distributed to the judgment creditors.

### 2. The Alter Ego Claims

The second fundamental issue concerns alter ego (reverse-veil piercing) theories that have been and may be asserted by creditors of the Republic or PDVSA against PDVH or its subsidiaries (collectively, the "Alter Ego Claims").  The Alter Ego Claims are current or future attempts to collect from PDVH and its subsidiaries on judgments or other liabilities of the Republic or PDVSA by piercing *through* the asset that this Court is selling.  Such attacks seek to obtain priority over not only the other earlier-in-time judgment creditors, but, crucially, also any good-faith purchaser, including Buyer.  Unlike the Equity Pledge, the Alter Ego Claims are not defined in magnitude or scope and are not being litigated in one forum by one set of parties in a single proceeding.

The Alter Ego Claims, if permitted to persist post-sale, threaten to frustrate the Court's carefully crafted sale process, including that the sale be "free and clear." D.I. 481, ¶ 14.  If the Alter Ego Claims were successful, the result would be that PDVH and its subsidiaries could be responsible for not only their own operating liabilities (which Buyer is prepared to assume under the SPA), but also *all of the liabilities of the Republic and PDVSA*.  Those liabilities could total over $100 billion and, even among just the Attached Judgments involved in this proceeding,

exceed $20 billion. That dwarfs the value of the CITGO group of companies, which comprise the flow of value up to the PDVH Shares.

This is not merely a hypothetical concern. At least one Additional Judgment Creditor previously asserted Alter Ego Claims against PDVH and its subsidiaries before this Court.[4] Certain of the Additional Judgment Creditors and their affiliates (collectively, the "Alter Ego Claimants") have more recently asserted alter ego claims against PDVH in other courts.[5] And, highlighting the concerns regarding the Alter Ego Claims expressed herein, ConocoPhillips, one of the senior-most writholders under the Court's priority order, just commenced a declaratory judgment action against the Republic, PDVSA, PDVH, and the Alter Ego Claimants.[6] That action seeks a declaration that PDVH is not an alter ego of PDVSA or the Republic, or alternatively, if PDVH is their alter ego, to seek the attachment of PDVH's shares in CITGO Holding in favor of the Additional Judgment Creditors in the priority order already established by the Court.[7]

To address the risks posed by the Alter Ego Claims, the proposed transaction provides for: (1) an injunction requiring the Alter Ego Claims to be asserted in this Court; and (2) reserving the remaining portion of the sale price in escrow pending a final, non-appealable order denying the Alter Ego Claims or permanently enjoining them. Buyer's proposed trust structure maximizes value by allowing the sale to close promptly rather than delaying a closing on a deteriorating asset,

---

[4] *See, e.g.*, *OI European Group B.V., v. Bolivarian Republic of Venezuela, et al.*, No. 19 Civ. 290 (LPS) (D. Del. Feb. 11, 2019) (D.I. 1).

[5] The Alter Ego Claimants include Gramercy and its affiliates Girard Street and G&A Strategic (each as defined in D.I. 1249), and Siemens Energy, Inc. ("Siemens"). Siemens and Gramercy are Additional Judgment Creditors in the Final Priority Order. D.I. 1102. Gramercy also unsuccessfully challenged the priority scheme established by the Court. D.I. 893; D.I. 963.

[6] *See ConocoPhillips Petrozuata B.V. et al. v. Girard Street Investment Holdings LLC et al.*, Case No. 1:24-cv-01140-UNA (D. Del. Oct. 14, 2024) (D.I. 1).

[7] An illustration of claims by writholders and their affiliates is attached hereto as Exhibit A.

10

which would result in a significantly lower price. It also ensures that the sale is free and clear of the Republic's and PDVSA's liabilities, including through the back door of Alter Ego Claims. Absent such protections, the Alter Ego Claims would render worthless the very property the Court is trying to sell. Moreover, CITGO has approximately 3,600 employees. Allowing this company to languish indefinitely under a cloud of uncertain ownership is not in the best interests of the company or its hard-working employees.

