# Morris, Nichols, Arsht & Tunnell llp

1201 North Market Street
P.O. Box 1347
Wilmington, Delaware 19899-1347

———

(302) 658-9200
(302) 658-3989 FAX

Alexandra M. Cumings
(302) 351-9248
(302) 425-4670 FAX
acumings@morrisnichols.com

October 22, 2024

**PUBLIC VERSION**
**Filed October 22, 2024**

**_VIA EFILING_**

The Honorable Leonard P. Stark
U.S. Court of Appeals for the Federal Circuit
717 Madison Place, NW
Washington, D.C. 20439

      Re:    *Crystallex International Corp. v. Bolivarian Republic of Venezuela*,
              D. Del. C.A. No. 1:17-mc-00151-LPS

Dear Judge Stark:

      I write to provide an unredacted version of the positions taken by CITGO Petroleum Corporation ("CITGO"), PDV Holding, Inc. ("PDVH" and together with CITGO, the "CITGO Parties"), and Petróleos de Venezuela ("PDVSA") in the Joint Status Report filed by the Special Master, the Sale Process Parties, and other interested entities on October 18, 2024 (D.I. 1373; D.I. 1373-6 (Ex. B-5)), as well as the joinder and separate statement of the Bolivarian Republic of Venezuela. The version of the positions taken by the CITGO Parties and PDVSA included in the Joint Status Report was redacted to remove information designated as Confidential by the Special Master under the Special Master Confidentiality Order (D.I. 291). The CITGO Parties and PDVSA separately are filing a joint motion for leave to file this letter under seal and will serve this letter on counsel for the Special Master, Crystallex, and ConocoPhillips.

**Position of CITGO, PDVH, and PDVSA**

      CITGO and PDVH (the "CITGO Parties") are in the unique position of knowing the full impact of the deductions and holdbacks from the Proposed Buyer's headline price, because the CITGO Parties possess proprietary and highly confidential information regarding the CITGO Parties' business to which no other Sale Process Party or Attached Judgment Creditor has access. Explaining the impact of the proposed holdbacks and deductions does not require reference to or disclosure of specific highly confidential information, but because the unredacted Sale Purchase

The Honorable Leonard P. Stark
October 22, 2024
Page 2

Agreement ("SPA") and exhibits have not yet been disclosed to any party other than the Sale Process Parties, the Special Master, and the Proposed Buyer, the CITGO Parties and PDVSA are submitting their portion of the Joint Status Report under seal, with a redacted version available to everyone other than the Special Master, Crystallex and ConocoPhillips.

**Preliminary Statement of the CITGO Parties and PDVSA**

The CITGO Parties and PDVSA agree that a status conference should be held before the Court establishes a schedule for further proceedings, including for the Special Master's proposed "bidder protection motion." It is now clear that the process as it stands is fundamentally broken and that the unanimous or near-unanimous opposition to the terminally deficient proposed SPA requires the Court, the Special Master, and the Parties to rethink how to move forward. The Special Master's continued efforts to advantage the Proposed Buyer do not aid in that endeavor. The status conference should be held sometime after November 6, 2024, when briefing concludes on the Special Master's injunction motion, rather than October 25, 2024 as proposed by the Special Master, so that the Court can hold a hearing on both matters on the same day.

***The Special Master's Motion to Provide a Termination Fee for the Non-Final Proposed SPA Should Not Be Considered at this Time.*** Under the guise of responding to the seven questions the Court put to the parties in this case, the Special Master has made clear that he has completely surrendered his independence and is acting as a mere envoy for the proposed purchaser. Though he denies having assumed any obligations to the Proposed Buyer, Amber Energy (a weeks-old shell corporation with no assets and no committed financing), he has granted the Proposed Buyer a lengthy and unjustified "exclusivity period" over the objection of all the Sale Process Parties, surrendered to the most outrageous of terms in his proposed, non-final, and non-binding "agreement", and concealed from the Attached Judgment Creditors and the Republic critical terms of that agreement. Now, he is proposing—over the objections of all or nearly all of the creditors, the CITGO Parties, the Republic, and PDVSA—to give the Proposed Buyer a ▉▉▉▉▉▉▉▉▉▉▉▉▉▉ termination fee before it even has finalized the SPA escrow documents and while the Proposed Buyer retains the right to walk away and pocket that fee if the Court denies the Special Master's injunction motion. The Special Master describes this arrangement as a "customary bid protection" that is "analogous to the Stalking Horse Bid Protections set forth in the SPO." But the Proposed Buyer is not a stalking horse bidder, and the protections go far beyond what is "customary" or reasonable here. As a threshold matter, therefore, the CITGO Parties and PDVSA join the creditors in objecting to the terms of the proposed SPA and oppose any effort on the part of the Special Master to advance that non-agreement, whether through consideration or adoption of so-called "bidder protections," any further exclusivity, artificially restricting access to the data room to legitimate potential bidders, or otherwise.

