IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| CRYSTALLEX INTERNATIONAL CORP., <br><br> *Plaintiff,* <br><br> v. <br><br> BOLIVARIAN REPUBLIC OF VENEZUELA, <br><br> *Defendant.* | ) <br> ) <br> ) <br> ) No. 1:17-mc-00151-LPS <br> ) <br> ) **PUBLIC - REDACTED** <br> ) <br> ) <br> ) <br> ) |

**THE CITGO PARTIES' MEMORANDUM IN SUPPORT OF SEALING PORTIONS OF AMBER ENERGY INC.'S *AMICUS CURIAE* SUBMISSION AND RESPONSE TO CERTAIN STATEMENTS BY AMBER ENERGY INC. AND THE <u>ALTERNATIVE PROPOSAL CREDITORS</u>**

CITGO Petroleum Corporation ("CITGO") and PDV Holding, Inc. ("PDVH" and, together with CITGO, the "CITGO Parties") respectfully submit this memorandum in support of their position that CITGO's confidential and commercially sensitive business information in footnote 2 of the *Amicus Curiae* Submission of Amber Energy Inc. (D.I. 1365) (the "Redacted Information") should remain under seal, or, in the alternative that footnote 2 of the brief be stricken from the *Amicus Curiae* Submission and the brief re-filed without the confidential information.

Public disclosure of CITGO's confidential information could unnecessarily harm CITGO's business, including relationships with customers and suppliers, without any corresponding public benefit. Moreover, Amber and its controlling investor, Elliott Investment Management ("Elliott"), selectively disclosed information provided to them in confidence. They did this to justify their effort to purchase the PDVH shares for a materially discounted price. Simultaneously, Amber demanded that the Special Master close the data room to prevent potential topping bidders and attached judgment holders from learning information that would contradict Amber's false

characterization of CITGO as a "deteriorating asset," D.I. 1365 at 9. Amber has clearly displayed the intent to justify its inadequately low offer for the shares of PDVH, and to drive away any possible competing topping bids, by unjustly proclaiming that "the underlying CITGO companies represented by the PDVH Shares are deteriorating in value and further that the underlying CITGO assets are degrading." D.I. 1365 at 9. Nothing could be further from the truth. The short-term ups and downs of the refining market should not be surprising to Elliot and its group of "accomplished" energy executives. *See id.* at 10. All refining companies have seen their earnings reduced in the second half of 2024 because of lower margins for gasoline and diesel. Clearly any interest in acquiring the PDVH stock is not based on short term results, but on the longer-term view of tighter fuel supplies as no significant additional refining capacities will be added globally after 2026. Disclosure of CITGO's outlook on earnings for the remaining quarters of 2024 and for 2025, violates CITGO's policy of not providing earnings guidance to the general public.

Amber could have no purpose in making these statements other than to discourage competing bids and justify its own bid far below fair market value. Given recent reports that refer to Amber's misleading public statements about the value of the PDVH shares and the characterization of CITGO as a "deteriorating asset," Amber is getting exactly what it wants: negative publicity intended to chill the interest by other bidders and leaving the creditors with nothing other than Amber's grossly inadequate bid. *See* Exhibit A. Correcting such a misleading impression would require CITGO to disclose substantial additional confidential information. Therefore, the confidential information in footnote 2 should remain under seal or redacted from a public version, to avoid further damage to CITGO and to the sale process.

**NATURE AND STAGE OF PROCEEDINGS**

On October 18, 2024, Amber Energy Inc. ("Amber"), a shell company formed by Elliott, submitted a Motion for Leave to File Brief as *Amicus Curiae* in this proceeding ("Motion for Leave") and attached its proposed amicus brief as Exhibit A to its Motion for Leave (the "*Amicus Curiae* Submission"). *See* D.I. 1365. Amber redacted footnote 2 of the *Amicus Curiae* Submission and submitted the entire filing under seal. *See* D.I. 1365 at 9, n.2. Amber also filed a separate Motion to Seal its *Amicus Curiae* Submission, in which it contended that the *Amicus Curiae* Submission contained "confidential information that impacts [Amber's] and/or CITGO's business operations . . . ." *See* D.I. 1366 at 1–2.

