# Morris, Nichols, Arsht & Tunnell llp

1201 North Market Street
P.O. Box 1347
Wilmington, Delaware 19899-1347
———
(302) 658-9200
(302) 658-3989 FAX

Alexandra M. Cumings
(302) 351-9248
(302) 425-4670 FAX
acumings@morrisnichols.com

November 8, 2024

**VIA EFILING**

The Honorable Leonard P. Stark
U.S. Court of Appeals for the Federal Circuit
717 Madison Place, NW
Washington, D.C. 20439

Re: *Crystallex International Corp. v. Bolivarian Republic of Venezuela*,
D. Del. C.A. No. 1:17-mc-00151-LPS

Dear Judge Stark:

I write to provide the Venezuela Parties' preliminary views regarding the Special Master's November 6, 2024, Status Report and "Alternative Transaction Term Sheet" ("Term Sheet") submitted by Amber Energy, Inc., which improperly and drastically reduces the already inadequate consideration in its original bid and signed Stock Purchase Agreement ("SPA"). D.I. 1414, 1414-1. It is unclear what purpose the Special Master intends from his submission, other than to create the illusion of progress before the Court issues its views on how the Sale Process should proceed and to help Amber's parent Elliott "divide and conquer," as several Attached Judgment Holders wrote to the Court yesterday. D.I. 1417 at 1. Is he recommending the Court approve the Term Sheet as the successful bid rather than the transaction outlined in the SPA? Is he suggesting that the Term Sheet is superior to the SPA? Does he intend to recommend two SPAs to the Court from which to choose? Whatever the answer to these questions, it is clear Elliott is being given advantages that have not been provided to any other bidder, and that the Special Master should be directed to immediately stop pursuing—at great expense to the parties—Elliott's failed bid.

On September 27, 2024, the Special Master filed a notice of his recommendation of a successful bid and attached an "executed" SPA, D.I. 1325, 1325-1, which was incomplete, still being negotiated, and was not accompanied by a good faith deposit, as required by the Sale Procedures Order, *see* D.I. 480-1 at 12. Elliott's SPA faced immediate and near universal condemnation from the parties, particularly because it included a surprise trust structure—imposed after the Special Master granted Elliott exclusivity over other bidders—that would keep any

The Honorable Leonard P. Stark
November 8, 2024
Page 2

remaining proceeds from the meager bid from being distributed to creditors for years, gave Elliott the option to rescind the deal entirely at some point in the future, keeping interim profits while leaving creditors unpaid.

The fact that the trust structure was imposed by Elliott after bidding had concluded was outrageous. The purported reason for this trust was to protect against pending and potential future alter ego claims against PDVH and its subsidiaries (together, the "CITGO Companies") that had supposedly only recently arisen, but the Special Master and all potential bidders were on notice long ago that there were actual and potential alter ego claims that had been or could be asserted by creditors of Venezuela and PDVSA. The virtual data room, which opened to bidders in February 2024, included litigation disclosures from PDVH and CITGO of alter ego claims filed in 2019 by OI European Group in this Court and in 2020 by Rusoro in the Southern District of Texas, and of the potential that other present or future judgment creditors of the Republic or PDVSA might also seek to hold the CITGO Companies directly liable for their judgments on an alter ego theory. Moreover, PDVH and CITGO notified the Special Master of these same issues beginning in October 2023, telling him that they wanted to make sure that he was particularly aware of the potential for the continuance of these claims and the filing of new claims after the sale process has concluded. PDVH and CITGO also repeatedly asked the Special Master how he planned to address pending and potential future alter ego claims with bidders. The Special Master never responded, and apparently failed to account for this potential risk until after Elliott began to renege on its bid.

Since that time, and over the objections of the Sale Process Parties and multiple Attached Judgment Holders, the Special Master has kept the virtual data room closed to other bidders and potential bidders and has refused to consider or even discuss alternative bids. If the Special Master wants to allow Elliott to submit a revised bid, after near universal condemnation of the SPA, then other bidders and potential bidders should be given the same opportunity to access the data room and to submit their own revised bids on a reasonable schedule established by this Court.

