IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| CRYSTALLEX INTERNATIONAL CORPORATION,<br><br>              Plaintiff,<br><br>   v.<br><br>BOLIVARIAN REPUBLIC OF VENEZUELA,<br><br>              Defendant. | C.A. No. 17-mc-151-LPS |

**CRYSTALLEX INTERNATIONAL CORPORATION'S COMMENTS ON THE
COURT'S "INCLINATIONS" REGARDING SALE PROCESS**

OF COUNSEL:

Robert L. Weigel
Jason W. Myatt
Rahim Moloo
GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue
New York, New York 10166
Tel: (212) 351-4000
Fax: (212) 351-4035

Miguel A. Estrada
Lucas C. Townsend
Adam M. Smith
GIBSON, DUNN & CRUTCHER LLP
1700 M Street, N.W.
Washington, D.C. 20036
Tel: (202) 955-8500
Fax: (202) 467-0539

Dated: November 26, 2024

Raymond J. DiCamillo (#3188)
Jeffrey L. Moyer (#3309)
Travis S. Hunter (#5350)
RICHARDS, LAYTON & FINGER, P.A.
One Rodney Square
920 North King Street
Wilmington, Delaware 19801
Tel: (302) 651-7700
Fax: (302) 651-7701

*Attorneys for Plaintiff*

## INTRODUCTION

Crystallex submits this brief in response to the Court's November 19, 2024 Order, D.I. 1433, setting out the Court's "inclinations" regarding the next steps in the sale process. Crystallex welcomes this opportunity to comment on potential clarifications and adjustments to the sale process in light of the lessons learned from what has occurred so far.

The events to date, including the opposition generated by the bid recommended by the Special Master, confirm that the attached PDVH Shares should be sold on an as is, where is basis. This is what Delaware law contemplates in the circumstances: by statute this is a judgment execution sale where the goal is to sell the amount of PDVH Shares necessary to satisfy the Attached Judgments. It is not a traditional M&A transaction or a bankruptcy proceeding. Thus, bidders should expect to assume the risks inherent in the asset they propose to purchase—the shares—just as would bidders in any other execution sale. With the exception of the need for requisite regulatory approvals, bidders should not expect to walk away from the sale based on events impacting PDVH's subsidiaries, nor should they expect the Special Master to secure a settlement with the 2020 Bondholders or other creditors of PDVH and its subsidiaries on their behalf as a condition of the sale. As recent events have shown, such contingencies introduce too much uncertainty into the sale process and threaten the likelihood that the sale will close at all, or satisfy the judgments of any of Venezuela's and PDVSA's creditors.

Relatedly, while Crystallex agrees with the Court's view that enjoining the Alter Ego Actions may not be essential to the willingness of *all* potential bidders to participate in the auction, Crystallex does not rule out the possibility that financing sources for some potential bidders may attach significance to the pendency of such Alter Ego Actions. Crystallex respectfully maintains that the Court has the power to (and should) issue the limited injunction against the Gramercy

1

Parties that it has described in its previous filings in order to prevent further interference with this Court's processes by those parties.

In all events, the sale should now move forward expeditiously. The Court's Sale Procedure Order was issued on October 11, 2022, D.I. 481, and the Court was informed of OFAC's decision not to obstruct the sale on April 28, 2023, D.I. 553. In the 18 months since OFAC's decision, the sale has been widely publicized and interested bidders have had more than sufficient time to analyze the value of PDVH and its subsidiaries. Once the data room is re-opened, which Crystallex believes should be as soon as possible, the Court should set a reasonable but speedy timeline to complete the execution sale and bring this long-running litigation to a close.

