# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| CRYSTALLEX INTERNATIONAL CORP., <br><br> Plaintiff, <br><br> v. <br><br> BOLIVARIAN REPUBLIC OF VENEZUELA, <br><br> Defendant. | Misc. No. 17-151-LPS |

## 2020 BOND ENTITIES' SUBMISSION PURSUANT TO THE COURT'S ORDER OF NOVEMBER 20, 2024, D.I. 1433

PAUL, WEISS, RIFKIND,
   WHARTON & GARRISON LLP
Daniel A. Mason (#5206)
1313 North Market St., Suite 806
Wilmington, DE 19801
Telephone: 302-655-4410
Facsimile: 302-655-4420
Email: dmason@paulweiss.com

*Counsel for 2020 Bond Entities*

OF COUNSEL:

Jonathan Hurwitz
PAUL, WEISS, RIFKIND,
   WHARTON & GARRISON LLP
1285 Avenue of the Americas
New York, New York 10019-6064
Telephone: 212-373-3000
Facsimile: 212-757-3990
Email: jhurwitz@paulweiss.com

TABLE OF CONTENTS

**Page**

Table of Authorities ....................................................................................................................... ii

Preliminary Statement......................................................................................................................1

Factual Background ........................................................................................................................4

    A.    The 2020 Bonds ....................................................................................................... 4

    B.    PDVSA's Default on the 2020 Bonds ..................................................................... 7

    C.    The Southern District Action ................................................................................. 7

    D.    The Special Master's Recommendation and the Court's Order ............................. 9

Argument .......................................................................................................................................11

I.    The Special Master Should Not Recommend Any Bids That Contemplate or Are Conditioned on Impairments of the 2020 Bond Entities' Rights........................................11

    A.    Bidders Should Agree Not to Seek the Nonconsensual Release of the Collateral Lien ....................................................................................................... 12

    B.    Bidders Should Agree Not to Seek to Halt the Accrual of Interest on the 2020 Bondholders' Claims .................................................................................... 14

    C.    Bidders Should Agree Not to Impair the 2020 Bond Entities' Post-Event of Default Rights to Vote the Collateral Shares or Otherwise Act as the Owner of the Shares ............................................................................................... 15

    D.    Bidders Should Agree Not to Seek to Upstream CITGO Holding Assets in Violation of the Pledge Agreement ....................................................................... 15

II.    At a Minimum, the Court Should Direct the Special Master to Strongly Disfavor Any Bids That Contemplate Efforts to Impair the 2020 Bond Entities' Rights .................16

Conclusion ....................................................................................................................................17

## TABLE OF AUTHORITIES

Page(s)

**Cases**

*Liberty Mut. Fire Ins. Co.* v. *JDS Constr. Grp. LLC*,
  2023 WL 6143559 (S.D.N.Y. Sept. 20, 2023)..........................................................................12

*LTV Corp.* v. *Gulf States Steel, Inc.*,
  969 F.2d 1050 (11th Cir. 1993) ...............................................................................................14

*NML Capital* v. *Rep. of Argentina*,
  17 N.Y.3d 250 (2011) ..............................................................................................................14

*Petróleos de Venezuela S.A.* v. *MUFG Union Bank, N.A.*,
  106 F.4th 263 (2d Cir. 2024) .....................................................................................................9

*Petróleos de Venezuela S.A.* v. *MUFG Union Bank, N.A.*,
  235 N.E.3d 949 (2024)..............................................................................................................9

*Petróleos de Venezuela S.A.* v. *MUFG Union Bank, N.A.*,
  495 F. Supp. 3d 257 (S.D.N.Y. 2020), *vacated and remanded*,
  106 F.4th 263 (2d Cir. 2024) .........................................................................................4, 6, 7, 8

*R&G Props., Inc.* v. *Column Fin., Inc.*,
  184 Vt. 494 (2008) ..................................................................................................................13

*Rievman* v. *Burlington Northern Railroad Company*,
  618 F. Supp. 592 (S.D.N.Y. 1985)..........................................................................................13

*TCW Gem V. Ltd.* v. *Grupo Iusacell Celular, S.A. de C.V.*,
  7 Misc. 3d 1008(A), 801 N.Y.S.2d 243 (Sup. Ct. 2004) ........................................................13

**Other Authorities**

N.Y. CPLR § 5001(a) ....................................................................................................................14

This submission is made by an ad hoc group of holders of more than two-thirds of PDVSA 2020 Bonds (the "2020 Bondholders") and the Trustee and the Collateral Agent for the PDVSA 2020 Bonds solely in their respective capacities as such (collectively, the "2020 Bond Entities") pursuant to the Court's November 20, 2024 Order, D.I. 1433 (the "Order"). The Order invited "interested entit[ies]" to provide their "views as to whether the Special Master should develop and disclose to potential bidders (including Amber Energy) a list of material terms that any successful bidder must agree to" and as to "the framework by which the Special Master will evaluate which bid is the best available and whether to recommend that the Court approve that bid." Order ¶¶ 3, 6.

