IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| CRYSTALLEX INTERNATIONAL CORP., | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Misc. No. 17-151-LPS |
| | ) |
| BOLIVARIAN REPUBLIC OF VENEZUELA, | ) |
| | ) |
| Defendant. | ) |

**SUBMISSION OF AMBER ENERGY INC. PURSUANT TO
COURT'S NOVEMBER 20, 2024 ORDER AND INCLINATIONS [D.I. 1433]**

Amber Energy Inc. ("Amber"), as a prospective buyer of the PDVH Shares, respectfully submits this statement regarding the Court's Inclinations set forth in the Court's November 20, 2024 Order and Inclinations (the "Order and Inclinations") [D.I. 1433].[1][2]

As a threshold matter, in light of the Court's Order and Inclinations and rationale, Amber has no objection to making its prior proposed SPA version public (although, as set forth below, this non-binding, proposed SPA conditioned on court approval is now largely moot despite Amber being ready and willing to pursue it). D.I. 1433 at 5.[3] Next, Amber agrees that appropriate bidding protections should be approved by the Court as soon as possible and such protections should include a customary breakup fee, a reasonable topping period, good-faith deposit, and other

---

[1] Capitalized terms used but not defined herein have the meanings given to them in the Order and Inclinations, and all references to the docket index ("D.I.") are to the *Crystallex* docket, Misc. No. 17-mc-151, unless otherwise noted.

[2] Amber submits this statement as an interested party in line with the Court's request. D.I. 1433 at 8 (allowing submissions by "interested entit[ies]"); *see also* D.I. 1380 (Court order granting Amber to leave to file brief as Amicus Curiae).

[3] Consistent with the Order and Inclinations, certain information will continue to be redacted including CITGO's confidential business information. D.I. 1433 at 12 n.7.

provisions that would apply regardless of which bidder is selected. *See* D.I. 1433 at 10-11.[4] Amber understands that once those protections are approved by the Court, the Special Master may thereafter select an initial lead bidder and that bidder will automatically benefit from those protections without the need for further approval.

To date, Amber has faithfully followed the process established by the Court and directed by the Special Master. Throughout the sale process, Amber had understood that the alter-ego litigation overhang would be resolved in connection with a sale of the PDVH Shares. Amber respectfully submits that the Court's inclination not to require parties—including those that have already appeared before the Court—to resolve any such claims against PDVH in connection with the sale of PDVH will create a chaotic environment that will negatively impact the purchase price. Although the Court noted the Injunction Motion "appears to be unnecessary and unwarranted" (D.I. 1433 at 9), it may have done so in part on mistaken premises: *First*, that Amber's Alternative Transaction Term Sheet suggested that it was prepared to acquire the PDVH Shares without such an injunction—it did not, and the Alternative Transaction Term Sheet expressly included a condition precedent on obtaining an injunction order; *second*, that another bidder submitted a viable unconditional bid—Amber doubts that is the case; and *third*, that materially identical claims were filed, have been pending, and were disclosed to, and therefore must have been considered by, potential bidders—it is actually that very consideration that supports an injunction. Thus, Amber

---

[4] As Amber has stated, it cannot "continue to be involved in a sale process in which the Court-approved rules are changed mid-stream." D.I. 1373-3, at 2 (Joint Status Report). The SPO specifically contemplates bidding protections, and Amber believed based on the Special Master's representations, that everything Amber was doing was in accordance with and pursuant to the SPO (as modified by the Special Master and the Court). Although the bid set forth in Amber's SPA is inoperative absent an injunction, and therefore cannot serve as a floor, any bidder (Amber or otherwise) will want to know that it will receive bid protections *before* it will agree to put forth a bid that could be used as a floor.

wishes to correct the record, at least as to Amber's own prior bids, so the Court can consider these facts before rendering its final determination.

