Execution Version

**STOCK PURCHASE AGREEMENT**

dated as of

September 27, 2024

between

AMBER ENERGY INC.

and

ROBERT B. PINCUS,

solely in his capacity as the Special Master for the United States District Court for the District of Delaware

# TABLE OF CONTENTS

Page

ARTICLE I DEFINITIONS AND INTERPRETIVE MATTERS ...................................................2

    Section 1.1.        Certain Defined Terms .............................................2
    Section 1.2.        Other Definitional and Interpretive Matters ...............2

ARTICLE II SALE AND PURCHASE OF THE SHARES; CLOSING ......................................4

    Section 2.1.        Sale and Purchase of Shares ....................................4
    Section 2.2.        Closing ....................................................................4
    Section 2.3.        Closing Deliveries of the Parties .............................5

ARTICLE III PURCHASE PRICE ..............................................................................................5

    Section 3.1.        Lock Box Consideration Amount .............................5
    Section 3.2.        Closing Consideration ..............................................7
    Section 3.3.        Good Faith Deposit ..................................................8
    Section 3.4.        Closing Date Payments by the Buyer .......................8
    Section 3.5.        Adjustment to Closing Consideration .......................9
    Section 3.6.        Earn-Out Payment ..................................................12
    Section 3.7.        Withholding ............................................................12

ARTICLE IV REPRESENTATIONS RELATING TO THE COMPANY AND THE
    SPECIAL MASTER ......................................................................13

    Section 4.1.        Corporate Existence; Title to Shares.......................13
    Section 4.2.        Governmental Authorization ...................................14
    Section 4.3.        Non-Contravention .................................................14
    Section 4.4.        Capitalization .........................................................15
    Section 4.5.        Subsidiaries; Non-Controlled Entities. ...................15
    Section 4.6.        Financial Statements ..............................................16
    Section 4.7.        Absence of Certain Changes ...................................17
    Section 4.8.        No Undisclosed Material Liabilities ........................17
    Section 4.9.        Legal Proceedings ..................................................18
    Section 4.10.       Taxes .....................................................................18
    Section 4.11.       Company Benefit Plans; Employment.....................19
    Section 4.12.       Compliance with Laws; Permits .............................24
    Section 4.13.       Regulatory Matters .................................................24
    Section 4.14.       Environmental Matters............................................26
    Section 4.15.       Title to Properties ..................................................26
    Section 4.16.       Material Contracts..................................................27
    Section 4.17.       Intellectual Property and Data Privacy ...................29
    Section 4.18.       Brokers; Financial Advisor .....................................31
    Section 4.19.       Real Property .........................................................31
    Section 4.20.       Government Contracts .............................................33
    Section 4.21.       Business Relationships............................................33
    Section 4.22.       Related Party Transactions .....................................33
    Section 4.23.       Insurance ...............................................................34

i

Section 4.24.     No Additional Representations ...................................................... 34

ARTICLE V REPRESENTATIONS AND WARRANTIES OF THE BUYER ......................... 35

Section 5.1.     Corporate Existence and Power .................................................. 35
Section 5.2.     Corporate Authorization ............................................................. 35
Section 5.3.     Governmental Authorization ...................................................... 36
Section 5.4.     Non-Contravention ...................................................................... 36
Section 5.5.     Litigation ....................................................................................... 36
Section 5.6.     Regulatory Matters ...................................................................... 36
Section 5.7.     Financing ........................................................................................ 37
Section 5.8.     Solvency .......................................................................................... 39
Section 5.9.     No Additional Representations ................................................... 39

ARTICLE VI COVENANTS .................................................................................................. 40

Section 6.1.     Conduct of the Business Pending the Closing ......................... 40
Section 6.2.     Access to Information ................................................................... 46
Section 6.3.     Regulatory Approvals; Third Party Consents .......................... 48
Section 6.4.     Further Assurances ....................................................................... 51
Section 6.5.     Confidentiality ............................................................................... 52
Section 6.6.     Indemnification, Exculpation and Insurance ........................... 52
Section 6.7.     Public Announcements ................................................................. 54
Section 6.8.     Employee Matters .......................................................................... 54
Section 6.9.     The Buyer's Obligations in Respect of Debt Financing ......... 56
Section 6.10.    Company's Obligations in Respect of Debt Financing ........... 59
Section 6.11.    Treatment of Existing Senior Secured Notes ........................... 63
Section 6.12.    Tax Matters ..................................................................................... 65
Section 6.13.    R&W Insurance Policy .................................................................. 66
Section 6.14.    Notices of Certain Events ............................................................ 66
Section 6.15.    No Control of Other Party's Business ....................................... 67
Section 6.16.    OFAC ................................................................................................ 68
Section 6.17.    No Solicitation ............................................................................... 68
Section 6.18.    Court Action ................................................................................... 71
Section 6.19.    Actions Regarding the EPP and RRP ......................................... 72
Section 6.20.    Casualty Loss .................................................................................. 72
Section 6.21.    Termination of Certain Services and Contracts ...................... 73
Section 6.22.    Financial Statements ..................................................................... 74
Section 6.23.    Observation Committee ................................................................ 74
Section 6.24.    Assumed Claims ............................................................................ 75
Section 6.25.    Section 280G ................................................................................... 75
Section 6.26.    Trust Structure Effective Date Matters ..................................... 76
Section 6.27.    Supplements to Company Disclosure Schedules ..................... 77
Section 6.1.     Declaratory Judgment .................................................................. 77

ARTICLE VII CONDITIONS TO CLOSING ........................................................................ 77

Section 7.1.     Conditions Precedent to Obligations of the Parties ............... 77
Section 7.2.     Conditions Precedent to Obligations of the Buyer ................. 78
Section 7.3.     Conditions Precedent to Obligations of the Special Master ... 79

ii

Section 7.4.    Frustration of Closing Conditions........................................................79

ARTICLE VIII TERMINATION .................................................................................79

Section 8.1.    Termination..............................................................................79
Section 8.2.    Effect of Termination................................................................81
Section 8.3.    Termination Fee.......................................................................82
Section 8.4.    Reverse Termination Fee..........................................................83

ARTICLE IX MISCELLANEOUS ...............................................................................84

Section 9.1.    Survival ...................................................................................84
Section 9.2.    Expenses .................................................................................84
Section 9.3.    Governing Law ........................................................................84
Section 9.4.    Dispute Resolution; Consent to Jurisdiction.................................85
Section 9.5.    Consent to Service of Process; Waiver of Jury..............................85
Section 9.6.    Entire Agreement.....................................................................85
Section 9.7.    Amendments and Waivers .........................................................86
Section 9.8.    Notices ....................................................................................86
Section 9.9.    Severability .............................................................................87
Section 9.10.   Binding Effect; Assignment........................................................87
Section 9.11.   No Third Party Beneficiaries .....................................................88
Section 9.12.   Non-Recourse .........................................................................88
Section 9.13.   Specific Performance ................................................................88
Section 9.14.   Successors and Assigns.............................................................89
Section 9.15.   Release ....................................................................................89
Section 9.16.   Counterparts.............................................................................89
Section 9.17.   Debt Financing Sources ............................................................90
Section 9.18.   Special Master and his Representatives' Judicial Immunity ..............91

ANNEX A

Definitions

ANNEX B

Limited Indemnification

EXHIBITS

Exhibit A – Trust Structure Term Sheet
Exhibit B – Earn-Out Term Sheet

WEIL:\99805227\35\67816.0003

## DEFINED TERMS

| Term | Section |
|---|---|
| Acceptable Confidentiality Agreement | Section 6.17(c) |
| Acquired Companies | Annex A |
| Acquisition Agreement | Section 6.17(a) |
| Action | Annex A |
| Additional Judgment Creditors | Annex A |
| Adjustment Escrow Amount | Annex A |
| Advanced Transaction Expenses | Annex A |
| Affected Employees | Section 6.8(c) |
| Affiliate | Annex A |
| Agreed Principles | Annex A |
| Agreement | Preamble |
| Anti-Corruption Laws | Annex A |
| Antitrust Laws | Annex A |
| Audited Financial Statements | Section 4.6(a) |
| Bolivarian Republic of Venezuela | Section 1.2(a)(ix) |
| Borrowing Base Certificate | Section 6.10(a)(xii) |
| Business Day | Annex A |
| Buyer | Preamble |
| Buyer Disclosure Schedules | Article V |
| Buyer Documents | Section 5.2 |
| Buyer Financing Documents | Section 6.26(a) |
| Buyer Related Parties | Section 8.4(a) |
| Buyer Subsidiary | Annex A |
| CapEx Budget | Section 6.1(b)(iii) |
| Cash | Annex A |
| Casualty Loss | Annex A |
| Casualty Loss Amount | Section 6.20(a) |
| Casualty Loss Threshold | Annex A |
| Casualty Repair Deadline | Section 6.20(c) |
| Cause | Section 1.2(a)(x) |
| CITGO Holding | Recitals |
| CITGO Petroleum | Annex A |
| Claim | Annex A |
| Claimholders | Preamble |
| Closing | Section 2.2 |
| Closing Consideration | Annex A |
| Closing Date | Section 2.2 |
| Closing Marketing Period | Annex A |
| Closing Statement | Section 3.5(a) |
| Closing Statement Components | Section 3.5(a) |

WEIL:\99805227\35\67816.0003

| Term | Section |
|------|---------|
| Closing Transaction Expenses | Annex A |
| COBRA | Annex A |
| Code | Annex A |
| Collective Bargaining Agreement | Section 4.11(n) |
| Commitment Letters | Section 5.7(a) |
| Committee Mandate | Section 6.23(a) |
| Company | Preamble |
| Company Balance Sheet | Section 4.6(a) |
| Company Balance Sheet Date | Section 4.6(a) |
| Company Benefit Plan | Annex A |
| Company By-Laws | Section 4.1(a) |
| Company Charter | Section 4.1(a) |
| Company Collective Bargaining Agreement | Section 4.11(n) |
| Company Disclosure Schedules | Article IV |
| Company Environmental Permits | Section 4.14 |
| Company Fundamental Representations | Annex A |
| Company Intellectual Property | Section 4.17(a) |
| Company Material Adverse Effect | Annex A |
| Company Owned Intellectual Property | Section 4.17(a) |
| Company Subsidiary | Annex A |
| Company Transaction Expenses | Annex A |
| Competing Proposal | Section 6.17(f)(i) |
| Confidentiality Agreement | Section 6.5 |
| Contract | Annex A |
| Court | Recitals |
| Credit Support Arrangements | Annex A |
| Damaged Portion | Annex A |
| Debt | Annex A |
| Debt Commitment Letter | Section 5.7(a) |
| Debt Financing | Section 5.7(a) |
| Debt Financing Commitments | Section 5.7(a) |
| Debt Financing Documents | Annex A |
| Debt Financing Source | Annex A |
| Debt Payoff Amount | Annex A |
| Definitive Debt Documents | Section 6.9(b)(ii) |
| Definitive Trust Documents | Section 6.26(a) |
| Deposit Amount | Section 3.3 |
| Designated Contacts | Section 6.2(a) |
| Designated Managers | Annex A |
| Dispute Notice | Section 3.5(b) |
| Economic Sanctions/Trade Laws | Annex A |
| Enterprise Value | Annex A |
| Environmental Laws | Annex A |
| E.O. 11246 | Section 4.11(r) |
| EPP | Annex A |

WEIL:\99805227\35\67816.0003

| Term | Section |
|------|---------|
| EPP Rabbi Trust | Section 4.11(t) |
| EPP Rabbi Trust Contribution | Section 6.19(b) |
| Equitable Exceptions | Annex A |
| Equity Commitment Letter | Section 6.26(a) |
| Equity Financing | Section 5.7(a) |
| Equity Financing Commitments | Section 5.7(a) |
| Equity Financing Sources | Annex A |
| Equity Interests | Annex A |
| Equity Pledge | Preamble |
| ERISA | Annex A |
| ERISA Affiliate | Annex A |
| Escrow Account | Annex A |
| Escrow Agent | Section 3.3 |
| Escrow Agreement | Section 3.3 |
| Estimated FCF Adjustment | Section 3.2 |
| Estimated Leakage Amount | Section 3.2 |
| Estimated Statement | Section 3.2 |
| Estimated Transaction Expenses | Section 3.2 |
| Evercore | Recitals |
| Execution Date | Preamble |
| Existing Senior Secured Notes | Annex A |
| Expense Reserve Holdback Account | Annex A |
| Expense Reserve Holdback Amount | Annex A |
| FCF Adjustment | Annex A |
| Final Adjustment to FCF Adjustment | Annex A |
| Fee Letters | Section 5.7(a) |
| Final Leakage Amount | Section 3.5(d) |
| Final Leakage Amount Adjustment | Annex A |
| Final Transaction Expenses | Section 3.5(d) |
| Final Transaction Expenses Adjustment | Annex A |
| Final Working Capital Adjustment | Annex A |
| Financings | Section 5.7(a) |
| Financial Statements | Section 4.6(a) |
| FIRPTA Certificate | Section 6.17(a) |
| GAAP | Section 4.6 |
| GLAS | Recitals |
| Good Industry Practice | Annex A |
| Government Bid | Annex A |
| Governmental Body | Annex A |
| Government Contract | Annex A |
| Government Official | Section 4.13(a) |
| Guarantors | Recitals |
| Hazardous Substance | Annex A |
| HSR Act | Annex A |
| Hydrocarbon | Annex A |

WEIL:\99805227\35\67816.0003

| Term | Section |
|------|---------|
| Imbalance | Annex A |
| Indemnity Escrow Account | Annex B |
| Indemnitees | Section 6.6(a) |
| Initial Outside Date | Section 8.1(b) |
| Injunction Motion | Annex A |
| Intellectual Property | Section 4.17(a) |
| Interest Rate | Annex A |
| Interim Financial Statements | Section 4.6(a) |
| Interim Period | Annex A |
| Inventory Principles | Annex A |
| IRS | Annex A |
| Jointly Owned Properties | Section 4.19(c) |
| Judgment Creditors | Annex A |
| Knowledge of the Buyer | Annex A |
| Knowledge of the Company | Annex A |
| Knowledge of the Special Master | Annex A |
| Law | Annex A |
| Leakage Amount | Annex A |
| Legal Proceeding | Annex A |
| Lender Protective Provisions | Annex A |
| Lien | Annex A |
| Limited Guaranty | Section 6.26(a) |
| Lock Box Cash | Annex A |
| Lock Box Components | Section 3.1(a) |
| Lock Box Consideration Amount | Section 3.1(e) |
| Lock Box Date | Annex A |
| Lock Box Debt | Annex A |
| Lock Box Inventory Adjustment | Annex A |
| Lock Box Payables Adjustment | Annex A |
| Lock Box Period | Annex A |
| Lock Box Receivables Adjustment | Annex A |
| Lock Box Statement | Section 3.1(a) |
| Lock Box Time | Annex A |
| Lock Box Working Capital | Annex A |
| Lock Box Working Capital Adjustment | Annex A |
| Lookback Date | Annex A |
| Loss Proceeds | Section 6.20(a) |
| Major Customers | Section 4.22 |
| Major Suppliers | Section 4.22 |
| Marketing Business Day | Annex A |
| Material Contract | Section 4.16 |
| May Order | Recitals |
| Money Laundering Laws | Annex A |
| MTP | Section 6.1(b)(iii) |
| MUFG | Recitals |

| Term | Section |
|------|---------|
| Negative Consequences | Annex A |
| Net Negative Purchase Price Adjustment Amount | Section 3.5(e) |
| Net Positive Purchase Price Adjustment Amount | Section 3.5(e) |
| Net Working Capital | Annex A |
| Net Working Capital Schedule | Annex A |
| Net Working Capital Target | Annex A |
| Neutral Accountant | Section 3.1(d) |
| No-Shop Period | Annex A |
| Non-Controlled Entity | Annex A |
| Non-Parties | Section 9.12 |
| Non-Union Affected Employees | Section 6.8(c) |
| Notice Period | Section 6.17(e) |
| NWC Principles | Annex A |
| Observation Committee | Section 6.23(a) |
| OFAC | Annex A |
| OFAC License | Annex A |
| OFAC License Applications | Annex A |
| Offering Documents | Annex A |
| Order | Annex A |
| Ordinary Course | Annex A |
| Organizational Documents | Annex A |
| Outside Date | Section 8.1(b) |
| Owned Real Property | Section 4.19(b) |
| Parties | Preamble |
| Paying Agent | Recitals |
| Paying Agent Account | Annex A |
| Paying Agent Agreement | Recitals |
| Payoff Letters | Section 3.4(b) |
| PBGC | Section 4.11(d) |
| PCI DSS | Annex A |
| PDV Appeal | Recitals |
| PDV Entities | Recitals |
| PDVSA | Recitals |
| PDVSA v. MUFG Action | Recitals |
| Permit | Annex A |
| Permitted Leakage | Annex A |
| Permitted Liens | Annex A |
| Person | Annex A |
| Personal Information | Annex A |
| PFAS | Annex A |
| Post-Closing Tax Period | Annex A |
| Post-Lock Box Tax Period | Annex A |
| Pre-Closing Tax Period | Annex A |
| Pre-Lock Box Tax Period | Annex A |
| Pre-Lock Box Taxes | Annex A |

WEIL:\99805227\35\67816.0003

| Term | Section |
|------|---------|
| Preferential Right | Annex A |
| Privacy Laws and Obligations | Section 4.17(g) |
| Procedures Summary | Annex A |
| Product | Section 4.16(a)(ix) |
| Prohibited Modification | Section 6.9(b)(ii) |
| Proprietary Software | Section 4.17(d) |
| Purchase Price Adjustment | Section 3.5(e) |
| R&W Insurance Policy | Section 6.13 |
| Real Property | Section 4.19(b) |
| Real Property Lease | Section 4.19(a) |
| Receivables Securitization Facility | Section 6.1(b)(vi) |
| Refinery Inventory | Annex A |
| Registered Intellectual Property | Section 4.17(a) |
| Related Claim | Annex A |
| Related Party Contracts | Section 4.23 |
| Release | Annex A |
| Released Parties | Section 9.15 |
| Releasing Parties | Section 9.15 |
| Repair | Annex A |
| Replacement Financing | Section 6.9(e) |
| Representatives | Annex A |
| Required Amount | Section 5.7(d) |
| Required Information | Annex A |
| Reverse Termination Fee | Section 8.4(a) |
| RRP | Annex A |
| RRP Rabbi Trust | Section 4.11(t) |
| RRP Rabbi Trust Contribution | Section 6.19(b) |
| Sale Order | Annex A |
| Sale Order Entry | Annex A |
| Sale Process Parties | Annex A |
| Sale Procedures Order | Recitals |
| Sanctions Target | Annex A |
| SDNY | Recitals |
| Second Circuit | Recitals |
| Section 503 | Recitals |
| Security Incident | Annex A |
| Sensitive Data | Annex A |
| Shares | Recitals |
| Solvent | Annex A |
| Special Master | Preamble |
| Special Master and Company Related Parties | Section 8.3(d) |
| Special Master Transaction Expenses | Annex A |
| Specially Designated Nationals and Blocked Persons List | Annex A |
| Specified Debt | Annex A |
| Specified Litigation | Recitals |

WEIL:\99805227\35\67816.0003

| Term | Section |
|------|---------|
| ████████████ | ███ |
| Straddle Period | Annex A |
| Subsidiary | Annex A |
| Superior Proposal | Section 6.17(f)(ii) |
| Supplemental Schedules | Section 6.27 |
| Survival Period | Annex B |
| Systems | Annex A |
| Target Inventory | Annex A |
| Tax or Taxes | Annex A |
| Tax Benefit Amount | Annex A |
| Tax Proceeding | Section 4.10(c) |
| Tax Returns | Annex A |
| Taxing Authority | Annex A |
| Termination Fee | Annex A |
| Transaction Documents | Annex A |
| Transactions | Annex A |
| Transaction Tax Deductions | Annex A |
| Transfer Taxes | Annex A |
| Treasury Regulations | Annex A |
| Trust Account | Section 6.26(a) |
| Trust Agreement | Section 6.26(a) |
| Trust Structure Effective Date | Section 6.26(a) |
| Trust Structure Term Sheet | Section 6.26(a) |
| Turnaround/Catalyst Budget | Section 6.1(b)(iv) |
| Union | Section 4.11(n) |
| Union Affected Employees | Section 6.8(b) |
| VDR | Annex A |
| Vesting Instruments | Section 4.19(a) |
| VEVRAA | Section 4.11(r) |
| WARN Act | Section 4.11(p) |
| Willful Breach | Annex A |
| Withholding Agent | Section 3.6 |
| 2020 Bondholders | Recitals |
| 2020 Bonds | Recitals |
| 2020 Judgment | Recitals |
| 2020s Maximum Claim Amount | Recitals |
| 2020s Settlement | Recitals |
| 2020s Settlement Amount | Recitals |
| 6.375% Senior Secured Notes | Annex A |
| 7.000% Senior Secured Notes | Annex A |
| 8.375% Senior Secured Notes | Annex A |

x

## STOCK PURCHASE AGREEMENT

THIS STOCK PURCHASE AGREEMENT (this "Agreement") dated as of September 27, 2024 (the "Execution Date") is entered into by and between Amber Energy Inc., a Delaware corporation (the "Buyer"), and Robert B. Pincus, solely in his capacity as special master (the "Special Master" and, together with the Buyer, the "Parties" and each a "Party") for the Honorable Leonard P. Stark, United States District Court for the District of Delaware (the "Court").

### W I T N E S S E T H :

WHEREAS, the Special Master has been appointed by the Court in connection with the case of *Crystallex International Corp. v. Bolivarian Republic of Venezuela* (D. Del. Case. No. 17-151-LPS) (the "Specified Litigation") pursuant to that certain Order entered by the Court on April 13, 2021 [D.I. 258], that certain Order Regarding Special Master entered by the Court on May 27, 2021 [D.I. 277] (the "May Order") and the Order (A) Establishing Sale and Bidding Procedures, (B) Approving Special Master's Report and Recommendation Regarding Proposed Sale Procedures Order, (C) Affirming Retention of Evercore Group, LLC ("Evercore") as Investment Banker by Special Master and (D) Regarding Related Matters entered by the Court on October 4, 2022 [D.I. 481] (the "Sale Procedures Order").

WHEREAS, Petróleos de Venezuela, S.A., a Venezuelan company ("PDVSA") owns all of the issued and outstanding capital stock of PDV Holding, Inc., a Delaware corporation (the "Company"), which consists of 1,000 shares of common stock, par value $1.00 per share (collectively, the "Shares").

WHEREAS, pursuant to the Sale Procedures Order, the Special Master has the authority to enter into this Agreement in making his determination to the Court as to which of the Qualified Bids (as defined in the Sale Procedures Order) was highest or best, and in making a recommendation to the Court as to which Qualified Bid is the Successful Bid (as defined in the Sale Procedures Order).

WHEREAS, the Buyer desires to purchase the Shares upon the terms and subject to the conditions set forth in this Agreement.

WHEREAS, on October 27, 2016, PDVSA, as issuer, entered into an indenture with PDVSA Petróleo, S.A., as guarantor, MUFG Union Bank, N.A., as trustee ("MUFG"), GLAS Americas LLC, as collateral agent ("GLAS"), Law Debenture Trust Company of New York, as registrar, transfer agent and principal agent, and Banque Internationale À Luxembourg, Société Anonyme, as Luxembourg paying agent, whereby PDVSA issued 8.50% senior secured notes due in 2020 in the aggregate principal amount of $3,367,529,000 (the "2020 Bonds") which were purportedly secured, in part, by a pledge of 50.1% of the equity (the "Equity Pledge") in CITGO Holding, Inc., a Delaware corporation and wholly owned direct subsidiary of the Company ("CITGO Holding").

WHEREAS, on October 29, 2019, the case of *Petroleos de Venezuela S.A. v. MUFG Union Bank*, N.A., 19-10023 (KPF) (S.D.N.Y.) ("PDVSA v. MUFG Action") was initiated by PDVSA, the Company and CITGO Holding (collectively, the "PDV Entities") against GLAS and MUFG

in their capacities as collateral agent and trustee, respectively, for the noteholders of the 2020 Bonds (such noteholders, the ("2020 Bondholders")).

WHEREAS, solely to the extent set forth in the Definitive Trust Documents, at Closing, Acquiom Financial LLC, in its capacity as paying agent (the "Paying Agent"), will distribute a portion of the Closing Consideration paid pursuant to Section 3.4 to those creditors of the Bolivarian Republic of Venezuela or PDVSA that are party to the Specified Litigation and who have obtained a writ of attachment on or before January 12, 2024 (the "Claimholders") pursuant to the terms of that certain Paying Agent Agreement to be entered into as of Closing by and among the Buyer, the Special Master and the Paying Agent in the form to be mutually agreed by the Parties (the "Paying Agent Agreement").

NOW, THEREFORE, in consideration of the promises and the respective representations, warranties, covenants and agreements set forth herein, the Parties agree as follows:

# ARTICLE I

# DEFINITIONS AND INTERPRETIVE MATTERS

Section 1.1.    Certain Defined Terms. Capitalized terms used in this Agreement have the meanings specified in Annex A or elsewhere in this Agreement.

Section 1.2.    Other Definitional and Interpretive Matters.

(a)    Unless otherwise expressly provided herein, for purposes of this Agreement, the following rules of interpretation shall apply:

(i)    Calculation of Time Period. When calculating the period of time before which, within which or following which any act is to be done or step taken pursuant to this Agreement, the date that is the reference date in calculating such period shall be excluded. If the last day of such period is a non-Business Day, the period in question shall end on the next succeeding Business Day. The word "day" shall mean "calendar day" unless "Business Day" is expressly identified.

(ii)    Dollars. Any reference in this Agreement to "$" shall mean U.S. dollars. The specification of any dollar amount in the representations and warranties or otherwise in this Agreement or in the Exhibits or the Company Disclosure Schedules is not intended and shall not be deemed to be an admission or acknowledgment of the materiality of such amounts or items, nor shall the same be used in any dispute or controversy between the Parties to determine whether any obligation, item or matter (whether or not described herein or included in the Company Disclosure Schedules) is or is not material for purposes of this Agreement.

(iii)    Exhibits/Schedules. The Exhibits and the Company Disclosure Schedules annexed hereto or referred to herein are an integral part of this Agreement and are hereby incorporated in and made a part of this Agreement as if set forth in full herein. Any matter or item disclosed on one Schedule or section of the Company Disclosure Schedules shall be deemed to have been disclosed on each other Schedule or section of the

WEIL:\99805227\35\67816.0003

Company Disclosure Schedules in which it is reasonably apparent on the face of such disclosure that the information is required to be included in such other Schedule or section of the Company Disclosure Schedules. Disclosure of any item on any Schedule of the Company Disclosure Schedules shall not constitute an admission, indication, acknowledgment or representation that such item or matter is material or would reasonably be expected to have a Company Material Adverse Effect. No disclosure on a Schedule of the Company Disclosure Schedules relating to a possible breach or violation of any Contract, Law or Order shall be construed as an admission, indication, acknowledgment or representation that a breach or violation exists or has actually occurred. Any capitalized terms used in any Schedule of the Company Disclosure Schedules or Exhibit but not otherwise defined therein shall be defined as set forth in this Agreement.

(iv)    <u>Gender and Number</u>. Any reference in this Agreement to gender shall include all genders, and words imparting the singular number only shall include the plural and vice versa.

(v)    <u>Headings</u>. The provision of a table of contents, the division of this Agreement into Articles, Sections and other subdivisions and the insertion of headings are for convenience of reference only and shall not affect or be utilized in construing or interpreting this Agreement. All references in this Agreement to any "<u>Section</u>" or "<u>Article</u>" are to the corresponding Section or Article of this Agreement unless otherwise specified.

(vi)    <u>Herein</u>. The words "<u>herein</u>," "<u>hereinafter</u>," "<u>hereof</u>," and "<u>hereunder</u>" refer to this Agreement as a whole and not merely to a subdivision in which such words appear unless the context otherwise requires.

(vii)    <u>Inclusive Terms</u>. The word "<u>including</u>" or any variation thereof means (unless the context of its usage otherwise requires) "<u>including, without limitation</u>" and shall not be construed to limit any general statement that it follows to the specific or similar items or matters immediately following it. The term "<u>any</u>" means "<u>any and all</u>." The term "<u>or</u>" shall not be exclusive and shall mean "<u>and/or</u>."

(viii)    <u>Reflected On or Set Forth In</u>. An item arising with respect to a specific representation or warranty shall be deemed to be "<u>reflected on</u>" or "<u>set forth in</u>" a balance sheet or financial statements, to the extent any such phrase appears in such representation or warranty, if (A) there is a reserve, accrual or other similar item underlying a number on such balance sheet or financial statements that related to the subject matter of such representation or warranty, (B) such item is otherwise specifically set forth on the balance sheet or financial statements or (C) such item is reflected on the balance sheet or financial statements and is specifically set forth in the notes thereto.

(ix)    <u>Bolivarian Republic of Venezuela</u>. Any reference herein to the "Bolivarian Republic of Venezuela" shall include any successor nation thereto.

(x)    <u>Special Master and the Acquired Companies</u>. Any pre-Closing obligation of any of the Acquired Companies hereunder shall be deemed to include an obligation of the Special Master to "Cause" the Acquired Companies to comply with such

3

obligation. With respect to any obligation of the Special Master hereunder to "Cause" any of the Acquired Companies to take an action or refrain from taking an action, or which otherwise requires action (or refraining from action) by any such Acquired Company, such obligation will be deemed to be an obligation of the Special Master to use reasonable best efforts to cause the Company or the applicable Company Subsidiary to take such action (or refrain from taking such action), including by seeking an order from the Court with respect to such action or refrainment pursuant to the Sale Order or otherwise (including orders to obligate any such Acquired Company to execute required documentation to effect such actions, if applicable).

(xi)     "Made Available." Unless expressly stated otherwise, references to any document or information having been "delivered", "furnished", "provided" or "made available" to the Buyer or its Representatives shall mean such document or information has been posted to the VDR at least two (2) Business Days prior to the Execution Date.

(b)     The Parties have participated jointly in the negotiation and drafting of this Agreement and, in the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as jointly drafted by the Parties and no presumption or burden of proof shall arise favoring or disfavoring any Party by virtue of the authorship of any provision of this Agreement. The language used in this Agreement shall be deemed to be the language chosen by the Parties to express their mutual intent, and no rule of strict construction shall be applied against any Person.

## ARTICLE II

## SALE AND PURCHASE OF THE SHARES; CLOSING

Section 2.1.     Sale and Purchase of Shares. Subject to approval of this Agreement by the Court, and upon the terms and subject to the conditions set forth in this Agreement and in the Sale Order, and pursuant to the authority provided to the Special Master under the Sale Procedures Order and the May Order, at the Closing, the Special Master shall sell, assign, transfer, convey and deliver to the Buyer, and the Buyer shall purchase and accept from the Special Master, the Shares, free and clear of all Liens (other than transfer restrictions imposed by applicable securities Laws).

Section 2.2.     Closing. The consummation of the sale and purchase of Shares (the "Closing") shall take place at 10:00 a.m., Eastern Time, on a date to be specified by the Parties, which date shall be no later than the twelfth (12th) Marketing Business Day after satisfaction or waiver of the conditions set forth in Article VII (other than those conditions that by their nature are to be satisfied at the Closing, but subject to the satisfaction or waiver of those conditions at such time), remotely by electronic exchange of documents and signatures, unless another time, date or place is agreed to in writing by the Parties; provided, that unless mutually agreed in writing by the Buyer and the Special Master, in no event shall the Closing occur prior to March 31, 2025. The date on which the Closing actually occurs is referred to in this Agreement as the "Closing Date."

4

Section 2.3.    Closing Deliveries of the Parties.

(a)    Deliveries by the Special Master. At or prior to the Closing, the Special Master shall deliver or otherwise cause to be delivered to the Buyer:

(i)    Affirmation. An affirmation, executed by the Special Master, stating that the Special Master has used reasonable best efforts to cause the Chief Financial Officer of the Company to confirm the satisfaction of the conditions set forth in Sections 7.2(a) and 7.2(c) as of the Closing Date;

(ii)    Stock Certificate. The original certificate evidencing all of the Shares, duly endorsed in blank, or accompanied by a stock power duly executed in blank by the Special Master; and

(iii)    FIRPTA Certificate. A validly issued certificate from the Company, in such form consistent and in accordance with the requirements of Treasury Regulations Sections 1.897-2(h)(2) and 1.1445-2(c)(3)(i) and a validly issued notice to the IRS from the Company in accordance with the provisions of Treasury Regulations Section 1.897-2(h)(2) (such certificate and notice issued by the Company, the "FIRPTA Certificate").

(b)    Deliveries by the Buyer. At or prior to the Closing, the Buyer will deliver or cause to be delivered to the Special Master:

(i)    Closing Certificate. A certificate, dated as of the Closing Date, signed by an authorized officer of the Buyer as to the satisfaction of the conditions set forth in Section 7.3(a) and Section 7.3(b).

## ARTICLE III

## PURCHASE PRICE

Section 3.1.    Lock Box Consideration Amount.

(a)    No earlier than March 6, 2025 and no later than April 5, 2025, the Special Master shall Cause the Company to provide the Buyer with a written statement (the "Lock Box Statement") reflecting the Company's good faith estimate of (i) Lock Box Cash, (ii) Lock Box Working Capital, (iii) the Lock Box Receivables Adjustment, (iv) the Lock Box Payables Adjustment, (v) the Lock Box Inventory Adjustment and (vi) Lock Box Debt (items (i)-(vi) collectively, the "Lock Box Components"), in each case, together with all underlying documentation supporting each such calculation, and the resulting calculation of the Lock Box Consideration Amount. The Lock Box Statement, and the components thereof, shall be prepared based upon the books and records of the Acquired Companies and in accordance with the definitions of Lock Box Cash, Lock Box Working Capital, Lock Box Receivables Adjustment, Lock Box Payables Adjustment, Lock Box Inventory Adjustment and Lock Box Debt hereunder. The determinations of each Lock Box Component shall be prepared in accordance with the applicable Agreed Principles.

(b)    Until the Lock Box Statement is finally determined in accordance with this Section 3.1, the Buyer, the Special Master and their respective Representatives shall have the right, upon reasonable notice to the Company, to reasonable access (and the Special Master shall Cause the Company to grant the Buyer access) to the Company's books and records, appropriate staff members and such other information as the Buyer, the Special Master and their respective Representatives shall reasonably request in order to review and analyze the Lock Box Statement.

(c)    The Lock Box Statement (and the calculation of each Lock Box Component) delivered by the Company to the Buyer pursuant to Section 3.1(a) or delivered by the Buyer to the Special Master pursuant to Section 3.1(f) shall be conclusive and binding on all Parties unless the Buyer or the Special Master, as applicable, prior to the later of (i) the thirtieth (30th) day following the applicable Party's receipt of the Lock Box Statement and (ii) the fifth (5th) Business Day following the applicable Party's receipt of all information reasonably requested by such Party or its Representatives in order to review the Lock Box Statement, delivers a Dispute Notice to the other Party stating that such Party disagrees with such calculations and specifying in reasonable detail those items as to which such Party disagrees, the dollar amount of such disagreement and the basis therefor. The Party that delivers such Dispute Notice shall be deemed to have agreed with all other items contained in the Lock Box Statement delivered pursuant to Section 3.1(a) or Section 3.1(f), as applicable, other than any Lock Box Component that is the subject of a Dispute Notice.

(d)    If a Dispute Notice is duly delivered pursuant to Section 3.1(c), the Buyer and the Special Master shall, during the fifteen (15) days following such delivery, consult in good faith on the disputed items in order to mutually agree upon the amount of each Lock Box Component, as applicable. If during such period, the Buyer and the Special Master are unable to reach such agreement, they shall promptly thereafter cause a nationally recognized U.S. accounting firm (other than KPMG or EY) on which the Special Master and the Buyer mutually agree, which agreement shall not be unreasonably withheld, conditioned or delayed (the "Neutral Accountant"), to review this Agreement and the disputed items for the purpose of determining the Lock Box Components, as applicable (it being understood that in making such determination, the Neutral Accountant shall be functioning as an expert and not as an arbitrator and shall not have any authority to interpret any provision of this Section 3.1 or any other provision of this Agreement). The Buyer and the Special Master shall cooperate with the Neutral Accountant and promptly provide all documents and information requested by the Neutral Accountant; provided, that copies of all such documents and information are concurrently furnished to the other Party. In making such determination, the Neutral Accountant shall consider only those items in the Lock Box Statement, and the determination of the Lock Box Components, as applicable, as to which the Buyer or the Special Master, as applicable, has disagreed in its Dispute Notice duly delivered pursuant to Section 3.1(c) and as to which the Parties were unable to reach a mutual agreement during the fifteen (15) day period following delivery of the Dispute Notice, all in accordance with the definitions provided in this Agreement and the applicable Agreed Principles. The Neutral Accountant shall resolve each item of disagreement based solely on the supporting materials provided by each Party and not by independent review. The Neutral Accountant's determination of each item in dispute shall not be greater than the greater value for such item claimed by either the Special Master or the Buyer or less than the lower value for such item claimed by either the Special Master or the Buyer. The Special Master and the Buyer shall direct the Neutral Accountant to deliver to the Special Master and the Buyer, as promptly as practicable (but in any case no later

WEIL:\99805227\35\67816.0003

than thirty (30) days from the date of its engagement), a report setting forth such determination. Such report shall be final and binding upon the Special Master, the Company and the Buyer absent fraud or manifest error. All fees, costs and expenses incurred in connection with the Neutral Accountant's services, including but not limited to its review and report, shall be borne in the same proportion that the aggregate dollar amount of such remaining disputed items so submitted to the Neutral Accountant that are unsuccessfully disputed by the Buyer, on the one hand, and the Special Master, on the other hand, as finally determined by the Neutral Accountant, bears to the total dollar amount of such remaining disputed items so submitted.

(e)    The "Lock Box Consideration Amount" shall be an amount equal to (i) the Enterprise Value, plus (ii) Lock Box Cash, plus (iii) the Lock Box Working Capital Adjustment, plus (iv) the Lock Box Receivables Adjustment, minus (v) the Lock Box Payables Adjustment, plus (vi) the Lock Box Inventory Adjustment, minus (vii) Lock Box Debt (in each case of (ii)-(vii), as finally determined in accordance with this Section 3.1).

(f)    Without limiting the Buyer's rights under any other provision of this Agreement (including the right to terminate this Agreement pursuant to Section 8.1(c)), in the event that the Company fails to deliver the Lock Box Statement in accordance with Section 3.1(a), then the Buyer shall have the right (but not the obligation) to prepare the Lock Box Statement using the most recent financial statements of the Acquired Companies available to the Buyer to make good faith estimates of each Lock Box Component as of the Lock Box Date and deliver such Lock Box Statement to the Special Master. It is understood and agreed that the Lock Box Statement prepared by the Buyer pursuant to this Section 3.4(f) will reflect the Buyer's good faith estimates and projections of the Lock Box Components as of the Lock Box Date based solely on information made available to the Buyer by the Special Master and the Company and, accordingly and notwithstanding anything to the contrary in this Agreement, with respect to a Lock Box Statement prepared by the Buyer pursuant to this Section 3.4(f), the Special Master's right to deliver a Dispute Notice pursuant to Section 3.1(c) shall be strictly limited to instances where the Special Master objects to any Lock Box Component as not having been estimated in good faith by the Buyer (and any review by the Neutral Accountant pursuant to Section 3.1(f) shall be limited to a determination as to whether the disputed items set forth in the Lock Box Statement reflect a good faith estimate by the Buyer).

Section 3.2.    Closing Consideration. No later than three (3) Business Days prior to the Closing Date, the Special Master shall Cause the Company to provide the Buyer with a written statement (the "Estimated Statement") reflecting (x) the Company's good faith estimate of (a) the Leakage Amount (the "Estimated Leakage Amount"), (b) Closing Transaction Expenses (the "Estimated Transaction Expenses") and (c) the FCF Adjustment (the "Estimated FCF Adjustment"), in each case, together with all underlying documentation supporting each such estimate, (y) the Advanced Transaction Expenses Amount, and (z) the resulting calculation of the Closing Consideration (which shall reflect any adjustments pursuant to Section 6.20(d), as applicable). The Estimated Statement, and the components thereof, shall be prepared based upon the accounting books and records of the Acquired Companies and in accordance with the definitions of Leakage Amount and Closing Transaction Expenses hereunder. The Estimated Statement shall include the name of, wiring instructions for, and amount of Closing Transaction Expenses payable to, each payee of Closing Transaction Expenses. The Special Master shall ensure that the Estimated Transaction Expenses (and payees thereof) and the Advanced Transaction

7

Expenses Amount (and payees thereof) set forth on the Estimated Statement are in compliance in all respects with the Sale Procedures Order and the May Order, respectively. The Company shall consider any Buyer-proposed comments on the Estimated Statement in good faith. No later than one (1) Business Day after receipt of the Estimated Statement, the Special Master shall distribute a detailed funds flow memorandum in Excel format (including all underlying calculations, formulas and amounts therein) setting forth all payments to be made by or on behalf of the Parties at Closing in accordance with this Agreement.

Section 3.3.    Good Faith Deposit. On the Trust Structure Effective Date, the Buyer shall deposit with Acquiom Clearinghouse LLC, in its capacity as escrow agent (the "Escrow Agent"), the sum of $50,000,000 (such amount, the "Deposit Amount") in cash, pursuant to the terms of that certain Escrow Agreement, to be entered into on the Trust Structure Effective Date by and among the Special Master, the Buyer and the Escrow Agent, in the form to be mutually agreed by the Parties (the "Escrow Agreement"). The Deposit Amount will be released by the Escrow Agent and delivered to either the Buyer or the Trust Account, in accordance with the provisions of this Agreement, the Escrow Agreement and the Definitive Trust Documents. The Deposit Amount will be distributed out of the Escrow Account as follows:

(a)    if the Closing occurs, the Deposit Amount will remain in the Escrow Account to be available (together with the Closing Escrow Amount) to satisfy the payment of the Net Negative Purchase Price Adjustment Amount, if any, as contemplated by Section 3.5 and be released subject to the terms of this Agreement and the Escrow Agreement;

(b)    if this Agreement is terminated (i) by the Special Master pursuant to Section 8.1(f) (Buyer Breach) or Section 8.1(g) (Buyer Closing Failure), or (ii) by either Party pursuant to Section 8.1(b) (relating to the Outside Date) if the Special Master could otherwise have terminated pursuant to Section 8.1(f) (Buyer Breach) or Section 8.1(g) (Buyer Closing Failure) on the Outside Date, then in each case of the immediately preceding clauses (i) and (ii), the Buyer and the Special Master shall promptly (and in any event within two (2) Business Days of such termination) deliver joint written instructions to the Escrow Agent directing the release of (x) the Deposit Amount to the Paying Agent Account and (y) the balance of the Escrow Account, after giving effect to the distribution in the preceding clause (x), to the Buyer or its designees; and

(c)    if this Agreement is terminated for any reason other than as contemplated by clause (i) or clause (ii) of Section 3.3(b), the Buyer and the Special Master shall promptly (and in any event within two (2) Business Days of such termination) deliver joint written instructions to the Escrow Agent directing the release of the balance of the Escrow Account to the Buyer or its designees.

Section 3.4.    Closing Date Payments by the Buyer.

(a)    Payment in Respect of Closing Escrow Amount. At the Closing, the Buyer shall pay, or cause to be paid, to the Escrow Account, an amount equal to the Closing Escrow Amount for deposit in accordance with this Agreement and the Escrow Agreement. The Adjustment Escrow Amount will not be used for any purpose except as expressly provided in this Agreement or in the Escrow Agreement. Any net profit resulting from, or interest on income produced by, the Adjustment Escrow Amount will be paid to the Paying Agent Account.

(b)      *Payment in respect of Debt*. At the Closing, the Buyer shall pay, or cause to be paid, on behalf of the Acquired Companies, the Debt Payoff Amount by wire transfer of immediately available funds to the Persons as specified in the "payoff letters" or similar documents, executed by the applicable lender(s) (or agent thereof) or as set forth in the applicable indenture with respect to each item of Specified Debt (the "Payoff Letters").

(c)      *Payment in respect of the Closing Transaction Expenses*. At the Closing, the Buyer shall pay, or cause to be paid, the Estimated Transaction Expenses to the applicable recipients as set forth on the Estimated Statement by wire transfer of immediately available funds to such Persons.

(d)      *Payment in respect of Expense Reserve Holdback Amount*. At the Closing, the Buyer shall pay, or cause to be paid, to the Expense Reserve Holdback Account an amount equal to the Expense Reserve Holdback Amount. The Expense Reserve Holdback Amount will be used by the Special Master to pay the Special Master's compensation and any out-of-pocket costs, fees and expenses incurred by the Special Master on or after the Closing related to the Transactions or any Action related to or arising therefrom for investment bankers, third party consultants, legal counsel and any of his other Representatives or Advisors (as defined in the Sale Procedures Order in effect on the date hereof) and such amount shall be paid or distributed at the direction of the Special Master; provided, that, any amounts remaining in the Expense Reserve Holdback Account after all such costs, fees and expenses incurred by the Special Master have been so paid or distributed shall be paid to the Paying Agent Account as promptly as practicable upon the later of (i) three (3) years following the Closing Date and (ii) one (1) year after any Action brought against the Special Master relating to the Transactions has been definitively adjudicated by a court of final determination.

(e)      *Payment in respect of Reimbursement for Advanced Transaction Expenses*. At the Closing, in accordance with the May Order, the Buyer shall pay, or cause to be paid, an amount to the Paying Agent Account equal to the aggregate amount of the Advanced Transaction Expenses paid by the Sale Process Parties and Additional Judgment Creditors prior to the Closing (the "Advanced Transaction Expenses Amount").

(f)      *Payment in respect of* ███████ *Indemnity Escrow Amount*. At the Closing, the Buyer shall pay, or cause to be paid, to the ███████ Indemnity Escrow Account an amount equal to the ███████ Indemnity Escrow Amount.

(g)      *Payment in respect of* ███████ *Indemnity Escrow Amount*. At the Closing, the Buyer shall pay, or cause to be paid, to the ███████ Indemnity Escrow Account an amount equal to the ███████ Indemnity Escrow Amount.

(h)      *Payment in respect of Closing Consideration*. At the Closing, the Buyer shall pay, or cause to be paid, an aggregate amount of cash equal to the Closing Consideration to the Trust Account and/or the Paying Agent Account as provided in the Definitive Trust Documents.

Section 3.5.      *Adjustment to Closing Consideration*.

9

(a)    As promptly as practicable, but no later than seventy-five (75) days after the Closing Date (or, in the event that the provisions of Section 3.1(f) apply, no later than ninety (90) days after the Closing Date), the Buyer shall cause to be prepared and delivered to the Special Master a statement (the "Closing Statement") setting forth: (i) the Leakage Amount, (ii) the Closing Transaction Expenses, and (iii) the FCF Adjustment (items (i), (ii) and (iii) collectively, the "Closing Statement Components"), together, in each case, with all underlying documentation supporting each such calculation. The Closing Statement Components shall be prepared based upon the books and records of the Acquired Companies and in accordance with the definitions of each Closing Statement Component.

(b)    Until the Closing Statement is finally determined in accordance with this Section 3.5, the Special Master and his advisors shall have the right, upon reasonable notice to the Company, to reasonable access to the Company's books and records, appropriate staff members and such other information as the Special Master shall reasonably request in order to review the Closing Statement. The Closing Statement (and the computation of the Closing Statement Components set forth therein) delivered by the Buyer to the Special Master shall be conclusive and binding on all Parties unless the Special Master, prior to the later of (i) the thirtieth (30th) day following receipt of the Closing Statement and (ii) the third (3rd) Business Day following receipt of all information reasonably requested by the Special Master in order to review the Closing Statement, delivers a notice to the Buyer stating that the Special Master disagrees with such calculation and specifying in reasonable detail those items as to which the Special Master disagrees, the dollar amount of such disagreement and the basis therefor (any such notice, a "Dispute Notice"). The Special Master shall be deemed to have agreed with all other items contained in the Closing Statement delivered pursuant to Section 3.5(a) other than any Closing Statement Component that is the subject of a Dispute Notice.

(c)    If a Dispute Notice is duly delivered pursuant to Section 3.5(b), the Special Master and the Buyer shall, during the fifteen (15) days following such delivery, consult in good faith on the disputed items in order to determine, as may be required, the applicable Closing Statement Component. If during such period, the Special Master and the Buyer are unable to reach such agreement, they shall promptly thereafter cause the Neutral Accountant to review this Agreement and the disputed items for the purpose of calculating the applicable Closing Statement Component (it being understood that in making such determination, the Neutral Accountant shall be functioning as an expert and not as an arbitrator and shall not have any authority to interpret any provision of this Section 3.5 or any other provision of this Agreement). The Buyer and the Special Master shall cooperate with the Neutral Accountant and promptly provide, and the Buyer shall cause the Company to provide, all documents and information requested by the Neutral Accountant; provided, that copies of all such documents and information are concurrently furnished to the other Party. In making such determination, the Neutral Accountant shall consider only those items in the Closing Statement, and the Special Master's calculation of the applicable Closing Statement Component as to which the Special Master has disagreed in its Dispute Notice duly delivered pursuant to Section 3.5(b), and as to which the Parties were unable to reach a mutual agreement during the fifteen (15) day period following the delivery of the Dispute Notice, all in accordance with the definitions provided in this Agreement. The Neutral Accountant shall resolve each item of disagreement based solely on the supporting materials provided by each Party and not by independent review. The Neutral Accountant's determination of each item in dispute shall not be greater than the greater value for such item claimed by either the Special Master or the

Buyer or less than the lower value for such item claimed by either the Special Master or the Buyer. The Special Master and the Buyer shall direct the Neutral Accountant to deliver to the Special Master and the Buyer, as promptly as practicable (but in any case no later than thirty (30) days from the date of its engagement), a report setting forth such determination. Such report shall be final and binding upon the Special Master and the Buyer absent fraud or manifest error. All fees, costs and expenses incurred in connection with the Neutral Accountant's services, including but not limited to its review and report, shall be borne in the same proportion that the aggregate dollar amount of such disputed items so submitted to the Neutral Accountant that are unsuccessfully disputed by the Buyer, on the one hand, and the Special Master, on the other hand, as finally determined by the Neutral Accountant, bears to the total dollar amount of such disputed items so submitted; provided, that, any such amount payable by the Special Master will be payable solely from the Expense Reserve Holdback Account, and if no funds remain in the Expense Reserve Holdback Account when such fees, costs and expenses are due and payable, Buyer shall bear all such fees, costs and expenses incurred in connection with the Neutral Accountant's services.

(d)      The Leakage Amount, Closing Transaction Expenses and FCF Adjustment as finally determined in accordance with Sections 3.5(a)-(c) shall be the "Final Leakage Amount", "Final Transaction Expenses" and "Final FCF Adjustment", respectively. For the avoidance of doubt, in no event shall the Final Leakage Amount, Final Transaction Expenses or Final FCF Adjustment be more than the highest value or lower than the lowest value for such component set forth in the Special Master's calculation pursuant to Section 3.5(b) or the Buyer's calculation delivered pursuant to Section 3.5(a), as applicable.

(e)      The "Purchase Price Adjustment" will be an amount, which may be positive or negative, equal to (1) the Final Leakage Amount Adjustment, minus (2) the Final Transaction Expenses Adjustment, minus (3) the Final Adjustment to FCF Adjustment. If the Purchase Price Adjustment is a positive number (the "Net Positive Purchase Price Adjustment Amount"), then (i) the Buyer and the Special Master shall jointly instruct the Escrow Agent in writing to pay the balance of the Escrow Account to the Trust Account by wire transfer of immediately available funds and (ii) the Buyer shall disburse the Net Positive Purchase Price Adjustment Amount to the Trust Account or the Paying Agent as provided in the Definitive Trust Documents as an adjustment to the dollar amount of the Closing Consideration by wire transfer of immediately available funds; provided, that the Buyer's obligations to pay any Net Positive Purchase Price Adjustment Amount shall be capped at an amount equal to the Adjustment Escrow Amount. If the Purchase Price Adjustment is a negative number (the absolute value of such number, the "Net Negative Purchase Price Adjustment Amount"), the Buyer shall be entitled to receive a payment in cash solely from the Escrow Account in an amount equal to the lesser of (x) the Adjustment Escrow Amount and (y) the Net Negative Purchase Price Adjustment Amount, and the Buyer and the Special Master shall jointly instruct the Escrow Agent in writing to disburse a payment to the Buyer out of the Escrow Account in an amount equal to the lesser of clauses (x) and (y) of this sentence; provided, that, if the Adjustment Escrow Amount is greater than the Net Negative Purchase Price Adjustment Amount, then the Buyer and the Special Master shall jointly instruct the Escrow Agent in writing to disburse an amount equal to the difference of the Adjustment Escrow Amount minus the Net Negative Purchase Price Adjustment Amount to the Trust Account or the Paying Agent as provided in the Definitive Trust Documents by wire transfer of immediately available funds out of the Escrow Account. The Buyer and the Special Master acknowledge and agree that any Net Negative Purchase Price Adjustment Amount shall be satisfied solely and exclusively from the

11

Escrow Account up to an amount equal to the Adjustment Escrow Amount. For the avoidance of doubt, in the event that the Purchase Price Adjustment equals zero, then the Buyer and the Special Master shall jointly instruct the Escrow Agent in writing to disburse the balance of the Escrow Account to the Trust Account or the Paying Agent as provided in the Definitive Trust Documents by wire transfer of immediately available funds. To the extent the Buyer and the Special Master are in agreement that an amount should be paid either to (i) the Buyer or (ii) the Trust Account or the Paying Agent, and any dispute to be resolved under Section 3.5(c) relates only to the quantum of such amount, the amount not in dispute shall be paid promptly to the appropriate party and any subsequent amount shall be paid in accordance with the final determination by the Neutral Accountant of such amount and any remaining disputed items.

(f)     Any payment pursuant to Section 3.5(e) shall be made by the Buyer or the Escrow Agent, as the case may be, within five (5) Business Days after the Purchase Price Adjustment (and the components thereof) has been finally determined, by wire transfer of immediately available funds to the account of the Buyer, in the event such payment is to be made by the Escrow Agent, or to the Trust Account or the Paying Agent as provided in the Definitive Trust Documents, in the event such payment is to be made by the Buyer and/or to the extent that there is any amount remaining in the Escrow Account following payment to the Buyer of the amounts to be paid pursuant to Section 3.5(e). All payments under this Section 3.5 shall be without interest, except that any amounts not paid when required by this Section 3.5 shall bear interest from the date due pursuant to this Section 3.5(f) to, and including, the date of payment at the Interest Rate.

(g)     The Parties acknowledge and waive any actual or potential conflict of interest of Company Representatives providing information as described in this Section 3.5 and shall not prevent such Persons from providing such information requested or required hereunder.

(h)     Amounts paid by and among the Parties pursuant to this Section 3.5 shall be treated as an adjustment to the purchase price for the Shares for U.S. federal income and other applicable Tax purposes.

Section 3.6.    Earn-Out Payment.  From and after the Execution Date until the Trust Structure Effective Date or earlier termination of this Agreement, the Parties shall use their respective reasonable best efforts to negotiate in good faith to agree upon amendments to this Agreement acceptable to each Party in their sole discretion to reflect the earn-out payments contemplated by the term sheet attached hereto as Exhibit B (the "Earn-Out Term Sheet").

Section 3.7.    Withholding. Notwithstanding anything to the contrary in this Agreement, each of the Parties, their respective Affiliates and any other Person that has any withholding obligation with respect to any payment made pursuant to this Agreement (each, a "Withholding Agent"), shall be entitled to deduct and withhold (without duplication) from any and all payments made under this Agreement such amounts that are required to be deducted and withheld with respect to the making of such payments under the Code or under any provisions of state, local or foreign Tax Law, provided, that except with respect to payments in the nature of compensation for services, if the applicable Withholding Agent determines in good faith that any payment hereunder is subject to deduction and/or withholding, then such Withholding Agent shall, unless otherwise commercially unreasonable, (i) prior to making any deduction or withholding an amount pursuant

to this <u>Section 3.6</u> (and in any event no later than ten (10) days prior to making any payment hereunder), provide written notice to the applicable recipient of any anticipated deduction or withholding (together with the legal basis thereof) and (ii) cooperate in good faith with the applicable recipient to reduce or eliminate any amounts that would otherwise be deducted or withheld. To the extent that any amounts are so withheld and timely paid over to the proper Taxing Authority, such withheld and deducted amounts will be treated for all purposes of this Agreement as having been paid to the recipient of the payment in respect of which such deduction or withholding was made. In addition, the Buyer and the Special Master shall reasonably cooperate to mitigate any Tax impact of the use of Cash of the Acquired Companies to the extent any such Cash is used for the Closing Consideration, including using such Cash to repay the Specified Debt, pay Company Transaction Expenses, and other such strategies as mutually agreed by the Buyer and the Special Master, which may include use of Buyer's or its Affiliates' debt financing. Any Taxes paid or incurred or reasonably expected to be paid or incurred by the Buyer, the Acquired Companies or their direct or indirect owners as a result of the use of Cash of the Acquired Companies to make the payments in respect of the Closing Consideration shall constitute Leakage.

## ARTICLE IV

## REPRESENTATIONS RELATING TO THE COMPANY AND THE SPECIAL MASTER

It is represented and warranted to the Buyer in accordance with the Procedures Summary that except as disclosed in the correspondingly numbered section of the disclosure schedules delivered to the Buyer simultaneously with the execution of this Agreement (the "<u>Company Disclosure Schedules</u>") (it being agreed that any matter or item disclosed in one Schedule or section of the Company Disclosure Schedules shall be deemed to have been disclosed on each other Schedule or section of the Company Disclosure Schedules in which it is reasonably apparent on the face of such disclosure that the information is required to be included in such other Schedule or section of the Company Disclosure Schedules), each statement contained in this <u>Article IV</u> is true and correct as of the Execution Date and as of the Closing Date (unless otherwise provided in this <u>Article IV</u>).

Section 4.1.    <u>Corporate Existence; Title to Shares</u>.

(a)    The Company is a corporation duly incorporated, validly existing and in good standing under the Laws of the State of Delaware and has all requisite corporate powers and all governmental franchises, licenses, permits, authorizations, consents and approvals required to enable it to own, lease or otherwise hold its properties and assets and to carry on its business as now conducted, except for those the absence of which would not, individually or in the aggregate, be reasonably likely to materially impair the Acquired Companies, taken as a whole. The Company is duly qualified to do business as a foreign corporation and is in good standing under the Laws in each jurisdiction in which the character of the property owned or leased by it or the nature of its activities or the ownership or leasing of its properties make such qualification necessary, except for those jurisdictions where the failure to be so qualified would not, individually or in the aggregate, be reasonably likely to materially impair the Acquired Companies, taken as a whole. The Special Master has heretofore made available to the Buyer true, correct and complete copies of the certificate of incorporation of the Company (the "<u>Company Charter</u>"), and the by-laws of the Company (the "<u>Company By-Laws</u>"). There is no pending or, to the Knowledge of the

WEIL:\99805227\35\67816.0003

Company, threatened Legal Proceedings for the dissolution, liquidation, insolvency, or rehabilitation of any of the Acquired Companies.

(b)    The Special Master (or his counsel or advisors) is in possession of the original certificate evidencing 100% of the Shares. PDVSA is the record and beneficial owner of all of the outstanding Shares. To the extent provided by, and subject to the decrees of, the Sale Procedures Order in effect on the date hereof, the Special Master has the legal capacity, power and authority to (i) execute and deliver this Agreement and each other Transaction Document to which the Special Master is or will be a party, and (ii) surrender the Shares pursuant to the Transactions, and sell, transfer, assign, and deliver the Shares to the Buyer, in each case, the delivery of which will convey good and marketable title to the Shares, free and clear of all Liens (other than transfer restrictions imposed by applicable securities Laws).

(c)    This Agreement has been duly executed and delivered by the Special Master and, assuming due authorization, execution and delivery by the Buyer, and subject to the Sale Order Entry, constitutes, and each other Transaction Document (to the extent the Special Master is or will be a party thereto), when executed and delivered by the Special Master (assuming due authorization, execution and delivery by the other parties thereto) shall constitute, a legal, valid and binding obligation of the Special Master, enforceable against the Special Master in accordance with its terms, except that such enforcement may be limited by the Equitable Exceptions.

Section 4.2.    <u>Governmental Authorization</u>. Except as set forth on <u>Section 4.2</u> of the Company Disclosure Schedules, the execution, delivery and performance by the Special Master of this Agreement and the other Transaction Documents and the consummation by the Special Master of the Transactions require no action by or in respect of, or filing with, any Governmental Body other than (a) applicable requirements of Antitrust Laws as set forth in <u>Section 4.2</u> of the Company Disclosure Schedules, (b) the OFAC License, (c) the entry of the Sale Order by the Court (the "<u>Sale Order Entry</u>"), and (d) other actions or filings the absence or omission of which would not, individually or in the aggregate, be material to the business of the Acquired Companies, taken as a whole.

Section 4.3.    <u>Non-Contravention</u>. Except as set forth on <u>Section 4.3</u> of the Company Disclosure Schedules, the execution, delivery and performance by the Special Master of this Agreement and the other Transaction Documents and the consummation by the Special Master of the Transactions do not and will not, assuming compliance with the matters referred to in <u>Section 4.2</u>, (a) contravene or conflict with the Company Charter or the Company By-Laws or the Organizational Documents of any of the Acquired Companies or any of the Non-Controlled Entities, (b) contravene or conflict with or constitute a violation of any provision of any Law binding upon or applicable to the Acquired Companies or, to the Knowledge of the Company, the Non-Controlled Entities, (c) result in any Negative Consequences under any (i) Material Contract or (ii) any license, franchise, permit or other similar authorization held by the Acquired Companies, or (d) result in the creation or imposition of any Lien (other than Permitted Liens) on any asset of the Acquired Companies, except for such Negative Consequences referred to in clauses (b) or (c) or Liens referred to in clause (d) that would not, individually or in the aggregate, be material to the business of the Acquired Companies, taken as a whole.

Section 4.4.    <u>Capitalization</u>.

(a)    The authorized capital stock of the Company consists of 1,000 Shares. There are 1,000 Shares issued and outstanding, all of which are owned by PDVSA. The Shares have been duly authorized and are validly issued, fully paid and non-assessable and have not been issued in violation of any preemptive rights or Preferential Rights. The Shares constitute the only outstanding Equity Interests of the Company and are not subject to any Preferential Rights.

(b)    Except for this Agreement, there is no outstanding option, warrant, call, right, or Contract of any character to which the Company is a party requiring, and there are no Equity Interests of the Company outstanding which upon conversion or exchange would require, the issuance of any Shares or other securities convertible into, exchangeable for or evidencing the right to subscribe for or purchase Shares. Other than as set forth in <u>Section 4.4(b)</u> of the Company Disclosure Schedules, there are no outstanding equity appreciation, phantom equity, stock unit, profit participation, equity, equity-based performance or similar rights with respect to the Company or any of its Subsidiaries. The Company is not a party to any voting trust or other Contract with respect to the voting, redemption, sale, transfer or other disposition of the Shares.

Section 4.5.    <u>Subsidiaries; Non-Controlled Entities</u>.

(a)    <u>Section 4.5(a)</u> of the Company Disclosure Schedules reflects a true and complete list of each entity (the "<u>Company Entities</u>") in which the Company owns, directly or indirectly, any Equity Interests, other than any Subsidiary of a Non-Controlled Entity. Except as set forth on <u>Section 4.5(a)</u> of the Company Disclosure Schedules, the Company does not, directly or indirectly, own any Equity Interests in any other Person.

(b)    <u>Section 4.5(a)</u> of the Company Disclosure Schedules sets forth the following information with respect to each Company Entity: (i) its name and jurisdiction of organization or formation; (ii) the number of authorized shares or other Equity Interests as of the date hereof; and (iii) the number of issued and outstanding shares or other Equity Interests, the names of the holders thereof, and the number of shares or other Equity Interests held by each such holder. Each Company Subsidiary is duly organized and validly existing under the Laws of its jurisdiction of organization, except where the failure to be so organized and existing would not, individually or in the aggregate, be reasonably likely to be material to the business of the Acquired Companies, taken as a whole.

(c)    Each Company Subsidiary is in good standing under the Laws of its jurisdiction of organization, to the extent such concepts are recognized under the Laws of the jurisdiction of its organization, and has all requisite corporate (or similar entity) power and authority to own, lease and operate its properties and to carry on its business in all material respects as now conducted, except where the failure to in good standing or to have such power and authority would not, individually or in the aggregate, be reasonably likely to be material to the business of the Acquired Companies and Non-Controlled Entities, taken as a whole. To the Knowledge of the Company, each Non-Controlled Entity is duly organized, validly existing and in good standing under the Laws of its jurisdiction of organization, to the extent such concepts are recognized under the Laws of the jurisdiction of its organization, and has all requisite corporate (or similar entity) power and authority to own, lease and operate its properties and to carry on its business in all

material respects as now conducted, except where the failure to be so organized, existing and in good standing or to have such power and authority would not, individually or in the aggregate, be reasonably likely to be material to the business of the Acquired Companies and Non-Controlled Entities, taken as a whole. Each Company Subsidiary and to the Knowledge of the Company, each Non-Controlled Entity: (i) is duly qualified or authorized to do business as a foreign corporation or entity and is in good standing to the extent such concepts are recognized under the Laws of each jurisdiction in which the conduct of its business or the ownership of its properties requires such qualification or authorization, except where the failure to be so qualified, authorized or in good standing would not, individually or in the aggregate, be reasonably likely to be material to the business of the Acquired Companies, taken as a whole and (ii) has full organizational power and authority to own, lease and operate its properties and carry on its business as presently conducted, except where the failure to have such power and authority would not, individually or in the aggregate, be reasonably likely to be material to the business of the Acquired Companies, taken as a whole.

(d)    The Special Master has heretofore made available to the Buyer true, correct and complete copies of the Organizational Documents of each Company Subsidiary.

(e)    The outstanding Equity Interests of each Company Subsidiary are validly issued, fully paid and non-assessable, to the extent such concepts are applicable to such Equity Interests, and have not been issued in violation of any preemptive rights or Preferential Rights or similar rights, and all such Equity Interests represented as being owned by the Company or any Company Subsidiaries are owned by it free and clear of any Liens, other than (i) Liens securing Debt of the Company or any Company Subsidiaries (which Liens shall be removed on or before the Closing), (ii) Liens relating to the transferability of securities under applicable securities Laws, (iii) Liens created by acts of the Buyer or any of its Affiliates and (iv) the Equity Pledge and Liens as a result of the 2020 Bonds. There is no outstanding option, warrant, call, Preferential Right, right or Contract to which any Company Subsidiary is a party requiring, and there are no convertible securities of any Company Subsidiary outstanding which upon conversion would require, the issuance of any Equity Interests of any Company Subsidiary or other securities convertible into Equity Interests of any Company Subsidiary. No Company Subsidiary is a party to any voting trust or other Contract with respect to the voting, redemption, sale, transfer or other disposition of the Equity Interests of such Company Subsidiary.

Section 4.6.    Financial Statements.

(a)    Section 4.6 of the Company Disclosure Schedules sets forth true, correct, and complete copies of: (i) the audited consolidated balance sheet of the Acquired Companies reflected therein as of December 31, 2023, December 31, 2022, and December 31, 2021, the related audited consolidated statements of income and comprehensive income, stockholder's equity and cash flow of the Acquired Companies for the fiscal year then ended, together with the related notes thereof (the "Audited Financial Statements"); and (ii) the unaudited consolidated balance sheet of the Acquired Companies (the "Company Balance Sheet") as of March 31, 2024 (the "Company Balance Sheet Date") and the related condensed consolidated statements of income and comprehensive income, stockholder's equity and cash flows of the Acquired Companies for the three-month period then ended (the "Interim Financial Statements" and, collectively with the Audited Financial Statements, and, as and when delivered, the financial statements delivered by

the Special Master pursuant to <u>Section 6.23</u>, the "<u>Financial Statements</u>"). Except as set forth in the notes to the Financial Statements, with the exception of the absence of normal year-end audit adjustments and footnotes in the Interim Financial Statements, each of the Financial Statements has been prepared in conformity with United States generally accepted accounting principles ("<u>GAAP</u>") applied on a consistent basis (except as may be indicated in the notes thereto) and fairly presents, in all material respects, the consolidated financial position, results of operations and cash flows of the Acquired Companies as of the dates and for the periods indicated therein.

(b)     The Acquired Companies (i) maintain a standard system of accounting established and administered in accordance with GAAP and (ii) have established and maintain a system of internal controls over financial reporting designed to provide reasonable assurance regarding the reliability of the financial reporting and the preparation of the Financial Statements for external purposes in accordance with GAAP. Except as disclosed on <u>Section 4.6(b)</u> of the Company Disclosure Schedules, there (x) are no significant deficiencies or weaknesses in any system of internal accounting controls used by each of the Acquired Companies, (y) has not been since the Lookback Date any fraud or other unlawful wrongdoing on the part of any of management or other employees of the Acquired Companies who have a significant role in the preparation of Financial Statements or the internal accounting controls used by the Company and each of its Subsidiaries relating to such preparation or controls, or (z) has not been since the Lookback Date any claim or allegation regarding any of the foregoing.

Section 4.7.     <u>Absence of Certain Changes</u>. From December 31, 2023 to the date of this Agreement:

(a)     the Acquired Companies have conducted their businesses in the Ordinary Course in all material respects;

(b)     there has not been a Company Material Adverse Effect; and

(c)     no Acquired Company has entered into, terminated, amended or otherwise modified any Related Party Contract.

Section 4.8.     <u>No Undisclosed Material Liabilities</u>.

(a)     The Acquired Companies have no material liabilities of any kind that would be required to be reflected in or reserved against on a consolidated balance sheet of the Company or in the notes thereto prepared in accordance with GAAP, other than:

(i)     liabilities that are adequately accrued and specifically reflected in the Company Balance Sheet or the notes thereto;

(ii)     liabilities incurred since the Company Balance Sheet Date in the Ordinary Course and which, individually or in the aggregate, would not be reasonably likely to be material to the Acquired Companies (taken as a whole);

(iii)     liabilities or obligations that have been discharged or paid in full in the Ordinary Course or which, individually or in the aggregate, would not be reasonably likely to have a Company Material Adverse Effect;

(iv)     liabilities or obligations under this Agreement or otherwise in connection with the Transactions; or

(v)     liabilities or obligations set forth in Section 4.8(a)(iv) of the Company Disclosure Schedules.

(b)     Section 4.8(b) of the Company Disclosure Schedules sets forth a complete and accurate accounting of all of the Debt and Credit Support Arrangements owed by the Acquired Companies to any Person, calculated as of the date hereof in accordance with GAAP.

Section 4.9.    Legal Proceedings. As of the Execution Date, except for the Specified Litigation and as set forth in Section 4.9 of the Company Disclosure Schedules and as would not, individually or in the aggregate, be material to the business of the Acquired Companies, taken as a whole, there are no material Legal Proceedings pending, or, to the Knowledge of the Company, threatened in writing against the Acquired Companies or, to the Knowledge of the Company, threatened in writing against any Non-Controlled Entity, in each case, before any Governmental Body (whether local, state, federal or foreign). As of the Execution Date, except as would not, individually or in the aggregate, be reasonably likely to be material to the business of the Acquired Companies, taken as a whole, neither the Company nor any of its Subsidiaries is subject to any outstanding judgment, Order, decree or injunction of any court or other Governmental Body.

Section 4.10.    Taxes. Except as set forth in the Company Balance Sheet (including the notes thereto) and except as would not, individually or in the aggregate, be reasonably likely to have a Company Material Adverse Effect:

(a)     all income and other material Tax Returns required to be filed with any Taxing Authority by, or with respect to, the Acquired Companies have been filed (taking into account any applicable extensions) in accordance with all applicable Laws, the Acquired Companies have paid, or caused to be paid, all material Taxes shown as due and payable on such Tax Returns, and, as of the time of filing, such Tax Returns were true and complete in all material respects;

(b)     all material amounts of Taxes which any of the Acquired Companies were obligated to withhold from amounts owing to any employee, creditor, owner or third party have been fully and timely paid;

(c)     except as set forth in Section 4.10(c) of the Company Disclosure Schedules, as of the date hereof, there is no Legal Proceeding or Claim in respect of any Tax or Tax Return (each, a "Tax Proceeding") now proposed in writing or pending against or with respect to the Acquired Companies;

(d)     except as set forth in Section 4.10(d) of the Company Disclosure Schedules, none of the Acquired Companies have waived any statute of limitations in respect of Taxes beyond the date hereof or agreed to any extension of time beyond the date hereof with respect to a Tax assessment or deficiency (other than pursuant to extensions of time to file Tax Returns obtained in the Ordinary Course);

18

(e)    except as set forth in <u>Section 4.10(e)</u> of the Company Disclosure Schedules, the Acquired Companies are not a party to, are not bound by and do not have any obligation under any Tax sharing, allocation or indemnity agreement, or any similar agreement or arrangement, except for (i) any such agreement or arrangement solely between or among the Acquired Companies or (ii) any commercial agreement entered into in the Ordinary Course the primary purpose of which does not relate to Taxes;

(f)    no claim has been made by a Taxing Authority in a jurisdiction where any of the Acquired Companies do not file Tax Returns that the Acquired Companies are or may be subject to taxation by that jurisdiction, which claim has not been resolved;

(g)    none of the Acquired Companies will be required to include any material item of income in, or exclude any material item of deduction from, income for any Tax period (or portion thereof) ending after the Lock Box Date as a result of any: (i) change in method of accounting made on or prior to the Lock Box Date pursuant to Section 481(a) of the Code (or any comparable provision of applicable Law), (ii) "closing agreement" as described in Section 7121 of the Code (or any comparable provision of applicable Law), (iii) installment sale or open transaction disposition made on or prior to the Lock Box Date, or (iv) prepaid amount received on or prior to the Lock Box Date;

(h)    none of the Acquired Companies has participated in any "listed transaction" (other than a "loss transaction") within the meaning of Treasury Regulation Section 1.6011-4; and

(i)    there are no Liens with respect to Taxes upon any asset of the Acquired Companies other than Permitted Liens.

Notwithstanding any other provision in this Agreement, no representation or warranty is made with respect to the existence, availability, amount, usability or limitations (or lack thereof) of any net operating loss, net operating loss carryforward, capital loss, capital loss carryforward, basis amount or other Tax attribute (whether federal, state, local or foreign) of the Acquired Companies after the Closing Date, and none of the Buyer or any of its Affiliates (including, after the Closing, the Acquired Companies) may rely on any of the representations and warranties in this <u>Section 4.10</u> with respect to any position taken in or any Taxes with respect to any Post-Closing Tax Period.

Section 4.11.    <u>Company Benefit Plans; Employment</u>.

(a)    The Special Master has provided the Buyer with a list (set forth in <u>Section 4.11(a)</u> of the Company Disclosure Schedules) identifying each material Company Benefit Plan.

(b)    With respect to each material Company Benefit Plan, the Special Master has made available to the Buyer true, complete and correct copies (or, to the extent such plan is unwritten, an accurate written description), to the extent applicable, of: (i) the current plan and trust document and any amendments thereto and the most recent summary plan description, together with each subsequent summary of material modifications with respect to such Company Benefit Plan, (ii) the most recent annual report on Form 5500 thereto (including any related actuarial valuation report) filed with the Internal Revenue Service (if any such report was required), (iii) the most recent financial statements, (iv) the most recent Internal Revenue Service

determination, opinion or advisory letter, and (v) for the three (3) most recent years, nondiscrimination testing results in respect of such Company Benefit Plan. For purposes of this Section 4.11(b), summary plan descriptions and summaries of material modification available at https://www.hr.citgo.com as of five (5) business days prior to the Execution Date are considered to have been made available to the Buyer. The Special Master has made available copies of Code Section 280G calculations prepared by the Company or its representatives (whether or not final) with respect to certain employees of the Acquired Companies in connection with the Transactions.

(c)     Except as would not, individually or in the aggregate, be reasonably likely to result in a material liability to the Acquired Companies taken as a whole, (i) each Company Benefit Plan has been established, maintained, operated, funded and administered in compliance with (A) its terms and (B) the requirements prescribed by Law (including, to the extent applicable, ERISA and the Code) which are applicable to such Company Benefit Plan and (ii) all benefits, contributions and premium payments required to be made with respect to a Company Benefit Plan have been timely made or paid in full, or to the extent not required to be made or paid in full, have been accrued and reflected on the Financial Statements as required by GAAP.

(d)     Except as would not, individually or in the aggregate, be reasonably likely to result in a material liability to the Acquired Companies taken as a whole, (i) no  Acquired Company or any of their respective ERISA Affiliates has incurred any liability under Title IV of ERISA, Sections 412, 430 or 4971 of the Code or Section 302 of ERISA that has not been satisfied in full when due, and (ii) all insurance premiums with respect to Company Benefit Plans, including premiums to the Pension Benefit Guaranty Corporation ("PBGC"), have been paid when due. No Acquired Company or any of their respective ERISA Affiliates currently, sponsors, maintains, or contributes to (or is obligated to contribute to) or has any liability, contingent or otherwise, or has within the last six (6) years, sponsored or maintained, contributed to or been obligated to contribute to, with respect to (i) a "multiemployer plan," as defined in Section 3(37) of ERISA, (ii) a "multiple employer plan" as defined in Section 413(c) of the Code, or (iii) a "multiple employer welfare arrangement" within the meaning of Section 3(40) of ERISA.

(e)     Except as set forth in Section 4.11(e) of the Company Disclosure Schedules, with respect to any Company Benefit Plan that is subject to Title IV of ERISA: (i) there does not exist any failure to meet the "minimum funding standard" of Section 412 of the Code or 302 of ERISA (whether or not waived); (ii) such plan is not in "at-risk" status for purposes of Section 430 of the Code; (iii) as of the last day of the most recent plan year ended prior to the Execution Date, there is no "amount of unfunded benefit liabilities" as defined in Section 4001(a)(18) of ERISA; (iv) except as would not, individually or in the aggregate, be reasonably likely to result in a material liability to the Acquired Companies taken as a whole, no reportable event within the meaning of Section 4043(c) of ERISA has occurred; and (v) the PBGC has not instituted proceedings to terminate any such plan and, to the Knowledge of the Company, no circumstances exist which could serve as a basis for the institution of such proceedings.

(f)     Each Company Benefit Plan that is intended to be qualified under Section 401(a) of the Code is so qualified and has received a favorable determination letter or opinion letter, if applicable, from the Internal Revenue Service, and the related trust is intended to be exempt from federal income taxation under the Code and is so exempt. There are no facts or set of circumstances and, to the Knowledge of the Company, nothing has occurred that would reasonably

20

be expected to cause the loss of such qualification or exemption or reasonably be expected to result in any Company Benefit Plan being required to pay any Tax or penalty under applicable Law that is material to the Acquired Companies taken as a whole as a condition to maintaining such qualification or exemption.. Each trust funding any Company Benefit Plan which is intended to meet the requirements of Section 501(c)(9) of the Code meets such requirements and provides no disqualified benefits (as such term is defined in Section 4976(b) of the Code).

(g)     Except (i) as would not, individually or in the aggregate, be reasonably likely to result in a material liability to the Acquired Companies taken as a whole or (ii) as set forth in Section 4.11(g) of the Company Disclosure Schedules, no Acquired Company has any obligation or liability to provide post-employment medical or welfare benefits, except (A) as required by the continuing coverage requirements of COBRA and at the sole expense of the participant or such participant's spouse or dependents or (B) death or disability benefits under any retirement or deferred compensation plans.. To the Company's Knowledge, since the Lookback Date, there have been no written communications by the Acquired Companies to employees of any Acquired Company which promise or guarantee post-employment medical or welfare benefits on a permanent basis.

(h)     Except as would not, individually or in the aggregate, be reasonably likely to result in a material liability to the Acquired Companies taken as a whole, no Acquired Company nor any plan sponsor or plan administrator of a Company Benefit Plan, or to the Company's Knowledge, any third-party fiduciary of a Company Benefit Plan, has engaged in any prohibited transaction (within the meaning of Section 406 of ERISA or Section 4975 of the Code) or breached any fiduciary duty under ERISA with respect to such Company Benefit Plan that would be reasonably likely to subject any Acquired Company or Company Benefit Plan to any Tax or penalty (civil or otherwise) imposed by ERISA, the Code or other applicable Law, or any other material liability. Except (i) as would not, individually or in the aggregate, be reasonably likely to result in a material liability to the Acquired Companies taken as a whole, or (ii) as set forth in Section 4.11(h) of the Company Disclosure Schedules, there are no pending or, to the Knowledge of the Company, threatened claims (other than routine claims for benefits) by or on behalf of any Company Benefit Plan or any trusts which are associated with such Company Benefit Plans and, to the Knowledge of the Company, no facts or circumstances exist that would reasonably be expected to result in such claim. Except as would not, individually or in the aggregate, be reasonably likely to result in a material liability to the Acquired Companies taken, none of the Company Benefit Plans are under audit or subject to an administrative proceeding or, to the Knowledge of the Company, investigation or examination by the Internal Revenue Service, the Department of Labor, the PBGC or any other Governmental Body.

(i)     Except as would not, individually or in the aggregate, be reasonably likely to result in a material liability to the Acquired Companies taken as a whole, each Company Benefit Plan that is a "nonqualified deferred compensation plan" within the meaning of Section 409A(d)(1) of the Code that is subject to Section 409A of the Code, complies with, and has been operated and administered in compliance with, Section 409A of the Code and the regulations and related guidance promulgated thereunder in all material respects.

(j)     Except (x) as would not, individually or in the aggregate, be reasonably likely to result in a material liability to the Acquired Companies taken as a whole, (y) as provided

in Section 6.8, or (z) as set forth on <u>Section 4.11(j)</u> of the Company Disclosure Schedules, neither the execution, delivery or the performance of this Agreement nor the consummation of the Transactions (alone or in conjunction with any other event) will or could reasonably be expected to (i) accelerate the time of payment or vesting or increase the amount of, or trigger any funding of, compensation or benefits under any Company Benefit Plan; (ii) result in any limitation on the right of an Acquired Company or Buyer, or any of their respective Affiliates, to amend, merge, terminate or receive a reversion of assets from a Company Benefit Plan or related trust; (iii) entitle any current or former director, officer, manager, employee, contractor or consultant of any Acquired Company to severance pay, termination pay or any other similar payment, right or benefit; (iv) result in any payment, right or benefit that (A) would not be deductible under Section 280G of the Code and/or (B) would result in any excise tax on any "disqualified individual" (within the meaning of Section 280G of the Code) under Section 4999 of the Code. Except as set forth on <u>Section 4.11(j)</u> of the Company Disclosure Schedules, none of the Acquired Companies has any obligation to gross-up or reimburse any current or former director, officer, manager, employee, contractor or consultant of any Acquired Company for any Taxes or related interest or penalties incurred by such individual, including under Section 4999, 409A or 105(h) of the Code.

(k)     No Company Benefit Plan is maintained primarily in respect of any current or former director, officer, manager, employee, contractor or consultant of any Acquired Company who is located outside of the United States.

(l)     Except as set forth in <u>Section 4.11(l)</u> of the Company Disclosure Schedules and as would not, individually or in the aggregate, be material to the Acquired Companies, taken as a whole, (i) the Acquired Companies are in material compliance with all applicable Laws respecting employment, employment practices and terms and conditions of employment, including all Laws relating to labor, labor relations, collective bargaining, occupational safety and health, and wages, hours, worker classification, immigration, whistleblower protections, reasonable accommodation, leaves of absence, paid sick leave, unemployment insurance, workers' compensation, retaliation, harassment, and employment discrimination and (ii) there are no actual or, to the Knowledge of the Company, threatened unfair labor practice charges, labor grievances, or labor arbitrations against the Acquired Companies which, individually or in the aggregate, are expected to result in material liability for the Company.

(m)     To the Knowledge of the Company, no employee of the Acquired Companies holding a position of executive vice president or above has notified the Company or the Acquired Companies in writing of an intention to resign, retire, or otherwise terminate his or her employment prior to the Closing or in connection with the Transactions nor, to the Knowledge of the Company, does any such employee have an intention to do so.

(n)     Except as set forth in <u>Section 4.11(n)</u> of the Company Disclosure Schedules, (i) none of the Acquired Companies are party to or bound by any collective bargaining agreements or other agreement (each, a "<u>Collective Bargaining Agreement</u>") with any labor union, works council, or other labor organization (each, a "<u>Union</u>") and no such agreement is being negotiated by any of the Acquired Companies (each such Collective Bargaining Agreement set forth on <u>Section 4.11(n)</u> of the Company Disclosure Schedules, a "<u>Company Collective Bargaining Agreement</u>"); (ii) since the Lookback Date, to the Knowledge of the Company, no group of employees of an Acquired Company or Union has sought to organize any employees of an Acquired Company not covered by

a Company Collective Bargaining Agreement for purposes of collective bargaining, made a demand for recognition or certification, sought to bargain collectively with any Acquired Company, or filed a petition for recognition with any Governmental Body, except that resulted in entry into or involved a pre-existing Company Collective Bargaining Agreement; and (iii) since the Lookback Date, there has been no labor strike, lockout, slowdown, stoppage, picketing, boycott, handbilling, demonstration, leafletting, sit-in, sick-out, lockout or other form of organized labor disruption pending or, to the Knowledge of the Company, threatened against or affecting any Acquired Company.

(o)     Since the Lookback Date, (i) to the Knowledge of the Company, no material allegations of sexual harassment or other sexual misconduct have been made by any current or former employee of the Acquired Companies against any current employee of the Acquired Companies with the title of executive vice president or above and, to the Knowledge of the Company, no employee of any Acquired Company has engaged in any cover up of such harassment or misconduct or knowingly aided or assisted any other person or entity to engage in any such harassment or misconduct, (ii) there are no Legal Proceedings pending or, to the Knowledge of the Company, threatened related to any allegations made by any current or former employee of the Acquired Companies of sexual harassment or other sexual misconduct against any employee of the Acquired Companies with the title of executive vice president or above and (iii) none of the Acquired Companies have entered into any settlement agreements related to allegations of sexual harassment or other sexual misconduct made by any current or former employee of the Acquired Companies against any current employee of the Acquired Companies who is or was at the time of the alleged conduct in a managerial or supervisory role with the title of executive vice president or above.

(p)     Since the Lookback Date, the Acquired Companies have complied in all material respects with Worker Adjustment and Retraining Notification Act and any similar state or local law, as amended (collectively, the "WARN Act") and have not incurred any material liability or material obligation under the WARN Act.

(q)     Except as would not be reasonably expected to result in material liability to the Company, each of the employees of the Acquired Companies have all work permits, immigration permits, visas, or other authorizations required by applicable Law for such individual given the duties and nature of such individual's employment, and the Acquired Companies have on file for each employee of the Acquired Companies a Form I-9 that is validly and properly completed in accordance with applicable Law.

(r)     No Acquired Company is a party to a U.S. federal Government Contract. The Acquired Companies are not, and have not been since the Lookback Date, the subject of any Legal Proceeding in connection with any U.S. federal Government Contract or related compliance with Executive Order No. 11246 of 1965, Section 503 of the Rehabilitation Act of 1973 or the Vietnam Era Veterans' Readjustment Assistance Act of 1974. The Acquired Companies are not debarred, suspended or otherwise ineligible from doing business with the U.S. government or any U.S. government contractor.

(s)     Except as would not, individually or in the aggregate, be reasonably likely to result in a material liability to the Acquired Companies taken as a whole; there are no, and since

WEIL:\99805227\35\67816.0003

the Lookback Date there have not been, any material workers' compensation claims, insured or uninsured, pending or, to the Knowledge of the Company, threatened, relating to any employee of the Acquired Companies or any Company Benefit Plan. Except as would not, individually or in the aggregate, be reasonably likely to have a Company Material Adverse Effect, all amounts required by any statute, insurance policy, Governmental Body or agreement to be paid by the Acquired Companies into any workers' compensation loss or reserve fund, collateral fund, sinking fund or similar account have been duly paid into such fund or account as required.

(t)    Pursuant to the terms of the EPP and the RRP, the Company has established and maintains a grantor trust that will become irrevocable as of the Closing (the "<u>EPP and RRP Rabbi Trust</u>").

Section 4.12.    <u>Compliance with Laws; Permits</u>.

(a)    Except as set forth in <u>Section 4.12(a)</u> of the Company Disclosure Schedules, since the Lookback Date, (i) none of the Acquired Companies and, to the Knowledge of the Company, none of the Non-Controlled Entities has materially violated or is in material violation of, any Laws except for any violations that, individually or in the aggregate, are not, and would not be reasonably likely to be material to the business of the Acquired Companies, taken as a whole and (ii) none of the Acquired Companies has received any written notice of or been charged with the material violation of any Laws except for any violations that, individually or in the aggregate, are not, and would not be reasonably likely to be material to the business of the Acquired Companies, taken as a whole.

(b)    Except as set forth in <u>Section 4.12(b)</u> of the Company Disclosure Schedules, the Acquired Companies have all Permits which are required for the operation of its respective business as presently conducted (and such Permits are in full force and effect), except for any Permit which the failure of the Acquired Companies to have (or to be in full force and effect) would not be material to the business of the Acquired Companies, taken as a whole. Except as would not be material to the Acquired Companies, taken as a whole, the Acquired Companies are, and since the Lookback Date have been, in compliance in all material respects with the terms, conditions or provisions of any such Permits.

Section 4.13.    <u>Regulatory Matters</u>.

(a)    Except as would not, individually or in the aggregate, reasonably be expected to be material to the Acquired Companies, taken as a whole, and except as set forth in <u>Section 4.13(a)</u> of the Company Disclosure Schedules, since the Lookback Date, (i) none of the Acquired Companies, the Acquired Companies' directors, officers, employees, nor to the Knowledge of the Company, any Representatives or other Person acting on behalf of the Acquired Companies has violated any Anti-Corruption Law and (ii) none of the Acquired Companies, the Acquired Companies' directors, officers, employees, nor to the Knowledge of the Company, any Representatives or other Person acting on behalf of the Acquired Companies, has offered, paid, given, promised, authorized, solicited or received, the payment of, anything of value (including, but not limited to, money, checks, wire transfers, tangible and intangible gifts, favors, services, employment or entertainment and travel) directly or indirectly to or from any employee, officer, or Representative of, or any Person otherwise acting in an official capacity for or on behalf of a

Governmental Body, whether elected or appointed, including an officer or employee of a state-owned or state-controlled enterprise, a political party, political party official or employee, candidate for public office, or an officer or employee of a public international organization (such as the World Bank, United Nations, International Monetary Fund, or Organization for Economic Cooperation and Development) (any such person, a "<u>Government Official</u>") (A) for the purpose of (1) influencing any act or decision of a Government Official or any other person in his or her official capacity, (2) inducing a Government Official or any other person to do or omit to do any act in violation of his or her lawful duties, (3) securing any improper advantage, (4) inducing a Government Official or any other person to influence or affect any act or decision of any Governmental Body or (5) assisting the Acquired Companies, or any Acquired Company director, officer employee, Representative, or any other person acting on behalf of an Acquired Company in obtaining or retaining business, or (B) in a manner which would constitute or have the purpose or effect of public or commercial bribery or corruption, acceptance of, or acquiescence in extortion, kickbacks, or other unlawful or improper means of obtaining or retaining business or any improper advantage.

(b)     Except as would not, individually or in the aggregate, reasonably be expected to be material to the Acquired Companies, taken as a whole, and except as set forth in <u>Section 4.13(b)</u> of the Company Disclosure Schedules, (i) the Acquired Companies and their respective directors, officers, employees, and, to the Knowledge of the Company, Representatives and other Persons acting for or on behalf of any of the foregoing Persons, are, and at all times since the Lookback Date, in compliance with all applicable Economic Sanctions/Trade Laws and all applicable Money Laundering Laws and (ii) in the five (5) years prior to the Execution Date none of the Acquired Companies is a Sanctions Target or has carried on or carries on, any business, directly or knowingly indirectly, involving Cuba, Iran, Syria, North Korea, the Crimea region, the non-government-controlled areas of Zaporizhzhia and Kherson or the so-called Donetsk or Luhansk People's Republics or any Sanctions Target in violation of applicable Economic Sanctions/Trade Laws.

(c)     Except as would not, individually or in the aggregate, reasonably be expected to be material to the Acquired Companies, taken as a whole, and except as set forth in <u>Section 4.13(c)</u> of the Company Disclosure Schedules, since the Lookback Date (i) none of the Acquired Companies has conducted or initiated any internal investigation, review or audit, or made a voluntary, directed, or involuntary disclosure to any Governmental Body or third party with respect to any alleged or suspected act or omission arising under or relating to any potential noncompliance with any applicable Anti-Corruption Law, Economic Sanctions/Trade Law, or Money Laundering Law, (ii) none of the Acquired Companies, nor any of their respective directors or officers, nor, to the Knowledge of the Company, any employees (other than officers), Representatives, or any other Person acting at the direction of an Acquired Company has received any written notice, request or citation (including a whistleblower complaint) for any actual or potential noncompliance with any applicable Anti-Corruption Law, Economic Sanctions/Trade Law or Money Laundering Law, (iii) the Acquired Companies have implemented and maintained internal controls, policies and procedures designed to detect and prevent violations of Anti-Corruption Laws, Economic Sanctions/Trade Laws and Money Laundering Laws, and (iv) the Acquired Companies have at all times made and maintained accurate books and records in material compliance with all applicable Anti-Corruption Laws, Economic Sanctions/Trade Laws or Money Laundering Laws.

Section 4.14.  Environmental Matters. Except as set forth in Section 4.14 of the Company Disclosure Schedules and except as would not, individually or in the aggregate, reasonably be expected to result in the Acquired Companies incurring liabilities which are material to the Acquired Companies, taken as a whole, (i) no written Claim or Order has been received by, and no Legal Proceeding is pending or, to the Knowledge of the Company, threatened by any Person against the Acquired Companies, and no penalty has been assessed or consent decree or Order issued by a Governmental Body against the Acquired Companies, in each case, with respect to any matters arising out of any Environmental Law, which remains outstanding; (ii) the Acquired Companies have been since the Lookback Date, and are, in compliance with all Environmental Laws, which compliance includes obtaining, maintaining and complying with Permits required under Environmental Laws for the conduct of their respective businesses (the "Company Environmental Permits"); (iii) no Governmental Body has begun, or to the Knowledge of the Company, threatened to begin, any Legal Proceeding to terminate, revoke, cancel, suspend, materially reform or not renew any Company Environmental Permit; (iv) to the Knowledge of the Company, there is no investigation pending or threatened against the Acquired Companies by any Governmental Body alleging non-compliance with or liability under any Environmental Law; (v) to the Knowledge of the Company, the Acquired Companies have not generated, treated, stored, disposed of, arranged for the disposal of, transported, or Released, or exposed any Person to, any Hazardous Substances in a manner or concentration that has given rise, or would reasonably be expected to give rise, to liabilities of the Acquired Companies under Environmental Laws, which liability has not been resolved; (vi) to the Knowledge of the Company, no Hazardous Substances have been Released in or under, and no Hazardous Substances are migrating from, (x) properties currently, or to the Knowledge of the Company, formerly owned, leased or operated by the Acquired Companies in a manner or concentrations requiring the Acquired Companies to undertake any investigation, monitoring, removal or remediation under Environmental Laws or (y) to the Knowledge of the Company, any other properties in a manner or concentrations requiring the Acquired Companies to undertake any investigation, monitoring, removal or remediation under Environmental Laws; and (vii) none of the Acquired Companies has assumed by contract liabilities or obligations of any other Person arising under Environmental Laws. The Company has made available to the Buyer copies of all material, non-privileged environmental investigations, assessments or reports conducted in the three (3) years prior to the Execution Date by or on behalf of the Acquired Companies in relation to any current or prior business of the Acquired Companies or any property or facility currently or previously owned, leased or operated by the Acquired Companies, which investigation, assessment or report reveals actual or potential unresolved material non-compliance with or liability under any Environmental Law, but excluding routine environmental monitoring reports conducted by the Acquired Companies in the Ordinary Course.

Section 4.15.  Title to Properties. Except as would not, individually or in the aggregate, be material to the Acquired Companies, taken as a whole, each of the Acquired Companies has good title to, or valid leasehold or other ownership interests or rights in, all its material properties and assets except: (i) for such interest or rights as are no longer used or useful in the conduct of the business of the Acquired Companies as of the Execution Date or as have been disposed of in the Ordinary Course, and (ii) for defects in title, burdens, easements, restrictive covenants and similar encumbrances or impediments that, in each case that do not and will not, individually or in the aggregate, interfere with its ability to conduct its business as currently conducted. None of the properties and assets of the Acquired Companies are subject to any Liens (other than Permitted Liens) that, in the aggregate, interfere with the ability of the Acquired Companies to conduct their

WEIL:\99805227\35\67816.0003

business in the Ordinary Course except as would not, individually or in the aggregate, have a Company Material Adverse Effect.

Section 4.16.   Material Contracts.

(a)   Section 4.16(a) of the Company Disclosure Schedules sets forth a true, correct and complete list of each Material Contract. For purposes of this Agreement, "Material Contract" shall mean any Contract to which any Acquired Company, and to the Knowledge of the Company, any Specified Joint Venture, is a party or to which any assets, properties, or businesses of any Acquired Company, or to the Knowledge of the Company, any Specified Joint Venture, are bound as of the Execution Date (in each case, excluding (i) Contacts between or among Acquired Companies only and (ii) spot order Contracts entered into in the Ordinary Course of Business) that:

(i)   (A) limits in any material respect either the type of business in which any Acquired Company may engage or the manner or locations in which any of them may so engage in any business (including through "non-competition" or "exclusivity" provisions), (B) would require the disposition of any material assets or line of business of any Acquired Company or (C) grants "most favored nation" or similar status with respect to any material obligations and would run in favor of any Person (other than the Company or a wholly owned Company Subsidiary);

(ii)   (A) is an indenture, loan or credit Contract, loan note, mortgage Contract, or other Contract representing, or any guarantee of, indebtedness for borrowed money of any Acquired Company in excess of $10,000,000 (excluding any government-mandated or state-wide bonds or guarantees), (B) is a finance lease of any Acquired Company as lessee in excess of $5,000,000, or (C) is a guarantee by any Acquired Company of indebtedness for borrowed money or any finance lease of any Person other than the Company or a wholly owned Company Subsidiary (excluding any government-mandated or state-wide bonds or guarantees);

(iii)   grants (A) any right of first refusal, right of first negotiation or similar right, or (B) any put, call or similar right, to any Person (other than the Company or a wholly owned Company Subsidiary) with respect to any Equity Interest, property, or other asset, in each case, that is material to the Acquired Companies;

(iv)   was entered into to resolve or settle any litigation or threatened litigation (A) for an amount in excess of $5,000,000 payable by an Acquired Company (without taking into account insurance proceeds) or (B) which imposes any non-monetary ongoing obligation on any Acquired Company or any Non-Controlled Entity (other than customary confidentiality obligations), in each case of clause (A) and clause (B), that has not been fully paid or performed, as applicable;

(v)   limits or restricts the ability of any Acquired Company to declare or pay dividends or make distributions in respect of their Equity Interests that will be binding from and after the Closing;

WEIL:\99805227\35\67816.0003

(vi)     is a partnership, limited liability company, joint venture, co-development or other similar agreement, relating to the formation, creation, operation, management or control of any partnership, limited liability company, joint venture, co-development or similar entity (however organized) in which the Company owns, directly or indirectly, through a Company Subsidiary (excluding Equity Interests owned directly or indirectly by any Non-Controlled Entities) any Equity Interest and has invested or is contractually required to invest capital (including for the avoidance of doubt with respect to any Non-Controlled Entity or non-wholly owned Company Subsidiary, but excluding any wholly owned Company Subsidiary);

(vii)     relates to the sale, transfer or acquisition or disposition of any material business, material assets (other than those providing for sales, transfers or acquisitions of assets in the Ordinary Course) or Equity Interests of any Acquired Company, in each case (A) for an amount in excess of $10,000,000 in any transaction or series of related transactions (other than Contracts for transactions that were consummated prior to the Lookback Date or Contracts that do not contain any ongoing rights owing to, or obligations or liabilities of, any Acquired Company) or (B) pursuant to which any Acquired Company has any material ongoing obligations or liabilities (including in respect of indemnification, "earn-out" and similar contingent or deferred payment obligations);

(viii)     is a Contract providing for indemnification by an Acquired Company of any officer, manager, director or employee of any Acquired Company;

(ix)     is a Contract (A) with an employee of an Acquired Company, pursuant to which such employee is entitled to receive base annual compensation in excess of $400,000, (B) that provides for mandatory or potential severance payments by an Acquired Company in excess of $100,000 or (C) with an employee, officer or director of any Acquired Company that (I) contains any non-compete or non-solicitation covenants or (II) modifies the at-will nature of the employment of any employee or otherwise requires advance notice for the termination of the Contract by any Acquired Company;

(x)     is a Company Collective Bargaining Agreement;

(xi)     is a term Contract with one of the ten largest suppliers of a Business Unit of the Acquired Companies (as determined by dollar volume for the 12-month period immediately prior to the Effective Date); and

(xii)     is a term Contract with one of the ten largest customers of a Business Unit of the Acquired Companies (as determined by dollar volume for the 12-month period immediately prior to the Effective Date).

(b)     Each Material Contract is a legal, valid and binding obligation of the Acquired Companies as applicable, other than those Material Contracts to which a Non-Controlled Entity is party, each of which are, to the Knowledge of the Company, a legal, valid and binding obligation of such Non-Controlled Entity. Except as would not, individually or in the aggregate, be material to the Acquired Companies, taken as a whole, each Material Contract is in full force and effect and enforceable by the applicable Acquired Company, or, to the Knowledge of the

Company, the applicable Non-Controlled Entity, in each case, subject to the Equitable Exceptions, and none of the Acquired Companies or, to the Knowledge of the Company, any Non-Controlled Entity or any other party to a Material Contract, is in material breach or violation of any provision of, or in material default under, any Material Contract, and no event has occurred that, with or without notice, lapse of time or both, would constitute a material breach, violation or default or give rise to a right of termination, cancellation or acceleration of any material right or obligation or loss of any benefit thereunder. A true and correct copy of each Material Contract has previously been made available to the Buyer.

(c)     Since the Lookback Date, none of any Acquired Company or its Affiliates, or to the Knowledge of the Company, any Non-Controlled Entity, has given or received (i) written notice regarding any actual or alleged or potential violation of any provision under any Material Contract or (ii) written notice to any Material Contract threatening, intending or electing to terminate, repudiate, modify or cancel such Material Contract. Except as would not, individually or in the aggregate, be material to any Acquired Company, the Acquired Companies (or, if applicable, to the Knowledge of the Company, the Non-Controlled Entities) have properly paid all amounts to be paid and otherwise performed all material obligations required to be performed by them under the Material Contracts.

Section 4.17.   <u>Intellectual Property and Data Privacy</u>.

(a)     <u>Section 4.17(a)</u> of the Company Disclosure Schedules sets forth a list of all registered Intellectual Property that is owned by the Acquired Companies and is used in, held by, or held for use in the conduct of the business of the Acquired Companies as of the Execution Date ("<u>Registered Intellectual Property</u>"). Except as would not, individually or in the aggregate, be material to the Acquired Companies, taken as a whole, the Acquired Companies own or possess the right to use, license and enforce all (i) patents and patent applications, (ii) registered, applied for, or unregistered trademarks, trade names, trade dress, service marks, logos, and business names, and all related goodwill, (iii) internet domain names, (iv) registered, applied for, or unregistered works of authorship and copyrights, including copyrights in computer software programs or applications, and (v) trade secrets, know- how and other confidential and proprietary information, including ideas, inventions (whether patentable or not), research, pricing and cost information, customer information, business plans, marketing plans, and proposals (collectively, "<u>Intellectual Property</u>") that are used in, held by, or held for use in the conduct of the business of the Acquired Companies as currently conducted (collectively, the "<u>Company Intellectual Property</u>" and to the extent owned by the Acquired Companies the "<u>Company Owned Intellectual Property</u>"), free and clear of all Liens, except for Permitted Liens. To the Knowledge of the Company, the Registered Intellectual Property is valid and enforceable.

(b)     (i) Since the Lookback Date, to the Knowledge of the Company, the conduct of the business of the Acquired Companies and use of the Company Intellectual Property does not and has not infringed upon or otherwise violated any Intellectual Property rights of any other Person; (ii) no third party is challenging, or, to the Knowledge of the Company, infringing or otherwise violating any right of the Acquired Companies in the Company Owned Intellectual Property; and (iii) since the Lookback Date, the Acquired Companies have not received written notice of any pending Claim, Order or Legal Proceeding with respect to any alleged or potential infringement or other violation of Intellectual Property rights of any other Person or with respect

29

to any Company Intellectual Property. The Acquired Companies have taken commercially reasonable measures to maintain the confidentiality of any material proprietary information or trade secrets included in Company Intellectual Property.

(c)     Except as would not, individually or in the aggregate, reasonably be expected to be material to the Acquired Companies, taken as a whole, each current and former employee and independent contractor of any Acquired Company who has participated in the conception or development of any Intellectual Property has assigned to such Acquired Company by operation of law, or has entered into a valid and enforceable written agreement with such Acquired Company assigning to such Acquired Company all Intellectual Property created by such Person within the scope of such Person's duties to the Acquired Company and prohibiting such Person from using or disclosing confidential information of the Acquired Company. To the Knowledge of the Company, no current or former employee or independent contractor of the Acquired Companies is in violation of any such agreement, and there has been no unlawful, accidental, or unauthorized access to or use or disclosure of any trade secrets, know-how and other confidential and proprietary information of the Acquired Companies.

(d)     Since the Lookback Date, no third party (including any employee, worker, contractor or subcontractor) has made any claim of ownership in respect of any of the Company Owned Intellectual Property in writing to any Acquired Company and, to the Company's Knowledge, the Acquired Companies are not aware of any matter or fact which is likely to give rise to any such claim.

(e)     Except as would not, individually or in the aggregate, be material to the Acquired Companies, taken as a whole, to the extent that the Acquired Companies license Intellectual Property to a third party or license any Intellectual Property belonging to any third party: (i) no such licenses have been the subject of any breach or default by any Acquired Company or, to the Company's Knowledge, any such third party; (ii) such licenses are valid and binding; (iii) such licenses have not been the subject of any claim, dispute or proceedings; and (iv) in respect of licenses of Intellectual Property by any Acquired Company to third parties, such licenses do not materially restrict any Acquired Company from using the Intellectual Property to which they relate.

(f)     Since the Lookback Date, except as would not, individually or in the aggregate, be material to the Acquired Companies, taken as a whole, the Acquired Companies have: (i) materially complied with all applicable Laws and self-regulatory guidelines, PCI DSS, the obligations under their Contracts, and their public privacy policies, in each case, relating to the processing of any Personal Information (collectively, "Privacy Laws and Obligations"); (ii) implemented and maintained reasonable administrative, physical and technical safeguards designed to protect all Personal Information in their possession or under their control against loss, theft, or unauthorized access, use modification, disclosure; (iii) not experienced any material Security Incident, and, to the Knowledge of the Company, no service provider (in the course of processing Personal Information for or on behalf of the Acquired Companies) has suffered any material Security Incident impacting Personal Information in the possession or control of the Acquired Companies; and (iv) not received any written notice of any claims of, or been charged with, the violation of any Privacy Laws and Obligations. The execution of this Agreement and the

other Transaction Documents and the consummation of the transactions contemplated hereunder and thereunder do not materially violate any Privacy Laws and Obligations.

(g)     The Acquired Companies have used commercially reasonable efforts to prevent the introduction into the Systems, and, to the Company's Knowledge, such Systems do not contain, any ransomware, disabling codes or instructions, spyware, Trojan horses, worms, viruses or other software routines that permit or cause unauthorized access to, or disruption, impairment, disablement, or destruction of, software, data or other materials. The Acquired Companies have used commercially reasonable efforts to implement material security patches that are generally available for the Systems. To the Company's Knowledge, since the Lookback Date, the Systems have not suffered any unplanned or critical failures, continued substandard performance, errors, breakdowns or other adverse events that have caused any material disruption or interruption in the operation of the business of the Acquired Companies. The Acquired Companies have implemented and maintain commercially reasonable business continuity and disaster recovery plans, procedures and facilities for its business.

(h)     The Acquired Companies have in place commercially reasonable measures to protect the confidentiality, integrity, availability and security of the Systems. To the Company's Knowledge, the Systems (i) are in good working order; (ii) function in all material respects in accordance with all specifications and any other descriptions under which they were supplied; (iii) are substantially free of any material defects, bugs and errors; and (iv) are sufficient for the existing needs of the business of the Acquired Companies. The Acquired Companies have conducted commercially reasonable penetration tests at reasonable intervals on the Systems, and have addressed, or, are in the process of addressing, all material privacy or data security issues raised in any such audits or penetration tests (including third party audits of the Systems).

Section 4.18.   Brokers; Financial Advisor. No broker, investment banker, financial advisor or other Person, other than Evercore, is entitled to any commission, brokerage fee or "finders fee" in connection with the consummation of the Transactions.

Section 4.19.   Real Property.

(a)     Section 4.19(a) of the Company Disclosure Schedules sets forth a true, accurate and complete list as of the Execution Date of all leases or subleases of real property with respect to which any Acquired Company is the tenant or lessee, together with a list of the addresses of all such real property (if specified in such lease or sublease) which are material to the Acquired Companies  (individually, a "Real Property Lease" and, collectively, the "Real Property Leases"). Subject to the Equitable Exceptions, the applicable Acquired Company has a good, valid, binding and enforceable interest under each of the Real Property Leases and the vesting instruments under which an Acquired Company holds an easement or similar interest (such vesting instruments, collectively with the Real Property Leases, the "Vesting Instruments"), free and clear of all Liens (other than Permitted Liens). No Acquired Company nor, to the Knowledge of the Company, any other party to any Vesting Instrument is in material breach or default thereunder, and no event has occurred or condition exists that, with notice or lapse of time, or both, would constitute a default by an Acquired Company or, to the Knowledge of the Company, any other Person under any of the Vesting Instruments, other than defaults that have been cured or waived in writing. Except as would not, individually or in the aggregate, be material to the Acquired Companies, taken as a

31

whole, all landlord work or tenant work under each Real Property Lease has been completed and there are no leasing commissions due or payable with respect to any Real Property Lease. Each Vesting Instrument is in full force and effect and, to the Knowledge of the Company, is the valid, binding and enforceable obligation of each party thereto, in accordance with its terms.

(b)    Section 4.19(b) of the Company Disclosure Schedules sets forth a true, accurate, and complete list of all real property owned in fee by the Acquired Companies ("Owned Real Property" and together with the real property in which the Acquired Companies hold interests pursuant to the Vesting Instruments, the "Real Property"), together with the address of the applicable property. Each Acquired Company owns good, valid and marketable title in fee simple to the Owned Real Property and there are no outstanding Preferential Rights, ownership or use, or other contractual rights in favor of any other Person to purchase, acquire, sell, assign or otherwise dispose of any Acquired Companies' interest in any Real Property or any portion thereof or interest therein. Each Acquired Company has the valid and enforceable power and unqualified right to use and sell, transfer, convey or assign the Owned Real Property, free and clear of all Liens other than Permitted Liens.

(c)    Section 4.19(c) of the Company Disclosure Schedules sets forth a complete list of all Owned Real Property held by the Acquired Companies as a tenant in common or other joint ownership structure (collectively, the "Jointly Owned Properties"), together with a detailed description of the respective ownership structure (and the applicable Acquired Company's ownership percentage) of each Jointly Owned Property. None of the other owners of the Jointly Owned Properties have any rights of first refusal, rights of first offer or other Preferential Rights to purchase, or otherwise modify or later the applicable Acquired Company's interest in, any of the Jointly Owned Properties that would be triggered by the Transactions.

(d)    To the Knowledge of the Company, all material buildings, structures, improvements, fixtures, building systems and attached equipment, and all material components thereof, included in the Real Property are in good condition and repair, normal wear and tear excepted. No work has been done at the Real Property, and no materials have been supplied to the Real Property, that have not been paid for, and there are no material materialman's liens or mechanic's liens affecting the Real Property.

(e)    The Real Property constitutes all interests in real property (i) currently used, occupied or held for use in connection with the business of the Acquired Companies as presently conducted and (ii) necessary for the continued operation of the business of the Acquired Companies. None of the improvements to any Real Property constitute a legal non-conforming use or otherwise require any special dispensation, variance or permit under any Law. To the Knowledge of the Company, the Company or the applicable Acquired Company has all certificates of occupancy, permits, licenses, certificates of authority, authorizations, approvals, registrations, and similar consents issued by or obtained from any Governmental Body necessary for the current use and operation of the Real Property, except for any such items where the failure of the applicable Acquired Company to hold or possess such item would not, individually or in the aggregate, be material to any Acquired Company. The Real Property is in compliance in all material respects with all applicable Laws and fire, health, building, use, occupancy, subdivision and zoning codes.

(f)     Except as would not, individually or in the aggregate, be material to the Acquired Companies, taken as a whole, the Company, any Acquired Company and each parcel of Real Property (i) are now, and have been since the Lookback Date, in material compliance with all declarations of covenants, conditions or restrictions, restrictive covenants and reciprocal easement agreements, in each case, affecting any Real Property, and (ii) have not received any notice of any material breach, violation or default under any such declarations, agreements or easements.

(g)     There do not exist any actual or, to the Knowledge of the Company, threatened condemnation or eminent domain proceedings that affect any Real Property or any part thereof.

(h)     Since the Lookback Date, no Acquired Company has received written notice of any, and to the Knowledge of the Company there is no, default under any restrictive covenants or other encumbrances pertaining to the Real Property.

Section 4.20.   Government Contracts.

(a)     Section 4.20(a) of the Company Disclosure Schedules sets forth a true, correct and complete list of each Government Contract and Government Bid to which any Acquired Company is a party. A true, correct and complete copy of each such Government Contract and Government Bid has been made available to the Buyer. Each such Government Contract is a legal, valid and binding obligation of the applicable Acquired Company and, to the Knowledge of the Company, is in full force and effect and enforceable by the applicable Acquired Company in accordance with its terms, and no such Government Contract (nor any interest therein) has been the subject of any assignment or financing arrangement.

Section 4.21.   Business Relationships. Section 4.22 of the Company Disclosure Schedules sets forth a list of the (a) ten (10) largest customers of the Acquired Companies, as determined by dollar volume for the last twelve (12) months ("Major Customers") and (b) the top ten (10) suppliers, vendors and service providers of the Acquired Companies by aggregate expenses of the Acquired Companies during the last twelve (12) months ("Major Suppliers"). During the last twelve (12) months, no Major Customer or Major Supplier has cancelled, terminated or threatened to terminate or cancel in writing (or, to the Knowledge of the Company, orally), its relationship with any Acquired Company. No Acquired Company has received any notice that any Major Customer or Major Supplier may materially modify its relationship with any Acquired Company or decrease its purchase of goods or services to or from any Acquired Company. No Acquired Company is involved in any material claim, dispute, controversy, or Legal Proceeding with any Major Customer or Major Supplier. Except as noted in Section 4.22 of the Company Disclosure Schedules, no Contract between any Acquired Company, on the one hand, and any Major Customer or Major Supplier, on the other hand, is subject to cancellation or termination by any party to such Contract on notice of one hundred twenty (120) days or less without any liability to such canceling or terminating party.

Section 4.22.   Related Party Transactions. Except as set forth in Section 4.22 of the Company Disclosure Schedules, none of the Acquired Companies, on the one hand, is party to any agreement with PDVSA or its Affiliates (excluding the Acquired Companies and their

Subsidiaries) pursuant to which an Acquired Company has material ongoing obligations. Other than the Shares, neither PDVSA nor any of its Affiliates (excluding the Acquired Companies and their Subsidiaries), owns any interest in or any property (real, personal or mixed, tangible or intangible) of the Acquired Companies.

Section 4.23.   Insurance. Section 4.23 of the Company Disclosure Schedules lists each material insurance policy maintained by the Acquired Companies with respect to the properties, assets, business, operations and employees of the Acquired Companies. To the Knowledge of the Company, all such policies are valid and binding on the Acquired Company and enforceable in accordance with their terms against the Acquired Companies, in each case except for the Equitable Exceptions, and all premiums with respect thereto have been paid to the extent due. To the Knowledge of the Company, there are no material Claims by the Acquired Companies pending under any such insurance policies as to which coverage has been denied by the underwriters of such policies. To the Knowledge of the Company, the Acquired Companies have not received written notice of termination or material reduction of coverage with respect to any of such insurance policies.

Section 4.24.   No Additional Representations.

(a)     Except for the representations and warranties made in (i) this Article IV, as qualified by the Company Disclosure Schedules, (ii) any certificate delivered pursuant to this Agreement or (iii) any other Transaction Document, no Person makes or shall be deemed to make any other representation or warranty of any kind whatsoever, express or implied, written or oral, at law or in equity, with respect to any of the Acquired Companies or their respective businesses, operations, assets, liabilities or conditions (financial or otherwise) in connection with this Agreement or the Transactions, any other rights or obligations to be transferred pursuant to the Transaction Documents or any other matter, and the Special Master (on behalf of himself and the Company) hereby disclaims any such other representations or warranties. In particular, without limiting the foregoing disclaimer, except for the representations and warranties made in (i) this Article IV, as qualified by the Company Disclosure Schedules, or (ii) any certificate delivered pursuant to this Agreement, no Person makes or has made any representation or warranty to the Buyer or any of its Affiliates or Representatives with respect to (x) projections, forecasts, estimates, financial statements, financial information, appraisals, statements, promises, advice, data or information made, communicated or furnished (orally or in writing, including electronically) or prospect information relating to the Acquired Companies or their respective businesses; or (y) except for the representations and warranties made in (i) this Article IV, as qualified by the Company Disclosure Schedules, (ii) any certificate delivered pursuant to this Agreement, or (iii) any other Transaction Documents, any oral or written information presented to the Buyer or any of its Affiliates or Representatives in the course of their due diligence investigation of the Company, the negotiation of this Agreement or in the course of the Transactions (including any opinion, information, projection, or advice that may have been or may be provided to the Buyer by any Representative of the Company).

(b)     Notwithstanding anything contained in this Agreement to the contrary, the Special Master acknowledges and agrees that neither the Buyer nor any other Person has made or is making, and the Special Master expressly disclaims reliance upon, any representations, warranties or statements relating to the Buyer or any Buyer Subsidiaries whatsoever, express or

implied, beyond those expressly given by the Buyer in Article V, as qualified by the Buyer Disclosure Schedules, or in any certificate delivered pursuant to this Agreement or in any other Transaction Documents, including any implied representation or warranty as to the accuracy or completeness of any information regarding the Buyer, furnished or made available to the Company, or any of its Representatives. Without limiting the generality of the foregoing, the Special Master acknowledges that, except for the representations and warranties expressly provided in Article V, as qualified by the Buyer Disclosure Schedules, or in any certificate delivered pursuant to this Agreement or in any other Transaction Documents, no representations or warranties are made with respect to any projections, forecasts, estimates, budgets or prospect information that may have been made available to the Special Master, the Company or any of their Representatives.

## ARTICLE V

## REPRESENTATIONS AND WARRANTIES OF THE BUYER

The Buyer represents and warrants to the Special Master that, except as disclosed in the correspondingly numbered section of the disclosure schedules delivered by the Buyer to the Company simultaneously with the execution of this Agreement (the "Buyer Disclosure Schedules"), each statement contained in this Article V is true and correct as of the Execution Date and as of the Closing Date:

Section 5.1. Corporate Existence and Power. The Buyer is a corporation duly incorporated, validly existing and in good standing under the Laws of its jurisdiction of incorporation and has all requisite corporate powers and all governmental franchises, licenses, permits, authorizations, consents and approvals required to enable it to own, lease or otherwise hold its properties and assets and to carry on its business as now conducted. The Buyer is duly qualified to do business as a foreign corporation and is in good standing in each jurisdiction in which the character of the property owned or leased by it, the nature of its activities, or the ownership or leasing of its properties make such qualification necessary, except for those jurisdiction where the failure to be so qualified would not, individually or in the aggregate, materially impair or delay the ability of the Buyer to consummate the Transactions contemplated by, or perform its obligations under, this Agreement.

Section 5.2. Corporate Authorization. The Buyer has all requisite corporate power and authority to execute, deliver and perform its obligations under this Agreement, the Transaction Documents, and each other agreement, document, instrument or certificate contemplated by this Agreement to be executed and delivered by the Buyer in connection with the consummation of the Transactions (the "Buyer Documents"). The execution and delivery of this Agreement and the Buyer Documents by the Buyer, the performance of its obligations hereunder and thereunder, and the consummation by the Buyer of the Transactions have been duly authorized by all necessary corporate or organizational action on the part of the Buyer, and no shareholder or other similar approval is required in connection with the Buyer's execution, delivery and performance of the Transactions. The board of directors of the Buyer, at a meeting duly called and held on or prior to the date of this Agreement, has approved this Agreement and the Transactions. This Agreement constitutes a valid and binding agreement against the Buyer, enforceable against the Buyer in

35

accordance with its terms, except that such enforcement may be limited by the Equitable Exceptions.

Section 5.3.    Governmental Authorization. The execution, delivery and performance by the Buyer of this Agreement and the consummation by the Buyer of the Transactions require no Order, authorization, or approval of, or filing with, any Governmental Body other than (a) applicable requirements of Antitrust Laws as set forth in Section 5.3 of the Buyer Disclosure Schedules and (b) the OFAC License.

Section 5.4.    Non-Contravention. The execution, delivery and performance by the Buyer of this Agreement and the consummation by the Buyer of the Transactions do not and will not, assuming compliance with the matters referred to in Section 5.2 and Section 5.3, (a) contravene or conflict with the certificate of incorporation or by-laws of the Buyer, (b) contravene or conflict with or constitute a violation of any provision of any Law binding upon or applicable to the Buyer or any of the Buyer Subsidiaries, (c) constitute a default (or an event which with notice or the passage of time would become a default) under, or give rise to any right of termination, cancellation or acceleration of any right or obligation of the Buyer or any of the Buyer Subsidiaries or to a loss of any benefit to which the Buyer or any of the Buyer Subsidiaries is entitled under any provision of, any agreement, contract or other instrument binding upon the Buyer or any of the Buyer Subsidiaries or any license, franchise, permit or other similar authorization held by the Buyer or any of the Buyer Subsidiaries or (d) result in the creation or imposition of any Lien (other than Liens arising under applicable securities Laws) on any asset of the Buyer or any of the Buyer Subsidiaries. As of the date of this Agreement, there is no Effect that would reasonably be expected to prevent, impede or interfere with the execution of this Agreement and the consummation by the Buyer of the Transactions.

Section 5.5.    Litigation. Except as set forth in Section 5.5 of the Buyer Disclosure Schedules, there are no Legal Proceedings, pending against, or, to the Knowledge of the Buyer, threatened in writing against or affecting, the Buyer, any of the Buyer Subsidiaries, any of their respective properties or any of their respective officers or directors before any Governmental Body that would reasonably be expected to (a) prohibit or restrain the ability of the Buyer to enter into this Agreement or consummate the Transactions or (b) affect the legality, validity or enforceability of any Debt Financing. The Buyer is not subject to any Order of any Governmental Body that would reasonably be expected to (x) prohibit or restrain the ability of the Buyer to enter into this Agreement or consummate the Transactions or (y) affect the legality, validity or enforceability of any Debt Financing.

Section 5.6.    Regulatory Matters.

(a)    In the three (3) years prior to the date hereof, (i) none of the Buyer or any of the Buyer Subsidiaries or any Equity Financing Source, nor any of their respective directors, officers, employees, nor, to the Knowledge of the Buyer, any Representative, agent, or other person acting on behalf of the Buyer, any of the Buyer Subsidiaries or any Equity Financing Source, has violated any Anti-Corruption Law, and (ii) none of the Buyer, any of the Buyer Subsidiaries or any Equity Financing Source, nor any of their respective directors, officers, employees, nor, to the Knowledge of the Buyer, any Representative, agent or any other person acting on behalf of the Buyer, the Buyer Subsidiaries or any Equity Financing Source, has offered,

paid, given, promised, or authorized the payment of, anything of value (including money, checks, wire transfers, tangible and intangible gifts, favors, services, employment or entertainment and travel) directly or indirectly to any Government Official (A) for the purpose of (1) influencing any act or decision of a Government Official or any other person in his or her official capacity, (2) inducing a Government Official or any other person to do or omit to do any act in violation of his or her lawful duties, (3) securing any improper advantage, or (4) inducing a Government Official or any other person to influence or affect any act or decision of any Governmental Body; or (B) in a manner which would constitute or have the purpose or effect of public or commercial bribery or corruption, acceptance of, or acquiescence in extortion, kickbacks, or other unlawful or improper means of obtaining or retaining business or any improper advantage.

(b)  (i) The Buyer, each of the Buyer Subsidiaries and each Equity Financing Source and their respective directors, officers, employees, and, to the Knowledge of the Buyer, agents, Representatives and other persons acting for or on behalf of any of the foregoing Persons, are, and at all times in the three (3) years prior to the date hereof, in compliance in all material respects with all applicable Economic Sanctions/Trade Laws and all applicable Money Laundering Laws and (ii) in the three (3) years prior to the date hereof none of the Buyer, any of the Buyer Subsidiaries or any Equity Financing Source is a Sanctions Target or has carried on or carries on, any business, directly or knowingly indirectly, involving any Sanctions Target in violation of applicable Economic Sanctions/Trade Laws.

(c)  Except as would not, individually or in the aggregate, be reasonably likely to have a material adverse effect, in the three (3) years prior to the date hereof (i) none of the Buyer, any of the Buyer Subsidiaries or any Equity Financing Source has conducted or initiated any internal investigation, review or audit, or made a voluntary, directed, or involuntary disclosure to any Governmental Body or third party with respect to any alleged or suspected act or omission arising under or relating to any potential noncompliance with any applicable Anti-Corruption Law, Economic Sanctions/Trade Law, or Money Laundering Law, (ii) none of the Buyer, any of the Buyer Subsidiaries or any Equity Financing Source, nor any of their respective directors or officers, nor, to the Knowledge of the Buyer, any agents, employees (other than officers), Representatives, or any other person acting at the direction of the Buyer, any of the Buyer Subsidiaries or any Equity Financing Source has received any written notice, request or citation for any actual or potential noncompliance with any applicable Anti-Corruption Law, Economic Sanctions/Trade Law or Money Laundering Law, (iii) the Buyer, the Buyer Subsidiaries and the Equity Financing Sources have implemented and have maintained internal controls, policies and procedures designed to detect and prevent violations of Anti-Corruption Laws, Economic Sanctions/Trade Laws and Money Laundering Laws, and (iv) the Buyer, each of the Buyer Subsidiaries and each of the Equity Financing Sources have at all times made and maintained accurate books and records in material compliance with all applicable Anti-Corruption Laws, Economic Sanctions/Trade Laws or Money Laundering Laws.

Section 5.7.  Financing.

(a)  On the Trust Structure Effective Date, the Buyer will deliver to the Special Master true, correct, and complete copies of (i) the executed Equity Commitment Letters from the Equity Financing Sources, which Equity Commitment Letters each provide that the Special Master is an express third party beneficiary thereto (the "Equity Financing", and the commitments under

the Equity Commitment Letters, the "Equity Financing Commitments") and (ii) (A) an executed commitment letter from each of the Debt Financing Sources identified therein, dated as of the Trust Structure Effective Date (together with all annexes, schedules, and exhibits thereto, as amended from time to time as permitted herein, the "Debt Commitment Letter", and the commitments under the Debt Commitment Letter, the "Debt Financing Commitments"; the Debt Commitment Letter and the Equity Commitment Letters, collectively, the "Commitment Letters"), pursuant to which, and subject to the terms and conditions of which, the lenders party thereto will have committed to lend the amounts set forth therein to the Buyer for the purpose of funding the Transactions (the "Debt Financing", and, together with the Equity Financing, the "Financings"), and (B) each related fee letter (collectively, the "Fee Letters"), which copy of such Fee Letter has been redacted for fees, "securities demand" provisions, pricing terms and pricing caps, "market flex" provisions and other terms that are customarily redacted (including any dates related thereto), none of such redacted terms which would adversely affect the conditionality, availability or aggregate principal amount of the Debt Financing.

(b)    As of the Trust Structure Effective Date, the Commitment Letters shall be in full force and effect and shall not have been withdrawn, rescinded, replaced or terminated, or otherwise amended, restated, amended and restated, waived, supplemented or otherwise modified in any respect (and no such amendment, restatement or modification shall be contemplated except any amendment, restatement or modification to add additional Debt Financing Sources). As of the Trust Structure Effective Date, the Commitment Letters will be legal, valid and binding obligations (subject to the Equitable Exceptions) of the Buyer and, to the Knowledge of the Buyer, the other parties thereto, enforceable in accordance with their terms. There are no agreements, side letters or arrangements (other than the Debt Commitment Letter and the Fee Letters) relating to the Debt Financing Commitments or the Debt Financing that imposes or permits the imposition of conditions precedent to the funding of the Debt Financing on the Closing Date or would otherwise affect the availability of the Debt Financing on the Closing Date. As of the Trust Structure Effective Date, the Buyer and the Debt Financing Sources shall not be in breach of any of the terms or conditions set forth in the Debt Commitment Letter. As of the Trust Structure Effective Date, no event shall have occurred which, with or without notice, lapse of time or both, would constitute a default or breach on the part of the Buyer under any term or condition of the Commitment Letters, and the Buyer does not have any reason to believe that it will be unable to satisfy, on a timely basis, any term or condition of closing to be satisfied by it contained in the Debt Commitment Letter, or that the full amount of the Equity Financing or the Debt Financing will not be available to the Buyer on the Closing Date. On the Trust Structure Effective Date, the Buyer shall have fully paid any and all commitment fees or other fees required by the Debt Financing Commitments or any Fee Letter to be paid on or before the Trust Structure Effective Date. On the Trust Structure Effective Date, the Debt Commitment Letter will contain all of the conditions precedent to the obligations of the Parties thereunder to make the full amount of the Debt Financing available to the Buyer on the terms set forth therein and there shall be no contingencies that would permit the Debt Financing Sources to change the total amount of the Debt Financing or impose any additional conditions precedent to the availability of the Debt Financing. As of the Trust Structure Effective Date, none of the Debt Financing Commitments shall have been terminated or withdrawn, no lender shall have notified the Buyer of its intention to terminate or withdraw the Debt Financing Commitments, and, assuming satisfaction of the conditions set forth in Article VII, as of the Trust Structure Effective Date, the Buyer does not know of any facts or circumstances that may be expected to result in any of the conditions set forth in the Debt Commitment Letter not being satisfied. To the extent this

Agreement must be in a form acceptable to any lender providing Debt Financing, such lender or lenders shall have approved this Agreement.

(c)    Except as expressly set forth in Section 7.1, the obligations of the Buyer under this Agreement are not subject to any conditions regarding the Buyer's, its Affiliates', or any other Person's ability to obtain financing for the consummation of the Transactions contemplated hereby.

(d)    Assuming that the Debt Financing is funded in accordance with the Debt Commitment Letter, as of the Trust Structure Effective Date, the aggregate proceeds from the Debt Financing (net of original issue discount, upfront fees and other fees, premiums and charges payable in connection therewith, after giving effect to the maximum amount of "market flex" provided under the Debt Financing Commitments and each Fee Letter) together with the Equity Financing and Buyer's cash on hand will be sufficient for satisfaction of all of the Buyer's obligations under this Agreement and to consummate the Transactions, including the payment of the Closing Consideration, repayment of the Specified Debt and the payment of all associated costs and expenses (including the Closing Transaction Expenses) (collectively, the "Required Amount").

Section 5.8.    Solvency. The Buyer is Solvent as of the date of this Agreement and the Trust Structure Effective Date. Assuming (x) the accuracy of the representations and warranties set forth in Article IV, and (y) the performance by the Company and the Special Master of the covenants and agreements required to be performed by them under this Agreement prior to the Closing, the Buyer, the Company and their respective Subsidiaries, on a consolidated basis, will, after giving effect to all of the Transactions, including the payment of any amounts required to be paid in connection with the consummation of the Transactions and the payment of all related fees and expenses, be Solvent at and immediately after the Closing.

Section 5.9.    No Additional Representations.

(a)    Except for the representations and warranties expressly made by the Buyer in (i) this Article V, as qualified by the Buyer Disclosure Schedules, or (ii) any certificate delivered pursuant to this Agreement, the Buyer makes (and shall not be deemed to make) no other representation or warranty of any kind whatsoever, express or implied, written or oral, at law or in equity, in connection with this Agreement or the Transactions, any other rights or obligations to be transferred pursuant to the Transaction Documents or any other matter, and the Buyer hereby disclaims any such other representations or warranties.

(b)    Except for the specific representations and warranties expressly made by the Special Master in Article IV, and subject to the specifically bargained-for limitations as set forth in this Agreement, the Buyer acknowledges and agrees that the Special Master does not make, and that the Buyer is not relying upon, and will not rely upon any representation or warranty, expressed or implied, at law or in equity, made by any Person in respect of the Special Master or in respect of the Company and the Company's Subsidiaries' respective businesses, assets (including the stocks), liabilities, operations, prospects, or condition (financial or otherwise), including with respect to merchantability or fitness for any particular purpose of any assets, the nature or extent of any liabilities, the prospects of their respective businesses, the effectiveness or

39

the success or profitability of any operations, or the accuracy or completeness of any confidential information memoranda, documents, projections, forecasts, opinions, advice, material, statement, data, or other information (financial or otherwise) regarding the Acquired Companies provided to, or otherwise made available to, the Buyer or its Representatives in connection with the Transactions, including any "data rooms," "virtual data rooms," management presentations, or in respect of any other matter or thing whatsoever. The Buyer expressly disclaims that is relying on any representations or warranties, other than the specific representations and warranties expressly made by the Special Master in Article IV or in any certificate delivered pursuant to this Agreement.

## ARTICLE VI

## COVENANTS

Section 6.1.    Conduct of the Business Pending the Closing.

(a)    During the Interim Period, except (w) with the prior written consent of the Buyer (such consent not to be unreasonably withheld, conditioned or delayed), (x) as expressly permitted or required by this Agreement, (y) as may be required by applicable Law, (z) as set forth in Section 6.1(a) of the Company Disclosure Schedules, the Special Master shall Cause the Acquired Companies to (i) conduct their business in the Ordinary Course, (ii) use commercially reasonable efforts to preserve intact their business organizations, assets (ordinary wear and tear excepted), ongoing operations, and goodwill, and maintain material relationships with third parties (including suppliers, vendors, creditors, licensors and employees of the Acquired Companies and Governmental Bodies having regulatory authority in respect of the Acquired Companies and their operations), (iii) preserve and maintain all material Permits, and (iv) comply in all material respects with applicable Laws.

(b)    Without limiting the generality of Section 6.1(a), except (v) with the prior written consent of the Buyer (such consent not to be unreasonably withheld, conditioned or delayed), (w) as expressly permitted or required by this Agreement, (x) as required to comply with a Material Contract that has been disclosed in the Company Disclosure Schedules, (y) as may be required by applicable Law, or (z) as set forth in Section 6.1(b) of the Company Disclosure Schedules, the Special Master shall Cause the Acquired Companies not to:

(i)    (A) amend the Company Charter or Company By-Laws, (B) permit any Company Subsidiary to amend such Company Subsidiary's Organizational Documents, or (C) vote in favor of the amendment of any of the Organizational Documents of any Non-Controlled Entity;

(ii)    (A) (I) adopt a plan or agreement of complete or partial liquidation, dissolution, merger or consolidation of any of the Acquired Companies, or (II) incur or assume any liability or expense in connection with the complete or partial liquidation or wind-down of any of the Acquired Companies, or (B) vote in favor of the adoption of a plan or agreement of complete or partial liquidation, dissolution, merger or consolidation, of any Non-Controlled Entity;

WEIL:\99805227\35\67816.0003

(iii)    (A) make or authorize any capital expenditures or commitments, except (I) for 2024, in accordance with the capital budgets of the Acquired Companies for 2024 as set forth in Section 6.1(b)(iii)(A)(I) of the Company Disclosure Schedules, (II) for 2025, in accordance with the capital budgets to be adopted by the Acquired Companies for 2025 in consultation with the Observation Committee (which such capital budgets will be consistent with the 2025 projection included in the medium term plan set forth in Section 6.1(b)(iii)(A)(II)(x) of the Company Disclosure Schedules, as updated by the Flash set forth in Section 6.1(b)(iii)(A)(II)(x) of the Company Disclosure Schedules (the "MTP") and will not exceed, for sustaining capex or strategic capex, 5% of the 2025 projections included in the MTP as aggregated and set forth on Section 6.1(b)(iii)(A)(II)(y) of the Company Disclosure Schedules for sustaining capex or strategic capex, as applicable unless otherwise approved by the Observation Committee), and (III) for 2026, in accordance with the capital budgets to be adopted by the Acquired Companies for 2026 in consultation with the Observation Committee (which such capital budgets will be consistent with the 2026 projection included in the MTP and will not exceed, for sustaining capex or strategic capex, 5% of the 2026 projections included in the MTP as aggregated and set forth on Section 6.1(b)(iii)(A)(II)(y) of the Company Disclosure Schedules unless otherwise approved by the Observation Committee) (each capital budget described in clauses (I)-(III), a "CapEx Budget"), or (B) propose or vote in favor of any capital expenditures or commitments that would reasonably be expected to require additional cash contributions by any Acquired Company to any Non-Controlled Entity in amounts in excess of (1) $1,000,000 individually or (2) $1,000,000 in the aggregate for all Non-Controlled Entities;

(iv)    make or authorize any turnaround or catalyst expenditures or commitments, except (A) for 2024, in accordance with the turnaround/catalyst budgets of the Acquired Companies for 2024 as set forth in Section 6.1(b)(iv)(A) of the Company Disclosure Schedules, (B) for 2025, in accordance with the turnaround/catalyst budgets to be adopted by the Acquired Companies for 2025 in consultation with the Observation Committee (which such turnaround/catalyst budgets will be consistent with the 2025 projection included in the MTP and will not exceed 5% of the 2025 projection included in the MTP as set forth on set forth on Section 6.1(b)(iii)(A)(II)(y) of the Company Disclosure Schedules unless otherwise approved by the Observation Committee), and (C) for 2026, in accordance with the turnaround/catalyst budgets to be adopted by the Acquired Companies for 2026 in consultation with the Observation Committee (which such turnaround/catalyst budgets will be consistent with the 2026 projection included in the MTP and will not exceed 5% of the 2026 projection included in the MTP as set forth on set forth on Section 6.1(b)(iii)(A)(II)(y) of the Company Disclosure Schedules unless otherwise approved by the Observation Committee) (each turnaround/catalyst budget described in clauses (A)-(C), a "Turnaround/Catalyst Budget");

(v)    except as required under any Company Benefit Plan or Company Collective Bargaining Agreement, (A) increase the compensation of any current or former director, officer, manager, employee, contractor or consultant of any Acquired Company, or take any action to accelerate the vesting or payment, or fund or in any other way secure the payment of, compensation or benefits under any Contract, Company Benefit Plan or otherwise for or to any current or former director, officer, manager, employee, contractor

or consultant of any Acquired Company (other than annual increases to compensation based on merit (with respect to the immediately preceding performance period only), market-based adjustments or tenure in the Ordinary Course and in accordance with standards, policies and practices of the Acquired Companies in place as of the Execution Date and disclosed to the Buyer); (B) make, grant or promise any bonus, equity or equity-based compensation, severance, change of control, retention, termination or similar compensation or benefits to any current or former director, officer, manager, employee, contractor or consultant of any Acquired Company (other than bonuses, severance, change of control, retention, termination, or similar compensation or benefits not to exceed $1,000,000 in the aggregate unless otherwise agreed by the Observation Committee); (C) except as permitted in clause (B) above, amend, adopt, establish, agree to establish, enter into or terminate any Company Benefit Plan or establish, adopt or enter into any plan, agreement, program, policy, practice, trust or other arrangement that would be a Company Benefit Plan if it were in existence as of the Execution Date for the benefit of any current or former director, officer, manager, employee, contractor or consultant of any Acquired Company (other than (x) amendments to any Company Benefit Plan in the Ordinary Course that do not materially increase the costs to the Acquired Companies of such Company Benefit Plan, and (y) renewals or replacements of any Company Benefit Plan expiring in accordance with its terms, provided that any such renewal or replacement plan is on commercially reasonable terms no less favorable in the aggregate to the Acquired Companies than the terms of the expiring Company Benefit Plan); (D) unless otherwise agreed by the Observation Committee, terminate (other than for "cause" (as determined by the Company consistent with its practices)) ███████████████████████████; (E) unless otherwise agreed by the Observation Committee, hire employees in a manner that would cause the Acquired Companies to exceed the applicable budget for hirings for the fiscal year in which such hirings occur (provided, that for 2025, the applicable budget for hirings shall be reasonably consistent with the 2025 projection for hirings set forth in the MTP, and for 2026, the applicable budget for hirings shall be reasonably consistent with the 2026 projection for hirings set forth in the MTP); or (F) except as required by applicable Law, adopt, enter into, or amend in any material respect any Company Collective Bargaining Agreement unless otherwise required by Law or pursuant to the terms of any Company Collective Bargaining Agreement listed on Section 4.11(n) of the Company Disclosure Schedules (and, for the avoidance of doubt, nothing in this Section 6.1(b) shall restrict the Acquired Companies from performing their obligations under any Company benefit Plan existing as of the Execution Date and set forth in the Company Disclosure Schedules or any Company Benefit Plan adopted after the Execution Date in compliance with this Section 6.1(b)(v));

(vi)    acquire (x) all or a substantial portion of the capital assets of any other Person (or of any business) or (y) the business of any other Person (in case of clause (x) or (y), whether by merger, consolidation, acquisition of Equity Interests or assets or otherwise), except that the Acquired Companies shall be permitted to make (A) acquisitions pursuant to any Contract in effect on the Execution Date that is made available to the Buyer and listed in Section 6.1(b)(vi) of the Company Disclosure Schedules, (B) acquisitions of assets solely among the Company and wholly owned Company Subsidiaries, or among wholly owned Company Subsidiaries, or (C) acquisitions of assets pursuant to the receivables securitization transaction evidenced by the Receivables

Purchase Agreement, dated as of December 18, 2020, among CITGO AR2008 Funding Company, LLC, CITGO Petroleum, the various purchasers and purchaser agents from time to time party thereto, and Barclays Bank PLC, as program administrator, and the Purchase and Sale Agreement, dated as of December 18, 2020, between CITGO Petroleum and CITGO AR2008 Funding Company, LLC (each as amended and collectively, the "Receivables Securitization Facility"); provided, that any acquisitions permitted under Section 6.1(b)(iii) shall not be subject to the restrictions set forth in this Section 6.1(b)(vi);

(vii)    propose or vote in favor of any action by a Non-Controlled Entity to acquire (x) all or a substantial portion of the capital assets of any other Person (or of any business) or (y) the business of any other Person (whether by merger, consolidation, acquisition of Equity Interests or assets or otherwise), except that the Acquired Companies shall be permitted to vote in favor of acquisitions of capital assets of any other Person or business of any other Person by a Non-Controlled Entity which would not require additional cash contributions by any Acquired Company to any Non-Controlled Entity in amounts in excess of $5,000,000 individually or $10,000,000 in the aggregate for all Non-Controlled Entities (net to the applicable Acquired Company);

(viii)    (A) sell, lease, license, encumber (including by the grant of any Preferential Right thereon) (other than by Permitted Liens) or otherwise dispose of any material assets or material property of any Acquired Company (excluding any issuance of any Equity Interest of any Acquired Company addressed in Section 6.1(b)(xvi)) or (B) propose or vote in favor of any action by a Non-Controlled Entity to sell, lease, license, encumber (including by the grant of any Preferential Right thereon) (other than by Permitted Liens) or otherwise dispose of any material assets or material property of such Non-Controlled Entity, in each case except (I) pursuant to existing Contracts set forth in Section 6.1(b)(viii) of the Company Disclosure Schedules, (II) sales of inventory in the Ordinary Course, (III) sales of or disposals of obsolete or worthless assets in the Ordinary Course, or (IV) with respect to the immediately preceding clause (A) only, (x) transfers among the Company and wholly owned Company Subsidiaries, or among wholly owned Company Subsidiaries, or (y) dispositions pursuant to the Receivables Securitization Facility;

(ix)    (A) incur any indebtedness for borrowed money or guarantee or assume any indebtedness for borrowed money of another Person or enter into any finance lease other than (I) borrowings or other advances of capital pursuant to the Receivables Securitization Facility, (III) borrowings that can be repaid at Closing without penalty, or (III) indebtedness for borrowed money and finance leases incurred in the Ordinary Course that do not exceed $50.0 million in the aggregate or (B) with respect to any Non-Controlled Entity, propose or vote in favor of such Non-Controlled Entity incurring any indebtedness for borrowed money, guaranteeing or assuming any indebtedness for borrowed money of another Person (other than any Non-Controlled Entity's incurrence of any incremental indebtedness for borrowed money incurred in the Ordinary Course that is not in excess of $10,000,000 in the aggregate (net to the applicable Acquired Company);

(x)    prepay, repay, redeem, repurchase, defease, or cancel any indebtedness for borrow money, in each case, for cash, other than (A) for transactions

among the Acquired Companies, (B) prepayment and repayment of borrowings or advanced capital to the extent required pursuant to the terms of the Receivables Securitization Facility, (C) prepayment and repayment of revolving loans in the Ordinary Course, and (D) any required amortization payments, mandatory prepayments, and repayments at maturity, in each case in accordance with the terms of the instrument governing such indebtedness for borrowed money as in effect on the Execution Date;

(xi)     enter into, amend, terminate or waive any material right under any Material Contract or Vesting Instrument (or Contract that would be a Material Contract if it existed on the Execution Date), other than (A) amendments to renew any Material Contract on the same (or better in respect of the applicable Acquired Company) terms and conditions in all material respects as the terms and conditions of such Material Contract as of the Execution Date and (B) Contracts that would be Material Contracts if they existed on the Execution Date, provided, such Contracts described in this clause (B) are entered into in the Ordinary Course on commercial, arm's length terms and provided, further that such Contracts do not (I) limit in any material respect either the type of business in which any Acquired Company may engage or the manner or locations in which any of them may so engage in any business (including through "non-competition" or "exclusivity" provisions), or (II) grant "most favored nation" or similar status with respect to any material obligations and would run in favor of any Person (other than an Acquired Company);

(xii)     except for any such change which is not material or which is required by reason of a concurrent change in GAAP or applicable Law, change any method of financial accounting or financial accounting practice (other than any change for Tax purposes, which shall be governed by Section 6.1(b)(xv)) used by it;

(xiii)    (A) enter into any joint venture, partnership, participation, profit-sharing or other similar arrangement or (B) make any loans, capital contributions or advances to or investments in any other Person (other than (I) investments in wholly owned Company Subsidiaries, (II) pursuant to capital calls required pursuant to the terms of existing equity investments to the extent disclosed on Section 6.1(b)(xiii) of the Company Disclosure Schedules, or (III) advances for reimbursable employee expenses in the Ordinary Course or advancements of expenses to directors and officers of the Acquired Companies pursuant to bona fide advancement provisions under the Company Charter, Company By-Laws, Organizational Documents of any of the Company Subsidiaries or any indemnification agreement with any such director or officer);

(xiv)    take any action (other than in the Ordinary Course) which would materially limit the Company's freedom to license, cross-license or otherwise dispose of any material Company Intellectual Property;

(xv)    (A) except, in respect of clauses (II)-(IV) only, in the Ordinary Course, (I) make, revoke or amend any material election relating to Taxes or change any of its Tax accounting period or Tax accounting methods currently in effect, (II) settle any Tax Proceeding, (III) file any amended Tax Return, or (IV) surrender any right to claim a refund of Taxes, in each case, if such action is reasonably likely to result in an increase to a Tax liability of the Acquired Companies that is material to the Acquired Companies,

44

taken as a whole, or (B) with respect to any Non-Controlled Entity, vote in favor of or propose that such Non-Controlled Entity take any action described in the immediately preceding clause (A);

(xvi)    authorize, issue, reserve for issuance, pledge, transfer or otherwise encumber, sell or redeem or enter into any Contract with respect to, any Equity Interests of any of the Acquired Companies or any Equity Interests of any Non-Controlled Entity owned by any Acquired Company (including, in each case, any split, combination, recapitalization or reclassification of any such Equity Interests);

(xvii)    declare, set aside, make or pay dividends or distributions (whether in cash, stock or property) on or with respect to the Shares;

(xviii)    (A) commence, initiate, settle, satisfy, release or forgive any claim, demand, lawsuit or other Legal Proceeding (I) in an amount in excess of $10,000,000 in the aggregate or (II) that seeks or imposes any non-monetary relief (excluding customary confidentiality obligations), or (B) with respect to any Non-Controlled Entity, vote in favor of or propose that such Non-Controlled Entity take any action described in the immediately preceding clause (A);

(xix)    (A) make or authorize any operational expenditures or commitments with respect to Labor and Burden, Non-Energy, or Corporate SG&A, except (I) for 2024, in accordance with the operational budgets of the Acquired Companies for 2024 as set forth in Section 6.1(b)(xix)(A)(I) of the Company Disclosure Schedules, (II) for 2025, operational expenditures or commitments with respect to Labor and Burden, Non-Energy, or Corporate SG&A not exceeding $50,000,000 in the aggregate, and (III) for 2026, in accordance with the operational budgets to be adopted by the Acquired Companies for 2026 in consultation with the Observation Committee (which such operational budgets for Labor and Burden, Non-Energy, or Corporate SG&A will be consistent with the 2026 projections included in the MTP and will not exceed, for Labor and Burden, Non-Energy, or Corporate SG&A, 5% of the aggregate 2026 projection included in the MTP for such categories of expenditures unless otherwise approved by the Observation Committee); or

(xx)    agree or commit to do any of the foregoing (or, with respect to any Non-Controlled Entity, vote in favor of or propose that such Non-Controlled Entity agree or commit to do any of the foregoing).

Notwithstanding the foregoing, during the Interim Period, the Special Master may permit each Acquired Company to utilize any and all available Cash to repay outstanding Debt (and the Special Master shall not seek to prevent such use of available Cash).

(c)    Notwithstanding anything to the contrary herein, the Special Master may request the Acquired Companies to take commercially reasonable actions to prevent or mitigate the effects of any damage to property or injury to any person or the environment in emergency circumstances, as reasonably determined in good faith by the Acquired Companies, so long as the Acquired Companies (i) use Good Industry Practices with respect to such circumstances, (ii) provide the Buyer with the opportunity to consult with the Acquired Companies on any such

WEIL:\99805227\35\67816.0003

actions in advance (to the extent reasonably practicable), and (iii) provide the Buyer with notice of any such actions, as soon as reasonably practicable (and in any event, no later than one (1) Business Day) after such action is taken.

(d)     Upon the written request of the Buyer from time to time (such requests to be delivered with reasonably detailed descriptions of the applicable projects contemplated by the CapEx Budgets and the Turnaround/Catalyst Budgets to which such request relates), the Special Master shall Cause the Acquired Companies to use commercially reasonable efforts to effect and perform the projects contemplated by the CapEx Budgets and the Turnaround/Catalyst Budgets and specified in such written request, in each case, in accordance with such budgets and Good Industry Practices.

(e)     For the avoidance of doubt, nothing in this Agreement, including the provisions of this <u>Section 6.1</u> or <u>Section 6.3</u>, in any way impairs the right of the Acquired Companies or PDVSA to object to the approval or execution of this Agreement or the approval or consummation of the Transactions, including on appeal, and the taking of any actions in connection therewith.

Section 6.2.    <u>Access to Information</u>.

(a)     Prior to the Closing or earlier termination of this Agreement, the Special Master shall Cause the Company to provide the Buyer and its Representatives, upon reasonable advance notice and under reasonable circumstances, with reasonable access during normal business hours, to the books and records (including all electronic data related thereto), information, assets, operations and properties of the Acquired Companies and to the officers and employees of the Acquired Companies; <u>provided</u>, that (i) any such access and activities shall be conducted in a manner not to unreasonably interfere with the normal operations of the Acquired Companies or their respective business and (ii) without the prior written consent of the Special Master and the Company, which may be withheld for any reason in the sole and absolute discretion of the Special Master or the Company, as applicable, the Buyer and its Representatives shall have no right to perform invasive or subsurface investigations of the properties or facilities of the Acquired Companies (<u>provided</u>, <u>further</u>, that notwithstanding this clause (ii), the Parties agree that the Buyer may conduct (and the Special Master shall Cause the Acquired Companies to permit and facilitate) the investigations described on <u>Section 6.2(a)</u> of the Company Disclosure Schedules). The Special Master shall Cause the Acquired Companies and their Representatives to reasonably cooperate and communicate with the Buyer and its Representatives in connection with such access and with the Buyer's and its Representatives' continuing due diligence efforts and investigation and examination of the Acquired Companies, such cooperation and communication to include (x) uploading materials to the VDR and hosting diligence calls and responding to diligence requests and inquiries, in each case, from time to time as reasonably requested by the Buyer and its Representatives and (y) granting a designated Representative of the Buyer (such Representative to be approved by outside antitrust legal counsel) observer rights with respect to the day-to-day operations of the Acquired Companies, such observer rights to include, upon reasonable advance notice and under reasonable circumstances, reasonable access during normal business hours to the properties of the Acquired Companies (it being agreed that such access shall be limited to that of an observer, and in no event shall the designated Representative have control over such day-to-day operations). Notwithstanding anything herein to the contrary, no such access or disclosure or

46

cooperation shall be required if doing so could reasonably be expected to (A) result in a waiver of attorney-client privilege, work product doctrine or similar privilege, (B) violate the terms of any Contract to which any Acquired Company is a party, or (C) violate any Law to which any Acquired Company is subject; provided, that the Special Master shall Cause the Company to, to the extent legally permissible and practicable, use commercially reasonable efforts to make appropriate substitute disclosure arrangements, or seek appropriate joint defense agreements, waivers or consents, under circumstances in which the foregoing restrictions of this sentence apply. There may be withheld from the Buyer and its Representatives such portions of documents or information relating to pricing or other matters that are highly sensitive if the exchange of such documents (or portions thereof) or information as determined by the Company's outside counsel would be reasonably likely to result in antitrust difficulties between the Company and the Buyer or any of their respective Affiliates; provided, that at the Buyer's request, the Special Master shall use commercially reasonable efforts to establish "clean team" procedures in order to mitigate such antitrust difficulties. All requests for such access shall be directed to such Person as the Special Master may designate in writing from time to time (collectively, the "Designated Contacts"). Other than the Designated Contacts, prior to the Closing, without the prior written consent of the Special Master (not to be unreasonably withheld, conditioned or delayed), neither the Buyer, its Affiliates or their respective Representatives shall contact any employee, contractors, supplier, customer, landlord or other material business relationship of any Acquired Company regarding any Acquired Company, their respective businesses or the Transactions.

(b)      Prior to the Closing or earlier termination of this Agreement, the Special Master shall Cause the Company to use commercially reasonable efforts to (i) maintain and protect the confidentiality, integrity, availability and security of all Systems and all data stored thereon and (ii) prevent the introduction into the Systems of any ransomware, disabling codes or instructions, spyware, Trojan horses, worms, viruses or other software routines that permit or cause unauthorized access to, or disruption, impairment, disablement, or destruction of, software, data or other materials.

(c)      Notwithstanding anything in this Agreement to the contrary, in no event will the Acquired Companies be required to provide Buyer or the Special Master with access to any information regarding its objections to the sale process, the negotiation of the Transactions or the Acquired Companies' objection to this Agreement or the approval or the consummation of the Transactions.

(d)      For a period commencing on the Closing Date and ending on the later of (x) the date that is twelve (12) months after the Closing Date and (y) the final, non-appealable resolution of a Legal Proceeding relating to or arising from the Sale Order to appeal the sale and purchase of the Shares, the Buyer shall cause the Acquired Companies to use commercially reasonable efforts to maintain all books and records (including all electronic data related thereto) of the Acquired Companies relating to periods ending on or prior to the Closing Date and the Buyer shall cause the Acquired Companies to (i) provide the Special Master and its Representatives during the Company's normal business hours, upon reasonable advance notice and under reasonable circumstances, reasonable access to such books and records and the individuals responsible for preparing and maintaining such books and records, and (ii) permit the Special Master and its Representatives to make copies of any such books and records, in each case of the immediately preceding clause (i) and clause (ii), as reasonably requested in connection with any

47

Legal Proceeding relating to or arising from the Sale Order to appeal the sale and purchase of the Shares (other than any Legal Proceeding between the Special Master, on the one hand, and the Buyer, on the other hand, related to the Sale Order, this Agreement, the other Transaction Documents or the Transactions, which would be governed by and subject to other applicable provisions of this Agreement and subject to applicable rules relating to discovery and document retention). Notwithstanding anything in this Section 6.2(d) to the contrary, the Buyer and the Acquired Companies shall not be required to provide such access or disclose any information to the Special Master if doing so could reasonably be expected to (A) result in a waiver of attorney-client privilege, work product doctrine or similar privilege (B) violate the terms of any Contract to which any Acquired Company is a party, or (C) violate any Law to which any Acquired Company is subject; provided, that the Parties will, to the extent legally permissible and practicable, use commercially reasonable efforts to make appropriate substitute disclosure arrangements, or seek appropriate joint defense agreements, waivers or consents, under circumstances in which the foregoing restrictions of this sentence apply. Notwithstanding anything in this Agreement to the contrary, in no event will the Acquired Companies be required to provide Buyer or the Special Master with access to any information regarding its objections to the sale process, the negotiation of the Transactions or the Acquired Companies' objection to this Agreement or the approval or the consummation of the Transactions.

Section 6.3.    Regulatory Approvals; Third Party Consents.

(a)    Each of the Parties shall, if required by applicable Law, within ten (10) Business Days following the Trust Structure Effective Date, file or supply, or in the case of the Special Master Cause to be filed or supplied, in connection with the Transactions, all notifications and information required to be filed or supplied pursuant to the HSR Act; provided, that in the event there shall be any change in the regulations under the HSR Act following the date of this Agreement but prior to the Buyer submitting a filing under the HSR Act in connection with the Transactions that would render such timing impracticable, the Parties shall cooperate in good faith to submit, or in the case of the Special Master, Cause to be submitted, such filing as promptly as practicable on a mutually agreed date. Each of the Parties shall request early termination of the waiting period under the HSR Act, if available. The Parties shall (and the Special Master shall Cause the Acquired Companies to), as soon as reasonably practicable following the date of this Agreement, file or supply, or cause to be filed or supplied in connection with the Transactions, all filings and submissions required under any relevant Laws, including Antitrust Laws. The Buyer acknowledges and agrees that it shall pay all filing fees in connection with this Section 6.3. Consistent with its obligations hereunder, the Buyer shall plan and propose the strategy, timing, content, action, advocacy and resolution of matters related to such required filings and submission, and in the event of a disagreement between the Parties, the Buyer shall control and direct such matters.

(b)    Neither Party shall (i) consent to any voluntary extension of any waiting period; (ii) pull and refile any filing made under the HSR Act, or any other Antitrust Laws; or (iii) consent to any other voluntary delay of the consummation of the Transactions at the behest of any Governmental Body, in each case, without the prior written consent of the other Party, which consent shall not be unreasonably withheld, conditioned or delayed.

WEIL:\99805227\35\67816.0003

(c)     The Parties shall coordinate and cooperate with one another in exchanging and providing such information to each other and in making the filings and requests referred to in <u>Section 6.3(a)</u>. The Parties shall supply such reasonable assistance as may be reasonably requested by the other Party in connection with the foregoing and shall promptly furnish the other Party with all information within its possession that is reasonably required for all filings and submissions required under any relevant Laws, including Antitrust Laws.

(d)     Notwithstanding anything to the contrary in this Agreement, the Buyer shall take, and shall cause its Subsidiaries to take, as promptly as practicable, all action necessary, proper or advisable to consummate the Transactions prior to the Outside Date to (x) avoid or eliminate each and every impediment, resolve any objection and obtain all consents under any applicable Antitrust Laws as promptly as practicable so as to enable the Parties to consummate the Transactions and (y) avoid the entry or to effect the dissolution of, or vacate or lift, any Order, objection of any Governmental Body or waiting period under applicable Antitrust Laws that would otherwise have the effect of preventing, impairing or delaying the Closing, including: (i) proposing, negotiating and offering to commit and effect, by Order, consent decree, hold separate order, trust, or otherwise, the sale, license, divestiture, disposition or hold separate of such entities, assets, Intellectual Property, businesses, product lines, Equity Interests, properties or services of the Buyer or its Subsidiaries (including, following the Closing, the Acquired Companies); (ii) offering to take or offering to commit to take any action, including any action that limits the Buyer's freedom of action, ownership or control with respect to, or its ability to retain or hold, any of the businesses, assets, product lines, Equity Interests, properties or services of the Buyer or its Subsidiaries (including, following the Closing, the Acquired Companies), to the extent legally permissible; (iii) terminating, amending, relinquishing, modifying, waiving or assigning existing relationships, ventures or contractual rights, obligations or other arrangements of the Buyer or its Subsidiaries (including, following the Closing, the Acquired Companies); (iv) changing or modifying, or agreeing not to engage in, any course of conduct regarding future operations; (v) creating any relationships, ventures, contractual rights, obligations or other arrangements of the Buyer or its Subsidiaries (including, following the Closing, the Acquired Companies); (vi) committing to take any such actions in the foregoing clauses (i), (ii), (iii), (iv); or (v) or entering or offering to enter into agreements and stipulating to the entry of an Order or filing appropriate applications with any Governmental Body in connection with any of the actions contemplated by the foregoing clauses (i), (ii), (iii), (iv), or (v); <u>provided</u>, that notwithstanding anything in this <u>Section 6.3</u> to the contrary, in no event shall the Buyer be obligated to take any action in respect of any Affiliate of the Buyer other than the Buyer's Subsidiaries (including, following the Closing, the Acquired Companies); and <u>provided</u>, <u>further</u>, that nothing in this Agreement shall require the Buyer or its Subsidiaries (including, following the Closing, the Acquired Companies) to propose, execute, carry out or agree or submit to any action or remedy contemplated by the foregoing clauses (i), (ii), (iii), (iv), or (v) that, individually or in the aggregate, reasonably would be expected to have a material adverse effect on the business, operations, financial conditions or results of operations of the Acquired Companies and their Affiliates (taken as a whole). For the avoidance of doubt, neither the Buyer nor any Subsidiary of the Buyer nor any Acquired Company shall be required to negotiate, agree or commit to, or effect to take or cause to be taken, any structural or behavioral remedy or any other action that is not conditioned (either as a condition precedent or subsequent) upon the consummation of the Transactions.

49

(e)    In addition and without limiting the other provisions of this Section 6.3, the Buyer shall defend through litigation, appealing, contesting or otherwise resisting any action, proceeding, or Order by any Governmental Body challenging the Transactions under applicable Antitrust Laws, including to defend through litigation on the merits any claim asserted in court by any Person in order to avoid entry of, or to have vacated or terminated, any Order (whether temporary, preliminary or permanent) that would delay the Closing or prevent the Closing by the Outside Date; provided, however, that such litigation in no way limits the obligation of the Buyer to take the actions set forth in Section 6.3(d).

(f)    Except as specifically required by the Agreement, the Buyer shall not take, and shall cause its Subsidiaries not to take, any action or refrain from taking any action, the effect of which would be to delay or impede the ability of the Parties to consummate the Transactions. Without limiting the generality of the foregoing, the Buyer shall not, and shall cause its Subsidiaries not to, acquire or agree to acquire by merging or consolidating with, or by purchasing a substantial portion of the assets of or equity in or otherwise make any investment in, or by any other manner, any Person or portion thereof, or otherwise acquire or agree to acquire or make any investment in any assets, or agree to a commercial or strategic relationship with any person, if the entering into of a definitive agreement relating to or the consummation of such acquisition, merger, consolidation, investment, commercial or strategic relationship would reasonably be expected to (i) impose any delay in the obtaining of, or increase the risk of not obtaining, any consent, approval, authorization, declaration, waiver, license, franchise, permit, certificate or Order of any Governmental Body necessary to consummate the Transactions or the expiration or termination of any applicable waiting period, (ii) increase the risk of any Governmental Body entering an Order prohibiting the consummation of the Transactions, (iii) increase the risk of not being able to remove any such Order on appeal or otherwise, (iv) increase the risk of any Governmental Body asserting jurisdiction over the Transactions or (v) delay the consummation of the Transactions. In addition to and without limiting the generality of the foregoing, the Buyer shall cause its Affiliates not to acquire or agree to acquire (A) any downstream assets if such acquisition or agreement would reasonably be expected to impose any delay in the obtaining of, or increase the risk of not obtaining, the applicable approval required under the HSR Act, or (B) more than 10% of the Equity Interests of any of the issuers listed on Section 6.3(f) of the Company Disclosure Schedules.

(g)    Each Party shall promptly inform the other Party of any material communication from the Federal Trade Commission, the Department of Justice or any other Governmental Body regarding any of the Transactions. Each Party (including its respective Affiliates or Subsidiaries) will provide the other Party with copies (or, if provided orally, a summary) of all substantive correspondence, filings or communications between them or any of their Representatives, on the one hand, and any Governmental Body or members of its staff, on the other hand, with respect to this Agreement and the Transactions; provided, however, that materials may be redacted as necessary to (i) comply with contractual arrangements and (ii) address reasonable attorney-client or other privilege or confidentiality concerns. If any Party or any Affiliate thereof receives a request for additional information or documentary material from any such Governmental Body with respect to the Transactions, then such Party will use its reasonable best efforts to make, or cause to be made, as soon as reasonably practicable and after consultation with the other Party, an appropriate response in compliance with such request. The Buyer will advise the Special Master and the Company promptly in respect of any understandings, undertakings or agreements (oral or written) that the Buyer proposes to make or enter into with the

Federal Trade Commission, the Department of Justice or any other Governmental Body in connection with the Transactions, and will use its best efforts to cause the Special Master and the Company to be given the opportunity to attend and participate at any meetings with respect thereto. None of the Buyer, the Special Master or the Company (including their respective Affiliates or Subsidiaries) will agree to participate in any meeting, telephone call or discussion with a Governmental Body in respect of any submissions, filings, investigation (including any settlement of the investigation), litigation or other inquiry relating to the matters that are the subject of this Agreement unless it consults with the other Party in advance and, except as may be prohibited by a Governmental Body or by any Law, and will permit authorized Representatives of the other Parties and the Special Master to be present at each meeting, telephone call or discussion. Notwithstanding the foregoing, the Buyer shall determine, direct and control the strategy and process by which the Parties will seek required approvals under the Antitrust Laws and the Buyer shall approve any filings and submissions before they are made. Notwithstanding this Section 6.3(g) and Section 6.7 (Public Announcements), the Special Master acknowledges and agrees that, following the Execution Date and the issuance of Buyer's press release pursuant to Section 6.7, the Buyer and its Affiliates and each of their respective Representative may contact Governmental Bodies and federal, state and local officials in connection with the Transaction and respond to inquiries (including informal in-person meetings) from such Persons and their representatives in each case, in connection with the Transaction for purposes of discussing the Buyer's identity and go-forward plans with respect to the Acquired Companies and impacts on stakeholders; provided, that (i) this sentence shall not apply to any communications with Department of Justice, Federal Trade Commission, or OFAC; (ii) such communications shall not disclose substantive non-public information regarding the terms and conditions of the Transactions; (iii) prior to providing any such Person with written materials containing substantive non-public information regarding the Transactions, the Buyer shall provide the Special Master with copies of such written materials at least twenty-four (24) hours in advance of dissemination; and (iv) upon the reasonable request of the Special Master from time to time, the Buyer shall provide the Special Master with reasonable updates on the status of communications permitted pursuant to this sentence.

(h)     With respect to each consent or right set forth on Section 4.3(a) of the Company Disclosure Schedule, following the Sale Order Entry, the Special Master shall Cause the Acquired Companies, within fifteen (15) Business Days of the written request of the Buyer, to prepare and send written notice to the holder of such consent or right in compliance with the contractual provisions applicable to such consent or right seeking such holder's consent to the Transactions, which notice shall be in a form reasonably satisfactory to the Buyer. The Special Master shall Cause the Acquired Companies to use commercially reasonable efforts to cause any such consent or right required to be obtained or complied with prior to the Closing. If the Acquired Companies discover any consent or right following the date hereof that is not set forth on Section 4.3(a) of the Company Disclosure Schedule, but should have been set forth thereon, then the Special Master shall Cause the Acquired Companies to (i) send the holder of such consent or right a notice in accordance with the first sentence of this Section 6.3(h) as promptly as practicable after the date that the Acquired Companies become aware of such consent or right, and (ii) otherwise comply with such consent or right in accordance with this Section 6.3(h).

Section 6.4.     Further Assurances. Subject to, and not in limitation of, Section 6.3, until the Closing or earlier termination of this Agreement, each of the Parties shall (a) execute such documents and perform such further acts as may be reasonably required to carry out the provision

hereof and the actions contemplated hereby and (b) use its reasonable best efforts to, at the earliest practicable date, satisfy, or cause the satisfaction of, the condition precedents to the consummation of the Transactions; provided, that, this Section 6. 4 shall continue to apply to Section 6.21 after the Closing.

Section 6.5.    Confidentiality. The Buyer acknowledges that the information provided to them in connection with this Agreement and the Transactions is subject to the terms of the confidentiality agreement between Elliott Investment Management L.P. and the Special Master dated January 5, 2024 (the "Confidentiality Agreement"), the terms of which are incorporated herein by reference; subject to disclosure permitted in accordance with Section 6.10. The Parties acknowledge and agree that, notwithstanding anything to the contrary in the Confidentiality Agreement, as of the Execution Date, (a) the defined term "Representatives" under the Confidentiality Agreement shall be deemed to include any actual or potential bidding partners, equity financing sources, and debt financing sources (without any requirement of notice to, or consent from, the Special Master, including with respect to entering into exclusive arrangements with any such party), and (b) Section 2(d) of the Confidentiality Agreement shall terminate and be of no further force or effect. Effective as of the Closing, the Confidentiality Agreement shall terminate and be of no further force or effect.

Section 6.6.    Indemnification, Exculpation and Insurance.

(a)    Except as set forth in Section 6.6(a)(1) of the Company Disclosure Schedules, from and after the Closing, the Buyer shall, and shall cause each Acquired Company to continue in full force and effect in accordance with their respective terms until the applicable statute of limitations with respect to any claims against such Indemnitees (as defined below), all rights to indemnification, advancement of expenses and exculpation by the Acquired Companies, now existing in favor of each of the Persons who at or prior to the Closing were (i) directors (or equivalent), officers or employees of any Acquired Company or (ii) serving as directors (or equivalent), officers or employees of another entity (including a joint venture) at the request of any Acquired Company (collectively, the "Indemnitees") pursuant to the Organizational Documents of the Acquired Companies (and to the extent permitted by Section 3, clause fifth of the Certificate of Incorporation of CITGO Petroleum as in effect on the Effective Date) or pursuant to the Contracts disclosed in Section 6.6(a)(2) of the Company Disclosure Schedules, in each case as in effect on the date of this Agreement.

(b)    The indemnification and exculpation provisions of the Acquired Companies' Organizational Documents and indemnification Contracts disclosed in Section 6.6(a)(2) of the Company Disclosure Schedules shall not be amended, or otherwise modified in any manner that would adversely affect the rights of the Indemnitees under Section 6.6(a), unless such amendment or modification is required by Law. From and after the Closing, the Buyer agrees to cause the Acquired Companies to maintain in effect in accordance with their respective terms (i) the escrow agreement, dated May 5, 2023, by and among Citgo Petroleum Corporation, Morris James, LLP and JPMorgan Chase Bank, N.A. and (ii) the escrow agreement, dated May 5, 2023, by and among the Company, Morris James, LLP and JPMorgan Chase Bank, N.A., and not to amend the foregoing in any manner that would adversely affect the rights of the applicable Indemnitees thereunder, unless such modification is required by Law.

(c)     Prior to the Closing, the Company may, or, immediately upon the Closing if the Company has not already done so, the Buyer shall cause the Company and the Company Subsidiaries to, purchase the directors' and officers' "tail" or "runoff" insurance program currently available to be purchased under the existing directors' and officers' liability insurance plan covering the Acquired Companies' directors and officers, to the extent such plan remains available as of the Closing on materially the same terms and conditions; provided, that the premium paid for such "tail" policy shall not exceed 350% of the annual premiums paid for the Acquired Companies' current directors' and officers' liability insurance policy; and provided, further, that to the extent the premium paid for such "tail" policy exceeds 350% of the annual premiums paid for the Acquired Companies' current directors' and officers' liability insurance policy, the Buyer shall maintain a "tail" policy that has the most favorable coverage obtainable for an amount at or below 350% of the annual premiums paid for the Acquired Companies' current directors' and officers' liability insurance policy. To the extent that such plan is no longer available on materially the same terms and conditions at the Closing, prior to the Closing, the Buyer shall, or, immediately upon the Closing, shall cause the Company, to purchase a directors' and officers' liability "tail" or "run-off" insurance program, selected by the Company prior to the Closing, for a period of six (6) years after the Closing (such coverage shall have an aggregate coverage limit over the term of such policy in an amount no less than the aggregate coverage limit under the Company's existing directors' and officers' liability policy, and in all other respects comparable to such existing coverage); provided, that the premium paid for such "tail" policy shall not exceed 350% of the annual premiums paid for the Acquired Companies' current directors' and officers' liability insurance policy; and provided, further, that to the extent the premium paid for such "tail" policy exceeds 350% of the annual premiums paid for the Acquired Companies' current directors' and officers' liability insurance policy, the Buyer shall maintain a "tail" policy that has the most favorable coverage obtainable for an amount at or below 350% of the annual premiums paid for the Acquired Companies' current directors' and officers' liability insurance policy.

(d)     The provisions of this Section 6.6 are intended to be for the benefit of, and shall be enforceable by, each Indemnitee.

(e)     In the event that the Buyer, the Company or any of its successors or assigns (i) consolidates with or merges into any other Person and is not the continuing or surviving corporation or entity of such consolidation or merger; or (ii) transfers or conveys all or substantially all of its properties and assets to any Person, then, and in each such case, proper provision shall be made so that the successors and assigns of the Buyer and of the Company shall assume all of the obligations of the Buyer and the Company set forth in this Section 6.6.

(f)     Notwithstanding anything to the contrary in this Section 6.6, in no event shall the obligations of the Buyer under this Section 6.6 apply to any Person who committed any act or failed to act, in each case, in violation of (or in furtherance of another Person's violation of) any criminal Law, Anti-Corruption Law, Economic Sanctions/Trade Laws, or Money Laundering Laws, in each case, in such Person's capacity as a director (or equivalent), officer or employee of any Acquired Company (or any other entity if such Person was serving at the request of any Acquired Company) at any time, and any such Person shall in no event be deemed an "Indemnitee" under this Agreement or have any rights hereunder.

Section 6.7.    <u>Public Announcements</u>. The Buyer and the Special Master shall not, and the Special Master shall Cause the Acquired Companies not to, issue any press release or make any public statement without the prior consent of the other Party, which consent shall not be unreasonably withheld, conditioned or delayed, except that each of the Buyer and the Special Master may issue (x) the initial press release announcing the execution of this Agreement that has been agreed upon by the Buyer and the Special Master, (y) any press release or public announcement so long as any statements contained therein concerning the Transactions are consistent with previous releases or announcements made by the applicable Party with respect to which such Party has complied with the provisions of this <u>Section 6.7</u>, and (z) such other release or announcement that, upon the advice of outside counsel, is required by Law or the rules and regulations of any stock exchange upon which the securities of the Buyer, as applicable, or any of its Affiliates, are listed. Without limiting the foregoing, the Buyer and the Special Master shall consult with one another prior to issuing any press release or making any public statement with respect to this Agreement or the Transactions, and each Party shall, to the extent practicable, allow the other Party reasonable time to review and comment on all public releases, filings, notifications, announcement or other communications (including proxy statement and other communications with shareholders and filings, notifications or other communications with Governmental Bodies) concerning the Transactions in advance of their issuance, release, filing, dissemination or publication. For the avoidance of doubt, nothing in this <u>Section 6.7</u> shall prevent the Parties from (a) issuing any press release or making any public statement in the Ordinary Course that does not relate specifically to this Agreement or the Transactions, (b) disclosing this Agreement or the substance or any relevant details of the Transactions on a confidential basis to any of its Representatives (<u>provided</u>, that such Representatives have been informed of such party's confidentiality obligations hereunder and under the Confidentiality Agreement or are otherwise obligated to keep such information confidential) or (c) in the case of the Special Master, complying with any reporting obligations of the Court and nothing in this <u>Section 6.7</u> or in any other provision of this Agreement shall impact the ability of PDVSA or the Acquired Companies to use confidential information in connection with opposing the sale process, this Agreement or the Transactions.

Section 6.8.    <u>Employee Matters</u>.

(a)    The Buyer and the Special Master hereby agree that the Closing shall constitute a "Change in Control" for purpose of any employee arrangement and all other Company Benefit Plans, pursuant to the terms of such plans as in effect on the date of this Agreement (or as adopted or amended to the extent permitted by <u>Section 6.1(b)</u>). No provision of this <u>Section 6.8(a)</u> shall be construed to create a right in any employee or beneficiary of such employee under any Company Benefit Plan that such employee or beneficiary would not otherwise have under the terms of such Company Benefit Plan and, for the avoidance of doubt, no provision of this <u>Section 6.8</u> will be deemed to supersede the terms of any Company Benefit Plan to the extent such terms are more favorable to Affected Employees than the rights granted hereunder.

(b)    As of the Closing, the Buyer shall, or shall cause the Acquired Companies to, assume the Company Collective Bargaining Agreements and adhere to the obligations thereunder pursuant to the terms therein. Following the Closing, the Buyer or the Acquired Companies will continue to employ the employees who are subject to or covered by the Company Collective Bargaining Agreements and employed by one of the Acquired Companies as of the

WEIL:\99805227\35\67816.0003

Closing (the "Union Affected Employees") on the terms therein, including with respect to employee wages and benefits.

(c)    For a period of twelve (12) months following the Closing (or, if shorter, the applicable employee's period of employment with the Buyer or one of the Acquired Companies), the Buyer shall continue to provide (or shall cause the Acquired Companies to provide) to each employee of any of the Acquired Companies as of the Closing who are not subject to or covered by a Company Collective Bargaining Agreement (the "Non-Union Affected Employees," together with the Union Affected Employees, the "Affected Employees"), for so long as each such Non-Union Affected Employee remains employed by the Buyer or any of the Acquired Companies, (i) a base salary or hourly wage rate (as applicable) and short-term cash incentive compensation opportunities (excluding equity and equity-based awards and transaction-based or other one-time payments or awards), in each case, that are no less favorable than those provided to such Non-Union Affected Employee immediately prior to the Closing, and (ii) employee benefits that are substantially comparable in the aggregate to those provided to such Non-Union Affected Employee immediately prior to the Closing.

(d)    The Buyer will give (or will cause the Acquired Companies to give) each Affected Employee full credit for purposes of eligibility, vesting and benefit accrual under any employee benefit plans or arrangements maintained by the Buyer (or any of the Acquired Companies) for such Affected Employee's service with any of the Acquired Companies (and their respective predecessor entities) to the same extent recognized by any of the Acquired Companies immediately prior to the Closing, except to the extent that such credit would result in a duplication of benefits or compensation for the same period of service.

(e)    The Buyer will (or will cause the Acquired Companies to) use commercially reasonably efforts to (i) waive all limitations as to preexisting conditions, exclusions and waiting periods with respect to participation and coverage requirements applicable to each Affected Employee under any welfare benefit plans that such Affected Employee may be eligible to participate in after the Closing, other than limitations or waiting periods that are already in effect with respect to such Affected Employee and that have not been satisfied as of the Closing under any welfare plan maintained for the Affected Employee immediately prior to the Closing, and (ii) for the first plan year of eligibility, provide each Affected Employee with credit for any co-payments and deductibles, paid by such Affected Employee prior to the Closing, in satisfying any applicable deductible or out-of-pocket requirements under any welfare plans that such Affected Employee is eligible to participate in after the Closing. References to "Affected Employee" in this Section 6.8(e) shall also refer to the applicable Affected Employee's eligible dependents.

(f)    Upon the Buyer's request (and at the Buyer's sole cost and expense), the Special Master shall Cause the Company to adopt and maintain an employee retention plan in form and substance as proposed by the Buyer in writing. Any such employee retention plan shall be in addition to, and shall not replace or substitute any existing Company Benefit Plan.

(g)    The provisions contained in this Section 6.8 shall not (i) be treated as an amendment or other modification of any Company Benefit Plan, Company Collective Bargaining Agreement or other employee benefit plan, agreement or other arrangement, (ii) limit the right of the Buyer or any Acquired Company to terminate any employee at any time and for any reason or

55

(iii) create any third party rights, benefits or remedies of any nature whatsoever in any employee of any Acquired Company (or any beneficiaries or dependents thereof) or any other Person that is not a party to this Agreement. The benefits and compensation provided to each employee of any of the Acquired Companies as of the Closing ("Affected Employee") following the Closing Date shall be subject to the requirements of applicable Law. Notwithstanding the foregoing, nothing herein will impose on the Buyer or any of the Acquired Companies any obligation to (A) retain any Affected Employee in its or their employ for any amount of time or (B) maintain any terms and conditions of employment other than as expressly set forth above.

Section 6.9.    The Buyer's Obligations in Respect of Debt Financing.

(a)    The Buyer acknowledges and agrees that the Special Master, the Company and their respective Affiliates have no responsibility for any financing that Buyer may raise in connection with the Transactions, other than any obligations expressly set forth in Section 6.10.

(b)    The Buyer shall use reasonable best efforts to take, or cause to be taken, all actions and to do, or cause to be done, all things necessary, proper or advisable to obtain the Debt Financing contemplated by the Debt Financing Commitments on or prior to the Closing Date, including to:

(i)    maintain in effect the Commitment Letters from and after the Trust Structure Effective Date (subject to the Buyer's right to amend, modify, supplement, restate, assign, substitute or replace the Commitment Letters in accordance herewith);

(ii)    negotiate and enter into definitive financing agreements (the "Definitive Debt Documents") with respect to the Debt Financing that reflect the terms contained in the Debt Commitment Letter (including any "market flex" provisions related thereto) or on such other terms acceptable to the Buyer and its Debt Financing Sources, so that such agreements are in effect no later than the Closing Date; it being understood that in no event shall any of the Definitive Debt Documents (A) reduce the aggregate amount of the Debt Financing provided for in the Debt Commitment Letter (including by changing the amount of fees or original issue discount contemplated by the Debt Commitment Letter and the Fee Letters) to an amount that would reduce the total sources of funding below the Required Amount; (B) expand the conditions or other contingencies relating to the receipt or funding of the Debt Financing beyond those expressly set forth in the Debt Commitment Letter, amend or modify any such conditions or other contingencies in a manner adverse to the Buyer and/or the Acquired Companies (whether by making any such conditions or other contingencies less likely to be satisfied on a timely basis or otherwise) or impose any new or additional condition or other contingency relating to the receipt or funding of the Debt Financing or (C) contain terms (other than those terms expressly set forth in the Debt Commitment Letter) that (1) could reasonably be expected to delay the Closing or the date on which the Debt Financing would be obtained or make the timely funding of the Debt Financing less likely to occur, or (2) adversely impact the ability of the Buyer to consummate the Debt Financing (clauses (A) through (C), a "Prohibited Modification");

(iii)    satisfy on a timely basis all conditions applicable to the Buyer contained in the Debt Financing Commitments and Equity Financing Commitments,

including the payment of any commitment, engagement or placement fees required as a condition to the Debt Financing or the Equity Financing, as applicable;

(iv)    consummate the Debt Financing (including by instructing the Debt Financing Sources to fund the Debt Financing in accordance with the Debt Commitment Letter, instructing the Equity Financing Sources to fund the Equity Financing in accordance with the Equity Commitment Letters and enforcing the Buyer's rights under the Debt Commitment Letter (including if necessary or appropriate, to commence, participate in and diligently pursue Legal Proceedings against or involving any of the Persons that have committed to provide any portion of, or otherwise with respect to, the Debt Financing)) at or prior to the date that the Closing is required to be effected in accordance with Section 2.2 (the Buyer acknowledges and agrees that it is not a condition to Closing under this Agreement, nor to the consummation of the Transactions, for the Buyer to obtain the Debt Financing or any Replacement Financing); and

(v)    comply with its obligations under the Debt Commitment Letter.

Subject to the terms and upon satisfaction of the conditions set forth in the Debt Commitment Letter, the Buyer shall use its reasonable best efforts to cause the lenders and the other Persons providing such Debt Financing to provide the Debt Financing on the Closing Date.

(c)    From and after the Trust Structure Effective Date, the Buyer shall provide to the Special Master copies of all agreements and other documents relating to the Debt Financing and, shall keep the Special Master reasonably informed on a current basis and in reasonable detail of material developments in respect of the financing process relating thereto. Without limiting the generality of the foregoing, the Buyer shall provide the Special Master prompt written notice (i) of any expiration or termination of, or any breach, default or violation (or any event or circumstance that, with or without notice, lapse of time or both, could reasonably be expected to give rise to any breach, default or violation) by any party to the Debt Commitment Letter or definitive agreements related to the Debt Financing of which the Buyer becomes aware, (ii) of the receipt of any written notice or other written communication, in each case from any Debt Financing Source with respect to any (x) actual or potential breach, default, violation, termination or repudiation by any party to the Debt Commitment Letter or definitive agreements related to the Debt Financing of any provision of the Debt Commitment Letter or definitive agreements related to the Debt Financing, (y) any actual dispute or disagreement between or among any parties to the Debt Commitment Letter or definitive agreements related to the obligation to fund the Debt Financing or the amount of the Debt Financing to be funded at the Closing, and (iii) if at any time for any reason the Buyer believes in good faith that it will not be able to obtain all or any portion of the Debt Financing on the terms and conditions contemplated by the Debt Financing Commitments or definitive agreements related to the Debt Financing. From and after the Trust Structure Effective Date, as soon as reasonably practicable after the Special Master delivers to the Buyer a written request therefor, the Buyer shall provide any information reasonably requested by the Special Master relating to any circumstance referred to in clause (i), (ii) or (iii) of the immediately preceding sentence; provided, that the right of the Special Master to request such information shall not limit the obligations of the Buyer to promptly provide such information as otherwise required by this Section 6.9(c).

(d)    After the Trust Structure Effective Date and prior to the Closing, the Buyer shall not, without the prior written consent of the Special Master, agree to, or permit, any amendment, restatement, amendment and restatement, replacement, supplement, or other modification of, or waiver or consent under, the Debt Commitment Letter or other documentation relating to the Debt Financing which would constitute a Prohibited Modification. For purposes of this Section 6.8, the definitions of "Debt Commitment Letter," "Debt Financing," "Debt Financing Commitments," "Debt Financing Sources," shall include the Debt Financing Commitment or documents related thereto as permitted to be amended, amended and restated, replaced, supplemented, modified, waived or consented to by this Section 6.9(d). The Buyer shall promptly deliver to the Special Master copies of any such amendment, restatement, amendment and restatement, replacement, supplement, modification, waiver or consent. The Buyer shall not agree to or permit the withdrawal, repudiation, termination or rescission of any Debt Commitment Letter or Definitive Debt Document or any provision thereof (except in connection with Replacement Financing). Further, for the avoidance of doubt, if from and after the Trust Structure Effective Date the Debt Financing (or any Replacement Financing) has not been obtained, the Buyer shall continue to be obligated to consummate the Transactions subject only to the satisfaction or waiver of the conditions set forth in Section 7.1 and Section 7.2.

(e)    If, notwithstanding the use of commercially reasonable efforts by the Buyer to satisfy its obligations under Section 6.9(b), (c) and (d), any of the Debt Financing or the Debt Financing Commitments (or any definitive financing agreement relating thereto) expire or are terminated or after being entered into, subsequently become unavailable prior to the Closing, in whole or in part, for any reason, the Buyer shall (i) promptly notify the Special Master of such expiration, termination, or unavailability and the reasons therefor and (ii) use its commercially reasonable efforts promptly to arrange for alternative financing ("Replacement Financing") (which shall be sufficient, together with the Equity Financing and cash on hand of the Buyer, to pay the Required Amount and shall not, without the prior written consent of the Special Master, include any conditions to such Replacement Financing that are more onerous than, or in addition to, the conditions set forth in the Commitment Letters, as applicable, to replace the financing contemplated by such expired, terminated, or unavailable commitments or arrangements). The Buyer shall deliver to the Special Master true, correct and complete copies of all contracts or other arrangements pursuant to which any such alternative source shall have committed to provide any portion of the Replacement Financing (provided that any fee letters in connection therewith may be redacted in a manner consistent with the Fee Letter provided as of the date hereof). To the extent applicable, the Buyer shall use its reasonable best efforts to take, or cause to be taken, all actions necessary, proper or advisable to arrange and consummate the Replacement Financing on the terms and conditions described in such contracts or other arrangements relating thereto on or before the Closing Date, including (A) using commercially reasonable efforts to (x) satisfy on a timely basis, all terms, covenants and conditions set forth therein; (y) enter into definitive agreements with respect thereto on the terms and conditions set forth therein and (z) consummate the Replacement Financing at or prior to the Closing and (B) if necessary or appropriate, seeking to enforce its rights thereunder. In the event that Replacement Financing is obtained in accordance with this Section 6.9(e), the definitions of "Debt Commitment Letter," "Debt Financing," "Debt Financing Commitments," and "Debt Financing Sources" shall include the commitments in respect of the Replacement Financing or the documents related thereto, as applicable. Notwithstanding the foregoing, compliance by the Buyer with the provisions of this Section 6.9(e) shall not relieve the

WEIL:\99805227\35\67816.0003

Buyer of their obligation to consummate the Transactions whether or not the Debt Financing is available.

Section 6.10.   Company's Obligations in Respect of Debt Financing.

(a)   Subject to Section 6.10(b), from and after the Trust Structure Effective Date and prior to the Closing, the Special Master shall Cause the Acquired Companies to use reasonable best efforts to provide to the Buyer such customary cooperation in connection with the arrangement of the Debt Financing as is reasonably requested by the Buyer. Such assistance shall include using commercially reasonable efforts to do the following, at the Buyer's sole expense, in connection with the Debt Financing:

(i)   as promptly as practicable, to furnish, or cause to be furnished, to the Buyer, the Required Information;

(ii)   causing the appropriate members of senior management of the Company to participate in a reasonable number of meetings (including customary one-on-one meetings and calls that are requested in advance with or by the parties acting as lead arrangers or agents for, and prospective lenders of, the Debt Financing), presentations, sessions with rating agencies, drafting sessions, conference calls, road shows, due diligence sessions or other customary syndication activities;

(iii)   (A) assisting with the preparation of appropriate and customary materials for a rating agency presentation, a bank information memorandum and a lender presentation reasonably required in connection with the Debt Financing and (B) having an officer of the Company execute a customary authorization letter with respect to the bank information memorandum that authorizes distribution of information to prospective lenders;

(iv)   to the extent not prohibited or restricted under applicable Law or any Contract of the Company or its applicable Affiliate, facilitating the pledging of collateral; provided that no pledge shall be effective until the Closing;

(v)   assisting in the preparation of definitive financing documents, including guarantee and collateral documents and customary closing certificates and other customary documents as reasonably necessary, in each case, not to be effective until the Closing (provided, that, unless specifically provided for in this Section 6.10, in no event will any of the Acquired Companies or their respective Representatives be required to execute or deliver any opinion or certificate in connection with the Financings);

(vi)   furnishing the Buyer at least three (3) Business Days prior to the Closing Date with all documentation and other information required by a Governmental Body with respect to the Debt Financing under applicable "know your customer" and anti-money laundering rules and regulations that is reasonably requested by the Buyer at least ten (10) Business Days prior to the Closing Date;

(vii)   solely with respect to financial information and data derived from the Acquired Companies' historical books and records, provide reasonable and customary

59

assistance to the Buyer with the preparation of pro forma financial information and pro forma financial statements to the extent reasonably requested by the Buyer or the Debt Financing Sources and customary to be included in any marketing materials or Offering Documents or of the type required by the Debt Commitment Letter (provided, that none of the Acquired Companies or any of their respective Representatives shall be responsible for the preparation of any pro forma financial statements or pro forma adjustments thereto);

(viii)    provide reasonable and customary assistance to the Buyer and the Debt Financing Sources in the preparation of customary Offering Documents, syndication memoranda, ratings agency presentations and other marketing material for the Debt Financing, including the execution and delivery of customary authorization letters related thereto (provided, that, unless specifically provided for in this Section 6.10, in no event will any of the Acquired Companies or their respective Representatives be required to execute or deliver any opinion or certificate in connection with the Debt Financing);

(ix)    cooperate with the Buyer to obtain customary corporate and facilities credit ratings, consents, landlord waivers and estoppels, non-disturbance agreements as reasonably requested by the Buyer, in each case, not to be effective prior to the Closing Date;

(x)    subject to an Acceptable Confidentiality Agreement, taking all actions reasonably necessary and customary to (A) permit the Debt Financing Sources and their respective Representatives to evaluate the Acquired Companies' current assets, properties, rights, inventory, cash management and accounting systems, and policies and procedures relating thereto for the purpose of establishing collateral arrangements to the extent customary and reasonable and (B) establish bank and other accounts and blocked account agreements and lock box arrangements in connection with the foregoing, provided that such agreements and arrangements will only be effective upon Closing;

(xi)    subject to an Acceptable Confidentiality Agreement, granting the Debt Financing Sources on reasonable terms and upon reasonable request, at reasonable times and on reasonable notice at times and locations to be mutually agreed, access to the Acquired Companies' properties, rights, assets and cash management and accounting systems (including cooperating in and facilitating the completion of field examinations, collateral audits, asset appraisals and surveys) for the purpose of establishing collateral arrangements required to be in place pursuant to the Financings;

(xii)    subject to an Acceptable Confidentiality Agreement, furnishing the Buyer and the Debt Financing Sources all existing field examinations, collateral audits and asset appraisals and surveys of the Acquired Companies to the extent prepared in the Ordinary Course and other information prepared in the Ordinary Course as necessary to enable the Buyer to furnish the "Borrowing Base Certificate" required to be delivered pursuant to clause 4(b) of Exhibit E to the Debt Commitment Letter;

(xiii)    assisting in the preparation of at Closing, the Debt Financing Documents, including assistance with the preparation of schedules, information required by the perfection certificate and exhibits thereto or other customary informational

requirements relating to the Acquired Companies as are requested by the Buyer, and other customary documents as may be reasonably requested by the Buyer or the Debt Financing Sources, and otherwise assist in facilitating the creation and perfection of the security interests in the collateral contemplated by the Debt Financing, in each case, to the extent required to facilitate the satisfaction of the financing conditions set forth in the Debt Commitment Letter that are within its control, provided that no such document or certificate or the creation or perfection of any security interest in any of the Equity Interests of or assets owned by the Company and its Subsidiaries shall be effective prior to Closing (provided, that, unless specifically provided for in this Section 6.10, in no event will any of the Acquired Companies or their respective Representatives be required to execute or deliver any opinion or certificate in connection with the Debt Financing);

(xiv)    facilitate customary cooperation and assistance of the Company's independent auditors to (A) provide customary "comfort" letters (including "negative assurance" and change period comfort), (B) deliver consents and (C) attend accounting diligence sessions;

(xv)    cooperating with the Buyer to take such corporate or other organizational action, subject to the occurrence of the Closing, as is reasonably necessary to permit the consummation of the Debt Financing (provided, that, unless specifically provided for in this Section 6.10, in no event will any of the Acquired Companies or their respective Representatives be required to execute or deliver any opinion or certificate in connection with the Debt Financing); and

(xvi)    Cause the Acquired Companies to use commercially reasonable efforts to facilitate the delivery of the Payoff Letters and the discharge and release documentation at least three (3) Business Days prior to the Closing Date.

(b)    Notwithstanding anything in Section 6.10(a) or this Agreement to the contrary, the cooperation requested by the Buyer pursuant to Section 6.10(a) shall not:

(i)    require the entry by the Special Master or any Acquired Company into any agreement or commitment, or the taking of any action, that would be effective prior to the Closing and that is not contingent on the occurrence of the Closing;

(ii)    unreasonably interfere with the ongoing operations of the Acquired Companies; or

(iii)    include any action that the Special Master or the Company reasonably believes would require any of the Acquired Companies to (A) pay any commitment or other similar fee, (B) have or incur any liability or obligation in connection with the Debt Financing, including under any agreement or any document related to the Debt Financing, (C) take any action that would conflict with, violate or result in a breach of or default under the Company Charter and Company By-Laws or any Organizational Documents of the Company's Affiliates, any Contract, any Transaction Document or any Law, (D) take any action that could subject any director, manager, officer or employee of the Company or any of its Affiliates to any personal liability, (E) provide access to or

61

disclose information that the Company determines in good faith could jeopardize any attorney client privilege of, or conflict with any confidentiality requirements applicable to, the Company or any of its Affiliates, (F) cause any director or manager of the Company or any of its Affiliates to pass resolutions or consents to approve or authorize the execution of the Debt Financing (other than continuing directors or managers), (G) reimburse any expenses or provide any indemnities, (H) make any representation, warranty or certification that, in the good faith determination of the Company, is not true, (I) require the delivery of any financial statements in a form or subject to a standard different than those provided to the Buyer on or prior to the date hereof, (J) provide any cooperation or information that does not pertain to the Acquired Companies or (K) provide (i) any description of all or any component of the Financings (including any such description to be included in any liquidity or capital resources disclosure or any "description of notes"), (ii) projections, risk factors or other forward-looking statements relating to all or any component of the Financings, or (iii) any solvency certificate or similar certification in connection with the Financings (which items (i) through (iii) shall be the sole responsibility of the Buyer). In no event shall the Special Master be in breach of <u>Section 6.10(a)</u> because of the Company's failure (x) to deliver any financial or other information that is not (I) currently readily prepared in the Ordinary Course at the time requested by the Buyer or (II) of the type prepared in connection with the offering of the 8.375% Senior Secured Notes or (y) to obtain review of any financial or other information by its accountants.

       (c)     Notwithstanding anything to the contrary contained herein, it is understood and agreed by the Parties that the failure of the Special Master or the Company to comply with the provisions of this <u>Section 6.10</u> shall not give rise to a failure of a condition precedent set forth in <u>Section 7.2(b)</u> or a termination right pursuant to <u>Section 8.1(c)</u>.

       (d)     The Buyer shall promptly reimburse the Acquired Companies, the Special Master, and/or their respective Representatives for all reasonable and documented out-of-pocket third-party costs and expenses incurred by the Acquired Companies, the Special Master, and/or their respective Representatives in connection with the cooperation contemplated by <u>Section 6.10(a)</u>, including (i) attorneys' fee and (ii) expenses of the Company's accounting firms engaged to assist in connection with the Debt Financing, other than (x) costs and expenses incurred in connection with the preparation of historical financial statements in the ordinary course of business, and (y) any other ordinary course amounts that would have been incurred in connection with the transactions contemplated hereby entirely and completely regardless of (A) any debt financing established in connection herewith and (B) any requirements or actions under this <u>Section 6.10</u>. The Buyer shall indemnify and hold harmless, the Special Master, Acquired Companies, and their respective Representatives, from and against any and all liabilities or losses suffered or incurred by them in connection with the arrangement of the Debt Financing and any information utilized in connection therewith, except to the extent arising from (i) any material inaccuracy of any historical information furnished in writing by or on behalf of the Acquired Companies, including financial statements or (ii) the gross negligence, bad faith, willful misconduct, fraud or intentional misrepresentation of the Acquired Companies or any of their respective employees or representatives (provided that the gross negligence, material breach of this Agreement or willful misconduct of the Special Master or any of his Representatives will not impact the foregoing obligations of Buyer with respect to the Acquired Companies or its Representatives).

(e)     Any information provided pursuant to this Section 6.10 shall be subject to the Confidentiality Agreement; provided, that the Buyer will be permitted to disclose such information to any Debt Financing Sources or prospective Debt Financing Sources and other financial institutions and investors that are or may become parties to the Debt Financing and to any underwriters, initial purchasers or placement agents in connection with the Debt Financing or with respect to the Equity Financing or any other equity financing in connection with the Transactions (and, in each case, to their respective counsel and auditors) so long as such Persons (i) agree to be bound by confidentiality provisions substantially similar to those in the Confidentiality Agreement (and any confidentiality agreements between the Company and its Affiliates) as if parties thereto, or (ii) are subject to other confidentiality undertakings reasonably satisfactory to the Company and of which the Company is a beneficiary.

(f)     The Special Master will Cause the Company to consent to the use of the logos of the Acquired Companies in connection with any such Debt Financing; provided, that such logos shall be used solely in a manner that is not intended or reasonably likely to harm, disparage or otherwise adversely affect the Acquired Companies, their reputation or goodwill.

(g)     Subject to the terms and conditions set forth in this Agreement, the Buyer acknowledges and agrees that neither obtaining the Financings nor any Replacement Financing, by the Buyer nor any cooperation by the Acquired Companies at the direction of the Special Master is a condition to Closing and reaffirms its obligations to consummate the Transactions irrespective and independently of the availability of the Financing or any Replacement Financing, subject to fulfillment or waiver of the conditions set forth in Section 7.1 and Section 7.2.

Section 6.11.   Treatment of Existing Senior Secured Notes.

(a)     The Buyer will be permitted to commence and conduct one or more offers to purchase, including any "Change of Control Offer" (as such term is defined in the applicable indenture governing each series of Existing Senior Secured Notes (each, an "Indenture")), any tender offer, any exchange offer, and/or other liability management transaction, including redemptions, and to conduct any consent solicitations (each, a "Debt Offer" and collectively, the "Debt Offers"), with respect to any or all of the outstanding aggregate principal amount of the Existing Senior Secured Notes identified by the Buyer to the Company in writing prior to, on, or after the date hereof on terms that are acceptable to the Buyer. The Buyer shall not be permitted to commence any applicable Debt Offer until the Buyer shall have provided the Company with the necessary offer to purchase, letter of transmittal or other related documents in connection with the Debt Offer (collectively, the "Debt Offer Documents") a reasonable period of time in advance of the Buyer commencing the applicable Debt Offer to allow the Company and its counsel to review and comment on the related Debt Offer Documents. The Buyer will reasonably consult with the Company regarding the timing and commencement of any Debt Offer and any relevant tender or consent deadlines. The closing (or, in the case of consent solicitations, operativeness) of the Debt Offers shall be expressly conditioned on the occurrence of the Closing, and the Parties shall, and the Special Master shall Cause the Company and the Acquired Companies to, use their reasonable best efforts to cause the Debt Offers to close on the Closing Date. The Debt Offers shall be conducted in compliance with any applicable provisions of the applicable Indenture and with applicable Law, including SEC rules and regulations, and the Company shall not be required to cooperate with respect to any Debt Offer that is not in compliance with the applicable Indenture

and applicable Law. The Special Master shall Cause the Company, the Company Subsidiaries and their respective Representatives to, in each case, use their reasonable best efforts, at the Buyer's sole expense as contemplated by Section 6.11(d), to provide all cooperation reasonably requested by the Buyer in connection with any Debt Offer. To the extent that the provisions of any applicable Law conflict with this Section 6.10, the Buyer shall, and the Special Master shall Cause the Company to, comply with the applicable Law and shall not be deemed to have breached their obligations under this Agreement by such compliance.

(b)    Subject to the receipt of any requisite consents, the Special Master shall Cause the Company to execute a supplemental indenture to the indenture governing each series of Existing Senior Secured Notes identified by the Buyer to the Company in writing prior to, on, or after the date hereof in accordance with the applicable Indenture, amending the terms and provisions of each such Indenture as described in the Debt Offer Documents as reasonably requested by the Buyer, which supplemental indenture shall become operative no earlier than the Closing, and shall use reasonable best efforts to cause the trustee under each such Indenture to enter into such supplemental indenture substantially simultaneously with the Closing as determined by Buyer; provided, that in no event shall the Company or of its Representatives have any obligation to authorize, adopt or execute any amendments or other agreement that would become operative prior to the Closing. The Special Master shall Cause the Acquired Companies and their respective Representatives to, in each case, use their reasonable best efforts to provide all cooperation reasonably requested by the Buyer in connection with the execution of the supplemental indentures, including using reasonable best efforts to cause the applicable trustee to proceed with the Debt Offer, and take any such action as is reasonably necessary to cause the applicable trustee and/or other applicable agent to send the notices of the Debt Offer and/or other documents necessary to commence the Debt Offer to the holders of the Existing Senior Secured Notes.

(c)    If requested by the Buyer in writing, in lieu of or in addition to the Buyer commencing or closing a Debt Offer for any series of Existing Senior Secured Notes, the Special Master shall Cause the Company to use its reasonable best efforts, to the extent permitted by such series of Existing Senior Secured Notes and the applicable Indenture, to (i) issue a notice of redemption for all of the outstanding aggregate principal amount of such series of Existing Senior Secured Notes, pursuant to the redemption provisions of the applicable Indenture, which notice of redemption shall either be issued substantially simultaneously with the Closing or be expressly conditioned on the occurrence of the Closing and (ii) take any other actions prior to or at the Closing reasonably requested by the Buyer to facilitate the redemption and satisfaction and discharge of such series of Existing Senior Secured Notes pursuant to the redemption and the satisfaction and discharge provisions of the applicable Indenture and the other provisions of such Indenture applicable thereto. The redemption and satisfaction and discharge of any series of Existing Senior Secured Notes pursuant to the preceding sentence are referred to collectively as the "Discharge" of such series of Existing Senior Secured Notes. The Company shall, and shall cause the Company Subsidiaries and their respective Representatives to, in each case, use their reasonable best efforts, at Buyer's sole expense as contemplated by Section 6.11(d), to provide all cooperation reasonably requested by the Buyer in connection with the Discharge of any series of Existing Senior Secured Notes identified to the Company by the Buyer in writing at any time.

64

(d)     The Buyer shall, upon request by the Company, reimburse the Company for (i) all reasonable and documented out-of-pocket costs and expenses (including reasonable outside attorneys' fees and expenses) incurred by the Company, any of the Company Subsidiaries or their respective Representatives in connection with the Debt Offers or Discharge in respect of any series of Existing Senior Secured Notes and (ii) any out-of-pocket costs incurred by the Company, any of the Company Subsidiaries or their respective Representatives to the trustee or its counsel pursuant to the applicable Indenture in connection with the Debt Offers or Discharge in respect of any series of Existing Senior Secured Notes.

Section 6.12.   <u>Tax Matters</u>.

(a)     Neither the Buyer nor any of its Affiliates shall (or, from and after the Closing, shall cause or permit the Company or any of its Affiliates to) make an election under Section 336 or Section 338 of the Code (or any similar election under state, local or foreign Law) with respect to the Transactions. The Parties shall treat the Closing Date as the last day of the taxable period of the Company for all Tax purposes.

(b)     All Transfer Taxes shall be paid by the Buyer; <u>provided</u>, that the Company shall (and shall cause each other Acquired Company to) use commercially reasonable efforts to provide to the Buyer such cooperation in connection with the payment of any Transfer Taxes and the filing of any Tax Returns required in connection with the payment of such Transfer Taxes as is reasonably requested by the Buyer. The Buyer shall procure any stock transfer stamps required by any Transfer Tax, and timely file, to the extent required by applicable Law, all necessary Tax Returns and other documentation with respect to all such Transfer Taxes and provide to the Special Master upon request evidence of payment of all Transfer Taxes.

(c)     The Buyer shall prepare or cause to be prepared and timely file or cause to be timely filed all Tax Returns of the Acquired Companies for any Pre-Closing Tax Period that is first due (taking into account any applicable extensions properly obtained in the Ordinary Course) after the Closing Date; <u>provided</u>, that all such Tax Returns described in this <u>Section 6.12(c)</u> shall be prepared in a manner consistent with the past practices of the Acquired Companies. The Buyer shall deliver a draft of any such Tax Return that reflects Pre-Lock Box Taxes to the Special Master for review at least thirty (30) days prior to the due date for the filing of such Tax Return and Buyer shall consider in good faith all reasonable comments made by the Special Master in respect of any such Tax Return.

(d)     For purposes of this Agreement, including and for the purposes of calculating the amount of Pre-Lock Box Taxes, (i) in the case of any Taxes not described in clause (ii) herein, such Taxes shall be allocated between the Pre-Lock Box Tax Period and the portion of the Straddle Period beginning after the Lock Box Date by treating the relevant Tax period as if it ended on (and included) the Lock Box Date; provided that exemptions, allowances or deductions that are calculated on an annual basis (including depreciation and amortization deductions) shall be allocated between the Pre-Lock Box Tax Period and the portion of such Straddle Period beginning after the Lock Box Date in proportion to the number of days in each period to which such exemption, allowance or deduction is applicable, and (ii) any property, ad valorem or similar Taxes (and refunds in respect of such Taxes) shall be allocated between the Pre-Lock Box Tax Period and the portion of such Straddle Period beginning after the Lock Box Date on a daily basis,

65

with the portion of such Taxes (or applicable refunds and other Tax assets) that are attributable to the Pre-Lock Box Tax Period determined by multiplying the amount of such Taxes by a fraction the numerator of which is the number of days in the Pre-Lock Box Tax Period and the denominator of which is the number of days in the entire Straddle Period. Notwithstanding anything else in this Agreement, any Transaction Tax Deductions shall be allocated to the Pre-Lock Box Tax Period to the maximum extent permitted by applicable Law.

Section 6.13.    R&W Insurance Policy. In the event the Buyer or any of its Affiliates obtains a representations and warranties insurance policy in respect of the representations and warranties contained in this Agreement or in any certificate or other instrument contemplated by or delivered in connection with this Agreement (such policy, a "R&W Insurance Policy"), (a) all premiums, underwriting fees, brokers' commissions and other costs and expenses related to such R&W Insurance Policy shall be borne solely by the Buyer or such Affiliate, (b) such R&W Insurance Policy shall not provide for any "seller retention" (as such phrase is commonly used in the representations and warranties insurance policy industry) and (c) such R&W Insurance Policy shall expressly waive any claims of subrogation against the Special Master and any Acquired Company (other than, solely in the case of an Acquired Company, in connection with Fraud of any Acquired Company). The Special Master shall, and shall Cause the Company to, use commercially reasonable efforts to cooperate with the Buyer's efforts, as applicable, and provide assistance as reasonably requested by the Buyer to obtain and bind the R&W Insurance Policy and to maintain its effectiveness through the Closing.

Section 6.14.    Notices of Certain Events.

(a)    During the Interim Period, the Special Master shall, and shall Cause the Company to notify the Buyer, and the Buyer shall promptly notify the Special Master, of:

(i)    any written notice or other written communication from any Person alleging that the consent of such Person is or may be required in connection with the Transactions;

(ii)    any notice or other written communication from any Governmental Body in connection with the Transactions;

(iii)    any actions, suits, claims, investigations or proceedings (A) commenced or (B) to the Knowledge of the Buyer or to the Knowledge of the Special Master, as applicable, threatened against, relating to or involving or otherwise affecting such Party or any of its Subsidiaries which relate to the consummation of the Transactions (excluding any appeals or other oppositions by the Acquired Companies or PDVSA); and

(iv)    any item or information referred to in, or received by the Special Master pursuant to, Section 6.14(b);

provided, that any failure to comply with this Section 6.14(a) shall not constitute the failure of any condition set forth in Article VII to be satisfied unless the underlying circumstance would independently result in the failure of a condition set forth in Article VII to be satisfied.

66

(b)    The Special Master shall Cause the Company and its Subsidiaries to, upon request by the Special Master, promptly provide to the Special Master:

(i)    access to the books and records (including all electronic data related thereto), information, assets, operations and properties of the Acquired Companies;

(ii)    contact information for any vendors, customers and manufacturers and others with whom the Company does business;

(iii)    the status of the Acquired Companies' business and financial condition; and

(iv)    access to consult with the Acquired Companies' officers and employees, who shall make themselves reasonably available for such consultation.

(c)    The Special Master shall Cause the Company and its Subsidiaries to immediately provide to the Special Master (upon any of the following being received by or made available to the Company or any of its Subsidiaries):

(i)    copies of any written notice or other written communication from any Person alleging that the consent of such Person is or may be required in connection with the Transactions;

(ii)    copies of any notice or other written communication from any Governmental Body in connection with the Transactions;

(iii)    documentation relating to any Legal Proceeding (A) commenced or (B) to the Knowledge of the Company or the Knowledge of the Buyer, as applicable, threatened against, relating to or involving or otherwise affecting such Party or any of its Subsidiaries which relate to the consummation of the Transactions;

(iv)    notice of (A) the occurrence, or failure to occur, of any event which occurrence or failure would reasonably be likely to cause a breach of any representation or warranty made by such Party in this Agreement being untrue or inaccurate or (B) any failure of a Party to comply with or satisfy any covenant, condition or agreement to be complied with or satisfied by it pursuant to this Agreement, in each case that would reasonably be expected to result in any condition set forth in Article VII not to be satisfied;

(v)    notice of any circumstance or occurrence that has had or would reasonably be expected to have a Company Material Adverse Effect; and

(vi)    notice of any Casualty Loss.

Section 6.15.    No Control of Other Party's Business. Without in any way limiting any Party's rights or obligations under this Agreement, the Parties acknowledge and agree that the restrictions set forth in this Agreement are not intended to give the Buyer, directly or indirectly, the right to control or direct the Acquired Companies' operations prior to the Closing Date. Prior

to the Closing Date, each of the Company and the Buyer shall exercise, consistent with the terms and conditions of this Agreement, complete control and supervision over its respective operations.

Section 6.16.  <u>OFAC</u>. The Buyer shall, at its own expense, (a) within fifteen (15) days after the Trust Structure Effective Date, submit the OFAC License Application; (b) promptly supply any additional information and documentary material that may be requested by OFAC; (c) prior to submitting the OFAC License Application and any other filing with or submissions to OFAC, (i) provide drafts of such application and any other filings to the Special Master, (ii) provide the Special Master with a reasonable opportunity to review and comment on such application and such other filings and (iii) consider in good faith any comments from the Special Master to such application and such other filings; (d) keep the Special Master regularly informed of the processing of the OFAC License Application and any other filings or contacts with OFAC or other Governmental Body in relation to the Transaction; and (e) fully cooperate with and furnish to the Special Master available information and assistance as reasonably may be requested by the Special Master in connection with any communications that the Special Master may have with OFAC or other Governmental Body in relation to the Transaction (<u>provided</u>, that materials, including the OFAC application and related filings, may be redacted as necessary to (i) comply with contractual arrangements and (ii) address reasonable attorney-client or other privilege or confidentiality concerns).

Section 6.17.  <u>No Solicitation</u>.

(a)    Except as expressly permitted by this <u>Section 6.17</u>, the Special Master shall not, and shall cause each of its Representatives not to, and shall Cause the Acquired Companies and their Representatives not to, directly or indirectly, (i) solicit, initiate, knowingly encourage or knowingly facilitate any proposal or offer that constitutes, or would reasonably be expected to lead to, a Competing Proposal, (ii) participate in any discussions or negotiations regarding, or furnish to any other Person any information in connection with or for the purpose of facilitating, any proposal or offer that constitutes, or would reasonably be expected to lead to, a Competing Proposal (other than (A) prior to the Commencement Date, in the event such Competing Proposal is filed with the Court to make a filing solely referring the inquiring Person to this <u>Section 6.17(a)</u> and (B) following the Commencement Date, to ascertain facts from the Person making such proposal or offer for the sole purpose of informing himself about such proposal or offer and the Person that made it and to refer the inquiring Person to this <u>Section 6.17(a)</u>) or (iii) enter into any letter of intent, agreement or agreement in principle providing for a Competing Proposal (other than an Acceptable Confidentiality Agreement) (a "<u>Acquisition Agreement</u>").

(b)    The Special Master shall, and shall cause each of its Representatives to and shall Cause the Acquired Companies and their Representatives to: (i) immediately cease and cause to be terminated any discussions or negotiations with any Persons (other than the Buyer and its Affiliates and Representatives) that may be ongoing with respect to a Competing Proposal, (ii) terminate access to any physical or electronic data rooms related to a possible Competing Proposal (other than a data room utilized solely by the Buyer, its Affiliates and their respective Representatives and not any third Person) and (iii) request that any such Person and its Representatives return or destroy all confidential information concerning the Acquired Companies theretofore furnished thereto by or on behalf of the Special Master or the Company, and destroy all analyses and other materials prepared by or on behalf of such Person that contain, reflect or

analyze such information, in each case, in accordance with the terms of the applicable confidentiality agreement between the Special Master and such Person. From and after the commencement of the No-Shop Period, the Special Master shall, and shall cause each of its Representatives to and shall Cause the Acquired Companies and their Representatives to, comply with each of clauses (i) through (iii) above with respect to any discussions, negotiations, access, confidential information, or any other actions taken or information provided prior to the No-Shop Period.

(c)      Notwithstanding anything to the contrary contained in this Agreement, if at any time after the date on which the Special Master files a motion with the Court to approve the Sale Order (the "Commencement Date") and prior to the No-Shop Period, the Special Master receives a Competing Proposal from any Person that the Special Master determines in good faith constitutes or could reasonably be expected to lead to a Superior Proposal not solicited in violation of this Section 6.17, then the Special Master and its Representatives may, after the Commencement Date and prior to the No-Shop Period, (i) furnish, pursuant to an executed confidentiality agreement containing confidentiality provisions that are not less favorable in any material respect to the Special Master than those contained in the Confidentiality Agreement (an "Acceptable Confidentiality Agreement"), information concerning the acquisition of Acquired Companies (including non-public information) to the Person that has made such Competing Proposal and its Representatives (provided, that the Special Master shall, substantially concurrently with the delivery to such Person, provide to the Buyer any non-public information that is provided or made available to such Person or its Representatives unless such non-public information has been previously provided to the Buyer or its Representatives, and provided, further, that the Special Master shall withhold such portions of documents or information, or provide pursuant to customary "clean-room" or other appropriate procedures, to the extent relating to any commercially sensitive or relate to pricing or other matters that are highly sensitive or competitive in nature if the exchange of such information (or portions thereof) would reasonably be materially harmful to the operations of the Acquired Companies) and (ii) engage in or otherwise participate in discussions or negotiations with the Person making such Competing Proposal and its Representatives regarding such Competing Proposal.

(d)      The Special Master shall notify the Buyer in writing as promptly as reasonably practicable (but in any event within one (1) Business Day) in the event that (i) the Special Master or any of his Representatives receives (or becomes aware that any Acquired Company or any of their Representatives has received) (A) a Competing Proposal or any amendment thereto or (B) any offer, proposal, inquiry or request for information or discussions relating to the acquisition of the Acquired Companies that reasonably would be likely to lead to a Competing Proposal, including the material terms and conditions thereof and the identity of the Person making the Competing Proposal or offer, proposal, inquiry or request or (ii) the Special Master enters into an Acceptable Confidentiality Agreement (which notice shall include a copy of such Acceptable Confidentiality Agreement). Such notice to the Buyer shall indicate the identity of the person or group of persons making such Competing Proposal or amendment thereto and provide (x) an unredacted copy of such written Competing Proposal or amendment thereto (including, in each case, financing commitments with customary redaction) and any material transaction documents, and (y) with respect to any Competing Proposal or amendment thereto not made in writing, a written summary of the material terms and conditions of each such Competing Proposal or amendment thereto. The Special Master shall keep the Buyer informed, on a

reasonably current basis (and, in any event within one (1) Business Day of the Special Master's knowledge of any such event) of any material developments, discussions or negotiations regarding any Competing Proposals, or material changes to the terms of any such Competing Proposal or any amendment thereto (including copies of any written proposed agreements).

(e)     Notwithstanding anything to the contrary set forth in this Agreement, if the Special Master has determined in good faith that a Competing Proposal made after the Commencement Date  but prior to the No-Shop Period constitutes a Superior Proposal, the Special Master may, at any time after the Commencement Date  and prior to the No-Shop Period, subject to compliance with this Section 6.17(e) and subject to the Person making such Superior Proposal paying, or causing to be paid, the Termination Fee in accordance with Section 8.3(a), terminate this Agreement in accordance with Section 8.1(c) in order to enter into a definitive agreement relating to such Superior Proposal; provided, that prior to so terminating this Agreement, (A) the Special Master has given the Buyer at least five (5) Business Days' prior written notice (such period, the "Notice Period") of its intention to take such action, which notice shall include, as applicable, unredacted copies of the Superior Proposal and any material transaction agreements and financing commitments (provided, that such financing commitments may include customary redactions) and a written summary of the material terms of any Superior Proposal not made in writing, including any financing commitments relating thereto, (B) after providing such notice, the Special Master shall have negotiated, and shall have caused its Representatives to negotiate, with the Buyer in good faith (to the extent the Buyer desires to negotiate) during the Notice Period to make such adjustments in the terms and conditions of this Agreement, the Debt Financing and the Equity Financing as would permit the Special Master to make a determination that such Competing Proposal is no longer a Superior Proposal after giving effect to any revisions to the terms of this Agreement and/or the Transactions committed to by the Buyer in writing in response to such Competing Proposal under this Section 6.17(e), and (C) in the event of any material change to the terms of such Superior Proposal, the Special Master shall, in each case, have delivered to the Buyer an additional notice consistent with that described in clause (A) of this proviso and a new notice period under clause (A) of this proviso shall commence during which time the Special Master shall be required to comply with the requirements of this Section 6.17(e) anew with respect to such additional notice, including clauses (A), (B) and this clause (C) of this proviso (except that the reference to "five (5) Business Days" in clause (A) of this proviso shall be replaced with "three (3) Business Days").

(f)     For purposes of this Agreement:

(i)     "Competing Proposal" means any bona fide proposal or offer made by any Person or group of related Persons (other than the Buyer and its Affiliates) (A) to purchase or otherwise acquire, directly or indirectly, in one transaction or a series of transactions, pursuant to a merger, consolidation or other business combination, sale of shares of capital stock, sale of assets or similar transaction (1) beneficial ownership (as defined under Section 13(d) of the Exchange Act), of more than twenty percent (20%) of any class of equity securities of the Company or (2) any one or more assets or businesses of the Acquired Companies that constitute more than twenty percent (20%) of the consolidated assets of the Acquired Companies (based on the fair market value thereof), (B) to effect any other transaction pursuant to which any other alternative to the Transactions would be consummated, or (C) relating to any reorganization,

recapitalization, license, joint venture, partnership, liquidation, dissolution or other similar transaction involving any one or more assets or businesses of the Acquired Companies that constitute more than twenty percent (20%) of the consolidated assets of the Acquired Companies (based on the fair market value thereof).

(ii)    "Superior Proposal" means a Competing Proposal (with all percentages in the definition of Competing Proposal increased to fifty percent (50%)) made by a Person or group of related Persons (other than the Buyer and its Affiliates) on terms that the Special Master determines in good faith, after consultation with the Special Master's financial and legal advisors would result in the Judgment Creditors receiving value in excess of the value the Judgment Creditors would receive if the Transactions were consummated (including any revisions to the terms of this Agreement or the Transactions committed to by the Buyer in writing in response to such Competing Proposal under the provisions of Section 6.17(e)), and considering such factors as the Special Master considers to be appropriate, including the consideration, terms, conditions (including any financing condition or the reliability of any debt or equity financing commitment), timing, identity of the counterparty, likelihood of consummation, financing terms and legal, financial, and regulatory aspects of such Competing Proposal, are more favorable to the Claimholders (in their capacities as such) from a value maximization point of view than the Transactions (including any revisions to the terms of this Agreement and/or the Transactions committed to by the Buyer in writing in response to such Competing Proposal under the provisions of Section 6.17(e)).

Section 6.18.   Court Action.

(a)    No later than three (3) Business Days following the Trust Structure Effective Date, the Special Master shall file, or cause to be filed, with the Court a recommendation seeking approval of the Sale Order. The Special Master shall use its best efforts to schedule a hearing with the Court to consider entry of the Sale Order as promptly as practicable and in any event within sixty-five (65) calendar days following the filing of the recommendation with the Court seeking approval of the Sale Order.

(b)    Until the Closing or earlier termination of this Agreement, the Special Master agrees to provide to the Buyer draft copies of all motions and documents that the Special Master intends to file with the Court in connection with this Agreement, the Sale Order or the Transactions as soon as reasonably practicable, but in no event less than two (2) Business Days prior to the date when the Special Master intends to file such motions or documents and, without limiting any approval rights set forth herein, consult in good faith with the Buyer regarding the form and substance of any such proposed filing (including considering in good faith any changes to such filings as the Buyer may reasonably request); provided, that in the event that two (2) Business Days' notice is impossible or impracticable under the circumstances, the Special Master shall provide draft copies of any motions or pleadings to the Buyer as soon as otherwise practicable before the date when the Special Master intends to file any such motion or other pleading; provided, further, that the Special Master shall not be required to provide such draft copies to the Buyer if there reasonably exists a conflict or potential conflict between the Special Master's position and the Buyer's position with respect to such motion or document, as determined by the Special Master in his sole and absolute discretion.

WEIL:\99805227\35\67816.0003

Section 6.19.   Actions Regarding the EPP and RRP.

(a)      Pursuant to, and in accordance with, the terms of the EPP and the EPP Rabbi Trust, immediately prior to the Closing Date, the Company shall to contribute to the EPP Rabbi Trust an amount in cash equal to the accrued benefits under the EPP as of the Closing Date, determined as of the end of the fiscal quarter immediately preceding the Closing Date in accordance with ASC 715 (the "EPP Rabbi Trust Contribution").

(b)      Pursuant to, and in accordance with, the terms of the RRP and the RRP Rabbi Trust, immediately prior to the Closing Date, the Company shall contribute to the RRP Rabbi Trust an amount in cash equal to the accrued benefits under the RRP as of the Closing Date, determined as of the end of the fiscal quarter immediately preceding the Closing Date in accordance with ASC 715 (the "RRP Rabbi Trust Contribution").

Section 6.20.   Casualty Loss. In the event of a Casualty Loss, the Parties acknowledge and agree that the following provisions shall apply:

(a)      The Special Master shall promptly, but in no event later than five (5) Business Days after becoming aware of the same, notify the Buyer of any Casualty Loss. As promptly as practicable (but in no event later than thirty (30) calendar days after becoming aware of any such Casualty Loss), the Special Master shall provide the Buyer with a supplemental notice, which notice shall set forth (i) (A) the cost of restoring, repairing or replacing such damaged or destroyed asset affected by such Casualty Loss to a condition substantially comparable to its prior condition immediately prior to the event or circumstance causing the Casualty Loss, or (B) in the case of an asset taken by condemnation or eminent domain proceedings, the condemnation value thereof, in each case net of all insurance, condemnation award or other third-party proceeds actually received by the Acquired Companies for any Casualty Loss (and, if applicable and in accordance with the provisions of this Section 6.20, actually applied to restoring, repairing or replacing the affected asset) plus (ii) the amount of any lost profits reasonably expected to accrue after the Lock Box Date as a result of such Casualty Loss (the "Casualty Loss Amount"); provided, that Casualty Loss Amount shall not include lost profits to the extent Buyer exercises its option set forth in clause (ii) of the first sentence of Section 6.20(c). To the extent that the aggregate amount of all Casualty Loss Amounts is less than or equal to the Casualty Loss Threshold, there shall be no effect on the Transactions and the applicable Acquired Companies shall be entitled to and shall retain all insurance, condemnation award or other third-party proceeds for any such Casualty Loss (the "Loss Proceeds") received by any Acquired Company (without such amount being considered a contribution to the Acquired Companies for any purpose hereunder).

(b)      In the event that the Parties do not agree to the quantum of the Casualty Loss Amount, the Parties shall negotiate in good faith to determine the value of the Casualty Loss Amount; provided, that if the Parties cannot mutually agree to the value of the Casualty Loss Amount within twenty (20) Business Days of commencing negotiations, then the applicable Casualty Loss Amount shall be determined by an independent third party appraiser mutually selected by the Parties (and in the absence of agreement between the Parties as to the selection of the independent third party appraiser after five (5) Business Days following the end of such twenty (20)-Business Day period, the independent third party appraiser shall be selected by the Wilmington, Delaware office of the American Arbitration Association).

WEIL:\99805227\35\67816.0003

(c)     Upon the occurrence of any Casualty Loss involving an aggregate Casualty Loss Amount in excess of the Casualty Loss Threshold, at the Buyer's option, the Special Master shall Cause the Acquired Companies to either (i) Repair the Damaged Portion subject to such Casualty Loss prior to the Closing or (ii) refrain from Repairing the Damaged Portion subject to such Casualty Loss. If the Buyer exercises the option in clause (i) of the immediately preceding sentence, which shall be exercised by delivering written notice to the Special Master prior to the Closing and as soon as practicable, but in no event more than ten (10) Business Days, after the determination of the Casualty Loss Amount pursuant to and in accordance with Section 6.20(a) and Section 6.20(b), as applicable, then (A) the Acquired Companies shall, at their sole cost and expense, complete or cause to be completed the Repair of the Damaged Portion subject to such Casualty Loss on or before a date reasonably agreed among the Special Master and the Buyer (each, a "Casualty Repair Deadline") and (B) the Closing Date shall be postponed for an amount of time reasonably necessary to complete such Repair as reasonably agreed among the Special Master and the Buyer to allow for such Repair; provided, that in no event shall the Casualty Repair Deadline or the postponement of the Closing Date extend beyond the date that is sixty (60) days prior to the Outside Date. The Acquired Companies and the Buyer shall confer in good faith to mutually agree on the scope and specifications of any planned Repairs prior to the undertaking of such Repairs by the Acquired Companies, and the Acquired Companies shall provide the Observation Committee with updates (not less frequently than weekly) regarding any such Repairs, including supporting information and documentation as may reasonably be requested by the Buyer's representatives on the Observation Committee. The Acquired Companies may utilize any Loss Proceeds in furtherance of such Repair and shall be entitled to and shall retain all Loss Proceeds for any such Casualty Loss following such completion.

(d)     In the event where there is any Casualty Loss involving an aggregate Casualty Loss Amount in excess of the Casualty Loss Threshold and (i) the Buyer exercises its option set forth in clause (ii) of the first sentence of Section 6.20(c), (ii) the Buyer exercises its option set forth in clause (i) of the first sentence of Section 6.20(c) and the Special Master and the Acquired Companies fail to complete such Repair on or before the Casualty Repair Deadline or (iii) the Damaged Portion subject to such Casualty Loss is/are otherwise not capable of being Repaired, then, in each case, the Parties shall adjust the Closing Consideration downward by the aggregate Casualty Loss Amount related thereto (in each case, net of the amount of Loss Proceeds up to the amount of such Closing Consideration adjustment) and proceed to the Closing.

Section 6.21.    Termination of Certain Services and Contracts. At or prior to the Closing, the Special Master shall Cause the Acquired Companies to, as applicable (a) terminate, sever or assign to PDVSA or an Affiliate thereof, in each case, without any liability or claim to any Acquired Company party thereto or any of its Affiliates (including, after the Closing, the Buyer), effective on or before the Closing any services provided to the Acquired Companies by PDVSA or any of its Affiliates (other than the Acquired Companies), including the termination and severance of any Tax services, legal services and banking services (to include the severance of any centralized clearance accounts), it being understood that certain of such services may not arise under written Contract, in which case such services shall be deemed to be terminated at the Closing, (b) cause all liabilities under any accounts, balances, payables, receivables or Debt or other amount owing to PDVSA or any of its Affiliates, on the one hand, and any Acquired Company, on the other hand, to be paid, settled, netted, cancelled, forgiven and/or released, and (c) cause all claims or liabilities (contingent or otherwise) between any of the Acquired

Companies, on the one hand, and PDVSA or any Affiliate thereof (other than any Acquired Company) on the other hand, to be satisfied effective at the Closing, in each case, without any liability or claim to any Acquired Company party thereto or any of its Affiliates (including, after the Closing, the Buyer); provided, that, any obligation of the Special Master to Cause the Acquired Companies to take any action pursuant to this Section 6.21 shall only be an obligation on the Special Master to the extent such actions can be unilaterally taken or Caused to be taken by the Company under applicable Law.

Section 6.22.   Financial Statements. From and after the date hereof until the Closing Date or the earlier termination of this Agreement in accordance with its terms, the Special Master shall Cause the Acquired Companies to furnish to the Buyer:

(a)      within ninety (90) days after the end of each fiscal year commencing with the fiscal year ending December 31, 2024, a consolidated balance sheet and related statements income and cash flow showing the financial position of the Acquired Companies as of the close of such fiscal year and the consolidated results of its operations during such fiscal year and setting forth in comparative form the corresponding figures for the prior fiscal year, which consolidated balance sheet and related statements of income and cash flow shall be audited by independent public accountants and accompanied by an opinion of such accountants (which shall not be qualified as to scope of audit) to the effect that such consolidated financial statements fairly present, in all material respects, the financial position and results of operations of the Acquired Companies on a consolidated basis in accordance with GAAP;

(b)      within forty five (45) days after the end of each fiscal quarter, except for the fourth fiscal quarter, (i) a balance sheet showing the consolidated financial position of the Acquired Companies as of the last day of such fiscal quarter and (ii) statements of income and cash flows showing the consolidated results of operations of the Acquired Companies for such fiscal quarter and the then-elapsed portion of the fiscal year and setting forth in comparative form the corresponding figures for the corresponding periods of the prior fiscal year, in each case consistent with the form of quarterly financial statements provided to the Buyer prior to the date hereof. The consolidated balance sheet and related statements of operations and cash flows shall fairly present, in all material respects, the financial position and results of operations of the Acquired Companies on a consolidated basis in accordance with GAAP (subject to normal quarter-end review adjustments and the absence of footnotes); and

(c)      within thirty (30) days after the end of each fiscal month (other than months that include the end of any fiscal quarter), (i) a financial summary of the month's operations by business units in the form set forth on Section 6.22(c) of the Company Disclosure Schedules and (ii) such other financial reports and operational reports as are prepared by the Acquired Companies on a monthly basis, consistent with such monthly reports provided to the Buyer prior to the Effective Date.

Section 6.23.   Observation Committee.

(a)      As promptly as practicable following the Execution Date, the Special Master shall Cause the Company to establish a committee (the "Observation Committee") for the purposes of (i) observing and providing collaborative support during the Interim Period with

WEIL\99805227\35\67816.0003

respect to the Acquired Companies' operations and asset maintenance (including with respect to any Casualty Loss), (ii) monitoring the Acquired Companies' commercial activities, infrastructure, systems, and long-term projects and (iii) monitoring the safety of the workforce, community and the environment during the Interim Period (the "Committee Mandate"). The Observation Committee shall be comprised of three (3) representatives from each of the Buyer and the Company. The initial representatives from the Buyer and the Company are set forth on Section 6.23(a) of the Company Disclosure Schedules. The representatives of the Company on the Observation Committee shall be individuals with professional experience and technical expertise in refinery operations or related commercial activities, in each case, at the Vice President level (or directly reporting to the Vice President level). The Company and the Buyer may replace their respective representatives on the Observation Committee upon written notice to the other party.

(b)     Within five (5) Business Days of a written request (email being acceptable) by any member of the Observation Committee (such requests not to exceed one (1) per month unless otherwise agreed by the Company's representatives on the Observation Committee), members of the Observation Committee shall meet (and the Special Master shall Cause the Company to cause its representatives on the Observation Committee to attend and participate in good faith in such meetings) in person for the purpose of reviewing budgets, plans, financial information and such other matters as are consistent with the Committee Mandate and specified in reasonable detail by any member of the Observation Committee in a written notice (email being acceptable) to the other Observation Committee members not less than one (1) Business Day prior to any such meeting. From time to time the Buyer may invite other Representatives to participate in meetings of the Observation Committee in one or more observer roles. The Special Master shall Cause the Company to use reasonable efforts to cause such other employees of the Acquired Companies to participate in any meeting of the Observation Committee as may reasonably be requested by the Buyer from time to time (it being agreed that any such request by the Buyer shall be reasonable if the scope of responsibility and expertise of such other employee are relevant to the Committee Mandate).

(c)     With respect to each of the projects set forth on Section 6.23(b) of the Company Disclosure Schedules, the Committee Mandate shall be deemed to expressly include the observation of such project's timing and execution and expenditures by the Acquired Companies in connection therewith, and upon the request of any member of the Observation Committee, the Observation Committee shall be granted (and the Special Master shall Cause the Acquired Companies to grant to the Observation Committee) physical access to visit the applicable project site in connection with the Committee Mandate (such visits not to exceed one visit per calendar month for each applicable project site).

Section 6.24.   Assumed Claims. The Parties acknowledge and agree that, from and after the Closing, the Assumed Claims shall entitle the holder thereof to receive only the Assumed Claims' allocable share of proceeds to be distributed by the Special Master in accordance with the priority arrangements (as described in the Specified Litigation) and, upon the final distribution of proceeds from the Transactions by the Special Master in accordance with the priority arrangements (as described in the Specified Litigation), the Assumed Claims shall be extinguished automatically.

Section 6.25.   Section 280G. Concurrently with the delivery of the Lock Box Statement, the Special Master shall Cause the Company to deliver to the Buyer a Code Section 280G analysis

(with respect to all disqualified individuals as reasonably determined by the Company, without redactions and including all back-up assumptions and calculations), and the Special Master shall Cause the Company to confer with the Buyer in good faith regarding such analysis. No later than ten (10) days prior to the Closing Date, the Special Master shall Cause the Company to deliver to the Buyer an updated Code Section 280G analysis (with respect to all disqualified individuals as reasonably determined by the Company, without redactions and including all back-up assumptions and calculations) and the Special Master shall Cause the Company to confer with the Buyer in good faith regarding such updated analysis. The Special Master shall Cause the Company to, and the Buyer will, cooperate in good faith with respect to all matters relating to Code Section 280G.

Section 6.26.  <u>Trust Structure Effective Date Matters</u>.

(a)  From and after the Execution Date until the Trust Structure Effective Date or earlier termination of this Agreement, the Parties shall use their respective reasonable best efforts to negotiate in good faith to agree upon definitive documentation acceptable to each Party in their sole discretion to be executed in connection with the Closing (the "<u>Definitive Trust Documents</u>") to reflect the transactions contemplated by the term sheet attached hereto as <u>Exhibit A</u> (the "<u>Trust Structure Term Sheet</u>"). Without limiting the generality of the foregoing, the Definitive Trust Documents shall include (i) an agreement (the "<u>Trust Agreement</u>") establishing one or more trust accounts (the "<u>Trust Account</u>") as contemplated by the Trust Structure Term Sheet, (ii) a draft order of the Court approving this Agreement, authorizing the Sale of the Shares and granting related relief (the "<u>Form Sale Order</u>"), (iii) the form of Paying Agent Agreement, (iv) the form of Escrow Agreement, (iv) modifications to the "inside date" concept set forth in the proviso in <u>Section 2.2</u>, and (v) such other amendments, restatements or other modifications of this Agreement and any other Transaction Document, in each case, to the extent necessary or advisable in connection with the Trust Structure or other documents to be executed and delivered by or on behalf of the Parties on the Trust Structure Effective Date. From and after the Execution Date until the Trust Structure Effective Date or earlier termination of this Agreement, the Buyer shall use commercially reasonable efforts to negotiate and finalize (x) the limited guaranties in favor of the Special Master, to be executed by each Equity Financing Source, guaranteeing such Equity Financing Source's pro rata share of the Buyer's obligations to pay the Reverse Termination Fee (each, a "<u>Limited Guaranty</u>" and collectively, the "<u>Limited Guaranties</u>"), (y) the equity commitment letters to be executed by each Equity Financing Source (each, an "<u>Equity Commitment Letter</u>" and collectively, the "<u>Equity Commitment Letters</u>"), and (z) the Debt Commitment Letter to be executed by the Debt Financing Sources. The Limited Guaranties, the Equity Commitment Letters, and the Debt Commitment Letter shall each be in a form mutually acceptable to the Buyer and the Special Master (collectively, and together with any Fee Letters, the "<u>Buyer Financing Documents</u>"). The date on which (I) the Definitive Trust Documents are agreed upon and (II) the Buyer Financing Documents are executed and delivered by the parties thereto is the "<u>Trust Structure Effective Date</u>."

(b)  On the Trust Structure Effective Date:

(i)  The Special Master shall deliver or cause to be delivered to the Buyer the Escrow Agreement, duly executed by the Special Master and the Escrow Agent.

(ii)     The Buyer shall deliver or cause to be delivered to the Special Master (A) the Escrow Agreement, duly executed by the Buyer, (B) the Limited Guaranties, duly executed by the Equity Financing Sources, (C) the Equity Commitment Letters, duly executed by the Equity Financing Sources, (D) the Debt Commitment Letter, duly executed by the Debt Financing Sources, and (E) the Fee Letters.

(iii)     The Buyer shall cause to be deposited with the Escrow Agent the Deposit Amount pursuant to the terms of this Agreement and the Escrow Agreement.

Section 6.27.   Supplements to Company Disclosure Schedules. The Special Master shall Cause the Acquired Companies to, (i) prepare and deliver to the Buyer on or before October 14, 2024 a draft supplement to the Company Disclosure Schedules (the "Supplemental Schedules") and (ii) from and after delivery of the Supplemental Schedules, confer with the Buyer and the Special Master in good faith regarding such Supplemental Schedules, including reviewing comments and revisions reasonably proposed by the Buyer, in order to finalize such Supplemental Schedules in a form mutually agreeable to the Parties no later than the Trust Structure Effective Date. The Supplemental Schedules shall set forth all additional facts, matters and circumstances as they existed as of the Execution Date to the extent necessary to make the corresponding representations and warranties true and correct as of the Execution Date (and not, for the avoidance of doubt, as of the date of delivery of the Supplemental Schedules or any other date). Following the Trust Structure Effective Date, the "Company Disclosure Schedules" shall refer to the Company Disclosure Schedules in effect on the Execution Date as supplemented by the Final Supplemental Schedules. The Special Master and the Company shall not be permitted to amend, modify or supplement any other Section of the Company Disclosure Schedules except to the extent necessary to include additional facts, matters and circumstances as they existed on the Execution Date with respect to each change to Article IV made between the September 13 Draft (as defined in the Procedures Summary) and this Agreement; provided, that the interpretive provisions of the Section 1.2(a)(iii) shall apply to the Company Disclosure Schedules as modified by the Supplemental Schedules.

Section 6.1.   Declaratory Judgment.  The Special Master and the Buyer agree to work in good faith to determine the appropriate path to seek a determination by a court of competent jurisdiction as to the calculation of the 2020s Escrow Amount consistent with the Trust Structure Term Sheet.

**ARTICLE VII**

**CONDITIONS TO CLOSING**

Section 7.1.   Conditions Precedent to Obligations of the Parties. The respective obligations of each of the Parties to consummate the Transactions are subject to the satisfaction, on or prior to the Closing, of each of the following conditions:

(a)     there shall not be in effect any Law or Order by a Governmental Body of competent jurisdiction restraining, enjoining or otherwise prohibiting the consummation of the Transactions;

WEIL:\99805227\35\67816.0003

(b)    the Sale Order Entry shall have occurred prior to the date that is 180 days following the Commencement Date;

(c)    the OFAC License shall have been obtained;

(d)    the waiting period applicable to the Transactions under the HSR Act (and any extensions thereof, including expiration of any voluntary timing agreement) shall have expired or early termination shall have been granted;

(e)    the approvals, clearances or expirations of waiting periods set forth in Section 7.1(e) of the Company Disclosure Schedules shall have been obtained; and

(f)    the Trust Structure Effective Date shall have occurred prior to the date that is the later of (i) October 25, 2024 and (ii) the tenth (10th) Business Day following the granting of the Injunction Motion by the Court (the "Trust Structure Outside Date").

Section 7.2.    Conditions Precedent to Obligations of the Buyer. The obligations of the Buyer to consummate the Transactions are subject to the satisfaction, on or prior to the Closing, of each of the following conditions (any or all of which may be waived by the Buyer in whole or in part):

(a)    (i) the Company Fundamental Representations shall be true and correct as of the date of this Agreement and as of the Closing Date as if made on and as of the Closing Date (except to the extent that any such Company Fundamental Representation, by its terms, is expressly limited to a specific date, in which case, it shall be true and correct as of such specific date) except, in each case, for de minimis inaccuracies, and (ii) other than the Company Fundamental Representations, the representations and warranties set forth in Article IV shall be true and correct (without (other than in the case of the representations and warranties set forth in Section 4.7(b)) giving effect to any "materiality", "Company Material Adverse Effect" or similar qualifiers contained in any of such representations and warranties) as of the date of this Agreement and as of the Closing Date as if made on and as of the Closing Date (except to the extent that any such representation or warranty, by its terms, is expressly limited to a specific date, in which case, it shall be true and correct as of such specific date), except where the failure of such representations and warranties to be so true and correct would not have a Company Material Adverse Effect;

(b)    the Special Master shall have performed and complied in all material respects with all obligations and agreements required by this Agreement to be performed or complied with by him on or prior to the Closing;

(c)    no Company Material Adverse Effect shall have occurred since the date hereof and remain ongoing;

(d)    (i) the Sale Order shall be in full force and effect in all respects and not subject to any stay, and (ii) there is no Order or decision on the merits (including a ruling on summary judgment or a decision after trial) by a court of competent jurisdiction that is unfavorable to the Buyer or any Acquired Company, in a case by any potential creditor of the Bolivarian Republic of Venezuela or PDVSA that seeks to impose liability or seeks any remedy against the Buyer, the Company, or any of their assets on the basis that the Company or any of its direct or

78

indirect subsidiaries is the alter ego of the Republic or PDVSA, or on any similar veil-piercing, successor or similar legal or equitable or other doctrine), or otherwise seeks relief that is in conflict with the provisions of the Sale Order regarding such purported liabilities and related matters; and

(e)     the Injunction Motion shall have been granted by an Order that is satisfactory to the Buyer in its sole discretion, and shall be in full force and effect; and has not been modified in a manner adverse to the Buyer or the holders of Attached Judgments, other than the parties sought to be enjoined in the Injunction Motion.

Section 7.3.    Conditions Precedent to Obligations of the Special Master. The obligations of the Special Master to consummate the Transactions are subject to the satisfaction, on or prior to the Closing, of each of the following conditions (any or all of which may be waived by the Special Master in whole or in part):

(a)     the representations and warranties of the Buyer set forth in Article V shall be true and correct (without giving effect to any "materiality", "material adverse effect", or similar qualifiers contained in any of such representations and warranties) as of the date of this Agreement and as of the Closing Date as if made on and as of the Closing Date (except to the extent that any such representation or warranty, by its terms, is expressly limited to a specific date, in which case, it shall be true and correct as of such specific date), except for where the failure of such representations and warranties to be so true and correct would not (i) have a material adverse effect on the ability of the Buyer to perform its obligations under this Agreement or (ii) otherwise prevent or materially delay the consummation of the Transactions; and

(b)     the Buyer shall have performed and complied in all material respects with all obligations and agreements required by this Agreement to be performed or complied with by the Buyer on or prior to the Closing.

Section 7.4.    Frustration of Closing Conditions. Neither the Special Master, nor the Buyer may rely, either as a basis for not consummating the Transactions or for terminating this Agreement and abandoning the Transactions, on the failure of any condition set forth in Section 7.1, Section 7.2, or Section 7.3, as the case may be, to be satisfied if such failure was caused principally by any material breach of a covenant, agreement, representation, or warranty of this Agreement by such Party (and, notwithstanding Section 1.2(a)(x), solely for purposes of this Section 7.4, any failure of the Acquired Companies to comply with the covenants and agreements applicable to the Acquired Companies set forth herein shall be deemed to be a breach of such covenants and agreements by the Special Master).

## ARTICLE VIII

## TERMINATION

Section 8.1.    Termination. This Agreement may be terminated at any time prior to the Closing (notwithstanding the Sale Order Entry) as follows:

(a)     by mutual written consent of the Special Master and the Buyer;

(b)       by the Special Master or the Buyer, by written notice to the other Party, if: the Closing has not occurred prior to the date that is twelve (12) months after the Trust Structure Effective Date (such date, the "Initial Outside Date" and, as may be automatically extended pursuant to this Section 8.1(b), the "Outside Date"); provided, that if the Closing has not occurred by the Outside Date due to the nonsatisfaction of any of the conditions set forth in Section 7.1(b) (OFAC License), Section 7.1(d) (HSR Act), Section 7.1(e) (Other Antitrust Approvals) or Section 7.2(d) (Sale Order), then the Outside Date shall be extended automatically for up to two (2) consecutive periods of ninety (90) calendar days each (and in no event shall the Outside Date extend beyond the date that is one hundred eighty (180) calendar days after the Initial Outside Date); provided, that notwithstanding the foregoing, the right to terminate this Agreement pursuant this Section 8.1(b) shall not be available to any Party whose failure to fulfill any obligation under this Agreement has principally caused or resulted in the failure of the Closing to occur on or before the Outside Date;

(c)       by the Special Master, at any time after the Commencement Date and prior to the No-Shop Period in order to enter into a definitive written agreement providing for a Superior Proposal; provided, that (i) the Special Master has complied with the provisions of Section 6.17 and received a Superior Proposal after the date of this Agreement that did not result from a breach of Section 6.17, (ii) concurrently with, and as a condition to, any such termination the Special Master causes to be paid into escrow the Termination Fee pursuant to Section 8.3(a) and (iii) the Special Master concurrently enters into, a definitive written agreement providing for such Superior Proposal (the "Superior Proposal Agreement") it being agreed that (x) the Special Master may enter into such definitive written agreement concurrently with any such termination and (y) if the Termination Fee is not paid into escrow pursuant to Section 8.3(a) when due, this Agreement shall not terminate and shall continue in full force and effect;

(d)       by the Buyer, by written notice to the Special Master, if there shall have been a breach by the Special Master of any of its representations, warranties, covenants or agreements contained in this Agreement, which breach would result in the failure to satisfy one or more of the conditions set forth in Section 7.2, and in any such case such breach shall be incapable of being cured or, if capable of being cured, shall not have been cured prior to the earlier of (i) forty-five (45) calendar days after providing written notice of such breach to the Special Master and (ii) the Outside Date; provided, that the Buyer shall not have the right to terminate this Agreement pursuant to this Section 8.1(d) if the Buyer is then in breach of this Agreement and such breach would result in the failure of any of the conditions set forth in Section 7.1 or Section 7.3;

(e)       by the Buyer, by written notice to the Special Master, if there shall have occurred a Company Material Adverse Effect;

(f)       by the Special Master, by written notice to the Buyer, if there shall have been a breach by the Buyer of any of its representations, warranties, covenants or agreements contained in this Agreement, which breach would result in the failure to satisfy one or more of the conditions set forth in Section 7.3, and in any such case such breach shall be incapable of being cured or, if capable of being cured, shall not have been cured prior to the earlier of (i) forty-five (45) calendar days after providing written notice of such breach to the Buyer and (ii) the Outside Date; provided, that the Special Master shall not have the right to terminate this Agreement

pursuant to this Section 8.1(f) if the Special Master is then in breach of this Agreement and such breach would result in the failure of any of the conditions set forth in Section 7.1 or Section 7.2;

(g)    by the Special Master, by written notice to the Buyer, if (i) the conditions set forth in Section 7.1 and Section 7.2 (other than those conditions that by their nature can only be satisfied at the Closing, but subject to those conditions being capable of being satisfied if the Closing Date were the date of such termination) have been satisfied or waived, (ii) the Special Master has irrevocably confirmed in writing to the Buyer that (A) all conditions set forth in Section 7.1 and Section 7.3 (other than those conditions that by their nature can only be satisfied at the Closing, but subject to those conditions being capable of being satisfied if the Closing Date were the date of such termination) have been satisfied or waived and (B) the Special Master is ready, willing and able to consummate the Closing, and (iii) within three (3) Business Days after the Special Master has delivered written notice to the Buyer of the satisfaction of such conditions and such confirmation, the Closing shall not have been consummated;

(h)    by the Buyer, by written notice to the Special Master, if the satisfaction of any of the conditions set forth in Section 7.1 or Section 7.2 is or becomes impossible by the Outside Date (other than those conditions that by their nature are to be satisfied at the Closing, but subject to those conditions being capable of being satisfied if the Closing were to occur; and provided, that such impossibility is not a result of the Buyer's failure to comply with its obligations under this Agreement) and the Buyer has not waived such condition;

(i)    by the Special Master, by written notice to the Buyer, if the satisfaction of any of the conditions set forth in Section 7.1 or Section 7.3 is or becomes impossible by the Outside Date (other than those conditions that by their nature are to be satisfied at the Closing, but subject to those conditions being capable of being satisfied if the Closing were to occur; and provided, that such impossibility is not a result of the Special Master's failure to comply with its obligations under this Agreement) and the Special Master has not waived such condition;

(j)    by the Special Master or the Buyer, by written notice to the other Party, if the Trust Structure Effective Date has not occurred prior to the Trust Structure Outside Date;

(k)    by the Buyer, by written notice to the Special Master, if the Injunction Motion has been denied by the Court or modified in a manner adverse to the Buyer or the holders of Attached Judgments, other than the parties sought to be enjoined in the Injunction Motion; provided, however, that the Buyer shall no longer have such right to terminate if the Buyer has not elected to terminate pursuant to this Section 8.1(k) on or prior to the date that is fourteen (14) calendar days after the event giving rise to a termination right under this Section 8.1(k); or

(l)    by the Buyer, by written notice to the Special Master, prior to the Trust Structure Effective Date if the Supplemental Schedules are not satisfactory to the Buyer in its sole discretion.

Section 8.2.    Effect of Termination. In the event that this Agreement is validly terminated in accordance with Section 8.1, this Agreement shall immediately become null and void and the Parties shall be relieved of their duties and obligations arising under this Agreement after the date of such termination and such termination shall be without liability to the Buyer, the Special Master

or the Company; provided, that the Confidentiality Agreement and the provisions of Section 3.3, this Section 8.2, Section 8.3, Section 8.4 and Article IX hereof shall survive any such termination and remain valid and binding obligations of each of the Parties.

Section 8.3.    Termination Fee.

(a)    If this Agreement is terminated by the Special Master pursuant to Section 8.1(c) (Superior Proposal), then the Special Master shall cause the acquiring party to the Superior Proposal Agreement (the "Superior Proposal Acquiror") to pay an amount equal to the Termination Fee, by wire transfer of immediately available funds prior to or concurrently with, and as a condition to, such termination into an escrow account mutually determined by the Special Master and the Buyer, and the Special Master and the Buyer shall jointly instruct the escrow agent for such escrow to release the Termination Fee to the Buyer upon consummation of such Superior Proposal Agreement (or any alternative or replacement transaction consummated in the event the transactions contemplated by the Superior Proposal Agreement is terminated) or upon the termination of such Superior Proposal Agreement or alternative or replacement Superior Proposal Agreement in any situation other than on account of a breach by the Special Master.

(b)    If this Agreement is terminated (i) by either Party pursuant to Section 8.1(b) (Outside Date) (provided, that at the time of such termination, the Special Master could not otherwise have terminated this Agreement pursuant to Section 8.1(f) (Buyer Breach) or Section 8.1(g) (Buyer Closing Failure)), or (ii) by the Buyer pursuant to Section 8.1(d) (Special Master Breach), Section 8.1(e) (Company Material Adverse Effect), Section 8.1(h) (Buyer Termination Due to Impossibility), or Section 8.1(i) (Special Master Termination Due to Impossibility) (provided, that the grounds for termination under Section 8.1(i) do not result from the Buyer's failure to comply with its obligations under this Agreement), then, in each case of the immediately preceding clauses (i) and (ii), the Sale Order shall provide that the Buyer shall receive the Termination Fee Claim. The Termination Fee Claim shall be approved at a level in the priority arrangement such that Buyer shall have a reasonable expectation of being repaid the Termination Fee, and the Termination Fee Claim will be payable at the same time as any other claim in the priority arrangement (as described in the Specified Litigation) is paid.

(c)    The Parties acknowledge and agree that (i) the Termination Fee and other provisions of this Section 8.3 are an integral part of the Transactions, (ii) the Termination Fee shall constitute liquidated damages and not a penalty, (iii) the Termination Fee shall be fully earned and non-refundable by the Buyer upon payment thereof pursuant to Section 8.3(a), or upon the Buyer's receipt of the Termination Fee Claim, as applicable, and (iv) without these agreements, the Parties would not enter into this Agreement.

(d)    Notwithstanding anything to the contrary set forth in this Agreement, but subject to Section 9.13 and this Section 8.3(d), in the event this Agreement is terminated, each of the Parties expressly acknowledges and agrees that the Buyer's right to receive payment of the Termination Fee pursuant to Section 8.3(a) or the Termination Fee Claim, as applicable, shall constitute the sole and exclusive remedy of the Buyer and its Affiliates, and all other affected Persons against the Special Master, the Company and each of their respective former, current or future Affiliates and any of their respective former, current or future general or limited partners, equityholders, subsidiaries, members, managers, directors, officers, employees, agents, Affiliates,

successors, beneficiaries, heirs and assigns (collectively, the "Special Master and Company Related Parties") for all losses and damages (including attorneys' fees and expenses) in respect of this Agreement (and the termination hereof) or the Transactions (and the abandonment thereof), or any breach (whether intentional, unintentional or otherwise) of any representation, warranty, covenant or agreement in this Agreement, and none of the Buyer or its Affiliates or any other affected Person shall be entitled to bring or maintain any other Legal Proceeding against the Special Master, the Company or any other Special Master and Company Related Party relating to or arising out of this Agreement, or any of the Transactions or any matters forming the basis for such termination (whether at law, in equity, in contract, in tort or otherwise), and upon payment of the Termination Fee to the Buyer pursuant to Section 8.3(a), or upon the Buyer's receipt of the Termination Fee Claim, as applicable, none of the Special Master and Company Related Parties shall have any further liability or obligation to the Buyer or any other affected Person relating to or arising out of this Agreement or the transactions contemplated by this Agreement. The Parties acknowledge and agree that in no event shall the Special Master or the Company be required to pay the Termination Fee, and that the Superior Proposal Acquiror shall not be required to pay the Termination Fee on more than one occasion.

Section 8.4.    Reverse Termination Fee.

(a)    If this Agreement is terminated (i) by the Special Master pursuant to Section 8.1(f) (Buyer Breach) or Section 8.1(g) (Buyer Closing Failure) or (ii) by either Party pursuant to Section 8.1(b) (Outside Date) if the Special Master could otherwise have terminated pursuant to Section 8.1(f) (Buyer Breach) or Section 8.1(g) (Buyer Closing Failure) on the Outside Date, then in each case of the immediately preceding clauses (i) and (ii), the Buyer shall pay to the Paying Agent (for distribution to the Claimholders), as liquidated damages in connection with any such termination, a fee in an amount equal to $409,380,000 (the "Reverse Termination Fee") by wire transfer of immediately available funds to an account designated in writing by the Paying Agent within five (5) Business Days after such termination. For the avoidance of doubt, the Special Master may, subject to Section 8.2, this Section 8.4, and Section 9.13, simultaneously pursue: (i) a grant of specific performance pursuant to Section 9.13, and (ii) payment of the Reverse Termination Fee pursuant to this Section 8.4(a); provided, that the Special Master shall not be entitled to both obtain specific performance to cause the Closing to occur and also receive the Reverse Termination Fee, and in no event shall the Reverse Termination Fee be paid on more than one occasion; and provided, further, that the Special Master acknowledges and agrees that, upon payment of the Reverse Termination Fee pursuant to this Section 8.4(a), the right to receive the Reverse Termination Fee from the Buyer shall constitute the sole and exclusive remedy of the Special Master and Company Related Parties against the Buyer, the Equity Financing Sources, the Debt Financing Sources, and any of their former, current or future Affiliates and any of their respective former, current or future general or limited partners, equityholders, subsidiaries, members, managers, directors, officers, employees, agents, Affiliates, successors, beneficiaries, heirs and assigns (collectively, the "Buyer Related Parties") for all losses and damages (including attorneys' fees and expenses) in respect of this Agreement (and the termination hereof) or the Transactions (and the abandonment thereof), or any breach (whether intentional, unintentional or otherwise) of any representation, warranty, covenant or agreement in this Agreement, and no Special Master and Company Related Party or any other affected Person shall be entitled to bring or maintain any other Legal Proceeding against the Buyer or any Buyer Related Party relating to or arising out of this Agreement, the Debt Financing or any other Debt Financing (and/or any of

WEIL:\99805227\35\67816.0003

the agreements (including the Debt Commitment Letter) entered into in connection with the Debt Financing or any other Debt Financing), the Equity Financing, or the Transactions, or any matters forming the basis for such termination (whether at law, in equity, in contract, in tort or otherwise), and upon payment of the Reverse Termination Fee to the Special Master pursuant to this Section 8.4(a), neither the Buyer nor any Buyer Related Party shall have any further liability or obligation to the Special Master or any Special Master and Company Related Party or any other affected Person relating to or arising out of this Agreement or the transactions contemplated by this Agreement.

(b)    The Parties acknowledge and agree that (i) the fees and other provisions of this Section 8.4 are an integral part of the transactions contemplated by this Agreement, (ii) the Reverse Termination Fee shall constitute liquidated damages and not a penalty and (iii) without these agreements, the Parties would not enter into this Agreement.

## ARTICLE IX

## MISCELLANEOUS

Section 9.1.    Survival. None of the representations and warranties contained in this Agreement or any of the other Transaction Documents (including any certificate to be delivered pursuant to this Agreement) and none of the covenants of any party required to be performed before the Closing (including obligations with which the Special Master agrees to Cause the Acquired Companies to comply) shall survive the Closing, and thereafter none of the Parties or any of their Affiliates or any of their respective Representatives or any other Person shall have any liability whatsoever with respect to any such representation, warranty, covenant or agreement, and no claim for breach of any such representation or warranty, detrimental reliance or other right or remedy (whether in contract, in tort or at law or in equity) may be brought after the Closing with respect thereto. The provisions of this Section 9.1 will not, however, prevent or limit a cause of action to obtain an injunction to prevent breaches of this Agreement, to enforce specifically the terms and provisions hereof or for declaratory relief. Unless otherwise indicated, the covenants and agreements set forth in this Agreement which by their terms are required to be performed after the Closing shall survive the Closing until such covenants or agreements have been performed or satisfied. Notwithstanding the foregoing, the Buyer shall be entitled to the indemnification rights set forth in Annex B.

Section 9.2.    Expenses. Whether or not the Transactions are consummated, and except as otherwise provided in this Agreement, each Party to this Agreement will bear its respective fees, costs and expenses incurred in connection with the preparation, negotiation, execution and performance of this Agreement or the Transactions (including legal, accounting and other professional fees), and the Special Master Transaction Expenses shall be paid in accordance with Section 3.4(c) and Section 3.4(d) and the Advanced Transaction Expenses shall be paid in accordance with Section 3.4(e).

Section 9.3.    Governing Law. This Agreement and all Related Claims shall be governed by, construed and enforced in accordance with the internal Laws of the State of Delaware, without giving effect to any Laws (whether of the State of Delaware or any other jurisdiction) that would cause the application of the Laws of any jurisdiction other than the State of Delaware and without

regard to any borrowing statute that would result in the application of the statutes of limitations or repose of any other jurisdiction. In furtherance of the foregoing, the Laws of the State of Delaware will control even if under such jurisdiction's choice of law or conflict of law analysis, the substantive or procedural law of some other jurisdiction would ordinarily or necessarily apply.

Section 9.4.    <u>Dispute Resolution; Consent to Jurisdiction</u>. Without limiting any Party's right to appeal any Order of the Court, (a) the Court shall retain exclusive jurisdiction to enforce the terms of this Agreement and to decide any dispute which may arise or result from, or be connected with, this Agreement, any breach or default hereunder, or the Transactions, and (b) any and all proceedings related to the foregoing shall be filed and maintained only in the Court, and the Parties hereby consent to and submit to the jurisdiction and venue of the Court and shall receive notices at such locations as indicated in <u>Section 9.7</u> (as may be updated from time to time in accordance with <u>Section 9.7</u>).

Section 9.5.    <u>Consent to Service of Process; Waiver of Jury</u>.

(a)    Each of the Parties hereby consents to process being served by any party to this Agreement in any Legal Proceeding by the delivery of a copy thereof (other than by e-mail) in accordance with the provisions of <u>Section 9.7</u>.

(b)    EACH PARTY HERETO ACKNOWLEDGES THAT ANY LEGAL PROCEEDING, DIRECTLY OR INDIRECTLY, ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY RELATED CLAIM IS LIKELY TO INVOLVE COMPLICATED AND DIFFICULT ISSUES, AND THEREFORE EACH SUCH PARTY HEREBY IRREVOCABLY AND UNCONDITIONALLY WAIVES ANY RIGHT SUCH PARTY MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY SUCH LEGAL PROCEEDING OR RELATED CLAIM. EACH PARTY CERTIFIES AND ACKNOWLEDGES THAT: (I) NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF SUCH LEGAL PROCEEDING, SEEK TO ENFORCE THE FOREGOING WAIVER; (II) IT UNDERSTANDS AND HAS CONSIDERED THE IMPLICATIONS OF THIS WAIVER; (III) IT MAKES THIS WAIVER VOLUNTARILY AND (IV) IT HAS BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS <u>SECTION 9.5(B)</u>.

Section 9.6.    <u>Entire Agreement</u>.

(a)    This Agreement (including the Company Disclosure Schedules and any Exhibits hereto) and the Transaction Documents contain the entire understanding and agreement between the Parties with respect to the subject matter hereof and thereof, and supersede all prior and contemporaneous agreements, discussions, negotiations, correspondence, communications, undertakings and understandings among the Parties with respect to such subject matter (except for the Confidentiality Agreement, which shall continue in full force and effect in accordance with its terms as modified hereunder). The Parties have voluntarily agreed to define their rights, liabilities and obligations with respect to the Transactions exclusively in contract pursuant to the express terms and provisions of this Agreement and the other Transaction Documents, and the Parties expressly disclaim that they are owed any duties or are entitled to any remedies not expressly set

forth in this Agreement or the other Transaction Documents. Furthermore, the Parties each hereby acknowledge that this Agreement embodies the justifiable expectations of sophisticated parties derived from arm's-length negotiations; the Parties specifically acknowledge that no party has any special relationship with another party that would justify any expectation beyond that of ordinary parties in an arm's-length transaction.

(b)     The sole and exclusive remedies for any breach of the terms and provisions of this Agreement (including any representations and warranties set forth herein, made in connection herewith or as an inducement to enter into this Agreement) or any claim or cause of action otherwise arising out of or related to the Transactions shall be those remedies available at law or in equity for breach of contract against the Parties to this Agreement only (as such contractual remedies have been further limited or excluded pursuant to the express terms of this Agreement), and then only subject to the limitations hereunder, the Parties hereby agreeing that neither Party shall have any remedies or causes of action (whether in contract, tort, statute or otherwise) for any statements, communications, disclosures, failures to disclose, representations or warranties not explicitly set forth in this Agreement.

(c)     All representations and warranties set forth in this Agreement are contractual in nature only and subject to the sole and exclusive remedies set forth herein.

Section 9.7.     <u>Amendments and Waivers</u>. This Agreement may not be amended except by an instrument in writing signed by the Buyer and the Special Master. No waiver by any Party of any provision of this Agreement or any breach of this Agreement hereunder, whether intentional or not, shall be valid unless the same shall be in writing and signed by the party making such waiver. The waiver by any Party of a breach of any provision of this Agreement shall not operate or be construed as a further or continuing waiver of such breach or as a waiver of any other or subsequent breach. No failure on the part of any Party to exercise, and no delay in exercising, any right, power or remedy hereunder shall operate as a waiver thereof, nor shall any single or partial exercise of such right, power or remedy by such Party preclude any other or further exercise thereof or the exercise of any other right, power or remedy. Notwithstanding anything to the contrary contained herein, the Lender Protective Provisions contained in this Agreement (and, solely as they relate to such Lender Protective Provisions, the definitions of any terms used in such Lender Protective Provisions) may not be amended, waived or otherwise modified in any manner that adversely affects any Debt Financing or the Debt Financing Sources without the prior written consent of the Debt Financing Sources party to the Debt Commitment Letter.

Section 9.8.     <u>Notices</u>. All notices, requests, instruction, demands and other communications under this Agreement shall be in writing and shall be deemed given (a) when delivered personally by hand (with written confirmation of receipt), (b) on the date sent by e-mail (provided confirmation of email receipt is obtained) if sent during normal business hours of the recipient, and on the next Business Day if sent after normal business hours of the recipient, or (c) when received by the addressee if sent by nationally recognized overnight delivery service (with written confirmation of receipt), in each case, at the following addresses (or to such other address as a party may have specified by notice given to the other party pursuant to this provision):

If to the Special Master, to:               Robert B. Pincus in his capacity as Special
                                            Master for the United States District Court for the

District of Delaware
PO Box 4570
Wilmington, DE 19807
██████████████████████

With a copies to:                    Weil, Gotshal & Manges LLP, counsel to the
                                     Special Master
                                     767 Fifth Avenue
                                     New York, NY 10153
                                     Attention: Michael J. Aiello
                                                Ray C. Schrock
                                                Eoghan P. Keenan
                                     Email:     Michael.Aiello@weil.com
                                                Ray.Schrock@weil.com
                                                Eoghan.Keenan@weil.com

If to the Buyer, to:                 Amber Energy Inc.
                                     c/o Elliott Investment Management L.P.
                                     360 S. Rosemary Ave, 18th Floor
                                     West Palm Beach, FL 33401

With a copy to:                      Akin Gump Strauss Hauer & Feld LLP
                                     One Bryant Park
                                     New York, NY 10036
                                     Attention: Project Horizon
                                     E-mail:    HorizonAkinCore@akingump.com

Section 9.9.    Severability. If any term or other provision of this Agreement is invalid, illegal, or incapable of being enforced by any Law or public policy, all other terms or provisions of this Agreement shall nevertheless remain in full force and effect so long as the economic or legal substance of the Transactions is not affected in any manner materially adverse to any party. Upon such determination that any term or other provision is invalid, illegal, or incapable of being enforced, the Parties shall negotiate in good faith to modify this Agreement so as to effect the original intent of the Parties as closely as possible in an acceptable manner such that the Transactions are consummated as originally contemplated to the greatest extent possible.

Section 9.10.    Binding Effect; Assignment. This Agreement shall be binding upon and inure to the benefit of the Parties and their respective successors and permitted assigns and, without limiting the foregoing, references to the "Special Master" in this Agreement shall be deemed to include any successor, substitute or replacement thereof. This Agreement shall not be assigned by (a) the Buyer without the prior written consent of the Special Master; provided, that the Buyer may assign its rights (but not its obligations) hereunder as collateral to the Debt Financing Sources under the definitive documents governing the Debt Financing or (b) the Special Master or the Company, without the prior written consent of the Buyer.

Section 9.11.  <u>No Third Party Beneficiaries</u>. Nothing in this Agreement shall confer any rights, remedies or claims of any nature upon any Person other than the Parties and their respective successors or permitted assigns, except for the rights of (a) the Indemnitees as set forth <u>Section 6.6</u>; (b) the Non-Parties (including the Acquired Companies and their Representatives) set forth in <u>Section 9.12</u>; (c) the Released Parties as set forth in <u>Section 9.15</u>; and (d) the Debt Financing Sources as set forth in <u>Section 9.17</u>. All of the Persons identified as third-party beneficiaries in the immediately preceding sentence shall be entitled to enforce such provisions and to avail themselves of the benefits of any remedy for any breach of such provisions, all to the same extent as if such Persons were parties to this Agreement.

Section 9.12.  <u>Non-Recourse</u>. This Agreement may only be enforced against, and any Related Claims may only be made or asserted against (and are expressly limited to) the Persons that are expressly identified as the Parties in the preamble to this Agreement and solely in their capacities as such. No Person who is not a Party, including the Acquired Companies and any current, former or future Affiliate or Representative of any Party or the Acquired Companies or any current, former, or future Affiliate or Representative of any of the foregoing (such Persons, collectively, but specifically excluding the Parties, "<u>Non-Parties</u>"), shall have any liability (whether at law or in equity, based upon contract, tort, statute or otherwise) for obligations or liabilities arising under, in connection with or related to this Agreement or for any Related Claim and each Party hereby irrevocably waives and releases all such liabilities, obligations and Related Claims against any such Non-Party. Without limiting the rights of any Party hereto against the other Parties as set forth herein, in no event shall any Party, any of its Affiliates or any Person claiming by, through or on behalf of any of them institute any Related Claim against any Non-Party.

Section 9.13.  <u>Specific Performance</u>.

(a)     The Parties agree that irreparable damage would occur in the event that any of the provisions of this Agreement were not performed in accordance with their specific terms or were otherwise breached, and that money damages or legal remedies would not be an adequate remedy for any such damages. Therefore, it is accordingly agreed that prior to the termination of this Agreement in accordance with <u>Section 8.1</u>, each Party shall be entitled to an injunction or injunctions to prevent or restrain any breach or threatened breach of this Agreement by any other party and to seek specific performance of the terms and provisions of this Agreement, to prevent breaches or threatened breaches of, or to enforce compliance with, the covenants and obligations of any other party, in any court of competent jurisdiction, and appropriate injunctive relief shall be granted in connection therewith. Such remedies shall be in addition to and not in substitution for any other remedy to which such party is entitled at law or in equity.

(b)     Each Party hereto hereby waives (i) any defenses in any action for specific performance, and agrees not to oppose the granting of an injunction, specific performance or other equitable relief as provided herein, on the basis that (A) the other Party has an adequate remedy at law or (B) an award of specific performance is not an appropriate remedy for any reason at law or in equity and (ii) any requirement under any Law to post a bond or other security as a prerequisite to obtaining equitable relief.

WEIL:\99805227\35\67816.0003

(c)     The Parties agree that, notwithstanding anything in this Agreement to the contrary, the Special Master shall, unless this Agreement has been terminated in accordance with its terms and subject to <u>Section 8.4</u>, be entitled to specific performance (or any other equitable relief) to cause the Buyer to effect the Closing on the terms and subject to the conditions in this Agreement, if and only if: (i) all conditions in <u>Section 7.1</u> and <u>Section 7.2</u> have been satisfied or waived (other than those conditions that by their nature can only be satisfied at the Closing, but subject to those conditions being capable of being satisfied if the Closing Date were to occur); (ii) the Buyer fails to complete the Closing by the date the Closing would otherwise be required to have occurred pursuant to <u>Section 2.2</u>; (iii) the Debt Financing has been funded, or would be funded to the Buyer at the Closing in accordance with the terms thereof; (iv) the Closing will occur substantially simultaneously with or after the drawdown of the Debt Financing; and (v) the Special Master has irrevocably confirmed in writing to the Buyer that (1) all conditions set forth in <u>Section 7.1</u> and <u>Section 7.3</u> have been satisfied or waived (other than those conditions that by their nature can only be satisfied at the Closing, but subject to those conditions being capable of being satisfied if the Closing Date were to occur) and (2) the Special Master is ready, willing and able to consummate the Closing.

Section 9.14.   <u>Successors and Assigns</u>. The provisions of this Agreement shall be binding upon and inure to the benefit of the Parties and their respective successors and assigns; provided that no Party may assign, delegate or otherwise transfer any of its rights or obligations under this Agreement without the consent of the Special Master and the other Parties.

Section 9.15.   <u>Release</u>. Effective as of the Closing Date, except for any rights or obligations under this Agreement or the other Transaction Documents each of the Buyer and the Company on behalf of itself and each of its Affiliates and each of its current, former and future officers, directors, employees, partners, members, advisors, successors and assigns, each Designated Manager, and each other director, officer and employee of the Acquired Companies who participated in the Buyer's due diligence and investigation of the Acquired Companies or the preparation of the Company Disclosure Schedules (collectively, the "Releasing Parties"), hereby irrevocably and unconditionally releases and forever discharges the Special Master and each of his current, former and future financial advisors, attorneys, consultants or other advisors and his and their respective, successors and assigns, the Designated Managers, the other Company Employees listed in the Procedures Summary and any other individuals as reasonably agreed by Buyer and the Special Master during the Interim Period (collectively, the "Released Parties") of and from any and all actions, causes of action, suits, proceedings, executions, judgments, duties, debts, dues, accounts, bonds, contracts and covenants (whether express or implied), and claims and demands whatsoever whether in law or in equity which the Releasing Parties may have against each of the Released Parties, now has or in the future may have, in respect of any cause, matter or thing relating to the business or operations of the Acquired Companies, the Transactions, this Agreement, the Transaction Documents, or the ownership of Shares by the Released Parties, in each case, occurring or arising on or prior to the Closing Date. Each Party, on behalf of itself and each Releasing Party, covenants and agrees that no Releasing Party shall assert any such claim against the Released Parties.

Section 9.16.   <u>Counterparts</u>. This Agreement may be executed in one or more counterparts including by facsimile or other means of electronic transmission, such as by electronic mail in

".pdf" form, each of which will be deemed to be an original copy of this Agreement and all of which, when taken together, will be deemed to constitute one and the same agreement.

Section 9.17.  <u>Debt Financing Sources</u>. Notwithstanding anything in this Agreement to the contrary, the Special Master hereby:

(a)    agrees that any proceeding, whether in law or in equity, whether in contract or in tort or otherwise, involving the Debt Financing Sources, arising out of or relating to, this Agreement, the Debt Financing and/or any of the agreements (including the Debt Commitment Letter) entered into in connection with the Debt Financing or any of the transactions contemplated hereby or thereby or the performance of any services thereunder shall be subject to the exclusive jurisdiction of any federal or state court in the Borough of Manhattan, New York, New York, so long as such forum is and remains available, and any appellate court thereof and each Party hereto irrevocably submits itself and its property with respect to any such proceeding to be the exclusive jurisdiction of such court;

(b)    agrees that any such proceeding shall be governed by the laws of the State of New York (without giving effect to any conflicts of law principles that would result in the application of the laws of another state), except as otherwise provided in the Debt Commitment Letter or any other applicable definitive document relating to the Debt Financing;

(c)    without limiting the rights of the Buyer under the Debt Commitment Letter and/or any right or remedy available to any person under the definitive documentation governing the Debt Financing, agrees not to bring or support or permit any of its Affiliates to bring or support any proceeding of any kind or description, whether in law or in equity, whether in contract or in tort or otherwise, against any Debt Financing Source in any way arising out of or relating to, this Agreement, the Debt Financing and/or any of the agreements (including the Debt Commitment Letter) entered into in connection with the Debt Financing or any of the transactions contemplated hereby or thereby or the performance of any services thereunder in any forum other than any federal or state court in the Borough of Manhattan, New York, New York;

(d)    agrees that service of process upon the Acquired Companies and/or each of its controlled Affiliates or the Special Master in any such proceeding shall be effective if notice is given in accordance with <u>Section 9.7</u>;

(e)    irrevocably waives, to the fullest extent that it may effectively do so, the defense of an inconvenient forum to the maintenance of such Legal Proceeding in any such court;

(f)    knowingly, intentionally and voluntarily waives trial by jury in any proceeding brought against any Debt Financing Source in any way arising out of or relating to this Agreement, the Debt Financing and/or any of the agreements (including the Debt Commitment Letter) entered into in connection with the Debt Financing or any of the transactions contemplated hereby or thereby or the performance of any services thereunder;

(g)    without limiting the rights of the Buyer under the Debt Commitment Letter and/or any right or remedy available to any person under the definitive documentation governing the Debt Financing, agrees that none of the Debt Financing Sources will have any liability to the Acquired Companies and/or any of their respective controlled Affiliates (in each case, other than

90

the Buyer and the Buyer Subsidiaries) or the Special Master relating to or arising out of this Agreement, the Debt Financing and/or any of the agreements (including the Debt Commitment Letter) entered into in connection with the Debt Financing or any of the transactions contemplated hereby or thereby or the performance of any services thereunder, whether in law or in equity, whether in contract or in tort or otherwise; and

(h)      agrees that the Debt Financing Sources are express third party beneficiaries of, and may enforce, any of the provisions of this <u>Section 9.17</u> and that such provisions and the definitions of "Debt Commitment Letter," "Debt Financing," and "Debt Financing Sources," shall not be amended in any way adverse to any Debt Financing Source without the prior written consent of such Debt Financing Source.

Section 9.18.   <u>Special Master and his Representatives' Judicial Immunity</u>. The Buyer agrees that in no circumstance shall the Special Master or his Representatives be personally or otherwise liable for any amounts or obligations owed to the Buyer, for any breach of any representations or warranties in this Agreement, or for any other claims or liabilities arising out of or in connection with this Agreement or the transaction contemplated by this Agreement. The Buyer further agrees that the Special Master and his Representatives are acting as an arm of the Court and are entitled to judicial immunity in the performance of their duties and in connection with this Agreement and the Transactions.

[*Signature Pages Follow*]

IN WITNESS WHEREOF, the Parties have duly executed this Agreement as of the day and year first written above.

AMBER ENERGY INC., as the Buyer

By:_____
Name:  Elliot Greenberg
Title:    Vice President and Secretary


ROBERT B. PINCUS, as the Special Master


By:_____
Name:  Robert B. Pincus
Title:    Special Master for the United States District
            Court for the District of Delaware

[SIGNATURE PAGE TO STOCK PURCHASE AGREEMENT]

IN WITNESS WHEREOF, the Parties have duly executed this Agreement as of the day and year first written above.

AMBER ENERGY INC., as the Buyer

By: _____
Name:
Title:

ROBERT B. PINCUS, as the Special Master

By: _____
Name: Robert B. Pincus
Title: Special Master for the United States District Court for the District of Delaware

[SIGNATURE PAGE TO STOCK PURCHASE AGREEMENT]

**ANNEX A**

DEFINITIONS

"<u>Acquired Companies</u>" means, collectively, the Company and each of the Company Subsidiaries.

"<u>Additional Judgment Creditors</u>" means the judgment holders, other than Crystallex Corporation and ConocoPhillips Petrozuata B.V., set forth in the Priority Order [D.I. 996], dated March 1, 2024, in the Specified Litigation.

"<u>Adjustment Escrow Amount</u>" means an amount equal to (i) the balance of the Escrow Account as of immediately prior to the Closing plus (ii) the Closing Escrow Amount, in each case, together with accrued income and interest thereon.

"<u>Advanced Transaction Expenses</u>" means, as provided in the Sale Procedures Order and the May Order (in each case as in effect on Execution Date), the Special Master's compensation and any out-of-pocket costs, fees and expenses incurred by the Special Master in connection with the Transactions for investment bankers, third party consultants, legal counsel and any of his other Representatives or Advisors (as defined in the Sale Procedures Order) that have previously been paid as an advance by the Sale Process Parties and Additional Judgment Creditors pursuant to the procedures set forth in the May Order, which for the avoidance of doubt will include the monthly expenses of the Special Master (including fees and expenses of Weil, Gotshal & Manges LLP, Potter Anderson & Carroon LLP, Jenner & Block LLP, Evercore and any other advisors engaged by the Special Master).

"<u>Affiliate</u>" means, with respect to any Person, any other Person that, directly or indirectly through one or more intermediaries, controls, or is controlled by, or is under common control with, such Person, and the term "<u>control</u>" (including the terms "<u>controlled by</u>" and "<u>under common control with</u>") means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of such Person, whether through ownership of voting securities, by contract or otherwise; <u>provided</u>, <u>however</u>, that (i) in no event shall any direct or indirect equity investor in the Buyer be deemed an "Affiliate" of the Buyer other than Elliott Associates, L.P. and Elliott International L.P. and their respective Affiliates and (ii) "Affiliates" shall in no event include any portfolio company of Elliot Investment Management, L.P., Elliott Associates, L.P. or Elliott International L.P.

"<u>Agreed Principles</u>" means (a) with respect to Cash or Debt, the Company's past practices, principles, accounting methods, policies, procedures, classifications, conventions, categorizations, calculations, definitions, judgments, assumptions, techniques, methodologies, and estimation methods (including as they relate to the nature of accounts, calculation of levels or reserves or levels of accruals and in respect of the exercise of management judgment) adopted in the Financial Statements and (b) with respect to Net Working Capital, the procedures, definitions, methods and exceptions set forth in <u>Section 1.1(a)</u> of the Company Disclosure Schedules (the "<u>NWC Principles</u>"), and (c) with respect to Inventory, the procedures, definitions, methods and exceptions set forth in <u>Section 1.1(b)</u> of the Company Disclosure Schedules (the "<u>Inventory Principles</u>").

"Anti-Corruption Laws" means any applicable Law for the prevention or punishment of public or commercial corruption or bribery, including the U.S. Foreign Corrupt Practices Act, U.K. Bribery Act 2010 and any other applicable anti-corruption or anti-bribery Law of any other applicable jurisdiction.

"Antitrust Laws" means the HSR Act, the Sherman Act, the Clayton Act, the Federal Trade Commission Act, and any other Laws that are designed to prohibit, restrict or regulate actions having the purpose or effect of monopolization, lessening of competition, or restraint of trade.

"Assumed Claims" means those certain Attached Judgements (as defined in the Sale Procedures Order) purchased and assumed by the Buyer from certain Claimholders pursuant to that certain Claim Purchase Agreement, dated as of August 17, 2024, as amended, restated, supplemented or otherwise modified from time to time.

"Assumed Claims Amount" means the total judgement amount of the Assumed Claims as of the Closing Date, inclusive of pre- and post-judgment interests and costs; provided, that the Assumed Claims Amount shall be reduced on a dollar for dollar basis by an amount equal to the portion of Attached Judgments held by Claimholders senior in priority to the Assumed Claims for which Closing Consideration is not received solely for the purposes of the Special Master's evaluation of a Superior Proposal and not for any other purpose hereunder.

"Business Day" means any day of the year other than (a) a Saturday, Sunday or federal holiday in the United States or (b) a day on which national banking institutions in New York, New York are required or authorized to close.

"Buyer Subsidiary" means any Subsidiary of the Buyer, as of the date hereof.

"Cash" means the aggregate amount, which may be positive or negative, of cash and cash equivalents of the Acquired Companies calculated on a consolidated basis and determined in accordance with the Agreed Principles; provided, that Cash shall (a) be calculated net of (i) all issued but uncleared checks and drafts of the Acquired Companies, (ii) cash deposits and cash held in escrow accounts, (iii) with respect to any cash held outside the United States, all Taxes, fees, expenses and other costs associated with repatriating such cash into the United States, (iv) cash held by the Acquired Companies for third parties, and (v) cash held as collateral for outstanding letters of credit and any other restricted or trapped cash; (b) include all checks and wire transfers and drafts deposited or available for deposit for the account of the Acquired Companies; provided, further, that in no event will any asset be included in both the calculation of Lock Box Working Capital and Cash.

"Casualty Loss" means any loss, damage, destruction, impairment or reduction in value of any of the assets of any Acquired Company that occurs during the Interim Period as a result of (a) fire, explosion, collision, hurricane, earthquake, windstorm, flood, sabotage, terrorism or cyber-attack, or other casualty or act of God (any such event in this clause (a), a "Casualty Loss Event"), but excluding any loss, damage, impairment or reduction in value as a result of depreciation, ordinary wear and tear and any change in condition of any of the assets of any Acquired Company in the Ordinary Course or (b) condemnation or eminent domain proceedings by a Governmental Body, in each Casualty Loss Event, condemnation or eminent domain proceeding, which would

WEIL:\99805227\35\67816.0003

reasonably be expected to result in losses, damages, destruction, impairment or reduction in value in excess of $20,000,000 in the aggregate with respect to such Casualty Loss Event, condemnation or eminent domain proceeding, including any event or series of events arising from, related to or in connection with a similar set of underlying facts; ███████████████████████████
████████████████████████████████████████████████████████████████████

"Casualty Loss Threshold" means an amount equal to $100,000,000; ███████████
████████████████████████████████

"CITGO Petroleum" means CITGO Petroleum Corporation, a Delaware corporation.

"Claim" means (a) a right to a payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured or (b) an equitable remedy for breach of performance if such breach gives rise to a right to payment, whether or not such right to an equitable remedy is reduced to judgment, fixed, contingent, matured, unmatured, disputed, undisputed, secured or unsecured. Without limiting the foregoing and for the avoidance of doubt, a Claim includes any loss, liability, demand, claim, judgment, sanction, penalty, action, obligation, commitment, assessment, settlement, fee, debt, deficiency, guaranty of any kind, proceeding, damage, cost, or expense (including court costs and professional fees (including attorneys' fees and costs)) whatsoever, whether at law or in equity, whether known or unknown, fixed, liquidated, contingent, or otherwise, whether under any theory of successor or transferee liability and whether imposed by agreement, understanding, law, or otherwise.

"Closing Consideration" means the Lock Box Consideration Amount, minus the Estimated Leakage Amount, minus the Estimated Transaction Expenses, minus the Expense Reserve Holdback Amount, minus the Adjustment Escrow Amount, minus the Advanced Transaction Expenses Amount, minus the Assumed Claims Amount, plus the Estimated FCF Adjustment, minus any adjustment to the Closing Consideration pursuant to Section 6.20(d), and minus the amount Buyer is required to fund into the Indemnity Escrow Accounts pursuant to the terms of this Agreement.

"Closing Date Cash" means Cash as of the Measurement Time.

"Closing Date Debt" means Debt as of immediately prior to the Closing.

"Closing Date Inventory Value" is defined in the Inventory Principles.

"Closing Date Working Capital" means Net Working Capital as of the Measurement Time as determined in accordance with the applicable NWC Principles.

"Closing Escrow Amount" means an amount in cash to be reasonably agreed in good faith between the Special Master and the Buyer.

"Closing Transaction Expenses" means the Special Master Transaction Expenses and the Company Transaction Expenses that are unpaid as of the Closing.

"COBRA" means Part 6 of Subtitle B of Title I of ERISA, Section 4980B of the Code and any similar state applicable Law.

"Code" means the U.S. Internal Revenue Code of 1986, as amended.

"Company Benefit Plan" means (a) each "employee benefit plan" (as such term is defined in Section 3(3) of ERISA), (b) each plan, program, policy, agreement or arrangement that would be an "employee benefit plan" (within the meaning of Section 3(3) of ERISA), if it were subject to ERISA, (c) each stock purchase, stock option, restricted stock, stock bonus, stock ownership, stock appreciation rights, phantom equity, profits interests or other equity or equity-based plan or agreement, (d) each compensation, bonus, commission, incentive or deferred compensation plan, agreement, arrangement, program, policy or practice, (e) each employment or consulting agreement, offer letter or severance, retention, change of control, termination, employee loan or other compensation plan, agreement, arrangement, program, policy, or practice, (f) each health or welfare plan, agreement, arrangement, program, policy, or practice, and (g) each vacation policy, or other employee fringe benefit or perquisite arrangement whether or not subject to ERISA, in the cases of clauses (a) through (g), (x) that is maintained, sponsored, or contributed to by (or required to be contributed to by) any Acquired Company or with respect to which any Acquired Company has any liability and (y) under which any current or former director, officer, manager, employee, contractor or consultant of any Acquired Company has any present or future right to benefits or is eligible to participate.

"Company Fundamental Representations" means the representations and warranties set forth in Section 4.1 (Corporate Existence; Title to Shares); Section 4.4 (Capitalization) and Section 4.5(a), Section 4.5(b) (Subsidiaries; Non-Controlled Entities), solely with respect to the outstanding shares or equity interests held by an Acquired Company.

"Company Material Adverse Effect" means any state of facts, change, development, event, effect, circumstance, condition or occurrence (each, an "Effect") that, individually or in the aggregate, (x) would materially delay or impair the ability of the Special Master or the Acquired Companies (as applicable) to consummate the Transactions , in each case, other than Legal Proceedings arising out of or in relation to the Sale Order or the Injunction Motion or (y)results in or would reasonably be expected to have a material adverse effect on the condition (financial or otherwise), business, assets, liabilities or results of operations of the Acquired Companies and the Non-Controlled Entities, taken as a whole; provided, however, that in no event shall any of the following Effects, alone or in combination, be deemed to constitute, or be taken into account, in determining whether there has been, or would be, a Company Material Adverse Effect (A) any changes or conditions in the U.S. or any other national or regional economy, any global economic changes or conditions or securities, credit, financial or other capital markets conditions; (B) any changes or conditions affecting the oil and gas industry in general (including changes to the prices of commodities or of the raw material inputs or value of the outputs of the Company's products, general market prices and regulatory changes affecting the industry); (C) pandemics or epidemics, and any escalation or general worsening of any of the foregoing or other response by any Governmental Bodies; (D) Effects resulting from the announcement of this Agreement, the Transactions or the terms hereof or the consummation of the Transactions; (E) any action taken by an Acquired Company or failure of such Acquired Company to take action, in each case, which the Buyer has requested in writing or consented to when asked under Section 6.1; (F) changes in

A-4

applicable Law or in GAAP or in accounting standards, or any changes in the interpretation or enforcement by any Governmental Body of any of the foregoing, or any changes in general legal or regulatory conditions, including any Effects arising out of, in connection with, or as a result of, any "shut-down" of the U.S. federal government (including its agencies); (G) any failure to meet any internal projections, forecasts, guidance, estimates, milestones, or budgets or internal or published financial or operating predictions of revenue, earnings, cash flow or cash position; (H) any downgrade in the Company's credit rating (it being understood that the exceptions in clauses (G) and (H) shall not prevent or otherwise affect a determination that the underlying cause of any such Effect referred to therein (if not otherwise falling within any of the exceptions provided hereof) is a Company Material Adverse Effect); or (I) any action required to be taken by the Buyer or its Affiliates under the terms of this Agreement or in connection with the Transactions including but not limited to Section 6.3(d); provided, that in the case of clauses (A), (B), (C), and (F), to the extent the impact on the Acquired Companies, taken as a whole, is disproportionately adverse compared to the impact on similarly situated entities, the incrementally disproportionate impact or impacts shall be taken into account in determining whether there has been, or would reasonably be expected to be, a Company Material Adverse Effect. Subject to the foregoing definition, a Casualty Loss event may constitute a Company Material Adverse Effect for all purposes hereunder notwithstanding clause (C) or Section 6.20(d). Notwithstanding anything to the contrary in this Agreement, any breach by the Acquired Companies of any covenant set forth in Article VI that requires performance by the Acquired Companies prior to the Closing, and the effects of any such breach, shall in no event be deemed to be excluded from the definition of "Company Material Adverse Effect" hereunder.

"Company Subsidiary" means any Subsidiary of the Company, as of the date hereof.

"Company Transaction Expenses" means, without duplication, the aggregate amount of all fees, disbursements, costs and expenses incurred by or on behalf of any of the Acquired Companies in connection with the process to sell the Acquired Companies, including the negotiation, preparation, documentation, execution or consummation of this Agreement or any of the Transactions contemplated hereby, including (a) all of the fees (including brokerage fees and "finders fees"), commissions and expenses of Jones Day and other outside legal counsel, accountants, investment bankers, advisors or brokers in connection with the consummation of the Transactions (whether prior to, during or after the Lock Box Period); (b) any "single-trigger" success, change of control, retention, severance, sale or transaction bonuses, or other compensation or benefit due and payable to any Person, in each case, (i) solely upon the consummation of the Transactions, and (ii) not as a result of any actions taken by the Buyer or the Acquired Companies after the Closing or by the Buyer (or solely at the direction of the Buyer) on or prior to the Closing; (c) the employer portion of any associated payroll, social security or similar Taxes related to any such payments described in clause (b), or any Tax "gross up" payments payable with respect to the foregoing; and (d) the EPP Rabbi Trust Contribution and RRP Rabbi Trust Contribution and any costs or fees associated with the establishment of the EPP Rabbi Trust and RRP Rabbi Trust, and the estimated employer portion of any payroll, social security of similar Taxes with respect to the accrued benefits under the EPP and RRP, to the extent unpaid as of the Closing, plus the estimated true-up amount to the extent the employer portion of Federal Insurance Contribution Act taxes were paid pursuant to Treasury Regulation 31.3121(v)(2)-1(e)(4)(ii).

"Contract" means any written or oral contract, agreement, lease, easement, license, sublicense, subcontract, note, evidence of indebtedness, mortgage, indenture, bond, letter of credit, purchase order, binding bid, security agreement or other legally binding arrangement, whether express or implied (including all amendments, supplements, and modifications thereto), but shall exclude Permits and Company Benefit Plans.

"Credit Support Arrangements" means guaranties, performance bonds, performance guaranties, indemnities, keep-wells, sureties, bankers' acceptances, letters of credit, agreement to assume liabilities, other security, credit support or financial assurances and any other Contract or arrangement pursuant to which any person is or may be directly or indirectly liable or responsible for the liabilities, or the maintenance of a financial position, of any other person, including by the posting (or potential forfeiture) of any collateral, security or bond.

"Damaged Portion" means, with respect to any Casualty Loss, the portion of such asset(s) so damaged or destroyed.

"Debt" means, with respect to the Acquired Companies, without duplication, and the following obligations: (i) the principal amount of obligations of the Acquired Companies (A) for borrowed money, whether or not contingent, or (B) evidenced by notes, debentures, bonds or other similar instruments (including debt-like instruments) or debt securities; (ii) all obligations of the Acquired Companies for the reimbursement of any obligor of any guaranties, performance bonds, performance guaranties, indemnities, keep-wells, sureties, bankers' acceptances, letters of credit or similar arrangements, to the extent drawn upon; (iii) all liabilities of any Person (other than any Acquired Company) for which any Acquired Company has guaranteed repayment (to the extent of such guarantee); (iv) all obligations for deferred purchase price of property, assets or services, all conditional sale obligations, earnouts, holdbacks or other similar obligations (calculated at the full amount of the possible payment outstanding); (v) all obligations under finance leases; (vi) the defined benefit obligation less the fair value of plan assets under post-retirement benefit plans and Executive Death and Disability Benefit Plan, in each case, calculated as of December 31, 2024 in accordance with ASC 715, and unfunded or underfunded pensions as determined under 29 U.S.C. 1301(a)(18), and the employer portion of any associated payroll, social security or similar Taxes on any payments described in this clause (vi); (vii) the non-current liabilities set forth on Section 1.1(c) of the Company Disclosure Schedules; (viii) exit costs or expenses associated with leases terminated prior to the expiration of the term of such lease of any Real Property that remains leased by the Acquired Companies, but that has been vacated by the Acquired Companies; (ix) to the extent drawn, obligations under the Receivables Securitization Facility; (x) trade payables older than one hundred eighty (180) days; and (xi) all obligations of the type referred to in clauses (i) through (x) above of other Persons secured by any Lien on any property or asset of the Acquired Companies, whether or not such obligation is assumed by the Acquired Companies (with Debt under this clause (xi) being limited, in the case of any such obligation of another Person, to the lower of such obligation and the fair market value of the properties and assets securing the same); provided, that for all purposes under this Agreement, the aggregate amount of "Debt" under clauses (v)-(vi) shall in no event be less than $479,404,785. Debt shall not include (A) any amounts to the extent included in the calculation of Net Working Capital, (B) any amounts to the extent included in the calculation of the Lock Box Inventory Adjustment, (C) any amounts included in Closing Transaction Expenses, (D) any obligations or guarantees under bankers acceptance, letters of credit or similar arrangements to the extent undrawn as of the Closing Date and which do not

become drawable as a result of the Transactions, (E) any intercompany Debt of the Company and its wholly owned Subsidiaries and (F) Pre-Lock Box Taxes; provided, however, that, in no event will any liability be included in both the calculation of Lock Box Working Capital and Debt.

"Debt Financing Documents" means any credit agreements, note purchase agreements, engagement letters, fee letters, indentures, guarantees, pledge and security documents, definitive financing documents, agreements, schedules or other certificates or documents contemplated by the Debt Financing.

"Debt Financing Source" means, in its capacity as such, any lender, similar debt financing source, agent or arranger providing or arranging a commitment to, or that has entered into definitive agreements related to, the Debt Financing, including pursuant to the Debt Commitment Letter (as modified by any joinder agreement, amendment, or other modification thereto as permitted hereunder) or any Debt Financing Document (or any other commitment letter or definitive agreement in respect of any alternative debt financing) and their respective Affiliates, and such Person's (and their respective Affiliates') former, current or future equityholders, members, employees, officers, directors, attorneys, agents or advisors, and, in each case, their respective successors and assigns; provided, however, that neither the Buyer nor any of its Affiliates shall constitute a Debt Financing Source.

"Debt Payoff Amount" means the aggregate principal amount of the Specified Debt, plus all accrued but unpaid interest, fees and other amounts payable thereon (including any premiums, penalties, breakage costs and any other fees, expenses or other obligations relating thereto), in each case, calculated as of the Closing Date or as of the Redemption Date as defined in the applicable indenture to such item of Specified Debt.

"Designated Managers" means the employees of the Company or its Subsidiaries designated as such in the Procedures Summary.

"Economic Sanctions/Trade Laws" means all applicable Laws relating to export controls, anti-boycott, and Sanctions Targets, including prohibited or restricted international trade and financial transactions and lists maintained by any Governmental Body targeting countries, territories, entities or persons, including the United States, the United Nations Security Council, the European Union, or His Majesty's Treasury of the United Kingdom. For the avoidance of doubt, the applicable Laws referenced in the foregoing sentence include (1) any of the Trading With the Enemy Act, the International Emergency Economic Powers Act, the United Nations Participation Act, or the Syria Accountability and Lebanese Sovereignty Act, or any regulations of OFAC, or any export control Law applicable to U.S.-origin goods, technology, or software, or any enabling legislation or executive order relating to any of the above, as collectively interpreted and applied by the U.S. Government at the prevailing point in time, (2) any U.S. sanctions related to or administered by the U.S. Department of State and (3) any sanctions measures or embargoes imposed by the United Nations Security Council, His Majesty's Treasury or the European Union.

"Effective Date Working Capital" means Net Working Capital as of the Lock Box Time as determined in accordance with the applicable NWC Principles.

"Enterprise Value" means $7,286,000,001.

"Environmental Laws" means any and all Laws relating to (a) pollution or the protection, cleanup, preservation or restoration of the environment or natural resources (including air, water, land, soil, subsoil, wildlife, plants, or other natural resources), (b) the generation, manufacture, processing, handling, use, labeling, treatment, storage, disposal, transportation, or Release or threatened Release of, or exposure to, any Hazardous Substance, or (c) the health and safety of Persons, including but not limited to the following, to the extent applicable: the Comprehensive Environmental Response, Compensation, and Liability Act, 42 U.S.C. §§ 9601 et seq.; the Federal Water Pollution Control Act, 33 U.S.C. § 1251 et seq.; the Clean Air Act, 42 U.S.C. § 7401 et seq.; the Toxic Substances Control Act, 15 U.S.C. § 2601 et seq.; the Emergency Planning and Community Right to Know Act of 1986, 42 U.S.C. § 11001 et seq.; the Safe Drinking Water Act, 42 U.S.C. § 300(f) et seq.; the Hazardous Materials Transportation Act, 49 U.S.C. § 5101 et seq.; the Federal Insecticide, Fungicide and Rodenticide Act, 7 U.S.C. § 136 et seq.; the Resource Conservation and Recovery Act of 1976, 42 U.S.C. § 6901 et seq.; the Oil Pollution Act of 1990, 33 U.S.C. § 2701 et seq.; the Occupational Safety and Health Act, 29 U.S.C. §651 et seq. (with respect to human exposure to Hazardous Substances); the Endangered Species Act of 1973, 16 U.S.C. §§ 1531 et seq.; the Bald and Golden Eagle Protection Act, 16 U.S.C. § 668 et seq.; the Migratory Bird Treaty Act, 16 U.S.C. § 703 et seq.; and any similar or implementing state or local Law, all amendments or regulations promulgated thereunder.

"EPP" means the CITGO Petroleum Corporation Executive Protection Plan, as amended.

"Equitable Exceptions" means, collectively, (a) applicable bankruptcy, insolvency, reorganization, moratorium and similar Laws affecting creditors' rights and remedies generally, and (b) general principles of equity, including principles of commercial reasonableness, good faith and fair dealing (regardless of whether enforcement is sought in a proceeding at law or in equity).

"Equity Financing Sources" means the Persons set forth in Section 1.1(a) of the Buyer Disclosure Schedules and each other Person who delivers an Equity Commitment Letter on the Trust Structure Effective Date.

"Equity Interests" means, with respect to any entity, any and all capital stock, shares, quotas, limited liability company interests (however designated), partnership or membership interests or units (whether general or limited), or other similar interest or participation that confers on a Person the right to receive a share of the profits and losses of, or distribution of assets of, such entity, the right to vote for or appoint directors (or other similar governing body members) of such entity or the right to otherwise cause the direction or management and policies of such entity in a manager, general partner or other similar capacity.

"ERISA" means the Employee Retirement Income Security Act of 1974 and the rules and regulations thereunder.

"ERISA Affiliate" means with respect to any Person, trade or business, or entity, any other Person, trade or business, or entity, (a) that is, or was at the relevant time, a member of a group described in Section 414(b), (c), (m) or (o) of the Code that includes, or included at the relevant time, the first Person, trade or business, or entity, or (b) that is, or was at the relevant time, a member of the same "controlled group" as the first Person, trade or business, or entity pursuant to Section 4001(a)(14) of ERISA.

"Escrow Account" means the deposit escrow account to be maintained with the Escrow Agent in accordance with the Escrow Agreement.

"Existing Senior Secured Notes" means the 6.375% Senior Secured Notes, the 7.000% Senior Secured Notes and the 8.375% Senior Secured Notes, or any of them.

"Expense Reserve Holdback Account" means the account established by the Special Master in respect of the Expense Reserve Holdback Amount.

"Expense Reserve Holdback Amount" means a reasonable amount to be determined by the Special Master in good faith that is approved by the Court prior to Closing.

"FCF Adjustment" means an amount equal to the sum of: (i) Closing Date Working Capital minus Effective Date Working Capital; minus (ii) Closing Date Debt minus Lock Box Debt; plus (iii) Closing Date Inventory Value minus Lock Box Inventory Value; plus (iv) Closing Date Cash minus Lock Box Cash; provided, that if the sum of clauses (i)-(iv) is greater than or equal to zero ($0), then the FCF Adjustment shall be zero ($0). The FCF Adjustment shall not include any amounts to the extent included in Leakage Amount.

"Final Adjustment to FCF Adjustment" means the amount, which may be positive or negative, equal to the Final FCF Adjustment minus the Estimated FCF Adjustment.

"Final Leakage Amount Adjustment" means the amount, which may be positive or negative, equal to the Final Leakage Amount minus the Estimated Leakage Amount.

"Final Transaction Expenses Adjustment" means the amount, which may be positive or negative, equal to the Final Transaction Expenses minus the Estimated Transaction Expenses.

"Fraud" means a knowing misrepresentation of a material fact or concealment of a material fact by a Person with respect to any representation or warranty in this Agreement or the other Transaction Documents which is made or concealed with the specific intent to deceive and the intent of inducing another Person to enter into the Transaction Documents; provided, that at the time such representation was made (a) such representation was materially inaccurate, (b) such Person had actual knowledge (and not imputed or constructive knowledge), without any duty of inquiry or investigation, of the material inaccuracy of such representation, (c) such Person had the specific intent to deceive another Person and (d) the other Person acted in reliance on such inaccurate representation and suffered financial injury as a result of such material inaccuracy. For the avoidance of doubt, "Fraud" does not include any Claim for equitable fraud, promissory fraud, unfair dealings fraud, or any torts (including a Claim for fraud) based on negligence or recklessness.

"Good Industry Practice" means, with respect to any industry, any of the practices, methods, standards, procedures and acts engaged in or approved by a significant portion of such industry for similarly situated facilities in the United States during the relevant time period, or any of the practices, methods, standards, procedures and acts which, in each case, in the exercise of good judgment in light of the applicable manufacturer's recommendations and the facts known at the time the decision is made, would reasonably be expected to accomplish the desired result in a manner consistent with good business practices, applicable Law, reliability and safety. "Good

WEIL:\99805227\35\67816.0003

Industry Practice" is not intended to be limited to the optimum practice, method, standard or act to the exclusion of all others, but rather is intended to include a spectrum of practices, methods, standards or acts that meet the foregoing qualifications.

"Government Bid" means any quotation, bid or proposal that is outstanding and in effect as of the Execution Date, which if accepted or awarded, would lead to a Government Contract or an order under an existing Government Contract, and any teaming agreement in effect as of the Execution Date entered into in preparation for a Government Bid.

"Governmental Body" means any domestic or foreign national, state, multi-state, municipal or other local government, including any governmental, regulatory, or administrative department, division, subdivision, agency, bureau, board, commission, or authority thereof, or any quasi-governmental or private body exercising any regulatory or Taxing Authority (to the extent that the rules, regulations or orders of such organization or authority have the force of Law), or any court, tribunal or arbitral body of competent jurisdiction.

"Government Contract" means any Contract, grant, basic ordering agreement, letter contract, or order with (i) any Governmental Body, (ii) another Person under such other Person's prime contract with a Governmental Body, or (iii) any higher tier subcontractor of a Governmental Body in its capacity as a subcontractor, for which the period of performance has not expired or terminated, or final payment has not been received, or which remains open to audit as of the date of this Agreement. Unless otherwise indicated, a task, purchase or delivery order under a Government Contract will not constitute a separate Government Contract for purposes of this definition but will be part of the Government Contract under which it was issued.

"Hazardous Substance" means any substance, material or waste that is regulated, listed, designated, classified, defined or characterized under or pursuant to any Environmental Law as "hazardous," "toxic," "radioactive", a "pollutant," a "contaminant," or words of similar meaning, including petroleum or petroleum products, byproducts, derivatives, crude oil or any fraction thereof, PFAS, explosive materials, radioactive materials, asbestos, lead-based paint, or polychlorinated biphenyls.

"HSR Act" means the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended.

"Hydrocarbon" means hydrocarbons (including crude oil), feedstock, raw materials, blend stocks, byproducts, facility products and refined and intermediate petroleum products, and any byproducts of the foregoing.

"Imbalance" means any imbalance between (i) the quantity of Hydrocarbons required to be delivered by the applicable Acquired Company under a Contract relating to the purchase and sale, gathering, transportation, storage or processing thereof and (ii) the quantity of such Hydrocarbons actually delivered by such Acquired Company under such Contract, together with any appurtenant rights and obligations concerning balancing at the delivery point into the relevant sale, gathering, transportation, terminal, storage or processing facility, including cash settlement obligations.

"Injunction Motion" means the Special Master's motion to enjoin Gramercy Distressed Opportunity Fund LLC, G&A Strategic and Girard Street Investment Holdings, LLC from seeking to enforce judgments against PDVSA or the Bolivarian Republic of Venezuela by recovering from the Acquired Companies in Legal Proceedings in New York and Texas.

"Interest Rate" means (x) the rate of interest published from time to time by The Wall Street Journal, Eastern Edition, as the "prime rate" at large U.S. money center banks during the period from the date that payment is due to the date of payment, plus (y) one percent (1.0%).

"Interim Period" means the period beginning on the Execution Date and ending upon the earlier of the Closing and the termination of this Agreement in accordance with its terms.

"Inventory" is defined in the Inventory Principles.

"Inventory Principles" is defined in the definition of "Agreed Principles."

"IRS" means the United States Internal Revenue Service.

"Judgment Creditors" means the judgment holders in the Specified Litigation.

"Knowledge of the Buyer" means the actual knowledge (and not imputed or constructive knowledge) of any of the Persons set forth in Section 1.1(b) of the Buyer Disclosure Schedules after due inquiry.

"Knowledge of the Company" or "Company's Knowledge" means the actual knowledge (and not imputed or constructive knowledge) of the Designated Managers after due inquiry.

"Knowledge of the Special Master" means actual knowledge (and not imputed or constructive knowledge) of the Special Master.

"Law" means any applicable foreign, federal, state, local law (including common law), statute, treaty, code, ordinance, rule, regulation, judgment, decree, binding directive, injunction, Order or other legal requirement of any Governmental Body; provided, that in no event shall "applicable Law" be deemed to include Laws and Orders of the Bolivarian Republic of Venezuela.

"Leakage Amount" means the aggregate amount of all payments made, liabilities or obligations incurred, or rights and/or assets waived, settled, released or forgiven during the Lock Box Period pursuant to any of the following transactions:

(a)    any prepayment penalties, premiums, breakage costs, fees and other costs and expenses associated with any repayment, refinancing, renewal, or extension of any Debt in violation of Section 6.1 (whether repayment, refinancing, renewal, or extension occurs prior to or concurrently with the Closing and subject to the cure right described in clause (e) below);

(b)    the declaration, making or payment of any dividend, return of capital or other distribution of profits, rights or assets by any of the Acquired Companies (other than cash distributions to an Acquired Company in the Ordinary Course);

WEIL:\99805227\35\67816.0003

(c)      any payment (or assets transferred to or liabilities assumed, indemnified, guaranteed or incurred) or agreement or obligation to make a payment (or transfer assets or assume, indemnify, guarantee or incur a liability) by or on behalf of any Acquired Company to or for the benefit of any Special Master or Company Related Party (including any management, monitoring, advisory, supervisory or other shareholder or director's fees or bonuses or payments of a similar nature), any gift or other gratuitous payment or future benefits granted by any Acquired Company to, or for the benefit of, any of any Special Master and Company Related Party, and the forgiveness, release, settlement, compromise, indemnification, assumption, incurrence, modification or amendment of the terms of, or waiver by any Acquired Company of any Debt or other amount owed by or claim outstanding against any Special Master and Company Related Party;

(d)      any Tax becoming payable by any Acquired Company as a consequence of any of the matters with respect to any of the foregoing;

(e)      any violation of Section 6.1; provided that the Buyer has provided written notice of such violation to the Special Master and such violation shall not have been cured within the earlier of forty-five (45) calendar days of the Special Master's receipt of such written notice from the Buyer or the Closing; and

(f)      any binding obligation or commitment by any Acquired Company with respect to any of the foregoing.

Notwithstanding the foregoing, in no event shall "Leakage Amount" be deemed to include: (i) any Permitted Leakage; (ii) any amounts to the extent included as Closing Transaction Expenses; (iii) any Taxes of the Acquired Companies other than Taxes described in clause (d) hereof, and (iv) with respect to Taxes described in clause (d) hereof, (1) any Tax that is recoverable by the relevant Acquired Company incurring such Leakage Amount (or any member of its affiliated, consolidated, combined or unitary group for Tax purposes) or (2) any amount of Tax that could be saved by the utilization of any loss, allowance, exemption, set-off, deduction, credit or other relief that arises to any Acquired Company in connection with any Leakage Amount.

"Legal Proceeding" means any judicial, regulatory, administrative or arbitral action, suit, claim, appeal, cause of action, objection, demand, inquiry, audit, notice of violation, citation, summon, subpoena, proceeding, or investigation of any nature, civil, criminal, public or private.

"Lender Protective Provisions" means Section 9.6, Section 9.9, Section 9.10, Section 9.11 and Section 9.14 of this Agreement.

"Lien" means, with respect to any asset, any mortgage, deed of trust, lien, pledge, reservation, conditional sale or other title retention agreement, right of first refusal, preemptive right, collateral assignment, hypothecation, right of way, easement, security interest or encumbrance of any kind in respect of such asset.

"Lock Box Cash" means Cash as of the Lock Box Time.

"Lock Box Date" means December 31, 2024.

"Lock Box Debt" means Debt as of the Lock Box Time.

"Lock Box Inventory Adjustment" means the amount, which may be positive or negative, equal to (i) if the Lock Box Inventory Value exceeds the Target Inventory Value, the amount by which the Lock Box Inventory Value exceeds Target Inventory Value, which amount shall be expressed as a positive number; (ii) if the Lock Box Inventory Value is less than the Target Inventory Value, the amount by which the Target Inventory Value exceeds the Lock Box Inventory Value, which amount shall be expressed as a negative number, or (iii) if the Lock Box Inventory Value is equal to the Target Inventory Value, zero ($0).

"Lock Box Inventory Value" is defined in the Inventory Principles.

"Lock Box Payables Adjustment" is defined in the NWC Principles.

"Lock Box Period" means the period beginning at 11:59 PM Eastern Time on December 31, 2024 and ending as of (and including) the Closing.

"Lock Box Receivables Adjustment" is defined in the NWC Principles.

"Lock Box Time" means 11:59 PM Eastern Time on December 31, 2024.

"Lock Box Working Capital" means Net Working Capital as of the Lock Box Time as determined in accordance with the applicable NWC Principles.

"Lock Box Working Capital Adjustment" means, the amount, which may be positive or negative, equal to (i) if the Lock Box Working Capital exceeds the Net Working Capital Target, the amount, if any, by which the Lock Box Working Capital exceeds the Net Working Capital Target, which amount shall be expressed as a positive number, (ii) if the Lock Box Working Capital is less than the Net Working Capital Target, the amount, if any, by which the Net Working Capital Target exceeds the Lock Box Working Capital, which amount shall be expressed as a negative number or (iii) if the Lock Box Working Capital is equal to the Net Working Capital Target, zero. For purposes of this definition, the term "Lock Box Working Capital" shall refer to such amount as finally determined in accordance with Section 3.1.

"Lookback Date" means the date that is three (3) years prior to the date hereof.

"Marketing Business Day" means any Business Day, excluding the following: (1) if the period beginning on the date of satisfaction or waiver of the conditions set forth in Section 7.1 and ending on the twelfth (12th) Business Day thereafter (such period, the "Closing Marketing Period") were to commence but would not be completed in accordance with its terms on or prior to December 20, 2024, then no day prior to January 3, 2025 shall be a Business Day (for purposes of this definition) (and the Closing Marketing Period shall commence on January 3, 2025); (2) if the Closing Marketing Period is not completed by February 12, 2025, then no day prior to the earlier of (x) March 31, 2025 and (y) the date that the audited financial statements of the Company as of December 31, 2024 are available, shall be a Business Day (for purposes of this definition); (3) if the Closing Marketing Period were to commence but would not be completed in accordance with its terms on or prior to August 15, 2025, then no day prior to September 2, 2025 shall be a Marketing Business Day (and the Closing Marketing Period shall not commence prior to

September 2, 2025); and (4) if the Closing Marketing Period were to commence but would not be completed in accordance with its terms on or prior to December 19, 2025, then no day prior to January 2, 2026 shall be a Business Day (for purposes of this definition) (and the Closing Marketing Period shall commence on January 2, 2026).

"Measurement Time" means 11:59 PM Eastern Time on the day immediately preceding the Closing Date.

"Money Laundering Laws" means any law or regulation regarding money laundering or financial recordkeeping and reporting requirements, including the U.S. Currency and Foreign Transactions Reporting Act of 1970, the U.S. Money Laundering Control Act of 1986, the USA PATRIOT Act of 2001, and any applicable money laundering-related laws of other jurisdictions where the Acquired Companies conduct business, conduct financial transactions or own assets.

"Negative Consequences" means (a) if related to any consent with respect to any Contract, (i) any default, breach or violation of such Contract (or any default, breach or violation that would result with notice, lapse of time or both) or (ii) any modification or supplement to the rates, service levels, performance schedules or other terms or conditions of such Contract or any right to modify any of the foregoing, in each case, that would be or reasonably could be expected to be adverse to the Acquired Companies, (b) the imposition of any restriction, limitation or new covenant on any Acquired Company, (c) the imposition or creation of any Lien on any assets or properties of any Acquired Company, (d) any right of termination, cancellation, revocation, non-renewal or acceleration or loss of benefit or vesting of any right of any person, in each case, that would be or reasonably could be expected to be adverse to any of the Acquired Companies (upon the exercise of any rights or otherwise), (e) any right to receive any rebate, chargeback, refund, credit or penalty and (f) any payment, compensation or incremental liability (or any right to any payment, compensation or incremental liability).

"Net Working Capital" means the consolidated current assets of the Acquired Companies minus the consolidated current liabilities of the Acquired Companies solely to the extent such current assets and current liabilities are specifically listed in the applicable NWC Principles (and excluding any asset or liability accounts explicitly identified as excluded from the calculation in the applicable NWC Principles) provided, that, the consolidated current Tax assets and consolidated current Tax liabilities of the Acquired Companies shall be calculated in accordance with the definition of Pre-Lock Box Taxes. For the avoidance of doubt, "Net Working Capital" shall not include (a) any amounts reflected in Lock Box Cash and Lock Box Debt, (b) any intercompany receivables, payables or loans of any kind or nature between or among any of the Acquired Companies, or (c) any deferred Tax assets or liabilities of any of the Acquired Companies.

"Net Working Capital Target" means ███████████████████████████ ███████████████████████████.

"No-Shop Period" means the period beginning on the earlier of (i) forty five (45) days after the Commencement Date and (ii) the conclusion of the Court's hearing to consider approval of the Transactions, and ending on the Closing Date or the date on which this Agreement terminates pursuant to its terms.

A-14

"Non-Controlled Entity" means any entity in which an Acquired Company owns, directly or indirectly, any Equity Interest other than a Company Subsidiary.

"NWC Principles" has the meaning set forth in the definition of "Agreed Principles."

"OFAC" means the U.S. Department of the Treasury's Office of Foreign Assets Control.

"OFAC License" means a general or specific license or licenses from OFAC authorizing the Parties to participate in and close the Transaction, in form and substance reasonably satisfactory to the Buyer.

"OFAC License Application" means a request for an OFAC License pursuant to 31 CFR § 501.801 or other relevant authority.

"Offering Documents" means prospectuses, private placement memoranda, offering memoranda, information memoranda, syndication memoranda and packages and lender and investor presentations in each case to the extent the same are customary and required in connection with the Debt Financing.

"Order" means any order, injunction, judgment, decree, ruling, writ, assessment or arbitration award of a Governmental Body, other than the Bolivarian Republic of Venezuela.

"Ordinary Course" means the ordinary and usual course of day-to-day operations of the Acquired Companies and/or the Non-Controlled Entities (as applicable), in each case, consistent with past practice, taken as a whole.

"Organizational Documents" means the charter, memorandum, certificate of incorporation, articles of association, bylaws or other similar document of a Person, as may be amended, restated or otherwise modified from time to time.

"Paying Agent Account" means the deposit account established by the Paying Agent pursuant to the terms of the Paying Agent Agreement for the benefit of the Claimholders.

"PCI DSS" means the Payment Card Industry Data Security Standard, issued by the Payment Card Industry Security Standards Council, as revised from time to time.

"Permit" means all permits, licenses, approvals, certifications, consents, registrations, variances, exemptions, waivers, Orders, franchises and other authorizations of any Governmental Body.

"Permitted Leakage" means:

(a)     any transaction, payment or amount specifically and expressly provided for in any of the Audited Financial Statements and/or provided for or taken into account in the calculation of the Lock Box Consideration Amount;

(b)     any transaction or payment entered into, paid, made or agreed to be entered into, paid or made by or on behalf of any Acquired Company to the extent required by the terms of this Agreement or any other Transaction Document;

(c)     any matter which the Buyer agrees in writing shall be Permitted Leakage;

(d)     any amounts paid by any Acquired Company to any director, officer, employee, consultant or contractor of any Acquired Company in accordance with the terms of his employment, appointment, contract or consultancy, provided in any case such payments are in the Ordinary Course;

(e)     any payment or costs incurred by any Acquired Company in respect of any directors' and officers' liability insurance plan taken out in accordance with the terms of this Agreement;

(f)     any Leakage Amount to the extent refunded or otherwise made good to the relevant Acquired Company prior to the Closing without any liability to the relevant Acquired Company;

(g)     any payment in respect of Tax by or on behalf of any Acquired Company, or any use of any loss, allowance, exemption, set-off, deduction, credit or other relief in respect of Tax by or on behalf of any Acquired Company in respect of or in consequence of any of the matters referred to above (including, in each case, by reason of any such Acquired Company being a member of an affiliated, consolidated, combined or unitary group for Tax purposes);

(h)     any surrender of any loss, allowance, exemption, set-off, deduction, credit or other relief in respect of Taxes which arose before the Lock Box Date (and is not reflected in Net Working Capital) by any Acquired Company (including by reason of any such Acquired Company being a member of an affiliated, consolidated, combined or unitary group for Tax purposes); and

(i)     any Tax for which any Acquired Company is liable in respect of or in consequence of any of the matters referred to above.

"Permitted Liens" means (a) all non-monetary defects, exceptions, restrictions, easements, rights of way and encumbrances of record that do not or would not, individually or in the aggregate, reasonably be expected to interfere with the operation of the business of the Acquired Companies as presently conducted; (b) Liens securing liabilities which are reflected or reserved against in the consolidated balance sheet of the Company prepared in accordance with GAAP to the extent so reflected or reserved; (c) statutory Liens for Taxes not yet due and payable or that are being contested in good faith through appropriate proceedings and for which appropriate reserves have been established in accordance with GAAP; (d) landlords', mechanics', carriers', workers', repairers' and similar statutory Liens arising or incurred in the Ordinary Course to the extent relating to amounts that are not due and payable or may be paid without penalty, or that are being contested by appropriate proceedings and for which adequate reserves have been established; (e) zoning, building code, entitlement and other land use restrictions and Environmental Laws that individually or in the aggregate, do not materially affect, impair or interfere with the use, ownership and maintenance of, or the access to any property affected

thereby or the conduct of the business of the Company as presently conducted; (f) title of a lessor under a capital or operating lease, and leases, subleases, and similar transactions in the Ordinary Course, in each case solely to the extent that the same would not, individually or in the aggregate, reasonably be expected to interfere with the operation of the business of the Acquired Companies as currently conducted; (g) any license, covenant or other right to or under Intellectual Property granted in the Ordinary Course; (h) Liens set forth in <u>Section 1.1(d)</u> of the Company Disclosure Schedules; and (i) the Equity Pledge.

"<u>Person</u>" means any individual, corporation, partnership, limited liability company, firm, joint venture, association, joint-stock company, trust, unincorporated organization, Governmental Body or other entity.

"<u>Personal Information</u>" means all information that identifies, could be used to identify or is otherwise related to an individual person or household, including demographic, health, behavioral, biometric, financial, nonpublic, and geolocation information, IP addresses, network and hardware identifiers, employee information, and any other individually identifiable information that is protected under any applicable Privacy Law and Obligation, in addition to any definition for "personal information", "personal data", "personally identifiable information", "protected health information" or any similar term provided by applicable Privacy Laws and Obligations.

"<u>PFAS</u>" stands for per- and polyfluoroalkyl substances and means any substance which contains at least one fully fluorinated methyl or methylene carbon atom (without any hydrogen (H)/chlorine/bromine/iodine atom attached to it), including any acids, salts, precursors, polymers or derivatives thereof.

"<u>Post-Closing Tax Period</u>" means any taxable period beginning after the Closing Date, and the portion of any Straddle Period beginning on the day after the Closing Date.

"<u>Post-Lock Box Tax Period</u>" means any taxable period beginning after the Lock Box Date and the portion of any Straddle Period beginning on the day after the Lock Box Date.

"<u>Pre-Closing Tax Period</u>" means any taxable period ending on or before the Closing Date, and the portion of any Straddle Period ending on and including the Closing Date.

"<u>Pre-Lock Box Tax Period</u>" means any taxable period ending on or before the Lock Box Date, and the portion of any Straddle Period ending on and including the Lock Box Date.

"<u>Pre-Lock Box Taxes</u>" means an amount equal to, without duplication, the aggregate liability for any accrued but unpaid Taxes of any Acquired Company for all Pre-Lock Box Tax Periods. The calculation of the Pre-Lock Box Taxes shall (a) to the extent allowed under Law, take into account any Tax assets that are deductible in a Pre-Lock Box Tax Period to the extent available to offset the Tax liability for such period (including (1) any Transaction Tax Deductions allocated to the Acquired Companies under <u>Section 6.12(d)</u> and (2) any Tax refund (or any credit or offset in lieu of such refund) for Taxes paid (or prepaid) to the appropriate Taxing Authority prior to the Lock Box Date that any Acquired Company is substantially certain to receive, whether or not such refund (or any credit or offset in lieu of such refund) is realized prior to Lock Box Date), (b) take into account applicable estimated (or other prepaid) Tax payments paid to the appropriate Taxing

WEIL:\99805227\35\67816.0003

Authority prior to Lock Box Date and net of any U.S. federal Taxes to be paid with respect to such refund, credit or offset, (c) take into account any and all Taxes of any Person (other than any of the Acquired Companies) imposed on or payable by any of the Acquired Companies as a transferee or successor, by contract or pursuant to any Law, including Treasury Regulation Section 1.1502-6 or any analogous or similar provision of state, local or non-U.S. Law, which Taxes relate to an event or transaction occurring before the Lock Box Date, (d) exclude any Tax liabilities for which accruals or reserves have been properly established and expressly reflected on the Financial Statements, (e) exclude any Tax assets, attributes or refunds that were properly established and expressly reflected on the Financial Statements, (f) exclude any foreign Tax credits, and exclude any Tax refunds or Tax credits related to claims with respect to (i) alternative fuel mixture credit or (ii) oil spill tax on Venezuelan or Canadian crude, in each case, identified on the Company Disclosure Schedules, (g) exclude any Taxes attributable to (i) any action taken by the Buyer or any of its Affiliates (including any Acquired Company) after the Closing (including, for the avoidance of doubt, on the Closing Date but after the Closing) or (ii) any amendment of any Tax Returns for any Pre-Lock Box Tax Period, Tax election that has retroactive effect to any Pre-Lock Box Tax Period, or entry into of any voluntary disclosure or similar agreement with respect to any Pre-Lock Box Tax Period, in each case to the extent occurring after the Closing, (h) be determined in accordance with past practices (including reporting positions, elections and tax accounting methods) of the Acquired Companies in preparing their applicable Tax Returns, (i) be determined in accordance with Section 6.12(d), (j) exclude any Taxes with respect to a Post-Lock Box Tax Period and (k) exclude any Taxes (including any Transfer Taxes) resulting from any actions contemplated under this Agreement.

"Preferential Right" means any rights of first refusal, rights of first offer, put or call options, preferential rights to purchase, preemptive rights, change in control, or other similar rights in favor of any Person.

"Procedures Summary" means the procedures described in Section 1.1(e) of the Company Disclosure Schedules.

"Refinery Inventory" means, with respect to any refinery owned by an Acquired Company, all inventory owned by the Acquired Companies for use in or resulting from any such refinery, regardless of whether located within or upon any such refinery, in-transit, or otherwise, including:

(a)    hydrocarbon inventories including (i) all Hydrocarbons, including in-process units or in interconnecting piping or other lines; (ii) all refined and intermediate product inventories, including petroleum coke and sulfur; and (iii) all additives held for use at a refinery, in each of the foregoing cases, (x) excluding all finished and unfinished products that have left such refinery and are en route to any customer or end user and (y) including the contents of all applicable storage tanks, railcars, terminal facilities and in-line, propellant and unit fill at such refinery or at an off-site storage (including linefill, tank bottoms, heels, unit fill, inventory below suction level and fill line), to the extent such inventory is owned by any Acquired Company, but excluding bottom sediment, sludge and water; and

(b)    non-hydrocarbon inventories, including chemicals, catalysts and precious metals (including whether located in process units), store stocks, supplies and consumables.

"<u>Related Claim</u>" means any Legal Proceeding that may be based upon, arise out of or relate to this Agreement or the negotiation, execution, performance, breach, interpretation, construction, validity or enforcement of this Agreement (including any Legal Proceeding based upon, arising out of or related to any representation or warranty made or alleged to be made in or in connection with, or as an inducement to enter into, this Agreement).

"<u>Release</u>" means any actual or threatened releasing, spilling, leaking, pumping, pouring, emitting, emptying, discharging, injecting, escaping, or allowing to escape, leaching, migrating, dumping, abandoning, or disposing into or through the indoor or outdoor environment (including soil, surface water, ground water, land surface, subsurface strata, ambient air, wildlife, plants or other natural resources).

"<u>Repair</u>" means, with respect to any Damaged Portion, the full repair or restoration of the Damaged Portion to, at the Buyer's election, (i) a condition consistent in all material respects with its condition prior the damage to such Damaged Portion taking place, or (ii) good working order in accordance with Good Industry Practices, including with respect to any engineering, design, procurement, or installation performed by or for any Acquired Company or any of their respective Affiliates in connection with such repair or restoration. The term "repair or restoration" (and similar terms) shall be broadly construed and shall include or allow for the replacement of all or any portion of the Damaged Portion.

"<u>Representatives</u>" means, with respect to any Person, such Person's equityholders, partners, members, officers, directors, employees, consultants, agents, attorneys, accountants, advisors, financing sources and other representatives.

"<u>Required Information</u>" means (i) the audited consolidated balance sheet of the Company as of December 31, 2023 and December 31, 2022 and the related audited consolidated statements of income and cash flows for the fiscal years then ended, and, if the Closing Marketing Period is not completed by February 12, 2025, the audited consolidated balance sheet of the Company as of December 31, 2024, (ii) the unaudited condensed consolidated balance sheet of the Company as of the last date of each subsequent fiscal quarter, other than the fourth fiscal quarter in any fiscal year, ending after December 31, 2023, and at least forty five (45) days prior to the Closing Date, and the related unaudited condensed consolidated statements of income and cash flows for the three months then ending and for the portion of the year to date and (iii) historical information reasonably requested by the Buyer in the Buyer's preparation of the pro forma financial statements referred to in <u>Section 6.10(a)(viii)</u> (after giving effect to the proviso thereto), <u>provided</u>, that notwithstanding anything to the contrary in this definition or otherwise, nothing herein shall require the Special Master or the Company to provide (or be deemed to require the Special Master or the Company to prepare) any (1) description of all or any portion of the Debt Financing, including any "description of notes," "plan of distribution" and information customarily provided by investment banks or their counsel or advisors in the preparation of Offering Documents for private placements of non-convertible bonds pursuant to Rule 144A under the Securities Act, (2) risk factors relating to, or any description of, all or any component of the financing contemplated thereby, (3) historical financial statements or other information required by Rule 3-05, Rule 3-09, Rule 3-10, Rule 3-16, Rule 13-01 or Rule 13-02 of Regulation S-X under the Securities Act in each case which are prepared on a basis not consistent with the Company's reporting practices for the periods presented in the Required Information; any compensation discussion and analysis or

other information required by Item 10, Item 402 and Item 601 of Regulation S-K under the Securities Act or XBRL exhibits; or any information regarding executive compensation or related persons related to SEC Release Nos. 33-8732A, 34-54302A and IC-27444A, (4) other information customarily excluded from Offering Documents for private placements of non-convertible high-yield bonds pursuant to Rule 144A under the Securities Act in a "Rule 144A-for-life" offering, (5) consolidating financial statements, separate Subsidiary financial statements, related party disclosures, or any segment information, including any required by FASB Accounting Standards Codification Topic 280 in each case which are prepared on a basis not consistent with the Company's reporting practices for the periods presented in the Required Information, (6) financial information that the Acquired Companies do not maintain in the ordinary course of business (other than the historical financial statements and other historical information expressly set forth in the foregoing clauses (i) to (iv)), (7) information not reasonably available to the Acquired Companies under their respective current reporting systems (other than the historical financial statements and other historical information expressly set forth in the foregoing clauses (i) to (iv)) or (8) projections (the information described in this proviso, the "Excluded Information"). Financial statements referred to in the foregoing clauses (i) and (ii) will be prepared in accordance with GAAP and the unaudited financial statements referred to in clause (ii) will be reviewed by the independent accountants of the Company as provided in the procedures specified by PCAOB AS 4015; provided, that no opinion shall be required with respect to such review of such unaudited financial statements. Notwithstanding anything included herein to the contrary, no Required Information shall be required to be provided after the satisfaction of the Closing Marketing Period or the date on which the Debt Financing has been consummated (including if the proceeds of the Debt Financing are placed into escrow upon consummation).

"RRP" means the CITGO Petroleum Corporation Retirement Restoration Plan, as amended.

"Sale Order" means an order of the Court in the form of the Form Sale Order, with such changes and modifications acceptable to the Buyer in its sole discretion.

"Sale Process Parties" means, as set forth in Sale Procedures Order, Crystallex International Corporation, the Bolivarian Republic of Venezuela, PDVSA, the Company, CITGO Petroleum Corporation, and Phillips Petroleum Company Venezuela Limited and ConocoPhillips Petrozuata B.V.

"Sanctions Target" means (1) any country or territory that is the target of country-wide or territory-wide Economic Sanctions/Trade Laws, which, as of the date of this Agreement, are Iran, Cuba, Syria, North Korea, and certain occupied regions of Ukraine, including the Crimea region, the non-government-controlled areas of Zaporizhzhia and Kherson and the so-called Donetsk or Luhansk People's Republics; (2) a Person that is on the Specially Designated Nationals and Blocked Persons List or any of the other sanctioned persons lists published by OFAC, or any similar list of sanctioned persons issued by the U.S. Department of State; (3) a Person that is located or resident in or organized under the laws of a country or territory that is identified as the subject of country-wide or territory-wide Economic Sanctions/Trade Laws; or (4) an entity that, under applicable Economic Sanctions/Trade Laws, is automatically a target of restrictions or prohibitions because it is owned or controlled by a country or territory identified in clause (1) or Person in clauses (2) or (3) above.

"Security Incident" means any unauthorized or unlawful access, acquisition, exfiltration, manipulation, erasure, loss, use, or disclosure that compromises the confidentiality, integrity, availability or security of Sensitive Data or the Systems, or that triggers any reporting requirement under any breach notification Law or contractual provision, including any ransomware or denial of service attacks that prevent or materially degrade access to Sensitive Data or the Systems.

"Sensitive Data" means all Personal Information, confidential information, proprietary information, intellectual property, and any other information protected by applicable Law or contract that is collected, maintained, stored, transmitted, used, disclosed, or otherwise processed by, for or on behalf of the Acquired Companies.

"Solvent" means, with respect to any Person as of a particular date, that on such date, such Person and its Subsidiaries (on a consolidated basis) (a) have property with fair value greater than the total amount of their debts and liabilities, contingent (it being understood that the amount of contingent liabilities at any time shall be computed as the amount that, in light of all the facts and circumstances existing at such time, represents the amount that can reasonably be expected to become an actual or matured liability in the ordinary course), subordinated or otherwise, (b) have assets with present fair salable value not less than the amount that will be required to pay their liability on their debts as they become absolute and matured in the ordinary course, (c) will be able generally to pay their debts and liabilities, subordinated, contingent or otherwise, as they become absolute and matured in the ordinary course, (d) are not engaged in business or a transaction, and are not about to engage in business or a transaction, for which their property would constitute an unreasonably small capital and (e) does not intend to, and does not believe that it will, incur debts or liabilities beyond such Person's ability to pay such debts and liabilities as they mature.

"Special Master Transaction Expenses" means, as provided in the Sale Procedures Order and the May Order (in each case as in effect on Execution Date), the Special Master's unpaid compensation and any out-of-pocket costs, fees and expenses incurred by the Special Master in connection with the Transactions for investment bankers, third party consultants, legal counsel and any of his other Representatives or Advisors (as defined in the Sale Procedures Order), which for the avoidance of doubt will include fees and expenses of Weil, Gotshal & Manges LLP, Potter Anderson & Carroon LLP, Jenner & Block LLP, Evercore and any other advisors engaged by the Special Master.

"Specially Designated Nationals and Blocked Persons List" means the list of blocked persons, specifically designated nationals, specially designated terrorists, specially designated global terrorists, foreign terrorist organizations, specially designated narcotics traffickers, and blocked vessels referenced in Appendix A to 31 CFR Chapter V, as updated and made available at http://www.treasury.gov/sdn.

"Specified Debt" means the Debt specified in writing by the Buyer to the Special Master not less than thirty (30) days prior to the Closing Date.

"Specified Joint Venture" means each of (i) Lake Charles Pipe Line Company and (ii) TCP Petcoke Corporation.

"Straddle Period" means any taxable period that begins on or before the Lock Box Date and ends after the Lock Box Date.

"Subsidiary" means, when used with respect to any Person, any other Person, whether incorporated or unincorporated, of which (i) more than fifty percent of the voting securities or other ownership interests is owned by such Person or one or more of its Subsidiaries, (ii) such Person or one or more of its Subsidiaries is a general partner or holds a majority of the voting interests of a partnership or (iii) securities or other interests having by their terms ordinary voting power to elect more than fifty percent of the board of directors or others performing similar functions with respect to such corporation or other organization, are directly owned or controlled by such Person or by any one or more of its Subsidiaries.

"Systems" means the information technology systems, operational technology systems, and infrastructure used, owned, leased or licensed by or for the Acquired Companies, including industrial control systems, software, computer programs (in both source and object code form), servers, databases, firmware, hardware, equipment, networks, record keeping, communications, telecommunications, interfaces, platforms, peripherals and related systems.

"Target Inventory" is defined in the Inventory Principles.

"Target Inventory Value" is defined in the Inventory Principles.

"Tax" or "Taxes" means (a) all federal, state, local or foreign taxes, charges, fees, levies or other assessments, including, all net income, excise, stamp, real or personal property, ad valorem, withholding, social security (or similar), unemployment, occupation, use, production, service, service use, license, net worth, payroll, franchise, severance, transfer, recording, employment, premium, windfall profits, environmental, customs duties, capital stock, profits, disability, sales, registration, value added, alternative or add-on minimum, estimated taxes and any other taxes of any kind whatsoever; and (b) all interest, penalties, fines and additions to tax imposed in connection with any item described in clause (a) of this definition (c) any liability for the payment of any amounts of the type described in clause (a) or (b) as a result of being (or ceasing to be) a member of an affiliated, consolidated, combined, unitary, aggregate or similar group for any period, including pursuant to Treasury Regulation Section 1.1502-6 or any similar applicable Law; and (d) any liability for the payment of any amounts of the type described in clauses (a)-(c) as a result of being treated as a successor or transferee to any Person (whether by Contract, statute or otherwise), as a result of any secondary liability or as a result of any express or implied obligation to indemnify any other Person.

"Tax Returns" means any return, report, form or similar statement filed or required to be filed with respect to any Tax (including any attached schedules), including, any information return, claim for refund, amended return or declaration of estimated Tax.

"Taxing Authority" means any Governmental Body exercising any authority to impose, assess or collect any Tax or any other authority exercising Tax regulatory authority.

"Termination Fee" means $204,690,000; provided that if the enterprise value of the Superior Proposal resulting in the payment of the Termination Fee exceeds the Enterprise Value, then the Termination Fee shall mean $218,580,000.

"<u>Termination Fee Claim</u>" has the meaning ascribed to such term in the Sale Order.

"<u>Transaction Documents</u>" means this Agreement, the Sale Order, the Escrow Agreement, the Paying Agent Agreement, the Debt Commitment Letter, the Equity Commitment Letters, the Limited Guaranties, the Definitive Trust Documents and all other agreements and instruments to be executed by the Buyer, the Special Master and/or the Company at or prior to the Closing pursuant to this Agreement.

"<u>Transactions</u>" means the transactions contemplated by this Agreement and the other Transaction Documents.

"<u>Transaction Tax Deductions</u>" means, without duplication, any item of loss, deduction, or credit resulting from or attributable to (a) any payments of bonuses, change of control payments, severance payments, or retention payments, any payments for, or vesting of, any stock options, restricted stock, or stock appreciation rights, or any other compensatory payments, management, advisory or consulting fees and other similar items (including the amount of any employment Taxes with respect thereto), (b) any costs, fees and expenses (including any breakage fees or deferred or capitalized financing fees) with respect to the payment of Debt, or (c) Company Transaction Expenses, in each case, paid or incurred by, or on behalf of, the Acquired Companies in connection with the transactions contemplated by this Agreement. For purposes of the foregoing, (i) Buyer shall be assumed to cause the Company to make an election under Revenue Procedure 2011-29, 2011-18 IRB, to treat 70% of any success-based fees that were paid by or on behalf of any Acquired Company as an amount that did not facilitate the transactions contemplated under this Agreement and (ii) Special Master Transaction Expenses shall be treated as paid or incurred on behalf of the Company to the maximum extent permitted under applicable Law.

"<u>Transfer Taxes</u>" means any real property transfer, sales, use, value added, stamp, documentary, recording, registration, conveyance, stock transfer, intangible property transfer, personal property transfer, gross receipts, registration, duty, securities transactions or similar fees or Taxes or governmental charges (together with any interest or penalty, addition to Tax or additional amount imposed) as levied by any Taxing Authority or other Governmental Body in connection with the Transactions, including any payments made in lieu of any such Taxes or governmental charges that become payable in connection with the Transactions.

"<u>Treasury Regulations</u>" means the regulations promulgated under the Code.

"<u>VDR</u>" means the virtual data room established by Representatives of the Special Master to facilitate the provisions of information to potential bidders pursuant to the Sale Procedures Order.

"<u>6.375% Senior Secured Notes</u>" means CITGO Petroleum Corporation's 6.375% senior secured notes due 2026, issued pursuant to the indenture dated as of February 11, 2021 among CITGO Petroleum Corporation as Issuer, the guarantors party thereto, and TMI Trust Company as trustee.

"7.000% Senior Secured Notes" means CITGO Petroleum Corporation's 7.00% senior secured notes due 2025, issued pursuant to the indenture dated as of June 9, 2020 among CITGO Petroleum Corporation, as Issuer, the guarantors party thereto, and TMI Trust Company, as trustee.

"8.375% Senior Secured Notes" means CITGO Petroleum Corporation's 8.375% senior secured notes due 2029, issued pursuant to the indenture dated as of September 20, 2023 among CITGO Petroleum Corporation as Issuer, the guarantors party thereto, and Argent Institutional Trust Company as trustee.

A-24

# ANNEX B

## LIMITED INDEMNIFICATION

10.1    <u>Survival</u>.  No claim for indemnification may be asserted pursuant to this <u>Annex B</u> unless (a) prior to the expiration the applicable Survival Period, such claim is asserted by proper written notice in accordance with this <u>Annex B</u>, specifying, in reasonable detail, the basis of the claim and (b) such claim is made in respect of Losses specified, in reasonable detail, and incurred prior to the expiration of the applicable Survival Period.

10.2    <u>Indemnification Relating to the</u> ███████████ <u>and</u> ███████████. From and after the Closing, the Buyer shall be entitled to assert, as its sole and exclusive remedy for, in accordance with the terms of this <u>Annex B</u> and the Escrow Agreement, claims against any amounts then remaining in (a) the ███████ Indemnity Escrow Account in respect of any and all actual out-of-pocket liabilities, losses, damages or expenses sustained or incurred by the Buyer resulting from the ██████████ (a ██████████ <u>Loss</u>" or the ██████████ <u>Losses</u>") or (b) the ██████████ Indemnity Escrow Account in respect of any and all actual out-of-pocket liabilities, losses, damages or expenses sustained or incurred by the Buyer resulting from ██████████ (a ██████████ <u>Loss</u>" or the ██████████ <u>Losses</u>", and collectively with the ███████ Losses, a "<u>Loss</u>" or the "<u>Losses</u>"). Prior to the Closing, the Acquired Companies shall not settle any Legal Proceedings with respect to any Losses without the prior written consent of the Buyer in its sole discretion.

10.3    <u>Calculation of Losses</u>.

(a)    The amount of any Losses payable under <u>Annex B</u> by the Special Master out of an Indemnity Escrow Account shall be net of (i) any amounts recovered or recoverable by the Buyer or any of its Affiliates under any insurance policies or from any other sources of indemnification or other Person alleged to be responsible with respect to such Losses and (ii) the reduction in Taxes realized (or reasonably expected to be realized) by the Buyer or any of its Affiliates arising from the incurrence or payment of, or, in the case of Taxes, the adjustment giving rise to, any such Losses. If the Buyer or any of its Affiliates receives any amounts under any insurance policies, or from any other sources of indemnification or any other Person alleged to be responsible for any Losses or realizes a reduction in Taxes attributable to a Loss, subsequent to an indemnification payment by the Special Master from an Indemnity Escrow Account, in each case, that was not taken into account under the immediately preceding sentence, then such Buyer shall promptly reimburse the applicable Indemnity Escrow Account for any payment made or expense incurred or reduction in Taxes realized by such Indemnity Escrow Account in connection with providing such indemnification payment up to the amount received or realized by the Buyer or any of its Affiliates, net of any expenses incurred by the Buyer or any of its Affiliates in collecting such amount. The Buyer shall use reasonable best efforts to collect any amounts available under any insurance policies or from any other sources of indemnification or such other Person alleged to have responsibility therefor.

(b)    The Buyer shall take, and shall cause its Affiliates to take, all reasonable steps to mitigate and otherwise minimize its Losses to the maximum extent reasonably possible

upon and after becoming aware of any event which would reasonably be expected to give rise to any Losses.

(c)    If the Buyer receives any payment from an Indemnity Escrow Account in respect of any Losses, and the Buyer may be entitled to recover all or a part of such Losses from a third party based on the underlying claim asserted, the Buyer shall assign such of its rights to proceed against such third party as are necessary or desirable to enable the Special Master to recover from such third party the amount of such indemnification payment.

10.4    <u>Limitation on Indemnities</u>.

(a)    Solely with respect to ███████ Losses, Buyer shall pay and be responsible for 40% of any ███████ Losses and only the remaining 60% of such ███████ Losses shall be payable solely from the ███████ Indemnity Escrow Account in accordance with the terms of this <u>Annex B</u> ███████ Losses shall by payable solely from the ███████ Account in accordance with the terms of this <u>Annex B</u>.

(b)    In no event shall the Buyer be entitled to indemnification under this <u>Annex B</u> in excess of the amount then remaining in the applicable Indemnity Escrow Account (if any); <u>provided</u>, that the Buyer shall not be entitled to such indemnification for (i) ███████ Losses for any amount in excess of $██████ (the "██████ Cap") and (ii) any ███████ Losses for any amount in excess of $██████ (the "██████ Cap"). Notwithstanding anything of the contrary set forth in this Agreement, all claims by the Buyer in respect of such indemnification under this <u>Annex B</u> (x) relating to ███████ Losses shall be asserted solely and exclusively against the ███████ Indemnity Account and (y) relating to ███████ Losses shall be asserted solely and exclusively against the ███████ Indemnity Account, in each case, pursuant to the terms of the Escrow Agreement, and the amount then remaining in the respective Indemnity Escrow Account (if any) shall be the Buyer's sole and exclusive source of recovery for any amounts owing to the Buyer pursuant thereto. For the avoidance of doubt, and without limiting the generality of the foregoing, the Buyer shall not assert any such claim, or be entitled to indemnification from, the Special Master or any other Person.

(c)    The Buyer shall not be entitled to indemnification under this <u>Annex B</u> for any Loss if a court of competent jurisdiction shall have determined by final judgement that such Loss resulted from the bad faith, gross negligence or willful misconduct of the Buyer.

10.5    <u>Exclusive Remedy</u>.  The Buyer acknowledges and agrees that, from and after the Closing, its sole and exclusive remedy with respect to any and all claims relating to the ███████ and the ███████ shall be pursuant to the indemnification provisions set forth in this <u>Annex B</u>.  In furtherance of the foregoing, the Buyer acknowledges and agrees that no Person will have any other entitlement, remedy or recourse (whether at law or in equity, or whether in contract, tort, statute or otherwise) relating to the ███████ and ███████ and the Buyer hereby expressly waives and releases any such entitlement, remedy or recourse to the fullest extent permitted by Law.

10.6    <u>Escrow Release</u>.

(a)     The Buyer and the Special Master shall jointly instruct the Escrow Agent to release:

(i)     the amount available in the ██████ Indemnity Escrow Account (net of any amounts in the ██████ Indemnity Escrow Account subject to an outstanding claim by the Buyer, together with interest accrued thereon) to the Paying Agent in accordance with the terms of the Paying Agent Agreement and Sale Procedures Order at the end of the ████ Survival Period (the ██████ Indemnity Escrow Release Date"), to the extent funds are available in the Indemnity Escrow Account up to the amount of the ████ Cap; and

(ii)     the amount available in the ████████ Indemnity Escrow Account (net of any amounts in the Indemnity Escrow Account subject to an outstanding claim by the Buyer, together with interest accrued thereon) to the Paying Agent in accordance with the terms of the Paying Agent Agreement and Sale Procedures Order at the end of the ████ Survival Period (the ████████ Indemnity Escrow Release Date"), to the extent funds are available in the ████████ Indemnity Escrow Account up to the amount of the ████ Audit Cap.

(b)     In the event:

(i)     any portion of the ████ Indemnity Escrow Account is not released to the Paying Agent on the ████ Indemnity Escrow Release Date on account of a then-outstanding claim by the Buyer relating to the ████, then following the final determination of all such outstanding claims and, as applicable, payment in respect thereof, the Buyer and the Special Master shall promptly and in any event within five (5) Business Days, jointly direct the Escrow Agent to release the applicable amount remaining in the ████ Indemnity Escrow Account to the Paying Agent for distribution to the Claimholders in accordance with the terms of the Paying Agent Agreement and Sale Procedures Order; and

(ii)     any portion of the ████ Indemnity Escrow Account is not released to the Paying Agent on the ████ Indemnity Escrow Release Date on account of a then-outstanding claim by the Buyer relating to the ████, then in each case, following the final determination of all such outstanding claims and, as applicable, payment in respect thereof, the Buyer and the Special Master shall promptly and in any event within five (5) Business Days, jointly direct the Escrow Agent to release the applicable amount remaining in the ████ Indemnity Escrow Account to the Paying Agent for distribution to the Claimholders in accordance with the terms of the Paying Agent Agreement and Sale Procedures Order.

10.7     <u>Tax Treatment of Indemnification Payments</u>. All indemnification payments made under this Agreement shall be treated by the parties as an adjustment to the Closing Consideration for Tax purposes, unless otherwise required by Law.

10.8     <u>Defined Terms</u>. For purposes of this <u>Annex B</u>:

(a) ████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████

(b) ████████ Indemnity Escrow Amount" means an amount equal to ████████

(c) ████████ Survival Period" means the period of time from Closing until the earlier of ████████████████████████████████████████████████████████████████████

(d)    "Indemnity Escrow Account" means each of the deposit escrow account to be maintained with the Escrow Agent in accordance with the Escrow Agreement for purposes of the (i) indemnification related to the ████████████, for which the ████████ Indemnity Escrow Amount shall be paid by the Buyer into such account at Closing pursuant to Section 3.4(f) (the ████████ Indemnity Escrow Account"), and (ii) indemnification related to the ████████ for which the ████████████ Indemnity Escrow Amount shall be paid by the Buyer into such account at Closing pursuant to Section 3.4(g) (the ████████████ Indemnity Escrow Account"), in each case, as provided pursuant to this Annex B.

(e) ████████████████████████████████████████████████████████████████████████

(f) ████████████████ Indemnity Escrow Amount" means an amount equal to ████████

(g) ████████████ Survival Period" means the period of time from Closing until the earliest of ████████████████████████████████████████████████████████████████

(h)    "Survival Period" means, as applicable, either the ████████ Survival Period or the ████████████ Survival Period.



Exhibit A

Trust Structure Term Sheet

(Attached.)

**TERM SHEET**

This term sheet (including all exhibits, annexes, appendices, and/or schedules hereto, the "Term Sheet") summarizes the principal terms of a series of transactions (the "Escrow Transactions") pursuant to which the Special Master[1] and the Buyer (as defined below) will arrange for the creation of two escrow accounts into which all or a portion of the Closing Consideration of the sale of Petróleos de Venezuela, S.A.'s ("PDVSA") shares in PDV Holding, Inc. ("PDVH" and such shares, the "PDVH Shares", and PDVH and its subsidiaries, the "Company") pursuant to that certain Stock Purchase Agreement by and between the Special Master and the Buyer (as amended, restated, supplemented or otherwise modified from time to time, the "Purchase Agreement"), will be deposited in accordance with this Term Sheet. This Term Sheet shall be an exhibit to the Purchase Agreement and subject to the terms and conditions set forth therein.

This Term Sheet is not intended to be an exhaustive list of all terms and conditions which shall govern the Escrow Transactions and unless otherwise specified in this Term Sheet, the key terms set out below are qualified in their entirety by the final form of the binding documentation for the Escrow Transactions contemplated herewith (the "Definitive Documents"). To the extent any of the terms of this Term Sheet conflict with those in the final Definitive Documents, the terms of the Definitive Documents shall govern.

| Overview | |
|---|---|
| **Parties** | The following parties (each, a "Party" and, collectively, the "Parties") shall support the Escrow Transactions:<br><br>1. Robert B. Pincus, in his capacity as the Special Master for the United States District Court for the District of Delaware (the "Special Master"), pursuant to that certain Memorandum Order, dated April 13, 2021 [D.I. 258] issued in *Crystallex International Corporation* v. *Bolivarian Republic of Venezuela* (Case No. 1:17-mc-00151-LPS) (the "Crystallex Matter"), related to the sale of the PDVH Shares (the "Sale Transaction"); and<br><br>2. Amber Energy Inc. (the "Buyer") |
| **Transaction Overview** | The Escrow Transactions will be subject to the Definitive Documents and shall be implemented as follows:<br><br>1. Contemporaneous with the closing of the Sale Transaction (the "Closing"), the Buyer shall pay, or cause to be paid, into two separate and distinct escrow accounts: |

---

[1] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the *Sixth Revised Proposed Order (A) Establishing Sale and Bidding Procedures, (B) Approving Special Master's Report and Recommendation Regarding Proposed Sale Procedures Order, (C) Affirming Retention of Evercore as Investment Banker by Special Master and (D) Regarding Related Matters* (D.I. 481) (the "Sale Procedures Order") or the Purchase Agreement. Unless otherwise noted all docket references herein shall be made with respect to Crystallex Matter currently pending in the United States District Court for the District of Delaware (the "Court").

a. an amount of the Closing Consideration equal to the accrued claim of the PDVSA 2020 Bondholders as of the date of the Closing, subject to necessary adjustments determined by the Special Master and the Buyer to implement the Transactions (the "2020s Escrow Amount" and such account, the "2020s Escrow Account") for the purpose of resolving any claims related to the CITGO Holding Pledge;[2] and

b. an amount equal to the Closing Consideration *minus* the 2020s Escrow Amount (the "Attached Judgment Creditor Escrow Amount" and, together with the 2020s Escrow Amount and such other amounts described below, the "Escrow Amount", and the escrow account containing the Attached Judgment Creditor Escrow Amount, the "Attached Judgment Creditor Escrow Account").

2. The Attached Judgments will attach to the Escrow Amount in the same order as provided in the *Final Priority Order* [D.I. 1102] (the "Final Priority Order"), subject to the interest of the Buyer pursuant to this Term Sheet and the Definitive Documents, including the Trust Documentation.

3. Upon the Closing, the Special Master shall serve as, or otherwise appoint, subject to Buyer's reasonable consent and after consultation with the holders of Attached Judgments, a trustee (the "Trustee") to act for the benefit and at the direction of the holders of Attached Judgments.

4. The Trustee shall undertake to resolve the CITGO Holding Pledge and the Alter Ego Claims[3] in the best interests of the holders of Attached Judgments, which resolution may include settlement or litigation or any other means of resolution in the judgment of the Trustee, in each case subject to the terms of the Trust Documentation (as defined

---

[2] In the event the Special Master seeks, but is not granted, a declaratory ruling from a court of competent jurisdiction that the 2020s Escrow Amount is not sufficient to stop the accrual of interest on the PDVSA 2020s Bondholders' claims as of the date of deposit of the 2020s Escrow Amount into the 2020s Escrow Account, or such other date requested by the Special Master, then the Special Master and the Buyer shall determine whether a revised 2020s Escrow Amount is necessary. As soon as reasonably practicable after such determination, the Special Master shall advise the Court of any changes to the 2020s Escrow Amount, including by filing an amended Term Sheet if necessary.

[3] "Alter Ego Claims" means any claims asserted or that may be asserted against PDVH or any of its direct or indirect subsidiaries on the basis that PDVH or any of its direct or indirect subsidiaries is the alter ego of the Republic or PDVSA, or on any similar veil-piercing, successor or similar legal or equitable or other doctrine.

2

<table>
<tr><td></td><td>

below) and Buyer's consent in its reasonable discretion. Buyer and the Special Master shall mutually agree on the parameters of the Alter Ego Claims to be addressed in such resolution (the "<u>Ascertained Alter Ego Claims</u>").

5. The 2020s Escrow Account and the Attached Judgment Creditor Escrow Account shall each be subject to the joint control and direction of the Special Master and Buyer.

6. In the event of any post-Closing purchase price adjustment contemplated by the Purchase Agreement that would result in amounts that would otherwise be paid to the holders of Attached Judgments, including by release from the Adjustment Escrow or Special Master Expense Reserve, such amounts shall be deposited into the escrow account holding the Attached Judgment Creditor Escrow Amount; *provided*, that the deposit of the Special Master Expense Reserve into the Attached Judgment Creditor Escrow Amount shall not preclude the Special Master from seeking payment of such expenses from the Sale Process Parties and Additional Judgment Creditors pursuant to existing protocols.

7. The Trustee (or the Buyer, if appropriate, as determined by the Special Master and the Buyer) shall move to intervene in that certain action, *Petroleos de Venezuela S.A. v. MUFG Union Bank, N.A.*, C.A. No. 19-10023 (KPF) (S.D.N.Y.), pending before the United States District Court for the Southern District of New York and take such actions as deemed necessary by the Special Master and the Buyer, including to assert an interpleader claim seeking to deposit the 2020s Escrow Amount into the registry of the court, and seek the release of the CITGO Holding Pledge.

</td></tr>
<tr><td colspan="2" align="center">**Implementation**</td></tr>
<tr><td>

**Attached Judgment Creditor Escrow Release Conditions**

</td><td>

Upon satisfaction of each of the following conditions (and such conditions remaining satisfied):

1. the entry of a final order on appeal entered by the United States District Court for the District of Delaware or the Third Circuit Court of Appeals (the "<u>Third Circuit</u>"), and if any appellant seeks a writ of certiorari to the Supreme Court of the United States, such writ shall have been denied, affirming a decision denying, or providing an injunction against, all Ascertained Alter Ego Claims against PDVH and/or any of its direct or indirect subsidiaries;

2. either (a) the 2020 Notes Release Conditions (as defined below) or (b) the 2020 Notes Creditor Release Conditions (as defined below) are satisfied;

</td></tr>
</table>

<table>
<tr>
<td></td>
<td>

3. the Injunction Order (as defined below) shall not have been vacated or modified in a manner adverse to Buyer in Buyer's sole discretion, and the Third Circuit shall have affirmed the Injunction Order, and if any appellant seeks a writ of certiorari to the Supreme Court of the United States, such writ shall have been denied;

4. the Sale Order shall not have been vacated or modified in a manner adverse to Buyer in Buyer's sole discretion and, the Third Circuit shall have affirmed the Sale Order, and if any appellant sought a writ of certiorari to the Supreme Court of the United States, such writ shall have been denied; and

5. no Buyer Release Condition (as defined below) has occurred, (items (1)-(5) collectively, the "Attached Judgment Creditor Release Conditions"),

then the Attached Judgment Creditor Escrow Amount shall be released to the Trustee for distribution to holders of Attached Judgments in accordance with the *Final Priority Order* [D.I. 1102] (the "Final Priority Order" and, the release of the Attached Judgment Creditor Escrow Amount, the "Alter Ego Release").

The Buyer and the Special Master may jointly waive any of the foregoing conditions.

</td>
</tr>
<tr>
<td>

**2020 Notes Escrow Release Conditions to PDVSA 2020 Bondholders**

</td>
<td>

Upon satisfaction of each of the following conditions (and such conditions remaining satisfied):

1. the holders of the 8.5% Senior Secured Notes due 2020 issued by PDVSA (the "PDVSA 2020 Bondholders") receive a final, non-appealable order resulting in PDVH liability in respect of the CITGO Holding Pledge or otherwise;

2. the Attached Judgment Creditor Conditions are satisfied;

3. no Buyer Release Condition has occurred; and

4. the CITGO Holding Pledge (and any related claims against Buyer or any of its subsidiaries) has been released or is released concurrently upon satisfaction of the judgment, (items (1)-(4) collectively, the "2020 Notes Release Conditions"),

then, upon the Alter Ego Release, the 2020s Escrow Amount shall be released to the Trustee for the purpose of satisfying the judgment in favor of the PDVSA 2020 Bondholders.  In the event the 2020s Escrow Amount exceeds the judgment amount in favor of the

</td>
</tr>
</table>

4

| | |
|---|---|
| | PDVSA 2020 Bondholders, the Trustee shall distribute such excess proceeds to holders of Attached Judgments in accordance with the Final Priority Order.<br><br>The Buyer and the Special Master may jointly waive any of the foregoing conditions. |
| **2020s Notes Escrow Release Conditions to Holders of Attached Judgments** | Upon satisfaction of each of the following conditions (and such conditions remaining satisfied):<br><br>1. the satisfaction of the Attached Judgment Creditor Release Conditions;<br><br>2. a final, non-appealable resolution as to PDVH's liability (if any) to the PDVSA 2020 Bondholders such that the amount needed to satisfy such judgment is less than the amount of the 2020 Notes Escrow;<br><br>3. no Buyer Release Condition has occurred; and<br><br>4. the Equity Pledge has been released, or is released concurrently upon satisfaction of the judgment, on terms acceptable to the Buyer in its sole discretion (items (1)-(4) collectively, the "2020 Notes Creditor Release Conditions"),<br><br>then upon the Alter Ego Release, (x) the portion of the 2020 Notes Escrow necessary to satisfy such judgment shall be used to satisfy such judgment, and (y) the remaining portion shall be released to the Trustee for distribution to holders of attached claims in connection with the Final Priority Order.<br><br>The Buyer and the Special Master may jointly waive any of the foregoing conditions. |
| **Buyer Release Conditions** | Upon the occurrence of either of the following conditions:<br><br>1. The aggregate amount of all Alter Ego Claims that are found to exist by a final, non-appealable order exceed the remaining amount in the Attached Judgement Creditor Escrow Account;<br><br>2. The Republic or PDVSA obtain a final, non-appealable order of rescission, unwinding, damages or other remedy with respect to the Definitive Documents and the Sale Transaction thereby (item (1) or (2), a "Buyer Release Condition"), or<br><br>3. The accrued claim of the PDVSA 2020 Bondholders exceeds the remaining 2020s Escrow Amount. |

|  | then, at the election of the Buyer, and after ten (10) days' notice to the Special Master, the entirety of the Escrow Amount (including all interest thereon) shall be returned to the Buyer and the Buyer shall cooperate in good faith to transition the operations of the Company and, subject to receipt of the Escrow Amount, the Buyer shall return the PDVH Shares to be held by the Trustee in accordance with a further order of the Court (collectively, the "Unwind"). In connection with the implementation of the Unwind, the current Attached Judgments will attach to the returned PDVH Shares in the same order as provided in the Final Priority Order. |
|---|---|
|  | Buyer shall be entitled to retain all Net Operating Profits and Agreed Upon Permanent Working Capital Improvements[4] from Closing until the date of implementation of the Unwind (such period, the "Ownership Period") in accordance with Schedule 1 hereto. |
|  | During the period beginning on the Closing and ending on the earlier of (x) effectiveness of the Unwind and (ii) the satisfaction of each of the Attached Judgment Creditor Release Conditions and either (A) the 2020 Notes Release Conditions or (B) the 2020 Notes Creditor Release Conditions, the Buyer shall not be permitted to take, or cause the Company to sell, transfer or dispose of more than 50% of the aggregate assets of the Acquired Companies (taken as a whole) other than in the ordinary course of business, or a majority of voting stock of the Acquired Companies to an unaffiliated third party. The proceeds of any other sale of assets or the voting stock of any of the Acquired Companies, in each case, other than in the ordinary course of business and subject to customary exceptions (i) shall not constitute Net Operating Profits and Agreed Upon Permanent Working Capital Improvements, (ii) shall not be transferred, directly or indirectly, through dividend, distribution, or otherwise, to the Buyer or any other party that is not an Acquired Company, and (iii) may be reinvested into the business or used to pay *bona fide* third-party debt of the Acquired Companies. |
|  | Buyer and the Special Master will cooperate with respect to structuring any such Unwind in a tax efficient manner for the Parties, the Trustee, and the holders of Attached Judgments. |
| **Escrow Agent** | The Special Master shall, with the consent of Buyer, in its sole discretion, designate an escrow agent (the "Escrow Agent") who shall act (i) upon notice of automatic release triggers consistent with the Definitive Documentation and (ii) at the direction of the Special |

---

[4] "Net Operating Profits and Agreed Upon Permanent Working Capital Improvements" has the meaning set forth on Schedule 1 to this Term Sheet.

| | |
|---|---|
| | Master and, upon appointment, the Trustee.  If the Escrow Agent resigns or is removed, the replacement escrow agent shall be subject to the consent of the Special Master and Buyer. |
| **Other Material Terms** | |
| **Conditions Precedent to the Effective Date** | The effectiveness of the Escrow Transactions and the Definitive Documentation (the "<u>Effective Date</u>") shall be subject to the following conditions precedent and the conditions precedent in the Purchase Agreement: <br><br> 1.  each Definitive Document will have been executed and/or effectuated, will be in form and substance consistent with this Term Sheet, and any conditions precedent related thereto or contained therein will have been satisfied prior to or contemporaneously with the occurrence of the Effective Date or otherwise waived; <br><br> 2.  the Court shall have entered the Sale Order (as defined in the Purchase Agreement),and such Sale Order shall be in full force and effect and shall not be subject to a stay; <br><br> 3.  there is no Order or decision on the merits (including a ruling on summary judgment, or a decision after trial) by a court of competent jurisdiction that is unfavorable to the Buyer, the Company or any Company subsidiary, in a case by any potential creditor of the Bolivarian Republic of Venezuela or PDVSA that seeks to impose liability or seeks any remedy against the Buyer, the Company, or any of their assets on the basis that PDVH or any of its direct or indirect subsidiaries is the alter ego of the Republic or PDVSA, or on any similar veil-piercing, successor or similar legal or equitable or other doctrine), or otherwise seeks relief that is in conflict with the provisions of the Sale Order regarding such purported liabilities and related matters; <br><br> 4.  the Buyer shall have obtained all authorizations, consents, regulatory approvals, rulings, or documents that are necessary to implement and effectuate the Sale Transaction in accordance with the Purchase Agreement (and the other conditions in the Purchase Agreement are satisfied); and <br><br> 5.  an order enjoining the Gramercy Alter Ego Claims[5] is entered in a form acceptable to Buyer in its sole discretion (the "<u>Injunction Order</u>"), and has not been modified in a manner adverse to Buyer or the holders of Attached |

---

[5] "<u>Gramercy Alter Ego Claims</u>" means the claims that are the subject of the *Special Master's Motion to Enjoin the Alter Ego Claimants from Enforcing Claims Against the Republic or PDVSA by Collecting from PDVH or its Subsidiaries in Other Forums* [D.I. 1248].

|  | Judgments, other than holders of Attached Judgments asserting an Alter Ego Claim. |
|---|---|
| **Definitive Documents** | The Parties shall work in good faith to negotiate and execute any Definitive Documents necessary to implement the Escrow Transactions.  The Definitive Documents and the terms contained therein shall be subject to the consent of the Special Master and, unless indicated otherwise in this Term Sheet, the Buyer, in each case in his or its respective sole discretion, in all respects. |
| **Trustee; Transferability of Interests in Trust** | Prior to the Closing, the Special Master shall consult with the Buyer and the holders of Attached Judgments regarding (i) the identity and selection of the Trustee, who shall be subject to Buyer's reasonable consent, and (ii) the terms of any documentation necessary to establish a trust related to the Escrow Accounts, including the terms for direction and authority of the Trustee, which must be satisfactory to the Buyer and the Special Master (the "**Trust Documentation**"). After consultation, the appointment of the Trustee and execution of the Trust Documentation shall be subject to approval by the Court.

The Trust Documentation shall provide that, among other things, the Trustee must consult in good faith with the Buyer and the holders of Attached Judgments regarding the adjudication and resolution of matters related to the Alter Ego Claims and the PDVSA 2020 Bondholders.

For the avoidance of doubt, all Trust Documentation shall be consistent with the terms of the Definitive Documentation and any order entered by the Court in the Crystallex Action.

Any trust certificates issued to the Buyer and holders of Attached Judgments as part of the Trust Documentation shall be transferable subject to applicable securities laws. |
| **Limitation of Liability** | The Buyer agrees that in no circumstance shall the Special Master or his representatives be personally or otherwise liable for any amounts or obligations owed to the Buyer and the Special Master and his Advisors are acting as an arm of the Court and are entitled to judicial immunity in the performance of their duties. |
| **Confidentiality** | All Parties agree that the contents of this Term Sheet and the fact that negotiations are ongoing are confidential.  All Parties agree not to disclose, without the prior written consent of the Parties, such information to any third party. |
| **Costs and Expenses** | Each Party shall bear its own costs, fees and expenses incurred in connection with the negotiation, execution and consummation of the Escrow Transactions; *provided*, that all fees and expenses incurred by the Special Master, the Trustee, and the Escrow Agent shall be |

| | deemed "Transaction Expenses" pursuant to the Sale Procedures Order.<br><br>The Attached Judgment Creditor Escrow Amount shall be available to fund the expenses of the Special Master and the Trustee with respect to resolving the Escrow Transactions, the Alter Ego Claims and release of the CITGO Holding Pledge and matters related thereto. |
|---|---|
| **Tax Matters** | All Parties shall work in good faith to ensure that the Escrow Transactions contemplated herein are structured in a tax efficient manner for the Parties, the Trustee, and the holders of Attached Judgments (each as applicable). |
| **Informational Rights of the Special Master** | The Parties agree to provide the Special Master with information upon written request to facilitate the Special Master's implementation of the Escrow Transactions. |
| **Jurisdiction** | Each Party hereto irrevocably and unconditionally submits, for itself and its property, to the exclusive jurisdiction of the Court. Each of the Parties hereto agrees that a final judgment in any such action or proceeding shall, to the extent permitted by law, be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law. |

\* \* \* \* \*

## **Schedule 1**

**Net Operating Profits and Agreed Upon Permanent Working Capital Improvements** [6]

Upon an Unwind, Buyer shall be entitled to cash in an amount equal to a 15% IRR on the aggregate equity contributions of Buyer less any Net Operating Profit and Agreed Upon Permanent Working Capital Improvements actually received by Buyer as of the date of the Unwind.

Net Operating Profits and Agreed Upon Permanent Working Capital Improvements shall be calculated as follows: [●]

Buyer shall be permitted to make periodic distributions of Net Operating Profits and Agreed Upon Permanent Working Capital Improvements after delivery of an officer's certificate to the Trustee. The Trustee may challenge the Buyer's proposed calculation of Net Operating Profits and Agreed Upon Permanent Working Capital Improvements and, if necessary, seek leave of the Court to determine the appropriate calculation.  In the event the cumulative Net Operating Profits and Agreed Upon Permanent Working Capital Improvements during the Ownership Period are less than the aggregate amount of distributions to Buyer, then the difference of such amounts will be subtracted from the Escrow Amount returned to the Buyer upon an Unwind.

---

[6] To be set forth in Definitive Documentation to be filed prior to the Special Master seeking approval of the Sale Transaction and the Definitive Documents.

Exhibit B

Earn-Out Term Sheet

The Parties shall agree to an earn-out adjustment to the Closing Consideration payable in accordance with the principles and methodologies set forth on this Earn-Out Term Sheet.

- The 2025 Earn Out Amount (as defined below) is a number that is between $0 and $500 million, with $500 million being the maximum 2025 Earn Out Amount with respect to the Acquired Companies' fiscal year 2025.

- The 2026 Earn Out Amount (as defined below) is a number that is between $0 and $500 million, with $500 million being the maximum 2026 Earn Out Amount with respect to the Acquired Companies' fiscal year 2026.

- The "2025 Earn-Out Amount" is calculated as an amount equal to the minimum of (a) the product of (x) the Shortfall Factor (as defined below) and (y) $500 million and (b) 50% of the excess over $2.5 billion of EBITDA of the Acquired Companies in fiscal year 2025.

- The "2026 Earn-Out Amount" is calculated as an amount equal to the minimum of (a) the product of (x) the Shortfall Factor and (y) $500 million multiplied by (b) 50% of the excess over $2.5 billion of EBITDA of the Acquired Companies in fiscal year 2026.

- "Shortfall Factor" shall mean, calculated as of December 31, 2026, the minimum of (a) 1.0 and (b) the quotient of (i) (x) the maximum amount of proceeds payable with respect to the Attached Judgments of Claimholders senior in priority to the Assumed Claims minus (y) the proceeds actually payable with respect to the Attached Judgments of Claimholders senior in priority to the Assumed Claims pursuant to this Agreement, whether in the Escrow Accounts or distributed therefrom over (ii) $1,000,000,000.

- Payment of the 2025 Earn-Out Amount and the 2026 Earn-Out Amount, if any, shall occur after the availability of audited financial statements for the Acquired Companies for fiscal year 2026.

- Definition of EBITDA and other customary earn-out terms and conditions to be agreed by the Special Master and Buyer.

Execution Version

---

# COMPANY DISCLOSURE SCHEDULES

## TO THE

## STOCK PURCHASE AGREEMENT

by and among

## AMBER ENERGY INC.

and

ROBERT B. PINCUS,

solely in his capacity as the Special Master for the United States District Court for the District of Delaware

_____

Dated as of September 27, 2024

_____

**THIS COMPANY DISCLOSURE SCHEDULE IS SUBJECT TO REVISION BY THE SPECIAL MASTER AND/OR THE COMPANY PURSUANT TO SECTION 6.27 OF THE AGREEMENT AND MUST BE KEPT CONFIDENTIAL IN ACCORDANCE WITH THE TERMS OF THE CONFIDENTIALITY AGREEMENT ENTERED INTO BETWEEN THE RECIPIENT OF THIS DOCUMENT AND THE SPECIAL MASTER.**

---

# TABLE OF CONTENTS

Section 1.1(a)  Net Working Capital Principles.............................................................................2

Section 1.1(b)  Inventory Principles .............................................................................................1

Section 1.1(c)  Debt (Non-Current Liabilities).............................................................................7

Section 1.1(d)  Permitted Liens.....................................................................................................8

Section 1.1(e)   Procedures Summary .........................................................................................10

Section 4.2  Governmental Authorization...................................................................................11

Section 4.3  Non-Contravention..................................................................................................12

Section 4.5  Subsidiaries; Non-Controlled Entities ......................................................................7

Section 4.6(a)  Financial Statements ...........................................................................................11

Section 4.8  No Undisclosed Material Liabilities ........................................................................12

Section 4.9  Legal Proceedings....................................................................................................13

Section 4.10  Taxes ......................................................................................................................14

Section 4.11  Company Benefit Plans; Employment....................................................................17

Section 4.12  Compliance with Laws; Permits ............................................................................26

Section 4.13  Regulatory Matters.................................................................................................29

Section 4.14  Environmental Matters...........................................................................................31

Section 4.16  Material Contracts..................................................................................................33

Section 4.17  Intellectual Property and Data Privacy ..................................................................97

Section 4.19  Real Property........................................................................................................103

Section 4.20(a)  Government Contracts ......................................................................................109

Section 4.22  Business Relationships.........................................................................................110

Section 4.23  Related Party Transactions...................................................................................111

Section 4.24  Insurance ..............................................................................................................113

Section 6.1  Conduct of the Business Pending the Closing .......................................................128

Section 6.2  Access to Information.............................................................................................130

Section 6.3(f)  Regulatory Approvals; Third Party Consents ....................................................131

Section 6.6(a)  Indemnification, Exculpation and Insurance .....................................................132

Section 6.21(c)  Financial Statements ........................................................................................136

Section 6.24  Observation Committee ........................................................................................137

Section 7.1(e)  Conditions Precedent to Obligations of the Parties...........................................138

1

## COMPANY DISCLOSURE SCHEDULES

These Company Disclosure Schedules (these "Disclosure Schedules") are being delivered pursuant to and form part of that certain Stock Purchase Agreement (the "Agreement"), dated as of September 27, 2024 by and between Amber Energy Inc. ("Buyer") and Robert B. Pincus, solely in his capacity as special master (the "Special Master") for the Honorable Leonard P. Stark, United States District Court for the District of Delaware (the "Court"). Capitalized terms used but not defined herein shall have the meanings ascribed to such terms in the Agreement. The representations and warranties set forth in Article IV the Agreement are made and given subject to these Disclosure Schedules.

These Disclosure Schedules are being provided under an order of the Court in the Specified Litigation pursuant to the Sale Procedures Order. The Transactions are being compelled by the Court. Neither the Bolivarian Republic of Venezuela, nor its subsidiary entities, PDVSA or PDV Holding, Inc. (the "Company"), have approved or endorsed the Transactions as of the date of this Agreement.

Any matter or item disclosed on one Schedule or section of the Company Disclosure Schedules shall be deemed to have been disclosed on each other Schedule or section of the Company Disclosure Schedules in which it is reasonably apparent on the face of such disclosure that the information is required to be included in such other Schedule or section of the Company Disclosure Schedules. Disclosure of any item on any Schedule or section of the Company Disclosure Schedules shall not constitute an admission, indication, acknowledgment or representation that such item or matter is required to be disclosed, is material or would reasonably be expected to have a Company Material Adverse Effect. No disclosure on a Schedule or section of the Company Disclosure Schedules relating to a possible breach or violation of any Contract, Law or Order shall be construed as an admission, indication, acknowledgment or representation that a breach or violation exists or has actually occurred. The inclusion of any matter, information or item in any section of this Disclosure Schedule shall not be deemed to constitute an admission of any liability by the Special Master or the Company to any third party or otherwise imply, that any such matter, information or item is material or creates a measure for materiality for the purposes of the Agreement.

The references to any instrument, report or other document shall be deemed to include any and all exhibits, schedules, annexes and other attachments to such document (but shall not include any amendment, modification or supplement unless specifically identified and listed).

In no event shall the listing of any matter in these Disclosure Schedules be deemed or interpreted to expand the scope of the representations, warranties and/or covenants relating to the Special Master or the Company that are set forth in the Agreement.

Headings have been inserted herein for convenience of reference only and are not in lieu of their respective definitions in the Agreement, and will not affect the meaning or interpretation of these Disclosure Schedules.

**<u>Section 1.1(a)</u>**

**Net Working Capital Principles**

See attached.

## Section 1.1(a)

## NWC Principles

Any capitalized terms used in these NWC Principles and not otherwise defined herein shall have the meanings assigned to them in the Agreement.

1.  Net Working Capital and the components thereof shall be calculated in accordance with:

    (a)  The accounting categorizations, methods, practices, principles, policies and procedures (with consistent classifications, judgments, inclusions, exclusions, and valuation and estimation methodologies) set forth these NWC Principles (including the Annexes attached hereto);

    (b)  to the extent not inconsistent with paragraph 1(a) above, clause (a) of the defined term for "Agreed Principles" in the Agreement; and

    (c)  to the extent not inconsistent with paragraphs 1(a) and 1(b) above, GAAP as of the Lock Box Time and Measurement Time, as applicable.

For avoidance of doubt, paragraph 1(a) shall take precedence over paragraphs 1(b) and 1(c), and paragraph 1(b) shall take precedence over paragraph 1(c).

2.  Net Working Capital (and the components thereof) shall be calculated so as not to take into account the effects of any purchase accounting in connection with the Agreement or any of the Transaction Documents or other changes arising from or resulting as a consequence of the Transactions, including, for the avoidance of doubt: (a) actions taken by, intentions of or obligations of PDVSA or any of its Subsidiaries or any Affiliates at or following the Lock Box Time and the Measurement Time, as applicable, (b) the effect of change of control or ownership of the Acquired Companies, (c) the effects of any post-Closing reorganizations and (d) any financing undertaken by Buyer or any of its Affiliates or at the direction of Buyer or any of its Affiliates. For the avoidance of doubt, Net Working Capital (and the components thereof) shall be calculated based on the facts and circumstances as they exist as of the Lock Box Time and Closing Time, as applicable, and will exclude the effect of any act, development, change, decision or event occurring at or after the Closing.

3.  No liability that has not previously been characterized as a current liability in the unaudited consolidated balance sheet of the Acquired Companies as of December 31, 2024 (the "FY2024 Financial Statements") shall be classified as a current liability and no asset that has not previously been characterized as a long-term asset in the NWC Effective Date Example (as defined below) or the FY2024 Financial Statements shall be classified as a long-term asset, in each case, other than solely as a result of the passage of time.

4.  No new categories, classifications or types of costs or assets will be included as inventory, accounts receivables, prepaid expenses or other current assets in the determination of Net Working Capital that were not classified as such in the NWC Effective Date Example (as defined below) or the FY2024 Financial Statements.

5.   The provisions of these NWC Principles shall be interpreted so as to avoid double counting (whether positive or negative) of any item to be included in any calculation of Net Working Capital.

6.   Net Working Capital shall be prepared applying no minimum materiality limit.

7.   Net Working Capital shall be prepared as though the Acquired Companies are a going concern.

8.   [Reserved]

9.   As provided in the example calculation attached hereto as <u>Annex 1</u> (the "<u>NWC Lock Box Example</u>"), Lock Box Working Capital shall be calculated as follows:

   (a)  consolidated current assets of the Acquired Companies shall exclude (i) "cash and cash equivalents", (ii) "prepaid turnaround – current", (iii) "down payments to vendors" (iv) "prepaid catalyst – current", (v) "property, plant and equipment, net", (vi) "operating lease right of use assets", (vii) "non-current restricted cash", (viii) "investments in affiliates", (ix) "non-current prepaid turnaround, net" and (x) "non-current other assets";

   (b)  current liabilities of the Acquired Companies shall exclude (i) "current portion of pension & other post-retirement obligations", (ii)  "current portion of operating lease liability", (iii) "current portion of finance lease liability", (iv) "current portion of long-term debt", (v) "long-term debt", (vi) "operating lease liabilities", (vii) "finance lease obligations", (viii) "pension and other postretirement benefits", (ix) "other non-current liabilities", and (x) "deferred income taxes"; and

   (c)  accounts payable and accounts receivable shall be excluded from the calculation of Lock Box Working Capital and shall instead be reflected in the Lock Box Receivables Adjustment and Lock Box Payables Adjustment described below.

10.  As provided in the example calculation attached hereto as <u>Annex 2</u> (the "<u>NWC Effective Date Example</u>"), Effective Date Working Capital and Closing Date Working Capital shall be calculated as follows:

   (a)  consolidated current assets of the Acquired Companies shall exclude (i) "cash and cash equivalents", (ii) "prepaid turnaround – current", (iii) "prepaid catalyst – current", (iv) "property, plant and equipment, net", (v) "operating lease right of use assets", (vi) "non-current restricted cash", (vii) "investments in affiliates", (viii) "non-current prepaid turnaround, net" and (ix) "non-current other assets";

   (b)  current liabilities of the Acquired Companies shall exclude (i) "current portion of pension & other post-retirement obligations", (ii) "accrued interest debt and tax assessment", (iii) "current portion of operating lease liability", (iv) "current portion of finance lease liability", (v) "current portion of long-term debt", (vi) "long-term debt", (vii) "operating lease liabilities", (viii) "finance lease obligations", (ix) "pension and other postretirement benefits", (x) "other non-current liabilities", and (xi) "deferred income taxes"; and

(c) accounts payable and accounts receivable shall be included in the calculation of Effective Date Working Capital and Closing Date Working Capital.

11. The "Lock Box Receivables Adjustment" shall be calculated as follows:

$$Lock\ Box\ Receivables\ Adjustment = Delivered\ Receivables - \frac{Receivable\ Days * Annualized\ Revenue}{365}$$

Where:

"Annualized Revenue" means an amount equal to the product obtained by multiplying (a) Q4 Revenue by (b) 4.

"Delivered Receivables" means the aggregate amount of receivables of the Acquired Companies as of the Lock Box Time for the accounts listed on Annex 3 attached hereto.

"Receivable Days" means the greater of (a) 13.7 and (b) an amount equal to the product obtained by multiplying (x) the quotient obtained by dividing Delivered Receivables by Annualized Revenue by (y) 365.

"Q4 Revenue" means net sales of the Acquired Companies on a consolidated basis for the fiscal quarter ending December 31, 2024.

12. The "Lock Box Payables Adjustment" shall be calculated as follows

$$Lock\ Box\ Payables\ Adjustment = Delivered\ Payables - \left(\frac{Payable\ Days}{365} * Annualized\ COGS\right)$$

Where:

"Annualized COGS" means an amount equal to the product obtained by multiplying (a) Q4 COGS by (b) 4.

"Delivered Payables" means the aggregate amount of payables of the Acquired Companies as of the Lock Box Time for the accounts listed on Annex 3 attached hereto.

"Payable Days" means the lesser of (a) 13.5 and (b) an amount equal to the product of (x) 365 and (y) the quotient obtained by dividing Delivered Payables by Annualized COGS.

"Q4 COGS" means cost of sales of the Acquired Companies on a consolidated basis for the fiscal quarter ending December 31, 2024.

## Annex 1

## NWC Lock Box Example



## Annex 1

### NWC Lock Box Example (cont.)

Bridge to Target:

| Illustrative Calculation of Net Working Capital Target as of 3/31/2024 | | | | |
|---|---|---|---|---|
| $ in USD: | | | | *Target* |
| Account | Account # | 3/31/2024 B/S | (+/-) | *Working Capital* |
| **Net Working Capital Target:** | | | | |
| No Change to Seller Target | | | | |
| Federal & State Income Tax Receivable | | | | |
| Prepaid Insurance | | | | |
| Derivative Assets | | | | |
| **Current Assets** | | | | |
| No Change to Seller Target | | | | |
| Federal & State Income Tax Payable | | | | |
| Accrued Premium Insurance Liabilities | | | | |
| Derivative Liabilities | | | | |
| Accrued EPA Ethanol RIN Credits | | | | |
| **Current Liabilities** | | | | |
| | | | | |
| **Net Working Capital Target (SPA Definition)** | | | | |

## **Annex 2**

### **NWC Effective Date Example**

### (Attached)



PDV Holding
U.S. Dollars in Thousands

|  | | Illustrative Calculation | | |
|---|---|---|---|---|
|  | | Closing Date NWC | Effective Date NWC | |
| **ASSETS** | | | | |
| **CURRENT ASSETS:** | FCF Adjustment | 6/30/2024 | 3/31/2024 | Notes |
| Cash and cash equivalents | | | | Excluded |
| Current restricted cash | | | | Included |
| Accounts receivable, net | | | | Included |
| Due from affiliates | | | | Included |
| Inventories excluding material and supplies inventory value | | | | Included |
| Materials and supplies inventory value | | | | Included |
| Prepaid expenses and other | | | | |
|     Prepaid turnaround-current | | | | Excluded |
|     Downpayments to vendors | | | | Included |
|     Prepaid insurance | | | | Included |
|     Income tax receivable | | | | Included |
|     Prepaid catalyst-current | | | | Excluded |
|     State income tax receivable | | | | Included |
|     Derivative asset -RINs fixed price contracts | | | | Included |
|     Exchange-cleared derivative instruments | | | | Included |
|     Prepaid Licenses & Software | | | | Included |
|     Short-term customer incentives | | | | Included |
|     Prepaid Misc. (Including data services/subscriptions) | | | | Included |
|     Other | | | | Included |
| **Total current assets** | | | | |
| | | | | |
| **CURRENT LIABILITIES:** | | | | |
| Accounts payable | | | | Included |
| Payables to affiliates | | | | Included |
| Advances from affiliates | | | | Included |
| Taxes other than income | | | | Included |
| Other current liabilities (expand for more detail) | | | | |
|     RINs obligation | | | | Included |
|     Accrued refinery liability | | | | Included |
|     Derivative liabilities - exchange-cleared derivative instruments | | | | Included |
|     Accrued employee and retiree compensation/benefits | | | | Included |
|     Current portion of pension & other post-retirement obligations | | | | Excluded |
|     Federal income taxes | | | | Included |
|     Derivative liabilities -RINs fixed price contracts | | | | Included |
|     Accrued interest-debt & tax assessments | | | | Included |
|     Current portion of operating lease liability | | | | Excluded |
|     Current portion of finance lease liability | | | | Excluded |
|     Marketing advertising liability | | | | Included |
|     State income tax | | | | Included |
|     Shareholder support | | | | Included |
|     Accrued Premium Insurance Liabilities | | | | Included |
|     Current portion of long-term debt | | | | Excluded |
|     Other | | | | Included |
| Current portion of long-term debt | | | | Excluded |
| **Total current liabilities** | | | | |

**Annex 3**

**Delivered Receivables & Delivered Payables – Accounts**

(Attached)

| Illustrative Definition of Delivered Receivables and Delivered Payables at 3/31/2024 | | |
|---|---|---|
| $ in USD: | CITGO Account # | 3/31/2024 |
| Trade AR | TRADE | |
| **Delivered Receivables** | | |
| (/) Annualized Revenue | | |
| **Receivable Days** | | |
| | | |
| Trade AP | | |
| GR/IR - Crude Hydrocarbons | | |
| GR/IR - Other Hydrocarbons | | |
| Accrued Imported Feestock | | |
| Accrued Refined Products | | |
| **Delivered Payables** | | |
| (/) Annualized COGS | | |
| **Payable Days** | | |

## **Section 1.1(b)**

### **Inventory Principles**

See attached.

WEIL:\99901747\18\67816.0003

## Section 1.1(b)

## Inventory Principles

Any capitalized terms used in these Inventory Principles and not otherwise defined herein shall have the meanings assigned to them in the Agreement.

1. **Inventory**. "Inventory" means the categories of hydrocarbons set forth on Annex 1 owned by, or reflected on the balance sheet of, the Acquired Companies as of the applicable measurement time.

2. **Inventory Valuation**.

   a. The Buyer and the Special Master will mutually agree on a detailed schedule of the Inventory categories to include (i) sub-categories based on Inventory location and type/grade[1], and (ii) allocations of the Target Inventory amount by sub-category (such mutually agreed detailed schedule, the "Inventory Schedule").

   b. The Inventory Schedule shall include an allocation of a target Inventory amount equal to      bbls (the "Target Inventory") by sub-category. Such allocation shall be based on 3/31/2024 locational amounts provided by the Company with mutually agreed changes to reflect reasonable operational levels by location and grade. For the avoidance of doubt, the Target Inventory shall not be subject to change, and the allocations described in this paragraph shall only relate to allocations of such aggregate Target Inventory among sub-categories of Inventory.

   c. For each sub-category of Inventory set forth on the Inventory Schedule, the Buyer and the Special Master will mutually agree upon a pricing methodology based on an appropriate industry benchmark price adjusted for differences in location and quality which reflects a third party arm's length market price. These Inventory Principles will be updated to reflect, and "Lock Box Inventory Value" shall be defined in accordance with, such mutually agreed valuation methodologies.

3. **Inventory Measurement**.

As used in these Inventory Principles, "Location" refers to each location where Inventory is either stored, contained within, or on account for, at or with respect to (each, a "Location") including:
1. Owned Facilities
   a. Refineries
   b. Owned Terminals
   c. Owned Pipelines
2. Non Owned Facilities
   a. Third-Party Terminals
   b. Third-Party Pipelines

---

[1] Sub-categories to be consistent with the level of detail shown in tabs "1Q24 RP" and "1Q24 Crude" of the Company-provided Excel spreadsheet uploaded to the VDR ("2.5.19_1610A_1540_FIN_2024 inventory by location and product").

    c.  In-Transit
        i.  Vessels
        ii.  Railcars
        iii.  Trucks
    d.  Exchange Partner Imbalances

The procedures (below) are intended to provide global guidance for a one-time inventory measurement event (the "<u>Measurement Event</u>") at the Agreed Measurement Time (as defined below).  The procedures below are not exhaustive but instead refer to recognized industry standards methods.  For avoidance of doubt, the standards for measurements of the Hydrocarbon Inventory Amount are the recognized petroleum industry measurement standards for custody transfers.

The Special Master shall cause the Company to make all reasonable accommodations and expenditures for accurate inventory measurement of the Hydrocarbon Inventory Amount at the Agreed Measurement Time.  These accommodations shall include reasonable operational exceptions, plans for static tanks where practicable, temporary shutdowns of transfers where practicable, advance notices to counterparties, commercial arrangements, and the planned enlistment of significant outside resources such as the Field Inspector (as defined below).

The Special Master shall, or shall Cause the Company to, provide a table one month before the Agreed Measurement Time (the "<u>Inventory Procedure Table</u>") that itemizes:

- <u>Owned Facilities</u>:  The Inventory Procedure Table shall include the name of the responsible Company local operations manager, the identifier of each discrete volume location (e.g. tank number), the product name/crude quality specifications, method of measurement, independent inspector (or "N/A" if not applicable), projected time of measurement (Midnight or other), static or running.
  - o  The Special Master shall Cause the Company to cause the responsible local operations manager to update the Inventory Procedure Table one week prior to the Agreed Measurement Time.
  - o  In the Inventory Procedure Table, the Special Master shall Cause the Company to identify tanks in the Owned Facilities that utilize routine inventory measurement processes that meet industry custody transfer standards.  For example, if a tank utilizes a radar Gauge that meets industry measurement and calibration standards, this method will be adequate for the Measurement Event.  These routine processes should help minimize needs for manual tank gauging during the Measurement Event.
- <u>Non-Owned Facilities</u>:  The Inventory Procedure Table shall include the name of the responsible Company commercial manager, the identification of each discrete volume location, (e.g. third-party terminal, vessel), the product name/ quality specifications, and an estimate of the contractually defined volume at the Agreed Measurement Time.
  - o  The Special Master shall Cause the Company to cause the responsible commercial manager to update the Inventory Procedure Table one week prior to the Measurement Event to capture changes in commercial purchases and sales.

In this document:

- "inventory" may refer to either a physical volume (a noun), or the process of measuring and recording a volume (a verb, e.g. "idle tanks are inventoried").
- "Gauge" may refer to either a measurement instrument (a noun) or the process of measuring a volume (a verb, e.g. "to gauge a tank").
- "Midnight" refers to one minute after 11:59 PM on December 31, 2024; (or the same time on a different date).
- All sediment and water (S&W) should be excluded from the Hydrocarbon Inventory Amount.

<u>Procedures and Assumptions for Calculating the Hydrocarbon Inventory Amount</u>

1. Between the hours of [____] and [____] on [____], (the "<u>Agreed Measurement Time</u>"), all active tanks and vessels at each Location shall be Gauged, sampled and calculated following the latest applicable API Manual of Petroleum Measurement Standards (MPMS).
2. In the event that the applicable MPMS method cannot be followed, such as an equipment malfunction or an unsafe condition, the Field Inspector shall make an estimate of the volume using a reasonable secondary method and document this procedure in writing.
3. All liquid volumes shall be determined on a Net Standard Volume (NSV) basis, excluding free water, entrained S&W and Hard Bottoms and adjusted to a standard temperature of 60°F by the appropriate volume correction factor for the observed temperature and API gravity
4. Hydrocarbons belonging to third parties shall be identified and excluded from the Hydrocarbon Inventory Amount
5. The Hydrocarbon Inventory Amount shall include tank bottoms (excluding any hard bottoms)
6. No physical count or measurement of line fill or unit fill at the Refineries, Owned Terminals, and Owned Pipelines will be performed. Hydrocarbon Inventory Amounts in any process unit and any intra-unit, intra-facility and intra-terminal pipelines shall be furnished by the Company (and the Special Master shall Cause the Company to furnish such information) along with supporting documentation of the calculations.
7. Idle tanks shall be inventoried prior to the Agreed Measurement Time. Once inventoried, idle tanks shall remain inactive until the inventory of active tanks and vessels has been completed
8. Active tanks and vessels shall become static to the extent practicable and then manually Gauged as close to the Agreed Measurement Time as possible. The physical inventory of such tanks and vessels shall be obtained using the applicable procedures prescribed herein and must coincide with the "closing" of rack or pipeline meters where appropriate. For example, if a sales tank transfer is interrupted for the Measurement Event, any corresponding purchase, sales, or custody transfer meters should also report zero flow at the Agreed Measurement Time.
9. The volume of any Hydrocarbon located in any Third-Party Terminal, Third Party Pipeline or other off-site third party storage at the Agreed Measurement Time or otherwise in transit to a Location via pipeline at the Agreed Measurement Time will, in the case of a pipeline, be based on the ticketed volume of the batches as provided by the pipeline companies transporting or storing the Hydrocarbons, and, in the case of Hydrocarbons held at any Third-Party Terminal or other off-site third party storage, will be based on third party

3

volume statements. The volume of crude oil delivered via Third Party Pipelines, where such deliveries are made on a continuous basis, will be based on custody transfer tickets generated at the Agreed Measurement Time. Hydrocarbon receiving tanks shall be Gauged at the time the custody transfer tickets are generated. The volumes of any in-transit Hydrocarbons at the Agreed Measurement Time will be based on the transportation company's ticketed quantities when such Hydrocarbon is unloaded. If there is uncertainty with a volume of Third Party Pipeline Hydrocarbon or in-transit Hydrocarbons, an assessment will be determined when received at the Location. The determination of the amounts of Hydrocarbons exclusive of S&W shall be determined in accordance with the procedures outlined above.

10. Locations that may require being active during the Measurement Event because of the Location operation, or pipeline or vessel receipts; shall be identified in the Inventory Procedure Table. The parties will agree on an alternate means of measurement, net quantity determination, and sampling. While every reasonable effort should be made to enable a tank to be Gauged and sampled, at some point during the inventory process, if that is not possible, the parties shall determine and agree upon a process on a tank-by-tank basis that results in a representative net standard volume at the Agreed Measurement Time, and the best samples to be used as representative of the tank contents at the Agreed Measurement Time. Reasonable consideration shall be given to the same method of measurement, including tank strapping tables, used to determine the Acquired Companies' volume on the Agreed Measurement Time.

Independent Hydrocarbon Inspection Company(s)

A field inspector from an independent third party nationally recognized measurement service provider selected by the Buyer (the "Field Inspector") will perform all gauging, temperature determinations, sampling, and net volume calculations. Representatives of each of the Buyer, the Special Master and the Company shall have the right to participate in the physical measurement of the Hydrocarbons by observing the gauging, temperature readings, sampling, calculations, and product description and nomenclature testing. Unless otherwise determined and agreed by the parties, the Field Inspector shall perform the required testing in its laboratory (or conducted by the Field Inspector in the Location's laboratory) using the latest procedures and test methods published by the ASTM. In the event that the Field Inspector is unable to run a specific test in its laboratory, the parties shall agree upon another option, including but not limited to:

1. Causing the test to be conducted in the Location's laboratory;
2. Electing to use existing test results from the Location's laboratory; or
3. Electing to have the test performed by an independent laboratory acceptable to the parties.

4

Gauging Procedure

All gauging, sampling, and testing related to the determination of quality and quantity of the Hydrocarbon in each tank and elsewhere at each Location shall be done in accordance with the API-MPMS (latest revisions) or the ASTM standards (latest revisions), or if such standards are inapplicable, then by currently acceptable industry standards or procedures, or as otherwise agreed by the parties. The specific standards to be used shall be determined by the parties in conjunction with the Field Inspector at the time of selecting the Field Inspector.

Physical Measurement Procedures – Non-Pressurized Storage

A.  The following items will be measured, recorded, and/or obtained for each atmospheric tank:
    1.  Tank location, tank number and tank type;
    2.  Date and time inventory taken;
    3.  Hydrocarbon stored in the tank;
    4.  Reference Gauge height from the calibration table, if applicable;
    5.  Physically measured Gauge height;
    6.  Manual Hydrocarbon Gauge reported in feet, inches and fractions of an inch to the minimum increment of the tank calibration table, specifying outage or innage, and equivalent quantity in appropriate units;
    7.  Digital temperature readings will be determined in accordance with API-MPMS Chapter 7.3. If the tank contains more than ten (10) feet of Hydrocarbons, temperatures will be reported for the middle of the upper third of the tank, the middle of the tank, and middle of the lower third of the tank, all of which will be averaged for the composite tank temperature. If the tank contains ten (10) feet or less of Hydrocarbons, the temperature of the middle of the tank will be reported;
    8.  Free water on the bottom of the tank (will be determined by the Field Inspector's Ullage, Temperature and Interface (UTI) detector and two water cut pastes on a bob);
    9.  Hard Bottoms;
    10. Local automatic tank Gauge and temperature reading;
    11. Automatic tank Gauge, temperature and water reading registered on the computer; and
    12. Free water and Hydrocarbon levels will be determined in accordance with API-MPMS Chapter 3.1A. If the Field Inspector is unable to accurately determine the free water due to sludge, sediment, floor configuration relative to the Gauge point, or any other reason, manual bottom samples shall be obtained for testing and used in determining the tank NSV.
B.  If a tank is found to have an excessive level of Hard Bottoms during the gauging, it will be immediately made known to parties. If the quantity of the Hard Bottoms cannot be agreed between parties, arrangements will be made to conduct a Hard Bottom profile at a later time. The profile will be determined by taking additional gauges from the roof of the tank.
C.  Using the physical gauges, the Midnight report adjusted by the agreed upon Gauge and temperature delta and the tank's calibration table, the Field Inspector shall determine the total observed volume in each tank. The floating roof correction (if applicable) shall be applied and then the volume of S&W, free water, sediment, sludge and solids shall be subtracted to determine a corrected gross physical Hydrocarbon Inventory Amount. The appropriate API volume correction factor and the analytically determined S&W shall be applied to determine the net standard volume in each tank at 60°F.

5

D. As determined and agreed by the parties, all-level samples shall be drawn for laboratory testing and retain samples (the quantity of sample from each tank will depend on the required tests).

<u>Physical Measurement Procedures – Pressurized Storage</u>

A. The following items will be measured, recorded, and/or obtained for each pressurized storage tank or cavern:
   1. Tank or cavern location, tank number and tank or cavern type;
   2. Hydrocarbon stored in the tank or cavern;
   3. Date and time inventory taken;
   4. Manual Gauge of the Hydrocarbon reported in feet, inches, and eighths of an inch;
   5. Temperature readings from the applicable automatic temperature Gauge according to Chapter 7 of the API-MPMS; and
   6. Pressure readings from the tank's automatic pressure Gauge (where available).
B. The net standard pressurized Hydrocarbon volumes shall be determined at 60°F temperature, by combining the volume of liquid at standard conditions with the volume of vapor above the liquid in equivalent liquid units at standard condition, in accordance with API-MPMS Chapter 14.8.
   1. The volume of liquid at standard conditions is the liquid volume at tank conditions (from the tank capacity tables) times the volume correction factor for temperature and density; and
   2. The volume of vapor above the liquid in equivalent liquid units is the volume of vapor above the liquid (from the tank capacity tables) times the temperature and pressure ratios times the liquid volume per vapor factor for the Hydrocarbon in the tank/cavern.
C. The parties will make a list of LPG railcars or trucks present in the Locations. Location operations personnel will be consulted to verify which cars or trucks are full and which are empty at the Agreed Measurement Time. Railcar and truck seals may be inspected by each party to further validate railcars and trucks deemed as full. Reasonable efforts will be made to cease loading/unloading any railcars or trucks at the Agreed Measurement Time. The quantity of Hydrocarbon in railcars or trucks designated as full will be based on the bill of lading.

6

### Annex 1

## Inventory Categories

| Target Hydrocarbon Inventory (barrels) | | | |
|---|---|---|---|
| **Category** | **3/31/2024 Total Adjusted Inventory** | **% of Total** | **Illustrative Inventory Target Based on Adj. 3/31/2024 Total Adjusted Inventory Composition** |
| Petcoke | | | |
| Lubes | | | |
| Petrochemicals | | | |
| *Petrochemicals* | | | |
| *Solvents* | | | |
| Feedstocks/Industrial Products | | | |
| Light Products | | | |
| *Gasoline* | | | |
| *Ethanol* | | | |
| *Diesel / Biodiesel* | | | |
| *Jet / #1 Distillate* | | | |
| *Butane* | | | |
| *Transmix* | | | |
| *Exchanges* | | | |
| Crude | | | |
| **Target Hydrocarbon Inventory** | | | |

Inventory Categories to be further divided into sub-categories set forth on the Inventory Schedule.

## Section 1.1(c)

### Debt (Non-Current Liabilities)

See attached.

**Section 1.1(c)**

**Non-Current Liabilties**

"Debt" shall include the following sub-accounts of Non-Current Liabilities:



"Debt" shall not include the ████████████ sub-account in ████████████████

## Section 1.1(d)

## Permitted Liens

1.    Liens on metals and the right to receive metals arising out of any transaction in the Ordinary Course relating to the sale and/or use of precious metals or other catalyst necessary or useful for the operation of refinery assets of the Acquired Companies in the Ordinary Course; provided that such Liens do not encumber assets other than the catalyst and the related metals and the proceeds of the foregoing.

2.    Liens on equipment of the Acquired Companies granted in the Ordinary Course.

3.    Liens related to the Indenture, dated as of June 9, 2020, among CITGO Petroleum Corporation, as Issuer, the Guarantors party thereto and Argent Institutional Trust Company (as successor to TMI Trust Company), as Trustee (as supplemented by the First Supplemental Indenture, dated as of November 30, 2023, among CITGO Petroleum Corporation, as Issuer, the Guarantors party thereto and Argent Institutional Trust Company (as successor to TMI Trust Company), as Trustee) ("2020 Indenture").

4.    Liens securing the obligations under the Indenture, dated as of February 11, 2021, among CITGO Petroleum Corporation, as Issuer, the Guarantors party thereto and Argent Institutional Trust Company (as successor to TMI Trust Company), as Trustee (as supplemented by the First Supplemental Indenture, dated as of November 30, 2023, among CITGO Petroleum Corporation, as Issuer, the Guarantors party thereto and Argent Institutional Trust Company (as successor to TMI Trust Company), as Trustee) ("2021 Indenture").

5.    Liens securing the obligations under the Indenture, dated as of September 20, 2023 among CITGO Petroleum Corporation, as Issuer, the Guarantors party thereto and Argent Institutional Trust Company, as Trustee (as supplemented by the First Supplemental Indenture, dated as of November 30, 2023 among CITGO Petroleum Corporation, as Issuer, the Guarantors party thereto and Argent Institutional Trust Company, as Trustee) ("2023 Indenture").

6.    Liens securing the obligations under the Loan Agreement by and between Gulf Coast Industrial Development Authority, as Issuer, and CITGO Petroleum Corporation, dated as of April 1, 1995 ("1995 Loan Agreement").

7.    Liens securing the obligations under the Loan Agreement by and between Gulf Coast Industrial Development Authority, as Issuer, and CITGO Petroleum Corporation, dated as of April 1, 1998 ("1998 Loan Agreement").

8.    Liens securing the obligations under the Loan Agreement between Illinois Development Finance Authority, as Issuer, and CITGO Petroleum Corporation, dated as of June 1, 2002 ("2002 Loan Agreement").

9.    Liens securing the obligations under the Receivables Purchase Agreement, dated as of December 18, 2020, among CITGO AR2008 Funding Company, LLC, as the Seller,

WEIL:\99901747\18\67816.0003

CITGO Petroleum Corporation, as the Servicer, the various purchasers and purchaser agents from time to time party thereto, and Barclays Bank PLC, as Program Administrator (as amended by that certain Amendment No. 1 to Receivables Purchase Agreement, dated as of September 30, 2021, that certain Amendment No. 2 dated as of September 20, 2022, that certain Amendment No. 3 dated as of April 15, 2024 and that certain Amendment No. 4, dated as of September 5, 2024 (the "<u>Receivables Purchase Agreement</u>").

10.    Liens securing the obligations under the Purchase and Sale Agreement, dated as of December 18, 2022, among CITGO AR2008 Funding Company, LLC, as Purchaser, and CITGO Petroleum Corporation, as Seller (as amended by that certain Amendment No. 1 to Purchase and Sale Agreement, dated as of September 20, 2022 and that certain Amendment No. 2 to Purchase and Sale Agreement, dated as of April 15, 2024, the "<u>Purchase and Sale Agreement</u>").

11.    Pledges or deposits in the ordinary course of business in connection with (i) workers' compensation, unemployment insurance and other social security legislation, other than any Lien imposed by ERISA, and (ii) public utility services provided to the Acquired Companies.

12.    Deposits to secure the performance of bids, trade contracts and leases (other than Debt), and leases, statutory obligations, surety and appeal bonds, performance bonds and other obligations of a like nature, in each case, incurred in the Ordinary Course.

13.    Liens (i) of a collecting bank arising under Section 4-210 of the Uniform Commercial Code on items in the course of collection, and (ii) in favor of a banking institution arising as a matter of law encumbering deposits (including the right of setoff) that are customary in the banking industry.

14. Liens securing the obligations under one or more letters of credit facilities not to exceed an aggregate face amount of $100.0 million at any one time.

9

## **Section 1.1(e)**

### **Procedures Summary**

1.    See attached.

## SCHEDULE 1.1(E)

## PROCEDURES SUMMARY

Pursuant to Paragraphs 34 and 35 of the Sale Procedures Order, the Company is obligated to promptly cooperate and comply with certain of the Special Master's requests, including the Special Master's requests to provide information with respect to the potential bidders' due diligence review and to assist with the preparation of the Stock Purchase Agreement, dated September 27, 2024, by and between Amber Energy Inc. and Robert B. Pincus, solely in his capacity as the Special Master for the United States District Court for the District of Delaware (the "Agreement") and the Company Disclosure Schedule. Capitalized terms used but not defined herein have the meanings given to them in the Agreement.

FOR THE AVOIDANCE OF DOUBT, AND NOTWITHSTANDING ANYTHING TO THE CONTRARY CONTAINED IN ANY OF THE TRANSACTION DOCUMENTS, NONE OF THE ACQUIRED COMPANIES OR ANY OF ITS REPRESENTATIVES IS MAKING ANY REPRESENTATION OR WARRANTY IN ARTICLE IV OF THE AGREEMENT OR OTHERWISE, AND, BY EXECUTING THE AGREEMENT, EACH OF THE SPECIAL MASTER AND BUYER EXPRESSLY DISCLAIMS ANY SUCH REPRESENTATIONS OR WARRANTIES.

In connection with the Transactions, the Company has provided an extensive number of documents and a significant amount of information with respect to the Buyer's due diligence review, and such information was used in connection with the Company's review of Article IV (Representations Relating to the Company and the Special Master) of Jones Day's September 13, 2024 comments to the Agreement (the "September 13 Draft"), among other things.

The following provides an overview of the form and format in which the documents and information described above were provided to the Buyer and the Special Master or their respective Representatives:

- The Company provided due diligence materials to the Special Master's advisors, resulting in a bidder-facing electronic data room into which over 37,500 documents have been uploaded and made available to the Buyer and its Representatives;

- Company management, in coordination with its Representatives, participated in approximately 171 hours of expert calls, site tours or in-person meetings with Buyer and its Representatives;

- Company management responded, in writing, to over 900 written due diligence questions submitted by the Buyer and its Representatives and included in the Q&A Tracker as of the date hereof, in addition to numerous other due diligence questions submitted or asked by the Buyer and its Representatives;

- Company management reviewed the auction draft and each subsequent draft of the Agreement and provided material comments and input with respect thereto,

including but not limited to Article IV (*Representations Relating to the Company and the Special Master*) of Jones Day's September 13, 2024 comments to the Agreement, to the Special Master's counsel; and

- Company management prepared the initial Company Disclosure Schedules, reviewed and helped prepare each subsequent draft of the Company Disclosure Schedules, provided material comments and input with respect thereto and assisted in finalizing the Company Disclosure Schedules.

Members of the Company's management team, led by those individuals listed on **Schedule I** (collectively, the "Designated Managers" and each a "Designated Manager"), played an active role in each of the foregoing workstreams.

The Designated Managers solicited and received material input from other Company employees, including those employees listed on **Schedule II**, and external advisors to the Company with respect to each of the foregoing workstreams.

The information provided by the Company in due diligence and in the Company Disclosure Schedules was prepared in good faith with the assistance of in-house and outside counsel based on information provided by over 400 Company employees, including those individuals listed on **Schedule II**, which such information was available to them in the Ordinary Course or in connection with answering a diligence request. This procedures summary is qualified in its entirety by Section 4.27 of the Agreement, and nothing in this procedures summary will be deemed to constitute a representation or warranty of any kind.

FINAL 9/27/2024
Confidential

## Schedule I

## Designated Managers

1.
2.
3.
4.
5.

FINAL 9/27/2024
Confidential

## Schedule II

## Other Company Employees





**<u>Section 4.2</u>**

**Governmental Authorization**

1.    All notifications and information required to be filed or supplied pursuant to the HSR Act.

2.    All notifications and information required to be filed or supplied in Chile with the Fiscalía Nacional Económica.

3.    All notifications and information required to be filed or supplied in ███ with the competent ███ merger control authority.

11

## Section 4.3

### Non-Contravention



WEIL:\99901747\18\67816.0003



13



14



15



16



17

WEIL:\99901747\18\67816.0003



18



19

**Section 4.5**

**Subsidiaries; Non-Controlled Entities**

**(a)**

| Entity | Jurisdiction | Authorized Equity Interests | Outstanding Equity Interests |
|---|---|---|---|
| ███ ████████ | ███ | █ | ██████████████ |
| ████ ██████████ | ███ | ██████ | █████████████████ |
| ██████████ | ███ | █ | ██████████████ |
| ██████████ | ███ | █ | █████████████ |
| ████████ | ███ | █████ | █ ████████████ |
| █████████ | ███ | █████ | █ ██████████ |
| ████████ | ███ | █████ | █ █████████████ |
| ████████ | ███ | █ | █ ██████████████ |
| ████████ | ███ | █ | █ ██████████████ |
| ██████████ | ███ | █████ | ███████████████ |
| █████████ | ███ | █ | ██████████████ |
| ████████ | ██ | █████ | █████████████ |
| ████████ | ██ | █████ | █████████████ |
| ████████ | ███ | █████ | █████████ |
| █████████ | ███ | █ | ██████ █████ |
| █████████ | ███ | █ | ███████████ |

| Entity | Jurisdiction | Authorized Equity Interests | Outstanding Equity Interests |
|---|---|---|---|
| | | | ███ |
| ███ | ███ | ███ | ███ |
| ███ | ███ | █ | ███ |
| ███ | ██ | ███ | ███ |
| ███ | ██ | | ███ |
| ███ | ██ | ███ | ███ |
| ███ | ██ | ███ | ███ |
| ███ | ██ | █ | ███ |
| ███ | ██ | ███ | ███ |
| ███ | ██ | | ███ |
| ███ | ██ | ███ | ███ |
| ███ | ██ | █ | ███ |
| ███ | █ | █ | ███ |
| ███ | ██ | ███ | ███ |
| ███ | ██ | ███ | ███ |

8

| Entity | Jurisdiction | Authorized Equity Interests | Outstanding Equity Interests |
|---|---|---|---|
|  |  |  | ███████ |
| ██ | ███ | ███ | ███████ |
| ████ | ████ | ███ | █████ |
| ███ | ████ | ███ | █████ |
| ████ | ███ | █ | █████ |
| ████ | ██ | █████ | █████ |
| ███ | ███ | █ | █████ |
| ████ | ███ | ███ | █████ |
| ███ | ███ | ███ | █████ |
| ████ | ███ | ███ | █████ |

**(b)**

    1. 

**(d)**

    1. 

9

2. 

| Pledgor(s) | Pledged Equity | % Owned / Type of Interest | Certificate No. |
|---|---|---|---|
| ████████ | ████████ | ████████ | ██ |
| ████████ | ████ | ████ | ████████ |
| ████████ | ████ | ████████ | ████ |
| ████████ | ████ | ████████ | ██ |
| ████████ | ████ | ████ | ████████ |
| ████████ | ████ | ████ | ████████ |
| ████ | ████████ | ████████ | ██ |
| ██ | ████████ | ████████ | ████████ |
| ████████ | ████████ | ████████ | ████████ |
| ████████ | ████ | ████ | ████████ |

WEIL:\99901747\18\67816.0003

## <u>Section 4.6(a)</u>

**Financial Statements**

1.    The Financial Statements located at #1.6.1 in the "Horizon" virtual data room hosted by Datasite is incorporated herein by reference.

WEIL:\99901747\18\67816.0003

**Section 4.8**

**No Undisclosed Material Liabilities**

**(b)**

1.  [Company to provide in Supplemental Schedules pursuant to Section 6.27 of the Agreement.]

**Section 4.9**

**Legal Proceedings**

1. The Revision 18 Material Litigation and Claims located at #1.15.1.1.19 in the "Horizon" virtual data room hosted by Datasite is incorporated herein by reference. For the avoidance of doubt, nothing in Revision 18 Material Litigation and Claims will be deemed to broaden the scope of the representations and warranties included in <u>Article IV</u> of the Agreement and no Person makes any representations or warranties with respect to any detail provided beyond the scope of such representations and warranties.

2. Items listed on <u>Section 4.12</u> of the Company Disclosure Schedules are incorporated herein by reference. To the extent other matters described, listed or contained within the Company Disclosures Schedules are "Legal Proceedings" they are incorporated as if set forth fully herein.

WEIL:\99901747\18\67816.0003

**Section 4.10**

**Taxes**

(c)

| COMPANY | STATE | TAX TYPE 1 | TAX TYPE 2 | TAX PERIODS AUDITED | STATUTE OF LIMITATIONS WAIVER |
|---|---|---|---|---|---|
| ███ | ██ | ███ | ████ | ██ | █ |
| ███ | ██ | ██ | ████ | ██ | █ |
| ██ | ██ | ██ | ███ | ████ | █ |
| ███ | ██ | | ███ | █ | █ |
| ███ | █ | ██ | | ██ | |
| ███ | █ | ██ | | ██ | ███ |
| ███ | | ██ | ██ | ██ | ███ |
| ███ | | ██ | ███ | ██ | █ |
| ███ | █ | ██ | ██ | ██ | █ |
| ██ | | ██ | | ██ | |
| ██ | | ██ | ██ | ██ | █ |
| ███ | █ | ██ | ██ | ██ | ██ |
| ███ | █ | ██ | █ | | ██ |
| ██ | █ | ███ | █ | ██ | ███ |
| ██ | █ | ███ | █ | ██ | ███ |

| COMPANY | STATE | TAX TYPE 1 | TAX TYPE 2 | TAX PERIODS AUDITED | STATUTE OF LIMITATIONS WAIVER |
|---|---|---|---|---|---|
| ███ | ▪ | ███ | ▪ | ██ | ▪ |
| ███ | ▪ | ███ | ▪ | ██ | ███ |
| ███ | ▪ | ███ | ▪ | ██ | ███ |
| ███ | ▪ | ███ | ▪ | ██ | ▪ |
| ███ | ▪ | ███ | ▪ | ██ | |
| ▪ | ▪ | ███ | ▪ | ██ | ███ |

**(d)**

| COMPANY | STATE | TAX TYPE 1 | TAX TYPE 2 | TAX PERIODS AUDITED | STATUTE OF LIMITATIONS WAIVER |
|---|---|---|---|---|---|
| ███ | ▪ | ███ | ▪ | ██ | ███ |
| ███ | ▪ | ███ | ▪ | ██ | ███ |
| ███ | ▪ | ███ | ███ | ██ | ███ |
| ███ | ▪ | ███ | ▪ | ██ | ███ |
| ███ | ▪ | ███ | ▪ | ███ | ███ |
| ███ | ▪ | ███ | ▪ | ██ | ███ |
| ███ | ▪ | ███ | ▪ | ██ | ███ |
| ▪ | ▪ | ▪ | ▪ | ██ | ███ |

**(e)**

WEIL:\99901747\18\67816.0003

1. ████████████████████████████████████████
   ████████████████████████████████

## Section 4.11

### Company Benefit Plans; Employment

(a)



WEIL:\99901747\18\67816.0003



WEIL:\99901747\18\67816.0003



WEIL:\99901747\18\67816.0003



WEIL:\99901747\18\67816.0003



(c)

1.

    a.

    b.

(e)

(iii)

1.

2.

3.

(iv)

1.

(g)

1.

2.

3.

    a.

21

b.

4.

5.

**(h)**

1.

2.

**(j)**

**(i), (iii)**

1.

2.

3.

4.

5.

6.

7.

8.

9.

10.

**(ii)**



22

**(iv)**



**(n)**

Collectively, the "Collective Bargaining Agreements":

WEIL:\99901747\18\67816.0003



24



**(s)**

1.

**<u>Section 4.12</u>**

**Compliance with Laws; Permits**

**(a)**

1.

2.

3.

    a.

    b.

    c.

    d.

    e.

    f.

4.

5.

6.

7.

26





**(b)**

1.

2.

## Section 4.13

### Regulatory Matters

**(a)**

    1.

**(b)**

**(ii)**

    1.

    2.

**(c)**

    1.

    2.

29

WEIL:\99901747\18\67816.0003

## Section 4.14

### Environmental Matters

1.

2.

3.  **Updates to the SLR Report**:

    a.

    b.

    c.

WEIL:\99901747\18\67816.0003



d.

e.

WEIL:\99901747\18\67816.0003

## Section 4.16

### Material Contracts

**(a)**

**(i)**

**(A)**

**(ii)**

**(A)**

WEIL:\99901747\18\67816.0003



WEIL:\99901747\18\67816.0003



WEIL:\99901747\18\67816.0003



WEIL:\99901747\18\67816.0003

**(C)**



**(iii)**

*Procurement:*

*Terminals & Pipelines:*



*Specialty Products:*

WEIL:\99901747\18\67816.0003

**(iv)**





**(v)**

**(vi)**

**(viii)**

Collectively, the "Indemnification Agreements":





WEIL:\99901747\18\67816.0003



WEIL:\99901747\18\67816.0003



WEIL:\99901747\18\67816.0003



WEIL:\99901747\18\67816.0003



WEIL:\99901747\18\67816.0003



47



WEIL:\99901747\18\67816.0003



WEIL:\99901747\18\67816.0003



WEIL:\99901747\18\67816.0003



51



WEIL:\99901747\18\67816.0003



WEIL:\99901747\18\67816.0003



WEIL:\99901747\18\67816.0003



55



**(ix)**

*Product Supply & Trading:*

*Specialty Products:*

*Terminals & Pipelines:*

*Lubricant:*



**(x)**

*Procurement:*





*Product Supply & Trading:*

*Specialty Products:*





*Lubricants:*

*Logistics:*



WEIL:\99901747\18\67816.0003



*Lemont Refinery:*



*Lake Charles Refinery:*

*Crude Supply & Trading:*

*Corpus Christi Refinery:*

WEIL:\99901747\18\67816.0003



**(xi)**

*Product Supply & Trading:*

*Specialty Products:*



*Terminals & Pipelines:*







































*Lubricants:*







*Light Oils Marketing:*















**Section 4.17**

**Intellectual Property and Data Privacy**

**(a)**

**(i)**

| Country | Serial No. | Filing Date | Patent No. | Issue Date | Title | Owner |
|---------|-----------|-------------|-----------|-----------|-------|-------|
| ███ | ████ | ████ | ████ | ████ | ██████ | ████ |
| ████ | ████ | ███ | ███ | ███ | ████████ | ████ |

**(ii)**

1.   ████████████████

**(iii)**

| Domain Name | Account Holder |
|-------------|----------------|
| ████ | ██████ |
| ██████ | ██████ |
| ██████ | ██████ |
| ██████ | ██████ |
| ██████ | ██████ |
| ████ | ██████ |
| ███████ | ██████ |
| ██ | ██████ |
| ███ | ██████ |
| ██ | ██████ |
| ███ | ██████ |
| ████ | ██████ |
| ███ | ██████ |
| ██ | ██████ |
| ███ | ██████ |
| ██ | ██████ |
| ████ | ██████ |
| ███ | ██████ |
| ████ | ██████ |

97



**(iv)**

| Registration No. | Registration Date | Title | Owner |
|---|---|---|---|
| ███████ ███ | ████ ██ | ████████ ███ | ███████ ██ |
| ███ ███ | ███ | ████ ██ | ████ ██ |
| ██████ | ███ | ████ ██ | ████ █ |
| ████ | ███ | ████ ██ | ████ █ |
| ████ ██ | ███ ██ | ███████ ██ | ████ ██ |
| ████ ██ | ███ ██ | ████ ██ ██ | ████ ██ |
| ████ ██ | ███ ██ | ████ ██ | ████████ █ |
| ████ ██ | ███ ██ | ████ █ ██ | ████████ █ |



| Registration No. | Registration Date | Title | Owner |
|---|---|---|---|
| | | ████████ | |
| ████ | ███ | ████████<br>████ | ████████<br>████ |

**(e)**

1.  

**CITGO PETROLEUM CORPORATION**
**TRADEMARK STATUS REPORT**
September 1, 2024



Highly Confidential Pursuant to Order of the United States District Court for the District of Delaware,
Crystallex International Corp. v. Bolivarian Republic of Venezuela
Clean Team Evaluation Material



Highly Confidential Pursuant to Order of the United States District Court for the District of Delaware,
Crystallex International Corp. v. Bolivarian Republic of Venezuela
Clean Team Evaluation Material



Highly Confidential Pursuant to Order of the United States District Court for the District of Delaware,
Crystallex International Corp. v. Bolivarian Republic of Venezuela
Clean Team Evaluation Material



Highly Confidential Pursuant to Order of the United States District Court for the District of Delaware,
Crystallex International Corp. v. Bolivarian Republic of Venezuela
Clean Team Evaluation Material



Highly Confidential Pursuant to Order of the United States District Court for the District of Delaware,
Crystallex International Corp. v. Bolivarian Republic of Venezuela
Clean Team Evaluation Material



Highly Confidential Pursuant to Order of the United States District Court for the District of Delaware,
Crystallex International Corp. v. Bolivarian Republic of Venezuela
Clean Team Evaluation Material



Highly Confidential Pursuant to Order of the United States District Court for the District of Delaware,
Crystallex International Corp. v. Bolivarian Republic of Venezuela
Clean Team Evaluation Material



Highly Confidential Pursuant to Order of the United States District Court for the District of Delaware,
Crystallex International Corp. v. Bolivarian Republic of Venezuela
Clean Team Evaluation Material



Highly Confidential Pursuant to Order of the United States District Court for the District of Delaware,
Crystallex International Corp. v. Bolivarian Republic of Venezuela
Clean Team Evaluation Material



Highly Confidential Pursuant to Order of the United States District Court for the District of Delaware,
Crystallex International Corp. v. Bolivarian Republic of Venezuela
Clean Team Evaluation Material



Highly Confidential Pursuant to Order of the United States District Court for the District of Delaware,
Crystallex International Corp. v. Bolivarian Republic of Venezuela
Clean Team Evaluation Material



Highly Confidential Pursuant to Order of the United States District Court for the District of Delaware,
Crystallex International Corp. v. Bolivarian Republic of Venezuela
Clean Team Evaluation Material



Highly Confidential Pursuant to Order of the United States District Court for the District of Delaware,
Crystallex International Corp. v. Bolivarian Republic of Venezuela
Clean Team Evaluation Material



Highly Confidential Pursuant to Order of the United States District Court for the District of Delaware,
Crystallex International Corp. v. Bolivarian Republic of Venezuela
Clean Team Evaluation Material



Highly Confidential Pursuant to Order of the United States District Court for the District of Delaware,
Crystallex International Corp. v. Bolivarian Republic of Venezuela
Clean Team Evaluation Material



Highly Confidential Pursuant to Order of the United States District Court for the District of Delaware,
Crystallex International Corp. v. Bolivarian Republic of Venezuela
Clean Team Evaluation Material



Highly Confidential Pursuant to Order of the United States District Court for the District of Delaware,
Crystallex International Corp. v. Bolivarian Republic of Venezuela
Clean Team Evaluation Material



Highly Confidential Pursuant to Order of the United States District Court for the District of Delaware,
Crystallex International Corp. v. Bolivarian Republic of Venezuela
Clean Team Evaluation Material



Highly Confidential Pursuant to Order of the United States District Court for the District of Delaware,
Crystallex International Corp. v. Bolivarian Republic of Venezuela
Clean Team Evaluation Material



Highly Confidential Pursuant to Order of the United States District Court for the District of Delaware,
Crystallex International Corp. v. Bolivarian Republic of Venezuela
Clean Team Evaluation Material



Highly Confidential Pursuant to Order of the United States District Court for the District of Delaware,
Crystallex International Corp. v. Bolivarian Republic of Venezuela
Clean Team Evaluation Material



Highly Confidential Pursuant to Order of the United States District Court for the District of Delaware,
Crystallex International Corp. v. Bolivarian Republic of Venezuela
Clean Team Evaluation Material



Highly Confidential Pursuant to Order of the United States District Court for the District of Delaware,
Crystallex International Corp. v. Bolivarian Republic of Venezuela
Clean Team Evaluation Material



Highly Confidential Pursuant to Order of the United States District Court for the District of Delaware,
Crystallex International Corp. v. Bolivarian Republic of Venezuela
Clean Team Evaluation Material



Highly Confidential Pursuant to Order of the United States District Court for the District of Delaware,
Crystallex International Corp. v. Bolivarian Republic of Venezuela
Clean Team Evaluation Material



Highly Confidential Pursuant to Order of the United States District Court for the District of Delaware,
Crystallex International Corp. v. Bolivarian Republic of Venezuela
Clean Team Evaluation Material



Highly Confidential Pursuant to Order of the United States District Court for the District of Delaware,
Crystallex International Corp. v. Bolivarian Republic of Venezuela
Clean Team Evaluation Material



Highly Confidential Pursuant to Order of the United States District Court for the District of Delaware,
Crystallex International Corp. v. Bolivarian Republic of Venezuela
Clean Team Evaluation Material



Highly Confidential Pursuant to Order of the United States District Court for the District of Delaware,
Crystallex International Corp. v. Bolivarian Republic of Venezuela
Clean Team Evaluation Material



Highly Confidential Pursuant to Order of the United States District Court for the District of Delaware,
Crystallex International Corp. v. Bolivarian Republic of Venezuela
Clean Team Evaluation Material



Highly Confidential Pursuant to Order of the United States District Court for the District of Delaware,
Crystallex International Corp. v. Bolivarian Republic of Venezuela
Clean Team Evaluation Material



Highly Confidential Pursuant to Order of the United States District Court for the District of Delaware,
Crystallex International Corp. v. Bolivarian Republic of Venezuela
Clean Team Evaluation Material



Highly Confidential Pursuant to Order of the United States District Court for the District of Delaware,
Crystallex International Corp. v. Bolivarian Republic of Venezuela
Clean Team Evaluation Material



Highly Confidential Pursuant to Order of the United States District Court for the District of Delaware,
Crystallex International Corp. v. Bolivarian Republic of Venezuela
Clean Team Evaluation Material



Highly Confidential Pursuant to Order of the United States District Court for the District of Delaware,
Crystallex International Corp. v. Bolivarian Republic of Venezuela
Clean Team Evaluation Material



Highly Confidential Pursuant to Order of the United States District Court for the District of Delaware,
Crystallex International Corp. v. Bolivarian Republic of Venezuela
Clean Team Evaluation Material



Highly Confidential Pursuant to Order of the United States District Court for the District of Delaware,
Crystallex International Corp. v. Bolivarian Republic of Venezuela
Clean Team Evaluation Material



Highly Confidential Pursuant to Order of the United States District Court for the District of Delaware,
Crystallex International Corp. v. Bolivarian Republic of Venezuela
Clean Team Evaluation Material



Highly Confidential Pursuant to Order of the United States District Court for the District of Delaware,
Crystallex International Corp. v. Bolivarian Republic of Venezuela
Clean Team Evaluation Material



Highly Confidential Pursuant to Order of the United States District Court for the District of Delaware,
Crystallex International Corp. v. Bolivarian Republic of Venezuela
Clean Team Evaluation Material



Highly Confidential Pursuant to Order of the United States District Court for the District of Delaware, Crystallex International Corp. v. Bolivarian Republic of Venezuela Clean Team Evaluation Material



Highly Confidential Pursuant to Order of the United States District Court for the District of Delaware,
Crystallex International Corp. v. Bolivarian Republic of Venezuela
Clean Team Evaluation Material



Highly Confidential Pursuant to Order of the United States District Court for the District of Delaware,
Crystallex International Corp. v. Bolivarian Republic of Venezuela
Clean Team Evaluation Material



Highly Confidential Pursuant to Order of the United States District Court for the District of Delaware,
Crystallex International Corp. v. Bolivarian Republic of Venezuela
Clean Team Evaluation Material



Highly Confidential Pursuant to Order of the United States District Court for the District of Delaware,
Crystallex International Corp. v. Bolivarian Republic of Venezuela
Clean Team Evaluation Material



Highly Confidential Pursuant to Order of the United States District Court for the District of Delaware,
Crystallex International Corp. v. Bolivarian Republic of Venezuela
Clean Team Evaluation Material



Highly Confidential Pursuant to Order of the United States District Court for the District of Delaware,
Crystallex International Corp. v. Bolivarian Republic of Venezuela
Clean Team Evaluation Material



Highly Confidential Pursuant to Order of the United States District Court for the District of Delaware,
Crystallex International Corp. v. Bolivarian Republic of Venezuela
Clean Team Evaluation Material



Highly Confidential Pursuant to Order of the United States District Court for the District of Delaware,
Crystallex International Corp. v. Bolivarian Republic of Venezuela
Clean Team Evaluation Material



Highly Confidential Pursuant to Order of the United States District Court for the District of Delaware,
Crystallex International Corp. v. Bolivarian Republic of Venezuela
Clean Team Evaluation Material



Highly Confidential Pursuant to Order of the United States District Court for the District of Delaware,
Crystallex International Corp. v. Bolivarian Republic of Venezuela
Clean Team Evaluation Material



Highly Confidential Pursuant to Order of the United States District Court for the District of Delaware,
Crystallex International Corp. v. Bolivarian Republic of Venezuela
Clean Team Evaluation Material



Highly Confidential Pursuant to Order of the United States District Court for the District of Delaware,
Crystallex International Corp. v. Bolivarian Republic of Venezuela
Clean Team Evaluation Material



Highly Confidential Pursuant to Order of the United States District Court for the District of Delaware,
Crystallex International Corp. v. Bolivarian Republic of Venezuela
Clean Team Evaluation Material



Highly Confidential Pursuant to Order of the United States District Court for the District of Delaware,
Crystallex International Corp. v. Bolivarian Republic of Venezuela
Clean Team Evaluation Material



Highly Confidential Pursuant to Order of the United States District Court for the District of Delaware,
Crystallex International Corp. v. Bolivarian Republic of Venezuela
Clean Team Evaluation Material



Highly Confidential Pursuant to Order of the United States District Court for the District of Delaware,
Crystallex International Corp. v. Bolivarian Republic of Venezuela
Clean Team Evaluation Material



Highly Confidential Pursuant to Order of the United States District Court for the District of Delaware,
Crystallex International Corp. v. Bolivarian Republic of Venezuela
Clean Team Evaluation Material



Highly Confidential Pursuant to Order of the United States District Court for the District of Delaware,
Crystallex International Corp. v. Bolivarian Republic of Venezuela
Clean Team Evaluation Material



Highly Confidential Pursuant to Order of the United States District Court for the District of Delaware, Crystallex International Corp. v. Bolivarian Republic of Venezuela Clean Team Evaluation Material



Highly Confidential Pursuant to Order of the United States District Court for the District of Delaware,
Crystallex International Corp. v. Bolivarian Republic of Venezuela
Clean Team Evaluation Material



Highly Confidential Pursuant to Order of the United States District Court for the District of Delaware,
Crystallex International Corp. v. Bolivarian Republic of Venezuela
Clean Team Evaluation Material



Highly Confidential Pursuant to Order of the United States District Court for the District of Delaware,
Crystallex International Corp. v. Bolivarian Republic of Venezuela
Clean Team Evaluation Material



Highly Confidential Pursuant to Order of the United States District Court for the District of Delaware,
Crystallex International Corp. v. Bolivarian Republic of Venezuela
Clean Team Evaluation Material



Highly Confidential Pursuant to Order of the United States District Court for the District of Delaware,
Crystallex International Corp. v. Bolivarian Republic of Venezuela
Clean Team Evaluation Material



Highly Confidential Pursuant to Order of the United States District Court for the District of Delaware, Crystallex International Corp. v. Bolivarian Republic of Venezuela Clean Team Evaluation Material



Highly Confidential Pursuant to Order of the United States District Court for the District of Delaware,
Crystallex International Corp. v. Bolivarian Republic of Venezuela
Clean Team Evaluation Material



Highly Confidential Pursuant to Order of the United States District Court for the District of Delaware,
Crystallex International Corp. v. Bolivarian Republic of Venezuela
Clean Team Evaluation Material



Highly Confidential Pursuant to Order of the United States District Court for the District of Delaware,
Crystallex International Corp. v. Bolivarian Republic of Venezuela
Clean Team Evaluation Material



Highly Confidential Pursuant to Order of the United States District Court for the District of Delaware,
Crystallex International Corp. v. Bolivarian Republic of Venezuela
Clean Team Evaluation Material

## Section 4.19

### Real Property

(a)



WEIL:\99901747\18\67816.0003







**(b)**



| | | | |
|---|---|---|---|
| ██████████ | ████████████ | ██████████ | ██ |
| ████████ | ██████████ | ██████████ | ██ |
| ████████ | ██████████ | ██████████ | ██ |

### Section 4.20(a)

**Government Contracts**



## Section 4.22

### Business Relationships

1. [redacted]

**Section 4.23**

**Related Party Transactions**





112

## Section 4.24

### Insurance

1.  █████████

WEIL:\99901747\18\67816.0003

| Insured | Coverage Group | Coverage | Policy Effective | Policy Expiration | Insurer Group | Insurer Company | Policy # |
|---------|----------------|----------|------------------|-------------------|---------------|-----------------|----------|
| ███ | ██ | ████ █ | █ | █ | ██ | ███████ | ████ |
| | ██ | ███ ██ | █ | █ | ██ | █████ | ███ |
| | ██ | ████ ██ | █ | █ | | ████ | ████ |
| | ██ | █████ | █ | █ | ██ | █████ | ████ |
| ███ | ██ | █████ █ | █ | █ | ██ | ███ ██ | ████ |
| | ██ | ████ ██ | █ | █ | ██ | ███████ | ████ |
| | ██ | ████ ██ | █ | █ | ██ | ███████ | |
| | ██ | ████ ██ | █ | █ | ██ | ███████ | ████ |
| | ██ | ████ █ | █ | █ | ██ | ███████ | ████ |
| | ██ | █████ | █ | █ | ██ | ███████ | ████ |
| | ██ | █████ | █ | █ | ██ | ████████ | █████ |
| | ██ | ████ █ | █ | █ | ██ | ████████ | ████ |
| | ██ | ████ █ | █ | █ | ██ | ████████ | ████ |
| | ██ | ████ ██ | █ | █ | ██ | ████████ | ████ |
| | ██ | ████ ██ | █ | █ | ██ | ████████ | ████ |
| | ██ | ████ █ | █ | █ | ██ | ███████ | ████ |
| | ██ | ████ █ | █ | █ | █ | ██████ | ████ |
| | ██ | ████ █ | █ | █ | ██ | ██████ | ████ |

WEIL:\99901747\18\67816.0003

| | | | | | | | |
|---|---|---|---|---|---|---|---|

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| | | | | | | | |

| ███ | ███ | ███ | █ █ | █ | ███ | █████ | ███ |
|---|---|---|---|---|---|---|---|
| ███ | ████ | █████ | █ █ | █ | ██ | ████████ | █████ |
| ███ | ███ | ███ | █ █ | █ | ██ | ████████ | ██ |
| ███ | ██ | ████ | █ █ | █ | ██ | ███████ | █████ |
| ███ | ██ | ████ | █ █ | █ | ██ | ███████ | ████ |
| ███ | ██ | ███ | █ █ | █ | ███ | ██████ | ████ |
| ███ | ██ | ███ | █ █ | █ | ███ | ███████ | ████ |
| ███ | ██ | ███ | █ █ | █ | ██ | ██████ | ████ |
| ███ | ██ | ███ | █ █ | █ | ███ | ██████ | █████ |
| ███ | ██ | ███ | █ █ | █ | ███ | █████ | ████ |
| ███ | ██ | ███ | █ █ | █ | ███ | █████ | ████ |
| ███ | ██ | ███ | █ █ | █ | ██ | ████ | ███ |
| ███ | ██ | ███ | █ █ | █ | ███ | █████ | ███ |
| ███ | ████ | ████ | █ █ | █ | ███ | █████ | ████ |
| ███ | ████ | ██████ | █ █ | █ | ██ | █████ | ████ |
| ███ | ████ | ████ | █ █ | █ | ██ | █████ | ████ |
| ███ | ███ | ███ | █ █ | █ | ██ | ██████ | ████ |
| ███ | ███ | ███ | █ █ | █ | ██ | ██████ | ████ |
| ███ | ████ | ███ | █ █ | █ | ███ | ███████ | ████ |

█████████

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| ████ | ███▼ | ████ | ██ ██ | ███ | ████████ | ████ | |
| ███████ | ███ | ██████ | | ████ | ███████ | ████ | |
| ███████ | ███ | ██████ | | ██ | ██████ | ███ | |
| ███████ | ███ | ██████ | | █ | ████████ | ███ | |
| ███████ | ███ | █████ | | ████ | ██████ | ████ | |
| ███████ | ███ | █████ | | ██ | ███████ | ████ | |
| ███████ | ███ | █████ | | ███ | ████████ | ████ | |
| ███████ | ███ | █████ | | ███ | ████████ | ████ | |
| ███████ | ███ | █████ | | | ███████ | █████ | |
| ██████ | | █████ | | | ████████ | █████ | |
| ██████ | ███ | █████ | | ███ | ███████ | ███ | |
| ███████ | ███ | ██████ | | ██ | ████████ | ████ | |
| ███████ | ███ | █████ | | ████ | ██████ | ████ | |
| ███████ | ███ | ██████ | | ██ | ███████ | █████ | |
| ███████ | ███ | ██████ | | ███ | ████████ | ████ | |
| ███████ | ███ | █████ | | ██ | ███████ | ████ | |
| ███████ | ███ | ██████ | | ██ | ████████ | ▄ | |
| ██████ | ██ | ██████ | | ██ | ████ | ████ | |





| ███ | ███ | ███ | █ █ | ██ | ████ | ██ |
|-----|-----|-----|-----|-----|------|-----|
| ███████ | ███ | ███ | █ █ | ████ | ████████ | ████ |
| ███████ | ███ | ███ | █ █ | ██ | █████████ | ████ |
| ████████ | ███ | ██████ | █ █ | ██ | ██████ | ████ |
| ██████ | ███ | ██████ | █ █ | █ | ███████ | ████ |
| ██████ | ███ | ██████ | █ █ | ██ | ██████ | ████ |
| ██████ | ███ | ██████ | █ █ | ██ | ████████ | ████ |

## Section 6.1

### Conduct of the Business Pending the Closing

**(a)**

**(b)**

**(iii)**



**(v)**

(A) – (C)



(D)

    1.  None.

(E)

    1.  None.

**(x)**



**(xi)**

128

**(xiii)**



**(xv)**

(ii)

(iv)

Project Horizon































































































































































Confidential Information – Subject to Confidentiality Order Entered by the United States District Court for the District of Delaware, Crystallex International Corp. v. Bolivarian Republic of Venezuela

**CITGO Petroleum Corporation**
June 4, 2024
Page 2









## Section 6.2

### Access to Information

**(a)**

    1.

**<u>Section 6.3(f)</u>**

**<u>Regulatory Approvals;  Third Party Consents</u>**



WEIL:\99901747\18\67816.0003

**<u>Section 6.6(a)</u>**

**Indemnification, Exculpation and Insurance**

**(1)**



132



WEIL:\99901747\18\67816.0003



134

██     ███████

**(2)**

██     █████████████

## Section 6.21(c)

**Financial Statements**

1. The Financial Statements located at #1.6.1 in the "Horizon" virtual data room hosted by Datasite is incorporated herein by reference.

136

Project Horizon

## <u>Section 6.24</u>

### Observation Committee

**(a)**

Buyer's Representatives:

1. [Buyer to update as of the Trust Structure Effective Date]

2. [Buyer to update as of the Trust Structure Effective Date]

3. [Buyer to update as of the Trust Structure Effective Date]

Company's Representatives:



137

## Section 7.1(e)

**Conditions Precedent to Obligations of the Parties**

1.    Further to a pre-closing notification, the Fiscalía Nacional Económica of Chile shall have (i) approved the Transaction or (ii) the applicable waiting period expired without the Fiscalía Nacional Económica taking a decision and the transaction shall have been deemed to be approved by virtue of the applicable legislation.

2.    Further to a pre-closing notification, the competent ▆▆▆▆ merger control authority shall have (i) approved the Transaction or otherwise issued a favorable written resolution or (ii) issued a no objection letter or equivalent after the applicable waiting period expired without the competent authority taking a decision and the transaction is deemed to be approved by virtue of the applicable legislation. This obligation may be waived by Buyer after consultation with ▆▆▆▆ counsel (which may include a formal or informal consultation with the competent ▆▆▆▆ merger control authority) if the Transaction, in Buyer's sole discretion, is deemed to not require clearance in ▆▆▆▆.

138

EXECUTION VERSION
Confidential

---

**BUYER DISCLOSURE SCHEDULES**

**TO THE**

**STOCK PURCHASE AGREEMENT**

by and among

**AMBER ENERGY INC.**

and

ROBERT B. PINCUS,

solely in his capacity as the Special Master for the United States District Court for the District of Delaware

_____

Dated as of September 27, 2024

_____

**THESE BUYER DISCLOSURE SCHEDULES ARE SUBJECT TO REVISION BY BUYER AT ANY TIME PRIOR TO SIGNING AND MUST BE KEPT CONFIDENTIAL IN ACCORDANCE WITH THE TERMS OF THE CONFIDENTIALITY AGREEMENT ENTERED INTO BETWEEN THE RECIPIENT OF THIS DOCUMENT AND BUYER.**

---

## TABLE OF CONTENTS

Section 1.1(a)  Equity Financing Sources .......................................................................................... 2

Section 1.1(b)  Knowledge of the Buyer ............................................................................................ 3

Section 5.3  Governmental Authorization ........................................................................................ 4

1

## BUYER DISCLOSURE SCHEDULES

These Buyer Disclosure Schedules (these "Disclosure Schedules") are being delivered pursuant to and form part of that certain Stock Purchase Agreement (the "Agreement"), dated as of September 27, 2024 by and between Amber Energy Inc. ("Buyer") and Robert B. Pincus, solely in his capacity as special master (the "Special Master") for the Honorable Leonard P. Stark, United States District Court for the District of Delaware (the "Court"). Capitalized terms used but not defined herein shall have the meanings ascribed to such terms in the Agreement. The representations and warranties set forth in Article V the Agreement are made and given subject to these Disclosure Schedules.

These Disclosure Schedules are being provided under an order of the Court in the Specified Litigation pursuant to the Sale Procedures Order.  The Transactions are being compelled by the Court. Neither the Bolivarian Republic of Venezuela, nor its subsidiary entities, PDVSA or PDV Holding, Inc. (the "Company"), have approved or endorsed the Transactions as of the date of this Agreement.

Any matter or item disclosed on one Schedule or section of the Buyer Disclosure Schedules shall be deemed to have been disclosed on each other Schedule or section of the Buyer Disclosure Schedules in which it is reasonably apparent on the face of such disclosure that the information is required to be included in such other Schedule or section of the Buyer Disclosure Schedules. Disclosure of any item on any Schedule or section of the Buyer Disclosure Schedules shall not constitute an admission, indication, acknowledgment or representation that such item or matter is required to be disclosed, is material, or would or would reasonably be expected to (i) have a material adverse effect on the ability of the Buyer to perform its obligations under the Agreement or (ii) otherwise prevent or materially delay the consummation of the Transactions. No disclosure on a Schedule or section of the Buyer Disclosure Schedules relating to a possible breach or violation of any Contract, Law or Order shall be construed as an admission, indication, acknowledgment or representation that a breach or violation exists or has actually occurred. The inclusion of any matter, information or item in any section of this Disclosure Schedule shall not be deemed to constitute an admission of any liability by the Buyer to any third party or otherwise imply, that any such matter, information or item is material or creates a measure for materiality for the purposes of the Agreement.

The references to any instrument, report or other document shall be deemed to include any and all exhibits, schedules, annexes and other attachments to such document (but shall not include any amendment, modification or supplement unless specifically identified and listed).

In no event shall the listing of any matter in these Disclosure Schedules be deemed or interpreted to expand the scope of the representations, warranties and/or covenants relating to the Buyer that are set forth in the Agreement.

Headings have been inserted herein for convenience of reference only and are not in lieu of their respective definitions in the Agreement, and will not affect the meaning or interpretation of these Disclosure Schedules.

1

## **Section 1.1(a)**

### **Equity Financing Sources**



## __Section 1.1(b)__

**Knowledge of the Buyer**



## Section 5.3

**Governmental Authorization**

1.    All notifications and information required to be filed or supplied pursuant to the HSR Act.

2.    All notifications and information required to be filed or supplied in Chile with the Fiscalía Nacional Económica.

3.    All notifications and information required to be filed or supplied in ▮▮▮ with the competent ▮▮▮ merger control authority.