IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

CRYSTALLEX INTERNATIONAL
CORPORATION,

        Plaintiff,

  v.

BOLIVARIAN REPUBLIC
OF VENEZUELA,

        Defendant.

C.A. No. 17-mc-151-LPS

**CRYSTALLEX INTERNATIONAL CORPORATION'S RESPONSE TO
COMMENTS ON THE COURT'S "INCLINATIONS" REGARDING SALE PROCESS**

OF COUNSEL:

Robert L. Weigel
Jason W. Myatt
Rahim Moloo
GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue
New York, New York 10166
Tel: (212) 351-4000
Fax: (212) 351-4035

Miguel A. Estrada
Lucas C. Townsend
Adam M. Smith
GIBSON, DUNN & CRUTCHER LLP
1700 M Street, N.W.
Washington, D.C. 20036
Tel: (202) 955-8500
Fax: (202) 467-0539

Dated: December 3, 2024

Raymond J. DiCamillo (#3188)
Jeffrey L. Moyer (#3309)
Travis S. Hunter (#5350)
RICHARDS, LAYTON & FINGER, P.A.
One Rodney Square
920 North King Street
Wilmington, Delaware 19801
Tel: (302) 651-7700
Fax: (302) 651-7701

*Attorneys for Plaintiff*

## INTRODUCTION

Pursuant to the Court's Order, D.I. 1433, Crystallex submits this brief in response to the comments on the sale process and this Court's "inclinations" submitted by the Seven Creditors (D.I. 1439),[1] Red Tree (D.I. 1440), the 2020 Bond Entities (D.I. 1441),[2] Conoco (D.I. 1442), Amber Energy (D.I. 1444), and the Special Master (D.I. 1445).

The proposals submitted to the Court confirm Crystallex's view that the sale process should expeditiously proceed to a live auction or, alternatively, a Stalking Horse Bid process including a Topping Period, either of which can, if properly designed, be concluded in or around the first quarter of 2025. Where the submissions differ, Crystallex submits that the Court's decision on the path forward should be guided by the desire to close a sale in a timely manner and the requirement under Delaware law to sell "as many … shares of PDVH as are necessary to satisfy the judgment of Crystallex (and of any other judgment creditor whose judgment may be added to the sale)." D.I. 234, at 36. Certainty and expedition of closing and the cash value to creditors upon closing are of paramount importance in designing further bid procedures and in evaluating the bids submitted under either proposed sale process.

The lesson of the sale process to-date is that any viable sale requires clarity regarding what bid terms are acceptable and what the Special Master should, and should not, do with respect to

---

[1] OI European Group B.V. ("OIEG"); Northrop Grumman Ship Systems, Inc., f/k/a Ingalls Shipbuilding, Inc., and now known as Huntington Ingalls Incorporated ("Huntington Ingalls"); ACL1 Investments Ltd., ACL2 Investments Ltd., and LDO (Cayman) XVIII Ltd. (together, "ACL"); Rusoro Mining Limited; Gold Reserve Inc.; Tidewater Investment SRL and Tidewater Caribe S.A. (together, "Tidewater"); and Valores Mundiales, S.L. and Consorcio Andino, S.L. (together "Valores") (collectively, the "Seven Creditors"). *See* D.I. 1439.

[2] The group of creditors representing holders of more than two-thirds of PDVSA 2020 Bonds (the "2020 Bondholders") and the Trustee and Collateral Agent for the PDVSA 2020 Bonds (collectively, the "2020 Bond Entities"). *See* D.I. 1441.

