IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| CRYSTALLEX INTERNATIONAL CORP., ) <br> ) <br> Plaintiff, ) <br> ) <br> v. ) <br> ) <br> BOLIVARIAN REPUBLIC OF ) <br> VENEZUELA, ) <br> ) <br> Defendant. ) | Misc. No. 17-151-LPS |

### ANSWER SUBMISSION OF AMBER ENERGY INC. PURSUANT TO THE COURT'S NOVEMBER 20, 2024 ORDER AND INCLINATIONS [D.I. 1433]

Amber Energy Inc. ("Amber") respectfully submits this answering brief pursuant to the Court's November 20, 2024 Order and Inclinations (the "Order and Inclinations") [D.I. 1433][1] solely to address the sale process and bidding protections "that will apply to whichever bid the Special Master deems the best-available" [*id.* at 11], and specifically in response to the opening submissions of other interested parties.[2]

Consistent with the Court's Inclinations, the sale process should proceed expeditiously and in a manner that would encourage third parties (not just Attached Judgment Creditors) to invest their time and resources in a competitive environment. Amber believes that the Court should create the framework for a two-step process as contemplated by the Order and Inclinations, in the

---

[1] Capitalized terms used but not defined herein have the meanings given to them in the Order and Inclinations, and all references to the docket index ("D.I.") are to the *Crystallex* docket, Misc. No. 17-mc-151, unless otherwise noted.

[2] *See* D.I 1438 (Crystallex submission); D.I. 1439, 1443 (OIEG, Huntington Ingalls, ACL, Rusoro, Gold Reserve, Tidewater, and Valores submission); D.I. 1440 (Red Tree submission); D.I. 1441 (2020 Bondholders' submission); 1442 (ConocoPhillips' submission); D.I. 1445 (Special Master's submission).

event the Special Master subsequently chooses to anchor the bidding process with a stalking horse. As a threshold matter, the Special Master should *immediately* re-open the virtual data room to all interested parties (subject to whatever confidentiality arrangements the Special Master deems appropriate).[3]

Next, the Court should establish a reasonable termination fee, topping period, and other customary provisions in the event the Special Master opts to use a stalking horse (which would not be a requirement) as well as a deadline for any bidder (which may include Attached Judgment Creditors) to submit its proposed definitive agreement and evidence of financial wherewithal (*i.e.*, a bid package) if a bidder is interested in serving as a stalking horse. As the Court indicated, if a bidder is selected as the stalking horse, it would be required to submit a good-faith deposit and its definitive documentation would be filed publicly for others to try to beat by the end of the Topping Period. If the Special Master elects not to select any stalking horse bid, the end of the Topping Period would instead convert into the simple deadline for any interested bidder to come forward with a bid package. If multiple bid packages (*i.e.*, definitive agreement and evidence of financial wherewithal) are received, then there would be a live auction after which the Special Master would select its Updated Final Recommendation (which may be the only recommendation, if no stalking horse was selected). Briefing over the propriety of the Special Master's ultimate selection of the winning bidder would thereafter occur on a timetable established at the outset. All of these deadlines should be established at the outset so that everyone is working from the same framework and the Court can set a timeframe for concluding the sale. Amber summarizes a suggested process below and attaches a proposed illustrative schedule as Exhibit A.

---

3   In light of the Order and Inclinations, and statements from the Attached Judgment Creditors, Amber has encouraged the Special Master to re-open the virtual data room immediately, and not to wait until the status conference on December 13, 2024.

2

***Re-Opening of the Virtual Data Room.***  The data room should be opened, and indeed Amber has proposed that the Special Master do so immediately in light of the Court's Inclinations, notwithstanding the Special Master's commitment to adhere to the SPA's provisions regarding exclusivity [D.I. 1373 at 3].

