**IN THE UNITED STATES DISTRICT COURT FOR**
**THE DISTRICT OF DELAWARE**

| | |
|---|---|
| CRYSTALLEX INTERNATIONAL CORPORATION, <br><br> Plaintiff, <br><br> v. <br><br> BOLIVARIAN REPUBLIC OF VENEZUELA, <br><br> Defendant. | Case No. 17-mc-151-LPS |
| GOLD RESERVE, INC., <br><br> Plaintiff, <br><br> v. <br><br> BOLIVARIAN REPUBLIC OF VENEZUELA, <br><br> Defendant. | Case No. 22-mc-453-LPS |

**ANSWERING BRIEF OF GOLD RESERVE REGARDING THE COURT'S INCLINATIONS**

Gold Reserve Inc. ("Gold Reserve")[1] hereby submits this response brief in respect of the

Inclinations Order[2] and in response to (i) *Crystallex International Corporation's Comments on the*

*Court's "Inclinations" Regarding Sale Process* (D.I. 1438) ("Crystallex Opening"), (ii) *Red Tree*

*Investments, LLC's Position Statement in Response to the Court's Inclinations* (D.I. 1440) ("Red

---

[1] Gold Reserve holds a writ of attachment on the PDVH Shares and has been declared an Additional Judgment Creditor by this Court and holds an Attached Judgment (in accordance with, and each term as defined in, the *Sixth Revised Proposed Order (A) Establishing Sale and Bidding Procedures, (B) Approving Special Master's Report and Recommendation Regarding Proposed Sale Procedures Order, (C) Affirming Retention of Evercore as Investment Banker by Special Master and (D) Regarding Related Matters* (D.I. 481) (the "Sale Procedures Order")). References to the docket index ("D.I.") are to the *Crystallex* docket, Misc. No. 17-151-LPS.

[2] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the Inclinations Order, the Sale Procedures Order or the *Seven Creditors' Opening Position of the Court's Inclinations* (D.I. 1439) (the "Seven Creditors' Opening").

Tree Opening"), (iii) *2020 Bond Entities Submission Pursuant to the Court's Order of November 20, 2024* (D.I. 1441) ("Bondholder Opening"),[3] (iv) *ConocoPhillips' Opening Brief in Response to the Court's Inclinations* (D.I. 1442) ("Conoco Opening"), (v) *Submission of Amber Energy Inc. Pursuant to Court's November 20, 2024 Order and Inclinations* (D.I. 1444) ("Amber Opening"), and (vi) *Special Master's Opening Position in Response to Court's November 20, 2024 Order* (D.I. 1445) ("Special Master Opening").

**Response to the Special Master's Proposed "Significant Pivot"**

Gold Reserve sees substantial problems in, and therefore respectfully objects to, the Special Master's proposal to engage in a "significant pivot" from the current Sale Process to an "open auction."  While the stated basis for this proposal is the absence of a "viable" alternative bid to the now-defunct Elliott bid(s) (Special Master Opening at 2), Gold Reserve believes that the problems encountered in the Sale Process arose because the Special Master materially deviated from the existing process.  Specifically, and as has been observed by multiple parties, those deviations included:

   a.  entering into exclusive negotiations with a single party (Elliott/Amber Energy) for the past 3 months pursuant to the terms of a quasi-contractual exclusivity agreement, the terms of which were not approved by the Court;

   b.  closing the Data Room to all other potential bidders during this extended period;

   c.  negotiating bespoke SPA terms that materially deviated from the terms of the Proposed SPA that was previously made available in the Data Room and that was supposed to be the baseline for the Sale Transaction; and

---

[3] Gold Reserve takes no express position on the Bondholder Opening other than to note that nearly all the requests made in the Bondholder Opening appear to be premature objections that should be raised at the selection of the winning bid and/or at the hearing to approve the winning bid.

d.  refusing to engage in negotiations, or even substantive discussions regarding the Sale Process, with alternative bidders and/or Attached Judgment Holder during this extended period.

