# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| CRYSTALLEX INTERNATIONAL CORP., | ) |
| *Plaintiff*, | ) ) ) |
| v. | ) No. 1:17-mc-00151-LPS ) ) |
| BOLIVARIAN REPUBLIC OF VENEZUELA, | ) ) |
| *Defendant*. | ) ) ) |
| _____ | ) |

## CITGO AND PDVH'S ANSWERING BRIEF PURSUANT TO THE COURT'S NOVEMBER 20, 2024 ORDER AND INCLINATIONS

OF COUNSEL:

Nathan P. Eimer
Lisa S. Meyer
Daniel D. Birk
Gregory M. Schweizer
Hannah Bucher
EIMER STAHL LLP
224 South Michigan Avenue
Suite 1100
Chicago, IL 60604
(312) 660-7600
NEimer@eimerstahl.com
LMeyer@eimerstahl.com
DBirk@eimerstahl.com
GSchweizer@eimerstahl.com
HBucher@eimerstahl.com

December 3, 2024

MORRIS, NICHOLS, ARSHT & TUNNELL LLP

Kenneth J. Nachbar (#2067)
Susan W. Waesco (#4476)
Alexandra M. Cumings (#6146)
Kirk C. Andersen (#7156)
1201 North Market Street
Wilmington, DE 19801
302-658-9200
knachbar@morrisnichols.com
swaesco@morrisnichols.com
acumings@morrisnichols.com
kandersen@morrisnichols.com

*Attorneys for PDV Holding, Inc. and CITGO Petroleum Corporation*

**TABLE OF CONTENTS**

I. Preliminary Statement ................................................................................................................ 1

II. Process Defects ........................................................................................................................ 2

III. Proposed Structure for Remainder of the Sale Process ....................................................... 5

   A. CITGO's Proposed Schedule ................................................................................................ 5

   B. Collaborative Decision-Making with the Sale Process Parties ............................................ 9

   C. Bidding by Sale Process Parties at the Auction .................................................................. 10

   D. Post-Recommendation Timeline .........................................................................................11

   E. The Court Should Not Conduct a Comprehensive Adjudication of Alter Ego Issues ....... 12

Conclusion……………………………………………………………………………………….12

## TABLE OF AUTHORITIES

**Cases**

*In re TransPerfect Global, Inc.*,
  C.A. No. 9700–CB, 2018 WL 904160 (Del. Ch. Feb. 15, 2018) ............................................... 5

*JP Morgan Chase Bank, Nat'l Ass'n v. Shea*,
  C. A. No. S18L-07-047, 2019 WL 4071855 (Del. Super. Ct. Aug. 28, 2019) ............................ 5

*Petróleos De Venezuela S.A. v. MUFG Union Bank, N.A.*,
  106 F.4th 263 (2d Cir. 2024) ................................................................................................ 4, 7

CITGO Petroleum Corporation ("CITGO"), joined by PDV Holding, Inc. ("PDVH"), submits this brief to provide its perspective on the timeline and process proposed in the Special Master's Opening Position in Response to the Court's November 20, 2024 Order (D.I. 1445) and the Court's November 20, 2024 Order (the "Inclinations Order") (D.I. 1433). CITGO's perspective is based on its refining knowledge and experience, as well as its experience during the sale process providing due diligence, working with bidders, and observing the Special Master's implementation of the Sale Procedures Order.

I. **Preliminary Statement**

After spending years and more than $30 million of the Sale Process Parties' money on a failed process to sell the PDVH shares, the Special Master now is advocating for a "significant pivot" because, as he admits, the process yielded no viable bids. *See* D.I. 1445 at 2. The Special Master's "pivot" is in reality a proposal to start over, leaving the parties where they were a year ago and with little assurance that the Special Master will not repeat the same mistakes that caused the first process to fail.[1]

While some of the decisions that resulted in such shockingly low and otherwise non-viable bids could have been prevented by the Court's inclination to require bids to be accompanied by definitive deal documentation based on uniform terms and from which neither bidders nor the Special Master may deviate, many of the process's failures were caused by the Special Master's repeated adoption of unreasonable timelines and his failure to consult meaningfully with the Sale

---

[1] This brief's references to decisions or actions taken or not taken by the Special Master are intended to include both the Special Master and his Advisors. The Special Master's Advisors have had significant authority and autonomy to act on his behalf and have been directly responsible for most of the implementation of the process. Nevertheless, because in these instances the Advisors are acting in the Special Master's name and under his authority, and because the Special Master has ultimate responsibility for any decisions or actions taken on his behalf, CITGO refers to such decisions or actions as having been taken by the Special Master himself.

