# IN THE UNITED STATES DISTRICT COURT FOR
# THE DISTRICT OF DELAWARE

| | |
|---|---|
| CRYSTALLEX INTERNATIONAL CORPORATION,<br><br>  Plaintiff,<br><br>v.<br><br>BOLIVARIAN REPUBLIC OF VENEZUELA,<br><br>  Defendant. | Case No. 17-mc-151-LPS |
| RUSORO MINING LIMITED,<br><br>  Plaintiff,<br><br>v.<br><br>BOLIVARIAN REPUBLIC OF VENEZUELA,<br><br>  Defendant. | Case No. 21-mc-481-LPS |
| GOLD RESERVE, INC.,<br><br>  Plaintiff,<br><br>v.<br><br>BOLIVARIAN REPUBLIC OF VENEZUELA,<br><br>Defendant. | Case No. 22-mc-453-LPS |

**OBJECTIONS TO THE SPECIAL MASTER'S SEPTEMBER 2024 STATUS REPORT**

Additional Judgment Creditor Rusoro Mining Ltd., together with Additional Judgment Creditor Gold Reserve Inc. (the foregoing Additional Judgment Creditors, the "Objecting Parties"), hereby object to the Court's entry of a proposed order approving the fees set forth in the Special Master's report for the month of September 2024. D.I. 1430; D.I. 1432. As mentioned in their initial objection letter, D.I. 1435, the Objecting Parties feel compelled to object to the fees

1

incurred during the month of September 2024 because the fees (a) were primarily incurred for the benefit of Amber Energy Inc., as opposed to being incurred for the benefit of the Additional Judgment Creditors or the Sale Process Parties; (b) were objectively unreasonable in amount; and (c) were incurred in pursuit of a transaction that had no support from any of the stakeholders involved in the Sale Process, and that has now effectively been abandoned.   For all these reasons, the Objecting Parties respectfully submit that the Special Master should reduce its submitted invoices so as to eliminate any fees incurred in connection with negotiations over potential bid protections, the form of a purchase agreement, and/or any other direct negotiations with Amber Energy.[1]

## I. THE SPECIAL MASTER'S SEPTEMBER INVOICES PRIMARILY REFLECT WORK DONE FOR AMBER ENERGY'S BENEFIT

### A. The SPA Would Not Have Benefitted Any Party Other Than Amber Energy

The Special Master's September 2024 Status Report (the "Status Report") revealed that the sole beneficiary of the previously proposed Sale Transaction was Amber Energy Inc. ("Amber Energy").  The Special Master's Summary of Events in the Status Report, in September 2024, showed that he spent massive amounts of time (i) reviewing and analyzing Amber Energy's Bid (32 lawyers, 690 hours); (ii) conferring with Amber Energy regarding the terms of its Bid (13 lawyers, 284 hours); (iii) drafting a bidder protection motion for Amber's benefit that was never filed (3 lawyers, 15 hours); (iv) conducting "mock cross examinations" in preparation for the October 1, 2024 status hearing, where no witness testimony was anticipated or scheduled (2 lawyers, 38 hours); and (v) in the most time intensive endeavor, "[p]reparing and finalizing documentation related to a potential Sale Transaction, including the Stock Purchase Agreement…

---

[1] All capitalized terms used but not otherwise defined herein, have the meanings ascribed to such terms in the May 27 Order and Sale Procedures Order. D.I. 277; D.I. 481.

and negotiating the same with Amber Energy." (15 lawyers, 970 hours). D.I. 1430-1 at 3. Based on the Objecting Parties' calculations, the Special Master spent a total of **2,483.90** hours working to conclude a Stock Purchase Agreement ("SPA") with Amber Energy, despite the fact that the Special Master had previously deposited in the virtual data room a form SPA that was supposed to be the basis of the Sale Transaction, and incurred not insubstantial fees to preparing this form SPA. D.I. 1430-1 at 167. As discussed more fully below, the result of these negotiations was a heavily-redacted SPA that left the Additional Judgment Creditors substantially in the dark: it was impossible to tell what the net purchase price would be, how much of the purchase price would be deducted before the substantial escrows, and, most pertinently, whether any particular Additional Judgment Creditor would recover anything as a result of the proposed sale. Only Amber Energy, CITGO, and the Special Master were permitted to know those key facts, and based on this knowledge CITGO vigorously objected.

