# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| CRYSTALLEX INTERNATIONAL CORP., <br>     Plaintiff, <br>     v. <br> BOLIVARIAN REPUBLIC OF VENEZUELA, <br>     Defendant. | Misc. No. 17-151-LPS |
| RED TREE INVESTMENTS, LLC, <br>     Plaintiff, <br>     v. <br> PETROLEOS DE VENEZUELA, S.A., and <br> PDVSA PETROLEOS, S.A., <br>     Defendants. | Misc. Nos. 22-68-LPS & 22-69-LPS |
| CONTRARIAN CAPITAL MANAGEMENT, L.L.C., et al., <br>     Plaintiffs, <br>     v. <br> BOLIVARIAN REPUBLIC OF VENEZUELA, <br>     Defendant. | Misc. Nos. 21-18-LPS, 22-131-LPS, & 22-263-LPS |
| OI EUROPEAN GROUP B.V., <br>     Plaintiff, <br>     v. <br> BOLIVARIAN REPUBLIC OF VENEZUELA, <br>     Defendant. | Misc. No. 19-290-LPS |
| ACL1 INVESTMENTS LTD., ACL2 INVESTMENTS LTD., and LDO (CAYMAN) XVIII LTD., <br>     Plaintiffs, <br>     v. <br> BOLIVARIAN REPUBLIC OF VENEZUELA, <br>     Defendant. | Misc. No. 21-46-LPS |
| RUSORO MINING LIMITED, <br>     Plaintiff, <br>     v. <br> BOLIVARIAN REPUBLIC OF VENEZUELA, <br>     Defendant. | Misc. No. 21-481-LPS |

| | |
|---|---|
| TIDEWATER INVESTMENT SRL and TIDEWATER CARIBE S.A., <br>     Plaintiffs, <br> v. <br> BOLIVARIAN REPUBLIC OF VENEZUELA, <br>     Defendant. | Misc. No. 19-79-LPS |
| PHILLIPS PETROLEUM COMPANY VENEZUELA LIMITED and CONOCOPHILLIPS PETROZUATA B.V., <br>     Plaintiffs, <br> v. <br> PETROLEOS DE VENEZUELA, S.A., CORPOGUANIPA, S.A., and PDVSA PETROLEO, S.A., <br>     Defendants. | Misc. No. 19-342-LPS |
| NORTHROP GRUNMAN SHIP SYSTEMS, INC., <br>     Plaintiff, <br> v. <br> THE MINISTRY OF DEFENSE OF THE REPUBLIC OF VENEZUELA, <br>     Defendant. | Misc. No. 20-257-LPS |
| CONOCOPHILLIPS GULF PARIA B.V., <br>     Plaintiff, <br> v. <br> CORPORACION VENEZOLANA DEL PETROLEO, S.A., and PETROLEOS DE VENEZUELA, S.A., <br>     Defendants. | Misc. No. 22-264-LPS |
| KOCH MINERALS SARL and KOCH NITROGEN INTERNATIONAL SARL, <br>     Plaintiffs, <br> v. <br> BOLIVARIAN REPUBLIC OF VENEZUELA, <br>     Defendant. | Misc. No. 22-156-LPS |
| GOLD RESERVE INC., <br>     Plaintiff, <br> v. <br> BOLIVARIAN REPUBLIC OF VENEZUELA, <br>     Defendant. | Misc. No. 22-453-LPS |

