# MORRIS, NICHOLS, ARSHT & TUNNELL LLP

1201 NORTH MARKET STREET
P.O. BOX 1347
WILMINGTON, DELAWARE 19899-1347
———
(302) 658-9200
(302) 658-3989 FAX

ALEXANDRA M. CUMINGS
(302) 351-9248
(302) 425-4670 FAX
acumings@morrisnichols.com

December 23, 2024

**VIA EFILING**

The Honorable Leonard P. Stark
U.S. Court of Appeals for the Federal Circuit
717 Madison Place, NW
Washington, D.C. 20439

      Re:    *Crystallex International Corp. v. Bolivarian Republic of Venezuela*,
               D. Del. No. 1:17-mc-00151-LPS

Dear Judge Stark:

      I write to provide the positions of PDV Holding, Inc. ("PDVH") and CITGO Petroleum Corporation ("CITGO") on the open questions to be decided by the Court following the December 13, 2024 status conference. The Special Master refused to include PDVH and CITGO's positions in the list he submitted to the Court without his rewriting them. We objected to his characterization of those positions, and as a result nothing was included from my clients. Accordingly, I am providing PDVH and CITGO's positions here. To potentially assist the Court, I also am submitting PDVH and CITGO's proposed schedule and a draft proposed order that would implement PDVH and CITGO's positions, attached as <u>Exhibits A and B</u>, respectively.[1]

1. ***Should the Sale Process[2] now proceed to selection of a Stalking Horse or to a Live Auction?***

    a. Should the Special Master be *required* to select a Stalking Horse, subject to being permitted to petition the Court to relieve him of such requirement because he does

---

[1] I have been informed that the Bolivarian Republic of Venezuela (the "Republic") and Petróleos de Venezuela, S.A. ("PDVSA") join in the positions taken by PDVH and CITGO, though they advise that their doing so should not be construed to imply consent to a forced sale in any circumstances and that they preserve all rights and positions, including on appeal.

[2] All capitalized terms have the meaning given to them in the Sale Procedures Order (D.I. 481) or in the Inclinations Order (D.I. 1433).

The Honorable Leonard P. Stark
December 23, 2024
Page 2

> not believe there exists a Stalking Horse bid worthy of full bid protections? Or, instead, should the Special Master have the *option* to select a Stalking Horse?
>
> **PDVH and CITGO's Position:** The Court should require the Special Master, after good-faith consultation with the Sale Process Parties, to designate a Stalking Horse Bidder under CITGO's proposed schedule, contained in Exhibit A, which proposes 90 days for due diligence. Dec. 13, 2024, Hrg. Tr. ("Hrg. Tr.") 37:20–25; 38:5–22. As Red Tree explained at the hearing, both new and returning bidders require at least 90 days to conduct sufficient diligence. *Id.* at 98:14–99:24. If the Special Master determines in good faith after such consultation that no bid should be afforded the general bidder protections available to a Stalking Horse Bid, he may file a motion asking the Court to relieve him of the obligation to select a Stalking Horse Bidder and instead allow him to designate a base bid. *Id.* at 42:21–44:12.

  b. If the Special Master does not recommend approval of a Stalking Horse, should the process proceed to a live auction with a base bid designated, or should the base bid be subject to a Topping Period (the same as would have occurred if a formal Stalking Horse was approved)?

> **PDVH and CITGO's Position:** If a base bid is chosen, it should be subject to a Topping Period. Hrg. Tr. 42:21–44:12. The Topping Period should be long enough to allow parties to obtain necessary financing and approvals to submit a superior offer and for the Special Master to seek to improve bids throughout the Topping Period. *Id.* at 43:5–44:12. In this regard, PDVH and CITGO propose a 45-day Topping Period, consistent with the Special Master's recommendation to the Court on October 18, 2024, D.I. 1373-1 at 2. *See* Ex. A. An artificially short timeline has the potential to materially detract from the value that can be obtained. To encourage a competitive process, the Special Master should have discretion to set a date by which initial topping bids would be due and should be directed to seek, through his Advisor Evercore, to improve these bids throughout the Topping Period by continuing to diligently canvass potentially interested bidders. Hrg. Tr. 43:5–44:12. Further, the Special Master, acting through his Advisor Evercore, should be given wide latitude to seek to obtain bids that maximize value for Attached Judgment Creditors, including by disclosing to bidders and potentially interested bidders (on a confidential and anonymized basis) all material terms of bids under discussion.

