# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| CRYSTALLEX INTERNATIONAL CORP., | ) | |
| Plaintiff, | ) | |
| v. | ) | C.A. No. 17-151-LPS |
| BOLIVARIAN REPUBLIC OF VENEZUELA, | ) | |
| Defendant. | ) | |
|  | ) | |

Myron T. Steele, Matthew F. Davis, and Bindu A. Palapura, POTTER ANDERSON & CORROON LLP, Wilmington, DE

David Lender, Alexander W. Welch, and Chase A. Bentley, WEIL, GOTSHAL & MANGES LLP, New York, NY

> Attorneys for Special Master Robert B. Pincus

Raymond J. DiCamillo, Jeffrey L. Moyer, and Travis S. Hunter, RICHARDS, LAYTON & FINGER, P.A., Wilmington, DE

Robert L. Weigel, Jason W. Myatt, and Rahim Moloo, GIBSON, DUNN & CRUTCHER LLP, New York, NY

Miguel A. Estrada, Lucas C. Townsend, and Adam M. Smith, GIBSON, DUNN & CRUTCHER LLP, Washington, DC

> Attorneys for Crystallex International Corporation

Garrett B. Moritz and Elizabeth M. Taylor, ROSS ARONSTAM & MORITZ LLP, Wilmington, DE

Michael S. Kim, Marcus J. Green, Josef M. Klazen, and Lydia L. Halpern, KOBRE & KIM LLP, New York, NY

Richard G. Mason, Amy R. Wolf, and Michael H. Cassel, WACHTELL, LIPTON, ROSEN & KATZ, New York, NY

> Attorneys for Phillips Petroleum Company Venezuela Limited, ConocoPhillips Petrozuata B.V., ConocoPhillips Gulf of Paria B.V., and ConocoPhillips Hamaca B.V.

A. Thompson Bayliss and Christopher Fitzpatrick Cannataro, ABRAMS & BAYLISS LLP, Wilmington, DE

Donald B. Verrilli, Jr., Elaine J. Goldenberg, and Ginger D. Anders, MUNGER, TOLLES & OLSON LLP, Washington, DC

George M. Garvey and Adeel Mohammadi, MUNGER, TOLLES & OLSON LLP, Los Angeles, CA

     Attorneys for the Bolivarian Republic of Venezuela


Samuel T. Hirzel, II and Brendan Patrick McDonnell, HEYMAN ENERIO GATTUSO & HIRZEL LLP, Wilmington, DE

Joseph D. Pizzurro, Kevin A. Meehan, and Juan O. Perla, CURTIS, MALLET-PREVOST, COLT & MOSLE LLP, New York, NY

     Attorneys for Petróleos de Venezuela, S.A.


Theodore A. Kittila, HALLORAN FARKAS + KITTILA LLP, Wilmington, DE

Mark W. Friedman, William H. Taft V, Carl Micarelli, Juan Fandiño, and Caroline Wallace, DEBEVOISE & PLIMPTON LLP, New York, NY

Robert Drain and Lisa Laukitis, SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP, New York, NY

     Attorneys for Gramercy Distressed Opportunity Fund LLC


Andrew H. Sauder, DAILEY LLP, Wilmington, DE

Michael J. Baratz and Emma Marshak, STEPTOE & JOHNSON LLP, Washington, DC

Robert Drain and Lisa Laukitis, SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP, New York, NY

     Attorneys for G&A Strategic Investments I LLC, G&A Strategic Investments II LLC, G&A Strategic Investments III LLC, G&A Strategic Investments IV LLC, G&A Strategic Investments V LLC, G&A Strategic Investments VI LLC, G&A Strategic Investments VII LLC, and Girard Street Investment Holdings LLC


**OPINION**


December 30, 2024
Wilmington, Delaware

**STARK, U.S. Circuit Judge:**

Pending before the Court is the Special Master's Motion to Enjoin the Alter Ego Claimants. (D.I. 1248)[1] ("Injunction Motion" or "Motion")  After briefing (*see* D.I. 1249, 1277, 1306, 1327) and oral argument (*see* D.I. 1357 at 64-144) ("Tr."), the Court disclosed its inclination to deny the Motion, setting out a summary of a portion of its reasoning in its Order and Inclinations ("Inclinations Order").  (D.I. 1433 at 5-6)  Thereafter, as part of ongoing briefing as to how the Sale Process[2] and the Litigation should proceed, the Court received additional briefing, largely opposed to its inclination. (*See, e.g.,* D.I. 1438, 1439, 1442, 1445)  Having considered all of this input, as well as its experience presiding over now more than seven years of litigation related to judgment creditors' efforts to collect what they are owed by the Republic of Venezuela (the "Republic" or "Venezuela") and its state-owned oil company, Petróleos de Venezuela, S.A. ("PDVSA"), the Court issued an order on December 11, 2024 denying the Injunction Motion, indicating that an opinion would be issued in due course.  (D.I. 1493)  This is that Opinion.

## BACKGROUND

The undersigned Judge is presiding over numerous lawsuits in which judgment creditors of the Republic and PDVSA are seeking to enforce their judgments.  In these cases, the Court has issued writs of attachment against the shares of PDV Holding, Inc. ("PDVH Shares"), 100% of which are currently owned by PDVSA, which is itself wholly-owned by Venezuela.  PDV Holding,

---

[1] All references to the docket index ("D.I.") are to the docket in the *Crystallex* Action, Misc. No. 17-151, unless otherwise noted.

[2] All capitalized terms have the meanings given to them in the Sale Procedures Order (D.I. 481), the Injunction Motion (D.I. 1248), or the subsequent letter relating to the Injunction Motion (D.I. 1374).

1

Inc. ("PDVH"), a Delaware corporation, owns (via a network of corporate relationships) Citgo Petroleum Corp. ("CITGO"), a large U.S.-based oil refiner. The Court took issued writs of attachment after finding that PDVSA is the alter ego of Venezuela, making the property owned by PDVSA in this District, i.e., the PDVH Shares, available as a potential source of funds from which judgment creditors of Venezuela (and of PDVSA) can collect. The United States Court of Appeals for the Third Circuit has, on several occasions, affirmed this alter ego finding. *See Crystallex Int'l Corp. v. Bolivarian Republic of Venezuela*, 932 F.3d 126, 140-50 (3d Cir. 2019); *OI Eur. Grp. B.V. v. Bolivarian Republic of Venezuela*, 73 F.4th 157, 172-74 (3d Cir. 2023), *cert. denied,* 144 S. Ct. 549 (2024).

