### IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| CRYSTALLEX INTERNATIONAL CORP., | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | Misc. No. 17-151-LPS |
| | : | |
| BOLIVARIAN REPUBLIC OF VENEZUELA, | : | |
| | : | |
| Defendant. | : | |

### <u>MEMORANDUM ORDER</u>

At Wilmington this **27th** day of **January, 2025**:

Having reviewed the briefing submitted (*see* D.I. 1521-27, 1529-33)[1] in response to the

Court's January 1, 2025 Order regarding open matters in connection with the Sale Process[2] (D.I.

1518) ("Open Matters"); and

Having reviewed the briefing submitted in response to the Special Master's January 14,

2025 Joint Status Report (D.I. 1528) ("JSR") (*see* D.I. 1534-53), setting out proposed Bidder

Protections to be made available to any Stalking Horse Bid approved by the Court; the material

terms for a Stock Purchase Agreement ("SPA"), including which terms are non-negotiable and

which are strongly disfavored; and Evaluation Criteria for Stalking Horse Bids, Base Bids, and

Successful Bids,

---

[1]    All references to the docket index ("D.I.") are to the Crystallex docket, Misc No. 17-mc-151, unless otherwise noted.

[2]    Capitalized terms have the meaning given to them in the Sale Procedures Order (D.I. 481) or the November 20, 2024 Inclinations Order (D.I. 1433), unless otherwise noted.

**IT IS HEREBY ORDERED** that:[3]

## DISPUTES RELATING TO OPEN MATTERS

<u>Open Matters Issue 1</u> is **MOOT**.  (*See, e.g.*, D.I. 1522 at 2)  To be clear, Crystallex and ConocoPhillips are not restricted to making a Defensive Credit Bid and are instead permitted to make any type of bid in any bidding round in which they have not been provided confidential bid information specific to that round.  (*See, e.g.*, D.I. 1521 at 1; D.I. 1522 at 2)

The Court adheres to its rejection of Gold Reserve's request that "all material bid terms of the Stalking Horse bids should be made public ***upon submission***."  (D.I. 1523 at 3 n.3) (emphasis added)  Instead, the Court reiterates that "[a]ll bids submitted in the Stalking Horse stage of the Sale Process shall be made public once a Stalking Horse bid is selected."  (D.I. 1517 at 6)

With respect to <u>Open Matters Issue 2</u>, the Court sees no objection to the Venezuela Parties' proposal that they each be treated as a separate Sale Process Party for purposes of the Sale Process.  (*See, e.g.*, D.I. 1521 at 2; D.I. 1522 at 2-3; D.I. 1523 at 3)  Hence, this proposal is **ADOPTED**.  This treatment of the Venezuela Parties relates solely to their treatment as bidders and potential bidders and means, in particular, that "the decision of one Venezuela Party as to whether to view or not view bids or to bid on the PDVH Shares shall not be imputed to any other Venezuela Party." (D.I. 1511-2 at 5-6)[4]  To be clear, if any of the Venezuela Parties wishes to be

---

[3]    Any proposal in any of the filings referenced in this Order, to which no one in any of those filings expressed any objection, are **ADOPTED**, even if not expressly discussed in this Order.  Any proposal in any of the filings referenced in this Order, to which one or more entities did object and which are not expressly addressed in this Order, is **REJECTED**.

[4]    Citations to specific pages of exhibits are to the ECF-generated page numbering at the top of the page.

treated as a separate Sale Process Party, it must not share or receive confidential sale process information with or from another Venezuela Party in violation of any applicable non-disclosure or confidentiality agreement or order.  (*See* D.I. 1522 at 3)

Turning to <u>Open Matters Issue 3</u> – the Venezuela Parties' contention that Delaware law does not permit the Court to approve a sale of the PDVH Shares for less than half of their fair market value or for a price that "will shock the conscience of the Court" (*see* D.I. 1518) – it would be premature for the Court to make any definitive ruling at this time (*see, e.g.*, D.I. 1523 at 3-4; D.I. 1524 at 3; D.I. 1525 at 1).  It is appropriate, however, for the Court to provide some limited guidance in connection with this dispute.[5]

First, to the extent any Venezuela Party (or any other interested entity) intends to persuade the Court, at or in connection with the Sale Hearing in July, that the Successful Bid (whatever it may be, and regardless of whether the Special Master recommends that the bid be adopted or rejected) does not reflect fair value, or is a bid that should "shock the conscience of the Court" (assuming, without deciding, that these standards are applicable in the unusual and seemingly unprecedented circumstances presented by this case), such party should be using all reasonable efforts *now*, and continuously going forward, to gather the evidence necessary to attempt to make such a showing – e.g., evidence purportedly indicating the "fair market value" of the PDVH Shares.  The Special Master and his advisors, including Evercore, should likewise be endeavoring to use reasonable efforts to produce materials requested by the Venezuela Parties (*see, e.g.*, D.I. 1529 at 7) (referring to Evercore valuation) or should work with the requesting

---

[5]    In sharing these views today, the Court is not retracting the opportunity to take "*limited* discovery" as set out in the governing schedule (D.I. 1517 at 8) (emphasis added); nor is the Court denying that its obligation will be to evaluate the full facts and circumstances existing at the time the Court is asked (if it is) to evaluate a Successful Bid and objections to it.

parties to crystallize specific discovery disputes and bring them to the Court's attention as soon as practicable.  The Court will be strongly disinclined to grant any extension or modification to the governing schedule (*see generally* D.I. 1517) to accommodate discovery or other evidence-gathering efforts that could have been pursued sooner.

