IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| CRYSTALLEX INTERNATIONAL CORP., | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Misc. No. 17-151-LPS |
| | ) |
| BOLIVARIAN REPUBLIC OF VENEZUELA, | ) |
| | ) |
| Defendant. | ) |

**NOTICE OF SPECIAL MASTER'S
RECOMMENDATION OF STALKING HORSE**

**PLEASE TAKE NOTICE THAT**, Robert B. Pincus, solely in his capacity as special master (the "**Special Master**") for the United States District Court for the District of Delaware (the "**Court**") in *Crystallex International Corp. v. Bolivarian Republic of Venezuela* (D. Del. Case. No. 17-151-LPS), with the assistance of his advisors, recommends Red Tree Investments, LLC ("**Red Tree**" or the "**Stalking Horse**"), an indirect subsidiary of Contrarian Funds, LLC, an affiliate of Contrarian Capital Management, LLC ("**Contrarian**"), as the stalking horse, pursuant to the *Memorandum Order Regarding Sale Process and Litigation* dated December 31, 2024 (D.I. 1517) (the "**December 2024 Order**"). *See* December 2024 Order at ¶ 12. The Special Master respectfully submits this *Notice of Special Master's Recommendation of Stalking Horse* (this "**Notice**") recommending a stalking horse for the purchase of all of the shares of PDV Holding, Inc. ("**PDVH**" and the shares of which, the "**PDVH Shares**") owned by Petróleos De Venezuela, S.A. ("**PDVSA**"), pursuant to the terms and conditions set forth in the proposed stock purchase agreement (together with the exhibits and schedules thereto, the "**Stalking Horse Agreement**" and the transactions contemplated thereby, the "**Proposed Transaction**") attached

hereto as **Exhibit A**.[1]  Pursuant to section 4.1(c) of the Stalking Horse Agreement, the obligations of the Special Master contained in the Stalking Horse Agreement are subject to entry of the Sale Order.  Further, the Court has held that the respective protections approved by the Court in its *Memorandum Order* dated January 27, 2024 (D.I. 1554) (the "**January 27 Order**") shall be afforded to a bidder upon Court approval of its bid as either a stalking horse or base bid, rather than by mere execution of an agreement by the Special Master.  *See* D.I. 1517 ¶ 10; *see also* D.I. 1554 n. 6.[2]

## Preliminary Statement

1. Since his appointment in April 2021, the Special Master has worked diligently to conduct the Marketing Process in pursuit of a value-maximizing sale of the PDVH Shares.

2. After the Court and Special Master, with input from the Sale Process Parties and Additional Judgment Creditors, laid the groundwork for a competitive bidding process in the preceding months and years, the Special Master's efforts to sell the PDVH Shares to the best bidder began in earnest on October 23, 2023, when the Court officially launched the Marketing Process.

3. Since launching, the Special Master and his advisors have extensively engaged with potential bidders, conducted substantial due diligence of CITGO's operations, undertaken extensive and hard-fought negotiations regarding bid proposals, regularly consulted

---

[1] To the extent of any inconsistency between this Notice and the Stalking Horse Agreement, the terms of the Stalking Horse Agreement shall prevail.

[2] All capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the *Sixth Revised Proposed Order (A) Establishing Sale and Bidding Procedures, (B) Approving Special Master's Report and Recommendation Regarding Proposed Sale Procedures Order, (C) Affirming Retention of Evercore as Investment Banker by Special Master and (D) Regarding Related Matters* (D.I. 481) (the "**Sale Procedures Order**") or the Stalking Horse Agreement, as applicable.

with the Sale Process Parties, consulted as required with the Additional Judgment Creditors, solicited input from regulatory agencies, and otherwise facilitated a competitive Marketing Process according to the procedures approved by the Court.

4. Throughout the course of the Marketing Process, the Special Master has navigated issues of first impression and a multitude of considerations that make the sale of the PDVH Shares an intensely complex process. Most recently, after concluding the first two (2) bidding rounds, the Special Master preliminarily recommended a winning bidder in September 2024. But ultimately, when his recommendation did not receive public support from the Sale Process Parties or Additional Judgment Creditors, the Special Master pivoted to another round of bidding based on further input and direction from the Court. The contours of that pivot were debated among the Special Master and the parties-in-interest, culminating in the approval by the Court of certain procedures for the solicitation of stalking horse bids (the "**Stalking Horse Bids**") and this recommendation of the Stalking Horse by the Special Master.

