## Exhibit A

**Stalking Horse Agreement**

Execution Version
Confidential

# STOCK PURCHASE AGREEMENT

dated as of

March 21, 2025

among

RED TREE ACQUISITIONS, LLC,

ROBERT B. PINCUS,

solely in his capacity as the Special Master for the United States District Court for the District of Delaware

and

RED TREE INVESTMENTS, LLC,

solely with respect to the Sections specified in the preamble

# TABLE OF CONTENTS

Page

ARTICLE I DEFINITIONS AND INTERPRETIVE MATTERS ............................................ 3

    Section 1.1.    Certain Defined Terms ........................................................... 3
    Section 1.2.    Other Definitional and Interpretive Matters ....................... 3

ARTICLE II SALE AND PURCHASE OF THE SHARES; CLOSING ............................... 5

    Section 2.1.    Sale and Purchase of Shares .................................................. 5
    Section 2.2.    Closing ..................................................................................... 5
    Section 2.3.    Closing Deliveries of the Parties ........................................... 5

ARTICLE III PURCHASE PRICE; CLOSING DATE PAYMENTS ............................... 6

    Section 3.1.    Purchase Price ......................................................................... 6
    Section 3.2.    Closing Transaction Expenses; Funds Flow Memorandum ... 6
    Section 3.3.    Good Faith Deposit ................................................................. 7
    Section 3.4.    Closing Date Payments by the Buyer ................................... 7
    Section 3.5.    Withholding ............................................................................. 8

ARTICLE IV REPRESENTATIONS RELATING TO THE COMPANY AND THE
        SPECIAL MASTER .......................................................................................... 9

    Section 4.1.    Corporate Existence; Title to Shares ................................... 9
    Section 4.2.    Governmental Authorization ................................................ 10
    Section 4.3.    Non-Contravention ................................................................ 10
    Section 4.4.    Capitalization ......................................................................... 10
    Section 4.5.    Subsidiaries; Non-Controlled Entities. ............................... 11
    Section 4.6.    Financial Statements ............................................................. 12
    Section 4.7.    Absence of Certain Changes ................................................ 12
    Section 4.8.    No Undisclosed Material Liabilities .................................... 13
    Section 4.9.    Legal Proceedings ................................................................. 13
    Section 4.10.   Taxes ....................................................................................... 13
    Section 4.11.   Company Benefit Plans; Employment ................................. 15
    Section 4.12.   Compliance with Laws; Permits .......................................... 19
    Section 4.13.   Regulatory Matters ................................................................ 20
    Section 4.14.   Environmental Matters .......................................................... 21
    Section 4.15.   Title to Properties ................................................................. 22
    Section 4.16.   Material Contracts ................................................................. 22
    Section 4.17.   Intellectual Property and Data Privacy ............................... 24
    Section 4.18.   Brokers; Financial Advisor .................................................. 26
    Section 4.19.   Real Property ......................................................................... 26
    Section 4.20.   Affiliate Transactions ........................................................... 28
    Section 4.21.   Insurance ................................................................................. 28
    Section 4.22.   No Additional Representations ............................................. 28

i

ARTICLE V REPRESENTATIONS AND WARRANTIES OF THE BUYER AND THE
     RECORD HOLDER ........................................................................................29

Section 5.1.     Corporate Existence and Power ....................................................30
Section 5.2.     Corporate Authorization ................................................................30
Section 5.3.     Governmental Authorization ..........................................................31
Section 5.4.     Non-Contravention ........................................................................31
Section 5.5.     Litigation ........................................................................................31
Section 5.6.     Regulatory Matters ........................................................................31
Section 5.7.     Financing ........................................................................................33
Section 5.8.     Solvency ........................................................................................34
Section 5.9.     Purported Equity Pledge ................................................................35
Section 5.10.     Claim Obligations ..........................................................................35
Section 5.11.     Closing Consideration ....................................................................35
Section 5.12.     No Additional Representations ......................................................35

ARTICLE VI COVENANTS ..................................................................................36

Section 6.1.     Conduct of the Business Pending the Closing ..............................36
Section 6.2.     Access to Information ....................................................................43
Section 6.3.     Regulatory Approvals ....................................................................44
Section 6.4.     Further Assurances ........................................................................48
Section 6.5.     Confidentiality ................................................................................48
Section 6.6.     Indemnification, Exculpation and Insurance ................................48
Section 6.7.     Public Announcements ..................................................................49
Section 6.8.     Employee Matters ..........................................................................50
Section 6.9.     The Buyer's Obligations in Respect of Financing ........................52
Section 6.10.     Company's Obligations in Respect of Debt Financing ..................55
Section 6.11.     Tax Matters ....................................................................................59
Section 6.12.     R&W Insurance Policy ..................................................................60
Section 6.13.     Notices of Certain Events ..............................................................60
Section 6.14.     No Control of Other Party's Business ..........................................62
Section 6.15.     [Reserved] ......................................................................................62
Section 6.16.     Bidder Protections and Competing Proposals. ..............................62
Section 6.17.     Section 280G ..................................................................................65
Section 6.18.     Financial Statements ......................................................................65
Section 6.19.     Third Party Consents ......................................................................66
Section 6.20.     Transaction Support Agreement ....................................................66

ARTICLE VII CONDITIONS TO CLOSING ........................................................66

Section 7.1.     Conditions Precedent to Obligations of the Parties ......................66
Section 7.2.     Conditions Precedent to Obligations of the Buyer ......................67
Section 7.3.     Conditions Precedent to Obligations of the Special Master ........67
Section 7.4.     Frustration of Closing Conditions ................................................68

ARTICLE VIII TERMINATION ............................................................................68

Section 8.1.     Termination ....................................................................................68
Section 8.2.     Effect of Termination ....................................................................70

WEIL:\100337387\20\67816.0003

Section 8.3.       Termination Fee and Expense Reimbursement ................................ 70

ARTICLE IX MISCELLANEOUS ................................................................................ 72

Section 9.1.       Survival ................................................................................................ 72
Section 9.2.       Expenses .............................................................................................. 73
Section 9.3.       Governing Law .................................................................................... 73
Section 9.4.       Dispute Resolution; Consent to Jurisdiction ...................................... 73
Section 9.5.       Consent to Service of Process; Waiver of Jury ................................... 73
Section 9.6.       Entire Agreement ................................................................................ 74
Section 9.7.       Amendments and Waivers ................................................................... 75
Section 9.8.       Notices ................................................................................................. 75
Section 9.9.       Severability .......................................................................................... 76
Section 9.10.      Binding Effect; Assignment ................................................................ 76
Section 9.11.      No Third Party Beneficiaries ............................................................... 76
Section 9.12.      Non-Recourse ...................................................................................... 77
Section 9.13.      Specific Performance .......................................................................... 77
Section 9.14.      Successors and Assigns ........................................................................ 78
Section 9.15.      Release ................................................................................................. 78
Section 9.16.      Counterparts ........................................................................................ 79
Section 9.17.      Debt Financing Sources ...................................................................... 79
Section 9.18.      Special Master and his Representatives' Judicial Immunity .............. 81
Section 9.19.      Special Master Indemnification .......................................................... 81

ANNEX A

Definitions

EXHIBITS

Exhibit A – Form of Escrow Agreement
Exhibit B – Form of Paying Agent Agreement
Exhibit C – Form of Release
Exhibit D – Form of Termination Release

## DEFINED TERMS

| Term | Section |
|------|---------|
| Acquired Companies | Annex A |
| Additional Judgment Creditors | Annex A |
| Advanced Transaction Expenses | Annex A |
| Affected Employees | Section 6.8(c) |
| Affiliate | Annex A |
| Affiliate Transactions | Section 4.20 |
| Agreement | Preamble |
| Ancillary Agreements | Annex A |
| Anti-Corruption Laws | Annex A |
| Antitrust Laws | Annex A |
| Audited Financial Statements | Section 4.6(a) |
| Base Bid Agreement | Section 6.16(d) |
| Bolivarian Republic of Venezuela | Section 1.2(a)(ix) |
| Bonus Amounts | Section 6.8(g) |
| Business Day | Annex A |
| Business Unit | Annex A |
| Buyer | Preamble |
| Buyer Disclosure Schedules | Article V |
| Buyer Documents | Section 5.2 |
| Buyer Subsidiary | Annex A |
| CapEx Budget | Section 6.1(b)(iii) |
| Cash | Annex A |
| Cause | Section 1.2(a)(x) |
| CITGO Petroleum | Annex A |
| Claim | Annex A |
| Claim Commitment Letter | Annex A |
| Claimholders | Recitals |
| Closing | Section 2.2 |
| Closing Consideration | Annex A |
| Closing Transaction Expenses | Annex A |
| Closing Transaction Expenses Statement | Section 3.2(a) |
| COBRA | Annex A |
| Code | Annex A |
| Collective Bargaining Agreement | Section 4.11(n) |
| Commitment Letters | Section 5.7(a) |
| Company | Preamble |
| Company Balance Sheet | Section 4.6(a) |
| Company Balance Sheet Date | Section 4.6(a) |
| Company Benefit Plan | Annex A |
| Company By-Laws | Section 4.1(a) |
| Company Charter | Section 4.1(a) |
| Company Collective Bargaining Agreement | Section 4.11(n) |
| Company Disclosure Schedules | Article IV |

WEIL:\100337387\20\67816.0003

| Term | Section |
|---|---|
| Company Environmental Permits | Section 4.14 |
| Company Fundamental Representations | Annex A |
| Company Intellectual Property | Section 4.17(a) |
| Company Material Adverse Effect | Annex A |
| Company Owned Intellectual Property | Section 4.17(a) |
| Competing Proposal | Section 6.16(g)(i) |
| Confidentiality Agreement | Section 6.5 |
| Contract | Annex A |
| Convertible Commitment Letters | Section 5.7(a) |
| Convertible Commitments | Section 5.7(a) |
| Convertible Financing | Section 5.7(a) |
| Convertible Notes Commitment Letter | Annex A |
| Court | Recitals |
| Credit Bid Amount | Recitals |
| Credit Bid Purchase Price | Section 3.4(d) |
| Credit Support Arrangements | Annex A |
| Debt | Annex A |
| Debt Commitment Letter | Section 5.7(a) |
| Debt Commitment Letter Effective Date | Section 6.9(d)(i) |
| Debt Financing | Section 5.7(a) |
| Debt Financing Commitments | Section 5.7(a) |
| Debt Financing Documents | Annex A |
| Debt Financing Source | Annex A |
| Definitive Debt Documents | Section 6.9(d)(ii) |
| Deposit Amount | Recitals |
| Deposit Amount Release Date | Section 3.3(b) |
| Deposit Forfeiture Termination Event | Annex A |
| Designated Contacts | Section 6.2(a) |
| Designated Managers | Annex A |
| Economic Sanctions | Annex A |
| Environmental Laws | Annex A |
| EPP | Annex A |
| Equitable Exceptions | Annex A |
| Equity Interests | Annex A |
| Equity Pledge Litigation | Annex A |
| ERISA | Annex A |
| ERISA Affiliate | Annex A |
| Escrow Account | Annex A |
| Escrow Agent | Recitals |
| Evaluation Criteria | Annex A |
| Evercore | Recitals |
| Execution Date | Preamble |
| Existing Senior Secured Notes | Annex A |
| Expense Reimbursement Amount | Annex A |
| Expense Reserve Holdback Account | Annex A |

WEIL:\100337387\20\67816.0003

| Term | Section |
|------|---------|
| Expense Reserve Holdback Amount | Annex A |
| Extended Outside Date | Section 8.1(b) |
| Federal Energy Regulatory Law | Annex A |
| Final Recommendation Date | Section 6.3(a) |
| Financial Statements | Section 4.6(a) |
| Financing Party | Annex A |
| Financing Related Authorization Letters | Section 6.10(a)(iii) |
| Financings | Section 5.7(a) |
| Funds Flow Memorandum | Section 3.2(b) |
| GAAP | Section 4.6 |
| Good Industry Practice | Annex A |
| Government Contract | Annex A |
| Government Official | Section 4.13(a) |
| Governmental Body | Annex A |
| Hazardous Substance | Annex A |
| HSR Act | Annex A |
| HSR Filing | Section 6.3(a) |
| Improved Overbid Minimum | Section 6.16(g)(i) |
| Indemnitees | Section 6.6(a) |
| Initial Outside Date | Section 8.1(b) |
| Interest Rate | Annex A |
| Interim Financial Statements | Section 4.6(a) |
| Interim Period | Annex A |
| IRS | Annex A |
| January Order | Annex A |
| Jointly Owned Properties | Section 4.19(c) |
| Judgment Creditors | Annex A |
| Knowledge of the Buyer | Annex A |
| Knowledge of the Company | Annex A |
| Knowledge of the Special Master | Annex A |
| Law | Annex A |
| Legal Proceeding | Annex A |
| Legal Restraint | Section 8.1(c) |
| Lien | Annex A |
| Lookback Date | Annex A |
| Marketing Period | Annex A |
| Material Contract | Section 4.16(a) |
| May Order | Recitals |
| Money Laundering Laws | Annex A |
| MTP | Section 6.1(b)(iii) |
| Negative Consequences | Annex A |
| New Indemnification Agreements | Section 6.6(a) |
| No-Shop Period | Annex A |
| Non-Controlled Entity | Annex A |
| Non-Parties | Section 9.12 |

WEIL:\100337387\20\67816.0003

| Term | Section |
|------|---------|
| Non-Union Affected Employees | Section 6.8(c) |
| OFAC | Annex A |
| OFAC License | Annex A |
| OFAC License Applications | Annex A |
| Order | Annex A |
| Ordinary Course | Annex A |
| Organizational Documents | Annex A |
| Outside Date | Section 8.1(b) |
| Overbid Minimum | Section 6.16(g)(i) |
| Owned Real Property | Section 4.19(b) |
| Parties | Preamble |
| Paying Agent | Recitals |
| Paying Agent Account | Annex A |
| Paying Agent Agreement | Recitals |
| PBGC | Section 4.11(d) |
| PCI DSS | Annex A |
| PDVSA | Recitals |
| Performance Incentive Program | Section 6.8(g) |
| Permit | Annex A |
| Permitted Liens | Annex A |
| Person | Annex A |
| Personal Information | Annex A |
| PFAS | Annex A |
| Preferential Right | Annex A |
| Privacy Laws and Obligations | Section 4.17(f) |
| Procedures Summary | Annex A |
| Prohibited Modification | Section 6.9(d)(ii) |
| Purchase Price | Annex A |
| Purported Equity Pledge | Annex A |
| R&W Insurance Policy | Section 6.12 |
| Real Property | Section 4.19(b) |
| Real Property Lease | Section 4.19(a) |
| Receivables Securitization Facility | Section 6.1(b)(vi) |
| Record Holders | Preamble |
| Registered Intellectual Property | Section 4.17(a) |
| Related Claim | Annex A |
| Release | Annex A |
| Released Parties | Section 9.15 |
| Releasing Parties | Section 9.15 |
| Replacement Financing | Section 6.9(h) |
| Representatives | Annex A |
| Required Amount | Section 5.7(e) |
| Required Information | Annex A |
| RRP | Annex A |
| Sale Hearing | Section 6.16(c) |

WEIL:\100337387\20\67816.0003

| Term | Section |
|------|--------|
| Sale Order | Annex A |
| Sale Procedures Order | Recitals |
| Sale Process Parties | Annex A |
| Sanctioned Country | Annex A |
| Sanctions Target | Annex A |
| Security Incident | Annex A |
| Sensitive Data | Annex A |
| Shares | Recitals |
| Solvent | Annex A |
| Special Master | Preamble |
| Special Master and Company Related Parties | Section 8.3(g) |
| Special Master Transaction Expenses | Annex A |
| Specially Designated Nationals and Blocked Persons List | Annex A |
| Specified Information | Annex A |
| Specified Litigation | Recitals |
| Specified Litigation Claim | Recitals |
| Subsequent Overbid Minimum | Section 6.16(e)(i) |
| Subsidiary | Annex A |
| Superior Proposal | Section 6.16(g)(ii) |
| Superior Proposal Agreement | Section 6.16(d) |
| Systems | Annex A |
| Tax or Taxes | Annex A |
| Tax Proceeding | Section 4.10(c) |
| Tax Returns | Annex A |
| Taxing Authority | Annex A |
| Termination Fee | Annex A |
| Third-Party Record Holder | Annex A |
| Topping Period | Annex A |
| Transaction Documents | Annex A |
| Transaction Support Agreement | Recitals |
| Transactions | Annex A |
| Transfer Taxes | Annex A |
| Treasury Regulations | Annex A |
| Turnaround/Catalyst Budget | Section 6.1(b)(iv) |
| Union | Section 4.11(n) |
| Union Affected Employees | Section 6.8(b) |
| Unsolicited Competing Proposal | Section 6.16(e) |
| Unsolicited Competing Proposal Agreement | Section 6.16(e) |
| VDR | Annex A |
| Vesting Instruments | Section 4.19(a) |
| WARN Act | Section 4.11(p) |
| 2020 Bondholders | Annex A |
| 2020 Bonds | Annex A |
| 2020 Collateral Agent | Annex A |
| 2020 Indenture | Annex A |

WEIL:\100337387\20\67816.0003

| Term | Section |
|------|---------|
| 2020 Trustee | Annex A |
| 6.375% Senior Secured Notes | Annex A |
| 8.375% Senior Secured Notes | Annex A |

## STOCK PURCHASE AGREEMENT

THIS STOCK PURCHASE AGREEMENT (this "Agreement") dated as of March 21, 2025 (the "Execution Date") is entered into by and among Red Tree Acquisitions, LLC, a Delaware limited liability company (the "Buyer"), Robert B. Pincus, solely in his capacity as special master (the "Special Master" and, together with the Buyer, the "Parties" and each a "Party") for the Honorable Leonard P. Stark, United States District Court for the District of Delaware (the "Court") and Red Tree Investments, LLC, a Delaware limited liability company (the "Record Holder"), solely with respect to Section 2.3(b)(ii), Section 3.3(b), Section 3.4(d), Section 5.1(b), Section 5.2, Section 5.3, Section 5.4, Section 5.5, Section 5.6, Section 5.8, Section 5.10, Section 5.12(a) and Article IX.

## W I T N E S S E T H:

WHEREAS, the Special Master has been appointed by the Court in connection with the case of *Crystallex International Corp. v. Bolivarian Republic of Venezuela* (D. Del. Case. No. 17- 151-LPS) (the "Specified Litigation") pursuant to that certain Order entered by the Court on April 13, 2021 [D.I. 258], that certain Order Regarding Special Master entered by the Court on May 27, 2021 [D.I. 277] (the "May Order") and the Order (A) Establishing Sale and Bidding Procedures, (B) Approving Special Master's Report and Recommendation Regarding Proposed Sale Procedures Order, (C) Affirming Retention of Evercore Group, LLC ("Evercore") as Investment Banker by Special Master and (D) Regarding Related Matters entered by the Court on October 4, 2022 [D.I. 481] (as amended, restated, supplemented or otherwise modified from time to time, the "Sale Procedures Order").

WHEREAS, Petróleos de Venezuela, S.A., a Venezuelan company ("PDVSA"), owns all of the issued and outstanding capital stock of PDV Holding, Inc., a Delaware corporation (the "Company"), which consists of 1,000 shares of common stock, par value $1.00 per share (collectively, the "Shares").

WHEREAS, pursuant to the Sale Procedures Order, the Special Master has the authority to enter into this Agreement in making his determination to the Court as to which of the Qualified Bids (as defined in the Sale Procedures Order) was highest or best, and in making a recommendation to the Court as to which Qualified Bid is the Successful Bid (as defined in the Sale Procedures Order).

WHEREAS, each of the Record Holder and the Third-Party Record Holder is a creditor who is a party to the Specified Litigation and each has obtained a writ of attachment by January 12, 2024 (each, a "Specified Litigation Claim") and each such Specified Litigation Claim is secured by a valid and duly perfected lien on the Shares.

WHEREAS, the Buyer desires to purchase the Shares upon the terms and subject to the conditions set forth in this Agreement.

WHEREAS, the Buyer intends to effectuate a credit bid in respect of the obligations owed to the Record Holder and the Third-Party Record Holder pursuant to the respective Specified Litigation Claim, for a portion of the Purchase Price equal to the aggregate amount of principal set forth in Section 5.10 of the Buyer Disclosure Schedules, together with accrued

interest on such principal through the Closing in accordance with that certain Order entered by the Court on April 25, 2024 [D.I. 1136] (the "Credit Bid Amount"), which, in conjunction with the Closing Consideration and other amounts to be paid by Buyer hereunder, will be in exchange for the transfer to the Buyer, as applicable, of the Shares.

WHEREAS, on the date of the Sale Order Entry, the Buyer shall deposit with Acquiom Clearinghouse LLC, in its capacity as escrow agent (the "Escrow Agent"), the sum of $50,000,000 (such amount, the "Deposit Amount") in cash, to be held in the Escrow Account pursuant to the terms of that certain Escrow Agreement, to be entered into on or prior to the date of the Sale Order Entry, by and among the Special Master, the Buyer and the Escrow Agent, in substantially the form attached hereto as Exhibit A (as amended, restated, supplemented or otherwise modified from time to time, the "Escrow Agreement"), to be released in accordance with the provisions of this Agreement and the Escrow Agreement.

WHEREAS, on October 27, 2016, PDVSA, as issuer, entered into the 2020 Indenture whereby PDVSA issued the 2020 Bonds which were purportedly secured, in part, by a pledge of 50.1% of the equity in CITGO Holding, Inc., a Delaware corporation and wholly owned direct subsidiary of the Company (the "Equity Pledge").

WHEREAS, at the Closing, the Buyer intends to effectuate a consensual exchange of the 2020 Bonds for a combination of secured and convertible secured notes to be issued by CITGO Holding, Inc. in accordance with the terms of that certain Amended and Restated Transaction Support Agreement, dated as of the date hereof, by and among the Record Holder and certain 2020 Bondholders party thereto (as amended, restated, supplemented or otherwise modified from time to time, the "Transaction Support Agreement") and pursuant to which Transaction Support Agreement the requisite 2020 Bondholders consent to the consummation of the transactions contemplated hereby and the release and full termination of the Equity Pledge;

WHEREAS, at the Closing (as defined below), the Buyer shall deposit the Closing Consideration (as defined below) with the Escrow Agent in cash pursuant to the terms of the Escrow Agreement, to be released to those creditors of the Bolivarian Republic of Venezuela (the "Republic") or PDVSA that are party to the Specified Litigation and who have obtained a writ of attachment on or before January 12, 2024 (the "Claimholders") or the Buyer, in accordance with the provisions of the Escrow Agreement and that certain Paying Agent Agreement, to be entered into on or prior to the date of the Sale Order Entry by and among the Buyer, the Special Master and Acquiom Financial LLC, in its capacity as paying agent (the "Paying Agent"), in substantially the form attached hereto as Exhibit B (as amended, restated, supplemented or otherwise modified from time to time, the "Paying Agent Agreement").

WHEREAS, the Parties acknowledge that, as part of an integrated plan that includes the acquisition by the Buyer of the Shares pursuant to this Agreement, immediately after Closing, (i) the Buyer intends to merge downstream with and into the Company, with the Company surviving and (ii) a to-be-formed Delaware limited liability company and, after giving effect to the acquisition and the merger contemplated by the foregoing clause (i), wholly owned direct subsidiary of the Company intends to merge with and into CITGO Petroleum (as defined below), with CITGO Petroleum surviving.

2

NOW, THEREFORE, in consideration of the promises and the respective representations, warranties, covenants and agreements set forth herein, the Parties agree as follows:

<div align="center">

**ARTICLE I**

**DEFINITIONS AND INTERPRETIVE MATTERS**

</div>

Section 1.1.    Certain Defined Terms. Capitalized terms used in this Agreement have the meanings specified in Annex A or elsewhere in this Agreement.

Section 1.2.    Other Definitional and Interpretive Matters.

(a)    Unless otherwise expressly provided herein, for purposes of this Agreement, the following rules of interpretation shall apply:

(i)    Calculation of Time Period. When calculating the period of time before which, within which or following which any act is to be done or step is to be taken pursuant to this Agreement, the date that is the reference date in calculating such period shall be excluded. If the last day of such period is a non-Business Day, the period in question shall end on the next succeeding Business Day. The word "day" shall mean "calendar day" unless "Business Day" is expressly identified.

(ii)    Dollars. Any reference in this Agreement to "$" shall mean U.S. dollars. The specification of any dollar amount in the representations and warranties or otherwise in this Agreement or in the Exhibits or the Company Disclosure Schedules is not intended and shall not be deemed to be an admission or acknowledgment of the materiality of such amounts or items, nor shall the same be used in any dispute or controversy between the Parties to determine whether any obligation, item or matter (whether or not described herein or included in the Company Disclosure Schedules) is or is not material for purposes of this Agreement.

(iii)    Exhibits/Schedules. The Exhibits and the Company Disclosure Schedules annexed hereto or referred to herein are an integral part of this Agreement and are hereby incorporated in and made a part of this Agreement as if set forth in full herein. Any matter or item disclosed on one Schedule or section of the Company Disclosure Schedules shall be deemed to have been disclosed on each other Schedule or section of the Company Disclosure Schedules in which it is reasonably apparent on the face of such disclosure that the information is required to be included in such other Schedule or section of the Company Disclosure Schedules. Disclosure of any item on any Schedule of the Company Disclosure Schedules shall not constitute an admission, indication, acknowledgment or representation that such item or matter is material or would reasonably be expected to have a Company Material Adverse Effect. No disclosure on a Schedule of the Company Disclosure Schedules relating to a possible breach or violation of any Contract, Law or Order shall be construed as an admission, indication, acknowledgment or representation that a breach or violation exists or has actually occurred. Any capitalized terms used in any Schedule of the Company Disclosure

<div align="center">3</div>

Schedules or Exhibit but not otherwise defined therein shall be defined as set forth in this Agreement.

           (iv)     <u>Gender and Number</u>. Any reference in this Agreement to gender shall include all genders, and words imparting the singular number only shall include the plural and vice versa.

           (v)     <u>Headings</u>. The provision of a table of contents, the division of this Agreement into Articles, Sections and other subdivisions and the insertion of headings are for convenience of reference only and shall not affect or be utilized in construing or interpreting this Agreement. All references in this Agreement to any "Section" or "Article" are to the corresponding Section or Article of this Agreement unless otherwise specified.

           (vi)     <u>Herein</u>. The words "herein," "hereinafter," "hereof," and "hereunder" refer to this Agreement as a whole and not merely to a subdivision in which such words appear unless the context otherwise requires.

           (vii)     <u>Inclusive Terms</u>. The word "including" or any variation thereof means (unless the context of its usage otherwise requires) "including, without limitation" and shall not be construed to limit any general statement that it follows to the specific or similar items or matters immediately following it. The term "any" means "any and all." The term "or" shall not be exclusive and shall mean "and/or."

           (viii)     <u>Reflected On or Set Forth In</u>. An item arising with respect to a specific representation or warranty shall be deemed to be "reflected on" or "set forth in" a balance sheet or financial statements, to the extent any such phrase appears in such representation or warranty, if (A) there is a reserve, accrual or other similar item underlying a number on such balance sheet or financial statements that related to the subject matter of such representation or warranty, (B) such item is otherwise specifically set forth on the balance sheet or financial statements or (C) such item is reflected on the balance sheet or financial statements and is specifically set forth in the notes thereto.

           (ix)     <u>Bolivarian Republic of Venezuela</u>. Any reference herein to the "Bolivarian Republic of Venezuela" or the "Republic" shall include any successor nation thereto, and shall encompass any and all governments and administrations that purport to be Venezuela's legitimate governing body.

           (x)     <u>Special Master and the Acquired Companies</u>. Any pre-Closing obligation of any of the Acquired Companies hereunder shall be deemed to include an obligation of the Special Master to "Cause" the Acquired Companies to comply with such obligation. With respect to any obligation of the Special Master hereunder to "<u>Cause</u>" any of the Acquired Companies to take an action or refrain from taking an action, or which otherwise requires action (or refraining from action) by any such Acquired Company, such obligation shall be deemed to be an obligation of the Special Master to use reasonable best efforts to cause the Company or the applicable Company Subsidiary to take such action (or refrain from taking such action), including by seeking

WEIL:\100337387\20\67816.0003

an order from the Court with respect to such action or refraining from taking such action. For the avoidance of doubt, none of the Acquired Companies, PDVSA or the Republic is a party hereto, and the Special Master shall not be deemed to be in breach of any of its obligations under this Agreement as a result of a failure by the Special Master to Cause any of the Acquired Companies to take any action or refrain from taking any action prior to the Sale Order Entry.

(xi)     "Made Available." Unless expressly stated otherwise, references to any document or information having been "delivered", "furnished", "provided" or "made available" to the Buyer or its Representatives shall mean such document, item or information has been posted to the VDR or transmitted directly by email from the Special Master's advisors to the Buyer or its Representatives at least two (2) Business Days prior to the Execution Date.

(b)     The Parties have participated jointly in the negotiation and drafting of this Agreement and, in the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as jointly drafted by the Parties and no presumption or burden of proof shall arise favoring or disfavoring any Party by virtue of the authorship of any provision of this Agreement. The language used in this Agreement shall be deemed to be the language chosen by the Parties to express their mutual intent, and no rule of strict construction shall be applied against any Person.

## ARTICLE II

## SALE AND PURCHASE OF THE SHARES; CLOSING

Section 2.1.     Sale and Purchase of Shares. Subject to approval of this Agreement by the Court, and upon the terms and subject to the conditions set forth in this Agreement and in the Sale Order, and pursuant to the authority provided to the Special Master under the Sale Procedures Order and the May Order, at the Closing, the Special Master shall sell, assign, transfer, convey and deliver to the Buyer, and the Buyer shall purchase and accept from the Special Master, the Shares, free and clear of all Liens (other than Permitted Liens and transfer restrictions imposed by applicable securities Laws).

Section 2.2.     Closing. The consummation of the sale and purchase of Shares (the "Closing") shall take place at 10:00 a.m., Eastern Time, on a date to be specified by the Parties, which date shall be no later than the third (3rd) Business Day after satisfaction or waiver of the conditions set forth in Article VII (other than those conditions that by their nature are to be satisfied at the Closing, but subject to the satisfaction or waiver of those conditions at such time), remotely by electronic exchange of documents and signatures, unless another time, date or place is agreed to in writing by the Parties; provided, however that the Closing shall not occur prior to the fifth (5th) Business Day after the end of the Marketing Period. The date on which the Closing actually occurs is referred to in this Agreement as the "Closing Date."

WEIL:\100337387\20\67816.0003

Section 2.3.    <u>Closing Deliveries of the Parties</u>.

(a)    <u>Deliveries by the Special Master</u>. At or prior to the Closing, the Special Master shall deliver or otherwise cause to be delivered to the Buyer:

(i)    <u>Closing Release</u>. A counterpart to the Closing Release, duly executed by the Special Master as of the Closing;

(ii)    <u>Stock Certificate</u>. The original certificate evidencing all of the Shares, duly endorsed in blank, or accompanied by a stock power duly executed in blank by the Special Master; and

(iii)    <u>FIRPTA Certificate</u>. A validly issued certificate from the Company, in such form consistent and in accordance with the requirements of Treasury Regulations Sections 1.897-2(h)(2) and 1.1445-2(c)(3)(i) and a validly issued notice to the IRS from the Company in accordance with the provisions of Treasury Regulations Section 1.897- 2(h)(2) (such certificate and notice issued by the Company, the "<u>FIRPTA Certificate</u>").

(b)    <u>Deliveries by the Buyer</u>. At or prior to the Closing, the Buyer and the Record Holder, as applicable, shall deliver or cause to be delivered to the Special Master:

(i)    <u>Closing Certificate</u>. A certificate, dated as of the Closing Date, signed by an authorized officer of the Buyer as to the satisfaction of the conditions set forth in <u>Section 7.3(a)</u> and <u>Section 7.3(b)</u>; and

(ii)    <u>Closing Release</u>. A counterpart to the Closing Release, duly executed by each the Buyer, the Record Holder and the Third-Party Record Holder as of the Closing.

## ARTICLE III

## PURCHASE PRICE; CLOSING DATE PAYMENTS

Section 3.1.    <u>Purchase Price</u>. The aggregate consideration payable by the Buyer for the Shares shall be the Purchase Price. The Purchase Price shall not be subject to any adjustments other than as set forth in the definition of Purchase Price.

Section 3.2.    <u>Closing Transaction Expenses; Funds Flow Memorandum</u>.

(a)    No later than five (5) Business Days prior to the Closing Date, the Special Master shall provide the Buyer with a written statement (the "<u>Closing Transaction Expenses Statement</u>") reflecting the Special Master's calculation of Closing Transaction Expenses in accordance with the definition of Closing Transaction Expenses hereunder, along with reasonable supporting documentation. The Buyer shall be given a reasonable opportunity to review and comment on the Closing Transaction Expenses Statement prior to the Closing Date. The Special Master shall consider in good faith the Buyer's comments to the Closing Transaction Expenses Statement and/or any of the components thereof or calculations therein

WEIL:\100337387\20\67816.0003

and thereafter, the Closing Transaction Expenses Statement shall be binding on the Parties for purposes of this <u>Section 3.2</u> and shall be used to determine the Purchase Price.

(b)     No later than one (1) Business Day after the Special Master's delivery of the Closing Transaction Expenses Statement, the Special Master shall distribute to the Buyer a detailed funds flow memorandum in Excel format (including all underlying calculations, formulas and amounts therein) setting forth all payments to be made by or on behalf of the Parties at Closing in accordance with this Agreement (the "<u>Funds Flow Memorandum</u>").

Section 3.3.     <u>Good Faith Deposit</u>. On the date of the Sale Order Entry, the Buyer shall deposit into the Escrow Account with the Escrow Agent an amount equal to Deposit Amount in cash. The Deposit Amount will be released by the Escrow Agent and delivered to either the Buyer or, at the direction of the Special Master, the Paying Agent, in accordance with the provisions of this Agreement, the Escrow Agreement and the Sale Procedures Order. The Deposit Amount will be distributed out of the Escrow Account as follows (and the Buyer and the Special Master hereby agree to promptly deliver joint written instructions to the Escrow Agent to the extent required by the Escrow Agent to effect such distributions as and when required hereunder):

(a)     if the Closing occurs, the Buyer and the Special Master shall jointly instruct the Escrow Agent in writing to disburse the Deposit Amount to the Paying Agent by wire transfer of immediately available funds out of the Escrow Account;

(b)     if a Deposit Forfeiture Termination Event occurs, the Buyer and the Special Master shall promptly (and in any event within five (5) Business Days of such termination) deliver joint written instructions to the Escrow Agent directing the release the balance of the Escrow Account to the Paying Agent Account; <u>provided</u>, that, in lieu of the foregoing, the Buyer and the Record Holder may elect, in writing, within five (5) Business Days after such termination to forever waive, forfeit and discharge from the Specified Litigation Claim an amount equal to the Net Deposit Amount effective immediately upon such termination and the Buyer and the Record Holder shall execute and deliver to the Special Master a Termination Release within two (2) Business Days after the Deposit Amount Release Date (as defined below), and in such case, within forty (40) Business Days after such election, pursuant to a written instruction to the Escrow Agent by the Special Master, the Net Deposit Amount shall be released by the Escrow Agent from the Escrow Account by wire transfer of immediately available funds to the account designated in writing by the Buyer (the date of such release, the "<u>Deposit Amount Release Date</u>"); <u>provided</u>, <u>further</u>, that any funds remaining in the Escrow Account after the Net Deposit Amount is released to the Buyer by the Escrow Agent pursuant to this <u>Section 3.3(b)</u> shall be, pursuant to a written instruction to the Escrow Agent by the Special Master, released by the Escrow Agent to the Paying Agent to disburse such funds pursuant to the terms of the Paying Agent Agreement; and

(c)     if this Agreement is terminated for any reason other than as contemplated by <u>Section 3.3(b)</u>, the Buyer and the Special Master shall promptly (and in any event within two (2) Business Days of such termination) deliver joint written instructions to the Escrow Agent directing the release of the balance of the Escrow Account to the Buyer or its designees.

<div align="center">7</div>

Section 3.4.     Closing Date Payments by the Buyer.

(a)     Payment in respect of the Closing Transaction Expenses. At the Closing, the Buyer shall pay, or cause to be paid, the Closing Transaction Expenses to the applicable recipients as set forth on the Closing Transaction Expenses Statement by wire transfer of immediately available funds to such Persons.

(b)     Payment in respect of Expense Reserve Holdback Amount. At the Closing, the Buyer shall pay, or cause to be paid, to the Expense Reserve Holdback Account an amount equal to the Expense Reserve Holdback Amount as set forth in the Funds Flow Memorandum. The Expense Reserve Holdback Amount will be used by the Special Master to pay the Special Master's compensation and any out-of-pocket costs, fees and expenses incurred by the Special Master on or after the date of the delivery of the Closing Transaction Expenses Statement by the Special Master related to the Transactions or any Action related to or arising therefrom for investment bankers, third-party consultants, legal counsel and any of his other Representatives or Advisors (as defined in the Sale Procedures Order) and such amount shall be paid or distributed at the direction of the Special Master; provided, that any amounts remaining in the Expense Reserve Holdback Account after all such costs, fees and expenses incurred by the Special Master have been so paid or distributed shall be paid to the Paying Agent Account as promptly as practicable upon the later of (i) three (3) years following the Closing Date and (ii) one (1) year after all Actions, if any, brought against the Special Master relating to the Transactions have been definitively adjudicated by a court of final determination.

(c)     Payment in respect of Reimbursement for Advanced Transaction Expenses. At the Closing, in accordance with the May Order, the Buyer shall pay, or cause to be paid, an amount to the Paying Agent Account equal to the aggregate amount of the Advanced Transaction Expenses paid by the Sale Process Parties and Additional Judgment Creditors prior to the Closing (the "Advanced Transaction Expenses Amount") as set forth in the Funds Flow Memorandum.

(d)     Payment in respect of Closing Consideration. At the Closing, the Buyer and, as applicable, the Record Holder, shall pay, or cause to be paid (including by causing the Third-Party Record Holder to pay), (i) an amount equal to the sum of the Credit Bid Amount and (ii) an aggregate amount of cash equal to the Closing Consideration to the Paying Agent Account (together with the Credit Bid Amount, the "Credit Bid Purchase Price") as set forth in the Funds Flow Memorandum. The portion of the Credit Bid Purchase Price equal to the Credit Bid Amount shall be paid by means of a credit against all amounts due and owing to the Record Holder under the Specified Litigation Claim by the delivery of an executed Closing Release by the Buyer and the Record Holder as set forth in Section 2.3(b)(ii).

Section 3.5.     Withholding. Notwithstanding anything to the contrary in this Agreement, except as otherwise provided for in this Section 3.5, the Buyer shall be entitled to deduct and withhold (without duplication) from any and all payments made under this Agreement such amounts that are required to be deducted and withheld with respect to the making of such payments under the Code or under any provisions of state, local or foreign Tax Law, provided, that, the Buyer shall (i) prior to making any deduction or withholding of any amount pursuant to this Section 3.5 (and in any event no later than ten (10) days prior to making any payment

8

hereunder), provide written notice to the applicable recipient of any anticipated deduction or withholding (together with the legal basis thereof) and (ii) cooperate in good faith with the applicable recipient to reduce or eliminate any amounts that would otherwise be deducted or withheld. To the extent that any amounts are so withheld and timely paid over to the proper Taxing Authority, such withheld and deducted amounts will be treated for all purposes of this Agreement as having been paid to the recipient of the payment in respect of which such deduction or withholding was made. The Buyer acknowledges and agrees that, other than a deduction or withholding attributable to the failure of the Company to provide the FIRPTA Certificate described in <u>Section 2.3(a)(iii)</u>, no withholding applies to the Closing Consideration under Chapter 3 or Chapter 4 of the Code and any and all payments of the Closing Consideration made by Buyer or its Affiliates (including any Acquired Company) shall be made without deduction or withholding for any Taxes imposed under Chapter 3 or Chapter 4 of the Code.

<div align="center">

**ARTICLE IV**

**REPRESENTATIONS RELATING TO THE COMPANY AND THE SPECIAL MASTER**

</div>

It is represented and warranted to the Buyer based solely upon the Specified Information furnished by the Designated Managers to the Special Master in accordance with the Procedures Summary that, as of the date of this Agreement and as of Closing, except as disclosed in the correspondingly numbered section of the disclosure schedules delivered to the Buyer simultaneously with the execution of this Agreement (the "<u>Company Disclosure Schedules</u>") (it being agreed that any matter or item disclosed in one Schedule or section of the Company Disclosure Schedules shall be deemed to have been disclosed on each other Schedule or section of the Company Disclosure Schedules in which it is reasonably apparent on the face of such disclosure that the information is required to be included in such other Schedule or section of the Company Disclosure Schedules):

Section 4.1.    <u>Corporate Existence; Title to Shares</u>.

(a)    The Company is a corporation duly incorporated, validly existing and in good standing under the Laws of the State of Delaware and has all requisite corporate powers and all governmental franchises, licenses, permits, authorizations, consents and approvals required to enable it to own, lease or otherwise hold its properties and assets and to carry on its business as now conducted, except for those the absence of which would not, individually or in the aggregate, be reasonably likely to materially impair the Acquired Companies, taken as a whole. The Company is duly qualified to do business as a foreign corporation and is in good standing under the Laws in each jurisdiction in which the character of the property owned or leased by it or the nature of its activities or the ownership or leasing of its properties make such qualification necessary, except for those jurisdictions where the failure to be so qualified would not, individually or in the aggregate, be reasonably likely to materially impair the Acquired Companies, taken as a whole. The Special Master has heretofore made available to the Buyer true, correct and complete copies of the certificate of incorporation of the Company (the "<u>Company Charter</u>"), and the by-laws of the Company (the "<u>Company By-Laws</u>"). There is no pending or, to the Knowledge of the Company, threatened Legal Proceedings for the dissolution, liquidation, insolvency, or rehabilitation of any of the Acquired Companies.

<div align="center">9</div>

(b)     The Special Master (or his counsel or advisors) is in possession of the original certificate evidencing 100% of the Shares. PDVSA is the record and beneficial owner of all of the outstanding Shares. To the extent provided by, and subject to the decrees of, the Sale Procedures Order, the Special Master has the legal capacity, power and authority to (i) execute and deliver this Agreement and each other Transaction Document to which the Special Master is or will be a party, and (ii) surrender the Shares pursuant to the Transactions, and sell, transfer, assign, and deliver the Shares to the Buyer, in each case, the delivery of which will convey good and marketable title to the Shares, free and clear of all Liens (other than Permitted Liens and transfer restrictions imposed by applicable securities Laws).

(c)     This Agreement has been duly executed and delivered by the Special Master and, assuming due authorization, execution and delivery by the Buyer, and subject to the Sale Order Entry, will constitute, and each other Transaction Document (to the extent the Special Master is or will be a party thereto), when executed and delivered by the Special Master (assuming due authorization, execution and delivery by the other parties thereto), subject to the Sale Order Entry, will constitute, a legal, valid and binding obligation of the Special Master, enforceable against the Special Master in accordance with its terms, except that such enforcement may be limited by the Equitable Exceptions.

Section 4.2.     Governmental Authorization. Except as set forth in Section 4.2 of the Company Disclosure Schedules, the execution, delivery and performance by the Special Master of this Agreement and the other Transaction Documents and the consummation by the Special Master of the Transactions require no action by or in respect of, or filing with, any Governmental Body other than (a) applicable requirements of Antitrust Laws as set forth in Section 4.2 of the Company Disclosure Schedules, (b) the OFAC License, (c) the entry of the Sale Order by the Court (the "Sale Order Entry"), and (d) other actions or filings the absence or omission of which would not, individually or in the aggregate, be material to the business of the Acquired Companies, taken as a whole.

Section 4.3.     Non-Contravention. Except as set forth in Section 4.3 of the Company Disclosure Schedules, the execution, delivery and performance by the Special Master of this Agreement and the other Transaction Documents and the consummation by the Special Master of the Transactions do not and will not, assuming compliance with the matters referred to in Section 4.2, (a) result in any Negative Consequences under the Company Charter or the Company By-Laws or the Organizational Documents of any of the Acquired Companies or, to the Knowledge of the Company (and based only on information made available to the Acquired Companies with respect to the Non-Controlled Entities prior to the Execution Date), any of the Non-Controlled Entities, (b) contravene or conflict with or constitute a violation of any provision of any Law binding upon or applicable to the Acquired Companies or, to the Knowledge of the Company, the Non-Controlled Entities, (c) result in any Negative Consequences under any (i) Material Contract or (ii) any license, franchise, permit or other similar authorization held by the Acquired Companies, or (d) result in the creation or imposition of any Lien (other than Permitted Liens) on any asset of the Acquired Companies, except for such Negative Consequences referred to in clauses (b) or (c) or Liens referred to in clause (d) that would not, individually or in the aggregate, be material to the business of the Acquired Companies, taken as a whole.

10

Section 4.4.    Capitalization.

(a)    The authorized capital stock of the Company consists of 1,000 Shares. There are 1,000 Shares issued and outstanding, all of which are owned by PDVSA. The Shares have been duly authorized and are validly issued, fully paid and non-assessable and have not been issued in violation of any preemptive rights or Preferential Rights. The Shares constitute the only outstanding Equity Interests of the Company and are not subject to any Preferential Rights.

(b)    Except for this Agreement, there is no outstanding option, warrant, call, right, or Contract of any character to which the Company is a party requiring, and there are no Equity Interests of the Company outstanding which upon conversion or exchange would require, the issuance of any Shares or other securities convertible into, exchangeable for or evidencing the right to subscribe for or purchase Shares. Other than as set forth in Section 4.4(b) of the Company Disclosure Schedules, there are no outstanding equity appreciation, phantom equity, stock unit, profit participation, equity, equity-based performance or similar rights with respect to the Company. The Company is not a party to any voting trust or other Contract with respect to the voting, redemption, sale, transfer or other disposition of the Shares.

Section 4.5.    Subsidiaries; Non-Controlled Entities.

(a)    Section 4.5(a) of the Company Disclosure Schedules reflects a true and complete list of each entity in which the Company owns, directly or indirectly, any Equity Interests (excluding Equity Interests owned directly or indirectly by Non-Controlled Entities), and with respect to each entity (except as otherwise provided in this Section 4.5(a)), sets forth the following information: (i) its name and jurisdiction of organization or formation; (ii) the number of authorized shares or other Equity Interests as of the date hereof (with respect to Company Subsidiaries only); and (iii) the number of issued and outstanding shares or other Equity Interests, the names of the holders thereof, and the number of shares or other Equity Interests held by each such holder (with respect to Company Subsidiaries only). Except as set forth in Section 4.5(a) of the Company Disclosure Schedules, the Company does not, directly or indirectly, own any Equity Interests in any other entity.

(b)    Each Company Subsidiary and, to the Knowledge of the Company, each Non-Controlled Entity, is duly organized, validly existing and in good standing under the Laws of its jurisdiction of organization, to the extent such concepts are recognized under the Laws of the jurisdiction of its organization, and has all requisite corporate (or similar entity) power and authority to own, lease and operate its properties and to carry on its business in all material respects as now conducted, except where the failure to be so organized, existing and in good standing or to have such power and authority would not, individually or in the aggregate, be reasonably likely to be material to the business of the Acquired Companies, taken as a whole. Each Company Subsidiary: (i) is duly qualified or authorized to do business as a foreign corporation or entity and is in good standing to the extent such concepts are recognized under the Laws of each jurisdiction in which the conduct of its business or the ownership of its properties requires such qualification or authorization, except where the failure to be so qualified, authorized or in good standing would not, individually or in the aggregate, be reasonably likely to be material to the business of the Acquired Companies, taken as a whole and (ii) has full organizational power and authority to own, lease and operate its properties and carry on its

11

business as presently conducted, except where the failure to have such power and authority would not, individually or in the aggregate, be reasonably likely to be material to the business of the Acquired Companies, taken as a whole.

(c)　　The Special Master has heretofore made available to the Buyer true, correct and complete copies of the Organizational Documents of each Company Subsidiary.

(d)　　The outstanding Equity Interests of each Company Subsidiary are validly issued, fully paid and non-assessable, to the extent such concepts are applicable to such Equity Interests, and have not been issued in violation of any preemptive rights or Preferential Rights or similar rights, and all such Equity Interests represented as being owned by the Company or any Company Subsidiaries are owned by it free and clear of any Liens, other than (i) Liens securing Debt of the Company or any Company Subsidiaries (which Liens shall be removed on or before the Closing), (ii) Liens relating to the transferability of securities under applicable securities Laws, (iii) Liens created by acts of the Buyer or any of its Affiliates and (iv) the Equity Pledge and Liens as a result of the 2020 Bonds. There is no outstanding option, warrant, call, Preferential Right, right, or Contract to which any Company Subsidiary is a party requiring, and there are no convertible securities of any Company Subsidiary outstanding which upon conversion would require, the issuance of any Equity Interests of any Company Subsidiary or other securities convertible into Equity Interests of any Company Subsidiary. No Company Subsidiary is a party to any voting trust or other Contract with respect to the voting, redemption, sale, transfer or other disposition of the Equity Interests of such Company Subsidiary.

Section 4.6.　　Financial Statements.

(a)　　Section 4.6(a) of the Company Disclosure Schedules sets forth true, correct, and complete copies of: (i) the audited consolidated balance sheet of the Acquired Companies reflected therein as of December 31, 2023, December 31, 2022, and December 31, 2021, the related audited consolidated statements of income and comprehensive income, stockholder's equity and cash flow of the Acquired Companies for the fiscal year then ended, together with the related notes thereof (the "Audited Financial Statements"); and (ii) the unaudited consolidated balance sheet of the Acquired Companies (the "Company Balance Sheet") as of September 30, 2024 (the "Company Balance Sheet Date") and the related condensed consolidated statements of income and comprehensive income, stockholder's equity and cash flows of the Acquired Companies for the nine-month period then ended (the "Interim Financial Statements" and, collectively with the Audited Financial Statements, the "Financial Statements"). Except as set forth in the notes to the Financial Statements and with the exception of the absence of normal year-end audit adjustments and footnotes in the Interim Financial Statements, each of the Financial Statements has been prepared in conformity with United States generally accepted accounting principles ("GAAP") applied on a consistent basis (except as may be indicated in the notes thereto) and fairly presents, in all material respects, the consolidated financial position, results of operations and cash flows of the Acquired Companies as of the dates and for the periods indicated therein.

(b)　　The Acquired Companies (i) maintain a standard system of accounting established and administered in accordance with GAAP and (ii) have established and maintain a system of internal controls over financial reporting designed to provide reasonable assurance

12

regarding the reliability of the financial reporting and the preparation of the Financial Statements for external purposes in accordance with GAAP. Except as disclosed on Section 4.6(b) of the Company Disclosure Schedules, there (x) are no significant deficiencies or weaknesses in any system of internal accounting controls used by each of the Acquired Companies, (y) has not been since the Lookback Date any fraud or other unlawful wrongdoing on the part of any of management or other employees of the Acquired Companies who have a significant role in the preparation of Financial Statements or the internal accounting controls used by the Company and each of its Subsidiaries relating to such preparation or controls, or (z) has not been since the Lookback Date any claim or allegation regarding any of the foregoing.

Section 4.7.   Absence of Certain Changes. Except as contemplated by this Agreement, from the Company Balance Sheet Date to the date of this Agreement:

(a)   the Acquired Companies have conducted their businesses in the Ordinary Course in all material respects;

(b)   there has not been a Company Material Adverse Effect; and

(c)   no Acquired Company has entered into, terminated, amended or otherwise modified any Contracts set forth in Section 4.20 of the Company Disclosure Schedules (Affiliate Transactions).

Section 4.8.   No Undisclosed Material Liabilities. The Acquired Companies have no material liabilities of any kind that would be required to be reflected in or reserved against on a consolidated balance sheet of the Company or in the notes thereto prepared in accordance with GAAP, other than:

(a)   liabilities that are adequately accrued and specifically reflected in the Company Balance Sheet or the notes thereto;

(b)   liabilities incurred since the Company Balance Sheet Date in the Ordinary Course and which, individually or in the aggregate, would not be reasonably likely to be material to the Acquired Companies (taken as a whole);

(c)   liabilities or obligations that have been discharged or paid in full in the Ordinary Course or which, individually or in the aggregate, would not be reasonably likely to have a Company Material Adverse Effect;

(d)   liabilities or obligations under this Agreement or otherwise in connection with the Transactions; or

(e)   liabilities or obligations set forth in Section 4.8(e) of the Company Disclosure Schedules.

Section 4.9.   Legal Proceedings. As of the Execution Date, except for the Specified Litigation and as set forth in Section 4.9 of the Company Disclosure Schedules and as would not, individually or in the aggregate, be reasonably likely to be material to the business of the Acquired Companies, taken as a whole, there are no material Legal Proceedings pending, or, to

13

WEIL:\100337387\20\67816.0003

the Knowledge of the Company, threatened in writing against the Acquired Companies before or by any Governmental Body (whether local, state, federal or foreign). As of the Execution Date, except as would not, individually or in the aggregate, be reasonably likely to be material to the business of the Acquired Companies, taken as a whole, neither the Company nor any of its Subsidiaries is subject to any outstanding judgment, Order, decree or injunction of any court or other Governmental Body (other than Orders of general applicability which do not impact the Acquired Companies in a manner that is materially different than the impact of similarly situated companies).

Section 4.10.    <u>Taxes</u>.

Except as set forth in the Company Balance Sheet (including the notes thereto) and except as would not, individually or in the aggregate, be reasonably likely to have a Company Material Adverse Effect:

(a)    all income and other material Tax Returns required to be filed with any Taxing Authority by, or with respect to, the Acquired Companies have been filed (taking into account any applicable extensions) in accordance with all applicable Laws, the Acquired Companies have paid, or caused to be paid, all material Taxes shown as due and payable on such Tax Returns, and, as of the time of filing, such Tax Returns were true and complete in all material respects;

(b)    all material amounts of Taxes which any of the Acquired Companies were obligated to withhold from amounts owing to any employee, creditor, owner or third party have been fully and timely paid;

(c)    except as set forth in <u>Section 4.10(c)</u> of the Company Disclosure Schedules, as of the date hereof, there is no Legal Proceeding or Claim in respect of any Tax or Tax Return (each, a "<u>Tax Proceeding</u>") now proposed in writing or pending against or with respect to the Acquired Companies;

(d)    except as set forth in <u>Section 4.10(d)</u> of the Company Disclosure Schedules, none of the Acquired Companies have waived any statute of limitations in respect of Taxes beyond the date hereof or agreed to any extension of time beyond the date hereof with respect to a Tax assessment or deficiency (other than pursuant to extensions of time to file Tax Returns obtained in the Ordinary Course);

(e)    except as set forth in <u>Section 4.10(e)</u> of the Company Disclosure Schedules, the Acquired Companies are not a party to, are not bound by and do not have any obligation under any Tax sharing, allocation or indemnity agreement, or any similar agreement or arrangement, except for (i) any such agreement or arrangement solely between or among the Acquired Companies or (ii) any commercial agreement entered into in the Ordinary Course the primary purpose of which does not relate to Taxes;

(f)    no claim has been made by a Taxing Authority in a jurisdiction where any of the Acquired Companies do not file Tax Returns that the Acquired Companies are or may be subject to taxation by that jurisdiction, which claim has not been resolved;

WEIL:\100337387\20\67816.0003

(g)     none of the Acquired Companies will be required to include any material item of income in, or exclude any material item of deduction from, income for any Tax period (or portion thereof) ending after the Closing Date as a result of any: (i) change in method of accounting made on or prior to the Company Balance Sheet Date pursuant to Section 481(a) of the Code (or any comparable provision of applicable Law), (ii) "closing agreement" as described in Section 7121 of the Code (or any comparable provision of applicable Law), (iii) installment sale or open transaction disposition made on or prior to the Company Balance Sheet Date, or (iv) prepaid amount received on or prior to the Company Balance Sheet Date;

(h)     none of the Acquired Companies has participated in any "reportable transaction" (other than a "loss transaction") within the meaning of Treasury Regulation Section 1.6011-4; and

(i)     there are no Liens with respect to Taxes upon any asset of the Acquired Companies other than Permitted Liens.

Notwithstanding any other provision in this Agreement, no representation or warranty is made with respect to the existence, availability, amount, usability or limitations (or lack thereof) of any net operating loss, net operating loss carryforward, capital loss, capital loss carryforward, basis amount or other Tax attribute (whether federal, state, local or foreign) of the Acquired Companies after the Closing Date, and none of the Buyer or any of its Affiliates (including, after the Closing, the Acquired Companies) may rely on any of the representations and warranties in this <u>Section 4.10</u> with respect to any position taken in or any Taxes with respect to any Post-Closing Tax Period.

Section 4.11.     <u>Company Benefit Plans; Employment</u>.

(a)     The Special Master has provided the Buyer with a list (set forth in <u>Section 4.11(a)</u> of the Company Disclosure Schedules) identifying each material Company Benefit Plan as of the Execution Date.

(b)     With respect to each material Company Benefit Plan, the Special Master has made available to the Buyer true, complete and correct copies (or, to the extent such plan is unwritten, an accurate written description), to the extent applicable, of: (i) the current plan and trust document and any amendments thereto and the most recent summary plan description, together with each subsequent summary of material modifications with respect to such Company Benefit Plan, (ii) the most recent annual report on Form 5500 thereto (including any related actuarial valuation report) filed with the Internal Revenue Service (if any such report was required), (iii) the most recent financial statements, (iv) the most recent Internal Revenue Service determination, opinion or advisory letter, and (v) for the three (3) most recent years, nondiscrimination testing results in respect of such Company Benefit Plan. For purposes of this <u>Section 4.11(b)</u>, summary plan descriptions and summaries of material modification available at https://www.hr.citgo.com as of five (5) Business Days prior to the Execution Date are considered to have been made available to the Buyer. The Special Master has made available copies of Code Section 280G calculations prepared by the Company or its representatives (whether or not final)

with respect to certain employees of the Acquired Companies in connection with the Transactions.

(c)     Except as would not, individually or in the aggregate, be reasonably likely to result in a material liability to the Acquired Companies taken as a whole, (i) each Company Benefit Plan has been established, maintained, operated, funded and administered in compliance with (A) its terms and (B) the requirements prescribed by Law (including, to the extent applicable, ERISA and the Code) which are applicable to such Company Benefit Plan and (ii) all benefits, contributions and premium payments required to be made with respect to a Company Benefit Plan have been timely made or paid in full, or to the extent not required to be made or paid in full, have been accrued and reflected on the Financial Statements as required by GAAP.

(d)     Except as would not, individually or in the aggregate, be reasonably likely to result in a material liability to the Acquired Companies taken as a whole, (i) no Acquired Company or any of their respective ERISA Affiliates has incurred any liability under Title IV of ERISA, Sections 412, 430 or 4971 of the Code or Section 302 of ERISA that has not been satisfied in full when due, and (ii) all insurance premiums with respect to Company Benefit Plans, including premiums to the Pension Benefit Guaranty Corporation ("PBGC"), have been paid when due. No Acquired Company or any of their respective ERISA Affiliates currently sponsors, maintains, or contributes to (or is obligated to contribute to) or has, within the last six (6) years, sponsored or maintained, contributed to or been obligated to contribute to (i) a "multiemployer plan," as defined in Section 3(37) of ERISA, (ii) a "multiple employer plan" as defined in Section 413(c) of the Code, or (iii) a "multiple employer welfare arrangement" within the meaning of Section 3(40) of ERISA.

(e)     Except as set forth in Section 4.11(e) of the Company Disclosure Schedules, with respect to any Company Benefit Plan that is subject to Title IV of ERISA: (i) there does not exist any failure to meet the "minimum funding standard" of Section 412 of the Code or 302 of ERISA (whether or not waived); (ii) such plan is not in "at-risk" status for purposes of Section 430 of the Code; (iii) as of the last day of the most recent plan year ended prior to the Execution Date, there is no "amount of unfunded benefit liabilities" as defined in Section 4001(a)(18) of ERISA; (iv) except as would not, individually or in the aggregate, be reasonably likely to result in a material liability to the Acquired Companies taken as a whole, no reportable event within the meaning of Section 4043(c) of ERISA has occurred; and (v) the PBGC has not instituted proceedings to terminate any such plan and, to the Knowledge of the Company, no circumstances exist which would serve as a basis for the institution of such proceedings.

(f)     Each Company Benefit Plan that is intended to be qualified under Section 401(a) of the Code is so qualified and has received a favorable determination letter or opinion letter, if applicable, from the Internal Revenue Service, and the related trust is intended to be exempt from federal income taxation under the Code and is so exempt. There are no facts or set of circumstances and, to the Knowledge of the Company, nothing has occurred that would reasonably be expected to cause the loss of such qualification or exemption or reasonably be expected to result in any Company Benefit Plan being required to pay any Tax or penalty under applicable Law that is material to the Acquired Companies taken as a whole as a condition to maintaining such qualification or exemption. Each trust funding any Company Benefit Plan

16

which is intended to meet the requirements of Section 501(c)(9) of the Code meets such requirements and provides no disqualified benefits (as such term is defined in Section 4976(b) of the Code).

(g)     Except (i) as would not, individually or in the aggregate, be reasonably likely to result in a material liability to the Acquired Companies taken as a whole or (ii) as set forth in Section 4.11(g) of the Company Disclosure Schedules, no Acquired Company has any obligation or liability to provide post-employment medical or welfare benefits, except (A) as required by the continuing coverage requirements of COBRA and at the sole expense of the participant or such participant's spouse or dependents or (B) death or disability benefits under any retirement or deferred compensation plan. To the Company's Knowledge, since the Lookback Date, there have been no written communications by the Acquired Companies to employees of any Acquired Company which promise or guarantee post-employment medical or welfare benefits on a permanent basis.

(h)     Except as would not, individually or in the aggregate, be reasonably likely to result in a material liability to the Acquired Companies taken as a whole, no Acquired Company nor any plan sponsor or plan administrator of a Company Benefit Plan, or to the Company's Knowledge, any third-party fiduciary of a Company Benefit Plan, has engaged in any prohibited transaction (within the meaning of Section 406 of ERISA or Section 4975 of the Code) or breached any fiduciary duty under ERISA with respect to such Company Benefit Plan that would be reasonably likely to subject any Acquired Company or Company Benefit Plan to any Tax or penalty (civil or otherwise) imposed by ERISA, the Code or other applicable Law, or any other material liability. Except (i) as would not, individually or in the aggregate, be reasonably likely to result in a material liability to the Acquired Companies taken as a whole, or (ii) as set forth in Section 4.11(h) of the Company Disclosure Schedules, there are no pending or, to the Knowledge of the Company, threatened claims (other than routine claims for benefits) by or on behalf of any Company Benefit Plan or any trusts which are associated with such Company Benefit Plans and, to the Knowledge of the Company, no facts or circumstances exist that would reasonably be expected to result in such claim. Except as would not, individually or in the aggregate, be reasonably likely to result in a material liability to the Acquired Companies taken as a whole, as of the Execution Date, none of the Company Benefit Plans are under audit or subject to an administrative proceeding or, to the Knowledge of the Company, investigation or examination by the Internal Revenue Service, the Department of Labor, the PBGC or any other Governmental Body.

(i)     Except as would not, individually or in the aggregate, be reasonably likely to result in a material liability to the Acquired Companies taken as a whole, each Company Benefit Plan that is a "nonqualified deferred compensation plan" within the meaning of Section 409A(d)(1) of the Code that is subject to Section 409A of the Code, complies with, and has been operated and administered in compliance with, Section 409A of the Code and the regulations and related guidance promulgated thereunder.

(j)     Except (x) as would not, individually or in the aggregate, be reasonably likely to result in a material liability to the Acquired Companies taken as a whole, or (y) as set forth in Section 4.11(j) of the Company Disclosure Schedules, neither the execution, delivery or the performance of this Agreement nor the consummation of the Transactions (alone or in

17

conjunction with any other event) will or could reasonably be expected to (i) accelerate the time of payment or vesting or increase the amount of, or trigger any funding of, compensation or benefits under any Company Benefit Plan; (ii) result in any limitation on the right of an Acquired Company or Buyer, or any of their respective Affiliates, to amend, merge, terminate or receive a reversion of assets from a Company Benefit Plan or related trust; (iii) entitle any current or former director, officer, manager, employee, contractor or consultant of any Acquired Company to severance pay, termination pay or any other similar payment, right or benefit; (iv) result in any payment, right or benefit that (A) would not be deductible under Section 280G of the Code or (B) would result in any excise tax on any "disqualified individual" (within the meaning of Section 280G of the Code) under Section 4999 of the Code. Except as set forth in Section 4.11(j) of the Company Disclosure Schedules, none of the Acquired Companies has any obligation to gross-up or reimburse any current or former director, officer, manager, employee, contractor or consultant of any Acquired Company for any Taxes or related interest or penalties incurred by such individual, including under Section 4999, 409A or 105(h) of the Code.

(k)     No Company Benefit Plan is maintained primarily in respect of any current or former director, officer, manager, employee, contractor or consultant of any Acquired Company who is located outside of the United States.

(l)     Except as set forth in Section 4.11(l) of the Company Disclosure Schedules and as would not, individually or in the aggregate, be material to the Acquired Companies, taken as a whole, (i) the Acquired Companies are in material compliance with all applicable Laws respecting employment, employment practices and terms and conditions of employment, including all Laws relating to labor, labor relations, collective bargaining, occupational safety and health, and wages, hours, worker classification, immigration, whistleblower protections, reasonable accommodation, leaves of absence, paid sick leave, unemployment insurance, workers' compensation, retaliation, harassment, and employment discrimination and (ii) there are no actual or, to the Knowledge of the Company, as of the Execution Date, threatened unfair labor practice charges, labor grievances, or labor arbitrations against the Acquired Companies which, individually or in the aggregate, are expected to result in material liability for the Company.

(m)     To the Knowledge of the Company, as of the Execution Date, no employee of the Acquired Companies holding a position of executive vice president or above has notified the Company or the Acquired Companies in writing of an intention to resign, retire, or otherwise terminate his or her employment prior to the Closing or in connection with the Transactions nor, to the Knowledge of the Company as of the Execution Date, does any such employee have an intention to do so.

(n)     Except as set forth in Section 4.11(n) of the Company Disclosure Schedules, (i) as of the Execution Date, none of the Acquired Companies are party to or bound by any collective bargaining agreements or other agreement (each, a "Collective Bargaining Agreement") with any labor union, works council, or other labor organization (each, a "Union") and no such agreement is being negotiated by any of the Acquired Companies (each such Collective Bargaining Agreement set forth in Section 4.11(n) of the Company Disclosure Schedules, a "Company Collective Bargaining Agreement"); (ii) since the Lookback Date, to the Knowledge of the Company, no group of employees of an Acquired Company or Union has sought to organize any

18

employees of an Acquired Company not covered by a Company Collective Bargaining Agreement for purposes of collective bargaining, made a demand for recognition or certification, sought to bargain collectively with any Acquired Company, or filed a petition for recognition with any Governmental Body, except that resulted in entry into or involved a pre-existing Company Collective Bargaining Agreement; and (iii) since the Lookback Date, there has been no labor strike, lockout, slowdown, stoppage, picketing, boycott, hand billing, demonstration, leafletting, sit-in, sick-out, lockout or other form of organized labor disruption pending or, to the Knowledge of the Company, threatened against any Acquired Company.

(o)      Since the Lookback Date, (i) to the Knowledge of the Company, no material allegations of sexual harassment or other sexual misconduct have been made by any current or former employee of the Acquired Companies against any current employee of the Acquired Companies with the title of executive vice president or above and, to the Knowledge of the Company, no employee of any Acquired Company has engaged in any cover up of such harassment or misconduct or knowingly aided or assisted any other person or entity to engage in any such harassment or misconduct, (ii) there are no Legal Proceedings pending or, to the Knowledge of the Company, threatened related to any allegations made by any current or former employee of any of the Acquired Companies of sexual harassment or other sexual misconduct against any employee of the Acquired Companies with the title of executive vice president or above and (iii) none of the Acquired Companies have entered into any settlement agreements related to allegations of sexual harassment or other sexual misconduct made by any current or former employee of the Acquired Companies against any current employee of the Acquired Companies with the title of executive vice president or above.

(p)      Since the Lookback Date, the Acquired Companies have complied in all material respects with Worker Adjustment and Retraining Notification Act and any similar state or local law, as amended (collectively, the "WARN Act") and have not incurred any material liability or material obligation under the WARN Act.

(q)      Except as would not be reasonably expected to result in material liability to the Company, each of the employees of the Acquired Companies have all work permits, immigration permits, visas, or other authorizations required by applicable Law for such individual given the duties and nature of such individual's employment, and the Acquired Companies have on file for each employee of the Acquired Companies a Form I-9 that is validly and properly completed in accordance with applicable Law.

(r)      No Acquired Company is a party to a U.S. federal Government Contract. The Acquired Companies are not, and have not been since the Lookback Date, the subject of any Legal Proceeding in connection with any U.S. federal Government Contract or related compliance with Executive Order No. 11246 of 1965, Section 503 of the Rehabilitation Act of 1973 or the Vietnam Era Veterans' Readjustment Assistance Act of 1974. The Acquired Companies are not debarred, suspended or otherwise ineligible from doing business with the U.S. government or any U.S. government contractor.

(s)      Except as would not, individually or in the aggregate, be reasonably likely to result in a material liability to the Acquired Companies taken as a whole; there are no, and since the Lookback Date there have not been, any material workers' compensation claims,

19

insured or uninsured, pending or, to the Knowledge of the Company, threatened, relating to any employee of the Acquired Companies. Except as would not, individually or in the aggregate, be reasonably likely to have a Company Material Adverse Effect, all amounts required by any statute, insurance policy, Governmental Body or agreement to be paid by the Acquired Companies into any workers' compensation loss or reserve fund, collateral fund, sinking fund or similar account have been duly paid into such fund or account as required.

(t)     Pursuant to the terms of the EPP and the RRP, the Company has established and maintains a grantor trust that will become irrevocable as of the Closing.

Section 4.12.    <u>Compliance with Laws; Permits</u>.

(a)     Except as set forth in <u>Section 4.12(a)</u> of the Company Disclosure Schedules, since the Lookback Date, (i) to the Knowledge of the Company, none of the Acquired Companies has materially violated or is in material violation of, any Laws except for any violations that, individually or in the aggregate, are not, and would not be reasonably likely to be material to the business of the Acquired Companies, taken as a whole and (ii) none of the Acquired Companies has received any written notice of or been charged with the material violation of any Laws except for any violations that, individually or in the aggregate, are not, and would not be reasonably likely to be material to the business of the Acquired Companies, taken as a whole.

(b)     Except as set forth in <u>Section 4.12(b)</u> of the Company Disclosure Schedules, the Acquired Companies have all Permits which are required for the operation of its respective business as presently conducted (and such Permits are in full force and effect), except for any Permit which the failure of the Acquired Companies to have (or to be in full force and effect) would not be material to the business of the Acquired Companies, taken as a whole. Except as would not be material to the Acquired Companies, taken as a whole, the Acquired Companies are, and since the Lookback Date have been, in compliance in all material respects with the terms, conditions or provisions of any such Permits.

Section 4.13.    <u>Regulatory Matters</u>.

(a)     Except as would not, individually or in the aggregate, reasonably be expected to be material to the Acquired Companies, taken as a whole, and except as set forth in <u>Section 4.13(a)</u> of the Company Disclosure Schedules, since the Lookback Date, (i) none of the Acquired Companies, the Acquired Companies' directors, officers, employees, nor to the Knowledge of the Company, any Representatives or other Person acting on behalf of the Acquired Companies has violated any Anti-Corruption Law and (ii) none of the Acquired Companies, the Acquired Companies' directors, officers, employees, nor to the Knowledge of the Company, any Representatives or other Person acting on behalf of the Acquired Companies, has offered, paid, given, promised, authorized, solicited or received, the payment of, anything of value (including money, checks, wire transfers, tangible and intangible gifts, favors, services, employment or entertainment and travel) directly or indirectly to or from any employee, officer, or Representative of, or any Person otherwise acting in an official capacity for or on behalf of a Governmental Body, whether elected or appointed, including an officer or employee of a state-owned or state-controlled enterprise, a political party, political party official or employee,

20

candidate for public office, or an officer or employee of a public international organization (such as the World Bank, United Nations, International Monetary Fund, or Organization for Economic Cooperation and Development) (any such person, a "Government Official") (A) for the purpose of (1) influencing any act or decision of a Government Official or any other person in his or her official capacity, (2) inducing a Government Official or any other person to do or omit to do any act in violation of his or her lawful duties, (3) securing any improper advantage, (4) inducing a Government Official or any other person to influence or affect any act or decision of any Governmental Body or (5) assisting the Acquired Companies, or any Acquired Company director, officer employee, Representative, or any other person acting on behalf of an Acquired Company in obtaining or retaining business, or (B) in a manner which would constitute or have the purpose or effect of public or commercial bribery or corruption, acceptance of, or acquiescence in extortion, kickbacks, or other unlawful or improper means of obtaining or retaining business or any improper advantage.

(b)     Except as would not, individually or in the aggregate, reasonably be expected to be material to the Acquired Companies, taken as a whole, and except as set forth in Section 4.13(b) of the Company Disclosure Schedules, (i) the Acquired Companies and their respective directors, officers, employees, and, to the Knowledge of the Company, Representatives and other Persons acting for or on behalf of any of the foregoing Persons, are, and at all times since the Lookback Date, in compliance with all applicable Economic Sanctions/Trade Laws and all applicable Money Laundering Laws and (ii) in the five (5) years prior to the Execution Date none of the Acquired Companies is a Sanctions Target or has carried on, or carries on, any business, directly or knowingly indirectly, involving any Sanctioned Country or Sanctions Target in violation of applicable Economic Sanctions/Trade Laws.

(c)     Except as would not, individually or in the aggregate, reasonably be expected to be material to the Acquired Companies, taken as a whole, and except, and except as set forth in Section 4.13(c) of the Company Disclosure Schedules, since the Lookback Date (i) none of the Acquired Companies has conducted or initiated any internal investigation, review or audit, or made a voluntary, directed, or involuntary disclosure to any Governmental Body or third party with respect to any alleged or suspected act or omission arising under or relating to any potential noncompliance with any applicable Anti-Corruption Law, Economic Sanctions/Trade Law, or Money Laundering Law, (ii) none of the Acquired Companies, nor any of their respective directors or officers, nor, to the Knowledge of the Company, any employees (other than officers), Representatives, or any other Person acting at the direction of an Acquired Company has received any written notice, request or citation (including a whistleblower complaint) for any actual or potential noncompliance with any applicable Anti-Corruption Law, Economic Sanctions/Trade Law or Money Laundering Law, (iii) the Acquired Companies have implemented and maintained internal controls, policies and procedures designed to detect and prevent violations of Anti-Corruption Laws, Economic Sanctions/Trade Laws and Money Laundering Laws, and (iv) the Acquired Companies have at all times made and maintained accurate books and records in material compliance with all applicable Anti-Corruption Laws, Economic Sanctions/Trade Laws or Money Laundering Laws.

Section 4.14.   Environmental Matters. Except as set forth in Section 4.14 of the Company Disclosure Schedules and except as would not, individually or in the aggregate, reasonably be expected to result in the Acquired Companies incurring liabilities which are

21

material to the Acquired Companies, taken as a whole, (i) no written Claim or Order has been received by, and no Legal Proceeding is pending or, to the Knowledge of the Company, threatened by any Person against the Acquired Companies, and no penalty has been assessed or consent decree or Order issued by a Governmental Body against the Acquired Companies, in each case, with respect to any matters arising out of any Environmental Law, which remains outstanding; (ii) the Acquired Companies have been since the Lookback Date, and are, in compliance with all Environmental Laws, which compliance includes obtaining, maintaining and complying with Permits required under Environmental Laws for the conduct of their respective businesses (the "Company Environmental Permits"); (iii) no Governmental Body has begun, or to the Knowledge of the Company, threatened to begin, any Legal Proceeding to terminate, revoke, cancel, suspend, materially reform or not renew any Company Environmental Permit; (iv) to the Knowledge of the Company, there is no investigation pending or threatened against the Acquired Companies by any Governmental Body alleging non-compliance with or liability under any Environmental Law; (v) to the Knowledge of the Company, the Acquired Companies have not generated, treated, stored, disposed of, arranged for the disposal of, transported, or Released, or exposed any Person to, any Hazardous Substances in a manner or concentration that has given rise, or would reasonably be expected to give rise, to liabilities of the Acquired Companies under Environmental Laws, which liability has not been resolved; (vi) to the Knowledge of the Company, no Hazardous Substances have been Released in or under, and no Hazardous Substances are migrating from, (x) properties currently, or to the Knowledge of the Company, formerly owned, leased or operated by the Acquired Companies in a manner or concentrations requiring the Acquired Companies to undertake any investigation, monitoring, removal or remediation under Environmental Laws or (y) to the Knowledge of the Company, any other properties in a manner or concentrations requiring the Acquired Companies to undertake any investigation, monitoring, removal or remediation under Environmental Laws; and (vii) none of the Acquired Companies has assumed by contract liabilities or obligations of any other Person arising under Environmental Laws. The Company has made available to the Buyer copies of all material, non-privileged environmental investigations, assessments or reports conducted in the three (3) years prior to the Execution Date by or on behalf of the Acquired Companies in relation to any current or prior business of the Acquired Companies or any property or facility currently or previously owned, leased or operated by the Acquired Companies, which investigation, assessment or report reveals actual or potential unresolved material non-compliance with or liability under any Environmental Law, but excluding routine environmental monitoring reports conducted by the Acquired Companies in the Ordinary Course.

Section 4.15.  Title to Properties. Except as would not, individually or in the aggregate, be material to the Acquired Companies, taken as a whole, each of the Acquired Companies has good title to, or valid leasehold or other ownership interests or rights in, all its material properties and assets except: (i) for such interest or rights as are no longer used or useful in the conduct of the business of the Acquired Companies as of the Execution Date or as have been disposed of in the Ordinary Course, and (ii) for defects in title, burdens, easements, restrictive covenants and similar encumbrances or impediments that, in each case that do not and will not, individually or in the aggregate, interfere with its ability to conduct its business as currently conducted. None of the properties and assets of the Acquired Companies are subject to any Liens (other than Permitted Liens) that, in the aggregate, interfere with the ability of the Acquired Companies to

WEIL:\100337387\20\67816.0003

conduct their business in the Ordinary Course except as would not, individually or in the aggregate, have a Company Material Adverse Effect.

Section 4.16.   Material Contracts.

(a)    Section 4.16(a) of the Company Disclosure Schedules sets forth a true, correct and complete list of each Material Contract. For purposes of this Agreement, "Material Contract" shall mean any Contract to which any Acquired Company is a party or to which any assets, properties, or businesses of any Acquired Company are bound as of the Execution Date (in each case, excluding (i) Contracts between or among Acquired Companies only and (ii) spot order Contracts entered into in the Ordinary Course) that:

(i)    (A) limits in any material respect either the type of business in which any Acquired Company may engage or the manner or locations in which any of them may so engage in any business (including through "non-competition" or "exclusivity" provisions), (B) would require the disposition of any material assets or line of business of any Acquired Company or (C) grants "most favored nation" or similar status with respect to any material obligations and would run in favor of any Person (other than the Company or a wholly owned Company Subsidiary);

(ii)    (A) is an indenture, loan or credit Contract, loan note, mortgage Contract, or other Contract representing, or any guarantee of, indebtedness for borrowed money of any Acquired Company in excess of $10,000,000 (excluding any government-mandated or state-wide bonds or guarantees), (B) is a finance lease of any Acquired Company as lessee in excess of $5,000,000, or (C) is a guarantee by any Acquired Company of indebtedness for borrowed money or any finance lease of any Person other than the Company or a wholly owned Company Subsidiary (excluding any government-mandated or state-wide bonds or guarantees);

(iii)    grants (A) any right of first refusal, right of first negotiation or similar right, or (B) any put, call or similar right, to any Person (other than the Company or a wholly owned Company Subsidiary) with respect to any Equity Interest, property, or other asset, in each case, that is material to the Acquired Companies;

(iv)    was entered into to resolve or settle any litigation or threatened litigation (A) for an amount in excess of $15,000,000 payable by an Acquired Company (without taking into account insurance proceeds) or (B) which imposes any material non-monetary ongoing obligation on any Acquired Company (other than customary confidentiality obligations), in each case of clause (A) and clause (B), that has not been fully paid or performed, as applicable;

(v)    limits or restricts the ability of any Acquired Company to declare or pay dividends or make distributions in respect of their Equity Interests that will be binding from and after the Closing;

(vi)    is a partnership, limited liability company, joint venture, co-development or other similar agreement, relating to the formation, creation, operation, management or control of any partnership, limited liability company, joint venture,

23

co-development or similar entity (however organized) in which the Company owns, directly or indirectly, through a Company Subsidiary (excluding Equity Interests owned directly or indirectly by any Non-Controlled Entities) any Equity Interest and has invested or is contractually required to invest capital (including for the avoidance of doubt with respect to any Non-Controlled Entity or non-wholly owned Company Subsidiary, but excluding any wholly owned Company Subsidiary);

(vii)    relates to the sale, transfer or acquisition or disposition of any material business, material assets (other than those providing for sales, transfers or acquisitions of assets in the Ordinary Course) or Equity Interests of any Acquired Company, in each case (A) for an amount in excess of $10,000,000 in any transaction or series of related transactions (other than Contracts for transactions that were consummated prior to the Lookback Date or Contracts that do not contain any ongoing rights owing to, or obligations or liabilities of, any Acquired Company) or (B) pursuant to which any Acquired Company has any material ongoing obligations or liabilities (including in respect of indemnification, "earn-out" and similar contingent or deferred payment obligations);

(viii)    is a Contract (A) with an employee of an Acquired Company, pursuant to which such employee is entitled to receive base salary in excess of $400,000, (B) that provides for mandatory or potential severance payments by an Acquired Company in excess of $100,000 or (C) with an employee, officer or director of any Acquired Company that (I) contains any non-compete or non-solicitation covenants or (II) modifies the at-will nature of the employment of any employee or otherwise requires advance notice for the termination of the Contract by any Acquired Company;

(ix)    is a Contract providing for indemnification by an Acquired Company of any officer, manager, director or employee of any Acquired Company;

(x)    is a Contract between or among any Acquired Company, on the one hand, and any Governmental Body, on the other hand;

(xi)    is a term Contract with one of the ten largest suppliers of any applicable Business Unit of the Acquired Companies (as determined by dollar volume for the 12-month period immediately prior to the Company Balance Sheet Date); and

(xii)    is a term Contract with one of the ten largest customers of any applicable Business Unit of the Acquired Companies (as determined by dollar volume for the 12-month period immediately prior to the Company Balance Sheet Date).

(b)    Each Material Contract is a legal, valid and binding obligation of the Acquired Companies as applicable. Except as would not, individually or in the aggregate, be material to the Acquired Companies, taken as a whole, each Material Contract is in full force and effect and enforceable by the applicable Acquired Company, in each case, subject to the Equitable Exceptions, and none of the Acquired Companies or, to the Knowledge of the Company any other party to a Material Contract, is in material breach or violation of any provision of, or in material default under, any Material Contract, and no event has occurred that,

24

with or without notice, lapse of time or both, would constitute a material breach, violation or default or give rise to a right of termination, cancellation or acceleration of any material right or obligation or loss of any benefit thereunder. A true and correct copy of each Material Contract has previously been made available to the Buyer.

(c)     Since the Lookback Date, no Acquired Company has given or received (i) written notice regarding any actual or alleged or potential violation of any provision under any Material Contract or (ii) written notice threatening, intending or electing to terminate, repudiate, modify or cancel such Material Contract.

Section 4.17.   <u>Intellectual Property and Data Privacy</u>.

(a)     <u>Section 4.17(a)</u> of the Company Disclosure Schedules sets forth a list of all registered Intellectual Property that is owned by the Acquired Companies and is used in, held by, or held for use in the conduct of the business of the Acquired Companies as of the Execution Date ("<u>Registered Intellectual Property</u>"). Except as would not, individually or in the aggregate, be material to the Acquired Companies, taken as a whole, the Acquired Companies own or possess the right to use, license and enforce all (i) patents and patent applications, (ii) registered, applied for, or unregistered trademarks, trade names, trade dress, service marks, logos, and business names, and all related goodwill, (iii) internet domain names, (iv) registered, applied for, or unregistered works of authorship and copyrights, including copyrights in computer software programs or applications, and (v) trade secrets, know- how and other confidential and proprietary information, including ideas, inventions (whether patentable or not), research, pricing and cost information, customer information, business plans, marketing plans, and proposals (collectively, "<u>Intellectual Property</u>") that are used in, held by, or held for use in the conduct of the business of the Acquired Companies as currently conducted (collectively, the "<u>Company Intellectual Property</u>" and to the extent owned by the Acquired Companies the "<u>Company Owned Intellectual Property</u>"), free and clear of all Liens, except for Permitted Liens. To the Knowledge of the Company, the Registered Intellectual Property is valid and enforceable.

(b)     (i) Since the Lookback Date, to the Knowledge of the Company, the conduct of the business of the Acquired Companies and use of the Company Intellectual Property does not and has not infringed upon or otherwise violated any Intellectual Property rights of any other Person; (ii) no third party is challenging, or, to the Knowledge of the Company, infringing or otherwise violating any right of the Acquired Companies in the Company Owned Intellectual Property; and (iii) since the Lookback Date, the Acquired Companies have not received written notice of any pending Claim, Order or Legal Proceeding with respect to any alleged or potential infringement or other violation of Intellectual Property rights of any other Person or with respect to any Company Intellectual Property. The Acquired Companies have taken commercially reasonable measures to maintain the confidentiality of any material proprietary information or trade secrets included in Company Intellectual Property.

(c)     Except as would not, individually or in the aggregate, reasonably be expected to be material to the Acquired Companies, taken as a whole, each current and former employee and independent contractor of any Acquired Company who has participated in the conception or development of any Intellectual Property has assigned to such Acquired Company by operation of law, or has entered into a valid and enforceable written agreement with such

<div align="center">25</div>

Acquired Company assigning to such Acquired Company all Intellectual Property created by such Person within the scope of such Person's duties to the Acquired Company and prohibiting such Person from using or disclosing confidential information of the Acquired Company. To the Knowledge of the Company, no current or former employee or independent contractor of the Acquired Companies is in violation of any such agreement, and there has been no unlawful, accidental, or unauthorized access to or use or disclosure of any trade secrets, know-how and other confidential and proprietary information of the Acquired Companies.

(d)     Since the Lookback Date, no third party (including any employee, worker, contractor or subcontractor) has made any written claim to the Acquired Companies of ownership in respect of any of the Company Owned Intellectual Property.

(e)     Except as would not, individually or in the aggregate, be material to the Acquired Companies, taken as a whole, to the extent that the Acquired Companies license Intellectual Property to a third party or license any Intellectual Property belonging to any third party: (i) no such licenses have been the subject of any breach or default by any Acquired Company or, to the Company's Knowledge, any such third party; (ii) such licenses are valid and binding; (iii) such licenses have not been the subject of any claim, dispute or proceedings; and (iv) in respect of licenses of Intellectual Property by any Acquired Company to third parties, such licenses do not materially restrict any Acquired Company from using the Intellectual Property to which they relate.

(f)     Since the Lookback Date, except as has not had and would not reasonably be expected to have, individually or in the aggregate, a Company Material Adverse Effect: (i) materially complied with all applicable Laws and self-regulatory guidelines, PCI DSS, the obligations under their Contracts, and their public privacy policies, in each case, relating to the processing of any Personal Information (collectively, "Privacy Laws and Obligations"); (ii) implemented and maintained reasonable administrative, physical and technical safeguards designed to protect all Personal Information in their possession or under their control against loss, theft, or unauthorized access, use modification, disclosure; (iii) not experienced any material Security Incident, and, to the Knowledge of the Company, no service provider (in the course of processing Personal Information for or on behalf of the Acquired Companies) has suffered any material Security Incident impacting Personal Information in the possession or control of the Acquired Companies; and (iv) not received any written notice of any claims of, or been charged with, the violation of any Privacy Laws and Obligations.

(g)     The Acquired Companies have used commercially reasonable efforts to prevent the introduction into the Systems, and, to the Company's Knowledge, such Systems do not contain, any ransomware, disabling codes or instructions, spyware, Trojan horses, worms, viruses or other software routines that permit or cause unauthorized access to, or disruption, impairment, disablement, or destruction of, software, data or other materials. The Acquired Companies have used commercially reasonable efforts to implement material security patches that are generally available for the Systems. To the Company's Knowledge, since the Lookback Date, the Systems have not suffered any unplanned or critical failures, continued substandard performance, errors, breakdowns or other adverse events that have caused any material disruption or interruption in the operation of the business of the Acquired Companies. The

26

Acquired Companies have implemented and maintain commercially reasonable business continuity and disaster recovery plans, procedures and facilities for its business.

(h)     The Acquired Companies have in place commercially reasonable measures to protect the confidentiality, integrity, availability and security of the Systems. To the Company's Knowledge, the Systems (i) are in good working order; (ii) function in all material respects in accordance with all specifications and any other descriptions under which they were supplied; (iii) are substantially free of any material defects, bugs and errors; and (iv) are sufficient for the existing needs of the business of the Acquired Companies. The Acquired Companies have conducted commercially reasonable penetration tests at reasonable intervals on the Systems, and have addressed, or are in the process of addressing, all material issues raised in any such audits or penetration tests (including third party audits of the Systems).

Section 4.18.   <u>Brokers; Financial Advisor</u>. No broker, investment banker, financial advisor or other Person, other than Evercore, is entitled to any commission, brokerage fee or "finders fee" in connection with the consummation of the Transactions.

Section 4.19.   <u>Real Property</u>.

(a)     <u>Section 4.19(a)</u> of the Company Disclosure Schedules sets forth a true, accurate and complete list as of the Execution Date of all leases or subleases of real property with respect to which any Acquired Company is the tenant or lessee, together with a list of the addresses of all such real property (if specified in such lease or sublease) which are material to the Acquired Companies (individually, a "<u>Real Property Lease</u>" and, collectively, the "<u>Real Property Leases</u>"). Subject to the Equitable Exceptions, the applicable Acquired Company has a good, valid, binding and enforceable interest under each of the Real Property Leases and the vesting instruments under which an Acquired Company holds an easement or similar interest (such vesting instruments, collectively with the Real Property Leases, the "<u>Vesting Instruments</u>"), free and clear of all Liens (other than Permitted Liens). No Acquired Company nor, to the Knowledge of the Company, any other party to any Vesting Instrument is in material breach or default thereunder, and no event has occurred or condition exists that, with notice or lapse of time, or both, would constitute a default by an Acquired Company or, to the Knowledge of the Company, any other Person under any of the Vesting Instruments, other than defaults that have been cured or waived in writing. Except as would not, individually or in the aggregate, be material to the Acquired Companies, taken as a whole, all landlord work or tenant work under each Real Property Lease has been completed and there are no leasing commissions due or payable with respect to any Real Property Lease. Each Vesting Instrument is in full force and effect and, to the Knowledge of the Company, is the valid, binding and enforceable obligation of each party thereto, in accordance with its terms.

(b)     <u>Section 4.19(b)</u> of the Company Disclosure Schedules sets forth a true, accurate, and complete list of all real property owned in fee by the Acquired Companies ("<u>Owned Real Property</u>"; and together with the real property in which the Acquired Companies hold interests pursuant to the Vesting Instruments, the "<u>Real Property</u>"), together with the address of the applicable property. Each Acquired Company owns good, valid and marketable title in fee simple to the Owned Real Property and there are no outstanding Preferential Rights, ownership or use, or other contractual rights in favor of any other Person to purchase, acquire,

sell, assign or otherwise dispose of any Acquired Companies' interest in any Real Property or any portion thereof or interest therein. Each Acquired Company has the valid and enforceable power and unqualified right to use and sell, transfer, convey or assign the Owned Real Property, free and clear of all Liens other than Permitted Liens.

(c)    Section 4.19(c) of the Company Disclosure Schedules sets forth a complete list of all Owned Real Property held by the Acquired Companies as a tenant in common or other joint ownership structure (collectively, the "Jointly Owned Properties"), together with a detailed description of the respective ownership structure (and the applicable Acquired Company's ownership percentage) of each Jointly Owned Property. None of the other owners of the Jointly Owned Properties have any rights of first refusal, rights of first offer or other Preferential Rights to purchase, or otherwise modify or later the applicable Acquired Company's interest in, any of the Jointly Owned Properties that would be triggered by the Transactions.

(d)    To the Knowledge of the Company, all material buildings, structures, improvements, fixtures, building systems and attached equipment, and all material components thereof, included in the Real Property are in good condition and repair, normal wear and tear excepted. No work has been done at the Real Property, and no materials have been supplied to the Real Property, that have not been paid for, and there are no material materialman's liens or mechanic's liens affecting the Real Property.

(e)    The Real Property constitutes all interests in real property (i) currently used, occupied or held for use in connection with the business of the Acquired Companies as presently conducted and (ii) necessary for the continued operation of the business of the Acquired Companies. None of the improvements to any Real Property constitute a legal non-conforming use or otherwise require any special dispensation, variance or permit under any Law. To the Knowledge of the Company, the Company or the applicable Acquired Company has all certificates of occupancy, permits, licenses, certificates of authority, authorizations, approvals, registrations, and similar consents issued by or obtained from any Governmental Body necessary for the current use and operation of the Real Property, except for any such items where the failure of the applicable Acquired Company to hold or possess such item would not, individually or in the aggregate, be material to any Acquired Company. The Real Property is in compliance in all material respects with all applicable Laws and fire, health, building, use, occupancy, subdivision and zoning codes.

(f)    Except as would not, individually or in the aggregate, be material to the Acquired Companies, taken as a whole, each Acquired Company and each parcel of Real Property (i) are now, and have been since the Lookback Date, in material compliance with all declarations of covenants, conditions or restrictions, restrictive covenants and reciprocal easement agreements, in each case, affecting any Real Property, and (ii) have not received any notice of any material breach, violation or default under any such declarations, agreements or easements since the Lookback Date.

WEIL:\100337387\20\67816.0003

(g)     There do not exist any actual or, to the Knowledge of the Company, threatened condemnation or eminent domain proceedings that affect any Real Property or any part thereof.

(h)     Since the Lookback Date, no Acquired Company has received written notice of any, and to the Knowledge of the Company there is no, default under any restrictive covenants or other encumbrances pertaining to the Real Property.

Section 4.20.   <u>Affiliate Transactions</u>. Except as set forth in <u>Section 4.20</u> of the Company Disclosure Schedules, none of the Acquired Companies, on the one hand, is party to any agreement with PDVSA or its Affiliates (excluding the Acquired Companies and their Subsidiaries), on the other hand, pursuant to which an Acquired Company has material ongoing obligations. Other than the Shares, neither PDVSA nor any of its Affiliates (excluding the Acquired Companies and their Subsidiaries), owns any interest in or any property (real, personal or mixed, tangible or intangible) of the Acquired Companies.

Section 4.21.   <u>Insurance</u>. <u>Section 4.21</u> of the Company Disclosure Schedules lists each material insurance policy maintained by the Acquired Companies with respect to the properties, assets, business, operations and employees of the Acquired Companies. To the Knowledge of the Company, all such policies are valid and binding on the Acquired Company and enforceable in accordance with their terms against the Acquired Companies, in each case except for the Equitable Exceptions, and all premiums with respect thereto have been paid to the extent due. To the Knowledge of the Company, there are no material Claims by the Acquired Companies pending under any such insurance policies as to which coverage has been denied by the underwriters of such policies. To the Knowledge of the Company, the Acquired Companies have not received written notice of termination or material reduction of coverage with respect to any of such insurance policies.

Section 4.22.   <u>No Additional Representations</u>.

(a)     Except for the representations and warranties made in (i) this <u>Article IV</u>, as qualified by the Company Disclosure Schedules, (ii) any certificate delivered pursuant to this Agreement or (iii) any other Transaction Document, no Person makes or shall be deemed to make any other representation or warranty of any kind whatsoever, express or implied, written or oral, at law or in equity, with respect to any of the Acquired Companies or their respective businesses, operations, assets, liabilities or conditions (financial or otherwise) in connection with this Agreement or the Transactions, any other rights or obligations to be transferred pursuant to the Transaction Documents or any other matter, and the Special Master (on behalf of himself and the Company) hereby disclaims any such other representations or warranties. In particular, without limiting the foregoing disclaimer, except for the representations and warranties made in (i) this <u>Article IV</u>, as qualified by the Company Disclosure Schedules, or (ii) any certificate delivered pursuant to this Agreement, no Person makes or has made any representation or warranty to the Buyer or any of its Affiliates or Representatives with respect to (x) projections, forecasts, estimates, financial statements, financial information, appraisals, statements, promises, advice, data or information made, communicated or furnished (orally or in writing, including electronically) or prospect information relating to the Acquired Companies or their respective businesses; or (y) except for the representations and warranties made in (i) this <u>Article IV</u>, as

WEIL\100337387\20\67816.0003

qualified by the Company Disclosure Schedules, (ii) any certificate delivered pursuant to this Agreement, or (iii) any other Transaction Documents, any oral or written information presented to the Buyer or any of its Affiliates or Representatives in the course of their due diligence investigation of the Company, the negotiation of this Agreement or in the course of the Transactions (including any opinion, information, projection, or advice that may have been or may be provided to the Buyer by any Representative of the Company).

(b)     Notwithstanding anything contained in this Agreement to the contrary, the Special Master acknowledges and agrees that neither the Buyer nor any other Person has made or is making, and the Special Master expressly disclaims reliance upon, any representations, warranties or statements relating to the Buyer or any Buyer Subsidiaries whatsoever, express or implied, beyond those expressly given by the Buyer in Article V, as qualified by the Buyer Disclosure Schedules, or in any certificate delivered pursuant to this Agreement or in any other Transaction Documents, including any implied representation or warranty as to the accuracy or completeness of any information regarding the Buyer, furnished or made available to the Company, or any of its Representatives. Without limiting the generality of the foregoing, the Special Master acknowledges that, except for the representations and warranties expressly provided in Article V, as qualified by the Buyer Disclosure Schedules, or in any certificate delivered pursuant to this Agreement or in any other Transaction Documents, no representations or warranties are made with respect to any projections, forecasts, estimates, budgets or prospect information that may have been made available to the Special Master, the Company or any of their Representatives.

<h1 style="text-align:center">ARTICLE V</h1>

<h2 style="text-align:center">REPRESENTATIONS AND WARRANTIES OF THE BUYER AND THE RECORD HOLDER</h2>

The Buyer and, solely with respect to Section 5.1(b), Section 5.2, Section 5.3, Section 5.4, Section 5.5, Section 5.6, Section 5.8, Section 5.10, and Section 5.12(a), the Record Holder, represent and warrant to the Special Master, severally and not jointly that, except as disclosed in the correspondingly numbered section of the disclosure schedules delivered by the Buyer to the Company simultaneously with the execution of this Agreement (the "Buyer Disclosure Schedules"):

Section 5.1.     Corporate Existence and Power.

(a)     The Buyer is a limited liability company duly incorporated, validly existing and in good standing under the Laws of its jurisdiction of the State of Delaware and has all requisite limited liability company powers and all governmental franchises, licenses, permits, authorizations, consents and approvals required to enable it to own, lease or otherwise hold its properties and assets and to carry on its business as now conducted. The Buyer is duly qualified to do business as a foreign company and is in good standing in each jurisdiction in which the character of the property owned or leased by it, the nature of its activities, or the ownership or leasing of its properties make such qualification necessary, except for those jurisdiction where the failure to be so qualified would not, individually or in the aggregate, materially impair or

<div style="text-align:center">30</div>

delay the ability of the Buyer to consummate the Transactions or perform its obligations under this Agreement.

(b)    The Record Holder is a limited liability company duly incorporated, validly existing and in good standing under the Laws of its jurisdiction of the State of Delaware and has all requisite limited liability company powers and all governmental franchises, licenses, permits, authorizations, consents and approvals required to enable it to own, lease or otherwise hold its properties and assets and to carry on its business as now conducted. The Record Holder is duly qualified to do business as a foreign company and is in good standing in each jurisdiction in which the character of the property owned or leased by it, the nature of its activities, or the ownership or leasing of its properties make such qualification necessary, except for those jurisdiction where the failure to be so qualified would not, individually or in the aggregate, materially impair or delay the ability of the Record Holder to consummate the Transactions or perform its obligations under this Agreement.

Section 5.2.    Corporate Authorization. Each of the Buyer and the Record Holder has all requisite limited liability company power and authority to execute, deliver and perform its obligations under this Agreement, the Transaction Documents, and each other agreement, document, instrument or certificate contemplated by this Agreement to be executed and delivered by the Buyer or the Record Holder, as applicable, in connection with the consummation of the Transactions (the "Buyer Documents"). The execution and delivery of this Agreement and the Buyer Documents by the Buyer or the Record Holder, as applicable, the performance of its obligations hereunder and thereunder, and the consummation by the Buyer or the Record Holder, as applicable, of the Transactions have been duly authorized by all necessary corporate or organizational action on the part of the Buyer and the Record Holder, as applicable, and no shareholder or other similar approval is required in connection with the Buyer's or the Record Holder's execution, delivery and performance of the Transactions. The manager of the Buyer and the manager of the Record Holder, at a meeting duly called and held (or by written consent in lieu of a meeting duly adopted by the applicable manager) on or prior to the Execution Date, has approved this Agreement and the Transactions. This Agreement constitutes a valid and binding agreement against each of the Buyer and the Record Holder, enforceable against the Buyer and the Record Holder in accordance with its terms, except that such enforcement may be limited by the Equitable Exceptions.

Section 5.3.    Governmental Authorization. The execution, delivery and performance by the Buyer of this Agreement and the consummation by the Buyer and the Record Holder of the Transactions require no Order, authorization, or approval of, or filing with, any Governmental Body other than (a) applicable requirements of Antitrust Laws as set forth in Section 5.3 of the Buyer Disclosure Schedules and (b) the OFAC License.

Section 5.4.    Non-Contravention. The execution, delivery and performance by the Buyer and the Record Holder of this Agreement and the consummation by the Buyer and the Record Holder of the Transactions do not and will not, assuming compliance with the matters referred to in Section 5.2 and Section 5.3, (a) contravene or conflict with the certificate of incorporation or by-laws of the Buyer, (b) contravene or conflict with or constitute a violation of any provision of any Law binding upon or applicable to the Buyer or any of the Buyer Subsidiaries or the Record Holder or Record Holder Subsidiaries, as applicable, (c) constitute a

31

default (or an event which with notice or the passage of time would become a default) under, or give rise to any right of termination, cancellation or acceleration of any right or obligation of the Buyer or any of the Buyer Subsidiaries or the Record Holder or Record Holder Subsidiaries, as applicable, or to a loss of any benefit to which the Buyer or any of the Buyer Subsidiaries or the Record Holder or any of the Record Holder Subsidiaries, as applicable, is entitled under any provision of, any agreement, contract or other instrument binding upon the Buyer or any of the Buyer Subsidiaries or the Record Holder or any of the Record Holder Subsidiaries, as applicable, or any license, franchise, permit or other similar authorization held by the Buyer or any of the Buyer Subsidiaries or the Record Holder or any of the Record Holder Subsidiaries, as applicable, or (d) result in the creation or imposition of any Lien (other than Liens arising under applicable securities Laws) on any asset of the Buyer or any of the Buyer Subsidiaries. As of the Execution Date, there is no Effect that would reasonably be expected to prevent, impede or interfere with the execution of this Agreement and the consummation by the Buyer of the Transactions.

Section 5.5.    <u>Litigation</u>. Except as set forth in <u>Section 5.5</u> of the Buyer Disclosure Schedules, there are no Legal Proceedings, pending against, or, to the Knowledge of the Buyer, threatened in writing against or affecting, the Buyer, any of the Buyer Subsidiaries, the Record Holder or any of the Record Holder Subsidiaries, any of their respective properties or any of their respective officers or directors before any Governmental Body that would reasonably be expected to (a) prohibit or restrain the ability of the Buyer to enter into this Agreement or consummate the Transactions or (b) affect the legality, validity or enforceability of any Debt Financing. The Buyer or the Record Holder is not subject to any Order of any Governmental Body that would reasonably be expected to (x) prohibit or restrain the ability of the Buyer to enter into this Agreement or consummate the Transactions or (y) affect the legality, validity or enforceability of any Debt Financing.

Section 5.6.    <u>Regulatory Matters</u>.

(a)    In the three (3) years prior to the Execution Date, (i) none of the Buyer or any of the Buyer Subsidiaries or the Record Holder or any of the Record Holder Subsidiaries, nor any of their respective directors, officers, employees, nor, to the Knowledge of the Buyer, any Representative, agent, or other person acting on behalf of the Buyer, any of the Buyer Subsidiaries, in each case in such capacity, has violated any applicable Anti-Corruption Law in any material respect, and (ii) none of the Buyer, any of the Buyer Subsidiaries, nor any of their respective directors, officers, employees, nor, to the Knowledge of the Buyer, any Representative, agent or any other person acting on behalf of the Buyer, the Buyer Subsidiaries, the Record Holder, the Record Holder Subsidiaries, in each case in such capacity, has offered, paid, given, promised, or authorized the payment of, anything of value (including money, checks, wire transfers, tangible and intangible gifts, favors, services, employment or entertainment and travel) directly or indirectly to any Government Official (A) for the purpose of (1) influencing any act or decision of a Government Official or any other person in his or her official capacity, (2) inducing a Government Official or any other person to do or omit to do any act in violation of his or her lawful duties, (3) securing any improper advantage, or (4) inducing a Government Official or any other person to influence or affect any act or decision of any Governmental Body; or (B) in a manner which would constitute or have the purpose or effect of public or commercial bribery or corruption, acceptance of, or acquiescence in extortion, kickbacks, or other unlawful or improper means of obtaining or retaining business or any improper advantage. Without

limiting the generality of the foregoing, none of the Buyer or any of the Buyer Subsidiaries, the Record Holder or any of the Record Holder Subsidiaries, any of their respective directors, officers, employees, Affiliates or, to the Knowledge of the Buyer, any Representative, agent, or other person acting on behalf of the Buyer, any of the Buyer Subsidiaries, the Record Holder or any of the Record Holder Subsidiaries is a Venezuelan national or has any professional or family relationship to Nicolás Maduro, the United Socialist Party of Venezuela or any Affiliate thereof.

(b)    (i) The Buyer and the Record Holder, each of the Buyer Subsidiaries and of the Record Holder Subsidiaries and their respective directors, officers, employees, and, to the Knowledge of the Buyer, agents, Representatives and other persons acting for or on behalf of any of the foregoing Persons, in each case in such capacity, are, and at all times in the three (3) years prior to the Execution Date, have been in compliance in all material respects with all applicable Economic Sanctions/Trade Laws and Money Laundering Laws and (ii) in the three (3) years prior to the Execution Date none of the Buyer, any of the Buyer Subsidiaries has been a Sanctions Target or has carried on or carries on, any business, directly or knowingly indirectly, involving any Sanctions Target in violation of applicable Economic Sanctions/Trade Laws.

(c)    Except as would not, individually or in the aggregate, be reasonably likely to have a material adverse effect, in the three (3) years prior to the Execution Date (i) none of the Buyer, any of the Buyer Subsidiaries, the Record Holder, any of the Record Holder Subsidiaries has conducted or initiated any internal investigation, review or audit, or made a voluntary, directed, or involuntary disclosure to any Governmental Body or third party with respect to any actual, alleged or suspected act or omission arising under or relating to any potential noncompliance with any applicable Anti-Corruption Law, Economic Sanctions/Trade Law, or Money Laundering Law, (ii) none of the Buyer, any of the Buyer Subsidiaries, the Record Holder, any of the Record Holder Subsidiaries, nor any of their respective directors or officers, nor, to the Knowledge of the Buyer, any agents, employees (other than officers), Representatives, or any other person acting at the direction of the Buyer, any of the Buyer Subsidiaries has received any written notice, request or citation for any actual or potential noncompliance with any applicable Anti-Corruption Law, Economic Sanctions/Trade Law or Money Laundering Law, and (iii) the Buyer, each of the Buyer Subsidiaries, the Record Holder and each of the Record Holder Subsidiaries have at all times made and maintained accurate books and records in compliance with all applicable Anti-Corruption Laws, Economic Sanctions/Trade Laws or Money Laundering Laws, and (iv) the Buyer, each of the Buyer Subsidiaries, the Record Holder and each of the Record Holder Subsidiaries have at all times made and maintained accurate books and records in material compliance with all applicable Anti-Corruption Laws, Economic Sanctions/Trade Laws and Money Laundering Laws. In the three (3) years prior to the Execution Date, (v) the Buyer, the Buyer Subsidiaries have implemented and have maintained internal controls, policies and procedures designed to detect and prevent violations of applicable Anti-Corruption Laws, Economic Sanctions/Trade Laws and Money Laundering Laws.

(d)    The Buyer, the Buyer Subsidiaries, the Record Holder and the Record Holder Subsidiaries are each not a "foreign person" within the meaning of the Defense Production Act of 1950, as amended, including all implementing regulations thereof.

WEIL:\100337387\20\67816.0003

Section 5.7.    <u>Financing</u>.

(a)    On the Execution Date, the Buyer has delivered to the Special Master true, correct, and complete copies of (i) the Claim Commitment Letter and the Convertible Notes Commitment Letter (together, the "<u>Convertible Commitment Letters</u>"), which Convertible Notes Commitment Letter provides that the Special Master is an express third party beneficiary thereto (the "<u>Convertible Financing</u>", and the commitments under the Convertible Commitment Letters, the "<u>Convertible Commitments</u>") and (ii) (A) a final commitment letter from each of the Debt Financing Sources identified therein (together with all annexes, schedules, and exhibits thereto, as amended from time to time as permitted herein and therein, the "<u>Debt Commitment Letter</u>", and the commitments under the Debt Commitment Letter, the "<u>Debt Financing Commitments</u>"; the Debt Commitment Letter and the Convertible Commitment Letters, collectively, the "<u>Commitment Letters</u>"), pursuant to which, and subject to the terms and conditions of which, the lenders party thereto have committed to lend the amounts set forth therein to the Buyer for the purpose of funding the Transactions (together with the Exchange Offer, the "<u>Debt Financing</u>", and, together with the Convertible Financing, the "<u>Financings</u>")), and (B) each related fee letter (collectively, the "<u>Fee Letters</u>"), which copy of such Fee Letter may be redacted to remove only the fees, "market flex" and other economic terms set forth therein so long as such redacted information does not adversely affect the conditionality, availability or aggregate principal amount of the Debt Financing.

(b)    As of the Execution Date, the Convertible Commitment Letters are in full force and effect and have not been withdrawn, rescinded, replaced or terminated, or otherwise amended, restated, amended and restated, waived, supplemented or otherwise modified in any respect (and no such amendment, restatement or modification is contemplated). The Convertible Commitment Letters are legal, valid and binding obligations (subject to the Equitable Exceptions) of the Buyer and the other parties thereto, enforceable in accordance with their terms.

(c)    As of the Debt Commitment Letter Effective Date, the Debt Commitment Letters shall be in full force and effect and shall not have been withdrawn, rescinded, replaced or terminated, or otherwise amended, restated, amended and restated, waived, supplemented or otherwise modified in any respect except in accordance with both (x) the implementation of "market flex" provisions set forth in the applicable Fee Letters and (y) this Agreement (and no such amendment, restatement or modification shall be contemplated). As of the Debt Commitment Letter Effective Date, the Debt Commitment Letters will be legal, valid and binding obligations (subject to the Equitable Exceptions) of the Buyer and the other parties thereto, enforceable in accordance with their terms. There are no agreements, side letters or arrangements (other than the Debt Commitment Letter and the Fee Letters) relating to the Debt Financing Commitments or the Debt Financing that imposes or permits the imposition of conditions precedent to the funding of the Debt Financing on the Closing Date or would otherwise affect the availability of the Debt Financing on the Closing Date. As of the Debt Commitment Letter Effective Date, the Buyer and the Debt Financing Sources shall not be in breach of any of the terms or conditions set forth in the Debt Commitment Letter. As of the Debt Commitment Letter Effective Date, no event shall have occurred which, with or without notice, lapse of time or both, would constitute a default or breach on the part of the Buyer under any term or condition of the Debt Commitment Letters, and the Buyer does not have any reason to believe that it will be

34

unable to satisfy, on a timely basis, any term or condition of closing to be satisfied by it contained in the Debt Commitment Letter, or that the full amount of the Convertible Financing or the Debt Financing will not be available to the Buyer on the Closing Date. On the Debt Commitment Letter Effective Date, the Buyer shall have fully paid any and all commitment fees or other fees that, in each case, are required by the Debt Financing Commitments or any Fee Letter to be paid on or before the Debt Commitment Letter Effective Date. On the Debt Commitment Letter Effective Date, the Debt Commitment Letter will contain all of the conditions precedent to the obligations of the Parties thereunder to make the full amount of the Debt Financing available to the Buyer on the terms set forth therein and there shall be no contingencies that would permit the Debt Financing Sources to reduce the total amount of the Debt Financing or impose any additional conditions precedent to the availability of the Debt Financing. As of the Debt Commitment Letter Effective Date, none of the Debt Financing Commitments shall have been terminated or withdrawn, no lender shall have notified the Buyer of its intention to terminate or withdraw the Debt Financing Commitments, and the Buyer does not know of any facts or circumstances that may be expected to result in any of the conditions set forth in the Debt Commitment Letter not being satisfied. To the extent this Agreement must be in a form acceptable to any lender providing Debt Financing, such lender or lenders have approved this Agreement.

(d)    The obligations of the Buyer under this Agreement are not subject to any conditions regarding the Buyer's, its Affiliates', or any other Person's ability to obtain financing for the consummation of the Transactions contemplated hereby.

(e)    The aggregate proceeds from the Debt Financing (net of original issue discount, upfront fees and other fees, premiums and charges payable in connection therewith, after giving effect to the maximum amount of "market flex" provided under the Debt Financing Commitments and each Fee Letter) together with the Convertible Financing and Buyer's cash on hand will be sufficient for satisfaction of all of the Buyer's obligations under this Agreement and to consummate the Transactions, including the payment of the Closing Consideration and the payment of all associated costs and expenses (including the Closing Transaction Expenses) (collectively, the "Required Amount").

Section 5.8.    Solvency. Each of the Buyer and the Record Holder is Solvent as of the Execution Date. Assuming (x) the accuracy of the representations and warranties set forth in Article IV, and (y) the performance by the Company and the Special Master of the covenants and agreements required to be performed by them under this Agreement prior to the Closing, the Buyer, the Record Holder, the Company and their respective Subsidiaries, on a consolidated basis, will, after giving effect to all of the Transactions, including the payment of any amounts required to be paid in connection with the consummation of the Transactions and the payment of all related fees and expenses, be Solvent at and immediately after the Closing.

Section 5.9.    Purported Equity Pledge. The Buyer acknowledges the existence of the 2020 Bonds, the Purported Equity Pledge and the Equity Pledge Litigation.

Section 5.10.    Claim Obligations. As of the date hereof, the amount of principal as set forth in Section 5.10 of the Buyer Disclosure Schedules is due and owing to each of the Record Holder and the Third-Party Record Holder under the Specified Litigation Claim. For the

35

avoidance of doubt, such amount includes all interest, fees, expenses and premiums that have accrued in connection with the Specified Litigation Claim after the commencement of the Specified Litigation.

Section 5.11. <u>Closing Consideration</u>. The Buyer will not provide any consideration to any holder of an Attached Judgment (as defined in the Sale Procedures Order) at the Closing unless each other holder of an Attached Judgment senior to such holder (as set forth in the Priority Order (as defined below)) has either (i) received cash in full in satisfaction of its Attached Judgment or (ii) consented to receive non-cash consideration in satisfaction of its Attached Judgment, or (iii) consented to release its attachment (in which case it may, at its election, attempt to execute its judgment against other property besides the PDVH Shares). Nothing in this <u>Section 5.11</u> precludes a bidder from offering, as part of its bid, non-cash consideration, including non-cash consideration to holders of Attached Judgments that are junior to holders of Attached Judgment who have, as of the time of the bid, not provided consent consistent with (ii) or (iii) above. The Special Master, as part of his obligation to make a recommendation to the Court as to which of the Qualified Bids is highest or best, and in making a recommendation to the Court as to which Qualified Bid is the Successful Bid (as defined in the Sale Procedures Order), shall consider the value of non-cash consideration and the likelihood of obtaining consents consistent with this provision. As part of the Special Master's recommendation of a Successful Bid, he will advise the Court as to whether he received Qualified Bids including a component of non-cash consideration, what that non-cash consideration was and which creditors it would be offered to, and how he evaluated the non-cash component in reaching his recommendation.

Section 5.12. <u>No Additional Representations</u>.

(a)     Except for the representations and warranties expressly made by the Buyer and the Record Holder, as applicable, in (i) this <u>Article V</u>, as qualified by the Buyer Disclosure Schedules, or (ii) any certificate delivered pursuant to this Agreement, the Buyer and the Record Holder make (and shall not be deemed to make) no other representation or warranty of any kind whatsoever, express or implied, written or oral, at law or in equity, in connection with this Agreement or the Transactions, any other rights or obligations to be transferred pursuant to the Transaction Documents or any other matter, and the Buyer and the Record Holder hereby disclaim any such other representations or warranties.

(b)     Except for the specific representations and warranties expressly made by the Special Master in <u>Article IV</u>, and subject to the specifically bargained-for limitations as set forth in this Agreement, the Buyer acknowledges and agrees that the Special Master does not make, and that the Buyer is not relying upon, and will not rely upon any representation or warranty, expressed or implied, at law or in equity, made by any Person in respect of the Special Master or in respect of the Company and the Company's Subsidiaries' respective businesses, assets (including the stocks), liabilities, operations, prospects, or condition (financial or otherwise), including with respect to merchantability or fitness for any particular purpose of any assets, the nature or extent of any liabilities, the prospects of their respective businesses, the effectiveness or the success or profitability of any operations, or the accuracy or completeness of any confidential information memoranda, documents, projections, forecasts, opinions, advice, material, statement, data, or other information (financial or otherwise) regarding the Acquired

36

Companies provided to, or otherwise made available to, the Buyer or its Representatives in connection with the Transactions, including any "data rooms," "virtual data rooms," management presentations, or in respect of any other matter or thing whatsoever. The Buyer expressly disclaims that is relying on any representations or warranties, other than the specific representations and warranties expressly made by the Special Master in <u>Article IV</u> or in any certificate delivered pursuant to this Agreement.

<div align="center">

**ARTICLE VI**

**COVENANTS**

</div>

Section 6.1.    <u>Conduct of the Business Pending the Closing</u>.

(a)    During the Interim Period, except (w) with the prior written consent of the Buyer (such consent not to be unreasonably withheld, conditioned or delayed), (x) as expressly permitted or required by this Agreement, (y) as may be required by applicable Law, or (z) any action taken, or omitted to be taken, by the Acquired Companies as set forth in <u>Section 6.1(a)</u> or <u>(b)</u> of the Company Disclosure Schedules, the Special Master shall Cause the Acquired Companies to use their reasonable best efforts to (i) conduct their business in the Ordinary Course, (ii) preserve intact their business organizations, assets (ordinary wear and tear excepted), ongoing operations, and goodwill, and maintain material relationships with third parties (including suppliers, vendors, creditors, licensors and employees of the Acquired Companies and Governmental Bodies having regulatory authority in respect of the Acquired Companies and their operations), (iii) comply in all material respects with all applicable Laws and (iv) preserve and maintain all material Permits.

(b)    Without limiting the generality of <u>Section 6.1(a)</u>, except (v) with the prior written consent of the Buyer (such consent not to be unreasonably withheld, conditioned or delayed), (w) as expressly permitted or required by this Agreement, (x) as required to comply with a Material Contract that has been disclosed in the Company Disclosure Schedules, (y) as may be required by applicable Law, or (z) as set forth in <u>Section 6.1(b)</u> of the Company Disclosure Schedules, the Special Master shall Cause the Acquired Companies not to:

(i)    (A) amend or propose any change in the Company Charter or Company By-Laws, (B) permit any Company Subsidiary to amend or propose any change in such Company Subsidiary's Organizational Documents, or (C) vote in favor of the amendment of any of the Organizational Documents of any Non-Controlled Entity;

(ii)    (A) (I) adopt a plan or agreement of complete or partial liquidation, dissolution, merger or consolidation of any of the Acquired Companies, or (II) incur or assume any liability or expense in connection with the complete or partial liquidation or wind-down of any of the Acquired Companies, or (B) vote in favor of the adoption of a plan or agreement of complete or partial liquidation, dissolution, merger or consolidation, of any Non-Controlled Entity;

(iii)    (A) make or authorize any capital expenditures or commitments, except (I) for 2025, in accordance with the capital budgets of the Acquired Companies

<div align="center">37</div>

for 2025 as set forth in Section 6.1(b)(iii)(A)(I) of the Company Disclosure Schedules,
(II) for 2026, in accordance with the capital budgets to be adopted by the Acquired
Companies for 2026 (which such capital budgets will not exceed, in the aggregate, 10%
of the 2026 projection included in the medium term plan set forth in Section
6.1(b)(iii)(A)(II) of the Company Disclosure Schedules (the "MTP")), and (III) for any
subsequent year, in accordance with the capital budgets of the Acquired Companies to be
adopted by the Acquired Companies for such subsequent year (which such capital
budgets will not exceed, in the aggregate, 15% of the projection included in the MTP for
such subsequent year) (each of the foregoing, a "CapEx Budget") (provided, that, the
Acquired Companies may make or authorize capital expenditures or commitments in
excess of any applicable CapEx Budget so long as such excess expenditures do not, in the
aggregate, result in an expenditure above 120% of the aggregate amount included in the
applicable CapEx Budget), (B) make or authorize any growth or enhancing capital
expenditures or commitments in excess of $15,000,000 (except, during 2025, as provided
in the applicable CapEx Budget), (C) with respect to any line item in excess of
$15,000,000 for growth or enhancing capital expenditures in any CapEx Budget, make or
authorize an increase with respect to such line item in excess of 20% of the applicable
budgeted amount, or (D) propose or vote in favor of any capital expenditures or
commitments that would reasonably be expected to require additional cash contributions
by any Acquired Company to any Non-Controlled Entity in amounts in excess of
$3,000,000 in the aggregate for all Non-Controlled Entities;

      (iv)    make or authorize any turnaround or catalyst expenditures or
commitments, except (A) for 2025, in accordance with the turnaround/catalyst budget of
the Acquired Companies for 2025 as set forth in Section 6.1(b)(iv)(A)(I) of the Company
Disclosure Schedules, (B) for 2026, in accordance with the turnaround/catalyst budget of
the Acquired Companies to be adopted by the Acquired Companies for 2026 (which such
turnaround/catalyst budgets will not exceed 10% of the 2026 projection included in the
MTP), and (C) for any subsequent year, in accordance with the turnaround/catalyst
budget of the Acquired Companies to be adopted for such subsequent year (which such
turnaround/catalyst budget will not exceed, in the aggregate, 15% of the projection
included in the MTP for such subsequent year) (each turnaround/catalyst budget
described in clauses (A)-(C), a "Turnaround/Catalyst Budget"); (provided, that, (1) the
Acquired Companies may make or authorize turnaround or catalyst expenditures or
commitments in excess of any applicable Turnaround/Catalyst Budget so long as such
excess expenditures collectively do not result in an expenditure above 120% of the
aggregate amount included in the applicable Turnaround/Catalyst Budget and (2) to the
extent any turnaround project is expected to exceed the applicable budgeted amount in
the applicable Turnaround/Catalyst Budget by more than 20%, the Acquired Companies
will provide Buyer with a detailed explanation of such deviation promptly following such
approval or expenditure, and provided, further, that, to the extent that the Acquired
Companies determine that any turnaround/catalyst project included in the
Turnaround/Catalyst Budget for a specific year should instead, in whole or in part, be
executed in 2026 or a subsequent year, the inclusion of the remaining expenses with
respect thereto in the Turnaround/Catalyst Budget 2026 or such subsequent year, as
applicable, will not count towards the variance cap applicable to the Turnaround/Catalyst

Budget to be adopted for such subsequent year and will not require the prior written consent of Buyer);

(v)     except as required under any Company Benefit Plan or Company Collective Bargaining Agreement, (A) increase the compensation of ███████ ███████ employee of any Acquired Company (such current and former employees, together, "Senior Management"), or take any action to accelerate the vesting or payment, or fund or in any other way secure the payment of, compensation or benefits under any Contract, Company Benefit Plan or otherwise for or to any current or former director, officer, manager, employee, contractor or consultant of any Acquired Company; provided that nothing in this Section 6.1(b)(v) shall prohibit (x) providing annual increases to compensation based on merit (with respect to the immediately preceding performance period only), market-based adjustments or tenure in the Ordinary Course and in accordance with standards, policies and practices of the Acquired Companies in place as of the Execution Date and disclosed to the Buyer, or (y) making, in the Ordinary Course and in accordance with standards, policies and practices of the Acquired Companies in place as of the Execution Date and disclosed to the Buyer, annual cash bonus and long term cash incentive grants that (I) do not provide for single trigger vesting upon the Closing and (II) do not provide for full vesting and payout of performance-based components in the case of a qualifying termination of the recipient after the Closing; (B) make, grant or promise any equity or equity-based compensation, severance, change of control, retention, termination or similar compensation or benefits to any current or former director, officer, manager, employee, contractor or consultant of any Acquired Company; provided, that, nothing in this Section 6.1(b)(v) shall prohibit making, granting or promising severance, change of control, retention, termination, or similar compensation or benefits in amounts which are less than $1,000,000 in the aggregate; (C) amend, adopt, establish, agree to establish, enter into or terminate any Company Benefit Plan or establish, adopt or enter into any plan, agreement, program, policy, practice, trust or other arrangement that would be a Company Benefit Plan if it were in existence as of the Execution Date for the benefit of any current or former director, officer, manager, employee, contractor or consultant of any Acquired Company; provided that nothing in this Section 6.1(b)(v) shall prohibit (x) amendments to any Company Benefit Plan in the Ordinary Course that do not materially increase the costs to the Acquired Companies of such Company Benefit Plan, or (y) renewals or replacements of any Company Benefit Plan on commercially reasonable terms no less favorable in the aggregate to the Acquired Companies than the terms of the Company Benefit Plan being renewed or replaced; (D) terminate (other than for "cause" (as determined by the Company consistent with its practices)) any member of Senior Management; or (E) except as required by applicable Law, adopt or enter into any collective bargaining agreement, or amend in any material respect any Company Collective Bargaining Agreement (and, for the avoidance of doubt, nothing in this Section 6.1(b) shall restrict the Acquired Companies from entering into a successor collective bargaining agreement to any Company Collective Bargaining Agreement that expires prior to Closing) (provided, that, for the avoidance of doubt, to the extent any action with respect to employees or Company Benefit Plans is not prohibited by this Section 6.1(b)(v), then Section 6.1(b)(xii) will not be deemed to restrict any such action);

WEIL:\100337387\20\67816.0003

(vi)     acquire (x) all or a substantial portion of the capital assets of any other Person (or of any business) or (y) the business organization, division or other business of any other Person (in case of clause (x) or (y), whether by merger, consolidation, acquisition of Equity Interests or assets or otherwise), except that the Acquired Companies shall be permitted to make (A) acquisitions pursuant to any Contract in effect on the Execution Date that is made available to the Buyer and listed in Section 6.1(b)(vi) of the Company Disclosure Schedules, (B) acquisitions of assets solely among the Company and wholly owned Company Subsidiaries, or among wholly owned Company Subsidiaries, or (C) acquisitions of assets pursuant to the receivables securitization transaction evidenced by the Receivables Purchase Agreement, dated as of December 18, 2020, among CITGO AR2008 Funding Company, LLC, CITGO Petroleum, the various purchasers and purchaser agents from time to time party thereto, and Barclays Bank PLC, as program administrator, and the Purchase and Sale Agreement, dated as of December 18, 2020, between CITGO Petroleum and CITGO AR2008 Funding Company, LLC (each as amended and collectively, the "Receivables Securitization Facility"); provided, that any acquisitions included in the capital expenditures permitted under Section 6.1(b)(iii) shall not be subject to the restrictions set forth in this Section 6.1(b)(vi);

(vii)     propose or vote in favor of any action by a Non-Controlled Entity to acquire (x) all or a substantial portion of the capital assets of any other Person (or of any business) or (y) the business of any other Person (whether by merger, consolidation, acquisition of Equity Interests or assets or otherwise), except that the Acquired Companies shall be permitted to vote in favor of acquisitions of capital assets of any other Person or business of any other Person by a Non-Controlled Entity in the Ordinary Course so long as such acquisition would not require additional cash contributions by any Acquired Company to any Non-Controlled Entity in excess of $5,000,000 individually or $10,000,000 in the aggregate for all Non-Controlled Entities;

(viii)     (A) sell, lease, license, pledge or otherwise encumber (including by the grant of any option or any Preferential Right thereon) (other than by Permitted Liens), or subject to any Lien, abandon, cancel, let lapse or convey or dispose of, directly or indirectly, any material assets or material property of any Acquired Company (excluding any issuance of any Equity Interest of any Acquired Company addressed in Section 6.1(b)(xv)) or (B) propose or vote in favor of any action by a Non-Controlled Entity to sell, lease, license, pledge or otherwise encumber (including by the grant of any option or any Preferential Right thereon) (other than by Permitted Liens) or subject to any Lien, abandon, cancel, let lapse or convey or dispose of, directly or indirectly, any material assets or material property of such Non-Controlled Entity, in each case except (I) pursuant to existing Contracts set forth in Section 6.1(b)(viii) of the Company Disclosure Schedules, (II) sales of inventory to customers in the Ordinary Course, (III) sales of or disposals of obsolete or worthless assets in the Ordinary Course, or (IV) with respect to the immediately preceding clause (A) only, (x) transfers among the Company and wholly owned Company Subsidiaries, or among wholly owned Company Subsidiaries, or (y) dispositions pursuant to the Receivables Securitization Facility;

(ix)     (A) incur, create or otherwise become liable for any indebtedness for borrowed money or guarantee or assume any indebtedness for borrowed money of another Person (other than (I) borrowings or other advances of capital pursuant to the Receivables Securitization Facility, (II) borrowings that can be repaid at Closing without penalty, or (III) indebtedness for borrowed money incurred in the Ordinary Course that, in the case of this clause (III) does not exceed $50.0 million in the aggregate), or (IV) Finance Leases or (B) with respect to any Non-Controlled Entity, propose or vote in favor of such Non-Controlled Entity incurring, creating or otherwise becoming liable for any indebtedness for borrowed money, guaranteeing or assuming any indebtedness for borrowed money of another Person (other than any Non-Controlled Entity's incurrence of any incremental indebtedness for borrowed money incurred in the Ordinary Course that is not in excess of $10,000,000 in the aggregate (net to the applicable Acquired Company));

(x)     prepay, repay, redeem, repurchase, defease, or cancel any indebtedness for borrowed money in excess of $10,000,000, in each case, for cash, other than (A) for transactions among the Acquired Companies, (B) prepayment and repayment of borrowings or advanced capital to the extent required pursuant to the terms of the Receivables Securitization Facility, (C) prepayment and repayment of revolving loans in the Ordinary Course, and (D) any required amortization payments, mandatory prepayments, and repayments at maturity, in each case in accordance with the terms of the instrument governing such indebtedness for borrowed money as in effect on the Execution Date;

(xi)     (A) other than in the Ordinary Course, materially modify, amend, fail to exercise any renewal rights, terminate or waive any material right under any Material Contract or any material Vesting Instrument (other than amendments to renew any Material Contract on the same (or better in respect of the applicable Acquired Company) terms and conditions in all material respects as the terms and conditions of such Material Contract as of the Execution Date) or (B) enter into any Contract that would be a Material Contract if in effect as of the Execution Date, other than in the Ordinary Course (including entry into indemnification agreements with directors or officers in substantially the same form as indemnification agreements made available to the Buyer prior to the date hereof), and provided, that, with respect to this Clause (B), such Contracts do not (I) limit in any material respect either the type of business in which any Acquired Company may engage or the manner or locations in which any of them may so engage in any business (including through "non-competition" or "exclusivity" provisions), or (II) grant "most favored nation" or similar status with respect to any material obligations and would run in favor of any Person (other than an Acquired Company); provided, that, for the avoidance of doubt, nothing in this Agreement will limit the ability of CITGO Petroleum to execute guarantees of the Company's payment obligations pursuant to the Contracts disclosed in Section 6.6(a) of the Company Disclosure Schedules or New Indemnification Agreements (such guarantees, collectively, the "CITGO Petroleum Guarantees");

(xii)     except for any such change which is not material or which is required by reason of a concurrent change in GAAP or applicable Law, change any

method of financial accounting or financial accounting practice (other than any change for Tax purposes, which shall be governed by Section 6.1(b)(xiv)) used by it;

(xiii)   (A) enter into any joint venture, partnership, participation, profit-sharing or other similar arrangement or (B) make any loans, capital contributions or advances to or investments in any other Person (other than (I) investments in wholly owned Company Subsidiaries, (II) pursuant to capital calls required pursuant to the terms of existing Contracts to the extent disclosed on Section 6.1(b)(xiii) of the Company Disclosure Schedules, or (III) advances for reimbursable employee expenses in the Ordinary Course or advancements of expenses to directors and officers of the Acquired Companies pursuant to bona fide advancement provisions under the Company Charter, Company By-Laws, Organizational Documents of any of the Company Subsidiaries or any indemnification agreement with any such director or officer);

(xiv)   (A)(I) make, revoke or amend any material election relating to Taxes or change any of its Tax accounting periods or Tax accounting methods currently in effect, (II) other than in the Ordinary Course, settle any Tax Proceeding, or (III) other than in the Ordinary Course, file any amended Tax Return, in each case of the foregoing clauses (I), (II) and (III), if such action is reasonably likely to result in an increase to a Tax liability of the Acquired Companies that is material to the Acquired Companies, taken as a whole, or (B) with respect to any Non-Controlled Entity, vote in favor of or propose that such Non-Controlled Entity take any action described in the immediately preceding clause (A); provided, that, for the avoidance of doubt, the foregoing will not prohibit the Acquired Companies from taking any action in good faith as a result of, or to comply with, changes in applicable Tax Laws;

(xv)    authorize, issue, reserve for issuance, pledge, transfer or otherwise encumber, sell or redeem or enter into any Contract providing for any of the foregoing with respect to, any Equity Interests of any of the Acquired Companies or any Equity Interests of any Non-Controlled Entity owned by any Acquired Company (including, in each case, any split, combination, recapitalization or reclassification of any such Equity Interests);

(xvi)   other than as set forth in Section 6.1(b)(xvi) of the Company Disclosure Schedules, declare, set aside, make or pay dividends or similar distributions (whether in cash, stock or property) on or with respect to the Shares or otherwise, other than dividends or similar distributions between or among the Company and the Company Subsidiaries; provided, that, for the avoidance of doubt, nothing in this Agreement will limit the Acquired Companies' ability to satisfy payables to PDVSA described on Section 4.22 of the Company Disclosure Schedules;

(xvii)  (A) settle, satisfy, release or forgive any claim, demand, lawsuit or other Legal Proceeding (I) in an amount payable by an Acquired Company in excess of $15,000,000 in the aggregate or (II) that would impose any material non-monetary relief (excluding customary confidentiality obligations) on the Acquired Companies, or (B) with respect to any Non-Controlled Entity, vote in favor of or propose that such

42

Non-Controlled Entity take any action described in the immediately preceding clause (A);
or

(xviii)  agree or commit to do any of the foregoing (or, with respect to any
of the foregoing restrictions which expressly relates to the Non-Controlled Entities, vote
in favor of or propose that any Non-Controlled Entity agree or commit to take any such
restricted action).

(c)     Notwithstanding the foregoing, during the Interim Period, the Acquired
Companies may (i) utilize any and all available Cash to repay outstanding Debt and (ii) amend,
restate, refinance or terminate any outstanding Debt or the Receivables Securitization Facility, or
replace such Debt or Receivables Securitization Facility with new Debt (and the related
incurrence of any guarantees for such borrowed money and the incurrence of any related liens on
its property) including in the form of, but not limited to, a new securitization facility, an asset
based loan or other revolving credit facility (and the Acquired Companies may vote in favor or
propose that a Non-Controlled Entity do any of the foregoing, as applicable); provided, that, (x)
the Special Master shall Cause the Acquired Companies to consult in advance with the Buyer
and in good faith take the Buyer's views into account regarding any such new Debt (and the
related incurrence of any guarantees for such borrowed money and the incurrence of any related
liens on its property), (y) no new Debt shall increase the amount of Debt being refinanced or
replaced or include prepayment or make-whole premiums or penalties or otherwise limit or
restrict the Acquired Companies' right to repay outstanding Debt at the Closing and (z) any such
repayment of outstanding Debt, or amendment, restatement, refinancing, termination, or
replacement of outstanding Debt or the Receivables Securitization Facility is determined in good
faith by the Company's board of directors to be in the best interest of the Acquired Companies
(or the applicable Non-Controlled Entity).

(d)     In the event that the Closing does not occur by the first anniversary of the
Execution Date, the dollar amounts in this Section 6.1 shall, without further action, increase by
an incremental 10% on each anniversary of the Execution Date.

(e)     Notwithstanding anything to the contrary herein, nothing in this
Agreement will restrict the Acquired Companies from taking actions to prevent or mitigate the
effects of any damage to property or injury to any person or the environment in emergency
circumstances, as reasonably determined in good faith by the Acquired Companies, so long as
the Acquired Companies (i) use Good Industry Practices with respect to such circumstances and
(ii) provide the Buyer with notice of any such actions, as soon as reasonably practicable (and in
any event, no later than one (1) Business Day) after such action is taken.

(f)     For the avoidance of doubt, nothing in this Agreement, including the
provisions of this Section 6.1 or Section 6.3, in any way impairs the right of the Acquired
Companies or PDVSA to object to the approval or execution of this Agreement or the approval
or consummation of the Transactions, including on appeal, and the taking of any actions in
connection therewith.

(g)     Notwithstanding anything in this Agreement to the contrary, to the extent
that the Venezuela Parties propose a Competing Proposal which constitutes, or could reasonably

WEIL:\100337387\20\67816.0003

be expected to lead to, a Superior Proposal, nothing in this Agreement will prohibit the Venezuela Parties from proposing that the Acquired Companies take actions otherwise prohibited by this <u>Section 6.1</u> or any other provision of this Agreement in connection therewith (including, for the avoidance of doubt, the actions described in <u>Section 6.1(b)(xvi)</u>) and, subject to the termination of this Agreement pursuant to <u>Section 8.1(d)</u> or <u>Section 8.1(g)</u> in connection with the entry into a definitive agreement with respect to such Competing Proposal by the Venezuela Parties, the Acquired Companies committing to take such actions if permitted by applicable Law.

Section 6.2.    <u>Access to Information</u>.

(a)    During the Interim Period, the Special Master shall (i) Cause the Designated Contacts or such other members of the Company's senior management team as may be reasonable and appropriate from time to time and upon reasonable advance notice to be available to meet and confer with Buyer and its Representatives, (ii) Cause the Designated Contacts or such other members of the Company's senior management team as may be appropriate time to time to provide, upon reasonable advance notice and at the Buyer's sole cost and expense, responses to the Buyer's questions and requests as the Buyer and its Representatives may from time to time reasonably request, and (iii) Cause the Company to provide the Buyer and its Representatives, upon reasonable advance notice and under reasonable circumstances, with reasonable access during normal business hours, to the books and records (including all electronic data related thereto), information, assets, operations and properties of the Acquired Companies; <u>provided</u>, that (A) any such access and activities shall be conducted in a manner not to unreasonably interfere with the normal operations of the Acquired Companies or their respective business and (B) without the prior written consent of the Special Master and the Company, which may be withheld for any reason in the sole and absolute discretion of the Special Master or the Company, as applicable, the Buyer and its Representatives shall have no right to perform invasive or subsurface investigations of the properties or facilities of the Acquired Companies. Notwithstanding anything herein to the contrary, no such access or disclosure shall be required if doing so could reasonably be expected to (X) result in a waiver of attorney-client privilege, work product doctrine or similar privilege, (Y) violate the terms of any Contract to which any Acquired Company is a party, or (Z) violate any Law to which any Acquired Company is subject to (clauses (X), (Y) and (Z), the "<u>Disclosure Exceptions</u>"); <u>provided</u> that, if the Company does not provide or cause to be provided access or information in reliance on a Disclosure Exception, then the Special Master shall or shall Cause the Company to take reasonable actions or implement arrangements (which could include, depending on the reasonableness thereof in the circumstances, entering into confidentiality agreements or joint defense agreements, obtaining the consent of third parties, redacting parts of documents, preparing "clean" summaries of information or limiting the availability of information to a "clean team" or to outside legal counsel) (such arrangements, "<u>Disclosure Arrangements</u>") in order to make information available to the Buyer and its Representatives to the extent legally permissible and practicable or make appropriate substitute disclosure arrangements, taking into account the applicable Disclosure Exception. There may be withheld from the Buyer and its Representatives such portions of documents or information relating to pricing or other matters that are highly sensitive if the exchange of such documents (or portions thereof) or information as determined by the Company's outside counsel would be reasonably likely to result in antitrust difficulties between the Company and the Buyer or any of their respective Affiliates. All requests

44

for such access shall be directed to such Person as the Special Master may designate in writing from time to time (collectively, the "Designated Contacts"). Other than the Designated Contacts, prior to the Closing, without the prior written consent of the Special Master (not to be unreasonably withheld, conditioned or delayed), neither the Buyer, its Affiliates or their respective Representatives shall contact any employee, contractors, supplier, customer, landlord or other material business relationship of any Acquired Company regarding any Acquired Company, their respective businesses or the Transactions.

(b)        Notwithstanding anything in this Agreement to the contrary, in no event will the Acquired Companies be required to provide Buyer or the Special Master with access to any information regarding its objections to the sale process, the negotiation of the Transactions or the Acquired Companies' objection to this Agreement or the approval or the consummation of the Transactions.

(c)        For a period commencing on the Closing Date and ending on the latest of (x) the date that is twelve (12) months after the Closing Date and (y) the final, non-appealable resolution of a Legal Proceeding relating to or arising from the Sale Order to appeal the sale and purchase of the Shares, the Buyer shall cause the Acquired Companies to use commercially reasonable efforts to maintain all books and records (including all electronic data related thereto) of the Acquired Companies relating to periods ending on or prior to the Closing Date and the Buyer shall cause the Acquired Companies to (i) provide the Special Master and its Representatives during the Company's normal business hours, upon reasonable advance notice and under reasonable circumstances, reasonable access to such books and records and the individuals responsible for preparing and maintaining such books and records, and (ii) permit the Special Master and its Representatives to make copies of any such books and records, in each case of the immediately preceding clause (i) and clause (ii), as reasonably requested in connection with any Legal Proceeding relating to or arising from the Sale Order to appeal the sale and purchase of the Shares (other than any Legal Proceeding between the Special Master, on the one hand, and the Buyer, on the other hand, related to the Sale Order, this Agreement, the other Transaction Documents or the Transactions, which would be governed by and subject to other applicable provisions of this Agreement and subject to applicable rules relating to discovery and document retention). Notwithstanding anything in this Section 6.2(c) to the contrary, the Buyer and the Acquired Companies shall not be required to provide such access or disclose any information to the Special Master if doing so could fall under the Disclosure Exceptions; provided that, if the Buyer does not provide or cause to be provided access or information in reliance on a Disclosure Exception, then the Buyer or the Company shall take reasonable actions or implement Disclosure Arrangements in order to make information available to the Special Master to the extent reasonably possible, taking into account the applicable Disclosure Exception. The Buyer agrees to cause the Company to hold all the books and records of the Acquired Companies existing on the Closing Date and not to destroy or dispose of any thereof for a period of twelve (12) months after the finalization of any appeal of the sale and purchase of the Shares or for a longer period of time as may be required by Law.

Section 6.3.        Regulatory Approvals.

(a)        Each of the Parties shall, if required by applicable Law, within thirty (30) calendar days following the date on which the Special Master files a motion with the Court to approve

the Sale Order (the "Final Recommendation Date"), file or supply, or in the case of the Special Master Cause to be filed or supplied, in connection with the Transactions, all notifications and information required to be filed or supplied pursuant to the HSR Act (collectively, the "HSR Filing"); provided, that there are no changes in the applicable regulations under the HSR Act between the date hereof and the date of filing pursuant to the HSR Act; if there are such changes, the Parties shall use reasonable best efforts to file or cause to be filed any and all required notifications and information under the HSR Act as promptly as reasonably practicable thereafter. Each of the Parties shall request early termination of the waiting period under the HSR Act, if available. The Parties shall (and the Special Master shall Cause the Acquired Companies to), as soon as reasonably practicable following the Final Recommendation Date (and in any event no later than ten (10) Business Days thereafter), file or supply, or cause to be filed or supplied in connection with the Transactions, all filings and submissions required under any relevant Laws, including Antitrust Laws. The Buyer acknowledges and agrees that it shall pay and shall be solely responsible for the payment of all fees, costs, expenses and other charges in connection with compliance with this Section 6.3 (including filing fees).

(b)     The Buyer shall take the lead and have sole responsibility for devising and implementing the strategy for obtaining any necessary authorizations, consents or approvals from any Governmental Body, without limiting any rights or obligations of either Party set forth in other provisions of this Section 6.3; provided, however, that Buyer shall consult in advance with the Special Master and in good faith take the Special Master's views into account regarding the overall strategic direction of obtaining those authorizations, consents, or approvals and consult with the Special Master prior to taking any material or substantive position in any written statement or document, or, to the extent practicable, discussions with any Governmental Body.

(c)     The Buyer shall, at its own expense, (i) within ten (10) Business Days after the Final Recommendation Date, submit the OFAC License Application; (ii) promptly supply any additional information and documentary material that may be requested by OFAC in relation to the OFAC License Application; (iii) seek and obtain, prior to submitting the OFAC License Application and any other filing with or submission to OFAC, written consent from the Special Master, which consent shall not be unreasonably withheld or delayed; (iv) keep the Special Master regularly informed of the processing of the OFAC License Application and any other filings or material contacts with OFAC or other Governmental Body in relation to the OFAC License Application; and (v) fully cooperate with and furnish to the Special Master available information and assistance as reasonably may be requested by the Special Master in connection with any communications that the Special Master may have with OFAC or other Governmental Body in relation to the OFAC License Application. The Special Master shall cooperate, and shall Cause the Company to cooperate with and provide any information or assistance reasonably requested by the Buyer to prepare, submit and obtain approval of the OFAC License Application.

(d)     The Parties shall coordinate and cooperate with one another in exchanging and providing such information to each other and in making the filings and requests referred to in Section 6.3(a)-(c). The Parties shall supply such reasonable assistance as may be reasonably requested by the other Party in connection with the foregoing and shall promptly furnish the other Party with all information within its possession that is reasonably required for all filings and submissions required under any relevant Laws, including Antitrust Laws. In furtherance of

46

the foregoing, at least once every two weeks following the Final Recommendation Date, the Buyer shall provide the Special Master a written update, in reasonable detail, on the status and progress of, or any other developments regarding, the OFAC License Application (and/or any other filings or material contacts with OFAC or other Governmental Body in relation to the OFAC License Application) and the HSR Filing (and/or any material contracts with the relevant Governmental Bodies in relation to the HSR Filing). Following receipt of any such update, the Special Master may, but shall not be obligated to, provide the Buyer with written feedback if it disagrees with or otherwise has concerns regarding, the actions, timing or strategy employed by the Buyer with respect to the OFAC License Application and the HSR Filing, and, upon receipt thereof, the Buyer will use commercially reasonable efforts to address any such written feedback.

(e)     Notwithstanding anything to the contrary in this Agreement, the Buyer shall take, and shall cause its Subsidiaries and Affiliates to take and the Special Master shall, and shall Cause the Acquired Companies to take, as promptly as practicable, all action necessary, proper or advisable to consummate the Transactions prior to the Outside Date to (x) avoid or eliminate each and every impediment, resolve any objection and obtain all consents under any applicable Laws (including Antitrust Laws) as promptly as practicable so as to enable the Parties to consummate the Transactions and (y) avoid the entry or to effect the dissolution of, or vacate or lift, any Order, objection of any Governmental Body or waiting period under applicable Antitrust Laws that would otherwise have the effect of preventing, impairing or delaying the Closing, including: (i) proposing, negotiating and offering to commit and effect, by Order, consent decree, hold separate order, trust, or otherwise, the sale, license, divestiture, disposition or hold separate of such entities, assets, Intellectual Property, businesses, product lines, Equity Interests, properties or services of the Buyer or its Affiliates or Subsidiaries (including, following the Closing, the Acquired Companies); (ii) offering to take or offering to commit to take any action, including any action that limits the Buyer's freedom of action, ownership or control with respect to, or its ability to retain or hold, any of the businesses, assets, product lines, Equity Interests, properties or services of the Buyer or its Subsidiaries or Affiliates (including, following the Closing, the Acquired Companies), to the extent legally permissible, and if the offer is accepted, taking or committing to take such action; (iii) terminating, amending, relinquishing, modifying, waiving or assigning existing relationships, ventures or contractual rights, obligations or other arrangements of the Buyer or its Subsidiaries or Affiliates (including, following the Closing, the Acquired Companies); (iv) changing or modifying, or agreeing not to engage in, any course of conduct regarding future operations; (v) creating any relationships, ventures, contractual rights, obligations or other arrangements of the Buyer or its Subsidiaries or Affiliates (including, following the Closing, the Acquired Companies); (vi) committing to take any such actions in the foregoing clauses (i), (ii), (iii), (iv); or (v) or entering or offering to enter into agreements and stipulating to the entry of an Order or filing appropriate applications with any Governmental Body in connection with any of the actions contemplated by the foregoing clauses (i), (ii), (iii), (iv), or (v); and (vii) opposing, and causing its Subsidiaries and Affiliates to oppose, through and including action on the merits (and all appeals with respect thereto), any action asserted in court or other forum by any Governmental Body or other Person in order to avoid entry of, or to have vacated or terminated, any Order (whether temporary, preliminary or permanent) that would restrain or prevent the Closing by the Outside Date. For the avoidance of doubt, neither the Buyer nor any Subsidiary of the Buyer nor any Acquired Company shall be required to negotiate, agree or commit to, or effect to take or cause to be taken, any structural or

behavioral remedy or any other action that is not conditioned (either as a condition precedent or subsequent) upon the consummation of the Transactions.

(f)     In addition and without limiting the other provisions of this Section 6.3, the Buyer shall defend through litigation, appealing, contesting or otherwise resisting any action, proceeding, or Order by any Governmental Body challenging the Transactions under applicable Laws (including Antitrust Laws), including to defend through litigation on the merits any claim asserted in court by any Person in order to avoid entry of, or to have vacated or terminated, any Order (whether temporary, preliminary or permanent) that would delay the Closing or prevent the Closing by the Outside Date; provided, however, that such litigation in no way limits the obligation of the Buyer to take any and all steps necessary to eliminate each and every impediment under any applicable Laws (including Antitrust Laws) to close the Transactions prior to the Outside Date.

(g)     Except as specifically required by the Agreement, the Buyer shall not take, and shall cause its Subsidiaries and Affiliates not to take, any action or refrain from taking any action, the effect of which would be to delay or impede the ability of the Parties to consummate the Transactions. Without limiting the generality of the foregoing, the Buyer shall not, and shall cause its Subsidiaries and Affiliates not to, acquire or agree to acquire by merging or consolidating with, or by purchasing a substantial portion of the assets of or equity in or otherwise make any investment in, or by any other manner, any Person or portion thereof, or otherwise acquire or agree to acquire or make any investment in any assets, or agree to a commercial or strategic relationship with any person, if the entering into of a definitive agreement relating to or the consummation of such acquisition, merger, consolidation, investment, commercial or strategic relationship would reasonably be expected to (i) impose any delay in the obtaining of, or increase the risk of not obtaining, any consent, approval, authorization, declaration, waiver, license, franchise, permit, certificate or Order of any Governmental Body necessary to consummate the Transactions or the expiration or termination of any applicable waiting period, (ii) increase the risk of any Governmental Body entering an Order prohibiting the consummation of the Transactions, (iii) increase the risk of not being able to remove any such Order on appeal or otherwise, (iv) increase the risk of any Governmental Body asserting jurisdiction over the Transactions or (v) delay the consummation of the Transactions.

(h)     Each Party shall promptly inform the other Party of any material communication from the Federal Trade Commission, the Department of Justice or any other Governmental Body regarding any of the Transactions. Each Party (including its respective Affiliates or Subsidiaries) will provide the other Party with copies (or, if provided orally, a summary) of all substantive correspondence, filings or communications between them or any of their Representatives, on the one hand, and any Governmental Body or members of its staff, on the other hand, with respect to this Agreement and the Transactions; provided, however, that materials may be redacted as necessary to (i) comply with contractual arrangements and (ii) address reasonable attorney-client or other privilege or confidentiality concerns. If any Party or any Affiliate thereof receives a request for additional information or documentary material from any such Governmental Body with respect to the Transactions, then such Party will use its reasonable best efforts to make, or cause to be made, as soon as reasonably practicable and after consultation with the other Party, an appropriate response in compliance with such request. The

48

Buyer will advise the Special Master and the Company promptly in respect of any understandings, undertakings or agreements (oral or written) that the Buyer proposes to make or enter into with the Federal Trade Commission, the Department of Justice or any other Governmental Body in connection with the Transactions, and will use its best efforts to cause the Special Master and the Company to be given the opportunity to attend and participate at any meetings with respect thereto. None of the Buyer, the Special Master or the Company (including their respective Affiliates or Subsidiaries) will agree to participate in any meeting, telephone call or discussion with a Governmental Body in respect of any submissions, filings, investigation (including any settlement of the investigation), litigation or other inquiry relating to the matters that are the subject of this Agreement unless it consults with the other Party in advance and, except as may be prohibited by a Governmental Body or by any Law, and will permit authorized Representatives of the other Parties and the Special Master to be present at each meeting, telephone call or discussion.

Section 6.4.    <u>Further Assurances</u>. Subject to, and not in limitation of, <u>Section 6.3</u>, until the Closing or earlier termination of this Agreement, each of the Parties and the Record Holder shall (a) execute such documents and perform such further acts as may be reasonably required to carry out the provision hereof and the actions contemplated hereby and (b) use its reasonable best efforts to, at the earliest practicable date, satisfy, or cause the satisfaction of, the condition precedents to the consummation of the Transactions.

Section 6.5.    <u>Confidentiality</u>. The Buyer acknowledges that the information provided to them in connection with this Agreement and the Transactions is subject to the terms of the confidentiality agreement between the Record Holder and the Special Master dated February 12, 2024 (the "<u>Confidentiality Agreement</u>"), the terms of which are incorporated herein by reference; subject to disclosure permitted in accordance with <u>Section 6.10</u>.

Section 6.6.    <u>Indemnification, Exculpation and Insurance</u>.

(a)    From and after the Closing, the Buyer shall, and shall cause each Acquired Company to continue in full force and effect in accordance with their respective terms until the applicable statute of limitations with respect to any claims against such Indemnitees (as defined below), all rights to indemnification, advancement of expenses and exculpation by the Acquired Companies, now existing in favor of each of the Persons who at or prior to the Closing were (i) directors (or equivalent), officers or employees of any Acquired Company or (ii) serving as directors (or equivalent), officers or employees of another entity (including a joint venture) at the request of any Acquired Company (collectively, the "<u>Indemnitees</u>") pursuant to the Organizational Documents of the Acquired Companies in effect on the Execution Date (and to the extent permitted by Section 3, clause fifth of the Certificate of Incorporation of CITGO Petroleum as in effect on the Execution Date) or pursuant to the Contracts disclosed in <u>Section 6.6(a)</u> of the Company Disclosure Schedules in effect as of the Execution Date (as the same may be amended to reflect the CITGO Petroleum Guarantees) or indemnification Contracts entered into during the Interim Period between an Acquired Company, on the one hand, and an Indemnitee first hired or engaged by the Acquired Companies during the Interim Period, on the other hand (which such Contracts will not be materially less favorable to the Acquired

49

Companies than those Contracts disclosed in Section 6.6(a) of the Company Disclosure
Schedules) ("New Indemnification Agreements").

(b)    The indemnification and exculpation provisions of the Acquired
Companies' Organizational Documents and indemnification Contracts disclosed in Section
6.6(a) of the Company Disclosure Schedules shall not be amended, or otherwise modified in any
manner that would adversely affect the rights of the Indemnitees under Section 6.6(a), unless
such amendment or modification is required by Law. From and after the Closing, the Buyer
agrees to cause the Acquired Companies to maintain in effect in accordance with their respective
terms (i) the escrow agreement, dated May 5, 2023, by and among Citgo Petroleum Corporation,
Morris James, LLP and JPMorgan Chase Bank, N.A. and (ii) the escrow agreement, dated May
5, 2023, by and among the Company, Morris James, LLP and JPMorgan Chase Bank, N.A., and
not to amend the foregoing in any manner that would adversely affect the rights of the applicable
Indemnitees thereunder, unless such modification is required by Law.

(c)    Prior to the Closing, the Company may, or, as promptly as reasonably
practicable after the Closing if the Company has not already done so, the Buyer shall cause the
Company and the Company Subsidiaries to, purchase the directors' and officers' "tail" or
"runoff" insurance program currently available to be purchased under the existing directors' and
officers' liability insurance plan covering the Acquired Companies' directors and officers, to the
extent such plan remains available as of the Closing on materially the same terms and
conditions; provided, that the premium paid for such "tail" policy shall not exceed 350% of the
annual premiums paid for the Acquired Companies' current directors' and officers' liability
insurance policy; and provided, further, that to the extent the premium paid for such "tail" policy
exceeds 350% of the annual premiums paid for the Acquired Companies' current directors' and
officers' liability insurance policy, the Buyer shall maintain a "tail" policy that has the most
favorable coverage obtainable for an amount at or below 350% of the annual premiums paid for
the Acquired Companies' current directors' and officers' liability insurance policy. To the extent
that such plan is no longer available on materially the same terms and conditions at the Closing,
prior to the Closing, the Buyer shall, or, immediately upon the Closing, shall cause the Company,
to purchase a directors' and officers' liability "tail" or "run-off" insurance program, selected by
the Company prior to the Closing, for a period of six (6) years after the Closing (such coverage
shall have an aggregate coverage limit over the term of such policy in an amount no less than the
aggregate coverage limit under the Company's existing directors' and officers' liability policy,
and in all other respects comparable to such existing coverage); provided, that the premium paid
for such "tail" policy shall not exceed 350% of the annual premiums paid for the Acquired
Companies' current directors' and officers' liability insurance policy; and provided, further, that
to the extent the premium paid for such "tail" policy exceeds 350% of the annual premiums paid
for the Acquired Companies' current directors' and officers' liability insurance policy, the Buyer
shall maintain a "tail" policy that has the most favorable coverage obtainable for an amount at or
below 350% of the annual premiums paid for the Acquired Companies' current directors' and
officers' liability insurance policy.

(d)    The provisions of this Section 6.6 are intended to be for the benefit of, and
shall be enforceable by, each Indemnitee.

WEIL:\100337387\20\67816.0003

(e)     In the event that the Buyer, the Company or any of its successors or assigns (i) consolidates with or merges into any other Person and is not the continuing or surviving corporation or entity of such consolidation or merger; or (ii) transfers or conveys all or substantially all of its properties and assets to any Person, then, and in each such case, proper provision shall be made so that the successors and assigns of the Buyer and of the Company shall assume all of the obligations of the Buyer and the Company set forth in this <u>Section 6.6</u>.

Section 6.7.    <u>Public Announcements</u>. The Buyer and the Special Master shall not, and the Special Master shall Cause the Acquired Companies not to, issue any press release or make any public statement without the prior consent of the other Party, which consent shall not be unreasonably withheld, conditioned or delayed, except that each of the Buyer and the Special Master may issue (x) the initial press release announcing the execution of this Agreement that has been agreed upon by the Buyer and the Special Master, (y) any press release or public announcement so long as any statements contained therein concerning the Transactions are consistent with previous releases or announcements made by the applicable Party with respect to which such Party has complied with the provisions of this <u>Section 6.7</u>, and (z) such other release or announcement that, upon the advice of outside counsel, is required by Law or the rules and regulations of any stock exchange upon which the securities of the Buyer, as applicable, or any of its Affiliates, are listed. For the avoidance of doubt, nothing in this <u>Section 6.7</u> shall prevent the Parties from (a) issuing any press release or making any public statement in the Ordinary Course that does not relate specifically to this Agreement or the Transactions, (b) disclosing this Agreement or the substance or any relevant details of the Transactions on a confidential basis to any of its Representatives (<u>provided</u>, that such Representatives have been informed of such party's confidentiality obligations hereunder and under the Confidentiality Agreement or are otherwise obligated to keep such information confidential) or (c) in the case of the Special Master, complying with any reporting obligations of the Court and nothing in this <u>Section 6.7</u> or in any other provision of this Agreement shall impact the ability of PDVSA or the Acquired Companies to use confidential information in connection with opposing the sale process, this Agreement or the Transactions.

Section 6.8.    <u>Employee Matters</u>.

(a)     The Buyer and the Special Master hereby agree that the Closing shall constitute a "Change in Control" for purpose of any employee arrangement and all other Company Benefit Plans, pursuant to the terms of such plans as in effect on the Execution Date (or as adopted or amended to the extent permitted by <u>Section 6.1(b)</u>). No provision of this <u>Section 6.8(a)</u> shall be construed to create a right in any employee or beneficiary of such employee under any Company Benefit Plan that such employee or beneficiary would not otherwise have under the terms of such Company Benefit Plan and, for the avoidance of doubt, no provision of this <u>Section 6.8</u> will be deemed to supersede the terms of any Company Benefit Plan to the extent such terms are more favorable to Affected Employees than the rights granted hereunder.

(b)     As of the Closing, the Buyer shall, or shall cause the Acquired Companies to, assume the Company Collective Bargaining Agreements and adhere to the obligations thereunder pursuant to the terms therein. Following the Closing, the Buyer or the Acquired Companies will continue to employ the employees who are subject to or covered by the

51

Company Collective Bargaining Agreements and employed by one of the Acquired Companies as of the Closing (the "Union Affected Employees") on the terms therein, including with respect to employee wages and benefits.

(c)     For a period of twelve (12) months following the Closing (or, if shorter, the applicable employee's period of employment with the Buyer or one of the Acquired Companies), the Buyer shall continue to provide (or shall cause the Acquired Companies to provide) to each employee of any of the Acquired Companies as of the Closing who is not subject to or covered by a Company Collective Bargaining Agreement (the "Non-Union Affected Employees," together with the Union Affected Employees, the "Affected Employees"), for so long as such Non-Union Affected Employee remains employed by the Buyer or any of the Acquired Companies, (i) a base salary or wage rate (as applicable), in each case, that is no less favorable than that provided to such Non-Union Affected Employee immediately prior to the Closing, (ii) short-term and long-term incentive compensation opportunities and Responsibility Incentive (as such term is defined in the CITGO Petroleum Corporation 2024 Compensation and Incentive Omnibus Plan for Salaried Employees or its successor), in each case, that are no less favorable in the aggregate than those provided to such Non-Union Affected Employee immediately prior to the Closing, (iii) all other compensation and employee benefits (including any defined benefit pension and post-retirement health and welfare benefits, but excluding equity or equity-based compensation, change in control, transaction, retention or other special one-times bonuses) that are no less favorable in the aggregate to those provided to such Non-Union Affected Employee immediately prior to the Closing, and (iv) severance payments, entitlements and benefits that are no less favorable in the aggregate than those provided to such Non-Union Affected Employee immediately prior to the Closing. Except as required by applicable Law, for the period beginning on the Closing Date and ending on the first anniversary thereof, the Buyer agrees to cause the Acquired Companies to maintain in effect and without reduction retiree health and life insurance benefits for the individuals who are participants in the Acquired Companies' retiree health and life insurance benefits as of immediately prior to the Closing Date and individuals who become eligible to participate in such retiree health and life insurance benefits during the period beginning on the Closing Date and ending on the one year anniversary thereof.

(d)     The Buyer will give (or will cause the Acquired Companies to give) each Affected Employee full credit for purposes of eligibility, vesting and benefit accrual under any employee benefit plans or arrangements maintained by the Buyer (or any of the Acquired Companies) for such Affected Employee's service with any of the Acquired Companies (and their respective predecessor entities) to the same extent recognized by any of the Acquired Companies immediately prior to the Closing, except to the extent that such credit would result in a duplication of benefits or compensation for the same period of service.

(e)     The Buyer will (or will cause the Acquired Companies to) use commercially reasonable efforts to (i) waive all limitations as to preexisting conditions, exclusions and waiting periods with respect to participation and coverage requirements applicable to each Affected Employee under any welfare benefit plans that such Affected Employee may be eligible to participate in after the Closing, other than limitations or waiting periods that are already in effect with respect to such Affected Employee and that have not been satisfied as of the Closing under any welfare plan maintained for the Affected Employee

immediately prior to the Closing, and (ii) for the first plan year of eligibility, provide each
Affected Employee with credit for any co-payments and deductibles, paid by such Affected
Employee prior to the Closing, in satisfying any applicable deductible or out-of-pocket
requirements under any welfare plans that such Affected Employee is eligible to participate in
after the Closing. References to "Affected Employee" in this Section 6.8(e) shall also refer to the
applicable Affected Employee's eligible dependents.

(f)    Upon the Buyer's request (and at the Buyer's sole cost and expense), the
Special Master shall Cause the Company to adopt and maintain an employee retention plan in
form and substance as proposed by the Buyer in writing. Any such employee retention plan shall
be in addition to, and shall not replace or substitute, any existing Company Benefit Plan.

(g)    To the extent any awards under any cash bonus, sales and other incentive
plans of the Acquired Companies ("Bonus Amounts") with respect to a performance period
completed prior to the Closing remain unpaid as of the Closing Date, the Buyer shall cause such
Bonus Amounts to be calculated and paid in the Ordinary Course to the eligible employees of the
Acquired Companies. With respect to Bonus Amounts for the performance period in which the
Closing occurs, the Buyer shall cause such Bonus Amounts to be calculated and paid in the
Ordinary Course to the eligible employees of the Acquired Companies based on the actual level
of Company performance for such performance period. Without limiting in any way any rights
an Affected Employee may have under any Company Benefit Plan, if an Affected Employee
participating in the CITGO Petroleum Corporation Performance Incentive program for salaried
employees (the "Performance Incentive Program") has a qualifying termination of employment
entitling the Affected Employee to severance under a severance program, agreement or
arrangement of the Buyer or the Acquired Companies and such termination occurs during the
period that begins on the Closing Date and ends on the date on which Bonus Amounts under the
Performance Incentive Program are paid for the performance period in which the Closing occurs,
then such Affected Employee will not lose eligibility, solely due to the termination of
employment, for payment of any Bonus Amount under the Performance Incentive Program for
performance periods completed prior to the Closing or for the performance period in which the
Closing occurs; provided that any such Bonus Amounts shall be paid to such employee at the
same time as such awards are paid to other participants in the Performance Incentive Program,
and provided, further, that any such Bonus Amount for the performance period in which the
termination of employment occurs shall be prorated based on the number of completed months
of employment during the performance period prior to the termination of employment.

(h)    The provisions contained in this Section 6.8 shall not (i) be treated as an
amendment or other modification of any Company Benefit Plan, Company Collective Bargaining
Agreement or other employee benefit plan, agreement or other arrangement, (ii) limit the right of
the Buyer or any Acquired Company to terminate any employee at any time and for any reason or
(iii) create any third party rights, benefits or remedies of any nature whatsoever in any employee
of any Acquired Company (or any beneficiaries or dependents thereof) or any other Person that is
not a party to this Agreement. The benefits and compensation provided to each Affected
Employee following the Closing Date shall be subject to the requirements of applicable Law.
Notwithstanding the foregoing, nothing herein will impose on the Buyer or any of the Acquired
Companies any obligation to (A) retain any Affected Employee in its or their employ for any
amount of time or (B) maintain any terms and conditions of employment other than as expressly

WEIL:\100337387\20\67816.0003

set forth above, subject to applicable Law and the Acquired Companies' existing contractual obligations to the respective Affected Employee.

(i)     From and after the Execution Date, the Buyer will cooperate with and provide all information reasonably requested by the Acquired Companies and their representatives in connection with any notice to be filed by the Acquired Companies with the PBGC pursuant to ERISA Section 4043 and the regulations thereunder as a result of the Transactions or in connection with any related requests for information from the PBGC.

Section 6.9.     <u>The Buyer's Obligations in Respect of Financing</u>.

(a)     The Buyer acknowledges and agrees that the Special Master, the Company and their respective Affiliates have no responsibility for any financing that Buyer may raise in connection with the Transactions.

(b)     The Buyer shall use its commercially reasonable efforts to amend the Claim Commitment Letter to provide that the Special Master is an express third party beneficiary thereto.

(c)     The Buyer shall deliver to the Special Master fully executed versions of the Debt Commitment Letters, each in the form of the applicable Debt Commitment Letter delivered on the Execution Date, on or prior to the last day of the Topping Period.

(d)     The Buyer shall use its commercially reasonable efforts to take, or cause to be taken, all actions and to do, or cause to be done, all things necessary, proper or advisable to obtain the Debt Financing contemplated by the Debt Financing Commitments on or prior to the Closing Date, including to:

(i)     maintain in effect (A) the Convertible Commitment Letters from and after the Execution Date and (B) the Debt Commitment Letters from and after the date on which the Buyer delivers the executed Debt Commitment Letters to the Special Master pursuant to <u>Section 6.9(c)</u> (the "<u>Debt Commitment Letter Effective Date</u>");

(ii)     negotiate and enter into definitive financing agreements (the "<u>Definitive Debt Documents</u>") with respect to the Debt Financing that reflect terms contained in the Debt Commitment Letter (including any "market flex" provisions related thereto), so that such agreements are in effect no later than the Closing Date; it being understood that in no event shall any of the Definitive Debt Documents (A) reduce the aggregate amount of the Debt Financing provided for in the Debt Commitment Letter (including by increasing the amount of fees or original issue discount contemplated by the Debt Commitment Letter and the Fee Letters other than through the operation of "market flex" pursuant to the terms of the applicable Fee Letters); (B) expand the conditions or other contingencies relating to the receipt or funding of the Debt Financing beyond those expressly set forth in the Debt Commitment Letter, amend or modify any such conditions or other contingencies in a manner adverse to the Buyer or the Acquired Companies (whether by making any such conditions or other contingencies less likely to be satisfied on a timely basis or otherwise) or impose any new or additional condition or other contingency relating to the receipt or funding of the Debt Financing or (C) contain

54

terms (other than those terms expressly set forth in the Debt Commitment Letter) that (1) could reasonably be expected to delay the Closing or the date on which the Debt Financing would be obtained or make the timely funding of the Debt Financing less likely to occur or (2) adversely impact the ability of the Buyer to consummate the Debt Financing or enforce its rights against any of the other parties to the Debt Commitment Letter or the Definitive Debt Documents to consummate the Debt Financing (clauses (A) through (C), a "Prohibited Modification");

(iii)    satisfy on a timely basis (or obtain a waiver of) all conditions applicable to the Buyer contained in the Debt Financing Commitments and the Convertible Commitments, including the payment of any commitment, engagement or placement fees required as a condition to the Debt Financing or the Convertible Financing, as applicable;

(iv)    consummate the Debt Financing (including by instructing the Debt Financing Sources to fund the Debt Financing in accordance with the Debt Commitment Letter, consummating the Convertible Financing (including by instructing the parties to the Convertible Commitment Letters to fund the Convertible Financing in accordance with the Convertible Commitment Letter), and enforcing the Buyer's rights under the Debt Commitment Letter (including if necessary or appropriate to commence, participate in and diligently pursue Legal Proceedings against or involving any of the Persons that have committed to provide any portion of, or otherwise with respect to, the Debt Financing)) at or prior to the date that the Closing is required to be effected in accordance with Section 2.2 (the Buyer acknowledges and agrees that it is not a condition to Closing under this Agreement, nor to the consummation of the Transactions, for the Buyer to obtain the Debt Financing or any Replacement Financing); and

(v)    comply with its obligations under the Debt Commitment Letter.

(e)    Subject to the terms and upon satisfaction of the conditions set forth in the Debt Commitment Letter, the Buyer shall use its commercially reasonable efforts (including initiating Legal Proceedings) to cause the lenders and the other Persons providing such Debt Financing to provide the Debt Financing on the Closing Date.

(f)    The Buyer shall provide to the Special Master copies of all agreements and other documents relating to the Debt Financing and shall keep the Special Master reasonably informed on a current basis and in reasonable detail of material developments in respect of the financing process relating thereto. Without limiting the generality of the foregoing, the Buyer shall provide the Special Master prompt (and in no event later than forty eight (48) hours after obtaining knowledge) written notice (i) of any expiration or termination of, or any breach, default or violation (or any event or circumstance that, with or without notice, lapse of time or both, could reasonably be expected to give rise to any breach, default or violation) by any party to the Debt Commitment Letter or definitive agreements related to the Debt Financing of which the Buyer becomes aware, (ii) of the receipt of any notice or other communication, in each case from any Debt Financing Source with respect to any (x) actual or potential breach, default, violation, termination or repudiation by any party to the Debt Commitment Letter or definitive agreements related to the Debt Financing of any provision of the Debt Commitment Letter or definitive

55

agreements related to the Debt Financing, (y) any actual dispute or disagreement between or among any parties to the Debt Commitment Letter or definitive agreements, in each case, related to the obligation to fund the Debt Financing or the amount of the Debt Financing to be funded at the Closing, and (iii) if at any time for any reason the Buyer believes in good faith that it will not be able to obtain all or any portion of the Debt Financing on the terms and conditions contemplated by the Debt Financing Commitments or definitive agreements related to the Debt Financing. As soon as reasonably practicable after the Special Master delivers to the Buyer a written request therefor, the Buyer shall provide any information reasonably requested by the Special Master relating to any circumstance referred to in clause (i), (ii) or (iii) of the immediately preceding sentence; provided, that the right of the Special Master to request such information shall not limit the obligations of the Buyer to promptly provide such information as otherwise required by this Section 6.9(f).

(g)      Prior to the Closing, the Buyer shall not, without the prior written consent of the Special Master, which consent shall not be unreasonably withheld, agree to, or permit, any amendment, restatement, amendment and restatement, replacement, supplement, or other modification of, or waiver or consent under, the Debt Commitment Letter or other documentation relating to the Debt Financing which would constitute a Prohibited Modification (provided that the Debt Commitment Letter and the related Fee Letters may be amended to join additional lead arrangers, commitment parties and/or lenders in accordance with terms thereof without the prior written consent of the Special Master). For purposes of this Section 6.9, the definitions of "Debt Commitment Letter," "Debt Financing," "Debt Financing Commitments," "Debt Financing Sources," shall include the Debt Financing Commitment or documents related thereto as permitted to be amended, amended and restated, replaced, supplemented, modified, waived or consented to by this Section 6.9(g). The Buyer shall promptly deliver to the Special Master copies of any such amendment, restatement, amendment and restatement, replacement, supplement, modification, waiver or consent. The Buyer shall not agree to or permit the withdrawal, repudiation, termination or rescission of any Debt Commitment Letter or Definitive Debt Document or any provision thereof (except in connection with Replacement Financing). Further, for the avoidance of doubt, if from and after the Execution Date the Debt Financing (or any Replacement Financing) has not been obtained, the Buyer shall continue to be obligated to consummate the Transactions subject only to the satisfaction or waiver of the conditions set forth in Section 7.1 and Section 7.2.

(h)      If, notwithstanding the use of commercially reasonable efforts by the Buyer to satisfy its obligations under Section 6.9(c), (d), (e), (f) and (g), any of the Debt Financing or the Debt Financing Commitments (or any definitive financing agreement relating thereto) expire or are terminated or become unavailable prior to the Closing, in whole or in part, for any reason, the Buyer shall (i) promptly notify the Special Master of such expiration, termination, or unavailability and the reasons therefor and (ii) use its commercially reasonable efforts promptly to arrange for alternative financing whether subject to the same or alternative financing structures ("Replacement Financing") (which shall be sufficient, together with the Convertible Financing and cash on hand of the Buyer, to pay the Required Amount and shall not, without the prior written consent of the Special Master, include any conditions to such Replacement Financing that are more onerous to the Buyer than, or in addition to, the conditions set forth in the Debt Commitment Letters, as applicable, to replace the financing contemplated by such expired, terminated, or unavailable commitments or arrangements). The Buyer shall deliver to the Special

Master true, correct and complete copies of all contracts or other arrangements pursuant to which any such alternative source shall have committed to provide any portion of the Replacement Financing (provided that any fee letters in connection therewith may be redacted in a manner consistent with the Fee Letter provided as of the Execution Date). To the extent applicable, the Buyer shall use its commercially reasonable efforts to take, or cause to be taken, all actions necessary, proper or advisable to arrange and consummate the Replacement Financing on the terms and conditions described in such contracts or other arrangements relating thereto on or before the Closing Date, including (A) using commercially reasonable efforts to (x) satisfy on a timely basis, all terms, covenants and conditions set forth therein; (y) enter into definitive agreements with respect thereto on the terms and conditions set forth therein and (z) consummate the Replacement Financing at or prior to the Closing and (B) seeking to enforce its rights thereunder. In the event that Replacement Financing is obtained in accordance with this Section 6.9(h), the definitions of "Debt Commitment Letter," "Debt Financing," "Debt Financing Commitments," and "Debt Financing Sources" shall include the commitments in respect of the Replacement Financing or the documents related thereto, as applicable. Notwithstanding the foregoing, compliance by the Buyer with the provisions of this Section 6.9(h) shall not relieve the Buyer of their obligation to consummate the Transactions whether or not the Debt Financing or any Replacement Financing is available.

Section 6.10.   Company's Obligations in Respect of Debt Financing.

(a)      Subject to Section 6.10(b), prior to the Closing, the Special Master shall Cause the Company and each of its Subsidiaries to use commercially reasonable efforts to provide to the Buyer such customary cooperation in connection with the arrangement of the Debt Financing as is reasonably requested by the Buyer. Such assistance shall include using commercially reasonable efforts to do the following, at the Buyer's sole expense, to the extent reasonably requested by the Buyer in connection with the Debt Financing:

(i)      causing the Company's officers (with appropriate seniority), employees (with appropriate seniority), accountants and advisors to participate in a reasonable number of meetings, presentations, road shows, due diligence sessions and sessions with rating agencies or other customary activities related to the Debt Financing;

(ii)      (A) assisting with the preparation of\ appropriate and customary materials for one or more rating agency presentations, bank information memoranda, offering memoranda, exchange offer memoranda, solicitation statements, tender offer materials and lender and investor presentations, in each case, reasonably required in connection with the Debt Financing and (B) having an officer of the Company execute and deliver customary "authorization letters" (the "Financing Related Authorization Letters") that (A) authorize the distribution of information to prospective lenders (subject to confidentiality obligations) relating to the Debt Financing and (B) include customary representations and confirmations; provided, that, in connection with the Financing Related Authorization Letters (x) the Company and each of its respective Representatives and Affiliates shall not have any liability of any kind or nature resulting from the use of information contained in any marketing material and (y) the recipient of such Financing Related Authorization Letters agrees that it shall be entitled to rely only on the

WEIL:\100337387\20\67816.0003

representations and warranties contained in the definitive documentation with respect to the financing;

(iii)    (A) furnishing to Buyer as promptly as reasonably practicable (or (x) in the case of any audited financial statements furnished pursuant to this clause (iii) below, as promptly as reasonably practicable but in no event more than 90 days after the relevant fiscal year end and (y) in the case of any unaudited quarterly financial statements furnished pursuant to this clause (iii), as promptly as reasonably practicable but in no event more than 45 days after the relevant fiscal quarter end other than the fourth quarter) (I) the Required Information and (II) any other financial information (including audited financial information) of the Company and/or one or more of its Subsidiaries to the extent readily available or obtainable and prepared by the Company or one or more of its Subsidiaries in the Ordinary Course and reasonably requested by Buyer in connection with the Debt Financing, and (B) reasonably cooperating with Buyer in the preparation of pro forma financial statements that would be required under the Securities Act on a Form S-1 for the debt or other securities issued in respect of the Debt Financing by providing pertinent information as may be reasonably requested by Buyer to enable Buyer to prepare such pro forma financial statements; provided that (x) the Company's obligation to provide information for such pro forma financial statements shall be limited to information about the Company and its Subsidiaries that it or its Subsidiaries prepare in the Ordinary Course and (y) Buyer shall be solely responsible for the preparation of pro forma financial statements, including any adjustments incorporated into any such pro forma financial statements;

(iv)    (A) delivering one or more customary representation letters to the independent auditors of the Company and its Subsidiaries to allow such auditors to complete an audit (or review of any financial statements) and to issue an opinion with respect to an audit of those financial statements and (B) causing the independent auditors of the Company and its Subsidiaries to reasonably assist and cooperate with Buyer in connection with the Debt Financing, including by (x) providing consent to offering documents that include or incorporate by reference the financial statements and financial information of the Company and its Subsidiaries and such auditor's reports thereon, (y) issuing customary comfort letters (which include customary "negative assurance" (including with respect to pro forma financial statements and information) and change period comfort) with respect to financial information relating to the Company and its Subsidiaries and (z) attending customary accounting due diligence sessions in connection with the Debt Financing at reasonable times and with advance notice, and in each case which shall be virtual unless otherwise agreed by the Company in its reasonable discretion;

(v)    (A) to the extent not prohibited or restricted under applicable Law or any Contract of the Company or its applicable Affiliate, facilitating the pledging of collateral; provided that no pledge shall be effective until the Closing, (B) cooperating with any collateral appraisals and field examinations as may be reasonably requested by the Buyer at reasonable times and with reasonable advance notice for the Company and its Subsidiaries, and provided that one or more representatives from the Company and its

58

Subsidiaries shall be permitted to attend all such collateral appraisals and field examinations and (C) assistance in the preparation of a borrowing base certificate;

(vi)    assisting in the preparation of definitive financing documents, including guarantee and collateral documents and customary closing certificates and other customary documents as reasonably necessary, in each case, not to be effective until the Closing (provided, that, unless specifically provided for in this Section 6.10, in no event will any of the Company and any of its Subsidiaries or their respective Representatives be required to execute or deliver any opinion or certificate in connection with the Debt Financing prior to the Closing);

(vii)    furnishing the Buyer at least four (4) Business Days prior to the Closing Date with all documentation and other information required by a Governmental Body with respect to the Debt Financing under applicable "know your customer" and anti-money laundering rules and regulations that is reasonably requested by the Buyer at least nine (9) Business Days prior to the Closing Date;

(viii)    cooperate with the Buyer to obtain customary corporate and facilities credit ratings, as reasonably requested by the Buyer, in each case, not to be effective prior to the Closing Date; and

(ix)    cooperating with the Buyer to take such corporate or other organizational action, subject to the occurrence of the Closing, as is reasonably necessary to permit the consummation of the Debt Financing (provided, that, unless specifically provided for in this Section 6.10, in no event will the Company and any of its Subsidiaries or their respective Representatives be required to execute or deliver any opinion or certificate in connection with the Debt Financing prior to the Closing).

(b)    Notwithstanding anything in Section 6.10(a) or this Agreement to the contrary, the cooperation requested by the Buyer pursuant to Section 6.10(a) shall not:

(i)    require the entry by the Special Master or the Company or any of its Subsidiaries into any agreement or commitment (other than any Financing Related Authorization Letters) that would be effective prior to the Closing and that is not contingent on the occurrence of the Closing;

(ii)    unreasonably interfere with the ongoing operations of the Company and each of its Subsidiaries; or

(iii)    include any action that the Special Master or the Company reasonably believes would require the Company and any of its Subsidiaries prior to the Closing (other than by virtue of executing any Financing Related Authorization Letters) to (A) pay any commitment or other similar fee, (B) have or incur any liability or obligation in connection with the Debt Financing, including under any agreement or any document related to the Debt Financing, (C) take any action that would conflict with, violate or result in a breach of or default under the Company Charter and Company By-Laws or any Organizational Documents of the Company's Affiliates, any Contract, any Transaction Document or any Law, (D) take any action that could subject any

59

director, manager, officer or employee of the Company or any of its Affiliates to any personal liability, (E) provide access to or disclose information that the Company determines in good faith could jeopardize any attorney client privilege of, or conflict with any confidentiality requirements applicable to, the Company or any of its Affiliates, (F) [reserved], (G) reimburse any expenses or provide any indemnities, (H) make any representation, warranty or certification that, in the good faith determination of the Company, is not true, (I) [reserved], (J) provide any cooperation or information that does not pertain to the Company and each of its Subsidiaries or (K) [reserved]. In no event shall the Special Master be in breach of <u>Section 6.10(a)</u> because of the Company's failure to deliver any financial or other information that is not currently readily prepared by the Company or its Subsidiaries in the Ordinary Course at the time requested by the Buyer or to obtain review of any financial or other information by its accountants that is not currently readily prepared by the Company or its Subsidiaries in the Ordinary Course at the time requested.

(c)    [Reserved].

(d)    The Buyer shall promptly reimburse the Company and each of its Subsidiaries, the Special Master, and/or their respective Representatives for all reasonable and documented out-of-pocket costs and expenses incurred by the Company and each of its Subsidiaries, the Special Master, and/or their respective Representatives in connection with any cooperation requested by the Buyer and/or its parent pursuant to <u>Section 6.10(a)</u> excluding any costs incurred in connection with the preparation, review and/or audit of historical financial information but including (i) attorneys' fee of a single counsel and (ii) expenses of the Company's accounting firms engaged to assist in connection with the Debt Financing (excluding any costs incurred in connection with the preparation, review and/or audit of historical financial information). The Buyer shall indemnify and hold harmless, the Special Master, Acquired Companies, and their respective Representatives, from and against any and all liabilities or losses suffered or incurred by them in connection with the arrangement of the Debt Financing and any information utilized in connection therewith.

(e)    Any information provided pursuant to this <u>Section 6.10</u> shall be subject to the Confidentiality Agreement; <u>provided</u>, that the Buyer will be permitted to disclose such information to any Debt Financing Sources or prospective Debt Financing Sources and other financial institutions and investors that are or may become parties to the Debt Financing and to any underwriters, initial purchasers or placement agents in connection with the Debt Financing or with respect to the Convertible Financing or any equity financing in connection with the Transactions (and, in each case, to their respective counsel and auditors) so long as such Persons (i) agree to be bound by confidentiality provisions substantially similar to those in the Confidentiality Agreement (and any confidentiality agreements between the Company and its Affiliates) as if parties thereto, or (ii) are subject to other confidentiality undertakings reasonably satisfactory to the Company and of which the Company is a beneficiary.

(f)    The Company hereby consents to the reasonable use of its and its Subsidiaries' logos in connection with the Debt Financing; provided, that such logos shall be

used solely in a manner that is not intended or reasonably likely to harm, disparage or otherwise adversely affect the Company or any of its Subsidiaries.

(g)    Subject to the terms and conditions set forth in this Agreement, the Buyer acknowledges and agrees that neither obtaining the Financings nor any Replacement Financing by the Buyer nor any cooperation by the Acquired Companies at the direction of the Special Master is a condition to Closing and reaffirms its obligations to consummate the Transactions irrespective and independently of the availability of the Financings or any Replacement Financing, subject to fulfillment or waiver of the conditions set forth in Section 7.1 and Section 7.2.

Section 6.11.   Tax Matters.

(a)    All Transfer Taxes shall be paid by the Buyer; provided, however, that those certain Transfer Taxes related to any sale and/or transfer of Owned Real Property, including real estate transfer, stamp, documentary, recording and other similar fees or Taxes or governmental charges, together with any interest, penalties or additions to such Transfer Taxes, shall be borne by either Buyer or the Company consistent with local law where such Owned Real Property is located. Further, upon the reasonable request of the Buyer, the Special Master shall cooperate, and shall Cause the Company to cooperate, in timely making all filings, returns, reports and forms as necessary or appropriate to comply with the provisions of all applicable Laws in connection with the payment of Transfer Taxes, and shall cooperate in good faith to minimize, to the fullest extent possible under such laws, the amount of any Transfer Taxes payable; provided, that in no event shall the Special Master or the Company or any of its Subsidiaries or their respective Representatives, be required to execute or deliver any filings, returns, reports or forms in connection therewith. The Buyer shall procure any stock transfer stamps required by any Transfer Tax, and timely file, to the extent required by applicable Law, all necessary Tax Returns and other documentation with respect to all such Transfer Taxes and provide to the Special Master upon request evidence of payment of all Transfer Taxes. For the avoidance of doubt, all Transfer Taxes arising from the transactions contemplated under this Agreement shall be for the account of Buyer and shall not reduce or otherwise adjust the Closing Consideration.

(b)    The Special Master shall Cause the Company to prepare and deliver FIRPTA Certificate as set forth in Section 2.3(a)(iii).

Section 6.12.   R&W Insurance Policy. In the event the Buyer or any of its Affiliates obtains a representations and warranties insurance policy in respect of the representations and warranties contained in this Agreement or in any certificate or other instrument contemplated by or delivered in connection with this Agreement (such policy, a "R&W Insurance Policy"), (a) all premiums, underwriting fees, brokers' commissions and other costs and expenses related to such R&W Insurance Policy shall be borne solely by the Buyer or such Affiliate, (b) such R&W Insurance Policy shall not provide for any "seller retention" (as such phrase is commonly used in the representations and warranties insurance policy industry) and (c) such R&W Insurance Policy shall expressly waive any claims of subrogation against the Special Master and any Acquired Company (other than, solely in the case of an Acquired Company, in connection with Fraud of any Acquired Company). The Special Master shall, and shall Cause the Company to, use

61

commercially reasonable efforts to cooperate with the Buyer's efforts, as applicable, and provide assistance as reasonably requested by the Buyer to obtain and bind the R&W Insurance Policy and to maintain its effectiveness through the Closing.

Section 6.13.   Notices of Certain Events.

(a)     During the Interim Period, the Special Master shall, and shall Cause the Company to notify the Buyer, and the Buyer shall promptly notify the Special Master, of:

(i)     any written notice or other written communication from any Person alleging that the consent of such Person is or may be required in connection with the Transactions;

(ii)     any notice or other written communication from any Governmental Body in connection with the Transactions;

(iii)     any actions, suits, claims, investigations or proceedings (A) commenced or (B) to the Knowledge of the Buyer or to the Knowledge of the Special Master, as applicable, threatened against, relating to or involving or otherwise affecting such Party or any of its Subsidiaries which relate to the consummation of the Transactions (excluding any appeals or other oppositions by the Acquired Companies or PDVSA);

(iv)      any circumstance or occurrence that has or would reasonably be expected to have a Company Material Adverse Effect;

(v)     any notice or written communication from any Governmental Body that is commencing any investigation or enforcement action against the Acquired Companies; and

(vi)     any item or information referred to in, or received by the Special Master pursuant to, Section 6.13(b);

provided, that any failure to comply with this Section 6.13(a) shall not constitute the failure of any condition set forth in Article VII to be satisfied; provided, further, that no such notification (and no other notification required to be given under any other Section of this Agreement) shall affect the representations, warranties, covenants or agreements of the Parties or the conditions to the obligations of the Parties under this Agreement.

(b)     During the Interim Period, in order to enable the Special Master and his Representatives to satisfy the obligations of the Special Master in this Agreement, the Special Master may Cause the Company and its Subsidiaries to, upon request by the Special Master, promptly provide to the Special Master:

(i)     access to the books and records (including all electronic data related thereto), information, assets, operations and properties of the Acquired Companies;

WEIL:\100337387\20\67816.0003

(ii)     contact information for any vendors, customers and manufacturers and others with whom the Company does business;

(iii)     the status of the Acquired Companies' business and financial condition; and

(iv)     access to consult with the Acquired Companies' officers and employees, who shall make themselves reasonably available for such consultation.

(c)     During the Interim Period, in order to enable the Special Master and his Representatives to satisfy the obligations of the Special Master in this Agreement, the Special Master may Cause the Company and its Subsidiaries to immediately provide to the Special Master (upon any of the following being received by or made available to the Company or any of its Subsidiaries):

(i)     copies of any written notice or other written communication from any Person alleging that the consent of such Person is or may be required in connection with the Transactions;

(ii)     copies of any notice or other written communication from any Governmental Body in connection with the Transactions;

(iii)     documentation relating to any Legal Proceeding (A) commenced or (B) to the Knowledge of the Company or the Knowledge of the Buyer, as applicable, threatened against, relating to or involving or otherwise affecting such Party or any of its Subsidiaries which relate to the consummation of the Transactions;

(iv)     notice of (A) the occurrence, or failure to occur, of any event which occurrence or failure would reasonably be likely to cause a breach of any representation or warranty made by such Party in this Agreement being untrue or inaccurate or (B) any failure of a Party to comply with or satisfy any covenant, condition or agreement to be complied with or satisfied by it pursuant to this Agreement, in each case that would reasonably be expected to result in any condition set forth in Article VII not to be satisfied; and

(v)     notice of any circumstance or occurrence that has had or would reasonably be expected to have a Company Material Adverse Effect.

Section 6.14.   No Control of Other Party's Business. Without in any way limiting any Party's rights or obligations under this Agreement, the Parties acknowledge and agree that the restrictions set forth in this Agreement are not intended to give the Buyer, directly or indirectly, the right to control or direct the Acquired Companies' operations prior to the Closing Date. Prior to the Closing Date, each of the Company and the Buyer shall exercise, consistent with the terms and conditions of this Agreement, complete control and supervision over its respective operations.

Section 6.15.   [Reserved].

63

Section 6.16.    <u>Bidder Protections and Competing Proposals</u>.

(a)    This Agreement is subject to approval by the Court and the consideration by the Special Master of higher or better competing bids in respect of the Shares, as determined in accordance with the Evaluation Criteria set by the January Order and the Sale Procedures Order. From the date of this Agreement and until the commencement of the No-Shop Period, the Special Master is permitted to, and to cause its financial and legal advisors to, initiate contact with, solicit or encourage submission of any Competing Proposal. For the avoidance of doubt, the Buyer acknowledges that following the date of this Agreement, throughout the Topping Period and until the commencement of the No-Shop Period, the Special Master is expected to, and intends to, (i) engage with prospective purchasers of the Shares (including the Buyer), (ii) evaluate any Competing Proposals received during the Topping Period and (iii) compare any such Competing Proposals to the Buyer's proposal to purchase the Shares. In addition, the Special Master shall have the responsibility and obligation to respond to any Competing Proposal and perform any and all other acts related thereto which are required under the Sale Procedures Order, the January Order or other applicable Law, including supplying information relating to the Acquired Companies to prospective purchasers of the Shares. So long as, prior to the expiration of the Topping Period, Buyer has delivered executed Debt Commitment Letters in accordance with <u>Section 6.9(c)</u>, as promptly as practicable following the conclusion of the Topping Period, but in no event later than five (5) Business Days following the conclusion of the Topping Period, the Special Master shall notify the Buyer if the Special Master has received a Competing Proposal that the Special Master has determined in good faith constitutes a Superior Proposal.

(b)    During the No-Shop Period, the Special Master (i) shall, and shall instruct each of its Representatives to, immediately cease and cause to be terminated any discussions or negotiations with any Persons (other than the Buyer and its Affiliates and Representatives) that may be ongoing with respect to a Competing Proposal, other than pursuant to <u>Section 6.16(c)</u> and (ii) shall not, and shall instruct each of its Representatives not to, directly or indirectly, solicit, initiate, knowingly encourage or knowingly facilitate any proposal or offer that constitutes, or would reasonably be expected to lead to, a Competing Proposal.

(c)    Notwithstanding anything to the contrary set forth above, in the event that during the No-Shop Period but prior to the Court's hearing to consider the Special Master's motion to approve the Sale Order (the "<u>Sale Hearing</u>") the Special Master receives an unsolicited Competing Proposal, he shall inform the Court and the Buyer of the receipt of such unsolicited Competing Proposal and, if approved by the Court (<u>provided</u>, that, in connection with seeking such approval, if requested by the Person making such unsolicited Competing Proposal, the Special Master shall request that the Court not make public the identity of the Person making such unsolicited Competing Proposal), may engage with the Person submitting such Competing Proposal.

(d)    Notwithstanding anything to the contrary set forth in this Agreement, if the Special Master has determined in good faith that a Competing Proposal made after the Commencement Date but prior to the No-Shop Period constitutes a Superior Proposal, the Special Master may, at any time after the Commencement Date but prior to the No-Shop Period, subject to (i) compliance with this <u>Section 6.16(d)</u>, (ii) the Person making such Superior

WEIL:\100337387\20\67816.0003

Proposal agreeing to pay to Buyer the Termination Fee (to the extent that the bid reflected in this Agreement is designated by the Court as the stalking horse bid (in such case, this Agreement constituting the "Stalking Horse Bid Agreement")) or the Expense Reimbursement Amount (to the extent that the bid reflected in this Agreement is designated by the Court as a base bid (in such case, this Agreement constituting the "Base Bid Agreement")) in accordance with Section 8.3(a) to the extent the transaction contemplated by the Superior Proposal is consummated, and (iii) the Person making such Superior Proposal depositing an amount equal to the Deposit Amount with the Escrow Agent, terminate this Agreement in accordance with Section 8.1(d)(i) in order to enter into a definitive agreement relating to such Superior Proposal (a "Superior Proposal Agreement").

(e)     Notwithstanding anything to the contrary set forth in this Agreement, if the Special Master has determined in good faith that an unsolicited Competing Proposal made during the No-Shop Period but prior to the Sale Hearing (any such unsolicited Competing Proposal, an "Unsolicited Competing Proposal") constitutes a Superior Proposal, the Special Master may, at any time during the No-Shop Period but prior to the Sale Hearing, subject to (i) approval by the Court of such Unsolicited Competing Proposal in accordance with Section 6.16(c) and Section 8.1(d)(ii), (ii) compliance with this Section 6.16(e), (iii) the Person making such Superior Proposal agreeing to pay (x) to Buyer the Termination Fee (in the event this Agreement constitutes the Stalking Horse Bid Agreement) or the Expense Reimbursement Amount (in the event this Agreement constitutes the Base Bid Agreement) in accordance with Section 8.3(e) to the extent the transaction contemplated by the Unsolicited Competing Proposal is consummated and (y) if applicable, to the buyer party to the Superior Proposal Agreement the Expense Reimbursement Amount in accordance with Section 8.3(a), in each case, to the extent the transaction contemplated by the Unsolicited Competing Proposal is consummated, and (iv) the Person making such Superior Proposal depositing an amount equal to the Deposit Amount with the Escrow Agent, terminate this Agreement in accordance with Section 8.1(d)(ii) (or, if this Agreement has already been terminated in accordance with Section 8.1(d)(i), terminate the Superior Proposal Agreement) in order to enter into a definitive agreement providing for such Superior Proposal (the "Unsolicited Competing Proposal Agreement"); provided, that prior to so terminating this Agreement, (A) the Special Master has given the Buyer at least five (5) Business Days' prior written notice of its intention to take such action, which notice shall include a description of the material terms and conditions of such Superior Proposal and a copy of any proposed Unsolicited Competing Proposal Agreement, (B) at the end of such notice period, the Special Master shall have considered in good faith any revisions to the terms of this Agreement proposed in writing by the Buyer, and shall have determined that such Superior Proposal would continue to constitute a Superior Proposal if such revisions proposed by the Buyer were to be given effect, and (C) in the event of any material change to the terms of such Superior Proposal, the Special Master shall, in each case, have delivered to the Buyer an additional notice consistent with that described in clause (A) of this proviso and a new notice period under clause (A) of this proviso shall commence during which time the Special Master shall be required to comply with the requirements of this Section 6.16(e) anew with respect to such additional notice, including clauses (A), (B) and this clause (C) of this proviso (except that the reference to "five (5) Business Days" in clause (A) of this proviso shall be replaced with "three (3) Business Days").

(f)     The Special Master and the Buyer acknowledge that this Agreement and the Transactions are subject to the Sale Procedures Order and the Sale Order Entry. In the event

of any conflict between this Agreement and the Sale Procedures Order or the Sale Order, the Sale Procedures Order or the Sale Order, as applicable, shall govern. The Special Master and the Buyer shall comply with the Sale Procedures Order and the Sale Order.

(g)    For purposes of this Agreement:

(i)    "Competing Proposal" means any bona fide proposal or offer made by any Person or group of related Persons (other than the Buyer and its Affiliates and, in the case of an Unsolicited Competing Proposal, excluding the buyer under the Superior Proposal Agreement or any Affiliates thereof) (A) to purchase or otherwise acquire, directly or indirectly, in one transaction or a series of transactions, pursuant to a merger, consolidation or other business combination, sale of shares of capital stock, sale of assets or similar transaction (1) beneficial ownership (as defined under Section 13(d) of the Exchange Act), of more than twenty percent (20%) of any class of equity securities of the Company or (2) any one or more assets or businesses of the Acquired Companies that constitute more than twenty percent (20%) of the consolidated assets of the Acquired Companies (based on the fair market value thereof), (B) to effect any other transaction pursuant to which any other alternative to the Transactions would be consummated, or (C) relating to any reorganization, recapitalization, license, joint venture, partnership, liquidation, dissolution or other similar transaction involving any one or more assets or businesses of the Acquired Companies that constitute more than twenty percent (20%) of the consolidated assets of the Acquired Companies (based on the fair market value thereof); provided, that (i) received prior to the end of the Topping Period must satisfy an overbid minimum above the Purchase Price equal to or in excess of (A) the Termination Fee (to the extent this Agreement constitutes the Stalking Horse Bid Agreement) or the Expense Reimbursement Amount (to the extent this Agreement constitutes the Base Bid Agreement) plus (B) $25,000,000 ((A) and (B), collectively, the "Overbid Minimum"), (ii) any Competing Proposal received after the end of the Topping Period and prior to the No-Shop Period (whether or not constituting an Unsolicited Competing Proposal) must satisfy an increased overbid minimum above the purchase price of the then highest or best offer (which will be as determined by the Special Master and communicated to bidders following the end of the Topping Period) equal to or in excess of (A) the Termination Fee (to the extent this Agreement constitutes the Stalking Horse Bid Agreement) or the Expense Reimbursement Amount (to the extent this Agreement constitutes the Base Bid Agreement) plus (B) $25,000,000 ((A) and (B), collectively, the "Improved Overbid Minimum"), and (iii) any Unsolicited Competing Proposal received during the No-Shop Period must satisfy an overbid minimum above the Purchase Price (or, if this Agreement shall have been terminated by the Special Master pursuant to Section 8.1(d)(i), above the "Purchase Price" as defined in the Superior Proposal Agreement) equal to or in excess of (A) the Termination Fee (to the extent this Agreement constitutes the Stalking Horse Bid Agreement) or the Expense Reimbursement Amount (to the extent this Agreement constitutes the Base Bid Agreement) plus (B) the Expense Reimbursement Amount pursuant to Section 8.3(e), if applicable, plus (C) $50,000,000 ((A), (B) and (C), collectively, the "Subsequent Overbid Minimum"); provided, further, that the Special Master may, in his sole discretion, lower

or raise the Overbid Minimum, the Improved Overbid Minimum or the Subsequent Overbid Minimum for any Competing Proposal.

(ii)     "Superior Proposal" means a Competing Proposal made by a Person or group of related Persons (other than the Buyer and its Affiliates and, in the case of an Unsolicited Competing Proposal, excluding the buyer under the Superior Proposal Agreement or any Affiliates thereof) on terms that the Special Master determines in good faith, after consultation with the Special Master's financial and legal advisors and the Sale Process Parties, would constitute a higher or better bid for the Shares based upon the Evaluation Criteria; provided, that the Special Master shall act in good faith to ensure that this Agreement is not terminated as a direct result of any order or judgment in the Declaratory Judgment Action that does not (x) stay consummation of the sale of the Shares to a date beyond the Outside Date or (y) permanently enjoin the sale of the Shares.

(h)     For the avoidance of doubt, notwithstanding anything to the contrary contained herein, the Special Master may, at any time after the conclusion of the Topping Period but prior to the Final Recommendation Date, after consultation with the Sale Process Parties (as defined in the Sale Procedures Order), propose to the Court that the sale process proceed to a multi-day live auction to determine the Successful Bidder for the sale of the Shares.

(i)     The Buyer acknowledges that nothing hereunder limits any Venezuela Party from proposing or negotiating any alternative transaction or series of transactions, and the Venezuela Parties (as defined in the Sale Procedures Order) will not at any time be prevented from making a Competing Proposal.

Section 6.17.     Section 280G. No later than ten (10) days prior to the Closing Date, the Special Master shall Cause the Company to deliver to the Buyer a Code Section 280G analysis (with respect to all disqualified individuals as reasonably determined by the Company) and the Special Master shall Cause the Company to confer with the Buyer in good faith regarding such analysis.

Section 6.18.     Financial Statements. During the Interim Period, the Special Master shall Cause the Acquired Companies to furnish to the Buyer:

(a)     within ninety (90) days after the end of each fiscal year commencing with the fiscal year ending December 31, 2024, a consolidated balance sheet and related statements income and cash flow showing the financial position of the Acquired Companies as of the close of such fiscal year and the consolidated results of its operations during such fiscal year and setting forth in comparative form the corresponding figures for the prior fiscal year, which consolidated balance sheet and related statements of income and cash flow shall be audited by independent public accountants and accompanied by an opinion of such accountants (which shall not be qualified as to scope of audit) to the effect that such consolidated financial statements fairly present, in all material respects, the financial position and results of operations of the Acquired Companies on a consolidated basis in accordance with GAAP; and

(b)     within forty five (45) days after the end of each fiscal quarter, except for the fourth fiscal quarter, (i) a balance sheet showing the consolidated financial position of the

Acquired Companies as of the last day of such fiscal quarter and (ii) statements of income and cash flows showing the consolidated results of operations of the Acquired Companies for such fiscal quarter and the then-elapsed portion of the fiscal year and setting forth in comparative form the corresponding figures for the corresponding periods of the prior fiscal year. The consolidated balance sheet and related statements of operations and cash flows shall fairly present, in all material respects, the financial position and results of operations of the Acquired Companies on a consolidated basis in accordance with GAAP (subject to normal quarter-end review adjustments and the absence of footnotes).

Section 6.19.   Third Party Consents. Prior to the Closing, the Special Master shall Cause the Acquired Companies to, use reasonable best efforts to obtain, or cause to be obtained any third party consents required under any Material Contract (other than regulatory approvals that are governed by Section 6.3) in connection with the consummation of the Transactions; provided, that the Acquired Companies shall not agree to any modification of any term of or condition that is adverse to the Acquired Companies, in any applicable Material Contract or commit on behalf of the Buyer or its Affiliates (after giving effect to the Closing) or the Acquired Companies to any post-Closing obligation, in each case, in order to obtain any such consent, except with the prior written consent of the Buyer.

Section 6.20.   Transaction Support Agreement.

(a)     Prior to the Closing, the Record Holder shall not, and shall cause its Affiliates not to, consent to any termination, amendment, waiver or other modification of the Transaction Support Agreement in a manner that would reasonably be expected to prevent or materially delay the Buyer's ability to obtain the Debt Financing or consummate the Transactions without the prior written consent of the Special Master.

(b)     If (i) the Closing has not occurred prior to June 30, 2026, and (ii) as of such date, the Transaction Support Agreement has not otherwise terminated in accordance with its terms, the Record Holder shall exercise its right to extend the Initial Deadline (as defined in the Transaction Support Agreement) to the date that is eighteen (18) months after the Execution Date.

## ARTICLE VII

## CONDITIONS TO CLOSING

Section 7.1.   Conditions Precedent to Obligations of the Parties. The respective obligations of each of the Parties to consummate the Transactions are subject to the satisfaction, on or prior to the Closing, of each of the following conditions:

(a)     there shall not be in effect any Law or Order by a Governmental Body of competent jurisdiction restraining, enjoining or otherwise prohibiting the consummation of the Transactions;

(b)     the Sale Order Entry shall have occurred;

WEIL:\100337387\20\67816.0003

(c)    the OFAC License shall have been obtained; and

(d)    the waiting period applicable to the Transactions under the HSR Act (and any extensions thereof, including expiration of any voluntary timing agreement) shall have expired or early termination shall have been granted.

Section 7.2.    Conditions Precedent to Obligations of the Buyer. The obligations of the Buyer to consummate the Transactions are subject to the satisfaction, on or prior to the Closing, of each of the following conditions (any or all of which may be waived by the Buyer in whole or in part):

(a)    the Company Fundamental Representations shall be true and correct in all material respects (without giving effect to any "materiality", "Company Material Adverse Effect" or similar qualifiers contained in any of such representations and warranties) as of the Closing, as if made on and as of the Closing (except to the extent that any such Company Fundamental Representation, by its terms, is expressly limited to a specific date, in which case, as of such specific date);

(b)    the Special Master shall have performed and complied in all material respects with all obligations and agreements required by this Agreement to be performed or complied with by him on or prior to the Closing;

(c)    no Company Material Adverse Effect shall have occurred and remain ongoing; and

(d)    the Sale Order shall be in full force and effect in all respects and not subject to any stay.

Section 7.3.    Conditions Precedent to Obligations of the Special Master. The obligations of the Special Master to consummate the Transactions are subject to the satisfaction, on or prior to the Closing, of each of the following conditions (any or all of which may be waived by the Special Master in whole or in part):

(a)    the representations and warranties of the Buyer and the Record Holder, as applicable, set forth in Article V shall be true and correct (without giving effect to any "materiality", "material adverse effect", or similar qualifiers contained in any of such representations and warranties) as of the Closing as if made on and as of the Closing (except to the extent that any such representation or warranty, by its terms, is expressly limited to a specific date, in which case, as of such specific date), except for where the failure of such representations and warranties to be so true and correct would not (i) have a material adverse effect on the ability of the Buyer or the Record Holder to perform its obligations under this Agreement or (ii) otherwise prevent, or materially hinder or delay the consummation of the Transactions;

(b)    the Buyer shall have performed and complied in all material respects with all obligations and agreements required by this Agreement to be performed or complied with by the Buyer on or prior to the Closing; and

(c)      the Company shall have delivered the FIRPTA Certificate as set forth in Section 2.3(a)(iii).

Section 7.4.    <u>Frustration of Closing Conditions</u>. Neither the Special Master, nor the Buyer may rely, either as a basis for not consummating the Transactions or for terminating this Agreement and abandoning the Transactions, on the failure of any condition set forth in <u>Section 7.1</u>, <u>Section 7.2</u>, or <u>Section 7.3</u>, as the case may be, to be satisfied if such failure was caused by any material breach of a covenant, agreement, representation, or warranty of this Agreement by such Party.

## ARTICLE VIII

## TERMINATION

Section 8.1.    <u>Termination</u>. This Agreement may be terminated at any time prior to the Closing (notwithstanding the Sale Order Entry, except as otherwise specified below) as follows:

(a)      by mutual written consent of the Special Master (which consent shall be subject to approval of the Court) and the Buyer;

(b)      by the Special Master or the Buyer, by written notice to the other Party, if: the Closing has not occurred prior to the date that is twelve (12) months after the Execution Date (such date, the "<u>Initial Outside Date</u>" and, as may be automatically extended, or extended by the Special Master or the Buyer, pursuant to this <u>Section 8.1(b)</u>, the "<u>Outside Date</u>"); <u>provided</u>, that if the Closing has not occurred by the Initial Outside Date due to the nonsatisfaction of any of the conditions set forth in <u>Section 7.1(c)</u> (OFAC License), <u>Section 7.1(d)</u> (HSR Act) or <u>Section 7.2(d)</u> (Sale Order), then the Initial Outside Date shall be extended automatically for up to two (2) consecutive periods of ninety (90) calendar days each (the Initial Outside Date, as automatically extended pursuant to this proviso, the "<u>Extended Outside Date</u>"); <u>provided</u>, <u>further</u>, that without limiting the automatic ninety (90) calendar day extensions described herein, in the event the Transaction Support Agreement is terminated for any reason, each of the Special Master and the Buyer shall have the right, in his or its sole discretion, upon prior written notice to the other Party, to extend the Extended Outside Date for one hundred eighty (180) calendar days (and in no event shall the Outside Date extend beyond the date that is three hundred sixty (360) calendar days after the Initial Outside Date); <u>provided</u>, that notwithstanding the foregoing, the right to terminate this Agreement pursuant this <u>Section 8.1(b)</u> shall not be available to any Party whose failure to fulfill any obligation under this Agreement has caused or resulted in the failure of the Closing to occur on or before the Outside Date;

(c)      by the Special Master or the Buyer, by written notice to the other Party, if: there shall be any Law that makes consummation of the Transactions illegal or otherwise prohibited or if any Order preventing, enjoining or making illegal the Buyer, the Special Master or the Company from consummating the Transactions is entered and such Order shall become final and non-appealable (any such Law, Order, a "<u>Legal Restraint</u>"); <u>provided</u> that the right to terminate this Agreement under this <u>Section 8.1(c)</u> shall not be available to any Party whose failure to fulfill any obligation under <u>Section 6.3</u> hereof has principally caused or resulted in the

70

imposition of such Legal Restraint or the failure of such Legal Restraint to be resisted, resolved or lifted;

(d)     by the Special Master, (i) at any time after the Commencement Date and prior to the commencement of the No-Shop Period in order to enter into a Superior Proposal Agreement pursuant to Section 6.16(d) or (ii) subject to approval of the Court, at any time during the No-Shop Period but prior to the Sale Hearing in order to enter into an Unsolicited Competing Proposal Agreement pursuant to Section 6.16(e) that did not result from a breach of Section 6.16(b);

(e)     by the Buyer, by written notice to the Special Master, if there shall have been a breach by the Special Master of any of its representations, warranties, covenants or agreements contained in this Agreement, which breach would result in the failure to satisfy one or more of the conditions set forth in Section 7.2(a) or Section 7.2(b), and in any such case such breach shall be incapable of being cured or, if capable of being cured, shall not have been cured prior to the earlier of (i) forty-five (45) calendar days after providing written notice of such breach to the Special Master and (ii) the Outside Date; provided, that the Buyer shall not have the right to terminate this Agreement pursuant to this Section 8.1(e) if the Buyer is then in breach of this Agreement and such breach would result in the failure of any of the conditions set forth in Section 7.1 or Section 7.3;

(f)     by the Special Master (subject to approval of the Court), by written notice to the Buyer, if there shall have been a breach by the Buyer of any of its representations, warranties, covenants or agreements contained in this Agreement, which breach would result in the failure to satisfy one or more of the conditions set forth in Section 7.3(a) or Section 7.3(b), and in any such case such breach shall be incapable of being cured or, if capable of being cured, shall not have been cured prior to the earlier of (i) forty-five (45) calendar days after providing written notice of such breach to the Buyer and (ii) the Outside Date; provided, that the Special Master shall not have the right to terminate this Agreement pursuant to this Section 8.1(f) if the Special Master is then in breach of this Agreement and such breach would result in the failure of any of the conditions set forth in Section 7.1 or Section 7.2;

(g)     by the Special Master, after being ordered to terminate this Agreement by the Court, as a result of one or more of the Venezuela Parties (as defined in the Sale Procedures Order) proposing an alternative to the Transactions and such alternative is approved by the Court;

(h)     by the Special Master on the day following the expiration of the Topping Period if the Buyer has not delivered the executed Debt Commitment Letters in accordance with Section 6.9(c);

(i)     by the Special Master or the Buyer, by written notice to the other Party, if the Court issues an order in which it denies the Special Master's recommendation to designate this Agreement as either a stalking horse bid or as a base bid; or

(j)     by the Special Master, by written notice to the Buyer, if the Buyer has not delivered to the Special Master a copy of the Transaction Support Agreement, duly executed by

71

additional Consenting 2020 Noteholders that together satisfy the Minimum Participation Threshold (each as defined in the Transaction Support Agreement) by 5:00 p.m. Eastern Time on March 24, 2025.

Section 8.2.   Effect of Termination. In the event that this Agreement is validly terminated in accordance with Section 7.1, this Agreement shall immediately become null and void and the Parties shall be relieved of their duties and obligations arising under this Agreement after the date of such termination and such termination shall be without liability to the Buyer or the Record Holder, the Special Master or the Acquired Companies; provided, that (i) no such termination shall relieve any party hereto from any obligation to pay or cause to be paid, if applicable, the Termination Fee, the Expense Reimbursement Amount and (ii) the Confidentiality Agreement and the provisions of Section 3.3, this Section 8.2, Section 8.3 and Article IX hereof shall survive any such termination and remain valid and binding obligations of each of the Parties and of the Record Holder, as applicable.

Section 8.3.   Termination Fee and Expense Reimbursement.

(a)      To the extent this Agreement constitutes a Stalking Horse Bid Agreement, in consideration for the Buyer having expended considerable time and expense in connection with this Agreement and the Transactions, if this Agreement is terminated by the Special Master pursuant to Section 8.1(d)(i) or Section 8.1(d)(ii) and the transaction contemplated by the Superior Proposal are consummated, then the Special Master shall cause the acquiring party to the Superior Proposal Agreement or the Unsolicited Competing Proposal Agreement, as applicable (the "Superior Proposal Acquiror"), in accordance with the terms hereof and the January Order, to pay an amount equal to the Termination Fee, by wire transfer of immediately available funds to the Buyer on the closing date of the consummation of the transactions provided in such Superior Proposal Agreement or Unsolicited Competing Proposal Agreement, as applicable; provided, however, that the Special Master shall have no obligation to cause the Superior Proposal Acquiror to pay such Termination Fee to the Buyer if (i) the Buyer does not deliver the Debt Commitment Letters, duly executed by each Debt Financing Source, in accordance with Section 6.9(c), prior to the end of the Topping Period, (ii) the Superior Proposal Agreement or the Unsolicited Competing Proposal Agreement, as applicable, is not approved by the Court, (iii) the Buyer subsequently becomes the Successful Bidder (as defined in the Sale Procedures Order) or (iv) the transaction contemplated by the Superior Proposal Agreement or the Unsolicited Competing Proposal Agreement, as applicable, are for any other reason not consummated.

(b)      To the extent this Agreement constitutes Base Bid Agreement, in consideration for the Buyer having expended considerable time and expense in connection with this Agreement and the Transactions, if this Agreement is terminated by the Special Master pursuant to Section 8.1(d)(i) or Section 8.1(d)(ii), and the transaction contemplated by the Superior Proposal are consummated, then the Special Master shall cause the Superior Proposal Acquiror, in accordance with the terms hereof and the January Order, to pay an amount equal to the Expense Reimbursement Amount by wire transfer of immediately available funds to the Buyer on the closing date of the consummation of the transactions provided in such Superior Proposal Agreement or Unsolicited Competing Proposal Agreement, as applicable provided, however, that the Special Master shall have no obligation to cause the Superior Proposal

Acquiror to pay such Expense Reimbursement Amount to the Buyer if (i) the Buyer does not deliver the Debt Commitment Letters, duly executed by each Debt Financing Source, in accordance with <u>Section 6.9(c)</u>, prior to the end of the Topping Period, (ii) the Superior Proposal Agreement or the Unsolicited Competing Proposal Agreement, as applicable, is not approved by the Court, (iii) the Buyer subsequently becomes the Successful Bidder (as defined in the Sale Procedures Order) or (iv) the transaction contemplated by the Superior Proposal Agreement or the Unsolicited Competing Proposal Agreement, as applicable, are for any other reason not consummated.

(c)    To the extent the bid reflected in this Agreement constitutes the Successful Bid (as defined in the Sale Procedures Order), if, following the Sale Order Entry, this Agreement is terminated by the Buyer pursuant to <u>Section 8.1(b)</u> (solely to the extent such termination arises from the nonsatisfaction of the condition set forth in <u>Section 7.1(c)</u> (OFAC License) for any reason not related to the identity of the Buyer) or <u>Section 8.1(e)</u> (solely to the extent such termination, and the failure to satisfy one or more conditions set forth in <u>Section 7.2</u>, arises from either (i) the Special Master's breach of the covenants contained in <u>Section 6.1</u> or (ii) the occurrence of a Company Material Adverse Effect), then, pursuant to the bidder protections set forth in the January Order, the Buyer shall be deemed to hold a claim equal to the Expense Reimbursement Amount as a priority claim over the judgments held by Crystallex, ConocoPhillips and the Additional Judgment Creditors as set forth in the Priority Order [D.I. 996], dated March 1, 2024, in the Specified Litigation, which amount shall be paid to the Buyer from the proceeds, and at the closing, of a subsequent sale of the Shares pursuant to the Specified Litigation.

(d)    To the extent the bid reflected in this Agreement constitutes the Successful Bid, if, following the Sale Order Entry, this Agreement is terminated by the Special Master pursuant to <u>Section 8.1(g)</u>, then, pursuant to the bidder protections set forth in the January Order, the Buyer shall be entitled to be paid the Expense Reimbursement Amount in-full by the Venezuela Parties (as defined in the Sale Procedures Order) prior to any payments made on account of any other Specified Litigation Claims.

(e)    If (i) this Agreement is terminated by the Special Master pursuant to <u>Section 8.1(d)(i)</u> and (ii) the Superior Proposal Agreement is subsequently terminated because the Special Master enters into an Unsolicited Competing Proposal Agreement, then, in accordance with the January Order, to the extent the transaction contemplated by the Unsolicited Competing Proposal Agreement is consummated, (A) the Buyer shall be entitled to be paid the Termination Fee (to the extent this Agreement constitutes the Stalking Horse Bid Agreement) or the Expense Reimbursement Amount (to the extent this Agreement constitutes the Base Bid Agreement), as applicable, and (B) the Superior Proposal Acquiror with respect to the Superior Proposal Agreement shall be entitled to be paid the Expense Reimbursement Amount from the Unsolicited Competing Proposal acquiror from the proceeds, and at the closing, of the transactions provided in such Unsolicited Competing Proposal; <u>provided</u>, however, that the Buyer shall not be entitled to be paid the Termination Fee if the Buyer does not deliver the Debt Commitment Letters, duly executed by each Debt Financing Source, in accordance with <u>Section 6.9(c)</u>, as applicable, prior to the end of the Topping Period.

(f)     The Parties acknowledge and agree that (i) the Termination Fee (to the extent this Agreement constitutes the Stalking Horse Bid Agreement) or the Expense Reimbursement Amount (to the extent this Agreement constitutes the Base Bid Agreement) (as applicable) and other provisions of this <u>Section 8.3</u> are an integral part of the Transactions, (ii) the Termination Fee and the Expense Reimbursement Amount (in each case, to the extent applicable) shall constitute liquidated damages and not a penalty, and (iii) without these agreements, the Parties would not enter into this Agreement.

(g)     Notwithstanding anything to the contrary set forth in this Agreement, but subject to <u>Section 9.13</u> and this <u>Section 8.3(g)</u>, in the event this Agreement is terminated, each of the Parties expressly acknowledges and agrees that the Buyer's right to receive payment of the Termination Fee pursuant to <u>Section 8.3(a)</u> (to the extent this Agreement constitutes the Stalking Horse Bid Agreement) or the Expense Reimbursement Amount pursuant to <u>Section 8.3(b)</u> (to the extent this Agreement constitutes the Base Bid Agreement), the Expense Reimbursement Amount pursuant to <u>Section 8.3(c)</u> or <u>Section 8.3(d)</u> (to the extent the bid reflected in this Agreement constitutes the Successful Bid), or the Termination Fee or Expense Reimbursement Amount (as applicable) pursuant to <u>Section 8.3(e)</u> constitute the sole and exclusive remedy of the Buyer and its Affiliates, and all other affected Persons against the Special Master, the Company and each of their respective former, current or future Affiliates and any of their respective former, current or future general or limited partners, equityholders, subsidiaries, members, managers, directors, officers, employees, agents, Affiliates, successors, beneficiaries, heirs and assigns (collectively, the "<u>Special Master and Company Related Parties</u>") for all losses and damages (including attorneys' fees and expenses) in respect of this Agreement (and the termination hereof) or the Transactions (and the abandonment thereof), or any breach (whether intentional, unintentional or otherwise) of any representation, warranty, covenant or agreement in this Agreement, and none of the Buyer or its Affiliates or any other affected Person shall be entitled to bring or maintain any other Legal Proceeding against the Special Master, the Company or any other Special Master and Company Related Party relating to or arising out of this Agreement, or any of the Transactions or any matters forming the basis for such termination (whether at law, in equity, in contract, in tort or otherwise), and upon payment of the Termination Fee pursuant to <u>Section 8.3(a)</u> (to the extent this Agreement constitutes the Stalking Horse Bid Agreement) or the Expense Reimbursement Amount pursuant to <u>Section 8.3(b)</u> (to the extent this Agreement constitutes the Base Bid Agreement), the Expense Reimbursement Amount pursuant to <u>Section 8.3(c)</u> or <u>Section 8.3(d)</u> (to the extent the bid reflected in this Agreement constitutes the Successful Bid), or the Termination Fee or Expense Reimbursement Amount (as applicable) pursuant to <u>Section 8.3(e)</u>, none of the Special Master and Company Related Parties shall have any further liability or obligation to the Buyer or any other affected Person relating to or arising out of this Agreement or the Transactions. The Parties acknowledge and agree that in no event shall the Special Master or the Company be required to pay the Termination Fee or the Expense Reimbursement Amount.

(h)     For the avoidance of doubt, Buyer will not be entitled to receive the Termination Fee or the Expense Reimbursement Amount if Buyer has not delivered the Debt Commitment Letters, duly executed by each Debt Financing Source, in accordance with <u>Section 6.9(c)</u>, on or prior to the last day of the Topping Period, including to the extent the Special Master terminates this Agreement pursuant to <u>Section 8.1(h)</u>.

WEIL:\100337387\20\67816.0003

# ARTICLE IX

# MISCELLANEOUS

Section 9.1.    Survival. None of the representations and warranties contained in this Agreement or any of the other Transaction Documents (including any certificate to be delivered pursuant to this Agreement) and none of the covenants of any party required to be performed before the Closing (including obligations with which the Special Master agrees to Cause the Acquired Companies to comply) shall survive the Closing, and thereafter none of the Parties, the Record Holder or any of their Affiliates or any of their respective Representatives or any other Person shall have any liability whatsoever with respect to any such representation, warranty, covenant or agreement, and no claim for breach of any such representation or warranty, detrimental reliance or other right or remedy (whether in contract, in tort or at law or in equity) may be brought after the Closing with respect thereto. The provisions of this Section 9.1 will not, however, prevent or limit a cause of action to obtain an injunction to prevent breaches of this Agreement, to enforce specifically the terms and provisions hereof or for declaratory relief. Unless otherwise indicated, the covenants and agreements set forth in this Agreement which by their terms are required to be performed after the Closing shall survive the Closing until such covenants or agreements have been performed or satisfied.

Section 9.2.    Expenses. Whether or not the Transactions are consummated, and except as otherwise provided in this Agreement, each Party and the Record Holder will bear its respective fees, costs and expenses incurred in connection with the preparation, negotiation, execution and performance of this Agreement or the Transactions (including legal, accounting and other professional fees), and the Special Master Transaction Expenses shall be paid in accordance with Section 3.4(a) and the Advanced Transaction Expenses shall be paid in accordance with Section 3.4(c).

Section 9.3.    Governing Law. This Agreement and all Related Claims shall be governed by, construed and enforced in accordance with the internal Laws of the State of Delaware, without giving effect to any Laws (whether of the State of Delaware or any other jurisdiction) that would cause the application of the Laws of any jurisdiction other than the State of Delaware and without regard to any borrowing statute that would result in the application of the statutes of limitations or repose of any other jurisdiction. In furtherance of the foregoing, the Laws of the State of Delaware will control even if under such jurisdiction's choice of law or conflict of law analysis, the substantive or procedural law of some other jurisdiction would ordinarily or necessarily apply.

Section 9.4.    Dispute Resolution; Consent to Jurisdiction. Without limiting any Party's or the Record Holder's right to appeal any Order of the Court, (a) the Court shall retain exclusive jurisdiction to enforce the terms of this Agreement and to decide any dispute which may arise or result from, or be connected with, this Agreement, any breach or default hereunder, or the Transactions, and (b) any and all proceedings related to the foregoing shall be filed and maintained only in the Court, and the Parties and the Record Holder hereby consent to and submit to the jurisdiction and venue of the Court and shall receive notices at such locations as indicated in Section 9.7 (as may be updated from time to time in accordance with Section 9.7).

WEIL:\100337387\20\67816.0003

Section 9.5.    Consent to Service of Process; Waiver of Jury.

(a)    Each of the Parties and the Record Holder hereby consents to process being served by any party to this Agreement in any Legal Proceeding by the delivery of a copy thereof (other than by e-mail) in accordance with the provisions of Section 9.7.

(b)    EACH PARTY HERETO ACKNOWLEDGES THAT ANY LEGAL PROCEEDING, DIRECTLY OR INDIRECTLY, ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY RELATED CLAIM IS LIKELY TO INVOLVE COMPLICATED AND DIFFICULT ISSUES, AND THEREFORE EACH SUCH PARTY HERETO HEREBY IRREVOCABLY AND UNCONDITIONALLY WAIVES ANY RIGHT SUCH PARTY MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY SUCH LEGAL PROCEEDING OR RELATED CLAIM. EACH PARTY HERETO CERTIFIES AND ACKNOWLEDGES THAT: (I) NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF SUCH LEGAL PROCEEDING, SEEK TO ENFORCE THE FOREGOING WAIVER; (II) IT UNDERSTANDS AND HAS CONSIDERED THE IMPLICATIONS OF THIS WAIVER; (III) IT MAKES THIS WAIVER VOLUNTARILY AND (IV) IT HAS BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION 9.5(B).

Section 9.6.    Entire Agreement.

(a)    This Agreement (including the Company Disclosure Schedules and any Exhibits hereto) and the Transaction Documents contain the entire understanding and agreement between the Parties and the Record Holder with respect to the subject matter hereof and thereof, and supersede all prior and contemporaneous agreements, discussions, negotiations, correspondence, communications, undertakings and understandings among the Parties with respect to such subject matter (except for the Confidentiality Agreement, which shall continue in full force and effect in accordance with its terms as modified hereunder). The Parties and the Record Holder have voluntarily agreed to define their rights, liabilities and obligations with respect to the Transactions exclusively in contract pursuant to the express terms and provisions of this Agreement and the other Transaction Documents, and the Parties and the Record Holder expressly disclaim that they are owed any duties or are entitled to any remedies not expressly set forth in this Agreement or the other Transaction Documents. Furthermore, the Parties and the Record Holder each hereby acknowledge that this Agreement embodies the justifiable expectations of sophisticated parties derived from arm's-length negotiations; the Parties and the Record Holder specifically acknowledge that no party has any special relationship with another party that would justify any expectation beyond that of ordinary parties in an arm's-length transaction.

(b)    The sole and exclusive remedies for any breach of the terms and provisions of this Agreement (including any representations and warranties set forth herein, made in connection herewith or as an inducement to enter into this Agreement) or any claim or cause of action otherwise arising out of or related to the Transactions shall be those remedies available at law or in equity for breach of contract against the Parties to this Agreement or the Record Holder only (as such contractual remedies have been further limited or excluded pursuant

76

to the express terms of this Agreement), and then only subject to the limitations hereunder, the Parties and the Record Holder hereby agreeing that neither Party or the Record Holder shall have any remedies or causes of action (whether in contract, tort, statute or otherwise) for any statements, communications, disclosures, failures to disclose, representations or warranties not explicitly set forth in this Agreement.

(c)     All representations and warranties set forth in this Agreement are contractual in nature only and subject to the sole and exclusive remedies set forth herein.

(d)     The Transactions relate to the purchase and sale of the Shares conducted pursuant to Section 324 of the Delaware General Corporation Law and the Sale Procedures Order, under which the Special Master has the authority to carry out the Transactions herein contemplated to be carried out by him. In connection therewith, the Designated Managers have furnished Specified Information to the Special Master. The Special Master, the Designated Managers, the Acquired Companies, its direct or indirect Subsidiaries and their respective Representatives have no liabilities or obligations hereunder or in respect of the Transactions for monetary damages or other relief (other than, if the conditions applicable thereto are satisfied, the Special Master's obligations to transfer the Shares and take or cause to be taken other actions under this Agreement and the Sale Procedures Order) except as expressly provided in Section 9.13. By executing this Agreement, each of the Parties waives on their behalf and on the behalf of their respective Representatives and forever relinquishes any right, claim or cause of action for damages or any other form of monetary relief against the Special Master, or any such Person based on, relating to or arising out of the Specified Information, this Agreement and any of the Transactions.

Section 9.7.     Amendments and Waivers. This Agreement may not be amended except by an instrument in writing signed by the Buyer and the Special Master; provided that (x) this Section 9.7, Section 9.10, Section 9.11, Section 9.15(b) and Section 9.17 (and any defined term used, directly or indirectly, in any of the foregoing) may not be amended or modified in a manner that is materially adverse to the Debt Financing Sources without the prior written consent of the Debt Financing Sources. No waiver by any Party or the Record Holder of any provision of this Agreement or any breach of this Agreement hereunder, whether intentional or not, shall be valid unless the same shall be in writing and signed by the party making such waiver. The waiver by any Party or the Record Holder of a breach of any provision of this Agreement shall not operate or be construed as a further or continuing waiver of such breach or as a waiver of any other or subsequent breach. No failure on the part of any Party or of the Record Holder to exercise, and no delay in exercising, any right, power or remedy hereunder shall operate as a waiver thereof, nor shall any single or partial exercise of such right, power or remedy by such Party or the Record Holder preclude any other or further exercise thereof or the exercise of any other right, power or remedy. Any amendment to, or the Special Master's waiver of, a provision of this Agreement of which the Acquired Companies or the Venezuela Parties are third-party beneficiaries in accordance with Section 9.11 will require the prior written consent of the Company to the extent such amendment or waiver would be reasonably likely to adversely impact the Acquired Companies or the Venezuela Parties.

Section 9.8.     Notices. All notices, requests, instruction, demands and other communications under this Agreement shall be in writing and shall be deemed given (a) when

WEIL:\100337387\20\67816.0003

delivered personally by hand (with written confirmation of receipt), (b) on the date sent by e-mail (provided confirmation of email receipt is obtained) if sent during normal business hours of the recipient, and on the next Business Day if sent after normal business hours of the recipient, or (c) when received by the addressee if sent by nationally recognized overnight delivery service (with written confirmation of receipt), in each case, at the following addresses (or to such other address as a party may have specified by notice given to the other party pursuant to this provision):

| | |
|---|---|
| If to the Special Master, to: | Robert B. Pincus in his capacity as Special Master for the United States District Court for the District of Delaware [redacted] |
| With a copies to: | Weil, Gotshal & Manges LLP, counsel to the Special Master<br>767 Fifth Avenue<br>New York, NY 10153<br>Email: Horizon.Notice@weil.com |
| If to the Buyer, to: | As set forth in Section 9.8(a) of the Buyer Disclosure Schedules |
| If to the Record Holder, to: | As set forth in Section 9.8(b) of the Buyer Disclosure Schedules |

Section 9.9.    Severability. If any term or other provision of this Agreement is invalid, illegal, or incapable of being enforced by any Law or public policy, all other terms or provisions of this Agreement shall nevertheless remain in full force and effect so long as the economic or legal substance of the Transactions is not affected in any manner materially adverse to any party. Upon such determination that any term or other provision is invalid, illegal, or incapable of being enforced, the Parties and the Record Holder shall negotiate in good faith to modify this Agreement so as to effect the original intent of the Parties and the Record Holder as closely as possible in an acceptable manner such that the Transactions are consummated as originally contemplated to the greatest extent possible.

Section 9.10.    Binding Effect; Assignment. This Agreement shall be binding upon and inure to the benefit of the Parties and, as applicable, the Record Holder, and their respective successors and permitted assigns and, without limiting the foregoing, references to the "Special Master" in this Agreement shall be deemed to include any successor, substitute or replacement thereof. This Agreement shall not be assigned by (a) the Buyer or the Record Holder without the prior written consent of the Special Master or (b) the Special Master, without the prior written consent of the Buyer; provided, however, that nothing in this Agreement shall or is intended to limit the ability of the Buyer to assign its rights or delegate its responsibilities, liabilities and obligations under this Agreement, in whole or in part, to one or more of its controlled Affiliates, and, effective as of such assignment, Buyer shall remain jointly and severally liable with the

78

assignee for the performance of any obligations arising under, or in connection with, this Agreement.

Section 9.11.   No Third Party Beneficiaries. Nothing in this Agreement shall confer any rights, remedies or claims of any nature upon any Person other than the Parties and, as applicable, the Record Holder, and their respective successors or permitted assigns, except for the rights of (a) the Indemnitees as set forth in Section 6.6; (b) the Non-Parties (including the Acquired Companies and their Representatives) set forth in Section 9.12; (c) the Released Parties and the Buyer Released Parties as set forth in Section 9.15; (d) the Debt Financing Sources as set forth in Section 6.10, Section 8.2, Section 8.3, Section 9.7 and Section 9.17; (e) the Venezuela Parties as set forth in Section 6.1(g) and Section 6.16(i); and (f) the Acquired Companies and their Representatives with respect to Section 4.22, Section 5.12 and Section 9.1. All of the Persons identified as third-party beneficiaries in the immediately preceding sentence shall be entitled to enforce such provisions and to avail themselves of the benefits of any remedy for any breach of such provisions, all to the same extent as if such Persons were parties to this Agreement.

Section 9.12.   Non-Recourse. This Agreement may only be enforced against, and any Related Claims may only be made or asserted against (and are expressly limited to) the Persons that are expressly identified as the Parties or as the Record Holder in the preamble to this Agreement and solely in their capacities as such. No Person who is not a Party or the Record Holder, including the Acquired Companies and any current, former or future Affiliate or Representative of any Party or the Acquired Companies or any current, former, or future Affiliate or Representative of any of the foregoing (such Persons, collectively, but specifically excluding the Parties, "Non-Parties"), shall have any liability (whether at law or in equity, based upon contract, tort, statute or otherwise) for obligations or liabilities arising under, in connection with or related to this Agreement or for any Related Claim and each Party and the Record Holder hereby irrevocably waives and releases all such liabilities, obligations and Related Claims against any such Non-Party. Without limiting the rights of any Party hereto or, as applicable, the Record Holder against the other Parties as set forth herein, in no event shall any Party, any of its Affiliates or any Person claiming by, through or on behalf of any of them institute any Related Claim against any Non-Party. In no event shall any Person be liable for the Fraud of any other Person, and a claim for Fraud may only be asserted against the Person that committed such Fraud; provided, that, in no case will any claim for Fraud be asserted against the Special Master.

Section 9.13.   Specific Performance.

(a)     The Parties and the Record Holder agree that irreparable damage would occur in the event that any of the provisions of this Agreement were not performed in accordance with their specific terms or were otherwise breached, and that money damages or legal remedies would not be an adequate remedy for any such damages. Therefore, it is accordingly agreed that prior to the termination of this Agreement in accordance with Section 8.1, each Party shall be entitled to an injunction or injunctions to prevent or restrain any breach or threatened breach of this Agreement by any other party and to seek specific performance of the terms and provisions of this Agreement, to prevent breaches or threatened breaches of, or to enforce compliance with, the covenants and obligations of any other party, in any court of competent jurisdiction, and appropriate injunctive relief shall be granted in connection therewith. Such remedies shall be in

79

addition to and not in substitution for any other remedy to which such party is entitled at law or in equity. If either Party or the Record Holder brings any action to enforce specifically the performance of the terms and provisions hereof by the other Party or by the Record Holder, the Outside Date shall be automatically extended by (i) the amount of time during which such action is pending, plus twenty (20) Business Days or (ii) such other time period established by the court presiding over such action.

(b)     Each Party hereto and the Record Holder hereby waives (i) any defenses in any action for specific performance, and agrees not to oppose the granting of an injunction, specific performance or other equitable relief as provided herein, on the basis that (A) the other Party and, as applicable, the Record Holder, has an adequate remedy at law or (B) an award of specific performance is not an appropriate remedy for any reason at law or in equity and (ii) any requirement under any Law to post a bond or other security as a prerequisite to obtaining equitable relief.

(c)     The Parties and the Record Holder agree that (i) by seeking the remedies provided for in this Section 9.13, no party shall in any respect waive its right to seek at any time any other form of relief that may be available to it under this Agreement or any other Transaction Document (including monetary damages) in the event that this Agreement has been terminated or in the event that the remedies provided for in this Section 9.13 are not available or otherwise are not granted, and (ii) nothing set forth in this Section 9.13 shall require any party hereto to institute any proceeding for (or limit any party's right to institute any proceeding for) specific performance under this Section 9.13 prior to or as a condition to exercising any termination right under Article VIII, nor shall the commencement of any Legal Proceeding pursuant to this Section 9.13 or anything set forth in this Section 9.13 restrict or limit any party's right to terminate this Agreement in accordance with the terms of Article VIII or pursue any other remedies under this Agreement any other Transaction Document that may be available then or thereafter; provided, that, in no event will Buyer be entitled to receive both (A) a grant of specific performance to cause the Closing to occur and (B) the Termination Fee or the Expense Reimbursement Amount (as applicable).

Section 9.14.     Successors and Assigns. The provisions of this Agreement shall be binding upon and inure to the benefit of the Parties and their respective successors and assigns; provided that no Party may assign, delegate or otherwise transfer any of its rights or obligations under this Agreement without the consent of the Special Master and the other Parties.

Section 9.15.     Release.

(a)     Effective as of the Closing Date, except for any rights or obligations under this Agreement or any of the other Transaction Documents, each of the Buyer, the Record Holder and the Company on behalf of itself and each of its Affiliates and Representatives and each of its current, former and future officers, directors, employees, partners, members, advisors, successors and assigns (collectively, the "Buyer Releasing Parties"), hereby irrevocably and unconditionally releases and forever discharges (A) the Special Master and each of his current, former and future financial advisors, attorneys, consultants or other advisors and his and their respective, successors and assigns, the Designated Managers, the other Company Employees listed in the Procedures Summary, and (B) any other current or former employees, directors, officers,

80

partners, members or managers of the Acquired Companies who participated in the Buyer's due diligence and investigation of the Acquired Companies, the preparation of the Company Disclosure Schedules or the preparation, negotiation or consummation of the Transactions or otherwise participated in the sale process contemplated by the Sale Procedures Order and any other individuals as reasonably agreed by Buyer and the Special Master during the Interim Period, and (the Persons described in the immediately preceding clause (A) and clause (B), collectively, the "Special Master Released Parties") of and from any and all actions, claims, causes of action, controversies, demands, rights, indemnities, guaranties, suits, proceedings, obligations, liabilities, executions, judgments, damages, duties, debts, dues, offsets, powers, privileges, accounts, bonds, contracts and covenants (whether express or implied), and claims and demands whatsoever, known or unknown, contingent or non-contingent, matured or unmatured, suspected or unsuspected, foreseen or unforeseen, liquidated or unliquidated, disputed or undisputed, secured or unsecured, assertable directly or derivatively, whether in contract or in tort, in law or in equity which the Buyer Releasing Parties now has or in the future may have against each of the Special Master Released Parties and the Financing Parties, in respect of any cause, matter or thing based on or relating to, or in any manner arising from, in whole or in part, the business or operations of the Acquired Companies, the Transactions or the ownership of Shares by the Released Parties, in each case, occurring or arising on or prior to the date of the Closing Date. The Buyer, on behalf of itself and each Buyer Releasing Party, covenants and agrees that no Buyer Releasing Party shall assert any such claim against the Special Master Released Parties; provided, however, that nothing herein shall operate as a release of any causes of action or liabilities unknown to the Buyer Releasing Party as of the Closing Date arising out of willful misconduct, fraud or criminal acts of a Special Master Released Party.

(b)      Effective as of the Closing Date, except for any rights or obligations under this Agreement or any of the other Transaction Documents, the Special Master and on behalf of himself and each of his current, former and future financial advisors, attorneys, consultants or other advisors and his and their respective, successors and assigns (collectively, the "Special Master Releasing Parties"), hereby irrevocably and unconditionally releases and forever discharges the Buyer, the Company, the Financing Parties, their respective Affiliates and Representatives and each of its and their respective current, former and future officers, directors, employees, partners, members, advisors, successors and assigns (collectively, the "Buyer Released Parties") of and from any and all actions, claims, causes of action, controversies, demands, rights, indemnities, guaranties, suits, proceedings, obligations, liabilities, executions, judgments, damages, duties, debts, dues, offsets, powers, privileges, accounts, bonds, contracts and covenants (whether express or implied), and claims and demands whatsoever, known or unknown, contingent or non-contingent, matured or unmatured, suspected or unsuspected, foreseen or unforeseen, liquidated or unliquidated, disputed or undisputed, secured or unsecured, assertable directly or derivatively, whether in contract or in tort, in law or in equity which the Special Master Releasing Parties now has or in the future may have against each of the Buyer Released Parties, in respect of any cause, matter or thing relating to the business or operations of the Acquired Companies or the Transactions, in each case, occurring or arising on or prior to the date of the Closing Date. The Special Master, on behalf of itself and each Special Master Releasing Party, covenants and agrees that no Special Master Releasing Party shall assert any such claim against the Buyer Released Parties; provided, however, nothing herein shall operate as a release of any causes of action or liabilities unknown to the Special Master Releasing Party

81

as of the Closing Date arising out of willful misconduct, fraud or criminal acts of the Buyer, the Company or a Financing Party.

Section 9.16.    <u>Counterparts</u>. This Agreement may be executed in one or more counterparts including by facsimile or other means of electronic transmission, such as by electronic mail in ".pdf" form, each of which will be deemed to be an original copy of this Agreement and all of which, when taken together, will be deemed to constitute one and the same agreement.

Section 9.17.    <u>Debt Financing Sources</u>. Notwithstanding anything in this Agreement to the contrary, the Special Master hereby:

(a)    agrees that any proceeding, whether in law or in equity, whether in contract or in tort or otherwise, involving the Debt Financing Sources, arising out of or relating to, this Agreement, the Debt Financing and/or any of the agreements (including the Debt Commitment Letter) entered into in connection with the Debt Financing or any of the transactions contemplated hereby or thereby or the performance of any services thereunder shall be subject to the exclusive jurisdiction of any federal or state court in the Borough of Manhattan, New York, New York, so long as such forum is and remains available, and any appellate court thereof and each Party hereto irrevocably submits itself and its property with respect to any such proceeding to be the exclusive jurisdiction of such court;

(b)    agrees that any such proceeding shall be governed by the laws of the State of New York (without giving effect to any conflicts of law principles that would result in the application of the laws of another state), except as otherwise provided in the Debt Commitment Letter or any other applicable definitive document relating to the Debt Financing;

(c)    without limiting the rights of the Buyer under the Debt Commitment Letter and/or any right or remedy available to any person under the definitive documentation governing the Debt Financing, agrees not to bring or support or permit any of its Affiliates to bring or support any proceeding of any kind or description, whether in law or in equity, whether in contract or in tort or otherwise, against any Debt Financing Source in any way arising out of or relating to, this Agreement, the Debt Financing and/or any of the agreements (including the Debt Commitment Letter) entered into in connection with the Debt Financing or any of the transactions contemplated hereby or thereby or the performance of any services thereunder in any forum other than any federal or state court in the Borough of Manhattan, New York, New York;

(d)    agrees that service of process upon the Acquired Companies and/or each of its controlled Affiliates or the Special Master in any such proceeding shall be effective if notice is given in accordance with <u>Section 9.7</u>;

(e)    irrevocably waives, to the fullest extent that it may effectively do so, the defense of an inconvenient forum to the maintenance of such Legal Proceeding in any such court;

(f)    knowingly, intentionally and voluntarily waives, to the fullest extent permitted by Law, trial by jury in any proceeding brought against any Debt Financing Source in any way arising out of or relating to this Agreement, the Debt Financing and/or any of the

agreements (including the Debt Commitment Letter) entered into in connection with the Debt Financing or any of the transactions contemplated hereby or thereby or the performance of any services thereunder;

(g)     without limiting the rights of the Buyer under the Debt Commitment Letter and/or any right or remedy available to any person under the definitive documentation governing the Debt Financing, agrees that none of the Debt Financing Sources will have any liability to the Acquired Companies and/or any of their respective controlled Affiliates (in each case, other than the Buyer and the Buyer Subsidiaries) or the Special Master relating to or arising out of this Agreement, the Debt Financing and/or any of the agreements (including the Debt Commitment Letter) entered into in connection with the Debt Financing or any of the transactions contemplated hereby or thereby or the performance of any services thereunder, whether in law or in equity, whether in contract or in tort or otherwise; and

(h)     agrees that the Debt Financing Sources are express third party beneficiaries of, and may enforce, any of the provisions of this Section 9.17 and that such provisions and the definitions of "Debt Commitment Letter," "Debt Financing," and "Debt Financing Sources," shall not be amended in any way adverse to any Debt Financing Source without the prior written consent of such Debt Financing Source.

Section 9.18.   Special Master and his Representatives' Judicial Immunity. The Buyer and the Record Holder agree that in no circumstance shall the Special Master or his Representatives be personally or otherwise liable for any amounts or obligations owed to the Buyer or, as applicable, to the Record Holder, for any breach of any representations or warranties in this Agreement, or for any other claims or liabilities arising out of or in connection with this Agreement or the transaction contemplated by this Agreement. The Buyer and the Record Holder further agree that the Special Master and his Representatives are acting as an arm of the Court and are entitled to judicial immunity in the performance of their duties and in connection with this Agreement and the Transactions.

Section 9.19.   Special Master Indemnification. From and after the Closing, the Buyer and the Record Holder shall, and shall cause each Acquired Company to, indemnify, defend and hold harmless, to the fullest extent permitted under applicable Law, the Special Master against any and all losses, damages, liabilities, deficiencies, claims, actions, judgments, settlements, interest, awards, penalties, fines, costs or expenses of whatever kind, including attorneys' fees, that are incurred by Special Master, arising out of or related to this Agreement. Further, from and after the Closing, the Buyer shall, or shall cause the Acquired Companies to, advance any expenses (including fees and expenses of legal counsel) of the Special Master under this Section 9.19 (including in connection with enforcing the indemnity and other obligations referred to in this Section 9.19), as incurred, to the fullest extent permitted under applicable Law.

*[Signature Pages Follow]*

WEIL:\100337387\20\67816.0003

IN WITNESS WHEREOF, the parties hereto have duly executed this Agreement as of the day and year first written above.

RED TREE ACQUISITIONS, LLC, as the Buyer

By: _____
Name:
Title:

ROBERT B. PINCUS, as the Special Master

By: _____
Name:
Title:

RED TREE INVESTMENTS, LLC, as the Record Holder

By: _____
Name:
Title:

[SIGNATURE PAGE TO STOCK PURCHASE AGREEMENT]

**ANNEX A**

DEFINITIONS

"Acquired Companies" means, collectively, the Company and each of the Company Subsidiaries.

"Additional Judgment Creditors" means the judgment holders, other than Crystallex Corporation and ConocoPhillips Petrozuata B.V., set forth in the Priority Order [D.I. 996], dated March 1, 2024, in the Specified Litigation.

"Advanced Transaction Expenses" means, as provided in the Sale Procedures Order and the May Order (in each case as in effect on Execution Date), the Special Master's compensation and any out-of-pocket costs, fees and expenses incurred by the Special Master in connection with the Transactions for investment bankers, third party consultants, legal counsel and any of his other Representatives or Advisors (as defined in the Sale Procedures Order) that have previously been paid as an advance by the Sale Process Parties and Additional Judgment Creditors pursuant to the procedures set forth in the May Order, which for the avoidance of doubt will include the monthly expenses of the Special Master (including fees and expenses of Weil, Gotshal & Manges LLP, Potter Anderson & Carroon LLP, Jenner & Block LLP, Evercore and any other advisors engaged by the Special Master).

"Affiliate" means, with respect to any Person, any other Person that, directly or indirectly through one or more intermediaries, controls, or is controlled by, or is under common control with, such Person, and the term "control" (including the terms "controlled by" and "under common control with") means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of such Person, whether through ownership of voting securities, by contract or otherwise.

"Ancillary Agreements" means any other agreement, document, instrument or certificate contemplated by this Agreement to be executed by and between the Buyer, on the one hand, and the Special Master, on the other hand.

"Anti-Corruption Laws" means any Law for the prevention or punishment of public or commercial corruption or bribery, including the U.S. Foreign Corrupt Practices Act, U.K. Bribery Act 2010 and any other applicable anti-corruption or anti-bribery Law of any other applicable jurisdiction.

"Antitrust Laws" means the HSR Act, the Sherman Act, the Clayton Act, the Federal Trade Commission Act, and any other Laws that are designed to prohibit, restrict or regulate actions having the purpose or effect of monopolization, lessening of competition, or restraint of trade.

"Business Day" means any day of the year other than (a) a Saturday, Sunday or federal holiday in the United States or (b) a day on which national banking institutions in New York, New York are required or authorized to close.

A-1

"<u>Business Unit</u>" each of (a) Corpus Christi Refinery, (b) Crude Supply & Trading, (c) Lake Charles Refinery, (d) Lemont Refinery, (e) Lights Oils Marketing, (f) Logistics, (g) Lubricants, (h) Procurement, (i) Product Supply & Trading, (j) Specialty Products, and (k) Terminals & Pipelines.

"<u>Buyer Subsidiary</u>" means any Subsidiary of the Buyer, as of the Execution Date.

"<u>Cash</u>" means the cash and cash equivalents of the Acquired Companies; <u>provided</u>, that Cash shall (a) exclude (i) all issued but uncleared checks and drafts of the Acquired Companies, (ii) cash deposits and cash held in escrow accounts, (iii) with respect to any cash held outside the United States, all Taxes, fees, expenses and other costs associated with repatriating such cash into the United States, (iv) cash held by the Acquired Companies for third parties, and (v) cash held as collateral for outstanding letters of credit and any other restricted or trapped cash; and shall (b) include all checks and wire transfers and drafts deposited or available for deposit for the account of the Acquired Companies.

"<u>CITGO Petroleum</u>" means CITGO Petroleum Corporation, a Delaware corporation.

"<u>Claim</u>" means (a) a right to a payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured or (b) an equitable remedy for breach of performance if such breach gives rise to a right to payment, whether or not such right to an equitable remedy is reduced to judgment, fixed, contingent, matured, unmatured, disputed, undisputed, secured or unsecured. Without limiting the foregoing and for the avoidance of doubt, a Claim includes any loss, liability, demand, claim, judgment, sanction, penalty, action, obligation, commitment, assessment, settlement, fee, debt, deficiency, guaranty of any kind, proceeding, damage, cost, or expense (including court costs and professional fees (including attorneys' fees and costs)) whatsoever, whether at law or in equity, whether known or unknown, fixed, liquidated, contingent, or otherwise, whether under any theory of successor or transferee liability and whether imposed by agreement, understanding, law, or otherwise.

"<u>Claim Commitment Letter</u>" means the executed Commitment Letter, dated as of March 16, 2025, by and between Contrarian Capital Management, LLC and VR Global Partners, LP.

"<u>Closing Consideration</u>" means $3,698,985,643.02, <u>plus</u> the aggregate amount of accrued interest on judgments held by the Claimholders (other than Claimholders junior to the Record Holder) from the date hereof through the Closing in accordance with that certain Order entered by the Court on April 25, 2024 [D.I. 1136], <u>minus</u> the Deposit Amount, <u>minus</u> the Credit Bid Amount.

"<u>Closing Release</u>" means that certain release, dated the Closing Date, in the form attached hereto as <u>Exhibit C</u> or otherwise in form and substance acceptable to the Special Master.

"<u>Closing Transaction Expenses</u>" means the Special Master Transaction Expenses that are unpaid as of the Closing.

"COBRA" means Part 6 of Subtitle B of Title I of ERISA, Section 4980B of the Code and any similar state applicable Law.

"Code" means the U.S. Internal Revenue Code of 1986, as amended.

"Commencement Date" means the date on which the Court issues an order identifying the bid reflected in this Agreement as a stalking horse bid or a base bid.

"Company Benefit Plan" means (a) each "employee benefit plan" (as such term is defined in Section 3(3) of ERISA), (b) each plan, program, policy, agreement or arrangement that would be an "employee benefit plan" (within the meaning of Section 3(3) of ERISA), if it were subject to ERISA, (c) each stock purchase, stock option, restricted stock, stock bonus, stock ownership, stock appreciation rights, phantom equity, profits interests or other equity or equity-based plan or agreement, (d) each compensation, bonus, commission, incentive or deferred compensation plan, agreement, arrangement, program, policy or practice, (e) each employment or consulting agreement, offer letter or severance, retention, change of control, termination, employee loan or other compensation plan, agreement, arrangement, program, policy, or practice, (f) each health or welfare plan, agreement, arrangement, program, policy, or practice, and (g) each vacation policy, or other employee fringe benefit or perquisite arrangement whether or not subject to ERISA, in the cases of clauses (a) through (g), (x) that is maintained, sponsored, or contributed to by (or required to be contributed to by) any Acquired Company or with respect to which any Acquired Company has any liability and (y) under which any current or former director, officer, manager, employee, contractor or consultant of any Acquired Company has any present or future right to benefits or is eligible to participate.

"Company Fundamental Representations" means the representations and warranties set forth in Section 4.1 (Corporate Existence; Title to Shares) and Section 4.4 (Capitalization).

"Company Material Adverse Effect" means any state of facts, change, development, event, effect, circumstance, condition or occurrence (each, an "Effect") that, individually or in the aggregate, (x) would materially delay or impair the ability of the Special Master or the Acquired Companies (as applicable) to consummate the Transactions pursuant to the terms of this Agreement, in each case, other than Claims or Legal Proceedings arising out of or in relation to the Sale Order, the Purported Equity Pledge or the Equity Pledge Litigation or (y) results in or would reasonably be expected to have a material adverse effect on the condition (financial or otherwise), business, assets, liabilities or results of operations of the Acquired Companies and the Non-Controlled Entities, taken as a whole; provided, however, that in no event shall any of the following Effects, alone or in combination, be deemed to constitute, or be taken into account, in determining whether there has been, or would be, a Company Material Adverse Effect (A) any changes or conditions in the U.S. or any other national or regional economy, any global economic changes or conditions or securities, credit, financial or other capital markets conditions; (B) any changes or conditions affecting the oil and gas industry in general (including changes to the prices of commodities or of the raw material inputs or value of the outputs of the Company's products, general market prices and regulatory changes affecting the industry); (C) any weather-related or other force majeure event or outbreak (including earthquakes, hurricanes, tsunamis, tornadoes, floods, mudslides, wild fires or other natural disasters); (D) pandemics, epidemics, COVID-19 measures, acts of war (whether or not declared), armed hostility (by

recognized governmental forces or otherwise), sabotage, terrorism or cyber-attack, and any escalation or general worsening of any of the foregoing or other response to any Governmental Bodies (including requirements for business closures, restrictions on operations or "sheltering-in-place"); (E) Effects resulting from the negotiation, execution, announcement, pendency, compliance with or performance of this Agreement, the Transactions or the terms hereof or the consummation of the Transactions, including the impact thereof on the relationships of the Acquired Companies with customers, suppliers, partners, employees or Governmental Bodies; (F) any action taken by an Acquired Company or failure of such Acquired Company to take action, in each case, which the Buyer has requested in writing or consented to when asked under Section 6.1; (G) changes in applicable Law or in GAAP or in accounting standards, or any changes in the interpretation or enforcement by any Governmental Body of any of the foregoing, or any changes in general legal or regulatory conditions, including any Effects arising out of, in connection with, or as a result of, any "shut-down" or funding freeze of the U.S. federal government (including any of its agencies); (H) any failure to meet any internal projections, forecasts, guidance, estimates, milestones, or budgets or internal or published financial or operating predictions of revenue, earnings, cash flow or cash position; (I) any downgrade in the Company's credit rating (it being understood that the exceptions in clauses (H) and (I) shall not prevent or otherwise affect a determination that the underlying cause of any such Effect referred to therein (if not otherwise falling within any of the exceptions provided hereof) is a Company Material Adverse Effect); (J) compliance with, or any action required to be taken by the Buyer or its Affiliates under the terms of this Agreement or in connection with the Transactions including Section 6.3(e); or (K) Claims or Legal Proceedings arising out of or in relation to the Sale Order, the Purported Equity Pledge or the Equity Pledge Litigation; provided, that in the case of clauses (A), (B), (C), (D) and (G), to the extent the impact on the Acquired Companies, taken as a whole, is disproportionately adverse compared to the impact on similarly situated entities, the incrementally disproportionate impact or impacts shall be taken into account in determining whether there has been, or would reasonably be expected to be, a Company Material Adverse Effect.

"Company Subsidiary" means any Subsidiary of the Company.

"Contract" means any written or oral contract, agreement, lease, easement, license, sublicense, subcontract, note, evidence of indebtedness, mortgage, indenture, bond, letter of credit, purchase order, binding bid, security agreement or other legally binding arrangement, whether express or implied (including all amendments, supplements, and modifications thereto), but shall exclude Permits and Company Benefit Plans.

"Convertible Notes Commitment Letter" means the executed Convertible Notes Commitment Letter, dated as of the date hereof, by and between Red Tree Investments, LLC and the Investor named therein, together with the Secured Convertible Note Term Sheet attached thereto.

"Credit Support Arrangements" means guaranties, performance bonds, performance guaranties, indemnities, keep-wells, sureties, bankers' acceptances, letters of credit, agreement to assume liabilities, other security, credit support or financial assurances and any other Contract or arrangement pursuant to which any person is or may be directly or indirectly liable or responsible

WEIL:\100337387\20\67816.0003

for the liabilities, or the maintenance of a financial position, of any other person, including by the posting (or potential forfeiture) of any collateral, security or bond.

"Debt" means, with respect to the Acquired Companies, without duplication, the following obligations: (i) the principal amount of obligations of the Acquired Companies (A) for borrowed money, whether or not contingent whether current, short term or long term and whether secured or unsecured, or (B) evidenced by notes, debentures, bonds or other similar instruments (including debt-like instruments) or debt securities; (ii) all obligations of the Acquired Companies for the reimbursement of any obligor of any guaranties, performance bonds, performance guaranties, indemnities, keep-wells, sureties, bankers' acceptances, letters of credit or similar arrangements, to the extent drawn upon; (iii) all liabilities of any Person (other than any Acquired Company) for which any Acquired Company has guaranteed repayment (to the extent of such guarantee); (iv) all obligations for deferred purchase price of property, assets or services, all conditional sale obligations, earnouts, holdbacks or other similar obligations (calculated at the full amount of the possible payment outstanding); (v) all obligations under finance leases; (vi) non-current liabilities; (vii) post-retirement welfare benefits and unfunded or underfunded pensions; (viii) to the extent drawn, obligations under the Receivables Securitization Facility; and (ix) all obligations of the type referred to in clauses (i) through (viii) above of other Persons secured by any Lien on any property or asset of the Acquired Companies, whether or not such obligation is assumed by the Acquired Companies (with Debt under this clause (ix) being limited, in the case of any such obligation of another Person, to the lower of such obligation and the fair market value of the properties and assets securing the same). Debt shall not include (A) any amounts included in Closing Transaction Expenses, (B) any obligations or guarantees under bankers acceptance, letters of credit or similar arrangements to the extent undrawn as of the Closing Date and which do not become drawable as a result of the Transactions, (C) any intercompany Debt of the Company and its wholly owned Subsidiaries and (D) any Taxes.

"Debt Financing Documents" means any credit agreements, note purchase agreements, engagement letters, fee letters, indentures, guarantees, pledge and security documents, definitive financing documents, agreements, schedules or other certificates or documents contemplated by the Debt Financing.

"Debt Financing Source" means, in its capacity as such, any lender, similar debt financing source, agent or arranger providing or arranging a commitment to, or that has entered into definitive agreements related to, the Debt Financing, including pursuant to the Debt Commitment Letter (as modified by any joinder agreement, amendment, or other modification thereto as permitted hereunder) or any Debt Financing Document (or any other commitment letter or definitive agreement in respect of any alternative debt financing) and their respective current, former and future Affiliates, and such Person's (and their respective Affiliates') former, current or future direct or indirect equityholders, members, employees, officers, directors, attorneys, agents or advisors, and, in each case, their respective successors and assigns; provided, however, that neither the Buyer nor any of its Affiliates shall constitute a Debt Financing Source.

"Deposit Forfeiture Termination Event" means the occurrence of this Agreement being terminated (i) by the Special Master or the Buyer pursuant to Section 8.1(b) (Outside Date) or Section 8.1(c) (Legal Restraint); provided, however, that termination pursuant to Section 8.1(c)

(Legal Restraint) shall not constitute a Deposit Forfeiture Termination Event to the extent that such Legal Restraint was not caused by any action or inaction of Buyer in breach of this Agreement or related to the Buyer's identity or (ii) by the Special Master pursuant to Section 8.1(f) (Buyer Breach).

"Designated Managers" means the employees of the Company or its Subsidiaries designated as such in the Procedures Summary.

"Economic Sanctions/Trade Laws" means all Laws relating to export controls, anti-boycott, and Sanctions Targets, including prohibited or restricted international trade and financial transactions and lists maintained by any Governmental Body targeting countries, territories, entities or persons, including the United States, the United Nations Security Council, the European Union, or His Majesty's Treasury of the United Kingdom. For the avoidance of doubt, the Laws referenced in the foregoing sentence include (1) any of the Trading With the Enemy Act, the International Emergency Economic Powers Act, the United Nations Participation Act, or the Syria Accountability and Lebanese Sovereignty Act, or any regulations of OFAC, or any export control Law applicable to U.S.-origin goods, technology, or software, or any enabling legislation or executive order relating to any of the above, as collectively interpreted and applied by the U.S. Government at the prevailing point in time, (2) any U.S. sanctions related to or administered by the U.S. Department of State and (3) any sanctions measures or embargoes imposed by the United Nations Security Council, His Majesty's Treasury or the European Union.

"Environmental Laws" means any and all Laws relating to (a) pollution or the protection, cleanup, preservation or restoration of the environment or natural resources (including air, water, land, soil, subsoil, wildlife, plants, or other natural resources), (b) the generation, manufacture, processing, handling, use, labeling, treatment, storage, disposal, transportation, or Release or threatened Release of, or exposure to, any Hazardous Substance, or (c) the health and safety of Persons, including the following, to the extent applicable: the Comprehensive Environmental Response, Compensation, and Liability Act, 42 U.S.C. §§ 9601 et seq.; the Federal Water Pollution Control Act, 33 U.S.C. § 1251 et seq.; the Clean Air Act, 42 U.S.C. § 7401 et seq.; the Toxic Substances Control Act, 15 U.S.C. § 2601 et seq.; the Emergency Planning and Community Right to Know Act of 1986, 42 U.S.C. § 11001 et seq.; the Safe Drinking Water Act, 42 U.S.C. § 300(f) et seq.; the Hazardous Materials Transportation Act, 49 U.S.C. § 5101 et seq.; the Federal Insecticide, Fungicide and Rodenticide Act, 7 U.S.C. § 136 et seq.; the Resource Conservation and Recovery Act of 1976, 42 U.S.C. § 6901 et seq.; the Oil Pollution Act of 1990, 33 U.S.C. § 2701 et seq.; the Occupational Safety and Health Act, 29 U.S.C. §651 et seq. (with respect to human exposure to Hazardous Substances); the Endangered Species Act of 1973, 16 U.S.C. §§ 1531 et seq.; the Bald and Golden Eagle Protection Act, 16 U.S.C. § 668 et seq.; the Migratory Bird Treaty Act, 16 U.S.C. § 703 et seq.; and any similar or implementing state or local Law, all amendments or regulations promulgated thereunder.

"EPP" means the CITGO Petroleum Corporation Executive Protection Plan, as amended.

"Equitable Exceptions" means, collectively, (a) applicable bankruptcy, insolvency, reorganization, moratorium and similar Laws affecting creditors' rights and remedies generally, and (b) general principles of equity, including principles of commercial reasonableness, good

WEIL:\100337387\20\67816.0003

faith and fair dealing (regardless of whether enforcement is sought in a proceeding at law or in equity).

"Equity Interests" means, with respect to any entity, any and all capital stock, shares, quotas, limited liability company interests (however designated), partnership or membership interests or units (whether general or limited), or other similar interest or participation that confers on a Person the right to receive a share of the profits and losses of, or distribution of assets of, such entity, the right to vote for or appoint directors (or other similar governing body members) of such entity or the right to otherwise cause the direction or management and policies of such entity in a manager, general partner or other similar capacity.

"Equity Pledge Litigation" means the case of Petroleos de Venezuela S.A. v. MUFG Union Bank, N.A., 19-10023 (KPF) (S.D.N.Y.) that was initiated on October 29, 2019 by PDVSA, the Company and CITGO Holding against the 2020 Collateral Agent and the 2020 Trustee in their capacities as collateral agent and trustee, respectively, for the 2020 Bondholders, disputing the Purported Equity Pledge.

"ERISA" means the Employee Retirement Income Security Act of 1974 and the rules and regulations thereunder.

"ERISA Affiliate" means with respect to any Person, trade or business, or entity, any other Person, trade or business, or entity, (a) that is, or was at the relevant time, a member of a group described in Section 414(b), (c), (m) or (o) of the Code that includes, or included at the relevant time, the first Person, trade or business, or entity, or (b) that is, or was at the relevant time, a member of the same "controlled group" as the first Person, trade or business, or entity pursuant to Section 4001(a)(14) of ERISA.

"Escrow Account" means the escrow account established pursuant to the Escrow Agreement in respect of the Deposit Amount.

"Evaluation Criteria" means the non-exhaustive list of criteria, as approved by the Court pursuant to the January Order, based on which the Special Master shall determine which bid to recommend as the stalking horse bid, base bid or Successful Bid, if any and as applicable.

"Exchanges Offer" means one or more exchange offers conducted by the Company or its Subsidiaries on or after the Execution Date with respect to the 2020 Bonds in accordance with the terms of the Transaction Support Agreement.

"Existing Senior Secured Notes" means the 6.375% Senior Secured Notes and the 8.375% Senior Secured Notes, or any of them.

"Expense Reimbursement Amount" means an amount equal to the reasonable and documented out-of-pocket costs, fees and expenses, inclusive of any out-of-pocket financing commitment structuring and placement fees, incurred by the Buyer in connection with the Transactions; provided, that in no event shall the Expense Reimbursement Amount exceed $30,000,000.

"Expense Reserve Holdback Account" means the account established by the Special Master in respect of the Expense Reserve Holdback Amount.

"Expense Reserve Holdback Amount" means a reasonable amount to be determined by the Special Master in good faith that is approved by the Court prior to Closing.

"Financing Party" means, in its capacity as such, any Debt Financing Source, any financing source that provides equity financing in connection with the Transactions, any placement agent in connection with such equity financing, and their respective current, former and future Affiliates, and such financing source's or placement agent's (and their respective Affiliates') current, former and future direct or indirect equityholders, members, employees, officers, directors, attorneys, investment bankers, financial advisors, agents or other advisors; provided, however, that neither the Buyer nor any of its Affiliates shall constitute a Financing Party.

"Fraud" means a knowing misrepresentation of a material fact or concealment of a material fact by a Person with respect to any representation or warranty in this Agreement or the other Transaction Documents which is made or concealed with the specific intent to deceive and the intent of inducing another Person to enter into the Transaction Documents; provided, that at the time such representation was made (a) such representation was materially inaccurate, (b) such Person had actual knowledge (and not imputed or constructive knowledge), without any duty of inquiry or investigation, of the material inaccuracy of such representation, (c) such Person had the specific intent to deceive another Person and (d) the other Person acted in reliance on such inaccurate representation and suffered financial injury as a result of such material inaccuracy. For the avoidance of doubt, "Fraud" does not include any Claim for equitable fraud, promissory fraud, unfair dealings fraud, or any torts (including a Claim for fraud) based on negligence or recklessness.

"Good Industry Practice" means any of the practices, methods, standards, procedures and actions which could reasonably be expected to be used or taken by a reasonably prudent operator of properties or other assets, as applicable, similar to the applicable properties or other assets of the Acquired Companies, in each case, in light of the facts and circumstances known as of the relevant time of measurement. "Good Industry Practice" is not intended to be limited to the optimal practice, method, standard, procedure or action to the exclusion of all others, but rather is intended to include a range of practices, methods, standards or actions that meet the foregoing qualifications.

"Government Contract" means any Contract, grant, basic ordering agreement, letter contract, or order with (i) any Governmental Body, (ii) another Person under such other Person's prime contract with a Governmental Body, or (iii) any higher tier subcontractor of a Governmental Body in its capacity as a subcontractor, for which the period of performance has not expired or terminated, or final payment has not been received, or which remains open to audit as of the Execution Date. Unless otherwise indicated, a task, purchase or delivery order under a Government Contract will not constitute a separate Government Contract for purposes of this definition but will be part of the Government Contract under which it was issued.

A-8

"Governmental Body" means any domestic or foreign national, state, multi-state, municipal or other local government, including any governmental, regulatory, or administrative department, division, subdivision, agency, bureau, board, commission, or authority thereof, or any quasi-governmental or private body exercising any regulatory or taxing authority (to the extent that the rules, regulations or orders of such organization or authority have the force of Law), or any court, tribunal or arbitral body of competent jurisdiction.

"Hazardous Substance" means any substance, material or waste that is regulated, listed, designated, classified, defined or characterized under or pursuant to any Environmental Law as "hazardous," "toxic," "radioactive", a "pollutant," a "contaminant," or words of similar meaning, including petroleum or petroleum products, byproducts, derivatives, crude oil or any fraction thereof, PFAS, explosive materials, radioactive materials, asbestos, lead-based paint, or polychlorinated biphenyls.

"HSR Act" means the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended.

"Interest Rate" means (x) the rate of interest published from time to time by The Wall Street Journal, Eastern Edition, as the "prime rate" at large U.S. money center banks during the period from the date that payment is due to the date of payment, plus (y) one percent (1.0%).

"Interim Period" means the period beginning on the date of the Sale Order Entry and ending upon the earlier of the Closing and the termination of this Agreement in accordance with its terms.

"IRS" means the United States Internal Revenue Service.

"January Order" means that certain *Memorandum Order* [D.I. 1554] entered by the Court on January 27, 2025 in the Specified Litigation.

"Judgment Creditors" means the judgment holders in the Specified Litigation.

"Knowledge of the Buyer" means the actual knowledge (and not imputed or constructive knowledge) of any of the Persons set forth in Section 1.1(b) of the Buyer Disclosure Schedules after due inquiry.

"Knowledge of the Company" or "Company's Knowledge" means the actual knowledge (and not imputed or constructive knowledge) of the Designated Managers after due inquiry.

"Knowledge of the Special Master" means actual knowledge (and not imputed or constructive knowledge) of the Special Master.

"Law" means any applicable foreign, federal, state, local law (including common law), statute, treaty, code, ordinance, rule, regulation, judgment, decree, binding directive, policy, injunction, Order or other legal requirement of any Governmental Body; provided, that in no event shall "applicable Law" be deemed to include Laws and Orders of the Bolivarian Republic of Venezuela.

A-9

"<u>Legal Proceeding</u>" means any judicial, regulatory, administrative or arbitral action, suit, claim, appeal, cause of action, objection, demand, inquiry, audit, notice of violation, citation, summon, subpoena, enforcement action, complaint, proceeding, or investigation of any nature, civil, criminal, public or private.

"<u>Lien</u>" means, with respect to any asset, any mortgage, lien, pledge, charge, security interest or encumbrance of any kind in respect of such asset.

"<u>Lookback Date</u>" means the date that is three (3) years prior to the Execution Date.

"<u>Marketing Period</u>" means a period of fifteen (15) consecutive Business Days commencing on the last day of which the conditions set forth in <u>Section 7.1</u> shall have been satisfied or waived in accordance with this Agreement; <u>provided</u>, that such fifteen (15) consecutive Business Days period shall exclude April 18, 2025, May 26, 2025, June 19, 2025, July 4, 2025, September 1, 2025, November 27, 2025, November 28, 2025, December 24, 2025 through January 1, 2026, January 19, 2026, February 16, 2026, and April 3, 2026 which days, for purposes of such calculation, shall not constitute Business Days (<u>provided,</u> that, for the avoidance of doubt, such exclusions (other than for the period commencing on December 24, 2025 and ending on January 1, 2026) shall not restart such fifteen (15) consecutive Business Day period).

"<u>Money Laundering Laws</u>" means any law or regulation regarding money laundering, financial recordkeeping and reporting requirements or terrorism financing, including the U.S. Currency and Foreign Transactions Reporting Act of 1970, the U.S. Money Laundering Control Act of 1986, the USA PATRIOT Act of 2001, and any applicable money laundering-related laws of other jurisdictions where the Acquired Companies conduct business, conduct financial transactions or own assets.

"<u>Negative Consequences</u>" means (a) if related to any consent with respect to any Contract, (i) any default, breach or violation of such Contract (or any default, breach or violation that would result with notice, lapse of time or both) or (ii) any modification or supplement to the rates, service levels, performance schedules or other terms or conditions of such Contract or any right to modify any of the foregoing, in each case, that would be or reasonably could be expected to be adverse to the Acquired Companies, (b) the imposition of any restriction, limitation or new covenant on any Acquired Company, (c) the imposition or creation of any Lien on any assets or properties of any Acquired Company, (d) any right of termination, cancellation, revocation, non-renewal or acceleration or loss of benefit or vesting of any right of any person, in each case, that would be or reasonably could be expected to be adverse to any of the Acquired Companies (upon the exercise of any rights or otherwise), (e) any right to receive any rebate, chargeback, refund, credit or penalty and (f) any payment, compensation or incremental liability (or any right to any payment, compensation or incremental liability).

"<u>Net Deposit Amount</u>" means the Deposit Amount <u>minus</u> the aggregate amount of any (a) Advanced Transaction Expenses <u>plus</u> (b) unpaid Special Master Transaction Expenses, and in the case of each of clauses (a) and (b), that have been approved by the Court pursuant to the Sale Procedures Order.

"No-Shop Period" means the period beginning on the date that is five (5) Business Days after the conclusion of the Topping Period, and ending on the Closing Date or the date on which this Agreement terminates pursuant to its terms.

"Non-Controlled Entity" means any entity in which an Acquired Company owns, directly or indirectly, any Equity Interest other than a Company Subsidiary.

"OFAC" means the U.S. Department of the Treasury's Office of Foreign Assets Control.

"OFAC License" means a general or specific license or licenses from OFAC authorizing the Parties to participate in and close the Transaction.

"OFAC License Application" means a request for an OFAC License pursuant to 31 CFR § 501.801 or other relevant authority.

"Order" means any order, injunction, judgment, decree, ruling, writ, assessment or arbitration award of a Governmental Body, other than the Bolivarian Republic of Venezuela.

"Ordinary Course" means the ordinary and usual course of day-to-day operations of the Acquired Companies and/or the Non-Controlled Entities (as applicable), in each case, consistent with past practice, taken as a whole.

"Organizational Documents" means the charter, memorandum, certificate of incorporation, articles of association, bylaws, partnership agreements, limited liability company agreement, operating agreement, or other similar document of a Person, as may be amended, restated or otherwise modified from time to time.

"Paying Agent Account" means the deposit account established by the Paying Agent pursuant to the terms of the Paying Agent Agreement for the benefit of the Claimholders.

"PCI DSS" means the Payment Card Industry Data Security Standard, issued by the Payment Card Industry Security Standards Council, as revised from time to time.

"Permit" means all permits, licenses, approvals, tariffs, certifications, consents, registrations, variances, exemptions, waivers, Orders, franchises and other authorizations of any Governmental Body.

"Permitted Liens" means (a) all defects, exceptions, restrictions, easements, rights of way and encumbrances of record; (b) Liens securing liabilities which are reflected or reserved against in the consolidated balance sheet of the Company prepared in accordance with GAAP to the extent so reflected or reserved; (c) Liens for Taxes not yet due and payable or that are being contested in good faith through appropriate proceedings and for which adequate reserves are being maintained in accordance with GAAP; (d) landlords', mechanics', carriers', workers', repairers' and similar statutory Liens arising or incurred in the Ordinary Course; (e) zoning, building code, entitlement and other land use restrictions and Environmental Laws; (f) title of a lessor under a capital or operating lease, and leases, subleases, and similar transactions in the Ordinary Course; (g) any license, covenant or other right to or under Intellectual Property granted in the Ordinary Course; (h) gaps in the chain of title for Intellectual Property evident from the

WEIL:\100337387\20\67816.0003

public records of the Governmental Body maintaining the applications or registrations therefor; (i) Liens set forth in Section 1.1(d) of the Company Disclosure Schedules; (j) the Purported Equity Pledge; (k) Claims or Legal Proceedings seeking to enforce judgments against PDVSA or the Bolivarian Republic of Venezuela by recovering from the Acquired Companies; and (l) such other imperfections in title, charges, easements, restrictions and encumbrances which would not result in a Company Material Adverse Effect.

"Person" means any individual, corporation, partnership, limited liability company, firm, joint venture, association, joint-stock company, trust, unincorporated organization, Governmental Body or other entity.

"Personal Information" means all information that identifies, could be used to identify or is otherwise related to an individual person or household, including demographic, health, behavioral, biometric, financial, nonpublic, and geolocation information, IP addresses, network and hardware identifiers, employee information, and any other individually identifiable information that is protected under any applicable Privacy Law and Obligation, in addition to any definition for "personal information", "personal data", "personally identifiable information", "protected health information" or any similar term provided by applicable Privacy Laws and Obligations.

"PFAS" stands for per- and polyfluoroalkyl substances and means any substance which contains at least one fully fluorinated methyl or methylene carbon atom (without any hydrogen (H)/chlorine/bromine/iodine atom attached to it), including any acids, salts, precursors, polymers or derivatives thereof.

"Post-Closing Tax Period" means any taxable period beginning after the Closing Date.

"Preferential Right" means any rights of first refusal, rights of first offer, put or call options, preferential rights to purchase, preemptive rights, change in control, or other similar rights in favor of any Person.

"Procedures Summary" means the procedures described in Section 1.1(e) of the Company Disclosure Schedules.

"Purchase Price" means the Closing Consideration, plus the Deposit Amount, plus the Credit Bid Amount, plus the Advanced Transaction Expenses Amount, plus the Closing Transaction Expenses, plus the Expense Reserve Holdback Amount.

"Purported Equity Pledge" means the purported pledge of 50.1% of the equity in CITGO Holding, Inc., a Delaware corporation and wholly owned direct subsidiary of the Company that purportedly secured, in part, the 2020 Bonds.

"Record Holder Subsidiary" means any Subsidiary of the Record Holder.

"Related Claim" means any Legal Proceeding that may be based upon, arise out of or relate to this Agreement or the negotiation, execution, performance, breach, interpretation, construction, validity or enforcement of this Agreement (including any Legal Proceeding based

WEIL:\100337387\20\67816.0003

upon, arising out of or related to any representation or warranty made or alleged to be made in or in connection with, or as an inducement to enter into, this Agreement).

"<u>Release</u>" means any actual or threatened releasing, spilling, leaking, pumping, pouring, emitting, emptying, discharging, injecting, escaping, or allowing to escape, leaching, migrating, dumping, abandoning, or disposing into or through the indoor or outdoor environment (including soil, surface water, ground water, land surface, subsurface strata, ambient air, wildlife, plants or other natural resources).

"<u>Representatives</u>" means, with respect to any Person, such Person's equityholders, partners, members, officers, directors, employees, consultants, agents, attorneys, accountants, advisors, financing sources and other representatives.

"<u>Required Information</u>" shall mean the specific financial statements, financial data, audit reports and other information regarding the Company or its Subsidiaries (including that of each of CITGO Holding, Inc., as an issuer, and CITGO Petroleum, as a potential issuer of securities) in each case, to the extent prepared by the Company and/or its Subsidiaries in the Ordinary Course that are (i) required by clauses (a) and (b) of paragraph 6 of Exhibit D to the Debt Commitment Letter or (ii) otherwise reasonably requested by Buyer to the extent that, in the case of this clause (ii), such information is of the type that would be required for a Rule 144A offering by CITGO Petroleum to consummate the offering of any securities or debt contemplated to be issued in respect of any Financing.

"<u>RRP</u>" means the CITGO Petroleum Corporation Retirement Restoration Plan, as amended.

"<u>Sale Order</u>" means an order of the Court that approves this Agreement and the Transactions in a form to be reasonably agreed by the Parties on or prior to the Final Recommendation Date.

"<u>Sale Process Parties</u>" means, as set forth in Sale Procedures Order, Crystallex International Corporation**,** the Bolivarian Republic of Venezuela**,** PDVSA, the Company, CITGO Petroleum Corporation**,** and Phillips Petroleum Company Venezuela Limited and ConocoPhillips Petrozuata B.V.

"<u>Sanctioned Country</u>" means any country or territory that is the target of country-wide or territory-wide Economic Sanctions/Trade Laws which, as of the Execution Date, are Iran, Cuba, Syria, North Korea, and certain occupied regions of Ukraine, including the Crimea region, the non-government-controlled areas of Zaporizhzhia and Kherson and the so-called Donetsk or Luhansk People's Republics.

"<u>Sanctions Target</u>" means (1) any country or territory that is the target of country-wide or territory-wide Economic Sanctions/Trade Laws, which, as of the Execution Date, are Iran, Cuba, Syria, North Korea, and certain occupied regions of Ukraine, including the Crimea region, the non-government-controlled areas of Zaporizhzhia and Kherson and the so-called Donetsk or Luhansk People's Republics; (2) a Person that is on the Specially Designated Nationals and Blocked Persons List or any of the other sanctioned persons lists published by OFAC, or any similar list of sanctioned persons issued by the U.S. Department of State; (3) a Person that is

located or resident in or organized under the laws of a country or territory that is identified as the subject of country-wide or territory-wide Economic Sanctions/Trade Laws; or (4) an entity that, under applicable Economic Sanctions/Trade Laws, is automatically a target of restrictions or prohibitions because it is owned or controlled by a country or territory identified in clause (1) or Person in clauses (2) or (3) above.

"Security Incident" means any unauthorized or unlawful access, acquisition, exfiltration, manipulation, erasure, loss, use, or disclosure that compromises the confidentiality, integrity, availability or security of Sensitive Data or the Systems, or that triggers any reporting requirement under any breach notification Law or contractual provision, including any ransomware or denial of service attacks that prevent or materially degrade access to Sensitive Data or the Systems.

"Sensitive Data" means all Personal Information, confidential information, proprietary information, intellectual property, and any other information protected by applicable Law or contract that is collected, maintained, stored, transmitted, used, disclosed, or otherwise processed by, for or on behalf of the Acquired Companies.

"Solvent" means, with respect to any Person as of a particular date, that on such date, such Person and its Subsidiaries (on a consolidated basis) (a) have property with fair value greater than the total amount of their debts and liabilities, contingent (it being understood that the amount of contingent liabilities at any time shall be computed as the amount that, in light of all the facts and circumstances existing at such time, represents the amount that can reasonably be expected to become an actual or matured liability in the ordinary course), subordinated or otherwise, (b) have assets with present fair salable value not less than the amount that will be required to pay their liability on their debts as they become absolute and matured in the ordinary course, (c) will be able generally to pay their debts and liabilities, subordinated, contingent or otherwise, as they become absolute and matured in the ordinary course, (d) are not engaged in business or a transaction, and are not about to engage in business or a transaction, for which their property would constitute an unreasonably small capital and (e) does not intend to, and does not believe that it will, incur debts or liabilities beyond such Person's ability to pay such debts and liabilities as they mature.

"Special Master Transaction Expenses" means, as provided in the Sale Procedures Order and the May Order (in each case as in effect on Execution Date), the Special Master's compensation and any out-of-pocket costs, fees and expenses incurred by the Special Master in connection with the Transactions for investment bankers, third party consultants, legal counsel and any of his other Representatives or Advisors (as defined in the Sale Procedures Order), which for the avoidance of doubt will include fees and expenses of Weil, Gotshal & Manges LLP, Potter Anderson & Carroon LLP, Jenner & Block LLP, Evercore and any other advisors engaged by the Special Master.

"Specially Designated Nationals and Blocked Persons List" means the list of blocked persons, specifically designated nationals, specially designated terrorists, specially designated global terrorists, foreign terrorist organizations, specially designated narcotics traffickers, and

WEIL:\100337387\20\67816.0003

blocked vessels referenced in Appendix A to 31 CFR Chapter V, as updated and made available at http://www.treasury.gov/sdn.

"Specified Information" means information furnished by Designated Managers to the Special Master (a) as used in Article IV, with respect to the representations and warranties relating to the Acquired Companies, and (b) as used in Section 6.10, in connection with such covenant.

"Subsidiary" means, when used with respect to any Person, any other Person, whether incorporated or unincorporated, of which (a) more than fifty percent of the voting securities or other ownership interests is owned by such Person or one or more of its Subsidiaries, (b) such Person or one or more of its Subsidiaries is a general partner or holds a majority of the voting interests of a partnership or (c) securities or other interests having by their terms ordinary voting power to elect more than fifty percent of the board of directors or others performing similar functions with respect to such corporation or other organization, are directly owned or controlled by such Person or by any one or more of its Subsidiaries.

"Systems" means the information technology systems, operational technology systems, and infrastructure used, owned, leased or licensed by or for the Acquired Companies, including industrial control systems, software, computer programs (in both source and object code form), servers, databases, firmware, hardware, equipment, networks, record keeping, communications, telecommunications, interfaces, platforms, peripherals and related systems.

"Tax" or "Taxes" means (a) all federal, state, local or foreign taxes, charges, fees, levies or other assessments, including, all net income, excise, stamp, real or personal property, ad valorem, withholding, social security (or similar), unemployment, occupation, use, production, service, service use, license, net worth, payroll, franchise, severance, transfer, recording, employment, premium, windfall profits, environmental, customs duties, capital stock, profits, disability, sales, registration, value added, alternative or add-on minimum, estimated taxes and any other taxes of any kind whatsoever; (b) all interest, penalties, fines and additions to tax imposed in connection with any item described in clause (a) of this definition; and (c) any liability for the payment of any amounts of the type described in clause (a) or (b) as a result of being (or ceasing to be) a member of an affiliated, consolidated, combined, unitary, aggregate or similar group for any period, including pursuant to Treasury Regulation Section 1.1502-6 or any similar applicable Law; and (d) any liability for the payment of any amounts of the type described in clauses (a)-(c) as a result of being treated as a successor or transferee to any Person (whether by Contract, statute or otherwise), as a result of any secondary liability or as a result of any express or implied obligation to indemnify any other Person.

"Tax Returns" means any return, report, form or similar statement filed or required to be filed with respect to any Tax (including any attached schedules), including, any information return, claim for refund, amended return or declaration of estimated Tax.

"Taxing Authority" means any Governmental Body exercising any authority to impose, assess or collect any Tax or any other authority exercising Tax regulatory authority.

A-15

"Termination Fee" means (i) the amount, not to exceed $75,000,000 in the aggregate, of actual and documented out-of-pocket expenses incurred by the Buyer and its Affiliates in connection with the negotiation and execution of this Agreement and the other Transaction Documents and the consummation of the Transactions (provided that the Buyer shall provide written confirmation of the amount of such expenses) in the event such fee becomes payable on or prior to the Final Recommendation Date or (ii) in the event such fee becomes payable after the Final Recommendation Date, an amount equal to $112,000,000; provided, however that, if this Agreement is amended to include the satisfaction of additional Attached Judgments junior to the Record Holder, the Termination Fee pursuant to this clause (ii) shall be automatically increased to an amount equal to three percent (3%) of the aggregate value of Attached Judgments that would be satisfied, whether in cash or agreed non-cash consideration (without giving effect to escrowed funds, earn-outs or similarly contingent consideration) at the Closing if the Closing were to occur on the date of the applicable termination of this Agreement, but in no event shall the Termination Fee exceed $150,000,000.

"Termination Release" means that certain release in the form attached hereto as Exhibit D or otherwise in form and substance acceptable to the Special Master.

"Third-Party Record Holder" means Huntington Ingalls Incorporated and Huntington Ingalls Industries Incorporated.

"Topping Period" means the period beginning on the Commencement Date and ending on the date that is thirty (30) calendar days after the Commencement Date or such other date or extended date as approved by the Court.

"Transaction Documents" means this Agreement, the Sale Order, the Escrow Agreement, the Paying Agent Agreement, the Debt Commitment Letter, the Convertible Commitment Letters and all other agreements and instruments to be executed by the Buyer, the Special Master and/or the Company at or prior to the Closing pursuant to this Agreement.

"Transactions" means the transactions contemplated by this Agreement and the other Transaction Documents.

"Transfer Taxes" means any real property transfer, sales, use, value added, stamp, documentary, recording, registration, conveyance, stock transfer, intangible property transfer, personal property transfer, registration, stamp, duty, or similar fees or Taxes or governmental charges (together with any interest or penalty, addition to Tax or additional amount imposed) as levied by any Taxing Authority or other Governmental Body in connection with the Transactions, including any payments made in lieu of any such Taxes or governmental charges that become payable in connection with the Transactions.

"Treasury Regulations" means the regulations promulgated under the Code.

"VDR" means the virtual data room established by Representatives of the Special Master to facilitate the provisions of information to potential bidders pursuant to the Sale Procedures Order to which the Buyer and its Representatives have had access prior to the date of this Agreement.

A-16

"2020 Bonds" means the 8.50% senior secured notes due in 2020 in the aggregate principal amount of $3,367,529,000, issued by PDVSA pursuant to the 2020 Indenture.

"2020 Bondholders" means the holders of the 2020 Bonds.

"2020 Collateral Agent" has the meaning set forth in the definition of "2020 Indenture."

"2020 Indenture" means the indenture issued on October 27, 2016, by PDVSA, as issuer, with PDVSA Petróleo, S.A., as guarantor, MUFG Union Bank, N.A., as trustee (the "2020 Trustee"), GLAS Americas LLC, as collateral agent (the "2020 Collateral Agent"), Law Debenture Trust Company of New York, as registrar, transfer agent and principal agent, and Banque Internationale À Luxembourg, Société Anonyme, as Luxembourg paying agent.

"2020 Trustee" has the meaning set forth in the definition of "2020 Indenture."

"6.375% Senior Secured Notes" means CITGO Petroleum Corporation's 6.375% senior secured notes due 2026, issued pursuant to the indenture dated as of February 11, 2021 among CITGO Petroleum Corporation as Issuer, the guarantors party thereto, and TMI Trust Company as trustee.

"8.375% Senior Secured Notes" means CITGO Petroleum Corporation's 8.375% senior secured notes due 2029, issued pursuant to the indenture dated as of September 20, 2023 among CITGO Petroleum Corporation as Issuer, the guarantors party thereto, and Argent Institutional Trust Company as trustee.

A-17

**A-1**

*Agreed Form*
Confidential

## ESCROW AGREEMENT

THIS ESCROW AGREEMENT (this "Agreement") is entered into and effective this [•] day of [•], 2025, by and among ████████████████████, a ████████ limited liability company (the "Escrow Agent"), Red Tree Acquisitions, LLC, a Delaware limited liability company ("Buyer")[1] and Robert B. Pincus, solely in his capacity as special master for the Honorable Leonard P. Stark, United States District Court for the District of Delaware (the "Special Master" and together with Buyer, the "Parties"), in connection with that certain Stock Purchase Agreement, dated as of March 21, 2025 (the "Purchase Agreement"), by and between Buyer and the Special Master. As between the Parties, capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the Purchase Agreement.

WHEREAS, Buyer and the Special Master have entered into the Purchase Agreement on [•];

WHEREAS, Buyer, the Special Master and ████████████████ (the "Paying Agent") have entered into that certain Payments Administration Agreement (the "Paying Agent Agreement"), dated as of [•], 2025, pursuant to which the Paying Agent has established an account (the "Paying Account") for the purpose of receiving funds disbursed pursuant to this Agreement;

WHEREAS, Buyer and the Special Master desire for the Escrow Agent to open two separate, distinct and non-commingled escrow accounts into which Buyer will deposit (or cause to be deposited), funds to be held and disbursed in accordance with this Escrow Agreement;

WHEREAS, on the date hereof, Buyer shall deposit $50,000,000.00 (the "Deposit Amount") by wire transfer of immediately available funds with the Escrow Agent as provided by the Purchase Agreement; and

WHEREAS, on the Closing Date, the Buyer shall deposit an amount in cash equal to the Expense Reserve Holdback Amount (as defined in the Purchase Agreement) by wire transfer of immediately available funds (the "Holdback Escrow Funds", and together with the Deposit Amount, the "Escrow Funds") with the Escrow Agent for the purpose of establishing a separate source of funds to secure and satisfy the Special Master's compensation and out-of-pocket costs, fees and expenses incurred by the Special Master pursuant to Section 3.4(c) of the Purchase Agreement.

NOW, THEREFORE, in consideration of the promises herein, the parties hereto agree as follows:

## I.     Terms and Conditions

1.1     Appointment of the Escrow Agent. Buyer and the Special Master hereby appoint the Escrow Agent as their escrow agent, and the Escrow Agent hereby accepts its duties as provided herein.

1.2     Deposit Escrow Account (Deposits). Immediately following the execution of this Agreement, Buyer shall deposit, or cause to be deposited, the Deposit Amount by wire transfer of immediately available funds to the Escrow Agent using the wire instructions set forth on Schedule I. As promptly as practicable following receipt of the Deposit Amount, the Escrow Agent shall deposit the Deposit Amount into a separate, distinct and non-commingled interest bearing escrow account, insured by the Federal Deposit Insurance Corporation ("FDIC"), established by the Escrow Agent to hold the Deposit Amount (the "Deposit Escrow Account"). The Escrow Agent shall maintain the Deposit Escrow Account

---

[1]  **Note to Bidder:** Prior to the entry of the Escrow Agreement, the Escrow Agent will require the Buyer to complete a KYC via an electronic questionnaire. A link to the electronic questionnaire will be sent to the Buyer's desired contact person.

as set forth on <u>Exhibit B</u>. The Deposit Amount shall not be used for any purposes other than as set forth in this Escrow Agreement and the Purchase Agreement.

1.3    <u>Deposit Escrow Account (Disbursements)</u>. The Escrow Agent shall retain the Deposit Amount in the Deposit Escrow Account and shall not make any disbursement of all or any portion of the Deposit Amount except in accordance with the following <u>Sections 1.3.1</u>, <u>1.3.2</u> and <u>1.3.3</u>:

1.3.1

(a)    If the Closing occurs, then in accordance with <u>Section 3.3(a)</u> of the Purchase Agreement, the Buyer and the Special Master shall deliver to the Escrow Agent joint written instructions signed by an authorized representative of the Buyer listed on Exhibit A-1 hereto and the Special Master ("<u>Joint Instructions</u>") to disburse the Deposit Amount to the Paying Agent Account by wire transfer of immediately available funds out of the Deposit Escrow Account, and the Escrow Agent shall promptly (and, in any event within two (2) Business Days) after the receipt of the Joint Instructions, disburse the Deposit Amount in accordance with and as specified in such Joint Instructions. The Joint Instructions shall specify the amount of funds to be disbursed from the Adjustment Escrow Account and shall identify the payee to whom the disbursement shall be made, which shall be either Buyer or the Paying Account. For purposes of this Agreement, "<u>Business Day</u>" shall mean any day of the year other than (a) a Saturday, Sunday or federal holiday in the United States or (b) a day on which national banking institutions in New York, New York are required or authorized to close.

(b)    Notwithstanding anything to the contrary in this Agreement, the Escrow Agent shall comply with any instruction from the Special Master to withhold tax from any amounts paid pursuant to this Agreement. The Escrow Agent and Buyer acknowledge and agree that no withholding applies to any payments of Closing Consideration paid pursuant to this Agreement under Chapter 3 or Chapter 4 of the Code.

1.3.2    If the Purchase Agreement is terminated as a result of a Deposit Forfeiture Termination Event, then pursuant to <u>Section 3.3(b)</u> of the Purchase Agreement, Buyer and the Special Master shall promptly (and in any event within five (5) Business Days of such termination) deliver Joint Instructions to the Escrow Agent, directing the release of the Deposit Amount to the Paying Account in accordance with the wire instructions set forth on Schedule I, and the Escrow Agent shall promptly (and, in any event within two (2) Business Days) after the receipt of the Joint Instructions, release the Deposit Amount in accordance with and as specified in such Joint Instructions; *provided*, that, in lieu of the foregoing, the Buyer may elect, in accordance with <u>Section 3.3(b)</u> of the Purchase Agreement, in writing, within five (5) Business Days after such termination to forever waive, forfeit and discharge from its Specified Litigation Claim (as defined in the Purchase Agreement) an amount equal to the Net Deposit Amount (as defined in the Purchase Agreement) effective immediately upon such termination and the Buyer shall execute and deliver to the Special Master a Termination Release (as defined in the Purchase Agreement) within two (2) Business Days after the Deposit Amount Release Date (as defined below), and in such case, within forty (40) Business Days after such election, pursuant to a written instruction to the Escrow Agent by the Special Master, the Net Deposit Amount shall be released by the Escrow Agent from the Deposit Escrow Account by wire transfer of immediately available funds to the account designated in writing by the Buyer (the

date of such release, the "Deposit Amount Release Date"); provided, further, that any funds remaining in the Deposit Escrow Account after the Net Deposit Amount is released to the Buyer by the Escrow Agent pursuant to Section 3.3(b) of the Purchase Agreement shall be, pursuant to a written instruction to the Escrow Agent by the Special Master, released by the Escrow Agent to the Paying Agent to disburse such funds pursuant to the terms of the Paying Agent Agreement.

1.3.3     If the Purchase Agreement is terminated for any reason other than a Deposit Forfeiture Termination Event, then pursuant to Section 3.3(c) of the Purchase Agreement, Buyer and the Special Master shall promptly (and in any event within two (2) Business Days of such termination) deliver Joint Instructions to the Escrow Agent directing the release of the balance of the Deposit Escrow Account to the Buyer or its designees, and the Escrow Agent shall promptly (and, in any event within two (2) Business Days) after the receipt of the Joint Instructions, disburse the Deposit Amount in accordance with and as specified in such Joint Instructions.

1.4     Holdback Escrow Account (Deposits). At the Closing, and in accordance with Section 3.4(c) of the Purchase Agreement, the Buyer shall deposit, or cause to be deposited, the Expense Reserve Holdback Amount by wire transfer of immediately available funds to the Escrow Agent using the wire instructions set forth on Schedule I. As promptly as practicable following receipt of any portion of the Holdback Escrow Funds, Escrow Agent shall deposit such portion of the Holdback Escrow Funds into a separate, distinct and non-commingled escrow account established by Escrow Agent (the "Holdback Escrow Account", and together with the Deposit Escrow Account, the "Escrow Accounts"). The Escrow Agent shall maintain the Holdback Escrow Account as set forth on Exhibit B. No Holdback Escrow Funds shall be used for any other purposes other than as set forth in this Escrow Agreement and the Purchase Agreement.

1.5     Holdback Escrow Account (Disbursements). After the Closing occurs, at any time and from time to time, within two (2) Business Days from the receipt of the Special Master's written instructions, signed by the Special Master ("Special Master Instructions"), the Escrow Agent shall disburse the Holdback Escrow Funds (or a portion of such funds) as instructed in such Special Master Instructions and this Section 1.5. The Special Master Instructions shall specify the amount of funds to be disbursed from the Holdback Escrow Account to the Paying Account. Disbursements of funds from the Holdback Escrow Account shall be made in accordance with the payment instructions set forth in such Special Master Instructions.

## II.     Provisions as to the Escrow Agent

2.1     This Agreement expressly and exclusively sets forth the duties of the Escrow Agent with respect to any and all matters pertinent hereto and no implied duties or obligations shall be read into this Agreement against the Escrow Agent. In performing its duties and obligations under this Agreement, or upon the claimed failure to perform such duties or obligations, the Escrow Agent shall have no liability in connection herewith except for the Escrow Agent's fraud, willful misconduct or gross negligence. In no event shall the Escrow Agent be liable hereunder for incidental, indirect, special, consequential or punitive damages of any kind whatsoever (including but not limited to lost profits), even if the Escrow Agent has been advised of the likelihood of such loss or damage and regardless of the form of action. The Escrow Agent shall have no liability with respect to the transfer or distribution of any funds effected by the Escrow Agent pursuant to wiring or transfer instructions provided to the Escrow Agent in accordance with the provisions of this Agreement. Any wire transfers of funds made by the Escrow Agent pursuant to this Agreement will be made subject to and in accordance with the Escrow Agent's usual and ordinary wire transfer procedures in effect from time to time, including without limitation call-back procedures. The

3

Escrow Agent's inability to receive or confirm funds transfer instructions pursuant to such security procedures may result in a delay in accomplishing such funds transfer and the Parties agree that the Escrow Agent shall not be liable for any loss caused by any such delay, other than as a result of Escrow Agent's fraud, willful misconduct or gross negligence. No provision of this Agreement shall require the Escrow Agent to risk or advance its own funds or otherwise incur any financial liability in connection with this Agreement. The Escrow Agent shall not be obligated to take any legal action or to commence any proceedings in connection with the performance of this Agreement or any property held hereunder or to appear in, prosecute or defend in any such legal action or proceedings.

2.2     This Agreement constitutes the entire agreement between the Escrow Agent, the Buyer and the Special Master in connection with the subject matter of this Agreement, and no other agreement entered into between the Buyer and the Special Master, or either of them, including, without limitation, the Purchase Agreement, shall be considered as adopted or binding, in whole or in part, upon the Escrow Agent; *provided*, that, to the extent there exists a conflict between the terms and provisions of this Agreement and the Purchase Agreement, solely as between the Buyer and the Special Master, the terms and provisions of the Purchase Agreement will control.

2.3     Except in cases of the Escrow Agent's fraud, willful misconduct or gross negligence, the Escrow Agent shall be protected in acting upon any written instructions, notice, request or instrument which the Escrow Agent in good faith reasonably believes to be genuine and what it purports to be. The Escrow Agent may consult with nationally recognized outside legal counsel with expertise in the matter at issue in the event of any dispute or question as to the construction of any of the provisions hereof or its duties hereunder, and it shall incur no liability and shall be fully protected in acting reasonably and in good faith in accordance with the advice of such counsel.

2.4     In the event of any disagreement between Buyer and the Special Master, or between either or both of them and any other person, resulting in adverse claims or demands being made in connection with the matters covered by this Agreement, or in the event that the Escrow Agent reasonably and in good faith is in doubt as to what action it should take hereunder, the Escrow Agent may, at its option, refuse to comply with any such claims or demands on it, or refuse to take any other action hereunder (but only for so long as such disagreement continues or such reasonable doubt exists), and in any such event, the Escrow Agent shall not be or become liable in any way or to any party for its failure or refusal to act (absent Escrow Agent's fraud, willful misconduct or gross negligence), and the Escrow Agent shall be entitled to continue to refrain from acting until (i) the rights of the Buyer and the Special Master and all other interested persons shall have been fully and finally adjudicated by a court of competent jurisdiction or (ii) all disagreements been adjudged and all reasonable doubt resolved by agreement among the Buyer and the Special Master and all other interested persons, and the Escrow Agent shall have been notified thereof in writing signed by the Buyer and the Special Master. Notwithstanding the preceding sentence, the Escrow Agent may in its reasonable discretion obey the order, judgment, decree or levy of any court of competent jurisdiction or of an agency of the United States or any political subdivision thereof, or of any agency of any State of the United States or of any political subdivision thereof having authority over the Escrow Agent, and the Escrow Agent is hereby authorized in its reasonable discretion, to comply with and obey any such orders, judgments, decrees or levies and it shall not be liable to any of the Parties or to any other person, firm or corporation, by reason of such compliance notwithstanding such writ, order or decree being subsequently reversed, modified, annulled, set aside or vacated. The rights of the Escrow Agent under this <u>Section 2.4</u> are cumulative of all other rights which it may have by law or otherwise.

2.5     Buyer agrees to indemnify the Escrow Agent from and against any and all reasonable, documented and out-of-pocket losses, liabilities and expenses (collectively, "<u>Losses</u>") which the Escrow Agent incurs in connection with its performance under this Agreement; *provided*, *however*, that the Escrow Agent shall not be entitled to indemnity with respect to Losses that have been finally adjudicated by a court

4

of competent jurisdiction to have been caused by the Escrow Agent's fraud, willful misconduct or gross negligence. Notwithstanding anything in this Agreement to the contrary, in no event shall Buyer or the Special Master be liable for incidental, indirect, special, consequential or punitive damages of any kind whatsoever (including but not limited to lost profits) of the Escrow Agent, even if such Party has been advised of the likelihood of such loss or damage and regardless of the form of action; *provided*, this sentence shall not prejudice the Escrow Agent's right to be indemnified by Buyer for Losses paid by the Escrow Agent to third parties. This <u>Section 2.5</u> shall survive the termination of this Agreement and any resignation or removal of the Escrow Agent.

2.6     Any entity into which the Escrow Agent may be merged or converted or with which it may be consolidated, or any entity to which all or substantially all of the escrow business of the Escrow Agent may be transferred, shall be the Escrow Agent under this Agreement without further act, and the Escrow Agent (or its successor) shall provide prompt written notice of such transfer to Buyer and the Special Master.

2.7     The Escrow Agent may resign at any time from its obligations under this Agreement by providing written notice to the Buyer and the Special Master. In addition, the Buyer and the Special Master may jointly terminate this Agreement by providing written notice to the Escrow Agent. Such resignation or termination shall be effective on the date set forth in such written notice, which shall be no earlier than thirty (30) days after such written notice has been furnished. The Buyer and the Special Master shall promptly appoint a mutually agreeable successor escrow agent following receipt or delivery, as applicable, of any such notice of resignation or termination (as applicable). In the event no successor escrow agent has been appointed on or prior to the date such resignation or termination is to become effective, (i) the Escrow Agent shall be entitled to tender into the custody of any court of competent jurisdiction all Escrow Funds and other property (if any) then held by the Escrow Agent and shall thereupon be relieved of all further duties and obligations under this Agreement and (ii) the Buyer and the Special Master (or either of them acting alone) may apply to the Court for the appointment of a successor escrow agent or other appropriate relief. The Escrow Agent shall have no responsibility for the appointment of a successor escrow agent hereunder.

## III.     Compensation of the Escrow Agent

3.1     The Escrow Agent hereby acknowledges and agrees that no fees, expenses or other compensation for the Escrow Agent's services as contemplated by this Agreement will be payable by the Parties, as set forth on <u>Exhibit B</u> hereto. Notwithstanding anything to the contrary herein, and for the avoidance of doubt, the Special Master will not be responsible for any fees or other liabilities in connection with this Agreement.

## IV.     Miscellaneous

4.1     During the term of this Agreement, the Escrow Funds shall be deposited as indicated in <u>Exhibit B</u>. Any interest will accrue on the Escrow Funds deposits, beginning the day immediately following the day the Escrow Funds deposits are received, based on the daily average balances of the Escrow Funds so held in the Escrow Accounts. Any interest will be credited monthly and become part of the Escrow Funds. Deposits into the Escrow Accounts are insured, subject to the applicable rules and regulations of the FDIC, in the standard FDIC insurance amount of ██████, including principal and accrued interest, and are not secured. Escrow Agent or its affiliates may receive compensation from third parties based on balances deposited in the Escrow Accounts.

4.2     The Buyer and the Special Master agree that, subject to the terms and conditions of this Agreement, for U.S. federal, state and local income tax purposes, the Buyer shall be treated as the owner

5

of the Escrow Funds until such funds are released in accordance with this Agreement and all interest and income from the investment of the Escrow Funds ("Escrow Earnings") shall be reported as having been earned by Buyer for U.S. federal, state and local income tax purposes as of the end of the calendar year in which it was earned, whether or not such income was disbursed during such calendar year, to the extent required by the United States Internal Revenue Service ("IRS"), on IRS Form 1099 (or other appropriate form as required by U.S. law of the Escrow Agent). Upon written instructions delivered to the Escrow Agent by Buyer and the Special Master and within ten (10) days following the end of each calendar quarter, the Escrow Agent shall release and disburse to any account or accounts designated by Buyer from the Escrow Funds held in the Escrow Accounts an amount equal to [twenty-one] ([21]%) percent of the Escrow Earnings earned since the preceding calendar quarter on the Escrow Funds held in the Escrow Accounts (if any). Any residual interest that posts after the final distribution of the Escrow Accounts shall be delivered (i) to the Buyer in an amount equal to [twenty-one] ([21]%) percent of the amount of such residual interests and (ii), with respect to any amounts in excess of the amount distributed to Buyer under clause (i), to the Paying Account in accordance with the wire instructions set forth on Schedule I or as otherwise set forth in Joint Instructions. On or before the execution and delivery of this Agreement, each of Buyer and the Special Master shall provide to the Escrow Agent a correct, duly completed, dated and executed current IRS Form W-9 or Form W-8, whichever is appropriate, or any successor forms thereto, in a form and substance satisfactory to the Escrow Agent (which such forms the Escrow Agent shall be permitted to transmit to the depository institution where the Escrow Funds are held) including appropriate supporting documentation and/or any other form, document, and/or certificate required or reasonably requested by the Escrow Agent to validate the form provided. Except for the delivery and filing of tax information reporting forms required pursuant to the Internal Revenue Code of 1986, as amended, to be delivered and filed with the IRS by the Escrow Agent, as escrow agent hereunder, or by the institution where the Escrow Account is held, the Escrow Agent shall have no duty to prepare or file any Federal or state tax report or return with respect to any funds held pursuant to this Agreement or any income earned thereon.

      4.3      The Escrow Agent shall provide monthly reports of transactions and balances to Buyer and the Special Master as of the end of each month, until the disbursement of all Escrow Funds. This Agreement shall terminate upon the final disbursement of all Escrow Funds.

      4.4      Any notice, request for consent, report, or any other communication required or permitted in this Agreement, including the monthly reports described in Section 4.3, shall be in writing and shall be deemed to have been given when delivered (i) personally, (ii) by facsimile transmission with written confirmation of receipt, (iii) by electronic mail to the email address given below, and email confirmation of receipt is obtained promptly after completion of the transmission, (iv) by overnight delivery with a reputable national overnight delivery service, or (v) by United States mail, postage prepaid, or by certified mail, return receipt requested and postage prepaid, in each case to the appropriate address set forth below or at such other address as any party hereto may have furnished to the other parties hereto in writing:

If to the Escrow Agent:



If to Buyer:

[•]
[•]
[•]
[•]
Attention: [•]
Telephone: [•]

Email: [•]

with a copy (which shall not constitute notice) to:

[•], counsel to the Buyer
[•]
[•]
Attention: [•]
Telephone: [•]
Email: [•]

If to the Special Master:

Robert B. Pincus in his capacity as Special
Master for the United States District Court for the District of Delaware



With a copy (which shall not constitute notice) to:

Weil, Gotshal & Manges LLP, counsel to the Special Master
767 Fifth Avenue
New York, NY 10153
Matthew S. Barr
Eoghan P. Keenan
Chase A. Bentley

Any party may unilaterally designate a different address by giving notice of each change in the manner specified above to each other party.

4.5    This Agreement (including any claims, issues, controversies or matters arising hereunder, whether arising in law, contract, tort or equity) shall be governed by and construed according to the laws of the State of Delaware, without regard to conflicts of laws rules or principles. Except as otherwise permitted herein, neither this Agreement nor any rights or obligations hereunder may be assigned by any party hereto without the express written consent of each of the other parties hereto. This Agreement shall inure to and be binding upon the parties hereto and their respective successors, heirs and permitted assigns. TO THE EXTENT NOT PROHIBITED BY APPLICABLE LAW THAT CANNOT BE WAIVED, EACH PARTY HERETO HEREBY WAIVES, AND COVENANTS THAT IT WILL NOT ASSERT (WHETHER AS PLAINTIFF, DEFENDANT OR OTHERWISE), ANY RIGHT TO TRIAL BY JURY IN ANY FORUM IN RESPECT OF ANY ISSUE, CLAIM, DEMAND, ACTION OR CAUSE OF ACTION ARISING IN WHOLE OR IN PART UNDER, RELATED TO, BASED ON OR IN CONNECTION WITH THIS AGREEMENT OR THE SUBJECT MATTER HEREOF, WHETHER NOW EXISTING OR HEREAFTER ARISING AND WHETHER SOUNDING IN TORT OR CONTRACT OR OTHERWISE.

7

ANY PARTY HERETO MAY FILE AN ORIGINAL COUNTERPART OR A COPY OF THIS SECTION 4.5 WITH ANY COURT AS WRITTEN EVIDENCE OF THE CONSENT OF EACH SUCH PARTY HERETO THE WAIVER OF ITS RIGHT TO TRIAL BY JURY.

4.6     The terms of this Agreement may be altered, amended, modified or revoked only by an instrument in writing signed by all the parties hereto. No course of conduct shall constitute a waiver of any terms or conditions of this Agreement, unless such waiver is specified in writing, and then only to the extent so specified. A waiver of any of the terms and conditions of this Agreement on one occasion shall not constitute a waiver of the other terms of this Agreement, or of such terms and conditions on any other occasion.

4.7     If any provision of this Agreement shall be held or deemed to be or shall in fact, be illegal, inoperative or unenforceable, the same shall not affect any other provision or provisions herein contained or render the same invalid, inoperative or unenforceable to any extent whatsoever.

4.8     This Agreement is for the sole benefit of Buyer, the Special Master and the Escrow Agent, and their respective successors and permitted assigns, and nothing herein, express or implied, is intended to or shall confer upon any other person or entity any legal or equitable right, benefit or remedy of any nature whatsoever under or by reason of this Agreement. The Escrow Agent shall have the right to perform any of its duties hereunder through its affiliates, agents, attorneys, custodians or nominees; *provided*, that such right shall not relieve the Escrow Agent of any of its duties or obligations hereunder.

4.9     No party to this Agreement shall be liable to any other party hereto for losses due to, or if it is unable to perform its obligations under the terms of this Agreement because of, acts of God, fire, war, terrorism, floods, strikes, electrical outages, equipment or transmission failure, or other causes reasonably beyond its control.

4.10     Following the public announcement of the transactions contemplated by the Purchase Agreement, Escrow Agent may reference the Parties as clients and disclose that it is serving as the escrow agent in connection herewith.

4.11     All titles and headings in this Agreement are intended solely for convenience of reference and shall in no way limit or otherwise affect the interpretation of any of the provisions hereof.

4.12     This Agreement may be executed in one or more counterparts, each of which shall be deemed an original but all of which together shall constitute one and the same instrument. Counterparts may be delivered via electronic mail (including pdf or any electronic signature complying with the U.S. federal ESIGN Act of 2000, e.g., www.docusign.com) or other transmission method and any counterpart so delivered shall be deemed to have been duly and validly delivered and be valid and effective for all purposes.

4.13     Contemporaneously with the execution and delivery of this Agreement and, if necessary, from time to time thereafter, each of the Parties shall execute and deliver to the Escrow Agent a Certificate of Incumbency substantially in the forms of <u>Exhibit A-1</u> and <u>A-2</u> hereto, respectively (each, a "<u>Certificate of Incumbency</u>") for the purpose of establishing the identity and authority of persons entitled to issue notices, instructions or directions to the Escrow Agent on behalf of the applicable Party. Until such time as the Escrow Agent receives from a Party a new Certificate of Incumbency replacing the most recent Certificate of Incumbency theretofore delivered to the Escrow Agent, the Escrow Agent shall be fully protected in relying, without further inquiry, on the most recent Certificate of Incumbency furnished to the Escrow Agent. Whenever this Agreement provides for joint written notices, joint written instructions or other joint actions to be delivered to the Escrow Agent, the Escrow Agent shall be fully protected in relying,

8

without further inquiry, on any joint written notice, instructions or action executed by persons named in such Certificate of Incumbency.

4.14    The Buyer and Escrow Agent agree that in no circumstance shall the Special Master or his Representatives (as defined in the Purchase Agreement) be personally or otherwise liable for any amounts or obligations owed to the Buyer, and the Special Master and his Representatives are acting as an arm of the Court (as defined in the Purchase Agreement) and are entitled to judicial immunity in the performance of their duties in connection herewith.

**IMPORTANT INFORMATION ABOUT PROCEDURES FOR OPENING A NEW ACCOUNT:**

**To help the government fight the funding of terrorism and money laundering activities, federal law requires all financial institutions to obtain, verify and record information that identifies each person who opens an account. When a party opens an account, the Escrow Agent will ask for each party's name, address, date of birth, or other appropriate information that will allow the Escrow Agent to identify such party. The Escrow Agent may also ask to see each party's driver's license or other identifying documents.**

9

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed as of the date first above written.

<div style="text-align:right">

████████████████ , as the Escrow Agent

By:_____
Name:
Title:

RED TREE ACQUISITIONS, LLC, as Buyer

By:_____
Name:
Title:

ROBERT B. PINCUS, solely in his capacity as the Special Master

_____

</div>

**EXHIBIT A-1**

**Certificate of Incumbency**
**(List of Authorized Representatives)**

Client Name: [BUYER]

As an authorized officer of the above referenced entity, I hereby certify that each person listed below is an authorized signer for such entity, and that the title and signature appearing beside each name is true and correct.

**Name   Title   Signature          Phone              Alt. Phone   Email**

IN WITNESS WHEREOF, this certificate has been executed by a duly authorized officer on:[2]

_____.
     Date

By: _____
Name:
Title:

---

[2] **Note to Draft:** The specimen signature page of each authorized signer (including those delivered in counterpart) must include the signature of the witnessing authorized officer. It is permissible for an authorized signer to witness and date his/her own signature if such signer is also an authorized officer of the referenced entity.

**EXHIBIT A-2**

**Certificate of Incumbency**


Client Name: ROBERT B. PINCUS, solely in his capacity as the Special Master

In my capacity as the Special Master, I hereby certify that the signature appearing beside my name is true and correct.

| **Name** | **Title** | **Signature** | **Phone** | **Alt. Phone** | **Email** |
|---|---|---|---|---|---|



IN WITNESS WHEREOF, this certificate has been executed by the Special Master on:

_____.
      Date

**<u>SCHEDULE I</u>**

WIRE TRANSFER INSTRUCTIONS

**<u>Buyer</u>**:

[BANK NAME]
ABA #:
Account Name:
Account #:
Reference:
Attention:

**<u>Paying Account</u>**:

[BANK NAME]
ABA #:
Account Name:
Account #:
Reference:
Attention:

**<u>Deposit Escrow Account</u>**:

███████████
ABA #:
Account Name:
Account #:
Reference:
Attention:

**<u>Holdback Escrow Account</u>**:

███████████
ABA #:
Account Name:
Account #:
Reference:
Attention:

**EXHIBIT B**

**SCHEDULE OF ESCROW AGENT FEES**



---

[3] **Note to Draft**: The final interest rate will be determined based on the aggregate amounts to be held in escrow.

**A-2**

*Agreed Form*
Confidential

## PAYMENTS ADMINISTRATION AGREEMENT

This Payments Administration Agreement (this "Agreement") is entered into as of [●], 2025 by and among Red Tree Acquisitions, LLC, a Delaware limited liability company ("Buyer"), Robert B. Pincus, solely in his capacity as special master (the "Special Master" and together with Buyer, the "Parties") for the Honorable Leonard P. Stark, United States District Court for the District of Delaware (the "Court"), and ▮▮▮▮▮▮▮▮▮▮▮▮, a ▮▮▮▮▮▮ limited liability company (in its capacity as the payments administrator, "Agent"), in connection with the Stock Purchase Agreement, dated as of March 21, 2025 (as may be amended or modified from time to time, the "Purchase Agreement"), by and between Buyer and the Special Master, which contemplates the sale of all of the issued and outstanding capital stock (the "Shares") of PDV Holding, Inc., a Delaware corporation (the "Company") to Buyer. This Agreement is entered into for the benefit of the creditors who are party to the case of *Crystallex International Corp. v. Bolivarian Republic of Venezuela* (D. Del. Case. No. 17-151-LPS) and have obtained a writ of attachment by January 12, 2024 (a "Claim") and such Claim is secured by a valid and duly perfected lien on the Shares (collectively, the "Creditors", and together with the Expense Amount Recipients (as defined below), collectively, "Payees"). Solely as between the Parties, capitalized terms used but not otherwise defined in this Agreement shall have the respective meanings given to such terms in the Purchase Agreement.

1.    **Appointment.** The Parties hereby engage Agent as the payments administrator concerning the Account (as defined below) for the purposes set forth herein, and Agent hereby accepts such appointment and agrees to perform the services set forth herein.

2.    **Account; Fees.** The Special Master (or its counsel or designee) will advise Agent of the closing date of the transactions contemplated by the Purchase Agreement and will instruct Agent of the date that Agent shall commence payments hereunder (such date, the "Initial Payment Date"). At least three (3) Business Days prior to the Initial Payment Date, the Parties will provide, or cause to be provided, to Agent completed account opening forms and, no later than the Initial Payment Date, the Special Master (or its counsel or designee) will provide an execution version of the Purchase Agreement. Agent shall establish and administer a regulated broker-dealer paying account and any related trust or custodial account for unclaimed funds (collectively, the "Account") for the purposes set forth herein. The funds in the Account are non-interest-bearing. On or before 10:00 a.m. Eastern Time on the Initial Payment Date, Buyer shall wire, or cause to be wired, the necessary and immediately available funds to the Account pursuant to the wire instructions on Exhibit A and will pay, or cause to be paid, the fees on Exhibit B that are due as of such time. Upon receipt of such funds, Agent shall promptly provide the Special Master with written confirmation (email being sufficient) to the appropriate email addresses or notice addresses as set forth on the signature pages hereto that the funds have been received by Agent on behalf of and for the benefit of the Payees. Following the Initial Payment Date, the Special Master and/or ▮▮▮▮▮▮▮▮▮▮▮▮▮▮, a Delaware limited liability company, in its capacity as escrow agent (the "Escrow Agent") pursuant to that certain Escrow Agreement, dated as of the date hereof, by and among Buyer, the Special Master and the Escrow Agent, may from time to time deposit or cause to be deposited additional funds pursuant to the Purchase Agreement (collectively, "Additional Amounts") to fund additional payments through the Account as contemplated hereunder (collectively, "Additional Payments"), including payments to the Expense Amount Recipients with respect to the Special Master's compensation and out-of-pocket costs, fees and expenses incurred by the Special Master after the Closing out of the funds deposited with the Escrow Agent in accordance with the Purchase Agreement (collectively, "Approved Expense Amounts"). For purposes of this Agreement, "Expense Amount Recipient" shall mean any recipient of any Approved Expense Amount.

3.    **Payee Materials; Review.**

a.    **Delivery of Payee Materials.** Agent shall make any documents and other information required to be returned by the Payees (collectively, the "Payee Materials"), available to the applicable

Payees on the date directed by the Special Master (or its counsel or designee) (each, a "Solicitation Date"). Each Payee shall deliver the duly completed Payee Materials, documentation representing their Claims that is satisfactory to the Special Master, any required tax forms and information (including an Internal Revenue Service ("IRS") Form W-9 or appropriate Form W-8, as applicable), and all other required materials (each such Payee that has done so, a "Tendering Payee") prior to, and as a condition to, payment. Agent shall be provided with tax forms for each recipient (other than recipients of transaction expenses as set forth on the Spreadsheet) prior to being required to make payments to such persons. If payment is to be made to a person other than the registered Payee, Agent shall not be required to process such payment until the required Payee Materials and other necessary materials have been properly completed by the new recipient. Agent shall further make available, electronically or by email, the Payee Materials to the Special Master.

       b.      **Examination of Documents.** Agent shall examine the materials received from each Tendering Payee to ascertain whether they appear to have been properly completed and executed in accordance with the instructions set forth in the Payee Materials. In the event Agent determines that any document has been improperly completed or executed, or that any other irregularity exists, Agent shall attempt to cause such irregularity to be corrected. As to any irregularity that Agent cannot resolve, Agent shall promptly provide notice to the Special Master for instructions and final determination.

       c.      **Maintaining Records and Reports.** Agent shall keep and maintain complete and accurate ledgers showing the amount of cash paid to each Payee. Upon making payment to Payees, Agent shall, if so requested by the Special Master, make available the Payee Materials to the Special Master. Agent shall, in accordance with its standard procedures, preserve electronic versions of all documents (physical and electronic) described in this section and received by Agent, and will dispose of any physical documents no earlier than ninety (90) days after receipt, *provided* that Agent makes available copies of such documents to the Special Master (or its counsel or designee) prior to such disposal.

**4.**      **Spreadsheets; Payments.**

       a.      **Delivery of Spreadsheets.** The Special Master (or its counsel or designee) shall deliver to Agent and Buyer a spreadsheet (the "Initial Closing Spreadsheet") containing (in each case to the extent applicable) Payees that will be paid any amounts on the Initial Payment Date, payment amounts, email and physical addresses of such Payees, tax characterizations, and, if applicable, withholding amounts. The Initial Closing Spreadsheet shall also contain any other information and documents required to solicit and verify the Payee Materials and other necessary materials. The Special Master (or its counsel or designee) shall prepare a preliminary form of such Initial Closing Spreadsheet and deliver such Initial Closing Spreadsheet, subject to completion and further changes by the Special Master (or its counsel or designee) as reflected in the final Initial Closing Spreadsheet, by 2:00 pm Eastern Time at least two (2) Business Days prior to the Solicitation Date. The Special Master (or its counsel or designee) shall deliver such Initial Closing Spreadsheet by 2:00 p.m. Eastern Time at least two (2) Business Days prior to the Initial Payment Date; *provided*, that if the Initial Closing Spreadsheet is delivered after such time, the Parties acknowledge that any substantial revisions could delay the Solicitation Date, and all payments will be made on a commercially reasonable efforts basis and may be delayed to the next Business Day. Should any revisions to the Initial Closing Spreadsheet be required, the Special Master (or its counsel or designee) shall deliver a revised Initial Closing Spreadsheet to Agent and Buyer any time prior to 10:00 a.m. Eastern Time on the Initial Payment Date (such final form of the Initial Closing Spreadsheet, the "Closing Spreadsheet"). Any subsequent payments of Additional Payments shall be made pursuant to written disbursement instructions delivered to Agent and Buyer by the Special Master (or its counsel or designee) (each such subsequent instructions, a "Subsequent Spreadsheet" and together with the Closing Spreadsheet, "Spreadsheets").

       b.      **Payments.** With respect to all payments hereunder other than payments of Approved Expense Amounts, subject to sufficient funds being available in the Account, Agent shall pay each Payee that has properly signed and completed all required documents no later than two (2) full Business Days after receipt of the applicable Spreadsheet the amount due to such Payee pursuant to such Spreadsheet less

any applicable withholding. Except as provided below, all payments shall be in United States (U.S.) dollars and shall be made by ACH, check or wire transfer in accordance with the Payee Materials (if applicable) or as otherwise specified on the Spreadsheets. The Parties hereby direct Agent to make available to the Payees, subject to eligibility, the option to receive their payments in a foreign currency (the "Foreign Currency Payment Option"). If a Payee elects the Foreign Currency Payment Option, the Parties hereby direct Agent to deliver such Payee's payment to the currency exchange provider conducting the exchange on behalf of the Payee (the "Currency Exchange Provider") and acknowledge and agree that the Payee shall receive by wire its converted payment directly from Currency Exchange Provider generally within two (2) Business Days of the Currency Exchange Provider initiating the currency exchange. Any payments made pursuant to this Agreement shall be considered payments in United States (U.S.) dollars for tax reporting and withholding purposes.

c.    **Expense Amount Recipients.** Solely with respect to the disbursement by Agent of any Approved Expense Amounts after the Closing, within two (2) Business Days of receipt of written instructions signed by the Special Master that attach (i) a copy of an order of the Court that authorizes payment of such Approved Expense Amount (each such order, an "Order") and (ii) the applicable Spreadsheet, then, subject to sufficient funds being available in the Account, the Agent shall pay each Expense Amount Recipient the amount due to such Expense Amount Recipient pursuant to such Order and Spreadsheet less any applicable withholding. All payments shall be in United States (U.S.) dollars and shall be made by ACH, check or wire transfer in accordance with the Payee Materials (if applicable) or as otherwise specified on the applicable Spreadsheet. Any payments made pursuant to this Agreement shall be considered payments in United States (U.S.) dollars for tax reporting and withholding purposes.

d.    **Employee Compensation Payments.** The Parties hereby represent that no payments deposited in the Account will be deemed employee compensation payments.

**5.    Tax Matters.**

a.    **U.S. Payees.** For distributions to U.S. persons (actual or presumed), Agent shall complete tax reporting required by U.S. law of Agent. Unless otherwise set forth on the applicable Spreadsheet as interest or other reportable income (collectively, "Other Income") not reportable on Forms 1099-B, Agent shall report payments to U.S. persons (actual or presumed) as gross proceeds on Forms 1099-B.

b.    **Foreign Payees.** Except for distributions identified on the Spreadsheet as Other Income, Agent shall not withhold on distributions made to Payees that demonstrate their status as non-U.S. persons in accordance with U.S. Treasury Regulations ("Foreign Payees"). Agent shall report distributions to Foreign Payees that are identified on the Spreadsheet as domestic source Other Income for which withholding may be required (as set forth on the Spreadsheet) on Forms 1042-S, using Buyer's Federal Employer Identification Number ("FEIN"). Agent shall withhold from such distributions the applicable amounts (as set forth on the Spreadsheet or as otherwise directed by the Special Master) and shall remit such taxes to the appropriate authorities on Buyer's FEIN. To the extent direction is not otherwise provided by the Special Master to Agent, Agent may, after notice to the Special Master, consult with tax counsel in connection with making any tax form validation or withholding determinations hereunder.

c.    **Compensation Payments.** Without limitation to section 4.d. above, Agent shall not be responsible for performing any tax reporting for distributions that constitute employment-related compensation payments.

d.    **Withholding.** Notwithstanding anything to the contrary in this Agreement, Agent shall comply with any instruction from the Special Master to withhold tax from any amounts paid pursuant to this Agreement. The Agent and Buyer acknowledge and agree that no withholding applies to any payments of Closing Consideration paid pursuant to this Agreement under Chapter 3 or Chapter 4 of the Code.

**6.    Exculpation; Indemnification.** Agent shall not be liable for any loss to any Party in connection herewith except to the extent that its fraud, bad faith, gross negligence or willful misconduct was the

primary cause of any loss to any Party. Notwithstanding anything in this Agreement to the contrary, in no event shall Agent be liable for special, incidental, punitive, indirect, or consequential losses or damages of any kind (including but not limited to lost profits) (all of the foregoing, "Excluded Damages") even if it has been advised of the likelihood of such loss or damage and regardless of the form of action; *provided*, that this sentence shall not apply to Excluded Damages that are required by final adjudication to be paid by Buyer to a third party plaintiff or any consequential losses that are reasonably foreseeable. Buyer shall indemnify Agent for any reasonable, documented and out-of-pocket losses, liabilities and expenses arising out of or in connection with this Agreement, except to the extent caused by Agent's fraud, bad faith, gross negligence or willful misconduct. This section shall survive the resignation or removal of Agent and the termination of this Agreement. Agent shall have no obligation to make or facilitate any payment unless Buyer shall have provided, or cause to be provided, the necessary readily available funds in accordance with the terms hereof to make such payments and shall not be liable or responsible for any delay or failure of Buyer or other person or entity to comply with any of their respective obligations. In no event shall the Special Master or any of his consultants, agents, attorneys, accountants, advisors, financing sources and other representatives (individually, "Representatives") be personally or otherwise liable for any amounts or obligations owed to the Agent or any other party in connection herewith, as the Special Master and his Representatives are acting as an arm of the Court and are entitled to judicial immunity in the performance of their duties. This section shall survive the resignation or removal of Agent and the termination of this Agreement. Notwithstanding anything to the contrary herein, Buyer hereby agrees that any obligation for indemnification under this agreement shall be borne 100% by Buyer.

7.    **Miscellaneous.**

a.    **Confidentiality.** Agent shall, and shall cause its officers, employees, advisors and agents to, hold all documents and information (including, but not limited to, names, addresses, bank accounts, tax identification numbers and amounts receivable) furnished by the Parties to Agent, whether on, before or after the date hereof, in connection with the engagement of Agent hereunder (including the terms of the Purchase Agreement, the transactions contemplated thereby and the identity of the parties thereto) (the "Confidential Information") in strict confidence. Agent shall only use the Confidential Information for the sole purpose of performing its obligations, duties and responsibilities contemplated by this Agreement and shall only communicate such Confidential Information to (i) the recipients of documents or funds hereunder, (ii) Agent's officers, employees, advisors and agents who have a need to know such information in order to perform Agent's obligations, duties and responsibilities contemplated by this Agreement and subject to obligations of confidentiality to Agent and Parties and (iii) as required law, rule, regulation or legal process after prior written notice (to the extent legally permissible) to the applicable Party hereunder and taking reasonable steps to obtain protective treatment of such Party's Confidential Information.

b.    **Agent's Duties, Compliance.** Agent hereby represents that it is a registered broker-dealer and member of the Financial Industry Regulatory Authority (FINRA) and Securities Investor Protection Corporation (SIPC). Agent's duties shall be limited to those specifically set forth herein, which shall be deemed purely ministerial in nature. Agent may take any actions it determines in good faith is reasonably necessary to comply with applicable laws, rules and regulations including, without limitation, in connection with verification of identities under Section 326 of the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001; *provided* that, to the extent permitted by applicable law, Agent shall provide notice to the Parties promptly after taking such action. Agent may perform any of its duties hereunder directly or through affiliates or agents (including the bank where the Account is held); *provided* that, Agent shall be liable to the Parties on account of any action or omission by any affiliate or agent to the same extent that any affiliate or agent is liable to Agent, except that Agent shall be fully liable for the actions and omissions of such affiliates or agents to the extent that Agent acted with fraud, bad faith, gross negligence, or willful misconduct in the selection of such affiliate or agent. Notwithstanding anything to the contrary herein, payments for securities held by a securities depository (not directly in the name of the applicable beneficial holder) may be subject to additional

4

requirements and processing time. Agent will not be required to provide any services that would require it to register as a transfer agent or money services business, be licensed as a money transmitter or obtain a banking license, and any provisions herein shall be deemed automatically modified to provide for such alternative services as necessary to avoid such registration or licensure. Agent is not required to have knowledge of the terms of, or compliance by any party with, any other agreement between the Parties in connection herewith. In the event of any conflict between the terms and provisions of this Agreement, those of the Purchase Agreement, any exhibit attached to this Agreement, or any other agreement among the Parties, as between Agent and the Parties, the terms and conditions of this Agreement shall control, and as between the Parties, the Purchase Agreement shall control.

     c.    **Definition of Business Day.** "<u>Business Day</u>" means any day of the year other than (a) a Saturday, Sunday or federal holiday in the United States or (b) a day on which national banking institutions in New York, New York are required or authorized to close.

     d.    **Notices.** Any notices, requests, claims, demands or other communications given pursuant to this Agreement shall be in writing and shall be delivered, and deemed given, as follows (i) on the date delivered in person, (ii) on the date of confirmed receipt when emailed, (iii) on receipt after dispatch by registered or certified mail (postage prepaid and return receipt requested) or (iv) on the next Business Day if transmitted by national overnight courier, in each case to the applicable addresses set forth on the signature pages hereto.

     e.    **Authorized Representatives.** The persons designated as "<u>Authorized Representatives</u>" on the signature page are authorized to act on behalf of the applicable Party. Agent may rely upon, and shall not be liable for acting upon, any written notice, document, instruction or request furnished hereunder (including instructions or documents provided by an Authorized Representative of a Party or such Party's counsel, or provided by a Payee or a person acting on behalf of such Payee) and reasonably believed in good faith by it to be genuine and to have been signed or presented by the proper entity or individual without inquiry and without requiring substantiating evidence of any kind. Without limiting the intent of the foregoing, Agent may in its sole discretion (i) employ or decline to employ any process or procedure that it deems necessary or advisable to carry out its responsibilities set forth herein, including, without limitation, in connection with the confirmation of identities (including Payee identities), account information or payment instructions and (ii) determine the sufficiency of any documents or instructions delivered to it hereunder including, without limitation, Payee Materials required as a condition of payment. Without limiting the foregoing, the specified Party acknowledges and agrees that Agent may authenticate Payees by sending a one time passcode (OTP) to the Payee email addresses included in the applicable Spreadsheet and that this procedure constitutes a commercially reasonable method of authenticating the identity of such Payees. Agent may rely on the continued authority of each Authorized Representative until Agent has been duly notified in writing by the applicable Party of any updates to its Authorized Representatives.

     f.    **Resignation, Termination.** The Special Master may terminate this Agreement and discharge Agent from its duties or obligations hereunder by giving fifteen (15) days' advance written notice of such termination to Agent specifying a date when such termination shall take effect. Agent's sole responsibility after such notice period expires shall be to deliver the remainder of any funds deposited into the Account pursuant to this Agreement to an account designated by the Special Master. Additionally, this Agreement shall automatically terminate upon completion of all distributions required hereunder, including any Additional Amounts. No termination of this Agreement shall relieve any party hereto from any liability incurred prior to such termination.

     g.    **Amendments, Waivers.** Except for changes to the Authorized Representatives as set forth above, the provisions of this Agreement may be altered, amended or supplemented, in whole or in part, only by a writing signed by Agent and the Parties. No waiver by any party hereto of any of the provisions hereof shall be effective unless explicitly set forth in writing and signed by the party so waiving.

h.      **Assignment.** Neither this Agreement nor any right or interest of a party hereunder may be assigned in whole or in part without the prior written consent of Agent and the Parties; *provided* that any entity into which Agent may be merged or converted or with which it may be consolidated shall be the successor and deemed assignee of Agent hereunder without further act, and Agent may assign its rights and obligations under this Agreement to any entity to which all or substantially all the payments administration business may be transferred.

i.      **Third Party Beneficiaries.** Nothing in this Agreement shall confer any rights, remedies or claims of any nature upon any person other than the Parties or Agent and their respective successors or permitted assigns.

j.      **Governing Law.** This Agreement, and any claims, causes of action or proceedings (whether at law or in equity, based upon contract, tort, statute or otherwise) that may be based upon or arise out of or related to this Agreement or the negotiation, execution, performance, breach, interpretation, construction or validity of this Agreement, shall be governed by, construed and enforced in accordance with internal laws of the State of Delaware, without giving effect to any laws, provisions or rules (whether of the State of Delaware or any other jurisdiction) that would cause the application of the laws of any jurisdiction other than the State of Delaware and without regard to any borrowing statute that would result in the application of the statute of limitations of any other jurisdiction.

k.      **Submission to Jurisdiction.** Agent and the Parties hereby irrevocably submit to the exclusive jurisdiction of the Court of Chancery of the State of Delaware sitting in Wilmington, Delaware (or if such court declines to exercise such jurisdiction in any appropriate state or federal court in the State of Delaware sitting in Wilmington, Delaware) any claims, causes of action or proceedings (whether at law or in equity, based upon contract, tort, statute or otherwise) that may be based upon, arise out of or relate to this Agreement or the negotiation, execution, performance, breach, interpretation, construction or validity of this Agreement.

l.      **Waiver of Jury Trial.** BUYER, THE SPECIAL MASTER AND AGENT HEREBY WAIVE ANY RIGHTS TO TRIAL BY JURY WITH RESPECT TO ANY CLAIMS, CAUSES OF ACTION OR PROCEEDINGS BASED UPON, ARISING OUT OF OR RELATED TO THIS AGREEMENT OR THE NEGOTIATION, EXECUTION, PERFORMANCE, BREACH, INTEPRETATION, CONSTRUCTION OR VALIDITY OF THIS AGREEMENT.

m.      **Third Party Fees.** Agent (or its affiliates) may receive fees from third parties as transaction fees based on balances deposited and may receive, directly or indirectly, fees and other revenue from Payees for service level upgrades requested by such Payees including but not limited to the Foreign Currency Payment Option, in which case such fees or revenue shall be deducted from the applicable payments. Any such compensation based on balances deposited may be reflected as a reduction or waiver of fees that Agent or its affiliates otherwise would have charged for services to be rendered hereunder. If any provision of this Agreement is determined to be prohibited or unenforceable, then such provision shall be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions thereof.

n.      **Counterparts.** This Agreement may be executed in one or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument. The parties hereto hereby consent to conducting business electronically and all signatures of the parties to this Agreement may be transmitted by facsimile or email or other electronic or digital means, and such facsimile, email or other electronic delivery will, for all purposes, be deemed to be the original signature of such party whose signature it reproduces, and will be binding upon such party.

o.      **Authority.** The individual signing below on behalf of a party is authorized by that party to execute this Agreement on behalf of that party and to legally and validly bind that party to the terms of this Agreement.

*[Signature pages follow.]*

**IN WITNESS WHEREOF**, the parties hereto have executed this Agreement as of the date set forth above.

**ROBERT B. PINCUS, solely in his Capacity as Special Master**


By:_____
Robert B. Pincus
Special Master for the United States District Court for the District of Delaware
Address: PO Box 4570 Wilmington, DE 19807
Email: RBPincus@gmail.com

With copies to (which shall not constitute notice to the Special Master):
Weil, Gotshal & Manges LLP, counsel to the Special Master
767 Fifth Avenue
New York, NY 10153
Attention: Matthew S. Barr
          Eoghan P. Keenan
          Chase A. Bentley
Email:  Horizon.Notice@weil.com

[Authorized Representative 1:
    Name: Robert Pincus
    Email: ███████████████


**Red Tree Acquisitions, LLC**


By:_____
Name: [_]
Title: [_]
Address: [_]
Email: [_]

With Copies to (which shall not constitute notice to the Special Master):
[_], counsel to the [_]
[_]
[_]
Attention: [_]
Email: [_]
[Authorized Representative 1:
    Name: [_]
    Email: [_]]

By: _____
Name: _____
Title: _____

**Exhibit A**

**Wire Instructions**

**Account Wire Instructions:**

> [*To be provided by Agent.*]



**Note:** Any service requested that is not detailed in this fee schedule may be provided for an additional charge.

Securities products and Payments services offered through ▮▮▮▮▮▮▮, an affiliate broker-dealer of ▮▮▮▮▮▮.

**Note:** *Any service requested that is not detailed in this fee schedule may be provided for an additional charge.*

*Securities products and payments services offered through ▮▮▮▮▮▮▮, an affiliate broker-dealer of ▮▮▮*

# A-3

Form of Release

*Agreed Form*
**Confidential**

[●], 2025

Special Master



**RE:    CLOSING RELEASE**

Ladies and Gentlemen:

Reference is made to (a) the case of Crystallex International Corp. v. Bolivarian Republic of Venezuela (D. Del. Case. No. 17-151-LPS) (the "*Crystallex*" case) to which Red Tree Investments, LLC, a Delaware limited liability company and a shareholder of the Buyer (as defined below) (the "Record Holder") is a party (or a successor in interest of a party), (b) the judgments entered in favor of, or assigned to the Record Holder on [●] (the "Claims") as a creditor of the Bolivarian Republic of Venezuela or PDVSA, (c) the writs of attachment *fieri facias* issued and served upon the shares of PDV Holding, Inc., a Delaware corporation ("PDVH"), in the *Crystallex* case to the Record Holder (or its predecessors in interest) in enforcement of the Claims, (d) that certain Stock Purchase Agreement, dated as of March 21, 2025 (the "Agreement"), by and between Red Tree Acquisitions, LLC, a Delaware limited liability company (the "Buyer") and Robert B. Pincus, solely in his capacity as special master (the "Special Master") for the Honorable Leonard P. Stark, United States District Court for the District of Delaware (the "Court") and the Record Holder, solely with respect to the Sections specified in the preamble of the Agreement, (e) the deposit made by the Buyer with Acquiom Clearinghouse LLC, a Delaware limited liability company, in its capacity as escrow agent (the "Escrow Agent"), of $50,000,000 (such amount, the "Deposit Amount") in cash, pursuant to the terms of that certain Escrow Agreement, dated as of [●], 2025, by and among the Special Master, the Buyer and the Escrow Agent. Capitalized terms used in this letter agreement (this "Release Letter") without definition have the respective meanings given to them in the Agreement.

Pursuant to Section 3.4(e) of the Agreement, the Buyer and the Record Holder have agreed to pay, at the Closing, an amount equal to the Credit Bid Amount by means of a credit against all amounts due and owing under the Claims owed to the Record Holder effective immediately upon the Closing. The Buyer and the Record Holder hereby deliver to the Special Master this Release Letter in accordance with Section 2.3(b)(ii) of the Agreement.

In our capacity as the Record Holder and the Buyer, we hereby confirm that the (a) obligations of PDVSA or the Bolivarian Republic of Venezuela (together, the "Venezuela Parties"), as the case may be, to the Record Holder relating to or arising out of the Claims, including principal, accrued interest, costs, expenses and fees for an amount equal to the Claims (the "Forfeited Claim Amount") are hereby deemed satisfied, (b) the attachments on the PDVH shares in enforcement of the Claims are hereby released, (c) all commitments and other agreements and obligations of the Venezuela Parties to the Record Holder related to or arising out of the Claims are hereby irrevocably terminated (without recourse and without representation or warranty of any kind (either express or implied)) with no further action on the part of the Venezuela Parties, the Special Master, the Record Holder or the Buyer and (d) all guarantees provided by the Venezuela Parties to the Record Holder related to or arising from the Claims are hereby irrevocably terminated (without recourse and without representation or warranty of any kind (either express or implied)) with no further action on the part of the Venezuela Parties, the Special Master, the Record Holder and (e) any security interest or Lien granted to the Record Holder from the Venezuela Parties to secure the Claim (collectively, the "Existing Liens") are hereby irrevocably terminated.

The Record Holder and the Buyer hereby authorize (a) the Special Master to direct the Venezuela

Parties or the Company to file or send, as applicable, and (b) the Venezuela Parties or the Company to file or send, as applicable, UCC-3 termination statements with respect to the Existing Liens. By its signature below, each of the Record Holder and the Buyer hereby agrees that the Record Holder and the Buyer will, at its sole cost and expense, execute, as applicable, and deliver to the Venezuela Parties, the Company and the Special Master any such additional lien releases, discharges of security interests, pledges and guarantees, and other similar discharge or release documents, and take such further actions as are reasonably requested, in each case, to release the Existing Liens.

If any term or other provision of this Release Letter is invalid, illegal, or incapable of being enforced by any Law or public policy, all other terms or provisions of this Release Letter shall nevertheless remain in full force and effect so long as the economic or legal substance of the transactions contemplated hereunder is not affected in any manner materially adverse to any party hereto. Upon such determination that any term or other provision is invalid, illegal, or incapable of being enforced, the parties hereto shall negotiate in good faith to modify this Release Letter so as to effect the original intent of the parties hereto as closely as possible in an acceptable manner such that the transactions contemplated hereunder are consummated as originally contemplated to the greatest extent possible.

This Agreement shall be governed by, construed and enforced in accordance with the internal Laws of the State of Delaware, without giving effect to any Laws (whether of the State of Delaware or any other jurisdiction) that would cause the application of the Laws of any jurisdiction other than the State of Delaware and without regard to any borrowing statute that would result in the application of the statutes of limitations or repose of any other jurisdiction. In furtherance of the foregoing, the Laws of the State of Delaware will control even if under such jurisdiction's choice of law or conflict of law analysis, the substantive or procedural law of some other jurisdiction would ordinarily or necessarily apply.

Without limiting the right of any party hereto to appeal any Order of the Court, (a) the Court shall retain exclusive jurisdiction to enforce the terms of this Release Letter and to decide any dispute which may arise or result from, or be connected with, this Release Letter, any breach or default hereunder, or the transactions contemplated hereunder, and (b) any and all proceedings related to the foregoing shall be filed and maintained only in the Court, and the parties hereto hereby consent to and submit to the jurisdiction and venue of the Court.

This Release Letter may be executed in counterparts (and by different parties hereto on different counterparts), each of which shall constitute an original, but all of which when taken together shall constitute a single contract. This Release Letter constitutes the entire agreement among the parties hereto relating to the subject matter hereof and supersedes any and all previous agreements and understandings, oral or written, relating to the subject matter hereof. This Release Letter shall become effective when it has been executed by the Buyer and the Record Holder, and thereafter shall be binding upon and inure to the benefit of the parties hereto and their respective successors and permitted assigns. Delivery of an executed counterpart of a signature page to this Release Letter by facsimile or by email as a ".pdf" or ".tif" attachment shall be effective as delivery of a manually executed counterpart of this Release Letter.

To the extent there exists a conflict between the terms and provisions of this Release Letter and the Agreement, the terms and provisions of the Agreement will control.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

Very truly yours,

RED TREE ACQUISITIONS, LLC,
as the Buyer

By:_____
_____
_____
Name:   [●]
Title:    [●]

RED TREE INVESTMENTS, LLC,
as the Record Holder

By:_____
_____
Name:   [●]
Title:    [●]]

# A-4

**Form of Termination Release**

*Agreed Form*
**Confidential**

[●], 2025

Special Master

██████████████
██████████████████
██████████████████

**RE:    TERMINATION RELEASE**

Ladies and Gentlemen:

Reference is made to (a) the case of Crystallex International Corp. v. Bolivarian Republic of Venezuela (D. Del. Case. No. 17-151-LPS) (the "*Crystallex*" case) to which Red Tree Investments, LLC, a Delaware limited liability company and a shareholder of the Buyer (as defined below)(the "Record Holder") is a party or a successor in interest of a party , (b) the judgments entered in favor of, or assigned to, the Record Holder on [●] (the "Claims") against the Bolivarian Republic of Venezuela or PDVSA, (c) the writs of attachment *fieri facias* issued and served upon the shares of PDV Holding, Inc., a Delaware corporation ("PVDH"), in the *Crystallex* case to the Record Holder (or its predecessors in interest) in enforcement of the Claims; (d) that certain Stock Purchase Agreement, dated as of March 21, 2025 (the "Agreement"), by and between Red Tree Acquisitions, LLC, a Delaware limited liability company (the "Buyer") and Robert B. Pincus, solely in his capacity as special master (the "Special Master") for the Honorable Leonard P. Stark, United States District Court for the District of Delaware (the "Court") and the Record Holder, solely with respect to the Sections specified in the preamble of the Agreement, (e) the deposit made by the Buyer with Acquiom Clearinghouse LLC, a Delaware limited liability company, in its capacity as escrow agent (the "Escrow Agent"), of $50,000,000 (such amount, the "Deposit Amount") in cash, pursuant to the terms of that certain Escrow Agreement, dated as of [●], 2025, by and among the Special Master, the Buyer and the Escrow Agent. Capitalized terms used in this letter agreement (this "Release Letter") without definition have the respective meanings given to them in the Agreement.

The Agreement was terminated on [_], 202[_] by [the Special Master / the Buyer] pursuant to [Section 8.1(b) (Outside Date) / Section 8.1(c) (Legal Restraint) / Section 8.1(f) (Buyer Breach)] of the Agreement, and on [_], 202[_] , in accordance with Section 3.3(b) of the Agreement, the Buyer elected to forever waive, forfeit and discharge from the Record Holder's Claims an amount equal to the Net Deposit Amount effective immediately upon such termination and hereby deliver to the Special Master this Release Letter.

In our capacity as the Record Holder and the Buyer, we hereby confirm (a) that the obligations of PDVSA or the Bolivarian Republic of Venezuela, as the case may be, to the Record Holder relating to or arising out of to the Claims, including principal, accrued interest, costs, expenses and fees for an amount equal to the Net Deposit Amount (the "Forfeited Claim Amount") are hereby deemed satisfied and (b) so much of the attachments on the PDVH shares as was issued to secure the Forfeited Claim Amount are hereby released. For the avoidance of doubt, all commitments and other agreements and obligations of PDVSA or the Bolivarian Republic of Venezuela to the Record Holder other than the Forfeited Claim Amount shall remain outstanding and any security interest or Lien granted to the Record Holder from PDVSA or the Bolivarian Republic of Venezuela in the assets of PDV Holding, Inc., a Delaware corporation (collectively, the "Existing Liens") and all other rights and obligations of PDVSA or the Bolivarian Republic of Venezuela shall remain unaffected by this Release Letter.

If any term or other provision of this Release Letter is invalid, illegal, or incapable of being enforced by any Law or public policy, all other terms or provisions of this Release Letter shall nevertheless remain in full force and effect so long as the economic or legal substance of the transactions contemplated hereunder is not affected in any manner materially adverse to any party hereto. Upon such determination that any term or

other provision is invalid, illegal, or incapable of being enforced, the parties hereto shall negotiate in good faith to modify this Release Letter so as to effect the original intent of the parties hereto as closely as possible in an acceptable manner such that the transactions contemplated hereunder are consummated as originally contemplated to the greatest extent possible.

This Agreement shall be governed by, construed and enforced in accordance with the internal Laws of the State of Delaware, without giving effect to any Laws (whether of the State of Delaware or any other jurisdiction) that would cause the application of the Laws of any jurisdiction other than the State of Delaware and without regard to any borrowing statute that would result in the application of the statutes of limitations or repose of any other jurisdiction. In furtherance of the foregoing, the Laws of the State of Delaware will control even if under such jurisdiction's choice of law or conflict of law analysis, the substantive or procedural law of some other jurisdiction would ordinarily or necessarily apply.

Without limiting the right of any party hereto to appeal any Order of the Court, (a) the Court shall retain exclusive jurisdiction to enforce the terms of this Release Letter and to decide any dispute which may arise or result from, or be connected with, this Release Letter, any breach or default hereunder, or the transactions contemplated hereunder, and (b) any and all proceedings related to the foregoing shall be filed and maintained only in the Court, and the parties hereto hereby consent to and submit to the jurisdiction and venue of the Court.

This Release Letter may be executed in counterparts (and by different parties hereto on different counterparts), each of which shall constitute an original, but all of which when taken together shall constitute a single contract. This Release Letter constitutes the entire agreement among the parties hereto relating to the subject matter hereof and supersedes any and all previous agreements and understandings, oral or written, relating to the subject matter hereof. This Release Letter shall become effective when it has been executed by the Buyer and the Record Holder, and thereafter shall be binding upon and inure to the benefit of the parties hereto and their respective successors and permitted assigns. Delivery of an executed counterpart of a signature page to this Release Letter by facsimile or by email as a ".pdf" or ".tif" attachment shall be effective as delivery of a manually executed counterpart of this Release Letter.

To the extent there exists a conflict between the terms and provisions of this Release Letter and the Agreement, the terms and provisions of the Agreement will control.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

Very truly yours,

Red Tree Acquisitions, LLC, as the Buyer

By: _____
Name:  [●]
Title:  [●]

RED TREE INVESTMENTS, LLC, as the Record Holder

By: _____
Name:  [●]
Title:  [●]]

# A-5

Execution Version
Privileged & Confidential

**COMPANY DISCLOSURE SCHEDULES**

**TO THE**

**STOCK PURCHASE AGREEMENT**

by and among

**RED TREE ACQUISITIONS, LLC**,

a Delaware limited liability company,

**RED TREE INVESTMENTS, LLC**,

a Delaware limited liability company
solely with respect to the Sections specified in the preamble to the Stock Purchase Agreement

**and**

**ROBERT B. PINCUS**,

solely in his capacity as the Special Master for the United States District Court for the District of Delaware

Dated as of March 21, 2025

**[THIS COMPANY DISCLOSURE SCHEDULE IS SUBJECT TO REVISION BY THE SPECIAL MASTER AND/OR THE COMPANY AT ANY TIME AND MUST BE KEPT CONFIDENTIAL IN ACCORDANCE WITH THE TERMS OF THE CONFIDENTIALITY AGREEMENT ENTERED INTO BETWEEN THE RECIPIENT OF THIS DOCUMENT AND THE SPECIAL MASTER.]**

## TABLE OF CONTENTS

Section 1.1(d)  Permitted Liens ................................................................................................2

Section 1.1(e)  Procedures Summary ........................................................................................4

Section 4.1  Corporate Existence; Title to Shares....................................................................10

Section 4.2  Governmental Authorization ................................................................................11

Section 4.3  Non-Contravention ...............................................................................................12

Section 4.4  Capitalization ........................................................................................................26

Section 4.5  Subsidiaries; Non-Controlled Entities .................................................................27

Section 4.6  Financial Statements .............................................................................................31

Section 4.7  Absence of Certain Changes .................................................................................32

Section 4.8  No Undisclosed Material Liabilities .....................................................................33

Section 4.9  Legal Proceedings .................................................................................................34

Section 4.10  Taxes ...................................................................................................................35

Section 4.11  Company Benefit Plans; Employment ................................................................38

Section 4.12  Compliance with Laws; Permits .........................................................................46

Section 4.13  Regulatory Matters ..............................................................................................49

Section 4.14  Environmental Matters ........................................................................................51

Section 4.15  Title to Properties ...............................................................................................54

Section 4.16  Material Contracts................................................................................................55

Section 4.17  Intellectual Property and Data Privacy ...............................................................124

Section 4.18  Brokers; Financial Advisor .................................................................................133

Section 4.19  Real Property .......................................................................................................134

Section 4.20  Affiliate Transactions..........................................................................................140

Section 4.21  Insurance ..............................................................................................................141

Section 6.1  Conduct of the Business Pending the Closing ......................................................165

Section 6.6(a)  Indemnification, Exculpation and Insurance ....................................................168

Section 7.1  Conditions Precedent to Obligations of the Parties ..............................................169

i

# COMPANY DISCLOSURE SCHEDULE

This Company Disclosure Schedule (this "<u>Disclosure Schedule</u>") is being delivered pursuant to and forms part of that certain Stock Purchase Agreement (the "<u>Agreement</u>"), dated as of March 21 2025, by and among (a) Red Tree Acquisitions, LLC, a Delaware limited liability company ("<u>Buyer</u>"), (b) Red Tree Investments, LLC, a Delaware limited liability company (the "<u>Record Holder</u>"), solely with respect to Sections specified in the preamble to the Agreement and (c) Robert B. Pincus, solely in his capacity as special master (the "<u>Special Master</u>") for the Honorable Leonard P. Stark, United States District Court for the District of Delaware (the "<u>Court</u>"). Capitalized terms used but not defined herein shall have the meanings ascribed to such terms in the Agreement. The representations and warranties set forth in Article IV the Agreement are made and given subject to this Disclosure Schedule.

This Disclosure Schedule is being provided under an order of the Court in the Specified Litigation pursuant to the Sale Procedures Order. The Transactions are being compelled by the Court. Neither the Bolivarian Republic of Venezuela, nor its subsidiary entities, PDVSA or PDV Holding, Inc. (the "<u>Company</u>"), have approved or endorsed the Transactions and all of the representations, warranties and covenants set forth in the Agreement are qualified in their entirety by such fact. The foregoing disclosure is deemed disclosed against each section of this Disclosure Schedule.

The disclosure of any matter in any section of this Disclosure Schedule of any facts or circumstances shall be deemed to be an adequate response and disclosure of such facts or circumstances with respect to all representations or warranties calling for disclosure of such information, if it is reasonably apparent from a disclosure item or the documentation referenced that another disclosure section is also applicable. The disclosure of any matter or item in any schedule shall not be deemed to constitute an acknowledgement that any such matter is required to be disclosed. The inclusion of any matter, information or item in any section of this Disclosure Schedule shall not be deemed to constitute an admission of any liability by the Special Master or the Company to any third party or otherwise imply, that any such matter, information or item is material or creates a measure for materiality for the purposes of the Agreement. The disclosure of any Contract will be deemed modified by any subsequent amendments thereto.

In no event shall the listing of any matter in this Disclosure Schedule be deemed or interpreted to expand the scope of the representations, warranties and/or covenants relating to the Special Master or the Company that are set forth in the Agreement.

Headings have been inserted herein for convenience of reference only and are not in lieu of their respective definitions in the Agreement, and will not affect the meaning or interpretation of this Disclosure Schedule. All information and disclosures contained herein are made as of the date of the Agreement and their accuracy is confirmed only as of that date and not at any time thereafter, except as otherwise provided in the Agreement.

## Section 1.1(d)

### Permitted Liens

1. Liens on metals and the right to receive metals arising out of any transaction in the Ordinary Course relating to the sale and/or use of precious metals or other catalyst necessary or useful for the operation of refinery assets of the Acquired Companies in the Ordinary Course; provided that such Liens do not encumber assets other than the catalyst and the related metals and the proceeds of the foregoing.

2. Liens on equipment of the Acquired Companies granted in the Ordinary Course.[1]

3. Liens securing the obligations under the Indenture, dated as of February 11, 2021, among CITGO Petroleum Corporation, as Issuer, the Guarantors party thereto and Argent Institutional Trust Company (as successor to TMI Trust Company), as Trustee (as supplemented by the First Supplemental Indenture, dated as of November 30, 2023, among CITGO Petroleum Corporation, as Issuer, the Guarantors party thereto and Argent Institutional Trust Company (as successor to TMI Trust Company), as Trustee) ("2021 Indenture").

4. Liens securing the obligations under the Indenture, dated as of September 20, 2023 among CITGO Petroleum Corporation, as Issuer, the Guarantors party thereto and Argent Institutional Trust Company, as Trustee (as supplemented by the First Supplemental Indenture, dated as of November 30, 2023 among CITGO Petroleum Corporation, as Issuer, the Guarantors party thereto and Argent Institutional Trust Company, as Trustee) ("2023 Indenture").

5. Liens securing the obligations under the Loan Agreement by and between Gulf Coast Industrial Development Authority, as Issuer, and CITGO Petroleum Corporation, dated as of April 1, 1995 ("1995 Loan Agreement").

6. Liens securing the obligations under the Loan Agreement by and between Gulf Coast Industrial Development Authority, as Issuer, and CITGO Petroleum Corporation, dated as of April 1, 1998 ("1998 Loan Agreement").

7. Liens securing the obligations under the Loan Agreement between Illinois Development Finance Authority, as Issuer, and CITGO Petroleum Corporation, dated as of June 1, 2002 ("2002 Loan Agreement").

8. Liens securing the obligations under the Receivables Purchase Agreement, dated as of December 18, 2020, among CITGO AR2008 Funding Company, LLC, as the Seller, CITGO Petroleum Corporation, as the Servicer, the various purchasers and purchaser agents from time to time party thereto, and Barclays Bank PLC, as Program Administrator (as amended by that certain Amendment No. 1 to Receivables Purchase Agreement, dated

---

[1] **Note to Buyer**: The 2020 Indenture was removed from Permitted Liens schedule because it was paid off.

as of September 30, 2021, that certain Amendment No. 2 dated as of September 20, 2022, that certain Amendment No. 3 dated as of April 15, 2024 and that certain Amendment No. 4, dated as of September 5, 2024 (the "Receivables Purchase Agreement").

9.  Liens securing the obligations under the Purchase and Sale Agreement, dated as of December 18, 2022, among CITGO AR2008 Funding Company, LLC, as Purchaser, and CITGO Petroleum Corporation, as Seller (as amended by that certain Amendment No. 1 to Purchase and Sale Agreement, dated as of September 20, 2022 and that certain Amendment No. 2 to Purchase and Sale Agreement, dated as of April 15, 2024, the "Purchase and Sale Agreement").

10. Pledges or deposits in the ordinary course of business in connection with (i) workers' compensation, unemployment insurance and other social security legislation, other than any Lien imposed by ERISA, and (ii) public utility services provided to the Acquired Companies.

11. Deposits to secure the performance of bids, trade contracts and leases (other than Indebtedness), and leases, statutory obligations, surety and appeal bonds, performance bonds and other obligations of a like nature, in each case, incurred in the Ordinary Course.

12. Liens (i) of a collecting bank arising under Section 4-210 of the Uniform Commercial Code on items in the course of collection, and (ii) in favor of a banking institution arising as a matter of law encumbering deposits (including the right of setoff) that are customary in the banking industry.

13. Liens securing the obligations under the Master Reimbursement Agreement, dated as of December 6, 2024, between CITGO Petroleum Corporation and Barclays Bank PLC, as the Bank (the "Master Reimbursement Agreement"), not to exceed an aggregate face amount of $200.0 million at any one time.

WEIL:\100340116\7\67816.0003

**<u>Section 1.1(e)</u>**

**Procedures Summary**

Pursuant to Paragraphs 34 and 35 of the Sale Procedures Order, the Company is obligated to promptly cooperate and comply with certain of the Special Master's requests, including the Special Master's requests to provide information with respect to the potential bidders' due diligence review and to assist with the preparation of the Agreement and the Company Disclosure Schedule. Capitalized terms used but not defined herein have the meanings given to them in the Agreement.

FOR THE AVOIDANCE OF DOUBT, AND NOTWITHSTANDING ANYTHING TO THE CONTRARY CONTAINED IN ANY OF THE TRANSACTION DOCUMENTS, NONE OF THE ACQUIRED COMPANIES OR ANY OF ITS REPRESENTATIVES IS MAKING ANY REPRESENTATION OR WARRANTY IN ARTICLE IV OF THE AGREEMENT OR OTHERWISE, AND, BY EXECUTING THE AGREEMENT, EACH OF THE SPECIAL MASTER AND BUYER EXPRESSLY DISCLAIMS ANY SUCH REPRESENTATIONS OR WARRANTIES.

In connection with the Transactions, the Company has provided an extensive number of documents and a significant amount of information with respect to the Buyer's due diligence review, and such information was used in connection with the Company's review of Article IV (Representations Relating to the Company and the Special Master) of Jones Day's February 10, 2025 comments to the Agreement, among other things.

The following provides an overview of the form and format in which the documents and information described above were provided to the Buyer and the Special Master or their respective Representatives:

- The Company provided due diligence materials to the Special Master's advisors, resulting in a bidder-facing electronic data room into which over 53,737 documents have been uploaded and made available to the Buyer and its Representatives;

- Company management, in coordination with its Representatives, participated in approximately 74 hours of expert calls, site tours or in-person meetings with Buyer and its Representatives;

- Company management responded, in writing, to over 292 written due diligence questions submitted by the Buyer and its Representatives and included in the Q&A Tracker as of the date hereof, in addition to numerous other due diligence questions submitted or asked by the Buyer and its Representatives;

- Company management reviewed the auction draft and each subsequent draft of the Agreement and provided material comments and input with respect thereto, including but not limited to Article IV (*Representations Relating to the Company*

*and the Special Master*) of Jones Day's February 10, 2025 comments to the Agreement, to the Special Master's counsel; and

- Company management prepared the initial Company Disclosure Schedules, reviewed and helped prepare each subsequent draft of the Company Disclosure Schedules, provided material comments and input with respect thereto and assisted in finalizing the Company Disclosure Schedules.

Members of the Company's management team, led by those individuals listed on **Schedule I** (collectively, the "Designated Managers" and each a "Designated Manager"), played an active role in each of the foregoing workstreams.

The Designated Managers solicited and received material input from other Company employees, including those employees listed on **Schedule II**, and external advisors to the Company with respect to each of the foregoing workstreams, constituting "due inquiry," as such term is used in the definition of "Knowledge of the Company" and "Company's Knowledge" in the Agreement.

The information provided by the Company in due diligence and in the Company Disclosure Schedules was prepared in good faith with the assistance of in-house and outside counsel based on information provided by over 400 Company employees, including those individuals listed on **Schedule II**, which such information was available to them in the Ordinary Course or in connection with answering a diligence request. This procedures summary is qualified in its entirety by Section 4.22 of the Agreement, and nothing in this procedures summary will be deemed to constitute a representation or warranty of any kind.

**<u>Schedule I</u>**

**<u>Designated Managers</u>**

**Schedule II**

**Other Company Employees**







## <u>Section 4.1</u>

**Corporate Existence; Title to Shares**

1.  None.

**<u>Section 4.2</u>**

**Governmental Authorization**

1.  All notifications and information required to be filed or supplied pursuant to the HSR Act.

## Section 4.3

### Non-Contravention





















NAI-1543423097v2

WEIL:\100340116\7\67816.0003









## <u>Section 4.4</u>

## **Capitalization**

**(a)**

    1.  None.

**(b)**

    1.  None.

**Section 4.5**

**Subsidiaries; Non-Controlled Entities**

**(a)**

| Entity | Jurisdiction | Authorized Equity Interests | Outstanding Equity Interests |
|---|---|---|---|
| | | | |





**(b)**



2. 

| Pledgor(s) | Pledged Equity | % Owned / Type of Interest | Certificate No. |
|---|---|---|---|

## <u>Section 4.6</u>

### Financial Statements

**(a)**

    1.  See attached.

**(b)**

    1.  None.

**<u>Section 4.7</u>**

**Absence of Certain Changes**

1. None.

## **Section 4.8**

### **No Undisclosed Material Liabilities**

**(e)**

    1.  None.

## Section 4.9

### Legal Proceedings

1.  See Exhibit 4.9 attached herein by reference. For the avoidance of doubt, nothing in Exhibit 4.9 will be deemed to broaden the scope of the representations and warranties included in Article IV of the Agreement and no Person makes any representations or warranties with respect to any detail provided beyond the scope of such representations and warranties.[2]

2.  Items listed in Sections 4.12 and 4.14 of the Company Disclosure Schedules are incorporated herein by reference. To the extent other matters described, listed or contained within the Company Disclosures Schedules are "Legal Proceedings" they are incorporated as if set forth fully herein.

---

[2] **Note to Draft**: To include all unresolved matters listed on the Revision 25 Material Litigation and Claims Tracker (VDR Index No. 1.5.1.1.26).

**Section 4.10**

**Taxes**

**(c)**

| COMPANY | STATE | TAX TYPE 1 | TAX TYPE 2 | TAX PERIODS AUDITED | STATUTE OF LIMITATIONS WAIVER |
|---------|-------|------------|------------|---------------------|-------------------------------|
|         |       |            |            |                     |                               |



**(d)**

| COMPANY | STATE | TAX TYPE 1 | TAX TYPE 2 | TAX PERIODS AUDITED | STATUTE OF LIMITATIONS WAIVER |
|---------|-------|------------|------------|---------------------|-------------------------------|
|         |       |            |            |                     |                               |

**(e)**

1.

**Section 4.11**

**Company Benefit Plans; Employment**

**(a)**



WEIL:\100340116\7\67816.0003







**(b)**

    1. None.

**(c)**

**(d)**

    1. None.

**(e)**

(iii)

(iv)

NAI-1543423097v2

WEIL:\100340116\7\67816.0003

**(g)**

**(h)**

**(j)**

(i), (iii)









## Section 4.12

**Compliance with Laws; Permits**

**(a)**







## <u>Section 4.13</u>

### Regulatory Matters

**(a)**



**(b)**

(ii)

**(c)**

.

## Section 4.14

### Environmental Matters





## Section 4.15

### Title to Properties

1.  None.

## Section 4.16

### Material Contracts

**(a)**

**(i)**

(A)









NAI-1543423097v2

WEIL:\100340116\7\67816.0003



(C)







NAI-1543423097v2

WEIL:\100340116\7\67816.0003









**(viii)**















[redacted]

NAI-1543423097v2

WEIL:\100340116\7\67816.0003









NAI-1543423097v2















*Terminals & Pipelines:*

1. 





















NAI-1543423097v2





































NAI-1543423097v2







NAI-1543423097v2















**Section 4.17**

**Intellectual Property and Data Privacy**

**(a)**

**(i)**

| Country | Serial No. | Filing Date | Patent No. | Issue Date | Title | Owner |
|---------|-----------|-------------|-----------|-----------|-------|-------|
|         |           |             |           |           |       |       |

**(ii)**

1.  See Exhibit 4.17(a)(ii) attached hereto.[6]

**(iii)**

| Domain Name | Account Holder |
|-------------|----------------|
|             |                |



---

[6] **Note to Draft**: The CITGO Trademark Status Report will be attached as an exhibit (VDR #2.1.6.3.5).





NAI-1543423097v2

WEIL:\100340116\7\67816.0003



NAI-1543423097v2

WEIL:\100340116\7\67816.0003



NAI-1543423097v2



WEIL:\100340116\7\67816.0003



**(iv)**

| Registration No. | Registration Date | Title | Owner |
|---|---|---|---|
| | | | |



**(e)**



**(f)**

(i)



## Section 4.18

**Brokers; Financial Advisor**

1.  None.

**Section 4.19**

**Real Property**

(a)







**(b)**

| Refineries | Physical Addresses |
|------------|-------------------|
|            |                   |

| Terminals | Physical Addresses |
|-----------|-------------------|



| Lubricants | Physical Addresses |
|---|---|

| Miscellaneous | Physical Addresses |
|---|---|
| | |

**(c)**

| Jointly Owned Property | Physical Addresses | Ownership Structure | Acquired Company's Ownership Percentage |
|---|---|---|---|
| | | | |

## Section 4.20

## Affiliate Transactions



---

<sup>7</sup> **Note to Draft**: Approximate amounts are as of December 31, 2024 and are derived from the PDV Holding, Inc. Annual Report for the Fiscal Year Ended December 31, 2024. Such amounts may have increased (and continue to increase) due to interest and decrease due to payments made with respect thereto. In addition, such amounts are expected to increase by up to approximately $10,000,000, primarily as a result of the anticipated reclassification of payables to PDVSA of amounts for which legal reserves were established but no associated liabilities have resulted.

## Section 4.21

### Insurance

1. See attached.

| Insured | Coverage Group | Coverage | Policy Effective | Policy Expiration | Insurer Group | Insurer Company | Policy # |
|---------|----------------|----------|------------------|-------------------|---------------|-----------------|----------|













































**<u>Section 6.1</u>**

**Conduct of the Business Pending the Closing**

**(a)**

    1.  None.

**(b)**

**(i)**



**(iii)**

    1.  None.

**(iv)**

    1.  None.

**(v)**

(A) – (C)



165



WEIL:\100340116\7\67816.0003

**(xiv)**



**Section 6.6(a)**

**Indemnification, Exculpation and Insurance**

## Section 7.1

### Conditions Precedent to Obligations of the Parties

(e)

**A-6**

Execution Version
Confidential

# BUYER DISCLOSURE SCHEDULES

## TO THE

## STOCK PURCHASE AGREEMENT

by and among

## RED TREE ACQUISITIONS, LLC,

a Delaware limited liability company,

## RED TREE INVESTMENTS, LLC,

a Delaware limited liability company
solely with respect to the Sections specified in the preamble to the Stock Purchase Agreement

and

## ROBERT B. PINCUS,

solely in his capacity as the Special Master for the United States District Court for the District of Delaware

---

Dated as of March 21, 2025

---

**[THESE BUYER DISCLOSURE SCHEDULES ARE SUBJECT TO REVISION BY BUYER AT ANY TIME PRIOR TO SIGNING AND MUST BE KEPT CONFIDENTIAL IN ACCORDANCE WITH THE TERMS OF THE CONFIDENTIALITY AGREEMENT ENTERED INTO BETWEEN THE RECIPIENT OF THIS DOCUMENT AND BUYER.]**

## TABLE OF CONTENTS

Section 1.1(b)  Knowledge of the Buyer ........................................................................................2

Section 5.1  Corporate Existence and Power ................................................................................3

Section 5.2  Corporate Authorization ..........................................................................................4

Section 5.3  Governmental Authorization ....................................................................................5

Section 5.4  Non-Contravention ...................................................................................................6

Section 5.5  Litigation ..................................................................................................................7

Section 5.6  Regulatory Matters...................................................................................................8

Section 5.7  Financing..................................................................................................................9

Section 5.8  Solvency..................................................................................................................10

Section 5.9  Purported Equity Pledge ........................................................................................11

Section 5.10  Claim Obligations .................................................................................................12

Section 5.11  Closing Consideration...........................................................................................13

Section 5.12  No Additional Representations ..............................................................................14

Section 9.8  Notices ....................................................................................................................15

1

## BUYER DISCLOSURE SCHEDULE

This Buyer Disclosure Schedule (this "Disclosure Schedule") is being delivered pursuant to and forms part of that certain Stock Purchase Agreement (the "Agreement"), dated as of March 21, 2025, by and among (a) Red Tree Acquisitions, LLC, a Delaware limited liability company ("Buyer"), (b) Red Tree Investments, LLC, a Delaware limited liability company (the "Record Holder"), solely with respect to Sections specified in the preamble to the Agreement, and (c) Robert B. Pincus, solely in his capacity as special master (the "Special Master") for the Honorable Leonard P. Stark, United States District Court for the District of Delaware (the "Court"). Capitalized terms used but not defined herein shall have the meanings ascribed to such terms in the Agreement. The representations and warranties set forth in Article V the Agreement are made and given subject to this Disclosure Schedule.

This Disclosure Schedule is being provided under an order of the Court in the Specified Litigation pursuant to the Sale Procedures Order. The Transactions are being compelled by the Court. Neither the Bolivarian Republic of Venezuela, nor its subsidiary entities, PDVSA or PDV Holding, Inc. (the "Company"), have approved or endorsed the Transactions as of the date of this Agreement and all of the representations, warranties and covenants set forth in the Agreement are qualified in their entirety by such fact. The foregoing disclosure is deemed disclosed against each section of this Disclosure Schedule.

The disclosure of any matter in any section of this Disclosure Schedule or any facts or circumstances shall be deemed to be an adequate response and disclosure of such facts or circumstances with respect to all representations or warranties calling for disclosure of such information, if it is reasonably apparent from a disclosure item or the documentation referenced that another disclosure section is also applicable. The disclosure of any matter or item in any schedule shall not be deemed to constitute an acknowledgement that any such matter is required to be disclosed. The inclusion of any matter, information or item in any section of this Disclosure Schedule shall not be deemed to constitute an admission of any liability by the Buyer to any third party or otherwise imply, that any such matter, information or item is material or creates a measure for materiality for the purposes of the Agreement. The disclosure of any Contract will be deemed modified by any subsequent amendments thereto.

In no event shall the listing of any matter in this Disclosure Schedule be deemed or interpreted to expand the scope of the representations, warranties and/or covenants relating to the Buyer that are set forth in the Agreement.

Headings have been inserted herein for convenience of reference only and are not in lieu of their respective definitions in the Agreement, and will not affect the meaning or interpretation of this Disclosure Schedule. All information and disclosures contained herein are made as of the date of the Agreement and their accuracy is confirmed only as of that date and not at any time thereafter, except as otherwise provided in the Agreement.

WEIL:\100340121\5\67816.0003

## <u>Section 1.1(b)</u>

**Knowledge of the Buyer**



WEIL:\100340121\5\67816.0003

## <u>Section 5.1</u>

### Corporate Existence and Power

1. None.

## **Section 5.2**

### **Corporate Authorization**

1. None.

## **Section 5.3**

### **Governmental Authorization**

(a)

    1.   All notifications and information required to be filed or supplied pursuant to the HSR Act.

(b)

    1.   All notifications and information required to be filed or supplied pursuant to the OFAC License

WEIL:\100340121\5\67816.0003

## <u>Section 5.4</u>

### Non-Contravention

1.  None.

## Section 5.5

### Litigation

1. None

## <u>Section 5.6</u>

### Regulatory Matters

(a)

    1.  None.

(b)

    1.  None.

(c)

    1.  None.

(d)

    1.  None.

WEIL:\100340121\5\67816.0003

## <u>Section 5.7</u>

### Financing

(a)

    1.  None.

(b)

    1.  None.

(c)

    1.  None.

(d)

    1.  None.

(e)

    1.  None.

WEIL:\100340121\5\67816.0003

## <u>Section 5.8</u>

### Solvency

1. None.

WEIL:\100340121\5\67816.0003

## Section 5.9

### Purported Equity Pledge

1. None.

## __Section 5.10__

### Claim Obligations

1.  $318,998,207.70 for the Record Holder.

2.  $139,147,354.76 for the Third-Party Record Holder.

12

## Section 5.11

**Closing Consideration**

1. None.

13

## **Section 5.12**

### **No Additional Representations**

(a)

    1.  None.

(b)

    1.  None.

WEIL:\100340121\5\67816.0003

## Section 9.8

## Notices

(a)

      Red Tree Acquisitions, LLC
      c/o Contrarian Capital Management, L.L.C.
      411 West Putnam Avenue, Suite 425
      Greenwich, CT 06830
      Email: legal@contrariancapital.com

      With a copy to:

      Milbank LLP
      55 Hudson Yards
      New York, NY 10001
      Email: Notices.Horizon@milbank.com

(b)

      Red Tree Investments, LLC
      c/o Contrarian Capital Management, L.L.C.
      411 West Putnam Avenue, Suite 425
      Greenwich, CT 06830
      Email: legal@contrariancapital.com

      With a copy to:

      Milbank LLP
      55 Hudson Yards
      New York, NY 10001
      Email: Notices.Horizon@milbank.com