## **Exhibit B**

**Summary of Bid Draft SPA Material Terms v. Terms of Stalking Horse Agreement**

## Exhibit B

**Summary of Bid Draft SPA Material Terms v. Terms of Stalking Horse Agreement**

The following chart contains a summary comparison of the material terms of the draft Stock Purchase Agreement, as approved by the Court in its (i) *Memorandum Order* on January 27, 2025 (D.I. 1554), (ii) *Memorandum Order* on February 24, 2025, and (iii) *Memorandum Order* on March 4, 2025 (D.I.1583), and the material terms of the Stalking Horse Agreement. The summary set forth below does not contain all of the terms of the Stalking Horse Agreement and should not be used or relied upon as a substitute for the full terms and conditions set forth in the Stalking Horse Agreement. The summary of the Stalking Horse Agreement contained herein is qualified in its entirety by the actual terms and conditions thereof. To the extent that there is any conflict between any such summary and such actual terms and conditions, the actual terms and conditions shall control.

| | **Material Term in the Special Master Draft SPA** | **Special Master's Original Proposed Position Regarding Any Changes** | **Summary of Material Term in Stalking Horse Agreement** |
|---|---|---|---|
| 1. | **Parties to the Agreement**. PDVH/CITGO and PDVSA/the Republic will not be parties to the SPA (unless PDVH/CITGO or PDVSA/the Republic elects to submit a bid). | **Non-Negotiable**. | <u>Buyer</u>: Red Tree Acquisitions, LLC, a Delaware limited liability company. <br><br> <u>Special Master</u>: Robert B. Pincus, solely in his capacity as special master for the Honorable Leonard P. Stark, United States District Court for the District of Delaware. <br><br> <u>Record Holder</u> (solely with respect to Sections specified in the preamble of the Stalking Horse Agreement): Red Tree Investments, LLC, a Delaware limited liability company. |
| 2. | **Financing Commitment**. All bids must be fully financed and such financing must be free of contingencies other than the Closing Conditions in the SPA. Any bid including third party financing will need to submit final commitment letters in order to be | **Non-Negotiable**. | The obligations of the Buyer under the Stalking Horse Agreement are not subject to any conditions regarding the Buyer's, its Affiliates', or any other Person's ability to obtain financing |

| | **Material Term in the Special Master Draft SPA** | **Special Master's Original Proposed Position Regarding Any Changes** | **Summary of Material Term in Stalking Horse Agreement** |
|---|---|---|---|
| | considered for selection as a Stalking Horse, though at this stage commitment letters need not be actually signed. Any bid including third party financing submitted during the Topping Period will need to deliver final commitment letters signed by such third party financing source prior to the end of the Topping Period in order to be considered for the Special Master's Final Recommendation. The bid selected as the Stalking Horse must also submit final commitment letters signed by the third party financing source by the end of the Topping Period. | | for the consummation of the transactions contemplated by the Stalking Horse Agreement.<br><br>The Buyer shall deliver to the Special Master final versions of the Debt Commitment Letters signed by the third party financing source, each in the form of the applicable Debt Commitment Letter delivered on the Execution Date, on or prior to the last day of the Topping Period. Further, on the Execution Date, the Buyer has delivered to the Special Master true, correct, and complete copies of the Convertible Commitment Letters. |
| 3. | **Purchase Price and Adjustments**. Purchase price will be a fixed dollar amount for the shares of PDVH (*i.e.*, no enterprise value calculation), typical of a public company M&A transaction.  No purchase price adjustments will be accepted. No "lock box", "leakage" or similar constructs will be accepted.  Bidders will receive protection through the interim operating covenants that PDVH/CITGO will be operated in the ordinary course of business between signing and closing. | **Non-Negotiable**. | The Purchase Price shall not be subject to any adjustments other than as set forth below. The Stalking Horse Agreement does not contemplate "lock box", "leakage" or similar constructs.<br><br>Purchase Price is an amount equal to (i) $3,698,985,643.02, plus the aggregate interest accrued on judgments held by the Claimholders (other than Claimholders junior to the Record Holder), minus the Deposit Amount minus the Credit Bid Amount (the "Closing Consideration"), (ii) plus the Advanced Transaction Expenses Amount, (iii) plus the Closing Transaction Expenses, (iv) plus the Expense Reserve Holdback Amount.<br><br>At the Closing, the Buyer and the Record Holder shall pay (i) the Credit Bid Amount and (ii) an aggregate amount of cash equal to the Closing |

| | Material Term in the Special Master Draft SPA | Special Master's Original Proposed Position Regarding Any Changes | Summary of Material Term in Stalking Horse Agreement |
|---|---|---|---|
| | | | Consideration to the Paying Agent. The Credit Bid Amount shall be paid by means of a credit against all amounts due and owing to the Record Holder (and the Third-Party Record Holder) under the Specified Litigation Claim. |
| 4. | **Good Faith Deposit**. The Successful Bidder will be required to make a cash deposit in accordance with the terms prescribed by the specific provisions in the Sales Procedures Order / Bidding Procedures. | **Non-Negotiable**. | On the date of the Sale Order Entry, the Buyer shall deposit into the Escrow Account with the Escrow Agent a sum of $50,000,000 in cash.<br><br>Buyer shall forfeit the deposit if the Stalking Horse Agreement is terminated by (i) the Special Master due to a breach by Buyer of the Stalking Horse Agreement or (ii) by the Special Master or Buyer due to (A) Closing not having occurred by the Outside Date or (B) Legal Restraint, to the extent such Legal Restraint was caused by the Buyer in breach of the Stalking Horse Agreement or related to the Buyer's identity. |
| 5. | **Treatment of CITGO Debt**.  Provide flexibility to bidders on whether to roll existing CITGO debt or pay off "Specified Debt." | **Provide Flexibility**. | The Stalking Horse Agreement does not contemplate a payment of "Specified Debt." |
| 6. | **Indemnities**.  No indemnities will be provided to buyer. Bidders should seek R&W or other insurance to cover identified risks and/or factor such risks into their proposed purchase price. | **Non-Negotiable**. | The Stalking Horse Agreement does not contemplate any indemnities to Buyer. |

| | Material Term in the Special Master Draft SPA | Special Master's Original Proposed Position Regarding Any Changes | Summary of Material Term in Stalking Horse Agreement |
|---|---|---|---|
| 7. | **Escrows**.  Any portion of the purchase price being payable to an escrow will be strongly disfavored and have no value attributed to it by the Special Master unless the applicable judgment holder consents to receive the escrow. | **Strongly Disfavored**. | The Stalking Horse Agreement does not contemplate any portion of the purchase price being payable to an escrow. |
| 8. | **Earn-Out Payment / Deferred Purchase Price**.  Any "earn-out" or deferred purchase price concepts will be strongly disfavored and have no value attributed to them by the Special Master unless the applicable judgment holder consents to receive the earn-out payment/deferred purchase price. | **Strongly Disfavored**. | The Stalking Horse Agreement does not contemplate any "earn-out" or deferred purchase price concepts. |
| 9. | **Representations and Warranties Relating to the Company and the Special Master**. R&Ws will be provided on the basis of the information provided by certain members of CITGO management as described in the Procedures Summary. <br><br> A suite of representations and warranties and corresponding Company Disclosure Schedules will be prepared based upon the representations and warranties negotiated in connection with the sale process to date, together with certain modifications reflecting input from CITGO management. | **Strongly Disfavored**. Given the extensive negotiation of the R&Ws in connection with the sale process to date and significant historical and anticipated future input from CITGO management, further comments / requests for additional R&Ws will be strongly disfavored. | The Stalking Horse Agreement includes non-material changes to the representations and warranties relating to the Company and the Special Master included in the Special Master Draft SPA. |
| 10. | **Interim Operating Covenants**.  A suite of IOCs intended to minimize changes to the ordinary course operation of the business will be developed with input from CITGO management. For the avoidance of doubt, no dividends or similar distributions by PDVH/CITGO | **Strongly Disfavored**. Extensive comments / requests for additional IOCs will be strongly disfavored. | The Stalking Horse Agreement includes non-material changes to the interim operating covenants included in the Special Master Draft SPA. |

| | **Material Term in the Special Master Draft SPA** | **Special Master's Original Proposed Position Regarding Any Changes** | **Summary of Material Term in Stalking Horse Agreement** |
|---|---|---|---|
| | will be permitted during the interim operating period, other than dividends or similar distributions between or among PDVH and its subsidiaries. | | |
| 11. | **Regulatory Efforts Standard**. Include a hell-or-high-water regulatory efforts standard. | **Strongly Disfavored**. Given the direct impact on closing certainty of revisions to the bidder commitment to obtain regulatory approvals, revisions to this covenant which bring into question the certainty of closing will be strongly disfavored. | Stalking Horse Agreement does not amend the hell-or-high-water regulatory efforts standard included in the Special Master Draft SPA. Buyer to take the lead and have sole responsibility for the strategy for obtaining authorizations from any Governmental Body; provided, that Buyer shall consult in advance with the Special Master and in good faith take the Special Master's views into account regarding overall strategic direction and consult with the Special Master prior to taking any material or substantive position in any written statement or document or, as practicable, discussions with any Governmental Body. |
| 12. | **No Solicitation**. | Subject to Court order regarding bidder protections. | Stalking Horse Agreement does not materially amend the no solicitation provisions of the Draft SPA. The Special Master shall have a good faith obligation to ensure that the Stalking Horse Agreement is not terminated as a direct result of any order in the PDVSA 2020 Bondholder's declaratory judgment action. |
| 13. | **Casualty Loss**. No "Casualty Loss" or similar provisions will be accepted as they introduce uncertainty to the closing consideration to be delivered to the creditors. | **Non-Negotiable**. | The Stalking Horse Agreement does not include any "Casualty Loss" or similar provisions. |

| | Material Term in the Special Master Draft SPA | Special Master's Original Proposed Position Regarding Any Changes | Summary of Material Term in Stalking Horse Agreement |
|---|---|---|---|
| 14. | **Closing Conditions**. <br><br> a. <u>Mutual Closing Conditions</u> to include: <br><br>     i. No Law or Order in effect restraining, enjoining or prohibiting the consummation of the transaction. <br><br>     ii. The Sale Order Entry shall have occurred. <br><br>     iii. Obtaining of OFAC License. <br><br>     iv. HSR approval (or expiration of waiting period). <br><br>     v. Other regulatory approvals (if applicable). <br><br> b. <u>Buyer Closing Conditions</u> to include: <br><br>     i. Bring-down of Special Master R&Ws limited to <u>only</u> fundamental R&Ws. <br><br>     ii. Special Master shall have performed and complied in all material respects with all obligations and agreements required under the SPA. <br><br>     iii. No Company Material Adverse Effect shall have occurred and remain ongoing. Off-market revisions to the definition of Material Adverse Effect will be strongly disfavored. For the avoidance of doubt, it is non-negotiable | **Strongly Disfavored**. Additional closing conditions that introduce uncertainty to closing will be strongly disfavored. | In addition to the closing conditions included in the Special Master Draft SPA, the Special Master shall not be obligated to close if CITGO has not delivered the FIRPTA Certificate. |

| | **Material Term in the Special Master Draft SPA** | **Special Master's Original Proposed Position Regarding Any Changes** | **Summary of Material Term in Stalking Horse Agreement** |
|---|---|---|---|
| | that events relating to the 2020s litigation will be specifically excluded from consideration in determining a Material Adverse Effect; however, nothing herein expressly excludes the ability of a buyer to argue that a finding by a court of competent jurisdiction that PDVH or any of its subsidiaries is an alter ego of PDVSA or the Republic constitutes a Company Material Adverse Effect.<br><br>iv.    The Sale Order shall be in full force and effect in all respects and not subject to any stay, but no affirmance by appellate court is necessary to close.<br><br>c.    Special Master Closing Conditions to include:<br><br>i.    Bring-down of Buyer R&Ws.<br><br>ii.    Buyer shall have performed and complied in all material respects with all obligations and agreements required under the SPA. | | |
| 15. | **Outside Date.**    Minimum of 12 months with two automatic 90-day extensions for regulatory approval. | **Non-Negotiable**. | Initial Outside Date is twelve (12) months from the Execution Date and is automatically extended by two 90-day periods if the Closing has not occurred by the Initial Outside Date as a result of nonsatisfaction of any of the closing conditions relating to OFAC, HSR Act or the Sale Order. |

| | **Material Term in the Special Master Draft SPA** | **Special Master's Original Proposed Position Regarding Any Changes** | **Summary of Material Term in Stalking Horse Agreement** |
|---|---|---|---|
| | | | Both the Special Master and the Buyer further have the right to extend the Initial Outside Date (as automatically extended) for an additional 180 calendar days in the event the Transaction Support Agreement (*see* "PDVSA 2020 Bonds" below) is terminated for any reason. In no event shall the Outside Date extend beyond a date that is 360 calendar days after the Initial Outside date. |
| 16. | **Termination Rights**. Termination rights to include: <br><br> a. The **Special Master**, subject to Court approval, and the **Buyer** may terminate by mutual written consent. <br><br> b. The **Special Master** or the **Buyer** may terminate if the closing has not occurred by the Outside Date, other than for a reason that is the fault of the terminating party. <br><br> c. The **Special Master** may terminate for a Superior Proposal prior to the Sale Hearing and consistent with the Non-Solicitation Provisions of the SPA (subject to the Court's consideration of an Unsolicited Competing Proposal). <br><br> d. The **Buyer** may terminate if there has been a breach by the Special Master of any of its representations, warranties, covenants or agreements resulting in the failure of the closing condition (subject to a 45-day cure right). | **Strongly Disfavored**. Additional termination rights that introduce uncertainty to closing will be strongly disfavored. | In addition to the termination rights included in the Special Master Draft SPA, the Stalking Horse Agreement includes (i) a right for the Special Master to terminate the Stalking Horse Agreement if the Buyer has not delivered a copy of the Transaction Support Agreement (*see* "PDVSA 2020 Bonds" below) duly executed by additional Consenting 2020 Noteholders that together satisfy the Minimum Participation Threshold (each as defined in the Transaction Support Agreement) by 5:00 p.m. Eastern Time on March 24, 2025, and (ii) a right for both the Special Master and the Buyer to terminate the Stalking Horse Agreement if the Court issues an order in which it denies the Special Master's recommendation to designate the Stalking Horse Agreement as either a stalking horse bid or as a base bid. |

| | **Material Term in the Special Master Draft SPA** | **Special Master's Original Proposed Position Regarding Any Changes** | **Summary of Material Term in Stalking Horse Agreement** |
|---|---|---|---|
| | e. Subject to Court approval, the **Special Master** may terminate if there has been a breach by the Buyer of any of its representations, warranties, covenants or agreements resulting in the failure of the closing condition (subject to a 45-day cure right).<br><br>f. The **Buyer** or the **Special Master** may terminate if there is any Law that makes consummation of the transactions illegal or otherwise prohibited or if any Order enjoining the Buyer, the Special Master or the Company from consummating the Transactions is entered and such Order becomes final and non-appealable. | | |
| 17. | **Termination Fee & Expense Reimbursement**. | Subject to Court order regarding bidder protections. | The Stalking Horse Agreement does not materially amend the Termination Fee & Expense Reimbursement provisions of the Special Master Draft SPA.<br><br>Termination Fee shall be (i) the amount, not to exceed $75,000,000 in the aggregate, of actual and documented out-of-pocket expenses incurred by the Buyer and its Affiliates in connection with the negotiation and execution of this Agreement and the other Transaction Documents and the consummation of the Transactions if such fee becomes payable on or prior to the Final Recommendation Date or (ii) if such fee becomes payable after the Final Recommendation Date, an amount equal to $112,000,000; provided, that if |

| | Material Term in the Special Master Draft SPA | Special Master's Original Proposed Position Regarding Any Changes | Summary of Material Term in Stalking Horse Agreement |
|---|---|---|---|
| | | | the Stalking Horse Agreement is amended to include the satisfaction of additional Attached Judgments junior to the Record Holder, the Termination Fee shall be automatically increased to an amount equal to 3% of the aggregate value of Attached Judgments to be satisfied (whether in cash or agreed non-cash consideration), but in no event shall the Termination Fee exceed $150,000,000. |
| 18. | **PDVSA 2020 Bonds**. No trust/escrow constructs or similar revisions impacting certainty of funds payable relating to the PDVSA 2020 Bonds will be included.<br><br>No stand-alone closing conditions relating to the PDVSA 2020 Bonds will be included.<br><br>The SPA will not include any requirement or condition with respect to the 2020 Bond Entities other than that Buyer acknowledges that the 2020 Bond Entities purport to have a pledge of 50.1% of the equity of CITGO Holding, Inc., which is disputed by the Venezuela Parties and is subject to active litigation. | **Non-Negotiable**. Bidders are welcome to address the 2020s separately, but this should not impact closing certainty or clarity around proceeds to creditors. | The Stalking Horse Agreement does not include trust/escrow constructs or similar revisions impacting certainty of funds payable, or stand-along closing conditions, relating to the PDVSA 2020 Bonds, or any requirement or condition with respect to the 2020 Bond Entities.<br><br>The Record Holder has entered into an Amended and Restated Transaction Support Agreement, dated as of the Stalking Horse Agreement, with certain 2020 Bondholders and providing for the requisite 2020 Bondholders consent to the consummation of the Transactions and the release and full termination of the Equity Pledge. |
| 19. | **Alter Ego Claims**. No trust/escrow constructs or purchase price alterations relating to Alter Ego claims will be included unless expressly agreed to by the affected Sale Process Party or Attached Judgment Creditor. | **Strongly Disfavored**.<br><br>**Non-Negotiable**. | The Stalking Horse Agreement does not include trust/escrow constructs or purchase price alterations, or stand-alone closing conditions, relating to Alter Ego claims. |

| | **Material Term in the Special Master Draft SPA** | **Special Master's Original Proposed Position Regarding Any Changes** | **Summary of Material Term in Stalking Horse Agreement** |
|---|---|---|---|
| | No stand-alone closing conditions relating to Alter Ego Claims will be included. | | |
| 20. | **Company Employee-Related Covenants.**<br><br>a. No termination, amendment or waiver of Company employment contracts will be included, without prejudice to the Buyer's right post-Closing to terminate any employment contract consistent with applicable law but subject to PDVH/CITGO's existing contractual obligations to the respective employees.<br><br>b. The SPA will include a customary covenant obligating buyer to maintain employee severance, compensation and benefits consistent with market practice.<br><br>c. The SPA will include a customary covenant obligating buyer to maintain existing D&O indemnification commitments (including acquisition of a D&O tail policy).<br><br>d. The SPA will include a customary release for CITGO management, at a minimum, who participate and cooperate in the sale process. | **Strongly Disfavored**. Material comments to these provisions will be strongly disfavored. | The Stalking Horse Agreement does not materially amend the Company Employee-Related Covenants included in the Special Master Draft SPA. |

## **Exhibit C**

**Financing Commitment Letters**

*Final Version*

| **JPMORGAN CHASE BANK, N.A.** | **WELLS FARGO BANK, NATIONAL ASSOCIATION** |
|---|---|
| 383 Madison Avenue | **WELLS FARGO SECURITIES, LLC** |
| New York, New York 10179 | 550 South Tryon St. |
| | Charlotte, North Carolina 28202 |

**CONFIDENTIAL**

March 20, 2025

Red Tree Investments, LLC ("Red Tree")
c/o Contrarian Capital Management, LLC
411 West Putnam Avenue, Suite 425
Greenwich, CT 06830

Project Horizon
Commitment Letter

Ladies and Gentlemen:

      Red Tree, on behalf of a Delaware limited liability company or corporation to be formed ("Issuer" or "you"), have advised JPMorgan Chase Bank, N.A. ("JPM"), Wells Fargo Bank, National Association (acting through such of its affiliates or branches as it deems appropriate, "WF") and Wells Fargo Securities, LLC ("WF Securities" and, together with WF and their respective affiliates, "Wells Fargo") (JPM and Wells Fargo, collectively, the "Commitment Parties," "us" or "we") that you intend to acquire, directly or indirectly (including indirectly through the Borrower (as defined on Exhibit A hereto)), Target (as defined on Exhibit A hereto) and consummate the other transactions described on Exhibit A hereto. Capitalized terms used but not otherwise defined herein are used with the meaning ascribed to such terms in the Exhibits hereto, as applicable.

1.      Commitments.

      In connection with the Transactions (as defined below) contemplated hereby, (a) each of JPM and Wells Fargo (each, an "Initial Base Bridge Lender" and, together, the "Initial Base Bridge Lenders") hereby commits, severally and not jointly, to provide the percentage of the entire principal amount of the Initial Bridge Facility (as defined in Exhibit A) as set forth opposite its name on Schedule 1(a) hereto (as such schedule may be amended or supplemented in accordance with the terms of this Commitment Letter), (b) each of JPM and Wells Fargo (each, an "Initial Backstop Bridge Lender" and, together, the "Initial Backstop Bridge Lenders" and, together with the Initial Base Bridge Lenders, the "Initial Bridge Lenders") hereby commits, severally and not jointly, to provide the percentage of the entire principal amount of the Backstop Bridge Loans (as defined in Exhibit A) as set forth opposite its name on Schedule 1(b) hereto (as such schedule may be amended or supplemented in accordance with the terms of this Commitment Letter) and (c) each of JPM and Wells Fargo (each, an "Initial ABL Lender" and, together, the "Initial ABL Lenders" and, together with the Initial Bridge Lenders, the "Initial Lenders") hereby commits, severally and not jointly, to provide the amount of $1,250.0 million of the ABL Facility (as

defined in <u>Exhibit A</u>) as set forth opposite its name on <u>Schedule 2</u> hereto (as such schedule may be amended or supplemented in accordance with the terms of this Commitment Letter) (i) upon the terms set forth in this letter, the Transaction Summary attached as <u>Exhibit A</u> hereto and the Summary of Terms and Conditions attached as <u>Exhibits B</u> and <u>C</u>, respectively, hereto and (ii) the initial funding of which is subject only to the conditions set forth on <u>Exhibit D</u> hereto (such <u>Exhibits A</u> through <u>D</u>, including the annexes thereto, the "<u>Term Sheets</u>" and together with this letter, this "<u>Commitment Letter</u>").

2.     <u>Titles and Roles</u>.

It is agreed that (a) JPM and Wells Fargo will act as joint lead arrangers and joint bookrunners for the Base Bridge Facility (acting in such capacities, the "<u>Base Bridge Lead Arrangers</u>"), (b) JPM and Wells Fargo will act as joint lead arrangers and joint bookrunners for the Backstop Bridge Loans (acting in such capacities, the "<u>Backstop Bridge Lead Arrangers</u>" and, together with the Base Bridge Lead Arrangers, the "<u>Bridge Lead Arrangers</u>") and (c) Wells Fargo and JPM will act as joint lead arrangers and joint bookrunners for the ABL Facility (acting in such capacities, the "<u>ABL Lead Arrangers</u>" and, together with the Bridge Lead Arrangers, the "<u>Lead Arrangers</u>").  It is further agreed that (x) JPM will act as sole administrative agent and sole collateral agent for the Bridge Facility (the "<u>Bridge Administrative Agent</u>") and (y) Wells Fargo will act as sole administrative agent for the ABL Facility (the "<u>ABL Administrative Agent</u>" and, together with the Bridge Administrative Agent, the "<u>Administrative Agents</u>").

It is understood and agreed that (a)(i) JPM will have "left" placement in any marketing materials or other documentation used in connection with the Bridge Facility and (ii) Wells Fargo will have "left" placement in any marketing material or other documentation used in connection with the ABL Facility, and in each case having the roles and responsibilities customarily associated with such name placement, (b)(i) Wells Fargo shall appear immediately to the right of JPM in any marketing materials or other documentation used in connection with the Bridge Facility and (ii) JPM shall appear immediately to the right of Wells Fargo in any marketing materials or other documentation used in connection with the ABL Facility and (c) the other Lead Arrangers (or their affiliates, as applicable) for the Facilities (as defined in <u>Exhibit A</u>) appointed as described below will be listed in any marketing materials or other documentation used in connection with the Facilities in an order determined by you in consultation with the Commitment Parties.

You agree that no other agents, co-agents, lead arrangers, bookrunners, managers or arrangers will be appointed, and no other titles will be awarded and no other compensation (other than that compensation expressly contemplated by this Commitment Letter and the Fee Letter referred to below) will be paid for the provision of the commitments hereunder by the Lenders, in each case, in connection with the Facilities unless you and we shall so reasonably agree.  Notwithstanding the foregoing, you may, on or prior to the date which is fifteen (15) calendar days after the Signing Date, appoint (in consultation with the Lead Arrangers) one or more financial institutions to act as additional agents, co-agents, lead arrangers, bookrunners, managers or arrangers (any such agent, co-agent, lead arranger, bookrunner, manager or arranger, an "<u>Additional Agent</u>") or confer other titles in respect of each of the Facilities and may allocate up to ████ and █████████████ in the aggregate of the commitments of the Initial Lenders party hereto as of the date hereof with respect to each of the Base Bridge Facility and the ABL Facility, respectively, and, at your election, up to an amount to be agreed of the commitments of the Initial Backstop Bridge Lenders party hereto as of the date hereof with respect to the Backstop Bridge Loans; <u>provided</u> that each Additional Agent shall participate in each of the Base Bridge Facility, the ABL Facility and, at your election, the Backstop Bridge Facility, each Additional Agent shall assume a proportion of the commitments with respect to the ABL Facility that is not less than (but may be greater than) the proportion of the commitments it assumes with respect to the Base Bridge Facility (it being understood that (w) (i) each such Additional Agent (or its affiliate) shall assume a proportion of the commitments with respect to each Facility that is equal to the proportion of the economics in respect of such Facility that is so allocated to such Additional

Agent (or its affiliates) from each Initial Lender as of the date hereof and (ii) to the extent you appoint an Additional Agent or confer other titles in respect of the Facilities, the economics allocated to, and the commitment amount of, each Initial Lender in respect of a Facility as of the date hereof will be proportionately reduced by the amount of the economics allocated to, and the commitment amount of, such Additional Agent (or its affiliate) in respect of such Facility (it being understood and agreed that any such assumption shall reduce the commitments of each such Initial Lender on a ratable basis), (x) JPM and Wells Fargo shall each retain no less than (i) ▮▮▮▮ and ▮▮▮▮, respectively, of the commitments in respect of the Base Bridge Facility and (ii) ▮▮▮▮ and ▮▮▮▮, respectively, of the commitments in respect of the ABL Facility and (y) after giving effect to this proviso, no Additional Agent will be entitled to a percentage of economics in respect of (i) the Base Bridge Facility or the ABL Facility that is greater than the percentage of economics applicable to JPM or Wells Fargo or (ii) the Backstop Bridge Facility that is greater than the percentage of economics applicable to JPM or Wells Fargo), in each case upon the execution and delivery by such Additional Agent of customary joinder documentation reasonably acceptable to you and us and, thereafter, such Additional Agent shall constitute a "Commitment Party", an "Initial Bridge Lender", "Initial ABL Lender", "Bridge Lead Arranger" and/or "ABL Lead Arranger", as applicable, under this Commitment Letter and under the Fee Letter.

3.   <u>Syndication</u>.

We intend to syndicate each Facility to a group of lenders identified by us in consultation with you and acceptable to you (such consent not to be unreasonably withheld or delayed) (together with the Initial Lenders, the "<u>Lenders</u>"); it being understood and agreed that we will not syndicate to those persons that are (i) identified by you in writing to us on or prior to the date hereof, (ii) your competitors or any competitors of any of your subsidiaries or of Target or any of its subsidiaries (each, a "<u>Competitor</u>") that are identified by you in writing (A) to us, on or prior to the date hereof or from time to time after the date hereof and prior to launch of general syndication of the Bridge Facility or (B) to the Administrative Agents, from time to time after the Closing Date or (iii) an affiliate of any person described in <u>clause (i)</u> or <u>(ii)</u> above (other than, in the case of any Competitor, any of its affiliates that is a bona fide debt fund) that is (x) reasonably identifiable as such an affiliate solely on the basis of its name or (y) identified by you in writing (A) to us, on or prior to the date hereof or from time to time after the date hereof and prior to launch of general syndication of the Bridge Facility or (B) to the Administrative Agents, from time to time after the Closing Date (collectively, "<u>Disqualified Institutions</u>"); <u>provided</u> that the list of Disqualified Institutions, including any updates thereto pursuant to <u>clause (i)</u> or <u>(ii)</u> above, shall be made available to a Lender upon request; <u>provided</u>, <u>further</u>, no such written identification of any Disqualified Institution pursuant to <u>clause (i)</u> or <u>(ii)</u> above after the Closing Date shall apply retroactively to disqualify any person from being a Lender to the extent that such person has already become a Lender prior to such date; <u>provided</u>, <u>further</u>, that no Administrative Agent shall have any obligation to monitor the list of Disqualified Institutions or shall be liable for any failure to do so. Notwithstanding anything in this Commitment Letter, the Fee Letter, the Facilities Documentation or any other letter agreement or other undertaking concerning the financing of the transactions contemplated hereby to the contrary and notwithstanding any syndication, assignment or other transfer by any Initial Lender, (a) no Initial Lender shall be relieved, released or novated from its obligations hereunder (including its obligation to fund its applicable percentage of the Facilities on the Closing Date) in connection with any syndication, assignment or other transfer until after the initial funding of the Facilities on the Closing Date, (b) no such syndication, assignment or other transfer shall become effective with respect to any portion of the Initial Lenders' commitments in respect of the applicable Facilities until the initial funding of the Facilities on the Closing Date, and (c) unless you agree in writing, each Initial Lender shall retain exclusive control over all rights and obligations with respect to its commitments in respect of the Facilities, including all rights with respect to consents, waivers, modifications, supplements and amendments, until the Closing Date has occurred.

The Lead Arrangers intend to commence syndication efforts promptly, and from the Signing Date until the earlier to occur of (x) a Successful Syndication (as defined in the Fee Letter) and (y) the date that is 60 days after the Closing Date (such period, the "Syndication Period"), you agree to assist (and, subject to the limitations on your rights set forth in the Acquisition Agreement, to use your commercially reasonable efforts to cause Target to assist) the Lead Arrangers in completing a syndication reasonably satisfactory to the Lead Arrangers and you.  Such assistance shall include (a) using your commercially reasonable efforts to ensure that the syndication efforts benefit from your and your subsidiaries' existing banking relationships and the existing banking relationships of the Investors (as defined in Exhibit A) (and, to the extent appropriate and subject to the limitations on your rights set forth in the Acquisition Agreement, using your commercially reasonable efforts to cause the syndication efforts to benefit from Target's and its subsidiaries' existing banking relationships), (b) facilitating direct contact between appropriate members of your senior management, on the one hand, and the proposed Lenders, on the other hand (and, to the extent appropriate and subject to the limitations on your rights set forth in the Acquisition Agreement, using your commercially reasonable efforts to ensure such contact between your non-legal advisors and appropriate members of senior management and non-legal advisors of Target, on the one hand, and the proposed Lenders, on the other hand), in all cases at times and locations to be mutually agreed upon, (c) using your commercially reasonable efforts to provide assistance and provision of information for use by you and the Investors (and, to the extent appropriate and subject to the limitations on your rights set forth in the Acquisition Agreement, using your commercially reasonable efforts to cause Target to assist and provide information for use) in the preparation of a customary confidential information memorandum (the "Confidential Information Memorandum") and other reasonable and customary marketing materials to be used in connection with the syndication of the Facilities, including an updated projection model, (d) the hosting, with the Lead Arrangers and appropriate members of your senior management, of a reasonable number of meetings (or, if you and we shall agree, conference calls in lieu of any such meeting) of prospective Lenders at times and locations to be mutually agreed (which meetings may be held by videoconference) (and, to the extent appropriate and subject to the limitations on your rights set forth in the Acquisition Agreement, using your commercially reasonable efforts to cause the senior management of Target to be available for such meetings), (e) during the Syndication Period (or, if later, prior to the Closing Date), using your commercially reasonable efforts to ensure that there is no competing issuance or incurrence of debt for borrowed money by or on behalf of you, the Borrower or your or their respective subsidiaries (and, to the extent appropriate and subject to the limitations on your rights set forth in the Acquisition Agreement, your using commercially reasonable efforts to ensure that there are no competing issuances or incurrences of debt for borrowed money by or on behalf of Target or any of its subsidiaries) announced, offered, placed or arranged (in each case, other than (i) the Facilities, (ii) the Notes or the Term Loans (if any), (iii) replacements, extensions and renewals of existing indebtedness maturing within one year, (iv) any working capital facilities, letters of credit, capital leases, purchase money indebtedness and equipment financings, in each case, incurred or issued in the ordinary course of business, (v) any indebtedness existing or permitted to be incurred and remain outstanding under the terms of the Acquisition Agreement (including, for the avoidance of doubt, Citgo Petroleum Corporation's ("Citgo") $1,100.0 million 8.375% Senior Secured Notes due 2029, Citgo's $25.0 million 8.00% Industrial Revenue Bonds due 2028 and Citgo's $30.0 million 8.00% Industrial Revenue Bonds due 2028 (collectively, the "Permitted Existing Debt")) and (vi) other indebtedness to the extent issued or incurred with our prior written consent (not to be unreasonably withheld or delayed)), in each case that would reasonably be expected to materially and adversely impair the primary syndication of the Facilities, (f) your using commercially reasonable efforts to obtain the requisite consents for the Backstopped Amendments and to cause such Backstopped Amendments to become effective prior to the Closing Date as described on Exhibit A hereto and (g) your using commercially reasonable efforts to assist the Lead Arrangers with field examinations, inventory appraisals and other collateral diligence related to the ABL Facility. Notwithstanding anything contained in this Commitment Letter, the Fee Letter, the Facilities Documentation or any other letter agreement or other undertaking concerning the financing of the transactions contemplated hereby to the contrary, none of the commencement nor the successful completion

of the syndication of the Facilities or any other provision in this paragraph, shall constitute a condition precedent to the availability and initial funding of the Facilities. The Commitment Parties acknowledge and agree that any failure of the Company and its subsidiaries to comply with the instructions of the Special Master pursuant to Section 6.10 of the Acquisition Agreement shall not be a condition precedent to the availability and initial funding of the Facilities.

