## Exhibit A

**Other Bid Materials Submitted by Bidder A**



March 7, 2025

**Via E-Mail**

**Evercore Group L.L.C.**
2 Houston Center
909 Fannin Street, Suite 1800
Houston, TX 77010

**Attention: Ray Strong & William Hiltz**
Ray.strong@evercore.com
hiltz@evercore.com

**cc: Weil, Gotshal & Manges LLP**
767 Fifth Avenue
New York, NY 10153-0119

**Attention: Matt Barr, Eoghan P. Keenan, and Chase Bentley**
matt.barr@weil.com
eoghan.keenan@weil.com
chase.bentley@weil.com

Dear Sirs:

**RE: STALKING HORSE PROPOSAL FOR PURCHASE OF 100% SHARES OF PDV HOLDING INC. ("PDVH")**

This letter sets out the terms of a definitive and binding proposal (the "**Proposal**") by ███████ ███████ ("███████████████" or the "**Purchaser**"), a wholly-owned subsidiary of ██████████████████ [1] ("██████████████"), to purchase 100% of the common shares of PDVH for a net purchase price of **$7.081 billion** ("**Net Purchase Price**").[2]  The Proposal is supported by Attached Judgment Holders ██████████████████ ("█████ and ███████████ ███████ and ██████████████████████████████ ("

---

[1] ██████████████████████████████████████████████████████████████████████████████████████████████████████████████████████.

[2] The Net Purchase Price is net of the Advanced Transaction Expenses, Closing Transaction Expenses and the Expense Reserve Holdback Amount, as those terms are defined in the SPA.

**Strictly Confidential Pursuant to Confidentiality Agreement**

## Summary of the Proposal

- The Net Purchase Price will fully satisfy, in cash delivered at Closing of the Sale Transaction in the amount of **$3.925 billion**, the Attached Judgments of the following Attached Judgment Holders, listed in the priority order established by the Court: Crystallex International Corp. ("**Crystallex**"); Tidewater Investment SRL and Tidewater Caribe S.A. (collectively, "**Tidewater**"); ConocoPhillips Gulf Paria B.V., et al (Judgments #1 and #2) (collectively, "**ConocoPhillips**"); OI European Group B.V. ("**OIEG**"); Northrop Grumman Ship Systems, Inc./Huntington Ingalls ("**Huntington Ingalls**"); ACLI Investments Ltd., ACL2 Investments Ltd., and LDO (Cayman) XVIII Ltd. (collectively, "**ACL1**"); and Red Tree Investments, LLC ("**Red Tree**").

- The Net Purchase Price will also satisfy, through the exchange of equity securities of ▮▮▮▮▮▮ a further **$3.156 billion** in Attached Judgments as follows: the Attached Judgment of ▮▮▮▮▮ in full, the Attached Judgment of ▮▮▮▮ in full, and the Attached Judgment of ▮▮▮▮▮▮ in full excluding ▮▮▮▮▮.

- The Proposal is supported by a package of debt financing totaling **$4.5 billion**, of which 50% (**$2.25 billion)** is fully committed, as evidenced by the annexed Commitment Letter from ▮▮▮▮▮▮▮▮▮▮▮. ("▮▮▮▮▮▮"). The remainder (**$2.25 billion**) is supported by the annexed Highly Confident Letter ("HCL") from ▮▮▮▮▮, which provides a detailed description of the funds that ▮▮▮▮▮ is highly confident it can raise to finance the Proposed Transaction as lead arranger and lead book manager.

- No purchase price adjustments, "lock box," "leakage" or similar constructs are included in the Net Purchase Price.

- No portion of the Net Purchase Price is payable to an escrow or trust, whether in respect of the PDVSA 2020 Bonds, the Alter Ego Claims, or otherwise.

- The Proposal does not include any "earn-out" or deferred purchase price concepts.

- The Proposal does not include any requirements, and is not subject to any closing condition precedent, related to the PDVSA 2020 Notes or the Alter Ego Claims.

- The details of how the Net Purchase Price will satisfy the Attached Judgments at Closing is set out in the below chart:

**Strictly Confidential Pursuant to Confidentiality Agreement**

| | | | | Cash Paid at |
|---|---|---|---|---|
| # | Holder: | Value ($mm)[3] | Consideration | Closing ($mm) |
| 1 | Crystallex | $1,025 | Cash | $1,025 |
| 2 | Tidewater #1 | $80 | Cash | $80 |
| 3 | Tidewater #2 | $3 | Cash | $3 |
| 4 | Conoco Phillips (#1) | $1,444 | Cash | $1,444 |
| 5 | OIEG | $695 | Cash | $695 |
| 6 | Huntington Ingalls | $140 | Cash | $140 |
| 7 | ACLI | $119 | Cash | $119 |
| 8 | Red Tree #1 | $232 | Cash | $232 |
| 9 | Red Tree #2 | $135 | Cash | $135 |
| 10 | Red Tree #3 | $3 | Cash | $3 |
| 11 | Rusoro | $1,584 | ▮▮▮ Securities | -- |
| 12 | Conoco Phillips (#2) | $49 | Cash | $49 |
| 13 | Koch | $473 | ▮▮▮ Securities | -- |
| 14 | Gold Reserve | $1,099 | ▮▮▮ Securities | -- |
| | **Total** | **$7,081** | | **$3,925** |

Table title (spanning header): Attached Judgments as at December 31, 2026 Projected Closing Date

- The Proposal also includes a mechanism whereby, if the Proposal is selected as the Stalking Horse Bid, and approved by the Court, junior creditors can have the option of participating in the bid by receiving warrants in ▮▮▮▮▮ in exchange for contributing a portion of their Attached Judgments to the bid and therefore the Net Purchase Price. Attached hereto at Annex 1 is a form of Warrants to Purchase Common Shares of ▮▮▮▮▮ Ltd.[4]

The Proposal is submitted pursuant to the stalking horse bid instruction letter sent by Ray Strong on behalf of Robert B. Pincus, Special Master (the "**Special Master**") for the United States District Court for the District of Delaware (the "**Court**"), dated February 10, 2025 (the "**Stalking Horse**

---

[3] The value of the Attached Judgments is calculated through a projected closing date of December 31, 2026, using the calculation methodology previously used by the Special Master to calculate the values of the Attached Judgments through December 31, 2024.

[4] The purpose of this mechanism is to create broad consensus and support among the Attached Judgment Creditors of PDVSA for Court approval of the Proposal following acceptance and recommendation by the Special Master. The Purchaser intends to work cooperatively with the Special Master to communicate this mechanism to junior creditors in a way that does not disturb the competitive bid process.

**Strictly Confidential Pursuant to Confidentiality Agreement**

**Bid Instruction Letter**"),[5] and the *Sixth Revised Proposed Order (A) Establishing Sale and Bidding Procedures, (B) Approving Special Master's Report and Recommendation Regarding Proposed Sale Procedures Order, (C) Affirming Retention of Evercore as Investment Banker by Special Master and (D) Regarding Related Matters* (D.I. 481) (as amended, modified, supplemented, or superseded, the "**Sale Procedures Order**") dated October 4, 2022, in the case of *Crystallex International Corporation v. Bolivarian Republic of Venezuela*, No. 17 Misc. 151 (D. Del) (the "**Crystallex Case**").

Capitalized terms used herein and not otherwise defined have the meanings given to them in the Stalking Horse Bid Instruction Letter and Sale Procedures Order.

### A. <u>Proposed Transaction Structure</u>

The Proposal is for the purchase of 100% of the common shares of PDVH, sold free and clear of all claims, encumbrances, and liabilities on or against the shares, in accordance with the terms of the Sale Procedures Order and subject to the qualifications referenced in Paragraphs A.iv. and F. below.

As directed in the Stalking Horse Bid Instruction Letter, the Proposal is based on the following key assumptions and notes:

i.   <u>Purchase Price; No Adjustments</u>.  The net purchase price for the shares of PDVH is $7.081 billion.  This is a fixed dollar amount.  No purchase price adjustments, "lock box," "leakage" or similar constructs are included in the purchase price.  The Proposal is made in reliance on the Purchaser receiving protection through the interim operating covenants set forth in the SPA, under which PDVH/CITGO will be operated in the ordinary course of business during the period between approval of the Proposal by the Court in the Final Sale Order and Closing.

ii.  <u>No Escrows</u>:  No portion of the purchase price is payable to an escrow.

iii. <u>No "Earn-Out" Payment or Deferred Purchase Price</u>: The Proposal does not include any "earn-out" or deferred purchase price concepts.

iv.  <u>No Trust/Escrow Constructs regarding PDVSA 2020 Bonds Share Pledge</u>.  The Proposal does not include any trust/escrow constructs or similar revisions regarding the PDVSA 2020 Notes and does not include any requirement or closing condition precedent related to the PDVSA 2020 Notes.

v.   <u>No Stand-Alone Closing Conditions relating to Alter Ego Claims</u>: The Proposal and Proposed SPA (defined below) do not include any stand-alone closing conditions relating

---

[5] To the extent that the Stalking Horse Bid Instruction Letter contains terms or conditions that are in variance with, or conflict, with the terms of the Sale Procedures Order or other order of the Court, the Court's Orders control and therefore would supersede any such terms of the Stalking Horse Bid Letter.

**Strictly Confidential Pursuant to Confidentiality Agreement**

to Alter Ego Claims, and the Proposed SPA does not include trust/escrow constructs or purchase price alterations relating to Alter Ego claims.

**B.  Stock Purchase Agreement**

Attached hereto at Annex 2 is a draft Stock Purchase Agreement (the "**Proposed SPA**") that provides for the Purchaser's acquisition of 100% of the shares of PDVH, together with a redline marked to show Purchaser's proposed changes to the Bid Draft SPA, including any proposed changes to all exhibits and schedules thereto.  As requested by the Special Master, comments are provided in Microsoft Word format and both a clean Word version as well as a PDF comparison to the Bid Draft SPA are attached.

**C.  Identity of Purchaser**



**D.  Purchase Price and Principal Economic Terms**

Purchaser would pay a net purchase price of $7.081 billion for the shares of PDVH, comprised of the below components:

- A credit bid of $███████████ of ███████████ Attached Judgment.  The amount of ███████
  ██████ Attached Judgment (the "███████████ **Judgment**"), inclusive of post-

5

**Strictly Confidential Pursuant to Confidentiality Agreement**

judgment interest, was calculated by the Special Master for illustrative purposes as ██████████ as as December 31, 2024. At the Projected Closing Date, the ████ ████ Judgment, inclusive of post-judgment interest calculated using the Special Master's methodology, is calculated to be $██████████.

- A credit bid of ██████ entire Attached Judgment (the "████ **Judgment**") for which ████████ will receive at Closing equity securities of ████████████. The amount of the Judgment, inclusive of post-judgment interest, was calculated by the Special Master for illustrative purposes as $██████████ as at December 31, 2024. At the Projected Closing Date, the ████ Judgment, inclusive of post-judgment interest calculated using the Special Master's methodology, is calculated to be $████████.

- A credit bid of ████████ entire Attached Judgment (the "████████ **Judgment**"), for which ████████████ will receive at Closing equity securities of ████████████. The ████ Judgment, inclusive of post-judgment interest, was calculated by the Special Master for illustrative purposes as $████████████ as at December 31, 2024. At the Projected Closing Date, the ████ Judgment, inclusive of post-judgment interest calculated using the Special Master's methodology, is calculated to be $████████.

- Debt financing up to the amount of $4,500,000,000 to support cash payments in the total amount of $3,925,000,000 to satisfy in full, at Closing, the following Attached Judgment Holders, listed in the priority order established by the Court: Crystallex; Tidewater; ConocoPhillips (Judgments #1 and #2); OIEG; Huntington Ingalls; ACL1; and Red Tree, as set forth in the above chart.

**Strictly Confidential Pursuant to Confidentiality Agreement**

### E.  Sources of Financing

Set out below is a Sources and Uses table, which provides a detailed description of the sources and uses of financing for the Proposal.

| SOURCES | | | | USES | | | |
|---|---|---|---|---|---|---|---|
| *(Figures in $Millions Unless Noted)* | | **Claims** | | *(Figures in $Millions Unless Noted)* | | **Equity** | |
| | **Cash** | **Contributed** | **Total** | | **Cash** | **Securities** | **Total** |
| Citgo Cash & Equivalents (1) | | | | **Attached Judgement Redemptions** (1) | | | |
| Buyer's Good Faith Deposit (2) | | | | 1) Crystallex | 1,025 | - | 1,025 |
| | | | | 2) Tidewater | 83 | - | 83 |
| **Debt** | | | | 3) Conoco Phillips | 1,444 | - | 1,444 |
| Term Loan | 2,000 | | 2,000 | 4) OI European | 695 | - | 695 |
| Senior Secured Notes | 2,500 | | 2,500 | 5) Huntington Ingalls | 140 | - | 140 |
| $2.0B ABL Draw | - | | - | 6) ACL1 | 119 | - | 119 |
| | | | | 7) Red Tree | 370 | - | 370 |
| **Equity Securities** | | | | 8) Rusoro Mining | - | 1,584 | 1,584 |
| Preferred Equity | | | | 9) Conoco Phillips | 49 | - | 49 |
| | | | | 10) Koch Ag & Energy | - | 473 | 473 |
| | | | | 11) Gold Reserve | - | 1,099 | 1,099 |
| | | | | **Total Redeemed Claims** | 3,924 | 3,157 | 7,081 |
| **Common Equity** | | | | | | | |
| | | | | Retire Existing Citgo Debt: | | | |
| | | | | Industrial Revenue Bonds | 55 | | 55 |
| | | | | 8.375% 2029 SSN | 1,100 | | 1,100 |
| | | | | Call Premium on 2029 SSN | 23 | | 23 |
| | | | | Minimum Balance Sheet Cash | 250 | | 250 |
| | | | | Transaction Fees & Expenses | 411 | | 411 |
| | | | | Buyer's Good Faith Deposit | 50 | | 50 |
| **Total** | | | | **Total** | 5,814 | 3,157 | 8,970 |
| (1) Estimate of Citgo's cash balance at closing. | | | | (1) Assumes 12/31/26 transaction close. Purchase price to be adjusted to | | | |
| (2) Funded from ▮▮▮ existing cash balances. | | | | reflect actual accrued judgement interest at time of closing. | | | |

Attached hereto at Annex 3 is the Commitment Letter from ▮▮▮ that demonstrates that 50% ($2.25 billion) of the Purchaser's debt financing is already fully committed.  This financing is free of off-market contingencies other than closing conditions outlined in the SPA.

Attached hereto at Annex 4 is the HCL that demonstrates that ▮▮▮ is highly confident that it can raise the remaining 50% ($2.25 billion) of the Purchaser's debt financing.

### F.  Credit Bid

Purchaser confirms that it is submitting a credit bid for the shares of PDVH consistent with the terms outlined in the Sale Procedure Order.  The details of the credit bid are set forth above in Paragraph D.  For the avoidance of doubt, the credit bid:  (i) will provide sufficient cash consideration to pay in full all Transaction Expenses; (ii) will provide sufficient cash (or consented non-cash consideration) to satisfy in full any obligations secured by a senior lien on the shares of PDVH (which, for the purposes of this section F, shall not include the Purported CITGO Equity Pledge); and (iii) is accompanied by evidence of the consent of ▮▮▮ and ▮▮▮ that each has agreed to receive non-cash consideration, in the form of the Bidder Equity Commitment Letter / Consent to Accept Non-Cash Consideration attached hereto at Annex 5.

**Strictly Confidential Pursuant to Confidentiality Agreement**

**G.  Good Faith Deposit**

Evidence of Purchaser's financial ability to make a cash deposit (in the amount of $50 million) on the date that the Proposal is approved by the Court is attached hereto at Annex 6.

**H.  Purchaser Approvals**

Attached hereto at Annex 7 is evidence of the requisite corporate or other organizational authority and approval for Purchaser with respect to the submission, execution, and delivery of the Proposal (including the execution of the Proposed SPA), participation in any auction, and closing of the Proposed Transaction contemplated by the Proposed SPA in accordance with its terms and the terms of the Sale Procedures Order (including the Bidding Procedures contained therein).

Purchaser does not anticipate a need for further approvals to execute a definitive Stock Purchase Agreement (the "**Definitive SPA**").

Purchaser confirms that it will make in a timely manner (1) all filings and disclosures necessary to comply with the regulations of the Department of Treasury's Office of Foreign Assets Control ("**OFAC**"), (2) all necessary filings under the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended, and any other antitrust laws, as applicable, and pay the fees associated with such filings and (3) all necessary filings in connection with any review by the Committee on Foreign Investment in the United States (CFIUS), if applicable.

This confirms that Purchaser's Stalking Horse Proposal, if selected as the Successful Bid and approved by the Court, is reasonably likely to be consummated within a timeframe acceptable to the Special Master and the Court, after taking into consideration antitrust and any other regulatory matters and given Purchaser's and ▮▮▮▮▮▮▮▮ prior experience in such matters and any other relevant considerations.

**I.  Due Diligence Requirements**

Purchaser would expect to perform a customary confirmatory review, and expects to be able to conclude this exercise expeditiously and in advance of the deadline for executing the Definitive SPA in advance of the Final Recommendation Date.

**J.  Advisors**

Purchaser has retained the following advisors in connection with the Proposed Transaction:

▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮

8

### K. <u>Contacts</u>

The following is a list of persons (including e-mail addresses and phone numbers) who should be contacted with respect to any questions regarding the Proposal:



### L. <u>Special Master Consent</u>

The Purchaser consents to the Special Master, in his discretion, sharing information pertaining to the Purchaser's Stalking Horse Proposal with U.S. Government regulators, including OFAC, as well as the Sale Process Parties, subject to the limitations of bidding Sale Process Parties to receive bid information established by the Court, including in the December Order.

### M. <u>Cooperation</u>

The Purchaser (i) agrees that its advisors will coordinate in good faith with the Special Master's advisors to discuss and explain its regulatory and other consent analysis, strategy and timeline for securing all such approvals and consents as soon as reasonably practicable and (ii) agrees to cooperate with the Special Master to provide pertinent factual information regarding its ownership and operations reasonably required to respond to, or otherwise analyze issues arising with respect to, U.S. sanctions laws and regulations, CFIUS, any applicable antitrust laws and other relevant regulatory requirements or requests.

### N. <u>No Entitlement to Reimbursement</u>

The Purchaser agrees that its Stalking Horse Proposal does not entitle it to any break-up fee, termination fee, expense reimbursement or similar type of payment or reimbursement; except for as provided in the January Order or as is otherwise ordered by the Court.

### O. <u>No Liability</u>

The Purchaser agrees that (i) in no circumstance shall the Special Master or his advisors be personally or otherwise liable for any amounts or obligations owed to the Purchaser, (ii) the Special Master and his advisors are acting as an arm of the Court and are entitled to judicial immunity in the performance of their duties and (iii) PDVH, CITGO and their respective officers, directors and advisors will have no liability or obligation to Purchaser or its affiliates in connection with the execution of the Definitive SPA.

9

**Strictly Confidential Pursuant to Confidentiality Agreement**

### P.  **Representations and Warranties**

Without limiting any terms expressly provided for in the SPA if, as and when executed, and pursuant to the Bidding Procedures set out in the Sale Procedures Order:

a.  the Purchaser states that it recognizes and acknowledges that the Special Master, his advisors, PDVH, CITGO, and their respective representatives make no representations, covenants or warranties (or any other promise) as to the accuracy or completeness of any information provided in the data room or otherwise made available by the Special Master and his advisors in connection with the bid process;

b.  the Purchaser states that, other than with respect to Purchaser's reliance on the representations and warranties provided in the SPA if, as and when executed, Purchaser has relied solely upon its own independent review, investigation, and/or inspection of any relevant documents regarding the assets to be purchased and did not rely on any written or oral statements, representations, promises, warranties, or guaranties whatsoever, whether express or implied, by operation of law or otherwise, regarding PDVH and its subsidiaries or the completeness of any information made available in connection therewith;

c.  the Purchaser states that it has not engaged in any collusion with respect to the submission of its Stalking Horse Proposal; and

d.  the Purchaser states that all proof of financial ability to consummate the Proposed Transaction in a timely manner and other information Purchaser submits is true and correct.

### Q.  **Bidding Procedures**

The Purchaser agrees to be bound by the terms and conditions of the Bidding Procedures, if any, set out in the Sale Procedures Order, as such order may be modified.

10

**Strictly Confidential Pursuant to Confidentiality Agreement**

Yours truly,



Per: _____

Per: _____

██████████████████ – Stock Purchase Agreement
Confidential

# STOCK PURCHASE AGREEMENT

dated as of

[●]

between

████████████████

and

ROBERT B. PINCUS,

solely in his capacity as the Special Master for the United States District Court for the District of Delaware

NOTE: STRICTLY PRIVATE AND CONFIDENTIAL DRAFT FOR DISCUSSION PURPOSES ONLY AND SUBJECT IN ALL RESPECTS TO THE CONFIDENTIALITY AGREEMENT SIGNED BETWEEN THE SPECIAL MASTER (AS DEFINED HEREIN) AND RECIPIENT (OR ITS AFFILIATE). CIRCULATION OF THIS DRAFT SHALL NOT GIVE RISE TO ANY DUTY TO NEGOTIATE OR CREATE OR IMPLY ANY OTHER LEGAL OBLIGATION. NO LEGAL OBLIGATION OF ANY KIND WILL ARISE UNLESS AND UNTIL A DEFINITIVE WRITTEN AGREEMENT IS EXECUTED AND DELIVERED BY ALL PARTIES.

## TABLE OF CONTENTS

Page

ARTICLE I DEFINITIONS AND INTERPRETIVE MATTERS .................................................2
    Section 1.1.       Certain Defined Terms..........................................................................2
    Section 1.2.       Other Definitional and Interpretive Matters .........................................2

ARTICLE II SALE AND PURCHASE OF THE SHARES; CLOSING .......................................5
    Section 2.1.       Sale and Purchase of Shares ...............................................................5
    Section 2.2.       Closing ..............................................................................................5
    Section 2.3.       Closing Deliveries of the Parties.........................................................5

ARTICLE III PURCHASE PRICE; CLOSING DATE PAYMENTS........................................6
    Section 3.1.       Purchase Price ....................................................................................6
    Section 3.2.       Closing Transaction Expenses; Funds Flow Memorandum .................6
    Section 3.3.       Good Faith Deposit.............................................................................6
    Section 3.4.       Closing Date Payments by the Buyer ..................................................7
    Section 3.5.       Withholding .......................................................................................8

ARTICLE IV REPRESENTATIONS RELATING TO THE COMPANY AND THE SPECIAL MASTER .................................................................................................9
    Section 4.1.       Corporate Existence; Title to Shares....................................................9
    Section 4.2.       Governmental Authorization ..............................................................10
    Section 4.3.       Non-Contravention ............................................................................10
    Section 4.4.       Capitalization....................................................................................11
    Section 4.5.       Subsidiaries; Non-Controlled Entities. ..............................................11
    Section 4.6.       Financial Statements .........................................................................12
    Section 4.7.       Absence of Certain Changes ..............................................................13
    Section 4.8.       No Undisclosed Material Liabilities ...................................................13
    Section 4.9.       Legal Proceedings.............................................................................14
    Section 4.10.      Taxes ...............................................................................................14
    Section 4.11.      Company Benefit Plans; Employment.................................................15
    Section 4.12.      Compliance with Laws; Permits ........................................................20
    Section 4.13.      Regulatory Matters............................................................................20
    Section 4.14.      Environmental Matters.......................................................................21
    Section 4.15.      Title to Properties.............................................................................22
    Section 4.16.      Material Contracts.............................................................................22
    Section 4.17.      Intellectual Property and Data Privacy ..............................................25
    Section 4.18.      Brokers; Financial Advisor ...............................................................27
    Section 4.19.      Real Property ....................................................................................27
    Section 4.20.      Affiliate Transactions........................................................................28

i

Section 4.21.    Insurance ........................................................................................29
Section 4.22.    No Additional Representations ........................................................29

ARTICLE V REPRESENTATIONS AND WARRANTIES OF THE BUYER ..........................30

Section 5.1.    Corporate Existence and Power ......................................................30
Section 5.2.    Corporate Authorization ................................................................30
Section 5.3.    Governmental Authorization ..........................................................30
Section 5.4.    Non-Contravention ........................................................................31
Section 5.5.    Litigation .......................................................................................31
Section 5.6.    Regulatory Matters.........................................................................31
Section 5.7.    Financing........................................................................................33
Section 5.8.    Solvency.........................................................................................34
Section 5.9.    Purported Equity Pledge ................................................................34
Section 5.10.    Claim Obligations ..........................................................................35
Section 5.11.    Closing Consideration....................................................................35
Section 5.12.    No Additional Representations .......................................................35

ARTICLE VI COVENANTS .....................................................................................................36

Section 6.1.    Conduct of the Business Pending the Closing ...................................36
Section 6.2.    Access to Information ....................................................................42
Section 6.3.    Regulatory Approvals; Third Party Consents ................................44
Section 6.4.    Further Assurances .........................................................................46
Section 6.5.    Confidentiality ...............................................................................46
Section 6.6.    Indemnification, Exculpation and Insurance ..................................47
Section 6.7.    Public Announcements ...................................................................48
Section 6.8.    Employee Matters ..........................................................................49
Section 6.9.    The Buyer's Obligations in Respect of Debt Financing .................51
Section 6.10.    Company's Obligations in Respect of Debt Financing....................54
Section 6.11.    Tax Matters ....................................................................................57
Section 6.12.    R&W Insurance Policy ...................................................................57
Section 6.13.    Notices of Certain Events ..............................................................57
Section 6.14.    No Control of Other Party's Business ............................................59
Section 6.15.    OFAC..............................................................................................59
Section 6.16.    Bidder Protections and Competing Proposals.................................59
Section 6.17.    Section 280G...................................................................................62
Section 6.18.    Financial Statements ......................................................................62

ARTICLE VII CONDITIONS TO CLOSING ...........................................................................63

Section 7.1.    Conditions Precedent to Obligations of the Parties ........................63
Section 7.2.    Conditions Precedent to Obligations of the Buyer .........................63
Section 7.3.    Conditions Precedent to Obligations of the Special Master ...............64
Section 7.4.    Frustration of Closing Conditions...................................................64

ARTICLE VIII TERMINATION ...............................................................................................64

Section 8.1.    Termination.....................................................................................64

ii

Section 8.2.    Effect of Termination..................................................................66
Section 8.3.    Termination Fee and Expense Reimbursement ..................................66

ARTICLE IX MISCELLANEOUS ..........................................................................69

Section 9.1.    Survival........................................................................................69
Section 9.2.    Expenses ......................................................................................69
Section 9.3.    Governing Law .............................................................................69
Section 9.4.    Dispute Resolution; Consent to Jurisdiction....................................70
Section 9.5.    Consent to Service of Process; Waiver of Jury.................................70
Section 9.6.    Entire Agreement .........................................................................70
Section 9.7.    Amendments and Waivers .............................................................71
Section 9.8.    Notices ........................................................................................72
Section 9.9.    Severability ..................................................................................72
Section 9.10.   Binding Effect; Assignment...........................................................72
Section 9.11.   No Third Party Beneficiaries .........................................................73
Section 9.12.   Non-Recourse ..............................................................................73
Section 9.13.   Specific Performance ....................................................................73
Section 9.14.   Successors and Assigns..................................................................74
Section 9.15.   Release ........................................................................................74
Section 9.16.   Counterparts.................................................................................75
Section 9.17.   Debt Financing Sources .................................................................75
Section 9.18.   Special Master and his Representatives' Judicial Immunity ...............76
Section 9.19.   Special Master Indemnification ......................................................76

ANNEX A

Definitions

EXHIBITS[1]

Exhibit A – Escrow Agreement
Exhibit B – Paying Agent Agreement
Exhibit C – Form of Sale Order
Exhibit D – Form of Release
Exhibit E – Form of Termination Release

---

[1] **NTD**: Please provide Form of Sale Order for review.   Bid subject to finalizing same.

**DEFINED TERMS**

| Term | Section |
|------|---------|
| Acquired Companies | Annex A |
| Additional Judgment Creditors | Annex A |
| Advanced Transaction Expenses | Annex A |
| Affected Employees | Section 6.8(c) |
| Affiliate | Annex A |
| Affiliate Transactions | Section 4.20 |
| Agreement | Preamble |
| Anti-Corruption Laws | Annex A |
| Antitrust Laws | Annex A |
| Audited Financial Statements | Section 4.6(a) |
| Base Bid Agreement | Section 6.16(d) |
| Bolivarian Republic of Venezuela | Section 1.2(a)(ix) |
| Bonus Amounts | Section 6.8(g) |
| Business Day | Annex A |
| Business Unit | Annex A |
| Buyer | Preamble |
| Buyer Disclosure Schedules | Article V |
| Buyer Documents | Section 5.2 |
| Buyer Subsidiary | Annex A |
| CapEx Budget | Section 6.1(b)(iii) |
| Cash | Annex A |
| Cause | Section 1.2(a)(x) |
| CITGO Petroleum | Annex A |
| Claim | Annex A |
| Claimholders | Recitals |
| Closing | Section 2.2 |
| Closing Consideration | Annex A |
| Closing Transaction Expenses | Annex A |
| Closing Transaction Expenses Statement | Section 3.2(a) |
| COBRA | Annex A |
| Code | Annex A |
| Collective Bargaining Agreement | Section 4.11(n) |
| Commitment Letters | Section 5.7(a) |
| Company | Preamble |
| Company Balance Sheet | Section 4.6(a) |
| Company Balance Sheet Date | Section 4.6(a) |
| Company Benefit Plan | Annex A |
| Company By-Laws | Section 4.1(a) |
| Company Charter | Section 4.1(a) |
| Company Collective Bargaining Agreement | Section 4.11(n) |
| Company Disclosure Schedules | Article IV |
| Company Environmental Permits | Section 4.14 |
| Company Fundamental Representations | Annex A |

iv

| Term | Section |
|------|---------|
| Company Intellectual Property | Section 4.17(a) |
| Company Material Adverse Effect | Annex A |
| Company Owned Intellectual Property | Section 4.17(a) |
| Competing Proposal | Section 6.16(g)(i) |
| Confidentiality Agreement | Section 6.5 |
| Contract | Annex A |
| Court | Recitals |
| Credit Bid Amount | Recitals |
| Credit Bid Purchase Price | Section 3.4(f) |
| Credit Support Arrangements | Annex A |
| Debt | Annex A |
| Debt Commitment Letter | Section 5.7(a) |
| Debt Commitment Letter Effective Date | Section 6.9(c)(i) |
| Debt Financing | Section 5.7(a) |
| Debt Financing Commitments | Section 5.7(a) |
| Debt Financing Documents | Annex A |
| Debt Financing Source | Annex A |
| Debt Payoff Amount | Annex A |
| Definitive Debt Documents | Section 6.9(c)(ii) |
| Deposit Amount | Recitals |
| Deposit Amount Release Date | Section 3.3(b) |
| Deposit Forfeiture Termination Event | Annex A |
| Designated Contacts | Section 6.2(a) |
| Designated Managers | Annex A |
| Economic Sanctions/Trade Laws | Annex A |
| Execution Date | Preamble |
| Environmental Laws | Annex A |
| EPP | Annex A |
| Equitable Exceptions | Annex A |
| Equity Commitment Letter | Annex A |
| Equity Financing | Section 5.7(a) |
| Equity Financing Commitments | Section 5.7(a) |
| Equity Financing Sources | Annex A |
| Equity Interests | Annex A |
| Equity Pledge Litigation | Annex A |
| ERISA | Annex A |
| ERISA Affiliate | Annex A |
| Escrow Account | Annex A |
| Escrow Agent | Recitals |
| Evercore | Recitals |
| Expense Reimbursement Amount | Annex A |
| Expense Reserve Holdback Account | Annex A |
| Expense Reserve Holdback Amount | Annex A |
| Financings | Section 5.7(a) |
| Financial Statements | Section 4.6(a) |

WEIL:\100255289\1\67816.0003

| Term | Section |
|------|---------|
| Final Recommendation Date | Section 6.3(a) |
| Funds Flow Memorandum | Section 3.2(b) |
| GAAP | Section 4.6 |
| Good Industry Practice | Annex A |
| Governmental Body | Annex A |
| Government Contract | Annex A |
| Government Official | Section 4.13(a) |
| Hazardous Substance | Annex A |
| HSR Act | Annex A |
| Indemnitees | Section 6.6(a) |
| Indenture | Annex A |
| Initial Outside Date | Section 8.1(b) |
| Intellectual Property | Section 4.17(a) |
| Interest Rate | Annex A |
| Interim Financial Statements | Section 4.6(a) |
| Interim Period | Annex A |
| IRS | Annex A |
| January Order | Annex A |
| Jointly Owned Properties | Section 4.19(c) |
| Judgment Creditors | Annex A |
| Knowledge of the Buyer | Annex A |
| Knowledge of the Company | Annex A |
| Knowledge of the Special Master | Annex A |
| Law | Annex A |
| Legal Proceeding | Annex A |
| Legal Restraint | Section 8.1(c) |
| Lien | Annex A |
| Lookback Date | Annex A |
| Material Contract | Section 4.16(a) |
| May Order | Recitals |
| Money Laundering Laws | Annex A |
| MTP | Section 6.1(b)(iii) |
| Negative Consequences | Annex A |
| New Indemnification Agreements | Section 6.6(a) |
| No-Shop Period | Annex A |
| Non-Controlled Entity | Annex A |
| Non-Parties | Section 9.12 |
| Non-Union Affected Employees | Section 6.8(c) |
| OFAC | Annex A |
| OFAC License | Annex A |
| OFAC License Applications | Annex A |
| Order | Annex A |
| Ordinary Course | Annex A |
| Organizational Documents | Annex A |
| Outside Date | Section 8.1(b) |

WEIL:\100255289\1\67816.0003

| Term | Section |
|---|---|
| Owned Real Property | Section 4.19(b) |
| Parties | Preamble |
| Paying Agent | Recitals |
| Paying Agent Account | Annex A |
| Paying Agent Agreement | Recitals |
| Payoff Letters | Section 3.4(a) |
| PBGC | Section 4.11(d) |
| PCI DSS | Annex A |
| PDVSA | Recitals |
| Performance Incentive Program | Section 6.8(g) |
| Permit | Annex A |
| Permitted Liens | Annex A |
| Person | Annex A |
| Personal Information | Annex A |
| PFAS | Annex A |
| Post-Closing Tax Period | Annex A |
| Preferential Right | Annex A |
| Privacy Laws and Obligations | Section 4.17(f) |
| Procedures Summary | Annex A |
| Prohibited Modification | Section 6.9(c)(ii) |
| Purchase Price | Section 3.1 |
| Purported Equity Pledge | Annex A |
| R&W Insurance Policy | Section 6.12 |
| Real Property | Section 4.19(b) |
| Real Property Lease | Section 4.19(a) |
| Receivables Securitization Facility | Section 6.1(b)(vi) |
| Registered Intellectual Property | Section 4.17(a) |
| Related Claim | Annex A |
| Release | Annex A |
| Released Parties | Section 9.15 |
| Releasing Parties | Section 9.15 |
| Replacement Financing | Section 6.9(f) |
| Representatives | Annex A |
| Required Amount | Section 5.7(e) |
| RRP | Annex A |
| Sale Hearing | Section 6.16(c) |
| Sale Order | Annex A |
| Sale Process Parties | Annex A |
| Sale Procedures Order | Recitals |
| Sanctions Target | Annex A |
| Security Incident | Annex A |
| Sensitive Data | Annex A |
| Shares | Recitals |
| Solvent | Annex A |
| Special Master | Preamble |

WEIL:\100255289\1\67816.0003

| Term | Section |
|------|---------|
| Special Master and Company Related Parties | Section 8.3(g) |
| Special Master Transaction Expenses | Annex A |
| Specially Designated Nationals and Blocked Persons List | Annex A |
| Specified Debt | Annex A |
| Specified Information | Annex A |
| Subsequent Overbid Minimum | Section 6.16(e)(i) |
| Subsidiary | Annex A |
| Superior Proposal | Section 6.16(g)(ii) |
| Superior Proposal Agreement | Section 6.16(d) |
| Stalking Horse Bid Agreement | Section 6.16(d) |
| Systems | Annex A |
| Tax or Taxes | Annex A |
| Tax Proceeding | Section 4.10(c) |
| Tax Returns | Annex A |
| Taxing Authority | Annex A |
| Termination Fee | Annex A |
| Topping Period | Annex A |
| Transaction Documents | Annex A |
| Transactions | Annex A |
| Transfer Taxes | Annex A |
| Treasury Regulations | Annex A |
| Turnaround/Catalyst Budget | Section 6.1(b)(iv) |
| Union | Section 4.11(n) |
| Union Affected Employees | Section 6.8(b) |
| Unsolicited Competing Proposal | Section 6.16(e) |
| Unsolicited Competing Proposal Agreement | Section 6.16(e) |
| VDR | Annex A |
| Vesting Instruments | Section 4.19(a) |
| WARN Act | Section 4.11(p) |
| Willful Breach | Annex A |
| 2020 Bondholders | Annex A |
| 2020 Bonds | Annex A |

WEIL:\100255289\1\67816.0003

## STOCK PURCHASE AGREEMENT

THIS STOCK PURCHASE AGREEMENT (this "Agreement") dated as of [●], 2025 (the "Execution Date")[2] is entered into by and between ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ (the "Buyer")[3], and Robert B. Pincus, solely in his capacity as special master (the "Special Master" and, together with the Buyer, the "Parties" and each a "Party") for the Honorable Leonard P. Stark, United States District Court for the District of Delaware (the "Court").

## W I T N E S S E T H:

WHEREAS, the Special Master has been appointed by the Court in connection with the case of *Crystallex International Corp. v. Bolivarian Republic of Venezuela* (D. Del. Case. No. 17-151-LPS) (the "Specified Litigation") pursuant to that certain Order entered by the Court on April 13, 2021 [D.I. 258], that certain Order Regarding Special Master entered by the Court on May 27, 2021 [D.I. 277] (the "May Order") and the Order (A) Establishing Sale and Bidding Procedures, (B) Approving Special Master's Report and Recommendation Regarding Proposed Sale Procedures Order, (C) Affirming Retention of Evercore Group, LLC ("Evercore") as Investment Banker by Special Master and (D) Regarding Related Matters entered by the Court on October 4, 2022 [D.I. 481] (as amended, restated, supplemented or otherwise modified from time to time, the "Sale Procedures Order").[4]

WHEREAS, Petróleos de Venezuela, S.A., a Venezuelan company ("PDVSA"), owns all of the issued and outstanding capital stock of PDV Holding, Inc., a Delaware corporation (the "Company"), which consists of 1,000 shares of common stock, par value $1.00 per share (collectively, the "Shares").

WHEREAS, pursuant to the Sale Procedures Order, the Special Master has the authority to enter into this Agreement in making his determination to the Court as to which of the Qualified Bids (as defined in the Sale Procedures Order) was highest or best, and in making a recommendation to the Court as to which Qualified Bid is the Successful Bid (as defined in the Sale Procedures Order).

WHEREAS, each of ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮



▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮", and, collectively, with ▮▮▮▮▮▮▮ and ▮▮▮▮ the "Record Holders") is a creditor who is a party to the Specified Litigation and have each

---

[2] **NTD**: Per Court order, SPA is non-binding until Court approval. "Execution Date" to be updated as needed to effectuate the same.

[3] **Note to Bidder**: If the Buyer will be a newly formed entity or does not have sufficient financial resources to consummate the purchase of Shares, the controlling owner(s) of the Buyer will be required to provide a guarantee of certain of the Buyer's obligations hereunder and a commitment to provide equity financing to the Buyer in a satisfactory amount.

[4] **Note to Bidder**: Recitals and SPA to be updated as necessary to reflect amendments to the Sale Procedures Order.

obtained a writ of attachment by January 12, 2024 (each, a "Specified Litigation Claim") and each such Specified Litigation Claim is secured by a valid and duly perfected lien on the Shares.[5]

WHEREAS, the Buyer desires to purchase the Shares upon the terms and subject to the conditions set forth in this Agreement.

WHEREAS, the Buyer intends to effectuate a credit bid in respect of certain obligations owed to the Record Holders pursuant to those certain writs of attachment in ) for a portion of the Purchase Price equal to $3.156 billion (the "Credit Bid Amount"), which, in conjunction with the Closing Consideration and other amounts to be paid by Buyer hereunder, will be in exchange for the transfer to the Buyer, as applicable, of the Shares.[6]

WHEREAS, contemporaneous with the execution of this Agreement, the Buyer has deposited with [Acquiom Clearinghouse LLC], in its capacity as escrow agent (the "Escrow Agent"), the sum of $50,000,000[7] (such amount, the "Deposit Amount") in cash, to be held in the Escrow Account pursuant to the terms of that certain Escrow Agreement, dated as of [the date hereof], by and among the Special Master, the Buyer and the Escrow Agent (as amended, restated, supplemented or otherwise modified from time to time, the "Escrow Agreement"), to be released in accordance with the provisions of this Agreement and the Escrow Agreement.

WHEREAS, at the Closing (as defined below), the Buyer shall deposit the Closing Consideration (as defined below) with the Escrow Agent in cash pursuant to the terms of the Escrow Agreement, to be released to those creditors of the Bolivarian Republic of Venezuela (the "Republic") or PDVSA that are party to the Specified Litigation and who have obtained a writ of attachment on or before January 12, 2024 (the "Claimholders") or the Buyer, in accordance with the provisions of the Escrow Agreement and that certain Paying Agent Agreement attached hereto as Exhibit B, dated as of the date hereof, by and among the Buyer, the Special Master and [Acquiom Financial LLC], in its capacity as paying agent (the "Paying Agent") (as amended, restated, supplemented or otherwise modified from time to time, the "Paying Agent Agreement").

NOW, THEREFORE, in consideration of the promises and the respective representations, warranties, covenants and agreements set forth herein, the Parties agree as follows:

## ARTICLE I

## DEFINITIONS AND INTERPRETIVE MATTERS

Section 1.1.    Certain Defined Terms. Capitalized terms used in this Agreement have the meanings specified in Annex A or elsewhere in this Agreement.

---

[5] **Note to Bidder**: Bracketed language to be included for credit bidders.

[6] **Note to Bidder**: Bracketed language to be included for credit bidders.

[7] **Note to Bidder**: In accordance with the Sale Procedures Order, the Good Faith Deposit will be $50,000,000 in cash.

WEIL:\100255289\1\67816.0003

Section 1.2.    <u>Other Definitional and Interpretive Matters</u>.

(a)    Unless otherwise expressly provided herein, for purposes of this Agreement, the following rules of interpretation shall apply:

(i)    <u>Calculation of Time Period</u>. When calculating the period of time before which, within which or following which any act is to be done or step is to be taken pursuant to this Agreement, the date that is the reference date in calculating such period shall be excluded. If the last day of such period is a non-Business Day, the period in question shall end on the next succeeding Business Day. The word "<u>day</u>" shall mean "calendar day" unless "Business Day" is expressly identified.

(ii)    <u>Dollars</u>. Any reference in this Agreement to "$" shall mean U.S. dollars. The specification of any dollar amount in the representations and warranties or otherwise in this Agreement or in the Exhibits or the Company Disclosure Schedules is not intended and shall not be deemed to be an admission or acknowledgment of the materiality of such amounts or items, nor shall the same be used in any dispute or controversy between the Parties to determine whether any obligation, item or matter (whether or not described herein or included in the Company Disclosure Schedules) is or is not material for purposes of this Agreement.

(iii)    <u>Exhibits/Schedules</u>. The Exhibits and the Company Disclosure Schedules annexed hereto or referred to herein are an integral part of this Agreement and are hereby incorporated in and made a part of this Agreement as if set forth in full herein. Any matter or item disclosed on one Schedule or section of the Company Disclosure Schedules shall be deemed to have been disclosed on each other Schedule or section of the Company Disclosure Schedules in which it is reasonably apparent on the face of such disclosure that the information is required to be included in such other Schedule or section of the Company Disclosure Schedules. Disclosure of any item on any Schedule of the Company Disclosure Schedules shall not constitute an admission, indication, acknowledgment or representation that such item or matter is material or would reasonably be expected to have a Company Material Adverse Effect. No disclosure on a Schedule of the Company Disclosure Schedules relating to a possible breach or violation of any Contract, Law or Order shall be construed as an admission, indication, acknowledgment or representation that a breach or violation exists or has actually occurred. Any capitalized terms used in any Schedule of the Company Disclosure Schedules or Exhibit but not otherwise defined therein shall be defined as set forth in this Agreement.

(iv)    <u>Gender and Number</u>. Any reference in this Agreement to gender shall include all genders, and words imparting the singular number only shall include the plural and vice versa.

(v)    <u>Headings</u>. The provision of a table of contents, the division of this Agreement into Articles, Sections and other subdivisions and the insertion of headings are for convenience of reference only and shall not affect or be utilized in construing or interpreting this Agreement. All references in this Agreement to any "Section" or "Article" are to the corresponding Section or Article of this Agreement unless otherwise specified.

3

(vi)    <u>Herein</u>. The words "herein," "hereinafter," "hereof," and "hereunder" refer to this Agreement as a whole and not merely to a subdivision in which such words appear unless the context otherwise requires.

(vii)    <u>Inclusive Terms</u>. The word "including" or any variation thereof means (unless the context of its usage otherwise requires) "including, without limitation" and shall not be construed to limit any general statement that it follows to the specific or similar items or matters immediately following it. The term "any" means "any and all." The term "or" shall not be exclusive and shall mean "and/or."

(viii)    <u>Reflected On or Set Forth In</u>. An item arising with respect to a specific representation or warranty shall be deemed to be "reflected on" or "set forth in" a balance sheet or financial statements, to the extent any such phrase appears in such representation or warranty, if (A) there is a reserve, accrual or other similar item underlying a number on such balance sheet or financial statements that related to the subject matter of such representation or warranty, (B) such item is otherwise specifically set forth on the balance sheet or financial statements or (C) such item is reflected on the balance sheet or financial statements and is specifically set forth in the notes thereto.

(ix)    <u>Bolivarian Republic of Venezuela</u>. Any reference herein to the "Bolivarian Republic of Venezuela" or the "Republic" shall include any successor nation thereto, and shall encompass any and all governments and administrations that purport to be Venezuela's legitimate governing body.

(x)    <u>Special Master and the Acquired Companies</u>. Any pre-Closing obligation of any of the Acquired Companies hereunder shall be deemed to include an obligation of the Special Master to "Cause" the Acquired Companies to comply with such obligation. With respect to any obligation of the Special Master hereunder to "<u>Cause</u>" any of the Acquired Companies to take an action or refrain from taking an action, or which otherwise requires action (or refraining from action) by any such Acquired Company, such obligation shall be deemed to be an obligation of the Special Master to use reasonable best efforts to cause the Company or the applicable Company Subsidiary to take such action (or refrain from taking such action), including by seeking an order from the Court with respect to such action or refraining from taking such action. For the avoidance of doubt, none of the Acquired Companies, PDVSA or the Republic is a party hereto, and the Special Master shall not be deemed to be in breach of any of its obligations under this Agreement as a result of a failure by the Special Master to Cause any of the Acquired Companies to take any action or refrain from taking any action prior to the Sale Entry Order.

(xi)    "<u>Made Available</u>." Unless expressly stated otherwise, references to any document or information having been "delivered", "furnished", "provided" or "made available" to the Buyer or its Representatives shall mean such document or information has been posted to the VDR or transmitted by email from the Special Master's advisors to the Buyer or its Representatives at least one (1) Business Day prior to the Execution Date.

(b)    The Parties have participated jointly in the negotiation and drafting of this Agreement and, in the event an ambiguity or question of intent or interpretation arises, this

4

Agreement shall be construed as jointly drafted by the Parties and no presumption or burden of proof shall arise favoring or disfavoring any Party by virtue of the authorship of any provision of this Agreement. The language used in this Agreement shall be deemed to be the language chosen by the Parties to express their mutual intent, and no rule of strict construction shall be applied against any Person.

## ARTICLE II

## SALE AND PURCHASE OF THE SHARES; CLOSING[8]

Section 2.1.    <u>Sale and Purchase of Shares</u>. Subject to approval of this Agreement by the Court, and upon the terms and subject to the conditions set forth in this Agreement and in the Sale Order, and pursuant to the authority provided to the Special Master under the Sale Procedures Order and the May Order, at the Closing, the Special Master shall sell, assign, transfer, convey and deliver to the Buyer, and the Buyer shall purchase and accept from the Special Master, the Shares, free and clear of all Liens (other than Permitted Liens and transfer restrictions imposed by applicable securities Laws).

Section 2.2.    <u>Closing</u>. The consummation of the sale and purchase of Shares (the "<u>Closing</u>") shall take place at 10:00 a.m., Eastern Time, on a date to be specified by the Parties, which date shall be no earlier than the twentieth (20th) Business Day after and no later than the [●] Business Day after satisfaction or waiver of the conditions set forth in <u>Article VII</u> (other than those conditions that by their nature are to be satisfied at the Closing, but subject to the satisfaction or waiver of those conditions at such time), remotely by electronic exchange of documents and signatures, unless another time, date or place is agreed to in writing by the Parties; <u>provided</u> that, if the Marketing Period has not ended at the time of the satisfaction or waiver of the last of the conditions set forth in Article VII (other than conditions that by their nature are to be satisfied at the Closing, but subject to the satisfaction or, to the extent permissible, waiver of those conditions at the Closing), the Closing shall take place on the earlier to occur of (x) any Business Day before or during the Marketing Period as may be specified by Buyer on no fewer than three (3) Business Days' written notice to the Company and (y) the third Business Day immediately following the final day of the Marketing Period (subject, in each case, to the satisfaction or, to the extent permissible, waiver of all of the conditions set forth in Article VII as of the date determined pursuant to this proviso (other than conditions that by their nature are to be satisfied at the Closing, but subject to the satisfaction or, to the extent permissible, waiver of those conditions at the Closing). The date on which the Closing actually occurs is referred to in this Agreement as the "<u>Closing Date</u>."

---

[8] **Note to Bidder**: No trust/escrow constructs or purchase price alterations relating to Alter Ego claims will be included in the SPA unless expressly agreed to by the affected holder of an Attached Judgment. No stand-alone closing conditions relating to Alter Ego Claims will be included in the SPA.

WEIL:\100255289\1\67816.0003

Section 2.3.    Closing Deliveries of the Parties.

(a)    Deliveries by the Special Master. At or prior to the Closing, the Special Master shall deliver or otherwise cause to be delivered to the Buyer:

(i)    Closing Certificate. A certificate, dated as of the Closing Date, signed by the Special Master as to the satisfaction of the conditions set forth in Section 7.2(a) and Section 7.2(b);

(ii)    Stock Certificate. The original certificate evidencing all of the Shares, duly endorsed in blank, or accompanied by a stock power duly executed in blank by the Special Master; and

(iii)    FIRPTA Certificate. A validly issued certificate from the Company, in such form consistent and in accordance with the requirements of Treasury Regulations Sections 1.897-2(h)(2) and 1.1445-2(c)(3)(i) and a validly issued notice to the IRS from the Company in accordance with the provisions of Treasury Regulations Section 1.897-2(h)(2) (such certificate and notice issued by the Company, the "FIRPTA Certificate").

(b)    Deliveries by the Buyer. At or prior to the Closing, the Buyer will deliver or cause to be delivered to the Special Master:

(i)    Closing Certificate. A certificate, dated as of the Closing Date, signed by an authorized officer of the Buyer as to the satisfaction of the conditions set forth in Section 7.3(a) and Section 7.3(a); and

(ii)    Closing Release. A counterpart to the Closing Release, duly executed by the Buyer and the Record Holders, as applicable, as of the Closing.[9]

## ARTICLE III

## PURCHASE PRICE; CLOSING DATE PAYMENTS[10]

Section 3.1.    Purchase Price.[11] The aggregate consideration payable by the Buyer for the

---

[9] **Note to Bidder**: Bracketed language to be included for credit bidders.

[10] **Note to Bidder**: All bids must be fully financed and such financing must be free of contingencies other than the Closing Conditions in the SPA. Any bid including third-party financing will need to submit final commitment letters in order to be considered for selection as a Stalking Horse Bid, though at this stage commitment letters need not be actually signed. Any bid including third-party financing submitted during the Topping Period will need to deliver final commitment letters signed by such third-party financing source prior to the end of the Topping Period in order to be considered for the Special Master's Final Recommendation. The bid selected as the Stalking Horse must also submit final commitment letters signed by the third-party financing source by the end of the Topping Period.

[11] **Note to Bidder**: Purchase price will be a fixed dollar amount for the shares of PDVH (i.e., no enterprise value calculation), typical of a public company M&A transaction. No purchase price adjustments will be accepted. No "lock box", "leakage" or similar constructs will be accepted. Bidders will receive protection through the interim operating covenants that PDVH/CITGO will be operated in the ordinary course of business between signing and closing.

6

Shares shall be $7.081 billion (the "<u>Purchase Price</u>"). The Purchase Price shall not be subject to any adjustments (including, for the avoidance of doubt, with respect to the Debt Payoff Amount).

Section 3.2.    <u>Closing Transaction Expenses; Funds Flow Memorandum</u>.

(a)    No later than three (3) Business Days prior to the Closing Date, the Special Master shall provide the Buyer with a written statement (the "<u>Closing Transaction Expenses Statement</u>") reflecting the Special Master's calculation of Closing Transaction Expenses in accordance with the definition of Closing Transaction Expenses hereunder, along with reasonable supporting documentation. The Closing Transaction Expenses Statement shall be binding on the Parties for purposes of this <u>Article III</u> and shall be used to determine the Closing Consideration.

(b)    No later than one (1) Business Day after the Special Master's delivery of the Closing Transaction Expenses Statement, the Special Master shall distribute to the Buyer a detailed funds flow memorandum in Excel format (including all underlying calculations, formulas and amounts therein) setting forth all payments to be made by or on behalf of the Parties at Closing in accordance with this Agreement (the "<u>Funds Flow Memorandum</u>").

Section 3.3.    <u>Good Faith Deposit</u>. The Buyer has deposited into the Escrow Account with the Escrow Agent an amount equal to Deposit Amount in cash. The Deposit Amount will be released by the Escrow Agent and delivered to either the Buyer or, at the direction of the Special Master, the Paying Agent, in accordance with the provisions of this Agreement, the Escrow Agreement and the Sale Procedures Order. The Deposit Amount will be distributed out of the Escrow Account as follows (and the Buyer and the Special Master hereby agree to promptly deliver joint written instructions to the Escrow Agent to the extent required by the Escrow Agent to effect such distributions as and when required hereunder):

(a)    if the Closing occurs, the Buyer and the Special Master shall jointly instruct the Escrow Agent in writing to disburse the Deposit Amount to the Paying Agent by wire transfer of immediately available funds out of the Escrow Account;

(b)    if a Deposit Forfeiture Termination Event occurs, the Buyer and the Special Master shall promptly (and in any event within five (5) Business Days of such termination) deliver joint written instructions to the Escrow Agent directing the release of the balance of the Escrow Account to the Paying Agent Account; <u>provided</u>, that, in lieu of the foregoing, the Buyer may elect, in writing, within five (5) Business Days after such termination to forever waive, forfeit and discharge from ▮▮▮▮▮▮▮▮ Specified Litigation Claims, an amount equal to the Net Deposit Amount effective immediately upon such termination and the Buyer and ▮▮▮▮▮▮▮▮ shall execute and deliver to the Special Master a Termination Release within two (2) Business Days after the Deposit Amount Release Date (as defined below), and in such case, within forty (40) Business Days after such election, pursuant to a written instruction to the Escrow Agent by the Special Master, the Net Deposit Amount shall be released by the Escrow Agent from the Escrow Account by wire transfer of immediately available funds to the account designated in writing by the Buyer (the date of such release, the "<u>Deposit Amount Release Date</u>"); <u>provided</u>, <u>further</u>, that any funds remaining in the Escrow Account after the Net Deposit Amount is released to the Buyer by the Escrow Agent pursuant to this <u>Section 3.3(b)</u> shall be, pursuant to a written instruction to

7

the Escrow Agent by the Special Master, released by the Escrow Agent to the Paying Agent to disburse such funds pursuant to the terms of the Paying Agent Agreement;[12] and

(c)     if this Agreement is terminated for any reason other than as contemplated by Section 3.3(b), the Buyer and the Special Master shall promptly (and in any event within two (2) Business Days of such termination) deliver joint written instructions to the Escrow Agent directing the release of the balance of the Escrow Account to the Buyer or its designees.

Section 3.4.     Closing Date Payments by the Buyer.[13]

(a)     Payment in respect of Debt. At the Closing, the Buyer shall pay, or cause to be paid, on behalf of the Acquired Companies, the Debt Payoff Amount by wire transfer of immediately available funds to the Persons as specified in the "payoff letters" or similar documents, executed by the applicable lender(s) (or agent thereof) or as set forth in the applicable indenture with respect to each item of Specified Debt (the "Payoff Letters").[14]

(b)     Payment in respect of the Closing Transaction Expenses. At the Closing, the Buyer shall pay, or cause to be paid, the Closing Transaction Expenses to the applicable recipients as set forth on the Closing Transaction Expenses Statement by wire transfer of immediately available funds to such Persons.

(c)     Payment in respect of Expense Reserve Holdback Amount. At the Closing, the Buyer shall pay, or cause to be paid, to the Expense Reserve Holdback Account an amount equal to the Expense Reserve Holdback Amount as set forth in the Funds Flow Memorandum. The Expense Reserve Holdback Amount will be used by the Special Master to pay the Special Master's compensation and any out-of-pocket costs, fees and expenses incurred by the Special Master on or after the date of the delivery of the Closing Transaction Expenses Statement by the Special Master related to the Transactions or any Action related to or arising therefrom for investment bankers, third-party consultants, legal counsel and any of his other Representatives or Advisors (as defined in the Sale Procedures Order) and such amount shall be paid or distributed at the direction of the Special Master; provided, that any amounts remaining in the Expense Reserve Holdback Account after all such costs, fees and expenses incurred by the Special Master have been so paid or distributed shall be paid to the Paying Agent Account as promptly as practicable upon the later of (i) three (3) years following the Closing Date and (ii) one (1) year after all Actions, if any, brought against the Special Master relating to the Transactions have been definitively adjudicated by a court of final determination.

(d)     Payment in respect of Reimbursement for Advanced Transaction Expenses. At the Closing, the Buyer shall pay, in accordance with the May Order, or cause to be paid, an

---

[12] **Note to Bidder**: Bracketed language to be included for credit bidders.

[13] **Note to Bidder**: Any "earn-out" or deferred purchase price concepts will be strongly disfavored and have no value attributed to them by the Special Master unless the applicable judgment holder(s) consents to receive the earn-out payment/deferred purchase price. Any portion of the purchase price being payable to an escrow will be strongly disfavored and have no value attributed to it by the Special Master unless the applicable judgment holder(s) consents to receive the escrow.

[14] **Note to Bidder**: Bracketed language to be included if any Specified Debt will be repaid at Closing.

amount to the Paying Agent Account equal to the aggregate amount of the Advanced Transaction Expenses paid by the Sale Process Parties and Additional Judgment Creditors prior to the Closing (the "Advanced Transaction Expenses Amount") as set forth in the Funds Flow Memorandum.[15]

(e)     Payment in respect of Closing Consideration.    At the Closing, the Buyer shall pay, or cause to be paid, (i) an amount equal to the sum of the Credit Bid Amount and (ii) an aggregate amount of cash equal to the Closing Consideration to the Paying Agent Account (together with the Credit Bid Amount, the "Credit Bid Purchase Price") as set forth in the Funds Flow Memorandum. The portion of the Credit Bid Purchase Price equal to the Credit Bid Amount shall be paid by means of a credit against an amount equal to the Credit Bid Amount that is due and owing under the Specified Litigation Claims.[16]

Section 3.5.    Withholding. Notwithstanding anything to the contrary in this Agreement, the Buyer shall be entitled to deduct and withhold (without duplication) from any and all payments made under this Agreement such amounts that are required to be deducted and withheld with respect to the making of such payments under the Code or under any provisions of state, local or foreign Tax Law, provided, that the Buyer shall (i) prior to making any deduction or withholding an amount pursuant to this Section 3.5 (and in any event no later than ten (10) days prior to making any payment hereunder), provide written notice to the applicable recipient of any anticipated deduction or withholding (together with the legal basis thereof) and (ii) cooperate in good faith with the applicable recipient to reduce or eliminate any amounts that would otherwise be deducted or withheld. To the extent that any amounts are so withheld and timely paid over to the proper Taxing Authority, such withheld and deducted amounts will be treated for all purposes of this Agreement as having been paid to the recipient of the payment in respect of which such deduction or withholding was made.

## ARTICLE IV

## REPRESENTATIONS RELATING TO THE COMPANY AND THE SPECIAL MASTER

It is represented and warranted to the Buyer based solely upon the Specified Information furnished by the Designated Managers to the Special Master in accordance with the Procedures Summary[17][18] that, except as disclosed in the correspondingly numbered section of the disclosure schedules delivered to the Buyer simultaneously with the execution of this Agreement (the "Company Disclosure Schedules") (it being agreed that any matter or item disclosed in one Schedule or section of the Company Disclosure Schedules shall be deemed to have been disclosed on each other Schedule or section of the Company Disclosure Schedules in which it is reasonably

---

[15] **Note to Bidder**: Bracketed language to be included in lieu of Section 3.4(f) for non-credit bidders.

[16] **Note to Bidder**: Bracketed language to be included in lieu of Section 3.4(e) for credit bidders.

[17] **Note to Bidder**: R&Ws are being provided on the basis of the information provided by CITGO as described in the Procedures Summary. Any changes to this construct will be strongly disfavored.

[18] **NTD**: Procedures Summary not listed as an exhibit or schedule hereto. Buyer's understanding is that this is due at execution of Definitive SPA at or about the Final Recommendation Date.

apparent on the face of such disclosure that the information is required to be included in such other Schedule or section of the Company Disclosure Schedules):[19]

Section 4.1.     Corporate Existence; Title to Shares.

(a)     The Company is a corporation duly incorporated, validly existing and in good standing under the Laws of the State of Delaware and has all requisite corporate powers and all governmental franchises, licenses, permits, authorizations, consents and approvals required to enable it to own, lease or otherwise hold its properties and assets and to carry on its business as now conducted, except for those the absence of which would not, individually or in the aggregate, be reasonably likely to materially impair the Acquired Companies, taken as a whole. The Company is duly qualified to do business as a foreign corporation and is in good standing under the Laws in each jurisdiction in which the character of the property owned or leased by it or the nature of its activities or the ownership or leasing of its properties make such qualification necessary, except for those jurisdictions where the failure to be so qualified would not, individually or in the aggregate, be reasonably likely to materially impair the Acquired Companies, taken as a whole. The Special Master has heretofore made available to the Buyer true, correct and complete copies of the certificate of incorporation of the Company (the "Company Charter"), and the by-laws of the Company (the "Company By-Laws"). There is no pending or, to the Knowledge of the Company, threatened Legal Proceedings for the dissolution, liquidation, insolvency, or rehabilitation of any of the Acquired Companies.

(b)     The Special Master (or his counsel or advisors) is in possession of the original certificate evidencing 100% of the Shares. PDVSA is the record and beneficial owner of all of the outstanding Shares. To the extent provided by, and subject to the decrees of, the Sale Procedures Order, the Special Master has the legal capacity, power and authority to (i) execute and deliver this Agreement and each other Transaction Document to which the Special Master is or will be a party, and (ii) surrender the Shares pursuant to the Transactions, and sell, transfer, assign, and deliver the Shares to the Buyer, in each case, the delivery of which will convey good and marketable title to the Shares, free and clear of all Liens (other than Permitted Liens and transfer restrictions imposed by applicable securities Laws).

(c)     This Agreement has been duly executed and delivered by the Special Master and, assuming due authorization, execution and delivery by the Buyer, and subject to the Sale Order Entry, will constitute, and each other Transaction Document (to the extent the Special Master is or will be a party thereto), when executed and delivered by the Special Master (assuming due authorization, execution and delivery by the other parties thereto), subject to the Sale Order Entry, will constitute, a legal, valid and binding obligation of the Special Master, enforceable against the Special Master in accordance with its terms, except that such enforcement may be limited by the Equitable Exceptions.

Section 4.2.     Governmental Authorization. Except as set forth on Section 4.2 of the Company Disclosure Schedules, the execution, delivery and performance by the Special Master of this Agreement and the other Transaction Documents and the consummation by the Special Master

---

[19] **Note to Bidder**: Given the extensive negotiation of the R&Ws in connection with the sale process to date and significant input from CITGO, further comments / requests for additional R&Ws will be strongly disfavored.

WEIL:\100255289\1\67816.0003

of the Transactions require no action by or in respect of, or filing with, any Governmental Body other than (a) applicable requirements of Antitrust Laws as set forth in <u>Section 4.2</u> of the Company Disclosure Schedules, (b) the OFAC License, (c) the entry of the Sale Order by the Court (the "<u>Sale Order Entry</u>"), and (d) other actions or filings the absence or omission of which would not, individually or in the aggregate, be material to the business of the Acquired Companies, taken as a whole.

Section 4.3.    <u>Non-Contravention</u>. Except as set forth on <u>Section 4.3</u> of the Company Disclosure Schedules, the execution, delivery and performance by the Special Master of this Agreement and the other Transaction Documents and the consummation by the Special Master of the Transactions do not and will not, assuming compliance with the matters referred to in <u>Section 4.2</u>, (a) result in any Negative Consequences under the Company Charter or the Company By-Laws or the Organizational Documents of any of the Acquired Companies or, to the Knowledge of the Company (and based only on information made available to the Acquired Companies with respect to the Non-Controlled Entities prior to the Execution Date), any of the Non-Controlled Entities, (b) contravene or conflict with or constitute a violation of any provision of any Law binding upon or applicable to the Acquired Companies or, to the Knowledge of the Company, the Non-Controlled Entities, (c) result in any Negative Consequences under any (i) Material Contract or (ii) any license, franchise, permit or other similar authorization held by the Acquired Companies, or (d) result in the creation or imposition of any Lien (other than Permitted Liens) on any asset of the Acquired Companies, except for such Negative Consequences referred to in clauses (b) or (c) or Liens referred to in clause (d) that would not, individually or in the aggregate, be material to the business of the Acquired Companies, taken as a whole.

Section 4.4.    <u>Capitalization</u>.

(a)    The authorized capital stock of the Company consists of 1,000 Shares. There are 1,000 Shares issued and outstanding, all of which are owned by PDVSA. The Shares have been duly authorized and are validly issued, fully paid and non-assessable and have not been issued in violation of any preemptive rights or Preferential Rights. The Shares constitute the only outstanding Equity Interests of the Company and are not subject to any Preferential Rights.

(b)    Except for this Agreement, there is no outstanding option, warrant, call, right, or Contract of any character to which the Company is a party requiring, and there are no Equity Interests of the Company outstanding which upon conversion or exchange would require, the issuance of any Shares or other securities convertible into, exchangeable for or evidencing the right to subscribe for or purchase Shares. Other than as set forth in <u>Section 4.4(b)</u> of the Company Disclosure Schedules, (x) there are no outstanding equity appreciation, phantom equity, stock unit, profit participation, equity, equity-based performance or similar rights with respect to the Company or any of its Subsidiaries, and (y) all of the Equity Interests of each Company Subsidiary are owned, directly or indirectly, by the Company. The Company is not a party to any voting trust or other Contract with respect to the voting, redemption, sale, transfer or other disposition of the Shares.

11

Section 4.5.     Subsidiaries; Non-Controlled Entities.

(a)     Section 4.5(a) of the Company Disclosure Schedules reflects a true and complete list of each entity in which the Company owns, directly or indirectly, any Equity Interests (excluding Equity Interests owned directly or indirectly by Non-Controlled Entities), and with respect to each entity (except as otherwise provided in this Section 4.5(a)), sets forth the following information: (i) its name and jurisdiction of organization or formation; (ii) the number of authorized shares or other Equity Interests as of the date hereof (with respect to Company Subsidiaries only); and (iii) the number of issued and outstanding shares or other Equity Interests, the names of the holders thereof, and the number of shares or other Equity Interests held by each such holder (with respect to Company Subsidiaries only). Except as set forth on Section 4.5(a) of the Company Disclosure Schedules, the Company does not, directly or indirectly, own any Equity Interests in any other entity.

(b)     Each Company Subsidiary and, to the Knowledge of the Company, each Non-Controlled Entity, is duly organized, validly existing and in good standing under the Laws of its jurisdiction of organization, to the extent such concepts are recognized under the Laws of the jurisdiction of its organization, and has all requisite corporate (or similar entity) power and authority to own, lease and operate its properties and to carry on its business in all material respects as now conducted, except where the failure to be so organized, existing and in good standing or to have such power and authority would not, individually or in the aggregate, be reasonably likely to be material to the business of the Acquired Companies, taken as a whole. Each Company Subsidiary: (i) is duly qualified or authorized to do business as a foreign corporation or entity and is in good standing to the extent such concepts are recognized under the Laws of each jurisdiction in which the conduct of its business or the ownership of its properties requires such qualification or authorization, except where the failure to be so qualified, authorized or in good standing would not, individually or in the aggregate, be reasonably likely to be material to the business of the Acquired Companies, taken as a whole and (ii) has full organizational power and authority to own, lease and operate its properties and carry on its business as presently conducted, except where the failure to have such power and authority would not, individually or in the aggregate, be reasonably likely to be material to the business of the Acquired Companies, taken as a whole.

(c)     The Special Master has heretofore made available to the Buyer true, correct and complete copies of the Organizational Documents of each Company Subsidiary.

(d)     The outstanding Equity Interests of each Company Subsidiary are validly issued, fully paid and non-assessable, to the extent such concepts are applicable to such Equity Interests, and have not been issued in violation of any preemptive rights or Preferential Rights or similar rights, and all such Equity Interests represented as being owned by the Company or any Company Subsidiaries are owned by it free and clear of any Liens, other than (i) Liens securing Debt of the Company or any Company Subsidiaries (which Liens shall be removed on or before the Closing), (ii) Liens relating to the transferability of securities under applicable securities Laws, (iii) Liens created by acts of the Buyer or any of its Affiliates and (iv) the Equity Pledge and Liens as a result of the 2020 Bonds. There is no outstanding option, warrant, call, Preferential Right, right or Contract to which any Company Subsidiary is a party requiring, and there are no convertible securities of any Company Subsidiary outstanding which upon conversion would require, the issuance of any Equity Interests of any Company Subsidiary or other securities

12

convertible into Equity Interests of any Company Subsidiary. No Company Subsidiary is a party to any voting trust or other Contract with respect to the voting, redemption, sale, transfer or other disposition of the Equity Interests of such Company Subsidiary.

Section 4.6.    <u>Financial Statements</u>.

(a)    <u>Section 4.6(a)</u> of the Company Disclosure Schedules sets forth true, correct, and complete copies of: (i) the audited consolidated balance sheet of the Acquired Companies reflected therein as of December 31, 2024, December 31, 2023, December 31, 2022, and December 31, 2021, the related audited consolidated statements of income and comprehensive income, stockholder's equity and cash flow of the Acquired Companies for the fiscal year then ended, together with the related notes thereof (the "<u>Audited Financial Statements</u>"); and (ii) the unaudited consolidated balance sheet of the Acquired Companies (the "<u>Company Balance Sheet</u>") as of [●][20] (the "<u>Company Balance Sheet Date</u>") and the related condensed consolidated statements of income and comprehensive income, stockholder's equity and cash flows of the Acquired Companies for the nine-month period then ended (the "<u>Interim Financial Statements</u>" and, collectively with the Audited Financial Statements, the "<u>Financial Statements</u>"). Except as set forth in the notes to the Financial Statements and with the exception of the absence of normal year-end audit adjustments and footnotes in the Interim Financial Statements, each of the Financial Statements has been prepared in conformity with United States generally accepted accounting principles ("<u>GAAP</u>") applied on a consistent basis (except as may be indicated in the notes thereto) and fairly presents, in all material respects, the consolidated financial position, results of operations and cash flows of the Acquired Companies as of the dates and for the periods indicated therein.

(b)    The Acquired Companies (i) maintain a standard system of accounting established and administered in accordance with GAAP and (ii) have established and maintain a system of internal controls over financial reporting designed to provide reasonable assurance regarding the reliability of the financial reporting and the preparation of the Financial Statements for external purposes in accordance with GAAP. Except as disclosed on <u>Section 4.6(b)</u> of the Company Disclosure Schedules, there (x) are no significant deficiencies or weaknesses in any system of internal accounting controls used by each of the Acquired Companies, (y) has not been since the Lookback Date any fraud or other unlawful wrongdoing on the part of any of management or other employees of the Acquired Companies who have a significant role in the preparation of Financial Statements or the internal accounting controls used by the Company and each of its Subsidiaries relating to such preparation or controls, or (z) has not been since the Lookback Date any claim or allegation regarding any of the foregoing.

Section 4.7.    <u>Absence of Certain Changes</u>. Except as contemplated by this Agreement, from the Company Balance Sheet Date to the date of this Agreement:

(a)    the Acquired Companies have conducted their businesses in the Ordinary Course in all material respects;

(b)    the Acquired Companies have not taken any action described in <u>Section 6.1</u>;

---

[20] **NTD**: Buyer proposes December 31, 2024 or December 31, 2023 depending on the Final Recommendation Date.

WEIL:\100255289\1\67816.0003

(c)    there has not been a Company Material Adverse Effect; and

(d)    no Acquired Company has entered into, terminated, amended or otherwise modified any Contracts set forth in <u>Section 4.20</u> of the Company Disclosure Schedules (Affiliate Transactions).

Section 4.8.    <u>No Undisclosed Material Liabilities</u>. The Acquired Companies have no material liabilities of any kind that would be required to be reflected in or reserved against on a consolidated balance sheet of the Company or in the notes thereto prepared in accordance with GAAP, other than:

(a)    liabilities that are adequately accrued and specifically reflected in the Company Balance Sheet or the notes thereto;

(b)    liabilities incurred since the Company Balance Sheet Date in the Ordinary Course and which, individually or in the aggregate, would not be reasonably likely to be material to the Acquired Companies (taken as a whole);

(c)    liabilities or obligations that have been discharged or paid in full in the Ordinary Course or which, individually or in the aggregate, would not be reasonably likely to have a Company Material Adverse Effect;

(d)    liabilities or obligations under this Agreement or otherwise in connection with the Transactions; or

(e)    liabilities or obligations set forth in <u>Section 4.8(e)</u> of the Company Disclosure Schedules.

Section 4.9.    <u>Legal Proceedings</u>[21] As of the Execution Date, except for the Specified Litigation and as set forth in <u>Section 4.9</u> of the Company Disclosure Schedules and as would not, individually or in the aggregate, be reasonably likely to be material to the business of the Acquired Companies, taken as a whole, there are no material Legal Proceedings pending, or, to the Knowledge of the Company, threatened in writing against the Acquired Companies before or by any Governmental Body (whether local, state, federal or foreign). As of the Execution Date, except as would not, individually or in the aggregate, be reasonably likely to be material to the business of the Acquired Companies, taken as a whole, neither the Company nor any of its Subsidiaries is subject to any outstanding judgment, Order, decree or injunction of any court or other Governmental Body (other than Orders of general applicability which do not impact the Acquired Companies in a manner that is materially different than the impact of similarly situated companies).

Section 4.10.    <u>Taxes</u>. Except as set forth in the Company Balance Sheet (including the notes thereto) and except as would not, individually or in the aggregate, be reasonably likely to have a Company Material Adverse Effect:

---

[21] **Note to Bidder**: CITGO will not accept comments to disclosure schedules which delete references to the litigation listing provided in the VDR.

(a)    all income and other material Tax Returns required to be filed with any Taxing Authority by, or with respect to, the Acquired Companies have been filed (taking into account any applicable extensions) in accordance with all applicable Laws, the Acquired Companies have paid, or caused to be paid, all material Taxes shown as due and payable on such Tax Returns, and, as of the time of filing, such Tax Returns were true and complete in all material respects;

(b)    all material amounts of Taxes which any of the Acquired Companies were obligated to withhold from amounts owing to any employee, creditor, owner or third party have been fully and timely paid;

(c)    except as set forth in Section 4.10(c) of the Company Disclosure Schedules, as of the date hereof, there is no Legal Proceeding or Claim in respect of any Tax or Tax Return (each, a "Tax Proceeding") now proposed in writing or pending against or with respect to the Acquired Companies;

(d)    except as set forth in Section 4.10(d) of the Company Disclosure Schedules, none of the Acquired Companies have waived any statute of limitations in respect of Taxes beyond the date hereof or agreed to any extension of time beyond the date hereof with respect to a Tax assessment or deficiency (other than pursuant to extensions of time to file Tax Returns obtained in the Ordinary Course);

(e)    except as set forth in Section 4.10(e) of the Company Disclosure Schedules, the Acquired Companies are not a party to, are not bound by and do not have any obligation under any Tax sharing, allocation or indemnity agreement, or any similar agreement or arrangement, except for (i) any such agreement or arrangement solely between or among the Acquired Companies or (ii) any commercial agreement entered into in the Ordinary Course the primary purpose of which does not relate to Taxes;

(f)    none of the Acquired Companies have any liability for Taxes of any Person (other than the Company or any of its Subsidiaries) under Treasury Regulations § 1.1502-6 (or any similar provision of state, local or foreign Law) or as a transferee or successor;

(g)    no claim has been made by a Taxing Authority in a jurisdiction where any of the Acquired Companies do not file Tax Returns that the Acquired Companies are or may be subject to taxation by that jurisdiction, which claim has not been resolved;

(h)    none of the Acquired Companies will be required to include any material item of income in, or exclude any material item of deduction from, income for any Tax period (or portion thereof) ending after the Closing Date as a result of any: (i) change in method of accounting made on or prior to the Company Balance Sheet Date pursuant to Section 481(a) of the Code (or any comparable provision of applicable Law), (ii) "closing agreement" as described in Section 7121 of the Code (or any comparable provision of applicable Law), (iii) installment sale or open transaction disposition made on or prior to the Company Balance Sheet Date, or (iv) prepaid amount received on or prior to the Company Balance Sheet Date;

(i)    none of the Acquired Companies has participated in any "listed transaction" (other than a "loss transaction") within the meaning of Treasury Regulation Section 1.6011-4; and

15

(j)    there are no Liens with respect to Taxes upon any asset of the Acquired Companies other than Permitted Liens.

Notwithstanding any other provision in this Agreement, no representation or warranty is made with respect to the existence, availability, amount, usability or limitations (or lack thereof) of any net operating loss, net operating loss carryforward, capital loss, capital loss carryforward, basis amount or other Tax attribute (whether federal, state, local or foreign) of the Acquired Companies after the Closing Date, and none of the Buyer or any of its Affiliates (including, after the Closing, the Acquired Companies) may rely on any of the representations and warranties in this 0 with respect to any position taken in or any Taxes with respect to any Post-Closing Tax Period.

Section 4.11.    Company Benefit Plans; Employment.

(a)    The Special Master has provided the Buyer with a list (set forth in Section 4.11(a) of the Company Disclosure Schedules) identifying each material Company Benefit Plan as of the Execution Date.

(b)    With respect to each material Company Benefit Plan, the Special Master has made available to the Buyer true, complete and correct copies (or, to the extent such plan is unwritten, an accurate written description), to the extent applicable, of: (i) the current plan and trust document and any amendments thereto and the most recent summary plan description, together with each subsequent summary of material modifications with respect to such Company Benefit Plan, (ii) the most recent annual report on Form 5500 thereto (including any related actuarial valuation report) filed with the Internal Revenue Service (if any such report was required), (iii) the most recent financial statements, (iv) the most recent Internal Revenue Service determination, opinion or advisory letter, and (v) for the three (3) most recent years, nondiscrimination testing results in respect of such Company Benefit Plan. For purposes of this Section 4.11(b), summary plan descriptions and summaries of material modification available at https://www.hr.citgo.com as of five (5) business days prior to the Execution Date are considered to have been made available to the Buyer. The Special Master has made available copies of Code Section 280G calculations prepared by the Company or its representatives (whether or not final) with respect to certain employees of the Acquired Companies in connection with the Transactions.

(c)    Except as would not, individually or in the aggregate, be reasonably likely to result in a material liability to the Acquired Companies taken as a whole, (i) each Company Benefit Plan has been established, maintained, operated, funded and administered in compliance with (A) its terms and (B) the requirements prescribed by Law (including, to the extent applicable, ERISA and the Code) which are applicable to such Company Benefit Plan and (ii) all benefits, contributions and premium payments required to be made with respect to a Company Benefit Plan have been timely made or paid in full, or to the extent not required to be made or paid in full, have been accrued and reflected on the Financial Statements as required by GAAP.

(d)    Except as would not, individually or in the aggregate, be reasonably likely to result in a material liability to the Acquired Companies taken as a whole, (i) no  Acquired Company or any of their respective ERISA Affiliates has incurred any liability under Title IV of ERISA, Sections 412, 430 or 4971 of the Code or Section 302 of ERISA that has not been satisfied

16

in full when due, and (ii) all insurance premiums with respect to Company Benefit Plans, including premiums to the Pension Benefit Guaranty Corporation ("PBGC"), have been paid when due. No Acquired Company or any of their respective ERISA Affiliates currently sponsors, maintains, or contributes to (or is obligated to contribute to) or has, within the last six (6) years, sponsored or maintained, contributed to or been obligated to contribute to (i) a "multiemployer plan," as defined in Section 3(37) of ERISA, (ii) a "multiple employer plan" as defined in Section 413(c) of the Code, or (iii) a "multiple employer welfare arrangement" within the meaning of Section 3(40) of ERISA.

(e)     Except as set forth in Section 4.11(e) of the Company Disclosure Schedules, with respect to any Company Benefit Plan that is subject to Title IV of ERISA: (i) there does not exist any failure to meet the "minimum funding standard" of Section 412 of the Code or 302 of ERISA (whether or not waived); (ii) such plan is not in "at-risk" status for purposes of Section 430 of the Code; (iii) as of the last day of the most recent plan year ended prior to the Execution Date, there is no "amount of unfunded benefit liabilities" as defined in Section 4001(a)(18) of ERISA; (iv) except as would not, individually or in the aggregate, be reasonably likely to result in a material liability to the Acquired Companies taken as a whole, no reportable event within the meaning of Section 4043(c) of ERISA has occurred; and (v) the PBGC has not instituted proceedings to terminate any such plan and, to the Knowledge of the Company, no circumstances exist which would serve as a basis for the institution of such proceedings.

(f)     Each Company Benefit Plan that is intended to be qualified under Section 401(a) of the Code is so qualified and has received a favorable determination letter or opinion letter, if applicable, from the Internal Revenue Service, and the related trust is intended to be exempt from federal income taxation under the Code and is so exempt. There are no facts or set of circumstances and, to the Knowledge of the Company, nothing has occurred that would reasonably be expected to cause the loss of such qualification or exemption or reasonably be expected to result in any Company Benefit Plan being required to pay any Tax or penalty under applicable Law that is material to the Acquired Companies taken as a whole as a condition to maintaining such qualification or exemption. Each trust funding any Company Benefit Plan which is intended to meet the requirements of Section 501(c)(9) of the Code meets such requirements and provides no disqualified benefits (as such term is defined in Section 4976(b) of the Code).

(g)     Except (i) as would not, individually or in the aggregate, be reasonably likely to result in a material liability to the Acquired Companies taken as a whole or (ii) as set forth in Section 4.11(g) of the Company Disclosure Schedules, no Acquired Company has any obligation or liability to provide post-employment medical or welfare benefits, except (A) as required by the continuing coverage requirements of COBRA and at the sole expense of the participant or such participant's spouse or dependents or (B) death or disability benefits under any retirement or deferred compensation plan. To the Company's Knowledge, since the Lookback Date, there have been no written communications by the Acquired Companies to employees of any Acquired Company which promise or guarantee post-employment medical or welfare benefits on a permanent basis.

(h)     Except as would not, individually or in the aggregate, be reasonably likely to result in a material liability to the Acquired Companies taken as a whole, no Acquired Company nor any plan sponsor or plan administrator of a Company Benefit Plan, or to the Company's

17

Knowledge, any third-party fiduciary of a Company Benefit Plan, has engaged in any prohibited transaction (within the meaning of Section 406 of ERISA or Section 4975 of the Code) or breached any fiduciary duty under ERISA with respect to such Company Benefit Plan that would be reasonably likely to subject any Acquired Company or Company Benefit Plan to any Tax or penalty (civil or otherwise) imposed by ERISA, the Code or other applicable Law, or any other material liability. Except (i) as would not, individually or in the aggregate, be reasonably likely to result in a material liability to the Acquired Companies taken as a whole, or (ii) as set forth in Section 4.11(h) of the Company Disclosure Schedules, there are no pending or, to the Knowledge of the Company, threatened claims (other than routine claims for benefits) by or on behalf of any Company Benefit Plan or any trusts which are associated with such Company Benefit Plans and, to the Knowledge of the Company, no facts or circumstances exist that would reasonably be expected to result in such claim. Except as would not, individually or in the aggregate, be reasonably likely to result in a material liability to the Acquired Companies taken as a whole, as of the Execution Date, none of the Company Benefit Plans are under audit or subject to an administrative proceeding or, to the Knowledge of the Company, investigation or examination by the Internal Revenue Service, the Department of Labor, the PBGC or any other Governmental Body.

(i)     Except as would not, individually or in the aggregate, be reasonably likely to result in a material liability to the Acquired Companies taken as a whole, each Company Benefit Plan that is a "nonqualified deferred compensation plan" within the meaning of Section 409A(d)(1) of the Code that is subject to Section 409A of the Code, complies with, and has been operated and administered in compliance with, Section 409A of the Code and the regulations and related guidance promulgated thereunder.

(j)     Except (x) as would not, individually or in the aggregate, be reasonably likely to result in a material liability to the Acquired Companies taken as a whole, or (y) as set forth on Section 4.11(j) of the Company Disclosure Schedules, neither the execution, delivery or the performance of this Agreement nor the consummation of the Transactions (alone or in conjunction with any other event) will or could reasonably be expected to (i) accelerate the time of payment or vesting or increase the amount of, or trigger any funding of, compensation or benefits under any Company Benefit Plan; (ii) result in any limitation on the right of an Acquired Company or Buyer, or any of their respective Affiliates, to amend, merge, terminate or receive a reversion of assets from a Company Benefit Plan or related trust; (iii) entitle any current or former director, officer, manager, employee, contractor or consultant of any Acquired Company to severance pay, termination pay or any other similar payment, right or benefit; (iv) result in any payment, right or benefit that (A) would not be deductible under Section 280G of the Code or (B) would result in any excise tax on any "disqualified individual" (within the meaning of Section 280G of the Code) under Section 4999 of the Code. Except as set forth on Section 4.11(j) of the Company Disclosure Schedules, none of the Acquired Companies has any obligation to gross-up or reimburse any current or former director, officer, manager, employee, contractor or consultant of any Acquired Company for any Taxes or related interest or penalties incurred by such individual, including under Section 4999, 409A or 105(h) of the Code.

(k)     No Company Benefit Plan is maintained primarily in respect of any current or former director, officer, manager, employee, contractor or consultant of any Acquired Company who is located outside of the United States.

18

(l)     Except as set forth in <u>Section 4.11(l)</u> of the Company Disclosure Schedules and as would not, individually or in the aggregate, be material to the Acquired Companies, taken as a whole, (i) the Acquired Companies are in material compliance with all applicable Laws respecting employment, employment practices and terms and conditions of employment, including all Laws relating to labor, labor relations, collective bargaining, occupational safety and health, and wages, hours, worker classification, immigration, whistleblower protections, reasonable accommodation, leaves of absence, paid sick leave, unemployment insurance, workers' compensation, retaliation, harassment, and employment discrimination and (ii) there are no actual or, to the Knowledge of the Company, as of the Execution Date, threatened unfair labor practice charges, labor grievances, or labor arbitrations against the Acquired Companies which, individually or in the aggregate, are expected to result in material liability for the Company.

(m)     To the Knowledge of the Company, as of the Execution Date, no employee of the Acquired Companies holding a position of executive vice president or above has notified the Company or the Acquired Companies in writing of an intention to resign, retire, or otherwise terminate his or her employment prior to the Closing or in connection with the Transactions nor, to the Knowledge of the Company as of the Execution Date, does any such employee have an intention to do so.

(n)     Except as set forth in <u>Section 4.11(n)</u> of the Company Disclosure Schedules, (i) as of the Execution Date, none of the Acquired Companies are party to or bound by any collective bargaining agreements or other agreement (each, a "<u>Collective Bargaining Agreement</u>") with any labor union, works council, or other labor organization (each, a "<u>Union</u>") and no such agreement is being negotiated by any of the Acquired Companies (each such Collective Bargaining Agreement set forth on <u>Section 4.11(n)</u> of the Company Disclosure Schedules, a "<u>Company Collective Bargaining Agreement</u>"); (ii) since the Lookback Date, to the Knowledge of the Company, no group of employees of an Acquired Company or Union has sought to organize any employees of an Acquired Company not covered by a Company Collective Bargaining Agreement for purposes of collective bargaining, made a demand for recognition or certification, sought to bargain collectively with any Acquired Company, or filed a petition for recognition with any Governmental Body, except that resulted in entry into or involved a pre-existing Company Collective Bargaining Agreement; and (iii) since the Lookback Date, there has been no labor strike, lockout, slowdown, stoppage, picketing, boycott, handbilling, demonstration, leafletting, sit-in, sick-out, lockout or other form of organized labor disruption pending or, to the Knowledge of the Company, threatened against any Acquired Company.

(o)     Since the Lookback Date, (i) to the Knowledge of the Company, no material allegations of sexual harassment or other sexual misconduct have been made by any current or former employee of the Acquired Companies against any current employee of the Acquired Companies with the title of executive vice president or above and, to the Knowledge of the Company, no employee of any Acquired Company has engaged in any cover up of such harassment or misconduct or knowingly aided or assisted any other person or entity to engage in any such harassment or misconduct, (ii) there are no Legal Proceedings pending or, to the Knowledge of the Company, threatened related to any allegations made by any current or former employee of the Acquired Companies of sexual harassment or other sexual misconduct against any employee of the Acquired Companies with the title of executive vice president or above and (iii) none of the Acquired Companies have entered into any settlement agreements related to allegations of sexual

19

harassment or other sexual misconduct made by any current or former employee of the Acquired Companies against any current employee of the Acquired Companies with the title of executive vice president or above.

(p)     Since the Lookback Date, the Acquired Companies have complied in all material respects with Worker Adjustment and Retraining Notification Act and any similar state or local law, as amended (collectively, the "<u>WARN Act</u>") and have not incurred any material liability or material obligation under the WARN Act.

(q)     Except as would not be reasonably expected to result in material liability to the Company, each of the employees of the Acquired Companies have all work permits, immigration permits, visas, or other authorizations required by applicable Law for such individual given the duties and nature of such individual's employment, and the Acquired Companies have on file for each employee of the Acquired Companies a Form I-9 that is validly and properly completed in accordance with applicable Law.

(r)     No Acquired Company is a party to a U.S. federal Government Contract. The Acquired Companies are not, and have not been since the Lookback Date, the subject of any Legal Proceeding in connection with any U.S. federal Government Contract or related compliance with Executive Order No. 11246 of 1965, Section 503 of the Rehabilitation Act of 1973 or the Vietnam Era Veterans' Readjustment Assistance Act of 1974. The Acquired Companies are not debarred, suspended or otherwise ineligible from doing business with the U.S. government or any U.S. government contractor.

(s)     Except as would not, individually or in the aggregate, be reasonably likely to result in a material liability to the Acquired Companies taken as a whole; there are no, and since the Lookback Date there have not been, any material workers' compensation claims, insured or uninsured, pending or, to the Knowledge of the Company, threatened, relating to any employee of the Acquired Companies. Except as would not, individually or in the aggregate, be reasonably likely to have a Company Material Adverse Effect, all amounts required by any statute, insurance policy, Governmental Body or agreement to be paid by the Acquired Companies into any workers' compensation loss or reserve fund, collateral fund, sinking fund or similar account have been duly paid into such fund or account as required.

(t)     Pursuant to the terms of the EPP and the RRP, the Company has established and maintains a grantor trust that will become irrevocable as of the Closing.

Section 4.12.     <u>Compliance with Laws; Permits</u>.

(a)     Except as set forth in <u>Section 4.12(a)</u> of the Company Disclosure Schedules, since the Lookback Date, (i) to the Knowledge of the Company, none of the Acquired Companies has materially violated or is in material violation of, any Laws except for any violations that, individually or in the aggregate, are not, and would not be reasonably likely to be material to the business of the Acquired Companies, taken as a whole  and (ii) none of the Acquired Companies has received any written notice of or been charged with the material violation of any Laws except for any violations that, individually or in the aggregate, are not, and would not be reasonably likely to be material to the business of the Acquired Companies, taken as a whole.

20

(b)     Except as set forth in <u>Section 4.12(b)</u> of the Company Disclosure Schedules, the Acquired Companies have all Permits which are required for the operation of its respective business as presently conducted (and such Permits are in full force and effect), except for any Permit which the failure of the Acquired Companies to have (or to be in full force and effect) would not be material to the business of the Acquired Companies, taken as a whole. Except as would not be material to the Acquired Companies, taken as a whole, the Acquired Companies are, and since the Lookback Date have been, in compliance in all material respects with the terms, conditions or provisions of any such Permits.

Section 4.13.   <u>Regulatory Matters</u>.

(a)     Except as would not, individually or in the aggregate, reasonably be expected to be material to the Acquired Companies, taken as a whole, and except as set forth in <u>Section 4.13(a)</u> of the Company Disclosure Schedules, since the Lookback Date, (i) none of the Acquired Companies, the Acquired Companies' directors, officers, employees, nor to the Knowledge of the Company, any Representatives or other Person acting on behalf of the Acquired Companies has violated any Anti-Corruption Law and (ii) none of the Acquired Companies, the Acquired Companies' directors, officers, employees, nor to the Knowledge of the Company, any Representatives or other Person acting on behalf of the Acquired Companies, has offered, paid, given, promised, authorized, solicited or received, the payment of, anything of value (including money, checks, wire transfers, tangible and intangible gifts, favors, services, employment or entertainment and travel) directly or indirectly to or from any employee, officer, or Representative of, or any Person otherwise acting in an official capacity for or on behalf of a Governmental Body, whether elected or appointed, including an officer or employee of a state-owned or state-controlled enterprise, a political party, political party official or employee, candidate for public office, or an officer or employee of a public international organization (such as the World Bank, United Nations, International Monetary Fund, or Organization for Economic Cooperation and Development) (any such person, a "<u>Government Official</u>") (A) for the purpose of (1) influencing any act or decision of a Government Official or any other person in his or her official capacity, (2) inducing a Government Official or any other person to do or omit to do any act in violation of his or her lawful duties, (3) securing any improper advantage, (4) inducing a Government Official or any other person to influence or affect any act or decision of any Governmental Body or (5) assisting the Acquired Companies, or any Acquired Company director, officer employee, Representative, or any other person acting on behalf of an Acquired Company in obtaining or retaining business, or (B) in a manner which would constitute or have the purpose or effect of public or commercial bribery or corruption, acceptance of, or acquiescence in extortion, kickbacks, or other unlawful or improper means of obtaining or retaining business or any improper advantage.

(b)     Except as would not, individually or in the aggregate, reasonably be expected to be material to the Acquired Companies, taken as a whole, and except as set forth in <u>Section 4.13(b)</u> of the Company Disclosure Schedules, (i) the Acquired Companies and their respective directors, officers, employees, and, to the Knowledge of the Company, Representatives and other Persons acting for or on behalf of any of the foregoing Persons, are, and at all times since the Lookback Date, in compliance with all applicable Economic Sanctions/Trade Laws and all applicable Money Laundering Laws and (ii) in the five (5) years prior to the Execution Date none of the Acquired Companies is a Sanctions Target or has carried on or carries on, any business,

directly or knowingly indirectly, involving any Sanctions Target in violation of applicable Economic Sanctions/Trade Laws.[22]

(c)     Except as would not, individually or in the aggregate, reasonably be expected to be material to the Acquired Companies, taken as a whole, and except as set forth in Section 4.13(c) of the Company Disclosure Schedules, since the Lookback Date (i) none of the Acquired Companies has conducted or initiated any internal investigation, review or audit, or made a voluntary, directed, or involuntary disclosure to any Governmental Body or third party with respect to any alleged or suspected act or omission arising under or relating to any potential noncompliance with any applicable Anti-Corruption Law, Economic Sanctions/Trade Law, or Money Laundering Law, (ii) none of the Acquired Companies, nor any of their respective directors or officers, nor, to the Knowledge of the Company, any employees (other than officers), Representatives, or any other Person acting at the direction of an Acquired Company has received any written notice, request or citation (including a whistleblower complaint) for any actual or potential noncompliance with any applicable Anti-Corruption Law, Economic Sanctions/Trade Law or Money Laundering Law, (iii) the Acquired Companies have implemented and maintained internal controls, policies and procedures designed to detect and prevent violations of Anti-Corruption Laws, Economic Sanctions/Trade Laws and Money Laundering Laws, and (iv) the Acquired Companies have at all times made and maintained accurate books and records in material compliance with all applicable Anti-Corruption Laws, Economic Sanctions/Trade Laws or Money Laundering Laws.

Section 4.14.    Environmental Matters. Except as set forth in Section 4.14 of the Company Disclosure Schedules and except as would not, individually or in the aggregate, reasonably be expected to result in the Acquired Companies incurring liabilities which are material to the Acquired Companies, taken as a whole, (i) no written Claim or Order has been received by, and no Legal Proceeding is pending or, to the Knowledge of the Company, threatened by any Person against the Acquired Companies, and no penalty has been assessed or consent decree or Order issued by a Governmental Body against the Acquired Companies, in each case, with respect to any matters arising out of any Environmental Law, which remains outstanding; (ii) the Acquired Companies have been since the Lookback Date, and are, in compliance with all Environmental Laws, which compliance includes obtaining, maintaining and complying with Permits required under Environmental Laws for the conduct of their respective businesses (the "Company Environmental Permits"); (iii) no Governmental Body has begun, or to the Knowledge of the Company, threatened to begin, any Legal Proceeding to terminate, revoke, cancel, suspend, materially reform or not renew any Company Environmental Permit; (iv) to the Knowledge of the Company, there is no investigation pending or threatened against the Acquired Companies by any Governmental Body alleging non-compliance with or liability under any Environmental Law; (v) to the Knowledge of the Company, the Acquired Companies have not generated, treated, stored, disposed of, arranged for the disposal of, transported, or Released, or exposed any Person to, any Hazardous Substances in a manner or concentration that has given rise, or would reasonably be expected to give rise, to liabilities of the Acquired Companies under Environmental Laws, which liability has not been resolved; (vi) to the Knowledge of the Company, no Hazardous Substances have been Released in or under, and no Hazardous Substances are migrating from, (x) properties

---

[22] **NTD**: Included in definition of Sanctions Target.

currently, or to the Knowledge of the Company, formerly owned, leased or operated by the Acquired Companies in a manner or concentrations requiring the Acquired Companies to undertake any investigation, monitoring, removal or remediation under Environmental Laws or (y) to the Knowledge of the Company, any other properties in a manner or concentrations requiring the Acquired Companies to undertake any investigation, monitoring, removal or remediation under Environmental Laws; and (vii) none of the Acquired Companies has assumed by contract liabilities or obligations of any other Person arising under Environmental Laws. The Company has made available to the Buyer copies of all material, non-privileged environmental investigations, assessments or reports conducted in the three (3) years prior to the Execution Date by or on behalf of the Acquired Companies in relation to any current or prior business of the Acquired Companies or any property or facility currently or previously owned, leased or operated by the Acquired Companies, which investigation, assessment or report reveals actual or potential unresolved material non-compliance with or liability under any Environmental Law, but excluding routine environmental monitoring reports conducted by the Acquired Companies in the Ordinary Course.

Section 4.15.  <u>Title to Properties</u>. Except as would not, individually or in the aggregate, be material to the Acquired Companies, taken as a whole, each of the Acquired Companies has good title to, or valid leasehold or other ownership interests or rights in, all its material properties and assets except: (i) for such interest or rights as are no longer used or useful in the conduct of the business of the Acquired Companies as of the Execution Date or as have been disposed of in the Ordinary Course, and (ii) for defects in title, burdens, easements, restrictive covenants and similar encumbrances or impediments that, in each case that do not and will not, individually or in the aggregate, interfere with its ability to conduct its business as currently conducted. None of the properties and assets of the Acquired Companies are subject to any Liens (other than Permitted Liens) that, in the aggregate, interfere with the ability of the Acquired Companies to conduct their business in the Ordinary Course except as would not, individually or in the aggregate, have a Company Material Adverse Effect.

Section 4.16.  <u>Material Contracts</u>.

(a)     <u>Section 4.16(a)</u> of the Company Disclosure Schedules sets forth a true, correct and complete list of each Material Contract. For purposes of this Agreement, "<u>Material Contract</u>" shall mean any Contract to which any Acquired Company is a party or to which any assets, properties, or businesses of any Acquired Company are bound as of the Execution Date (in each case, excluding (i) Contracts between or among Acquired Companies only and (ii) spot order Contracts entered into in the Ordinary Course) that:

(i)     (A) limits in any material respect either the type of business in which any Acquired Company may engage or the manner or locations in which any of them may so engage in any business (including through "non-competition" or "exclusivity" provisions), (B) would require the disposition of any material assets or line of business of any Acquired Company or (C) grants "most favored nation" or similar status with respect to any material obligations and would run in favor of any Person (other than the Company or a wholly owned Company Subsidiary);

(ii)     (A) is an indenture, loan or credit Contract, loan note, mortgage Contract, or other Contract representing, or any guarantee of, indebtedness for borrowed

23

money of any Acquired Company in excess of $10,000,000 (excluding any government-mandated or state-wide bonds or guarantees), (B) is a finance lease of any Acquired Company as lessee in excess of $5,000,000, or (C) is a guarantee by any Acquired Company of indebtedness for borrowed money or any finance lease of any Person other than the Company or a wholly owned Company Subsidiary (excluding any government-mandated or state-wide bonds or guarantees);

(iii)     grants (A) any right of first refusal, right of first negotiation or similar right, or (B) any put, call or similar right, to any Person (other than the Company or a wholly owned Company Subsidiary) with respect to any Equity Interest, property, or other asset, in each case, that is material to the Acquired Companies;

(iv)     was entered into to resolve or settle any litigation or threatened litigation (A) for an amount in excess of $15,000,000 payable by an Acquired Company (without taking into account insurance proceeds) or (B) which imposes any material non-monetary ongoing obligation on any Acquired Company (other than customary confidentiality obligations), in each case of clause (A) and clause (B), that has not been fully paid or performed, as applicable;

(v)     limits or restricts the ability of any Acquired Company to declare or pay dividends or make distributions in respect of their Equity Interests that will be binding from and after the Closing;

(vi)     is a partnership, limited liability company, joint venture, co-development or other similar agreement, relating to the formation, creation, operation, management or control of any partnership, limited liability company, joint venture, co-development or similar entity (however organized) in which the Company owns, directly or indirectly, through a Company Subsidiary (excluding Equity Interests owned directly or indirectly by any Non-Controlled Entities) any Equity Interest and has invested or is contractually required to invest capital (including for the avoidance of doubt with respect to any Non-Controlled Entity or non-wholly owned Company Subsidiary, but excluding any wholly owned Company Subsidiary);

(vii)     relates to the sale, transfer or acquisition or disposition of any material business, material assets (other than those providing for sales, transfers or acquisitions of assets in the Ordinary Course) or Equity Interests of any Acquired Company, in each case (A) for an amount in excess of $10,000,000 in any transaction or series of related transactions (other than Contracts for transactions that were consummated prior to the Lookback Date or Contracts that do not contain any ongoing rights owing to, or obligations or liabilities of, any Acquired Company) or (B) pursuant to which any Acquired Company has any material ongoing obligations or liabilities (including in respect of indemnification, "earn-out" and similar contingent or deferred payment obligations);

(viii)     is a Contract (A) with an employee of an Acquired Company, pursuant to which such employee is entitled to receive base salary in excess of $400,000, (B) that provides for mandatory or potential severance payments by an Acquired Company in excess of $100,000 or (C) with an employee, officer or director of any Acquired

24

Company that (I) contains any non-compete or non-solicitation covenants or (II) modifies the at-will nature of the employment of any employee or otherwise requires advance notice for the termination of the Contract by any Acquired Company;

(ix)    is a Contract providing for indemnification by an Acquired Company of any officer, manager, director or employee of any Acquired Company;

(x)    is a Contract between or among any Acquired Company, on the one hand, and any Governmental Body, on the other hand;

(xi)    is a term Contract with one of the ten largest suppliers of any applicable Business Unit of the Acquired Companies (as determined by dollar volume for the 12-month period immediately prior to the Company Balance Sheet Date); and

(xii)    is a term Contract with one of the ten largest customers of any applicable Business Unit of the Acquired Companies (as determined by dollar volume for the 12-month period immediately prior to the Company Balance Sheet Date).

(b)    Each Material Contract is a legal, valid and binding obligation of the Acquired Companies as applicable. Except as would not, individually or in the aggregate, be material to the Acquired Companies, taken as a whole, each Material Contract is in full force and effect and enforceable by the applicable Acquired Company, in each case, subject to the Equitable Exceptions, and none of the Acquired Companies or, to the Knowledge of the Company any other party to a Material Contract, is in material breach or violation of any provision of, or in material default under, any Material Contract, and no event has occurred that, with or without notice, lapse of time or both, would constitute a material breach, violation or default or give rise to a right of termination, cancellation or acceleration of any material right or obligation or loss of any benefit thereunder. A true and correct copy of each Material Contract has previously been made available to the Buyer.

(c)    Since the Lookback Date, no Acquired Company has given or received (i) written notice regarding any actual or alleged or potential violation of any provision under any Material Contract or (ii) written notice threatening, intending or electing to terminate, repudiate, modify or cancel such Material Contract.

Section 4.17.    Intellectual Property and Data Privacy.

(a)    Section 4.17(a) of the Company Disclosure Schedules sets forth a list of all registered Intellectual Property that is owned by the Acquired Companies and is used in, held by, or held for use in the conduct of the business of the Acquired Companies as of the Execution Date ("Registered Intellectual Property"). Except as would not, individually or in the aggregate, be material to the Acquired Companies, taken as a whole, the Acquired Companies own or possess the right to use, license and enforce all (i) patents and patent applications, (ii) registered, applied for, or unregistered trademarks, trade names, trade dress, service marks, logos, and business names, and all related goodwill, (iii) internet domain names, (iv) registered, applied for, or unregistered works of authorship and copyrights, including copyrights in computer software programs or applications, and (v) trade secrets, know- how and other confidential and proprietary information, including ideas, inventions (whether patentable or not), research, pricing and cost

25

information, customer information, business plans, marketing plans, and proposals (collectively, "Intellectual Property") that are used in, held by, or held for use in the conduct of the business of the Acquired Companies as currently conducted (collectively, the "Company Intellectual Property" and to the extent owned by the Acquired Companies the "Company Owned Intellectual Property"), free and clear of all Liens, except for Permitted Liens. To the Knowledge of the Company, the Registered Intellectual Property is valid and enforceable.

(b)     (i) Since the Lookback Date, to the Knowledge of the Company, the conduct of the business of the Acquired Companies and use of the Company Intellectual Property does not and has not infringed upon or otherwise violated any Intellectual Property rights of any other Person; (ii) no third party is challenging, or, to the Knowledge of the Company, infringing or otherwise violating any right of the Acquired Companies in the Company Owned Intellectual Property; and (iii) since the Lookback Date, the Acquired Companies have not received written notice of any pending Claim, Order or Legal Proceeding with respect to any alleged or potential infringement or other violation of Intellectual Property rights of any other Person or with respect to any Company Intellectual Property. The Acquired Companies have taken commercially reasonable measures to maintain the confidentiality of any material proprietary information or trade secrets included in Company Intellectual Property.

(c)     Except as would not, individually or in the aggregate, reasonably be expected to be material to the Acquired Companies, taken as a whole, each current and former employee and independent contractor of any Acquired Company who has participated in the conception or development of any Intellectual Property has assigned to such Acquired Company by operation of law, or has entered into a valid and enforceable written agreement with such Acquired Company assigning to such Acquired Company all Intellectual Property created by such Person within the scope of such Person's duties to the Acquired Company and prohibiting such Person from using or disclosing confidential information of the Acquired Company. To the Knowledge of the Company, no current or former employee or independent contractor of the Acquired Companies is in violation of any such agreement, and there has been no unlawful, accidental, or unauthorized access to or use or disclosure of any trade secrets, know-how and other confidential and proprietary information of the Acquired Companies.

(d)     Since the Lookback Date, no third party (including any employee, worker, contractor or subcontractor) has made any written claim to the Acquired Companies of ownership in respect of any of the Company Owned Intellectual Property.

(e)     Except as would not, individually or in the aggregate, be material to the Acquired Companies, taken as a whole, to the extent that the Acquired Companies license Intellectual Property to a third party or license any Intellectual Property belonging to any third party: (i) no such licenses have been the subject of any breach or default by any Acquired Company or, to the Company's Knowledge, any such third party; (ii) such licenses are valid and binding; (iii) such licenses have not been the subject of any claim, dispute or proceedings; and (iv) in respect of licenses of Intellectual Property by any Acquired Company to third parties, such licenses do not materially restrict any Acquired Company from using the Intellectual Property to which they relate.

WEIL:\100255289\1\67816.0003

(f)     Since the Lookback Date, except as has not had and would not reasonably be expected to have, individually or in the aggregate, a Company Material Adverse Effect: (i) materially complied with all applicable Laws and self-regulatory guidelines, PCI DSS, the obligations under their Contracts, and their public privacy policies, in each case, relating to the processing of any Personal Information (collectively, "Privacy Laws and Obligations"); (ii) implemented and maintained reasonable administrative, physical and technical safeguards designed to protect all Personal Information in their possession or under their control against loss, theft, or unauthorized access, use modification, disclosure; (iii) not experienced any material Security Incident, and, to the Knowledge of the Company, no service provider (in the course of processing Personal Information for or on behalf of the Acquired Companies) has suffered any material Security Incident impacting Personal Information in the possession or control of the Acquired Companies; and (iv) not received any written notice of any claims of, or been charged with, the violation of any Privacy Laws and Obligations.

(g)     The Acquired Companies have used commercially reasonable efforts to prevent the introduction into the Systems, and, to the Company's Knowledge, such Systems do not contain, any ransomware, disabling codes or instructions, spyware, Trojan horses, worms, viruses or other software routines that permit or cause unauthorized access to, or disruption, impairment, disablement, or destruction of, software, data or other materials. The Acquired Companies have used commercially reasonable efforts to implement material security patches that are generally available for the Systems. To the Company's Knowledge, since the Lookback Date, the Systems have not suffered any unplanned or critical failures, continued substandard performance, errors, breakdowns or other adverse events that have caused any material disruption or interruption in the operation of the business of the Acquired Companies. The Acquired Companies have implemented and maintain commercially reasonable business continuity and disaster recovery plans, procedures and facilities for its business.

(h)     The Acquired Companies have in place commercially reasonable measures to protect the confidentiality, integrity, availability and security of the Systems. To the Company's Knowledge, the Systems (i) are in good working order; (ii) function in all material respects in accordance with all specifications and any other descriptions under which they were supplied; (iii) are substantially free of any material defects, bugs and errors; and (iv) are sufficient for the existing needs of the business of the Acquired Companies. The Acquired Companies have conducted commercially reasonable penetration tests at reasonable intervals on the Systems, and have addressed, or are in the process of addressing, all material issues raised in any such audits or penetration tests (including third party audits of the Systems).

Section 4.18.   Brokers; Financial Advisor. No broker, investment banker, financial advisor or other Person, other than Evercore, is entitled to any commission, brokerage fee or "finders fee" in connection with the consummation of the Transactions.

Section 4.19.   Real Property.

(a)     Section 4.19(a) of the Company Disclosure Schedules sets forth a true, accurate and complete list as of the Execution Date of all leases or subleases of real property with respect to which any Acquired Company is the tenant or lessee, together with a list of the addresses of all such real property (if specified in such lease or sublease) which are material to the Acquired

27

Companies (individually, a "Real Property Lease" and, collectively, the "Real Property Leases"). Subject to the Equitable Exceptions, the applicable Acquired Company has a good, valid, binding and enforceable interest under each of the Real Property Leases and the vesting instruments under which an Acquired Company holds an easement or similar interest (such vesting instruments, collectively with the Real Property Leases, the "Vesting Instruments"), free and clear of all Liens (other than Permitted Liens). No Acquired Company nor, to the Knowledge of the Company, any other party to any Vesting Instrument is in material breach or default thereunder, and no event has occurred or condition exists that, with notice or lapse of time, or both, would constitute a default by an Acquired Company or, to the Knowledge of the Company, any other Person under any of the Vesting Instruments, other than defaults that have been cured or waived in writing. Except as would not, individually or in the aggregate, be material to the Acquired Companies, taken as a whole, all landlord work or tenant work under each Real Property Lease has been completed and there are no leasing commissions due or payable with respect to any Real Property Lease. Each Vesting Instrument is in full force and effect and, to the Knowledge of the Company, is the valid, binding and enforceable obligation of each party thereto, in accordance with its terms.

(b)     Section 4.19(b) of the Company Disclosure Schedules sets forth a true, accurate, and complete list of all real property owned in fee by the Acquired Companies ("Owned Real Property" and together with the real property in which the Acquired Companies hold interests pursuant to the Vesting Instruments, the "Real Property"), together with the address of the applicable property. Each Acquired Company owns good, valid and marketable title in fee simple to the Owned Real Property and there are no outstanding Preferential Rights, ownership or use, or other contractual rights in favor of any other Person to purchase, acquire, sell, assign or otherwise dispose of any Acquired Companies' interest in any Real Property or any portion thereof or interest therein. Each Acquired Company has the valid and enforceable power and unqualified right to use and sell, transfer, convey or assign the Owned Real Property, free and clear of all Liens other than Permitted Liens.

(c)     Section 4.19(c) of the Company Disclosure Schedules sets forth a complete list of all Owned Real Property held by the Acquired Companies as a tenant in common or other joint ownership structure (collectively, the "Jointly Owned Properties"), together with a detailed description of the respective ownership structure (and the applicable Acquired Company's ownership percentage) of each Jointly Owned Property. None of the other owners of the Jointly Owned Properties have any rights of first refusal, rights of first offer or other Preferential Rights to purchase, or otherwise modify or later the applicable Acquired Company's interest in, any of the Jointly Owned Properties that would be triggered by the Transactions.

(d)     To the Knowledge of the Company, all material buildings, structures, improvements, fixtures, building systems and attached equipment, and all material components thereof, included in the Real Property are in good condition and repair, normal wear and tear excepted. No work has been done at the Real Property, and no materials have been supplied to the Real Property, that have not been paid for, and there are no material materialman's liens or mechanic's liens affecting the Real Property.

(e)     The Real Property constitutes all interests in real property (i) currently used, occupied or held for use in connection with the business of the Acquired Companies as presently conducted and (ii) necessary for the continued operation of the business of the Acquired

28

Companies. None of the improvements to any Real Property constitute a legal non-conforming use or otherwise require any special dispensation, variance or permit under any Law. To the Knowledge of the Company, the Company or the applicable Acquired Company has all certificates of occupancy, permits, licenses, certificates of authority, authorizations, approvals, registrations, and similar consents issued by or obtained from any Governmental Body necessary for the current use and operation of the Real Property, except for any such items where the failure of the applicable Acquired Company to hold or possess such item would not, individually or in the aggregate, be material to any Acquired Company. The Real Property is in compliance in all material respects with all applicable Laws and fire, health, building, use, occupancy, subdivision and zoning codes.

(f)     Except as would not, individually or in the aggregate, be material to the Acquired Companies, taken as a whole, each Acquired Company and each parcel of Real Property (i) are now, and have been since the Lookback Date, in material compliance with all declarations of covenants, conditions or restrictions, restrictive covenants and reciprocal easement agreements, in each case, affecting any Real Property, and (ii) have not received any notice of any material breach, violation or default under any such declarations, agreements or easements since the Lookback Date.

(g)     There do not exist any actual or, to the Knowledge of the Company, threatened condemnation or eminent domain proceedings that affect any Real Property or any part thereof.

(h)     Since the Lookback Date, no Acquired Company has received written notice of any, and to the Knowledge of the Company there is no, default under any restrictive covenants or other encumbrances pertaining to the Real Property.

Section 4.20.   Affiliate Transactions. Except as set forth in Section 4.20 of the Company Disclosure Schedules, none of the Acquired Companies, on the one hand, is party to any agreement with PDVSA or its Affiliates (excluding the Acquired Companies and their Subsidiaries), on the other hand, pursuant to which an Acquired Company has material ongoing obligations. Other than the Shares, neither PDVSA nor any of its Affiliates (excluding the Acquired Companies and their Subsidiaries), owns any interest in or any property (real, personal or mixed, tangible or intangible) of the Acquired Companies.

Section 4.21.   Insurance. Section 4.21 of the Company Disclosure Schedules lists each material insurance policy maintained by the Acquired Companies with respect to the properties, assets, business, operations and employees of the Acquired Companies. To the Knowledge of the Company, all such policies are valid and binding on the Acquired Company and enforceable in accordance with their terms against the Acquired Companies, in each case except for the Equitable Exceptions, and all premiums with respect thereto have been paid to the extent due. To the Knowledge of the Company, there are no material Claims by the Acquired Companies pending under any such insurance policies as to which coverage has been denied by the underwriters of such policies. To the Knowledge of the Company, the Acquired Companies have not received written notice of termination or material reduction of coverage with respect to any of such insurance policies.

WEIL:\100255289\1\67816.0003

Section 4.22.   No Additional Representations.

(a)      Except for the representations and warranties made in (i) this Article IV, as qualified by the Company Disclosure Schedules, (ii) any certificate delivered pursuant to this Agreement or (iii) any other Transaction Document, no Person makes or shall be deemed to make any other representation or warranty of any kind whatsoever, express or implied, written or oral, at law or in equity, with respect to any of the Acquired Companies or their respective businesses, operations, assets, liabilities or conditions (financial or otherwise) in connection with this Agreement or the Transactions, any other rights or obligations to be transferred pursuant to the Transaction Documents or any other matter, and the Special Master (on behalf of himself and the Company) hereby disclaims any such other representations or warranties. In particular, without limiting the foregoing disclaimer, except for the representations and warranties made in (i) this Article IV, as qualified by the Company Disclosure Schedules, or (ii) any certificate delivered pursuant to this Agreement, no Person makes or has made any representation or warranty to the Buyer or any of its Affiliates or Representatives with respect to (x) projections, forecasts, estimates, financial statements, financial information, appraisals, statements, promises, advice, data or information made, communicated or furnished (orally or in writing, including electronically) or prospect information relating to the Acquired Companies or their respective businesses; or (y) except for the representations and warranties made in (i) this Article IV, as qualified by the Company Disclosure Schedules, (ii) any certificate delivered pursuant to this Agreement, or (iii) any other Transaction Documents, any oral or written information presented to the Buyer or any of its Affiliates or Representatives in the course of their due diligence investigation of the Company, the negotiation of this Agreement or in the course of the Transactions (including any opinion, information, projection, or advice that may have been or may be provided to the Buyer by any Representative of the Company).

(b)      Notwithstanding anything contained in this Agreement to the contrary, the Special Master acknowledges and agrees that neither the Buyer nor any other Person has made or is making, and the Special Master expressly disclaims reliance upon, any representations, warranties or statements relating to the Buyer or any Buyer Subsidiaries whatsoever, express or implied, beyond those expressly given by the Buyer in Article V, as qualified by the Buyer Disclosure Schedules, or in any certificate delivered pursuant to this Agreement or in any other Transaction Documents, including any implied representation or warranty as to the accuracy or completeness of any information regarding the Buyer, furnished or made available to the Company, or any of its Representatives. Without limiting the generality of the foregoing, the Special Master acknowledges that, except for the representations and warranties expressly provided in Article V, as qualified by the Buyer Disclosure Schedules, or in any certificate delivered pursuant to this Agreement or in any other Transaction Documents, no representations or warranties are made with respect to any projections, forecasts, estimates, budgets or prospect information that may have been made available to the Special Master, the Company or any of their Representatives.

WEIL:\100255289\1\67816.0003

## ARTICLE V

## REPRESENTATIONS AND WARRANTIES OF THE BUYER

The Buyer represents and warrants to the Special Master that, except as disclosed in the correspondingly numbered section of the disclosure schedules delivered by the Buyer to the Company simultaneously with the execution of this Agreement (the "Buyer Disclosure Schedules"):

Section 5.1.    Corporate Existence and Power. The Buyer is a corporation duly incorporated, validly existing and in good standing under the Laws of its jurisdiction of incorporation and has all requisite corporate powers and all governmental franchises, licenses, permits, authorizations, consents and approvals required to enable it to own, lease or otherwise hold its properties and assets and to carry on its business as now conducted. The Buyer is duly qualified to do business as a foreign corporation and is in good standing in each jurisdiction in which the character of the property owned or leased by it, the nature of its activities, or the ownership or leasing of its properties make such qualification necessary, except for those jurisdiction where the failure to be so qualified would not, individually or in the aggregate, materially impair or delay the ability of the Buyer to consummate the Transactions or perform its obligations under this Agreement.

Section 5.2.    Corporate Authorization. The Buyer has all requisite corporate power and authority to execute, deliver and perform its obligations under this Agreement, the Transaction Documents, and each other agreement, document, instrument or certificate contemplated by this Agreement to be executed and delivered by the Buyer in connection with the consummation of the Transactions (the "Buyer Documents"). The execution and delivery of this Agreement and the Buyer Documents by the Buyer, the performance of its obligations hereunder and thereunder, and the consummation by the Buyer of the Transactions have been duly authorized by all necessary corporate or organizational action on the part of the Buyer, and no shareholder or other similar approval is required in connection with the Buyer's execution, delivery and performance of the Transactions. The board of directors of the Buyer, at a meeting duly called and held on or prior to the Execution Date, has approved this Agreement and the Transactions. This Agreement constitutes a valid and binding agreement against the Buyer, enforceable against the Buyer in accordance with its terms, except that such enforcement may be limited by the Equitable Exceptions.

Section 5.3.    Governmental Authorization. The execution, delivery and performance by the Buyer of this Agreement and the consummation by the Buyer of the Transactions require no Order, authorization, or approval of, or filing with, any Governmental Body other than (a) applicable requirements of Antitrust Laws as set forth in Section 5.3 of the Buyer Disclosure Schedules and (b) the OFAC License.

Section 5.4.    Non-Contravention. The execution, delivery and performance by the Buyer of this Agreement and the consummation by the Buyer of the Transactions do not and will not, assuming compliance with the matters referred to in Section 5.2 and Section 5.3, (a) contravene or conflict with the certificate of incorporation or by-laws of the Buyer, (b) contravene or conflict with or constitute a violation of any provision of any Law binding upon or applicable to the Buyer

31

or any of the Buyer Subsidiaries, (c) constitute a default (or an event which with notice or the passage of time would become a default) under, or give rise to any right of termination, cancellation or acceleration of any right or obligation of the Buyer or any of the Buyer Subsidiaries or to a loss of any benefit to which the Buyer or any of the Buyer Subsidiaries is entitled under any provision of, any agreement, contract or other instrument binding upon the Buyer or any of the Buyer Subsidiaries or any license, franchise, permit or other similar authorization held by the Buyer or any of the Buyer Subsidiaries or (d) result in the creation or imposition of any Lien (other than Liens arising under applicable securities Laws) on any asset of the Buyer or any of the Buyer Subsidiaries, other than a lien of the stock of the Company in connection with the Debt Financing. As of the Execution Date, there is no Effect that would reasonably be expected to prevent, or materially impede or interfere with, the execution of this Agreement and the consummation by the Buyer of the Transactions.

Section 5.5.    <u>Litigation</u>. Except as set forth in <u>Section 5.5</u> of the Buyer Disclosure Schedules, there are no Legal Proceedings, pending against, or, to the Knowledge of the Buyer, threatened in writing against, the Buyer, any of the Buyer Subsidiaries, any of their respective properties or any of their respective officers or directors before any Governmental Body that would reasonably be expected to (a) prohibit or restrain the ability of the Buyer to enter into this Agreement or consummate the Transactions or (b) affect the legality, validity or enforceability of any Debt Financing. The Buyer is not subject to any Order of any Governmental Body that would reasonably be expected to (x) prohibit or restrain the ability of the Buyer to enter into this Agreement or consummate the Transactions or (y) affect the legality, validity or enforceability of any Debt Financing.

Section 5.6.    <u>Regulatory Matters</u>.

(a)    [23]Except as would not, individually or in the aggregate, reasonably be expected to be material to the Buyer, Buyer Subsidiaries or Equity Financing Sources, in the three (3) years prior to the Execution Date, (i) none of the Buyer or any of the Buyer Subsidiaries, nor any of their respective directors, officers, employees, nor, to the Knowledge of the Buyer, any Equity Financing Source, Representative, agent, or other person acting on behalf of the Buyer, any of the Buyer Subsidiaries or any Equity Financing Source, has violated any Anti-Corruption Law, and (ii) none of the Buyer, any of the Buyer Subsidiaries, nor any of their respective directors, officers, employees, nor, to the Knowledge of the Buyer, any Equity Financing Source, Representative, agent or any other person acting on behalf of the Buyer, the Buyer Subsidiaries or any Equity Financing Source, has offered, paid, given, promised, or authorized the payment of, anything of value (including money, checks, wire transfers, tangible and intangible gifts, favors, services, employment or entertainment and travel) directly or indirectly to any Government Official (A) for the purpose of (1) influencing any act or decision of a Government Official or any other person in his or her official capacity, (2) inducing a Government Official or any other person to do or omit to do any act in violation of his or her lawful duties, (3) securing any improper advantage, or (4) inducing a Government Official or any other person to influence or affect any act or decision of any Governmental Body; or (B) in a manner which would constitute or have the purpose or effect of public or commercial bribery or corruption, acceptance of, or acquiescence in extortion, kickbacks, or other unlawful or improper means of obtaining or retaining business or

---

[23] **NTD**: Lead in language in Section 5.6(a) and (b) added to mirror lead in to Section 4.13(a) and (b).

any improper advantage. Without limiting the generality of the foregoing, none of the Buyer or any of the Buyer Subsidiaries, any of their respective directors, officers, employees, Affiliates or, to the Knowledge of the Buyer, any Equity Financing Source, Representative, agent, or other person acting on behalf of the Buyer, any of the Buyer Subsidiaries or any Equity Financing Source is a Venezuelan national or has any relationship to Nicolás Maduro, the United Socialist Party of Venezuela or any Affiliate thereof.

(b)     Except as would not, individually or in the aggregate, reasonably be expected to be material to the Buyer, Buyer Subsidiaries or Equity Financing Sources, (i) the Buyer, each of the Buyer Subsidiaries  and their respective directors, officers, employees, and, to the Knowledge of the Buyer, agents, Representatives, each Equity Financing Sources and other persons acting for or on behalf of any of the foregoing Persons, are, and at all times in the three (3) years prior to the Execution Date, in compliance in all material respects with all applicable Economic Sanctions/Trade Laws and all applicable Money Laundering Laws and (ii) in the three (3) years prior to the Execution Date none of the Buyer, any of the Buyer Subsidiaries or, to the Knowledge of the Buyer,  any Equity Financing Source is a Sanctions Target or has carried on or carries on, any business, directly or knowingly indirectly, involving any Sanctions Target in violation of applicable Economic Sanctions/Trade Laws.

(c)     Except as would not, individually or in the aggregate, be reasonably likely to have a material adverse effect on the ability of Buyer to consummate the Transaction, in the three (3) years prior to the Execution Date (i) none of the Buyer, any of the Buyer Subsidiaries or, to the Knowledge of the Buyer, any Equity Financing Source has conducted or initiated any internal investigation, review or audit, or made a voluntary, directed, or involuntary disclosure to any Governmental Body or third party with respect to any alleged or suspected act or omission arising under or relating to any potential noncompliance with any applicable Anti-Corruption Law, Economic Sanctions/Trade Law, or Money Laundering Law, (ii) none of the Buyer, any of the Buyer Subsidiaries, nor any of their respective directors or officers, nor, to the Knowledge of the Buyer, any agents, employees (other than officers), Representatives, or any other person acting at the direction of the Buyer, any of the Buyer Subsidiaries or any Equity Financing Source has received any written notice, request or citation for any actual or potential noncompliance with any applicable Anti-Corruption Law, Economic Sanctions/Trade Law or Money Laundering Law, (iii) the Buyer, the Buyer Subsidiaries and, to the Knowledge of the Buyer, the Equity Financing Sources have implemented and have maintained internal controls, policies and procedures designed to detect and prevent violations of Anti-Corruption Laws, Economic Sanctions/Trade Laws and Money Laundering Laws, and (iv) the Buyer, each of the Buyer Subsidiaries and, to the Knowledge of the Buyer, each of the Equity Financing Sources have at all times made and maintained accurate books and records in material compliance with all applicable Anti-Corruption Laws, Economic Sanctions/Trade Laws or Money Laundering Laws.

(d)     The Buyer, the Buyer Subsidiaries and, to the Knowledge of the Buyer, the Equity Financing Sources are each not a "foreign person" within the meaning of the Defense Production Act of 1950, as amended, including all implementing regulations thereof.

33

Section 5.7.    Financing.

(a)    On the Execution Date, the Buyer has delivered to the Special Master true, correct, and complete copies of (i) the executed Equity Commitment Letters[24] from the Equity Financing Sources, which Equity Commitment Letters each provide that the Special Master is an express third party beneficiary thereto (the "Equity Financing", and the commitments under the Equity Commitment Letters, the "Equity Financing Commitments") and (ii) (A) a commitment letter from each of the Debt Financing Sources identified therein (together with all annexes, schedules, and exhibits thereto, as amended from time to time as permitted herein, the "Debt Commitment Letter", and the commitments under the Debt Commitment Letter, the "Debt Financing Commitments"; the Debt Commitment Letter and the Equity Commitment Letters, collectively, the "Commitment Letters"), pursuant to which, and subject to the terms and conditions of which, the lenders party thereto have committed to lend the amounts set forth therein to the Buyer for the purpose of funding the Transactions in accordance with the terms set forth therein (the "Debt Financing" and, together with the Equity Financing, the "Financings"), and (B) each related fee letter (collectively, the "Fee Letters"), which copy of such Fee Letter may be redacted to remove only the fees, price caps and economic "flex" terms and any other numerical amounts set forth therein.

(b)    As of the Execution Date, the Equity Commitment Letters are in full force and effect and have not been withdrawn, rescinded, replaced or terminated, or otherwise amended, restated, amended and restated, waived, supplemented or otherwise modified in any respect (and no such amendment, restatement or modification is contemplated). The Equity Commitment Letters are legal, valid and binding obligations (subject to the Equitable Exceptions) of the Buyer and to the Knowledge of Buyer the other parties thereto, enforceable in accordance with their terms.

(c)    As of the Debt Commitment Letter Effective Date, the Debt Commitment Letters shall be in full force and effect and shall not have been withdrawn, rescinded, replaced or terminated, or otherwise amended, restated, amended and restated, waived, supplemented or otherwise modified in any respect (and no such amendment, restatement or modification shall be contemplated).  As of the Debt Commitment Letter Effective Date, the Debt Commitment Letters will be legal, valid and binding obligations (subject to the Equitable Exceptions) of the Buyer and to the Knowledge of Buyer the other parties thereto, enforceable in accordance with their terms. There are no agreements, side letters or arrangements (other than the Debt Commitment Letter and the Fee Letters) relating to the Debt Financing Commitments or the Debt Financing that imposes or permits the imposition of conditions precedent to the funding of the Debt Financing on the Closing Date or would otherwise affect the availability of the Debt Financing on the Closing Date. As of the Debt Commitment Letter Effective Date, the Buyer and the Debt Financing Sources shall not be in breach of any of the terms or conditions set forth in the Debt Commitment Letter. As of the Debt Commitment Letter Effective Date, no event shall have occurred which, with or without notice, lapse of time or both, would constitute a default or breach on the part of the Buyer under

---

[24] **Note to Bidder**: If the Buyer will be a newly formed entity or does not have sufficient financial resources to consummate the purchase of Shares, the controlling owner(s) of the Buyer will be required to provide a guarantee of certain of the Buyer's obligations hereunder and a commitment to provide equity financing to the Buyer in a satisfactory amount.

WEIL:\100255289\1\67816.0003

any term or condition of the Commitment Letters, and, subject to (i) the compliance by Special Master and the Company of the terms and conditions set forth herein, and (ii) the timely satisfaction or waiver of the conditions precedent to the obligations of the Buyer set forth herein, the Buyer does not have any reason to believe that it will be unable to satisfy, on a timely basis, any term or condition of closing to be satisfied by it contained in the Debt Commitment Letter, or that the full amount of the Equity Financing or the Debt Financing will not be available to the Buyer on the Closing Date. On the Debt Commitment Letter Effective Date, the Buyer shall have fully paid any and all commitment fees or other fees required by the Debt Financing Commitments or any Fee Letter to be paid on or before the Debt Commitment Letter Effective Date. On the Debt Commitment Letter Effective Date, the Debt Commitment Letter will contain all of the conditions precedent to the obligations of the Parties thereunder to make the full amount of the Debt Financing available to the Buyer on the terms set forth therein and there shall be no contingencies that would permit the Debt Financing Sources to decrease the total amount of the Debt Financing below the Required Amount or impose any additional conditions precedent to the availability of the Debt Financing. As of the Debt Commitment Letter Effective Date, none of the Debt Financing Commitments shall have been terminated or withdrawn, no lender shall have notified the Buyer of its intention to terminate or withdraw the Debt Financing Commitments, and, subject to (i) the compliance by Special Master and the Company with the terms and conditions set forth herein, and (ii) the timely satisfaction or waiver of the conditions precedent to the obligations of the Buyer set forth herein, the Buyer does not know of any facts or circumstances that may be reasonably expected to result in any of the conditions set forth in the Debt Commitment Letter not being satisfied. To the extent this Agreement must be in a form acceptable to any lender providing Debt Financing, such lender or lenders have approved this Agreement.

(d)     Except as expressly set forth in Section 7.1, the obligations of the Buyer under this Agreement are not subject to any conditions regarding the Buyer's, its Affiliates', or any other Person's ability to obtain financing for the consummation of the Transactions contemplated hereby.

(e)     Assuming (i) that the Debt Financing is funded in accordance with the Commitment Letters, (ii) this Agreement is in full force and effect and (iii) the performance by the Special Master and the Company of the covenants and agreements contained in this Agreement, the aggregate proceeds from the Debt Financing (net of original issue discount, upfront fees and other fees, premiums and charges payable in connection therewith, after giving effect to the maximum amount of "market flex" provided under the Debt Financing Commitments and each Fee Letter) together with the Equity Financing and Buyer's cash on hand will be sufficient for satisfaction of all of the Buyer's obligations under this Agreement and to consummate the Transactions, including the payment of the Closing Consideration, repayment of the Specified Debt and the payment of all associated costs and expenses (including the Closing Transaction Expenses) (collectively, the "Required Amount").[25][26]

---

[25] **Note to Bidder**: Section 5.7 to be altered if necessary based on Buyer's source(s) of financing.

[26] **NTD**: The Proposal is supported by a package of debt financing totaling $4.5 billion, of which 50% is fully committed. The remainder ($2.25 billion) is supported by a Highly Confident Letter from JP Morgan, which provides a detailed description of the funds that JP Morgan is highly confident it can raise to support Buyer's

Section 5.8.    Solvency. The Buyer is Solvent as of the Execution Date. Assuming (x) the accuracy of the representations and warranties set forth in Article IV, and (y) the performance by the Company and the Special Master of the covenants and agreements required to be performed by them under this Agreement prior to the Closing, the Buyer, the Company and their respective Subsidiaries, on a consolidated basis, will, after giving effect to all of the Transactions, including the payment of any amounts required to be paid in connection with the consummation of the Transactions and the payment of all related fees and expenses, be Solvent at and immediately after the Closing.

Section 5.9.    Purported Equity Pledge. The Buyer acknowledges the existence of the 2020 Bonds, the Purported Equity Pledge and the Equity Pledge Litigation, without admitting to the validity of the 2020 Bonds or the Purported Equity Pledge.

Section 5.10.    Claim Obligations. Schedule 5.10 sets forth, as of the date hereof, the principal amount due and owing under the Specified Litigation Claims. For the avoidance of doubt, such amount includes all interest, fees, expenses and premiums that have accrued in connection with the Specified Litigation Claims after the commencement of the applicable Specified Litigation.[27]

Section 5.11.    Closing Consideration.   The Buyer will not provide any consideration to any holder of an Attached Judgment (as defined in the Sale Procedures Order) at the Closing unless each other holder of an Attached Judgment senior to such holder (as set forth in the Priority Order (as defined below)) has either (i) received cash in full in satisfaction of its Attached Judgment, (ii) consented to receive non-cash consideration in satisfaction of its Attached Judgment, or (iii) consented to release its attachment (in which case it may, at its election, attempt to execute its judgment against other property besides the PDVH Shares). Nothing in this Section 5.11 precludes a Bidder from offering, as part of its Bid, non-cash consideration, including non-cash consideration to holders of Attached Judgments that are junior to holders of Attached Judgment who have, as of the time of the Bid, not provided consent consistent with (ii) or (iii) above. The Special Master, as part of his obligation to make a recommendation to the Court as to which of the Qualified Bids is highest or best, and in making a recommendation to the Court as to which Qualified Bid is the Successful Bid (as defined in the Sale Procedures Order), shall consider the value of non-cash consideration and the likelihood of obtaining consents consistent with this provision. As part of the Special Master's recommendation of a Successful Bid, he will advise the Court as to whether he received Qualified Bids including a component of non-cash consideration, what that non-cash consideration was and which creditors it would be offered to, and how he evaluated the non-cash component in reaching his recommendation.[28][29]

---

obligations. Buyer fully expects that as of the Execution Date the total amount of the debt financing will be fully committed.

[27] **Note to Bidder**: Bracketed language to be included for credit bidders.

[28] **Note to Bidder**: Bracketed language to be included in the event any non-cash consideration is included in the Purchase Price.

[29] **NTD**:  Per February 24, 2025 Order (D.I. 1571), and subject to March 4, 2025 Order (D.I. 1583).

WEIL:\100255289\1\67816.0003

Section 5.12.   No Additional Representations.

(a)     Except for the representations and warranties expressly made by the Buyer in (i) this Article V, as qualified by the Buyer Disclosure Schedules, or (ii) any certificate delivered pursuant to this Agreement, the Buyer makes (and shall not be deemed to make) no other representation or warranty of any kind whatsoever, express or implied, written or oral, at law or in equity, in connection with this Agreement or the Transactions, any other rights or obligations to be transferred pursuant to the Transaction Documents or any other matter, and the Buyer hereby disclaims any such other representations or warranties.

(b)     Except for the specific representations and warranties expressly made by the Special Master in Article IV, and subject to the specifically bargained-for limitations as set forth in this Agreement, the Buyer acknowledges and agrees that the Special Master does not make, and that the Buyer is not relying upon, and will not rely upon any representation or warranty, expressed or implied, at law or in equity, made by any Person in respect of the Special Master or in respect of the Company and the Company's Subsidiaries' respective businesses, assets (including the stocks), liabilities, operations, prospects, or condition (financial or otherwise), including with respect to merchantability or fitness for any particular purpose of any assets, the nature or extent of any liabilities, the prospects of their respective businesses, the effectiveness or the success or profitability of any operations, or the accuracy or completeness of any confidential information memoranda, documents, projections, forecasts, opinions, advice, material, statement, data, or other information (financial or otherwise) regarding the Acquired Companies provided to, or otherwise made available to, the Buyer or its Representatives in connection with the Transactions, including any "data rooms," "virtual data rooms," management presentations, or in respect of any other matter or thing whatsoever. The Buyer expressly disclaims that is relying on any representations or warranties, other than the specific representations and warranties expressly made by the Special Master in Article IV or in any certificate delivered pursuant to this Agreement.

## ARTICLE VI

## COVENANTS

Section 6.1.   Conduct of the Business Pending the Closing.[30]

(a)     During the Interim Period, except (w) with the prior written consent of the Buyer (such consent not to be unreasonably withheld, conditioned or delayed), (x) as expressly permitted or required by this Agreement, (y) as may be required by applicable Law, or (z) as set forth in Section 6.1(a) or (b) of the Company Disclosure Schedules, the Special Master shall Cause the Acquired Companies to, (i) conduct their business in the Ordinary Course, (ii) preserve intact their business organizations, assets (ordinary wear and tear excepted), ongoing operations, and goodwill, and maintain material relationships with third parties (including suppliers, vendors, creditors, licensors and employees of the Acquired Companies and Governmental Bodies having regulatory authority in respect of the Acquired Companies and their operations), and (iii) preserve and maintain all material Permits.

---

[30] **Note to Bidder**: Extensive comments / requests for additional IOCs will be strongly disfavored.

(b)     Without limiting the generality of <u>Section 6.1(a)</u>, except (v) with the prior written consent of the Buyer (such consent not to be unreasonably withheld, conditioned or delayed), (w) as expressly permitted or required by this Agreement, (x) as required to comply with a material provision of a Material Contract that has been disclosed in the Company Disclosure Schedules, (y) as may be required by applicable Law, or (z) as set forth in <u>Section 6.1(b)</u> of the Company Disclosure Schedules, the Acquired Companies shall not, and the Special Master shall Cause the Acquired Companies not to:

(i)     (A) amend the Company Charter or Company By-Laws, (B) permit any Company Subsidiary to amend such Company Subsidiary's Organizational Documents, or (C) vote in favor of the amendment of any of the Organizational Documents of any Non-Controlled Entity;

(ii)     (A) (I) adopt a plan or agreement of complete or partial liquidation, dissolution, merger or consolidation of any of the Acquired Companies, or (II) incur or assume any liability or expense in connection with the complete or partial liquidation or wind-down of any of the Acquired Companies, or (B) vote in favor of the adoption of a plan or agreement of complete or partial liquidation, dissolution, merger or consolidation, of any Non-Controlled Entity;

(iii)     (A) other than with respect to growth or enhancing capital expenditures or commitments, which are addressed in (B) and (C) below, make or authorize any capital expenditures or commitments, except (I) for 2025, in accordance with the capital budgets of the Acquired Companies for 2025 as set forth in <u>Section 6.1(b)(iii)(A)(I)</u> of the Company Disclosure Schedules, (II) for 2026, in accordance with the capital budgets to be adopted by the Acquired Companies for 2026 (which such capital budgets will not exceed, in the aggregate, the 2026 projection included in the medium term plan set forth in <u>Section 6.1(b)(iii)(A)(II)</u> of the Company Disclosure Schedules by more than 10% (the "<u>MTP</u>")), and (III) for any subsequent year, in accordance with the capital budgets of the Acquired Companies to be adopted by the Acquired Companies for such subsequent year (which such capital budgets will not exceed, in the aggregate, the projection included in the MTP for such subsequent year by more than 15%) (each of the foregoing, a "<u>CapEx Budget</u>") (provided, that, the Acquired Companies may make or authorize capital expenditures or commitments in excess of any applicable CapEx Budget so long as such excess expenditures do not, in the aggregate, result in an expenditure above 120% of the aggregate amount included in the applicable CapEx Budget), (B) make or authorize any growth or enhancing capital expenditures or commitments in excess of $15,000,000 (except, during 2025, as provided in the applicable CapEx Budget), (C) with respect to any line item in excess of $15,000,000 for growth or enhancing capital expenditures in any CapEx Budget, make or authorize an increase with respect to such line item in excess of 20% of the applicable budgeted amount, or (D) propose or vote in favor of any capital expenditures or commitments that would reasonably be expected to require additional cash contributions by any Acquired Company to any Non-Controlled Entity in amounts in excess of $3,000,000 in the aggregate for all Non-Controlled Entities;

(iv)     make or authorize any turnaround or catalyst expenditures or commitments, except (A) for 2025, in accordance with the turnaround/catalyst budget of

the Acquired Companies for 2025 as set forth in (iv) of the Company Disclosure Schedules, (B) for 2026, in accordance with the turnaround/catalyst budget of the Acquired Companies to be adopted by the Acquired Companies for 2026 (which such turnaround/catalyst budgets will not exceed the 2026 projection included in the MTP by more than 10%), and (C) for any subsequent year, in accordance with the turnaround/catalyst budget of the Acquired Companies to be adopted for such subsequent year (which such turnaround/catalyst budget will not exceed, in the aggregate, the projection included in the MTP for such subsequent year by more than 15%) (each turnaround/catalyst budget described in clauses (A)-(C), a "Turnaround/Catalyst Budget"); (provided, that, (1) the Acquired Companies may make or authorize turnaround or catalyst expenditures or commitments in excess of any applicable Turnaround/Catalyst Budget so long as such excess expenditures do not result in an expenditure above 120% of the aggregate amount included in the applicable Turnaround/Catalyst Budget and (2) to the extent any turnaround project exceeds the applicable budgeted amount in the applicable Turnaround/Catalyst Budget by more than 20%, the Acquired Companies will provide Buyer with a detailed explanation of such deviation promptly following such approval or expenditure, and provided, further, that, to the extent that the Acquired Companies determine that any turnaround/catalyst project included in the Turnaround/Catalyst Budget for a specific year should instead, in whole or in part, be executed in 2026 or a subsequent year, the inclusion of the remaining expenses with respect thereto in the Turnaround/Catalyst Budget 2026 or such subsequent year, as applicable, will not count towards the variance cap applicable to the Turnaround/Catalyst Budget to be adopted for such subsequent year and will not require the prior written consent of Buyer);

(v)    except as required under any Company Benefit Plan or Company Collective Bargaining Agreement, (A) increase the compensation of ██████████████ ██████████████ of any Acquired Company (such current and former employees, together, "Senior Management"), or take any action to accelerate the vesting or payment, or fund or in any other way secure the payment of, compensation or benefits under any Contract, Company Benefit Plan or otherwise for or to any current or former director, officer, manager, employee, contractor or consultant of any Acquired Company; provided that nothing in this Section 6.1(b)(v) shall prohibit (x) providing annual increases to compensation based on merit (with respect to the immediately preceding performance period only), market-based adjustments or tenure in the Ordinary Course and in accordance with standards, policies and practices of the Acquired Companies in place as of the Execution Date and disclosed to the Buyer, or (y) making, in the Ordinary Course and in accordance with standards, policies and practices of the Acquired Companies in place as of the Execution Date and disclosed to the Buyer, annual cash bonus and long term cash incentive grants that (I) do not provide for single trigger vesting upon the Closing and (II) do not provide for full vesting and payout of performance-based components in the case of a qualifying termination of the recipient after the Closing; (B) make, grant or promise any equity or equity-based compensation, severance, change of control, retention, termination or similar compensation or benefits to any current or former director, officer, manager, employee, contractor or consultant of any Acquired Company; provided, that, nothing in this Section 6.1(b)(v) shall prohibit making, granting or promising severance, change of control, retention, termination, or similar compensation or benefits in amounts which are less than $1,000,000 in the aggregate; (C) amend, adopt, establish, agree to establish, enter

39

into or terminate any Company Benefit Plan or establish, adopt or enter into any plan, agreement, program, policy, practice, trust or other arrangement that would be a Company Benefit Plan if it were in existence as of the Execution Date for the benefit of any current or former director, officer, manager, employee, contractor or consultant of any Acquired Company; provided that nothing in this Section 6.1(b)(v) shall prohibit (x) amendments to any Company Benefit Plan in the Ordinary Course that do not materially increase the costs to the Acquired Companies of such Company Benefit Plan, or (y) renewals or replacements of any Company Benefit Plan on commercially reasonable terms no less favorable in the aggregate to the Acquired Companies than the terms of the Company Benefit Plan being renewed or replaced; (D) terminate (other than for "cause" (as determined by the Company consistent with its practices)) any member of Senior Management; or (E) except as required by applicable Law, adopt or enter into any collective bargaining agreement, or amend in any material respect any Company Collective Bargaining Agreement (and, for the avoidance of doubt, nothing in this Section 6.1(b) shall restrict the Acquired Companies from entering into a successor collective bargaining to any Company Collective Bargaining Agreement that expires prior to Closing) (provided, that, for the avoidance of doubt, to the extent any action with respect to employees or Company Benefit Plans is not prohibited by this Section 6.1(b)(v), then Section 6.1(b)(xii) will not be deemed to restrict any such action);

(vi)    acquire (x) all or a substantial portion of the capital assets of any other Person (or of any business) or (y) the business of any other Person (in case of clause (x) or (y), whether by merger, consolidation, acquisition of Equity Interests or assets or otherwise), except that the Acquired Companies shall be permitted to make (A) acquisitions pursuant to any Contract in effect on the Execution Date that is made available to the Buyer and listed in Section 6.1(b)(vi) of the Company Disclosure Schedules, (B) acquisitions of assets solely among the Company and wholly owned Company Subsidiaries, or among wholly owned Company Subsidiaries, or (C) acquisitions of assets pursuant to the receivables securitization transaction evidenced by the Receivables Purchase Agreement, dated as of December 18, 2020, among CITGO AR2008 Funding Company, LLC, CITGO Petroleum, the various purchasers and purchaser agents from time to time party thereto, and Barclays Bank PLC, as program administrator, and the Purchase and Sale Agreement, dated as of December 18, 2020, between CITGO Petroleum and CITGO AR2008 Funding Company, LLC (each as amended and collectively, the "Receivables Securitization Facility"); provided, that any acquisitions included in the capital expenditures permitted under Section 6.1(b)(iii) shall not be subject to the restrictions set forth in this Section 6.1(b)(vi);

(vii)    propose or vote in favor of any action by a Non-Controlled Entity to acquire (x) all or a substantial portion of the capital assets of any other Person (or of any business) or (y) the business of any other Person (whether by merger, consolidation, acquisition of Equity Interests or assets or otherwise), except that the Acquired Companies shall be permitted to vote in favor of acquisitions of capital assets of any other Person or business of any other Person by a Non-Controlled Entity so long as such acquisition would not require additional cash contributions by any Acquired Company to any Non-Controlled Entity in excess of $5,000,000 individually or $10,000,000 in the aggregate for all Non-Controlled Entities;

40

(viii)    (A) sell, lease, license, encumber (including by the grant of any Preferential Right thereon) (other than by Permitted Liens) or otherwise dispose of any material assets or material property of any Acquired Company (excluding any issuance of any Equity Interest of any Acquired Company addressed in <u>Section 6.1(b)(xv)</u>) or (B) propose or vote in favor of any action by a Non-Controlled Entity to sell, lease, license, encumber (including by the grant of any Preferential Right thereon) (other than by Permitted Liens) or otherwise dispose of any material assets or material property of such Non-Controlled Entity, in each case except (I) pursuant to existing Contracts set forth in <u>Section 6.1(b)(viii)</u> of the Company Disclosure Schedules, (II) sales of inventory to customers in the Ordinary Course, (III) sales of or disposals of obsolete or worthless assets in the Ordinary Course, or (IV) with respect to the immediately preceding clause (A) only, (x) transfers among (1) CITGO Petroleum and any Subsidiary thereof (the "CITGO Petroleum Subsidiaries"), (2) a CITGO Petroleum Subsidiary and another CITGO Petroleum Subsidiary or (3) the Acquired Companies (other than CITGO Petroleum and any CITGO Petroleum Subsidiary), or (y) dispositions pursuant to the Receivables Securitization Facility;[31]

(ix)    (A) incur any indebtedness for borrowed money or guarantee or assume any indebtedness for borrowed money of another Person (other than (I) borrowings or other advances of capital pursuant to the Receivables Securitization Facility as in effect on the date hereof and without giving effect to any amendments or modifications thereto that would increase the maximum amount available to be borrowed or advanced thereunder or (II) indebtedness for borrowed money incurred in the Ordinary Course that, in the case of this clause (III) does not exceed $25.0 million in the aggregate) or (B) with respect to any Non-Controlled Entity, propose or vote in favor of such Non-Controlled Entity incurring any indebtedness for borrowed money, guaranteeing or assuming any indebtedness for borrowed money of another Person (other than any Non-Controlled Entity's incurrence of any incremental indebtedness for borrowed money incurred in the Ordinary Course that is not in excess of $10,000,000 in the aggregate (net to the applicable Acquired Company);[32]

(x)    prepay, repay, redeem, repurchase, defease, or cancel any indebtedness for borrow money in excess of $10,000,000 in the aggregate, in each case, for cash, other than (A) for transactions among (1) CITGO Petroleum and any wholly owned Subsidiary thereof (the "CITGO Petroleum Subsidiaries"), (2) a CITGO Petroleum Subsidiary and another CITGO Petroleum Subsidiary or (3) the Acquired Companies (other than CITGO Petroleum and any CITGO Petroleum Subsidiary), (B) prepayment and repayment of borrowings or advanced capital to the extent required pursuant to the terms of the Receivables Securitization Facility and (C) any required amortization payments, mandatory prepayments, and repayments at maturity, in each case in accordance with the terms of the 2021 Indenture, the 2023 Indenture, the 1995 Loan Agreement, the 1998 Loan Agreement, the 2002 Loan Agreement and the under the Master Reimbursement

---

[31] **NTD**: These changes have been requested by Buyer's financing sources and Buyer considers them to be standard. However, Buyer would be willing to consider more targeted exceptions as requested by Special Master.

[32] **NTD**: See FN 30.

Agreement instrument governing such indebtedness for borrowed money as in effect on the Execution Date;[33]

(xi)    (A) other than in the Ordinary Course, materially amend, terminate or waive any material right under any Material Contract or any material Vesting Instrument (other than amendments to renew any Material Contract on the same (or better in respect of the applicable Acquired Company) terms and conditions in all material respects as the terms and conditions of such Material Contract as of the Execution Date) or (B) enter into any Contract that would be a Material Contract if in effect as of the Execution Date, other than in the Ordinary Course (including entry into indemnification agreements with directors or officers in substantially the same form as indemnification agreements made available to the Buyer prior to the date hereof), and provided, that, with respect to this Clause (B), such Contracts do not (I) limit in any material respect either the type of business in which any Acquired Company may engage or the manner or locations in which any of them may so engage in any business (including through "non-competition" or "exclusivity" provisions), or (II) grant "most favored nation" or similar status with respect to any material obligations and would run in favor of any Person (other than an Acquired Company); provided, that, for the avoidance of doubt, nothing in this Agreement will limit the ability of CITGO Petroleum to execute guarantees of the Company's payment obligations pursuant to the Contracts disclosed in Section 6.6(a) of the Company Disclosure Schedules or New Indemnification Agreements (such guarantees, collectively, the "CITGO Petroleum Guarantees");

(xii)    except for any such change which is not material or which is required by reason of a concurrent change in GAAP or applicable Law, change any method of financial accounting or financial accounting practice (other than any change for Tax purposes, which shall be governed by Section 6.1(b)(xiv)) used by it;

(xiii)    (A) enter into any joint venture, partnership, participation, profit-sharing or other similar arrangement or (B) make any loans, capital contributions or advances to or investments in any other Person (other than (I) investments by (1) CITGO Petroleum in any CITGO Petroleum Subsidiary, (2) by a CITGO Petroleum Subsidiary in another CITGO Petroleum Subsidiary or (3) by any Acquired Company (other than CITGO Petroleum and any CITGO Petroleum Subsidiary) into another Acquired Company (other than CITGO Petroleum and any CITGO Petroleum Subsidiary), (II) pursuant to capital calls required pursuant to the terms of existing Contracts to the extent disclosed on Section 6.1(b)(xiii) of the Company Disclosure Schedules, or (III) advances for reimbursable employee expenses in the Ordinary Course or advancements of expenses to directors and officers of the Acquired Companies pursuant to bona fide advancement provisions under the Company Charter, Company By-Laws, Organizational Documents of any of the Company Subsidiaries or any indemnification agreement with any such director or officer);[34]

---

[33] **NTD**: See FN 30.

[34] **NTD**: See FN 30.

WEIL:\100255289\1\67816.0003

(xiv)   (A) (I) make, revoke or amend any material election relating to Taxes or change any of its Tax accounting period or Tax accounting methods currently in effect, (II) other than in the Ordinary Course, settle any Tax Proceeding, (III) other than in the Ordinary Course, file any amended Tax Return, (iv) surrender any claim for a refund of Taxes, or (v) waive or extend any statute of limitations in respect of Taxes, in each case of the foregoing clauses (I), (II), (III), (IV) and (V), if such action is reasonably likely to result in an increase to a Tax liability of the Acquired Companies that is material to the Acquired Companies, taken as a whole, or (B) with respect to any Non-Controlled Entity, vote in favor of or propose that such Non-Controlled Entity take any action described in the immediately preceding clause (A); provided, that, for the avoidance of doubt, the foregoing will not prohibit the Acquired Companies from taking any action in good faith as a result of, or to comply with, changes in applicable Tax Laws;

(xv)   authorize, issue, reserve for issuance, pledge, transfer or otherwise encumber, sell or redeem or enter into any Contract providing for any of the foregoing with respect to, any Equity Interests of any of the Acquired Companies or any Equity Interests of any Non-Controlled Entity owned by any Acquired Company (including, in each case, any split, combination, recapitalization or reclassification of any such Equity Interests);

(xvi)   other than as set forth in Section 6.1(b)(xvi) of the Company Disclosure Schedules, declare, set aside, make or pay dividends or similar distributions (whether in cash, stock or property) on or with respect to the Shares or otherwise, other than dividends or similar distributions between or among (A) CITGO Petroleum and any CITGO Petroleum Subsidiary (B) a CITGO Petroleum Subsidiary and another CITGO Petroleum Subsidiary or (C) the Acquired Companies (other than CITGO Petroleum and any CITGO Petroleum Subsidiary); provided, that, for the avoidance of doubt, nothing in this Agreement will limit the Acquired Companies' ability to satisfy payables to PDVSA described on Section 4.20 of the Company Disclosure Schedules; [35][36]

(xvii)   (A) settle, satisfy, release or forgive any claim, demand, lawsuit or other Legal Proceeding (I) in an amount in excess of $15,000,000 in the aggregate or (II) that would impose any material non-monetary relief (excluding customary confidentiality obligations) on the Acquired Companies, or (B) with respect to any Non-Controlled Entity, vote in favor of or propose that such Non-Controlled Entity take any action described in the immediately preceding clause (A); or

(xviii)   agree or commit to do any of the foregoing (or, with respect to any of the foregoing restrictions which expressly relates to the Non-Controlled Entities, vote in favor of or propose that any Non-Controlled Entity agree or commit to take any such restricted action).

(c)   Notwithstanding the foregoing, during the Interim Period, the Acquired Companies may (i) utilize any and all available Cash to make regularly scheduled payments of

---

[35] **Note to Buyer**: An updated schedule of payables to PDVSA will be provided in the VDR as a priority.

[36] **NTD**: See FN 30.

outstanding Debt under the 2021 Indenture, the 2023 Indenture, the 1995 Loan Agreement, the 1998 Loan Agreement, the 2002 Loan Agreement and the under the Master Reimbursement Agreement or other Debt (other than Debt for borrowed money or Debt evidenced by notes, debentures, bonds or other similar instruments), provided, that such payments do not exceed the amounts owed and outstanding and (ii) amend, restate or refinance any outstanding Debt or the Receivables Securitization Facility, or replace such Debt or Receivables Securitization Facility with new Debt (and the related incurrence of any guarantees for such borrowed money and the incurrence of any related liens on its property) including in the form of, but not limited to, a new securitization facility, an asset based loan or other revolving credit facility; provided that, (i) no new Debt shall increase the amount of Debt being refinanced or replaced or include prepayment premiums or penalties or otherwise limit or restrict the Acquired Companies right to repay outstanding Debt at the Closing and (ii) any such repayment of outstanding Debt, or amendment, restatement, refinancing, or replacement of outstanding Debt or the Receivables Securitization Facility is determined in good faith by the Company's board of directors to be in the best interest of the Acquired Companies.

(d)     In the event that the Closing does not occur by the first anniversary of the Execution Date, the dollar amounts in this Section 6.1 shall, without further action, increase by an incremental 10% on each anniversary of the Execution Date.

(e)     Notwithstanding anything to the contrary herein, nothing in this Agreement will restrict the Acquired Companies from taking actions to prevent or mitigate the effects of any damage to property or injury to any person or the environment in emergency circumstances, as reasonably determined in good faith by the Acquired Companies, so long as the Acquired Companies (i) use Good Industry Practices with respect to such circumstances and (ii) provide the Buyer with notice of any such actions, as soon as reasonably practicable (and in any event, no later than one (1) Business Day) after such action is taken.

(f)     For the avoidance of doubt, nothing in this Agreement, including the provisions of this Section 6.1 or Section 6.3, in any way impairs the right of the Acquired Companies or PDVSA to object to the approval or execution of this Agreement or the approval or consummation of the Transactions, including on appeal, and the taking of any actions in connection therewith.

(g)     Notwithstanding anything in this Agreement to the contrary, to the extent that the Venezuela Parties propose a Competing Proposal which constitutes, or could reasonably be expected to lead to, a Superior Proposal, nothing in this Agreement will prohibit the Venezuela Parties from proposing that the Acquired Companies take actions otherwise prohibited by this Section 6.1 or any other provision of this Agreement in connection therewith (including, for the avoidance of doubt, the actions described in Section 6.1(b)(xvi)) and, subject to the termination of this Agreement pursuant to Section 8.1(d) or Section 8.1(g) in connection with the entry into a definitive agreement with respect to such Competing Proposal by the Venezuela Parties, the Acquired Companies committing to take such actions if permitted by applicable Law.

Section 6.2.    <u>Access to Information</u>.

(a)    During the Interim Period, the Special Master shall Cause the Company to provide the Buyer and its Representatives, upon reasonable advance notice and under reasonable circumstances, with reasonable access during normal business hours, to the books and records (including all electronic data related thereto), information, assets, operations and properties of the Acquired Companies (including, without limitation, Required Information); <u>provided</u>, that (i) any such access and activities shall be conducted in a manner not to unreasonably interfere with the normal operations of the Acquired Companies or their respective business and (ii) without the prior written consent of the Special Master and the Company, which may be withheld for any reason in the sole and absolute discretion of the Special Master or the Company, as applicable, the Buyer and its Representatives shall have no right to perform invasive or subsurface investigations of the properties or facilities of the Acquired Companies. Notwithstanding anything herein to the contrary, no such access or disclosure shall be required if doing so could reasonably be expected to (A) result in a waiver of attorney-client privilege, work product doctrine or similar privilege, (B) violate the terms of any Contract to which any Acquired Company is a party, or (C) violate any Law to which any Acquired Company is subject; <u>provided</u>, that the Special Master shall Cause the Company to, to the extent legally permissible and practicable, use commercially reasonable efforts to make appropriate substitute disclosure arrangements, or seek appropriate joint defense agreements, waivers or consents, under circumstances in which the foregoing restrictions of this sentence apply. There may be withheld from the Buyer and its Representatives such portions of documents or information relating to pricing or other matters that are highly sensitive if the exchange of such documents (or portions thereof) or information as determined by the Company's outside counsel would be reasonably likely to result in antitrust difficulties between the Company and the Buyer or any of their respective Affiliates. All requests for such access shall be directed to such Person as the Special Master may designate in writing from time to time (collectively, the "<u>Designated Contacts</u>"). Other than the Designated Contacts, prior to the Closing, without the prior written consent of the Special Master (not to be unreasonably withheld, conditioned or delayed), neither the Buyer, its Affiliates or their respective Representatives shall contact any employee, contractors, supplier, customer, landlord or other material business relationship of any Acquired Company regarding any Acquired Company, their respective businesses or the Transactions.

(b)    Notwithstanding anything in this Agreement to the contrary, in no event will the Acquired Companies be required to provide Buyer or the Special Master with access to any information regarding its objections to the sale process, the negotiation of the Transactions or the Acquired Companies' objection to this Agreement or the approval or the consummation of the Transactions.

(c)    For a period commencing on the Closing Date and ending on the latest of (x) the date that is twelve (12) months after the Closing Date and (y) the final, non-appealable resolution of a Legal Proceeding relating to or arising from the Sale Order to appeal the sale and purchase of the Shares, the Buyer shall cause the Acquired Companies to use commercially reasonable efforts to maintain all books and records (including all electronic data related thereto) of the Acquired Companies relating to periods ending on or prior to the Closing Date and the Buyer shall cause the Acquired Companies to (i) provide the Special Master and its Representatives during the Company's normal business hours, upon reasonable advance notice and under reasonable circumstances, reasonable access to such books and records and the individuals

45

responsible for preparing and maintaining such books and records, and (ii) permit the Special Master and its Representatives to make copies of any such books and records, in each case of the immediately preceding clause (i) and clause (ii), as reasonably requested in connection with any Legal Proceeding relating to or arising from the Sale Order to appeal the sale and purchase of the Shares (other than any Legal Proceeding between the Special Master, on the one hand, and the Buyer, on the other hand, related to the Sale Order, this Agreement, the other Transaction Documents or the Transactions, which would be governed by and subject to other applicable provisions of this Agreement and subject to applicable rules relating to discovery and document retention). Notwithstanding anything in this <u>Section 6.2(c)</u> to the contrary, the Buyer and the Acquired Companies shall not be required to provide such access or disclose any information to the Special Master if doing so could reasonably be expected to (A) result in a waiver of attorney-client privilege, work product doctrine or similar privilege, (B) violate the terms of any Contract to which any Acquired Company is a party, or (C) violate any Law to which any Acquired Company is subject; <u>provided</u>, that the Parties will, to the extent legally permissible and practicable, use commercially reasonable efforts to make appropriate substitute disclosure arrangements, or seek appropriate joint defense agreements, waivers or consents, under circumstances in which the foregoing restrictions of this sentence apply.

Section 6.3.    <u>Regulatory Approvals; Third Party Consents</u>.[37]

(a)    Each of the Parties shall, if required by applicable Law, within thirty (30) calendar days following the date on which the Special Master files a motion with the Court to approve the Sale Order (the "<u>Final Recommendation Date</u>"), file or supply, or in the case of the Special Master Cause to be filed or supplied, in connection with the Transactions, all notifications and information required to be filed or supplied pursuant to the HSR Act. Each of the Parties shall request early termination of the waiting period under the HSR Act, if available. The Parties shall (and the Special Master shall Cause the Acquired Companies to), as soon as reasonably practicable following the Final Recommendation Date (and in any event no later than [●] ([●]) Business Days thereafter)[38], file or supply, or cause to be filed or supplied in connection with the Transactions, all filings and submissions required under any relevant Laws, including Antitrust Laws. The Buyer acknowledges and agrees that it shall pay and shall be solely responsible for the payment of all fees, costs, expenses and other charges in connection with compliance with this <u>Section 6.3</u> (including filing fees).

(b)    Neither Party shall (i) consent to any voluntary extension of any waiting period; (ii) pull and refile any filing made under the HSR Act, or any other Antitrust Laws; or (iii) consent to any other voluntary delay of the consummation of the Transactions at the behest of any Governmental Body, in each case, without the prior written consent of the other Party, which consent shall not be unreasonably withheld, conditioned or delayed.

(c)    The Parties shall coordinate and cooperate with one another in exchanging and providing such information to each other and in making the filings and requests referred to in

---

[37] **Note to Bidder**: Given the direct impact on closing certainty of revisions to the bidder commitment to obtain regulatory approvals, any revisions to this covenant which bring into question the certainty of closing will be strongly disfavored.

[38] **Note to Bidder**: Timing to be discussed pending confirmation of any foreign filings.

<u>Section 6.3(a)</u>. The Parties shall supply such reasonable assistance as may be reasonably requested by the other Party in connection with the foregoing and shall promptly furnish the other Party with all information within its possession that is reasonably required for all filings and submissions required under any relevant Laws, including Antitrust Laws.

    (d)  Notwithstanding anything to the contrary in this Agreement, the Buyer shall take, and shall cause its Subsidiaries and Affiliates to take, as promptly as practicable, all action necessary, proper or advisable to consummate the Transactions prior to the Outside Date to (x) avoid or eliminate each and every impediment, resolve any objection and obtain all consents under any applicable Laws (including Antitrust Laws) as promptly as practicable so as to enable the Parties to consummate the Transactions and (y) avoid the entry or to effect the dissolution of, or vacate or lift, any Order, objection of any Governmental Body or waiting period under applicable Antitrust Laws that would otherwise have the effect of preventing, impairing or delaying the Closing, including: (i) proposing, negotiating and offering to commit and effect, by Order, consent decree, hold separate order, trust, or otherwise, the sale, license, divestiture, disposition or hold separate of such entities, assets, Intellectual Property, businesses, product lines, Equity Interests, properties or services of the Buyer or its Affiliates or Subsidiaries (including, following the Closing, the Acquired Companies); (ii) offering to take or offering to commit to take any action, including any action that limits the Buyer's freedom of action, ownership or control with respect to, or its ability to retain or hold, any of the businesses, assets, product lines, Equity Interests, properties or services of the Buyer or its Subsidiaries or Affiliates (including, following the Closing, the Acquired Companies), to the extent legally permissible, and if the offer is accepted, taking or committing to take such action; (iii) terminating, amending, relinquishing, modifying, waiving or assigning existing relationships, ventures or contractual rights, obligations or other arrangements of the Buyer or its Subsidiaries or Affiliates (including, following the Closing, the Acquired Companies); (iv) changing or modifying, or agreeing not to engage in, any course of conduct regarding future operations; (v) creating any relationships, ventures, contractual rights, obligations or other arrangements of the Buyer or its Subsidiaries or Affiliates (including, following the Closing, the Acquired Companies); (vi) committing to take any such actions in the foregoing clauses (i), (ii), (iii), (iv); or (v) or entering or offering to enter into agreements and stipulating to the entry of an Order or filing appropriate applications with any Governmental Body in connection with any of the actions contemplated by the foregoing clauses (i), (ii), (iii), (iv), or (v); and (vii) opposing, and causing its Subsidiaries and Affiliates to oppose, through and including action on the merits (and all appeals with respect thereto), any action asserted in court or other forum by any Governmental Body or other Person in order to avoid entry of, or to have vacated or terminated, any Order (whether temporary, preliminary or permanent) that would restrain or prevent the Closing by the Outside Date. For the avoidance of doubt, neither the Buyer nor any Subsidiary or Affiliate of the Buyer nor any Acquired Company shall be required to negotiate, agree or commit to, or effect to take or cause to be taken, any structural or behavioral remedy or any other action that is not conditioned (either as a condition precedent or subsequent) upon the consummation of the Transactions.

    (e)  In addition and without limiting the other provisions of this <u>Section 6.3</u>, the Buyer shall defend through litigation, appealing, contesting or otherwise resisting any action, proceeding, or Order by any Governmental Body challenging the Transactions under applicable Laws (including Antitrust Laws), including to defend through litigation on the merits any claim asserted in court by any Person in order to avoid entry of, or to have vacated or terminated, any

47

Order (whether temporary, preliminary or permanent) that would delay the Closing or prevent the Closing by the Outside Date; provided, however, that such litigation in no way limits the obligation of the Buyer to take any and all steps necessary to eliminate each and every impediment under any applicable Laws (including Antitrust Laws) to close the Transactions prior to the Outside Date.

(f)    Except as specifically required by the Agreement, the Buyer shall not take, and shall cause its Subsidiaries and Affiliates not to take, any action or refrain from taking any action, the effect of which would be to delay or impede the ability of the Parties to consummate the Transactions. Without limiting the generality of the foregoing, the Buyer shall not, and shall cause its Subsidiaries and Affiliates not to, acquire or agree to acquire by merging or consolidating with, or by purchasing a substantial portion of the assets of or equity in or otherwise make any investment in, or by any other manner, any Person or portion thereof, or otherwise acquire or agree to acquire or make any investment in any assets, or agree to a commercial or strategic relationship with any person, if the entering into of a definitive agreement relating to or the consummation of such acquisition, merger, consolidation, investment, commercial or strategic relationship would reasonably be expected to (i) impose any delay in the obtaining of, or increase the risk of not obtaining, any consent, approval, authorization, declaration, waiver, license, franchise, permit, certificate or Order of any Governmental Body necessary to consummate the Transactions or the expiration or termination of any applicable waiting period, (ii) increase the risk of any Governmental Body entering an Order prohibiting the consummation of the Transactions, (iii) increase the risk of not being able to remove any such Order on appeal or otherwise, (iv) increase the risk of any Governmental Body asserting jurisdiction over the Transactions or (v) delay the consummation of the Transactions.

(g)    Each Party shall promptly inform the other Party of any material communication from the Federal Trade Commission, the Department of Justice or any other Governmental Body regarding any of the Transactions. Each Party (including its respective Affiliates or Subsidiaries) will provide the other Party with copies (or, if provided orally, a summary) of all substantive correspondence, filings or communications between them or any of their Representatives, on the one hand, and any Governmental Body or members of its staff, on the other hand, with respect to this Agreement and the Transactions; provided, however, that materials may be redacted as necessary to (i) comply with contractual arrangements and (ii) address reasonable attorney-client or other privilege or confidentiality concerns. If any Party or any Affiliate thereof receives a request for additional information or documentary material from any such Governmental Body with respect to the Transactions, then such Party will use its reasonable best efforts to make, or cause to be made, as soon as reasonably practicable and after consultation with the other Party, an appropriate response in compliance with such request. The Buyer will advise the Special Master and the Company promptly in respect of any understandings, undertakings or agreements (oral or written) that the Buyer proposes to make or enter into with the Federal Trade Commission, the Department of Justice or any other Governmental Body in connection with the Transactions, and will use its best efforts to cause the Special Master and the Company to be given the opportunity to attend and participate at any meetings with respect thereto. None of the Buyer, the Special Master or the Company (including their respective Affiliates or Subsidiaries) will agree to participate in any meeting, telephone call or discussion with a Governmental Body in respect of any submissions, filings, investigation (including any settlement of the investigation), litigation or other inquiry relating to the matters that are the subject of this Agreement unless it consults with the other Party in advance and, except as may be prohibited by

48

a Governmental Body or by any Law, and will permit authorized Representatives of the other Parties and the Special Master to be present at each meeting, telephone call or discussion.

Section 6.4.    Further Assurances. Subject to, and not in limitation of, Section 6.3, until the Closing or earlier termination of this Agreement, each of the Parties shall (a) execute such documents and perform such further acts as may be reasonably required to carry out the provision hereof and the actions contemplated hereby and (b) use its best efforts to, at the earliest practicable date, satisfy, or cause the satisfaction of, the condition precedents to the consummation of the Transactions.

Section 6.5.    Confidentiality. The Buyer acknowledges that the information provided to them in connection with this Agreement and the Transactions is subject to the terms of the confidentiality agreement between [●] and the Special Master dated [●] (the "Confidentiality Agreement"), the terms of which are incorporated herein by reference; subject to disclosure permitted in accordance with Section 6.10.

Section 6.6.    Indemnification, Exculpation and Insurance.

(a)    From and after the Closing, the Buyer shall, and shall cause each Acquired Company to continue in full force and effect in accordance with their respective terms until the applicable statute of limitations with respect to any claims against such Indemnitees (as defined below), all rights to indemnification, advancement of expenses and exculpation by the Acquired Companies, now existing in favor of each of the Persons who at or prior to the Closing were (i) directors (or equivalent), officers or employees of any Acquired Company or (ii) serving as directors (or equivalent), officers or employees of another entity (including a joint venture) at the request of any Acquired Company (collectively, the "Indemnitees") pursuant to the Organizational Documents of the Acquired Companies in effect on the Execution Date (and to the extent permitted by Section 3, clause fifth of the Certificate of Incorporation of CITGO Petroleum as in effect on the Execution Date) or pursuant to the Contracts disclosed in Section 6.6(a) of the Company Disclosure Schedules in effect as of the Execution Date (as the same may be amended to reflect the CITGO Petroleum Guarantees) or indemnification Contracts entered into during the Interim Period between an Acquired Company, on the one hand, and an Indemnitee first hired or engaged by the Acquired Companies during the Interim Period, on the other hand (which such Contracts will not be materially less favorable to the Acquired Companies than those Contracts disclosed in Section 6.6(a) of the Company Disclosure Schedules) ("New Indemnification Agreements").

(b)    The indemnification and exculpation provisions of the Acquired Companies' Organizational Documents and indemnification Contracts disclosed in Section 6.6(a) of the Company Disclosure Schedules shall not be amended, or otherwise modified in any manner that would adversely affect the rights of the Indemnitees under Section 6.6(a), unless such amendment or modification is required by Law. From and after the Closing, the Buyer agrees to cause the Acquired Companies to maintain in effect in accordance with their respective terms  (i) the escrow agreement, dated May 5, 2023, by and among Citgo Petroleum Corporation, Morris James, LLP and JPMorgan Chase Bank, N.A. and (ii) the escrow agreement, dated May 5, 2023, by and among the Company, Morris James, LLP and JPMorgan Chase Bank, N.A., and not to

49

amend the foregoing in any manner that would adversely affect the rights of the applicable Indemnitees thereunder, unless such modification is required by Law[39].

(c)    Prior to the Closing, the Company may, or, immediately upon the Closing if the Company has not already done so, the Buyer shall cause the Company and the Company Subsidiaries to, purchase the directors' and officers' "tail" or "runoff" insurance program currently available to be purchased under the existing directors' and officers' liability insurance plan covering the Acquired Companies' directors and officers, to the extent such plan remains available as of the Closing on materially the same terms and conditions; provided, that the premium paid for such "tail" policy shall not exceed 350% of the annual premiums paid for the Acquired Companies' current directors' and officers' liability insurance policy; and provided, further, that to the extent the premium paid for such "tail" policy exceeds 350% of the annual premiums paid for the Acquired Companies' current directors' and officers' liability insurance policy, the Buyer shall maintain a "tail" policy that has the most favorable coverage obtainable for an amount at or below 350% of the annual premiums paid for the Acquired Companies' current directors' and officers' liability insurance policy. To the extent that such plan is no longer available on materially the same terms and conditions at the Closing, prior to the Closing, the Buyer shall, or, immediately upon the Closing, shall cause the Company, to purchase a directors' and officers' "tail" or "run-off" insurance program, selected by the Company prior to the Closing, for a period of six (6) years after the Closing (such coverage shall have an aggregate coverage limit over the term of such policy in an amount no less than the aggregate coverage limit under the Company's existing directors' and officers' liability policy, and in all other respects comparable to such existing coverage); provided, that the premium paid for such "tail" policy shall not exceed 350% of the annual premiums paid for the Acquired Companies' current directors' and officers' liability insurance policy; and provided, further, that to the extent the premium paid for such "tail" policy exceeds 350% of the annual premiums paid for the Acquired Companies' current directors' and officers' liability insurance policy, the Buyer shall maintain a "tail" policy that has the most favorable coverage obtainable for an amount at or below 350% of the annual premiums paid for the Acquired Companies' current directors' and officers' liability insurance policy.

(d)    The provisions of this Section 6.6 are intended to be for the benefit of, and shall be enforceable by, each Indemnitee.

(e)    In the event that the Buyer, the Company or any of its successors or assigns (i) consolidates with or merges into any other Person and is not the continuing or surviving corporation or entity of such consolidation or merger; or (ii) transfers or conveys all or substantially all of its properties and assets to any Person, then, and in each such case, proper provision shall be made so that the successors and assigns of the Buyer and of the Company shall assume all of the obligations of the Buyer and the Company set forth in this Section 6.6.

Section 6.7.    Public Announcements. The Buyer and the Special Master shall not, and the Special Master shall Cause the Acquired Companies not to, issue any press release or make any public statement without the prior consent of the other Party, which consent shall not be unreasonably withheld, conditioned or delayed, except that each of the Buyer and the Special Master may issue (x) the initial press release announcing the execution of this Agreement that has

---

[39] **NTD**: Suggest scheduling these agreements.

WEIL:\100255289\1\67816.0003

been agreed upon by the Buyer and the Special Master, (y) any press release or public announcement so long as any statements contained therein concerning the Transactions are consistent with previous releases or announcements made by the applicable Party with respect to which such Party has complied with the provisions of this <u>Section 6.7</u>, and (z) such other release or announcement that, upon the advice of outside counsel, is required by Law or the rules and regulations of any stock exchange upon which the securities of the Buyer, as applicable, or any of its Affiliates, are listed. For the avoidance of doubt, nothing in this <u>Section 6.7</u> shall prevent the Parties from (a) issuing any press release or making any public statement in the Ordinary Course that does not relate specifically to this Agreement or the Transactions, (b) disclosing this Agreement or the substance or any relevant details of the Transactions on a confidential basis to any of its Representatives (<u>provided</u>, that such Representatives have been informed of such party's confidentiality obligations hereunder and under the Confidentiality Agreement or are otherwise obligated to keep such information confidential) or (c) in the case of the Special Master, complying with any reporting obligations of the Court and nothing in this <u>Section 6.7</u> or in any other provision of this Agreement shall impact the ability of PDVSA or the Acquired Companies to use confidential information in connection with opposing the sale process, this Agreement or the Transactions.

Section 6.8.    <u>Employee Matters</u>.

(a)    The Buyer and the Special Master hereby agree that the Closing shall constitute a "Change in Control" for purpose of any employee arrangement and all other Company Benefit Plans, pursuant to the terms of such plans as in effect on the Execution Date (or as adopted or amended to the extent permitted by <u>Section 6.1(b)</u>). No provision of this <u>Section 6.8(a)</u> shall be construed to create a right in any employee or beneficiary of such employee under any Company Benefit Plan that such employee or beneficiary would not otherwise have under the terms of such Company Benefit Plan and, for the avoidance of doubt, no provision of this <u>Section 6.8</u> will be deemed to supersede the terms of any Company Benefit Plan to the extent such terms are more favorable to Affected Employees than the rights granted hereunder.

(b)    As of the Closing, the Buyer shall, or shall cause the Acquired Companies to, assume the Company Collective Bargaining Agreements and adhere to the obligations thereunder pursuant to the terms therein. Following the Closing, the Buyer or the Acquired Companies will continue to employ the employees who are subject to or covered by the Company Collective Bargaining Agreements and employed by one of the Acquired Companies as of the Closing (the "<u>Union Affected Employees</u>") on the terms therein, including with respect to employee wages and benefits.

(c)    For a period of twelve (12) months  following the Closing (or, if shorter, the applicable employee's period of employment with the Buyer or one of the Acquired Companies), the Buyer shall continue to provide (or shall cause the Acquired Companies to provide) to each employee of any of the Acquired Companies as of the Closing who are not subject to or covered by a Company Collective Bargaining Agreement (the "<u>Non-Union Affected Employees</u>," together with the Union Affected Employees, the "<u>Affected Employees</u>"), for so long as each such Non-Union Affected Employee remains employed by the Buyer or any of the Acquired Companies, compensation and employee benefits which are no less favorable than those provided to the Non-Union Affected Employees prior to the Closing.  Notwithstanding the generality of the foregoing,

WEIL:\100255289\1\67816.0003

for a period of twelve (12) months following the Closing, the Buyer shall continue to provide (or shall cause the Acquired Companies to provide) to each Non-Union Affected Employee, for so long as such Non-Union Affected Employee remains employed by the Buyer or any of the Acquired Companies, (i) a base salary or wage rate (as applicable), in each case, that is no less favorable than those provided to such Non-Union Affected Employee immediately prior to the Closing, (ii) short-term and long-term incentive compensation opportunities and Responsibility Incentive (as such term is defined in the CITGO Petroleum Corporation 2024 Compensation and Incentive Omnibus Plan for Salaried Employees or its successor), in each case, that are no less favorable in the aggregate than those provided to such Non-Union Affected Employee immediately prior to the Closing, (iii) all other compensation and employee benefits (including any defined benefit pension and post-retirement health and welfare benefits) that are no less favorable in the aggregate than those provided to such Non-Union Affected Employee immediately prior to the Closing, and (iv) severance payments, entitlements and benefits that are no less favorable in the aggregate than those provided to such Non-Union Affected Employee immediately prior to the Closing. Except as required by applicable Law, for the period beginning on the Closing Date and ending on the first anniversary thereof, the Buyer agrees to cause the Acquired Companies to maintain in effect and without reduction retiree health and life insurance benefits for the individuals who are participants in the Acquired Companies' retiree health and life insurance benefits as of immediately prior to the Closing Date and individuals who become eligible to participate in such retiree health and life insurance benefits during the period beginning on the Closing Date and ending on the one year anniversary thereof.

(d)     The Buyer will give (or will cause the Acquired Companies to give) each Affected Employee full credit for purposes of eligibility, vesting and benefit accrual under any employee benefit plans or arrangements maintained by the Buyer (or any of the Acquired Companies) for such Affected Employee's service with any of the Acquired Companies (and their respective predecessor entities) to the same extent recognized by any of the Acquired Companies immediately prior to the Closing, except to the extent that such credit would result in a duplication of benefits or compensation for the same period of service.

(e)     The Buyer will (or will cause the Acquired Companies to) use commercially reasonable efforts to (i) waive all limitations as to preexisting conditions, exclusions and waiting periods with respect to participation and coverage requirements applicable to each Affected Employee under any welfare benefit plans that such Affected Employee may be eligible to participate in after the Closing, other than limitations or waiting periods that are already in effect with respect to such Affected Employee and that have not been satisfied as of the Closing under any welfare plan maintained for the Affected Employee immediately prior to the Closing, and (ii) for the first plan year of eligibility, provide each Affected Employee with credit for any co-payments and deductibles, paid by such Affected Employee prior to the Closing, in satisfying any applicable deductible or out-of-pocket requirements under any welfare plans that such Affected Employee is eligible to participate in after the Closing. References to "Affected Employee" in this Section 6.8(e) shall also refer to the applicable Affected Employee's eligible dependents.

(f)     Upon the Buyer's request (and at the Buyer's sole cost and expense), the Special Master shall Cause the Company to adopt and maintain an employee retention plan in form and substance as proposed by the Buyer in writing. Any such employee retention plan shall be in addition to, and shall not replace or substitute any existing Company Benefit Plan.

(g)     To the extent any awards under any cash bonus, sales and other incentive plans of the Acquired Companies ("Bonus Amounts") with respect to a performance period completed prior to the Closing remain unpaid as of the Closing Date, the Buyer shall cause such Bonus Amounts to be calculated and paid in the Ordinary Course to the eligible employees of the Acquired Companies.  With respect to Bonus Amounts for the performance period in which the Closing occurs, the Buyer shall cause such Bonus Amounts to be calculated and paid in the Ordinary Course to the eligible employees of the Acquired Companies based on the actual level of Company performance for such performance period.  Without limiting in any way any rights an Affected Employee may have under any Company Benefit Plan, if an Affected Employee participating in the CITGO Petroleum Corporation Performance Incentive program for salaried employees (the "Performance Incentive Program") has a qualifying termination of employment entitling the Affected Employee to severance under a severance program, agreement or arrangement of the Buyer or the Acquired Companies and such termination occurs during the period that begins on the Closing Date and ends on the date on which Bonus Amounts under the Performance Incentive Program are paid for the performance period in which the Closing occurs, then such Affected Employee will not lose eligibility, solely due to the termination of employment, for payment of any Bonus Amount under the Performance Incentive Program for performance periods completed prior to the Closing or for the performance period in which the Closing occurs; provided that any such Bonus Amounts shall be paid to such employee at the same time as such awards are paid to other participants in the Performance Incentive Program, and provided, further, that any such Bonus Amount for the performance period in which the termination of employment occurs shall be prorated based on the number of completed months of employment during the performance period prior to the termination of employment.

(h)     The provisions contained in this Section 6.8 shall not (i) be treated as an amendment or other modification of any Company Benefit Plan, Company Collective Bargaining Agreement or other employee benefit plan, agreement or other arrangement, (ii) limit the right of the Buyer or any Acquired Company to terminate any employee at any time and for any reason or (iii) create any third party rights, benefits or remedies of any nature whatsoever in any employee of any Acquired Company (or any beneficiaries or dependents thereof) or any other Person that is not a party to this Agreement. The benefits and compensation provided to each Affected Employee following the Closing Date shall be subject to the requirements of applicable Law. Notwithstanding the foregoing, nothing herein will impose on the Buyer or any of the Acquired Companies any obligation to (A) retain any Affected Employee in its or their employ for any amount of time or (B) maintain any terms and conditions of employment other than as expressly set forth above, subject to applicable Law and the Acquired Companies' existing contractual obligations to the respective Affected Employee.

(i)     From and after the Execution Date, the Buyer will cooperate with and provide all information reasonably requested by the Acquired Companies and their representatives in connection with any notice to be filed by the Acquired Companies with the PBGC pursuant to ERISA Section 4043 and the regulations thereunder as a result of the Transactions or in connection with any related requests for information from the PBGC. To the extent such notice is required to be filed prior to Closing, the Acquired Companies shall cause the applicable plan sponsor and plan administrator to timely file such notice with the PBGC and, prior to such filing, shall provide Buyer a reasonable opportunity to review and comment on such notice.

(j)     Not less than thirty days prior to the Closing, the Acquired Companies shall contribute to the grantor trust established for the EPP and the RRP such funds as are required to be contributed to such trust pursuant to the terms of the EPP and RRP.

Section 6.9.     The Buyer's Obligations in Respect of Debt Financing.

(a)     The Buyer acknowledges and agrees that the Special Master, the Company and their respective Affiliates have no responsibility for any financing that Buyer may raise in connection with the Transactions, except to the extent specifically set forth in Section 6.10.

(b)     The Buyer shall deliver to the Special Master the Debt Commitment Letters, executed by each Debt Financing Source[40], each in the form of the applicable Debt Commitment Letter delivered on the Execution Date, on or prior to the last day of the Topping Period.

(c)     The Buyer shall use reasonable best efforts to take, or cause to be taken, all actions and to do, or cause to be done, all things necessary, proper or advisable to obtain the Debt Financing contemplated by the Debt Financing Commitments on or prior to the Closing Date, including to:

(i)     maintain in effect (A) any Equity Commitment Letters from and after the Execution Date and (B) the Debt Commitment Letters from and after the date on which the Buyer delivers the executed Debt Commitment Letters to the Special Master pursuant to Section 6.9(b) (the "Debt Commitment Letter Effective Date");

(ii)     negotiate and enter into definitive financing agreements (the "Definitive Debt Documents") with respect to the Debt Financing that reflect the terms contained in the Debt Commitment Letter (including any "market flex" provisions related thereto), so that such agreements are in effect as promptly as practicable but in any event no later than the Closing Date; it being understood that in no event shall any of the Definitive Debt Documents (A) reduce the aggregate amount of the Debt Financing provided for in the Debt Commitment Letter (including by changing the amount of fees or original issue discount contemplated by the Debt Commitment Letter and the Fee Letters) below the Required Amount, unless there is a corresponding increase in the Equity Financing; (B) expand the conditions or other contingencies relating to the receipt or funding of the Debt Financing beyond those expressly set forth in the Debt Commitment Letter, amend or modify any such conditions or other contingencies in a manner adverse to the Buyer and/or the Acquired Companies (whether by making any such conditions or other contingencies less likely to be satisfied on a timely basis or otherwise) or impose any new or additional condition or other contingency relating to the receipt or funding of the Debt Financing or (C) contain terms (other than those terms expressly set forth in the Debt Commitment Letter) that (1) could reasonably be expected to materially delay the Closing or the date on which the Debt Financing would be obtained or make the timely funding of the Debt Financing materially less likely to occur, or (2) materially adversely impact the ability of the Buyer to consummate the Debt Financing (clauses (A) through (C), a "Prohibited Modification"); provided, however, notwithstanding anything to the contrary

---

[40] **NTD**: Edit made as Debt Commitment Letters will not be fully executed until after such time.

in this Section 6.9 or elsewhere in this Agreement, a Prohibited Modification shall not include, and Buyer shall have the right from time to time to amend, replace, supplement or otherwise modify, or waive any of its rights under a Debt Commitment Letter and/or substitute financing for all or any portion of the Debt Financing from the same and/or alternative financing sources, provided that any such amendment, replacement, supplement or other modification to or waiver of any provision of a Debt Commitment Letter or the Definitive Financing Documents that amends the contemplated Financing and/or substitutes all or any portion of the Debt Financing (y) shall not expand upon, or delay, the satisfaction of the conditions precedent to the Debt Financing on the Closing Date of the Debt Financing as set forth in the original Debt Commitment Letter or the Definitive Financing Documents and (z) shall provide for a financing amount (which when added to Buyer's available, unrestricted cash on hand, cash equivalents and marketable securities and the Equity Financing) will not be less than the amount necessary to satisfy the Required Amount in full;

> (iii)    satisfy on a timely basis all conditions applicable to the Buyer contained in the Debt Financing Commitments and Equity Financing Commitments, including the payment of any commitment, engagement or placement fees required as a condition to the Debt Financing or the Equity Financing, as applicable;

> (iv)    consummate the Debt Financing (including by instructing the Debt Financing Sources to fund the Debt Financing in accordance with the Debt Commitment Letter, instructing the Equity Financing Sources to fund the Equity Financing in accordance with the Equity Commitment Letters and enforcing the Buyer's rights under the Debt Commitment Letter (including if necessary or appropriate, to commence, participate in and diligently pursue Legal Proceedings against or involving any of the Persons that have committed to provide any portion of, or otherwise with respect to, the Debt Financing)) at or prior to the date that the Closing is required to be effected in accordance with Section 2.2 (the Buyer acknowledges and agrees that it is not a condition to Closing under this Agreement, nor to the consummation of the Transactions, for the Buyer to obtain the Debt Financing or any Replacement Financing); and

> (v)    comply with its obligations under the Debt Commitment Letter.

Subject to the terms and upon satisfaction of the conditions set forth in the Debt Commitment Letter, the Buyer shall use its reasonable best efforts (including initiating Legal Proceedings) to cause the lenders and the other Persons providing such Debt Financing to provide the Debt Financing on the Closing Date.

> (d)    The Buyer shall provide to the Special Master copies of all agreements and other documents relating to the Debt Financing and, shall keep the Special Master reasonably informed on a current basis and in reasonable detail of material developments in respect of the financing process relating thereto. Without limiting the generality of the foregoing, the Buyer shall provide the Special Master prompt (and in no event later than forty-eight (48) hours after obtaining knowledge) written notice (i) of any expiration or termination of, or any breach, default or violation (or any event or circumstance that, with or without notice, lapse of time or both, could reasonably be expected to give rise to any breach, default or violation) by any party to the Debt Commitment

55

Letter or definitive agreements related to the Debt Financing of which the Buyer becomes aware, (ii) of the receipt of any notice or other communication, in each case from any Debt Financing Source with respect to any (x) actual or potential breach, default, violation, termination or repudiation by any party to the Debt Commitment Letter or definitive agreements related to the Debt Financing of any provision of the Debt Commitment Letter or definitive agreements related to the Debt Financing, (y) any actual dispute or disagreement between or among any parties to the Debt Commitment Letter or definitive agreements related to the obligation to fund the Debt Financing or the amount of the Debt Financing to be funded at the Closing, and (iii) if at any time for any reason the Buyer believes in good faith that it will not be able to obtain all or any portion of the Debt Financing on the terms and conditions contemplated by the Debt Financing Commitments or definitive agreements related to the Debt Financing. As soon as reasonably practicable, but in any event within forty-eight (48) hours after the Special Master delivers to the Buyer a written request therefor, the Buyer shall provide any information reasonably requested by the Special Master relating to any circumstance referred to in clause (i), (ii) or (iii) of the immediately preceding sentence; provided, that the right of the Special Master to request such information shall not limit the obligations of the Buyer to promptly provide such information as otherwise required by this Section 6.9(d).

(e)    Prior to the Closing, the Buyer shall not, without the prior written consent of the Special Master, agree to, or permit, any amendment, restatement, amendment and restatement, replacement, supplement, or other modification of, or waiver or consent under, the Debt Commitment Letter or other documentation relating to the Debt Financing which would constitute a Prohibited Modification. For purposes of this Section 6.9, the definitions of "Debt Commitment Letter," "Debt Financing," "Debt Financing Commitments," "Debt Financing Sources," shall include the Debt Financing Commitment or documents related thereto as permitted to be amended, amended and restated, replaced, supplemented, modified, waived or consented to by this Section 6.9(e). The Buyer shall promptly deliver to the Special Master copies of any such amendment, restatement, amendment and restatement, replacement, supplement, modification, waiver or consent. The Buyer shall not agree to or permit the withdrawal, repudiation, termination or rescission of any Debt Commitment Letter or Definitive Debt Document or any provision thereof (except in connection with Replacement Financing). Further, for the avoidance of doubt, if from and after the Execution Date the Debt Financing (or any Replacement Financing) has not been obtained, the Buyer shall continue to be obligated to consummate the Transactions subject only to the satisfaction or waiver of the conditions set forth in Section 7.1 and Section 7.2.

(f)    If, notwithstanding the use of reasonable best efforts by the Buyer to satisfy its obligations under Section 6.9(c), (d), (d) and (e), any of the Debt Financing or the Debt Financing Commitments (or any definitive financing agreement relating thereto) expire or are terminated or become unavailable prior to the Closing, in whole or in part, for any reason, the Buyer shall (i) promptly notify the Special Master of such expiration, termination, or unavailability and the reasons therefor and (ii) use its reasonable best efforts promptly to arrange for alternative financing ("Replacement Financing") (which shall be sufficient, together with the Equity Financing and cash on hand of the Buyer, to pay the Required Amount and shall not, without the prior written consent of the Special Master, include any conditions to such Replacement Financing that are more onerous than, or in addition to, the conditions set forth in the Commitment Letters, as applicable, to replace the financing contemplated by such expired, terminated, or unavailable commitments or arrangements). The Buyer shall deliver to the Special Master true, correct and complete copies of

all contracts or other arrangements pursuant to which any such alternative source shall have committed to provide any portion of the Replacement Financing (provided that any fee letters in connection therewith may be redacted in a manner consistent with the Fee Letter provided as of the Execution Date). To the extent applicable, the Buyer shall use its reasonable best efforts to take, or cause to be taken, all actions necessary, proper or advisable to arrange and consummate the Replacement Financing on the terms and conditions described in such contracts or other arrangements relating thereto on or before the Closing Date, including (A) using reasonable best efforts to (x) satisfy on a timely basis, all terms, covenants and conditions set forth therein; (y) enter into definitive agreements with respect thereto on the terms and conditions set forth therein and (z) consummate the Replacement Financing at or prior to the Closing and (B) seeking to enforce its rights thereunder. In the event that Replacement Financing is obtained in accordance with this Section 6.9(f), the definitions of "Debt Commitment Letter," "Debt Financing," "Debt Financing Commitments," and "Debt Financing Sources" shall include the commitments in respect of the Replacement Financing or the documents related thereto, as applicable. Notwithstanding the foregoing, compliance by the Buyer with the provisions of this Section 6.9(f) shall not relieve the Buyer of their obligation to consummate the Transactions whether or not the Debt Financing is available.

Section 6.10.    Company's Obligations in Respect of Debt Financing.[41]

(a)    Subject to Section 6.10(b), prior to the Closing, the Special Master shall Cause the Acquired Companies to use reasonable best efforts to provide to the Buyer such customary cooperation in connection with the arrangement of the Debt Financing as is reasonably requested by the Buyer. Such assistance shall include using reasonable best efforts to do the following, at the Buyer's sole expense, in connection with the Debt Financing:

(i)    causing the Company's employees with the title of executive vice president or above to participate in a reasonable number of meetings, presentations, sessions with rating agencies or other customary syndication activities;

(ii)    (A) assisting with the preparation of appropriate and customary materials for a rating agency presentation, a bank information memorandum, offering memoranda and a lender presentation reasonably required in connection with the Debt Financing and (B) having an officer of the Company execute a customary authorization letter with respect to the bank information memorandum that authorizes distribution of information to prospective lenders;

(iii)    to the extent not prohibited or restricted under applicable Law or any Contract of the Company or its applicable Affiliate, facilitating the pledging of collateral; provided that no pledge shall be effective until the Closing;

(iv)    assisting in the preparation of definitive financing documents, including guarantee and collateral documents and customary closing certificates and other customary documents as reasonably necessary, in each case, not to be effective until the Closing (provided, that, unless specifically provided for in this Section 6.10, in no event

---

[41] **NTD**: To the extent there is Equity Financing, this section will be revised to include the same.

will any of the Acquired Companies or their respective Representatives be required to execute or deliver any opinion or certificate in connection with the Financings);

(v)    furnishing the Buyer at least five (5) Business Days prior to the Closing Date with all documentation and other information required by a Governmental Body with respect to the Debt Financing under applicable "know your customer" and anti-money laundering rules and regulations that is reasonably requested by the Buyer at least ten (10) Business Days prior to the Closing Date;

(vi)    cooperate with the Buyer to obtain customary corporate and facilities credit ratings, as reasonably requested by the Buyer, in each case, not to be effective prior to the Closing Date; and

(vii)    cooperating with the Buyer to take such corporate or other organizational action, subject to the occurrence of the Closing, as is reasonably necessary to permit the consummation of the Debt Financing (provided, that, unless specifically provided for in this Section 6.10, in no event will any of the Acquired Companies or their respective Representatives be required to execute or deliver any opinion or certificate in connection with the Debt Financing)

(b)    Notwithstanding anything in Section 6.10(a) or this Agreement to the contrary, the cooperation requested by the Buyer pursuant to Section 6.10(a) shall not:

(i)    require the entry by the Special Master or any Acquired Company into any agreement or commitment, or the taking of any action, that would be effective prior to the Closing and that is not contingent on the occurrence of the Closing;

(ii)    unreasonably interfere with the ongoing operations of the Acquired Companies; or

(iii)    include any action that the Special Master or the Company reasonably believes would require any of the Acquired Companies to (A) pay any commitment or other similar fee, (B) have or incur any liability or obligation in connection with the Debt Financing, including under any agreement or any document related to the Debt Financing, (C) take any action that would conflict with, violate or result in a breach of or default under the Company Charter and Company By-Laws or any Organizational Documents of the Company's Affiliates, any Contract, any Transaction Document or any Law in any material respect, (D) take any action that could subject any director, manager, officer or employee of the Company or any of its Affiliates to any personal liability, (E) provide access to or disclose information that the Company determines in good faith could jeopardize any attorney client privilege of, or conflict with any confidentiality requirements applicable to, the Company or any of its Affiliates, (F) cause any director or manager of the Company or any of its Affiliates to pass resolutions or consents to approve or authorize the execution of the Debt Financing (other than continuing directors or managers), (G) reimburse any expenses or provide any indemnities, (H) make any representation, warranty or certification that, in the good faith determination of the Company, is not true, (I) require the delivery of any financial statements in a form or subject to a standard different than

58

those provided to the Buyer on or prior to the Execution Date that (1) are not produced it the ordinary course of business and (2) that cannot be produced or provided without undue cost or expense, (J) provide any cooperation or information that does not pertain to the Acquired Companies or (K) provide (i) any description of all or any component of the Financings (including any such description to be included in any liquidity or capital resources disclosure or any "description of notes"), (ii) projections, risk factors or other forward-looking statements relating to all or any component of the Financings, or (iii) any solvency certificate or similar certification in connection with the Financings (which items (i) through (iii) shall be the sole responsibility of the Buyer). In no event shall the Special Master be in breach of <u>Section 6.10(a)</u> because of the Company's failure to deliver any financial or other information that is not currently readily prepared in the Ordinary Course at the time requested by the Buyer or to obtain review of any financial or other information by its accountants.

(c)    [Reserved][42]

(d)    The Buyer shall promptly, upon written request, reimburse the Acquired Companies, the Special Master, and/or their respective Representatives for all reasonable and documented out-of-pocket costs and expenses incurred by the Acquired Companies, the Special Master, and/or their respective Representatives in connection with the cooperation contemplated by <u>Section 6.10(a)</u>, including (i) attorneys' fee and (ii) expenses of the Company's accounting firms engaged to assist in connection with the Debt Financing. The Buyer shall indemnify and hold harmless, the Special Master, Acquired Companies, and their respective Representatives, from and against any and all liabilities or losses suffered or incurred by them in connection with the arrangement of the Debt Financing and any information utilized in connection therewith.

(e)    Any information provided pursuant to this <u>Section 6.10</u> shall be subject to the Confidentiality Agreement; <u>provided</u>, that the Buyer will be permitted to disclose such information to any Debt Financing Sources or prospective Debt Financing Sources and other financial institutions and investors that are or may become parties to the Debt Financing and to any underwriters, initial purchasers or placement agents in connection with the Debt Financing or with respect to the Equity Financing or any other equity financing in connection with the Transactions (and, in each case, to their respective counsel and auditors) so long as such Persons (i) agree to be bound by confidentiality provisions substantially similar to those in the Confidentiality Agreement (and any confidentiality agreements between the Company and its Affiliates) as if parties thereto, or (ii) are subject to other confidentiality undertakings reasonably satisfactory to the Company and of which the Company is a beneficiary.

(f)    Subject to the terms and conditions set forth in this Agreement, the Buyer acknowledges and agrees that neither obtaining the Financings nor any Replacement Financing,

---

[42] **NTD**: While the limitations of the Sale Process prevent the Company from being legally obligated to comply with the provisions of Section 6.10, in the event of such non-compliance, particularly material non-compliance, or in the event that the Special Master does not comply with the same provisions, which merely require the Special Master to attempt to cause the Company to comply with the provisions of Section 6.10, then the Buyer should be protected by Section 7.2(b) and Section 8.1(e). Otherwise, and unless we are misunderstanding this issue, Section 6.10 would be meaningless. Buyer would appreciate the opportunity to discuss this issue with the Special Master.

by the Buyer nor any cooperation by the Acquired Companies at the direction of the Special Master is a condition to Closing and reaffirms its obligations to consummate the Transactions irrespective and independently of the availability of the Financing or any Replacement Financing, subject to fulfillment or waiver of the conditions set forth in <u>Section 7.1</u> and <u>Section 7.2</u>.

(g)    At least three (3) Business Days prior to the Closing Date, the Buyer shall deliver the Payoff Letters and all other termination and release documentation reasonably necessary to provide for or evidence the release of all guarantees supporting and all Liens securing the Specified Debt, including, if applicable, UCC termination statements, deed of trust releases, mortgage releases or intellectual property releases in fully executed and authorized form, subject to the conditions to effectiveness and release thereof as set forth in the Payoff Letters.

Section 6.11.   <u>Tax Matters</u>. All Transfer Taxes shall be paid by the Buyer. The Buyer shall procure any stock transfer stamps required by any Transfer Tax, and timely file, to the extent required by applicable Law, all necessary Tax Returns and other documentation with respect to all such Transfer Taxes and provide to the Special Master upon request evidence of payment of all Transfer Taxes.

Section 6.12.   <u>R&W Insurance Policy</u>. In the event the Buyer or any of its Affiliates obtains a representations and warranties insurance policy in respect of the representations and warranties contained in this Agreement or in any certificate or other instrument contemplated by or delivered in connection with this Agreement (such policy, a "<u>R&W Insurance Policy</u>"), (a) all premiums, underwriting fees, brokers' commissions and other costs and expenses related to such R&W Insurance Policy shall be borne solely by the Buyer or such Affiliate, (b) such R&W Insurance Policy shall not provide for any "seller retention" (as such phrase is commonly used in the representations and warranties insurance policy industry) and (c) such R&W Insurance Policy shall expressly waive any claims of subrogation against the Special Master and any Acquired Company (other than, solely in the case of an Acquired Company, in connection with Fraud of any Acquired Company). The Special Master shall, and shall Cause the Company to, use commercially reasonable efforts to cooperate with the Buyer's efforts, as applicable, and provide assistance as reasonably requested by the Buyer to obtain and bind the R&W Insurance Policy and to maintain its effectiveness through the Closing.

Section 6.13.   <u>Notices of Certain Events</u>.

(a)    During the Interim Period, the Special Master shall, and shall Cause the Company to notify the Buyer, and the Buyer shall promptly notify the Special Master, of:

(i)    any written notice or other written communication from any Person alleging that the consent of such Person is or may be required in connection with the Transactions;

(ii)    any notice or other written communication from any Governmental Body in connection with the Transactions;

WEIL:\100255289\1\67816.0003

(iii)    any actions, suits, claims, investigations or proceedings (A) commenced or (B) to the Knowledge of the Buyer or to the Knowledge of the Special Master, as applicable, threatened against, relating to or involving or otherwise affecting such Party or any of its Subsidiaries which relate to the consummation of the Transactions (excluding any appeals or other oppositions by the Acquired Companies or PDVSA); and

(iv)    any item or information referred to in, or received by the Special Master pursuant to, Section 6.13(b);

provided, that any failure to comply with this Section 6.13(a) shall not constitute the failure of any condition set forth in Article VII to be satisfied; provided, further, that no such notification (and no other notification required to be given under any other Section of this Agreement) shall affect the representations, warranties, covenants or agreements of the Parties or the conditions to the obligations of the Parties under this Agreement.

(b)    During the Interim Period, in order to enable the Special Master and his Representatives to satisfy the obligations of the Special Master in this Agreement, the Special Master may Cause the Company and its Subsidiaries to, upon request by the Special Master, promptly provide to the Special Master:

(i)    access to the books and records (including all electronic data related thereto), information, assets, operations and properties of the Acquired Companies;

(ii)    contact information for any vendors, customers and manufacturers and others with whom the Company does business;

(iii)    the status of the Acquired Companies' business and financial condition; and

(iv)    access to consult with the Acquired Companies' officers and employees, who shall make themselves reasonably available for such consultation.

(c)    During the Interim Period, in order to enable the Special Master and his Representatives to satisfy the obligations of the Special Master in this Agreement, the Special Master may Cause the Company and its Subsidiaries to immediately provide to the Special Master (upon any of the following being received by or made available to the Company or any of its Subsidiaries):

(i)    copies of any written notice or other written communication from any Person alleging that the consent of such Person is or may be required in connection with the Transactions;

(ii)    copies of any notice or other written communication from any Governmental Body in connection with the Transactions;

(iii)    documentation relating to any Legal Proceeding (A) commenced or (B) to the Knowledge of the Company or the Knowledge of the Buyer, as applicable,

WEIL:\100255289\1\67816.0003

threatened against, relating to or involving or otherwise affecting such Party or any of its Subsidiaries which relate to the consummation of the Transactions;

(iv)    notice of (A) the occurrence, or failure to occur, of any event which occurrence or failure would reasonably be likely to cause a breach of any representation or warranty made by such Party in this Agreement being untrue or inaccurate or (B) any failure of a Party to comply with or satisfy any covenant, condition or agreement to be complied with or satisfied by it pursuant to this Agreement, in each case that would reasonably be expected to result in any condition set forth in Article VII not to be satisfied; and

(v)    notice of any circumstance or occurrence that has had or would reasonably be expected to have a Company Material Adverse Effect.

Section 6.14.    No Control of Other Party's Business. Without in any way limiting any Party's rights or obligations under this Agreement, the Parties acknowledge and agree that the restrictions set forth in this Agreement are not intended to give the Buyer, directly or indirectly, the right to control or direct the Acquired Companies' operations prior to the Closing Date. Prior to the Closing Date, each of the Company and the Buyer shall exercise, consistent with the terms and conditions of this Agreement, complete control and supervision over its respective operations.

Section 6.15.    OFAC. The Buyer shall, at its own expense, (a) within ten (10) Business Days after the Final Recommendation Date, submit the OFAC License Application; (b) promptly supply any additional information and documentary material that may be requested by OFAC; (c) seek and obtain, prior to submitting the OFAC License Application and any other filing with or submission to OFAC, written consent from the Special Master, which consent shall not be unreasonably withheld; (d) keep the Special Master regularly informed of the processing of the OFAC License Application and any other filings or contacts with OFAC or other Governmental Body in relation to the Transaction; and (e) fully cooperate with and furnish to the Special Master available information and assistance as reasonably may be requested by the Special Master in connection with any communications that the Special Master may have with OFAC or other Governmental Body in relation to the Transaction.

Section 6.16.    Bidder Protections and Competing Proposals.

(a)    This Agreement is subject to approval by the Court and the consideration by the Special Master of higher or better competing bids in respect of the Shares, as determined in accordance with the Evaluation Criteria set by the January Order and the Sale Procedures Order. From the date of this Agreement and until the commencement of the No-Shop Period, the Special Master is permitted to, and to cause its financial and legal advisors to, initiate contact with, solicit or encourage submission of any Competing Proposal. For the avoidance of doubt, the Buyer acknowledges that following the date of this Agreement, throughout the Topping Period and until the commencement of the No-Shop Period, the Special Master is expected to, and intends to, (i) engage with prospective purchasers of the Shares, (ii) evaluate any Competing Proposals received during the Topping Period and (iii) compare any such Competing Proposals to the Buyer's proposal to purchase the Shares. In addition, the Special Master shall have the responsibility and obligation to respond to any Competing Proposal and perform any and all other acts related thereto

62

which are required under the Sale Procedures Order, the January Order or other applicable Law, including supplying information relating to the Acquired Companies to prospective purchasers of the Shares. So long as, prior to the expiration of the Topping Period, Buyer has delivered executed Debt Commitment Letters in accordance with Section 6.9(b)[43], as promptly as practicable following the conclusion of the Topping Period, but in no event later than five (5) Business Days following the conclusion of the Topping Period, the Special Master shall notify the Buyer if the Special Master has received a Competing Proposal that the Special Master has determined in good faith constitutes a Superior Proposal.

(b)    During the No-Shop Period, the Special Master shall not, directly or indirectly, solicit, initiate, knowingly encourage or knowingly facilitate any proposal or offer that constitutes, or would reasonably be expected to lead to, a Competing Proposal.

(c)    Notwithstanding anything to the contrary set forth above, in the event that following the end of the Topping Period but prior to the Court's hearing to consider the Special Master's motion to approve the Sale Order (the "Sale Hearing") the Special Master receives an unsolicited Competing Proposal, he shall inform the Court and the Buyer of the receipt of such unsolicited Competing Proposal, and, if approved by the Court (provided, that, in connection with seeking such approval, if requested by the Person making such unsolicited Competing Proposal, the Special Master shall request that the Court not make public the identity of the Person making such unsolicited Competing Proposal), may engage with the Person submitting such Competing Proposal.

(d)    Notwithstanding anything to the contrary set forth in this Agreement, if the Special Master has determined in good faith that a Competing Proposal made after the Commencement Date but prior to the No-Shop Period constitutes a Superior Proposal, the Special Master may, at any time after the Commencement Date but prior to the No-Shop Period, subject to (i) compliance with this Section 6.16(b), (ii) the Person making such Superior Proposal agreeing to pay to Buyer the Termination Fee (to the extent that the bid reflected in this Agreement is designated by the Court as the stalking horse bid (in such case, this Agreement constituting the "Stalking Horse Bid Agreement")) or the Expense Reimbursement Amount (to the extent that the bid reflected in this Agreement is designated by the Court as a base bid (in such case, this Agreement constituting the "Base Bid Agreement")) in accordance with Section 8.3(a) to the extent the transaction contemplated by the Superior Proposal is consummated, (iii) the Person making such Superior Proposal depositing an amount equal to the Deposit Amount with the Escrow Agent, and (iv) approval by the Court of such Superior Proposal, terminate this Agreement in accordance with Section 8.1(d)(i) in order to enter into a definitive agreement relating to such Superior Proposal (a "Superior Proposal Agreement").

(e)    Notwithstanding anything to the contrary set forth in this Agreement, if the Special Master has determined in good faith that an unsolicited Competing Proposal made following the end of the Topping Period but prior to the Sale Hearing (any such unsolicited Competing Proposal, an "Unsolicited Competing Proposal") constitutes a Superior Proposal, the Special Master may, at any time during the No-Shop Period but prior to the Sale Hearing, subject to (i) approval by the Court of such Unsolicited Competing Proposal in accordance with Section

---

[43] **Note to Bidder**: Bracketed language to be included if Debt Commitment Letters are to be required for bid.

6.16(c) and Section 8.1(d)(ii), (ii) compliance with this Section 6.16(e), (iii) the Person making such Superior Proposal agreeing to pay (x) to Buyer the Termination Fee (in the event this Agreement constitutes the Stalking Horse Bid Agreement) or the Expense Reimbursement Amount (in the event this Agreement constitutes the Base Bid Agreement) in accordance with Section 8.3(a) to the extent the transaction contemplated by the Unsolicited Competing Proposal is consummated and (y) if applicable, to the buyer party to the Superior Proposal Agreement the Expense Reimbursement Amount in accordance with Section 8.3(e), in each case, to the extent the transaction contemplated by the Unsolicited Competing Proposal is consummated, and (iv) the Person making such Superior Proposal depositing an amount equal to the Deposit Amount with the Escrow Agent, terminate this Agreement in accordance with Section 8.1(d)(ii) (or, if this Agreement has already been terminated in accordance with Section 8.1(d)(i), terminate the Superior Proposal Agreement) in order to enter into a definitive agreement providing for such Superior Proposal (the "Unsolicited Competing Proposal Agreement"); provided, that prior to so terminating this Agreement, (A) the Special Master has given the Buyer at least three (3) Business Days' prior written notice of its intention to take such action, which notice shall include a description of the material terms and conditions of such Superior Proposal and a copy of any proposed Unsolicited Competing Proposal Agreement, (B) at the end of such notice period, the Special Master shall have considered in good faith any revisions to the terms of this Agreement proposed in writing by the Buyer, and shall have determined (which determination shall be subject to approval by the Court) that such Superior Proposal would continue to constitute a Superior Proposal if such revisions proposed by the Buyer were to be given effect, and (C) in the event of any material change to the terms of such Superior Proposal, the Special Master shall, in each case, have delivered to the Buyer an additional notice consistent with that described in clause (A) of this proviso and a new notice period under clause (A) of this proviso shall commence during which time the Special Master shall be required to comply with the requirements of this Section 6.16(e) anew with respect to such additional notice, including clauses (A), (B) and this clause (C) of this proviso (except that the reference to "three (3) Business Days" in clause (A) of this proviso shall be replaced with "two (2) Business Days").

(f)      The Special Master and the Buyer acknowledge that this Agreement and the Transactions are subject to the Sale Procedures Order and the Sale Order Entry. In the event of any conflict between this Agreement and the Sale Procedures Order or the Sale Order, the Sale Procedures Order or the Sale Order, as applicable, shall govern. The Special Master and the Buyer shall comply with the Sale Procedures Order and the Sale Order.

(g)      For purposes of this Agreement:

(i)      "Competing Proposal" means any bona fide proposal or offer made by any Person or group of related Persons (other than the Buyer and its Affiliates and, in the case of an Unsolicited Competing Proposal, excluding the buyer under the Superior Proposal Agreement or any Affiliates thereof) (A) to purchase or otherwise acquire, directly or indirectly, in one transaction or a series of transactions, pursuant to a merger, consolidation or other business combination, sale of shares of capital stock, sale of assets or similar transaction (1) beneficial ownership (as defined under Section 13(d) of the Exchange Act), of more than twenty percent (20%) of any class of equity securities of the Company or (2) any one or more assets or businesses of the Acquired Companies that constitute more than twenty percent (20%) of the consolidated assets of the Acquired

64

Companies (based on the fair market value thereof), (B) for any acquisition, redemption or sale of securities of the Company or rights or interests therein or thereto or similar transactions that would result in any Person owning or controlling 20% or more of the equity securities (or rights thereto) of the Company and/or any of its Subsidiaries, or (C) relating to any reorganization, recapitalization, license, joint venture, partnership, liquidation, dissolution or other similar transaction involving any one or more assets or businesses of the Acquired Companies that constitute more than twenty percent (20%) of the consolidated assets of the Acquired Companies (based on the fair market value thereof); provided, that (i) any Competing Proposal must satisfy an overbid minimum above the Purchase Price equal to or in excess of the Termination Fee (to the extent this Agreement constitutes the Stalking Horse Bid Agreement) or the Expense Reimbursement Amount (to the extent this Agreement constitutes the Base Bid Agreement) *plus* $25,000,000 and (ii) any increase in such Competing Proposal must satisfy an overbid minimum equal to or in excess of $50,000,000 (the "Subsequent Overbid Minimum"); provided, further, that the Special Master may, in his sole discretion, lower the Subsequent Overbid Minimum for any Competing Proposal.

(ii)     "Superior Proposal" means a Competing Proposal made by a Person or group of related Persons (other than the Buyer and its Affiliates and, in the case of an Unsolicited Competing Proposal, excluding the buyer under the Superior Proposal Agreement or any Affiliates thereof) on terms that the Special Master determines in good faith, after consultation with the Special Master's financial and legal advisors and the Sale Process Parties, would constitute a higher or better bid for the Shares based upon the Evaluation Criteria.

(h)     For the avoidance of doubt, notwithstanding anything to the contrary contained herein, the Special Master may, at any time after the conclusion of the Topping Period but prior to the Final Recommendation Date, after consultation with the Sale Process Parties (as defined in the Sale Procedures Order), propose to the Court that the sale process proceed to a multi-day live auction to determine the Successful Bidder for the sale of the Shares.

(i)     The Buyer acknowledges that nothing hereunder limits any Venezuela Party from proposing or negotiating any alternative transaction or series of transactions, and the Venezuela Parties (as defined in the Sale Procedures Order) will not at any time be prevented from making a Competing Proposal.

Section 6.17.   Section 280G. No later than ten (10) days prior to the Closing Date, the Special Master shall Cause the Company to deliver to the Buyer a Code Section 280G analysis (with respect to all disqualified individuals as reasonably determined by the Company) and the Special Master shall Cause the Company to confer with the Buyer in good faith regarding such analysis.

Section 6.18.   Financial Statements. During the Interim Period, the Special Master shall Cause the Acquired Companies to furnish to the Buyer:

(a)     within ninety (90) days after the end of each fiscal year commencing with the fiscal year ending December 31, 2024, a consolidated balance sheet and related statements

65

income and cash flow showing the financial position of each of (i) the Acquired Companies and (ii) CITGO Petroleum, as of the close of such fiscal year and the consolidated results of its operations during such fiscal year and setting forth in comparative form the corresponding figures for the prior fiscal year, which consolidated balance sheet and related statements of income and cash flow shall be audited by independent public accountants and accompanied by an opinion of such accountants (which shall not be qualified as to scope of audit) to the effect that such consolidated financial statements fairly present, in all material respects, the financial position and results of operations of the Acquired Companies and CITGO Petroleum, respectively, on a consolidated basis in accordance with GAAP; and

(b)     within forty five (45) days after the end of each fiscal quarter, except for the fourth fiscal quarter, (i) a balance sheet showing the consolidated financial position of the each of (x) the Acquired Companies and (y) CITGO Petroleum, as of the last day of such fiscal quarter and (ii) statements of income and cash flows showing the consolidated results of operations of the Acquired Companies and CITGO Petroleum, respectively, for such fiscal quarter and the then-elapsed portion of the fiscal year and setting forth in comparative form the corresponding figures for the corresponding periods of the prior fiscal year. The applicable consolidated balance sheet and related financial statements of operations and cash flows shall fairly present, in all material respects, the financial position and results of operations of the Acquired Companies or CITGO Petroleum, as applicable, on a consolidated basis in accordance with GAAP (subject to normal quarter-end review adjustments and the absence of footnotes).

## ARTICLE VII

## CONDITIONS TO CLOSING[44][45]

Section 7.1.     <u>Conditions Precedent to Obligations of the Parties</u>. The respective obligations of each of the Parties to consummate the Transactions are subject to the satisfaction, on or prior to the Closing, of each of the following conditions:

(a)     there shall not be in effect any Law or Order by a Governmental Body of competent jurisdiction restraining, enjoining or otherwise prohibiting the consummation of the Transactions;

(b)     the Sale Order Entry shall have occurred;

(c)     the OFAC License shall have been obtained;

(d)     the waiting period applicable to the Transactions under the HSR Act (and any extensions thereof, including expiration of any voluntary timing agreement) shall have expired or early termination shall have been granted; and

---

[44] **Note to Bidder**: Additional closing conditions that introduce uncertainty to closing will be strongly disfavored.

[45] **Note to Bidder**: No closing conditions, trust/escrow constructs or similar revisions impacting certainty of funds payable relating to the 2020 bonds will be included. Bidders are welcome to address the 2020 bonds separately, but this should not impact deal certainty or clarity around proceeds to creditors.

WEIL:\100255289\1\67816.0003

(e)     the approvals, clearances or expirations of waiting periods set forth in Section 7.1(e) of the Company Disclosure Schedules shall have been obtained.[46]

Section 7.2.     <u>Conditions Precedent to Obligations of the Buyer</u>. The obligations of the Buyer to consummate the Transactions are subject to the satisfaction, on or prior to the Closing, of each of the following conditions (any or all of which may be waived by the Buyer in whole or in part):

(a)     the Company Fundamental Representations shall be true and correct in all respects as of the Closing as if made on and as of the Closing (except to the extent that any such Company Fundamental Representation, by its terms, is expressly limited to a specific date, in which case, as of such specific date);

(b)     the Special Master shall have performed and complied in all material respects with all obligations and agreements required by this Agreement to be performed or complied with by him on or prior to the Closing;

(c)     no Company Material Adverse Effect shall have occurred since the Execution Date and remain ongoing; and

(d)     the Sale Order shall be in full force and effect in all respects and not subject to any stay.

Section 7.3.     <u>Conditions Precedent to Obligations of the Special Master</u>. The obligations of the Special Master to consummate the Transactions are subject to the satisfaction, on or prior to the Closing, of each of the following conditions (any or all of which may be waived by the Special Master in whole or in part):

(a)     the representations and warranties of the Buyer set forth in <u>Article V</u> shall be true and correct (without giving effect to any "materiality", "material adverse effect", or similar qualifiers contained in any of such representations and warranties) as of the Closing as if made on and as of the Closing (except to the extent that any such representation or warranty, by its terms, is expressly limited to a specific date, in which case, as of such specific date), except for where the failure of such representations and warranties to be so true and correct would not (i) have a material adverse effect on the ability of the Buyer to perform its obligations under this Agreement or (ii) otherwise prevent, hinder, or delay the consummation of the Transactions; and

(b)     the Buyer shall have performed and complied in all material respects with all obligations and agreements required by this Agreement to be performed or complied with by the Buyer on or prior to the Closing.

Section 7.4.     <u>Frustration of Closing Conditions</u>. Neither the Special Master, nor the Buyer may rely, either as a basis for not consummating the Transactions or for terminating this Agreement and abandoning the Transactions, on the failure of any condition set forth in <u>Section 7.1</u>, <u>Section 7.2</u>, or <u>Section 7.3</u>, as the case may be, to be satisfied if such failure was caused

---

[46] **Note to Bidder**: Pending confirmation of any foreign filings.

WEIL:\100255289\1\67816.0003

principally by any material breach of a covenant, agreement, representation, or warranty of this Agreement by such Party.

## ARTICLE VIII

## TERMINATION[47]

Section 8.1.    <u>Termination</u>. This Agreement may be terminated at any time prior to the Closing (notwithstanding the Sale Order Entry, except as otherwise specified below) as follows:

(a)      by mutual written consent of the Special Master (which consent shall be subject to approval of the Court) and the Buyer;

(b)      by the Special Master or the Buyer, by written notice to the other Party, if: the Closing has not occurred prior to the date that is twelve (12) months after the Final Recommendation Date (such date, the "<u>Initial Outside Date</u>" and, as may be automatically extended pursuant to this <u>Section 8.1(b)</u>, the "<u>Outside Date</u>"); <u>provided</u>, that if the Closing has not occurred by the Outside Date due to the nonsatisfaction of any of the conditions set forth in <u>Section 7.1(b)</u> (OFAC License),  <u>Section 7.1(d)</u> (HSR Act), Section 7.1(e) (Other Antitrust Approvals) or Section 7.2(b) (Sale Order), then the Outside Date shall be extended automatically for up to two (2) consecutive periods of ninety (90) calendar days each (and in no event shall the Outside Date extend beyond the date that is one hundred eighty (180) calendar days after the Initial Outside Date)[48]; <u>provided</u>, that notwithstanding the foregoing, the Special Master and/or the Buyer shall have the right to request an extension of the Outside Date by the Court for good cause; <u>provided</u> further that in the event the Marketing Period has commenced on or prior to the Outside Date but has not completed as of the Outside Date, the Outside Date shall be extended (or further extended) to the date that is three (3) Business Days after the then-scheduled expiration date of the Marketing Period; and, <u>provided</u>, <u>further</u>, that, the right to terminate this Agreement pursuant this <u>Section 8.1(b)</u> shall not be available to any Party whose failure to fulfill any obligation under this Agreement has principally caused or resulted in the failure of the Closing to occur on or before the Outside Date;

(c)      by the Special Master or the Buyer, by written notice to the other Party, if: there shall be any Law that makes consummation of the Transactions illegal or otherwise prohibited or if any Order enjoining the Buyer, the Special Master or the Company from consummating the Transactions is entered and such Order shall become final and non-appealable (any such Law, Order, a "<u>Legal Restraint</u>"); <u>provided</u> that the right to terminate this Agreement under this <u>Section 8.1(c)</u> shall not be available to any Party whose failure to fulfill any obligation under <u>Section 6.3</u> hereof has principally caused or resulted in the imposition of such Legal Restraint or the failure of such Legal Restraint to be resisted, resolved or lifted;

(d)      by the Special Master (subject to approval by the Court), (i) at any time after the Commencement Date and prior to the commencement of the No-Shop Period in order to enter

---

[47] **Note to Bidder**: Additional termination rights that introduce uncertainty to closing will be strongly disfavored.

[48] **Note to Bidder**: The outside date must be a minimum of twelve (12) months with two automatic ninety (90) day extensions for OFAC and regulatory/antitrust approvals.

WEIL:\100255289\1\67816.0003

into a Superior Proposal Agreement pursuant to <u>Section 6.16(d)</u> or (ii) at any time during the No-Shop Period but prior to the Sale Hearing in order to enter into an Unsolicited Competing Proposal Agreement pursuant to <u>Section 6.16(c)</u>;

(e)    by the Buyer, by written notice to the Special Master, if (x) the Acquired Companies shall fail to be operated in accordance with Section 6.1 in any material respect or (y) there shall have been a breach by the Special Master of any of its representations, warranties, covenants or agreements contained in this Agreement, which breach would result (or would reasonably be anticipated to result) in the failure to satisfy one or more of the conditions set forth in <u>Section 7.2(a)</u> or <u>Section 7.2(b)</u>, and in any such case such breach shall be incapable of being cured or, if capable of being cured, shall not have been cured prior to the earlier of (i) forty-five (45) calendar days after providing written notice of such breach to the Special Master and (ii) the Outside Date; <u>provided</u>, that the Buyer shall not have the right to terminate this Agreement pursuant to this <u>Section 8.1(d)</u> if the Buyer is then in breach of this Agreement and such breach would result in the failure of any of the conditions set forth in <u>Section 7.1</u> or <u>Section 7.3</u>;

(f)    by the Special Master (subject to approval of the Court), by written notice to the Buyer, if there shall have been a breach by the Buyer of any of its representations, warranties, covenants or agreements contained in this Agreement, which breach would result (or would reasonably be anticipated to result) in the failure to satisfy one or more of the conditions set forth in <u>Section 7.3(a)</u> or <u>Section 7.3(b)</u>, and in any such case such breach shall be incapable of being cured or, if capable of being cured, shall not have been cured prior to the earlier of (i) forty-five (45) calendar days after providing written notice of such breach to the Buyer and (ii) the Outside Date; <u>provided</u>, that the Special Master shall not have the right to terminate this Agreement pursuant to this <u>Section 8.1(f)</u> if the Special Master is then in breach of this Agreement and such breach would result in the failure of any of the conditions set forth in <u>Section 7.1</u> or <u>Section 7.2</u>;

(g)    by the Special Master, after being ordered to terminate this Agreement by the Court, as a result of one or more of the Venezuela Parties (as defined in the Sale Procedures Order) proposing an alternative to the Transactions and such alternative is approved by the Court;

(h)    by the Special Master on the day following the expiration of the Topping Period if the Buyer has not delivered the executed Debt Commitment Letters in accordance with <u>Section 6.9(b)</u>;[49] or

(i)    by the Buyer, by written notice to the Special Master, if there shall have been a Company Material Adverse Effect.

Section 8.2.    <u>Effect of Termination</u>. In the event that this Agreement is validly terminated in accordance with <u>Section 7.1</u>, this Agreement shall immediately become null and void and the Parties shall be relieved of their duties and obligations arising under this Agreement after the date of such termination and such termination shall be without liability to the Buyer, the Special Master or the Acquired Companies; <u>provided</u>, that the Confidentiality Agreement and the provisions of

---

[49] **Note to Bidder**: In the event a bidder is not relying on debt financing and the bid contemplates a full equity purchase price, then this language shall not apply.

Section 3.3, this Section 8.2, Section 8.3 and Article IX hereof shall survive any such termination and remain valid and binding obligations of each of the Parties.

    Section 8.3.    Termination Fee and Expense Reimbursement.[50]

    (a)    To the extent this Agreement constitutes a Stalking Horse Bid Agreement, in consideration for the Buyer having expended considerable time and expense in connection with this Agreement and the Transactions, if this Agreement is terminated by the Special Master pursuant to Section 8.1(d)(i) or Section 8.1(d)(ii), and the transaction contemplated by the Superior Proposal are consummated, then the Special Master shall cause the acquiring party to the Superior Proposal Agreement or the Unsolicited Competing Proposal Agreement, as applicable (the "Superior Proposal Acquiror"), in accordance with the terms hereof and the January Order, to pay an amount equal to the Termination Fee, by wire transfer of immediately available funds to the Buyer on the closing date of the consummation of the transactions provided in such Superior Proposal Agreement or Unsolicited Competing Proposal Agreement, as applicable; provided, however, that the Special Master shall have no obligation to cause the Superior Proposal Acquiror to pay such Termination Fee to the Buyer if (i) the Buyer does not deliver the Debt Commitment Letters, duly executed by each Debt Financing Source, in accordance with Section 6.9(b),[51] prior to the end of the Topping Period, (ii) the Superior Proposal Agreement or the Unsolicited Competing Proposal Agreement, as applicable, is not approved by the Court, (iii) the Buyer subsequently becomes the Successful Bidder (as defined in the Sale Procedures Order) or (iv) the transaction contemplated by the Superior Proposal Agreement or the Unsolicited Competing Proposal Agreement, as applicable, are for any other reason not consummated.

    (b)    To the extent this Agreement constitutes Base Bid Agreement, in consideration for the Buyer having expended considerable time and expense in connection with this Agreement and the Transactions, if this Agreement is terminated by the Special Master pursuant to Section 8.1(d)(i) or Section 8.1(d)(ii), and the transaction contemplated by the Superior Proposal are consummated, then the Special Master shall cause the Superior Proposal Acquiror, in accordance with the terms hereof and the January Order, to pay an amount equal to the Expense Reimbursement Amount by wire transfer of immediately available funds to the Buyer on the closing date of the consummation of the transactions provided in such Superior Proposal Agreement or the Unsolicited Competing Proposal Agreement, as applicable; provided, however, that the Special Master shall have no obligation to cause the Superior Proposal Acquiror to pay such Expense Reimbursement Amount to the Buyer if (i) the Buyer does not deliver the Debt Commitment Letters, duly executed by each Debt Financing Source, in accordance with Section 6.9(b),[52] prior to the end of the Topping Period, (ii) the Superior Proposal Agreement or the Unsolicited Competing Proposal Agreement, as applicable, is not approved by the Court, (iii) the

---

[50] **Note to Bidder**: Entitlement to a Termination Fee is subject to a determination by the Special Master that a Stalking Horse has been selected. If the Special Master does not agree that a bid warrants Stalking Horse protections, a Base Bid may be identified. The Buyer in the Base Bid would be entitled to expense reimbursement in lieu of the Termination Fee in accordance with the January Order.

[51] **Note to Bidder**: In the event a bidder is not relying on debt financing and the bid contemplates a full equity purchase price, then the language in (i) shall not apply.

[52] **Note to Bidder**: In the event a bidder is not relying on debt financing and the bid contemplates a full equity purchase price, then the language in (i) shall not apply.

70

Buyer subsequently becomes the Successful Bidder (as defined in the Sale Procedures Order) or (iv) the transaction contemplated by the Superior Proposal Agreement or the Unsolicited Competing Proposal Agreement, as applicable, are for any other reason not consummated.

(c)     To the extent the bid reflected in this Agreement constitutes the Successful Bid (as defined in the Sale Procedures Order), if, following the Sale Order Entry, this Agreement is terminated by the Buyer pursuant to Section 8.1(b) (solely to the extent such termination arises from the nonsatisfaction of the condition set forth in Section 7.1(c) (OFAC License) for any reason not related to the identity of the Buyer) or Section 8.1(e) (solely to the extent such termination, and the failure to satisfy one or more conditions set forth in Section 7.2, arises from either (i) the Special Master's breach of the covenants contained in Section 6.1 or (ii) the occurrence of a Company Material Adverse Effect, then, pursuant to the bidder protections set forth in the January Order, the Buyer shall be deemed to hold a claim equal to the Expense Reimbursement Amount as a priority claim over the judgments held by Crystallex, ConocoPhillips and the Additional Judgment Creditors as set forth in the Priority Order [D.I. 996], dated March 1, 2024, in the Specified Litigation, which amount shall be paid to the Buyer from the proceeds, and at the closing, of a subsequent sale of the Shares pursuant to the Specified Litigation.

(d)     To the extent the bid reflected in this Agreement constitutes the Successful Bid, if, following the Sale Order Entry, this Agreement is terminated by the Special Master pursuant to Section 8.1(g), then, pursuant to the bidder protections set forth in the January Order, the Buyer shall be entitled to be paid the Expense Reimbursement Amount in-full by the Venezuela Parties (as defined in the Sale Procedures Order) prior to any payments made on account of any other Specified Litigation Claims.

(e)     If (i) this Agreement is terminated by the Special Master pursuant to Section 8.1(d)(i) and (ii) the Superior Proposal Agreement is subsequently terminated because the Special Master enters into an Unsolicited Competing Proposal Agreement, then, in accordance with the January Order, to the extent the transaction contemplated by the Unsolicited Competing Proposal Agreement is consummated, (A) the Buyer shall be entitled to be paid the Termination Fee (to the extent this Agreement constitutes the Stalking Horse Bid Agreement) or the Expense Reimbursement Amount (to the extent this Agreement constitutes the Base Bid Agreement), as applicable, and (B) the Superior Proposal Acquiror with respect to the Superior Proposal Agreement shall be entitled to be paid the Expense Reimbursement Amount from the Unsolicited Competing Proposal acquiror from the proceeds, and at the closing, of the transactions provided in such Unsolicited Competing Proposal; provided, however, that the Buyer shall not be entitled to be paid the Termination Fee if the Buyer does not deliver the Debt Commitment Letters, duly executed by each Debt Financing Source, in accordance with Section 6.9(b), as applicable, prior to the end of the Topping Period.

(f)     The Parties acknowledge and agree that (i) the Termination Fee (to the extent this Agreement constitutes the Stalking Horse Bid Agreement) or the Expense Reimbursement Amount (to the extent this Agreement constitutes the Base Bid Agreement) (as applicable) and other provisions of this Section 8.3 are an integral part of the Transactions, (ii) the Termination Fee and the Expense Reimbursement Amount (in each case, to the extent applicable) shall constitute liquidated damages and not a penalty, and (iii) without these agreements, the Parties would not enter into this Agreement.

71

(g)    Notwithstanding anything to the contrary set forth in this Agreement, but subject to Section 9.13 and this Section 8.3(g), in the event this Agreement is terminated, each of the Parties expressly acknowledges and agrees that the Buyer's right to receive payment of the Termination Fee pursuant to Section 8.3(a) (to the extent this Agreement constitutes the Stalking Horse Bid Agreement) or the Expense Reimbursement Amount pursuant to Section 8.3(b) (to the extent this Agreement constitutes the Base Bid Agreement), the Expense Reimbursement Amount pursuant to Section 8.3(c) or Section 8.3(d) (to the extent the bid reflected in this Agreement constitutes the Successful Bid), or the Termination Fee or Expense Reimbursement Amount (as applicable) pursuant to Section 8.3(e) shall constitute the sole and exclusive remedy of the Buyer and its Affiliates, and all other affected Persons against the Special Master, the Company and each of their respective former, current or future Affiliates and any of their respective former, current or future general or limited partners, equityholders, subsidiaries, members, managers, directors, officers, employees, agents, Affiliates, successors, beneficiaries, heirs and assigns (collectively, the "Special Master and Company Related Parties") for all losses and damages (including attorneys' fees and expenses) in respect of this Agreement (and the termination hereof) or the Transactions (and the abandonment thereof), or any breach (whether intentional, unintentional or otherwise) of any representation, warranty, covenant or agreement in this Agreement, and none of the Buyer or its Affiliates or any other affected Person shall be entitled to bring or maintain any other Legal Proceeding against the Special Master, the Company or any other Special Master and Company Related Party relating to or arising out of this Agreement, or any of the Transactions or any matters forming the basis for such termination (whether at law, in equity, in contract, in tort or otherwise), and upon payment of the Termination Fee pursuant to Section 8.3(a) (to the extent this Agreement constitutes the Stalking Horse Bid Agreement) or the Expense Reimbursement Amount pursuant to Section 8.3(b) (to the extent this Agreement constitutes the Base Bid Agreement), the Expense Reimbursement Amount pursuant to Section 8.3(c) or Section 8.3(d) (to the extent the bid reflected in this Agreement constitutes the Successful Bid), or the Termination Fee or Expense Reimbursement Amount (as applicable) pursuant to Section 8.3(e), none of the Special Master and Company Related Parties shall have any further liability or obligation to the Buyer or any other affected Person relating to or arising out of this Agreement or the Transactions. The Parties acknowledge and agree that in no event shall the Special Master or the Company be required to pay the Termination Fee or the Expense Reimbursement Amount.

(h)    For the avoidance of doubt, Buyer will not be entitled to receive the Termination Fee or the Expense Reimbursement Amount if Buyer has not delivered the Debt Commitment Letters, duly executed by each Debt Financing Source, in accordance with Section 6.9(b), on or prior to the last day of the Topping Period, including to the extent the Special Master terminates this Agreement pursuant to Section 8.1(h).[53]

---

[53] **Note to Bidder**: In the event a bidder is not relying on debt financing and the bid contemplates a full equity purchase price, then this language shall not apply.

WEIL:\100255289\1\67816.0003

# ARTICLE IX

## MISCELLANEOUS

Section 9.1.    Survival.[54] None of the representations and warranties contained in this Agreement or any of the other Transaction Documents (including any certificate to be delivered pursuant to this Agreement) and none of the covenants of any party required to be performed before the Closing (including obligations with which the Special Master agrees to Cause the Acquired Companies to comply) shall survive the Closing, and thereafter none of the Parties or any of their Affiliates or any of their respective Representatives or any other Person shall have any liability whatsoever with respect to any such representation, warranty, covenant or agreement, and no claim for breach of any such representation or warranty, detrimental reliance or other right or remedy (whether in contract, in tort or at law or in equity) may be brought after the Closing with respect thereto. The provisions of this Section 9.1 will not, however, prevent or limit a cause of action to obtain an injunction to prevent breaches of this Agreement, to enforce specifically the terms and provisions hereof or for declaratory relief. Unless otherwise indicated, the covenants and agreements set forth in this Agreement which by their terms are required to be performed after the Closing shall survive the Closing until such covenants or agreements have been performed or satisfied.

Section 9.2.    Expenses. Whether or not the Transactions are consummated, and except as otherwise provided in this Agreement, each Party to this Agreement will bear its respective fees, costs and expenses incurred in connection with the preparation, negotiation, execution and performance of this Agreement or the Transactions (including legal, accounting and other professional fees), and the Special Master Transaction Expenses shall be paid in accordance with Section 3.4(b) and the Advanced Transaction Expenses shall be paid in accordance with Section 3.4(d).

Section 9.3.    Governing Law. This Agreement and all Related Claims shall be governed by, construed and enforced in accordance with the internal Laws of the State of Delaware, without giving effect to any Laws (whether of the State of Delaware or any other jurisdiction) that would cause the application of the Laws of any jurisdiction other than the State of Delaware and without regard to any borrowing statute that would result in the application of the statutes of limitations or repose of any other jurisdiction. In furtherance of the foregoing, the Laws of the State of Delaware will control even if under such jurisdiction's choice of law or conflict of law analysis, the substantive or procedural law of some other jurisdiction would ordinarily or necessarily apply.

Section 9.4.    Dispute Resolution; Consent to Jurisdiction. Without limiting any Party's right to appeal any Order of the Court, (a) the Court shall retain exclusive jurisdiction to enforce the terms of this Agreement and to decide any dispute which may arise or result from, or be connected with, this Agreement, any breach or default hereunder, or the Transactions, and (b) any and all proceedings related to the foregoing shall be filed and maintained only in the Court, and the Parties hereby consent to and submit to the jurisdiction and venue of the Court and shall receive

---

[54] **Note to Bidder**: No indemnities will be provided. Bidders should seek R&W or other insurance to cover identified risks and/or factor such risks into their proposed purchase price.

WEIL:\100255289\1\67816.0003

notices at such locations as indicated in Section 9.7 (as may be updated from time to time in accordance with Section 9.7).

Section 9.5.    Consent to Service of Process; Waiver of Jury.

(a)    Each of the Parties hereby consents to process being served by any party to this Agreement in any Legal Proceeding by the delivery of a copy thereof (other than by e-mail) in accordance with the provisions of Section 9.7.

(b)    EACH PARTY HERETO ACKNOWLEDGES THAT ANY LEGAL PROCEEDING, DIRECTLY OR INDIRECTLY, ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY RELATED CLAIM IS LIKELY TO INVOLVE COMPLICATED AND DIFFICULT ISSUES, AND THEREFORE EACH SUCH PARTY HEREBY IRREVOCABLY AND UNCONDITIONALLY WAIVES ANY RIGHT SUCH PARTY MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY SUCH LEGAL PROCEEDING OR RELATED CLAIM. EACH PARTY CERTIFIES AND ACKNOWLEDGES THAT: (I) NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF SUCH LEGAL PROCEEDING, SEEK TO ENFORCE THE FOREGOING WAIVER; (II) IT UNDERSTANDS AND HAS CONSIDERED THE IMPLICATIONS OF THIS WAIVER; (III) IT MAKES THIS WAIVER VOLUNTARILY AND (IV) IT HAS BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION 9.5(B).

Section 9.6.    Entire Agreement.

(a)    This Agreement (including the Company Disclosure Schedules and any Exhibits hereto) and the Transaction Documents contain the entire understanding and agreement between the Parties with respect to the subject matter hereof and thereof, and supersede all prior and contemporaneous agreements, discussions, negotiations, correspondence, communications, undertakings and understandings among the Parties with respect to such subject matter (except for the Confidentiality Agreement, which shall continue in full force and effect in accordance with its terms as modified hereunder). The Parties have voluntarily agreed to define their rights, liabilities and obligations with respect to the Transactions exclusively in contract pursuant to the express terms and provisions of this Agreement and the other Transaction Documents, and the Parties expressly disclaim that they are owed any duties or are entitled to any remedies not expressly set forth in this Agreement or the other Transaction Documents. Furthermore, the Parties each hereby acknowledge that this Agreement embodies the justifiable expectations of sophisticated parties derived from arm's-length negotiations; the Parties specifically acknowledge that no party has any special relationship with another party that would justify any expectation beyond that of ordinary parties in an arm's-length transaction.

(b)    The sole and exclusive remedies for any breach of the terms and provisions of this Agreement (including any representations and warranties set forth herein, made in connection herewith or as an inducement to enter into this Agreement) or any claim or cause of action otherwise arising out of or related to the Transactions shall be those remedies available at law or in equity for breach of contract against the Parties to this Agreement only (as such

74

contractual remedies have been further limited or excluded pursuant to the express terms of this Agreement), and then only subject to the limitations hereunder, the Parties hereby agreeing that neither Party shall have any remedies or causes of action (whether in contract, tort, statute or otherwise) for any statements, communications, disclosures, failures to disclose, representations or warranties not explicitly set forth in this Agreement.

(c)     All representations and warranties set forth in this Agreement are contractual in nature only and subject to the sole and exclusive remedies set forth herein.

(d)     The Transactions relate to the purchase and sale of the Shares conducted pursuant to Section 324 of the Delaware General Corporation Law and the Sale Procedures Order, under which the Special Master has the authority to carry out the Transactions herein contemplated to be carried out by him.  In connection therewith, the Designated Managers have furnished Specified Information to the Special Master.  The Special Master, the Designated Managers, the Acquired Companies, its direct or indirect Subsidiaries and their respective Representatives have no liabilities or obligations hereunder or in respect of the Transactions for monetary damages or other relief (other than, if the conditions applicable thereto are satisfied, the Special Master's obligations to transfer the Shares and take or cause to be taken other actions under this Agreement and the Sale Procedures Order) except as expressly provided in Section 9.13. By executing this Agreement, each of the Parties waives on their behalf and on the behalf of their respective Representatives and forever relinquishes any right, claim or cause of action for damages or any other form of monetary relief against the Special Master, or any such Person based on, relating to or arising out of the Specified Information, this Agreement and any of the Transactions.

Section 9.7.    Amendments and Waivers. This Agreement may not be amended except by an instrument in writing signed by the Buyer and the Special Master. No waiver by any Party of any provision of this Agreement or any breach of this Agreement hereunder, whether intentional or not, shall be valid unless the same shall be in writing and signed by the party making such waiver. The waiver by any Party of a breach of any provision of this Agreement shall not operate or be construed as a further or continuing waiver of such breach or as a waiver of any other or subsequent breach. No failure on the part of any Party to exercise, and no delay in exercising, any right, power or remedy hereunder shall operate as a waiver thereof, nor shall any single or partial exercise of such right, power or remedy by such Party preclude any other or further exercise thereof or the exercise of any other right, power or remedy.  Any amendment to, or the Special Master's waiver of, a provision of this Agreement of which the Acquired Companies or the Venezuela Parties are third-party beneficiaries in accordance with Section 9.11 will require the prior written consent of the Company to the extent such amendment or waiver would be reasonably likely to adversely impact the Acquired Companies or the Venezuela Parties.

Section 9.8.    Notices. All notices, requests, instruction, demands and other communications under this Agreement shall be in writing and shall be deemed given (a) when delivered personally by hand (with written confirmation of receipt), (b) on the date sent by e-mail (provided confirmation of email receipt is obtained) if sent during normal business hours of the recipient, and on the next Business Day if sent after normal business hours of the recipient, or (c) when received by the addressee if sent by nationally recognized overnight delivery service (with written confirmation of receipt), in each case, at the following addresses (or to such other address as a party may have specified by notice given to the other party pursuant to this provision):

75

| | |
|---|---|
| If to the Special Master, to: | Robert B. Pincus in his capacity as Special Master for the United States District Court for the District of Delaware ███████ ███████████ ██████████████████ |
| With a copies to: | Weil, Gotshal & Manges LLP, counsel to the Special Master<br>767 Fifth Avenue<br>New York, NY 10153<br>Email: Horizon.Notice@weil.com |
| If to the Buyer, to: | ███████ ████████ ██ ████ ███████████████████████ ██████ █████████ ████████████ |
| With a copy to: | ███████████ ███████████ ███████████ ████████████████ |
| | And |
| | ██████████████ █████████████ █████████████ █████████████ ████████ ████████████████ |

Section 9.9.    Severability. If any term or other provision of this Agreement is invalid, illegal, or incapable of being enforced by any Law or public policy, all other terms or provisions of this Agreement shall nevertheless remain in full force and effect so long as the economic or legal substance of the Transactions is not affected in any manner materially adverse to any party. Upon such determination that any term or other provision is invalid, illegal, or incapable of being enforced, the Parties shall negotiate in good faith to modify this Agreement so as to effect the original intent of the Parties as closely as possible in an acceptable manner such that the Transactions are consummated as originally contemplated to the greatest extent possible.

WEIL:\100255289\1\67816.0003

Section 9.10.  <u>Binding Effect; Assignment</u>. This Agreement shall be binding upon and inure to the benefit of the Parties and their respective successors and permitted assigns and, without limiting the foregoing, references to the "Special Master" in this Agreement shall be deemed to include any successor, substitute or replacement thereof. This Agreement shall not be assigned by (a) the Buyer without the prior written consent of the Special Master or (b) the Special Master, without the prior written consent of the Buyer.

Section 9.11.  <u>No Third Party Beneficiaries</u>. Nothing in this Agreement shall confer any rights, remedies or claims of any nature upon any Person other than the Parties and their respective successors or permitted assigns, except for the rights of (a) the Indemnitees as set forth in <u>Section 6.6</u>; (b) the Non-Parties (including the Acquired Companies and their Representatives) set forth in <u>Section 9.12</u>; (c) the Released Parties as set forth in <u>Section 9.15</u>; (d) the Debt Financing Sources as set forth in <u>Section 9.17</u>; (e) the Venezuela Parties as set forth in <u>Section 6.1(g)</u> and <u>Section 6.16(i)</u>; and (f) the Acquired Companies and their Representatives with respect to <u>Section 4.22</u>, <u>Section 5.12</u> and <u>Section 9.1</u>. All of the Persons identified as third-party beneficiaries in the immediately preceding sentence shall be entitled to enforce such provisions and to avail themselves of the benefits of any remedy for any breach of such provisions, all to the same extent as if such Persons were parties to this Agreement.

Section 9.12.  <u>Non-Recourse</u>. This Agreement may only be enforced against, and any Related Claims may only be made or asserted against (and are expressly limited to) the Persons that are expressly identified as the Parties in the preamble to this Agreement and solely in their capacities as such. No Person who is not a Party, including the Acquired Companies and any current, former or future Affiliate or Representative of any Party or the Acquired Companies or any current, former, or future Affiliate or Representative of any of the foregoing (such Persons, collectively, but specifically excluding the Parties, "<u>Non-Parties</u>"), shall have any liability (whether at law or in equity, based upon contract, tort, statute or otherwise) for obligations or liabilities arising under, in connection with or related to this Agreement or for any Related Claim and each Party hereby irrevocably waives and releases all such liabilities, obligations and Related Claims against any such Non-Party. Without limiting the rights of any Party hereto against the other Parties as set forth herein, in no event shall any Party, any of its Affiliates or any Person claiming by, through or on behalf of any of them institute any Related Claim against any Non-Party. In no event shall any Person be liable for the Fraud of any other Person, and a claim for Fraud may only be asserted against the Person that committed such Fraud; <u>provided</u>, that, in no case will any claim for Fraud be asserted against the Special Master.

Section 9.13.  <u>Specific Performance</u>.

(a)    The Parties agree that irreparable damage would occur in the event that any of the provisions of this Agreement were not performed in accordance with their specific terms or were otherwise breached, and that money damages or legal remedies would not be an adequate remedy for any such damages. Therefore, it is accordingly agreed that prior to the termination of this Agreement in accordance with <u>Section 7.1</u>, each Party shall be entitled to an injunction or injunctions to prevent or restrain any breach or threatened breach of this Agreement by any other party and to seek specific performance of the terms and provisions of this Agreement, to prevent breaches or threatened breaches of, or to enforce compliance with, the covenants and obligations of any other party, in any court of competent jurisdiction, and appropriate injunctive relief shall be

77

granted in connection therewith. Such remedies shall be in addition to and not in substitution for any other remedy to which such party is entitled at law or in equity. If either Party brings any action to enforce specifically the performance of the terms and provisions hereof by the other Party, the Outside Date shall be automatically extended by (i) the amount of time during which such action is pending, plus twenty (20) Business Days or (ii) such other time period established by the court presiding over such action.

(b)     Each Party hereto hereby waives (i) any defenses in any action for specific performance, and agrees not to oppose the granting of an injunction, specific performance or other equitable relief as provided herein, on the basis that (A) the other Party has an adequate remedy at law or (B) an award of specific performance is not an appropriate remedy for any reason at law or in equity and (ii) any requirement under any Law to post a bond or other security as a prerequisite to obtaining equitable relief.

(c)     The Parties agree that (i) by seeking the remedies provided for in this Section 9.13, no party shall in any respect waive its right to seek at any time any other form of relief that may be available to it under this Agreement or any other Transaction Document (including monetary damages) in the event that this Agreement has been terminated or in the event that the remedies provided for in this Section 9.13 are not available or otherwise are not granted, and (ii) nothing set forth in this Section 9.13 shall require any party hereto to institute any proceeding for (or limit any party's right to institute any proceeding for) specific performance under this Section 9.13 prior to or as a condition to exercising any termination right under Article VIII, nor shall the commencement of any Legal Proceeding pursuant to this Section 9.13 or anything set forth in this Section 9.13 restrict or limit any party's right to terminate this Agreement in accordance with the terms of Article VIII or pursue any other remedies under this Agreement any other Transaction Document that may be available then or thereafter; provided, that, in no event will Buyer be entitled to receive both (A) a grant of specific performance to cause the Closing to occur and (B) the Termination Fee or the Expense Reimbursement Amount (as applicable).

Section 9.14.   Successors and Assigns. The provisions of this Agreement shall be binding upon and inure to the benefit of the Parties and their respective successors and assigns; provided that no Party may assign, delegate or otherwise transfer any of its rights or obligations under this Agreement without the consent of the Special Master and the other Parties.

Section 9.15.   Release. Effective as of the Closing Date, except for any rights or obligations under this Agreement or the other Transaction Documents each of the Buyer and the Company on behalf of itself and each of its Affiliates and each of its current, former and future officers, directors, employees, partners, members, advisors, successors and assigns (collectively, the "Releasing Parties"), hereby irrevocably and unconditionally releases and forever discharges the Special Master and each of his current, former and future financial advisors, attorneys, consultants or other advisors and his and their respective, successors and assigns, the Designated Managers, the other Company Employees listed in the Procedures Summary, any other current or former employees, directors, officers, partners, members or managers of the Acquired Companies who participated in the Buyer's due diligence and investigation of the Acquired Companies, the preparation of the Company Disclosure Schedules or the preparation, negotiation or consummation of the Transactions or otherwise participated in the sale process contemplated by the Sale Procedures Order and any other individuals as reasonably agreed by Buyer and the Special Master

78

during the Interim Period (collectively, the "Released Parties") of and from any and all actions, causes of action, suits, proceedings, executions, judgments, duties, debts, dues, accounts, bonds, contracts and covenants (whether express or implied), and claims and demands whatsoever whether in law or in equity which the Releasing Parties may have against each of the Released Parties, now has or in the future may have, in respect of any cause, matter or thing relating to the business or operations of the Acquired Companies, the Transactions, this Agreement, the Transaction Documents, or the ownership of Shares by the Released Parties, in each case, occurring or arising on or prior to the Closing Date. Each Party, on behalf of itself and each Releasing Party, covenants and agrees that no Releasing Party shall assert any such claim against the Released Parties.

Section 9.16.   Counterparts. This Agreement may be executed in one or more counterparts including by facsimile or other means of electronic transmission, such as by electronic mail in ".pdf" form, each of which will be deemed to be an original copy of this Agreement and all of which, when taken together, will be deemed to constitute one and the same agreement.

Section 9.17.   Debt Financing Sources. Notwithstanding anything in this Agreement to the contrary, the Special Master hereby:

(a)      agrees that any proceeding, whether in law or in equity, whether in contract or in tort or otherwise, involving the Debt Financing Sources, arising out of or relating to, this Agreement, the Debt Financing and/or any of the agreements (including the Debt Commitment Letter) entered into in connection with the Debt Financing or any of the transactions contemplated hereby or thereby or the performance of any services thereunder shall be subject to the exclusive jurisdiction of any federal or state court in the Borough of Manhattan, New York, New York, so long as such forum is and remains available, and any appellate court thereof and each Party hereto irrevocably submits itself and its property with respect to any such proceeding to be the exclusive jurisdiction of such court;

(b)      agrees that any such proceeding shall be governed by the laws of the State of New York (without giving effect to any conflicts of law principles that would result in the application of the laws of another state), except as otherwise provided in the Debt Commitment Letter or any other applicable definitive document relating to the Debt Financing;

(c)      without limiting the rights of the Buyer under the Debt Commitment Letter and/or any right or remedy available to any person under the definitive documentation governing the Debt Financing, agrees not to bring or support or permit any of its Affiliates to bring or support any proceeding of any kind or description, whether in law or in equity, whether in contract or in tort or otherwise, against any Debt Financing Source in any way arising out of or relating to, this Agreement, the Debt Financing and/or any of the agreements (including the Debt Commitment Letter) entered into in connection with the Debt Financing or any of the transactions contemplated hereby or thereby or the performance of any services thereunder in any forum other than any federal or state court in the Borough of Manhattan, New York, New York;

(d)      agrees that service of process upon the Acquired Companies and/or each of its controlled Affiliates or the Special Master in any such proceeding shall be effective if notice is given in accordance with Section 9.7;

WEIL:\100255289\1\67816.0003

(e)     irrevocably waives, to the fullest extent that it may effectively do so, the defense of an inconvenient forum to the maintenance of such Legal Proceeding in any such court;

(f)     knowingly, intentionally and voluntarily waives trial by jury in any proceeding brought against any Debt Financing Source in any way arising out of or relating to this Agreement, the Debt Financing and/or any of the agreements (including the Debt Commitment Letter) entered into in connection with the Debt Financing or any of the transactions contemplated hereby or thereby or the performance of any services thereunder;

(g)     without limiting the rights of the Buyer under the Debt Commitment Letter and/or any right or remedy available to any person under the definitive documentation governing the Debt Financing, agrees that none of the Debt Financing Sources will have any liability to the Acquired Companies and/or any of their respective controlled Affiliates (in each case, other than the Buyer and the Buyer Subsidiaries) or the Special Master relating to or arising out of this Agreement, the Debt Financing and/or any of the agreements (including the Debt Commitment Letter) entered into in connection with the Debt Financing or any of the transactions contemplated hereby or thereby or the performance of any services thereunder, whether in law or in equity, whether in contract or in tort or otherwise;

(h)     irrevocably waives, to the fullest extent that it may effectively do so, any and all claims and causes of action against the Debt Financing Sources relating to or arising out of this Agreement, the Debt Financing, the Debt Commitment Letter or any other agreement entered into in connection with the Debt Financing or any of the transactions contemplated hereby or thereby or the performance of any services thereunder, whether in law or in equity, whether in contract or in tort or otherwise; and

(i)     agrees that the Debt Financing Sources are express third party beneficiaries of, and may enforce, any of the provisions of this Section 9.17 and that such provisions and the definitions of "Debt Commitment Letter," "Debt Financing," and "Debt Financing Sources," shall not be amended in any way adverse to any Debt Financing Source without the prior written consent of such Debt Financing Source.

Section 9.18.     Special Master and his Representatives' Judicial Immunity. The Buyer agrees that in no circumstance shall the Special Master or his Representatives be personally or otherwise liable for any amounts or obligations owed to the Buyer, for any breach of any representations or warranties in this Agreement, or for any other claims or liabilities arising out of or in connection with this Agreement or the transaction contemplated by this Agreement. The Buyer further agrees that the Special Master and his Representatives are acting as an arm of the Court and are entitled to judicial immunity in the performance of their duties and in connection with this Agreement and the Transactions.

Section 9.19.     Special Master Indemnification.  From and after the Closing, the Buyer shall, and shall cause each Acquired Company to, indemnify, defend and hold harmless, to the fullest extent permitted under applicable Law, the Special Master against any and all losses, damages, liabilities, deficiencies, claims, actions, judgments, settlements, interest, awards, penalties, fines, costs or expenses of whatever kind, including attorneys' fees, that are incurred by Special Master, arising out of or related to this Agreement. Further, from and after the Closing, the

80

Buyer shall, or shall cause the Acquired Companies to, advance any expenses (including fees and expenses of legal counsel) of the Special Master under this <u>Section 9.19</u> (including in connection with enforcing the indemnity and other obligations referred to in this <u>Section 9.19</u>), as incurred, to the fullest extent permitted under applicable Law.

[*Signature Pages Follow*]

WEIL:\100255289\1\67816.0003

IN WITNESS WHEREOF, the Parties have duly executed this Agreement as of the day and year first written above.

██████████████████████, as the Buyer

By: _____
Name:
Title:


ROBERT B. PINCUS, as the Special Master

By: _____
Name:
Title:

WEIL:\100255289\1\67816.0003

**ANNEX A**

DEFINITIONS

"<u>Acquired Companies</u>" means, collectively, the Company and each of the Company Subsidiaries.

"<u>Additional Judgment Creditors</u>" means the judgment holders, other than Crystallex Corporation and ConocoPhillips Petrozuata B.V., set forth in the Priority Order [D.I. 996], dated March 1, 2024, in the Specified Litigation.

"<u>Advanced Transaction Expenses</u>" means, as provided in the Sale Procedures Order and the May Order (in each case as in effect on Execution Date), the Special Master's compensation and any out-of-pocket costs, fees and expenses incurred by the Special Master in connection with the Transactions for investment bankers, third party consultants, legal counsel and any of his other Representatives or Advisors (as defined in the Sale Procedures Order) that have previously been paid as an advance by the Sale Process Parties and Additional Judgment Creditors pursuant to the procedures set forth in the May Order, which for the avoidance of doubt will include the monthly expenses of the Special Master (including fees and expenses of Weil, Gotshal & Manges LLP, Potter Anderson & Carroon LLP, Jenner & Block LLP, Evercore and any other advisors engaged by the Special Master).

"<u>Affiliate</u>" means, with respect to any Person, any other Person that, directly or indirectly through one or more intermediaries, controls, or is controlled by, or is under common control with, such Person, and the term "<u>control</u>" (including the terms "<u>controlled by</u>" and "<u>under common control with</u>") means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of such Person, whether through ownership of voting securities, by contract or otherwise.

"<u>Anti-Corruption Laws</u>" means any applicable Law for the prevention or punishment of public or commercial corruption or bribery, including the U.S. Foreign Corrupt Practices Act, U.K. Bribery Act 2010 and any other applicable anti-corruption or anti-bribery Law of any other applicable jurisdiction.

"<u>Antitrust Laws</u>" means the HSR Act, the Sherman Act, the Clayton Act, the Federal Trade Commission Act, and any other Laws that are designed to prohibit, restrict or regulate actions having the purpose or effect of monopolization, lessening of competition, or restraint of trade.

"<u>Business Day</u>" means any day of the year other than (a) a Saturday, Sunday or federal holiday in the United States or (b) a day on which national banking institutions in New York, New York are required or authorized to close.

"<u>Business Unit</u>" each of (a) Corpus Christi Refinery, (b) Crude Supply & Trading, (c) Lake Charles Refinery, (d) Lemont Refinery, (e) Lights Oils Marketing, (f) Logistics, (g) Lubricants, (h) Procurement, (i) Product Supply & Trading, (j) Specialty Products, and (k) Terminals & Pipelines.

"<u>Buyer Subsidiary</u>" means any Subsidiary of the Buyer, as of the Execution Date.

"Cash" means the cash and cash equivalents of the Acquired Companies; provided, that Cash shall (a) exclude (i) all issued but uncleared checks and drafts of the Acquired Companies, (ii) cash deposits and cash held in escrow accounts, (iii) with respect to any cash held outside the United States, all Taxes, fees, expenses and other costs associated with repatriating such cash into the United States, (iv) cash held by the Acquired Companies for third parties, and (v) cash held as collateral for outstanding letters of credit and any other restricted or trapped cash; and shall (b) include all checks and wire transfers and drafts deposited or available for deposit for the account of the Acquired Companies.

"CITGO Petroleum" means CITGO Petroleum Corporation, a Delaware corporation.

"Claim" means (a) a right to a payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured or (b) an equitable remedy for breach of performance if such breach gives rise to a right to payment, whether or not such right to an equitable remedy is reduced to judgment, fixed, contingent, matured, unmatured, disputed, undisputed, secured or unsecured. Without limiting the foregoing and for the avoidance of doubt, a Claim includes any loss, liability, demand, claim, judgment, sanction, penalty, action, obligation, commitment, assessment, settlement, fee, debt, deficiency, guaranty of any kind, proceeding, damage, cost, or expense (including court costs and professional fees (including attorneys' fees and costs)) whatsoever, whether at law or in equity, whether known or unknown, fixed, liquidated, contingent, or otherwise, whether under any theory of successor or transferee liability and whether imposed by agreement, understanding, law, or otherwise.

"Closing Consideration" means the Purchase Price, minus the Advanced Transaction Expenses Amount, minus the Deposit Amount, minus the Closing Transaction Expenses, minus the Expense Reserve Holdback Amount, minus the Credit Bid Amount.[55]

"Closing Transaction Expenses" means the Special Master Transaction Expenses that are unpaid as of the Closing.

"Closing Release" means that certain release, dated the Closing Date, in the form attached hereto as Exhibit D or otherwise in form and substance acceptable to the Special Master.[56]

"COBRA" means Part 6 of Subtitle B of Title I of ERISA, Section 4980B of the Code and any similar state applicable Law.

"Code" means the U.S. Internal Revenue Code of 1986, as amended.

"Commencement Date" means the date on which the Court issues an order identifying the bid reflected in this Agreement as a stalking horse bid or a base bid.

---

[55] **Note to Bidder**: Bracketed language to be included for credit bidders.

[56] **Note to Bidder**: Bracketed language to be included for credit bidders. Form of release should provide for a full release of all of PDVSA's obligations arising under the Claim equal to the amount of the Credit Bid Amount as of the Closing.

"Company Benefit Plan" means (a) each "employee benefit plan" (as such term is defined in Section 3(3) of ERISA), (b) each plan, program, policy, agreement or arrangement that would be an "employee benefit plan" (within the meaning of Section 3(3) of ERISA), if it were subject to ERISA, (c) each stock purchase, stock option, restricted stock, stock bonus, stock ownership, stock appreciation rights, phantom equity, profits interests or other equity or equity-based plan or agreement, (d) each compensation, bonus, commission, incentive or deferred compensation plan, agreement, arrangement, program, policy or practice, (e) each employment or consulting agreement, offer letter or severance, retention, change of control, termination, employee loan or other compensation plan, agreement, arrangement, program, policy, or practice, (f) each health or welfare plan, agreement, arrangement, program, policy, or practice, and (g) each vacation policy, or other employee fringe benefit or perquisite arrangement whether or not subject to ERISA, in the cases of clauses (a) through (g), (x) that is maintained, sponsored, or contributed to by (or required to be contributed to by) any Acquired Company or with respect to which any Acquired Company has any liability and (y) under which any current or former director, officer, manager, employee, contractor or consultant of any Acquired Company has any present or future right to benefits or is eligible to participate.

"Company Fundamental Representations" means the representations and warranties set forth in Section 4.1 (Corporate Existence; Title to Shares), Section 4.3 (Non-Contravention), Section 4.4 (Capitalization), and Section 4.5(a) and (d) (Subsidiaries; Non-Controlled Entities).

"Company Material Adverse Effect"[57] means any state of facts, change, development, event, effect, circumstance, condition or occurrence (each, an "Effect") that, individually or in the aggregate, (x) would materially delay or impair the ability of the Special Master or the Acquired Companies (as applicable) to consummate the Transactions, in each case, other than Claims or Legal Proceedings arising out of or in relation to the Sale Order, the Purported Equity Pledge or the Equity Pledge Litigation[58] or (y) results in or would reasonably be expected to have a material adverse effect on the condition (financial or otherwise), business, assets, liabilities or results of operations of the Acquired Companies and the Non-Controlled Entities, taken as a whole; provided, however, that in no event shall any of the following Effects, alone or in combination, be deemed to constitute, or be taken into account, in determining whether there has been, or would be, a Company Material Adverse Effect (A) any changes or conditions in the U.S. or any other national or regional economy, any global economic changes or conditions or securities, credit, financial or other capital markets conditions; (B) any changes or conditions affecting the oil and gas industry in general (including changes to the prices of commodities or of the raw material inputs or value of the outputs of the Company's products, general market prices and regulatory changes affecting the industry); (C) any weather-related or other force majeure event or outbreak (including earthquakes, hurricanes, tsunamis, tornadoes, floods, mudslides, wild fires or other natural disasters); (D) pandemics, epidemics, COVID-19 measures, acts of war (whether or not declared), armed hostility (by recognized governmental forces or otherwise), sabotage, terrorism

---

[57] **Note to Bidder**: Off-market revisions to the definition of Company Material Adverse Effect will be strongly disfavored. However, nothing herein expressly excludes the ability of a Buyer to argue that a finding by a court of competent jurisdiction that PDVH or any of its subsidiaries is an alter ego of PDVSA or the Republic constitutes a Company Material Adverse Effect.

[58] **Note to Bidder**: Events relating to the 2020s litigation must be specifically excluded from consideration in determining a Company Material Adverse Effect.

or cyber-attack, and any escalation or general worsening of any of the foregoing or other response to any Governmental Bodies (including requirements for business closures, restrictions on operations or "sheltering-in-place"); (E) effects resulting from the negotiation, execution, announcement, pendency, compliance with or performance of this Agreement, the Transactions or the terms hereof or the consummation of the Transactions, including the impact thereof on the relationships of the Acquired Companies with customers, suppliers, partners, employees or Governmental Bodies; (F) any action taken by an Acquired Company or failure of such Acquired Company to take action, in each case, which the Buyer has requested in writing or consented to when asked under <u>Section 6.1</u>; (G) changes in applicable Law or in GAAP or in accounting standards, or any changes in the interpretation or enforcement by any Governmental Body of any of the foregoing, or any changes in general legal or regulatory conditions, including any Effects arising out of, in connection with, or as a result of, any "shut-down" or funding freeze of the U.S. federal government (including any of its agencies); (H) any failure to meet any internal projections, forecasts, guidance, estimates, milestones, or budgets or internal or published financial or operating predictions of revenue, earnings, cash flow or cash position; (I) any downgrade in the Company's credit rating (it being understood that the exceptions in clauses (H) and (I) shall not prevent or otherwise affect a determination that the underlying cause of any such Effect referred to therein (if not otherwise falling within any of the exceptions provided hereof) is a Company Material Adverse Effect); (J) compliance with, or any action required to be taken by the Buyer or its Affiliates under the terms of this Agreement or in connection with the Transactions including <u>Section 6.3(d)</u>; or (K) Claims or Legal Proceedings arising out of or in relation to the Sale Order, the Purported Equity Pledge or the Equity Pledge Litigation; <u>provided</u>, that in the case of clauses (A), (B), (C), and (D), to the extent the impact on the Acquired Companies, taken as a whole, is disproportionately adverse compared to the impact on similarly situated entities, the incrementally disproportionate impact or impacts shall be taken into account in determining whether there has been, or would reasonably be expected to be, a Company Material Adverse Effect.

"<u>Company Subsidiary</u>" means any Subsidiary of the Company, as of the Execution Date.

"<u>Compliant</u>" means, as of any time of determination, with respect to any Required Information, that (i) such Required Information, taken as a whole, does not contain any untrue statement of a material fact or omit to state any material fact regarding the Company necessary in order to make such Required Information, in light of the circumstances under which the statements contained therein are made, not misleading; provided that the availability of financial information of the Company, including any "flash" numbers, prior to the time that the Required Information would become not Compliant for periods subsequent to the latest quarterly or annual period for which financial information is included in the Required Information, shall not, by virtue of such availability, render such previously delivered Required Information not Compliant, (ii) no independent auditor has withdrawn its audit opinion with respect to any financial statements contained in the Required Information, (iii) such Required Information is compliant in all material respects with all applicable requirements of Regulation S-K and Regulation S-X under the Securities Act and in a form customarily included in private placements of debt securities under Rule 144A of the Securities Act and (iv) the financial statements and other financial information included in such Required Information would not be deemed "stale" for use in a private placement of debt securities under Rule 144A of the Securities Act, and are of a date and remain otherwise sufficient throughout the Marketing Period, in each case, to permit the Company's independent accountants to issue customary "comfort" letters with respect to such financial statements and

financial information to the Debt Financing Sources providing the portion of the Debt Financing consisting of debt securities (including customary "negative assurance" comfort) in order to consummate any private placement of debt securities under Rule 144A of the Securities Act during any Business Day during the Marketing Period.

"Contract" means any written or oral contract, agreement, lease, easement, license, sublicense, subcontract, note, evidence of indebtedness, mortgage, indenture, bond, letter of credit, purchase order, binding bid, security agreement or other legally binding arrangement, whether express or implied (including all amendments, supplements, and modifications thereto), but shall exclude Permits and Company Benefit Plans.

"Credit Support Arrangements" means guaranties, performance bonds, performance guaranties, indemnities, keep-wells, sureties, bankers' acceptances, letters of credit, agreement to assume liabilities, other security, credit support or financial assurances and any other Contract or arrangement pursuant to which any person is or may be directly or indirectly liable or responsible for the liabilities, or the maintenance of a financial position, of any other person, including by the posting (or potential forfeiture) of any collateral, security or bond.

"Debt" means, with respect to the Acquired Companies, without duplication, the following obligations: (i) the principal amount of obligations of the Acquired Companies (A) for borrowed money, whether or not contingent, or (B) evidenced by notes, debentures, bonds or other similar instruments (including debt-like instruments) or debt securities; (ii) all obligations of the Acquired Companies for the reimbursement of any obligor of any guaranties, performance bonds, performance guaranties, indemnities, keep-wells, sureties, bankers' acceptances, letters of credit or similar arrangements, to the extent drawn upon; (iii) all liabilities of any Person (other than any Acquired Company) for which any Acquired Company has guaranteed repayment (to the extent of such guarantee); (iv) all obligations for deferred purchase price of property, assets or services, all conditional sale obligations, earnouts, holdbacks or other similar obligations (calculated at the full amount of the possible payment outstanding); (v) all obligations under finance leases; (vi) the non-current liabilities set forth on Section 1.1(c) of the Company Disclosure Schedules; (vii) post-retirement welfare benefits and unfunded or underfunded pensions; (viii) to the extent drawn, obligations under the Receivables Securitization Facility; and (ix) all obligations of the type referred to in clauses (i) through (viii) above of other Persons secured by any Lien on any property or asset of the Acquired Companies, whether or not such obligation is assumed by the Acquired Companies (with Debt under this clause (ix) being limited, in the case of any such obligation of another Person, to the lower of such obligation and the fair market value of the properties and assets securing the same). Debt shall not include (A) any amounts included in Closing Transaction Expenses, (B) any obligations or guarantees under bankers acceptance, letters of credit or similar arrangements to the extent undrawn as of the Closing Date and which do not become drawable as a result of the Transactions, (C) any intercompany Debt of the Company and its wholly owned Subsidiaries and (D) any Taxes.

"Debt Financing Documents" means any credit agreements, note purchase agreements, engagement letters, fee letters, indentures, guarantees, pledge and security documents, definitive financing documents, agreements, schedules or other certificates or documents contemplated by the Debt Financing.

"<u>Debt Financing Source</u>" means, in its capacity as such, any lender, similar debt financing source, agent or arranger providing or arranging a commitment to, or that has entered into definitive agreements related to, the Debt Financing, including pursuant to the Debt Commitment Letter (as modified by any joinder agreement, amendment, or other modification thereto as permitted hereunder) or any Debt Financing Document (or any other commitment letter or definitive agreement in respect of any alternative debt financing) and their respective Affiliates, and such Person's (and their respective Affiliates') former, current or future equityholders, members, employees, officers, directors, attorneys, agents or advisors, and, in each case, their respective successors and assigns; <u>provided</u>, <u>however</u>, that neither the Buyer nor any of its Affiliates shall constitute a Debt Financing Source.

"<u>Debt Payoff Amount</u>" means the aggregate principal amount of the Specified Debt, plus all accrued but unpaid interest, fees and other amounts payable thereon (including any premiums, penalties, breakage costs and any other fees, expenses or other obligations relating thereto), in each case, calculated as of the Closing Date or as of the Redemption Date as defined in the applicable indenture to such item of Specified Debt.

"<u>Deposit Forfeiture Termination Event</u>" means the occurrence of this Agreement being terminated by the Special Master or the Buyer pursuant to <u>Section 8.1(b)</u> (Outside Date) or Section 8.1(c) (Legal Restraint) or by the Special Master pursuant to <u>Section 8.1(f)</u> (Buyer Breach); [provided, however, that termination pursuant to Section 8.1(c) (Legal Restraint) shall only constitute a Deposit Forfeiture Termination Event to the extent the failure of Buyer to fulfill any obligation under Section 6.3 principally caused or resulted in the imposition of such Legal Restraint or the failure of such Legal Restrain to be resisted, resolved or lifted.][59]

"<u>Designated Managers</u>" means the employees of the Company or its Subsidiaries designated as such in the Procedures Summary.

"<u>Economic Sanctions/Trade Laws</u>" means all applicable Laws relating to export controls, anti-boycott, and Sanctions Targets, including prohibited or restricted international trade and financial transactions and lists maintained by any Governmental Body targeting countries, territories, entities or persons, including the United States, the United Nations Security Council, the European Union, or His Majesty's Treasury of the United Kingdom. For the avoidance of doubt, the applicable Laws referenced in the foregoing sentence include (1) any of the Trading With the Enemy Act, the International Emergency Economic Powers Act, the United Nations Participation Act, or the Syria Accountability and Lebanese Sovereignty Act, or any regulations of OFAC, or any export control Law applicable to U.S.-origin goods, technology, or software, or any enabling legislation or executive order relating to any of the above, as collectively interpreted and applied by the U.S. Government at the prevailing point in time, (2) any U.S. sanctions related to or administered by the U.S. Department of State and (3) any sanctions measures or embargoes imposed by the United Nations Security Council, His Majesty's Treasury or the European Union.

---

[59] **NTD**: We believe that the insertion of this language is necessary to comport with our understanding of the Special Master's position that the Bidder would not have to forfeit the deposit if the Bidder was not the cause of the Legal Restraint.

"Environmental Laws" means any and all Laws relating to (a) pollution or the protection, cleanup, preservation or restoration of the environment or natural resources (including air, water, land, soil, subsoil, wildlife, plants, or other natural resources), (b) the generation, manufacture, processing, handling, use, labeling, treatment, storage, disposal, transportation, or Release or threatened Release of, or exposure to, any Hazardous Substance, or (c) the health and safety of Persons, including the following, to the extent applicable: the Comprehensive Environmental Response, Compensation, and Liability Act, 42 U.S.C. §§ 9601 et seq.; the Federal Water Pollution Control Act, 33 U.S.C. § 1251 et seq.; the Clean Air Act, 42 U.S.C. § 7401 et seq.; the Toxic Substances Control Act, 15 U.S.C. § 2601 et seq.; the Emergency Planning and Community Right to Know Act of 1986, 42 U.S.C. § 11001 et seq.; the Safe Drinking Water Act, 42 U.S.C. § 300(f) et seq.; the Hazardous Materials Transportation Act, 49 U.S.C. § 5101 et seq.; the Federal Insecticide, Fungicide and Rodenticide Act, 7 U.S.C. § 136 et seq.; the Resource Conservation and Recovery Act of 1976, 42 U.S.C. § 6901 et seq.; the Oil Pollution Act of 1990, 33 U.S.C. § 2701 et seq.; the Occupational Safety and Health Act, 29 U.S.C. §651 et seq. (with respect to human exposure to Hazardous Substances); the Endangered Species Act of 1973, 16 U.S.C. §§ 1531 et seq.; the Bald and Golden Eagle Protection Act, 16 U.S.C. § 668 et seq.; the Migratory Bird Treaty Act, 16 U.S.C. § 703 et seq.; and any similar or implementing state or local Law, all amendments or regulations promulgated thereunder.

"EPP" means the CITGO Petroleum Corporation Executive Protection Plan, as amended.

"Equitable Exceptions" means, collectively, (a) applicable bankruptcy, insolvency, reorganization, moratorium and similar Laws affecting creditors' rights and remedies generally, and (b) general principles of equity, including principles of commercial reasonableness, good faith and fair dealing (regardless of whether enforcement is sought in a proceeding at law or in equity).

"Equity Commitment Letters" means the equity commitment letters to be executed by each Equity Financing Source on the Execution Date.

"Equity Financing Sources" means the Persons set forth in Section 1.1(a) of the Buyer Disclosure Schedules and each other Person who delivers an Equity Commitment Letter on the Execution Date.

"Equity Interests" means, with respect to any entity, any and all capital stock, shares, quotas, limited liability company interests (however designated), partnership or membership interests or units (whether general or limited), or other similar interest or participation that confers on a Person the right to receive a share of the profits and losses of, or distribution of assets of, such entity, the right to vote for or appoint directors (or other similar governing body members) of such entity or the right to otherwise cause the direction or management and policies of such entity in a manager, general partner or other similar capacity.

"Equity Pledge Litigation" means the case of Petroleos de Venezuela S.A. v. MUFG Union Bank, N.A., 19-10023 (KPF) (S.D.N.Y.) that was initiated on October 29, 2019 by PDVSA, the Company and CITGO Holding against GLAS and MUFG in their capacities as collateral agent and trustee, respectively, for the 2020 Bondholders, disputing the Purported Equity Pledge.

"ERISA" means the Employee Retirement Income Security Act of 1974 and the rules and regulations thereunder.

"ERISA Affiliate" means with respect to any Person, trade or business, or entity, any other Person, trade or business, or entity, (a) that is, or was at the relevant time, a member of a group described in Section 414(b), (c), (m) or (o) of the Code that includes, or included at the relevant time, the first Person, trade or business, or entity, or (b) that is, or was at the relevant time, a member of the same "controlled group" as the first Person, trade or business, or entity pursuant to Section 4001(a)(14) of ERISA.

"Excluded Information" means any (i) pro forma financial statements (but excluding financial information relating solely to the Company necessary for Buyer to prepare (1) pro forma statements of income of the Company and its subsidiaries (giving effect to the Transactions) for the latest full fiscal year provided pursuant to clause (x)(a) of the definition of Required Information, (2) a pro forma statement of income of the Company and its subsidiaries (giving effect to the Transactions) for the latest interim period (and the comparative period of the prior year) of the Company covered by the Quarterly Financial Statements; and (3) a pro forma balance sheet of the Company and its subsidiaries (giving effect to the Transactions) as of the last day of the latest fiscal year or quarterly period of the Company provided pursuant to clause (x)(a) or (x)(b) of the definition of Required Information), (ii) description of all or any portion of the Debt Financing, including any "description of notes," "plan of distribution" and other information customarily provided by Buyer, the Debt Financing Sources or their counsel, (iii) risk factors relating to all or any component of the Debt Financing, (iv) "segment" financial information, (v) other information required by Rules 3-09, 3-10 or 3-16 of Regulation S-X under the Securities Act, or information required by Item 10, Item 402 and Item 601 of Regulation S-K, XBRL exhibits and information regarding executive compensation and related party disclosure related to SEC Release Nos. 33-8732A, 34-54302A and IC-27444A and other information not customarily provided in an offering memorandum for a Rule 144A or (vi) any financial information or other information (other than the financial statements and other information set forth in the definition of Required Information) that is not reasonably available to the Company under its current reporting systems or that the Company is not reasonably able to produce without undue burden.

"Escrow Account" means the escrow account established pursuant to the Escrow Agreement in respect of the Deposit Amount.[60]

"Expense Reimbursement Amount" means an amount equal to the reasonable and documented out-of-pocket costs, fees and expenses, inclusive of any out-of-pocket financing commitment fees, incurred by the Buyer in connection with the Transactions; provided, that in no event shall the Expense Reimbursement Amount exceed $30,000,000.

"Expense Reserve Holdback Account" means the account established by the Special Master in respect of the Expense Reserve Holdback Amount.

---

[60] **NTD**: Deleted defined terms not used herein.

"Expense Reserve Holdback Amount" means a reasonable amount to be determined by the Special Master in good faith that is approved by the Court prior to Closing.

"Evaluation Criteria" means the non-exhaustive list of criteria, as approved by the Court pursuant to the January Order, based on which the Special Master shall determine which bid to recommend as the stalking horse bid, base bid or Successful Bid, if any and as applicable.

"Fraud" means a knowing misrepresentation of a material fact or concealment of a material fact by a Person with respect to any representation or warranty in this Agreement or the other Transaction Documents which is made or concealed with the specific intent to deceive and the intent of inducing another Person to enter into the Transaction Documents; provided, that at the time such representation was made (a) such representation was materially inaccurate, (b) such Person had actual knowledge (and not imputed or constructive knowledge), without any duty of inquiry or investigation, of the material inaccuracy of such representation, (c) such Person had the specific intent to deceive another Person and (d) the other Person acted in reliance on such inaccurate representation and suffered financial injury as a result of such material inaccuracy. For the avoidance of doubt, "Fraud" does not include any Claim for equitable fraud, promissory fraud, unfair dealings fraud, or any torts (including a Claim for fraud) based on negligence or recklessness.

"Good Industry Practice" means any of the practices, methods, standards, procedures and actions which could reasonably be expected to be used or taken by a reasonably prudent operator of properties or other assets, as applicable, similar to the applicable properties or other assets of the Acquired Companies, in each case, in light of the facts and circumstances known as of the relevant time of measurement. "Good Industry Practice" is not intended to be limited to the optimal practice, method, standard, procedure or action to the exclusion of all others, but rather is intended to include a range of practices, methods, standards or actions that meet the foregoing qualifications.

"Governmental Body" means any domestic or foreign national, state, multi-state, municipal or other local government, including any governmental, regulatory, or administrative department, division, subdivision, agency, bureau, board, commission, or authority thereof, or any quasi-governmental or private body exercising any regulatory or Taxing Authority (to the extent that the rules, regulations or orders of such organization or authority have the force of Law), or any court, tribunal or arbitral body of competent jurisdiction.

"Government Contract" means any Contract, grant, basic ordering agreement, letter contract, or order with (i) any Governmental Body, (ii) another Person under such other Person's prime contract with a Governmental Body, or (iii) any higher tier subcontractor of a Governmental Body in its capacity as a subcontractor, for which the period of performance has not expired or terminated, or final payment has not been received, or which remains open to audit as of the Execution Date. Unless otherwise indicated, a task, purchase or delivery order under a Government Contract will not constitute a separate Government Contract for purposes of this definition but will be part of the Government Contract under which it was issued.

"Hazardous Substance" means any substance, material or waste that is regulated, listed, designated, classified, defined or characterized under or pursuant to any Environmental Law as "hazardous," "toxic," "radioactive", a "pollutant," a "contaminant," or words of similar meaning,

including petroleum or petroleum products, byproducts, derivatives, crude oil or any fraction thereof, PFAS, explosive materials, radioactive materials, asbestos, lead-based paint, or polychlorinated biphenyls.

"HSR Act" means the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended.

"Indenture" means the indenture issued on October 27, 2016, by PDVSA, as issuer, with PDVSA Petróleo, S.A., as guarantor, MUFG Union Bank, N.A., as trustee, GLAS Americas LLC, as collateral agent, Law Debenture Trust Company of New York, as registrar, transfer agent and principal agent, and Banque Internationale À Luxembourg, Société Anonyme, as Luxembourg paying agent.

"Interest Rate" means (x) the rate of interest published from time to time by The Wall Street Journal, Eastern Edition, as the "prime rate" at large U.S. money center banks during the period from the date that payment is due to the date of payment, plus (y) one percent (1.0%).

"Interim Period" means the period beginning on the date of the Sale Order Entry and ending upon the earlier of the Closing and the termination of this Agreement in accordance with its terms.

"IRS" means the United States Internal Revenue Service.

"January Order" means that certain *Memorandum Order* [D.I. 1554] entered by the Court on January 27, 2025 in the Specified Litigation.

"Judgment Creditors" means the judgment holders in the Specified Litigation.

"Knowledge of the Buyer" means the actual knowledge (and not imputed or constructive knowledge) of any of the Persons set forth in Section 1.1(b) of the Buyer Disclosure Schedules after due inquiry.

"Knowledge of the Company" or "Company's Knowledge" means the actual knowledge (and not imputed or constructive knowledge) of the Designated Managers after due inquiry.

"Knowledge of the Special Master" means actual knowledge (and not imputed or constructive knowledge) of the Special Master.

"Law" means any applicable foreign, federal, state, local law (including common law), statute, treaty, code, ordinance, rule, regulation, judgment, decree, binding directive, injunction, Order or other legal requirement of any Governmental Body; provided, that in no event shall "applicable Law" be deemed to include Laws and Orders of the Bolivarian Republic of Venezuela.

"Legal Proceeding" means any judicial, regulatory, administrative or arbitral action, suit, claim, appeal, cause of action, objection, demand, inquiry, audit, notice of violation, citation, summon, subpoena, proceeding, or investigation of any nature, civil, criminal, public or private.

"Lien" means, with respect to any asset, any mortgage, lien, pledge, charge, security interest or encumbrance of any kind in respect of such asset.

"Lookback Date" means the date that is three (3) years prior to the Execution Date. "Money Laundering Laws" means any law or regulation regarding money laundering or financial recordkeeping and reporting requirements, including the U.S. Currency and Foreign Transactions Reporting Act of 1970, the U.S. Money Laundering Control Act of 1986, the USA PATRIOT Act of 2001, and any applicable money laundering-related laws of other jurisdictions where the Acquired Companies conduct business, conduct financial transactions or own assets.

"Marketing Period" means the first period of fifteen (15) consecutive Business Days commencing on the earlier of (a) [●] and (b) the later of (i) [●] and (ii) the first Business Day following the date that the condition set forth in Section 7.01(d) has been satisfied or, to the extent permitted by Applicable Law, waived and during and at the end of which Buyer has received all Required Information and throughout which period all such Required Information is Compliant; provided that that such 15 consecutive business day period shall exclude April 18, 2025, May 26, 2025, June 19, 2025, July 4, 2025, September 1, 2025, November 27, 2025, November 28, 2025, December 24, 2025 through January 1, 2026, January 19, 2026, February 16, 2026, April 3, 2026[61] which, for purposes of such calculation, shall not constitute a business day (provided that, for the avoidance of doubt, such exclusions (other than for the period commencing on December 24, 2025 and ending on January 1, 2026) shall not restart such 15 consecutive business day period) If the Company shall in good faith reasonably believe it has provided all of the Required Information, it may deliver to the Buyer a written notice to that effect (stating when it believes it completed such delivery), in which case the Marketing Period shall be deemed to have commenced as of the Business Day immediately following the delivery date indicated in such written notice unless Buyer in good faith reasonably believes the Company has not completed the delivery of all of the Required Information and, within five (5) Business Days after the delivery of such notice by the Company, delivers a written notice to the Company to that effect (stating with specificity which Required Information the Company has not delivered); provided that it is understood that the delivery of such written notice from the Buyer to the Company will not prejudice the Company's right to assert that all of the Required Financial Information has in fact been delivered.

"Negative Consequences" means (a) if related to any consent with respect to any Contract, (i) any default, breach or violation of such Contract (or any default, breach or violation that would result with notice, lapse of time or both) or (ii) any modification or supplement to the rates, service levels, performance schedules or other terms or conditions of such Contract or any right to modify any of the foregoing, in each case, that would be or reasonably could be expected to be adverse to the Acquired Companies, (b) the imposition of any restriction, limitation or new covenant on any Acquired Company, (c) the imposition or creation of any Lien on any assets or properties of any Acquired Company, (d) any right of termination, cancellation, revocation, non-renewal or acceleration or loss of benefit or vesting of any right of any person, in each case, that would be or reasonably could be expected to be adverse to any of the Acquired Companies (upon the exercise of any rights or otherwise), (e) any right to receive any rebate, chargeback, refund, credit or penalty and (f) any payment, compensation or incremental liability (or any right to any payment, compensation or incremental liability).

"Net Deposit Amount" means the Deposit Amount minus the aggregate amount of any (a) Advanced Transaction Expenses plus (b) unpaid Special Master Transaction Expenses, and in the

---

[61] **NTD**: To be updated pending confirmation of date of signing.

case of each of clauses (a) and (b), that have been approved by the Court pursuant to the Sale Procedures Order.[62]

"No-Shop Period" means the period beginning on the date that is five (5) Business Days after the conclusion of the Topping Period, and ending on the Closing Date or the date on which this Agreement terminates pursuant to its terms.

"Non-Controlled Entity" means any entity in which an Acquired Company owns, directly or indirectly, any Equity Interest other than a Company Subsidiary.

"OFAC" means the U.S. Department of the Treasury's Office of Foreign Assets Control.

"OFAC License" means a general or specific license or licenses from OFAC authorizing the Parties to participate in and close the Transaction.

"OFAC License Application" means a request for an OFAC License pursuant to 31 CFR § 501.801 or other relevant authority.

"Order" means any order, injunction, judgment, decree, ruling, writ, assessment or arbitration award of a Governmental Body, other than the Bolivarian Republic of Venezuela.

"Ordinary Course" means the ordinary and usual course of day-to-day operations of the Acquired Companies and/or the Non-Controlled Entities (as applicable), in each case, consistent with past practice, taken as a whole.

"Organizational Documents" means the charter, memorandum, certificate of incorporation, articles of association, bylaws, partnership agreements, limited liability company agreement, operating agreement, or other similar document of a Person, as may be amended, restated or otherwise modified from time to time.

"Paying Agent Account" means the deposit account established by the Paying Agent pursuant to the terms of the Paying Agent Agreement for the benefit of the Claimholders.

"PCI DSS" means the Payment Card Industry Data Security Standard, issued by the Payment Card Industry Security Standards Council, as revised from time to time.

"Permit" means all permits, licenses, approvals, certifications, consents, registrations, variances, exemptions, waivers, Orders, franchises and other authorizations of any Governmental Body.

"Permitted Liens" means (a) all defects, exceptions, restrictions, easements, rights of way and encumbrances of record; (b) Liens securing liabilities which are reflected or reserved against in the consolidated balance sheet of the Company prepared in accordance with GAAP to the extent so reflected or reserved; (c) Liens for Taxes not yet due and payable or that are being contested in good faith through appropriate proceedings; (d) landlords', mechanics', carriers', workers', repairers' and similar statutory Liens arising or incurred in the Ordinary Course; (e) zoning,

---

[62] **Note to Bidder**: Bracketed language to be included for credit bidders.

building code, entitlement and other land use restrictions and Environmental Laws; (f) title of a lessor under a capital or operating lease, and leases, subleases, and similar transactions in the Ordinary Course; (g) any license, covenant or other right to or under Intellectual Property granted in the Ordinary Course; (h) gaps in the chain of title for Intellectual Property evident from the public records of the Governmental Body maintaining the applications or registrations therefor; (i) Liens set forth in <u>Section 1.1(d)</u> of the Company Disclosure Schedules; (j) the Purported Equity Pledge; (k) Claims or Legal Proceedings seeking to enforce judgments against PDVSA or the Bolivarian Republic of Venezuela by recovering from the Acquired Companies; and (l) such other imperfections in title, charges, easements, restrictions and encumbrances which would not result in a Company Material Adverse Effect.

"<u>Person</u>" means any individual, corporation, partnership, limited liability company, firm, joint venture, association, joint-stock company, trust, unincorporated organization, Governmental Body or other entity.

"<u>Personal Information</u>" means all information that identifies, could be used to identify or is otherwise related to an individual person or household, including demographic, health, behavioral, biometric, financial, nonpublic, and geolocation information, IP addresses, network and hardware identifiers, employee information, and any other individually identifiable information that is protected under any applicable Privacy Law and Obligation, in addition to any definition for "personal information", "personal data", "personally identifiable information", "protected health information" or any similar term provided by applicable Privacy Laws and Obligations.

"<u>PFAS</u>" stands for per- and polyfluoroalkyl substances and means any substance which contains at least one fully fluorinated methyl or methylene carbon atom (without any hydrogen (H)/chlorine/bromine/iodine atom attached to it), including any acids, salts, precursors, polymers or derivatives thereof.

"<u>Post-Closing Tax Period</u>" means any taxable period beginning after the Closing Date.

"<u>Preferential Right</u>" means any rights of first refusal, rights of first offer, put or call options, preferential rights to purchase, preemptive rights, change in control, or other similar rights in favor of any Person.

"<u>Procedures Summary</u>" means the procedures described in <u>Section 1.1(e)</u> of the Company Disclosure Schedules.

"<u>Purported Equity Pledge</u>" means the purported pledge of 50.1% of the equity in CITGO Holding, Inc., a Delaware corporation and wholly owned direct subsidiary of the Company that purportedly secured, in part, the 2020 Bonds.

"<u>Related Claim</u>" means any Legal Proceeding that may be based upon, arise out of or relate to this Agreement or the negotiation, execution, performance, breach, interpretation, construction, validity or enforcement of this Agreement (including any Legal Proceeding based upon, arising out of or related to any representation or warranty made or alleged to be made in or in connection with, or as an inducement to enter into, this Agreement).

"Release" means any actual or threatened releasing, spilling, leaking, pumping, pouring, emitting, emptying, discharging, injecting, escaping, or allowing to escape, leaching, migrating, dumping, abandoning, or disposing into or through the indoor or outdoor environment (including soil, surface water, ground water, land surface, subsurface strata, ambient air, wildlife, plants or other natural resources).

"Representatives" means, with respect to any Person, such Person's equityholders, partners, members, officers, directors, employees, consultants, agents, attorneys, accountants, advisors, financing sources and other representatives.

"Required Information" means (x) (a) the audited consolidated balance sheets of the Company and its subsidiaries as of the end of each fiscal year ended after December 31, 2021 and at least 90 days prior to the Closing Date and related audited consolidated statements of income, comprehensive income, changes in stockholders' equity and cash flows of the Company and its subsidiaries for each fiscal year ended after December 31, 2021 and at least 90 days prior to the Closing Date (the "Annual Financial Statements"); (b) the unaudited consolidated balance sheets and related statements of income, comprehensive income, changes in stockholders' equity and cash flows of the Company and its subsidiaries for each fiscal quarter of the Company ended after the date of the most recent balance sheet delivered pursuant to clause (a) above and at least 45 days prior to the Closing Date (the "Quarterly Financial Statements" and, together with the Annual Financial Statements, the "Financial Statements") (provided that the financial statements specified in this clause (b) shall be subject to normal year-end adjustments), all of which financial statements described in clause (a) shall be prepared in accordance with generally accepted accounting principles in the United States and prepared in a customary manner for Rule 144A offerings of high yield debt securities; (y) other financial information of the Company reasonably necessary to assist Buyer in preparing (1) pro forma statements of income of the Company and its subsidiaries (giving effect to the Transactions) for the latest full fiscal year provided pursuant to clause (x)(a) above, (2) a pro forma statement of income of the Company and its subsidiaries (giving effect to the Transactions) for the latest interim period (and the comparative period of the prior year) of the Company covered by the Quarterly Financial Statements; and (3) a pro forma balance sheet of the Company and its subsidiaries (giving effect to the Transactions) as of the last day of the latest fiscal year or quarterly period of the Company provided pursuant to clause (x)(a) or (x)(b) above, in each case of this clause (y) prepared accordance with Regulation S-X of the Securities Act (other than with respect to the inclusion of periods prior to the Company's last completed fiscal year); and (z) other information with respect to the Company and its Subsidiaries of the type and form customarily included in high yield private placements of debt securities under Rule 144A of the Securities Act (including information required by Regulation S-X and Regulation S-K under the Securities Act) and including or incorporating by reference financial statements, pro forma financial statements, business and other operating and financial data of the type customary for Rule 144A offerings by first time issuers and, in the case of the annual financial statements, the auditors' reports thereon, and all other operating and financial data necessary to receive customary (for high yield unsecured debt securities issued in a private placement pursuant to Rule 144A) "comfort" letters (including "negative assurance" comfort) from the independent accountants of the Company upon completion of customary procedures in connection with the offering of the of such debt securities.  Notwithstanding anything to the contrary in this Agreement, nothing will require the Company to provide (or be deemed to require the Company to prepare), and the Required

Information shall be deemed to exclude, any Excluded Information (other than clause (iv) of the definition thereof).

"RRP" means the CITGO Petroleum Corporation Retirement Restoration Plan, as amended.

"Sale Order" means an order of the Court substantially in the form attached hereto as Exhibit C.

"Sale Process Parties" means, as set forth in Sale Procedures Order, Crystallex International Corporation, the Bolivarian Republic of Venezuela, PDVSA, the Company, CITGO Petroleum Corporation, and Phillips Petroleum Company Venezuela Limited and ConocoPhillips Petrozuata B.V.

"Sanctions Target" means (1) any country or territory that is the target of country-wide or territory-wide Economic Sanctions/Trade Laws, which, as of the Execution Date, are Iran, Cuba, Syria, North Korea, and certain occupied regions of Ukraine, including the Crimea region, the non-government-controlled areas of Zaporizhzhia and Kherson and the so-called Donetsk or Luhansk People's Republics; (2) a Person that is on the Specially Designated Nationals and Blocked Persons List or any of the other sanctioned persons lists published by OFAC, or any similar list of sanctioned persons issued by the U.S. Department of State; (3) a Person that is located or resident in or organized under the laws of a country or territory that is identified as the subject of country-wide or territory-wide Economic Sanctions/Trade Laws; or (4) an entity that, under applicable Economic Sanctions/Trade Laws, is automatically a target of restrictions or prohibitions because it is owned or controlled by a country or territory identified in clause (1) or Person in clauses (2) or (3) above.

"Security Incident" means any unauthorized or unlawful access, acquisition, exfiltration, manipulation, erasure, loss, use, or disclosure that compromises the confidentiality, integrity, availability or security of Sensitive Data or the Systems, or that triggers any reporting requirement under any breach notification Law or contractual provision, including any ransomware or denial of service attacks that prevent or materially degrade access to Sensitive Data or the Systems.

"Sensitive Data" means all Personal Information, confidential information, proprietary information, intellectual property, and any other information protected by applicable Law or contract that is collected, maintained, stored, transmitted, used, disclosed, or otherwise processed by, for or on behalf of the Acquired Companies.

"Solvent" means, with respect to any Person as of a particular date, that on such date, such Person and its Subsidiaries (on a consolidated basis) (a) have property with fair value greater than the total amount of their debts and liabilities, contingent (it being understood that the amount of contingent liabilities at any time shall be computed as the amount that, in light of all the facts and circumstances existing at such time, represents the amount that can reasonably be expected to become an actual or matured liability in the ordinary course), subordinated or otherwise, (b) have assets with present fair salable value not less than the amount that will be required to pay their liability on their debts as they become absolute and matured in the ordinary course, (c) will be able generally to pay their debts and liabilities, subordinated, contingent or otherwise, as they become

absolute and matured in the ordinary course, (d) are not engaged in business or a transaction, and are not about to engage in business or a transaction, for which their property would constitute an unreasonably small capital and (e) does not intend to, and does not believe that it will, incur debts or liabilities beyond such Person's ability to pay such debts and liabilities as they mature.

"Special Master Transaction Expenses" means, as provided in the Sale Procedures Order and the May Order (in each case as in effect on Execution Date), the Special Master's compensation and any out-of-pocket costs, fees and expenses incurred by the Special Master in connection with the Transactions for investment bankers, third party consultants, legal counsel and any of his other Representatives or Advisors (as defined in the Sale Procedures Order), which for the avoidance of doubt will include fees and expenses of Weil, Gotshal & Manges LLP, Potter Anderson & Carroon LLP, Jenner & Block LLP, Evercore and any other advisors engaged by the Special Master and paid by the Sale Process Parties and Additional Judgment Creditors pursuant to the procedures set forth in the May Order.

"Specially Designated Nationals and Blocked Persons List" means the list of blocked persons, specifically designated nationals, specially designated terrorists, specially designated global terrorists, foreign terrorist organizations, specially designated narcotics traffickers, and blocked vessels referenced in Appendix A to 31 CFR Chapter V, as updated and made available at http://www.treasury.gov/sdn.

"Specified Debt" means the Debt set forth in Section 1.1(d) of the Company Disclosure Schedules.[63]

"Specified Information" means information furnished by Designated Managers to the Special Master (a) as used in Article IV, with respect to the representations and warranties relating to the Acquired Companies, and (b) as used in Section 6.10, in connection with such covenant.

"Subsidiary" means, when used with respect to any Person, any other Person, whether incorporated or unincorporated, of which (a) more than fifty percent of the voting securities or other ownership interests is owned by such Person or one or more of its Subsidiaries, (b) such Person or one or more of its Subsidiaries is a general partner or holds a majority of the voting interests of a partnership or (c) securities or other interests having by their terms ordinary voting power to elect more than fifty percent of the board of directors or others performing similar functions with respect to such corporation or other organization, are directly owned or controlled by such Person or by any one or more of its Subsidiaries.

"Systems" means the information technology systems, operational technology systems, and infrastructure used, owned, leased or licensed by or for the Acquired Companies, including industrial control systems, software, computer programs (in both source and object code form), servers, databases, firmware, hardware, equipment, networks, record keeping, communications, telecommunications, interfaces, platforms, peripherals and related systems.

---

[63] **Note to Bidder**: The Specified Debt construct is intended to provide flexibility in the event the bidder desires to roll all or a portion of the CITGO bonds.

"Tax" or "Taxes" means (a) all federal, state, local or foreign taxes, charges, fees, levies or other assessments, including, all net income, excise, stamp, real or personal property, ad valorem, withholding, social security (or similar), unemployment, occupation, use, production, service, service use, license, net worth, payroll, franchise, severance, transfer, recording, employment, premium, windfall profits, environmental, customs duties, capital stock, profits, disability, sales, registration, value added, alternative or add-on minimum, estimated taxes and any other taxes of any kind whatsoever; and (b) all interest, penalties, fines and additions to tax imposed in connection with any item described in clause (a) of this definition (c) any liability for the payment of any amounts of the type described in clause (a) or (b) as a result of being (or ceasing to be) a member of an affiliated, consolidated, combined, unitary, aggregate or similar group for any period, including pursuant to Treasury Regulation Section 1.1502-6 or any similar applicable Law; and (d) any liability for the payment of any amounts of the type described in clauses (a)-(c) as a result of being treated as a successor or transferee to any Person (whether by Contract, statute or otherwise), as a result of any secondary liability or as a result of any express or implied obligation to indemnify any other Person.

"Tax Returns" means any return, report, form or similar statement filed or required to be filed with respect to any Tax (including any attached schedules), including, any information return, claim for refund, amended return or declaration of estimated Tax.

"Taxing Authority" means any Governmental Body exercising any authority to impose, assess or collect any Tax or any other authority exercising Tax regulatory authority.

"Termination Fee" means $[●].[64]

"Termination Release" means that certain release in the form attached hereto as Exhibit E or otherwise in form and substance acceptable to the Special Master.[65]

"Topping Period" means the period beginning on the Commencement Date and ending on the date that is thirty (30) calendar days after the Commencement Date or such other date or extended date as approved by the Court.

"Transaction Documents" means this Agreement, the Sale Order, the Escrow Agreement, the Paying Agent Agreement, the Debt Commitment Letter, the Equity Commitment Letters, and all other agreements and instruments to be executed by the Buyer, the Special Master and/or the Company at or prior to the Closing pursuant to this Agreement.

"Transactions" means the transactions contemplated by this Agreement and the other Transaction Documents.

"Transfer Taxes" means any real property transfer, sales, use, value added, stamp, documentary, recording, registration, conveyance, stock transfer, intangible property transfer,

---

[64] **Note to Bidder**: Termination Fee to be a fixed dollar amount equal to three percent (3%) of value of Attached Judgments expected to be satisfied, whether in cash or agreed non-cash consideration, by sale proceeds at Closing (*i.e.*, no credit for escrowed funds, earn-outs, or similarly contingent consideration) up to a maximum of $150 million.

[65] **Note to Bidder**: Bracketed language to be included for credit bidders.

personal property transfer, gross receipts, registration, duty, securities transactions or similar fees or Taxes or governmental charges (together with any interest or penalty, addition to Tax or additional amount imposed) as levied by any Taxing Authority or other Governmental Body in connection with the Transactions, including any payments made in lieu of any such Taxes or governmental charges that become payable in connection with the Transactions.

"<u>Treasury Regulations</u>" means the regulations promulgated under the Code.

"<u>VDR</u>" means the virtual data room established by Representatives of the Special Master to facilitate the provisions of information to potential bidders pursuant to the Sale Procedures Order.

"<u>Willful Breach</u>" means a deliberate act or a deliberate failure to act, which act or failure to act constitutes in and of itself a material breach of any representation, warranty, covenant or agreement set forth in this Agreement, which breach was the conscious object of the act or failure to act.

"<u>2020 Bonds</u>" means the 8.50% senior secured notes due in 2020 in the aggregate principal amount of $3,367,529,000, issued by PDVSA pursuant to the Indenture.

"<u>2020 Bondholders</u>" means the holders of the 2020 Bonds.

## **Exhibit B**

**Other Bid Materials Submitted by Bidder B**

March 7, 2025

**VIA EMAIL**

Evercore
909 Fannin, Suite 1800
Houston, Texas 77010
Attention:  Ray Strong; William Hiltz
Email:  ray.strong@evercore.com; hiltz@evercore.com

with a copy to:

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, New York 10153
Attention: Matt Barr; Eoghan P. Keenan; Chase Bentley
Email: matt.barr@weil.com; eoghan.keenan@weil.com; chase.bentley@weil.com

Dear Messrs. Strong and Hiltz:

      We are pleased to submit this confidential letter to you setting forth the terms of a definitive proposal (this "*Proposal*") on behalf of ███████████████████ (collectively with its affiliates ███████ *we*" or "*us*") pursuant to ████████████ acquire 100% of the outstanding shares (the "*Shares*") of PDV Holding, Inc. ("*PDVH*"), the sole shareholder of CITGO Holding, Inc. ("*CITGO Holding*"), which is in turn the sole shareholder of CITGO Petroleum Corporation ("*CITGO Petroleum*," and together with CITGO Holding, "*CITGO*," and CITGO together with PDVH, the "*Company*"), upon the terms and subject to the conditions set forth herein (the "*Proposed Transaction*").



March 7, 2025
Page 2



---

[1] Unless otherwise defined herein, all capitalized terms used shall have the meanings ascribed to them in the *Sixth Revised Proposed Order (A) Establishing Sale and Bidding Procedures, (B) Approving Special master's Report and Recommendation Regarding Proposed Sale Procedures Order, (C) Affirming Retention of Evercore as Investment Banker by Special Master and (D) Regarding Related Matters* [D.I. 481] (as amended, restated, supplemented or otherwise modified from time to time, the "***Sale Procedures Order***") filed in the matter of *Crystallex International Corp. v. Bolivarian Republic of Venezuela*, D. Del. C.A. No. 1:17-mc-00151-LPS.

March 7, 2025
Page 3



**The Acquisition**



has been a long-term investor in the energy space, having deployed tens of billions of dollars in public and private energy companies over many years. We are committed to enhancing the world-class assets of CITGO and continuing to deliver products vital to the economy. The management team we have assembled has decades of experience leading companies across the energy industry and the expertise to ensure CITGO continues to operate according to the highest standards of safety and reliability for the benefit of its people, customers, and communities.

Issues arising from the risks involved in the refining business can significantly affect individuals, communities, the environment, customers, and suppliers. As an experienced investor in natural resource businesses, ▇▇▇ embraces its responsibility to minimize these risks. To that end, we are committed to (i) attracting the best team to manage the Company (a team we have already begun assembling as described above), (ii) investing in the most thorough maintenance and asset-integrity practices, (iii) providing comprehensive training to all team members, (iv) investing in the latest technology to improve productivity, and (v) deploying state-of-the-art incident response plans. ▇▇▇ aims for CITGO to be an industry leader in personal and process safety management, which would be a fundamental part of the Company's operating philosophy following the consummation of a Proposed Transaction.

We have delivered a fully conforming proposal consistent with the stalking horse bid instruction letter, dated February 10, 2025, delivered by Evercore on behalf of the Special Master (the "***Stalking Horse Bid Instruction Letter***"). Given the Special Master's emphasis that certainty of financing is critical, our Proposal does not contemplate any financing contingencies and includes agreed forms of financing commitment letters that would be executed concurrently with the Purchase Agreement (as defined below). Therefore, we are uniquely positioned to quickly negotiate definitive documentation, obtain any necessary pre-closing approvals, and ensure a rapid, smooth, and successful transaction that maximizes stakeholder value.

March 7, 2025
Page 4

**Proposal**

The principal terms of the Proposal are set forth below:

      A.    <u>Proposed Transaction Structure</u>. ▮▮▮▮▮▮ acquire the Company through a purchase of the Shares pursuant to the terms of a negotiated, mutually acceptable definitive written agreement consistent with the terms of this Proposal and the Exhibits attached hereto (the "***Purchase Agreement***"). As this Proposal contemplates an acquisition of 100% of the outstanding equity interests of PDVH, the Proposed Transaction does not contemplate any minority shareholder rights, minority protections, or other terms.

      B.    <u>Stock Purchase Agreement</u>. Attached to this Proposal as <u>Exhibit A-1</u>, please find a Word version of a draft Stock Purchase Agreement (the "***Proposed SPA***") that provides for the acquisition of all of the Acquired Interests, and attached as <u>Exhibit A-2</u> is a PDF redline marked to show our proposed changes (including filling in blanks) to the bid draft Stock Purchase Agreement (the "***Bid Draft SPA***"). Attached to this Proposal as <u>Exhibit B-1</u>, please find a Word version of the proposed Company Disclosure Schedules and Buyer Disclosure Schedules (the "***Schedules***") to accompany the Proposed SPA, and attached as <u>Exhibit B-2</u> is a PDF redline marked to show our changes to the Schedules marked against the drafts that were provided on March 5, 2025 and March 3, 2025, respectively.

      C.    <u>Identity of Purchaser</u>. As noted above, the purchaser will be ▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮, which has sufficient financial wherewithal to timely consummate the Proposed Transaction on the terms included herein, and is prepared to move forward on that basis. Consummation of the Proposed Transaction will not be conditioned upon the involvement or capital contribution of any third-party partners.

      D.    <u>Purchase Price</u>. Based upon the information provided to us to date, we are offering USD $3,422,000,000 in cash for the Shares which, as calculated ▮▮▮▮▮▮▮ assuming the Court makes the determination to distribute the cash to the current outstanding writs in accordance with the priority waterfall, will pay the outstanding writs of Claimholders through OIEG and HII as illustrated on <u>Annex 1</u>. The cash purchase price assumes an aggregate amount equal to $100,000,000 for Advanced Transaction Expenses Amount, the Closing Transaction Expenses, and the Expense Reserve Holdback Amount (as such terms are defined in the Bid Draft SPA). The proposed purchase price does not include any non-cash consideration, and we do not anticipate effectuating any related transactions in connection with the Proposed Transaction, except with respect to obtaining financing.

      E.    <u>Sources of Financing</u>. The Proposed Transaction and related fees and expenses will be financed by $3,500,000,000 of funded 1L/2L debt from ▮▮▮▮ and other third-party lenders and an assumed $1,959,000,000 of closing balance sheet cash.[2] Post-closing, the Company will have at least $2,800,000,000 of additional cash availability, which is more than sufficient to cover any shortfalls in the closing cash position that may result from delivered inventory, closing date net working capital or interim period operational performance that fall below the projections that inform the balance sheet cash assumed on <u>Annex 1</u>. We ▮▮▮▮▮▮▮▮▮▮
▮▮▮▮ have attached to this Proposal as <u>Exhibit C-1</u> an agreed form of debt commitment letter (to be executed and delivered concurrently with the Purchase Agreement) evidencing a total commitment of up to $3,500,000,000 in funded debt financing. In addition, attached as <u>Exhibit C-2</u> is an agreed form of debt commitment letter (to be executed and delivered concurrently with the Purchase Agreement) from ▮▮▮▮▮

---

[2] The closing balance sheet cash amount assumes that the Company's senior notes due 2025 and 2026 are repaid prior to the Closing, and the Company's senior notes due 2029 remain outstanding as of the closing.

March 7, 2025
Page 5

███████ providing commitments for a $2,000,000,000 asset-based revolving facility for working capital and liquidity that is expected to be undrawn at closing of the Proposed Transaction based on current assumptions. In combination, these commitments allow ███████ certainty of financing for the Proposed Transaction with a prudent balance sheet and robust liquidity to position the Company to continue to invest, grow, and weather the cycles inherent in the refining industry.

Additionally, attached hereto as <u>Exhibit C-3</u> is a final form of equity commitment letter for $300,000,000. This cash equity investment by ████ will not be distributed to Claimholders but will be funded into a reserve account (and therefore we do not anticipate receiving bid credit for this portion of the investment and it is not included in our purchase price stated above). The reserve account is in addition to, and not included in the calculation of, the projected starting cash balance shown on <u>Annex 1</u>.

F.    <u>Good Faith Deposit</u>. Upon execution of the Purchase Agreement, the Purchaser will make a cash deposit of $50,000,000 into an escrow account pursuant to a mutually agreeable escrow agreement, which will be distributed as set out in the Purchase Agreement.

G.    <u>Purchaser Approvals</u>. We have received all requisite approvals required to make this Proposal. Final approval by ███████ committee of the Proposed Transaction will require finalization of the definitive documents, which we expect could be completed in short order given our minimal proposed edits to the Bid Draft SPA.

H.    <u>Due Diligence Requirements</u>. This proposal is not subject to any remaining due diligence.

I.



J.

K.    <u>Special Master Consent</u>. We hereby consent for Robert B. Pincus, in his capacity as Special Master for the Court (the "***Special Master***"), in his sole discretion, to share information with U.S. Government regulators, including the U.S. Department of the Treasury's Office of Foreign Assets Control, as well as the Sale Process Parties, subject to the limitations of bidding Sale Process Parties to receive bid information (as outlined in the December Order), pertaining to this Proposal; <u>provided</u>, that the Special Master seeks confidential treatment for information pertaining to this Proposal shared with the U.S.

Government regulators; provided, further, that the Special Master ███████ if the Special Master is notified by a U.S. Government regulator of a request for information pertaining to this Proposal pursuant to the Freedom of Information Act, 5 U.S.C. § 552.

L.    Cooperation. We (i) agree that our advisors will coordinate in good faith with the Special Master's advisors to discuss and explain our regulatory and other consent analysis, strategy and timeline for securing all such approvals and consents as soon as reasonably practicable and (ii) agree to cooperate with the Special Master to provide pertinent factual information regarding our ownership and operations reasonably required to respond to, or otherwise analyze issues arising with respect to, U.S. sanctions laws and regulations, the Committee on Foreign Investment in the United States, any applicable antitrust laws and other relevant regulatory requirements or requests, subject to attorney-client privilege and similar rights, in each case subject to the terms of a Purchase Agreement.

M.    No Entitlement to Reimbursement. We acknowledge that submission of this Proposal alone does not entitle us to any break-up fee, termination fee, expense reimbursement, or similar type of payment or reimbursement; provided, however, that Purchase Agreement will include termination fee and expense reimbursement concepts as provided in the January Order.

N.    No Liability. We agree that (i) in no circumstance shall the Special Master or his advisors be personally or otherwise liable for any amounts or obligations owed to us, (ii) the Special Master and his advisors are acting as an arm of the Court and are entitled to judicial immunity in the performance of their duties and (iii) PDVH, CITGO, and their respective officers, directors and advisors will have no liability or obligation to us or our affiliates, except and only to the extent it is expressly provided for in the Purchase Agreement if, as and when executed.

O.    Representations and Warranties. We hereby represent and warrant as follows:

(i)    We recognize and acknowledge that the Special Master, his advisors, PDVH, CITGO, and their respective representatives make no representations, covenants, or warranties (or any other promise) as to the accuracy or completeness of any information provided in the data room or otherwise made available by the Special Master and his advisors in connection with the bid process, except as otherwise provided in the Purchase Agreement;

(ii)    Other than with respect to our reliance on the representations and warranties provided in the Purchase Agreement if, as, and when executed, we have relied solely upon our own independent review, investigation, and/or inspection of any relevant documents regarding the assets to be purchased and did not rely on any written or oral statements, representations, promises, warranties, or guaranties whatsoever, whether express or implied, by operation of law or otherwise, regarding PDVH and its subsidiaries or the completeness of any information made available in connection therewith;

(iii)    We have not engaged in any collusion with respect to the submission of our Proposal; and

(iv)    All proof of financial ability to consummate the Proposed Transaction in a timely manner and other information we have submitted to the Special Master as of the date of this Proposal is true and correct in all material respects.

P.    Bidding Procedures. We agree to be bound by the terms and conditions of the Bidding Procedures set out in the Sale Procedures Order.

March 7, 2025
Page 7

       Q.     <u>Expenses</u>. Except as may be provided in definitive written agreements, each of the Purchaser, on the one hand, and the judgment creditors of the Company, on the other, will be responsible for their own fees and expenses arising out of or in connection with the Proposed Transaction, including those of our and their respective accountants, bankers, counsel, and other advisors.

       R.     <u>Confidential Proposal</u>. Other than (x) as set forth in Paragraph J, (y) to the extent required for the Special Master to consult with the Sale Process Parties in accordance with the Bid Procedures, and/or (z) as contemplated by the December Order, neither the Company nor its affiliates or representatives will disclose the existence or contents of this letter, this Proposal, the transactions contemplated hereby, or the status or the fact of negotiations with respect thereto to any third party (other than its officers, directors, financial advisors, accountants, attorneys, and other representatives who have a need to know such information in furtherance of the transactions contemplated hereby). No public announcement or disclosure of any element of this letter or this Proposal shall be permitted without our express prior written consent.

       S.     <u>Non-Binding Offer.</u> As we have previously noted, and other than as set forth in Paragraph J and Paragraphs Q-S herein, this confidential Proposal is not intended to be legally binding and is for discussion purposes only. This Proposal is subject to, among other things, the negotiation and execution of mutually satisfactory definitive agreements containing provisions customary for this type of transaction, regulatory approvals, and satisfactory completion of our due diligence. Subject to Paragraph J and Paragraphs Q-S herein, none ██████████ Purchaser, the Company, nor any of our or their respective affiliates or representatives shall have any rights or obligations of any type or kind relating to the subject matter hereof, or contemplated hereby, unless and until definitive written agreements have been executed and delivered by each of the parties to be bound thereby.

       T.     <u>Governing Law and Jurisdiction</u>. This letter shall be governed by the substantive laws (and not the laws of conflict) of the State of Delaware. Any action, suit, litigation, claim, cause of action, arbitration, or other proceeding of any kind whatsoever against any other entity in any way, whether at law or in equity, whether in contract or in tort or otherwise, involving, arising out of, or relating to this letter or this Proposal, will be subject to the exclusive jurisdiction of the Court, or, if the Court does not have subject matter jurisdiction, such other courts of the State of Delaware or of the United States sitting within the State of Delaware and any appellate court from any thereof.

* * * * *

Thank you for the opportunity to present this Proposal. We █████████████████ ███████████ are prepared to move expeditiously to execute a Purchase Agreement and consummate the Proposed Transaction. If you have any questions concerning this Proposal, please do not hesitate to contact any of the persons listed in Paragraph I above.

Very truly yours,

████████████████████████████████

By:     _____
        Name: ██████████████
        Title: ████████████

**Annex 1**

**Purchase Price Illustration and Proceeds to Claimholders**

| Transaction Sources & Uses \| Writ Holder Waterfall Calculation | | | | |
|---|---|---|---|---|

| *$mm in USD* | | | **Illustration** | **Assumptions & Notes** |
|---|---|---|---|---|
| | | | *12/31/2025 Close* | |
| **Total Purchase Price** | | | **$3,422** | |
| (+) New 1L Debt Proceeds | | | $2,550 | |
| (+) New 2L Debt Proceeds | | | 1,000 | |
| (+) Cash on Balance Sheet at Close | | | 1,959 | Incorporates paydown of the 2025 Secured Notes and anticipated 2026 Secured Notes paydown |
| **Total Cash Drawn** | | | **$5,509** | |
| (-) Funded Debt Paydown | | | (1,205) | Utilized for the 2029 Secured Notes and Industrial Revenue Bonds |
| (-) Projected Starting Cash | | | (500) | |
| (-) Transaction Fees and Breakage | | | (382) | |
| **Total Purchase Price** | | | **$3,422** | Inclusive of the deposit |

| Writ Holder Summary | Writ | Cumulative Writ | Recovery to Writ | | |
|---|---|---|---|---|---|
| | | | $ | % | |
| Court Fees & Expenses (Estimated) | $100 | $100 | $100 | 100% | Court Fees & Expenses (Estimated) represents the Advanced Transaction Expenses Amount, the... |
| Crystallex | 1,015 | 1,115 | 1,015 | 100% | ... Closing Transaction Expenses and the Expense Reserve Holdback Amount |
| Tidewater | 80 | 1,194 | 80 | 100% | |
| ConocoPhillips (Petroz. / Hama.) | 1,410 | 2,604 | 1,410 | 100% | Writ amounts per the Motion for Final Determination (D.I. 1140) |
| OIEG & HII (Pari Passu) | 818 | 3,422 | 818 | 100% | "Illustrative Example of Total Judgment Amount... |
| ACL1 Investments | 119 | 3,541 | 0 | 0% | ... Inclusive of Estimated Post-Judgment Interest as of 12/31/2025" |
| Red Tree Investments | 348 | 3,890 | 0 | 0% | |
| Rusoro Mining | 1,553 | 5,443 | 0 | 0% | |
| ConocoPhillips (Corocoro) | 48 | 5,491 | 0 | 0% | |
| Koch | 468 | 5,959 | 0 | 0% | |
| Gold Reserve | 1,210 | 7,169 | 0 | 0% | |
| Siemens | 236 | 7,405 | 0 | 0% | |
| Consorcio Andino | 701 | 8,106 | 0 | 0% | |
| Contrarian | 396 | 8,502 | 0 | 0% | |
| ConocoPhillips (ICSID) | 11,310 | 19,812 | 0 | 0% | |

| Transaction Sources: | |
|---|---|
| (+) 1L Debt | $2,550 |
| (+) 2L Debt | 1,000 |
| (+) Cash on Balance Sheet at Close | 1,959 |
| (+) Funded Equity | 300 |
| **Total Sources** | **$5,809** |

| Additional Cash Availability: | |
|---|---|
| (+) Equity Reserve Account | $300 |
| (+) Projected Starting Cash | 500 |
| (+) Undrawn ABL | 2,000 |
| **Total Additional Cash Availability** | **$2,800** |

| Transaction Uses: | |
|---|---|
| (+) Court Fees & Writ Extinguishment | $3,422 |
| (+) Funded Debt Paydown | 1,205 |
| (+) Equity Reserve Account | 300 |
| (+) Projected Starting Cash | 500 |
| (+) Transaction Fees & Expenses | 382 |
| **Total Uses** | **$5,809** |

## STOCK PURCHASE AGREEMENT

dated as of

[●]

between

██████████████

and

ROBERT B. PINCUS,

solely in his capacity as the Special Master for the United States District Court for the District of Delaware

NOTE: STRICTLY PRIVATE AND CONFIDENTIAL DRAFT FOR DISCUSSION PURPOSES ONLY AND SUBJECT IN ALL RESPECTS TO THE CONFIDENTIALITY AGREEMENT SIGNED BETWEEN THE SPECIAL MASTER (AS DEFINED HEREIN) AND RECIPIENT (OR ITS AFFILIATE).  CIRCULATION OF THIS DRAFT SHALL NOT GIVE RISE TO ANY DUTY TO NEGOTIATE OR CREATE OR IMPLY ANY OTHER LEGAL OBLIGATION.  NO LEGAL OBLIGATION OF ANY KIND WILL ARISE UNLESS AND UNTIL A DEFINITIVE WRITTEN AGREEMENT IS EXECUTED AND DELIVERED BY ALL PARTIES.

# TABLE OF CONTENTS

Page

ARTICLE I DEFINITIONS AND INTERPRETIVE MATTERS ................................................2

    Section 1.1.    Certain Defined Terms ................................................2
    Section 1.2.    Other Definitional and Interpretive Matters ................................2

ARTICLE II SALE AND PURCHASE OF THE SHARES; CLOSING ......................................4

    Section 2.1.    Sale and Purchase of Shares ................................................4
    Section 2.2.    Closing ................................................................4
    Section 2.3.    Closing Deliveries of the Parties ................................................5

ARTICLE III PURCHASE PRICE; CLOSING DATE PAYMENTS ........................................5

    Section 3.1.    Purchase Price ................................................5
    Section 3.2.    Closing Transaction Expenses; Funds Flow Memorandum .................5
    Section 3.3.    Good Faith Deposit ................................................6
    Section 3.4.    Closing Date Payments by the Buyer ................................................6
    Section 3.5.    Withholding ................................................7

ARTICLE IV REPRESENTATIONS RELATING TO THE COMPANY AND THE
        SPECIAL MASTER ................................................7

    Section 4.1.    Corporate Existence; Title to Shares ................................................8
    Section 4.2.    Governmental Authorization ................................................8
    Section 4.3.    Non-Contravention ................................................9
    Section 4.4.    Capitalization ................................................9
    Section 4.5.    Subsidiaries; Non-Controlled Entities. ................................................9
    Section 4.6.    Financial Statements ................................................11
    Section 4.7.    Absence of Certain Changes ................................................11
    Section 4.8.    No Undisclosed Material Liabilities ................................................12
    Section 4.9.    Legal Proceedings ................................................12
    Section 4.10.    Taxes ................................................12
    Section 4.11.    Company Benefit Plans; Employment ................................................14
    Section 4.12.    Compliance with Laws; Permits ................................................18
    Section 4.13.    Regulatory Matters ................................................19
    Section 4.14.    Environmental Matters ................................................20
    Section 4.15.    Title to Properties ................................................21
    Section 4.16.    Material Contracts ................................................21
    Section 4.17.    Intellectual Property and Data Privacy ................................................23
    Section 4.18.    Brokers; Financial Advisor ................................................25
    Section 4.19.    Real Property ................................................25
    Section 4.20.    Affiliate Transactions ................................................27
    Section 4.21.    Insurance ................................................27
    Section 4.22.    No Additional Representations ................................................27

ARTICLE V REPRESENTATIONS AND WARRANTIES OF THE BUYER ..........................28

Section 5.1.     Corporate Existence and Power ................................................28
Section 5.2.     Corporate Authorization .........................................................29
Section 5.3.     Governmental Authorization ...................................................29
Section 5.4.     Non-Contravention .................................................................29
Section 5.5.     Litigation ...............................................................................29
Section 5.6.     Regulatory Matters .................................................................30
Section 5.7.     Financing ...............................................................................31
Section 5.8.     Solvency .................................................................................33
Section 5.9.     Purported Equity Pledge ........................................................33
Section 5.10.    [Reserved.] .............................................................................33
Section 5.11.    Closing Consideration ............................................................33
Section 5.12.    No Additional Representations ...............................................33

ARTICLE VI COVENANTS .......................................................................................34

Section 6.1.     Conduct of the Business Pending the Closing ........................34
Section 6.2.     Access to Information .............................................................40
Section 6.3.     Regulatory Approvals; Third Party Consents .........................42
Section 6.4.     Further Assurances .................................................................45
Section 6.5.     Confidentiality .......................................................................45
Section 6.6.     Indemnification, Exculpation and Insurance ..........................45
Section 6.7.     Public Announcements ...........................................................46
Section 6.8.     Employee Matters ..................................................................47
Section 6.9.     The Buyer's Obligations in Respect of Debt Financing ..........50
Section 6.10.    Company's Obligations in Respect of Debt Financing ............53
Section 6.11.    Tax Matters ............................................................................57
Section 6.12.    R&W Insurance Policy ...........................................................57
Section 6.13.    Notices of Certain Events ......................................................58
Section 6.14.    No Control of Other Party's Business .....................................59
Section 6.15.    OFAC ......................................................................................59
Section 6.16.    Bidder Protections and Competing Proposals .........................59
Section 6.17.    Section 280G ..........................................................................63
Section 6.18.    Financial Statements ..............................................................63
Section 6.19.    Extraordinary Payments ........................................................63
Section 6.20.    Interim Period Incentive Bonuses ..........................................64

ARTICLE VII CONDITIONS TO CLOSING ...............................................................65

Section 7.1.     Conditions Precedent to Obligations of the Parties .................65
Section 7.2.     Conditions Precedent to Obligations of the Buyer ..................65
Section 7.3.     Conditions Precedent to Obligations of the Special Master .....65
Section 7.4.     Frustration of Closing Conditions ..........................................66

ARTICLE VIII TERMINATION ..................................................................................66

Section 8.1.     Termination ............................................................................66
Section 8.2.     Effect of Termination .............................................................67
Section 8.3.     Termination Fee and Expense Reimbursement ........................68

ARTICLE IX MISCELLANEOUS ..................................................................................71

    Section 9.1.    Survival ..................................................................................71
    Section 9.2.    Expenses ..................................................................................71
    Section 9.3.    Governing Law ..................................................................................71
    Section 9.4.    Dispute Resolution; Consent to Jurisdiction........................................71
    Section 9.5.    Consent to Service of Process; Waiver of Jury....................................72
    Section 9.6.    Entire Agreement ..................................................................................72
    Section 9.7.    Amendments and Waivers ....................................................................73
    Section 9.8.    Notices ..................................................................................73
    Section 9.9.    Severability ..................................................................................74
    Section 9.10.    Binding Effect; Assignment.................................................................74
    Section 9.11.    No Third Party Beneficiaries ...............................................................75
    Section 9.12.    Non-Recourse ..................................................................................75
    Section 9.13.    Specific Performance ...........................................................................75
    Section 9.14.    Successors and Assigns........................................................................76
    Section 9.15.    Release ..................................................................................76
    Section 9.16.    Counterparts ..................................................................................77
    Section 9.17.    Debt Financing Sources .......................................................................77
    Section 9.18.    Special Master and his Representatives' Judicial Immunity ...............78


Definitions
EXHIBITS

Exhibit A – Escrow Agreement
Exhibit B – Paying Agent Agreement
Exhibit C – Form of Sale Order

# DEFINED TERMS

| Term | Section |
|------|---------|
| Acceptable Confidentiality Agreement | Section 6.10(a)(x) |
| Acquired Companies | Annex A |
| Additional Judgment Creditors | Annex A |
| Advanced Transaction Expenses | Annex A |
| Affected Employees | Section 6.8(c) |
| Affiliate | Annex A |
| Affiliate Transactions | Section 4.20 |
| Agreement | Preamble |
| Anti-Corruption Laws | Annex A |
| Antitrust Laws | Annex A |
| Attached Judgment | Annex A |
| Audited Financial Statements | Section 4.6(a) |
| Base Bid Agreement | Section 6.16(d) |
| Bolivarian Republic of Venezuela | Section 1.2(a)(ix) |
| Bonus Amounts | Section 6.8(g) |
| Business Day | Annex A |
| Business Unit | Annex A |
| Buyer | Preamble |
| Buyer Disclosure Schedules | Article V |
| Buyer Documents | Section 5.2 |
| Buyer Subsidiary | Annex A |
| CapEx Budget | Section 6.1(b)(iii) |
| Cash | Annex A |
| Cause | Section 1.2(a)(x) |
| CITGO Petroleum | Annex A |
| Claim | Annex A |
| Claimholders | Recitals |
| Closing | Section 2.2 |
| Closing Consideration | Annex A |
| Closing Transaction Expenses | Annex A |
| Closing Transaction Expenses Statement | Section 3.2(a) |
| COBRA | Annex A |
| Code | Annex A |
| Collective Bargaining Agreement | Section 4.11(n) |
| Commitment Letters | Section 5.7(a) |
| Company | Preamble |
| Company Balance Sheet | Section 4.6(a) |
| Company Balance Sheet Date | Section 4.6(a) |
| Company Benefit Plan | Annex A |
| Company By-Laws | Section 4.1(a) |
| Company Charter | Section 4.1(a) |
| Company Collective Bargaining Agreement | Section 4.11(n) |
| Company Disclosure Schedules | Article IV |

iv

| Term | Section |
|------|---------|
| Company Environmental Permits | Section 4.14 |
| Company Fundamental Representations | Annex A |
| Company Intellectual Property | Section 4.17(a) |
| Company Material Adverse Effect | Annex A |
| Company Owned Intellectual Property | Section 4.17(a) |
| Competing Proposal | Section 6.16(g)(i) |
| Confidentiality Agreement | Section 6.5 |
| Contract | Annex A |
| Court | Recitals |
| Credit Support Arrangements | Annex A |
| Debt | Annex A |
| Debt Commitment Letter | Section 5.7(a) |
| Debt Commitment Letter Effective Date | Section 6.9(c)(i) |
| Debt Financing | Section 5.7(a) |
| Debt Financing Commitments | Section 5.7(a) |
| Debt Financing Documents | Annex A |
| Debt Financing Source | Annex A |
| Debt Payoff Amount | Annex A |
| Definitive Debt Documents | Section 6.9(c)(ii) |
| Deposit Amount | Recitals |
| Deposit Amount Release Date | Section 3.3(b) |
| Deposit Forfeiture Termination Event | Annex A |
| Designated Contacts | Section 6.2(a) |
| Designated Managers | Annex A |
| Economic Sanctions/Trade Laws | Annex A |
| Execution Date | Preamble |
| Environmental Laws | Annex A |
| EPP | Annex A |
| Equitable Exceptions | Annex A |
| Equity Financing | Section 5.7(a) |
| Equity Financing Commitments | Section 5.7(a) |
| Equity Financing Sources | Annex A |
| Equity Interests | Annex A |
| Equity Pledge Litigation | Annex A |
| ERISA | Annex A |
| ERISA Affiliate | Annex A |
| Escrow Account | Annex A |
| Escrow Agent | Recitals |
| Evercore | Recitals |
| Existing Senior Secured Notes | Annex A |
| Expense Reimbursement Amount | Annex A |
| Expense Reserve Holdback Account | Annex A |
| Expense Reserve Holdback Amount | Annex A |
| Extraordinary Payment | Section 6.19 |
| Financings | Section 5.7(a) |

| Term | Section |
|------|---------|
| Financial Statements | Section 4.6(a) |
| Final Recommendation Date | Section 6.3(a) |
| Funds Flow Memorandum | Section 3.2(b) |
| GAAP | Section 4.6 |
| Good Industry Practice | Annex A |
| Governmental Body | Annex A |
| Government Contract | Annex A |
| Government Official | Section 4.13(a) |
| Hazardous Substance | Annex A |
| HSR Act | Annex A |
| Indemnitees | Section 6.6(a) |
| Indenture | Annex A |
| Initial Outside Date | Section 8.1(b) |
| Intellectual Property | Section 4.17(a) |
| Intended Tax Treatment | Section 6.11(b) |
| Interest Rate | Annex A |
| Interim Financial Statements | Section 4.6(a) |
| Interim Period | Annex A |
| IRS | Annex A |
| January Order | Annex A |
| Jointly Owned Properties | Section 4.19(c) |
| Judgment Creditors | Annex A |
| Knowledge of the Buyer | Annex A |
| Knowledge of the Company | Annex A |
| Knowledge of the Special Master | Annex A |
| Law | Annex A |
| Legal Proceeding | Annex A |
| Legal Restraint | Section 8.1(c) |
| Lien | Annex A |
| Lookback Date | Annex A |
| Material Contract | Section 4.16(a) |
| May Order | Recitals |
| Money Laundering Laws | Annex A |
| MTP | Section 6.1(b)(iii) |
| Negative Consequences | Annex A |
| New Indemnification Agreements | Section 6.6(a) |
| No-Shop Period | Annex A |
| Non-Controlled Entity | Annex A |
| Non-Parties | Section 9.12 |
| Non-Union Affected Employees | Section 6.8(c) |
| OFAC | Annex A |
| OFAC License | Annex A |
| OFAC License Applications | Annex A |
| Order | Annex A |
| Ordinary Course | Annex A |

| Term | Section |
|------|---------|
| Organizational Documents | Annex A |
| Outside Date | Section 8.1(b) |
| Owned Real Property | Section 4.19(b) |
| Parties | Preamble |
| Paying Agent | Recitals |
| Paying Agent Account | Annex A |
| Paying Agent Agreement | Recitals |
| Payoff Letters | Section 3.4(a) |
| PBGC | Section 4.11(d) |
| PCI DSS | Annex A |
| PDVSA | Recitals |
| Performance Incentive Program | Section 6.8(g) |
| Permit | Annex A |
| Permitted Liens | Annex A |
| Person | Annex A |
| Personal Information | Annex A |
| PFAS | Annex A |
| Post-Closing Tax Period | Annex A |
| Preferential Right | Annex A |
| Privacy Laws and Obligations | Section 4.17(f) |
| Procedures Summary | Annex A |
| Prohibited Modification | Section 6.9(b)(ii) |
| Purchase Price | Section 3.1 |
| Purported Equity Pledge | Annex A |
| R&W Insurance Policy | Section 6.12 |
| Real Property | Section 4.19(b) |
| Real Property Lease | Section 4.19(a) |
| Receivables Securitization Facility | Section 6.1(b)(vi) |
| Registered Intellectual Property | Section 4.17(a) |
| Related Claim | Annex A |
| Release | Annex A |
| Released Parties | Section 9.15 |
| Releasing Parties | Section 9.15 |
| Replacement Financing | Section 6.9(f) |
| Representatives | Annex A |
| Required Amount | Section 5.7(e) |
| RRP | Annex A |
| Sale Hearing | Section 6.16(c) |
| Sale Order | Annex A |
| Sale Process Parties | Annex A |
| Sale Procedures Order | Recitals |
| Sanctions Target | Annex A |
| Security Incident | Annex A |
| Sensitive Data | Annex A |
| Shares | Recitals |

| Term | Section |
|------|---------|
| Solvent | Annex A |
| Special Master | Preamble |
| Special Master and Company Related Parties | Section 8.3(g) |
| Special Master Transaction Expenses | Annex A |
| Specially Designated Nationals and Blocked Persons List | Annex A |
| Specified Debt | Annex A |
| Specified Information | Annex A |
| Subsequent Overbid Minimum | Section 6.16(e)(i) |
| Subsidiary | Annex A |
| Superior Proposal | Section 6.16(g)(ii) |
| Superior Proposal Agreement | Section 6.16(d) |
| Stalking Horse Bid Agreement | Section 6.16(d) |
| Systems | Annex A |
| Tax or Taxes | Annex A |
| Tax Proceeding | Section 4.10(c) |
| Tax Returns | Annex A |
| Taxing Authority | Annex A |
| Termination Fee | Annex A |
| Threshold | Section 6.19 |
| Topping Period | Annex A |
| Transaction Documents | Annex A |
| Transactions | Annex A |
| Transfer Taxes | Annex A |
| Treasury Regulations | Annex A |
| Turnaround/Catalyst Budget | Section 6.1(b)(iv) |
| Union | Section 4.11(n) |
| Union Affected Employees | Section 6.8(b) |
| Unsolicited Competing Proposal | Section 6.16(e) |
| Unsolicited Competing Proposal Agreement | Section 6.16(e) |
| VDR | Annex A |
| Vesting Instruments | Section 4.19(a) |
| WARN Act | Section 4.11(p) |
| Willful Breach | Annex A |
| 2020 Bondholders | Annex A |
| 2020 Bonds | Annex A |
| 6.375% Senior Secured Notes | Annex A |
| 7.000% Senior Secured Notes | Annex A |
| 8.375% Senior Secured Notes | Annex A |

## STOCK PURCHASE AGREEMENT

THIS STOCK PURCHASE AGREEMENT (this "Agreement") dated as of [●], 2025 (the "Execution Date") is entered into by and between ███████████████████████ (the "Buyer"), and Robert B. Pincus, solely in his capacity as special master (the "Special Master" and, together with the Buyer, the "Parties" and each a "Party") for the Honorable Leonard P. Stark, United States District Court for the District of Delaware (the "Court").

### W I T N E S S E T H :

WHEREAS, the Special Master has been appointed by the Court in connection with the case of *Crystallex International Corp. v. Bolivarian Republic of Venezuela* (D. Del. Case. No. 17-151-LPS) (the "Specified Litigation") pursuant to that certain Order entered by the Court on April 13, 2021 [D.I. 258], that certain Order Regarding Special Master entered by the Court on May 27, 2021 [D.I. 277] (the "May Order") and the Order (A) Establishing Sale and Bidding Procedures, (B) Approving Special Master's Report and Recommendation Regarding Proposed Sale Procedures Order, (C) Affirming Retention of Evercore Group, LLC ("Evercore") as Investment Banker by Special Master and (D) Regarding Related Matters entered by the Court on October 4, 2022 [D.I. 481] (as amended, restated, supplemented or otherwise modified from time to time, the "Sale Procedures Order").

WHEREAS, Petróleos de Venezuela, S.A., a Venezuelan company ("PDVSA"), owns all of the issued and outstanding capital stock of PDV Holding, Inc., a Delaware corporation (the "Company"), which consists of 1,000 shares of common stock, par value $1.00 per share (collectively, the "Shares").

WHEREAS, pursuant to the Sale Procedures Order, the Special Master has the authority to enter into this Agreement in making his determination to the Court as to which of the Qualified Bids (as defined in the Sale Procedures Order) was highest or best, and in making a recommendation to the Court as to which Qualified Bid is the Successful Bid (as defined in the Sale Procedures Order).

WHEREAS, the Buyer desires to purchase the Shares upon the terms and subject to the conditions set forth in this Agreement.

WHEREAS, contemporaneous with the execution of this Agreement, the Buyer has deposited with [Acquiom Clearinghouse LLC], in its capacity as escrow agent (the "Escrow Agent"), the sum of $50,000,000 (such amount, the "Deposit Amount") in cash, to be held in the Escrow Account pursuant to the terms of that certain Escrow Agreement, dated as of the date hereof and attached hereto as Exhibit A, by and among the Special Master, the Buyer and the Escrow Agent (as amended, restated, supplemented or otherwise modified from time to time, the "Escrow Agreement"), to be released in accordance with the provisions of this Agreement and the Escrow Agreement.

WHEREAS, at the Closing (as defined below), the Buyer shall deposit the Closing Consideration (as defined below) with [Acquiom Financial LLC], in its capacity as paying agent (the "Paying Agent") in cash pursuant to the terms of that certain Paying Agent Agreement, dated as of the date hereof and attached hereto as Exhibit B, by and among the Buyer, the Special Master

and the Paying Agent (as amended, restated, supplemented or otherwise modified from time to time, the "Paying Agent Agreement"), to be released to those creditors of the Bolivarian Republic of Venezuela (the "Republic") or PDVSA that are party to the Specified Litigation and who have obtained a writ of attachment on or before January 12, 2024 (the "Claimholders").

NOW, THEREFORE, in consideration of the promises and the respective representations, warranties, covenants and agreements set forth herein, the Parties agree as follows:

## ARTICLE I

## DEFINITIONS AND INTERPRETIVE MATTERS

Section 1.1.    Certain Defined Terms. Capitalized terms used in this Agreement have the meanings specified in Annex A or elsewhere in this Agreement.

Section 1.2.    Other Definitional and Interpretive Matters.

(a)    Unless otherwise expressly provided herein, for purposes of this Agreement, the following rules of interpretation shall apply:

(i)    Calculation of Time Period. When calculating the period of time before which, within which or following which any act is to be done or step is to be taken pursuant to this Agreement, the date that is the reference date in calculating such period shall be excluded. If the last day of such period is a non-Business Day, the period in question shall end on the next succeeding Business Day. The word "day" shall mean "calendar day" unless "Business Day" is expressly identified.

(ii)    Dollars. Any reference in this Agreement to "$" shall mean U.S. dollars. The specification of any dollar amount in the representations and warranties or otherwise in this Agreement or in the Exhibits or the Company Disclosure Schedules is not intended and shall not be deemed to be an admission or acknowledgment of the materiality of such amounts or items, nor shall the same be used in any dispute or controversy between the Parties to determine whether any obligation, item or matter (whether or not described herein or included in the Company Disclosure Schedules) is or is not material for purposes of this Agreement.

(iii)    Exhibits/Schedules. The Exhibits and the Company Disclosure Schedules annexed hereto or referred to herein are an integral part of this Agreement and are hereby incorporated in and made a part of this Agreement as if set forth in full herein. Any matter or item disclosed on one Schedule or section of the Company Disclosure Schedules shall be deemed to have been disclosed on each other Schedule or section of the Company Disclosure Schedules in which it is reasonably apparent on the face of such disclosure that the information is required to be included in such other Schedule or section of the Company Disclosure Schedules. Disclosure of any item on any Schedule of the Company Disclosure Schedules shall not constitute an admission, indication, acknowledgment or representation that such item or matter is material or would reasonably be expected to have a Company Material Adverse Effect. No disclosure on a Schedule of the Company Disclosure Schedules relating to a possible breach or violation of any

2

Contract, Law or Order shall be construed as an admission, indication, acknowledgment or representation that a breach or violation exists or has actually occurred. Any capitalized terms used in any Schedule of the Company Disclosure Schedules or Exhibit but not otherwise defined therein shall be defined as set forth in this Agreement.

(iv)　　Gender and Number. Any reference in this Agreement to gender shall include all genders, and words imparting the singular number only shall include the plural and vice versa.

(v)　　Headings. The provision of a table of contents, the division of this Agreement into Articles, Sections and other subdivisions and the insertion of headings are for convenience of reference only and shall not affect or be utilized in construing or interpreting this Agreement. All references in this Agreement to any "Section" or "Article" are to the corresponding Section or Article of this Agreement unless otherwise specified.

(vi)　　Herein. The words "herein," "hereinafter," "hereof," and "hereunder" refer to this Agreement as a whole and not merely to a subdivision in which such words appear unless the context otherwise requires.

(vii)　　Inclusive Terms. The word "including" or any variation thereof means (unless the context of its usage otherwise requires) "including, without limitation" and shall not be construed to limit any general statement that it follows to the specific or similar items or matters immediately following it. The term "any" means "any and all." The term "or" shall not be exclusive and shall mean "and/or."

(viii)　　Reflected On or Set Forth In. An item arising with respect to a specific representation or warranty shall be deemed to be "reflected on" or "set forth in" a balance sheet or financial statements, to the extent any such phrase appears in such representation or warranty, if (A) there is a reserve, accrual or other similar item underlying a number on such balance sheet or financial statements that related to the subject matter of such representation or warranty, (B) such item is otherwise specifically set forth on the balance sheet or financial statements or (C) such item is reflected on the balance sheet or financial statements and is specifically set forth in the notes thereto.

(ix)　　Bolivarian Republic of Venezuela. Any reference herein to the "Bolivarian Republic of Venezuela" or the "Republic" shall include any successor nation thereto, and shall encompass any and all governments and administrations that purport to be Venezuela's legitimate governing body.

(x)　　Special Master and the Acquired Companies. Any pre-Closing obligation of any of the Acquired Companies hereunder shall be deemed to include an obligation of the Special Master to "Cause" the Acquired Companies to comply with such obligation. With respect to any obligation of the Special Master hereunder to "Cause" any of the Acquired Companies to take an action or refrain from taking an action, or which otherwise requires action (or refraining from action) by any such Acquired Company, such obligation shall be deemed to be an obligation of the Special Master to use reasonable best efforts to cause the Company or the applicable Company Subsidiary to take such action (or

refrain from taking such action), including by seeking an order from the Court with respect to such action or refraining from taking such action. For the avoidance of doubt, none of the Acquired Companies, PDVSA or the Republic is a party hereto, and the Special Master shall not be deemed to be in breach of any of its obligations under this Agreement as a result of a failure by the Special Master to Cause any of the Acquired Companies to take any action or refrain from taking any action prior to the Sale Entry Order.

(xi)    "Made Available." Unless expressly stated otherwise, references to any document or information having been "delivered", "furnished", "provided" or "made available" to the Buyer or its Representatives shall mean such document or information has been posted to the VDR or transmitted by email from the Special Master's advisors to the Buyer or its Representatives (in each case, with the counsel to the Buyer specified in Section 9.8 copied on such email communications) at least one (1) Business Day prior to the Execution Date.

(b)    The Parties have participated jointly in the negotiation and drafting of this Agreement and, in the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as jointly drafted by the Parties and no presumption or burden of proof shall arise favoring or disfavoring any Party by virtue of the authorship of any provision of this Agreement. The language used in this Agreement shall be deemed to be the language chosen by the Parties to express their mutual intent, and no rule of strict construction shall be applied against any Person.

## ARTICLE II

## SALE AND PURCHASE OF THE SHARES; CLOSING

Section 2.1.    Sale and Purchase of Shares. Subject to approval of this Agreement by the Court, and upon the terms and subject to the conditions set forth in this Agreement and in the Sale Order, and pursuant to the authority provided to the Special Master under the Sale Procedures Order and the May Order, at the Closing, the Special Master shall sell, assign, transfer, convey and deliver to the Buyer, and the Buyer shall purchase and accept from the Special Master, the Shares, free and clear of all Liens (other than Permitted Liens and transfer restrictions imposed by applicable securities Laws).

Section 2.2.    Closing. The consummation of the sale and purchase of Shares (the "Closing") shall take place at 10:00 a.m., Eastern Time, on a date to be specified by the Parties, which date shall be no later than the tenth (10th) Business Day after satisfaction or waiver of the conditions set forth in Article VII (other than those conditions that by their nature are to be satisfied at the Closing, but subject to the satisfaction or waiver of those conditions at such time), remotely by electronic exchange of documents and signatures, unless another time, date or place is agreed to in writing by the Parties. The date on which the Closing actually occurs is referred to in this Agreement as the "Closing Date."

Section 2.3.    <u>Closing Deliveries of the Parties</u>.

(a)    <u>Deliveries by the Special Master</u>. At or prior to the Closing, the Special Master shall deliver or otherwise cause to be delivered to the Buyer:

(i)    <u>Stock Certificate</u>. The original certificate evidencing all of the Shares, duly endorsed in blank, or accompanied by a stock power duly executed in blank by the Special Master; and

(ii)    <u>FIRPTA Certificate</u>. A validly issued certificate from the Company, in such form consistent and in accordance with the requirements of Treasury Regulations Sections 1.897-2(h)(2) and 1.1445-2(c)(3)(i) and a validly issued notice to the IRS from the Company in accordance with the provisions of Treasury Regulations Section 1.897-2(h)(2) (such certificate and notice issued by the Company, the "<u>FIRPTA Certificate</u>").

(b)    <u>Deliveries by the Buyer</u>. At or prior to the Closing, the Buyer will deliver or cause to be delivered to the Special Master a certificate, dated as of the Closing Date, signed by an authorized officer of the Buyer as to the satisfaction of the conditions set forth in <u>Section 7.3(a)</u> and <u>Section 7.3(b)</u>.

# ARTICLE III

# PURCHASE PRICE; CLOSING DATE PAYMENTS

Section 3.1.    <u>Purchase Price</u>. The aggregate consideration payable by the Buyer for the Shares shall be $[3,422,000,000] (the "<u>Purchase Price</u>"). The Purchase Price shall not be subject to any adjustments (including, for the avoidance of doubt, with respect to the Debt Payoff Amount).

Section 3.2.    <u>Closing Transaction Expenses; Funds Flow Memorandum</u>.

(a)    No later than three (3) Business Days prior to the Closing Date, the Special Master shall provide the Buyer with a written statement (the "<u>Closing Transaction Expenses Statement</u>") reflecting the Special Master's calculation of Closing Transaction Expenses in accordance with the definition of Closing Transaction Expenses hereunder, along with reasonable supporting documentation. The Closing Transaction Expenses Statement shall be binding on the Parties for purposes of this <u>Section 3.2</u> and shall be used to determine the Closing Consideration.

(b)    No later than one (1) Business Day after the Special Master's delivery of the Closing Transaction Expenses Statement, the Special Master shall distribute to the Buyer a detailed funds flow memorandum in Excel format (including all underlying calculations, formulas and amounts therein) setting forth all payments to be made by or on behalf of the Parties at Closing in accordance with this Agreement (the "<u>Funds Flow Memorandum</u>"). The Special Master will consider in good faith the Buyer's reasonable comments and changes to the Funds Flow Memorandum. The Parties agree that the Buyer shall be entitled to rely on the Funds Flow Memorandum in making payments under <u>Section 3.4</u> and the Buyer shall not be responsible for the calculations or the determinations regarding such calculations in the Funds Flow Memorandum or liable for any claim by any Claimholder that any payments made in accordance with the Funds

Flow Memorandum were not made in accordance with the Priority Order [D.I. 996], dated March 1, 2024 in the Specified Litigation or were otherwise improper.

Section 3.3.    <u>Good Faith Deposit</u>. The Buyer has deposited into the Escrow Account with the Escrow Agent an amount equal to Deposit Amount in cash. The Deposit Amount will be released by the Escrow Agent and delivered to either the Buyer or, at the direction of the Special Master, the Paying Agent, in accordance with the provisions of this Agreement, the Escrow Agreement and the Sale Procedures Order. The Deposit Amount will be distributed out of the Escrow Account as follows (and the Buyer and the Special Master hereby agree to promptly deliver joint written instructions to the Escrow Agent to the extent required by the Escrow Agent to effect such distributions as and when required hereunder):

(a)    if the Closing occurs, the Buyer and the Special Master shall jointly instruct the Escrow Agent in writing to disburse the Deposit Amount to the Paying Agent by wire transfer of immediately available funds out of the Escrow Account;

(b)    if a Deposit Forfeiture Termination Event occurs, the Buyer and the Special Master shall promptly (and in any event within five (5) Business Days of such termination) deliver joint written instructions to the Escrow Agent directing the release the balance of the Escrow Account to the Paying Agent Account; and

(c)    if this Agreement is terminated for any reason other than as contemplated by <u>Section 3.2(b)</u>, the Buyer and the Special Master shall promptly (and in any event within two (2) Business Days of such termination) deliver joint written instructions to the Escrow Agent directing the release of the balance of the Escrow Account to the Buyer or its designees.

Section 3.4.    <u>Closing Date Payments by the Buyer</u>.

(a)    <u>Payment in respect of Debt</u>. At the Closing, the Buyer shall pay, or cause to be paid, on behalf of the Acquired Companies, the Debt Payoff Amount by wire transfer of immediately available funds to the Persons as specified in the "payoff letters" or similar documents, executed by the applicable lender(s) (or agent thereof) or as set forth in the applicable indenture with respect to each item of Specified Debt (the "<u>Payoff Letters</u>").

(b)    <u>Payment in respect of the Closing Transaction Expenses</u>. At the Closing, the Buyer shall pay, or cause to be paid, the Closing Transaction Expenses to the applicable recipients as set forth on the Closing Transaction Expenses Statement by wire transfer of immediately available funds to such Persons.

(c)    <u>Payment in respect of Expense Reserve Holdback Amount</u>. At the Closing, the Buyer shall pay, or cause to be paid, to the Expense Reserve Holdback Account an amount equal to the Expense Reserve Holdback Amount as set forth in the Funds Flow Memorandum. The Expense Reserve Holdback Amount will be used by the Special Master to pay the Special Master's compensation and any out-of-pocket costs, fees and expenses incurred by the Special Master on or after the date of the delivery of the Closing Transaction Expenses Statement by the Special Master related to the Transactions or any Action related to or arising therefrom for investment bankers, third-party consultants, legal counsel and any of his other Representatives or Advisors (as defined in the Sale Procedures Order) and such amount shall be paid or distributed at the

direction of the Special Master; provided, that any amounts remaining in the Expense Reserve Holdback Account after all such costs, fees and expenses incurred by the Special Master have been so paid or distributed shall be paid to the Paying Agent Account as promptly as practicable upon the later of (i) three (3) years following the Closing Date and (ii) one (1) year after all Actions, if any, brought against the Special Master relating to the Transactions have been definitively adjudicated by a court of final determination.

        (d)    Payment in respect of Reimbursement for Advanced Transaction Expenses. At the Closing, in accordance with the May Order, the Buyer shall pay, or cause to be paid, an amount to the Paying Agent Account equal to the aggregate amount of the Advanced Transaction Expenses paid by the Sale Process Parties and Additional Judgment Creditors prior to the Closing (the "Advanced Transaction Expenses Amount") as set forth in the Funds Flow Memorandum.

        (e)    Payment in respect of Closing Consideration.  At the Closing, the Buyer shall pay, or cause to be paid, an aggregate amount of cash equal to the Closing Consideration to the Paying Agent Account as set forth in the Funds Flow Memorandum. The Closing Consideration distributed by the Paying Agent to a Claimholder shall constitute the full and final satisfaction of payment of the applicable Attached Judgment, including any and all claims in respect of such Attached Judgment that have been, could have been, or may be asserted against the Company or any of its Subsidiaries.

        Section 3.5.    Withholding. Notwithstanding anything to the contrary in this Agreement, the Buyer shall be entitled to deduct and withhold (without duplication) from any and all payments made under this Agreement such amounts that are required to be deducted and withheld with respect to the making of such payments under the Code or under any provisions of state, local or foreign Tax Law, provided, that the Buyer shall (i) prior to making any deduction or withholding an amount pursuant to this Section 3.5 (and in any event no later than ten (10) days prior to making any payment hereunder), provide written notice to the applicable recipient of any anticipated deduction or withholding (together with the legal basis thereof) and (ii) cooperate in good faith with the applicable recipient to reduce or eliminate any amounts that would otherwise be deducted or withheld. To the extent that any amounts are so withheld and timely paid over to the proper Taxing Authority, such withheld and deducted amounts will be treated for all purposes of this Agreement as having been paid to the recipient of the payment in respect of which such deduction or withholding was made.

## ARTICLE IV

## REPRESENTATIONS RELATING TO THE COMPANY AND THE SPECIAL MASTER

        It is represented and warranted to the Buyer based solely upon the Specified Information furnished by the Designated Managers to the Special Master in accordance with the Procedures Summary that, except as disclosed in the correspondingly numbered section of the disclosure schedules delivered to the Buyer simultaneously with the execution of this Agreement (the "Company Disclosure Schedules") (it being agreed that any matter or item disclosed in one Schedule or section of the Company Disclosure Schedules shall be deemed to have been disclosed on each other Schedule or section of the Company Disclosure Schedules in which it is reasonably

apparent on the face of such disclosure that the information is required to be included in such other Schedule or section of the Company Disclosure Schedules):

Section 4.1. <u>Corporate Existence; Title to Shares</u>.

(a)    The Company is a corporation duly incorporated, validly existing and in good standing under the Laws of the State of Delaware and has all requisite corporate powers and all governmental franchises, licenses, permits, authorizations, consents and approvals required to enable it to own, lease or otherwise hold its properties and assets and to carry on its business as now conducted, except for those the absence of which would not, individually or in the aggregate, be reasonably likely to materially impair the Acquired Companies, taken as a whole. The Company is duly qualified to do business as a foreign corporation and is in good standing under the Laws in each jurisdiction in which the character of the property owned or leased by it or the nature of its activities or the ownership or leasing of its properties make such qualification necessary, except for those jurisdictions where the failure to be so qualified would not, individually or in the aggregate, be reasonably likely to materially impair the Acquired Companies, taken as a whole. The Special Master has heretofore made available to the Buyer true, correct and complete copies of the certificate of incorporation of the Company (the "<u>Company Charter</u>"), and the by-laws of the Company (the "<u>Company By-Laws</u>"). There is no pending or, to the Knowledge of the Company, threatened Legal Proceedings for the dissolution, liquidation, insolvency, or rehabilitation of any of the Acquired Companies.

(b)    The Special Master (or his counsel or advisors) is in possession of the original certificate evidencing 100% of the Shares. PDVSA is the record and beneficial owner of all of the outstanding Shares. To the extent provided by, and subject to the decrees of, the Sale Procedures Order, the Special Master has the legal capacity, power and authority to (i) execute and deliver this Agreement and each other Transaction Document to which the Special Master is or will be a party, and (ii) surrender the Shares pursuant to the Transactions, and sell, transfer, assign, and deliver the Shares to the Buyer, in each case, the delivery of which will convey good and marketable title to the Shares, free and clear of all Liens (other than Permitted Liens and transfer restrictions imposed by applicable securities Laws).

(c)    This Agreement has been duly executed and delivered by the Special Master and, assuming due authorization, execution and delivery by the Buyer, and subject to the Sale Order Entry, will constitute, and each other Transaction Document (to the extent the Special Master is or will be a party thereto), when executed and delivered by the Special Master (assuming due authorization, execution and delivery by the other parties thereto), subject to the Sale Order Entry, will constitute, a legal, valid and binding obligation of the Special Master, enforceable against the Special Master in accordance with its terms, except that such enforcement may be limited by the Equitable Exceptions.

Section 4.2. <u>Governmental Authorization</u>. Except as set forth on <u>Section 4.2</u> of the Company Disclosure Schedules, the execution, delivery and performance by the Special Master of this Agreement and the other Transaction Documents and the consummation by the Special Master of the Transactions require no action by or in respect of, or filing with, any Governmental Body other than (a) applicable requirements of Antitrust Laws as set forth in <u>Section 4.2</u> of the Company Disclosure Schedules, (b) the OFAC License, (c) the entry of the Sale Order by the Court (the

"Sale Order Entry"), and (d) other actions or filings the absence or omission of which would not, individually or in the aggregate, be material to the business of the Acquired Companies, taken as a whole.

Section 4.3.    Non-Contravention. Except as set forth on Section 4.3 of the Company Disclosure Schedules, the execution, delivery and performance by the Special Master of this Agreement and the other Transaction Documents and the consummation by the Special Master of the Transactions do not and will not, assuming compliance with the matters referred to in Section 4.2, (a) result in any Negative Consequences under the Company Charter or the Company By-Laws or the Organizational Documents of any of the Acquired Companies or, to the Knowledge of the Company (and based only on information made available to the Acquired Companies with respect to the Non-Controlled Entities prior to the Execution Date), any of the Non-Controlled Entities, (b) contravene or conflict with or constitute a violation of any provision of any Law binding upon or applicable to the Acquired Companies or, to the Knowledge of the Company, the Non-Controlled Entities, (c) result in any Negative Consequences under any (i) Material Contract or (ii) any license, franchise, permit or other similar authorization held by the Acquired Companies, or (d) result in the creation or imposition of any Lien (other than Permitted Liens) on any asset of the Acquired Companies, except for such Negative Consequences referred to in clauses (b) or (c) or Liens referred to in clause (d) that would not, individually or in the aggregate, be material to the business of the Acquired Companies, taken as a whole.

Section 4.4.    Capitalization.

(a)    The authorized capital stock of the Company consists of 1,000 Shares. There are 1,000 Shares issued and outstanding, all of which are owned by PDVSA. The Shares have been duly authorized and are validly issued, fully paid and non-assessable and have not been issued in violation of any preemptive rights or Preferential Rights. The Shares constitute the only outstanding Equity Interests of the Company and are not subject to any Preferential Rights.

(b)    Except for this Agreement, there is no outstanding option, warrant, call, right, or Contract of any character to which the Company is a party requiring, and there are no Equity Interests of the Company outstanding which upon conversion or exchange would require, the issuance of any Shares or other securities convertible into, exchangeable for or evidencing the right to subscribe for or purchase Shares. Other than as set forth in Section 4.4(b) of the Company Disclosure Schedules, (x) there are no outstanding equity appreciation, phantom equity, stock unit, profit participation, equity, equity-based performance or similar rights with respect to the Company or any of its Subsidiaries, and (y) all of the Equity Interests of each Company Subsidiary are owned, directly or indirectly, by the Company. The Company is not a party to any voting trust or other Contract with respect to the voting, redemption, sale, transfer or other disposition of the Shares.

Section 4.5.    Subsidiaries; Non-Controlled Entities.

(a)    Section 4.5(a) of the Company Disclosure Schedules reflects a true and complete list of each entity in which the Company owns, directly or indirectly, any Equity Interests (excluding Equity Interests owned directly or indirectly by Non-Controlled Entities), and with respect to each entity (except as otherwise provided in this Section 4.5(a)), sets forth the following

information: (i) its name and jurisdiction of organization or formation; (ii) the number of authorized shares or other Equity Interests as of the date hereof (with respect to Company Subsidiaries only); and (iii) the number of issued and outstanding shares or other Equity Interests, the names of the holders thereof, and the number of shares or other Equity Interests held by each such holder (with respect to Company Subsidiaries only).  Except as set forth on Section 4.5(a) of the Company Disclosure Schedules, the Company does not, directly or indirectly, own any Equity Interests in any other entity.

(b)    Each Company Subsidiary is duly organized, validly existing and in good standing under the Laws of its jurisdiction of organization, to the extent such concepts are recognized under the Laws of the jurisdiction of its organization, and has all requisite corporate (or similar entity) power and authority to own, lease and operate its properties and to carry on its business in all material respects as now conducted, except where the failure to be so organized, existing and in good standing or to have such power and authority would not, individually or in the aggregate, be reasonably likely to be material to the business of the Acquired Companies, taken as a whole. Each Company Subsidiary: (i) is duly qualified or authorized to do business as a foreign corporation or entity and is in good standing to the extent such concepts are recognized under the Laws of each jurisdiction in which the conduct of its business or the ownership of its properties requires such qualification or authorization, except where the failure to be so qualified, authorized or in good standing would not, individually or in the aggregate, be reasonably likely to be material to the business of the Acquired Companies, taken as a whole and (ii) has full organizational power and authority to own, lease and operate its properties and carry on its business as presently conducted, except where the failure to have such power and authority would not, individually or in the aggregate, be reasonably likely to be material to the business of the Acquired Companies, taken as a whole.

(c)    The Special Master has heretofore made available to the Buyer true, correct and complete copies of the Organizational Documents of each Company Subsidiary.

(d)    The outstanding Equity Interests of each Company Subsidiary are validly issued, fully paid and non-assessable, to the extent such concepts are applicable to such Equity Interests, and have not been issued in violation of any preemptive rights or Preferential Rights or similar rights, and all such Equity Interests represented as being owned by the Company or any Company Subsidiaries are owned by it free and clear of any Liens, other than (i) Liens securing Debt of the Company or any Company Subsidiaries (which Liens shall be removed on or before the Closing), (ii) Liens relating to the transferability of securities under applicable securities Laws, (iii) Liens created by acts of the Buyer or any of its Affiliates and (iv) the Equity Pledge and Liens as a result of the 2020 Bonds. There is no outstanding option, warrant, call, Preferential Right, right or Contract to which any Company Subsidiary is a party requiring, and there are no convertible securities of any Company Subsidiary outstanding which upon conversion would require, the issuance of any Equity Interests of any Company Subsidiary or other securities convertible into Equity Interests of any Company Subsidiary. No Company Subsidiary is a party to any voting trust or other Contract with respect to the voting, redemption, sale, transfer or other disposition of the Equity Interests of such Company Subsidiary.

(e)    To the Knowledge of the Company, each Non-Controlled Entity is duly organized, validly existing and in good standing under the Laws of its jurisdiction of organization,

to the extent such concepts are recognized under the Laws of the jurisdiction of its organization, and has all requisite corporate (or similar entity) power and authority to own, lease and operate its properties and to carry on its business in all material respects as now conducted, except where the failure to be so organized, existing and in good standing or to have such power and authority would not, individually or in the aggregate, be reasonably likely to be material to the business of the Acquired Companies, taken as a whole.

Section 4.6.    Financial Statements.

(a)    Section 4.6(a) of the Company Disclosure Schedules sets forth true, correct, and complete copies of: (i) the audited consolidated balance sheet of the Acquired Companies reflected therein as of December 31, 2023, December 31, 2022, and December 31, 2021, the related audited consolidated statements of income and comprehensive income, stockholder's equity and cash flow of the Acquired Companies for the fiscal year then ended, together with the related notes thereof (the "Audited Financial Statements"); and (ii) the unaudited consolidated balance sheet of the Acquired Companies (the "Company Balance Sheet") as of September 30, 2024 (the "Company Balance Sheet Date") and the related condensed consolidated statements of income and comprehensive income, stockholder's equity and cash flows of the Acquired Companies for the nine-month period then ended (the "Interim Financial Statements" and, collectively with the Audited Financial Statements, the "Financial Statements"). Except as set forth in the notes to the Financial Statements and with the exception of the absence of normal year-end audit adjustments and footnotes in the Interim Financial Statements, each of the Financial Statements has been prepared in conformity with United States generally accepted accounting principles ("GAAP") applied on a consistent basis (except as may be indicated in the notes thereto) and fairly presents, in all material respects, the consolidated financial position, results of operations and cash flows of the Acquired Companies as of the dates and for the periods indicated therein.

(b)    The Acquired Companies (i) maintain a standard system of accounting established and administered in accordance with GAAP and (ii) have established and maintain a system of internal controls over financial reporting designed to provide reasonable assurance regarding the reliability of the financial reporting and the preparation of the Financial Statements for external purposes in accordance with GAAP. Except as disclosed on Section 4.6(b) of the Company Disclosure Schedules, there (x) are no significant deficiencies or weaknesses in any system of internal accounting controls used by each of the Acquired Companies, (y) has not been since the Lookback Date any fraud or other unlawful wrongdoing on the part of any of management or other employees of the Acquired Companies who have a significant role in the preparation of Financial Statements or the internal accounting controls used by the Company and each of its Subsidiaries relating to such preparation or controls, or (z) has not been since the Lookback Date any claim or allegation regarding any of the foregoing.

Section 4.7.    Absence of Certain Changes. Except as contemplated by this Agreement, from the Company Balance Sheet Date to the date of this Agreement:

(a)    the Acquired Companies have conducted their businesses in the Ordinary Course in all material respects;

(b)    there has not been a Company Material Adverse Effect; and

(c)    no Acquired Company has entered into, terminated, amended or otherwise modified any Contracts set forth in <u>Section 4.20</u> of the Company Disclosure Schedules (Affiliate Transactions).

Section 4.8.    <u>No Undisclosed Material Liabilities</u>. The Acquired Companies have no material liabilities of any kind that would be required to be reflected in or reserved against on a consolidated balance sheet of the Company or in the notes thereto prepared in accordance with GAAP, other than:

(a)    liabilities that are adequately accrued and specifically reflected in the Company Balance Sheet or the notes thereto;

(b)    liabilities incurred since the Company Balance Sheet Date in the Ordinary Course and which, individually or in the aggregate, would not be reasonably likely to be material to the Acquired Companies (taken as a whole);

(c)    liabilities or obligations that have been discharged or paid in full in the Ordinary Course or which, individually or in the aggregate, would not be reasonably likely to have a Company Material Adverse Effect;

(d)    liabilities or obligations under this Agreement or otherwise in connection with the Transactions; or

(e)    liabilities or obligations set forth in <u>Section 4.8(e)</u> of the Company Disclosure Schedules.

Section 4.9.    <u>Legal Proceedings</u> As of the Execution Date, except for the Specified Litigation and as set forth in <u>Section 4.9</u> of the Company Disclosure Schedules and as would not, individually or in the aggregate, be reasonably likely to be material to the business of the Acquired Companies, taken as a whole, there are no material Legal Proceedings pending, or, to the Knowledge of the Company, threatened in writing against the Acquired Companies before or by any Governmental Body (whether local, state, federal or foreign). As of the Execution Date, except as would not, individually or in the aggregate, be reasonably likely to be material to the business of the Acquired Companies, taken as a whole, neither the Company nor any of its Subsidiaries is subject to any outstanding judgment, Order, decree or injunction of any court or other Governmental Body (other than Orders of general applicability which do not impact the Acquired Companies in a manner that is materially different than the impact of similarly situated companies).

Section 4.10.    <u>Taxes</u>. Except as set forth in the Company Balance Sheet (including the notes thereto) and except as would not, individually or in the aggregate, be reasonably likely to have a Company Material Adverse Effect:

(a)    all income and other material Tax Returns required to be filed with any Taxing Authority by, or with respect to, the Acquired Companies have been filed (taking into account any applicable extensions) in accordance with all applicable Laws, the Acquired Companies have paid, or caused to be paid, all material Taxes shown as due and payable on such

Tax Returns, and, as of the time of filing, such Tax Returns were true and complete in all material respects;

     (b)    all material amounts of Taxes which any of the Acquired Companies were obligated to withhold from amounts owing to any employee, creditor, owner or third party have been fully and timely paid;

     (c)    except as set forth in Section 4.10(c) of the Company Disclosure Schedules, as of the date hereof, there is no Legal Proceeding or Claim in respect of any Tax or Tax Return (each, a "Tax Proceeding") now proposed in writing or pending against or with respect to the Acquired Companies;

     (d)    except as set forth in Section 4.10(d) of the Company Disclosure Schedules, none of the Acquired Companies have waived any statute of limitations in respect of Taxes beyond the date hereof or agreed to any extension of time beyond the date hereof with respect to a Tax assessment or deficiency (other than pursuant to extensions of time to file Tax Returns obtained in the Ordinary Course);

     (e)    except as set forth in Section 4.10(e) of the Company Disclosure Schedules, the Acquired Companies are not a party to, are not bound by and do not have any obligation under any Tax sharing, allocation or indemnity agreement, or any similar agreement or arrangement, except for (i) any such agreement or arrangement solely between or among the Acquired Companies or (ii) any commercial agreement entered into in the Ordinary Course the primary purpose of which does not relate to Taxes;

     (f)    no claim has been made by a Taxing Authority in a jurisdiction where any of the Acquired Companies do not file Tax Returns that the Acquired Companies are or may be subject to taxation by that jurisdiction, which claim has not been resolved;

     (g)    none of the Acquired Companies will be required to include any material item of income in, or exclude any material item of deduction from, income for any Tax period (or portion thereof) ending after the Closing Date as a result of any: (i) change in method of accounting made on or prior to the Company Balance Sheet Date pursuant to Section 481(a) of the Code (or any comparable provision of applicable Law), (ii) "closing agreement" as described in Section 7121 of the Code (or any comparable provision of applicable Law), (iii) installment sale or open transaction disposition made on or prior to the Company Balance Sheet Date, or (iv) prepaid amount received on or prior to the Company Balance Sheet Date;

     (h)    none of the Acquired Companies has participated in any "listed transaction" (other than a "loss transaction") within the meaning of Treasury Regulation Section 1.6011-4; and

     (i)    there are no Liens with respect to Taxes upon any asset of the Acquired Companies other than Permitted Liens.

     Notwithstanding any other provision in this Agreement, no representation or warranty is made with respect to the existence, availability, amount, usability or limitations (or lack thereof) of any net operating loss, net operating loss carryforward, capital loss, capital loss carryforward, basis amount or other Tax attribute (whether federal, state, local or foreign) of the Acquired

Companies after the Closing Date, and none of the Buyer or any of its Affiliates (including, after the Closing, the Acquired Companies) may rely on any of the representations and warranties in this Section 4.10 with respect to any position taken in or any Taxes with respect to any Post-Closing Tax Period.

Section 4.11.   Company Benefit Plans; Employment.

(a)      The Special Master has provided the Buyer with a list (set forth in Section 4.11(a) of the Company Disclosure Schedules) identifying each material Company Benefit Plan as of the Execution Date.

(b)      With respect to each material Company Benefit Plan, the Special Master has made available to the Buyer true, complete and correct copies (or, to the extent such plan is unwritten, an accurate written description), to the extent applicable, of: (i) the current plan and trust document and any amendments thereto and the most recent summary plan description, together with each subsequent summary of material modifications with respect to such Company Benefit Plan, (ii) the most recent annual report on Form 5500 thereto (including any related actuarial valuation report) filed with the Internal Revenue Service (if any such report was required), (iii) the most recent financial statements, (iv) the most recent Internal Revenue Service determination, opinion or advisory letter, and (v) for the three (3) most recent years, nondiscrimination testing results in respect of such Company Benefit Plan. For purposes of this Section 4.11(b), summary plan descriptions and summaries of material modification available at https://www.hr.citgo.com as of five (5) business days prior to the Execution Date are considered to have been made available to the Buyer. The Special Master has made available copies of Code Section 280G calculations prepared by the Company or its representatives (whether or not final) with respect to certain employees of the Acquired Companies in connection with the Transactions.

(c)      Except as would not, individually or in the aggregate, be reasonably likely to result in a material liability to the Acquired Companies taken as a whole, (i) each Company Benefit Plan has been established, maintained, operated, funded and administered in compliance with (A) its terms and (B) the requirements prescribed by Law (including, to the extent applicable, ERISA and the Code) which are applicable to such Company Benefit Plan and (ii) all benefits, contributions and premium payments required to be made with respect to a Company Benefit Plan have been timely made or paid in full, or to the extent not required to be made or paid in full, have been accrued and reflected on the Financial Statements as required by GAAP.

(d)      Except as would not, individually or in the aggregate, be reasonably likely to result in a material liability to the Acquired Companies taken as a whole, (i) no  Acquired Company or any of their respective ERISA Affiliates has incurred any liability under Title IV of ERISA, Sections 412, 430 or 4971 of the Code or Section 302 of ERISA that has not been satisfied in full when due, and (ii) all insurance premiums with respect to Company Benefit Plans, including premiums to the Pension Benefit Guaranty Corporation ("PBGC"), have been paid when due. No Acquired Company or any of their respective ERISA Affiliates currently sponsors, maintains, or contributes to (or is obligated to contribute to) or has, within the last six (6) years, sponsored or maintained, contributed to or been obligated to contribute to (i) a "multiemployer plan," as defined in Section 3(37) of ERISA, (ii) a "multiple employer plan" as defined in Section 413(c) of the

14

Code, or (iii) a "multiple employer welfare arrangement" within the meaning of Section 3(40) of ERISA.

(e)    Except as set forth in Section 4.11(e) of the Company Disclosure Schedules, with respect to any Company Benefit Plan that is subject to Title IV of ERISA: (i) there does not exist any failure to meet the "minimum funding standard" of Section 412 of the Code or 302 of ERISA (whether or not waived); (ii) such plan is not in "at-risk" status for purposes of Section 430 of the Code; (iii) as of the last day of the most recent plan year ended prior to the Execution Date, there is no "amount of unfunded benefit liabilities" as defined in Section 4001(a)(18) of ERISA; (iv) except as would not, individually or in the aggregate, be reasonably likely to result in a material liability to the Acquired Companies taken as a whole, no reportable event within the meaning of Section 4043(c) of ERISA has occurred; and (v) the PBGC has not instituted proceedings to terminate any such plan and, to the Knowledge of the Company, no circumstances exist which would serve as a basis for the institution of such proceedings.

(f)    Each Company Benefit Plan that is intended to be qualified under Section 401(a) of the Code is so qualified and has received a favorable determination letter or opinion letter, if applicable, from the Internal Revenue Service, and the related trust is intended to be exempt from federal income taxation under the Code and is so exempt. There are no facts or set of circumstances and, to the Knowledge of the Company, nothing has occurred that would reasonably be expected to cause the loss of such qualification or exemption or reasonably be expected to result in any Company Benefit Plan being required to pay any Tax or penalty under applicable Law that is material to the Acquired Companies taken as a whole as a condition to maintaining such qualification or exemption. Each trust funding any Company Benefit Plan which is intended to meet the requirements of Section 501(c)(9) of the Code meets such requirements and provides no disqualified benefits (as such term is defined in Section 4976(b) of the Code).

(g)    Except (i) as would not, individually or in the aggregate, be reasonably likely to result in a material liability to the Acquired Companies taken as a whole or (ii) as set forth in Section 4.11(g) of the Company Disclosure Schedules, no Acquired Company has any obligation or liability to provide post-employment medical or welfare benefits, except (A) as required by the continuing coverage requirements of COBRA and at the sole expense of the participant or such participant's spouse or dependents or (B) death or disability benefits under any retirement or deferred compensation plan. To the Company's Knowledge, since the Lookback Date, there have been no written communications by the Acquired Companies to employees of any Acquired Company which promise or guarantee post-employment medical or welfare benefits on a permanent basis.

(h)    Except as would not, individually or in the aggregate, be reasonably likely to result in a material liability to the Acquired Companies taken as a whole, no Acquired Company nor any plan sponsor or plan administrator of a Company Benefit Plan, or to the Company's Knowledge, any third-party fiduciary of a Company Benefit Plan, has engaged in any prohibited transaction (within the meaning of Section 406 of ERISA or Section 4975 of the Code) or breached any fiduciary duty under ERISA with respect to such Company Benefit Plan that would be reasonably likely to subject any Acquired Company or Company Benefit Plan to any Tax or penalty (civil or otherwise) imposed by ERISA, the Code or other applicable Law, or any other material liability. Except (i) as would not, individually or in the aggregate, be reasonably likely to

15

result in a material liability to the Acquired Companies taken as a whole, or (ii) as set forth in Section 4.11(h) of the Company Disclosure Schedules, there are no pending or, to the Knowledge of the Company, threatened claims (other than routine claims for benefits) by or on behalf of any Company Benefit Plan or any trusts which are associated with such Company Benefit Plans and, to the Knowledge of the Company, no facts or circumstances exist that would reasonably be expected to result in such claim. Except as would not, individually or in the aggregate, be reasonably likely to result in a material liability to the Acquired Companies taken as a whole, as of the Execution Date, none of the Company Benefit Plans are under audit or subject to an administrative proceeding or, to the Knowledge of the Company, investigation or examination by the Internal Revenue Service, the Department of Labor, the PBGC or any other Governmental Body.

(i)     Except as would not, individually or in the aggregate, be reasonably likely to result in a material liability to the Acquired Companies taken as a whole, each Company Benefit Plan that is a "nonqualified deferred compensation plan" within the meaning of Section 409A(d)(1) of the Code that is subject to Section 409A of the Code, complies with, and has been operated and administered in compliance with, Section 409A of the Code and the regulations and related guidance promulgated thereunder.

(j)     Except (x) as would not, individually or in the aggregate, be reasonably likely to result in a material liability to the Acquired Companies taken as a whole, or (y) as set forth on Section 4.11(j) of the Company Disclosure Schedules, neither the execution, delivery or the performance of this Agreement nor the consummation of the Transactions (alone or in conjunction with any other event) will or could reasonably be expected to (i) accelerate the time of payment or vesting or increase the amount of, or trigger any funding of, compensation or benefits under any Company Benefit Plan; (ii) result in any limitation on the right of an Acquired Company or Buyer, or any of their respective Affiliates, to amend, merge, terminate or receive a reversion of assets from a Company Benefit Plan or related trust; (iii) entitle any current or former director, officer, manager, employee, contractor or consultant of any Acquired Company to severance pay, termination pay or any other similar payment, right or benefit; (iv) result in any payment, right or benefit that (A) would not be deductible under Section 280G of the Code or (B) would result in any excise tax on any "disqualified individual" (within the meaning of Section 280G of the Code) under Section 4999 of the Code. Except as set forth on Section 4.11(j) of the Company Disclosure Schedules, none of the Acquired Companies has any obligation to gross-up or reimburse any current or former director, officer, manager, employee, contractor or consultant of any Acquired Company for any Taxes or related interest or penalties incurred by such individual, including under Section 4999, 409A or 105(h) of the Code.

(k)     No Company Benefit Plan is maintained primarily in respect of any current or former director, officer, manager, employee, contractor or consultant of any Acquired Company who is located outside of the United States.

(l)     Except as set forth in Section 4.11(l) of the Company Disclosure Schedules and as would not, individually or in the aggregate, be material to the Acquired Companies, taken as a whole, (i) the Acquired Companies are in material compliance with all applicable Laws respecting employment, employment practices and terms and conditions of employment, including all Laws relating to labor, labor relations, collective bargaining, occupational safety and health,

16

and wages, hours, worker classification, immigration, whistleblower protections, reasonable accommodation, leaves of absence, paid sick leave, unemployment insurance, workers' compensation, retaliation, harassment, and employment discrimination and (ii) there are no actual or, to the Knowledge of the Company, as of the Execution Date, threatened unfair labor practice charges, labor grievances, or labor arbitrations against the Acquired Companies which, individually or in the aggregate, are expected to result in material liability for the Company.

        (m)    To the Knowledge of the Company, as of the Execution Date, no employee of the Acquired Companies holding a position of executive vice president or above has notified the Company or the Acquired Companies in writing of an intention to resign, retire, or otherwise terminate his or her employment prior to the Closing or in connection with the Transactions nor, to the Knowledge of the Company as of the Execution Date, does any such employee have an intention to do so.

        (n)    Except as set forth in <u>Section 4.11(n)</u> of the Company Disclosure Schedules, (i) as of the Execution Date, none of the Acquired Companies are party to or bound by any collective bargaining agreements or other agreement (each, a "<u>Collective Bargaining Agreement</u>") with any labor union, works council, or other labor organization (each, a "<u>Union</u>") and no such agreement is being negotiated by any of the Acquired Companies (each such Collective Bargaining Agreement set forth on <u>Section 4.11(n)</u> of the Company Disclosure Schedules, a "<u>Company Collective Bargaining Agreement</u>"); (ii) since the Lookback Date, to the Knowledge of the Company, no group of employees of an Acquired Company or Union has sought to organize any employees of an Acquired Company not covered by a Company Collective Bargaining Agreement for purposes of collective bargaining, made a demand for recognition or certification, sought to bargain collectively with any Acquired Company, or filed a petition for recognition with any Governmental Body, except that resulted in entry into or involved a pre-existing Company Collective Bargaining Agreement; and (iii) since the Lookback Date, there has been no labor strike, lockout, slowdown, stoppage, picketing, boycott, handbilling, demonstration, leafletting, sit-in, sick-out, lockout or other form of organized labor disruption pending or, to the Knowledge of the Company, threatened against any Acquired Company.

        (o)    Since the Lookback Date, (i) to the Knowledge of the Company, no material allegations of sexual harassment or other sexual misconduct have been made by any current or former employee of the Acquired Companies against any current employee of the Acquired Companies with the title of executive vice president or above and, to the Knowledge of the Company, no employee of any Acquired Company has engaged in any cover up of such harassment or misconduct or knowingly aided or assisted any other person or entity to engage in any such harassment or misconduct, (ii) there are no Legal Proceedings pending or, to the Knowledge of the Company, threatened related to any allegations made by any current or former employee of the Acquired Companies of sexual harassment or other sexual misconduct against any employee of the Acquired Companies with the title of executive vice president or above and (iii) none of the Acquired Companies have entered into any settlement agreements related to allegations of sexual harassment or other sexual misconduct made by any current or former employee of the Acquired Companies against any current employee of the Acquired Companies with the title of executive vice president or above.

(p)    Since the Lookback Date, the Acquired Companies have complied in all material respects with Worker Adjustment and Retraining Notification Act and any similar state or local law, as amended (collectively, the "WARN Act") and have not incurred any material liability or material obligation under the WARN Act.

(q)    Except as would not be reasonably expected to result in material liability to the Company, each of the employees of the Acquired Companies have all work permits, immigration permits, visas, or other authorizations required by applicable Law for such individual given the duties and nature of such individual's employment, and the Acquired Companies have on file for each employee of the Acquired Companies a Form I-9 that is validly and properly completed in accordance with applicable Law.

(r)    No Acquired Company is a party to a U.S. federal Government Contract. The Acquired Companies are not, and have not been since the Lookback Date, the subject of any Legal Proceeding in connection with any U.S. federal Government Contract or related compliance with Executive Order No. 11246 of 1965, Section 503 of the Rehabilitation Act of 1973 or the Vietnam Era Veterans' Readjustment Assistance Act of 1974. The Acquired Companies are not debarred, suspended or otherwise ineligible from doing business with the U.S. government or any U.S. government contractor.

(s)    Except as would not, individually or in the aggregate, be reasonably likely to result in a material liability to the Acquired Companies taken as a whole; there are no, and since the Lookback Date there have not been, any material workers' compensation claims, insured or uninsured, pending or, to the Knowledge of the Company, threatened, relating to any employee of the Acquired Companies. Except as would not, individually or in the aggregate, be reasonably likely to have a Company Material Adverse Effect, all amounts required by any statute, insurance policy, Governmental Body or agreement to be paid by the Acquired Companies into any workers' compensation loss or reserve fund, collateral fund, sinking fund or similar account have been duly paid into such fund or account as required.

(t)    Pursuant to the terms of the EPP and the RRP, the Company has established and maintains a grantor trust that will become irrevocable as of the Closing.

Section 4.12.    Compliance with Laws; Permits.

(a)    Except as set forth in Section 4.12(a) of the Company Disclosure Schedules, since the Lookback Date, (i) to the Knowledge of the Company, none of the Acquired Companies has materially violated or is in material violation of, any Laws except for any violations that, individually or in the aggregate, are not, and would not be reasonably likely to be material to the business of the Acquired Companies, taken as a whole and (ii) none of the Acquired Companies has received any written notice of or been charged with the material violation of any Laws except for any violations that, individually or in the aggregate, are not, and would not be reasonably likely to be material to the business of the Acquired Companies, taken as a whole.

(b)    Except as set forth in Section 4.12(b) of the Company Disclosure Schedules, the Acquired Companies have all Permits which are required for the operation of its respective business as presently conducted (and such Permits are in full force and effect), except for any

18

Permit which the failure of the Acquired Companies to have (or to be in full force and effect) would not be material to the business of the Acquired Companies, taken as a whole. Except as would not be material to the Acquired Companies, taken as a whole, the Acquired Companies are, and since the Lookback Date have been, in compliance in all material respects with the terms, conditions or provisions of any such Permits.

Section 4.13.  <u>Regulatory Matters</u>.

(a)    Except as would not, individually or in the aggregate, reasonably be expected to be material to the Acquired Companies, taken as a whole, and except as set forth in <u>Section 4.13(a)</u> of the Company Disclosure Schedules, since the Lookback Date, (i) none of the Acquired Companies, the Acquired Companies' directors, officers, employees, nor to the Knowledge of the Company, any Representatives or other Person acting on behalf of the Acquired Companies has violated any Anti-Corruption Law and (ii) none of the Acquired Companies, the Acquired Companies' directors, officers, employees, nor to the Knowledge of the Company, any Representatives or other Person acting on behalf of the Acquired Companies, has offered, paid, given, promised, authorized, solicited or received, the payment of, anything of value (including money, checks, wire transfers, tangible and intangible gifts, favors, services, employment or entertainment and travel) directly or indirectly to or from any employee, officer, or Representative of, or any Person otherwise acting in an official capacity for or on behalf of a Governmental Body, whether elected or appointed, including an officer or employee of a state-owned or state-controlled enterprise, a political party, political party official or employee, candidate for public office, or an officer or employee of a public international organization (such as the World Bank, United Nations, International Monetary Fund, or Organization for Economic Cooperation and Development) (any such person, a "<u>Government Official</u>") (A) for the purpose of (1) influencing any act or decision of a Government Official or any other person in his or her official capacity, (2) inducing a Government Official or any other person to do or omit to do any act in violation of his or her lawful duties, (3) securing any improper advantage, (4) inducing a Government Official or any other person to influence or affect any act or decision of any Governmental Body or (5) assisting the Acquired Companies, or any Acquired Company director, officer employee, Representative, or any other person acting on behalf of an Acquired Company in obtaining or retaining business, or (B) in a manner which would constitute or have the purpose or effect of public or commercial bribery or corruption, acceptance of, or acquiescence in extortion, kickbacks, or other unlawful or improper means of obtaining or retaining business or any improper advantage.

(b)    Except as would not, individually or in the aggregate, reasonably be expected to be material to the Acquired Companies, taken as a whole, and except as set forth in <u>Section 4.13(b)</u> of the Company Disclosure Schedules, (i) the Acquired Companies and their respective directors, officers, employees, and, to the Knowledge of the Company, Representatives and other Persons acting for or on behalf of any of the foregoing Persons, are, and at all times since the Lookback Date, in compliance with all applicable Economic Sanctions/Trade Laws and all applicable Money Laundering Laws and (ii) in the five (5) years prior to the Execution Date none of the Acquired Companies is a Sanctions Target or has carried on or carries on, any business, directly or knowingly indirectly, involving Cuba, Iran, Syria, North Korea, the Crimea region, the non-government-controlled areas of Zaporizhzhia and Kherson or the so-called Donetsk or Luhansk People's Republics or any Sanctions Target in violation of applicable Economic Sanctions/Trade Laws.

(c)     Except as would not, individually or in the aggregate, reasonably be expected to be material to the Acquired Companies, taken as a whole, and except as set forth in Section 4.13(c) of the Company Disclosure Schedules, since the Lookback Date (i) none of the Acquired Companies has conducted or initiated any internal investigation, review or audit, or made a voluntary, directed, or involuntary disclosure to any Governmental Body or third party with respect to any alleged or suspected act or omission arising under or relating to any potential noncompliance with any applicable Anti-Corruption Law, Economic Sanctions/Trade Law, or Money Laundering Law, (ii) none of the Acquired Companies, nor any of their respective directors or officers, nor, to the Knowledge of the Company, any employees (other than officers), Representatives, or any other Person acting at the direction of an Acquired Company has received any written notice, request or citation (including a whistleblower complaint) for any actual or potential noncompliance with any applicable Anti-Corruption Law, Economic Sanctions/Trade Law or Money Laundering Law, (iii) the Acquired Companies have implemented and maintained internal controls, policies and procedures designed to detect and prevent violations of Anti-Corruption Laws, Economic Sanctions/Trade Laws and Money Laundering Laws, and (iv) the Acquired Companies have at all times made and maintained accurate books and records in material compliance with all applicable Anti-Corruption Laws, Economic Sanctions/Trade Laws or Money Laundering Laws.

Section 4.14.   Environmental Matters. Except as set forth in Section 4.14 of the Company Disclosure Schedules and except as would not, individually or in the aggregate, reasonably be expected to result in the Acquired Companies incurring liabilities which are material to the Acquired Companies, taken as a whole, (i) no written Claim or Order has been received by, and no Legal Proceeding is pending or, to the Knowledge of the Company, threatened by any Person against the Acquired Companies, and no penalty has been assessed or consent decree or Order issued by a Governmental Body against the Acquired Companies, in each case, with respect to any matters arising out of any Environmental Law, which remains outstanding; (ii) the Acquired Companies have been since the Lookback Date, and are, in compliance with all Environmental Laws, which compliance includes obtaining, maintaining and complying with Permits required under Environmental Laws for the conduct of their respective businesses (the "Company Environmental Permits"); (iii) no Governmental Body has begun, or to the Knowledge of the Company, threatened to begin, any Legal Proceeding to terminate, revoke, cancel, suspend, materially reform or not renew any Company Environmental Permit; (iv) to the Knowledge of the Company, there is no investigation pending or threatened against the Acquired Companies by any Governmental Body alleging non-compliance with or liability under any Environmental Law; (v) to the Knowledge of the Company, the Acquired Companies have not generated, treated, stored, disposed of, arranged for the disposal of, transported, or Released, or exposed any Person to, any Hazardous Substances in a manner or concentration that has given rise, or would reasonably be expected to give rise, to liabilities of the Acquired Companies under Environmental Laws, which liability has not been resolved; (vi) to the Knowledge of the Company, no Hazardous Substances have been Released in or under, and no Hazardous Substances are migrating from, (x) properties currently, or to the Knowledge of the Company, formerly owned, leased or operated by the Acquired Companies in a manner or concentrations requiring the Acquired Companies to undertake any investigation, monitoring, removal or remediation under Environmental Laws or (y) to the Knowledge of the Company, any other properties in a manner or concentrations requiring the Acquired Companies to undertake any investigation, monitoring, removal or remediation under Environmental Laws; and (vii) none of the Acquired Companies has assumed by contract liabilities

or obligations of any other Person arising under Environmental Laws. The Company has made available to the Buyer copies of all material, non-privileged environmental investigations, assessments or reports conducted in the three (3) years prior to the Execution Date by or on behalf of the Acquired Companies in relation to any current or prior business of the Acquired Companies or any property or facility currently or previously owned, leased or operated by the Acquired Companies, which investigation, assessment or report reveals actual or potential unresolved material non-compliance with or liability under any Environmental Law, but excluding routine environmental monitoring reports conducted by the Acquired Companies in the Ordinary Course.

Section 4.15. <u>Title to Properties</u>. Except as would not, individually or in the aggregate, be material to the Acquired Companies, taken as a whole, each of the Acquired Companies has good title to, or valid leasehold or other ownership interests or rights in, all its material properties and assets except: (i) for such interest or rights as are no longer used or useful in the conduct of the business of the Acquired Companies as of the Execution Date or as have been disposed of in the Ordinary Course, and (ii) for defects in title, burdens, easements, restrictive covenants and similar encumbrances or impediments that, in each case that do not and will not, individually or in the aggregate, interfere with its ability to conduct its business as currently conducted. None of the properties and assets of the Acquired Companies are subject to any Liens (other than Permitted Liens) that, in the aggregate, interfere with the ability of the Acquired Companies to conduct their business in the Ordinary Course except as would not, individually or in the aggregate, have a Company Material Adverse Effect.

Section 4.16. <u>Material Contracts</u>.

(a) <u>Section 4.16(a)</u> of the Company Disclosure Schedules sets forth a true, correct and complete list of each Material Contract. For purposes of this Agreement, "<u>Material Contract</u>" shall mean any Contract to which any Acquired Company is a party or to which any assets, properties, or businesses of any Acquired Company are bound as of the Execution Date (in each case, excluding (i) Contracts between or among Acquired Companies only and (ii) spot order Contracts entered into in the Ordinary Course)  that:

(i) (A) limits in any material respect either the type of business in which any Acquired Company may engage or the manner or locations in which any of them may so engage in any business (including through "non-competition" or "exclusivity" provisions), (B) would require the disposition of any material assets or line of business of any Acquired Company or (C) grants "most favored nation" or similar status with respect to any material obligations and would run in favor of any Person (other than the Company or a wholly owned Company Subsidiary);

(ii) (A) is an indenture, loan or credit Contract, loan note, mortgage Contract, or other Contract representing, or any guarantee of, indebtedness for borrowed money of any Acquired Company in excess of $10,000,000 (excluding any government-mandated or state-wide bonds or guarantees), (B) is a finance lease of any Acquired Company as lessee in excess of $5,000,000, or (C) is a guarantee by any Acquired Company of indebtedness for borrowed money or any finance lease of any Person other than the Company or a wholly owned Company Subsidiary (excluding any government-mandated or state-wide bonds or guarantees);

21

(iii)     grants (A) any right of first refusal, right of first negotiation or similar right, or (B) any put, call or similar right, to any Person (other than the Company or a wholly owned Company Subsidiary) with respect to any Equity Interest, property, or other asset, in each case, that is material to the Acquired Companies;

(iv)     was entered into to resolve or settle any litigation or threatened litigation (A) for an amount in excess of $15,000,000 payable by an Acquired Company (without taking into account insurance proceeds) or (B) which imposes any material non-monetary ongoing obligation on any Acquired Company (other than customary confidentiality obligations), in each case of clause (A) and clause (B), that has not been fully paid or performed, as applicable;

(v)     limits or restricts the ability of any Acquired Company to declare or pay dividends or make distributions in respect of their Equity Interests that will be binding from and after the Closing;

(vi)     is a partnership, limited liability company, joint venture, co-development or other similar agreement, relating to the formation, creation, operation, management or control of any partnership, limited liability company, joint venture, co-development or similar entity (however organized) in which the Company owns, directly or indirectly, through a Company Subsidiary (excluding Equity Interests owned directly or indirectly by any Non-Controlled Entities) any Equity Interest and has invested or is contractually required to invest capital (including for the avoidance of doubt with respect to any Non-Controlled Entity or non-wholly owned Company Subsidiary, but excluding any wholly owned Company Subsidiary);

(vii)     relates to the sale, transfer or acquisition or disposition of any material business, material assets (other than those providing for sales, transfers or acquisitions of assets in the Ordinary Course) or Equity Interests of any Acquired Company, in each case (A) for an amount in excess of $10,000,000 in any transaction or series of related transactions (other than Contracts for transactions that were consummated prior to the Lookback Date or Contracts that do not contain any ongoing rights owing to, or obligations or liabilities of, any Acquired Company) or (B) pursuant to which any Acquired Company has any material ongoing obligations or liabilities (including in respect of indemnification, "earn-out" and similar contingent or deferred payment obligations);

(viii)     is a Contract (A) with an employee of an Acquired Company, pursuant to which such employee is entitled to receive base salary in excess of $400,000, (B) that provides for mandatory or potential severance payments by an Acquired Company in excess of $100,000 or (C) with an employee, officer or director of any Acquired Company that (I) contains any non-compete or non-solicitation covenants or (II) modifies the at-will nature of the employment of any employee or otherwise requires advance notice for the termination of the Contract by any Acquired Company;

(ix)     is a Contract providing for indemnification by an Acquired Company of any officer, manager, director or employee of any Acquired Company;

(x)    is a Contract between or among any Acquired Company, on the one hand, and any Governmental Body, on the other hand;

(xi)    is a term Contract with one of the ten largest suppliers of any applicable Business Unit of the Acquired Companies (as determined by dollar volume for the 12-month period immediately prior to the Company Balance Sheet Date); and

(xii)    is a term Contract with one of the ten largest customers of any applicable Business Unit of the Acquired Companies (as determined by dollar volume for the 12-month period immediately prior to the Company Balance Sheet Date).

(b)    Each Material Contract is a legal, valid and binding obligation of the Acquired Companies as applicable. Except as would not, individually or in the aggregate, be material to the Acquired Companies, taken as a whole, each Material Contract is in full force and effect and enforceable by the applicable Acquired Company, in each case, subject to the Equitable Exceptions, and none of the Acquired Companies or, to the Knowledge of the Company any other party to a Material Contract, is in material breach or violation of any provision of, or in material default under, any Material Contract, and no event has occurred that, with or without notice, lapse of time or both, would constitute a material breach, violation or default or give rise to a right of termination, cancellation or acceleration of any material right or obligation or loss of any benefit thereunder. A true and correct copy of each Material Contract has previously been made available to the Buyer.

(c)    Since the Lookback Date, no Acquired Company has given or received (i) written notice regarding any actual or alleged or potential violation of any provision under any Material Contract or (ii) written notice threatening, intending or electing to terminate, repudiate, modify or cancel such Material Contract.

Section 4.17.    Intellectual Property and Data Privacy.

(a)    Section 4.17(a) of the Company Disclosure Schedules sets forth a list of all registered Intellectual Property that is owned by the Acquired Companies and is used in, held by, or held for use in the conduct of the business of the Acquired Companies as of the Execution Date ("Registered Intellectual Property"). Except as would not, individually or in the aggregate, be material to the Acquired Companies, taken as a whole, the Acquired Companies own or possess the right to use, license and enforce all (i) patents and patent applications, (ii) registered, applied for, or unregistered trademarks, trade names, trade dress, service marks, logos, and business names, and all related goodwill, (iii) internet domain names, (iv) registered, applied for, or unregistered works of authorship and copyrights, including copyrights in computer software programs or applications, and (v) trade secrets, know- how and other confidential and proprietary information, including ideas, inventions (whether patentable or not), research, pricing and cost information, customer information, business plans, marketing plans, and proposals (collectively, "Intellectual Property") that are used in, held by, or held for use in the conduct of the business of the Acquired Companies as currently conducted (collectively, the "Company Intellectual Property" and to the extent owned by the Acquired Companies the "Company Owned Intellectual Property"), free and clear of all Liens, except for Permitted Liens. To the Knowledge of the Company, the Registered Intellectual Property is valid and enforceable.

23

(b)     (i) Since the Lookback Date, to the Knowledge of the Company, the conduct of the business of the Acquired Companies and use of the Company Intellectual Property does not and has not infringed upon or otherwise violated any Intellectual Property rights of any other Person; (ii) no third party is challenging, or, to the Knowledge of the Company, infringing or otherwise violating any right of the Acquired Companies in the Company Owned Intellectual Property; and (iii) since the Lookback Date, the Acquired Companies have not received written notice of any pending Claim, Order or Legal Proceeding with respect to any alleged or potential infringement or other violation of Intellectual Property rights of any other Person or with respect to any Company Intellectual Property. The Acquired Companies have taken commercially reasonable measures to maintain the confidentiality of any material proprietary information or trade secrets included in Company Intellectual Property.

(c)     Except as would not, individually or in the aggregate, reasonably be expected to be material to the Acquired Companies, taken as a whole, each current and former employee and independent contractor of any Acquired Company who has participated in the conception or development of any Intellectual Property has assigned to such Acquired Company by operation of law, or has entered into a valid and enforceable written agreement with such Acquired Company assigning to such Acquired Company all Intellectual Property created by such Person within the scope of such Person's duties to the Acquired Company and prohibiting such Person from using or disclosing confidential information of the Acquired Company. To the Knowledge of the Company, no current or former employee or independent contractor of the Acquired Companies is in violation of any such agreement, and there has been no unlawful, accidental, or unauthorized access to or use or disclosure of any trade secrets, know-how and other confidential and proprietary information of the Acquired Companies.

(d)     Since the Lookback Date, no third party (including any employee, worker, contractor or subcontractor) has made any written claim to the Acquired Companies of ownership in respect of any of the Company Owned Intellectual Property.

(e)     Except as would not, individually or in the aggregate, be material to the Acquired Companies, taken as a whole, to the extent that the Acquired Companies license Intellectual Property to a third party or license any Intellectual Property belonging to any third party: (i) no such licenses have been the subject of any breach or default by any Acquired Company or, to the Company's Knowledge, any such third party; (ii) such licenses are valid and binding; (iii) such licenses have not been the subject of any claim, dispute or proceedings; and (iv) in respect of licenses of Intellectual Property by any Acquired Company to third parties, such licenses do not materially restrict any Acquired Company from using the Intellectual Property to which they relate.

(f)     Since the Lookback Date, except as has not had and would not reasonably be expected to have, individually or in the aggregate, a Company Material Adverse Effect: (i) materially complied with all applicable Laws and self-regulatory guidelines, PCI DSS, the obligations under their Contracts, and their public privacy policies, in each case, relating to the processing of any Personal Information (collectively, "Privacy Laws and Obligations"); (ii) implemented and maintained reasonable administrative, physical and technical safeguards designed to protect all Personal Information in their possession or under their control against loss, theft, or unauthorized access, use modification, disclosure; (iii) not experienced any material

Security Incident, and, to the Knowledge of the Company, no service provider (in the course of processing Personal Information for or on behalf of the Acquired Companies) has suffered any material Security Incident impacting Personal Information in the possession or control of the Acquired Companies; and (iv) not received any written notice of any claims of, or been charged with, the violation of any Privacy Laws and Obligations.

(g)    The Acquired Companies have used commercially reasonable efforts to prevent the introduction into the Systems, and, to the Company's Knowledge, such Systems do not contain, any ransomware, disabling codes or instructions, spyware, Trojan horses, worms, viruses or other software routines that permit or cause unauthorized access to, or disruption, impairment, disablement, or destruction of, software, data or other materials. The Acquired Companies have used commercially reasonable efforts to implement material security patches that are generally available for the Systems. To the Company's Knowledge, since the Lookback Date, the Systems have not suffered any unplanned or critical failures, continued substandard performance, errors, breakdowns or other adverse events that have caused any material disruption or interruption in the operation of the business of the Acquired Companies. The Acquired Companies have implemented and maintain commercially reasonable business continuity and disaster recovery plans, procedures and facilities for its business.

(h)    The Acquired Companies have in place commercially reasonable measures to protect the confidentiality, integrity, availability and security of the Systems. To the Company's Knowledge, the Systems (i) are in good working order; (ii) function in all material respects in accordance with all specifications and any other descriptions under which they were supplied; (iii) are substantially free of any material defects, bugs and errors; and (iv) are sufficient for the existing needs of the business of the Acquired Companies. The Acquired Companies have conducted commercially reasonable penetration tests at reasonable intervals on the Systems, and have addressed, or are in the process of addressing, all material issues raised in any such audits or penetration tests (including third party audits of the Systems).

Section 4.18.    <u>Brokers; Financial Advisor</u>. No broker, investment banker, financial advisor or other Person, other than Evercore, is entitled to any commission, brokerage fee or "finders fee" in connection with the consummation of the Transactions.

Section 4.19.    <u>Real Property</u>.

(a)    <u>Section 4.19(a)</u> of the Company Disclosure Schedules sets forth a true, accurate and complete list as of the Execution Date of all leases or subleases of real property with respect to which any Acquired Company is the tenant or lessee, together with a list of the addresses of all such real property (if specified in such lease or sublease) which are material to the Acquired Companies (individually, a "<u>Real Property Lease</u>" and, collectively, the "<u>Real Property Leases</u>"). Subject to the Equitable Exceptions, the applicable Acquired Company has a good, valid, binding and enforceable interest under each of the Real Property Leases and the vesting instruments under which an Acquired Company holds an easement or similar interest (such vesting instruments, collectively with the Real Property Leases, the "<u>Vesting Instruments</u>"), free and clear of all Liens (other than Permitted Liens). No Acquired Company nor, to the Knowledge of the Company, any other party to any Vesting Instrument is in material breach or default thereunder, and no event has occurred or condition exists that, with notice or lapse of time, or both, would constitute a default

by an Acquired Company or, to the Knowledge of the Company, any other Person under any of the Vesting Instruments, other than defaults that have been cured or waived in writing. Except as would not, individually or in the aggregate, be material to the Acquired Companies, taken as a whole, all landlord work or tenant work under each Real Property Lease has been completed and there are no leasing commissions due or payable with respect to any Real Property Lease. Each Vesting Instrument is in full force and effect and, to the Knowledge of the Company, is the valid, binding and enforceable obligation of each party thereto, in accordance with its terms.

(b)    Section 4.19(b) of the Company Disclosure Schedules sets forth a true, accurate, and complete list of all real property owned in fee by the Acquired Companies ("Owned Real Property" and together with the real property in which the Acquired Companies hold interests pursuant to the Vesting Instruments, the "Real Property"), together with the address of the applicable property. Each Acquired Company owns good, valid and marketable title in fee simple to the Owned Real Property and there are no outstanding Preferential Rights, ownership or use, or other contractual rights in favor of any other Person to purchase, acquire, sell, assign or otherwise dispose of any Acquired Companies' interest in any Real Property or any portion thereof or interest therein. Each Acquired Company has the valid and enforceable power and unqualified right to use and sell, transfer, convey or assign the Owned Real Property, free and clear of all Liens other than Permitted Liens.

(c)    Section 4.19(c) of the Company Disclosure Schedules sets forth a complete list of all Owned Real Property held by the Acquired Companies as a tenant in common or other joint ownership structure (collectively, the "Jointly Owned Properties"), together with a detailed description of the respective ownership structure (and the applicable Acquired Company's ownership percentage) of each Jointly Owned Property. None of the other owners of the Jointly Owned Properties have any rights of first refusal, rights of first offer or other Preferential Rights to purchase, or otherwise modify or later the applicable Acquired Company's interest in, any of the Jointly Owned Properties that would be triggered by the Transactions.

(d)    To the Knowledge of the Company, all material buildings, structures, improvements, fixtures, building systems and attached equipment, and all material components thereof, included in the Real Property are in good condition and repair, normal wear and tear excepted. No work has been done at the Real Property, and no materials have been supplied to the Real Property, that have not been paid for, and there are no material materialman's liens or mechanic's liens affecting the Real Property.

(e)    The Real Property constitutes all interests in real property (i) currently used, occupied or held for use in connection with the business of the Acquired Companies as presently conducted and (ii) necessary for the continued operation of the business of the Acquired Companies. None of the improvements to any Real Property constitute a legal non-conforming use or otherwise require any special dispensation, variance or permit under any Law. To the Knowledge of the Company, the Company or the applicable Acquired Company has all certificates of occupancy, permits, licenses, certificates of authority, authorizations, approvals, registrations, and similar consents issued by or obtained from any Governmental Body necessary for the current use and operation of the Real Property, except for any such items where the failure of the applicable Acquired Company to hold or possess such item would not, individually or in the aggregate, be

material to any Acquired Company. The Real Property is in compliance in all material respects with all applicable Laws and fire, health, building, use, occupancy, subdivision and zoning codes.

(f)     Except as would not, individually or in the aggregate, be material to the Acquired Companies, taken as a whole, each Acquired Company and each parcel of Real Property (i) are now, and have been since the Lookback Date, in material compliance with all declarations of covenants, conditions or restrictions, restrictive covenants and reciprocal easement agreements, in each case, affecting any Real Property, and (ii) have not received any notice of any material breach, violation or default under any such declarations, agreements or easements since the Lookback Date.

(g)     There do not exist any actual or, to the Knowledge of the Company, threatened condemnation or eminent domain proceedings that affect any Real Property or any part thereof.

(h)     Since the Lookback Date, no Acquired Company has received written notice of any, and to the Knowledge of the Company there is no, default under any restrictive covenants or other encumbrances pertaining to the Real Property.

Section 4.20.  Affiliate Transactions. Except as set forth in Section 4.20 of the Company Disclosure Schedules, none of the Acquired Companies, on the one hand, is party to any agreement with PDVSA or its Affiliates (excluding the Acquired Companies and their Subsidiaries), on the other hand, pursuant to which an Acquired Company has material ongoing obligations. Other than the Shares, neither PDVSA nor any of its Affiliates (excluding the Acquired Companies and their Subsidiaries), owns any interest in or any property (real, personal or mixed, tangible or intangible) of the Acquired Companies.

Section 4.21.  Insurance. Section 4.21 of the Company Disclosure Schedules lists each material insurance policy maintained by the Acquired Companies with respect to the properties, assets, business, operations and employees of the Acquired Companies. To the Knowledge of the Company, all such policies are valid and binding on the Acquired Company and enforceable in accordance with their terms against the Acquired Companies, in each case except for the Equitable Exceptions, and all premiums with respect thereto have been paid to the extent due. To the Knowledge of the Company, there are no material Claims by the Acquired Companies pending under any such insurance policies as to which coverage has been denied by the underwriters of such policies. To the Knowledge of the Company, the Acquired Companies have not received written notice of termination or material reduction of coverage with respect to any of such insurance policies.

Section 4.22.  No Additional Representations.

(a)     Except for the representations and warranties made in (i) this Article IV, as qualified by the Company Disclosure Schedules, (ii) any certificate delivered pursuant to this Agreement or (iii) any other Transaction Document, no Person makes or shall be deemed to make any other representation or warranty of any kind whatsoever, express or implied, written or oral, at law or in equity, with respect to any of the Acquired Companies or their respective businesses, operations, assets, liabilities or conditions (financial or otherwise) in connection with this

Agreement or the Transactions, any other rights or obligations to be transferred pursuant to the Transaction Documents or any other matter, and the Special Master (on behalf of himself and the Company) hereby disclaims any such other representations or warranties. In particular, without limiting the foregoing disclaimer, except for the representations and warranties made in (i) this Article IV, as qualified by the Company Disclosure Schedules, or (ii) any certificate delivered pursuant to this Agreement, no Person makes or has made any representation or warranty to the Buyer or any of its Affiliates or Representatives with respect to (x) projections, forecasts, estimates, financial statements, financial information, appraisals, statements, promises, advice, data or information made, communicated or furnished (orally or in writing, including electronically) or prospect information relating to the Acquired Companies or their respective businesses; or (y) except for the representations and warranties made in (i) this Article IV, as qualified by the Company Disclosure Schedules, (ii) any certificate delivered pursuant to this Agreement, or (iii) any other Transaction Documents, any oral or written information presented to the Buyer or any of its Affiliates or Representatives in the course of their due diligence investigation of the Company, the negotiation of this Agreement or in the course of the Transactions (including any opinion, information, projection, or advice that may have been or may be provided to the Buyer by any Representative of the Company).

(b)    Notwithstanding anything contained in this Agreement to the contrary, the Special Master acknowledges and agrees that neither the Buyer nor any other Person has made or is making, and the Special Master expressly disclaims reliance upon, any representations, warranties or statements relating to the Buyer or any Buyer Subsidiaries whatsoever, express or implied, beyond those expressly given by the Buyer in Article V, as qualified by the Buyer Disclosure Schedules, or in any certificate delivered pursuant to this Agreement or in any other Transaction Documents, including any implied representation or warranty as to the accuracy or completeness of any information regarding the Buyer, furnished or made available to the Company, or any of its Representatives. Without limiting the generality of the foregoing, the Special Master acknowledges that, except for the representations and warranties expressly provided in Article V, as qualified by the Buyer Disclosure Schedules, or in any certificate delivered pursuant to this Agreement or in any other Transaction Documents, no representations or warranties are made with respect to any projections, forecasts, estimates, budgets or prospect information that may have been made available to the Special Master, the Company or any of their Representatives.

## ARTICLE V

## REPRESENTATIONS AND WARRANTIES OF THE BUYER

The Buyer represents and warrants to the Special Master that, except as disclosed in the correspondingly numbered section of the disclosure schedules delivered by the Buyer to the Company simultaneously with the execution of this Agreement (the "Buyer Disclosure Schedules"):

Section 5.1.    Corporate Existence and Power. The Buyer is a corporation duly incorporated, validly existing and in good standing under the Laws of its jurisdiction of incorporation and has all requisite corporate powers and all governmental franchises, licenses, permits, authorizations, consents and approvals required to enable it to own, lease or otherwise

hold its properties and assets and to carry on its business as now conducted. The Buyer is duly qualified to do business as a foreign corporation and is in good standing in each jurisdiction in which the character of the property owned or leased by it, the nature of its activities, or the ownership or leasing of its properties make such qualification necessary, except for those jurisdiction where the failure to be so qualified would not, individually or in the aggregate, materially impair or delay the ability of the Buyer to consummate the Transactions or perform its obligations under this Agreement.

Section 5.2.    <u>Corporate Authorization</u>. The Buyer has all requisite corporate power and authority to execute, deliver and perform its obligations under this Agreement, the Transaction Documents, and each other agreement, document, instrument or certificate contemplated by this Agreement to be executed and delivered by the Buyer in connection with the consummation of the Transactions (the "<u>Buyer Documents</u>"). The execution and delivery of this Agreement and the Buyer Documents by the Buyer, the performance of its obligations hereunder and thereunder, and the consummation by the Buyer of the Transactions have been duly authorized by all necessary corporate or organizational action on the part of the Buyer, and no shareholder or other similar approval is required in connection with the Buyer's execution, delivery and performance of the Transactions. The board of directors of the Buyer has duly approved this Agreement and the Transactions. This Agreement constitutes a valid and binding agreement against the Buyer, enforceable against the Buyer in accordance with its terms, except that such enforcement may be limited by the Equitable Exceptions.

Section 5.3.    <u>Governmental Authorization</u>. The execution, delivery and performance by the Buyer of this Agreement and the consummation by the Buyer of the Transactions require no Order, authorization, or approval of, or filing with, any Governmental Body other than (a) applicable requirements of Antitrust Laws as set forth in <u>Section 5.3</u> of the Buyer Disclosure Schedules and (b) the OFAC License.

Section 5.4.    <u>Non-Contravention</u>. The execution, delivery and performance by the Buyer of this Agreement and the consummation by the Buyer of the Transactions do not and will not, assuming compliance with the matters referred to in <u>Section 5.2</u> and <u>Section 5.3</u>, (a) contravene or conflict with the certificate of incorporation or by-laws of the Buyer, (b) contravene or conflict with or constitute a violation of any provision of any Law binding upon or applicable to the Buyer or any of the Buyer Subsidiaries, (c) constitute a default (or an event which with notice or the passage of time would become a default) under, or give rise to any right of termination, cancellation or acceleration of any right or obligation of the Buyer or any of the Buyer Subsidiaries or to a loss of any benefit to which the Buyer or any of the Buyer Subsidiaries is entitled under any provision of, any agreement, contract or other instrument binding upon the Buyer or any of the Buyer Subsidiaries or any license, franchise, permit or other similar authorization held by the Buyer or any of the Buyer Subsidiaries or (d) result in the creation or imposition of any Lien (other than Liens arising under applicable securities Laws) on any asset of the Buyer or any of the Buyer Subsidiaries. As of the Execution Date, there is no Effect that would reasonably be expected to prevent, impede or interfere with the execution of this Agreement and the consummation by the Buyer of the Transactions.

Section 5.5.    <u>Litigation</u>. Except as set forth in <u>Section 5.5</u> of the Buyer Disclosure Schedules, there are no Legal Proceedings, pending against, or, to the Knowledge of the Buyer,

threatened in writing against or affecting, the Buyer, any of the Buyer Subsidiaries, any of their respective properties or any of their respective officers or directors before any Governmental Body that would reasonably be expected to (a) prohibit or restrain the ability of the Buyer to enter into this Agreement or consummate the Transactions or (b) affect the legality, validity or enforceability of any Debt Financing. The Buyer is not subject to any Order of any Governmental Body that would reasonably be expected to (x) prohibit or restrain the ability of the Buyer to enter into this Agreement or consummate the Transactions or (y) affect the legality, validity or enforceability of any Debt Financing.

Section 5.6.    <u>Regulatory Matters</u>.

(a)    In the three (3) years prior to the Execution Date, (i) none of the Buyer or any of the Buyer Subsidiaries or any Equity Financing Source, nor any of their respective directors, officers, employees, nor, to the Knowledge of the Buyer, any Representative, agent, or other person acting on behalf of the Buyer, any of the Buyer Subsidiaries or any Equity Financing Source, has violated any Anti-Corruption Law, and (ii) none of the Buyer, any of the Buyer Subsidiaries or any Equity Financing Source, nor any of their respective directors, officers, employees, nor, to the Knowledge of the Buyer, any Representative, agent or any other person acting on behalf of the Buyer, the Buyer Subsidiaries or any Equity Financing Source, has offered, paid, given, promised, or authorized the payment of, anything of value (including money, checks, wire transfers, tangible and intangible gifts, favors, services, employment or entertainment and travel) directly or indirectly to any Government Official (A) for the purpose of (1) influencing any act or decision of a Government Official or any other person in his or her official capacity, (2) inducing a Government Official or any other person to do or omit to do any act in violation of his or her lawful duties, (3) securing any improper advantage, or (4) inducing a Government Official or any other person to influence or affect any act or decision of any Governmental Body; or (B) in a manner which would constitute or have the purpose or effect of public or commercial bribery or corruption, acceptance of, or acquiescence in extortion, kickbacks, or other unlawful or improper means of obtaining or retaining business or any improper advantage. Without limiting the generality of the foregoing, none of the Buyer or any of the Buyer Subsidiaries or any Equity Financing Source is a Venezuelan national or otherwise acting on behalf of Nicolás Maduro, the United Socialist Party of Venezuela or any Affiliate thereof and, to the Knowledge of the Buyer, none of the Buyer or any of the Buyer Subsidiaries or any Equity Financing Source or any of their respective directors, officers, employees, Affiliates or any Representative, agent, or other person acting on behalf of any of the foregoing in connection with the Transactions has any relationship to Nicolás Maduro, the United Socialist Party of Venezuela or any Affiliate thereof.

(b)    (i) The Buyer, each of the Buyer Subsidiaries and each Equity Financing Source and their respective directors, officers, employees, and, to the Knowledge of the Buyer, agents, Representatives and other persons acting for or on behalf of any of the foregoing Persons, are, and at all times in the three (3) years prior to the Execution Date, in compliance in all material respects with all applicable Economic Sanctions/Trade Laws and all applicable Money Laundering Laws and (ii) in the three (3) years prior to the Execution Date none of the Buyer, any of the Buyer Subsidiaries or any Equity Financing Source is a Sanctions Target or has carried on or carries on, any business, directly or knowingly indirectly, involving any Sanctions Target in violation of applicable Economic Sanctions/Trade Laws.

30

(c)      Except as would not, individually or in the aggregate, be reasonably likely to have a material adverse effect, in the three (3) years prior to the Execution Date (i) none of the Buyer, any of the Buyer Subsidiaries or any Equity Financing Source has conducted or initiated any internal investigation, review or audit, or made a voluntary, directed, or involuntary disclosure to any Governmental Body or third party with respect to any alleged or suspected act or omission arising under or relating to any potential noncompliance with any applicable Anti-Corruption Law, Economic Sanctions/Trade Law, or Money Laundering Law, (ii) none of the Buyer, any of the Buyer Subsidiaries or any Equity Financing Source, nor any of their respective directors or officers, nor, to the Knowledge of the Buyer, any agents, employees (other than officers), Representatives, or any other person acting at the direction of the Buyer, any of the Buyer Subsidiaries or any Equity Financing Source has received any written notice, request or citation for any actual or potential noncompliance with any applicable Anti-Corruption Law, Economic Sanctions/Trade Law or Money Laundering Law, (iii) the Buyer, the Buyer Subsidiaries and the Equity Financing Sources have implemented and have maintained internal controls, policies and procedures designed to detect and prevent violations of Anti-Corruption Laws, Economic Sanctions/Trade Laws and Money Laundering Laws, and (iv) the Buyer, each of the Buyer Subsidiaries and each of the Equity Financing Sources have at all times made and maintained accurate books and records in material compliance with all applicable Anti-Corruption Laws, Economic Sanctions/Trade Laws or Money Laundering Laws.

Section 5.7.    <u>Financing</u>.

(a)      On the Execution Date, the Buyer has delivered to the Special Master true, correct, and complete copies of (i) the executed Equity Commitment Letters from the Equity Financing Sources, which Equity Commitment Letters each provide that the Special Master is an express third party beneficiary thereto (the "<u>Equity Financing</u>", and the commitments under the Equity Commitment Letters, the "<u>Equity Financing Commitments</u>") and (ii) (A) a final (but unexecuted) commitment letter from each of the Debt Financing Sources identified therein (together with all annexes, schedules, and exhibits thereto, as amended from time to time as permitted herein, each a "<u>Debt Commitment Letter</u>" and collectively, the "<u>Debt Commitment Letters</u>", and the commitments under the Debt Commitment Letters, the "<u>Debt Financing Commitments</u>"; the Debt Commitment Letters and the Equity Commitment Letters, collectively, the "<u>Commitment Letters</u>"), pursuant to which, and subject to the terms and conditions of which, the lenders party thereto have committed to lend the amounts set forth therein to the Buyer for the purpose of funding the Transactions (the "<u>Debt Financing</u>" and, together with the Equity Financing, the "<u>Financings</u>"), and (B) each related fee letter (collectively, the "<u>Fee Letters</u>"), which copy of such Fee Letter has been redacted for fees, pricing terms and pricing caps, "market flex" provisions and other terms that are customarily redacted (including any dates related thereto), none of such redacted terms which would adversely affect the conditionality, availability or aggregate principal amount of the Debt Financing.

(b)      As of the Execution Date, the Equity Commitment Letters are in full force and effect and have not been withdrawn, rescinded, replaced or terminated, or otherwise amended, restated, amended and restated, waived, supplemented or otherwise modified in any respect (and no such amendment, restatement or modification is contemplated. The Equity Commitment Letters are legal, valid and binding obligations (subject to the Equitable Exceptions) of the Buyer and the other parties thereto, enforceable in accordance with their terms.

(c)    As of the Debt Commitment Letter Effective Date, the Debt Commitment Letters shall be in full force and effect and shall not have been withdrawn, rescinded, replaced or terminated, or otherwise amended, restated, amended and restated, waived, supplemented or otherwise modified in any respect (and no such amendment, restatement or modification shall be contemplated except any amendment, restatement or modification to add additional Debt Financing Sources). As of the Debt Commitment Letter Effective Date, the Debt Commitment Letters will be legal, valid and binding obligations (subject to the Equitable Exceptions) of the Buyer and the other parties thereto, enforceable in accordance with their terms. There are no agreements, side letters or arrangements (other than the Debt Commitment Letters and the Fee Letters) relating to the Debt Financing Commitments or the Debt Financing that imposes or permits the imposition of conditions precedent to the funding of the Debt Financing on the Closing Date or would otherwise affect the availability of the Debt Financing on the Closing Date. As of the Debt Commitment Letter Effective Date, the Buyer and the Debt Financing Sources shall not be in breach of any of the terms or conditions set forth in the Debt Commitment Letters. As of the Debt Commitment Letter Effective Date, no event shall have occurred which, with or without notice, lapse of time or both, would constitute a default or breach on the part of the Buyer under any term or condition of the Commitment Letters, and the Buyer does not have any reason to believe that it will be unable to satisfy, on a timely basis, any term or condition of closing to be satisfied by it contained in the Debt Commitment Letters, or that the full amount of the Equity Financing or the Debt Financing will not be available to the Buyer on the Closing Date. On the Debt Commitment Letter Effective Date, the Buyer shall have fully paid any and all commitment fees or other fees required by the Debt Financing Commitments or any Fee Letter to be paid on or before the Debt Commitment Letter Effective Date. On the Debt Commitment Letter Effective Date, the Debt Commitment Letters will contain all of the conditions precedent to the obligations of the Parties thereunder to make the full amount of the Debt Financing available to the Buyer on the terms set forth therein and there shall be no contingencies that would permit the Debt Financing Sources to change the total amount of the Debt Financing or impose any additional conditions precedent to the availability of the Debt Financing. As of the Debt Commitment Letter Effective Date, none of the Debt Financing Commitments shall have been terminated or withdrawn, no lender shall have notified the Buyer of its intention to terminate or withdraw the Debt Financing Commitments, and the Buyer does not know of any facts or circumstances that may be expected to result in any of the conditions set forth in the Debt Commitment Letters not being satisfied. To the extent this Agreement must be in a form acceptable to any lender providing Debt Financing, such lender or lenders have approved this Agreement.

(d)    The obligations of the Buyer under this Agreement are not subject to any conditions regarding the Buyer's, its Affiliates', or any other Person's ability to obtain financing for the consummation of the Transactions contemplated hereby.

(e)    The aggregate proceeds from the Debt Financing (net of original issue discount, upfront fees and other fees, premiums and charges payable in connection therewith, after giving effect to the maximum amount of "market flex" provided under the Debt Financing Commitments and each Fee Letter) together with the Equity Financing and Buyer's cash on hand will be sufficient for satisfaction of all of the Buyer's obligations under this Agreement and to consummate the Transactions, including the payment of the Closing Consideration, repayment of the Specified Debt and the payment of all associated costs and expenses (including the Closing Transaction Expenses) (collectively, the "Required Amount").

Section 5.8.    <u>Solvency</u>. The Buyer is Solvent as of the Execution Date. Assuming (x) the accuracy of the representations and warranties set forth in <u>Article IV</u>, and (y) the performance by the Company and the Special Master of the covenants and agreements required to be performed by them under this Agreement prior to the Closing, the Buyer, the Company and their respective Subsidiaries, on a consolidated basis, will, after giving effect to all of the Transactions, including the payment of any amounts required to be paid in connection with the consummation of the Transactions and the payment of all related fees and expenses, be Solvent at and immediately after the Closing.

Section 5.9.    <u>Purported Equity Pledge</u>. The Buyer acknowledges the existence of the 2020 Bonds, the Purported Equity Pledge and the Equity Pledge Litigation.

Section 5.10.    [Reserved.].

Section 5.11.    <u>Closing Consideration</u>.  The Buyer will not provide any consideration to any holder of an Attached Judgment at the Closing unless each other holder of an Attached Judgment senior or *pari passi* to such holder (as set forth in the Priority Order (as defined below)) has either (i) received cash in full in satisfaction of its Attached Judgment, (ii) consented to receive non-cash consideration in satisfaction of its Attached Judgment or (iii) been offered by the Buyer the same non-cash consideration in satisfaction of its Attached Judgment offered by the Buyer to each holder of a senior or *pari passu* claim (if any) and declined such offer of non-cash consideration.

Section 5.12.    <u>No Additional Representations</u>.

(a)    Except for the representations and warranties expressly made by the Buyer in (i) this <u>Article V</u>, as qualified by the Buyer Disclosure Schedules, or (ii) any certificate delivered pursuant to this Agreement, the Buyer makes (and shall not be deemed to make) no other representation or warranty of any kind whatsoever, express or implied, written or oral, at law or in equity, in connection with this Agreement or the Transactions, any other rights or obligations to be transferred pursuant to the Transaction Documents or any other matter, and the Buyer hereby disclaims any such other representations or warranties.

(b)    Except for the specific representations and warranties expressly made by the Special Master in <u>Article IV</u>, and subject to the specifically bargained-for limitations as set forth in this Agreement, the Buyer acknowledges and agrees that the Special Master does not make, and that the Buyer is not relying upon, and will not rely upon any representation or warranty, expressed or implied, at law or in equity, made by any Person in respect of the Special Master or in respect of the Company and the Company's Subsidiaries' respective businesses, assets (including the stocks), liabilities, operations, prospects, or condition (financial or otherwise), including with respect to merchantability or fitness for any particular purpose of any assets, the nature or extent of any liabilities, the prospects of their respective businesses, the effectiveness or the success or profitability of any operations, or the accuracy or completeness of any confidential information memoranda, documents, projections, forecasts, opinions, advice, material, statement, data, or other information (financial or otherwise) regarding the Acquired Companies provided to, or otherwise made available to, the Buyer or its Representatives in connection with the Transactions, including any "data rooms," "virtual data rooms," management presentations, or in

33

respect of any other matter or thing whatsoever. The Buyer expressly disclaims that is relying on any representations or warranties, other than the specific representations and warranties expressly made by the Special Master in Article IV or in any certificate delivered pursuant to this Agreement.

## ARTICLE VI

## COVENANTS

Section 6.1.    Conduct of the Business Pending the Closing.

(a)    During the Interim Period, except (w) with the prior written consent of the Buyer (such consent not to be unreasonably withheld, conditioned or delayed), (x) as expressly permitted or required by this Agreement, (y) as may be required by applicable Law, or (z) as set forth in Section 6.1(a) or Section 6.1(b) of the Company Disclosure Schedules, the Special Master shall Cause the Acquired Companies to use their commercially reasonable efforts to (i) conduct their business in the Ordinary Course, (ii) preserve intact their business organizations, assets (ordinary wear and tear excepted), ongoing operations, and goodwill, and maintain material relationships with third parties (including suppliers, vendors, creditors, licensors and employees of the Acquired Companies and Governmental Bodies having regulatory authority in respect of the Acquired Companies and their operations), and (iii) preserve and maintain all material Permits.

(b)    Without limiting the generality of Section 6.1(a), except (v) with the prior written consent of the Buyer (such consent not to be unreasonably withheld, conditioned or delayed), (w) as expressly permitted or required by this Agreement, (x) as required to comply with a Material Contract that has been disclosed in the Company Disclosure Schedules, (y) as may be required by applicable Law, or (z) as set forth in Section 6.1(b) of the Company Disclosure Schedules, the Special Master shall Cause the Acquired Companies not to:

(i)    (A) amend the Acquired Charter or Company By-Laws, (B) permit any Company Subsidiary to amend such Company Subsidiary's Organizational Documents, or (C) vote in favor of the amendment of any of the Organizational Documents of any Non-Controlled Entity;

(ii)    (A) (I) adopt a plan or agreement of complete or partial liquidation, dissolution, merger or consolidation of any of the Acquired Companies, or (II) incur or assume any liability or expense in connection with the complete or partial liquidation or wind-down of any of the Acquired Companies, or (B) vote in favor of the adoption of a plan or agreement of complete or partial liquidation, dissolution, merger or consolidation, of any Non-Controlled Entity;

(iii)    (A) make or authorize any capital expenditures or commitments, except (I) for 2025, in accordance with the capital budgets of the Acquired Companies for 2025 as set forth in Section 6.1(b)(iii)(A)(I) of the Company Disclosure Schedules, (II) for 2026, in accordance with the capital budgets to be adopted by the Acquired Companies for 2026 (which such capital budgets will not exceed, in the aggregate, 10% of the 2026 projection included in the medium term plan set forth in Section 6.1(b)(iii)(A)(II) of the Company Disclosure Schedules (the "MTP")), and (III) for any subsequent year, in

accordance with the capital budgets of the Acquired Companies to be adopted by the Acquired Companies for such subsequent year (which such capital budgets will not exceed, in the aggregate, 15% of the projection included in the MTP for such subsequent year) (each of the foregoing, a "CapEx Budget") (provided, that, the Acquired Companies may make or authorize capital expenditures or commitments in excess of any applicable CapEx Budget so long as such excess expenditures do not, in the aggregate, result in an expenditure above 120% of the aggregate amount included in the applicable CapEx Budget), (B) make or authorize any growth or enhancing capital expenditures or commitments in excess of $15,000,000 (except, during 2025, as provided in the applicable CapEx Budget), (C) with respect to any line item in excess of $15,000,000 for growth or enhancing capital expenditures in any CapEx Budget, make or authorize an increase with respect to such line item in excess of 20% of the applicable budgeted amount, or (D) propose or vote in favor of any capital expenditures or commitments that would reasonably be expected to require additional cash contributions by any Acquired Company to any Non-Controlled Entity in amounts in excess of $3,000,000 in the aggregate for all Non-Controlled Entities;

(iv)    make or authorize any turnaround or catalyst expenditures or commitments, except (A) for 2025, in accordance with the turnaround/catalyst budget of the Acquired Companies for 2025 as set forth in Section 6.1(b)(iv)(A)(I) of the Company Disclosure Schedules, (B) for 2026, in accordance with the turnaround/catalyst budget of the Acquired Companies to be adopted by the Acquired Companies for 2026 (which such turnaround/catalyst budgets will not exceed 10% of the 2026 projection included in the MTP), and (C) for any subsequent year, in accordance with the turnaround/catalyst budget of the Acquired Companies to be adopted for such subsequent year (which such turnaround/catalyst budget will not exceed, in the aggregate, 15% of the projection included in the MTP for such subsequent year) (each turnaround/catalyst budget described in clauses (A)-(C), a "Turnaround/Catalyst Budget"); (provided, that, (1) the Acquired Companies may make or authorize turnaround or catalyst expenditures or commitments in excess of any applicable Turnaround/Catalyst Budget so long as such excess expenditures do not result in an expenditure above 120% of the aggregate amount included in the applicable Turnaround/Catalyst Budget and (2) to the extent any turnaround project exceeds the applicable budgeted amount in the applicable Turnaround/Catalyst Budget by more than 20%, the Acquired Companies will provide Buyer with a detailed explanation of such deviation promptly following such approval or expenditure, and provided, further, that, to the extent that the Acquired Companies determine that any turnaround/catalyst project included in the Turnaround/Catalyst Budget for a specific year should instead, in whole or in part, be executed in 2026 or a subsequent year, the inclusion of the remaining expenses with respect thereto in the Turnaround/Catalyst Budget 2026 or such subsequent year, as applicable, will not count towards the variance cap applicable to the Turnaround/Catalyst Budget to be adopted for such subsequent year and will not require the prior written consent of Buyer);

(v)    except as required under any Company Benefit Plan or Company Collective Bargaining Agreement, (A) increase the compensation of ███████████ ██████████████████████    of any Acquired Company (such current and former employees, together, "Senior Management"), or take any action to accelerate the vesting

35

or payment, or fund or in any other way secure the payment of, compensation or benefits under any Contract, Company Benefit Plan or otherwise for or to any current or former director, officer, manager, employee, contractor or consultant of any Acquired Company; provided that nothing in this <u>Section 6.1(b)(v)</u> shall prohibit (x) providing annual increases to compensation based on merit (with respect to the immediately preceding performance period only), market-based adjustments or tenure in the Ordinary Course and in accordance with standards, policies and practices of the Acquired Companies in place as of the Execution Date and disclosed to the Buyer, or (y) making, in the Ordinary Course and in accordance with standards, policies and practices of the Acquired Companies in place as of the Execution Date and disclosed to the Buyer, annual cash bonus and long term cash incentive grants that (I) do not provide for single trigger vesting upon the Closing and (II) do not provide for full vesting and payout of performance-based components in the case of a qualifying termination of the recipient after the Closing; (B) make, grant or promise any equity or equity-based compensation, severance, change of control, retention, termination or similar compensation or benefits to any current or former director, officer, manager, employee, contractor or consultant of any Acquired Company; provided, that, nothing in this <u>Section 6.1(b)(v)</u> shall prohibit making, granting or promising severance, change of control, retention, termination, or similar compensation or benefits in amounts which are less than $1,000,000 in the aggregate; (C) amend, adopt, establish, agree to establish, enter into or terminate any Company Benefit Plan or establish, adopt or enter into any plan, agreement, program, policy, practice, trust or other arrangement that would be a Company Benefit Plan if it were in existence as of the Execution Date for the benefit of any current or former director, officer, manager, employee, contractor or consultant of any Acquired Company; provided that nothing in this <u>Section 6.1(b)(v)</u> shall prohibit  (x) amendments to any Company Benefit Plan in the Ordinary Course that do not materially increase the costs to the Acquired Companies of such Company Benefit Plan, or (y) renewals or replacements of any Company Benefit Plan on commercially reasonable terms no less favorable in the aggregate to the Acquired Companies than the terms of the Company Benefit Plan being renewed or replaced; (D) terminate (other than for "cause" (as determined by the Company consistent with its practices)) any member of Senior Management; or (E) except as required by applicable Law, adopt or enter into any collective bargaining agreement, or amend in any material respect any Company Collective Bargaining Agreement (and, for the avoidance of doubt, nothing in this <u>Section 6.1(b)</u> shall restrict the Acquired Companies from entering into a successor collective bargaining to any Company Collective Bargaining Agreement that expires prior to Closing) (provided, that, for the avoidance of doubt, to the extent any action with respect to employees or Company Benefit Plans is not prohibited by this <u>Section 6.1(b)(v)</u>, then <u>Section 6.1(b)(xii)</u> will not be deemed to restrict any such action);

(vi)    acquire (x) all or a substantial portion of the capital assets of any other Person (or of any business) or (y) the business of any other Person (in case of clause (x) or (y), whether by merger, consolidation, acquisition of Equity Interests or assets or otherwise), except that the Acquired Companies shall be permitted to make (A) acquisitions pursuant to any Contract in effect on the Execution Date that is made available to the Buyer and listed in <u>Section 6.1(b)(vi)</u> of the Company Disclosure Schedules, (B) acquisitions of assets solely among the Company and wholly owned Company Subsidiaries, or among wholly owned Company Subsidiaries, or (C) acquisitions of assets

pursuant to the receivables securitization transaction evidenced by the Receivables Purchase Agreement, dated as of December 18, 2020, among CITGO AR2008 Funding Company, LLC, CITGO Petroleum, the various purchasers and purchaser agents from time to time party thereto, and Barclays Bank PLC, as program administrator, and the Purchase and Sale Agreement, dated as of December 18, 2020, between CITGO Petroleum and CITGO AR2008 Funding Company, LLC (each as amended and collectively, the "Receivables Securitization Facility"); provided, that any acquisitions included in the capital expenditures permitted under Section 6.1(b)(iii) shall not be subject to the restrictions set forth in this Section 6.1(b)(vi);

(vii)    propose or vote in favor of any action by a Non-Controlled Entity to acquire (x) all or a substantial portion of the capital assets of any other Person (or of any business) or (y) the business of any other Person (whether by merger, consolidation, acquisition of Equity Interests or assets or otherwise), except that the Acquired Companies shall be permitted to vote in favor of acquisitions of capital assets of any other Person or business of any other Person by a Non-Controlled Entity so long as such acquisition would not require additional cash contributions by any Acquired Company to any Non-Controlled Entity in excess of $5,000,000 individually or $10,000,000 in the aggregate for all Non-Controlled Entities;

(viii)    (A) sell, lease, license, encumber (including by the grant of any Preferential Right thereon) (other than by Permitted Liens) or otherwise dispose of any material assets or material property of any Acquired Company (excluding any issuance of any Equity Interest of any Acquired Company addressed in Section 6.1(b)(xv)) or (B) propose or vote in favor of any action by a Non-Controlled Entity to sell, lease, license, encumber (including by the grant of any Preferential Right thereon) (other than by Permitted Liens) or otherwise dispose of any material assets or material property of such Non-Controlled Entity, in each case except (I) pursuant to existing Contracts set forth in Section 6.1(b)(viii) of the Company Disclosure Schedules, (II) sales of inventory to customers in the Ordinary Course, (III) sales of or disposals of obsolete or worthless assets in the Ordinary Course, or (IV) with respect to the immediately preceding clause (A) only, (x) transfers among the Company and wholly owned Company Subsidiaries, or among wholly owned Company Subsidiaries, or (y) dispositions pursuant to the Receivables Securitization Facility;

(ix)    (A) incur any indebtedness for borrowed money or guarantee or assume any indebtedness for borrowed money of another Person (other than (I) borrowings or other advances of capital pursuant to the Receivables Securitization Facility, (II) borrowings that can be repaid at Closing without penalty, or (III) indebtedness for borrowed money incurred in the Ordinary Course that, in the case of this clause (III) does not exceed $50.0 million in the aggregate) or (B) with respect to any Non-Controlled Entity, propose or vote in favor of such Non-Controlled Entity incurring any indebtedness for borrowed money, guaranteeing or assuming any indebtedness for borrowed money of another Person (other than any Non-Controlled Entity's incurrence of any incremental indebtedness for borrowed money incurred in the Ordinary Course that is not in excess of $10,000,000 in the aggregate (net to the applicable Acquired Company);

(x)     prepay, repay, redeem, repurchase, defease, or cancel any indebtedness for borrow money in excess of $10,000,000, in each case, for cash, other than (A) for transactions among the Acquired Companies, (B) prepayment and repayment of borrowings or advanced capital to the extent required pursuant to the terms of the Receivables Securitization Facility, (C) prepayment and repayment of revolving loans in the Ordinary Course, and (D) any required amortization payments, mandatory prepayments, and repayments at maturity, in each case in accordance with the terms of the instrument governing such indebtedness for borrowed money as in effect on the Execution Date;

(xi)     (A) other than in the Ordinary Course, materially amend, terminate or waive any material right under any Material Contract or any material Vesting Instrument (other than amendments to renew any Material Contract on the same (or better in respect of the applicable Acquired Company) terms and conditions in all material respects as the terms and conditions of such Material Contract as of the Execution Date) or (B) enter into any Contract that would be a Material Contract if in effect as of the Execution Date, other than in the Ordinary Course (including entry into indemnification agreements with directors or officers in substantially the same form as indemnification agreements made available to the Buyer prior to the date hereof), and provided, that, with respect to this Clause (B), such Contracts do not (I) limit in any material respect either the type of business in which any Acquired Company may engage or the manner or locations in which any of them may so engage in any business (including through "non-competition" or "exclusivity" provisions), or (II) grant "most favored nation" or similar status with respect to any material obligations and would run in favor of any Person (other than an Acquired Company); provided, that, for the avoidance of doubt, nothing in this Agreement will limit the ability of CITGO Petroleum to execute guarantees of the Company's payment obligations pursuant to the Contracts disclosed in Section 6.6(a) of the Company Disclosure Schedules or New Indemnification Agreements (such guarantees, collectively, the "CITGO Petroleum Guarantees");

(xii)     except for any such change which is not material or which is required by reason of a concurrent change in GAAP or applicable Law, change any method of financial accounting or financial accounting practice (other than any change for Tax purposes, which shall be governed by Section 6.1(b)(xiv)) used by it;

(xiii)     (A) enter into any joint venture, partnership, participation, profit-sharing or other similar arrangement or (B) make any loans, capital contributions or advances to or investments in any other Person (other than (I) investments in wholly owned Company Subsidiaries, (II) pursuant to capital calls required pursuant to the terms of existing Contracts to the extent disclosed on Section 6.1(b)(xiii) of the Company Disclosure Schedules, or (III) advances for reimbursable employee expenses in the Ordinary Course or advancements of expenses to directors and officers of the Acquired Companies pursuant to bona fide advancement provisions under the Company Charter, Company By-Laws, Organizational Documents of any of the Company Subsidiaries or any indemnification agreement with any such director or officer);

(xiv)    (A) (I) make, revoke or amend any material election relating to Taxes or change any of its Tax accounting period or Tax accounting methods currently in effect, (II) other than in the Ordinary Course, settle any Tax Proceeding, or (III) other than in the Ordinary Course, file any amended Tax Return, in each case of the foregoing clauses (I), (II) and (III), if such action is reasonably likely to result in an increase to a Tax liability of the Acquired Companies that is material to the Acquired Companies, taken as a whole, or (B) with respect to any Non-Controlled Entity, vote in favor of or propose that such Non-Controlled Entity take any action described in the immediately preceding clause (A); provided, that, for the avoidance of doubt, the foregoing will not prohibit the Acquired Companies from taking any action in good faith as a result of, or to comply with, changes in applicable Tax Laws;

(xv)    authorize, issue, reserve for issuance, pledge, transfer or otherwise encumber, sell or redeem or enter into any Contract providing for any of the foregoing with respect to, any Equity Interests of any of the Acquired Companies or any Equity Interests of any Non-Controlled Entity owned by any Acquired Company (including, in each case, any split, combination, recapitalization or reclassification of any such Equity Interests);

(xvi)    other than as set forth in Section 6.1(b)(xvi) of the Company Disclosure Schedules, declare, set aside, make or pay dividends or similar distributions (whether in cash, stock or property) on or with respect to the Shares or otherwise, other than dividends or similar distributions between or among the Company and the Company Subsidiaries; provided, that, for the avoidance of doubt, nothing in this Agreement will limit the Acquired Companies' ability to satisfy payables to PDVSA described on Section 4.20 of the Company Disclosure Schedules;

(xvii)    (A) settle, satisfy, release or forgive any claim, demand, lawsuit or other Legal Proceeding (I) in an amount in excess of $15,000,000 in the aggregate or (II) that would impose any material non-monetary relief (excluding customary confidentiality obligations) on the Acquired Companies, or (B) with respect to any Non-Controlled Entity, vote in favor of or propose that such Non-Controlled Entity take any action described in the immediately preceding clause (A); or

(xviii)    agree or commit to do any of the foregoing (or, with respect to any of the foregoing restrictions which expressly relates to the Non-Controlled Entities, vote in favor of or propose that any Non-Controlled Entity agree or commit to take any such restricted action).

(c)    Notwithstanding the foregoing, during the Interim Period, the Acquired Companies may (i) utilize any and all available Cash to repay outstanding Debt and (ii) amend, restate, refinance or terminate any outstanding Debt or the Receivables Securitization Facility, or replace such Debt or Receivables Securitization Facility with new Debt (and the related incurrence of any guarantees for such borrowed money and the incurrence of any related liens on its property) including in the form of, but not limited to, a new securitization facility, an asset based loan or other revolving credit facility; provided, that any such repayment of outstanding Debt, or amendment, restatement, refinancing, termination, or replacement of outstanding Debt or the

Receivables Securitization Facility is determined in good faith by the Company's board of directors to be in the best interest of the Acquired Companies.

(d)    In the event that the Closing does not occur by the first anniversary of the Execution Date, the dollar amounts in this Section 6.1 shall, without further action, increase by an incremental 10% on each anniversary of the Execution Date.

(e)    Notwithstanding anything to the contrary herein, nothing in this Agreement will restrict the Acquired Companies from taking actions to prevent or mitigate the effects of any damage to property or injury to any person or the environment in emergency circumstances, as reasonably determined in good faith by the Acquired Companies, so long as the Acquired Companies (i) use Good Industry Practices with respect to such circumstances and (ii) provide the Buyer with notice of any such actions, as soon as reasonably practicable (and in any event, no later than one (1) Business Day) after such action is taken.

(f)    For the avoidance of doubt, nothing in this Agreement, including the provisions of this Section 6.1 or Section 6.3, in any way impairs the right of the Acquired Companies or PDVSA to object to the approval or execution of this Agreement or the approval or consummation of the Transactions, including on appeal, and the taking of any actions in connection therewith.

(g)    Notwithstanding anything in this Agreement to the contrary, to the extent that the Venezuela Parties propose a Competing Proposal which constitutes, or could reasonably be expected to lead to, a Superior Proposal, nothing in this Agreement will prohibit the Venezuela Parties from proposing that the Acquired Companies take actions otherwise prohibited by this Section 6.1 or any other provision of this Agreement in connection therewith (including, for the avoidance of doubt, the actions described in Section 6.1(b)(xvi)) and, subject to the termination of this Agreement pursuant to Section 8.1(d) or Section 8.1(g) in connection with the entry into a definitive agreement with respect to such Competing Proposal by the Venezuela Parties, the Acquired Companies committing to take such actions if permitted by applicable Law.

Section 6.2.    Access to Information.

(a)    During the Interim Period, the Special Master shall Cause the Company to provide the Buyer and its Representatives, upon reasonable advance notice and under reasonable circumstances, with reasonable access during normal business hours, to the books and records (including all electronic data related thereto), information, assets, operations and properties of the Acquired Companies and to the officers and employees of the Acquired Companies; provided, that (i) any such access and activities shall be conducted in a manner not to unreasonably interfere with the normal operations of the Acquired Companies or their respective business and (ii) without the prior written consent of the Special Master and the Company, which may be withheld for any reason in the sole and absolute discretion of the Special Master or the Company, as applicable, the Buyer and its Representatives shall have no right to perform invasive or subsurface investigations of the properties or facilities of the Acquired Companies. Notwithstanding anything herein to the contrary, no such access or disclosure or cooperation shall be required if doing so could reasonably be expected to (A) result in a waiver of attorney-client privilege, work product doctrine or similar privilege, (B) violate the terms of any Contract to which any Acquired Company is a party, or (C)

40

violate any Law to which any Acquired Company is subject; provided, that the Special Master shall Cause the Company to, to the extent legally permissible and practicable, use commercially reasonable efforts to make appropriate substitute disclosure arrangements, or seek appropriate joint defense agreements, waivers or consents, under circumstances in which the foregoing restrictions of this sentence apply. There may be withheld from the Buyer and its Representatives such portions of documents or information relating to pricing or other matters that are highly sensitive if the exchange of such documents (or portions thereof) or information as determined by the Company's outside counsel would be reasonably likely to result in antitrust difficulties between the Company and the Buyer or any of their respective Affiliates. All requests for such access shall be directed to such Person as the Special Master may designate in writing from time to time (collectively, the "Designated Contacts"). Other than the Designated Contacts, prior to the Closing, without the prior written consent of the Special Master (not to be unreasonably withheld, conditioned or delayed), neither the Buyer, its Affiliates or their respective Representatives shall contact any employee, contractors, supplier, customer, landlord or other material business relationship of any Acquired Company regarding any Acquired Company, their respective businesses or the Transactions.

(b)    Notwithstanding anything in this Agreement to the contrary, in no event will the Acquired Companies be required to provide Buyer or the Special Master with access to any information regarding its objections to the sale process, the negotiation of the Transactions or the Acquired Companies' objection to this Agreement or the approval or the consummation of the Transactions.

(c)    For a period commencing on the Closing Date and ending on the latest of (x) the date that is twelve (12) months after the Closing Date and (y) the final, non-appealable resolution of a Legal Proceeding relating to or arising from the Sale Order to appeal the sale and purchase of the Shares, the Buyer shall cause the Acquired Companies to use commercially reasonable efforts to maintain all books and records (including all electronic data related thereto) of the Acquired Companies relating to periods ending on or prior to the Closing Date and the Buyer shall cause the Acquired Companies to (i) provide the Special Master and its Representatives during the Company's normal business hours, upon reasonable advance notice and under reasonable circumstances, reasonable access to such books and records and the individuals responsible for preparing and maintaining such books and records, and (ii) permit the Special Master and its Representatives to make copies of any such books and records, in each case of the immediately preceding clause (i) and clause (ii), as reasonably requested in connection with any Legal Proceeding relating to or arising from the Sale Order to appeal the sale and purchase of the Shares (other than any Legal Proceeding between the Special Master, on the one hand, and the Buyer, on the other hand, related to the Sale Order, this Agreement, the other Transaction Documents or the Transactions, which would be governed by and subject to other applicable provisions of this Agreement and subject to applicable rules relating to discovery and document retention). Notwithstanding anything in this Section 6.2(c) to the contrary, the Buyer and the Acquired Companies shall not be required to provide such access or disclose any information to the Special Master if doing so could reasonably be expected to (A) result in a waiver of attorney-client privilege, work product doctrine or similar privilege (B) violate the terms of any Contract to which any Acquired Company is a party, or (C) violate any Law to which any Acquired Company is subject; provided, that the Parties will, to the extent legally permissible and practicable, use commercially reasonable efforts to make appropriate substitute disclosure arrangements, or seek

41

appropriate joint defense agreements, waivers or consents, under circumstances in which the foregoing restrictions of this sentence apply.

Section 6.3.     Regulatory Approvals; Third Party Consents.

(a)     Each of the Parties shall, if required by applicable Law, within thirty (30) calendar days following the date on which the Special Master files a motion with the Court to approve the Sale Order (the "Final Recommendation Date"), file or supply, or in the case of the Special Master Cause to be filed or supplied, in connection with the Transactions, all notifications and information required to be filed or supplied pursuant to the HSR Act. Each of the Parties shall request early termination of the waiting period under the HSR Act, if available. The Parties shall (and the Special Master shall Cause the Acquired Companies to), as soon as reasonably practicable following the Final Recommendation Date (and in any event no later than [●] ([●]) Business Days thereafter), file or supply, or cause to be filed or supplied in connection with the Transactions, all filings and submissions required under any relevant Laws, including Antitrust Laws. The Buyer acknowledges and agrees that it shall pay and shall be solely responsible for the payment of all filing fees in connection with any filings made pursuant to this Section 6.3 under any Antitrust Laws.

(b)     Neither Party shall (i) consent to any voluntary extension of any waiting period; (ii) pull and refile any filing made under the HSR Act, or any other Antitrust Laws; or (iii) consent to any other voluntary delay of the consummation of the Transactions at the behest of any Governmental Body, in each case, without the prior written consent of the other Party, which consent shall not be unreasonably withheld, conditioned or delayed.

(c)     The Parties shall coordinate and cooperate with one another in exchanging and providing such information to each other and in making the filings and requests referred to in Section 6.3(a). The Parties shall supply such reasonable assistance as may be reasonably requested by the other Party in connection with the foregoing and shall promptly furnish the other Party with all information within its possession that is reasonably required for all filings and submissions required under any relevant Laws, including Antitrust Laws.

(d)     Notwithstanding anything to the contrary in this Agreement, the Buyer shall take, and shall cause its Subsidiaries to take, as promptly as practicable, all action necessary, proper or advisable to consummate the Transactions prior to the Outside Date to (x) avoid or eliminate each and every impediment, resolve any objection and obtain all consents under any applicable Antitrust Laws as promptly as practicable so as to enable the Parties to consummate the Transactions and (y) avoid the entry or to effect the dissolution of, or vacate or lift, any Order, objection of any Governmental Body or waiting period under applicable Antitrust Laws that would otherwise have the effect of preventing, impairing or delaying the Closing, including: (i) proposing, negotiating and offering to commit and effect, by Order, consent decree, hold separate order, trust, or otherwise, the sale, license, divestiture, disposition or hold separate of such entities, assets, Intellectual Property, businesses, product lines, Equity Interests, properties or services of the Buyer or its Subsidiaries (including, following the Closing, the Acquired Companies); (ii) offering to take or offering to commit to take any action, including any action that limits the Buyer's freedom of action, ownership or control with respect to, or its ability to retain or hold, any of the businesses, assets, product lines, Equity Interests, properties or services of the Buyer or its

Subsidiaries (including, following the Closing, the Acquired Companies), to the extent legally permissible, and if the offer is accepted, taking or committing to take such action; (iii) terminating, amending, relinquishing, modifying, waiving or assigning existing relationships, ventures or contractual rights, obligations or other arrangements of the Buyer or its Subsidiaries (including, following the Closing, the Acquired Companies); (iv) changing or modifying, or agreeing not to engage in, any course of conduct regarding future operations; (v) creating any relationships, ventures, contractual rights, obligations or other arrangements of the Buyer or its Subsidiaries (including, following the Closing, the Acquired Companies); and (vi) committing to take any such actions in the foregoing clauses (i), (ii), (iii), (iv), or (v) or entering or offering to enter into agreements and stipulating to the entry of an Order or filing appropriate applications with any Governmental Body in connection with any of the actions contemplated by the foregoing clauses (i), (ii), (iii), (iv), or (v); provided, that notwithstanding anything in this Section 6.3 to the contrary, in no event shall the Buyer be obligated to take any action in respect of any Affiliate of the Buyer other than the Buyer's Subsidiaries (including, following the Closing, the Acquired Companies); and provided, further, that nothing in this Agreement shall require the Buyer or its Subsidiaries (including, following the Closing, the Acquired Companies) to propose, execute, carry out or agree or submit to any action or remedy contemplated by the foregoing clauses (i), (ii), (iii), (iv), or (v) that, individually or in the aggregate, reasonably would be expected to have a material adverse effect on the business, operations, financial conditions or results of operations of the Acquired Companies and their Affiliates (taken as a whole). For the avoidance of doubt, neither the Buyer nor any Subsidiary of the Buyer nor any Acquired Company shall be required to negotiate, agree or commit to, or effect to take or cause to be taken, any structural or behavioral remedy or any other action that is not conditioned (either as a condition precedent or subsequent) upon the consummation of the Transactions.

(e)     In addition and without limiting the other provisions of this Section 6.3, the Buyer shall defend through litigation, appealing, contesting or otherwise resisting any action, proceeding, or Order by any Governmental Body challenging the Transactions under applicable Antitrust Laws, including to defend through litigation on the merits any claim asserted in court by any Person in order to avoid entry of, or to have vacated or terminated, any Order (whether temporary, preliminary or permanent) that would delay the Closing or prevent the Closing by the Outside Date; provided, however, that such litigation in no way limits the obligation of the Buyer to take the actions set forth in Section 6.3(d).

(f)     Except as specifically required by the Agreement, the Buyer shall not take, and shall cause its Subsidiaries not to take, any action or refrain from taking any action, the effect of which would be to delay or impede the ability of the Parties to consummate the Transactions. Without limiting the generality of the foregoing, the Buyer shall not, and shall cause its Subsidiaries not to, acquire or agree to acquire by merging or consolidating with, or by purchasing a substantial portion of the assets of or equity in or otherwise make any investment in, or by any other manner, any Person or portion thereof, or otherwise acquire or agree to acquire or make any investment in any assets, or agree to a commercial or strategic relationship with any person, if the entering into of a definitive agreement relating to or the consummation of such acquisition, merger, consolidation, investment, commercial or strategic relationship would reasonably be expected to (i) impose any delay in the obtaining of, or increase the risk of not obtaining, any consent, approval, authorization, declaration, waiver, license, franchise, permit, certificate or Order of any Governmental Body necessary to consummate the Transactions or the expiration or termination of

43

any applicable waiting period, (ii) increase the risk of any Governmental Body entering an Order prohibiting the consummation of the Transactions, (iii) increase the risk of not being able to remove any such Order on appeal or otherwise, (iv) increase the risk of any Governmental Body asserting jurisdiction over the Transactions or (v) delay the consummation of the Transactions. In addition to and without limiting the generality of the foregoing, the Buyer shall cause its Affiliates not to acquire or agree to acquire (A) any downstream assets if such acquisition or agreement would reasonably be expected to impose any delay in the obtaining of, or increase the risk of not obtaining, the applicable approval required under the HSR Act, or (B) beneficial ownership (as defined under Section 13(d) of the Exchange Act) of more than 10% of a voting class of registered equity securities of any of the issuers listed on <u>Section 6.3(f)</u> of the Company Disclosure Schedules.

        (g)      Each Party shall promptly inform the other Party of any material communication from the Federal Trade Commission, the Department of Justice or any other Governmental Body regarding any of the Transactions. Each Party (including its respective Affiliates or Subsidiaries) will provide the other Party with copies (or, if provided orally, a summary) of all substantive correspondence, filings or communications between them or any of their Representatives, on the one hand, and any Governmental Body or members of its staff, on the other hand, with respect to this Agreement and the Transactions; <u>provided</u>, <u>however</u>, that materials may be redacted as necessary to (i) comply with contractual arrangements and (ii) address reasonable attorney-client or other privilege or confidentiality concerns. If any Party or any Affiliate thereof receives a request for additional information or documentary material from any such Governmental Body with respect to the Transactions, then such Party will use its reasonable best efforts to make, or cause to be made, as soon as reasonably practicable and after consultation with the other Party, an appropriate response in compliance with such request. The Buyer will advise the Special Master and the Company promptly in respect of any understandings, undertakings or agreements (oral or written) that the Buyer proposes to make or enter into with the Federal Trade Commission, the Department of Justice or any other Governmental Body in connection with the Transactions, and will use its best efforts to cause the Special Master and the Company to be given the opportunity to attend and participate at any meetings with respect thereto. None of the Buyer, the Special Master or the Company (including their respective Affiliates or Subsidiaries) will agree to participate in any meeting, telephone call or discussion with a Governmental Body in respect of any submissions, filings, investigation (including any settlement of the investigation), litigation or other inquiry relating to the matters that are the subject of this Agreement unless it consults with the other Party in advance and, except as may be prohibited by a Governmental Body or by any Law, and will permit authorized Representatives of the other Parties and the Special Master to be present at each meeting, telephone call or discussion. Notwithstanding the foregoing, the Buyer shall determine, direct and control the strategy and process by which the Parties will seek required approvals under the Antitrust Laws and the Buyer shall approve any filings and submissions before they are made. Notwithstanding this <u>Section 6.3(g)</u> and <u>Section 6.7</u> (Public Announcements), the Special Master acknowledges and agrees that, following the Execution Date and the issuance of Buyer's press release pursuant to <u>Section 6.7</u>, the Buyer and its Affiliates and each of their respective Representatives may contact Governmental Bodies and federal, state and local officials in connection with the Transaction and respond to inquiries (including informal in-person meetings) from such Persons and their representatives in each case, in connection with the Transaction for purposes of discussing the Buyer's identity and go-forward plans with respect to the Acquired Companies and impacts on stakeholders; <u>provided</u>,

that (i) this sentence shall not apply to any communications with Department of Justice, Federal Trade Commission, or OFAC; (ii) such communications shall not disclose substantive non-public information regarding the terms and conditions of the Transactions; (iii) prior to providing any such Person with written materials containing substantive non-public information regarding the Transactions, the Buyer shall provide the Special Master with copies of such written materials at least twenty-four (24) hours in advance of dissemination; and (iv) upon the reasonable request of the Special Master from time to time, the Buyer shall provide the Special Master with reasonable updates on the status of communications permitted pursuant to this sentence.

Section 6.4.    Further Assurances. Subject to, and not in limitation of, Section 6.3, unless this Agreement is terminated in accordance with Article VIII, each of the Parties shall (a) execute such documents and perform such further acts as may be reasonably required to carry out the provision hereof and the actions contemplated hereby and (b) use its best efforts to, at the earliest practicable date, satisfy, or cause the satisfaction of, the condition precedents to the consummation of the Transactions.

Section 6.5.    Confidentiality. The Buyer acknowledges that the information provided to them in connection with this Agreement and the Transactions is subject to the terms of the confidentiality agreement between ▮▮▮▮▮▮▮▮▮▮ and the Special Master dated ▮▮▮▮▮▮ (the "Confidentiality Agreement"), the terms of which are incorporated herein by reference; subject to disclosure permitted in accordance with Section 6.10. Effective as of the Closing, the Confidentiality Agreement shall terminate and be of no further force or effect.

Section 6.6.    Indemnification, Exculpation and Insurance.

(a)    From and after the Closing, the Buyer shall, and shall cause each Acquired Company to continue in full force and effect in accordance with their respective terms until the applicable statute of limitations with respect to any claims against such Indemnitees (as defined below), all rights to indemnification, advancement of expenses and exculpation by the Acquired Companies, now existing in favor of each of the Persons who at or prior to the Closing were (i) directors (or equivalent), officers or employees of any Acquired Company or (ii) serving as directors (or equivalent), officers or employees of another entity (including a joint venture) at the request of any Acquired Company (collectively, the "Indemnitees") pursuant to the Organizational Documents of the Acquired Companies in effect on the Execution Date (and to the extent permitted by Section 3, clause fifth of the Certificate of Incorporation of CITGO Petroleum as in effect on the Execution Date) or pursuant to the Contracts disclosed in Section 6.6(a) of the Company Disclosure Schedules in effect as of the Execution Date (as the same may be amended to reflect the CITGO Petroleum Guarantees) or indemnification Contracts entered into during the Interim Period between an Acquired Company, on the one hand, and an Indemnitee first hired or engaged by the Acquired Companies during the Interim Period, on the other hand (which such Contracts will not be materially less favorable to the Acquired Companies than those Contracts disclosed in Section 6.6(a) of the Company Disclosure Schedules) ("New Indemnification Agreements").

(b)    The indemnification and exculpation provisions of the Acquired Companies' Organizational Documents and indemnification Contracts disclosed in Section 6.6(a) of the Company Disclosure Schedules shall not be amended, or otherwise modified in any manner that would adversely affect the rights of the Indemnitees under Section 6.6(a), unless such

45

amendment or modification is required by Law. From and after the Closing, the Buyer agrees to cause the Acquired Companies to maintain in effect in accordance with their respective terms (i) the escrow agreement, dated May 5, 2023, by and among Citgo Petroleum Corporation, Morris James, LLP and JPMorgan Chase Bank, N.A. and (ii) the escrow agreement, dated May 5, 2023, by and among the Company, Morris James, LLP and JPMorgan Chase Bank, N.A., and not to amend the foregoing in any manner that would adversely affect the rights of the applicable Indemnitees thereunder, unless such modification is required by Law.

(c)     Prior to the Closing, the Company may, or, immediately upon the Closing if the Company has not already done so, the Buyer shall cause the Company and the Company Subsidiaries to, purchase the directors' and officers' "tail" or "runoff" insurance program currently available to be purchased under the existing directors' and officers' liability insurance plan covering the Acquired Companies' directors and officers, to the extent such plan remains available as of the Closing on materially the same terms and conditions; provided, that the premium paid for such "tail" policy shall not exceed 350% of the annual premiums paid for the Acquired Companies' current directors' and officers' liability insurance policy; and provided, further, that to the extent the premium paid for such "tail" policy exceeds 350% of the annual premiums paid for the Acquired Companies' current directors' and officers' liability insurance policy, the Buyer shall maintain a "tail" policy that has the most favorable coverage obtainable for an amount at or below 350% of the annual premiums paid for the Acquired Companies' current directors' and officers' liability insurance policy. To the extent that such plan is no longer available on materially the same terms and conditions at the Closing, prior to the Closing, the Buyer shall, or, immediately upon the Closing, shall cause the Company, to purchase a directors' and officers' liability "tail" or "run-off" insurance program, selected by the Company prior to the Closing, for a period of six (6) years after the Closing (such coverage shall have an aggregate coverage limit over the term of such policy in an amount no less than the aggregate coverage limit under the Company's existing directors' and officers' liability policy, and in all other respects comparable to such existing coverage); provided, that the premium paid for such "tail" policy shall not exceed 350% of the annual premiums paid for the Acquired Companies' current directors' and officers' liability insurance policy; and provided, further, that to the extent the premium paid for such "tail" policy exceeds 350% of the annual premiums paid for the Acquired Companies' current directors' and officers' liability insurance policy, the Buyer shall maintain a "tail" policy that has the most favorable coverage obtainable for an amount at or below 350% of the annual premiums paid for the Acquired Companies' current directors' and officers' liability insurance policy.

(d)     The provisions of this Section 6.6 are intended to be for the benefit of, and shall be enforceable by, each Indemnitee.

(e)     In the event that the Buyer, the Company or any of its successors or assigns (i) consolidates with or merges into any other Person and is not the continuing or surviving corporation or entity of such consolidation or merger; or (ii) transfers or conveys all or substantially all of its properties and assets to any Person, then, and in each such case, proper provision shall be made so that the successors and assigns of the Buyer and of the Company shall assume all of the obligations of the Buyer and the Company set forth in this Section 6.6.

Section 6.7.     Public Announcements. The Buyer and the Special Master shall not, and the Special Master shall Cause the Acquired Companies not to, issue any press release or make any

public statement without the prior consent of the other Party, which consent shall not be unreasonably withheld, conditioned or delayed, except that each of the Buyer and the Special Master may issue (x) the initial press release announcing the execution of this Agreement that has been agreed upon by the Buyer and the Special Master, (y) any press release or public announcement so long as any statements contained therein concerning the Transactions are consistent with previous releases or announcements made by the applicable Party with respect to which such Party has complied with the provisions of this Section 6.7, and (z) such other release or announcement that, upon the advice of outside counsel, is required by Law or the rules and regulations of any stock exchange upon which the securities of the Buyer, as applicable, or any of its Affiliates, are listed. Without limiting the foregoing, the Buyer and the Special Master shall consult with one another prior to issuing any press release or making any public statement with respect to this Agreement or the Transactions, and each Party shall, to the extent practicable, allow the other Party reasonable time to review and comment on all public releases, filings, notifications, announcement or other communications (including proxy statement and other communications with shareholders and filings, notifications or other communications with Governmental Bodies) concerning the Transactions in advance of their issuance, release, filing, dissemination or publication. For the avoidance of doubt, nothing in this Section 6.7 shall prevent the Parties from (a) issuing any press release or making any public statement in the Ordinary Course that does not relate specifically to this Agreement or the Transactions, (b) disclosing this Agreement or the substance or any relevant details of the Transactions on a confidential basis to any of its Representatives (provided, that such Representatives have been informed of such party's confidentiality obligations hereunder and under the Confidentiality Agreement or are otherwise obligated to keep such information confidential) or (c) in the case of the Special Master, complying with any reporting obligations of the Court and nothing in this Section 6.7 or in any other provision of this Agreement shall impact the ability of PDVSA or the Acquired Companies to use confidential information in connection with opposing the sale process, this Agreement or the Transactions.

Section 6.8.    Employee Matters.

(a)    The Buyer and the Special Master hereby agree that the Closing shall constitute a "Change in Control" for purpose of any employee arrangement and all other Company Benefit Plans, pursuant to the terms of such plans as in effect on the Execution Date (or as adopted or amended to the extent permitted by Section 6.1(b)). No provision of this Section 6.8(a) shall be construed to create a right in any employee or beneficiary of such employee under any Company Benefit Plan that such employee or beneficiary would not otherwise have under the terms of such Company Benefit Plan and, for the avoidance of doubt, no provision of this Section 6.8 will be deemed to supersede the terms of any Company Benefit Plan to the extent such terms are more favorable to Affected Employees than the rights granted hereunder.

(b)    As of the Closing, the Buyer shall, or shall cause the Acquired Companies to, assume the Company Collective Bargaining Agreements and adhere to the obligations thereunder pursuant to the terms therein. Following the Closing, the Buyer or the Acquired Companies will continue to employ the employees who are subject to or covered by the Company Collective Bargaining Agreements and employed by one of the Acquired Companies as of the Closing (the "Union Affected Employees") on the terms therein, including with respect to employee wages and benefits.

(c)      For a period of twelve (12) months  following the Closing (or, if shorter, the applicable employee's period of employment with the Buyer or one of the Acquired Companies), the Buyer shall continue to provide (or shall cause the Acquired Companies to provide) to each employee of any of the Acquired Companies as of the Closing who are not subject to or covered by a Company Collective Bargaining Agreement (the "Non-Union Affected Employees," together with the Union Affected Employees, the "Affected Employees"), compensation and employee benefits which are no less favorable than those provided to the Non-Union Affected Employees prior to the Closing.  Notwithstanding the generality of the foregoing, for a period of twelve (12) months following the Closing (or, if shorter, the applicable employee's period of employment with the Buyer or one of the Acquired Companies), the Buyer shall continue to provide (or shall cause the Acquired Companies to provide) to each Non-Union Affected Employee, (i) a base salary or wage rate (as applicable), in each case, that is no less favorable than those provided to such Non-Union Affected Employee immediately prior to the Closing, (ii) short-term and long-term incentive compensation opportunities and Responsibility Incentive (as such term is defined in the CITGO Petroleum Corporation 2024 Compensation and Incentive Omnibus Plan for Salaried Employees or its successor), in each case, that are no less favorable in the aggregate than those provided to such Non-Union Affected Employee immediately prior to the Closing, (iii) all other compensation and employee benefits (including any defined benefit pension and post-retirement health and welfare benefits) that are no less favorable in the aggregate than those provided to such Non-Union Affected Employee immediately prior to the Closing, and (iv) severance payments, entitlements and benefits that are no less favorable in the aggregate than those provided to such Non-Union Affected Employee immediately prior to the Closing. Except as required by applicable Law, for the period beginning on the Closing Date and ending on the first anniversary thereof, the Buyer agrees to cause the Acquired Companies to maintain in effect and without reduction retiree health and life insurance benefits for the individuals who are participants in the Acquired Companies' retiree health and life insurance benefits as of immediately prior to the Closing Date and individuals who become eligible to participate in such retiree health and life insurance benefits during the period beginning on the Closing Date and ending on the one year anniversary thereof.

(d)      The Buyer will give (or will cause the Acquired Companies to give) each Affected Employee full credit for purposes of eligibility, vesting and benefit accrual under any employee benefit plans or arrangements maintained by the Buyer (or any of the Acquired Companies) for such Affected Employee's service with any of the Acquired Companies (and their respective predecessor entities) to the same extent recognized by any of the Acquired Companies immediately prior to the Closing, except to the extent that such credit would result in a duplication of benefits or compensation for the same period of service.

(e)      The Buyer will (or will cause the Acquired Companies to) use commercially reasonably efforts to (i) waive all limitations as to preexisting conditions, exclusions and waiting periods with respect to participation and coverage requirements applicable to each Affected Employee under any welfare benefit plans that such Affected Employee may be eligible to participate in after the Closing, other than limitations or waiting periods that are already in effect with respect to such Affected Employee and that have not been satisfied as of the Closing under any welfare plan maintained for the Affected Employee immediately prior to the Closing, and (ii) for the first plan year of eligibility, provide each Affected Employee with credit for any co-payments and deductibles, paid by such Affected Employee prior to the Closing, in satisfying any applicable deductible or out-of-pocket requirements under any welfare plans that such Affected

Employee is eligible to participate in after the Closing. References to "Affected Employee" in this Section 6.8(e) shall also refer to the applicable Affected Employee's eligible dependents.

(f)     Upon the Buyer's request (and at the Buyer's sole cost and expense), the Special Master shall Cause the Company to adopt and maintain an employee retention plan in form and substance as proposed by the Buyer in writing. Any such employee retention plan shall be in addition to, and shall not replace or substitute any existing Company Benefit Plan.

(g)     To the extent any awards under any cash bonus, sales and other incentive plans of the Acquired Companies ("Bonus Amounts") with respect to a performance period completed prior to the Closing remain unpaid as of the Closing Date, the Buyer shall cause such Bonus Amounts to be calculated and paid in the Ordinary Course to the eligible employees of the Acquired Companies.  With respect to Bonus Amounts for the performance period in which the Closing occurs, the Buyer shall cause such Bonus Amounts to be calculated and paid in the Ordinary Course to the eligible employees of the Acquired Companies based on the actual level of Company performance for such performance period.  Without limiting in any way any rights an Affected Employee may have under any Company Benefit Plan, if an Affected Employee participating in the CITGO Petroleum Corporation Performance Incentive program for salaried employees (the "Performance Incentive Program") has a qualifying termination of employment entitling the Affected Employee to severance under a severance program, agreement or arrangement of the Buyer or the Acquired Companies and such termination occurs during the period that begins on the Closing Date and ends on the date on which Bonus Amounts under the Performance Incentive Program are paid for the performance period in which the Closing occurs, then such Affected Employee will not lose eligibility, solely due to the termination of employment, for payment of any Bonus Amount under the Performance Incentive Program for performance periods completed prior to the Closing or for the performance period in which the Closing occurs; provided, that any such Bonus Amounts shall be paid to such employee at the same time as such awards are paid to other participants in the Performance Incentive Program, and provided, further, that any such Bonus Amount for the performance period in which the termination of employment occurs shall be prorated based on the number of completed months of employment during the performance period prior to the termination of employment.

(h)     The provisions contained in this Section 6.8 shall not (i) be treated as an amendment or other modification of any Company Benefit Plan, Company Collective Bargaining Agreement or other employee benefit plan, agreement or other arrangement, (ii) limit the right of the Buyer or any Acquired Company to terminate any employee at any time and for any reason or (iii) create any third party rights, benefits or remedies of any nature whatsoever in any employee of any Acquired Company (or any beneficiaries or dependents thereof) or any other Person that is not a party to this Agreement. The benefits and compensation provided to each Affected Employee following the Closing Date shall be subject to the requirements of applicable Law. Notwithstanding the foregoing, nothing herein will impose on the Buyer or any of the Acquired Companies any obligation to (A) retain any Affected Employee in its or their employ for any amount of time or (B) maintain any terms and conditions of employment other than as expressly set forth above, subject to applicable Law and the Acquired Companies' existing contractual obligations to the respective Affected Employee.

(i)    From and after the Execution Date, the Buyer will cooperate with and provide all information reasonably requested by the Acquired Companies and their representatives in connection with any notice to be filed by the Acquired Companies with the PBGC pursuant to ERISA Section 4043 and the regulations thereunder as a result of the Transactions or in connection with any related requests for information from the PBGC.

Section 6.9.    <u>The Buyer's Obligations in Respect of Debt Financing</u>.

(a)    The Buyer acknowledges and agrees that the Special Master, the Company and their respective Affiliates have no responsibility for any financing that Buyer may raise in connection with the Transactions.

(b)    The Buyer shall deliver to the Special Master fully executed versions of the Debt Commitment Letters, each in the form of the applicable Debt Commitment Letter delivered on the Execution Date, on or prior to the last day of the Topping Period.

(c)    The Buyer shall use reasonable best efforts to take, or cause to be taken, all actions and to do, or cause to be done, all things necessary, proper or advisable to obtain the Debt Financing contemplated by the Debt Financing Commitments on or prior to the Closing Date, including to:

(i)    maintain in effect (A) the Equity Commitment Letters from and after the Execution Date and (B) the Debt Commitment Letters from and after the date on which the Buyer delivers the executed Debt Commitment Letters to the Special Master pursuant to <u>Section 6.9(b)</u> (the "<u>Debt Commitment Letter Effective Date</u>"), subject to the Buyer's right to amend, modify, supplement, restate, assign, substitute or replace the Debt Commitment Letters in accordance herewith;

(ii)    negotiate and enter into definitive financing agreements (the "<u>Definitive Debt Documents</u>") with respect to the Debt Financing that reflect the terms contained in the Debt Commitment Letters (including any "market flex" provisions related thereto) or such other terms acceptable to the Buyer and the Debt Financing Sources, so that such agreements are in effect no later than the Closing Date; it being understood that in no event shall any of the Definitive Debt Documents (A) reduce the aggregate amount of the Debt Financing provided for in the Debt Commitment Letters (including by changing the amount of fees or original issue discount contemplated by the Debt Commitment Letters and the Fee Letters) to an amount that would reduce the total sources of funding below the Required Amount; (B) expand the conditions or other contingencies relating to the receipt or funding of the Debt Financing beyond those expressly set forth in the Debt Commitment Letters, amend or modify any such conditions or other contingencies in a manner adverse to the Buyer and/or the Acquired Companies (whether by making any such conditions or other contingencies less likely to be satisfied on a timely basis or otherwise) or impose any new or additional condition or other contingency relating to the receipt or funding of the Debt Financing or (C) contain terms (other than those terms expressly set forth in the Debt Commitment Letters) that (1) could reasonably be expected to delay the Closing or the date on which the Debt Financing would be obtained or make the timely funding of the Debt Financing less likely to occur, or (2) adversely impact the ability of the

Buyer to consummate the Debt Financing (clauses (A) through (C), a "Prohibited Modification");

(iii)    satisfy on a timely basis all conditions applicable to the Buyer contained in the Debt Financing Commitments and Equity Financing Commitments, including the payment of any commitment, engagement or placement fees required as a condition to the Debt Financing or the Equity Financing, as applicable;

(iv)    consummate the Debt Financing (including by instructing the Debt Financing Sources to fund the Debt Financing in accordance with the Debt Commitment Letters, instructing the Equity Financing Sources to fund the Equity Financing in accordance with the Equity Commitment Letters and enforcing the Buyer's rights under the Debt Commitment Letters) at or prior to the date that the Closing is required to be effected in accordance with Section 2.2 (the Buyer acknowledges and agrees that it is not a condition to Closing under this Agreement, nor to the consummation of the Transactions, for the Buyer to obtain the Debt Financing or any Replacement Financing); and

(v)    comply with its obligations under the Debt Commitment Letters.

Subject to the terms and upon satisfaction of the conditions set forth in the Debt Commitment Letters, the Buyer shall use its reasonable best efforts to cause the lenders and the other Persons providing such Debt Financing to provide the Debt Financing on the Closing Date.

(d)    The Buyer shall provide to the Special Master copies of all agreements and other documents relating to the Debt Financing and, shall keep the Special Master reasonably informed on a current basis and in reasonable detail of material developments in respect of the financing process relating thereto. Without limiting the generality of the foregoing, the Buyer shall provide the Special Master prompt (and in no event later than forty-eight (48) hours after obtaining knowledge) written notice (i) of any expiration or termination of, or any breach, default or violation (or any event or circumstance that, with or without notice, lapse of time or both, could reasonably be expected to give rise to any breach, default or violation) by any party to the Debt Commitment Letters or definitive agreements related to the Debt Financing of which the Buyer becomes aware, (ii) of the receipt of any written notice or other written communication, in each case from any Debt Financing Source with respect to any (x) actual or potential breach, default, violation, termination or repudiation by any party to the Debt Commitment Letters or definitive agreements related to the Debt Financing of any provision of the Debt Commitment Letters or definitive agreements related to the Debt Financing, (y) any actual dispute or disagreement between or among any parties to the Debt Commitment Letters or definitive agreements related to the obligation to fund the Debt Financing or the amount of the Debt Financing to be funded at the Closing, and (iii) if at any time for any reason the Buyer believes in good faith that it will not be able to obtain all or any portion of the Debt Financing on the terms and conditions contemplated by the Debt Financing Commitments or definitive agreements related to the Debt Financing. As soon as reasonably practicable, but in any event within forty-eight (48) hours after the Special Master delivers to the Buyer a written request therefor, the Buyer shall provide any information reasonably requested by the Special Master relating to any circumstance referred to in clause (i), (ii) or (iii) of the immediately preceding sentence; provided, that the right of the Special Master to request such

information shall not limit the obligations of the Buyer to promptly provide such information as otherwise required by this Section 6.9(d).

(e)     Prior to the Closing, the Buyer shall not, without the prior written consent of the Special Master, agree to, or permit, any amendment, restatement, amendment and restatement, replacement, supplement, or other modification of, or waiver or consent under, the Debt Commitment Letters or other documentation relating to the Debt Financing which would constitute a Prohibited Modification. For purposes of this Section 6.9, the definitions of "Debt Commitment Letter," "Debt Financing," "Debt Financing Commitments," "Debt Financing Sources," shall include the Debt Financing Commitment or documents related thereto as permitted to be amended, amended and restated, replaced, supplemented, modified, waived or consented to by this Section 6.9(e). The Buyer shall promptly deliver to the Special Master copies of any such amendment, restatement, amendment and restatement, replacement, supplement, modification, waiver or consent. The Buyer shall not agree to or permit the withdrawal, repudiation, termination or rescission of any Debt Commitment Letter or Definitive Debt Document or any provision thereof (except in connection with Replacement Financing). Further, for the avoidance of doubt, if from and after the Execution Date the Debt Financing (or any Replacement Financing) has not been obtained, the Buyer shall continue to be obligated to consummate the Transactions subject only to the satisfaction or waiver of the conditions set forth in Section 7.1 and Section 7.2.

(f)     If, notwithstanding the use of reasonable best efforts by the Buyer to satisfy its obligations under Section 6.9(b), (c), (d) and (e), any of the Debt Financing or the Debt Financing Commitments (or any definitive financing agreement relating thereto) expire or are terminated or become unavailable prior to the Closing, in whole or in part, for any reason, the Buyer shall (i) promptly notify the Special Master of such expiration, termination, or unavailability and the reasons therefor and (ii) use its reasonable best efforts promptly to arrange for alternative financing ("Replacement Financing") (which shall be sufficient, together with the Equity Financing and cash on hand of the Buyer, to pay the Required Amount and shall not, without the prior written consent of the Special Master, include any conditions to such Replacement Financing that are more onerous than, or in addition to, the conditions set forth in the Commitment Letters, as applicable, to replace the financing contemplated by such expired, terminated, or unavailable commitments or arrangements). The Buyer shall deliver to the Special Master true, correct and complete copies of all contracts or other arrangements pursuant to which any such alternative source shall have committed to provide any portion of the Replacement Financing (provided that any fee letters in connection therewith may be redacted in a manner consistent with the Fee Letter provided as of the Execution Date). To the extent applicable, the Buyer shall use its reasonable best efforts to take, or cause to be taken, all actions necessary, proper or advisable to arrange and consummate the Replacement Financing on the terms and conditions described in such contracts or other arrangements relating thereto on or before the Closing Date, including (A) using reasonable best efforts to (x) satisfy on a timely basis, all terms, covenants and conditions set forth therein; (y) enter into definitive agreements with respect thereto on the terms and conditions set forth therein and (z) consummate the Replacement Financing at or prior to the Closing and (B) if necessary or appropriate, seeking to enforce its rights thereunder. In the event that Replacement Financing is obtained in accordance with this Section 6.9(f), the definitions of "Debt Commitment Letter," "Debt Financing," "Debt Financing Commitments," and "Debt Financing Sources" shall include the commitments in respect of the Replacement Financing or the documents related thereto, as applicable. Notwithstanding the foregoing, compliance by the Buyer with the provisions of this

Section 6.9(f) shall not relieve the Buyer of their obligation to consummate the Transactions whether or not the Debt Financing is available.

Section 6.10.   <u>Company's Obligations in Respect of Debt Financing</u>.

(a)     Subject to <u>Section 6.10(b)</u>, prior to the Closing, the Special Master shall Cause the Acquired Companies to use commercially reasonable efforts to provide to the Buyer such customary cooperation in connection with the arrangement of the Debt Financing as is reasonably requested by the Buyer. Such assistance shall include using commercially reasonable efforts to do the following, at the Buyer's sole expense, in connection with the Debt Financing:

(i)     as promptly as practicable, to furnish, or cause to be furnished, to the Buyer, the Required Information;

(ii)     causing the Company's employees with the title of executive vice president or above to participate in a reasonable number of meetings, presentations, sessions with rating agencies or other customary syndication activities;

(iii)     (A) assisting with the preparation of appropriate and customary materials for a rating agency presentation, a bank information memorandum and a lender presentation reasonably required in connection with the Debt Financing and (B) having an officer of the Company execute a customary authorization letter with respect to the bank information memorandum that authorizes distribution of information to prospective lenders;

(iv)     to the extent not prohibited or restricted under applicable Law or any Contract of the Company or its applicable Affiliate, facilitating the pledging of collateral; provided that no pledge shall be effective until the Closing;

(v)     assisting in the preparation of definitive financing documents, including guarantee and collateral documents and customary closing certificates and other customary documents as reasonably necessary, in each case, not to be effective until the Closing (<u>provided</u>, that, unless specifically provided for in this <u>Section 6.10</u>, in no event will any of the Acquired Companies or their respective Representatives be required to execute or deliver any opinion or certificate in connection with the Financings);

(vi)     furnishing the Buyer at least three (3) Business Days prior to the Closing Date with all documentation and other information required by a Governmental Body with respect to the Debt Financing under applicable "know your customer" and anti-money laundering rules and regulations that is reasonably requested by the Buyer at least ten (10) Business Days prior to the Closing Date;

(vii)     solely with respect to financial information and data derived from the Acquired Companies' historical books and records, provide reasonable and customary assistance to the Buyer with the preparation of pro forma financial information and pro forma financial statements to the extent reasonably requested by the Buyer or the Debt Financing Sources and customary to be included in any marketing materials or Offering Documents or of the type required by the Debt Commitment Letters (<u>provided</u>, that none

of the Acquired Companies or any of their respective Representatives shall be responsible for the preparation of any pro forma financial statements or pro forma adjustments thereto);

(viii)    provide reasonable and customary assistance to the Buyer and the Debt Financing Sources in the preparation of customary Offering Documents, syndication memoranda, ratings agency presentations and other marketing material for the Debt Financing, including the execution and delivery of customary authorization letters related thereto (provided, that, unless specifically provided for in this Section 6.10, in no event will any of the Acquired Companies or their respective Representatives be required to execute or deliver any opinion or certificate in connection with the Debt Financing);

(ix)    cooperate with the Buyer to obtain customary corporate and facilities credit ratings, consents, landlord waivers and estoppels, non-disturbance agreements as reasonably requested by the Buyer, in each case, not to be effective prior to the Closing Date;

(x)    subject to an executed confidentiality agreement containing confidentiality provisions that are not less favorable in any material respect to the Special Master than those contained in the Confidentiality Agreement (an "Acceptable Confidentiality Agreement"), taking all actions reasonably necessary and customary to (A) permit the Debt Financing Sources and their respective Representatives to evaluate the Acquired Companies' current assets, properties, rights, inventory, cash management and accounting systems, and policies and procedures relating thereto for the purpose of establishing collateral arrangements to the extent customary and reasonable and (B) establish bank and other accounts and blocked account agreements and lock box arrangements in connection with the foregoing, provided that such agreements and arrangements will only be effective upon Closing;

(xi)    subject to an Acceptable Confidentiality Agreement, granting the Debt Financing Sources on reasonable terms and upon reasonable request, at reasonable times and on reasonable notice at times and locations to be mutually agreed, access to the Acquired Companies' properties, rights, assets and cash management and accounting systems (including cooperating in and facilitating the completion of field examinations, collateral audits, asset appraisals and surveys) for the purpose of establishing collateral arrangements required to be in place pursuant to the Financings;

(xii)    subject to an Acceptable Confidentiality Agreement, furnishing the Buyer and the Debt Financing Sources all existing field examinations, collateral audits and asset appraisals and surveys of the Acquired Companies to the extent prepared in the Ordinary Course and other information prepared in the Ordinary Course as necessary to enable the Buyer to furnish the "Borrowing Base Certificate" required to be delivered pursuant to clause 4(b) of Exhibit E to the Debt Commitment Letters;

(xiii)    assisting in the preparation of at Closing, the Debt Financing Documents, including assistance with the preparation of schedules, information required by the perfection certificate and exhibits thereto or other customary informational requirements relating to the Acquired Companies as are requested by the Buyer, and other

customary documents as may be reasonably requested by the Buyer or the Debt Financing Sources, and otherwise assist in facilitating the creation and perfection of the security interests in the collateral contemplated by the Debt Financing, in each case, to the extent required to facilitate the satisfaction of the financing conditions set forth in the Debt Commitment Letters that are within its control, provided that no such document or certificate or the creation or perfection of any security interest in any of the Equity Interests of or assets owned by the Company and its Subsidiaries shall be effective prior to Closing (provided, that, unless specifically provided for in this Section 6.10, in no event will any of the Acquired Companies or their respective Representatives be required to execute or deliver any opinion or certificate in connection with the Debt Financing);

(xiv)    cooperating with the Buyer to take such corporate or other organizational action, subject to the occurrence of the Closing, as is reasonably necessary to permit the consummation of the Debt Financing (provided, that, unless specifically provided for in this Section 6.10, in no event will any of the Acquired Companies or their respective Representatives be required to execute or deliver any opinion or certificate in connection with the Debt Financing); and

(xv)    using commercially reasonable efforts to facilitate the delivery of the Payoff Letters and the discharge and release documentation at least three (3) Business Days prior to the Closing Date.

(b)    Notwithstanding anything in Section 6.10(a) or this Agreement to the contrary, the cooperation requested by the Buyer pursuant to Section 6.10(a) shall not:

(i)    require the entry by the Special Master or any Acquired Company into any agreement or commitment, or the taking of any action, that would be effective prior to the Closing and that is not contingent on the occurrence of the Closing;

(ii)    unreasonably interfere with the ongoing operations of the Acquired Companies; or

(iii)    include any action that the Special Master or the Company reasonably believes would require any of the Acquired Companies to (A) pay any commitment or other similar fee, (B) have or incur any liability or obligation in connection with the Debt Financing, including under any agreement or any document related to the Debt Financing, (C) take any action that would conflict with, violate or result in a breach of or default under the Company Charter and Company By-Laws or any Organizational Documents of the Company's Affiliates, any Contract, any Transaction Document or any Law, (D) take any action that could subject any director, manager, officer or employee of the Company or any of its Affiliates to any personal liability, (E) provide access to or disclose information that the Company determines in good faith could jeopardize any attorney client privilege of, or conflict with any confidentiality requirements applicable to, the Company or any of its Affiliates, (F) cause any director or manager of the Company or any of its Affiliates to pass resolutions or consents to approve or authorize the execution of the Debt Financing (other than continuing directors or managers), (G) reimburse any expenses or provide any indemnities, (H) make any representation, warranty or

55

certification that, in the good faith determination of the Company, is not true, (I) require the delivery of any financial statements in a form or subject to a standard different than those provided to the Buyer on or prior to the Execution Date, (J) provide any cooperation or information that does not pertain to the Acquired Companies or (K) provide (i) any description of all or any component of the Financings (including any such description to be included in any liquidity or capital resources disclosure or any "description of notes"), (ii) projections, risk factors or other forward-looking statements relating to all or any component of the Financings, or (iii) any solvency certificate or similar certification in connection with the Financings (which items (i) through (iii) shall be the sole responsibility of the Buyer). In no event shall the Special Master be in breach of Section 6.10(a) because of the Company's failure to deliver any financial or other information that is not currently readily prepared in the Ordinary Course at the time requested by the Buyer or to obtain review of any financial or other information by its accountants.

(c)    Notwithstanding anything to the contrary contained herein, it is understood and agreed by the Parties that the failure of the Special Master or the Company to comply with the provisions of this Section 6.10 shall not give rise to a failure of a condition precedent set forth in Section 7.2(b) or a termination right pursuant to Section 8.1(e).

(d)    The Buyer shall promptly reimburse the Acquired Companies, the Special Master, and/or their respective Representatives for all reasonable and documented out-of-pocket costs and expenses incurred by the Acquired Companies, the Special Master, and/or their respective Representatives in connection with the cooperation contemplated by Section 6.10(a), including (i) attorneys' fee and (ii) expenses of the Company's accounting firms engaged to assist in connection with the Debt Financing other than (x) costs and expenses incurred in connection with the preparation of historical financial statements in the ordinary course of business, and (y) any other ordinary course amounts that would have been incurred in connection with the Transactions entirely and completely regardless of (A) any debt financing established in connection herewith and (B) any requirements or actions under this Section 6.10. The Buyer shall indemnify and hold harmless, the Special Master, Acquired Companies, and their respective Representatives, from and against any and all liabilities or losses suffered or incurred by them in connection with the arrangement of the Debt Financing and any information utilized in connection therewith.

(e)    Any information provided pursuant to this Section 6.10 shall be subject to the Confidentiality Agreement; provided, that the Buyer will be permitted to disclose such information to any Debt Financing Sources or prospective Debt Financing Sources and other financial institutions and investors that are or may become parties to the Debt Financing and to any underwriters, initial purchasers or placement agents in connection with the Debt Financing or with respect to the Equity Financing or any other equity financing in connection with the Transactions (and, in each case, to their respective counsel and auditors) so long as such Persons (i) agree to be bound by confidentiality provisions substantially similar to those in the Confidentiality Agreement (and any confidentiality agreements between the Company and its Affiliates) as if parties thereto, or (ii) are subject to other confidentiality undertakings reasonably satisfactory to the Company and of which the Company is a beneficiary.

56

(f)     Subject to the terms and conditions set forth in this Agreement, the Buyer acknowledges and agrees that neither obtaining the Financings nor any Replacement Financing, by the Buyer nor any cooperation by the Acquired Companies at the direction of the Special Master is a condition to Closing and reaffirms its obligations to consummate the Transactions irrespective and independently of the availability of the Financing or any Replacement Financing, subject to fulfillment or waiver of the conditions set forth in <u>Section 7.1</u> and <u>Section 7.2</u>.

Section 6.11.   <u>Tax Matters</u>.

(a)     All Transfer Taxes shall be paid by the Buyer. The Buyer shall procure any stock transfer stamps required by any Transfer Tax, and timely file, to the extent required by applicable Law, all necessary Tax Returns and other documentation with respect to all such Transfer Taxes and provide to the Special Master upon request evidence of payment of all Transfer Taxes.

(b)     The Parties agree that any amount of cash or property directly or indirectly transferred by the Acquired Companies to PDVSA or in satisfaction of liabilities of PDVSA in connection with this Agreement shall be effected through a redemption of Shares and shall for U.S. tax purposes be integrated with the purchase of Shares by the Buyer in accordance with the principles set forth in Zenz v. Quinlivan, 213 F.2d. 914 (6th Cir. 1954) and treated as a redemption of a portion of PDVSA's interest in the Company pursuant to Section 302(b) of the Code (the "<u>Intended Tax Treatment</u>"). The Parties hereto agree to file, and to cause the Acquired Companies to file, all Tax Returns and take all actions in a manner consistent with the Intended Tax Treatment and not to take any action that is inconsistent with the Intended Tax Treatment unless otherwise required by (i) a change in applicable Law after the date hereof, or (ii) pursuant to a final determination of an applicable Taxing Authority.

(c)     The Buyer shall prepare or cause to be prepared and timely file or cause to be timely filed all Tax Returns of the Acquired Companies that are first due (taking into account any applicable extensions properly obtained in the Ordinary Course) after the Closing Date.

Section 6.12.   <u>R&W Insurance Policy</u>. In the event the Buyer or any of its Affiliates obtains a representations and warranties insurance policy in respect of the representations and warranties contained in this Agreement or in any certificate or other instrument contemplated by or delivered in connection with this Agreement (such policy, a "<u>R&W Insurance Policy</u>"), (a) all premiums, underwriting fees, brokers' commissions and other costs and expenses related to such R&W Insurance Policy shall be borne solely by the Buyer or such Affiliate, (b) such R&W Insurance Policy shall not provide for any "seller retention" (as such phrase is commonly used in the representations and warranties insurance policy industry) and (c) such R&W Insurance Policy shall expressly waive any claims of subrogation against the Special Master and any Acquired Company (other than, solely in the case of an Acquired Company, in connection with Fraud of any Acquired Company). The Special Master shall, and shall Cause the Company to, use commercially reasonable efforts to cooperate with the Buyer's efforts, as applicable, and provide assistance as reasonably requested by the Buyer to obtain and bind the R&W Insurance Policy and to maintain its effectiveness through the Closing.

Section 6.13.   <u>Notices of Certain Events</u>.

(a)    During the Interim Period, the Special Master shall, and shall Cause the Company to notify the Buyer, and the Buyer shall promptly notify the Special Master, of:

(i)    any written notice or other written communication from any Person alleging that the consent of such Person is or may be required in connection with the Transactions;

(ii)    any notice or other written communication from any Governmental Body in connection with the Transactions;

(iii)    any actions, suits, claims, investigations or proceedings (A) commenced or (B) to the Knowledge of the Buyer or to the Knowledge of the Special Master, as applicable, threatened against, relating to or involving or otherwise affecting such Party or any of its Subsidiaries which relate to the consummation of the Transactions (excluding any appeals or other oppositions by the Acquired Companies or PDVSA); and

(iv)    any item or information referred to in, or received by the Special Master pursuant to, <u>Section 6.13(b)</u>;

<u>provided</u>, that any failure to comply with this <u>Section 6.13(a)</u> shall not constitute the failure of any condition set forth in <u>Article VII</u> to be satisfied unless the underlying circumstance would independently result in the failure of a condition set forth in <u>Article VII</u> to be satisfied.

(b)    During the Interim Period, in order to enable the Special Master and his Representatives to satisfy the obligations of the Special Master in this Agreement, the Special Master may Cause the Company and its Subsidiaries to, upon request by the Special Master, promptly provide to the Special Master:

(i)    access to the books and records (including all electronic data related thereto), information, assets, operations and properties of the Acquired Companies;

(ii)    contact information for any vendors, customers and manufacturers and others with whom the Company does business;

(iii)    the status of the Acquired Companies' business and financial condition; and

(iv)    access to consult with the Acquired Companies' officers and employees, who shall make themselves reasonably available for such consultation.

(c)    During the Interim Period, in order to enable the Special Master and his Representatives to satisfy the obligations of the Special Master in this Agreement, the Special Master may Cause the Company and its Subsidiaries to immediately provide to the Special Master (upon any of the following being received by or made available to the Company or any of its Subsidiaries):

(i)      copies of any written notice or other written communication from any Person alleging that the consent of such Person is or may be required in connection with the Transactions;

(ii)      copies of any notice or other written communication from any Governmental Body in connection with the Transactions;

(iii)      documentation relating to any Legal Proceeding (A) commenced or (B) to the Knowledge of the Company or the Knowledge of the Buyer, as applicable, threatened against, relating to or involving or otherwise affecting such Party or any of its Subsidiaries which relate to the consummation of the Transactions;

(iv)      notice of (A) the occurrence, or failure to occur, of any event which occurrence or failure would reasonably be likely to cause a breach of any representation or warranty made by such Party in this Agreement being untrue or inaccurate or (B) any failure of a Party to comply with or satisfy any covenant, condition or agreement to be complied with or satisfied by it pursuant to this Agreement, in each case that would reasonably be expected to result in any condition set forth in Article VII not to be satisfied; and

(v)      notice of any circumstance or occurrence that has had or would reasonably be expected to have a Company Material Adverse Effect.

Section 6.14.   No Control of Other Party's Business. Without in any way limiting any Party's rights or obligations under this Agreement, the Parties acknowledge and agree that the restrictions set forth in this Agreement are not intended to give the Buyer, directly or indirectly, the right to control or direct the Acquired Companies' operations prior to the Closing Date. Prior to the Closing Date, each of the Company and the Buyer shall exercise, consistent with the terms and conditions of this Agreement, complete control and supervision over its respective operations.

Section 6.15.   OFAC. The Buyer shall, at its own expense, (a) within ten (10) Business Days after the Final Recommendation Date, submit the OFAC License Application; (b) promptly supply any additional information and documentary material that may be requested by OFAC; (c) seek and obtain, prior to submitting the OFAC License Application and any other filing with or submission to OFAC, written consent from the Special Master, which consent shall not be unreasonably withheld; (d) keep the Special Master regularly informed of the processing of the OFAC License Application and any other filings or contacts with OFAC or other Governmental Body in relation to the Transaction; and (e) fully cooperate with and furnish to the Special Master available information and assistance as reasonably may be requested by the Special Master in connection with any communications that the Special Master may have with OFAC or other Governmental Body in relation to the Transaction.

Section 6.16.   Bidder Protections and Competing Proposals.

(a)      This Agreement is subject to approval by the Court and the consideration by the Special Master of higher or better competing bids in respect of the Shares, as determined in accordance with the Evaluation Criteria set by the January Order and the Sale Procedures Order. From the date of this Agreement and until the commencement of the No-Shop Period, the Special

Master is permitted to, and to cause its financial and legal advisors to, initiate contact with, solicit or encourage submission of any Competing Proposal. For the avoidance of doubt, the Buyer acknowledges that following the date of this Agreement, throughout the Topping Period and until the commencement of the No-Shop Period, the Special Master is expected to, and intends to, (i) engage with prospective purchasers of the Shares, (ii) evaluate any Competing Proposals received during the Topping Period and (iii) compare any such Competing Proposals to the Buyer's proposal to purchase the Shares. In addition, the Special Master shall have the responsibility and obligation to respond to any Competing Proposal and perform any and all other acts related thereto which are required under the Sale Procedures Order, the January Order or other applicable Law, including supplying information relating to the Acquired Companies to prospective purchasers of the Shares. So long as, prior to the expiration of the Topping Period, Buyer has delivered executed Debt Commitment Letters in accordance with Section 6.9(b), as promptly as practicable following the conclusion of the Topping Period, but in no event later than five (5) Business Days following the conclusion of the Topping Period, the Special Master shall notify the Buyer if the Special Master has received a Competing Proposal that the Special Master has determined in good faith constitutes a Superior Proposal.

(b)    During the No-Shop Period, the Special Master shall not, directly or indirectly, solicit, initiate, knowingly encourage or knowingly facilitate any proposal or offer that constitutes, or would reasonably be expected to lead to, a Competing Proposal.

(c)    Notwithstanding anything to the contrary set forth above, in the event that following the end of the Topping Period but prior to the Court's hearing to consider the Special Master's motion to approve the Sale Order (the "Sale Hearing") the Special Master receives an unsolicited Competing Proposal, he shall inform the Court and the Buyer of the receipt of such unsolicited Competing Proposal and, if approved by the Court (provided, that, in connection with seeking such approval, if requested by the Person making such unsolicited Competing Proposal, the Special Master shall request that the Court not make public the identity of the Person making such unsolicited Competing Proposal), may engage with the Person submitting such Competing Proposal.

(d)    Notwithstanding anything to the contrary set forth in this Agreement, if the Special Master has determined in good faith that a Competing Proposal made after the Commencement Date but prior to the No-Shop Period constitutes a Superior Proposal, the Special Master may, at any time after the Commencement Date but prior to the No-Shop Period, subject to (i) compliance with this Section 6.16(d), (ii) the Person making such Superior Proposal agreeing to pay to Buyer the Termination Fee (in the event that the bid reflected in this Agreement is designated by the Court as the stalking horse bid (in such case, this Agreement constituting the "Stalking Horse Bid Agreement")) or the Expense Reimbursement Amount (in the event that the bid reflected in this Agreement is designated by the Court as a base bid (in such case, this Agreement constituting the "Base Bid Agreement")) in accordance with Section 8.3(a) to the extent the transaction contemplated by the Superior Proposal is consummated, and (iii) the Person making such Superior Proposal depositing an amount equal to the Deposit Amount with the Escrow Agent, terminate this Agreement in accordance with Section 8.1(d)(i) in order to enter into a definitive agreement relating to such Superior Proposal (a "Superior Proposal Agreement"); provided, that prior to so terminating this Agreement, (A) the Special Master has given the Buyer at least three (3) Business Days' prior written notice of its intention to take such action, which

notice shall include a description of the material terms and conditions of such Superior Proposal and a copy of any proposed Superior Proposal Agreement, (B) at the end of such notice period, the Special Master shall have considered in good faith any revisions to the terms of this Agreement proposed in writing by the Buyer, and shall have determined that such Superior Proposal would continue to constitute a Superior Proposal if such revisions proposed by the Buyer were to be given effect, and (C) in the event of any material change to the terms of such Superior Proposal, the Special Master shall, in each case, have delivered to the Buyer an additional notice consistent with that described in clause (A) of this proviso and a new notice period under clause (A) of this proviso shall commence during which time the Special Master shall be required to comply with the requirements of this Section 6.16(d) anew with respect to such additional notice, including clauses (A), (B) and this clause (C) of this proviso (except that the reference to "three (3) Business Days" in clause (A) of this proviso shall be replaced with "two (2) Business Days").

(e)     Notwithstanding anything to the contrary set forth in this Agreement, if the Special Master has determined in good faith that an unsolicited Competing Proposal made following the end of the Topping Period but prior to the Sale Hearing (any such unsolicited Competing Proposal, an "Unsolicited Competing Proposal") constitutes a Superior Proposal, the Special Master may, at any time during the No-Shop Period but prior to the Sale Hearing, subject to (i) approval by the Court of such Unsolicited Competing Proposal in accordance with Section 6.16(c) and Section 8.1(d)(ii), (ii) compliance with this Section 6.16(e), (iii) the Person making such Superior Proposal agreeing to pay (x) to Buyer the Termination Fee (in the event this Agreement constitutes the Stalking Horse Bid Agreement) or the Expense Reimbursement Amount (in the event this Agreement constitutes the Base Bid Agreement) in accordance with Section 8.3(a) to the extent the transaction contemplated by the Unsolicited Competing Proposal is consummated and (y) if applicable, to the buyer party to the Superior Proposal Agreement the Expense Reimbursement Amount in accordance with Section 8.3(e), in each case, to the extent the transaction contemplated by the Unsolicited Competing Proposal is consummated, and (iv) the Person making such Superior Proposal depositing an amount equal to the Deposit Amount with the Escrow Agent, terminate this Agreement in accordance with Section 8.1(d)(ii) (or, if this Agreement has already been terminated in accordance with Section 8.1(d)(i), terminate the Superior Proposal Agreement) in order to enter into a definitive agreement providing for such Superior Proposal (the "Unsolicited Competing Proposal Agreement"); provided, that prior to so terminating this Agreement, (A) the Special Master has given the Buyer at least three (3) Business Days' prior written notice of its intention to take such action, which notice shall include a description of the material terms and conditions of such Superior Proposal and a copy of any proposed Unsolicited Competing Proposal Agreement, (B) at the end of such notice period, the Special Master shall have considered in good faith any revisions to the terms of this Agreement proposed in writing by the Buyer, and shall have determined that such Superior Proposal would continue to constitute a Superior Proposal if such revisions proposed by the Buyer were to be given effect, and (C) in the event of any material change to the terms of such Superior Proposal, the Special Master shall, in each case, have delivered to the Buyer an additional notice consistent with that described in clause (A) of this proviso and a new notice period under clause (A) of this proviso shall commence during which time the Special Master shall be required to comply with the requirements of this Section 6.16(e) anew with respect to such additional notice, including clauses (A), (B) and this clause (C) of this proviso (except that the reference to "three (3) Business Days" in clause (A) of this proviso shall be replaced with "two (2) Business Days").

(f)    The Special Master and the Buyer acknowledge that this Agreement and the Transactions are subject to the Sale Procedures Order and the Sale Order Entry. In the event of any conflict between this Agreement and the Sale Procedures Order or the Sale Order, the Sale Procedures Order or the Sale Order, as applicable, shall govern. The Special Master and the Buyer shall comply with the Sale Procedures Order and the Sale Order.

(g)    For purposes of this Agreement:

(i)    "Competing Proposal" means any bona fide proposal or offer made by any Person or group of related Persons (other than the Buyer and its Affiliates and, in the case of an Unsolicited Competing Proposal, excluding the buyer under the Superior Proposal Agreement or any Affiliates thereof) (A) to purchase or otherwise acquire, directly or indirectly, in one transaction or a series of transactions, pursuant to a merger, consolidation or other business combination, sale of shares of capital stock, sale of assets or similar transaction (1) beneficial ownership (as defined under Section 13(d) of the Exchange Act), of more than twenty percent (20%) of any class of equity securities of the Company or (2) any one or more assets or businesses of the Acquired Companies that constitute more than twenty percent (20%) of the consolidated assets of the Acquired Companies (based on the fair market value thereof), (B) to effect any other transaction pursuant to which any other alternative to the Transactions would be consummated, or (C) relating to any reorganization, recapitalization, license, joint venture, partnership, liquidation, dissolution or other similar transaction involving any one or more assets or businesses of the Acquired Companies that constitute more than twenty percent (20%) of the consolidated assets of the Acquired Companies (based on the fair market value thereof); provided, that (i) any Competing Proposal must satisfy an overbid minimum above the Purchase Price equal to or in excess of $25,000,000 *plus* the Termination Fee (to the extent this Agreement constitutes the Stalking Horse Bid Agreement) or the Expense Reimbursement Amount (to the extent this Agreement constitutes the Base Bid Agreement) and (ii) any increase in such Competing Proposal must satisfy an overbid minimum equal to or in excess of $50,000,000 (the "Subsequent Overbid Minimum"); provided, further, that the Special Master may, in his sole discretion, lower the Subsequent Overbid Minimum for any Competing Proposal.

(ii)    "Superior Proposal" means a Competing Proposal made by a Person or group of related Persons (other than the Buyer and its Affiliates and, in the case of an Unsolicited Competing Proposal, excluding the buyer under the Superior Proposal Agreement or any Affiliates thereof) on terms that the Special Master determines in good faith, after consultation with the Special Master's financial and legal advisors and the Sale Process Parties, would constitute a higher or better bid for the Shares based upon the Evaluation Criteria.

(h)    The Buyer acknowledges that nothing hereunder limits any Venezuela Party from proposing or negotiating any alternative transaction or series of transactions, and the Venezuela Parties (as defined in the Sale Procedures Order) will not at any time be prevented from making a Competing Proposal.

Section 6.17.  Section 280G. No later than ten (10) days prior to the Closing Date, the Special Master shall Cause the Company to deliver to the Buyer a Code Section 280G analysis (with respect to all disqualified individuals as reasonably determined by the Company) and the Special Master shall Cause the Company to confer with the Buyer in good faith regarding such analysis.

Section 6.18.  Financial Statements. During the Interim Period, the Special Master shall Cause the Acquired Companies to furnish to the Buyer:

(a)    within ninety (90) days after the end of each fiscal year commencing with the fiscal year ending December 31, 2024, a consolidated balance sheet and related statements income and cash flow showing the financial position of the Acquired Companies as of the close of such fiscal year and the consolidated results of its operations during such fiscal year and setting forth in comparative form the corresponding figures for the prior fiscal year, which consolidated balance sheet and related statements of income and cash flow shall be audited by independent public accountants and accompanied by an opinion of such accountants (which shall not be qualified as to scope of audit) to the effect that such consolidated financial statements fairly present, in all material respects, the financial position and results of operations of the Acquired Companies on a consolidated basis in accordance with GAAP;

(b)    within forty five (45) days after the end of each fiscal quarter, except for the fourth fiscal quarter, (i) a balance sheet showing the consolidated financial position of the Acquired Companies as of the last day of such fiscal quarter and (ii) statements of income and cash flows showing the consolidated results of operations of the Acquired Companies for such fiscal quarter and the then-elapsed portion of the fiscal year and setting forth in comparative form the corresponding figures for the corresponding periods of the prior fiscal year. The consolidated balance sheet and related statements of operations and cash flows shall fairly present, in all material respects, the financial position and results of operations of the Acquired Companies on a consolidated basis in accordance with GAAP (subject to normal quarter-end review adjustments and the absence of footnotes); and

(c)    within thirty (30) days after the end of each fiscal month (other than months that include the end of any fiscal quarter), (i) a financial summary of the month's operations by business units in the form set forth on Section 6.18(c) of the Company Disclosure Schedules and (ii) such other financial reports and operational reports as are prepared by the Acquired Companies on a monthly basis.

Section 6.19.  Extraordinary Payments. During the Interim Period, the Special Master shall Cause the Acquired Companies not to, directly or indirectly, make, approve, authorize, permit, or commit to make any payments, disbursements, grants of liens or other encumbrances, dividends, distributions or transfers of Cash or other property or value of the Acquired Companies outside of the Ordinary Course (each, an "Extraordinary Payment") in an amount in cash or fair value exceeding $200,000,000 either individually or in the aggregate (the "Threshold"); provided, that Extraordinary Payments for the repayment of outstanding Debt at maturity or bona fide capital expenditures, turnaround or catalyst expenditures, or repairs, in each case, as approved by appropriate board of directors or other governing body of the applicable Acquired Company, shall be excluded from any determination as to whether the Threshold has been exceeded and any

adjustment to the Closing Consideration pursuant to this <u>Section 6.19</u> (if applicable). In the event that Extraordinary Payments exceeding the Threshold are made, Buyer shall have the right, in its sole discretion, exercisable upon delivery of written notice to the Special Master to either (a) terminate this Agreement in accordance with <u>Section 8.1(i)</u> or (b) reduce the Closing Consideration by an amount equal to the aggregate amount of Extraordinary Payments made during the Interim Period (subject to the proviso in the immediately preceding sentence). The Buyer's right to terminate this Agreement or adjust the Closing Consideration pursuant to this <u>Section 6.19</u> shall apply anew upon the occurrence of each Extraordinary Payment in excess of the Threshold. The Special Master shall notify the Buyer promptly (and in any event within one (1) Business Day) in writing upon becoming aware of any actual, potential, or threatened Extraordinary Payment that reasonably would be expected to exceed the Threshold.[1]

Section 6.20.   <u>Interim Period Incentive Bonuses</u>.

(a)     In the event that the Acquired Companies comply in all material respects (as reasonably determined by the Buyer acting in good faith) with the covenants set forth in <u>Section 6.1</u> and <u>Section 6.19</u> of this Agreement, the Buyer shall, within ninety (90) days after Closing Date, cause the Company to make cash bonus payments in an aggregate amount equal to $25,000,000 (less applicable withholding), such bonuses to be made in such amounts and to such ███████████████████████ of the Acquired Companies as specified and identified in writing within seventy-five (75) days after the Closing Date by the then current Chief Executive Officer of the Company in consultation with the then current Chief Operating Officer of the Company.

(b)     In addition to the bonus amount contemplated by <u>Section 6.20(a)</u> above, in the event that the Acquired Companies comply in all material respects (as reasonably determined by the Buyer acting in good faith), with the covenants and agreements as set forth in <u>Section 6.20(b)</u> of the Company Disclosure Schedule, the Buyer shall, within ninety (90) days after Closing Date, cause the Company to make cash bonus payments in an aggregate amount equal to $25,000,000 (less applicable withholding), such bonuses to be made in such amounts and to such ███████████████████████ of the Acquired Companies as specified and identified in writing within seventy-five (75) days after the Closing Date by the then current Chief Executive Officer of the Company in consultation with the then current Chief Operating Officer of the Company.

---

[1] **Note to Draft**: Section 6.19 is intended to protect against extraordinary cash depletion during the Interim Period. It specifically targets payments or transfers of value that are outside of the ordinary course. This is not intended to restrict operations or unduly limit management's discretion but rather to safeguard against extraordinary or improper cash outflows that could diminish the Company's value. To avoid creating a certain causal link between a dollar spend and termination of the transaction, the option for a purchase price reduction as an alternative to termination was included.

## ARTICLE VII

## CONDITIONS TO CLOSING

Section 7.1.    <u>Conditions Precedent to Obligations of the Parties</u>. The respective obligations of each of the Parties to consummate the Transactions are subject to the satisfaction, on or prior to the Closing, of each of the following conditions:

(a)    there shall not be in effect any Law or Order by a Governmental Body of competent jurisdiction restraining, enjoining or otherwise prohibiting the consummation of the Transactions;

(b)    the Sale Order Entry shall have occurred;

(c)    the OFAC License shall have been obtained;

(d)    the waiting period applicable to the Transactions under the HSR Act (and any extensions thereof, including expiration of any voluntary timing agreement) shall have expired or early termination shall have been granted; and

(e)    the approvals, clearances or expirations of waiting periods set forth in <u>Section 7.1(e)</u> of the Company Disclosure Schedules shall have been obtained.

Section 7.2.    <u>Conditions Precedent to Obligations of the Buyer</u>. The obligations of the Buyer to consummate the Transactions are subject to the satisfaction, on or prior to the Closing, of each of the following conditions (any or all of which may be waived by the Buyer in whole or in part):

(a)    the Company Fundamental Representations shall be true and correct in all respects as of the Closing as if made on and as of the Closing (except for de minimis inaccuracies);

(b)    the Special Master shall have performed and complied in all material respects with all obligations and agreements required by this Agreement to be performed or complied with by him on or prior to the Closing;

(c)    no Company Material Adverse Effect shall have occurred since the Execution Date and remain ongoing; and

(d)    the Sale Order shall be in full force and effect in all respects and not subject to any stay.

Section 7.3.    <u>Conditions Precedent to Obligations of the Special Master</u>. The obligations of the Special Master to consummate the Transactions are subject to the satisfaction, on or prior to the Closing, of each of the following conditions (any or all of which may be waived by the Special Master in whole or in part):

(a)    the representations and warranties of the Buyer set forth in <u>Article V</u> shall be true and correct (without giving effect to any "materiality", "material adverse effect", or similar

65

qualifiers contained in any of such representations and warranties) as of the Closing as if made on and as of the Closing (except to the extent that any such representation or warranty, by its terms, is expressly limited to a specific date, in which case, as of such specific date), except for where the failure of such representations and warranties to be so true and correct would not (i) have a material adverse effect on the ability of the Buyer to perform its obligations under this Agreement or (ii) otherwise prevent, hinder, or delay the consummation of the Transactions; and

        (b)    the Buyer shall have performed and complied in all material respects with all obligations and agreements required by this Agreement to be performed or complied with by the Buyer on or prior to the Closing.

        Section 7.4.    <u>Frustration of Closing Conditions</u>. Neither the Special Master, nor the Buyer may rely, either as a basis for not consummating the Transactions or for terminating this Agreement and abandoning the Transactions, on the failure of any condition set forth in <u>Section 7.1</u>, <u>Section 7.2</u>, or <u>Section 7.3</u>, as the case may be, to be satisfied if such failure was caused principally by any material breach of a covenant, agreement, representation, or warranty of this Agreement by such Party.

# ARTICLE VIII

# TERMINATION

        Section 8.1.    <u>Termination</u>. This Agreement may be terminated at any time prior to the Closing (notwithstanding the Sale Order Entry, except as otherwise specified below) as follows:

        (a)    by mutual written consent of the Special Master (which consent shall be subject to approval of the Court) and the Buyer;

        (b)    by the Special Master or the Buyer, by written notice to the other Party, if: the Closing has not occurred prior to the date that is twelve (12) months after the Execution Date (such date, the "<u>Initial Outside Date</u>" and, as may be automatically extended pursuant to this <u>Section 8.1(b)</u>, the "<u>Outside Date</u>"); <u>provided</u>, that if the Closing has not occurred by the Outside Date due to the nonsatisfaction of any of the conditions set forth in <u>Section 7.1(c)</u> (OFAC License), <u>Section 7.1(d)</u> (HSR Act), <u>Section 7.1(e)</u> (Other Antitrust Approvals) or <u>Section 7.2(d)</u> (Sale Order), then the Outside Date shall be extended automatically for up to two (2) consecutive periods of ninety (90) calendar days each (and in no event shall the Outside Date extend beyond the date that is one hundred eighty (180) calendar days after the Initial Outside Date); <u>provided</u>, that notwithstanding the foregoing, the right to terminate this Agreement pursuant this <u>Section 8.1(b)</u> shall not be available to any Party whose failure to fulfill any obligation under this Agreement has principally caused or resulted in the failure of the Closing to occur on or before the Outside Date;

        (c)    by the Special Master or the Buyer, by written notice to the other Party, if: there shall be any Law that makes consummation of the Transactions illegal or otherwise prohibited or if any Order enjoining the Buyer, the Special Master or the Company from consummating the Transactions is entered and such Order shall become final and non-appealable (any such Law, Order, a "<u>Legal Restraint</u>"); <u>provided</u> that the right to terminate this Agreement under this <u>Section 8.1(c)</u> shall not be available to any Party whose failure to fulfill any obligation

under <u>Section 6.3</u> hereof has principally caused or resulted in the imposition of such Legal Restraint or the failure of such Legal Restraint to be resisted, resolved or lifted;

(d)    by the Special Master, (i) at any time after the Commencement Date and prior to the commencement of the No-Shop Period in order to enter into a Superior Proposal Agreement pursuant to <u>Section 6.16(d)</u> or (ii) subject to approval of the Court, at any time during the No-Shop Period but prior to the Sale Hearing in order to enter into an Unsolicited Competing Proposal Agreement pursuant to <u>Section 6.16(e)</u>;

(e)    by the Buyer, by written notice to the Special Master, if there shall have been a breach by the Special Master of any of its representations, warranties, covenants or agreements contained in this Agreement, which breach would result in the failure to satisfy one or more of the conditions set forth in <u>Section 7.2(a)</u> or <u>Section 7.2(b)</u>, and in any such case such breach shall be incapable of being cured or, if capable of being cured, shall not have been cured prior to the earlier of (i) forty-five (45) calendar days after providing written notice of such breach to the Special Master and (ii) the Outside Date; <u>provided</u>, that the Buyer shall not have the right to terminate this Agreement pursuant to this <u>Section 8.1(e)</u> if the Buyer is then in breach of this Agreement and such breach would result in the failure of any of the conditions set forth in <u>Section 7.1</u> or <u>Section 7.3</u>;

(f)    by the Special Master (subject to approval of the Court), by written notice to the Buyer, if there shall have been a breach by the Buyer of any of its representations, warranties, covenants or agreements contained in this Agreement, which breach would result in the failure to satisfy one or more of the conditions set forth in <u>Section 7.3(a)</u> or <u>Section 7.3(b)</u>, and in any such case such breach shall be incapable of being cured or, if capable of being cured, shall not have been cured prior to the earlier of (i) forty-five (45) calendar days after providing written notice of such breach to the Buyer and (ii) the Outside Date; <u>provided</u>, that the Special Master shall not have the right to terminate this Agreement pursuant to this <u>Section 8.1(f)</u> if the Special Master is then in breach of this Agreement and such breach would result in the failure of any of the conditions set forth in <u>Section 7.1</u> or <u>Section 7.2</u>;

(g)    by the Special Master, after being ordered to terminate this Agreement by the Court, as a result of one or more of the Venezuela Parties (as defined in the Sale Procedures Order) proposing an alternative to the Transactions and such alternative is approved by the Court;

(h)    by the Special Master on the day following the expiration of the Topping Period if the Buyer has not delivered the executed Debt Commitment Letters in accordance with <u>Section 6.9(b)</u>; or

(i)    by the Buyer, by written notice to the Special Master, upon the Buyer's election to terminate this Agreement pursuant to <u>Section 6.19</u>.

Section 8.2.    <u>Effect of Termination</u>. In the event that this Agreement is validly terminated in accordance with <u>Section 8.1</u>, this Agreement shall immediately become null and void and the Parties shall be relieved of their duties and obligations arising under this Agreement after the date of such termination and such termination shall be without liability to the Buyer, the Special Master or the Acquired Companies; <u>provided</u>, that the Confidentiality Agreement and the provisions of

Section 3.3, this Section 8.2, Section 8.3 and Article IX hereof shall survive any such termination and remain valid and binding obligations of each of the Parties.

Section 8.3.     Termination Fee and Expense Reimbursement.

(a)     To the extent this Agreement constitutes a Stalking Horse Bid Agreement, in consideration for the Buyer having expended considerable time and expense in connection with this Agreement and the Transactions, if this Agreement is terminated by the Special Master pursuant to Section 8.1(d)(i) or Section 8.1(d)(ii), and the transaction contemplated by the Superior Proposal is consummated, then the Special Master shall cause the acquiring party to the Superior Proposal Agreement or the Unsolicited Competing Proposal Agreement, as applicable (the "Superior Proposal Acquiror"), in accordance with the terms hereof and the January Order, to pay or cause to be paid to the Buyer or its designee an amount equal to the Termination Fee, by wire transfer of immediately available funds to the Buyer on the closing date of the consummation of the transactions provided in such Superior Proposal Agreement or Unsolicited Competing Proposal Agreement, as applicable; provided, however, that the Special Master shall have no obligation to cause the Superior Proposal Acquiror to pay such Termination Fee to the Buyer if (i) the Buyer does not deliver the Debt Commitment Letters, duly executed by each Debt Financing Source, in accordance with Section 6.9(b), prior to the end of the Topping Period, (ii) the Superior Proposal Agreement or the Unsolicited Competing Proposal Agreement, as applicable, is not approved by the Court, (iii) the Buyer subsequently becomes the Successful Bidder (as defined in the Sale Procedures Order) or (iv) the transaction contemplated by the Superior Proposal Agreement or the Unsolicited Competing Proposal Agreement, as applicable, are for any other reason not consummated; provided, further, that if the transaction contemplated by the Superior Agreement or the Unsolicited Competing Proposal Agreement, as applicable, is for any reason not consummated, then, upon the termination of such Superior Agreement or Unsolicited Competing Proposal Agreement, as applicable, the Buyer shall be deemed to hold a claim equal to the Termination Fee as a priority claim over the judgements held by Crystallex, ConocoPhillips and the Additional Judgment Creditors as set forth in the Priority Order [D.I. 996], dated March 1, 2024 in the Specified Litigation, which amount shall be paid to the Buyer from the proceeds, and at the closing, of a subsequent sale of the Shares pursuant to the Specified Litigation.

(b)     To the extent this Agreement constitutes Base Bid Agreement, in consideration for the Buyer having expended considerable time and expense in connection with this Agreement and the Transactions, if this Agreement is terminated by the Special Master pursuant to Section 8.1(d)(i) or Section 8.1(d)(ii), and the transaction contemplated by the Superior Proposal is consummated, then the Special Master shall cause the Superior Proposal Acquiror, in accordance with the terms hereof and the January Order, to pay an amount equal to the Expense Reimbursement Amount by wire transfer of immediately available funds to the Buyer on the closing date of the consummation of the transactions provided in such Superior Proposal Agreement or the Unsolicited Competing Proposal Agreement, as applicable; provided, however, that the Special Master shall have no obligation to cause the Superior Proposal Acquiror to pay such Expense Reimbursement Amount to the Buyer if (i) the Buyer does not deliver the Debt Commitment Letters, duly executed by each Debt Financing Source, in accordance with Section 6.9(b), prior to the end of the Topping Period, (ii) the Superior Proposal Agreement or the Unsolicited Competing Proposal Agreement, as applicable, is not approved by the Court, (iii) the Buyer subsequently becomes the Successful Bidder (as defined in the Sale Procedures Order) or

(iv) the transaction contemplated by the Superior Proposal Agreement or the Unsolicited Competing Proposal Agreement, as applicable, are for any other reason not consummated; provided, further, that if the transaction contemplated by the Superior Agreement or the Unsolicited Competing Proposal Agreement, as applicable, is for any reason not consummated, then, upon the termination of such Superior Agreement or Unsolicited Competing Proposal Agreement, as applicable, the Buyer shall be deemed to hold a claim equal to the Expense Reimbursement Amount as a priority claim over the judgements held by Crystallex, ConocoPhillips and the Additional Judgment Creditors as set forth in the Priority Order [D.I. 996], dated March 1, 2024 in the Specified Litigation, which amount shall be paid to the Buyer from the proceeds, and at the closing, of a subsequent sale of the Shares pursuant to the Specified Litigation.

(c)      To the extent the bid reflected in this Agreement constitutes the Successful Bid (as defined in the Sale Procedures Order), if, following the Sale Order Entry, this Agreement is terminated by the Buyer pursuant to Section 8.1(b) (solely to the extent such termination arises from the nonsatisfaction of the condition set forth in Section 7.1(c) (OFAC License) for any reason not related to the identity of the Buyer), Section 8.1(e) (solely to the extent such termination, and the failure to satisfy one or more conditions set forth in Section 7.2, arises from either (i) the Special Master's breach of the covenants contained in Section 6.1 or (ii) the occurrence of a Company Material Adverse Effect) or Section 8.1(i), then, pursuant to the bidder protections set forth in the January Order, the Buyer shall be deemed to hold a claim equal to the Expense Reimbursement Amount as a priority claim over the judgments held by Crystallex, ConocoPhillips and the Additional Judgment Creditors as set forth in the Priority Order [D.I. 996], dated March 1, 2024, in the Specified Litigation, which amount shall be paid to the Buyer from the proceeds, and at the closing, of a subsequent sale of the Shares pursuant to the Specified Litigation.

(d)      To the extent the bid reflected in this Agreement constitutes the Successful Bid, if, following the Sale Order Entry, this Agreement is terminated by the Special Master pursuant to Section 8.1(g), then, pursuant to the bidder protections set forth in the January Order, the Buyer shall be entitled to be paid the Expense Reimbursement Amount in-full by the Venezuela Parties (as defined in the Sale Procedures Order) prior to any payments made on account of any other Attached Judgment.

(e)      If (i) this Agreement is terminated by the Special Master pursuant to Section 8.1(d)(i) and (ii) the Superior Proposal Agreement is subsequently terminated because the Special Master enters into an Unsolicited Competing Proposal Agreement, then, in accordance with the January Order, to the extent the transaction contemplated by the Unsolicited Competing Proposal Agreement is consummated, (A) the Buyer shall be entitled to be paid the Termination Fee (to the extent this Agreement constitutes the Stalking Horse Bid Agreement) or the Expense Reimbursement Amount (to the extent this Agreement constitutes the Base Bid Agreement), as applicable, and (B) the Superior Proposal Acquiror with respect to the Superior Proposal Agreement shall be entitled to be paid the Expense Reimbursement Amount from the Unsolicited Competing Proposal acquiror from the proceeds, and at the closing, of the transactions provided in such Unsolicited Competing Proposal; provided, however, that the Buyer shall not be entitled to be paid the Termination Fee if the Buyer does not deliver the Debt Commitment Letters, duly executed by each Debt Financing Source, in accordance with Section 6.9(b), as applicable, prior to the end of the Topping Period.

(f)     The Parties acknowledge and agree that (i) the Termination Fee (to the extent this Agreement constitutes the Stalking Horse Bid Agreement) or the Expense Reimbursement Amount (to the extent this Agreement constitutes the Base Bid Agreement) (as applicable) and other provisions of this Section 8.3 are an integral part of the Transactions, (ii) the Termination Fee and the Expense Reimbursement Amount (in each case, to the extent applicable) shall constitute liquidated damages and not a penalty, and (iii) without these agreements, the Parties would not enter into this Agreement.

(g)     Notwithstanding anything to the contrary set forth in this Agreement, but subject to Section 9.13 and this Section 8.3(g), in the event this Agreement is terminated, each of the Parties expressly acknowledges and agrees that the Buyer's right to receive payment of the Termination Fee pursuant to Section 8.3(a) (to the extent this Agreement constitutes the Stalking Horse Bid Agreement) or the Expense Reimbursement Amount pursuant to Section 8.3(b) (to the extent this Agreement constitutes the Base Bid Agreement), the Expense Reimbursement Amount pursuant to Section 8.3(c) or Section 8.3(d) (to the extent the bid reflected in this Agreement constitutes the Successful Bid), or the Termination Fee or Expense Reimbursement Amount (as applicable) pursuant to Section 8.3(e) shall constitute the sole and exclusive remedy of the Buyer and its Affiliates, and all other affected Persons against the Special Master, the Company and each of their respective former, current or future Affiliates and any of their respective former, current or future general or limited partners, equityholders, subsidiaries, members, managers, directors, officers, employees, agents, Affiliates, successors, beneficiaries, heirs and assigns (collectively, the "Special Master and Company Related Parties") for all losses and damages (including attorneys' fees and expenses) in respect of this Agreement (and the termination hereof) or the Transactions (and the abandonment thereof), or any breach (whether intentional, unintentional or otherwise) of any representation, warranty, covenant or agreement in this Agreement, and none of the Buyer or its Affiliates or any other affected Person shall be entitled to bring or maintain any other Legal Proceeding against the Special Master, the Company or any other Special Master and Company Related Party relating to or arising out of this Agreement, or any of the Transactions or any matters forming the basis for such termination (whether at law, in equity, in contract, in tort or otherwise), and upon payment of the Termination Fee pursuant to Section 8.3(a) (to the extent this Agreement constitutes the Stalking Horse Bid Agreement) or the Expense Reimbursement Amount pursuant to Section 8.3(b) (to the extent this Agreement constitutes the Base Bid Agreement), the Expense Reimbursement Amount pursuant to Section 8.3(c) or Section 8.3(d) (to the extent the bid reflected in this Agreement constitutes the Successful Bid), or the Termination Fee or Expense Reimbursement Amount (as applicable) pursuant to Section 8.3(e), none of the Special Master and Company Related Parties shall have any further liability or obligation to the Buyer or any other affected Person relating to or arising out of this Agreement or the Transactions. The Parties acknowledge and agree that in no event shall the Special Master or the Company be required to pay the Termination Fee or the Expense Reimbursement Amount.

(h)     For the avoidance of doubt, Buyer will not be entitled to receive the Termination Fee or the Expense Reimbursement Amount if Buyer has not delivered the Debt Commitment Letters, duly executed by each Debt Financing Source, in accordance with Section 6.9(b), on or prior to the last day of the Topping Period, including to the extent the Special Master terminates this Agreement pursuant to Section 8.1(h).

# ARTICLE IX

# MISCELLANEOUS

Section 9.1.    Survival. None of the representations and warranties contained in this Agreement or any of the other Transaction Documents (including any certificate to be delivered pursuant to this Agreement) and none of the covenants of any party required to be performed before the Closing (including obligations with which the Special Master agrees to Cause the Acquired Companies to comply) shall survive the Closing, and thereafter none of the Parties or any of their Affiliates or any of their respective Representatives or any other Person shall have any liability whatsoever with respect to any such representation, warranty, covenant or agreement, and no claim for breach of any such representation or warranty, detrimental reliance or other right or remedy (whether in contract, in tort or at law or in equity) may be brought after the Closing with respect thereto. The provisions of this Section 9.1 will not, however, prevent or limit a cause of action to obtain an injunction to prevent breaches of this Agreement, to enforce specifically the terms and provisions hereof or for declaratory relief. Unless otherwise indicated, the covenants and agreements set forth in this Agreement which by their terms are required to be performed after the Closing shall survive the Closing until such covenants or agreements have been performed or satisfied.

Section 9.2.    Expenses. Whether or not the Transactions are consummated, and except as otherwise provided in this Agreement, each Party to this Agreement will bear its respective fees, costs and expenses incurred in connection with the preparation, negotiation, execution and performance of this Agreement or the Transactions (including legal, accounting and other professional fees), and the Special Master Transaction Expenses shall be paid in accordance with Section 3.4(b) and the Advanced Transaction Expenses shall be paid in accordance with Section 3.4(d).

Section 9.3.    Governing Law. This Agreement and all Related Claims shall be governed by, construed and enforced in accordance with the internal Laws of the State of Delaware, without giving effect to any Laws (whether of the State of Delaware or any other jurisdiction) that would cause the application of the Laws of any jurisdiction other than the State of Delaware and without regard to any borrowing statute that would result in the application of the statutes of limitations or repose of any other jurisdiction. In furtherance of the foregoing, the Laws of the State of Delaware will control even if under such jurisdiction's choice of law or conflict of law analysis, the substantive or procedural law of some other jurisdiction would ordinarily or necessarily apply.

Section 9.4.    Dispute Resolution; Consent to Jurisdiction. Without limiting any Party's right to appeal any Order of the Court, (a) the Court shall retain exclusive jurisdiction to enforce the terms of this Agreement and to decide any dispute which may arise or result from, or be connected with, this Agreement, any breach or default hereunder, or the Transactions, and (b) any and all proceedings related to the foregoing shall be filed and maintained only in the Court, and the Parties hereby consent to and submit to the jurisdiction and venue of the Court and shall receive notices at such locations as indicated in Section 9.7 (as may be updated from time to time in accordance with Section 9.7).

Section 9.5.    Consent to Service of Process; Waiver of Jury.

(a)    Each of the Parties hereby consents to process being served by any party to this Agreement in any Legal Proceeding by the delivery of a copy thereof (other than by e-mail) in accordance with the provisions of Section 9.7.

(b)    EACH PARTY HERETO ACKNOWLEDGES THAT ANY LEGAL PROCEEDING, DIRECTLY OR INDIRECTLY, ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY RELATED CLAIM IS LIKELY TO INVOLVE COMPLICATED AND DIFFICULT ISSUES, AND THEREFORE EACH SUCH PARTY HEREBY IRREVOCABLY AND UNCONDITIONALLY WAIVES ANY RIGHT SUCH PARTY MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY SUCH LEGAL PROCEEDING OR RELATED CLAIM. EACH PARTY CERTIFIES AND ACKNOWLEDGES THAT: (I) NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF SUCH LEGAL PROCEEDING, SEEK TO ENFORCE THE FOREGOING WAIVER; (II) IT UNDERSTANDS AND HAS CONSIDERED THE IMPLICATIONS OF THIS WAIVER; (III) IT MAKES THIS WAIVER VOLUNTARILY AND (IV) IT HAS BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION 9.5(B).

Section 9.6.    Entire Agreement.

(a)    This Agreement (including the Company Disclosure Schedules and any Exhibits hereto) and the Transaction Documents contain the entire understanding and agreement between the Parties with respect to the subject matter hereof and thereof, and supersede all prior and contemporaneous agreements, discussions, negotiations, correspondence, communications, undertakings and understandings among the Parties with respect to such subject matter (except for the Confidentiality Agreement, which shall continue in full force and effect in accordance with its terms as modified hereunder). The Parties have voluntarily agreed to define their rights, liabilities and obligations with respect to the Transactions exclusively in contract pursuant to the express terms and provisions of this Agreement and the other Transaction Documents, and the Parties expressly disclaim that they are owed any duties or are entitled to any remedies not expressly set forth in this Agreement or the other Transaction Documents. Furthermore, the Parties each hereby acknowledge that this Agreement embodies the justifiable expectations of sophisticated parties derived from arm's-length negotiations; the Parties specifically acknowledge that no party has any special relationship with another party that would justify any expectation beyond that of ordinary parties in an arm's-length transaction.

(b)    The sole and exclusive remedies for any breach of the terms and provisions of this Agreement (including any representations and warranties set forth herein, made in connection herewith or as an inducement to enter into this Agreement) or any claim or cause of action otherwise arising out of or related to the Transactions shall be those remedies available at law or in equity for breach of contract against the Parties to this Agreement only (as such contractual remedies have been further limited or excluded pursuant to the express terms of this Agreement), and then only subject to the limitations hereunder, the Parties hereby agreeing that neither Party shall have any remedies or causes of action (whether in contract, tort, statute or

otherwise) for any statements, communications, disclosures, failures to disclose, representations or warranties not explicitly set forth in this Agreement.

(c)    All representations and warranties set forth in this Agreement are contractual in nature only and subject to the sole and exclusive remedies set forth herein.

(d)    The Transactions relate to the purchase and sale of the Shares conducted pursuant to Section 324 of the Delaware General Corporation Law and the Sale Procedures Order, under which the Special Master has the authority to carry out the Transactions herein contemplated to be carried out by him.  In connection therewith, the Designated Managers have furnished Specified Information to the Special Master.  The Special Master, the Designated Managers, the Acquired Companies, its direct or indirect Subsidiaries and their respective Representatives have no liabilities or obligations hereunder or in respect of the Transactions for monetary damages or other relief (other than, if the conditions applicable thereto are satisfied, the Special Master's obligations to transfer the Shares and take or cause to be taken other actions under this Agreement and the Sale Procedures Order) except as expressly provided in <u>Section 9.13</u>. By executing this Agreement, each of the Parties waives on their behalf and on the behalf of their respective Representatives and forever relinquishes any right, claim or cause of action for damages or any other form of monetary relief against the Special Master, or any such Person based on, relating to or arising out of the Specified Information, this Agreement and any of the Transactions.

Section 9.7.    <u>Amendments and Waivers</u>. This Agreement may not be amended except by an instrument in writing signed by the Buyer and the Special Master. No waiver by any Party of any provision of this Agreement or any breach of this Agreement hereunder, whether intentional or not, shall be valid unless the same shall be in writing and signed by the party making such waiver. The waiver by any Party of a breach of any provision of this Agreement shall not operate or be construed as a further or continuing waiver of such breach or as a waiver of any other or subsequent breach. No failure on the part of any Party to exercise, and no delay in exercising, any right, power or remedy hereunder shall operate as a waiver thereof, nor shall any single or partial exercise of such right, power or remedy by such Party preclude any other or further exercise thereof or the exercise of any other right, power or remedy.  Any amendment to, or the Special Master's waiver of, a provision of this Agreement of which the Acquired Companies or the Venezuela Parties are third-party beneficiaries in accordance with <u>Section 9.11</u> will require the prior written consent of the Company to the extent such amendment or waiver would be reasonably likely to adversely impact the Acquired Companies or the Venezuela Parties.

Section 9.8.    <u>Notices</u>. All notices, requests, instruction, demands and other communications under this Agreement shall be in writing and shall be deemed given (a) when delivered personally by hand (with written confirmation of receipt), (b) on the date sent by e-mail (provided confirmation of email receipt is obtained) if sent during normal business hours of the recipient, and on the next Business Day if sent after normal business hours of the recipient, or (c) when received by the addressee if sent by nationally recognized overnight delivery service (with written confirmation of receipt), in each case, at the following addresses (or to such other address as a party may have specified by notice given to the other party pursuant to this provision):

| | |
|---|---|
| If to the Special Master, to: | Robert B. Pincus in his capacity as Special Master for the United States District Court for the |



District of Delaware

With a copies to:    Weil, Gotshal & Manges LLP, counsel to the
Special Master

If to the Buyer, to:

With a copy to:

Section 9.9.    Severability. If any term or other provision of this Agreement is invalid, illegal, or incapable of being enforced by any Law or public policy, all other terms or provisions of this Agreement shall nevertheless remain in full force and effect so long as the economic or legal substance of the Transactions is not affected in any manner materially adverse to any party. Upon such determination that any term or other provision is invalid, illegal, or incapable of being enforced, the Parties shall negotiate in good faith to modify this Agreement so as to effect the original intent of the Parties as closely as possible in an acceptable manner such that the Transactions are consummated as originally contemplated to the greatest extent possible.

Section 9.10.    Binding Effect; Assignment. This Agreement shall be binding upon and inure to the benefit of the Parties and their respective successors and permitted assigns and, without limiting the foregoing, references to the "Special Master" in this Agreement shall be deemed to include any successor, substitute or replacement thereof. This Agreement shall not be assigned by (a) the Buyer without the prior written consent of the Special Master; provided, that the consent of the Special Master shall not be required for any assignment by the Buyer of (i) its rights (but not its obligations) hereunder as collateral to the Debt Financing Sources under the definitive documents governing the Debt Financing and (ii) its rights and obligations hereunder to any Affiliate of the Buyer (provided, that any assignment pursuant to this proviso shall in no event release the Buyer from its obligations hereunder) or (b) the Special Master, without the prior written consent of the Buyer.

Section 9.11.   No Third Party Beneficiaries. Nothing in this Agreement shall confer any rights, remedies or claims of any nature upon any Person other than the Parties and their respective successors or permitted assigns, except for the rights of (a) the Indemnitees as set forth in Section 6.6; (b) the Non-Parties (including the Acquired Companies and their Representatives) set forth in Section 9.12; (c) the Released Parties as set forth in Section 9.15; and (d) the Debt Financing Sources as set forth in Section 9.17. All of the Persons identified as third-party beneficiaries in the immediately preceding sentence shall be entitled to enforce such provisions and to avail themselves of the benefits of any remedy for any breach of such provisions, all to the same extent as if such Persons were parties to this Agreement.

Section 9.12.   Non-Recourse. This Agreement may only be enforced against, and any Related Claims may only be made or asserted against (and are expressly limited to) the Persons that are expressly identified as the Parties in the preamble to this Agreement and solely in their capacities as such. No Person who is not a Party, including the Acquired Companies and any current, former or future Affiliate or Representative of any Party or the Acquired Companies or any current, former, or future Affiliate or Representative of any of the foregoing (such Persons, collectively, but specifically excluding the Parties, "Non-Parties"), shall have any liability (whether at law or in equity, based upon contract, tort, statute or otherwise) for obligations or liabilities arising under, in connection with or related to this Agreement or for any Related Claim and each Party hereby irrevocably waives and releases all such liabilities, obligations and Related Claims against any such Non-Party. Without limiting the rights of any Party hereto against the other Parties as set forth herein, in no event shall any Party, any of its Affiliates or any Person claiming by, through or on behalf of any of them institute any Related Claim against any Non-Party. In no event shall any Person be liable for the Fraud of any other Person, and a claim for Fraud may only be asserted against the Person that committed such Fraud; provided, that, in no case will any claim for Fraud be asserted against the Special Master.

Section 9.13.   Specific Performance.

(a)     The Parties agree that irreparable damage would occur in the event that any of the provisions of this Agreement were not performed in accordance with their specific terms or were otherwise breached, and that money damages or legal remedies would not be an adequate remedy for any such damages. Therefore, it is accordingly agreed that prior to the termination of this Agreement in accordance with Section 8.1, each Party shall be entitled to an injunction or injunctions to prevent or restrain any breach or threatened breach of this Agreement by any other party and to seek specific performance of the terms and provisions of this Agreement, to prevent breaches or threatened breaches of, or to enforce compliance with, the covenants and obligations of any other party, in any court of competent jurisdiction, and appropriate injunctive relief shall be granted in connection therewith. Such remedies shall be in addition to and not in substitution for any other remedy to which such party is entitled at law or in equity.

(b)     Each Party hereto hereby waives (i) any defenses in any action for specific performance, and agrees not to oppose the granting of an injunction, specific performance or other equitable relief as provided herein, on the basis that (A) the other Party has an adequate remedy at law or (B) an award of specific performance is not an appropriate remedy for any reason at law or in equity and (ii) any requirement under any Law to post a bond or other security as a prerequisite to obtaining equitable relief.

(c)     The Parties agree that (i) by seeking the remedies provided for in this
Section 9.13, no Party shall in any respect waive its right to seek at any time any other form of
relief that may be available to it under this Agreement or any other Transaction Document
(including monetary damages) in the event that this Agreement has been terminated or in the event
that the remedies provided for in this Section 9.13 are not available or otherwise are not granted,
and (ii) nothing set forth in this Section 9.13 shall require any Party hereto to institute any
proceeding for (or limit any Party's right to institute any proceeding for) specific performance
under this Section 9.13 prior to or as a condition to exercising any termination right under Article
VIII, nor shall the commencement of any Legal Proceeding pursuant to this Section 9.13 or
anything set forth in this Section 9.13 restrict or limit any Party's right to terminate this Agreement
in accordance with the terms of Article VIII or pursue any other remedies under this Agreement
any other Transaction Document that may be available then or thereafter; provided, that, in no
event will Buyer be entitled to receive both (A) a grant of specific performance to cause the Closing
to occur and (B) the Termination Fee or the Expense Reimbursement Amount (as applicable).

Section 9.14.  Successors and Assigns. The provisions of this Agreement shall be binding
upon and inure to the benefit of the Parties and their respective successors and assigns; provided
that no Party may assign, delegate or otherwise transfer any of its rights or obligations under this
Agreement without the consent of the Special Master and the other Parties.

Section 9.15.  Release. Effective as of the Closing Date, except for any rights or
obligations under this Agreement or the other Transaction Documents each of the Buyer and the
Company on behalf of itself and each of its Affiliates and each of its current, former and future
officers, directors, employees, partners, members, advisors, successors and assigns (collectively,
the "Releasing Parties"), hereby irrevocably and unconditionally releases and forever discharges
(a) the Special Master and each of his current, former and future financial advisors, attorneys,
consultants or other advisors and his and their respective, successors and assigns, the Designated
Managers, the other Company Employees listed in the Procedures Summary, and (b) any other
current or former employees, directors, officers, partners, members or managers of the Acquired
Companies who participated in the Buyer's due diligence and investigation of the Acquired
Companies, the preparation of the Company Disclosure Schedules or the preparation, negotiation
or consummation of the Transactions or otherwise participated in the sale process contemplated
by the Sale Procedures Order and any other individuals as reasonably agreed by Buyer and the
Special Master during the Interim Period, and (the Persons described in the immediately preceding
clause (a) and clause (b), collectively, the "Released Parties") of and from any and all actions,
causes of action, suits, proceedings, executions, judgments, duties, debts, dues, accounts, bonds,
contracts and covenants (whether express or implied), and claims and demands whatsoever
whether in law or in equity which the Releasing Parties may have against each of the Released
Parties, now has or in the future may have, in respect of any cause, matter or thing relating to the
business or operations of the Acquired Companies, the Transactions, this Agreement, the
Transaction Documents, or the ownership of Shares by the Released Parties, in each case of clause,
occurring or arising on or prior to the Closing Date; provided, solely with respect to the Released
Parties described in clause (b), that this Section 9.15 shall not release any claims to the extent such
claims or the underlying losses arise from such Released Party's willful misconduct or gross
negligence. Each Party, on behalf of itself and each Releasing Party, covenants and agrees that no
Releasing Party shall assert any such released claim against the Released Parties.

Section 9.16.   Counterparts. This Agreement may be executed in one or more counterparts including by facsimile or other means of electronic transmission, such as by electronic mail in ".pdf" form, each of which will be deemed to be an original copy of this Agreement and all of which, when taken together, will be deemed to constitute one and the same agreement.

Section 9.17.   Debt Financing Sources. Notwithstanding anything in this Agreement to the contrary, the Special Master hereby:

(a)      agrees that any proceeding, whether in law or in equity, whether in contract or in tort or otherwise, involving the Debt Financing Sources, arising out of or relating to, this Agreement, the Debt Financing and/or any of the agreements (including the Debt Commitment Letters) entered into in connection with the Debt Financing or any of the transactions contemplated hereby or thereby or the performance of any services thereunder shall be subject to the exclusive jurisdiction of any federal or state court in the Borough of Manhattan, New York, New York, so long as such forum is and remains available, and any appellate court thereof and each Party hereto irrevocably submits itself and its property with respect to any such proceeding to be the exclusive jurisdiction of such court;

(b)      agrees that any such proceeding shall be governed by the laws of the State of New York (without giving effect to any conflicts of law principles that would result in the application of the laws of another state), except as otherwise provided in the Debt Commitment Letters or any other applicable definitive document relating to the Debt Financing;

(c)      without limiting the rights of the Buyer under the Debt Commitment Letters and/or any right or remedy available to any person under the definitive documentation governing the Debt Financing, agrees not to bring or support or permit any of its Affiliates to bring or support any proceeding of any kind or description, whether in law or in equity, whether in contract or in tort or otherwise, against any Debt Financing Source in any way arising out of or relating to, this Agreement, the Debt Financing and/or any of the agreements (including the Debt Commitment Letters) entered into in connection with the Debt Financing or any of the transactions contemplated hereby or thereby or the performance of any services thereunder in any forum other than any federal or state court in the Borough of Manhattan, New York, New York;

(d)      agrees that service of process upon the Acquired Companies and/or each of its controlled Affiliates or the Special Master in any such proceeding shall be effective if notice is given in accordance with Section 9.7;

(e)      irrevocably waives, to the fullest extent that it may effectively do so, the defense of an inconvenient forum to the maintenance of such Legal Proceeding in any such court;

(f)      knowingly, intentionally and voluntarily waives trial by jury in any proceeding brought against any Debt Financing Source in any way arising out of or relating to this Agreement, the Debt Financing and/or any of the agreements (including the Debt Commitment Letters) entered into in connection with the Debt Financing or any of the transactions contemplated hereby or thereby or the performance of any services thereunder;

(g)      without limiting the rights of the Buyer under the Debt Commitment Letters and/or any right or remedy available to any person under the definitive documentation governing

the Debt Financing, agrees that none of the Debt Financing Sources will have any liability to the Acquired Companies and/or any of their respective controlled Affiliates (in each case, other than the Buyer and the Buyer Subsidiaries) or the Special Master relating to or arising out of this Agreement, the Debt Financing and/or any of the agreements (including the Debt Commitment Letters) entered into in connection with the Debt Financing or any of the transactions contemplated hereby or thereby or the performance of any services thereunder, whether in law or in equity, whether in contract or in tort or otherwise; and

(h)    agrees that the Debt Financing Sources are express third party beneficiaries of, and may enforce, any of the provisions of this Section 9.17 and that such provisions and the definitions of "Debt Commitment Letter," "Debt Financing," and "Debt Financing Sources," shall not be amended in any way adverse to any Debt Financing Source without the prior written consent of such Debt Financing Source.

Section 9.18.  Special Master and his Representatives' Judicial Immunity. The Buyer agrees that in no circumstance shall the Special Master or his Representatives be personally or otherwise liable for any amounts or obligations owed to the Buyer, for any breach of any representations or warranties in this Agreement, or for any other claims or liabilities arising out of or in connection with this Agreement or the transaction contemplated by this Agreement. The Buyer further agrees that the Special Master and his Representatives are acting as an arm of the Court and are entitled to judicial immunity in the performance of their duties and in connection with this Agreement and the Transactions.

Section 9.19.  Special Master Indemnification.  From and after the Closing, the Buyer shall, and shall cause each Acquired Company to, indemnify, defend and hold harmless, to the fullest extent permitted under applicable Law, the Special Master against any and all losses, damages, liabilities, deficiencies, claims, actions, judgments, settlements, interest, awards, penalties, fines, costs or expenses of whatever kind, including attorneys' fees, that are incurred by Special Master, arising out of or related to this Agreement. Further, from and after the Closing, the Buyer shall, or shall cause the Acquired Companies to, advance any expenses (including fees and expenses of legal counsel) of the Special Master under this Section 9.19 (including in connection with enforcing the indemnity and other obligations referred to in this Section 9.19), as incurred, to the fullest extent permitted under applicable Law. Buyer's obligations pursuant to this Section 9.19 shall in no event exceed $10,000,000 in the aggregate.

[*Signature Pages Follow*]

IN WITNESS WHEREOF, the Parties have duly executed this Agreement as of the day and year first written above.

███████████████, as the Buyer

By: _____
Name:
Title:


ROBERT B. PINCUS, as the Special Master

By: _____
Name:
Title:

**ANNEX A**

DEFINITIONS

"<u>Acquired Companies</u>" means, collectively, the Company and each of the Company Subsidiaries.

"<u>Additional Judgment Creditors</u>" means the judgment holders, other than Crystallex Corporation and ConocoPhillips Petrozuata B.V., set forth in the Priority Order [D.I. 996], dated March 1, 2024, in the Specified Litigation.

"<u>Advanced Transaction Expenses</u>" means, as provided in the Sale Procedures Order and the May Order (in each case as in effect on Execution Date), the Special Master's compensation and any out-of-pocket costs, fees and expenses incurred by the Special Master in connection with the Transactions for investment bankers, third party consultants, legal counsel and any of his other Representatives or Advisors (as defined in the Sale Procedures Order) that have previously been paid as an advance by the Sale Process Parties and Additional Judgment Creditors pursuant to the procedures set forth in the May Order, which for the avoidance of doubt will include the monthly expenses of the Special Master (including fees and expenses of Weil, Gotshal & Manges LLP, Potter Anderson & Carroon LLP, Jenner & Block LLP, Evercore and any other advisors engaged by the Special Master).

"<u>Affiliate</u>" means, with respect to any Person, any other Person that, directly or indirectly through one or more intermediaries, controls, or is controlled by, or is under common control with, such Person, and the term "<u>control</u>" (including the terms "<u>controlled by</u>" and "<u>under common control with</u>") means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of such Person, whether through ownership of voting securities, by contract or otherwise; <u>provided</u>, that (i) in no event shall <u>any direct or indirect equity investor in the Buyer be deemed an "Affiliate" of the Buyer other than</u> ███████████████ and ███████████ <u>and their respective Affiliates and (ii) "Affiliates" shall in no event include any portfolio company of</u> ██████████████████████, ██████████████ or ████████████████

"<u>Anti-Corruption Laws</u>" means any applicable Law for the prevention or punishment of public or commercial corruption or bribery, including the U.S. Foreign Corrupt Practices Act, U.K. Bribery Act 2010 and any other applicable anti-corruption or anti-bribery Law of any other applicable jurisdiction.

"<u>Antitrust Laws</u>" means the HSR Act, the Sherman Act, the Clayton Act, the Federal Trade Commission Act, and any other Laws that are designed to prohibit, restrict or regulate actions having the purpose or effect of monopolization, lessening of competition, or restraint of trade.

"<u>Attached Judgment</u>" means a judgment held by a Claimholder and listed in the Final Priority Order [D.I. 1102] in the Specified Litigation.

"<u>Business Day</u>" means any day of the year other than (a) a Saturday, Sunday or federal holiday in the United States or (b) a day on which national banking institutions in New York, New York are required or authorized to close.

"Business Unit" each of (a) Corpus Christi Refinery, (b) Crude Supply & Trading, (c) Lake Charles Refinery, (d) Lemont Refinery, (e) Lights Oils Marketing, (f) Logistics, (g) Lubricants, (h) Procurement, (i) Product Supply & Trading, (j) Specialty Products, and (k) Terminals & Pipelines.

"Buyer Subsidiary" means any Subsidiary of the Buyer, as of the Execution Date.

"Cash" means the cash and cash equivalents of the Acquired Companies; provided, that Cash shall (a) exclude (i) all issued but uncleared checks and drafts of the Acquired Companies, (ii) cash deposits and cash held in escrow accounts, (iii) with respect to any cash held outside the United States, all Taxes, fees, expenses and other costs associated with repatriating such cash into the United States, (iv) cash held by the Acquired Companies for third parties, and (v) cash held as collateral for outstanding letters of credit and any other restricted or trapped cash; and shall (b) include all checks and wire transfers and drafts deposited or available for deposit for the account of the Acquired Companies.

"CITGO Petroleum" means CITGO Petroleum Corporation, a Delaware corporation.

"Claim" means (a) a right to a payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured or (b) an equitable remedy for breach of performance if such breach gives rise to a right to payment, whether or not such right to an equitable remedy is reduced to judgment, fixed, contingent, matured, unmatured, disputed, undisputed, secured or unsecured. Without limiting the foregoing and for the avoidance of doubt, a Claim includes any loss, liability, demand, claim, judgment, sanction, penalty, action, obligation, commitment, assessment, settlement, fee, debt, deficiency, guaranty of any kind, proceeding, damage, cost, or expense (including court costs and professional fees (including attorneys' fees and costs)) whatsoever, whether at law or in equity, whether known or unknown, fixed, liquidated, contingent, or otherwise, whether under any theory of successor or transferee liability and whether imposed by agreement, understanding, law, or otherwise.

"Closing Consideration" means the Purchase Price, minus the Advanced Transaction Expenses Amount, minus the Deposit Amount, minus the Closing Transaction Expenses, minus the Expense Reserve Holdback Amount and minus any adjustment pursuant to Section 6.19.

"Closing Transaction Expenses" means the Special Master Transaction Expenses that are unpaid as of the Closing.

"COBRA" means Part 6 of Subtitle B of Title I of ERISA, Section 4980B of the Code and any similar state applicable Law.

"Code" means the U.S. Internal Revenue Code of 1986, as amended.

"Commencement Date" means the date on which the Court issues an order identifying the bid reflected in this Agreement as a stalking horse bid or a base bid.

"Company Benefit Plan" means (a) each "employee benefit plan" (as such term is defined in Section 3(3) of ERISA), (b) each plan, program, policy, agreement or arrangement that would

be an "employee benefit plan" (within the meaning of Section 3(3) of ERISA), if it were subject to ERISA, (c) each stock purchase, stock option, restricted stock, stock bonus, stock ownership, stock appreciation rights, phantom equity, profits interests or other equity or equity-based plan or agreement, (d) each compensation, bonus, commission, incentive or deferred compensation plan, agreement, arrangement, program, policy or practice, (e) each employment or consulting agreement, offer letter or severance, retention, change of control, termination, employee loan or other compensation plan, agreement, arrangement, program, policy, or practice, (f) each health or welfare plan, agreement, arrangement, program, policy, or practice, and (g) each vacation policy, or other employee fringe benefit or perquisite arrangement whether or not subject to ERISA, in the cases of clauses (a) through (g), (x) that is maintained, sponsored, or contributed to by (or required to be contributed to by) any Acquired Company or with respect to which any Acquired Company has any liability and (y) under which any current or former director, officer, manager, employee, contractor or consultant of any Acquired Company has any present or future right to benefits or is eligible to participate.

"Company Fundamental Representations" means the representations and warranties set forth in Section 4.1 (Corporate Existence; Title to Shares), Section 4.4 (Capitalization) and Section 4.5(a)-(d) (Subsidiaries).

"Company Material Adverse Effect" means any state of facts, change, development, event, effect, circumstance, condition or occurrence (each, an "Effect") that, individually or in the aggregate, (x) would materially delay or impair the ability of the Special Master or the Acquired Companies (as applicable) to consummate the Transactions, in each case, other than Claims or Legal Proceedings arising out of or in relation to the Sale Order, the Purported Equity Pledge or the Equity Pledge Litigation or (y) results in or would reasonably be expected to have a material adverse effect on the condition (financial or otherwise), business, assets, liabilities or results of operations of the Acquired Companies and the Non-Controlled Entities, taken as a whole; provided, however, that in no event shall any of the following Effects, alone or in combination, be deemed to constitute, or be taken into account, in determining whether there has been, or would be, a Company Material Adverse Effect (A) any changes or conditions in the U.S. or any other national or regional economy, any global economic changes or conditions or securities, credit, financial or other capital markets conditions; (B) any changes or conditions affecting the oil and gas industry in general (including changes to the prices of commodities or of the raw material inputs or value of the outputs of the Company's products, general market prices and regulatory changes affecting the industry); (C) any weather-related or other force majeure event or outbreak (including earthquakes, hurricanes, tsunamis, tornadoes, floods, mudslides, wild fires or other natural disasters); (D) pandemics, epidemics, COVID-19 measures, acts of war (whether or not declared), armed hostility (by recognized governmental forces or otherwise), sabotage, terrorism or cyber-attack, and any escalation or general worsening of any of the foregoing or other response to any Governmental Bodies (including requirements for business closures, restrictions on operations or "sheltering-in-place"); (E) Effects resulting from the negotiation, execution, announcement, pendency, compliance with or performance of this Agreement, the Transactions or the terms hereof or the consummation of the Transactions, including the impact thereof on the relationships of the Acquired Companies with customers, suppliers, partners, employees or Governmental Bodies; (F) any action taken by an Acquired Company or failure of such Acquired Company to take action, in each case, which the Buyer has requested in writing or consented to when asked under Section 6.1; (G) changes in applicable Law or in GAAP or in accounting

A-3

standards, or any changes in the interpretation or enforcement by any Governmental Body of any of the foregoing, or any changes in general legal or regulatory conditions, including any Effects arising out of, in connection with, or as a result of, any "shut-down" or funding freeze of the U.S. federal government (including any of its agencies); (H) any failure to meet any internal projections, forecasts, guidance, estimates, milestones, or budgets or internal or published financial or operating predictions of revenue, earnings, cash flow or cash position; (I) any downgrade in the Company's credit rating (it being understood that the exceptions in clauses (H) and (I) shall not prevent or otherwise affect a determination that the underlying cause of any such Effect referred to therein (if not otherwise falling within any of the exceptions provided hereof) is a Company Material Adverse Effect); (J) compliance with, or any action required to be taken by the Buyer or its Affiliates under the terms of this Agreement or in connection with the Transactions including Section 6.3(d); or (K) Claims or Legal Proceedings arising out of or in relation to the Sale Order, the Purported Equity Pledge or the Equity Pledge Litigation; provided, that in the case of clauses (A), (B), (C), and (D), to the extent the impact on the Acquired Companies, taken as a whole, is disproportionately adverse compared to the impact on similarly situated entities, the incrementally disproportionate impact or impacts shall be taken into account in determining whether there has been, or would reasonably be expected to be, a Company Material Adverse Effect.

"Company Subsidiary" means any Subsidiary of the Company, as of the Execution Date.

"Contract" means any written or oral contract, agreement, lease, easement, license, sublicense, subcontract, note, evidence of indebtedness, mortgage, indenture, bond, letter of credit, purchase order, binding bid, security agreement or other legally binding arrangement, whether express or implied (including all amendments, supplements, and modifications thereto), but shall exclude Permits and Company Benefit Plans.

"Credit Support Arrangements" means guaranties, performance bonds, performance guaranties, indemnities, keep-wells, sureties, bankers' acceptances, letters of credit, agreement to assume liabilities, other security, credit support or financial assurances and any other Contract or arrangement pursuant to which any person is or may be directly or indirectly liable or responsible for the liabilities, or the maintenance of a financial position, of any other person, including by the posting (or potential forfeiture) of any collateral, security or bond.

"Debt" means, with respect to the Acquired Companies, without duplication, the following obligations: (i) the principal amount of obligations of the Acquired Companies (A) for borrowed money, whether or not contingent, or (B) evidenced by notes, debentures, bonds or other similar instruments (including debt-like instruments) or debt securities; (ii) all obligations of the Acquired Companies for the reimbursement of any obligor of any guaranties, performance bonds, performance guaranties, indemnities, keep-wells, sureties, bankers' acceptances, letters of credit or similar arrangements, to the extent drawn upon; (iii) all liabilities of any Person (other than any Acquired Company) for which any Acquired Company has guaranteed repayment (to the extent of such guarantee); (iv) all obligations for deferred purchase price of property, assets or services, all conditional sale obligations, earnouts, holdbacks or other similar obligations (calculated at the full amount of the possible payment outstanding); (v) all obligations under finance leases; (vi) the non-current liabilities set forth on Section 1.1(c) of the Company Disclosure Schedules; (vii) post-retirement welfare benefits and unfunded or underfunded pensions; (viii) to the extent drawn, obligations under the Receivables Securitization Facility; and (ix) all obligations of the type

referred to in clauses (i) through (viii) above of other Persons secured by any Lien on any property or asset of the Acquired Companies, whether or not such obligation is assumed by the Acquired Companies (with Debt under this clause (ix) being limited, in the case of any such obligation of another Person, to the lower of such obligation and the fair market value of the properties and assets securing the same). Debt shall not include (A) any amounts included in Closing Transaction Expenses, (B) any obligations or guarantees under bankers acceptance, letters of credit or similar arrangements to the extent undrawn as of the Closing Date and which do not become drawable as a result of the Transactions, (C) any intercompany Debt of the Company and its wholly owned Subsidiaries and (D) any Taxes.

"Debt Financing Documents" means any credit agreements, note purchase agreements, engagement letters, fee letters, indentures, guarantees, pledge and security documents, definitive financing documents, agreements, schedules or other certificates or documents contemplated by the Debt Financing.

"Debt Financing Source" means, in its capacity as such, any lender, similar debt financing source, agent or arranger providing or arranging a commitment to, or that has entered into definitive agreements related to, the Debt Financing, including pursuant to the Debt Commitment Letters (as modified by any joinder agreement, amendment, or other modification thereto as permitted hereunder) or any Debt Financing Document (or any other commitment letter or definitive agreement in respect of any alternative debt financing) and their respective Affiliates, and such Person's (and their respective Affiliates') former, current or future equityholders, members, employees, officers, directors, attorneys, agents or advisors, and, in each case, their respective successors and assigns; provided, however, that neither the Buyer nor any of its Affiliates shall constitute a Debt Financing Source.

"Debt Payoff Amount" means the aggregate principal amount of the Specified Debt, plus all accrued but unpaid interest, fees and other amounts payable thereon (including any premiums, penalties, breakage costs and any other fees, expenses or other obligations relating thereto), in each case, calculated as of the Closing Date or as of the Redemption Date as defined in the applicable indenture to such item of Specified Debt.

"Deposit Forfeiture Termination Event" means the occurrence of this Agreement being terminated (i) by either Party pursuant to Section 8.1(b) (Outside Date) if the Special Master could otherwise have terminated pursuant to Section 8.1(f) (Buyer Breach) on the Outside Date, or (ii) by the Special Master pursuant to Section 8.1(f) (Buyer Breach).

"Designated Managers" means the employees of the Company or its Subsidiaries designated as such in the Procedures Summary.

"Economic Sanctions/Trade Laws" means all applicable Laws relating to export controls, anti-boycott, and Sanctions Targets, including prohibited or restricted international trade and financial transactions and lists maintained by any Governmental Body targeting countries, territories, entities or persons, including the United States, the United Nations Security Council, the European Union, or His Majesty's Treasury of the United Kingdom. For the avoidance of doubt, the applicable Laws referenced in the foregoing sentence include (1) any of the Trading With the Enemy Act, the International Emergency Economic Powers Act, the United Nations

Participation Act, or the Syria Accountability and Lebanese Sovereignty Act, or any regulations of OFAC, or any export control Law applicable to U.S.-origin goods, technology, or software, or any enabling legislation or executive order relating to any of the above, as collectively interpreted and applied by the U.S. Government at the prevailing point in time, (2) any U.S. sanctions related to or administered by the U.S. Department of State and (3) any sanctions measures or embargoes imposed by the United Nations Security Council, His Majesty's Treasury or the European Union.

"Environmental Laws" means any and all Laws relating to (a) pollution or the protection, cleanup, preservation or restoration of the environment or natural resources (including air, water, land, soil, subsoil, wildlife, plants, or other natural resources), (b) the generation, manufacture, processing, handling, use, labeling, treatment, storage, disposal, transportation, or Release or threatened Release of, or exposure to, any Hazardous Substance, or (c) the health and safety of Persons, including the following, to the extent applicable: the Comprehensive Environmental Response, Compensation, and Liability Act, 42 U.S.C. §§ 9601 et seq.; the Federal Water Pollution Control Act, 33 U.S.C. § 1251 et seq.; the Clean Air Act, 42 U.S.C. § 7401 et seq.; the Toxic Substances Control Act, 15 U.S.C. § 2601 et seq.; the Emergency Planning and Community Right to Know Act of 1986, 42 U.S.C. § 11001 et seq.; the Safe Drinking Water Act, 42 U.S.C. § 300(f) et seq.; the Hazardous Materials Transportation Act, 49 U.S.C. § 5101 et seq.; the Federal Insecticide, Fungicide and Rodenticide Act, 7 U.S.C. § 136 et seq.; the Resource Conservation and Recovery Act of 1976, 42 U.S.C. § 6901 et seq.; the Oil Pollution Act of 1990, 33 U.S.C. § 2701 et seq.; the Occupational Safety and Health Act, 29 U.S.C. §651 et seq. (with respect to human exposure to Hazardous Substances); the Endangered Species Act of 1973, 16 U.S.C. §§ 1531 et seq.; the Bald and Golden Eagle Protection Act, 16 U.S.C. § 668 et seq.; the Migratory Bird Treaty Act, 16 U.S.C. § 703 et seq.; and any similar or implementing state or local Law, all amendments or regulations promulgated thereunder.

"EPP" means the CITGO Petroleum Corporation Executive Protection Plan, as amended.

"Equitable Exceptions" means, collectively, (a) applicable bankruptcy, insolvency, reorganization, moratorium and similar Laws affecting creditors' rights and remedies generally, and (b) general principles of equity, including principles of commercial reasonableness, good faith and fair dealing (regardless of whether enforcement is sought in a proceeding at law or in equity).

"Equity Commitment Letters" means the equity commitment letters to be executed by each Equity Financing Source on the Execution Date.

"Equity Financing Sources" means the Persons set forth in Section 1.1(a) of the Buyer Disclosure Schedules and each other Person who delivers an Equity Commitment Letter on the Execution Date.

"Equity Interests" means, with respect to any entity, any and all capital stock, shares, quotas, limited liability company interests (however designated), partnership or membership interests or units (whether general or limited), or other similar interest or participation that confers on a Person the right to receive a share of the profits and losses of, or distribution of assets of, such entity, the right to vote for or appoint directors (or other similar governing body members) of such entity or the right to otherwise cause the direction or management and policies of such entity in a manager, general partner or other similar capacity.

A-6

"<u>Equity Pledge Litigation</u>" means the case of Petroleos de Venezuela S.A. v. MUFG Union Bank, N.A., 19-10023 (KPF) (S.D.N.Y.) that was initiated on October 29, 2019 by PDVSA, the Company and CITGO Holding against GLAS and MUFG in their capacities as collateral agent and trustee, respectively, for the 2020 Bondholders, disputing the Purported Equity Pledge.

"<u>ERISA</u>" means the Employee Retirement Income Security Act of 1974 and the rules and regulations thereunder.

"<u>ERISA Affiliate</u>" means with respect to any Person, trade or business, or entity, any other Person, trade or business, or entity, (a) that is, or was at the relevant time, a member of a group described in Section 414(b), (c), (m) or (o) of the Code that includes, or included at the relevant time, the first Person, trade or business, or entity, or (b) that is, or was at the relevant time, a member of the same "controlled group" as the first Person, trade or business, or entity pursuant to Section 4001(a)(14) of ERISA.

"<u>Escrow Account</u>" means the escrow account established pursuant to the Escrow Agreement in respect of the Deposit Amount.

"<u>Existing Senior Secured Notes</u>" means the 6.375% Senior Secured Notes, the 7.000% Senior Secured Notes and the 8.375% Senior Secured Notes, or any of them.

"<u>Expense Reimbursement Amount</u>" means an amount equal to the reasonable and documented out-of-pocket costs, fees and expenses, inclusive of any out-of-pocket financing commitment fees and attorney fees, incurred by the Buyer or any of its Affiliates in connection with the Transactions; <u>provided</u>, that in no event shall the Expense Reimbursement Amount exceed $30,000,000.

"<u>Expense Reserve Holdback Account</u>" means the account established by the Special Master in respect of the Expense Reserve Holdback Amount.

"<u>Expense Reserve Holdback Amount</u>" means a reasonable amount to be determined by the Special Master in good faith that is approved by the Court prior to Closing.

"<u>Evaluation Criteria</u>" means the non-exhaustive list of criteria, as approved by the Court pursuant to the January Order, based on which the Special Master shall determine which bid to recommend as the stalking horse bid, base bid or Successful Bid, if any and as applicable.

"<u>Fraud</u>" means a knowing misrepresentation of a material fact or concealment of a material fact by a Person with respect to any representation or warranty in this Agreement or the other Transaction Documents which is made or concealed with the specific intent to deceive and the intent of inducing another Person to enter into the Transaction Documents; <u>provided</u>, that at the time such representation was made (a) such representation was materially inaccurate, (b) such Person had actual knowledge (and not imputed or constructive knowledge), without any duty of inquiry or investigation, of the material inaccuracy of such representation, (c) such Person had the specific intent to deceive another Person and (d) the other Person acted in reliance on such inaccurate representation and suffered financial injury as a result of such material inaccuracy. For the avoidance of doubt, "<u>Fraud</u>" does not include any Claim for equitable fraud, promissory fraud,

unfair dealings fraud, or any torts (including a Claim for fraud) based on negligence or recklessness.

"Good Industry Practice" means any of the practices, methods, standards, procedures and actions which could reasonably be expected to be used or taken by a reasonably prudent operator of properties or other assets, as applicable, similar to the applicable properties or other assets of the Acquired Companies, in each case, in light of the facts and circumstances known as of the relevant time of measurement. "Good Industry Practice" is not intended to be limited to the optimal practice, method, standard, procedure or action to the exclusion of all others, but rather is intended to include a range of practices, methods, standards or actions that meet the foregoing qualifications.

"Governmental Body" means any domestic or foreign national, state, multi-state, municipal or other local government, including any governmental, regulatory, or administrative department, division, subdivision, agency, bureau, board, commission, or authority thereof, or any quasi-governmental or private body exercising any regulatory or Taxing Authority (to the extent that the rules, regulations or orders of such organization or authority have the force of Law), or any court, tribunal or arbitral body of competent jurisdiction.

"Government Contract" means any Contract, grant, basic ordering agreement, letter contract, or order with (i) any Governmental Body, (ii) another Person under such other Person's prime contract with a Governmental Body, or (iii) any higher tier subcontractor of a Governmental Body in its capacity as a subcontractor, for which the period of performance has not expired or terminated, or final payment has not been received, or which remains open to audit as of the Execution Date. Unless otherwise indicated, a task, purchase or delivery order under a Government Contract will not constitute a separate Government Contract for purposes of this definition but will be part of the Government Contract under which it was issued.

"Hazardous Substance" means any substance, material or waste that is regulated, listed, designated, classified, defined or characterized under or pursuant to any Environmental Law as "hazardous," "toxic," "radioactive", a "pollutant," a "contaminant," or words of similar meaning, including petroleum or petroleum products, byproducts, derivatives, crude oil or any fraction thereof, PFAS, explosive materials, radioactive materials, asbestos, lead-based paint, or polychlorinated biphenyls.

"HSR Act" means the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended.

"Indenture" means the indenture issued on October 27, 2016, by PDVSA, as issuer, with PDVSA Petróleo, S.A., as guarantor, MUFG Union Bank, N.A., as trustee, GLAS Americas LLC, as collateral agent, Law Debenture Trust Company of New York, as registrar, transfer agent and principal agent, and Banque Internationale À Luxembourg, Société Anonyme, as Luxembourg paying agent.

"Interest Rate" means (x) the rate of interest published from time to time by The Wall Street Journal, Eastern Edition, as the "prime rate" at large U.S. money center banks during the period from the date that payment is due to the date of payment, plus (y) one percent (1.0%).

"Interim Period" means the period beginning on the date of the Sale Order Entry and ending upon the earlier of the Closing and the termination of this Agreement in accordance with its terms.

"IRS" means the United States Internal Revenue Service.

"January Order" means that certain *Memorandum Order* [D.I. 1554] entered by the Court on January 27, 2025 in the Specified Litigation.

"Judgment Creditors" means the judgment holders in the Specified Litigation.

"Knowledge of the Buyer" means the actual knowledge (and not imputed or constructive knowledge) of any of the Persons set forth in Section 1.1(b) of the Buyer Disclosure Schedules after due inquiry.

"Knowledge of the Company" or "Company's Knowledge" means the actual knowledge (and not imputed or constructive knowledge) of the Designated Managers after due inquiry.

"Knowledge of the Special Master" means actual knowledge (and not imputed or constructive knowledge) of the Special Master.

"Law" means any applicable foreign, federal, state, local law (including common law), statute, treaty, code, ordinance, rule, regulation, judgment, decree, binding directive, injunction, Order or other legal requirement of any Governmental Body; provided, that in no event shall "applicable Law" be deemed to include Laws and Orders of the Bolivarian Republic of Venezuela.

"Legal Proceeding" means any judicial, regulatory, administrative or arbitral action, suit, claim, appeal, cause of action, objection, demand, inquiry, audit, notice of violation, citation, summon, subpoena, proceeding, or investigation of any nature, civil, criminal, public or private.

"Lien" means, with respect to any asset, any mortgage, lien, pledge, charge, security interest or encumbrance of any kind in respect of such asset.

"Lookback Date" means the date that is three (3) years prior to the Execution Date.

"Money Laundering Laws" means any law or regulation regarding money laundering or financial recordkeeping and reporting requirements, including the U.S. Currency and Foreign Transactions Reporting Act of 1970, the U.S. Money Laundering Control Act of 1986, the USA PATRIOT Act of 2001, and any applicable money laundering-related laws of other jurisdictions where the Acquired Companies conduct business, conduct financial transactions or own assets.

"Negative Consequences" means (a) if related to any consent with respect to any Contract, (i) any default, breach or violation of such Contract (or any default, breach or violation that would result with notice, lapse of time or both) or (ii) any modification or supplement to the rates, service levels, performance schedules or other terms or conditions of such Contract or any right to modify any of the foregoing, in each case, that would be or reasonably could be expected to be adverse to the Acquired Companies, (b) the imposition of any restriction, limitation or new covenant on any Acquired Company, (c) the imposition or creation of any Lien on any assets or properties of any Acquired Company, (d) any right of termination, cancellation, revocation, non-renewal or

acceleration or loss of benefit or vesting of any right of any person, in each case, that would be or reasonably could be expected to be adverse to any of the Acquired Companies (upon the exercise of any rights or otherwise), (e) any right to receive any rebate, chargeback, refund, credit or penalty and (f) any payment, compensation or incremental liability (or any right to any payment, compensation or incremental liability).

"No-Shop Period" means the period beginning on the date that is five (5) Business Days after the conclusion of the Topping Period, and ending on the Closing Date or the date on which this Agreement terminates pursuant to its terms.

"Non-Controlled Entity" means any entity in which an Acquired Company owns, directly or indirectly, any Equity Interest other than a Company Subsidiary.

"OFAC" means the U.S. Department of the Treasury's Office of Foreign Assets Control.

"OFAC License" means a general or specific license or licenses from OFAC authorizing the Parties to participate in and close the Transaction, in form and substance reasonably satisfactory to the Buyer.

"OFAC License Application" means a request for an OFAC License pursuant to 31 CFR § 501.801 or other relevant authority.

"Offering Documents" means prospectuses, private placement memoranda, information memoranda, syndication memoranda and packages and lender and investor presentations in each case to the extent the same are customary and required in connection with the Debt Financing.

"Order" means any order, injunction, judgment, decree, ruling, writ, assessment or arbitration award of a Governmental Body, other than the Bolivarian Republic of Venezuela.

"Ordinary Course" means the ordinary and usual course of day-to-day operations of the Acquired Companies and/or the Non-Controlled Entities (as applicable), in each case, consistent with past practice, taken as a whole.

"Organizational Documents" means the charter, memorandum, certificate of incorporation, articles of association, bylaws, partnership agreements, limited liability company agreement, operating agreement, or other similar document of a Person, as may be amended, restated or otherwise modified from time to time.

"Paying Agent Account" means the deposit account established by the Paying Agent pursuant to the terms of the Paying Agent Agreement for the benefit of the Claimholders.

"PCI DSS" means the Payment Card Industry Data Security Standard, issued by the Payment Card Industry Security Standards Council, as revised from time to time.

"Permit" means all permits, licenses, approvals, certifications, consents, registrations, variances, exemptions, waivers, Orders, franchises and other authorizations of any Governmental Body.

"Permitted Liens" means (a) all defects, exceptions, restrictions, easements, rights of way and encumbrances of record; (b) Liens securing liabilities which are reflected or reserved against in the consolidated balance sheet of the Company prepared in accordance with GAAP to the extent so reflected or reserved; (c) Liens for Taxes not yet due and payable or that are being contested in good faith through appropriate proceedings; (d) landlords', mechanics', carriers', workers', repairers' and similar statutory Liens arising or incurred in the Ordinary Course; (e) zoning, building code, entitlement and other land use restrictions and Environmental Laws; (f) title of a lessor under a capital or operating lease, and leases, subleases, and similar transactions in the Ordinary Course; (g) any license, covenant or other right to or under Intellectual Property granted in the Ordinary Course; (h) gaps in the chain of title for Intellectual Property evident from the public records of the Governmental Body maintaining the applications or registrations therefor; (i) Liens set forth in Section 1.1(d) of the Company Disclosure Schedules; (j) the Purported Equity Pledge; and (k) Claims or Legal Proceedings seeking to enforce judgments against PDVSA or the Bolivarian Republic of Venezuela by recovering from the Acquired Companies.

"Person" means any individual, corporation, partnership, limited liability company, firm, joint venture, association, joint-stock company, trust, unincorporated organization, Governmental Body or other entity.

"Personal Information" means all information that identifies, could be used to identify or is otherwise related to an individual person or household, including demographic, health, behavioral, biometric, financial, nonpublic, and geolocation information, IP addresses, network and hardware identifiers, employee information, and any other individually identifiable information that is protected under any applicable Privacy Law and Obligation, in addition to any definition for "personal information", "personal data", "personally identifiable information", "protected health information" or any similar term provided by applicable Privacy Laws and Obligations.

"PFAS" stands for per- and polyfluoroalkyl substances and means any substance which contains at least one fully fluorinated methyl or methylene carbon atom (without any hydrogen (H)/chlorine/bromine/iodine atom attached to it), including any acids, salts, precursors, polymers or derivatives thereof.

"Post-Closing Tax Period" means any taxable period beginning after the Closing Date.

"Preferential Right" means any rights of first refusal, rights of first offer, put or call options, preferential rights to purchase, preemptive rights, change in control, or other similar rights in favor of any Person.

"Procedures Summary" means the procedures described in Section 1.1(e) of the Company Disclosure Schedules.

"Purported Equity Pledge" means the purported pledge of 50.1% of the equity in CITGO Holding, Inc., a Delaware corporation and wholly owned direct subsidiary of the Company that purportedly secured, in part, the 2020 Bonds.

"Related Claim" means any Legal Proceeding that may be based upon, arise out of or relate to this Agreement or the negotiation, execution, performance, breach, interpretation, construction,

validity or enforcement of this Agreement (including any Legal Proceeding based upon, arising out of or related to any representation or warranty made or alleged to be made in or in connection with, or as an inducement to enter into, this Agreement).

"Release" means any actual or threatened releasing, spilling, leaking, pumping, pouring, emitting, emptying, discharging, injecting, escaping, or allowing to escape, leaching, migrating, dumping, abandoning, or disposing into or through the indoor or outdoor environment (including soil, surface water, ground water, land surface, subsurface strata, ambient air, wildlife, plants or other natural resources).

"Representatives" means, with respect to any Person, such Person's equityholders, partners, members, officers, directors, employees, consultants, agents, attorneys, accountants, advisors, financing sources and other representatives.

"Required Information" means (i) the audited consolidated balance sheet of the Company as of December 31, 2023 and December 31, 2022 and the related audited consolidated statements of income and cash flows for the fiscal years then ended, and, if the ten (10) Business Day period referred to in Section 2.2 is not completed by February 12, 2025, the audited consolidated balance sheet of the Company as of December 31, 2024, (ii) the unaudited condensed consolidated balance sheet of the Company as of the last date of each subsequent fiscal quarter, other than the fourth fiscal quarter in any fiscal year, ending after December 31, 2023, and at least forty five (45) days prior to the Closing Date, and the related unaudited condensed consolidated statements of income and cash flows for the three months then ending and for the portion of the year to date and (iii) historical information reasonably requested by the Buyer in the Buyer's preparation of the pro forma financial statements referred to in Section 6.10(a)(viii) (after giving effect to the proviso thereto), provided, that notwithstanding anything to the contrary in this definition or otherwise, nothing herein shall require the Special Master or the Company to provide (or be deemed to require the Special Master or the Company to prepare) any (1) description of all or any portion of the Debt Financing, including any "description of notes," "plan of distribution" and information customarily provided by investment banks or their counsel or advisors in the preparation of Offering Documents for private placements of non-convertible bonds pursuant to Rule 144A under the Securities Act, (2) risk factors relating to, or any description of, all or any component of the financing contemplated thereby, (3) historical financial statements or other information required by Rule 3-05, Rule 3-09, Rule 3-10, Rule 3-16, Rule 13-01 or Rule 13-02 of Regulation S-X under the Securities Act in each case which are prepared on a basis not consistent with the Company's reporting practices for the periods presented in the Required Information; any compensation discussion and analysis or other information required by Item 10, Item 402 and Item 601 of Regulation S-K under the Securities Act or XBRL exhibits; or any information regarding executive compensation or related persons related to SEC Release Nos. 33-8732A, 34-54302A and IC-27444A, (4) other information customarily excluded from Offering Documents for private placements of non-convertible high- yield bonds pursuant to Rule 144A under the Securities Act in a "Rule 144A-for-life" offering, (5) consolidating financial statements, separate Subsidiary financial statements, related party disclosures, or any segment information, including any required by FASB Accounting Standards Codification Topic 280 in each case which are prepared on a basis not consistent with the Company's reporting practices for the periods presented in the Required Information, (6) financial information that the Acquired Companies do not maintain in the ordinary course of business (other than the historical financial statements and other historical information

expressly set forth in the foregoing clauses (i) to (iv)), (7) information not reasonably available to the Acquired Companies under their respective current reporting systems (other than the historical financial statements and other historical information expressly set forth in the foregoing clauses (i) to (iv)) or (8) projections (the information described in this proviso, the "Excluded Information"). Financial statements referred to in the foregoing clauses (i) and (ii) will be prepared in accordance with GAAP and the unaudited financial statements referred to in clause (ii) will be reviewed by the independent accountants of the Company as provided in the procedures specified by PCAOB AS 4015; provided, that no opinion shall be required with respect to such review of such unaudited financial statements. Notwithstanding anything included herein to the contrary, no Required Information shall be required to be provided after the satisfaction of the ten (10) Business Day period referred to in <u>Section 2.2</u> or the date on which the Debt Financing has been consummated (including if the proceeds of the Debt Financing are placed into escrow upon consummation).

"<u>RRP</u>" means the CITGO Petroleum Corporation Retirement Restoration Plan, as amended.

"<u>Sale Order</u>" means an order of the Court in the form attached hereto as <u>Exhibit C</u>.[2]

"<u>Sale Process Parties</u>" means, as set forth in Sale Procedures Order, Crystallex International Corporation**,** the Bolivarian Republic of Venezuela**,** PDVSA, the Company, CITGO Petroleum Corporation**,** and Phillips Petroleum Company Venezuela Limited and ConocoPhillips Petrozuata B.V.

"<u>Sanctions Target</u>" means (1) any country or territory that is the target of country-wide or territory-wide Economic Sanctions/Trade Laws, which, as of the Execution Date, are Iran, Cuba, Syria, North Korea, and certain occupied regions of Ukraine, including the Crimea region, the non-government-controlled areas of Zaporizhzhia and Kherson and the so-called Donetsk or Luhansk People's Republics; (2) a Person that is on the Specially Designated Nationals and Blocked Persons List or any of the other sanctioned persons lists published by OFAC, or any similar list of sanctioned persons issued by the U.S. Department of State; (3) a Person that is located or resident in or organized under the laws of a country or territory that is identified as the subject of country-wide or territory-wide Economic Sanctions/Trade Laws; or (4) an entity that, under applicable Economic Sanctions/Trade Laws, is automatically a target of restrictions or prohibitions because it is owned or controlled by a country or territory identified in clause (1) or Person in clauses (2) or (3) above.

"<u>Security Incident</u>" means any unauthorized or unlawful access, acquisition, exfiltration, manipulation, erasure, loss, use, or disclosure that compromises the confidentiality, integrity, availability or security of Sensitive Data or the Systems, or that triggers any reporting requirement

---

[2] **Note to Draft**: Sale Order to provide that the Closing Consideration distributed by the Paying Agent to a Claimholder shall constitute the full and final satisfaction of payment of the applicable Attached Judgment, including any and all claims in respect of such Attached Judgment that have been, could have been or may be asserted against the Company or any of its Subsidiaries.

under any breach notification Law or contractual provision, including any ransomware or denial of service attacks that prevent or materially degrade access to Sensitive Data or the Systems.

"Sensitive Data" means all Personal Information, confidential information, proprietary information, intellectual property, and any other information protected by applicable Law or contract that is collected, maintained, stored, transmitted, used, disclosed, or otherwise processed by, for or on behalf of the Acquired Companies.

"Solvent" means, with respect to any Person as of a particular date, that on such date, such Person and its Subsidiaries (on a consolidated basis) (a) have property with fair value greater than the total amount of their debts and liabilities, contingent (it being understood that the amount of contingent liabilities at any time shall be computed as the amount that, in light of all the facts and circumstances existing at such time, represents the amount that can reasonably be expected to become an actual or matured liability in the ordinary course), subordinated or otherwise, (b) have assets with present fair salable value not less than the amount that will be required to pay their liability on their debts as they become absolute and matured in the ordinary course, (c) will be able generally to pay their debts and liabilities, subordinated, contingent or otherwise, as they become absolute and matured in the ordinary course, (d) are not engaged in business or a transaction, and are not about to engage in business or a transaction, for which their property would constitute an unreasonably small capital and (e) does not intend to, and does not believe that it will, incur debts or liabilities beyond such Person's ability to pay such debts and liabilities as they mature.

"Special Master Transaction Expenses" means, as provided in the Sale Procedures Order and the May Order (in each case as in effect on Execution Date), the Special Master's compensation and any out-of-pocket costs, fees and expenses incurred by the Special Master in connection with the Transactions for investment bankers, third party consultants, legal counsel and any of his other Representatives or Advisors (as defined in the Sale Procedures Order), which for the avoidance of doubt will include fees and expenses of Weil, Gotshal & Manges LLP, Potter Anderson & Carroon LLP, Jenner & Block LLP, Evercore and any other advisors engaged by the Special Master.

"Specially Designated Nationals and Blocked Persons List" means the list of blocked persons, specifically designated nationals, specially designated terrorists, specially designated global terrorists, foreign terrorist organizations, specially designated narcotics traffickers, and blocked vessels referenced in Appendix A to 31 CFR Chapter V, as updated and made available at http://www.treasury.gov/sdn.

"Specified Debt" means the Debt set forth in Section 1.1(d) of the Company Disclosure Schedules.

"Specified Information" means information furnished by Designated Managers to the Special Master (a) as used in Article IV, with respect to the representations and warranties relating to the Acquired Companies, and (b) as used in Section 6.10, in connection with such covenant.

"Subsidiary" means, when used with respect to any Person, any other Person, whether incorporated or unincorporated, of which (a) more than fifty percent of the voting securities or other ownership interests is owned by such Person or one or more of its Subsidiaries, (b) such

A-14

Person or one or more of its Subsidiaries is a general partner or holds a majority of the voting interests of a partnership or (c) securities or other interests having by their terms ordinary voting power to elect more than fifty percent of the board of directors or others performing similar functions with respect to such corporation or other organization, are directly owned or controlled by such Person or by any one or more of its Subsidiaries.

"Systems" means the information technology systems, operational technology systems, and infrastructure used, owned, leased or licensed by or for the Acquired Companies, including industrial control systems, software, computer programs (in both source and object code form), servers, databases, firmware, hardware, equipment, networks, record keeping, communications, telecommunications, interfaces, platforms, peripherals and related systems.

"Tax" or "Taxes" means (a) all federal, state, local or foreign taxes, charges, fees, levies or other assessments, including, all net income, excise, stamp, real or personal property, ad valorem, withholding, social security (or similar), unemployment, occupation, use, production, service, service use, license, net worth, payroll, franchise, severance, transfer, recording, employment, premium, windfall profits, environmental, customs duties, capital stock, profits, disability, sales, registration, value added, alternative or add-on minimum, estimated taxes and any other taxes of any kind whatsoever; and (b) all interest, penalties, fines and additions to tax imposed in connection with any item described in clause (a) of this definition (c) any liability for the payment of any amounts of the type described in clause (a) or (b) as a result of being (or ceasing to be) a member of an affiliated, consolidated, combined, unitary, aggregate or similar group for any period, including pursuant to Treasury Regulation Section 1.1502-6 or any similar applicable Law; and (d) any liability for the payment of any amounts of the type described in clauses (a)-(c) as a result of being treated as a successor or transferee to any Person (whether by Contract, statute or otherwise), as a result of any secondary liability or as a result of any express or implied obligation to indemnify any other Person.

"Tax Returns" means any return, report, form or similar statement filed or required to be filed with respect to any Tax (including any attached schedules), including, any information return, claim for refund, amended return or declaration of estimated Tax.

"Taxing Authority" means any Governmental Body exercising any authority to impose, assess or collect any Tax or any other authority exercising Tax regulatory authority.

"Termination Fee" means $[99,660,000].

"Topping Period" means the period beginning on the Commencement Date and ending on the date that is thirty (30) calendar days after the Commencement Date or such other date or extended date as approved by the Court.

"Transaction Documents" means this Agreement, the Sale Order, the Escrow Agreement, the Paying Agent Agreement, the Debt Commitment Letters, the Equity Commitment Letters, and all other agreements and instruments to be executed by the Buyer, the Special Master and/or the Company at or prior to the Closing pursuant to this Agreement.

"Transactions" means the transactions contemplated by this Agreement and the other Transaction Documents.

"Transfer Taxes" means any real property transfer, sales, use, value added, stamp, documentary, recording, registration, conveyance, stock transfer, intangible property transfer, personal property transfer, gross receipts, registration, duty, securities transactions or similar fees or Taxes or governmental charges (together with any interest or penalty, addition to Tax or additional amount imposed) as levied by any Taxing Authority or other Governmental Body in connection with the Transactions, including any payments made in lieu of any such Taxes or governmental charges that become payable in connection with the Transactions.

"Treasury Regulations" means the regulations promulgated under the Code.

"VDR" means the virtual data room established by Representatives of the Special Master to facilitate the provisions of information to potential bidders pursuant to the Sale Procedures Order.

"Willful Breach" means a deliberate act or a deliberate failure to act, which act or failure to act constitutes in and of itself a material breach of any representation, warranty, covenant or agreement set forth in this Agreement, which breach was the conscious object of the act or failure to act.

"6.375% Senior Secured Notes" means CITGO Petroleum Corporation's 6.375% senior secured notes due 2026, issued pursuant to the indenture dated as of February 11, 2021 among CITGO Petroleum Corporation as Issuer, the guarantors party thereto, and TMI Trust Company as trustee.

"7.000% Senior Secured Notes" means CITGO Petroleum Corporation's 7.00% senior secured notes due 2025, issued pursuant to the indenture dated as of June 9, 2020 among CITGO Petroleum Corporation, as Issuer, the guarantors party thereto, and TMI Trust Company, as trustee.

"8.375% Senior Secured Notes" means CITGO Petroleum Corporation's 8.375% senior secured notes due 2029, issued pursuant to the indenture dated as of September 20, 2023 among CITGO Petroleum Corporation as Issuer, the guarantors party thereto, and Argent Institutional Trust Company as trustee.

"2020 Bonds" means the 8.50% senior secured notes due in 2020 in the aggregate principal amount of $3,367,529,000, issued by PDVSA pursuant to the Indenture.

"2020 Bondholders" means the holders of the 2020 Bonds.

## Exhibit C

**Other Bid Materials Submitted by Bidder C**



**Strictly Private and Confidential**
**Only to be Opened by Addressee**

March 7, 2025

**To: Evercore**

| Ray Strong | William Hiltz |
|---|---|
| Senior Managing Director | Senior Managing Director |
| ray.strong@evercore.com | hiltz@evercore.com |

**With a copy to: Weil, Gotshal & Manges LLP**

| Matt Barr | Chase Bentley | Eoghan P. Keenan |
|---|---|---|
| matt.barr@weil.com | chase.bentley@weil.com | eoghan.keenan@weil.com |

**SUBJECT TO CONTRACT**

**Project Horizon Proposal**

Dear Sirs,

████████████████████████ is pleased to submit this stalking horse proposal (this "**Proposal**")
with respect to the sale of shares of PDV Holding, Inc., a Delaware corporation ("**PDVH**"), to satisfy
Attached Judgements (the "**Proposed Transaction**").

Defined terms used but not otherwise defined herein shall have the meaning given to them in the process
letter dated February 10, 2025.

We believe our Proposal provides the most compelling and most certain value proposition for a stalking
horse bid:

1. Full and fair value for 100% of the capital stock of PDVH while navigating matters associated
   with alter ego;
2. Full approval of the ███ board, executive committee and shareholders;
3. No financing conditionality and fully-backstopped by ███ parent company guarantee, as
   needed;

1

4. No competitive overlaps with PVDH that will bring regulatory scrutiny and delay (*a criterion buyers with ownership, direct or indirect, of US refineries simply cannot proffer*);

5. Our successful track record ███████████████████████████████ ███████████████████████; and,

6. Our timing, expediency and willingness to work constructively with the Special Master and its advisors to consummate a transaction as quickly as possible, as evidenced by our significant efforts to date.

## A. Proposed Transaction Structure

We confirm that our Proposal is for 100% of the shares of PDVH.

With respect to the CITGO Equity Pledge, we expect that we or the Special Master will negotiate and implement, with approval of the Court, a release of the CITGO Equity Pledge in advance of, or in connection with, implementation of the Proposed Transaction.

## B. Stock Purchase Agreement Issues List

Please refer to Exhibit A for our response to the Bid Draft SPA posted to the VDR on February 10, 2025. We are also enclosing our mark-up of the Disclosure Schedules, the Escrow Agreement and the Paying Agent Agreement that have been provided as further evidence of our willingness to move quickly. We stand ready to discuss any questions or comments as soon as possible.

## C. Identity of Purchaser or Counterparty



2

## D. Purchase Price and Principal Economic Terms

   i.   Purchase Price
        Our Proposal ascribes a purchase price of $3.5 billion for 100% of PDVH.

   ii.  Detail
        The purchase price is comprised of $1.85 billion in cash and $1.65 billion in the form of non-cash consideration available to Attached Judgments who elect to roll their claim. We have had a significant number of conversations with certain holders of Attached Judgments regarding our preferred equity structure (please see Exhibit B for term sheet we have socialized) and believe there is a potential willingness on their part to acquire such preferred equity.

## E. Sources of Financing

We intend to finance the transaction entirely with cash on hand and existing or new intracompany credit facilities. ▮ has significant commercial banking relationships and access to significant committed lines of capital. We confirm that financing would not be a condition to consummation of the Proposed Transaction and believe that this absence of conditionality enhances the compelling nature of our Proposal.

## F. Credit Bid

*Not Applicable.*

## G. Good Faith Deposit

We are prepared with readily available cash on hand to fund a $50MM deposit.

## H. Purchaser Approvals

This Proposal has received a high level of attention from within ▮. We have received all board, executive committee and shareholder approvals; no further ▮ approvals are required. We do not believe any regulatory approvals are needed other than (a) customary antitrust clearance under the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended (the "**HSR Act**")and (b) approval of the Department of Treasury's Office of Foreign Assets Control ("**OFAC**"). We also believe that making a short-form filing with the Committee on Foreign Investment in the United States ("**CFIUS**") may help to expedite the OFAC license process.

In order to expedite approvals, ▮ has already submitted its application to OFAC. ▮ will make all reasonable efforts to complete (i) all remaining disclosures necessary to comply with the regulations of OFAC and CFIUS; and (ii) all necessary filings under the HSR Act and any other antitrust laws, as applicable, and pay the fees associated with such filing (as applicable).

▮ is confident that this Proposal is reasonably likely to be consummated as soon as possible and within a time frame acceptable to the Special Master. ▮ does not anticipate facing any regulatory delays as it does not operate any assets that compete with the Company. Strategic buyers with competitive operations cannot offer similar speed and certainty of closing.

## I. Due Diligence Requirements

██████ has devoted significant time and resources to complete the diligence of the Assets, including numerous site visits, meetings with key CITGO personnel and an extensive dataroom review and Q&A process. Given the level of access to management and data made available in the virtual data room, ██████ has substantially completed its business due diligence necessary to conduct the ascribed valuation. The remainder of its outstanding due diligence is confirmatory in nature, including but not limited to, items that PDVH has indicated will be provided at a later date and outstanding Q&A. ██████ would typically expect to complete such confirmatory diligence if it is selected to proceed in the process and in connection with the negotiation of the definitive documentation and related exhibits and schedules. We look forward to working together to expedite the diligence process if possible.

## J. Advisors
We have engaged the following consultants and advisors in connection with the Proposed Transaction:
- Financial: ██████████████████████
- Accounting: ██████
- Tax: ██
- Legal: ██████████
- Consulting: ██████
- Environmental: ██████████

## K. Contacts
The individuals listed below are available to respond to any questions you might have.



## L. Special Master Consent
We confirm our consent for the Special Master, in his discretion, to share information with U.S. Government regulators, including OFAC, pertaining to our Proposal.

## M. Cooperation
██████ agrees that our advisors will coordinate in good faith with the Special Master's advisors to discuss and explain our regulatory and other consent analysis, strategy and timeline for securing all such approvals and consents as soon as reasonably practicable.

██████ agrees to cooperate with the Special Master to provide pertinent factual information regarding our ownership and operations reasonably required to respond to, or otherwise analyze issues arising with respect to, U.S. sanctions laws and regulations, CFIUS, any applicable antitrust laws and other relevant regulatory requirements or requests.

## N. No Entitlement to Reimbursement
We acknowledge that this Proposal does not entitle us to any break-up fee, termination fee, expense reimbursement or similar type of payment or reimbursement, outside of those that will be provided for in the definitive documentation if, as and when executed.

## O. No Liability

██ acknowledges and agrees that: (i) in no circumstance shall the Special Master or his advisors be personally or otherwise liable for any amounts or obligations owed to ██; (ii) the Special Master and his advisors are acting as an arm of the Court and are entitled to judicial immunity in the performance of their duties; and (iii) PDVH, CITGO and their respective officers, directors and advisors will have no liability or obligation to ██ or its affiliates, except and only to the extent it is expressly provided for in the definitive documentation if, as and when executed.

## P. Representations and Warranties

██ recognizes and acknowledges that the Special Master, his advisors, PDVH, CITGO and their respective representatives make no representations, covenants or warranties (or any other promise) as to the accuracy or completeness of any information provided in the data room or otherwise made available by the Special Master and his advisors in connection with the bid process, other than any representations, covenants or warranties (or any other promise) expressly provided for in the definitive documentation if, as and when executed.

██ has relied solely upon our own independent review, investigation and/or inspection of any relevant documents regarding the assets to be purchased and did not rely on any written or oral statements, representations, promises, warranties or guaranties whatsoever, whether express or implied, by operation of law or otherwise, regarding PDVH and its subsidiaries or the completeness of any information made available in connection therewith.

██ has not engaged in any collusion with respect to the submission of this Proposal.

All proof of financial ability to consummate the Proposed Transaction in a timely manner and other information submitted with this Proposal is true and correct.

## Q. Bidding Procedures

██ agrees to be bound by the terms and conditions of the Bidding Procedures set out in the Sale Procedures Order.

Thank you for your consideration.

Yours sincerely,



5

Draft 3.6.25
Confidential

# STOCK PURCHASE AGREEMENT

dated as of

[●]

between

[BUYER]

and

ROBERT B. PINCUS,

solely in his capacity as the Special Master for the United States District Court for the District of Delaware

NOTE: STRICTLY PRIVATE AND CONFIDENTIAL DRAFT FOR DISCUSSION PURPOSES ONLY AND SUBJECT IN ALL RESPECTS TO THE CONFIDENTIALITY AGREEMENT SIGNED BETWEEN THE SPECIAL MASTER (AS DEFINED HEREIN) AND RECIPIENT (OR ITS AFFILIATE). CIRCULATION OF THIS DRAFT SHALL NOT GIVE RISE TO ANY DUTY TO NEGOTIATE OR CREATE OR IMPLY ANY OTHER LEGAL OBLIGATION. NO LEGAL OBLIGATION OF ANY KIND WILL ARISE UNLESS AND UNTIL A DEFINITIVE WRITTEN AGREEMENT IS EXECUTED AND DELIVERED BY ALL PARTIES.

# TABLE OF CONTENTS

Page

**ARTICLE I DEFINITIONS AND INTERPRETIVE MATTERS** ......................................... 2

Section 1.1     Certain Defined Terms.................................................................. 2
Section 1.2     Other Definitional and Interpretive Matters .............................. 2

**ARTICLE II SALE AND PURCHASE OF THE SHARES; CLOSING** ............................... 4

Section 2.1     Sale and Purchase of Shares ....................................................... 4
Section 2.2     Closing ......................................................................................... 4
Section 2.3     Closing Deliveries of the Parties................................................ 5

**ARTICLE III PURCHASE PRICE; CLOSING DATE PAYMENTS**..................................... 5

Section 3.1     Purchase Price.............................................................................. 5
Section 3.2     Closing Transaction Expenses; Funds Flow Memorandum ...... 5
Section 3.3     Good Faith Deposit...................................................................... 6
Section 3.4     Closing Date Payments by the Buyer ......................................... 7
Section 3.5     Withholding ................................................................................. 7

**ARTICLE IV REPRESENTATIONS RELATING TO THE COMPANY AND THE
SPECIAL MASTER** ........................................................................................... 8

Section 4.1     Corporate Existence; Title to Shares........................................... 8
Section 4.2     Governmental Authorization ...................................................... 9
Section 4.3     Non-Contravention ...................................................................... 9
Section 4.4     Capitalization ............................................................................ 10
Section 4.6     Subsidiaries; Non-Controlled Entities ..................................... 10
Section 4.7     Financial Statements ................................................................. 11
Section 4.8     Absence of Certain Changes ..................................................... 12
Section 4.9     No Undisclosed Material Liabilities ......................................... 12
Section 4.10    Legal Proceedings ..................................................................... 13
Section 4.11    Taxes .......................................................................................... 13
Section 4.12    Company Benefit Plans; Employment....................................... 14
Section 4.13    Compliance with Laws; Permits ............................................... 19
Section 4.14    Regulatory Matters.................................................................... 19
Section 4.15    Environmental Matters .............................................................. 21
Section 4.16    Title to Properties...................................................................... 21
Section 4.17    Material Contracts ..................................................................... 22
Section 4.18    Intellectual Property and Data Privacy .................................... 24
Section 4.19    Brokers; Financial Advisor ....................................................... 26
Section 4.20    Real Property ............................................................................ 26
Section 4.21    Energy Regulatory Status. ......................................................... 28
Section 4.22    Affiliate Transactions................................................................ 28
Section 4.23    Insurance ................................................................................... 29

Section 4.24   No Additional Representations ................................................................ 29

**ARTICLE V REPRESENTATIONS AND WARRANTIES OF THE BUYER ................... 30**

Section 5.1   Corporate Existence and Power ................................................................ 30
Section 5.2   Corporate Authorization ......................................................................... 30
Section 5.3   Governmental Authorization ................................................................... 30
Section 5.4   Non-Contravention .................................................................................. 31
Section 5.5   Litigation ................................................................................................ 31
Section 5.6   Regulatory Matters .................................................................................. 31
Section 5.7   Financing ................................................................................................ 32
Section 5.8   Solvency ................................................................................................. 33
Section 5.9   Purported Equity Pledge ......................................................................... 33
Section 5.10  No Additional Representations ................................................................ 33

**ARTICLE VI COVENANTS ............................................................................................. 34**

Section 6.1   Conduct of the Business Pending the Closing ......................................... 34
Section 6.2   Access to Information .............................................................................. 40
Section 6.3   Regulatory Approvals; Third Party Consents .......................................... 42
Section 6.4   Further Assurances .................................................................................. 44
Section 6.5   Confidentiality ......................................................................................... 45
Section 6.6   Indemnification, Exculpation and Insurance ........................................... 45
Section 6.7   Public Announcements ............................................................................ 46
Section 6.8   Employee Matters .................................................................................... 47
Section 6.9   Company's Obligations in Respect of Debt Financing............................. 50
Section 6.10  Tax Matters ............................................................................................. 52
Section 6.11  R&W Insurance Policy ............................................................................ 53
Section 6.12  Notices of Certain Events ........................................................................ 53
Section 6.13  No Control of Other Party's Business ..................................................... 54
Section 6.14  OFAC ...................................................................................................... 55
Section 6.15  Bidder Protections and Competing Proposals.......................................... 55
Section 6.16  Section 280G............................................................................................ 58
Section 6.17  Financial Statements ................................................................................ 58
Section 6.18  Observation Committee ........................................................................... 59

**ARTICLE VII CONDITIONS TO CLOSING .................................................................. 60**

Section 7.1   Conditions Precedent to Obligations of the Parties ................................. 60
Section 7.2   Conditions Precedent to Obligations of the Buyer .................................. 60
Section 7.3   Conditions Precedent to Obligations of the Special Master .................... 61
Section 7.4   Frustration of Closing Conditions............................................................ 61

**ARTICLE VIII TERMINATION ...................................................................................... 61**

Section 8.1   Termination............................................................................................... 61
Section 8.2   Effect of Termination ............................................................................... 63
Section 8.3   Termination Fee and Expense Reimbursement ........................................ 63

**ARTICLE IX MISCELLANEOUS** ................................................................................ **65**

Section 9.1    Survival ................................................................................... 65
Section 9.2    Expenses .................................................................................. 65
Section 9.3    Governing Law .......................................................................... 66
Section 9.4    Dispute Resolution; Consent to Jurisdiction ................................. 66
Section 9.5    Consent to Service of Process; Waiver of Jury ............................ 66
Section 9.6    Entire Agreement ...................................................................... 66
Section 9.7    Amendments and Waivers .......................................................... 67
Section 9.8    Notices ..................................................................................... 68
Section 9.9    Severability .............................................................................. 68
Section 9.10   Binding Effect; Assignment ....................................................... 69
Section 9.11   No Third Party Beneficiaries ...................................................... 69
Section 9.12   Non-Recourse ........................................................................... 69
Section 9.13   Specific Performance ................................................................ 69
Section 9.14   Successors and Assigns ............................................................ 70
Section 9.15   Release .................................................................................... 70
Section 9.16   Counterparts ............................................................................ 71
Section 9.17   Debt Financing Sources ............................................................ 71
Section 9.18   Special Master and his Representatives' Judicial Immunity ........... 72
Section 9.19   Special Master Indemnification .................................................. 72

ANNEX A

Definitions

EXHIBITS

Exhibit A – Escrow Agreement
Exhibit B – Paying Agent Agreement
Exhibit C – Form of Sale Order

## DEFINED TERMS

| Term | Section |
|---|---:|
| Acquired Companies | Annex A |
| Additional Judgment Creditors | Annex A |
| Advanced Transaction Expenses | Annex A |
| Affected Employees | Section 6.8(c) |
| Affiliate | Annex A |
| Affiliate Transactions | Section 4.20 |
| Agreement | Preamble |
| Anti-Corruption Laws | Annex A |
| Antitrust Laws | Annex A |
| Audited Financial Statements | Section 4.6(a) |
| Base Bid Agreement | Section 6.16(d) |
| Bolivarian Republic of Venezuela | Section 1.2(a)(ix) |
| Bonus Amounts | Section 6.8(g) |
| Business Day | Annex A |
| Business Unit | Annex A |
| Buyer | Preamble Buyer |
| Buyer Disclosure Schedules | Article V |
| Buyer Documents | Section 5.2 |
| Buyer Subsidiary | Annex A |
| CapEx Budget | Section 6.1(b)(iii) |
| Cash | Annex A |
| Cause | Section 1.2(a)(x) |
| CITGO Petroleum | Annex A |
| Claim | Annex A |
| Claimholders | Recitals |
| Closing | Section 2.2 |
| Closing Consideration | Annex A |
| Closing Transaction Expenses | Annex A |
| Closing Transaction Expenses Statement | Section 3.2(a) |
| COBRA | Annex A |
| Code | Annex A |
| Collective Bargaining Agreement | Section 4.11(n) |
| Committee Mandate | Section 6.18(a) |
| Company | Preamble |
| Company Balance Sheet | Section 4.6(a) |
| Company Balance Sheet Date | Section 4.6(a) |
| Company Benefit Plan | Annex A |
| Company By-Laws | Section 4.1(a) |
| Company Charter | Section 4.1(a) |
| Company Collective Bargaining Agreement | Section 4.11(n) |
| Company Disclosure Schedules | Article IV |
| Company Environmental Permits | Section 4.14 |
| Company Fundamental Representations | Annex A |

| Term | Section |
|------|---------|
| Company Intellectual Property | Section 4.17(a) |
| Company Material Adverse Effect | Annex A |
| Company Owned Intellectual Property | Section 4.17(a) |
| Competing Proposal | Section 6.16(g)(i) |
| Confidentiality Agreement | Section 6.5 |
| Contract | Annex A |
| Court | Recitals |
| Credit Support Arrangements | Annex A |
| Debt | Annex A |
| Debt Payoff Amount | Annex A |
| Deposit Amount | Recitals |
| Deposit Forfeiture Termination Event | Annex A |
| Designated Contacts | Section 6.2(a) |
| Designated Managers | Annex A |
| Economic Sanctions/Trade Laws | Annex A |
| Execution Date | Preamble |
| Environmental Laws | Annex A |
| EPP | Annex A |
| Equitable Exceptions | Annex A |
| Equity Interests | Annex A |
| Equity Pledge Litigation | Annex A |
| ERISA | Annex A |
| ERISA Affiliate | Annex A |
| Escrow Account | Annex A |
| Escrow Agent | Recitals |
| Evercore | Recitals |
| Existing Senior Secured Notes | Annex A |
| Expense Reimbursement Amount | Annex A |
| Expense Reserve Holdback Account | Annex A |
| FERC | Annex A |
| Financings | Section 5.7(a) |
| Financial Statements | Section 4.6(a) |
| Final Recommendation Date | Section 6.3(a) |
| Funds Flow Memorandum | Section 3.2(b) |
| GAAP | Section 4.6 |
| Good Industry Practice | Annex A |
| Governmental Body | Annex A |
| Government Contract | Annex A |
| Government Official | Section 4.13(a) |
| Hazardous Substance | Annex A |
| HSR Act | Annex A |
| Indemnitees | Section 6.6(a) |
| Indenture | Annex A |
| Initial Outside Date | Section 8.1(b) |
| Intellectual Property | Section 4.17(a) |

v

| Term | Section |
|---|---|
| Interest Rate | Annex A |
| Interim Financial Statements | Section 4.6(a) |
| Interim Period | Annex A |
| IRS | Annex A |
| January Order | Annex A |
| Jointly Owned Properties | Section 4.19(c) |
| Judgment Creditors | Annex A |
| Knowledge of the Buyer | Annex A |
| Knowledge of the Company | Annex A |
| Knowledge of the Special Master | Annex A |
| Law | Annex A |
| Legal Proceeding | Annex A |
| Legal Restraint | Section 8.1(c) |
| Lien | Annex A |
| Lookback Date | Annex A |
| Material Contract | Section 4.16(a) |
| May Order | Recitals |
| Money Laundering Laws | Annex A |
| MTP | Section 6.1(b)(iii) |
| Negative Consequences | Annex A |
| New Indemnification Agreements | Section 6.6(a) |
| No-Shop Period | Annex A |
| Non-Controlled Entity | Annex A |
| Non-Parties | Section 9.12 |
| Non-Union Affected Employees | Section 6.8(c) |
| Observation Committee | Section 6.18(a) |
| OFAC | Annex A |
| OFAC License | Annex A |
| OFAC License Applications | Annex A |
| Order | Annex A |
| Ordinary Course | Annex A |
| Organizational Documents | Annex A |
| Outside Date | Section 8.1(b) |
| Owned Real Property | Section 4.19(b) |
| Parties | Preamble |
| Paying Agent | Recitals |
| Paying Agent Account | Annex A |
| Paying Agent Agreement | Recitals |
| Payoff Letters | Section 3.4(a) |
| PBGC | Section 4.11(d) |
| PCI DSS | Annex A |
| PDVSA | Recitals |
| Performance Incentive Program | Section 6.8(g) |
| Permit | Annex A |
| Permitted Liens | Annex A |

| Term | Section |
|------|---------|
| Person | Annex A |
| Personal Information | Annex A |
| PFAS | Annex A |
| Post-Closing Tax Period | Annex A |
| Preferential Right | Annex A |
| Privacy Laws and Obligations | Section 4.17(f) |
| Procedures Summary | Annex A |
| Purchase Price | Section 3.1 |
| PURPA | Annex A |
| Purported Equity Pledge | Annex A |
| QF | Annex A |
| R&W Insurance Policy | Section 6.12 |
| Real Property | Section 4.19(b) |
| Real Property Lease | Section 4.19(a) |
| Receivables Securitization Facility | Section 6.1(b)(vi) |
| Registered Intellectual Property | Section 4.17(a) |
| Related Claim | Annex A |
| Release | Annex A |
| Released Parties | Section 9.15 |
| Releasing Parties | Section 9.15 |
| Replacement Financing | Section 6.9(f) |
| Representatives | Annex A |
| RRP | Annex A |
| Sale Hearing | Section 6.16(c) |
| Sale Order | Annex A |
| Sale Process Parties | Annex A |
| Sale Procedures Order | Recitals |
| Sanctions Target | Annex A |
| Security Incident | Annex A |
| Sensitive Data | Annex A |
| Shares | Recitals |
| Solvent | Annex A |
| Special Master | Preamble |
| Special Master and Company Related Parties | Section 8.3(g) |
| Special Master Transaction Expenses | Annex A |
| Specially Designated Nationals and Blocked Persons List | Annex A |
| Specified Debt | Annex A |
| Specified Information | Annex A |
| Subsequent Overbid Minimum | Section 6.16(e)(i) |
| Subsidiary | Annex A |
| Superior Proposal | Section 6.16(g)(ii) |
| Superior Proposal Agreement | Section 6.16(d) |
| Stalking Horse Bid Agreement | Section 6.16(d) |
| Systems | Annex A |
| Tax or Taxes | Annex A |

| Term | Section |
|------|---------|
| Tax Proceeding | Section 4.10(c) |
| Tax Returns | Annex A |
| Taxing Authority | Annex A |
| Termination Fee | Annex A |
| Topping Period | Annex A |
| Transaction Documents | Annex A |
| Transactions | Annex A |
| Transfer Taxes | Annex A |
| Treasury Regulations | Annex A |
| Turnaround/Catalyst Budget | Section 6.1(b)(iv) |
| Union | Section 4.11(n) |
| Union Affected Employees | Section 6.8(b) |
| Unsolicited Competing Proposal | Section 6.16(e) |
| Unsolicited Competing Proposal Agreement | Section 6.16(e) |
| VDR | Annex A |
| Vesting Instruments | Section 4.19(a) |
| WARN Act | Section 4.11(p) |
| Willful Breach | Annex A |
| 2020 Bondholders | Annex A |
| 2020 Bonds | Annex A |
| 6.375% Senior Secured Notes | Annex A |
| 8.375% Senior Secured Notes | Annex A |

## STOCK PURCHASE AGREEMENT

THIS STOCK PURCHASE AGREEMENT (this "Agreement") dated as of [●], 2025 (the "Execution Date") is entered into by and between [●], a [●] (the "Buyer"), and Robert B. Pincus, solely in his capacity as special master (the "Special Master" and, together with the Buyer, the "Parties" and each a "Party") for the Honorable Leonard P. Stark, United States District Court for the District of Delaware (the "Court").

### W I T N E S S E T H:

WHEREAS, the Special Master has been appointed by the Court in connection with the case of *Crystallex International Corp. v. Bolivarian Republic of Venezuela* (D. Del. Case. No. 17-151-LPS) (the "Specified Litigation") pursuant to that certain Order entered by the Court on April 13, 2021 [D.I. 258], that certain Order Regarding Special Master entered by the Court on May 27, 2021 [D.I. 277] (the "May Order") and the Order (A) Establishing Sale and Bidding Procedures, (B) Approving Special Master's Report and Recommendation Regarding Proposed Sale Procedures Order, (C) Affirming Retention of Evercore Group, LLC ("Evercore") as Investment Banker by Special Master and (D) Regarding Related Matters entered by the Court on October 4, 2022 [D.I. 481] (as amended, restated, supplemented or otherwise modified from time to time, the "Sale Procedures Order").[1]

WHEREAS, Petróleos de Venezuela, S.A., a Venezuelan company ("PDVSA"), owns all of the issued and outstanding capital stock of PDV Holding, Inc., a Delaware corporation (the "Company"), which consists of 1,000 shares of common stock, par value $1.00 per share (collectively, the "Shares").

WHEREAS, pursuant to the Sale Procedures Order, the Special Master has the authority to enter into this Agreement in making his determination to the Court as to which of the Qualified Bids (as defined in the Sale Procedures Order) was highest or best, and in making a recommendation to the Court as to which Qualified Bid is the Successful Bid (as defined in the Sale Procedures Order).

WHEREAS, the Buyer desires to purchase the Shares upon the terms and subject to the conditions set forth in this Agreement.

WHEREAS, contemporaneous with the execution of this Agreement, the Buyer has deposited with [Acquiom Clearinghouse LLC], in its capacity as escrow agent (the "Escrow Agent"), the sum of $50,000,000 (such amount, the "Deposit Amount") in cash, to be held in the Escrow Account pursuant to the terms of that certain Escrow Agreement, dated as of [the date hereof], by and among the Special Master, the Buyer and the Escrow Agent (as amended, restated, supplemented or otherwise modified from time to time, the "Escrow Agreement"), to be released in accordance with the provisions of this Agreement and the Escrow Agreement.

WHEREAS, at the Closing (as defined below), the Buyer shall deposit the Closing Consideration (as defined below) with the Escrow Agent in cash pursuant to the terms of the

---

[1]    **Note to Bidder:** Recitals and SPA to be updated as necessary to reflect amendments to the Sale Procedures Order.

Escrow Agreement, to be released to those creditors of the Bolivarian Republic of Venezuela (the "Republic") or PDVSA that are party to the Specified Litigation and who have obtained a writ of attachment on or before January 12, 2024 (the "Claimholders") or the Buyer, in accordance with the provisions of the Escrow Agreement and that certain Paying Agent Agreement attached hereto as Exhibit B, dated as of the date hereof, by and among the Buyer, the Special Master and [Acquiom Financial LLC], in its capacity as paying agent (the "Paying Agent") (as amended, restated, supplemented or otherwise modified from time to time, the "Paying Agent Agreement").

NOW, THEREFORE, in consideration of the promises and the respective representations, warranties, covenants and agreements set forth herein, the Parties agree as follows:

## ARTICLE I
## DEFINITIONS AND INTERPRETIVE MATTERS

Section 1.1    Certain Defined Terms. Capitalized terms used in this Agreement have the meanings specified in Annex A or elsewhere in this Agreement.

Section 1.2    Other Definitional and Interpretive Matters.

(a)    Unless otherwise expressly provided herein, for purposes of this Agreement, the following rules of interpretation shall apply:

(i)    Calculation of Time Period. When calculating the period of time before which, within which or following which any act is to be done or step is to be taken pursuant to this Agreement, the date that is the reference date in calculating such period shall be excluded. If the last day of such period is a non-Business Day, the period in question shall end on the next succeeding Business Day. The word "day" shall mean "calendar day" unless "Business Day" is expressly identified.

(ii)    Dollars. Any reference in this Agreement to "$" shall mean U.S. dollars. The specification of any dollar amount in the representations and warranties or otherwise in this Agreement or in the Exhibits or the Company Disclosure Schedules is not intended and shall not be deemed to be an admission or acknowledgment of the materiality of such amounts or items, nor shall the same be used in any dispute or controversy between the Parties to determine whether any obligation, item or matter (whether or not described herein or included in the Company Disclosure Schedules) is or is not material for purposes of this Agreement.

(iii)    Exhibits/Schedules. The Exhibits and the Company Disclosure Schedules annexed hereto or referred to herein are an integral part of this Agreement and are hereby incorporated in and made a part of this Agreement as if set forth in full herein. Any matter or item disclosed on one Schedule or section of the Company Disclosure Schedules shall be deemed to have been disclosed on each other Schedule or section of the Company Disclosure Schedules in which it is reasonably apparent on the face of such disclosure that the information is required to be included in such other Schedule or section of the Company Disclosure Schedules. Disclosure of any item on any Schedule of the Company Disclosure Schedules shall not constitute an admission, indication, acknowledgment or representation that such item or matter is material or would reasonably

be expected to have a Company Material Adverse Effect. No disclosure on a Schedule of the Company Disclosure Schedules relating to a possible breach or violation of any Contract, Law or Order shall be construed as an admission, indication, acknowledgment or representation that a breach or violation exists or has actually occurred. Any capitalized terms used in any Schedule of the Company Disclosure Schedules or Exhibit but not otherwise defined therein shall be defined as set forth in this Agreement.

(iv)     Gender and Number. Any reference in this Agreement to gender shall include all genders, and words imparting the singular number only shall include the plural and vice versa.

(v)     Headings. The provision of a table of contents, the division of this Agreement into Articles, Sections and other subdivisions and the insertion of headings are for convenience of reference only and shall not affect or be utilized in construing or interpreting this Agreement. All references in this Agreement to any "Section" or "Article" are to the corresponding Section or Article of this Agreement unless otherwise specified.

(vi)     Herein. The words "herein," "hereinafter," "hereof," and "hereunder" refer to this Agreement as a whole and not merely to a subdivision in which such words appear unless the context otherwise requires.

(vii)     Inclusive Terms. The word "including" or any variation thereof means (unless the context of its usage otherwise requires) "including, without limitation" and shall not be construed to limit any general statement that it follows to the specific or similar items or matters immediately following it. The term "any" means "any and all." The term "or" shall not be exclusive and shall mean "and/or."

(viii)     Reflected On or Set Forth In. An item arising with respect to a specific representation or warranty shall be deemed to be "reflected on" or "set forth in" a balance sheet or financial statements, to the extent any such phrase appears in such representation or warranty, if (A) there is a reserve, accrual or other similar item underlying a number on such balance sheet or financial statements that related to the subject matter of such representation or warranty, (B) such item is otherwise specifically set forth on the balance sheet or financial statements or (C) such item is reflected on the balance sheet or financial statements and is specifically set forth in the notes thereto.

(ix)     Bolivarian Republic of Venezuela. Any reference herein to the "Bolivarian Republic of Venezuela" or the "Republic" shall include any successor nation thereto, and shall encompass any and all governments and administrations that purport to be Venezuela's legitimate governing body.

(x)     Special Master and the Acquired Companies. Any pre-Closing obligation of any of the Acquired Companies hereunder shall be deemed to include an obligation of the Special Master to "Cause" the Acquired Companies to comply with such obligation. With respect to any obligation of the Special Master hereunder to "Cause" any of the Acquired Companies to take an action or refrain from taking an action, or which otherwise requires action (or refraining from action) by any such Acquired Company, such

3

obligation shall be deemed to be an obligation of the Special Master to use reasonable best efforts to cause the Company or the applicable Company Subsidiary to take such action (or refrain from taking such action), including by seeking an order from the Court with respect to such action or refraining from taking such action. For the avoidance of doubt, none of the Acquired Companies, PDVSA or the Republic is a party hereto, and the Special Master shall not be deemed to be in breach of any of its obligations under this Agreement as a result of a failure by the Special Master to Cause any of the Acquired Companies to take any action or refrain from taking any action prior to the Sale Order Entry (provided, that Special Master has used reasonable best efforts to cause the Company or the applicable Company Subsidiary to take such action (or refrain from taking such action)).

(xi)    "Made Available." Unless expressly stated otherwise, references to any document or information having been "delivered", "furnished", "provided" or "made available" to the Buyer or its Representatives shall mean such document or information has been posted to the VDR or transmitted by email from the Special Master's advisors to the Buyer or its Representatives at least one (1) Business Day prior to the Execution Date and remains posted to the VDR through Closing.

(b)    The Parties have participated jointly in the negotiation and drafting of this Agreement and, in the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as jointly drafted by the Parties and no presumption or burden of proof shall arise favoring or disfavoring any Party by virtue of the authorship of any provision of this Agreement. The language used in this Agreement shall be deemed to be the language chosen by the Parties to express their mutual intent, and no rule of strict construction shall be applied against any Person.

**ARTICLE II**
**SALE AND PURCHASE OF THE SHARES; CLOSING**

Section 2.1    Sale and Purchase of Shares. Subject to approval of this Agreement by the Court, and upon the terms and subject to the conditions set forth in this Agreement and in the Sale Order, and pursuant to the authority provided to the Special Master under the Sale Procedures Order and the May Order, at the Closing, the Special Master shall sell, assign, transfer, convey and deliver (a) to the Buyer, [__] Shares of the Company in exchange for a cash payment equal to $[__] (the "Initial Payment") and (b) to the Company, the remaining [__] Shares of the Company as a redemption of such Shares in exchange for a cash distribution equal to $[__] (the "Redemption Distribution"), and the Buyer and the Company, respectively, shall purchase and accept from the Special Master, the Shares, free and clear of all Liens (other than Permitted Liens and transfer restrictions imposed by applicable securities Laws).[2]

Section 2.2    Closing. The consummation of the sale and purchase of Shares (the "Closing") shall take place at 10:00 a.m., Eastern Time, on a date to be specified by the Parties, which date shall be no later than the third (3rd) Business Day after satisfaction or waiver of the conditions set forth in Article VII (other than those conditions that by their nature are to be satisfied

---

[2]    **Note to Draft**: This proposed structure is solely for tax purposes. To avoid 30% withholding tax on the amounts paid to creditors, a portion of the Shares must be redeemed by the Company rather than transferred to the Buyer.

4

at the Closing, but subject to the satisfaction or waiver of those conditions at such time), remotely by electronic exchange of documents and signatures, unless another time, date or place is agreed to in writing by the Parties. The date on which the Closing actually occurs is referred to in this Agreement as the "Closing Date."

Section 2.3    Closing Deliveries of the Parties.

(a)    Deliveries by the Special Master. At or prior to the Closing, the Special Master shall deliver or otherwise cause to be delivered to the Buyer:

(i)    Stock Certificate. The original certificate evidencing all of the Shares, duly endorsed in blank, or accompanied by a stock power duly executed in blank by the Special Master;

(ii)    FIRPTA Certificate. A validly issued certificate from the Company, in such form consistent and in accordance with the requirements of Treasury Regulations Sections 1.897-2(h)(2) and 1.1445-2(c)(3)(i) and a validly issued notice to the IRS from the Company in accordance with the provisions of Treasury Regulations Section 1.897-2(h)(2) (such certificate and notice issued by the Company, the "FIRPTA Certificate");

(iii)    Closing Certificate. The Special Master shall deliver a duly executed certificate, dated of the Closing Date, certifying that the conditions set forth in Section 7.2 have been satisfied; and

(iv)    Other Documents. All other documents and instruments which are required by the other terms of this Agreement to be executed and/or delivered at Closing by the Special Master, the Acquired Companies or any of their respective Affiliates.

(b)    Deliveries by the Buyer. At or prior to the Closing, the Buyer will deliver or cause to be delivered to the Special Master:

(i)    Closing Certificate. A certificate, dated as of the Closing Date, signed by an authorized officer of the Buyer as to the satisfaction of the conditions set forth in Section 7.3(a) and Section 7.3(b); and

(ii)    Other Documents. All other documents and instruments which are required by the other terms of this Agreement to be executed and/or delivered at Closing by Buyer.

**ARTICLE III**
**PURCHASE PRICE; CLOSING DATE PAYMENTS**

Section 3.1    Purchase Price. The aggregate consideration payable by the Buyer for the Shares shall be (a) the Initial Payment plus (b) the Redemption Distribution (the "Purchase Price"). The Purchase Price shall not be subject to any adjustments (including, for the avoidance of doubt, with respect to the Debt Payoff Amount).

Section 3.2    Closing Transaction Expenses; Funds Flow Memorandum.

(a)    No later than [five (5)] Business Days prior to the Closing Date, the Special Master shall provide the Buyer a written statement (the "Closing Transaction Expenses Statement") reflecting the Special Master's calculation of Closing Transaction Expenses in accordance with the definition of Closing Transaction Expenses hereunder, along with reasonable supporting documentation. The Closing Transaction Expenses Statement shall be binding on the Parties for purposes of this Section 3.2 and shall be used to determine the Closing Consideration.

(b)    No later than one (1) Business Day after the Special Master's delivery of the Closing Transaction Expenses Statement, the Special Master shall distribute to the Buyer a detailed funds flow memorandum in Excel format (including all underlying calculations, formulas and amounts therein) setting forth all payments to be made by or on behalf of the Parties at Closing in accordance with this Agreement (the "Funds Flow Memorandum"). Following delivery of the Funds Flow Memorandum, the Company will provide the Buyer and its Representatives with a reasonable opportunity to review the Funds Flow Memorandum, including by providing the Buyer and its Representatives reasonable access to the books and records of the Acquired Companies and the personnel and advisers of the Acquired Companies who were involved in preparation of the Funds Flow Memorandum in order to ask questions and receive answers regarding the Funds Flow Memorandum, and the Company shall consider in good faith the Buyer's and its Representatives' comments thereto, it being understood that the Buyer's approval of the Funds Flow Memorandum will not be a condition to the Buyer's obligation to consummate the transactions contemplated hereunder and any review by the Buyer or its Representatives will not delay Closing. In addition, and without limiting the foregoing, Buyer and its Affiliates and Representatives shall be entitled to rely, without any independent investigation or inquiry, on the names, amounts, wire instructions and other payment related information forth in the Funds Flow Memorandum. None of Buyer or any of its Affiliates or Representatives shall have any liability to the Special Master or any other Person for relying on the Funds Flow Memorandum. Further, the Parties acknowledge that neither Buyer nor any of its Affiliates, shall have any liability or obligation to any person with respect to the calculation of amounts or information set forth in the Funds Flow Memorandum, including that any amounts set forth therein were not appropriately calculated, it being understood and agreed that the Special Master will be responsible for the accuracy of such calculations and information.

Section 3.3    Good Faith Deposit. The Buyer has deposited into the Escrow Account with the Escrow Agent an amount equal to Deposit Amount in cash. The Deposit Amount will be released by the Escrow Agent and delivered to either the Buyer or the Paying Agent, in accordance with the provisions of this Agreement, the Escrow Agreement and the Sale Procedures Order. The Deposit Amount will be distributed out of the Escrow Account as follows (and the Buyer and the Special Master hereby agree to promptly deliver joint written instructions to the Escrow Agent to the extent required by the Escrow Agent to effect such distributions as and when required hereunder):

(a)    if the Closing occurs, the Buyer and the Special Master shall jointly instruct the Escrow Agent in writing to disburse the Deposit Amount to the Paying Agent by wire transfer of immediately available funds out of the Escrow Account;

(b)    if a Deposit Forfeiture Termination Event occurs, the Buyer and the Special Master shall promptly (and in any event within five (5) Business Days of such termination) deliver

joint written instructions to the Escrow Agent directing the release the balance of the Escrow Account to the Paying Agent Account; and

(c)    if this Agreement is terminated for any reason other than as contemplated by Section 3.2(b), the Buyer and the Special Master shall promptly (and in any event within two (2) Business Days of such termination) deliver joint written instructions to the Escrow Agent directing the release of the balance of the Escrow Account to the Buyer or its designees.

Section 3.4    Closing Date Payments by the Buyer.

(a)    Payment in respect of the Closing Transaction Expenses. At the Closing, the Buyer shall pay, or cause to be paid (including by using Cash), the Closing Transaction Expenses to the applicable recipients as set forth on the Closing Transaction Expenses Statement by wire transfer of immediately available funds to such Persons.

(b)    Payment in respect of Expense Reserve Holdback Amount. At the Closing, the Buyer shall pay, or cause to be paid (including by using Cash), to the Expense Reserve Holdback Account an amount equal to the Expense Reserve Holdback Amount as set forth in the Funds Flow Memorandum. The Expense Reserve Holdback Amount will be used by the Special Master to pay the Special Master's compensation and any out-of-pocket costs, fees and expenses incurred by the Special Master on or after the date of the delivery of the Closing Transaction Expenses Statement by the Special Master related to the Transactions or any action related to or arising therefrom for investment bankers, third party consultants, legal counsel and any of his other Representatives or Advisors (as defined in the Sale Procedures Order) and such amount shall be paid or distributed at the direction of the Special Master; provided, that any amounts remaining in the Expense Reserve Holdback Account after all such costs, fees and expenses incurred by the Special Master have been so paid or distributed shall be paid to the Paying Agent Account as promptly as practicable upon the later of (i) three (3) years following the Closing Date and (ii) one (1) year after all actions, if any, brought against the Special Master relating to the Transactions have been definitively adjudicated by a court of final determination.

(c)    Payment in respect of Reimbursement for Advanced Transaction Expenses. At the Closing, in accordance with the May Order, the Buyer shall pay, or cause to be paid (including by using Cash), an amount to the Paying Agent Account equal to the aggregate amount of the Advanced Transaction Expenses paid by the Sale Process Parties and Additional Judgment Creditors prior to the Closing (the "Advanced Transaction Expenses Amount") as set forth in the Funds Flow Memorandum.

(d)    Payment in respect of Closing Consideration. At the Closing, the Buyer shall pay, or cause to be paid (including by using Cash), an aggregate amount of cash equal to the Closing Consideration to the Paying Agent Account as set forth in the Funds Flow Memorandum.

Section 3.5    Withholding. Notwithstanding anything to the contrary in this Agreement, the Buyer shall be entitled to deduct and withhold (without duplication) from any and all payments made under this Agreement such amounts that are required to be deducted and withheld with respect to the making of such payments under the Code or under any provisions of state, local or foreign Tax Law, provided, that the Buyer shall (i) prior to making any deduction or withholding

7

an amount pursuant to this Section 3.5 (and in any event no later than ten (10) days prior to making any payment hereunder), provide written notice to the applicable recipient of any anticipated deduction or withholding (together with the legal basis thereof) and (ii) cooperate in good faith with the applicable recipient to reduce or eliminate any amounts that would otherwise be deducted or withheld. To the extent that any amounts are so withheld and timely paid over to the proper Taxing Authority, such withheld and deducted amounts will be treated for all purposes of this Agreement as having been paid to the recipient of the payment in respect of which such deduction or withholding was made.

**ARTICLE IV**
**REPRESENTATIONS RELATING TO THE COMPANY AND THE SPECIAL MASTER**

It is represented and warranted to the Buyer as of the Execution Date and the Closing Date based solely upon the Specified Information furnished by the Designated Managers to the Special Master in accordance with the Procedures Summary that, except as disclosed in the correspondingly numbered section of the disclosure schedules delivered to the Buyer simultaneously with the execution of this Agreement (the "Company Disclosure Schedules") (it being agreed that any matter or item disclosed in one Schedule or section of the Company Disclosure Schedules shall be deemed to have been disclosed on each other Schedule or section of the Company Disclosure Schedules in which it is reasonably apparent on the face of such disclosure that the information is required to be included in such other Schedule or section of the Company Disclosure Schedules):

Section 4.1    Corporate Existence; Title to Shares.

(a)    The Company is a corporation duly incorporated, validly existing and in good standing under the Laws of the State of Delaware and has all requisite corporate powers and all governmental franchises, licenses, permits, authorizations, consents and approvals required to enable it to own, lease or otherwise hold its properties and assets and to carry on its business as now conducted, except for those the absence of which would not, individually or in the aggregate, be reasonably likely to materially impair the Acquired Companies, taken as a whole. The Company is duly qualified to do business as a foreign corporation and is in good standing under the Laws in each jurisdiction in which the character of the property owned or leased by it or the nature of its activities or the ownership or leasing of its properties make such qualification necessary, except for those jurisdictions where the failure to be so qualified would not, individually or in the aggregate, be reasonably likely to materially impair the Acquired Companies, taken as a whole. The Special Master has heretofore made available to the Buyer true, correct and complete copies of the certificate of incorporation of the Company (the "Company Charter"), and the by-laws of the Company (the "Company By-Laws"). There is no pending or, to the Knowledge of the Company, threatened Legal Proceedings for the dissolution, liquidation, insolvency, or rehabilitation of any of the Acquired Companies.

(b)    The Special Master (or his counsel or advisors) is in possession of the original, validly-issued, certificate evidencing 100% of the Shares. PDVSA is the record and beneficial owner of all of the outstanding Shares. The Special Master has complied with the Sale Procedures Order such that the Special Master has the legal capacity, power and authority to (i) execute and deliver this Agreement and each other Transaction Document to which the Special

8

Master is or will be a party, and (ii) surrender the Shares pursuant to the Transactions, and sell, transfer, assign, and deliver the Shares to the Buyer, in each case, the delivery of which will convey good and marketable title to the Shares, free and clear of all Liens (other than Permitted Liens and transfer restrictions imposed by applicable securities Laws).

(c)     This Agreement has been duly executed and delivered by the Special Master and, assuming due authorization, execution and delivery by the Buyer, and subject to the Sale Order Entry, will constitute, and each other Transaction Document (to the extent the Special Master is or will be a party thereto), when executed and delivered by the Special Master (assuming due authorization, execution and delivery by the other parties thereto), subject to the Sale Order Entry, will constitute, a legal, valid and binding obligation of the Special Master, enforceable against the Special Master in accordance with its terms, except that such enforcement may be limited by the Equitable Exceptions.

Section 4.2     <u>Governmental Authorization</u>. Except as set forth on <u>Section 4.2</u> of the Company Disclosure Schedules, the execution, delivery and performance by the Special Master of this Agreement and the other Transaction Documents and the consummation by the Special Master of the Transactions require no action by or in respect of, or filing with, any Governmental Body other than (a) applicable requirements of Antitrust Laws as set forth in <u>Section 4.2</u> of the Company Disclosure Schedules, (b) the OFAC License, (c) the entry of the Sale Order by the Court (the "<u>Sale Order Entry</u>"), and (d) other actions or filings the absence or omission of which would not, individually or in the aggregate, be material to the business of the Acquired Companies, taken as a whole.[3]

Section 4.3     <u>Non-Contravention</u>. Except as set forth on <u>Section 4.3</u> of the Company Disclosure Schedules, the execution, delivery and performance by the Special Master of this Agreement and the other Transaction Documents and the consummation by the Special Master of the Transactions do not and will not, assuming compliance with the matters referred to in <u>Section 4.2</u>, (a) result in any Negative Consequences under the Company Charter or the Company By-Laws or the Organizational Documents of any of the Acquired Companies or, to the Knowledge of the Company (and based only on information made available to the Acquired Companies with respect to the Non-Controlled Entities prior to the Execution Date), any of the Non-Controlled Entities, (b) contravene or conflict with or constitute a violation of any provision of any Law binding upon or applicable to the Acquired Companies or, to the Knowledge of the Company, the Non-Controlled Entities, (c) result in any Negative Consequences under any (i) Material Contract or (ii) any license, franchise, permit or other similar authorization held by the Acquired Companies, or (d) result in the creation or imposition of any Lien (other than Permitted Liens) on any asset of the Acquired Companies, except for such Negative Consequences referred to in clauses (b) or (c) or Liens referred to in clause (d) that would not, individually or in the aggregate, be material to the business of the Acquired Companies, taken as a whole or prevent, impede, impair or delay such Acquired Company's ability to perform its obligations under the Transaction Documents to which it is, or will be, a party.

---

[3]     **Note to Draft**: To discuss how to address the obligation to obtain approval of the FCC prior to change of control of the Company's approximately 150 FCC licenses.

Section 4.4    Capitalization.

(a)    The authorized capital stock of the Company consists of 1,000 Shares. There are 1,000 Shares issued and outstanding, all of which are owned by PDVSA, free and clear of all Liens other than Permitted Liens. The Shares have been duly authorized and are validly issued, fully paid and non-assessable and have not been issued in violation of any preemptive rights or Preferential Rights. The Shares constitute the only outstanding Equity Interests of the Company and are not subject to any Preferential Rights.

(b)    Except for this Agreement, there is no outstanding option, warrant, call, right, or Contract of any character to which the Company is a party requiring, and there are no Equity Interests of the Company outstanding which upon conversion or exchange would require, the issuance, transference or sale of any Shares or other securities convertible into, exchangeable for or evidencing the right to subscribe for or purchase Shares. Other than as set forth in Section 4.4(b) of the Company Disclosure Schedules, (x) there are no outstanding equity appreciation, phantom equity, stock unit, profit participation, equity, equity-based performance or similar rights with respect to the Company or any of its Subsidiaries, and (y) all of the Equity Interests of each Company Subsidiary are owned, directly or indirectly, by the Company. The Company is not a party to any voting trust, agreement, other Contract or understanding with respect to the voting, redemption, sale, transfer or other disposition of the Shares.

(c)    Neither the Company nor any of its Subsidiaries has outstanding bonds, debentures, notes or other indebtedness, the holders of which have the right to vote (or which are convertible or exchangeable into or exercisable for Equity Interests having the right to vote) with the shareholders of the Company on any matter.

Section 4.6    Subsidiaries; Non-Controlled Entities.

(a)    Section 4.5(a) of the Company Disclosure Schedules reflects a true and complete list of each entity in which the Company owns, directly or indirectly, any Equity Interests (excluding Equity Interests owned directly or indirectly by Non-Controlled Entities), and with respect to each entity (except as otherwise provided in this Section 4.5(a)), sets forth the following information: (i) its name and jurisdiction of organization or formation; (ii) the number of authorized shares or other Equity Interests as of the date hereof (with respect to Company Subsidiaries only); and (iii) the number of issued and outstanding shares or other Equity Interests, the names of the holders thereof, and the number of shares or other Equity Interests held by each such holder (with respect to Company Subsidiaries only). Except as set forth on Section 4.5(a) of the Company Disclosure Schedules, the Company does not, directly or indirectly, own any Equity Interests in any other entity.

(b)    Each Company Subsidiary and, to the Knowledge of the Company, each Non-Controlled Entity, is duly organized, validly existing and in good standing under the Laws of its jurisdiction of organization, to the extent such concepts are recognized under the Laws of the jurisdiction of its organization, and has all requisite corporate (or similar entity) power and authority to own, lease and operate its properties and to carry on its business in all material respects as now conducted, except where the failure to be so organized, existing and in good standing or to have such power and authority would not, individually or in the aggregate, be reasonably likely to

be material to the business of the Acquired Companies, taken as a whole. Each Company Subsidiary: (i) is duly qualified or authorized to do business as a foreign corporation or entity and is in good standing to the extent such concepts are recognized under the Laws of each jurisdiction in which the conduct of its business or the ownership of its properties requires such qualification or authorization, except where the failure to be so qualified, authorized or in good standing would not, individually or in the aggregate, be reasonably likely to be material to the business of the Acquired Companies, taken as a whole and (ii) has full organizational power and authority to own, lease and operate its properties and carry on its business as presently conducted, except where the failure to have such power and authority would not, individually or in the aggregate, be reasonably likely to be material to the business of the Acquired Companies, taken as a whole.

(c)     The Special Master has heretofore made available to the Buyer true, correct and complete copies of the Organizational Documents of each Company Subsidiary. The Special Master has heretofore made available to the Buyer copies of all available Organizational Documents for each Non-Controlled Entity.

(d)     The outstanding Equity Interests of each Company Subsidiary are validly issued, fully paid and non-assessable, to the extent such concepts are applicable to such Equity Interests, and have not been issued in violation of any preemptive rights or Preferential Rights or similar rights, and all such Equity Interests represented as being owned by the Company or any Company Subsidiaries are owned by it free and clear of any Liens, other than (i) Liens securing Debt of the Company or any Company Subsidiaries (which Liens shall be removed on or before the Closing), (ii) Liens relating to the transferability of securities under applicable securities Laws, (iii) Liens created by acts of the Buyer or any of its Affiliates and (iv) the Equity Pledge and Liens as a result of the 2020 Bonds. There is no outstanding option, warrant, call, Preferential Right, right or Contract to which any Company Subsidiary is a party requiring, and there are no convertible securities of any Company Subsidiary outstanding which upon conversion would require, the issuance of any Equity Interests of any Company Subsidiary or other securities convertible into Equity Interests of any Company Subsidiary. No Company Subsidiary is a party to any voting trust or other Contract with respect to the voting, redemption, sale, transfer or other disposition of the Equity Interests of such Company Subsidiary.

Section 4.7     Financial Statements.

(a)     Section 4.6(a) of the Company Disclosure Schedules sets forth true, correct, and complete copies of: (i) the audited consolidated balance sheet of the Acquired Companies reflected therein as of December 31, 2023, December 31, 2022, and December 31, 2021, the related audited consolidated statements of income and comprehensive income, stockholder's equity and cash flow of the Acquired Companies for the fiscal year then ended, together with the related notes thereof (the "Audited Financial Statements"); and (ii) the unaudited consolidated balance sheet of the Acquired Companies (the "Company Balance Sheet") as of September 30, 2024 (the "Company Balance Sheet Date") and the related condensed consolidated statements of income and comprehensive income, stockholder's equity and cash flows of the Acquired Companies for the nine-month period then ended (the "Interim Financial Statements" and, collectively with the Audited Financial Statements, the "Financial Statements"). Except as set forth in the notes to the Financial Statements and with the exception of the absence of normal year-end audit adjustments (none of which would be expected to be material, individually or in the aggregate) and footnotes

11

in the Interim Financial Statements, each of the Financial Statements has been prepared in conformity with United States generally accepted accounting principles ("GAAP") applied on a consistent basis (except as may be indicated in the notes thereto) and fairly presents, in all material respects, the consolidated financial position, results of operations and cash flows of the Acquired Companies as of the dates and for the periods indicated therein.

(b)     The Acquired Companies (i) maintain a standard system of accounting established and administered in accordance with GAAP and (ii) have established and maintain a system of internal controls over financial reporting designed to provide reasonable assurance regarding the reliability of the financial reporting and the preparation of the Financial Statements for external purposes in accordance with GAAP. Except as disclosed on Section 4.6(b) of the Company Disclosure Schedules, there (x) are no significant deficiencies or weaknesses in any system of internal accounting controls used by each of the Acquired Companies, (y) has not been since the Lookback Date any fraud or other unlawful wrongdoing on the part of any of management or other employees of the Acquired Companies who have a significant role in the preparation of Financial Statements or the internal accounting controls used by the Company and each of its Subsidiaries relating to such preparation or controls, or (z) has not been since the Lookback Date any claim or allegation regarding any of the foregoing.

Section 4.8     Absence of Certain Changes. Except as contemplated by this Agreement, from the Company Balance Sheet Date to the date of this Agreement:

(a)     the Acquired Companies have conducted their businesses in the Ordinary Course in all material respects;

(b)     there has not been a Company Material Adverse Effect; and

(c)     no Acquired Company has entered into, terminated, amended or otherwise modified any Contracts set forth in Section 4.20 of the Company Disclosure Schedules (Affiliate Transactions).

Section 4.9     No Undisclosed Material Liabilities. The Acquired Companies have no material liabilities of any kind that would be required to be reflected in or reserved against on a consolidated balance sheet of the Company or in the notes thereto prepared in accordance with GAAP, other than:

(a)     liabilities that are adequately accrued and specifically reflected in the Company Balance Sheet or the notes thereto;

(b)     liabilities incurred since the Company Balance Sheet Date in the Ordinary Course (none of which is for tort, breach of contract, breach of warranty, infringement, violation of Law or arising out of a claim or lawsuit) and which, individually or in the aggregate, would not be reasonably likely to be material to the Acquired Companies (taken as a whole);

(c)     liabilities or obligations that have been discharged or paid in full in the Ordinary Course or which, individually or in the aggregate, would not be reasonably likely to be material to any Acquired Company;

12

(d)      liabilities or obligations under this Agreement or otherwise in connection with the Transactions; or

(e)      liabilities or obligations set forth in <u>Section 4.8(e)</u> of the Company Disclosure Schedules.

Section 4.10   <u>Legal Proceedings</u>. As of the Execution Date, except for the Specified Litigation and as set forth in <u>Section 4.9</u> of the Company Disclosure Schedules and as would not, individually or in the aggregate, be reasonably likely to be material to the business of the Acquired Companies, taken as a whole, there are no material Legal Proceedings pending, or, to the Knowledge of the Company, threatened in writing against the Acquired Companies before or by any Governmental Body (whether local, state, federal or foreign). As of the Execution Date, except as would not, individually or in the aggregate, be reasonably likely to be material to the business of the Acquired Companies, taken as a whole, neither the Company nor any of its Subsidiaries is subject to any outstanding judgment, Order, decree or injunction of any court or other Governmental Body (other than Orders of general applicability which do not impact the Acquired Companies in a manner that is materially different than the impact of similarly situated companies).

Section 4.11   <u>Taxes</u>. Except as set forth in the Company Balance Sheet (including the notes thereto) and except as would not, individually or in the aggregate, be reasonably likely to have a Company Material Adverse Effect:

(a)      all income and other material Tax Returns required to be filed with any Taxing Authority by, or with respect to, the Acquired Companies have been duly and timely filed (taking into account any applicable extensions) in accordance with all applicable Laws, the Acquired Companies have duly and timely paid, or caused to be paid, all material Taxes shown as due and payable on such Tax Returns, and, as of the time of filing, such Tax Returns were true and complete in all material respects;

(b)      all material amounts of Taxes which any of the Acquired Companies were obligated to withhold from amounts owing to any employee, creditor, owner or third party have been fully and timely paid;

(c)      except as set forth in <u>Section 4.10(c)</u> of the Company Disclosure Schedules, as of the date hereof, there is no Legal Proceeding or Claim in respect of any Tax or Tax Return (each, a "<u>Tax Proceeding</u>") now proposed in writing or pending against or with respect to the Acquired Companies;

(d)      except as set forth in <u>Section 4.10(d)</u> of the Company Disclosure Schedules, none of the Acquired Companies have waived any statute of limitations in respect of Taxes beyond the date hereof or agreed to any extension of time beyond the date hereof with respect to a Tax assessment or deficiency (other than pursuant to extensions of time to file Tax Returns obtained in the Ordinary Course);

(e)      except as set forth in <u>Section 4.10(e)</u> of the Company Disclosure Schedules, the Acquired Companies are not a party to, are not bound by and do not have any obligation under any Tax sharing, allocation or indemnity agreement, or any similar agreement or arrangement,

13

except for (i) any such agreement or arrangement solely between or among the Acquired Companies or (ii) any commercial agreement entered into in the Ordinary Course the primary purpose of which does not relate to Taxes;

(f)    no claim has been made by a Taxing Authority in a jurisdiction where any of the Acquired Companies do not file Tax Returns that the Acquired Companies are or may be subject to taxation by that jurisdiction, which claim has not been resolved;

(g)    none of the Acquired Companies will be required to include any material item of income in, or exclude any material item of deduction from, income for any Tax period (or portion thereof) ending after the Closing Date as a result of any: (i) change in method of accounting made on or prior to the Company Balance Sheet Date pursuant to Section 481(a) of the Code (or any comparable provision of applicable Law), (ii) "closing agreement" as described in Section 7121 of the Code (or any comparable provision of applicable Law), (iii) installment sale or open transaction disposition made on or prior to the Company Balance Sheet Date, or (iv) prepaid amount received on or prior to the Company Balance Sheet Date;

(h)    none of the Acquired Companies has participated in any "listed transaction" (other than a "loss transaction") within the meaning of Treasury Regulation Section 1.6011-4; and

(i)    there are no Liens with respect to Taxes upon any asset of the Acquired Companies other than Permitted Liens.

Notwithstanding any other provision in this Agreement, no representation or warranty is made with respect to the existence, availability, amount, usability or limitations (or lack thereof) of any net operating loss, net operating loss carryforward, capital loss, capital loss carryforward, basis amount or other Tax attribute (whether federal, state, local or foreign) of the Acquired Companies after the Closing Date, and none of the Buyer or any of its Affiliates (including, after the Closing, the Acquired Companies) may rely on any of the representations and warranties in this Section 4.10 with respect to any position taken in or any Taxes with respect to any Post-Closing Tax Period.

Section 4.12    Company Benefit Plans; Employment.

(a)    The Special Master has provided the Buyer with a list (set forth in Section 4.11(a) of the Company Disclosure Schedules) identifying each material Company Benefit Plan as of the Execution Date.

(b)    With respect to each material Company Benefit Plan, the Special Master has made available to the Buyer true, complete and correct copies (or, to the extent such plan is unwritten, an accurate written description), to the extent applicable, of: (i) the current plan and trust document and any amendments thereto and the most recent summary plan description, together with each subsequent summary of material modifications with respect to such Company Benefit Plan, (ii) the most recent annual report on Form 5500 thereto (including any related actuarial valuation report) filed with the Internal Revenue Service (if any such report was required), (iii) the most recent financial statements, (iv) the most recent Internal Revenue Service determination, opinion or advisory letter, (v) for the three (3) most recent years, nondiscrimination testing results in respect of such Company Benefit Plan, (vi) all material non-routine

correspondence received or sent from any Governmental Body since the Lookback Date and (vii) all related insurance contracts and other funding arrangements. For purposes of this <u>Section 4.11(b)</u>, summary plan descriptions and summaries of material modification available at <u>https://www.hr.citgo.com</u> as of five (5) business days prior to the Execution Date are considered to have been made available to the Buyer. The Special Master has made available copies of Code Section 280G calculations prepared by the Company or its representatives (whether or not final) with respect to certain employees of the Acquired Companies in connection with the Transactions.

(c)     Except as would not, individually or in the aggregate, be reasonably likely to result in a material liability to the Acquired Companies taken as a whole, (i) each Company Benefit Plan has been established, maintained, operated, funded and administered in compliance with (A) its terms and (B) the requirements prescribed by Law (including, to the extent applicable, ERISA and the Code) which are applicable to such Company Benefit Plan and (ii) all benefits, contributions and premium payments required to be made with respect to a Company Benefit Plan have been timely made or paid in full, or to the extent not required to be made or paid in full, have been accrued and reflected on the Financial Statements as required by GAAP.

(d)     Except as would not, individually or in the aggregate, be reasonably likely to result in a material liability to the Acquired Companies taken as a whole, (i) no Acquired Company or any of their respective ERISA Affiliates has incurred any liability under Title IV of ERISA, Sections 412, 430 or 4971 of the Code or Section 302 of ERISA that has not been satisfied in full when due, and (ii) all insurance premiums with respect to Company Benefit Plans, including premiums to the Pension Benefit Guaranty Corporation ("PBGC"), have been paid when due. No Company Benefit Plan is, and no Acquired Company or any of their respective ERISA Affiliates currently sponsors, maintains, or contributes to (or is obligated to contribute to) or has, within the last six (6) years, sponsored or maintained, contributed to or been obligated to contribute to (i) a "multiemployer plan," as defined in Section 3(37) of ERISA, (ii) a "multiple employer plan" as defined in Section 413(c) of the Code, or (iii) a "multiple employer welfare arrangement" within the meaning of Section 3(40) of ERISA.

(e)     Except as set forth in <u>Section 4.11(e)</u> of the Company Disclosure Schedules, with respect to any Company Benefit Plan that is subject to Title IV of ERISA: (i) there does not exist any failure to meet the "minimum funding standard" of Section 412 of the Code or 302 of ERISA (whether or not waived); (ii) such plan is not in "at-risk" status for purposes of Section 430 of the Code; (iii) as of the last day of the most recent plan year ended prior to the Execution Date, there is no "amount of unfunded benefit liabilities" as defined in Section 4001(a)(18) of ERISA; (iv) except as would not, individually or in the aggregate, be reasonably likely to result in a material liability to the Acquired Companies taken as a whole, no reportable event within the meaning of Section 4043(c) of ERISA has occurred; and (v) the PBGC has not instituted proceedings to terminate any such plan and, to the Knowledge of the Company, no circumstances exist which would serve as a basis for the institution of such proceedings.

(f)     Each Company Benefit Plan that is intended to be qualified under Section 401(a) of the Code is so qualified and has received a favorable determination letter or opinion letter, if applicable, from the Internal Revenue Service, and the related trust is intended to be exempt from federal income taxation under the Code and is so exempt. There are no facts or set of circumstances and, to the Knowledge of the Company, nothing has occurred that would reasonably

be expected to cause the loss of such qualification or exemption or reasonably be expected to result in any Company Benefit Plan being required to pay any Tax or penalty under applicable Law that is material to the Acquired Companies taken as a whole as a condition to maintaining such qualification or exemption. Each trust funding any Company Benefit Plan which is intended to meet the requirements of Section 501(c)(9) of the Code meets such requirements and provides no disqualified benefits (as such term is defined in Section 4976(b) of the Code).

(g)     Except (i) as would not, individually or in the aggregate, be reasonably likely to result in a material liability to the Acquired Companies taken as a whole or (ii) as set forth in Section 4.11(g) of the Company Disclosure Schedules, no Acquired Company has any obligation or liability to provide post-employment or post-service medical or welfare benefits to any Person, except (A) as required by the continuing coverage requirements of COBRA and at the sole expense of the participant or such participant's spouse or dependents or (B) death or disability benefits under any retirement or deferred compensation plan. Since the Lookback Date, there have been no written communications by the Acquired Companies to employees of any Acquired Company which promise or guarantee post-employment medical or welfare benefits on a permanent basis.

(h)     Except as would not, individually or in the aggregate, be reasonably likely to result in a material liability to the Acquired Companies taken as a whole, no Acquired Company nor any plan sponsor or plan administrator of a Company Benefit Plan, or to the Company's Knowledge, any third party fiduciary of a Company Benefit Plan, has engaged in any prohibited transaction (within the meaning of Section 406 of ERISA or Section 4975 of the Code) or breached any fiduciary duty under ERISA with respect to such Company Benefit Plan that would be reasonably likely to subject any Acquired Company or Company Benefit Plan to any Tax or penalty (civil or otherwise) imposed by ERISA, the Code or other applicable Law, or any other material liability. Except (i) as would not, individually or in the aggregate, be reasonably likely to result in a material liability to the Acquired Companies taken as a whole, or (ii) as set forth in Section 4.11(h) of the Company Disclosure Schedules, there are no pending or, to the Knowledge of the Company, threatened claims (other than routine claims for benefits) by or on behalf of any Company Benefit Plan or any trusts which are associated with such Company Benefit Plans and, to the Knowledge of the Company, no facts or circumstances exist that would reasonably be expected to result in such claim. Except as would not, individually or in the aggregate, be reasonably likely to result in a material liability to the Acquired Companies taken as a whole, as of the Execution Date, none of the Company Benefit Plans are under audit or subject to an administrative proceeding or, to the Knowledge of the Company, investigation or examination by the Internal Revenue Service, the Department of Labor, the PBGC or any other Governmental Body.

(i)     Except as would not, individually or in the aggregate, be reasonably likely to result in a material liability to the Acquired Companies taken as a whole, each Company Benefit Plan that is a "nonqualified deferred compensation plan" within the meaning of Section 409A(d)(1) of the Code that is subject to Section 409A of the Code, complies with, and has been operated and administered in compliance with, Section 409A of the Code and the regulations and related guidance promulgated thereunder.

(j)       Except (x) as would not, individually or in the aggregate, be reasonably likely to result in a material liability to the Acquired Companies taken as a whole, or (y) as set forth on Section 4.11(j) of the Company Disclosure Schedules, neither the execution, delivery or the performance of this Agreement nor the consummation of the Transactions (alone or in conjunction with any other event) will or could reasonably be expected to (i) accelerate the time of payment or vesting or increase the amount of, or trigger any funding of, compensation or benefits under any Company Benefit Plan; (ii) result in any limitation on the right of an Acquired Company or Buyer, or any of their respective Affiliates, to amend, merge, terminate or receive a reversion of assets from a Company Benefit Plan or related trust; (iii) entitle any current or former director, officer, manager, employee, contractor or consultant of any Acquired Company to severance pay, termination pay or any other similar payment, right or benefit; (iv) result in any payment, right or benefit that (A) would not be deductible under Section 280G of the Code or (B) would result in any excise tax on any "disqualified individual" (within the meaning of Section 280G of the Code) under Section 4999 of the Code. Except as set forth on Section 4.11(j) of the Company Disclosure Schedules, none of the Acquired Companies has any obligation to gross-up or reimburse any current or former director, officer, manager, employee, contractor or consultant of any Acquired Company for any Taxes or related interest or penalties incurred by such individual, including under Section 4999, 409A or 105(h) of the Code.

(k)       No Company Benefit Plan is maintained primarily in respect of any current or former director, officer, manager, employee, contractor or consultant of any Acquired Company who is located outside of the United States.

(l)       Except as set forth in Section 4.11(l) of the Company Disclosure Schedules and as would not, individually or in the aggregate, be material to the Acquired Companies, taken as a whole, since the Lookback Date (i) the Acquired Companies have been in material compliance with all applicable Laws respecting employment, employment practices and terms and conditions of employment, including all Laws relating to labor, labor relations, collective bargaining, occupational safety and health, and wages, hours, worker classification, immigration, whistleblower protections, child labor, reasonable accommodation, leaves of absence, paid sick leave, unemployment insurance, workers' compensation, retaliation, harassment, and employment discrimination and (ii) there have been no actual or, to the Knowledge of the Company, threatened unfair labor practice charges, labor grievances, or labor arbitrations against the Acquired Companies which, individually or in the aggregate, are expected to result in material liability for the Company.

(m)       To the Knowledge of the Company, as of the Execution Date, no employee of the Acquired Companies holding a position of executive vice president or above has notified the Company or the Acquired Companies in writing of an intention to resign, retire, or otherwise terminate his or her employment prior to the Closing or in connection with the Transactions nor, to the Knowledge of the Company as of the Execution Date, does any such employee have an intention to do so.

(n)       Except as set forth in Section 4.11(n) of the Company Disclosure Schedules, (i) none of the Acquired Companies are party to or bound by any collective bargaining agreements or other agreement (each, a "Collective Bargaining Agreement") with any labor union, works council, or other labor organization (each, a "Union") and no such agreement is being negotiated

by any of the Acquired Companies (each such Collective Bargaining Agreement set forth on Section 4.11(n) of the Company Disclosure Schedules, a "Company Collective Bargaining Agreement"); (ii) since the Lookback Date, to the Knowledge of the Company, no group of employees of an Acquired Company or Union has sought to organize any employees of an Acquired Company not covered by a Company Collective Bargaining Agreement for purposes of collective bargaining, made a demand for recognition or certification, sought to bargain collectively with any Acquired Company, or filed a petition for recognition with any Governmental Body, except that resulted in entry into or involved a pre-existing Company Collective Bargaining Agreement; and (iii) since the Lookback Date, there has been no labor strike, lockout, slowdown, stoppage, picketing, boycott, handbilling, demonstration, leafletting, sit-in, sick-out, lockout or other form of organized labor disruption pending or, to the Knowledge of the Company, threatened against any Acquired Company. The Acquired Companies have timely satisfied any legal or contractual requirement to provide notice or information to, bargain with, enter into any consultation procedure with, or obtain consent from, any Union which is representing any employee of the Acquired Companies, or any applicable labor tribunal, in connection with the execution of this Agreement or the transactions contemplated by this Agreement.

(o)     Since the Lookback Date, (i) to the Knowledge of the Company, no material allegations of sexual harassment or other sexual misconduct have been made by any current or former employee of the Acquired Companies against any current employee of the Acquired Companies with the title of executive vice president or above and, to the Knowledge of the Company, no employee of any Acquired Company has engaged in any cover up of such harassment or misconduct or knowingly aided or assisted any other person or entity to engage in any such harassment or misconduct, (ii) there are no Legal Proceedings pending or, to the Knowledge of the Company, threatened related to any allegations made by any current or former employee of the Acquired Companies of sexual harassment or other sexual misconduct against any employee of the Acquired Companies with the title of executive vice president or above and (iii) none of the Acquired Companies have entered into any settlement agreements related to allegations of sexual harassment or other sexual misconduct made by any current or former employee of the Acquired Companies against any current employee of the Acquired Companies with the title of executive vice president or above.

(p)     Since the Lookback Date, the Acquired Companies have complied in all material respects with Worker Adjustment and Retraining Notification Act and any similar state or local law, as amended (collectively, the "WARN Act") and have not incurred any material liability or material obligation under the WARN Act.

(q)     Except as would not be reasonably expected to result in material liability to the Company, each of the employees of the Acquired Companies have all work permits, immigration permits, visas, or other authorizations required by applicable Law for such individual given the duties and nature of such individual's employment, and the Acquired Companies have on file for each employee of the Acquired Companies a Form I-9 that is validly and properly completed in accordance with applicable Law.

(r)     No Acquired Company is a party to a U.S. federal Government Contract. The Acquired Companies are not, and have not been since the Lookback Date, the subject of any

Legal Proceeding in connection with any U.S. federal Government Contract or related compliance with Executive Order No. 11246 of 1965, Section 503 of the Rehabilitation Act of 1973 or the Vietnam Era Veterans' Readjustment Assistance Act of 1974. The Acquired Companies are not debarred, suspended or otherwise ineligible from doing business with the U.S. government or any U.S. government contractor.

(s)     Except as would not, individually or in the aggregate, be reasonably likely to result in a material liability to the Acquired Companies taken as a whole; there are no, and since the Lookback Date there have not been, any material workers' compensation claims, insured or uninsured, pending or, to the Knowledge of the Company, threatened, relating to any employee of the Acquired Companies. Except as would not, individually or in the aggregate, be reasonably likely to have a Company Material Adverse Effect, all amounts required by any statute, insurance policy, Governmental Body or agreement to be paid by the Acquired Companies into any workers' compensation loss or reserve fund, collateral fund, sinking fund or similar account have been duly paid into such fund or account as required.

(t)     Pursuant to the terms of the EPP and the RRP, the Company has established and maintains a grantor trust that will become irrevocable as of the Closing.

Section 4.13    Compliance with Laws; Permits.

(a)     Except as set forth in Section 4.12(a) of the Company Disclosure Schedules, since the Lookback Date, (i) to the Knowledge of the Company, none of the Acquired Companies has materially violated or is in material violation of, any Laws except for any violations that, individually or in the aggregate, are not, and would not be reasonably likely to be material to the business of the Acquired Companies, taken as a whole and (ii) none of the Acquired Companies has received any written notice of or been charged with the material violation of any Laws except for any violations that, individually or in the aggregate, are not, and would not be reasonably likely to be material to the business of the Acquired Companies, taken as a whole.

(b)     Except as set forth in Section 4.12(b) of the Company Disclosure Schedules, the Acquired Companies have all Permits which are required for the operation of its respective business as presently conducted (and such Permits are in full force and effect), except for any Permit which the failure of the Acquired Companies to have (or to be in full force and effect) would not be material to the business of the Acquired Companies, taken as a whole. Except as would not be material to the Acquired Companies, taken as a whole, the Acquired Companies are, and since the Lookback Date have been, in compliance in all material respects with the terms, conditions or provisions of any such Permits.

Section 4.14    Regulatory Matters.

(a)     Except as would not, individually or in the aggregate, reasonably be expected to be material to the Acquired Companies, taken as a whole, and except as set forth in Section 4.13(a) of the Company Disclosure Schedules, since the Lookback Date, (i) none of the Acquired Companies, the Acquired Companies' directors, officers, employees, nor to the Knowledge of the Company, any Representatives or other Person acting on behalf of the Acquired Companies has violated any Anti-Corruption Law and (ii) none of the Acquired Companies, the

Acquired Companies' directors, officers, employees, nor to the Knowledge of the Company, any Representatives or other Person acting on behalf of the Acquired Companies, has offered, paid, given, promised, received or authorized, solicited or received, the payment of, anything of value (including money, checks, wire transfers, tangible and intangible gifts, favors, services, employment or entertainment and travel) directly or indirectly to or from, or for the benefit of any employee, officer, or Representative of, or any Person otherwise acting in an official capacity for or on behalf of a Governmental Body, whether elected or appointed, including an officer or employee of a state-owned or state-controlled enterprise, a political party, political party official or employee, candidate for public office, or an officer or employee of a public international organization (such as the World Bank, United Nations, International Monetary Fund, or Organization for Economic Cooperation and Development) (any such person, a "<u>Government Official</u>") (A) for the purpose of (1) influencing any act or decision of a Government Official or any other person in his or her official capacity, (2) inducing a Government Official or any other person to do or omit to do any act in violation of his or her lawful duties, (3) securing any improper advantage, (4) inducing a Government Official or any other person to influence or affect any act or decision of any Governmental Body or (5) assisting the Acquired Companies, or any Acquired Company director, officer employee, Representative, or any other person acting on behalf of an Acquired Company in obtaining or retaining business, or (B) in a manner which would constitute or have the purpose or effect of public or commercial bribery or corruption, acceptance of, or acquiescence in extortion, kickbacks, or other unlawful or improper means of obtaining or retaining business or any improper advantage.

(b)     Except as would not, individually or in the aggregate, reasonably be expected to be material to the Acquired Companies, taken as a whole, and except as set forth in <u>Section 4.13(b)</u> of the Company Disclosure Schedules, (i) the Acquired Companies and their respective directors, officers, employees, and, to the Knowledge of the Company, Representatives and other Persons acting for or on behalf of any of the foregoing Persons, are, and at all times since the Lookback Date, in compliance with all applicable Economic Sanctions/Trade Laws and all applicable Money Laundering Laws and (ii) in the five (5) years prior to the Execution Date none of the Acquired Companies is a Sanctions Target or has carried on or carries on, any business, directly or knowingly indirectly, involving Cuba, Iran, Syria, North Korea, the Crimea region, the non-government-controlled areas of Zaporizhzhia and Kherson or the so-called Donetsk or Luhansk People's Republics or any Sanctions Target in violation of applicable Economic Sanctions/Trade Laws.

(c)     Except as would not, individually or in the aggregate, reasonably be expected to be material to the Acquired Companies, taken as a whole, and except as set forth in <u>Section 4.13(c)</u> of the Company Disclosure Schedules, since the Lookback Date (i) none of the Acquired Companies has conducted or initiated any internal investigation, review or audit, or made a voluntary, directed, or involuntary disclosure to any Governmental Body or third-party with respect to any alleged or suspected act or omission arising under or relating to any potential noncompliance with any applicable Anti-Corruption Law, Economic Sanctions/Trade Law, or Money Laundering Law, (ii) none of the Acquired Companies, nor any of their respective directors or officers, nor, to the Knowledge of the Company, any employees (other than officers), Representatives, or any other Person acting at the direction of an Acquired Company has received any written notice, request or citation (including a whistleblower complaint) for any actual or potential noncompliance with any applicable Anti-Corruption Law, Economic Sanctions/Trade

20

Law or Money Laundering Law, (iii) the Acquired Companies have implemented and maintained internal controls, policies and procedures designed to detect and prevent violations of Anti-Corruption Laws, Economic Sanctions/Trade Laws and Money Laundering Laws, and (iv) the Acquired Companies have at all times made and maintained accurate books and records in material compliance with all applicable Anti-Corruption Laws, Economic Sanctions/Trade Laws or Money Laundering Laws.

Section 4.15    Environmental Matters. Except as set forth in Section 4.14 of the Company Disclosure Schedules and except as would not, individually or in the aggregate, reasonably be expected to result in the Acquired Companies incurring liabilities which are material to the Acquired Companies, taken as a whole, (i) no written Claim or Order has been received by, and no Legal Proceeding is pending or, to the Knowledge of the Company, threatened by any Person against the Acquired Companies, and no penalty has been assessed or consent decree or Order issued by a Governmental Body against the Acquired Companies, in each case, with respect to any matters arising out of any Environmental Law, which remains outstanding; (ii) the Acquired Companies have been since the Lookback Date, and are, in compliance with all Environmental Laws, which compliance includes obtaining, maintaining and complying with Permits required under Environmental Laws for the conduct of their respective businesses (the "Company Environmental Permits"); (iii) no Governmental Body has begun, or to the Knowledge of the Company, threatened to begin, any Legal Proceeding to terminate, revoke, cancel, suspend, materially reform or not renew any Company Environmental Permit; (iv) to the Knowledge of the Company, there is no investigation pending or threatened against the Acquired Companies by any Governmental Body alleging non-compliance with or liability under any Environmental Law; (v) to the Knowledge of the Company, the Acquired Companies have not generated, treated, stored, disposed of, arranged for the disposal of, transported, or Released, or exposed any Person to, any Hazardous Substances in a manner or concentration that has given rise, or would reasonably be expected to give rise, to liabilities of the Acquired Companies under Environmental Laws, which liability has not been resolved; (vi) to the Knowledge of the Company, no Hazardous Substances have been Released in or under, and no Hazardous Substances are migrating from, (x) properties currently, or to the Knowledge of the Company, formerly owned, leased or operated by the Acquired Companies in a manner or concentrations requiring the Acquired Companies to undertake any investigation, monitoring, removal or remediation under Environmental Laws or (y) to the Knowledge of the Company, any other properties in a manner or concentrations requiring the Acquired Companies to undertake any investigation, monitoring, removal or remediation under Environmental Laws; and (vii) none of the Acquired Companies has assumed by contract liabilities or obligations of any other Person arising under Environmental Laws. The Company has made available to the Buyer copies of all material, non-privileged environmental investigations, assessments or reports conducted in the three (3) years prior to the Execution Date by or on behalf of the Acquired Companies in relation to any current or prior business of the Acquired Companies or any property or facility currently or previously owned, leased or operated by the Acquired Companies, which investigation, assessment or report reveals actual or potential unresolved material non-compliance with or liability under any Environmental Law, but excluding routine environmental monitoring reports conducted by the Acquired Companies in the Ordinary Course.

Section 4.16    Title to Properties. Except as would not, individually or in the aggregate, be material to the Acquired Companies, taken as a whole, each of the Acquired Companies has good title to, or valid leasehold or other ownership interests or rights in, all its material properties and

assets except: (i) for such interest or rights as are no longer used or useful in the conduct of the business of the Acquired Companies as of the Execution Date or as have been disposed of in the Ordinary Course, and (ii) for defects in title, burdens, easements, restrictive covenants and similar encumbrances or impediments that, in each case that do not and will not, individually or in the aggregate, interfere with its ability to conduct its business as currently conducted. None of the properties and assets of the Acquired Companies are subject to any Liens (other than Permitted Liens) that, in the aggregate, interfere with the ability of the Acquired Companies to conduct their business in the Ordinary Course except as would not, individually or in the aggregate, have a Company Material Adverse Effect.

Section 4.17    Material Contracts.

(a)    Section 4.16(a) of the Company Disclosure Schedules sets forth a true, correct and complete list of each Material Contract. For purposes of this Agreement, "Material Contract" shall mean any Contract to which any Acquired Company is a party or to which any assets, properties, or businesses of any Acquired Company are bound as of the Execution Date (in each case, excluding (i) Contracts between or among Acquired Companies only and (ii) spot order Contracts entered into in the Ordinary Course) that:

(i)    (A) limits in any material respect either the type of business in which any Acquired Company may engage or the manner or locations in which any of them may so engage in any business (including through "non-competition" or "exclusivity" provisions), (B) would require the disposition of any material assets or line of business of any Acquired Company or (C) grants "most favored nation" or similar status with respect to any material obligations and would run in favor of any Person (other than the Company or a wholly owned Company Subsidiary);

(ii)    (A) is an indenture, loan or credit Contract, loan note, mortgage Contract, or other Contract representing, or any guarantee of, indebtedness for borrowed money of any Acquired Company in excess of $10,000,000 (excluding any government-mandated or state-wide bonds or guarantees), (B) is a finance lease of any Acquired Company as lessee in excess of $5,000,000, or (C) is a guarantee by any Acquired Company of indebtedness for borrowed money or any finance lease of any Person other than the Company or a wholly owned Company Subsidiary (excluding any government-mandated or state-wide bonds or guarantees);

(iii)    grants (A) any right of first refusal, right of first negotiation or similar right, or (B) any put, call or similar right, to any Person (other than the Company or a wholly owned Company Subsidiary) with respect to any Equity Interest, property, or other asset, in each case, that is material to the Acquired Companies;

(iv)    was entered into to resolve or settle any litigation or threatened litigation (A) for an amount in excess of $15,000,000 payable by an Acquired Company (without taking into account insurance proceeds) or (B) which imposes any material non-monetary ongoing obligation on any Acquired Company (other than customary confidentiality obligations), in each case of clause (A) and clause (B), that has not been fully paid or performed, as applicable;

(v)　limits or restricts the ability of any Acquired Company to declare or pay dividends or make distributions in respect of their Equity Interests that will be binding from and after the Closing;

(vi)　is a partnership, limited liability company, joint venture, co-development or other similar agreement, relating to the formation, creation, operation, management or control of any partnership, limited liability company, joint venture, co-development or similar entity (however organized) in which the Company owns, directly or indirectly, through a Company Subsidiary (excluding Equity Interests owned directly or indirectly by any Non-Controlled Entities) any Equity Interest and has invested or is contractually required to invest capital (including for the avoidance of doubt with respect to any Non-Controlled Entity or non-wholly owned Company Subsidiary, but excluding any wholly owned Company Subsidiary);

(vii)　relates to the sale, transfer or acquisition or disposition of any material business, material assets (other than those providing for sales, transfers or acquisitions of assets in the Ordinary Course) or Equity Interests of any Acquired Company, in each case (A) for an amount in excess of $10,000,000 in any transaction or series of related transactions (other than Contracts for transactions that were consummated prior to the Lookback Date or Contracts that do not contain any ongoing rights owing to, or obligations or liabilities of, any Acquired Company) or (B) pursuant to which any Acquired Company has any material ongoing obligations or liabilities (including in respect of indemnification, "earn-out" and similar contingent or deferred payment obligations);

(viii)　is a Contract (A) with an employee of an Acquired Company, pursuant to which such employee is entitled to receive base salary in excess of $400,000, (B) that provides for mandatory or potential severance payments by an Acquired Company in excess of $100,000 or (C) with an employee, officer or director of any Acquired Company that (I) contains any non-compete or non-solicitation covenants or (II) modifies the at-will nature of the employment of any employee or otherwise requires advance notice for the termination of the Contract by any Acquired Company;

(ix)　is a Collective Bargaining Agreement;

(x)　is a Contract providing for indemnification by an Acquired Company of any officer, manager, director or employee of any Acquired Company;

(xi)　is a Contract between or among any Acquired Company, on the one hand, and any Governmental Body, on the other hand;

(xii)　is a term Contract with one of the ten largest suppliers of any applicable Business Unit of the Acquired Companies (as determined by dollar volume for the 12-month period immediately prior to the Company Balance Sheet Date); and

(xiii)　is a term Contract with one of the ten largest customers of any applicable Business Unit of the Acquired Companies (as determined by dollar volume for the 12-month period immediately prior to the Company Balance Sheet Date).

(b)    Each Material Contract is a legal, valid and binding obligation of the Acquired Companies as applicable. Except as would not, individually or in the aggregate, be material to the Acquired Companies, taken as a whole, each Material Contract is in full force and effect and enforceable by the applicable Acquired Company, in each case, subject to the Equitable Exceptions, and none of the Acquired Companies or, to the Knowledge of the Company any other party to a Material Contract, is in material breach or violation of any provision of, or in material default under, any Material Contract, and no event has occurred that, with or without notice, lapse of time or both, would constitute a material breach, violation or default or give rise to a right of termination, cancellation or acceleration of any material right or obligation or loss of any benefit thereunder. A true and correct copy of each Material Contract has previously been made available to the Buyer.

(c)    Since the Lookback Date, no Acquired Company has given or received (i) written notice regarding any actual or alleged or potential violation of any provision under any Material Contract or (ii) written notice threatening, intending or electing to terminate, repudiate, modify or cancel such Material Contract.

Section 4.18    Intellectual Property and Data Privacy.

(a)    Section 4.17(a) of the Company Disclosure Schedules sets forth a list of all registered Intellectual Property that is owned by the Acquired Companies and is used in, held by, or held for use in the conduct of the business of the Acquired Companies as of the Execution Date ("Registered Intellectual Property"). Except as would not, individually or in the aggregate, be material to the Acquired Companies, taken as a whole, the Acquired Companies own or possess the right to use, license and enforce all (i) patents and patent applications, (ii) registered, applied for, or unregistered trademarks, trade names, trade dress, service marks, logos, and business names, and all related goodwill, (iii) internet domain names, (iv) registered, applied for, or unregistered works of authorship and copyrights, including copyrights in computer software programs or applications, and (v) trade secrets, know-how and other confidential and proprietary information, including ideas, inventions (whether patentable or not), research, pricing and cost information, customer information, business plans, marketing plans, and proposals (collectively, "Intellectual Property") that are used in, held by, or held for use in the conduct of the business of the Acquired Companies as currently conducted (collectively, the "Company Intellectual Property" and to the extent owned by the Acquired Companies the "Company Owned Intellectual Property"), free and clear of all Liens, except for Permitted Liens. To the Knowledge of the Company, the Registered Intellectual Property is valid and enforceable.

(b)    (i) Since the Lookback Date, to the Knowledge of the Company, the conduct of the business of the Acquired Companies and use of the Company Intellectual Property does not and has not infringed upon or otherwise violated any Intellectual Property rights of any other Person; (ii) no third party is challenging, or, to the Knowledge of the Company, infringing or otherwise violating any right of the Acquired Companies in the Company Owned Intellectual Property; and (iii) since the Lookback Date, the Acquired Companies have not received written notice of any pending Claim, Order or Legal Proceeding with respect to any alleged or potential infringement or other violation of Intellectual Property rights of any other Person or with respect to any Company Intellectual Property. The Acquired Companies have taken commercially

24

reasonable measures to maintain the confidentiality of any material proprietary information or trade secrets included in Company Intellectual Property.

(c)    Except as would not, individually or in the aggregate, reasonably be expected to be material to the Acquired Companies, taken as a whole, each current and former employee and independent contractor of any Acquired Company who has participated in the conception or development of any Intellectual Property has assigned to such Acquired Company by operation of law, or has entered into a valid and enforceable written agreement with such Acquired Company assigning to such Acquired Company all Intellectual Property created by such Person within the scope of such Person's duties to the Acquired Company and prohibiting such Person from using or disclosing confidential information of the Acquired Company. To the Knowledge of the Company, no current or former employee or independent contractor of the Acquired Companies is in violation of any such agreement, and there has been no unlawful, accidental, or unauthorized access to or use or disclosure of any trade secrets, know-how and other confidential and proprietary information of the Acquired Companies.

(d)    Since the Lookback Date, no third party (including any employee, worker, contractor or subcontractor) has made any written claim to the Acquired Companies of ownership in respect of any of the Company Owned Intellectual Property.

(e)    Except as would not, individually or in the aggregate, be material to the Acquired Companies, taken as a whole, to the extent that the Acquired Companies license Intellectual Property to a third party or license any Intellectual Property belonging to any third party: (i) no such licenses have been the subject of any breach or default by any Acquired Company or, to the Company's Knowledge, any such third party; (ii) such licenses are valid and binding; (iii) such licenses have not been the subject of any claim, dispute or proceedings; and (iv) in respect of licenses of Intellectual Property by any Acquired Company to third parties, such licenses do not materially restrict any Acquired Company from using the Intellectual Property to which they relate.

(f)    Since the Lookback Date, except as would not reasonably be expected to be, individually or in the aggregate, material to the Acquired Companies, taken as a whole, the Acquired Companies have: (i) materially complied with all applicable Laws and self-regulatory guidelines, PCI DSS, the obligations under their Contracts, and their public privacy policies, in each case, relating to the processing of any Personal Information (collectively, "Privacy Laws and Obligations"); (ii) implemented and maintained reasonable administrative, physical and technical safeguards designed to protect all Personal Information in their possession or under their control against loss, theft, or unauthorized access, use modification, disclosure; (iii) not experienced any material Security Incident, and, to the Knowledge of the Company, no service provider (in the course of processing Personal Information for or on behalf of the Acquired Companies) has suffered any material Security Incident impacting Personal Information in the possession or control of the Acquired Companies; and (iv) not received any written notice of any claims of, or been charged with, the violation of any Privacy Laws and Obligations.

(g)    The Acquired Companies have used commercially reasonable efforts to prevent the introduction into the Systems, and, to the Company's Knowledge, such Systems do not contain, any ransomware, disabling codes or instructions, spyware, Trojan horses, worms,

viruses or other software routines that permit or cause unauthorized access to, or disruption, impairment, disablement, or destruction of, software, data or other materials. The Acquired Companies have used commercially reasonable efforts to implement material security patches that are generally available for the Systems. To the Company's Knowledge, since the Lookback Date, the Systems have not suffered any unplanned or critical failures, continued substandard performance, errors, breakdowns or other adverse events that have caused any material disruption or interruption in the operation of the business of the Acquired Companies. The Acquired Companies have implemented and maintain commercially reasonable business continuity and disaster recovery plans, procedures and facilities for its business.

(h)    The Acquired Companies have in place commercially reasonable measures to protect the confidentiality, integrity, availability and security of the Systems. To the Company's Knowledge, the Systems (i) are in good working order; (ii) function in all material respects in accordance with all specifications and any other descriptions under which they were supplied; (iii) are substantially free of any material defects, bugs and errors; and (iv) are sufficient for the existing needs of the business of the Acquired Companies. The Acquired Companies have conducted commercially reasonable penetration tests at reasonable intervals on the Systems, and have addressed, or are in the process of addressing, all material issues raised in any such audits or penetration tests (including third party audits of the Systems).

Section 4.19    <u>Brokers; Financial Advisor</u>. No broker, investment banker, financial advisor or other Person, other than Evercore, is entitled to any commission, brokerage fee or "finders fee" in connection with the consummation of the Transactions.[4]

Section 4.20    <u>Real Property</u>.

(a)    <u>Section 4.19(a)</u> of the Company Disclosure Schedules sets forth a true, accurate and complete list as of the Execution Date of all leases or subleases of real property with respect to which any Acquired Company is the tenant or lessee, together with a list of the addresses of all such real property (if specified in such lease or sublease) which are material to the Acquired Companies (individually, a "<u>Real Property Lease</u>" and, collectively, the "<u>Real Property Leases</u>"). Subject to the Equitable Exceptions, the applicable Acquired Company has a good, valid, binding and enforceable interest under each of the Real Property Leases and the vesting instruments under which an Acquired Company holds an easement or similar interest (such vesting instruments, collectively with the Real Property Leases, the "<u>Vesting Instruments</u>"), free and clear of all Liens (other than Permitted Liens). No Acquired Company nor, to the Knowledge of the Company, any other party to any Vesting Instrument is in material breach or default thereunder, and no event has occurred or condition exists that, with notice or lapse of time, or both, would constitute a default by an Acquired Company or, to the Knowledge of the Company, any other Person under any of the Vesting Instruments, other than defaults that have been cured or waived in writing. Except as would not, individually or in the aggregate, be material to the Acquired Companies, taken as a whole, all landlord work or tenant work under each Real Property Lease has been completed and there are no leasing commissions due or payable with respect to any Real Property Lease. Each

---

[4]    **Note to Draft**: Please provide Evercore's engagement letter so it can be confirmed that it terminates at closing once the fee is paid.

Vesting Instrument is in full force and effect and, to the Knowledge of the Company, is the valid, binding and enforceable obligation of each party thereto, in accordance with its terms.

(b)     <u>Section 4.19(b)</u> of the Company Disclosure Schedules sets forth a true, accurate, and complete list of all real property owned in fee by the Acquired Companies ("<u>Owned Real Property</u>" and together with the real property in which the Acquired Companies hold interests pursuant to the Vesting Instruments, the "<u>Real Property</u>"), together with the address of the applicable property. Each Acquired Company owns good, valid and marketable title in fee simple to the Owned Real Property and there are no outstanding Preferential Rights, ownership or use, or other contractual rights in favor of any other Person to purchase, acquire, sell, assign or otherwise dispose of any Acquired Companies' interest in any Real Property or any portion thereof or interest therein. Each Acquired Company has the valid and enforceable power and unqualified right to use and sell, transfer, convey or assign the Owned Real Property, free and clear of all Liens other than Permitted Liens.

(c)     <u>Section 4.19(c)</u> of the Company Disclosure Schedules sets forth a complete list of all Owned Real Property held by the Acquired Companies as a tenant in common or other joint ownership structure (collectively, the "<u>Jointly Owned Properties</u>"), together with a detailed description of the respective ownership structure (and the applicable Acquired Company's ownership percentage) of each Jointly Owned Property. None of the other owners of the Jointly Owned Properties have any rights of first refusal, rights of first offer or other Preferential Rights to purchase, or otherwise modify or later the applicable Acquired Company's interest in, any of the Jointly Owned Properties that would be triggered by the Transactions.

(d)     To the Knowledge of the Company, all material buildings, structures, improvements, fixtures, building systems and attached equipment, and all material components thereof, included in the Real Property are in good condition and repair, normal wear and tear excepted. No work has been done at the Real Property, and no materials have been supplied to the Real Property, that have not been paid for, and there are no material materialman's liens or mechanic's liens affecting the Real Property.

(e)     The Real Property constitutes all interests in real property (i) currently used, occupied or held for use in connection with the business of the Acquired Companies as presently conducted and (ii) necessary for the continued operation of the business of the Acquired Companies. None of the improvements to any Real Property constitute a legal non-conforming use or otherwise require any special dispensation, variance or permit under any Law. To the Knowledge of the Company, the Company or the applicable Acquired Company has all certificates of occupancy, permits, licenses, certificates of authority, authorizations, approvals, registrations, and similar consents issued by or obtained from any Governmental Body necessary for the current use and operation of the Real Property, except for any such items where the failure of the applicable Acquired Company to hold or possess such item would not, individually or in the aggregate, be material to any Acquired Company. The Real Property is in compliance in all material respects with all applicable Laws and fire, health, building, use, occupancy, subdivision and zoning codes.

(f)     Except as would not, individually or in the aggregate, be material to the Acquired Companies, taken as a whole, each Acquired Company and each parcel of Real Property are now, and have been since the Lookback Date, in material compliance with all declarations of

covenants, conditions or restrictions, restrictive covenants and reciprocal easement agreements, in each case, affecting any Real Property, and (ii) have not received any notice of any material breach, violation or default under any such declarations, agreements or easements since the Lookback Date.

(g)    There do not exist any actual or, to the Knowledge of the Company, threatened condemnation or eminent domain proceedings that affect any Real Property or any part thereof.

(h)    Since the Lookback Date, no Acquired Company has received written notice of any, and to the Knowledge of the Company there is no, default under any restrictive covenants or other encumbrances pertaining to the Real Property.

Section 4.21    <u>Energy Regulatory Status</u>.

(a)    None of the Acquired Companies (i) is a natural gas company under the NGA, or a utility, gas service company, gas company, or any similar entity however described under the Laws of any state or local jurisdiction and the regulations promulgated thereunder, or (ii) is subject to regulation by FERC under the NGPA. Except as set forth on <u>Section 4.20(a)</u> of the Company Disclosure Schedule, no Acquired Company has acquired any of the assets owned by it through the use of eminent domain or condemnation.

(b)    Except for certain facilities, as described on Section 4.20(b) of the Company Disclosure Schedule, used in the transport of hydrocarbons which are subject to the Interstate Commerce Act ("<u>ICA</u>") and are subject to the jurisdiction of FERC, and which are in substantial compliance with the applicable Laws, rules and regulations issued by any Governmental Body, none of the Acquired Companies owns, controls, or has under development any (i) refining capacity or (ii) oil or gas transportation infrastructure (other than gathering facilities).

(c)    For any generation facility owned by the Acquired Companies, the Company has filed, or caused the Company Subsidiaries to file, a self-certification with FERC as a QF, and such certification is valid and in full force and effect.

(d)    Except as would not, individually or in the aggregate, have a Company Material Adverse Effect, all filings (other than immaterial filings) required to be made by the Acquired Companies since the Lookback Date, with the FERC under the ICA implemented by FERC pursuant to 49 U.S.C. § 60502 and the regulations promulgated by FERC thereunder, with the Federal Communications Commission (the "<u>FCC</u>"), the Department of Transportation's Pipeline and Hazardous Materials Safety Administration, or any applicable state public utility commission or department, as the case may be, have been made, including all rates, tariffs, agreements, reports and related documents, and all such filings complied with applicable statutes and the rules and regulations promulgated thereunder except for such non-compliance as would not, individually or in the aggregate, be reasonably likely to be material to the business of the Acquired Companies, taken as a whole.

Section 4.22    <u>Affiliate Transactions</u>. Except as set forth in <u>Section 4.20</u> of the Company Disclosure Schedules, none of the Acquired Companies, on the one hand, is party to any agreement with PDVSA or its Affiliates (excluding the Acquired Companies and their Subsidiaries), on the

other hand, pursuant to which an Acquired Company has material ongoing obligations. Other than the Shares, neither PDVSA nor any of its Affiliates (excluding the Acquired Companies and their Subsidiaries), owns any interest in or any property (real, personal or mixed, tangible or intangible) of the Acquired Companies.

Section 4.23    Insurance. Section 4.21 of the Company Disclosure Schedules lists each material insurance policy maintained by the Acquired Companies with respect to the properties, assets, business, operations and employees of the Acquired Companies. To the Knowledge of the Company, all such policies are valid and binding on the Acquired Company and enforceable in accordance with their terms against the Acquired Companies, in each case except for the Equitable Exceptions, and all premiums with respect thereto have been paid to the extent due. To the Knowledge of the Company, there are no material Claims by the Acquired Companies pending under any such insurance policies as to which coverage has been denied by the underwriters of such policies. To the Knowledge of the Company, the Acquired Companies have not received written notice of termination or material reduction of coverage with respect to any of such insurance policies.

Section 4.24    No Additional Representations.

(a)    Except for the representations and warranties made in (i) this Article IV, as qualified by the Company Disclosure Schedules, (ii) any certificate delivered pursuant to this Agreement or (iii) any other Transaction Document, no Person makes or shall be deemed to make any other representation or warranty of any kind whatsoever, express or implied, written or oral, at law or in equity, with respect to any of the Acquired Companies or their respective businesses, operations, assets, liabilities or conditions (financial or otherwise) in connection with this Agreement or the Transactions, any other rights or obligations to be transferred pursuant to the Transaction Documents or any other matter, and the Special Master (on behalf of himself and the Company) hereby disclaims any such other representations or warranties. In particular, without limiting the foregoing disclaimer, except for the representations and warranties made in (i) this Article IV, as qualified by the Company Disclosure Schedules, or (ii) any certificate delivered pursuant to this Agreement, no Person makes or has made any representation or warranty to the Buyer or any of its Affiliates or Representatives with respect to (x) projections, forecasts, estimates, financial statements, financial information, appraisals, statements, promises, advice, data or information made, communicated or furnished (orally or in writing, including electronically) or prospect information relating to the Acquired Companies or their respective businesses; or (y) except for the representations and warranties made in (i) this Article IV, as qualified by the Company Disclosure Schedules, (ii) any certificate delivered pursuant to this Agreement, or (iii) any other Transaction Documents, any oral or written information presented to the Buyer or any of its Affiliates or Representatives in the course of their due diligence investigation of the Company, the negotiation of this Agreement or in the course of the Transactions (including any opinion, information, projection, or advice that may have been or may be provided to the Buyer by any Representative of the Company).

(b)    Notwithstanding anything contained in this Agreement to the contrary, the Special Master acknowledges and agrees that neither the Buyer nor any other Person has made or is making, and the Special Master expressly disclaims reliance upon, any representations, warranties or statements relating to the Buyer or any Buyer Subsidiaries whatsoever, express or

implied, beyond those expressly given by the Buyer in <u>Article V</u>, as qualified by the Buyer Disclosure Schedules, or in any certificate delivered pursuant to this Agreement or in any other Transaction Documents, including any implied representation or warranty as to the accuracy or completeness of any information regarding the Buyer, furnished or made available to the Company, or any of its Representatives. Without limiting the generality of the foregoing, the Special Master acknowledges that, except for the representations and warranties expressly provided in <u>Article V</u>, as qualified by the Buyer Disclosure Schedules, or in any certificate delivered pursuant to this Agreement or in any other Transaction Documents, no representations or warranties are made with respect to any projections, forecasts, estimates, budgets or prospect information that may have been made available to the Special Master, the Company or any of their Representatives.

**ARTICLE V**
**REPRESENTATIONS AND WARRANTIES OF THE BUYER**

The Buyer represents and warrants to the Special Master as of the Execution Date and the Closing Date that, except as disclosed in the correspondingly numbered section of the disclosure schedules delivered by the Buyer to the Company simultaneously with the execution of this Agreement (the "<u>Buyer Disclosure Schedules</u>"):

Section 5.1    <u>Corporate Existence and Power</u>. The Buyer is a [●] duly incorporated, validly existing and in good standing under the Laws of its jurisdiction of [●] and has all requisite [●] powers and all governmental franchises, licenses, permits, authorizations, consents and approvals required to enable it to own, lease or otherwise hold its properties and assets and to carry on its business as now conducted. The Buyer is duly qualified to do business as a foreign [●] and is in good standing in each jurisdiction in which the character of the property owned or leased by it, the nature of its activities, or the ownership or leasing of its properties make such qualification necessary, except for those jurisdiction where the failure to be so qualified would not, individually or in the aggregate, materially impair or delay the ability of the Buyer to consummate the Transactions or perform its obligations under this Agreement.

Section 5.2    <u>Corporate Authorization</u>. The Buyer has all requisite [●] power and authority to execute, deliver and perform its obligations under this Agreement, the Transaction Documents, and each other agreement, document, instrument or certificate contemplated by this Agreement to be executed and delivered by the Buyer in connection with the consummation of the Transactions (the "<u>Buyer Documents</u>"). The execution and delivery of this Agreement and the Buyer Documents by the Buyer, the performance of its obligations hereunder and thereunder, and the consummation by the Buyer of the Transactions have been duly authorized by all necessary corporate or organizational action on the part of the Buyer, and no shareholder or other similar approval is required in connection with the Buyer's execution, delivery and performance of the Transactions. The [●] of the Buyer, at a meeting duly called and held on or prior to the Execution Date, has approved this Agreement and the Transactions. This Agreement constitutes a valid and binding agreement against the Buyer, enforceable against the Buyer in accordance with its terms, except that such enforcement may be limited by the Equitable Exceptions.

Section 5.3    <u>Governmental Authorization</u>. The execution, delivery and performance by the Buyer of this Agreement and the consummation by the Buyer of the Transactions require no

30

Order, authorization, or approval of, or filing with, any Governmental Body other than (a) applicable requirements of Antitrust Laws as set forth in <u>Section 5.3</u> of the Buyer Disclosure Schedules, (b) the OFAC License, (c) the Sale Order Entry and (d) other actions or filings the absence or omission of which would not, individually or in the aggregate, be reasonably likely to have a material adverse effect upon the Buyer.

Section 5.4    <u>Non-Contravention</u>. The execution, delivery and performance by the Buyer of this Agreement and the consummation by the Buyer of the Transactions do not and will not, assuming compliance with the matters referred to in <u>Section 5.2</u> and <u>Section 5.3</u>, (a) contravene or conflict with the Organizational Documents of the Buyer, or result in a breach under the Organizational Documents, (b) contravene or conflict with or constitute a violation of any provision of any Law binding upon or applicable to the Buyer, (c) constitute a default (or an event which with notice or the passage of time would become a default) under, or give rise to any right of termination, cancellation or acceleration of any right or obligation of the Buyer or to a loss of any benefit to which the Buyer is entitled under any provision of, any agreement, contract or other instrument binding upon the Buyer or any of the Buyer Subsidiaries or any license, franchise, permit or other similar authorization held by the Buyer or any of the Buyer Subsidiaries or (d) result in the creation or imposition of any Lien (other than Liens arising under applicable securities Laws) on any asset of the Buyer. As of the Execution Date, there is no Effect that would reasonably be expected to prevent, impede or interfere with the execution of this Agreement and the consummation by the Buyer of the Transactions.

Section 5.5    <u>Litigation</u>. Except as set forth in <u>Section 5.5</u> of the Buyer Disclosure Schedules, there are no Legal Proceedings, pending against, or, to the Knowledge of the Buyer, threatened in writing against or affecting, the Buyer, any of the Buyer Subsidiaries, any of their respective properties or any of their respective officers or directors before any Governmental Body that would reasonably be expected to (a) prohibit or restrain the ability of the Buyer to enter into this Agreement or consummate the Transactions. The Buyer is not subject to any Order of any Governmental Body that would reasonably be expected to prohibit or restrain the ability of the Buyer to enter into this Agreement or consummate the Transactions.

Section 5.6    <u>Regulatory Matters</u>.

(a)    In the three (3) years prior to the Execution Date, (i) none of the Buyer or any of the Buyer Subsidiaries, nor any of their respective directors, officers, employees, nor, to the Knowledge of the Buyer, any Representative, agent, or other person acting on behalf of the Buyer, any of the Buyer Subsidiaries, has violated any Anti-Corruption Law, and (ii) none of the Buyer, any of the Buyer Subsidiaries, nor any of their respective directors, officers, employees, nor, to the Knowledge of the Buyer, any Representative, agent or any other person acting on behalf of the Buyer, the Buyer Subsidiaries, has offered, paid, given, promised, or authorized the payment of, anything of value (including money, checks, wire transfers, tangible and intangible gifts, favors, services, employment or entertainment and travel) directly or indirectly to any Government Official (A) for the purpose of (1) influencing any act or decision of a Government Official or any other person in his or her official capacity, (2) inducing a Government Official or any other person to do or omit to do any act in violation of his or her lawful duties, (3) securing any improper advantage, or (4) inducing a Government Official or any other person to influence or affect any act or decision of any Governmental Body; or (B) in a manner which would constitute or have the

purpose or effect of public or commercial bribery or corruption, acceptance of, or acquiescence in extortion, kickbacks, or other unlawful or improper means of obtaining or retaining business or any improper advantage. Without limiting the generality of the foregoing, none of the Buyer or any of the Buyer Subsidiaries, any of their respective directors, officers, employees, Affiliates or, to the Knowledge of the Buyer, any Representative, agent, or other person acting on behalf of the Buyer, any of the Buyer Subsidiaries is a Venezuelan national or has any relationship to Nicolás Maduro, the United Socialist Party of Venezuela or any Affiliate thereof.

(b)    (i) The Buyer, each of the Buyer Subsidiaries and their respective directors, officers, employees, and, to the Knowledge of the Buyer, agents, Representatives and other persons acting for or on behalf of any of the foregoing Persons, are, and at all times in the three (3) years prior to the Execution Date, in compliance in all material respects with all applicable Economic Sanctions/Trade Laws and all applicable Money Laundering Laws and (ii) in the three (3) years prior to the Execution Date none of the Buyer, any of the Buyer Subsidiaries is a Sanctions Target or has carried on or carries on, any business, directly or knowingly indirectly, involving any Sanctions Target in violation of applicable Economic Sanctions/Trade Laws.

(c)    Except as would not, individually or in the aggregate, be reasonably likely to have a material adverse effect, in the three (3) years prior to the Execution Date (i) none of the Buyer, any of the Buyer Subsidiaries has conducted or initiated any internal investigation, review or audit, or made a voluntary, directed, or involuntary disclosure to any Governmental Body or third party with respect to any alleged or suspected act or omission arising under or relating to any potential noncompliance with any applicable Anti-Corruption Law, Economic Sanctions/Trade Law, or Money Laundering Law, (ii) none of the Buyer, any of the Buyer Subsidiaries, nor any of their respective directors or officers, nor, to the Knowledge of the Buyer, any agents, employees (other than officers), Representatives, or any other person acting at the direction of the Buyer, any of the Buyer Subsidiaries has received any written notice, request or citation for any actual or potential noncompliance with any applicable Anti-Corruption Law, Economic Sanctions/Trade Law or Money Laundering Law, (iii) the Buyer, the Buyer Subsidiaries have implemented and have maintained internal controls, policies and procedures designed to detect and prevent violations of Anti-Corruption Laws, Economic Sanctions/Trade Laws and Money Laundering Laws, and (iv) the Buyer, each of the Buyer Subsidiaries have at all times made and maintained accurate books and records in material compliance with all applicable Anti-Corruption Laws, Economic Sanctions/Trade Laws or Money Laundering Laws.

(d)    The Buyer, the Buyer Subsidiaries are each not a "foreign person" within the meaning of the Defense Production Act of 1950, as amended, including all implementing regulations thereof.

Section 5.7    Financing.

(a)    On the Closing Date, the Buyer will have sufficient cash on hand and available credit to pay all amounts required to be paid by the Buyer at the Closing pursuant to the terms of this Agreement.

(b)     The obligations of the Buyer under this Agreement are not subject to any conditions regarding the Buyer's, its Affiliates', or any other Person's ability to obtain financing for the consummation of the Transactions contemplated hereby.

Section 5.8     <u>Solvency</u>. The Buyer is Solvent as of the Execution Date. Assuming (x) the accuracy of the representations and warranties set forth in <u>Article IV</u>, and (y) the performance by the Company and the Special Master of the covenants and agreements required to be performed by them under this Agreement prior to the Closing, the Buyer, the Company and their respective Subsidiaries, on a consolidated basis, will, after giving effect to all of the Transactions, including the payment of any amounts required to be paid in connection with the consummation of the Transactions and the payment of all related fees and expenses, be Solvent at and immediately after the Closing.

Section 5.9     <u>Purported Equity Pledge</u>. The Buyer acknowledges the existence of the 2020 Bonds, the Purported Equity Pledge and the Equity Pledge Litigation.

Section 5.10     <u>No Additional Representations</u>.

(a)     Except for the representations and warranties expressly made by the Buyer in (i) this <u>Article V</u>, as qualified by the Buyer Disclosure Schedules, or (ii) any certificate delivered pursuant to this Agreement, the Buyer makes (and shall not be deemed to make) no other representation or warranty of any kind whatsoever, express or implied, written or oral, at law or in equity, in connection with this Agreement or the Transactions, any other rights or obligations to be transferred pursuant to the Transaction Documents or any other matter, and the Buyer hereby disclaims any such other representations or warranties.

(b)     Except for the specific representations and warranties expressly made by the Special Master in <u>Article IV</u>, and subject to the specifically bargained-for limitations as set forth in this Agreement, the Buyer acknowledges and agrees that the Special Master does not make, and that the Buyer is not relying upon, and will not rely upon any representation or warranty, expressed or implied, at law or in equity, made by any Person in respect of the Special Master or in respect of the Company and the Company's Subsidiaries' respective businesses, assets (including the stocks), liabilities, operations, prospects, or condition (financial or otherwise), including with respect to merchantability or fitness for any particular purpose of any assets, the nature or extent of any liabilities, the prospects of their respective businesses, the effectiveness or the success or profitability of any operations, or the accuracy or completeness of any confidential information memoranda, documents, projections, forecasts, opinions, advice, material, statement, data, or other information (financial or otherwise) regarding the Acquired Companies provided to, or otherwise made available to, the Buyer or its Representatives in connection with the Transactions, including any "data rooms," "virtual data rooms," management presentations, or in respect of any other matter or thing whatsoever. The Buyer expressly disclaims that is relying on any representations or warranties, other than the specific representations and warranties expressly made by the Special Master in <u>Article IV</u> or in any certificate delivered pursuant to this Agreement.

**ARTICLE VI**
**COVENANTS**

Section 6.1     Conduct of the Business Pending the Closing.

(a)     During the Interim Period, except (w) with the prior written consent of the Buyer (such consent not to be unreasonably withheld, conditioned or delayed), (x) as expressly permitted or required by this Agreement, (y) as may be required by applicable Law, or (z) as set forth in Section 6.1(a) or Section 6.1(b) of the Company Disclosure Schedules, the Special Master shall Cause the Acquired Companies to (i) conduct their business in the Ordinary Course, (ii) use their commercially reasonable efforts to preserve intact their business organizations, assets (ordinary wear and tear excepted), ongoing operations, and goodwill, and maintain material relationships with third parties (including suppliers, vendors, creditors, licensors and employees of the Acquired Companies and Governmental Bodies having regulatory authority in respect of the Acquired Companies and their operations),(iii) preserve and maintain all material Permits and (iv) use their commercially reasonable efforts to comply in all material respects with applicable Laws.

(b)     Without limiting the generality of Section 6.1(a), except (v) with the prior written consent of the Buyer (such consent not to be unreasonably withheld, conditioned or delayed), (w) as expressly permitted or required by this Agreement, (x) as required to comply with a Material Contract that has been disclosed in the Company Disclosure Schedules, (y) as may be required by applicable Law, or (z) as set forth in Section 6.1(b) of the Company Disclosure Schedules, the Special Master shall Cause the Acquired Companies not to:

(i)     (A) amend the Company Charter or Company By-Laws, (B) permit any Company Subsidiary to amend such Company Subsidiary's Organizational Documents, or (C) vote in favor of the amendment of any of the Organizational Documents of any Non-Controlled Entity;

(ii)     (A) (I) adopt a plan or agreement of complete or partial liquidation, dissolution, merger or consolidation of any of the Acquired Companies, or (II) incur or assume any liability or expense in connection with the complete or partial liquidation or wind-down of any of the Acquired Companies, or (B) vote in favor of the adoption of a plan or agreement of complete or partial liquidation, dissolution, merger or consolidation, of any Non-Controlled Entity;

(iii)     (A) make or authorize any capital expenditures or commitments, except (I) for 2025, in accordance with the capital budgets of the Acquired Companies for 2025 as set forth in Section 6.1(b)(iii)(A)(I) of the Company Disclosure Schedules, (II) for 2026, in accordance with the capital budgets to be adopted by the Acquired Companies for 2026 (which such capital budgets will not exceed, in the aggregate, 10% of the 2026 projection included in the medium term plan set forth in Section 6.1(b)(iii)(A)(II) of the Company Disclosure Schedules (the "MTP")), and (III) for any subsequent year, in accordance with the capital budgets of the Acquired Companies to be adopted by the Acquired Companies for such subsequent year (which such capital budgets will not exceed, in the aggregate, 15% of the projection included in the MTP for such subsequent year)

34

(each of the foregoing, a "CapEx Budget") (provided, that, the Acquired Companies may make or authorize capital expenditures or commitments in excess of any applicable CapEx Budget so long as such excess expenditures do not, in the aggregate, result in an expenditure above 120% of the aggregate amount included in the applicable CapEx Budget), (B) make or authorize any growth or enhancing capital expenditures or commitments in excess of $15,000,000 (except, during 2025, as provided in the applicable CapEx Budget), (C) with respect to any line item in excess of $15,000,000 for growth or enhancing capital expenditures in any CapEx Budget, make or authorize an increase with respect to such line item in excess of 20% of the applicable budgeted amount, or (D) propose or vote in favor of any capital expenditures or commitments that would reasonably be expected to require additional cash contributions by any Acquired Company to any Non-Controlled Entity in amounts in excess of $3,000,000 in the aggregate for all Non-Controlled Entities;

(iv)     make or authorize any turnaround or catalyst expenditures or commitments, except (A) for 2025, in accordance with the turnaround/catalyst budget of the Acquired Companies for 2025 as set forth in Section 6.1(b)(iv) (A)(I) of the Company Disclosure Schedules, (B) for 2026, in accordance with the turnaround/catalyst budget of the Acquired Companies to be adopted by the Acquired Companies for 2026 (which such turnaround/catalyst budgets will not exceed 10% of the 2026 projection included in the MTP), and (C) for any subsequent year, in accordance with the turnaround/catalyst budget of the Acquired Companies to be adopted for such subsequent year (which such turnaround/catalyst budget will not exceed, in the aggregate, 15% of the projection included in the MTP for such subsequent year) (each turnaround/catalyst budget described in clauses (A)-(C), a "Turnaround/Catalyst Budget"); (provided, that, (1) the Acquired Companies may make or authorize turnaround or catalyst expenditures or commitments in excess of any applicable Turnaround/Catalyst Budget so long as such excess expenditures do not result in an expenditure above 120% of the aggregate amount included in the applicable Turnaround/Catalyst Budget and (2) to the extent any turnaround project exceeds the applicable budgeted amount in the applicable Turnaround/Catalyst Budget by more than 20%, the Acquired Companies will provide Buyer with a detailed explanation of such deviation promptly following such approval or expenditure, and provided, further, that, to the extent that the Acquired Companies determine that any turnaround/catalyst project included in the Turnaround/Catalyst Budget for a specific year should instead, in whole or in part, be executed in 2026 or a subsequent year, the inclusion of the remaining expenses with respect thereto in the Turnaround/Catalyst Budget 2026 or such subsequent year, as applicable, will not count towards the variance cap applicable to the Turnaround/Catalyst Budget to be adopted for such subsequent year and will not require the prior written consent of Buyer);

(v)     except as required under any Company Benefit Plan or Company Collective Bargaining Agreement, (A) increase the compensation of ███████████████ ███████████████████ of any Acquired Company (such current and former employees, together, "Senior Management"), or take any action to accelerate the vesting or payment, or fund or in any other way secure the payment of, compensation or benefits under any Contract, Company Benefit Plan or otherwise for or to any current or former director, officer, manager, employee, contractor or consultant of any Acquired Company;

provided that nothing in this Section 6.1(b)(v) shall prohibit (x) providing annual increases to compensation based on merit (with respect to the immediately preceding performance period only), market-based adjustments or tenure in the Ordinary Course and in accordance with standards, policies and practices of the Acquired Companies in place as of the Execution Date and disclosed to the Buyer, or (y) making, in the Ordinary Course and in accordance with standards, policies and practices of the Acquired Companies in place as of the Execution Date and disclosed to the Buyer, annual cash bonus and long term cash incentive grants that (I) do not provide for single trigger vesting upon the Closing and (II) do not provide for full vesting and payout of performance-based components in the case of a qualifying termination of the recipient after the Closing; (B) make, grant or promise any equity or equity-based compensation, severance, change of control, retention, termination or similar compensation or benefits to any current or former director, officer, manager, employee, contractor or consultant of any Acquired Company; provided, that, nothing in this Section 6.1(b)(v) shall prohibit making, granting or promising severance, change of control, retention, termination, or similar compensation or benefits in amounts which are less than $1,000,000 in the aggregate and disclosed to the Buyer; (C) amend, adopt, establish, agree to establish, enter into or terminate any Company Benefit Plan or establish, adopt or enter into any plan, agreement, program, policy, practice, trust or other arrangement that would be a Company Benefit Plan if it were in existence as of the Execution Date for the benefit of any current or former director, officer, manager, employee, contractor or consultant of any Acquired Company; provided that nothing in this Section 6.1(b)(v) shall prohibit (x) amendments to any Company Benefit Plan in the Ordinary Course that do not materially increase the costs to the Acquired Companies of such Company Benefit Plan, or (y) renewals or replacements of any Company Benefit Plan that is a group welfare plan on commercially reasonable terms consistent with past practice no less favorable in the aggregate to the Acquired Companies than the terms of the Company Benefit Plan being renewed or replaced; (D) terminate (other than for "cause" (as determined by the Company consistent with its practices)) any member of Senior Management; or (E) except as required by applicable Law, adopt or enter into any collective bargaining agreement or a similar agreement with any Union, or amend or terminate any Company Collective Bargaining Agreement (and, for the avoidance of doubt, nothing in this Section 6.1(b) shall restrict the Acquired Companies from extending a Company Collective Bargaining Agreement that expires prior to Closing) (provided, that, for the avoidance of doubt, to the extent any action with respect to employees or Company Benefit Plans is not prohibited by this Section 6.1(b)(v), then Section 6.1(b)(xii) will not be deemed to restrict any such action);

(vi)    acquire (x) all or a substantial portion of the capital assets of any other Person (or of any business) or (y) the business of any other Person (in case of clause (x) or (y), whether by merger, consolidation, acquisition of Equity Interests or assets or otherwise), except that the Acquired Companies shall be permitted to make (A) acquisitions pursuant to any Contract in effect on the Execution Date that is made available to the Buyer and listed in Section 6.1(b)(vi) of the Company Disclosure Schedules, (B) acquisitions of assets solely among the Company and wholly owned Company Subsidiaries, or among wholly owned Company Subsidiaries, or (C) acquisitions of assets pursuant to the receivables securitization transaction evidenced by the Receivables Purchase Agreement, dated as of December 18, 2020, among CITGO AR2008 Funding

Company, LLC, CITGO Petroleum, the various purchasers and purchaser agents from time to time party thereto, and Barclays Bank PLC, as program administrator, and the Purchase and Sale Agreement, dated as of December 18, 2020, between CITGO Petroleum and CITGO AR2008 Funding Company, LLC (each as amended and collectively, the "Receivables Securitization Facility"); provided, that any acquisitions included in the capital expenditures permitted under Section 6.1(b)(iii) shall not be subject to the restrictions set forth in this Section 6.1(b)(vi);

(vii)    propose or vote in favor of any action by a Non-Controlled Entity to acquire (x) all or a substantial portion of the capital assets of any other Person (or of any business) or (y) the business of any other Person (whether by merger, consolidation, acquisition of Equity Interests or assets or otherwise), except that the Acquired Companies shall be permitted to vote in favor of acquisitions of capital assets of any other Person or business of any other Person by a Non-Controlled Entity so long as such acquisition would not require additional cash contributions by any Acquired Company to any Non-Controlled Entity in excess of $5,000,000 individually or $10,000,000 in the aggregate for all Non-Controlled Entities;

(viii)    (A) sell, lease, license, encumber (including by the grant of any Preferential Right thereon) (other than by Permitted Liens) or otherwise dispose of any material assets or material property of any Acquired Company (excluding any issuance of any Equity Interest of any Acquired Company addressed in Section 6.1(b)(xv)) or (B) propose or vote in favor of any action by a Non-Controlled Entity to sell, lease, license, encumber (including by the grant of any Preferential Right thereon) (other than by Permitted Liens) or otherwise dispose of any material assets or material property of such Non-Controlled Entity, in each case except (I) pursuant to existing Contracts set forth in Section 6.1(b)(viii) of the Company Disclosure Schedules, (II) sales of inventory to customers in the Ordinary Course, (III) sales of or disposals of obsolete or worthless assets in the Ordinary Course, or (IV) with respect to the immediately preceding clause (A) only, (x) transfers among the Company and wholly owned Company Subsidiaries, or among wholly owned Company Subsidiaries, or (y) dispositions pursuant to the Receivables Securitization Facility;

(ix)    (A) incur any indebtedness for borrowed money or guarantee or assume any indebtedness for borrowed money of another Person (other than (I) borrowings or other advances of capital pursuant to the Receivables Securitization Facility, (II) borrowings that can be repaid at Closing without penalty, or (III) indebtedness for borrowed money incurred in the Ordinary Course that, in the case of this clause (III) does not exceed $50,000,000 in the aggregate) or (B) with respect to any Non-Controlled Entity, propose or vote in favor of such Non-Controlled Entity incurring any indebtedness for borrowed money, guaranteeing or assuming any indebtedness for borrowed money of another Person (other than any Non-Controlled Entity's incurrence of any incremental indebtedness for borrowed money incurred in the Ordinary Course that is not in excess of $10,000,000 in the aggregate (net to the applicable Acquired Company));

(x)    prepay, repay, redeem, repurchase, defease, or cancel any indebtedness for borrow money in excess of $10,000,000, in each case, for cash, other than

37

(A) for transactions among the Acquired Companies, (B) prepayment and repayment of borrowings or advanced capital to the extent required pursuant to the terms of the Receivables Securitization Facility, (C) prepayment and repayment of revolving loans in the Ordinary Course, and (D) any required amortization payments, mandatory prepayments, and repayments at maturity, in each case in accordance with the terms of the instrument governing such indebtedness for borrowed money as in effect on the Execution Date;

(xi)    (A) other than in the Ordinary Course, materially amend, terminate or waive any material right under any Material Contract or any material Vesting Instrument (other than amendments to renew any Material Contract on the same (or better in respect of the applicable Acquired Company) terms and conditions in all material respects as the terms and conditions of such Material Contract as of the Execution Date) or (B) enter into any Contract that would be a Material Contract if in effect as of the Execution Date, other than in the Ordinary Course (including entry into indemnification agreements with directors or officers in substantially the same form as indemnification agreements made available to the Buyer prior to the date hereof), and provided, that, with respect to this Clause (B), such Contracts do not (I) limit in any material respect either the type of business in which any Acquired Company may engage or the manner or locations in which any of them may so engage in any business (including through "non-competition" or "exclusivity" provisions), or (II) grant "most favored nation" or similar status with respect to any material obligations and would run in favor of any Person (other than an Acquired Company); provided, that, for the avoidance of doubt, nothing in this Agreement will limit the ability of CITGO Petroleum to execute guarantees of the Company's payment obligations pursuant to the Contracts disclosed in Section 6.6(a) of the Company Disclosure Schedules or New Indemnification Agreements (such guarantees, collectively, the "CITGO Petroleum Guarantees");

(xii)    except for any such change which is not material or which is required by reason of a concurrent change in GAAP or applicable Law, change any method of financial accounting or financial accounting practice (other than any change for Tax purposes, which shall be governed by Section 6.1(b)(xiv)) used by it;

(xiii)    (A) enter into any joint venture, partnership, participation, profit-sharing or other similar arrangement or (B) make any loans, capital contributions or advances to or investments in any other Person (other than (I) investments in wholly owned Company Subsidiaries, (II) pursuant to capital calls required pursuant to the terms of existing Contracts to the extent disclosed on Section 6.1(b)(xiii) of the Company Disclosure Schedules, or (III) advances for reimbursable employee expenses in the Ordinary Course or advancements of expenses to directors and officers of the Acquired Companies pursuant to bona fide advancement provisions under the Company Charter, Company By-Laws, Organizational Documents of any of the Company Subsidiaries or any indemnification agreement with any such director or officer);

(xiv)    (A) (I) make, revoke or amend any material election relating to Taxes or change any of its Tax accounting period or Tax accounting methods currently in effect, (II) other than in the Ordinary Course, settle any Tax Proceeding, or (III) other than

in the Ordinary Course, file any amended Tax Return, in each case of the foregoing clauses (I), (II) and (III), if such action is reasonably likely to result in an increase to a Tax liability of the Acquired Companies that is material to the Acquired Companies, taken as a whole, or (B) with respect to any Non-Controlled Entity, vote in favor of or propose that such Non-Controlled Entity take any action described in the immediately preceding clause (A); provided, that, for the avoidance of doubt, the foregoing will not prohibit the Acquired Companies from taking any action in good faith as a result of, or to comply with, changes in applicable Tax Laws;

(xv)    authorize, issue, reserve for issuance, pledge, transfer or otherwise encumber, sell or redeem or enter into any Contract providing for any of the foregoing with respect to, any Equity Interests of any of the Acquired Companies or any Equity Interests of any Non-Controlled Entity owned by any Acquired Company (including, in each case, any split, combination, recapitalization or reclassification of any such Equity Interests);

(xvi)    other than as set forth in Section 6.1(b)(xvi) of the Company Disclosure Schedules, declare, set aside, make or pay dividends or similar distributions (whether in cash, stock or property) on or with respect to the Shares or otherwise, other than dividends or similar distributions between or among the Company and the Company Subsidiaries; provided, that, for the avoidance of doubt, nothing in this Agreement will limit the Acquired Companies' ability to satisfy payables to PDVSA described on Section 4.20 of the Company Disclosure Schedules;[5]

(xvii)    (A) commence, initiate, settle, satisfy, release or forgive any claim, demand, lawsuit or other Legal Proceeding (I) in an amount in excess of $15,000,000 in the aggregate or (II) that would impose any non-monetary relief (excluding customary confidentiality obligations) on the Acquired Companies, or (B) with respect to any Non-Controlled Entity, vote in favor of or propose that such Non-Controlled Entity take any action described in the immediately preceding clause (A);

(xviii)    implement or announce any employee layoffs, furloughs, reductions in force, plant closings, reductions in compensation or other similar actions that could implicate the WARN Act; or

(xix)    agree or commit to do any of the foregoing (or, with respect to any of the foregoing restrictions which expressly relates to the Non-Controlled Entities, vote in favor of or propose that any Non-Controlled Entity agree or commit to take any such restricted action).

(c)    Notwithstanding the foregoing, during the Interim Period, the Acquired Companies may (i) utilize any and all available Cash to repay outstanding Debt and (ii) amend, restate, refinance or terminate any outstanding Debt or the Receivables Securitization Facility, or replace such Debt or Receivables Securitization Facility with new Debt (and the related incurrence of any guarantees for such borrowed money and the incurrence of any related liens on its property) including in the form of, but not limited to, a new securitization facility, an asset based loan or

---

[5]    **Note to Buyer**: An updated schedule of payables to PDVSA will be provided in the VDR as a priority.

other revolving credit facility; <u>provided</u>, that any such repayment of outstanding Debt, or amendment, restatement, refinancing, termination, or replacement of outstanding Debt or the Receivables Securitization Facility is determined in good faith by the Company's board of directors to be in the best interest of the Acquired Companies and on terms no worse, in the aggregate, as the existing Debt.

(d)    In the event that the Closing does not occur by the first anniversary of the Execution Date, the dollar amounts in this <u>Section 6.1</u> shall, without further action, increase by an incremental 5% on each anniversary of the Execution Date.

(e)    Notwithstanding anything to the contrary herein, nothing in this Agreement will restrict the Acquired Companies from taking actions to prevent or mitigate the effects of any damage to property or injury to any person or the environment in emergency circumstances, as reasonably determined in good faith by the Acquired Companies, so long as the Acquired Companies (i) use Good Industry Practices with respect to such circumstances and (ii) provide the Buyer with notice of any such actions, as soon as reasonably practicable (and in any event, no later than one (1) Business Day) after such action is taken.

(f)    For the avoidance of doubt, nothing in this Agreement, including the provisions of this <u>Section 6.1</u> or <u>Section 6.3</u>, in any way impairs the right of the Acquired Companies or PDVSA to object to the approval or execution of this Agreement or the approval or consummation of the Transactions, including on appeal, and the taking of any actions in connection therewith.

(g)    Notwithstanding anything in this Agreement to the contrary, to the extent that the Venezuela Parties propose a Competing Proposal which constitutes, or could reasonably be expected to lead to, a Superior Proposal, nothing in this Agreement will prohibit the Venezuela Parties from proposing that the Acquired Companies take actions otherwise prohibited by this <u>Section 6.1</u> or any other provision of this Agreement in connection therewith (including, for the avoidance of doubt, the actions described in <u>Section 6.1(b)(xvi)</u>) and, subject to the termination of this Agreement pursuant to <u>Section 8.1(d)</u> or <u>Section 8.1(g)</u> in connection with the entry into a definitive agreement with respect to such Competing Proposal by the Venezuela Parties, the Acquired Companies committing to take such actions if permitted by applicable Law.

(h)    No later than five (5) Business Days prior to the Closing Date, the Special Master shall cause the Acquired Companies to provide the Buyer with a written statement reflecting the Acquired Companies' estimated Total Hydrocarbon Inventory as of Closing, along with reasonable supporting documentation. For purposes of this Agreement, it shall be deemed not to be Ordinary Course if the Total Hydrocarbon Inventory is less than [●] Bbl.

Section 6.2    <u>Access to Information</u>.

(a)    During the Interim Period, the Special Master shall Cause the Company to provide the Buyer and its Representatives, upon reasonable advance notice and under reasonable circumstances, with reasonable access during normal business hours, to the books and records (including all electronic data related thereto), information, assets, operations and properties of the Acquired Companies; <u>provided</u>, that (i) any such access and activities shall be conducted in a

manner not to unreasonably interfere with the normal operations of the Acquired Companies or their respective business and (ii) without the prior written consent of the Special Master and the Company, which may be withheld for any reason in the sole and absolute discretion of the Special Master or the Company, as applicable, the Buyer and its Representatives shall have no right to perform invasive or subsurface investigations of the properties or facilities of the Acquired Companies. Notwithstanding anything herein to the contrary, no such access or disclosure or cooperation shall be required if doing so could reasonably be expected to (A) result in a waiver of attorney-client privilege, work product doctrine or similar privilege, (B) violate the terms of any Contract to which any Acquired Company is a party, or (C) violate any Law to which any Acquired Company is subject; provided, that the Special Master shall Cause the Company to, to the extent legally permissible and practicable, use commercially reasonable efforts to make appropriate substitute disclosure arrangements, or seek appropriate joint defense agreements, waivers or consents, under circumstances in which the foregoing restrictions of this sentence apply. There may be withheld from the Buyer and its Representatives such portions of documents or information relating to pricing or other matters that are highly sensitive if the exchange of such documents (or portions thereof) or information as determined by the Company's outside counsel would be reasonably likely to result in antitrust difficulties between the Company and the Buyer or any of their respective Affiliates. All requests for such access shall be directed to such Person as the Special Master may designate in writing from time to time (collectively, the "Designated Contacts"). Other than the Designated Contacts, prior to the Closing, without the prior written consent of the Special Master (not to be unreasonably withheld, conditioned or delayed), neither the Buyer, its Affiliates or their respective Representatives shall contact any employee, contractors, supplier, customer, landlord or other material business relationship of any Acquired Company regarding any Acquired Company, their respective businesses or the Transactions except for contacts in the ordinary course of business that are consistent with past practice and wholly-unrelated to the Transactions.

       (b)    Notwithstanding anything in this Agreement to the contrary, in no event will the Acquired Companies be required to provide Buyer or the Special Master with access to any information regarding its objections to the sale process, the negotiation of the Transactions or the Acquired Companies' objection to this Agreement or the approval or the consummation of the Transactions.

       (c)    For a period commencing on the Closing Date and ending on the latest of (x) the date that is twelve (12) months after the Closing Date and (y) the final, non-appealable resolution of a Legal Proceeding relating to or arising from the Sale Order to appeal the sale and purchase of the Shares, the Buyer shall cause the Acquired Companies to use commercially reasonable efforts to maintain all books and records (including all electronic data related thereto) of the Acquired Companies relating to periods ending on or prior to the Closing Date and the Buyer shall cause the Acquired Companies to (i) provide the Special Master and its Representatives during the Company's normal business hours, upon reasonable advance notice and under reasonable circumstances, reasonable access to such books and records and the individuals responsible for preparing and maintaining such books and records, and (ii) permit the Special Master and its Representatives to make copies of any such books and records, in each case of the immediately preceding clause (i) and clause (ii), as reasonably requested in connection with any Legal Proceeding relating to or arising from the Sale Order to appeal the sale and purchase of the Shares (other than any Legal Proceeding between the Special Master, on the one hand, and the

Buyer, on the other hand, related to the Sale Order, this Agreement, the other Transaction Documents or the Transactions, which would be governed by and subject to other applicable provisions of this Agreement and subject to applicable rules relating to discovery and document retention). Notwithstanding anything in this Section 6.2(c) to the contrary, the Buyer and the Acquired Companies shall not be required to provide such access or disclose any information to the Special Master if doing so could reasonably be expected to (A) result in a waiver of attorney-client privilege, work product doctrine or similar privilege (B) violate the terms of any Contract to which any Acquired Company is a party, or (C) violate any Law to which any Acquired Company is subject; provided, that the Parties will, to the extent legally permissible and practicable, use commercially reasonable efforts to make appropriate substitute disclosure arrangements, or seek appropriate joint defense agreements, waivers or consents, under circumstances in which the foregoing restrictions of this sentence apply.

Section 6.3    Regulatory Approvals; Third Party Consents.

(a)    Each of the Parties shall, if required by applicable Law, within thirty (30) calendar days following the date on which the Special Master files a motion with the Court to approve the Sale Order (the "Final Recommendation Date"), file or supply, or in the case of the Special Master cause to be filed or supplied, in connection with the Transactions, all notifications and information required to be filed or supplied pursuant to the HSR Act. Each of the Parties shall request early termination of the waiting period under the HSR Act, if available. The Parties shall (and the Special Master shall Cause the Acquired Companies to), as soon as reasonably practicable following the Final Recommendation Date (and in any event no later than [twenty-five] ([25]) Business Days thereafter), file or supply, or cause to be filed or supplied in connection with the Transactions, all filings and submissions required under any relevant Laws, including Antitrust Laws. The Buyer acknowledges and agrees that it shall pay and shall be solely responsible for the payment of all fees, costs, expenses and other charges in connection with compliance with this Section 6.3 (including filing fees).

(b)    Neither Party shall (i) consent to any voluntary extension of any waiting period; (ii) pull and refile any filing made under the HSR Act, or any other Antitrust Laws; or (iii) consent to any other voluntary delay of the consummation of the Transactions at the behest of any Governmental Body, in each case, without the prior written consent of the other Party, which consent shall not be unreasonably withheld, conditioned or delayed.

(c)    The Parties shall coordinate and cooperate with one another in exchanging and providing such information to each other and in making the filings and requests referred to in Section 6.3(a) and in any other filings required to be submitted to a Governmental Body in connection with the Transactions, including in any filings that may be required to be made after closing. The Parties shall supply such reasonable assistance as may be reasonably requested by the other Party in connection with the foregoing and shall promptly furnish the other Party with all information within its possession that is reasonably required for all filings and submissions required under any relevant Laws, including Antitrust Laws.

(d)    Notwithstanding anything to the contrary in this Agreement, the Buyer shall take, and shall cause its Subsidiaries and Affiliates to take, as promptly as practicable, all action necessary, proper or advisable to consummate the Transactions prior to the Outside Date to (x)

avoid or eliminate each and every impediment, resolve any objection and obtain all consents under any applicable Laws (including Antitrust Laws) as promptly as practicable so as to enable the Parties to consummate the Transactions and (y) avoid the entry or to effect the dissolution of, or vacate or lift, any Order, objection of any Governmental Body or waiting period under applicable Antitrust Laws that would otherwise have the effect of preventing, impairing or delaying the Closing, including: (i) proposing, negotiating and offering to commit and effect, by Order, consent decree, hold separate order, trust, or otherwise, the sale, license, divestiture, disposition or hold separate of such entities, assets, Intellectual Property, businesses, product lines, Equity Interests, properties or services of the Buyer or its Affiliates or Subsidiaries (including, following the Closing, the Acquired Companies); (ii) offering to take or offering to commit to take any action, including any action that limits the Buyer's freedom of action, ownership or control with respect to, or its ability to retain or hold, any of the businesses, assets, product lines, Equity Interests, properties or services of the Buyer or its Subsidiaries or Affiliates (including, following the Closing, the Acquired Companies), to the extent legally permissible, and if the offer is accepted, taking or committing to take such action; (iii) terminating, amending, relinquishing, modifying, waiving or assigning existing relationships, ventures or contractual rights, obligations or other arrangements of the Buyer or its Subsidiaries or Affiliates (including, following the Closing, the Acquired Companies); (iv) changing or modifying, or agreeing not to engage in, any course of conduct regarding future operations; (v) creating any relationships, ventures, contractual rights, obligations or other arrangements of the Buyer or its Subsidiaries or Affiliates (including, following the Closing, the Acquired Companies); (vi) committing to take any such actions in the foregoing clauses (i), (ii), (iii), (iv); or (v) or entering or offering to enter into agreements and stipulating to the entry of an Order or filing appropriate applications with any Governmental Body in connection with any of the actions contemplated by the foregoing clauses (i), (ii), (iii), (iv), or (v); and (vii) opposing, and causing its Subsidiaries and Affiliates to oppose, through and including action on the merits (and all appeals with respect thereto), any action asserted in court or other forum by any Governmental Body or other Person in order to avoid entry of, or to have vacated or terminated, any Order (whether temporary, preliminary or permanent) that would restrain or prevent the Closing by the Outside Date. For the avoidance of doubt, neither the Buyer nor any Subsidiary of the Buyer nor any Acquired Company shall be required to negotiate, agree or commit to, or effect to take or cause to be taken, any structural or behavioral remedy or any other action that is not conditioned (either as a condition precedent or subsequent) upon the consummation of the Transactions.

(e)     In addition and without limiting the other provisions of this Section 6.3, the Buyer shall defend through litigation, appealing, contesting or otherwise resisting any action, proceeding, or Order by any Governmental Body challenging the Transactions under applicable Laws (including Antitrust Laws), including to defend through litigation on the merits any claim asserted in court by any Person in order to avoid entry of, or to have vacated or terminated, any Order (whether temporary, preliminary or permanent) that would delay the Closing or prevent the Closing by the Outside Date; provided, however, that such litigation in no way limits the obligation of the Buyer to take any and all steps necessary to eliminate each and every impediment under any applicable Laws (including Antitrust Laws) to close the Transactions prior to the Outside Date.

(f)     Except as specifically required by the Agreement, the Buyer shall not take, and shall cause its Subsidiaries and Affiliates not to take, any action or refrain from taking any action, the effect of which would be to delay or impede the ability of the Parties to consummate

the Transactions. Without limiting the generality of the foregoing, the Buyer shall not, and shall cause its Subsidiaries and Affiliates not to, acquire or agree to acquire by merging or consolidating with, or by purchasing a substantial portion of the assets of or equity in or otherwise make any investment in, or by any other manner, any Person or portion thereof, or otherwise acquire or agree to acquire or make any investment in any assets, or agree to a commercial or strategic relationship with any person, if the entering into of a definitive agreement relating to or the consummation of such acquisition, merger, consolidation, investment, commercial or strategic relationship would reasonably be expected to (i) impose any delay in the obtaining of, or increase the risk of not obtaining, any consent, approval, authorization, declaration, waiver, license, franchise, permit, certificate or Order of any Governmental Body necessary to consummate the Transactions or the expiration or termination of any applicable waiting period, (ii) increase the risk of any Governmental Body entering an Order prohibiting the consummation of the Transactions, (iii) increase the risk of not being able to remove any such Order on appeal or otherwise, (iv) increase the risk of any Governmental Body asserting jurisdiction over the Transactions or (v) delay the consummation of the Transactions.

(g)    Each Party shall promptly inform the other Party of any material communication from the Federal Trade Commission, the Department of Justice or any other Governmental Body regarding any of the Transactions. Each Party (including its respective Affiliates or Subsidiaries) will provide the other Party with copies (or, if provided orally, a summary) of all substantive correspondence, filings or communications between them or any of their Representatives, on the one hand, and any Governmental Body or members of its staff, on the other hand, with respect to this Agreement and the Transactions; provided, however, that materials may be redacted as necessary to (i) comply with contractual arrangements and (ii) address reasonable attorney-client or other privilege or confidentiality concerns. If any Party or any Affiliate thereof receives a request for additional information or documentary material from any such Governmental Body with respect to the Transactions, then such Party will use its reasonable best efforts to make, or cause to be made, as soon as reasonably practicable and after consultation with the other Party, an appropriate response in compliance with such request. The Buyer will advise the Special Master and the Company promptly in respect of any understandings, undertakings or agreements (oral or written) that the Buyer proposes to make or enter into with the Federal Trade Commission, the Department of Justice or any other Governmental Body in connection with the Transactions, and will use its best efforts to cause the Special Master and the Company to be given the opportunity to attend and participate at any meetings with respect thereto. None of the Buyer, the Special Master or the Company (including their respective Affiliates or Subsidiaries) will agree to participate in any meeting, telephone call or discussion with a Governmental Body in respect of any submissions, filings, investigation (including any settlement of the investigation), litigation or other inquiry relating to the matters that are the subject of this Agreement unless it consults with the other Party in advance and, except as may be prohibited by a Governmental Body or by any Law, and will permit authorized Representatives of the other Parties and the Special Master to be present at each meeting, telephone call or discussion.

Section 6.4    Further Assurances. Subject to, and not in limitation of, Section 6.3, until the Closing or earlier termination of this Agreement, each of the Parties shall (a) execute such documents and perform such further acts as may be reasonably required to carry out the provision hereof and the actions contemplated hereby and (b) use its best efforts to, at the earliest practicable

date, satisfy, or cause the satisfaction of, the condition precedents to the consummation of the Transactions.

Section 6.5    Confidentiality. The Buyer acknowledges that the information provided to them in connection with this Agreement and the Transactions is subject to the terms of the confidentiality agreement between an Affiliate of Buyer and the Special Master dated as of October 27, 2023 (as amended, the "Confidentiality Agreement"), the terms of which are incorporated herein by reference; subject to disclosure permitted in accordance with Section 6.10.

Section 6.6    Indemnification, Exculpation and Insurance.

(a)    From and after the Closing, the Buyer shall, and shall cause each Acquired Company to continue in full force and effect in accordance with their respective terms until the applicable statute of limitations with respect to any claims against such Indemnitees (as defined below), all rights to indemnification, advancement of expenses and exculpation by the Acquired Companies, now existing in favor of each of the Persons who at or prior to the Closing were (i) directors (or equivalent), officers or employees of any Acquired Company or (ii) serving as directors (or equivalent), officers or employees of another entity (including a joint venture) at the request of any Acquired Company (collectively, the "Indemnitees") pursuant to the Organizational Documents of the Acquired Companies in effect on the Execution Date (and to the extent permitted by Section 3, clause fifth of the Certificate of Incorporation of CITGO Petroleum as in effect on the Execution Date) or pursuant to the Contracts disclosed in Section 6.6(a) of the Company Disclosure Schedules in effect as of the Execution Date (as the same may be amended to reflect the CITGO Petroleum Guarantees) or indemnification Contracts entered into during the Interim Period between an Acquired Company, on the one hand, and an Indemnitee first hired or engaged by the Acquired Companies during the Interim Period, on the other hand (which such Contracts will not be materially less favorable to the Acquired Companies than those Contracts disclosed in Section 6.6(a) of the Company Disclosure Schedules) ("New Indemnification Agreements").

(b)    The indemnification and exculpation provisions of the Acquired Companies' Organizational Documents and indemnification Contracts disclosed in Section 6.6(a) of the Company Disclosure Schedules shall not be amended, or otherwise modified in any manner that would adversely affect the rights of the Indemnitees under Section 6.6(a), unless such amendment or modification is required by Law. From and after the Closing, the Buyer agrees to cause the Acquired Companies to maintain in effect in accordance with their respective terms (i) the escrow agreement, dated May 5, 2023, by and among Citgo Petroleum Corporation, Morris James, LLP and JPMorgan Chase Bank, N.A. and (ii) the escrow agreement, dated May 5, 2023, by and among the Company, Morris James, LLP and JPMorgan Chase Bank, N.A., and not to amend the foregoing in any manner that would adversely affect the rights of the applicable Indemnitees thereunder, unless such modification is required by Law.

(c)    Prior to the Closing, the Company may, or, immediately upon the Closing if the Company has not already done so, the Buyer shall cause the Company and the Company Subsidiaries to, purchase the directors' and officers' "tail" or "runoff" insurance program currently available to be purchased under the existing directors' and officers' liability insurance plan covering the Acquired Companies' directors and officers, to the extent such plan remains available as of the Closing on materially the same terms and conditions; provided, that the premium paid for

45

such "tail" policy shall not exceed 350% of the annual premiums paid for the Acquired Companies'
current directors' and officers' liability insurance policy; and provided, further, that to the extent
the premium paid for such "tail" policy exceeds 350% of the annual premiums paid for the
Acquired Companies' current directors' and officers' liability insurance policy, the Buyer shall
maintain a "tail" policy that has the most favorable coverage obtainable for an amount at or below
350% of the annual premiums paid for the Acquired Companies' current directors' and officers'
liability insurance policy. To the extent that such plan is no longer available on materially the same
terms and conditions at the Closing, prior to the Closing, the Buyer shall, or, immediately upon
the Closing, shall cause the Company, to purchase a directors' and officers' liability "tail" or "run-
off" insurance program, selected by the Company prior to the Closing, for a period of six (6) years
after the Closing (such coverage shall have an aggregate coverage limit over the term of such
policy in an amount no less than the aggregate coverage limit under the Company's existing
directors' and officers' liability policy, and in all other respects comparable to such existing
coverage); provided, that the premium paid for such "tail" policy shall not exceed 350% of the
annual premiums paid for the Acquired Companies' current directors' and officers' liability
insurance policy; and provided, further, that to the extent the premium paid for such "tail" policy
exceeds 350% of the annual premiums paid for the Acquired Companies' current directors' and
officers' liability insurance policy, the Buyer shall maintain a "tail" policy that has the most
favorable coverage obtainable for an amount at or below 350% of the annual premiums paid for
the Acquired Companies' current directors' and officers' liability insurance policy.

(d)    The provisions of this Section 6.6 are intended to be for the benefit of, and
shall be enforceable by, each Indemnitee.

(e)    In the event that the Buyer, the Company or any of its successors or assigns
(i) consolidates with or merges into any other Person and is not the continuing or surviving
corporation or entity of such consolidation or merger; or (ii) transfers or conveys all or
substantially all of its properties and assets to any Person, then, and in each such case, proper
provision shall be made so that the successors and assigns of the Buyer and of the Company shall
assume all of the obligations of the Buyer and the Company set forth in this Section 6.6.

Section 6.7    Public Announcements. The Buyer and the Special Master shall not, and the
Special Master shall Cause the Acquired Companies not to, issue any press release or make any
public statement without the prior consent of the other Party, which consent shall not be
unreasonably withheld, conditioned or delayed, except that each of the Buyer and the Special
Master may issue (x) the initial press release announcing the execution of this Agreement that has
been agreed upon by the Buyer and the Special Master, (y) any press release or public
announcement so long as any statements contained therein concerning the Transactions are
consistent with previous releases or announcements made by the applicable Party with respect to
which such Party has complied with the provisions of this Section 6.7, and (z) such other release
or announcement that, upon the advice of outside counsel, is required by Law or the rules and
regulations of any stock exchange upon which the securities of the Buyer, as applicable, or any of
its Affiliates, are listed. For the avoidance of doubt, nothing in this Section 6.7 shall prevent the
Parties from (a) issuing any press release or making any public statement in the Ordinary Course
that does not relate specifically to this Agreement or the Transactions, (b) disclosing this
Agreement or the substance or any relevant details of the Transactions on a confidential basis to
any of its Representatives (provided, that such Representatives have been informed of such party's

46

confidentiality obligations hereunder and under the Confidentiality Agreement or are otherwise obligated to keep such information confidential) or (c) in the case of the Special Master, complying with any reporting obligations of the Court and nothing in this Section 6.7 or in any other provision of this Agreement shall impact the ability of PDVSA or the Acquired Companies to use confidential information in connection with opposing the sale process, this Agreement or the Transactions.

Section 6.8    Employee Matters.

(a)    The Buyer and the Special Master hereby agree that the Closing shall constitute a "Change in Control" for purpose of any employee arrangement and all other Company Benefit Plans, pursuant to the terms of such plans as in effect on the Execution Date (or as adopted or amended to the extent permitted by Section 6.1(b)). No provision of this Section 6.8(a) shall be construed to create a right in any employee or beneficiary of such employee under any Company Benefit Plan that such employee or beneficiary would not otherwise have under the terms of such Company Benefit Plan and, for the avoidance of doubt, no provision of this Section 6.8 will be deemed to supersede the terms of any Company Benefit Plan to the extent such terms are more favorable to Affected Employees than the rights granted hereunder.

(b)    As of the Closing, the Buyer shall, or shall cause the Acquired Companies to, assume the Company Collective Bargaining Agreements and adhere to the obligations thereunder pursuant to the terms therein. Following the Closing, the Buyer or the Acquired Companies will continue to employ the employees who are subject to or covered by the Company Collective Bargaining Agreements and employed by one of the Acquired Companies as of the Closing (the "Union Affected Employees") on the terms therein, including with respect to employee wages and benefits.

(c)    For a period of twelve (12) months following the Closing (or, if shorter, the applicable employee's period of employment with the Buyer or one of the Acquired Companies), the Buyer shall continue to provide (or shall cause the Acquired Companies to provide) to each employee of any of the Acquired Companies as of the Closing who are not subject to or covered by a Company Collective Bargaining Agreement (the "Non-Union Affected Employees," together with the Union Affected Employees, the "Affected Employees"), for so long as each such Non-Union Affected Employee remains employed by the Buyer or any of the Acquired Companies, (i) a base salary or wage rate (as applicable), in each case, that is no less favorable than those provided to such Non-Union Affected Employee immediately prior to the Closing, (ii) short-term and long-term incentive compensation opportunities[ and Responsibility Incentive (as such term is defined in the CITGO Petroleum Corporation 2024 Compensation and Incentive Omnibus Plan for Salaried Employees or its successor)][6], in each case, that are no less favorable in the aggregate than those provided to such Non-Union Affected Employee immediately prior to the Closing, (iii) all other compensation and employee benefits (including any defined benefit pension and post-retirement health and welfare benefits but excluding nonqualified deferred compensation, change in control, transaction, retention, long-term incentive, equity or equity-based compensation or benefits (collectively, the "Excluded Benefits")) that are no less favorable

---

[6]    **Note to Company**: Please provide.

in the aggregate to, either, in Buyer's discretion, those provided to such Non-Union Affected Employee immediately prior to the Closing under the Company Benefit Plans listed under <u>Section 4.11(a)</u> of the Company Disclosure Schedules but excluding the Excluded Benefits, and (iv) severance payments, entitlements and benefits that are no less favorable in the aggregate than those provided to such Non-Union Affected Employee immediately prior to the Closing under the Company Benefit Plans listed under <u>Section 4.11(a)</u> of the Company Disclosure Schedules. Except as required by applicable Law, for the period beginning on the Closing Date and ending on the first anniversary thereof, the Buyer agrees to cause the Acquired Companies to maintain in effect and without reduction retiree health and life insurance benefits for the individuals who are participants in the Acquired Companies' retiree health and life insurance benefits as of immediately prior to the Closing Date and individuals who become eligible to participate in such retiree health and life insurance benefits during the period beginning on the Closing Date and ending on the one year anniversary thereof.

(d)     The Buyer will give (or will cause the Acquired Companies to give) each Affected Employee full credit for purposes of eligibility, vesting and future vacation accrual under any employee benefit plans or arrangements maintained by the Buyer (or any of the Acquired Companies) for such Affected Employee's service with any of the Acquired Companies (and their respective predecessor entities) to the same extent and for the same purposes as such service was recognized by any of the Acquired Companies immediately prior to the Closing under the Company Benefit Plans in which such Affected Employee participated immediately prior to the Closing Date, except that the foregoing shall not apply for purposes of benefit accrual under any defined benefit pension plan, for purposes of any post-retirement or post service health and welfare benefits or for purposes of any Excluded Benefit or to the extent that such credit would result in a duplication of benefits, coverage or compensation for the same period of service.

(e)     For the plan year in which the Closing Date occurs, the Buyer will (or will cause the Acquired Companies to) use commercially reasonably efforts to (i) waive all limitations as to preexisting conditions, exclusions and waiting periods with respect to participation and coverage requirements applicable to each Affected Employee under any welfare benefit plans that such Affected Employee participates in after the Closing to the same extent waived or satisfied under the corresponding Company Benefit Plan in which such, Affected Employee participated immediately prior to the Closing Date, and (ii) provide each Affected Employee with credit for any co-payments and deductibles, paid by such Affected Employee prior to the Closing under the Company Benefit Plans that are group health plans, for purposes of satisfying the corresponding deductible or out-of-pocket requirements under any group health plans that such Affected Employee is eligible to participate in after the Closing. References to "Affected Employee" in this <u>Section 6.8(e)</u> shall also refer to the applicable Affected Employee's eligible dependents.

(f)     Upon the Buyer's request (and at the Buyer's sole cost and expense), the Special Master shall Cause the Company to adopt and maintain an employee retention plan in form and substance as proposed by the Buyer in writing. Any such employee retention plan shall be in addition to, and shall not replace or substitute any existing Company Benefit Plan.

(g)     To the extent any awards under any cash bonus, sales and other incentive plans of the Acquired Companies ("<u>Bonus Amounts</u>") with respect to a performance period completed prior to the Closing remain unpaid as of the Closing Date, the Buyer shall cause such

Bonus Amounts to be calculated and paid in the Ordinary Course to the eligible employees of the Acquired Companies. With respect to Bonus Amounts for the performance period in which the Closing occurs, the Buyer shall cause such Bonus Amounts to be calculated and paid in the Ordinary Course to the eligible employees of the Acquired Companies based on the actual level of Company performance for such performance period. Without limiting in any way any rights an Affected Employee may have under any Company Benefit Plan, if an Affected Employee participating in the CITGO Petroleum Corporation Performance Incentive program for salaried employees (the "Performance Incentive Program") has a qualifying termination of employment entitling the Affected Employee to severance under a severance program, agreement or arrangement of the Buyer or the Acquired Companies and such termination occurs during the period that begins on the Closing Date and ends on the date on which Bonus Amounts under the Performance Incentive Program are paid for the performance period in which the Closing occurs, then such Affected Employee will not lose eligibility, solely due to the termination of employment, for payment of any Bonus Amount under the Performance Incentive Program for performance periods completed prior to the Closing or for the performance period in which the Closing occurs; provided that any such Bonus Amounts shall be paid to such employee at the same time as such awards are paid to other participants in the Performance Incentive Program, and provided, further, that any such Bonus Amount for the performance period in which the termination of employment occurs shall be prorated based on the number of completed months of employment during the performance period prior to the termination of employment.

(h)    The provisions contained in this Section 6.8 shall not (i) be treated as an amendment, termination or other modification of any Company Benefit Plan, Company Collective Bargaining Agreement or any other employee benefit or compensation plan, program, policy, agreement or other arrangement, (ii) limit the right of the Buyer or any Acquired Company to terminate any employee at any time and for any reason (iii) create any third party rights, benefits or remedies of any nature whatsoever in any employee of any Acquired Company (or any beneficiaries or dependents thereof) or any other Person that is not a party to this Agreement or (iv) limit the ability of Buyer or any of its Affiliates from amending, modifying or terminating any Company Benefit Plan or any other benefit or compensation plan, program, policy, agreement or arrangement. The benefits and compensation provided to each Affected Employee following the Closing Date shall be subject to the requirements of applicable Law. Notwithstanding the foregoing, nothing herein will impose on the Buyer or any of the Acquired Companies any obligation to (A) retain any Affected Employee in its or their employ for any amount of time or (B) maintain any terms and conditions of employment other than as expressly set forth above, subject to applicable Law and the Acquired Companies' existing contractual obligations to the respective Affected Employee.

(i)    [From and after the Execution Date, the Buyer will cooperate with and provide all information reasonably requested by the Acquired Companies and their representatives in connection with any notice to be filed by the Acquired Companies with the PBGC pursuant to ERISA Section 4043 and the regulations thereunder as a result of the Transactions or in connection with any related requests for information from the PBGC.][7]

---

[7] **Note to Draft**: Subject to diligence.

Section 6.9    Company's Obligations in Respect of Debt Financing.

(a)    Subject to Section 6.10(b), prior to the Closing, the Special Master shall Cause the Acquired Companies to use commercially reasonable efforts to provide to the Buyer such customary cooperation in connection with Buyer's arrangement of commitments from lenders to fund the Transactions (the "Debt Financing") as is reasonably requested by the Buyer. Such assistance shall include using commercially reasonable efforts to do the following, at the Buyer's sole expense, in connection with the Debt Financing:

(i)    causing the Company's employees with the title of executive vice president or above to participate in a reasonable number of meetings, presentations, sessions with rating agencies or other customary syndication activities;

(ii)    (A) assisting with the preparation of appropriate and customary materials for a rating agency presentation, a bank information memorandum and a lender presentation reasonably required in connection with the Debt Financing and (B) having an officer of the Company execute a customary authorization letter with respect to the bank information memorandum that authorizes distribution of information to prospective lenders;

(iii)    to the extent not prohibited or restricted under applicable Law or any Contract of the Company or its applicable Affiliate, facilitating the pledging of collateral; provided that no pledge shall be effective until the Closing;

(iv)    assisting in the preparation of definitive financing documents, including guarantee and collateral documents and customary closing certificates and other customary documents as reasonably necessary, in each case, not to be effective until the Closing (provided, that, unless specifically provided for in this Section 6.10, in no event will any of the Acquired Companies or their respective Representatives be required to execute or deliver any opinion or certificate in connection with the Financings);

(v)    furnishing the Buyer at least three (3) Business Days prior to the Closing Date with all documentation and other information required by a Governmental Body with respect to the Debt Financing under applicable "know your customer" and anti-money laundering rules and regulations that is reasonably requested by the Buyer at least ten (10) Business Days prior to the Closing Date;

(vi)    cooperate with the Buyer to obtain customary corporate and facilities credit ratings, as reasonably requested by the Buyer, in each case, not to be effective prior to the Closing Date;

(vii)    cooperating with the Buyer to take such corporate or other organizational action, subject to the occurrence of the Closing, as is reasonably necessary to permit the consummation of the Debt Financing (provided, that, unless specifically provided for in this Section 6.10, in no event will any of the Acquired Companies or their respective Representatives be required to execute or deliver any opinion or certificate in connection with the Debt Financing); and

(viii)    using commercially reasonable efforts to facilitate the delivery of the Payoff Letters and the discharge and release documentation at least three (3) Business Days prior to the Closing Date.

(b)    Notwithstanding anything in Section 6.10(a) or this Agreement to the contrary, the cooperation requested by the Buyer pursuant to Section 6.10(a) shall not:

(i)    require the entry by the Special Master or any Acquired Company into any agreement or commitment, or the taking of any action, that would be effective prior to the Closing and that is not contingent on the occurrence of the Closing;

(ii)    unreasonably interfere with the ongoing operations of the Acquired Companies; or

(iii)    include any action that the Special Master or the Company reasonably believes would require any of the Acquired Companies to (A) pay any commitment or other similar fee, (B) have or incur any liability or obligation in connection with the Debt Financing, including under any agreement or any document related to the Debt Financing, (C) take any action that would conflict with, violate or result in a breach of or default under the Company Charter and Company By-Laws or any Organizational Documents of the Company's Affiliates, any Contract, any Transaction Document or any Law, (D) take any action that could subject any director, manager, officer or employee of the Company or any of its Affiliates to any personal liability, (E) provide access to or disclose information that the Company determines in good faith could jeopardize any attorney client privilege of, or conflict with any confidentiality requirements applicable to, the Company or any of its Affiliates, (F) cause any director or manager of the Company or any of its Affiliates to pass resolutions or consents to approve or authorize the execution of the Debt Financing (other than continuing directors or managers), (G) reimburse any expenses or provide any indemnities, (H) make any representation, warranty or certification that, in the good faith determination of the Company, is not true, (I) require the delivery of any financial statements in a form or subject to a standard different than those provided to the Buyer on or prior to the Execution Date, (J) provide any cooperation or information that does not pertain to the Acquired Companies or (K) provide (i) any description of all or any component of the Financings (including any such description to be included in any liquidity or capital resources disclosure or any "description of notes"), (ii) projections, risk factors or other forward-looking statements relating to all or any component of the Financings, or (iii) any solvency certificate or similar certification in connection with the Financings (which items (i) through (iii) shall be the sole responsibility of the Buyer). In no event shall the Special Master be in breach of Section 6.10(a) because of the Company's failure to deliver any financial or other information that is not currently readily prepared in the Ordinary Course at the time requested by the Buyer or to obtain review of any financial or other information by its accountants.

(c)    Notwithstanding anything to the contrary contained herein, it is understood and agreed by the Parties that the failure of the Special Master or the Company to comply with the provisions of this Section 6.10 shall not give rise to a failure of a condition precedent set forth in Section 7.2(b) or a termination right pursuant to Section 8.1(e).

(d)      The Buyer shall promptly reimburse the Acquired Companies, the Special Master, and/or their respective Representatives for all reasonable and documented out-of-pocket costs and expenses incurred by the Acquired Companies, the Special Master, and/or their respective Representatives in connection with the cooperation contemplated by Section 6.10(a), including (i) attorneys' fee and (ii) expenses of the Company's accounting firms engaged to assist in connection with the Debt Financing. The Buyer shall indemnify and hold harmless, the Special Master, Acquired Companies, and their respective Representatives, from and against any and all liabilities or losses suffered or incurred by them in connection with the arrangement of the Debt Financing and any information utilized in connection therewith.

(e)      Any information provided pursuant to this Section 6.10 shall be subject to the Confidentiality Agreement; provided, that the Buyer will be permitted to disclose such information to any Debt Financing Sources or prospective Debt Financing Sources and other financial institutions and investors that are or may become parties to the Debt Financing and to any underwriters, initial purchasers or placement agents in connection with the Debt Financing in connection with the Transactions (and, in each case, to their respective counsel and auditors) so long as such Persons (i) agree to be bound by confidentiality provisions substantially similar to those in the Confidentiality Agreement (and any confidentiality agreements between the Company and its Affiliates) as if parties thereto, or (ii) are subject to other confidentiality undertakings reasonably satisfactory to the Company and of which the Company is a beneficiary.

(f)      Subject to the terms and conditions set forth in this Agreement, the Buyer acknowledges and agrees that neither obtaining the Financings nor any Replacement Financing, by the Buyer nor any cooperation by the Acquired Companies at the direction of the Special Master is a condition to Closing and reaffirms its obligations to consummate the Transactions irrespective and independently of the availability of the Financing or any Replacement Financing, subject to fulfillment or waiver of the conditions set forth in Section 7.1 and Section 7.2.

Section 6.10    Tax Matters.

(a)      All Transfer Taxes shall be paid by the Buyer. The Buyer shall procure any stock transfer stamps required by any Transfer Tax, and timely file, to the extent required by applicable Law, all necessary Tax Returns and other documentation with respect to all such Transfer Taxes and provide to the Special Master upon request evidence of payment of all Transfer Taxes.

(b)      Unless otherwise required pursuant to a "determination" within the meaning of Section 1313(a) of the Code (or any similar provision of state, local or non-U.S. Tax Law) the Parties agree that (i) the Redemption Distribution and the Initial Payment shall be treated as a single integrated transaction, such that PDVSA is treated as surrendering a portion of its Shares in the Redemption Distribution in a transaction qualifying for sale or exchange treatment under Section 302(b) of the Code in accordance with Zenz v. Quinlivan, 213 F.2d 914 (6th Cir. 1954) and (ii) the payments of the Closing Consideration shall be treated as paid to PDVSA and immediately remitted by PDVSA to the applicable recipients in accordance with the Funds Flow Memorandum.

Section 6.11    R&W Insurance Policy. In the event the Buyer or any of its Affiliates obtains a representations and warranties insurance policy in respect of the representations and warranties contained in this Agreement or in any certificate or other instrument contemplated by or delivered in connection with this Agreement (such policy, a "R&W Insurance Policy"), (a) all premiums, underwriting fees, brokers' commissions and other costs and expenses related to such R&W Insurance Policy shall be borne solely by the Buyer or such Affiliate, (b) such R&W Insurance Policy shall not provide for any "seller retention" (as such phrase is commonly used in the representations and warranties insurance policy industry) and (c) such R&W Insurance Policy shall expressly waive any claims of subrogation against the Special Master and any Acquired Company (other than, solely in the case of an Acquired Company, in connection with Fraud of any Acquired Company). The Special Master shall, and shall Cause the Company to, use commercially reasonable efforts to cooperate with the Buyer's efforts, as applicable, and provide assistance as reasonably requested by the Buyer to obtain and bind the R&W Insurance Policy and to maintain its effectiveness through the Closing.

Section 6.12    Notices of Certain Events.

(a)    During the Interim Period, the Special Master shall, and shall Cause the Company to notify the Buyer, and the Buyer shall promptly notify the Special Master, of:

(i)    any written notice or other written communication from any Person alleging that the consent of such Person is or may be required in connection with the Transactions;

(ii)    any notice or other written communication from any Governmental Body in connection with the Transactions;

(iii)    any actions, suits, claims, investigations or proceedings (A) commenced or (B) to the Knowledge of the Buyer or to the Knowledge of the Special Master, as applicable, threatened against, relating to or involving or otherwise affecting such Party or any of its Subsidiaries which relate to the consummation of the Transactions (excluding any appeals or other oppositions by the Acquired Companies or PDVSA); and

(iv)    any item or information referred to in, or received by the Special Master pursuant to, Section 6.13(b);

provided, that any failure to comply with this Section 6.13(a) shall not constitute the failure of any condition set forth in Article VII to be satisfied; provided, further, that no such notification (and no other notification required to be given under any other Section of this Agreement) shall affect the representations, warranties, covenants or agreements of the Parties or the conditions to the obligations of the Parties under this Agreement.

(b)    During the Interim Period, in order to enable the Special Master and his Representatives to satisfy the obligations of the Special Master in this Agreement, the Special Master may Cause the Company and its Subsidiaries to, upon request by the Special Master, promptly provide to the Special Master:

(i)    access to the books and records (including all electronic data related thereto), information, assets, operations and properties of the Acquired Companies;

(ii)    contact information for any vendors, customers and manufacturers and others with whom the Company does business;

(iii)    the status of the Acquired Companies' business and financial condition; and

(iv)    access to consult with the Acquired Companies' officers and employees, who shall make themselves reasonably available for such consultation.

(c)    During the Interim Period, in order to enable the Special Master and his Representatives to satisfy the obligations of the Special Master in this Agreement, the Special Master may Cause the Company and its Subsidiaries to immediately provide to the Special Master (upon any of the following being received by or made available to the Company or any of its Subsidiaries):

(i)    copies of any written notice or other written communication from any Person alleging that the consent of such Person is or may be required in connection with the Transactions;

(ii)    copies of any notice or other written communication from any Governmental Body in connection with the Transactions;

(iii)    documentation relating to any Legal Proceeding (A) commenced or (B) to the Knowledge of the Company or the Knowledge of the Buyer, as applicable, threatened against, relating to or involving or otherwise affecting such Party or any of its Subsidiaries which relate to the consummation of the Transactions;

(iv)    notice of (A) the occurrence, or failure to occur, of any event which occurrence or failure would reasonably be likely to cause a breach of any representation or warranty made by such Party in this Agreement being untrue or inaccurate or (B) any failure of a Party to comply with or satisfy any covenant, condition or agreement to be complied with or satisfied by it pursuant to this Agreement, in each case that would reasonably be expected to result in any condition set forth in Article VII not to be satisfied; and

(v)    notice of any circumstance or occurrence that has had or would reasonably be expected to have a Company Material Adverse Effect.

Section 6.13    No Control of Other Party's Business. Without in any way limiting any Party's rights or obligations under this Agreement, the Parties acknowledge and agree that the restrictions set forth in this Agreement are not intended to give the Buyer, directly or indirectly, the right to control or direct the Acquired Companies' operations prior to the Closing Date. Prior to the Closing Date, each of the Company and the Buyer shall exercise, consistent with the terms and conditions of this Agreement, complete control and supervision over its respective operations.

Section 6.14    <u>OFAC</u>. The Buyer has prior to the date hereof made certain filings with OFAC, including submission of the OFAC License Application. The Buyer shall use commercially reasonable efforts to (a) keep the Special Master regularly informed of the processing of the OFAC License Application and any other filings or contacts with OFAC or other Governmental Body in relation to the Transaction and(b) fully cooperate with and furnish to the Special Master available information and assistance as reasonably may be requested by the Special Master in connection with any communications that the Special Master may have with OFAC or other Governmental Body in relation to the Transaction.

Section 6.15    <u>Bidder Protections and Competing Proposals</u>.

(a)    This Agreement is subject to approval by the Court and the consideration by the Special Master of higher or better competing bids in respect of the Shares, as determined in accordance with the Evaluation Criteria set by the January Order and the Sale Procedures Order. From the date of this Agreement and until the commencement of the No-Shop Period, the Special Master is permitted to, and to cause its financial and legal advisors to, initiate contact with, solicit or encourage submission of any Competing Proposal. For the avoidance of doubt, the Buyer acknowledges that following the date of this Agreement, throughout the Topping Period and until the commencement of the No-Shop Period, the Special Master is expected to, and intends to, (i) engage with prospective purchasers of the Shares, (ii) evaluate any Competing Proposals received during the Topping Period and (iii) compare any such Competing Proposals to the Buyer's proposal to purchase the Shares. In addition, the Special Master shall have the responsibility and obligation to respond to any Competing Proposal and perform any and all other acts related thereto which are required under the Sale Procedures Order, the January Order or other applicable Law, including supplying information relating to the Acquired Companies to prospective purchasers of the Shares, as promptly as practicable following the conclusion of the Topping Period, but in no event later than five (5) Business Days following the conclusion of the Topping Period, the Special Master shall notify the Buyer if the Special Master has received a Competing Proposal that the Special Master has determined in good faith constitutes a Superior Proposal.

(b)    During the No-Shop Period, the Special Master shall not, directly or indirectly, solicit, initiate, knowingly encourage or knowingly facilitate any proposal or offer that constitutes, or would reasonably be expected to lead to, a Competing Proposal.

(c)    Notwithstanding anything to the contrary set forth above, in the event that following the end of the Topping Period but prior to the Court's hearing to consider the Special Master's motion to approve the Sale Order (the "<u>Sale Hearing</u>") the Special Master receives an unsolicited Competing Proposal, he shall inform the Court and the Buyer of the receipt of such unsolicited Competing Proposal and, if approved by the Court (<u>provided</u>, <u>that</u>, in connection with seeking such approval, if requested by the Person making such unsolicited Competing Proposal, the Special Master shall request that the Court not make public the identity of the Person making such unsolicited Competing Proposal), may engage with the Person submitting such Competing Proposal.

(d)    Notwithstanding anything to the contrary set forth in this Agreement, if the Special Master has determined in good faith that a Competing Proposal made after the Commencement Date but prior to the No-Shop Period constitutes a Superior Proposal, the Special

Master may, at any time after the Commencement Date but prior to the No-Shop Period, subject to (i) compliance with this <u>Section 6.16(d)</u>, (ii) the Person making such Superior Proposal agreeing to pay to Buyer the Termination Fee (to the extent that the bid reflected in this Agreement is designated by the Court as the stalking horse bid (in such case, this Agreement constituting the "<u>Stalking Horse Bid Agreement</u>")) or the Expense Reimbursement Amount (to the extent that the bid reflected in this Agreement is designated by the Court as a base bid (in such case, this Agreement constituting the "<u>Base Bid Agreement</u>")) in accordance with <u>Section 8.3(a)</u> to the extent the transaction contemplated by the Superior Proposal is consummated, and (iii) the Person making such Superior Proposal depositing an amount equal to the Deposit Amount with the Escrow Agent, terminate this Agreement in accordance with <u>Section 8.1(d)(i)</u> in order to enter into a definitive agreement relating to such Superior Proposal (a "<u>Superior Proposal Agreement</u>").

(e)    Notwithstanding anything to the contrary set forth in this Agreement, if the Special Master has determined in good faith that an unsolicited Competing Proposal made following the end of the Topping Period but prior to the Sale Hearing (any such unsolicited Competing Proposal, an "<u>Unsolicited Competing Proposal</u>") constitutes a Superior Proposal, the Special Master may, at any time during the No-Shop Period but prior to the Sale Hearing, subject to (i) approval by the Court of such Unsolicited Competing Proposal in accordance with <u>Section 6.16(c)</u> and <u>Section 8.1(d)(ii)</u>, (ii) compliance with this <u>Section 6.16(e)</u>, (iii) the Person making such Superior Proposal agreeing to pay (x) to Buyer the Termination Fee (in the event this Agreement constitutes the Stalking Horse Bid Agreement) or the Expense Reimbursement Amount (in the event this Agreement constitutes the Base Bid Agreement) in accordance with <u>Section 8.3(a)</u> to the extent the transaction contemplated by the Unsolicited Competing Proposal is consummated and (y) if applicable, to the buyer party to the Superior Proposal Agreement the Expense Reimbursement Amount in accordance with <u>Section 8.3(e)</u>, in each case, to the extent the transaction contemplated by the Unsolicited Competing Proposal is consummated, and (iv) the Person making such Superior Proposal depositing an amount equal to the Deposit Amount with the Escrow Agent, terminate this Agreement in accordance with <u>Section 8.1(d)(ii)</u> (or, if this Agreement has already been terminated in accordance with <u>Section 8.1(d)(i)</u>, terminate the Superior Proposal Agreement) in order to enter into a definitive agreement providing for such Superior Proposal (the "<u>Unsolicited Competing Proposal Agreement</u>"); <u>provided</u>, that prior to so terminating this Agreement, (A) the Special Master has given the Buyer at least three (3) Business Days' prior written notice of its intention to take such action, which notice shall include a description of the material terms and conditions of such Superior Proposal and a copy of any proposed Unsolicited Competing Proposal Agreement, (B) at the end of such notice period, the Special Master shall have considered in good faith any revisions to the terms of this Agreement proposed in writing by the Buyer, and shall have determined that such Superior Proposal would continue to constitute a Superior Proposal if such revisions proposed by the Buyer were to be given effect, and (C) in the event of any material change to the terms of such Superior Proposal, the Special Master shall, in each case, have delivered to the Buyer an additional notice consistent with that described in clause (A) of this proviso and a new notice period under clause (A) of this proviso shall commence during which time the Special Master shall be required to comply with the requirements of this <u>Section 6.16(e)</u> anew with respect to such additional notice, including clauses (A), (B) and this clause (C) of this proviso (except that the reference to "three (3) Business Days" in clause (A) of this proviso shall be replaced with "two (2) Business Days").

(f)　　The Special Master and the Buyer acknowledge that this Agreement and the Transactions are subject to the Sale Procedures Order and the Sale Order Entry. In the event of any conflict between this Agreement and the Sale Procedures Order or the Sale Order, the Sale Procedures Order or the Sale Order, as applicable, shall govern. The Special Master and the Buyer shall comply with the Sale Procedures Order and the Sale Order.

(g)　　For purposes of this Agreement:

(i)　　"Competing Proposal" means any bona fide proposal or offer made by any Person or group of related Persons (other than the Buyer and its Affiliates and, in the case of an Unsolicited Competing Proposal, excluding the buyer under the Superior Proposal Agreement or any Affiliates thereof) (A) to purchase or otherwise acquire, directly or indirectly, in one transaction or a series of transactions, pursuant to a merger, consolidation or other business combination, sale of shares of capital stock, sale of assets or similar transaction (1) beneficial ownership (as defined under Section 13(d) of the Exchange Act), of more than twenty percent (20%) of any class of equity securities of the Company or (2) any one or more assets or businesses of the Acquired Companies that constitute more than twenty percent (20%) of the consolidated assets of the Acquired Companies (based on the fair market value thereof), (B) to effect any other transaction pursuant to which any other alternative to the Transactions would be consummated, or (C) relating to any reorganization, recapitalization, license, joint venture, partnership, liquidation, dissolution or other similar transaction involving any one or more assets or businesses of the Acquired Companies that constitute more than twenty percent (20%) of the consolidated assets of the Acquired Companies (based on the fair market value thereof); provided, that (i) any Competing Proposal must satisfy an overbid minimum above the Purchase Price equal to or in excess of the Termination Fee (to the extent this Agreement constitutes the Stalking Horse Bid Agreement) or the Expense Reimbursement Amount (to the extent this Agreement constitutes the Base Bid Agreement) *plus* $25,000,000 and (ii) any increase in such Competing Proposal must satisfy an overbid minimum equal to or in excess of $50,000,000 (the "Subsequent Overbid Minimum"); provided, further, that the Special Master may, in his sole discretion, lower the Subsequent Overbid Minimum for any Competing Proposal.

(ii)　　"Superior Proposal" means a Competing Proposal made by a Person or group of related Persons (other than the Buyer and its Affiliates and, in the case of an Unsolicited Competing Proposal, excluding the buyer under the Superior Proposal Agreement or any Affiliates thereof) on terms that the Special Master determines in good faith, after consultation with the Special Master's financial and legal advisors and the Sale Process Parties, would constitute a higher or better bid for the Shares based upon the Evaluation Criteria.

(h)　　For the avoidance of doubt, notwithstanding anything to the contrary contained herein, the Special Master may, at any time after the conclusion of the Topping Period but prior to the Final Recommendation Date, after consultation with the Sale Process Parties (as defined in the Sale Procedures Order), propose to the Court that the sale process proceed to a multi-day live auction to determine the Successful Bidder for the sale of the Shares.

(i)      The Buyer acknowledges that nothing hereunder limits any Venezuela Party from proposing or negotiating any alternative transaction or series of transactions, and the Venezuela Parties (as defined in the Sale Procedures Order) will not at any time be prevented from making a Competing Proposal.

Section 6.16    Section 280G. No later than ten (10) days following the Execution Date, the Special Master shall Cause the Company to deliver to the Buyer a Code Section 280G analysis (with respect to all disqualified individuals as reasonably determined by the Company, without redactions and including all back-up assumptions and calculations) and the Special Master shall Cause the Company to confer with the Buyer in good faith regarding such analysis. The Special Master shall Cause the Company to, and the Buyer will, cooperate in good faith with respect to all matters related to Code Section 280G. Not later than ten (10) days prior to the Closing Date, the Special Master shall cause the Company to deliver an updated Code Section 280G analysis (with respect to all disqualified individuals as reasonably determined by the Company, without redactions and including all back-up assumptions and calculations) and the Special Master shall Cause the Company to confer with the Buyer in good faith regarding such updated analysis. The Special Master shall Cause the Company to, and the Buyer will, cooperate in good faith with respect to all matters relating to Code Section 280G.

Section 6.17    Financial Statements. During the Interim Period, the Special Master shall Cause the Acquired Companies to furnish to the Buyer:

(a)      within ninety (90) days after the end of each fiscal year commencing with the fiscal year ending December 31, 2024, a consolidated balance sheet and related statements income and cash flow showing the financial position of the Acquired Companies as of the close of such fiscal year and the consolidated results of its operations during such fiscal year and setting forth in comparative form the corresponding figures for the prior fiscal year, which consolidated balance sheet and related statements of income and cash flow shall be audited by independent public accountants and accompanied by an opinion of such accountants (which shall not be qualified as to scope of audit) to the effect that such consolidated financial statements fairly present, in all material respects, the financial position and results of operations of the Acquired Companies on a consolidated basis in accordance with GAAP;

(b)      within forty five (45) days after the end of each fiscal quarter, except for the fourth fiscal quarter, (i) a balance sheet showing the consolidated financial position of the Acquired Companies as of the last day of such fiscal quarter and (ii) statements of income and cash flows showing the consolidated results of operations of the Acquired Companies for such fiscal quarter and the then-elapsed portion of the fiscal year and setting forth in comparative form the corresponding figures for the corresponding periods of the prior fiscal year. The consolidated balance sheet and related statements of operations and cash flows shall fairly present, in all material respects, the financial position and results of operations of the Acquired Companies on a consolidated basis in accordance with GAAP (subject to normal quarter-end review adjustments and the absence of footnotes); and

(c)      within thirty (30) days after the end of each fiscal month (other than months that include the end of any fiscal quarter), (i) a financial summary of the month's operations by business units in the form set forth on Section 6.22(c) of the Company Disclosure Schedules and

(ii) such other financial reports and operational reports as are prepared by the Acquired Companies on a monthly basis, consistent with the monthly reports provided to the Buyer prior to the date hereof.

      Section 6.18    <u>Observation Committee</u>.

      (a)    As of the Execution Date, there is hereby established a committee (the "<u>Observation Committee</u>") for the purposes of (i) providing oversight and collaborative support during the Interim Period with respect to the Acquired Companies' operations and asset maintenance, (ii) evaluating and monitoring the Acquired Companies' commercial activities, infrastructure, systems, and long-term projects and (iii) ensuring the safety of the workforce, community and the environment during the Interim Period (the "<u>Committee Mandate</u>"). The Observation Committee shall be comprised of the Special Master (or a representative thereof) and three (3) representatives from each of the Buyer and the Company (provided, that the Special Master shall designate the three (3) representatives of the Company). The initial representatives from the Buyer and the Company are set forth on <u>Schedule 6.18(a)</u> of the Company Disclosure Schedules. The Buyer and the Special Master agree that the members of the Observation Committee shall be individuals with professional experience and technical expertise in refinery operations or related commercial activities, in each case, at the Vice President level (or directly reporting to the Vice President level). The Special Master (with respect to representatives of the Company) and the Buyer may replace their respective representatives on the Observation Committee upon written notice to the other Party. For the avoidance of doubt, the Observation Committee shall not have any decision-making authority or control over the operations of the Acquired Companies.

      (b)    On a monthly basis during the Interim Period commencing on [●], 2025, members of the Observation Committee shall meet (and the Special Master shall Cause the Company to cause its representatives to attend and participate in good faith in such meetings) in person for the purpose of reviewing the Company's budget, MTP, and rolling three month plan in effect at such time and discussing the planning, progress and results of matters specified in such budget, MTP, and rolling three month plan (including the components of each), the matters specified in the Committee Mandate, and such other matters as are consistent with the Committee Mandate and specified in reasonable detail by any member of the Observation Committee in a written notice (email being acceptable) to the other Observation Committee members not less than one Business Day prior to any such meeting. The Special Master shall Cause the Company to cause such other employees of the Acquired Companies to participate in any meeting of the Observation Committee as may reasonably be requested by the Buyer from time to time (it being agreed that any such request by the Buyer shall be reasonable if the scope of responsibility and expertise of such other employee are relevant to the Committee Mandate).

      (c)    With respect to each of the projects set <u>Schedule 6.18(c)</u> of the Company Disclosure Schedules, the Committee Mandate shall be deemed to expressly include the oversight of such project's timing and execution and expenditures by the Acquired Companies in connection therewith, and upon the request of any member of the Observation Committee, the Observation Committee shall be granted (and the Special Master shall Cause the Acquired Companies to grant to the Observation Committee) physical access to visit the applicable project site in connection

with the Committee Mandate (such visits not to exceed one visit per calendar month for each applicable project site).

## ARTICLE VII
## CONDITIONS TO CLOSING

Section 7.1    <u>Conditions Precedent to Obligations of the Parties</u>. The respective obligations of each of the Parties to consummate the Transactions are subject to the satisfaction, on or prior to the Closing, of each of the following conditions:

(a)    there shall not be in effect any Law or Order by a Governmental Body of competent jurisdiction restraining, enjoining or otherwise prohibiting the consummation of the Transactions;

(b)    the Sale Order Entry shall have occurred and the Sale Order shall remain valid and enforceable and no stay pursuant to Rule 8 of the Federal Rules of Appellate Procedure or Rule 62 of the Federal Rules of Civil Procedure shall have been granted;

(c)    the OFAC License shall have been obtained;

(d)    the waiting period applicable to the Transactions under the HSR Act (and any extensions thereof, including expiration of any voluntary timing agreement) shall have expired or early termination shall have been granted; and

(e)    [the approvals, clearances or expirations of waiting periods set forth in <u>Section 7.1(e)</u> of the Company Disclosure Schedules shall have been obtained.][8]

Section 7.2    <u>Conditions Precedent to Obligations of the Buyer</u>. The obligations of the Buyer to consummate the Transactions are subject to the satisfaction, on or prior to the Closing, of each of the following conditions (any or all of which may be waived by the Buyer in whole or in part to the extent permitted by applicable Law):

(a)    the Company Fundamental Representations shall be true and correct in all material respects (without giving effect to any "materiality", "Company Material Adverse Effect" or similar qualifiers contained in any of such representations and warranties) as of the Closing as if made on and as of the Closing (except to the extent that any such Company Fundamental Representation, by its terms, is expressly limited to a specific date, in which case, as of such specific date);

(b)    the Special Master shall have performed and complied in all material respects with all obligations and agreements required by this Agreement to be performed or complied with by him on or prior to the Closing;

---

[8]    **Note to Bidder**: Pending confirmation of any foreign filings.

(c)    since the Execution Date there shall not have occurred and be continuing any effect, change, event or occurrence that, individually or in the aggregate, has had or would reasonably be expected to have a Company Material Adverse Effect; and

(d)    the Sale Order shall be in full force and effect in all respects and not subject to any stay.

Section 7.3    Conditions Precedent to Obligations of the Special Master. The obligations of the Special Master to consummate the Transactions are subject to the satisfaction, on or prior to the Closing, of each of the following conditions (any or all of which may be waived by the Special Master in whole or in part to the extent permitted by applicable law):

(a)    the representations and warranties of the Buyer set forth in Article V shall be true and correct (without giving effect to any "materiality", "material adverse effect", or similar qualifiers contained in any of such representations and warranties) as of the Closing as if made on and as of the Closing (except to the extent that any such representation or warranty, by its terms, is expressly limited to a specific date, in which case, as of such specific date), except for where the failure of such representations and warranties to be so true and correct would not (i) have a material adverse effect on the ability of the Buyer to perform its obligations under this Agreement or (ii) otherwise prevent, hinder, or delay the consummation of the Transactions; and

(b)    the Buyer shall have performed and complied in all material respects with all obligations and agreements required by this Agreement to be performed or complied with by the Buyer on or prior to the Closing.

Section 7.4    Frustration of Closing Conditions. Neither the Special Master, nor the Buyer may rely, either as a basis for not consummating the Transactions or for terminating this Agreement and abandoning the Transactions, on the failure of any condition set forth in Section 7.1, Section 7.2, or Section 7.3, as the case may be, to be satisfied if such failure was caused principally by any material breach of a covenant, agreement, representation, or warranty of this Agreement by such Party.

## ARTICLE VIII
## TERMINATION

Section 8.1    Termination. This Agreement may be terminated at any time prior to the Closing (notwithstanding the Sale Order Entry, except as otherwise specified below) as follows:

(a)    by mutual written consent of the Special Master (which consent shall be subject to approval of the Court) and the Buyer;

(b)    by the Special Master or the Buyer, by written notice to the other Party, if: the Closing has not occurred prior to the date that is twelve (12) months after the Execution Date (such date, the "Initial Outside Date" and, as may be automatically extended pursuant to this Section 8.1(b), the "Outside Date"); provided, that if the Closing has not occurred by the Outside Date due to the nonsatisfaction of any of the conditions set forth in Section 7.1(c) (OFAC License), Section 7.1(d) (HSR Act), Section 7.1(e) (Other Antitrust Approvals) or Section 7.2(b) (Sale Order), then the Outside Date shall be extended automatically for up to two (2) consecutive periods

of ninety (90) calendar days each (and in no event shall the Outside Date extend beyond the date that is one hundred eighty (180) calendar days after the Initial Outside Date); provided, that notwithstanding the foregoing, the right to terminate this Agreement pursuant this Section 8.1(b) shall not be available to any Party whose failure to fulfill any obligation under this Agreement has principally caused or resulted in the failure of the Closing to occur on or before the Outside Date;

(c)    by the Special Master or the Buyer, by written notice to the other Party, if: there shall be any Law that makes consummation of the Transactions illegal or otherwise prohibited or if any Order enjoining the Buyer, the Special Master or the Company from consummating the Transactions is entered and such Order shall become final and non-appealable (any such Law, Order, a "Legal Restraint"); provided that the right to terminate this Agreement under this Section 8.1(c) shall not be available to any Party whose failure to fulfill any obligation under Section 6.3 hereof has principally caused or resulted in the imposition of such Legal Restraint or the failure of such Legal Restraint to be resisted, resolved or lifted;

(d)    by the Special Master, (i) at any time after the Commencement Date and prior to the commencement of the No-Shop Period in order to enter into a Superior Proposal Agreement pursuant to Section 6.16(d) or (ii) subject to approval of the Court, at any time during the No-Shop Period but prior to the Sale Hearing in order to enter into an Unsolicited Competing Proposal Agreement pursuant to Section 6.16(e);

(e)    by the Buyer, by written notice to the Special Master, if there shall have been a breach by the Special Master of any of its representations, warranties, covenants or agreements contained in this Agreement, which breach would result in the failure to satisfy one or more of the conditions set forth in Section 7.2(a) or Section 7.2(b), and in any such case such breach shall be incapable of being cured or, if capable of being cured, shall not have been cured prior to the earlier of (i) forty-five (45) calendar days after providing written notice of such breach to the Special Master and (ii) the Outside Date; provided, that the Buyer shall not have the right to terminate this Agreement pursuant to this Section 8.1(e) if the Buyer is then in breach of this Agreement and such breach would result in the failure of any of the conditions set forth in Section 7.1 or Section 7.3;

(f)    by the Special Master (subject to approval of the Court), by written notice to the Buyer, if there shall have been a breach by the Buyer of any of its representations, warranties, covenants or agreements contained in this Agreement, which breach would result in the failure to satisfy one or more of the conditions set forth in Section 7.3(a) or Section 7.3(b), and in any such case such breach shall be incapable of being cured or, if capable of being cured, shall not have been cured prior to the earlier of (i) forty-five (45) calendar days after providing written notice of such breach to the Buyer and (ii) the Outside Date; provided, that the Special Master shall not have the right to terminate this Agreement pursuant to this Section 8.1(f) if the Special Master is then in breach of this Agreement and such breach would result in the failure of any of the conditions set forth in Section 7.1 or Section 7.2;

(g)    by the Special Master, after being ordered to terminate this Agreement by the Court, as a result of one or more of the Venezuela Parties (as defined in the Sale Procedures Order) proposing an alternative to the Transactions and such alternative is approved by the Court; or

(h)    by Buyer, by written notice to the Special Master, if there shall have occurred a Company Material Adverse Effect.

Section 8.2    Effect of Termination. In the event that this Agreement is validly terminated in accordance with Section 8.1, this Agreement shall immediately become null and void and the Parties shall be relieved of their duties and obligations arising under this Agreement after the date of such termination and such termination shall be without liability to the Buyer, the Special Master or the Acquired Companies; provided, that the Confidentiality Agreement and the provisions of Section 3.3, this Section 8.2, Section 8.3 and Article IX hereof shall survive any such termination and remain valid and binding obligations of each of the Parties.

Section 8.3    Termination Fee and Expense Reimbursement.

(a)    To the extent this Agreement constitutes a Stalking Horse Bid Agreement, in consideration for the Buyer having expended considerable time and expense in connection with this Agreement and the Transactions, if this Agreement is terminated by the Special Master pursuant to Section 8.1(d)(i) or Section 8.1(d)(ii), and the transaction contemplated by the Superior Proposal are consummated, then the Special Master shall cause the acquiring party to the Superior Proposal Agreement or the Unsolicited Competing Proposal Agreement, as applicable (the "Superior Proposal Acquiror"), in accordance with the terms hereof and the January Order, to pay an amount equal to the Termination Fee, by wire transfer of immediately available funds to the Buyer on the closing date of the consummation of the transactions provided in such Superior Proposal Agreement or Unsolicited Competing Proposal Agreement, as applicable; provided, however, that the Special Master shall have no obligation to cause the Superior Proposal Acquiror to pay such Termination Fee to the Buyer if (i) the Superior Proposal Agreement or the Unsolicited Competing Proposal Agreement, as applicable, is not approved by the Court, (ii) the Buyer subsequently becomes the Successful Bidder (as defined in the Sale Procedures Order) or (iii) the transaction contemplated by the Superior Proposal Agreement or the Unsolicited Competing Proposal Agreement, as applicable, are for any other reason not consummated.

(b)    To the extent this Agreement constitutes Base Bid Agreement, in consideration for the Buyer having expended considerable time and expense in connection with this Agreement and the Transactions, if this Agreement is terminated by the Special Master pursuant to Section 8.1(d)(i) or Section 8.1(d)(ii), and the transaction contemplated by the Superior Proposal are consummated, then the Special Master shall cause the Superior Proposal Acquiror, in accordance with the terms hereof and the January Order, to pay an amount equal to the Expense Reimbursement Amount by wire transfer of immediately available funds to the Buyer on the closing date of the consummation of the transactions provided in such Superior Proposal Agreement or the Unsolicited Competing Proposal Agreement, as applicable; provided, however, that the Special Master shall have no obligation to cause the Superior Proposal Acquiror to pay such Expense Reimbursement Amount to the Buyer if (i) the Superior Proposal Agreement or the Unsolicited Competing Proposal Agreement, as applicable, is not approved by the Court, (ii) the Buyer subsequently becomes the Successful Bidder (as defined in the Sale Procedures Order) or (iii) the transaction contemplated by the Superior Proposal Agreement or the Unsolicited Competing Proposal Agreement, as applicable, are for any other reason not consummated.

(c)    To the extent the bid reflected in this Agreement constitutes the Successful Bid (as defined in the Sale Procedures Order), if, following the Sale Order Entry, this Agreement is terminated by the Buyer pursuant to Section 8.1(b) (solely to the extent such termination arises from the nonsatisfaction of the condition set forth in Section 7.1(c) (OFAC License) for any reason not related to the identity of the Buyer) or Section 8.1(e) (solely to the extent such termination, and the failure to satisfy one or more conditions set forth in Section 7.2, arises from either (i) the Special Master's breach of the covenants contained in Section 6.1 or (ii) the occurrence of a Company Material Adverse Effect), then, pursuant to the bidder protections set forth in the January Order, the Buyer shall be deemed to hold a claim equal to the Expense Reimbursement Amount as a priority claim over the judgments held by Crystallex, ConocoPhillips and the Additional Judgment Creditors as set forth in the Priority Order [D.I. 996], dated March 1, 2024, in the Specified Litigation, which amount shall be paid to the Buyer from the proceeds, and at the closing, of a subsequent sale of the Shares pursuant to the Specified Litigation.

(d)    To the extent the bid reflected in this Agreement constitutes the Successful Bid, if, following the Sale Order Entry, this Agreement is terminated by the Special Master pursuant to Section 8.1(g), then, pursuant to the bidder protections set forth in the January Order, the Buyer shall be entitled to be paid the Expense Reimbursement Amount in-full by the Venezuela Parties (as defined in the Sale Procedures Order) prior to any payments made on account of any other Specified Litigation Claims.

(e)    If (i) this Agreement is terminated by the Special Master pursuant to Section 8.1(d)(i) and (ii) the Superior Proposal Agreement is subsequently terminated because the Special Master enters into an Unsolicited Competing Proposal Agreement, then, in accordance with the January Order, to the extent the transaction contemplated by the Unsolicited Competing Proposal Agreement is consummated, (A) the Buyer shall be entitled to be paid the Termination Fee (to the extent this Agreement constitutes the Stalking Horse Bid Agreement) or the Expense Reimbursement Amount (to the extent this Agreement constitutes the Base Bid Agreement), as applicable, and (B) the Superior Proposal Acquiror with respect to the Superior Proposal Agreement shall be entitled to be paid the Expense Reimbursement Amount from the Unsolicited Competing Proposal acquiror from the proceeds, and at the closing, of the transactions provided in such Unsolicited Competing Proposal.

(f)    The Parties acknowledge and agree that (i) the Termination Fee (to the extent this Agreement constitutes the Stalking Horse Bid Agreement) or the Expense Reimbursement Amount (to the extent this Agreement constitutes the Base Bid Agreement) (as applicable) and other provisions of this Section 8.3 are an integral part of the Transactions, (ii) the Termination Fee and the Expense Reimbursement Amount (in each case, to the extent applicable) shall constitute liquidated damages and not a penalty, and (iii) without these agreements, the Parties would not enter into this Agreement.

(g)    Notwithstanding anything to the contrary set forth in this Agreement, but subject to Section 9.13 and this Section 8.3(g), in the event this Agreement is terminated, each of the Parties expressly acknowledges and agrees that the Buyer's right to receive payment of the Termination Fee pursuant to Section 8.3(a) (to the extent this Agreement constitutes the Stalking Horse Bid Agreement) or the Expense Reimbursement Amount pursuant to Section 8.3(b) (to the extent this Agreement constitutes the Base Bid Agreement), the Expense Reimbursement Amount

pursuant to Section 8.3(c) or Section 8.3(d) (to the extent the bid reflected in this Agreement
constitutes the Successful Bid), or the Termination Fee or Expense Reimbursement Amount (as
applicable) pursuant to Section 8.3(e) shall constitute the sole and exclusive remedy of the Buyer
and its Affiliates, and all other affected Persons against the Special Master, the Company and each
of their respective former, current or future Affiliates and any of their respective former, current
or future general or limited partners, equityholders, subsidiaries, members, managers, directors,
officers, employees, agents, Affiliates, successors, beneficiaries, heirs and assigns (collectively,
the "Special Master and Company Related Parties") for all losses and damages (including
attorneys' fees and expenses) in respect of this Agreement (and the termination hereof) or the
Transactions (and the abandonment thereof), or any breach (whether intentional, unintentional or
otherwise) of any representation, warranty, covenant or agreement in this Agreement, and none of
the Buyer or its Affiliates or any other affected Person shall be entitled to bring or maintain any
other Legal Proceeding against the Special Master, the Company or any other Special Master and
Company Related Party relating to or arising out of this Agreement, or any of the Transactions or
any matters forming the basis for such termination (whether at law, in equity, in contract, in tort
or otherwise), and upon payment of the Termination Fee pursuant to Section 8.3(a) (to the extent
this Agreement constitutes the Stalking Horse Bid Agreement) or the Expense Reimbursement
Amount pursuant to Section 8.3(b) (to the extent this Agreement constitutes the Base Bid
Agreement), the Expense Reimbursement Amount pursuant to Section 8.3(c) or Section 8.3(d) (to
the extent the bid reflected in this Agreement constitutes the Successful Bid), or the Termination
Fee or Expense Reimbursement Amount (as applicable) pursuant to Section 8.3(e), none of the
Special Master and Company Related Parties shall have any further liability or obligation to the
Buyer or any other affected Person relating to or arising out of this Agreement or the Transactions.
The Parties acknowledge and agree that in no event shall the Special Master or the Company be
required to pay the Termination Fee or the Expense Reimbursement Amount.

### ARTICLE IX
### MISCELLANEOUS

Section 9.1    Survival. None of the representations and warranties contained in this
Agreement or any of the other Transaction Documents (including any certificate to be delivered
pursuant to this Agreement) and none of the covenants of any party required to be performed
before the Closing (including obligations with which the Special Master agrees to Cause the
Acquired Companies to comply) shall survive the Closing, and thereafter none of the Parties or
any of their Affiliates or any of their respective Representatives or any other Person shall have any
liability whatsoever with respect to any such representation, warranty, covenant or agreement, and
no claim for breach of any such representation or warranty, detrimental reliance or other right or
remedy (whether in contract, in tort or at law or in equity) may be brought after the Closing with
respect thereto. The provisions of this Section 9.1 will not, however, prevent or limit a cause of
action to obtain an injunction to prevent breaches of this Agreement, to enforce specifically the
terms and provisions hereof or for declaratory relief. Unless otherwise indicated, the covenants
and agreements set forth in this Agreement which by their terms are required to be performed after
the Closing shall survive the Closing until such covenants or agreements have been performed or
satisfied.

Section 9.2    Expenses. Whether or not the Transactions are consummated, and except as
otherwise provided in this Agreement, each Party to this Agreement will bear its respective fees,

costs and expenses incurred in connection with the preparation, negotiation, execution and performance of this Agreement or the Transactions (including legal, accounting and other professional fees), and the Special Master Transaction Expenses shall be paid in accordance with Section 3.4(b) and the Advanced Transaction Expenses shall be paid in accordance with Section 3.4(d).

Section 9.3    Governing Law. This Agreement and all Related Claims shall be governed by, construed and enforced in accordance with the internal Laws of the State of Delaware, without giving effect to any Laws (whether of the State of Delaware or any other jurisdiction) that would cause the application of the Laws of any jurisdiction other than the State of Delaware and without regard to any borrowing statute that would result in the application of the statutes of limitations or repose of any other jurisdiction. In furtherance of the foregoing, the Laws of the State of Delaware will control even if under such jurisdiction's choice of law or conflict of law analysis, the substantive or procedural law of some other jurisdiction would ordinarily or necessarily apply.

Section 9.4    Dispute Resolution; Consent to Jurisdiction. Without limiting any Party's right to appeal any Order of the Court, (a) the Court shall retain exclusive jurisdiction to enforce the terms of this Agreement and to decide any dispute which may arise or result from, or be connected with, this Agreement, any breach or default hereunder, or the Transactions, and (b) any and all proceedings related to the foregoing shall be filed and maintained only in the Court, and the Parties hereby consent to and submit to the jurisdiction and venue of the Court and shall receive notices at such locations as indicated in Section 9.7 (as may be updated from time to time in accordance with Section 9.7).

Section 9.5    Consent to Service of Process; Waiver of Jury.

(a)    Each of the Parties hereby consents to process being served by any party to this Agreement in any Legal Proceeding by the delivery of a copy thereof (other than by e-mail) in accordance with the provisions of Section 9.7.

(b)    EACH PARTY HERETO ACKNOWLEDGES THAT ANY LEGAL PROCEEDING, DIRECTLY OR INDIRECTLY, ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY RELATED CLAIM IS LIKELY TO INVOLVE COMPLICATED AND DIFFICULT ISSUES, AND THEREFORE EACH SUCH PARTY HEREBY IRREVOCABLY AND UNCONDITIONALLY WAIVES ANY RIGHT SUCH PARTY MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY SUCH LEGAL PROCEEDING OR RELATED CLAIM. EACH PARTY CERTIFIES AND ACKNOWLEDGES THAT: (I) NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF SUCH LEGAL PROCEEDING, SEEK TO ENFORCE THE FOREGOING WAIVER; (II) IT UNDERSTANDS AND HAS CONSIDERED THE IMPLICATIONS OF THIS WAIVER; (III) IT MAKES THIS WAIVER VOLUNTARILY AND (IV) IT HAS BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION 9.5(B).

Section 9.6    Entire Agreement.

(a)    This Agreement (including the Company Disclosure Schedules and any Exhibits hereto) and the Transaction Documents contain the entire understanding and agreement between the Parties with respect to the subject matter hereof and thereof, and supersede all prior and contemporaneous agreements, discussions, negotiations, correspondence, communications, undertakings and understandings among the Parties with respect to such subject matter (except for the Confidentiality Agreement, which shall continue in full force and effect in accordance with its terms as modified hereunder). The Parties have voluntarily agreed to define their rights, liabilities and obligations with respect to the Transactions exclusively in contract pursuant to the express terms and provisions of this Agreement and the other Transaction Documents, and the Parties expressly disclaim that they are owed any duties or are entitled to any remedies not expressly set forth in this Agreement or the other Transaction Documents. Furthermore, the Parties each hereby acknowledge that this Agreement embodies the justifiable expectations of sophisticated parties derived from arm's-length negotiations; the Parties specifically acknowledge that no party has any special relationship with another party that would justify any expectation beyond that of ordinary parties in an arm's-length transaction.

(b)    The sole and exclusive remedies for any breach of the terms and provisions of this Agreement (including any representations and warranties set forth herein, made in connection herewith or as an inducement to enter into this Agreement) or any claim or cause of action otherwise arising out of or related to the Transactions shall be those remedies available at law or in equity for breach of contract against the Parties to this Agreement only (as such contractual remedies have been further limited or excluded pursuant to the express terms of this Agreement), and then only subject to the limitations hereunder, the Parties hereby agreeing that neither Party shall have any remedies or causes of action (whether in contract, tort, statute or otherwise) for any statements, communications, disclosures, failures to disclose, representations or warranties not explicitly set forth in this Agreement.

(c)    All representations and warranties set forth in this Agreement are contractual in nature only and subject to the sole and exclusive remedies set forth herein.

(d)    The Transactions relate to the purchase and sale of the Shares conducted pursuant to Section 324 of the Delaware General Corporation Law and the Sale Procedures Order, under which the Special Master has the authority to carry out the Transactions herein contemplated to be carried out by him. In connection therewith, the Designated Managers have furnished Specified Information to the Special Master. The Special Master, the Designated Managers, the Acquired Companies, its direct or indirect Subsidiaries and their respective Representatives have no liabilities or obligations hereunder or in respect of the Transactions for monetary damages or other relief (other than, if the conditions applicable thereto are satisfied, the Special Master's obligations to transfer the Shares and take or cause to be taken other actions under this Agreement and the Sale Procedures Order) except as expressly provided in <u>Section 9.13</u>. By executing this Agreement, each of the Parties waives on their behalf and on the behalf of their respective Representatives and forever relinquishes any right, claim or cause of action for damages or any other form of monetary relief against the Special Master, or any such Person based on, relating to or arising out of the Specified Information, this Agreement and any of the Transactions.

Section 9.7    <u>Amendments and Waivers</u>. This Agreement may not be amended except by an instrument in writing signed by the Buyer and the Special Master. No waiver by any Party of

any provision of this Agreement or any breach of this Agreement hereunder, whether intentional or not, shall be valid unless the same shall be in writing and signed by the party making such waiver. The waiver by any Party of a breach of any provision of this Agreement shall not operate or be construed as a further or continuing waiver of such breach or as a waiver of any other or subsequent breach. No failure on the part of any Party to exercise, and no delay in exercising, any right, power or remedy hereunder shall operate as a waiver thereof, nor shall any single or partial exercise of such right, power or remedy by such Party preclude any other or further exercise thereof or the exercise of any other right, power or remedy. Any amendment to, or the Special Master's waiver of, a provision of this Agreement of which the Acquired Companies or the Venezuela Parties are third party beneficiaries in accordance with Section 9.11 will require the prior written consent of the Company to the extent such amendment or waiver would be reasonably likely to adversely impact the Acquired Companies or the Venezuela Parties.

Section 9.8    Notices.    All notices, requests, instruction, demands and other communications under this Agreement shall be in writing and shall be deemed given (a) when delivered personally by hand (with written confirmation of receipt), (b) on the date sent by e-mail (provided confirmation of email receipt is obtained) if sent during normal business hours of the recipient, and on the next Business Day if sent after normal business hours of the recipient, or (c) when received by the addressee if sent by nationally recognized overnight delivery service (with written confirmation of receipt), in each case, at the following addresses (or to such other address as a party may have specified by notice given to the other party pursuant to this provision):

If to the Special Master, to:    Robert B. Pincus in his capacity as Special Master for the United States District Court for the District of Delaware

With a copies to:    Weil, Gotshal & Manges LLP, counsel to the Special Master
767 Fifth Avenue
New York, NY 10153
Email: Horizon.Notice@weil.com

If to the Buyer, to:    [●]

With a copy to:



Section 9.9    Severability. If any term or other provision of this Agreement is invalid, illegal, or incapable of being enforced by any Law or public policy, all other terms or provisions of this Agreement shall nevertheless remain in full force and effect so long as the economic or

legal substance of the Transactions is not affected in any manner materially adverse to any party. Upon such determination that any term or other provision is invalid, illegal, or incapable of being enforced, the Parties shall negotiate in good faith to modify this Agreement so as to effect the original intent of the Parties as closely as possible in an acceptable manner such that the Transactions are consummated as originally contemplated to the greatest extent possible.

Section 9.10    Binding Effect; Assignment. This Agreement shall be binding upon and inure to the benefit of the Parties and their respective successors and permitted assigns and, without limiting the foregoing, references to the "Special Master" in this Agreement shall be deemed to include any successor, substitute or replacement thereof. This Agreement shall not be assigned by (a) the Buyer without the prior written consent of the Special Master or (b) the Special Master, without the prior written consent of the Buyer.

Section 9.11    No Third Party Beneficiaries. Nothing in this Agreement shall confer any rights, remedies or claims of any nature upon any Person other than the Parties and their respective successors or permitted assigns, except for the rights of (a) the Indemnitees as set forth in Section 6.6; (b) the Non-Parties (including the Acquired Companies and their Representatives) set forth in Section 9.12; (c) the Released Parties as set forth in Section 9.15; (d) the Debt Financing Sources as set forth in Section 9.17; (e) the Venezuela Parties as set forth in Section 6.1(g) and Section 6.16(i); and (f) the Acquired Companies and their Representatives with respect to Section 4.22, Section 5.12 and Section 9.1. All of the Persons identified as third party beneficiaries in the immediately preceding sentence shall be entitled to enforce such provisions and to avail themselves of the benefits of any remedy for any breach of such provisions, all to the same extent as if such Persons were parties to this Agreement.

Section 9.12    Non-Recourse. This Agreement may only be enforced against, and any Related Claims may only be made or asserted against (and are expressly limited to) the Persons that are expressly identified as the Parties in the preamble to this Agreement and solely in their capacities as such. No Person who is not a Party, including the Acquired Companies and any current, former or future Affiliate or Representative of any Party or the Acquired Companies or any current, former, or future Affiliate or Representative of any of the foregoing (such Persons, collectively, but specifically excluding the Parties, "Non-Parties"), shall have any liability (whether at law or in equity, based upon contract, tort, statute or otherwise) for obligations or liabilities arising under, in connection with or related to this Agreement or for any Related Claim and each Party hereby irrevocably waives and releases all such liabilities, obligations and Related Claims against any such Non-Party. Without limiting the rights of any Party hereto against the other Parties as set forth herein, in no event shall any Party, any of its Affiliates or any Person claiming by, through or on behalf of any of them institute any Related Claim against any Non-Party. In no event shall any Person be liable for the Fraud of any other Person, and a claim for Fraud may only be asserted against the Person that committed such Fraud; provided, that, in no case will any claim for Fraud be asserted against the Special Master.

Section 9.13    Specific Performance.

(a)    The Parties agree that irreparable damage would occur in the event that any of the provisions of this Agreement were not performed in accordance with their specific terms or were otherwise breached, and that money damages or legal remedies would not be an adequate

69

remedy for any such damages. Therefore, it is accordingly agreed that prior to the termination of this Agreement in accordance with Section 8.1, each Party shall be entitled to an injunction or injunctions to prevent or restrain any breach or threatened breach of this Agreement by any other party and to seek specific performance of the terms and provisions of this Agreement, to prevent breaches or threatened breaches of, or to enforce compliance with, the covenants and obligations of any other party, in any court of competent jurisdiction, and appropriate injunctive relief shall be granted in connection therewith. Such remedies shall be in addition to and not in substitution for any other remedy to which such party is entitled at law or in equity. If either Party brings any action to enforce specifically the performance of the terms and provisions hereof by the other Party, the Outside Date shall be automatically extended by (i) the amount of time during which such action is pending, plus twenty (20) Business Days or (ii) such other time period established by the court presiding over such action.

(b)    Each Party hereto hereby waives (i) any defenses in any action for specific performance, and agrees not to oppose the granting of an injunction, specific performance or other equitable relief as provided herein, on the basis that (A) the other Party has an adequate remedy at law or (B) an award of specific performance is not an appropriate remedy for any reason at law or in equity and (ii) any requirement under any Law to post a bond or other security as a prerequisite to obtaining equitable relief.

(c)    The Parties agree that (i) by seeking the remedies provided for in this Section 9.13, no party shall in any respect waive its right to seek at any time any other form of relief that may be available to it under this Agreement or any other Transaction Document (including monetary damages) in the event that this Agreement has been terminated or in the event that the remedies provided for in this Section 9.13 are not available or otherwise are not granted, and (ii) nothing set forth in this Section 9.13 shall require any party hereto to institute any proceeding for (or limit any party's right to institute any proceeding for) specific performance under this Section 9.13 prior to or as a condition to exercising any termination right under Article VIII, nor shall the commencement of any Legal Proceeding pursuant to this Section 9.13 or anything set forth in this Section 9.13 restrict or limit any party's right to terminate this Agreement in accordance with the terms of Article VIII or pursue any other remedies under this Agreement any other Transaction Document that may be available then or thereafter; provided, that, in no event will Buyer be entitled to receive both (A) a grant of specific performance to cause the Closing to occur and (B) the Termination Fee or the Expense Reimbursement Amount (as applicable).

Section 9.14    Successors and Assigns. The provisions of this Agreement shall be binding upon and inure to the benefit of the Parties and their respective successors and assigns; provided that no Party may assign, delegate or otherwise transfer any of its rights or obligations under this Agreement without the consent of the Special Master and the other Parties.

Section 9.15    Release. Effective as of the Closing Date, except for any rights or obligations under this Agreement or the other Transaction Documents each of the Buyer and the Company on behalf of itself and each of its Affiliates and each of its current, former and future officers, directors, employees, partners, members, advisors, successors and assigns (collectively, the "Releasing Parties"), hereby irrevocably and unconditionally releases and forever discharges the Special Master and each of his current, former and future financial advisors, attorneys, consultants or other advisors and his and their respective, successors and assigns, the Designated

Managers, the other Company Employees listed in the Procedures Summary, any other current or former employees, directors, officers, partners, members or managers of the Acquired Companies who participated in the Buyer's due diligence and investigation of the Acquired Companies, the preparation of the Company Disclosure Schedules or the preparation, negotiation or consummation of the Transactions or otherwise participated in the sale process contemplated by the Sale Procedures Order and any other individuals as reasonably agreed by Buyer and the Special Master during the Interim Period (collectively, the "Released Parties") of and from any and all actions, causes of action, suits, proceedings, executions, judgments, duties, debts, dues, accounts, bonds, contracts and covenants (whether express or implied), and claims and demands whatsoever whether in law or in equity which the Releasing Parties may have against each of the Released Parties, now has or in the future may have, in respect of any cause, matter or thing relating to the business or operations of the Acquired Companies, the Transactions, this Agreement, the Transaction Documents, or the ownership of Shares by the Released Parties, in each case, occurring or arising on or prior to the Closing Date. Each Party, on behalf of itself and each Releasing Party, covenants and agrees that no Releasing Party shall assert any such claim against the Released Parties.

Section 9.16    Counterparts. This Agreement may be executed in one or more counterparts including by facsimile or other means of electronic transmission, such as by electronic mail in ".pdf" form, each of which will be deemed to be an original copy of this Agreement and all of which, when taken together, will be deemed to constitute one and the same agreement.

Section 9.17    Debt Financing Sources. Notwithstanding anything in this Agreement to the contrary, the Special Master hereby:

(a)    agrees that any proceeding, whether in law or in equity, whether in contract or in tort or otherwise, involving the Debt Financing Sources, arising out of or relating to, this Agreement, the Debt Financing and/or any of the agreements entered into in connection with the Debt Financing or any of the transactions contemplated hereby or thereby or the performance of any services thereunder shall be subject to the exclusive jurisdiction of any federal or state court in the Borough of Manhattan, New York, New York, so long as such forum is and remains available, and any appellate court thereof and each Party hereto irrevocably submits itself and its property with respect to any such proceeding to be the exclusive jurisdiction of such court;

(b)    agrees that any such proceeding shall be governed by the laws of the State of New York (without giving effect to any conflicts of law principles that would result in the application of the laws of another state), except as otherwise provided in any other applicable definitive document relating to the Debt Financing;

(c)    without limiting any right or remedy available to any person under the definitive documentation governing the Debt Financing, agrees not to bring or support or permit any of its Affiliates to bring or support any proceeding of any kind or description, whether in law or in equity, whether in contract or in tort or otherwise, against any Debt Financing Source in any way arising out of or relating to, this Agreement, the Debt Financing and/or any of the agreements entered into in connection with the Debt Financing or any of the transactions contemplated hereby or thereby or the performance of any services thereunder in any forum other than any federal or state court in the Borough of Manhattan, New York, New York;

71

(d)      agrees that service of process upon the Acquired Companies and/or each of its controlled Affiliates or the Special Master in any such proceeding shall be effective if notice is given in accordance with <u>Section 9.7</u>;

(e)      irrevocably waives, to the fullest extent that it may effectively do so, the defense of an inconvenient forum to the maintenance of such Legal Proceeding in any such court;

(f)      knowingly, intentionally and voluntarily waives trial by jury in any proceeding brought against any Debt Financing Source in any way arising out of or relating to this Agreement, the Debt Financing and/or any of the agreements entered into in connection with the Debt Financing or any of the transactions contemplated hereby or thereby or the performance of any services thereunder;

(g)      without limiting any right or remedy available to any person under the definitive documentation governing the Debt Financing, agrees that none of the Debt Financing Sources will have any liability to the Acquired Companies and/or any of their respective controlled Affiliates (in each case, other than the Buyer and the Buyer Subsidiaries) or the Special Master relating to or arising out of this Agreement, the Debt Financing and/or any of the agreements entered into in connection with the Debt Financing or any of the transactions contemplated hereby or thereby or the performance of any services thereunder, whether in law or in equity, whether in contract or in tort or otherwise; and

(h)      agrees that the Debt Financing Sources are express third party beneficiaries of, and may enforce, any of the provisions of this <u>Section 9.17</u> and that such provisions and the definitions of "Debt Financing," and "Debt Financing Sources," shall not be amended in any way adverse to any Debt Financing Source without the prior written consent of such Debt Financing Source.

Section 9.18   <u>Special Master and his Representatives' Judicial Immunity</u>. The Buyer agrees that in no circumstance shall the Special Master or his Representatives be personally or otherwise liable for any amounts or obligations owed to the Buyer, for any breach of any representations or warranties in this Agreement, or for any other claims or liabilities arising out of or in connection with this Agreement or the transaction contemplated by this Agreement. The Buyer further agrees that the Special Master and his Representatives are acting as an arm of the Court and are entitled to judicial immunity in the performance of their duties and in connection with this Agreement and the Transactions.

Section 9.19   <u>Special Master Indemnification</u>. From and after the Closing, the Buyer shall, and shall cause each Acquired Company to, indemnify, defend and hold harmless, to the fullest extent permitted under applicable Law, the Special Master against any and all losses, damages, liabilities, deficiencies, claims, actions, judgments, settlements, interest, awards, penalties, fines, costs or expenses of whatever kind, including attorneys' fees, that are incurred by Special Master, arising out of or related to this Agreement. Further, from and after the Closing, the Buyer shall, or shall cause the Acquired Companies to, advance any expenses (including fees and expenses of legal counsel) of the Special Master under this <u>Section 9.19</u> (including in connection with enforcing the indemnity and other obligations referred to in this <u>Section 9.19</u>), as incurred, to the fullest extent permitted under applicable Law.

[*Signature Pages Follow*]

IN WITNESS WHEREOF, the Parties have duly executed this Agreement as of the day and year first written above.

[●], as the Buyer

By: _____
Name:
Title:

ROBERT B. PINCUS, as the Special Master

By: _____
Name:
Title:

**ANNEX A**

DEFINITIONS

"<u>Acquired Companies</u>" means, collectively, the Company and each of the Company Subsidiaries.

"<u>Additional Judgment Creditors</u>" means the judgment holders, other than Crystallex Corporation and ConocoPhillips Petrozuata B.V., set forth in the Priority Order [D.I. 996], dated March 1, 2024, in the Specified Litigation.

"<u>Advanced Transaction Expenses</u>" means, as provided in the Sale Procedures Order and the May Order (in each case as in effect on Execution Date), the Special Master's compensation and any out-of-pocket costs, fees and expenses incurred by the Special Master in connection with the Transactions for investment bankers, third party consultants, legal counsel and any of his other Representatives or Advisors (as defined in the Sale Procedures Order) that have previously been paid as an advance by the Sale Process Parties and Additional Judgment Creditors pursuant to the procedures set forth in the May Order, which for the avoidance of doubt will include the monthly expenses of the Special Master (including fees and expenses of Weil, Gotshal & Manges LLP, Potter Anderson & Carroon LLP, Jenner & Block LLP, Evercore and any other advisors engaged by the Special Master).

"<u>Affiliate</u>" means, with respect to any Person, any other Person that, directly or indirectly through one or more intermediaries, controls, or is controlled by, or is under common control with, such Person, and the term "<u>control</u>" (including the terms "<u>controlled by</u>" and "<u>under common control with</u>") means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of such Person, whether through ownership of voting securities, by contract or otherwise.

"<u>Anti-Corruption Laws</u>" means any applicable Law for the prevention or punishment of public or commercial corruption or bribery, including the U.S. Foreign Corrupt Practices Act, U.K. Bribery Act 2010 and any other applicable anti-corruption or anti-bribery Law of any other applicable jurisdiction.

"<u>Antitrust Laws</u>" means the HSR Act, the Sherman Act, the Clayton Act, the Federal Trade Commission Act, and any other Laws that are designed to prohibit, restrict or regulate actions having the purpose or effect of monopolization, lessening of competition, or restraint of trade.

"<u>Business Day</u>" means any day of the year other than (a) a Saturday, Sunday or federal holiday in the United States or (b) a day on which national banking institutions in New York, New York are required or authorized to close.

"<u>Business Unit</u>" each of (a) Corpus Christi Refinery, (b) Crude Supply & Trading, (c) Lake Charles Refinery, (d) Lemont Refinery, (e) Lights Oils Marketing, (f) Logistics, (g) Lubricants, (h) Procurement, (i) Product Supply & Trading, (j) Specialty Products, and (k) Terminals & Pipelines.

"<u>Buyer Subsidiary</u>" means any Subsidiary of the Buyer, as of the Execution Date.

"Cash" means the cash and cash equivalents of the Acquired Companies; provided, that Cash shall (a) exclude (i) all issued but uncleared checks and drafts of the Acquired Companies, (ii) cash deposits and cash held in escrow accounts, (iii) with respect to any cash held outside the United States, all Taxes, fees, expenses and other costs associated with repatriating such cash into the United States, (iv) cash held by the Acquired Companies for third parties, and (v) cash held as collateral for outstanding letters of credit and any other restricted or trapped cash; and shall (b) include all checks and wire transfers and drafts deposited or available for deposit for the account of the Acquired Companies.

"CITGO Petroleum" means CITGO Petroleum Corporation, a Delaware corporation.

"Claim" means (a) a right to a payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured or (b) an equitable remedy for breach of performance if such breach gives rise to a right to payment, whether or not such right to an equitable remedy is reduced to judgment, fixed, contingent, matured, unmatured, disputed, undisputed, secured or unsecured. Without limiting the foregoing and for the avoidance of doubt, a Claim includes any loss, liability, demand, claim, judgment, sanction, penalty, action, obligation, commitment, assessment, settlement, fee, debt, deficiency, guaranty of any kind, proceeding, damage, cost, or expense (including court costs and professional fees (including attorneys' fees and costs)) whatsoever, whether at law or in equity, whether known or unknown, fixed, liquidated, contingent, or otherwise, whether under any theory of successor or transferee liability and whether imposed by agreement, understanding, law, or otherwise.

"Closing Consideration" means the Purchase Price, minus the Advanced Transaction Expenses Amount, minus the Deposit Amount, minus the Closing Transaction Expenses, minus the Expense Reserve Holdback Amount.

"Closing Transaction Expenses" means the Special Master Transaction Expenses that are unpaid as of the Closing.

"COBRA" means Part 6 of Subtitle B of Title I of ERISA, Section 4980B of the Code and any similar state applicable Law.

"Code" means the U.S. Internal Revenue Code of 1986, as amended.

"Commencement Date" means the date on which the Court issues an order identifying the bid reflected in this Agreement as a stalking horse bid or a base bid.

"Company Benefit Plan" means (a) each "employee benefit plan" (as such term is defined in Section 3(3) of ERISA), (b) each plan, program, policy, agreement or arrangement that would be an "employee benefit plan" (within the meaning of Section 3(3) of ERISA), if it were subject to ERISA, (c) each stock purchase, stock option, restricted stock, stock bonus, stock ownership, stock appreciation rights, phantom equity, profits interests or other equity or equity-based plan or agreement, (d) each compensation, bonus, commission, incentive or deferred compensation plan, agreement, arrangement, program, policy or practice, (e) each employment or consulting agreement, offer letter or severance, retention, change of control, termination, employee loan or other compensation plan, arrangement, program, policy, or practice, (f) each health or

A-2

welfare plan, agreement, arrangement, program, policy, or practice, and (g) each vacation policy, or other employee fringe benefit or perquisite arrangement whether or not subject to ERISA, in the cases of clauses (a) through (g), (x) that is maintained, sponsored, or contributed to by (or required to be contributed to by) any Acquired Company or with respect to which any Acquired Company has or could reasonably be expected to have any current or contingent liability or obligation and (y) under which any current or former director, officer, manager, employee, contractor or consultant of any Acquired Company has any present or future right to benefits or is eligible to participate.

"Company Fundamental Representations" means the representations and warranties set forth in Section 4.1 (Corporate Existence; Title to Shares), Section 4.2 (Governmental Authorization), Section 4.3 (Non-Contravention), Section 4.7(b) (Absence of Certain Changes), Section 4.19 (Brokers; Financial Advisor) and Section 4.4 (Capitalization).

"Company Material Adverse Effect" means any state of facts, change, development, event, effect, circumstance, condition or occurrence (each, an "Effect") that, individually or in the aggregate, (a) (x) would materially delay or impair the ability of the Special Master or the Acquired Companies (as applicable) to consummate the Transactions, in each case, other than Claims or Legal Proceedings arising out of or in relation to the Sale Order or the Purported Equity Pledge or (y) results in or would reasonably be expected to have a material adverse effect on the condition (financial or otherwise), business, assets, liabilities or results of operations of the Acquired Companies and the Non-Controlled Entities, taken as a whole or (b) the ability of the Company to enter into this Agreement or consummate the transactions contemplated hereby in a timely manner; provided, however, that, with respect to clause (a), in no event shall any of the following Effects, alone or in combination, be deemed to constitute, or be taken into account, in determining whether there has been, or would be, a Company Material Adverse Effect (A) any changes or conditions in the U.S. or any other national or regional economy, any global economic changes or conditions or securities, credit, financial or other capital markets conditions; (B) any changes or conditions affecting the oil and gas industry in general (including changes to the prices of commodities or of the raw material inputs or value of the outputs of the Company's products, general market prices and regulatory changes affecting the industry); (C) any weather-related or other force majeure event or outbreak (including earthquakes, hurricanes, tsunamis, tornadoes, floods, mudslides, wild fires or other natural disasters); (D) pandemics, epidemics, COVID-19 measures, acts of war (whether or not declared), armed hostility (by recognized governmental forces or otherwise), sabotage, terrorism or cyber-attack, and any escalation or general worsening of any of the foregoing or other response to any Governmental Bodies (including requirements for business closures, restrictions on operations or "sheltering-in-place"); (E) Effects resulting from the negotiation, execution, announcement, pendency, compliance with or performance of this Agreement, the Transactions or the terms hereof or the consummation of the Transactions, including the impact thereof on the relationships of the Acquired Companies with customers, suppliers, partners, employees or Governmental Bodies; (F) any action taken by an Acquired Company or failure of such Acquired Company to take action, in each case, which the Buyer has requested in writing or consented to when asked under Section 6.1; (G) changes in applicable Law or in GAAP or in accounting standards, or any changes in the interpretation or enforcement by any Governmental Body of any of the foregoing, or any changes in general legal or regulatory conditions, including any Effects arising out of, in connection with, or as a result of, any "shut-down" or funding freeze of the U.S. federal government (including any of its agencies); (H) any

failure to meet any internal projections, forecasts, guidance, estimates, milestones, or budgets or internal or published financial or operating predictions of revenue, earnings, cash flow or cash position; (I) any downgrade in the Company's credit rating (it being understood that the exceptions in clauses (H) and (I) shall not prevent or otherwise affect a determination that the underlying cause of any such Effect referred to therein (if not otherwise falling within any of the exceptions provided hereof) is a Company Material Adverse Effect); (J) compliance with, or any action required to be taken by the Buyer or its Affiliates under the terms of this Agreement or in connection with the Transactions including Section 6.3(d); or (K) Claims or Legal Proceedings arising out of or in relation to the Sale Order or the Purported Equity Pledge or the Equity Pledge Litigation; provided, that in the case of clauses (A), (B), (C), and (D), to the extent the impact on the Acquired Companies, taken as a whole, is disproportionately adverse compared to the impact on similarly situated entities, the incrementally disproportionate impact or impacts shall be taken into account in determining whether there has been, or would reasonably be expected to be, a Company Material Adverse Effect. For the avoidance of doubt, and notwithstanding anything to the contrary in this Agreement, a Company Material Adverse Effect shall be deemed to have occurred in the event of any holding, order, or resolution by a Governmental Body pursuant to which PDV Holding, Inc. is determined to be an alter ego of Petróleos de Venezuela, S.A. and/or the country or any government of the Republic.

"Company Subsidiary" means any Subsidiary of the Company, as of the Execution Date.

"Contract" means any written or oral contract, agreement, lease, easement, license, sublicense, subcontract, note, evidence of indebtedness, mortgage, indenture, bond, letter of credit, purchase order, binding bid, security agreement or other legally binding arrangement, whether express or implied (including all amendments, supplements, and modifications thereto), but shall exclude Permits and Company Benefit Plans.

"Credit Support Arrangements" means guaranties, performance bonds, performance guaranties, indemnities, keep-wells, sureties, bankers' acceptances, letters of credit, agreement to assume liabilities, other security, credit support or financial assurances and any other Contract or arrangement pursuant to which any person is or may be directly or indirectly liable or responsible for the liabilities, or the maintenance of a financial position, of any other person, including by the posting (or potential forfeiture) of any collateral, security or bond.

"Debt" means, with respect to the Acquired Companies, without duplication, the following obligations: (i) the principal amount of obligations of the Acquired Companies (A) for borrowed money, whether or not contingent, or (B) evidenced by notes, debentures, bonds or other similar instruments (including debt-like instruments) or debt securities; (ii) all obligations of the Acquired Companies for the reimbursement of any obligor of any guaranties, performance bonds, performance guaranties, indemnities, keep-wells, sureties, bankers' acceptances, letters of credit or similar arrangements, to the extent drawn upon; (iii) all liabilities of any Person (other than any Acquired Company) for which any Acquired Company has guaranteed repayment (to the extent of such guarantee); (iv) all obligations for deferred purchase price of property, assets or services, all conditional sale obligations, earnouts, holdbacks or other similar obligations (calculated at the full amount of the possible payment outstanding); (v) all obligations under finance leases; (vi) the non-current liabilities set forth on Section 1.1(c) of the Company Disclosure Schedules; (vii) post-retirement welfare benefits and all unfunded or underfunded or unpaid obligations with respect to

any defined benefit pension plan; (viii) to the extent drawn, obligations under the Receivables Securitization Facility; and (ix) all obligations of the type referred to in clauses (i) through (viii) above of other Persons secured by any Lien on any property or asset of the Acquired Companies, whether or not such obligation is assumed by the Acquired Companies (with Debt under this clause (ix) being limited, in the case of any such obligation of another Person, to the lower of such obligation and the fair market value of the properties and assets securing the same). Debt shall not include (A) any amounts included in Closing Transaction Expenses, (B) any obligations or guarantees under bankers acceptance, letters of credit or similar arrangements to the extent undrawn as of the Closing Date and which do not become drawable as a result of the Transactions, (C) any intercompany Debt of the Company and its wholly owned Subsidiaries and (D) any Taxes.

"Debt Financing Documents" means any credit agreements, note purchase agreements, engagement letters, fee letters, indentures, guarantees, pledge and security documents, definitive financing documents, agreements, schedules or other certificates or documents contemplated by the Debt Financing.

"Debt Financing Source" means, in its capacity as such, any lender, similar debt financing source, agent or arranger providing or arranging a commitment to, or that has entered into definitive agreements related to, the Debt Financing, including pursuant to any Debt Financing Document (or any other commitment letter or definitive agreement in respect of any alternative debt financing) and their respective Affiliates, and such Person's (and their respective Affiliates') former, current or future equityholders, members, employees, officers, directors, attorneys, agents or advisors, and, in each case, their respective successors and assigns.

"Debt Payoff Amount" means the aggregate principal amount of the Specified Debt, plus all accrued but unpaid interest, fees and other amounts payable thereon (including any premiums, penalties, breakage costs and any other fees, expenses or other obligations relating thereto), in each case, calculated as of the Closing Date or as of the Redemption Date as defined in the applicable indenture to such item of Specified Debt.

"Deposit Forfeiture Termination Event" means the occurrence of this Agreement being terminated by the Special Master pursuant to Section 8.1(f) (Buyer Breach).

"Designated Managers" means the employees of the Company or its Subsidiaries designated as such in the Procedures Summary.

"Economic Sanctions/Trade Laws" means all applicable Laws relating to export controls, anti-boycott, and Sanctions Targets, including prohibited or restricted international trade and financial transactions and lists maintained by any Governmental Body targeting countries, territories, entities or persons, including the United States, the United Nations Security Council, the European Union, or His Majesty's Treasury of the United Kingdom. For the avoidance of doubt, the applicable Laws referenced in the foregoing sentence include (1) any of the Trading With the Enemy Act, the International Emergency Economic Powers Act, the United Nations Participation Act, or the Syria Accountability and Lebanese Sovereignty Act, or any regulations of OFAC, or any export control Law applicable to U.S.-origin goods, technology, or software, or any enabling legislation or executive order relating to any of the above, as collectively interpreted and applied by the U.S. Government at the prevailing point in time, (2) any U.S. sanctions related

to or administered by the U.S. Department of State and (3) any sanctions measures or embargoes imposed by the United Nations Security Council, His Majesty's Treasury or the European Union.

"Environmental Laws" means any and all Laws relating to (a) pollution or the protection, cleanup, preservation or restoration of the environment or natural resources (including air, water, land, soil, subsoil, wildlife, plants, or other natural resources), (b) the generation, manufacture, processing, handling, use, labeling, treatment, storage, disposal, transportation, or Release or threatened Release of, or exposure to, any Hazardous Substance, or (c) the health and safety of Persons, including the following, to the extent applicable: the Comprehensive Environmental Response, Compensation, and Liability Act, 42 U.S.C. §§ 9601 et seq.; the Federal Water Pollution Control Act, 33 U.S.C. § 1251 et seq.; the Clean Air Act, 42 U.S.C. § 7401 et seq.; the Toxic Substances Control Act, 15 U.S.C. § 2601 et seq.; the Emergency Planning and Community Right to Know Act of 1986, 42 U.S.C. § 11001 et seq.; the Safe Drinking Water Act, 42 U.S.C. § 300(f) et seq.; the Hazardous Materials Transportation Act, 49 U.S.C. § 5101 et seq.; the Federal Insecticide, Fungicide and Rodenticide Act, 7 U.S.C. § 136 et seq.; the Resource Conservation and Recovery Act of 1976, 42 U.S.C. § 6901 et seq.; the Oil Pollution Act of 1990, 33 U.S.C. § 2701 et seq.; the Occupational Safety and Health Act, 29 U.S.C. §651 et seq. (with respect to human exposure to Hazardous Substances); the Endangered Species Act of 1973, 16 U.S.C. §§ 1531 et seq.; the Bald and Golden Eagle Protection Act, 16 U.S.C. § 668 et seq.; the Migratory Bird Treaty Act, 16 U.S.C. § 703 et seq.; and any similar or implementing state or local Law, all amendments or regulations promulgated thereunder.

"EPP" means the CITGO Petroleum Corporation Executive Protection Plan, as amended.

"Equitable Exceptions" means, collectively, (a) applicable bankruptcy, insolvency, reorganization, moratorium and similar Laws affecting creditors' rights and remedies generally, and (b) general principles of equity, including principles of commercial reasonableness, good faith and fair dealing (regardless of whether enforcement is sought in a proceeding at law or in equity).

"Equity Interests" means, with respect to any entity, any and all capital stock, shares, quotas, limited liability company interests (however designated), partnership or membership interests or units (whether general or limited), or other similar interest or participation that confers on a Person the right to receive a share of the profits and losses of, or distribution of assets of, such entity, the right to vote for or appoint directors (or other similar governing body members) of such entity or the right to otherwise cause the direction or management and policies of such entity in a manager, general partner or other similar capacity.

"Equity Pledge Litigation" means the case of Petroleos de Venezuela S.A. v. MUFG Union Bank, N.A., 19-10023 (KPF) (S.D.N.Y.) that was initiated on October 29, 2019 by PDVSA, the Company and CITGO Holding against GLAS and MUFG in their capacities as collateral agent and trustee, respectively, for the 2020 Bondholders, disputing the Purported Equity Pledge.

"ERISA" means the Employee Retirement Income Security Act of 1974 and the rules and regulations thereunder.

"ERISA Affiliate" means with respect to any Person, trade or business, or entity, any other Person, trade or business, or entity, (a) that is, or was at the relevant time, a member of a group

described in Section 414(b), (c), (m) or (o) of the Code that includes, or included at the relevant time, the first Person, trade or business, or entity, or (b) that is, or was at the relevant time, a member of the same "controlled group" as the first Person, trade or business, or entity pursuant to Section 4001(a)(14) of ERISA.

"Escrow Account" means the escrow account established pursuant to the Escrow Agreement in respect of the Deposit Amount.

"Existing Senior Secured Notes" means the 6.375% Senior Secured Notes and the 8.375% Senior Secured Notes, or any of them.

"Expense Reimbursement Amount" means an amount equal to the reasonable and documented out-of-pocket costs, fees and expenses, inclusive of any out-of-pocket financing commitment fees, incurred by the Buyer in connection with the Transactions; provided, that in no event shall the Expense Reimbursement Amount exceed $30,000,000.

"Expense Reserve Holdback Account" means the account established by the Special Master in respect of the Expense Reserve Holdback Amount.

"Expense Reserve Holdback Amount" means a reasonable amount to be determined by the Special Master in good faith that is approved by the Court prior to Closing.

"Evaluation Criteria" means the non-exhaustive list of criteria, as approved by the Court pursuant to the January Order, based on which the Special Master shall determine which bid to recommend as the stalking horse bid, base bid or Successful Bid, if any and as applicable.

"FERC" means the Federal Energy Regulatory Commission, or any successor thereto.

"Fraud" means a knowing misrepresentation of a material fact or concealment of a material fact by a Person with respect to any representation or warranty in this Agreement or the other Transaction Documents which is made or concealed with the specific intent to deceive and the intent of inducing another Person to enter into the Transaction Documents; provided, that at the time such representation was made (a) such representation was materially inaccurate, (b) such Person had actual knowledge (and not imputed or constructive knowledge), without any duty of inquiry or investigation, of the material inaccuracy of such representation, (c) such Person had the specific intent to deceive another Person and (d) the other Person acted in reliance on such inaccurate representation and suffered financial injury as a result of such material inaccuracy. For the avoidance of doubt, "Fraud" does not include any Claim for equitable fraud, promissory fraud, unfair dealings fraud, or any torts (including a Claim for fraud) based on negligence or recklessness.

"Good Industry Practice" means any of the practices, methods, standards, procedures and actions which could reasonably be expected to be used or taken by a reasonably prudent operator of properties or other assets, as applicable, similar to the applicable properties or other assets of the Acquired Companies, in each case, in light of the facts and circumstances known as of the relevant time of measurement. "Good Industry Practice" is not intended to be limited to the optimal practice, method, standard, procedure or action to the exclusion of all others, but rather is intended to include a range of practices, methods, standards or actions that meet the foregoing qualifications.

"Governmental Body" means any domestic or foreign national, state, multi-state, municipal or other local government, including any governmental, regulatory, or administrative department, division, subdivision, agency, bureau, board, commission, or authority thereof, or any quasi-governmental or private body exercising any regulatory or Taxing Authority (to the extent that the rules, regulations or orders of such organization or authority have the force of Law), or any court, tribunal or arbitral body of competent jurisdiction.

"Government Contract" means any Contract, grant, basic ordering agreement, letter contract, or order with (i) any Governmental Body, (ii) another Person under such other Person's prime contract with a Governmental Body, or (iii) any higher tier subcontractor of a Governmental Body in its capacity as a subcontractor, for which the period of performance has not expired or terminated, or final payment has not been received, or which remains open to audit as of the Execution Date. Unless otherwise indicated, a task, purchase or delivery order under a Government Contract will not constitute a separate Government Contract for purposes of this definition but will be part of the Government Contract under which it was issued.

"Hazardous Substance" means any substance, material or waste that is regulated, listed, designated, classified, defined or characterized under or pursuant to any Environmental Law as "hazardous," "toxic," "radioactive", a "pollutant," a "contaminant," or words of similar meaning, including petroleum or petroleum products, byproducts, derivatives, crude oil or any fraction thereof, PFAS, explosive materials, radioactive materials, asbestos, lead-based paint, or polychlorinated biphenyls.

"HSR Act" means the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended.

"Indenture" means the indenture issued on October 27, 2016, by PDVSA, as issuer, with PDVSA Petróleo, S.A., as guarantor, MUFG Union Bank, N.A., as trustee, GLAS Americas LLC, as collateral agent, Law Debenture Trust Company of New York, as registrar, transfer agent and principal agent, and Banque Internationale À Luxembourg, Société Anonyme, as Luxembourg paying agent.

"Interest Rate" means (x) the rate of interest published from time to time by The Wall Street Journal, Eastern Edition, as the "prime rate" at large U.S. money center banks during the period from the date that payment is due to the date of payment, plus (y) one percent (1.0%).

"Interim Period" means the period beginning on the date of the Sale Order Entry and ending upon the earlier of the Closing and the termination of this Agreement in accordance with its terms.

"IRS" means the United States Internal Revenue Service.

"January Order" means that certain *Memorandum Order* [D.I. 1554] entered by the Court on January 27, 2025 in the Specified Litigation.

"Judgment Creditors" means the judgment holders in the Specified Litigation.

"Knowledge of the Buyer" means the actual knowledge (and not imputed or constructive knowledge) of any of the Persons set forth in Section 1.1(b) of the Buyer Disclosure Schedules after due inquiry.

"Knowledge of the Company" or "Company's Knowledge" means the actual knowledge (and not imputed or constructive knowledge) of the Designated Managers after due inquiry.

"Knowledge of the Special Master" means actual knowledge (and not imputed or constructive knowledge) of the Special Master.

"Law" means any applicable foreign, federal, state, local law (including common law), statute, treaty, code, ordinance, rule, regulation, judgment, decree, binding directive, injunction, Order or other legal requirement of any Governmental Body; provided, that in no event shall "applicable Law" be deemed to include Laws and Orders of the Bolivarian Republic of Venezuela.

"Legal Proceeding" means any judicial, regulatory, administrative or arbitral action, suit, claim, appeal, cause of action, objection, demand, inquiry, audit, notice of violation, citation, summon, subpoena, proceeding, or investigation of any nature, civil, criminal, public or private.

"Lien" means, with respect to any asset, any mortgage, lien, pledge, charge, security interest or encumbrance of any kind in respect of such asset.

"Lookback Date" means the date that is three (3) years prior to the Execution Date.

"Money Laundering Laws" means any law or regulation regarding money laundering or financial recordkeeping and reporting requirements, including the U.S. Currency and Foreign Transactions Reporting Act of 1970, the U.S. Money Laundering Control Act of 1986, the USA PATRIOT Act of 2001, and any applicable money laundering-related Laws of other jurisdictions where the Acquired Companies conduct business, conduct financial transactions or own assets.

"Negative Consequences" means (a) if related to any consent with respect to any Contract, (i) any default, breach or violation of such Contract (or any default, breach or violation that would result with notice, lapse of time or both) or (ii) any modification or supplement to the rates, service levels, performance schedules or other terms or conditions of such Contract or any right to modify any of the foregoing, in each case, that would be or reasonably could be expected to be adverse to the Acquired Companies, (b) the imposition of any restriction, limitation or new covenant on any Acquired Company, (c) the imposition or creation of any Lien on any assets or properties of any Acquired Company, (d) any right of termination, cancellation, revocation, non-renewal or acceleration or loss of benefit or vesting of any right of any person, in each case, that would be or reasonably could be expected to be adverse to any of the Acquired Companies (upon the exercise of any rights or otherwise), (e) any right to receive any rebate, chargeback, refund, credit or penalty and (f) any payment, compensation or incremental liability (or any right to any payment, compensation or incremental liability).

"NGA" means the Natural Gas Act of 1938, as amended, and the rules, orders, and regulations of the Federal Energy Regulatory Commission pursuant thereto.

"NGPA" means the Natural Gas Policy Act of 1978, as amended, and the rules, orders, and regulations of the Federal Energy Regulatory Commission pursuant thereto.

"No-Shop Period" means the period beginning on the date that is five (5) Business Days after the conclusion of the Topping Period, and ending on the Closing Date or the date on which this Agreement terminates pursuant to its terms.

"Non-Controlled Entity" means any entity in which an Acquired Company owns, directly or indirectly, any Equity Interest other than a Company Subsidiary.

"OFAC" means the U.S. Department of the Treasury's Office of Foreign Assets Control.

"OFAC License" means a general or specific license or licenses from OFAC authorizing the Parties to participate in and close the Transaction.

"OFAC License Application" means a request for an OFAC License pursuant to 31 CFR § 501.801 or other relevant authority.

"Order" means any order, injunction, judgment, decree, ruling, writ, assessment or arbitration award of a Governmental Body, other than the Bolivarian Republic of Venezuela.

"Ordinary Course" means the ordinary and usual course of day-to-day operations of the Acquired Companies and/or the Non-Controlled Entities (as applicable), in each case, consistent with past custom and practice, including with respect to timing, frequency and magnitude.

"Organizational Documents" means the charter, memorandum, certificate of incorporation, articles of association, bylaws, partnership agreements, limited liability company agreement, operating agreement, or other similar document of a Person, as may be amended, restated or otherwise modified from time to time.

"Paying Agent Account" means the deposit account established by the Paying Agent pursuant to the terms of the Paying Agent Agreement for the benefit of the Claimholders.

"PCI DSS" means the Payment Card Industry Data Security Standard, issued by the Payment Card Industry Security Standards Council, as revised from time to time.

"Permit" means all permits, licenses, approvals, certifications, consents, registrations, variances, exemptions, waivers, Orders, franchises and other authorizations of any Governmental Body.

"Permitted Liens" means (a) all defects, exceptions, restrictions, easements, rights of way and encumbrances of record which do not or would not materially impair the use or occupancy of any Real Property in the operation of the business conducted thereon; (b) Liens securing liabilities which are reflected or reserved against in the consolidated balance sheet of the Company prepared in accordance with GAAP to the extent so reflected or reserved; (c) Liens for Taxes not yet due and payable or that are being contested in good faith through appropriate proceedings; (d) landlords', mechanics', carriers', workers', repairers' and similar statutory Liens arising or incurred in the Ordinary Course which are not due and payable as of the Closing Date; (e) zoning,

building code, entitlement and other land use restrictions and Environmental Laws which are not violated by the current use or occupancy of any Real Property; (f) title of a lessor under a capital or operating lease, and leases, subleases, and similar transactions in the Ordinary Course; (g) any license, covenant or other right to or under Intellectual Property granted in the Ordinary Course; (h) gaps in the chain of title for Intellectual Property evident from the public records of the Governmental Body maintaining the applications or registrations therefor; (i) Liens set forth in Section 1.1(d) of the Company Disclosure Schedules; (j) the Purported Equity Pledge; (k) Claims or Legal Proceedings seeking to enforce judgments against PDVSA or the Bolivarian Republic of Venezuela by recovering from the Acquired Companies; and (l) such other imperfections in title, charges, easements, restrictions and encumbrances which would not result in a Company Material Adverse Effect.

"Person" means any individual, corporation, partnership, limited liability company, firm, joint venture, association, joint-stock company, trust, unincorporated organization, Governmental Body or other entity.

"Personal Information" means all information that identifies, could be used to identify or is otherwise related to an individual person or household, including demographic, health, behavioral, biometric, financial, nonpublic, and geolocation information, IP addresses, network and hardware identifiers, employee information, and any other individually identifiable information that is protected under any applicable Privacy Law and Obligation, in addition to any definition for "personal information", "personal data", "personally identifiable information", "protected health information" or any similar term provided by applicable Privacy Laws and Obligations.

"PFAS" stands for per- and polyfluoroalkyl substances and means any substance which contains at least one fully fluorinated methyl or methylene carbon atom (without any hydrogen (H)/chlorine/bromine/iodine atom attached to it), including any acids, salts, precursors, polymers or derivatives thereof.

"Post-Closing Tax Period" means any taxable period beginning after the Closing Date.

"Preferential Right" means any rights of first refusal, rights of first offer, put or call options, preferential rights to purchase, preemptive rights, change in control, or other similar rights in favor of any Person.

"Procedures Summary" means the procedures described in Section 1.1(e) of the Company Disclosure Schedules.

"PURPA" means the Public Utility Regulatory Policies Act of 1978, as amended, 16 U.S.C. §§ 2601 *et seq.*, and FERC's implementing regulations adopted thereunder.

"Purported Equity Pledge" means the purported pledge of 50.1% of the equity in CITGO Holding, Inc., a Delaware corporation and wholly owned direct subsidiary of the Company that purportedly secured, in part, the 2020 Bonds.

"QF" means a "qualifying facility" and a "qualifying small power production facility" as defined in Section 3(17)(c) of the Federal Power Act, 16 U.S.C. § 796(17)(C), and FERC's regulations implementing PURPA.

"Related Claim" means any Legal Proceeding that may be based upon, arise out of or relate to this Agreement or the negotiation, execution, performance, breach, interpretation, construction, validity or enforcement of this Agreement (including any Legal Proceeding based upon, arising out of or related to any representation or warranty made or alleged to be made in or in connection with, or as an inducement to enter into, this Agreement).

"Release" means any actual or threatened releasing, spilling, leaking, pumping, pouring, emitting, emptying, discharging, injecting, escaping, or allowing to escape, leaching, migrating, dumping, abandoning, or disposing into or through the indoor or outdoor environment (including soil, surface water, ground water, land surface, subsurface strata, ambient air, wildlife, plants or other natural resources).

"Representatives" means, with respect to any Person, such Person's equityholders, partners, members, officers, directors, employees, consultants, agents, attorneys, accountants, advisors, financing sources and other representatives.

"RRP" means the CITGO Petroleum Corporation Retirement Restoration Plan, as amended.

"Sale Order" means an order of the Court substantially in the form attached hereto as Exhibit C.

"Sale Process Parties" means, as set forth in Sale Procedures Order, Crystallex International Corporation, the Bolivarian Republic of Venezuela, PDVSA, the Company, CITGO Petroleum Corporation, and Phillips Petroleum Company Venezuela Limited and ConocoPhillips Petrozuata B.V.

"Sanctions Target" means (1) any country or territory that is the target of country-wide or territory-wide Economic Sanctions/Trade Laws, which, as of the Execution Date, are Iran, Cuba, Syria, North Korea, and certain occupied regions of Ukraine, including the Crimea region, the non-government-controlled areas of Zaporizhzhia and Kherson and the so-called Donetsk or Luhansk People's Republics; (2) a Person that is on the Specially Designated Nationals and Blocked Persons List or any of the other sanctioned persons lists published by OFAC, or any similar list of sanctioned persons issued by the U.S. Department of State; (3) a Person that is located or resident in or organized under the laws of a country or territory that is identified as the subject of country-wide or territory-wide Economic Sanctions/Trade Laws; or (4) an entity that, under applicable Economic Sanctions/Trade Laws, is automatically a target of restrictions or prohibitions because it is owned or controlled by a country or territory identified in clause (1) or Person in clauses (2) or (3) above.

"Security Incident" means any unauthorized or unlawful access, acquisition, exfiltration, manipulation, erasure, loss, use, or disclosure that compromises the confidentiality, integrity, availability or security of Sensitive Data or the Systems, or that triggers any reporting requirement

under any breach notification Law or contractual provision, including any ransomware or denial of service attacks that prevent or materially degrade access to Sensitive Data or the Systems.

"Sensitive Data" means all Personal Information, confidential information, proprietary information, intellectual property, and any other information protected by applicable Law or contract that is collected, maintained, stored, transmitted, used, disclosed, or otherwise processed by, for or on behalf of the Acquired Companies.

"Solvent" means, with respect to any Person as of a particular date, that on such date, such Person and its Subsidiaries (on a consolidated basis) (a) have property with fair value greater than the total amount of their debts and liabilities, contingent (it being understood that the amount of contingent liabilities at any time shall be computed as the amount that, in light of all the facts and circumstances existing at such time, represents the amount that can reasonably be expected to become an actual or matured liability in the ordinary course), subordinated or otherwise, (b) have assets with present fair salable value not less than the amount that will be required to pay their liability on their debts as they become absolute and matured in the ordinary course, (c) will be able generally to pay their debts and liabilities, subordinated, contingent or otherwise, as they become absolute and matured in the ordinary course, (d) are not engaged in business or a transaction, and are not about to engage in business or a transaction, for which their property would constitute an unreasonably small capital and (e) does not intend to, and does not believe that it will, incur debts or liabilities beyond such Person's ability to pay such debts and liabilities as they mature.

"Special Master Transaction Expenses" means, as provided in the Sale Procedures Order and the May Order (in each case as in effect on Execution Date), the Special Master's compensation and any out-of-pocket costs, fees and expenses incurred by the Special Master in connection with the Transactions for investment bankers, third party consultants, legal counsel and any of his other Representatives or Advisors (as defined in the Sale Procedures Order), which for the avoidance of doubt will include fees and expenses of Weil, Gotshal & Manges LLP, Potter Anderson & Carroon LLP, Jenner & Block LLP, Evercore and any other advisors engaged by the Special Master. For the avoidance of doubt, no costs or expenses of the Acquired Companies shall be considered "Special Master Transaction Expenses."

"Specially Designated Nationals and Blocked Persons List" means the list of blocked persons, specifically designated nationals, specially designated terrorists, specially designated global terrorists, foreign terrorist organizations, specially designated narcotics traffickers, and blocked vessels referenced in Appendix A to 31 CFR Chapter V, as updated and made available at http://www.treasury.gov/sdn.

"Specified Debt" means the Debt set forth in Section 1.1(d) of the Company Disclosure Schedules.[9]

---

[9]    **Note to Bidder:** The Specified Debt construct is intended to provide flexibility in the event the bidder desires to roll all or a portion of the CITGO bonds.

"<u>Specified Information</u>" means information furnished by Designated Managers to the Special Master (a) as used in <u>Article IV</u>, with respect to the representations and warranties relating to the Acquired Companies, and (b) as used in <u>Section 6.10</u>, in connection with such covenant.

"<u>Subsidiary</u>" means, when used with respect to any Person, any other Person, whether incorporated or unincorporated, of which (a) more than fifty percent of the voting securities or other ownership interests is owned by such Person or one or more of its Subsidiaries, (b) such Person or one or more of its Subsidiaries is a general partner or holds a majority of the voting interests of a partnership or (c) securities or other interests having by their terms ordinary voting power to elect more than fifty percent of the board of directors or others performing similar functions with respect to such corporation or other organization, are directly owned or controlled by such Person or by any one or more of its Subsidiaries.

"<u>Systems</u>" means the information technology systems, operational technology systems, and infrastructure used, owned, leased or licensed by or for the Acquired Companies, including industrial control systems, software, computer programs (in both source and object code form), servers, databases, firmware, hardware, equipment, networks, record keeping, communications, telecommunications, interfaces, platforms, peripherals and related systems.

"<u>Tax</u>" or "<u>Taxes</u>" means (a) all federal, state, local or foreign taxes, charges, fees, levies or other assessments, including, all net income, excise, stamp, real or personal property, ad valorem, withholding, social security (or similar), unemployment, occupation, use, production, service, service use, license, net worth, payroll, franchise, severance, transfer, recording, employment, premium, windfall profits, environmental, customs duties, capital stock, profits, disability, sales, registration, value added, alternative or add-on minimum, estimated taxes and any other taxes of any kind whatsoever; and (b) all interest, penalties, fines and additions to tax imposed in connection with any item described in clause (a) of this definition (c) any liability for the payment of any amounts of the type described in clause (a) or (b) as a result of being (or ceasing to be) a member of an affiliated, consolidated, combined, unitary, aggregate or similar group for any period, including pursuant to Treasury Regulation Section 1.1502-6 or any similar applicable Law; and (d) any liability for the payment of any amounts of the type described in clauses (a)-(c) as a result of being treated as a successor or transferee to any Person (whether by Contract, statute or otherwise), as a result of any secondary liability or as a result of any express or implied obligation to indemnify any other Person.

"<u>Tax Returns</u>" means any return, report, form or similar statement filed or required to be filed with respect to any Tax (including any attached schedules), including, any information return, claim for refund, amended return or declaration of estimated Tax.

"<u>Taxing Authority</u>" means any Governmental Body exercising any authority to impose, assess or collect any Tax or any other authority exercising Tax regulatory authority.

["<u>Total Hydrocarbon Inventory</u>" means all crude oil, feedstock, raw materials, blendstocks and refined and intermediate petroleum products (including, in process and finished products), each case that are owned by the Acquired Companies as of the Execution Date wherever located or however stored.]

"Termination Fee" means $[●].[10]

"Topping Period" means the period beginning on the Commencement Date and ending on the date that is thirty (30) calendar days after the Commencement Date or such other date or extended date as approved by the Court.

"Transaction Documents" means this Agreement, the Sale Order, the Escrow Agreement, the Paying Agent Agreement, and all other agreements and instruments to be executed by the Buyer, the Special Master and/or the Company at or prior to the Closing pursuant to this Agreement.

"Transactions" means the transactions contemplated by this Agreement and the other Transaction Documents.

"Transfer Taxes" means any real property transfer, sales, use, value added, stamp, documentary, recording, registration, conveyance, stock transfer, intangible property transfer, personal property transfer, gross receipts, registration, duty, securities transactions or similar fees or Taxes or governmental charges (together with any interest or penalty, addition to Tax or additional amount imposed) as levied by any Taxing Authority or other Governmental Body in connection with the Transactions, including any payments made in lieu of any such Taxes or governmental charges that become payable in connection with the Transactions.

"Treasury Regulations" means the regulations promulgated under the Code.

"VDR" means the "Horizon" virtual data room hosted by Datasite and established by Representatives of the Special Master to facilitate the provisions of information to potential bidders pursuant to the Sale Procedures Order.

"Willful Breach" means a deliberate act or a deliberate failure to act, which act or failure to act constitutes in and of itself a material breach of any representation, warranty, covenant or agreement set forth in this Agreement, which breach was the conscious object of the act or failure to act.

"6.375% Senior Secured Notes" means CITGO Petroleum Corporation's 6.375% senior secured notes due 2026, issued pursuant to the indenture dated as of February 11, 2021 among CITGO Petroleum Corporation as Issuer, the guarantors party thereto, and TMI Trust Company as trustee.[11]

---

[10]   **Note to Bidder:** Termination Fee to be a fixed dollar amount equal to three percent (3%) of value of Attached Judgments expected to be satisfied, whether in cash or agreed non-cash consideration, by sale proceeds at Closing (i.e., no credit for escrowed funds, earn-outs, or similarly contingent consideration) up to a maximum of $150 million.

[11]   **Note to Draft**: We have assumed that, pursuant to the Notice of Full Redemption dated January 28, 2025 and with a fixed date of redemption of February 27, 2025, the 7.000% Senior Secured Notes have been redeemed in full.

"8.375% Senior Secured Notes" means CITGO Petroleum Corporation's 8.375% senior secured notes due 2029, issued pursuant to the indenture dated as of September 20, 2023 among CITGO Petroleum Corporation as Issuer, the guarantors party thereto, and Argent Institutional Trust Company as trustee.

"2020 Bonds" means the 8.50% senior secured notes due in 2020 in the aggregate principal amount of $3,367,529,000, issued by PDVSA pursuant to the Indenture.

"2020 Bondholders" means the holders of the 2020 Bonds.