# EXHIBIT 1

*Execution Version*

## AMENDED AND RESTATED
## TRANSACTION SUPPORT AGREEMENT

This Amended and Restated Transaction Support Agreement (this "**Agreement**"), dated as of March 21, 2025, is entered into by and among (a) Red Tree Investments, LLC ("**Red Tree**" or the "**Leading Bidder**"); and (b) the undersigned holders of, or nominees, investment managers, investment advisors, or subadvisors to funds and/or accounts that hold, or trustees of trusts that hold, the 2020 Notes (as defined below) (collectively, the "**Initial Consenting 2020 Noteholders**"). Each of Red Tree and each Consenting 2020 Noteholder (as defined below) is referred to individually as a "**Party**," and such parties are referred to collectively as the "**Parties**." This Agreement amends and restates, in its entirety, and replaces, the Transaction Support Agreement dated as of March 7, 2025, entered into by and among the Parties.

## RECITALS

WHEREAS, Red Tree holds a final judgment entered against one of Petróleos de Venezuela, S.A. ("**PDVSA**") or the Bolivarian Republic of Venezuela ("**Venezuela**");

WHEREAS, Red Tree has obtained and served a writ of attachment *fieri facias* against PDVSA's equity interest in PDV Holding, Inc. ("**PDVH**") in the supplemental proceedings *Red Tree Investments, LLC v Petróleos de Venezuela, S.A. and PDVSA Petróleo, S.A.*, Nos. 22 Misc. 68 and 22 Misc. 69 (D. Del.);

WHEREAS, on October 4, 2022, in *Crystallex International Corporation v. Bolivarian Republic of Venezuela*, No. 17 Misc. 151 (D. Del) (the "**Crystallex Case**"), Judge Leonard P. Stark sitting by designation on the United States District Court for the District of Delaware (the "**Delaware Court**") entered the *Sixth Revised Proposed Order (A) Establishing Sale and Bidding Procedures, (B) Approving Special Master's Report and Recommendation Regarding Proposed Sale Procedures Order, (C) Affirming Retention of Evercore as Investment Banker by Special Master and (D) Regarding Related Matters* [D.I. 480-1] (as amended, modified, supplemented or superseded, the "**Bidding Procedures Order**"), to govern a future court-ordered auction (the "**Auction**") of PDVH's common equity (the "**PDVH Shares**") to satisfy the Attached Judgments of Additional Judgment Creditors (each, as defined in the Bidding Procedures Order);

WHEREAS, Robert B. Pincus acts as special master (the "**Special Master**") in the Crystallex Case;

WHEREAS, the Bidding Procedures Order provides that any Additional Judgment Creditor may submit a credit bid to purchase the PDVH Shares in the Auction;

WHEREAS, on July 27, 2023, the Delaware Court, in the Crystallex Case, entered a *Memorandum Order* [D.I. 738] holding that Red Tree and certain other judgment creditors of PDVSA or the Bolivarian Republic of Venezuela, as holders of conditional writs of attachment on the PDVH Shares (together with Red Tree, the "**PDVH Creditors**"), would each constitute an Additional Judgment Creditor (the "**July 2023 Order**");

WHEREAS, on October 11, 2023, the Delaware Court, in the Crystallex Case, entered a *Memorandum Order* [D.I. 738] directing the Special Master to maintain a chart "tracking the progress of each party seeking to become an Additional Judgment Creditor" and on November 15, 2023, the Special Master filed in the Crystallex Case a letter to Judge Stark [D.I. 789] including a chart which lists each PDVH Creditor;

WHEREAS, on April 3, 2024, the Delaware Court, in the Crystallex Case, issued a "Final Priority Order" listing the priority of judgment creditors with conditional or perfected attachments on the PDVH Shares, which Final Priority Order is annexed hereto as **Exhibit A** and includes the PDVH Creditors [D.I. 1102];

WHEREAS, on April 8, 2024, the writs of attachment on the PDVH Shares as to each PDVH Creditor were returned executed by the U.S. Marshal for the District of Delaware;

WHEREAS, on December 31, 2024, the Delaware Court issued a "Memorandum Order Regarding Sales Process and Litigation" (the "**Memorandum Order**");

WHEREAS, pursuant to the Memorandum Order, the Delaware Court directed that a bidding period for the PDVH Shares would commence on or around January 27, 2025 (the "**Bidding Period**");

WHEREAS, in the Bidding Period, bidders, including credit bidders, will have the opportunity either to be selected as a stalking horse bidder (the "**Stalking Horse Bid**") or, after the selection of a Stalking Horse Bid, to submit a topping bid superior to the Stalking Horse Bid (a "**Topping Bid**");

WHEREAS, pursuant to the Memorandum Order, potential Stalking Horse Bids must be submitted no later than March 7, 2025;

WHEREAS, the Leading Bidder intends to form an entity ("**AcquisitionCo**") to submit a partial credit bid in the Auction on or before March 7, 2025, either as a Stalking Horse Bid or as a Topping Bid, and in either event for selection as a Successful Bid pursuant to the Bidding Procedures Order (the "**Credit Bid**"), and Red Tree has formed AcquisitionCo for the purpose of effectuating the Credit Bid;

WHEREAS, Red Tree has provided a commitment letter for AcquisitionCo Convertible Notes (as defined below) in favor of AcquisitionCo pursuant to which the Leading Bidder has committed to fund its respective share of the Credit Bid upon the closing of the acquisition of PDVH (whether funded through the contribution of claims or cash);

WHEREAS, on October 28, 2019, PDVSA defaulted on the 2020 Notes (as defined below) by failing to make required payments of principal and interest due on the 2020 Notes;

WHEREAS, on October 29, 2019, PDVSA, PDVH and PDVSA Petróleo, S.A. ("**Petroleo**", and collectively with PDVSA and PDVH, the "**PDVSA Parties**") commenced an action (the "**Declaratory Judgment Action**") in the United States District Court for the Southern District of New York (the "**New York Court**") against MUFG Union Bank, N.A., the Trustee under the 2020 Notes Indenture (as defined below) (the "**Trustee**"), and GLAS Americas LLC, the Collateral Agent under the 2020 Notes Indenture (the "**Collateral Agent**"), seeking a judgement declaring the 2020 Notes invalid, illegal, null and void *ab initio*;

WHEREAS, in the Declaratory Judgment Action, the Trustee and Collateral Agent asserted counterclaims against the PDVSA Parties for breach of contract, declaratory judgment, unjust enrichment, and quantum merit, arguing that (i) the 2020 Notes are governed by New York law, and therefore the Venezuelan Constitution does not apply, and (ii) even if the contracts were in any way governed by Venezuelan law, the 2020 Notes are not "contracts of national interest" such that they would ever require National Assembly approval;

WHEREAS, the Declaratory Judgment Action is pending in the New York Court;

WHEREAS, on June 29, 2023, VR Global Partners, L.P., commenced an action in the United States District Court for the Southern District of New York against PDVSA asserting common law fraud, stylized as *VR Global Partners, L.P. v. Petróleos de Venezuela, S.A. et al*, No. 23-cv-05604 (the "**Fraud Action**");

WHEREAS, in support of the Credit Bid, the Parties have, in good faith and at arm's-length, negotiated a consensual recapitalization of the 2020 Notes (the "**Transaction**"), subject to the terms and conditions set forth in this Agreement and the term sheet attached hereto as **Exhibit B** (the "**Transaction Term Sheet**"); and

WHEREAS, this Agreement sets forth the agreement among the Parties concerning their commitment to support and implement the Transaction, on the terms and subject to the conditions hereof.

NOW, THEREFORE, in consideration of the mutual covenants and agreements in this Agreement and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Parties hereby agree as follows:

## AGREEMENT

**Section 1.**     **Definitions and Interpretation.**

> *Section 1.1*     *Defined Terms*. As used in this Agreement, the following terms have the meanings specified below:

"**2020 Noteholder**" means a holder of, or a nominee, investment manager, investment advisor, or subadvisor to funds and/or accounts that hold, or a trustee of trusts that beneficially hold the 2020 Notes.

"**2020 Notes**" means 8½% Senior Notes due 2020, issued by PDVSA under the 2020 Notes Indenture, guaranteed by Petroleo, and secured with a pledge on 50.1% of the equity of CITGO Holding, Inc. ("**CITGO Holding**").

"**2020 Notes Indenture**" means that certain Indenture, dated as of October 27, 2016, among PDVSA as Issuer; Petróleo, as Guarantor; the Trustee; the Collateral Agent; Law Debenture Trust Company of New York as Registrar, Transfer Agent, and Principal Paying Agent; and Banque Internationale à Luxembourg, Société Anonyme, as Luxembourg Paying Agent.

"**2020 Notes Pledge Agreement**" means that certain Pledge and Security Agreement, dated as of October 28, 2016, among PDVSA as Issuer; Petróleo, as Guarantor; the Trustee; and the Collateral Agent.

"**2020 Noteholder Joinder**" means a joinder to this Agreement substantially in the form attached as **Exhibit D** hereto.

"**2020 Noteholder Transferee Joinder**" means a joinder to this Agreement substantially in the form attached as **Exhibit C** hereto.

"**AcquisitionCo**" has the meaning set forth in the Recitals.

"**AcquisitionCo Convertible Notes**" has the meaning set forth in the Transaction Term Sheet.

"**AcquisitionCo Convertible Notes Indenture**" means the indenture to be entered into on or prior to the Effective Date by the applicable CITGO Parties pursuant to which the AcquisitionCo Convertible Notes shall be issued.

"**AcquisitionCo Convertible Note Documents**" means other note documents to be entered into on or prior to the Effective Date by the applicable CITGO Parties together with the AcquisitionCo Convertible Notes Indenture.

"**Additional Consenting 2020 Noteholder**" has the meaning set forth in Section 6.3.

"**Affiliate**" means, with respect to any Person, any other Person directly or indirectly controlling, controlled by, or under common control with, such Person.

"**Agreement**" has the meaning set forth in the preamble.

"**Agreement Effective Date**" has the meaning set forth in Section 8.10.

"**Agreement Effective Date Group Holdings**" has the meaning set forth in Section 6.2.

"**Alternative Transaction**" means any refinancing, settlement, exchange, extension, tender or other restructuring of the 2020 Notes, in each case, that is ratable (including with respect to any fees or other amounts (other than expense reimbursement) payable in connection therewith) among Consenting 2020 Noteholders and that is an alternative to the Transaction.

"**Automatic Termination Event**" has the meaning set forth in Section 5.4.

"**Bankruptcy Code**" means title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq.*, as amended.

"**Bidder Termination Event**" has the meaning set forth in Section 5.3.

"**Business Day**" means any day other than a Saturday, Sunday, or any other day on which banks in New York, New York are authorized or required by law to close.

"**CITGO**" means CITGO Petroleum Corporation.

"**CITGO Parties**" means CITGO, CITGO Holding, and their subsidiaries.

"**Collateral Agent D&I Agreement**" has the meaning set forth in Section 2.2(b)(iii).

"**Collateral Release**" means the release of the shares of CITGO Holding pledged as collateral securing the 2020 Notes under the 2020 Notes Pledge Agreement.

"**Consent Solicitation**" has the meaning set forth in the Transaction Term Sheet.

"**Consenting 2020 Noteholders**" means the Initial Consenting 2020 Noteholders, each Additional Consenting 2020 Noteholder and each Notes Permitted Transferee.

"**Consenting 2020 Noteholder Advisor Fees and Expenses**" means all fees, expenses, and disbursements (including of the External Advisors) incurred and/or paid (whether before or after the date hereof, including after the Effective Date) (i) by (or at the behest of) the Initial Consenting 2020 Noteholders (or by funds and/or accounts managed and/or advised by any

4

investment manager and/or advisor constituting an Initial Consenting 2020 Noteholder (and irrespective as to whether such funds and/or accounts are 2020 Noteholders as of the Agreements Effective Date)) (a) relating to any litigation concerning the 2020 Notes, including the Fraud Action, the Declaratory Judgment Action, and the Crystallex Case (including all appeals therefrom) or (b) relating to the negotiation, formulation, preparation, execution, delivery, implementation, consummation, and/or enforcement of this Agreement (including all amendments hereto), any prior transaction support agreement between all or some of the Parties hereto, the Transaction, and/or any of the other Definitive Documents and regulatory issues associated with the foregoing; *provided*, *however*, that the fees, expenses and disbursements described above shall not include the fees, expenses, or disbursements incurred by and/or paid to any independent advisors retained by any Consenting 2020 Noteholder outside of the External Advisors without the prior written consent of the Required Consenting 2020 Noteholders and (ii) by the Trustee or Collateral Agent, in each case in their capacities as such and whether in relation to the Declaratory Judgment Action or the Auction.

"**Consenting 2020 Noteholder CA Indemnity**" has the meaning set forth in Section 2.2(b)(iii).

"**Consenting 2020 Noteholder Consent Right**" means the requirement for the Required Consenting 2020 Noteholders to approve the Definitive Documents (or any amendment, modifications, supplements, extensions, terminations, withdrawals, or waivers thereto) in their reasonable discretion, *provided*, that solely to the extent such Definitive Documents contain the Marketed or Committed Terms (as defined in the Transaction Term Sheet), they are deemed to have been approved by the Required Consenting 2020 Noteholders.

