# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| CRYSTALLEX INTERNATIONAL CORP., | ) |
| *Plaintiff,* | ) ) ) ) No. 1:17-mc-00151-LPS |
| v. | ) ) **PUBLIC** |
| BOLIVARIAN REPUBLIC OF VENEZUELA, | ) ) ) |
| *Defendant.* | ) |

## THE VENEZUELA PARTIES' OPPOSITION TO
## RED TREE INVESTMENT LLC'S MOTION TO SEAL

The Bolivarian Republic of Venezuela (the "Republic"), Petróleos de Venezuela, S.A. ("PDVSA"), PDV Holding, Inc. ("PDVH"), and CITGO Petroleum Corporation ("CITGO" and, together with the Republic, PDVSA, and PDVH, the "Venezuela Parties")[1] oppose Red Tree Investment LLC's ("Red Tree") Motion for Leave to File Under Seal ("Motion to Seal"), D.I. 1601, and respectfully request that the Court order Red Tree to disclose a full unredacted version of the Transaction Support Agreement ("TSA") relating to the 2020 notes.[2] Red Tree's response to Gold Reserve's Emergency Request for Relief, D.I. 1606, and proposed redacted version of the TSA, D.I. 1606-1, do not change the need for a full unredacted version of the TSA to immediately be made available on the public docket.

**I.    Creditors, Bidders, and the Public Need to Know the Terms of the TSA to Properly Understand and Object to the "Red Tree" Bid.**

Delaware law requires that, once attached, corporate shares must be sold "at [a] *public sale* to the highest bidder." 8 *Del. C.* § 324(a) (emphasis added). Consistent with the command of the statute, this Court ordered that "[a]ll bids submitted in the Stalking Horse stage of the Sale Process shall be made public once a Stalking Horse bid is selected." D.I. 1517 ¶ 23; *see also* D.I. 1554 at 2 ("[T]he Court reiterates that '[a]ll bids submitted in the Stalking Horse stage of the Sale Process shall be made public once a Stalking Horse bid is selected.'"). The Court also acknowledged that

---

[1] As with the Venezuela Parties' other filings, nothing in this filing should be construed to imply the Venezuela Parties' consent to a forced sale under any circumstances. The Venezuela Parties preserve all rights and positions, including on appeal.
[2] Consistent with the Court's Confidentiality Order, D.I. 291, the Venezuela Parties are filing this opposition brief under seal because it refers to information over which Red Tree is seeking to maintain confidential treatment as well as confidential information that was disclosed to the Sale Process Parties by the Special Master in the course of his evaluations of the stalking horse bids. Moreover, the Venezuela Parties submit this opposition only to emphasize the importance of making the TSA available to the public and, accordingly, reserve all rights to further comment on and/or object to the Special Master's Notice of Stalking Horse Recommendation, D.I. 1596, when the Court sets a briefing schedule. *See* D.I. 1605 (staying objections briefing "until after the Court resolves" the instant dispute).

1

in balancing the rights of the parties in this case to access public information against a bidder's interest in non-disclosure, "the 'customary' protections a bidder would ordinarily seek in a transaction of this sort may, on occasion, have to yield to the realities of litigation." D.I. 1433 at 5. To that end, the only information that the Special Master was permitted to redact from the bids was anything that would constitute "identifying information" about the non-selected stalking horse bidders. D.I. 1517 ¶ 23. Red Tree—a subsidiary of Contrarian Capital Management, LLC, which is a significant holder of the 2020 notes, D.I. 105 at 8—now petitions the Court to keep the central documentation supporting the recommended stalking horse bid of Red Tree's shell company bidder, Red Tree Acquisitions, LLC[3] under seal and out of the public eye. Red Tree offers no convincing reason to justify this request, and its Motion to Seal should therefore be denied.

