# IN THE UNITED STATES DISTRICT COURT FOR
# THE DISTRICT OF DELAWARE

| | |
|---|---|
| CRYSTALLEX INTERNATIONAL CORPORATION, <br><br> Plaintiff, <br><br> v. <br><br> BOLIVARIAN REPUBLIC OF VENEZUELA, <br><br> Defendant. | Case No. 17-mc-151-LPS |
| RUSORO MINING LTD., <br><br> Plaintiff, <br><br> v. <br><br> BOLIVARIAN REPUBLIC OF VENEZUELA, <br><br> Defendant. | Case No. 21-mc-481-LPS |
| KOCH MINERALS SARL and KOCH NITROGEN INTERNATIONAL SARL, <br><br> Plaintiffs, <br><br> v. <br><br> BOLIVARIAN REPUBLIC OF VENEZUELA, <br><br> Defendant. | Case No. 22-mc-156-LPS |
| GOLD RESERVE INC., <br><br> Plaintiff, <br><br> v. <br><br> BOLIVARIAN REPUBLIC OF VENEZUELA, <br><br> Defendant. | Case No. 22-mc-453-LPS |

## KOCH'S OBJECTION TO SPECIAL MASTER'S RECOMMENDATION

Koch Minerals SARL and Koch Nitrogen International SARL ("Koch") respectfully object to the Notice of Special Master's Recommendation of Stalking Horse (D.I. 1596) (the "Recommendation"), and join those filed by their bidding consortium members Gold Reserve Inc., n/k/a Gold Reserve Ltd. ("Gold Reserve") and Rusoro Mining Ltd. ("Rusoro").

The Special Master's Recommendation should be rejected for the reasons stated by Gold Reserve and Rusoro. Moreover, the Special Master's reliance on the alleged settlement by Red Tree Investments, LLC ("Red Tree"), a subsidiary of Contrarian Funds, LLC, an affiliate of Contrarian Capital Management, LLC ("Contrarian"), with the 2020 bondholders in justifying the low purchase price, without *any* explanation of how to weigh the risk relative to the purchase price, completely undermines the purpose of the Stalking Horse/Base Bid and the value of a Topping Period. When bidders have no understanding of what bid level would top a bid – or even *how* to top a bid, there can be no competitive process. In addition, while Rusoro correctly notes that 2020 litigation risk is not a proper evaluation criterion, even if it were, it would not overcome the $3.382 billion difference in price between the Red Tree/Contrarian bid and that of the Gold Reserve consortium, particularly since the Red Tree/Contrarian Transaction Support Agreement ("TSA") provides no certainty of settlement with the 2020 bondholders.

**I.   The Special Master's Selection of the Red Tree/Contrarian Bid as a Stalking Horse Bid Will Eliminate *Any* Chance of Competitive Bidding**

    **A.   The Special Master Erred by Selecting a Stalking Horse Bidder Based on Ambiguous Criteria for a Successful Topping Bid.**

The goal of selecting a Stalking Horse Bidder is to maximize value received for the assets by increasing competition.[1] Indeed, the Court has "endeavored for years to formulate and

---

[1] *See* (D.I. 1433 at 7) (Nov. 20, 2024 Order) (The purpose of the Topping Period is to, *inter alia*, "allow for the possibility of better bids to be prepared, presented to the Special Master, and carefully evaluated by the Special Master.").

1

implement a process that will result in a Successful Bid that is value-maximizing and also reflective of the fair market value of the PDVH Shares . . ." *See* (D.I. 1554 at 4) (Jan. 27, 2025 Order).  In discharging his duties, the Special Master owes an obligation to "maximiz[e] the sale price of any assets to be sold."  (D.I. 277 ¶ 2) (Order Regarding Special Master). This requires he ensure his actions do not chill the receipt of higher and better offers. Yet, by selecting a bid that is $3.382 billion less than the highest bid without providing *any* guidance as to the discount applied to the highest bid based on the Special Master's assessment of the incremental closing risk compared to the Red Tree/Contrarian bid, the Recommendation fails to achieve this objective.

