# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| CRYSTALLEX INTERNATIONAL CORP., ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Misc. No. 17-151-LPS |
| ) | |
| BOLIVARIAN REPUBLIC OF VENE- ) | |
| ZUELA, ) | |
| ) | |
| Defendant. ) | |

**SPECIAL MASTER'S RESPONSE TO OBJECTIONS TO**
**HIS RECOMMENDATION OF STALKING HORSE**

OF COUNSEL:

Matthew S. Barr (Admitted *pro hac vice*)
David Lender (Admitted *pro hac vice*)
Jared R. Friedmann (Admitted *pro hac vice*)
Chase A. Bentley (Admitted *pro hac vice*)
WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
Matt.Barr@weil.com
David.Lender@weil.com
Jared.Friedmann@weil.com
Chase.Bentley@weil.com

Dated: April 3, 2025
12156979 / 21202.00001

Myron T. Steele (#0002)
Matthew F. Davis (#4696)
Bindu A. Palapura (#5370)
POTTER ANDERSON & CORROON LLP
Hercules Plaza, 6th Floor
1313 North Market Street
P.O. Box 951
Wilmington, DE 19801
Telephone: (302) 984-6000
Facsimile: (302) 658-1192
msteele@potteranderson.com
mdavis@potteranderson.com
bpalapura@potteranderson.com

*Counsel for Special Master Robert B. Pincus*

Robert B. Pincus, as special master in the above-captioned case (the "**Special Master**"), respectfully submits this response to objections (D.I.s 1635-1640, 1644) to the *Notice of Special Master's Recommendation of Stalking Horse* (D.I. 1596) (the "**Stalking Horse Rec.**").[1]

## I. The Special Master recommended the bid most likely to maximize value during the Topping Period

The Special Master recommended the Stalking Horse bid he believes is the best "starting point," D.I. 1433 ¶ 4, the one best situated to encourage further bidding and "generat[e] as much 'competitive tension' among bidders as possible during the Topping Period." D.I. 1554 at 12 (emphasis omitted); *see* D.I. 1517. The Special Master's recommendation was guided by the Evaluation Criteria approved by the Court, which mandate that the Special Master must consider both price and certainty of closing. *See* D.I. 1552-1 at 8-9; D.I. 1554 at 24-27.

The Special Master believed it important to recommend a bid at the Stalking Horse stage that had a high degree of closing certainty. All of the bids received had some degree of closing uncertainty or conditionality, including with respect to the PDVSA 2020 Bonds. The Special Master carefully considered and discussed with the bidders and the Sale Process Parties various risks associated with each bidder's ability to close, including structuring uncertainty, the strength of bidders' balance sheets, and their ability to obtain necessary financing. The Special Master also carefully considered risks associated with Red Tree's settlement with the ad hoc group of the PDVSA 2020 Bondholders and the terms of the Transaction Support Agreement, including any potential for challenge by a minority group of PDVSA 2020 Bondholders. The Special Master

---

[1] All capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the *Sixth Revised Proposed Order (A) Establishing Sale and Bidding Procedures, (B) Approving Special Master's Report and Recommendation Regarding Proposed Sale Procedures Order, (C) Affirming Retention of Evercore as Investment Banker by Special Master and (D) Regarding Related Matters* (D.I. 481) (the "**Sale Procedures Order**") or the Stalking Horse Recommendation.

concluded, after numerous discussions with the Sale Process Parties, that the Red Tree Bid has the most closing certainty and is best positioned to generate a robust Topping Period. *See* Stalking Horse Rec. ¶¶ 32-42.

The Special Master also cautioned that his recommendation of Red Tree as the Stalking Horse "does not mean that the Proposed Transaction will be preferred to others following the topping period, regardless of whether the bids previously submitted materially change . . . between now and the date on which the Special Master files his final recommendation for a Successful Bidder." *Id.* ¶ 5. Pursuant to the Court's instructions, the Special Master plans to, "continuously and throughout the 30-day Topping Period, engage with bidders, generating as much 'competitive tension' among bidders as possible." D.I. 1554 at 12 (emphasis omitted). If the Court adopts his Stalking Horse Recommendation, the Special Master is hopeful he will receive improved bids in terms of price and/or certainty during the Topping Period—whether as a result of Red Tree improving its bid or because other bidders are able to improve their bid.

