# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| CRYSTALLEX INTERNATIONAL CORP., <br><br> Plaintiff, <br><br> v. <br><br> BOLIVARIAN REPUBLIC OF VENEZUELA, <br><br> Defendant. | Misc. No. 17-151-LPS |

**RESPONSE OF 2020 BONDHOLDERS TO MARCH 31, 2025 OBJECTIONS TO THE NOTICE OF SPECIAL MASTER'S RECOMMENDATION OF STALKING HORSE**

An ad hoc group of holders of a majority of PDVSA 2020 Bonds (the "2020 Bondholders") respectfully submits this response to the March 31, 2025 objections of Rusoro (D.I. 1635), Gold Reserve (D.I. 1636), Koch (D.I. 1638), and the Venezuela Parties (D.I. 1644) (collectively, the "Objections" and "Objectors") to the Notice of the Special Master's Recommendation of Stalking Horse, which recommended Red Tree Investments, LLC ("Red Tree") as the Stalking Horse (D.I. 1596).[1]  The Objections misconstrue this Court's orders, Red Tree's bid, and the Transaction Support Agreement ("TSA").  They should be rejected.

*First*, contrary to the Objectors' contentions, this Court has *never* held that the Special Master must "not . . . consider the 2020 [B]ondholders in its evaluation of the bids." (*See, e.g.*, D.I. 1635 at 4.)  To the contrary, the Court directed the Special Master to consider two criteria when evaluating bids:  price and certainty of closing.  (*See* D.I. 1552-1 at 8-9 (proposed Evaluation Criteria); D.I. 1554 at 24-26 (adopting proposed Evaluation Criteria with minor alterations).)  The latter specifically requires the Special Master to evaluate "the certainty associated with a given bidder and the likelihood its applicable bid will successfully proceed to closing," including through an analysis of "[c]onditionality related to pending or future litigation *(including with respect to the 2020 Bonds* and the Alter Ego Claims)."  (D.I. 1552-1 at 8 (emphasis added).)  Thus, far from prohibiting any analysis of the 2020 Bondholders' claims in evaluating bids, the Evaluation Criteria approved by this Court *specifically required* the Special Master to consider how the 2020 Bondholders' claims affected the bid's certainty of closing.

As the 2020 Bondholders have made clear, they will vigorously defend their rights by challenging any bid that attempts to violate their protections under the Pledge

---

[1]  The Trustee and the Collateral Agent are separately represented in this proceeding at this time as set forth in their reservation of rights (D.I. 1637).

Agreement or Indenture—including any bid that compromises their security by encumbering CITGO assets to pay PDVSA creditors. (*See* D.I. 1375; D.I. 1441; D.I. 1469; D.I. 1553; D.I. 1558; D.I. 1568.) This Court has recognized that the 2020 Bondholders "intend to challenge any future bid that involves the upstreaming of any funds from CITGO to pay creditors of PDVSA." (D.I. 1571 at 1.) Those challenges would at least significantly delay and most likely imperil the closing of any such transaction. Those considerations go directly to the "certainty of closing," "including with respect to the 2020 Bonds," that the Court directed the Special Master to consider in evaluating bids. As the Special Master explained, "[t]he existence of a dispute, and the virtual certainty of litigation by the PDVSA 2020 Bondholders, is by definition a risk that weighs on closing certainty." (D.I. 1596 at 14.) Although the 2020 Bondholders do not have complete information about the competing bids, the Special Master's discussion of those bids suggests they include features that may run afoul of the Pledge Agreement or Indenture and therefore would impose substantial risk that they could never be consummated. (*Id.* at 13.)

