IN THE UNITED STATES DISTRICT COURT FOR
THE DISTRICT OF DELAWARE

| | |
|---|---|
| CRYSTALLEX INTERNATIONAL CORPORATION,<br><br>        Plaintiff,<br><br>v.<br><br>BOLIVARIAN REPUBLIC OF VENEZUELA,<br><br>        Defendant. | Case No. 17-mc-151-LPS |

**RED TREE INVESTMENTS, LLC'S RESPONSE TO THE COURT'S QUESTIONS REGARDING THE RECOMMENDATION OF STALKING HORSE BIDDER**

Red Tree Investments, LLC (Red Tree) respectfully responds as follows to the Court's questions in its April 5 oral order. D.I. 1668.

**1. If the Court were to direct the Special Master to place no weight on the increased certainty of closing he associates with the TSA component of Red Tree's bid, would that alter his recommendation?**

While the Special Master can speak for himself, it is true that Red Tree's bid would appear less attractive if the Special Master ignored the 2020 Bondholders' litigation. However, that approach would flout the Court's approved Evaluation Criteria. In those criteria, the Court directed the Special Master to consider "[c]onditionality related to pending or future litigation (***including with respect to the 2020 Bonds*** . . .)." D.I. 1528-3 at 2 (emphasis added). No stakeholder has objected to, or asked to reargue, that order. *Cf.* L.R. 7.1.5(a).

The Court was correct to require the Special Master to consider the 2020 Bonds' litigation risk. Otherwise, any bid that, like Gold Reserve's, requires nonconsensual financing from CITGO Holding or its subsidiaries is doomed to fail. In particular, Gold Reserve's bid relies on a "newly created acquisition vehicle to be merged with CITGO Petroleum." D.I. 1658 (Crystallex Resp.) at 2 (citing D.I. 1599 ¶ 34). To fund that vehicle, the Gold Reserve consortium would contribute only

$50 million of equity – less than 1% of its bid value – while financing the remainder with more than $4.5 billion of debt issued by CITGO Petroleum. *See* D.I. 1603-1 at 7. CITGO Petroleum and CITGO Holdings must then upstream proceeds to pay Additional Judgment Creditors. But that distribution would directly violate the 2020 Bonds' Pledge Agreement, which requires any dividends and distributions from CITGO Holding to be paid solely for the benefit of the 2020 Bondholders.[1] The 2020 Bondholders could thus seek an injunction to prohibit PDVH from consummating Gold Reserve's deal or any similar deal involving unconsented-to (or tortiously interfering) financing from CITGO Holding or CITGO Petroleum. As a result, Gold Reserve's bid violates the Court's December 31 order because it is conditioned on the assumptions that the 2020 Bondholders will not move for an injunction and will lose their litigation. D.I. 1517 at 7-8.

Ultimately, however, the Court's question cannot be answered on the current record. Gold Reserve has not made its bid package, including its financing commitment letters, public. As a result, there is no meaningful way for the Court and the parties to assess how the Special Master could or should have approached that bid, either under the current Evaluation Criteria or any other standard. The Court also cannot take Gold Reserve's advocacy about its bid at face value, given that – as Crystallex and the Special Master note – Gold Reserve has omitted key details about the conditionality of its financing. Crystallex Resp. at 2; D.I. 1660 (SM Resp.) at 4. At a minimum, the Court should order Gold Reserve's bid package to be made public before the April 17 hearing.[2]

---

[1] *See* Ex. A (2020 Bonds Pledge Agreement) § 2.05(c) (post-Event of Default dividends on the "Securities" must be paid to the 2020 Bondholders' "Collateral Agent"); *id.* § 2.01(a)(iv) (defining "Securities"). It is undisputed that the 2020 Bonds are in default. *See* Complaint, *Petróleos de Venez., S.A. v. MUFG Union Bank, N.A.*, No. 19 Civ. 10023, D.I. 1 ¶72 (S.D.N.Y. Oct. 29, 2019).

[2] Gold Reserve has indicated it does not consent to the requested relief. The Special Master has indicated that he does not oppose the requested relief.

2. **The Special Master's recommendation appears to imply that the increased certainty of closing he associates with the TSA component of Red Tree's bid is valued at 3.382 billion (i.e., $7.081 billion minus $3.699 billion equals $3.382 billion). Is this correct?**

As with question (1), the Special Master can speak as to his own assessment of Red Tree's bid compared to Gold Reserve's bid. The parties and the Court cannot meaningfully compare the Gold Reserve bid to the Red Tree bid until the Gold Reserve bid is made public.

