# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| CRYSTALLEX INTERNATIONAL CORP., | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Misc. No. 17-151-LPS |
| | ) |
| BOLIVARIAN REPUBLIC OF VENEZUELA, | ) |
| | ) |
| Defendant. | ) |

## SPECIAL MASTER'S OPENING BRIEF ON QUESTIONS REGARDING THE STALKING HORSE RECOMMENDATION

OF COUNSEL:

Matthew S. Barr (Admitted *pro hac vice*)
David Lender (Admitted *pro hac vice*)
Jared R. Friedmann (Admitted *pro hac vice*)
Chase A. Bentley (Admitted *pro hac vice*)
WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
Matt.Barr@weil.com
David.Lender@weil.com
Jared.Friedmann@weil.com
Chase.Bentley@weil.com

Myron T. Steele (#0002)
Matthew F. Davis (#4696)
Bindu A. Palapura (#5370)
POTTER ANDERSON & CORROON LLP
Hercules Plaza, 6th Floor
1313 North Market Street
P.O. Box 951
Wilmington, DE 19801
Telephone: (302) 984-6000
Facsimile: (302) 658-1192
msteele@potteranderson.com
mdavis@potteranderson.com
bpalapura@potteranderson.com

*Counsel for Special Master Robert B. Pincus*

Dated: April 9, 2025
12166504 / 21202.00001

Robert B. Pincus, in his capacity as special master for the United States District Court for the District of Delaware in the above-captioned case (the "**Special Master**"),[1] respectfully submits his responses to the questions raised in the Court's April 5, 2025 Oral Order. *See* D.I. 1668.

## I. If the Court were to direct the Special Master to place no weight on the increased certainty of closing he associates with the TSA component of Red Tree's bid, would that alter his recommendation?

The Special Master anticipates that he would recommend that the Court select the Gold Reserve Bid as a Base Bid if the Court were to direct the Special Master to place no weight on the increased closing certainty associated with the TSA. To be clear, he would only reach this conclusion if he were directed to disregard the TSA, since the financing structures of the Red Tree and Gold Reserve Bids are essentially the same in the absence of Red Tree's proposed settlement with the PDVSA 2020 Bondholders, and both financing structures involve some degree of risk relating to the PDVSA 2020 Bondholders. Disregarding the TSA would not eliminate other risks associated with closing certainty for the respective bids, but the Special Master believes those risks were less significant than the risks associated with the PDVSA 2020 Bondholders litigation or otherwise could be mitigated in a way that is less likely to prohibit closing of a transaction. He does not believe that differences in those other closing risks between the two bids would make up for the price disparity and thus justify recommending the Red Tree Bid as a Stalking Horse over the Gold Reserve Bid.

To be sure, the fact that the Special Master would hypothetically recommend the Gold Reserve Bid if he were to give no weight to the TSA does not mean that the Special Master is

---

[1] All capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the *Sixth Revised Proposed Order (A) Establishing Sale and Bidding Procedures, (B) Approving Special Master's Report and Recommendation Regarding Proposed Sale Procedures Order, (C) Affirming Retention of Evercore as Investment Banker by Special Master and (D) Regarding Related Matters* (D.I. 481) (the "**Sale Procedures Order**") or *Notice of Special Master's Recommendation of Stalking Horse* (D.I. 1596) (the "**Stalking Horse Rec.**").

requiring a settlement with the PDVSA 2020 Bondholders. For example, the Special Master would likely be inclined to select the Gold Reserve Bid as the Base Bid, if the Gold Reserve Consortium either (i) structured its bid in a way that the Special Master was satisfied did not implicate the PDVSA 2020 Bondholder litigation *at all*, or (ii) retained its existing structure, but explained to the Special Master's satisfaction how it will be able to close the transaction in the event that the PDVSA 2020 Bondholders succeed in their litigation prior to that closing and thus bear the risk of the PDVSA 2020 Bondholder litigation itself, rather than forcing the Special Master and the holders of Attached Judgments to bear the risk of a broken deal.

II. **The Special Master's recommendation appears to imply that the increased certainty of closing he associates with the TSA component of Red Tree's bid is valued at $3.382 billion (i.e., $7.081 billion minus $3.699 billion equals $3.382 billion). Is this correct?**

No, the Special Master only made a recommendation *as to the Stalking Horse*, not as to the final purchaser of the PDVH Shares, and did not allocate a dollar value to components of each bid. His selection of a Stalking Horse is meant to be an interim step in the sale process and is designed to help "generat[e] as much 'competitive tension' among bidders as possible during the Topping Period." D.I. 1554 at 12 (emphasis omitted). In recommending the Stalking Horse, the Special Master was focused on selecting a bid that he believed would be most likely to lead to a competitive Topping Period. *See Special Master's Resp. to Objs. to his Recommendation of Stalking Horse* (D.I. 1660) (the "**Response**") at 1-2. He believed that selecting a sufficiently high bid that also provided the greatest certainty of closing would best achieve that goal, as it would help encourage bidders to improve their bids while ensuring the bidding process has a backstop with a reasonably high likelihood of closing and actually delivering proceeds to the creditors.

