# IN THE UNITED STATES DISTRICT COURT FOR
# THE DISTRICT OF DELAWARE

| | |
|---|---|
| CRYSTALLEX INTERNATIONAL CORPORATION, <br><br> Plaintiff, <br><br> v. <br><br> BOLIVARIAN REPUBLIC OF VENEZUELA, <br><br> Defendant. | Case No. 17-mc-151-LPS |
| RUSORO MINING LTD., <br><br> Plaintiff, <br><br> v. <br><br> BOLIVARIAN REPUBLIC OF VENEZUELA, <br><br> Defendant. | Case No. 21-mc-481-LPS |
| KOCH MINERALS SARL and KOCH NITROGEN INTERNATIONAL SARL, <br><br> Plaintiffs, <br><br> v. <br><br> BOLIVARIAN REPUBLIC OF VENEZUELA, <br><br> Defendant. | Case No. 22-mc-156-LPS |
| GOLD RESERVE INC., <br><br> Plaintiff, <br><br> v. <br><br> BOLIVARIAN REPUBLIC OF VENEZUELA, <br><br> Defendant. | Case No. 22-mc-453-LPS |

**JOINT RESPONSE OF GOLD RESERVE,
RUSORO AND KOCH TO APRIL 5, 2025 ORAL ORDER**

Gold Reserve Inc., n/k/a Gold Reserve Ltd. ("Gold Reserve"), Rusoro Mining Ltd. ("Rusoro"), and Koch Minerals SARL and Koch Nitrogen International SARL ("Koch") (collectively, the "Consortium") respectfully submit this response to the six questions set forth in the Court's April 5, 2025 Oral Order.

1. **If the Court were to direct the Special Master to place no weight on the increased certainty of closing he associates with the TSA component of Red Tree's bid, would that alter his recommendation?**

   This question is directed to the Special Master, and the Consortium reserves its response pending receipt of the Special Master's answer.

2. **The Special Master's recommendation appears to imply that the increased certainty of closing he associates with the TSA component of Red Tree's bid is valued at $3.382 billion (i.e., $7.081 billion minus $3.699 billion equals $3.382 billion) is this correct?**

   This question also is directed to the Special Master, and the Consortium reserves its response pending receipt of the Special Master's answer, however, the Consortium does note at present that, based on the content of the Recommendation, the answer to this question must be: "Yes, the Special Master has valued this element of the Red Tree bid at least at $3.382 billion given that the Special Master stated that it only selected the Red Tree bid over the Consortium bid because of the existence of the TSA."

3. **The Special Master is reserving the right to weigh the Evaluation Criteria differently in the Topping Period, and while a different approach makes it possible that a non-recommended Stalking Horse Bid may be recommended as the Final Bid, is such differential application consistent with the intent of a Topping Period, because it leaves bidders without clarity as to what they need to do to "top" the Stalking Horse Bid?**

   As stated in its prior briefing (*see, e.g.*, D.I. 1638 at 4), the Consortium respectfully submits that the Special Master's application of the evaluation criteria differently in evaluating topping bids would create a situation in which the Topping Period – and the entire bidding process – would

1

be completely subjective, secretive and discretionary, and thus be inconsistent with the intent of the Topping Period. "[T]he purpose of a stalking horse bid is to 'establish a competitive floor or minimum bid,' for future bidding." D.I. 1636 at 6; *In re AE Liquidation, Inc.*, 866 F.3d 515, 519 n.3 (3d Cir. 2017). Here, the Special Master's indication that he may change the rules of the game during the Topping Period leaves the parties and potential bidders with no objective guidance as to what the floor is, or what they need to do to top the Red Tree (or any other) bid. Specifically, it is not clear whether bidders will need to top the highest bid, being the Consortium's Bid, the lower Red Tree Bid, or simply make a better deal with the 2020 Bondholders. And if this last criteria is to be given weight by the Special Master in evaluating topping bids, as the Court's sixth question observes, it remains unclear whether a different bidder could reach a settlement with the 2020 Bondholders, or what the terms of a more favorable settlement with the 2020 Bondholders would need to be given that the Special Master has failed to disclose the precise value he ascribes to that settlement or the percentage by which he discounted bids which did not include such a settlement.

