# IN THE UNITED STATES DISTRICT COURT FOR
# THE DISTRICT OF DELAWARE

| | |
|---|---|
| CRYSTALLEX INTERNATIONAL CORPORATION,<br><br>    Plaintiff,<br><br>v.<br><br>BOLIVARIAN REPUBLIC OF VENEZUELA,<br><br>    Defendant. | Case No. 17-mc-151-LPS |
| RUSORO MINING LTD.,<br><br>    Plaintiff,<br><br>v.<br><br>BOLIVARIAN REPUBLIC OF VENEZUELA,<br><br>    Defendant. | Case No. 21-mc-481-LPS |
| KOCH MINERALS SARL and KOCH NITROGEN INTERNATIONAL SARL,<br><br>    Plaintiffs,<br><br>v.<br><br>BOLIVARIAN REPUBLIC OF VENEZUELA,<br><br>    Defendant. | Case No. 22-mc-156-LPS |
| GOLD RESERVE INC.,<br><br>    Plaintiff,<br><br>v.<br><br>BOLIVARIAN REPUBLIC OF VENEZUELA,<br><br>    Defendant. | Case No. 22-mc-453-LPS |

**RUSORO'S ANSWERING BRIEF ON QUESTIONS IN APRIL 5, 2025 ORAL ORDER**

Rusoro Mining Ltd. ("Rusoro"), respectfully submits this answering brief on the responses to the six questions set forth in the Court's April 5, 2025 Oral Order, and join those filed by their bidding consortium members Gold Reserve Inc., n/k/a Gold Reserve Ltd. ("Gold Reserve") and Koch Minerals SARL and Koch Nitrogen International SARL ("Koch").[1]

1. **If the Court were to direct the Special Master to place no weight on the increased certainty of closing he associates with the TSA component of Red Tree's bid, would that alter his recommendation?**

Red Tree's response to the Court's questions concedes what is already glaringly obvious: "Red Tree's bid would appear less attractive if the Special Master ignored the 2020 Bondholders' litigation." D.I. 1675 at 1. In yet another attempt to justify why the Special Master impermissibly accorded weight to the "certainty" associated with the 2020 Bondholders settlement at the expense of over $3 billion in value, Red Tree has continued to stand on the same, willfully distorted interpretation of the Court's Evaluation Criteria by cherry-picking language out of context. *Id*.

As previously explained,[2] in the Proposed Evaluation Criteria (D.I. 1528-3 at 2), the Court permitted the Special Master to evaluate "[c]onditionality related to pending or future litigation (including with respect to the 2020 Bonds)." While Red Tree and the Special Master cite this language in support of the Recommendation (D.I. 1675 at 1; D.I. 1660 at 2), they neglect to mention the remainder of this Criterion, which provides that any consideration of conditionality, "for the avoidance of doubt **must otherwise comply with the Material SPA Terms** approved by the Court." *Id*. (emphasis supplied.) This necessarily includes Material SPA Term No. 18, regarding the 2020 Bondholders, which provides that "**the SPA will not include any requirement**

---

[1] Capitalized terms used herein shall have the same meaning as used in the Consortium members' prior briefing on their objections to the Recommendation.

[2] D.I. 1635 at 1-3; 1682.

1

**or condition with respect to the 2020 Bond Entities** other than certain acknowledgements[.]" D.I. 1554 at 23 (emphasis supplied).  Thus, the only measure of conditionality related to the 2020 Bondholders that should have been considered is those bids that contain "certain acknowledgements."  *Id*.  Red Tree and the Special Master's continued refusal to acknowledge the incontrovertible language of the Material SPA Term itself, through which the Court explicitly prohibited the consideration of this Criteria,[3] should be discredited.

For their part, the 2020 Bondholders have now attempted to defend the Special Master's Recommendation through arguments that they have made previously, and that the Court firmly rejected.  The Court will recall that the 2020 Bondholders originally asked this Court to "direct the Special Master to require that any potential bidder… respect[] the rights of the 2020 Bond Entities…by requiring those bidders to agree to material terms that protect those rights." D.I. 1441 at 11.  That request was denied.  D.I. 1493 at 8.  Importantly, the 2020 Bondholders appeared to accept the Court's position at the December 13, 2024 hearing on the sale process, where the 2020 Bondholders explained that the Court's Inclinations would "satisfy the[ir] concerns" and agreed that bids "**should not be conditioned on any resolution of the 2020 claims**." D.I. 1507, Dec. 13, 2024 Hrg. Tr. At 94:13-19.  In a striking reversal, the 2020 Bondholders issued an ultimatum in their latest response to the Court's April 5, 2025 Order:

---

[3] D.I. 1433 at 10 ("9. The Court is not inclined to grant the 2020 Bond Entities' request that it direct the Special Master "to negotiate a new SPA that respects the 2020 Bond Entities' rights."); D.I. 1493 at 8 ("6. What weight, if any, should the Special Master give to bidders' plans with respect to the 2020 Bond Entities? . . . The Court is strongly inclined to agree with those who urge the Court to require, with respect to the 2020 Bond Entities, nothing more from bidders other than that they acknowledge their existence."); *see also* D.I. 1554 at 23 ("The Court has already determined that the SPA will not include any requirement or condition with respect to the 2020 Bond Entities other than certain acknowledgements."); D.I. 1507, Dec. 13, 2024 Hrg. Tr. at 193:1-2 ("The Court: "with respect to the 2020's . . . bidders would have to acknowledge their existence and nothing else.").

