# IN THE UNITED STATES DISTRICT COURT FOR
# THE DISTRICT OF DELAWARE

| | |
|---|---|
| CRYSTALLEX INTERNATIONAL CORPORATION,<br><br>  Plaintiff,<br><br>v.<br><br>BOLIVARIAN REPUBLIC OF VENEZUELA,<br><br>  Defendant. | Case No. 17-mc-151-LPS |
| RUSORO MINING LTD.,<br><br>  Plaintiff,<br><br>v.<br><br>BOLIVARIAN REPUBLIC OF VENEZUELA,<br><br>  Defendant. | Case No. 21-mc-481-LPS |
| KOCH MINERALS SARL and KOCH NITROGEN INTERNATIONAL SARL,<br><br>  Plaintiffs,<br><br>v.<br><br>BOLIVARIAN REPUBLIC OF VENEZUELA,<br><br>  Defendant. | Case No. 22-mc-156-LPS |
| GOLD RESERVE INC.,<br><br>  Plaintiff,<br><br>v.<br><br>BOLIVARIAN REPUBLIC OF VENEZUELA,<br><br>  Defendant. | Case No. 22-mc-453-LPS |

**GOLD RESERVE'S RESPONSE BRIEF REGARDING APRIL 5, 2025 ORAL ORDER**

Gold Reserve respectfully submits this response in respect of the April 5, 2025 Oral Order and joins the response briefs of its bidding Consortium members Koch and Rusoro.

**INTRODUCTION**

The Special Master's opening brief confirms the two critical points here. First, in response to Question 1, the Special Master confirms that "he would recommend the Gold Reserve Bid if the Court were to direct the Special Master to place no weight on the increased closing certainty associated with the TSA." (D.I. 1679 at 2). Second, in response to Question 2, the Special Master confirms that he "did not ascribe any numerical value to the increased certainty of closing that he associates with the TSA because he does not believe there is any reliable way to do so." (D.I. 1679 at 2-3) (emphasis added). These candid admissions confirm why the Recommendation cannot be approved, i.e., a factor that cannot reliably be quantified is worth zero and therefore cannot, under any circumstance, outweigh the $3.382 billion higher value of the Consortium bid. This should conclude the analysis of the Recommendation, however, in an abundance of caution, Gold Reserve responds herein to various other points made by other parties in their opening briefs.

1. **The Opening Briefs Have No Credible Response to the Consortium's Argument That the Red Tree Bid Can Never Be Selected Because It Works a Fundamental Injustice**

There is no credible response in any of the opening briefs to the Consortium's alternative argument that selection of the Red Tree bid cannot, under any circumstance, be approved because it would result in a fundamental injustice, in that it: (1) definitely strips $3.382 billion in value from the AJCs in this Court and transfers it to the non-party 2020 Bondholders and (2) potentially creates a massive windfall for Red Tree in the event the 2020 Bondholders lose in the long-running SDNY litigation. Knowing there is no answer to this critical flaw in the Red Tree bid, the opening briefs simply fall back on repeating the prior argument that the purported higher certainty of

1

closing associated with the TSA is sufficient to outweigh the higher price of the Consortium's bid. In addition to not answering the Court's questions, this position lacks merit, for several reasons.

    **A.    The Starting Point of the Analysis Is the Delaware Law Requirement that the PDVH Shares Must Be Sold to the Highest Bidder**

Re-stating this fundamental point should be unnecessary but appears critical given that, contrary to the position taken by Red Tree and others, the proper analytical framework is not to first go down the rabbit-hole of assessing speculative future litigation risks and then working backwards, but rather the opposite–identifying the highest-price and then assessing whether any credible, quantifiable risks exist that justify a price adjustment. Here, as re-confirmed by the Special Master, no such risk exists and there thus is no cause to not select the highest bid.

    **B.    There Is No Dispute that the 2020 Bondholder Risk is So Uncertain That It Cannot Be Quantified**

No party disputes that the "litigation risk" threatened by Red Tree/Contrarian and its fellow 2020 Bondholders is highly uncertain. Specifically, the opening briefs do not dispute that **if** the 2020 Bondholders do not succeed in their long-running SDNY litigation, **if** they do not succeed in getting OFAC to lift the long-standing stay of the exercise of their remedies, **or if** their threatened attempt to interfere with the Consortium's purchase of the PDVH shares fails, then the entire rationale for the Recommendation evaporates. Indeed, as noted, the Special Master has now re-confirmed that the compound probability of this risk is so speculative that it is impossible to ascribe any numerical value to the supposed increased certainty of closing associated with the TSA.[1]

The Red Tree position skips over this fundamental issue. Instead, it and others put their finger in the air and say **if** there is a 50% risk of closing for the Consortium's bid, then its "expected

---

[1] This restates, in stronger terms, the Special Master's prior statement that not only did he _not_ analyze the highly uncertain risks that the 2020 Bondholders will ever prevail in the SDNY litigation or lift the long-standing OFAC stay, the settlement of which forms the entire basis of the Recommendation, but that any assessment of these risks would be "arbitrary at best." (D.I. 1660 at 4).

