# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| CRYSTALLEX INTERNATIONAL CORP., | ) |
| *Plaintiff*, | ) ) ) |
| v. | ) No. 1:17-mc-00151-LPS ) ) |
| BOLIVARIAN REPUBLIC OF VENEZUELA, | ) ) |
| *Defendant*. | ) |

**THE VENEZUELA PARTIES' RESPONSE TO SUBMISSIONS ADDRESSING THE
QUESTIONS POSED BY THE COURT'S APRIL 5, 2025 ORDER**

The Special Master's ("SM") response contradicts the Court's previous instructions and makes clear that the SM has given the 2020 Bondholders ("2020s") an effective veto over the sale.[1] Instead of balancing price and closing risk in a rational way, as he said he was initially inclined to do, the SM has elevated a single risk to the paramount consideration at the demand of two senior creditors with no interest in maximizing value. Worse, he now confirms he will do so again in the Topping Period unless he is "satisfied" a bid carries no risk related to the 2020s "*at all*," D.I. 1679 at 2 (emphasis in original), meaning any bid carrying an iota of risk associated with the 2020s— no matter how high its price—cannot succeed. *Id.* at 4 ("Bidders *must* propose transactions [with] a high degree of closing certainty, regardless of the outcome of the [2020 Notes] litigation[.]" (emphasis added)). That cannot be right. The Evaluation Criteria require the SM to *balance* price and closing certainty. Such balancing is particularly important here, where there is a stark difference in price between the competing bids and the specific risk posed by the 2020s is insignificant. The Court specifically ordered that the "Evaluation Criteria shall NOT include any requirement or condition with respect to the 2020 Bond Entities[.]" D.I. 1517 ¶ 28. The SM's *requirement* to either settle with the 2020s or eliminate *any* risk from their threats contradicts that instruction.

The SM is required to attempt to maximize value. D.I. 277 at 3. If he is allowed to continue to apply his improper value-depressing criteria, then at best the Topping Period will devolve into a bidding war to see who can pay the 2020s[2] even more than they will receive under the conflicted

---

[1] Nothing in this filing should be construed to imply the Venezuela Parties' ("VPs") consent to a forced sale. The VPs preserve all rights and positions, including on appeal.

[2] The 2020s make the unsubstantiated contention that they are accepting a 30% discount on their claims, which they have assigned a value of $2.9 billion—a value that remains very much in dispute. Even that discounted amount would be a tremendous windfall given that both the validity and amount of their claims are both being actively challenged in litigation, and are not likely to be resolved any time soon. In fact, however, the 2020s' claimed 30% discount is dubious and made without any support: even using the preliminary valuation prepared by the SM's own financial

deal they negotiated with themselves (the 2020s' assertion that "Contrarian, as a bidder, negotiated the terms of the TSA with the other bondholders on an arm's length basis," D.I. 1661 at 4, is unsupportable given that Contrarian is part of the majority bondholder group that had to consent to—and would benefit from—the deal), improperly diverting billions of dollars of consideration that should be used to satisfy judgments of attachment holders. At worst, the SM's approach would ensure no one can top Red Tree's ("RT") bid. Contrarian, the holder of (it claims) 14% of the outstanding 2020 Bonds, is unlikely to agree to an alternative settlement, because if its subsidiary RT wins, then Contrarian will obtain almost complete ownership of CITGO plus close to full payment on its bonds. Without Contrarian's participation, the remaining members of the majority would not have the required 2/3 consent to release the pledge. Accordingly, the best solution to this problem—and apparently the *only* solution given the SM's conceded inability to make any estimation of the risk posed by the 2020s' unsubstantiated threats to block the sale—is for the Court to direct the SM to give no weight to perceived risk related to the 2020s' threats, as suggested by Question 1. The VPs respond more specifically to each of the Court's questions below.

