IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| CRYSTALLEX INTERNATIONAL CORP., | : |
| Plaintiff, | : |
| v. | : Misc. No. 17-151-LPS |
| BOLIVARIAN REPUBLIC OF VENEZUELA, | : |
| Defendant. | : |

## INCLINATIONS REGARDING SELECTION OF STALKING HORSE BID

Having reviewed the Special Master's Notice of Recommendation of Stalking Horse (D.I. 1596) ("Recommendation"), in which he recommends the designation of a bid by Red Tree Investments, LLC ("Red Tree") as the Stalking Horse Bidder, and further having reviewed the objections to that Recommendation filed by a consortium of other bidders including Gold Reserve Inc. ("Gold Reserve"), Rusoro Mining Ltd. ("Rusoro"), and Koch Minerals SARL and Koch Nitrogen International SARL ("Koch" and collectively the "Consortium") (D.I. 1635, 1636, 1638) and other objections (D.I. 1637, 1639-40) (collectively, the "Objections"), and also having considered the many additional briefs received in connection with the Recommendation and the Objections (D.I. 1656-62, 1664-67, 1675-83, 1688-90, 1692-93, 1695-1705), the Court is

**INCLINED to OVERRULE the Objections,**

after it completes its *de novo* review, for reasons including the following:

- The Special Master and his expert advisors are of the opinion that the Red Tree bid "is the best starting point" and is the bid "best situated to encourage further bidding and generat[e] as much competitive tension among bidders as possible during the Topping Period." (D.I. 1660 at 1 (internal quotation marks and citations omitted); *see also* D.I. 1599 ¶ 7 (Red Tree's bid is, in view of Special Master, most likely to "lead to a robust topping period and potentially elicit better bids for the PDVH Shares"))

- It seems sensible to set as the minimum bid for beginning the Topping Period the bid that appears to have the greatest likelihood of closing, even though the Court expects that any bid it is likely to approve at the conclusion of the Sale Process may well need to place greater emphasis on price and lesser emphasis on certainty than the weights it appears the Special Master gave these two Evaluation Criteria in making his Stalking Horse Recommendation.

- As Crystallex points out, because the Red Tree bid appears to be "highly certain to close," it "is a signal to other interested bidders that they must either participate in the Topping Period or else lose out on the opportunity to acquire PDVH through this Court's sale process," which the Court agrees is a crucially important message to communicate to the market. (D.I. 1658 at 1)

- While the Special Master appears to have placed great weight on the Red Tree settlement with the 2020 Bondholders, he has not violated the literal terms of the Court's repeated instruction that "[t]he SPA and Evaluation Criteria shall NOT include any *requirement or condition* with respect to the 2020 Bond Entities other than" an acknowledgement of their purported claims (D.I. 1517 ¶ 28 (emphasis added); *see also* D.I. 1554 at 23; D.I. 1507 at 193; D.I. 1493 at 8; D.I. 1433 ¶ 9), as the Court's instruction does not prevent some value being accorded to a bidder's voluntary decision to reach such a settlement.

- Contrary to the Consortium's contention (D.I. 1636 at 1), no provision of Delaware law with which the Court is familiar, including 8 Del. C. § 324(a) (requiring attached shares be *sold* "to the highest bidder"), requires the Court to *start* the bidding process with the highest price received so far, especially if the headline price associated with that bid may be undermined by a significant risk of non-closing, even if it may be true that Delaware law may require that the Court place greater weight on pricing considerations when it comes time to determine whether to accept a recommended Final Bid.

- The Red Tree Bid appears to be worthy of the Bidder Protections, particularly as Red Tree has agreed to a $75 million cap on the fee it will obtain if its bid is topped, which is approximately $35 million less than the 3% fee approved by the Court. (D.I. 1596 at 11 ¶ 30; D.I. 1656 at 3)

3

- The Special Master's Recommendation is consistent with the Court's intention, as reflected in the Evaluation Criteria and as accurately summarized by Crystallex: "Of course, no bidder is required to reach any deal with the 2020 Bondholders," rather, each bid must provide an adequate balance of price and certainty of closing "notwithstanding the 2020 Bondholder litigation." (D.I. 1676 at 6)

- The Red Tree Bid holds out the prospect of junior Additional Judgment Creditors having an opportunity to, potentially, accept non-cash consideration, although "the Special Master has not applied a numerical value to th[is] consideration." (D.I. 1596 at 8-9, 16)

The Court's INCLINATION, as announced herein, is *not* an Order and is subject to further consideration, including during and after the oral argument tomorrow.

