# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| CRYSTALLEX INTERNATIONAL CORP., : | |
| : | |
| Plaintiff, : | |
| : | |
| v. : | Misc. No. 17-151-LPS |
| : | |
| BOLIVARIAN REPUBLIC OF VENEZUELA, : | |
| : | |
| Defendant. : | |

## ORDER

Having reviewed the Special Master's Notice of Recommendation of Stalking Horse (D.I. 1596) ("Recommendation"), in which he recommends the designation of a bid by Red Tree Investments, LLC ("Red Tree") as the Stalking Horse Bidder, and further having reviewed the objections to that Recommendation filed by a consortium of other bidders including Gold Reserve Inc. ("Gold Reserve"), Rusoro Mining Ltd. ("Rusoro"), and Koch Minerals SARL and Koch Nitrogen International SARL ("Koch" and collectively the "Consortium") (D.I. 1635, 1636, 1638) and other objections filed by the Venezuela Parties (D.I. 1637, 1639-40) (collectively, the "Objections"), and also having considered the many additional briefs received in connection with the Recommendation and the Objections (D.I. 1656-62, 1664-67, 1675-83, 1688-90, 1692-93, 1695-1705), and having heard extensive oral argument on April 17, 2025 (*see* Transcript of Apr. 17, 2025 hearing ("Tr.")),

**IT IS HEREBY ORDERED** that:

1. The Recommendation is **ADOPTED** and Red Tree is designated as the Stalking Horse.

2. The Objections filed by the Consortium and the Venezuela Parties are **OVERRULED.**

3. The Special Master shall meet and confer with the Sale Process Parties and submit, no later than **April 24,** a proposed form of order the Court may enter to (a) set the beginning and end dates of the Topping Period, (b) establish deadlines for discovery and deadlines and page limits for objections to be filed and briefed (such briefing to be concluded no later than **July 3**) in connection with whatever recommendation the Special Master makes at the conclusion of the Topping Period,[1] and (c) direct that he submit a joint status report to the Court on **July 10** setting out, as best as he can determine after meeting and conferring widely, which witnesses (if any) will appear at the hearing on **July 22-24,** how much courtroom time the Court should allocate for the hearing, and how that time should be divided among those who intend to participate in the hearing.

Reasons for Adopting the Recommendation and Overruling the Objections

The Special Master's Recommendation of Red Tree is based on a reasonable assessment that, for purposes of designating a Stalking Horse Bid – which is where the competition to purchase the PDVH Shares *begins* but does *not end* – Red Tree's bid constitutes the best balance of the Evaluation Criteria, which may be fairly summarized as price and certainty of closing. The Special Master will, appropriately, remain open during the Topping Period to placing greater emphasis on price and lesser emphasis on certainty as he determines what bid to recommend as a Final Bid. That the Evaluation Criteria may be evaluated differently in the context of determining a recommended Final Bid than they were in making a recommendation of a Stalking Horse Bid

---

[1] All capitalized terms have the meaning given to them in the Sale Procedures Order (D.I. 481) or the proposed Stock Purchase Agreement (D.I. 1557-1), unless otherwise noted.

2

reflects the complexity of the context in which the Sale Process is taking place – but, importantly, it does not deprive bidders of the guidance required to know with confidence how to top the Stalking Horse Bid.[2] (*See generally* D.I. 1596 ¶ 4 (Special Master explaining need to "navigate[] issues of first impression and a multitude of considerations that make the sale of the PDVH Shares an intensely complex process"); D.I. 1697 at 1 (Venezuela Parties agreeing "[t]he Evaluation Criteria require the [Special Master] to balance price and closing certainty") (emphasis omitted))

The Court is persuaded by the Special Master and his expert advisors that the Red Tree bid "is the best starting point" and is the bid "best situated to encourage further bidding and generat[e] as much competitive tension among bidders as possible during the Topping Period." (D.I. 1660 at 1 (internal quotation marks and citations omitted; alteration in original); *see also* D.I. 1596 ¶ 7 (Special Master expressing view that Red Tree's bid is most likely to "lead to a robust topping period and potentially elicit better bids for the PDVH Shares"))

It seems sensible to set as the minimum bid for beginning the Topping Period the bid that appears to have the greatest likelihood of closing, even though the Court expects that any bid it is likely to approve at the conclusion of the Sale Process will need a balance that places much greater emphasis on price and lesser emphasis on certainty.

