# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| CRYSTALLEX INTERNATIONAL CORP., | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Misc. No. 17-151-LPS |
| | ) |
| BOLIVARIAN REPUBLIC OF | ) |
| VENEZUELA, | ) |
| | ) |
| Defendant. | ) |

## SPECIAL MASTER'S
## <u>FINAL RECOMMENDATION</u>

OF COUNSEL:

Matthew S. Barr (Admitted *pro hac vice*)
David Lender (Admitted *pro hac vice*)
Jared R. Friedmann (Admitted *pro hac vice*)
Chase A. Bentley (Admitted *pro hac vice*)
WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
Matt.Barr@weil.com
David.Lender@weil.com
Jared.Friedmann@weil.com
Chase.Bentley@weil.com

Dated: July 2, 2025
12341347 / 21202.00001

Myron T. Steele (#0002)
Matthew F. Davis (#4696)
Bindu A. Palapura (#5370)
POTTER ANDERSON & CORROON LLP
Hercules Plaza, 6th Floor
1313 North Market Street
P.O. Box 951
Wilmington, DE 19801
Telephone: (302) 984-6000
Facsimile: (302) 658-1192
msteele@potteranderson.com
mdavis@potteranderson.com
bpalapura@potteranderson.com

*Counsel for Special Master Robert B. Pincus*

## TABLE OF CONTENTS

I. INTRODUCTION ................................................................................................ 1

II. PRELIMINARY STATEMENT ......................................................................... 2

III. JURISDICTION AND VENUE ......................................................................... 5

IV. PROCEDURAL BACKGROUND ..................................................................... 6

    A.   Entry of the Sale Procedures Order ...................................................... 6

    B.   Engagement with OFAC ....................................................................... 7

    C.   Additional Attached Judgments and Final Priority Order ................... 8

    D.   Initial Marketing Process ...................................................................... 9

    E.   Stalking Horse Bidding Round and Topping Period ........................... 11

V. NOTICE PROCEDURES .................................................................................. 15

VI. RECEIPT OF TOPPING PROPOSALS .......................................................... 16

VII. EVALUATION OF TOPPING PROPOSALS ................................................. 18

    A.   Non-Conforming Bids ......................................................................... 20

    B.   Conforming Bids .................................................................................. 23

VIII. OVERVIEW OF RECOMMENDED BID AND MATERIAL TERMS OF STOCK PURCHASE AGREEMENT ........................................................ 24

IX. SPECIAL MASTER'S RECOMMENDATION OF SALE TO DALINAR ....... 28

    A.   Evaluation Criteria: Purchase Price .................................................... 29

    B.   Evaluation Criteria: Closing Certainty ................................................ 30

    C.   Evaluation Criteria: Other ................................................................... 32

X. BASIS FOR APPROVING THE PROPOSED SALE TRANSACTION ............ 33

    A.   The Proposed Sale Transaction Represents a Reasonable Exercise of this Court's Authority and Should be Approved. ...................... 33

    B.   The PDVH Shares Should Be Sold Free and Clear of Liens, Claims, and Encumbrances. .................................................................. 39

    C.   The Bidding and Sale Process Were Conducted in Good Faith .......... 44

    D.   The Recommended Bidder Will Acquire All Necessary Licenses to Ensure Timely Consummation of the Proposed Sale Transaction.................................. 46

XI. CONCLUSION ................................................................................................. 47

# I.  <u>INTRODUCTION</u>

Robert B. Pincus, solely in his capacity as special master (the "**Special Master**") for the United States District Court for the District of Delaware (the "**Court**") in *Crystallex International Corp. v. Bolivarian Republic of Venezuela* (D. Del. Case. No. 17-151-LPS), with the assistance of his Advisors, recommends the Court authorize and approve the sale of all of the shares of PDV Holding, Inc. ("**PDVH**" and the shares of which, the "**PDVH Shares**") owned by Petróleos De Venezuela, S.A. ("**PDVSA**") to Dalinar Energy Corporation ("**Dalinar**" or the "**Recommended Bidder**"), a wholly-owned subsidiary of Gold Reserve Ltd., f/k/a Gold Reserve Inc. ("**Gold Reserve**"), for a purchase price of approximately $7.382 billion (as described in detail herein), and enter an Order substantially in the form annexed hereto as <u>**Exhibit A**</u> (the "**Sale Order**").  The Special Master respectfully submits this *Special Master's Final Recommendation* (this "**Recommendation**") recommending the sale of the PDVH Shares to Dalinar pursuant to the terms and conditions set forth in the proposed stock purchase agreement (together with the exhibits and schedules thereto, the "**Stock Purchase Agreement**," and the transactions contemplated thereby, the "**Proposed Sale Transaction**") attached hereto as <u>**Exhibit B**</u>.  Pursuant to section 4.1(c) of the Stock Purchase Agreement, the obligations of the Special Master contained in the Stock Purchase Agreement are subject to entry of the Sale Order.[1]  In support of this

---

[1]  All capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the *Sixth Revised Proposed Order (A) Establishing Sale and Bidding Procedures, (B) Approving Special Master's Report and Recommendation Regarding Proposed Sale Procedures Order, (C) Affirming Retention of Evercore as Investment Banker by Special Master and (D) Regarding Related Matters* (D.I. 481) (as may be amended from time to time, the "**Sale Procedures Order**") or the Stock Purchase Agreement, as applicable.

Recommendation, the *Declaration of William O. Hiltz in Support of the Special Master's Final Recommendation* (the "**Hiltz Declaration**") is filed concurrently herewith.[2]

## II. <u>PRELIMINARY STATEMENT</u>

1.      Since his appointment in April 2021, the Special Master has worked diligently to conduct the Marketing Process in pursuit of a value-maximizing sale of the PDVH Shares.  This Recommendation, and the Proposed Sale Transaction, represent the results of the cumulative effort of the Special Master, the Sale Process Parties, the Additional Judgment Creditors, and this Court to conduct a historically expansive marketing process for the public sale of what is an exceptionally complicated asset, particularly given the context of its disposition in a forced judicial sale to satisfy billions of dollars of judgments against a foreign sovereign.

2.      After the Court and the Special Master, with input from the Sale Process Parties and Additional Judgment Creditors, laid the groundwork for a competitive bidding process in the preceding months and years, the Special Master's efforts to sell the PDVH Shares to the best bidder consistent with the Sale Procedures Order began in earnest on October 23, 2023, when the Special Master officially launched the Marketing Process with authority from the Court.

3.      Since launching the Marketing Process, the Special Master and his Advisors have extensively engaged with potential bidders, conducted substantial due diligence of the operations of CITGO Holding, Inc. ("**CITGO**") and its subsidiaries, undertaken extensive and hard-fought negotiations regarding bid proposals, regularly consulted with the Sale Process Parties, consulted as required with the Additional Judgment Creditors, solicited input from regulatory agencies, and otherwise facilitated a competitive Marketing Process according to the

---

[2]      To the extent of any inconsistency between this Recommendation and the Stock Purchase Agreement, the terms of the Stock Purchase Agreement shall prevail.

procedures approved by the Court including certain bidding procedures adopted by the Court pursuant to the Sale Procedures Order (the "**Bidding Procedures**") and the Court's various other orders relating to the Special Master's evaluation of bids.  *See* D.I. 480-1, Ex. 1; D.I. 481; D.I. 1517; D.I. 1554; D.I. 1741.

       4.      Throughout the course of the Marketing Process, the Special Master has navigated issues of first impression and a multitude of considerations that make the sale of the PDVH Shares an intensely complex process.  After concluding the first two (2) bidding rounds, the Special Master preliminarily recommended a winning bidder in September 2024.  In light of feedback from the Sale Process Parties and Additional Judgment Creditors, the Special Master abandoned the initial recommendation and pivoted to another round of bidding based on further input and direction from the Court.  The contours of that pivot were debated among the Special Master and the parties-in-interest, culminating in the approval by the Court of certain procedures for the solicitation and selection of a stalking horse (the "**Stalking Horse Round**") and solicitation of bids to top the stalking horse (the "**Topping Period**") in 2025, culminating in this Recommendation.

       5.      On March 21, 2025, the Special Master filed the *Notice of Special Master's Recommendation of Stalking Horse* (D.I. 1596) (the "**Stalking Horse Recommendation**") recommending Red Tree Investments, LLC as the stalking horse ("**Red Tree**" or the "**Stalking Horse**," and the transaction contemplated thereby, the "**Stalking Horse Transaction**").

       6.      In the Stalking Horse Recommendation, the Special Master was clear that "the factors driving the selection of a stalking horse [were] not necessarily the same as those underpinning the recommendation of a final successful purchaser of the PDVH Shares."  D.I. 1596 ¶ 5.  The Special Master made "abundantly clear" that his recommendation of Red Tree as the

stalking horse did "not mean that the [Stalking Horse Transaction] will be preferred to others following the topping period, regardless of whether the bids previously submitted materially change . . . between now and the date on which the Special Master files his final recommendation for a Successful Bidder." *Id*. The Court agreed. D.I. 1741 at 2–3.

7.      On April 21, 2025, the Court entered an Order designating Red Tree as the Stalking Horse (D.I. 1741) (the "**Stalking Horse Approval Order**") following briefing on objections to the Stalking Horse Recommendation and "having heard extensive oral argument on April 17, 2025." *See id.* at 1.

8.      In the Stalking Horse Approval Order, the Court provided guidance on the application of the Evaluation Criteria (as defined below) for purposes of the Special Master's final recommendation. *Id*. at 3. In particular, the Court emphasized that it "expects that any bid it is likely to approve at the conclusion of the [Marketing] Process will need a balance that places much greater emphasis on price and lesser emphasis on certainty." *Id*.

9.      The Court further addressed the Evaluation Criteria as it applied to the risk to any closing posed by the PDVSA 2020 Bondholders. The Court explained that "[a]ny prudent bidder, as well as the Special Master on behalf of the Court, must factor into its assessment of a transaction relating to the purchase of the PDVH Shares the risk to closing posed by the [PDVSA] 2020 Bondholders being able to assert their rights (assuming they exist) in a manner that would interfere with closing." *Id*. at 6–7. The Court emphasized, however, that such risk "must be viewed realistically, as it appears to be dependent on (perhaps among other conditions) the [PDVSA] 2020 Bondholders (a) obtaining injunctive relief from some court . . . and (b) persuading

OFAC to change the position to which it has constantly adhered for over five years, i.e., the suspension of General License No. 5 ("GL-5")." *Id.*

10.    Finally, the Court noted that, "in evaluating certainty of closing during the Topping Period, the Special Master should consider the possibility that the Court (or an appellate court)" could "reject a Final Bid that . . . places, expressly or implicitly, substantial value on settlement of the [PDVSA] 2020 Bondholders' litigation" if "subsequent events (*e.g.*, the Southern District of New York granting Venezuela's pending motion for summary judgment and concluding the [PDVSA] 2020 Bondholders have no rights to CITGO Holding; that same court indicating it will stay enforcement of any judgment entered in favor of the [PDVSA] 2020 Bondholders; or OFAC indicating it will continue to suspend GL-5 beyond the date of the expected closing of sale of the PDVH Shares) reveal it would be a fundamental injustice to close on such a Final Bid, when bids with a much greater purchase price were rejected." *Id.* at 7–8.