The proposed transaction's escrow mechanism also protects the Additional Judgment Creditors (*i.e.*, those below Crystallex in the Final Priority Order), because it allows Buyer to purchase the PDVH Shares at a value-maximizing price. Without any protection regarding the Alter Ego Claims, no rational buyer would provide any bid (or at most a severely discounted bid). Any such bid would likely impair a significant amount of writholders' claims that would otherwise be paid under Buyer's proposed transaction.[8]

As a result, any value-maximizing sale process must isolate the liabilities of the Republic and PDVSA from PDVH and its subsidiaries. Any purchaser would expect to be able to purchase the PDVH Shares free and clear of the Republic's and PDVSA's liabilities, including indirect attempts via alter ego to hold PDVH or its subsidiaries liable for them. The proposed transaction accomplishes this essential goal, is fair and equitable to creditors, maximizes the value of the assets being sold, and comports with Delaware law.

---

[8] While the structure may not be viewed as valuable by some of the senior-most writholders, as we heard at the last hearing, that is because they envision being paid no matter what price is paid for the asset by virtue of their position in the waterfall.

11

Dated: October 18, 2024

| | |
|---|---|
| OF COUNSEL:<br><br>Andrew J. Rossman<br>Susheel Kirpalani<br>Matthew R. Scheck<br> QUINN EMANUEL URQUHART  & SULLIVAN, LLP<br>51 Madison Avenue, Fl. 22<br>New York, New York 10010<br>(212) 849-7000<br>susheelkirpalani@quinnemanuel.com<br>andrewrossman@quinnemanuel.com<br>matthewscheck@quinnemanuel.com<br><br>-and-<br><br>Stephen M. Baldini<br>Stephanie Lindemuth<br>Richard J. D'Amato<br>AKIN GUMP STRAUSS HAUER & FELD LLP<br>One Bryant Park<br>New York, New York 10036-6745<br>(212) 872-1000<br>sbaldini@akingump.com<br>slindemuth@akingump.com<br>rdamato@akingump.com<br><br>-and-<br><br>Julius Chen<br>AKIN GUMP STRAUSS HAUER & FELD LLP<br>Robert S. Strauss Tower<br>2001 K St NW<br>Washington, DC 20006-1037<br>(202) 887-4000<br>jchen@akingump.com<br><br>-and-<br><br>Erin E. Murphy<br>H. Bartow Farr<br>CLEMENT & MURPHY PLLC<br>706 Duke Street<br>Alexandria, VA 22314<br>(202) 742-8900 | /s/ Michael A. Barlow<br>Michael A. Barlow (No. 3928)<br>QUINN EMANUEL URQUHART<br> & SULLIVAN, LLP<br>500 Delaware Avenue, Suite 220<br>Wilmington, Delaware 19801<br>(302) 302-4000<br>michaelbarlow@quinnemanuel.com<br><br>*Attorneys for Amber Energy Inc.* |

12

# EXHIBIT A

# Corporate Structure

[1] *Crystallex Int'l Corp. v. Bolivarian Republic of Venezuela*, 932 F.3d 126 (3rd Cir. 2019).
[2] ConocoPhillips has also initiated a declaratory judgment action seeking a declaration that PDV Holding Inc. is not an alter ego or, in the alternative, to apply the same priority order as already exists. Complaint, *ConocoPhillips Petrozuata B.V. et al. v. Girard Street Investment Holdings LLC et al.*, Case No. 1:24-cv-01140-UNA (D. Del. Oct. 14, 2024), ECF No. 1.
[3] Original Petition, *Siemens Energy, Inc. v. PDV Holding, Inc.*, Cause No. 24-BC11B-0010 (Tex. Business Ct., Harris Cnty. Oct. 4, 2024).
[4] Original Petition, *Gramercy Distressed Opportunity Fund, LLC v. PDV Holding, Inc.*, Civ. Action No. 4:24-cv-02981 (S.D. Tex. Aug. 9, 2024), ECF No. 1-2.
[5] Consolidated Amended Complaint, *Girard Street Investment Holdings LLC v. Petróleos de Venezuela, S.A. et al.*, Case No. 1:24-cv-04448-JSR (S.D.N.Y. Sept. 30, 2024), ECF No. 47.
[6] Original Petition, *G&A Strategic Investments I LLC et al. v. PDV Holding, Inc.*, Civ. Action No. 4:24-cv-02774 (S.D. Tex. July 25, 2024).
[7] Complaint, *OI European Group B.V., v. Bolivarian Republic of Venezuela, et. al*, No. 19 Cv. 290 (LPS) (D. Del. Feb. 11, 2019), ECF No. 1.