***The Proposed Termination Fee Is Unreasonable, Particularly Given that the Non-Final SPA Could Never Be Approved.*** It is clear that the proposed SPA suffers from fatal flaws in substance and in form, and because of these flaws could never be approved. Nevertheless, and inexplicably, the Special Master now seeks the extraordinary relief of locking in a windfall for Elliott Investment Management, the New York City hedge fund behind the Proposed Buyer before

The Honorable Leonard P. Stark
October 22, 2024
Page 3

material terms of their proposed SPA have even been negotiated, let alone finalized and disclosed to the Sale Process Parties, the Attached Judgment Creditors, and the Court. If approved by the Court, these so-called "bidder protections" ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

Such a windfall would be untenable even if the proposed SPA stood a chance of receiving approval. But given the proposed SPA's irremediable flaws, there is no reason even to brief the question of bidder protections at this time (much less to grant them).

The Court heard about some of the proposed SPA's flaws at the October 1 hearing from judgment creditors, including Crystallex and ConocoPhillips. The discussion at that hearing only scratched the surface. Indeed, the Special Master has agreed to a deal that not only would not see any creditors compensated potentially for years after the Proposed Buyer assumes possession of the shares (if ever); it also would leave the vast majority of Attached Judgment Holders out of the money.

The Special Master's representation to this Court that the proposed SPA would be for "up to $7.286 billion" was entirely illusory, if not misleading. *See* Oct. 1, 2024 H'rg Tr. at 8:10–12. There is no prospect of that transaction yielding anything close to $7.286 billion. Hidden throughout the SPA are material contingencies and deductions that will drastically reduce the value of the bid:

- 2020s Escrow: First, and most obviously, it appears that $2.5 billion of the headline price has been earmarked for an escrow to pay liabilities to or a settlement with the 2020 PDVSA Bondholders.[1]
- ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ to the 2020s' escrow and other deductions described below.
- Hidden Price Cuts: Third, the proposed SPA includes further deductions and holdbacks from the headline price. ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

---

[1] PDVSA and PDVH do not agree with the 2020 Noteholders' characterization of their rights under the governing documents, including the Indenture and the Pledge Agreement, the validity of those documents, and the statements regarding the PDVSA v. MUFG litigation.



After all these adjustments and the deduction of fees and costs, there could be as little as ▓▓▓▓▓▓ left for attachment holders, and even that will be placed in another proposed escrow to resolve "asserted and unasserted" alter ego claims against PDVH. It is unclear how much, if any, of that money will be left for payment to Attached Judgment Holders when those "asserted and unasserted" alter ego claims will be resolved, thus allowing for distribution of that escrow to the creditors.

Despite the illusory and insufficient purchase price presented in the proposed SPA, the Special Master also has agreed, over the objections of the CITGO Parties, the Republic, PDVSA, and some or all of the creditors, "in his discretion," to continue to negotiate exclusively with Amber and to restrict the ability of potential topping bidders to access the data room, and has proposed an unreasonably short schedule that discourages competitive bidding and benefits no one but Amber. Moreover, the Special Master's claim that it was "customary" to grant exclusivity to a single bidder without locking in a price or financing, and without even a firm commitment to buy, is fanciful.

The CITGO Parties and PDVSA also object to the Special Master's characterization of his efforts to date as having achieved a "value-maximizing transaction" and description of the sale process as having "positive momentum." Neither statement is true. Every aspect of the Special Master's proposal is aimed at protecting Amber and at inhibiting the generation of a purchase price that adequately reflects the true value of the PDVH shares, which is more than twice the headline purchase price in the proposed SPA. As counsel for PDVH and CITGO told the Court in the Status Hearing on October 1, 2024, the fair market value of the PDVH shares today is likely closer to $17

billion. *See* Oct. 1, 2024 Hr'g Tr. at 52:19 – 53:20.

It is now clear that the Special Master's process has failed to date. To ensure a robust bidding process that avoids previous missteps, the CITGO Parties and PDVSA submit that the Virtual Data Room should be re-opened to any interested, qualified bidder immediately, and those bidders should be given an opportunity to develop new bids or refresh existing bids for the PDVH shares, as described below.

**Additional Opening Statement of the Bolivarian Republic of Venezuela**

The Republic joins in the statement and responses of the CITGO Parties and PDVSA in this report—to the extent it has been able to see them. However, the Special Master's continued insistence that the Republic not be permitted to see redacted portions of the SPA has put the CITGO Parties and PDVSA in the awkward position of excluding from the view of the Republic the portions of their Opening Statement that discuss redacted information. The Special Master's insistence that material information continue to be withheld from the Republic infringes on the Republic's rights to a fair proceeding, and imposes on the Court, its staff, and all parties the needless burden of dealing with redacted and sealed documents.