On October 21, 2024, this Court entered an oral order granting Amber leave to file the brief as amicus curiae and directing Amber to file a redacted version of its *Amicus Curiae* Submission and a "supporting memorandum defending any redactions" by October 23, 2024. D.I. 1380. Because the Redacted Information in Amber's sealed *Amicus Curiae* Submission refers to CITGO's confidential and commercially sensitive business information, CITGO has a direct interest in ensuring that the information remains under seal and accordingly submits this Memorandum in support of its position.

**LEGAL STANDARD**

While the public has a presumptive right to access documents filed in court, that presumption is overcome where the interest in redacting such material "outweighs" the public's interest in having access to it. *In re Avandia Mktg., Sales Pracs. & Prod. Liab. Litig.*, 924 F.3d 662, 672 (3d Cir. 2019). *Cf. Stafford v. Int'l Bus. Machines Corp.*, 78 F.4th 62, 66 (2d Cir. 2023) ("[A]ny presumption of public access to judicial documents is outweighed by the importance of confidentiality . . . and the impropriety of [plaintiff's] effort to evade the confidentiality provision"

3

of a contractual agreement). The party seeking to maintain documents under seal must demonstrate that the material "is the kind of information that courts will protect and that disclosure will work a clearly defined and serious injury to the party seeking closure." *Avandia* at 672. The Third Circuit requires specific identification of the harm that would be caused by disclosure on a document-by-document basis. *Id.* at 672–73; *accord Mosaid Techs. Inc. v. LSI Corp.*, 878 F. Supp. 2d 503, 507 (D. Del. 2012) (requiring party seeking to seal to demonstrate "good cause" for redactions or sealing, namely that "disclosure will work a clearly defined and serious injury").

The Special Master Confidentiality Order governing these proceedings likewise permits sealing confidential information for "good cause" and prohibits parties from publicly filing such information. D.I. 291 ¶¶ 8, 9. As defined by the Confidentiality Order, "Confidential Information" is "nonpublic, confidential, proprietary, or commercially sensitive information" that requires the protections of the Confidentiality Order. *Id.* ¶ 1.

## ARGUMENT

**I.     There Is Good Cause for Keeping the Redacted Information Under Seal.**

There is "good cause" to keep the Redacted Information under seal. First, the Redacted Information constitutes or is derived from CITGO's nonpublic, confidential, and commercially sensitive business information. For example, footnote 2 describes CITGO's preliminary, non-public internal projections from early August regarding its 2024 end-of-year EBITDA and unlevered free cash flow. These kinds of internal projections are among the most sensitive information that companies have and are prepared for strategic planning purposes, not with a view towards public disclosure. Nevertheless, in order to cooperate with the Sale Process and with the Special Master's request that CITGO facilitate due diligence requests, CITGO agreed to share the information with Elliott under the protections of the Confidentiality Order and the NDA governing

the diligence process. CITGO did this with the clear expectation and understanding that the information would not be publicly disclosed.

This information was never made public, as CITGO's provided guidance on its second quarter earnings call with its bondholders later in August contained updated EBITDA and cash flow projections based on the then-most current market-based inputs, not the information cited by Amber. (Indeed, CITGO shared the preliminary projections with Elliott with the explicit warning that the information would be further refined as the company prepared to release its second quarter earnings report.) The public has no real interest in learning about CITGO's long-since-superseded preliminary projections for 2024 earnings, particularly given that CITGO already expects to provide updated 2024 guidance to its bondholders in November in connection with CITGO's release of third quarter earnings. If anything, releasing dated projections now would only serve to mislead the public and CITGO bond investors, as well as the Attached Judgment Creditors.

▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬

▬▬▬▬▬ Again, CITGO's preliminary internal 2025 projections are non-public and were provided to Elliott on a confidential basis under the Confidentiality Order and NDA.

Elliott did not explain, or even attempt to explain why it wanted to disclose this outdated information. Indeed, the Redacted Information is irrelevant to the subject of Amber's *Amicus Curiae* Submission which is, ostensibly, presented to "assist the Court" by providing Amber's perspective on the sale process. *See* D.I. 1365 at 7. The gratuitous inclusion of a footnote containing only CITGO's confidential business information and the related statements it made in its brief do nothing to advance that perspective. When understood in this context, it becomes all the more apparent that Amber is attempting to disclose the Redacted Information for self-serving purposes to justify its low purchase price for the PDVH shares and to chill future bidding. Making

5

such erroneous conjecture public also could cause serious harm to the CITGO business, notwithstanding its speculative and incorrect nature.