On October 18, 2024, the parties and the Special Master submitted a Joint Status Report in which he continued to defend the still-unfinished SPA (which he promised, as he did at the October 1, 2024 hearing, would be completed very soon), stated that he planned to request bidder protections even though the terms of the SPA had not yet been finalized and Elliott had the ability to walk away from the deal, and requested that a status conference be held on October 25, 2024. D.I. 1373, 1373-1 at 2. In response, multiple Sale Process Parties and Attached Judgment Holders argued that Elliott's bid was economically and legally non-viable and asked the Court to order the Special Master to conduct a new round of bidding for the PDVH shares, during which Elliott and any other interested bidder could submit a bid not subject to the legally impermissible trust structure contained in Elliott's proposed SPA. *See* D.I. 1373, 1373-2, 1373-4, 1373-5, 1373-6, 1373-7. The Court issued an order on October 23, 2024, stating that it would wait for already ordered filings, scheduled for completion by November 6, 2024, to set a status conference and "anticipate[d] providing its inclinations" before the conference "as to how and when the litigation and the Sale Process should proceed and providing an opportunity for additional submissions responding to those inclinations."

The Honorable Leonard P. Stark
November 8, 2024
Page 3

Now, however (and even though the SPA still has not been finalized or fully disclosed), the Special Master has apparently allowed Elliott—but no one else—to submit a revised, drastically reduced bid while having exclusive access to the data room and updated diligence information. It is improper for Elliott to rebid in response to overwhelming criticism of its SPA and yet insist that the Special Master continue to give it exclusivity, preventing anyone else from rebidding. *See* D.I. 1414-1 at 3 (Elliot stating that it wants "to emphasize that this alternative remains subject to the Special Master continuing to abide by the exclusivity terms in the Signed SPA").

Elliott's $2 billion reduction to its already inadequate bid to account for forgoing its own trust structure is also improper. The risk of pending and potential future alter ego claims was disclosed to it and other bidders as soon as the data room was opened to them, and due to the proposed lockbox structure, Elliott gets to keep all profits generated by the CITGO Companies between December 31, 2024 and the closing of the transaction, whenever in the future that may be. In addition, the undisclosed holdbacks and deductions will reduce the proceeds to creditors to a mere fraction of the fictitious $5.2 billion headline price provided in the Special Master's latest filing. (As the CITGO Parties have previously noted, even the old headline price—and certainly the new one—is itself far below the fair market value of the PDVH shares.)

Separately, the Venezuela Parties anticipate objecting to any proposed bidder protections sought by the Special Master based on the "Revised SPA" he says he is expecting from Elliott based on the Term Sheet—a Term Sheet that provides for even less compensation to creditors than the original SPA and incorporates by reference many of the objectionable terms from the SPA itself. Among other things, the Term Sheet improperly seeks to advance both Elliott's revised bid and its original bid simultaneously and purports to require any topping bid to be superior to both bids. Such a proposal is unfair and contrary to this Court's Sale Procedures Order, which requires the Special Master to select "*the* Successful Bid," not an array of options submitted by a bidder. D.I. 481 ¶ 9. The Term Sheet's dual proposals will only engender confusion among potential bidders, creditors, the Special Master, and the Court, who all will have to determine how to measure—and for bidders, how they anticipate the Special Master will measure—the superiority of a topping bid when there are two materially different transactions with two materially different structures being proposed. It is unclear, for instance, how to compare the value of not having a trust structure against the $2 billion reduction in consideration. The Term Sheet also gives the Special Master only one business day after the end of the topping period to sift through these complexities and decide whether to recommend a topping bid, after Elliott has spent months (and continues to this day) doing post-bid due diligence and negotiating the original SPA. Such provisions can only have been designed solely to ensure that no responsible bidder could successfully put in a topping bid.

In recent months, the Sale Process Parties and Attached Judgment Creditors have seen the Special Master's invoices become troublingly large, amounting to multiple millions of dollars each month. The over $4 million July invoice from the Special Master's advisor Weil Gotshal, for example, included a staggering 76 timekeepers, with hourly rates up to $2,350 an hour. The Sale Process Parties have repeatedly told the Special Master that he should stop wasting

The Honorable Leonard P. Stark
November 8, 2024
Page 4

time and money pursuing Elliott's non-viable and inadequate bid, revoke Elliott's exclusivity, and instead shift his efforts towards getting other bidders, who seem willing to submit a far superior bid to Elliott's, back into the process. Yet, the Special Master has ignored all entreaties to stop wasting time and money and change direction.

The Venezuela Parties reserve all rights to object to these or other aspects of any proposed revised SPA and the original SPA submitted by the Special Master and Elliott.

Respectfully,

*/s/ Alexandra M. Cumings*

Alexandra M. Cumings (#6146)

cc:   All Counsel of Record (via CM/ECF filing)