Below, Crystallex responds to the Court's inclinations, beginning with a brief discussion of Crystallex's position on the Court's power to enjoin the Alter Ego Creditors' actions that seek to undermine this Court's attachment of the PDVH Shares. Crystallex then addresses the remainder of the Court's comments in the context of the two primary paths forward that are available in this case. On the one hand, the Court may order a new round of bidding after which a preliminary winning bid will be selected and granted bidder protections—essentially a Stalking Horse Bid— to be followed by a brief Topping Period in which other bidders might try to outbid the original selected bid. Alternatively, the Court may order bidders to submit bids that the Special Master will review to determine which bidders should count as "qualified bidders," at which point those qualified bidders will be permitted to participate in a live auction in Delaware on a date certain. As addressed below, many of the Court's suggestions may be appropriate in either scenario, and Crystallex looks forward to the opportunity to comment on the details of their implementation into a modified Sale Procedures Order. Likewise, in either case, Crystallex fully expects to submit a credit bid. Crystallex may work with other creditors or interested parties on such a bid, but in all

events its bid will ensure at least one offer is made that provides substantial value for the PDVH Shares.

## CRYSTALLEX'S COMMENTS ON THE COURT'S INCLINATIONS

### I. The Injunction Motion

The Court stated that it is inclined to deny the Special Master's motion to enjoin the Gramercy Parties from pursuing claims in other jurisdictions that seek to levy on the assets of PDVH on the theory that courts should ignore its separate corporate existence from PDVSA. D.I. 1433, at 5. The Court explained that it is inclined to do so essentially because (1) such an injunction does not appear necessary for at least some bidders to be willing to purchase the PDVH Shares; (2) many parties agree that the Gramercy Parties' claims are mere nuisance claims similar to other alter-ego claims that have been filed that may be dismissed by the courts in which they have been filed; and (3) the fact that the Gramercy Parties' claims might impact the value bidders are willing to pay for the PDVH Shares does not necessarily empower this Court to enjoin them. *Id.* at 5-6.

As previously argued, Crystallex agrees that there is no need (and at present no basis) to enjoin any party that might conceivably bring an alter ego action of the type brought by the Gramercy Parties, as suggested by the Special Master. Crystallex also agrees with the Court's view that enjoining the Gramercy Parties may not be an essential prerequisite for bidders to be willing to purchase the PDVH Shares. If the Gramercy Parties' alter-ego claims are not enjoined, "bidders will simply price their view of the risk associated with" the Gramercy Parties' claims "when formulating their bids." D.I. 643, at 10 (quoting D.I. 582, at 7). Crystallex continues to believe that there are bidders who would be willing to purchase the PDVH Shares on an as-is basis, without

3

conditioning its bid on the Special Master prevailing on a particular motion or on this Court enjoining certain parties.[1]

That said, Crystallex maintains that enjoining the Gramercy Parties' claims is "necessary or appropriate in aid of" this Court's jurisdiction over the PDVH Shares, to enforce orders relating to the sale of those shares, and to prevent interference with the res in the Court's custody. 28 U.S.C. § 1651(a); *Princess Lida of Thurn & Taxis v. Thompson*, 305 U.S. 456, 467 (1939). In August 2018, this Court issued a writ attaching the PDVH Shares for the purpose of auctioning them in a judicial sale to satisfy Crystallex's judgment. D.I. 95, 96. Pursuant to this Court's Order, D.I. 644, PDVH delivered to the Special Master's custody a certificate evidencing PDVSA's ownership of the PDVH Shares, D.I. 810. The proceeds from the sale of the PDVH Shares—which necessarily reflect the value of PDVH's interest in its subsidiaries—will satisfy the judgments of various creditors of Venezuela and PDVSA in accord with this Court's priority order. D.I. 481, at 2; D.I. 1102.