For the reasons explained herein, the 2020 Bond Entities respectfully request that the Court direct (i) the Special Master to require that bidders agree not to seek to impair the 2020 Bond Entities' contractual rights under the 2020 Bonds and governing documents, or, at a minimum, (ii) that the framework for the Special Master's evaluation of bids should assume that provisions in any bid contemplating efforts to impair the 2020 Bond Entities' contractual rights will be contested and should therefore weigh heavily against recommending such a bid. The 2020 Bond Entities reserve the right to request further relief upon review of the unredacted Stock Purchase Agreement that the Order requires the Special Master to file today.

### PRELIMINARY STATEMENT

The documents governing the 2020 Bonds grant the 2020 Bond Entities structural seniority, lien rights, rights to accrual of interest, and voting rights with respect to their Collateral shares. There is no legal basis to strip them of those contractual rights. Any bid for PDVH that contemplates impairing the 2020 Bond Entities' rights so structured will at best result in years of litigation that will substantially delay any closing. Far more likely, the 2020 Bond Entities'

challenges will succeed and the proposed transaction, to the extent that it is conditioned on impairing the 2020 Bond Entities' rights, will be unable to close.

The 2020 Bond Entities' concerns are not speculative. The Special Master has recommended that the Court approve a bid for PDVH that contemplates impairing the rights of the 2020 Bond Entities. As set forth in the 2020 Bond Entities' prior submission, that bid (the "SPA") contemplates efforts by the Special Master and the bidder to illegally impair the rights of the 2020 Bond Entities, including through improperly seeking the release of the lien held by the Collateral Agent for the benefit of the 2020 Bonds; improperly attempting to stop the accrual of interest owed to the 2020 Bondholders; improperly upstreaming assets of CITGO in violation of restrictions in the 2020 Bond governing documents; and improperly disregarding the 2020 Bond Entities' voting rights in collateralized CITGO Holding Shares. The financing of the SPA may also contemplate the diversion of CITGO Holding assets in violation of the Pledge Agreement governing the 2020 Bonds, to which PDVH is a party. The 2020 Bond Entities will vigorously oppose approval of the SPA, or any other bid with similar provisions, and any effort to impair their rights.

There is no reason for the Special Master to recommend or for the Court to approve such a bid. As the Court recognized in the analogous circumstance of the pending alter ego claims, bidders are free to take account of the claims of the 2020 Bond Entities in pricing their bids. That is, they can either commit to satisfying the 2020 Bond Entities' claims or incorporate into the price they are willing to pay the risks to PDVH associated with those claims. But they should not be permitted to disregard the 2020 Bond Entities' rights for their benefit or for the benefit of the structurally junior judgment creditors who are the intended beneficiaries of the PDVH auction.

Accordingly, the Court should direct the Special Master to require that any bid adhere to the following material terms preserving the 2020 Bond Entities' rights.

*First*, bidders should not seek to release the Collateral without the 2020 Bond Entities' consent in violation of the governing Pledge Agreement and Indenture. We are aware of no precedent for any court, outside of the bankruptcy context, permitting the release of contractually specified collateral in violation of governing documents and without the consent of the lenders.

*Second*, bidders should not seek to halt the accrual of interest owed to the 2020 Bond Entities. The 2020 Bond Entities are entitled to continued accrual of contractual and statutory prejudgment interest until the 2020 Bonds are fully repaid—an amount that already approaches one billion dollars on top of approximately $1.68 billion in unpaid principal due when PDVSA defaulted on the Bonds in 2019, and that could accrue hundreds of millions more before the 2020 Bondholders' claims are resolved. There is no legal basis for any bidder to halt the accrual of interest.

*Third*, bidders should not be permitted to impair the voting rights of the Trustee and the Collateral Agent with respect to the Collateral shares.