### A.     The Sale Process To Date

To date, the Special Master, utilizing his and his legal and financial advisors' expertise in M&A transactions, has sought to conduct a robust sale process amid the unique challenges of selling a domestic company against the will of its foreign sovereign owners. Amber, for its part, has participated in that process from its inception, dedicating extraordinary resources at the cost of millions of dollars to conduct due diligence, develop its bids, assemble a management team, and negotiate a proposed transaction with the Special Master, whom Elliott understood to be implementing the Court-ordered sale process.

#### 1.     *Amber And The Special Master Entered Into The SPA.*

In September, it became clear that (while the economic substance of Amber's bid was largely agreed upon with the Special Master) there were open issues as to the structure, process, and timing that remained largely outside the Special Master or Amber's control. Specifically, both Amber and the Special Master understood that the value of the PDVH Shares (and thus, the amount of liabilities of the Republic that could be satisfied through a sale) could be maximized only if bidders obtained certainty that the sale would be "free and clear" of the Republic's liabilities. Bids were solicited from Amber on that premise and the Injunction Motion was the Special Master's proposed vehicle to achieve that outcome. In that regard, Amber agreed when the Special Master requested that the SPA be put forth as the proposed definitive agreement for the purchase of PDVH, notwithstanding that it was non-binding and conditioned on the Court granting the Injunction Motion before the Court gave any indication that it would. Thus, it was an indication of Amber's good-faith efforts to reach a definitive, value-maximizing, and actionable agreement

3

with the Special Master who, in his experienced judgment and that of his legal and financial advisors, deemed Amber's bid the best-available.

### 2. *Amber Proposed The Alternative Transaction At The Special Master's Request.*

When the Special Master asked Amber to submit an alternative transaction to address concerns with the proposed SPA raised by Crystallex and ConocoPhillips, including to condition the sale on a narrower injunction, Amber did so, while also keeping the proposed SPA in place.

Amber's Alternative Transaction proposal reflected a purchase price reduction—but it would pay writholders at closing (rather than escrow all the proceeds until the alter-ego dust settled) and be conditioned only on the Court granting an injunction against those parties that have already appeared in these attachment proceedings. *See* D.I. 1414-1. Although Amber's Alternative Transaction did not include an escrow of the sale proceeds to protect against *unknown* and *unasserted* alter-ego claims, it was still conditioned on enjoining at least the parties that have appeared before the Court in these proceedings—a condition that Amber continues to believe is well within the Court's authority and is consistent with the scope of the injunction contemplated in the Special Master's Proposed Order submitted on October 18, 2024. D.I. 1414-1 at 7;[5] D.I. 1374-1. The Alternative Transaction, to be clear, never contemplated the possibility of purchasing the PDVH Shares in the absence of any injunction at all. Instead, it was merely Amber's attempt

---

[5] The "Alternative Transaction Closing Conditions" includes: "the injunction contemplated by the Injunction Motion shall be limited in scope to enjoin all claimants or writ holders who have filed an Attached Judgment Statement in the Specified Litigation or who are Attached Judgment Creditors, shall have become final and non-appealable, shall not be subject to any stay, and shall not have been vacated or modified in a manner adverse to the Buyer in the Buyer's sole discretion; or if the Injunction Motion was appealed, and such appeal is not dismissed, the Third Circuit shall have affirmed the Injunction Motion and shall not have vacated or modified it in a manner adverse to the Buyer in the Buyer's sole discretion." D.I. 1414-1 at 7.

to meet the Special Master's requests throughout this process and to assuage concerns raised by Crystallex and ConocoPhillips about the structure set forth in the SPA.

### 3. The SPA And The Alternative Transaction Are Moot Without An Injunction.

Consummation of a sale pursuant to the SPA has always been expressly conditioned upon the Court granting a broad injunction to prevent *any* party from asserting alter-ego claims against PDVH or its subsidiaries for the legacy liabilities of the Republic or PDVSA after the sale. In other words, the transaction contemplated by the SPA is expressly conditioned on the granting of the Injunction Motion and the attendant adjudication by this Court of the Alter-Ego Claims. Absent such an injunction and merits determination, the SPA's conditions precedent will not be met; accordingly, the SPA will be moot. *See* D.I. 1325-1 § 7.2(e) (condition precedent to closing is that "the Injunction Motion shall have been granted"); D.I. 1433 at 9 ("The Court is presently inclined to deny the Injunction Motion."). Regardless, Amber understands that the Court has directed the Special Master to file Amber's unredacted proposed definitive SPA even though it would be non-actionable in light of the Inclinations (and despite Amber's efforts).