the bids going forward. Thus, Crystallex submits that ground rules and terms, including standardized evaluation terms, are necessary to avoid the conflicts and issues with bids that have been submitted thus far. Such a process would be consistent with the fact that this Court is overseeing an execution sale, not a consensual merger and acquisition transaction, and that execution sales are almost invariably conducted on an "as is, where is" basis. As discussed herein, in an attempt to address concerns that might arise outside of the execution context, many of the proposals submitted by other entities stray into issues that are beyond the scope of this Court's and the Special Master's mandate, such as the legitimacy of the 2020 Bondholders' claims and how to treat them. The 2020 Bondholders do not hold an Attached Judgment. Thus, their claims (which remain to be litigated) against some of PDVH's assets are just one of many factors that bidders should price into their bids. The same is true of the claims by others who may bring claims against PDVH or its subsidiaries. And there is no point in further discussion of the two Amber proposals, which Amber acknowledges are no longer "operative" in light of the inclinations disclosed by the Court's Order of November 20, 2024. *See* D.I. 1444, at 2. Amber of course will be entitled to submit a new bid in accordance with whatever procedures the Court adopts following the hearing currently scheduled for December 13, 2024.

It is also clear that bids should not be contingent on the occurrence or non-occurrence of events external to this Court's sale process. For example, to participate in a live auction or be selected as a winning bid in any scenario, bidders must submit final transaction documents with no financing contingencies (and with financing commitments of a sufficient length to permit the transaction to close after any required regulatory or judicial review). Since this is an "as is" judgment execution sale, there should be no opportunity for the buyer to withdraw after closing, except

in the event OFAC does not license the sale[3] or, potentially, in the case of a "material adverse event," as that concept is narrowly and strictly construed in the relevant caselaw.[4]

Below, Crystallex comments on the specific proposals submitted in response to the Court's "inclinations" order. At bottom, it is clear that all parties desire clarity that allows the Court to select a winning bid in early 2025. It is also clear that implementing the Sale Process Parties', Special Master's, and other entities' suggestions will require some modifications to the Court's Sale Procedures Order. It is Crystallex's hope that such amendments can be quickly ordered and implemented, to the extent that they are not largely established at the upcoming December 13, 2024 status conference.

**CRYSTALLEX'S RESPONSES TO COMMENTS ON THE COURT'S INCLINATIONS**

    **I.   The Path Forward: Live Auction or a Topping Period**

The opening briefs responding to this Court's inclinations on how the sale process should proceed generally accord with Crystallex's position that there are two potential paths forward: (1) a live auction for the sale of the PDVH Shares in which qualified bidders will be entitled to participate; or (2) the designation of a Stalking Horse Bid that would be granted appropriate bid protections, followed by a Topping Period in which other bidders have an opportunity to submit superior bids that generate more proceeds for the Attached Judgment Creditors. D.I. 1438, at 5-7. The Special Master recommends the live-auction option, urging the Court to "cast aside the concept of a stalking horse bidder and bidder protections entirely, and proceed with a streamlined sale process." D.I. 1445, at 2. The Seven Creditors and Red Tree, on the other hand, recommend that

---

[3] The Special Master should be directed to consider the likelihood of obtaining an OFAC license for a given transaction as a key factor in his evaluation of the competing bids.

[4] To be clear, litigation risk concerning any action other than this proceeding should not qualify as a material adverse event or change. Rather, any material adverse change provision should be limited to truly exceptional changes in the business operations of PDVH.

3

the Court order the Special Master to designate a Stalking Horse Bid that (after an opportunity for objections) would be granted bid protections and then would be subject to being surpassed during a Topping Period. D.I. 1439, at 7-8; D.I. 1440, at 5.

Crystallex submits that, properly implemented, both a live auction and the designation of a Stalking Horse Bid followed by a Topping Period provide reasonable frameworks for the sale process. Each option can solicit competitive bids to satisfy the Attached Judgments that the sale process is designed to enforce. Both processes, if appropriately designed, would be consistent with the requirement of Delaware law that "[s]o many of the shares … may be sold at public sale to the highest bidder, as shall be sufficient to satisfy the debt[s]" owed to the Attached Judgment Creditors. 8 *Del. C.* § 324(a). Whichever option this Court adopts, it is critical that either the live auction or Stalking Horse and Topping Period process be designed to efficiently and expeditiously determine the "highest bidder" under Delaware law.