***Establishing Bidding Protections, Including a Customary Termination Fee.***  Amber agrees with the Court's Inclination to "establish bidder protections that will apply to whichever bid the Special Master deems the best-available as the Sale Process proceeds following the upcoming status conference," and agrees that those bidding protections should include, among others, a customary breakup fee, a reasonable topping period, and a good-faith deposit.  *See* D.I. 1433 at 10-11; D.I. 1444 at 1-2.  Selecting a stalking horse bidder and providing it bidder protections is a customary means of maximizing value in a sale process and is generally preferable to a naked auction because a stalking horse bid sets a price floor, adds an element of certainty to the sale process, and "may encourage later bidders" based on the stalking horse's "initial research, due diligence, and subsequent bid" which publicly indicates the potential value of the for-sale asset.  *See In re 310 Assocs.*, 346 F.3d 31, 34 (2d Cir. 2003).  Beyond enhancing the sale price, from a bidder's perspective, stalking horse protections allow bidders to put out a serious bid (and devote the attendant time and resources) with the protection of a breakup fee if their bid is selected and then topped.  Absent bidding protections, bidders are disincentivized to submit their best bid—indeed, any bid at all—and could simply wait for a naked auction where they need only bid a dollar more than the next highest bidder.  But bidders and writholders alike would benefit from avoiding the chaos and unpredictability of a naked auction in an already complex, multi-party process.[4]

---

[4] *In re Bouchard Transp. Co.*, 74 F.4th 743, (5th Cir. 2023) ("Furthermore, the break-up fee and expense reimbursement provided numerous benefits to the estate.  First, by securing Hartree's participation as the stalking horse bidder, it helped Bouchard avoid a 'naked' auction.  When an auction begins with no

3

Amber, and we suspect other sophisticated parties, are willing to pay a premium for a structured process that rewards parties for putting forward their best bid.

Moreover, as explained, those bidding protections would apply only in the event the Special Master selects a bidder as a stalking horse, something the Special Master would not be required to do but may decide to do based on whether he deems it helpful to the overall process to have a floor or target to beat rather than an unwieldy open auction. Ample authority recognizes that "there is no single blueprint" to conduct a value-maximizing sale, and as such the Special Master having the option to select a stalking horse (but not being required to) can only add value to the sale process. *See C&J Energy Servs. Inc. v. City of Miami General Emps'. & Sanitation Emps'. Ret. Tr.*, 107 A.3d 1049, 1067 (Del. 2014). To the extent certain writholders assert that there should be additional briefing on a bidding protections motion, *see* D.I. 1439 at 12, Amber disagrees. There is no need for significant briefing of general bid protections applicable to any chosen bid, and doing so will merely cause additional undue delay. Particularly after the Court permitted parties to engage in three rounds of briefs on its Inclinations ahead of the status conference, parties should be prepared to address any concerns regarding such customary bidding protections at the December 13th status conference.

In that regard, Amber further submits that a breakup fee of 3 percent of PDVH's enterprise value or bid value (*i.e.*, how much consideration a bid is providing) is customary and should be applied here, particularly given the unusual complexity of this situation and the attendant litigation risk to any buyer. Here, a bidder will likely be putting more value at risk than solely the actual cash that is distributed to writholders, including any value required to extinguish the pledge to the

---

known bidder, the debtor risks receiving no offers or being forced to sell its assets below market value…. By getting Hartree to set a floor price, Bouchard secured value for the estate.").

2020 PDVSA Noteholders. The break-up fee should account for, and not ignore, that value, which provides a floor for other bidders to meet.