The result of these actions was a proposed transaction that, even before being finalized, generated near-universal opposition.  Gold Reserve believes that the Special Master's revised proposal fails to address, and could exacerbate, the problems currently facing the Court and the parties.  Specifically:

a.  Rather than have potential bidders submit alternative bids within the 30-45 days that all partes have submitted is reasonable, the Special Master is proposing that potential bidders go into the Data Room for a 90-day period, and then submit potential bids.

b.  Rather than have the Court consider and approve the terms of the initial bid – after hearing and resolving any objections from all interested parties – the Special Master is proposing that he should have unilateral authority to select the "base bid."

c.  Rather than having uniform, Court-approved bidder protections apply to the initial bid, the Special Master is proposing to dispense with bid protection altogether, and instead have only an amorphous "expense reimbursement" for the initial winning bidder.

d.  Rather than having the 30-45 day topping period that all parties advocate to be reasonable and necessary to formulate and submit topping bids, the Special Master is proposing to have a one-day "open auction," with the winning bid then selected by the Special Master and recommended to the Court shortly thereafter.

Gold Reserve does not believe this proposal constitutes an improvement to the Sale Process, and creates substantial problems, for the following reasons:

3

a. Potential bidders do not require 90 days to formulate and submit revised bids. Credible potential bidders are likely to already have accessed the Data Room before it was closed on August 7, 2024; most have likely already submitted a bid. Attracting new bids should therefore require nothing more than an immediate re-opening of the Data Room, allowing bidders to refresh their diligence and formulate their bid. With the intervention of the year-end holidays, this process should be able to completed in the 42 days advocated by Gold Reserve. Other parties have suggested 28 days should be sufficient. In any event, this process need not take 3 months, and Gold Reserve believes that this would cause an unnecessary delay.

b. The Court – not the Special Master – should be authorized to select the initial winning bid – whether the "stalking horse bid" in the existing Sale Process or the "base bid" in the proposed "significant pivot" process. Gold Reserve believes that Court approval of the initial bid, as proposed by the Seven Creditors, will obviate many process-related objections, imbue the initial bid with more legitimacy, and substantially expedite the Sale Hearing and ultimate Sale Transaction.

c. The Special Master's proposal to eliminate standard bid protections is a potentially fatal flaw. Again, the problem here is not the existence of bidder protections but rather that the Special Master negotiated the terms of those bidder protections with a single putative bidder, with the result being a set of bid protections that would almost certainly have chilled the topping bid environment. The proper solution to this problem is not to eliminate bidder protections altogether, but rather for the Court to standardize the bidder protections for the initial winning bid, as the Seven Creditors and others have

4

advocated.[4] Having reasonable bid protections for the initial winning bidder is a critical element to obtaining the best and highest initial winning bid, which in turn is critical to obtain a value-maximizing transaction.

d.  In the view of Gold Reserve, and the other members of the Seven Creditors group, the standardized bid protection terms should be set by the Court. The Seven Creditors proposed that this should be done via a motion filed by the Special Master but, if the Special Master does not wish to file this motion then the same result can be obtained via a motion filed by the Seven Creditors and/or any other group of interested parties. Standard bid protections should not be difficult to formulate. Indeed, a set of such protections was included in the Proposed SPA that was made available in the Data Room by the Special Master in advance of the June 11, 2024 Final Bid deadline. These bid protection terms were reasonable, and Gold Reserve expects that standardized terms that are acceptable to a number of parties could be reached through a relatively brief meet and confer/briefing process, as proposed in the Seven Creditors' Opening Submission.

e.  The Special Master's proposal to convert the 30-45 topping period into a one-day "open auction" is unworkable.

    i.  First, Gold Reserve does not think it is possible for the Special Master to evaluate multiple bids within the confines of one-day period and select an initial winning bidder. As a comparison, it took the Special Master a period of over