1

Process Parties or to consider their input. The Special Master again proposes a completely unrealistic timeline that he has little chance of meeting and that would, if adhered to, fail to generate viable bids. *See* D.I. 1445, Ex. A. This brief outlines the key missteps CITGO observed in the first process and then offers proposals for a better process. In particular, CITGO proposes a timeline that will foster competitive bidding and that has the additional benefit of allowing for developments in the pending Alter Ego Actions and 2020 Bondholder Litigation.

## II. Process Defects

From CITGO's perspective, the shockingly low bids and unacceptable closing conditions that ultimately caused the process to collapse were the product of several flaws in the design and implementation of the Special Master's process. First, perhaps because he was employing procedures customarily used in sales of distressed assets in bankruptcy rather than procedures suited for the sale of a thriving, complex, multi-billion-dollar refining business, D.I. 1398 at 6, the Special Master failed to allot sufficient time for due diligence, the submission of bids, the selection of a winning bid, and the negotiation of definitive deal documentation. This not only forced the Special Master to seek repeated extensions from the Court, *see* D.I. 1201; D.I. 1232; D.I. 1241; D.I. 1282, but it also interfered with his ability to maximize value and as will be explained below, was a major factor in the process's failure.

Second, instead of fostering a collaborative process with the Sale Process Parties, as contemplated by the Sale Procedures Order ("SPO"),[2] the Special Master isolated himself and refused to meaningfully consult with or even provide information to the Sale Process Parties until late in his decision-making process, and often after he had made a decision, such as when he abruptly agreed to Elliott's conditional, non-final SPA and escrow structures. D.I. 1325. Consulting with

---

[2] *See, e.g.,* D.I. 481 (SPO) ¶¶ E, 4, 9 10, 21, 33, 39, 42, 43; D.I. 480-1 (Bidding Procedures) at 2, 6–8, 10, 12–14, 16–19.

2

the Sale Process Parties about Elliott's proposal would have avoided the universal public repudiation of a deal that the Special Master ultimately was forced to abandon. *See* D.I. 1407 at 2; D.I. 1445 at 2–3. When he did consult with the Sale Process Parties, the Special Master did so in an adversarial posture, holding separate consultations with each Sale Process Party in a "divide and conquer" strategy, repeatedly impugning the Sale Process Parties' motives (especially the Venezuela Parties' motives) to the Court, *see, e.g.*, D.I. 356 at 2; D.I. 1155 at 1, and ignoring the Sale Process Parties' input.

The Special Master's unworkable timeline and isolated, adversarial approach directly contributed to major errors that exacerbated his process's defects. For example, although the Special Master had not obtained a final, binding bid or proposed SPA from any bidder by the second-round bid deadline this past summer, D.I. 1201 at 2–3, he nevertheless attempted to create the illusion of progress by repeatedly granting and extending—over the objections of the Sale Process Parties—exclusivity to two successive bidders, *see* D.I. 1359-1 at 3; D.I. 1373-5 at 3, 4; D.I. 1373-6 at 2, 4, neither of which was ready or real. Unsurprisingly, these bidders took advantage of the leverage provided by exclusivity to reduce the value of their bids and add onerous conditions to the terms of their proposed SPAs, to the detriment of the Sale Process Parties and Attached Judgment Creditors. To grant exclusivity in such circumstances once is perhaps explainable as the result of either an overabundance of optimism or a fear of failure. To grant it a second time, especially to a bidder whose bid remained subject to substantial due diligence that had only just started and did not have committed financing, and then to repeatedly extend it while the bidder continued to degrade its bid and add more onerous conditions to the Stock Purchase Agreement, borders on the incomprehensible.