It is, the Objecting Parties respectfully submit, difficult to view this work as having been done on their behalf or for their benefit. Under the terms of the Sale Procedures Order ("SPO"), the Marketing Process is required to be:

> (a) fair, open, comprehensive, and a public process, (b) adequate, (c) reasonable, (d) appropriate, (e) consistent with applicable law, (f) <u>sufficient to promote a competitive and robust bidding and auction process to generate competitive interest in the PDVH Shares</u>, (g) <u>reasonably calculated to maximize value and result in the highest offer in connection with any Sale Transaction at least sufficient to satisfy the Attached Judgments</u>, and (h) reasonably calculated to balance the many competing interests in a dynamic and internationally sensitive set of circumstances." (emphasis added.)

D.I. 481 at 7. Put simply, the Special Master's work in September 2024 did not fulfill this mandate. As has been documented in multiple prior submissions, during the two month period leading up to the Special Master's announcement of his "Final Recommendation," the Special Master generally refused to engage with the Additional Judgment Creditors, closed the data room, and negotiated

3

exclusively with Amber Energy, despite requests to engage that were being made by other bidders. D.I. 1419.

Pursuant to the terms of the Sale Procedures Order, fees incurred primarily for one party's benefit may not be borne by the Sale Process Parties and Additional Judgment Creditors. D.I. 481. The Objecting Parties should not be required to pay for fees incurred to conclude an SPA and further a Sale Transaction that, by any objective measure, appears to have been negotiated primarily for Amber Energy's benefit and not for the benefit of the Additional Judgment Creditors or Sale Process Parties. The Objecting Parties request that the Court reduce the Special Master's fees by an amount which represents the total value of the work performed solely for Amber Energy's benefit.

### B. The Special Master's Sale Transaction Has Effectively Been Abandoned

The Sale Transaction advanced by the Special Master in September 2024 has effectively been abandoned. In a recent filing, the Special Master conceded that the parties in interest "do not support the transaction on the proposed terms," that "Amber Energy has yet to garner any public support beyond the Special Master," and thus, that "the current framework of the sale process needs to be revisited." D.I. 1445 at 2. These are striking admissions of a broken process that cannot be squared with the exorbitant fees incurred in September 2024, particularly in light of the substantial fees that have already been passed on to, and paid, by the Sale Process Parties and Additional Judgment Creditors for prior periods.[2] The Special Master, only now acknowledging that the Parties for whom the Sale Transaction was conceived have delivered a vote of no

---

[2] The aggregate fees and expenses incurred by the Special Master and his advisors for the preceding four month-period totaled **$12,058,891.34**, as follows: August ($3,406,981.54, D.I. 1404); July ($4,163,419.75, D.I. 1360); June ($2,376,491.25, D.I. 1246); and May ($2,111,998.80, D.I. 1237).

4

confidence, proposes to "cast aside" the framework that he has followed for the past year (albeit not always in strict accordance with the SPO) and to make a "significant pivot." D.I. 1445 at 2-3. The Objecting Parties, for their part, object to being asked to pay for over 2,000 hours of legal work on a process that the Special Master himself has now asked to be "cast aside."

## II. THE TIME AND AMOUNT BILLED WAS OBJECTIVELY UNREASONABLE

In addition, the **$4,093,901.35** total bill for September 2024 is objectively unreasonable given that, even if the previously-proposed transaction had been acceptable (which it was not), the most critical work to complete the Sale Transaction still had not even begun. As the Court noted in its Inclinations Order, "[t]he Special Master's submission on September 27 of a "Notice of Successful Bidder" (D.I. 1325) is not the required Final Recommendation." D.I. 1433 at 13. Still left to be done were a number of significant steps, including (i) the data room being reopened; (ii) a Final Recommendation accompanied by public, final versions of all necessary documentation, showing the best-available bid; (iii) an updated Final Recommendation after the Topping Period ends; and (iv) a full Sale Hearing. D.I. 1433 at 12-13. As the Court has observed, "**[n]one of the foregoing steps has yet occurred**," D.I. 1433 at 13, and there no doubt would have been significant additional fees to complete these requisite steps

The Objecting Parties also respectfully submit that the size of the Special Master's legal team, and the amount of work being done by that team, is objectively unreasonable, particularly given the Special Master's lack of progress to achieve his mandate. And his legal team is comprised of 18 partners, 7 counsel, 43 associates and 6 support staff who billed a total of **2,483.90 hours in September 2024**. D.I. 1430-1 at 5-8; D.I. 1430-1 at 167. The counsel team spans six locations – New York, Boston, Washington, Miami, Silicon Valley and London (in addition to the Special Master's Delaware counsel). D.I. 1430-1 at 5-8.