| | |
|---|---|
| SIEMENS ENERGY, INC., <br>     Plaintiff, <br> v. <br> PETROLEOS DE VENEZUELA, S.A., <br>     Defendant. | Misc. No. 22-347-LPS |
| VALORES MUNDIALES, S.L. and <br> CONSORCIO ANDINO, S.L., <br>     Plaintiffs, <br> v. <br> BOLIVARIAN REPUBLIC OF VENEZUELA, <br>     Defendant. | Misc. No. 23-298-LPS |
| CONOCOPHILLIPS PETROZUATA B.V., <br> CONOCOPHILLIPS HAMACA B.V., <br> CONOCOPHILLIPS GULF OF PARIA B.V., <br> and CONOCOPHILLIPS COMPANY, <br>     Plaintiffs, <br> v. <br> BOLIVARIAN REPUBLIC OF VENEZUELA, <br>     Defendant. | Misc. No. 22-464-LPS |
| PHARO GAIA FUND LTD. and PHARO <br> MACRO FUND LTD., <br>     Plaintiffs, <br> v. <br> BOLIVARIAN REPUBLIC OF VENEZUELA, <br>     Defendant. | Misc. No. 23-360-LPS |
| PHARO GAIA FUND LTD., PHARO MACRO <br> FUND LTD., and PHARO TRADING FUND, <br> LTD., <br>     Plaintiffs, <br> v. <br> BOLIVARIAN REPUBLIC OF VENEZUELA, <br>     Defendant. | Misc. No. 23-361-LPS |
| RUDI LOVATI and ALESSANDRO <br> LUCIBELLO PIANI, <br>     Plaintiffs, <br> v. <br> BOLIVARIAN REPUBLIC OF VENEZUELA, <br>     Defendant. | Misc. No. 23-340-LPS |

| | |
|---|---|
| GRANMERCY DISTRESSED OPPORTUNITY FUND LLC,<br>　　　　Plaintiff,<br>　　　　v.<br>BOLIVARIAN REPUBLIC OF VENEZUELA,<br>　　　　Defendant. | Misc. Nos. 23-378-LPS & 23-379-LPS |
| SAINT-GOBAIN PERFORMANCE PLASTICS EUROPE,<br>　　　　Plaintiff,<br>　　　　v.<br>BOLIVARIAN REPUBLIC OF VENEZUELA,<br>　　　　Defendant. | Misc. No. 23-397-LPS |
| ALTANA CREDIT OPPORTUNITIES FUND SPC, ALTANA CREDIT OPPORTUNITIES FUND 1 SP, and ALTANA FUNDS LTD. CAYMAN,<br>　　　　Plaintiffs,<br>　　　　v.<br>BOLIVARIAN REPUBLIC OF VENEZUELA,<br>　　　　Defendant. | Misc. No. 23-608-LPS |
| CONOCOPHILLIPS PETROZUATA B.V., CONOCOPHILLIPS GULF OF PARIA B.V., PHILLIPS PETROLEUM COMPANY VENEZUELA LIMITED, and CONOCOPHILLIPS HAMACA B.V.,<br>　　　　Plaintiffs,<br>　　　　v.<br>GIRARD STREET INVESTMENT HOLDINGS LLC, G&A STRATEGIC INVESTMENTS I LLC G&A STRATEGIC INVESTMENTS II LLC, G&A STRATEGIC INVESTMENTS III LLC, G&A STRATEGIC INVESTMENTS IV LLC, G&A STRATEGIC INVESTMENTS V LLC, G&A STRATEGIC INVESTMENTS VI LLC, G&A STRATEGIC INVESTMENTS VII LLC, GRAMERCY DISTRESSED OPPORTUNITY FUND, LLC, SIEMENS ENERGY, INC., THE BOLIVARIAN REPUBLIC OF VENEZUELA, PETROLEOS DE VENEZUELA, S.A., and PDV HOLDING, INC.,<br>　　　　Defendants. | Misc. No. 24-1140-LPS |

## ORDER

Having reviewed the at least 26 briefs[1] filed in response to the Court's November 20, 2024 "Inclinations Order" (D.I. 1427),[2]

**IT IS HEREBY ORDERED** that the Special Master's Injunction Motion (D.I. 1248) is **DENIED** for the reasons that will be set out in a Memorandum Opinion to follow in due course.