2. ***Should the Court expect that the Sale Process will now involve new bidders and should additional marketing be conducted?***

   **PDVH and CITGO's Position:** The Special Master, acting through Evercore and after consultation with CITGO, should conduct initial marketing between January 6, 2025 and February 6, 2025. *See* Ex. A; Hrg. Tr. 36:7–37:1; 54:6–56:20. Such marketing is necessary, among other reasons, because CITGO has heard from multiple parties who believe, based on news reports regarding the Special Master's September 27, 2024 recommendation of Amber Energy, that the Sale Process has concluded. Hrg. Tr. 36:7–16. Beginning

The Honorable Leonard P. Stark
December 23, 2024
Page 3

marketing in late December, as the Special Master proposes, is impractical and unlikely to be productive (and in fact may be counterproductive). Such marketing should include, without limitation, outreach by Evercore to all parties that previously received a "teaser" or other marketing materials, as well as a good-faith review and evaluation of whether, in Evercore's professional judgment, other parties that might be interested in participating, due to changed circumstances or otherwise, should be contacted. *See id.* at 54:6–56:20. Additional marketing and/or outreach to potentially interested bidders should be conducted throughout the sale process, including throughout the Topping Period. *See id.*

3. ***Should Bidder Protections, a model Stock Purchase Agreement ("SPA") with certain non-negotiable material terms, and evaluation criteria (for selecting a Stalking Horse Bid/Base Bid and Successful Bid) be established, if necessary by motion practice, and on what schedule?***

    a. How should the Special Master and the parties go about submitting the following matters to the Court: (i) content of general bid protections available to any Stalking Horse approved by the Court; (ii) material terms of a stock purchase agreement ("SPA") or a form of SPA, and whether those terms or sections of that draft will be non-negotiable; and (iii) evaluation criteria for Stalking Horse and final bids?

        **PDVH and CITGO's Position:** Based in substantial part on the outcome of the initial phase of the sale process, PDVH and CITGO disagree with the Special Master's proposal on this question and instead propose that the Special Master and the Sale Process Parties jointly and in good faith prepare a draft long-form SPA containing general Stalking Horse bid protections, non-negotiable material terms, and evaluation criteria. Hrg. Tr. 87:3–88:3; 88:8–89:13. Afterward, the Special Master should provide the draft SPA to Attached Judgment Creditors for comment. The Special Master would then file a final proposed SPA along with a joint status report addressing specific items as to which the parties have reached a consensus and as to which the parties do not agree. Hrg. Tr. 89:14–90:2.

    b. Should parties other than the Special Master and Sale Process Parties be included in the drafting of the full draft of the SPA or just the material terms list?

        **PDVH and CITGO's Position:** PDVH and CITGO agree with the Special Master's position on this question, but as noted above, the draft SPA prepared by the Special Master and the Sale Process Parties should be sent to Additional Judgment Creditors for comment before being submitted for Court approval.

    c. Should the full draft of the SPA be subject to approval by the Court (and therefore filed on the public docket) or should it be uploaded directly to the data room?

        **PDVH and CITGO's Position:** The full draft of the SPA, once developed by the Special Master and the Sale Process Parties as outlined above, should be subject to

The Honorable Leonard P. Stark
December 23, 2024
Page 4

Court approval (and therefore filed on the public docket) and should be uploaded directly to the data room. *See* Hrg. Tr. 89:14–90:2.

4. ***Should the Court permit all Sale Process Parties "to submit a bid in the auction" or as part of a Stalking Horse process, "as a matter of right, regardless of whether they submitted a bid to become a qualified bidder or whether they viewed the other bids submitted during the selection process," as PDVH and CITGO request? (D.I. 1459 at 10)***

   **PDVH and CITGO's Position:** The goal of the Sale Process is to maximize the value of the PDVH shares for the benefit of all Attached Judgment Creditors. Consistent with this fundamental premise, PDVH and CITGO propose that any person or entity should be allowed to submit bids in subsequent bidding rounds regardless of whether they bid in earlier rounds. Hrg. Tr. 146:25–147:19. The current SPO, for example, did not limit participation in the Stalking Horse round to bidders that submitted a Non-Binding Indication of Interest, and did not limit participation in the Qualified Bid round to bidders that submitted a Stalking Horse bid. *See* Bidding Procedures, D.I. 480-1 at 4 ("For the avoidance of doubt, a party that does not submit a Non-Binding Indication of Interest is not precluded from submitting a Qualified Bid by the Bid Deadline."); *id.* at 6–13 (setting Bid Deadline and qualifications without requiring submission of Stalking Horse bid). Further, by definition, any Qualified Bid or other offer submitted during the Topping Period must be superior to the publicly filed Stalking Horse Bid. As such, there is no reason to prohibit a Sale Process Party that has viewed bids submitted during the Stalking Horse round from submitting a Qualified Bid or other offer during the Topping Period. Hrg. Tr. 146:25–147:19. To provide otherwise would compromise the process's goal of value maximization. PDVH and CITGO agree that a Sale Process Party that submits a bid during the initial round should be precluded from conferring with the Special Master regarding the contents of other non-public bids during that round, but not subsequent rounds, for the reasons explained above. *See* Hrg. Tr. 147:24–148:6. For the avoidance of doubt, the Special Master has recognized and treated each Venezuela Party as separate parties, including for purposes of sharing confidential information and restrictions on bidding and consultation rights. He should continue to do so.