As part of its effort to conduct a judicial execution sale of the PDVH Shares, the Court in April 2021 appointed a Special Master. (D.I. 258) The individual the Court selected as its Special Master was recommended by the Venezuela Parties based on his "directly relevant experience crafting and running multi-million dollar corporate auctions, serving as a court-appointed officer, and working with the petroleum industry." (D.I. 244 at 5) After his appointment, over the course of a full year, the Special Master drafted multiple iterations of a Sale Procedures Order ("SPO"). (*See, e.g.*, D.I. 302, 341, 391, 411, 451, 472) The "Sale Process Parties" – a group consisting of the Special Master as well as Crystallex, Inc. ("Crystallex"), the first judgment creditor of Venezuela to file suit and seek a writ of attachment on the PDVH Shares; ConocoPhillips, Inc. ("ConocoPhillips"), another large judgment creditor which sought writs of attachment early in the Court's process; and the Venezuela Parties (i.e., Venezuela, PDVSA, PDVH, and CITGO) – litigated waves of objections relating to the SPO. (*See, e.g.*, D.I. 423, 457) Eventually, on October 11, 2022 the Court adopted the currently-governing version of the SPO. (D.I. 481)

2

As he was authorized to do by the Court, the Special Master hired teams of expert advisors, including dozens of investment bankers and attorneys. To date, the Special Master and his advisors have billed more than $30 million for their extensive efforts. (*See* D.I. 1478 at 2)

Pursuant to the SPO, on October 23, 2023 the Special Master launched the Sale Process by, among other things, marketing the PDVH Shares, communicating with scores of parties potentially interested in purchasing the shares, and opening a data room in which interested parties could conduct due diligence. (*See* D.I. 771)  On September 27, 2024, the Special Master gave notice that he had selected a Successful Bidder and recommended that the Court approve a bid for the PDVH Shares made by Amber Energy. (D.I. 1325)

Just before selecting the Successful Bidder, the Special Master had, on September 9, 2024, filed the Injunction Motion. (D.I. 1248)  In his Motion, the Special Master asked the Court to enjoin the relief sought in certain lawsuits pending in other courts.  These suits had been brought by creditors of one or more of the Venezuela Parties, seeking determinations that PDVH is an alter ego of PDVSA and/or of the Republic, therefore allowing – through a theory known as "reverse veil-piercing" – execution of judgments against Venezuela and PDVSA directly from PDVH. (*See generally* D.I. 1248-50)

The Injunction Motion is particularly directed to three lawsuits, which had been filed weeks or months before the Special Master sought relief in this Court.  These three suits, which the Court will refer to collectively as the "Alter Ego Actions," are as follows:

- On June 10, 2024, Girard Street Investment Holdings LLC ("Girard") filed a complaint against PDVH in the Southern District of New York. *See Girard St. Inv. Holdings LLC v. PDV Holding, Inc.*, No. 24-cv-4448 D.I. 1 (S.D.N.Y. June 10, 2024) ("Girard Complaint").  Girard had previously participated in this Court's Sale Process.  In particular, on August 14, 2023, Girard submitted an Attached Judgment Statement – satisfying Step 1 of this Court's seven-step process for adding a judgment to the sale – based on its $258,707,694 judgment against the Republic. (D.I. 672; *see also* D.I. 646 (listing seven steps))  Later, on March 8, 2024, Girard completed Step 2 by enforcing its

3

award in a U.S. court and receiving a judgment. (D.I. 1038) The Girard Complaint seeks to execute on the same judgment that was the basis for Girard's Attached Judgment Statement filed in this Court.

- Also on June 10, 2024, G&A Strategic Investments I LLC ("G&A"), an entity related to Girard, filed a complaint against PDVH in a state court in Harris County, Texas. *See G&A Strategic Invs. I LLC v. PDV Holding, Inc.*, 2024-36664 D.I. 1 (D. Ct. Tex. June 10, 2024) ("G&A Complaint"). PDVH and intervenor PDVSA removed the G&A action to the U.S. District Court for the Southern District of Texas, where it is now proceeding. *See G&A Strategic Invs. I LLC v. PDV Holding, Inc.*, Civ. Action No. 4:24-cv-02774 (S.D. Tex.). G&A had previously participated in this Court's Sale Process. In particular, on August 14, 2023, G&A submitted an Attached Judgment Statement, based on its $825,156,172 judgment against the Republic (D.I. 675). On March 8, 2024, G&A completed Step 2. (D.I. 1039) The G&A Complaint seeks to execute on the same judgment that was the basis for G&A's Attached Judgment Statement filed in this Court.

- On July 29, 2024, Gramercy Distressed Opportunity Fund, LLC ("Gramercy") – which, according to the Special Master, is the parent of both Girard and G&A – filed its own suit, nearly identical to those filed by Girard and G&A. Gramercy filed in Texas state court, *see Gramercy Distressed Opportunity Fund, LLC v. PDV Holding, Inc.*, 2024-47814 D.I. 1 (D. Ct. Tex. July 29, 2024) ("Gramercy Complaint"), but PDVH removed the case to the Southern District of Texas, where it is now proceeding, *see Gramercy Distressed Opportunity Fund, LLC v. PDV Holding, Inc.*, No. 4:24-cv-02981 (S.D. Tex.). Gramercy had been an active participant in this Court's Sale Process. On August 14, 2023, Gramercy submitted an Attached Judgment Statement based on two judgments, for $256,375,009 and $280,667,040, against the Republic. (D.I. 656; *see also* D.I. 963 at 8) Gramercy eventually progressed through Step 5 in the Sale Process and was named an Additional Judgment Creditor. (D.I. 783; D.I. 1055) After the Court determined the order of priority by which judgment creditors may recover from the proceeds of the sale of the PDVH Shares, Gramercy was placed 16th, with more than $18 billion of judgments ahead of it. (D.I. 969-1, 1102, 1136) Gramercy sought reconsideration of the Court's priority order (D.I. 893 at 1-2), which the Court denied on February 15, 2024 (D.I. 963). The Gramercy Complaint seeks to execute on the same judgments that were the basis for Gramercy's Attached Judgment Statement filed in this Court. (D.I. 1306 at 9-10)[3]

In the Injunction Motion, the Special Master asserted that the claims being pressed by

Girard, G&A, and Gramercy (hereinafter, the "Alter Ego Claimants") in the Alter Ego Actions

---

[3] On October 4, 2024, Siemens Energy Inc. ("Siemens"), another Additional Judgment Creditor in this Court's Sale Process (D.I. 1113), filed suit in the Eleventh District Business Court of Harris County, Texas (*Siemens Energy, Inc. v. PDV Holding, Inc.*, No. 24-BC11B-0010 (D. Ct. Tex. Oct. 4, 2024), D.I. 2). The Siemens suit is similar to the Alter Ego Actions.