Second, the Court has endeavored for years to formulate and implement a process that will result in a Successful Bid that is value-maximizing and also reflective of the fair market value of the PDVH Shares, giving due consideration to the many challenges confronting such a process and the impact of those challenges on the value of PDVH.  (*See generally* D.I. 1522 at 4 (Special Master explaining "[t]he diligence process has been extensive"); D.I. 1527 at 4 ("Here, the Marketing Process has been carefully designed to avoid any confusion at the sale or lack of knowledge of the sale, . . . and the Special Master does not intend to recommend a bid if he believes that a higher or better bid is likely to be available."))

Third, the Court anticipates that, while not dispositive, "[t]he price that results from the Marketing Process will be the best evidence that exists of the fair market value of the PDVH Shares taking into account the benefits and risks associated with this unique asset," as the Special Master writes.  (D.I. 1522 at 5; *see also* D.I. 1527 at 2 (Special Master: "These proceedings involve a multi-year process run by the Court and the Special Master – who engaged Evercore to assist in the sale process and market the asset – with the aim of obtaining a value-maximizing sale of the PDVH Shares."))

Fourth, PDVSA may not be a "willing seller" (D.I. 1529 at 5; *see also* D.I. 1527 at 2-3) but the Court is acting pursuant to a mandate of the Court of Appeals for the Third Circuit to enforce judgments against PDVSA's alter ego, Venezuela, and is endeavoring to do so to the best of its abilities and consistent with all governing law.  (*See generally* D.I. 1530 at 2) ("[T]he

4

Special Master is effectively filling the role of seller in an arm's length transaction. He has no obligation to accept the highest bid (or any bid), and does not intend to recommend any bid if he believes the price is too low or a superior bid would be forthcoming.")

Fifth, the Court agrees with Crystallex that (i) "[s]hould the Venezuela Parties attempt to object to the recommended sale transaction on the ground that a higher bid was likely, it is worth noting that there is nothing preventing them from identifying such a bidder now and encouraging it to participate in this Court's sale process" (D.I. 1521 at 4) (internal quotation marks and citation omitted); and (ii) "to the extent the Venezuela Parties may view the successful bid as too low, the Venezuela Parties could simply pay what they owe[] and avoid the sale process altogether" (*id.*) (internal quotation marks omitted).

Sixth, the Court assures all involved in the Sale Process and the Litigation that whatever recommendation the Special Master makes to the Court will be subjected to full and adequate judicial scrutiny – including at and around the multi-day Sale Hearing in July and the extensive briefing likely to precede it – regardless of the price associated with any Successful Bid and the Sale Process that produces it.

With respect to Open Matters Issue 4, relating to posting in the Data Room of questions from and answers to potential bidders, the Court confronts, regrettably, a lack of consensus, absence of evidence, and dire predictions. The Venezuela Parties, joined by numerous creditors, bemoan the purported lack of a fair informational playing field, while the Special Master advises the Court (without citing any evidence, such as a declaration or even argument from an actual or potential bidder) that sharing a potential bidder's questions (and CITGO's answers) with all other potential bidders would thwart well-settled expectations of confidentiality and might undermine the integrity of the Marketing Process. (*Compare, e.g.*, D.I. 1522 at 5-6 (Special Master

5

warnings); D.I. 1527 at 5-7 (same); D.I. 1530 at 3 (same) *with, e.g.*, D.I. 1524 at 7 (Venezuela Parties asking Court to ensure "a level informational playing field for all bidders" by "[a]llowing bidders to access written responses already provided to others") *and* D.I. 1523 at 5 (Four Creditors supporting Venezuela Proposal))

The Court decides as follows: (1) it is the Court's understanding that CITGO has or soon will make available in the Data Room ***all documents*** it provided to any potential bidder, at any stage of the Sale Process, as part of its answers to a question from any potential bidder, which allows any other potential bidder to, using its own resources, potentially discern whatever information CITGO provided as an answer to a previous question – and to the extent this is ***not*** occurring or contemplated, the Special Master and the Sale Process Parties shall, **no later than January 31**, submit a Joint Status Report providing further, succinct briefing on why the Court should not order all such documents to be placed in the Data Room immediately; (2) the Court **ADOPTS** what the Venezuela Parties describe as "the Special Master's proposal to have Evercore screen duplicative questions and provide the answers from the previous Q&A" (D.I. 1531 at 3), so that any potential bidder asking a question materially similar to a question previously asked and answered will quickly receive the materially same answer (potentially updated, if necessary); and (3) the Special Master, working with Evercore and CITGO, may work cooperatively in an attempt to anonymize any or all prior questions and answers and place them in the Data Room, should the Special Master, in his sole discretion, determine that doing so (with respect to one, more, or all such questions) is worth the expenditure of resources and will promote a value-maximizing process.

## DISPUTES RELATING TO BIDDER PROTECTIONS[6]

Bidder Protection 1: Termination Fee for a Stalking Horse

The Court agrees with and **ADOPTS** the proposal that the Termination Fee be paid to the Stalking Horse only if Court approves a transaction by entering a final order and the approved transaction closes. (*See, e.g.*, D.I. 1542 at 10 (Crystallex: "[T]he termination fee is payable only in the event the Special Master recommends a bid other than the Stalking Horse and that transaction closes."); D.I. 1543 at 1 (Venezuela Parties: "[A]ny termination fee should be payable only if a transaction ultimately closes."))