5. After receiving four (4) proposed Stalking Horse Bids on or about the March 7, 2025 deadline, the Special Master immediately began evaluating the bids with his advisors in accordance with the Court-approved evaluation criteria (the "**Evaluation Criteria**"). In considering which bid to recommend as a stalking horse or base bid, the Special Master weighed the two (2) criteria prescribed by the Court—purchase price and certainty of closing—and had numerous calls with the Sale Process Parties to understand and consider their views on the bids submitted. To be clear, consistent with the Special Master's prior statements, there is no "paramount criterion", nor is there a rigid formula by which a bid must be selected. *See e.g.*, D.I. 1433 ¶ 6. That is particularly true across bidding rounds—the factors driving the selection of a stalking horse are not necessarily the same as those underpinning the recommendation of a final

3

successful purchaser of the PDVH Shares. Therefore, to be abundantly clear, the Special Master's selection of Red Tree as the stalking horse, and his evaluation of the advantages of the Red Tree bid for purposes of that selection, does not mean that the Proposed Transaction will be preferred to others following the topping period, regardless of whether the bids previously submitted materially change (or change) between now and the date on which the Special Master files his final recommendation for a Successful Bidder.

6. The Special Master believes the Proposed Transaction represents the best available bid for consideration as a stalking horse at this time and is worthy of the bidder protections in the Stalking Horse Agreement and described herein. In its Proposed Transaction, Red Tree agrees to provide both payment on account of a substantial amount of Attached Judgments and certainty (including by delivering a settlement with holders of the PDVSA 2020 Bonds). Red Tree's Proposed Transaction has the second highest purchase price, and the Special Master believes it has the least conditionality, and thus is, the most likely to close of all of the Stalking Horse Bids received by the Special Master. The Special Master considers that the combination of value and the certainty of the Proposed Transaction results in its being the best available stalking horse.

7. The Special Master's recommendation of the Proposed Transaction as the stalking horse brings the Special Master, and the holders of Attached Judgments, one step closer to the conclusion of the Marketing Process. The Special Master is confident that approval of Red Tree as the stalking horse will lead to a robust topping period and potentially elicit better bids for the PDVH Shares, whether that be the Proposed Transaction or a transaction proposed by another bidder.

**Background**

8. On January 14, 2021, the Court issued an *Opinion* and *Order* (D.I. 234, 235) on several motions brought by Plaintiff Crystallex, Defendant Bolivarian Republic of Venezuela (the "**Republic**"), and Interveners PDVSA, PDVH, and CITGO (collectively with the Republic, the "**Venezuela Parties**"), in which the Court "set out some of the contours of the sales procedures that it will follow" in conducting a sale of the PDVH Shares. *See* D.I. 234 at 34.

9. By order dated April 13, 2021, the Court appointed the Special Master to assist with the sale of the PDVH Shares. *See* D.I. 258.

10. For over a year, the Special Master and the Sale Process Parties extensively negotiated the terms of a proposed sale of the PDVH Shares.[3] These extensive negotiations culminated in the entry of the Sale Procedures Order.

11. Pursuant to the Sale Procedures Order and subsequent orders entered by the Court (*see* D.I. 643 (directing the sale process to proceed and authorizing the Special Master to begin preparations for the launch of the marketing process); *see also* D.I. 768 (authorizing the launch of the marketing process)), the Special Master conducted a marketing process for the sale of the PDVH Shares, culminating in the collection of binding bids by the Special Master on June 11, 2024.

12. On April 3, 2024 the Court entered the *Final Priority Order* (D.I. 1102) (the "**Final Priority Order**") establishing a priority waterfall with respect to the Attached Judgments.

---

[3] *See* D.I. 302, D.I. 303, D.I 341, D.I. 391, D.I. 411-1, D.I. 451-1, Ex. A, D.I. 472-1, Ex. A.

13. On September 27, 2024, the Special Master filed the *Notice of Special Master's Recommendation* (D.I. 1325) (the "**Initial Notice**"), recommending a transaction for the purchase of the PDVH Shares proposed by Amber Energy Inc. ("**Amber**") to the Court.