The Lead Arrangers, in their capacity as such, will manage, subject to your consent (not to be unreasonably withheld or delayed), all aspects of the syndication, including decisions as to the selection of prospective Lenders (which may not be Disqualified Institutions) to be approached and when they will be approached, when the Lenders' commitments will be accepted, which Lenders will participate, the allocation of the commitments among the Lenders and the amount and distribution of fees among the Lenders.

You acknowledge that (a) the Lead Arrangers will make available a customary information package and presentation to the proposed syndicate of Lenders by posting the information package and presentation on IntraLinks, Debtdomain, SyndTrak or another similar electronic system, in each case subject to a standard "click through" or similar confidentiality arrangements substantially consistent with the second paragraph set forth in Section 9 hereof, and (b) certain of the prospective Lenders may be "public side" Lenders (i.e., Lenders that have personnel that wish to receive only information that (i) is publicly available, (ii) is not material with respect to you, Target or any of your or its respective subsidiaries or the respective securities of any of the foregoing for purposes of United States federal or state securities laws or (iii) is of a type that would be publicly available (or could be derived from publicly available information) if you, Target or any of your or its subsidiaries were a public reporting company (each, a "Public Lender" and, collectively, the "Public Lenders" and such information, collectively, "Public Side Information")). At the request of the Lead Arrangers, you agree to use commercially reasonably efforts to (and, to the extent appropriate and subject to the limitations on your rights set forth in the Acquisition Agreement, to use commercially reasonable efforts to cause Target to) assist us in preparing an additional version of the information package and presentation consisting exclusively of information and documentation with respect to you, Target, your and its respective subsidiaries and the respective securities of any of the foregoing that is either publicly available or not material with respect to you, Target or any of your or its respective subsidiaries or the respective securities of any of the foregoing for purposes of United States federal or state securities laws, or of a type that would be publicly available (or could be derived from publicly available information) if you, Target or any of your or its subsidiaries were a public reporting company (the "Public Package"). It is understood that in connection with your assistance described above, customary authorization letters will be included in the Confidential Information Memorandum that authorize the distribution of the Confidential Information Memorandum and the Public Package to prospective Lenders, confirms that the Public Package contains only Public Side Information about you, Target, any of your or its respective subsidiaries or the securities of any of the foregoing, contains customary disclaimers and include a representation substantially consistent with the representation referred to in Section 4 hereof (other than with respect to the ability to supplement the information subject thereto), and the Public Package will contain customary language exculpating you (without limitation of your indemnification obligations under Section 7 hereof), Target, any of your or its respective affiliates and the Commitment Parties and their respective affiliates, with respect to any liability related to the use or misuse of the contents of the Public Package. You acknowledge and agree that, in addition to the Public Package, the following documents may be distributed to all prospective Lenders (other than Disqualified Institutions), including prospective Public Lenders (except to the extent you notify us in writing to the contrary prior to the distribution and provided that you have been given a reasonable opportunity to review such documents and comply with United States federal and state securities laws and any other applicable disclosure obligations): (i) the Term Sheets, (ii) drafts and final definitive documentation with respect to each Facility, (iii) administrative materials prepared by the Lead Arrangers for prospective Lenders (such as Lender meeting invitations, allocations and funding and closing memoranda) and (iv) notifications of

changes in the terms of the Facilities. You also agree, at our request, to use commercially reasonable efforts to designate (or, in the case of information relating to Target and its subsidiaries, use commercially reasonable efforts to designate) information to be distributed to the Public Lenders by clearly and conspicuously designating the same as "PUBLIC." All information that is not specifically designated as "PUBLIC" (including the Projections) shall be treated as being suitable only for posting to Lenders that are not Public Lenders. By designating such materials "PUBLIC," you shall be deemed to have authorized the Commitment Parties and the prospective Lenders to treat such materials as only containing Public Side Information (it being understood that you shall not be under any obligation to mark any particular information or materials as "PUBLIC").

4.      <u>Information</u>.

        You hereby represent and warrant that (with respect to information relating to Target and its subsidiaries prior to the Closing Date, to your knowledge) (a) all written information concerning you, Target and your and its respective subsidiaries (other than (i) any estimates, forecasts, projections or other forward looking information with respect to you, Target or your or its respective subsidiaries delivered in connection with the Acquisition or the preparation of the Confidential Information Memorandum (the "<u>Projections</u>") and (ii) information of a general economic and industry-specific nature) that has been or will be made available to any of us by you, the Investors or any of your or their respective representatives on your behalf, in connection with the transactions contemplated hereby (the "<u>Information</u>"), when taken as a whole and as supplemented as provided below, is true and correct in all material respects and does not or will not, when furnished, contain any untrue statement of a material fact or omit to state a material fact necessary in order to make the statements contained therein not materially misleading in light of the circumstances under which such statements are made and (b) the Projections have been or will be prepared in good faith based upon assumptions believed by the preparer thereof to be reasonable at the time furnished (it being recognized by the Commitment Parties that such Projections are not to be viewed as facts or a guarantee of performance and are subject to significant uncertainties and contingencies many of which are beyond your control, that no assurance can be given that any particular financial projections (including the Projections) will be realized, that actual results may differ significantly from projected results and that such differences may be material). You agree that if, at any time prior to the later of the expiration of the Syndication Period and the Closing Date, you become aware that any of the representations in the preceding sentence would be incorrect in any material respect if the Information or the Projections were being furnished and such representations were being made at such time, you will (or prior to the Closing Date with respect to Information and Projections concerning Target and its subsidiaries, to the extent appropriate and subject to the limitations on your rights set forth in the Acquisition Agreement, you will use commercially reasonable efforts to) promptly notify us and promptly supplement the Information and the Projections so that the representations in the preceding sentence remain true (or, prior to the Closing Date, to your knowledge with respect to information relating to Target and its subsidiaries) in all material respects. The accuracy of the foregoing representations, whether or not cured, shall not be a condition to the obligations of the Commitment Parties hereunder. You understand that in arranging and syndicating the Facilities we may use and rely on the Information and the Projections without independent verification thereof, and we do not assume responsibilities for the accuracy or completeness of the Information or the Projections.

5.      <u>Fee Letter</u>.

        As consideration for the commitments and agreements of the Commitment Parties hereunder, you agree to pay or cause to be paid the fees and other amounts described in the Term Sheets and the Fee Letter, dated as of the date hereof (the "<u>Fee Letter</u>"), among you, JPM and Wells Fargo, on the terms and subject to the conditions set forth therein.

6.    <u>Limited Conditionality Provision</u>.

Notwithstanding anything in this Commitment Letter, the Fee Letter, the Facilities Documentation or any other letter agreement or other undertaking concerning the financing of the transactions contemplated hereby to the contrary, (a) the only representations, the making or accuracy of which shall be a condition to availability and funding of the Facilities on the Closing Date, shall be (A) the Acquisition Agreement Representations (as defined in Exhibit D) and (B) the Specified Representations (as defined in <u>Exhibit D</u>) and (b) the terms of the Facilities Documentation shall be in a form such that they do not impair the availability of the Facilities on the Closing Date if the conditions set forth on <u>Exhibit D</u> hereto are satisfied or waived by the applicable Lead Arrangers, it being understood and agreed that, with respect to the Collateral (as defined in <u>Exhibit B</u> hereto) (including the creation or perfection of any security interest) (other than the creation of the security interest in the Collateral pursuant to a New York law security agreement and perfection to the extent possible by the filing of a financing statement under the Uniform Commercial Code, filings with the United States Patent and Trademark Office and United States Copyright Office or the delivery of physical stock or other equity certificates and accompanying stock powers of, to the extent certificated, (A) the Borrower's material wholly-owned domestic restricted subsidiaries (excluding the Target and its subsidiaries) and (B) to the extent received by the Borrower from Target on or prior to the Closing Date after you have used commercially reasonable efforts to obtain them on or prior to the Closing Date, the Target and the Target's material wholly-owned domestic restricted subsidiaries), the creation and/or perfection of such Collateral shall not constitute a condition precedent to the availability and initial funding of the Facilities on the Closing Date but may instead be delivered and/or perfected with respect to the stock of subsidiaries, within 5 business days and, with respect to the other collateral, within 90 days after the Closing Date (or, in each case, such longer period as the Bridge Administrative Agent may agree in its reasonable discretion) pursuant to arrangements mutually agreed by the parties hereto acting reasonably and otherwise customary for financings of this type and (b) the only conditions (express or implied) to the availability of the Facilities on the Closing Date are those expressly set forth on <u>Exhibit D</u> hereto, and such conditions shall be subject in all respects to the provisions of this paragraph.  This paragraph, and the provisions contained herein, is referred to in this Commitment Letter as the "<u>Limited Conditionality Provision</u>."

7.    <u>Indemnification; Expenses; Limitation of Liability</u>.

You agree (a) to indemnify and hold harmless each of the Commitment Parties, their respective affiliates and controlling persons and the directors, officers, employees, partners, agents, advisors and other representatives of any of the foregoing (each, an "<u>indemnified person</u>") from and against any and all losses, claims, damages and liabilities to which any such indemnified person may become subject arising out of or in connection with this Commitment Letter, the Fee Letter, the Facilities, the use of the proceeds thereof, the Acquisition and the Transactions or any claim, litigation, investigation or proceeding relating to any of the foregoing (a "<u>Proceeding</u>"), regardless of whether any indemnified person is a party thereto or whether such Proceeding is brought by you, any of your affiliates, security holders, creditors or any other person or any third party, and to reimburse each indemnified person within 30 days following written demand therefor for any reasonable and documented out-of-pocket expenses incurred in connection with investigating or defending any of the foregoing (but limited, in the case of legal fees and expenses, (x) to one counsel to such indemnified persons, taken as a whole, and, if reasonably necessary, one firm of local counsel in each relevant jurisdiction (which may include a single special counsel acting in multiple jurisdictions), in each case, for all indemnified persons, taken as a whole, and (y) solely in the case of an actual or potential conflict of interest, one additional counsel (and, if reasonably necessary, one firm of local counsel in each relevant jurisdiction (which may include a single special counsel acting in multiple jurisdictions) to all affected indemnified persons, taken as a whole)); <u>provided</u> that the foregoing indemnity will not, as to any indemnified person, apply to losses, claims, damages, liabilities or expenses to the extent they result from (i) the willful misconduct, gross negligence or bad faith of such indemnified person (or

any of its Related Parties (as defined below)), in each case as determined by a final, non-appealable judgment of a court of competent jurisdiction, or (ii) any disputes solely among indemnified persons and not arising out of any act or omission of you or Target or any of your or Target's respective subsidiaries (other than any Proceeding against any Commitment Party solely in its capacity or in fulfilling its role as an administrative agent or Lead Arranger or similar role under any Facility), and (b) (i) if the Closing Date occurs, to reimburse each Commitment Party on the Closing Date to the extent an invoice therefor is received by you at least three business days prior to the Closing Date or, if invoiced after such date, within 30 days thereafter, for all reasonable and documented out-of-pocket expenses (except as set forth in clause (ii) below, including due diligence expenses, applicable syndication expenses and travel expenses, but limited, in the case of legal fees and expenses, to the reasonable and documented fees, charges and disbursements of one counsel to the Commitment Parties in respect of the ABL Facility and one counsel to the Commitment Parties in respect of the Bridge Facility, Notes and/or Term Loans (if any), in each case, taken as a whole (and, if reasonably necessary, of one local counsel in any relevant jurisdiction (which may include a single special counsel acting in multiple jurisdictions) to all such persons, taken as a whole), incurred by the Commitment Parties in connection with the Facilities and any related documentation (including this Commitment Letter, the Fee Letter and the Facilities Documentation) and (ii) regardless of whether the Closing Date occurs, to reimburse each Commitment Party promptly after demand for all reasonable and documented out-of-pocket expenses relating to field examinations, collateral audits and/or inventory appraisals. No indemnified person or any other party hereto shall be liable for any damages resulting from the use by any person (other than such indemnified person (or its Related Parties)) of Information or other materials obtained through electronic, telecommunications or other information transmission systems, except to the extent any such damages result from the gross negligence, bad faith or willful misconduct of such indemnified person (or any of its Related Parties), as applicable, in each case as determined by a final, non-appealable judgment of a court of competent jurisdiction. None of the indemnified persons, you, Target, the Investors, or any of your or their respective affiliates or the respective directors, officers, employees, agents, advisors or other representatives of any of the foregoing shall be liable for any special, indirect, consequential or punitive damages in connection with this Commitment Letter, the Fee Letter or the Facilities (including the use or intended use of the proceeds of the Facilities) or the transactions contemplated hereby; provided that nothing contained in this sentence shall limit your indemnification obligations to the extent set forth hereinabove to the extent such special, indirect, consequential or punitive damages are included in any third party claim in connection with which such indemnified person is entitled to indemnification hereunder. You shall not be liable for any settlement of any Proceeding effected without your consent (which consent shall not be unreasonably withheld or delayed), but if settled with your written consent, you agree to indemnify and hold harmless such indemnified person to the extent and in the manner set forth above. You shall not, without the prior written consent of the affected indemnified person (which consent shall not be unreasonably withheld or delayed), effect any settlement of any pending or threatened Proceeding against such indemnified person in respect of which indemnity could have been sought hereunder by such indemnified person unless such settlement (a) includes an unconditional release of such indemnified person from all liability or claims that are the subject matter of such Proceeding and (b) does not include any statement as to any admission of fault or culpability. Each indemnified person shall be severally obligated to refund or return any and all amounts paid by you under this Section 7 to the extent such indemnified person is not entitled to payment of such amounts in accordance with the terms hereof (as determined by a final, non-appealable judgment of a court of competent jurisdiction). For purposes hereof, "Related Party" and "Related Parties" of an indemnified person mean any (or all, as the context may require) of such indemnified persons and its (or their) respective affiliates and controlling persons and its or their respective directors, officers, employees, partners, agents, advisors and other representatives, and in the case of agents, advisors and other representatives, to the extent acting on behalf of, or at the express instructions of, such indemnified person, affiliate or controlling persons.

8.    <u>Sharing of Information, Absence of Fiduciary Relationship</u>.

Each Commitment Party, together with its respective affiliates (the "<u>Banks</u>" (for the avoidance of doubt, regardless of whether such Commitment Party or any of its affiliates is a "bank")), is a full service financial firm and as such from time to time may (a) effect transactions for its own account or the account of customers, and hold long or short positions in debt or equity securities or loans of companies that may be the subject of the transactions contemplated hereby or (b) provide debt financing, equity capital, investment banking, financial advisory services, securities trading, hedging, financing and brokerage activities and financial planning and benefits counseling to other companies in respect of which you, the Investors or Target and your and their respective subsidiaries may have conflicting interests.  You acknowledge that the Banks have no obligation to use in connection with the transactions contemplated hereby, or to furnish to you, confidential information obtained from other companies or other persons.  The Banks may have economic interests that conflict with those of you and Target.  You acknowledge and agree that (a)(i) the arranging and other services described herein regarding the Facilities are arm's-length commercial transactions between you and your affiliates, on the one hand, and the Banks, on the other hand, (ii) you have consulted your own legal, accounting, regulatory and tax advisors to the extent you have deemed appropriate and you are not relying on the Commitment Parties for such advice and (iii) you are capable of evaluating, and understand and accept, the terms, risks and conditions of the transactions contemplated hereby; and (b) in connection with the transactions contemplated hereby, (i) each Bank has been, is, and will be acting solely as a principal and, except as otherwise expressly agreed in writing by the relevant parties, has not been, is not, and will not be acting as an advisor, agent or fiduciary for you or any of your affiliates and (ii) no Bank has any obligation to you or your affiliates except those obligations expressly set forth in this Commitment Letter and any other agreement with you or any of your affiliates. You further acknowledge and agree that you are responsible for making your own independent judgment with respect to such transactions and the process leading thereto. Please note that the Commitment Parties and their affiliates have not provided any legal, accounting, regulatory or tax advice and you are not relying on the Banks for such advice. You agree that you will not claim that the Commitment Parties or their applicable affiliates, as the case may be, have rendered advisory services of any nature or respect, or owe a fiduciary or similar duty to you or your affiliates, in connection with the transactions contemplated by this Commitment Letter.

You acknowledge that the Commitment Parties and their affiliates may be providing debt financing, equity capital or other services (including, without limitation, financial advisory services) to other persons in respect of which you, the Investors, Target and your and their respective affiliates may have conflicting interests regarding the transactions described herein and otherwise. None of the Commitment Parties or their affiliates will use confidential information obtained from you, the Investors, Target or your or their respective representatives by virtue of the transactions contemplated by this Commitment Letter or their other relationships with you in connection with the performance by them or their affiliates of services for such other persons, and none of the Commitment Parties or their affiliates will furnish any such information to other persons, except to the extent permitted under <u>Section 9</u> below. You also acknowledge that none of the Commitment Parties or their affiliates has any obligation to use in connection with the transactions contemplated by this Commitment Letter, or to furnish to you, confidential information obtained by them from other persons.

9.    <u>Confidentiality</u>.

This Commitment Letter is entered into on the understanding that neither this Commitment Letter nor the Fee Letter nor any of their terms or substance shall be disclosed by you, directly or indirectly, to any other person or entity except (a) your subsidiaries, the Investors, Target and its subsidiaries and to your and their respective directors, officers, employees, affiliates, members, partners, stockholders, attorneys, accountants, independent auditors, agents and other advisors on a confidential and "need to

know" basis solely in connection with the transactions contemplated hereby and who are informed of the confidential nature of such information and are or have been advised of their obligation to keep information of this type confidential (provided that any disclosure prior to the Closing Date of the Fee Letter or its contents to Target or its subsidiaries or their respective directors, officers, employees, affiliates, members, partners, stockholders, attorneys, accountants, independent auditors, agents or other advisors shall be redacted in a manner reasonably satisfactory to the Commitment Parties), (b) in any legal, judicial or administrative proceeding or as otherwise required by applicable law, rule or regulation or as requested by a governmental, regulatory or self-regulatory authority (in which case you agree (i) to the extent permitted by law and reasonably practicable, to inform us promptly in advance thereof and (ii) to use commercially reasonable efforts to ensure that any such information so disclosed is accorded confidential treatment), (c) to the extent reasonably necessary or advisable in connection with the exercise of any remedy or enforcement of any right under this Commitment Letter and/or the Fee Letter, (d) this Commitment Letter, including the existence and contents of this Commitment Letter (but not the contents of the Fee Letter, other than the existence thereof and the contents thereof as part of projections, pro forma information and a generic disclosure of aggregate sources and uses in offering or marketing materials and other related disclosures) may be disclosed (i) in any syndication or other marketing materials in connection with the Facilities or Term Loans or in any offering memorandum related to the Notes and (ii) in connection with any public filing requirement, (e) the Term Sheets, including the existence and contents thereof (but not the Fee Letter or the contents thereof, other than the existence thereof and the aggregate amount of fees payable thereunder, as part of projections, pro forma information and a generic disclosure of aggregate sources and uses), may be disclosed to any rating agency in connection with the Transactions, (f) the Term Sheets, including the existence and contents thereof (but not the Fee Letter) may be disclosed (in consultation with the Lead Arrangers) to any Lenders or participants or prospective Lenders or prospective participants and, in each case, their respective directors (or equivalent managers), officers, employees, affiliates, independent auditors or other experts and advisors on a confidential basis, (g) the Commitment Letter and Fee Letter may be disclosed (in consultation with the Lead Arrangers) to any Additional Agent or prospective Additional Agent and, in each case, their respective directors (or equivalent managers), officers, employees, affiliates, independent auditors or other experts and advisors on a confidential basis and (h) the Commitment Letter and Fee Letter (customarily redacted in a manner reasonably satisfactory to us) may be disclosed (in consultation with the Lead Arrangers) to the Special Master and the District Court on a confidential basis. The foregoing restrictions shall cease to apply in respect of the existence and contents of this Commitment Letter (but not in respect of the Fee Letter and its contents) on the date that is one year following the termination of this Commitment Letter in accordance with its terms unless earlier superseded by the Facilities Documentation.

The Commitment Parties shall use all information received by them from you in connection with the Acquisition and the related transactions solely for the purposes of providing the services or commitments, as the case may be, that are the subject of this Commitment Letter and shall treat confidentially all such information and the terms and contents of this Commitment Letter, the Fee Letter and the Facilities Documentation and shall not publish, disclose or otherwise divulge such information; provided, however, that nothing herein shall prevent any Commitment Party from disclosing any such information (a) subject to the final proviso of this sentence, to any Lenders or participants or prospective Lenders or participants (in each case, other than a Disqualified Institution), (b) to the extent compelled by legal process in, or reasonably necessary to, the defense of such legal, judicial or administrative proceeding, in any legal, judicial or administrative proceeding or otherwise as required by applicable law, rule or regulation (in which case such Commitment Party shall (i) to the extent permitted by law, inform you promptly thereof and (ii) use commercially reasonable efforts to ensure that any such information so disclosed is accorded confidential treatment), (c) upon the request or demand of any governmental, regulatory or self-regulatory authority having jurisdiction over such Commitment Party or its affiliates (in which case such Commitment Party shall except with respect to any audit or examination conducted by bank accountants or any governmental regulatory or self-regulatory authority (x) to the extent permitted by

law, inform you promptly thereof and (y) use commercially reasonable efforts to ensure that any such information so disclosed is accorded confidential treatment), (d) to such Commitment Party's affiliates and the directors (or equivalent managers), officers, employees, members, attorneys, accountants, independent auditors, agents or other experts and advisors of such Commitment Party and of such Commitment Party's affiliates (collectively, the "Representatives") on a "need to know" basis solely in connection with the transactions contemplated hereby or in connection with the administration, evaluation or monitoring of the commitments of such Commitment Party hereunder and who are informed of the confidential nature of such information and are or have been advised of their obligation to keep information of this type confidential; provided, such Commitment Party shall be responsible for its affiliates' and their Representatives' compliance with this paragraph with respect to any information provided to them by such Commitment Party, (e) to the extent any such information becomes publicly available other than by reason of disclosure by such Commitment Party, its affiliates or its or their respective Representatives in violation of any confidentiality obligation owing to you, Target or any of your or its respective subsidiaries or affiliates, (f) to the extent applicable to establish a due diligence defense, (g) subject to the final proviso of this sentence, to any direct or indirect contractual counterparty to any credit default swap or similar derivative product (other than a Disqualified Institution), (h) [reserved], (i) in connection with the enforcement of the relevant Commitment Party's rights hereunder, (j) to the extent that such information is received by any Commitment Party from a third party that is not, to such Commitment Party's knowledge, subject to any contractual or fiduciary confidentiality obligation owing to you, Target or any of your or its respective affiliates or related parties, (k) to the extent that such information is independently developed by any Commitment Party without violating the terms of this Commitment Letter, and/or (l) to the extent that you have consented to the relevant disclosure in writing; provided, further, that the disclosure of any such information pursuant to clauses (a) and (g) above shall be made subject to the acknowledgment and acceptance by such recipient that such information is being disseminated on a confidential basis (on substantially the terms set forth in this paragraph or as is otherwise reasonably acceptable to you and each Commitment Party, including, without limitation, as set forth in the Confidential Information Memorandum or other marketing materials) in accordance with the standard syndication processes of the Commitment Parties or market standards for dissemination of such type of information, which shall in any event require "click through" or other affirmative action on the part of the recipient to access such confidential information and acknowledge its confidentiality obligations in respect thereof.  In addition, each Commitment Party may disclose the existence of the Facilities and/or the Notes and/or the Term Loans (if any) and the information about the Facilities and/or the Notes and/or the Term Loans (if any) to market data collectors, similar services providers to the lending industry and service providers to the Commitment Parties in connection with the syndication, administration and management of the Facilities. For the avoidance of doubt, nothing in this Commitment Letter prohibits any individual from communicating or disclosing information regarding suspected violations of laws, rules or regulations to a governmental, regulatory or self-regulatory authority. The provisions of this paragraph (other than with respect to the confidentiality of the Fee Letter) shall automatically terminate on the date that is one year following the Signing Date unless earlier superseded by the Facilities Documentation.

10.     Miscellaneous.

        This Commitment Letter shall not be assignable by any party hereto (except (i) as expressly contemplated under Section 2 above or (ii) by you, to the ultimate entity that is the Borrower, or another entity, so long as such entity is newly formed under the laws of any jurisdiction of the United States of America and is, or will be, controlled by the Investors after giving effect to the Transactions and shall (directly or through a wholly-owned subsidiary) own the Target) without the prior written consent of each other party hereto (and any purported assignment without such consent shall be null and void), is intended to be solely for the benefit of the parties hereto and, to the extent expressly provided in Section 7 above, the indemnified persons and is not intended to and does not confer any benefits upon, or create any rights in favor of, any person other than the parties hereto and, to the extent expressly set forth herein, the

indemnified persons. Notwithstanding the foregoing, but subject to the limitations otherwise set forth herein, each Commitment Party reserves the right to employ the services of its respective affiliates or branches in providing services contemplated hereby and to allocate, in whole or in part, to their affiliates or branches certain fees payable to such Commitment Party in such manner as such Commitment Party and its respective affiliates or branches may agree in their sole discretion and, to the extent so employed, such affiliates and branches shall be entitled to the benefits and protections afforded to, and subject to the provisions governing the conduct of, such Commitment Party hereunder. This Commitment Letter may not be amended or waived except by an instrument in writing signed by you and each Commitment Party. This Commitment Letter may be executed in multiple counterparts and by different parties hereto in separate counterparts, all of which, taken together, shall constitute an original. Delivery of an executed counterpart of a signature page to this Commitment Letter by telecopier, facsimile or other electronic transmission (e.g., a "pdf" or "tiff") shall be effective as delivery of a manually executed counterpart thereof. The words "execution," "signed," "signature," and words of like import in this Commitment Letter shall be deemed to include electronic signatures or electronic records, each of which shall be of the same legal effect, validity or enforceability as a manually executed signature or the use of a paper-based recordkeeping system, as the case may be, to the extent and as provided for in any applicable law, including the Federal Electronic Signatures in Global and National Commerce Act, the New York State Electronic Signatures and Records Act, or any other similar state laws based on the Uniform Electronic Transactions Act. Section headings used herein are for convenience of reference only, are not part of this Commitment Letter and are not to affect the construction of, or to be taken into consideration in interpreting, this Commitment Letter. This Commitment Letter, the Fee Letter and other letter agreements entered into in connection herewith on the date hereof are the only agreements that have been entered into among the parties hereto and you with respect to the Facilities and set forth the entire understanding of the parties with respect hereto and thereto, and supersede all prior agreements and understandings related to the subject matter hereof.

This Commitment Letter, and any claim, controversy or dispute arising under or related to this Commitment Letter, whether in tort, contract (at law or in equity) or otherwise, shall be governed by, and construed and interpreted in accordance with, the laws of the State of New York without regard to conflict of law principles that would result in the application of any law other than the law of the State of New York; provided, however, that (A) the interpretation of the definition of "Company Material Adverse Effect" (as defined in the Acquisition Agreement as in effect on the date hereof) and whether or not there shall have occurred any event, occurrence, state of facts, development, circumstance, change or effect that, individually or in the aggregate with all other events, occurrences, state of facts, developments, circumstances, changes and effects, has had or would reasonably be expected to have a Company Material Adverse Effect (in each case solely for purposes of the conditions to funding of the Facilities on the Closing Date), (B) the determination of the accuracy of the Acquisition Agreement Representations and whether as a result of any inaccuracy thereof you or your applicable affiliate have a right to terminate your (or its) obligations under the Acquisition Agreement or a right to refuse to consummate the Acquisition as a result of a breach of any such representations in the Acquisition Agreement and (C) whether the Acquisition has been consummated on the terms described in the Acquisition Agreement shall, in each case, be governed by and construed in accordance with the law governing the Acquisition Agreement, regardless of laws that might otherwise govern under applicable principles of conflicts of laws thereof. Each of the parties hereto irrevocably agrees to waive, to the fullest extent permitted by applicable law, all right to trial by jury in any suit, action, proceeding or counterclaim (whether based upon contract, tort or otherwise) related to or arising out of the Acquisition, this Commitment Letter, the Fee Letter or the performance by us or any of our affiliates of the services contemplated hereby or thereby.

Each of the parties hereto irrevocably and unconditionally (a) submits to the exclusive jurisdiction of any state or federal court sitting in the Borough of Manhattan in the City of New York (or any appellate court therefrom) over any suit, action or proceeding arising out of or relating to this Commitment Letter, the Fee Letter, the transactions contemplated hereby or the performance of services

hereunder and agrees that all claims in respect of any such suit, action or proceeding shall be heard and determined in such New York state, or to the extent permitted thereby, such federal court sitting in the Borough of Manhattan in the City of New York (or any appellate court therefrom) and (b) agrees that a final judgment in any such suit, action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit or the judgment or in any other matter provided by law. You and we agree that service of any process, summons, notice or document by registered mail addressed to such person shall be effective service of process against such person for any suit, action or proceeding brought in any such court. Each of the parties hereto hereby irrevocably and unconditionally waives any objection to the laying of venue of any such suit, action or proceeding brought in any such court and any claim that any such suit, action or proceeding has been brought in an inconvenient forum.

Each of the parties hereto agrees that (i) this Commitment Letter is a binding and enforceable agreement with respect to the subject matter herein (including an obligation to negotiate in good faith) notwithstanding that the funding of the Facilities is subject to the conditions specified herein, including the execution and delivery of the Facilities Documentation in a manner consistent with this Commitment Letter (including the applicable Documentation Principles); it being acknowledged and agreed that the commitments provided hereunder are subject only to those conditions set forth on Exhibit D hereto and (ii) the Fee Letter is a binding and enforceable agreement with respect to the subject matter therein.

Each of the Commitment Parties hereby notifies you that, pursuant to the requirements of the USA PATRIOT Act, Title III of Pub. L. 107-56 (signed into law on October 26, 2001) (as amended, the "PATRIOT Act") and 31 C.F.R. § 1010.230 (as amended, the "Beneficial Ownership Regulation"), it is required to obtain, verify and record information that identifies the Borrower and the Guarantors, which information includes names, addresses, tax identification numbers and other information that will allow each Lender to identify the Borrower and the Guarantors in accordance with the PATRIOT Act and the Beneficial Ownership Regulation. This notice is given in accordance with the requirements of the PATRIOT Act and the Beneficial Ownership Regulation and is effective for the Commitment Parties and each Lender.

The Fee Letter and the indemnification, confidentiality (subject to the last sentence in the first and second paragraphs of Section 9 hereof), jurisdiction, governing law, sharing of information, no agency or fiduciary duty, conflict waiver, waiver of jury trial, service of process, venue submission, information and syndication provisions contained herein (including the flex provisions in the Fee Letter) shall remain in full force and effect regardless of whether the Facilities Documentation shall be executed and delivered and notwithstanding the termination or expiration of this Commitment Letter or the commitments hereunder; provided that your obligations under this Commitment Letter (other than (a) your obligations with respect to syndication and information, which shall survive only until the expiration of the Syndication Period or, in the case of information, if later, the Closing Date, at which time such obligations shall terminate and be of no further force and effect, (b) confidentiality of the Commitment Letter, the Fee Letter and the contents hereof and thereof and (c) indemnification with respect to the syndication of the Facilities to the extent not covered by the Facilities Documentation) shall automatically terminate and be of no further force and effect to the extent superseded by the Facilities Documentation on the Closing Date and you shall automatically be released from all liability hereunder in connection therewith at such time. Subject to the preceding sentence, you may (upon written notice to the Initial Lenders at any time), at your option, terminate this Commitment Letter and the commitments hereunder in whole or in part (with any such partial termination reducing the commitments of the Initial Lenders on a pro rata basis based on their respective commitments to the relevant Facility).

If the foregoing correctly sets forth our agreement, please indicate your acceptance of the terms of this Commitment Letter and of the Fee Letter by returning to the Lead Arrangers executed

counterparts hereof and of the Fee Letter not later than 11:59 p.m., New York City time, on [       ], 2025 (the date you so return such executed counterparts, the "Signing Date").[1] The Commitment Parties' commitments hereunder and agreements contained herein will expire at such time on such date in the event that the Lead Arrangers have not received such executed counterparts in accordance with the immediately preceding sentence.