"**Consenting 2020 Noteholder Termination Event**" has the meaning set forth in Section 5.2.

"**Consenting 2020 Noteholder Trustee Indemnity**" has the meaning set forth in Section 2.2(b)(iv).

"**Control**" means with respect to any Person, the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of such Person, whether through the ownership of voting securities, by agreement, or otherwise, with the terms "controlling," "controlled by," and "under common control with" having correlative meanings.

"**Counsel Certification**" has the meaning set forth in Section 8.17(c).

"**D&I Agreements**" means, together, the Collateral Agent D&I Agreement and the Trustee D&I Agreement.

"**Definitive Documents**" has the meaning set forth in Section 2.2(b).

"**Documentation Principles**" has the meaning set forth in Section 2.2(a).

"**Effective Date**" means the date on which the Private Exchange is consummated in accordance with the terms of this Agreement and the applicable Definitive Documents.

"**External Advisors**" means, collectively, Paul, Weiss, Rifkind, Wharton & Garrison LLP ("**Paul Weiss**"), Latham & Watkins LLP, Clark Smith Villazor LLP, Sullivan & Cromwell LLP, Clifford Chance LLP, Seward & Kissel LLP, and Morris James LLP, it being understood that Paul Weiss and Clark Smith Villazor LLP are also counsel to the Trustee and Collateral Agent in the Declaratory Judgment Action.

"**Initial Deadline**" has the meaning set forth in Section 5.4(b).

"**Minimum Participation Threshold**" means the Participation of 2020 Noteholders that collectively hold greater than 66.7% of the aggregate principal amount of 2020 Notes outstanding as of the Successful Bid Date.

"**New CITGO Holding Notes**" has the meaning set forth in the Transaction Term Sheet.

"**New CITGO Holding Notes Indenture**" means the indenture to be entered into on or prior to the Effective Date by the applicable CITGO Parties pursuant to which the New CITGO Holding Notes shall be issued.

"**New CITGO Holding Note Documents**" means other note documents to be entered into on or prior to the Effective Date by the applicable CITGO Parties together with the New CITGO Holding Notes Indenture.

"**New CITGO Petroleum Notes**" has the meaning set forth in the Transaction Term Sheet.

"**New CITGO Petroleum Notes Indenture**" means the indenture to be entered into on or prior to the Effective Date by the applicable CITGO Parties pursuant to which the New CITGO Notes shall be issued.

"**New CITGO Petroleum Note Documents**" means other note documents to be entered into on or prior to the Effective Date by the applicable CITGO Parties together with the New CITGO Notes Indenture.

"**Notes Permitted Transferee**" has the meaning set forth in Section 6.1.

"**Notes Transfer**" has the meaning set forth in Section 6.1.

"**Offering Materials**" has the meaning set forth in Section 2.2(b)(ii).

"**Participate**" or "**Participation**" means: (a) with respect to the Private Exchange, a Participating Noteholder's timely execution and delivery of the Purchase Agreements and all other Definitive Documents necessary for such Participating Noteholder to exchange its 2020 Notes in the Private Exchange, and otherwise approve, implement, and effect the Transaction, including the Proposed Actions; and (b) with respect to the Public Exchange Offer, any other 2020 Noteholder's timely tender of its 2020 Notes, pursuant to the terms of the Public Exchange Offer, and non-revocation or withdrawal of such tender, in each case as contemplated by this Agreement and the Definitive Documents.

"**Participating Noteholders**" has the meaning set forth in Section 2.2(b)(i).

"**Party**" has the meaning set forth in the preamble.

"**PDVH Transaction**" means the purchase of the PDVH Shares in the Auction, either by (i) the Leading Bidder pursuant to the Credit Bid or (ii) by any third-party.

"**Person**" means an individual, partnership, joint venture, limited liability company, corporation, trust, unincorporated organization, group, or any other legal entity or association.

"**Private Exchange**" has the meaning set forth in Section 2.2(b)(i).

"**Proposed Actions**" means any amendments, waivers and other actions under the 2020 Notes Indenture, the 2020 Notes Pledge Agreement and related documents that are necessary in order to complete the PDVH Transaction, including the Collateral Release.

"**Public Exchange Offer**" means a public exchange offer of all 2020 Notes not subject to the Private Exchange.

"**Purchase Agreements**" has the meaning set forth in Section 2.2(b)(i).

"**Related Fund**" means, with respect to a Consenting 2020 Noteholder, a fund which is managed or advised by the same investment manager or investment advisor as manages or advises the Consenting 2020 Noteholder, or, if a fund is managed or advised by a different investment manager or investment advisor, a fund whose investment manager or investment advisor is an Affiliate of the investment manager or investment advisor of the Consenting 2020 Noteholder.

"**Required Consenting 2020 Noteholders**" means, as of any date of determination, Consenting 2020 Noteholders that collectively hold greater than 50% of the aggregate outstanding principal amount of the 2020 Notes (taken together as a single class) held by all Consenting 2020 Noteholders as of such date.

"**Sale Transaction Date**" means the closing date of the PDVH Transaction.

"**Successful Bid Date**" shall have the meaning set forth in Section 3.1(a)(iv)(A).

"**Termination Date**" has the meaning set forth in Section 5.5.

"**Termination Event**" means any Automatic Termination Event, Bidder Termination Event, or Consenting 2020 Noteholder Termination Event.

"**Transfer**" means to (a) sell, transfer, assign, hypothecate, pledge, or otherwise dispose of, directly or indirectly, right, title, or interest in or with respect to any security, loan, credit commitment, or other obligation, in whole or in part, or (b) deposit any such security, loan, credit commitment, or other obligation, into a voting trust, or to grant a proxy or enter into a voting agreement with respect to any such security, loan, credit commitment, or other obligation. "**Transferor**" and "**Transferee**" have correlative meanings.

"**Trustee D&I Agreement**" has the meaning set forth in Section 2.2(b)(iv).

   **Section 1.2  *Rules of Interpretation***. For purposes of this Agreement:

     (a)  each term, whether stated in the singular or the plural, shall include both the singular and the plural, and pronouns stated in the masculine, feminine, or neuter gender shall include all of the masculine, feminine, and neuter gender;

     (b)  capitalized terms defined only in the singular or the plural shall nonetheless have their defined meanings when used in both the singular and the plural;

     (c)  unless otherwise specified, any reference herein to a contract, lease, instrument, release, indenture, or other agreement or document being in a particular form or on particular terms and conditions means that such document shall be substantially in such form or substantially on such terms and conditions;

(d)    unless otherwise specified, any reference herein to an existing document, schedule, or exhibit shall mean such document, schedule, or exhibit as it may have been or may be amended, restated, supplemented, or otherwise modified from time to time; *provided* that any capitalized terms herein that are defined with reference to another agreement are defined with reference to such other agreement as of the Agreement Effective Date, without giving effect to any termination of such other agreement or any amendments to such capitalized terms in any such other agreement following the Agreement Effective Date;

(e)    unless otherwise specified, all references herein to "sections" and "exhibits" are references to the sections of and exhibits to this Agreement;

(f)    the words "herein," "hereof," and "hereto" refer to this Agreement in its entirety rather than to any particular provision of this Agreement;

(g)    the use of "include" or "including" is without limitation, whether stated or not;

(h)    the definitions of terms in the preamble, the recitals, and this Section 1 shall have the same force and effect as all decretal provisions of this Agreement; and

(i)    the use of the terms "ratable," "ratably," and "pro rata" shall be referable to the principal amount of the 2020 Notes held by a Consenting 2020 Noteholder and each of those terms and the phrase "disproportionately negative effect" is without prejudice to the ability of each Consenting 2020 Noteholder to recover its actual expenditure in respect of Consenting 2020 Noteholder Advisor Fees and Expenses on a dollar-for-dollar basis.

**Section 2.**    **Exhibits; Definitive Documentation.**

*Section 2.1    Exhibits*. The Transaction Term Sheet and each of the other exhibits attached hereto or thereto are incorporated by reference herein and made a part of this Agreement as if fully set forth herein, and all references to this Agreement include and incorporate all such exhibits; *provided, however*, (a) to the extent that there is a conflict between this Agreement, on the one hand, and the Transaction Term Sheet, on the other hand, the terms and provisions of the Transaction Term Sheet shall govern, and (b) to the extent that there is a conflict between the Transaction Term Sheet or this Agreement, on the one hand, and the Definitive Documents, on the other hand, the terms and provisions of the Definitive Documents will govern.

*Section 2.2    Definitive Documents*.

(a)    The Transaction shall consist of the Private Exchange and the Public Exchange Offer, the terms and execution of which shall be consistent with the terms of this Agreement, the Transaction Term Sheet and the Marketed or Committed Terms (as defined in the Transaction Term Sheet) (the "**Documentation Principles**") and, to the extent not addressed therein or consistent with the Documentation Principles, shall otherwise be on terms reasonably acceptable to the Leading Bidder and the Required Consenting 2020 Noteholders.

(b)    The Transaction will be implemented pursuant to the following agreements and related documentation (collectively, the "**Definitive Documents**"), the agreement and execution of which shall be subject to the Consenting 2020 Noteholder Consent Right:

(i)    agreements between the applicable CITGO Parties and those Consenting 2020 Noteholders (participating ratably in respect of their 2020 Notes) which together would satisfy the Minimum Participation Threshold (the "**Participating Noteholders**"), in each case, pursuant to which, on the Sale Transaction Date, such 2020 Noteholders will sell, assign, and transfer to the applicable CITGO Parties their existing 2020 Notes in exchange for (A) AcquisitionCo Convertible Notes, as further specified in the Transaction Term Sheet and/or (B) New CITGO Holding Notes, as further specified in the Transaction Term Sheet (collectively, the "**Purchase Agreements**" and the sale, assignment and transfer set forth therein, the "**Private Exchange**") and related procedures, forms, and other documents necessary or desirable to effect such purchase;

(ii)    offering materials for the Public Exchange Offer (collectively, the "**Offering Materials**"), including all forms, securities filings and other documents necessary or desirable to effect the Public Exchange Offer;

(iii)    a direction and indemnity agreement (the "**Collateral Agent D&I Agreement**") by and among the Consenting 2020 Noteholders, the Collateral Agent and (as of the Sale Transaction Date) the CITGO Parties, substantially in the form approved by the Required Consenting 2020 Noteholders, pursuant to which (A) the Consenting 2020 Noteholders will provide consent for the Proposed Actions, including the Collateral Release, (B) the Consenting 2020 Noteholders will provide a direction to the Collateral Agent to perform the Proposed Actions, including the Collateral Release, and (C)



(iv)    to the extent necessary for the Proposed Actions to be completed, a direction and indemnity agreement (the "**Trustee D&I Agreement**") by and among the Consenting 2020 Noteholders, the Trustee and (as of the Sale Transaction Date) the CITGO Parties, substantially in the form approved by the Required Consenting 2020 Noteholders, pursuant to which (A) the Consenting 2020 Noteholders will provide consent for the Proposed Actions, including the Collateral Release, (B) the Consenting 2020 Noteholders will provide a direction to the Trustee to perform, direct and/or permit (as applicable) the Proposed Actions, including the Collateral Release, and (C)



(v)    the New CITGO Petroleum Notes Indenture and other New CITGO Petroleum Note Documents;

(vi)    the New CITGO Holding Notes Indenture and other New CITGO Holding Note Documents;

(vii)    the AcquisitionCo Convertible Notes Indenture and other AcquisitionCo Convertible Note Documents; and

(viii)    all other ancillary and related documents and instruments to be entered into in connection with the Transaction, including any amendments to the 2020 Notes Indenture and the 2020 Notes Pledge Agreement reasonably required to consummate the Credit Bid.

(c)    The Definitive Documents remain subject to negotiation and completion and will, upon completion, contain terms, conditions, representations, warranties, and covenants consistent with the Documentation Principles, including, without limitation, being subject to Marketed or Committed Terms, and otherwise in form and substance reasonably satisfactory to the Required Consenting 2020 Noteholders and the Leading Bidder.

(d)    It is expected that the Definitive Documents will provide for the D&I Agreements be effective immediately prior to the Collateral Release, which will occur at or immediately prior to the Sale Transaction Date.