*First,* Red Tree offers only generic platitudes to justify keeping the TSA under seal, suggesting that publicly disclosing the "economic terms" in the TSA would "reveal the parties' confidential negotiating strategies" and their "views on the proper valuation of the 2020 notes." D.I. 1601 at 2. But no negotiating strategies or alternative views on the proper valuation of the 2020 notes are described in the TSA, only the terms of the ultimate deal. Red Tree's dubious argument is further undermined by the fact that Red Tree/Contrarian, in essence, negotiated with itself and other similarly situated entities to pay themselves ▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉

---

[3] While the question of whether Red Tree's stalking horse bid has a high degree of closing certainty is an issue that will be briefed in connection with the objections to the Special Master's Notice of Stalking Horse Recommendation, the Venezuela Parties note here that the putative bidder, Red Tree Acquisitions, LLC, is a shell company proposing to effect a leveraged buyout based on CITGO's balance sheet, but without the assurances of closing that are market standard for private equity deals.

████████████████████████████████████████████████ As noted above, Contrarian—without disclosing its actual holdings to anyone but the Special Master—has held itself out as a significant holder of the 2020 notes, and Red Tree's bid values the claims that Red Tree is proposing to acquire from the 2020 Bondholders at its own full (and dubious) $2.906 billion valuation. *See* D.I. 1596-2 at 117. In effect, Red Tree/Contrarian and other 2020 Bondholders would pay themselves in full for the 2020 Noteholder claims, which have not even been reduced to judgment, ahead of other Attached Judgment Creditors, and would do so by extracting value out of CITGO while still leaving PDVSA potentially on the hook for the 2020 Bondholders' claims.[5] Making public the fact that Contrarian "negotiated" a deal that richly values the claims of the 2020 Bondholders, the validity of which remains in question, does not implicate the kinds of competitive harm that the Third Circuit seeks to protect from public disclosure. *See In re Avandia Mktg., Sales Practices & Products Liab. Litig.*, 924 F.3d 662, 671 (3d Cir. 2019) ("[b]road allegations of harm, unsubstantiated by specific examples or articulated reasoning, do not support a good cause showing" to seal judicial records) (internal quotations omitted); *MED-EL Elektromedizinische Gerate Ges.m.b.H. v. Advanced Bionics, LLC*, 2021 WL 7209528, at *2 (D. Del. Dec. 2, 2021) ("While [defendant] might think that the harm is obvious, not all financial disclosures lead to competitive harm, and parties must make a showing to overcome the presumption, even where such harm may seem obvious to them.").

---

████████████████████████████████████████████ *See* D.I. SEALED 1600, Exhibit B at 3–5; D.I. 1606-1 at 40–42 (redacted).

[5] For the avoidance of doubt, the Venezuela Parties maintain that the 2020 Bondholders' claims are meritless because the pledge and the exchange offer that relied on that pledge were invalid under Venezuelan law. As the Court is aware, those claims are being litigated in the Southern District of New York.

*Second*, even if Red Tree's argument that the terms of the TSA are competitively sensitive had merit, which it does not, the terms of the Red Tree bid and the TSA are linked to such a degree that the bid's viability cannot be understood without access to the full TSA that "supports" it. While Red Tree suggests that the TSA is merely "incidental to the substantive issues in this case" and that the "economic terms" of the TSA are not "relevant" to its proposed transaction, D.I. 1601 at 3, this characterization is belied by both the terms of the TSA and the Special Master's own recommendation. ███████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████ *See* SEALED D.I. 1600 at 93-95; D.I. 1606-1 at 39–41 (redacted). ██████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████ *See* SEALED D.I. 1600 at 99-106; D.I. 1606-1 at 45–52 (redacted). Moreover, the Special Master himself is unwilling to move forward with Red Tree's bid unless and until the TSA garners support from the requisite holdings of 2020 Bondholders, D.I. 1569 at 10, n.5, further demonstrating that the terms of the TSA are inextricably intertwined with Red Tree's bid.