For an effective, value-maximizing process, potential bidders must know how to top the existing bid. In selecting the Red Tree/Contrarian bid, the Special Master apparently determined that a $3.7 billion bid that includes a settlement with 2/3 of the 2020 bondholders is a greater "combination of price and certainty" than a $7.1 billion bid with fully committed financing from two of the largest banks in the world. (D.I. 1596, ¶ 33). The Special Master asserts that the Red Tree/Contrarian bid "represents the greatest combination of price and certainty" and is thus "the best bid submitted for purposes of selection of a stalking horse." *Id*. But that sentence represents the *entirety* of the direction and guidance the Special Master has provided. [2]  As a result, bidders have been left completely in the dark as to how much their proposed price would need to change to constitute a viable topping bid or even what elements a bid must contain to achieve this supposed certainty short of a separate settlement with the 2020 bondholders – a group currently in the functional equivalent of a lockup period with Red Tree/Contrarian.

      **B.**      **The Special Master's Failure to Disclose the Discount He Attributed to Bids Lacking the Purported 2020s Settlement is Fatal to The Recommendation**

---

[2] For example, had the Special Master communicated a discount factor of 35% for bids without a 2020s settlement, a prospective bidder without a settlement would be able to derive that a bid greater than $6 billion ($3.7 billion / 0.65) would be required to "top" the Red Tree/Contrarian stalking horse bid.

2

Transparency and process fairness are critical in equitable receiverships and multi-claimant sales. *In re Hupp Industries*, 140 B.R. 191 (Bankr. N.D. Ohio 1992). In *In re Abbotts Dairies of Pennsylvania, Inc.*, the Third Circuit emphasized the need for good faith and full disclosure in bankruptcy sales, suggesting that all material factors affecting a bid's value, including closing risks, should be transparently communicated to stakeholders. *Id.* Here, the Special Master's failure to disclose the value or percentage discount he attributed to bids lacking a settlement with the 2020 bondholders provides no transparency and means that bidders will enter the Topping Period "in the dark," the exact situation the stalking horse process is intended to prevent.

This problem is further exacerbated by the Special Master's statement that he reserves the right to use different weightings of price and risk for the Stalking Horse selection than he will use to evaluate the topping bids for the purpose of making the Final Recommendation, and has not disclosed what those weightings were and will be.[3] This was neither contemplated nor approved by the Court when it determined the Evaluation Criteria. To have a viable stalking horse and then topping period, the Evaluation Criteria must be uniform and applied consistently throughout. Otherwise, bidders will not know how to construct a winning topping bid. The Special Master's Recommendation therefore achieves the exact opposite of his mandate.

      C.      **The Special Master Cannot Rely on the TSA to Elevate "Certainty" Over Any Attempt to Create a Competitive Process**

The Special Master's Recommendation would be rejected in virtually every other similar context. In bankruptcy sales by a debtor or trustee, courts recognize it is inappropriate to resolve outstanding contingencies in exchange for a lower price if such attempts reduce competition. *See*

---

[3] *See, e.g.*, D.I. 1596, at ¶ 5: "...the factors driving the selection of a stalking horse are not necessarily the same as those underpinning the recommendation of a final successful purchaser." (¶5) "...the factors driving the selection of a stalking horse are not necessarily the same as those underpinning the recommendation of a final successful purchaser."

3

*In re Innkeepers USA Trust*, 442 B.R. 227, 234-35 (Bankr. S.D.N.Y. 2010); s*ee also Dell, Inc. v. Magnetar Global Event Driven Master Fund Ltd.*, 177 A.3d 1, 21 (Del. 2017) (finding that "the court should exclude 'any synergies or other value expected from the merger giving rise to the appraisal proceeding itself'" when reviewing a valuation and appraisal for a stock sale (citation omitted)). In *Innkeepers USA Trust*, the court rejected a proposed plan support agreement that would resolve alleged outstanding contingencies while also prohibiting the debtors "from seeking competitive proposals which could maximize the value of these estates," holding that the "alleged advantages" conferred by a deal wherein certain contingencies are resolved do not outweigh the harm that such agreements can have on the competitive bidding process or the ability to maximize value. *In re Innkeepers USA Tr.*, 442 B.R. at 234-35.