**II.     The Special Master appropriately considered the risk of litigation on closing certainty**

Rusoro contends that a bidder's proposed strategy for addressing the PDVSA 2020 Bondholders "was to be given no weight by the Special Master when evaluating bids." D.I. 1635 at 3. That assertion contradicts the clear language of the Court's rulings. The Court directed the Special Master to comply with the Evaluation Criteria, which require him to consider "[c]onditionality related to pending or future litigation," "including with respect to the 2020 Bonds[.]" D.I. 1552-1 at 8; *see* D.I. 1554 at 24-27. Rusoro apparently confuses the Court's direction that the SPA and Evaluation Criteria should not "include any *requirement or condition* with respect to the 2020 Bond Entities," *see* D.I. 1517 ¶ 28 (emphasis added), for a mandate that the Special Master could not consider the bidders' proposed approaches to mitigate closing risk related to the PDVSA 2020 Bondholder litigation. The Court said no such thing. To the contrary, the Court expressly directed

2

the Special Master to consider conditionality "with respect to the 2020 Bonds." D.I. 1552-1 at 8; *see* D.I. 1554 at 24-27. That is precisely what the Special Master did.

Before making his recommendation, the Special Master and his Advisors worked closely with the leading bidders to minimize conditionality and uncertainty in their bids. The Special Master concluded the Red Tree Bid was best able to mitigate conditionality and uncertainty regarding the litigation risks associated with the PDVSA 2020 Bondholder litigation. The Red Tree Bid presents one way, but not the only way, to minimize those risks. For its part, the Gold Reserve Consortium did not sufficiently address those risks to the Special Master's satisfaction before he made his Stalking Horse Recommendation. Notwithstanding the Gold Reserve Consortium's assertions that their SPA "does not include any condition or requirement regarding the 2020 bondholders or their litigation," D.I. 1635 at 3, the Special Master identified elements of the Gold Reserve Consortium's financing commitments, SPA, and structure that present closing contingencies that could turn on the outcome of the PDVSA 2020 Bondholder litigation.[2] During the Topping Period, the Gold Reserve Consortium will have the opportunity to find ways of further mitigating those risks or convincing the Special Master that the risks have already been adequately addressed.

The Gold Reserve Consortium also argues bidders are "completely in the dark" as to "how to top the existing bid" absent "a separate settlement with the 2020 bondholders." D.I. 1638 at 2. Not so. Bidders know the purchase price they must beat to be competitive during the Topping Period, and the Special Master has made clear that bidders should do all they can to minimize any contingencies that could prevent the transaction from closing, including contingencies relating to

---

[2] The Gold Reserve Consortium's financing papers are not publicly available, and the Special Master is not describing the details of those papers here because he believes public disclosure could undermine the bidding process during the Topping Period. Nonetheless, the Special Master can submit the financing papers under seal if the Court wishes to review them or can discuss with the Court in camera.

3

the PDVSA 2020 Bondholder litigation. There is no prescribed way in which bidders must address those contingencies. But bidders should do their best to minimize and mitigate closing risks. The Special Master remains willing to engage in active discussions with the bidders about how to improve their bids—and address the Special Master's concerns—during the Topping Period.

Further, while the Special Master rigorously assessed both price and certainty of closing, he did not apply a mathematical formula or ascribe percentages to various contingencies to assess certainty of closing, *see* Stalking Horse Rec. ¶ 5—meaning there is no lack of transparency or disclosure, as suggested by Koch, *see* D.I. 1638 at 3. The Venezuela Parties argue the Special Master should have provided "a comparative analysis of the discounted value of the bids given their price and estimated probability of closing." D.I. 1639 at 3; *see also* D.I. 1638 at 2-3. Any such analysis, however, would have been arbitrary at best. There is no reliable way for the Special Master to predict to the percentage point how Judge Failla will rule in the PDVSA 2020 Bondholder litigation, whether that decision will be upheld on appeal, or whether the PDVSA 2020 Bondholders will be able to prevent the sale from closing. The same applies for a litany of risks and contingencies associated with the Stalking Horse bids. Accordingly, the Special Master did not and does not believe that attempting to quantify his decisions in numerical terms or applying a rigid formula was necessary or useful under the circumstances. Courts routinely decline to require formulaic or numerical analyses in similar contexts.[3] Moreover, the cases the Venezuela