The Objectors refer to the Court's directive (predating the Evaluation Criteria) that "[t]he SPA and Evaluation Criteria shall NOT include any requirement or condition with respect to the 2020 Bond Entities other than that bidders acknowledge that the 2020 Bond Entities purport to have a pledge of 50.1% of the equity of CITGO Holding, Inc., which is disputed by the Venezuela Parties and subject to active litigation." (D.I. 1517 at 7-8; *see also* D.I. 1644 at 3.) Those arguments miss the point. The Red Tree bid is not "conditioned" on the outcome of the litigation between the 2020 Bondholders and the Venezuela Parties. It does not, for example, provide that the available consideration or economics will turn on or be modified based on the results of that proceeding. To the contrary, the TSA contemplates that the

2

exchanging 2020 Bondholders will effectively compromise their claims by settlement (and at a discount to their current claim amount), thereby substantially reducing the risk of not closing.

*Second,* the Objectors argue that the selection of Red Tree's bid would be unjust because it would purportedly divert funds from Additional Judgment Creditors for the benefit of the 2020 Bondholders, who do not yet have a final judgment in their proceedings.  (*See* D.I. 1636 at 3-4; D.I. 1644 at 3, 5.)  The Objectors have it backwards.  There is no final judgment finding, as the Venezuela Parties wrongly contend, that the Indenture or Pledge Agreement are somehow invalid.  Under the Pledge Agreement, the 2020 Bondholders do not need a final judgment in order to exercise their rights (or even foreclose upon their Collateral).  (*See, e.g.*, Pledge Agreement §§ 2.05(c), 5.02, D.I. 1441-2.)  The 2020 Bondholders are entitled to enforce their rights now, and they would be forced to do so in order to prevent a competing bid that threatened to compromise the value of their Collateral.  The Special Master's recommendation of Red Tree as the Stalking Horse eliminates the significant uncertainties and delays that this would necessarily create.

*Third*, the Objections are premised on a slew of (irrelevant) factual inaccuracies. For example, they falsely claim that "Red Tree/Contrarian effectively negotiated with themselves" (D.I. 1635 at 1) because Contrarian is part of the 2020 Bondholders.  In fact, Contrarian accounts for just 14% of the bonds held by the 2020 Bondholders, and it is not even the largest holder in the group.  Contrarian, as a bidder, negotiated the terms of the TSA with the other bondholders on an arm's length basis and voluntarily recused itself from all discussions and negotiations with other bidders.  Indeed, there is nothing exclusive about the 2020 Bondholders' TSA with Red Tree; any bidder remains free to negotiate a settlement with the 2020 Bondholders in order to enhance the certainty their bid can close, as Red Tree did.  The

3

Objectors also suggest that the TSA is a "windfall" for the 2020 Bondholders. (D.I. 1636 at 4.) But the consideration that the exchanging 2020 Bondholders would be receiving if the Red Tree bid is consummated is approximately 30% *less* than the amounts that would be due to them if they prevailed in their litigation, which is a substantial concession (made in favor of finality and near-term liquidity) given the strength of their claims in litigation.

*Finally*, the Objectors misconstrue the TSA by claiming that, in various supposed respects, it "does not actually provide any certainty of settlement" and "thus provides no 'certainty of closing.'" (D.I. 1638 at 5.) Those claims are also false:

- The Objectors contend that the "TSA does not contain any representation that it has been approved by the Indenture Trustee" and is "unlikely to be approved." (*Id.*) But transaction support agreements are not "approved" by trustees; they are negotiated among economic stakeholders, as was done here. The 2020 Bondholders who are parties to the TSA hold well over two-thirds of the outstanding notes, as is required under the Pledge Agreement and the Indenture in order to cause the Collateral Release contemplated by the TSA. The 2020 Bondholders also have the power to direct the Trustee and the Collateral Agent more generally. The 2020 Bondholders have not yet taken steps to release the Collateral or directed the Trustee and the Collateral Agent to do so, because that would be premature at this time. Red Tree's bid has not yet even been selected by the Court as the Stalking Horse bid, much less selected as the final Successful Bid. And the Trustee and the Collateral Agent have made clear that, although they have not received any direction at this time, they are subject to the terms of the Indenture and the Pledge Agreement and will evaluate any direction in accordance with the terms thereof. (D.I. 1637 at 2-3).