However, it is incorrect to "value" the certainty of Red Tree's bid as the arithmetical difference between that bid and the Gold Reserve bid (or any other). Calculating a bid's expected value requires considering both the bid's value to creditors if it closes *and* the likelihood the bid will close. *See Mars Steel Corp. v. Cont'l Ill. Nat'l Bank & Tr. Co. of Chi.*, 834 F.2d 677, 682 (7th Cir. 1987) (Posner, J.) (discussing expected value of litigation outcomes). Thus, for example, if there were a 50% probability the Gold Reserve bid would close, the expected value of the Gold Reserve bid would be $3.541 billion (*i.e.*, $7.081 billion * 50%).

There is strong reason to think the expected value of Gold Reserve bid's is that low, if not lower. As described above, Gold Reserve's proposed transaction likely violates the 2020 Bonds Pledge Agreement and is subject to being enjoined. *See* pp. 1-2, *supra*. Moreover, with $4.5 billion of senior debt and little to no equity, the Gold Reserve deal may be too levered to support a future settlement with the 2020 Bondholders. Unsealing Gold Reserve's bid package may reveal additional contingencies that further reduce expected value. Either way, the Special Master was well within his discretion to recommend Red Tree's bid as a floor for competitive bidding.

3. **The Special Master is reserving the right to weigh the Evaluation Criteria differently in the Topping Period, and while a different approach makes it possible that a non-recommended Stalking Horse Bid may be recommended as the Final Bid, is such differential application consistent with the intent of a Topping Period, because it leaves bidders without clarity as to what they need to do to "top" the Stalking Horse Bid?**

Selecting Red Tree as Stalking Horse is fully consistent with the overall purpose of the Topping Period – to first "'achieve the highest, most robust Stalking Horse Bid possible from a

bidder that intends to close,'" and then "generate as much 'competitive tension' as possible" to top that bid. D.I. 1554 (quoting D.I. 1550 at 1-2 and D.I. 1545-1 at 6). Red Tree's bid can serve as Stalking Horse because it will satisfy multiple creditors' judgments while being almost certain to close. While the Special Master has reserved the right to weigh Evaluation Criteria differently in the Topping Period, there is no lack of clarity as to how to top Red Tree's bid. Competing creditors need to provide comparable certainty as Red Tree while satisfying more creditors' claims.

Moreover, the Special Master has given, and will continue to give, substantial feedback to bidders, including on how to approach the 2020 Bonds issue. For example, while the Special Master has made clear that a 2020s settlement is not a "necessary feature" of a bid, the Special Master has explained that the 2020s risks will be a material factor for his Final Recommendation. D.I. 1596 at 14; SM Resp. at 3. He has advised bidders that the "Red Tree Bid presents one way, but not the only way, to minimize those risks." SM Resp. at 3. And as a practical matter, the Special Master has been in constant communication with bidders throughout the Stalking Horse process. There is no reason to think that he would give any less feedback to bidders during the Topping Period. D.I. 1554.

**4. Why did the Special Master not recommend the Red Tree bid as a Base Bid instead of a Stalking Horse Bid?**

The Court directed the Special Master to "prefer a Stalking Horse Bid to a Base Bid, which, unlike the Stalking Horse Bid, would not obtain the benefit of Bidder Protections (and would receive no more than reimbursement of reasonable expenses)." D.I. 1517 at 4. The Special Master was permitted to choose a Base Bid only if, in his expert good-faith judgment, and after consultation with stakeholders, "he believe[d] no bid [was] worthy of being given general Bidder Protections." *Id.* As Red Tree **and** Gold Reserve observed at the time, bidder protections are a critical tool to compensate financing sources for their opportunity costs if a proposed transaction

4

does not close. *See* D.I. 1551 at 2 (joint brief); D.I. 1535 at 1-2 (Red Tree separate brief).

In addition, without at least some Stalking Horse bidder protections, Red Tree's bid would not have been viable. Red Tree's financing sources would not agree to commit up to $4.895 billion to support the bid without compensation if the deal did not go through. *See* D.I. 1596-2 at 116.[3] Because the Expense Reimbursement set for Base Bids would not cover that compensation, Red Tree could not act as a Base Bid. The Special Master therefore exercised his discretion – consistent with the Court's mandate – to designate Red Tree as Stalking Horse. However, Red Tree negotiated with its financing sources and professionals to accept bidder protections capped at $75 million – only *half* of the $150 million the Court approved. D.I. 1596 at 11. That is only 1% of Gold Reserve's bid. Gold Reserve cannot credibly argue that Red Tree's bidder protections would deter Gold Reserve or any other bidder from topping Red Tree.