This does not imply that the Special Master values the increased certainty associated with the TSA at $3.382 billion. The Special Master did not ascribe any numerical value to the increased certainty of closing that he associates with the TSA because he does not believe there is any reliable

2

way to do so. *See* Response at 4. Rather, the closing risk created by a bid that does not appropriately account for the purported rights of the PDVSA 2020 Bondholders is *binary*—either the transaction closes or it does not. If the Gold Reserve Consortium's proposed transaction is unable to close, that does not mean the Additional Judgment Creditors will receive $3.382 billion less than they would receive if the Court were to select Red Tree as the Stalking Horse. It means the creditors will receive *nothing* at the end of this process and the Special Master could be faced with the obligation to solicit new bids, subject to presumably an entirely new set of circumstances. Accordingly, the consequences would be significant if the Court were to select the Gold Reserve Bid and the proposed transaction ultimately failed to close. That situation would cause substantial, perhaps irreparable, harm to the creditors. The Special Master has no reason to believe the Red Tree Bid, or any comparative proposal, would remain on the table if the Gold Reserve Bid fell through because of a faulty assumption about the outcome of the PDVSA 2020 Bonds litigation without a structure that appropriately mitigates the attendant risk and ensures that it is the Gold Reserve Consortium, and not the other holders of Attached Judgments, that bears the risk.

**III.    The Special Master is reserving the right to weigh the Evaluation Criteria differently in the Topping Period, and while a different approach makes it possible that a non-recommended Stalking Horse Bid may be recommended as the Final Bid, is such differential application consistent with the intent of a Topping Period, because it leaves bidders without clarity as to what they need to do to "top" the Stalking Horse Bid?**

To top the Red Tree Bid, bidders will need to submit bids that are better than the Red Tree Bid with respect to price and/or certainty (including litigation risks associated with the PDVSA 2020 Bondholders). *See* D.I. 1552-1 at 8-9; see D.I. 1554 at 2427. There is no precise formula as to the weight applied to each factor because the application depends on the terms of the actual bids received. However, the first criterion is straightforward: The Red Tree bid currently provides $3.699 billion to creditors at closing, so bidders will need to offer higher purchase prices.

3

The second criterion is more nuanced, but also clear: Bidders must propose transactions and financing structures that have a high degree of closing certainty, regardless of the outcome of the PDVSA 2020 Bondholders litigation, and bidders (not the Special Master, or by proxy, the sale process or holders of Attached Judgments) must be the ones who bear the risk of the PDVSA 2020 Bondholders succeeding in their litigation. One option is for bidders to engage with the Ad Hoc Group of the PDVSA 2020 Bondholders (the "**Ad Hoc Group**") to attempt to settle the PDVSA 2020 Bondholders' claims—as Red Tree did and as any of the bidders could have done for the past several months. Bidders could also propose financing structures that do not present closing risks on account of the PDVSA 2020 Bondholders, or explain to the Special Master's satisfaction how their proposed transactions and accompanying financing will close regardless of the outcome of the litigation.² Therefore, the Special Master believes that there is significant potential for a robust Topping Period in which he will receive bids that improve upon the current Red Tree Bid. The Special Master is ready and willing to work closely with bidders, including the Gold Reserve Consortium, to help them improve their bids and "generat[e] as much 'competitive tension' among bidders as possible during the Topping Period." D.I. 1554 at 12.

Conversely, if the Gold Reserve Consortium Bid were selected as the Stalking Horse or Base Bid, the Special Master is concerned that there may be no further bidding during the Topping Period. All of the other bids he received deliver roughly similar amounts of proceeds to holders of Attached Judgments, which suggests that other bidders value the PDVH Shares—and the risks

---

² While the Gold Reserve Consortium verbally made this bald representation to the Special Master, it provided no assurances and refused to answer the Special Master's specific questions about how it would close the transaction in the face of the PDVSA 2020 Bondholders succeeding in the S.D.N.Y. litigation and refusing to consent to the Gold Reserve financing structure. Ultimately, the Special Master concluded that the sale process (and the holders of Attached Judgments) bore the risk of the Gold Reserve Consortium's bid failing to close, which contributed in part to the Special Master's decision to recommend a different bid.

associated with acquiring the shares—in a similar way and would be unlikely to top the Gold Reserve Bid (which is premised on promising significantly more distributable non-cash proceeds in an effort to cover the sponsor of the bid). As of yet, *no* third-party bidder (*i.e.*, non-credit bidder) has shown any willingness to acquire the PDVH Shares while the risk of the PDVSA 2020 Bondholder litigation is outstanding without reducing the purchase price on a roughly one-to-one basis or escrowing proceeds pending the outcome of that litigation. The Gold Reserve Consortium, a group of credit bidders, was able to offer a significantly higher purchase price because roughly half of it would be paid with interests in the acquiring entity. Other bidders would have difficulty topping that transaction structure. The Gold Reserve Consortium also proposed a transaction that could theoretically still close if the PDVSA 2020 Bondholders succeed—with the Consortium retaining 49.9% of the CITGO Holding stock—but it was unable to give any assurances that its financing would still be available in that scenario or that the transaction would still be able to close absent cooperation and consent of the PDVSA 2020 Bondholders.