      The consequence of a differential application of the Evaluation Criteria will be a frustrated Topping Period that culminates in a subjective decision by the Special Master governed by standards known, in advance, only to him. In order to bid, Bidders will have to expend millions of dollars arranging financing and formulating what they perceive to be a competitive bid, not based on the clear and identifiable criteria this Court has established, but rather on speculation and guesswork as to how the Special Master will employ those criteria. It is clear that bidders will be less likely to undertake these expenses and submit a bid for the PDVH shares when it is unclear what criteria will be applied to their bids in what proportions, and thus whether their topping bids have a likelihood of succeeding. In all, the moving target contemplated by the Special Master is likely to defeat the purpose of these proceedings by depressing the market for topping bids, and

by lessening the likelihood of achieving a value maximizing transaction that satisfies the highest number of attached judgments.

4. **Why did the Special Master not recommend the Red Tree bid as a Base Bid instead of a Stalking Horse Bid?**

This question is directed to the Special Master, and the Consortium reserves its response pending receipt of the Special Master's answer.

5. **If the Court accepts the recommendation, should it expect Gold Reserve to renew its same bid during the Topping Period but also expect the Special Master to again reject it?**

This question is directed to the Special Master, and the Consortium reserves its response pending receipt of the Special Master's answer.

6. **There appears to be a dispute as to whether the 2020 Bondholders can, legally and practically, reach a settlement with any bidder other than the Red Tree consortium how does the Court resolve such dispute?**

The Consortium confirms that this dispute does exist. As noted, Red Tree has locked up what is substantively an *exclusive* deal with its fellow 2020 Bondholders to settle their claims. (D.I. 1656 at 2). This is confirmed by the terms of the TSA, specifically, Section 3.2(a)(i) which "commits the 2020 Noteholders to use commercially reasonable efforts to support and consummate the transaction." (D.I. 1656, n.7). This is further underscored by the fact that not even **the parties to the TSA** agree on its binding effect. *Compare* Red Tree/Contrarian Response (D.I. 1656 at 4) ("The 2020 Noteholders' commitments . . . are promises to help consummate the transaction."), *with* 2020 Bondholders' Response (D.I. 1661 at 7) ("Indeed, there is nothing exclusive about the 2020 Bondholders' TSA with Red Tree; any bidder remains free to negotiate a settlement with the 2020 Bondholders in order to enhance the certainty their bid can close, as Red Tree did.").

This dispute is only relevant to this case because the Special Master has made it relevant, placing at least $3.382 billion in value alone on the mere existence of the TSA. As a consequence,

3

if the existing Recommendation is approved, the question of whether a bidder can negotiate a deal with the 2020 Bondholders is a threshold issue that must be adjudicated before a viable Topping Period can begin.

In terms of the mechanism to resolve this dispute, the Consortium respectfully submits that the Court has two options. First, the Court could schedule briefing and a hearing to resolve this dispute, preceded by the disclosure of evidence by Red Tree/Contrarian and the 2020 Bondholders, including the following: (1) a complete, unredacted copy of the Red Tree TSA, including all signatories; (2) a schedule, and supporting evidence, showing the identity and holdings of 2020 bonds by each 2020 Bondholder; (3) the communications between Red Tree/Contrarian and the other 2020 Bondholders relating to the formation of the TSA, and any prior versions thereof, and the circumstances under which each 2020 Bondholder consented to joining the TSA; (4) disclosure of any other formal or informal agreements between Red Tree/Contrarian and any of the 2020 Bondholders to support the TSA or not engage in discussions with other parties on alternative proposals; and (5) sworn affidavits from both Red Tree/Contrarian and the 2020 Bondholders on the issue of whether and under what circumstances the 2020 Bondholders could accept a settlement proposal from another bidder without violating the terms of the TSA. The above-referenced briefing would include but not be limited to the question of whether the "outs" contained in the TSA are sufficient to distinguish this agreement from other lockup agreements strongly disfavored in competitive bidding environments. *See*, *e.g.*, *In re GOL Linhas Aéreas Inteligentes S.A.*, 659 B.R. 641, 657-58 (Bankr. S.D.N.Y. 2024).