> "[u]nless Gold Reserve…is willing to reach an agreement with the 2020 Bondholders [injecting conditionality] on terms that would protect their interests [the same terms earlier proposed, and definitively denied], the 2020 Bondholders would be forced to object" and prevent closing.

D.I. 1677 at 6.  The 2020 Bondholders are now demanding the very same conditionality, on the very same terms, that they previously acknowledged **should not** be included in the SPA.  The Court should not credit this volte-face and attempt by the 2020 Bondholders to hold this proceeding hostage to its demand to be paid for its contingent, and potentially worthless, claims.

3. **The Special Master is reserving the right to weigh the Evaluation Criteria differently in the Topping Period, and while a different approach makes it possible that a non-recommended Stalking Horse Bid may be recommended as the Final Bid, is such differential application consistent with the intent of a Topping Period, because it leaves bidders without clarity as to what they need to do to "top" the Stalking Horse Bid?**

The Special Master has still failed to offer up any reasonable or convincing explanation as to how or why his differential application (of an already prohibited criteria) would achieve the goal of a robust Topping Period.  Instead, the Special Master alleges that the certainty criteria is "clear" and proposes several options for bidders in the Topping Period, the first of which is to reach a similar settlement with the 2020 Bondholders.  D.I. 1679 at 4. The latter two recommendations require that parties propose financing structures that "do not present closing risks on account of the PDVSA 2020 Bondholders," or explain to the Special Master's satisfaction, how a bid would close regardless of the 2020 Bondholders' litigation.  *Id.*[4]  The only goal these "recommendations" achieve is to demonstrate that bidders in the Topping Period do not have a hope of being selected as the winning bidder unless they, too, divert billions of dollars in value to the 2020 Bondholders.  As Koch notes in its accompanying memorandum, these statements by the Special Master

---

[4] The Special Master concedes that the Consortium has made representations that their Bid would close regardless of the 2020 Bondholders' litigation. D.I. 1679, n. 2.

3

essentially cede control of this process to the 2020 Bondholders and ensure that potential Topping Bidders will compete on the deals they need to make to placate the 2020 Bondholders, as opposed to increasing the price they are willing to pay for the PDVH Shares. *See also* D.I. 1665 at 2. These "Topping Bids" would likely provide no benefit to the AJCs, but instead would deliver additional money to the 2020 Bondholders, who do not even have judgments to enforce at this time and whose ability to exercise any rights over the Shares being sold in this proceeding are subject to a series of contingencies, none of which is guaranteed to occur.

The Special Master further explained that if he had not considered the 2020 Bondholder settlement and the Consortium's Bid was selected as the Stalking Horse, he would be "concerned that there may be no further bidding during the Topping Period" because all of the other bids he received offered roughly the same purchase price and would be "unlikely to top the Gold Reserve Bid" which, he concedes, will provide "significantly more distributable non-cash proceeds." *Id*. at 4-5. The Consortium members fail to see how the higher price offered by the Consortium would cause the Special Master "concern" or why it would be held against the Consortium. Instead, the Special Master has illustrated what would happen by selecting a Stalking Horse Bid that actually has the power to generate "competitive tension" among bidders: it forces other bidders to make a better offer. D.I. 1554 at 12.

Dated: April 11, 2025

Respectfully submitted,

| | |
|---|---|
| **DLA Piper LLP (US)**<br><br>By: _/s/ R. Craig Martin_<br>R. Craig Martin (#005032)<br>1201 North Market Street<br>Suite 2100<br>Wilmington, DE 19801<br>Telephone: 302-468-5655<br>Fax: 302-778-7834<br>craig.martin@us.dlapiper.com<br><br> - and -<br><br>James E. Berger (*pro hac vice*)<br>Charlene C. Sun (*pro hac vice*)<br>Joshua S. Wan (*pro hac vice*)<br>1251 Avenue of the Americas<br>New York, NY 10020<br>Telephone: 212-335-4715<br>Fax: 212-884-8715<br>James.berger@us.dlapiper.com<br>Charlene.sun@us.dlapiper.com<br>Joshua.wan@us.dlapiper.com<br><br>*Attorneys for Rusoro Mining Ltd.* | |