2

value" is lower than that of the Red Tree bid. *See*, *e.g.*, D.I. 1675 at 3. With respect, this is nonsensical. It just picks a percentage to produce a numerical result to supports Red Tree's argument. It is supported by no evidence – fact or expert – and it does not constitute analysis. Moreover, the point is not whether an arbitrary calculation can be constructed to increase the supposed probabilistic value of the Red Tree bid or decreases the value of the Consortium bid, but rather that the Special Master has admitted that <u>he</u> did not undertake any such analysis because <u>he</u> recognizes that any such analysis is futile.[2]

    **C.**    **Gold Reserve's Financing Structure Does Not Violate the Pledge**

The entire premise of Red Tree's position is the incorrect assertion that Gold Reserve's financing structure violates the purported Pledge held by the 2020 Bondholders. While Gold Reserve's structure <u>does</u> use CITGO assets <u>post-Closing</u>, the Court has already determined that this is permitted,[3] over the same objections and litigation threats now made again by the 2020 Bondholders. (D.I. 1553 at 2). As such, the fact that the 2020 Bondholders ***may***, despite this clear ruling, try to object to the debt-financing structure of Gold Reserve's bid, or ***may*** attempt to interfere with consummation of the Sale Transaction, the possibility of that un-test objections does not justify any decrement to the Consortium's purchase price, much less $3.382 billion.

    **D.**    **The 2020 Bondholder Risk is Just One Risk Among Many**

---

[2] Indeed, the type of litigation risk presented by the 2020 Bondholders is compound, requiring the occurrence of several distinct, independent events—such as success in pending litigation, lifting of an OFAC stay, exhaustion of appellate remedies, and the ability to translate such success into a mechanism to block the Consortium's closing. Even under generous assumptions (e.g., assigning each event a 50% likelihood), the combined probability of all events occurring is just 6.25%. This is not a call for mathematical precision but rather perspective: when the Consortium bid is nearly double the value of the Red Tree bid, there is <u>no reliable</u> risk assessment that would justify the price decrement of the Red Tree bid – as the Special Master has now effectively conceded.

[3] (D.I. 1554, at p. 15-16) ("The Special Master appears to agree with the Venezuela Parties. . ."[i]f . . . a bidder desires to utilize [CITGO] cash/assets after closing (i.e., once it owns the PDVH Shares), the bidder is free to do so" (D.I. 1545-2 at 3 of 10) – and the Court agrees as well. The Special Master's proposal is ADOPTED").

3

The Red Tree position also ignores that there substantially more litigation risk to the Sale Process would arise from the potential objections of the Venezuela Parties, the Consortium members, other bidders, and other Attached Judgment Holders from acceptance of a bid that contravenes Delaware law by being substantially undervalued and fundamentally unjust. There also is, for example, litigation risk from the Gramercy alter ego claims – which as the Court will recall was given equal significance by the Special Master in connection with the failed Elliot/Amber Energy bid but now is not mentioned at all. In any event, there is no sound reason to elevate the one risk threatened by the 2020 Bondholders above all others, particularly given that this risk is so speculative as to defy reliable quantification.

**5.    Gold Reserve's Obligation to Close Is Not Conditioned on the 2020 Litigation**

The Red Tree position is based on the assertion that there <u>may</u> be a risk to the Consortium's fully committed financing if a series of hypothetical future events occur. Putting aside everything else, this position fails because it ignores that under the Consortium's SPA, Gold Reserve is legally obligated to close its Sale Transaction, and this obligation, as the Court required, is <u>not</u> conditioned on the outcome of the 2020 Bondholder litigation. Various parties attempt to second-guess this legal obligation by attacking Gold Reserve (D.I. 1675 at 1-2), but, in addition to being improper, that goes to an entirely different point, i.e., Gold Reserve's qualifications as a bidder. As litigated by the parties and ordered by the Court, the financial qualifications of a bidder are established by one thing – the $50 million deposit. (D.I. 1571 at 1-2: "A cash deposit is an appropriate indicator of good faith and financial means for any bid, even a credit bid."). If a bidder is able to make this deposit – as Gold Reserve has proven it can – it is improper for Red Tree or any other party to now denigrate its status as a qualified bidder by looking behind the deposit or reading into the Sale Procedures some other, unspecified financial test in order to be deemed able to perform its binding legal obligations under the SPA.

Dated: April 11, 2025

Respectfully submitted,

| | |
|---|---|
| **WOMBLE BOND DICKINSON (US) LLP**<br><br>By: /s/ *Kevin J. Mangan*<br>Kevin J. Mangan (#3810)<br>Matthew P. Ward (#4471)<br>Stephanie S. Riley (#5803)<br>1313 N. Market St., Suite 1200<br>Wilmington, DE 19801<br>Telephone: 302-252-4320<br>Kevin.mangan@wbd-us.com<br>Matthew.ward@wbd-us.com<br>Stephanie.riley@wbd-us.com<br><br>-and-<br><br>**NORTON ROSE FULBRIGHT US LLP**<br>Matthew H. Kirtland (*pro hac vice*)<br>799 9th Street NW, Suite 1000<br>Washington, DC 20001<br>Telephone: 202-662-0200<br>Matthew.kirtland@nortonrosefulbright.com<br><br>- and -<br><br>Katherine G. Connolly (*pro hac vice*)<br>555 California Street, Suite 3300<br>San Francisco, CA 94101<br>Telephone: 628-231-6816<br>Katie.connolly@nortonrosefulbright.com<br><br>*Attorneys for Gold Reserve Inc.* | |