**Question 1.** The SM concedes that he would have made a different recommendation if the Court were to direct him to give no weight to the TSA. D.I. 1679 at 1. The SM also made clear—contrary to RT's obfuscations, D.I. 1675 at 1–3—that "the financing structures of the [RT] and [GR] Bids are essentially the same in the absence of" the TSA. D.I. 1679 at 1.

**Question 2.** Contrary to the SM's assertion, D.I. 1679 at 2, he is not addressing the closing uncertainty created by bids *conditioned* on the outcome of the 2020 Notes Litigation, which is all

---

advisor Evercore as a guide to the value of the 7% of equity in CITGO promised to the majority bondholders under the TSA, the majority holders would receive consideration approaching 100% of their own self-serving claim amount. And Evercore's preliminary valuation commits some elementary objective errors that cause Evercore to drastically undervalue the PDVH shares.

2

the Evaluation Criteria allow the SM to consider. D.I. 1517 ¶ 28. Instead, he is impermissibly making the elimination of any *risk* that the 2020s may seek to block a sale a requirement.

The Special Master's assertion that he cannot estimate this particular risk because it is "binary," D.I. 1679 at 3, is mystifying. As RT shows, such an analysis is both possible and *required* if the SM is going to choose a bid that is more than $3.3 billion below the highest bid. D.I. 1675 at 3 (citing *Mars Steel Corp. v. Cont'l Ill. Nat'l Bank & Tr. Co.*, 834 F.2d 677, 682 (7th Cir. 1987)). As RT concedes, despite neglecting its own risks, the value of its bid would not equal the value of Gold Reserve's (GR) bid unless one estimates that GR's bid has only a 50% likelihood of closing. *Id.*[3] And that assumes RT's bid is *certain* to close, which even the SM admits is not the case. Among other things, non-consenting minority bondholders might contest the TSA and seek to block it. The 2020s do not deny such a risk exists; they say only that they will win. D.I. 1661 at 5. Red Tree's bid also has the additional complexity of having to obtain OFAC authorization to affect rights in the Pledge. But even if one assumes that RT has, for example, an 80% likelihood of closing, then its bid would not equal the value of GR's bid unless the likelihood of GR's bid closing was less than 42% ($3.699 * 80.00% = $2.959 = $7.081 * 41.79%).

No one but the 2020s think there is any significant likelihood they could enjoin the sale. The 2020s not only fail to show how the financing agreement would disturb their rights or breach the pledge agreement, but they also fail to show they lack an adequate remedy at law. Instead, the risk the SM, Crystallex, and ConocoPhillips seize on is that the 2020s might be able to vote their CITGO Holding shares before a sale can close. But this outcome is itself a remote possibility. For it to occur, (1) the 2020s would have to win in the district court, (2) a stay would have to be denied

---

[3] Nothing herein should be construed to imply that the GR bid is adequate as an ultimately winning bid.

3

pending appeal or the 2020s would have to win on appeal (potentially including in the Supreme Court), (4) OFAC would have to grant the 2020s a license, (5) the 2020s would have to vote their shares to replace CITGO Holding's board members, (6) those new board members would have to replace CITGO's board members, and (7) CITGO's board would have to block the transaction.

**Question 3.** Instead of answering this question, the SM adopts the impermissible position that his sole concern is eliminating any risk from the 2020 Notes Litigation, regardless of price. He then curiously devotes the rest of his answer to denigrating the possibility that anyone will submit a higher bid than GR's in the Topping Period. D.I. 1679 at 4–5. Apart from undermining the Topping Period, this discounts the likely possibility that bidders were submitting lowball bids during the Stalking Horse Round, knowing they could submit a higher bid in the Topping Period.

**Question 4.** As previously explained, D.I. 1681 at 2, RT's Bid is too low to deserve stalking horse protections, particularly because the SM correctly states he could recommend GR's bid only as a Base Bid, D.I. 1679 at 1. The SM's disclosure that he was threatened into providing such protections against his judgment (just as he was pressured by senior lienholders into recommending RT's bid over a much higher bid) also is disconcerting.