To ensure that tomorrow's argument proceeds efficiently and provides the Court the information it needs to make a ruling on the Recommendation and Objections, the Court will proceed as follows, and the Court encourages all participants to be prepared to address the following questions:

1. <u>The Court will first hear from the Consortium objectors</u>. The Court is interested in understanding from the Consortium objectors:

(a) why they apparently refuse to provide assurances to the Special Master that they have the financing necessary to close on their proposed bid, should it be accepted at the end of the

4

Sale Process, even if the 2020 Bondholders were to obtain an injunction or succeed to any degree in their ongoing litigation in the Southern District of New York (*see, e.g.*, D.I. 1679 at 4 n.2);

(b) whether the Consortium disputes the contention that its financing is conditional because it is "dependent on financing that requires the buyer to have access to the value of CITGO Petroleum, which the 2020 [B]ondholders assert violates their pledge of the CITGO Holding shares" (D.I. 1659 at 4);

(c) how the Court could be confident that the Consortium has the financial wherewithal to close on a purchase of the PDVH Shares, when such closing is contingent on a merger between Dalinar Energy (described by ConocoPhillips as "a shell company which does not appear today to have any source of capital to fund the bid in the scenario where they do not have access to the financing" the Consortium requires for its bid (D.I. 1659 at 4)),[1] and when the ability to make a $50 million deposit plainly does not provide the necessary assurances the Consortium can and will come to closing with the at least $7.081 billion it would require to close;

(d) how the Consortium responds to the risks inherent in the merger transaction contemplated by its bid, as pointed out by (among others) Crystallex (D.I. 1658 at 2-3) ("[T]he Gold Reserve bid relies on a loan to an acquisition vehicle that will be released and paid to Attached Judgment Creditors only when that vehicle is merged with CITGO Petroleum, thus placing the debt used to finance the transaction below PDVH, the company whose shares are being sold.");

---

[1] *See also* D.I. 1666 at 1 (Venezuela Parties arguing that Gold Reserve's "bid requires that its financing vehicle merge with CITGO. Accordingly, if the 2020s were to prevail, they could exercise rights to vote 50.1% of the CITGO Holding stock and block that merger.") (internal citation omitted).

(e) why the Consortium cares (if it does) about being pushed (if it is) to "divert billions of dollars in value to the 2020 Bondholders" to become the winning bidder (D.I. 1690 at 3), if it turns out the Consortium is able to acquire the PDVH Shares for an overall price the Consortium is willing to pay;

(f) how, if all, does the Consortium bid meet the requirement that, as the Special Master puts it, "bidders (not the Special Master, or by proxy, the sale process or holders of Attached Judgments) must be the ones who bear the risk of the PDVSA 2020 Bondholders succeeding in their litigation" (D.I. 1679 at 4); and

(g) why the objectors continue to believe they do not have sufficient information as to how to top the Red Tree bid (assuming Red Tree is designated the Stalking Horse) by some combination of a better price than Red Tree and greater certainty of closing than exists with the Consortium's proposed Stalking Horse bid.

2. <u>The Court will next hear from the Venezuela Parties</u>, who have also filed objections.