As Crystallex points out, because the Red Tree bid appears to be "highly certain to close," it "is a signal to other interested bidders that they must either participate in the Topping Period or else lose out on the opportunity to acquire PDVH through this Court's sale process," which the Court agrees is a crucially important message to communicate to the market. (D.I. 1658 at 1)

---

[2] In addition to the guidance provided by the Evaluation Criteria, bidders considering participating in the Topping Period can find further guidance in the Court's Inclinations (D.I. 1728), the lengthy discussions during the April 17 hearing (*see* Tr.), and this Order. The Court believes it has provided bidders the "relatively clear" guidance the Venezuela Parties suggest is required to maximize the chances that the Topping Period will be effective. (Tr. at 73)

3

The Court's adoption of the Special Master's selection of the Red Tree bid reflects the reality that a successful bid in the Sale Process must, in one way or another, address the litigation risk posed by the 2020 Bondholders, as this risk (however great or small it may be) impacts the assessment of certainty of closing. There are numerous ways this risk can be addressed; the Court rejects any suggestion that a Final Bid must include a settlement with the 2020 Bondholders. (*See, e.g.*, D.I. 1692 at 1 (Crystallex explaining some ways in which bidder may prevail during Topping Period without reaching settlement with 2020 Bondholders, including by "adequately explain[ing] an alternative process to deal with the threat that the 2020 Bondholders leverage their Pledge Agreement with PDVH and associated lien of 50.1% of CITGO Holding to block the sale and distribution of funds to creditors")) The Court is open to approving a Final Bid that addresses the possible impact of the 2020 Bondholders' rights – whatever they may be (in reality or potentiality) – on the certainty of closing, even if such bid does not eliminate that risk, provided that such bid meaningfully addresses (and neither ignores nor dismisses as if non-existent) that risk.

The Special Master's placing of weight on the Red Tree settlement with the 2020 Bondholders does not violate the literal terms of the Court's repeated instruction that "[t]he SPA and Evaluation Criteria shall NOT include any *requirement or condition* with respect to the 2020 Bond Entities other than" an acknowledgement of their purported claims (D.I. 1517 ¶ 28 (emphasis added); *see also* D.I. 1554 at 23; D.I. 1507 at 192-93; D.I. 1493 at 8; D.I. 1433 ¶ 9), as the Court's instruction does not prevent some value being accorded to a bidder's voluntary decision to reach such a settlement as one way of addressing the pending litigation risk.

Contrary to the Consortium's contention (D.I. 1636 at 1), no provision of Delaware law with which the Court is familiar, including 8 Del. C. § 324(a) (requiring attached shares be *sold*

"to the highest bidder"), requires the Court to *start* the bidding process with the highest "headline" price received so far.

The Red Tree Bid appears to be worthy of the Bidder Protections. Notably, Red Tree has agreed to a $75 million cap on the fee it will obtain if its bid is topped, which is approximately $35 million less than the 3% fee approved by the Court. (D.I. 1596 ¶ 30; D.I. 1656 at 3)

Additional Guidance as to the Court's Expectations for the Topping Period and Final Bid

As is evident from the reasoning provided above, as well as the concerns expressed by the Court in its Inclinations of April 16 (D.I. 1728), the Court is *not* at this time adopting the Red Tree bid as the Final Bid, both because adoption of a Final Bid would be premature at this stage of the Sale Process and also because the Court has serious reservations about the price of the Red Tree bid and the implicit overvaluation placed on the TSA (i.e., Red Tree's settlement with the 2020 Bondholders) in the Special Master's evaluation of that bid.[3]

The Court encourages the Consortium to renew (and improve)[4] its bid and to engage further with the Special Master as to the Consortium's plans for addressing the contingencies relating to the 2020 Bondholders (i.e., risks including if those entities attempt to enjoin material aspects of the Consortium's bid or its financing). In that regard, the Consortium should, as it has stated it

---

[3] While a settlement with the 2020 Bondholders is *not* a required component of a bid to be recommended as the Final Bid, the Court is persuaded that there is neither a legal nor practical inability for bidders other than Red Tree to potentially reach a settlement with the 2020 Bondholders. (*See, e.g.*, D.I. 1688 at 3; D.I. 1702 at 2) Given the plain meaning of the TSA, the Court rejects the Consortium's request for discovery. (D.I. 1680 at 4)

[4] Red Tree's counsel represented that Red Tree will continue to try to improve its bid. (*See* Tr. at 160-61)