11.    The Special Master believes that Dalinar's Proposed Sale Transaction is the best bid submitted for the purchase of the PDVH Shares.  Dalinar's Proposed Sale Transaction is approximately $3.576 billion higher than the Stalking Horse Transaction and is the highest bid that meets the Bid Requirements (as defined below).  Thus, the Special Master concludes that Dalinar's Proposed Sale Transaction is the highest bid that he reasonably believes to be capable of being timely consummated after taking into account the factors in the Court's guidance, including through various orders and the June 24 Ex Parte Conference (as defined below), and the Bidding Procedures.

### III.    JURISDICTION AND VENUE

12.    The Court has jurisdiction to grant the relief in the proposed Sale Order pursuant to 28 U.S.C. §§ 1330, 1367, and 1605(a)(6), and its ancillary jurisdiction to enforce

federal judgments. *See Crystallex Int'l Corp. v. Bolivarian Republic of Venezuela*, 932 F.3d 126, 136–38 (3d Cir. 2019). Venue is proper before the Court pursuant to 28 U.S.C. § 1963.

13.     The statutory and legal predicates for the relief granted herein include (a) Rules 69(a) and 53 of the Federal Rules of Civil Procedure (the "**Federal Rules**"), (b) Section 324 of Title 8 of the Delaware Code, (c) the Court's general equitable powers to enforce its orders and judgments, *see Chambers v. NASCO, Inc.*, 501 U.S. 32, 43 (1991); *IFC Interconsult, AG v. Safeguard Int'l Partners, LLC*, 438 F.3d 298, 311 (3d Cir. 2006), (d) the All Writs Act, *see United States v. N.Y. Tel. Co.*, 434 U.S. 159, 172 (1977), and (f) 28 U.S.C. § 2004.

## IV. <u>PROCEDURAL BACKGROUND</u>

14.     On January 14, 2021, the Court issued an Opinion and Order (D.I. 234; D.I. 235) on several motions brought by Plaintiff Crystallex International Corp. ("**Crystallex**"), Defendant Bolivarian Republic of Venezuela (the "**Republic**"), and Interveners PDVSA, PDVH, and CITGO (together with the Republic, the "**Venezuela Parties**"), in which the Court "set out some of the contours of the sales procedures that it will follow" in conducting a sale of the PDVH Shares. *See* D.I. 234 at 34.

15.     By order dated April 13, 2021, the Court appointed the Special Master to assist with the sale of the PDVH Shares. *See* D.I. 258.

### A.     <u>Entry of the Sale Procedures Order</u>

16.     For over a year, the Special Master and the Sale Process Parties extensively negotiated the terms of a proposed sale of the PDVH Shares. These extensive negotiations culminated in the entry of the Sale Procedures Order (D.I. 481).

17.     Significantly, the Sale Procedures Order directed the Special Master to market the PDVH Shares (the "**Marketing Process**") pursuant to the Bidding Procedures. The Court found that the Bidding Procedures were "substantively and procedurally fair to all parties

and potential bidders," "afford[ed] notice and a full, fair and reasonable opportunity for any person or entity to make a higher or otherwise better offer to purchase the PDVH Shares," and were "fair, reasonable, and appropriate." *See* D.I. 481 ¶ C.

18.     The Sale Procedures Order contemplated that the sale process would proceed in three phases. *First*, during the first six (6) months following entry of the Sale Procedures Order (the "**Six-Month Window**"), the Special Master was directed to solicit feedback from the Office of Foreign Asset Control ("**OFAC**") and the Sale Process Parties regarding the Special Master's plans to market the PDVH Shares. *Second*, the Special Master would formally initiate the Marketing Process upon the Court's approval of a designated date (the "**Launch Date**"), at which point the Special Master would, among other things, solicit competitive bids for the PDVH Shares and identify other judgment creditors qualified to participate in the Marketing Process (the "**Additional Judgment Creditors**"). *See id.* ¶ 2. *Third*, after consideration of the bids, the Special Master would recommend a bidder (the "**Successful Bidder**"), and the Court would conduct a hearing (the "**Sale Hearing**") to approve the sale of the PDVH Shares to the Successful Bidder. *See id.* ¶¶ 2, 12.

## B.     Engagement with OFAC Prior to Launch

19.     Entry of the Sale Procedures Order triggered the Six-Month Window, during which the Special Master was authorized to, among other things, engage with OFAC to gain clarity or guidance with respect to its support for, or non-opposition to, the Marketing Process. *See id.* ¶ 3.

20.     In furtherance of the Court's directives, the Special Master and his Advisors sent a letter to representatives of the U.S. Government on November 22, 2022, sharing and summarizing the Sale Procedures Order and seeking guidance from the U.S. Government, in particular OFAC, regarding the sale of the PDVH Shares and the likelihood that OFAC would

provide authorization for consummation of a transaction for the sale of the PDVH Shares. *See* D.I. 553 ¶ 12. In response, the U.S. Government suggested a meeting in early January 2023 to facilitate a discussion between the Special Master and representatives of the U.S. Government regarding the proposed sale. *Id.* The Special Master met with attorneys from the Departments of Justice, State, and Treasury on January 12, 2023. *Id.* ¶ 13. The Special Master described the design of the Marketing Process, reiterated the importance of receiving clarity regarding the U.S. Government's position with respect to issuing required licenses, and detailed the prospective impact that such clarity would have on the Marketing Process. *See id.*

21.    On April 7, 2023, the Special Master received a letter from the Department of Justice, which conveyed the U.S. Government's determination that OFAC would not take enforcement action against participation in or compliance with "steps prefatory and antecedent to the consummation of the Sales Transaction," and further conveyed that OFAC intended to implement a "favorable licensing policy" for license applications in connection with the execution of a sale as contemplated by the Sale Procedures Order. *See* D.I. 553, Ex. 1 at 2.

22.    On April 28, 2023, as required by the Sale Procedures Order, the Special Master filed a supplemental report recommending that preparation for the launch of the Marketing Process begin without further delay and, in connection therewith, notified the Court of the U.S. Government's updated guidance. *See* D.I. 481 ¶ 3; D.I. 553.

### C.    Additional Attached Judgments and Final Priority Order

23.    Concurrent with the Six-Month Window, the Court considered and ruled upon the inclusion of additional judgments, beyond those held by Crystallex and Phillips Petroleum Company Venezuela Limited and ConocoPhillips Petrozuata B.V. (collectively, and as later joined with ConocoPhillips Gulf of Paria B.V. and ConocoPhillips Hamaca B.V., "**ConocoPhillips**"), in the sale process. *See* D.I. 646, 693, 902, 928, 996. At the conclusion

of the applicable briefing and judgment recordation process, the Court set the universe of Attached Judgments entitled to recover from the proceeds of a sale transaction as well as the priority among the Attached Judgments (the "**Final Priority Order**").  *See* D.I. 1136 at 3 (citing D.I. 969-1); *see also* D.I. 1102.[3]

### D.    Initial Marketing Process

24.    On July 17, 2023, the Court authorized the Special Master to begin preparations for the launch of the Marketing Process on July 24, 2023 (the "**Preparation Launch Date**").  *See* D.I. 643 at 11.

25.    On the Preparation Launch Date, and consistent with the directives of the Sale Procedures Order, the Special Master and his Advisors began to prepare for the Marketing Process.  The Special Master's activities included, among other things, (i) meeting and conferring with PDVSA regarding minority shareholder rights, (ii) meeting regularly with CITGO's management team regarding diligence matters, (iii) preparing marketing materials for potential bidders, including a confidential information memorandum, a teaser, and a comprehensive financial model, and (iv) preparing an initial outreach list of potential bidders in advance of the October 23, 2023 launch of the Marketing Process.

26.    On October 23, 2023, the Special Master officially launched the Marketing Process,[4] and immediately, with the assistance of his Advisors, undertook significant efforts to identify competitive bidders for the PDVH Shares.  Additional discussion of the Marketing Process undertaken by the Special Master and his Advisors is set forth in the Hiltz Declaration.

---

[3]    Since entry of the Court's orders determining the Attached Judgments, (D.I. 969-1; D.I. 1136), certain Additional Judgment Creditors filed Notices of Withdrawal, thereby relinquishing their entitlement to share in proceeds of the Proposed Sale Transaction.  *See* D.I. 1573, 1629, 1755.

[4]    On October 19, 2023, the Court issued an oral order authorizing the launch of the Marketing Process to occur on October 23, 2023.  *See* D.I. 768.

27.     In parallel, the Special Master and his Advisors continued to engage with CITGO's management team, evaluate potential sale transaction structures, and prepare sale transaction-related documentation.

28.     The Special Master and his Advisors also continued to engage with OFAC on an ad hoc basis to provide them with updates and solicit feedback and guidance where appropriate.

29.     The Special Master received twelve (12) non-binding indications of interest from potential bidders on or before January 22, 2024.  *See* Hiltz Decl. ¶ 11.

30.     Of these twelve (12) submissions, nine (9) of the potential bidders were invited to participate in the second round of bids, accompanied by a more comprehensive round of diligence.  *See id.*

31.     On June 11, 2024, the second round bid deadline (the "**Second Round Bid Deadline**"), the Special Master received six (6) definitive and binding bids for the PDVH Shares.  *See* Hiltz Decl. ¶ 13.

32.     On August 8, 2024, the Special Master entered into a period of exclusivity with Elliott Investment Management L.P. ("**Elliott**").  After extensive negotiations with Elliott and analysis of the options available, the Special Master determined that Elliott's bid was the best available at the time and recommended that Amber Energy, Inc. ("**Amber Energy**"), an affiliate of Elliott, be selected as the Successful Bidder.  *See* Hiltz Decl. ¶ 14.

33.     On September 27, 2024, the Special Master filed the *Notice of Special Master's Recommendation* (D.I. 1325) (the "**Initial Recommendation**"), recommending the Court approve a transaction for the purchase of the PDVH Shares by Amber Energy.  The Sale Process Parties and certain Additional Judgment Creditors raised concerns about the Initial

Recommendation and the proposed Amber Energy transaction. *See*, *e.g.*, D.I. 1337; D.I. 1373-2; D.I. 1373-4; D.I. 1373-5; D.I. 1373-6; D.I. 1373-7; D.I. 1417; D.I. 1418; D.I. 1419. In an attempt to address the concerns raised, Amber Energy submitted an alternative term sheet to the Special Master (the "**Alternative Transaction Term Sheet**"). *See* D.I. 1414-1. In response to continued criticism of the proposed transaction with Amber Energy, including the Alternative Transaction Term Sheet, the Court requested the parties submit extensive briefing on how the sale process should proceed and held a hearing to consider the same on December 13, 2024 (the "**December 13 Hearing**").

34.    At the conclusion of the December 13 Hearing, the Court directed the Special Master to re-open the virtual data room (the "**VDR**") by December 18, 2024. *See* D.I. 1505. Accordingly, the Special Master, with the assistance of his Advisors, reopened the VDR on December 18, 2024, which effectively reopened the bidding process. *See* Hiltz Decl. ¶ 16.

35.    On December 31, 2024, the Court issued a *Memorandum Order Regarding Sale Process and Litigation* (D.I. 1517) (the "**December 31 Order**"), which provided the Court's direction regarding how the Marketing Process would proceed.

**E.    Stalking Horse Bidding Round and Topping Period**

36.    As directed by the Court in the December 31 Order, Evercore completed additional bidder inquiries and marketing efforts solicited stalking horse bids for the sale of the PDVH Shares. Details of that marketing process are set forth in the Hiltz Declaration. *See* Hiltz Decl. ¶¶ 19–32.