To the extent the Republic understands the Special Master's rationale, it appears to be that because the Republic has reserved the right to propose an alternative transaction, it should not be given material information concerning Amber Energy's bid. If this rationale ever had any justification, that justification vanished long ago. The Special Master has promised to make the unredacted SPA public in the near future, and his insistence on keeping portions of it from the Republic in the meantime serves no purpose other than to hamstring the Republic's efforts to coordinate with PDVSA, the CITGO Parties, and the other Sale Process Parties. The Republic urges the Court to order the Special Master to provide an unredacted SPA to the Republic forthwith.

**Responses to Judge Stark's Questions**

1) **What, if any, obligations has the Special Master assumed, either on a legally-binding basis or in the exercise of his discretion, as a result of the Proposed Buyer's execution of the Sale Purchase Agreement ("SPA")?**

   **CITGO Parties and PDVSA's Response:** *See* Preliminary Statement of the CITGO Parties and PDVSA, above, for initial objections to the Special Master's proposals. As stated by the Special Master and affirmed by the Court during the status hearing held on October 1, 2024, the execution of the proposed SPA cannot have imposed any legally binding obligations on the Special Master or any other person, including but not limited to the CITGO Parties, who are not parties to the proposed SPA. Under Paragraph 12 of the Sale Procedures Order, the Special Master has authority to enter only into a "*proposed* definitive agreement," not a legally binding or enforceable one. An SPA can have effect only upon the entry of a final sale order by this Court, as the Court held in overruling PDVH and CITGO's objection to the Special Master's

The Honorable Leonard P. Stark
October 22, 2024
Page 6

intention to sign the proposed SPA. *See* D.I. 1321.

When the Special Master informed the CITGO Parties and PDVSA in August that he intended to enter a period of exclusivity with the Proposed Buyer, the CITGO Parties and PDVSA objected, stating that it was directly contrary to "customary" practice to grant exclusivity to a party that had conducted only very preliminary due diligence and had indicated a grossly inadequate price as that party would, without competition, use the due diligence process to cut the value even more. This is exactly what happened [REDACTED]. The entity that signed the proposed SPA is a shell company, has not demonstrated committed financing, or even identified the shell company's owners. The only thing that makes less sense than granting exclusivity is awarding "customary bid protections" to a party that has offered a grossly inadequate bid, is not committed to participating in the sale process, and has not even stopped negotiating the supposed "agreement." All this to say nothing of the fact that the numerous contingencies and deductions baked into the SPA potentially provide for zero distributions to the Attached Judgment Creditors—the very parties who are supposed to be the beneficiaries of the sale process.

The suggestion that the Proposed Buyer has provided any value in the context of the sale process and should therefore be rewarded with bidder protections is at odds with the very terms of the proposed SPA, and this Court should not approve any bidder protections that could have the effect of discouraging other bidders or degrading the value of another bidder's proposal.

**2) When will the escrow-related documentation and deposits be made?**

**CITGO Parties and PDVSA's Response:** *See* Preliminary Statement of the CITGO Parties and PDVSA, above, for initial objections to the Special Master's proposals . No part of the Special Master's proposed process reasonably can move forward without disclosure of the full, final SPA, including its escrow-related provisions and, apparently, an agreement with the 2020 Noteholders as to its terms. The Special Master and the Proposed Buyer do not, however, intend to finalize these provisions until the Court rules on the Special Master's pending injunction motion. If the Court decides to advance the Special Master's proposed schedule notwithstanding this issue, then the Special Master should be required to submit the current, working draft of the escrow documentation on the same date as the unredacted proposed SPA so that the parties briefing the bidder protection motion can evaluate the full terms of the escrow arrangements. The CITGO Parties and PDVSA reserve all rights to object to the terms of the escrow-related documents and the proposed SPA.

**3) When, and with what (if any) restrictions, will an unredacted version of the SPA be shared with the Sale Process Parties, Additional Judgment Creditors, and the public?**

**CITGO Parties and PDVSA's Response:** *See* Preliminary Statement of the CITGO Parties and PDVSA, above, for initial objections to the Special Master's proposals . The CITGO

The Honorable Leonard P. Stark
October 22, 2024
Page 7

Parties and PDVSA's position on Question 3 is consistent with the Special Master's position, particularly with respect to the need to continue to protect the CITGO Parties' proprietary and highly confidential information contained in the disclosure schedules and specific litigation indemnity escrow provisions, release of which could prejudice the CITGO Parties' ability to litigate or settle the subject litigation. Withholding the terms of the SPA hampers the ability of Additional Judgment Creditors to protect their rights and of potential bidders to prepare a superior proposal, but release of the CITGO Parties' highly confidential information is not required for either reason.