Second, disclosing the Redacted Information would be misleading to potential topping bidders, attached judgment holders, and the public unless CITGO were also to disclose substantial additional confidential information. Elliott's selective disclosure of CITGO's confidential information clearly was intended to support its unfounded characterization of CITGO as a distressed asset while hiding the context necessary to understand why that characterization is so ludicrous. ▮ ▮ as supposed evidence that the company is "deteriorating in value," D.I. 1365 at 9, it omits that ▮ —hardly the mark of a company in distress. And this is to say nothing of the fact that PDVH's combined 2022 and 2023 EBITDA was approximately $7.7 billion, more than the supposed gross amount of Elliott's proposed purchase price ($7.286 billion), and that PDVH had approximately $3.5 billion of cash on hand at June 30, 2024, and negative net debt as of that date—meaning that the company had hundreds of millions of dollars of cash more than its total indebtedness.

Moreover, and as Amber well knows, the mid-year revision was not caused by some deterioration unique to the CITGO business, but market-wide fluctuations in price forecasts, a common event (both upwards and downwards) in a commodity business like refining. Despite claiming to have "significant expertise in oil and gas," D.I. 1365 at 10, Elliott overlooks this fundamental market reality. A refiner's profits depend primarily on crack spreads—that is, the difference between the price of crude oil and the price of refined petroleum products such as gasoline. When crack spreads change, it requires companies to re-evaluate their profit projections

---

▮

and any related guidance. That is what happened here: crack spreads declined in 2024 as compared to 2023, and in the middle of 2024, industry observers began to take a more conservative view of spreads going forward.[2] Some observers even predicted that certain refiners (but not CITGO) could struggle to generate positive returns. Accordingly, CITGO revised its internal EBITDA and cash flow projections in line with industry trends, though as noted ███████████████████.

The Redacted Information is dated and non-final and, as a fundamental matter, is *CITGO's* proprietary information to disclose—*not* Amber's. If and to the extent CITGO chooses to disclose the Redacted Information, it would be shared within the appropriate context, not selectively by a bidder that has every incentive to tamp down others' views of the value of the company as it attempts to justify its proposal and fend off other bidders.

II.   **The Characterization of CITGO's Participation in Diligence Process by Amber and Other Entities is Misleading and Inaccurate.**

Separately, the CITGO Parties find it necessary to respond to Amber's assertion that it faced "atypical challenges procuring information from the company." D.I. 1365 at 12. To the extent this cryptic statement is intended to suggest that CITGO was uncooperative or dilatory, it is outrageously unfounded and directly at odds with Amber's lead-in to that very same paragraph, in which it states that it incurred over $30 million in due diligence expenses while analyzing over 37,500 documents provided by CITGO and participating in hundreds of hours of site tours and in-person meetings with CITGO management and representatives. *See id.*

Nor is it remotely credible for Amber or any other Attached Judgment Creditor to blame the delays in finalizing the (still non-final) SPA on the CITGO Parties' failure to provide final disclosure schedules. *See* D.I. 1365 at 12; D.I. 1373-5 at 2. As is the case in every M&A deal, both

---

[2] *See* Ronald Ferrie, *Valero Energy Earnings Preview: Industry Best Operating Costs Shine Bright in a Weak Market*, Seeking Alpha: Energy Analysis (Oct. 23, 2024), https://seekingalpha.com/article/4728495-valero-energy-earnings-preview-industry-best-operating-costs-shine-bright-in-a-weak-market.

7

the diligence and disclosure schedule work streams are iterative and continue up until a definitive purchase agreement is signed. CITGO's counsel provided the Special Master's counsel with an initial draft of the disclosure schedules on May 31, 2024, and followed up with a further revised draft on June 6, 2024, well in advance of the June 11, 2024, second round bid deadline.

Amber, the Attached Judgment Creditors, and their lawyers well know that disclosure schedules are tied to representations, warranties and covenants set forth in a definitive purchase agreement. Necessarily, then, disclosure schedules cannot be finalized until the relevant representations, warranties and covenants are finalized. The representations, warranties, and covenants in the proposed SPA between Amber and the Special Master were changing up until the September 27, 2024 "signing" date. In fact, two days *after* the purported "signing," counsel to the Special Master informed CITGO that it was still negotiating the terms of the representations and warranties, noting Amber made certain temporary concessions in order to reach signing. (Such tactics also make the Special Master's claim to have successfully executed the SPA by the Court's deadline puzzling.) Accordingly, any suggestion that CITGO's conduct contributed to the delay in finalizing the disclosure schedules is wholly without merit.