In its priority order, this Court determined that Girard Street and G&A Strategic are not entitled to any of the value of PDVH or its subsidiaries and that Gramercy is entitled to receive proceeds only after the judgments of several senior creditors have been satisfied. D.I. 1102. The Gramercy Parties should not be permitted to circumvent that order, and this Court has the power to enjoin them from doing so because their end-run around this Court's sale process requires the PDVH Shares to be treated as a nullity and thus undermines this Court's attachment of those shares

---

[1] Similarly, Crystallex believes that any successful bid should not be premised on any particular treatment of the claims of the 2020 Bondholders. Any value that a bidder ascribes the claims by the 2020 Bondholders may of course be factored into that bidder's offer for the shares, and a bidder could choose to negotiate a prepackaged settlement with those bondholders in contemplation of closing such a settlement after the bidder owns the shares. But in no event should any potential payment that a bidder may make to the bondholders be considered in valuing the bid or in comparing it with other bids.

and Order determining which creditors of Venezuela and PDVSA are entitled to have their judgments satisfied in this Court's sale process and in what order. D.I. 1397, at 1. Worse, the Gramercy Parties are currently harassing Crystallex and other senior creditors with burdensome third-party subpoenas seeking information that Crystallex prepared and obtained in its litigation against the Venezuela Parties in a parasitic effort to use Crystallex's own efforts against it and poach assets that are being auctioned for the benefit of Crystallex. D.I. 1425, 1426.

The Gramercy Parties' alter-ego actions threaten to interfere with the *res* in this Court's custody and with the sale process that this Court and the Sale Process Parties have devoted significant time and resources to develop and implement. Crystallex thus respectfully submits that this Court would be well within its authority to enjoin the Gramercy Parties, and the Court should do so to help bring these proceedings to a long-overdue conclusion.

## II. The Path Forward: Live Auction or a Topping Period

The current Sale Procedures Order suggests two possible paths forward—a live auction, in which the Special Master would be tasked with determining qualified bidders, with the winner to be selected based on the results of a true, real time auction, or a Stalking Horse process, in which a preferred bid would be selected, after which there would be the opportunity for overbids, after which the winning bid would be selected.

### a. Live Auction

Crystallex submits that the Court could proceed with a process modelled on the live auction process included in the Auction Procedures accompanying the October 11, 2022 Sale Procedures Order. *See* D.I. 480-1, at 56. A live auction is typically used in judgment execution sales because it allows bidders to compete on price, rather than bid terms that have little analog in the context of a forced sale of assets by an unwilling seller. In this scenario, once initial bids are submitted, they will be reviewed by the Special Master to determine which bidders have complied with the Bid

5

Procedures in the Sale Procedures Order, have obtained committed financing (or include the commitment of sufficient judgment dollars), and generally are prepared to close on the transaction subject to regulatory approval.  The Special Master would present bid procedures that set out the key material terms of any bid as well as an explanation of how bids will be evaluated.  That way, the qualified bidders participating in the auction know the terms the Special Master (in consultation with the Sale Process Parties) believes are most favorable and can focus their bidding on the price to be paid for the PDVH Shares to the maximum extent possible.  Qualified bidders would then be invited to participate in a live auction (likely to be conducted over one or two days) and a winner would be selected.  This procedure would resolve the sale process in an expeditious manner.

      **b.  Topping Period**

In the alternative, the process could go forward with a Stalking Horse Bid and formal Topping Period "of sufficient length as to allow for the possibility of better bids to be prepared, presented to the Special Master, and carefully evaluated by the Special Master."  D.I. 1433, at 7.  In this scenario, bidders would submit their best bids consistent with a list of terms and valuation criteria to be provided by the Special Master (after consulting with the Sale Process Parties).  The Special Master would select the best bid to serve as a Stalking Horse, and that bid would receive certain bid protections as an incentive to offer the best bid for the PDVH Shares.  The Topping Period would then provide an opportunity for bidders to submit superior offers to the Special Master's selected Stalking Horse Bid with the goal of generating more proceeds for judgment creditors.  A competitive Topping Period would help maximize the amount paid for the PDVH Shares in a Stalking Horse scenario and thus the amount available to satisfy the Attached Judgments.  *See, e.g.*, D.I. 1334, at 1 (Gold Reserve describing a "robust, competitive Topping Period" as a "critical element in achieving [a] value-maximizing Sale Transaction").