*Fourth*, bidders should not be permitted to use CITGO Holding assets for their own benefit (including to finance an acquisition of PDVH) in violation of provisions of the Pledge Agreement intended to preserve the value of the 2020 Bond Collateral.

At a minimum, should the Court determine not to grapple with these issues at this juncture, the Court should direct the Special Master, in evaluating which bid is the best available and whether to recommend that the Court approve that bid, to strongly disfavor any bid that contemplates or is conditioned upon efforts to impair the 2020 Bond Entities' rights. To avoid

3

any doubt, the 2020 Bond Entities will strongly oppose any such bid and will aggressively challenge any such efforts.[1]

**FACTUAL BACKGROUND**

A. **The 2020 Bonds**

As the 2020 Bond Entities explained in their prior submission, D.I. 1375-1, the 2020 Bonds were issued in connection with an exchange offer, first announced on September 16, 2016, by which PDVSA offered to exchange newly issued 2020 Bonds for earlier-issued notes due in 2017 (the "2017 Bonds"). *Petróleos de Venezuela S.A.* v. *MUFG Union Bank, N.A.*, 495 F. Supp. 3d 257, 265 (S.D.N.Y. 2020) ("*MUFG*"), *vacated and remanded*, 106 F.4th 263 (2d Cir. 2024). To induce investors to participate, the 2020 Bonds were secured by a pledge from PDVH of 50.1% of the equity in CITGO Holding (the "Collateral"). *Id.* at 261. As PDVSA acknowledged at the time and as investors recognized, PDVSA was likely to default on the 2017 Bonds unless the exchange was successful and, had such a default occurred, holders of the existing 2017 Bonds, most of which were held in the United States and in other jurisdictions outside of Venezuela, would likely have pursued repayment by seizing PDVSA's interest in PDVH. Case No. 1:19-cv-10023-KPF, D.I. 139 ¶ 131; D.I. 151-12 at 1; D.I. 121-1 at 23.

The documents governing the exchange offer and the Collateral, including the Indenture and Pledge Agreement, provide the Trustee and the Collateral Agent with critical protections, for the benefit of the 2020 Bondholders, following an Event of Default.[2] Among other things, the Pledge Agreement, to which PDVH is a party, authorizes the Collateral Agent,

---

[1] Any future actions in this matter by the Trustee and the Collateral Agent are subject to appropriate direction by 2020 Bondholders in accordance with the Indenture and applicable law.

[2] Under the Indenture, the holders of a majority of the outstanding principal amount of the 2020 Bonds have the right to direct the remedial actions of the Trustee and Collateral Agent, subject to the conditions set forth therein.

4

as instructed by the Trustee in writing, following an Event of Default, to foreclose on and sell the Collateral without the need to commence any judicial process. Pledge Agreement § 5.02(a) (annexed hereto as Exhibit 2, hereinafter "Pledge Agreement").

In the event the Collateral is not sold immediately following an Event of Default, the Pledge Agreement prohibits any distributions on the Collateral to be made to PDVH or any other entity. Section 2.05(c) of the Pledge Agreement provides in relevant part:

> If any Event of Default has occurred and is continuing, . . . **all profits and other distributions on the Securities [i.e., the Collateral shares of CITGO Holding] shall be paid directly to the Collateral Agent** and retained by it as part of the Collateral, subject to the terms of this Agreement. . . .

(Emphasis added.) The Pledge Agreement further provides that if PDVH receives any assets or other consideration in breach of Section 2.05(c), it must hold the consideration in trust for the Collateral Agent. Pledge Agreement § 2.05(f).[3]

The Pledge Agreement further grants the 2020 Bond Entities the right to act as "outright owner" of the Collateral following an Event of Default, including the right to vote the Collateral shares. Specifically, Section 2.05(d) authorizes the Collateral Agent, following an Event of Default, at the written direction of the Trustee, to direct PDVH "to vote the Securities representing the Pledged Shares [i.e., the Collateral]"; obligates PDVH to vote the Securities as

---

[3] Sections 2.05(c) and (f) of the Pledge Agreement read in full:

(c) If any Event of Default has occurred and is continuing, and whether or not the Collateral Agent, as directed in writing by the Trustee, or the requisite Holders seek or pursue any right, remedy, power or privilege available to them under Applicable Law, this Agreement or any other Transaction Document, all profits and other distributions on the Securities shall be paid directly to the Collateral Agent and retained by it as part of the Collateral, subject to the terms of this Agreement. . . .