As just described, the Alternative Transaction was also conditioned upon an injunction and, thus, is similarly moot if the Court enters an order in line with its Inclinations. Amber has never proposed to acquire the PDVH Shares without any injunction at all. Indeed, without an injunction, Amber would be asked to acquire PDVH in order to extinguish competing interests of creditors only to inherit more litigation from those same parties—that is the opposite of what any purchaser would consider "free and clear." It seems to Amber that, when the same creditors that appeared in the proceedings to attach the PDVH Shares subsequently assert alter-ego claims against PDVH itself, the Court has ample power to enjoin them because a ruling adverse to PDVH would directly affect, and indeed undermine, the *res* that is the subject of the sale. For that reason, Amber agrees

5

with ConocoPhillips that the Court should itself expeditiously determine whether PDVH can be held liable for the debts of the Republic and PDVSA.[6]

### B. Denying The Injunction Motion Will Negatively Impact The Sale Of The PDVH Shares

In the Order and Inclinations, the Court acknowledged that the lack of an injunction (or even a merits determination prior to the sale) will negatively impact the value of the PDVH Shares. *See* D.I. 1433 at 10.  While the Court is of course correct that leaving the *status quo* of unbridled litigation may reflect the present "true value" of the shares, the Special Master was keen to obtain the maximum possible price for PDVH, which necessarily means that litigation would not be foisted on an innocent buyer.  Indeed, Amber would be surprised if *any bidder with financial wherewithal* expressed interest in purchasing the PDVH Shares without protections against continuing alter-ego claims.[7]  Respectfully, Gold Reserve's unsubstantiated statements about having "no conditions" should not lead the Court to believe otherwise.  D.I. 1433 at 9.

Similarly, although certain interested parties characterize additional alter-ego claims as "nuisance" (D.I. 1433 at 9-10), idle commentary is no substitute for a court ruling to that effect and is of zero value to a potential bidder for the PDVH Shares, especially when weighed against the fact that the alter-ego claims have not been dismissed on the merits by any court and are proliferating.  It is the buyer (including any writholder that seeks to credit bid and inherit the

---

[6] *See, e.g., ConocoPhillips Petrozuata B.V. v. Girard Street Investment Holdings LLC*, No. 1:24-cv-01140-LPS (D. Del.) (D.I. 1) (ConocoPhillips Declaratory Judgment Complaint).  The Court noted that ConocoPhillips commenced a declaratory judgment action concerning the status of PDVH as an alleged alter ego of the Republic/PDVSA, but did not indicate how or when it would dispose of that action. *See* D.I. 1433 at 10 n. 6.

[7] Again, the Court pointed to Amber's Alternative Transaction and Gold Reserve's statements as supporting the potential for a bid not conditioned on alter-ego protections. D.I. 1433 at 5.  But, as noted, Amber's Alternative Transaction required an injunction.  As to Gold Reserve's statements, Amber cautions against relying on unsupported statements of competing bidders who were not selected by the Special Master, and otherwise defers to the Special Master to dutifully inform the Court as to the credibility of those statements.

6

litigation as its own) that will bear the costs, distraction, and risks of defending potentially over $100 billion of claims against the Republic that theoretically could be asserted as reverse veil-piercing claims after closing. While Amber expects that such claims ultimately will be adjudicated as meritless, the absence of an injunction in this Court significantly increases the risk profile of this investment by leaving the buyer subject to broad litigation overhang in multiple other courts, as recent events have shown.[8] No matter what, without an injunction, the risk of fractured, piecemeal resolution of multiple claims in different forums at both the state and federal level will prove a costly distraction, particularly where, as here, the new owner has had nothing to do with the Republic or PDVSA, but will nevertheless be forced to defend against their creditors' collection efforts.