While Crystallex believes, consistent with the Special Master's recommendation, that proceeding with a live auction rather than a Stalking Horse Bid and Topping Period could be the more effective path, there are a few aspects of the Special Master's specific proposal that are neither appropriate nor necessary in the context of a live auction. The Special Master proposes that, after opening the data room (which Crystallex believes should have occurred already, and the Special Master suggests could occur "almost immediately after the scheduled December 13, 2024 status conference"), bidders would have 90 days to submit final bids. D.I. 1445, at 2, 7. The Special Master would then determine which bidders are qualified bidders entitled to participate in the auction and designate a so-called "Base Bid" that would serve as the floor for bidding at the auction and would be entitled to "an expense reimbursement" if topped during the auction. *Id.* at 7.

4

But there is no need to give bidders *three months* after the reopening of the data room to submit bids. As the Special Master notes, this "has been an already extensively marketed sale process," D.I. 1445, at 2, and the odds of new bids from entities that are strangers to the sale process or unfamiliar with the asset are extremely remote. Thus, the potential bidders can update any necessary diligence in far less time, likely within 45 days. Nor is it necessary to select a "Base Bid." If the bid procedures make clear that this is an "as is" sale on largely fixed terms, as Crystallex believes they should, it is far from clear what value a baseline bid would provide in a live-auction scenario given that bidders are fully capable of expressing the price they are willing to pay in both their bids and at the live auction without the establishment of a base bid as a floor.[5]

If the Court decides to proceed with a live auction, all that is required is that the Special Master determines which bidders are qualified to participate in the auction. Bidders are qualified if: (1) they have complied with this Court's Bid Procedures in the Sale Procedures Order; (2) they have obtained committed financing without any financing contingencies or, in the case of a credit bid, have committed sufficient judgment dollars to cover the bid as well as the cash or committed financing necessary to satisfy the claims of any senior creditors; (3) the bidders' committed financing shall remain in place for the duration of the process such that it will still be in place when the time for closing actually comes; and (4) they are prepared to close the sale without conditioning their bid on external or business contingencies (such as enjoining certain creditors of Venezuela or PDVSA) or tying up sale proceeds in escrow accounts designed to protect the bidder from risk, but that may never be used to satisfy the Attached Judgments in these proceedings. D.I. 1438, at 5-6. Some of these qualifications are already part of the SPO, and others seem fairly obvious, but

---

[5] Although Crystallex believes it is unnecessary, if the Court were to order the Special Master to select a base bid and authorize the selected bidder to claim a reimbursement, any reimbursement should be for reasonable documented expenses only and it should not exceed $5 million.

5

in all events, it would be beneficial to the auction process for this Court to establish detailed qualifications and instructions like these in advance of the new round of bidding, not only to ensure that the Special Master can efficiently evaluate bids and determine which bidders are considered qualified to participate in the auction, but also to avoid a repetition of the failed process that now requires this new round of bids.

With these slight modifications and additions to the Special Master's proposal, a live auction likely will be more efficient than a Stalking Horse procedure, while still achieving the highest price for the shares. A Stalking Horse process will require briefing to address the propriety of bidder protections, then further briefing concerning the selection of the Stalking Horse Bid, followed by still more briefing regarding the final bid that is to be selected in the event the Stalking Horse Bid is "topped." On the other hand, a live auction will require the Court's input far less frequently if run properly. With the benefit of clear guidance from the Court following the instant round of submissions, Crystallex expects that the Court would be called upon to further weigh in only if there are material disagreements regarding the terms on which bids will be evaluated (but that would also be true in a Stalking Horse scenario) and then to resolve objections to the winning bid following the live auction.