This is consistent with the decisions of courts in Delaware, which routinely evaluate the reasonableness of a break-up fee in relation to the target company's enterprise value or the total value of the transaction. Indeed, enterprise value may be "more informative" than equity value because it more closely aligns with the obligations of the acquiror in refinancing and balancing the equity and debt of the target company. *See In re Comverge, Inc.*, 2014 WL 6686570, at *14 (Del. Ch. Nov. 25, 2014) ("As between the equity and enterprise value metrics, this Court sometimes finds the latter to be more informative 'for purposes of considering the preclusive effect of a termination fee on a rival bidder,' especially in the context of a highly leveraged target company, 'because ... most acquisitions require the buyer to pay for the company's equity and refinance all of its debt.'") (quoting *In re Lear Corp. S'holder Litig.*, 926 A.2d 94, 120 (Del. Ch. 2007)). Where courts apply equity value, such as public company mergers and acquisitions, the entirety of the transaction consideration goes to the shareholders, and as such in those circumstances the equity value *is* essentially the transaction value. *See, e.g.*, *In re Toys "R" Us, Inc. S'holder Litig.*, 877 A.2d 975, 997 (Del. Ch. 2005) (discussing equity value as "implied by the final deal terms" for acquisition of public company and finding termination fee of 3.75 percent of the equity and transaction value of $6.6 billion reasonable); *In re GGP, Inc. S'holder Litig.*, 2021 WL 2102326, at *19 (Del. Ch. May 25, 2021), *aff'd in part, rev'd in part and remanded*, 282 A.3d 37 (Del. 2022) (equating equity value with transaction value in acquisition of public company). That is not the case here, where bidders would purchase the entirety of a privately-held corporation that has unique actual and potential liabilities, and as such the enterprise value or transaction value is appropriate.

Moreover, termination fees of 3 percent of enterprise value or "total deal value" have repeatedly been found to be reasonable. *See*, *e.g.*, *In re Topps Co. S'holders Litig.*, 926 A.2d 58,

65, 86 (Del. Ch. 2007) (4.3 percent break-up fee on "total deal value" of $385 million "not … likely to have deterred a bidder with an interest in materially outbidding"); *In re Toys "R" US, Inc.*, 877 A.2d 975, 997, 1018 n.72 (Del. Ch. 2005) (finding reasonable a termination fee of 3.75 percent of equity value and 3.25 percent of enterprise value for a $6.6 billion bid and noting scholarly work finding that "termination fees exceeding 3% of enterprise or deal value were relatively common"); *In re Dollar Thrifty S'holder Litig.*, 14 A.3d 573, 614 (Del. Ch. 2010) (finding 3.9 percent termination fee on $1.275 billion deal value, consisting of 3.5 percent termination fee and an additional measure of expenses, to be a "relatively insubstantial barrier … to any serious topping bid"). A termination fee of 3 percent of enterprise value also closely aligns with market trends. The recently-published Houlihan Lokey 2023 Transaction Termination Fee Study found that the mean termination fee for acquisitions of 29 companies with an enterprise value of over $5 billion was 2.9 percent of the enterprise value.[5]

For these reasons, the breakup fee should be calculated as a percentage of enterprise value or transaction value, but in no event should it be calculated only as a percentage of cash to writholders at closing (as certain parties seem to assert, *see* D.I. 1438 at 9-10, D.I. 1442 at 5-6). Again, the Special Master could always determine no bid merits being selected as a stalking horse, but if Amber is going to continue investing time and energy on a viable bid in light of the Court's Inclinations, it should be compensated fairly if the Special Master subsequently selects Amber as a stalking horse and Amber is then topped by another bidder.

Amber also submits that, if a bidder is selected as the stalking horse and subsequently terminates for a reason other than its own breach or being topped by a superior bid, that bidder

---

[5] Houlihan Lokey, *2023 Transaction Termination Fee Study* at 15, May 2024, available at https://cdn.hl.com/pdf/2024/2023-transaction-termination-fee-study.pdf.

6

should receive expense reimbursement (rather than the full termination fee). Reimbursing the out-of-pocket costs and expenses of the stalking horse bidder in this circumstance is also customary and encourages bidders by ensuring they will not suffer losses for a termination that may be beyond their control. *E.g.*, *In re Nortel Networks Inc.*, 2011 WL 13501113, at *4 (Bankr. D. Del. Mar. 3, 2011).