---

[4] Gold Reserve agrees with other parties' recommendations regarding bid protections and procedures that should be addressed in future briefing. *See* Crystallex Opening at pp. 7-13 (proposing advance agreement on material terms, limits on termination fee amounts and trigger events, good faith deposit requirements, and fully drafted public documentations); Red Tree Opening at p. 6 (requesting greater clarity on non-price terms for bids); Conoco Opening at pp. 2-3 (suggesting termination fee structures, representations and warranties, and best bid determinations).

five (5) weeks to do this same task– from when Final Bids were submitted on June 11 to mid-July, when the Special Master selected the combined CVR/Gold Reserve bid as the initial winning bidder.  And, even after this six weeks of prep work, the Special Master then changed his position, and entered into the quasi-contractual exclusivity agreement with a new initial winning bidder (Elliott) on August 7, 2024.  This is not meant as a criticism of the Special Master, only to demonstrate that more than one day is required for the Special Master to properly evaluate and select the initial winning bidder.  In the Seven Creditors' prior submission, the period required for this exercise was proposed to be 2 weeks, and Gold Reserve maintains that this period is appropriate.

ii. Second, and as importantly, a one-day auction is counterproductive for a robust, competitive topping period and thus a value-maximizing Sale Transaction. This is because it simply is not feasible for potential bidders to re-arrange their financing and bid terms in such a way as to be able to submit alternative, topping bids in real time within the confines of an auction that takes place in a single business day.  The financing necessary to support bids for the PDVH shares is multi-faceted and itself subject to negotiation, between a bidder and its financing partners.  It will take, at minimum, multiple days for potential bidders to prepare alternative financing packages to submit topping bids.  As a result, compressing the topping period into a one-day auction would eliminate, or at minimum substantially reduce, the existence of topping bids, and thus result in a value-minimizing rather than value-maximizing Sale Transaction.

### Proposed Material Improvement in the Sales Process – Standardized SPA Terms

One latent issue in the Special Master's revised proposal is the continued absence of standardized non-monetary deal terms for the purchase of the PDVH shares. To remedy this issue, Gold Reserve proposes that the Court should adopt and fix terms of a draft SPA, after taking input from all interested parties. This proposal aligns with the Court's stated Inclination to have a "a list of material terms that any successful bidder must agree to (e.g., relating to appeal contingencies, whether the bidder may terminate if the Special Master fails to prevail on a particular motion, maximum amount of escrows (if any) permitted to reserve for Alter Ego Claims and 2020 Bondholders, etc.) so that any competition among bidders might be focused on price." Inclinations Order, ¶ 6.

The ability of putative bidders to propose bespoke terms for the Stock Purchase Agreement turned out to be a major flaw in the Sale Process. This issue manifested most acutely in the terms of the draft Elliott SPA, which represented a significant departure from the baseline SPA previously proposed by the Special Master, and which took the parties' weeks and multiple rounds of briefing to fully understand and then object to. If every bidder is again permitted to submit a bespoke terms for the SPA, it will likely again lead to individualized negotiations between the Special Master and various bidders – all with little or no transparency or oversight by the Court – and the problem will repeat itself.

The solution, in Gold Reserve's view, is to standardize the SPA terms for all bidders. The mechanism for so doing is via a motion filed with the Court, with all interested parties able to propose any changes in advance, and the terms of the SPA then fixed by the Court. Thereafter, no material modifications to the SPA should be permitted without Court approval.

This proposal is feasible.  Indeed, it is consistent with how the Sale Process was supposed to have operated.  Specifically, the Bidding Procedures issued by the Special Master in advance of the June 11, 2024 deadline for Final Bids envisioned that bidders would only make light mark-ups to Proposed SPA, and that the extent of any such mark-ups would be a negative factor in the Special Master's consideration of the initial winning bidder.

Now, the process for setting the SPA terms can be folded into the proposed briefing on the bidder protection motion.  Specifically, any party that has any objections to the form SPA that the Special Masters will be depositing into the Data Room on or before December 18, 2024 (see Special Master Opening at 6-7) can raise such objections on the same briefing schedule as has been proposed for the bidder protection motion.  In this manner, the Court can efficiently take up and resolve this issue while potential bidders are refreshing their review of the Data Room, and thus fix the material terms of the SPA before initial bids are submitted.