The Special Master also ignored PDVH and CITGO's views regarding the purported pledge of CITGO Holding stock to the 2020 Bondholders and associated litigation (the "2020 Bondholder Litigation"). Initially, he told the Court that the pledge would not impede the sale because bidders could simply price in the Bondholders' claims. *See* D.I. 643 at 9–10. Yet, when he went to implement the sale process, the Special Master publicly stated that the PDVH shares could not be sold without resolving and removing the pledge and consistently instructed or encouraged bidders to assume that the Special Master would negotiate a release of the pledge before the sale. *See, e.g.*, D.I. 1307-1 at 396 (19:5–17). This not only incentivized bidders to divert value to the 2020 Bondholders that should have gone to Attached Judgment Creditors, but it also interfered with PDVSA and PDVH's ongoing attempts to settle the 2020 Bondholder Litigation by making the Bondholders completely intractable even after suffering a major defeat in the Second Circuit and vacatur of the judgment they had previously obtained, *see Petróleos de Venezuela S.A. v. MUFG Union Bank, N.A.*, 106 F.4th 263, 270 (2d Cir. 2024) *("MUFG Union Bank"). See, e.g.*, D.I. 1144 at 9–12; D.I. 1155 at 3. Again unsurprisingly, the Special Master also was unable to reach a settlement to release the pledge with the Bondholders, D.I. 1323, who appear to be insisting on a full payout on their invalid claims in light of the Special Master's announcement that the pledge they held on the CITGO Holding stock needed to be released to accomplish his sale, *see* D.I. 1441 at 4–5.

As a final example, beginning well over a year ago, PDVH and CITGO repeatedly raised pending and potential alter ego claims against PDVH with the Special Master, warning him of the possibility that one or more creditors of PDVSA or the Republic would use such claims to attempt to gain leverage over the sale process. D.I. 1418 at 2. CITGO also included a disclosure regarding pending and possible future alter ego claims to potential bidders in the data room. *Id.* Nevertheless,

4

the Special Master did not listen and seemingly failed to take action to address them with bidders even after Girard Street, G&A Strategic, and Gramercy filed their actions in June and July. This enabled Elliott to later use the Alter Ego Actions as a post-exclusivity bargaining chip and seemingly as a device to depress competitive bidding, leading to Elliott's obviously non-viable escrow proposal and also non-viable reduced bid. D.I. 1414 at 2.

### III. Proposed Structure for Remainder of the Sale Process

*A. CITGO's Proposed Schedule*

Assuming the Court adopts the "pivot" suggested by the Special Master, the Court should modify the Special Master's proposed schedule to match the schedule proposed by CITGO in Exhibit A, which realistically reflects the time needed to properly market the PDVH shares, conduct diligence, determine the pool of Qualified Bidders, and make a Final Recommendation.[3] While the Court and Attached Judgment Creditors understandably would like to move with all deliberate speed, prior experience shows that focusing too much on speed undermines the fundamental goal of this process and of Delaware law, which is not to simply accept the "best-available bid," D.I. 1433 at 7, but to maximize the value of the PDVH shares to satisfy the claims of the greatest number of creditors. *See* D.I. 277 at 3 (ordering the Special Master to "devise a plan for the sale of shares of PDVH . . . to satisfy . . . the judgment of any other judgment creditor . . . while maximizing the sale price of any assets to be sold"); *see also, e.g.*, *JP Morgan Chase Bank, Nat'l Ass'n v. Shea*, C. A. No. S18L-07-047, 2019 WL 4071855, at *1 (Del. Super. Ct. Aug. 28, 2019) ("The dual goal of any Sheriff's Sale is to follow the procedural rules and achieve the highest price."); *In re TransPerfect Global, Inc.*, C.A. No. 9700–CB, 2018 WL 904160, at *1 (Del. Ch. Feb. 15,

---

[3] CITGO and PDVH submit these comments on the assumption that the Court will adopt some form of the Special Master's proposed "pivot." In doing so, however, they reserve all rights and objections previously made to the SPO and the process followed by the Special Master, including to oppose and appeal any sale order issued by the Court.

5

2018) (custodian's sale process was designed to effectuate the court's "dual mandate[] 'to sell the Company with a view toward maintaining the business as a going concern and maximizing value for the stockholders'").[4]

Under CITGO's proposed timeline, the data room would open on January 6, 2025, shortly after the New Year, to give CITGO the opportunity to update and refresh the data room and the more than 36,000 documents in it. (Bidders will not do much diligence during the holidays anyway.) At that time, any legitimate bidder or potential bidder that has executed an appropriate NDA should be able to access the data room and begin to conduct due diligence. During the time between the December 13, 2024 hearing and the opening of the data room, the Special Master and the Sale Process Parties should work in collaboration to develop any proposed modifications to the SPO and the uniform benchmarks for valuing bids and identifying the pool of Qualified Bidders.