5

The original fee cap agreed to by the Special Master, CITGO and PDVH was **$2 million**. D.I. 277 ¶ 15. Given the significant growth in the Special Master's legal expenses, the Objecting Parties respectfully submit that there should be additional oversight by the Court, and that if the Special Master predicts that his work in any given month will cause him to exceed the Court's fee cap, he should be required to inform the Court, identify the work to be performed, the anticipated value of the work as well as how much it will exceed the fee cap, and request permission from the Court to incur those fees. Only then should the Court consider increasing the fee cap: to paraphrase the saying common in our industry, it is time to ask permission, not forgiveness.

### III. AT MINIMUM, THE FEES OF THE SPECIAL MASTER'S RECENTLY DEPARTED LEAD COUNSEL SHOULD BE DEDUCTED

As the Court is aware, two of the Special Master's lead counsel – Mr. Ray Schrock and Mr. Alexander Welch – have withdrawn from this case for the stated reason that they no longer are employed by the law firm of Weil Gotshal. D.I. 1464; D.I. 1465. In September, Mr. Schrock billed 108 hours at $2350 per hour, for a total of **$253,800.00** in fees, making him the highest-billing lawyer on the file. D.I. 1430-1 at 5.

In view of the fact that Mr. Schrock's and Mr. Welch's departure will require a transition to successor attorneys, and that this is likely to create additional transactional cost, the Objecting Parties suggest that a reduction in the Special Master's September invoice in the amount of their combined fees represents a minimum appropriate reduction.

### IV. TWENTY PERCENT OF THE SEPTEMBER 2024 INVOICE SHOULD

The standard in bankruptcy courts in Delaware is that there should be a 20% holdback during an interim approval (e.g. each month) and then a quarterly approval by the Court of that holdback. This is designed to let law firms have a substantial amount of cash flow on a monthly basis, but then have the held back amount reviewed and approved by the Court in light of the

6

circumstances of the case. Here, the Objecting Creditors respectfully suggest that this too would be an appropriate oversight mechanism for the Court to implement. This is particularly true given that, in a bankruptcy case, the company pays the fees on an upfront basis, and they are not shared by the creditors as is the case in this action.

Dated: December 6, 2024

Respectfully submitted,

| **DLA Piper LLP (US)**<br><br>By: */s/ R. Craig Martin*<br>R. Craig Martin (#005032)<br>1201 North Market Street<br>Suite 2100<br>Wilmington, DE 19801<br>Telephone: 302-468-5655<br>Fax: 302-778-7834<br>craig.martin@us.dlapiper.com<br><br>- and -<br><br>James E. Berger (*pro hac vice*)<br>Charlene C. Sun (*pro hac vice*)<br>Joshua S. Wan (*pro hac vice*)<br>1251 Avenue of the Americas<br>New York, NY 10020<br>Telephone: 212-335-4715<br>Fax: 212-884-8715<br>James.berger@us.dlapiper.com<br>Charlene.sun@us.dlapiper.com<br>Joshua.wan@us.dlapiper.com<br><br>*Attorneys for Rusoro Mining Limited* | **WOMBLE BOND DICKINSON (US) LLP**<br><br>By: */s/ Kevin J. Mangan*<br>Kevin J. Mangan (#3810)<br>Matthew P. Ward (#4471)<br>Stephanie S. Riley (#5803)<br>1313 N. Market St., Suite 1200<br>Wilmington, DE 19801<br>Telephone: 302-252-4320<br>Kevin.mangan@wbd-us.com<br>Matthew.ward@wbd-us.com<br>Stephanie.riley@wbd-us.com<br><br>**NORTON ROSE FULBRIGHT US LLP**<br>Matthew H. Kirtland (*pro hac vice*)<br>799 9th Street NW, Suite 1000<br>Washington, DC 20001<br>Telephone: 202-662-0200<br>Matthew.kirtland@nortonrosefulbright.com<br><br>- and -<br><br>Katherine G. Connolly (*pro hac vice*)<br>555 California Street, Suite 3300<br>San Francisco, CA 94101<br>Telephone: 628-231-6816<br>Katie.connolly@nortonrosefulbright.com<br><br>*Attorneys for Gold Reserve Inc.* |
|---|---|