**IT IS FURTHER ORDERED** that the Special Master, Sale Process Parties, Attached Judgment Creditors, and other interested entities shall be prepared to address, at the status conference to be held on **Friday, December 13, 2024**, the following questions, which the Court intends to raise in essentially the following order (in some instances, the Court identifies its understanding of certain positions and/or provides its current inclinations, which are subject to further consideration at and after the status conference):

1. <u>Should the Sale Process[3] now proceed to selection of a Stalking Horse or to a Live Auction?</u>

    a. The Special Master contends that "the best way to accomplish the[] goals [of the Sale Process] is to cast aside the concept of a stalking horse bidder and bidder protections entirely, and proceed instead with" an auction process, asking the Court to "pivot" to such a live auction. (D.I. 1445 at 2)

---

[1] *See* D.I. 1438, 1439, 1440, 1441, 1442, 1444, 1445, 1450, 1451, 1452, 1453, 1454, 1455, 1456, 1457, 1458, 1459, 1460, 1461, 1470, 1471, 1472, 1473, 1476, 1481, 1482.

[2] The Special Master, Sale Process Parties, Additional Judgment Creditors, and other interested entities were each given the opportunity to file up to three briefs, containing their positions as to how the Litigation and the Sale Process should now proceed. The Court appreciates the input it received.

[3] All capitalized terms have the meaning given to them in the Sale Procedures Order (D.I. 481) or in the Inclinations Order (D.I. 1433), unless otherwise defined in this Order.

1

b. Crystallex, which is the judgment creditor in the first-priority position, supports either a live auction or a Stalking Horse Bid with a Topping Period, in which "bidders would submit their best bids consistent with a list of terms and valuation criteria to be provided by the Special Master (after consulting with the Sale Process Parties)." (D.I. 1438 at 6; *see also* D.I. 1454 at 2)

c. While several other Sales Process Parties, Additional Judgment Creditors, and interested entities also believe a live auction is feasible (*see, e.g.*, D.I. 1452 (OIEG) at 2-4; D.I. 1459 (CITGO) at 5-11), many more participants support a Stalking Horse process (*see, e.g.*, D.I. 1439 (OIEG) at 7-8; D.I. 1440 (Red Tree) at 5; D.I. 1456 (Amber Energy) at 3-4; D.I. 1457 (Gold Reserve) at 7); D.I. 1461 (Rusoro) at 3).

d. The Court is inclined to direct the Special Master to pursue the selection of a Stalking Horse bidder, which upon approval by the Court would become the beneficiary of to-be-determined Bidder Protections, followed by a Topping Period and later by a recommendation to the Court of a Successful Bid (that is, the highest Qualified Bid that the Special Master reasonably believes to be capable of being timely consummated after taking into account the factors set forth in the Bidding Procedures) as well as a recommendation as to whether the Court should approve or reject the Successful Bid. The Court would then evaluate these recommendations at a Sale Hearing following briefing of objections.

    e. Notwithstanding this inclination, the Court is open to whatever process, consistent with the law, is most likely to result in (1) the maximum value for the PDVH Shares, (2) closing, and (3) OFAC approval.

2. <u>Should the Court expect that the Sale Process will now involve new bidders and should additional marketing be conducted?</u>

    a. The Court is inclined to agree with PDVH and CITGO that new bidders may emerge, given the time that has elapsed since bids were first solicited, there are now "reduced interest rates and expectations of a change in antitrust and ESG policies," and there have been developments in this and other related litigations. (D.I. 1459 at 6-7)

    b. PDVH and CITGO suggest that, with respect to additional marketing, "[d]istribution of a teaser and direct outreach to potential bidders simultaneous with opening the data room should suffice." (D.I. 1476 at 2 n.1)

    c. The Special Master notes that he has already "extensively and directly marketed the PDVH Shares to a comprehensive list of potential buyers." (D.I. 1455 at 1) No one appears to disagree with this statement.