5. ***What, if any, guidance does Delaware law provide as to how to evaluate bids comprised of not only cash but also "equity securities, debt, earnouts, warrants, [and/]or a number of other forms of consideration?" (D.I. 1455 at 6)***

   a. Is the Special Master permitted to consider bids that contain consideration other than cash (*e.g.*, debt; securities) or any contingent consideration (*e.g.*, escrows; earn-outs)?

   **PDVH and CITGO's Position:** There was broad agreement at the hearing that non-cash consideration should not be precluded entirely. Most parties agreed that non-cash consideration should be considered on a case-by-case basis alongside the

The Honorable Leonard P. Stark
December 23, 2024
Page 5

views of Attached Judgment Creditors whose interests would be affected. *See e.g.,* Hrg. Tr. 118:15–23 (Amber Energy); 126:15–20 and 160:7–163:3 (Special Master); 100:13–23 and 172:11–173:3 (Red Tree); 173:24–174:3 (OIEG). Again, the goal is maximizing value. The Court need not answer this question now but can instead wait at least until areas of agreement and disagreement are crystallized as part of the joint status report addressing bid evaluation criteria, if not until any disagreement as to an actual offer containing non-cash components becomes ripe. Hrg. Tr. 166:25–167:16. That said, PDVH and CITGO fundamentally oppose any limitation on consideration that can be offered by potentially interested bidders to create a value-maximizing transaction. Hrg. Tr. 167:17–168:2; 168:15–169:3.

6. **What weight, if any, should the Special Master give to bidders' plans with respect to the 2020 Bond Entities?**

    a. Should the material SPA terms list and/or the bid draft of the SPA, as applicable, require any positions with respect to the 2020 Bond Entities? If so, should those terms be non-negotiable?

    **PDVH and CITGO's Position:** A sale should not be conditioned on settlement with the 2020 Bondholders or release of their purported pledge, no weight should be given to a bidder's plans with respect to the pledge, and any settlement or other payment to the 2020 Bondholders should not be treated as part of a bidder's proposed consideration for their bid. Nothing should be required of bidders as to the 2020 Bondholders' claims other than to acknowledge those claims' existence. Hrg. Tr. 192:25–193:6.

The Honorable Leonard P. Stark
December 23, 2024
Page 6

7. ***Should an opportunity for discovery be built into the period for briefing objections to whatever recommendation the Special Master makes at the end of the process (i.e., the recommendation that will be the subject of the Sale Hearing)? (See, e.g., D.I. 1459 at 11) If so, how much discovery should be permitted and what, if anything, can be done in advance of the objections period to reduce the time needed for discovery?***

   **PDVH and CITGO's Position:** PDVH and CITGO agree with the Special Master's revised position on discovery. Among other things, discovery will be needed regarding the fair market value of the PDVH shares. Contrary to Crystallex's position, the default rule in Delaware is that "if [the fair market] value" of the property sold "is more than twice the sale price, there is such gross inadequacy as will shock the conscience of the Court and justify setting the sale aside." *Girard Tr. Bank v. Castle Apartments, Inc.*, 379 A.2d 1144, 1145–46 (Del. Super. Ct. 1977); *see also Burge v. Fidelity Bond & Mortg. Co.*, 648 A.2d 414, 419 (Del. 1994) (stating that "special judicial scrutiny" is required "where a property sold at the sheriff's sale fails to secure a bid which represents at least fifty percent of its fair market value"). Discovery also will be needed regarding the conduct of the process. *See Burge*, 648 A.2d at 419 (holding that a forced sale may be set aside where "there was some defect or irregularity in the process or mode of conducting the sale, or neglect of duty, or misconduct on the part of the Sheriff or some other sufficient matter whereby the rights of parties to, or interested in the sale are, or may have been, prejudiced"). As noted at the hearing, less discovery would be required in a more transparent process, and document production before recommendation of the Successful Bidder would reduce the time needed, Hrg. Tr. 39:12–24, but, at a minimum, production of relevant documents and depositions of declarants and hearing witnesses will be necessary.