threaten to destroy this Court's Sale Process. Specifically, the Special Master argued that the Alter Ego Actions "create a cloud of uncertainty over the PDVH Shares and thereby threaten to inhibit the Special Master's ability to close a value-maximizing sale transaction and fulfill his mandate, since bidders are reasonably concerned about the risk that creditors will later lay claim to the assets the bidders are seeking to purchase." (D.I. 1249 at 2) This concern stems from the belief that if the Alter Ego Claimants succeed in their Alter Ego Actions, the assets owned by PDVH – including, most importantly, CITGO – may become available to judgment creditors of the Republic and PDVSA as sources of funds from which these creditors may collect on their judgments. This Court's longstanding efforts to market the PDVH Shares in order to enforce judgments according to the priority order this Court established as part of its Sale Process could, the Special Master fears, become a complete nullity. (*See id.* at 10, 20)

In support of the Motion, the Special Master submitted a declaration from one of his financial advisors, Ray Strong, stating that "bidders have expressed concerns to me, the Special Master, and his Advisors about the risks that the Alter Ego Claimants and other creditors may circumvent this Court's sale process by seeking relief in other courts." (D.I. 1250 at 3) ("Strong Declaration") Consistent with these concerns, the Amber Energy bid the Special Master recommended to the Court was contingent on the Injunction Motion being granted and on the creation of an escrow account, reserving a large portion of the Amber Energy purchase price for potential resolution of the Alter Ego Actions. (D.I. 1446-1 at 134-41) In a subsequent alternative proposed transaction, Amber Energy continued to condition its offer on the Court granting the Injunction Motion, but it removed the escrow requirement – at the same time reducing the top-line offer price by $2 billion. (D.I. 1414 at 2; D.I. 1414-1 at 6-7)

After expedited briefing (*see, e.g.,* D.I. 1249, 1277, 1306, 1327), the Court heard oral argument on the Motion on October 1, 2024. (D.I. 1357) On November 20, the Court issued the Inclinations Order, which included the Court's inclination to deny the Injunction Motion. (D.I. 1433 at 5-6) Subsequently, the Court received extensive additional briefing addressing the Injunction Motion. (*See* D.I. 1438-45, 1450-61, 1467-74, 1476, 1481-82) On December 11, the Court denied the Motion. (D.I. 1493)

## DISCUSSION

In the Inclinations Order, the Court observed that it was inclined to deny the Injunction Motion because it "appears to be unnecessary and unwarranted, for reasons including" that bidders may be willing to purchase the PDVH Shares without an injunction of the Alter Ego Actions; the Alter Ego Actions may be "worthless and mere nuisances" and, in any event, "can be litigated in the courts in which they are pending (possibly more expeditiously than they can be here);" and although materially identical claims have been pending throughout the Sale Process, it was not until quite recently that the Special Master, or anyone else, advised the Court that such claims could be fatal to the Court's carefully-crafted, extensively-litigated, and expensively-developed Sale Process, undermining the credibility of such characterizations. (D.I. 1433 at 6) The Court also observed that while the Alter Ego Actions may impact the value of the PDVH Shares, the Court's obligation is to market those shares in a manner designed to maximize their actual value – even if that value may turn out to be negatively impacted by the Alter Ego Actions – not to prevent all other claims that impact the value of the shares.

Additional reasons for denying the Injunction Motion include that none of the legal bases identified by the Special Master persuasively establish the Court's authority to grant an injunction;

the criteria traditionally applicable to requests for injunctive relief are not satisfied; and it may not be possible to appropriately tailor any injunction that might be imposed.

The Court adheres to the reasoning provided in the Inclinations Order and, below, elaborates on many of these and the additional grounds for denying the Injunction Motion. The points are addressed in a different order than outlined above.

### The Special Master Cites No Lawful Basis For The Injunction He Seeks

As an initial, and dispositive, matter, the Special Master failed to identify any proper legal basis for the Court to enjoin the Alter Ego Actions. None of the grounds he articulated for the Motion – the *Princess Lida* Doctrine, the All Writs Act, and the first-filed rule – provides a meritorious basis for granting the Injunction Motion.

The Court agrees with the Alter Ego Claimants that the doctrine outlined in *Princess Lida of Thurn & Taxis v. Thompson*, 305 U.S. 456 (1939), does not apply here. The *Princess Lida* Doctrine provides that where "two suits are in rem, or quasi in rem, so that the court, or its officer, has possession or must have control of the property which is the subject of the litigation in order to proceed with the cause and grant the relief sought," then "the jurisdiction of the one court must yield to that of the other." *Id.* at 466. It is undisputed that this Court has possession and control over the PDVH Shares. *See generally Crystallex*, 932 F.3d at 152 ("The District Court acted within its jurisdiction when it issued a writ of attachment on PDVSA's shares of PDVH to satisfy Crystallex's judgment against Venezuela, and the PDVH shares are not immune from attachment."). But, for several reasons, this fact does not make the *Princess Lida* doctrine applicable here.

7

First, while the suits here, including the *Crystallex* Action in which the Court appointed the Special Master, are *in rem* or *quasi in rem*, the Alter Ego Actions are not. They are, instead, actions "seeking to impose *in personam* liability on PDVH for the obligations of PDVSA [or the Republic] on the basis of reverse veil-piercing." (D.I. 1306 at 1) In other words, the Alter Ego Claimants are "seek[ing] to establish a liability of PDVH [but] not [to] exercise control over any property that is before this Court." (*Id.* at 15; *see also* Tr. at 105 ("We already have judgments against PDVSA . . . . We can't enforce them against the PDVH shares because those are in re[m] in front of Your Honor. But what these actions are trying to obtain is an in personam judgment against PDVH."))[4] The Special Master acknowledges that the claims asserted in the G&A Complaint and the Gramercy Complaint are "technical[ly]" *in personam*, but contends that the Girard Complaint seeks to state an *in rem* claim, as it is "seeking a turnover of the shares." (Tr. at 136) However, as the Alter Ego Claimants respond, under the applicable New York State law a turnover order does not create an interest in the property but is, instead, considered an *in personam* remedy. (Tr. at 139) (citing *Koehler v. Bank of Bermuda Ltd.*, 12 N.Y.3d 533, 911 N.E.2d 825 (2009))[5]

---

[4] The same sort of distinction arose early in the *Crystallex* Action, where, in the context of finding PDVSA to be the alter ego of the Republic, the Court explained it "views the present case as involving garnishment, seeking only to establish secondary liability (by attaching certain specified property), rather than an action seeking to impose primary liability on PDVSA." (D.I. 83 at 17) The Court did not hold that PDVSA has primary liability for all of the Republic's debts, only that property owned by PDVSA (and found in this District) is available to be executed on by creditors of the Republic. In the Alter Ego Actions, by contrast, the Alter Ego Claimants *are* trying to impose primary (*in personam*) liability on PDVH, *not* merely secondary (*in rem*) liability on specified *property of PDVH*.