Siemens Energy, Inc. ("SEI") objects on the grounds that any Termination Fee "is demonstrably unnecessary to incentivize any party to serve as a stalking horse bidder; and it could result in a windfall to more senior creditors at the expense of fulcrum creditors." (D.I. 1534 at 1; *see also* D.I. 1546 at 2-4) The Special Master disagrees with SEI (D.I. 1545-1 at 2-3 of 8) and so does the Court. "[T]hird party bidders have previously expressed to the Special Master that a Termination Fee is critical to their participation in the transaction" and, hence, the Termination Fee is "essential to incentivize third parties to submit bids." (*Id.*; *see also* D.I. 1544 at 3 (Red Tree stating neither it "nor any other prospective bidder agreed to bid under rules that would render third-party financing unfeasible")) "Bidders and financing sources must understand in advance the compensation available for their time, efforts, and opportunity costs if

---

[6] The Court does not understand there to be any dispute that, as Gold Reserve and Rusoro observe, "it is Court approval of a bid," as either a Stalking Horse or Base Bid, "that triggers the respective protections" – and mere execution of an agreement with the Special Master (unless and until the Court approves such an agreement) does not. (D.I. 1550 at 3) The Special Master should ensure that this is made clear in the final Bidder Protections.

they submit a winning bid or are selected as a stalking horse." (D.I. 1544 at 3)  Nor does the Court see any merit to deferring a decision on this dispute.  SEI's objection is **OVERRULED**.

Additional Judgment Creditors Red Tree and OIEG propose to expand the circumstances in which the Termination Fee would be paid to align with the circumstances that trigger a Buyer Termination Expense Reimbursement, including if "(i) OFAC declines to issue a license for any reason not related to the identity of the proposed buyer; (ii) PDVH Holdings Inc. or any of its direct or indirect subsidiaries violates an interim operating covenant; or (iii) occurrence of a Company Material Adverse Effect." (D.I. 1535 at 5)  The Special Master disagrees (D.I. 1545-1 at 3 of 8), as does Crystallex (D.I. 1542 at 10).  So, too, does the Court.  "[A]n expanded Termination Fee trigger would lead to a reduction in the amount of proceeds available to the holders of Attached Judgments" when creditors attempt to collect on their judgments via a subsequent proposed transaction involving the PDVH Shares or by attaching some other property, because it would give the Stalking Horse a claim to the Termination Fee in a greater number of circumstances.  The Court is not persuaded that risking this eventuality is required in order to adequately incentivize Stalking Horse Bids.  Red Tree and OIEG's objection is **OVERRULED**.

Additional Judgment Creditor Koch Parties propose that "[i]f the Stalking Horse bidder ultimately consummates a purchase of the PDVH Shares," after being temporarily supplanted by another bidder, "it should not receive a Termination Fee." (D.I. 1538-2 at 2 of 11)  This proposal is **ADOPTED**.

Bidder Protection 2: Buyer Termination Expense Reimbursement (Successful Bidder)

Certain Additional Judgment Creditors ask the Court to overrule the Special Master's proposal to cap all expense reimbursements for a Base Bidder at $15 million.  (*See* D.I. 1535 at 1-4 (Red Tree and OIEG); D.I. 1536 at 2 (Huntington Ingalls); D.I. 1538-2 at 2-3 of 11 (Koch Parties); D.I. 1539-1 at 2 of 3 (Gold Reserve and Rusoro))  These objecting parties propose that the Court "raise the cap to $50 million, including at least $35 million for termination fees incurred in connection with obtaining financing commitments."  (D.I. 1535 at 1)  After initially opposing any increase (D.I. 1543 at 2-3), the Venezuela Parties in the end agree with the Special Master's $30 million cap as "a reasonable compromise among multiple competing interests and concerns" (D.I. 1549 at 1)  Even though some Additional Judgment Creditors continue to press for a cap of up to $50 million (*see, e.g.*, D.I. 1551 at 1-3), the Court agrees with the Venezuela Parties and **ADOPTS** the Special Master's revised proposal "to expand the cap of the reimbursement to $30 million total, inclusive of any out-of-pocket [financing] commitment fees," in order to aid bidders to obtain financing while also "incentiviz[ing] [such] bidders to negotiate with their financing parties to not require the payment of such fees prior to a closing" (D.I. 1545-1 at 4 of 8).[7]

---

[7]    "Crystallex does not oppose providing the successful bidder a $35 million reimbursement of documented financing-commitment fees, *provided that* this Court overrules the objections requesting that an alter-ego finding against PDVH be considered a Material Adverse Effect and such reimbursement is payable only if an execution sale is in fact consummated."  (D.I. 1542 at 9)  As noted elsewhere in this Memorandum Order, the Court is not adopting Crystallex's position on Material Adverse Effect, although the burden on any Successful Bidder – to prove, under the totality of circumstances, that anything related to the heavily-litigated and comprehensively-discussed alter ego issue (*see, e.g.*, D.I. 1357 (Transcript of October 1, 2024 Hearing); D.I. 1493; D.I. 1515) meets the Delaware law standard for the type of material change allowing a purchaser out of a commitment to close – will be heavy.

Red Tree and OIEG "request that expense reimbursement also be triggered if the sale is terminated due to a settlement." (D.I. 1535 at 4) The Special Master supports this proposal (D.I. 1545-1 at 4 of 8) and the Court **ADOPTS** it, based on the description of it provided by the Special Master.

The Koch Parties further propose to "clarify that the Expense Reimbursement is paid out at a closing of a subsequent sale of the PDVH shares." (D.I. 1538-2 at 2 of 11) This proposal, which does not appear to be opposed, is **ADOPTED**.