14. After extended briefing related to the Initial Notice and the proposed transaction with Amber, on December 31, 2024, the Court directed the Special Master to solicit additional bids for the PDVH Shares. *See* D.I. 1517 ¶ 1. This order also acknowledged that the data room had been re-opened by the Special Master and directed that the data room shall remain open until further order of the Court. *See* D.I. 1517 ¶ 2. Subsequently, Evercore Group L.L.C. completed additional marketing and solicited stalking horse bids for the sale of the PDVH Shares (the "**Additional Marketing Process**").

15. The December 2024 Order also set forth revised procedures and a timeline for the sale of the PDVH Shares. The December 2024 Order included (i) procedures for approval of (A) certain bidder protections (the "**Bidder Protections**") that will be made available to any stalking horse that is approved by the Court, (B) material terms of a stock purchase agreement ("**SPA**") and, subsequently, a long-form SPA, and (C) the Evaluation Criteria; (ii) setting deadlines for the submission of bids, the Special Master's recommendations, and objections thereto; (iii) scheduling a sale hearing (the "**Sale Hearing**"); and (iv) granting related relief.

16. The December 2024 Order also set forth directions for the Special Master's selection of a stalking horse bid or base bid:

> [t]he Special Master shall prefer a [s]talking [h]orse [b]id to a [b]ase [b]id, which, unlike the [s]talking [h]orse [b]id, would not obtain the benefit of Bidder Protections (and would receive no more than reimbursement of reasonable expenses). However, the Special Master has discretion to recommend a [b]ase [b]id rather than a [s]talking [h]orse [b]id if, but only if, in his expert good faith judgment, reached after consultation with the Sale Process Parties and Additional Judgment Creditors, he believes he has received no bid worthy of being given general Bidder Protections.

D.I. 1517 ¶ 10.

17. On January 14, 2025, after conferring with the Sale Process Parties and Additional Judgment Creditors, the Special Master filed a *Joint Status Report* (D.I. 1528) submitting his proposal for (i) Bidder Protections to be made available to any stalking horse approved by the Court, (ii) the material terms of a draft SPA (the "**Draft SPA Material Terms**"), and (iii) the Evaluation Criteria.

18. After briefing by parties-in-interest, the Court issued the January 27 Order wherein the Court approved the Bidder Protections, the Draft SPA Material Terms, and the Evaluation Criteria to be uploaded to the virtual data room for the review of all potential bidders. In accordance with the December 2024 Order, the Special Master then proceeded to draft a long-form SPA reflecting such terms to be deposited in the virtual data room. *See* D.I. 1517 at ¶ 5.

19. On February 10, 2025, the Special Master filed the *Notice of Filing of Long-Form Stock Purchase Agreement* (D.I. 1557) containing the proposed bid draft long-form stock purchase agreement (as amended from time to time, the "**Bid Draft SPA**"). After briefing by parties-in-interest, on February 24, 2025, the Court issued a *Memorandum Order* (D.I. 1571) containing rulings on various objections to the terms of the Bid Draft SPA and inviting a further round of briefing regarding the Court's proposed formulation of section 5.11 of the Bid Draft SPA. On March 4, 2025, the Court entered a *Memorandum Order* (D.I. 1583) with respect to the briefing on the Court's proposed formulation of section 5.11 of the Bid Draft SPA.

20. Between February 24, 2025 and March 9, 2025, the Special Master caused a notice of the stalking horse bidding deadline (amongst other things) to be published twice in two (2) consecutive weeks in each of the following publications in accordance with the noticing procedures set forth in the Sale Procedures Order (i) *The Wilmington News Journal*, (ii) *Delaware*

*State News*, (iii) *The Wall Street Journal* (national edition), (iv) *USA Today* (national edition), and (v) the Venezuela publication, *La Razon*. *See* D.I. 481 at 7–8.

21. On or about March 7, 2025, the deadline for submission of Stalking Horse Bids, the Special Master received four (4) proposed Stalking Horse Bids.

22. The Special Master and his advisors conducted a comprehensive review of each proposed Stalking Horse Bid received in accordance with the Evaluation Criteria and regularly consulted the Sale Process Parties with respect to each proposed Stalking Horse Bid received. The Special Master also engaged with all of the bidders to obtain clarity on their proposed transaction structures and ascertain their willingness and ability to negotiate fundamental parts of each of their proposed transactions.