        In the event that the Closing Date does not occur on or before 11:59 p.m., New York City time, on the earliest of (a) the date that is five business days after the Outside Date (as defined in the Acquisition Agreement as in effect on the date hereof), as such Outside Date may be extended in accordance with the terms of the Acquisition Agreement as in effect on the date hereof, if the Acquisition shall not have occurred on or prior to such date, (b) the date that is twelve months following July 24, 2025 (with two extensions of 90 days each, as set forth in the Acquisition Agreement as in effect on the date hereof), (c) the date of the termination of the Acquisition Agreement by you (or your affiliate) or with your (or your affiliate's) written consent, in each case prior to the closing of the Acquisition, and (d) the date of the closing of the Acquisition without the use of any of the Facilities, then this Commitment Letter and the commitments hereunder shall automatically terminate unless we shall, in our sole discretion, agree to an extension; provided that the termination of any commitment pursuant to this sentence does not prejudice your rights and remedies in respect of any breach of this Commitment Letter that occurred prior to any such termination.  In addition, solely with respect to the Backstop Bridge Loans, in the event that the Backstop Termination Event occurs on or prior to the Closing Date, then the commitments of the Initial Backstop Bridge Lenders in respect of the Backstop Bridge Loans (but not, for the avoidance of doubt, any of the commitments of the Commitment Parties with respect to any of the other Facilities) shall automatically terminate; provided that the termination of any commitment pursuant to this sentence does not prejudice your rights and remedies in respect of any breach of this Commitment Letter with respect to the Backstop Bridge Loans that occurred prior to any such termination.

**[THE REMAINDER OF THIS PAGE IS INTENTIONALLY LEFT BLANK]**

---

[1] NTD: The Commitment Parties are willing to execute and deliver signed letters after you are selected as the Stalking Horse bidder prior to the end of the topping period.

We are pleased to have been given the opportunity to assist you in connection with this important financing.

Very truly yours,

**JPMORGAN CHASE BANK, N.A.**

By: _____
Name:
Title:

Signature Page to Project Horizon Commitment Letter

**WELLS FARGO BANK, NATIONAL ASSOCIATION**

By: _____
      Name:
      Title:

**WELLS FARGO SECURITIES, LLC**

By: _____
      Name:
      Title:

Signature Page to Project Horizon Commitment Letter

Accepted and agreed to as of
the date first above written:

**Red Tree Investments, LLC**

By: _____
     Name:
     Title:

Signature Page to Project Horizon Commitment Letter

## SCHEDULE 1

### (a) BASE BRIDGE FACILITY COMMITMENTS

| Commitment Party | Base Bridge Facility Commitment Percentage |
|---|---|
| JPMorgan Chase Bank, N.A. | 50% |
| Wells Fargo Bank, National Association | 50% |
| Total | 100% |

### (b) BACKSTOP BRIDGE FACILITY COMMITMENTS

| Commitment Party | Backstop Bridge Facility Commitment Percentage |
|---|---|
| JPMorgan Chase Bank, N.A. | 50% |
| Wells Fargo Bank, National Association | 50% |
| Total | 100% |

**SCHEDULE 2**

ABL FACILITY COMMITMENTS

| Commitment Party | ABL Facility Commitment |
|---|---|
| Wells Fargo Bank, National Association | $625,000,000 |
| JPMorgan Chase Bank, N.A. | $625,000,000 |
| Total | $1,250,000,000 |

**EXHIBIT A**

PROJECT HORIZON
TRANSACTION SUMMARY

Capitalized terms used but not otherwise defined herein shall have the meanings assigned to such terms in the Commitment Letter to which this <u>Exhibit A</u> is attached or on <u>Exhibits B</u>, <u>C</u> or <u>D</u> (including the Annexes thereto) attached thereto, as applicable.  In the case of any such capitalized term that is subject to multiple and differing definitions, the appropriate meaning thereof in this <u>Exhibit A</u> shall be determined by reference to the context in which it is used.

A Delaware corporation or limited liability company to be formed ("<u>AcquisitionCo</u>") will form a direct subsidiary ("<u>Acquisition MidCo</u>") that is a Delaware corporation or limited liability company which will in turn form a direct subsidiary ("<u>Acquisition Merger Sub</u>") that is a Delaware corporation or limited liability company, which will purchase 100% of the common shares of PDV Holding, Inc., a Delaware corporation ("<u>Target</u>") and will merge into Target immediately after the Acquisition (as defined below) with Target surviving.  Acquisition Merger Sub will form a direct finance subsidiary (the "<u>Borrower</u>") that is a Delaware corporation or limited liability company and will merge into CITGO Petroleum Corporation, a Delaware corporation ("<u>CITGO Petroleum</u>") immediately after the Acquisition, with CITGO Petroleum surviving.

Acquisition Merger Sub (and/or its affiliates) will enter into an Acquisition Agreement (including the schedules, exhibits, annexes, and disclosure letters thereto, the "<u>Acquisition Agreement</u>"), with Robert B. Pincus, solely in his capacity as special master (the "<u>Special Master</u>"). Pursuant to the Acquisition Agreement, and in accordance with the orders issued by the United States District Court for the District of Delaware (the "<u>District Court</u>") in the matter of *Crystallex International Corp. v. Bolivarian Republic of Venezuela*, D. Del. C.A. No. 1:17-mc-00151-LPS, including but not limited to, (i) the *Sixth Revised Proposed Order (A) Establishing Sale and Bidding Procedures, (B) Approving Special Master's Report and Recommendation Regarding Proposed Sale Procedures Order, (C) Affirming Retention of Evercore as Investment Banker by Special Master and (D) Regarding Related Matters* [D.I. 480-1], (ii) the *Memorandum Order Regarding Sale Process and Litigation* [D.I. 1517] and (iii) the *Memorandum Order* entered by the District Court on January 27, 2025 (collectively, the "<u>Sale Procedures Orders</u>"), Acquisition Merger Sub shall, directly or indirectly acquire (the "<u>Acquisition</u>") all of the issued and outstanding equity interests of Target.

In connection therewith, it is intended that:

(a)        AcquisitionCo will (i) issue $150.0 million aggregate principal amount of certain senior secured convertible notes (the "<u>Convertible Notes</u>") on the terms described in, and pursuant to, that certain Convertible Notes Commitment Letter, dated as of the date hereof (including the term sheets relating thereto, the "<u>Convertible Notes Commitment Letter</u>"), by and between Contrarian Funds, L.L.C. (and/or one or more affiliates thereof) (collectively, the "<u>Investor</u>") and Red Tree (as in effect on the date hereof) and (ii) contribute such Convertible Notes and AcquisitionCo's common equity to Acquisition MidCo;

(b)        Red Tree will contribute claims to Acquisition MidCo and will receive common equity of AcquisitionCo that will constitute more than a majority of the voting and economic interests in AcquisitionCo after closing of the Transactions (the "<u>Claims Contribution</u>");

A-1

(c)        pursuant to the Convertible Notes Commitment Letter, Acquisition MidCo will sell to the Investor $150.0 million aggregate principal amount of Convertible Notes for cash at par, with such cash proceeds being paid to Acquisition MidCo and later contributed to CITGO Petroleum following the closing of the Acquisition;

(d)        the Borrower will, at its option, either (i) (x) issue an aggregate principal amount of its senior secured notes (the "Notes") in a Rule 144A or other private placement and/or (y) obtain senior secured term loans (the "Term Loans", collectively with the Notes, the "Permanent Financing"), with such Permanent Financing generating up to $2,545.0 million in aggregate gross proceeds (as such amount may be increased as a result of a Flex Increase) or (ii) to the extent the Borrower does not receive such amount of gross proceeds of Notes and/or Term Loans on the Closing Date, borrow up to $2,545.0 million (as such amount may be reduced as set forth under the heading "Mandatory Commitment Reduction and Prepayment" in the Bridge Term Sheet or increased as a result of a Flex Increase) of senior term loans (the "Base Bridge Loans") under a new senior term loan credit facility (the "Base Bridge Facility") described in the Summary of Principal Terms and Conditions attached hereto as Exhibit B (the "Bridge Term Sheet");[2]

(e)        the Borrower will use its commercially reasonable efforts to (x) obtain the requisite consents from CITGO Petroleum and the applicable holders of CITGO Petroleum's $1,100,000,000 8.375% senior secured notes due 2029 (the "2029 Notes") to amend that certain Indenture, dated as of September 20, 2023, by and among CITGO Petroleum, the guarantors party thereto and Argent Institutional Trust Company, as trustee, governing the 2029 Notes (the "2029 Notes Indenture") to permit the Transactions, including, without limitation, the incurrence of Indebtedness or Liens (each as defined in the 2029 Notes Indenture) that may occur as a result of the Transactions (such amendments, collectively, the "Backstopped Amendments") and (y) to cause such amendment to the 2029 Notes to become effective and operative on or prior to the Closing Date in accordance with the terms of the 2029 Notes Indenture (the receipt of such requisite consents from CITGO Petroleum and the applicable holders of the 2029 Notes to the Backstopped Amendments and the effectiveness and operativeness of such Backstopped Amendments on or prior to the Closing Date being referred to as the "Backstop Termination Event");

(f)        solely to the extent the Backstop Termination Event has not occurred on or prior to the Closing Date, the Borrower will, at its option, either (i) (x) issue Permanent Financing in addition to the Permanent Financing pursuant to clause (d) above in an amount generating up to $1,100.0 million in aggregate gross proceeds (as such amount may be increased as a result of a Flex Increase) or (ii) to the extent the Borrower does not receive such additional amount of gross proceeds of Notes and/or Term Loans on the Closing Date, borrow up to $1,100.0 million (as such amount may be reduced as set forth under the heading "Mandatory Commitment Reduction and Prepayment" in the Bridge Term Sheet or increased as a result of a Flex Increase) of additional senior term loans (the "Backstop Bridge Loans") under the Bridge Facility as described in the Bridge Term Sheet (unless the context otherwise requires, all references to the "Bridge Facility" shall be deemed to refer to the Base Bridge Facility together with any Backstop Bridge Loans, if applicable, and all references to "Bridge Loans" shall be deemed to refer to the Base Bridge Loans together with any Backstop Bridge Loans, if applicable), the proceeds of which will be used to

---

[2]     It is assumed that prior to the closing of the Acquisition, CITGO Petroleum will have already refinanced, repaid or redeemed the entire principal amount, together with interest thereon and the applicable premium, if any, of its or its subsidiaries Industrial Revenue Bonds due 2025 and 6.375% Senior Secured Notes due 2026 and all guarantees and security interests in connection therewith shall have been released and terminated in full (the "Existing Notes Refinancing").

repay, prepay, repurchase, redeem, defease or discharge the 2029 Notes (and cause the release of any liens and guarantees related thereto);

(g)    the Borrower will obtain $1,250.0 million in commitments under a senior secured asset-based revolving credit facility (the "ABL Facility" and, together with the Bridge Facility, the "Facilities") described in the Summary of Principal Terms and Conditions attached hereto as Exhibit C (the "ABL Term Sheet"), with an expected draw under the ABL Facility on the Closing Date of $114.0 million (the transactions described in the preceding clause (d) and this clause (e), collectively, the "Senior Debt Financing");

(h)    pursuant to the Acquisition Agreement, Acquisition Merger Sub will purchase all of the equity interests of Target, and immediately after such Acquisition occurs, (i) Acquisition Merger Sub will merge with and into Target (with Target surviving), (ii) the Borrower will merge with and into CITGO Petroleum (with CITGO Petroleum surviving) and (iii) cash proceeds of the Senior Debt Financing will be used to pay the cash consideration under the Acquisition Agreement;

(i)    pursuant to that certain Transaction Support Agreement, dated as of March 7, 2025 (the "Transaction Support Agreement"), by and among Red Tree and certain holders of, or nominees, investment managers, investment advisors, or subadvisors to funds and/or accounts that hold, or trustees of trusts that hold the outstanding 8.5% notes due 2020 (the "PDVSA 2020 Notes") of Petróleos de Venezuela, S.A., a Venezuelan company, (i) CITGO Petroleum, CITGO Holding, Inc., a Delaware corporation ("CITGO Holding") and/or Acquisition MidCo will acquire the PDVSA 2020 Notes of participating holders of the 2020 Notes ("Participating 2020 Noteholders"), and (ii) as a result of the requisite holders of PDVSA 2020 Notes having executed the Transaction Support Agreement, the consents received under the Transaction Support Agreement will be sufficient to (x) cause the Acquisition to be permitted by the indenture governing the PDVSA 2020 Notes and (y) all of the security interests in the common stock of CITGO Holding that secure the PDVSA 2020 Notes to be released and terminated in full (collectively, the "PDVSA Notes Transaction")[3];

(j)    the fees, premiums, expenses and other transaction costs incurred in connection with the Transactions (provided that, solely with respect to the PDVSA Notes Transaction, this shall be limited to out-of-pocket costs and expenses and shall not include, for the avoidance of doubt, any work fees), including to fund any original issue discount and upfront fees (collectively, the "Transaction Costs"), will be paid; and

(k)    the proceeds of the Senior Debt Financing, together with cash on hand of AcquisitionCo and its subsidiaries, will be used to pay the consideration and other amounts owing in connection with the Acquisition under the Acquisition Agreement and to pay all or a portion of the Transaction Costs, with the cash proceeds of the Convertible Notes remaining at CITGO Petroleum to be used for general corporate purposes.

The transactions described above in clauses (a) through (k) (inclusive) are collectively referred to as the "Transactions." For purposes of the Commitment Letter and the Fee Letter, "Closing Date" shall mean the date of the consummation of the Acquisition and the satisfaction or waiver of the relevant conditions set forth on Exhibit D and the funding of the applicable Facilities.

---

[3]    NTD: The PDVSA 2020 Notes that are acquired by the various parties will remain outstanding, since they are owed by PDVSA, and there is no need to discharge what could be valuable claims against PDVSA.

**CONFIDENTIAL**

<u>**EXHIBIT B**</u>

<u>Project Horizon</u>
<u>$3,645.0 million Senior Secured Bridge Facility</u>
Summary of Principal Terms and Conditions[4]

| | |
|---|---|
| <u>Borrower</u>: | The Borrower, as defined in the Commitment Letter. |
| <u>Bridge Administrative Agent</u>: | JPM will act as sole and exclusive administrative agent and collateral agent (collectively, in such capacities, the "<u>Bridge Administrative Agent</u>") for a syndicate of banks, financial institutions and institutional lenders approved by the Borrower in accordance with the Commitment Letter excluding any Disqualified Institution (together with the Initial Bridge Lenders, the "<u>Bridge Lenders</u>"), and will perform the duties customarily associated with such role. |
| <u>Joint Bookrunner and Joint Lead Arranger</u>: | (x) JPM and Wells Fargo will act as joint lead arrangers for the Base Bridge Loans and (y) JPM and Wells Fargo will act as joint lead arrangers for the Backstop Bridge Loans (in such capacities, together with any other financial institution that becomes a Lead Arranger as set forth in Section 2 of the Commitment Letter, the "<u>Lead Arrangers</u>") and, in each case, as a joint bookrunner and will perform the duties customarily associated with such roles. |
| <u>Bridge Loans</u>: | Senior secured bridge term loans (the "<u>Bridge Loans</u>"). |
| <u>Use of Proceeds</u>: | The proceeds of the Bridge Loans will be used by the Borrower on the Closing Date, together with the proceeds of the Notes and/or Term Loans (if any), the Holdco Debt Securities, revolving borrowings under the ABL Facility the Holdco Convertible Junior Capital (as defined in the Fee Letter) and the Junior Capital Contribution (as defined in the Fee Letter), together with cash on hand of the immediate parent of the Borrower ("<u>Holdings</u>") and their subsidiaries, to pay the consideration and other amounts owing in connection with the Acquisition under the Acquisition Agreement, to effect the PDVSA Notes Defeasance and to pay all or a portion of the Transaction Costs.  To the extent the Backstop Termination Event has not occurred on or prior to the Closing Date, the proceeds of the Backstop Bridge Loans will be used by the Borrower on the Closing Date, together with the |

---

[4]    All capitalized terms used but not defined herein have the meanings given to them in the Commitment Letter to which this Term Sheet is attached, including the Exhibits thereto.  In the event any such capitalized term is subject to multiple and differing definitions, the appropriate meaning thereof in this Exhibit shall be determined by reference to the context in which it is used.

**CONFIDENTIAL**

proceeds of the Notes and/or Term Loans (if any), to repay, prepay, repurchase, redeem, defease or discharge the 2029 Notes (and cause the release of any liens and guarantees related thereto).

Facility Amount:
Availability:

A senior secured term loan credit facility ("Bridge Facility") in an aggregate principal amount of $3,645.0 million, consisting of (x) $2,545 million Base Bridge Loans and (y) $1,100 million Backstop Bridge Loans (each as such amount shall be reduced (i) as set forth under the heading "Mandatory Commitment Reduction and Prepayment" below or increased as a result of a Flex Increase (as defined in the Fee Letter) or (ii) in the sole discretion of the Investors prior to the Closing Date in accordance with the Commitment Letter).

The Bridge Facility will be available in a single draw on the Closing Date.

Mandatory Commitment
Reduction and Prepayment:

On or prior to the Closing Date, the aggregate commitments in respect of the Bridge Facility under the Commitment Letter or under the Bridge Facility Documentation (as applicable) shall be permanently reduced, and after the Closing Date, the Bridge Loans shall be prepaid, without penalty or premium, in each case, dollar-for dollar, by the following amounts (in each case, subject to customary exceptions to be mutually agreed):

(a) 100% of the amount of any net cash proceeds received by the Borrower or any of its restricted subsidiaries after the Closing Date, from all non-ordinary course asset sales or other dispositions of property by the Borrower and its restricted subsidiaries (including proceeds from the sale of stock of any restricted subsidiary of the Borrower and insurance and condemnation proceeds);

(b) 100% of the amount of any net cash proceeds received by the Borrower or any of the Borrower's restricted subsidiaries after the date of the Commitment Letter from any sale or issuance of Notes or any other debt securities or any incurrence of debt for borrowed money, including the Term Loans (collectively, "Debt Issuances"), other than Excluded Debt (as defined below); and

(c) 100% of the amount of any net cash proceeds received by the Borrower or its restricted subsidiaries after the date of the Commitment Letter from any issuance of equity securities or equity-linked securities (collectively, the "Equity Issuances"), other than (i) pursuant to any employee equity compensation plan or agreement or other employee equity compensation arrangement, any employee benefit plan or agreement or other

**CONFIDENTIAL**

employee benefit arrangement or any nonemployee director equity compensation plan or agreement or other non-employee director equity compensation arrangement or pursuant to the exercise or vesting of any employee or director stock options, restricted stock or restricted stock units, warrants or other equity awards or pursuant to dividend reinvestment programs, (ii) equity issuances contemplated under the Acquisition Agreement, including the Junior Capital Contribution and the Holdco Convertible Junior Capital, (iii) issuances between or among the Borrower and its subsidiaries, and (iv) other customary exceptions to be agreed.

In addition, in the event that the Backstop Termination Event occurs on or prior to the Closing Date, the aggregate commitments in respect of the Backstop Bridge Loans under the Commitment Letter or under the Bridge Facility Documentation (as applicable) shall be permanently reduced to zero.

For purposes hereof, "Excluded Debt" means (i) the Permitted Existing Debt, (ii) amendments, replacements, extensions, refinancings and renewals of existing indebtedness of the Borrower and its subsidiaries (including, for the avoidance of doubt, the Permitted Existing Debt), in consultation with the Lead Arrangers, *provided* that the principal amount of replacing, refinancing or renewed indebtedness shall not be greater than the amount of refinanced existing indebtedness (including any undrawn commitments) plus accrued interest, fees, premiums (if any) and penalties thereon and reasonable fees and expenses associated with the refinancing, (iii) revolving borrowings under the ABL Facility, (iv) borrowings for working capital purposes (including commercial paper issuances) or ordinary course purchase money, factoring, receivables or equipment financing or other capex financing, (v) indebtedness, loans, and advances solely among the Borrower and/or its subsidiaries, and (vi) other customary exceptions to be agreed.

Prepayments from net cash proceeds of Debt Issuances or Equity Issuances by non-U.S. subsidiaries of the Borrower will not be required if (and to the extent) such prepayments (or the distribution of such net cash proceeds to the Borrower in connection with such prepayment) would result in material adverse tax consequences (as reasonably determined by the Borrower) or would be prohibited or restricted by applicable law, rule or regulation.

<u>Ranking</u>:    The Bridge Loans will constitute senior secured indebtedness of the Borrower.

**CONFIDENTIAL**

| | |
|---|---|
| Guarantees: | All obligations under the Bridge Facility shall be fully and unconditionally guaranteed (the "Guarantees"), jointly and severally, by (i) Holdings and (ii) each of the Borrower's existing and subsequently acquired or organized wholly-owned domestic restricted subsidiaries other than "Excluded Subsidiaries" (as defined in the 2029 Notes Indenture). |
| Security: | Subject to the Limited Conditionality Provisions, obligations of the Borrower and the Guarantors (collectively, the "Loan Parties") in respect of the Bridge Facility and the Guarantees will be secured jointly and severally on a senior secured basis (subject to permitted liens) by the same property of the Loan Parties, wherever located, now owned or hereafter acquired that secures the 2029 Notes (collectively, the "Collateral"); provided that such collateral package shall be modified to reflect the nature of the ABL Facility having a first-priority security interest on the ABL Collateral (as defined in Exhibit C). |
| | In the event of (a) any action to enforce rights or exercise remedies in respect of the Collateral, (b) any distribution in respect of the Collateral in any insolvency or liquidation proceeding, or (c) any payment received in respect of the Collateral pursuant to any other intercreditor agreement, the proceeds from any sale, collection or liquidation of the Collateral shall be applied to the obligations under the ABL Facility, the Bridge Facility, the Notes and/or the Term Loans as set forth in a customary intercreditor agreement (the "ABL Intercreditor Agreement"), which shall be based upon a documentation precedent consistent with other similar transactions within the refining industry to be mutually agreed. |
| Interest Rates and Fees: | As set forth in Addendum I. |
| Default Rate: | The applicable interest rate plus 2.00% on overdue amounts. |
| | Notwithstanding anything to the contrary set forth herein, in no event shall any cap or limit on the yield or interest rate payable with respect to the Bridge Loans affect the payment of any default rate of interest in respect of any Bridge Loans. |
| Maturity: | The Bridge Facility shall mature on the date that is 364 days after the Closing Date (the "Maturity Date"). The Bridge Loans will not amortize and the aggregate principal amount of the Bridge Loans will be payable in full on the Maturity Date. |
| Optional Prepayment: | The Bridge Loans may be prepaid, in whole or in part, at par plus accrued and unpaid interest upon not less than three business days' prior written notice, at the option of the Borrower at any time. |

**CONFIDENTIAL**

Right to Resell Senior
Bridge Loans:

On or prior to the Closing Date, the making of assignments of and participations in commitments under Bridge Facility shall be subject to the provisions set forth in the Commitment Letter.

At all times thereafter, assignments of and participations in Bridge Loans shall be subject to limitations usual and customary for financings of this type, provided that, for the avoidance of doubt (i) the consent of the Borrower shall be required (other than during any payment or bankruptcy event of default) with respect to any assignment (such consent not to be unreasonably withheld or delayed) if, subsequent thereto, the Initial Bridge Lenders (together with their affiliates) would hold, in the aggregate, less than 50.1% of the outstanding Bridge Loans (other than assignments to a Bridge Lender, an affiliate of a Bridge Lender or an approved fund) and (ii) the Borrower shall be deemed to have consented to any assignment of Bridge Loans unless the Borrower shall have objected thereto within ten (10) business days after the Borrower having received written request therefor.

Bridge
Loan Documents:

The definitive documentation relating to the Bridge Loans (the "Bridge Facility Documentation") shall be negotiated in good faith to finalize the Bridge Facility Documentation, giving effect to the Limited Conditionality Provision, that shall (a) be initially drafted by counsel to the Borrower, (b) contain only the terms and conditions set forth in this Exhibit B, (c) reflect the Borrower's pro forma credit profile and operational and strategic requirements of the Borrower and its subsidiaries (after giving effect to the Acquisition), (d) be consistent with the proposed business plan and Projections provided to the Lead Arrangers, (e) give due regard to (i) the 2029 Notes Indenture and (ii) certain non-investment grade precedents in the oil refinery industry to be agreed, modified to reflect the 364-day bridge loan nature of the Bridge Facility (including that (x) the negative covenants will be more restrictive in a customary manner to be mutually agreed with respect to the incurrence of indebtedness and liens, (y) the making of equity restricted payments shall be limited to (1) ordinary course and non-discretionary equity restricted payments substantially similar to those in the 2029 Notes Indenture and (2) general equity restricted payments in an amount not to exceed $25,000,000 (such basket, the "General RP Basket") and (z) the negative covenants will include a limitation on the Borrower or any restricted subsidiary entering into or being party to any receivables factoring arrangements, sale leasebacks or any other sale of receivables or financing of inventory (other than the sale of inventory in the ordinary course of business or in connection with the ABL Facility)

**CONFIDENTIAL**

(such covenant, the "Working Capital Covenant")) and (f) reflect the Bridge Administrative Agent's customary administrative and operational requirements, including SOFR (and Term SOFR replacement) mechanics and erroneous payment provisions. The Bridge Facility Documentation will contain customary EU and UK "Bail-in" provisions and a customary ERISA lender representation as published by the LSTA. The foregoing is referred to herein, collectively, as the "Bridge Facility Documentation Principles."

Representations and Warranties:

Substantially consistent with the Bridge Facility Documentation Principles, subject to the Limited Conditionality Provision and Paragraph 4 of Exhibit D and limited to the following (to be applicable to the Borrower and its restricted subsidiaries and, with respect to certain customary representations, Holdings, subject to qualifications and exceptions to be mutually agreed): organization, existence, qualification and power; compliance with laws; due authorization; no contravention of laws, organizational documents and debt agreements; governmental approvals; execution, delivery and enforceability of the Bridge Facility Documentation; accuracy of financial statements and good faith preparation of financial projections as of the Closing Date; no material adverse effect after the Closing Date; litigation; labor matters; environmental matters; ownership of material property; insurance; taxes; compliance with ERISA; subsidiaries as of the Closing Date; margin regulations; Investment Company Act; accuracy of disclosure as of the Closing Date; PATRIOT Act, FCPA and OFAC and other applicable sanctions, anti-money laundering and anti-corruption laws; intellectual property; solvency on a consolidated basis as of the Closing Date consistent with the solvency certificate attached to the Commitment Letter; use of proceeds; and the creation, validity, perfection and priority of security interests in the Collateral (subject to permitted liens); provided that representations and warranties relating to qualification, compliance with laws, no contravention with laws and debt agreements, governmental approvals, litigation, labor matters, environmental matters, taxes, compliance with ERISA and intellectual property shall be qualified by "Material Adverse Effect".

For purposes of the Bridge Facility Documentation, "Material Adverse Effect" shall mean (a) on the Closing Date, a "Company Material Adverse Effect" as defined in the Acquisition Agreement and (b) after the Closing Date, a material adverse effect on (i) the business, assets, financial condition or results of operations, in each case, of the Borrower and its restricted subsidiaries, taken as a whole, (ii) the rights and remedies (taken as a whole) of the Bridge Administrative Agent and the Bridge Lenders under the

**CONFIDENTIAL**

|  | Bridge Facility Documentation or (iii) the ability of the Borrower and the Guarantors (taken as a whole) to perform their payment obligations under the Bridge Facility Documentation. |
|---|---|
| <u>Affirmative Covenants</u>: | Substantially consistent with the Bridge Facility Documentation Principles and limited to the following (to be applicable to the Borrower and its restricted subsidiaries and, with respect to certain customary affirmative covenants, Holdings, subject to qualifications and exceptions to be mutually agreed): delivery of annual audited financial statements within 120 days of the end of each fiscal year (which may include a "going concern" qualification relating to an anticipated or actual financial covenant default under the Bridge Facility or any other indebtedness or to an upcoming maturity date) and delivery of unaudited quarterly financial statements (for the first three fiscal quarters of any fiscal year) within 60 days of the end of each such fiscal quarter, annual budgets (within 120 days of year-end) and compliance certificate (within five days after delivery of annual audit and quarterly financial statements, as applicable); notices of default or event of default and other material events; quarterly lender calls, <u>provided</u> that this requirement may be satisfied by permitting Bridge Lenders to participate in any comparable calls held for the Borrower's securityholders; payment of taxes; maintenance of existence; maintenance of properties; maintenance of insurance; compliance with laws (including environmental laws); compliance with PATRIOT Act, FCPA, OFAC and other applicable sanctions, anti money laundering and anti-corruption laws; compliance with material contractual obligations; books and records; inspection rights of the Bridge Administrative Agent; covenant to guarantee obligations and give security; further assurances as to security and guarantees; designation of subsidiaries; customary syndication assistance and commercially reasonable efforts to refinance the Bridge Facility as soon as practicable; and use of proceeds. |

For the avoidance of doubt, the Borrower shall not, and shall ensure that each member of the Loan Parties will not, directly or indirectly use the proceeds of the Bridge Facility to fund, finance or facilitate any activities, business or transactions: (a) that are prohibited by Sanctions, (b) that would be prohibited by U.S. Sanctions if conducted by a U.S. Person, or (c) that would be prohibited by Sanctions if conducted by a Lender, or any other party hereto. The Borrower shall notify the Lenders in writing not more than one (1) business day after first becoming aware of any breach of this section.

"<u>Sanctions</u>" means any and all economic or financial sanctions, sectoral sanctions, secondary sanctions, trade

**CONFIDENTIAL**

embargoes and restrictions and anti-terrorism laws, including but not limited to those imposed, administered or enforced from time to time by the U.S. government (including those administered by OFAC or the U.S. Department of State), the United Nations Security Council, the European Union, any European member state, His Majesty's Treasury, or other relevant sanctions authority in any jurisdiction in which (a) the Borrower or any of its subsidiaries or affiliates is located or conducts business, (b) in which any of the proceeds of the Bridge Loans will be used, or (c) from which repayment of the Bridge Loans will be derived.

"U.S. Sanctions" means sectoral sanctions, secondary sanctions, trade embargoes and restrictions and anti-terrorism laws imposed, administered or enforced from time to time by the U.S. government (including those administered by OFAC or the U.S. Department of State).

Negative Covenants:

Substantially consistent with the Bridge Facility Documentation Principles and limited to the following (to be applicable to the Borrower and its restricted subsidiaries and, solely in the case of the customary passive holding company covenant, Holdings, subject to qualifications, thresholds, baskets and other exceptions to be mutually agreed): limitations on liens; limitations on investments; limitations on debt (including certain limitations on preferred stock); limitations on fundamental changes; limitations on modifying subordinated debt documents in a manner materially adverse to the Bridge Lenders (taken as a whole); limitations on dispositions; limitations on restricted payments; limitations on material changes in nature of business; limitations on transactions with affiliates; limitations on sale leaseback transactions; limitations on restrictions on subsidiary distributions and negative pledge clauses; limitations on prepaying subordinated debt; limitations on changes in fiscal periods; and with respect to Holdings, a customary passive holding company covenant.

For the avoidance of doubt, the Bridge Facility Documentation will also include the General RP Basket and Working Capital Covenant, in each case, described in the Bridge Facility Documentation Principles.

Financial Covenants:

The Bridge Facility Documentation will contain the following financial covenant with regard to the Borrower and its restricted subsidiaries on a consolidated basis: a maximum Total Net Leverage Ratio to be set at a 30% cushion to the Total Net Leverage Ratio as of the Closing Date calculated using (i) Closing Date Consolidated EBITDA (to be defined in a manner consistent with the Bridge Facility Documentation Principles and to be set at the lesser of (x) $1.7 billion and (y)

**CONFIDENTIAL**

actual Closing Date Consolidated EBITDA) and (ii) assuming $300,000,000 is drawn under the ABL Facility, which covenant shall be tested as of the end of the most recent fiscal quarter for which financial statements have been delivered or have been required to be delivered, commencing with the first fiscal quarter ending after the Closing Date.

"***Total Net Leverage Ratio***" shall mean during any period, with respect to the Borrower and its restricted subsidiaries on a consolidated basis, the ratio of (i) the outstanding principal amount of third party funded indebtedness for borrowed money, finance lease obligations and purchase money debt net of unrestricted cash and cash equivalents to (ii) Consolidated EBITDA.

<u>Events of Default</u>:

Limited to the following: nonpayment of principal, interest and fees (with not less than a five business day grace period for interest and fees); failure to perform negative covenants, the financial covenant and affirmative covenant to provide notice of defaults and maintain the Borrower's corporate existence; failure to perform other covenants subject to a 30-day cure period after the date on which written notice of default from the Bridge Administrative Agent is received; any representation or warranty incorrect in any material respect when made; cross-default to continuing defaults under other material indebtedness of Citgo Holding, Inc., the Borrower or a restricted subsidiary in excess of an amount to be agreed (which, for the avoidance of doubt, shall not include a cross-default to the Holdco Debt Securities); bankruptcy and similar proceedings of the Borrower or a material restricted subsidiary; material monetary judgment defaults in excess of an amount to be agreed against the Borrower or a restricted subsidiary (to the extent not covered by insurance or other indemnity); invalidity of the Bridge Facility Documentation (including any Guarantees) or invalidity or loss of perfection of a security interest on a material portion of the Collateral (subject to customary exceptions to be agreed); ERISA events (subject to "material adverse effect"); and change of control.