**Section 3.    Commitments of the Parties.**

*Section 3.1    Commitments of the Leading Bidder.*

(a)    As of the date of this Agreement, the Leading Bidder agrees, directly or through its authorized representatives and advisors:

(i)    to cooperate in good faith with the Consenting 2020 Noteholders to negotiate, complete, execute, and deliver, as applicable, the Definitive Documents which, for the avoidance of doubt, shall be subject to the Consenting 2020 Noteholder Consent Right;

(ii)    to use commercially reasonable efforts to take, or cause to be taken, all actions necessary, proper, or advisable to consummate the Transaction;

(iii)    without limiting the generality of the foregoing clause (ii), to, with regard to the Public Exchange Offer:

(A)    distribute or cause to be distributed the Offering Materials to 2020 Noteholders;

(B)    solicit or cause to be solicited tenders, consents, and acceptances from the 2020 Noteholders other than the Consenting 2020 Noteholders, in accordance with this Agreement and the Offering Materials;

(C)    use commercially reasonable efforts to timely prepare or cause to be prepared all amendments to the Offering Materials that the Leading Bidder and the Required Consenting 2020 Noteholders reasonably deem necessary or advisable;

(D)    use commercially reasonable efforts to otherwise solicit Participation by 2020 Noteholders in the Public Exchange Offer; and

(E)    to the extent no decision has been rendered in respect of the Declaratory Judgment Action, following commencement of the Public Exchange Offer, to use commercially reasonable efforts to cause the Declaratory Judgment Action to be stayed for a period of 90 days;

(iv)    without limiting the generality of the foregoing clause (C), to, with regard to the Private Exchange:

(A)    coordinate with counsel to the Initial Consenting 2020 Noteholders to facilitate the distribution of the Purchase Agreements to all of the Consenting 2020 Noteholders on or as soon as reasonably practicable following the Special Master's submission of his Final Recommendation (as defined in the Memorandum Order) no later than May 16, 2025 (as such date may be extended by the Delaware Court) (the "**Successful Bid Date**"); and

(B)    subject to the conditions precedent set forth in Section 4 and the performance by the Consenting 2020 Noteholders of their respective obligations hereunder, use commercially reasonable efforts to cause (x) the CITGO Parties to execute the Purchase Agreements on or prior to the Sale Transaction Date; (y) the Effective Date to occur on or about the Sale Transaction Date; and (z) the CITGO Parties to indemnify the Consenting 2020 Noteholders, the Trustee and the Collateral Agent pursuant to the D&I Agreements;

(v)    to the extent any legal or structural impediment arises that would prevent, hinder, or delay the consummation of the Transaction, to use commercially reasonable efforts to negotiate or to cause to be negotiated with the Required Consenting 2020 Noteholders appropriate additional or alternative provisions or alternative implementation mechanics to address any such impediment;

(vi)    to use commercially reasonable efforts to cause the CITGO Parties to pay all Consenting 2020 Noteholder Advisor Fees and Expenses on or prior to the Effective Date;

(vii)     that it shall not (i) object to, delay, or impede the Transaction or initiate any legal proceedings, make any filings, arguments, motions, or statements, or otherwise take any positions in any litigation, that are inconsistent with, or that would delay, prevent, frustrate, or impede the approval, solicitation, or consummation of, the Transaction, the Definitive Documents, or any other transactions outlined therein, (ii) amend, modify, supplement, extend, terminate, withdraw, or waive any terms or conditions of the Private Exchange without the prior written consent of the Required Consenting 2020 Noteholders, (iii) take any other action that is barred by this Agreement except as required by applicable law or regulations, or (iv) fail or omit to take any action that is required by this Agreement or the Definitive Documents except as required by applicable law or regulation; *provided* that AcquisitionCo shall, if legally permitted to do so, notify the Consenting 2020 Noteholders within 48 hours of their determination pursuant to the foregoing clauses (iii) or (iv) that applicable law or regulation requires any act or omission otherwise barred or required by this Agreement; and

(viii)     to act in good faith to ensure that this Agreement is not terminated as a direct result of any order or judgment in the Declaratory Judgment Action that does not (x) stay consummation of the Transaction to a date beyond the term of this Agreement per Section 5.4(b) hereof or (y) permanently enjoin the Transaction.

(b)     On the terms and subject to the conditions of this Agreement, if the Credit Bid is declared the Successful Bid, and for so long as no Termination Date has occurred, the Leading Bidder agrees, directly or through its authorized representatives and advisors to prepare or cause the preparation of the Definitive Documents, provide or cause to be provided draft copies of the Definitive Documents to counsel to the Initial Consenting 2020 Noteholders, and provide or cause to be provided to the Consenting 2020 Noteholders (subject to any confidentiality restrictions) a reasonable opportunity to review and comment on the Definitive Documents (which comments the Leading Bidder will consider in good faith, subject to the Documentation Principles and the Consenting 2020 Noteholder Consent Right);

(c)     On the terms and subject to the conditions of this Agreement and for so long as no Termination Date has occurred, the Leading Bidder agrees, directly or through its authorized representatives and advisors, subject to Section 8.19 (*Additional Negotiations*), not to seek, solicit, support, formulate, entertain, encourage, engage in any inquiries or discussions concerning, or enter into any agreements relating to or terminate this Agreement in relation to, any PDVH Transaction that does not (x) provide for financial terms and conditions on par with or more favorable to the 2020 Notes of the Consenting 2020 Noteholders than the financial terms for the Transaction contemplated herein or (y) have the prior written consent of the Required Consenting 2020 Noteholders.

### Section 3.2     *Commitments of the Consenting 2020 Noteholders*.

(a)     *Commitments of the Consenting 2020 Noteholders*. As of the date of this Agreement, each Consenting 2020 Noteholder agrees, severally and not jointly:

(i)     to use commercially reasonable efforts to pursue, support, solicit, implement, confirm, and consummate the Transaction and to act in good faith and use commercially reasonable efforts to negotiate the Definitive Documents with the Leading Bidder, the CITGO Parties and the other Consenting 2020 Noteholders and to take, or cause to be taken, all actions necessary or proper to consummate the Transaction in a manner consistent with this Agreement, subject to the Consenting 2020 Noteholder Consent Right;

(ii)    to the extent any legal or structural impediment arises that would prevent, hinder, or delay the consummation of the Transaction, to use commercially reasonable efforts to negotiate with the Leading Bidder and the other Consenting 2020 Noteholders in good faith in an effort to agree to appropriate additional or alternative provisions or alternative implementation mechanics to address any such impediment;

(iii)    to exchange its 2020 Notes held as of the Effective Date in the Private Exchange;

(iv)    to promptly notify the New York Court presiding over the Declaratory Judgment Action, upon selection of the Credit Bid as the Successful Bid, that the Credit Bid has been selected as the Successful Bid;

(v)    to the extent no decision has been rendered in respect of the Declaratory Judgment Action, following selection of the Credit Bid as the Successful Bid, to use commercially reasonable efforts to cause the Declaratory Judgment Action to be stayed until the closing date of the Transaction;

(vi)    to use commercially reasonable efforts to reach the Minimum Participation Threshold in the Private Exchange and to provide any associated and required direction and pro rata share (among Consenting 2020 Noteholders, but only to the extent that each such Consenting 2020 Noteholder is able to provide such indemnity) of an indemnity to the Trustee and/or the Collateral Agent consistent with Section 2.2(b)(iii) and Section 2.2(b)(iv) hereof;

(vii)    subject to the consent of the Special Master, if the Credit Bid is selected as the Successful Bid (as defined in the Bidding Procedures Order), that it will not, directly or indirectly, participate in, support, solicit, finance, or negotiate in respect of an Alternative Transaction;

(viii)    to act in good faith to ensure that this Agreement is not terminated as a direct result of any order or judgment in the Declaratory Judgment Action that does not (x) stay consummation of the Transaction to a date beyond the term of this Agreement per Section 5.4(b) hereof or (y) permanently enjoin the Transaction; and

(ix)    that it shall not:

(1)    (A) object to, delay, or impede the Transaction or initiate any legal proceedings or make any filings, arguments, motions, or statements, or otherwise take any positions in any litigation, that are inconsistent with, or that would delay, prevent, frustrate, or impede the approval, solicitation, or consummation of the Transaction, the Definitive Documents, or any other transactions outlined therein, (B) take any other action that is barred by this Agreement except as required by applicable law or regulations, or (C) fail or omit to take any action that is required by this Agreement or the Definitive Documents except as required by applicable law or regulations, *provided* that, it (or counsel on its behalf) shall, if legally permitted to do so, notify the Leading Bidder within 48 hours of their determination pursuant to the foregoing *clause (B)* or *(C)* that applicable law or regulation requires any act or omission otherwise barred or required by this Agreement;

(2)    [Intentionally Deleted];

13

(3)    instruct the Trustee to take any action, or to refrain from taking any action, that would be inconsistent with this Agreement or the Transaction; or

(4)    solicit, encourage, or direct any Person to undertake any action set forth in clauses (1) through (3) of this subsection (ix).

(b)    On the terms and subject to the conditions of this Agreement, upon and following the Successful Bid Date and for so long as no Termination Date has occurred, each Consenting 2020 Noteholder agrees, severally and not jointly to cooperate in good faith and to coordinate activities (to the extent practicable and subject to the terms hereof) with the Leading Bidder, the CITGO Parties and the other Consenting 2020 Noteholders to negotiate, complete, execute, and deliver, as applicable, the Definitive Documents, in each case so long as such Definitive Documents have been approved in accordance with the terms of this Agreement, subject to the Consenting 2020 Noteholder Consent Right;

(c)    *Equality of Treatment.* On the terms and subject to the conditions of this Agreement, upon and following the Successful Bid Date and for so long as no Termination Date has occurred, each Consenting 2020 Noteholder agrees, severally and not jointly, that it (i) shall not directly or indirectly, take any action to consummate or pursue or initiate or knowingly encourage, facilitate, solicit, continue or engage in discussions or negotiations with, or enter into any agreement with, any Person (other than the Leading Bidder and its Affiliates and representatives) concerning any Alternative Transaction unless such Alternative Transaction provides for financial terms and conditions on par with or more favorable to the 2020 Notes than the financial terms for the Transaction contemplated herein, and (ii) shall cease and cause to be terminated any existing discussions, communications or negotiations with any Person (other than the Leading Bidder and its Affiliates and representatives) conducted heretofore with respect to any Alternative Transaction unless such Alternative Transaction provides for financial terms and conditions on par with or more favorable to the 2020 Notes than the financial terms for the Transaction contemplated herein.  For avoidance of doubt, "financial terms" means fair market value of total consideration received by 2020 Noteholders pursuant to Purchase Agreements, including, but not limited to, the form of such consideration such as cash, securities and financial derivative instruments, if any.

Section 4.    **Conditions Precedent.**

**Section 4.1    Conditions Precedent to Obligations of All Parties**. The occurrence of the Effective Date and the obligation of each Party to consummate the Transaction are subject to the satisfaction or waiver by each Party of the following:

(a)    the Agreement shall not have been terminated in accordance with its terms;

(b)    the Successful Bid Date shall have occurred with the Credit Bid by the Leading Bidder being named as the Successful Bid;

(c)    the Minimum Participation Threshold shall have been satisfied, and the Private Exchange, as described in this Agreement, shall have been consummated;

(d)    each Definitive Document shall have been prepared in accordance with the Documentation Principles and has, if applicable, been duly approved, executed and delivered by each party thereto and is in full force and effect (and all conditions precedent to effectiveness thereunder have been satisfied or waived in accordance with the terms thereof) at or substantially concurrently with the Effective Date; *provided* that a Party's failure to execute and deliver a Definitive Document that has been

prepared in accordance with the Documentation Principles or otherwise approved in accordance with the provisions of this Agreement to which it is intended to be a party shall not be a condition precedent to such Party's obligations;

    (e)    the Collateral Release shall have occurred or will occur on the Effective Date;

    (f)    no temporary restraining order, preliminary or permanent injunction, judgment, or other order of any court of competent jurisdiction or governmental entity preventing the consummation of any part of the Transaction shall have been entered, issued, rendered, or made by any party other than a Party; nor shall there be any law, rule, or regulation promulgated, enacted, entered, enforced, or deemed applicable to the CITGO Parties or Leading Bidder which makes the consummation of any part of the Transaction illegal, void, or rescinded;

    (g)    the PDVH Transaction and Transaction shall have received the approval of any required regulatory authority or court of competent jurisdiction, and including the Office of Foreign Assets Control; and

    (h)    (i) the Delaware Court has issued a final sale order in respect of the Credit Bid, (ii) the final sale order shall be entered into on or before December 31, 2025, (iii) there is no stay of such order pending appeal and (iv) the transaction contemplated by the Credit Bid is consummated substantially concurrently with the Effective Date and the consummation of the Transaction.

    **Section 4.2**    ***Conditions Precedent to the Obligations of the Leading Bidder***. The occurrence of the Effective Date and the obligation of the Leading Bidder to consummate or cause the consummation of the Transaction are subject to the satisfaction or waiver by the Leading Bidder of the following:

    (a)    no Bidder Termination Event shall have occurred;

    (b)    the representations and warranties of the Consenting 2020 Noteholders in Section 7 are true and correct in all material respects (or, if any such representation or warranty is qualified by materiality, in all respects) at and as of the date hereof and as of the Effective Date with the same effect as if made at and as of such date and after giving effect to the Transaction (except for such representations and warranties made as of a specified date, which shall be true and correct in all material respects or true and correct, as applicable, only as of the specified date); and

    (c)    the Consenting 2020 Noteholders (taken as a whole) shall have performed and complied, in all material respects, with all of their respective covenants and agreements contained in this Agreement that contemplate, by their terms, performance or compliance on or prior to the Effective Date;

    **Section 4.3**    ***Conditions Precedent to the Obligations of the Consenting 2020 Noteholders***.

    (a)    The occurrence of the Effective Date and the obligation of the Consenting 2020 Noteholders to consummate the Transaction are subject to the satisfaction or waiver by the Required Consenting 2020 Noteholders, as applicable, in accordance with Section 4.3(b*),* of the following:

(i)        no Consenting 2020 Noteholder Termination Event has occurred;

(ii)        [Intentionally Deleted];

(iii)        the CITGO Parties shall have paid on the Effective Date all Consenting 2020 Noteholder Advisor Fees and Expenses, for which an invoice has been received by the CITGO Parties on or before the date that is five Business Days prior to the Effective Date; and

(iv)        the Leading Bidder shall have performed and complied, in all material respects, with all of its respective covenants and agreements contained in this Agreement that contemplate, by their terms, performance or compliance on or prior to the Effective Date.