Indeed, the Special Master selected Red Tree's bid over Bidder A's much higher bid because of the TSA. *See* D.I. 1597-1 at 2 (Bidder A offering $7.081 billion for the PDVH shares); D.I. 1596 ¶ 37 (Red Tree offering $3.699 billion for the PDVH shares). ████████████████████████████████████████████████████████████████████████████

4



*See also* D.I. 1596 ¶ 34 (stating that the TSA was "[a]n important factor in assessing the closing certainty" of Red Tree's bid). The Special Master also publicly stated in his recommendation that the TSA contains "extremely limited conditionality and termination rights" and purports to give the Special Master "rights . . . over amendments and terminations of the TSA." D.I. 1596 ¶ 34.

In other words, the Special Master, ▬▬▬▬▬▬▬▬▬▬▬ clearly (albeit erroneously), prized perceived certainty over price in assessing the viability of the stalking horse bids and selected Red Tree as a stalking horse bidder, in large part, because—in his mind—the TSA would resolve the uncertainty about any future litigation challenges that the 2020 Bondholders might levy at the structure of any other proposed transaction. D.I. 1596 ¶ 34. But absent public disclosure of the full terms of the TSA, the parties, the public, and other bidders cannot evaluate the terms of the TSA or the proposed settlement with the 2020 Bondholders and draw their own conclusions about the perceived "certainty" in Red Tree's stalking horse bid or fully object to the Special Master's recommendation of the lower bid. Moreover, the terms of the transactions contemplated by the TSA, which divert billions in value from Attached Judgment

5

Creditors to 2020 Bondholders merely to release the CITGO Holding pledge also purport to limit the 2020 Bondholders' ability to enter into alternative transactions with other bidders. *See* D.I. 1606-1 § 3.2(c) at 15. These provisions in the TSA presumably will serve as the basis for other objections by creditors or bidders.

## II. Allowing the TSA to Remain Under Seal Will Impede Topping Bidders.

Allowing the TSA to remain under seal would also harm the sale process by impeding topping bids. This Court has made clear—repeatedly—that "[t]he SPA and Evaluation Criteria shall NOT include any requirement or condition with respect to the 2020 Bond Entities other than that bidders acknowledge" the existence of their purported claims. D.I. 1517 ¶ 28 (emphasis original); *see also* Dec. 13, 2024 Hrg. Tr. 193:1-2 (The Court: "[W]ith respect to the 2020's . . . bidders would have to acknowledge their existence and nothing else."); D.I. 1554 at 23 ("The Court has already determined that the SPA will not include any requirement or condition with respect to the 2020 Bond Entities other than certain acknowledgements . . . ."). Contrary to this clear instruction from the Court, however, the Special Master made resolution of the 2020s' purported pledge a condition of the bidding and recommended a stalking horse bid worth billions of dollars less than another bid because the lower bid promises to pay the 2020 Bondholders to release their purported pledge. The TSA is the lynchpin of that resolution. As such, potential bidders participating in the topping period will need full access to the TSA to understand what they need to do to submit what the Special Master views as a superior proposal. Fundamentally, a bid cannot serve as a stalking horse when potential topping bids are not explicitly told what they have to beat.[6]

---

[6] Even if the Red Tree Shell bid is not ultimately selected as the stalking horse, the details of the TSA are still relevant to future bidders and allowing the TSA to remain under seal would still adversely impact the sale process. The Special Master has made clear that he privileges whatever

Because Red Tree's bid and the TSA are inextricably linked, and because the TSA has been held out by the Special Master as providing the "certainty" of closing that the Special Master prizes over bid value, it would be difficult—if not impossible—for a competing bidder to participate in the topping period without a full understanding of the economics of the proposed transactions or, if they so choose, to attempt to reach a similar or better arrangement with the 2020 Bondholders. (Among other things, the TSA purports to prohibit the 2020 Bondholders from entering into an alternative transaction with another bidder unless it provides for financial term and conditions on par with or more favorable to the 2020 Notes than the financial terms that Contrarian has offered itself. *See* D.I. 1606-1 § 3.2(c) at 15). Therefore, if the Court approves Red Tree as the stalking horse bidder without also ordering disclosure of the full unredacted version of the TSA, the topping period would be a ruse and utterly incapable of generating the kind of "'competitive tension' among bidders" that this Court contemplated in its prior orders. D.I. 1554 at 12.