II. **Even If 2020 Litigation Risk Were A Proper Evaluation Criteria (Which It is Not), It Could Not Justify a $3.382 Billion Price Decrement**

The Special Master did not actually analyze or quantify the 2020 bondholders' litigation risk and therefore failed to provide a meaningful assessment of the value of the Red Tree/Contrarian bid relative to the bid of the Gold Reserve Consortium, considering purchase price and closing certainty. The Special Master simply noted that risk exists – he made no attempt to value the risk – and, on that basis, recommended a Red Tree/Contrarian bid that is $3.382 billion less than the highest bid. By selecting the Red Tree/Contrarian bid due to the supposed "closing certainty" that comes with agreement from two-thirds of the 2020 bondholders, the Special Master has ensured *he* cannot maximize value because it is impossible for any bidder to make a meaningfully competitive bid.

III. **The Red Tree/Contrarian TSA Provides No Certainty of Settlement with the with the 2020 Bondholders**

Although the Special Master made the Red Tree/Contrarian settlement with the 2020 bondholders the singular justification for selecting the Red Tree/Contrarian bid, the document

4

relied upon by the Special Master – the Red Tree/Contrarian TSA – does not actually provide certainty of any settlement with the 2020 bondholders and thus provides no "certainty of closing." Now that the document has been produced, the following glaring holes are apparent:

- The TSA does not contain any representation that it has been approved by the Indenture Trustee. This is a critical omission given that the TSA is unlikely to be approved given its non-pro-rata structure, which opportunistically benefits Red Tree and other Ad Hoc Group Bondholders with a higher differentiated recovery at the expense of the minority, non-consenting 2020 bondholders who will contest the TSA. [4]

- The TSA includes the unworkable requirement that the CITGO Parties must sign agreements (and pay fees and expenses) *pre*-closing, including directions to and indemnities in favor of the trustee for the 2020 bonds. (D.I. 1627 §§ 2.2(b)(iii), (iv), 2.2(d), 4.3(a)(iii) (TSA).

- The commitments of the consenting 2020 bondholders under the TSA are conditioned on multiple events being resolved in a manner that the 2020 bondholders approve, and their approval is limited only by their commercial reasonableness. (D.I. 1627 § 3.2(a) (TSA).

- The TSA gives the 2020 bondholders expansive and unilateral rights to terminate, including based on a finding of "insolvency" (whether or not insolvency proceedings have commenced) of multiple parties, including PDVSA, PDVH, CITGO Holding, or CITGO Petroleum. (D.I. 1627, § 5.2(f)) (TSA).

IV. **There Is No Justification For Awarding Bid Protections to Red Tree/Contrarian Where Their Bid Eliminates Competitive Bidding**

Bid protections (break-up fees, expense reimbursements, etc.) are only justified when: (a) the stalking horse bid provides clear value to the estate by setting a true floor; and (b) the selection was made through a transparent, reasoned process.[5] That has not happened here. To the contrary, the only effect of giving bid protections to the Red Tree/Contrarian bid would be to further deter topping bidders through the unjust/improper $75 million surcharge. At minimum, therefore, the Court should not approve the modified bid protections recommended by the Special Master.

---

[4] This risk is not speculative – as evidenced by the notice previously issued to the Court by a significant minority bondholder stating that it will object, and vigorously litigate, any settlement with the 2020 bondholders that contains non-ratable terms for the minority.

[5] *In re Hupp Indus., Inc.*, 140 B.R. 191, 193-97 (Bankr. N.D. Ohio 1992) (denying bid protections where they would chill bidding or where the stalking horse had no unique role); *In re Genco Shipping & Trading Ltd.*, 509 B.R. 455, 462-67 (Bankr. S.D.N.Y. 2014) (emphasizing the need for bid protections to be justified by the competitive benefit to the estate).

Dated: March 31, 2025

Respectfully submitted,

| **WOMBLE BOND DICKINSON (US) LLP** | **STINSON LLP** |
|---|---|
| By: */s/ Matthew P. Ward* <br> Kevin J. Mangan (#3810) <br> Matthew P. Ward (#4471) <br> Stephanie S. Riley (#5803) <br> 1313 N. Market St., Suite 1200 <br> Wilmington, DE 19801 <br> Telephone: 302-252-4320 <br> Kevin.mangan@wbd-us.com <br> Matthew.ward@wbd-us.com <br> Stephanie.riley@wbd-us.com | Nicholas J. Zluticky (MO # 61203) <br> (*pro hac* pending) <br> 1201 Walnut, Suite 2900 <br> Kansas City, MO 64106 <br> Telephone: 816-691-3278 <br> nicholas.zluticky@stinson.com |