---

[3] *See, e.g.*, *In re Fam. Christian, LLC*, 533 B.R. 600, 614, 624 (Bankr. W.D. Mich. 2015) (holding that requiring debtors to "ascribe a value to the going concern nature of the [chosen bidder's] bid" and "provide a line-by-line analysis to each bidder" would "hinder[] the central purpose of the auction—to generate the highest and best bid for the Debtors' assets through competitive and robust bidding"); *In re Bakalis*, 220 B.R. 525, 534-35 (Bankr. E.D.N.Y. 1998) (rejecting the unsuccessful bidder's complaint that bidders were not given a precise valuation of the non-dollar aspects of their bids); *In re Fin. News Network Inc.*, 134 B.R. 737, 738 (S.D.N.Y. 1991), *aff'd*, 980 F.2d 165 (2d Cir. 1992) (similar).

Parties cite are inapposite—both *In re Xonics Photochemical, Inc.*, 841 F.2d 198, 200 (7th Cir. 1988) and *In re R.M.L., Inc.*, 92 F.3d 139, 156 (3d Cir. 1996) involved valuations of contingent liabilities as part of insolvency determinations in bankruptcies. Even those cases acknowledge that a contingent liability should only be quantified "if the future event is *likely to occur*." *Xonics Photochemical*, 841 F.2d at 200 (citation omitted). Here, even though the Venezuela Parties characterize the PDVSA 2020 Bondholders' claims as "dubious," D.I. 1639 at 2, there is little, if any, certainty as to whether the PDVSA 2020 Bondholders are likely to be successful, and it is therefore difficult to predict whether that future event is likely to occur.

### III.    The Court does not need to consider valuation issues at this stage of the proceedings

At this stage, the Special Master has *not* made a final recommendation on which bidder the PDVH Shares should be sold to. The Gold Reserve Consortium nonetheless objects that the Special Master's choice "contravenes the Delaware law requirement that the PDVH Shares be sold 'to the highest bidder'" under Section 324(a) of the Delaware Code. D.I. 1636 at 1; *see also* D.I. 1639 at 2. Section 324(a) only applies to the ultimate "public sale" of shares of stock. 8 *Del. C.* § 324(a). The Court is not approving a sale of the PDVH Shares at this stage. Thus, the Court need not decide whether the Red Tree Bid is the highest or best bid. It only needs to decide whether it agrees with the Special Master's selection of Red Tree as the Stalking Horse bid most likely to produce a robust and competitive Topping Period that is likely to result in a value-maximizing sale of the PDVH Shares, and whether, as a result, Red Tree is entitled to the bidder protections embodied in its SPA. *See* D.I. 1554 at 12-13. For the same reason, the Venezuela Parties' inaccurate assertion that "Bidder A's valuation of PDVH is at least billions of dollars more than (if not double) its bid" is irrelevant at this stage. *See* D.I. 1639 at 5. The question of whether the recommended Stalking Horse bid is best suited to be the ultimate purchaser of the PDVH Shares is premature.

|  |  |
|---|---|
| OF COUNSEL:<br><br>Matthew S. Barr (Admitted *pro hac vice*)<br>David Lender (Admitted *pro hac vice*)<br>Jared R. Friedmann (Admitted *pro hac vice*)<br>Chase A. Bentley (Admitted *pro hac vice*)<br>WEIL, GOTSHAL & MANGES LLP<br>767 Fifth Avenue<br>New York, New York 10153<br>Telephone: (212) 310-8000<br>Facsimile: (212) 310-8007<br>Matt.Barr@weil.com<br>David.Lender@weil.com<br>Jared.Friedmann@weil.com<br>Chase.Bentley@weil.com<br><br>Dated: April 3, 2025<br>12156979 / 21202.00001 | Respectfully submitted,<br><br>POTTER ANDERSON & CORROON LLP<br><br>By: */s/ Myron T. Steele*<br>    Myron T. Steele (#0002)<br>    Matthew F. Davis (#4696)<br>    Bindu A. Palapura (#5370)<br>    Hercules Plaza, 6th Floor<br>    1313 North Market Street<br>    P.O. Box 951<br>    Wilmington, DE 19801<br>    Telephone: (302) 984-6000<br>    Facsimile: (302) 658-1192<br>    msteele@potteranderson.com<br>    mdavis@potteranderson.com<br>    bpalapura@potteranderson.com<br><br>*Counsel for Special Master Robert B. Pincus* |