- The Objectors significantly overstate the risk that the transactions contemplated by the TSA may be challenged due to their non-pro-rata structure (D.I. 1638 at 5). The Objectors rely, in particular, on one bondholder's past statement that it would challenge such a transaction (D.I. 1644 at 2-3; D.I. 1638 at 5 n.4), but that bondholder is, in fact, a signatory to the TSA. Non-pro-rata structures are extremely common in debt transactions in order to compensate the entities that performed work that enhanced the value received by all holders, and the Objectors identify no reason to doubt the comparatively small additional benefits conferred on the 2020 Bondholders that are party to the TSA are entirely justified and would easily be defended here.

- The Objectors claim that the TSA includes "the unworkable requirement that the CITGO Parties must sign agreements (and pay fees and expenses) pre-closing, including directions to and indemnities in favor of the trustee for the 2020 [B]onds." (D.I. 1638 at 5 (emphasis omitted).) In fact, there is nothing in the TSA that requires the CITGO Parties to pay any fees or become party to any agreements prior to the Sale Transaction

4

Date. The referenced direction and indemnity would be effective only "as of the Sale Transaction Date" (i.e., the closing date of the sale of the PDVH shares). (TSA § 2.2(b)(iii), D.I. 1627-1.) At that point, Red Tree, as buyer of the CITGO Parties, could cause the CITGO Parties to become party to agreements and to pay fees.

- The Objectors complain that "the commitments of the consenting 2020 [B]ondholders under the TSA are conditioned on" the efforts of the 2020 Bondholders to consummate the transactions and resolve any impediments, "limited only by their commercial reasonableness." (D.I. 1638 at 5.) These provisions *enhance* certainty of closing because, as with any complex transaction, certain implementing actions (some of which may be unanticipated) are needed in the future, and these types of covenants impose obligations on the 2020 Bondholders to advance those actions. *See, e.g., Akorn, Inc.* v. *Fresenius Kabi AG*, 2018 WL 4719347, at *87 (Del. Ch. Oct. 1, 2018) ("[C]ovenants like the ones involved here impose obligations to take all reasonable steps to solve problems and consummate the transaction.") (quoting *Williams Cos.* v. *Energy Transfer Equity, L.P.*, 159 A.3d 264 (Del. 2017)), *aff'd*, 198 A.3d 724 (Del. 2018).

- Finally, the Objectors contend that the 2020 Bondholders have the right to terminate the TSA if various parties (including CITGO) become insolvent, but such termination rights are prudent and reasonable in light of the significantly decreased value that a purchaser would receive if the assets they are purchasing are insolvent. Moreover, any such termination right must be exercised in "good faith" under Section 8.15 of the TSA. Indeed, the Court previously recognized that bids could include a Material Adverse Effect provision, "which could allow a Successful Bidder to withdraw its commitment to a sale and refuse to close" under certain circumstances. (*See* D.I. 1554 at 20-21.)

*   *   *

For these reasons, the Objections should be denied.

5

Dated: Wilmington, Delaware
April 3, 2025

Respectfully submitted,

| | |
|---|---|
| | OF COUNSEL: |
| */s/ Daniel A. Mason* | |
| Daniel A. Mason (#5206) | Jeffrey J. Recher |
| PAUL, WEISS, RIFKIND, | Paul A. Paterson |
|     WHARTON & GARRISON LLP | PAUL, WEISS, RIFKIND, |
| 1313 North Market St., Suite 806 |     WHARTON & GARRISON LLP |
| Wilmington, DE 19801 | 1285 Avenue of the Americas |
| Telephone: 302-655-4410 | New York, New York 10019-6064 |
| Facsimile: 302-655-4420 | Telephone: 212-373-3000 |
| Email: dmason@paulweiss.com | Facsimile: 212-757-3990 |
| | Email: jrecher@paulweiss.com |
| *Counsel for the 2020 Bondholders* | Email: ppaterson@paulweiss.com |