5. **If the Court accepts the recommendation, should it expect Gold Reserve to renew its same bid during the Topping Period but also expect the Special Master to again reject it?**

While Gold Reserve can speak as to its own plans, it would be futile to renew a bid that is so unlikely to close. Gold Reserve's $4.5 billion debt financing at CITGO Petroleum could be immediately enjoined. The uncertainty around the 2020 Bondholders' lien will continue to loom over the Sale Process unless it is addressed. The parties in the 2020 Bondholders' suit only just finished briefing summary judgment. Moreover, the district court recently denied the Venezuela Parties' motion to expedite. *Petróleos de Venez., S.A. v. MUFG Union Bank, N.A.*, No. 19-cv-10023 (S.D.N.Y.), D.I. 378. Given that the 2020 Bonds litigation is unlikely to be resolved anytime soon, the best path forward is, as the Special Master recommended, to select a Stalking Horse bid that addresses the 2020 Bonds' risk now. Gold Reserve will have ample opportunity

---

[3] That amount does not include an additional $150 million commitment from Contrarian Funds, L.L.C., an affiliate of Red Tree. *See* D.I. 1596-2 at 116.

5

during the Topping Period to submit a revised bid that addresses the uncertainty.

6. **There appears to be a dispute as to whether the 2020 Bondholders can, legally and practically, reach a settlement with any bidder other than the Red Tree consortium. How does the Court resolve such dispute?**

Other bidders are free, both legally and practically, to reach a settlement with the 2020 Bondholders. As a legal matter, the TSA by its terms only affects the 2020 Bondholders' ability to pursue an "Alternative Transaction" with another bidder "following the Successful Bid Date" – that is, in the event Red Tree is picked as the ultimate winning bidder. D.I. 1627-1 (TSA) § 3.2(c); *see also id.* at 7 (defining "Successful Bid Date").[4] Koch's claim that, at the topping stage, Red Tree's deal is "an *exclusive* deal," Koch Reply at 2, is simply false. Koch cites Section 3.2(a)(i) of the TSA, but that section is a covenant to take commercially reasonable steps to consummate the deal with Red Tree, ***not*** a promise to avoid negotiating with others. As the 2020 Bondholders have stated, "***there is nothing exclusive about the 2020 Bondholders' TSA with Red Tree***; any bidder remains free to negotiate a settlement . . . ." D.I. 1661 (2020 Resp.) at 3 (emphasis added).

Nor is there any practical barrier. Contrarian holds only 14% of the 2020 Bonds and does not (and cannot) control the 2020 Bondholders' actions. Moreover, Contrarian has recused itself from the 2020 Bondholders' discussions with other bidders. 2020 Resp. at 3. Provided that bidders can secure financing, there is no reason that Gold Reserve – or anyone else – cannot make the 2020 Bondholders the same or a better offer than Red Tree's.[5]

---

[4] Even after the Successful Bid Date, the 2020 Bondholders may still negotiate an Alternative Transaction as long as "such Alternative Transaction provides for financial terms and conditions on par with or more favorable to the 2020 Notes than the financial terms" in the TSA. TSA § 3.2(c).

[5] Similarly, Rusoro complains that "if the Red Tree Bid is approved as the Stalking Horse Bid without giving all bidders the right to enter into the same settlement with the 2020 Bondholders," it will be inefficient for bidders to negotiate directly with the 2020 Bondholders." D.I. 1664. (Rusoro Reply) at 2. But the TSA does not restrict the 2020 Bondholders from negotiating, and it is no more "inefficient" for other bidders to negotiate than it was for Red Tree.

| | |
|---|---|
| Dated: April 9, 2025 | /s/ *Jennifer L. Cree*<br>Rebecca L. Butcher (#3816)<br>Jennifer L. Cree (#5919)<br>LANDIS RATH & COBB LLP<br>919 Market Street, Suite 1800<br>Wilmington, DE  19801<br>Tel.: (302) 467-4400<br>butcher@lrclaw.com<br>cree@lrclaw.com<br><br>Steven F. Molo (*pro hac vice*)<br>Justin M. Ellis (*pro hac vice*)<br>Mark W. Kelley (*pro hac vice*)<br>MOLOLAMKEN LLP<br>430 Park Avenue, 6th Floor<br>New York, NY  10022<br>Tel.: (212) 607-8170<br>smolo@mololamken.com<br>jellis@mololamken.com<br>mkelley@mololamken.com<br><br>*Counsel for Red Tree Investments, LLC* |