**IV.     Why did the Special Master not recommend the Red Tree bid as a Base Bid instead of a Stalking Horse Bid?**

As an initial matter, the Court ordered the Special Master to "prefer a Stalking Horse Bid to a Base Bid" and indicated that "the Special Master has discretion to recommend a Base Bid rather than a Stalking Horse Bid *if, but only if,* . . . he believes he has received no bid worthy of being given general Bidder Protections." *See* D.I. 1517 at ¶ 10 (emphasis added). The Special Master believes the Red Tree Bid meets all of the criteria to be a Stalking Horse Bid, is likely to lead to a robust and competitive Topping Period, and is therefore "worthy of being given general Bidder Protections." *Id.* Although not a dispositive consideration, Red Tree was also unwilling to proceed as a Base Bid rather than a Stalking Horse. Nevertheless, in an effort to achieve a value-maximizing sale, the Special Master successfully negotiated significantly reduced bid

5

protections for the Red Tree Bid. *See* Stalking Horse Rec. ¶ 30. The Special Master believes this concession by Red Tree will make it easier for other bidders to top the Red Tree Bid and will further promote robust competition between bidders during the Topping Period.

V. **If the Court accepts the recommendation, should it expect Gold Reserve to renew its same bid during the Topping Period but also expect the Special Master to again reject it?**

The Special Master does not know whether the Gold Reserve Consortium will renew its same bid during the Topping Period. However, the Special Master has been abundantly clear that he may recommend the Gold Reserve Bid as the final purchaser of the PDVH Shares if the Gold Reserve Consortium is able to improve the closing certainty of its bid or explain to the Special Master's satisfaction how it will be able to close the transaction should the PDVSA 2020 Bondholders succeed in their litigation. *See* Stalking Horse Rec. ¶ 5. The Special Master has been clear that the Gold Reserve Consortium did not meet that burden in the Stalking Horse round, but he is hopeful that the Gold Reserve Consortium will revise its bid or provide further explanation to him that addresses his concerns. *See* Response at 3. Finally, what happens during the Topping Period is likely to turn in large part on the Court's guidance with respect to the other five questions.

VI. **There appears to be a dispute as to whether the 2020 Bondholders can, legally and practically, reach a settlement with any bidder other than the Red Tree consortium. How does the Court resolve such dispute?**

The Special Master's understanding is that the Ad Hoc Group has the ability, legally and practically, to reach a settlement with bidders other than Red Tree. In fact, the Special Master specifically negotiated this point with Red Tree after receiving its Stalking Horse bid proposal and received assurances that the Ad Hoc Group would be able to negotiate settlements with other bidders. But, the parties to the TSA—Red Tree and the Ad Hoc Group—should clarify for the Court and all bidders whether it will engage with other bidders to reach a settlement, both during the Topping Period and after a Final Recommendation.

|  |  |
|---|---|
|  | Respectfully submitted, |
|  | POTTER ANDERSON & CORROON LLP |
| OF COUNSEL: | By: */s/ Myron T. Steele* |
|  | Myron T. Steele (#0002) |
| Matthew S. Barr (Admitted *pro hac vice*) | Matthew F. Davis (#4696) |
| David Lender (Admitted *pro hac vice*) | Bindu A. Palapura (#5370) |
| Jared R. Friedmann (Admitted *pro hac vice*) | Hercules Plaza, 6th Floor |
| Chase A. Bentley (Admitted *pro hac vice*) | 1313 North Market Street |
| WEIL, GOTSHAL & MANGES LLP | P.O. Box 951 |
| 767 Fifth Avenue | Wilmington, DE 19801 |
| New York, New York 10153 | Telephone: (302) 984-6000 |
| Telephone: (212) 310-8000 | Facsimile: (302) 658-1192 |
| Facsimile: (212) 310-8007 | msteele@potteranderson.com |
| Matt.Barr@weil.com | mdavis@potteranderson.com |
| David.Lender@weil.com | bpalapura@potteranderson.com |
| Jared.Friedmann@weil.com |  |
| Chase.Bentley@weil.com | *Counsel for Special Master Robert B. Pincus* |

Dated: April 9, 2025
12166504 / 21202.00001