The second option is for the Court to render the dispute moot by clarifying, for the reasons set forth in the Consortium members' prior briefing, that the Court excluded a purported settlement with the 2020 Bondholders as a component of the Special Master's (and the Court's) Evaluation

4

Criteria. Such exclusion eliminates the need for the Court to resolve the disputed question whether Red Tree has, either legally or practically, locked up exclusive terms with the 2020 Bondholders.

Dated: April 9, 2025

Respectfully submitted,

| **WOMBLE BOND DICKINSON (US) LLP**<br><br>By: */s/ Kevin J. Mangan*<br>Kevin J. Mangan (#3810)<br>Matthew P. Ward (#4471)<br>Stephanie S. Riley (#5803)<br>1313 N. Market St., Suite 1200<br>Wilmington, DE 19801<br>Telephone: 302-252-4320<br>Kevin.mangan@wbd-us.com<br>Matthew.ward@wbd-us.com<br>Stephanie.riley@wbd-us.com<br><br>-and-<br><br>**NORTON ROSE FULBRIGHT US LLP**<br>Matthew H. Kirtland (*pro hac vice*)<br>799 9th Street NW, Suite 1000<br>Washington, DC 20001<br>Telephone: 202-662-0200<br>Matthew.kirtland@nortonrosefulbright.com<br><br>- and -<br><br>Katherine G. Connolly (*pro hac vice*)<br>555 California Street, Suite 3300<br>San Francisco, CA 94101<br>Telephone: 628-231-6816<br>Katie.connolly@nortonrosefulbright.com<br><br>*Attorneys for Gold Reserve Inc.* | **WOMBLE BOND DICKINSON (US) LLP**<br><br>By: */s/ Kevin J. Mangan*<br>Kevin J. Mangan (#3810)<br>Matthew P. Ward (#4471)<br>Stephanie S. Riley (#5803)<br>1313 N. Market St., Suite 1200<br>Wilmington, DE 19801<br>Telephone: 302-252-4320<br>Kevin.mangan@wbd-us.com<br>Matthew.ward@wbd-us.com<br>Stephanie.riley@wbd-us.com<br><br>-and-<br><br>**STINSON LLP**<br>Nicholas J. Zluticky (MO # 61203)<br>(*pro hac vice* pending)<br>1201 Walnut, Suite 2900<br>Kansas City, MO 64106<br>Telephone: 816-691-3278<br>nicholas.zluticky@stinson.com<br><br>*Attorneys for Koch Minerals SARL and Koch Nitrogen International SARL* |
|---|---|
| **DLA Piper LLP (US)**<br><br>By: */s/ R. Craig Martin*<br>R. Craig Martin (#005032)<br>1201 North Market Street | |

5

| | |
|---|---|
| Suite 2100<br>Wilmington, DE 19801<br>Telephone: 302-468-5655<br>Fax: 302-778-7834<br>craig.martin@us.dlapiper.com<br><br> - and -<br><br>James E. Berger (*pro hac vice*)<br>Charlene C. Sun (*pro hac vice*)<br>Joshua S. Wan (*pro hac vice*)<br>1251 Avenue of the Americas<br>New York, NY 10020<br>Telephone: 212-335-4715<br>Fax: 212-884-8715<br>James.berger@us.dlapiper.com<br>Charlene.sun@us.dlapiper.com<br>Joshua.wan@us.dlapiper.com<br><br>*Attorneys for Rusoro Mining Ltd.* | |