**Question 5.** Contrary to his earlier statements, D.I. 1596 ¶ 5; 1660 at 2, the SM now is taking the position that he would again reject any bid that has any risk of being blocked by the 2020s. D.I. 1679 at 6 (stating he would "recommend the [GR] Bid as the" successful bidder only if GR can "improve the closing certainty of its bid or explain to the [SM]'s satisfaction how it will be able to close the transaction should the [2020s] succeed").

**Question 6.** As previously explained, D.I. 1681 at 2–3, the best way to resolve the dispute as to whether the TSA prevents the 2020s from agreeing to a settlement with another bidder is to neutralize it by directing the SM to give no weight to the 2020s' empty threats to block the sale.

4

|  |  |
|---|---|
|  | MORRIS, NICHOLS, ARSHT & TUNNELL LLP |
|  | */s/ Alexandra M. Cumings* |
| OF COUNSEL: | Susan W. Waesco (#4476) |
| Nathan P. Eimer | Alexandra M. Cumings (#6146) |
| Daniel D. Birk | Kirk Andersen (#7156) |
| Gregory M. Schweizer | 1201 North Market Street |
| Hannah Bucher | Wilmington, DE 19801 |
| EIMER STAHL LLP | (302) 658-9200 |
| 224 South Michigan Avenue | SWaesco@morrisnichols.com |
| Suite 1100 | ACumings@morrisnichols.com |
| Chicago, IL 60604 | KAndersen@morrisnichols.com |
| (312) 660-7600 |  |
| NEimer@eimerstahl.com | *Attorneys for PDV Holding, Inc. and* |
| DBirk@eimerstahl.com | *CITGO Petroleum Corporation* |
| GSchweizer@eimerstahl.com |  |
| HBucher@eimerstahl.com |  |

|  |  |
|---|---|
| OF COUNSEL: | HEYMAN ENERIO GATTUSO & HIRZEL LLP |
| Joseph D. Pizzurro |  |
| Kevin A. Meehan | */s/ Brendan Patrick McDonnell* |
| Juan O. Perla | Samuel Taylor Hirzel, II (#4415) |
| David V. Holmes | Brendan Patrick McDonnell (#7086) |
| CURTIS, MALLET-PREVOST, COLT | 300 Delaware Avenue, Suite 200 |
| & MOSLE LLP | Wilmington, DE 19801 |
| 101 Park Avenue New York, NY 10178 | (302) 472-7300 |
| (212) 696-6000 | shirzel@hegh.law |
| jpizzurro@curtis.com | bmcdonnell@hehg.law |
| kmeehan@curtis.com |  |
| jperla@curtis.com | *Attorneys for Petróleos de Venezuela, S.A.* |
| dholmes@curtis.com |  |

|  |  |
|---|---|
|  | ABRAMS & BAYLISS LLP |
|  | */s/ Christopher Fitzpatrick Cannataro* |
|  | A. Thompson Bayliss (#4379) |
|  | Christopher Fitzpatrick Cannataro (#6621) |
| OF COUNSEL: | 20 Montchanin Road, Suite 200 |
| Donald B. Verrilli, Jr. | Wilmington, DE 19807 |
| Elaine J. Goldenberg | (302) 778-1000 |
| Ginger D. Anders | bayliss@abramsbayliss.com |
| MUNGER, TOLLES & OLSON LLP | cannataro@abramsbayliss.com |
| 601 Massachusetts Avenue NW |  |
| Suite 500 E | *Attorneys for Bolivarian Republic of Venezuela* |

Washington, D.C. 20001
(202) 220-1100
Donald.Verrilli@mto.com
Elaine.Goldenberg@mto.com
Ginger.Anders@mto.com

George M. Garvey
Adeel Mohammadi
MUNGER, TOLLES & OLSON LLP
350 South Grand Avenue, 50th Floor
Los Angeles, CA 90071
(213) 683-9100
George.Garvey@mto.com
Adeel.Mohammadi@mto.com

April 11, 2025