3. <u>The Court will next hear from the Special Master</u>. The Court is interested in understanding from the Special Master:

(a) why he appears to be placing such a high premium on resolving any potential dispute with the 2020 Bondholders;

(b) whether he is overstating the risk posed to the Sale Process by the 2020 Bondholders, particularly given that (1) as the Venezuela Parties report, "OFAC has made clear that it intends to maintain the suspension of GL-5 to allow the [S.D.N.Y.] litigation to play out, including

through any appeal" (D.I. 1666 at 1), which may prevent the 2020 Bondholders from pursuing the injunctive relief they are threatening, and (2) seemingly all other participants in the Sale Process are of the view that the Bondholders are unlikely to succeed in their ongoing litigation;

(c) how he can avoid the Topping Period becoming nothing but "a 30-day mad dash to make the best possible deal to the 2020 Bondholders to win their approval" (D.I. 1695 at 3 (Koch advancing this argument); *see also* D.I. 1664 at 2 (Rusoro likewise worrying that "other bidders will have to negotiate directly with the mass of 2020 Bondholders, creating chaos and shifting control of the auction to them, away from this Court and its process")), when the 2020 Bondholders are not judgment creditors in the Sale Process and payments to them will almost necessarily be at the expense of Additional Judgment Creditors;

(d) the reasons for his confidence that the Red Tree Stalking Horse Bid has the greatest potential to create "competitive tension" in the Topping Period;

(e) his response to the Consortium's insistence that while its "structure *does* use CITGO assets *post-closing*, the Court has already determined that this is permitted, over the same objections and litigation threats now made again by the 2020 Bondholders" (D.I. 1696 at 3) (internal footnote omitted);

(f) why he doubts the Consortium's representation that, if selected, it will "bear the risk of any collateral litigation that could affect the value of th[e] [PDVH] shares" (D.I. 1635 at 5);

(g) the Special Master's view on whether the parties to the TSA, Red Tree and the Ad Hoc Group, have now "clarif[ied] for the Court and all bidders whether [they] will engage with other bidders to reach a settlement, both during the Topping Period and after a Final Recommendation" (D.I. 1679 at 6);

7

(h) how he can communicate to potential participants in the Topping Period that the Court hopes for a robust competition during the Topping Period, that the Stalking Horse Bid sets a floor and is not the Final Bid, and that the Court remains entirely open to selecting a Final Bid that does not reach a settlement with the 2020 Bondholders; and

(i) whether the Special Master has everything he needs from the Court to be empowered to consider, consistent with the Evaluation Criteria, any bid that may emerge during the Topping Period, even a bid received from an entity that did not seek to be designated the Stalking Horse Bidder.

4. <u>The Court will next hear from Red Tree</u>. The Court is interested in understanding from Red Tree:

(a) whether, and how, the Consortium is wrong that the Red Tree bid "transfer[s] several billion dollars of value away from the AJCs in order to hedge a highly contingent risk" (D.I. 1635 at 5);

(b) to what extent is the "risk" of litigation that might threaten the completion of this Court's Sale Process "a risk that they themselves [i.e., Red Tree and its affiliates] have created" (D.I. 1636 at 3);

(c) what, if any, support Red Tree has for its assertion that the 2020 Bondholders' litigation poses a "threat to the sale process . . . now worth approximately $2.8 billion" (D.I. 1656 at 4); and

(d) how would the Court avoid a fundamental injustice if the Red Tree bid becomes the recommended Final Bid and, sometime before closing of the sale of the PDVH Shares, the 2020

8

Bondholders lose their litigation, reducing (if not eliminating) whatever risk that litigation may pose.

5. <u>The Court will next provide an opportunity for Sale Process Parties Crystallex and ConocoPhillips to be heard</u>.

6. <u>The Court will next provide an opportunity for any other entity that filed briefing in connection with Objections to the Stalking Horse Recommendation to be heard</u>.[2]

7. <u>Finally, the Court will provide the Consortium and Venezuela Parties a brief opportunity for rebuttal</u>.

April 16, 2025　　　　　　　　　　　　　HONORABLE LEONARD P. STARK
Wilmington, Delaware　　　　　　　　　UNITED STATES DISTRICT COURT

---

[2] *See* D.I. 1637 (U.S. Bank National Association, as Trustee); D.I. 1640 (Siemens Energy Inc.); D.I. 1657 (Huntington Ingalls, Inc.); D.I. 1661 (2020 Bond Entities/Blackrock); D.I. 1662 (OI European Oil Group B.V.).

9