5

would, share with the Special Master any evaluation the Consortium has prepared of any risk to closing posed by the 2020 Bondholders. (*See* Tr. at 198)

As noted, the Court expects that beginning (but not ending) the bidding in the Topping Period with the Red Tree Stalking Horse Bid will have the effect of creating competitive tension, ultimately resulting in a Final Bid with a price at or exceeding that associated with the Consortium bid while also having a greater likelihood of closing than the current Consortium bid. Should such competition not occur – or, relatedly, should what occurs be more accurately characterized as a competition among bidders to strike a deal with the 2020 Bondholders, rather than (or at the expense of) improving bids to satisfy judgments of the Additional Judgment Creditors – such occurrences will tend to undermine the persuasiveness of any recommendation that the Court approve a Final Bid.

Any prudent bidder, as well as the Special Master on behalf of the Court, must factor into its assessment of a transaction relating to the purchase of the PDVH Shares the risk to closing posed by the 2020 Bondholders being able to assert their rights (assuming they exist) in a manner that would interfere with closing. Such risk, however, must be viewed realistically, as it appears to be dependent on (perhaps among other conditions) the 2020 Bondholders (a) obtaining injunctive relief from some court, presumably the Southern District of New York, where their litigation with the Republic of Venezuela is ongoing;[5] and (b) persuading OFAC to change the position to which it has consistently adhered for over five years, i.e., the suspension of General License No. 5 ("GL-5"), which it appears the 2020 Bondholders need to be in non-suspended status

---

[5] Such injunctive relief would presumably have to result from litigation of either a preliminary injunction motion or a request for a permanent injunction (and, likely, related litigation over whether the court should stay the effect of its determination on the merits) if, at the conclusion of the Southern District of New York litigation, the 2020 Bondholders prevail on the merits.

6

in order to effectuate any rights they may have as a consequence of the Republic's default on the 2020 bonds. (*See* Tr. at 84-85) (Venezuela Parties' counsel explaining numerous contingencies 2020 Bondholders may need to overcome to impact this Court's Sale Process)

The Court does not view the risk that the 2020 Bondholders, or other litigants (e.g., plaintiffs pressing any Alter Ego Claims that are ongoing or may yet be filed), will seek to enjoin the Sale Process or transactions (e.g., financing, necessary corporate transactions) as anywhere close to dispositive on the question of whether the Court should accept a Final Bid. The entire Sale Process has been, and continues to be, subject to risks that cannot be eliminated (e.g., that OFAC will not grant a license to a winning bidder) and the risks associated with the 2020 Bondholders do not appear to be materially greater or more important than other risks (although, again, no risk may prudently be ignored).

Additionally, in evaluating certainty of closing during the Topping Period, the Special Master should consider the possibility that the Court (or an appellate court) will reject a Final Bid that (a) places, expressly or implicitly, substantial value on settlement of the 2020 Bondholders' litigation, but then (b) subsequent events (e.g., the Southern District of New York granting Venezuela's pending motion for summary judgment and concluding the 2020 Bondholders have no rights to CITCO Holding; that same court indicating it will stay enforcement of any judgment entered in favor of the 2020 Bondholders; or OFAC indicating it will continue to suspend GL-5 beyond the date of the expected closing of sale of the PDVH Shares) reveal it would be a

fundamental injustice to close on such a Final Bid, when bids with a much greater purchase price were rejected.[6]

The commencement of the Topping Period indicates that the Court's present expectation is that its Sale Process is entering its final phase, to be concluded by the Special Master's recommendation of a Final Bid and litigation of objections to it, which may result in the Court ordering that the winning bidder move expeditiously toward closing on the sale of the PDVH Shares, consistent with a Stock Purchase Agreement and the Sales Procedures Order.

All bidders, including the Consortium, are encouraged to engage with the Special Master to demonstrate that their improved bids reflect the best combination of price and certainty of closing in light of the guidance provided here.

April 21, 2025
Wilmington, Delaware

HONORABLE LEONARD P. STARK
UNITED STATES DISTRICT COURT

---

[6] This risk cannot be assumed away on the expectation that the Southern District of New York will stay the 2020 Bondholders' litigation, for reasons including that (a) the Southern District of New York may deny any stay requested pursuant to the TSA, (b) even if such a stay is granted it may be vacated by an appellate court, and (c) even if such a stay is granted it may be vacated by the district court as a result of subsequent developments.

8