37.    The December 31 Order also set forth revised procedures and a timeline for the sale of the PDVH Shares, including (i) procedures for approval of (A) certain bidder protections (the "**Bidder Protections**") available to any stalking horse that is approved by the

Court, (B) material terms of a stock purchase agreement ("**SPA**," and such terms, the "**Draft SPA Material Terms**") and, subsequently, a draft long-form SPA, and (C) the evaluation criteria for bids (the "**Evaluation Criteria**"); (ii) deadlines for the submission of bids, the Special Master's recommendations, and objections thereto; (iii) scheduling the Sale Hearing; and (iv) related relief. *See* D.I. 1517 ¶ 3.

38.     Pursuant to the Court's December 31 Order, the Special Master filed a Joint Status Report attaching proposed Bidder Protections, a list of Draft SPA Material Terms, noting which terms were non-negotiable and which were strongly favored, and proposed Evaluation Criteria for stalking horse bids, base bids, and successful bids.  *See* D.I. 1528; *see also* D.I. 1517 ¶ 3.  Certain Sale Process Parties and Additional Judgment Creditors filed objections to the Bidder Protections, Draft SPA Material Terms, and Evaluation Criteria, and the Court ruled on the Special Master's proposals and the objections on January 27, 2025 (the "**January 27 Order**"). *See* D.I. 1554.

39.     The Special Master and his Advisors again continued to engage with OFAC on an ad hoc basis to provide them with updates on the sale process and solicit feedback and guidance where appropriate.

40.     On February 6, 2025, the Draft SPA Material Terms, Bidder Protections, and Evaluation Criteria, as modified in accordance with the January 27 Order were uploaded to the VDR.  *See* Hiltz Decl. ¶ 30.

41.     On February 10, 2025, after consulting with the Sale Process Parties, the Special Master filed a draft long-form SPA (the "**Bid Draft SPA**") consistent with the Court-approved Draft SPA Material Terms on the docket and deposited the Bid Draft SPA in the VDR. *See* D.I. 1557.   The Venezuela Parties, certain Additional Judgment Creditors, and the

PDVSA 2020 Bondholders submitted objections to the Bid Draft SPA, *see* D.I. 1558; D.I. 1559; D.I. 1560; to which the Special Master responded, *see* D.I. 1564. The Court ruled on these objections on February 24, 2025, sustaining some and denying others, and invited a further round of briefing regarding the Court's proposal relating to consent of holders of Attached Judgments to receive non-cash consideration. *See* D.I. 1571; D.I. 1572; and D.I. 1574-1582. Following this ruling, another round of briefing on the long-form SPA took place and, on March 4, 2025, the Court ruled on the remaining issue on the Bid Draft SPA regarding non-cash consideration. *See* D.I. 1583; *see also* D.I. 1572; D.I. 1574-1582.

42.    Meanwhile, on February 10, 2025, Evercore sent a stalking horse bid instruction letter (the "**Stalking Horse Bid Letter**") to all twenty-six (26) potential bidders with VDR access. The Stalking Horse Bid Letter provided potential bidders with information about the sale process, including information about the assets being sold (the PDVH Shares), and set forth the required contents for a bid to meet the Bid Requirements (as defined below). The Stalking Horse Bid Letter also expressly included a deadline of March 7, 2025 at 5:00 PM (Central Time), for potential bidders to submit stalking horse bids. *See* Hiltz Decl. ¶ 32.

43.    On March 7, 2025, the Special Master received stalking horse bid proposals (the "**Stalking Horse Proposals**") from four (4) bidders (collectively, the "**Stalking Horse Bidders**"). Immediately thereafter, the Special Master began a careful assessment of the merits of the four (4) Stalking Horse Proposals submitted. *See* Hiltz Decl. ¶ 35.

44.    After multiple extensions of the Stalking Horse Round, on March 21, 2025, the Special Master filed the Stalking Horse Recommendation recommending the Court approve Red Tree's Stalking Horse Transaction. *See* D.I. 1590; D.I. 1591; D.I. 1596.

45.     On March 31, 2025, Rusoro Mining Limited ("**Rusoro**"), Gold Reserve, Koch Minerals Sàrl and Koch Nitrogen International Sàrl (collectively, "**Koch**"), Siemens Inc. ("**Siemens**"), and the Venezuela Parties, submitted objections to the selection of Red Tree as the Stalking Horse, and the Special Master and others responded to those objections.  D.I. 1635-1640; D.I. 1656-1662; D.I. 1664-1667.

46.     The Court held a hearing on the Stalking Horse Recommendation on April 17, 2025.

47.     On April 21, 2025, the Court entered the Stalking Horse Approval Order approving the Stalking Horse Recommendation.  D.I. 1741.

48.     On April 25, 2025, the Court entered the *Order Regarding Schedule for the Remainder of the Marketing Process* (D.I. 1745) setting the dates for the Topping Period to be launched on April 28, 2025 and subsequent deadlines ahead of the Sale Hearing.

49.     On April 28, 2025, after consultation with the Sale Process Parties, the Special Master, through Evercore, sent a topping period bid instruction letter (the "**Topping Period Process Letter**") to approximately one hundred thirty (130) bidders of the bidders that Evercore had contacted during the prior outreach on December 18, 2024, January 6, 2025, and January 16, 2025.  The Topping Period Process Letter provided potential bidders with detailed information about the sale process, including information about the assets being sold (the PDVH Shares), and set forth the Bid Requirements.  The Topping Bid Process Letter also expressly included a deadline of 5:00 PM (Central Time) on May 28, 2025 (the "**Topping Period Deadline**"), for potential bidders to submit topping bids.  *See* Hiltz Decl. ¶ 39.

50.     On May 20, 2025, Judge Rakoff of the U.S. District Court for the Southern District of New York ruled on the summary judgment motions in *Girard Street Investment*

*Holdings, LLC v. PDV Holding, Inc.*, No. 24-cv-4448 (S.D.N.Y.), *Girard Street Investment Holdings, LLC v. PDV Holding, Inc.*, No. 23-cv-10772 (S.D.N.Y.), and *G&A Strategic Investments I LLC, et al v. Petróleos de Venezuela, S.A.*, No. 23-cv-10766 (S.D.N.Y.) (consolidated), dismissing the alter ego claims against PDVH. In light of Judge Rakoff's ruling, on May 23, 2025, the Venezuela Parties moved for an extension of the Topping Period. *See* D.I. 1575. On May 30, 2025, the Court granted the motion and extended the Topping Period Deadline to June 18, 2025. *See* D.I. 1779.

## V. <u>NOTICE PROCEDURES</u>

51.     The Sale Procedures Order provides for the following notice procedures:

> After the Launch Date, in addition to conducting the Marketing Process, the Special Master shall cause a notice . . . to be published (i) following the launch of the sale process, and (ii) prior to any Auction or designation of any Stalking Horse Bidder as the Successful Bidder in *The News Journal*, the *Delaware State News*, the *Wall Street Journal* (national edition), *USA Today* (national edition), and, if practicable, a regional or local newspaper published or circulated in Venezuela selected by the Special Master in consultation with the Sale Process Parties, in each case for two successive weeks.

D.I. 481 ¶ E.

52.     As evidenced by the notarized affirmations of publication attached hereto as **<u>Exhibit C</u>** (collectively, the "**Publication Affidavits**"), the Special Master published the Sale Notices (i) after the Launch Date, (ii) prior to the deadline for potential bidders to submit non-binding indications of interest in the sale of PDVH Shares (the "**First Round Indication of Interest Deadline**"), (iii) prior to the Second Round Bid Deadline, (iv) prior to the deadline for stalking horse bids, and (v) prior to the Topping Period Deadline.[5]

---

[5]     Copies of the actual publications referenced in the Publication Affidavits are on file on with the Special Master and can be provided upon request.

53.     No Sale Process Party objected to the sufficiency of the Sale Notice or its publication. *See* D.I. 481. (establishing procedures for a Sale Process Party to object if such Sale Process Party believed that further service of a Sale Notice or any additional publication or notice was necessary or appropriate).

## VI.  RECEIPT OF TOPPING PROPOSALS

54.     On or about the June 18, 2025 deadline (the "**June 18 Topping Bid Deadline**"), the Special Master received two (2) topping bids for the PDVH Shares (the "**June 18 Topping Proposals**"), one from Dalinar (the "**June 18 Dalinar Bid**") and one from another bidder ("**Bidder A**" and such bid, "**Bid A**").[6] Immediately thereafter, the Special Master and his Advisors began a careful assessment of the merits of the June 18 Topping Proposals, comparing them to each other and to the Stalking Horse Transaction. *See* Hiltz Decl. ¶ 42.

55.     Pursuant to the Bidder Protections as adopted by the January 27 Order, the Special Master was permitted to request revised bids from Dalinar, Bidder A, and the Stalking Horse during the five (5) business days following the end of the Topping Period. *See* D.I. 1554 at 12 (endorsing the five-business-day deadline in approving bidder protections).  Mirroring this procedure, the Court-approved SPA entered into with the Stalking Horse (the "**Stalking Horse Agreement**") provided for the commencement of a "No-Shop Period" on June 26, 2025, during which the Special Master was required to immediately cease and terminate any discussions or negotiations with potential competing bidders, effectively giving the Special Master until end of day on June 25, 2025 to determine whether he had received a Superior Proposal (as defined in the Stalking Horse Agreement). *See* D.I. 1596-1 §§ 6.16(b), (d), Annex A (definition of "No-Shop

---

[6]     Dalinar also submitted an initial topping bid during the Topping Period on June 3, 2025 (the "**Initial Dalinar Topping Bid**"), which was later replaced with the June 18 Dalinar Bid. *See* Hiltz Decl. at 14 n. 2.

Period"); D.I. 1545-1 at 5–7 (Non-Solicitation Period). Accordingly, the Special Master's Advisors directed bidders to submit any final revisions to their Topping Proposals no later than 9:00 AM on June 25, 2025 (the "**Revised Topping Bid Deadline**"). *See* Hiltz Decl. ¶ 43.

56.    On June 20, 2025, the Special Master received an additional topping bid from Black Lion Capital Advisors, LLC ("**Black Lion**," and such bid, the "**Black Lion Bid**"), which Black Lion also sent directly to the Court via a letter dated June 17, 2025, which was docketed on June 23, 2025. *See* D.I. 1822; *see also* Hiltz Decl. ¶ 45.

57.    On June 24, 2025, the Court held an *ex parte* conference with the Special Master (the "**June 24 Ex Parte Conference**") during which the Special Master provided the Court with a summary of the June 18 Topping Proposals and the status of discussions with Dalinar, Bidder A, and the Stalking Horse. The Special Master also noted his receipt of the Black Lion Bid. The Court provided its inclinations to the Special Master, which were consistent with its guidance set forth in the Stalking Horse Approval Order.

58.    On June 25, 2025, the Special Master received two (2) revised topping bids, one from Dalinar (the "**Dalinar Topping Bid**") and one from the Stalking Horse (the "**Revised Stalking Horse Bid**"). The Special Master also received a proposed bid from an additional alternative bidder ("**Bidder B**," and such bid, "**Bid B**" and together with the Dalinar Topping Bid, Bid A, Revised Stalking Horse Bid, and the Black Lion Bid, the "**Topping Proposals**") that did not submit a bid by the June 18 Topping Bid Deadline. Bidder A did not submit a revised bid proposal to its June 18, 2025 bid—therefore, its bid submitted on June 18, 2025 was determined to be its final proposal. *See* Hiltz Decl. ¶¶ 47–48.