4) **When and on what terms will the topping period occur?**

   **CITGO Parties and PDVSA's Response:** *See* Preliminary Statement of the CITGO Parties and PDVSA, above, for initial objections to the Special Master's proposals . There are too many unknown factors pending to propose a meaningful schedule for the sale process at this time. Therefore, the CITGO Parties and PDVSA urge the Court to postpone creating a sale process schedule until after (1) the Court has entered a decision on the Special Master's pending injunction motion (D.I. 1248); (2) this Court issues a decision on the Special Master's bidder protection motion; and (3) until the proposed SPA has been finalized, which would include the final versions of the escrow related documentation.

   If, however, the Court determines that a sale process schedule should be developed at this time, then the terms of the topping period should be the subject of separate briefing by the parties. Subject to and without waiving the right to object or propose additional terms during the briefing period of the topping period, the CITGO Parties and PDVSA submit that a 60-day topping period should begin in accordance with the CITGO Parties and PDVSA's response to Question 6, below.

5) **When and on what terms will access be provided to the data room?**

   **CITGO Parties and PDVSA's Response:** *See* Preliminary Statement of the CITGO Parties and PDVSA, above, for initial objections to the Special Master's proposals . Access to the VDR should be provided immediately to any legitimate potential bidder that signs a non-disclosure agreement, not artificially restricted as the Special Master currently proposes. The CITGO Parties will be prepared to provide such access whenever the Special Master requests or as directed by the Court.

6) **When will objections to the recommendation of the Special Master be due and briefed?**

   **CITGO Parties and PDVSA's Response:** *See* Preliminary Statement of the CITGO Parties and PDVSA, above, for initial objections to the Special Master's proposals . Establishing a timeline for the objections briefing and the remainder of the sale process is premature at this time. No timeline can be established until there is a consensus as to what the process should be. The CITGO Parties and PDVSA believe that the Sale Process Parties, and other interested parties, are aligned in their position that the terms of the proposed SPA and granting the

The Honorable Leonard P. Stark
October 22, 2024
Page 8

Proposed Buyer bidder protections are inappropriate. Therefore, a new process should be developed that reflects a fair consensus of the interested parties.

If, however, the Court decides to set an objections briefing schedule at this time, the CITGO Parties and PDVSA propose the following process, mindful of the need to reflect the consensus of the parties, and in the interest of generating a robust bidding process for the PDVH shares.

First, the virtual data room should be opened immediately to allow legitimate potential bidders to prepare new or revised bids. If the Court is going to consider the proposed bidder protection motion, then the CITGO Parties and PDVSA request 21 days to respond instead of the 14 days proposed by the Special Master. Following the Court's resolution of the Special Master's pending injunction motion and any appeal of that order is resolved, or the status of the alter ego claims is otherwise sufficiently clarified, the resolution of the Special Master's bidder protection motion, and the submission of a final SPA that includes the final escrow related documentation, potential bidders would have 45 days to prepare new or revised bids. After the submission of these new or revised bids, the Sale Process Parties, in coordination with the Special Master, will review the bids received and submit a proposed recommendation to the Court within 21 days. After the Sale Process Parties and the Special Master submit their proposed recommendation, a 60-day topping period will commence to solicit superior bids. At the conclusion of the topping period, the Sale Process Parties and the Special Master will have 21 days to select and finalize a final bid to recommend to the Court. Once a final bid is recommended, any interested party may propound discovery upon the Special Master in a 90-day period for discovery. Following the discovery period, the parties will be allotted 21 days to prepare objections to the final bid, the Special Master will, in turn, have 14 days to respond to the parties' objections, and any replies to the Special Master's response will be due within 3 business days. The sale hearing will commence 21 days after the conclusion of the briefing schedule.

7) **When should a Sale Hearing be scheduled for, how long of a proceeding is envisioned, and whether it should be an evidentiary hearing?**

**CITGO Parties and PDVSA's Response:** *See* Preliminary Statement of the CITGO Parties and PDVSA, above, for initial objections to the Special Master's proposals. Scheduling the sale hearing, like objections briefing, is premature. If the Court does enter a schedule at this time, then there should be at least three weeks between the conclusion of briefing and the sale hearing to allow a reasonable period for the parties and the Court to prepare. The Court should set aside at least three days for an evidentiary hearing to allow for the opportunity to present and cross examine witnesses and for the Court to hear argument.

            Respectfully,

            */s/ Alexandra Cumings*

            Alexandra Cumings (#6146)