The same is true of the characterization of CITGO's participation in the broader diligence process. Contrary to the unfounded assertions of Amber and certain Attached Judgment Creditors, *see* D.I. 1365 at 12; D.I. 1373-5 at 2, CITGO has—for over a year—demonstrated an exceptional commitment to participating and cooperating with the diligence process.[3] The Special Master

---

[3] Indeed, both the Court and the Special Master have recognized CITGO's efforts to cooperate with the Special Master in good faith over the preceding months. D.I. 1346-1 at 32:19–25 ("The Court: I, too, want to thank all of you, but particularly the [S]ales [P]rocess [P]arties and particularly the folks at CITGO and their representatives, who by all accounts are being cooperative in the process, and that is an important aspect to the hoped-for success of this process, and I think it's fair to note my -- my compliments as well."); D.I. 1346-1 at 21:11–20 ("Ray Schrock: I just want to note that it's really been a tremendous amount of work and no small feat getting to this point in the sale process. The [S]pecial [M]aster and advisors *with the cooperation of the [S]ales [P]rocess [P]arties and CITGO*

designed a process whereby CITGO was expected to allocate extraordinary resources for over a year now to comply with requests for information submitted first by the Special Master, and then by each and every bidder in the sale process, while still carrying on its day-to-day business.

To provide a brief overview of the rigors of this process: the Special Master began preparations for the sale process on July 24, 2023. Shortly after, the Special Master served CITGO with a request for the production of documents to aid him and his advisors in conducting initial due diligence. Through November 2023, the Special Master and his advisors continued to send periodic requests for additional due diligence information. Ultimately, CITGO produced over 9,000 documents to a virtual data room for bidders to access when it opened on February 10, 2024. Since that date, CITGO and its employees have produced over 33,000 additional documents in response to further bidder document requests, responded to nearly 3,000 bidder Q&As, and dedicated tens of thousands of hours of employee and external advisor time to responding to questions, hosting bidders and their advisors for multiple site visits at every stage of CITGO's operations, and preparing for and presenting in hundreds of meetings and expert calls. These efforts have included CITGO employees making themselves available for supposedly "urgent" bidder meeting requests in the early hours of the morning, during the weekend, on national holidays, and in the wake of hurricane weather events. As just one example, since the Special Master granted Elliott exclusivity on August 8, 2024, CITGO employees have hosted Elliott and their advisors for nearly 70 expert calls and meetings (totaling almost 110 hours) and responded to nearly 1,000 questions from Elliott alone. Throughout the diligence process, CITGO has, at every turn, gone

---

*management* have been diligently engaging with bidders, and we hope to soon be in a position to bring this process to a conclusion.") (emphasis added).

above and beyond to comply with the terms that the Special Master and the bidders set out for the diligence process. Any insinuation to the contrary is entirely unfounded.

## CONCLUSION

The CITGO Parties respectfully request that the Court leave the portions of the *Amicus Curiae* Submission highlighted in Exhibit A under seal, or, in the alternative that the confidential information highlighted in Exhibit A be stricken from the *Amicus Curiae* Submission and the brief re-filed without that information.

|  |  |
|---|---|
|  | MORRIS, NICHOLS, ARSHT & TUNNELL LLP |
|  | */s/ Alexandra M. Cumings* |
| OF COUNSEL: | Kenneth J. Nachbar (#2067) |
| Nathan P. Eimer | Susan W. Waesco (#4476) |
| Lisa S. Meyer | Alexandra M. Cumings (#6146) |
| Daniel D. Birk | Kirk Andersen (#7156) |
| Gregory M. Schweizer | 1201 North Market Street |
| Hannah Bucher | Wilmington, DE 19801 |
| EIMER STAHL LLP | (302) 658-9200 |
| 224 South Michigan Avenue | KNachbar@morrisnichols.com |
| Suite 1100 | SWaesco@morrisnichols.com |
| Chicago, IL 60604 | ACumings@morrisnichols.com |
| (312) 660-7600 | KAndersen@morrisnichols.com |
| NEimer@eimerstahl.com |  |
| LMeyer@eimerstahl.com | *Attorneys for PDV Holding, Inc. and* |
| DBirk@eimerstahl.com | *CITGO Petroleum Corporation* |
| GSchweizer@eimerstahl.com |  |
| HBucher@eimerstahl.com |  |

October 23, 2024