Crystallex also agrees that the Topping Period must be of sufficient length to allow potential topping bidders to evaluate the Special Master's recommended starting-point bid and prepare superior bids to be submitted to the Special Master. Various creditors have proposed different lengths for the Topping Period. D.I. 1373-4, at 1 (Red Tree and Contrarian recommending a Topping Period of 60 days); D.I. 1373-5, at 6 (Gold Reserve, Rusoro, Tidewater, and Valores Mundiales recommending a Topping Period of 30 days). Crystallex believes that a Topping Period of 45 days is appropriate to give bidders an opportunity to evaluate the recommended starting-point bid and prepare superior bids without unreasonably delaying the sale process.

During the Topping Period, bidders will need to make an informed judgment about whether to submit a bid and how much they are willing to pay. Accordingly, Crystallex also submits that the data room—once it is reopened, *see* D.I. 1433, at 8—should remain open to potential bidders until the close of the Topping Period (*i.e.*, the final deadline to submit binding bids). Keeping the data room open causes no harm to any Stalking Horse Bidder, particularly if, as discussed below, the Court establishes applicable bid protections in advance of the Topping Period.

### III. Bids and Bidder Protections

Whichever path this Court endorses, its "inclinations" assist the Special Master, Sale Process Parties, and bidders in coming to an appropriate offer for the PDVH Shares consistent with the requirements of Delaware law. Below, Crystallex addresses the Court's inclinations that relate to bids and bidder protections, noting in each case whether the proposal is appropriate to both a live auction and a Topping Period, or only in one of these scenarios.

#### a. Advance agreement on material terms

The Court invited the parties to comment on "whether the Special Master should develop and disclose to potential bidders (including Amber Energy) a list of material terms that any successful bidder must agree to … so that any competition among bidders might be focused on price."

7

D.I. 1433, at 9.  Crystallex supports such a proposal in either a live auction or a Topping Period scenario.

Crystallex specifically endorses the Court's suggestion that the material terms to be agreed in advance should include terms "relating to appeal contingencies, whether the bidder may terminate if the Special Master fails to prevail on a particular motion, [and] maximum amount of escrows (if any) permitted to reserve for Alter Ego Claims and 2020 Bondholders." *Id.*

Crystallex understands that for purposes of this submission the Court is simply asking whether setting terms in advance of the next round of bidding would be proper and thus reserves its right to comment more fully on appropriate terms in the future.  However, Crystallex offers the following initial observations.  First, while Crystallex suggests that no "appeal contingencies" are required and that, absent a stay, the sale can close upon receipt of the necessary regulatory approvals, any "appeal contingencies" that create termination or other rights should be limited to appeals from this Court's final order approving the sale of the attached PDVH Shares brought by the Sale Process Parties, the Additional Judgment Creditors, or other accepted intervenors in this action.  Appeals in other matters or on other dockets, while perhaps of interest to certain parties, are not relevant in a material way to this Court's process and should not delay the finality of any transaction.  Second, a bidder should not be granted the right to terminate its bid because the Special Master fails to prevail on a particular motion because no such off-ramps should be permitted.  "Off ramps" that permit a successful bidder to withdraw from the transaction, such as motion requirements or financing contingencies, would risk derailing the sale process and should be granted only in extraordinary circumstances.  Third, while they are not strictly necessary, any Adverse Material Change protections should be narrowly tailored and limited to traditional material changes to PDVH's business and should not protect against non-business-related adverse developments, such

as those that might occur in court cases involving the 2020 Bondholders or Alter Ego Claimants. Fourth, and finally, the default position should be that no funds are permitted to be placed in escrow for the Alter Ego Claims or 2020 Bondholders.  Generally, the risk associated with those and similar claims should be priced into the bids to acquire the shares of PDVH.

Should the Court order that material terms shall be agreed in advance, Crystallex reserves the right to further comment on such terms and propose additional material terms for consideration.

### b. Reasonable termination fee for the bidder

This Court also stated that it is inclined to establish bidder protections that would apply to any bid the Special Master deems to be the best available and that these protections should include a reasonable termination fee.  D.I. 1433, at 6-7.  Crystallex has no objection to this proposal, so long as such protections are **only afforded in a Stalking Horse/Topping Period scenario**.