(f) All payments, proceeds, dividends, distributions, monies, compensation, property, assets, instruments or rights that are received by the Pledgor contrary to the provisions of this Section 2.05 shall be received and held in trust for the benefit of the Collateral Agent for the benefit of the Secured Parties, shall be segregated by the Pledgor from other funds of the Pledgor and shall be forthwith paid over to the Collateral Agent in the same form as so received.

5

directed; and otherwise empowers the Collateral Agent "to act with respect to the Collateral as outright owner thereof." *Id.* § 2.05(d).[4]

The Indenture entitles the 2020 Bondholders to contractual 8.5% annual interest until the principal on the Bonds is fully paid or duly provided for. Indenture §§ 2.08(b), 5.01(b) (annexed hereto as Exhibit 1, hereinafter "Indenture"). The Indenture permits PDVSA to defease the 2020 Bonds only by "irrevocably" depositing sufficient amounts to pay all principal and interest due with the Trustee or its designee for the benefit of the 2020 Bondholders and satisfying certain other conditions. *Id*. § 8.12. The Indenture provides no similar option to PDVH or a buyer of PDVH.

The Exchange Offer was the subject of political controversy in Venezuela. At the time of the Exchange, the United States recognized the government of President Nicolas Maduro as the legitimate government of the Republic. *MUFG*, 495 F. Supp. 3d at 264. The opposition-controlled National Assembly criticized the Exchange Offer. *Id.* at 276–77. But, as Judge Failla found, the National Assembly's resolution did not "deem the Exchange Offer to be illegal, invalid, or void in any manner." *Id.*

PDVSA and PDVH represented to investors that the Exchange Offer was duly authorized, valid, and enforceable, and disclosed no risk that the Bonds were subject to challenge under Venezuelan law. PDVSA represented in the Indenture that the Exchange Offer was "duly authorized" and that it had done "all things necessary to make the [Bonds]" its "valid obligations." Indenture at 1. PDVH likewise represented that the Pledge Agreement did "not

---

[4] Section 2.05(d) of the Pledge Agreement provides:

The Collateral Agent (acting at the written direction of the Trustee) shall be entitled under this Agreement, upon the occurrence and during the continuation of any Event of Default, to instruct and direct the Pledgor [i.e., PDVH], and upon such instruction or direction the Pledgor shall be obligated, to vote the Securities representing the Pledged Shares in the manner and within the time frames indicated in such instruction or direction and otherwise to act with respect to the Collateral as outright owner thereof.

6

contravene any Applicable Law," including Venezuelan Law. Pledge Agreement § 3.01(b). The Offering Circular provided to investors contained twenty-eight pages of detailed risk disclosures, but identified no risk that the Bonds might be deemed illegal, unlawful, or invalid. Offering Circular, Case No. 1:19-cv-10023-KPF, D.I. 121-1 at 18–46.

### B. PDVSA's Default on the 2020 Bonds

After making payments of principal and interest through April 2019, PDVSA failed to make a required payment of principal and interest due on October 27, 2019. *MUFG*, 495 F. Supp.3d at 261, 267. PDVSA's failure to pay principal when due gave rise to an Event of Default under the Indenture. *Id*. On December 18, 2019, holders of the requisite amount of 2020 Bonds sent an Acceleration Notice (as defined in the Indenture) stating that Events of Default had occurred and were continuing, and declaring, pursuant to Section 5.01(b) of the Indenture, that the principal of, premium, if any, on, and accrued interest and additional amounts, if any, on the 2020 Bonds were "immediately due and payable." Case No. 1:19-cv-10023-KPF, D.I. 139 ¶ 271.

Those Events of Default continue. There is currently approximately $1.68 billion in unpaid principal on the 2020 Bonds, together with accrued contractual and prejudgment interest of nearly one billion dollars and additional amounts owed including fees and costs. Case No. 19-cv-10023-KPF, D.I. 229 at 2–3 (Dec. 12, 2020). In 2020, the district court in *MUFG* determined that the amount owed by PDVSA was increasing by more than $450,000 per day, or approximately $164 million annually. *Id*. at 2.