### C. The Pendency Of Alter-Ego Claims Is Exactly Why An Injunction Is An Appropriate Vehicle To Ensure The Sale Was "Free And Clear"

The pendency of alter-ego claims throughout the sale process should not be understood by the Court to mean that bidders have been willing to assume the risk on such claims. To the contrary, the status of those suits created the desire to have this Court expressly confirm that any sale would extinguish any interests that creditors of the Republic or PDVSA may have in PDVH or its subsidiaries. It also bears noting that the creditors asserting those claims themselves behaved as though their right to collect against the Republic's stake in CITGO would be marshalled through the attachment of the PDVH Shares. The Rusoro alter-ego claim "pending" in the Southern District of Texas was, in fact, **voluntarily dismissed nearly 16 months ago** by Rusoro who chose to participate in these attachment proceedings. This was over a year before the Special Master selected Amber as Proposed Buyer of the PDVH Shares. *See* Order of Dismissal Without

---

[8] *See, e.g., Girard Street Investment Holdings LLC, et al. v. Petroleos de Venezuela, S.A., et al.*, No. 1:24-cv-04448-JSR (S.D.N.Y.).

7

Prejudice, *Rusoro Mining Limited v. Bolivarian Rep. of Venezuela et al.*, No. 4:18-cv-01458 (S.D. Tex. Aug. 4, 2023) (D.I. 20).

      As to the OI European Group alter-ego claim, that was filed but never prosecuted before this Court and has been ***held in abeyance for years*** pending disposition of these attachment proceedings.  *See* Memorandum Order, *OI European Group B.V. v. Bolivarian Rep. of Venezuela et al.*, No. 1:19-cv-00290-LPS (D. Del.).  For its part, OI European Group specifically turned to directly collecting against Venezuela's stake in PDVH through this sale process rather than continuing to prosecute its alter-ego claims against PDVH, CITGO Holdings, Inc., among others.  The status of these suits thus gave bidders every indication that the litigants appropriately viewed these paths to recovery as mutually exclusive, and thus that, at the very least, writholders could not undercut this Court's process by lining up to recover value from the PDVH Shares' sale and then sue PDVH or its subsidiaries as alter-egos.

Dated: November 26, 2024

| | |
|---|---|
| OF COUNSEL:<br><br>Andrew J. Rossman<br>Susheel Kirpalani<br>Matthew R. Scheck<br>QUINN EMANUEL URQUHART & SULLIVAN, LLP<br>51 Madison Avenue, Fl. 22<br>New York, New York 10010<br>(212) 849-7000<br>susheelkirpalani@quinnemanuel.com<br>andrewrossman@quinnemanuel.com<br>matthewscheck@quinnemanuel.com | /s/ Michael A. Barlow<br>Michael A. Barlow (No. 3928)<br>QUINN EMANUEL URQUHART<br>  & SULLIVAN, LLP<br>500 Delaware Avenue, Suite 220<br>Wilmington, Delaware 19801<br>(302) 302-4000<br>michaelbarlow@quinnemanuel.com<br><br>*Attorneys for Amber Energy Inc.* |

-and-

Stephen M. Baldini
Stephanie Lindemuth
Richard J. D'Amato
AKIN GUMP STRAUSS HAUER & FELD LLP
One Bryant Park
New York, New York 10036-6745
(212) 872-1000
sbaldini@akingump.com
slindemuth@akingump.com
rdamato@akingump.com

-and-

Julius Chen
AKIN GUMP STRAUSS HAUER & FELD LLP
Robert S. Strauss Tower
2001 K St NW
Washington, DC 20006-1037
(202) 887-4000
jchen@akingump.com

-and-

Erin E. Murphy
H. Bartow Farr
CLEMENT & MURPHY PLLC
706 Duke Street
Alexandria, VA 22314
(202) 742-8900