## II. Advance Agreement on Material Terms

In addition, this Court should require, to qualify to participate in the auction, that any bidder agree to certain material terms to be set forth in the revised bidding procedures or a simplified form stock-purchase agreement. Those terms should ensure the bid is acceptable in the context of these judgment-enforcement proceedings. *See* D.I. 1438, at 7-9 (Crystallex's initial observations on appropriate material terms). Requiring bidders to accept such terms in advance as a condition to participate in the auction would help ensure that bidders are incentivized to submit offers that will satisfy the most Attached Judgments in this Court's priority waterfall and that "competition

6

among bidders" at the auction will be "focused on price." D.I. 1433, at 9. Agreeing on terms in advance will also serve to limit future arguments that the Special Master or this Court abused their discretion in favoring one bid over another. It will also help this process proceed in a manner more akin to public company merger and acquisition deals, in which the terms of the offer are largely set with minimal potential for adjustments to price or terms before the offer is made to the owners (as opposed to private company deals, where adjustments are more common).

There appears to be general agreement in this regard. The Seven Creditors, for example, "agree" that such a requirement would "benefit" the sale process, emphasizing that "all bidders should agree" that distributions to Attached Judgment Creditors "should not be subject to an escrow for, or contingent on resolution of, the Alter Ego Claims." D.I. 1439, at 8.

Crystallex disagrees, however, with Red Tree's submission that any successful bidder must provide "an affirmative statement as to how [its] bid proposes to deal with" the claims of the 2020 Bondholders. D.I. 1440, at 6. While the pendency of the 2020 Bondholders' claims clearly influence the sale process, and all bidders should be required to acknowledge the existence of those claims, resolving the 2020 Bondholders' claims is outside the scope of these proceedings, which are designed to sell as many shares of PDVH as necessary to satisfy the Attached Judgments in this Court's priority waterfall. *See* D.I. 234, at 36 ("The process will result in the sale of as many … shares of PDVH as are necessary to satisfy the judgment of Crystallex (and of any other judgment creditor whose judgment may be added to the sale)."). It would therefore be inappropriate for this Court to encourage bidders to compete on the question of how each bid would address the claims of the 2020 Bondholders, which would likely require other bidders and the Special Master to evaluate bids based on difficult-to-compare qualitative differences in each bid's treatment of the 2020 Bondholders' claims. It would be far more reasonable for all bidders to compete on the

amount that will be paid to the Attached Judgment Creditors, and "simply price their view of the risk associated with currently pending litigation when formulating their bids."  D.I. 643, at 10 (quoting D.I. 582, at 7); *see* D.I. 583, ¶ 10 (Special Master noting that Evercore "believes Potential Bidders will be fully capable of valuing the PDVH Shares and the CITGO operations agnostic to … whether claims held by the PDVSA 2020 Bondholders or other judgment creditors will need to be satisfied by the Sale Transaction proceeds").  Requiring bidders to incorporate perceived litigation risk—including risk posed by the claims of the 2020 Bondholders—into the price of their bids rather than through proposed plans to address pending litigation would streamline the evaluation of bids and ensure that competition is focused on price.[6]

The 2020 Bondholders, for their part, insist that any successful bid must not impair any contractual rights they may hold under the 2020 Bonds and governing documents.  D.I. 1441, at 1.  Crystallex agrees that the successful bidder must agree to take the PDVH Shares as they are and that any successful bid cannot alter the terms of any lawful agreements that PDVH may have entered.  That said, the validity of the 2020 Bonds, and any rights that the 2020 Bondholders purport to have because of the pledge of 50.1% of the shares of CITGO Holding, Inc., is currently being litigated in the Southern District of New York.  And following the Second Circuit's decision that "the law of Venezuela, not New York, governs the validity of the instruments at issue," and in light of PDVSA and PDVH's contention that the 2020 Bonds are "invalid under the law of Venezuela," *Petróleos de Venezuela S.A. v. MUFG Union Bank, N.A.*, 106 F.4th 263, 265 (2d Cir. 2024), the notion that the 2020 Bondholders have any enforceable rights remains questionable at

---

[6] As Crystallex has noted, none of this would prevent any potential bidder from negotiating a pre-packaged settlement with the 2020 Bondholders, in contemplation of executing such a settlement after the transaction closes in the event that bidder is declared the winner of the auction.  What the new owner of PDVH may do to settle litigation affecting PDVH's assets and subsidiaries after the transaction closes should be of no concern to this Court.

best.  Under these circumstances, it would not be appropriate for the Court to affirmatively endorse the 2020 Bondholders' view that they hold valid and legally enforceable rights under the 2020 Bonds (or to require bidders to do the same).  Rather, to the extent this Court is inclined to require bidders to make an affirmative statement concerning the 2020 Bondholders, that statement should be limited solely to an acknowledgement that they are aware of the 2020 Bondholders' litigation and that their bids are not contingent on the outcome of that litigation.