***Initial Bid Submission and Selection of Stalking Horse, If Any.*** With the bidding protections in place, and the data room opened to interested bidders that execute a confidentiality agreement that the Special Master deems appropriate, Amber submits that there should be a bidding deadline of January 13, 2025 for interested bidders to tender initial bids to the extent they wish to be eligible to receive bidding protections. The initial bids should include a proposed stock-purchase agreement and evidence of financial ability to carry out the transaction. The Special Master could then determine if any of the bids should be selected as a stalking horse, and if so, the Special Master would file definitive documents publicly, and the good-faith deposit would be due. Amber believes this could be done in relatively short order – e.g., by January 15, within two business days of the above January 13 initial bidding deadline.

***Topping Period or Qualifying Bid Submission Deadline.*** Amber further submits that if the Special Master has selected a stalking horse, then there should be a 45-day topping period (expiring on or around March 1, 2025). And, if the Special Master did not select a stalking horse bid, this same date would serve not as an expiration of a topping period, but rather as the deadline for the submission of qualifying bids for an auction (again, in the form of a definitive stock purchase agreement and evidence of financial wherewithal).

***Auction or Filing of Lead Bid.*** If necessary, Amber submits that an auction among qualifying bids received could be held shortly after the March 1 bid submission deadline (e.g., on

7

March 5, 2025). Alternatively, the Special Master could file a "Final Lead Bid" and notice of cancellation of auction if the stalking horse or a topping bid is selected. If an auction is held, Amber submits that the announcement of the Final Lead Bid could occur within a few days of the auction (by March 8), and that a sale hearing could be conducted on or around April 8.

The aforementioned two-step process is consistent with the Court's Inclinations, *see* D.I. 1433 at 11, and with the submissions of writholders. *See*, *e.g.*, D.I. 1438 at 2 (Crystallex proposing alternative processes, including a stalking horse and topping period process and a live auction process); D.I. 1442 at 2 (ConocoPhillips agreeing with Court's Inclination for bidder protections and a topping period). The above process also addresses the Special Master's submission by building flexibility into the process to maximize value. Rather than foregoing bid protections entirely for a "naked" auction, the process above allows for bidding protections *if* they are sensible based on the initial bids submitted. This is consistent with the Special Master's recognition that facts and circumstances "related to currently available bids" may change in a way that warrants a shift back to providing bidding protections to an initial anchor bid. D.I. 1445 at 3 n.2. This potential shift can and should be built directly into the process by putting into place generally-applicable bidding protections, which all of the writholders that made submissions support.

Dated: December 3, 2024

| | |
|---|---|
| OF COUNSEL: | /s/ Michael A. Barlow |
| | Michael A. Barlow (No. 3928) |
| Andrew J. Rossman | QUINN EMANUEL URQUHART |
| Susheel Kirpalani |   & SULLIVAN, LLP |
| Matthew R. Scheck | 500 Delaware Avenue, Suite 220 |
| QUINN EMANUEL URQUHART & SULLIVAN, LLP | Wilmington, Delaware 19801 |
| 51 Madison Avenue, Fl. 22 | (302) 302-4000 |
| New York, New York 10010 | michaelbarlow@quinnemanuel.com |
| (212) 849-7000 | |
| susheelkirpalani@quinnemanuel.com | *Attorneys for Amber Energy Inc.* |
| andrewrossman@quinnemanuel.com | |
| matthewscheck@quinnemanuel.com | |

-and-

Stephen M. Baldini
Stephanie Lindemuth
Richard J. D'Amato
AKIN GUMP STRAUSS HAUER & FELD LLP
One Bryant Park
New York, New York 10036-6745
(212) 872-1000
sbaldini@akingump.com
slindemuth@akingump.com
rdamato@akingump.com

-and-

Julius Chen
AKIN GUMP STRAUSS HAUER & FELD LLP
Robert S. Strauss Tower
2001 K St NW
Washington, DC 20006-1037
(202) 887-4000
jchen@akingump.com

-and-

Erin E. Murphy
H. Bartow Farr
CLEMENT & MURPHY PLLC
706 Duke Street
Alexandria, VA 22314
(202) 742-8900

9