Standardizing the material terms of the SPA in this manner will, in Gold Reserve's view, dramatically improve the Sale Process, in respect of speed, certainty and, most importantly, net consideration paid to the attached judgment creditors.  As importantly, it also will allow the Court and Special Master to be able to evaluate bids in a transparent and effective manner, thus eliminating objections that subjective, complex, non-monetary terms should be valued in one particular manner rather than another, all of which will contributing to eliminating (or least materially reducing) further objections.

### Response to Special Master's Comments Regarding Gold Reserve's Prior Bids

There is no merit whatsoever to the Special Master's contention that "both the CVR and Gold Reserve bids were critically flawed because of a high degree of financing uncertainty." Special Master Opening, n. 3.

8

With respect to Gold Reserve's initial standalone bid, it in fact was over-supported at all its financing levels, as confirmed in written documentation provided by the multiple debt and equity financing sources that supported the bid, including Tier 1 financial institutions. All this documentation was submitted to the Special Master's advisers on June 27, 2024. Should the Court find it helpful, Gold Reserve would be happy to submit this documentation to the Court under seal. This documentation proves that Gold Reserve had fully committed financing for its proposed bid terms.

With respect to the subsequent combined CVR/Gold Reserve bid, its financing was more certain, and at no point did the Special Master ever represent that it was "critically flawed." To the contrary, in early August 2024, immediately before the Special Master entered into his exclusivity "agreement" with Elliott, the Special Master's advisors represented to CVR that they thought they could "find a path forward" to closing on SPA terms with CVR. And, with respect to financing certainty, the only issue that the Special Master identified was whether CVR's financing sources would accept an 18- versus 12-month commitment to address the potential contingency of the Gramercy alter ego claims. Of note, these contingency terms were far more favorable to a value-maximizing Sale Transaction than the terms that the Special Master then agreed with Elliott.

And this is the ultimate point -- both the Gold Reserve and the CVR/Gold Reserve bids both were materially superior on every relevant metric – including price – and both were materially superior in respect of the contingencies associated with the Gramercy alter-ego claims. Gold Reserve thus stands by its prior submissions.

**Response Regarding Injunction Motion**

Gold Reserve concurs with Crystallex in that "enjoining the Gramercy Parties' claims is 'necessary or appropriate in aid of' this Court's jurisdiction over the PDVH Shares, to enforce

orders relating to the sale of those shares, and to prevent interference with the res in the Court's custody." Crystallex Opening at p. 4. As stated in the Seven Creditors' Opening, Gold Reserve maintains that *this* Court is best positioned to address the Alter Ego Claims and to do so in the context of the sale process.

Dated: December 3, 2024

Respectfully submitted,

| | |
|---|---|
| **WOMBLE BOND DICKINSON (US) LLP**<br><br>By: _/s/ Kevin J. Mangan_<br>Kevin J. Mangan (#3810)<br>Matthew P. Ward (#4471)<br>Stephanie S. Riley (#5803)<br>1313 N. Market St., Suite 1200<br>Wilmington, DE 19801<br>Telephone: 302-252-4320<br>Kevin.mangan@wbd-us.com<br>Matthew.ward@wbd-us.com<br>Stephanie.riley@wbd-us.com<br><br>**NORTON ROSE FULBRIGHT US LLP**<br>Matthew H. Kirtland (*pro hac vice*)<br>799 9th Street NW, Suite 1000<br>Washington, DC 20001<br>Telephone: 202-662-0200<br>Matthew.kirtland@nortonrosefulbright.com<br><br>- and -<br><br>Katherine G. Connolly (*pro hac vice*)<br>555 California Street, Suite 3300<br>San Francisco, CA 94101<br>Telephone: 628-231-6816<br>Katie.connolly@nortonrosefulbright.com<br><br>*Attorneys for Gold Reserve Inc.* | |