The Special Master should simultaneously take 30 days, also beginning January 6, to solicit new bidders. There are many reasons to believe that bidders who were not able to participate previously may be in a position to do so now. Much time has passed since the Special Master solicited bids a year ago. In addition, reduced interest rates and expectations of a change in antitrust and ESG policies under the incoming Presidential administration have fueled new interest in merger activity.[5] Finally, the 2020 Bondholders' judgment, which loomed so large for the Special Master,

---

[4] While this proposal assumes the Court will adopt the auction procedures that the Special Master now has endorsed, the Seven Creditors' proposed timeline for selection of a stalking horse bidder followed by a topping period, *see* D.I. 1439, Exhibit A, should (if adopted) be adjusted in a manner similar to what CITGO proposes herein.

[5] *See, e.g.*, Bloomberg Law, *Big law's energy dealmakers expect boost from Trump election win*, Nov. 8, 2024, https://news.bloomberglaw.com/business-and-practice/big-laws-energy-dealmakers-expect-boost-from-trump-election-win; Law360, *Expect surging oil and gas industry under new Trump admin*, Nov. 20, 2024, https://www.sidley.com/-/media/publications/expect-surging-oil-and-gas-industry-under-new-trump-admin--law360.pdf?la=en&rev=3fcbfb40cd514ba9a860db8c029acd93.

has been vacated on appeal, and the case has been remanded to the District Court for consideration of the validity of the bonds and accompanying pledge under Venezuelan rather than the New York law that the District Court had relied on in entering the now-vacated judgment. *See MUFG Union Bank*, 106 F.4th at 270. While several parties that participated in the previous round of bidding have expressed an interest in bidding again, D.I. 1373-5 at 5; D.I. 1419 at 1, new bidders could incentivize current bidders to submit more competitive bids. An initial marketing period could help draw these new bidders in. (To be clear, new bidders could sign an NDA and begin diligence either during this solicitation period or after the solicitation period ends.)

Next, the period to conduct due diligence and submit a Qualified Bid should be five months, rather than the three months proposed by the Special Master. CITGO's experience in accommodating extensive bidder due diligence requests throughout this last year, as well as Elliott's representations regarding its own diligence process, make clear how much diligence is required to support a bid for control of a complex refining company. *See* D.I. 1398 at 9 ("CITGO produced over 9,000 documents to a virtual data room . . . over 33,000 additional documents in response to further bidder requests, responded to nearly 3,000 bidder Q&As, and dedicated tens of thousands of hours of employee and external advisor time" to the diligence process); D.I. 1379-1 (Elliott explaining that it "reviewed and analyzed over 37,500 documents provided by CITGO management; participated in hundreds of hours of site tours and in-person meetings . . . and incurred over $30 million in expenses"). The 90 days proposed by the Special Master might be enough for previous bidders to update their information, but it is not enough for new bidders to prepare a viable bid. Bidders in the first round of the process had four months to conduct due diligence before bids were due, and that clearly was not enough, as the bidders continued to conduct due diligence for

7

another two months, and Elliott was still conducting diligence even after the Special Master submitted his notice recommending Elliott's non-final bid at the end of September.

CITGO's proposed schedule has the added benefit of providing for the submission of bids after the trial in the first of the pending Alter Ego Actions, which could provide greater clarity to bidders. In CITGO's view, bidders can simply discount the value of the claims from their bids, as with any other contingent liability. (Since the Special Master and other parties such as ConocoPhillips and Crystallex seem to agree that the claims lack merit, D.I. 1397 at 1; D.I. 1442 at 4; bidders should discount the claims to near zero.) Moreover, despite Elliott's use of the previously disclosed alter ego claims as a pretext to reduce the value of its bid after it was given exclusivity (or perhaps to ward off topping bidders by driving down the perceived value of the PDVH shares), none of the other bidders revoked or amended their bids, which were filed the same day as the recently filed Alter Ego Claims, perhaps because bidders already had considered pending and potential alter ego claims, which had been disclosed in the data room. (In fact, several bidders submitted higher bids in a subsequent round of bidding notwithstanding the filing of the Alter Ego Claims.)