    The Court would consider setting a schedule containing two tracks: one that will apply if one or more new bidders emerges during an initial defined period, and a shorter one that will apply if no such new bidders emerge.

3. <u>Should Bidder Protections, a model Stock Purchase Agreement ("SPA") with certain non-negotiable material terms, and evaluation criteria (for selecting a Stalking Horse Bid/Base Bid and Successful Bid) be established, if necessary by motion practice, and on what schedule?</u>

3

a. The Court is inclined to require these materials to be prepared and agreed-upon, after the Court resolves any objections (to be briefed on an expedited schedule), while the data room is open and in advance of the deadline for submission of bids.

   i. As several creditors observe (*see, e.g.*, D.I. 1468 at 2-3), "[t]here is substantial consensus around the Court's Inclinations to establish standardized bidder protections in advance of the submission of initial bids, and to standardize material SPA terms prior to the submission of initial bids" (internal footnotes omitted). (*See also* D.I. 1476 (PDVH/CITGO) at 4) ("Proposed modifications to the SPO, required terms and conditions, qualification for bidders, and other specifics should be worked out between the Special Master and the Sale Process Parties and then proposed to the Court.")

b. This seeming "consensus" makes sense to the Court, for reasons including that, as Crystallex puts it, bidders should understand "they need to bid not on what they would like to buy, but rather on what is actually being sold in this forced sale." (D.I. 1470 at 4)

c. The Special Master, however, may be a notable exception to this "consensus." In his submissions, the Special Master has indicated that he "does not see the need for general bid protections under the existing circumstances." (D.I. 1455 at 4) The Court needs further input from the Special Master to understand his apparent resistance to the approach seemingly favored by pretty much everyone else.

4

    i. The following comment from the Special Master is puzzling, in light of the views expressed by most other participants in the Sale Process: "Locking in a laundry list of non-negotiable terms and requiring bidders to focus only on price would do a disservice to the years invested by many parties in this process and would almost certainly reduce competition and the possibility that creditors other than Crystallex will be paid. The Sale Procedures Order did not contemplate such a simple 'as is where is' sale and the Special Master strongly recommends the Court does not adopt one now." (D.I. 1445 at 2) (citing D.I. 481 ¶ 14)

    ii. The Court also does not understand how a live auction taking place over the course of a single day – which the Court understands to be the Special Master's preferred way of selecting the Successful Bid – can be accomplished without Bidder Protections, non-negotiable material terms, and evaluation criteria.

 d. At the same time, the Special Master does propose (D.I. 1455 at 6) to "make available to potential bidders through the data room: (i) a form of SPA, which all bidders must use as a base for any proposed revisions in connection with submission of bids, and (ii) a process letter setting forth any material terms and assumptions that all potential bidders must consider in submission of bids." It is not clear to the Court how these proposals differ from what has been proposed by others (and described above as the Court's inclination).

 e. And then, in his December 6 filing, the Special Master states that he "is supportive of the concept of general bidder protections," adding that he will

5

"continue to engage with parties ahead of the status conference on the role of bidder protections." (D.I. 1481 at 4)

f. If Bidder Protections are established, the Court is inclined to include among them:

  i. reimbursement of reasonable expenses, subject to a cap (*see, e.g.,* D.I. 1438 at 9-10), or a termination fee, "calculated based solely on the cash proceeds that will be available to judgment creditors at closing" (D.I. 1470 at 3; *see also* D.I. 1438 at 9-10) but not based on enterprise value, as Amber Energy would prefer (D.I. 1456 at 4);

  ii. a prohibition on "exclusivity to a top bidder while in the process of completing diligence and finalizing the terms of the sale" (D.I. 1481 at 2), contrary to the Special Master's suggestion, because, instead, bids should be "submitted in final form, with no financing contingencies and all necessary documentation definitively negotiated and agreed," as Crystallex proposes (DI 1438 at 12); and

  iii. provision that short objections may be expeditiously briefed before a particular bidder becomes the beneficiary of the Bidder Protections.