8. ***Should the Court approve the Special Master's proposal that only the terms of the Stalking Horse Bid and the Successful Bid be made public, while "[b]ids submitted by other bidders should remain confidential and filed with the Court under seal and served on the Sale Process Parties, as contemplated by the Sale Procedures Order?" (D.I. 1455 at 7)***

   **PDVH and CITGO's Position:** PDVH and CITGO generally agree with the Special Master's proposal that only the Stalking Horse Bid (or base bid) and Successful Bid should be made public. No other bid should be made public. Unredacted Stalking Horse bids should be provided only to any Sale Process Party that has not made a Stalking Horse bid or reserved the right to do so, and immediately upon receipt. Hrg. Tr. 90:12–24. As with Stalking Horse Bids, unredacted topping bids should be provided only to any Sale Process Party that has not made a topping bid or reserved the right to do so, and immediately upon receipt. Hrg. Tr. 91:12–92:21. However, to encourage competitive bidding in this "public sale," 8 *Del. C.* § 324(a), anonymized versions of all topping bids should be provided to all bidders (including, but not limited to, any bidding Sale Process Party). *Id.*

9. ***Should the Court adopt ACL's proposal regarding "stapled financing?" (E.g., D.I. 1453)***

The Honorable Leonard P. Stark
December 23, 2024
Page 7

**PDVH and CITGO's Position:** The Venezuela Parties recommend that the Court not adopt ACL's proposal regarding "stapled financing," as it would slow down and not improve the process. *See* Hrg. Tr. 149:24–150:4.

10. ***When should the Sale Hearing be held and can all participants in the Sale Process be expected to negotiate all dates leading to the Sale Hearing once the Court puts the hearing on its calendar?***

    **PDVH and CITGO's Position:** A Sale Hearing lasting at least three days should begin on July 7, 2025 or August 11, 2025, depending on whether the short- or long-track schedule applies. PDVH and CITGO believe that the Court should establish the schedule and that it should adopt the schedule proposed by PDVH and CITGO in Exhibit A.

11. ***How soon should the data room be reopened?***

    **PDVH and CITGO's Position:** The data room re-opened on December 18, 2025. CITGO has substantially updated the information as requested by the Special Master and will continue to update the data room with new information as warranted. CITGO proposed to the Special Master that, in the interest of transparency, the answers to all questions previously submitted by bidders be placed in anonymized form in the data room for all potential bidders to review. The Special Master determined that previous questions and answers should not be included but that all documents produced in response to such questions would remain in the data room for all bidders to review.

12. ***How quickly can all participants meet and confer with the Special Master to agree upon, or succinctly brief objections to, any necessary modifications to the Sale Procedure Order to implement the way forward the Court settles on?***

    **PDVH and CITGO's Position:** The Special Master and the Sale Process Parties should meet and confer on necessary modifications to the Sale Procedures Order within ten days of the Court's ruling on the proposed Stock Purchase Agreement. *See* Hrg. Tr. 217:2–11.

13. ***Should the Court direct the Special Master to modify his approach to meeting and conferring?***

    **PDVH and CITGO's Position:** The Court should direct the Special Master and his Advisors to meet and consult in good faith with all Sale Process Parties jointly on a regular basis regarding the progress and trajectory of the Sale Process. The Court also should encourage the Special Master and his Advisors not just to meet with Sale Process Parties but also to work transparently and collaboratively with them in a sincere attempt to develop consensus positions. *See* Hrg. Tr. 217:12–218:4.

The Honorable Leonard P. Stark
December 23, 2024
Page 8

14. ***Should the Court sustain or overrule (in whole or in part) the pending objections to the Special Master's September 2024 billing?***

   **PDVH and CITGO's Position:** No position on this is needed because the Court has already ruled.

15. ***What other issues, if any, should be addressed at the status conference?***

   **PDVH and CITGO's Position:** No other issues other than those addressed at the status conference or in PDVH and CITGO's positions herein.

As the Court is aware, CITGO and PDVH (and the Republic and PDVSA) have objected to the process proposed and followed by the Special Master many times, as far back as when the Special Master was considering and drafting his first proposed Sale Procedures Order. These objections continue to apply to the "pivot" stage of the process now under consideration, given that the process still follows the contours originally laid out by the Special Master and adopted by the Court in the final Sale Procedures Order ("SPO"), D.I. 481. CITGO and PDVH reserve all rights and objections previously made to the SPO and the process followed by the Special Master, *see, e.g.*, D.I. 354; D.I 354-1; D.I. 355; D.I. 355-1, including to oppose and appeal any sale order issued by the Court.

Respectfully,

*/s/ Alexandra M. Cumings*

Alexandra Cumings (#6146)