[5] The Third Circuit has, on occasion, approved of application of *Princess Lida* where "the parties tacitly agree that the actions are not *in rem*," at least if both relevant actions "are not 'merely an adjudication of [a party's] right or . . . interest' nor 'strictly in personam.'" *Dailey v. National Hockey League*, 987 F.2d 172, 176-77 (3d Cir. 1993) (internal citation omitted). The circumstances

Second, while the subject of the litigation here is the PDVH Shares, the subject of the Alter Ego Actions is the *assets* of PDVH – assets which are not in the possession or control of this Court. (*See* D.I. 1450 at 5)  This Court exercises control over the shares, which evidence ultimate ownership of the assets owned or controlled by PDVH, but this Court does not exercise control over those assets themselves.  *Princess Lida* applies when "the relief sought *requires* that the second court exercise control over the property in dispute and *such property is already under the control of the first court*."  *Dailey*, 987 F.2d at 176 (emphasis added).  This condition is not satisfied here because the "second courts," i.e., the federal courts in New York and Texas in which the Alter Ego Actions are pending, are not "required" (in order to grant the relief sought by the Alter Ego Claimants) to "exercise control over" property that is "already under the control" of this "first" Court – that is, the PDVH Shares.  Again, then, *Princess Lida* does not apply.

The Court likewise agrees with the Alter Ego Claimants that the All Writs Act does not provide a meritorious basis upon which the Court may grant the Injunction Motion. (*See, e.g.*, D.I. 1306 at 15)  This is because the requested injunction is neither necessary nor appropriate to protect this Court's jurisdiction.

The All Writs Act, 28 U.S.C. § 1651(a), provides that "[t]he Supreme Court and all courts established by Act of Congress may issue all writs necessary or appropriate in aid of their respective jurisdictions and agreeable to the usages and principles of law."  The Supreme Court has "recognized the power of a federal court to issue such commands under the All Writs Act as

---

presented here do not come within even this broadened scope of *Princess Lida*.  In *Dailey*, the "primary relief sought in both actions" was the "restoration of trust funds which were allegedly misappropriated," as had been similarly true in the cases involved in *Princess Lida*.  *Id.*  Here, however, the Special Master has failed to show that the relief sought in the Alter Ego Actions is *quasi in rem* and has further failed to distinguish those actions from numerous other cases proceeding against PDVH, which he does not ask this Court to enjoin.

may be necessary or appropriate to effectuate and prevent the frustration of orders it has previously issued in its exercise of jurisdiction otherwise obtained." *United States v. N.Y. Tel. Co.*, 434 U.S. 159, 172 (1977). However, the "extraordinary powers" conferred on federal courts by the All Writs Act are "firmly circumscribed" and, consequently, may only be exercised in "narrow circumstances." *Grider v. Keystone Health Plan Cent., Inc.*, 500 F.3d 322, 328-29 (3d Cir. 2007).

The Third Circuit has approved the use of the All Writs Act to enjoin litigants from pursuing other proceedings where there was "justifiable fear in the District Court . . . that the plaintiffs were seeking to obtain through the back door what they were barred from receiving through the front," if, without an injunction from the lead court, proceedings in the second court would "render" the lead court's jurisdiction "nugatory." *In re: Diet Drugs*, 369 F.3d 293, 300, 306 (3d Cir. 2004). This Court does not have such a fear. While, as is further explained later in this Opinion, the Court anticipates that the pendency of the Alter Ego Actions could exert downward pressure on the value of the PDVH Shares, sophisticated bidders can (and, the Court expects, will) factor any potential liability and litigation risk into their bids for those shares. In no way would prevailing in the Alter Ego Actions allow the Alter Ego Claimants to alter this Court's order of priority of judgment creditors to proceeds of any sale of the PDVH Shares; nor would doing so allow them to obtain through the "back door" a higher-priority claim to the PDVH Shares than they obtained through the "front door" of this Court's Sale Process.[6] The Alter Ego Actions cannot result in an attachment

---

[6] The Court does not see how the Alter Ego Actions can be understood as defeating "the entire purpose of establishing priority with respect to the attached PDVH Shares," improperly allowing the Alter Ego Claimants to "leapfrog[] the very order of priority that the Court established." (D.I. 1415 at 2) The Court has established, and will enforce, a priority order with respect to judgment creditors' claims to the PDVH Shares, whatever those shares are worth.

of the PDVH Shares, only – potentially – an attachment of assets owned, directly or indirectly, by PDVH.

Additionally, "a court may not issue an injunction under the All Writs Act if adequate remedies at law are available." *Grider*, 500 F.3d at 332 (internal quotation marks omitted). "Under this standard, the general rule is that if a party will have opportunity to raise its claims in the concurrent federal proceeding sought to be enjoined, that concurrent proceeding is deemed to provide an adequate remedy at law." *Id.* (internal quotation marks omitted). Here, certain of the Venezuela Parties are already litigating the Alter Ego Actions, leaving no reason to doubt that those concurrent proceedings provide an adequate remedy for the ills that are supposed to be rectified by an injunction from this Court. Any party wishing to oppose the Alter Ego Actions may move to intervene in those actions, which could provide each of them an adequate remedy at law as well. In short, the circumstances presented here do not come within the narrow scope in which the Court may properly exercise its All Writs authority.