Gold Reserve and Rusoro further propose that the language be modified so as to trigger reimbursement of the Successful Bidder in the event OFAC denies a license for any reason, and not just for any reason not related to the identity of the proposed buyer, evidently because "OFAC often declines to license without giving any reason." (D.I. 1539-1 at 2 of 3) The Court **REJECTS** this proposal. As Crystallex writes, Gold Reserve and Rusoro's proposal would allow for "the successful bidder to receive $50 million from subsequent sale proceeds even if OFAC denies a license based on that bidder's identity[,] . . . encourag[ing] the submission of bids by persons who may be unlikely to obtain OFAC approval." (D.I. 1542 at 10)


Bidder Protection 3: Topping Expense Reimbursement (Base Bid)

The Koch Parties propose the same cap of $50 million for a Base Bidder as for the Successful Bidder as described above, including $35 million for expenses connected to financing commitment arrangements. (D.I. 1538-2 at 2-3 of 11; D.I. 1547 at 2) For the same reasons stated above in connection with Bidder Protection 2, this proposal is **ADOPTED** to the extent that the Special Master's proposed cap for expense reimbursement for a Base Bidder is raised to $30 million, to cover costs associated with obtaining financing commitments, and is

**REJECTED** in all other respects.  Further, the Court **ADOPTS** the unopposed proposal of Gold Reserve and Rusoro that this reimbursement be paid to a Base Bidder only if the Court approves a Sale Order.  (D.I. 1539-1 at 2)


Bidder Protection 4: Non-Solicitation Period

The Koch Parties propose to amend the Special Master's language to clarify that the Venezuela Parties may not "submit unsolicited competitive proposals after entry of the Sale Order," and that "only one Termination Fee is paid and only to the Stalking Horse bidder."  (D.I. 1538-2 at 3-4 of 11)  The Special Master does not appear to expressly address these proposals, as he did not modify his Bidding Protections in response to them.  (*Compare* D.I. 1545-4 at 2-3 of 10 *with* D.I. 1552-1 at 2-3 of 10)  The Venezuela Parties point out that the Court has already ruled that they "shall always be permitted to satisfy any judgments in full prior to consummation of a sale."  (D.I. 1543 at 3; *see also* D.I. 1549 at 1)  The Court adheres to this ruling, which means that the Venezuela Parties have a right that extends even beyond entry of the Sale Order, but their right and opportunity to do so will cease upon consummation of the sale.  Accordingly, the Court **REJECTS** the Koch Parties' proposal that the Venezuela Parties may not submit unsolicited settlement proposals after entry of the Sale Order (to the extent such proposal is nonetheless prior to consummation of the sale) and **ADOPTS** the proposal that only one Termination Fee is paid and only to the Stalking Horse Bidder (although Termination Expense Reimbursement may be paid under specified circumstances to a Successful Bidder who was not a Stalking Horse Bidder).

The Court further agrees with and **ADOPTS** what it understands to be an unopposed clarification contained in the Special Master's most recent filing (D.I. 1552-1 at 3 of 10): "For

the avoidance of doubt, a new right to expense reimbursement or the Termination Fee (as applicable) will not be created each time a new topping bid is submitted.  There will be only one (1) Stalking Horse Bidder entitled to a Termination Fee (or one (1) Base Bidder entitled to expense reimbursement), and only one (1) Successful Bidder entitled to expense reimbursement or a post-recommendation Topping Fee."

Gold Reserve and Rusoro propose that (i) the Final Recommended Bidder be informed of the existence of an unsolicited post-Final Recommendation Competing Proposal at the same time as the Court, and that (ii) all potential Topping Bids be submitted and evaluated during the Topping Period (according certain matching rights to the Stalking Horse Bidder), and not held by the Special Master until after the Topping Period.  (D.I. 1539-1 at 2-3 of 3)  The Special Master has no objection to the first of these proposals and it is **ADOPTED**.  (D.I. 1545-1 at 5 of 8)  The Special Master opposes the second proposal, describing the discretion to add five business days to the end of the Topping Period as potentially helpful to "increas[ing] competitive tension between bidders and increas[ing] value without giving the Stalking Horse Bidder an unfair advantage that could deter Topping Bids" and predicting that real-time matching rights "could deter Topping Bids."  (D.I. 1545-1 at 6 of 8)  Based on the reasoning of the Special Master, the Court **REJECTS** Gold Reserve and Rusoro's second proposal.

However, it is the Court's understanding that the Special Master ***will, continuously and throughout the 30-day Topping Period***, engage with bidders, generating as much "competitive tension" among bidders as possible ***during*** the Topping Period, and will not wait to do so until the subsequent five-day period ***following*** the Topping Period.  The Court's understanding derives from the explanation of the Topping Period provided by counsel for the Special Master at a recent hearing.  (*See* D.I. 1507 (Transcript of Dec. 13, 2024 Hrg.) at 133) ("THE COURT: It

seems to me, conceptually, that the topping period is just a longer auction; right?  An auction, in

theory, . . . can happen in a day even with a complex scenario like this.  For a topping period, we

would have set a certain number of weeks and you're going back and forth, presumably trying to

get the best value you can.  [COUNSEL]: Yes, that's right.")

The Court's understanding of the Topping Period, then, is generally consistent with the

description provided by Gold Reserve and Rusoro:

> [T]he court-approved Stalking Horse Bidder should be given immediate notice
> during the Topping Period of any bid that the Special Master deems to be a Superior
> Proposal. . . .  The objective of the revised Sale Process is to achieve the highest,
> most robust Stalking Horse Bid possible from a bidder that intends to close on the
> purchase of the PDVH Shares.  In order to best achieve this, . . . [the contemplated]
> protection is best afforded . . . by giving the Stalking Horse Bidder the right, in real
> time, to match any competing bid during the Topping Period that the Special Master
> deems is superior. . . .  [The Special Master's proposed delay would] create a
> substantial risk of further material scheduling delays caused by having to compress
> into 5 days after the Topping Period ends the back-and-forth with the Stalking Horse
> Bidder that instead could better occur during the full Topping Period.