23. For the reasons set forth herein, the Special Master recommends the Court approve the Proposed Transaction as the stalking horse.

**Overview of Stalking Horse Bid and Material Terms of Stalking Horse Agreement**

24. Subject to the Court's approval, the Stalking Horse Agreement provides that the Stalking Horse would acquire 100% of the PDVH Shares for an aggregate purchase price of approximately $3.699 billion of proceeds distributable to holders of Attached Judgment Creditors at closing. The Proposed Transaction provides for (i) cash consideration in the amount of approximately $3.241 billion and (ii) non-cash consideration in the amount of approximately $458 million consented to by the recipients thereof payable to two (2) Attached Judgment holders.[4] Specifically, in exchange for its respective Attached Judgments, Red Tree has agreed to receive non-cash consideration in the form of (i) equity in a new acquisition company to be formed as the

---

[4] Cash and distributions to holders of Attached Judgments are calculated based on accrued claim amounts as at March 20, 2025.

8

ultimate parent of PDVH ("**AcquisitionCo**") and (ii) new secured convertible notes to be issued by AcquisitionCo ("**New Convertible Notes**"), and Huntington Ingalls Incorporated ("**Huntington Ingalls**") has agreed to receive non-cash consideration in the form of New Convertible Notes.  The Stalking Horse has also offered non-cash consideration in the form of New Convertible Notes, contingent value rights based on the performance of CITGO Petroleum Corporation ("**CPC**") (both before and after the closing date of the Proposed Transaction), new common equity and common equity warrants in AcquisitionCo (the "**Additional Proposed Junior Creditor Non-cash Consideration**") to certain Additional Judgment Creditors junior to the Stalking Horse in the priority waterfall established pursuant to the Final Priority Order.  The Stalking Horse has represented to the Special Master that it believes the Additional Proposed Junior Creditor Non-cash Consideration has a potential value of $1.5 billion or greater, depending on the financial performance of CPC.  As of the date of this Notice, the Stalking Horse has not received any consent of junior Additional Judgment Creditors to the Additional Proposed Junior Creditor Non-cash Consideration and, therefore, the Special Master has not undertaken an evaluation of the proposed consideration.

        25.     Additionally, the Stalking Horse entered into a transaction support agreement (the "**TSA**"), with an ad hoc group (the "**2020 Bondholders AHG**") of holders of that certain series of 8.5% notes issued by PDVSA due in 2020 (the "**PDVSA 2020 Bonds**", and the holders of the PDVSA 2020 Bonds, the "**PDVSA 2020 Bondholders**").  The TSA is being filed under seal by the Stalking Horse promptly following the filing of this Notice.  Pursuant to the TSA, the 2020 Bondholders AHG has agreed to provide the requisite consents to cause the Proposed Transaction to be permitted under the indenture governing the PDVSA 2020 Bonds and to cause all of the purported security interests in the equity of CITGO Holding that secure the PDVSA 2020

Bonds (the "**CITGO Holding Pledge**") to be released and terminated in full. The TSA further provides for a consensual exchange of the PDVSA 2020 Bonds for a combination of debt at CPC, secured notes at CITGO Holding pursuant to a marketing process, and secured convertible notes at AcquisitionCo. A vote of 66 2/3% of the PDVSA 2020 Bondholders is required to release the purported CITGO Holding Pledge.[5]

26. The chart attached hereto as **Exhibit B** summarizes certain material terms of the Stalking Horse Agreement compared to the Draft SPA Material Terms approved by the Court.[6]

27. The Stalking Horse proposes financing for the Proposed Transaction from J.P. Morgan Chase Bank, N.A. ("**JP Morgan**"), Wells Fargo Bank, National Association ("**WFB**") and Wells Fargo Securities, LLC ("**WF Securities**" and, together with WFB and their respective affiliates, "**Wells Fargo**" and, together with JP Morgan, the "**Financing Parties**") whereby CPC is the borrower of a $1.25 billion asset-based revolving loan facility and a $3.645 billion senior secured bridge facility, including a $1.1 billion backstop facility in case refinancing the $1.1 billion aggregate principal amount of 8.375% senior secured notes due 2029 of CPC becomes necessary. The Financing Parties submitted a final form commitment letter, which are attached hereto as **Exhibit C**.