<u>Voting</u>:

Amendments and waivers of the Bridge Facility Documentation will require the approval of one or more Bridge Lenders (the "<u>Required Bridge Lenders</u>") holding more than 50% of the aggregate amount of loans and commitments under the Bridge Facility, except that: (a) the consent of each Bridge Lender directly and adversely affected thereby will be required with respect to (i) increases in commitments of such Bridge Lender, (ii) reductions of principal, interest (other than default interest) or fees (it being understood and agreed that the waiver of any mandatory prepayment, default interest, default or event of default will only require the consent of the Required Bridge Lenders),

**CONFIDENTIAL**

(iii) extensions of scheduled amortization, date of payment of interest or any fee or final maturity and (iv) changes to the *pro rata* sharing and *pro rata* payment provisions (with exceptions for certain transactions and actions to be agreed, including loan buy backs, amend and extend transactions and defaulting lender actions), including the "waterfall"; (b) the consent of 100% of the Bridge Lenders will be required with respect to (i) changes in voting thresholds, (ii) releases of liens on all or substantially all of the Collateral or all or substantially all of the aggregate value of the Guarantees (other than in connection with any sale of Collateral or of the relevant Guarantor permitted by the Bridge Facility Documentation) and (iii) any amendment that subordinates any obligations under the Bridge Facility to any other debt of the Loan Parties or subordinates the liens securing the obligations under any of the Bridge Facility to liens securing other debt or other obligations; and (c) the consent of the Bridge Administrative Agent will be required to amend, modify or otherwise affect the rights and duties of the Bridge Administrative Agent , as the case may be.

The Bridge Facility Documentation shall contain customary provisions relating to "defaulting" Lenders (including provisions relating to the suspension of voting rights, rights to receive certain fees, and the termination or assignment of commitments or loans of such Lenders).

Cost and Yield Protection:    Usual and customary for facilities similar to the Bridge Facility including customary tax gross-up provisions and customary protections for increased costs imposed as a result of the Dodd-Frank Act or Basel III.

Expenses and Indemnification:    The Borrower shall pay (a) <u>provided</u> that the Closing Date occurs, all reasonable documented and invoiced out-of-pocket expenses of the Bridge Administrative Agent and the Bridge Lead Arrangers associated with the syndication of the Bridge Facility and the preparation, execution, delivery and administration of the Bridge Facility Documentation and any amendment or waiver with respect thereto requested by the Borrower (in each case, limited to the extent set forth in the Commitment Letter), and (b) all reasonable and documented or invoiced out-of-pocket expenses of the Bridge Administrative Agent and the Bridge Lenders in connection with the enforcement of the Bridge Facility Documentation.

The Borrower will indemnify the Bridge Administrative Agent the Bridge Lead Arrangers and the Bridge Lenders and their respective affiliates, and the officers, directors, employees, agents, advisors and controlling persons of the foregoing, and hold them harmless from and against all losses, claims, damages, costs, expenses (including reasonable fees,

**CONFIDENTIAL**

disbursements and other charges of counsel, but limited to one counsel for all such persons taken as a whole and, if reasonably necessary, a single local counsel for all such persons taken as a whole in each relevant material jurisdiction (which may be a single local counsel acting in multiple jurisdictions) and, solely in the case of any actual or perceived conflict of interest between such persons where the persons affected by such conflict inform the Borrower of such conflict, one additional counsel in each relevant material jurisdiction to each group of affected persons similarly situated taken as a whole) and liabilities of any such indemnified person arising out of or relating to the Bridge Facility, the use or proposed use of the proceeds thereof, the Transactions, the Bridge Facility Documentation or any claim or any litigation or other proceedings (regardless of whether any such indemnified person is a party thereto or whether such claim, litigation or other proceeding is brought by a third party or by the Borrower or any of its affiliates, creditors or shareholders or any other person) that relate to the Bridge Facility Documentation, provided that no indemnified person will be indemnified for (1) its gross negligence or willful misconduct or that of its affiliates, or of its or its affiliates' respective officers, directors, employees, affiliates, agents, advisors and controlling persons, in each case as determined in a final, non-appealable judgment of a court of competent jurisdiction or (2) any such proceeding that does not involve an act or omission of the Borrower or any of its affiliates and that is brought by an indemnified person against any other indemnified person (other than any proceeding against the Bridge Administrative Agent or any similar agent in its capacity as such).

Governing Law:     New York (except that (a) for the interpretation of Company Material Adverse Effect as defined in the Acquisition Agreement and whether a Company Material Adverse Effect has occurred, (b) the accuracy of any Acquisition Agreement representation and warranties as a result of a breach thereof the Borrower (or any of its subsidiaries) have the right to terminate its (or their) obligations under the Acquisition Agreement, or to decline to consummate the Acquisition pursuant to the Acquisition Agreement and (c) whether the Acquisition has been consummated in accordance with the Acquisition Agreement, shall be governed by and construed in accordance with the laws of the State of Delaware, without regard to the conflicts of laws principles that would result in the application of the law of any other jurisdiction.) Each Party to the Bridge Facility Documentation will waive the right to trial by jury and will consent to the exclusive jurisdiction of the State and Federal courts located in the County of New York.

**CONFIDENTIAL**

Counsel to the
Bridge Lead Arrangers:                    Cahill Gordon & Reindel LLP.

Addendum I

Senior Secured Bridge Facility
Pricing and Fees

Interest Rates:   Interest on the Bridge Loans shall be payable, at the option of the Borrower, at Term SOFR (as defined below) plus the Bridge Applicable Margin or the Base Rate (as defined below) plus the Bridge Applicable Margin. Interest on the Bridge Loans shall be payable in cash, quarterly in arrears.

"Base Rate" means the highest of (a) the rate of interest last quoted by The Wall Street Journal in the U.S. as the prime rate in effect (the "Prime Rate"), (b) the greater of the effective federal funds rate and the overnight funding rate plus 0.50%, (c) one-month Term SOFR plus 1.00% and (d) 1.00% (the "Base Rate")).

"Term SOFR" means, for an interest period of 1, 3 and 6 months (as selected by the Borrower), the rate per annum equal to the Term SOFR Screen Rate two U.S. Government Securities Business Days prior to the commencement of such interest period with a term equivalent to such interest period; *provided* that if Term SOFR determined in accordance with this definition would otherwise be less than 0.00%, Term SOFR shall be deemed 0.00%.

"Term SOFR Screen Rate" means the forward-looking SOFR term rate administered by CME (or any successor administrator satisfactory to the Bridge Administrative Agent) and published on the applicable Reuters screen page (or such other commercially available source.

"U.S. Government Securities Business Day" means any business day, except any business day on which any of the Securities Industry and Financial Markets Association, the New York Stock Exchange or the Federal Reserve Bank of New York is not open for business because such day is a legal holiday under the federal laws of the United States or the laws of the State of New York, as applicable.

Calculation of   Other than calculations in respect of interest at the Base Rate when the Base Rate
Interest and Fees:   is calculated by reference to the Prime Rate (which shall be made on the basis of actual number of days elapsed in a 365/366 day year), all calculations of interest and fees shall be made on the basis of actual number of days elapsed in a 360 day year.

Duration Fees:   If the Bridge Loans are funded on the Closing Date, the Borrower shall pay to the Bridge Administrative Agent, for the account of each Bridge Lender, the Duration Fee (as defined in the Fee Letter).

**EXHIBIT C**

PROJECT HORIZON
$1,250,000,000 Asset-Based Revolving Facility
Summary of Principal Terms and Conditions[5]

Borrowers:

The Borrower, as defined in the Commitment Letter (in such capacity, the "Borrower").

ABL Administrative Agent:

Wells Fargo Bank, National Association will act as sole and exclusive administrative agent and sole collateral agent (collectively, in such capacities, the "ABL Administrative Agent") for a syndicate of banks, financial institutions and other institutional lenders selected by the ABL Lead Arrangers (as defined below) and approved by the Borrower in accordance with the Commitment Letter (the "ABL Lenders"), and will perform the duties customarily associated with such roles.

Joint Bookrunners and Joint Lead Arrangers:

Wells Fargo Bank, National Association and JPMorgan Chase Bank, N.A. will act as joint lead arrangers for the ABL Facility (in such capacity, together with and any other financial institution that becomes an ABL Lead Arranger as set forth in Section 2 of the Commitment Letter, the "ABL Lead Arrangers") and as joint bookrunners, and will perform the duties customarily associated with such roles.

ABL Facility:

A senior secured asset-based revolving credit facility (the "ABL Facility"; the loans thereunder, the "ABL Loans") in an aggregate principal amount of up to $1,250,000,000. The currencies available under the ABL Facility shall include U.S. dollars and other currencies as may be reasonably and mutually agreed.

Incremental ABL Increase:

The ABL Facility will permit the Borrower to increase commitments under the ABL Facility (any such increase, an "Incremental ABL Increase"); *provided* that (i) the aggregate principal amount of all such Incremental ABL Increases shall not exceed the sum of (1) the greater of (A) $250,000,000 and (B) the excess of the Borrowing Base at such time over the aggregate revolving commitments under the ABL Facility at such time and (2) the aggregate principal amount of permanent commitment reductions under the ABL Facility, (ii) no ABL Lender will be required to participate in any such Incremental ABL Increase without its consent, and no Issuing Bank or Swingline Lender shall be required to act as "Issuing Bank" or "Swingline Lender" under any Incremental ABL Increase without its consent, (iii) the interest rate margins and letter of credit participation fee rates and commitment fee

---

[5]     All capitalized terms used but not defined herein have the meanings given to them in the Commitment Letter to which this Term Sheet is attached, including the Exhibits thereto. In the event any such capitalized term is subject to multiple and differing definitions, the appropriate meaning thereof in this Exhibit shall be determined by reference to the context in which it is used.

**CONFIDENTIAL**

rates shall be consistent with the then-existing ABL Facility, (iv) any Incremental ABL Increase shall be on the same terms and pursuant to the same documentation applicable to the then-existing ABL Facility (except any upfront, arranger or similar fees), and (v) (A) no event of default shall have occurred and be continuing or would result under the ABL Facility immediately after giving effect to such Incremental ABL Increase and (B) the representations and warranties contained in the ABL Credit Documentation shall be true and correct in all material respects (or in all respects to the extent that any representation or warranty is qualified by materiality).

Availability and Purpose:

Availability under the ABL Facility at any time will be limited to the lesser of (a) the commitments under the ABL Facility (the "ABL Commitments") at such time and (b) the Borrowing Base (as defined below under the heading "Borrowing Base") at such time (such lesser amount, the "Line Cap").

Subject to Availability (as defined below), ABL Loans will be available at any time prior to the ABL Maturity Date (as defined below) in minimum principal amounts to be mutually agreed upon and, in the case of ABR Loans denominated in United States dollars, on one business day notice. The proceeds of the ABL Facility may be used (a) on the Closing Date, (i) to replace, backstop or cash collateralize existing letters of credit, (ii) for working capital, capital expenditures and other general corporate purposes, (iii) fund ABL Flex OID and (iv) to finance the Transactions, including fees and expenses incurred in connection with the Transactions, *provided* that all amounts described in the preceding clause (a) shall not exceed $300,000,000 and (b) after the Closing Date, for working capital, capital expenditures and other general corporate purposes.

Notwithstanding anything to the contrary herein, no proceeds of the ABL Facility may be applied to repay or refinance any portion of the Bridge Loans.

Guarantors:

All obligations under the ABL Facility and, at the option of the Borrower, under any interest rate protection or other hedging arrangements entered into with the ABL Administrative Agent, an entity that is a Lender or agent at the time of such transaction (or on the Closing Date, if applicable), or any affiliate of any of the foregoing, or any cash management arrangements with any such person shall be fully and unconditionally guaranteed, jointly and severally, by (i) Holdings and (ii) each other domestic Loan Party on substantially the same basis (and subject to the substantially the same exclusions) as the Bridge Loan Facility.

Notwithstanding the foregoing, it is understood that the ABL Facility Documentation will include customary limitations on the release of Guarantors solely as a result of such Guarantor becoming a non-wholly owned direct or indirect subsidiary of the Borrower unless such Guarantor becomes non-wholly owned pursuant to a transaction where

**CONFIDENTIAL**

such Guarantor becomes a *bona fide* joint venture where the other person taking an equity interest in such Guarantor is not an affiliate of Holdings (other than as a result of such joint venture).

The ABL Credit Documentation will provide that the Borrower shall deliver to the ABL Administrative Agent an updated borrowing base certificate giving pro forma effect to any release of a Guarantor.

<u>Letters of Credit</u>:

A portion of the ABL Facility in an amount to be mutually agreed shall be available for the issuance of standby or sight commercial letters of credit in United States dollars and other currencies to be mutually agreed. Letters of credit under the ABL Facility will be issued by Wells Fargo Bank, National Association, JPMorgan Chase Bank, N.A., each additional joint lead arranger under the ABL Facility appointed pursuant to the Commitment Letter and, if included as an additional Issuing Bank, one or more other Lenders acceptable to the Borrower and the ABL Administrative Agent (each, an "<u>Issuing Bank</u>") pursuant to terms and conditions set forth in the ABL Facility Documentation. The issuance of all letters of credit shall be subject to the customary procedures of the Issuing Bank.

<u>Swingline Loans</u>:

A portion of the ABL Facility in an amount to be agreed (which shall be at least $50 million) shall be available for swingline loans (the "<u>Swingline Loans</u>") from the ABL Administrative Agent (in its capacity as swingline lender, the "<u>Swingline Lender</u>") on same-day notice. Except for purposes of calculating the commitment fee described in Annex I, any Swingline Loans will reduce Availability under the ABL Facility on a dollar-for-dollar basis. Each ABL Lender shall be irrevocably and unconditionally required to purchase, under certain circumstances, a participation in each Swingline Loan on a pro rata basis. Swingline Loans shall be funded in U.S. dollars.

<u>Interest Rates and Fees</u>:

As set forth in Addendum I.

<u>Default Rate</u>:

Overdue principal amounts shall bear interest at the applicable interest rate plus 2.0% per annum and, with respect to any other overdue amounts, the interest rate applicable to ABR loans plus 2.0% per annum.

<u>Final Maturity</u>:

The ABL Facility will mature on the date that is the earliest of (i) five (5) years after the Closing Date, (ii) the maturity date of the Bridge Facility (and 91 days prior to the maturity date of any indebtedness that refinances the Bridge Facility) and (iii) 91 days prior to the maturity date of the 2029 Notes (solely to the extent greater than $250 million in aggregate principal amount of the notes issued pursuant to the 2029 Notes Indenture remain outstanding on such date) (the "<u>ABL Maturity Date</u>").

<u>Security</u>:

A first priority lien on and security interest in substantially all current assets of the Loan Parties (including accounts receivable (including intercompany claims), inventory, bank and securities accounts and cash and the proceeds thereof (including any business interruption

**CONFIDENTIAL**

insurance)) (the "ABL Collateral") and a second-priority lien on and security interest in all other Collateral (as defined in Exhibit B); *provided* that the ABL Facility will not be secured by any real property; *provided further* that the restrictions on entry into control agreements, lockbox or similar arrangements with respect to any deposit account, securities account, commodities account or other bank account and delivery of landlord lien waivers, estoppels, bailee letters or collateral access letters set forth in Exhibit B for the Collateral (as defined in Exhibit B) shall not apply to the ABL Collateral. The relative rights and priorities in the Collateral for each of the ABL Facility, on the one hand, and the Bridge Facility, on the other hand, will be set forth in the ABL Intercreditor Agreement (as defined in Exhibit B), which shall be based upon a documentation precedent consistent with other similar transactions within the refining industry to be mutually agreed.

Borrowing Base:

At any time after the Closing Borrowing Base Termination Date, the borrowing base (the "Borrowing Base") shall be equal to the sum of the following as set forth in the most recently delivered Borrowing Base certificate:

(a)    85.0% of eligible accounts receivable (to be defined on a basis reasonably and mutually satisfactory to the ABL Lead Arrangers and the Borrower and subject to the ABL Documentation Principles) of the Loan Parties (other than Holdings); plus

(b)    80.0% of the market value of the Loan Parties' (other than Holdings) eligible hydrocarbon inventory (to be defined on a basis reasonably and mutually satisfactory to the ABL Lead Arrangers and the Borrower and subject to the ABL Documentation Principles);

in each case, subject to eligibility criteria to be reasonably and mutually agreed subject to the ABL Documentation Principles, and reserves implemented by the ABL Administrative Agent in its Permitted Discretion and promptly communicated thereafter to the Borrower in writing from time to time, including reserves to reflect declines in the market value of the eligible hydrocarbon inventory or to reflect factors that may negatively impact the value of the eligible hydrocarbon inventory and a debt maturity reserve in an amount of up to the then-outstanding principal amount of any 2029 Notes that remain outstanding 91 days prior to the maturity date thereof.

"Permitted Discretion" means a determination made in the exercise, in good faith, of reasonable credit judgment (from the perspective of a secured, asset-based lender).

A field examination (but not an inventory appraisal) of the Borrower completed by a reasonably acceptable examiner, and a completed Borrowing Base certificate using the Borrowing Base formula described above will be required to be delivered on or prior to the 90th day (or such later date agreed to by the ABL Administrative Agent) following the Closing Date (the earlier of delivery of the field examination and

**CONFIDENTIAL**

such 90th day herein called the "<u>Closing Borrowing Base Termination Date</u>"). Until such delivery, the Borrowing Base shall be equal to the sum of (i) 50% of the net book value of the eligible accounts receivable of the Loan Parties (other than Holdings) and (ii) 60% of the market value of the Loan Parties' (other than Holdings) eligible hydrocarbon inventory (the "<u>Closing Borrowing Base</u>"), in each case, subject to reserves on terms consistent with those permitted to be implemented against the Borrowing Base (and which may, in the case of the Closing Borrowing Base, be calculated on an estimated basis in the Permitted Discretion of the ABL Administrative Agent). The amount of the Closing Borrowing Base shall be determined as of the Closing Date and may be re-determined at any time and from time to time prior to the Closing Borrowing Base Termination Date by the ABL Administrative Agent in its Permitted Discretion. Inclusion of any eligible hydrocarbon inventory in the Closing Borrowing Base shall be subject to receipt of an inventory perpetual including market prices of such inventory delivered to the ABL Administrative Agent five business days prior to the Closing Date. If the delivery of the field examination referenced above does not occur on or prior to the Closing Borrowing Base Termination Date, then the Borrowing Base shall be deemed to be $0 until the date of such delivery.

As used herein, "<u>Availability</u>" means, at any time, the excess of (i) the Line Cap at such time over (ii) the aggregate amount of loans, unreimbursed letter of credit drawings and outstanding letters of credit available to be drawn outstanding under the ABL Facility at such time.

<u>Mandatory Prepayments</u>:

If, at any time, the sum of the aggregate outstanding principal amount of ABL Loans and the aggregate amount of exposure in respect of letters of credit exceeds the Line Cap, the Borrower will be required to prepay ABL Loans and/or cash collateralize letters of credit to eliminate such excess.

<u>Voluntary Prepayments and Reductions of Commitments</u>:

Voluntary prepayments of ABL Loans and voluntary reductions of ABL Commitments will be permitted at any time, without premium or penalty, subject, in the cases of term rate loans, to reimbursement of breakage costs if the prepayment occurs other than at the end of an applicable interest period.

<u>ABL Facility Documentation</u>:

The definitive documentation relating to the ABL Facility (the "<u>ABL Facility Documentation</u>") shall be negotiated in good faith to finalize the ABL Facility Documentation, giving effect to the Limited Conditionality Provision, that shall (a) be initially drafted by counsel to the Borrower, (b) contain only the terms and conditions set forth in this <u>Exhibit C</u>, (c) reflect the Borrower's pro forma credit profile and the operational and strategic requirements of the Borrower and its subsidiaries (after giving effect to the Acquisition), (d) be consistent with the proposed business plan and Projections provided to the ABL Lead Arrangers, (e) give due regard to certain non-investment grade precedents in the oil refinery industry to be agreed, (f) give due regard

**CONFIDENTIAL**

|  |  |
|---|---|
|  | to the negative covenants contained in the 2029 Notes Indenture and (g) reflect the ABL Administrative Agent's customary administrative and operational requirements, including interest rate, alternative currency, letter of credit and swingline mechanics and erroneous payment provisions. The Bank Facilities Documentation will contain customary EU and UK "Bail-in" provisions and a customary ERISA lender representation as published by the LSTA. The foregoing is referred to herein, collectively, as the "<u>ABL Documentation Principles</u>." |
| <u>Representations and Warranties</u>: | Substantially consistent with the ABL Documentation Principles and subject to the Limited Conditionality Provision and Paragraph 4 of <u>Exhibit D</u> and limited to the following (to be applicable to the Borrower and its restricted subsidiaries and, with respect to certain customary representations, Holdings, subject to qualifications and exceptions to be mutually agreed): organization, existence, qualification and power; compliance with laws; due authorization; no contravention of laws, organizational documents and debt agreements; governmental approvals; execution, delivery and enforceability of the ABL Facility Documentation; accuracy of financial statements and good faith preparation of financial projections as of the Closing Date; no material adverse effect after the Closing Date; litigation; labor matters; environmental matters; ownership of material property; insurance; taxes; compliance with ERISA; subsidiaries as of the Closing Date; margin regulations; Investment Company Act; accuracy of disclosure as of the Closing Date; PATRIOT Act, FCPA and OFAC and other applicable sanctions, anti-money laundering and anti-corruption laws; intellectual property; solvency on a consolidated basis as of the Closing Date consistent with the solvency certificate attached to the Commitment Letter; use of proceeds; accuracy of borrowing base certificates; and the creation, validity, perfection and priority of security interests in the Collateral (subject to permitted liens); <u>provided</u> that representations and warranties relating to qualification, compliance with laws, no contravention with laws and debt agreements, governmental approvals, litigation, labor matters, environmental matters, taxes, compliance with ERISA and intellectual property shall be qualified by "Material Adverse Effect" (as defined in Exhibit B). |
| <u>Conditions Precedent to Initial Borrowing</u>: | The conditions precedent to the effectiveness of the ABL Facility and any borrowings thereunder on the Closing Date will be limited to those expressly set forth in <u>Exhibit D</u> to the Commitment Letter. |
| <u>Conditions Precedent to All Borrowings After the Closing Date</u>: | The making of each loan after the Closing Date shall be conditioned solely upon delivery of notice, accuracy of representations and warranties in all material respects (*provided* that any representation and warranty that is qualified as to "materiality", "material adverse effect" or similar language shall be true and correct in all respects (after giving effect to any such qualification therein)), absence of default or event of default and availability. |

**CONFIDENTIAL**

| | |
|---|---|
| <u>Affirmative Covenants</u>: | Substantially consistent with the ABL Documentation Principles and limited to the following (to be applicable to the Borrower and its restricted subsidiaries and, with respect to certain customary affirmative covenants, Holdings, subject to qualifications and exceptions to be mutually agreed): delivery of annual audited financial statements within 120 days of the end of the first fiscal year ending after the Closing Date and within 90 days of the end of each fiscal year thereafter (which may include a "going concern" qualification relating to an anticipated or actual financial covenant default under the ABL Facility or any other indebtedness or to an upcoming maturity date) and delivery of unaudited quarterly financial statements (for the first three fiscal quarters of any fiscal year) within 60 days of the end of the first three fiscal quarters after the Closing Date and within 45 days of the end of each fiscal quarter thereafter and delivery of unaudited monthly financial statements within 30 days of the end of each month (for the first two months of any fiscal quarter), annual budgets (including monthly projections) within 90 days of year-end and compliance certificate (within five days after delivery of annual audit and quarterly financial statements, as applicable); notices of default or event of default and other material events; quarterly lender calls, <u>provided</u> that this requirement may be satisfied by permitting the ABL Lenders to participate in any comparable calls held for the Borrower's securityholders; payment of taxes; maintenance of existence; maintenance of properties; maintenance of insurance; compliance with laws (including environmental laws); compliance with PATRIOT Act, FCPA, OFAC and other applicable sanctions, anti-money laundering and anti-corruption laws; compliance with material contractual obligations; books and records; inspection rights of the ABL Administrative Agent; covenant to guarantee obligations and give security; further assurances as to security and guarantees; designation of subsidiaries; use of proceeds; delivery of borrowing base certificates; field exams and appraisals; customary asset-based lending reporting requirements; and maintenance of cash management systems and control over accounts constituting Collateral. |
| | With respect to the affirmative covenant regarding field exams and appraisals, the ABL Credit Documentation will permit field exams and appraisals (in each case, at the Borrower's expense) limited to (i) one field exam and appraisal during any twelve month period and (ii) one additional field exam and appraisal during any twelve month period in which Availability has been less than the greater of (x) 25.0% of the Line Cap and (y) $312.50 million for three consecutive business days (which shall remain in effect until the date that Availability shall have exceeded such level, at all times, for a period of 30 consecutive days); <u>provided</u> that the ABL Administrative Agent shall be permitted to conduct an unlimited amount of field exams and appraisals at the Borrower's expense during any twelve month period in which an event of default has occurred. At any time when the Borrowing Base consists solely of eligible hydrocarbon inventory, the ABL Administrative Agent may, in its Permitted Discretion, elect not to perform any appraisals permitted by this paragraph. |

**CONFIDENTIAL**

With respect to the affirmative covenant regarding delivery of borrowing base certificates, the ABL Credit Documentation will require delivery of monthly Borrowing Base certificates within 20 calendar days after the end of each fiscal month (subject to weekly delivery (a) upon the occurrence and during the continuation of any event of default or (b) when Availability is less than the greater of (i) 20.0% of the Line Cap and (ii) $250 million for 3 consecutive business days, and ending on the date that Availability shall have exceeded such levels, at all times, for a period of 30 consecutive calendar days.

The ABL Credit Documentation will provide that the Borrower shall deliver to the ABL Administrative Agent an updated borrowing base certificate giving pro forma effect to any direct or indirect investment or non-ordinary course disposition involving ABL Collateral (including by transfer to an unrestricted subsidiary or other affiliate and/or the release of or sale of any obligor) which contributes to 5.0% or more of the Borrowing Base (calculated before giving effect to such investment or disposition).

For the avoidance of doubt, the Borrower shall not, and shall ensure that each member of the Loan Parties will not, directly or indirectly use the proceeds of the ABL Facility to fund, finance or facilitate any activities, business or transactions: (a) that are prohibited by Sanctions, (b) that would be prohibited by U.S. Sanctions if conducted by a U.S. Person, or (c) that would be prohibited by Sanctions if conducted by a Lender, or any other party hereto. The Borrower shall notify the Lenders in writing not more than one (1) business day after first becoming aware of any breach of this section.

"Sanctions" means any and all economic or financial sanctions, sectoral sanctions, secondary sanctions, trade embargoes and restrictions and anti-terrorism laws, including but not limited to those imposed, administered or enforced from time to time by the U.S. government (including those administered by OFAC or the U.S. Department of State), the United Nations Security Council, the European Union, any European member state, His Majesty's Treasury, or other relevant sanctions authority in any jurisdiction in which (a) the Borrower or any of its subsidiaries or affiliates is located or conducts business, (b) in which any of the proceeds of the Bridge Loans will be used, or (c) from which repayment of the Bridge Loans will be derived.

"U.S. Sanctions" means sectoral sanctions, secondary sanctions, trade embargoes and restrictions and anti-terrorism laws imposed, administered or enforced from time to time by the U.S. government (including those administered by OFAC or the U.S. Department of State).

Negative Covenants:     Substantially consistent with the ABL Documentation Principles and limited to the following (to be applicable to the Borrower and its restricted subsidiaries and, solely in the case of the customary passive holding company covenant, Holdings, subject to qualifications,

**CONFIDENTIAL**

thresholds, baskets and other exceptions to be mutually agreed (and including, without limitation, those summarized below)): limitations on liens; limitations on investments; limitations on debt (including, without limitation, restrictions on the incurrence of debt that has a maturity date that is prior to the ABL Maturity Date (other than Permitted Existing Debt and other exceptions to be agreed) and certain limitations on preferred stock); limitations on fundamental changes; limitations on modifying subordinated debt documents in a manner materially adverse to the Lenders (taken as a whole); limitations on dispositions; limitations on restricted payments; limitations on material changes in nature of business; limitations on transactions with affiliates; limitations on sale leaseback transactions; limitations on restrictions on subsidiary distributions and negative pledge clauses; limitations on prepaying subordinated debt; and limitations on changes in fiscal periods; and, with respect to Holdings, a customary passive holding company covenant.

The ABL Credit Documentation will include unlimited baskets for permitted acquisitions, investments, dividends and restricted debt payments subject to compliance with the Payment Conditions. "Payment Conditions" means (i) no default or event of default has occurred and is continuing or would result from any applicable action, and (ii) either (a) the Fixed Charge Coverage Ratio (to be defined in the ABL Credit Documentation and consistent with the ABL Documentation Principles) would be at least 1.0:1.0 on a pro forma basis and the Borrower would have Availability of at least the greater of (i) 15.0% of the Line Cap and (ii) $187.50 million on a pro forma basis immediately after giving effect to such transaction and over the 30 consecutive days immediately prior to such transaction, also on a pro forma basis, or (b) the Borrower would have pro forma Availability of at least the greater of (i) 17.5% of the Line Cap and (ii) $218.750 million on a pro forma basis immediately after giving effect to such transaction and over the 30 consecutive days immediately prior to such transaction, also on a pro forma basis.

The ABL Credit Documentation will also include a dedicated basket of $50 million to pay scheduled cash interest on the Holdco Debt Securities, which shall not be subject to any leverage or other conditions.

Notwithstanding anything to the contrary set forth herein, it is understood and agreed that the negative covenants applicable to the ABL Facility shall be no worse for the ABL Lenders than those applicable to the Bridge Facility, subject to the changes set forth in this ABL Term Sheet and other customary modifications for asset based revolving credit facilities.

Financial Covenant:    The ABL Credit Documentation will contain the following financial covenant with regard to the Borrower and its restricted subsidiaries on a consolidated basis:  a minimum Fixed Charge Coverage Ratio of 1.0:1.0, which covenant shall be tested immediately upon the triggering

**CONFIDENTIAL**

thereof as of the end of the most recent fiscal quarter for which financial statements have been delivered or have been required to be delivered at any time that (a) there is a continuing event of default or (b) Availability is less than the greater of (i) 12.5% of the Line Cap and (ii) $156.250 million and on the last day of each subsequent fiscal quarter ending thereafter and prior to the date that Availability has exceeded such threshold for at least 30 consecutive days.

Cash Dominion:

Consistent with the ABL Documentation Principles, the Loan Parties shall be required to enter into account control agreements on the Loan Parties' bank accounts (with exceptions for (i) accounts solely used as payroll and escrow or fiduciary accounts for the benefit of third parties (other than Loan Parties), (ii) accounts solely used for paying taxes, (iii) zero balance accounts; *provided* that the available balance of each such zero balance account is automatically swept on each business day into another account that is subject to a control agreement for the benefit of the ABL Administrative Agent and such other account does not provide for an automatic payments to, or debit of amounts disbursed from, other linked accounts that are not subject to a control agreement for the benefit of the ABL Administrative Agent, and (iv) certain other accounts with deposits up to an amount to be mutually agreed) within 90 days of the Closing Date (as such deadline may be extended by the ABL Administrative Agent in its sole discretion).  During a Cash Dominion Period (as defined below), all amounts in such controlled accounts will be swept into a collection account maintained with the ABL Administrative Agent and used to repay borrowings under the ABL Facility or unreimbursed letter of credit disbursements and cash collateralize any outstanding letters of credit.

As used herein, the term "Cash Dominion Period" means (a) each period beginning on the date that Availability is less than the greater of (x) $156.250 million and (y) 12.5% of the Line Cap, and ending on the date that Availability shall have exceeded such levels, at all times, for a period of 30 consecutive days, or (b) upon the occurrence of any event of default, the period that such event of default shall be continuing.

Events of Default:

Substantially consistent with the ABL Documentation Principles and limited to the following: nonpayment of principal, interest and fees (with not less than a five business day grace period for interest and fees); failure to perform negative covenants, the financial covenant and affirmative covenant to provide notice of defaults and maintain the Borrower's corporate existence; failure to perform other covenants subject to a 30-day cure period after the date on which written notice of default from the ABL Administrative Agent is received; any representation or warranty incorrect in any material respect when made; cross-default to continuing defaults under other material indebtedness of Holdings, the Borrower or a restricted subsidiary in excess of an amount to be agreed (which, for the avoidance of doubt, shall not include a cross-default to the Holdco Debt Securities); bankruptcy and similar proceedings of Holdings, the Borrower or a material restricted subsidiary; material monetary judgment defaults in excess of an amount

**CONFIDENTIAL**

to be agreed against Holdings, the Borrower or a restricted subsidiary (to the extent not covered by insurance or other indemnity); invalidity of the ABL Facility Documentation (including any Guarantees) or invalidity or loss of perfection of a security interest on a material portion of the Collateral (subject to customary exceptions to be agreed); ERISA events (subject to "material adverse effect"); failure to timely deliver a borrowing base certificate; failure to comply with collection account mandatory prepayments during a Cash Dominion Period; failure to comply with cash management covenants; and change of control.