(b)        The conditions precedent to the obligation of a Consenting 2020 Noteholder to consummate the Transaction set forth in Section 4.3(a) may only be waived by the Required Consenting 2020 Noteholders, respectively.

**Section 5.        Termination.**

*Section 5.1        Mutual Termination*. This Agreement may be terminated at any time by mutual written consent of the Leading Bidder and the Required Consenting 2020 Noteholders.

*Section 5.2        Termination by the Consenting 2020 Noteholders*. This Agreement may be terminated by the Required Consenting 2020 Noteholders upon prior written notice thereof to all other Parties (with notice by email solely to each of Paul Weiss and counsel to the Leading Bidder being sufficient) of the occurrence of any of the following events (each a "**Consenting 2020 Noteholder Termination Event**"):

(a)        the Leading Bidder materially breaches any of their representations, warranties, covenants, or obligations under this Agreement and such breach, if susceptible to cure, remains uncured for a period of five Business Days after the Leading Bidder's receipt of written notice of such breach;

(b)        subject to the Consenting 2020 Noteholder Consent Right, any Definitive Document is, upon its delivery, execution, or amendment or other modification, inconsistent with the terms hereof, unless such Definitive Document is reformed so as to be consistent with the terms hereof within five Business Days of receipt by the other Parties of written notice; or

(c)        the Leading Bidder's (i) public announcement of its intention not to support the Transaction, (ii) filing, public announcement, or execution of a definitive written agreement with respect to or in connection with a PDVH Transaction in violation of Section 3.1(c), or (iii) agreement or indication of a material commitment to pursue (including, for the avoidance of doubt, as may be evidenced by a term sheet, letter of intent, or similar document from or to a CITGO Party) or benefit from, or public announcement of its intent to pursue or benefit from, a PDVH Transaction in violation of Section 3.1(c);

(d)        the Required Consenting 2020 Noteholders' entry into an Alternative Transaction that complies with Section 3.2(c) hereof;

(e)     PDVH, PDVSA, CITGO Holding or CITGO commences insolvency proceedings (which shall not include the Declaratory Judgment Action), including by (i) voluntarily commencing any case or filing any petition seeking bankruptcy, winding up, dissolution, liquidation, administration, moratorium, reorganization, or other relief under any federal, state, or foreign bankruptcy, insolvency, administrative receivership, or similar law now or hereafter in effect, (ii) consenting to the institution of, or failing to contest in a timely manner, any involuntary proceeding or petition described above, (iii) filing an answer admitting the material allegations of a petition filed against it in any such proceeding, (iv) applying for or consenting to the appointment of a receiver, administrator, administrative receiver, trustee, custodian, sequestrator, conservator, or similar official for the applicable entity or for a substantial part of its assets, or (v) making a general assignment or arrangement for the benefit of creditors; or

(f)     the entry of an order, judgment, or decree (other than in respect of the Declaratory Judgment Action) adjudicating PDVH, PDVSA, CITGO Holding or CITGO bankrupt or insolvent, including the entry of any order for relief with respect to any such entity under the Bankruptcy Code.

**Section 5.3**     *Termination by the Leading Bidder*. This Agreement may be terminated by the Leading Bidder upon prior written notice thereof to all other Parties of the occurrence of any of the following events (each, a "**Bidder Termination Event**"):

(a)     [Intentionally Deleted];

(b)     [Intentionally Deleted];

(c)     any Consenting 2020 Noteholder breaches any of its representations, warranties, covenants, or obligations under this Agreement, and such breach, if susceptible to cure, remains uncured for a period of five Business Days after such breaching Party's receipt of written notice of such breach and such breach has a material and adverse effect on the Parties' ability to consummate the transactions contemplated by this Agreement;

(d)     PDVH, PDVSA, CITGO Holding or CITGO commences insolvency proceedings, including by (i) voluntarily commencing any case or filing any petition seeking bankruptcy, winding up, dissolution, liquidation, administration, moratorium, reorganization, or other relief under any federal, state, or foreign bankruptcy, insolvency, administrative receivership, or similar law now or hereafter in effect, (ii) consenting to the institution of, or failing to contest in a timely manner, any involuntary proceeding or petition described above, (iii) filing an answer admitting the material allegations of a petition filed against it in any such proceeding, (iv) applying for or consenting to the appointment of a receiver, administrator, administrative receiver, trustee, custodian, sequestrator, conservator, or similar official for the applicable entity or for a substantial part of its assets, or (v) making a general assignment or arrangement for the benefit of creditors; or

(e)     the entry of an order, judgment, or decree adjudicating PDVH, PDVSA, CITGO Holding or CITGO bankrupt or insolvent, including the entry of any order for relief with respect to any such entity under the Bankruptcy Code.

**Section 5.4**     *Automatic Termination*. This Agreement will automatically terminate upon the occurrence of any of the following events (each, an "**Automatic Termination Event**"):

(a)     the Effective Date;

(b)    June 30, 2026 (the "**Initial Deadline**"), as may be extended by written notice by Red Tree, subject to the accrual of the Ticking Fee (as defined in the Transaction Term Sheet) after the Initial Deadline; underlined, provided, that the Initial Deadline may not extended beyond the earlier of: (x) eighteen (18) months from the date of execution of the share purchase agreement governing the Credit Bid or (y) January 30, 2027, absent the consent of Red Tree and all Consenting 2020 Noteholders, which extension shall be in the sole and absolute discretion, and which discretion may be exercised in any manner whatsoever, of each such Person; or

(c)    execution of definitive documentation relating to any settlement or transaction pursuant to Section 8.19 (*Additional Negotiations*) hereof.

**Section 5.5    Termination Date and Survival**. The date on which this Agreement is terminated in accordance with this Section 5 is referred to as the "**Termination Date**." The provisions of this Agreement will terminate on the Termination Date; *provided* that Section 1, Section 3.2(c) (solely to the extent this Agreement is terminated in accordance with Section 5.2(d)) and Section 8 (other than Sections 8.15, 8.18, 8.19, and 8.20) will survive the Termination Date.

**Section 5.6    Effect of Termination**. Upon the Termination Date, this Agreement shall become null and void and have no further force or effect, each Party hereto shall be released from its commitments, undertakings, and agreements under or related to this Agreement and, to the extent the Effective Date has not occurred, any of the Definitive Documents, as applicable, and there shall be no liability or obligation on the part of any Party hereto; *provided* that in no event shall any such termination relieve a Party hereto from (i) liability for its breach or non-performance of its obligations hereunder prior to such Termination Date, notwithstanding any termination of this Agreement by any other Party, and (ii) obligations under this Agreement that expressly survive any such termination pursuant to Section 5.5. Upon any Termination Date, any and all consents, tenders, waivers, forbearances, directions and votes delivered by a Consenting 2020 Noteholder in connection with the Transaction automatically shall be deemed, for all purposes, to be null and void *ab initio*. Notwithstanding the foregoing or anything herein to the contrary, no Party may exercise any of its respective termination rights as set forth in this Section 5 if such Party has failed to perform or comply in all material respects with the terms and conditions of this Agreement unless such failure to perform or comply arises as a result of another Party's actions or inactions or would not otherwise give rise to a Termination Event in favor of the other Party.

**Section 6.    Transfers of Claims and Interests.**

**Section 6.1    Transfers of 2020 Notes**. Following the Successful Bid Date, so long as no Consenting 2020 Noteholder Termination Event or Automatic Termination Event has occurred, no Consenting 2020 Noteholder shall Transfer any 2020 Notes (a "**Notes Transfer**"), unless the Transferee is (a) another Consenting 2020 Noteholder or a Related Fund of a Consenting 2020 Noteholder as of the effective date of such Notes Transfer or (b) any other Person that executes and delivers to counsel to the Leading Bidder and counsel to the Initial Consenting 2020 Noteholders a 2020 Noteholder Transferee Joinder at least three (3) Business Days prior to the effective date of such 2020 Notes Transfer provided that the Required Consenting 2020 Noteholders have provided their prior written approval in respect of the identity of any such Transferee (any Person described in the preceding clause (a) or (b), a "**Notes Permitted Transferee**"). Upon the consummation of a Notes Transfer in accordance with this Section 6.1, the applicable Notes Permitted Transferee will be deemed to make all of the representations, warranties, and covenants of a Consenting 2020 Noteholder set forth in this Agreement, to be bound by all elections made by the applicable transferor under this Agreement, and to be a Party and a Consenting 2020 Noteholder for all purposes under this Agreement. Upon compliance with the foregoing, the applicable transferor will be deemed to relinquish its rights and be released from its obligations under this Agreement, in each case with respect to the 2020 Notes that are the subject of such Notes Transfer. Any

purported Notes Transfer made in violation of this Section 6.1 is null and void *ab initio* and is of no force or effect. For the avoidance of doubt, if a Notes Permitted Transferee who is not otherwise a Participating Noteholder beneficially held 2020 Notes prior to its receipt of 2020 Notes via a Notes Transfer, only those 2020 Notes purchased via a Notes Transfer shall Participate in the Private Exchange, absent written agreement of the Leading Bidder and the Required Consenting 2020 Noteholders. For the further avoidance of doubt, prior to the Successful Bid Date, any Consenting Noteholder may freely Transfer any of its 2020 Notes, and such Transfer shall not be considered a Notes Transfer hereunder.

       **Section 6.2    Additional Claims**. Except as set forth in Section 6.1, nothing in this Agreement shall be construed as precluding any Consenting 2020 Noteholder or any of its Affiliates or any of its Related Funds from acquiring additional 2020 Notes following the Agreement Effective Date provided that following the Agreement Effective Date, any such additional 2020 Notes acquired by a Consenting 2020 Noteholder or any of its Affiliates or any of its Related Funds (in each case by reference to its portion of the Agreement Effective Date Group Holdings (as defined below)) shall only Participate in the Private Exchange with the express written consent of the Leading Bidder and the Required Consenting 2020 Noteholders. Each Consenting 2020 Noteholder shall provide to Paul Weiss on the Agreement Effective Date the amount of its holdings of the 2020 Notes as of such date (the aggregate amount of such holdings of all Consenting 2020 Noteholders as of such date, after accounting for any unsettled trades to purchase or sell 2020 Notes pending as of such date, being the "**Agreement Effective Date Group Holdings**"). On or around the first business day of each calendar month, each Consenting 2020 Noteholder shall provide Paul Weiss with the current amount of its holdings of the 2020 Notes as of such date.

       **Section 6.3    Additional Joinders**. Additional Consenting 2020 Noteholders may accede to this Agreement as Consenting 2020 Noteholders; *provided* that (i) each Initial Consenting 2020 Noteholder has provided its prior written consent in relation to the identity of each such additional 2020 Noteholder and (ii) each such additional 2020 Noteholder has executed a 2020 Noteholder Joinder, after which such additional 2020 Noteholder shall be deemed a Consenting 2020 Noteholder hereunder in all respects (each such additional 2020 Noteholder being an "**Additional Consenting 2020 Noteholder**"); *provided*, *further*, that any Related Fund that accedes to this agreement shall be deemed an "Initial Consenting 2020 Noteholder".

     **Section 7.    Representations and Warranties.**

       **Section 7.1    Mutual Representations and Warranties**. Each Party, severally and not jointly, represents to each other Party that:

          (a)    such Party is duly organized, validly existing, and in good standing under the laws of the jurisdiction of its organization and has all requisite corporate, partnership, or limited liability company power and authority to enter into this Agreement, perform its obligations under this Agreement, and carry out the Transaction, and such Party's execution and delivery of this Agreement and the performance of its obligations hereunder have been duly authorized by, as applicable, all necessary corporate, limited liability company, partnership, or other similar actions on its part;

          (b)    such Party's execution, delivery, and performance of this Agreement does not and will not (i) violate any provision of law, rule, or regulation applicable to it or any of its subsidiaries or its organizational documents or those of any of its subsidiaries, or (ii) conflict with, result in a breach of, or constitute (with due notice or lapse of time or both) a default under its organizational documents or any material contractual obligations to which it or any of its subsidiaries is a party;

(c)     such Party's execution, delivery, and performance of this Agreement does not and will not require the consent or approval by any other Person or entity, except for any consent or approval obtained prior to, or contemporaneously with, the Agreement Effective Date; and

(d)     this Agreement is the legally valid and binding obligation of such Party, enforceable against it in accordance with its terms, except as enforcement may be limited by bankruptcy, insolvency, reorganization, moratorium, or other similar laws relating to or limiting creditors' rights generally or by equitable principles.