## CONCLUSION

For the foregoing reasons, the Venezuela Parties respectfully request that the Court deny Red Tree's Motion to Seal and order Red Tree to immediately disclose a fully unredacted version of the TSA on the public docket.

|  |  |
|---|---|
|  | MORRIS, NICHOLS, ARSHT & TUNNELL LLP |
|  | */s/ Alexandra M. Cumings* |
| OF COUNSEL: | Susan W. Waesco (#4476) |
| Nathan P. Eimer | Alexandra M. Cumings (#6146) |
| Lisa S. Meyer | Kirk Andersen (#7156) |
| Daniel D. Birk | 1201 North Market Street |
| Gregory M. Schweizer | Wilmington, DE 19801 |
| Hannah Bucher | (302) 658-9200 |

---

purported "certainty" is provided by the TSA over bid price. Future bidders who seek to have the Special Master ultimately recommend their topping bids will find the details of the TSA relevant to understanding the way the Special Master evaluates bids. And withholding the TSA will serve little purpose other than shrouding the Special Master's decision-making.

7

| | |
|---|---|
| EIMER STAHL LLP<br>224 South Michigan Avenue<br>Suite 1100<br>Chicago, IL 60604<br>(312) 660-7600<br>NEimer@eimerstahl.com<br>LMeyer@eimerstahl.com<br>DBirk@eimerstahl.com<br>GSchweizer@eimerstahl.com<br>HBucher@eimerstahl.com | SWaesco@morrisnichols.com<br>ACumings@morrisnichols.com<br>KAndersen@morrisnichols.com<br><br>*Attorneys for PDV Holding, Inc. and CITGO Petroleum Corporation* |
| | HEYMAN ENERIO GATTUSO & HIRZEL LLP |
| OF COUNSEL:<br>Joseph D. Pizzurro<br>Kevin A. Meehan<br>Juan O. Perla<br>David V. Holmes<br>CURTIS, MALLET-PREVOST, COLT & MOSLE LLP<br>101 Park Avenue New York, NY 10178<br>(212) 696-6000<br>jpizzurro@curtis.com<br>kmeehan@curtis.com<br>jperla@curtis.com<br>dholmes@curtis.com | */s/ Brendan Patrick McDonnell*<br>Samuel Taylor Hirzel, II (#4415)<br>Brendan Patrick McDonnell (#7086)<br>300 Delaware Avenue, Suite 200<br>Wilmington, DE 19801<br>(302) 472-7300<br>shirzel@hegh.law<br>bmcdonnell@hehg.law<br><br>*Attorneys for Petróleos de Venezuela, S.A.* |
| | ABRAMS & BAYLISS LLP |
| OF COUNSEL:<br>Donald B. Verrilli, Jr.<br>Elaine J. Goldenberg<br>Ginger D. Anders<br>MUNGER, TOLLES & OLSON LLP<br>601 Massachusetts Avenue NW<br>Suite 500 E<br>Washington, D.C. 20001<br>(202) 220-1100<br>Donald.Verrilli@mto.com<br>Elaine.Goldenberg@mto.com<br>Ginger.Anders@mto.com | */s/ Christopher Fitzpatrick Cannataro*<br>A. Thompson Bayliss (#4379)<br>Christopher Fitzpatrick Cannataro (#6621)<br>20 Montchanin Road, Suite 200<br>Wilmington, DE 19807<br>(302) 778-1000<br>bayliss@abramsbayliss.com<br>cannataro@abramsbayliss.com<br><br>*Attorneys for Bolivarian Republic of Venezuela* |

8

George M. Garvey
Adeel Mohammadi
MUNGER, TOLLES & OLSON LLP
350 South Grand Avenue, 50th Floor
Los Angeles, CA 90071
(213) 683-9100
George.Garvey@mto.com
Adeel.Mohammadi@mto.com

March 24, 2025

9