## VII.    EVALUATION OF TOPPING PROPOSALS

59.    Between June 18, 2025 and June 25, 2025, the Special Master evaluated all of the bids he received with his Advisors in accordance with the Sale Procedures Order, Bidding Procedures, Bid Requirements (as defined below), Evaluation Criteria and the Court's guidance, including through various orders and the June 24 Ex Parte Conference.  In evaluating each bid, the Special Master, with advice from his Advisors, and in regular consultation with the Sale Process Parties and Additional Judgment Creditors, considered (i) the purchase price offered for the PDVH Shares and (ii) the certainty of closing.  *See* D.I. 1552-1 (as approved and modified by the January 27 Order); *see also* D.I. 1554.  The Special Master also assessed each bid's compliance with the Bidding Procedures and bid requirements set forth in the January 27 Order adopting Bidder Protections, Draft SPA Material Terms, and the Evaluation Criteria (the "**Bid Requirements**"). *See* Hiltz Decl. ¶ 50.

60.    In determining the purchase price for each bid, the Special Master assessed the total value of the Attached Judgments expected to be satisfied by both cash and non-cash consideration that was consented to by the applicable Attached Judgment Creditor proposed to receive it.  *See id.* ¶ 51.[7]

61.    In assessing the non-cash consideration, the Special Master applied the Court's rulings that (i) non-cash consideration could be used as currency in the auction only upon

---

[7]    All amounts with respect to bids quoted in this Recommendation reflect amounts payable to holders of Attached Judgments as of June 30, 2026 as calculated by Evercore (and not amounts submitted by bidders) in accordance with and according to the claims calculations approved by the Court in its *Memorandum Order*, dated April 25, 2024.  *See* D.I. 1136 at 3 (citing D.I. 969-1).  Actual distributions to holders of Attached Judgments will be determined as of the date of the closing of the sale of the PDVH Shares.  These calculations have been prepared for the purposes of comparison of bids in circumstances where bidders ascribed different proposed closing dates for the purposes of their calculations

consent of the Sale Process Party or Additional Judgment Creditor that would receive it; (ii) non-cash consideration could only be offered according to the priority waterfall and in compliance with the Sale Procedures Order; and (iii) a recipient of non-cash consideration, including contingent cash consideration, could not be paid more than the amount of its claim. *See* 1552-1 at 8; *see also* D.I. 1554. Further, to the extent a bid contained cash consideration sufficient to satisfy all Attached Judgments senior in priority to bidders who hold Attached Judgments, the Special Master considered any credit bid or credit bids by such holders of Attached Judgments to be the equivalent of cash consideration for purposes of determining the purchase price and the amount available for distribution to holders of Attached Judgments. *See* 1552-1 at 8; *see also* D.I. 1554; Hiltz Decl. ¶ 52.

62.    In assessing the certainty of closing, the Special Master carefully assessed the certainty associated with each bid, its compliance with applicable law, and the likelihood it would be approved by the Court and then successfully proceed to closing. The Special Master and his Advisors specifically took into account the following considerations, among others: (i) likelihood of securing regulatory approval and timing thereof, including requisite approval from OFAC, the Federal Trade Commission, and other government entities; (ii) conditionality related to pending or future litigation (including with respect to the PDVSA 2020 Bondholders and the alter ego claims); (iii) conditionality related to securing entry of the proposed Sale Order, as well as related to any appeals of the Sale Order; (iv) each bidder's financial wherewithal and certainty of financing sources, including the presence of parent guarantees or other security in the event of a post-Sale Order refusal to close; (v) conditionality related to any other term proposed by the applicable bidder; (vi) certainty of obtaining requisite consents from the holders of Attached

Judgments proposed to receive non-cash consideration; and (vii) certainty of financing. *See* D.I. 1552-1 at 8; *see also* D.I. 1554; Hiltz Decl. ¶ 53.

63.     The Special Master determined that, of the Topping Proposals received, only the Dalinar Topping Bid and the Revised Stalking Horse Bid (collectively, the "**Conforming Bids**") conformed with the Bid Requirements.  The Conforming Bids were Qualified Bids (as defined in the Sale Procedures Order) and also met the other Bid Requirements embodied in the Court's subsequent orders.  The Special Master determined that Bid A, Bid B, and the Black Lion Bid (collectively, the "**Non-Conforming Bids**") did not conform with the Bid Requirements and therefore were not Qualified Bids as of the Revised Topping Period Deadline.

A.     <u>**Non-Conforming Bids**</u>

64.     *Bid A*.  The transaction contemplated by Bid A proposed a purchase price (*i.e.*, proceeds available to holders of Attached Judgments) of approximately $3.831 billion comprised entirely of cash consideration.  Bid A also proposed an in-process settlement with the PDVSA 2020 Bondholders, similar to the transaction support agreement contemplated by the Stalking Horse Transaction.  *See* D.I. 1627.  Bid A's proposed financing did not conform with the Bid Requirements because it was contingent on a settlement with the PDVSA 2020 Bondholders that, as of the submission of its bid on the June 18 Topping Bid Deadline, it did not have.  The Draft SPA Material Terms adopted by the Court required bidders to have committed financing. *See* D.I. 1554 at 14 (adopting D.I. 1545-2 at 2 ("All bids must be fully financed and such financing must be free of contingencies other than Closing Conditions in the SPA").  Bidder A did not have any binding settlement with the PDVSA 2020 Bondholders at the time of its bid submission, which the Special Master views as equivalent to committed financing where the related bid relies on such a settlement.  Therefore, the Special Master determined that Bid A was not a conforming bid.  The Special Master informed Bidder A of the deficiencies with its bid after receiving its bid.  After the

submission of its bid on June 18, 2025, Bidder A informed the Special Master that it was working to materially improve the price of its bid via the inclusion of additional non-cash consideration payable to Rusoro, which it was in discussions with Rusoro about. However, Bidder A did not ultimately submit a revised bid reflecting this proposed increased purchase price. *See* Hiltz Decl. ¶ 57.

65. *Bid B*. The transaction contemplated by Bid B proposed a purchase price of approximately $3.806 billion comprised entirely of cash consideration. Bid B also had the potential to increase its purchase price by approximately $1.569 billion if it received the requisite consents for its proposed non-cash consideration.[8] Bid B also proposed an in-process settlement with the PDVSA 2020 Bondholders, similar to the transaction support agreement contemplated by the Stalking Horse Transaction. *See* D.I. 1627. However, Bid B was submitted on June 25, 2025 after the Topping Period Deadline and failed to comply with the Bid Requirements as described below. Bidder B proposed a settlement with the PDVSA 2020 Bondholders, but it did not have a binding settlement at the time of submission of its bid. Bid B's bid letter also stated that the bid remained subject to outstanding due diligence. The Special Master determined that this additional due diligence and the conditionality relating to the proposed but not executed settlement with the PDVSA 2020 Bondholders, failed to comply with the Bid Requirements. The Bid Requirements require bids to be unconditional and bidders to provide a statement that the bid "is not subject to any further due diligence." *See* D.I. 480-1, Ex. 1, Bidding Procedures at 10. Further, as set forth above, the Special Master views a proposed but unexecuted settlement with the PDVSA 2020

---

[8] Bidder B had not procured the applicable consent for this proposed additional consideration at the time of submission of its bid. While Bid B also contemplated potentially providing an additional $200 million of cash consideration, delivery of such cash was subject to agreement with the applicable Attached Judgment holder on terms of non-cash consideration to accompany the $200 million.

Bondholders as equivalent to not having committed financing where the related bid relies on such a settlement.  Therefore, the Special Master determined Bid B was not a conforming bid.[9]  The Special Master informed Bidder of the deficiencies in its bid after receiving its bid.  *See* Hiltz Decl. at ¶ 58.

66.    *Black Lion Bid*.  The transaction contemplated by Black Lion proposed a purchase price of $8 billion, comprised entirely of cash consideration, which reflected an increase of approximately $4.194 billion above the Stalking Horse Transaction.  The Black Lion Bid contained numerous deficiencies that rendered it non-compliant with the Bid Requirements, including that it was subject to due diligence.  The Special Master determined that this additional due diligence did not comply with the Bidding Procedures, which require bids to be unconditional and bidders to provide a statement that the bid "is not subject to any further due diligence."  *See* D.I. 480-1, Ex. 1, Bidding Procedures at 10.  Additional deficiencies of the Black Lion Bid are outlined in detail in the Hiltz Declaration.  *See* Hiltz Decl. ¶¶ 59-60.  At the time of submission of its bid, Black Lion had not signed a non-disclosure agreement with the Special Master or entered the VDR established for the purposes of the Marketing Process.  *See id.*  Consequently, the Special Master determined that the Black Lion Bid did not conform to the Bid Requirements.  On June 25, 2025, the Special Master's Advisors sent an email to Black Lion outlining the deficiencies with the Black Lion Bid, and explaining that the Special Master had determined that the Black Lion Bid did not meet the Bid Requirements and was not eligible for consideration as a Superior Proposal at this time.  On June 25, 2025, the Special Master and Black Lion executed a non-disclosure

---

[9]    A substantial portion of Bid B's proposed purchase price ($1.354 billion) was non-cash consideration proposed to be paid to Rusoro that had not been consented to by Rusoro. Therefore, this non-cash consideration was not given material weight by the Special Master in light of the inherent uncertainty related to whether the Stalking Horse and Rusoro would reach an agreement.

agreement (an "**NDA**") and Black Lion was provided with access to and accessed the VDR. *See id*. At the time of the Special Master's execution of the Stock Purchase Agreement, Black Lion's access to the VDR was terminated, as was all other potential bidders' except for Dalinar. *See* Hiltz Decl. ¶ 60.

### B.   Conforming Bids

67.    *Dalinar Topping Bid*.   An overview of the Dalinar Topping Bid and the Special Master's evaluation of, and reasons for, recommending the Dalinar Topping Bid over the Revised Stalking Horse Bid is set forth below.

68.    *Revised Stalking Horse Bid.*  The Revised Stalking Horse Bid proposed total consideration of $3.806 billion, comprised of (i) cash consideration in the amount of $3.319 billion and (ii) consented-to non-cash consideration in the amount of $487 million, with approximately $139 million allocated to Northrop Grumman Ship Systems, Inc., f/k/a Ingalls Shipbuilding, Inc. and n/k/a Huntington Ingalls Incorporated ("**Huntington Ingalls**") and approximately $347 million allocated to Red Tree.  The Revised Stalking Horse Bid had the potential to increase its purchase price by approximately $1.5 billion if it received the requisite consents for its proposed non-cash consideration.[10]   Specifically, the Revised Stalking Horse Bid offered non-cash consideration to Rusoro or other Additional Judgment Creditors in two (2) tranches, which Red Tree submitted carries a value of approximately $1.5 billion.  However, as of the submission of its bid, Red Tree had not procured Rusoro's consent to receive such non-cash consideration, or otherwise release its attachment, as required by the Court's March 4, 2025 *Memorandum Order*

---

[10]    Red Tree had not procured the applicable consent for this proposed additional consideration at the time of submission of the Revised Stalking Horse Bid.