Crystallex submits that it would be appropriate to protect the Special Master's recommended Stalking Horse Bidder with a reasonable termination fee payable only in the event that bid is surpassed during the Topping Period.  *Accord* D.I. 481, at 21 (describing permissible Stalking Horse Bid protections).  There should be no other scenario in which a termination fee is paid.

At the moment, the Sale Procedures Order contemplates affording a Stalking Horse Bidder a termination payment of no more than 3% of the bid's value.  D.I. 481, at 20-21.  Crystallex has no objection to this figure as a potential ceiling but believes it is critical that, in any scenario, the "value" of the bid for purposes of any termination fee should be calculated as a percentage of the net proceeds that the bid would make available to Attached Judgment Creditors immediately upon closing.  That is, the termination fee should not be calculated as a percentage of any notional "enterprise value" that bears no relationship to the net proceeds creditors reasonably could expect to receive.  A termination fee based on the implied or enterprise value of the bid would not be reasonable in the context of these judgment-enforcement proceedings.  For example, a bid that is

9

subject to numerous post-closing price adjustments may still provide the best value, but it is the guaranteed value (*i.e.*, the low end of any range of payments) that should determine the amount of any termination fee. Because the purpose of the sale process is to attract bids that satisfy judgments in this Court's priority waterfall, tying the termination fee to the proceeds that will to be used to satisfy the Attached Judgments encourages bidders to prioritize satisfaction of Attached Judgments to the greatest extent possible, which benefits the creditors that hold those judgments as well as their debtors—Venezuela and PDVSA—in accordance with Delaware law. D.I. 234, at 36 ("The process will result in the sale of as many … shares of PDVH as are necessary to satisfy the judgment of Crystallex (and of any other judgment creditor whose judgment may be added to the sale).").

       **c. Period for objections to or support for bidder protections and recommended bid**

If the Court orders a sale process that includes a Topping Period, Crystallex agrees that the Court should set a date by which the Special Master shall be required to make a "Final Recommendation" "accompanied by public, final versions of all necessary documentation, showing the bid (i.e., a singular bid) the Special Master has identified as the best-available bid." Indeed, the Court already did so, and that date has come and gone. *Cf.* D.I. 1375 (Special Master's nonfinal recommendation). Thus, any renewed process should be structured to proceed—and conclude—in as expedited of a manner as possible. Crystallex also generally agrees with the Court's inclination that the period for objecting to, or expressing support for, the Recommended Bid should begin only after the Special Master identifies the best-available bid and bidder protections come into force. D.I. 1433, at 7.

10

### d. Requirement of a good faith deposit

In all cases (*i.e.*, whether the Court orders a live auction or Topping Period) Crystallex agrees with the Court's inclination to continue requiring bidders to make a good faith deposit. As the Court has previously recognized, "a substantial good faith deposit, which will be refundable to all but the winning bidder," is necessary "[t]o ensure that only serious bidders participate, and that only a bidder seriously interested in completing the transaction wins." *Id.* As discussed above, in order to incentivize the bidder to close the deal, the winning bidder's deposit should not be refundable.

The only qualification to this requirement concerns credit bids. Credit bidders are uniquely situated because they have skin in the game before the bidding even begins. Thus, as this Court has previously recognized, it is not necessary to require credit bidders to make a cash deposit. So long as the cash component of a credit bid is sufficient (as required under the current Sale Procedures Order) to cover Transaction Expenses, termination fees, and senior Attached Judgments, D.I. 481, at 23, the "deposit" required of a credit bidder should be limited to a percentage of the cash component of the bid with the remainder of the deposit (if any) to be satisfied by an agreement to forfeit a portion of the credit bidder's judgment. *Accord* D.I. 481, at 23 ("If any Credit Bidder withdraws its Credit Bid or in any other way fails to consummate its Credit Bid in a manner that would cause any other Bidder to lose its Good Faith Deposit, then the lesser of ten percent (10%) of the portion of the judgment that was Credit Bid or $50 million of the judgment shall be forever waived and the Court shall enter an order reducing the judgment in accordance therewith, provided however that no such forfeiture shall occur if the reason for the withdrawal or failure to consummate the Credit Bid is a settlement or other satisfaction of the judgment."). And in all cases no deposit required of a credit bidder shall be forfeited if the reason for withdrawal is a settlement or satisfaction of the judgment. *See id.*