### C. The Southern District Action

On October 29, 2019, two days after defaulting on its payment of principal and interest, PDVSA, together with PDVSA Petróleo (a PDVSA subsidiary and the guarantor of the 2020 Bonds) and PDVH, filed suit in the Southern District of New York against the Trustee and

7

the Collateral Agent seeking a declaration that the 2020 Bonds were "invalid, illegal, null and void ab initio, and thus unenforceable" under Venezuelan law. Case No. 1:19-cv-10023-KPF, D.I. 1 ¶ 1; *MUFG*, 495 F. Supp. 3d at 267. The PDVSA parties alleged that this was so because the documents governing the 2020 Bond issuance were allegedly "contracts of national public interest" under the Venezuelan Constitution requiring approval by the Venezuelan legislature. *MUFG*, 495 F. Supp. 3d at 263.

The Trustee and the Collateral Agent filed an answer and counterclaims seeking a declaratory judgment that the 2020 Bonds were valid and enforceable; that an Event of Default had occurred; that the Trustee and Collateral Agent were entitled to exercise their contractual rights upon an Event of Default (subject to any necessary approvals by the United States government), and that they are entitled to damages for breach of contract, breach of warranty, and a range of equitable claims. *MUFG*, 495 F. Supp. 3d at 267; Case No. 1:19-cv-10023-KPF, D.I. 40 at 20–21, 37–50.

Judge Failla granted summary judgment in favor of the Trustee and the Collateral Agent. *MUFG*, 495 F. Supp. 3d at 293. She held that the validity and enforceability of the Bonds were governed by New York law, not Venezuelan law, and that the Bonds were "indisputabl[y]" valid under New York law. *Id.* at 292. Judge Failla accordingly declared that the 2020 Bonds and the governing Bond documents were valid and enforceable; "that a default has occurred under the terms of the Indenture"; and that the Trustee and the Collateral Agent were entitled to enforce their rights under the Pledge Agreement. *Id.* at 293. Judge Failla also rejected the PDVSA parties' argument that the Bonds should be deemed invalid under the act of state doctrine. *Id.* at 270–83. While noting that the parties had submitted extensive expert

8

reports on Venezuelan law, Judge Failla elected not to address whether under that law the Bonds or the governing documents were "national public interest contracts." *Id*. at 263 n.3.

On appeal, the Second Circuit certified questions regarding the governing law to the New York Court of Appeals, and the Court of Appeals held that the validity of the Bonds was governed by Venezuelan law. *Petróleos de Venezuela S.A.* v. *MUFG Union Bank, N.A.*, 235 N.E.3d 949, 955 (2024). The Court of Appeals emphasized the "limited nature" of its inquiry, *id*., and stressed "that New York Law governs the transaction in all other respects, including the consequences if a security was 'issued with a defect going to its validity,'" *id*. at 951 (quoting N.Y. UCC § 8-202(b)(1)–(2)). In particular, the court noted, "[e]ven if a security issued by a Venezuelan entity is invalid under Venezuelan law, the effect of that invalidity is nonetheless governed by New York law." *Id*. at 957. The Second Circuit remanded the action to Judge Failla for further consideration in light of the Court of Appeals decision. *Petróleos de Venezuela S.A.* v. *MUFG Union Bank, N.A.*, 106 F.4th 263, 270 (2d Cir. 2024).

Judge Failla has established a schedule for the submission of expert reports on Venezuelan law and the act of state doctrine. The parties' opening submissions are due January 17, 2025, and responsive submissions are due March 18, 2025. Case No. 1:19-cv-10023-KPF, D.I. 320 at 11.

D. **The Special Master's Recommendation and the Court's Order**

On September 27, 2024, the Special Master filed a Notice of Special Master's Recommendation preliminarily recommending approval of a sale of PDVH to Amber Energy Inc. (the "Buyer"), a subsidiary of Elliott Investment Management L.P. D.I. 1325. The Special Master's recommendation was accompanied by a proposed SPA, including a Term Sheet setting forth certain additional terms of the transaction.

As the 2020 Bond Entities' prior submission demonstrated, D.I. 1375-1, the SPA

9

(including the Term Sheet) includes provisions that seek to illegally impair the rights of the 2020 Bond Entities.  For example, the proposed transaction contemplates that the lien held by the Collateral Agent for the benefit of the 2020 Bonds will be released without the contractually required consent of the 2020 Bondholders or compliance with the governing agreements; that the accrual of interest owed to the 2020 Bondholders will be stopped, contrary to the terms of the Bonds and the Indenture, before their rights are satisfied in full, and even while the *PDVSA* v. *MUFG* Action continues; that the Buyer could cause PDVH to upstream assets of CITGO Holding to PDVH or (in some instances) the Buyer in violation of restrictions in the 2020 Bond governing documents; and that the Buyer could disregard the 2020 Bond Entities' voting rights in collateralized CITGO Holding Shares.  *Id.* at 5–10.  The 2020 Bond Entities requested, among other things, that the Court direct the Special Master to negotiate a new SPA that respects the 2020 Bond Entities' rights.