### III.     Bidder Protections

To the extent this Court decides to proceed with a Stalking Horse and Topping Period process, Crystallex has no objection to the recommendations of the Seven Creditors and Red Tree that this Court should determine in advance the reasonable bid protections that would be accorded to whichever bid is selected as the Stalking Horse Bid.  D.I. 1439, at 6; D.I. 1440, at 4-5.  Informing bidders in advance of the protections to which they would be entitled in the event their bid is selected as the Stalking Horse Bid would encourage bidders to submit competitive offers designed to satisfy as many Attached Judgments as possible.

However, Crystallex also agrees with Red Tree that any preestablished bid protections should not automatically attach to the bid the Special Master selects as the Stalking Horse Bid before this Court has the opportunity to rule on any objections by the Sale Process Parties and Additional Judgment Creditors.  *See* D.I. 1440, at 4.  Before any particular bid is granted protections (such as a reasonable termination fee), the Sale Process Parties and Additional Judgment Creditors should be granted an opportunity to object on the ground that the proposed Stalking Horse Bid is not viable.  For example, if a bid proposes to purchase PDVH Shares without distributing any proceeds from the sale of such shares to Attached Judgment Creditors upon closing, the bid would violate the requirement of Delaware law that only "[s]o many of the shares" may be sold "as shall be sufficient to satisfy" the Attached Judgments.  8 *Del C.* § 324(a).  The Sale Process

9

Parties and Additional Judgment Creditors must be given a limited opportunity to object before such a non-actionable bid becomes entitled to bid protections such as a termination fee derived from sale proceeds in the event its bid is surpassed during the Topping Period.

## CONCLUSION

For the foregoing reasons, Crystallex submits that the Court should order either (1) a sale process that includes a live auction after an initial round of bidding to determine qualified opening bids and bidders or (2) an initial round of bidding followed by a Topping Period. In either scenario, Crystallex respectfully submits that the Court should order the Special Master and Sale Process Parties to propose necessary amendments to the Sale Procedures Order to accommodate the Court's views on the best path forward in light of the submissions in response to the Court's November 20, 2024 Order, D.I. 1433, and the lessons learned in the sale process to-date. Finally, Crystallex submits that any such amendments to the Sale Procedures Order should be made on an expedited basis such that the final sale hearing can be held within the first quarter of 2025 subject to the Court's schedule.

| | |
|---|---|
| OF COUNSEL: | */s/ Travis S. Hunter* |
| | Raymond J. DiCamillo (#3188) |
| Robert L. Weigel | Jeffrey L. Moyer (#3309) |
| Jason W. Myatt | Travis S. Hunter (#5350) |
| Rahim Moloo | RICHARDS, LAYTON & FINGER, P.A. |
| GIBSON, DUNN & CRUTCHER LLP | One Rodney Square |
| 200 Park Avenue | 920 North King Street |
| New York, New York  10166 | Wilmington, Delaware  19801 |
| (212) 351-4000 | (302) 651-7700 |
| | dicamillo@rlf.com |
| | moyer@rlf.com |
| Miguel A. Estrada | hunter@rlf.com |
| Lucas C. Townsend | |
| Adam M. Smith | *Attorneys for Plaintiff* |
| GIBSON, DUNN & CRUTCHER LLP | |
| 1700 M Street, N.W. | |
| Washington, D.C.  20036 | |
| Tel:  (202) 955-8500 | |
| Fax:  (202) 467-0539 | |

Dated:  December 3, 2024

11