Nevertheless, the *Girard Street* alter ego action in the Southern District of New York is scheduled for trial on March 31, 2025, and may be resolved even earlier given that PDVH's motion to dismiss is fully briefed and awaiting a decision. *See* Exhibit B (showing the schedule for Alter Ego Actions and 2020 Bondholder Litigation). PDVH's motion to dismiss in the *Gramercy* case in the Southern District of Texas also is fully briefed. *See id.* While any decision in these cases would of course be subject to appeal, resolution in PDVH's favor should provide greater clarity to bidders. The Special Master's proposal, by contrast, calls for the submission of bids less than two weeks before the start of *Girard Street* trial, D.I. 1445, Exhibit A, which makes little sense however one views the value of the alter ego claims.

8

CITGO's proposed timeline also would provide sufficient time for Judge Failla to rule on the validity of the 2020 Bondholders' pledge under Venezuelan law, which could occur as early as late-March 2025. *See* Exhibit B at 2. The 2020 Bondholders' submission clearly demonstrates that they will continue to try to obstruct any value-maximizing sale, including by bogging down the process with collateral litigation. *See* D.I. 1441 at 5 ("The 2020 Bond Entities will vigorously oppose approval of the SPA, or any other bid with similar provisions, and any effort to impair their rights."). Aligning the sale process with the likely initial resolution of the 2020 Bondholder Litigation would provide greater clarity to bidders while also mitigating any frustrations caused by the 2020 Bondholders.

Once bids are submitted, there also must be more time between the submission of bids and the selection of qualified bidders, as well as between the announcement of the base bid and the auction. The Special Master's proposed schedule allows for only seven days from the submission of bids to select qualified bidders. D.I. 1445, Ex. A. He also suggests that the auction occur two days after he designates a base bid. *Id.* It took the Special Master significantly longer than seven days to evaluate bids during the first round of the process, and two days does not provide qualified bidders enough time to obtain additional financing for a higher bid in the auction. There is no reason to impose impracticable deadlines that will destroy value. The Special Master and the Sale Process Parties should have 14 days to evaluate bids, and bidders should have 21 days between the selection of a base bid and the auction to prepare and shore up their financing.

B.  *Collaborative Decision-Making with the Sale Process Parties*

The Court also should order the Special Master to work more collaboratively with the Sale Process Parties during this next phase of the process. As a starting point, the Special Master should consult and reach consensus with the Sale Process Parties between the December 13, 2024 hearing and the opening of the data room on proposed modifications to the SPO. These modifications

9

should include transparent criteria for designating Qualified Bidders, standardized material terms for any SPA, including representations and warranties, and allowed and prohibited conditions from which the Special Master and bidders may not deviate. (If the Court decides to order a stalking horse/topping bid process, then the Special Master and the Sale Process Parties also should work together to develop uniform terms for any bidder protections.)[6] All of that needs to occur well before bids are submitted. The Court should further order the Special Master to bring unresolved issues to the Court for resolution instead of simply acting unilaterally, as he has done previously.

The Court also should order the Special Master to work with CITGO and the other Sale Process Parties to develop uniform benchmarks for valuing bids and identifying the pool of Qualified Bidders. CITGO agrees with the Court's inclination that all bids must contain definitive documentation, disclose any adjustments and holdbacks, and provide a "waterfall" showing the amount of judgments that the bid will satisfy to promote transparency and prevent the type of post-selection gamesmanship that Elliott used to materially reduce the value of its bid. All bids should be made available to both the Special Master and the Sale Process Parties for review, and both Qualified Bidders and the Baseline Bid should be selected jointly by the Special Master and the Sale Process Parties.

### C. Bidding by Sale Process Parties at the Auction

All Sale Process Parties should be allowed to submit a bid in the auction as a matter of right, regardless of whether they submitted a bid to become a qualified bidder or whether they viewed the other bids submitted during the selection process. Allowing the Sale Process Parties to bid in the auction as a matter of right will provide a backstop in case the process leads to a small

---

[6] CITGO invites the Special Master to confer with the Sale Process Parties prior to the December 13, 2024 hearing in an effort to agree on a schedule for moving forward (or at least narrow the areas of disagreement).