g. If the material terms of an SPA are established, the Court is inclined to include among them:

  i. a prohibition on "escrow arrangements or post-closing terms that allow the bidder to walk away from the deal" (D.I. 1470 (Crystallex) at 4-5);

6

  ii. a "material adverse change provision . . . limited to truly exceptional changes in the business operations of PDVH" (D.I. 1454 (Crystallex) at 3 n.4);

  iii. a requirement that CITGO "complies with interim operating covenants to provide bidders with comfort that CITGO will operate its business in the ordinary course during the period between the selection of the winning bid and the closing of the sale" (D.I. 1442 (ConocoPhillips) at 3-4));

  iv. a good faith deposit requirement, including for credit bidders (D.I. 1455 at 7); and

  v. other "[k]ey provisions" suggested by Crystallex in its reply (D.I. 1470 at Ex. A).

4. <u>Should the Court permit all Sale Process Parties "to submit a bid in the auction" or as part of a Stalking Horse process, "as a matter of right, regardless of whether they submitted a bid to become a qualified bidder or whether they viewed the other bids submitted during the selection process," as PDVH and CITGO request? (D.I. 1459 at 10)</u>

5. <u>What, if any, guidance does Delaware law provide as to how to evaluate bids comprised of not only cash but also "equity securities, debt, earnouts, warrants, [and/]or a number of other forms of consideration?" (D.I. 1455 at 6)</u>

  a. Crystallex contends that the "best deal" at the end of the process will be the one with "the highest *cash price* offered for a sale that is likely to close." (D.I. 1470 at 1) (emphasis added)

  b. ConocoPhillips suggests that the best bid "should be determined by the amount payable to creditors at closing of the transaction that the Special Master believes

7

is most likely to be executable. Executability would include the Special Master's assessment of the likelihood of obtaining regulatory and OFAC approvals in a timely manner, as well as the conditionality of any financing." (D.I. 1442 (ConocoPhillips) at 4)

6. <u>What weight, if any, should the Special Master give to bidders' plans with respect to the 2020 Bond Entities?</u>

   a. While the 2020 Bond Entities ask the Court to "direct the Special Master to require that any potential bidder . . . agree not to seek to impair the rights of the 2020 Bond Entities . . . , or, at a minimum, to strongly disfavor any bids that seek to do so," these same entities also "agree with Crystallex" that their rights are currently being litigated in the Southern District of New York "and that resolving the[ir] . . . claims is outside the scope of these proceedings." (D.I. 1441 at 1; *see also* D.I. 1469 at 2 (internal quotation marks omitted))

   b. The Court is strongly inclined to agree with those who urge the Court to require, with respect to the 2020 Bond Entities, nothing more from bidders other than that they acknowledge their existence.

      i. The Court agrees with the Special Master that none "of the terms proposed by the 2020 Bond Entities . . . should be included." (D.I. 1455 at 5)

      ii. The Court also agrees with Crystallex that "[w]hat the new owner of PDVH may do to settle litigation affecting PDVH's assets and subsidiaries after the transaction closes should be of no concern to this Court." (D.I. 1454 at 8 n.6)

8

7. Should an opportunity for discovery be built into the period for briefing objections to whatever recommendation the Special Master makes at the end of the process (i.e., the recommendation that will be the subject of the Sale Hearing)? (*See, e.g.*, D.I. 1459 at 11) If so, how much discovery should be permitted and what, if anything, can be done in advance of the objections period to reduce the time needed for discovery?