Finally, the first-filed rule also does not justify the relief sought by the Special Master. It is a "well-established rule" that "where the action is one in rem that court . . . which first acquires jurisdiction draws to itself the exclusive authority to control and dispose of the res." *Kline v. Burke Const. Co.*, 260 U.S. 226, 235 (1922). As the Court already explained in connection with the *Princess Lida* Doctrine, the Alter Ego Actions are not *in rem* (or *quasi in rem*) actions, so they are not directed to the same res over which this Court has control. *Id.* ("Since that necessity does exist in actions in rem and does not exist in actions in personam, involving a question of personal liability only, the rule applies in the former but does not apply in the latter."). Moreover, the first-filed rule only applies to duplicative actions; that is, cases "hav[ing] such an identity that a determination in one action leaves little or nothing to be determined in the other." *Grider*, 500

11

F.3d at 330 (internal quotation marks omitted).  The Alter Ego Actions, however, are *not* duplicative of the *Crystallex* Action or any other related action pending in this Court.  Instead, the Alter Ego Actions involve different property, different causes of action, different theories, and different requested relief than the cases pending here.[7]

In sum, the Special Master has not cited a legal basis on which the Court, in the circumstances presented here, could properly enjoin the Alter Ego Actions (either by ordering the Alter Ego Claimants to dismiss their cases or ordering them to refile them in this District). Accordingly, the Court must deny the Injunction Motion.[8]


Bidders May Be Willing To Purchase The PDVH Shares In The Absence Of An Injunction

The Special Master has explained that he filed the Injunction Motion because, in course of marketing the PDVH Shares, potential bidders told him they would not be willing to purchase the shares if the Alter Ego Actions were not enjoined.  (*See* D.I. 1445 at 3) ("[T]o date, the Special Master has not received a viable bid that did not also require the Alter Ego Actions to be addressed in some fashion.")  The logic behind such statements appears to be that if the Alter Ego Actions succeed, and if PDVH's assets become available to all creditors of PDVH's "parent entities," Venezuela and PDVSA, no one would want to own the PDVH Shares, as such ownership could bring with it unidentified, yet potentially massive, liabilities.  (Tr. at 72) (counsel for Special

---

[7] This Court has never made any finding regarding the alter ego status of PDVH or any subsidiary of PDVSA.  *See, e.g., Ostrider Limited v. PDVSA Petroleo S.A.*, C.A. No. 23-1405, Transcript of May 17, 2024 Hrg. at 49.  By contrast, a finding that PDVH is the alter ego of PDVSA and/or the Republic is precisely what the Alter Ego Actions seek.

[8] Given the multiple reasons the Court has for denying the Injunction Motion, the Court need not address the Alter Ego Claimants' contentions that the Court lacks personal jurisdiction over Girard or that the Special Master lacks standing.  (D.I. 1306 at 13-15, 27-28)

Master arguing that, absent injunction, "the ultimate buyer" of PDVH "would be responsible for all of the liabilities of the Republic and PDVSA" and, thus, "no reasonable bidder would go forward"))

Consistent with this posture, Amber Energy describes the Alter Ego Actions as "an existential threat to the sale process," warning the Court that "the possibility of reverse veil-piercing hangs like a sword of Damocles over the sale of the PDVH Shares." (D.I. 1365-1 at 2) As explained above, Amber Energy's two proposed transactions were contingent on the Court granting the Injunction Motion. (*See* D.I. 1414-1 at 7; D.I. 1444 at 2, 4; D.I. 1445 at 4)[9]

While others appearing before the Court similarly characterize the Injunction Motion as essential to success of the Sale Process (*see, e.g.*, D.I. 1442 at 1) (ConocoPhillips: "While certain bidders have indicated that they may be willing to take the risk of the potential for alter ego liability, it is not clear that any external financing can be obtained given that risk."), this view is not universal. Crystallex, for instance, although preferring that the Court grant the Motion, also "continues to believe that there are bidders who would be willing to purchase the PDVH Shares on an as-is basis, without conditioning [their] bid on the Special Master prevailing on a particular motion or on this Court enjoining certain parties." (D.I. 1438 at 3-4) Likewise, the Venezuela Parties express confidence that an injunction is unnecessary, as "there are other bidders willing to

---

[9] In the Inclinations Order, the Court stated that Amber Energy's second proposed transaction, which did not require an escrow for the Alter Ego Actions, "may be an indication that even Amber Energy is prepared to modify its bid rather than withdraw it, in the absence of the requested injunction." (D.I. 1433 at 5) Even though Amber Energy's alternative transaction was, like its original offer, contingent on the Court granting the Injunction Motion (*see* D.I. 1414-1 at 7), and even though the Court denied that Motion on December 11 (D.I. 1493), Amber Energy participated in the subsequent December 13 status conference and appears to be contemplating a renewed bid in the next stage of the Sale Process (*see* Transcript of Dec. 13, 2024 Hrg. (D.I. 1507) ("Dec. Tr.") at 129-21).

put in a bid for the PDVH shares without the alter ego protections, because they correctly view the Alter Ego Actions as meritless." (D.I. 1407 at 2)

Indeed, several potential bidders have indicated that they remain interested in bidding on the PDVH Shares and are prepared to make bids that do not require an escrow for the Alter Ego Actions; bids that, seemingly, will not be conditioned on any particular judicial action with respect to those claims. (*See, e.g.*, D.I. 1419 at 1 (Gold Reserve "continues to stand ready to submit a bid that is materially superior to the [Amber Energy] bid(s)"); D.I. 1440 at 1-3 (Red Tree stating it prefers "a prompt merits ruling on the PDVH alter ego claims" but is anyway "willing to proceed with its bid without a channeling injunction" and with "no contingencies based on the alter ego claims"))[10]

Considering the entirety of the record, the Court has concluded that there may be bidders who are willing to purchase the PDVH Shares even if the Alter Ego Actions are not enjoined. Such bidders may be motivated by a belief that the Alter Ego Actions lack merit, and so any potential liability associated with these claims (and others like them) should rationally be valued quite low, making the PDVH Shares tremendously valuable. Or such bidders may think there is merit to the Alter Ego Actions, but that the extent of liabilities associated with these claims is manageable (through litigation, settlement, or some other means), making them comfortable with assuming

---

[10] After denying the Injunction Motion on December 11, the Court held a lengthy status conference on December 13, at which all of the Sale Process Parties and Additional Judgment Creditors appeared. There, Gold Reserve, Red Tree, and even Amber Energy strongly suggested they remain interested in bidding on the PDVH Shares, notwithstanding the fact that the Court had denied the Injunction Motion. (*See* Dec. Tr. at 98, 114, 120-21) These statements appear to further corroborate the Court's belief that bidders may still be interested in bidding even without an injunction.

any resultant risk. Whether for these or other reasons, the fundamental premise of the Special Master's Motion, that an injunction is *necessary*, is unproven.[11]

<u>The Court Is Not Persuaded That The Alter Ego Actions Fatally Undermine Its Sale Process</u>

Closely related to the contention that no bidder will participate in the Sale Process if the Court refuses to grant the Injunction Motion is the suggestion that, by denying the Motion, the Court's Sale Process is doomed to fail. Again, the Court is not persuaded.