(D.I. 1550 at 1-2)

To be clear, the Court is ***not*** ordering the Special Master to provide "immediate" notice to

the Stalking Horse Bidder of Superior Bids, and is ***not*** ordering the Special Master to include in

the Bidder Protections that the Stalking Horse Bidder has an entitlement to real-time matching of

Superior Bids.  But the Court ***does*** expect, as noted above, that the Special Master will,

continuously and throughout the 30-day Topping Period, evaluate any and all bids received and

compare them to the Stalking Horse Bid, engage with bidders (including the Stalking Horse

Bidder), and generate as much "competitive tension" as possible ***during*** the Topping Period, and

will not wait to undertake these actions until the optional, subsequent five-day period ***following***

the Topping Period (or until any subsequent live auction).

Bidder Protection 5: Overbid Minimum

Gold Reserve and Rusoro's proposal of a higher ($50 million) threshold (D.I. 1539-1 at 3 of 3; D.I. 1550 at 2-3), which the Special Master does not oppose (D.I. 1545-1 at 7 of 8), is **ADOPTED IN PART**, subject to the Special Master retaining discretion to lower or raise the overbid minimum throughout the process, as he proposes, which is helpful for reasons including that "the evaluation criteria include criteria other than price" (*id.*). The Venezuela Parties' objection (D.I. 1543 at 3) to Gold Reserve and Rusoro's proposals (D.I. 1549 at 2) are **OVERRULED**, for the reasons given above and by the Special Master.


**DISPUTES RELATING TO MATERIAL TERMS OF SPA**

SPA Material Term 1: Parties to the Agreement – Non-Negotiable.

There appears to be no objection to either the language of this term or its characterization (i.e., non-negotiable). Accordingly, it is **ADOPTED**.


SPA Material Term 2: Financing Commitment – Non-Negotiable.

The Koch Parties' objection, by which they propose to allow greater flexibility with respect to financing commitments (D.I. 1538-2 at 5 of 11; D.I. 1547 at 2-3), is **OVERRULED**. As Crystallex argues, the Koch Parties' "changes would increase the risk that the sale will not close" because, for example, they might "encourage persons who have not obtained the financing commitments necessary to close to submit bids." (D.I. 1542 at 5; *see also* D.I. 1543 at 5 (Venezuela Parties opposing Koch proposal)) The Special Master states that "the inclusion of committed financing is critical to a determination by the Special Master that a bid is viable" and

14

the Court agrees.  (D.I. 1545-2 at 2 of  10)  Accordingly, the Special Master's proposal is **ADOPTED**.


SPA Material Term 3: Purchase Price and Adjustments – Non-Negotiable.

The Koch Parties' objection, seeking to preclude distributions or dividends by PDVH/CITGO during the period between signing and closing (D.I. 1538-2 at 5 of 11), is **OVERRULED**.  The Venezuela Parties oppose this as an example of an "ad hoc proposal[] from creditors" which should be rejected in favor of the Special Master's proposal of a "suite" of Interim Operative Covenants to "be developed with input from CITGO management."  (D.I. 1543 at 5) (internal quotation marks omitted)  The Special Master's proposal (D.I. 1528-2 at 3 of 5) is **ADOPTED**.


SPA Material Term 4: Good Faith Deposit – Non-Negotiable.

This proposal does not appear until the Special Master's January 23 reply.  (D.I. 1552-1 at 4 of 10)  The required good faith deposit by the Successful Bidder is consistent with the Sale Procedures Order and other prior Orders of the Court.  (*See, e.g.*, D.I. 481)  It is **ADOPTED**.


SPA Material Term 5: Treatment of CITGO Debt – Provide Flexibility.

The Koch Parties' objection, seeking to provide "maximize[] flexibility" for bidders to "utilize CITGO assets when restructuring . . . debts" (D.I. 1538-2 at 4-5; *see also* D.I. 1547 at 3), is **OVERRULED**.  While Crystallex "does not oppose this proposal *so long as* any judgment creditor receiving CITGO assets in satisfaction of its judgment consents to the receipt of such non-cash consideration" (D.I. 1542 at 7), the 2020 Bondholders urge the Court to reject the

proposal (D.I. 1553 at 2). The Venezuela Parties' position is that "until the sale closes and the PDVH Shares change hands, bidders have no right to bind, control, or 'utilize' PDVH's assets or the assets of its subsidiaries." (D.I. 1543 at 6; *see also* D.I. 1549 at 2-3) The Special Master appears to agree with the Venezuela Parties – he states that it is not within his authority to do as the Koch Parties request but "[i]f . . . a bidder desires to utilize [CITGO] cash/assets after closing (*i.e.*, once it owns the PDVH Shares), the bidder is free to do so" (D.I. 1545-2 at 3 of 10) – and the Court agrees as well. The Special Master's proposal is **ADOPTED**.

SPA Material Term 6: Indemnities – Non-Negotiable.

There appears to be no objection to either the language of this term or its characterization. (D.I. 1545-2 at 3 of 10) Accordingly, it is **ADOPTED**.

SPA Material Term 7: Escrows – Strongly Disfavored.

There appears to be no dispute with respect to this term. The Special Master's proposal is **ADOPTED**.

SPA Material Term 8: Earn-Out Payment/Deferred Purchase Price – Strongly Disfavored.

There appears to be no dispute with respect to this term. The Special Master's proposal is **ADOPTED**.

SPA Material Term 9: Representations and Warranties Relating to the Company and the Special Master – Strongly Disfavored.