---

[5] As of the date of this Notice, the TSA has been executed by approximately 65.7% of the PDVSA 2020 Bondholders. The Stalking Horse and counsel to the 2020 Bondholders AHG have indicated to the Special Master that signatures for an amount of PDVSA 2020 Bondholders sufficient to reach the 66 2/3% threshold are forthcoming imminently. In the event the threshold is not reached by 5:00 p.m. EDT on Monday, March 24, 2025, the Special Master may terminate the SPA with the Stalking Horse, without any attendant payment of a termination fee or expense reimbursement to the Stalking Horse. *See* Stalking Horse Agreement, section 8.1(j).

[6] As set forth above, to the extent of any inconsistency between this Notice and the Stalking Horse Agreement, the terms of the Stalking Horse Agreement shall prevail.

28. As set forth above, the Stalking Horse has received a commitment letter from the necessary parties to cause Huntington Ingalls to consent to receive non-cash consideration under the Proposed Transaction. The executed commitment letter is attached hereto as **Exhibit D**.

29. Additionally, an affiliate of Contrarian has committed to purchase for cash $150 million aggregate principal amount of New Convertible Notes at par pursuant to the commitment letter attached hereto as **Exhibit E**.

30. Notwithstanding the termination fee economics approved by the Court, the Stalking Horse has agreed to amend, what would have been the Court-approved termination fee[7] in response to a request by the Special Master. Pursuant to the terms of the Stalking Horse Agreement, (i) in the event the Stalking Horse Agreement is terminated by the Special Master in favor of a Superior Proposal received prior to the Special Master's final recommendation after the conclusion of the topping period, the Stalking Horse would receive an expense reimbursement in an amount equal to its actual and documented expenses, including advisor fees and financing fees, in connection with the Stalking Horse Bid process and related financings (including the TSA), up to a cap of $75 million, and (ii) in the event the Special Master ultimately recommends the Stalking Horse as the Successful Bidder in his Final Recommendation after the conclusion of the topping period, but the Court subsequently approves a Superior Proposal, the Stalking Horse would receive the full termination fee prescribed in the Bidder Protections (*i.e.*, the lesser of $150 million and three percent (3%) of the value of Attached Judgments expected to be satisfied, whether in cash or agreed non-cash consideration, by sale proceeds at closing).

---

[7] *See* D.I. 1528, Ex. A, setting forth the termination fee that was adopted by the Court pursuant to the January 27 Order with certain modifications (D.I. 1554 at 7–8).

31. The Stalking Horse submitted an initial bid package on or about March 7, 2025 and, after engaging in extensive negotiations with the Special Master, submitted amended and restated bid letters on March 12, 2025 and March 20, 2025. The final Stalking Horse bid letter is attached hereto as **Exhibit F**.

### Special Master's Recommendation of Stalking Horse

32. The Special Master recommends the Court approve Red Tree, and the Proposed Transaction, as the stalking horse and thereby grant to Red Tree the Bidder Protections approved in the December 2024 Order, as amended pursuant to the Stalking Horse Agreement and described herein.

33. As set forth above, in the January 27 Order, after extensive briefing from the parties-in-interest, the Court approved the Evaluation Criteria, according to which the Special Master must evaluate all bids. The Evaluation Criteria contains two overarching criteria (i) purchase price and (ii) certainty of closing. The Special Master considered each of these criteria in extensive detail in evaluating the bids and arriving at his determination that Red Tree's Proposed Transaction constituted the bid most deserving of selection as the stalking horse. In the Special Master's determination, the Proposed Transaction represents the greatest combination of price and certainty, according to the relevant weight each of those criteria carry for purposes of the Special Master's selection of a bid to serve as the floor for the sale of the PDVH Shares. At this stage of the Marketing Process, and given that the Special Master will solicit additional bids during the topping period, it is the Special Master's judgment that certainty of closing deserves particular (but not exclusive) importance. Therefore, while the Red Tree bid was the second highest Stalking Horse Bid submitted, rather than the highest, it was nonetheless the best bid submitted for purposes of selection of a stalking horse.

34. An important factor in assessing the closing certainty of the Proposed Transaction was Red Tree's settlement with the PDVSA 2020 Bondholders. The Special Master acknowledges the Court's instruction that

> [t]he SPA and Evaluation Criteria shall NOT include any requirement or condition with respect to the [PDVSA 2020 Bondholders] other than that bidders acknowledge that the [PDVSA 2020 Bondholders] purport to have a pledge of 50.1% of the equity of CITGO Holding, Inc., which is disputed by the Venezuela Parties and is subject to active litigation.