Assignments and Participations:    Usual and customary for asset-based financings of this type and substantially consistent with the ABL Documentation Principles.

Voting:    Usual and customary for asset-based financings of this type and substantially consistent with the ABL Documentation Principles.

The ABL Facility Documentation shall contain customary provisions relating to "defaulting" Lenders (including provisions relating to the suspension of voting rights, rights to receive certain fees, and the termination or assignment of commitments or loans of such Lenders).

Cost and Yield Protection:    Usual and customary for asset-based financings of this type and substantially consistent with the ABL Documentation Principles, including customary tax gross-up provisions and customary protections for increased costs imposed as a result of the Dodd-Frank Act or Basel III.

Expenses and Indemnification:    Usual and customary for asset-based financings of this type and substantially consistent with the ABL Documentation Principles.

Governing Law and Forum:    New York (except that (a) for the interpretation of Company Material Adverse Effect as defined in the Acquisition Agreement and whether a Company Material Adverse Effect has occurred, (b) the accuracy of any Acquisition Agreement representation and warranties as a result of a breach thereof the Borrower (or any of its subsidiaries) have the right to terminate its (or their) obligations under the Acquisition Agreement, or to decline to consummate the Acquisition pursuant to the Acquisition Agreement and (c) whether the Acquisition has been consummated in accordance with the Acquisition Agreement, shall be governed by and construed in accordance with the laws of the State of Delaware, without regard to the conflicts of laws principles that would result in the application of the law of any other jurisdiction.) Each Party to the Bridge Facility Documentation will waive the right to trial by jury and will consent to the exclusive jurisdiction of the State and Federal courts located in the County of New York.

Counsel to the ABL
Administrative Agent and
ABL Lead Arrangers:    Latham & Watkins LLP.

**CONFIDENTIAL**

Interest Rates:

The Borrower may elect that the loans comprising each borrowing bear interest at a rate equal to either: (a) the ABR plus the ABL Applicable Margin (as defined in the Fee Letter) or (b) the Adjusted Term SOFR plus the ABL Applicable Margin: *provided* that all Swingline Loans shall be ABR Loans.

As used herein:

"ABR" means the Alternate Base Rate, which is the highest of (a) the Floor, (b) the federal funds effective rate from time to time plus 0.50% per annum, (c) the rate of interest announced, from time to time, within Wells Fargo at its principal office in San Francisco as its "prime rate" in effect on such day, with the understanding that the "prime rate" is one of Wells Fargo's base rates (not necessarily the lowest of such rates) and serves as the basis upon which effective rates of interest are calculated for those loans making reference thereto and is evidenced by the recording thereof after its announcement in such internal publications as Wells Fargo may designate and (d) one-month Adjusted Term SOFR plus 1.00% per annum, provided that this clause (d) shall not be applicable during any period in which Adjusted Term SOFR is unavailable or unascertainable.

"ABR Loans" means the borrowings made under ABL Facility bearing interest based upon ABR.

"Floor" means a rate of interest equal to 0%.

"Adjusted Term SOFR" means, for any interest period, the Term SOFR Reference Rate published two U.S. Government securities business days prior to the first day of such interest period, as such rate is published by the Term SOFR Administrator; *provided* that if Term SOFR as so determined shall ever be less than the Floor, then Term SOFR shall be deemed the Floor.

"Term SOFR Administrator" means the CME Group Benchmark Administration Limited (CBA) (or a successor administrator of the Term SOFR Reference Rate selected by the ABL Administrative Agent in its reasonable discretion).

"Term SOFR Loans" means the borrowings made under the ABL Facility bearing interest based upon Adjusted Term SOFR.

"Term SOFR Reference Rate" means the forward-looking term rate based on SOFR.

The ABL Facility Documentation will contain provisions to be mutually agreed with respect to a replacement of Adjusted Term SOFR (and other interest rates, as applicable), which shall be substantially consistent with the ABL Administrative Agent's form provisions.

Interest Payment Dates:

In the case of ABR Loans, quarterly in arrears.

**CONFIDENTIAL**

|  |  |
|---|---|
|  | The Borrower may select interest periods of one, three or six months for Term SOFR Loans.  Interest shall be payable in arrears at the end of the selected interest period, but no less frequently than quarterly. |
| <u>Letter of Credit Fees</u>: | A per annum fee equal to the ABL Applicable Margin with respect to Term SOFR Loans under the ABL Facility will accrue on the aggregate face amount of outstanding letters of credit, payable in arrears at the end of each quarter and upon the termination of the ABL Facility, in each case for the actual number of days elapsed over a 360-day year.  Such fees shall be paid to the ABL Administrative Agent for distribution to the ABL Lenders pro rata in accordance with the amount of each such ABL Lender's aggregate ABL Commitments, with exceptions for defaulting lenders.  In addition, the Borrower shall pay to the Issuing Bank, for its own account, (a) a fronting fee equal to the LC Fronting Fee Amount (as defined in the Fee Letter), payable in arrears at the end of each quarter and upon the termination of the ABL Facility, calculated based upon the actual number of days elapsed over a 360-day year and (b) customary and reasonable issuance, amendment, extension, draw, administration and other fees. |
| <u>Unused Line Fee</u>: | An unused line fee equal to the Unused Line Fee Amount (as defined in the Fee Letter). |
| <u>Rate and Fee Basis</u>: | Calculation of interest shall be on the basis of the actual number of days elapsed over a 360-day year (or 365- or 366-day year, as the case may be, in the case of ABR Loans based on the "prime rate"). |

**CONFIDENTIAL**

**EXHIBIT D**

CONDITIONS

The availability and initial funding of the Facilities on the Closing Date shall be subject only to the satisfaction (or waiver by the applicable Lead Arrangers) of the following conditions. Capitalized terms used but not otherwise defined herein have the meanings assigned to such terms in the Commitment Letter to which this Exhibit D is attached or in Exhibits A, B and C (including the Annexes thereto) attached thereto, as applicable. In the case of any such capitalized term that is subject to multiple and differing definitions, the appropriate meaning thereof in this Exhibit D shall be determined by reference to the context in which it is used.

1.   [Reserved].

2.   On the Closing Date, the Borrower and the Guarantors shall have executed and delivered the relevant Facilities Documentation and, subject to the Limited Conditionality Provision, the Borrower and the Guarantors shall have executed and delivered the applicable guarantee documents in form and substance usual and customary for transactions of this type and consistent with the applicable Documentation Principles, in each case, to which it is required to become a party, and the Commitment Parties shall have received (in each case, subject to the Limited Conditionality Provision):

   (a)   customary officer's certificates with respect to the Loan Parties on the Closing Date in form and substance customary for facilities of this type and consistent with the applicable Documentation Principles, good standing certificates (or local equivalent) from the jurisdiction of organization of the Borrower and each Loan Party on the Closing Date dated as of a recent date, notices of borrowing, customary evidence of authority and customary legal opinions from counsel to the Loan Parties that are usual and customary for facilities of this type;

   (b)   a solvency certificate from the chief financial officer (or other officer with reasonably equivalent responsibilities) of the Borrower substantially in the form attached hereto as Annex I;

   (c)   with respect to the ABL Facility only, the ABL Administrative Agent shall have received a duly completed Borrowing Base certificate (which, for the avoidance of doubt, may state that the Borrowing Base is the Closing Borrowing Base); and

   (d)   documents and instruments reasonably required to be delivered (subject to the Limited Conditionality Provision) to establish that the Administrative Agents will have perfected first priority security interests (subject to permitted prior liens and security interests permitted under the Facilities Documentation) in the Collateral.

3.   Prior to or substantially concurrently with the funding of the initial borrowings under the applicable Facilities on the Closing Date, the Acquisition shall be consummated in all material respects in accordance with the terms of  the Acquisition Agreement; but without giving effect to any amendments, waivers or consents by you or your applicable affiliate that are materially adverse to the interests of the Initial Lenders or the Lead Arrangers, in their respective capacities as such, without the consent of the Lead Arrangers, such consent not to be unreasonably withheld, delayed or conditioned (provided that each Lead Arranger shall be deemed to have consented to any such

D-1

**CONFIDENTIAL**

amendment, consent or waiver unless it shall object in writing thereto within two business days of being notified in writing (for which electronic mail shall suffice) of any such proposed amendment, consent or waiver; provided, further, that (i) any decrease in the cash portion of the purchase price of the Acquisition shall not be materially adverse to the interests of the Initial Lenders or the Lead Arrangers so long as (x) any such decrease is equal to or less than 10% of the aggregate cash portion of the purchase price of the Acquisition as set forth in the Acquisition Agreement as of the date hereof and (y) any such decrease is allocated 100% to reduce the commitments in respect of the Bridge Facility, (ii) any increase in the purchase price of the Acquisition shall not be materially adverse to the Initial Lenders or the Lead Arrangers so long as such increase is funded by common equity, preferred equity on terms reasonably satisfactory to the Initial Lenders and the Lead Arrangers (or on the same terms as the Holdco Convertible Junior Capital (as defined in the Fee Letter)), structurally junior indebtedness on terms reasonably satisfactory to the Initial Lenders and the Lead Arrangers (or on the same terms as the Holdco Convertible Junior Capital) or cash on hand of Holdings and its subsidiaries or amounts permitted hereunder to be drawn under the ABL Facility on the Closing Date, (iii) any modification to the definition of "Company Material Adverse Effect" shall be deemed materially adverse and (iv) any amendment, modification or waiver with respect to Section 6.20 of the Acquisition Agreement shall be deemed materially adverse). The Junior Capital Contribution (as defined in the Fee Letter) shall have been made (or substantially concurrently made) with the closing under the Facilities in at least the amount set forth in Exhibit A. It is agreed and understood that no purchase price, working capital or similar adjustment provisions set forth in the Acquisition Agreement shall constitute a reduction or increase in purchase price (or otherwise constitute a waiver, amendment or modification to the Acquisition Agreement) for purposes of this paragraph 3.

4.  The Acquisition Agreement Representations and Specified Representations shall be true and correct in all material respects as of the Closing Date (unless such Acquisition Agreement Representations and Specified Representations relate to an earlier date, in which case such Acquisition Agreement Representations and Specified Representations shall be true and correct in all material respects as of such earlier date). As used herein, the "Acquisition Agreement Representations" shall mean such of the representations made by or on behalf of Target in the Acquisition Agreement as are material to the interests of the Lenders, but only to the extent that you or your applicable affiliate has the right to terminate your (or its) obligations under the Acquisition Agreement or refuse to consummate the Acquisition as a result of a breach of such representations in the Acquisition Agreement. As used herein, the "Specified Representations" shall mean the representations and warranties set forth in the Facilities Documentation relating to: organizational existence; organizational power and authority (as it relates to due authorization, execution and delivery of the Facilities Documentation); due authorization, execution and delivery of the Facilities Documentation, and enforceability, in each case, as it relates to entering into and performance under the Facilities Documentation; solvency on the Closing Date (after giving effect to the Transactions) of Borrower and its subsidiaries taken as a whole (determined consistent with the solvency certificate delivered pursuant to the terms of this letter); no conflicts of the Facilities Documentation with charter documents; Federal Reserve margin regulations; the Investment Company Act; the PATRIOT Act; use of proceeds of borrowings under the Facilities on the Closing Date not violating OFAC, FCPA and other applicable sanctions, anti-money laundering and anti-corruption laws; and, subject to the Limited Conditionality Provision, the validity and perfection of security interests with respect to the Collateral (subject to security interests and liens permitted under the Facilities Documentation).

5.  No Company Material Adverse Effect (as defined in the Acquisition Agreement as in effect on the date hereof) shall have occurred and remain ongoing.

**CONFIDENTIAL**

6.  The Lead Arrangers shall have received (a) audited consolidated balance sheets of Target, as of the years ended December 31, 2022 and 2023 and any subsequent fiscal year ended thereafter and at least 120 days prior to the Closing Date and audited consolidated statements of income, cash flows and shareholder's equity of Target, in each case for the years ended December 31, 2022 and 2023 and any subsequent fiscal year ended thereafter and at least 120 days prior to the Closing Date, (b) unaudited consolidated balance sheets and related statements of income and cash flows of Target for the fiscal quarter ended September 30, 2024 and any subsequent fiscal quarter ended thereafter and at least 60 days prior to the Closing Date (other than any fiscal fourth quarter) and (c) a pro forma consolidated statement of income for Target for the twelve-month period ending on the last day of the most recently completed four-fiscal quarter period for which financial statements of Target have been delivered pursuant to clause (a) or (b) above, as applicable and a pro forma balance sheet of Target as of the last day of such four-fiscal quarter period, in each case, prepared after giving effect to the Transactions as if the Transactions had occurred as of such date (in the case of such balance sheet) or at the beginning of such period (in the case of the statement of income) which need not be prepared in compliance with Regulation S-X of the Securities Act of 1933, as amended, or include adjustments for purchase accounting (including adjustments of the type contemplated by Financial Accounting Standards Board Accounting Standards Codification Topic 805, Business Combinations, tax adjustments, deferred taxes or other similar pro forma adjustments. The Lead Arrangers acknowledge that they have received the financial statements for the years ended December 31, 2022 and 2023 described in clause (a) and the financial statements for the fiscal quarter ended September 30, 2024 described in clause (b). If the borrower under the existing debt documentation of the Target delivers any such financial statements for an entity other than the Target after the date hereof in compliance with the terms of the Target's debt documentation as in effect on the date hereof in lieu of such financial statements for the Target, such financial statements shall be deemed to satisfy the requirements of this paragraph 6.

7.  The Special Master shall have filed with the District Court the Notice of Successful Bidder (as defined in the Sale Procedures Order) identifying the Acquisition as the Successful Bid (as defined in the Sale Procedures Order) and attaching the Acquisition Agreement to such Notice of Successful Bidder. A Sale Hearing (as defined in the Sale Procedures Order) shall have occurred with respect to such Notice of Successful Bidder, and the District Court shall have approved the Acquisition pursuant to (i) an order in the form of the "Form of Sale Order" attached as Exhibit C to the Acquisition Agreement (together with any modifications thereto that are not materially adverse to the Commitment Parties) or (ii) an order in such other form as reasonably satisfactory to the Commitment Parties (the "Confirmation Order").

8.  All fees required to be paid on the Closing Date pursuant to the Fee Letter and all expenses required to be paid on the Closing Date pursuant to the Commitment Letter, in the case of expenses to the extent invoiced at least three business days prior to the Closing Date, shall be paid prior to or substantially concurrently with the funding of the initial borrowings under the applicable Facilities.

9.  With respect to the Bridge Facility only, you shall have engaged one or more investment banks reasonably satisfactory to the Lead Arrangers with respect to the Notes (the "Investment Banks") (the Lead Arrangers acknowledge that such engagement has occurred as of the date hereof). With respect to the Bridge Facility only, the Borrower shall have used commercially reasonable efforts to deliver to the Investment Banks no later than 15 business days prior to the Closing Date all customary information to be included in a customary preliminary offering memorandum (other than the "Description of Notes" section and other information customarily provided by the Investment Banks or their counsel) (the "Preliminary Offering Memorandum"), in customary form for a Rule 144A offering by the Target and in form and substance necessary for the Investment Banks to receive customary "comfort" (including "negative assurance" comfort) in connection with

**CONFIDENTIAL**

the issuance of the Notes, that contains or incorporates by reference the financial statements to be included therein (which shall be limited to only the audited financial statements, unaudited financial statements and pro forma financial statements required by paragraph 6 above at the time of such delivery) and the other data to be included therein (which shall not be required to include information required by Rule 3-09, Rule 3-10, Rule 3-16, Rule 13-01 or Rule 13-02 of Regulation S-X, "segment reporting" or information required by Item 402 of Regulation S-K and other information customarily excluded from Rule 144A offerings) (any such information required to be provided by the Borrower, the "Required Information"). The Borrower shall have used commercially reasonable efforts to offer the Investment Banks a period of not less than 15 consecutive business days after delivery of such Preliminary Offering Memorandum to seek to place such notes with qualified purchasers thereof; provided that provided that such fifteen (15) consecutive Business Day period shall exclude April 18, 2025, May 26, 2025, June 19, 2025, July 4, 2025, September 1, 2025, November 27, 2025, November 28, 2025, December 24, 2025 through January 1, 2026, January 19, 2026, February 16, 2026, and April 3, 2026 which days, for purposes of such calculation, shall not constitute Business Days (provided, that, for the avoidance of doubt, such exclusions (other than for the period commencing on December 24, 2025 and ending on January 1, 2026) shall not restart such fifteen (15) consecutive Business Day period).. If the Borrower reasonably believes that it has delivered a Preliminary Offering Memorandum to the Investment Banks in accordance with this paragraph 9, the Borrower may deliver to the Lead Arrangers written notice to that effect (stating when the Borrower believes it completed such delivery), in which case the Borrower will be deemed to have delivered a Preliminary Offering Memorandum in accordance with this paragraph 9 unless the Lead Arrangers in good faith reasonably believe that the Borrower has not done so and, within two business days after their receipt of such notice from the Borrower, the Lead Arrangers deliver a written notice to the Borrower to that effect (stating with reasonable specificity what portions of the Preliminary Offering Memorandum are missing or unsuitable).

10. The Administrative Agents and the Lead Arrangers shall have received at least three business days prior to the Closing Date (x) all documentation and other information required by regulatory authorities under applicable "know your customer" and anti-money laundering rules and regulations, including, without limitation, the PATRIOT Act, that has been reasonably requested by the Initial Lenders at least ten business days in advance of the Closing Date and (y) with respect to the Borrower, to the extent that it qualifies as a "legal entity customer" under the Beneficial Ownership Regulation, a certification regarding beneficial ownership as required by the Beneficial Ownership Regulation to the extent requested in writing by such Administrative Agent and/or such Lead Arranger at least 10 business days prior to the Closing Date.

CONFIDENTIAL

<u>ANNEX I TO EXHIBIT D</u>

FORM OF SOLVENCY CERTIFICATE

[●], 20[●]

This Solvency Certificate is being executed and delivered pursuant to Section [●] of that certain [●][6] (as amended, restated, amended and restated, extended, supplemented or otherwise modified from time to time, the "<u>Credit Agreement</u>"; the terms defined therein being used herein as therein defined).

I, [●], the **[Chief Financial Officer/financial officer]** of the Borrower, in such capacity and not in an individual capacity, hereby certify that as of the date hereof, after giving effect to the Transactions and the incurrence of the indebtedness and obligations being incurred in connection with the Credit Agreement and the Transactions:

(i)     the sum of the debt (including contingent liabilities) of the Borrower and its Subsidiaries, taken as a whole, does not exceed the fair value of the assets of the Borrower and its Subsidiaries, taken as a whole;

(ii)    the present fair saleable value of the assets of the Borrower and its Subsidiaries, taken as a whole, is not less than the amount that will be required to pay the probable liabilities of the Borrower and its Subsidiaries, taken as a whole, on their debts as they become absolute and matured;

(iii)   the Borrower and its Subsidiaries, taken as a whole, are able to pay their debts and liabilities, subordinated, contingent or otherwise, as such liabilities become absolute and matured in the ordinary course of business; and

(iv)    the capital of the Borrower and its Subsidiaries, taken as a whole, is not unreasonably small in relation to the business of the Borrower and its Subsidiaries, taken as a whole, contemplated as of the date hereof.

For the purposes hereof, the amount of any contingent liability at any time shall be computed as the amount that, in light of all of the facts and circumstances existing at such time, represents the amount that can reasonably be expected to become an actual or matured liability.

*[Remainder of page intentionally left blank]*

---

[6]     Insert description of Credit Agreement.

D-I-1

**CONFIDENTIAL**

    IN WITNESS WHEREOF, I have executed this Solvency Certificate in my capacity as **[Chief Financial Officer/financial officer]** of the Borrower, on behalf of the Borrower, and not individually, as of the date first written above.

            By: _____

              Name: [●]

              Title: **[Chief Financial Officer/financial officer]**

**<u>Exhibit D</u>**

**Commitment Letter Regarding Hunting Ingalls Consent to Accept Non-cash Consideration**

## COMMITMENT LETTER

This **COMMITMENT LETTER** (this "Commitment Letter") is made as of this 16th day of March, 2025 (the "Effective Date"), by and among (i) Contrarian Capital Management, L.L.C., on behalf of certain funds, managed accounts or other Affiliates to be designated by it (together with its respective Affiliates, "Contrarian") and (ii) VR Global Partners, L.P. ("VR"). For purposes of this Commitment Letter, Contrarian and VR each may be referred to individually as a "Party", and together as the "Parties". For purposes of this Commitment Letter, the following terms shall have the following meanings: (i) "Affiliate" means, with respect to any person or entity, any other person or entity directly or indirectly controlling, controlled by or under common control with, such person or entity; and (ii) "Transfer" means to (a) sell, transfer, assign, hypothecate, pledge, or otherwise dispose of, directly or indirectly, any right, title, participation, or interest in or with respect to any PDVH Claim (as defined below), in whole or in part, or (b) deposit any PDVH Claim into a voting trust, or to grant a proxy or enter into a voting agreement with respect to any PDVH Claim. "Transferor" and "Transferee" have correlative meanings.

**WHEREAS**, Red Tree Investments, LLC ("Red Tree"), a Contrarian Affiliate, has obtained and served a writ of attachment *fieri facias* against Petróleos de Venezuela, S.A.'s ("PDVSA") equity interest in PDV Holding, Inc. ("PDVH") in the following supplemental proceeding: *Red Tree Investments, LLC v Petróleos de Venezuela, S.A. and PDVSA Petróleo, S.A.*, Nos. 22 Misc. 68 and 22 Misc. 69 (D. Del.) (the "Red Tree Claims");

**WHEREAS**, Huntington Ingalls Incorporated and Huntington Ingalls Industries, Inc. (together, "Huntington") have obtained and served a writ of attachment *fieri facias* against PDVSA's equity interest in PDVH in the following supplemental proceeding: *Northrop Grumman Ship Systems, Inc. v. The Ministry of Defense of the Republic of Venezuela*, No. 20 Misc. 257 (D. Del.) (the "Huntington Claim" and together, with the Red Tree Claims, the "PDVH Claims");

**WHEREAS**, in accordance with the *Sixth Revised Proposed Order (A) Establishing Sale and Bidding Procedures, (B) Approving Special Master's Report and Recommendation Regarding Proposed Sale Procedures Order, (C) Affirming Retention of Evercore as Investment Banker by Special Master and (D) Regarding Related Matters* [D.I. 646] (as amended, modified, supplemented or superseded, the "Bidding Procedures Order") dated October 4, 2022 in the case of Crystallex International Corporation v. Bolivarian Republic of Venezuela, No. 17 Misc. 151 (D. Del), Red Tree is evaluating a possible bid (the "Credit Bid") for the purchase of 100% common shares of PDVH, which bid shall comply with the Bidding Procedures Order (the Credit Bid, if deemed the Successful Bid (as defined in the Bidding Procedures Order) and consummated, the "Transaction" and the closing date thereof, the "Closing Date");

**WHEREAS**, it is expected that Red Tree will own more than 50% of the common equity of an acquisition company to be formed to complete the Transaction ("AcquisitionCo");

**WHEREAS**, VR and two entities managed by Contrarian, Contrarian Funds, L.L.C. and Boston Patriot Summer St LLC, purchased an assignment of an aggregate 88% participation interest in the Huntington Claim and, under the terms of the purchase documents, have authority to direct Huntington in its administration of the Huntington Claim;

**WHEREAS**, in connection with the evaluation and possible negotiation and documentation of the Credit Bid, the Parties wish to memorialize the terms and conditions under which Huntington will accept the Non-Cash Consideration (as defined below) pursuant to the Transaction, should the Credit Bid be named the Successful Bid (as defined in the Bidding Procedures Order).

**NOW, THEREFORE**, unless or until this Commitment Letter has been terminated in accordance

with the terms hereof, the Parties hereby agree as follows:

1.    <u>Condition to Effectiveness</u>.  This Commitment Letter, and the Parties' respective rights and obligations hereunder, shall become effective and binding upon each Party on the date and time by which each of the Parties shall have executed, delivered, and released counterpart signature pages of this Commitment Letter (which signature pages may be delivered and released by counsel and in electronic form) to counsel to the other Party.

2.    <u>Transaction Consideration</u>.  The Transaction contemplates a total purchase price at or around $6.4 billion inclusive of the 8.5% Senior Secured Notes due 2020 issued by PDVSA pursuant to the Indenture dated October 27, 2016 at the Closing Date.

3.    <u>Claim Treatment</u>.  At the Closing Date, the Parties shall cause Huntington to accept, for the Huntington Claim, Convertible Notes[1] issued by AcquisitionCo in an aggregate principal amount equal to the then accrued amount of the Huntington Claim (the "<u>Non-Cash Consideration</u>").  The Non-Cash Consideration shall be earned, due and payable at the Closing Date.  For the avoidance of doubt, (i) the amount of the Non-Cash Consideration received by each Party shall be calculated after giving effect to any applicable proceeds sharing provision contained in that certain Proceeds Letter, dated as of November 30, 2023, by and among Fulcrum Credit Partners LLC, Boston Patriot Summer St LLC, VR and Contrarian and (ii) VR shall have no liability for failure by Huntington to follow the direction referred to above.

4.    <u>Direction</u>.  Pursuant to Section 3 hereof, the Parties shall each use all commercially reasonable efforts to cause the transactions contemplated by this Commitment Letter to be consummated, and in furtherance thereof, the Parties shall provide the direction to Huntington annexed hereto as <u>Exhibit 2</u>.  The Parties shall also use all commercially reasonable efforts to cause Huntington to enter into an instrument obligating Huntington to accept the treatment of the Huntington Claim as described in Section 3.

5.    <u>Definitive Documents</u>.  Each Party hereby agrees to negotiate in good faith the definitive form of and execute, where applicable, any documents, deeds, agreements, filings, notifications, letters and instruments (the "<u>Definitive Documents</u>") by March 31, 2025 (or such later date as reasonably agreed to by the Parties) (if the Credit Bid is selected as a preferred stalking horse bid by the Special Master) reasonably required or desirable in order to implement the Huntington Claim treatment provided for hereunder.

All Definitive Documents, and any amendment, supplement, or modification thereto, shall be consistent with the terms of this Commitment Letter (including the exhibits hereto) in all respects and otherwise shall be in form and substance reasonably acceptable to and approved by the Parties.  It is understood that such Definitive Documents shall only be operative at the Closing Date.

6.    <u>Term and Termination</u>. The term of this Commitment Letter shall expire on the earlier of (x) June 30, 2027, (y) the date on which the court enters a sale order approving as the purchaser of the shares of PDVH a party other than Red Tree and/or Contrarian, and (z) the date Contrarian informs the Parties in writing that it no longer wishes to pursue the Transaction; provided that, this Commitment Letter may be earlier terminated by written agreement of all of the Parties.  Notwithstanding the foregoing, it is understood by the Parties that Contrarian and Red Tree shall have no obligation to pursue the Transaction, and time shall not be of the essence with respect to the Transaction.

7.    <u>Confidentiality</u>. The terms and conditions of this Commitment Letter, including its

---

[1] "<u>Convertible Notes</u>" means convertible debt the terms of which shall be substantially consistent with the terms set forth in the Convertible Notes Term Sheet annexed hereto as <u>Exhibit 1</u>.

existence, and the discussions related hereto, are confidential information and shall not be disclosed to any third party, other than the Special Master (as defined in the Bidding Procedures Order), without the written consent of the Parties, except that the Parties may make such disclosures to their respective attorneys and other advisers: *provided*, *however*, that any such attorneys and other advisers are advised of the confidentiality restrictions contained herein and directed to adhere to such restrictions. If any Party determines that it is required by law to disclose information regarding this Commitment Letter, it shall, to the extent reasonably practicable, consult with the Parties regarding such disclosure and seek confidential treatment for such portions of the disclosure as may be reasonably requested by the Parties.

8. <u>Governing Law; Venue; Waiver of Jury Trial</u>. This Commitment Letter will be governed by and construed under the laws of the State of New York, without regard to conflicts of laws principles that would cause the application of the laws of any jurisdiction other than the State of New York. Each of the Parties consents to the exclusive jurisdiction of any state or federal court located in New York, New York, in the event of any litigation arising out of, in connection with or with respect to, this Commitment Letter. EACH PARTY HERETO HEREBY IRREVOCABLY WAIVES ALL RIGHT TO TRIAL BY JURY IN ANY LITIGATION, ACTION, PROCEEDING, CROSS CLAIM, OR COUNTERCLAIM IN ANY COURT (WHETHER BASED ON CONTRACT, TORT, OR OTHERWISE) ARISING OUT OF, RELATING TO OR IN CONNECTION WITH THIS COMMITMENT LETTER.

9. <u>Equitable Relief; Injunctions; Specific Performance; Damages</u>. The Parties hereto agree that irreparable harm would occur, and that monetary damages would not be a sufficient remedy, in the event that the terms and provisions of this Commitment Letter were not performed in accordance with their specific terms or were otherwise breached. Accordingly, each Party agrees, on behalf of itself and its Affiliates, that the other Party shall be entitled to injunctive relief (without posting a bond or other security), including an injunction or injunctions to prevent any continuing breach or violation of the terms and provisions of this Commitment Letter and the remedy of specific performance to enforce specifically the terms and provisions hereof. The foregoing remedies shall not be deemed to be the exclusive remedy for any breach or violation of this Commitment Letter, but shall instead be in addition to any and all other remedies to which such Party may be entitled at law or in equity. The Parties acknowledge and agree that in no event shall either Party be liable to the other Party for any special, indirect, incidental, consequential or punitive damages, including, but not limited to, loss of business, loss of profits or loss of revenue, whether based on contract, negligence, tort or any other legal theory, regardless of whether advised of the possibility of such damages and irrespective of the number or nature of claims.

10. <u>Severability</u>. If any provision of this Commitment Letter shall be determined by a court of competent jurisdiction to be void or unenforceable in any jurisdiction, the validity and effectiveness of such provision in any other jurisdiction, and the validity and effectiveness of the remaining provisions, shall not be affected.

11. <u>Transfer of Claims</u>. VR hereby agrees that, in the case of any Transfer of its interest in the Huntington Claims, this Commitment Letter shall bind any Transferee of such claims and shall cause any Transferee to execute a joinder to this Commitment Letter.

12. <u>Amendments; Waivers</u>. Any provision of this Commitment Letter may be amended or waived if, but only if, such amendment or waiver is in writing and is signed, in the case of an amendment, by each Party to this Commitment Letter, or in the case of a waiver, by the Party against whom the waiver is to be effective.

13. <u>Miscellaneous</u>. No failure or delay by any Party in exercising any right, power or privilege hereunder shall operate as a waiver thereof nor shall any single or partial exercise thereof preclude any other or further exercise thereof or the exercise of any other right, power or privilege. The rights and

remedies herein provided shall be cumulative and not exclusive of any rights or remedies provided by law. This Commitment Letter may be executed in multiple counterparts, each of which shall be an original and all of which taken together shall constitute one and the same agreement. A person who is not a Party to this Commitment Letter shall have no right to enforce any term of this Commitment Letter. No Party hereto shall assign this Commitment Letter or any of such Party's rights or obligations hereunder without the prior written consent of the other Party hereto. This Commitment Letter (together with the confidentiality obligations between the Parties) constitutes the entire understanding and agreement between the Parties with respect to the subject matter hereof and supersedes and preempts all prior understandings, agreements (written or oral), representations and/or discussions that may have related to the subject matter hereof in any way. The headings and captions used in this Commitment Letter are used for convenience only and are not to be considered in construing or interpreting this Commitment Letter.

*[Remainder of This Page Intentionally Left Blank]*

4

IN WITNESS WHEREOF, the Parties hereto have executed this Commitment Letter as of the day and year first above written.

**CONTRARIAN CAPITAL MANAGEMENT, L.L.C.**

By: _____

Name: Jennifer Diagonale

Title: General Counsel


**VR GLOBAL PARTNERS, L.P.**


By: _____

Name: Emile du Toit

Title: Authorized signatory

IN WITNESS WHEREOF, the Parties hereto have executed this Commitment Letter as of the day and year first above written.