**Section 7.2     *Representations and Warranties of the Consenting 2020 Noteholders*.** Each Consenting 2020 Noteholder, severally and not jointly, represents to the CITGO Parties (solely in respect of its managed and/or advised funds and/or accounts in the case of any investment manager or investment advisor and not in respect of itself):

(a)     (i) it is (A) a "qualified institutional buyer" within the meaning of Rule 144A under the Securities Act, (B) an institutional "accredited investor" within the meaning of Rules 501(a)(1), (a)(2), (a)(3), (a)(7), (a)(8), or (a)(9) under the Securities Act or (C) outside the United States and not a U.S. person (and not purchasing for the account or benefit of a U.S. person) within the meaning of Regulation S under the Securities Act, and (ii) it is tendering its 2020 Notes (and delivering its consents related thereto) and investing in the New CITGO Notes for its own account or for one or more separate accounts maintained by such Consenting 2020 Noteholder or for the account of one or more pension or trust funds and not with a view to the distribution thereof; *provided* that the disposition of such Consenting 2020 Noteholder's property shall at all times be within such Consenting 2020 Noteholder's control;

(b)     other than in accordance with the Securities Act, it does not have any contract, undertaking, agreement, understanding, or arrangement with any person to sell, transfer, or pledge to any Person any part or all of the New CITGO Notes, or any interest therein, that the Consenting 2020 Noteholder would acquire pursuant to the Transaction, and it has no present plans to enter into the same;

(c)     it has sufficient experience in business, financial, and investment matters to be able to evaluate the risks involved in, and to make an informed investment decision with respect to, an exchange of its 2020 Notes (and delivery of the related consent) and an investment in the New CITGO Notes, and it acknowledges that: (i) it was given the opportunity to ask questions and receive answers concerning the terms and conditions of the Transaction and to obtain any additional information that the Leading Bidder possesses or can acquire without unreasonable effort or expense; (ii) the Leading Bidder makes no representation regarding the value of the 2020 Notes or the New CITGO Notes; and (iii) it has independently and without reliance upon the Leading Bidder made its own analysis and decision to enter into this Agreement and to exchange its 2020 Notes (and deliver consents related thereto) and to invest in the New CITGO Notes on the terms set forth in this Agreement;

(d)     the purchase of New CITGO Notes by such Consenting 2020 Noteholder has not been solicited by or through anyone except for as set forth herein; and

(e)     it acknowledges that it has made its own decision to execute this Agreement and Participate in the Transaction based upon its own independent assessment of the documents and information available to it, as it has deemed appropriate.

### Section 8.     Miscellaneous.

**Section 8.1     *Entire Agreement; Prior Negotiations***. This Agreement, including all of the exhibits attached hereto, constitutes the entire agreement of the Parties with respect to the subject matter of this Agreement and supersedes all other prior negotiations, agreements, representations, warranties, term sheets, proposals, and understandings, whether written, oral, or implied, among the Parties with respect to the subject matter of this Agreement. Each Party acknowledges and agrees that it is not relying on any representation or warranty from any other Party in entering into this Agreement except for those representations and warranties expressly set forth herein.

**Section 8.2     *Reservation of Rights***. This Agreement constitutes a confidential communication about a proposed settlement among the Parties. Regardless of whether or not the Transaction is consummated, or whether or not a Termination Date occurs, if applicable, nothing shall be construed herein as a waiver by any Party of any or all of such Party's rights or remedies, and the Parties expressly reserve any and all of their respective rights and remedies. Pursuant to Rule 408 of the Federal Rules of Evidence, any applicable state rule of evidence, and any other applicable law, the parties agree that, to the fullest extent under applicable law, neither this Agreement nor any negotiations relating hereto shall be admitted into evidence in any proceeding other than in a proceeding to enforce this Agreement or as a defense in connection with such a proceeding. This Agreement shall not be construed as or be deemed to be evidence of an admission or concession on the part of any Party for any claim, fault, liability, or damages whatsoever. Each Party denies any and all wrongdoing or liability of any kind and does not concede any infirmity in the claims or defenses that it has asserted or could assert. Except as expressly provided in this Agreement, nothing herein does or is intended to, in any manner, waive, limit, impair, or restrict the ability of each Party to protect and preserve its rights, remedies, and interests. Without limiting the foregoing sentence, each Party reserves any and all of its rights, remedies, and interests in the case of any claim for a breach of this Agreement.

**Section 8.3     *Representation by Counsel***. Each Party acknowledges that it has been represented by counsel (or had the opportunity to be represented by counsel and waived its right to do so) in connection with this Agreement and the Transaction. Accordingly, any rule of law or any legal decision that would provide any Party hereto with a defense to the enforcement of the terms of this Agreement against such Party based upon the lack of legal counsel shall have no application and is expressly waived. The provisions of this Agreement shall be interpreted in a reasonable manner to effectuate the intent of the Parties hereto. None of the Parties hereto shall have any term or provision of this Agreement construed against such Party solely by reason of such Party having drafted the same.

**Section 8.4     *Counterparts***. This Agreement may be executed in one or more counterparts, each of which, when so executed, shall constitute one and the same instrument, and the counterparts may be delivered by email in portable document format (.pdf) or by electronic signature.

**Section 8.5     *Amendments***.

(a)     Except as otherwise provided herein, this Agreement may not be modified, amended, or supplemented, and no provision of this Agreement may be waived, without the prior written consent of the Leading Bidder and the Required Consenting 2020 Noteholders; *provided* that (i) the definitions of "Required Consenting 2020 Noteholders," may not be amended or otherwise modified without the written consent of each Consenting 2020 Noteholder; (ii) Section 5.4(b) and this Section 8.5 may not be amended without the written consent of each of Red Tree and each Consenting 2020 Noteholder, notwithstanding anything to the contrary in this Section 8.5(a); (iii) no modification, amendment or supplement hereunder may have a disproportionately negative effect (including, but not limited to, an economic recovery or any amendment to Section 8.19) to any

Consenting 2020 Noteholder relative to another Consenting 2020 Noteholder without the written consent of such negatively affected Consenting 2020 Noteholder; (iv) the parenthetical (A) "only those Consenting 2020 Noteholders able to provide such indemnity" in Section 2.2(b)(iii) and Section 2.2(b)(iv), (B) "among Consenting 2020 Noteholders, but only to the extent that each such Consenting 2020 Noteholder is able to provide such indemnity" in Section 3.2(a)(vi), and (C) "and, in the case of the Consenting 2020 Noteholders, only those Consenting 2020 Noteholders able to provide such indemnity" in the Transaction Term Sheet (Consent Solicitation and D&I Agreements section) may not be amended or otherwise modified without the written consent of each Consenting 2020 Noteholder and (v) no modification, amendment, or supplement hereunder shall provide for any covenants of any Consenting 2020 Noteholders that apply prior to the Successful Bid Date; provided, that any covenants contained in any modification, amendment or supplement hereunder that apply after the Successful Bid Date shall be limited to those covenants necessary and appropriate to consummate the PDVH Transaction and the Transaction, absent the consent of each Consenting 2020 Noteholder.

(b)    No waiver of any of the provisions of this Agreement shall be deemed to constitute a waiver of any other provision of this Agreement, whether or not such provisions are similar, nor shall any waiver of a provision of this Agreement be deemed a continuing waiver of such provision.

(c)    Notwithstanding anything to the contrary set forth herein, where written consent is required pursuant to or contemplated by this Agreement, such written consent shall be deemed to have occurred if it is conveyed in writing (with email being sufficient) between Paul Weiss (on behalf of the Initial Consenting 2020 Noteholders), counsel to any other Consenting 2020 Noteholders (to the extent applicable), counsel to either the Leading Bidder or CITGO Parties (to the extent applicable), and without representations or warranties of any kind on behalf of such counsel.

Section 8.6    *Headings*. The headings of the sections, paragraphs, and subsections of this Agreement are included for convenience only and will not affect the interpretation of the provisions contained herein.

Section 8.7    *Acknowledgments; Obligations Several*. The obligations of the Parties under this Agreement are several and neither joint nor joint and several. A Consenting 2020 Noteholder will not be responsible for the performance of the obligations or any breach by any other Consenting 2020 Noteholder under this Agreement, and no presumption will arise from anything contained herein or any action taken by any Consenting 2020 Noteholder that the Consenting 2020 Noteholders constitute a partnership, an association, or joint venture. No presumption will arise from anything contained herein or any action taken by the Consenting 2020 Noteholders that the Consenting 2020 Noteholders are otherwise acting other than in their individual capacities. The Consenting 2020 Noteholders shall not have any fiduciary duty to any other 2020 Noteholder, the CITGO Parties, or the CITGO Parties' other lenders, noteholders, stockholders, or other stakeholders as a result of this Agreement or the transactions contemplated hereby. Each Consenting 2020 Noteholder acknowledges that no 2020 Noteholder will be acting as agent of any other 2020 Noteholder in connection with monitoring such 2020 Noteholder's investment or enforcing its rights under this Agreement, the Definitive Documents, or any other documents to be entered into in connection with the consummation of the Transaction.

Section 8.8    *Specific Performance; Damages*. The Parties understand, acknowledge, and agree that money damages would be an insufficient remedy for any breach of this Agreement by any Party and, thus, that each non-breaching Party will be entitled to specific performance and injunctive or other equitable relief to remedy any such breach, including an order, of a court of competent jurisdiction requiring any Party to comply promptly with any of its obligations in this Agreement. Notwithstanding anything to the contrary in this Agreement, no Party or its representatives will be liable to any other Party

for any punitive, incidental, consequential, special, or indirect damages, including the loss of future revenue or income or opportunity, relating to a breach or alleged breach of this Agreement.

Section 8.9    *Governing Law*. This Agreement will be governed by, and construed in accordance with, the laws of the State of New York without regard to any choice of law provision that would require the application of the laws of another jurisdiction. By executing and delivering this Agreement, each Party (a) irrevocably and unconditionally agrees for itself that any legal action, suit, or proceeding against it with respect to any matter arising under or out of or in connection with this Agreement or for recognition or enforcement of any judgment rendered in any such action, suit, or proceeding shall be brought in either a state or federal court of competent jurisdiction in the State and County of New York, Borough of Manhattan; (b) accepts and submits itself to the exclusive jurisdiction of each such court, generally and unconditionally, with respect to any such action, suit, or proceeding; and (c) submits to the personal jurisdiction of each such court described in this Section 8.9, solely for purposes of any action, suit, or proceeding arising out of or relating to this Agreement or for the recognition or enforcement of any judgment rendered or order entered in any such action, suit, or proceeding. Each Party to this Agreement irrevocably consents to service of process by personal delivery, certified mail, and email, with the addresses set forth in its signature page. EACH PARTY HERETO UNCONDITIONALLY WAIVES TRIAL BY JURY IN ANY ACTION, SUIT, OR PROCEEDING REFERRED TO ABOVE.

Section 8.10    *Agreement Effective Date*. This Agreement will become effective when executed and delivered by the Leading Bidder and each Initial Consenting 2020 Noteholder. The date that this Agreement becomes effective in accordance with this Section 8.10 is the "**Agreement Effective Date**."

Section 8.11    *Notices*. Any notice, direction, or other communication given regarding the matters contemplated by this Agreement must be in writing, sent by personal delivery, courier, or email, and addressed as follows:

If to the Leading Bidder, to the addresses set forth below



with a copy to:

Milbank LLP
55 Hudson Yards
New York, NY 10001
Attn: Lawrence Wee (lwee@milbank.com);
Andrew Fadale (afadale@milbank.com);
Benjamin Fidler (bfidler@milbank.com)

If to an Initial Consenting 2020 Noteholder, to the address set forth below

Paul, Weiss, Rifkind, Wharton & Garrison LLP.
1285 6th Ave.
New York NY 10019

Attn:    Andrew N. Rosenberg (arosenberg@paulweiss.com);
Karen R. Zeituni (kzeituni@paulweiss.com)

If to any other Consenting 2020 Noteholder, to the address set forth in the 2020 Noteholder Transferee Joinder or 2020 Noteholder Joinder to which it is party.

A notice is deemed to be given and received if sent by personal delivery, courier, or email, on the date of delivery if it is a Business Day and the delivery was made prior to 4:00 p.m. (local time in place of receipt), and otherwise on the next Business Day. A Party may change its address for notice from time to time by providing a notice in accordance with the foregoing. Any subsequent notice must be sent to the Party at its changed address. Any element of a Party's address that is not specifically changed in a notice will be assumed not to be changed.

**Section 8.12    *No Third-Party Beneficiaries***. Unless expressly stated herein, this Agreement is solely for the benefit of the Parties, and no other Person is a third-party beneficiary hereof.

**Section 8.13    *Successors and Assigns***. This Agreement is intended to bind and inure to the benefit of the Parties and their respective permitted successors, assigns, heirs, executors, estates, administrators, and representatives.

**Section 8.14    *Severability***. The invalidity or unenforceability at any time of any provision hereof in any jurisdiction shall not affect or diminish in any way the continuing validity and enforceability of the remaining provisions hereof or the continuing validity and enforceability of such provision in any other jurisdiction.