(D.I. 1583).[11]   Red Tree's Revised Stalking Horse Bid conformed to the Bid Requirements. Ultimately, the Revised Stalking Horse Bid was substantially similar to its Stalking Horse Transaction, including both in terms of price and a proposed settlement with the PDVSA 2020 Bondholders via a transaction support agreement without any material changes from the prior version. *See* Hiltz Decl. ¶ 61.

## VIII.   OVERVIEW OF RECOMMENDED BID AND MATERIAL TERMS OF STOCK PURCHASE AGREEMENT

69.   The Stock Purchase Agreement provides that Dalinar would acquire 100% of the PDVH Shares for an aggregate purchase price of approximately $7.382 billion[12] of proceeds distributable to holders of Attached Judgments at closing of the Proposed Sale Transaction, which is comprised of (i) cash consideration in the amount of $3.854 billion and (ii) non-cash consideration in the amount of $3.528 billion, all of which has been formally consented to in writing by the receiving Additional Judgment Creditors Rusoro, Koch, Gold Reserve, and XYQ US, LLC ("**XYQ**") (on behalf of Siemens).

---

[11]   Accordingly, this non-cash consideration was not given material weight when evaluating the purchase price of the Revised Stalking Horse Bid in light of the inherent uncertainty related to whether the Stalking Horse and Rusoro would reach an agreement that would result in Rusoro discharging approximately $1.5 billion of its claim at closing.

[12]   The Proposed Sale Transaction's estimated purchase price of $7.382 billion reflects the aggregate amount of cash and non-cash consideration to be paid in satisfaction of Attached Judgments in accordance with the Stock Purchase Agreement, with an assumed closing date of June 30, 2026, for purposes of calculating the accrued amount of Attached Judgments, which date the Special Master used to compare all Topping Proposals.  As of June 25, 2025, the execution date of the Stock Purchase Agreement, the accrued amount of Attached Judgments to be satisfied by the Proposed Sale Transaction's estimated purchase price was equal to approximately $7.166 billion.  Dalinar's final bid letter attached hereto as Exhibit G, reflects an estimated purchase price of approximately $7.530 billion because Dalinar assumed a closing date of December 31, 2026.

70.    The chart below summarizes the Attached Judgments that would be satisfied at closing of the Proposed Sale Transaction in accordance with the priority waterfall established in the Final Priority Order.[13]

| Priority | Attached Judgment Holder (Applicable Judgment(s)) | Cash Consideration or Non-Cash Consideration | Amount of Satisfied Attached Judgment as of June 25, 2025 | Amount of Satisfied Attached Judgment as of June 30, 2026 |
|---|---|---|---|---|
| 1 | Crystallex Corporation | Cash consideration | $1,009,182,817.30 | $1,019,679,606.70 |
| 2 | Tidewater Caribe S.A., Tidewater Investment SRL | Cash consideration | $77,755,054.77 | $81,306,469.53 |
| 3 | Phillips Petroleum Company Venezuela Limited and ConocoPhillips Petrozuata B.V. (Petrozuata/Hamaca Judgment) | Cash consideration | $1,378,293,951.71 | $1,412,367,042.37 |
| 4 | OI European Group B.V. | Cash consideration | $671,114,006.61 | $686,901,600.91 |
| 5 | Huntington Ingalls Incorporated | Cash consideration | $139,210,190.56 | $139,450,093.97 |
| 6 | ACL1 Investments Ltd., ACL2 Investments Ltd., LDO (Cayman) XVIII Ltd. | Cash consideration | $118,775,792.92 | $118,908,075.68 |

---

[13]    Amounts of Attached Judgments are estimated according to the claims calculations approved by the Court in its *Memorandum Order*, dated April 25, 2024.  *See* D.I. 1136 at 3 (citing D.I. 969-1).  Actual distributions to holders of Attached Judgments will be determined as of the date of the closing of the sale of the PDVH Shares.

| Priority | Attached Judgment Holder (Applicable Judgment(s)) | Cash Consideration or Non-Cash Consideration | Amount of Satisfied Attached Judgment as of June 25, 2025 | Amount of Satisfied Attached Judgment as of June 30, 2026 |
|---|---|---|---|---|
| 7 | Red Tree Investments, LLC (19-cv-2519 (S.D.N.Y.); 19-cv-2523 (S.D.N.Y.); Fee Judgment in cases 22-mc-00068 and 22-mc-00069) | Cash consideration | $324,833,910.53 | $347,095,930.57 |
| 8 | Rusoro | Non-cash consideration | $1,537,104,465.57 | $1,568,585,159.10 |
| 9 | ConocoPhillips Gulf of Paria B.V. Corocoro Judgment | Cash consideration | $48,244,419.78 | $48,296,957.36 |
| 10 | Koch | Non-cash consideration | $465,781,487.47 | $470,881,329.32 |
| 11 | Gold Reserve | Non-cash consideration | $1,177,001,991.99 | $1,255,605,277.03 |
| 12 | Siemens | Non-cash consideration | $218,257,235.60 | $232,705,880.67 |

71.     The chart attached hereto as **Exhibit D** summarizes certain material terms of the Stock Purchase Agreement compared to the Draft SPA Material Terms approved by the Court and the terms of the Stalking Horse Agreement.[14]

72.     Dalinar proposes to finance the Proposed Sale Transaction with committed financing from J.P. Morgan Chase Bank, N.A. ("**JP Morgan**"), The Toronto-Dominion Bank, New York Branch ("**TD Bank**"), and Sumitomo Mitsui Banking Corporation ("**SMBC**," and, together with JP Morgan and TD Bank, the "**Financing Parties**").  The Financing Parties are

---

[14]   As set forth above, to the extent of any inconsistency between this Recommendation and the Stock Purchase Agreement, the terms of the Stock Purchase Agreement shall prevail.

highly reputable global financial institutions.  *See* Hiltz Declaration ¶ 63.  The Financing Parties and Dalinar have executed a debt commitment letter, which is attached hereto within **Exhibit E**. Dalinar's financing structure involves Adolin Holdings Inc. ("**Adolin**"), a subsidiary of Dalinar, as the borrower of a $4.5 billion secured bridge facility (in the event Dalinar is not able to consummate a permanent financing in that amount prior to closing) (the "**Bridge Facility**"), and a $350 million asset-based pre-fund facility (the "**ABL Pre-Fund Facility**," and together with the Bridge Facility, the "**Initial Financing**"), which will roll into a $2 billion senior secured asset-based revolving credit facility after closing.  *See* Ex. E at 1, A-2, B-1.  After the Financing Parties fund the Initial Financing, Adolin will distribute the cash portion of the purchase price to the Escrow Agent (the "**Escrow Disbursement**") for distribution to the holders of Attached Judgments in accordance with the terms of the Payments Administration Agreement, attached as Exhibit B to the Stock Purchase Agreement, and consistent with the priority waterfall set by the Court pursuant to the Final Priority Order.  Following the Escrow Disbursement, Adolin will merge with and into CITGO Petroleum Corporation ("**CPC**"), resulting in CPC being the new borrower on the acquisition financing incurred in connection with the Proposed Sale Transaction.[15]

73.    Dalinar has received executed commitment letters from (i) Rusoro, (ii) Koch, (iii) Gold Reserve, and (iv) XYQ (on behalf of Siemens) providing their respective consents to receive the non-cash consideration provided under the Proposed Sale Transaction.  The executed commitment letters are attached hereto as **Exhibit F**.

---

[15]   Dalinar also submitted a Highly Confident Letter from JP Morgan (the "**JP Morgan HCL**") with respect to raising additional equity financing of up to $1.8 billion (the "**Additional Potential Equity Financing**").  The Special Master did not afford the JP Morgan HCL material weight given the Bid Requirement for bidders to have committed financing.  However, the Proposed Sale Transaction is not conditioned on Dalinar obtaining the Additional Potential Equity Financing.  A copy of the JP Morgan HCL is attached hereto within **Exhibit E**.

74.    Dalinar submitted its first topping bid package on June 3, 2025, and an amended bid package on June 18, 2025.  After a request from the Special Master to submit a revised bid, Dalinar submitted a revised bid package on the morning of June 25, 2025.  After further negotiations with the Special Master on June 25, 2025, a final bid letter in the late evening of June 25, 2025.  Dalinar's final bid letter is attached hereto as **Exhibit G**.

## IX.  SPECIAL MASTER'S RECOMMENDATION OF SALE TO DALINAR

75.    The Special Master recommends the Court enter an order substantially in the form of the proposed Sale Order attached hereto as **Exhibit A**: (i) approving the Proposed Sale Transaction with Dalinar; (ii) approving the Stock Purchase Agreement by and between Dalinar and the Special Master; (iii) authorizing the sale of the PDVH Shares free and clear of all liens, claims, encumbrances, and other interests; and (iv) granting related relief.

76.    As set forth above, in the January 27 Order, after extensive briefing from the parties-in-interest, the Court approved the Evaluation Criteria, according to which the Special Master must evaluate the stalking horse bids and the Topping Proposals.  The Evaluation Criteria contains two overarching criteria (i) purchase price and (ii) certainty of closing.  Additionally, as set forth in detail above, the Court provided detailed guidance with respect to the application of the Evaluation Criteria in the Stalking Horse Approval Order.  The Special Master considered each of the Evaluation Criteria and the Court's guidance in the Stalking Horse Approval Order, as well as in various other orders, in extensive detail in evaluating the Topping Proposals and arriving at his determination that the Proposed Sale Transaction constituted the highest and best bid for the sale of the PDVH Shares.  The Special Master also took into account the Court's consistent clarifying guidance with respect to its rulings in the Stalking Horse Approval Order provided during the Ex Parte Conference.  *See* Ex Parte Hr'g Tr. 49:9-13; 57:5-16, June 24, 2025.

A.    **Evaluation Criteria: Purchase Price**

77.    As set forth above, in the Stalking Horse Approval Order, the Court made its expectation clear that any bid that it is likely to approve "will need a balance that places much greater emphasis on price" compared to the Stalking Horse Transaction.  *See* D.I. 1741 at 3.

78.    The Proposed Sale Transaction represents the highest bid for the PDVH Shares that meets the Bid Requirements and that the Special Master believes to be capable of being timely consummated.  In its Proposed Sale Transaction, the Recommended Bidder will acquire 100% of the PDVH Shares for an aggregate purchase price of $7.382 billion which is $3.576 billion higher than the price of the Revised Stalking Horse Proposal.[16]  *See* Hiltz Decl. ¶ 63.

79.    In the Stalking Horse Approval Order the Court encouraged Dalinar to renew and improve its bid.  *See* D.I. 1741 at 5.

80.    Dalinar responded to the Court's direction by improving its purchase price from the Stalking Horse Round and proposing to pay through an additional approximately $433 million of Attached Judgments, as compared to its proposal in the Stalking Horse Round.[17]

81.    Conversely, the Revised Stalking Horse Bid did not actually improve upon the price it offered in the Stalking Horse Transaction—while it offers a more detailed breakdown of the $1.5 billion of non-cash consideration offered to Rusoro, it does not include an agreement

---

[16]   This is the same as the difference described above between Dalinar's Proposed Sale Transaction and Red Tree's original Stalking Horse Transaction because Red Tree has not procured the requisite consent of Rusoro for its proposed offering of non-cash consideration in the Revised Stalking Horse Bid.