11

### e. Requirement that purchase agreement and all necessary documentation be definitively and fully negotiated before the bidder protections come into effect

Whether the Court orders a Topping Period that includes bidder protections or a live auction that does not, it is critical in both scenarios that any bids are submitted in final form, with no financing contingencies and all necessary documentation definitively negotiated and agreed. It is difficult to see how any bid could be selected as the initial final bid in a Topping Period scenario or how sufficient evidence could exist to confirm a bidder is a qualified bidder in a live auction before the bid itself is fully negotiated.

For example, in a Topping Period scenario, it would be unreasonable for a bidder who fails to secure adequate financing to nevertheless be granted a termination fee (presumably in the form of a priority lien on the PDVH Shares) and thus detract from the value obtained in the sale. Requiring that bidder protections will only come into effect once all necessary documentation is finalized ensures that only serious parties capable of closing the transaction submit bids to acquire the PDVH Shares.

It is likewise appropriate that all documentation be fully negotiated and financing be in place in order for a bidder to be judged a qualified bidder entitled to participate in a live auction. The Court's October 2022 Sale Procedures Order requires that, in order for a bidder to become a Qualified Bidder, its bid must meet certain requirements such as the payment of any transaction expenses, and must also allow the Special Master (in consultation with the Sale Process Parties) to evaluate the percentage of PDVH Shares that will be sold and for how much, such that the value of the bid to Venezuela's and PDVSA's creditors may be assessed. That analysis cannot be reliably done if the bid does not include fully negotiated and finalized documentation associated with the proposed transaction.

      **f. Provision that the definitive documentation will be filed with the Court and made public (with redactions only to protect the confidential business information of PDVH and/or its subsidiaries)**

Crystallex agrees that all definitive documentation should be filed publicly with the Court, with redactions presumptively limited to confidential business information of PDVH and/or its subsidiaries, and provided to the Republic of Venezuela to the same extent they are provided to other Sale Process Parties. Should bids necessarily include other confidential information, Crystallex has no objection to the bidder being provided the opportunity to seek additional limited redactions, although it is unlikely that any such additional redactions would be warranted.

## IV. The Winning Bid

      **a. A projection of the amount that would be received by the Judgment Creditors**

Crystallex strongly agrees with this Court's inclination to require the Special Master to provide all interested parties a projection of the cash amount that any bid would provide to judgment creditors, as ACL and OIEG requested. D.I. 1433, at 8-9 (citing D.I. 1373, at 8).

This projection should also separately disclose (1) the amount of proceeds that would be immediately available upon closing to satisfy the Attached Judgments; and (2) how much *may* be available only if certain contingencies occur, specifying what each of those contingencies is. This information is critical to enable bidders to submit superior offers during either a live auction or a Topping Period and then later for the Sale Process Parties and Attached Judgment Creditors to determine whether to object to or express support for the final winning bid in either case.[2]

---

[2] Crystallex understands that calculating the flow of proceeds down the waterfall may require the use of confidential information. However, any redactions should still be limited and the Sale Process Parties and Additional Judgment Creditors should be provided the information necessary to test such calculations, even if on a confidential basis.

b. **An estimate on the impact of any adjustments on the headline purchase price and potential distributions to creditors in the current waterfall if such adjustments are a feature of any bid**