On November 20, 2024, the Court issued the Order addressing its inclinations concerning numerous substantive and procedural issues with the proposed transaction.  With respect to the 2020 Bond Entities' submission, the Court stated that it was not inclined to grant their request that it direct the Special Master to negotiate a new SPA, but did not express a view on the substance of the 2020 Bond Entities' objections to the SPA.  Order ¶ 9.  As the Court noted, the Special Master has not yet made a Final Recommendation, much less an Updated Final Recommendation following the Topping Period. *Id*. ¶ 5.

The Court also expressed its inclination to deny the Special Master's motion to enjoin pending alter ego claims. *Id*. ¶¶ 4–5.  The Court reasoned that, while the alter ego claims might affect the value of the PDVH shares, bidders were capable of pricing the risks posed by those claims in their bid.  The Court reasoned:

10

> [F]undamentally, while the Alter Ego Claims may impact the value of the PDVH Shares . . . , the Court's obligation is to market those shares in a manner designed to maximize their true value, recognizing that the true value may turn out to be negatively impacted by the Alter Ego Claims, but that reality (if it proves true) does not necessarily empower the Court to enjoin or impede those claims.

*Id.* ¶ 4.A

The Order invited the parties, including any "other interested entity," to express their views on the Court's inclinations, including with respect to "whether the Special Master should develop and disclose to potential bidders (including Amber Energy) a list of material terms that any successful bidder must agree to" and "the framework by which the Special Master will evaluate which bid is the best available and whether to recommend that the Court approve that bid." Order ¶¶ 3, 6.

## ARGUMENT

The Court should direct the Special Master to require that any potential bidder for the equity of the pledgor, PDVH, follow the law by respecting the rights of the 2020 Bond Entities under the Indenture and the Pledge Agreement by requiring those bidders to agree to material terms that protect those rights. At a minimum, the Court should direct the Special Master to adopt a framework for evaluating bids that significantly disfavors any bids that seek to impair the 2020 Bond Entities' rights.

### I. The Special Master Should Not Recommend Any Bids That Contemplate or Are Conditioned on Impairments of the 2020 Bond Entities' Rights

In order to increase the likelihood of a successful transaction and avoid unnecessary delay, the Court should direct the Special Master not to recommend any bids that contemplate or are conditioned upon impairing the rights of the 2020 Bond Entities without the required consents being granted by the 2020 Bond Entities in accordance with the relevant

11

governing agreements. Should the Special Master recommend a bid containing any such provisions, the 2020 Bond Entities would strongly oppose approval of such a bid.

### A. Bidders Should Agree Not to Seek the Nonconsensual Release of the Collateral Lien

The Special Master should not recommend any bid that seeks to release the lien on the 2020 Bond Collateral without the 2020 Bond Entities' consent and in violation of the Indenture and Pledge Agreement. Any such release—whether in a proposed transaction with Amber Energy or another buyer—without the consent of holders of at least two-thirds of the 2020 Bonds would violate the express terms of the Indenture and Pledge Agreement. *See* Indenture § 9.02(b) ("no amendment, supplement or waiver may release any Lien on Collateral" without the consent of holders of at least 66-2/3% of the outstanding Bonds); Pledge Agreement § 7.03 (permitting release of Collateral only upon the Termination Date or the application of the purchase price of Collateral purchased by the Collateral Agent or with the consent of "at least 66 2/3% aggregate in principal amount of the outstanding Notes"); *id*. § 1.01(b) (defining "Termination Date" as the date on which all of the 2020 Bonds and all other obligations secured by the Collateral "have been repaid in full in cash").[5]

Courts in New York and elsewhere specifically enforce parties' agreements to supply collateral according to contractual terms, and have repeatedly rejected attempts to substitute those obligations with cash or money damages. *See, e.g.*, *Liberty Mut. Fire Ins. Co.* v. *JDS Constr. Grp. LLC*, 2023 WL 6143559, at *6 (S.D.N.Y. Sept. 20, 2023) (noting a party's obligation to supply collateral "is subject to enforcement by specific performance because the damage resulting from the failure to give security is not ascertainable, and the legal remedy is

---

[5] The Trustee and Collateral Agent have additional rights and powers under the Indenture and Pledge Agreement that cannot be disregarded.