10

number of especially low bids. In addition, the political situation in Venezuela is rapidly changing. On July 28, 2024, the people of Venezuela overwhelmingly elected opposition candidate Edmundo González Urrutia, whom the United States recently recognized as Venezuela's president-elect.[7] President-elect González is scheduled to take office on January 10, 2025. This could improve the Venezuela Parties' position to participate in the auction, or might allow for an alternative proposal that could provide substantially more value to Attached Judgment Creditors.

### D. Post-Recommendation Timeline

The Court should provide a reasonable discovery period of 60 days before objections briefing. The need for a reasonable discovery period is apparent to numerous parties. *See* D.I. 1373 at 10 (2020 Bond Entities suggesting that briefing objections should only occur after the opportunity "conduct any appropriate discovery"); D.I. 1373-4 (Red Tree and Contrarian positing that "[o]bjections to the claims will also require discovery"). It would be difficult, if not impossible, for document production, depositions, and briefing to occur in only 21 days. CITGO attempted to avoid a scramble to conduct discovery by engaging proactively with the Special Master before he filed his Notice of Final Recommendation in September. But once CITGO formally propounded its initial discovery requests, the Special Master objected to the requests as premature (though, notably, not as irrelevant or otherwise unwarranted). The Special Master's view that discovery will not be timely until he submits his notice of final recommendation makes it even more important that sufficient time be provided between the submission of that notice and the filing of initial objections.

---

[7] See PBS.org, *U.S. recognizes Venezuela's opposition candidate Edmundo Gonzalez as president-elect*, Nov. 19, 2024, https://www.pbs.org/newshour/world/u-s-recognizes-venezuelas-opposition-candidate-gonzalez-as-president-elect.

11

The Court also should allot three days for the final sale hearing. The Special Master previously proposed two-to-three days for the hearing, as he intends to call multiple witnesses, and the Venezuela Parties and others likely will call multiple witnesses as well. It is not clear whether the Special Master's proposed schedule, which provides a date for the "commencement" of the final sale hearing, D.I. 1445, Exhibit A, still seeks a two-to-three-day hearing, but for the avoidance of doubt, CITGO reiterates its view that three days likely will be required.

### E.  The Court Should Not Conduct a Comprehensive Adjudication of Alter Ego Issues

Although the Special Master appears to have abandoned his request that the Court "conduct proceedings to determine whether PDVH and/or any of its subsidiaries are alter egos of PDVSA and/or the Republic" through a quasi-bankruptcy court procedure, D.I. 1445 at 3, several parties continue to support these requests. *See* D.I. 1438 at 3; D.I. 1439 at 7–8; D.I. 1440 at 4–5; D.I. 1442 at 5–8. CITGO and PDVH agree with the Court's inclination not to conduct such proceedings, which would only serve to complicate and prolong resolution of the Alter Ego Actions, for the reasons explained in prior submissions *See* D.I. 1407. As stated above, CITGO and PDVH agree that receiving greater clarity on these cases before new bids are submitted will help alleviate the confusion caused by those claims, but the most efficient and effective way to achieve such a resolution is for PDVH to continue to litigate the claims in the courts in which they are pending.

## CONCLUSION

CITGO respectfully requests that the Court adopt the foregoing proposals and the proposed schedule outlined in Exhibit A.

|  |  |
|---|---|
| OF COUNSEL:<br><br>Nathan P. Eimer<br>Lisa S. Meyer<br>Daniel D. Birk<br>Gregory M. Schweizer<br>Hannah Bucher<br>EIMER STAHL LLP<br>224 South Michigan Avenue<br>Suite 1100<br>Chicago, IL 60604<br>(312) 660-7600<br>NEimer@eimerstahl.com<br>LMeyer@eimerstahl.com<br>DBirk@eimerstahl.com<br>GSchweizer@eimerstahl.com<br>HBucher@eimerstahl.com<br><br>December 3, 2024 | MORRIS, NICHOLS, ARSHT & TUNNELL LLP<br><br>*/s/ Alexandra M. Cumings*<br>Kenneth J. Nachbar (#2067)<br>Alexandra M. Cumings (#6146)<br>Susan W. Waesco (#4476)<br>Kirk Andersen (#7156)<br>1201 North Market Street<br>Wilmington, DE 19801<br>(302) 658-9200<br>KNachbar@mnat.com<br>ACumings@mnat.com<br>SWaesco@morrisnichols.com<br>KAndersen@morrisnichols.com<br><br>*Attorneys for PDV Holding, Inc. and CITGO Petroleum Corporation* |