8. Should the Court approve the Special Master's proposal that only the terms of the Stalking Horse Bid and the Successful Bid be made public, while "[b]ids submitted by other bidders should remain confidential and filed with the Court under seal and served on the Sale Process Parties, as contemplated by the Sale Procedures Order?" (D.I. 1455 at 7)

9. Should the Court adopt ACL's proposal regarding "stapled financing?" (*E.g.*, D.I. 1453)

10. When should the Sale Hearing be held and can all participants in the Sale Process be expected to negotiate all dates leading to the Sale Hearing once the Court puts the hearing on its calendar?

    a. The Court is inclined to schedule a multi-day Sale Hearing for some time in the second quarter of 2025.

    b. The Court is not inclined to wait for developments in other litigations or other processes, in the U.S. or elsewhere, that are external to the cases pending in this District. On this point, the Court agrees with Red Tree, which (among others) states "there is no need to wait for other courts' resolution of the alter ego claims before selling the PDVH shares." (D.I. 1467 at 2)

11. How soon should the data room be reopened?

    a. All involved appear to agree that "the data room should be opened as quickly as possible." (D.I. 1481 at 3 n.4)

9

    b. The Court agrees as well.

12. <u>How quickly can all participants meet and confer with the Special Master to agree upon, or succinctly brief objections to, any necessary modifications to the Sale Procedure Order to implement the way forward the Court settles on?</u>

    a. CITGO and PDVH suggest that between the December 13 status conference and the opening of the data room, which they propose occur on January 6, 2025, "the Special Master and the Sale Process Parties should work in collaboration to develop any proposed modifications to the SPO and the uniform benchmarks for valuing bids and identifying the pool of Qualified Bidders." (D.I. 1459 at 6)

    b. The Court is inclined to agree with Crystallex that it "should order the Special Master and Sale Process Parties to propose necessary amendments to the Sale Procedures Order to accommodate the Court's views on the best path forward." (D.I. 1470 at 5)

    c. The Court does not agree with CITGO and PDVH that any proposed revisions, including those of the Special Master, are "in reality a proposal to start over." (D.I. 1459 at 1) Nor is the Court persuaded by their contention that "the Special Master failed to allot sufficient time for due diligence, the submission of bids, the selection of a winning bid, and the negotiation of definitive deal documentation." (*Id.* at 2) Neither the Special Master, nor the Court, is "abandoning the process that has already occurred or proposing to start over at square one." (D.I. 1481 at 5)

10

13. <u>Should the Court direct the Special Master to modify his approach to meeting and conferring?</u>

    a. CITGO and PDVH accuse the Special Master of acting in an "adversarial" manner and ask that the Court order him "[t]o work more collaboratively with the Sale Process Parties during [the] next phase of the process." (D.I. 1459 at 3, 9) These same parties also request that the Court "order the Special Master to bring unresolved issues to the Court for resolution instead of simply acting unilaterally." (*Id.* at 10)

    b. Similarly, a group of six Additional Judgment Creditors state that "there have been minimal recent efforts by the Special Master to meet-and-confer with the parties on critical issues." (D.I. 1468 at 3)

    c. While the Court prefers that the Special Master, Sale Process Parties, Additional Judgment Creditors, and other interested entities meet and confer extensively, and aim to cooperate and not burden the Court with any disputes other than those that absolutely necessarily require judicial intervention, the Court also recognizes that the Special Master has been given an enormously complex, multi-faceted task, and further notes that many participants in the sale process are now faulting him for spending too much time and money on carrying out his responsibilities. (*See, e.g.*, D.I. 1475)

14. <u>Should the Court sustain or overrule (in whole or in part) the pending objections to the Special Master's September 2024 billing?</u>

15. <u>What other issues, if any, should be addressed at the status conference?</u>

11

All participants in the Sale Process are reminded that, as Crystallex emphasizes, "this is a forced execution sale rather than a transaction between a willing buyer and seller. . . . [E]xecution sales are, at their core, for the benefit of creditors and not other theoretical stakeholders." (D.I. 1470 at 1)

Finally, all participants in the status conference are advised that, as they will likely have concluded from review of this Order, the conference is nearly certain to last most or all of the day.

December 11, 2024
Wilmington, Delaware

HONORABLE LEONARD P. STARK
UNITED STATES DISTRICT COURT

12