The Special Master argues that "if the Alter Ego Claimants are successful, there is nothing stopping any other creditor from bringing similar claims and potentially rendering this Court's sale process meaningless by seizing PDVH's primary asset and rendering the PDVH Shares valueless." (D.I. 1249 at 2) Other participants in the Court's process claim that the "rival actions . . . are interfering with this Court's exclusive control over the res – and indeed are designed to defeat that control." (D.I. 1277 (Crystallex) at 7; *see also* D.I. 1278 (ConocoPhillips) at 1 ("[T]he [Alter Ego Claimants] . . . seek[] rulings that would undermine and render the sale process in this Court effectively a nullity."))

---

[11] While the Injunction Motion was being briefed, the Court advised the parties that it would "assume, without deciding, that the statements in the [Strong] declaration (D.I. 1250) supporting the Motion for Injunction are true and, if that turns out to be genuinely disputed and material, the Court will schedule a subsequent hearing to take evidence." (D.I. 1329; *see also* Tr. at 122-23) One reason for this assumption was to accelerate briefing and resolution of the Motion without needing to make time for the Alter Ego Claimants to take discovery to challenge the Strong Declaration. (*Compare* D.I. 1306 at 35 ("[T]he Motion rests on bald assertions in the Special Master's brief and hearsay statements from unidentified bidders referenced in the Strong Declaration. . . . At a minimum, the [Alter Ego Claimants] have a right to investigate and rebut them through limited discovery.") *with* D.I. 1327 at 14 (Special Master arguing "[n]o discovery is necessary")) The Special Master did not seek discovery, so there is nothing improper about the Court finding (even without discovery) that the Special Master failed to prove the necessity of an injunction, notwithstanding the Court's initial assumption.

Just as the Court does not agree that bidders will be unwilling to make bids without the Court enjoining the Alter Ego Actions, the Court likewise disagrees that its Sale Process is now destined to end in failure. One reason for the Court's skepticism of the Special Master's dire prognostication is that his fears were only shared with the Court very recently, months after the Alter Ego Actions were filed and *years* into the Special Master's participation in the process. If the filing of the Alter Ego Actions in June 2024 was akin to imposing capital punishment on the Sale Process, the Court struggles to understand why the Special Master would allow three crucial months to elapse (while he was actively evaluating bids) before asking the Court to halt those cases. Even more confounding is the fact that actions similar to the Alter Ego Actions were filed at least as far back as 2018, *see, e.g., Rusoro Mining Limited v. Bolivarian Republic of Venezuela*, No. 18-cv-01458 (S.D. Tex. May 7, 2018), and the Venezuela Parties warned the Special Master that additional claims of this sort could be filed,[12] yet the Special Master did not (as best as the Court can recall) make any reference to these claims in the SPO, in the lengthy process of drafting and litigating it, or at any point before deep into the Sale Process.

The Court believes that if the Alter Ego Actions were truly the deadly threat that they have recently been characterized as, the Special Master – aided by sophisticated, well-compensated advisors – would have identified this risk far sooner, and would have sought an injunction much

---

[12] *See* D.I. 1418 at 2 (Venezuela Parties representing that "virtual data room . . . included litigation disclosures from PDVH and CITGO of alter ego claims filed in 2019 by OI European Group in this Court and in 2020 by Rusoro in the Southern District of Texas, and of the potential that other present or future judgment creditors of the Republic or PDVSA might also seek to hold the CITGO Companies directly liable for their judgments on an alter ego theory"); D.I. 1459 at 4 (PDVH and CITGO contending that they "repeatedly raised pending and potential alter ego claims against PDVH with the Special Master, warning him of the possibility that one or more creditors of PDVSA or the Republic would use such claims to attempt to gain leverage over the sale process").

more quickly.[13]  Thus, the Court concludes that, in reality, these claims are not nearly as big of a problem as the Injunction Motion portrays them as being.

To the extent the fears of failure are based on an impression that the Court is now marketing something different, and less desirable, than what it had set out in the Sale Procedures Order to market, that premise is incorrect.  The Court never intended the SPO to convey that the PDVH Shares are being marketed *free and clear of all risk* that some entity might somehow try to execute on judgments against Venezuela or PDVSA by seeking to attach assets owned by PDVH.  The closest the SPO comes to addressing this issue is the following provision:

> For the avoidance of doubt, subject to approval of any Sale Transaction by the Court, the Special Master shall have authority to select a Qualified Bid as the Successful Bid that *provides for a transfer of PDVH Shares free and clear of any claims, encumbrances, and liabilities*, which, for the avoidance of doubt, upon entry of an order by this Court approving any Sale Transaction and upon the consummation of any such Sale Transaction, may constitute a full and complete general assignment, conveyance, and transfer of all of PDVSA's or any other person's right, title, and interest in the PDVH Shares *and may provide for the valid transfer under applicable law of good and marketable title to the PDVH Shares to the Successful Bidder free and clear of all claims, encumbrances, and liabilities*; provided that such transfer shall be without prejudice to any such claims, encumbrances, and liabilities attaching to the proceeds of any Sale Transaction with the same nature, validity, priority, extent, perfection, and force and effect that such claims, encumbrances, and liabilities encumbered the PDVH Shares immediately prior to the consummation of any Sale Transaction.

(D.I. 481 at 18) (emphasis added)

With the clarity of hindsight, the Court now recognizes that this provision could have been written more clearly.  Still, the plain implication is – and the Court now makes explicit – that "PDVH Shares free and clear of any [and all] claims, encumbrances, and liabilities" means "PDVH Shares free and clear of any and all claims, encumbrances, and liabilities *attached to the PDVH*

---

[13] The Court recognizes the tension inherent in its conclusion that its confidence in the Special Master has contributed to its rejection of certain premises on which he based his Motion.

*Shares themselves*." The Court was not, and is not, marketing PDVH Shares free and clear of whatever claims, encumbrances, and liabilities are, have been, or may be attached to any asset or subsidiary of PDVH. Hence, the Alter Ego Claimants are correct that "the SPO does not purport to restrict future enforcement actions against assets other than the [PDVH] [S]hares themselves or provide for a release of claims against PDVH." (D.I. 1306 at 3; *see also id.* at 21 ("[T]hat protection, on its face, does not extend to claims against *PDVH itself*."); Tr. at 127-28 (Alter Ego Claimants: "[W]e understand that when these shares are sold . . . any claims against the shares, against that level, the asset, is going to be extinct. . . . [T]he claims against the shares are being resolved, but . . . any claims against the company are not."))