There appears to be no dispute with respect to this term. The Special Master's proposal is **ADOPTED**.

SPA Material Term 10: Interim Operating Covenants – Strongly Disfavored.

The Koch Parties' proposal that "[n]o distributions or dividends by the Company [be] permitted during" the interim operating period (i.e., the period between signing and closing) (D.I. 1538-2 at 5 of 11), is **OVERRULED**. The Special Master indicates he "intend[s] to include such a covenant" after consultation with CITGO management (D.I. 1545-2 at 4 of 10), which the Koch Parties view as "encourag[ing]" (D.I. 1547 at 3). The Venezuela Parties indicate that they have continued to meet and confer with the Special Master on this and related issues. (D.I. 1549 at 3; *see also* D.I. 1543 at 5 ("Intercompany dividends from CITGO to CITGO Holding, for instance, or from CITGO Holding to PDVH, may be required to allow PDVH and CITGO Holding to finance their operations during the interim period.")) In his January 23 response, the Special Master indicates that he intends to permit "dividends or similar distributions between or among PDVH and its subsidiaries." (D.I. 1552-1 at 5 of 10) The Special Master's proposal is **ADOPTED** (without prejudice to the Special Master continuing to proceed consistent with the intentions expressed in his filings).


SPA Material Term 11: Regulatory Efforts Standard – Strongly Disfavored.

The Koch Parties' proposal, which the Court understands would mandate a modified "hell-or-high water regulatory efforts standard" and would detail that a buyer need not agree to any criminal or civil liability and could reject "unacceptable remed[ies]" proposed by authorities (D.I. 1538-2 at 5 of 11), is **REJECTED**. The Court agrees with the concerns expressed by Crystallex on this point. (D.I. 1542 at 5-6) The Court is further persuaded by the Venezuela Parties, who write: "At best, the Koch Parties' proposed language is unnecessary; at worst, it could constrain the Special Master's ability to select a bid with other superior characteristics as

to price or closing certainty over a bid that is otherwise inferior but that has a hell-or-high-water regulatory standard." (D.I. 1543 at 7) The Special Master's proposal, which the Court understands as preferring a "hell-or-high-water" regulatory efforts standard and strongly disfavoring a request that some different standard be included in an SPA, is **ADOPTED**.

SPA Material Term 12: No Solicitation – Non-Negotiable.

There appears to be no dispute with respect to this term. The Special Master's proposal is **ADOPTED**.

SPA Material Term 13: Casualty Loss – Non-Negotiable.

There appears to be no dispute with respect to this term. The Special Master's proposal is **ADOPTED**.

SPA Material Term 14: Closing Conditions – Strongly Disfavored.

(A) The Special Master proposes, "For the avoidance of doubt, it is non-negotiable that events relating to the 2020s litigation will be specifically excluded from consideration in determining a Material Adverse Effect," and that any requested deviation from this term in a proposed SPA be strongly disfavored. (D.I. 1528-2 at 4-5) There is no dispute with respect to this proposal and it is **ADOPTED**.

(B) The Special Master further proposes, "The Sale Order shall be in full force and effect in all respects and shall not [be] subject to any stay, but no affirmance by appellate court is necessary to close," and that any requested deviation from this term in a proposed SPA be strongly disfavored. (D.I. 1528-2 at 4 of 5) The Special Master's proposal is **ADOPTED**.

The Venezuela Parties propose, instead, that "[a]ffirmance of the sale on appeal should be a default permissible condition for closing" – that is, that a requested SPA requirement of appellate affirmance **not** be strongly disfavored – because an appeal is "inevitable" and conditioning closing on affirmance "would prevent uncertainty and a rush to obtain a stay pending appeal." (D.I. 1540 at 1-2)  Crystallex supports "the Special Master's proposed default material term that 'no affirmance by [the] appellate court is necessary to close" and opposes the Venezuela Parties' alternative proposal. (D.I. 1542 at 3)  Crystallex observes: "[T]he buyer may wish to close as quickly as possible after receiving the required regulatory approvals in order to take control of PDVH and manage the company consistent with the bidder's own long-term objectives rather than those of the Venezuela Parties, and thereby reduce – if not entirely eliminate – the risk that PDVH might be held to be the alter ego of PDVSA or Venezuela." (D.I. 1542 at 4)

The Venezuela Parties' proposal is **REJECTED**.  The Court agrees with Crystallex that "the Special Master's proposal to exclude affirmance on appeal as a default closing condition appropriately encourages bids that provide as much certainty of closing as possible while retaining some flexibility to select a demonstrably superior bid that includes such a condition." (D.I. 1542 at 4)  The Court is not persuaded by the Venezuela Parties' prediction that the Special Master's proposal will "deter bidders from including an appeal condition" and, thereby, "incentivize [bidders] to discount their bids instead to account for the risks associated with post-closing appellate reversal." (D.I. 1549 at 5)  The Sale Process is subject to multiple post-closing risks the Court cannot eliminate (e.g., necessity of OFAC and regulatory approval).  More importantly, as the Venezuela Parties recognize (*see, e.g.*, *id.* at 5 n.2), any party may seek a stay,

from this or any other court with jurisdiction, if an approved sale is otherwise likely to close prior to any merits determination by the Court of Appeals.

(C)    The Special Master additionally proposes to define Material Adverse Effect, the occurrence of which could allow a Successful Bidder to withdraw its commitment to a sale and refuse to close, in a manner that would permit but strongly disfavor a request to allow developments in connection with the Alter Ego Claims (whether being litigated now or potentially in the future) to constitute a Material Adverse Effect.  (D.I. 1552-1 at 6 of 10) ("[N]othing herein expressly excludes the ability of a buyer to argue that a finding by a court of competent jurisdiction that PDVH or any of its subsidiaries is an alter ego of PDVSA or the Republic constitutes a Company Material Adverse Effect.")    Despite the vigorous disagreement this proposal has generated, it is **ADOPTED**.