D.I. 1517 at ¶ 28; *see also* D.I. 1554 at ¶ 23 ("[t]he Court has already determined that the SPA will not include any requirement or condition with respect to the 2020 Bond Entities . . ."). To be clear, the Special Master did not require anything of the bidders beyond the acknowledgement described in the January 27 Order. However, each of the four (4) proposed Stalking Horse Bids received by the Special Master contained some form of conditionality with respect to the PDVSA 2020 Bondholders—some more direct than others. One bid explicitly assumed that the buyer or the Special Master would secure a release of the CITGO Holding Pledge prior to closing. The remaining three bids, including the Proposed Transaction, contemplate a financing structure with obligors at or below CPC. Of those three, only Red Tree secured a settlement with the PDVSA 2020 Bondholders to, among other things, consensually implement the financing at a level below CITGO Holding. The PDVSA 2020 Bondholders have been vocal that they will seek to litigate any structure that, in their opinion, violates the purported CITGO Holding Pledge (*see e.g.*, D.I. 1558; D.I. 1568) and have directly informed the Special Master that they would take the position that any non-consensual financing implemented below CITGO Holding would trigger such a violation. For the avoidance of doubt, selection of Red Tree as the Stalking Horse, in part based on the existence of a settlement with the PDVSA 2020 Bondholders, shall by no means be interpreted as an admission by the Special Master that the financing structures in the other bids violate, or are likely to violate, the CITGO Holding Pledge. Nor does it mean that the Special

13

Master views settlement with the PDVSA 2020 Bondholders as a necessary feature of any bid worthy of the Special Master's recommendation at this stage or in subsequent bidding rounds. Rather, the selection of Red Tree as the stalking horse is an acknowledgement by the Special Master that all bids submitted in the current round contain a level of risk to their ability to close, but the Proposed Transaction accomplished the best mitigation of that risk. In fact, in the Special Master's good-faith expert judgment, any residual conditionality in the Proposed Transaction related to the PDVSA 2020 Bonds (*e.g.*, if the TSA is terminated) is acceptable in light of the extremely limited conditionality and termination rights in the TSA itself, and in the additional rights the Special Master has over amendments and terminations of the TSA. *See* Stalking Horse Agreement, section 6.20. The existence of a dispute, and the virtual certainty of litigation by the PDVSA 2020 Bondholders, is by definition a risk that weighs on closing certainty, regardless of the Special Master's or a bidder's assessment of the likelihood of success in that litigation. Absent an unconditional workaround to the financing structure, or a settlement, neither of which can be found in the other bids, there will always exist some level of risk related to implementation of the transactions contemplated by bidders other than Red Tree. That is not to say that in order to garner the Special Master's recommendation of a bid—now or as the final Successful Bid—there must be no risk related to the PDVSA 2020 Bonds. Instead, it is only an indication of the Special Master's priorities in selecting a stalking horse and setting a floor for the topping period.

35. As set forth above, nothing precludes the Special Master from recommending as a final Successful Bidder in his Final Recommendation a bid with a higher purchase price but a lesser degree of certainty of closing than the Proposed Transaction, even if that competing bid exists today.

14

36. A summary of the Special Master's additional considerations in recommending the Proposed Transaction in accordance with the Evaluation Criteria is set forth below.

**A.    Purchase Price**

37. The purchase price of—or, stated differently, the aggregate amount of Attached Judgments satisfied by—the Proposed Transaction is approximately $3.699 billion comprised of (i) cash consideration in the amount of approximately $3.241 billion and (ii) non-cash consideration in the amount of approximately $458 million consented to by the recipients thereof.  Additionally, the Stalking Horse has offered to junior Additional Judgment Creditors the Additional Proposed Junior Creditor Non-cash Consideration.  The Special Master considers that the purchase price included in the Proposed Transaction satisfies a substantial amount of Attached Judgments and is adequate for setting a floor as a stalking horse.