**CONTRARIAN CAPITAL MANAGEMENT, L.L.C.**

By: _____
Name:
Title:

**VR GLOBAL PARTNERS, L.P.**

By: _____
Name: Emile du Toit
Title:   Authorized signatory

5

**Exhibit 1**
**CONVERTIBLE NOTE TERM SHEET**

**Secured Convertible Note Term Sheet**
March 16, 2025

| | |
|---|---|
| **Issuer:** | AcquisitionCo (the "Issuer") |
| **Security Description:** | ███% Secured Convertible Notes (the "Convertible Notes"). |
| **Corporate Structure** | As set forth on Annex A hereto:<br><br>• The Issuer will be the 100% equity owner of Acquisition MidCo (a newly formed entity);<br>• Acquisition MidCo will be the 100% equity owner of PDVH;<br>• PDVH will be the 100% equity owner of PDVH MidCo (a newly formed disregarded entity);<br>• PDVH MidCo will be the 100% equity owner of CITGO Holding;<br>• CITGO Holding will be the 100% equity owner of CITGO MidCo (a newly formed disregarded entity); and<br>• CITGO MidCo will be the 100% equity owner of CITGO Petroleum. |
| **Guarantees, Security and Other Credit Support:** | The Convertible Notes will be secured by substantially all of the assets of the Issuer, including the equity of Acquisition MidCo.<br><br>The Convertible Notes will be guaranteed by Acquisition MidCo on a senior basis, secured by substantially all of Acquisition MidCo's assets, including the equity of PDVH and "Intercompany Note A" (as defined below).<br><br>The Issuer will make a capital contribution to Acquisition MidCo, consisting of Convertible Notes and the common equity of the Issuer (the common equity of the Issuer being used to satisfy the Leading Bidder's claims in the PDVH Transaction).<br><br>Acquisition MidCo will receive an intercompany note ("Intercompany Note A") (which will eventually have PDVH as its borrower, once the PDVH Transaction closes), which will be secured by substantially all of the assets of PDVH, including the equity of PDVH MidCo and "Intercompany Note B" (as defined below).<br><br>PDVH will lend PDVH MidCo the net cash proceeds of the Convertible Notes and contribute the equity of CITGO Holding to PDVH MidCo in return for an intercompany note ("Intercompany Note B"), which will be secured by substantially all of the assets of PDVH MidCo, including the equity of CITGO Holding. |

| | |
|---|---|
| | PDVH MidCo will guarantee the Convertible Notes, which guarantee will be secured (on a pari passu basis with Intercompany Note B) by substantially all of the assets of PDVH MidCo, including the equity of CITGO Holding. |
| **Purchasers:** | [●] |
| **Amount:** | Up to $2.0 billion aggregate principal amount of Convertible Notes to be issued at the closing date of the PDVH Transaction (the "Closing Date"), including Convertible Notes to be issued to certain holders of claims against Petroleos de Venezuela, S.A. and the Bolivarian Republic of Venezuela. |
| **Maturity Date:** | The 20th anniversary of the Closing Date. |
| **Ranking:** | The Convertible Notes will be senior secured obligations of the Issuer, ranking senior in right of payment to all subordinated obligations of the Issuer and pari passu in right of payment with all other senior obligations of the Issuer. The Convertible Notes will rank effectively senior to all unsecured obligations of the Issuer, to the extent of the value of the collateral securing the Convertible Notes. |
| | The guarantee of the Convertible Notes, Intercompany Note A or Intercompany Note B, as the case may be) by each guarantor will be a senior secured obligation of the guarantor, ranking senior in right of payment to all subordinated obligations of such guarantor and pari passu in right of payment with all other senior obligations of such guarantor. The guarantee of the Convertible Notes, Intercompany Note A or Intercompany Note B, as the case may be) by each guarantor will rank effectively senior to all unsecured obligations of such guarantor, to the extent of the value of the collateral securing such guarantee. |
| **Use of Proceeds:**[1] | The Issuer (or its subsidiaries) shall use the net proceeds of the issuance of the Convertible Notes to fund a capital contribution to CITGO Holding, which will make a capital contribution to CITGO Petroleum, which will use such net proceeds to retire existing indebtedness and to fund the ongoing capital needs of its business. |
| **Commitment Term, Extension Fees:** | The first anniversary of the date the United States District Court of Delaware enters a final sale order following the Sale |

---

[1] CITGO Holding and CITGO Petroleum to dividend cash to PDVH for payment of PDVH creditors.

2

| | |
|---|---|
| | Hearing as defined in the Memorandum Order dated 12/31/24, able to be extended from time to time by up to 365 days at the election of the Issuer. Any extension is subject to a fee paid by the Issuer in additional Convertible Notes of (x) 0.25% of the committed amount after the first 90 days and (y) 0.50% after each subsequent 90 days, in each case, to be added to the initial principal amount of Convertible Notes when issued. |
| ██████████ | ████████████████████████████. |
| **Interest:** | Interest on the Convertible Notes will accrue on the principal amount of the Convertible Notes from the date of Closing at a rate of ██ % per annum, payable in cash (such interest, "Cash Interest"), or at the option of the Issuer, may be deferred (such interest, "Deferred Interest"). For the avoidance of doubt, Deferred Interest shall not be interest-bearing but will be included in the accrued principal amount for purposes of calculating the Redemption Price. Interest will be paid semi-annually, in arrears and will be calculated on the basis of actual days elapsed in a 360-day year.<br><br>Upon and during the occurrence of an Event of Default (as defined below), the interest rate will increase by 2.0%. |
| **Issue Price:** | 100.0% |
| **Redemption Price:** | The "Redemption Price" of each $1,000 of original principal amount of Convertible Notes shall be (x) if the IRR Amount is equal to or greater than MOIC Amount, the IRR Amount and (y) if the IRR Amount is less than the MOIC Amount, the MOIC Payment, plus, in each case of (x) and (y), without duplication, accrued and unpaid interest thereon (but not Deferred Interest), to, but not including the date of redemption.<br><br>"IRR Amount" means a payment made at the date of redemption, in such an amount as to provide the holder of $1,000 original principal amount of Convertible Notes with an internal rate of return of 19.00%, assuming that such holder had purchased the Convertible Notes at par on the Closing Date and received all Cash Interest payments on the Convertible Notes that were made prior to the date of |

| | |
|---|---|
| | redemption on the Convertible Notes at the dates on which such Cash Interest payments were made. |
| | "MOIC Amount" means, with respect to any Note, ▮▮▮ times the original principal amount of such Note. |
| | "MOIC Payment" means, for each $1,000 of original principal amount of Convertible Notes, (x) the MOIC Amount of such Convertible Notes, minus (y) the amount of all Cash Interest previously paid with respect thereto. |
| | The Issuer will disclose to holders of the Convertible Notes a calculation of the IRR Amount at least annually. |
| **Mandatory Redemption:** | The Convertible Notes will be mandatorily redeemed by the Issuer at the Redemption Price per $1,000.00 original principal amount upon the occurrence of a Change of Control (to be defined in a manner customary for equity sponsor precedents, including a customary "Permitted Holders" definition), payable in cash. |
| **Issuer Optional Redemption Right:** | At any time, and from time to time, the Issuer may redeem all or any portion of the outstanding Convertible Notes at the Redemption Price per $1,000.00 original principal amount, payable in cash. |
| **Negative Covenants:** | The Issuer and its Restricted Subsidiaries shall not: <br><br> 1. purchase or redeem or pay any dividend, return or distribution on any equity interests of the Issuer except as otherwise allowed herein or as permitted by the Applicable Debt Document Exceptions (as defined below), unless (x) no Event of Default has occurred and is continuing and (y) on a pro forma basis, the Consolidated Total Net Leverage Ratio is less than 2.00:1.00; <br> 2. incur additional indebtedness for borrowed money other than (i) indebtedness for borrowed money such that, on a pro forma basis, the Consolidated Total Net Leverage Ratio of the Issuer and its Restricted Subsidiaries does not exceed 4.00:1.00; (ii) refinancing of existing indebtedness which does not increase the principal amount  outstanding thereunder (other than with respect to fees, call premiums, discount and expenses in connection with such refinancing) and (iii) Indebtedness permitted under the Applicable Debt Document Exceptions (as defined below); <br> 3. enter into any transactions with affiliates other than |

(a) transactions among the Issuer and its Restricted Subsidiaries, (b) transactions in connection with agreements already in place on the Closing Date (including customary board fees), (c) transactions determined by the board of the Issuer in good faith to be on arm's length terms and (d) as may be permitted under the Applicable Debt Document Exceptions;

4.  issue or dispose of any equity interests of Restricted Subsidiaries, in each case other than (i) in ordinary course of business, (ii) in connection with a bona-fide joint venture with a party that is not an affiliate of the Issuer or (iii) in the case of transactions by the borrower under the Applicable Debt Documents or its subsidiaries, a transaction in which the proceeds are applied in accordance with the "Limitation on Asset Sales" covenant of the Applicable Debt Documents.

"Applicable Debt Documents" means the agreements governing the most junior debt securities of CITGO Petroleum or CITGO Holding, in effect and as amended from time to time.

"Applicable Debt Document Exceptions" means the relevant exceptions and baskets contained in the Applicable Debt Documents, with an additional cushion of 15% with respect to dollar baskets or exceptions, 0.5x with respect to leverage ratio baskets or exceptions and 0.25x with respect to fixed charge ratio baskets or exceptions.

"Consolidated Total Net Leverage Ratio" means the ratio of (x) consolidated total indebtedness for borrowed money of the Issuer and its Restricted Subsidiaries (and any preferred equity of any Restricted Subsidiary that is not a guarantor of the Convertible Notes, other than preferred equity issued to the Issuer or any of its Subsidiaries), net of unrestricted cash, to (y) the consolidated EBITDA (to be defined in a manner to be mutually agreed,) of the Issuer and its Subsidiaries.

For the avoidance of doubt, unrestricted cash will include the aggregate amount of cash and cash equivalents (in each case, free and clear of all liens) of the Issuer and its subsidiaries, excluding cash and Cash Equivalents that are listed as "restricted" on the consolidated balance sheet of the Company and its Subsidiaries as of such date unless "restricted" in favor of the Convertible Notes or any Indebtedness not prohibited pursuant to the Convertible

5

| | Notes. |
|---|---|
| **Mandatory Conversion:** | Immediately upon completion of a Qualified IPO (a "Conversion Event"), each Note shall be automatically converted into a number of shares of the common equity of the Issuer (a direct or indirect subsidiary or parent thereof) issued in the Qualified IPO (the "IPO Common Equity") equal to the quotient obtained by dividing (i) the Redemption Price determined as of the date of the pricing of the Qualified IPO by (ii) the price per share at which the IPO Common Equity is first issued to the public in the Qualified IPO. |
| | "Qualified IPO" means an underwritten firm-commitment initial public offering of the IPO Common Equity on a U.S. nationally recognized stock exchange, which is managed by an independent nationally recognized investment bank, and (i) with respect to which the implied minimum Pre-Conversion Equity (as defined) is not less than $1.0 billion and (ii) which results in gross proceeds of not less than $100.0 million in the aggregate. |
| | "Pre-Conversion Equity" means total enterprise value of the Issuer minus consolidated total indebtedness for borrowed money of the Issuer and its Restricted Subsidiaries (net of unrestricted cash), as implied by the initial public offering. |
| **Forced Exit Right:** | Commencing on the sixth anniversary of the Closing Date, holders of not less than 2/3 of the aggregate principal amount of the outstanding Convertible Notes (the "Required Supermajority Holders") shall have a right to demand (each, a "Demand") that the Issuer engage in a process (the "Process") to effect a Qualified Exit IPO. For the avoidance of doubt, in the event that a Mandatory Redemption Event has occurred and the Required Supermajority Holders have elected to issue a Demand, then holders of Convertible Notes may not seek to enforce (the "Enforcement Suspension Period") the Mandatory Redemption Right during the pendency of the Process resulting from the issuance of such Demand. |
| | Upon receipt of such Demand, the Issuer shall promptly engage in a comprehensive Process in good faith. |
| | If the Issuer breaches such covenant or fails to consummate such Qualified IPO within 18 months after the date of such Demand and any Convertible Notes remain outstanding, then the Required Supermajority Holders shall have the right to (i) direct the Process and (ii) appoint additional directors to the Board or a committee thereof (in either case whose powers and authority shall be restricted to making determinations and |

6

| | |
|---|---|
| | taking actions in connection with the Process) so that directors appointed by the Required Supermajority Holders constitute a sufficient majority of directors on the Board (or the relevant subcommittee) to effectuate a Qualified IPO. |
| **Events of Default; Acceleration; Enforcement;** | "Event of Default" means (i) a failure to pay the principal amount of the Convertible Notes at the stated maturity thereof, (ii) a failure to pay interest on the Convertible Notes for period of 30 days after its due date (provided such interest is not Deferred Interest), (iii) a failure to make a payment at stated maturity or upon the acceleration of the stated maturity (which acceleration is not rescinded, or otherwise cured within 20 Business Days of receipt of notice of acceleration) for borrowed money of the Issuer or its Restricted Subsidiaries with an outstanding principal amount of $250.0 million or more ("Material Debt"), (iv) incurrence of alter ego liability at PDVH in excess of $250.0 million or more pursuant to a final, unappealable judgment, which liability has not been paid or otherwise discharged for a period of 90 days after incurrence, (v) any breach of the Negative Covenants (as defined above) that occurs and is continuing for a period of 90 days after notice thereof (with customary extension rights in the event capable of cure and good faith efforts being made to cure), and (vi) other customary Events of Default relating to insolvency and validity of security interests in the Collateral. <br><br> The Convertible Notes may be declared due and payable immediately at the Total Value (as defined below) after the occurrence of an Event of Default. <br><br> "Total Value" means the Redemption Price at the time of the relevant Event of Default plus the value of the mandatory conversion option at the time of the relevant Event of Default. |
| **Amendment:** | The consent of the holders of a majority in aggregate principal amount of Convertible Notes shall be required to amend or waive the terms of the Convertible Notes subject to customary provisions requiring the consent of all affected holders of Convertible Notes for amendments affecting the fundamental economic terms of the Convertible Notes and other customary sacred rights including release of guarantees or liens. |

| | |
|---|---|
| **Registration Rights:** | Holders of Convertible Notes shall be entitled to customary shelf and piggy-back registration rights with respect to the shares of IPO Common Equity issuable upon conversion of the Convertible Notes.<br><br>The registration rights agreement will provide that, with respect to the initial public offering of the Issuer, the underwriter cutback provisions with respect thereto will prioritize a primary offering of common equity by the Issuer (whether offered in an initial public offering or thereafter).<br><br>Holders of Convertible Notes will agree to be subject to customary lock-up agreements in connection with public offerings made by the Issuer (including 180 days in connection with an initial public offering and a customary duration in connection with other follow-on public offerings). |
| **Investors Agreement:** | An Investors Agreement will provide for customary tag-along and drag-along rights as well as quarterly and annual reporting that is consistent with the quarterly and annual reporting in the Applicable Debt Documents. |
| **Transfer Restrictions:** | Holders of Convertible Notes may only transfer Convertible Notes (or the shares of IPO Common Equity issuable upon conversion thereof) in accordance with applicable securities laws to persons other than (i) a person on a specified list of disqualified investors and (ii) a person that is a competitor of the Issuer or an affiliate of such competitor. Any transferee of Convertible Notes shall be required as a condition to such transfer to enter into a joinder agreement becoming a party to the Investors Agreement, |
| **Tax Structure:** | The parties shall work together to structure the transaction in a tax-efficient manner that avoids or mitigates adverse tax consequences for the parties. The Convertible Notes will be treated as equity for tax purposes.<br><br>The Issuer will be a U.S. entity. |
| **Private Placement:** | The Convertible Notes will be offered as a private placement under Section 4(a)(2) under the Securities Act of 1933. |
| **Governing Law:** | New York law. |

8

**Exhibit 2**
**DIRECTION**

Huntington Ingalls Incorporated and
Huntington Ingalls Industries Incorporated

5220 River Road
Avondale, LA, 70094
Attn: Tom Hamrick
Phone: 504-654-5720
E-mail: Tom.Hamrick@hii-co.com

4101 Washington A venue
Newport News, Virginia 23607
Attn: Office of the General Counsel
E-mail: Jeffrey.M.Bauer@hii-co.com, OfficeoftheGeneralCounsel@hii-co.com

To whom it may concern:

Reference is made to (x) the Participation Agreement (the "**Participation Agreement**") entered into as of the date hereof, by Fulcrum Credit Partners LLC ("**Fulcrum**"), as purchaser, and Huntington Ingalls Incorporated and Huntington Ingalls Industries Incorporated (together, "**Huntington**") and (y) the Assignment of Participation dated November 30, 2023 between Fulcrum Credit Partners LLC, as seller, and VR Global Partners, L.P. ("**VR**"), Contrarian Funds, L.L.C. ("**Contrarian**"), Boston Patriot Summer St LLC, ("**BPS**"), and Fulcrum Distressed Opportunities Fund IV, LLC, as purchasers.

As you know, Huntington previously filed a writ of attachment *fieri facias* against PDVSA's equity interest in PDVH in the following supplemental proceeding: *Northrop Grumman Ship Systems, Inc. v. The Ministry of Defense of the Republic of Venezuela*, No. 20 Misc. 257 (D. Del.) (the "**Huntington Claim**").

Pursuant to Article 7 of the Participation Agreement and Article 1 of the Assignment of Participation, VR, Contrarian and BPS hereby direct Huntington, in connection with a transaction (the "**Transaction**"), in accordance with the *Sixth Revised Proposed Order (A) Establishing Sale and Bidding Procedures, (B) Approving Special Master's Report and Recommendation Regarding Proposed Sale Procedures Order, (C) Affirming Retention of Evercore as Investment Banker by Special Master and (D) Regarding Related Matters* [D.I. 646], dated October 4, 2022 in the case of Crystallex International Corporation v. Bolivarian Republic of Venezuela, No. 17 Misc. 151 (D. Del), in which 100% of the shares of PDV Holding, Inc. will be sold, to credit bid the Huntington Claim (also defined as the "Award" in the Participation Agreement) and receive the "**Transaction Consideration**" (as defined below), which shall be due and payable on the closing date of such Transaction.

The "**Transaction Consideration**" shall consist of new Convertible Notes issued by an acquisition company formed to complete the Transaction in an aggregate principal amount equal to the then accrued amount of the Huntington Claim.

Yours sincerely,

**CONTRARIAN FUNDS, L.L.C.**


By: _____
Name:
Title:


**BOSTON PATRIOT SUMMER ST LLC**


By: _____
Name:
Title:


**VR GLOBAL PARTNERS, L.P.**


By: _____
Name: Emile du Toit
Title:   Authorized signatory

**Exhibit E**

**Commitment Letter of Affiliate of Contrarian Regarding Purchase of Convertible Notes**

*Execution Version*

Contrarian Funds, L.L.C. ("CFunds ")
411 West Putnam Avenue, Suite 425
Greenwich, CT 06830

**CONFIDENTIAL**

March 20, 2025

Red Tree Investments, LLC
("Red Tree" or the "Leading Bidder")
c/o Contrarian Capital Management, LLC
411 West Putnam Avenue, Suite 425
Greenwich, CT 06830

Project Horizon
Convertible Notes Commitment Letter

Ladies and Gentlemen:

Red Tree, on behalf of a Delaware corporation or limited liability company to be formed ("AcquisitionCo"), has advised CFunds ("Investor") that AcquisitionCo intends to acquire, directly or indirectly 100% of outstanding equity of PDV Holding, Inc. ("PDVH" or "Target") and consummate the other transactions described on Exhibit A hereto (collectively, the "PDVH Transaction"). Capitalized terms used but not otherwise defined herein are used with the meaning ascribed to such terms in the Exhibits hereto, as applicable.

1.    Commitments.

In connection with the PDVH Transaction, each of (a) CFunds hereby commits to purchase for cash certain senior secured convertible notes with the terms described in Exhibit B (the "Convertible Notes") having an initial aggregate principal amount equal to $150,000,000, (i) upon the terms set forth in this letter, the Transaction Summary attached as Exhibit A hereto and the Summary of Terms and Conditions attached as Exhibit B hereto and (ii) the purchase of which is subject only to the conditions set forth in the following sentence and on Exhibit C hereto (such Exhibits A through C, including the annexes thereto, the "Term Sheet" and together with this letter, this "Convertible Notes Commitment Letter"). Investor will pay the cash purchase price of the Convertible Notes to a subsidiary of the Issuer, as described in Exhibit A hereto.

2.    [Intentionally Left Blank]

3.    <u>Investor Representations</u>.  In connection with the offer and sale of the Convertible Notes by the Issuer to Investor, Investor represents, warrants, agrees and acknowledges as follows:

    A.    No disclosure or offering document has been prepared in connection with the offer and sale of the Convertible Notes by the Issuer, the Leading Bidder or any of their affiliates.

    B.    (a) It has conducted its own investigation of the Issuer and the Convertible Notes, and it has not relied on any statements or other information (other than the representations and warranties provided in Section 4 hereof) provided by the Issuer, Red Tree or any other person or entity concerning the Issuer or the Convertible Notes or the offer and sale of the Convertible Notes, (b) it has had access to, and an adequate opportunity to review, financial and other information as it deems necessary to make its decision to purchase the Convertible Notes, (c) it has been offered the opportunity to ask questions of the Issuer and received answers thereto, as it deemed necessary in connection with its decision to purchase the Convertible Notes; and (d) it has made its own assessment and has satisfied itself concerning the relevant tax and other economic considerations relevant to its investment in the Convertible Notes.

    C.    With respect to the sale of the Convertible Notes, Red Tree and its directors, officers, employees, representatives and controlling persons have made no independent investigation with respect to the Issuer or the Convertible Notes or the accuracy, completeness or adequacy of any information supplied to Investor by the Issuer.

    D.    In connection with the issue and sale of the Convertible Notes, neither the Issuer nor Red Tree has acted as its financial advisor or fiduciary.

    E.    It, individually or through its beneficial owners, is (x) a qualified institutional buyer (as defined in Rule 144A of the Securities Act of 1933 as amended (the "<u>Securities Act</u>")), or (y) an accredited investor (as defined in Rule 501 of the Securities Act) and, in the case of (y), either (i) an institutional account as defined in FINRA Rule 4512(c) or (ii) a qualified purchaser, as defined in Section 2(a)(51)(A) of the Investment Company Act, and, in any case, have total assets of at least $50 million.  It is aware that the sale of the Convertible Notes to it is being made in reliance on a private placement exemption from registration under the Securities Act under Section 4(a)(2) of the Securities Act (without reliance upon Regulation D thereunder) and is acquiring the Convertible Notes for its own account or for an account over which it exercises sole discretion for another qualified institutional buyer or accredited investor.

    F.    It has such knowledge and experience in financial and business matters as to be capable of evaluating the merits and risks of its prospective investment in the Convertible Notes, and has the ability to bear the economic risks of its prospective investment and can afford the complete loss of such investment.

G. The issuance and sale of the Convertible Notes have not been registered under the Securities Act or any other applicable securities laws. The Convertible Notes are being offered for sale in transactions not requiring registration under the Securities Act, and unless their issuance and sale are so registered, may not be offered, sold or otherwise transferred except in compliance with the registration requirements of the Securities Act or any other applicable securities laws, pursuant to any exemption therefrom or in a transaction not subject thereto.

4. <u>Information</u>.

You hereby represent and warrant that (with respect to information relating to Target and its subsidiaries prior to the Closing Date, to your knowledge) (a) all written information concerning you, Target and your and its respective subsidiaries (other than (i) any estimates, forecasts, projections or other forward looking information with respect to you, Target or your or its respective subsidiaries delivered in connection with the Acquisition (the "<u>Projections</u>") and (ii) information of a general economic or industry-specific nature) that has been or will be made available to any of us by you, the Leading Bidder or any of your or their respective representatives on your behalf, in connection with the transactions contemplated hereby (the "<u>Information</u>"), when taken as a whole and as supplemented as provided below, is true and correct in all material respects and does not or will not, when furnished, contain any untrue statement of a material fact or omit to state a material fact necessary in order to make the statements contained therein not materially misleading in light of the circumstances under which such statements are made and (b) the Projections have been or will be prepared in good faith based upon assumptions believed by the preparer thereof to be reasonable at the time furnished (it being recognized by Investor that such Projections are not to be viewed as facts or a guarantee of performance and are subject to significant uncertainties and contingencies many of which are beyond your control, that no assurance can be given that any particular financial projections (including the Projections) will be realized, that actual results may differ significantly from projected results and that such differences may be material). You agree that if, at any time prior to the Closing Date, you become aware that any of the representations in the preceding sentence would be incorrect in any material respect if the Information or the Projections were being furnished and such representations were being made at such time, you will (or prior to the Closing Date with respect to Information and Projections concerning Target and its subsidiaries, to the extent appropriate and subject to the limitations on your rights set forth in the Acquisition Agreement, you will use commercially reasonable efforts to) promptly notify the Investor and promptly supplement the Information and the Projections so that the representations in the preceding sentence remain true (or, prior to the Closing Date, to your knowledge with respect to information relating to Target and its subsidiaries) in all material respects. The accuracy of the foregoing representations, whether or not cured, shall not be a condition to the obligations of any Investor hereunder. You understand that the Investor may use and rely on the Information and the Projections without independent verification thereof, and the Investor does not assume responsibility for the accuracy or completeness of the Information or the Projections.

5. <u>Limited Conditionality Provision</u>.

Notwithstanding anything in this Convertible Notes Commitment Letter, the definitive documentation with respect to the issuance and sale of the Convertible Notes (collectively, the "<u>Convertible Notes Documentation</u>") or any other letter agreement or other undertaking concerning the financing of the transactions contemplated hereby to the contrary, (a) the terms of the Convertible Notes Documentation shall be in a form such that they do not impair the issuance and sale of the Convertible Notes on the Closing Date if the conditions set forth in <u>Exhibit C</u> hereto are satisfied or waived by the Initial Investor and (b) the only conditions (express or implied) to the purchase of the Convertible Notes by the Investor on the Closing Date are those expressly set forth in <u>Exhibit C</u> hereto (and upon satisfaction or waiver of such conditions, the issuance and sale of the Convertible Notes shall occur). This paragraph, and the provisions contained

herein, is referred to in this Convertible Notes Commitment Letter as the "Limited Conditionality Provision."

6.    Indemnification; Expenses; Limitation of Liability.

You agree to indemnify and hold harmless Investor, its affiliates and controlling persons and the directors, officers, employees, partners, agents, advisors and other representatives of any of the foregoing (each, an "indemnified person") from and against any and all losses, claims, damages and liabilities to which any such indemnified person may become subject arising out of or in connection with the Convertible Notes Documentation, and the PDVH Transaction or any claim, litigation, investigation or proceeding relating to any of the foregoing (a "Proceeding"), regardless of whether any indemnified person is a party thereto or whether such Proceeding is brought by you, any of your affiliates or any third party, and to reimburse each indemnified person within 30 days following written demand therefor for any reasonable and documented out-of-pocket expenses incurred in connection with investigating or defending any of the foregoing (but limited, in the case of legal fees and expenses, (x) to one counsel to such indemnified persons, taken as a whole, and, if reasonably necessary, one firm of local counsel in each relevant jurisdiction (which may include a single special counsel acting in multiple jurisdictions), in each case, for all indemnified persons, taken as a whole, and (y) solely in the case of an actual or potential conflict of interest, one additional counsel (and, if reasonably necessary, one firm of local counsel in each relevant jurisdiction (which may include a single special counsel acting in multiple jurisdictions) to all affected indemnified persons, taken as a whole)); provided that the foregoing indemnity will not, as to any indemnified person, apply to losses, claims, damages, liabilities or expenses to the extent they result from (i) the willful misconduct, gross negligence, bad faith or breach of any contractual obligations of such indemnified person (or any of its Related Parties (as defined below)), in each case as determined by a final judgment of a court of competent jurisdiction, or (ii) any disputes solely among indemnified persons and not arising out of any act or omission of you, the Opco Borrower or Target or any of your or their respective subsidiaries. No indemnified person or any other party hereto shall be liable for any damages resulting from the use by any person (other than such indemnified person (or its Related Parties)) of Information or other materials obtained through electronic, telecommunications or other information transmission systems, except to the extent any such damages result from the gross negligence, bad faith or willful misconduct of such indemnified person (or any of its Related Parties), as applicable, in each case as determined by a final, non-appealable judgment of a court of competent jurisdiction. None of the indemnified persons, you, Target, Red Tree, or any of your or their respective affiliates or the respective directors, officers, employees, agents, advisors or other representatives of any of the foregoing shall be liable for any special, indirect, consequential or punitive damages (including lost profits) in connection with this Convertible Notes Commitment Letter or the Convertible Notes (including the use or intended use of the proceeds of the Convertible Notes) or the transactions contemplated hereby; provided that nothing contained in this sentence shall limit your indemnification obligations to the extent set forth hereinabove to the extent such special, indirect, consequential or punitive damages are included in any third party claim in connection with which such indemnified person is entitled to indemnification hereunder. You shall not be liable for any settlement of any Proceeding effected without your consent (which consent shall not be unreasonably withheld or delayed), but if settled with your written consent, you agree to indemnify and hold harmless such indemnified person to the extent and in the manner set forth above. You shall not, without the prior written consent of the affected indemnified person (which consent shall not be unreasonably withheld or delayed), effect any settlement of any pending or threatened Proceeding against such indemnified person in respect of which indemnity could have been sought hereunder by such indemnified person unless such settlement (a) includes an unconditional release of such indemnified person from all liability or claims that are the subject matter of such Proceeding (without cost to such indemnified person) and (b) does not include any statement as to any admission of fault or culpability. Each indemnified person shall be severally obligated to refund or return any and all amounts paid by you under this Section 6 to the extent such indemnified person is not entitled to payment of such amounts in accordance with the terms hereof (as determined by a final, non-

appealable judgment of a court of competent jurisdiction). For purposes hereof, "Related Party" and "Related Parties" of an indemnified person mean any (or all, as the context may require) of such indemnified persons and its (or their) respective affiliates and controlling persons and its or their respective directors, officers, employees, partners, agents, advisors and other representatives, and in the case of agents, advisors and other representatives, to the extent acting on behalf of, or at the express instructions of, such indemnified person, affiliate or controlling person.

7.    Sharing of Information, Absence of Fiduciary Relationship.

Investor, together with its affiliates (the "Banks" (for the avoidance of doubt, regardless of whether the Investor or any of its affiliates is a "bank" as commonly understood)), is a full service financial firm and as such from time to time may (a) effect transactions for its own account or the account of customers, and hold long or short positions in debt or equity securities or loans of companies that may be the subject of the transactions contemplated hereby or (b) provide debt financing, equity capital, investment banking, financial advisory services, securities trading, hedging, financing and brokerage activities and financial planning and benefits counseling to other companies in respect of which you, Red Tree, the Opco Borrower or Target and your and their respective subsidiaries may have conflicting interests.  You acknowledge that the Banks have no obligation to use in connection with the transactions contemplated hereby, or to furnish to you, confidential information obtained from other companies or other persons.  The Banks may have economic interests that conflict with those of you, the Opco Borrower and Target.  You acknowledge and agree that (a)(i) the transactions described herein regarding the Convertible Notes are arm's-length commercial transactions between you and your affiliates, on the one hand, and the Banks, on the other hand, (ii) you have consulted your own legal, accounting, regulatory and tax advisors to the extent you have deemed appropriate and you are not relying on any Bank for such advice and (iii) you are capable of evaluating, and understand and accept, the terms, risks and conditions of the transactions contemplated hereby; and (b) in connection with the transactions contemplated hereby, (i) each Bank has been, is, and will be acting solely as a principal and, except as otherwise expressly agreed in writing by the relevant parties, has not been, is not, and will not be acting as an advisor, agent or fiduciary for you or any of your affiliates and (ii) no Bank has any obligation to you or your affiliates except those obligations expressly set forth in this Convertible Notes Commitment Letter and any other agreement with you or any of your affiliates.  You further acknowledge and agree that you are responsible for making your own independent judgment with respect to such transactions and the process leading thereto. Please note that the Investor and its affiliates have not provided any legal, accounting, regulatory or tax advice and you are not relying on the Banks for such advice. You agree that you will not claim that any Investor or its applicable affiliates, as the case may be, have rendered advisory services of any nature or respect, or owe a fiduciary or similar duty to you or your affiliates, in connection with the transactions contemplated by this Convertible Notes Commitment Letter.

Neither the Investor nor its affiliates will use confidential information obtained from you, the Opco Borrower, Red Tree, Target or your or their respective representatives by virtue of the transactions contemplated by this Convertible Notes Commitment Letter or their other relationships with you in connection with the performance by them or their affiliates of services for such other persons, and neither the Investor nor its affiliates will furnish any such information to other persons, except to the extent permitted under Section 8 below.  You also acknowledge that neither the Investor nor its affiliates has any obligation to use in connection with the transactions contemplated by this Convertible Notes Commitment Letter, or to furnish to you, confidential information obtained by them from other persons.