**Section 8.15    *Good-Faith Cooperation; Further Assurances***. The Parties shall (and shall cause each of their subsidiaries and affiliates to) cooperate with each other in good faith and shall coordinate their activities (to the extent practicable) in respect of all matters concerning the implementation and consummation of the Transaction. Furthermore, each Party shall (and shall cause each of its subsidiaries and affiliates to) take such action (including executing and delivering any other agreements and making and filing any required regulatory filings) as may be reasonably necessary to carry out the purposes and intent of this Agreement. Each Party hereby covenants and agrees to negotiate in good faith the Definitive Documents, each of which will (a) contain the same economic terms (and other terms consistent in all material respects) as the terms set forth in the Transaction Term Sheet (as amended, supplemented, or otherwise modified as provided herein), (b) except as otherwise provided for herein, be in form and substance acceptable in all respects to the Leading Bidder and the Required Consenting 2020 Noteholders, and (c) be consistent with this Agreement in all material respects.

**Section 8.16    *No Solicitation***. Each Party acknowledges that this Agreement is not, and is not intended to be, an offer for the purchase, sale, exchange, hypothecation, or other transfer of securities for purposes of the Securities Act or the Exchange Act.

**Section 8.17    *Confidentiality***. The Parties shall keep both this Agreement and the existence of this Agreement confidential; *provided that*,

(a)    the Leading Bidder is expressly permitted to (x) include a summary hereof in the Credit Bid (without referencing or otherwise naming the identities of any of the signatories hereto) and (y) disclose the existence of this Agreement (without referencing or otherwise naming the identities of any of the signatories hereto) to any third party (i) potentially joining the Credit Bid and (ii) which agrees to maintain the confidentiality of this Agreement in accordance with the provision of this Section 8.17;

(b)        unless the Minimum Participation Threshold shall have already been reached, the Initial Consenting 2020 Noteholders may disclose the existence of this Agreement (without referencing or otherwise naming the identities of any of the signatories hereto) to other 2020 Noteholders (the identities of which have been expressly approved by all of the Initial Consenting 2020 Noteholders) for the express purpose of satisfying the Minimum Participation Threshold;

(c)        at the request of counsel to the Leading Bidder, at the Agreement Effective Date, Paul Weiss shall deliver to the Leading Bidder a certification of counsel in the form attached hereto as **Exhibit E** for inclusion in any Credit Bid package (the "**Counsel Certification**"); and

(d)        the Leading Bidder otherwise may disclose this Agreement with the consent of (and in the form required by (including the need to redact signature pages)) the Initial Consenting 2020 Noteholders, such consent not to be unreasonably withheld.

**Section 8.18      Direction to Trustee**. Each Consenting 2020 Noteholder agrees that, subject to the entry of an order of the Delaware Court approving the purchase of the PDVH Shares by the Leading Bidder pursuant to the Bidding Procedures Order and Memorandum Order, this Agreement constitutes a direction to the Trustee, to: (a) subject to the Consenting 2020 Noteholder Consent Right, approve any of the Definitive Documents; (b) take all actions consistent with this Agreement to support pursuit of and consummation of the Transaction and the Consent Solicitation and the transactions contemplated by the Definitive Documents; and (c) use all authority under the 2020 Indenture, to bind all 2020 Noteholders to the Transaction, the Consent Solicitation and the Definitive Documents, to the extent applicable.

**Section 8.19      Additional Negotiations**. Nothing herein shall prevent the Initial Consenting 2020 Noteholders (with the agreement of each such Initial Consenting 2020 Noteholder) from negotiating with Venezuela, PDVSA, PDVH or any affiliate of the foregoing regarding a potential settlement of the Declaratory Judgment Action or other transaction concerning the Initial Consenting 2020 Noteholders' holdings of 2020 Notes and any consummation of any such settlement or transaction; *provided* that (a) any such settlement or transaction (i) shall be offered ratably (including with respect to fees or other amounts (other than expense reimbursement) payable in connection therewith) to all Consenting 2020 Noteholders, and (ii) shall include a Collateral Release and (b) no such negotiations shall be permitted following the commencement of the marketing period of the New CITGO Holding Notes and New CITGO Petroleum Notes. Following the Successful Bid Date, such settlement shall only occur upon lien release and release of all claims by each such Initial Consenting 2020 Noteholders against PDVH and its subsidiaries.

**Section 8.20      Public Exchange Offer Timing**. Notwithstanding anything else contained herein to the contrary, the Parties agree that the Private Exchange may be consummated at the Effective Date even if the Public Exchange Offer has not been launched, in which case, such Public Exchange Offer will be deemed a condition subsequent. The Parties will work in good faith with respect to the timing of any Public Exchange Offer.

**Section 8.21      Capacity; Actions**. Notwithstanding anything to the contrary in this Agreement, the Transaction Term Sheet or otherwise, each Consenting 2020 Noteholder is executing and agreeing to this Agreement solely in its capacity as a 2020 Noteholder and not in any other capacity (*provided* that if such Consenting 2020 Noteholder is also an equity holder along-side Red Tree, it is also executing and agreeing to this Agreement in its capacity as such an equity holder for purposes of actions to be taken by it as set forth herein if a PDVH Transaction is consummated and for so long as no Termination Date has occurred).

**EXHIBIT A**

**Final Priority Order**

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

---------------------------------------------------------------

CRYSTALLEX INTERNATIONAL CORP., )
        Plaintiff, )
        v. )  Misc. No. 17-151-LPS
BOLIVARIAN REPUBLIC OF VENEZUELA, )
        Defendant. )

---------------------------------------------------------------

RED TREE INVESTMENTS, LLC, )
        Plaintiff, )
        v. )  Misc. Nos. 22-68-LPS & 22-69-LPS
PETROLEOS DE VENEZUELA, S.A., and )
PDVSA PETROLEOS, S.A., )
        Defendants. )

---------------------------------------------------------------

CONTRARIAN CAPITAL MANAGEMENT, )
L.L.C., et al., )
        Plaintiffs, )
        v. )  Misc. Nos. 21-18-LPS, 22-131-LPS, &
BOLIVARIAN REPUBLIC OF VENEZUELA, )  22-263-LPS
        Defendant. )

---------------------------------------------------------------

OI EUROPEAN GROUP B.V., )
        Plaintiff, )
        v. )  Misc. No. 19-290-LPS
BOLIVARIAN REPUBLIC OF VENEZUELA, )
        Defendant. )

---------------------------------------------------------------

ACL1 INVESTMENTS LTD., ACL2 )
INVESTMENTS LTD., and LDO (CAYMAN) )
XVIII LTD., )
        Plaintiffs, )
        v. )  Misc. No. 21-46-LPS
BOLIVARIAN REPUBLIC OF VENEZUELA, )
        Defendant. )

---------------------------------------------------------------

| | | |
|---|---|---|
| RUSORO MINING LIMITED, | ) | |
| Plaintiff, | ) | |
| v. | ) | Misc. No. 21-481-LPS |
| BOLIVARIAN REPUBLIC OF VENEZUELA, | ) | |
| Defendant. | ) | |

------------------------------------------------------------

| | | |
|---|---|---|
| TIDEWATER INVESTMENT SRL and | ) | |
| TIDEWATER CARIBE S.A., | ) | |
| Plaintiffs, | ) | |
| v. | ) | Misc. No. 19-79-LPS |
| BOLIVARIAN REPUBLIC OF VENEZUELA, | ) | |
| Defendant. | ) | |

------------------------------------------------------------

| | | |
|---|---|---|
| PHILLIPS PETROLEUM COMPANY | ) | |
| VENEZUELA LIMITED and | ) | |
| CONOCOPHILLIPS PETROZUATA B.V., | ) | |
| Plaintiffs, | ) | |
| v. | ) | Misc. No. 19-342-LPS |
| PETROLEOS DE VENEZUELA, S.A., | ) | |
| CORPOGUANIPA, S.A., and PDVSA | ) | |
| PETROLEO, S.A., | ) | |
| Defendants. | ) | |

------------------------------------------------------------

| | | |
|---|---|---|
| NORTHROP GRUNMAN SHIP SYSTEMS, | ) | |
| INC., | ) | |
| Plaintiff, | ) | |
| v. | ) | Misc. No. 20-257-LPS |
| THE MINISTRY OF DEFENSE OF THE | ) | |
| REPUBLIC OF VENEZUELA, | ) | |
| Defendant. | ) | |

------------------------------------------------------------

| | | |
|---|---|---|
| CONOCOPHILLIPS GULF OF PARIA B.V., | ) | |
| Plaintiff, | ) | |
| v. | ) | Misc. No. 22-264-LPS |
| CORPORACION VENEZOLANA DEL | ) | |
| PETROLEO, S.A., and PETROLEOS DE | ) | |
| VENEZUELA, S.A., | ) | |
| Defendants. | ) | |

------------------------------------------------------------

KOCH MINERALS SARL and KOCH )
NITROGEN INTERNATIONAL SARL, )
        Plaintiffs, )
        v. )   Misc. No. 22-156-LPS
BOLIVARIAN REPUBLIC OF VENEZUELA, )
        Defendant. )

---

GOLD RESERVE INC., )
        Plaintiff, )
        v. )   Misc. No. 22-453-LPS
BOLIVARIAN REPUBLIC OF VENEZUELA, )
        Defendant. )

---

SIEMENS ENERGY, INC., )
        Plaintiff, )
        v. )   Misc. No. 22-347-LPS
PETROLEOS DE VENEZUELA, S.A., )
        Defendant. )

---

VALORES MUNDIALES, S.L. and )
CONSORCIO ANDINO, S.L., )
        Plaintiffs, )
        v. )   Misc. No. 23-298-LPS
BOLIVARIAN REPUBLIC OF VENEZUELA, )
        Defendant. )

---

CONOCOPHILLIPS PETROZUATA B.V., )
CONOCOPHILLIPS HAMACA B.V., )
CONOCOPHILLIPS GULF OF PARIA B.V., and )
CONOCOPHILLIPS COMPANY, )
        Plaintiffs, )
        v. )   Misc. No. 22-464-LPS
BOLIVARIAN REPUBLIC OF VENEZUELA, )
        Defendant. )

---

PHARO GAIA FUND LTD. and PHARO )
MACRO FUND LTD., )
        Plaintiffs, )
        v. )   Misc. No. 23-360-LPS
BOLIVARIAN REPUBLIC OF VENEZUELA, )
        Defendant. )

```
-------------------------------------------------
PHARO GAIA FUND LTD., PHARO MACRO          )
FUND LTD., and PHARO TRADING FUND,         )
LTD.,                                      )
              Plaintiffs,                  )
       v.                                  )    Misc. No. 23-361-LPS
BOLIVARIAN REPUBLIC OF VENEZUELA,          )
              Defendant.                   )
-------------------------------------------------
RUDI LOVATI and ALESSANDRO                 )
LUCIBELLO PIANI,                           )
              Plaintiffs,                  )
       v.                                  )    Misc. No. 23-340-LPS
BOLIVARIAN REPUBLIC OF VENEZUELA,          )
              Defendant.                   )
-------------------------------------------------
GRANMERCY DISTRESSED OPPORTUNITY           )
FUND LLC,                                  )
              Plaintiff,                    )
       v.                                  )    Misc. Nos. 23-378-LPS & 23-379-LPS
BOLIVARIAN REPUBLIC OF VENEZUELA,          )
              Defendant.                   )
-------------------------------------------------
SAINT-GOBAIN PERFORMANCE                   )
PLASTICS EUROPE,                           )
              Plaintiff,                    )
       v.                                  )    Misc. No. 23-397-LPS
BOLIVARIAN REPUBLIC OF VENEZUELA,          )
              Defendant.                   )
-------------------------------------------------
ALTANA CREDIT OPPORTUNITIES FUND           )
SPC, ALTANA CREDIT OPPORTUNITIES           )
FUND 1 SP, and ALTANA FUNDS LTD.           )
CAYMAN,                                    )
              Plaintiffs,                  )
       v.                                  )    Misc. No. 23-608-LPS
BOLIVARIAN REPUBLIC OF VENEZUELA,          )
              Defendant.                   )
-------------------------------------------------
```

## FINAL PRIORITY ORDER

WHEREAS, on July 27, 2023, the Court issued a *Memorandum Order* (D.I. 646)[1] (the "July 27 Order") outlining the steps that judgment holders must complete in order to participate in the Marketing Process;

WHEREAS, in the July 27 Order, the Court held that priority of the Attached Judgments will be determined based on the date an Additional Judgment Creditor moved for a writ of attachment (i.e., the "Step 4 Date") that was eventually granted (*see id.* at 23);

WHEREAS, on October 11, 2023, the Court issued a *Memorandum Order* (D.I. 738) (the "October 11 Order") adopting the Special Master's recommendations for procedures implementing the priority arrangement (the "Priority Arrangement Procedures") as set forth in the *Joint Status Report*, dated August 24, 2023 (D.I. 693) (the "August 24 Status Report");

WHEREAS, on February 27, 2024, the Court issued an *Order* (D.I. 990) (the "Priority Procedures Order"), granting the Special Master's *Motion Requesting Amendment of Certain Priority Arrangement Procedures* (D.I. 928) (the "Procedures Motion") and adopting the Special Master's proposed amendments to the Priority Arrangement Procedures therein (the "Amended Priority Arrangement Procedures");

WHEREAS, the Amended Priority Arrangement Procedures provide that, after receipt of an Updated Steps Chart (as defined in the Procedures Motion) from the Special Master, the Court will issue an order (the "Priority Order") stating the relative priority of judgments held by Crystallex Corporation ("Crystallex") and each Additional Judgment Creditor;

WHEREAS, the Special Master submitted a Steps Chart (as defined in the October 11

---

[1] All citations to the docket are to the *Crystallex* case docket (Misc. No. 17-151), unless otherwise noted.