[17]   The Proposed Sale Transaction is an improvement on Dalinar's stalking horse proposal (which was approximately $6.949 billion as of an assumed June 30, 2026 closing) by discharging the last $200 million of Gold Reserve's Attached Judgment not previously paid, as well as discharging Siemens' approximately $233 million Attached Judgment.

with Rusoro to accept that consideration.[18]  The Special Master is aware that the Stalking Horse made a concerted effort to reach a deal with Rusoro; however, without such an agreement, the $1.5 billion of additional consideration cannot be afforded anywhere near its face value in terms of proceeds to be distributed to the holders of Attached Judgments.  Even if, *arguendo*, the $1.5 billion of non-cash consideration were agreed to by Rusoro, the Special Master is skeptical that the revised purchase price (approximately $5.306 billion) and any value attributable to the Revised Stalking Horse Bid on account of closing certainty, as compared to the Dalinar Topping Bid, would be sufficient to make up for the over $2.076 billion purchase price difference.

### B.    Evaluation Criteria: Closing Certainty

82.    The Special Master considered the following non-exhaustive matters, as set forth in the Evaluation Criteria, relating to certainty of closing:

(a)    **Likelihood of Regulatory Approval**: The Special Master is reasonably satisfied that Dalinar is likely to attain the requisite regulatory approvals.  Dalinar has represented that it will make, in a timely manner, (i) all filings and disclosures necessary to comply with the regulations of OFAC, (ii) all necessary filings under the Hart-Scott Rodino Antitrust Improvements Act of 1976, as amended (the "**HSR Act**"), (iii) all necessary filings in connection with any review by the Committee on Foreign Investment in the United States ("**CFIUS**"), and (iv) all other necessary filings and submissions required under any relevant antitrust laws.  The Recommended Bidder has stated that the acquisition company created for the transaction, Dalinar, will be owned directly or indirectly by Rusoro, Koch , Gold Reserve, and XYQ.  The Special Master, upon the advice of his Advisors, determined that the Proposed Sale Transaction does not pose a significant risk from a regulatory approval perspective.  Further, Dalinar has submitted to the Special Master a "Commitment to Take Certain Regulatory Efforts" executed by Rusoro, Koch, Gold Reserve, and XYQ (the "**Regulatory Efforts Commitment**"), pursuant to which each of Rusoro, Koch, Gold Reserve, and XYQ (who are not direct parties to the Stock Purchase Agreement) make commitments to take (or commit to refrain from taking) certain actions to assist the parties with obtaining regulatory approvals, with third party beneficiary rights for the Special Master,  and the Stock Purchase Agreement includes a covenant obligating Dalinar to enforce

---

[18]    In the Stalking Horse Approval Order, the Court expressed that it "has some serious reservations about the price" of Red Tree's Stalking Horse Transaction and it expected a final bid would have a price at or exceeding Dalinar's Stalking Horse bid.  *See* D.I. 1741 at 5–6.

its rights under the Regulatory Efforts Commitment.  A copy of the Regulatory Efforts Commitment is attached hereto as **Exhibit H**.

(b)  **PDVSA 2020 Bondholders**: The Special Master acknowledges, as was the subject of litigation with respect to the Court's approval of the Stalking Horse Transaction,[19] that Dalinar's Proposed Sale Transaction contains a degree of risk with respect to the PDVSA 2020 Bondholders.[20]  The Proposed Sale Transaction contains two (2) closings with respect to its financing, as described above.  The PDVSA 2020 Bondholders have been vocal throughout these proceedings that they will seek to challenge any alleged violation of their purported rights under the CITGO Holding Pledge.  *See e.g.*, D.I. 1661 at 1–2.  The PDVSA 2020 Bondholders have asserted Dalinar's proposed financing structure violates their purported rights under the CITGO Holding Pledge.  *See* D.I. 1677 at 4-5.  On June 24, 2025, the PDVSA 2020 Bondholders filed a letter in their own litigation expressing their concerns with a recommendation and potential approval Dalinar's proposed transaction.  *See Petróleos de Venezuela, S.A. et al. v. MUFG Union Bank, N.A. et al.*, No. 1:19-cv-10023, E.C.F. 380.  On June 30, 2025, the SDNY Court scheduled a telephonic conference on July 10 to discuss the issues raised by the PDVSA 2020 Bondholders.  *See id* E.C.F. 383.  In the Stalking Horse Recommendation, the Special Master was clear that a bid does not need to eliminate all risk related to the PDVSA 2020 Bonds, including through a settlement, "in order to garner the Special Master's recommendation of a bid."  *See* D.I. 1596 at 14.  The Special Master acknowledges that there is at least some chance the PDVSA 2020 Bondholders could be successful in their efforts to enjoin a sale of the PDVH Shares similar to the Proposed Sale Transaction, though, after evaluation of the attendant risks with his Advisors, he does not believe the combination of the likelihood of such risk and the consequences of it coming to fruition outweigh the expansive gap in purchase price between the Dalinar Topping Bid and the Revised Stalking Horse Proposal.  Based on the Court's guidance, including through various orders and the June 24 Ex Parte Conference, and for the reasons set forth above the Special Master concludes that the risks relating to the PDVSA 2020 Bonds are significantly outweighed by the difference in purchase price between the Proposed Sale Transaction and the Revised Stalking Horse Bid.

(c)  **Conditionality Related to Pending or Future Litigation**: Aside from the risks associated with the PDVSA 2020 Bondholders, the Proposed Sale Transaction does

---

[19]  *See e.g.*, D.I. 1661; D.I. 1677.

[20]  Dalinar submitted a memorandum to the Special Master containing analysis with respect to the risks posed by the PDVSA 2020 Bondholders in connection with its Proposed Sale Transaction (the "**Dalinar Memorandum**").  The Dalinar Memorandum was submitted to the Special Master with a "Highly Confidential" designation pursuant to the *Confidentiality Order* dated July 6, 2021 (D.I. 291).  The Special Master affords the Dalinar Memorandum no weight with respect to his decision to recommend the Dalinar Bid and, instead, has relied primarily on the analysis provided by his Advisors.

not include any additional conditionality relating to pending or future litigation compared to the Bid Draft SPA.

(d) **Conditionality Related to Appeals of the Sale Order**: The Proposed Sale Transaction does not include any additional conditionality relating to an appeal of the Sale Order compared to the Bid Draft SPA.

(e) **Bidder's Financial Wherewithal and Certainty of Financing**: The Special Master has sufficient confidence with respect to Dalinar's financial wherewithal and certainty of financing to recommend approval of the Proposed Sale Transaction. As set forth above, the Recommended Bidder has secured financing from the Financing Parties, which are each highly reputable global financial institutions. As set forth above, the Special Master acknowledges that Dalinar's financing for its Proposed Sale Transaction is subject to risks associated with the PDVSA 2020 Bondholders. Except for the risks associated with the PDVSA 2020 Bondholders described above, the financing for the Proposed Sale Transaction contains closing conditions that either are customary or present a reasonable level of certainty under the circumstances.

(f) **Conditionality Related to Other Terms Proposed by the Recommended Bidder**: The Stock Purchase Agreement does not contain any additional conditionality with respect to its other terms compared to the Bid Draft SPA. The Bid Draft SPA contains customary conditionality such as receipt of HSR clearance and OFAC approval, accuracy of certain limited fundamental representations and warranties in all material respects, and compliance with covenants in all material respects, and the absence of an occurrence of a "Company Material Adverse Effect." Aside from conditionality associated with the PDSVA 2020 Bondholders, discussed in detail above, the financing documents proposed by the Recommended Bidder otherwise have closing conditions that either are customary or present a reasonable level of certainty under the circumstances.

(g) **Certainty of Obtaining Requisite Consents From Holders of Attached Judgments Proposed to Receive Non-Cash Consideration**: As set forth above, the Recommended Bidder has obtained consent from Rusoro, Koch, Gold Reserve, and XYQ (in satisfaction of Siemens' Attached Judgment) to receive non-cash consideration.

## C.   <u>Evaluation Criteria: Other.</u>

83.    In the Stalking Horse Approval Order, the Court outlined that the Special Master must consider that the Court or an appellate court may reject a bid that places substantial value on a settlement with the PDVSA 2020 Bondholders considering that subsequent events could

occur invalidating or inhibiting any rights of the PDVSA 2020 Bondholders.  *See* D.I. 1741 at 2-3, 6-7, and 7-8.

84.      Accordingly, the Special Master requested that Red Tree improve its bid to account for the scenario where the PDVSA 2020 Bondholders' purported rights were determined to be invalid in the SDNY Litigation prior to closing.  Specifically, the Special Master requested a termination right to be included in the stock purchase agreement in the event the PDVSA 2020 Bondholders are unsuccessful in the SDNY Litigation.  Red Tree was not able to secure agreement from the PDVSA 2020 Bondholders to this request.  The Special Master alternatively proposed to Red Tree that it negotiate a mechanism in a transaction support agreement with the PDVSA 2020 Bondholders which contemplated lower economics for the PDVSA 2020 Bondholders in the event they were unsuccessful in the SDNY Litigation.  Likewise, Red Tree informed the Special Master that it was not able to secure the consent of the PDVSA 2020 Bondholders to this request.

85.      Accordingly, the Special Master concludes that the Revised Stalking Horse Bid is not a substantial improvement to the Stalking Horse Bid.  Importantly, it does not address the matters the Court expected topping bidders to address, including increasing its price and taking into account in its settlement with the PDVSA 2020 Bondholders the possibility the PDVSA 2020 Bondholders are unsuccessful in the SDNY Litigation.  In light of the Court's guidance and the lack of material improvements over the Stalking Horse Bid, the Special Master believes that the Revised Stalking Horse Bid is not the best bid that he received leading up to this Recommendation.

## X.    **BASIS FOR APPROVING THE PROPOSED SALE TRANSACTION**

### A.    **The Proposed Sale Transaction Represents a Reasonable Exercise of this Court's Authority and Should be Approved.**

86.      Ample authority exists for approval of the Proposed Sale Transaction envisioned by this Recommendation.  The sale of the PDVH Shares is a judicial sale.  *See*

*Crystallex Int'l Corp. v. Bolivarian Republic of Venezuela*, 24 F.4th 242, 250 (3d Cir. 2022). It is well-settled that federal courts have the authority to decree the sale of property to satisfy a judgment, and "[t]here can be no doubt that Congress has authorized the federal judiciary to use sound discretion in setting the terms and conditions for judicial sales." *United States v. Branch Coal Corp.*, 390 F.2d 7, 10 (3d Cir. 1968) (explaining that "appellate courts will not disturb the exercise of a district court's discretion in setting the terms and conditions for a judicial sale and the confirmation thereof" except in cases of abuse); *United States v. Zimmerman*, 2023 WL 2882696, at *2 (3d Cir. Apr. 11, 2023) (finding that the district court was authorized in its discretion to include certain provisions in its order of sale).

87.    It is likewise well-settled that a special master, appointed as an officer of the court, is permitted to take all necessary actions authorized by a federal court to sell property at a judicial sale, and is vested with "reasonable discretion" as to the manner of that exercise. *See Blossom v. Milwaukee & Chi. R.R. Co.*, 70 U.S. 196, 208 (1865) ("Officers appointed under such decrees, and directed to make such sales, have the power to accomplish the object; but they are usually invested with a reasonable discretion as to the manner of its exercise, which they are not at liberty to overlook or disregard."); *Pewabic Min. Co. v. Mason*, 145 U.S. 349, 361–62 (1892) (describing the use of special masters in a judicial sale).