Crystallex also strongly agrees with this Court's inclination to order the Special Master, as Crystallex requested, to include in his analysis of any bid—in a live auction or Topping Period scenario—an estimate of the impact of any adjustments to the purchase price and distributions to creditors in this Court's priority waterfall that are included in a given bid, D.I. 1433, at 9, as it is critical to enable bidders to submit superior offers during the live auction or Topping Period and to enable the parties to these proceedings to determine whether to object to or express support for the winning bid. As with any termination fee, Crystallex believes that any evaluation should be based on the assumption that the maximum downward adjustments take place. Of course, a bidder can avoid this by simply pricing the PDVH Shares based on its own views of any downside risk and set its bid without such adjustments.

c. **Identifying the winning bid**

If the Court orders a procedure that includes a Topping Period, Crystallex agrees that this Court should set a deadline that gives the Special Master sufficient time to review potentially superior bids submitted during the Topping Period and to prepare his Updated Final Recommendation. D.I. 1433, at 8. Crystallex submits that a deadline set 30 days after the close of the Topping Period would likely provide the Special Master sufficient time to review potentially superior bids and consult the Sale Process Parties regarding the appropriate bid to be identified as the winning bid in the Special Master's Updated Final Recommendation. *Accord* D.I. 480-1, at 245 ("The Special Master may, in consultation with the Sale Process Parties, identify the highest Qualified Bid that the Special Master reasonably believes to be capable of being timely consummated … as the successful bid … .").

If the Court orders a procedure that includes a live auction instead of the use of a Stalking Horse and Topping Period, then the deadline for determining the winning bid should be the close of the auction, after which the Special Master should submit the winning bid to the Court (within 2 business days) and the period for the Sale Process Parties and Attached Judgment Creditors to object to or express support for the winning bid should begin to run.

In either scenario, Crystallex also agrees that there should be a reasonable period for briefing objections to (and/or support for) the winning bid, save that it should not be improper to comment on the terms of the bid to be selected if relevant to objections that are otherwise proper before the winning bid is determined (for example if bidder protections are not predetermined but are instead proposed as part of the proposed Stalking Horse Bid in a Topping Period scenario). Such objections, and the reasonableness of the winning bid, should be resolved at a final sale hearing.

## CONCLUSION

For the foregoing reasons, Crystallex submits that the Court should Order either (1) a sale process that includes a live auction after an initial round of bidding to determine qualified opening bids and bidders or (2) an initial round of bidding followed by a Topping Period. In either scenario, Crystallex respectfully submits that the Court should Order the Special Master and Sale Process Parties to propose necessary amendments to the Sale Procedures Order to accommodate the Court's views on the best path forward in light of the submissions in response to the Court's November 19, 2024 Order, D.I. 1433, and the lessons learned in the sale process to-date. Finally, Crystallex submits that any such amendments to the Sale Procedures Order should be made on an expedited basis such that the final sale hearing can be held within the first quarter of 2025, or earlier, subject to the Court's schedule.

| | |
|---|---|
| OF COUNSEL:<br><br>Robert L. Weigel<br>Jason W. Myatt<br>Rahim Moloo<br>GIBSON, DUNN & CRUTCHER LLP<br>200 Park Avenue<br>New York, New York  10166<br>(212) 351-4000<br><br>Miguel A. Estrada<br>Lucas C. Townsend<br>Adam M. Smith<br>GIBSON, DUNN & CRUTCHER LLP<br>1700 M Street, N.W.<br>Washington, D.C.  20036<br>Tel:  (202) 955-8500<br>Fax:  (202) 467-0539<br><br>Dated:  November 26, 2024 | */s/ Travis S. Hunter*<br>Raymond J. DiCamillo (#3188)<br>Jeffrey L. Moyer (#3309)<br>Travis S. Hunter (#5350)<br>RICHARDS, LAYTON & FINGER, P.A.<br>One Rodney Square<br>920 North King Street<br>Wilmington, Delaware  19801<br>(302) 651-7700<br>dicamillo@rlf.com<br>moyer@rlf.com<br>hunter@rlf.com<br><br>*Attorneys for Plaintiff* |