12

therefore inadequate"); *TCW Gem V. Ltd.* v. *Grupo Iusacell Celular, S.A. de C.V.*, 7 Misc. 3d 1008(A), 801 N.Y.S.2d 243 (Sup. Ct. 2004) (allowing plaintiff to seek specific performance because "[t]he damage resulting from the failure to give security is not ascertainable, and the legal remedy is therefore inadequate"); *R&G Props., Inc.* v. *Column Fin., Inc.*, 184 Vt. 494, 504 (2008) ("[B]orrower asks that we construe the contract to require lenders to accept partial collateral substitution when the parties' agreement does not explicitly require them to. In this case, the parties' intent as reflected in the language of the contract is clearly to the contrary.").

*Rievman* v. *Burlington Northern Railroad Company*, 618 F. Supp. 592 (S.D.N.Y. 1985), is on point. In that case, a railroad company, which had issued bonds secured by a mortgage on millions of acres of land that had later greatly increased in value, entered into agreements with the bond trustees to substitute the lien on the mortgaged land with irrevocable trusts containing government securities sufficient to pay all remaining principal and interest on the bonds. *Id.* at 594. The court granted a preliminary injunction in favor of bondholders challenging the transaction. While noting that the substitution of collateral would give bondholders "an iron-clad guarantee of timely payment of interest and principal," *id.* at 595, the court reasoned:

> The bonds . . . are a contract between the Railroad and the bondholders. The contract included the provision that a particular collateral . . . would secure the debt, and it did not provide for the substitution or release of that particular collateral. . . . ***If the Railroad now wishes to substitute collateral—if it wishes to vary the terms of the contract—it cannot do so without obtaining the consent of the bondholders***.

*Id.* at 598 (emphasis added).

Here, too, the Collateral cannot be substituted absent following the procedures set forth in the Indenture and Pledge Agreement, and any bid conditioned on releasing or substituting the Collateral could not for that reason be implemented. Buying the equity of a

13

company simply does not discharge its existing contractual duties or release any preexisting lien on its assets. By requiring potential bidders to agree to avoid illegal attempts to substitute the Collateral over objection from the 2020 Bond Entities, the Special Master can help prevent unnecessary delay, as any transaction that turns on nonconsensual substitution of the 2020 Bondholders' Collateral will be subject to challenge and is doomed to fail.

### B. Bidders Should Agree Not to Seek to Halt the Accrual of Interest on the 2020 Bondholders' Claims

For similar reasons, the Special Master should reject any bid that seeks to improperly halt the accrual of interest at the contractual rate on the 2020 Bonds or prejudgment interest on any unpaid interest payments. Any such provision would squarely violate the Indenture, which provides that semiannual interest is payable on the 2020 Bonds at an annual rate of 8.5% until the principal is fully paid or duly provided for. Indenture §§ 2.08(b), 5.01(b). Separately, the 2020 Bond Entities are also entitled to prejudgment interest as a matter of right under New York law. N.Y. CPLR § 5001(a); *see NML Capital* v. *Rep. of Argentina*, 17 N.Y.3d 250, 258–59 (2011) (holding that issuer was required to make contractual interest-only payments following Event of Default until bonds are paid in full, and that bondholders were entitled to statutory prejudgment interest on unpaid interest payments). Bidders may not, as the proposed SPA appears to contemplate, terminate the accrual of interest at the contract rate by depositing funds into escrow. *LTV Corp.* v. *Gulf States Steel, Inc.*, 969 F.2d 1050, 1063 (11th Cir. 1993) (defendant cannot avoid accrual of interest at contract rate following default by depositing disputed funds with the court). Accordingly, any bid contemplating an effort to terminate the accrual of interest on the 2020 Bonds could not be implemented.

      **C.**      **Bidders Should Agree Not to Impair the 2020 Bond Entities'
Post-Event of Default Rights to Vote the Collateral Shares or
Otherwise Act as the Owner of the Shares**

The Special Master should require that bidders agree to refrain from impairing the rights of the 2020 Bond Entities following an Event of Default to vote the shares and otherwise act as their owner. The Pledge Agreement provides that, following an Event of Default, at the written direction of the Trustee, the Collateral Agent may direct PDVH "to vote the Securities representing the Pledged Shares [i.e., the Collateral]" (and obligates PDVH to vote the Securities as directed), and otherwise authorizes the Collateral Agent "to act with respect to the Collateral as outright owner thereof." Pledge Agreement §§ 2.05(c), (d). Any bid contemplating action by CITGO Holding following closing that fails to take account of the 2020 Bond Entities' voting and other ownership rights to 50.1% of the shares of CITGO Holding is doomed to fail and for that reason should not be recommended.