The Special Master also offers a more modest version of his fatalistic contention: maybe, he allows, the lack of an injunction will not actually doom the Sale Process to failure, but it will certainly adversely affect the value the process is able to provide to creditors. In this regard he writes: "In all circumstances, however, the value to be obtained in the sale process will be significantly lower if the buyer is forced to accept potential liability for claims against the Republic and PDVSA." (D.I. 1415 at 3) This version of the Special Master's concern is likely true – but it does not provide a meritorious basis to grant the Injunction Motion. After all, the whole point of the endeavor in which the Court is engaged is to compensate judgment creditors by allowing them to execute on the *value* of judgment debtors' property found in this District. If there is no such property in this District, or if such property is here but it has little value or even negative value, then the creditors will have to continue their collection efforts elsewhere.[14]

---

[14] The Court's order appointing the Special Master directed him, among other things, to "devise a plan for the sale of shares of PDVH as necessary" to satisfy judgments "while maximizing the sale price of any assets to be sold." (D.I. 277) Of course, in this order, as in all others, the Court's authority, and therefore the Special Master's, is limited to what the law allows.

Bidders Can Factor The Alter Ego Actions Into Their Bids

As the Court has already indicated, its view is that the type of sophisticated parties who may participate in the Sale Process are fully capable of conducting due diligence and factoring into their bids whatever risk they associate with the Alter Ego Actions. Fundamentally, the Court is not persuaded that the situation relating to the Alter Ego Actions is materially different than that existing in connection with the PDVSA 2020 Bondholders – with respect to which the Special Master convinced the Court that while uncertainties might "chill" bids, they would not prevent a sale, because bidders would factor the attendant risks into their offers. (*See* D.I. 643 at 10)

All parties other than the Alter Ego Claimants apparently view the Alter Ego Actions as being meritless. The Venezuela Parties "agree with Crystallex and ConocoPhillips that the Alter Ego Actions are meritless and fail to state a claim upon which relief can be granted." (D.I. 1407 at 7; *see also* D.I. 1397 (Crystallex: "The Alter Ego Claimants' actions are without merit.")) Amber Energy likewise "expects that such claims ultimately will be adjudicated as meritless," although it also contends (somewhat incongruously) that no buyer will be willing to "bear the costs, distraction, and risks of defending potentially over $100 billion of claims against the Republic that theoretically could be asserted as reverse veil-piercing claims after closing." (D.I. 1444 at 6-7) If the Alter Ego Actions do lack merit, it should not be especially difficult for potential bidders to draw that conclusion and, consequently, accord relatively little downside risk to the impact of such claims.

While "the Special Master and almost all parties" view the Alter Ego Actions as meritless, most also posit "that a decision on the merits of th[ose] claims would help maximize value." (D.I. 1476 at 3) (CITGO and PDVH) Even accepting this proposition, at least for the sake of argument,

it does not follow that the Court should grant the Injunction Motion. Nor does it follow that this Court is the right court in which to litigate those (and similar) claims.

The Alter Ego Actions are currently being litigated in numerous other courts and appear to be proceeding at a pace that it would be difficult for this Court to match. In the Southern District of New York, a motion to dismiss the Girard Complaint is fully briefed and a final pretrial conference is scheduled for March 10, 2025. (D.I. 1406 at 8) In the Southern District of Texas, motions to dismiss the G&A and Gramercy Complaints are pending and briefed. *See G&A Strategic Investments I LLC v. PDV Holding, Inc.*, No. 4:24-cv-02774 (S.D. Tex.); *Gramercy Distressed Opportunity Fund, LLC v. PDV Holding, Inc.*, No. 4:24-cv-02981 (S.D. Tex.).

ConocoPhillips, and others, have filed actions in this District, which have been assigned to the undersigned Judge, seeking (among other things) a finding that PDVH is *not* the alter ego of PDVSA or the Republic and a legal determination that reverse veil-piercing is unavailable. *See ConocoPhillips Petrozuata B.V. et al v. Girard Street Investment Holdings LLC et al*, C.A. No. 24-1140 (D. Del. Oct 14, 2024) D.I. 1 ("*ConocoPhillips* Action"); *see also* D.I. 1395 at 1. Numerous creditors implore the Court to use the *ConocoPhillips* Action, or any other available vehicle, to resolve the merits of the alter ego claims, insisting that "*this* Court is uniquely positioned to have the most in-depth understanding of both the legal framework or an alter ego relationship involving Venezuela *and* how such claims should be addressed in the context of the ongoing sale process." (D.I. 1439 at 4 (Seven Creditors); *see also* D.I. 1440 at 3 (Red Tree: "this Court is uniquely well suited to resolve the alter ego claims"); D.I. 1452 at 2 ("OIEG continues to believe that *this* Court is best positioned to address the Alter Ego Claims and should do so within the context of the sale process."); D.I. 1457 at 10 ("Gold Reserve maintains that *this* Court is best positioned to address the Alter Ego Claims and to do so in the context of the sale process.")) While the Court appreciates

20

these votes of confidence, it has equal confidence in other courts. Thus, the Court agrees with PDVH and CITGO that "the most efficient and effective way to achieve" a resolution of the issues raised by the Alter Ego Actions "is for PDVH to continue to litigate the claims in the courts in which they are pending." (D.I. 1459 at 12)[15]

## The Traditional Factors For Awarding Injunctive Relief Are Not Satisfied

If the traditional requirements for injunctive relief apply – an issue the Court need not and does not decide, *but see generally Diet Drugs*, 369 F.3d at 307 ("Any court determining whether to issue an injunction must consider several factors that guide and constrain its equitable authority.") – the Court agrees with the Alter Ego Claimants that those requirements are not met here. (D.I. 1306 at 29-33)

> In the Third Circuit,
>
> cases recognize four factors to be considered in assessing a motion for a preliminary injunction. They are: (1) whether the movant has shown a reasonable probability of success on the merits; (2) whether the movant will be irreparably injured by denial of relief; (3) whether granting preliminary relief will result in even greater harm to the nonmoving party; and (4) whether granting the preliminary relief will be in the public interest.

*Council of Alt. Pol. Parties v. Hooks*, 121 F.3d 876, 879 (3d Cir. 1997). The Special Master failed to establish any of these factors.

First, for all the reasons already set out in this Opinion, the Special Master has not made the necessary showing on the merits. That would require, at minimum, that he identify a legal basis on which the Court could properly enjoin the Alter Ego Actions. Since the Court has rejected

---

[15] Several creditors have complained about purportedly "harassing" and unfair discovery requests that have been served on them in connection with the Alter Ego Actions. (D.I. 1438 at 5 (Crystallex); *see also* D.I. 1425 (ConocoPhillips)) If such disputes become ripe and are properly placed before this Court, they will be addressed at that time.

his contentions that the *Princess Lida* Doctrine, All Writs Act, and first-filed rule authorize the requested relief, the Special Master has not met his burden with respect to the merits.