Crystallex objects to the Special Master's proposal, asserting that Material Adverse Effect "is strictly interpreted by Delaware law" and "should exclude from its scope any risk or event already known to the buyer at the time the SPA is executed, including not only events relating to the 2020s litigation but also any risks arising from alter-ego claims against PDVH, such as those already brought by the Gramercy Parties."  (D.I. 1537 at 2; *see also* D.I. 1542 at 2 (Crystallex: "the SPA should, on the contrary, be drafted to make it crystal clear that the Material Adverse Effect clause would not be triggered by a court ruling that PDVH (or one of its subsidiaries) is an alter ego of PDVSA or Venezuela"))

In direct contrast, the Venezuela Parties argue "there is no question that an adverse judgment finding that PDVH is an alter ego of Venezuela could constitute a materially adverse change under Delaware law sufficient to allow a bidder to terminate."  (D.I. 1540 at 3)  They

therefore urge the Court "to expressly include an adverse judgment in the PDVH Alter Ego Actions as a ***potential*** material adverse effect." (D.I. 1549 at 3-4) (emphasis added)

Sale Process Party/Additional Judgment Creditor ConocoPhillips supports the Special Master's "reasonable compromise to address a thorny issue." (D.I. 1541 at 2)

The Court finds compelling Crystallex's concern that leaving the "door" open even a little bit to the known risks associated with the Alter Ego Claims factoring into an effort to show the occurrence of a Material Adverse Effect risks becoming "a recipe for instability and for a sale process without end." (D.I. 1548 at 2) The Court shares this very real concern. Nevertheless, it is undeniable that the Court will be able (if asked) to fully and fairly evaluate whether a Material Adverse Effect has occurred only with a concrete record and full knowledge of the specific totality of circumstances, none of which exists now.[8] Nevertheless, any potential bidders, including the Successful Bidder, should understand it will be extremely difficult to persuade the Court that the bidder should be allowed to exit an executed (and Court-approved) SPA based in any significant part on whatever may occur in connection with Alter Ego Claims (pending or potential).

(D)  The Koch Parties' proposal to give greater flexibility to potential bidders to modify closing conditions (D.I. 1538-2 at 7 of 11) is **REJECTED**. The Court believes the appropriate degree of flexibility is provided for by the Special Master's proposals, as modified by this Order.

---

[8]    In reaching this conclusion, the Court is ***not*** rejecting Crystallex's argument that Delaware law prohibits a known risk, including potentially the risks associated with the Alter Ego Claims, from constituting, independently or in combination with other factors, a Material Adverse Effect. The Court has merely determined that it is most appropriate ***not*** to answer this question as a matter of law in the absence of a full and complete record, particularly as resolution is not required at this point.

The Court further agrees with the Special Master that "[a]dditional closing conditions that introduce uncertainty to closing will be strongly disfavored."  (D.I. 1552-1 at 5 of 10)

SPA Material Term 15: Outside Date – Non-Negotiable.

There appears to be no dispute with respect to this term.  The Special Master's proposal is **ADOPTED**.

SPA Material Term 16: Termination Rights – Strongly Disfavored.

Neither the Special Master nor any other entity appears to object to Gold Reserve and Rusoro's requested clarification that the Special Master or Buyer may terminate if the closing has not occurred by the Outside Date, but may not terminate if the reason the closing has not yet occurred is "a reason that is the fault of, respectively, the Special Master or the Buyer."  (D.I. 1539-2 at 4 of 6; D.I. 1545-2 at 7 of 10)  The Gold Reserve/Rusoro proposal is **ADOPTED**.

Gold Reserve and Rusoro also propose that the Special Master may terminate for a Superior Proposal only "prior to entry of the Sale Order and consistent with the Non-Solicitation Provisions of the SPA."  (D.I. 1539-2 at 4 of 6)  The Special Master's suggestion that this "clarification" be adopted to the extent that "for the sake of judicial economy, such termination should only be permitted ***prior to the Sale Hearing***, so that the Court need not conduct a hearing to approve more than one transaction" (D.I. 1545-2 at 8 of 10) (emphasis added), is **ADOPTED**.

The Court further agrees with the Special Master that "[a]dditional termination rights that introduce uncertainty to closing will be strongly disfavored."  (D.I. 1552-1 at 6 of 10)

SPA Material Term 17: Termination Fee & Expense Reimbursement – "Subject to Court order regarding bidder protections."

There appears to be no dispute with respect to this term. The Special Master's proposal is **ADOPTED**.


SPA Material Term 18: 2020 Bonds – Non-Negotiable.

The Koch Parties' proposal to allow a buyer to "require certain documents to be executed by PDVSA relating to the 2020 bonds" (D.I. 1538-2 at 9 of 11), which is opposed by the Venezuela Parties (D.I. 1549 at 6), is **REJECTED**. The Court has already determined that the SPA will not include any requirement or condition with respect to the 2020 Bond Entities other than certain acknowledgements (D.I. 1517 at 11-12) and sees no reason to modify this determination. The Special Master's proposal is **ADOPTED**.


SPA Material Term 19: Alter Ego Claims – Strongly Disfavored/Non-Negotiable.