38. The chart below summarizes the Attached Judgments that would be satisfied at closing of the Proposed Transaction in accordance with the priority waterfall established in the Final Priority Order.

| Priority | Attached Judgment Holder (Applicable Judgment(s)) | Cash Consideration or Non-Cash Consideration[8] | Consideration Value[9] |
|---|---|---|---|
| 1 | Crystallex Corporation | Cash consideration | $1,006,448,879.16 |

---

[8] As set forth above, all creditors who would receive non-cash consideration in connection with the Proposed Transaction have consented to receiving such non-cash consideration.  The effects of the Additional Proposed Junior Creditor Non-cash Consideration are not reflected in this waterfall summary.

[9] Amounts of Attached Judgments are estimated as of March 20, 2025 and according to the claims calculations approved by the Court in its *Memorandum Order*, dated April 25, 2024.  *See* D.I. 1136 at 3 (citing D.I. 969-1).  Actual distributions to holders of Attached Judgments will be determined as of the date of the closing of the sale of the PDVH Shares.

| Priority | Attached Judgment Holder (Applicable Judgment(s)) | Cash Consideration or Non-Cash Consideration[8] | Consideration Value[9] |
|---|---|---|---|
| 2 | Tidewater Caribe S.A., Tidewater Investment SRL | Cash consideration | $76,850,067.68 |
| 3 | Phillips Petroleum Company Venezuela Limited and ConocoPhillips Petrozuata B.V. (Petrozuata/Hamaca Judgment) | Cash consideration | $1,371,747,774.25 |
| 4 | OI European Group B.V. | Cash consideration | $667,052,172.46 |
| 4 | Huntington Ingalls Incorporated | Non-cash consideration | $139,147,354.76 |
| 5 | ACL1 Investments Ltd., ACL2 Investments Ltd., LDO (Cayman) XVIII Ltd. | Cash consideration | $118,741,187.01 |
| 6 | Red Tree Investments, LLC (19-cv-2519 (S.D.N.Y.); 19-cv-2523 (S.D.N.Y.); Fee Judgment in cases 22-mc-00068 and 22-mc-00069) | Non-cash consideration | $318,998,207.70 |

39. While the Special Master considers the Stalking Horse's offer of the Additional Proposed Junior Creditor Non-Cash Consideration to be promising, given the preliminary nature of the discussions between the Stalking Horse and applicable Additional Judgment Creditors, the Special Master has not applied a numerical value to the consideration, has afforded the offer limited quantitative weight, and does not consider it a primary deciding factor in the Special Master's decision.

B.   **Certainty of Closure of Proposed Transaction**

40. As set forth above, the Special Master believes the Proposed Transaction offers the highest degree of certainty of closing in comparison to the other three (3) proposed

16

Stalking Horse Bids received. This certainty is in part due to the proposed settlement with the PDVSA 2020 Bondholders.

41. However, in reaching his recommendation, the Special Master also considered the following non-exhaustive matters, as set forth in the Evaluation Criteria, of certainty of closing:

(a) **Likelihood of Regulatory Approval**: The Special Master is reasonably satisfied that the Stalking Horse has sufficient likelihood of attaining the requisite regulatory approvals. The Stalking Horse has represented that it will make, in a timely manner, after being approved by the Court as a stalking horse, (i) all filings and disclosures necessary to comply with the regulations of the Office of Foreign Assets Control ("**OFAC**"), (ii) all necessary filings under the Hart-Scott Rodino Antitrust Improvements Act of 1976, as amended (the "**HSR Act**"), and (iii) all necessary filings in connection with any review by the Committee on Foreign Investment in the United States ("**CFIUS**"). The acquisition company created for the transaction, AcquisitionCo, will be owned directly or indirectly by Red Tree (or its respective affiliates) and managed by Contrarian, whose investor pool consists of 80% U.S. persons. The Special Master, upon the expertise and advice of his advisors, conducted an analysis of the necessary regulatory approvals and determined the Proposed Transaction posed limited risk.

(b) **Conditionality Related to Pending or Future Litigation**: The Proposed Transaction does not include any additional conditionality relating to pending or future litigation compared to the Bid Draft SPA. The Special Master weighs this favorably in his assessment of the certainty of closing of the Proposed Transaction.

(c) **Conditionality Related to Appeals of the Sale Order**: The Proposed Transaction does not include any additional conditionality relating to an appeal of the Sale Order compared to the Bid Draft SPA. The Special Master weighs this favorably in his assessment of the certainty of closing of the Proposed Transaction.