8.    Confidentiality.

This Convertible Notes Commitment Letter is entered into on the understanding that neither this Convertible Notes Commitment Letter nor any of its terms or substance shall be disclosed by you,

directly or indirectly, to any other person or entity except (a) your subsidiaries, Red Tree, Target and its subsidiaries, Robert B. Pincus, solely in his capacity as special master (the "Special Master") and to your and their respective directors, officers, employees, affiliates, members, partners, stockholders, attorneys, accountants, independent auditors, agents and other advisors on a confidential and "need to know" basis solely in connection with the transactions contemplated hereby and who are informed of the confidential nature of such information and are or have been advised of their obligation to keep information of this type confidential (provided that you will use commercially reasonable efforts to redact economic terms contained in this Convertible Notes Commitment Letter before providing to Target or its subsidiaries, the Special Master or their respective directors, officers, employees, affiliates, members, partners, stockholders, attorneys, accountants, independent auditors, agents or other advisors shall be redacted in a manner reasonably satisfactory to Investor), (b) in any legal, judicial or administrative proceeding or as otherwise required by applicable law, rule or regulation or as requested by a governmental, regulatory or self-regulatory authority (in which case you agree (i) to the extent permitted by law and reasonably practicable, to inform us promptly in advance thereof, (ii) to strictly limit disclosure specifically to that information that has been requested by such authority and (iii) to use commercially reasonable efforts to ensure that any such information so disclosed is accorded confidential treatment), (c) to the extent reasonably necessary or advisable in connection with the exercise of any remedy or enforcement of any right under this Convertible Notes Commitment Letter, (d) this Convertible Notes Commitment Letter, including the existence and contents of this Convertible Notes Commitment Letter may be disclosed in connection with any public filing requirement, (e) the Term Sheet, including the existence and contents thereof, may be disclosed to any rating agency in connection with the PDVH Transaction and (f) the Term Sheet, including the existence and contents thereof may be disclosed prospective additional investors in the Notes and, in each case, their respective directors (or equivalent managers), officers, employees, affiliates, independent auditors or other experts and advisors on a confidential basis.  The foregoing restrictions shall cease to apply in respect of the existence and contents of this Convertible Notes Commitment Letter on the date that is one year following the termination of this Convertible Notes Commitment Letter in accordance with its terms unless earlier superseded by the Convertible Notes Documentation.

Investor and its affiliates and its Representatives shall use all information received by them from you in connection with the PDVH Transaction solely for the purposes of providing the commitments that are the subject of this Convertible Notes Commitment Letter and shall treat confidentially all such information and the terms and contents of this Convertible Notes Commitment Letter and the Convertible Notes Documentation and shall not publish, disclose or otherwise divulge such information; provided, however, that nothing herein shall prevent any Investor from disclosing any such information (a) to the extent compelled by legal process in, or reasonably necessary to, the defense of such legal, judicial or administrative proceeding, in any legal, judicial or administrative proceeding or otherwise as required by applicable law, rule or regulation (in which case Investor shall (i) to the extent permitted by law, inform you promptly thereof and (ii) use commercially reasonable efforts to ensure that any such information so disclosed is accorded confidential treatment), (b) upon the request or demand of any governmental, regulatory or self-regulatory authority having jurisdiction over Investor or its affiliates (in which case the Initial Investor shall except with respect to any routine audit or examination conducted by bank accountants or any governmental regulatory or self-regulatory authority (x) to the extent permitted by law, inform you promptly thereof and (y) use commercially reasonable efforts to ensure that any such information so disclosed is accorded confidential treatment), (c) to Investor's affiliates and the directors (or equivalent managers), officers, employees, members, attorneys, accountants, independent auditors, agents or other experts and advisors of Investor and of Investor's affiliates (collectively, the "Representatives") on a "need to know" basis solely in connection with the transactions contemplated hereby or in connection with the administration, evaluation or monitoring of the commitments of Investor hereunder and who are informed of the confidential nature of such information and are or have been advised of their obligation to keep information of this type confidential; provided, Investor shall be responsible for its affiliates' and their Representatives' compliance with this paragraph with respect to any information provided to them by Investor, (d) to the extent any such

information becomes publicly available other than by reason of disclosure by Investor, its affiliates or its or their respective Representatives in violation of any confidentiality obligation owing to you, Target or any of your or its respective subsidiaries or affiliates, (e) to the extent applicable to establish a due diligence defense, (f) to Moody's or S&P in connection with obtaining a rating contemplated pursuant to this Convertible Notes Commitment Letter and/or the Convertible Notes Documentation, as applicable, (g) in connection with the enforcement of Investor's rights hereunder, (h) to the extent that such information is received by Investor from a third party that is not, to Investor's knowledge, subject to any contractual or fiduciary confidentiality obligation owing to you, Target or any of your or its respective affiliates or related parties, (i) to the extent that such information is independently developed by Investor without violating the terms of this Convertible Notes Commitment Letter, and/or (j) to the extent that you have consented to the relevant disclosure in writing; provided, further, that the disclosure of any such information pursuant to clauses (a) and (e) above shall be made subject to the acknowledgment and acceptance by such recipient that such information is being disseminated on a confidential basis (on substantially the terms set forth in this paragraph or as is otherwise reasonably acceptable to you and the Initial Investor) in accordance with market standards for dissemination of such type of information. In addition, Investor may disclose the existence of the Convertible Notes, the Committed Bank Debt Facilities, the Notes (if any) and/or the Term Loans (if any) and the information about the Convertible Notes, the Committed Bank Debt Facilities, the Notes (if any) and/or the Term Loans (if any) to comply with applicable reporting requirements under applicable laws and regulations and to market data collectors, similar services providers to the lending and/or investing industry and service providers to Investor in connection with the administration and management of its investment in the Convertible Notes. For the avoidance of doubt, nothing in this Convertible Notes Commitment Letter prohibits any individual from communicating or disclosing information regarding suspected violations of laws, rules or regulations to a governmental, regulatory or self-regulatory authority. The provisions of this paragraph shall automatically terminate on the date that is one year following the date hereof unless earlier superseded by the Convertible Notes Documentation.

9.      Miscellaneous.

        This Convertible Notes Commitment Letter shall not be assignable by any party hereto (except by Investor to one or more of its affiliates or affiliated or managed funds or accounts) without the prior written consent of each other party hereto (and any purported assignment without such consent shall be null and void), is intended to be solely for the benefit of the parties hereto and, to the extent expressly provided in Section 6 above, the indemnified persons and is not intended to and does not confer any benefits upon, or create any rights in favor of, any person other than the parties hereto and, to the extent expressly set forth herein, the indemnified persons. Notwithstanding the foregoing, the Special Master shall be deemed an intended third-party beneficiary of Section 1 of this Convertible Notes Commitment Letter and shall have the right to enforce the obligations under Section 1 as if it were a direct party hereto. Notwithstanding the foregoing, but subject to the limitations otherwise set forth herein, Investor reserves the right to allocate, in whole or in part, to their affiliates or branches certain fees payable to Investor in such manner as Investor and its respective affiliates or branches may agree in their sole discretion. This Convertible Notes Commitment Letter may not be amended or waived except by an instrument in writing signed by you and Investor. This Convertible Notes Commitment Letter may be executed in multiple counterparts and by different parties hereto in separate counterparts, all of which, taken together, shall constitute an original. Delivery of an executed counterpart of a signature page to this Convertible Notes Commitment Letter by telecopier, facsimile or other electronic transmission (e.g., a "pdf" or "tiff") shall be effective as delivery of a manually executed counterpart thereof. The words "execution", "signed," "signature," and words of like import in this Convertible Notes Commitment Letter shall be deemed to include electronic signatures or electronic records, each of which shall be of the same legal effect, validity or enforceability as a manually executed signature or the use of a paper-based recordkeeping system, as the case may be, to the extent and as provided for in any applicable law, including the Federal Electronic Signatures in Global and National Commerce Act, the New York State Electronic Signatures and Records Act, or any other similar state laws

based on the Uniform Electronic Transactions Act. Section headings used herein are for convenience of reference only, are not part of this Convertible Notes Commitment Letter and are not to affect the construction of, or to be taken into consideration in interpreting, this Convertible Notes Commitment Letter. This Convertible Notes Commitment Letter and other letter agreements entered into in connection herewith on the date hereof are the only agreements that have been entered into among the parties hereto and you with respect to the Convertible Notes and set forth the entire understanding of the parties with respect hereto and thereto, and supersede all prior agreements and understandings related to the subject matter hereof.

This Convertible Notes Commitment Letter, and any claim, controversy or dispute arising under or related to this Convertible Notes Commitment Letter, whether in tort, contract (at law or in equity) or otherwise, shall be governed by, and construed and interpreted in accordance with, the laws of the State of New York without regard to conflict of law principles that would result in the application of any law other than the law of the State of New York; provided, however, that (A) the interpretation of the definition of "Company Material Adverse Effect" (as defined in the Acquisition Agreement as in effect on the date hereof) and whether or not there shall have occurred any event, occurrence, state of facts, development, circumstance, change or effect that, individually or in the aggregate with all other events, occurrences, state of facts, developments, circumstances, changes and effects, has had or would reasonably be expected to have a Company Material Adverse Effect (in each case solely for purposes of the conditions to the purchase of the Convertible Notes by the Initial Investor on the Closing Date), (B) the determination of the accuracy of the Acquisition Agreement Representations and whether as a result of any inaccuracy thereof you or your applicable affiliate have a right to terminate your (or its) obligations under the Acquisition Agreement or a right to refuse to consummate the Acquisition as a result of a breach of any such representations in the Acquisition Agreement and (C) whether the Acquisition has been consummated on the terms described in the Acquisition Agreement shall, in each case, be governed by and construed in accordance with the law governing the Acquisition Agreement, regardless of laws that might otherwise govern under applicable principles of conflicts of laws thereof. Each of the parties hereto irrevocably agrees to waive, to the fullest extent permitted by applicable law, all right to trial by jury in any suit, action, proceeding or counterclaim (whether based upon contract, tort or otherwise) related to or arising out of the Acquisition or this Convertible Notes Commitment Letter.

Each of the parties hereto irrevocably and unconditionally (a) submits to the exclusive jurisdiction of any state or federal court sitting in the Borough of Manhattan in the City of New York (or any appellate court therefrom) over any suit, action or proceeding arising out of or relating to this Convertible Notes Commitment Letter or the transactions contemplated hereby and agrees that all claims in respect of any such suit, action or proceeding shall be heard and determined in such New York state, or to the extent permitted thereby, such federal court sitting in the Borough of Manhattan in the City of New York (or any appellate court therefrom) and (b) agrees that a final judgment in any such suit, action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit or the judgment or in any other matter provided by law. You and we agree that service of any process, summons, notice or document by registered mail addressed to such person shall be effective service of process against such person for any suit, action or proceeding brought in any such court. Each of the parties hereto hereby irrevocably and unconditionally waives any objection to the laying of venue of any such suit, action or proceeding brought in any such court and any claim that any such suit, action or proceeding has been brought in an inconvenient forum.

Each of the parties hereto agrees that this Convertible Notes Commitment Letter is a binding and enforceable agreement with respect to the subject matter herein (including an obligation to negotiate in good faith) notwithstanding that the purchase of the Convertible Notes by Investor is subject to the conditions specified herein, including the execution and delivery of the Convertible Notes Documentation in a manner consistent with this Convertible Notes Commitment Letter; it being acknowledged and agreed that the commitments provided hereunder are subject only to those conditions set forth on Exhibit C hereto.

Investor hereby notifies you that, pursuant to the requirements of the USA PATRIOT Act, Title III of Pub. L. 107-56 (signed into law on October 26, 2001) (as amended, the "PATRIOT Act") and 31 C.F.R. § 1010.230 (as amended, the "Beneficial Ownership Regulation"), it is required to obtain, verify and record information that identifies the Issuer, which information includes names, addresses, tax identification numbers and other information that will allow Investor to identify the Issuer in accordance with the PATRIOT Act and the Beneficial Ownership Regulation. This notice is given in accordance with the requirements of the PATRIOT Act and the Beneficial Ownership Regulation.

The indemnification, confidentiality (subject to the last sentence in the first and second paragraphs of Section 8 hereof), jurisdiction, governing law, sharing of information, no agency or fiduciary duty, conflict waiver, waiver of jury trial, service of process, venue submission and information provisions contained herein shall remain in full force and effect regardless of whether the Convertible Notes Documentation shall be executed and delivered and notwithstanding the termination or expiration of this Convertible Notes Commitment Letter or the commitments hereunder; provided that your obligations under this Convertible Notes Commitment Letter (other than (a) your obligations with respect to information, which shall survive only until the Closing Date, at which time such obligations shall terminate and be of no further force and effect, and (b) confidentiality of the Convertible Notes Commitment Letter and the contents hereof) shall automatically terminate and be of no further force and effect to the extent superseded by the Convertible Notes Documentation on the Closing Date and you shall automatically be released from all liability hereunder in connection therewith at such time. Subject to the preceding sentence, you may (upon written notice to Investor at any time), at your option, terminate this Convertible Notes Commitment Letter and the commitments hereunder in whole or in part (with any such partial termination reducing the commitments of Investor on a pro rata basis based on their respective commitments in respect of the Convertible Notes).

In the event that the Closing Date does not occur on or before 11:59 p.m., New York City time, on the earliest of (a) the date that is five business days after the Outside Date (as defined in the Acquisition Agreement as in effect on the date hereof), as such Outside Date may be extended in accordance with the terms of the Acquisition Agreement as in effect on the date hereof, if the Acquisition shall not have occurred on or prior to such date, (b) the date of the termination of the Acquisition Agreement by you (or your affiliate) or with your (or your affiliate's) written consent, in each case prior to the closing of the Acquisition, (c) the date of the closing of the Acquisition without the use of proceeds of the issuance and sale of the Convertible Notes and (d) the date of termination in full of the commitments under the Debt Commitment Letter (except as a result of the "Closing Date" (as defined in the Debt Commitment Letter) having occurred), then this Convertible Notes Commitment Letter and the commitments hereunder shall automatically terminate unless we shall, in our sole discretion, agree to an extension; provided that the termination of any commitment pursuant to this sentence does not prejudice your rights and remedies in respect of any breach of this Convertible Notes Commitment Letter that occurred prior to any such termination.

**[THE REMAINDER OF THIS PAGE IS INTENTIONALLY LEFT BLANK]**

We are pleased to have been given the opportunity to assist you in connection with this important financing.

Very truly yours,

CONTRARIAN FUNDS, L.L.C.

By: _____

Name:   Jennifer Diagonale
Title:   Authorized Signatory

Signature Page to Project Horizon Convertible Notes Commitment Letter

Accepted and agreed to as of
the date first above written:

RED TREE INVESTMENTS, LLC

By: _____
    Name:    Michael Ring
    Title:     Manager

Signature Page to Project Horizon Convertible Notes Commitment Letter

**EXHIBIT A**

PROJECT HORIZON
PDVH TRANSACTION SUMMARY

Capitalized terms used but not otherwise defined herein shall have the meanings assigned to such terms in the Convertible Notes Commitment Letter to which this Exhibit A is attached or on Exhibits B or C (including the Annexes thereto) attached thereto, as applicable. In the case of any such capitalized term that is subject to multiple and differing definitions, the appropriate meaning thereof in this Exhibit A shall be determined by reference to the context in which it is used.

A Delaware corporation or limited liability company to be formed ("AcquisitionCo" or the "Issuer") will form a direct subsidiary ("Acquisition MidCo") that is a Delaware corporation or limited liability company which will in turn form a direct subsidiary ("Acquisition Merger Sub") that is a Delaware corporation or limited liability company, which will purchase 100% of the common shares of PDV Holding, Inc., a Delaware corporation ("Target") and will merge into Target immediately after the Acquisition (as defined below) with Target surviving. Acquisition Merger Sub will form a direct finance subsidiary ("Opco Borrower") that is a Delaware corporation or limited liability company and will merge into CITGO Petroleum Corporation, a Delaware corporation ("CITGO Petroleum") immediately after the Acquisition, with CITGO Petroleum surviving.

Acquisition Merger Sub (and/or its affiliates) will enter into an Acquisition Agreement (including the schedules, exhibits, annexes, and disclosure letters thereto, the "Acquisition Agreement"), with Robert B. Pincus, solely in his capacity as special master (the "Special Master"). Pursuant to the Acquisition Agreement, and in accordance with the orders issued by the United States District Court for the District of Delaware (the "District Court") in the matter of *Crystallex International Corp. v. Bolivarian Republic of Venezuela*, D. Del. C.A. No. 1:17-mc-00151-LPS, including but not limited to, (i) the *Sixth Revised Proposed Order (A) Establishing Sale and Bidding Procedures, (B) Approving Special Master's Report and Recommendation Regarding Proposed Sale Procedures Order, (C) Affirming Retention of Evercore as Investment Banker by Special Master and (D) Regarding Related Matters* [D.I. 480-1], (ii) the *Memorandum Order Regarding Sale Process and Litigation* [D.I. 1517] and (iii) the *Memorandum Order* entered by the District Court on January 27, 2025 (collectively, the "Sale Procedures Orders"), Acquisition Merger Sub shall, directly or indirectly acquire (the "Acquisition") all of the issued and outstanding equity interests of Target.

In connection therewith, it is intended that:

(a)     the Issuer will (i) issue $150.0 million aggregate principal amount of Convertible Notes on the terms described in, and pursuant to the Convertible Notes Commitment Letter and (ii) contribute such Convertible Notes and the Issuer's common equity to Acquisition MidCo;

(b)     Red Tree will contribute claims to Acquisition MidCo and will receive common equity of the Issuer that will constitute more than a majority of the voting and economic interests in the Issuer after the closing of the PDVH Transaction (the "Claims Contribution");

(c)     pursuant to this Convertible Notes Commitment Letter, Acquisition MidCo will sell to the Investor $150.0 million aggregate principal amount of Convertible Notes for cash at par, with such cash proceeds being paid to Acquisition MidCo and later contributed to CITGO Petroleum following the closing of the Acquisition;

(d)    the Opco Borrower will, at its option, either (i) (x) issue an aggregate principal amount of its senior secured notes (the "Notes") in a Rule 144A or other private placement and/or (y) obtain senior secured term loans (the "Term Loans", collectively with the Notes, the "Permanent Financing"), with such Permanent Financing generating up to $2,545.0 million in aggregate gross proceeds, or (ii) to the extent the Opco Borrower does not receive such amount of gross proceeds of Notes and/or Term Loans on the Closing Date, borrow up to $2,545.0 million (as such amount may be reduced as set forth under the heading "Mandatory Commitment Reduction and Prepayment" in the Bridge Term Sheet (as defined in the Debt Commitment Letter) or increased pursuant to the terms of the Debt Commitment Letter) of senior term loans (the "Base Bridge Loans") under a new senior term loan credit facility (the "Base Bridge Facility") on the terms described in, and pursuant to, the Commitment Letter, to be entered into by the Commitment Parties (as defined therein) at or shortly after the bid by AcquisitionCo is declared the stalking horse bid by the Special Master pursuant to the Sale Procedures Orders (including the term sheets relating thereto, the "Debt Commitment Letter");[1]

(e)    the OpCo Borrower will use its commercially reasonable efforts to (x) obtain the requisite consents from Citgo and the applicable holders of Citgo's $1,100,000,000 8.375% senior secured notes due 2029 (the "2029 Notes") to amend that certain Indenture, dated as of September 20, 2023, by and among Citgo, the guarantors party thereto and Argent Institutional Trust Company, as trustee, governing the 2029 Notes (the "2029 Notes Indenture") to permit the Transactions, including, without limitation, the incurrence of Indebtedness or Liens (each as defined in the 2029 Notes Indenture) that may occur as a result of the Transactions (such amendments, collectively, the "Backstopped Amendments") and (y) to cause such amendment to the 2029 Notes to become effective and operative prior to the Closing Date in accordance with the terms of the 2029 Notes Indenture (the receipt of such requisite consents from Citgo and the applicable holders of the 2029 Notes to the Backstopped Amendments and the effectiveness and operativeness of such Backstopped Amendments prior to the Closing Date being referred to as the "Backstop Termination Event");

(f)    solely to the extent the Backstop Termination Event has not occurred on or prior to the Closing Date, the OpCo Borrower will, at its option, either (i) (x) issue Permanent Financing in addition to the Permanent Financing pursuant to clause (d) above in an amount generating up to $1,100.0 million in aggregate gross proceeds (as such amount may be increased as a result of a Flex Increase) or (ii) to the extent the OpCo Borrower does not receive such additional amount of gross proceeds of Notes and/or Term Loans on the Closing Date, borrow up to $1,100.0 million (as such amount may be reduced as set forth under the heading "Mandatory Commitment Reduction and Prepayment" in the Bridge Term Sheet (as defined in the Debt Commitment Letter) or increased pursuant to the terms of the Debt Commitment Letter) of additional senior term loans (the "Backstop Bridge Loans") under the Bridge Facility as described in the Bridge Term Sheet (unless the context otherwise requires, all references to the "Bridge Facility" shall be deemed to refer to the Base Bridge Facility together with any Backstop Bridge Loans, if applicable, and all references to "Bridge Loans" shall be deemed to refer to the Base Bridge Loans together with any Backstop

---

[1]    It is assumed that prior to the closing of the Acquisition, CITGO Petroleum will have already refinanced the entire principal amount, together with interest thereon and the applicable premium, if any, of its or its subsidiaries, Industrial Revenue Bonds due 2025 and 6.375% Senior Secured Notes due 2026 and all guarantees and security interests in connection therewith shall have been released and terminated in full (the "Existing Notes Refinancing").

Bridge Loans, if applicable), the proceeds of which will be used to repay, prepay, repurchase, re-deem, defease or discharge the 2029 Notes (and cause the release of any liens and guarantees related thereto);

     (g)    the Opco Borrower will obtain up to $1,250 million in commitments under a senior secured asset-based revolving credit facility, on the terms described in, and pursuant to, the Debt Commitment Letter (the "<u>ABL Facility</u>" and, together with the Bridge Facility, the "<u>Committed Bank Debt Facilities</u>"), with an expected draw under the ABL Facility on the Closing Date of $114.0 million (the transactions described in the preceding clauses (d) through (g), collectively, the "<u>Senior Debt Financing</u>");

     (h)    pursuant to the Acquisition Agreement, Acquisition Merger Sub will purchase all of the equity interests of Target, and immediately after such Acquisition occurs, (i) Acquisition Merger Sub will merge with and into Target (with Target surviving), (ii) Opco Borrower will merge with and into CITGO Petroleum (with CITGO Petroleum surviving) and (iii) cash proceeds of the Senior Debt Financing will be used to pay the cash consideration under the Acquisition Agreement;

     (i)    pursuant to that certain Transaction Support Agreement, dated as of March 7, 2025 (the "<u>Transaction Support Agreement</u>"), by and among Red Tree and certain holders of, or nomi-nees, investment managers, investment advisors, or subadvisors to funds and/or accounts that hold, or trustees of trusts that hold the outstanding 8.5% notes due 2020 (the "<u>PDVSA 2020 Notes</u>") of Petróleos de Venezuela, S.A., a Venezuelan company, (i) CITGO Petroleum, CITGO Holding, Inc., a Delaware corporation ("<u>CITGO Holding</u>") and/or Acquisition MidCo will acquire the PDVSA 2020 Notes of participating holders of the 2020 Notes ("<u>Participating 2020 Noteholders</u>"), and (ii) as a result of the requisite holders of PDVSA 2020 Notes having executed the Transaction Support Agreement, the consents received under the Transaction Support Agreement will be sufficient to (x) cause the Acquisition to be permitted by the indenture governing the PDVSA 2020 Notes and (y) all of the security interests in the common stock of CITGO Holding that secure the PDVSA 2020 Notes shall be released and terminated in full (collectively, the "<u>PDVSA Notes Transaction</u>");

     (j)    the fees, premiums, expenses and other transaction costs incurred in connection with the Transactions, including to fund any original issue discount and upfront fees (collectively, the "<u>Transaction Costs</u>"), will be paid; and

     (k)    the proceeds of the Senior Debt Financing, together with cash on hand of the Issuer and its subsidiaries, will be used to pay the consideration and other amounts owing in connection with the Acquisition under the Acquisition Agreement and to pay all or a portion of the Transaction Costs, with the cash proceeds of the Convertible Notes remaining at CITGO Petroleum to be used for general corporate purposes.

     The transactions described above in <u>clauses (a)</u> through <u>(k)</u> (inclusive) are collectively re-ferred to as the "<u>Transactions</u>" or the "<u>PDVH Transactions</u>".  For purposes of this Convertible Notes Com-mitment Letter, "<u>Closing Date</u>" shall mean the date of the consummation of the Acquisition and the satis-faction or waiver of the relevant conditions set forth on <u>Exhibit C</u> and the issuance and sale of the Convert-ible Notes.

**EXHIBIT B**

Project Horizon

Convertible Note Term Sheet

[Attached.]

**Secured Convertible Note Term Sheet**
March 20, 2025

| | |
|---|---|
| **Issuer:** | AcquisitionCo (the "<u>Issuer</u>") |
| **Security Description:** | [●]% Secured Convertible Notes (the "<u>Convertible Notes</u>"). |
| **Corporate Structure** | As set forth on Annex A hereto:<br><br>• The Issuer will be the 100% equity owner of Acquisition MidCo (a newly formed entity);<br>• Acquisition MidCo will be the 100% equity owner of PDVH;<br>• PDVH will be the 100% equity owner of PDVH MidCo (a newly formed disregarded entity);<br>• PDVH MidCo will be the 100% equity owner of CITGO Holding;<br>• CITGO Holding will be the 100% equity owner of CITGO MidCo (a newly formed disregarded entity); and<br>• CITGO MidCo will be the 100% equity owner of CITGO Petroleum. |
| **Guarantees, Security and Other Credit Support:** | The Convertible Notes will be secured by substantially all of the assets of the Issuer, including the equity of Acquisition MidCo.<br><br>The Convertible Notes will be guaranteed by Acquisition MidCo on a senior basis, secured by substantially all of Acquisition MidCo's assets, including the equity of PDVH and "<u>Intercompany Note A</u>" (as defined below).<br><br>The Issuer will make a capital contribution to Acquisition MidCo, consisting of Convertible Notes and the common equity of the Issuer (the common equity of the Issuer being used to satisfy the Leading Bidder's claims in the PDVH Transaction).<br><br>Acquisition MidCo will receive an intercompany note ("<u>Intercompany Note A</u>") (which will eventually have PDVH as its borrower, once the PDVH Transaction closes), which will be secured by substantially all of the assets of PDVH, including the equity of PDVH MidCo and "<u>Intercompany Note B</u>" (as defined below).<br><br>PDVH will lend PDVH MidCo the net cash proceeds of the Convertible Notes and contribute the equity of CITGO Holding to PDVH MidCo in return for an intercompany note ("<u>Intercompany Note B</u>"), which will be secured by substantially all of the assets of PDVH MidCo, including the equity of CITGO Holding. |

| | |
|---|---|
| | PDVH MidCo will guarantee the Convertible Notes, which guarantee will be secured (on a pari passu basis with Intercompany Note B) by substantially all of the assets of PDVH MidCo, including the equity of CITGO Holding. |
| **Purchasers:** | Contrarian Funds, L.L.C. and/or its Affiliates |
| **Amount:** | Up to $2.0 billion aggregate principal amount of Convertible Notes to be issued at the closing date of the PDVH Transaction (the "Closing Date"), including Convertible Notes to be issued to certain holders of claims against Petroleos de Venezuela, S.A. and the Bolivarian Republic of Venezuela. |
| **Maturity Date:** | The 20th anniversary of the Closing Date. |
| **Ranking:** | The Convertible Notes will be senior secured obligations of the Issuer, ranking senior in right of payment to all subordinated obligations of the Issuer and pari passu in right of payment with all other senior obligations of the Issuer. The Convertible Notes will rank effectively senior to all unsecured obligations of the Issuer, to the extent of the value of the collateral securing the Convertible Notes. <br><br> The guarantee of the Convertible Notes, Intercompany Note A or Intercompany Note B, as the case may be) by each guarantor will be a senior secured obligation of the guarantor, ranking senior in right of payment to all subordinated obligations of such guarantor and pari passu in right of payment with all other senior obligations of such guarantor. The guarantee of the Convertible Notes, Intercompany Note A or Intercompany Note B, as the case may be) by each guarantor will rank effectively senior to all unsecured obligations of such guarantor, to the extent of the value of the collateral securing such guarantee. |
| **Use of Proceeds:**[1] | The Issuer (or its subsidiaries) shall use the net proceeds of the issuance of the Convertible Notes to fund a capital contribution to CITGO Holding, which will make a capital contribution to CITGO Petroleum, which will use such net proceeds to retire existing indebtedness and to fund the ongoing capital needs of its business. |
| **Commitment Term, Extension Fees:** | The first anniversary of the date the United States District Court of Delaware enters a final sale order following the Sale |

---

[1] CITGO Holding and CITGO Petroleum to dividend cash to PDVH for payment of PDVH creditors.

| | |
|---|---|
| | Hearing as defined in the Memorandum Order dated 12/31/24, able to be extended from time to time by up to 365 days at the election of the Issuer. Any extension is subject to a fee paid by the Issuer in additional Convertible Notes of (x) 0.25% of the committed amount after the first 90 days and (y) 0.50% after each subsequent 90 days, in each case, to be added to the initial principal amount of Convertible Notes when issued. |
| ████████ | ████████████████████ |
| **Interest:** | Interest on the Convertible Notes will accrue on the principal amount of the Convertible Notes from the date of Closing at a rate of [●]% per annum, payable in cash (such interest, "Cash Interest"), or at the option of the Issuer, may be deferred (such interest, "Deferred Interest"). For the avoidance of doubt, Deferred Interest shall not be interest-bearing but will be included in the accrued principal amount for purposes of calculating the Redemption Price. Interest will be paid semi-annually, in arrears and will be calculated on the basis of actual days elapsed in a 360-day year. |
| | Upon and during the occurrence of an Event of Default (as defined below), the interest rate will increase by 2.0%. |
| **Issue Price:** | 100.0% |
| **Redemption Price:** | The "Redemption Price" of each $1,000 of original principal amount of Convertible Notes shall be (x) if the IRR Amount is equal to or greater than MOIC Amount, the IRR Amount and (y) if the IRR Amount is less than the MOIC Amount, the MOIC Payment, plus, in each case of (x) and (y), without duplication, accrued and unpaid interest thereon (but not Deferred Interest), to, but not including the date of redemption. |
| | "IRR Amount" means a payment made at the date of redemption, in such an amount as to provide the holder of $1,000 original principal amount of Convertible Notes with an internal rate of return of [●]%, assuming that such holder had purchased the Convertible Notes at par on the Closing Date and received all Cash Interest payments on the Convertible Notes that were made prior to the date of |

| | |
|---|---|
| | redemption on the Convertible Notes at the dates on which such Cash Interest payments were made. |
| | "MOIC Amount" means, with respect to any Note, [●] times the original principal amount of such Note. |
| | "MOIC Payment" means, for each $1,000 of original principal amount of Convertible Notes, (x) the MOIC Amount of such Convertible Notes, minus (y) the amount of all Cash Interest previously paid with respect thereto. |
| | The Issuer will disclose to holders of the Convertible Notes a calculation of the IRR Amount at least annually. |
| **Mandatory Redemption:** | The Convertible Notes will be mandatorily redeemed by the Issuer at the Redemption Price per $1,000.00 original principal amount upon the occurrence of a Change of Control (to be defined in a manner customary for equity sponsor precedents, including a customary "Permitted Holders" definition), payable in cash. |
| **Issuer Optional Redemption Right:** | At any time, and from time to time, the Issuer may redeem all or any portion of the outstanding Convertible Notes at the Redemption Price per $1,000.00 original principal amount, payable in cash. |
| **Negative Covenants:** | The Issuer and its Restricted Subsidiaries shall not: <br><br> 1. purchase or redeem or pay any dividend, return or distribution on any equity interests of the Issuer except as otherwise allowed herein or as permitted by the Applicable Debt Document Exceptions (as defined below), unless (x) no Event of Default has occurred and is continuing and (y) on a pro forma basis, the Consolidated Total Net Leverage Ratio is less than 2.00:1.00; <br> 2. incur additional indebtedness for borrowed money other than (i) indebtedness for borrowed money such that, on a pro forma basis, the Consolidated Total Net Leverage Ratio of the Issuer and its Restricted Subsidiaries does not exceed 4.00:1.00; (ii) refinancing of existing indebtedness which does not increase the principal amount outstanding thereunder (other than with respect to fees, call premiums, discount and expenses in connection with such refinancing) and (iii) Indebtedness permitted under the Applicable Debt Document Exceptions (as defined below); <br> 3. enter into any transactions with affiliates other than |

4

(a) transactions among the Issuer and its Restricted Subsidiaries, (b) transactions in connection with agreements already in place on the Closing Date (including customary board fees), (c) transactions determined by the board of the Issuer in good faith to be on arm's length terms and (d) as may be permitted under the Applicable Debt Document Exceptions;

4. issue or dispose of any equity interests of Restricted Subsidiaries, in each case other than (i) in ordinary course of business, (ii) in connection with a bona-fide joint venture with a party that is not an affiliate of the Issuer or (iii) in the case of transactions by the borrower under the Applicable Debt Documents or its subsidiaries, a transaction in which the proceeds are applied in accordance with the "Limitation on Asset Sales" covenant of the Applicable Debt Documents.

"Applicable Debt Documents" means the agreements governing the most junior debt securities of CITGO Petroleum or CITGO Holding, in effect and as amended from time to time.

"Applicable Debt Document Exceptions" means the relevant exceptions and baskets contained in the Applicable Debt Documents, with an additional cushion of 15% with respect to dollar baskets or exceptions, 0.5x with respect to leverage ratio baskets or exceptions and 0.25x with respect to fixed charge ratio baskets or exceptions.

"Consolidated Total Net Leverage Ratio" means the ratio of (x) consolidated total indebtedness for borrowed money of the Issuer and its Restricted Subsidiaries (and any preferred equity of any Restricted Subsidiary that is not a guarantor of the Convertible Notes, other than preferred equity issued to the Issuer or any of its Subsidiaries), net of unrestricted cash, to (y) the consolidated EBITDA (to be defined in a manner to be mutually agreed,) of the Issuer and its Subsidiaries.