Order) on February 29, 2024 (D.I. 994) (the "February Steps Chart") setting out the order of priority for each Attached Judgment based on the date the applicable judgment holder moved for a writ of attachment that was eventually granted;

WHEREAS, on March 1, 2024, the Court issued the Priority Order (D.I. 996);

WHEREAS, following the issuance of the Priority Order, Crystallex and each Additional Judgment Creditor submitted their respective Proposed Writ Packages (as defined in the Priority Order) to the Clerk of the Court ("Clerk") and thereafter filed an affidavit on the *Crystallex* case docket (Misc. No. 17-151) attesting to the submission of the Proposed Writ Packages as required by the Priority Order;

WHEREAS, the Amended Priority Arrangement Procedures provide that, following the second business day from the issuance of the Priority Order, the Court will issue an order (the "Writ Order") that, among other things, directs the Clerk to issue a writ of attachment *fieri facias* for Crystallex and each Additional Judgment Creditor on the PDV Holding, Inc. ("PDVH") share certificate conditioned by the order of priority set by the Court in the Priority Order;

WHEREAS, on March 7, 2024, the Court issued the Writ Order (D.I. 1036);

WHEREAS, on March 8, 2024, the Clerk issued the writs of attachment as required by the Writ Order;

WHEREAS, on March 27, 2024, Crystallex and all Additional Judgment Creditors, overseen by the Court, delivered their respective Service Packages (as defined in the Writ Order) to the U.S. Marshal in accordance with the priority set forth in the Priority Order. In compliance with the Writ Order, Additional Judgment Creditors having the same priority set forth in the Priority Order were deemed and declared by the Court to have delivered their respective Service Packages to the U.S. Marshal at the same time, notwithstanding any differences in time stamps

confirming receipt of the Service Packages;

WHEREAS, following the delivery of the Service Packages to the U.S. Marshal, and in compliance with the procedures set forth in the Writ Order, Crystallex and each Additional Judgment Creditor filed an affidavit on the *Crystallex* case docket (Misc. No. 17-151) attesting to the delivery of the Service Packages to the U.S. Marshal as required by the Writ Order;

WHEREAS, on April 1, 2024, the Special Master submitted a revised Steps Chart (D.I. 1101) (the "Final Steps Chart") setting out the relative priority in which Crystallex and the Additional Judgment Creditors delivered their respective Service Packages to the U.S. Marshal in accordance with the priority set by the Priority Order.

NOW, THEREFORE, IT IS HEREBY ORDERED that:

1.      The Final Priority (as defined in the Priority Procedures Order) of judgments held by Crystallex and the Additional Judgment Creditors is set forth as follows:

| Priority | Judgment Holder (Applicable Judgment) | Case Reference | Attached Judgment Statement (Docket No.) | Step 4 Date |
|---|---|---|---|---|
| 1 | Crystallex Corporation | 17-mc-00151 | 680 | 8/14/2017 |
| 2 | Tidewater Caribe S.A., Tidewater Investment SRL. | 19-mc-00079 | 684 | 11/15/2019 |
| 3 | Phillips Petroleum Company Venezuela Limited and ConocoPhillips Petrozuata B.V. (Petrozuata/Hamaca Judgment) | 19-mc-00342 | 676, 677 | 11/26/2019 |
| 4 | OI European Group B.V. | 19-mc-00290 | 657 | 02/19/2021 |
| 4 | Huntington Ingalls Incorporated | 20-mc-00257 | 661 | 02/19/2021 |
| 5 | ACL1 Investments Ltd., ACL2 Investments Ltd., LDO (Cayman) XVIII Ltd. | 21-mc-00046 | 658 | 11/22/2021 |
| 6 | Red Tree Investments, LLC (19- cv-2519 (S.D.N.Y.)) | 22-mc-00069 | 666 | 2/8/2022 |
| 6 | Red Tree Investments, LLC (19- cv-2523 (S.D.N.Y.)) | 22-mc-00068 | 666 | 2/8/2022 |

| Priority | Judgment Holder (Applicable Judgment) | Case Reference | Attached Judgment Statement (Docket No.) | Step 4 Date |
|---|---|---|---|---|
| 6 | Red Tree Investments, LLC (Fee Judgment) | 22-mc-00068; 22-mc-00069 | 666 | 2/8/2022 |
| 7 | Rusoro Mining Limited | 21-mc-00481 | 671 | 2/9/2022 |
| 8 | ConocoPhillips Gulf of Paria B.V. (Corocoro Judgment) | 22-mc-00264 | 676, 677 | 6/15/2022 |
| 9 | Koch Minerals Sarl and Koch Nitrogen International | 22-mc-00156 | 664 | 10/7/2022 |
| 10 | Gold Reserve Inc. | 22-mc-00453 | 663 | 10/20/2022 |
| 11 | Siemens Energy Inc. | 22-mc-00347 | 673 | 10/31/2022 |
| 12 | Consorcio Andino, S.L., Valores Mundiales, S.L. | 23-mc-00298 | 668 | 6/29/2023 |
| 13 | Contrarian Capital Management, L.L.C. (October 2020 Judgment) | 21-mc-00018 | 665 | 7/21/2023 |
| 13 | Contrarian Capital Management, L.L.C. (May 2021 Judgment) | 22-mc-00131 | 665 | 7/21/2023 |
| 13 | Contrarian Capital Management, L.L.C. (October 2021 Judgment) | 22-mc-00263 | 665 | 7/21/2023 |
| 14 | ConocoPhillips Petrozuata B.V., ConocoPhillips Hamaca B.V., and ConocoPhillips Gulf of Paria B.V. (ICSID Judgment) | 22-mc-00464 | 676, 677 | 8/1/2023 |
| 15 | Pharo Gaia Fund Ltd., Pharo Macro Fund Ltd., Pharo Gaia Fund, Ltd., Pharo Macro Fund, Ltd., Pharo Trading Fund, Ltd. (20-cv-8497 (S.D.N.Y.)) | 23-mc-00361 | 679 | 8/2/2023 |
| 15 | Pharo Gaia Fund Ltd., Pharo Macro Fund Ltd., Pharo Gaia Fund, Ltd., Pharo Macro Fund, Ltd., Pharo Trading Fund, Ltd. (19-cv-3123 (S.D.N.Y.)) | 23-mc-00360 | 679 | 8/2/2023 |
| 15 | Rudi Lovati and Alessandro Lucibello Piani | 23-mc-00340 | 695 | 8/2/2023 |
| 16 | Gramercy Distressed Opportunity Fund LLC (18- 1371-CRC (D.D.C.)) | 23-mc-00378 | 656 | 8/17/2023 |
| 16 | Gramercy Distressed Opportunity Fund LLC (18- 1373-CJN (D.D.C.)) | 23-mc-00379 | 656 | 8/17/2023 |

| Priority | Judgment Holder (Applicable Judgment) | Case Reference | Attached Judgment Statement (Docket No.) | Step 4 Date |
|---|---|---|---|---|
| 17 | Saint-Gobain Performance Plastics Europe | 23-mc-00397 | 667 | 9/5/2023 |
| 18 | Altana Credit Opportunities Fund SPC, Altana Credit Opportunities Fund 1 SP, and Altana Funds LTD. Cayman | 23-mc-00608 | 812 | 12/21/2023 |

2.      The U.S. Marshal is directed to, by no later than April 11, 2024, serve all received writs of attachment *fieri facias* in accordance with the order of the Final Priority on (i) the Special Master and (ii) PDVH.

3.      The Special Master shall, following receipt of the writs of attachment *fieri facias* from the U.S. Marshal, file a status report on the *Crystallex* case docket (Misc. No. 17-151) confirming receipt of the writs of attachment *fieri facias* in accordance with the order of the Final Priority.

**IT IS SO ORDERED** this 3rd day of April, 2024.

HONORABLE LEONARD P. STARK
UNITED STATES DISTRICT COURT

**EXHIBIT B**

**Transaction Term Sheet**

Execution Version

# Transaction Term Sheet

THIS TRANSACTION TERM SHEET IS NOT AN OFFER WITH RESPECT TO ANY SECURITIES. ANY SUCH OFFER OR SOLICITATION WILL BE MADE ONLY IN COMPLIANCE WITH APPLICABLE SECURITIES LAWS. THIS TRANSACTION TERM SHEET IS BEING PROVIDED IN FURTHERANCE OF TRANSACTION DISCUSSIONS AND IS ENTITLED TO PROTECTION PURSUANT TO RULE 408 OF THE FEDERAL RULES OF EVIDENCE AND ANY SIMILAR RULE OF EVIDENCE. THE EXCHANGE TRANSACTIONS DESCRIBED IN THIS TERM SHEET ARE SUBJECT IN ALL RESPECTS TO, AMONG OTHER THINGS, EXECUTION AND DELIVERY OF DEFINITIVE DOCUMENTATION AND SATISFACTION OR WAIVER OF THE CONDITIONS PRECEDENT SET FORTH THEREIN. UNLESS OTHERWISE SET FORTH HEREIN, ALL CAPITALIZED TERMS HERE SHALL HAVE THE MEANINGS ASCRIBED TO THEM IN THE TRANSACTION SUPPORT AGREEMENT TO WHICH THIS TRANSACTION TERM SHEET IS ANNEXED.

| TERM | DEFINITION |
|---|---|
| **2020 Notes** | The 8.5% Senior Secured Notes due 2020 issued by PDVSA pursuant to the Indenture dated October 27, 2016, executed by PDVSA as issuer and Petróleo as guarantor. |
| **AcquisitionCo** | An acquisition vehicle which will be the ultimate parent of PDVH, CITGO Holding and CITGO Petroleum. |
| **Ad Hoc Group** | Collectively, the Initial Consenting 2020 Noteholders and each Additional Consenting 2020 Noteholder that has acceded to the Transaction Support Agreement in accordance with its terms. |
| **Delaware Court** | The United States District Court for the District of Delaware. |
| **Bid** | A Bid for the PDVH shares and potential Successful Bid, as defined in the Bidding Procedures Order, to be submitted by the PDVH Creditors. |
| **Corporate Structure** | As set forth on Annex A hereto:<br><br>• AcquisitionCo will be the 100% equity owner of Acquisition MidCo (a newly formed entity);<br>• Acquisition MidCo will be the 100% equity owner of PDVH;<br>• PDVH will be the 100% equity owner of PDVH MidCo (a newly formed disregarded entity);<br>• PDVH MidCo will be the 100% equity owner of CITGO Holding;<br>• CITGO Holding will be the 100% equity owner of CITGO MidCo (a newly formed disregarded entity); and<br>• CITGO MidCo will be the 100% equity owner of CITGO Petroleum. |
| **AcquisitionCo Convertible Notes** | Convertible Notes issued by AcquisitionCo, with terms set forth materially consistent with the Convertible Note Term Sheet annexed as Annex B hereto.<br><br>The AcquisitionCo Convertible Notes will be guaranteed by Acquisition MidCo on a senior basis, secured by substantially all of Acquisition MidCo's assets, including the equity of PDVH and "Intercompany Note A" (as defined below).<br><br>AcquisitionCo will make a capital contribution to Acquisition MidCo, consisting of AcquisitionCo Convertible Notes and the common equity of AcquisitionCo (the common equity of AcquisitionCo being used to satisfy the Leading Bidder's claims in the PDVH Transaction).<br><br>Acquisition MidCo will receive an intercompany note ("Intercompany Note A") (which will eventually have PDVH as its borrower, once the PDVH Transactions close), which will be secured by substantially all of the assets of PDVH, including the equity of PDVH MidCo and "Intercompany Note B" (as defined below).<br><br>PDVH will lend PDVH MidCo the net cash proceeds of Convertible Notes issued by AcquisitionCo and contribute the equity of CITGO Holding to PDVH MidCo in return for an intercompany note ("Intercompany |

| | |
|---|---|
| | Note B"), which will be secured by substantially all of the assets of PDVH MidCo, including the equity of CITGO Holding.<br><br>PDVH MidCo will guarantee the AcquisitionCo Convertible Notes, which guarantee will be secured (on a pari passu basis with Intercompany Note B) by substantially all of the assets of PDVH MidCo, including the equity of CITGO Holding. |
| **New CITGO Holding Notes** | Secured notes issued by CITGO Holding with terms as set out below in this Transaction Term Sheet. |
| **New CITGO Petroleum Notes** | Secured notes issued by CITGO Petroleum Corp pursuant to the Marketing Process (as defined below). To the extent no marketed secured notes are issued by CITGO Petroleum Corp, "New CITGO Petroleum Notes" will mean new secured term loans or, at the option of a Consenting 2020 Noteholder, new secured notes issued by CITGO Petroleum Corp in connection with the PDVH Transaction. |
| **Other PDVH Creditors** | "Additional Judgment Creditors" as defined in the Bidding Procedures Order at completion of the Sale Transaction with a writ of attachment senior to Red Tree Investments, LLC in accordance with the rules of priority set out in the Final Priority Order in the *Crystallex* action [D.I. 1102]. |
| **Leading Bidder** | Red Tree Investments, LLC |
| **Sale Transaction** | The sale of the PDVH Shares and related transactions by order of the Delaware Court. |
| **Ticking Fee** | A fee paid to the 2020 Noteholders at the rate of ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ under the Exchange Transaction, accruing from and including (a) the Initial Deadline until and conditioned upon (b) the closing date of the Sale Transaction (the "Ticking Fee End Date"). The accrued and unpaid portion of the Ticking Fee shall be earned at Red Tree's written notice that the Initial Deadline is to be extended and shall be due and payable, at Red Tree's option, in cash, New CITGO Holding Notes or AcquisitionCo Convertible Notes at the Ticking Fee End Date. On such date, the Ticking Fee shall be paid to each 2020 Noteholder on a pro rata basis in immediately available funds or securities without setoff, counterclaim or deduction and shall not be refundable under any circumstances. However, the Ticking Fee shall not be payable if the Transaction is not consummated. |
| **Transaction Support Agreement** | The Bidder and the Initial Consenting 2020 Noteholders shall execute a Transaction Support Agreement, to which this Transaction Term Sheet shall be annexed. |
| **Exchange Transaction** | A transaction consisting of (x) the Private Exchange and (y) Public Exchange Offer. |