88.    In determining whether to authorize a judicial sale, courts consider whether: (i) parties received sufficient notice of the judicial sale; and (ii) the sale complied with the Court's directives. *See, e.g.*, *Breeding Motor Freight Lines v. Reconstruction Fin. Corp.*, 172 F.2d 416, 422–24 (10th Cir. 1949); *A.H. & R.S. Coal Corp. v. United States*, 461 F. Supp. 752, 755 (W.D. Pa. 1978); *First N. Bank & Tr. Co. v. United States*, Case No. 3:13–CV–01446, 2014 WL 2810118, at *5 (M.D. Pa. June 20, 2014).

1.    ***The Sale Process Parties and Interested Parties Received Proper Notice of the Marketing Process and the Proposed Sale Transaction.***

89.    "The purpose of a notice of a judicial sale is to inform the public of the kind and condition of the property to be sold, the time, the place, and the terms of the sale." *Breeding Motor*, 172 F.2d at 422.  Notice is required in advance of a judicial sale, and the notice of such sale must contain a description of the property that enables a purchaser "in the exercise of ordinary diligence to identify it." *Id.*  Notice "is sufficient if the information given in the notice enables the public to understand what property is being offered for sale and to identify it if more particular information is desired." *Id.*  "[A] minute description extending into details is not essential to a valid sale." *Id.*

90.    "An elementary and fundamental requirement of due process in any proceeding which is to be accorded finality is notice reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections." *Mullane v. Cent. Hanover Bank & Tr. Co.*, 339 U.S. 306, 314 (1950).  "The notice must be of such nature as reasonably to convey the required information . . . and it must afford a reasonable time for those interested to make their appearance." *Id.*  "But if with due regard for the practicalities and peculiarities of the case these conditions are reasonably met the constitutional requirements are satisfied." *Id.* at 314–15.

91.    Once the property at issue has been sold, an officer selling the property is required to "report that he has sold the property, naming the person purchasing; also, stating the amount for which the sale was made, and that it was the highest and best bid." *Blossom*, 70 U.S. at 201.

92.    As detailed above, the Sale Procedures Order clearly lays out the Notice Procedures the Special Master was required to follow in order to give notice to any parties that

may have an interest in the PDVH Shares, including the Sale Process Parties, creditors of the Republic, potential bidders with an interest in the PDVH Shares, and any other parties with any interests in the PDVH Shares.  Specifically, the Sale Procedures Order required the Special Master to publish two (2) notices: (i) one following the launch of the sale and (ii) one prior to any auction or designation of any stalking horse bidder as the Recommended Bidder.  *See* D.I. 481 ¶ E.  The Special Master was required to publish these notices in at least four (4) specific publications outlined in the Sale Procedures Order.  *See id.*

93.    The Special Master, in accordance with the Sale Procedures Order, has published Sale Notices at least eight (8) times since the Launch Date, in at least four (4) different publications.  *See* Publication Affidavits, Ex. C.  Each Sale Notice described the assets being sold (i.e., the PDVH Shares), the Bidding Procedures, and the Marketing Process.  *See id.*  The Sale Notices also provided notice of key dates and deadlines for the sale process, including, among other things, the Launch Date, the First Round Indication of Interest Deadline, the Second Round Bid Deadline, the deadline to submit a stalking horse bid, the deadline to submit a topping bid, and the time and location of the Sale Hearing.  Accordingly, all parties with an interest in the sale of PDVH Shares have had sufficient notice of the Marketing Process and Proposed Sale Transaction. In addition to the published Sale Notices, all parties with a valid interest or perfected lien in the PDVH Shares (*i.e.*, Crystallex, ConocoPhillips, and the Additional Judgment Creditors) have received notice from the Special Master of important milestones relating to the Marketing Process and Proposed Sale Transaction through a multitude of reports, motions, and notices submitted to the Court, as well as from regular and public status conferences, hearings, and orders of the Court. *See, e.g.*, D.I. 739; D.I. 771; D.I. 839; D.I. 871; D.I. 878; D.I. 1134; D.I. 1186; D.I. 1517; D.I. 1745; D.I. 1779.

94.     Further, the Sale Process Parties, including the Venezuela Parties, and other interested parties have been afforded adequate opportunities to object and be heard throughout the Marketing Process.

95.     Because all essential and necessary parties to this Action have received adequate and timely notice of the Proposed Sale Transaction, the Marketing Process, the Bidding Procedures, and the Sale Hearing, they will have or have had sufficient opportunities to appear and defend their interests in or claims to the PDVH Shares.  As a result, the requirements of due process have been satisfied.

2.      ***The Proposed Sale Transaction Complies with the Court's Directives Under the Sale Procedures Order to Produce a Fair and Reasonable Purchase Price for the Shares.***

96.     "To be classified as a judicial sale, the sale 'must be based upon an order, decree or judgment directing sale.'" *First Northern*, 2014 WL 2810118, at *5 (quoting *A.H. & R.S. Coal*, 461 F. Supp. at 755); *see also Branch Coal*, 390 F.2d at 9 ("A judicial sale . . . is conducted pursuant to directions of the court and the federal statutes."); *Breeding Motor*, 172 F.2d at 423 ("An officer selling property under a judgment of a court can sell only in substantial compliance with the terms and conditions provided in the judgment and the law governing a sale of that kind which is incorporated into and made a part of the judgment.").

97.     The Special Master and his Advisors have complied with the Bidding Procedures, the Sale Procedures Order, and the December 31 Order in all respects.

98.     The Special Master, with the assistance of his Advisors, has identified the best Topping Proposal that the Special Master reasonably believes to be capable of being timely consummated.  *See* D.I. 481 ¶ 12; *see also* D.I. 480-1, Ex. 1, Bidding Procedures at 17.  The Bidding Procedures were carefully designed to facilitate a robust and competitive bidding process

and have provided an appropriate framework for the Special Master and his Advisors to review, analyze, and compare the bids.

99.     Each of the Topping Proposals are the direct result of a competitive and robust bidding process that generated the greatest level of interest for the PDVH Shares under the circumstances.  The Special Master and his Advisors have reviewed all Topping Proposals and have determined that the purchase price under the Recommended Bidder's Stock Purchase Agreement is fair and reasonable for the PDVH Shares.

### 3.    *The Court Has Authority to Preserve the Value of the PDVH Shares by Directing Compliance with the Sale Order.*

100.    "[A]ll courts established by Act of Congress may issue all writs necessary or appropriate in aid of their respective jurisdictions and agreeable to the usages and principles of law." 28 U.S.C. § 1651.  The United States Supreme Court has established that this authority includes the power to enforce and protect federal court orders.  *See United States v. New York Tel. Co.*, 434 U.S. 159, 172 (1977) ("This Court has repeatedly recognized the power of a federal court to issue such commands under the All Writs Act as may be necessary or appropriate to effectuate and prevent the frustration of orders it has previously issued in its exercise of jurisdiction otherwise obtained.").  "The power conferred by the [All Writs] Act extends, under appropriate circumstances, to persons who, though not parties to the original action or engaged in wrongdoing, are in a position to frustrate the implementation of a court order or the proper administration of justice, and encompasses even those who have not taken any affirmative action to hinder justice." *Id.* at 174 (internal quotations omitted).

101.    The Court can direct compliance with the Sale Order to maintain the status quo as to property subject to judgments and prevent the frustration of those judgments.  If the Court adopts this Recommendation, to preserve the value of the PDVH Shares and prevent the

frustration of Additional Judgment Creditors who will not recover if the value of the shares is diminished, the Court can and should direct compliance with interim operating covenants contained in the Stock Purchase Agreement and Transaction Documents (as defined in the Stock Purchase Agreement) and enjoin any person from taking actions adversely affecting, interfering with, or frustrating the ability of the Special Master to transfer the PDVH Shares to the Recommended Bidder.  *See, e.g.*, *Berger v. Zeghibe*, 666 F. App'x. 119, 121 (3d Cir. 2016) (enjoining a non-party to maintain the status quo as to property subject to an attached judgment); *Catalytic, Inc. v. Monmouth & Ocean Cty. Bldg. Trades Council*, 829 F.2d 430, 434 (3d Cir. 1987) (enjoining a non-party to enforce a federal order).

### B.    The PDVH Shares Should Be Sold Free and Clear of Liens, Claims, and Encumbrances.

102.    Pursuant to the Sale Procedures Order, the Court has ordered the sale of the PDVH Shares "free and clear of any claims, encumbrances, and liabilities" such that the sale "may constitute a full and complete general assignment, conveyance, and transfer of all of PDVSA's or any other person's right, title, and interest in the PDVH Shares and may provide for the valid transfer under applicable law of good and marketable title to the PDVH Shares to the Recommended Bidder free and clear of all claims, encumbrances, and liabilities attaching to the proceeds of any Proposed Sale Transaction."  D.I. 481 ¶ 14.

103.    It is well-established that courts sitting in equity may, under proper circumstances, order the sale of property free and clear of all encumbrances.  *See Miners' Bank of Wilkes-Barre v. Acker*, 66 F.2d 850, 853 (3d Cir. 1933) ("A court of equity under proper circumstances has power to order a receiver to sell property free and clear of all incumbrances, and to deny the mortgagee the right to foreclose his mortgage."); *First Nat'l Bank of Cleveland v. Shedd*, 121 U.S. 74, 81, 86–87 (1887) (affirming a sale of property of a railroad company "freed

and discharged from all liens and incumbrances whatsoever"); *People's-Pittsburgh Tr. Co. v. Hirsch*, 65 F.2d 972, 973 (3d Cir. 1933) (finding it was appropriate to sell a tract of land free and clear of liens); *Broadway Tr. Co. v. Dill*, 17 F.2d 486 (3d Cir. 1927) ("The court had jurisdiction and power . . . to order a sale" by a receiver free of encumbrances "under its general equity authority as a federal court.").

104.    Courts have ordered sales of property free and clear of all encumbrances on three independent grounds.  Any one of these grounds is sufficient to order the sale of the property free and clear of any liens, claims, or encumbrances.  Here, all three of these bases support a sale of the PDVH Shares free and clear of all liens and encumbrances.

105.    *First*, an unencumbered sale is generally appropriate where such a sale will attract buyers and ensure the best price for the assets.  *See, e.g.*, *Spreckels v. Spreckels Sugar Corp.*, 79 F.2d 332, 334–35 (2d Cir. 1935); *Dill*, 17 F.2d at 486 (confirming that the lower court had the power to sell timber that had been in legal suspense for several years, and the discretion to the sell it free and clear of liens in order to attract buyers); *Cashin v. Murphy*, 132 Miss. 834, 96 So. 747, 749 (Miss. 1923) (selling property free and clear to encourage prospective purchasers and obtain best return); *Lasley v. Scales*, 103 S.E. 214, 215 (N.C. 1920) (selling property free and clear to obtain best price).

106.    The Marketing Process has been designed to attract as many buyers as possible and result in a value-maximizing sale of the PDVH Shares to satisfy as many of the judgments of Crystallex, ConocoPhillips, and the Additional Judgment Creditors as possible.  In some instances, those creditors have been pursuing litigation and the satisfaction of their judgments against the Venezuela Parties for nearly a decade.  To ensure the Marketing Process would result in a value-maximizing Proposed Sale Transaction, the Court used the carrot of a free

and clear sale to bring competitive bidders to the table, ultimately resulting in five (5) Topping Proposals, two (2) of which were Conforming Bids. Absent the understanding that the PDVH Shares would be sold free and clear of liens and encumbrances, the value of the sale would have been lower because: (i) fewer bidders would have been interested, reducing competition, and (ii) the value of the shares themselves would have been lower as bidders would have been compensated for the risk in the price. Significantly, all Qualified Bids submitted to the Special Master have been premised on the understanding that the PDVH Shares would be sold free and clear of liens and encumbrances.