      **D.**      **Bidders Should Agree Not to Seek to Upstream CITGO
Holding Assets in Violation of the Pledge Agreement**

The Court should direct the Special Master to require that any potential bidder agree to abide by the provisions in the documents governing the 2020 Bonds that prevent the diversion of CITGO Holding assets for the benefit of PDVH or third parties and thereby preserve the value of the Collateral.

The Pledge Agreement prohibits distributing "profits and [making] other distributions" on the Collateral to PDVH following an Event of Default. The Pledge Agreement provides that, if an Event of Default has occurred and is continuing, "all profits and other distributions on the Securities shall be paid directly to the Collateral Agent and retained by it as part of the Collateral." *Id.* § 2.05(c). It further requires that "[a]ll payments, proceeds, dividends, distributions, monies, compensation, property, assets, instruments or rights that are

15

received by [PDVH] contrary to the provisions of this Section 2.05" be "held in trust for the benefit of the Collateral Agent for the benefit of the Secured Parties, . . . [and] forthwith paid over to the Collateral Agent." *Id.* § 2.05(f).  These bargained-for commitments by PDVH are critical to protect the 2020 Bond Entities against the risk that the value of the Collateral is improperly diverted while it is securing PDVSA's obligations on the 2020 Bonds.

The Special Master should require any bidder to comply with these provisions.  In particular, it should not permit bidders to rely on financing for the acquisition of PDVH that contemplates the use of assets of CITGO Holding or its subsidiaries without ensuring that any distributions on the Collateral are made to the Collateral Agent as required by the Pledge Agreement.

## II. At a Minimum, the Court Should Direct the Special Master to Strongly Disfavor Any Bids That Contemplate Efforts to Impair the 2020 Bond Entities' Rights

At a bare minimum, should the Court determine not to address these issues now, the 2020 Bond Entities respectfully submit that the Special Master's framework for evaluating bids should strongly disfavor bids that contemplate impairment of the 2020 Bond Entities' contractual rights.  The approval of any such bid, and any effort to impair the 2020 Bond Entities' rights, would be aggressively challenged by the 2020 Bond Entities and would result in protracted litigation that could delay any closing for an extended period, and such efforts almost certainly would not survive that challenge.  For the avoidance of doubt, the 2020 Bond Entities intend to oppose—and reserve all rights to oppose—the approval of any bid that seeks to impair their rights and any effort to impair those rights.[6]

---

[6]  Any future actions in this matter by the Trustee and the Collateral Agent are subject to appropriate direction by 2020 Bondholders in accordance with the Indenture and applicable law.

16

Impairing the 2020 Bondholders' claims would also be inequitable. Their interest in CITGO Holding is structurally senior to the claims of the Judgment Creditors in these proceedings. The Court should not approve—and the Special Master should not recommend—any transaction that impairs the 2020 Bond Entities' structural seniority for the benefit of third party bidders or junior creditors.

## CONCLUSION

For the foregoing reasons, the Court should direct the Special Master to require that any potential bidder agree not to seek to impair the rights of the 2020 Bond Entities as set forth above. At a minimum, the framework for the Special Master's evaluation of any bids should strongly disfavor any bids that contemplate efforts to impair the 2020 Bond Entities' rights.

Respectfully submitted,

*s/ Daniel A. Mason*
Daniel A. Mason (#5206)
PAUL, WEISS, RIFKIND,
    WHARTON & GARRISON LLP
1313 North Market St., Suite 806
Wilmington, DE 19801
Telephone: 302-655-4410
Facsimile: 302-655-4420
Email: dmason@paulweiss.com

*Counsel for 2020 Bond Entities*

Dated: November 26, 2024

OF COUNSEL:

Jonathan Hurwitz
PAUL, WEISS, RIFKIND,
    WHARTON & GARRISON LLP
1285 Avenue of the Americas
New York, New York 10019-6064
Telephone: 212-373-3000
Facsimile: 212-757-3990
Email: jhurwitz@paulweiss.com