Second, as the Alter Ego Claimants write, "there is no evidence of *irreparable harm*" to the Special Master, the Court, or the Sale Process because, as the Court has explained above, bidders are likely to bid even without an injunction. (D.I. 1406 at 14)  There is also no irreparable harm to the Venezuela Parties because they have alternative remedies at law, including simply litigating (as they are doing) the Alter Ego Actions in the district courts in which they are pending. (*See id.* at 15)  The Special Master, Sale Process Parties, and Additional Judgment Creditors might also seek to intervene in the Alter Ego Actions and might then be heard by the courts presiding over those cases.

The balance of hardships weighs against the relief sought since, again, an injunction "is not necessary to consummate an otherwise viable proposed" Stock Purchase Agreement. (*Id.* at 15)  An injunction against only Girard, G&A, and Gramercy also "would unfairly single out these three creditors," treating them more poorly than other judgment creditors and other interested entities (e.g., the 2020 PDVSA Bondholders), by enjoining or channeling (against their wishes) just these three parties' actions to this Court. (*Id.*)  Even an injunction that reached slightly more broadly, to also include any Additional Judgment Creditor that participated in this Court's Sale Process (e.g., Siemens), would be unfair to the enjoined parties because the Court did not, through the SPO or otherwise, provide advance notice that submitting an Attached Judgment Statement as part of the Sale Process would constitute a waiver of other rights.  These are real harms that would befall the enjoined entities, and they outweigh whatever harms might flow from denying an injunction.

Finally, the public interest disfavors granting the requested injunction. As explained throughout this Opinion, such extraordinary relief is neither necessary nor warranted under the present circumstances. The public also has an interest in comity among courts, which favors allowing the Alter Ego Actions to proceed in the courts where the plaintiffs have chosen to file them. *See generally Bank of Augusta v. Earle*, 38 U.S. 519, 524-25 (1839); *see also E.E.O.C. v. Univ. of Pennsylvania*, 850 F.2d 969, 971 (3d Cir. 1988) (noting "policy of comity" applying among federal district courts). While this Court has been directed by the Third Circuit to enforce the judgments against Venezuela and PDVSA, *see, e.g., Crystallex*, 932 F.3d at 149 ("Venezuela owes Crystallex from a judgment that has been affirmed in our courts. Any outcome where Crystallex is not paid means that Venezuela has avoided its obligations."), and is doing its best to meet this mandate, the Court must strive to protect the rights of others, and act within the bounds of its lawful authority, while doing so.

Injunctive Relief Cannot Be Appropriately Tailored

The proposed order the Special Master initially submitted with the Injunction Motion was somewhat confusing as to the relief being sought. The requested order would have enjoined at least the Alter Ego Claimants "from seeking to enforce judgments against [PDVSA] or [Venezuela] by recovering from PDV Holding, Inc. ('PDVH'), its subsidiaries, or their assets in the Alter Ego Actions." (D.I. 1248-1 at 1) The Alter Ego Claimants read the Special Master's Motion as seeking "to permanently enjoin [their] claims from ever being adjudicated on the merits" anywhere, including in this Court. (D.I. 1306 at 12) In his Reply Brief, the Special Master rejected that interpretation: he emphasized that he was only asking the Court to enjoin the Alter Ego Claimants from recovering from PDVH, but was not trying to halt the Alter Ego Actions to the extent that

they sought to recover from Venezuela or PDVSA, and was not seeking to require that the claims be refiled here. (*See* D.I. 1327 at 5-6; *see also* Tr. at 74-75 (Special Master's counsel explaining that injunction "would not prevent [Alter Ego Claimants] from pursuing their claims in the other courts if they wanted to," but they could not "enforce judgments against PDVSA or the Republic by recovering from PDVH, its subsidiaries or its assets"))

At and after the October 1 oral argument, the Court invited the Special Master to reevaluate the relief he was seeking, and his position seemed to shift. He now asked that the Court (i) enjoin the Alter Ego Claimants from litigating their claims in any court other than this one; and (ii) require that they file their claims in this District by a date certain or otherwise be enjoined from ever litigating them anywhere. (*See* D.I. 1374-1 at 4-5) ("[The Alter Ego Claimants are hereby] enjoined from asserting or further prosecuting in any court other than this Court any alter ego or reverse veil-piercing theories against PDVH or any of its direct or indirect subsidiaries for liabilities of the Republic or PDVSA, [although they] may bring in this Court for an adjudication of the merits, not later than November 13, 2024, the Alter Ego Claims, including those that are pending in other jurisdictions, and are otherwise hereby enjoined. Any Alter Ego Claim that the Enjoined Parties fail to bring in this Court by that date will be barred.")

The Special Master's challenge in clearly and consistently articulating the relief he seeks is a further indication that the Injunction Motion should be denied. The Court understands the difficulty inherent in attempting to appropriately tailor an injunction. As the Alter Ego Claimants write, enjoining ***some but not all*** alter ego and reverse veil-piercing claims against PDVH – that is, enjoining ***only*** the Alter Ego Claimants – "would deprive specific parties of the right to litigate their claims without any jurisdictional or doctrinal basis," and would "demonstrate[] that the requested [i]njunction is not necessary to protect the Court's jurisdiction, because other parties

24

would continue to be free to pursue alter ego [and reverse veil-piercing] claims." (D.I. 1450 at 5) However, enjoining *all* alter ego and reverse veil-piercing claims would be impossible: even if all such potential claims could be identified, the Court could not provide notice to the holders of all such claims and, thus, could not accord those claimants their right to due process. (*See* D.I. 1407 at 2-3) (Venezuela Parties arguing that a broad injunction would run afoul of due process)

The Court, then, is left with the least bad option, which is to enjoin none of the alter ego claims and learn, as the Sale Process proceeds, what, if any, impact these claims have on bidders, on the perceived value of the PDVH Shares, and on the Sale Process as a whole.

## CONCLUSION

The Court understands the Special Master has been given an incredibly complex task: "to conduct a robust sale process amid the unique challenges of selling a domestic company against the will of its foreign sovereign owners." (D.I. 1444 at 3) (Amber Energy) The Court accepts that, as the Special Master reports, he and his advisors "have worked tirelessly," "[i]n the face of many challenges and complexities, . . . to fulfill [his] mandate." (D.I. 1481 at 5) And the Court recognizes that while the proposed Amber Energy transactions engendered universal opposition from all participants in the Sale Process, the Injunction Motion received widespread support. Nonetheless, for the reasons described in this Opinion, the Court has concluded that it cannot grant the Special Master's Injunction Motion. Accordingly, the Injunction Motion is denied.