The Special Master proposes that requested deviations from the following term be strongly disfavored: "No trust/escrow constructs or purchase price alterations relating to Alter Ego claims will be included unless expressly agreed to by the affected Sale Process Party or Attached Judgment Creditor." (D.I. 1528-2 at 5 of 5) He further proposes that the following term be non-negotiable: "No stand-alone closing conditions to Alter Ego Claims will be included." (D.I. 1528-2 at 5) There appears to be no disputes with respect to these terms and they are **ADOPTED**.

SPA Material Term 20: Company Employee-Related Covenants – Strongly Disfavored.

Rusoro and Gold Reserve propose that a Buyer may seek to terminate any employment contract so long as such action is consistent with applicable law. (D.I. 1539-2 at 6 of 6) The Venezuela Parties oppose this suggestion. (D.I. 1543 at 3-4; D.I. 1549 at 6-7) From their reply, it appears that Rusoro/Gold Reserve, the Special Master, and the Venezuela Parties may have resolved their differences on this point. (D.I. 1550 at 3-4) To the extent there remains a dispute, the Court agrees with the Venezuela Parties that "post-closing management can terminate the employment of Company employees, but it must do so subject to and while honoring the Company's existing contractual obligations to those employees." (D.I. 1543 at 4) Accordingly, Rusoro and Gold Reserve's proposal is **REJECTED** and the Special Master's proposal is **ADOPTED**.


## DISPUTES RELATING TO EVALUATION CRITERIA[9]

Evaluation Criterion 1: Price.

*Additional Judgment Creditor Huntington Ingalls states*: "the Special Master's proposal does not address the situation where a higher bid with non-cash consideration is rejected in favor of a lower, all-cash bid," and asks the Court to "make explicit" that any entity that "would have received the non-cash consideration in the rejected bid have a right to ***comment*** and ***consent*** before the Special Master rejects that bid in favor of the lower, [all]-cash bid." (D.I. 1536 at 3) (emphasis added)

---

[9]    The Court has considered the Koch Parties' suggestions with respect to the Evaluation Criteria. (D.I. 1538-2 at 10-11 of 11) The Special Master has responded to these suggestions. (D.I. 1545-3 at 2-3 of 4) The Court's understanding is that it has resolved any dispute presented by the Koch Parties in some portion of this Memorandum Order.

The Court agrees with and **ADOPTS** the Huntington Ingalls proposal that creditors that would receive non-cash consideration have the right to **comment** on that bid **before** the Special Master may reject that bid in favor of a lower, all-cash bid.  Some investment of time in consultation with creditors who would be impacted by a proposed bid prior to the Special Master making a Final Recommendation is likely to create efficiencies overall, as it should eliminate, reduce, or at minimum focus any objection a non-consenting creditor may express to that recommendation.  (*See generally* D.I. 1545-3 at 2 of 4) (Special Master: "Any such Additional Judgment Creditor will have the right to object to the Special Master's Final Recommendation.")

However, the Court disagrees with and **REJECTS** the Huntington Ingalls proposal that creditors that would receive non-cash consideration must **consent** to receipt of such non-cash consideration **before** the Special Master may make a Final Recommendation.  The Special Master has discretion to make a Final Recommendation of a Successful Bid that includes a component of non-cash consideration to which the proposed recipient of the non-cash consideration has not (or has not yet) consented, provided that (a) the proposed recipient of the non-cash consideration has been given the opportunity to **comment** on the bid (as described above), and (b) the Court may not compel any creditor to accept non-cash consideration.  As the Koch Parties put it, "if creditors' consent were required at the front end of the submission process, prior to the Special Master's evaluation of bids, those creditors would have a premature veto that could potentially function as a means to achieve the very exclusivity which the Special Master and the Court have thus far denied."  (D.I. 1547 at 4)

To be clear, the Court does not view non-consent by a creditor as necessarily compelling the Court to reject a Final Recommendation of a Successful Bid that includes non-cash consideration to a non-consenting creditor.  Instead, the Court understands that any creditor

participating in the Sale Process will (if it does not receive cash in the full amount of its judgment), at the conclusion of this process, either (a) with its consent, receive non-cash consideration, in whole or in part; or (b) retain its judgment and the opportunity to seek to enforce it against property other than the attached PDVH Shares.

 *The Venezuela Parties express concern that the Court may have overlooked the fact that* "'PDVH and CITGO fundamentally oppose any limitation on consideration that can be offered by potentially interested bidders to create a value-maximizing transaction.'" (D.I. 1540 at 4) (quoting D.I. 1511 at 4-5)  The Court did not overlook this position and intentionally adopted (D.I. 1517 at 7) – and hereby reaffirms adoption of – the Special Master's conditions for evaluating non-cash consideration.  The Court recognizes that it does not have authority to compel a judgment creditor to accept non-cash consideration in exchange for its judgment. Thus, to repeat, any judgment creditor that is part of the Sale Process has the right to emerge from this process with (a) cash, (b) its judgment, and/or (c) some combination of both, or such creditor may alternatively consent to receipt (in whole or in part) of non-cash consideration.[10]

 Subject to the modifications noted above, the Special Master's proposed Evaluation Criterion 1 is **ADOPTED**.

---

[10] It does not appear the Venezuela Parties disagree, as they state (correctly) that no creditor is "entitled to hold up such a deal [i.e., one including non-cash consideration] by refusing its consent and insisting on cash;" such creditor may, they observe, instead exercise its right to "take its judgment elsewhere."  (D.I. 1540 at 6)

Evaluation Criterion 2: Certainty of Closing.

Subject to any modifications noted above, the Special Master's proposed Evaluation Criterion 2 is **ADOPTED**.

 

_____

January 27, 2025                    HONORABLE LEONARD P. STARK
Wilmington, Delaware                UNITED STATES DISTRICT COURT