(d) **Bidder's Financial Wherewithal and Certainty of Financing**: The Special Master is reasonably satisfied with respect to the Stalking Horse's financial wherewithal and certainty of financing to recommend the Proposed Transaction as the stalking horse. As set forth above, the Stalking Horse has secured financing from the Financing Sources, which are highly reputable financial institutions. Additionally, an affiliate of Contrarian has committed to purchase for cash $150 million aggregate principal amount of New Convertible Notes and agreed to provide the Special Master with third party beneficiary rights to enforce Contrarian's obligations under the related commitment letter. Notwithstanding these financing commitments, the Special Master considers that the Proposed Transaction, including its associated finance commitments, contains a degree of conditionality (albeit very limited, having been significantly mitigated due to the

various amendments to the TSA and related provisions of the Stalking Horse Agreement, including that the financing commitments contain no direct condition related to the TSA) related to the PDVSA 2020 Bondholders in the event of termination of the TSA, in which case the financing structure underlying the Proposed Transaction might be affected. Accordingly, the Special Master acknowledges that there is a level of uncertainty with respect to the Stalking Horse's financing but believes the Proposed Transaction offers the highest level of certainty compared to the other Stalking Horse Bids received and considers any execution risk acceptable under the circumstances. In addition to the aforementioned limited conditionality related to the PDVSA 2020 Bonds, the financing for the Proposed Transaction contains only customary closing conditions.

(e) **Conditionality Related to Other Terms Proposed by the Stalking Horse**: The Stalking Horse Agreement has no additional conditionality with respect to its other terms compared to the Bid Draft SPA. The Bid Draft SPA contains customary conditionality such as receipt of HSR clearance and OFAC approval, accuracy of certain limited fundamental representations and warranties in all material respects, and compliance with covenants in all material respects. The financing documents proposed by the Stalking Horse otherwise have customary conditionality. The Special Master weighs this favorably in his assessment of the certainty of closing of the Proposed Transaction.

(f) **Certainty of Obtaining Requisite Consents From Holders of Attached Judgments Proposed to Receive Non-Cash Consideration**: As set forth above, the Stalking Horse has obtained consent to receive non-cash consideration from Huntington Ingalls, who is senior to Red Tree and thus must be paid in full prior to Red Tree. The Special Master weighs this favorably in his assessment of the certainty of closing of the Proposed Transaction. As set forth above, as of the date of this Notice, the Stalking Horse has not yet received any consent with respect to the Additional Proposed Junior Creditor Non-cash Consideration and, therefore, the Special Master has afforded such consideration only limited weight in his assessment.

42.     For the reasons set forth herein, the Special Master recommends that the Court approve Red Tree, and its Proposed Transaction, as the Stalking Horse and grant to Red Tree the Bidder Protections, as modified and limited by the Stalking Horse Agreement.

|  |  |
|---|---|
| OF COUNSEL:<br><br>Matthew S. Barr (Admitted *pro hac vice*)<br>David Lender (Admitted *pro hac vice*)<br>Jared R. Friedmann (Admitted *pro hac vice*)<br>Chase A. Bentley (Admitted *pro hac vice*)<br>WEIL, GOTSHAL & MANGES LLP<br>767 Fifth Avenue<br>New York, New York 10153<br>Telephone: (212) 310-8000<br>Facsimile: (212) 310-8007<br>Matt.Barr@weil.com<br>David.Lender@weil.com<br>Jared.Friedmann@weil.com<br>Chase.Bentley@weil.com<br><br>Dated: March 21, 2025<br>12127697 / 21202.00001 | Respectfully submitted,<br><br>POTTER ANDERSON & CORROON LLP<br><br>By: */s/ Myron T. Steele*<br>    Myron T. Steele (#0002)<br>    Matthew F. Davis (#4696)<br>    Bindu A. Palapura (#5370)<br>    Hercules Plaza, 6th Floor<br>    1313 North Market Street<br>    P.O. Box 951<br>    Wilmington, DE 19801<br>    Telephone: (302) 984-6000<br>    Facsimile: (302) 658-1192<br>    msteele@potteranderson.com<br>    mdavis@potteranderson.com<br>    bpalapura@potteranderson.com<br><br>*Counsel for Special Master Robert B. Pincus* |