For the avoidance of doubt, unrestricted cash will include the aggregate amount of cash and cash equivalents (in each case, free and clear of all liens) of the Issuer and its subsidiaries, excluding cash and Cash Equivalents that are listed as "restricted" on the consolidated balance sheet of the Company and its Subsidiaries as of such date unless "restricted" in favor of the Convertible Notes or any Indebtedness not prohibited pursuant to the Convertible

| | |
|---|---|
| | Notes. |
| **Mandatory Conversion:** | Immediately upon completion of a Qualified IPO (a "Conversion Event"), each Note shall be automatically converted into a number of shares of the common equity of the Issuer (a direct or indirect subsidiary or parent thereof) issued in the Qualified IPO (the "IPO Common Equity") equal to the quotient obtained by dividing (i) the Redemption Price determined as of the date of the pricing of the Qualified IPO by (ii) the price per share at which the IPO Common Equity is first issued to the public in the Qualified IPO.

"Qualified IPO" means an underwritten firm-commitment initial public offering of the IPO Common Equity on a U.S. nationally recognized stock exchange, which is managed by an independent nationally recognized investment bank, and (i) with respect to which the implied minimum Pre-Conversion Equity (as defined) is not less than $1.0 billion and (ii) which results in gross proceeds of not less than $100.0 million in the aggregate.

"Pre-Conversion Equity" means total enterprise value of the Issuer minus consolidated total indebtedness for borrowed money of the Issuer and its Restricted Subsidiaries (net of unrestricted cash), as implied by the initial public offering. |
| **Forced Exit Right:** | Commencing on the sixth anniversary of the Closing Date, holders of not less than 2/3 of the aggregate principal amount of the outstanding Convertible Notes (the "Required Supermajority Holders") shall have a right to demand (each, a "Demand") that the Issuer engage in a process (the "Process") to effect a Qualified Exit IPO. For the avoidance of doubt, in the event that a Mandatory Redemption Event has occurred and the Required Supermajority Holders have elected to issue a Demand, then holders of Convertible Notes may not seek to enforce (the "Enforcement Suspension Period") the Mandatory Redemption Right during the pendency of the Process resulting from the issuance of such Demand.

Upon receipt of such Demand, the Issuer shall promptly engage in a comprehensive Process in good faith.

If the Issuer breaches such covenant or fails to consummate such Qualified IPO within 18 months after the date of such Demand and any Convertible Notes remain outstanding, then the Required Supermajority Holders shall have the right to (i) direct the Process and (ii) appoint additional directors to the Board or a committee thereof (in either case whose powers and authority shall be restricted to making determinations and |

6

| | taking actions in connection with the Process) so that directors appointed by the Required Supermajority Holders constitute a sufficient majority of directors on the Board (or the relevant subcommittee) to effectuate a Qualified IPO. |
|---|---|
| **Events of Default; Acceleration; Enforcement;** | "Event of Default" means (i) a failure to pay the principal amount of the Convertible Notes at the stated maturity thereof, (ii) a failure to pay interest on the Convertible Notes for period of 30 days after its due date (provided such interest is not Deferred Interest), (iii) a failure to make a payment at stated maturity or upon the acceleration of the stated maturity (which acceleration is not rescinded, or otherwise cured within 20 Business Days of receipt of notice of acceleration) for borrowed money of the Issuer or its Restricted Subsidiaries with an outstanding principal amount of $250.0 million or more ("Material Debt"), (iv) incurrence of alter ego liability at PDVH in excess of $250.0 million or more pursuant to a final, unappealable judgment, which liability has not been paid or otherwise discharged for a period of 90 days after incurrence, (v) any breach of the Negative Covenants (as defined above) that occurs and is continuing for a period of 90 days after notice thereof (with customary extension rights in the event capable of cure and good faith efforts being made to cure), and (vi) other customary Events of Default relating to insolvency and validity of security interests in the Collateral. |
| | The Convertible Notes may be declared due and payable immediately at the Total Value (as defined below) after the occurrence of an Event of Default. |
| | "Total Value" means the Redemption Price at the time of the relevant Event of Default plus the value of the mandatory conversion option at the time of the relevant Event of Default. |
| **Amendment:** | The consent of the holders of a majority in aggregate principal amount of Convertible Notes shall be required to amend or waive the terms of the Convertible Notes subject to customary provisions requiring the consent of all affected holders of Convertible Notes for amendments affecting the fundamental economic terms of the Convertible Notes and other customary sacred rights including release of guarantees or liens. |

| | |
|---|---|
| **Registration Rights:** | Holders of Convertible Notes shall be entitled to customary shelf and piggy-back registration rights with respect to the shares of IPO Common Equity issuable upon conversion of the Convertible Notes.<br><br>The registration rights agreement will provide that, with respect to the initial public offering of the Issuer, the underwriter cutback provisions with respect thereto will prioritize a primary offering of common equity by the Issuer (whether offered in an initial public offering or thereafter).<br><br>Holders of Convertible Notes will agree to be subject to customary lock-up agreements in connection with public offerings made by the Issuer (including 180 days in connection with an initial public offering and a customary duration in connection with other follow-on public offerings). |
| **Investors Agreement:** | An Investors Agreement will provide for customary tag-along and drag-along rights as well as quarterly and annual reporting that is consistent with the quarterly and annual reporting in the Applicable Debt Documents. |
| **Transfer Restrictions:** | Holders of Convertible Notes may only transfer Convertible Notes (or the shares of IPO Common Equity issuable upon conversion thereof) in accordance with applicable securities laws to persons other than (i) a person on a specified list of disqualified investors and (ii) a person that is a competitor of the Issuer or an affiliate of such competitor. Any transferee of Convertible Notes shall be required as a condition to such transfer to enter into a joinder agreement becoming a party to the Investors Agreement, |
| **Tax Structure:** | The parties shall work together to structure the transaction in a tax-efficient manner that avoids or mitigates adverse tax consequences for the parties. The Convertible Notes will be treated as equity for tax purposes.<br><br>The Issuer will be a U.S. entity. |
| **Private Placement:** | The Convertible Notes will be offered as a private placement under Section 4(a)(2) under the Securities Act of 1933. |
| **Governing Law:** | New York law. |

**EXHIBIT C**

<u>CONDITIONS</u>

The commitments of Investor under the Convertible Notes Commitment Letter with respect to the purchase of the Convertible Notes on the Closing Date shall be subject only to the satisfaction (or waiver by Investor) of the following conditions.  Capitalized terms used but not otherwise defined herein have the meanings assigned to such terms in the Convertible Notes Commitment Letter to which this <u>Exhibit C</u> is attached or in <u>Exhibits A</u> or <u>B</u> (including the Annexes thereto) attached thereto, as applicable.  In the case of any such capitalized term that is subject to multiple and differing definitions, the appropriate meaning thereof in this <u>Exhibit C</u> shall be determined by reference to the context in which it is used.

1.  Prior to, substantially concurrently with or immediately after the issuance and sale of the Convertible Notes on the Closing Date, the Claims Contribution, the Existing Notes Refinancing and the PDVSA Notes Transaction shall have been (or shall be) consummated.

2.  Prior to, substantially concurrently with or immediately after the issuance and sale of the Convertible Notes on the Closing Date, the Senior Debt Financing shall have been consummated in all material respects as set forth in <u>Exhibit A</u> after giving effect to any modifications, amendments, supplements, consents, waivers or requests thereunder.

3.  On the Closing Date, the Issuer shall have executed and delivered the Convertible Notes Documentation (which shall include, without limitation, a notes purchase agreement, an indenture and constituent documents, and which shall be consistent with the terms and conditions of this Convertible Notes Commitment Letter), and Investor shall have received (in each case, subject to the Limited Conditionality Provision):

    (a)  customary officer's certificates with respect to the Issuer on the Closing Date in form and substance customary for investments of this type, good standing certificates (or local equivalent) from the jurisdiction of organization of the Issuer dated as of a recent date, customary evidence of authority and customary legal opinions from counsel to the Issuer that are usual and customary for investments of this type; and

    (b)  a solvency certificate from the chief financial officer (or other officer with reasonably equivalent responsibilities) of the Issuer substantially in the form attached hereto as <u>Annex I</u> or at the sole option of the Issuer, a third party opinion as to the solvency of the Issuer issued by a national recognized firm;

4.  Prior to, substantially concurrently with or immediately after the issuance and sale of the Convertible Notes on the Closing Date, the Acquisition shall be consummated in all material respects in accordance with the terms of  the Acquisition Agreement but without giving effect to any amendments, waivers or consents by you or your applicable affiliate that are materially adverse to the interests of Investor, in their respective capacities as such, without the consent of Investor, such consent not to be unreasonably withheld, delayed or conditioned (<u>provided</u> that the Initial Investor shall be deemed to have consented to any such amendment, consent or waiver unless it shall object in writing thereto within two business days of being notified in writing (for which electronic mail shall suffice) of any such proposed amendment, consent or waiver; <u>provided</u>, <u>further</u>, that (i) any decrease in the purchase price of the Acquisition shall not be materially adverse to the interests of Investor so long as such decrease is allocated 100% to reduce the commitments in respect of the

Convertible Notes or the Bridge Facility, (ii) any increase in the purchase price of the Acquisition shall not be materially adverse to Investor so long as such increase is funded by common equity, Convertible Notes (so long as the aggregate initial liquidation preference of Convertible Notes does not exceed $2.0 billion) or cash on hand of the Issuer and its subsidiaries and (iii) any modification to the definition of "Company Material Adverse Effect" shall be deemed materially adverse). It is agreed and understood that no purchase price, working capital or similar adjustment provisions set forth in the Acquisition Agreement shall constitute a reduction or increase in purchase price (or otherwise constitute a waiver, amendment or modification to the Acquisition Agreement) for purposes of this paragraph 4.

5. The Specified Representations shall be true and correct in all material respects as of the Closing Date (unless such Specified Representations relate to an earlier date, in which case such Specified Representations shall be true and correct in all material respects as of such earlier date). As used herein, the "Specified Representations" shall mean the representations and warranties set forth in the Convertible Notes Documentation relating to: organizational existence; organizational power and authority (as it relates to due authorization, execution and delivery of the Convertible Notes Documentation); due authorization, execution and delivery of the Convertible Notes Documentation, and enforceability, in each case, as it relates to entering into and performance under the Convertible Notes Documentation; solvency on the Closing Date (after giving effect to the Transactions) of the Issuer and its subsidiaries taken as a whole (determined consistent with the solvency certificate delivered pursuant to the terms of this letter); no conflicts of the Convertible Notes Documentation with charter documents; Federal Reserve margin regulations; the Investment Company Act; the PATRIOT Act, OFAC regulations or the FCPA; capitalization of the Issuer (including that the Convertible Notes have been duly authorized, are validly issued and are enforceable (subject to customary exceptions), and will vest in Investor good title, free and clear of all liens (other than restrictions under applicable securities laws and under the Convertible Notes Documentation)); the shares issuable upon conversion of the Convertible Notes have been duly authorized and, when issued in accordance with the Convertible Notes Documentation, will be validly issued, fully paid and non-assessable.

6. The Special Master shall have filed with the District Court the Notice of Successful Bidder (as defined in the Sale Procedures Order) identifying the Acquisition as the Successful Bid (as defined in the Sale Procedures Order) and attaching the Acquisition Agreement to such Notice of Successful Bidder. A Sale Hearing (as defined in the Sale Procedures Order) shall have occurred with respect to such Notice of Successful Bidder, and the District Court shall have approved the Acquisition (the "Confirmation Order").

7. All fees and expenses required to be paid on the Closing Date pursuant to the Convertible Notes Commitment Letter, in the case of expenses to the extent invoiced at least three business days prior to the Closing Date, shall be paid prior to, substantially concurrently with or immediately after the issuance and sale of the Convertible Notes.

8. Investor shall have received at least three business days prior to the Closing Date (x) all documentation and other information about the Issuer required by regulatory authorities under applicable "know your customer" and anti-money laundering rules and regulations, including, without limitation, the PATRIOT Act, that has been reasonably requested by the Initial Investor at least ten business days in advance of the Closing Date and (y) with respect to the Issuer, to the extent that it qualifies as a "legal entity customer" under the Beneficial Ownership Regulation, a certification regarding beneficial ownership as required by the Beneficial Ownership Regulation to the extent requested in writing by the Initial Investor at least 10 business days prior to the Closing Date.

**ANNEX I TO EXHIBIT C**

FORM OF SOLVENCY CERTIFICATE

[●], 20[●]

       This Solvency Certificate is being executed and delivered pursuant to Section [●] of that certain [●](as amended, restated, amended and restated, extended, supplemented or otherwise modified from time to time, the "<u>Purchase Agreement</u>"; the terms defined therein being used herein as therein defined).

       I, [●], the **[Chief Financial Officer/financial officer]** of the Issuer, in such capacity and not in an individual capacity, hereby certify that as of the date hereof, after giving effect to the Transactions and the incurrence of the indebtedness and obligations being incurred in connection with the Bank Facilities Credit Agreement and the Transactions:

(i)      the sum of the debt (including contingent liabilities) of the Issuer and its Subsidiaries, taken as a whole, does not exceed the fair value of the assets of the Issuer and its Subsidiaries, taken as a whole;

(ii)     the present fair saleable value of the assets of the Issuer and its Subsidiaries, taken as a whole, is not less than the amount that will be required to pay the probable liabilities of the Issuer and its Subsidiaries, taken as a whole, on their debts as they become absolute and matured;

(iii)    the Issuer and its Subsidiaries, taken as a whole, are able to pay their debts and liabilities, subordinated, contingent or otherwise, as such liabilities become absolute and matured in the ordinary course of business; and

(iv)    the capital of the Issuer and its Subsidiaries, taken as a whole, is not unreasonably small in relation to the business of the Issuer and its Subsidiaries, taken as a whole, contemplated as of the date hereof.

       For the purposes hereof, the amount of any contingent liability at any time shall be computed as the amount that, in light of all of the facts and circumstances existing at such time, represents the amount that can reasonably be expected to become an actual or matured liability.

*[Remainder of page intentionally left blank]*

IN WITNESS WHEREOF, I have executed this Solvency Certificate in my capacity as **[Chief Financial Officer/financial officer]** of the Issuer, on behalf of the Issuer, and not individually, as of the date first written above.

By: _____

Name:  [●]

Title:   **[Chief Financial Officer/financial officer]**

## **Exhibit F**

**Final Bid Letter Submitted by the Stalking Horse**

**Contrarian Capital Management, L.L.C.**
**("Contrarian")**
411 West Putnam Avenue,
Suite 425
Greenwich, CT 06830

March 20, 2025

Evercore Group LLC
55 East 52nd Street
New York, NY 10055

Via email to:
Ray Strong (ray.strong@evercore.com)
William Hiltz (hiltz@evercore.com)

With a copy to:
Michael J. Aiello (michael.aiello@weil.com)
Matt Barr (matt.barr@weil.com)
Eoghan P. Keenan (eoghan.keenan@weil.com)

RE: Equity Interests in PDV Holding, Inc. ("**PDVH**") – Amended and Restated Bid Letter

Ladies & Gentlemen:

Red Tree Investments, LLC ("**Red Tree**" or "**we**") are pleased to present this revised proposal to acquire all of the shares of PDVH (such proposal, the "**Credit Bid**" and such proposed transaction, the "**Proposed Transaction**") in response to your letter dated February 10, 2025 (the "**Stalking Horse Bid Instruction Letter**"). Capitalized terms used but not defined herein have the meanings set forth in the Stalking Horse Bid Instruction Letter or, if not therein, in the SPA (defined below). The Proposed Transaction, if consummated, would satisfy all PDVH judgment creditors into Red Tree and would also satisfy the PDVSA 2020 Notes (as defined below). This bid letter amends and restates in its entirety and is intended to replace the bid letter submitted by Red Tree on March 7, 2025.

Our financing package includes a very high degree of execution certainty. As you will see from the draft commitment papers provided herewith (collectively, the "**Commitment Letter**"), JPMorgan Chase Bank, N.A. ("**JPMorgan**") and Wells Fargo Bank N.A. and Wells Fargo Securities, LLC (collectively "**Wells Fargo**") (as arrangers) are committed to provide (i) a $1.25 billion asset-based revolving loan facility (the "**New CITGO Petroleum ABL**"), (ii) up to a $2.545 billion secured term bridge financing (the "**New CITGO Petroleum Bridge Facility**") and (iii) a $1.1 billion backstop facility (the "**CITGO Petroleum Backstop Facility**") in case a refinancing of the $1.1 billion aggregate principal amount of 8.375% Senior Secured Notes due 2029 of CITGO Petroleum Corp. ("**CITGO Petroleum**") becomes necessary, in each case, with CITGO Petroleum as borrower. Pursuant to a Commitment Letter, dated March 17, 2025 (the "**Convertible Notes Commitment Letter**"), Contrarian Funds L.L.C. has committed to purchase $150 million aggregate principal amount of new secured convertible notes

(the "**Convertible Notes**") issued by the acquisition company to be formed to be the ultimate parent of PDVH (the "**Buyer)**. As discussed previously, we intend that the Commitment Letter will be signed by JPMorgan and Wells Fargo if this Credit Bid is named the stalking horse bid.

In addition, under an executed Transaction Support Agreement (the "**PDVSA 2020 Notes TSA**"), dated as of March 20, 2025, we have commitments from an ad hoc group of holders representing a substantial majority ("**Committed PDVSA 2020 Note Holders**") of the 8.5% notes due 2020 (the "**PDVSA 2020 Notes**") of Petróleos de Venezuela, S.A., a Venezuelan company, to provide the requisite consents to cause the Proposed Transaction to be permitted by the indenture governing the PDVSA 2020 Notes and to cause all of the security interests in the equity of CITGO Holding, Inc. ("**CITGO Holding**") that secure the PDVSA 2020 Notes to be released and terminated in full. The PDVSA 2020 Notes TSA further provides for an exchange of the PDVSA 2020 Notes, which PDVSA 2020 Notes will become the property of subsidiaries of the Buyer. A certification of counsel executed by counsel to the Committed PDVSA 2020 Note Holders (attached as <u>Exhibit C</u> hereto) evidences its agreement.[1]

This Credit Bid is subject to the terms, conditions, and assumptions contained herein, the representations, warranties and other terms contained in the Agreed Form Stock Purchase Agreement attached hereto as <u>Exhibit A</u> (the "**SPA**"), execution of definitive documentation with respect to the Proposed Transaction (collectively, the "**Definitive Documentation**"), entry into definitive commitment letters for our contemplated debt and junior capital financing, fulfillment of all closing conditions (including applicable regulatory approvals), and approval by the Delaware Court pursuant to a final order.

This letter and the terms, conditions, and assumptions herein and in the exhibits attached hereto (together, the "**Proposal**") are intended to be supplemented by those set forth in the Definitive Documentation, when and if executed, which are to be mutually agreed. All financial figures set forth herein are represented in U.S. dollars.

This Credit Bid is being set forth on the terms summarized below:

A. <u>Proposed Transaction Structure; Purchase Price and Principal Economic Terms</u>. Subject to the terms and the conditions described above, the Credit Bid contemplates a transaction under which:

    1. The Buyer would acquire 100% of the equity of PDVH in exchange for an aggregate purchase price, on a cash- and debt-free basis, of $3.698 billion to $5.198 billion, based on March 20, 2025 claim amounts and assuming a December 31, 2025 Closing Date. Together with the $2.906 billion of acquired PDVSA 2020 Notes claims as of December 31, 2025, the total purchase price to stakeholders in PDVH and its subsidiaries is $6.605 billion to $8.104 billion.

    2. In connection with the Credit Bid, Red Tree has agreed to exchange $319.0 million (representing the accrued claim through March 20, 2025) of its Attached Judgments in exchange for equity in the Buyer and Convertible Notes, as described further herein.

---

[1] Red Tree is available to discuss the terms of the PDVSA 2020 TSA further with the Special Master and his advisors.

3. As described in more detail in the PDVH Claims Sources and Uses attached hereto as
Exhibit B, the Credit Bid provides sufficient cash to pay in full all Transaction
Expenses and comply with the "Cash Requirements" set forth in the Sales Procedures
Order to provide for the satisfaction of the claims of Additional Judgment Creditors
with a conditional writ of attachment senior to Red Tree, as described below:

| # | Creditor | Judgment Amount ($MM) | Form of Consideration |
|---|----------|----------------------|----------------------|
| 1 | Crystallex | $1,006.4 | Cash |
| 2 | Tidewater | 76.9 | Cash |
| 3 | ConocoPhillips | 1,371.7 | Cash |
| 4 | Oi | 667.1 | Cash |
| 5 | Huntington Ingalls[2] | 139.1 | Junior Capital |
| 6 | ACL 1 | 118.7 | Cash |
| 7 | Red Tree | 319.0 | Junior Capital |
| **Total Consideration for PDVH Shares** | | **$3,699.0** | |

4. Red Tree is offering additional consideration to Additional Judgment Creditors junior
to Red Tree in accordance with the claims waterfall, consisting of additional
Convertible Notes, contingent value rights based on the financial performance of
CITGO Petroleum (both before and after the Closing Date), new common equity and
common equity warrants of the Buyer. Red Tree believes the consideration offered has
a value of $1.5 billion or greater, depending on the financial performance of CITGO
Petroleum.

5. Red Tree has executed the PDVSA 2020 Notes TSA with the Committed PDVSA 2020
Noteholders, which will, through the transactions contemplated by the PDVSA 2020
Notes TSA, satisfy the totality of claims with respect to the PDVSA 2020 Notes and
permit the Proposed Transaction.

6. As described in Exhibit B hereto, to finance the Proposed Transaction, the Buyer will
issue Convertible Notes (in addition to common equity) and CITGO Holding will issue
new secured notes, in respect of various rolled claims, including the Red Tree claims
and the PDVSA 2020 Notes.

7. The net cash proceeds from the sale of $150 million aggregate principal amount of
Convertible Notes to Contrarian Funds will be contributed through the various
subsidiaries of PDVH to CITGO Petroleum.

8. The Credit Bid assumes that existing cash on hand would be (or has been) utilized to
satisfy the following existing indebtedness of CITGO Petroleum: (i) $1.125 billion

---

[2]    The claims of Huntington Ingalls are being included in the Credit Bid pursuant to a Commitment Letter,
dated as of March 16, 2025. Red Tree will use commercially reasonable efforts to cause the parties thereto to amend
the Commitment Letter to include the Special Master as an intended third-party beneficiary of the Commitment
Letter.

aggregate principal amount of 7.00% Senior Secured Notes due 2025 at par, (ii) $50 million aggregate principal amount of Industrial Revenue Bonds due 2025 at par and (iii) $650 million aggregate principal amount of 6.375% Senior Secured Notes due 2026 at an optional redemption price equal to 101.594% of their principal amount.

9.  As provided in the SPA, we would wish CITGO Petroleum to conduct a consent solicitation with respect to its $1.1 billion aggregate principal amount of existing 2029 Notes to permit the Proposed Transaction. In the event that such consent solicitation is not successful, we have obtained $1.1 billion of term financing commitments from JPMorgan and Wells Fargo under the CITGO Petroleum Backstop Facility to cover the repayment of the principal amount of the existing 2029 Notes. The CITGO Petroleum Backstop Facility will consist of $1.1 billion of additional 364-day term loans that are identical to those borrowed under the New CITGO Petroleum Bridge Facility. Any call premium or consent fee with respect to the 2029 Notes would be paid from proceeds of borrowings under the New CITGO Petroleum ABL.

10. We would expect the $55 million aggregate principal amount of existing Industrial Revenue Bonds due 2028 and 2032 of CITGO Petroleum would remain outstanding after the Proposed Transaction. The net cash proceeds of the Convertible Notes, plus a portion of the cash that would have otherwise been used to satisfy such indebtedness will remain on the balance sheet to achieve a Closing Date target of $1.0 billion of cash.

11. To provide further ongoing liquidity and working capital resources and to help cover any variances in the closing cash balances, CITGO Petroleum would replace its existing $500 million accounts receivable securitization facility with the $1.25 billion New CITGO Petroleum ABL, a portion of which may be drawn on the Closing Date to provide flexibility for the closing of the Proposed Transaction.

12. CITGO Petroleum would incur up to $2.545 billion under the 364-day New CITGO Petroleum Bridge Facility (which would rank pari passu in lien priority with the existing secured notes of CITGO Petroleum). Together with borrowings under the New CITGO Petroleum ABL and cash on hand, the net cash proceeds of the New CITGO Petroleum Bridge Facility will be used to satisfy all PDVH claims senior to Red Tree's claims.

13. Attached as Exhibit B to this Proposal is a summary of the sources and uses and the pro forma capitalization of the Buyer and its subsidiaries.

B.  <u>Stock Purchase Agreement</u>.  A modified SPA, clean and redlined against the original Proposed SPA, is attached to this Proposal as Exhibit A. The reduced expense reimbursement and break fee provisions in the modified SPA reflect amounts that are designed to cover the fees and expenses of third-party advisors and banking partners to the Buyer during the Topping Period

(as defined in the SPA) and are not expected to provide any compensation to the Buyer beyond such expenses and fees.

C. <u>Identity of Buyer</u>.

The Proposed Transaction would be consummated by one or more special purpose vehicles created for the Proposed Transaction and owned directly or indirectly by Red Tree (or its respective affiliates) and managed by Contrarian.

Founded in 1995, Contrarian is a credit and special situations investment firm headquartered in Greenwich, CT. Contrarian has approximately $4 billion in assets under management and employs over 50 professionals across offices in Greenwich, Connecticut, London, and Hong Kong. The Contrarian team has a particular expertise investing in restructurings, private securities and emerging markets, while maintaining a keen focus on capital preservation. Approximately 80% of the investors in Contrarian are U.S. persons.

Red Tree is an indirect subsidiary of Contrarian Funds, LLC, an affiliate of Contrarian Capital Management, LLC.

D. <u>Purchase Price and Principal Economic Terms</u>.  As discussed in more detail above, the Buyer would acquire 100% of the equity of PDVH in exchange for an aggregate purchase price, on a cash- and debt-free basis, of $3.699 billion to $5.198 billion, based on March 20, 2025 claim amounts and a December 31, 2025 Closing Date.  Together with the $2.906 billion of released PDVSA 2020 Notes claims as of December 31, 2025, the total purchase price to stakeholders in PDVH and its subsidiaries is $6.605 billion to $8.104 billion.

E. <u>Sources of Financing</u>. Red Tree has a Commitment Letter from JPMorgan and Wells Fargo regarding the New CITGO Petroleum ABL and the New CITGO Petroleum Bridge Facility to finance the Proposed Transaction.  A substantially final draft of the Commitment Letter is attached hereto as <u>Exhibit D</u>.  A copy of the executed Convertible Notes Commitment Letter is attached hereto as <u>Exhibit E</u>.

F. <u>Credit Bid</u>. We believe this Proposal meets the seller objectives of significant up-front cash distribution, ensuring certainty with regard to a resolution of the PDVSA 2020 Note Judgment and repayment of Additional Judgment Creditors in accordance with the rules of priority set out by the Delaware Court. Further, it ensures that CITGO Holding and its subsidiaries can focus on continuing to build upon a legacy of strong operating performance.  Red Tree hereby certifies that the amount of its claim was approximately $319.0 million as of March 20, 2025 and expects to include that amount of claim in the Credit Bid.

G. <u>Good Faith Deposit</u>.  Pursuant to the Court's February 24, 2025 *Memorandum Order* [D.I. 1571], Red Tree is prepared to make a good faith deposit pursuant to the Sales Procedures Order [D.I. 481] upon the Court's approval of the executed SPA.

H. <u>Purchaser Approvals</u>.  Red Tree has all required internal approvals associated with this Proposal and consummation of the Proposed Transaction on the terms set forth herein.  We

will make, in a timely manner, after being named stalking horse, (1) all filings and disclosures necessary to comply with the regulations of the Office of Foreign Assets Control ("**OFAC**"), (2) all necessary filings under the Hart-Scott Rodino Antitrust Improvements Act of 1976, as amended (the "**HSR Act**") and (3) all necessary filings in connection with any review by the Committee on Foreign Investment in the United States ("**CFIUS**"). Our Proposal is reasonably likely to be consummated, after taking into consideration antitrust and other regulatory matters, our prior experience and other relevant considerations, if our Proposal is selected as the Successful Bid, within a timeframe acceptable to the Special Master. Because approximately 80% of Contrarian's investors are U.S. persons, we expect to be able to obtain all applicable regulatory approvals, including under the regulations of OFAC and the HSR Act and approvals by CFIUS.

I.   <u>Due Diligence Requirements</u>.  We have conducted and completed an extensive due diligence review of the information which has been made available to us since the commencement of the Marketing Process, and have incurred significant expenses in the process, including retaining the advisors described below in Part J.

J.   <u>Advisors</u>.  We have been working with MoloLamken LLP and Milbank LLP as legal advisors, in addition to JPMorgan and Wells Fargo in connection with the arrangement of anticipated debt and junior capital financing as noted above. In connection with our diligence process, we have also engaged Ernst & Young, McKinsey & Company, Lummus Consultants, Downstream Advisors, DSS Consultants. We have also retained Wells Fargo and Morgan Stanley & Co, LLC as financial advisors. We have retained Peter Harrell of Peter Harrell LLC, a former State Department and White House official, to handle OFAC licensing matters. While we do not currently anticipate that our bid would be subject to CFIUS review, we plan to retain the law firm of Jacobson, Burton Kelley, PLLC, should any CFIUS filings be required.

K.   <u>Contacts.</u> Please contact any of the individuals listed below if you have any questions or require any clarifications with regard to this Proposal. We are also able to provide copies of other documentation and information that may be required in order to assist you in evaluating our proposal.

| | |
|---|---|
| Jennifer Diagonale | Michael Ring |
| Contrarian Capital Management, L.L.C. | Contrarian Capital Management, L.L.C. for |
| 411 West Putnam Avenue, Suite 425, | Red Tree Investments, LLC |
| Greenwich, CT 06830 | 411 West Putnam Avenue, Suite 425, |
| Phone: (203) 862-8200 | Greenwich, CT 06830 |
| | Phone: (203) 862-8200 |

L.   <u>Special Master Consent</u>.  We understand that the Proposed Transaction is subject to procedures approved by the Delaware Court and the discretion afforded to the Special Master. We hereby consent for the Special Master, in his discretion, to share information regarding this Proposal with U.S. Government regulators, including the OFAC, and are aware that the transactions themselves are subject to the Delaware Court's approval.

M.   <u>Cooperation</u>.  We agree that (i) our advisors will coordinate in good faith with the Special Master's advisors to discuss and explain our regulatory and other consent analysis, strategy

and timeline for securing all such approvals and consents as soon as reasonably practicable; and (ii) we will cooperate with the Special Master to provide pertinent factual information regarding our ownership and operations reasonably required to respond to, or otherwise analyze issues arising with respect to, U.S. sanctions laws and regulations, CFIUS, any applicable antitrust laws and other relevant regulatory requirements or requests.

N.  <u>No Entitlement to Reimbursement</u>.  This Proposal neither entitles us to receive, nor obligates us to pay, any break-up fee, termination fee, expense reimbursement or similar type of payment or reimbursement; provided, however, the definitive SPA would include a termination fee and an expense reimbursement to the full extent provided for in the January Order.

O.  <u>No Liability</u>.  We agree that (i) in no circumstance shall the Special Master or his advisors be personally or otherwise liable for any amounts or obligations owed to us, (ii) the Special Master and his advisors are acting as an arm of the Court and are entitled to judicial immunity in the performance of their duties and (iii) PDVH, CITGO and their respective officers, directors and advisors will have no liability or obligation to us or our affiliates with respect to the Proposed Transaction, except and only to the extent it is expressly provided for in the definitive SPA if, as and when executed.

P.  <u>Representations and Warranties</u>.  Red Tree hereby represents and warrants that:

1.  We recognize and acknowledge that the Special Master, his advisors, PDVH, CITGO and their respective representatives make no representations, covenants or warranties (or any other promise) as to the accuracy or completeness of any information provided in the data room or otherwise made available by the Special Master and his advisors in connection with the bid process;

2.  Other than with respect to our reliance on the representations and warranties provided in the definitive SPA if, as and when executed, we have relied solely upon our own independent review, investigation and/or inspection of any relevant documents regarding the assets to be purchased and did not rely on any written or oral statements, representations, promises, warranties or guaranties whatsoever, whether express or implied, by operation of law or otherwise, regarding PDVH and its subsidiaries or the completeness of any information made available in connection therewith;

3.  We have not engaged in any collusion with respect to the submission of the Proposal; and

4.  All proof of financial ability to consummate the Proposed Transaction in a timely manner and other information that, in either case, we may provide, is true and correct to the best of our knowledge.

Q.  <u>Bidding Procedures</u>.  We agree to be bound by the terms and conditions of the Bidding Procedures set out in the Sale Procedures Order.

We are highly enthusiastic about this opportunity and we remain at your disposal to answer any questions you may have. We look forward to continuing discussions with you in relation to the Proposed Transaction.


Yours faithfully,


**Red Tree Investment, LLC**

By: _Michael Ring_
    Name: Michael Ring
    Title:  Manager

Signature Page to Bid Letter