## PDVH CREDIT BID

| | |
|---|---|
| **Credit Bid** | The PDVH Creditors shall submit a Bid for a purchase of 100% of the PDVH common shares which Bid shall comply with the Cash Requirements (as defined in the Bidding Procedures Order) and otherwise provide for repayment of all Other PDVH Creditors, per the Bidding Procedures Order. |
| **PDVSA Notes Settlement** | The Bid shall include (or otherwise reference in a manner sufficient to evidence the existence thereof) a Transaction Support Agreement executed by the Leading Bidder, on one hand, and the Consenting 2020 Noteholders, on the other, as to the Exchange Transaction, materially on terms set forth herein or as is otherwise agreed by the Consenting 2020 Noteholders. |

## ECONOMIC TERMS[1]

| CLASS | TREATMENT |
|---|---|

---

[1] ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮



| Private Exchange | |
| --- | --- |
| Public Exchange Offer | |
| Consent Solicitation and D&I Agreements | At or prior to the Sale Transaction Date, in connection with the Proposed Actions, pursuant to the D&I Agreements, pursuant to which (i) the Consenting 2020 Noteholders will provide consent for the Proposed Actions, including the Collateral Release, (ii) the Consenting 2020 Noteholders will provide a direction to the Collateral Agent to perform the Proposed Actions, including the Collateral Release, pursuant to a D&I Agreement with the Collateral Agent, (iii) if necessary, the Consenting 2020 Noteholders will provide a direction to the Trustee to perform or permit the Proposed Actions, including the Collateral Release, pursuant to a D&I Agreement with the Trustee, and (iv) |
| Participating PDVH Creditors | The judgments held by Red Tree Investments, LLC will be settled in full in exchange for AcquisitionCo Convertible Notes and Common Stock. |
| Other PDVH Creditors | The claims of Other PDVH Creditors will be paid in full in cash at completion of the Sale Transaction or receive such other treatment as agreed by the Other PDVH Creditors. |

| Consenting 2020 Noteholder Advisor Fees and Expenses | ████████████████████████████████████████ |
|---|---|

## IMPLEMENTATION

| Implementation Steps | The Exchange Transaction shall be subject to, *inter alia*, the following conditions precedent: |
|---|---|
| | • Receipt of a license from the Office of Foreign Assets Control of the United States Treasury to complete the Sale Transaction, the Exchange Transaction and any related actions or transactions; |
| | • Absence of any ruling, order, or guidance by any governmental authority making illegal, enjoining, or otherwise prohibiting the Sale Transaction and the Exchange Transaction; |
| | • A determination by the Special Master that the Bid qualifies as a Successful Bid (as defined in the Bidding Procedures Order); |
| | • Dismissal of the Fraud Action and any other pending actions not yet reduced to judgment; |
| | • At the direction of the Participating Noteholders satisfying the applicable threshold to make a direction, resignation of Paul, Weiss, Rifkind, Wharton & Garrison LLP and Clark Smith Villazor LLP, as counsel to the Trustee and Collateral Agent, in the Declaratory Judgment Action; |
| | • Termination of any existing direction and indemnity between the Participating Noteholders and the Trustee and Collateral Agent as to the Declaratory Judgment Action (or, if that is not reasonably obtainable, an agreement as to the prior letter's cessation of effect); |
| | • Execution of a D&I Agreement with the Collateral Agent (and with the Trustee, to the extent necessary) and compliance by the Consenting 2020 Noteholders thereunder, including giving consent to the Proposed Actions (including the Collateral Release); |
| | • Completion of the Collateral Release and the other Proposed Actions; |
| | • ████████████████████████████████████████████ |
| | • ██████████████████████████████ and |
| | • Payment of the Other PDVH Creditors on the closing date of the Sale Transaction. |
| Declaratory Judgment Action | Any holder of 2020 Notes that did not Participate in the Private Exchange or Public Exchange Offer on account of all of the 2020 Notes that it holds shall remain subject to the Declaratory Judgment Action. |
| Marketing Process and Bridge Commitment | The Leading Bidder will use all commercially reasonable efforts to engage a nationally recognized investment bank as a placement agent to conduct a customary best-efforts bona-fide Rule 144A/Regulation S offering of New CITGO Petroleum Notes (the "Marketing Process"). It is expected that the restrictive covenants and other non-economic terms of the New CITGO Petroleum Notes will be modeled substantially on those of the existing CITGO Petroleum 8.375% Senior Secured Notes due 2029 (the "Existing CITGO Petroleum Notes"), with some modifications to reflect market precedent. |
| | In the event that the Marketing Process is not able to be completed prior to the Sale Transaction Date, the Leading Bidder will draw on a bridge commitment for the necessary financing for the PDVH Transaction at CITGO Petroleum, provided by one or more nationally recognized investment banks (the "Bridge Commitment"). ████████████████████████████████████████████████████ |

The terms resulting from the Marketing Process (or the Bridge Commitment, if the Marketing Process is not able to be completed prior to the Sale Transaction Date) are referred to herein as the "Marketed or Committed Terms."

## NEW CITGO HOLDING NOTES TERMS

### ECONOMIC TERMS

| | |
|---|---|
| **Issuer** | ▮▮▮▮▮ |
| **Guarantors** | ▮▮▮▮▮▮▮▮▮▮ |
| **Security** | ▮▮▮▮▮▮▮▮▮▮ |
| **Maturity Date** | ▮▮▮▮▮▮ |
| **Coupon** | ▮▮▮▮▮▮▮▮▮▮ |

### NON - ECONOMIC TERMS

| | |
|---|---|
| **General** | ▮▮▮▮▮▮. |
| **Debt and Lien Covenant** | ▮▮▮▮▮▮▮▮▮▮ |
| **Restricted Payments** | ▮▮▮▮▮▮▮▮▮▮ |
| **Asset Dispositions** | ▮▮▮▮▮ |
| **Other Covenants** | ▮▮▮▮▮▮ |
| **Mandatory Redemption** | ▮▮▮▮▮▮▮▮▮▮ |
| **Optional Redemption** | ▮▮▮▮▮▮▮▮ |
| **Representations and Warranties** | ▮▮▮▮▮▮▮▮ |

| Events of Default | ███████████████ |
|---|---|
| Amendments | ████████████████████████████████████████ |
| Governing Law and Forum | ████ |

| **NEW CITGO PETROLEUM NOTES TERMS** | |
|---|---|
| **ECONOMIC TERMS** | |
| Issuer | ███████████████ |
| Guarantors | ████████████████████ |
| Security | █████████████████████████████████████████ |
| Maturity Date | ███████████████ |
| Coupon | ██████████████████████████████████ |
| **NON - ECONOMIC TERMS** | |
| General | ███████████████ |
| Debt and Lien Covenant | █████████████████████████████████████████ |
| Restricted Payments | █████████████████████████████████████████ |
| Asset Dispositions | █████████████████████████████████████████ |
| Other Covenants | █████████████████████████████████████████ |
| Mandatory Redemption | ██████████████████████████████ |
| Optional Redemption | ██████████████████ |
| Representations and Warranties | ███ |
| Events of Default | ███████████████ |
| Amendments | ███████████████. |

## **Annex B**

Convertible Note Term Sheet

**Secured Convertible Note Term Sheet**
March 21, 2025





| | |
|---|---|
| | ████████████████████████ |
| **Purchasers:** | ██████████ |
| **Amount:** | ████████████████████████ |
| **Maturity Date:** | ████████████ |
| **Ranking:** | ████████████████████████ |
| **Use of Proceeds:**[1] | ████████████████████████ |
| **Commitment Term, Extension Fees:** | ████████████████████████ |

---

[1] CITGO Holding and CITGO Petroleum to dividend cash to PDVH for payment of PDVH creditors.



| | |
|---|---|
| | |
| **Closing Date Funded Debt; Cash Balance; Leverage:** | |
| **Interest:** | |
| **Issue Price:** | |
| **Redemption Price:** | |







2429755-NYCSR03A - MSW





| Registration Rights: | ██████████████████████████████ |
| Investors Agreement: | ██████████████████████████████ |
| Transfer Restrictions: | ██████████████████████████████ |
| Tax Structure: | ██████████████████████████████ |
| Private Placement: | ██████████████████████████████ |
| Governing Law: | ████████████ |

**EXHIBIT C**

**Form of 2020 Noteholder Transferee Joinder**

The undersigned (the "**Transferee**") hereby (a) acknowledges that it has read and understands the Amended and Restated Transaction Support Agreement (the "**Agreement**"), dated as of March 21, 2025, entered into by and among (x) Red Tree Investments, LLC and (y) the holders of, or nominees, investment managers, investment advisors, or subadvisors to funds and/or accounts that hold, or trustees of trusts that hold, the 2020 Notes; and (b) with respect to the 2020 Notes (as defined in the Agreement) acquired from Transferor, agrees to be bound to the terms and conditions of the Agreement to the extent that Transferor was thereby bound and to make (and be deemed to have made) all of the representations, warranties, covenants, and elections of the Transferor thereunder, in each case without modification, and shall be deemed a Consenting 2020 Noteholder under the terms of the Agreement. All 2020 Notes held by the Transferee (now or hereafter) shall, subject to Section 6.1 (*Transfers of 2020 Notes*) and Section 6.2 (*Additional Claims*) of the Agreement, be subject in all respects to the Agreement.

Date Executed: _____, 2025

**[Name of Transferee]**

By: _____
Name: _____
Title: _____
Address: _____

_____
Email: _____

2020 *Notes Acquired*:

$_____

**EXHIBIT D**

**Form of 2020 Noteholder Joinder**

The undersigned (the "**Joining Party**") hereby (a) acknowledges that it has read and understands the Amended and Restated Transaction Support Agreement (the "**Agreement**"), dated as of March 21, 2025 entered into by and among (x) Red Tree Investments, LLC; and (y) the holders of, or nominees, investment managers, investment advisors, or subadvisors to funds and/or accounts that hold, or trustees of trusts that hold, the 2020 Notes; and (b) with respect to the 2020 Notes (as defined in the Agreement) held by such Joining Party as at the date hereof, agrees to be bound to the terms and conditions of the Agreement and to make (and be deemed to have made) all of the representations, warranties, covenants, and elections of an Initial Consenting 2020 Noteholder thereunder, in each case without modification, and shall be deemed a Consenting 2020 Noteholder under the terms of the Agreement. All 2020 Notes held by the Joining Party (now or hereafter) shall, subject to Section 6.1 (*Transfers of 2020 Notes*) and Section 6.2 (*Additional Claims*) of the Agreement, be subject in all respects to the Agreement.

Date Executed: _____, 2025

**[Name of Joining Party]**

By:    _____
Name:  _____
Title:    _____
Address: _____

            _____
Email:   _____

2020 *Notes*:

$_____

**EXHIBIT E**

**Certification of Counsel**

We hereby certify that, our clients have entered into a transaction support agreement providing for the exchange of their $8\frac{1}{2}$% Senior Notes due 2020, issued by Petróleos de Venezuela, S.A. under the 2020 Notes Indenture, guaranteed by PDVSA Petróleo, S.A., and secured with a pledge on 50.1% of the equity of CITGO Holding, Inc. (the "2020 Notes") and a consent solicitation. We further certify that as of the date hereof, the holders of 2020 Notes signature to the transaction support agreement beneficially hold approximately 66% of the 2020 Notes. We expect such number to exceed 67% in the immediate future.

PAUL, WEISS, RIFKIND, WHARTON
& GARRISON LLP


By: _____*/s/ Andrew Rosenberg*_____
Name: Andrew Rosenberg
Title: Partner