107.    *Second*, an unencumbered sale of assets is also generally appropriate where the sale will maximize creditors' recoveries. *See, e.g.*, *State ex rel. W.E. Dooley & Co. v. Superior Court*, 222 P. 492, 493 (Wash. 1924) (explaining that the court may order a sale free and clear to conserve property and make proceeds go as far as possible to cover obligations); *Darley v. Ala. Pub. Utils. Co.*, 183 So. 447, 448 (1938) ("The court has full power to make such sale free from liens and incumbrances without awaiting the result of litigation touching the priority or validity of alleged incumbrances on the property, when such sale is necessary to protect the interest of all parties.").

108.    Without the protection of an unencumbered sale of the PDVH Shares, potential bidders would have been forced to price into their bids the risk of taking the PDVH Shares subject to potentially hundreds of millions of dollars' worth of judgments. Without question, such a scenario would significantly depress the prices offered for the PDVH Shares and in turn would depress the resulting proceeds that could be distributed to the judgment creditors. To avoid that scenario and maximize creditor recoveries, the sale here must be unencumbered.

109.    *Third*, the weight of authority supports the power of a court of equity to order a sale free and clear in instances where the public has a significant interest in the outcome of this Proposed Sale Transaction.  *See Miners' Bank of Wilkes-Barre*, 66 F.2d at 853; *Spreckels*, 79 F.2d at 334; *see also Pewabic Min. Co.*, 145 U.S. at 357–59 ("There comes a time in the history of a litigation like this when . . . there must be a sale . . . . A speedy end of litigation, as speedy as is consistent with the rights of each party, is to be desired.").

110.    The public has a significant interest in the outcome of this Proposed Sale Transaction.  The timely enforcement of court-ordered judgments is integral to a functioning legal system and critical to the public's interest.  *See State Farm Mut. Auto. Ins. Co. v. Am. Rehab & Physical Therapy, Inc.*, 376 F. Appx. 182, 184 (3d Cir. 2010) ("The public has an interest in the enforcement of judgments."); *W.R. Grace & Co. v. Local Union 759, Int'l Union of United Rubber*, 461 U.S. 757, 766 (1983) ("It is beyond question that obedience to judicial orders is an important public policy.").  The Proposed Sale Transaction represents the best opportunity to satisfy the billions of dollars of unpaid judgments of Crystallex, ConocoPhillips, and as many Additional Judgment Creditors as possible after years—and, in some cases, decades—of litigation and many unsuccessful attempts to recover these losses.  Thus, a free and clear sale of the PDVH Shares is clearly warranted in this case.

111.    In a similar vein, the Court should order that the Recommended Bidder may purchase the PDVH Shares free and clear of any "successor liability" claims.

112.    A buyer and its affiliates generally may not be held liable for successor liability claims.  *Brickley for CryptoMetrics, Inc. Creditors' Tr. v. ScanTech Identification Beams Sys., LLC*, 566 B.R. 815, 854 (W.D. Tex. 2017) ("Under Delaware law, when one company sells or otherwise transfers all of its assets to another company, the buyer generally is not responsible

for the seller's liabilities[.]" (citation omitted)).  Although courts have recognized four exceptions to that general rule, none of the exceptions apply here.

113.    *First*, successor liability applies if the buyer assumes liability.  *See id.*  In this case, the Recommended Bidder did not assume the liabilities of PDVSA.  *See* D.I. 481 ¶ 14.  Rather, the Recommended Bidder agreed to purchase the PDVH Shares based on the understanding that the sale would occur free and clear of any successor liability pursuant to the Sale Procedures Order.

114.    *Second*, successor liability applies if the buyer's purchase creates a de facto merger or consolidation with the previous owner.  *See Brickley for CryptoMetrics*, 566 B.R. at 854.  Neither the Recommended Bidder nor any of its affiliates effected a consolidation, merger, or de facto merger with or into PDVSA.

115.    *Third*, successor liability applies if the buyer is a mere continuation of the seller corporate entity under a different name.  *See id.*  The "mere continuation" theory is "narrowly construed" by Delaware courts and requires that the new company be the "same legal entity" as the old company.  *Fountain v. Colonial Chevrolet Co.*, 1988 WL 40019, at *8–9 (Del. Super. Ct. Apr. 13, 1988) (citation omitted) (explaining that the new company "must be the same legal person, having a continued existence under a new name").  In this case, the Recommended Bidder is not the same legal entity as PDVSA—the two entities have no relation to one another.  *See, e.g.*, *Magnolia's at Bethany, LLC v. Artesian Consulting Engineers, Inc.*, 2011 WL 4826106, at *3 (Del. Super. Ct. Sept. 19, 2011) (To determine whether the new company is the same legal entity, courts consider the following elements: "the common identity of the officers, directors, or stockholders of the predecessor and successor corporations, and the existence of only one corporation at the completion of the transfer.").

116.    *Fourth*, successor liability applies if fraud has taken place.  *See Brickley for CryptoMetrics*, 566 B.R. at 854.  Here, no fraud has occurred.  The Special Master carried out the Proposed Sale Transaction in accordance with the Court's Sale Procedures Order and its directive to conduct a competitive and robust bidding process that is fair to all parties and potential bidders.  *See* D.I. 481 ¶ C.

## C.    The Bidding and Sale Process Were Conducted in Good Faith

117.    A judicial sale should be upheld, even in the face of challenges as long as it is conducted in good faith.  Indeed, "[t]he rule is well settled that a judicial sale regularly made in the manner prescribed by law, upon due notice, and without fraud, unfairness, surprise or mistake, will not generally be set aside or refused confirmation on account of mere inadequacy of price, however great, unless the inadequacy is so gross as to shock the conscience and raise a presumption of fraud, unfairness, or mistake."  *See e.g.*, *Speers Sand & Clay Works v. Am. Tr. Co.*, 52 F.2d 831, 835 (4th Cir. 1931) (citation omitted); *see also* 47 Am. Jur. 2d Judicial Sales § 188 (updated May 2024) ("If the officer acted in good faith in making the sale, a difference of opinion among witnesses as to the value of the property furnishes no ground for disturbing the sale . . . .").  Here, the Proposed Sale Transaction is the product of arm's-length, good-faith negotiations, which comply with the Sale Procedures Order and applicable law.  There has been no fraud, unfairness, surprise, or mistake, and the sale price is not so low as to shock the conscience.

118.    Moreover, a purchaser in a judicial sale acts in good faith as long as the purchaser does not engage in misconduct involving fraud, collusion between the purchaser and other bidders, or efforts to take grossly unfair advantage of other bidders.  *See In re Rock Indus. Mach. Corp.*, 572 F.2d 1195, 1198 (7th Cir. 1978); *In re Suchy*, 786 F.2d 900, 902 (9th Cir. 1985).  The Special Master and his Advisors are aware of no misconduct by Dalinar.  Dalinar has proceeded in good faith in all respects in that, among other things, (i) Dalinar complied with the

provisions of the Sale Procedures Order, Bidding Procedures, and December 31 Order, including compliance with confidentiality obligations and restrictions under the Sale Procedures Order and the Bidding Procedures and any applicable non-disclosure or confidentiality agreement; (ii) Dalinar's bid was subjected to competitive Bidding Procedures as set forth in the Sale Procedures Order and December 31 Order; (iii) all consideration to be provided by Dalinar and all other material agreements or arrangements entered into by the Recommended Bidder and the Special Master in connection with the Proposed Sale Transaction have been disclosed and are appropriate; and (iv) the negotiation and execution of transaction documents were at arm's-length and in good faith. Accordingly, Dalinar has acted in good faith throughout the bidding and sale process.

### D.    The Recommended Bidder Will Acquire All Necessary Licenses to Ensure Timely Consummation of the Proposed Sale Transaction.

119.    The Bidding Procedures require the Dalinar to provide,

A statement or evidence (i) that the Potential Bidder has made or will make in a timely manner (a) all filings and disclosures necessary to comply with the regulations of OFAC (or that the Potential Bidder has already received any necessary authorization), (b) all necessary filings under the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended, and any other antitrust laws, as applicable, and pay the fees associated with such filings and (c) all necessary filings in connection with any applicable review by the Committee on Foreign Investment in the United States (CFIUS); (ii) of the Potential Bidder's plan and ability to obtain or make all requisite shareholder, governmental, regulatory, or other third-party approvals, consents and notifications (including a list of all contemplated third-party approvals, consents and notifications) and the proposed timing for the Potential Bidder to undertake the actions required to obtain or make such approvals, consents and notifications; (iii) that the Bid is reasonably likely, after taking into consideration antitrust and any other regulatory matters, the Potential Bidder's prior experience, and any other relevant considerations, to be consummated, if selected as the Successful Bid, within a time frame acceptable to the Special Master; and (iv) of the Potential Bidder's consent for the Special Master, in his discretion, to share with U.S. Government regulators, including OFAC, information pertaining to the Potential Bidder or the Bid. A Potential Bidder further agrees that its legal counsel will coordinate in good faith with the Special Master's legal counsel to discuss and explain such Potential Bidder's regulatory and other consent analysis, strategy, and timeline for securing all such approvals and consents as soon as reasonably practicable.

D.I. 480-1, Ex. 1, Bidding Procedures at 10.

120.    Dalinar has represented to the Special Master that it (i) will make all of the aforementioned filings and disclosures in a timely manner, (ii) consents to the Special Master, in his discretion, sharing with U.S. Government regulators, including OFAC, information pertaining to Dalinar or the Proposed Sale Transaction, and (iii) affirms that it will coordinate in good faith with the Special Master's legal counsel to discuss and explain Dalinar's regulatory and other consent analysis, strategy, and timeline for securing all such approvals and consents as soon as reasonably practicable.

# XI.    CONCLUSION

121.    For the reasons set forth herein, the Special Master recommends that the Court approve the sale of the PDVH Shares to Dalinar, and its Proposed Sale Transaction, and enters an order substantially in the form of the Sale Order.

Respectfully submitted,

POTTER ANDERSON & CORROON LLP

OF COUNSEL:

Matthew S. Barr (Admitted *pro hac vice*)
David Lender (Admitted *pro hac vice*)
Jared R. Friedmann (Admitted *pro hac vice*)
Chase A. Bentley (Admitted *pro hac vice*)
WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
Matt.Barr@weil.com
David.Lender@weil.com
Jared.Friedmann@weil.com
Chase.Bentley@weil.com

Dated: July 2, 2025
12341347 / 21202.00001

By:    */s/ Myron T. Steele*
Myron T. Steele (#0002)
Matthew F. Davis (#4696)
Bindu A. Palapura (#5370)
Malisa C. Dang (#7187)
Hercules Plaza, 6th Floor
1313 North Market Street
P.O. Box 951
Wilmington, DE 19801
Telephone: (302) 984-6000
Facsimile: (302) 658-1192
msteele@potteranderson.com
mdavis@potteranderson.com
bpalapura@potteranderson.com
mdang@potteranderson.com

*Counsel for Special Master Robert B. Pincus*

47