## Exhibit A

**Proposed Sale Order**

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

CRYSTALLEX INTERNATIONAL CORP.,          )
                                         )
                    Plaintiff,           )
                                         )
          v.                             )      Misc. No. 17-151-LPS
                                         )
BOLIVARIAN REPUBLIC OF                   )
VENEZUELA,                               )
                                         )
                    Defendant.           )

### ORDER (I) APPROVING STOCK PURCHASE AGREEMENT, (II) AUTHORIZING SALE OF THE PDVH SHARES FREE AND CLEAR OF LIENS, CLAIMS, ENCUMBRANCES, AND OTHER INTERESTS, AND (III) GRANTING RELATED RELIEF

Upon the recommendation, dated July 2, 2025 (the "**Recommendation**"),[1] of Robert B. Pincus, in his capacity as Special Master for the United States District Court for the District of Delaware (the "**Special Master**") in the above captioned case (the "**Action**"), recommending entry of an order authorizing and approving the sale of the PDVH Shares pursuant to, among other things, 28 U.S.C. § 2004, Rules 53 and 69 of the Federal Rules of Civil Procedure, Section 324 of Title 8 of the Delaware Code, the Court's equitable powers to enforce its orders and judgments, and the All Writs Act; and this Court having taken into consideration this Court's prior orders, including the *Order Regarding Special Master* [D.I. 277] (the "**Special Master Order**"), the *Memorandum Order* [D.I. 646], the *Final Priority Order* [D.I. 1102] (the "**Final Priority Order**"), and the *Sixth Revised Proposed Order (A) Establishing Sale and Bidding Procedures, (B) Approving Special Master's Report and Recommendation Regarding Proposed Sale*

---

[1] Capitalized terms used but not herein defined shall have the meanings ascribed to such terms in the Sale Procedures Order, the Recommendation or the Stock Purchase Agreement (each as herein defined), as applicable and as context may require.

*Procedures Order, (C) Affirming Retention of Evercore as Investment Banker by Special Master and (D) Regarding Related Matters* [D.I. 481], (the "**Sale Procedures Order**", and the bidding procedures for the sale of the PDVH Shares approved thereby, the "**Bidding Procedures**") and granting certain related relief, the *Memorandum Order Regarding Sale Process and Litigation* [D.I. 1517] (the "**December 2024 Order**"), the *Order* [D.I. 1741] designating Red Tree Investments, LLC as the Stalking Horse (the "**Stalking Horse Order**"), and the *Order Regarding Schedule for the Remainder of the Marketing Process* [D.I. 1745] (the "**April 2025 Scheduling Order**"), the *Order* entering the revised proposed scheduled proposed by the Special Master [D.I. 1809] (the "**June 2025 Scheduling Order**"); and four rounds of bidding (the "**Bidding Rounds**") having been held for the consideration of Qualified Bids and the selection of a Successful Bidder (each as defined in the Sale Procedures Order and the Bidding Procedures); and Buyer[2] having submitted the best bid for the PDVH Shares and having been recommended as the Successful Bidder by the Special Master with respect to the PDVH Shares; and this Court having conducted a hearing on [August 18 to August 20, 2025] (the "**Sale Hearing**") to consider the Sale Transaction (as defined herein), during which time all interested parties were offered an opportunity to be heard with respect to the Recommendation; and this Court having reviewed and considered (i) the Recommendation and the exhibits thereto, including[3] the Stock Purchase Agreement, dated as of June 25, 2025 (together with the exhibits thereto, as may be amended, modified, or supplemented from time to time in accordance with the terms thereof, the "**Stock**

---

[2]    For the purposes of this Order, "**Buyer**" means Dalinar Energy Corporation, a Delaware corporation, (together with its permitted assigns pursuant to Section [9.10] of the Stock Purchase Agreement (as defined below)); *provided*, *however*, that from and after the Closing, the term Buyer shall exclude PDVH and any of its direct or indirect subsidiaries.

[3]    The term "including," wherever it is used in this Order, means "including, without limitation."

**Purchase Agreement**") attached as **Exhibit A** hereto, by and among the Special Master and Buyer, whereby the Special Master, at the direction of the Court, has agreed to, among other things, sell or cause to be sold the PDVH Shares to Buyer, on the terms and conditions set forth in the Stock Purchase Agreement (the "**Sale Transaction**"); (ii) the notarized affirmations of publication attached hereto as **Exhibit B** (collectively, the "**Publication Affidavits**"); and (iii) the arguments of counsel made, and the evidence therein proffered or adduced at the Sale Hearing; and due notice of the Recommendation, the Sale Hearing, and the form of this Order having been provided; and all objections to the Sale Transaction and the Order having been withdrawn, resolved, or overruled; and it appearing that the relief granted herein is consistent with the directives of the Sale Procedures Order; and upon the record of the Sale Hearing and this Action; and after due deliberation and sufficient cause appearing therefor;

  **IT IS HEREBY FOUND AND DETERMINED THAT**:

  A. *Jurisdiction and Venue*.  The Court has jurisdiction to grant the relief recommended in the Recommendation pursuant to 28 U.S.C. §§ 1330, 1367, and 1605(a)(6) and its ancillary jurisdiction to enforce federal judgments.  Venue is proper before the Court pursuant to 28 U.S.C. § 1963.  Further, the Court has jurisdiction over the Additional Judgment Creditors (as defined in the Sale Procedures Order and as set forth in the Final Priority Order) and all other interested parties appearing in this proceeding pursuant to 28 U.S.C. § 1367 and over Crystallex International Corporation ("**Crystallex**") pursuant to ancillary jurisdiction for enforcing an arbitral award reduced to a federal judgment.  *See Crystallex Int'l Corp. v. Bolivarian Republic of Venezuela*, 932 F.3d 126 (3d Cir. 2019).

  B. *Statutory and Rule Predicates*.  The predicates for the relief granted herein include (i) Rules 53 and 69 of the Federal Rules of Civil Procedure, (ii) Section 324 of Title 8 of the

Delaware Code, (iii) the Court's general equitable powers to enforce its orders and judgments, *see Chambers v. NASCO, Inc.*, 501 U.S. 32, 43 (1991) (quoting *Link v. Wabash R.R. Co.*, 370 U.S. 626, 630–31 (1962)), (iv) the All Writs Act (*see United States v. N.Y. Tel. Co.*, 434 U.S. 159, 172 (1977) ("This Court has repeatedly recognized the power of a federal court to issue such commands under the All Writs Act as may be necessary or appropriate to effectuate and prevent the frustration of orders it has previously issued in its exercise of jurisdiction otherwise obtained.")), and (v) 28 U.S.C. § 2004.

      C.    *Sale Notice*.  As evidenced by the Publication Affidavits and the status reports filed on the Court's public docket on October 23, 2023 [D.I. 771], January 8, 2024 [D.I. 839], and April 16, 2024 [D.I. 1134] (the "**Status Reports**"), and the Court's orders setting deadlines for the Marketing Process including the December 2024 Order, the April 2025 Scheduling Order, the *Order* [D.I. 1779] extending the topping period, and the June 2025 Scheduling Order: (i) due, proper, timely, adequate, and sufficient notice of the PDVH Shares being sold, the Recommendation, the Bidding Rounds, the Bidding Procedures (including the bidding process and the deadline for submitting bids for the Bidding Rounds), the Sale Hearing, the Sale Transaction, and the Order was provided by the Special Master; (ii) such notice was and is good, sufficient, and appropriate under the particular circumstances and complies with the Sale Procedures Order, the Bidding Procedures, and applicable law; and (iii) no other or further notice of the Recommendation, the Bidding Rounds, the Bidding Procedures, the Sale Hearing, the Sale Transaction, or the Order is required.  With respect to Persons whose identities are not reasonably ascertained by the Special Master, as evidenced by the Publication Affidavits, publication of the notice each in the national print editions of *USA Today* on January 12, 2024, January 19, 2024, June 3, 2024, June 10, 2024, February 25, 2025, March 4, 2025, May 5, 2025, and May 12, 2025,

*the Wall Street Journal* on January 12, 2024, January 19, 2024, June 1, 2024, June 8, 2024, February 24, 2025, March 3, 2025, May 3, 2025, and May 10, 2025, the *Delaware State News* on January 12, 2024, January 19, 2024, June 2, 2024, June 11, 2024 (e-edition), June 12, 2024 (print edition), February 26, 2025, March 5, 2025, May 7, 2025, and May 14, 2025, the *Delaware News Journal* on January 12, 2024, January 19, 2024, June 4, 2024, June 11, 2024, February 25, 2025, March 4, 2025, May 6, 2025, and May 13, 2025, as well as the Venezuelan publication *La Razón* on June 9, 2024, March 2, 2025, March 9 2025, May 4, 2025, and May 11, 2025, was sufficient and reasonably calculated under the circumstances to reach such Persons and is in compliance with the Sale Procedures Order, Bidding Procedures, and applicable law including Section 324 of Title 8 of the Delaware Code (collectively, the "**Publication Notices**").

D.      *Notice and Opportunity to Object.*  As evidenced by the Publication Affidavits and the Status Reports [D.I. 771, 839 & 1134], a fair and reasonable opportunity to object to, and be heard with respect to, the Recommendation, the Bidding Rounds, and the Sale Transaction has been given to any and all Persons who are or could be entitled to notice pursuant to the Sale Procedures Order and the Bidding Procedures, including, but not limited to, the following: (i) Buyer by its counsel Brown Rudnick LLP and Norton Rose Fulbright US LLP;  (ii) PDVH Holding, Inc. ("**PDVH**"), by its counsel Eimer Stahl LLP ("**Eimer Stahl**"); (iii) CITGO Petroleum Corporation ("**CITGO**"), by its counsel Eimer Stahl; (iv) Petróleos de Venezuela, S.A., by its counsel Curtis, Mallet-Prevost, Colt & Mosle LLP ("**PDVSA**"); (v) the Bolivarian Republic of Venezuela (the "**Republic**"), by its counsel Munger, Tolles & Olson LLP; (vi) Crystallex International Corporation, by its counsel Gibson Dunn & Crutcher, LLP; (vii) Phillips Petroleum Company Venezuela Limited and ConocoPhillips Petrozuata B.V. ("**ConocoPhillips**"), by their counsel Wachtell, Lipton, Rosen & Katz; (viii) Former Additional Judgment Creditor, Altana

Credit Opportunities Fund SPC, Altana Credit Opportunities Fund 1 SP, and Altana Funds Ltd. Cayman, by their counsel Bayard, P.A.; (ix) Additional Judgment Creditor, ACL1 Investments Ltd., ACL2 Investments Ltd. and LDO (Cayman) XVIII Ltd., by their counsel Riley & Jacobson, PLC;  (x) Additional Judgment Creditor, Contrarian Capital Fund I, L.P., Contrarian Dome du Gouter Master Fund, LP, Contrarian Capital Senior Secured, L.P., Contrarian EM II, LP, Contrarian Emerging Markets, L.P., Boston Patriot Summer St LLC, Polonius Holdings, LLC, Emma I Master Fund, L.P., E1 SP, a Segregated Account of EMAP SPC, and Contrarian Capital Management, L.L.C., Contrarian Funds, L.L.C., by their counsel MoloLamken LLP; (xi) Additional Judgment Creditor, Gold Reserve Inc., by its counsel Norton Rose Fulbright US LLP; (xii) Additional Judgment Creditor, Huntington Ingalls Incorporated, f/k/a, Northrop Grumman Ship Systems, Inc., f/k/a Ingalls Shipbuilding, Inc., by its counsel Alston & Bird, LLP; (xiii) Additional Judgment Creditor, Koch Minerals Sàrl and Koch Nitrogen International Sàrl, by their counsel Alston & Bird, LLP and Stinson LLP; (xiv) Additional Judgment Creditor, OI European Group B.V., by its counsel Morgan, Lewis & Bockius LLP; (xv) Former Additional Judgment Creditor, Pharo Gaia Fund, Ltd., Pharo Macro Fund, Ltd., and Pharo Trading Fund, Ltd., by their counsel Bayard, P.A.; (xvi) Additional Judgment Creditor, Red Tree Investments, LLC, by its counsel MoloLamken LLP; (xvii) Former Additional Judgment Creditor, Rudi Lovati and Alessandro Lucibello Piani, by their counsel Duane Morris LLP; (xviii) Additional Judgment Creditor, Rusoro Mining Limited, by its counsel DLA Piper LLP (US); (xvix) Additional Judgment Creditor, Saint-Gobain Performance Plastics Europe, by its counsel Alston & Bird, LLP; (xx) Additional Judgment Creditor, Siemens Energy, Inc., by its counsel Reed Smith LLP; (xxi) Additional Judgment Creditor, Tenaris S.A., Talta-Trading e Marketing Sociedade Unipessoal Lda., and Gramercy Distressed Opportunity Fund LLC, by their counsel (a) Debevoise & Plimpton

LLP and (b) Halloran Farkas and Kittila LLP; (xxii) Additional Judgment Creditor, Tidewater Investment SRL and Tidewater Caribe S.A., by their counsel Covington & Burling LLP; (xxiii) Additional Judgment Creditor, Valores Mundiales, S.L. and Consorcio Andino, S.L., by their counsel Covington & Burling LLP; (xxiv) Mobil Cerro Negro Holding, LLC., Venezuela Holdings, B.V., and Mobil Cerro Negro, Ltd., by their counsel Connolly Gallagher LLP; (xxv) Banco San Juan Internacional, Inc., by its counsel McCollom D'Emilio Smith Uebler LLC; (xxvi) G&A Strategic Investments I LLC, G&A Strategic Investments II LLC, G&A Strategic Investments III LLC, G&A Strategic Investments IV LLC, G&A Strategic Investments V LLC, G&A Strategic Investments VI LLC, and G&A Strategic Investments VII LLC, by their counsel Andrew H. Sauder of Dailey LLP; (xxvii) Girard Street Investment Holdings LLC, by its counsel Andrew H. Sauder of Dailey LLP; (xxviii) Refineria Di Korsou N.V., by its counsel Gellert Scali Busenkell & Brown, LLC; (xxvix) Ricardo Devengoechea, by his counsel Werb & Sullivan; (xxx) all entities known by the Special Master to hold any judgment or have asserted any lien, claim, encumbrance, or other interest in the PDVH Shares, for whom identifying information and addresses are available to the Special Master; (xxxi) the United States Department of Treasury's Office of Foreign Assets Control ("**OFAC**"); and (xxxii) all other Persons as a result of Publication Notice or other notice (the parties listed at i–xxxii above, the "**Notice Parties**").

E.  *Reasonable Discretion*.  The Special Master has exercised his reasonable discretion in offering the PDVH Shares for sale, in units and as a whole, and has demonstrated good, sufficient, and sound justifications for approval of and entry into the Stock Purchase Agreement and the other agreements, documents, and instruments deliverable thereunder or attached thereto or referenced therein (collectively, the "**Transaction Documents**") and for approval of the Sale Transaction.  The Special Master's entry into and performance under the Transaction Documents

(i) constitutes a sound and reasonable exercise of the Special Master's discretion consistent with the exercise of his duties to the Court in accordance with the Bidding Procedures and his responsibilities under the Sale Procedures Order and Bidding Procedures, (ii) represents the best opportunity for the Notice Parties, as applicable, to recover value from the PDVH Shares on account of any judgments or Claims they may have against the Republic or PDVSA, and (iii) is reasonable and appropriate under the circumstances. Evidence of the Special Master's reasonable discretion in entering into and performing under the Transaction Documents includes (y) the Purchase Price, as defined in the Stock Purchase Agreement, and the other terms set forth in the Transaction Documents, which constitute the best offer received for the PDVH Shares; and (z) the Sale Transaction on the terms set forth in the Transaction Documents presents an orderly sale of the PDVH Shares and the best opportunity to maximize the value of the PDVH Shares and maximize distributions to the holders of Attached Judgments and the opportunity for recoveries to all Notice Parties, including Crystallex, ConocoPhillips, and the Additional Judgment Creditors.

F.    *Compliance with the Sale Procedures Order, December 2024 Order, Evaluation Criteria, April 2025 Scheduling Order, and June 2025 Scheduling Order.* On October 11, 2022, this Court entered the *Sixth Revised Proposed Order (A) Establishing Sale and Bidding Procedures, (B) Approving Special Master's Report and Recommendation Regarding Proposed Sale Procedures Order, (C) Affirming Retention of Evercore as Investment Banker by Special Master and (D) Regarding Related Matters* [D.I. 481] approving the initial Bidding Procedures for the PDVH Shares. On December 31, 2024, this Court entered the December 2024 Order. On January 27, 2025, this Court entered a *Memorandum Order* [D.I. 1554] (the "**January 2025 Order**") which adopted evaluation criteria for Stalking Horse Bids, Base Bids, and Successful Bids (the "**Evaluation Criteria**"). On April 25, 2025, this Court entered the April Scheduling

2025 Order.  On June 13, 2025, this Court entered the June 2025 Scheduling Order.  The Bidding

Procedures are substantively and procedurally fair, and non-collusive, and provided a full, fair,

and reasonable opportunity for any entity or Person to make an offer to purchase the PDVH Shares.

The Special Master complied with the Bidding Procedures, the Sale Procedures Order, the

December 2024 Order, and the April 2025 Scheduling Order in all respects.  Buyer complied with

the Bidding Procedures, the Sale Procedures Order, the December 2024 Order, the April 2025

Scheduling Order, and the June 2025 Scheduling Order in all respects except as properly waived

by the Special Master in the exercise of his duties to the Court in accordance with the Bidding

Procedures.  Buyer subjected its bid to competitive bidding in accordance with the Bidding

Procedures and was designated the Successful Bidder for the PDVH Shares.  The Bidding Rounds

were duly noticed and conducted fairly and in good faith, without collusion, and in accordance

with the Sale Procedures Order and the Bidding Procedures.  All potential bidders and other

potentially interested parties have been afforded a full, fair, and reasonable opportunity to submit

bids for the PDVH Shares and participate in the Bidding Rounds.  The Special Master complied

with the Evaluation Criteria.

G.    *Marketing Process.*  As demonstrated by the Recommendation, the Publication

Affidavits, the testimony and other evidence proffered or adduced at the Sale Hearing, and the

representations of counsel made on the record at the Sale Hearing: (i) the Special Master and his

investment banker, Evercore Group L.L.C., engaged in a robust and extensive Marketing Process

pursuant to the Sale Procedures Order, the Bidding Procedures, and the December 2024 Order;

(ii) the Special Master and his Advisors, as defined in the Sale Procedures Order, conducted the

Marketing Process in good faith and in a fair and open manner; (iii) the Marketing Process

provided all potential bidders sufficient information to enable them to make an informed judgment

on whether to make a bid to purchase the PDVH Shares and the terms of any such bid; (iv) the Marketing Process, the Bidding Procedures, and the Bidding Rounds were non-collusive, duly noticed, and provided a full, fair, and reasonable opportunity for any entity to conduct due diligence and make an offer to purchase the PDVH Shares and submit higher or better offers for the PDVH Shares than Buyer's bid; (v) the Special Master considered any and all bids submitted in good faith and in accordance with his duties under the Sale Procedures Order; (vi) the Special Master and Buyer have negotiated and undertaken their roles leading to the entry into the Stock Purchase Agreement in diligent, non-collusive, fair, reasonable, and good faith manner; and (vii) the Marketing Process conducted by the Special Master pursuant to the Sale Procedures Order and the Bidding Procedures obtained the best value for the PDVH Shares.

H.     *Fair and Adequate Consideration; Best Value.*  The consideration to be provided by Buyer under the Stock Purchase Agreement is fair, adequate, and reasonable consideration for the PDVH Shares and constitutes an adequate price for the purchase of the PDVH Shares under the terms of the Sale Procedures Order.  Such consideration constitutes the best bid for the PDVH Shares.  As a result, Buyer's bid represents the best opportunity to maximize distributions to the holders of Attached Judgments and the opportunity for recoveries to all Notice Parties, including Crystallex, ConocoPhillips, and the Additional Judgment Creditors.  Prompt approval of the Sale Transaction is the best means to preserve and maximize the value of the PDVH Shares and maximize distributions to Crystallex, ConocoPhillips, and the Additional Judgment Creditors.  The total consideration to be provided by Buyer under the Transaction Documents reflects Buyer's reliance on each term and provision in this Order and in the Transaction Documents, and Buyer would not be willing to enter into the Transaction Documents or acquire the PDVH Shares without each and every protection set forth in the Transaction Documents and this Order, including in

paragraphs I (*The Bidding and Sale Process Were Conducted in Good Faith*), J (*No Successor or Other Derivative Liability*), K (*The Shares Are Free and Clear of Any Claim, Lien, Interest, or Encumbrance*), L (*Necessary Condition*), M (*Validity of Transfer*), S (*Opportunity to Participate in Marketing Process*), 2 (*Objections Overruled*), 6 (*Consummation of Sale Transaction(s)*), 11 (*Transfer of PDVH Shares Free and Clear*), 13 (*Injunction*), 14 (*Release of Claims as to Buyer and other Entities; Recordation*), 15 (*Releases by Holders of Any Attached Judgments*), 18 (*No Successor or Other Derivative Liability*), 19 (*Non-Interference*), 21 (*Validity of Sale Absent Stay Pending Appeal*), and 24 (*Provisions Non-Severable*).   The Transaction Documents were not entered into, nor is the Sale Transaction being consummated, for the purpose of hindering, delaying, or defrauding present or future creditors of PDVSA under the laws of the United States, any state, territory, possession, the District of Columbia or otherwise, and none of the parties to the Transaction Documents nor any of their direct or indirect Affiliates[4] or subsidiaries are consummating the Sale Transaction for any other fraudulent or improper purpose.

      I.    *The Bidding and Sale Process Were Conducted in Good Faith*.  The Transaction Documents and the Sale Transaction were negotiated, proposed, and entered into, and are being undertaken by the Special Master, Buyer, and the other parties to the Transaction Documents and their respective representatives and advisors, in good faith, without collusion or fraud, and from arm's length bargaining positions.  There has been no fraud, unfairness, surprise, or mistake, and the sale price is not so low as to shock the conscience.  Likewise, the value to be paid by Buyer

---

[4]    For the purposes of this Order, "**Affiliate**" means any Person (as defined in the Stock Purchase Agreement) that, directly or indirectly through one or more intermediaries, controls, or is controlled by, or is under common control with, such Person, and the term "control" (including the terms "controlled by" and "under common control with") means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of such Person, whether through ownership of voting securities, by contract or otherwise.

upon consummation of the Sale Transaction is the product of arm's length negotiations between the Special Master, Buyer, and the other parties to the Transaction Documents and their respective representatives and advisors, in good faith and without collusion or fraud.  Buyer has proceeded in good faith in all respects in that, among other things, (i) Buyer complied with the provisions of the Sale Procedures Order and Bidding Procedures, including compliance with confidentiality obligations and restrictions under the Sale Procedures Order and the Bidding Procedures and any applicable non-disclosure or confidentiality agreement; (ii) Buyer's bid was subjected to competitive Bidding Procedures as set forth in the Sale Procedures Order; (iii) all consideration to be provided by Buyer and all other material agreements or arrangements entered into by Buyer and the Special Master in connection with the Sale Transaction have been disclosed and are appropriate; and (iv) the negotiation and execution of Transaction Documents were at arm's length and in good faith.  Other than agreements among the Special Master, Buyer, and any other parties as reflected in the Transaction Documents and herein, the Purchase Price in respect of the PDVH Shares was not controlled by any agreement, including any agreement among potential bidders.

J.      *No Successor or Other Derivative Liability*.  Except as otherwise expressly provided herein or in the Transaction Documents, upon and after Closing, and to the greatest extent allowed by applicable law (whether in effect now or in the future), Buyer and Buyer Affiliates[5] shall not have any liability, or any other obligation, of or related to the Republic, PDVSA, or their respective Affiliates, including any liability or obligation arising under or related to the sale and transfer of the PDVH Shares to Buyer.  Upon the closing, Buyer will not assume the liabilities of PDVSA.  Buyer and Buyer Affiliates are not, and the consummation of the Sale Transaction will

---

[5]     For the purposes of this Order, "**Buyer Affiliates**" means an Affiliate of Buyer; *provided*, *however*, that the term "Buyer Affiliate" shall exclude PDVH and any of its direct or indirect subsidiaries.

not render Buyer or Buyer Affiliates a continuation of or a mere continuation of, and Buyer is not holding itself out as a continuation of or a mere continuation of, the Republic, PDVSA or their enterprises or operations, and there is no continuity or common identity between Buyer and the Republic or PDVSA or their subsidiaries or Affiliates.  Accordingly, the Sale Transaction does not amount to a consolidation, merger, de facto merger, acquisition of all or substantially all assets, or similar transaction of Buyer or Buyer Affiliates with or into the Republic or PDVSA, and Buyer, and Buyer Affiliates are not, and shall not be deemed, as a result of the consummation of the Sale Transaction, past practice, historical operations, course of dealing, or otherwise: (i) to be a successor to the Republic, PDVSA or their Affiliates, (ii) to be a continuation, a mere continuation or substantial continuation of the Republic, PDVSA or the enterprise(s) of the Republic, PDVSA or their Affiliates, or (iii) to be liable for, or be subject to any obligations relating to, any acts or omissions of the Republic, PDVSA, any of their Affiliates, or an insider of the Republic, PDVSA or any of their Affiliates in the conduct of their business or related to the PDVH Shares, including with respect to the Attached Judgments and any judgment whose holder sought to have such judgment be an Attached Judgment, other than as set forth in the Transaction Documents.  Without limiting the generality of the foregoing, and except as otherwise provided in the Transaction Documents, Buyer and Buyer Affiliates shall not be liable for any Claims against PDVSA or any of its Affiliates, and Buyer and Buyer Affiliates shall have no successor or vicarious liability of any kind or character whatsoever, whether known or unknown as of the Closing, whether now existing or hereafter arising, whether asserted or unasserted, perfected or unperfected, liquidated or unliquidated, noticed or unnoticed, recorded or unrecorded, matured or unmatured, legal or equitable, non-contingent or contingent, or otherwise, with respect to the business operations of the Republic, PDVSA, their Affiliates, or the PDVH Shares.  To the extent there are any perfected

13

Liens on the PDVH Shares, the same shall only attach to the proceeds of the Sale Transaction ultimately attributable to the property against which such perfected Liens applied or other specifically dedicated funds, in the same order of priority and with the same validity, force, and effect that such perfected Liens applied prior to the Sale Transaction, subject to any rights, claims, and defenses of PDVSA. Buyer would not have entered into the Transaction Documents and would not acquire the PDVH Shares but for the foregoing protections against potential claims based upon successor or similar liability, vicarious liability, or any other legal, equitable or other doctrine, whether existing now or in the future, and those protections' effectiveness. A sale of the PDVH Shares without the foregoing protections would yield substantially less value for Crystallex, ConocoPhillips, and the Additional Judgment Creditors.

K.      *The Shares Are Free and Clear of Any Claim, Lien, Interest, or Encumbrance.* Except as otherwise expressly provided herein, the Special Master is authorized and directed to sell the PDVH Shares to Buyer free and clear of any (i) right to a payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured, (ii) equitable remedy for breach of performance if such breach gives rise to a right to payment, whether or not such right to an equitable remedy is reduced to judgment, fixed, contingent, matured, unmatured, disputed, undisputed, secured or unsecured, and (iii) loss, liability, demand, claim, chose in action, any derivative vicarious, transferee, or successor or similar liability claims, rights, or causes of action, judgment, entitlement, residue, sanction, penalty, action, obligation, commitment, assessment, settlement, fee, debt, deficiency, guaranty of any kind, proceeding, damage, cost, or expense (including court costs and professional fees (including attorneys' fees and costs) whatsoever), whether at law or in equity, whether known or unknown, fixed, liquidated, contingent, or

otherwise, whether under any theory of successor or transferee liability and whether imposed by agreement, understanding, law, or otherwise (a "**Claim**") and any mortgage, lien (whether consensual, statutory or arising under any Law), pledge, charge, security interest, financing statement, hypothecation, Preferential Right, easement, plot restriction, deed restriction, encumbrance of any kind, or other interest in property arising from an attachment, writ or other enforcement or execution of a judgment or Claim (a "**Lien**").  Following the Sale Transaction, the Notice Parties shall have no recourse against Buyer or Buyer Affiliates or against the PDVH Shares, on account of those parties' respective judgments or other Claims against the Republic, PDVSA, or their respective Affiliates.

L.      *Necessary Condition*.   Buyer would not have entered into the Transaction Documents and will not consummate the transactions contemplated thereby (i) if the sale of the PDVH Shares was not free and clear of all Claims and Liens, including any rights or Claims based on any successor, vicarious, or transferee liability, except as otherwise provided in the Transaction Documents; or (ii) if Buyer would, or in the future could, be liable for any such Claims and Liens. Failure to provide such relief in this Order would frustrate the Sale Procedures Order and the other orders of this Court in the Action.  The total consideration to be provided under the Transaction Documents reflects Buyer's reliance on this Order to provide it with title to and possession of the PDVH Shares free and clear of all Claims pursuant to this Court's broad equitable authority under the All Writs Act, and 28 U.S.C. § 2004.  A sale of the PDVH Shares without the foregoing protections would yield substantially less value for Crystallex, ConocoPhillips, and the Additional Judgment Creditors.

M.      *Validity of Transfer*.   The transfer of the PDVH Shares to Buyer will be a legal, valid, and effective transfer of the PDVH Shares, including for the purposes of Title 8 of the

Delaware Code and Article 8 of Title 6 of the Delaware Code, and will vest Buyer with any legal, equitable and beneficial right, title, and interest of PDVSA in and to the PDVH Shares, free and clear of all Claims and Liens. The consummation of the Sale Transaction is legal, valid, and properly authorized under all applicable law, and all of the applicable requirements of applicable law have been complied with in respect of the Sale Transaction. Entities providing financing in connection with the Sale Transaction may rely in all respects on all of the provisions of this Order.

N.    *Required Approval*.  Buyer has demonstrated that (i) Buyer has made, or will make in a timely manner (a) all filings and disclosures necessary to comply with the regulations of OFAC and (b) all necessary filings under the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended, and any other antitrust laws, as applicable, and pay the fees associated with such filings; (ii) Buyer has a plan and the ability to obtain or make all requisite shareholder, governmental, regulatory, or other third-party approvals, consents and notifications, (iii) the proposed timing to undertake the actions required to obtain or make such approvals, consents and notifications is reasonable; (iv) the Sale Transaction is reasonably likely, after taking into consideration antitrust and any other regulatory matters, Buyer's prior experience, Buyer's commitment to take all action necessary, proper or advisable for Buyer to consummate the Sale Transaction prior to the Closing Date, and any other relevant considerations, to be consummated within a time frame acceptable to the Special Master and the Court; and (v) Buyer has consented to the Special Master, in his discretion, sharing with U.S. Government regulators, including OFAC, information pertaining to the Sale Transaction.

O.    *Sale Authority*.  The Court has authority to sell the PDVH Shares to Buyer pursuant to (a) Rule 69(a) of the Federal Rules of Civil Procedure, (b) Section 324 of Title 8 of the Delaware Code, (c) Rule 53 of the Federal Rules, (d) the Court's general equitable powers to enforce its

orders and judgments (*see Chambers v. NASCO, Inc.*, 501 U.S. 32, 43 (1991) (quoting *Link v. Wabash R. Co.*, 370 U.S. 626, 630–31 (1962)); *see also IFC Interconsult, AG v. Safeguard Int'l Partners, LLC*, 438 F.3d 298, 311 (3d Cir. 2006)), (e) the All Writs Act (*see United States v. N.Y. Tel. Co.*, 434 U.S. 159, 172 (1977) ("This Court has repeatedly recognized the power of a federal court to issue such commands under the All Writs Act as may be necessary or appropriate to effectuate and prevent the frustration of orders it has previously issued in its exercise of jurisdiction otherwise obtained . . . .")), and (f) 28 U.S.C. § 2004.  The Court is in possession and control of the PDVH Shares, and is authorized to sell, transfer, assign, convey, and deliver all title, interest, and/or rights of PDVSA in the PDVH Shares to Buyer, as required by the Stock Purchase Agreement, under applicable law.

P.     *Sale Order Required by Buyer*.  Entry of this Order approving the Stock Purchase Agreement is a requirement of the Stock Purchase Agreement and such requirement is an appropriate condition precedent to Buyer's consummation of the Sale Transaction.

Q.     *Power and Authority*.  The Special Master (i) has full power and authority to execute the Transaction Documents and (ii) has all of the power and authority necessary to consummate the transactions contemplated by the Transaction Documents.  Upon entry of this Order, other than any consents identified in the Transaction Documents, the Special Master needs no consent or approval from any other Person to consummate the Sale Transaction.

R.     *Binding Contract*.  The Transaction Documents are valid and binding contracts among the Special Master and Buyer and such other applicable parties thereto and shall be enforceable pursuant to their terms.  The Transaction Documents, the Sale Transaction itself, and the consummation thereof, shall be specifically enforceable against and binding upon each of the Republic, PDVSA, PDVH, CITGO, and their respective Affiliates.

S.    *Opportunity to Participate in Marketing Process*.  This Action has been pending since June 19, 2017.  In that time, this Action, the Marketing Process, and the Sale Transaction have received substantial national and international media coverage. The Court has held at least 20 public hearings and status conferences regarding the subject matter of the PDVH Shares, the claims against the Republic, PDVSA, and/or PDVH, and proceedings related thereto.  The Marketing Process additionally conformed to the Notice Procedures laid out in the Sale Procedures Order, and gave notice to any parties that may have an interest in the PDVH Shares, including the Sales Process Parties, creditors of the Republic and/or PDVSA, potential bidders with interests in the PDVH Shares, and any other parties with any interests in the PDVH Shares.  The Special Master, in accordance with the Sale Procedures Order, has published Sale Notices at least eight (8) times since the Launch Date, in at least four different publications.  Each Sale Notice described the assets being sold (*i.e.*, the PDVH Shares), the Bidding Procedures, and the Marketing Process. The Sale Notices provided notice of key dates and deadlines for the Marketing Process, including, among other things, the Launch Date, the First Round Indication of Interest Deadline, the Second Round deadline to submit a Binding Bid, the stalking horse bid deadline, and the topping period deadline.  In addition to the Sale Notices, all parties with a valid interest or perfected lien in the PDVH Shares have received notice from the Special Master of important Marketing Process and Sale Transaction-related milestones through a multitude of reports, motions, and notices submitted to the Court, as well as in regular, public, status conferences.  Accordingly, persons holding judgments or Claims against the Republic, PDVSA, and/or PDVH and all parties with an interest in the sale of the PDVH Shares have had sufficient notice of and an opportunity to participate in the Marketing Process.  The failure of the holder of a judgment against, or other creditor of, the Republic, PDVSA and/or their Affiliates (whether now or in the future) to participate in the

Marketing Process, to seek to become an Additional Judgment Creditor, or to successfully become an Additional Judgment Creditor shall not be grounds for challenging the Sale Transaction or this Order or to bring claims against Buyer or Buyer Affiliates whether existing now or in the future, and this Order shall be binding upon all such current or future creditors.

T.    *Legal and Factual Bases*.    The legal and factual bases set forth in the Recommendation, and at the Sale Hearing, establish just cause for the relief granted herein.

U.    *Necessity of Order*.    The Sale Transaction represents the best bid for the PDVH Shares and, without the relief in this Order, the Special Master does not believe the Marketing Process would yield such comparable value.    The Special Master believes the Marketing Process provides the best opportunity to maximize the value of the PDVH Shares and maximize distributions to the holders of Attached Judgments and the opportunity for recoveries to all Notice Parties, including Crystallex, ConocoPhillips, and the Additional Judgment Creditors, and is not aware of a better alternative proposed by the Republic, PDVSA, PDVH, CITGO, or any other party.

**IT IS HEREBY ORDERED THAT:**

1.    *Recommendation Is Adopted*.    To the extent not already approved pursuant to the Sale Procedures Order, the Recommendation is adopted and the relief recommended therein is granted and approved as set forth herein.

2.    *Objections Overruled*.    Except in the case of objections described in [paragraphs [●] and [●] of this Order,] all objections, if any, and any and all joinders thereto, to the Recommendation or the relief granted herein that have not been previously overruled, withdrawn with prejudice, waived, or settled as announced to this Court at the Sale Hearing, by stipulation filed with this Court, or as provided in this Order, and all reservations of rights included therein, are hereby overruled on the merits and with prejudice.    Parties who did not properly object to the

19

entry of this Order in accordance with the Sale Procedures Order, or who withdrew their objections thereto, have, and are deemed to have, consented to the relief granted herein in respect of the Sale Transaction and the Transaction Documents for all purposes.  All holders of liens, claims, interests, and encumbrances against the PDVH Shares who did not object, or withdrew their objections to the Sale Transaction, or whose objections to the Sale Transaction were overruled either implicitly or explicitly, are deemed to have consented to the Sale Transaction.  To the extent there are any perfected Liens on the PDVH Shares, the same shall only attach to the proceeds of the Sale Transaction ultimately attributable to the property against which such perfected Liens applied or other specifically dedicated funds, in the same order of priority and with the same validity, force, and effect that such perfected Liens applied prior to the Sale Transaction, subject to any rights, claims, and defenses of PDVSA.

3.     *Notice*.   Notice of the Recommendation, the Bidding Rounds, the Bidding Procedures, the Sale Transaction, and the Sale Hearing was adequate, appropriate, fair and equitable under the circumstances and complied in all respects with the Sale Procedures Order and the Bidding Procedures.

4.     *Fair and Adequate Purchase Price*.  The consideration to be provided by Buyer under the Stock Purchase Agreement is fair, adequate, and reasonable consideration for the PDVH Shares and constitutes (i) fair consideration and fair value under any other applicable laws of the United States, any state, territory or possession or the District of Columbia and any other applicable law and (ii) an adequate  price for the purchase of the PDVH Shares under the circumstances of this Action and the terms of the Sale Procedures Order.  Such consideration constitutes the best bid for the PDVH Shares.

5.     *Approval of the Transaction Documents*.  The Transaction Documents, including all of the transactions contemplated thereby, and all of the terms and conditions thereof, are hereby authorized and approved in their entirety.  The failure specifically to include any particular provision of the Transaction Documents in this Order shall not diminish or impair the effectiveness of such provision, it being the intent of this Court that the Transaction Documents, and the entry into the Transaction Documents by the Special Master, be authorized and approved in their entirety.

6.     *Consummation of Sale Transaction(s)*.  Pursuant to 28 U.S.C. § 2004, Federal Rule of Civil Procedure 69, Section 324 of Title 8 of the Delaware Code, the All Writs Act, and the broad equitable powers of the Court, the Court is authorized and empowered to transfer the PDVH Shares in accordance with the terms of the Transaction Documents and the terms of this Order. The Special Master, his Advisors and agents, are authorized and directed to execute, deliver, and perform their obligations under and comply with the terms of the Transaction Documents and to consummate the Sale Transaction, including by taking any and all actions as may be reasonably necessary or desirable to implement the Sale Transaction and each of the transactions contemplated thereby pursuant to and in accordance with the terms and conditions of the Transaction Documents and this Order without leave of Court.  All Persons and entities are prohibited and enjoined from taking any action that adversely affects, interferes with, is likely to frustrate or is in any way inconsistent with the ability of the Special Master or his Advisors and agents to transfer the PDVH Shares to Buyer in accordance with the Transaction Documents and this Order; *provided* that, subject in all respects to paragraph 21 (*Validity of Sale Absent Stay Pending Appeal*) of this Order, the foregoing restriction shall not prevent any party from appealing this Order in accordance with applicable law or opposing any appeal of this Order in a court of competent jurisdiction.  PDVH,

CITGO and each of their direct and indirect subsidiaries, representatives, employees, agents, designees, successors, or assigns (collectively, the "**CITGO Related Parties**") are directed to comply with all interim operating covenants contained within the Stock Purchase Agreement or any other Transaction Document, including but not limited to those contained in Section 6.1 (*Conduct of the Business Pending the Closing*) of the Stock Purchase Agreement, and the Special Master is authorized to seek this Court's assistance if, in his reasonable judgment, any of PDVH, CITGO or CITGO Related Parties fail to comply with the interim operating covenants under the Stock Purchase Agreement or any other Transaction Document. Without limiting the foregoing, PDVH, CITGO and CITGO Related Parties are directed and hereby ordered to comply with all obligations and covenants contained in the Stock Purchase Agreement and Transaction Documents (regardless of, and independent of, any obligation for the Special Master to "cause" those parties to comply with such obligations and covenants), including, but not limited to, the obligations and covenants set forth in Section 2.3 (*Closing Deliveries of the Parties*), Section 3.1 (*Purchase Price*), Section 3.4 (*Closing Date Payments by Buyer*), Section 3.5 (*Withholding*), Section 6.1 (*Conduct of the Business Pending the Closing*), Section 6.2 (*Access to Information*), Section 6.3 (*Regulatory Approvals; Third Party Consents*), Section 6.7 (*Public Announcements*), Section 6.8 (*Employee Matters*), Section 6.10 (*Company's Obligations in Respect of Debt Financings*), Section 6.11 (*Tax Matters*), Section 6.13 (*Notices of Certain Events*), Section 6.16 (*Section 280G*), Section 6.17 (*Financial Statements*), and Section 6.18 (*CFIUS*) of the Stock Purchase Agreement, and the Special Master is authorized to seek this Court's assistance and/or an order from the Court to compel compliance if, in his reasonable judgment, PDVH, CITGO or CITGO Related Parties fail to comply with such obligations or covenants under the Stock Purchase Agreement or other Transaction Documents. Any failure by PDVH, CITGO or the CITGO Related Parties to comply,

or cause compliance, with any obligation or covenant contained in the Stock Purchase Agreement and Transaction Documents may result in a contempt order and appropriate sanctions against the violating entity, as well as the individual directors, officers or employees responsible for the violation.

7.      *Execution of Transaction Documents.*  The Special Master, his Advisors and agents, are authorized to execute and deliver, and authorized to perform under, consummate, and implement all additional notices, assumptions, conveyances, releases, acquittances, instruments, and documents that may be reasonably necessary or desirable to implement the Transaction Documents, including the transfer and, as applicable, the assignment of all the PDVH Shares, and to take all further actions as may be (i) reasonably requested by Buyer for the purpose of assigning, transferring, granting, conveying, and conferring to Buyer, or reducing to Buyer's possession, the PDVH Shares and/or (ii) necessary or appropriate to the performance of the obligations contemplated by the Transaction Documents, all without further order of this Court.

8.      *Payment of Transaction Expenses.*  The Special Master shall continue to file periodic status reports requesting the Court's approval of the Special Master's Transaction Expenses.  Any approved but unpaid Transaction Expenses as of the Closing shall be paid to the Special Master from the proceeds of the Sale Transaction prior to any distributions on account of Attached Judgments.

9.      *Special Master Expense Reserve Holdback.*  The Special Master shall be entitled to direct a portion of the sale proceeds [in the amount of $[●]] to be deposited into an escrow account for the purpose of paying any out-of-pocket costs, fees, or expenses incurred by the Special Master on or after the closing of the Sale Transaction for the Special Master, investment bankers, third party consultants, legal counsel and any other Representatives (as defined in the Stock Purchase

Agreement) or Advisors (as defined in the Sale Procedures Order) and approved by the Court, including any fees or expenses related to implementation, indemnification or reimbursement for any liability, legal costs, or court costs, or any further adjudication, of the Sale Transaction or this Order. Any such amounts remaining in escrow after all such costs, fees and expenses incurred by the Special Master have been so paid or distributed shall be paid to the Additional Judgment Creditors in compliance with the Final Priority Order, this Order, and any further order of the Court deemed necessary by the Special Master.

10. *Document Acceptance.* Each and every federal, state, local, or foreign government or governmental or regulatory authority, agency, board, bureau, commission, court, department, or other governmental entity is hereby authorized and directed to accept any and all documents and instruments necessary and appropriate to consummate the transactions contemplated by the Transaction Documents.

11. *Transfer of PDVH Shares Free and Clear.* Pursuant to applicable law, the Special Master is authorized and directed to transfer the PDVH Shares in accordance with the terms of the Stock Purchase Agreement and this Order. The transfer of the PDVH Shares by the Special Master to Buyer in accordance with the Stock Purchase Agreement and this Order shall: (i) be valid, legal, binding, and effective; (ii) vest Buyer with all right, title, and interest in and to the PDVH Shares; and (iii) be free and clear of all Claims and Liens against the PDVH Shares, pursuant to this Court's broad equitable authority, except as otherwise provided in the Transaction Documents. Following the Sale Transaction, the Notice Parties shall have no recourse against Buyer or Buyer Affiliates, or against the PDVH Shares, on account of those parties' respective judgments or other Claims against the Republic, PDVSA or their respective Affiliates, and any actions taken to enforce such judgments against PDVH shall be a violation of this Order. On the Closing Date, this Order shall

be considered, and shall constitute, for any and all purposes, a full and complete general assignment, conveyance and transfer of the PDVH Shares, transferring good and marketable and indefeasible title and interest in all of the PDVH Shares to Buyer with effect at Closing of the Sale Transaction in accordance with the Transaction Documents. The provisions of this Order authorizing and approving the transfer of the PDVH Shares free and clear of all interests shall be self-executing, and neither the Special Master or Buyer shall be required to execute or file releases, termination statements, assignments, consents or other instruments in order to effectuate, consummate and implementation the provisions of this Order and the Stock Purchase Agreement.

12.      *Endorsement of Certificates; Registration of Transfer.* The Special Master is authorized and directed to execute on behalf of PDVSA and deliver to Buyer, at Closing, the stock certificates representing the PDVH Shares duly endorsed in blank and any executed stock powers or other instruments of transfer necessary to transfer to Buyer good and marketable title to the PDVH Shares and otherwise proceed with the Sale Transaction. PDVH is directed, at Closing, to register the transfer of the PDVH Shares to Buyer upon the books and records of PDVH. Following the Closing, the sale of the PDVH Shares to Buyer shall be, and shall be deemed to be, "made and confirmed" as contemplated by Section 324 of Title 8 of the Delaware Code and, upon a certified copy of this Order being left with any officer or director or with the registered agent of PDVH, Buyer shall be entitled to the PDVH Shares and all income, or dividends which may have been declared, or become payable thereon since the attachment laid, subject to the terms of the Stock Purchase Agreement.

13.      *Injunction.* Pursuant to the All Writs Act, and except as otherwise provided in the Stock Purchase Agreement, the Transaction Documents, or this Order, all Persons (and their respective successors and assigns) including the Republic, PDVSA, PDVH, CITGO, Crystallex,

ConocoPhillips, the Additional Judgment Creditors, judgment holders or other creditors of the Republic or PDVSA (or their respective Affiliates) who are not Additional Judgment Creditors, all debt security holders, equity security holders or putative equity security holders, governmental tax and regulatory authorities, lenders, customers, vendors, employees, former employees, litigation claimants, trustees, trade creditors, and any other creditors (or agent of any of the foregoing) who may or do hold, now or in the future, Claims against the Republic, PDVSA or the PDVH Shares, arising under or out of, in connection with, or in any way relating to, the Republic, PDVSA, the PDVH Shares prior to the Closing, the operation of PDVH or ownership of the PDVH Shares by PDVSA prior to the Closing, or the Sale Transaction, are hereby forever barred, estopped, and permanently enjoined from asserting or pursuing such Claims against Buyer, Buyer Affiliates, or any of their respective successors or assigns including taking any of the following actions with respect to any Claims either directly or indirectly: (i) commencing or continuing in any manner any action, whether at law or in equity, in any judicial, administrative, arbitral, or any other proceeding, against Buyer, Buyer Affiliates, and any of their respective successors or assigns; (ii) enforcing, attaching, collecting, or recovering in any manner any judgment, award, decree, or order against Buyer, Buyer Affiliates, and any of their respective successors or assigns; (iii) creating, perfecting, or enforcing any Claim against Buyer, Buyer Affiliates, and any of their respective successors or assigns, and the PDVH Shares; (iv) asserting a Claim as a setoff, right of subrogation, or recoupment of any kind against any obligation due against Buyer, Buyer Affiliates, any of their respective successors or assigns, or the PDVH Shares; or (v) commencing or continuing any action in any manner or place that does not comply, or is inconsistent, with the provisions of this Order or the agreements or actions contemplated or taken in respect thereof.

14.    *Release of Claims as to Buyer and other Entities; Recordation.*  Except as expressly set forth in the Stock Purchase Agreement, the Transaction Documents, or this Order, this Order (i) shall be effective as a determination that, as of the Closing, all Claims have been unconditionally released, discharged and terminated as to Buyer and the PDVH Shares, and that the conveyances and transfers described herein and in the Stock Purchase Agreement and the Transaction Documents have been effected, and (ii) is and shall be binding upon and govern the acts of all Persons, including all filing agents, filing officers, title agents, title companies, recorders of mortgages, recorders of deeds, registrars of deeds, administrative agencies, governmental departments, secretaries of state, federal, state, county and local officials and all other Persons who may be required by operation of law, the duties of their office, or contract, to accept, file, register or otherwise record or release any documents or instruments that reflect that Buyer is the assignee and owner of the PDVH Shares, free and clear of all Claims, or who may be required to report or insure any title or state of title in or to any lease (all such entities being referred to as "**Recording Officers**").  All Recording Officers are authorized and directed to strike recorded encumbrances, claims, liens, and other interests against the PDVH Shares recorded prior to the date of this Order. A certified copy of this Order may be filed with the appropriate Recording Officers to evidence cancellation of any recorded encumbrances, claims, liens, pledges, and other interests against the PDVH Shares recorded prior to the date of this Order.   All Recording Officers are hereby authorized and directed to accept for filing any and all of the documents and instruments necessary, advisable or appropriate, and appropriate to consummate the transactions contemplated by the Stock Purchase Agreement.

15.    *Releases by Holders of Any Attached Judgments.*  Immediately upon the later of (i) the indefeasible receipt by a holder of an Attached Judgment of an amount sufficient to satisfy

its Attached Judgment based upon the available proceeds from the Sale Transaction (the "**Sale Proceeds**") or (ii) the Closing, the holder of an Attached Judgment (a) shall have, and shall be deemed to have, automatically released all of the security interests, liens and pledges, including its Attached Judgment, as defined in the Stock Purchase Agreement, and any other Claims on the Shares securing the Attached Judgment with no further action (the "**Lien Release**"), whether or not the holder's Attached Judgment was satisfied in full or at all from the Sale Proceeds, and (b) is authorized and directed to take any such actions as may be reasonably requested by the Court to evidence the release of such security interests, liens and pledges, including the execution, delivery and filing or recording of such releases as may be reasonably requested by the Court or Buyer or as may be required in order to terminate any related financing statements, mortgages, mechanic's liens, or *lis pendens*. This Order is, and shall be deemed to be, in recordable form sufficient to be placed in the filing or recording system of each and every federal, state, or local government agency, department, or office.

16.  *Licenses*.  In accordance with the Sale Procedures Order and the Bidding Procedures, Buyer shall obtain all required permit(s), license(s), registration(s), governmental authorization(s) or approval(s) or similar grant(s), including pursuant to the Hart-Scott-Rodino Act and any other applicable antitrust laws and all licenses required by OFAC relating to the transfer or conveyance of the PDVH Shares to Buyer under the Stock Purchase Agreement and the Transaction Documents, within a customary amount of time.  Buyer and its legal counsel and advisors shall coordinate in good faith with the Special Master's Advisors to discuss and explain Buyer's regulatory and other consent analysis, strategy, and timeline for securing all such approvals and consents in accordance with the terms of the Stock Purchase Agreement to facilitate the timely Closing of the Sale Transaction.

17.     *Distribution and Application of Sale Proceeds.*  In accordance with the Transaction Documents, prior to the Closing, the Special Master and his Advisors shall provide to Acquiom Financial LLC, a Colorado limited liability company, in its capacity as payments administrator (the "**Paying Agent**"), a spreadsheet pursuant to that certain Payments Administration Agreement, dated as of [●], 2025, by and among Buyer, the Special Master and the Paying Agent, which shall indicate, among other things, that, at the Closing, Buyer will pay the Closing Consideration (as defined in the Stock Purchase Agreement) to the Paying Agent, and the Paying Agent will pay to:

   i.   the Special Master and his Advisors, any approved but unpaid Transaction Expenses as of the Closing;

   ii.  the Sale Process Parties and the Additional Judgment Creditors, any Transaction Expenses paid as of Closing; and

   iii. the holders of any Attached Judgments, in accordance with the terms of the Stock Purchase Agreement and the Final Priority Order.

The remaining sale proceeds will be distributed in accordance with the terms of the Stock Purchase Agreement and other Transaction Documents.  Following the payments provided for in this paragraph, subject to paragraphs 16 and 17 herein, all Liens that existed prior to Closing in or on the PDVH Shares shall attach to the remaining proceeds of the Sale Transaction in the same order of priority and with the same extent, validity, force, and effect that such Liens had prior to the Sale Transaction.

18.     *No Successor or Other Derivative Liability.*  By virtue of the Sale Transaction, neither Buyer nor any of Buyer Affiliates shall be deemed to have effected a consolidation, merger, or de facto merger of Buyer and any of Buyer Affiliates with or into PDVSA and Buyer and Buyer Affiliates are not, and shall not be deemed, as a result of the consummation of the Sale Transaction:

(i) to be a successor to PDVSA, (ii) to be an alter ego or a mere continuation or substantial continuation or a successor in any respect of PDVSA, including within the meaning of any foreign, federal, state or local law, or (iii) to be liable for, or be subject to any obligations relating to, any acts or omissions of PDVSA in the conduct of its business or arising under or related to the PDVH Shares, other than as set forth in the Stock Purchase Agreement. To the maximum extent available under applicable law, Buyer's acquisition of the PDVH Shares shall be free and clear of any successor or similar liability claims and other types of transferee liability of any kind or character whatsoever, whether known or unknown, whether now existing or hereafter arising, whether asserted or unasserted, or whether fixed or contingent at the time of the Closing. The operations of Buyer and Buyer Affiliates shall not be deemed a continuation of PDVSA's business operations, the PDVH Shares, or any Liabilities of PDVSA as a result of the acquisition of the PDVH Shares. Following the Sale Transaction, the Notice Parties shall have no recourse against Buyer or Buyer Affiliates, or against the PDVH Shares, on account of those parties' respective judgments or other Claims against the Republic or PDVSA. The consideration given by Buyer shall constitute valid and valuable consideration for the releases of any potential successor or similar liability claims and other types of transferee liability of any kind or character whatsoever, which releases shall be deemed to have been given in favor of Buyer by all holders of such claims.

19.     *Non-Interference*.  Following the Closing Date, no holder of an adverse interest in the PDVH Shares, nor any other person or entity, shall interfere with Buyer's title to or use and enjoyment of the PDVH Shares based on or related to such adverse interest or any actions that Buyer, Buyer Affiliates, PDVH, PDVH's subsidiaries and Affiliates (including CITGO Holding, Inc. and CITGO), the Republic or PDVSA have taken or may take related to the Sale Transaction, this Action or any related action.

20.    *Judicial Immunity & Exculpation.*    The Special Master is entitled to judicial immunity in the performance of his duties as authorized by the Special Master Order, the Sale Procedures Order, the Bidding Procedures, and this Order, including implementation of the Sale Transaction.  The Special Master's Advisors are entitled to judicial immunity in connection with all actions taken at the direction of, on behalf of, or otherwise in connection with representation of, or advising, the Special Master.  No person or entity, including Buyer, shall be permitted to pursue any cause of action or commence or prosecute any suit or proceeding against the Special Master or the Advisors, or their respective employees, officers, directors, attorneys, auditors, representatives, agents, successors or assigns, for any reason whatsoever relating to this Action, implementation of the Sale Procedures, or in connection with the Sale Transaction, or the performance of the Special Master's and his Advisors' duties pursuant to this Order or any other orders of the Court, or any act or omission by the Special Master or any Advisor in connection with the foregoing.  All interested persons and entities, including but not limited to the Sale Process Parties, any holder of an Attached Judgment, any Potential Bidder or Buyer, and all persons acting in concert with them, are hereby enjoined and restrained from pursuing any such cause of action or commencing any such action or proceeding. If any person or entity attempts to pursue any such cause of action or commence any suit or proceeding against the Special Master or any of the Advisors with knowledge of this Order (or continues to pursue or prosecute any cause of action, suit or proceeding after having received notice of this Order), the Court shall issue an order to show cause to such person or entity and a hearing will be scheduled to consider appropriate relief, which may include payment of fees and expenses incurred by the Special Master or any of the Advisors in connection therewith. To the maximum extent permitted by applicable law, neither the Special Master nor his Advisors nor their respective employees, officers, directors, attorneys,

auditors, representatives, agents, successors and assigns will have or incur, and are hereby released and exculpated from, any claim, obligation, suit, judgment, damage, demand, debt, right, cause of action, remedy, loss, and liability for any claim in connection with or arising out of all actions taken to implement the Marketing Process, Sale Procedures, Bidding Procedures, or Sale Transaction, or the performance of the Special Master's and his Advisors' duties pursuant to this Order and all other orders of the Court.

21.      *Validity of Sale Absent Stay Pending Appeal*.  The transactions contemplated by the Stock Purchase Agreement and the other Transaction Documents are undertaken by Buyer without fraud or collusion and in good faith for reasonable and fair value under the circumstances, and were negotiated by the parties at arm's length and, accordingly, the reversal or modification on appeal of the authorization provided herein of the Sale Transaction shall neither affect the validity of the Sale Transaction nor the transfer of the PDVH Shares to Buyer free and clear of Claims, unless such authorization is duly stayed before the Closing Date pending such appeal.  Buyer has acted in good faith throughout the Marketing Process and is entitled to all of the benefits, immunities and protections afforded by applicable law. The Special Master and Buyer shall be, and shall be deemed to be, acting in good faith if they proceed to consummate the Sale Transaction at any time after entry of this Order.

22.      *Modification of Stock Purchase Agreement*.  Subject to the terms of the Transaction Documents, including the Stock Purchase Agreement, and any related agreements, documents, or other instruments, the Transaction Documents may be modified, amended, or supplemented by the parties thereto, in a writing signed by the party against whom enforcement of any such modification, amendment, or supplement is sought, and in accordance with the terms thereof, without further order of this Court; *provided*, that any proposed material modification, amendment

or supplement to the Transaction Documents that, in the Special Master's reasonable discretion, adversely affects the Sale Process Parties or the Additional Judgment Creditors shall be subject to further Court order.

23.    *Conflicts; Precedence*.  In the event that there is a direct conflict between the terms of this Order and the terms of the Transaction Documents, the terms of this Order shall control. The failure to specify or include any particular provisions of the Stock Purchase Agreement or the Transaction Documents in this Order shall not diminish or impair the effectiveness of such provisions, it being the intent of this Court that the Stock Purchase Agreement, the Transaction Documents, and the Sale Transaction be authorized and approved in their entirety.

24.    *Provisions Non-Severable*.  The transactions contemplated under the Transaction Documents (including the Sale Transaction) and in this Order are inextricably linked and collectively constitute a single, integrated transaction, and each provision of the Transaction Documents is incorporated into and part of this Order as if fully set forth herein.  Buyer would not have entered into the Transaction Documents and would not acquire the PDVH Shares but for its reliance on each term and provision in this Order and in the Transaction Documents being valid and enforceable pursuant to its terms.  The total consideration to be provided by Buyer under the Transaction Documents reflects Buyer's reliance on each term and provision in this Order and in the Transaction Documents.  As such, each term and provision in this Order and in the Transaction Documents is integral to the Sale Transaction, nonseverable and mutually dependent.

25.    *Retention of Jurisdiction*.  This Court shall retain jurisdiction to, among other things, (i) interpret, enforce, and implement the terms and provisions of this Order and the Stock Purchase Agreement (including all amendments thereto, any waivers and consents thereunder, and of each of the agreements executed in connection therewith) and (ii) adjudicate disputes related to

this Order and the Stock Purchase Agreement (including all amendments thereto, any waivers and consents thereunder, and of each of the agreements executed in connection therewith); *provided*, that no entity or person, including the Sale Process Parties, any holder of an Attached Judgment, any Potential Bidder, or Buyer, or any persons acting in concert with them, may commence or pursue any cause of action of any kind that arose or arises from, in whole or in part, the Special Master Order, the Sale Procedures Order, the Bidding Procedures, this Order, any other orders of this Court in this Action, or any cause of action related to the Sale Transaction, without this Court (i) first determining, after notice and a hearing, that such cause of action represents a colorable claim against such party and (ii) specifically authorizing such entity or person to bring such cause of action against such party; *provided*, *further*, that no entity or person, including the Sale Process Parties, any holder of an Attached Judgment, any Potential Bidder, or any persons acting in concert with them, may commence or pursue any cause of action of any kind against Buyer or Buyer Affiliates that arose or arises from, in whole or in part, this Order or the Sale Transaction, including any successor or similar liability, transferee liability, or other liability or obligation arising under or related to the sale and transfer of the PDVH Shares to Buyer, without this Court (i) first determining, after notice and a hearing, that such cause of action represents a colorable claim against such party and (ii) specifically authorizing such entity or person to bring such cause of action against such party.

26. *Effectiveness of Order*.  This Order shall become effective and enforceable immediately upon its entry and its provisions shall be self-executing.

Dated: _____, 2025

_____
HONORABLE LEONARD P. STARK
UNITED STATES DISTRICT COURT

**Exhibit A**

**Stock Purchase Agreement**

[*Intentionally omitted*]

**<u>Exhibit B</u>**

**Publication Affidavits**

[*Intentionally omitted*]

## Exhibit B

**Stock Purchase Agreement**

Execution Copy

# STOCK PURCHASE AGREEMENT

dated as of

June 25, 2025

between

DALINAR ENERGY CORPORATION

and

ROBERT B. PINCUS,

solely in his capacity as the Special Master for the United States District Court for the District of Delaware

# TABLE OF CONTENTS

Page

ARTICLE I DEFINITIONS AND INTERPRETIVE MATTERS ..................................................2

Section 1.1.    Certain Defined Terms.............................................................2
Section 1.2.    Other Definitional and Interpretive Matters ...........................2

ARTICLE II SALE AND PURCHASE OF THE SHARES; CLOSING.......................................5

Section 2.1.    Sale and Purchase of Shares ...................................................5
Section 2.2.    Closing ....................................................................................5
Section 2.3.    Closing Deliveries of the Parties.............................................5

ARTICLE III PURCHASE PRICE; CLOSING DATE PAYMENTS .......................................6

Section 3.1.    Purchase Price.........................................................................6
Section 3.2.    Closing Transaction Expenses; Funds Flow Memorandum ..........6
Section 3.3.    Good Faith Deposit.................................................................6
Section 3.4.    Closing Date Payments by the Buyer ......................................7
Section 3.5.    Withholding ............................................................................8

ARTICLE IV REPRESENTATIONS RELATING TO THE COMPANY AND THE
SPECIAL MASTER ...........................................................................................9

Section 4.1.     Corporate Existence; Title to Shares.......................................9
Section 4.2.     Governmental Authorization .................................................10
Section 4.3.     Non-Contravention ...............................................................10
Section 4.4.     Capitalization ........................................................................10
Section 4.5.     Subsidiaries; Non-Controlled Entities..................................11
Section 4.6.     Financial Statements .............................................................12
Section 4.7.     Absence of Certain Changes .................................................13
Section 4.8.     No Undisclosed Material Liabilities .....................................13
Section 4.9.     Legal Proceedings .................................................................13
Section 4.10.    Taxes .....................................................................................14
Section 4.11.    Company Benefit Plans; Employment...................................15
Section 4.12.    Compliance with Laws; Permits ...........................................19
Section 4.13.    Regulatory Matters................................................................20
Section 4.14.    Environmental Matters..........................................................21
Section 4.15.    Title to Properties..................................................................22
Section 4.16.    Material Contracts .................................................................22
Section 4.17.    Intellectual Property and Data Privacy .................................24
Section 4.18.    Brokers; Financial Advisor ...................................................26
Section 4.19.    Real Property .........................................................................26
Section 4.20.    Affiliate Transactions............................................................28
Section 4.21.    Insurance ...............................................................................28
Section 4.22.    No Additional Representations ..............................................28

ARTICLE V REPRESENTATIONS AND WARRANTIES OF THE BUYER .........................29

Section 5.1.     Corporate Existence and Power.............................................30

i

Section 5.2.        Corporate Authorization ................................................30
Section 5.3.        Governmental Authorization .........................................30
Section 5.4.        Non-Contravention .......................................................30
Section 5.5.        Litigation......................................................................31
Section 5.6.        Regulatory Matters........................................................31
Section 5.7.        Financing.......................................................................32
Section 5.8.        Solvency........................................................................34
Section 5.9.        Purported Equity Pledge ...............................................34
Section 5.10.       Claim Obligations .........................................................34
Section 5.11.       Closing Consideration...................................................34
Section 5.12.       No Additional Representations ......................................35

ARTICLE VI COVENANTS ...........................................................................35

Section 6.1.        Conduct of the Business Pending the Closing ..............35
Section 6.2.        Access to Information ....................................................43
Section 6.3.        Regulatory Approvals; Third Party Consents ...............44
Section 6.4.        Further Assurances........................................................47
Section 6.5.        Confidentiality ..............................................................47
Section 6.6.        Indemnification, Exculpation and Insurance ................48
Section 6.7.        Public Announcements ..................................................49
Section 6.8.        Employee Matters .........................................................50
Section 6.9.        The Buyer's Obligations in Respect of Debt Financing ....52
Section 6.10.       Company's Obligations in Respect of Debt Financing........56
Section 6.11.       Tax Matters ...................................................................58
Section 6.12.       R&W Insurance Policy ..................................................59
Section 6.13.       Notices of Certain Events .............................................59
Section 6.14.       No Control of Other Party's Business ...........................61
Section 6.15.       Bidder Protections and Competing Proposals................61
Section 6.16.       Section 280G.................................................................63
Section 6.17.       Financial Statements .....................................................63
Section 6.18.       CFIUS. ..........................................................................64

ARTICLE VII CONDITIONS TO CLOSING ................................................66

Section 7.1.        Conditions Precedent to Obligations of the Parties .........66
Section 7.2.        Conditions Precedent to Obligations of the Buyer ........66
Section 7.3.        Conditions Precedent to Obligations of the Special Master ...............66
Section 7.4.        Frustration of Closing Conditions.................................67

ARTICLE VIII TERMINATION ....................................................................67

Section 8.1.        Termination....................................................................67
Section 8.2.        Effect of Termination ....................................................69
Section 8.3.        Termination Fee and Expense Reimbursement .............69

ARTICLE IX MISCELLANEOUS ..................................................................70

Section 9.1.        Survival .........................................................................70
Section 9.2.        Expenses ........................................................................70
Section 9.3.        Governing Law ..............................................................71

Section 9.4.        Dispute Resolution; Consent to Jurisdiction.........................................71
Section 9.5.        Consent to Service of Process; Waiver of Jury....................................71
Section 9.6.        Entire Agreement ...............................................................................71
Section 9.7.        Amendments and Waivers ..................................................................72
Section 9.8.        Notices ...............................................................................................73
Section 9.9.        Severability ........................................................................................74
Section 9.10.       Binding Effect; Assignment.................................................................74
Section 9.11.       No Third Party Beneficiaries ...............................................................74
Section 9.12.       Non-Recourse ....................................................................................74
Section 9.13.       Specific Performance .........................................................................75
Section 9.14.       Successors and Assigns......................................................................76
Section 9.15.       Release ...............................................................................................76
Section 9.16.       Counterparts.......................................................................................77
Section 9.17.       Debt Financing Sources ......................................................................77
Section 9.18.       Special Master and his Representatives' Judicial Immunity ...............78
Section 9.19.       Special Master Indemnification ...........................................................78

ANNEX A

Definitions

EXHIBITS

Exhibit A – Form of Escrow Agreement
Exhibit B – Form of Paying Agent Agreement
Exhibit C – Form of Release
Exhibit D – Form of Termination Release
Exhibit E – Form of Sale Order

**DEFINED TERMS**

| Term | Section |
|------|---------|
| Acquired Companies | Annex A |
| Additional Judgment Creditors | Annex A |
| Advanced Transaction Expenses | Annex A |
| Affected Employees | Section 6.8(c) |
| Affiliate | Annex A |
| Affiliate Transactions | Section 4.20 |
| Agreement | Preamble |
| Anti-Corruption Laws | Annex A |
| Antitrust Laws | Annex A |
| Audited Financial Statements | Section 4.6(a) |
| Bolivarian Republic of Venezuela | Section 1.2(a)(ix) |
| Bonus Amounts | Section 6.8(g) |
| Business Day | Annex A |
| Business Unit | Annex A |
| Buyer | Preamble |
| Buyer Disclosure Schedules | Article V |
| Buyer Documents | Section 5.2 |
| Buyer Released Parties | Section 9.15(b) |
| Buyer Releasing Parties | Section 9.15(a) |
| Buyer Subsidiary | Annex A |
| CapEx Budget | Section 6.1(b)(iii) |
| Cash | Annex A |
| Cause | Section 1.2(a)(x) |
| CFIUS | Annex A |
| CFIUS Clearance | Annex A |
| CFIUS Notice | Annex A |
| CFIUS Turndown | Annex A |
| CITGO Petroleum | Annex A |
| CITGO Petroleum Subsidiaries | Section 6.1(b)(viii) |
| Claim | Annex A |
| Claimholders | Recitals |
| Closing | 0 |
| Closing Consideration | Annex A |
| Closing Transaction Expenses | Annex A |
| Closing Transaction Expenses Statement | Section 3.2(a) |
| COBRA | Annex A |
| Code | Annex A |
| Collective Bargaining Agreement | Section 4.11(n) |
| Commitment Letters | Section 5.7(a) |
| Company | Preamble |
| Company Balance Sheet | Section 4.6(a) |
| Company Balance Sheet Date | Section 4.6(a) |
| Company Benefit Plan | Annex A |

WEIL:\100339991\12\67816.0003

| Term | Section |
|------|---------|
| Company By-Laws | Section 4.1(a) |
| Company Charter | Section 4.1(a) |
| Company Collective Bargaining Agreement | Section 4.11(n) |
| Company Disclosure Schedules | Article IV |
| Company Environmental Permits | Section 4.14 |
| Company Fundamental Representations | Annex A |
| Company Intellectual Property | Section 4.17(a) |
| Company Material Adverse Effect | Annex A |
| Company Owned Intellectual Property | Section 4.17(a) |
| Competing Proposal | Section 6.16(f)(i) |
| Confidentiality Agreement | Section 6.5 |
| Contract | Annex A |
| Court | Recitals |
| Credit Bid Amount | Recitals |
| Credit Bid Purchase Price | Section 3.4(e) |
| Debt | Annex A |
| Debt Commitment Letter | Section 5.7(a) |
| Debt Financing | Section 5.7(a) |
| Debt Financing Commitments | Section 5.7(a) |
| Debt Financing Documents | Annex A |
| Debt Financing Source | Annex A |
| Debt Payoff Amount | Annex A |
| Definitive Debt Documents | Section 6.9(b)(ii) |
| Deposit Amount | Recitals |
| Deposit Amount Release Date | Section 3.3(b) |
| Deposit Forfeiture Termination Event | Annex A |
| Designated Contacts | Section 6.2(a) |
| Designated Managers | Annex A |
| DPA | Annex A |
| Economic Sanctions/Trade Laws | Annex A |
| Execution Date | Preamble |
| Environmental Laws | Annex A |
| EPP | Annex A |
| Equitable Exceptions | Annex A |
| Equity Commitment Letter | Annex A |
| Equity Financing | Section 5.7(a) |
| Equity Financing Commitments | Section 5.7(a) |
| Equity Financing Sources | Annex A |
| Equity Interests | Annex A |
| Equity Pledge Litigation | Annex A |
| ERISA | Annex A |
| ERISA Affiliate | Annex A |
| Escrow Account | Annex A |
| Escrow Agent | Recitals |
| Evercore | Recitals |

| Term | Section |
|------|--------:|
| Excluded Information | Annex A |
| Expense Reimbursement Amount | Annex A |
| Expense Reserve Holdback Account | Annex A |
| Expense Reserve Holdback Amount | Annex A |
| Financings | Section 5.7(a) |
| Financial Statements | Section 4.6(a) |
| Final Recommendation Date | Section 6.3(a) |
| FIRPTA Certificate | Section 2.3(a)(ii) |
| Funds Flow Memorandum | Section 3.2(b) |
| GAAP | Section 4.6(a) |
| GLAS | Annex A |
| Gold Reserve | Recitals |
| Good Industry Practice | Annex A |
| Governmental Body | Annex A |
| Government Contract | Annex A |
| Government Official | Section 4.13(a) |
| Hazardous Substance | Annex A |
| HSR Act | Annex A |
| Indemnitees | Section 6.6(a) |
| Indenture | Annex A |
| Initial Outside Date | Section 8.1(b) |
| Intellectual Property | Section 4.17(a) |
| Interest Rate | Annex A |
| Interim Financial Statements | Section 4.6(a) |
| Interim Period | Annex A |
| IRS | Annex A |
| January Order | Annex A |
| Jointly Owned Properties | Section 4.19(c) |
| Judgment Creditors | Annex A |
| KM | Recitals |
| KNI | Recitals |
| Knowledge of the Buyer | Annex A |
| Knowledge of the Company | Annex A |
| Knowledge of the Special Master | Annex A |
| Koch | Recitals |
| Law | Annex A |
| Legal Proceeding | Annex A |
| Legal Restraint | Section 8.1(c) |
| Lien | Annex A |
| Lookback Date | Annex A |
| Marketing Period | Annex A |
| Material Contract | Section 4.16(a) |
| May Order | Recitals |
| Money Laundering Laws | Annex A |
| MTP | Section 6.1(b)(iii) |

| Term | Section |
|------|---------|
| MUFG | Annex A |
| Negative Consequences | Annex A |
| New Indemnification Agreements | Section 6.6(a) |
| No-Shop Period | Annex A |
| Non-Controlled Entity | Annex A |
| Non-Parties | Section 9.12 |
| Non-Union Affected Employees | Section 6.8(c) |
| OFAC | Annex A |
| OFAC License | Annex A |
| OFAC License Applications | Annex A |
| Order | Annex A |
| Ordinary Course | Annex A |
| Organizational Documents | Annex A |
| Outside Date | Section 8.1(b) |
| Owned Real Property | Section 4.19(b) |
| Parties | Preamble |
| Paying Agent | Recitals |
| Paying Agent Account | Annex A |
| Paying Agent Agreement | Recitals |
| Payoff Letters | Section 3.4(a) |
| PBGC | Section 4.11(d) |
| PCI DSS | Annex A |
| PDVSA | Recitals |
| Performance Incentive Program | Section 6.8(g) |
| Permit | Annex A |
| Permitted Liens | Annex A |
| Person | Annex A |
| Personal Information | Annex A |
| PFAS | Annex A |
| Post-Closing Tax Period | Annex A |
| Preferential Right | Annex A |
| Privacy Laws and Obligations | Section 4.17(f) |
| Procedures Summary | Annex A |
| Prohibited Modification | Section 6.9(b)(ii) |
| Purchase Price | Annex A |
| Purported Equity Pledge | Annex A |
| R&W Insurance Policy | Section 6.12 |
| Real Property | Section 4.19(b) |
| Real Property Lease | Section 4.19(a) |
| Receivables Securitization Facility | Section 6.1(b)(vi) |
| Record Holders | Preamble |
| Registered Intellectual Property | Section 4.17(a) |
| Related Claim | Annex A |
| Release | Annex A |
| Replacement Financing | Section 6.9(e) |

| Term | Section |
|------|---------|
| Representatives | Annex A |
| Required Amount | Section 5.7(e) |
| Required Information | Annex A |
| RRP | Annex A |
| Rusoro | Recitals |
| Sale Hearing | Section 6.16(c) |
| Sale Order | Annex A |
| Sale Order Entry | Section 4.2 |
| Sale Process Parties | Annex A |
| Sale Procedures Order | Recitals |
| Sanctions Target | Annex A |
| Security Incident | Annex A |
| Sensitive Data | Annex A |
| Shares | Recitals |
| Siemens | Recitals |
| Solvent | Annex A |
| Special Master Released Parties | Section 9.15(a) |
| Special Master Releasing Parties | Section 9.15(b) |
| Special Master Transaction Expenses | Annex A |
| Specially Designated Nationals and Blocked Persons List | Annex A |
| Specified Debt | Annex A |
| Specified Information | Annex A |
| Stalking Horse Bidder | Annex A |
| Stalking Horse Stock Purchase Agreement | Annex A |
| Subsequent Overbid Minimum | Section 6.16(f)(i) |
| Subsidiary | Annex A |
| Superior Proposal | Section 6.16(f)(ii) |
| Systems | Annex A |
| Tax or Taxes | Annex A |
| Tax Proceeding | Section 4.10(c) |
| Tax Returns | Annex A |
| Taxing Authority | Annex A |
| Termination Fee | Annex A |
| Topping Period | Annex A |
| Transaction Documents | Annex A |
| Transactions | Annex A |
| Transfer Taxes | Annex A |
| Treasury Regulations | Annex A |
| Turnaround/Catalyst Budget | Section 6.1(b)(iv) |
| Union | Section 4.11(n) |
| Union Affected Employees | Section 6.8(b) |
| Unsolicited Competing Proposal | Section 6.16(d) |
| Unsolicited Competing Proposal Agreement | Section 6.16(d) |
| VDR | Annex A |
| Vesting Instruments | Section 4.19(a) |

| Term | Section |
|---|---|
| WARN Act | Section 4.11(p) |
| 2020 Bondholders | Annex A |
| 2020 Bonds | Annex A |

# STOCK PURCHASE AGREEMENT

THIS STOCK PURCHASE AGREEMENT (this "Agreement") dated as of June 25, 2025 (the "Execution Date") is entered into by and between Dalinar Energy Corporation, a Delaware corporation (the "Buyer"), and Robert B. Pincus, solely in his capacity as special master (the "Special Master" and, together with the Buyer, the "Parties" and each a "Party") for the Honorable Leonard P. Stark, United States District Court for the District of Delaware (the "Court").

## W I T N E S S E T H:

WHEREAS, the Special Master has been appointed by the Court in connection with the case of *Crystallex International Corp. v. Bolivarian Republic of Venezuela* (D. Del. Case. No. 17-151-LPS) (the "Specified Litigation") pursuant to that certain Order entered by the Court on April 13, 2021 [D.I. 258], that certain Order Regarding Special Master entered by the Court on May 27, 2021 [D.I. 277] (the "May Order") and the Order (A) Establishing Sale and Bidding Procedures, (B) Approving Special Master's Report and Recommendation Regarding Proposed Sale Procedures Order, (C) Affirming Retention of Evercore Group, LLC ("Evercore") as Investment Banker by Special Master and (D) Regarding Related Matters entered by the Court on October 4, 2022 [D.I. 481] (as amended, restated, supplemented or otherwise modified from time to time, the "Sale Procedures Order").

WHEREAS, Petróleos de Venezuela, S.A., a Venezuelan company ("PDVSA"), owns all of the issued and outstanding capital stock of PDV Holding, Inc., a Delaware corporation (the "Company"), which consists of 1,000 shares of common stock, par value $1.00 per share (collectively, the "Shares").

WHEREAS, pursuant to the Sale Procedures Order, the Special Master has the authority to enter into this Agreement in making his determination to the Court as to which of the Qualified Bids (as defined in the Sale Procedures Order) was highest or best, and in making a recommendation to the Court as to which Qualified Bid is the Successful Bid (as defined in the Sale Procedures Order).

WHEREAS, each of Gold Reserve, Ltd., a Bermuda exempted company limited by shares ("Gold Reserve"), Siemens Energy Inc. ("Siemens"), Rusoro Mining Ltd. ("Rusoro"), Koch Minerals Sarl ("KM") and Koch Nitrogen International Sarl ("KNI" and, together with KM, "Koch", and, collectively, with Gold Reserve, Siemens, and Rusoro, the "Record Holders") is a creditor who is a party to the Specified Litigation and have each obtained a writ of attachment by January 12, 2024 (each, a "Specified Litigation Claim") and each such Specified Litigation Claim is secured by a valid and duly perfected lien on the Shares.

WHEREAS, the Buyer desires to purchase the Shares upon the terms and subject to the conditions set forth in this Agreement.

WHEREAS, the Buyer intends to effectuate a credit bid in respect of certain obligations owed to the Record Holders pursuant to those certain writs of attachment in *Gold Reserve Inc. v. Bolivarian Republic of Venezuela*, Case No. 22-mc-453-LPS (D. Del), *Rusoro Mining Limited v. Bolivarian Republic of Venezuela*, Case No. 21-mc-481-LPS (D. Del.), *Koch Minerals SàRL, et al. v. Bolivarian Republic of Venezuela*, Case No. 22-mc-156-LPS (D.Del.), *and Siemens Energy,*

*Inc. v. Petroleos De Venezuela, S. A.,* Case No. 22-mc-347-LPS(D.Del.), for a portion of the Purchase Price equal to the aggregate amount of principal of $3,398,145,180.63 plus the aggregate amount of accrued interest on judgments held by the Record Holders from the date hereof through the Closing in accordance with that certain Order entered by the Court on April 25, 2024 [D.I. 1136] (the "Credit Bid Amount"), which, in conjunction with the Closing Consideration and other amounts to be paid by Buyer hereunder, will be in exchange for the transfer to the Buyer, as applicable, of the Shares.

WHEREAS, on the date of the Sale Order Entry, the Buyer shall deposit with Acquiom Clearinghouse LLC, in its capacity as escrow agent (the "Escrow Agent"), the sum of $50,000,000 (such amount, the "Deposit Amount") in cash, to be held in the Escrow Account pursuant to the terms of that certain Escrow Agreement, to be entered into on or prior to the date of the Sale Order Entry, by and among the Special Master, the Buyer and the Escrow Agent, in substantially the form attached hereto as Exhibit A (as amended, restated, supplemented or otherwise modified from time to time, the "Escrow Agreement"), to be released in accordance with the provisions of this Agreement and the Escrow Agreement.

WHEREAS, at the Closing (as defined below), the Buyer shall deposit the Closing Consideration (as defined below) with the Escrow Agent in cash pursuant to the terms of the Escrow Agreement, to be released to those creditors of the Bolivarian Republic of Venezuela (the "Republic") or PDVSA that are party to the Specified Litigation and who have obtained a writ of attachment on or before January 12, 2024 (the "Claimholders") or the Buyer, in accordance with the provisions of the Escrow Agreement and that certain Paying Agent Agreement, to be entered into on or prior to the date of the Sale Order Entry, by and among the Buyer, the Special Master and Acquiom Financial LLC, in its capacity as paying agent (the "Paying Agent"), in substantially the form attached hereto as Exhibit B (as amended, restated, supplemented or otherwise modified from time to time, the "Paying Agent Agreement").

NOW, THEREFORE, in consideration of the promises and the respective representations, warranties, covenants and agreements set forth herein, the Parties agree as follows:

## ARTICLE I

## DEFINITIONS AND INTERPRETIVE MATTERS

Section 1.1.    Certain Defined Terms. Capitalized terms used in this Agreement have the meanings specified in Annex A or elsewhere in this Agreement.

Section 1.2.    Other Definitional and Interpretive Matters.

(a)    Unless otherwise expressly provided herein, for purposes of this Agreement, the following rules of interpretation shall apply:

(i)    Calculation of Time Period. When calculating the period of time before which, within which or following which any act is to be done or step is to be taken pursuant to this Agreement, the date that is the reference date in calculating such period shall be excluded. If the last day of such period is a non-Business Day, the period in

question shall end on the next succeeding Business Day. The word "day" shall mean "calendar day" unless "Business Day" is expressly identified.

(ii)    Dollars. Any reference in this Agreement to "$" shall mean U.S. dollars. The specification of any dollar amount in the representations and warranties or otherwise in this Agreement or in the Exhibits or the Company Disclosure Schedules is not intended and shall not be deemed to be an admission or acknowledgment of the materiality of such amounts or items, nor shall the same be used in any dispute or controversy between the Parties to determine whether any obligation, item or matter (whether or not described herein or included in the Company Disclosure Schedules) is or is not material for purposes of this Agreement.

(iii)    Exhibits/Schedules. The Exhibits and the Company Disclosure Schedules annexed hereto or referred to herein are an integral part of this Agreement and are hereby incorporated in and made a part of this Agreement as if set forth in full herein. Any matter or item disclosed on one Schedule or section of the Company Disclosure Schedules shall be deemed to have been disclosed on each other Schedule or section of the Company Disclosure Schedules in which it is reasonably apparent on the face of such disclosure that the information is required to be included in such other Schedule or section of the Company Disclosure Schedules. Disclosure of any item on any Schedule of the Company Disclosure Schedules shall not constitute an admission, indication, acknowledgment or representation that such item or matter is material or would reasonably be expected to have a Company Material Adverse Effect. No disclosure on a Schedule of the Company Disclosure Schedules relating to a possible breach or violation of any Contract, Law or Order shall be construed as an admission, indication, acknowledgment or representation that a breach or violation exists or has actually occurred. Any capitalized terms used in any Schedule of the Company Disclosure Schedules or Exhibit but not otherwise defined therein shall be defined as set forth in this Agreement.

(iv)    Gender and Number. Any reference in this Agreement to gender shall include all genders, and words imparting the singular number only shall include the plural and vice versa.

(v)    Headings. The provision of a table of contents, the division of this Agreement into Articles, Sections and other subdivisions and the insertion of headings are for convenience of reference only and shall not affect or be utilized in construing or interpreting this Agreement. All references in this Agreement to any "Section" or "Article" are to the corresponding Section or Article of this Agreement unless otherwise specified.

(vi)    Herein. The words "herein," "hereinafter," "hereof," and "hereunder" refer to this Agreement as a whole and not merely to a subdivision in which such words appear unless the context otherwise requires.

(vii)    Inclusive Terms. The word "including" or any variation thereof means (unless the context of its usage otherwise requires) "including, without limitation" and shall not be construed to limit any general statement that it follows to the specific or

3

similar items or matters immediately following it. The term "any" means "any and all." The term "or" shall not be exclusive and shall mean "and/or."

(viii)    <u>Reflected On or Set Forth In</u>. An item arising with respect to a specific representation or warranty shall be deemed to be "reflected on" or "set forth in" a balance sheet or financial statements, to the extent any such phrase appears in such representation or warranty, if (A) there is a reserve, accrual or other similar item underlying a number on such balance sheet or financial statements that related to the subject matter of such representation or warranty, (B) such item is otherwise specifically set forth on the balance sheet or financial statements or (C) such item is reflected on the balance sheet or financial statements and is specifically set forth in the notes thereto.

(ix)    <u>Bolivarian Republic of Venezuela</u>. Any reference herein to the "Bolivarian Republic of Venezuela" or the "Republic" shall include any successor nation thereto, and shall encompass any and all governments and administrations that purport to be Venezuela's legitimate governing body.

(x)    <u>Special Master and the Acquired Companies</u>. Any pre-Closing obligation of any of the Acquired Companies hereunder shall be deemed to include an obligation of the Special Master to "Cause" the Acquired Companies to comply with such obligation. With respect to any obligation of the Special Master hereunder to "<u>Cause</u>" any of the Acquired Companies to take an action or refrain from taking an action, or which otherwise requires action (or refraining from action) by any such Acquired Company, such obligation shall be deemed to be an obligation of the Special Master to use reasonable best efforts to cause the Company or the applicable Company Subsidiary to take such action (or refrain from taking such action), including by seeking an order from the Court with respect to such action or refraining from taking such action.  For the avoidance of doubt, none of the Acquired Companies, PDVSA or the Republic is a party hereto, and the Special Master shall not be deemed to be in breach of any of its obligations under this Agreement as a result of a failure by the Special Master to Cause any of the Acquired Companies to take any action or refrain from taking any action prior to the Sale Order Entry.

(xi)    "<u>Made Available</u>." Unless expressly stated otherwise, references to any document or information having been "delivered", "furnished", "provided" or "made available" to the Buyer or its Representatives shall mean such document, item or information has been posted to the VDR or transmitted directly by email from the Special Master's advisors to the Buyer or its Representatives at least two (2) Business Days prior to the Execution Date.

(b)    The Parties have participated jointly in the negotiation and drafting of this Agreement and, in the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as jointly drafted by the Parties and no presumption or burden of proof shall arise favoring or disfavoring any Party by virtue of the authorship of any provision of this Agreement. The language used in this Agreement shall be deemed to be the language chosen by the Parties to express their mutual intent, and no rule of strict construction shall be applied against any Person.

# ARTICLE II

## SALE AND PURCHASE OF THE SHARES; CLOSING

Section 2.1.    <u>Sale and Purchase of Shares</u>. Subject to approval of this Agreement by the Court, and upon the terms and subject to the conditions set forth in this Agreement and in the Sale Order, and pursuant to the authority provided to the Special Master under the Sale Procedures Order and the May Order, at the Closing, the Special Master shall sell, assign, transfer, convey and deliver to the Buyer, and the Buyer shall purchase and accept from the Special Master, the Shares, free and clear of all Liens (other than Permitted Liens and transfer restrictions imposed by applicable securities Laws).

Section 2.2.    <u>Closing</u>. The consummation of the sale and purchase of Shares (the "<u>Closing</u>") shall take place at 10:00 a.m., Eastern Time, on a date to be specified by the Parties, which date shall be no earlier than the twentieth (20th) Business Day after and no later than the thirtieth (30th) Business Day after satisfaction or waiver of the conditions set forth in <u>Article VII</u> (other than those conditions that by their nature are to be satisfied at the Closing, but subject to the satisfaction or waiver of those conditions at such time), remotely by electronic exchange of documents and signatures, unless another time, date or place is agreed to in writing by the Parties; <u>provided</u> that, if the Marketing Period has not ended at the time of the satisfaction or waiver of the last of the conditions set forth in <u>Article VII</u> (other than conditions that by their nature are to be satisfied at the Closing, but subject to the satisfaction or, to the extent permissible, waiver of those conditions at the Closing), the Closing shall take place on the earlier to occur of (x) any Business Day before or during the Marketing Period as may be specified by Buyer on no fewer than three (3) Business Days' written notice to the Company and (y) the third (3rd) Business Day immediately following the final day of the Marketing Period (subject, in each case, to the satisfaction or, to the extent permissible, waiver of all of the conditions set forth in Article VII as of the date determined pursuant to this proviso (other than conditions that by their nature are to be satisfied at the Closing, but subject to the satisfaction or, to the extent permissible, waiver of those conditions at the Closing). The date on which the Closing actually occurs is referred to in this Agreement as the "<u>Closing Date</u>."

Section 2.3.    <u>Closing Deliveries of the Parties</u>.

(a)    <u>Deliveries by the Special Master</u>. At or prior to the Closing, the Special Master shall deliver or otherwise cause to be delivered to the Buyer:

(i)    <u>Affirmation</u>.   An affirmation, executed by the Special Master, stating that the Special Master has used reasonable best efforts to cause the Chief Financial Officer of the Company to confirm the satisfaction of the conditions set forth in <u>Section 7.2(a)</u> as of the Closing Date;

(ii)    <u>Stock Certificate</u>. The original certificate evidencing all of the Shares, duly endorsed in blank, or accompanied by a stock power duly executed in blank by the Special Master; and

(iii)     FIRPTA Certificate. A validly issued certificate from the Company, in such form consistent and in accordance with the requirements of Treasury Regulations Sections 1.897-2(h)(2) and 1.1445-2(c)(3)(i) and a validly issued notice to the IRS from the Company in accordance with the provisions of Treasury Regulations Section 1.897-2(h)(2) (such certificate and notice issued by the Company, the "FIRPTA Certificate").

(b)     Deliveries by the Buyer. At or prior to the Closing, the Buyer shall deliver or cause to be delivered to the Special Master:

(i)     a certificate, dated as of the Closing Date, signed by an authorized officer of the Buyer as to the satisfaction of the conditions set forth in Section 7.3(a) and Section 7.3(a); and

(ii)     a counterpart to the Closing Release, duly executed by the Buyer and each Record Holder as of the Closing.

## ARTICLE III

## PURCHASE PRICE; CLOSING DATE PAYMENTS

Section 3.1.     Purchase Price.  The aggregate consideration payable by the Buyer for the Shares shall be the Purchase Price. The Purchase Price shall not be subject to any adjustments (including, for the avoidance of doubt, with respect to the Debt Payoff Amount) other than as set forth in the definition of Purchase Price. Closing Transaction Expenses; Funds Flow Memorandum.

(a)     No later than five (5) Business Days prior to the Closing Date, the Special Master shall provide the Buyer with a written statement (the "Closing Transaction Expenses Statement") reflecting the Special Master's calculation of Closing Transaction Expenses in accordance with the definition of Closing Transaction Expenses hereunder, along with reasonable supporting documentation. The Buyer shall be given a reasonable opportunity to review and comment on the Closing Transaction Expenses Statement prior to the Closing Date.  The Special Master shall consider in good faith the Buyer's comments to the Closing Transaction Expenses Statement and/or any of the components thereof or calculations therein and thereafter, the Closing Transaction Expenses Statement shall be binding on the Parties for purposes of this Section 3.2 and shall be used to determine the Purchase Price.

(b)     No later than one (1) Business Day after the Special Master's delivery of the Closing Transaction Expenses Statement, the Special Master shall distribute to the Buyer a detailed funds flow memorandum in Excel format (including all underlying calculations, formulas and amounts therein) setting forth all payments to be made by or on behalf of the Parties at Closing in accordance with this Agreement (the "Funds Flow Memorandum").

Section 3.3.     Good Faith Deposit. On the date of the Sale Order Entry, the Buyer shall deposit into the Escrow Account with the Escrow Agent an amount equal to Deposit Amount in cash. The Deposit Amount will be released by the Escrow Agent and delivered to either the Buyer or, at the direction of the Special Master, the Paying Agent, in accordance with the provisions of this Agreement, the Escrow Agreement and the Sale Procedures Order. The Deposit Amount will

be distributed out of the Escrow Account as follows (and the Buyer and the Special Master hereby agree to promptly deliver joint written instructions to the Escrow Agent to the extent required by the Escrow Agent to effect such distributions as and when required hereunder):

(a)    if the Closing occurs, the Buyer and the Special Master shall jointly instruct the Escrow Agent in writing to disburse the Deposit Amount to the Paying Agent by wire transfer of immediately available funds out of the Escrow Account;

(b)    if a Deposit Forfeiture Termination Event occurs, the Buyer and the Special Master shall promptly (and in any event within five (5) Business Days of such termination) deliver joint written instructions to the Escrow Agent directing the release of the balance of the Escrow Account to the Paying Agent Account; provided, that, in lieu of the foregoing, the Buyer may elect, in writing, within five (5) Business Days after such termination to forever waive, forfeit and discharge from the Specified Litigation Claim of Gold Reserve or Siemens (as specified by Buyer in writing), an amount equal to all or a portion of the Net Deposit Amount effective immediately upon such termination and shall cause Gold Reserve and/or Siemens, as applicable, to execute and deliver to the Special Master a Termination Release within two (2) Business Days after the Deposit Amount Release Date (as defined below), and in such case, within forty (40) Business Days after such election, pursuant to a written instruction to the Escrow Agent by the Special Master, that portion of the Net Deposit Amount equal to the amount subject to the Termination Releases so delivered shall be released by the Escrow Agent from the Escrow Account by wire transfer of immediately available funds to the account designated in writing by the Buyer (the date of such release, the "Deposit Amount Release Date"); provided, further, that any funds remaining in the Escrow Account after the applicable portion of the Net Deposit Amount is released to the Buyer by the Escrow Agent pursuant to this Section 3.3(b) shall be, pursuant to a written instruction to the Escrow Agent by the Special Master, released by the Escrow Agent to the Paying Agent to disburse such funds pursuant to the terms of the Paying Agent Agreement; and

(c)    if this Agreement is terminated for any reason other than as contemplated by Section 3.3(b), the Buyer and the Special Master shall promptly (and in any event within two (2) Business Days of such termination) deliver joint written instructions to the Escrow Agent directing the release of the balance of the Escrow Account to the Buyer or its designees.

Section 3.4.    Closing Date Payments by the Buyer.

(a)    Payment in respect of Debt. At the Closing, the Buyer shall pay, or cause to be paid, on behalf of the Acquired Companies, the Debt Payoff Amount by wire transfer of immediately available funds to the Persons as specified in the "payoff letters" or similar documents, executed by the applicable lender(s) (or agent thereof) or as set forth in the applicable indenture with respect to each item of Specified Debt (the "Payoff Letters").

(b)    Payment in respect of the Closing Transaction Expenses. At the Closing, the Buyer shall pay, or cause to be paid, the Closing Transaction Expenses to the applicable recipients as set forth on the Closing Transaction Expenses Statement by wire transfer of immediately available funds to such Persons.

(c)    Payment in respect of Expense Reserve Holdback Amount. At the Closing, the Buyer shall pay, or cause to be paid, to the Expense Reserve Holdback Account an amount equal to the Expense Reserve Holdback Amount as set forth in the Funds Flow Memorandum. The Expense Reserve Holdback Amount will be used by the Special Master to pay the Special Master's compensation and any out-of-pocket costs, fees and expenses incurred by the Special Master on or after the date of the delivery of the Closing Transaction Expenses Statement by the Special Master related to the Transactions or any Action related to or arising therefrom for investment bankers, third-party consultants, legal counsel and any of his other Representatives or Advisors (as defined in the Sale Procedures Order) and such amount shall be paid or distributed at the direction of the Special Master; provided, that any amounts remaining in the Expense Reserve Holdback Account after all such costs, fees and expenses incurred by the Special Master have been so paid or distributed shall be paid to the Paying Agent Account as promptly as practicable upon the later of (i) three (3) years following the Closing Date and (ii) one (1) year after all Actions, if any, brought against the Special Master relating to the Transactions have been definitively adjudicated by a court of final determination.

(d)    Payment in respect of Reimbursement for Advanced Transaction Expenses. At the Closing, in accordance with the May Order, the Buyer shall pay, or cause to be paid, an amount to the Paying Agent Account equal to the aggregate amount of the Advanced Transaction Expenses paid by the Sale Process Parties and Additional Judgment Creditors prior to the Closing (the "Advanced Transaction Expenses Amount") as set forth in the Funds Flow Memorandum.

(e)    Payment in respect of Closing Consideration.    At the Closing, the Buyer shall pay, or cause to be paid (including by causing the Record Holders to pay), (i) an amount equal to the sum of the Credit Bid Amount and (ii) an aggregate amount of cash equal to the Closing Consideration to the Paying Agent Account (together with the Credit Bid Amount, the "Credit Bid Purchase Price") as set forth in the Funds Flow Memorandum. The portion of the Credit Bid Purchase Price equal to the Credit Bid Amount shall be paid by means of a credit against an amount equal to the Credit Bid Amount that is due and owing under the Specified Litigation Claims by the delivery of an executed Closing Release by the Buyer and the Record Holders as set forth in Section 2.3(b)(ii).

(f)    Payment in respect of Termination Fee. At the Closing, the Buyer shall pay, or cause to be paid, an amount to the Stalking Horse Bidder equal to the Termination Fee as set forth in the Funds Flow Memorandum.

Section 3.5.    Withholding. Notwithstanding anything to the contrary in this Agreement, except as otherwise provided for in this Section 3.5, the Buyer shall be entitled to deduct and withhold (without duplication) from any and all payments made under this Agreement such amounts that are required to be deducted and withheld with respect to the making of such payments under the Code or under any provisions of state, local or foreign Tax Law, provided, that the Buyer shall (i) prior to making any deduction or withholding of any amount pursuant to this Section 3.5 (and in any event no later than ten (10) days prior to making any payment hereunder), provide written notice to the applicable recipient of any anticipated deduction or withholding (together with the legal basis thereof) and (ii) cooperate in good faith with the applicable recipient to reduce or eliminate any amounts that would otherwise be deducted or withheld. To the extent that any amounts are so withheld and timely paid over to the proper Taxing Authority, such withheld and

8

deducted amounts will be treated for all purposes of this Agreement as having been paid to the recipient of the payment in respect of which such deduction or withholding was made. The Buyer acknowledges and agrees that, other than a deduction or withholding attributable to the failure of the Company to provide the FIRPTA Certificate described in Section 2.3(a)(iii), no withholding applies to the Closing Consideration under Chapter 3 or Chapter 4 of the Code and any and all payments of the Closing Consideration made by Buyer or its Affiliates (including any Acquired Company) shall be made without deduction or withholding for any Taxes imposed under Chapter 3 or Chapter 4 of the Code.

## ARTICLE IV

## REPRESENTATIONS RELATING TO THE COMPANY AND THE SPECIAL MASTER

It is represented and warranted to the Buyer based solely upon the Specified Information furnished by the Designated Managers to the Special Master in accordance with the Procedures Summary that, as of the date of this Agreement and as of Closing, except as disclosed in the correspondingly numbered section of the disclosure schedules delivered to the Buyer simultaneously with the execution of this Agreement (the "Company Disclosure Schedules") (it being agreed that any matter or item disclosed in one Schedule or section of the Company Disclosure Schedules shall be deemed to have been disclosed on each other Schedule or section of the Company Disclosure Schedules in which it is reasonably apparent on the face of such disclosure that the information is required to be included in such other Schedule or section of the Company Disclosure Schedules):

Section 4.1.    Corporate Existence; Title to Shares.

(a)     The Company is a corporation duly incorporated, validly existing and in good standing under the Laws of the State of Delaware and has all requisite corporate powers and all governmental franchises, licenses, permits, authorizations, consents and approvals required to enable it to own, lease or otherwise hold its properties and assets and to carry on its business as now conducted, except for those absence of which would not, individually or in the aggregate, be reasonably likely to materially impair the Acquired Companies, taken as a whole. The Company is duly qualified to do business as a foreign corporation and is in good standing under the Laws in each jurisdiction in which the character of the property owned or leased by it or the nature of its activities or the ownership or leasing of its properties make such qualification necessary, except for those jurisdictions where the failure to be so qualified would not, individually or in the aggregate, be reasonably likely to materially impair the Acquired Companies, taken as a whole. The Special Master has heretofore made available to the Buyer true, correct and complete copies of the certificate of incorporation of the Company (the "Company Charter"), and the by-laws of the Company (the "Company By-Laws"). There is no pending or, to the Knowledge of the Company, threatened Legal Proceedings for the dissolution, liquidation, insolvency, or rehabilitation of any of the Acquired Companies.

(b)     The Special Master (or his counsel or advisors) is in possession of the original certificate evidencing 100% of the Shares. PDVSA is the record and beneficial owner of all of the outstanding Shares. To the extent provided by, and subject to the decrees of, the Sale Procedures Order, the Special Master has the legal capacity, power and authority to (i) execute and

deliver this Agreement and each other Transaction Document to which the Special Master is or will be a party, and (ii) surrender the Shares pursuant to the Transactions, and sell, transfer, assign, and deliver the Shares to the Buyer, in each case, the delivery of which will convey good and marketable title to the Shares, free and clear of all Liens (other than Permitted Liens and transfer restrictions imposed by applicable securities Laws).

(c)     This Agreement has been duly executed and delivered by the Special Master and, assuming due authorization, execution and delivery by the Buyer, and subject to the Sale Order Entry, will constitute, and each other Transaction Document (to the extent the Special Master is or will be a party thereto), when executed and delivered by the Special Master (assuming due authorization, execution and delivery by the other parties thereto), subject to the Sale Order Entry, will constitute, a legal, valid and binding obligation of the Special Master, enforceable against the Special Master in accordance with its terms, except that such enforcement may be limited by the Equitable Exceptions.

Section 4.2.    Governmental Authorization. Except as set forth in Section 4.2 of the Company Disclosure Schedules, the execution, delivery and performance by the Special Master of this Agreement and the other Transaction Documents and the consummation by the Special Master of the Transactions require no action by or in respect of, or filing with, any Governmental Body other than (a) applicable requirements of Antitrust Laws as set forth in Section 4.2 of the Company Disclosure Schedules, (b) the OFAC License, (c) the entry of the Sale Order by the Court (the "Sale Order Entry"), and (d) other actions or filings the absence or omission of which would not, individually or in the aggregate, be material to the business of the Acquired Companies, taken as a whole.

Section 4.3.    Non-Contravention. Except as set forth in Section 4.3 of the Company Disclosure Schedules, the execution, delivery and performance by the Special Master of this Agreement and the other Transaction Documents and the consummation by the Special Master of the Transactions do not and will not, assuming compliance with the matters referred to in Section 4.2, (a) result in any Negative Consequences under the Company Charter or the Company By-Laws or the Organizational Documents of any of the Acquired Companies or, to the Knowledge of the Company (and based only on information made available to the Acquired Companies with respect to the Non-Controlled Entities prior to the Execution Date), any of the Non-Controlled Entities, (b) contravene or conflict with or constitute a violation of any provision of any Law binding upon or applicable to the Acquired Companies or, to the Knowledge of the Company, the Non-Controlled Entities, (c) result in any Negative Consequences under any (i) Material Contract or (ii) any license, franchise, permit or other similar authorization held by the Acquired Companies, or (d) result in the creation or imposition of any Lien (other than Permitted Liens) on any asset of the Acquired Companies, except for such Negative Consequences referred to in clauses (b) or (c) or Liens referred to in clause (d) that would not, individually or in the aggregate, be material to the business of the Acquired Companies, taken as a whole.

Section 4.4.    Capitalization.

(a)     The authorized capital stock of the Company consists of 1,000 Shares. There are 1,000 Shares issued and outstanding, all of which are owned by PDVSA. The Shares have been duly authorized and are validly issued, fully paid and non-assessable and have not been

issued in violation of any preemptive rights or Preferential Rights. The Shares constitute the only outstanding Equity Interests of the Company and are not subject to any Preferential Rights.

(b)     Except for this Agreement, there is no outstanding option, warrant, call, right, or Contract of any character to which the Company is a party requiring, and there are no Equity Interests of the Company outstanding which upon conversion or exchange would require, the issuance of any Shares or other securities convertible into, exchangeable for or evidencing the right to subscribe for or purchase Shares. Other than as set forth in Section 4.4(b) of the Company Disclosure Schedules, there are no outstanding equity appreciation, phantom equity, stock unit, profit participation, equity, equity-based performance or similar rights with respect to the Company. The Company is not a party to any voting trust or other Contract with respect to the voting, redemption, sale, transfer or other disposition of the Shares.

Section 4.5.     Subsidiaries; Non-Controlled Entities.

(a)     Section 4.5(a) of the Company Disclosure Schedules reflects a true and complete list of each entity in which the Company owns, directly or indirectly, any Equity Interests (excluding Equity Interests owned directly or indirectly by Non-Controlled Entities), and with respect to each entity (except as otherwise provided in this Section 4.5(a)), sets forth the following information: (i) its name and jurisdiction of organization or formation; (ii) the number of authorized shares or other Equity Interests as of the date hereof (with respect to Company Subsidiaries only); and (iii) the number of issued and outstanding shares or other Equity Interests, the names of the holders thereof, and the number of shares or other Equity Interests held by each such holder (with respect to Company Subsidiaries only).  Except as set forth in Section 4.5(a) of the Company Disclosure Schedules, the Company does not, directly or indirectly, own any Equity Interests in any other entity.

(b)     Each Company Subsidiary and, to the Knowledge of the Company, each Non-Controlled Entity, is duly organized, validly existing and in good standing under the Laws of its jurisdiction of organization, to the extent such concepts are recognized under the Laws of the jurisdiction of its organization, and has all requisite corporate (or similar entity) power and authority to own, lease and operate its properties and to carry on its business in all material respects as now conducted, except where the failure to be so organized, existing and in good standing or to have such power and authority would not, individually or in the aggregate, be reasonably likely to be material to the business of the Acquired Companies, taken as a whole. Each Company Subsidiary: (i) is duly qualified or authorized to do business as a foreign corporation or entity and is in good standing to the extent such concepts are recognized under the Laws of each jurisdiction in which the conduct of its business or the ownership of its properties requires such qualification or authorization, except where the failure to be so qualified, authorized or in good standing would not, individually or in the aggregate, be reasonably likely to be material to the business of the Acquired Companies, taken as a whole and (ii) has full organizational power and authority to own, lease and operate its properties and carry on its business as presently conducted, except where the failure to have such power and authority would not, individually or in the aggregate, be reasonably likely to be material to the business of the Acquired Companies, taken as a whole.

(c)     The Special Master has heretofore made available to the Buyer true, correct and complete copies of the Organizational Documents of each Company Subsidiary.

(d)     The outstanding Equity Interests of each Company Subsidiary are validly issued, fully paid and non-assessable, to the extent such concepts are applicable to such Equity Interests, and have not been issued in violation of any preemptive rights or Preferential Rights or similar rights, and all such Equity Interests represented as being owned by the Company or any Company Subsidiaries are owned by it free and clear of any Liens, other than (i) Liens securing Debt of the Company or any Company Subsidiaries (which Liens shall be removed on or before the Closing), (ii) Liens relating to the transferability of securities under applicable securities Laws, (iii) Liens created by acts of the Buyer or any of its Affiliates and (iv) the Purported Equity Pledge and Liens as a result of the 2020 Bonds. There is no outstanding option, warrant, call, Preferential Right, right or Contract to which any Company Subsidiary is a party requiring, and there are no convertible securities of any Company Subsidiary outstanding which upon conversion would require, the issuance of any Equity Interests of any Company Subsidiary or other securities convertible into Equity Interests of any Company Subsidiary. No Company Subsidiary is a party to any voting trust or other Contract with respect to the voting, redemption, sale, transfer or other disposition of the Equity Interests of such Company Subsidiary.

Section 4.6.    <u>Financial Statements</u>.

(a)     <u>Section 4.6(a)</u> of the Company Disclosure Schedules sets forth true, correct, and complete copies of: (i) the audited consolidated balance sheet of the Acquired Companies reflected therein as of December 31, 2023, December 31, 2022, and December 31, 2021, the related audited consolidated statements of income and comprehensive income, stockholder's equity and cash flow of the Acquired Companies for the fiscal year then ended, together with the related notes thereof (the "<u>Audited Financial Statements</u>"); and (ii) the unaudited consolidated balance sheet of the Acquired Companies (the "<u>Company Balance Sheet</u>") as of September 30, 2024 (the "<u>Company Balance Sheet Date</u>") and the related condensed consolidated statements of income and comprehensive income, stockholder's equity and cash flows of the Acquired Companies for the nine-month period then ended (the "<u>Interim Financial Statements</u>" and, collectively with the Audited Financial Statements, the "<u>Financial Statements</u>"). Except as set forth in the notes to the Financial Statements and with the exception of the absence of normal year-end audit adjustments and footnotes in the Interim Financial Statements, each of the Financial Statements has been prepared in conformity with United States generally accepted accounting principles ("<u>GAAP</u>") applied on a consistent basis (except as may be indicated in the notes thereto) and fairly presents, in all material respects, the consolidated financial position, results of operations and cash flows of the Acquired Companies as of the dates and for the periods indicated therein.

(b)     The Acquired Companies (i) maintain a standard system of accounting established and administered in accordance with GAAP and (ii) have established and maintain a system of internal controls over financial reporting designed to provide reasonable assurance regarding the reliability of the financial reporting and the preparation of the Financial Statements for external purposes in accordance with GAAP. Except as disclosed on <u>Section 4.6(b)</u> of the Company Disclosure Schedules, there (x) are no significant deficiencies or weaknesses in any system of internal accounting controls used by each of the Acquired Companies, (y) has not been since the Lookback Date any fraud or other unlawful wrongdoing on the part of any of management or other employees of the Acquired Companies who have a significant role in the preparation of Financial Statements or the internal accounting controls used by the Company and each of its

Subsidiaries relating to such preparation or controls, or (z) has not been since the Lookback Date any claim or allegation regarding any of the foregoing.

Section 4.7.    <u>Absence of Certain Changes</u>. Except as contemplated by this Agreement, from the Company Balance Sheet Date to the date of this Agreement:

(a)    the Acquired Companies have conducted their businesses in the Ordinary Course in all material respects;

(b)    there has not been a Company Material Adverse Effect; and

(c)    no Acquired Company has entered into, terminated, amended or otherwise modified any Contracts set forth in <u>Section 4.20</u> of the Company Disclosure Schedules (Affiliate Transactions).

Section 4.8.    <u>No Undisclosed Material Liabilities</u>. The Acquired Companies have no material liabilities of any kind that would be required to be reflected in or reserved against on a consolidated balance sheet of the Company or in the notes thereto prepared in accordance with GAAP, other than:

(a)    liabilities that are adequately accrued and specifically reflected in the Company Balance Sheet or the notes thereto;

(b)    liabilities incurred since the Company Balance Sheet Date in the Ordinary Course and which, individually or in the aggregate, would not be reasonably likely to be material to the Acquired Companies (taken as a whole);

(c)    liabilities or obligations that have been discharged or paid in full in the Ordinary Course or which, individually or in the aggregate, would not be reasonably likely to have a Company Material Adverse Effect;

(d)    liabilities or obligations under this Agreement or otherwise in connection with the Transactions; or

(e)    liabilities or obligations set forth in <u>Section 4.8(e)</u> of the Company Disclosure Schedules.

Section 4.9.    <u>Legal Proceedings</u>.  As of the Execution Date, except for the Specified Litigation and as set forth in <u>Section 4.9</u> of the Company Disclosure Schedules and as would not, individually or in the aggregate, be reasonably likely to be material to the business of the Acquired Companies, taken as a whole, there are no material Legal Proceedings pending, or, to the Knowledge of the Company, threatened in writing against the Acquired Companies before or by any Governmental Body (whether local, state, federal or foreign). As of the Execution Date, except as would not, individually or in the aggregate, be reasonably likely to be material to the business of the Acquired Companies, taken as a whole, neither the Company nor any of its Subsidiaries is subject to any outstanding judgment, Order, decree or injunction of any court or other Governmental Body (other than Orders of general applicability which do not impact the Acquired

Companies in a manner that is materially different than the impact of similarly situated companies).

Section 4.10.  Taxes. Except as set forth in the Company Balance Sheet (including the notes thereto) and except as would not, individually or in the aggregate, be reasonably likely to have a Company Material Adverse Effect:

(a)    all income and other material Tax Returns required to be filed with any Taxing Authority by, or with respect to, the Acquired Companies have been filed (taking into account any applicable extensions) in accordance with all applicable Laws, the Acquired Companies have paid, or caused to be paid, all material Taxes shown as due and payable on such Tax Returns, and, as of the time of filing, such Tax Returns were true and complete in all material respects;

(b)    all material amounts of Taxes which any of the Acquired Companies were obligated to withhold from amounts owing to any employee, creditor, owner or third party have been fully and timely paid;

(c)    except as set forth in Section 4.10(c) of the Company Disclosure Schedules, as of the date hereof, there is no Legal Proceeding or Claim in respect of any Tax or Tax Return (each, a "Tax Proceeding") now proposed in writing or pending against or with respect to the Acquired Companies;

(d)    except as set forth in Section 4.10(d) of the Company Disclosure Schedules, none of the Acquired Companies have waived any statute of limitations in respect of Taxes beyond the date hereof or agreed to any extension of time beyond the date hereof with respect to a Tax assessment or deficiency (other than pursuant to extensions of time to file Tax Returns obtained in the Ordinary Course);

(e)    except as set forth in Section 4.10(e) of the Company Disclosure Schedules, the Acquired Companies are not a party to, are not bound by and do not have any obligation under any Tax sharing, allocation or indemnity agreement, or any similar agreement or arrangement, except for (i) any such agreement or arrangement solely between or among the Acquired Companies or (ii) any commercial agreement entered into in the Ordinary Course the primary purpose of which does not relate to Taxes;

(f)    no claim has been made by a Taxing Authority in a jurisdiction where any of the Acquired Companies do not file Tax Returns that the Acquired Companies are or may be subject to taxation by that jurisdiction, which claim has not been resolved;

(g)    none of the Acquired Companies will be required to include any material item of income in, or exclude any material item of deduction from, income for any Tax period (or portion thereof) ending after the Closing Date as a result of any: (i) change in method of accounting made on or prior to the Company Balance Sheet Date pursuant to Section 481(a) of the Code (or any comparable provision of applicable Law), (ii) "closing agreement" as described in Section 7121 of the Code (or any comparable provision of applicable Law), (iii) installment sale or open transaction disposition made on or prior to the Company Balance Sheet Date, or (iv) prepaid amount received on or prior to the Company Balance Sheet Date;

(h)    none of the Acquired Companies has participated in any "reportable transaction" (other than a "loss transaction") within the meaning of Treasury Regulation Section 1.6011-4; and

(i)    there are no Liens with respect to Taxes upon any asset of the Acquired Companies other than Permitted Liens.

Notwithstanding any other provision in this Agreement, no representation or warranty is made with respect to the existence, availability, amount, usability or limitations (or lack thereof) of any net operating loss, net operating loss carryforward, capital loss, capital loss carryforward, basis amount or other Tax attribute (whether federal, state, local or foreign) of the Acquired Companies after the Closing Date, and none of the Buyer or any of its Affiliates (including, after the Closing, the Acquired Companies) may rely on any of the representations and warranties in this Section 4.10 with respect to any position taken in or any Taxes with respect to any Post-Closing Tax Period.

Section 4.11.    Company Benefit Plans; Employment.

(a)    The Special Master has provided the Buyer with a list (set forth in Section 4.11(a) of the Company Disclosure Schedules) identifying each material Company Benefit Plan as of the Execution Date.

(b)    With respect to each material Company Benefit Plan, the Special Master has made available to the Buyer true, complete and correct copies (or, to the extent such plan is unwritten, an accurate written description), to the extent applicable, of: (i) the current plan and trust document and any amendments thereto and the most recent summary plan description, together with each subsequent summary of material modifications with respect to such Company Benefit Plan, (ii) the most recent annual report on Form 5500 thereto (including any related actuarial valuation report) filed with the Internal Revenue Service (if any such report was required), (iii) the most recent financial statements, (iv) the most recent Internal Revenue Service determination, opinion or advisory letter, and (v) for the three (3) most recent years, nondiscrimination testing results in respect of such Company Benefit Plan. For purposes of this Section 4.11(b), summary plan descriptions and summaries of material modification available at https://www.hr.citgo.com as of five (5) Business Days prior to the Execution Date are considered to have been made available to the Buyer. The Special Master has made available copies of Code Section 280G calculations prepared by the Company or its representatives (whether or not final) with respect to certain employees of the Acquired Companies in connection with the Transactions.

(c)    Except as would not, individually or in the aggregate, be reasonably likely to result in a material liability to the Acquired Companies taken as a whole, (i) each Company Benefit Plan has been established, maintained, operated, funded and administered in compliance with (A) its terms and (B) the requirements prescribed by Law (including, to the extent applicable, ERISA and the Code) which are applicable to such Company Benefit Plan and (ii) all benefits, contributions and premium payments required to be made with respect to a Company Benefit Plan have been timely made or paid in full, or to the extent not required to be made or paid in full, have been accrued and reflected on the Financial Statements as required by GAAP.

(d)     Except as would not, individually or in the aggregate, be reasonably likely to result in a material liability to the Acquired Companies taken as a whole, (i) no Acquired Company or any of their respective ERISA Affiliates has incurred any liability under Title IV of ERISA, Sections 412, 430 or 4971 of the Code or Section 302 of ERISA that has not been satisfied in full when due, and (ii) all insurance premiums with respect to Company Benefit Plans, including premiums to the Pension Benefit Guaranty Corporation ("PBGC"), have been paid when due. No Acquired Company or any of their respective ERISA Affiliates currently sponsors, maintains, or contributes to (or is obligated to contribute to) or has, within the last six (6) years, sponsored or maintained, contributed to or been obligated to contribute to (i) a "multiemployer plan," as defined in Section 3(37) of ERISA, (ii) a "multiple employer plan" as defined in Section 413(c) of the Code, or (iii) a "multiple employer welfare arrangement" within the meaning of Section 3(40) of ERISA.

(e)     Except as set forth in Section 4.11(e) of the Company Disclosure Schedules, with respect to any Company Benefit Plan that is subject to Title IV of ERISA: (i) there does not exist any failure to meet the "minimum funding standard" of Section 412 of the Code or 302 of ERISA (whether or not waived); (ii) such plan is not in "at-risk" status for purposes of Section 430 of the Code; (iii) as of the last day of the most recent plan year ended prior to the Execution Date, there is no "amount of unfunded benefit liabilities" as defined in Section 4001(a)(18) of ERISA; (iv) except as would not, individually or in the aggregate, be reasonably likely to result in a material liability to the Acquired Companies taken as a whole, no reportable event within the meaning of Section 4043(c) of ERISA has occurred; and (v) the PBGC has not instituted proceedings to terminate any such plan and, to the Knowledge of the Company, no circumstances exist which would serve as a basis for the institution of such proceedings.

(f)     Each Company Benefit Plan that is intended to be qualified under Section 401(a) of the Code is so qualified and has received a favorable determination letter or opinion letter, if applicable, from the Internal Revenue Service, and the related trust is intended to be exempt from federal income taxation under the Code and is so exempt. There are no facts or set of circumstances and, to the Knowledge of the Company, nothing has occurred that would reasonably be expected to cause the loss of such qualification or exemption or reasonably be expected to result in any Company Benefit Plan being required to pay any Tax or penalty under applicable Law that is material to the Acquired Companies taken as a whole as a condition to maintaining such qualification or exemption. Each trust funding any Company Benefit Plan which is intended to meet the requirements of Section 501(c)(9) of the Code meets such requirements and provides no disqualified benefits (as such term is defined in Section 4976(b) of the Code).

(g)     Except (i) as would not, individually or in the aggregate, be reasonably likely to result in a material liability to the Acquired Companies taken as a whole or (ii) as set forth in Section 4.11(g) of the Company Disclosure Schedules, no Acquired Company has any obligation or liability to provide post-employment medical or welfare benefits, except (A) as required by the continuing coverage requirements of COBRA and at the sole expense of the participant or such participant's spouse or dependents or (B) death or disability benefits under any retirement or deferred compensation plan. To the Company's Knowledge, since the Lookback Date, there have been no written communications by the Acquired Companies to employees of any Acquired Company which promise or guarantee post-employment medical or welfare benefits on a permanent basis.

16

(h)      Except as would not, individually or in the aggregate, be reasonably likely to result in a material liability to the Acquired Companies taken as a whole, no Acquired Company nor any plan sponsor or plan administrator of a Company Benefit Plan, or to the Company's Knowledge, any third-party fiduciary of a Company Benefit Plan, has engaged in any prohibited transaction (within the meaning of Section 406 of ERISA or Section 4975 of the Code) or breached any fiduciary duty under ERISA with respect to such Company Benefit Plan that would be reasonably likely to subject any Acquired Company or Company Benefit Plan to any Tax or penalty (civil or otherwise) imposed by ERISA, the Code or other applicable Law, or any other material liability. Except (i) as would not, individually or in the aggregate, be reasonably likely to result in a material liability to the Acquired Companies taken as a whole, or (ii) as set forth in Section 4.11(h) of the Company Disclosure Schedules, there are no pending or, to the Knowledge of the Company, threatened claims (other than routine claims for benefits) by or on behalf of any Company Benefit Plan or any trusts which are associated with such Company Benefit Plans and, to the Knowledge of the Company, no facts or circumstances exist that would reasonably be expected to result in such claim. Except as would not, individually or in the aggregate, be reasonably likely to result in a material liability to the Acquired Companies taken as a whole, as of the Execution Date, none of the Company Benefit Plans are under audit or subject to an administrative proceeding or, to the Knowledge of the Company, investigation or examination by the Internal Revenue Service, the Department of Labor, the PBGC or any other Governmental Body.

(i)      Except as would not, individually or in the aggregate, be reasonably likely to result in a material liability to the Acquired Companies taken as a whole, each Company Benefit Plan that is a "nonqualified deferred compensation plan" within the meaning of Section 409A(d)(1) of the Code that is subject to Section 409A of the Code, complies with, and has been operated and administered in compliance with, Section 409A of the Code and the regulations and related guidance promulgated thereunder.

(j)      Except (x) as would not, individually or in the aggregate, be reasonably likely to result in a material liability to the Acquired Companies taken as a whole, or (y) as set forth in Section 4.11(j) of the Company Disclosure Schedules, neither the execution, delivery or the performance of this Agreement nor the consummation of the Transactions (alone or in conjunction with any other event) will or could reasonably be expected to (i) accelerate the time of payment or vesting or increase the amount of, or trigger any funding of, compensation or benefits under any Company Benefit Plan; (ii) result in any limitation on the right of an Acquired Company or Buyer, or any of their respective Affiliates, to amend, merge, terminate or receive a reversion of assets from a Company Benefit Plan or related trust; (iii) entitle any current or former director, officer, manager, employee, contractor or consultant of any Acquired Company to severance pay, termination pay or any other similar payment, right or benefit; (iv) result in any payment, right or benefit that (A) would not be deductible under Section 280G of the Code or (B) would result in any excise tax on any "disqualified individual" (within the meaning of Section 280G of the Code) under Section 4999 of the Code. Except as set forth in Section 4.11(j) of the Company Disclosure Schedules, none of the Acquired Companies has any obligation to gross-up or reimburse any current or former director, officer, manager, employee, contractor or consultant of any Acquired Company for any Taxes or related interest or penalties incurred by such individual, including under Section 4999, 409A or 105(h) of the Code.

(k) No Company Benefit Plan is maintained primarily in respect of any current or former director, officer, manager, employee, contractor or consultant of any Acquired Company who is located outside of the United States.

(l) Except as set forth in <u>Section 4.11(l)</u> of the Company Disclosure Schedules and as would not, individually or in the aggregate, be material to the Acquired Companies, taken as a whole, (i) the Acquired Companies are in material compliance with all applicable Laws respecting employment, employment practices and terms and conditions of employment, including all Laws relating to labor, labor relations, collective bargaining, occupational safety and health, and wages, hours, worker classification, immigration, whistleblower protections, reasonable accommodation, leaves of absence, paid sick leave, unemployment insurance, workers' compensation, retaliation, harassment, and employment discrimination and (ii) there are no actual or, to the Knowledge of the Company, as of the Execution Date, threatened unfair labor practice charges, labor grievances, or labor arbitrations against the Acquired Companies which, individually or in the aggregate, are expected to result in material liability for the Company.

(m) To the Knowledge of the Company, as of the Execution Date, no employee of the Acquired Companies holding a position of executive vice president or above has notified the Company or the Acquired Companies in writing of an intention to resign, retire, or otherwise terminate his or her employment prior to the Closing or in connection with the Transactions nor, to the Knowledge of the Company as of the Execution Date, does any such employee have an intention to do so.

(n) Except as set forth in <u>Section 4.11(n)</u> of the Company Disclosure Schedules, (i) as of the Execution Date, none of the Acquired Companies are party to or bound by any collective bargaining agreements or other agreement (each, a "<u>Collective Bargaining Agreement</u>") with any labor union, works council, or other labor organization (each, a "<u>Union</u>") and no such agreement is being negotiated by any of the Acquired Companies (each such Collective Bargaining Agreement set forth in <u>Section 4.11(n)</u> of the Company Disclosure Schedules, a "<u>Company Collective Bargaining Agreement</u>"); (ii) since the Lookback Date, to the Knowledge of the Company, no group of employees of an Acquired Company or Union has sought to organize any employees of an Acquired Company not covered by a Company Collective Bargaining Agreement for purposes of collective bargaining, made a demand for recognition or certification, sought to bargain collectively with any Acquired Company, or filed a petition for recognition with any Governmental Body, except that resulted in entry into or involved a pre-existing Company Collective Bargaining Agreement; and (iii) since the Lookback Date, there has been no labor strike, lockout, slowdown, stoppage, picketing, boycott, hand billing, demonstration, leafletting, sit-in, sick-out, lockout or other form of organized labor disruption pending or, to the Knowledge of the Company, threatened against any Acquired Company.

(o) Since the Lookback Date, (i) to the Knowledge of the Company, no material allegations of sexual harassment or other sexual misconduct have been made by any current or former employee of the Acquired Companies against any current employee of the Acquired Companies with the title of executive vice president or above and, to the Knowledge of the Company, no employee of any Acquired Company has engaged in any cover up of such harassment or misconduct or knowingly aided or assisted any other person or entity to engage in any such harassment or misconduct, (ii) there are no Legal Proceedings pending or, to the Knowledge of

the Company, threatened related to any allegations made by any current or former employee of any of the Acquired Companies of sexual harassment or other sexual misconduct against any employee of the Acquired Companies with the title of executive vice president or above and (iii) none of the Acquired Companies have entered into any settlement agreements related to allegations of sexual harassment or other sexual misconduct made by any current or former employee of the Acquired Companies against any current employee of the Acquired Companies with the title of executive vice president or above.

(p)    Since the Lookback Date, the Acquired Companies have complied in all material respects with Worker Adjustment and Retraining Notification Act and any similar state or local law, as amended (collectively, the "WARN Act") and have not incurred any material liability or material obligation under the WARN Act.

(q)    Except as would not be reasonably expected to result in material liability to the Company, each of the employees of the Acquired Companies have all work permits, immigration permits, visas, or other authorizations required by applicable Law for such individual given the duties and nature of such individual's employment, and the Acquired Companies have on file for each employee of the Acquired Companies a Form I-9 that is validly and properly completed in accordance with applicable Law.

(r)    No Acquired Company is a party to a U.S. federal Government Contract. The Acquired Companies are not, and have not been since the Lookback Date, the subject of any Legal Proceeding in connection with any U.S. federal Government Contract or related compliance with Executive Order No. 11246 of 1965, Section 503 of the Rehabilitation Act of 1973 or the Vietnam Era Veterans' Readjustment Assistance Act of 1974. The Acquired Companies are not debarred, suspended or otherwise ineligible from doing business with the U.S. government or any U.S. government contractor.

(s)    Except as would not, individually or in the aggregate, be reasonably likely to result in a material liability to the Acquired Companies taken as a whole; there are no, and since the Lookback Date there have not been, any material workers' compensation claims, insured or uninsured, pending or, to the Knowledge of the Company, threatened, relating to any employee of the Acquired Companies. Except as would not, individually or in the aggregate, be reasonably likely to have a Company Material Adverse Effect, all amounts required by any statute, insurance policy, Governmental Body or agreement to be paid by the Acquired Companies into any workers' compensation loss or reserve fund, collateral fund, sinking fund or similar account have been duly paid into such fund or account as required.

(t)    Pursuant to the terms of the EPP and the RRP, the Company has established and maintains a grantor trust that will become irrevocable as of the Closing.

Section 4.12.    Compliance with Laws; Permits.

(a)    Except as set forth in Section 4.12(a) of the Company Disclosure Schedules, since the Lookback Date, (i) to the Knowledge of the Company, none of the Acquired Companies has materially violated or is in material violation of, any Laws except for any violations that, individually or in the aggregate, are not, and would not be reasonably likely to be material to the

business of the Acquired Companies, taken as a whole and (ii) none of the Acquired Companies has received any written notice of or been charged with the material violation of any Laws except for any violations that, individually or in the aggregate, are not, and would not be reasonably likely to be material to the business of the Acquired Companies, taken as a whole.

(b)    Except as set forth in Section 4.12(b) of the Company Disclosure Schedules, the Acquired Companies have all Permits which are required for the operation of its respective business as presently conducted (and such Permits are in full force and effect), except for any Permit which the failure of the Acquired Companies to have (or to be in full force and effect) would not be material to the business of the Acquired Companies, taken as a whole. Except as would not be material to the Acquired Companies, taken as a whole, the Acquired Companies are, and since the Lookback Date have been, in compliance in all material respects with the terms, conditions or provisions of any such Permits.

Section 4.13.    Regulatory Matters.

(a)    Except as would not, individually or in the aggregate, reasonably be expected to be material to the Acquired Companies, taken as a whole, and except as set forth in Section 4.13(a) of the Company Disclosure Schedules, since the Lookback Date, (i) none of the Acquired Companies, the Acquired Companies' directors, officers, employees, nor to the Knowledge of the Company, any Representatives or other Person acting on behalf of the Acquired Companies has violated any Anti-Corruption Law and (ii) none of the Acquired Companies, the Acquired Companies' directors, officers, employees, nor to the Knowledge of the Company, any Representatives or other Person acting on behalf of the Acquired Companies, has offered, paid, given, promised, authorized, solicited or received, the payment of, anything of value (including money, checks, wire transfers, tangible and intangible gifts, favors, services, employment or entertainment and travel) directly or indirectly to or from any employee, officer, or Representative of, or any Person otherwise acting in an official capacity for or on behalf of a Governmental Body, whether elected or appointed, including an officer or employee of a state-owned or state-controlled enterprise, a political party, political party official or employee, candidate for public office, or an officer or employee of a public international organization (such as the World Bank, United Nations, International Monetary Fund, or Organization for Economic Cooperation and Development) (any such person, a "Government Official") (A) for the purpose of (1) influencing any act or decision of a Government Official or any other person in his or her official capacity, (2) inducing a Government Official or any other person to do or omit to do any act in violation of his or her lawful duties, (3) securing any improper advantage, (4) inducing a Government Official or any other person to influence or affect any act or decision of any Governmental Body or (5) assisting the Acquired Companies, or any Acquired Company director, officer employee, Representative, or any other person acting on behalf of an Acquired Company in obtaining or retaining business, or (B) in a manner which would constitute or have the purpose or effect of public or commercial bribery or corruption, acceptance of, or acquiescence in extortion, kickbacks, or other unlawful or improper means of obtaining or retaining business or any improper advantage.

(b)    Except as would not, individually or in the aggregate, reasonably be expected to be material to the Acquired Companies, taken as a whole, and except as set forth in Section 4.13(b) of the Company Disclosure Schedules, (i) the Acquired Companies and their respective directors, officers, employees, and, to the Knowledge of the Company, Representatives

and other Persons acting for or on behalf of any of the foregoing Persons, are, and at all times since the Lookback Date, in compliance with all applicable Economic Sanctions/Trade Laws and all applicable Money Laundering Laws and (ii) in the five (5) years prior to the Execution Date none of the Acquired Companies is a Sanctions Target or has carried on or carries on, any business, directly or knowingly indirectly, involving any Sanctioned Country or Sanctions Target in violation of applicable Economic Sanctions/Trade Laws.

(c)     Except as would not, individually or in the aggregate, reasonably be expected to be material to the Acquired Companies, taken as a whole, and except as set forth in Section 4.13(c) of the Company Disclosure Schedules, since the Lookback Date (i) none of the Acquired Companies has conducted or initiated any internal investigation, review or audit, or made a voluntary, directed, or involuntary disclosure to any Governmental Body or third party with respect to any alleged or suspected act or omission arising under or relating to any potential noncompliance with any applicable Anti-Corruption Law, Economic Sanctions/Trade Law, or Money Laundering Law, (ii) none of the Acquired Companies, nor any of their respective directors or officers, nor, to the Knowledge of the Company, any employees (other than officers), Representatives, or any other Person acting at the direction of an Acquired Company has received any written notice, request or citation (including a whistleblower complaint) for any actual or potential noncompliance with any applicable Anti-Corruption Law, Economic Sanctions/Trade Law or Money Laundering Law, (iii) the Acquired Companies have implemented and maintained internal controls, policies and procedures designed to detect and prevent violations of Anti-Corruption Laws, Economic Sanctions/Trade Laws and Money Laundering Laws, and (iv) the Acquired Companies have at all times made and maintained accurate books and records in material compliance with all applicable Anti-Corruption Laws, Economic Sanctions/Trade Laws or Money Laundering Laws.

Section 4.14.   Environmental Matters. Except as set forth in Section 4.14 of the Company Disclosure Schedules and except as would not, individually or in the aggregate, reasonably be expected to result in the Acquired Companies incurring liabilities which are material to the Acquired Companies, taken as a whole, (i) no written Claim or Order has been received by, and no Legal Proceeding is pending or, to the Knowledge of the Company, threatened by any Person against the Acquired Companies, and no penalty has been assessed or consent decree or Order issued by a Governmental Body against the Acquired Companies, in each case, with respect to any matters arising out of any Environmental Law, which remains outstanding; (ii) the Acquired Companies have been since the Lookback Date, and are, in compliance with all Environmental Laws, which compliance includes obtaining, maintaining and complying with Permits required under Environmental Laws for the conduct of their respective businesses (the "Company Environmental Permits"); (iii) no Governmental Body has begun, or to the Knowledge of the Company, threatened to begin, any Legal Proceeding to terminate, revoke, cancel, suspend, materially reform or not renew any Company Environmental Permit; (iv) to the Knowledge of the Company, there is no investigation pending or threatened against the Acquired Companies by any Governmental Body alleging non-compliance with or liability under any Environmental Law; (v) to the Knowledge of the Company, the Acquired Companies have not generated, treated, stored, disposed of, arranged for the disposal of, transported, or Released, or exposed any Person to, any Hazardous Substances in a manner or concentration that has given rise, or would reasonably be expected to give rise, to liabilities of the Acquired Companies under Environmental Laws, which liability has not been resolved; (vi) to the Knowledge of the Company, no Hazardous Substances

21

have been Released in or under, and no Hazardous Substances are migrating from, (x) properties currently, or to the Knowledge of the Company, formerly owned, leased or operated by the Acquired Companies in a manner or concentrations requiring the Acquired Companies to undertake any investigation, monitoring, removal or remediation under Environmental Laws or (y) to the Knowledge of the Company, any other properties in a manner or concentrations requiring the Acquired Companies to undertake any investigation, monitoring, removal or remediation under Environmental Laws; and (vii) none of the Acquired Companies has assumed by contract liabilities or obligations of any other Person arising under Environmental Laws. The Company has made available to the Buyer copies of all material, non-privileged environmental investigations, assessments or reports conducted in the three (3) years prior to the Execution Date by or on behalf of the Acquired Companies in relation to any current or prior business of the Acquired Companies or any property or facility currently or previously owned, leased or operated by the Acquired Companies, which investigation, assessment or report reveals actual or potential unresolved material non-compliance with or liability under any Environmental Law, but excluding routine environmental monitoring reports conducted by the Acquired Companies in the Ordinary Course.

Section 4.15.  Title to Properties. Except as would not, individually or in the aggregate, be material to the Acquired Companies, taken as a whole, each of the Acquired Companies has good title to, or valid leasehold or other ownership interests or rights in, all its material properties and assets except: (i) for such interest or rights as are no longer used or useful in the conduct of the business of the Acquired Companies as of the Execution Date or as have been disposed of in the Ordinary Course, and (ii) for defects in title, burdens, easements, restrictive covenants and similar encumbrances or impediments that, in each case that do not and will not, individually or in the aggregate, interfere with its ability to conduct its business as currently conducted. None of the properties and assets of the Acquired Companies are subject to any Liens (other than Permitted Liens) that, in the aggregate, interfere with the ability of the Acquired Companies to conduct their business in the Ordinary Course except as would not, individually or in the aggregate, have a Company Material Adverse Effect.

Section 4.16.  Material Contracts.

(a)  Section 4.16(a) of the Company Disclosure Schedules sets forth a true, correct and complete list of each Material Contract. For purposes of this Agreement, "Material Contract" shall mean any Contract to which any Acquired Company is a party or to which any assets, properties, or businesses of any Acquired Company are bound as of the Execution Date (in each case, excluding (i) Contracts between or among Acquired Companies only and (ii) spot order Contracts entered into in the Ordinary Course) that:

(i)  (A) limits in any material respect either the type of business in which any Acquired Company may engage or the manner or locations in which any of them may so engage in any business (including through "non-competition" or "exclusivity" provisions), (B) would require the disposition of any material assets or line of business of any Acquired Company or (C) grants "most favored nation" or similar status with respect to any material obligations and would run in favor of any Person (other than the Company or a wholly owned Company Subsidiary);

(ii)    (A) is an indenture, loan or credit Contract, loan note, mortgage Contract, or other Contract representing, or any guarantee of, indebtedness for borrowed money of any Acquired Company in excess of $10,000,000 (excluding any government-mandated or state-wide bonds or guarantees), (B) is a finance lease of any Acquired Company as lessee in excess of $5,000,000, or (C) is a guarantee by any Acquired Company of indebtedness for borrowed money or any finance lease of any Person other than the Company or a wholly owned Company Subsidiary (excluding any government-mandated or state-wide bonds or guarantees);

(iii)    grants (A) any right of first refusal, right of first negotiation or similar right, or (B) any put, call or similar right, to any Person (other than the Company or a wholly owned Company Subsidiary) with respect to any Equity Interest, property, or other asset, in each case, that is material to the Acquired Companies;

(iv)    was entered into to resolve or settle any litigation or threatened litigation (A) for an amount in excess of $15,000,000 payable by an Acquired Company (without taking into account insurance proceeds) or (B) which imposes any material non-monetary ongoing obligation on any Acquired Company (other than customary confidentiality obligations), in each case of clause (A) and clause (B), that has not been fully paid or performed, as applicable;

(v)    limits or restricts the ability of any Acquired Company to declare or pay dividends or make distributions in respect of their Equity Interests that will be binding from and after the Closing;

(vi)    is a partnership, limited liability company, joint venture, co-development or other similar agreement, relating to the formation, creation, operation, management or control of any partnership, limited liability company, joint venture, co-development or similar entity (however organized) in which the Company owns, directly or indirectly, through a Company Subsidiary (excluding Equity Interests owned directly or indirectly by any Non-Controlled Entities) any Equity Interest and has invested or is contractually required to invest capital (including for the avoidance of doubt with respect to any Non-Controlled Entity or non-wholly owned Company Subsidiary, but excluding any wholly owned Company Subsidiary);

(vii)    relates to the sale, transfer or acquisition or disposition of any material business, material assets (other than those providing for sales, transfers or acquisitions of assets in the Ordinary Course) or Equity Interests of any Acquired Company, in each case (A) for an amount in excess of $10,000,000 in any transaction or series of related transactions (other than Contracts for transactions that were consummated prior to the Lookback Date or Contracts that do not contain any ongoing rights owing to, or obligations or liabilities of, any Acquired Company) or (B) pursuant to which any Acquired Company has any material ongoing obligations or liabilities (including in respect of indemnification, "earn-out" and similar contingent or deferred payment obligations);

(viii)    is a Contract (A) with an employee of an Acquired Company, pursuant to which such employee is entitled to receive base salary in excess of $400,000,

(B) that provides for mandatory or potential severance payments by an Acquired Company in excess of $100,000 or (C) with an employee, officer or director of any Acquired Company that (I) contains any non-compete or non-solicitation covenants or (II) modifies the at-will nature of the employment of any employee or otherwise requires advance notice for the termination of the Contract by any Acquired Company;

(ix)     is a Contract providing for indemnification by an Acquired Company of any officer, manager, director or employee of any Acquired Company;

(x)     is a Contract between or among any Acquired Company, on the one hand, and any Governmental Body, on the other hand;

(xi)     is a term Contract with one of the ten largest suppliers of any applicable Business Unit of the Acquired Companies (as determined by dollar volume for the 12-month period immediately prior to the Company Balance Sheet Date); and

(xii)     is a term Contract with one of the ten largest customers of any applicable Business Unit of the Acquired Companies (as determined by dollar volume for the 12-month period immediately prior to the Company Balance Sheet Date).

(b)     Each Material Contract is a legal, valid and binding obligation of the Acquired Companies as applicable. Except as would not, individually or in the aggregate, be material to the Acquired Companies, taken as a whole, each Material Contract is in full force and effect and enforceable by the applicable Acquired Company, in each case, subject to the Equitable Exceptions, and none of the Acquired Companies or, to the Knowledge of the Company any other party to a Material Contract, is in material breach or violation of any provision of, or in material default under, any Material Contract, and no event has occurred that, with or without notice, lapse of time or both, would constitute a material breach, violation or default or give rise to a right of termination, cancellation or acceleration of any material right or obligation or loss of any benefit thereunder. A true and correct copy of each Material Contract has previously been made available to the Buyer.

(c)     Since the Lookback Date, no Acquired Company has given or received (i) written notice regarding any actual or alleged or potential violation of any provision under any Material Contract or (ii) written notice threatening, intending or electing to terminate, repudiate, modify or cancel such Material Contract.

Section 4.17.     Intellectual Property and Data Privacy.

(a)     Section 4.17(a) of the Company Disclosure Schedules sets forth a list of all registered Intellectual Property that is owned by the Acquired Companies and is used in, held by, or held for use in the conduct of the business of the Acquired Companies as of the Execution Date ("Registered Intellectual Property"). Except as would not, individually or in the aggregate, be material to the Acquired Companies, taken as a whole, the Acquired Companies own or possess the right to use, license and enforce all (i) patents and patent applications, (ii) registered, applied for, or unregistered trademarks, trade names, trade dress, service marks, logos, and business names, and all related goodwill, (iii) internet domain names, (iv) registered, applied for, or unregistered works of authorship and copyrights, including copyrights in computer software

programs or applications, and (v) trade secrets, know- how and other confidential and proprietary information, including ideas, inventions (whether patentable or not), research, pricing and cost information, customer information, business plans, marketing plans, and proposals (collectively, "Intellectual Property") that are used in, held by, or held for use in the conduct of the business of the Acquired Companies as currently conducted (collectively, the "Company Intellectual Property" and to the extent owned by the Acquired Companies the "Company Owned Intellectual Property"), free and clear of all Liens, except for Permitted Liens. To the Knowledge of the Company, the Registered Intellectual Property is valid and enforceable.

(b)     (i) Since the Lookback Date, to the Knowledge of the Company, the conduct of the business of the Acquired Companies and use of the Company Intellectual Property does not and has not infringed upon or otherwise violated any Intellectual Property rights of any other Person; (ii) no third party is challenging, or, to the Knowledge of the Company, infringing or otherwise violating any right of the Acquired Companies in the Company Owned Intellectual Property; and (iii) since the Lookback Date, the Acquired Companies have not received written notice of any pending Claim, Order or Legal Proceeding with respect to any alleged or potential infringement or other violation of Intellectual Property rights of any other Person or with respect to any Company Intellectual Property. The Acquired Companies have taken commercially reasonable measures to maintain the confidentiality of any material proprietary information or trade secrets included in Company Intellectual Property.

(c)     Except as would not, individually or in the aggregate, reasonably be expected to be material to the Acquired Companies, taken as a whole, each current and former employee and independent contractor of any Acquired Company who has participated in the conception or development of any Intellectual Property has assigned to such Acquired Company by operation of law, or has entered into a valid and enforceable written agreement with such Acquired Company assigning to such Acquired Company all Intellectual Property created by such Person within the scope of such Person's duties to the Acquired Company and prohibiting such Person from using or disclosing confidential information of the Acquired Company. To the Knowledge of the Company, no current or former employee or independent contractor of the Acquired Companies is in violation of any such agreement, and there has been no unlawful, accidental, or unauthorized access to or use or disclosure of any trade secrets, know-how and other confidential and proprietary information of the Acquired Companies.

(d)     Since the Lookback Date, no third party (including any employee, worker, contractor or subcontractor) has made any written claim to the Acquired Companies of ownership in respect of any of the Company Owned Intellectual Property.

(e)     Except as would not, individually or in the aggregate, be material to the Acquired Companies, taken as a whole, to the extent that the Acquired Companies license Intellectual Property to a third party or license any Intellectual Property belonging to any third party: (i) no such licenses have been the subject of any breach or default by any Acquired Company or, to the Company's Knowledge, any such third party; (ii) such licenses are valid and binding; (iii) such licenses have not been the subject of any claim, dispute or proceedings; and (iv) in respect of licenses of Intellectual Property by any Acquired Company to third parties, such licenses do not materially restrict any Acquired Company from using the Intellectual Property to which they relate.

(f)    Since the Lookback Date, except as has not had and would not reasonably be expected to have, individually or in the aggregate, a Company Material Adverse Effect: (i) materially complied with all applicable Laws and self-regulatory guidelines, PCI DSS, the obligations under their Contracts, and their public privacy policies, in each case, relating to the processing of any Personal Information (collectively, "Privacy Laws and Obligations"); (ii) implemented and maintained reasonable administrative, physical and technical safeguards designed to protect all Personal Information in their possession or under their control against loss, theft, or unauthorized access, use modification, disclosure; (iii) not experienced any material Security Incident, and, to the Knowledge of the Company, no service provider (in the course of processing Personal Information for or on behalf of the Acquired Companies) has suffered any material Security Incident impacting Personal Information in the possession or control of the Acquired Companies; and (iv) not received any written notice of any claims of, or been charged with, the violation of any Privacy Laws and Obligations.

(g)    The Acquired Companies have used commercially reasonable efforts to prevent the introduction into the Systems, and, to the Company's Knowledge, such Systems do not contain, any ransomware, disabling codes or instructions, spyware, Trojan horses, worms, viruses or other software routines that permit or cause unauthorized access to, or disruption, impairment, disablement, or destruction of, software, data or other materials. The Acquired Companies have used commercially reasonable efforts to implement material security patches that are generally available for the Systems. To the Company's Knowledge, since the Lookback Date, the Systems have not suffered any unplanned or critical failures, continued substandard performance, errors, breakdowns or other adverse events that have caused any material disruption or interruption in the operation of the business of the Acquired Companies. The Acquired Companies have implemented and maintain commercially reasonable business continuity and disaster recovery plans, procedures and facilities for its business.

(h)    The Acquired Companies have in place commercially reasonable measures to protect the confidentiality, integrity, availability and security of the Systems. To the Company's Knowledge, the Systems (i) are in good working order; (ii) function in all material respects in accordance with all specifications and any other descriptions under which they were supplied; (iii) are substantially free of any material defects, bugs and errors; and (iv) are sufficient for the existing needs of the business of the Acquired Companies. The Acquired Companies have conducted commercially reasonable penetration tests at reasonable intervals on the Systems, and have addressed, or are in the process of addressing, all material issues raised in any such audits or penetration tests (including third party audits of the Systems).

Section 4.18.    Brokers; Financial Advisor. No broker, investment banker, financial advisor or other Person, other than Evercore, is entitled to any commission, brokerage fee or "finders fee" in connection with the consummation of the Transactions.

Section 4.19.    Real Property.

(a)    Section 4.19(a) of the Company Disclosure Schedules sets forth a true, accurate and complete list as of the Execution Date of all leases or subleases of real property with respect to which any Acquired Company is the tenant or lessee, together with a list of the addresses of all such real property (if specified in such lease or sublease) which are material to the Acquired

Companies (individually, a "Real Property Lease" and, collectively, the "Real Property Leases"). Subject to the Equitable Exceptions, the applicable Acquired Company has a good, valid, binding and enforceable interest under each of the Real Property Leases and the vesting instruments under which an Acquired Company holds an easement or similar interest (such vesting instruments, collectively with the Real Property Leases, the "Vesting Instruments"), free and clear of all Liens (other than Permitted Liens). No Acquired Company nor, to the Knowledge of the Company, any other party to any Vesting Instrument is in material breach or default thereunder, and no event has occurred or condition exists that, with notice or lapse of time, or both, would constitute a default by an Acquired Company or, to the Knowledge of the Company, any other Person under any of the Vesting Instruments, other than defaults that have been cured or waived in writing. Except as would not, individually or in the aggregate, be material to the Acquired Companies, taken as a whole, all landlord work or tenant work under each Real Property Lease has been completed and there are no leasing commissions due or payable with respect to any Real Property Lease. Each Vesting Instrument is in full force and effect and, to the Knowledge of the Company, is the valid, binding and enforceable obligation of each party thereto, in accordance with its terms.

(b)    Section 4.19(b) of the Company Disclosure Schedules sets forth a true, accurate, and complete list of all real property owned in fee by the Acquired Companies ("Owned Real Property" and together with the real property in which the Acquired Companies hold interests pursuant to the Vesting Instruments, the "Real Property"), together with the address of the applicable property. Each Acquired Company owns good, valid and marketable title in fee simple to the Owned Real Property and there are no outstanding Preferential Rights, ownership or use, or other contractual rights in favor of any other Person to purchase, acquire, sell, assign or otherwise dispose of any Acquired Companies' interest in any Real Property or any portion thereof or interest therein. Each Acquired Company has the valid and enforceable power and unqualified right to use and sell, transfer, convey or assign the Owned Real Property, free and clear of all Liens other than Permitted Liens.

(c)    Section 4.19(c) of the Company Disclosure Schedules sets forth a complete list of all Owned Real Property held by the Acquired Companies as a tenant in common or other joint ownership structure (collectively, the "Jointly Owned Properties"), together with a detailed description of the respective ownership structure (and the applicable Acquired Company's ownership percentage) of each Jointly Owned Property. None of the other owners of the Jointly Owned Properties have any rights of first refusal, rights of first offer or other Preferential Rights to purchase, or otherwise modify or later the applicable Acquired Company's interest in, any of the Jointly Owned Properties that would be triggered by the Transactions.

(d)    To the Knowledge of the Company, all material buildings, structures, improvements, fixtures, building systems and attached equipment, and all material components thereof, included in the Real Property are in good condition and repair, normal wear and tear excepted. No work has been done at the Real Property, and no materials have been supplied to the Real Property, that have not been paid for, and there are no material materialman's liens or mechanic's liens affecting the Real Property.

(e)    The Real Property constitutes all interests in real property (i) currently used, occupied or held for use in connection with the business of the Acquired Companies as presently conducted and (ii) necessary for the continued operation of the business of the Acquired

27

Companies. None of the improvements to any Real Property constitute a legal non-conforming use or otherwise require any special dispensation, variance or permit under any Law. To the Knowledge of the Company, the Company or the applicable Acquired Company has all certificates of occupancy, permits, licenses, certificates of authority, authorizations, approvals, registrations, and similar consents issued by or obtained from any Governmental Body necessary for the current use and operation of the Real Property, except for any such items where the failure of the applicable Acquired Company to hold or possess such item would not, individually or in the aggregate, be material to any Acquired Company. The Real Property is in compliance in all material respects with all applicable Laws and fire, health, building, use, occupancy, subdivision and zoning codes.

(f)    Except as would not, individually or in the aggregate, be material to the Acquired Companies, taken as a whole, each Acquired Company and each parcel of Real Property (i) are now, and have been since the Lookback Date, in material compliance with all declarations of covenants, conditions or restrictions, restrictive covenants and reciprocal easement agreements, in each case, affecting any Real Property, and (ii) have not received any notice of any material breach, violation or default under any such declarations, agreements or easements since the Lookback Date.

(g)    There do not exist any actual or, to the Knowledge of the Company, threatened condemnation or eminent domain proceedings that affect any Real Property or any part thereof.

(h)    Since the Lookback Date, no Acquired Company has received written notice of any, and to the Knowledge of the Company there is no, default under any restrictive covenants or other encumbrances pertaining to the Real Property.

Section 4.20.    Affiliate Transactions. Except as set forth in Section 4.20 of the Company Disclosure Schedules, none of the Acquired Companies, on the one hand, is party to any agreement with PDVSA or its Affiliates (excluding the Acquired Companies and their Subsidiaries), on the other hand, pursuant to which an Acquired Company has material ongoing obligations. Other than the Shares, neither PDVSA nor any of its Affiliates (excluding the Acquired Companies and their Subsidiaries), owns any interest in or any property (real, personal or mixed, tangible or intangible) of the Acquired Companies.

Section 4.21.    Insurance. Section 4.21 of the Company Disclosure Schedules lists each material insurance policy maintained by the Acquired Companies with respect to the properties, assets, business, operations and employees of the Acquired Companies. To the Knowledge of the Company, all such policies are valid and binding on the Acquired Company and enforceable in accordance with their terms against the Acquired Companies, in each case except for the Equitable Exceptions, and all premiums with respect thereto have been paid to the extent due. To the Knowledge of the Company, there are no material Claims by the Acquired Companies pending under any such insurance policies as to which coverage has been denied by the underwriters of such policies. To the Knowledge of the Company, the Acquired Companies have not received written notice of termination or material reduction of coverage with respect to any of such insurance policies.

Section 4.22.    No Additional Representations.

(a)      Except for the representations and warranties made in (i) this <u>Article IV</u>, as qualified by the Company Disclosure Schedules, (ii) any certificate delivered pursuant to this Agreement or (iii) any other Transaction Document, no Person makes or shall be deemed to make any other representation or warranty of any kind whatsoever, express or implied, written or oral, at law or in equity, with respect to any of the Acquired Companies or their respective businesses, operations, assets, liabilities or conditions (financial or otherwise) in connection with this Agreement or the Transactions, any other rights or obligations to be transferred pursuant to the Transaction Documents or any other matter, and the Special Master (on behalf of himself and the Company) hereby disclaims any such other representations or warranties. In particular, without limiting the foregoing disclaimer, except for the representations and warranties made in (i) this <u>Article IV</u>, as qualified by the Company Disclosure Schedules, or (ii) any certificate delivered pursuant to this Agreement, no Person makes or has made any representation or warranty to the Buyer or any of its Affiliates or Representatives with respect to (x) projections, forecasts, estimates, financial statements, financial information, appraisals, statements, promises, advice, data or information made, communicated or furnished (orally or in writing, including electronically) or prospect information relating to the Acquired Companies or their respective businesses; or (y) except for the representations and warranties made in (i) this <u>Article IV</u>, as qualified by the Company Disclosure Schedules, (ii) any certificate delivered pursuant to this Agreement, or (iii) any other Transaction Documents, any oral or written information presented to the Buyer or any of its Affiliates or Representatives in the course of their due diligence investigation of the Company, the negotiation of this Agreement or in the course of the Transactions (including any opinion, information, projection, or advice that may have been or may be provided to the Buyer by any Representative of the Company).

(b)      Notwithstanding anything contained in this Agreement to the contrary, the Special Master acknowledges and agrees that neither the Buyer nor any other Person has made or is making, and the Special Master expressly disclaims reliance upon, any representations, warranties or statements relating to the Buyer or any Buyer Subsidiaries whatsoever, express or implied, beyond those expressly given by the Buyer in <u>Article V</u>, as qualified by the Buyer Disclosure Schedules, or in any certificate delivered pursuant to this Agreement or in any other Transaction Documents, including any implied representation or warranty as to the accuracy or completeness of any information regarding the Buyer, furnished or made available to the Company, or any of its Representatives. Without limiting the generality of the foregoing, the Special Master acknowledges that, except for the representations and warranties expressly provided in <u>Article V</u>, as qualified by the Buyer Disclosure Schedules, or in any certificate delivered pursuant to this Agreement or in any other Transaction Documents, no representations or warranties are made with respect to any projections, forecasts, estimates, budgets or prospect information that may have been made available to the Special Master, the Company or any of their Representatives.

## ARTICLE V

## REPRESENTATIONS AND WARRANTIES OF THE BUYER

The Buyer represents and warrants to the Special Master that, except as disclosed in the correspondingly numbered section of the disclosure schedules delivered by the Buyer to the

Company simultaneously with the execution of this Agreement (the "Buyer Disclosure Schedules"):

Section 5.1.    Corporate Existence and Power. The Buyer is a corporation duly incorporated, validly existing and in good standing under the Laws of its jurisdiction of incorporation and has all requisite corporate powers and all governmental franchises, licenses, permits, authorizations, consents and approvals required to enable it to own, lease or otherwise hold its properties and assets and to carry on its business as now conducted. The Buyer is duly qualified to do business as a foreign corporation and is in good standing in each jurisdiction in which the character of the property owned or leased by it, the nature of its activities, or the ownership or leasing of its properties make such qualification necessary, except for those jurisdiction where the failure to be so qualified would not, individually or in the aggregate, materially impair or delay the ability of the Buyer to consummate the Transactions or perform its obligations under this Agreement.

Section 5.2.    Corporate Authorization. The Buyer has all requisite corporate power and authority to execute, deliver and perform its obligations under this Agreement, the Transaction Documents, and each other agreement, document, instrument or certificate contemplated by this Agreement to be executed and delivered by the Buyer in connection with the consummation of the Transactions (the "Buyer Documents"). The execution and delivery of this Agreement and the Buyer Documents by the Buyer, the performance of its obligations hereunder and thereunder, and the consummation by the Buyer of the Transactions have been duly authorized by all necessary corporate or organizational action on the part of the Buyer, and no shareholder or other similar approval is required in connection with the Buyer's execution, delivery and performance of the Transactions. The board of directors of the Buyer, at a meeting duly called and held on or prior to the Execution Date, has approved this Agreement and the Transactions. This Agreement constitutes a valid and binding agreement against the Buyer, enforceable against the Buyer in accordance with its terms, except that such enforcement may be limited by the Equitable Exceptions.

Section 5.3.    Governmental Authorization. The execution, delivery and performance by the Buyer of this Agreement and the consummation by the Buyer of the Transactions require no Order, authorization, or approval of, or filing with, any Governmental Body other than (a) applicable requirements of Antitrust Laws as set forth in Section 5.3 of the Buyer Disclosure Schedules and (b) the OFAC License.

Section 5.4.    Non-Contravention. The execution, delivery and performance by the Buyer of this Agreement and the consummation by the Buyer of the Transactions do not and will not, assuming compliance with the matters referred to in Section 5.2 and Section 5.3, (a) contravene or conflict with the certificate of incorporation or by-laws of the Buyer, (b) contravene or conflict with or constitute a violation of any provision of any Law binding upon or applicable to the Buyer or any of the Buyer Subsidiaries, (c) constitute a default (or an event which with notice or the passage of time would become a default) under, or give rise to any right of termination, cancellation or acceleration of any right or obligation of the Buyer or any of the Buyer Subsidiaries or to a loss of any benefit to which the Buyer or any of the Buyer Subsidiaries is entitled under any provision of, any agreement, contract or other instrument binding upon the Buyer or any of the Buyer Subsidiaries or any license, franchise, permit or other similar authorization held by the

30

Buyer or any of the Buyer Subsidiaries or (d) result in the creation or imposition of any Lien (other than Liens arising under applicable securities Laws) on any asset of the Buyer or any of the Buyer Subsidiaries, other than a lien of the stock of the Company in connection with the Debt Financing. As of the Execution Date, there is no Effect that would reasonably be expected to prevent, or impede or interfere with, the execution of this Agreement and the consummation by the Buyer of the Transactions.

Section 5.5.    <u>Litigation</u>. Except as set forth in <u>Section 5.5</u> of the Buyer Disclosure Schedules, there are no Legal Proceedings, pending against, or, to the Knowledge of the Buyer, threatened in writing against or affecting, the Buyer, any of the Buyer Subsidiaries, any of their respective properties or any of their respective officers or directors before any Governmental Body that would reasonably be expected to (a) prohibit or restrain the ability of the Buyer to enter into this Agreement or consummate the Transactions or (b) affect the legality, validity or enforceability of any Debt Financing. The Buyer is not subject to any Order of any Governmental Body that would reasonably be expected to (x) prohibit or restrain the ability of the Buyer to enter into this Agreement or consummate the Transactions or (y) affect the legality, validity or enforceability of any Debt Financing.

Section 5.6.    <u>Regulatory Matters</u>.

(a)    In the three (3) years prior to the Execution Date, (i) none of the Buyer or any of the Buyer Subsidiaries, nor any of their respective directors, officers, employees, nor, to the Knowledge of the Buyer, any Equity Financing Source, Representative, agent, or other person acting on behalf of the Buyer, any of the Buyer Subsidiaries, in each case in such capacity, has violated any applicable Anti-Corruption Law in any material respect, and (ii) none of the Buyer, any of the Buyer Subsidiaries, nor any of their respective directors, officers, employees, nor, to the Knowledge of the Buyer, any Representative, agent or any other person acting on behalf of the Buyer, the Buyer Subsidiaries, or any Equity Financing Source, in each case in such capacity, has offered, paid, given, promised, or authorized the payment of, anything of value (including money, checks, wire transfers, tangible and intangible gifts, favors, services, employment or entertainment and travel) directly or indirectly to any Government Official (A) for the purpose of (1) influencing any act or decision of a Government Official or any other person in his or her official capacity, (2) inducing a Government Official or any other person to do or omit to do any act in violation of his or her lawful duties, (3) securing any improper advantage, or (4) inducing a Government Official or any other person to influence or affect any act or decision of any Governmental Body; or (B) in a manner which would constitute or have the purpose or effect of public or commercial bribery or corruption, acceptance of, or acquiescence in extortion, kickbacks, or other unlawful or improper means of obtaining or retaining business or any improper advantage. Without limiting the generality of the foregoing, none of the Buyer or any of the Buyer Subsidiaries, any of their respective directors, officers, employees, Affiliates or, to the Knowledge of the Buyer, any Equity Financing Source, Representative, agent, or other person acting on behalf of the Buyer, any of the Buyer Subsidiaries or any Equity Financing Source is a Venezuelan national or has any relationship to Nicolás Maduro, the United Socialist Party of Venezuela or any Affiliate thereof.

(b)    (i) The Buyer, each of the Buyer Subsidiaries and their respective directors, officers, employees, and, to the Knowledge of the Buyer, agents, Equity Financing Sources, Representative, and other persons acting for or on behalf of any of the foregoing Persons, in each

case in such capacity, are, and at all times in the three (3) years prior to the Execution Date, have been in compliance in all material respects with all applicable Economic Sanctions/Trade Laws and Money Laundering Laws and (ii) in the three (3) years prior to the Execution Date none of the Buyer or any of the Buyer Subsidiaries has been a Sanctions Target or has carried on or carries on, any business, directly or knowingly indirectly, involving any Sanctions Target in violation of applicable Economic Sanctions/Trade Laws.

(c)     Except as would not, individually or in the aggregate, be reasonably likely to have a material adverse effect, in the three (3) years prior to the Execution Date (i) none of the Buyer, any of the Buyer Subsidiaries or, to the Knowledge of the Buyer, any Equity Financing Source, has conducted or initiated any internal investigation, review or audit, or made a voluntary, directed, or involuntary disclosure to any Governmental Body or third party with respect to any actual, alleged or suspected act or omission arising under or relating to any potential noncompliance with any applicable Anti-Corruption Law, Economic Sanctions/Trade Law, or Money Laundering Law, (ii) none of the Buyer, any of the Buyer Subsidiaries, nor any of their respective directors or officers, nor, to the Knowledge of the Buyer, any agents, employees (other than officers), Representatives, or any other person acting at the direction of the Buyer, any of the Buyer Subsidiaries or any Equity Financing Source has received any written notice, request or citation for any actual or potential noncompliance with any applicable Anti-Corruption Law, Economic Sanctions/Trade Law or Money Laundering Law, and (iii) the Buyer, each of the Buyer Subsidiaries and, to the Knowledge of the Buyer, the Equity Financing Sources have at all times made and maintained accurate books and records in compliance with Anti-Corruption Laws, Economic Sanctions/Trade Laws or Money Laundering Laws, (iv) the Buyer, each of the Buyer Subsidiaries and, to the Knowledge of the Buyer, each of the Equity Financing Sources have at all times made and maintained accurate books and records in material compliance with all applicable Anti-Corruption Laws, Economic Sanctions/Trade Laws or Money Laundering Laws, and (v) in the three (3) years prior to the Execution Date, the Buyer, the Buyer Subsidiaries have implemented and maintained internal controls, policies and procedures designed to detect and prevent violations applicable Anti-Corruption Laws, Economic Sanctions/Trade Laws and Money Laundering Laws.

(d)     Except as set forth in Section 5.6(d) of the Buyer Disclosure Schedules, the Buyer, the Buyer Subsidiaries, the Record Holder, the Record Holder's Subsidiaries and, to the Knowledge of the Buyer, the Equity Financing Sources are each not a "foreign person" within the meaning of the Defense Production Act of 1950, as amended, including all implementing regulations thereof.

Section 5.7.    Financing.

(a)     On the Execution Date, the Buyer has delivered to the Special Master true, correct, and complete copies of (i) the executed Equity Commitment Letters from the Equity Financing Sources, which Equity Commitment Letters each provide that the Special Master is an express third party beneficiary thereto (the "Equity Financing", and the commitments under the Equity Commitment Letters, the "Equity Financing Commitments") and (ii) (A) a fully-executed commitment letter from each of the Debt Financing Sources identified therein (together with all annexes, schedules, and exhibits thereto, as amended from time to time as permitted herein, the "Debt Commitment Letter", and the commitments under the Debt Commitment Letter, the "Debt

32

Financing Commitments"; the Debt Commitment Letter and the Equity Commitment Letters, collectively, the "Commitment Letters"), pursuant to which, and subject to the terms and conditions of which, the lenders party thereto have committed to lend the amounts set forth therein to the Buyer for the purpose of funding the Transactions in accordance with the terms set forth therein (the "Debt Financing" and, together with the Equity Financing, the "Financings"), and (B) each related fee letter (collectively, the "Fee Letters"), which copy of such Fee Letter may be redacted to remove only the fees, "market flex" and other economic terms set forth therein so long as such redacted information does not adversely affect the conditionality, availability or aggregate principal amount of the Debt Financing.

(b)     As of the Execution Date, the Equity Commitment Letters are in full force and effect and have not been withdrawn, rescinded, replaced or terminated, or otherwise amended, restated, amended and restated, waived, supplemented or otherwise modified in any respect (and no such amendment, restatement or modification is contemplated). The Equity Commitment Letters are legal, valid and binding obligations (subject to the Equitable Exceptions) of the Buyer and the other parties thereto, enforceable in accordance with their terms.

(c)     As of the Execution Date, the Debt Commitment Letters are in full force and effect and have not been withdrawn, rescinded, replaced or terminated, or otherwise amended, restated, amended and restated, waived, supplemented or otherwise modified in any respect except in accordance with both (x) the implementation of "market flex" provisions set forth in the applicable Fee Letters and (y) this Agreement (and no such amendment, restatement or modification shall be contemplated). As of the Execution Date, the Debt Commitment Letters are legal, valid and binding obligations (subject to the Equitable Exceptions) of the Buyer and the other parties thereto, enforceable in accordance with their terms. There are no agreements, side letters or arrangements (other than the Debt Commitment Letter and the Fee Letters) relating to the Debt Financing Commitments or the Debt Financing that imposes or permits the imposition of conditions precedent to the funding of the Debt Financing on the Closing Date or would otherwise affect the availability of the Debt Financing on the Closing Date. As of the Execution Date, the Buyer and the Debt Financing Sources are not in breach of any of the terms or conditions set forth in the Debt Commitment Letter. As of the Execution Date, no event has occurred which, with or without notice, lapse of time or both, constitutes a default or breach on the part of the Buyer under any term or condition of the Debt Commitment Letters, and, the Buyer does not have any reason to believe that it will be unable to satisfy, on a timely basis, any term or condition of closing to be satisfied by it contained in the Debt Commitment Letter, or that the full amount of the Equity Financing or the Debt Financing will not be available to the Buyer on the Closing Date. On the Execution Date, the Buyer has fully paid any and all commitment fees or other fees that, in each case, are required by the Debt Financing Commitments or any Fee Letter to be paid on or before the Execution Date. On the Execution Date, the Debt Commitment Letters contain all of the conditions precedent to the obligations of the parties thereunder to make the full amount of the Debt Financing available to the Buyer on the terms set forth therein and there are no contingencies that would permit the Debt Financing Sources to reduce the total amount of the Debt Financing below the Required Amount or impose any additional conditions precedent to the availability of the Debt Financing. As of the Execution Date, none of the Debt Financing Commitments have been terminated or withdrawn, no lender has notified the Buyer of its intention to terminate or withdraw the Debt Financing Commitments, and the Buyer does not know of any facts or circumstances that may be expected to result in any of the conditions set forth in the Debt Commitment Letter not being satisfied. To the

extent this Agreement must be in a form acceptable to any lender providing Debt Financing, such lender or lenders have approved this Agreement.

(d) The obligations of the Buyer under this Agreement are not subject to any conditions regarding the Buyer's, its Affiliates', or any other Person's ability to obtain financing for the consummation of the Transactions contemplated hereby.

(e) The aggregate proceeds from the Debt Financing (net of original issue discount, upfront fees and other fees, premiums and charges payable in connection therewith, after giving effect to the maximum amount of "market flex" provided under the Debt Financing Commitments and each Fee Letter) together with the Equity Financing and Buyer's cash on hand will be sufficient for satisfaction of all of the Buyer's obligations under this Agreement and to consummate the Transactions, including the payment of the Closing Consideration, repayment of the Specified Debt and the payment of all associated costs and expenses (including the Closing Transaction Expenses) (collectively, the "Required Amount").

Section 5.8. Solvency. The Buyer is Solvent as of the Execution Date. Assuming (x) the accuracy of the representations and warranties set forth in Article IV, and (y) the performance by the Company and the Special Master of the covenants and agreements required to be performed by them under this Agreement prior to the Closing, the Buyer, the Company and their respective Subsidiaries, on a consolidated basis, will, after giving effect to all of the Transactions, including the payment of any amounts required to be paid in connection with the consummation of the Transactions and the payment of all related fees and expenses, be Solvent at and immediately after the Closing.

Section 5.9. Purported Equity Pledge. The Buyer acknowledges the existence of the 2020 Bonds, the Purported Equity Pledge and the Equity Pledge Litigation, without admitting to the validity of the 2020 Bonds or the Purported Equity Pledge.

Section 5.10. Claim Obligations. Schedule 5.10 sets forth, as of the date hereof, the principal amount due and owing under the Specified Litigation Claims. For the avoidance of doubt, such amount includes all interest, fees, expenses and premiums that have accrued in connection with the Specified Litigation Claims after the commencement of the applicable Specified Litigation.

Section 5.11. Closing Consideration. The Buyer will not provide any consideration to any holder of an Attached Judgment (as defined in the Sale Procedures Order) at the Closing unless each other holder of an Attached Judgment senior to such holder (as set forth in the Priority Order (as defined below)) has either (i) received cash in full in satisfaction of its Attached Judgment or (ii) consented to receive non-cash consideration in satisfaction of its Attached Judgment, or (iii) consented to release its attachment (in which case it may, at its election, attempt to execute its judgment against other property besides the PDVH Shares). Nothing in this Section 5.11 precludes a bidder from offering, as part of its bid, non-cash consideration, including non-cash consideration to holders of Attached Judgments that are junior to holders of Attached Judgment who have, as of the time of the bid, not provided consent consistent with (ii) or (iii) above. The Special Master, as part of his obligation to make a recommendation to the Court as to which of the Qualified Bids is highest or best, and in making a recommendation to the Court as to which Qualified Bid is the

Successful Bid (as defined in the Sale Procedures Order), shall consider the value of non-cash consideration and the likelihood of obtaining consents consistent with this provision. As part of the Special Master's recommendation of a Successful Bid, he will advise the Court as to whether he received Qualified Bids including a component of non-cash consideration, what that non-cash consideration was and which creditors it would be offered to, and how he evaluated the non-cash component in reaching his recommendation.

Section 5.12.    No Additional Representations.

(a)    Except for the representations and warranties expressly made by the Buyer in (i) this Article V, as qualified by the Buyer Disclosure Schedules, or (ii) any certificate delivered pursuant to this Agreement, the Buyer makes (and shall not be deemed to make) no other representation or warranty of any kind whatsoever, express or implied, written or oral, at law or in equity, in connection with this Agreement or the Transactions, any other rights or obligations to be transferred pursuant to the Transaction Documents or any other matter, and the Buyer hereby disclaims any such other representations or warranties.

(b)    Except for the specific representations and warranties expressly made by the Special Master in Article IV, and subject to the specifically bargained-for limitations as set forth in this Agreement, the Buyer acknowledges and agrees that the Special Master does not make, and that the Buyer is not relying upon, and will not rely upon any representation or warranty, expressed or implied, at law or in equity, made by any Person in respect of the Special Master or in respect of the Company and the Company's Subsidiaries' respective businesses, assets (including the stocks), liabilities, operations, prospects, or condition (financial or otherwise), including with respect to merchantability or fitness for any particular purpose of any assets, the nature or extent of any liabilities, the prospects of their respective businesses, the effectiveness or the success or profitability of any operations, or the accuracy or completeness of any confidential information memoranda, documents, projections, forecasts, opinions, advice, material, statement, data, or other information (financial or otherwise) regarding the Acquired Companies provided to, or otherwise made available to, the Buyer or its Representatives in connection with the Transactions, including any "data rooms," "virtual data rooms," management presentations, or in respect of any other matter or thing whatsoever. The Buyer expressly disclaims that is relying on any representations or warranties, other than the specific representations and warranties expressly made by the Special Master in Article IV or in any certificate delivered pursuant to this Agreement.

**ARTICLE VI**

**COVENANTS**

Section 6.1.    Conduct of the Business Pending the Closing.

(a)    During the Interim Period, except (w) with the prior written consent of the Buyer (such consent not to be unreasonably withheld, conditioned or delayed), (x) as expressly permitted or required by this Agreement, (y) as may be required by applicable Law, or (z) any action taken, or omitted to be taken, by the Acquired Companies as set forth in Section 6.1(a) or (b) of the Company Disclosure Schedules, the Special Master shall Cause the Acquired Companies to use their reasonable best efforts to (i) conduct their business in the Ordinary Course, (ii) preserve

intact their business organizations, assets (ordinary wear and tear excepted), ongoing operations, and goodwill, and maintain material relationships with third parties (including suppliers, vendors, creditors, licensors and employees of the Acquired Companies and Governmental Bodies having regulatory authority in respect of the Acquired Companies and their operations), (iii) comply in all material respects with all applicable laws and (iv) preserve and maintain all material Permits.

(b)     Without limiting the generality of <u>Section 6.1(a)</u>, except (v) with the prior written consent of the Buyer (such consent not to be unreasonably withheld, conditioned or delayed), (w) as expressly permitted or required by this Agreement, (x) as required to comply with a Material Contract that has been disclosed in the Company Disclosure Schedules, (y) as may be required by applicable Law, or (z) as set forth in <u>Section 6.1(b)</u> of the Company Disclosure Schedules, the Special Master shall Cause the Acquired Companies not to:

(i)     (A) amend or propose any change in the Company Charter or Company By-Laws, (B) permit any Company Subsidiary to amend or propose any change in such Company Subsidiary's Organizational Documents, or (C) vote in favor of the amendment of any of the Organizational Documents of any Non-Controlled Entity;

(ii)     (A) (I) adopt a plan or agreement of complete or partial liquidation, dissolution, merger or consolidation of any of the Acquired Companies, or (II) incur or assume any liability or expense in connection with the complete or partial liquidation or wind-down of any of the Acquired Companies, or (B) vote in favor of the adoption of a plan or agreement of complete or partial liquidation, dissolution, merger or consolidation, of any Non-Controlled Entity;

(iii)     (A) other than with respect to growth or enhancing capital expenditures or commitments, which are addressed in (B) and (C) below, make or authorize any capital expenditures or commitments, except (I) for 2025, in accordance with the capital budgets of the Acquired Companies for 2025 as set forth in <u>Section 6.1(b)(iii)(A)(I)</u> of the Company Disclosure Schedules, (II) for 2026, in accordance with the capital budgets to be adopted by the Acquired Companies for 2026 (which such capital budgets will not exceed, in the aggregate, the 2026 projection included in the medium term plan set forth in <u>Section 6.1(b)(iii)(A)(II)</u> of the Company Disclosure Schedules by more than 10% (the "<u>MTP</u>")), and (III) for any subsequent year, in accordance with the capital budgets of the Acquired Companies to be adopted by the Acquired Companies for such subsequent year (which such capital budgets will not exceed, in the aggregate, the projection included in the MTP for such subsequent year by more than 15%) (each of the foregoing, a "<u>CapEx Budget</u>") (provided, that, the Acquired Companies may make or authorize capital expenditures or commitments in excess of any applicable CapEx Budget so long as such excess expenditures do not, in the aggregate, result in an expenditure above 120% of the aggregate amount included in the applicable CapEx Budget), (B) approve any Authorization for Expenditure (AFE) or any growth or enhancing capital expenditures or projects in excess of $15,000,000 (except, during 2025, for any projects as provided in the applicable CapEx Budget and for 2026, 2027  and subsequent years, as provided in the MTP), (C) with respect to any line item in excess of $15,000,000 for growth or enhancing capital expenditures in any CapEx Budget, make or authorize an increase with respect to such line item in excess of 20% of the applicable budgeted amount, or (D) propose or vote

in favor of any capital expenditures or commitments that would reasonably be expected to require additional cash contributions by any Acquired Company to any Non-Controlled Entity in amounts in excess of $3,000,000 in the aggregate for all Non-Controlled Entities;

(iv)    make or authorize any turnaround or catalyst expenditures or commitments, except (A) for 2025, in accordance with the turnaround/catalyst budget of the Acquired Companies for 2025 as set forth in Section 6.1(b)(iv)(A)(I) of the Company Disclosure Schedules, (B) for 2026, in accordance with the turnaround/catalyst budget of the Acquired Companies to be adopted by the Acquired Companies for 2026 (which such turnaround/catalyst budgets will not exceed the 2026 projection included in the MTP by more than 10%), and (C) for any subsequent year, in accordance with the turnaround/catalyst budget of the Acquired Companies to be adopted for such subsequent year (which such turnaround/catalyst budget will not exceed, in the aggregate, the projection included in the MTP for such subsequent year by more than 15%) (each turnaround/catalyst budget described in clauses (A)-(C), a "Turnaround/Catalyst Budget"); (provided, that, (1) the Acquired Companies may make or authorize turnaround or catalyst expenditures or commitments in excess of any applicable Turnaround/Catalyst Budget so long as such excess expenditures collectively do not result in an expenditure above 120% of the aggregate amount included in the applicable Turnaround/Catalyst Budget and (2) to the extent any turnaround project is expected to exceed the applicable budgeted amount in the applicable Turnaround/Catalyst Budget by more than 20%, the Acquired Companies will provide Buyer with a detailed explanation of such deviation promptly following such approval or expenditure, and provided, further, that, to the extent that the Acquired Companies determine that any turnaround/catalyst project included in the Turnaround/Catalyst Budget for a specific year should instead, in whole or in part, be executed in 2026 or a subsequent year, the inclusion of the remaining expenses with respect thereto in the Turnaround/Catalyst Budget 2026 or such subsequent year, as applicable, will not count towards the variance cap applicable to the Turnaround/Catalyst Budget to be adopted for such subsequent year and will not require the prior written consent of Buyer);

(v)    except as required under any Company Benefit Plan or Company Collective Bargaining Agreement, (A) increase the compensation of ███████████ ████████████████████ of any Acquired Company (such current and former employees, together, "Senior Management"), or take any action to accelerate the vesting or payment, or fund or in any other way secure the payment of, compensation or benefits under any Contract, Company Benefit Plan or otherwise for or to any current or former director, officer, manager, employee, contractor or consultant of any Acquired Company; provided that nothing in this Section 6.1(b)(v) shall prohibit (x) providing annual increases to compensation based on merit (with respect to the immediately preceding performance period only), market-based adjustments or tenure in the Ordinary Course and in accordance with standards, policies and practices of the Acquired Companies in place as of the Execution Date and disclosed to the Buyer, or (y) making, in the Ordinary Course and in accordance with standards, policies and practices of the Acquired Companies in place as of the Execution Date and disclosed to the Buyer, annual cash bonus and long term cash incentive grants that (I) do not provide for single trigger vesting upon the Closing and (II) do not provide for full vesting and payout of performance-based components in the case of

a qualifying termination of the recipient after the Closing; (B) make, grant or promise any equity or equity-based compensation, severance, change of control, retention, termination or similar compensation or benefits to any current or former director, officer, manager, employee, contractor or consultant of any Acquired Company; provided, that, nothing in this Section 6.1(b)(v) shall prohibit making, granting or promising severance, change of control, retention, termination, or similar compensation or benefits in amounts which are less than $1,000,000 in the aggregate; (C) amend, adopt, establish, agree to establish, enter into or terminate any Company Benefit Plan or establish, adopt or enter into any plan, agreement, program, policy, practice, trust or other arrangement that would be a Company Benefit Plan if it were in existence as of the Execution Date for the benefit of any current or former director, officer, manager, employee, contractor or consultant of any Acquired Company; provided that nothing in this Section 6.1(b)(v) shall prohibit  (x) amendments to any Company Benefit Plan in the Ordinary Course that do not materially increase the costs to the Acquired Companies of such Company Benefit Plan, or (y) renewals or replacements of any Company Benefit Plan on commercially reasonable terms no less favorable in the aggregate to the Acquired Companies than the terms of the Company Benefit Plan being renewed or replaced; (D) terminate (other than for "cause" (as determined by the Company consistent with its practices)) any member of Senior Management; or (E) except as required by applicable Law, adopt or enter into any collective bargaining agreement, or amend in any material respect any Company Collective Bargaining Agreement (and, for the avoidance of doubt, nothing in this Section 6.1(b) shall restrict the Acquired Companies from entering into a successor collective bargaining agreement to any Company Collective Bargaining Agreement that expires prior to Closing) (provided, that, for the avoidance of doubt, to the extent any action with respect to employees or Company Benefit Plans is not prohibited by this Section 6.1(b)(v), then Section 6.1(b)(xii) will not be deemed to restrict any such action);

(vi)     acquire (x) all or a substantial portion of the capital assets of any other Person (or of any business) or (y) the business organization, division or other business of any other Person (in case of clause (x) or (y), whether by merger, consolidation, acquisition of Equity Interests or assets or otherwise), except that the Acquired Companies shall be permitted to make (A) acquisitions pursuant to any Contract in effect on the Execution Date that is made available to the Buyer and listed in Section 6.1(b)(vi) of the Company Disclosure Schedules, (B) acquisitions of assets solely among the Company and wholly owned Company Subsidiaries, or among wholly owned Company Subsidiaries, or (C) acquisitions of assets pursuant to the receivables securitization transaction evidenced by the Receivables Purchase Agreement, dated as of December 18, 2020, among CITGO AR2008 Funding Company, LLC, CITGO Petroleum, the various purchasers and purchaser agents from time to time party thereto, and Barclays Bank PLC, as program administrator, and the Purchase and Sale Agreement, dated as of December 18, 2020, between CITGO Petroleum and CITGO AR2008 Funding Company, LLC (each as amended and collectively, the "Receivables Securitization Facility"); provided, that any acquisitions included in the capital expenditures permitted under Section 6.1(b)(iii) shall not be subject to the restrictions set forth in this Section 6.1(b)(vi);

(vii)     propose or vote in favor of any action by a Non-Controlled Entity to acquire (x) all or a substantial portion of the capital assets of any other Person (or of any

38

business) or (y) the business of any other Person (whether by merger, consolidation, acquisition of Equity Interests or assets or otherwise), except that the Acquired Companies shall be permitted to vote in favor of acquisitions of capital assets of any other Person or business of any other Person by a Non-Controlled Entity in the Ordinary Course so long as such acquisition would not require additional cash contributions by any Acquired Company to any Non-Controlled Entity in excess of $5,000,000 individually or $10,000,000 in the aggregate for all Non-Controlled Entities;

(viii)    (A) sell, lease, license, pledge or otherwise encumber (including by the grant of any option or any Preferential Right thereon) (other than by Permitted Liens) or subject to any Lien, abandon, cancel, let lapse or convey or dispose of, directly or indirectly, any material assets or material property of any Acquired Company (excluding any issuance of any Equity Interest of any Acquired Company addressed in Section 6.1(b)(xiv)) or (B) propose or vote in favor of any action by a Non-Controlled Entity to sell, lease, license, pledge or otherwise encumber (including by the grant of any option or any Preferential Right thereon) (other than by Permitted Liens) or subject to any Lien, abandon, cancel, let lapse or convey or dispose of, directly or indirectly, any material assets or material property of such Non-Controlled Entity, in each case except (I) pursuant to existing Contracts set forth in Section 6.1(b)(viii) of the Company Disclosure Schedules, (II) sales of inventory to customers in the Ordinary Course, (III) sales of or disposals of obsolete or worthless assets in the Ordinary Course, or (IV) with respect to the immediately preceding clause (A) only, (x) transfers among (1) CITGO Petroleum and any Subsidiary thereof (the "CITGO Petroleum Subsidiaries"), (2) a CITGO Petroleum Subsidiary and another CITGO Petroleum Subsidiary or (3) the Acquired Companies (other than CITGO Petroleum and any CITGO Petroleum Subsidiary), or (y) dispositions pursuant to the Receivables Securitization Facility;

(ix)    (A) incur, create or otherwise become liable for any indebtedness for borrowed money or guarantee or assume any indebtedness for borrowed money of another Person (other than (I) borrowings or other advances of capital pursuant to the Receivables Securitization Facility as in effect on the date hereof and without giving effect to any amendments or modifications thereto that would increase the maximum amount available to be borrowed or advanced thereunder or (II) indebtedness for borrowed money incurred in the Ordinary Course that, in the case of this clause (II) does not exceed $50.0 million in the aggregate, or (III) finance leases in an aggregate principal amount not to exceed $250.0 million outstanding at any time) or (B) with respect to any Non-Controlled Entity, propose or vote in favor of such Non-Controlled Entity incurring, creating or otherwise becoming liable for any indebtedness for borrowed money, guaranteeing or assuming any indebtedness for borrowed money of another Person (other than any Non-Controlled Entity's incurrence of any incremental indebtedness for borrowed money incurred in the Ordinary Course that is not in excess of $10,000,000 in the aggregate (net to the applicable Acquired Company);

(x)    prepay, repay, redeem, repurchase, defease, or cancel any indebtedness for borrowed money in excess of $10,000,000 in the aggregate, in each case, for cash, other than (A) for transactions among (1) CITGO Petroleum and any CITGO Petroleum Subsidiary, (2) a CITGO Petroleum Subsidiary and another CITGO Petroleum

Subsidiary or (3) the Acquired Companies (other than CITGO Petroleum and any CITGO Petroleum Subsidiary), (B) prepayment and repayment of borrowings or advanced capital to the extent required pursuant to the terms of the Receivables Securitization Facility, (C) prepayment and repayment of revolving loans in the Ordinary Course and (D) any required amortization payments, mandatory prepayments, and repayments at maturity, in each case in accordance with the terms of the 2021 Indenture, the 2023 Indenture, the 1995 Loan Agreement, the 1998 Loan Agreement, the 2002 Loan Agreement and the under the Master Reimbursement Agreement instrument governing such indebtedness for borrowed money as in effect on the Execution Date;

(xi)     (A) other than in the Ordinary Course, materially modify, amend, fail to exercise any renewal rights, terminate or waive any material right under any Material Contract or any material Vesting Instrument (other than amendments to renew any Material Contract on the same (or better in respect of the applicable Acquired Company) terms and conditions in all material respects as the terms and conditions of such Material Contract as of the Execution Date) or (B) enter into any Contract that would be a Material Contract if in effect as of the Execution Date, other than in the Ordinary Course (including entry into indemnification agreements with directors or officers in substantially the same form as indemnification agreements made available to the Buyer prior to the date hereof), and provided, that, with respect to this Clause (B), such Contracts do not (I) limit in any material respect either the type of business in which any Acquired Company may engage or the manner or locations in which any of them may so engage in any business (including through "non-competition" or "exclusivity" provisions), or (II) grant "most favored nation" or similar status with respect to any material obligations and would run in favor of any Person (other than an Acquired Company); provided, that, for the avoidance of doubt, nothing in this Agreement will limit the ability of CITGO Petroleum to execute guarantees of the Company's payment obligations pursuant to the Contracts disclosed in Section 6.6(a) of the Company Disclosure Schedules or New Indemnification Agreements (such guarantees, collectively, the "CITGO Petroleum Guarantees");

(xii)     except for any such change which is not material or which is required by reason of a concurrent change in GAAP or applicable Law, change any method of financial accounting or financial accounting practice (other than any change for Tax purposes, which shall be governed by Section 6.1(b)(xiv)) used by it;

(xiii)     (A) enter into any joint venture, partnership, participation, profit-sharing or other similar arrangement or (B) make any loans, capital contributions or advances to or investments in any other Person (other than (I) investments by (1) CITGO Petroleum in any CITGO Petroleum Subsidiary, (2) by a CITGO Petroleum Subsidiary in another CITGO Petroleum Subsidiary or (3) by any Acquired Company (other than CITGO Petroleum and any CITGO Petroleum Subsidiary) into another Acquired Company (other than CITGO Petroleum and any CITGO Petroleum Subsidiary), (II) pursuant to capital calls required pursuant to the terms of existing Contracts to the extent disclosed on Section 6.1(b)(xiii) of the Company Disclosure Schedules, or (III) advances for reimbursable employee expenses in the Ordinary Course or advancements of expenses to directors and officers of the Acquired Companies pursuant to bona fide advancement provisions under

40

the Company Charter, Company By-Laws, Organizational Documents of any of the Company Subsidiaries or any indemnification agreement with any such director or officer);

(xiv)   (A) (I) make, revoke or amend any material election relating to Taxes or change any of its Tax accounting periods  or Tax accounting methods currently in effect, (II) other than in the Ordinary Course, settle any Tax Proceeding, or (III) other than in the Ordinary Course, file any amended Tax Return, in each case of the foregoing clauses (I), (II) and (III), if such action is reasonably likely to result in an increase to a Tax liability of the Acquired Companies that is material to the Acquired Companies, taken as a whole, or (B) with respect to any Non-Controlled Entity, vote in favor of or propose that such Non-Controlled Entity take any action described in the immediately preceding clause (A); provided, that, for the avoidance of doubt, the foregoing will not prohibit the Acquired Companies from taking any action in good faith as a result of, or to comply with, changes in applicable Tax Laws;

(xv)   authorize, issue, reserve for issuance, pledge, transfer or otherwise encumber, sell or redeem or enter into any Contract providing for any of the foregoing with respect to, any Equity Interests of any of the Acquired Companies or any Equity Interests of any Non-Controlled Entity owned by any Acquired Company (including, in each case, any split, combination, recapitalization or reclassification of any such Equity Interests);

(xvi)   other than as set forth in Section 6.1(b)(xvi) of the Company Disclosure Schedules, declare, set aside, make or pay dividends or similar distributions (whether in cash, stock or property) on or with respect to the Shares or otherwise, other than dividends or similar distributions between or among (A) CITGO Petroleum and any CITGO Petroleum Subsidiary (B) a CITGO Petroleum Subsidiary and another CITGO Petroleum Subsidiary or (C) the Acquired Companies (other than CITGO Petroleum and any CITGO Petroleum Subsidiary); provided, that, for the avoidance of doubt, nothing in this Agreement will limit the Acquired Companies' ability to satisfy payables to PDVSA described on Section 4.20 of the Company Disclosure Schedules;

(xvii)   (A) settle, satisfy, release or forgive any claim, demand, lawsuit or other Legal Proceeding (I) in an amount payable by an Acquired Company in excess of $15,000,000 in the aggregate or (II) that would impose any material non-monetary relief (excluding customary confidentiality obligations) on the Acquired Companies, or (B) with respect to any Non-Controlled Entity, vote in favor of or propose that such Non-Controlled Entity take any action described in the immediately preceding clause (A); or

(xviii)  agree or commit to do any of the foregoing (or, with respect to any of the foregoing restrictions which expressly relates to the Non-Controlled Entities, vote in favor of or propose that any Non-Controlled Entity agree or commit to take any such restricted action).

(c)   Notwithstanding the foregoing, during the Interim Period, the Acquired Companies may (i) utilize any and all available Cash to repay and make required payments of outstanding Debt under the 2021 Indenture, the 2023 Indenture, the 1995 Loan Agreement, the 1998 Loan Agreement, the 2002 Loan Agreement and the under the Master Reimbursement

Agreement or other Debt (other than Debt for borrowed money or Debt evidenced by notes, debentures, bonds or other similar instruments), provided, that such payments do not exceed the amounts owed and outstanding and (ii) amend, restate, refinance or terminate any outstanding Debt or the Receivables Securitization Facility, or replace such Debt or Receivables Securitization Facility with new Debt (and the related incurrence of any guarantees for such borrowed money and the incurrence of any related liens on its property) including in the form of, but not limited to, a new securitization facility, an asset based loan or other revolving credit facility (and the Acquired Companies may vote in favor or propose that a Non-Controlled Entity do any of the foregoing, as applicable); provided that, (x) the Special Master shall Cause the Acquired Companies to consult in advance with the Buyer and in good faith take the Buyer's views into account regarding any such new Debt (and the related incurrence of any guarantees for such borrowed money and the incurrence of any related liens on its property), (y) no new Debt shall increase the amount of Debt being refinanced or replaced or include prepayment or make-whole premiums or penalties or otherwise limit or restrict the Acquired Companies right to repay outstanding Debt at the Closing and (z) any such repayment of outstanding Debt, or amendment, restatement, refinancing, termination or replacement of outstanding Debt or the Receivables Securitization Facility is determined in good faith by the Company's board of directors to be in the best interest of the Acquired Companies (or the applicable Non-Controlled Entity).

(d)     In the event that the Closing does not occur by the first anniversary of the Execution Date, the dollar amounts in this Section 6.1 shall, without further action, increase by an incremental 10% on each anniversary of the Execution Date.

(e)     Notwithstanding anything to the contrary herein, nothing in this Agreement will restrict the Acquired Companies from taking actions to prevent or mitigate the effects of any damage to property or injury to any person or the environment in emergency circumstances, as reasonably determined in good faith by the Acquired Companies, so long as the Acquired Companies (i) use Good Industry Practices with respect to such circumstances and (ii) provide the Buyer with notice of any such actions, as soon as reasonably practicable (and in any event, no later than one (1) Business Day) after such action is taken.

(f)     For the avoidance of doubt, nothing in this Agreement, including the provisions of this Section 6.1 or Section 6.3, in any way impairs the right of the Acquired Companies or PDVSA to object to the approval or execution of this Agreement or the approval or consummation of the Transactions, including on appeal, and the taking of any actions in connection therewith.

(g)     Notwithstanding anything in this Agreement to the contrary, to the extent that the Venezuela Parties propose a Competing Proposal which constitutes, or could reasonably be expected to lead to, a Superior Proposal, nothing in this Agreement will prohibit the Venezuela Parties from proposing that the Acquired Companies take actions otherwise prohibited by this Section 6.1 or any other provision of this Agreement in connection therewith (including, for the avoidance of doubt, the actions described in Section 6.1(b)(xvi)) and, subject to the termination of this Agreement pursuant to Section 8.1(d) or Section 8.1(g) in connection with the entry into a definitive agreement with respect to such Competing Proposal by the Venezuela Parties, the Acquired Companies committing to take such actions if permitted by applicable Law.

Section 6.2.    <u>Access to Information</u>.

(a)    During the Interim Period, the Special Master shall (i) Cause the Designated Contacts or such other members of the Company's senior management team as may be reasonable and appropriate from time to time and upon reasonable advance notice to be available to meet and confer with Buyer and its Representatives, (ii) Cause the Designated Contacts or such other members of the Company's senior management team as may be appropriate time to time to provide, upon reasonable advance notice and at the Buyer's sole cost and expense, responses to the Buyer's questions and requests as the Buyer and its Representatives may from time to time reasonably request, and (iii) Cause the Company to provide the Buyer and its Representatives, upon reasonable advance notice and under reasonable circumstances, with reasonable access during normal business hours, to the books and records (including all electronic data related thereto), information, assets, operations and properties of the Acquired Companies; <u>provided</u>, that (i) any such access and activities shall be conducted in a manner not to unreasonably interfere with the normal operations of the Acquired Companies or their respective business and (ii) without the prior written consent of the Special Master and the Company, which may be withheld for any reason in the sole and absolute discretion of the Special Master or the Company, as applicable, the Buyer and its Representatives shall have no right to perform invasive or subsurface investigations of the properties or facilities of the Acquired Companies. Notwithstanding anything herein to the contrary, no such access or disclosure shall be required if doing so could reasonably be expected to (A) result in a waiver of attorney-client privilege, work product doctrine or similar privilege, (B) violate the terms of any Contract to which any Acquired Company is a party, or (C) violate any Law to which any Acquired Company is subject; <u>provided</u>, that the Special Master shall Cause the Company to, to the extent legally permissible and practicable, use commercially reasonable efforts to make appropriate substitute disclosure arrangements, or seek appropriate joint defense agreements, waivers or consents, under circumstances in which the foregoing restrictions of this sentence apply. There may be withheld from the Buyer and its Representatives such portions of documents or information relating to pricing or other matters that are highly sensitive if the exchange of such documents (or portions thereof) or information as determined by the Company's outside counsel would be reasonably likely to result in antitrust difficulties between the Company and the Buyer or any of their respective Affiliates. All requests for such access shall be directed to such Person as the Special Master may designate in writing from time to time (collectively, the "<u>Designated Contacts</u>"). Other than the Designated Contacts, prior to the Closing, without the prior written consent of the Special Master (not to be unreasonably withheld, conditioned or delayed), neither the Buyer, its Affiliates or their respective Representatives shall contact any employee, contractors, supplier, customer, landlord or other material business relationship of any Acquired Company regarding any Acquired Company, their respective businesses or the Transactions.

(b)    Notwithstanding anything in this Agreement to the contrary, in no event will the Acquired Companies be required to provide Buyer or the Special Master with access to any information regarding its objections to the sale process, the negotiation of the Transactions or the Acquired Companies' objection to this Agreement or the approval or the consummation of the Transactions.

(c)    For a period commencing on the Closing Date and ending on the latest of (x) the date that is twelve (12) months after the Closing Date and (y) the final, non-appealable resolution of a Legal Proceeding relating to or arising from the Sale Order to appeal the sale and

purchase of the Shares, the Buyer shall cause the Acquired Companies to use commercially reasonable efforts to maintain all books and records (including all electronic data related thereto) of the Acquired Companies relating to periods ending on or prior to the Closing Date and the Buyer shall cause the Acquired Companies to (i) provide the Special Master and its Representatives during the Company's normal business hours, upon reasonable advance notice and under reasonable circumstances, reasonable access to such books and records and the individuals responsible for preparing and maintaining such books and records, and (ii) permit the Special Master and its Representatives to make copies of any such books and records, in each case of the immediately preceding clause (i) and clause (ii), as reasonably requested in connection with any Legal Proceeding relating to or arising from the Sale Order to appeal the sale and purchase of the Shares (other than any Legal Proceeding between the Special Master, on the one hand, and the Buyer, on the other hand, related to the Sale Order, this Agreement, the other Transaction Documents or the Transactions, which would be governed by and subject to other applicable provisions of this Agreement and subject to applicable rules relating to discovery and document retention). Notwithstanding anything in this Section 6.2(c) to the contrary, the Buyer and the Acquired Companies shall not be required to provide such access or disclose any information to the Special Master if doing so could reasonably be expected to (A) result in a waiver of attorney-client privilege, work product doctrine or similar privilege, (B) violate the terms of any Contract to which any Acquired Company is a party, or (C) violate any Law to which any Acquired Company is subject; provided, that the Parties will, to the extent legally permissible and practicable, use commercially reasonable efforts to make appropriate substitute disclosure arrangements, or seek appropriate joint defense agreements, waivers or consents, under circumstances in which the foregoing restrictions of this sentence apply. The Buyer agrees to cause the Company to hold all the books and records of the Acquired Companies existing on the Closing Date and not to destroy or dispose of any thereof for a period of twelve (12) months after the finalization of any appeal of the sale and purchase of the Shares or for a longer period of time as may be required by Law.

Section 6.3.     Regulatory Approvals; Third Party Consents.

(a)     Each of the Parties shall, if required by applicable Law, within thirty (30) calendar days following the date on which the Special Master files a motion with the Court to approve the Sale Order (the "Final Recommendation Date"), file or supply, or in the case of the Special Master Cause to be filed or supplied, in connection with the Transactions, all notifications and information required to be filed or supplied pursuant to the HSR Act. Each of the Parties shall request early termination of the waiting period under the HSR Act, if available. The Parties shall (and the Special Master shall Cause the Acquired Companies to), as soon as reasonably practicable following the Final Recommendation Date (and in any event no later than ten (10) Business Days thereafter), file or supply, or cause to be filed or supplied in connection with the Transactions, all filings and submissions required under any relevant Laws, including Antitrust Laws. The Buyer acknowledges and agrees that it shall pay and shall be solely responsible for the payment of all fees, costs, expenses and other charges in connection with compliance with this Section 6.3 (including filing fees).

(b)     Neither Party shall (i) consent to any voluntary extension of any waiting period; (ii) pull and refile any filing made under the HSR Act, or any other Antitrust Laws; or (iii) consent to any other voluntary delay of the consummation of the Transactions at the behest of any

Governmental Body, in each case, without the prior written consent of the other Party, which consent shall not be unreasonably withheld, conditioned or delayed.

(c)    The Buyer shall, at its own expense, (i) within ten (10) Business Days after the Final Recommendation Date, submit the OFAC License Application; (ii) promptly supply any additional information and documentary material that may be requested by OFAC in relation to the OFAC License Application; (iii) seek and obtain, prior to submitting the OFAC License Application and any other filing with or submission to OFAC, written consent from the Special Master, which consent shall not be unreasonably withheld or delayed; (iv) keep the Special Master regularly informed of the processing of the OFAC License Application and any other filings or material contacts with OFAC or other Governmental Body in relation to the OFAC License Application; and (v) fully cooperate with and furnish to the Special Master available information and assistance as reasonably may be requested by the Special Master in connection with any communications that the Special Master may have with OFAC or other Governmental Body in relation to the OFAC License Application. The Special Master shall cooperate, and shall Cause the Company to cooperate with and provide any information or assistance reasonably requested by the Buyer to prepare, submit and obtain approval of the OFAC License Application.

(d)    The Parties shall coordinate and cooperate with one another in exchanging and providing such information to each other and in making the filings and requests referred to in Section 6.3(a). The Parties shall supply such reasonable assistance as may be reasonably requested by the other Party in connection with the foregoing and shall promptly furnish the other Party with all information within its possession that is reasonably required for all filings and submissions required under any relevant Laws, including Antitrust Laws.  In furtherance of the foregoing, at least once every two weeks following the Final Recommendation Date, the Buyer shall provide the Special Master a written update, in reasonable detail, on the status and progress of, or any other developments regarding, the OFAC License Application (and/or any other filings or material contacts with OFAC or other Governmental Body in relation to the OFAC License Application) and the HSR Filing (and/or any material contracts with the relevant Governmental Bodies in relation to the HSR Filing).  Following receipt of any such update, the Special Master may, but shall not be obligated to, provide the Buyer with written feedback if it disagrees with or otherwise has concerns regarding, the actions, timing or strategy employed by the Buyer with respect to the OFAC License Application and the HSR Filing, and, upon receipt thereof, the Buyer will use commercially reasonable efforts to address any such written feedback.

(e)    Notwithstanding anything to the contrary in this Agreement, the Buyer shall take, and shall cause its Subsidiaries and Affiliates to take, as promptly as practicable, all action necessary, proper or advisable to consummate the Transactions prior to the Outside Date to (x) avoid or eliminate each and every impediment, resolve any objection and obtain all consents under any applicable Laws (including Antitrust Laws) as promptly as practicable so as to enable the Parties to consummate the Transactions and (y) avoid the entry or to effect the dissolution of, or vacate or lift, any Order, objection of any Governmental Body or waiting period under applicable Antitrust Laws that would otherwise have the effect of preventing, impairing or delaying the Closing, including: (i) proposing, negotiating and offering to commit and effect, by Order, consent decree, hold separate order, trust, or otherwise, the sale, license, divestiture, disposition or hold separate of such entities, assets, Intellectual Property, businesses, product lines, Equity Interests, properties or services of the Buyer or its Affiliates or Subsidiaries (including, following the

45

Closing, the Acquired Companies); (ii) offering to take or offering to commit to take any action, including any action that limits the Buyer's freedom of action, ownership or control with respect to, or its ability to retain or hold, any of the businesses, assets, product lines, Equity Interests, properties or services of the Buyer or its Subsidiaries or Affiliates (including, following the Closing, the Acquired Companies), to the extent legally permissible, and if the offer is accepted, taking or committing to take such action; (iii) terminating, amending, relinquishing, modifying, waiving or assigning existing relationships, ventures or contractual rights, obligations or other arrangements of the Buyer or its Subsidiaries or Affiliates (including, following the Closing, the Acquired Companies); (iv) changing or modifying, or agreeing not to engage in, any course of conduct regarding future operations; (v) creating any relationships, ventures, contractual rights, obligations or other arrangements of the Buyer or its Subsidiaries or Affiliates (including, following the Closing, the Acquired Companies); (vi) committing to take any such actions in the foregoing clauses (i), (ii), (iii), (iv); or (v) or entering or offering to enter into agreements and stipulating to the entry of an Order or filing appropriate applications with any Governmental Body in connection with any of the actions contemplated by the foregoing clauses (i), (ii), (iii), (iv), or (v); and (vii) opposing, and causing its Subsidiaries and Affiliates to oppose, through and including action on the merits (and all appeals with respect thereto), any action asserted in court or other forum by any Governmental Body or other Person in order to avoid entry of, or to have vacated or terminated, any Order (whether temporary, preliminary or permanent) that would restrain or prevent the Closing by the Outside Date. For the avoidance of doubt, neither the Buyer nor any Subsidiary or Affiliate of the Buyer nor any Acquired Company shall be required to negotiate, agree or commit to, or effect to take or cause to be taken, any structural or behavioral remedy or any other action that is not conditioned (either as a condition precedent or subsequent) upon the consummation of the Transactions.

(f)     In addition and without limiting the other provisions of this <u>Section 6.3</u>, the Buyer shall defend through litigation, appealing, contesting or otherwise resisting any action, proceeding, or Order by any Governmental Body challenging the Transactions under applicable Laws (including Antitrust Laws), including to defend through litigation on the merits any claim asserted in court by any Person in order to avoid entry of, or to have vacated or terminated, any Order (whether temporary, preliminary or permanent) that would delay the Closing or prevent the Closing by the Outside Date; <u>provided</u>, <u>however</u>, that such litigation in no way limits the obligation of the Buyer to take any and all steps necessary to eliminate each and every impediment under any applicable Laws (including Antitrust Laws) to close the Transactions prior to the Outside Date.

(g)     Except as specifically required by the Agreement, the Buyer shall not take, and shall cause its Subsidiaries and Affiliates not to take, any action or refrain from taking any action, the effect of which would be to delay or impede the ability of the Parties to consummate the Transactions. Without limiting the generality of the foregoing, the Buyer shall not, and shall cause its Subsidiaries and Affiliates not to, acquire or agree to acquire by merging or consolidating with, or by purchasing a substantial portion of the assets of or equity in or otherwise make any investment in, or by any other manner, any Person or portion thereof, or otherwise acquire or agree to acquire or make any investment in any assets, or agree to a commercial or strategic relationship with any person, if the entering into of a definitive agreement relating to or the consummation of such acquisition, merger, consolidation, investment, commercial or strategic relationship would reasonably be expected to (i) impose any delay in the obtaining of, or increase the risk of not obtaining, any consent, approval, authorization, declaration, waiver, license, franchise, permit,

certificate or Order of any Governmental Body necessary to consummate the Transactions or the expiration or termination of any applicable waiting period, (ii) increase the risk of any Governmental Body entering an Order prohibiting the consummation of the Transactions, (iii) increase the risk of not being able to remove any such Order on appeal or otherwise, (iv) increase the risk of any Governmental Body asserting jurisdiction over the Transactions or (v) delay the consummation of the Transactions.

(h)    Each Party shall promptly inform the other Party of any material communication from the Federal Trade Commission, the Department of Justice or any other Governmental Body regarding any of the Transactions. Each Party (including its respective Affiliates or Subsidiaries) will provide the other Party with copies (or, if provided orally, a summary) of all substantive correspondence, filings or communications between them or any of their Representatives, on the one hand, and any Governmental Body or members of its staff, on the other hand, with respect to this Agreement and the Transactions; provided, however, that materials may be redacted as necessary to (i) comply with contractual arrangements and (ii) address reasonable attorney-client or other privilege or confidentiality concerns. If any Party or any Affiliate thereof receives a request for additional information or documentary material from any such Governmental Body with respect to the Transactions, then such Party will use its reasonable best efforts to make, or cause to be made, as soon as reasonably practicable and after consultation with the other Party, an appropriate response in compliance with such request. The Buyer will advise the Special Master and the Company promptly in respect of any understandings, undertakings or agreements (oral or written) that the Buyer proposes to make or enter into with the Federal Trade Commission, the Department of Justice or any other Governmental Body in connection with the Transactions, and will use its best efforts to cause the Special Master and the Company to be given the opportunity to attend and participate at any meetings with respect thereto. None of the Buyer, the Special Master or the Company (including their respective Affiliates or Subsidiaries) will agree to participate in any meeting, telephone call or discussion with a Governmental Body in respect of any submissions, filings, investigation (including any settlement of the investigation), litigation or other inquiry relating to the matters that are the subject of this Agreement unless it consults with the other Party in advance and, except as may be prohibited by a Governmental Body or by any Law, and will permit authorized Representatives of the other Parties and the Special Master to be present at each meeting, telephone call or discussion.

Section 6.4.    Further Assurances. Subject to, and not in limitation of, Section 6.3, until the Closing or earlier termination of this Agreement, each of the Parties shall (a) execute such documents and perform such further acts as may be reasonably required to carry out the provision hereof and the actions contemplated hereby and (b) use its best efforts to, at the earliest practicable date, satisfy, or cause the satisfaction of, the condition precedents to the consummation of the Transactions. Subject to, and not in limitation of, Section 6.3, until the Closing or earlier termination of this Agreement, the Buyer shall, at the request of the Special Master, use its reasonable best efforts to enforce its rights under that certain side letter regarding commitment to take certain regulatory efforts entered into among the Buyer and the Record Holders as of the date hereof.

Section 6.5.    Confidentiality. The Buyer acknowledges that the information provided to them in connection with this Agreement and the Transactions is subject to the terms of the confidentiality agreement between Gold Reserve Inc. and the Special Master dated April 23, 2024,

(the "<u>Confidentiality Agreement</u>"), the terms of which are incorporated herein by reference; subject to disclosure permitted in accordance with <u>Section 6.10</u>.

      Section 6.6.    <u>Indemnification, Exculpation and Insurance</u>.

      (a)    From and after the Closing, the Buyer shall, and shall cause each Acquired Company to continue in full force and effect in accordance with their respective terms until the applicable statute of limitations with respect to any claims against such Indemnitees (as defined below), all rights to indemnification, advancement of expenses and exculpation by the Acquired Companies, now existing in favor of each of the Persons who at or prior to the Closing were (i) directors (or equivalent), officers or employees of any Acquired Company or (ii) serving as directors (or equivalent), officers or employees of another entity (including a joint venture) at the request of any Acquired Company (collectively, the "<u>Indemnitees</u>") pursuant to the Organizational Documents of the Acquired Companies in effect on the Execution Date (and to the extent permitted by Section 3, clause fifth of the Certificate of Incorporation of CITGO Petroleum as in effect on the Execution Date) or pursuant to the Contracts disclosed in <u>Section 6.6(a)</u> of the Company Disclosure Schedules in effect as of the Execution Date (as the same may be amended to reflect the CITGO Petroleum Guarantees) or indemnification Contracts entered into during the Interim Period between an Acquired Company, on the one hand, and an Indemnitee first hired or engaged by the Acquired Companies during the Interim Period, on the other hand (which such Contracts will not be materially less favorable to the Acquired Companies than those Contracts disclosed in <u>Section 6.6(a)</u> of the Company Disclosure Schedules) ("<u>New Indemnification Agreements</u>").

      (b)    The indemnification and exculpation provisions of the Acquired Companies' Organizational Documents and indemnification Contracts disclosed in <u>Section 6.6(a)</u> of the Company Disclosure Schedules shall not be amended, or otherwise modified in any manner that would adversely affect the rights of the Indemnitees under <u>Section 6.6(a)</u>, unless such amendment or modification is required by Law. From and after the Closing, the Buyer agrees to cause the Acquired Companies to maintain in effect in accordance with their respective terms (i) the escrow agreement, dated May 5, 2023, by and among Citgo Petroleum Corporation, Morris James, LLP and JPMorgan Chase Bank, N.A. and (ii) the escrow agreement, dated May 5, 2023, by and among the Company, Morris James, LLP and JPMorgan Chase Bank, N.A., and not to amend the foregoing in any manner that would adversely affect the rights of the applicable Indemnitees thereunder, unless such modification is required by Law.

      (c)    Prior to the Closing, the Company may, or, immediately upon the Closing if the Company has not already done so, the Buyer shall cause the Company and the Company Subsidiaries to, purchase the directors' and officers' "tail" or "runoff" insurance program currently available to be purchased under the existing directors' and officers' liability insurance plan covering the Acquired Companies' directors and officers, to the extent such plan remains available as of the Closing on materially the same terms and conditions; <u>provided</u>, that the premium paid for such "tail" policy shall not exceed 350% of the annual premiums paid for the Acquired Companies' current directors' and officers' liability insurance policy; and <u>provided</u>, <u>further</u>, that to the extent the premium paid for such "tail" policy exceeds 350% of the annual premiums paid for the Acquired Companies' current directors' and officers' liability insurance policy, the Buyer shall maintain a "tail" policy that has the most favorable coverage obtainable for an amount at or below 350% of the annual premiums paid for the Acquired Companies' current directors' and officers'

liability insurance policy. To the extent that such plan is no longer available on materially the same terms and conditions at the Closing, prior to the Closing, the Buyer shall, or, immediately upon the Closing, shall cause the Company, to purchase a directors' and officers' liability "tail" or "runoff" insurance program, selected by the Company prior to the Closing, for a period of six (6) years after the Closing (such coverage shall have an aggregate coverage limit over the term of such policy in an amount no less than the aggregate coverage limit under the Company's existing directors' and officers' liability policy, and in all other respects comparable to such existing coverage); provided, that the premium paid for such "tail" policy shall not exceed 350% of the annual premiums paid for the Acquired Companies' current directors' and officers' liability insurance policy; and provided, further, that to the extent the premium paid for such "tail" policy exceeds 350% of the annual premiums paid for the Acquired Companies' current directors' and officers' liability insurance policy, the Buyer shall maintain a "tail" policy that has the most favorable coverage obtainable for an amount at or below 350% of the annual premiums paid for the Acquired Companies' current directors' and officers' liability insurance policy.

(d)    The provisions of this Section 6.6 are intended to be for the benefit of, and shall be enforceable by, each Indemnitee.

(e)    In the event that the Buyer, the Company or any of its successors or assigns (i) consolidates with or merges into any other Person and is not the continuing or surviving corporation or entity of such consolidation or merger; or (ii) transfers or conveys all or substantially all of its properties and assets to any Person, then, and in each such case, proper provision shall be made so that the successors and assigns of the Buyer and of the Company shall assume all of the obligations of the Buyer and the Company set forth in this Section 6.6.

Section 6.7.    Public Announcements. The Buyer and the Special Master shall not, and the Special Master shall Cause the Acquired Companies not to, issue any press release or make any public statement without the prior consent of the other Party, which consent shall not be unreasonably withheld, conditioned or delayed, except that each of the Buyer and the Special Master may issue (x) the initial press release announcing the execution of this Agreement that has been agreed upon by the Buyer and the Special Master, (y) any press release or public announcement so long as any statements contained therein concerning the Transactions are consistent with previous releases or announcements made by the applicable Party with respect to which such Party has complied with the provisions of this Section 6.7, and (z) such other release or announcement that, upon the advice of outside counsel, is required by Law or the rules and regulations of any stock exchange upon which the securities of the Buyer, as applicable, or any of its Affiliates, are listed. For the avoidance of doubt, nothing in this Section 6.7 shall prevent the Parties from (a) issuing any press release or making any public statement in the Ordinary Course that does not relate specifically to this Agreement or the Transactions, (b) disclosing this Agreement or the substance or any relevant details of the Transactions on a confidential basis to any of its Representatives (provided, that such Representatives have been informed of such party's confidentiality obligations hereunder and under the Confidentiality Agreement or are otherwise obligated to keep such information confidential) or (c) in the case of the Special Master, complying with any reporting obligations of the Court and nothing in this Section 6.7 or in any other provision of this Agreement shall impact the ability of PDVSA or the Acquired Companies to use confidential information in connection with opposing the sale process, this Agreement or the Transactions.

Section 6.8.     Employee Matters.

(a)     The Buyer and the Special Master hereby agree that the Closing shall constitute a "Change in Control" for purpose of any employee arrangement and all other Company Benefit Plans, pursuant to the terms of such plans as in effect on the Execution Date (or as adopted or amended to the extent permitted by Section 6.1(b)). No provision of this Section 6.8(a) shall be construed to create a right in any employee or beneficiary of such employee under any Company Benefit Plan that such employee or beneficiary would not otherwise have under the terms of such Company Benefit Plan and, for the avoidance of doubt, no provision of this Section 6.8 will be deemed to supersede the terms of any Company Benefit Plan to the extent such terms are more favorable to Affected Employees than the rights granted hereunder.

(b)     As of the Closing, the Buyer shall, or shall cause the Acquired Companies to, assume the Company Collective Bargaining Agreements and adhere to the obligations thereunder pursuant to the terms therein. Following the Closing, the Buyer or the Acquired Companies will continue to employ the employees who are subject to or covered by the Company Collective Bargaining Agreements and employed by one of the Acquired Companies as of the Closing (the "Union Affected Employees") on the terms therein, including with respect to employee wages and benefits.

(c)     For a period of twelve (12) months following the Closing (or, if shorter, the applicable employee's period of employment with the Buyer or one of the Acquired Companies), the Buyer shall continue to provide (or shall cause the Acquired Companies to provide) to each employee of any of the Acquired Companies as of the Closing who is not subject to or covered by a Company Collective Bargaining Agreement (the "Non-Union Affected Employees," together with the Union Affected Employees, the "Affected Employees"), for so long as each such Non-Union Affected Employee remains employed by the Buyer or any of the Acquired Companies, compensation and employee benefits which are no less favorable than those provided to the Non-Union Affected Employees prior to the Closing.  Notwithstanding the generality of the foregoing, for a period of twelve (12) months following the Closing, the Buyer shall continue to provide (or shall cause the Acquired Companies to provide) to each Non-Union Affected Employee, for so long as such Non-Union Affected Employee remains employed by the Buyer or any of the Acquired Companies, (i) a base salary or wage rate (as applicable), in each case, that is no less favorable than that provided to such Non-Union Affected Employee immediately prior to the Closing, (ii) short-term and long-term incentive compensation opportunities and Responsibility Incentive (as such term is defined in the CITGO Petroleum Corporation 2024 Compensation and Incentive Omnibus Plan for Salaried Employees or its successor), in each case, that are no less favorable in the aggregate than those provided to such Non-Union Affected Employee immediately prior to the Closing, (iii) all other compensation and employee benefits (including any defined benefit pension and post-retirement health and welfare benefits) that are no less favorable in the aggregate than those provided to such Non-Union Affected Employee immediately prior to the Closing, and (iv) severance payments, entitlements and benefits that are no less favorable in the aggregate than those provided to such Non-Union Affected Employee immediately prior to the Closing. Except as required by applicable Law, for the period beginning on the Closing Date and ending on the first anniversary thereof, the Buyer agrees to cause the Acquired Companies to maintain in effect and without reduction retiree health and life insurance benefits for the individuals who are participants in the Acquired Companies' retiree health and life

insurance benefits as of immediately prior to the Closing Date and individuals who become eligible to participate in such retiree health and life insurance benefits during the period beginning on the Closing Date and ending on the one year anniversary thereof.

(d)    The Buyer will give (or will cause the Acquired Companies to give) each Affected Employee full credit for purposes of eligibility, vesting and benefit accrual under any employee benefit plans or arrangements maintained by the Buyer (or any of the Acquired Companies) for such Affected Employee's service with any of the Acquired Companies (and their respective predecessor entities) to the same extent recognized by any of the Acquired Companies immediately prior to the Closing, except to the extent that such credit would result in a duplication of benefits or compensation for the same period of service.

(e)    The Buyer will (or will cause the Acquired Companies to) use commercially reasonable efforts to (i) waive all limitations as to preexisting conditions, exclusions and waiting periods with respect to participation and coverage requirements applicable to each Affected Employee under any welfare benefit plans that such Affected Employee may be eligible to participate in after the Closing, other than limitations or waiting periods that are already in effect with respect to such Affected Employee and that have not been satisfied as of the Closing under any welfare plan maintained for the Affected Employee immediately prior to the Closing, and (ii) for the first plan year of eligibility, provide each Affected Employee with credit for any co-payments and deductibles, paid by such Affected Employee prior to the Closing, in satisfying any applicable deductible or out-of-pocket requirements under any welfare plans that such Affected Employee is eligible to participate in after the Closing. References to "Affected Employee" in this Section 6.8(e) shall also refer to the applicable Affected Employee's eligible dependents.

(f)    Upon the Buyer's request (and at the Buyer's sole cost and expense), the Special Master shall Cause the Company to adopt and maintain an employee retention plan in form and substance as proposed by the Buyer in writing. Any such employee retention plan shall be in addition to, and shall not replace or substitute any existing Company Benefit Plan.

(g)    To the extent any awards under any cash bonus, sales and other incentive plans of the Acquired Companies ("Bonus Amounts") with respect to a performance period completed prior to the Closing remain unpaid as of the Closing Date, the Buyer shall cause such Bonus Amounts to be calculated and paid in the Ordinary Course to the eligible employees of the Acquired Companies.  With respect to Bonus Amounts for the performance period in which the Closing occurs, the Buyer shall cause such Bonus Amounts to be calculated and paid in the Ordinary Course to the eligible employees of the Acquired Companies based on the actual level of Company performance for such performance period.  Without limiting in any way any rights an Affected Employee may have under any Company Benefit Plan, if an Affected Employee participating in the CITGO Petroleum Corporation Performance Incentive program for salaried employees (the "Performance Incentive Program") has a qualifying termination of employment entitling the Affected Employee to severance under a severance program, agreement or arrangement of the Buyer or the Acquired Companies and such termination occurs during the period that begins on the Closing Date and ends on the date on which Bonus Amounts under the Performance Incentive Program are paid for the performance period in which the Closing occurs, then such Affected Employee will not lose eligibility, solely due to the termination of employment, for payment of any Bonus Amount under the Performance Incentive Program for performance

periods completed prior to the Closing or for the performance period in which the Closing occurs; provided that any such Bonus Amounts shall be paid to such employee at the same time as such awards are paid to other participants in the Performance Incentive Program, and provided, further, that any such Bonus Amount for the performance period in which the termination of employment occurs shall be prorated based on the number of completed months of employment during the performance period prior to the termination of employment.

(h)    The provisions contained in this Section 6.8 shall not (i) be treated as an amendment or other modification of any Company Benefit Plan, Company Collective Bargaining Agreement or other employee benefit plan, agreement or other arrangement, (ii) limit the right of the Buyer or any Acquired Company to terminate any employee at any time and for any reason or (iii) create any third party rights, benefits or remedies of any nature whatsoever in any employee of any Acquired Company (or any beneficiaries or dependents thereof) or any other Person that is not a party to this Agreement. The benefits and compensation provided to each Affected Employee following the Closing Date shall be subject to the requirements of applicable Law. Notwithstanding the foregoing, nothing herein will impose on the Buyer or any of the Acquired Companies any obligation to (A) retain any Affected Employee in its or their employ for any amount of time or (B) maintain any terms and conditions of employment other than as expressly set forth above, subject to applicable Law and the Acquired Companies' existing contractual obligations to the respective Affected Employee.

(i)    From and after the Execution Date, the Buyer will cooperate with and provide all information reasonably requested by the Acquired Companies and their representatives in connection with any notice to be filed by the Acquired Companies with the PBGC pursuant to ERISA Section 4043 and the regulations thereunder as a result of the Transactions or in connection with any related requests for information from the PBGC. To the extent such notice is required to be filed prior to Closing, the Special Master shall Cause the Acquired Companies to (i) cause the applicable plan sponsor and plan administrator to timely file such notice with the PBGC and (ii) prior to such filing, provide Buyer a reasonable opportunity to review and comment on such notice.

(j)    Not less than thirty (30) days prior to the Closing, the Special Master shall Cause the Acquired Companies to contribute to the grantor trust established for the EPP and the RRP such funds as are required to be contributed to such trust pursuant to the terms of the EPP and RRP.

Section 6.9.    The Buyer's Obligations in Respect of Debt Financing.

(a)    The Buyer acknowledges and agrees that the Special Master, the Company and their respective Affiliates have no responsibility for any financing that Buyer may raise in connection with the Transactions.

(b)    The Buyer shall use reasonable best efforts to take, or cause to be taken, all actions and to do, or cause to be done, all things necessary, proper or advisable to obtain the Debt Financing contemplated by the Debt Financing Commitments on or prior to the Closing Date, including to:

(i)        maintain in effect (A) any Equity Commitment Letters and (B) the Debt Commitment Letters from and after the Execution Date;

(ii)        negotiate and enter into definitive financing agreements (the "Definitive Debt Documents") with respect to the Debt Financing that reflect the terms contained in the Debt Commitment Letter (including any "market flex" provisions related thereto), so that such agreements are in effect as promptly as practicable but in any event no later than the Closing Date; it being understood that in no event shall any of the Definitive Debt Documents (A) reduce the aggregate amount of the Debt Financing provided for in the Debt Commitment Letter (including by changing the amount of fees or original issue discount contemplated by the Debt Commitment Letter and the Fee Letters) in accordance with the Debt Commitment Letter if such reduced amount is not below the Required Amount, unless (1) the Special Master consents to such reduction in writing and (2) there is a corresponding increase in the Equity Financing; (B) expand the conditions or other contingencies relating to the receipt or funding of the Debt Financing beyond those expressly set forth in the Debt Commitment Letter, amend or modify any such conditions or other contingencies in a manner adverse to the Buyer and/or the Acquired Companies (whether by making any such conditions or other contingencies less likely to be satisfied on a timely basis or otherwise) or impose any new or additional condition or other contingency relating to the receipt or funding of the Debt Financing or (C) contain terms (other than those terms expressly set forth in the Debt Commitment Letter) that (1) could reasonably be expected to materially delay the Closing or the date on which the Debt Financing would be obtained or make the timely funding of the Debt Financing materially less likely to occur, or (2) materially adversely impact the ability of the Buyer to consummate the Debt Financing or enforce its rights against any of the other parties to the Debt commitment Letter or the Definitive Debt Documents to consummate the Debt Financing (clauses (A) through (C), a "Prohibited Modification"); provided, however, notwithstanding anything to the contrary in this Section 6.9 or elsewhere in this Agreement, upon the prior written consent of the Special Master (such consent not to be unreasonably withheld, conditioned or delayed), the Buyer shall have the right from time to time to amend, replace, supplement or otherwise modify, or waive any of its rights under a Debt Commitment Letter and/or substitute financing for all or any portion of the Debt Financing from the same and/or alternative financing sources, provided that any such amendment, replacement, supplement or other modification to or waiver of any provision of a Debt Commitment Letter or the Definitive Financing Documents that amends the contemplated Financing and/or substitutes all or any portion of the Debt Financing (y) shall not expand upon, or delay, the satisfaction of the conditions precedent to the Debt Financing on the Closing Date of the Debt Financing as set forth in the original Debt Commitment Letter or the Definitive Financing Documents and (z) shall provide for a financing amount which (when added to Buyer's available, unrestricted cash on hand, cash equivalents and marketable securities and the Equity Financing) will not be less than the amount necessary to satisfy the Required Amount in full;

(iii)        satisfy on a timely basis (or obtain a waiver of) all conditions applicable to the Buyer contained in the Debt Financing Commitments and Equity Financing Commitments, including the payment of any commitment, engagement or

placement fees required as a condition to the Debt Financing or the Equity Financing, as applicable;

(iv)    consummate the Debt Financing (including by instructing the Debt Financing Sources to fund the Debt Financing in accordance with the Debt Commitment Letter, instructing the Equity Financing Sources to fund the Equity Financing in accordance with the Equity Commitment Letters and enforcing the Buyer's rights under the Debt Commitment Letter (including if necessary or appropriate, to commence, participate in and diligently pursue Legal Proceedings against or involving any of the Persons that have committed to provide any portion of, or otherwise with respect to, the Debt Financing)) at or prior to the date that the Closing is required to be effected in accordance with 0 (the Buyer acknowledges and agrees that it is not a condition to Closing under this Agreement, nor to the consummation of the Transactions, for the Buyer to obtain the Debt Financing or any Replacement Financing); and

(v)    comply with its obligations under the Debt Commitment Letter.

Subject to the terms and upon satisfaction of the conditions set forth in the Debt Commitment Letter, the Buyer shall use its reasonable best efforts (including initiating Legal Proceedings) to cause the lenders and the other Persons providing such Debt Financing to provide the Debt Financing on the Closing Date.

(c)    The Buyer shall provide to the Special Master copies of all agreements and other documents relating to the Debt Financing and, shall keep the Special Master reasonably informed on a current basis and in reasonable detail of material developments in respect of the financing process relating thereto. Without limiting the generality of the foregoing, the Buyer shall provide the Special Master prompt (and in no event later than forty eight (48) hours after obtaining knowledge) written notice (i) of any expiration or termination of, or any breach, default or violation (or any event or circumstance that, with or without notice, lapse of time or both, could reasonably be expected to give rise to any breach, default or violation) by any party to the Debt Commitment Letter or definitive agreements related to the Debt Financing of which the Buyer becomes aware, (ii) of the receipt of any notice or other communication, in each case from any Debt Financing Source with respect to any (x) actual or potential breach, default, violation, termination or repudiation by any party to the Debt Commitment Letter or definitive agreements related to the Debt Financing of any provision of the Debt Commitment Letter or definitive agreements, in each case, related to the Debt Financing, (y) any actual dispute or disagreement between or among any parties to the Debt Commitment Letter or definitive agreements related to the obligation to fund the Debt Financing or the amount of the Debt Financing to be funded at the Closing, and (iii) if at any time for any reason the Buyer believes in good faith that it will not be able to obtain all or any portion of the Debt Financing on the terms and conditions contemplated by the Debt Financing Commitments or definitive agreements related to the Debt Financing. As soon as reasonably practicable, but in any event within forty eight (48) hours after the Special Master delivers to the Buyer a written request therefor, the Buyer shall provide any information reasonably requested by the Special Master relating to any circumstance referred to in clause (i), (ii) or (iii) of the immediately preceding sentence; provided, that the right of the Special Master to request such information shall not limit the obligations of the Buyer to promptly provide such information as otherwise required by this Section 6.9(c).

(d)     Prior to the Closing, the Buyer shall not, without the prior written consent of the Special Master, which consent shall not be unreasonably withheld, agree to, or permit, any amendment, restatement, amendment and restatement, replacement, supplement, or other modification of, or waiver or consent under, the Debt Commitment Letter or other documentation relating to the Debt Financing which would constitute a Prohibited Modification. For purposes of this Section 6.9, the definitions of "Debt Commitment Letter," "Debt Financing," "Debt Financing Commitments," "Debt Financing Sources," shall include the Debt Financing Commitment or documents related thereto as permitted to be amended, amended and restated, replaced, supplemented, modified, waived or consented to by this Section 6.9(d). The Buyer shall promptly deliver to the Special Master copies of any such amendment, restatement, amendment and restatement, replacement, supplement, modification, waiver or consent. The Buyer shall not agree to or permit the withdrawal, repudiation, termination or rescission of any Debt Commitment Letter or Definitive Debt Document or any provision thereof (except in connection with Replacement Financing). Further, for the avoidance of doubt, if from and after the Execution Date the Debt Financing (or any Replacement Financing) has not been obtained, the Buyer shall continue to be obligated to consummate the Transactions subject only to the satisfaction or waiver of the conditions set forth in Section 7.1 and Section 7.2.

(e)     If, notwithstanding the use of reasonable best efforts by the Buyer to satisfy its obligations under Section 6.9(b), (c), (c)and (d), any of the Debt Financing or the Debt Financing Commitments (or any definitive financing agreement relating thereto) expire or are terminated or become unavailable prior to the Closing, in whole or in part, for any reason, the Buyer shall (i) promptly notify the Special Master of such expiration, termination, or unavailability and the reasons therefor and (ii) use its reasonable best efforts promptly to arrange for alternative financing whether subject to the same or alternative financing structures ("Replacement Financing") (which shall be sufficient, together with the Equity Financing and cash on hand of the Buyer, to pay the Required Amount and shall not, without the prior written consent of the Special Master, include any conditions to such Replacement Financing that are more onerous than, or in addition to, the conditions set forth in the Commitment Letters, as applicable, to replace the financing contemplated by such expired, terminated, or unavailable commitments or arrangements); provided, that any such alternative financing structures will require the prior written consent of the Special Master, which consent shall not be unreasonably withheld, conditioned or delayed. The Buyer shall deliver to the Special Master true, correct and complete copies of all contracts or other arrangements pursuant to which any such alternative source shall have committed to provide any portion of the Replacement Financing (provided that any fee letters in connection therewith may be redacted in a manner consistent with the Fee Letter provided as of the Execution Date). To the extent applicable, the Buyer shall use its reasonable best efforts to take, or cause to be taken, all actions necessary, proper or advisable to arrange and consummate the Replacement Financing on the terms and conditions described in such contracts or other arrangements relating thereto on or before the Closing Date, including (A) using reasonable best efforts to (x) satisfy on a timely basis, all terms, covenants and conditions set forth therein; (y) enter into definitive agreements with respect thereto on the terms and conditions set forth therein and (z) consummate the Replacement Financing at or prior to the Closing and (B) seeking to enforce its rights thereunder. In the event that Replacement Financing is obtained in accordance with this Section 6.9(e), the definitions of "Debt Commitment Letter," "Debt Financing," "Debt Financing Commitments," and "Debt Financing Sources" shall include the commitments in respect of the Replacement Financing or the documents related thereto, as applicable. Notwithstanding the

foregoing, compliance by the Buyer with the provisions of this Section 6.9(e) shall not relieve the Buyer of their obligation to consummate the Transactions whether or not the Debt Financing or any Replacement Financing is available.

Section 6.10.    Company's Obligations in Respect of Debt Financing.

(a)    Subject to Section 6.10(b), prior to the Closing, the Special Master shall Cause the Acquired Companies to use reasonable best efforts to provide to the Buyer such customary cooperation in connection with the arrangement of the Debt Financing as is reasonably requested by the Buyer. Such assistance shall include the Special Master Causing the Acquired Companies to use reasonable best efforts to do the following, at the Buyer's request and sole expense, in connection with the Debt Financing:

(i)    as promptly as practicable, furnishing, or causing to be furnished to the Buyer, the Required Information;

(ii)    causing the Company's officers (with appropriate seniority), employees, accountants and advisors to participate in a reasonable number of meetings, presentations, sessions with rating agencies or other customary syndication activities related to the Debt Financing;

(iii)    (A) assisting with the preparation of appropriate and customary materials for a rating agency presentation, a bank information memorandum, offering memoranda and a lender presentation reasonably required in connection with the Debt Financing and (B) having an officer of the Company execute a customary authorization letter with respect to the bank information memorandum that authorizes distribution of information to prospective lenders;

(iv)    to the extent not prohibited or restricted under applicable Law or any Contract of the Company or its applicable Affiliate, facilitating the pledging of collateral; provided that no pledge shall be effective until the Closing;

(v)    assisting in the preparation of definitive financing documents, including guarantee and collateral documents and customary closing certificates and other customary documents as reasonably necessary, in each case, not to be effective until the Closing (provided, that, unless specifically provided for in this Section 6.10, in no event will any of the Acquired Companies or their respective Representatives be required to execute or deliver any opinion or certificate in connection with the Debt Financing);

(vi)    furnishing the Buyer at least four (4) Business Days prior to the Closing Date with all documentation and other information required by a Governmental Body with respect to the Debt Financing under applicable "know your customer" and anti-money laundering rules and regulations that is reasonably requested by the Buyer at least nine (9) Business Days prior to the Closing Date;

(vii)    cooperating with the Buyer to obtain customary corporate and facilities credit ratings, as reasonably requested by the Buyer, in each case, not to be effective prior to the Closing Date; and

(viii)    cooperating with the Buyer to take such corporate or other organizational action, subject to the occurrence of the Closing, as is reasonably necessary to permit the consummation of the Debt Financing (provided, that, unless specifically provided for in this Section 6.10, in no event will any of the Acquired Companies or their respective Representatives be required to execute or deliver any opinion or certificate in connection with the Debt Financing)

(b)    Notwithstanding anything in Section 6.10(a) or this Agreement to the contrary, the cooperation requested by the Buyer pursuant to Section 6.10(a) shall not:

(i)    require the entry by the Special Master or any Acquired Company into any agreement or commitment, or the taking of any action, that would be effective prior to the Closing and that is not contingent on the occurrence of the Closing;

(ii)    unreasonably interfere with the ongoing operations of the Acquired Companies; or

(iii)    include any action that the Special Master or the Company reasonably believes would require any of the Acquired Companies to (A) pay any commitment or other similar fee, (B) have or incur any liability or obligation in connection with the Debt Financing, including under any agreement or any document related to the Debt Financing, (C) take any action that would conflict with, violate or result in a breach of or default under the Company Charter and Company By-Laws or any Organizational Documents of the Company's Affiliates, any Contract, any Transaction Document or any Law in any respect, (D) take any action that could subject any director, manager, officer or employee of the Company or any of its Affiliates to any personal liability, (E) provide access to or disclose information that the Company determines in good faith could jeopardize any attorney client privilege of, or conflict with any confidentiality requirements applicable to, the Company or any of its Affiliates, (F) cause any director or manager of the Company or any of its Affiliates to pass resolutions or consents to approve or authorize the execution of the Debt Financing (other than continuing directors or managers), (G) reimburse any expenses or provide any indemnities, (H) make any representation, warranty or certification that, in the good faith determination of the Company, is not true, (I) require the delivery of any financial statements in a form or subject to a standard different than those provided to the Buyer on or prior to the Execution Date that are not produced in the ordinary course of business, (J) provide any cooperation or information that does not pertain to the Acquired Companies or (K) provide (i) any description of all or any component of the Financings (including any such description to be included in any liquidity or capital resources disclosure or any "description of notes"), (ii) projections, risk factors or other forward-looking statements relating to all or any component of the Financings, or (iii) any solvency certificate or similar certification in connection with the Financings (which items (i) through (iii) shall be the sole responsibility of the Buyer). In no event shall the Special Master be in breach of Section 6.10(a) because of the Company's failure to deliver any financial or other information that is not currently readily prepared by the Acquired Companies in the Ordinary Course at the time requested by the Buyer or to obtain review of any financial or other information by its accountants.

(c)     It is understood and agreed by the Parties that Buyer reserves the right to apply to the Court for a determination that a failure of the Special Master to Cause the Company to comply with the provisions of this <u>Section 6.10</u> may give rise to a failure of a condition precedent set forth in <u>Section 7.2(b)</u> or a termination right pursuant to <u>Section 8.1(e)</u>.

(d)     The Buyer shall promptly, upon written request, reimburse the Acquired Companies, the Special Master, and/or their respective Representatives for all reasonable and documented out-of-pocket costs and expenses incurred by the Acquired Companies, the Special Master, and/or their respective Representatives in connection with the cooperation contemplated by <u>Section 6.10(a)</u>, including (i) attorneys' fee and (ii) expenses of the Company's accounting firms engaged to assist in connection with the Debt Financing. The Buyer shall indemnify and hold harmless, the Special Master, Acquired Companies, and their respective Representatives, from and against any and all liabilities or losses suffered or incurred by them in connection with the arrangement of the Debt Financing and any information utilized in connection therewith.

(e)     Any information provided pursuant to this <u>Section 6.10</u> shall be subject to the Confidentiality Agreement; <u>provided</u>, that the Buyer will be permitted to disclose such information to any Debt Financing Sources or prospective Debt Financing Sources and other financial institutions and investors that are or may become parties to the Debt Financing and to any underwriters, initial purchasers or placement agents in connection with the Debt Financing or with respect to the Equity Financing or any other equity financing in connection with the Transactions (and, in each case, to their respective counsel and auditors) so long as such Persons (i) agree to be bound by confidentiality provisions substantially similar to those in the Confidentiality Agreement (and any confidentiality agreements between the Company and its Affiliates) as if parties thereto, or (ii) are subject to other confidentiality undertakings reasonably satisfactory to the Company and of which the Company is a beneficiary.

(f)     Subject to the terms and conditions set forth in this Agreement, the Buyer acknowledges and agrees that neither obtaining the Financings nor any Replacement Financing, by the Buyer nor any cooperation by the Acquired Companies at the direction of the Special Master is a condition to Closing and reaffirms its obligations to consummate the Transactions irrespective and independently of the availability of the Financing or any Replacement Financing, subject to fulfillment or waiver of the conditions set forth in <u>Section 7.1</u> and <u>Section 7.2</u>.

(g)     The Special Master shall Cause the Acquired Companies to assist in the delivery of the Payoff Letters and all other termination and release documentation reasonably necessary to provide for or evidence the release of all guarantees supporting and all Liens securing the Specified Debt, including, if applicable, UCC termination statements, deed of trust releases, mortgage releases or intellectual property releases in fully executed and authorized form, subject to the conditions to effectiveness and release thereof as set forth in the Payoff Letters, no later than three (3) Business Days prior to the Closing Date (or such later date as is agreed to by the Buyer in its reasonable discretion).

Section 6.11.   <u>Tax Matters</u>.

(a)     All Transfer Taxes shall be paid by the Buyer; provided, however, that, at the option of the Buyer, those certain Transfer Taxes related to any sale and/or transfer of Owned

Real Property, including real estate transfer, stamp, documentary, recording and other similar fees or Taxes or governmental charges, together with any interest, penalties or additions to such Transfer Taxes, shall be borne by either Buyer or the Company consistent with local law where such Owned Real Property is located. Further, upon the reasonable request of the Buyer, the Special Master shall cooperate, and shall Cause the Company to cooperate, in timely making all filings, returns, reports and forms as necessary or appropriate to comply with the provisions of all applicable Laws in connection with the payment of Transfer Taxes, and shall cooperate in good faith to minimize, to the fullest extent possible under such laws, the amount of any Transfer Taxes payable; provided, that in no event shall the Special Master or the Company or any of its Subsidiaries or their respective Representatives, be required to execute or deliver any filings, returns, reports or forms in connection therewith. The Buyer shall procure any stock transfer stamps required by any Transfer Tax, and timely file, to the extent required by applicable Law, all necessary Tax Returns and other documentation with respect to all such Transfer Taxes and provide to the Special Master upon request evidence of payment of all Transfer Taxes. For the avoidance of doubt, all Transfer Taxes arising from the transactions contemplated under this Agreement shall be for the account of the Buyer and shall not reduce or otherwise adjust the Closing Consideration.

(b)     The Special Master shall Cause the Company to prepare and deliver the FIRPTA Certificate set forth in Section 2.3(a)(iii).

Section 6.12.   R&W Insurance Policy. In the event the Buyer or any of its Affiliates obtains a representations and warranties insurance policy in respect of the representations and warranties contained in this Agreement or in any certificate or other instrument contemplated by or delivered in connection with this Agreement (such policy, a "R&W Insurance Policy"), (a) all premiums, underwriting fees, brokers' commissions and other costs and expenses related to such R&W Insurance Policy shall be borne solely by the Buyer or such Affiliate, (b) such R&W Insurance Policy shall not provide for any "seller retention" (as such phrase is commonly used in the representations and warranties insurance policy industry) and (c) such R&W Insurance Policy shall expressly waive any claims of subrogation against the Special Master and any Acquired Company (other than, solely in the case of an Acquired Company, in connection with Fraud of any Acquired Company). The Special Master shall, and shall Cause the Company to, use commercially reasonable efforts to cooperate with the Buyer's efforts, as applicable, and provide assistance as reasonably requested by the Buyer to obtain and bind the R&W Insurance Policy and to maintain its effectiveness through the Closing.

Section 6.13.   Notices of Certain Events.

(a)     During the Interim Period, the Special Master shall, and shall Cause the Company to notify the Buyer, and the Buyer shall promptly notify the Special Master, of:

(i)     any written notice or other written communication from any Person alleging that the consent of such Person is or may be required in connection with the Transactions;

(ii)     any notice or other written communication from any Governmental Body in connection with the Transactions;

(iii)    any actions, suits, claims, investigations or proceedings (A) commenced or (B) to the Knowledge of the Buyer or to the Knowledge of the Special Master, as applicable, threatened against, relating to or involving or otherwise affecting such Party or any of its Subsidiaries which relate to the consummation of the Transactions (excluding any appeals or other oppositions by the Acquired Companies or PDVSA);

(iv)    any circumstance or occurrence that has or would reasonably be expected to have a Company Material Adverse Effect;

(v)    any notice or written communication from any Governmental Body that is commencing any investigation or enforcement action against the Acquired Companies; and

(vi)    any item or information referred to in, or received by the Special Master pursuant to, Section 6.13(b);

provided, that any failure to comply with this Section 6.13(a) shall not constitute the failure of any condition set forth in Article VII to be satisfied; provided, further, that no such notification (and no other notification required to be given under any other Section of this Agreement) shall affect the representations, warranties, covenants or agreements of the Parties or the conditions to the obligations of the Parties under this Agreement.

(b)    During the Interim Period, in order to enable the Special Master and his Representatives to satisfy the obligations of the Special Master in this Agreement, the Special Master may Cause the Company and its Subsidiaries to, upon request by the Special Master, promptly provide to the Special Master:

(i)    access to the books and records (including all electronic data related thereto), information, assets, operations and properties of the Acquired Companies;

(ii)    contact information for any vendors, customers and manufacturers and others with whom the Company does business;

(iii)    the status of the Acquired Companies' business and financial condition; and

(iv)    access to consult with the Acquired Companies' officers and employees, who shall make themselves reasonably available for such consultation.

(c)    During the Interim Period, in order to enable the Special Master and his Representatives to satisfy the obligations of the Special Master in this Agreement, the Special Master may Cause the Company and its Subsidiaries to immediately provide to the Special Master (upon any of the following being received by or made available to the Company or any of its Subsidiaries):

(i)    copies of any written notice or other written communication from any Person alleging that the consent of such Person is or may be required in connection with the Transactions;

(ii)     copies of any notice or other written communication from any Governmental Body in connection with the Transactions;

(iii)     documentation relating to any Legal Proceeding (A) commenced or (B) to the Knowledge of the Company or the Knowledge of the Buyer, as applicable, threatened against, relating to or involving or otherwise affecting such Party or any of its Subsidiaries which relate to the consummation of the Transactions;

(iv)     notice of (A) the occurrence, or failure to occur, of any event which occurrence or failure would reasonably be likely to cause a breach of any representation or warranty made by such Party in this Agreement being untrue or inaccurate or (B) any failure of a Party to comply with or satisfy any covenant, condition or agreement to be complied with or satisfied by it pursuant to this Agreement, in each case that would reasonably be expected to result in any condition set forth in Article VII not to be satisfied; and

(v)     notice of any circumstance or occurrence that has had or would reasonably be expected to have a Company Material Adverse Effect.

Section 6.14.   No Control of Other Party's Business. Without in any way limiting any Party's rights or obligations under this Agreement, the Parties acknowledge and agree that the restrictions set forth in this Agreement are not intended to give the Buyer, directly or indirectly, the right to control or direct the Acquired Companies' operations prior to the Closing Date. Prior to the Closing Date, each of the Company and the Buyer shall exercise, consistent with the terms and conditions of this Agreement, complete control and supervision over its respective operations.

Section 6.15.   [Reserved]

Section 6.16.   Bidder Protections and Competing Proposals.

(a)     This Agreement is subject to approval by the Court and the consideration by the Special Master of higher or better competing bids in respect of the Shares, as determined in accordance with the Evaluation Criteria set by the January Order and the Sale Procedures Order. From the date of this Agreement and until the commencement of the No-Shop Period, the Special Master is permitted to, and to cause its financial and legal advisors to, initiate contact with, solicit or encourage submission of any Competing Proposal. For the avoidance of doubt, the Buyer acknowledges that following the date of this Agreement, and until the commencement of the No-Shop Period, the Special Master is expected to, and intends to, (i) engage with prospective purchasers of the Shares, (ii) evaluate any Competing Proposals received during the Topping Period and (iii) compare any such Competing Proposals to the Buyer's proposal to purchase the Shares. In addition, the Special Master shall have the responsibility and obligation to respond to any Competing Proposal and perform any and all other acts related thereto which are required under the Sale Procedures Order, the January Order or other applicable Law, including supplying information relating to the Acquired Companies to prospective purchasers of the Shares.

(b)     During the No-Shop Period, the Special Master shall not, directly or indirectly, solicit, initiate, knowingly encourage or knowingly facilitate any proposal or offer that constitutes, or would reasonably be expected to lead to, a Competing Proposal.

(c)        Notwithstanding anything to the contrary set forth above, in the event that during the No-Shop Period but prior to the Court's hearing to consider the Special Master's motion to approve the Sale Order (the "Sale Hearing") the Special Master receives an unsolicited Competing Proposal, he shall inform the Court and the Buyer of the receipt of such unsolicited Competing Proposal, and, if approved by the Court (provided, that, in connection with seeking such approval, if requested by the Person making such unsolicited Competing Proposal, the Special Master shall request that the Court not make public the identity of the Person making such unsolicited Competing Proposal), may engage with the Person submitting such Competing Proposal.

(d)        Notwithstanding anything to the contrary set forth in this Agreement, if the Special Master has determined in good faith that an unsolicited Competing Proposal made during the No-Shop Period but prior to the Sale Hearing (any such unsolicited Competing Proposal, an "Unsolicited Competing Proposal") constitutes a Superior Proposal, the Special Master may, at any time during the No-Shop Period but prior to the Sale Hearing, subject to (i) approval by the Court of such Unsolicited Competing Proposal in accordance with Section 6.16(c) and Section 8.1(d), (ii) compliance with this Section 6.16(d), (iii) the Person making such Superior Proposal agreeing to pay (x) to the Stalking Horse Bidder the Termination Fee in accordance with Section 8.3(c) to the extent the transaction contemplated by the Unsolicited Competing Proposal is consummated and (y) to the Buyer the Expense Reimbursement Amount in accordance with Section 8.3(c), to the extent the transaction contemplated by the Unsolicited Competing Proposal is consummated, and (iv) the Person making such Superior Proposal agreeing to deposit an amount equal to the Deposit Amount with the Escrow Agent on the date of the Sale Order Entry, terminate this Agreement in accordance with Section 8.1(d) in order to enter into a definitive agreement providing for such Superior Proposal (the "Unsolicited Competing Proposal Agreement"); provided, that prior to so terminating this Agreement, (A) the Special Master has given the Buyer at least three (3) Business Days' prior written notice of its intention to take such action, which notice shall include a description of the material terms and conditions of such Superior Proposal and a copy of any proposed Unsolicited Competing Proposal Agreement, (B) at the end of such notice period, the Special Master shall have considered in good faith any revisions to the terms of this Agreement proposed in writing by the Buyer, and shall have determined that such Superior Proposal would continue to constitute a Superior Proposal if such revisions proposed by the Buyer were to be given effect, and (C) in the event of any material change to the terms of such Superior Proposal, the Special Master shall, in each case, have delivered to the Buyer an additional notice consistent with that described in clause (A) of this proviso and a new notice period under clause (A) of this proviso shall commence during which time the Special Master shall be required to comply with the requirements of this Section 6.16(d) anew with respect to such additional notice, including clauses (A), (B) and this clause (C) of this proviso (except that the reference to "three (3) Business Days" in clause (A) of this proviso shall be replaced with "two (2) Business Days").

(e)        The Special Master and the Buyer acknowledge that this Agreement and the Transactions are subject to the Sale Procedures Order and the Sale Order Entry. In the event of any conflict between this Agreement and the Sale Procedures Order or the Sale Order, the Sale Procedures Order or the Sale Order, as applicable, shall govern. The Special Master and the Buyer shall comply with the Sale Procedures Order and the Sale Order.

(f)        For purposes of this Agreement:

(i)    "Competing Proposal" means any bona fide proposal or offer made by any Person or group of related Persons (other than the Buyer and its Affiliates (A) to purchase or otherwise acquire, directly or indirectly, in one transaction or a series of transactions, pursuant to a merger, consolidation or other business combination, sale of shares of capital stock, sale of assets or similar transaction (1) beneficial ownership (as defined under Section 13(d) of the Exchange Act), of more than twenty percent (20%) of any class of equity securities of the Company or (2) any one or more assets or businesses of the Acquired Companies that constitute more than twenty percent (20%) of the consolidated assets of the Acquired Companies (based on the fair market value thereof), (B) to effect any other transaction pursuant to which any other alternative to the Transactions would be consummated, or (C) relating to any reorganization, recapitalization, license, joint venture, partnership, liquidation, dissolution or other similar transaction involving any one or more assets or businesses of the Acquired Companies that constitute more than twenty percent (20%) of the consolidated assets of the Acquired Companies (based on the fair market value thereof); provided, that any Unsolicited Competing Proposal received during the No-Shop Period must satisfy an overbid minimum above the Purchase Price (less the Debt Payoff Amount) equal to or in excess of (A) the Expense Reimbursement Amount pursuant to Section 8.3(c), if applicable, *plus* (B) $50,000,000 ((A) and (B), collectively, the "Subsequent Overbid Minimum"); provided, further, that the Special Master may, in his sole discretion, lower or raise the Subsequent Overbid Minimum for any Competing Proposal.

(ii)    "Superior Proposal" means a Competing Proposal made by a Person or group of related Persons (other than the Buyer and its Affiliates on terms that the Special Master determines in good faith, after consultation with the Special Master's financial and legal advisors and the Sale Process Parties, would constitute a higher or better bid for the Shares based upon the Evaluation Criteria.

(g)    For the avoidance of doubt, notwithstanding anything to the contrary contained herein, the Special Master may, at any time prior to the Final Recommendation Date, after consultation with the Sale Process Parties (as defined in the Sale Procedures Order), propose to the Court that the sale process proceed to a multi-day live auction to determine the Successful Bidder for sale of the Shares.

(h)    The Buyer acknowledges that nothing hereunder limits any Venezuela Party from proposing or negotiating any alternative transaction or series of transactions, and the Venezuela Parties (as defined in the Sale Procedures Order) will not at any time be prevented from making a Competing Proposal.

Section 6.17.    Section 280G. No later than ten (10) days prior to the Closing Date, the Special Master shall Cause the Company to deliver to the Buyer a Code Section 280G analysis (with respect to all disqualified individuals as reasonably determined by the Company) and the Special Master shall Cause the Company to confer with the Buyer in good faith regarding such analysis.

Section 6.18.    Financial Statements. During the Interim Period, the Special Master shall Cause the Acquired Companies to furnish to the Buyer, in each case, to the extent such financial

statements are prepared by the Acquired Companies and CITGO Petroleum in the Ordinary Course:

(a)     within ninety (90) days after the end of each fiscal year commencing with the fiscal year ending December 31, 2024, a consolidated balance sheet and related statements income and cash flow showing the financial position of each of (i) the Acquired Companies and (ii) CITGO Petroleum, as of the close of such fiscal year and the consolidated results of its operations during such fiscal year and setting forth in comparative form the corresponding figures for the prior fiscal year, which consolidated balance sheet and related statements of income and cash flow shall be audited by independent public accountants and accompanied by an opinion of such accountants (which shall not be qualified as to scope of audit) to the effect that such consolidated financial statements fairly present, in all material respects, the financial position and results of operations of the Acquired Companies and CITGO Petroleum, respectively, on a consolidated basis in accordance with GAAP; and

(b)     within forty five (45) days after the end of each fiscal quarter, except for the fourth fiscal quarter, (i) a balance sheet showing the consolidated financial position of the each of (x) the Acquired Companies and (y) CITGO Petroleum, as of the last day of such fiscal quarter and (ii) statements of income and cash flows showing the consolidated results of operations of the Acquired Companies and CITGO Petroleum, respectively, for such fiscal quarter and the then-elapsed portion of the fiscal year and setting forth in comparative form the corresponding figures for the corresponding periods of the prior fiscal year. The applicable consolidated balance sheet and related statements of operations and cash flows shall fairly present, in all material respects, the financial position and results of operations of the Acquired Companies or CITGO Petroleum, as applicable, on a consolidated basis in accordance with GAAP (subject to normal quarter-end review adjustments and the absence of footnotes).

Section 6.19.   CFIUS.

(a)     The Parties shall, and shall cause their Affiliates to use reasonable best efforts to, (or in the case of the Special Master, shall Cause the Acquired Companies to) obtain CFIUS Clearance. Such reasonable best efforts shall include the actions set forth in this Section 6.19.

(b)     The Parties or their Affiliates shall (or in the case of the Special Master, shall Cause the Acquired Companies to), as soon as reasonably practicable following the Final Recommendation Date (and in any event no later than fifteen (15) Business Days thereafter), submit to CFIUS a draft CFIUS Notice. The Buyer acknowledges and agrees that it shall pay and shall be solely responsible for the payment of all fees, costs, expenses and other charges in connection with compliance with this Section 6.19 (including filing fees).

(c)     After the Parties, or their Affiliates, submit a draft CFIUS Notice pursuant to Section 6.19(b), the Parties, or their Affiliates, shall (or in the case of the Special Master, shall Cause the Acquired Companies to) promptly prepare a final CFIUS Notice that addresses all questions and comments received from CFIUS relating to the draft CFIUS Notice. The Parties, or their Affiliates, shall (or in the case of the Special Master, shall Cause the Acquired Companies to) submit the definitive CFIUS Notice to CFIUS promptly after the date on which they receive

questions and comments on the draft CFIUS Notice or an indication that CFIUS has no questions or comments and in any event within the time frames set forth in the DPA or related laws or regulations or as otherwise stipulated by CFIUS. The Parties, or their Affiliates, shall (or in the case of the Special Master, shall Cause the Acquired Companies to) promptly address any further questions and comments raised by CFIUS concerning the CFIUS Notice following its submission and in any event within the time frames set forth in the DPA or related laws or regulations or as otherwise stipulated by CFIUS.

(d)      During the course of a CFIUS review or investigation of the Transactions, each Party, or their Affiliates, shall (or in the case of the Special Master, shall Cause the Acquired Companies to) provide any information requested by CFIUS or any other agency or branch of the U.S. government in connection with the review or investigation of the Transactions, within the time period specified by 31 C.F.R. § 800.504(a)(4), or otherwise specified by CFIUS staff.

(e)      Each Party, or their Affiliates, shall (or in the case of the Special Master, shall Cause the Acquired Companies to), in connection with the best efforts to obtain the CFIUS Clearance, (i) cooperate in all respects and consult with the other Party, or their Affiliates, in connection with the CFIUS Notice, including by allowing the other Party, or their Affiliates, to have a reasonable opportunity to review in advance and comment on drafts of filings and submissions; (ii) promptly inform the other Party, or their Affiliates, of any communication with CFIUS and promptly provide copies to the other Party, or their Affiliates, of any such written communications, except for personal identifying information required by 31 C.F.R. § 800.502(c)(5)(vi); and (iii) permit the other Party, or their Affiliates, to review in advance any communication that it gives to, and consult with each other in advance of any meeting, telephone call or conference with CFIUS, and to the extent not prohibited by CFIUS, give the other Party, or their Affiliates, the opportunity to attend and participate in any telephonic conferences or in-person meetings with CFIUS, in each case of (i)-(iii), subject to confidentiality considerations contemplated by the DPA, required by CFIUS, or otherwise agreed upon by the Parties, or their Affiliates, to be restricted to outside counsel only.

(f)      With respect to the Buyer, such reasonable best efforts shall also include taking or causing to be taken all action necessary to obtain the CFIUS Clearance so as to enable the consummation of the Transactions, including entering into a mitigation agreement, letter of assurance, national security agreement, proxy agreement, trust agreement or other similar arrangement or agreement in relation to the business and assets of the Buyer, or otherwise divesting or agreeing to divest assets, with mitigation and related terms and conditions that are required by CFIUS or the President (if under Presidential review) for such arrangements or agreements.

(g)      Notwithstanding anything to the contrary contained in this Agreement, in the event of a CFIUS Turndown, no Party, or their Affiliates, shall have any further obligation to seek CFIUS Clearance (or in the case of the Special Master, to Cause the Acquired Companies to seek CFIUS Clearance).

(h)      No Party shall take, or cause any of its Affiliates to take, any action that would reasonably be expected to prevent, materially delay or materially impede the receipt of CFIUS Clearance.

## ARTICLE VII

## CONDITIONS TO CLOSING

Section 7.1.    <u>Conditions Precedent to Obligations of the Parties</u>. The respective obligations of each of the Parties to consummate the Transactions are subject to the satisfaction, on or prior to the Closing, of each of the following conditions:

(a)    there shall not be in effect any Law or Order by a Governmental Body of competent jurisdiction restraining, enjoining or otherwise prohibiting the consummation of the Transactions;

(b)    the Sale Order Entry shall have occurred;

(c)    the OFAC License shall have been obtained; and

(d)    the waiting period applicable to the Transactions under the HSR Act (and any extensions thereof, including expiration of any voluntary timing agreement) shall have expired or early termination shall have been granted.

Section 7.2.    <u>Conditions Precedent to Obligations of the Buyer</u>. The obligations of the Buyer to consummate the Transactions are subject to the satisfaction, on or prior to the Closing, of each of the following conditions (any or all of which may be waived by the Buyer in whole or in part):

(a)    the Company Fundamental Representations shall be true and correct in all material respects (without giving effect to any "materiality", "Company Material Adverse Effect" or similar qualifiers contained in any of such representations and warranties) as of the Closing as if made on and as of the Closing (except to the extent that any such Company Fundamental Representation, by its terms, is expressly limited to a specific date, in which case, as of such specific date);

(b)    the Special Master shall have performed and complied in all material respects with all obligations and agreements required by this Agreement to be performed or complied with by him on or prior to the Closing;

(c)    no Company Material Adverse Effect shall have occurred and remain ongoing; and

(d)    the Sale Order shall be in full force and effect in all respects and not subject to any stay.

Section 7.3.    <u>Conditions Precedent to Obligations of the Special Master</u>. The obligations of the Special Master to consummate the Transactions are subject to the satisfaction, on or prior to the Closing, of each of the following conditions (any or all of which may be waived by the Special Master in whole or in part):

66

(a)      the representations and warranties of the Buyer set forth in Article V shall be true and correct (without giving effect to any "materiality", "material adverse effect", or similar qualifiers contained in any of such representations and warranties) as of the Closing as if made on and as of the Closing (except to the extent that any such representation or warranty, by its terms, is expressly limited to a specific date, in which case, as of such specific date), except for where the failure of such representations and warranties to be so true and correct would not (i) have a material adverse effect on the ability of the Buyer to perform its obligations under this Agreement or (ii) otherwise prevent, hinder, or delay the consummation of the Transactions;

(b)      the Buyer shall have performed and complied in all material respects with all obligations and agreements required by this Agreement to be performed or complied with by the Buyer on or prior to the Closing; and

(c)      the Company shall have delivered the FIRPTA Certificate set forth in Section 2.3(a)(iii).

Section 7.4.     Frustration of Closing Conditions. Neither the Special Master, nor the Buyer may rely, either as a basis for not consummating the Transactions or for terminating this Agreement and abandoning the Transactions, on the failure of any condition set forth in Section 7.1, Section 7.2, or Section 7.3, as the case may be, to be satisfied if such failure was caused by any material breach of a covenant, agreement, representation, or warranty of this Agreement by such Party.

## ARTICLE VIII

## TERMINATION

Section 8.1.     Termination. This Agreement may be terminated at any time prior to the Closing (notwithstanding the Sale Order Entry, except as otherwise specified below) as follows:

(a)      by mutual written consent of the Special Master (which consent shall be subject to approval of the Court) and the Buyer;

(b)      by the Special Master or the Buyer, by written notice to the other Party, if: the Closing has not occurred prior to the date that is twelve (12) months after the Final Recommendation Date (such date, the "Initial Outside Date" and, as may be automatically extended pursuant to this Section 8.1(b), the "Outside Date"); provided, that if the Closing has not occurred by the Outside Date due to the nonsatisfaction of any of the conditions set forth in Section 7.1(b) (OFAC License), Section 7.1(d) (HSR Act), or Section 7.2(a) (Sale Order), then the Initial Outside Date shall be extended automatically for up to two (2) consecutive periods of ninety (90) calendar days each (and in no event shall the Outside Date extend beyond the date that is one hundred eighty (180) calendar days after the Initial Outside Date); provided, that notwithstanding the foregoing, the Special Master and/or the Buyer shall have the right to request an extension of the Outside Date by the Court for good cause; provided further that in the event the Marketing Period has commenced on or prior to the Outside Date but has not concluded as of the Outside Date, the Outside Date shall be extended (or further extended) to the date that is three (3) Business Days after the then-scheduled expiration date of the Marketing Period; and, provided, further, that,

the right to terminate this Agreement pursuant this <u>Section 8.1(b)</u> shall not be available to any Party whose failure to fulfill any obligation under this Agreement has caused or resulted in the failure of the Closing to occur on or before the Outside Date;

(c)    by the Special Master or the Buyer, by written notice to the other Party, if: there shall be any Law that makes consummation of the Transactions illegal or otherwise prohibited or if any Order preventing, enjoining or making illegal the Buyer, the Special Master or the Company from consummating the Transactions is entered and such Order shall become final and non-appealable (any such Law, Order, a "<u>Legal Restraint</u>"); <u>provided</u> that the right to terminate this Agreement under this <u>Section 8.1(c)</u> shall not be available to any Party whose failure to fulfill any obligation under <u>Section 6.3</u> hereof has principally caused or resulted in the imposition of such Legal Restraint or the failure of such Legal Restraint to be resisted, resolved or lifted;

(d)    by the Special Master, subject to approval of the Court, at any time during the No-Shop Period but prior to the Sale Hearing in order to enter into an Unsolicited Competing Proposal Agreement pursuant to <u>Section 6.16(c)</u>;

(e)    by the Buyer, by written notice to the Special Master, if there shall have been a breach by the Special Master of any of its representations, warranties, covenants or agreements contained in this Agreement, which breach would result  in the failure to satisfy one or more of the conditions set forth in <u>Section 7.2(a)</u> or <u>Section 7.2(b)</u>, and in any such case such breach shall be incapable of being cured or, if capable of being cured, shall not have been cured prior to the earlier of (i) forty-five (45) calendar days after providing written notice of such breach to the Special Master and (ii) the Outside Date; <u>provided</u>, that the Buyer shall not have the right to terminate this Agreement pursuant to this <u>Section 8.1(d)</u> if the Buyer is then in breach of this Agreement and such breach would result in the failure of any of the conditions set forth in <u>Section 7.1</u> or <u>Section 7.3</u>;

(f)    by the Special Master (subject to approval of the Court), by written notice to the Buyer, if there shall have been a breach by the Buyer of any of its representations, warranties, covenants or agreements contained in this Agreement, which breach would result in the failure to satisfy one or more of the conditions set forth in <u>Section 7.3(a)</u> or <u>Section 7.3(b)</u>, and in any such case such breach shall be incapable of being cured or, if capable of being cured, shall not have been cured prior to the earlier of (i) forty-five (45) calendar days after providing written notice of such breach to the Buyer and (ii) the Outside Date; <u>provided</u>, that the Special Master shall not have the right to terminate this Agreement pursuant to this <u>Section 8.1(f)</u> if the Special Master is then in breach of this Agreement and such breach would result in the failure of any of the conditions set forth in <u>Section 7.1</u> or <u>Section 7.2</u>;

(g)    by the Special Master, after being ordered to terminate this Agreement by the Court, as a result of one or more of the Venezuela Parties (as defined in the Sale Procedures Order) proposing an alternative to the Transactions and such alternative is approved by the Court; or

(h)    by the Special Master or the Buyer, by written notice to the other Party, if the Court issues an order in which it denies the Special Master's recommendation to designate this Agreement as the Successful Bid.

Section 8.2.    Effect of Termination. In the event that this Agreement is validly terminated in accordance with Section 7.1, this Agreement shall immediately become null and void and the Parties shall be relieved of their duties and obligations arising under this Agreement after the date of such termination and such termination shall be without liability to the Buyer, the Special Master or the Acquired Companies; provided, that (i) no such termination shall relieve any Party hereto from any obligation to pay or cause to be paid the Termination Fee and the Confidentiality Agreement and the provisions of Section 3.3, this Section 8.2, Section 8.3 and Article IX hereof shall survive any such termination and remain valid and binding obligations of each of the Parties.

Section 8.3.    Termination Fee and Expense Reimbursement.

(a)    To the extent the bid reflected in this Agreement constitutes the Successful Bid (as defined in the Sale Procedures Order), if, following the Sale Order Entry, this Agreement is terminated by the Buyer pursuant to Section 8.1(b) (solely to the extent such termination arises from the nonsatisfaction of the condition set forth in Section 7.1(c) (OFAC License) for any reason not related to the identity of the Buyer) or Section 8.1(e) (solely to the extent such termination, and the failure to satisfy one or more conditions set forth in Section 7.2, arises from either (i) the Special Master's breach of the covenants contained in Section 6.1 or (ii) the occurrence of a Company Material Adverse Effect, then, pursuant to the bidder protections set forth in the January Order, the Buyer shall be deemed to hold a claim equal to the Expense Reimbursement Amount as a priority claim over the judgments held by Crystallex, ConocoPhillips and the Additional Judgment Creditors as set forth in the Priority Order [D.I. 996], dated March 1, 2024, in the Specified Litigation, which amount shall be paid to the Buyer from the proceeds, and at the closing, of a subsequent sale of the Shares pursuant to the Specified Litigation.

(b)    To the extent the bid reflected in this Agreement constitutes the Successful Bid, if, following the Sale Order Entry, this Agreement is terminated by the Special Master pursuant to Section 8.1(g), then, pursuant to the bidder protections set forth in the January Order, the Buyer shall be entitled to be paid the Expense Reimbursement Amount in-full by the Venezuela Parties (as defined in the Sale Procedures Order) prior to any payments made on account of any other Specified Litigation Claims.

(c)    If this Agreement is terminated by the Special Master pursuant to Section 8.1(d), then, in accordance with the January Order, to the extent the transaction contemplated by the Unsolicited Competing Proposal Agreement is consummated, (A) the Stalking Horse Bidder shall be entitled to be paid the Termination Fee and (B) the Buyer shall be entitled to be paid the Expense Reimbursement Amount from the Unsolicited Competing Proposal acquiror from the proceeds, and at the closing, of the transactions provided in such Unsolicited Competing Proposal.

(d)    The Parties acknowledge and agree that the Expense Reimbursement Amount (to the extent applicable) and the other provisions of this Section 8.3 are an integral part of the Transactions, (ii) the Expense Reimbursement Amount (to the extent applicable) shall constitute liquidated damages and not a penalty, and (iii) without these agreements, the Parties would not enter into this Agreement.

(e)    Notwithstanding anything to the contrary set forth in this Agreement, but subject to Section 9.13 and this Section 8.3(e), in the event this Agreement is terminated, each of

the Parties expressly acknowledges and agrees that the Buyer's right to receive payment of the Expense Reimbursement Amount pursuant to Section 8.3(b) (or Section 8.3(c) (to the extent the bid reflected in this Agreement constitutes the Successful Bid) constitutes the sole and exclusive remedy of the Buyer and its Affiliates, and all other affected Persons against the Special Master, the Company and each of their respective former, current or future Affiliates and any of their respective former, current or future general or limited partners, equityholders, subsidiaries, members, managers, directors, officers, employees, agents, Affiliates, successors, beneficiaries, heirs and assigns (collectively, the "Special Master and Company Related Parties") for all losses and damages (including attorneys' fees and expenses) in respect of this Agreement (and the termination hereof) or the Transactions (and the abandonment thereof), or any breach (whether intentional, unintentional or otherwise) of any representation, warranty, covenant or agreement in this Agreement, and none of the Buyer or its Affiliates or any other affected Person shall be entitled to bring or maintain any other Legal Proceeding against the Special Master, the Company or any other Special Master and Company Related Party relating to or arising out of this Agreement, or any of the Transactions or any matters forming the basis for such termination (whether at law, in equity, in contract, in tort or otherwise), and upon payment of the Expense Reimbursement Amount pursuant to Section 8.3(b) or Section 8.3(c), none of the Special Master and Company Related Parties shall have any further liability or obligation to the Buyer or any other affected Person relating to or arising out of this Agreement or the Transactions. The Parties acknowledge and agree that in no event shall the Special Master or the Company be required to pay the Termination Fee or the Expense Reimbursement Amount.

## ARTICLE IX

## MISCELLANEOUS

Section 9.1.    Survival. None of the representations and warranties contained in this Agreement or any of the other Transaction Documents (including any certificate to be delivered pursuant to this Agreement) and none of the covenants of any party required to be performed before the Closing (including obligations with which the Special Master agrees to Cause the Acquired Companies to comply) shall survive the Closing, and thereafter none of the Parties or any of their Affiliates or any of their respective Representatives or any other Person shall have any liability whatsoever with respect to any such representation, warranty, covenant or agreement, and no claim for breach of any such representation or warranty, detrimental reliance or other right or remedy (whether in contract, in tort or at law or in equity) may be brought after the Closing with respect thereto. The provisions of this Section 9.1 will not, however, prevent or limit a cause of action to obtain an injunction to prevent breaches of this Agreement, to enforce specifically the terms and provisions hereof or for declaratory relief. Unless otherwise indicated, the covenants and agreements set forth in this Agreement which by their terms are required to be performed after the Closing shall survive the Closing until such covenants or agreements have been performed or satisfied.

Section 9.2.    Expenses. Whether or not the Transactions are consummated, and except as otherwise provided in this Agreement, each Party will bear its respective fees, costs and expenses incurred in connection with the preparation, negotiation, execution and performance of this Agreement or the Transactions (including legal, accounting and other professional fees), and the

Special Master Transaction Expenses shall be paid in accordance with <u>Section 3.4(b)</u> and the Advanced Transaction Expenses shall be paid in accordance with <u>Section 3.4(d)</u>.

Section 9.3.    <u>Governing Law</u>. This Agreement and all Related Claims shall be governed by, construed and enforced in accordance with the internal Laws of the State of Delaware, without giving effect to any Laws (whether of the State of Delaware or any other jurisdiction) that would cause the application of the Laws of any jurisdiction other than the State of Delaware and without regard to any borrowing statute that would result in the application of the statutes of limitations or repose of any other jurisdiction. In furtherance of the foregoing, the Laws of the State of Delaware will control even if under such jurisdiction's choice of law or conflict of law analysis, the substantive or procedural law of some other jurisdiction would ordinarily or necessarily apply.

Section 9.4.    <u>Dispute Resolution; Consent to Jurisdiction</u>. Without limiting any Party's right to appeal any Order of the Court, (a) the Court shall retain exclusive jurisdiction to enforce the terms of this Agreement and to decide any dispute which may arise or result from, or be connected with, this Agreement, any breach or default hereunder, or the Transactions, and (b) any and all proceedings related to the foregoing shall be filed and maintained only in the Court, and the Parties hereby consent to and submit to the jurisdiction and venue of the Court and shall receive notices at such locations as indicated in <u>Section 9.7</u> (as may be updated from time to time in accordance with <u>Section 9.7</u>).

Section 9.5.    <u>Consent to Service of Process; Waiver of Jury</u>.

(a)    Each of the Parties hereby consents to process being served by any party to this Agreement in any Legal Proceeding by the delivery of a copy thereof (other than by e-mail) in accordance with the provisions of <u>Section 9.7</u>.

(b)    EACH PARTY HERETO ACKNOWLEDGES THAT ANY LEGAL PROCEEDING, DIRECTLY OR INDIRECTLY, ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY RELATED CLAIM IS LIKELY TO INVOLVE COMPLICATED AND DIFFICULT ISSUES, AND THEREFORE EACH SUCH PARTY HERETO HEREBY IRREVOCABLY AND UNCONDITIONALLY WAIVES ANY RIGHT SUCH PARTY MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY SUCH LEGAL PROCEEDING OR RELATED CLAIM. EACH PARTY HERETO CERTIFIES AND ACKNOWLEDGES THAT: (I) NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF SUCH LEGAL PROCEEDING, SEEK TO ENFORCE THE FOREGOING WAIVER; (II) IT UNDERSTANDS AND HAS CONSIDERED THE IMPLICATIONS OF THIS WAIVER; (III) IT MAKES THIS WAIVER VOLUNTARILY AND (IV) IT HAS BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS <u>SECTION 9.5(B)</u>.

Section 9.6.    <u>Entire Agreement</u>.

(a)    This Agreement (including the Company Disclosure Schedules and any Exhibits hereto) and the Transaction Documents contain the entire understanding and agreement between the Parties with respect to the subject matter hereof and thereof, and supersede all prior

and contemporaneous agreements, discussions, negotiations, correspondence, communications, undertakings and understandings among the Parties with respect to such subject matter (except for the Confidentiality Agreement, which shall continue in full force and effect in accordance with its terms as modified hereunder). The Parties have voluntarily agreed to define their rights, liabilities and obligations with respect to the Transactions exclusively in contract pursuant to the express terms and provisions of this Agreement and the other Transaction Documents, and the Parties expressly disclaim that they are owed any duties or are entitled to any remedies not expressly set forth in this Agreement or the other Transaction Documents. Furthermore, the Parties each hereby acknowledge that this Agreement embodies the justifiable expectations of sophisticated parties derived from arm's-length negotiations; the Parties specifically acknowledge that no party has any special relationship with another party that would justify any expectation beyond that of ordinary parties in an arm's-length transaction.

(b)    The sole and exclusive remedies for any breach of the terms and provisions of this Agreement (including any representations and warranties set forth herein, made in connection herewith or as an inducement to enter into this Agreement) or any claim or cause of action otherwise arising out of or related to the Transactions shall be those remedies available at law or in equity for breach of contract against the Parties to this Agreement only (as such contractual remedies have been further limited or excluded pursuant to the express terms of this Agreement), and then only subject to the limitations hereunder, the Parties hereby agreeing that neither Party shall have any remedies or causes of action (whether in contract, tort, statute or otherwise) for any statements, communications, disclosures, failures to disclose, representations or warranties not explicitly set forth in this Agreement.

(c)    All representations and warranties set forth in this Agreement are contractual in nature only and subject to the sole and exclusive remedies set forth herein.

(d)    The Transactions relate to the purchase and sale of the Shares conducted pursuant to Section 324 of the Delaware General Corporation Law and the Sale Procedures Order, under which the Special Master has the authority to carry out the Transactions herein contemplated to be carried out by him.  In connection therewith, the Designated Managers have furnished Specified Information to the Special Master.  The Special Master, the Designated Managers, the Acquired Companies, its direct or indirect Subsidiaries and their respective Representatives have no liabilities or obligations hereunder or in respect of the Transactions for monetary damages or other relief (other than, if the conditions applicable thereto are satisfied, the Special Master's obligations to transfer the Shares and take or cause to be taken other actions under this Agreement and the Sale Procedures Order) except as expressly provided in Section 9.13. By executing this Agreement, each of the Parties waives on their behalf and on the behalf of their respective Representatives and forever relinquishes any right, claim or cause of action for damages or any other form of monetary relief against the Special Master, or any such Person based on, relating to or arising out of the Specified Information, this Agreement and any of the Transactions.

Section 9.7.    Amendments and Waivers. This Agreement may not be amended except by an instrument in writing signed by the Buyer and the Special Master. No waiver by any Party of any provision of this Agreement or any breach of this Agreement hereunder, whether intentional or not, shall be valid unless the same shall be in writing and signed by the party making such waiver. The waiver by any Party of a breach of any provision of this Agreement shall not operate

or be construed as a further or continuing waiver of such breach or as a waiver of any other or subsequent breach. No failure on the part of any Party to exercise, and no delay in exercising, any right, power or remedy hereunder shall operate as a waiver thereof, nor shall any single or partial exercise of such right, power or remedy by such Party preclude any other or further exercise thereof or the exercise of any other right, power or remedy.  Any amendment to, or the Special Master's waiver of, a provision of this Agreement of which the Acquired Companies or the Venezuela Parties are third-party beneficiaries in accordance with <u>Section 9.11</u> will require the prior written consent of the Company to the extent such amendment or waiver would be reasonably likely to adversely impact the Acquired Companies or the Venezuela Parties.

Section 9.8.   <u>Notices</u>.  All notices, requests, instruction, demands and other communications under this Agreement shall be in writing and shall be deemed given (a) when delivered personally by hand (with written confirmation of receipt), (b) on the date sent by e-mail (provided confirmation of email receipt is obtained) if sent during normal business hours of the recipient, and on the next Business Day if sent after normal business hours of the recipient, or (c) when received by the addressee if sent by nationally recognized overnight delivery service (with written confirmation of receipt), in each case, at the following addresses (or to such other address as a party may have specified by notice given to the other party pursuant to this provision):

| | |
|---|---|
| If to the Special Master, to: | Robert B. Pincus in his capacity as Special Master for the United States District Court for the District of Delaware  |
| With a copy to: | Weil, Gotshal & Manges LLP, counsel to the Special Master<br>767 Fifth Avenue<br>New York, NY 10153<br>Email: Horizon.Notice@weil.com |
| If to the Buyer, to: | Gold Reserve<br>Rosebank Centre, 5th Floor<br>11 Bermudiana Road, Pembroke HM 08<br>Bermuda  |
| With a copy to: | Brown Rudnick LLP<br>Seven Times Square<br>New York, NY 10036 |

And

Norton Rose Fulbright US, LLP
799 9th Street NW, Suite 1000
Washington, DC 20001-4501

Section 9.9.     Severability. If any term or other provision of this Agreement is invalid, illegal, or incapable of being enforced by any Law or public policy, all other terms or provisions of this Agreement shall nevertheless remain in full force and effect so long as the economic or legal substance of the Transactions is not affected in any manner materially adverse to any party. Upon such determination that any term or other provision is invalid, illegal, or incapable of being enforced, the Parties shall negotiate in good faith to modify this Agreement so as to effect the original intent of the Parties as closely as possible in an acceptable manner such that the Transactions are consummated as originally contemplated to the greatest extent possible.

Section 9.10.     Binding Effect; Assignment. This Agreement shall be binding upon and inure to the benefit of the Parties and their respective successors and permitted assigns and, without limiting the foregoing, references to the "Special Master" in this Agreement shall be deemed to include any successor, substitute or replacement thereof. This Agreement shall not be assigned by (a) the Buyer without the prior written consent of the Special Master or (b) the Special Master, without the prior written consent of the Buyer.

Section 9.11.     No Third Party Beneficiaries. Nothing in this Agreement shall confer any rights, remedies or claims of any nature upon any Person other than the Parties and their respective successors or permitted assigns, except for the rights of (a) the Indemnitees as set forth in Section 6.6; (b) the Non-Parties (including the Acquired Companies and their Representatives) set forth in Section 9.12; (c) the Buyer Released Parties and the Special Master Released Parties as set forth in Section 9.15; (d) the Debt Financing Sources as set forth in Section 9.17; (e) the Venezuela Parties as set forth in Section 6.1(g) and Section 6.16(h); and (f) the Acquired Companies and their Representatives with respect to Section 4.22, Section 5.12 and Section 9.1. All of the Persons identified as third-party beneficiaries in the immediately preceding sentence shall be entitled to enforce such provisions and to avail themselves of the benefits of any remedy for any breach of such provisions, all to the same extent as if such Persons were parties to this Agreement.

Section 9.12.     Non-Recourse. This Agreement may only be enforced against, and any Related Claims may only be made or asserted against (and are expressly limited to) the Persons that are expressly identified as the Parties in the preamble to this Agreement and solely in their capacities as such. No Person who is not a Party, including the Acquired Companies and any current, former or future Affiliate or Representative of any Party or the Acquired Companies or any current, former, or future Affiliate or Representative of any of the foregoing (such Persons, collectively, but specifically excluding the Parties, "Non-Parties"), shall have any liability (whether at law or in equity, based upon contract, tort, statute or otherwise) for obligations or liabilities arising under, in connection with or related to this Agreement or for any Related Claim and each Party hereby irrevocably waives and releases all such liabilities, obligations and Related

Claims against any such Non-Party. Without limiting the rights of any Party hereto against the other Parties as set forth herein, in no event shall any Party, any of its Affiliates or any Person claiming by, through or on behalf of any of them institute any Related Claim against any Non-Party. In no event shall any Person be liable for the Fraud of any other Person, and a claim for Fraud may only be asserted against the Person that committed such Fraud; provided, that, in no case will any claim for Fraud be asserted against the Special Master.

Section 9.13. Specific Performance.

(a)    The Parties agree that irreparable damage would occur in the event that any of the provisions of this Agreement were not performed in accordance with their specific terms or were otherwise breached, and that money damages or legal remedies would not be an adequate remedy for any such damages. Therefore, it is accordingly agreed that prior to the termination of this Agreement in accordance with Section 7.1, each Party shall be entitled to an injunction or injunctions to prevent or restrain any breach or threatened breach of this Agreement by any other party and to seek specific performance of the terms and provisions of this Agreement, to prevent breaches or threatened breaches of, or to enforce compliance with, the covenants and obligations of any other party, in any court of competent jurisdiction, and appropriate injunctive relief shall be granted in connection therewith. Such remedies shall be in addition to and not in substitution for any other remedy to which such party is entitled at law or in equity. If either Party brings any action to enforce specifically the performance of the terms and provisions hereof by the other Party, the Outside Date shall be automatically extended by (i) the amount of time during which such action is pending, plus twenty (20) Business Days or (ii) such other time period established by the court presiding over such action.

(b)    Each Party hereto hereby waives (i) any defenses in any action for specific performance, and agrees not to oppose the granting of an injunction, specific performance or other equitable relief as provided herein, on the basis that (A) the other Party has an adequate remedy at law or (B) an award of specific performance is not an appropriate remedy for any reason at law or in equity and (ii) any requirement under any Law to post a bond or other security as a prerequisite to obtaining equitable relief.

(c)    The Parties agree that (i) by seeking the remedies provided for in this Section 9.13, no party shall in any respect waive its right to seek at any time any other form of relief that may be available to it under this Agreement or any other Transaction Document (including monetary damages) in the event that this Agreement has been terminated or in the event that the remedies provided for in this Section 9.13 are not available or otherwise are not granted, and (ii) nothing set forth in this Section 9.13 shall require any party hereto to institute any proceeding for (or limit any party's right to institute any proceeding for) specific performance under this Section 9.13 prior to or as a condition to exercising any termination right under Article VIII, nor shall the commencement of any Legal Proceeding pursuant to this Section 9.13 or anything set forth in this Section 9.13 restrict or limit any party's right to terminate this Agreement in accordance with the terms of Article VIII or pursue any other remedies under this Agreement any other Transaction Document that may be available then or thereafter; provided, that, in no event will Buyer be entitled to receive both (A) a grant of specific performance to cause the Closing to occur and (B) the Expense Reimbursement Amount (as applicable).

Section 9.14.  <u>Successors and Assigns</u>. The provisions of this Agreement shall be binding upon and inure to the benefit of the Parties and their respective successors and assigns; provided that no Party may assign, delegate or otherwise transfer any of its rights or obligations under this Agreement without the consent of the Special Master and the other Parties.

Section 9.15.  <u>Release</u>.

(a)     Effective as of the Closing Date, except for any rights or obligations under this Agreement or any of the other Transaction Documents each of the Buyer and the Company on behalf of itself and each of its Affiliates and Representatives and each of its current, former and future officers, directors, employees, partners, members, advisors, successors and assigns (collectively, the "<u>Buyer Releasing Parties</u>"), hereby irrevocably and unconditionally releases and forever discharges (A) the Special Master and each of his current, former and future financial advisors, attorneys, consultants or other advisors and his and their respective, successors and assigns, the Designated Managers, the other Company Employees listed in the Procedures Summary, (B) any other current or former employees, directors, officers, partners, members or managers of the Acquired Companies who participated in the Buyer's due diligence and investigation of the Acquired Companies, the preparation of the Company Disclosure Schedules or the preparation, negotiation or consummation of the Transactions or otherwise participated in the sale process contemplated by the Sale Procedures Order and any other individuals as reasonably agreed by Buyer and the Special Master during the Interim Period (the Persons described in the immediately preceding clause (A) and clause (B), collectively, the "<u>Special Master Released Parties</u>") of and from any and all actions, claims, causes of action, controversies, demands, rights, indemnities, guaranties, suits, proceedings, obligations, liabilities, executions, judgments, damages, duties, debts, dues, offsets, powers, privileges, accounts, bonds, contracts and covenants (whether express or implied), and claims and demands whatsoever, known or unknown, contingent or non-contingent, matured or unmatured, suspected or unsuspected, foreseen or unforeseen, liquidated or unliquidated, disputed or undisputed, secured or unsecured, assertable directly or derivatively, whether in contract or in tort, in law or in equity which the Buyer Releasing Parties now has or in the future may have against each of the Special Master Released Parties and the Financing Parties, in respect of any cause, matter or thing based on or relating to, or in any manner arising from, in whole or in part, the business or operations of the Acquired Companies, the Transactions, or the ownership of Shares by the Special Master Released Parties, in each case, occurring or arising on or prior to the date of the Closing Date. The Buyer, on behalf of itself and each Buyer Releasing Party, covenants and agrees that no Buyer Releasing Party shall assert any such claim against the Special Master Released Parties; provided, however, that nothing herein shall operate as a release of any causes of action or liabilities unknown to the Buyer Releasing Party as of the Closing Date arising out of willful misconduct, fraud or criminal acts of a Special Master Released Party.

(b)     Effective as of the Closing Date, except for any rights or obligations under this Agreement or any of the other Transaction Documents, the Special Master and on behalf of himself and each of his current, former and future financial advisors, attorneys, consultants or other advisors and his and their respective successors and assigns (collectively, the "<u>Special Master Releasing Parties</u>"), hereby irrevocably and unconditionally releases and forever discharges the Buyer, the Company, the Financing Parties, their respective Affiliates and Representatives and each of its and their respective current, former and future officers, directors, employees, partners,

76

members, advisors, successors and assigns (collectively, the "Buyer Released Parties") of and from any and all actions, claims, causes of action, controversies, demands, rights, indemnities, guaranties, suits, proceedings, obligations, liabilities, executions, judgments, damages, duties, debts, dues, offsets, powers, privileges, accounts, bonds, contracts and covenants (whether express or implied), and claims and demands whatsoever, known or unknown, contingent or non-contingent, matured or unmatured, suspected or unsuspected, foreseen or unforeseen, liquidated or unliquidated, disputed or undisputed, secured or unsecured, assertable directly or derivatively, whether in contract or in tort, in law or in equity which the Special Master Releasing Parties now has or in the future may have against each of the Buyer Released Parties, in respect of any cause, matter or thing based on or relating to, or in any manner arising from, in whole or in part, the business or operations of the Acquired Companies or the Transactions, in each case, occurring or arising on or prior to the date of the Closing Date. The Special Master, on behalf of itself and each Special Master Releasing Party, covenants and agrees that no Special Master Releasing Party shall assert any such claim against the Buyer Released Parties; provided, however, that nothing herein shall operate as a release of any causes of action or liabilities unknown to the Special Master Releasing Party as of the Closing Date arising out of willful misconduct, fraud or criminal acts of the Buyer, the Company or a Financing Party.

Section 9.16.   Counterparts. This Agreement may be executed in one or more counterparts including by facsimile or other means of electronic transmission, such as by electronic mail in ".pdf" form, each of which will be deemed to be an original copy of this Agreement and all of which, when taken together, will be deemed to constitute one and the same agreement.

Section 9.17.   Debt Financing Sources. Notwithstanding anything in this Agreement to the contrary, the Special Master hereby:

(a)    agrees that any proceeding, whether in law or in equity, whether in contract or in tort or otherwise, involving the Debt Financing Sources, arising out of or relating to, this Agreement, the Debt Financing and/or any of the agreements (including the Debt Commitment Letter) entered into in connection with the Debt Financing or any of the transactions contemplated hereby or thereby or the performance of any services thereunder shall be subject to the exclusive jurisdiction of any federal or state court in the Borough of Manhattan, New York, New York, so long as such forum is and remains available, and any appellate court thereof and each Party hereto irrevocably submits itself and its property with respect to any such proceeding to be the exclusive jurisdiction of such court;

(b)    agrees that any such proceeding shall be governed by the laws of the State of New York (without giving effect to any conflicts of law principles that would result in the application of the laws of another state), except as otherwise provided in the Debt Commitment Letter or any other applicable definitive document relating to the Debt Financing;

(c)    without limiting the rights of the Buyer under the Debt Commitment Letter and/or any right or remedy available to any person under the definitive documentation governing the Debt Financing, agrees not to bring or support or permit any of its Affiliates to bring or support any proceeding of any kind or description, whether in law or in equity, whether in contract or in tort or otherwise, against any Debt Financing Source in any way arising out of or relating to, this Agreement, the Debt Financing and/or any of the agreements (including the Debt Commitment

Letter) entered into in connection with the Debt Financing or any of the transactions contemplated hereby or thereby or the performance of any services thereunder in any forum other than any federal or state court in the Borough of Manhattan, New York, New York;

(d)    agrees that service of process upon the Acquired Companies and/or each of its controlled Affiliates or the Special Master in any such proceeding shall be effective if notice is given in accordance with Section 9.7;

(e)    irrevocably waives, to the fullest extent that it may effectively do so, the defense of an inconvenient forum to the maintenance of such Legal Proceeding in any such court;

(f)    knowingly, intentionally and voluntarily waives, to the fullest extent permitted by Law, trial by jury in any proceeding brought against any Debt Financing Source in any way arising out of or relating to this Agreement, the Debt Financing and/or any of the agreements (including the Debt Commitment Letter) entered into in connection with the Debt Financing or any of the transactions contemplated hereby or thereby or the performance of any services thereunder;

(g)    without limiting the rights of the Buyer under the Debt Commitment Letter and/or any right or remedy available to any person under the definitive documentation governing the Debt Financing, agrees that none of the Debt Financing Sources will have any liability to the Acquired Companies and/or any of their respective controlled Affiliates (in each case, other than the Buyer and the Buyer Subsidiaries) or the Special Master relating to or arising out of this Agreement, the Debt Financing and/or any of the agreements (including the Debt Commitment Letter) entered into in connection with the Debt Financing or any of the transactions contemplated hereby or thereby or the performance of any services thereunder, whether in law or in equity, whether in contract or in tort or otherwise; and

(h)    agrees that the Debt Financing Sources are express third party beneficiaries of, and may enforce, any of the provisions of this Section 9.17 and that such provisions and the definitions of "Debt Commitment Letter," "Debt Financing," and "Debt Financing Sources," shall not be amended in any way adverse to any Debt Financing Source without the prior written consent of such Debt Financing Source.

Section 9.18.    Special Master and his Representatives' Judicial Immunity. The Buyer agrees that in no circumstance shall the Special Master or his Representatives be personally or otherwise liable for any amounts or obligations owed to the Buyer, for any breach of any representations or warranties in this Agreement, or for any other claims or liabilities arising out of or in connection with this Agreement or the transaction contemplated by this Agreement. The Buyer further agrees that the Special Master and his Representatives are acting as an arm of the Court and are entitled to judicial immunity in the performance of their duties and in connection with this Agreement and the Transactions.

Section 9.19.    Special Master Indemnification.  From and after the Closing, the Buyer shall, and shall cause each Acquired Company to, indemnify, defend and hold harmless, to the fullest extent permitted under applicable Law, the Special Master against any and all losses, damages, liabilities, deficiencies, claims, actions, judgments, settlements, interest, awards,

penalties, fines, costs or expenses of whatever kind, including attorneys' fees, that are incurred by Special Master, arising out of or related to this Agreement. Further, from and after the Closing, the Buyer shall, or shall cause the Acquired Companies to, advance any expenses (including fees and expenses of legal counsel) of the Special Master under this <u>Section 9.19</u> (including in connection with enforcing the indemnity and other obligations referred to in this <u>Section 9.19</u>), as incurred, to the fullest extent permitted under applicable Law.

[*Signature Pages Follow*]

IN WITNESS WHEREOF, the Parties have duly executed this Agreement as of the day and year first written above.

DALINAR ENERGY CORPORATION, as the Buyer

By: _____

Name:   Paul Rivett

Title:    Chief Executive Officer


ROBERT B. PINCUS, as the Special Master


By: _____

Name:

Title:

   IN WITNESS WHEREOF, the Parties have duly executed this Agreement as of the day and year first written above.

DALINAR ENERGY CORPORATION, as the Buyer

By: _____
Name:
Title:

ROBERT B. PINCUS, as the Special Master

By: _____
Name:   Robert B. Pincus
Title:    Special  Master for the United States
           District Court for the District of Delaware

[SIGNATURE PAGE TO STOCK PURCHASE AGREEMENT]

**ANNEX A**

DEFINITIONS

"<u>Acquired Companies</u>" means, collectively, the Company and each of the Company Subsidiaries.

"<u>Additional Judgment Creditors</u>" means the judgment holders, other than Crystallex Corporation and ConocoPhillips Petrozuata B.V., set forth in the Priority Order [D.I. 996], dated March 1, 2024, in the Specified Litigation.

"<u>Advanced Transaction Expenses</u>" means, as provided in the Sale Procedures Order and the May Order (in each case as in effect on Execution Date), the Special Master's compensation and any out-of-pocket costs, fees and expenses incurred by the Special Master in connection with the Transactions for investment bankers, third party consultants, legal counsel and any of his other Representatives or Advisors (as defined in the Sale Procedures Order) that have previously been paid as an advance by the Sale Process Parties and Additional Judgment Creditors pursuant to the procedures set forth in the May Order, which for the avoidance of doubt will include the monthly expenses of the Special Master (including fees and expenses of Weil, Gotshal & Manges LLP, Potter Anderson & Carroon LLP, Jenner & Block LLP, Evercore and any other advisors engaged by the Special Master).

"<u>Affiliate</u>" means, with respect to any Person, any other Person that, directly or indirectly through one or more intermediaries, controls, or is controlled by, or is under common control with, such Person, and the term "<u>control</u>" (including the terms "<u>controlled by</u>" and "<u>under common control with</u>") means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of such Person, whether through ownership of voting securities, by contract or otherwise.

"<u>Anti-Corruption Laws</u>" means any applicable Law for the prevention or punishment of public or commercial corruption or bribery, including the U.S. Foreign Corrupt Practices Act, U.K. Bribery Act 2010 and any other applicable anti-corruption or anti-bribery Law of any other applicable jurisdiction.

"<u>Antitrust Laws</u>" means the HSR Act, the Sherman Act, the Clayton Act, the Federal Trade Commission Act, and any other Laws that are designed to prohibit, restrict or regulate actions having the purpose or effect of monopolization, lessening of competition, or restraint of trade.

"<u>Business Day</u>" means any day of the year other than (a) a Saturday, Sunday or federal holiday in the United States or (b) a day on which national banking institutions in New York, New York are required or authorized to close.

"<u>Business Unit</u>" each of (a) Corpus Christi Refinery, (b) Crude Supply & Trading, (c) Lake Charles Refinery, (d) Lemont Refinery, (e) Lights Oils Marketing, (f) Logistics, (g) Lubricants, (h) Procurement, (i) Product Supply & Trading, (j) Specialty Products, and (k) Terminals & Pipelines.

"<u>Buyer Subsidiary</u>" means any Subsidiary of the Buyer, as of the Execution Date.

"Cash" means the cash and cash equivalents of the Acquired Companies; provided, that Cash shall (a) exclude (i) all issued but uncleared checks and drafts of the Acquired Companies, (ii) cash deposits and cash held in escrow accounts, (iii) with respect to any cash held outside the United States, all Taxes, fees, expenses and other costs associated with repatriating such cash into the United States, (iv) cash held by the Acquired Companies for third parties, and (v) cash held as collateral for outstanding letters of credit and any other restricted or trapped cash; and shall (b) include all checks and wire transfers and drafts deposited or available for deposit for the account of the Acquired Companies.

"CFIUS" means the Committee on Foreign Investment in the United States.

"CFIUS Clearance" means that any of the following shall have occurred: (i) CFIUS has informed the Parties that the Transactions do not constitute a "covered transaction" under the DPA and are not subject to CFIUS jurisdiction under the DPA; (ii) CFIUS has completed its assessment of the Transactions and the Parties have received written notice from CFIUS that there are no unresolved national security concerns and all action under the DPA is concluded with respect to the Transactions; (iii) CFIUS has completed its assessment of the Contemplated Transactions and is unable to conclude action under the DPA on the basis of the CFIUS Notice, but is also not requesting that the Parties file a CFIUS Notice pursuant to 31 C.F.R. § 800.407(a)(1) or (2); or (iv) if CFIUS has sent a report to the President of the United States requesting the President's decision under the DPA, either (a) the period under the DPA during which the President may announce his decision shall have expired without his taking of any such action to suspend or prohibit the Transactions; or (b) the President shall have announced a decision not to take any action to suspend, prohibit, or place any limitations on the Transactions.

"CFIUS Notice" means a joint voluntary notice with respect to the Transactions prepared by the Parties (or in the case of the Special Master, Causing the Acquired Companies to prepare) in consultation with their legal counsel and submitted to CFIUS in accordance with the requirements of the DPA.

"CFIUS Turndown" means (i) the President of the United States has issued an order suspending or prohibiting the Transactions or (ii) CFIUS has notified the Parties, orally or in writing, that CFIUS intends to send a report to the President of the United States recommending that he act to suspend or prohibit the Transactions, or (iii) CFIUS has notified the Parties, orally or in writing, that it is unable to remediate, mitigate or address national security concerns identified through the CFIUS Clearance process; and the Parties shall have agreed in good faith that CFIUS Clearance is unlikely to be obtained.

"CITGO Petroleum" means CITGO Petroleum Corporation, a Delaware corporation.

"Claim" means (a) a right to a payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured or (b) an equitable remedy for breach of performance if such breach gives rise to a right to payment, whether or not such right to an equitable remedy is reduced to judgment, fixed, contingent, matured, unmatured, disputed, undisputed, secured or unsecured. Without limiting the foregoing and for the avoidance of doubt, a Claim includes any loss, liability, demand, claim, judgment, sanction, penalty, action, obligation, commitment, assessment,

settlement, fee, debt, deficiency, guaranty of any kind, proceeding, damage, cost, or expense (including court costs and professional fees (including attorneys' fees and costs)) whatsoever, whether at law or in equity, whether known or unknown, fixed, liquidated, contingent, or otherwise, whether under any theory of successor or transferee liability and whether imposed by agreement, understanding, law, or otherwise.

"Closing Consideration" means $7,323,145,180.63, plus the aggregate amount of accrued interest on judgments held by Claimholders (other than the Claimholders junior to Gold Reserve) from the date hereof through the Closing in accordance with that certain Order entered by the Court on April 25, 2024 [D.I. 1136], minus the Deposit Amount, minus the Credit Bid Amount.

"Closing Release" means that certain release, dated the Closing Date, in the form attached hereto as Exhibit C or otherwise in form and substance acceptable to the Special Master.

"Closing Transaction Expenses" means the Special Master Transaction Expenses that are unpaid as of the Closing.

"COBRA" means Part 6 of Subtitle B of Title I of ERISA, Section 4980B of the Code and any similar state applicable Law.

"Code" means the U.S. Internal Revenue Code of 1986, as amended.

"Company Benefit Plan" means (a) each "employee benefit plan" (as such term is defined in Section 3(3) of ERISA), (b) each plan, program, policy, agreement or arrangement that would be an "employee benefit plan" (within the meaning of Section 3(3) of ERISA), if it were subject to ERISA, (c) each stock purchase, stock option, restricted stock, stock bonus, stock ownership, stock appreciation rights, phantom equity, profits interests or other equity or equity-based plan or agreement, (d) each compensation, bonus, commission, incentive or deferred compensation plan, agreement, arrangement, program, policy or practice, (e) each employment or consulting agreement, offer letter or severance, retention, change of control, termination, employee loan or other compensation plan, agreement, arrangement, program, policy, or practice, (f) each health or welfare plan, agreement, arrangement, program, policy, or practice, and (g) each vacation policy, or other employee fringe benefit or perquisite arrangement whether or not subject to ERISA, in the cases of clauses (a) through (g), (x) that is maintained, sponsored, or contributed to by (or required to be contributed to by) any Acquired Company or with respect to which any Acquired Company has any liability and (y) under which any current or former director, officer, manager, employee, contractor or consultant of any Acquired Company has any present or future right to benefits or is eligible to participate.

"Company Fundamental Representations" means the representations and warranties set forth in Section 4.1 (Corporate Existence; Title to Shares) and Section 4.4 (Capitalization).

"Company Material Adverse Effect" means any state of facts, change, development, event, effect, circumstance, condition or occurrence (each, an "Effect") that, individually or in the aggregate, (x) would materially delay or impair the ability of the Special Master or the Acquired Companies (as applicable) to consummate the Transactions pursuant to the terms of this Agreement, in each case, other than Claims or Legal Proceedings arising out of or in relation to the Sale Order, the Purported Equity Pledge or the Equity Pledge Litigation or (y) results in or

would reasonably be expected to have a material adverse effect on the condition (financial or otherwise), business, assets, liabilities or results of operations of the Acquired Companies and the Non-Controlled Entities, taken as a whole; provided, however, that in no event shall any of the following Effects, alone or in combination, be deemed to constitute, or be taken into account, in determining whether there has been, or would be, a Company Material Adverse Effect (A) any changes or conditions in the U.S. or any other national or regional economy, any global economic changes or conditions or securities, credit, financial or other capital markets conditions; (B) any changes or conditions affecting the oil and gas industry in general (including changes to the prices of commodities or of the raw material inputs or value of the outputs of the Company's products, general market prices and regulatory changes affecting the industry); (C) any weather-related or other force majeure event or outbreak (including earthquakes, hurricanes, tsunamis, tornadoes, floods, mudslides, wild fires or other natural disasters); (D) pandemics, epidemics, COVID-19 measures, acts of war (whether or not declared), armed hostility (by recognized governmental forces or otherwise), sabotage, terrorism or cyber-attack, and any escalation or general worsening of any of the foregoing or other response to any Governmental Bodies (including requirements for business closures, restrictions on operations or "sheltering-in-place"); (E) Effects resulting from the negotiation, execution, announcement, pendency, compliance with or performance of this Agreement, the Transactions or the terms hereof or the consummation of the Transactions, including the impact thereof on the relationships of the Acquired Companies with customers, suppliers, partners, employees or Governmental Bodies; (F) any action taken by an Acquired Company or failure of such Acquired Company to take action, in each case, which the Buyer has requested in writing or consented to when asked under Section 6.1; (G) changes in applicable Law or in GAAP or in accounting standards, or any changes in the interpretation or enforcement by any Governmental Body of any of the foregoing, or any changes in general legal or regulatory conditions, including any Effects arising out of, in connection with, or as a result of, any "shut-down" or funding freeze of the U.S. federal government (including any of its agencies); (H) any failure to meet any internal projections, forecasts, guidance, estimates, milestones, or budgets or internal or published financial or operating predictions of revenue, earnings, cash flow or cash position; (I) any downgrade in the Company's credit rating (it being understood that the exceptions in clauses (H) and (I) shall not prevent or otherwise affect a determination that the underlying cause of any such Effect referred to therein (if not otherwise falling within any of the exceptions provided hereof) is a Company Material Adverse Effect); (J) compliance with, or any action required to be taken by the Buyer or its Affiliates under the terms of this Agreement or in connection with the Transactions including Section 6.3(e); or (K) Claims or Legal Proceedings arising out of or in relation to the Sale Order, the Purported Equity Pledge or the Equity Pledge Litigation; provided, that in the case of clauses (A), (B), (C), (D) and (G), to the extent the impact on the Acquired Companies, taken as a whole, is disproportionately adverse compared to the impact on similarly situated entities, the incrementally disproportionate impact or impacts shall be taken into account in determining whether there has been, or would reasonably be expected to be, a Company Material Adverse Effect.

"Company Subsidiary" means any Subsidiary of the Company.

"Contract" means any written or oral contract, agreement, lease, easement, license, sublicense, subcontract, note, evidence of indebtedness, mortgage, indenture, bond, letter of credit, purchase order, binding bid, security agreement or other legally binding arrangement, whether

express or implied (including all amendments, supplements, and modifications thereto), but shall exclude Permits and Company Benefit Plans.

"<u>Debt</u>" means, with respect to the Acquired Companies, without duplication, the following obligations: (i) the principal amount of obligations of the Acquired Companies (A) for borrowed money, whether or not contingent, or (B) evidenced by notes, debentures, bonds or other similar instruments (including debt-like instruments) or debt securities; (ii) all obligations of the Acquired Companies for the reimbursement of any obligor of any guaranties, performance bonds, performance guaranties, indemnities, keep-wells, sureties, bankers' acceptances, letters of credit or similar arrangements, to the extent drawn upon; (iii) all liabilities of any Person (other than any Acquired Company) for which any Acquired Company has guaranteed repayment (to the extent of such guarantee); (iv) all obligations for deferred purchase price of property, assets or services, all conditional sale obligations, earnouts, holdbacks or other similar obligations (calculated at the full amount of the possible payment outstanding); (v) all obligations under finance leases; (vi) non-current liabilities; (vii) post-retirement welfare benefits and unfunded or underfunded pensions; (viii) to the extent drawn, obligations under the Receivables Securitization Facility; and (ix) all obligations of the type referred to in clauses (i) through (viii) above of other Persons secured by any Lien on any property or asset of the Acquired Companies, whether or not such obligation is assumed by the Acquired Companies (with Debt under this clause (ix) being limited, in the case of any such obligation of another Person, to the lower of such obligation and the fair market value of the properties and assets securing the same). Debt shall not include (A) any amounts included in Closing Transaction Expenses, (B) any obligations or guarantees under bankers acceptance, letters of credit or similar arrangements to the extent undrawn as of the Closing Date and which do not become drawable as a result of the Transactions, (C) any intercompany Debt of the Company and its wholly owned Subsidiaries and (D) any Taxes.

"<u>Debt Financing Documents</u>" means any credit agreements, note purchase agreements, engagement letters, fee letters, indentures, guarantees, pledge and security documents, definitive financing documents, agreements, schedules or other certificates or documents contemplated by the Debt Financing.

"<u>Debt Financing Source</u>" means, in its capacity as such, any lender, similar debt financing source, agent or arranger providing or arranging a commitment to, or that has entered into definitive agreements related to, the Debt Financing, including pursuant to the Debt Commitment Letter (as modified by any joinder agreement, amendment, or other modification thereto as permitted hereunder) or any Debt Financing Document (or any other commitment letter or definitive agreement in respect of any alternative debt financing) and their respective Affiliates, and such Person's (and their respective Affiliates') former, current or future equityholders, members, employees, officers, directors, attorneys, agents or advisors, and, in each case, their respective successors and assigns; <u>provided</u>, <u>however</u>, that neither the Buyer nor any of its Affiliates shall constitute a Debt Financing Source.

"<u>Debt Payoff Amount</u>" means the aggregate principal amount of the Specified Debt, plus all accrued but unpaid interest, fees and other amounts payable thereon (including any premiums, penalties, breakage costs and any other fees, expenses or other obligations relating thereto), in each case, calculated as of the Closing Date or as of the Redemption Date as defined in the applicable indenture to such item of Specified Debt.

"Deposit Forfeiture Termination Event" means the occurrence of this Agreement being terminated (i) by the Special Master or the Buyer pursuant to Section 8.1(b) (Outside Date) or Section 8.1(c) (Legal Restraint); provided, however, that termination pursuant to Section 8.1(c) (Legal Restraint) shall not constitute a Deposit Forfeiture Termination Event to the extent that such Legal Restraint was not caused by any action or inaction of the Buyer in breach of this Agreement or related to the Buyer's identity or (ii) by the Special Master pursuant to Section 8.1(f) (Buyer Breach).

"Designated Managers" means the employees of the Company or its Subsidiaries designated as such in the Procedures Summary.

"DPA" means Section 721 of Title VII of the Defense Production Act of 1950, as amended, (codified at 50 U.S.C. § 4565) and the regulations promulgated thereunder, codified at 31 C.F.R. Parts 800 to 802.

"Economic Sanctions/Trade Laws" means all applicable Laws relating to export controls, anti-boycott, and Sanctions Targets, including prohibited or restricted international trade and financial transactions and lists maintained by any Governmental Body targeting countries, territories, entities or persons, including the United States, the United Nations Security Council, the European Union, or His Majesty's Treasury of the United Kingdom. For the avoidance of doubt, the applicable Laws referenced in the foregoing sentence include (1) any of the Trading With the Enemy Act, the International Emergency Economic Powers Act, the United Nations Participation Act, or the Syria Accountability and Lebanese Sovereignty Act, or any regulations of OFAC, or any export control Law applicable to U.S.-origin goods, technology, or software, or any enabling legislation or executive order relating to any of the above, as collectively interpreted and applied by the U.S. Government at the prevailing point in time, (2) any U.S. sanctions related to or administered by the U.S. Department of State and (3) any sanctions measures or embargoes imposed by the United Nations Security Council, His Majesty's Treasury or the European Union.

"Environmental Laws" means any and all Laws relating to (a) pollution or the protection, cleanup, preservation or restoration of the environment or natural resources (including air, water, land, soil, subsoil, wildlife, plants, or other natural resources), (b) the generation, manufacture, processing, handling, use, labeling, treatment, storage, disposal, transportation, or Release or threatened Release of, or exposure to, any Hazardous Substance, or (c) the health and safety of Persons, including the following, to the extent applicable: the Comprehensive Environmental Response, Compensation, and Liability Act, 42 U.S.C. §§ 9601 et seq.; the Federal Water Pollution Control Act, 33 U.S.C. § 1251 et seq.; the Clean Air Act, 42 U.S.C. § 7401 et seq.; the Toxic Substances Control Act, 15 U.S.C. § 2601 et seq.; the Emergency Planning and Community Right to Know Act of 1986, 42 U.S.C. § 11001 et seq.; the Safe Drinking Water Act, 42 U.S.C. § 300(f) et seq.; the Hazardous Materials Transportation Act, 49 U.S.C. § 5101 et seq.; the Federal Insecticide, Fungicide and Rodenticide Act, 7 U.S.C. § 136 et seq.; the Resource Conservation and Recovery Act of 1976, 42 U.S.C. § 6901 et seq.; the Oil Pollution Act of 1990, 33 U.S.C. § 2701 et seq.; the Occupational Safety and Health Act, 29 U.S.C. §651 et seq. (with respect to human exposure to Hazardous Substances); the Endangered Species Act of 1973, 16 U.S.C. §§ 1531 et seq.; the Bald and Golden Eagle Protection Act, 16 U.S.C. § 668 et seq.; the Migratory Bird Treaty Act, 16 U.S.C. § 703 et seq.; and any similar or implementing state or local Law, all amendments or regulations promulgated thereunder.

"EPP" means the CITGO Petroleum Corporation Executive Protection Plan, as amended.

"Equitable Exceptions" means, collectively, (a) applicable bankruptcy, insolvency, reorganization, moratorium and similar Laws affecting creditors' rights and remedies generally, and (b) general principles of equity, including principles of commercial reasonableness, good faith and fair dealing (regardless of whether enforcement is sought in a proceeding at law or in equity).

"Equity Commitment Letters" means the equity commitment letters to be executed by each Equity Financing Source on or prior to the Execution Date.

"Equity Financing Sources" means the Persons set forth in Section 1.1(a) of the Buyer Disclosure Schedules and each other Person who delivers an Equity Commitment Letter on the Execution Date.

"Equity Interests" means, with respect to any entity, any and all capital stock, shares, quotas, limited liability company interests (however designated), partnership or membership interests or units (whether general or limited), or other similar interest or participation that confers on a Person the right to receive a share of the profits and losses of, or distribution of assets of, such entity, the right to vote for or appoint directors (or other similar governing body members) of such entity or the right to otherwise cause the direction or management and policies of such entity in a manager, general partner or other similar capacity.

"Equity Pledge Litigation" means the case of Petroleos de Venezuela S.A. v. MUFG Union Bank, N.A., 19-10023 (KPF) (S.D.N.Y.) that was initiated on October 29, 2019 by PDVSA, the Company and CITGO Holding, Inc. against GLAS and MUFG in their capacities as collateral agent and trustee, respectively, for the 2020 Bondholders, disputing the Purported Equity Pledge.

"ERISA" means the Employee Retirement Income Security Act of 1974 and the rules and regulations thereunder.

"ERISA Affiliate" means with respect to any Person, trade or business, or entity, any other Person, trade or business, or entity, (a) that is, or was at the relevant time, a member of a group described in Section 414(b), (c), (m) or (o) of the Code that includes, or included at the relevant time, the first Person, trade or business, or entity, or (b) that is, or was at the relevant time, a member of the same "controlled group" as the first Person, trade or business, or entity pursuant to Section 4001(a)(14) of ERISA.

"Excluded Information" means any (i) pro forma financial statements, (ii) description of all or any portion of the Debt Financing, including any "description of notes," "plan of distribution" and other information customarily provided by Buyer, the Debt Financing Sources or their counsel, (iii) risk factors relating to all or any component of the Debt Financing, (iv) "segment" financial information, (v) other information required by Rules 3-09, 3-10 or 3-16 of Regulation S-X under the Securities Act, or information required by Item 10, Item 402 and Item 601 of Regulation S-K, XBRL exhibits and information regarding executive compensation and related party disclosure related to SEC Release Nos. 33-8732A, 34-54302A and IC-27444A and other information not customarily provided in an offering memorandum for a Rule 144A or (vi) any financial information or other information that is not reasonably available to CITGO

Petroleum under its current reporting systems or that CITGO Petroleum is not reasonably able to produce without undue burden.

"Escrow Account" means the escrow account established pursuant to the Escrow Agreement in respect of the Deposit Amount.

"Expense Reimbursement Amount" means an amount equal to the reasonable and documented out-of-pocket costs, fees and expenses, inclusive of any out-of-pocket financing commitment fees, incurred by the Buyer in connection with the Transactions; provided, that in no event shall the Expense Reimbursement Amount exceed $30,000,000.

"Expense Reserve Holdback Account" means the account established by the Special Master in respect of the Expense Reserve Holdback Amount.

"Expense Reserve Holdback Amount" means a reasonable amount to be determined by the Special Master in good faith that is approved by the Court prior to Closing.

"Evaluation Criteria" means the non-exhaustive list of criteria, as approved by the Court pursuant to the January Order, based on which the Special Master shall determine which bid to recommend as the stalking horse bid, base bid or Successful Bid, if any and as applicable.

"Fraud" means a knowing misrepresentation of a material fact or concealment of a material fact by a Person with respect to any representation or warranty in this Agreement or the other Transaction Documents which is made or concealed with the specific intent to deceive and the intent of inducing another Person to enter into the Transaction Documents; provided, that at the time such representation was made (a) such representation was materially inaccurate, (b) such Person had actual knowledge (and not imputed or constructive knowledge), without any duty of inquiry or investigation, of the material inaccuracy of such representation, (c) such Person had the specific intent to deceive another Person and (d) the other Person acted in reliance on such inaccurate representation and suffered financial injury as a result of such material inaccuracy. For the avoidance of doubt, "Fraud" does not include any Claim for equitable fraud, promissory fraud, unfair dealings fraud, or any torts (including a Claim for fraud) based on negligence or recklessness.

"Good Industry Practice" means any of the practices, methods, standards, procedures and actions which could reasonably be expected to be used or taken by a reasonably prudent operator of properties or other assets, as applicable, similar to the applicable properties or other assets of the Acquired Companies, in each case, in light of the facts and circumstances known as of the relevant time of measurement. "Good Industry Practice" is not intended to be limited to the optimal practice, method, standard, procedure or action to the exclusion of all others, but rather is intended to include a range of practices, methods, standards or actions that meet the foregoing qualifications.

"Governmental Body" means any domestic or foreign national, state, multi-state, municipal or other local government, including any governmental, regulatory, or administrative department, division, subdivision, agency, bureau, board, commission, or authority thereof, or any quasi-governmental or private body exercising any regulatory or Taxing Authority (to the extent that the rules, regulations or orders of such organization or authority have the force of Law), or any court, tribunal or arbitral body of competent jurisdiction.

"<u>Government Contract</u>" means any Contract, grant, basic ordering agreement, letter contract, or order with (i) any Governmental Body, (ii) another Person under such other Person's prime contract with a Governmental Body, or (iii) any higher tier subcontractor of a Governmental Body in its capacity as a subcontractor, for which the period of performance has not expired or terminated, or final payment has not been received, or which remains open to audit as of the Execution Date. Unless otherwise indicated, a task, purchase or delivery order under a Government Contract will not constitute a separate Government Contract for purposes of this definition but will be part of the Government Contract under which it was issued.

"<u>Hazardous Substance</u>" means any substance, material or waste that is regulated, listed, designated, classified, defined or characterized under or pursuant to any Environmental Law as "<u>hazardous,</u>" "<u>toxic,</u>" "<u>radioactive</u>", a "<u>pollutant,</u>" a "<u>contaminant,</u>" or words of similar meaning, including petroleum or petroleum products, byproducts, derivatives, crude oil or any fraction thereof, PFAS, explosive materials, radioactive materials, asbestos, lead-based paint, or polychlorinated biphenyls.

"<u>HSR Act</u>" means the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended.

"<u>Indenture</u>" means the indenture issued on October 27, 2016, by PDVSA, as issuer, with PDVSA Petróleo, S.A., as guarantor, MUFG Union Bank, N.A., as trustee ("<u>MUFG</u>"), GLAS Americas LLC, as collateral agent ("<u>GLAS</u>"), Law Debenture Trust Company of New York, as registrar, transfer agent and principal agent, and Banque Internationale À Luxembourg, Société Anonyme, as Luxembourg paying agent.

"<u>Interest Rate</u>" means (x) the rate of interest published from time to time by The Wall Street Journal, Eastern Edition, as the "prime rate" at large U.S. money center banks during the period from the date that payment is due to the date of payment, <u>plus</u> (y) one percent (1.0%).

"<u>Interim Period</u>" means the period beginning on the date of the Sale Order Entry and ending upon the earlier of the Closing and the termination of this Agreement in accordance with its terms.

"<u>IRS</u>" means the United States Internal Revenue Service.

"<u>January Order</u>" means that certain *Memorandum Order* [D.I. 1554] entered by the Court on January 27, 2025 in the Specified Litigation.

"<u>Judgment Creditors</u>" means the judgment holders in the Specified Litigation.

"<u>Knowledge of the Buyer</u>" means the actual knowledge (and not imputed or constructive knowledge) of any of the Persons set forth in <u>Section 1.1(b)</u> of the Buyer Disclosure Schedules after due inquiry.

"<u>Knowledge of the Company</u>" or "<u>Company's Knowledge</u>" means the actual knowledge (and not imputed or constructive knowledge) of the Designated Managers after due inquiry.

"<u>Knowledge of the Special Master</u>" means actual knowledge (and not imputed or constructive knowledge) of the Special Master.

"Law" means any applicable foreign, federal, state, local law (including common law), statute, treaty, code, ordinance, rule, regulation, judgment, decree, binding directive, policy, injunction, Order or other legal requirement of any Governmental Body; provided, that in no event shall "applicable Law" be deemed to include Laws and Orders of the Bolivarian Republic of Venezuela.

"Legal Proceeding" means any judicial, regulatory, administrative or arbitral action, suit, claim, appeal, cause of action, objection, demand, inquiry, audit, notice of violation, citation, summon, subpoena, enforcement action, complaint, proceeding, or investigation of any nature, civil, criminal, public or private.

"Lien" means, with respect to any asset, any mortgage, lien, pledge, charge, security interest or encumbrance of any kind in respect of such asset.

"Lookback Date" means the date that is three (3) years prior to the Execution Date.

"Marketing Period" means the first period of fifteen (15) consecutive Business Days commencing on the first (1st) Business Day following the date that the condition set forth in Section 7.1(d) has been satisfied or waived  in accordance with this Agreement; provided that such fifteen (15) consecutive Business Day period shall exclude July 4, 2025, September 1, 2025, October 13, 2025, November 27, 2025, November 28, 2025, December 24, 2025 through January 5, 2026, January 19, 2026, February 16, 2026 and  April 3, 2026, May 25, 2026, June 19, 2026, September 7, 2026, October 12, 2026, November 26, 2026, November 27, 2026, December 24, 2026 through January 1, 2027, January 18, 2027 and February 15, 2027, which days, for purposes of such calculation, shall not constitute Business Days (provided that, for the avoidance of doubt, such exclusions (other than for the period commencing on December 24, 2025 and ending on January 5, 2026 and the period commencing on December 24, 2026 and ending on January 1, 2027) shall not restart such fifteen (15) consecutive Business Day period).

"Money Laundering Laws" means any law or regulation regarding money laundering, financial recordkeeping and reporting requirements or terrorism financing, including the U.S. Currency and Foreign Transactions Reporting Act of 1970, the U.S. Money Laundering Control Act of 1986, the USA PATRIOT Act of 2001, and any applicable money laundering-related laws of other jurisdictions where the Acquired Companies conduct business, conduct financial transactions or own assets.

"Negative Consequences" means (a) if related to any consent with respect to any Contract, (i) any default, breach or violation of such Contract (or any default, breach or violation that would result with notice, lapse of time or both) or (ii) any modification or supplement to the rates, service levels, performance schedules or other terms or conditions of such Contract or any right to modify any of the foregoing, in each case, that would be or reasonably could be expected to be adverse to the Acquired Companies, (b) the imposition of any restriction, limitation or new covenant on any Acquired Company, (c) the imposition or creation of any Lien on any assets or properties of any Acquired Company, (d) any right of termination, cancellation, revocation, non-renewal or acceleration or loss of benefit or vesting of any right of any person, in each case, that would be or reasonably could be expected to be adverse to any of the Acquired Companies (upon the exercise of any rights or otherwise), (e) any right to receive any rebate, chargeback, refund, credit or penalty

and (f) any payment, compensation or incremental liability (or any right to any payment, compensation or incremental liability).

"Net Deposit Amount" means the Deposit Amount minus the aggregate amount of any (a) Advanced Transaction Expenses plus (b) unpaid Special Master Transaction Expenses, and in the case of each of clauses (a) and (b), that have been approved by the Court pursuant to the Sale Procedures Order.

"No-Shop Period" means the period beginning on the date that is five (5) Business Days after the conclusion of the Topping Period, and ending on the Closing Date or the date on which this Agreement terminates pursuant to its terms.

"Non-Controlled Entity" means any entity in which an Acquired Company owns, directly or indirectly, any Equity Interest other than a Company Subsidiary.

"OFAC" means the U.S. Department of the Treasury's Office of Foreign Assets Control.

"OFAC License" means a general or specific license or licenses from OFAC authorizing the Parties to participate in and close the Transaction.

"OFAC License Application" means a request for an OFAC License pursuant to 31 CFR § 501.801 or other relevant authority.

"Order" means any order, injunction, judgment, decree, ruling, writ, assessment or arbitration award of a Governmental Body, other than the Bolivarian Republic of Venezuela.

"Ordinary Course" means the ordinary and usual course of day-to-day operations of the Acquired Companies and/or the Non-Controlled Entities (as applicable), in each case, consistent with past practice, taken as a whole.

"Organizational Documents" means the charter, memorandum, certificate of incorporation, articles of association, bylaws, partnership agreements, limited liability company agreement, operating agreement, or other similar document of a Person, as may be amended, restated or otherwise modified from time to time.

"Paying Agent Account" means the deposit account established by the Paying Agent pursuant to the terms of the Paying Agent Agreement for the benefit of the Claimholders.

"PCI DSS" means the Payment Card Industry Data Security Standard, issued by the Payment Card Industry Security Standards Council, as revised from time to time.

"Permit" means all permits, licenses, approvals, tariffs, certifications, consents, registrations, variances, exemptions, waivers, Orders, franchises and other authorizations of any Governmental Body.

"Permitted Liens" means (a) all defects, exceptions, restrictions, easements, rights of way and encumbrances of record; (b) Liens securing liabilities which are reflected or reserved against in the consolidated balance sheet of the Company prepared in accordance with GAAP to the extent

A-11

so reflected or reserved; (c) Liens for Taxes not yet due and payable or that are being contested in good faith through appropriate proceedings; (d) landlords', mechanics', carriers', workers', repairers' and similar statutory Liens arising or incurred in the Ordinary Course; (e) zoning, building code, entitlement and other land use restrictions and Environmental Laws; (f) title of a lessor under a capital or operating lease, and leases, subleases, and similar transactions in the Ordinary Course; (g) any license, covenant or other right to or under Intellectual Property granted in the Ordinary Course; (h) gaps in the chain of title for Intellectual Property evident from the public records of the Governmental Body maintaining the applications or registrations therefor; (i) Liens set forth in <u>Section 1.1(d)</u> of the Company Disclosure Schedules; (j) the Purported Equity Pledge; (k) Claims or Legal Proceedings seeking to enforce judgments against PDVSA or the Bolivarian Republic of Venezuela by recovering from the Acquired Companies; and (l) such other imperfections in title, charges, easements, restrictions and encumbrances which would not result in a Company Material Adverse Effect.

"<u>Person</u>" means any individual, corporation, partnership, limited liability company, firm, joint venture, association, joint-stock company, trust, unincorporated organization, Governmental Body or other entity.

"<u>Personal Information</u>" means all information that identifies, could be used to identify or is otherwise related to an individual person or household, including demographic, health, behavioral, biometric, financial, nonpublic, and geolocation information, IP addresses, network and hardware identifiers, employee information, and any other individually identifiable information that is protected under any applicable Privacy Law and Obligation, in addition to any definition for "personal information", "personal data", "personally identifiable information", "protected health information" or any similar term provided by applicable Privacy Laws and Obligations.

"<u>PFAS</u>" stands for per- and polyfluoroalkyl substances and means any substance which contains at least one fully fluorinated methyl or methylene carbon atom (without any hydrogen (H)/chlorine/bromine/iodine atom attached to it), including any acids, salts, precursors, polymers or derivatives thereof.

"<u>Post-Closing Tax Period</u>" means any taxable period beginning after the Closing Date.

"<u>Preferential Right</u>" means any rights of first refusal, rights of first offer, put or call options, preferential rights to purchase, preemptive rights, change in control, or other similar rights in favor of any Person.

"<u>Procedures Summary</u>" means the procedures described in <u>Section 1.1(e)</u> of the Company Disclosure Schedules.

"<u>Purchase Price</u>" means the Closing Consideration, <u>plus</u> the Deposit Amount, <u>plus</u> the Credit Bid Amount, <u>plus the</u> Advanced Transaction Expenses Amount, <u>plus</u> the Closing Transaction Expenses, <u>plus</u> the Expense Reserve Holdback Amount, <u>plus</u> the Debt Payoff Amount, <u>plus</u> the Termination Fee.

A-12

"<u>Purported Equity Pledge</u>" means the purported pledge of 50.1% of the equity in CITGO Holding, Inc., a Delaware corporation and wholly owned direct subsidiary of the Company that purportedly secured, in part, the 2020 Bonds.

"<u>Related Claim</u>" means any Legal Proceeding that may be based upon, arise out of or relate to this Agreement or the negotiation, execution, performance, breach, interpretation, construction, validity or enforcement of this Agreement (including any Legal Proceeding based upon, arising out of or related to any representation or warranty made or alleged to be made in or in connection with, or as an inducement to enter into, this Agreement).

"<u>Release</u>" means any actual or threatened releasing, spilling, leaking, pumping, pouring, emitting, emptying, discharging, injecting, escaping, or allowing to escape, leaching, migrating, dumping, abandoning, or disposing into or through the indoor or outdoor environment (including soil, surface water, ground water, land surface, subsurface strata, ambient air, wildlife, plants or other natural resources).

"<u>Representatives</u>" means, with respect to any Person, such Person's equityholders, partners, members, officers, directors, employees, consultants, agents, attorneys, accountants, advisors, financing sources and other representatives.

"<u>Required Information</u>" means (x) (a) the audited consolidated balance sheets of CITGO Petroleum and its subsidiaries as of the end of each fiscal year ended after December 31, 2021 and at least 90 days prior to the Closing Date and related audited consolidated statements of income, comprehensive income, changes in stockholders' equity and cash flows of the CITGO Petroleum and its subsidiaries for each fiscal year ended after December 31, 2021 and at least 90 days prior to the Closing Date (the "<u>Annual Financial Statements</u>"); (b) the unaudited consolidated balance sheets and related statements of income, comprehensive income, changes in stockholders' equity and cash flows of CITGO Petroleum and its subsidiaries for each fiscal quarter of CITGO Petroleum ended after the date of the most recent balance sheet delivered pursuant to clause (a) above and at least 45 days prior to the Closing Date (the "<u>Quarterly Financial Statements</u>") (provided, that the financial statements specified in this clause (b) shall be subject to normal year-end adjustments), all of which financial statements described in clause (a) shall be prepared in accordance with generally accepted accounting principles in the United States and prepared in a customary manner for Rule 144A offerings of high yield debt securities of CITGO Petroleum; (y) other financial information of CITGO Petroleum reasonably necessary to assist the Buyer in preparing pro forma financial statements (it being understood the Buyer shall be solely responsible for the preparation of pro forma financial statements, including any adjustments incorporated into any such pro forma financial statements) and (z) other information with respect to the CITGO Petroleum and its subsidiaries of the type and form customarily included by CITGO Petroleum in high yield private placements of debt securities under Rule 144A of the Securities Act and including or incorporating by reference financial statements, business and other operating and financial data of the type customary for Rule 144A offerings by first time issuers and, in the case of the Annual Financial statements, the auditors' reports thereon, and all other operating and financial data necessary to receive customary (for high yield unsecured debt securities issued in a private placement by CITGO Petroleum pursuant to Rule 144A) "comfort" letters (including "negative assurance" comfort) from the independent accountants of CITGO Petroleum upon completion of customary procedures in connection with the offering of the of such debt securities.

Notwithstanding anything to the contrary in this Agreement, the Required Information shall be deemed to exclude, any Excluded Information.

"RRP" means the CITGO Petroleum Corporation Retirement Restoration Plan, as amended.

"Sale Order" means an order of the Court substantially in the form attached hereto as Exhibit E, with such changes and modifications reasonably acceptable to the Buyer and the Special Master.

"Sale Process Parties" means, as set forth in Sale Procedures Order, Crystallex International Corporation, the Bolivarian Republic of Venezuela, PDVSA, the Company, CITGO Petroleum Corporation, and Phillips Petroleum Company Venezuela Limited and ConocoPhillips Petrozuata B.V.

"Sanctioned Country" means any country or territory that is the target of country-wide or territory-wide Economic Sanctions/Trade Laws which, as of the Execution Date, are Iran, Cuba, Syria, North Korea, and certain occupied regions of Ukraine, including the Crimea region, the non-government-controlled areas of Zaporizhzhia and Kherson and the so-called Donetsk or Luhansk People's Republics.

"Sanctions Target" means (1) any country or territory that is the target of country-wide or territory-wide Economic Sanctions/Trade Laws, which, as of the Execution Date, are Iran, Cuba, Syria, North Korea, and certain occupied regions of Ukraine, including the Crimea region, the non-government-controlled areas of Zaporizhzhia and Kherson and the so-called Donetsk or Luhansk People's Republics; (2) a Person that is on the Specially Designated Nationals and Blocked Persons List or any of the other sanctioned persons lists published by OFAC, or any similar list of sanctioned persons issued by the U.S. Department of State; (3) a Person that is located or resident in or organized under the laws of a country or territory that is identified as the subject of country-wide or territory-wide Economic Sanctions/Trade Laws; or (4) an entity that, under applicable Economic Sanctions/Trade Laws, is automatically a target of restrictions or prohibitions because it is owned or controlled by a country or territory identified in clause (1) or Person in clauses (2) or (3) above.

"Security Incident" means any unauthorized or unlawful access, acquisition, exfiltration, manipulation, erasure, loss, use, or disclosure that compromises the confidentiality, integrity, availability or security of Sensitive Data or the Systems, or that triggers any reporting requirement under any breach notification Law or contractual provision, including any ransomware or denial of service attacks that prevent or materially degrade access to Sensitive Data or the Systems.

"Sensitive Data" means all Personal Information, confidential information, proprietary information, intellectual property, and any other information protected by applicable Law or contract that is collected, maintained, stored, transmitted, used, disclosed, or otherwise processed by, for or on behalf of the Acquired Companies.

"Solvent" means, with respect to any Person as of a particular date, that on such date, such Person and its Subsidiaries (on a consolidated basis) (a) have property with fair value greater than the total amount of their debts and liabilities, contingent (it being understood that the amount of

contingent liabilities at any time shall be computed as the amount that, in light of all the facts and circumstances existing at such time, represents the amount that can reasonably be expected to become an actual or matured liability in the ordinary course), subordinated or otherwise, (b) have assets with present fair salable value not less than the amount that will be required to pay their liability on their debts as they become absolute and matured in the ordinary course, (c) will be able generally to pay their debts and liabilities, subordinated, contingent or otherwise, as they become absolute and matured in the ordinary course, (d) are not engaged in business or a transaction, and are not about to engage in business or a transaction, for which their property would constitute an unreasonably small capital and (e) does not intend to, and does not believe that it will, incur debts or liabilities beyond such Person's ability to pay such debts and liabilities as they mature.

"Special Master Transaction Expenses" means, as provided in the Sale Procedures Order and the May Order (in each case as in effect on Execution Date), the Special Master's compensation and any out-of-pocket costs, fees and expenses incurred by the Special Master in connection with the Transactions for investment bankers, third party consultants, legal counsel and any of his other Representatives or Advisors (as defined in the Sale Procedures Order), which for the avoidance of doubt will include fees and expenses of Weil, Gotshal & Manges LLP, Potter Anderson & Carroon LLP, Jenner & Block LLP, Evercore and any other advisors engaged by the Special Master.

"Specially Designated Nationals and Blocked Persons List" means the list of blocked persons, specifically designated nationals, specially designated terrorists, specially designated global terrorists, foreign terrorist organizations, specially designated narcotics traffickers, and blocked vessels referenced in Appendix A to 31 CFR Chapter V, as updated and made available at http://www.treasury.gov/sdn.

"Specified Debt" means the Debt set forth in Section 1.1(f) of the Company Disclosure Schedules.

"Specified Information" means information furnished by Designated Managers to the Special Master (a) as used in Article IV, with respect to the representations and warranties relating to the Acquired Companies, and (b) as used in Section 6.10, in connection with such covenant.

"Stalking Horse Bidder" means Red Tree Acquisitions, LLC, a Delaware limited liability company.

"Stalking Horse Stock Purchase Agreement" means the Stock Purchase Agreement, dated as of March 21, 2025, by and among the Stalking Horse Bidder, the Special Master and, solely with respect to Section 2.3(b)(ii), Section 3.3(b), Section 3.4(d), Section 5.1(b), Section 5.2, Section 5.3, Section 5.4, Section 5.5, Section 5.6, Section 5.8, Section 5.10, Section 5.12(a) and Article IX therein, Red Tree Investments, LLC, a Delaware limited liability company, as such Stalking Horse Stock Purchase Agreement exists as of March 21, 2025.

"Subsidiary" means, when used with respect to any Person, any other Person, whether incorporated or unincorporated, of which (a) more than fifty percent of the voting securities or other ownership interests is owned by such Person or one or more of its Subsidiaries, (b) such Person or one or more of its Subsidiaries is a general partner or holds a majority of the voting

interests of a partnership or (c) securities or other interests having by their terms ordinary voting power to elect more than fifty percent of the board of directors or others performing similar functions with respect to such corporation or other organization, are directly owned or controlled by such Person or by any one or more of its Subsidiaries.

"Systems" means the information technology systems, operational technology systems, and infrastructure used, owned, leased or licensed by or for the Acquired Companies, including industrial control systems, software, computer programs (in both source and object code form), servers, databases, firmware, hardware, equipment, networks, record keeping, communications, telecommunications, interfaces, platforms, peripherals and related systems.

"Tax" or "Taxes" means (a) all federal, state, local or foreign taxes, charges, fees, levies or other assessments, including, all net income, excise, stamp, real or personal property, ad valorem, withholding, social security (or similar), unemployment, occupation, use, production, service, service use, license, net worth, payroll, franchise, severance, transfer, recording, employment, premium, windfall profits, environmental, customs duties, capital stock, profits, disability, sales, registration, value added, alternative or add-on minimum, estimated taxes and any other taxes of any kind whatsoever; (b) all interest, penalties, fines and additions to tax imposed in connection with any item described in clause (a) of this definition; and (c) any liability for the payment of any amounts of the type described in clause (a) or (b) as a result of being (or ceasing to be) a member of an affiliated, consolidated, combined, unitary, aggregate or similar group for any period, including pursuant to Treasury Regulation Section 1.1502-6 or any similar applicable Law; and (d) any liability for the payment of any amounts of the type described in clauses (a)-(c) as a result of being treated as a successor or transferee to any Person (whether by Contract, statute or otherwise), as a result of any secondary liability or as a result of any express or implied obligation to indemnify any other Person.

"Tax Returns" means any return, report, form or similar statement filed or required to be filed with respect to any Tax (including any attached schedules), including, any information return, claim for refund, amended return or declaration of estimated Tax.

"Taxing Authority" means any Governmental Body exercising any authority to impose, assess or collect any Tax or any other authority exercising Tax regulatory authority.

"Termination Fee" means the amount required to be paid to the Stalking Horse Bidder pursuant to and in accordance with Section 8.3 of the Stalking Horse Stock Purchase Agreement, which amount shall not exceed $75,000,000 in the aggregate, of actual and documented out-of-pocket expenses incurred by the Stalking Horse Bidder and its Affiliates in connection with the negotiation and execution of the Stalking Horse Stock Purchase Agreement, , the other transaction documents contemplated thereby and the transactions contemplated thereby (provided, that the Stalking Horse Bidder has provided written confirmation of the amount of such expenses), as set forth by the Special Master in the Funds Flow Memorandum.

"Termination Release" means that certain release in the form attached hereto as Exhibit D or otherwise in form and substance acceptable to the Special Master.

"Topping Period" means the period beginning on April 28, 2025 and ending on June 18, 2025 or such other date or extended date as approved by the Court.

"Transaction Documents" means this Agreement, the Sale Order, the Escrow Agreement, the Paying Agent Agreement, the Debt Commitment Letter, the Equity Commitment Letters, and all other agreements and instruments to be executed by the Buyer, the Special Master and/or the Company at or prior to the Closing pursuant to this Agreement.

"Transactions" means the transactions contemplated by this Agreement and the other Transaction Documents.

"Transfer Taxes" means any real property transfer, sales, use, value added, stamp, documentary, recording, registration, conveyance, stock transfer, intangible property transfer, personal property transfer, registration, stamp, duty, or similar fees or Taxes or governmental charges (together with any interest or penalty, addition to Tax or additional amount imposed) as levied by any Taxing Authority or other Governmental Body in connection with the Transactions, including any payments made in lieu of any such Taxes or governmental charges that become payable in connection with the Transactions.

"Treasury Regulations" means the regulations promulgated under the Code.

"VDR" means the virtual data room established by Representatives of the Special Master to facilitate the provisions of information to potential bidders pursuant to the Sale Procedures Order.

"2020 Bonds" means the 8.50% senior secured notes due in 2020 in the aggregate principal amount of $3,367,529,000, issued by PDVSA pursuant to the Indenture.

"2020 Bondholders" means the holders of the 2020 Bonds.

**B-1**

**Agreed Form**

## ESCROW AGREEMENT

THIS ESCROW AGREEMENT (this "Agreement") is entered into and effective this [•] day of [•], 2025, by and among Acquiom Clearinghouse LLC, a Delaware limited liability company (the "Escrow Agent"), Dalinar Energy Corporation, a Delaware corporation ("Buyer")[1] and Robert B. Pincus, solely in his capacity as special master for the Honorable Leonard P. Stark, United States District Court for the District of Delaware (the "Special Master" and together with Buyer, the "Parties"), in connection with that certain Stock Purchase Agreement, dated as of June 25, 2025 (the "Purchase Agreement"), by and between Buyer and the Special Master. As between the Parties, capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the Purchase Agreement.

WHEREAS, Buyer and the Special Master have entered into the Purchase Agreement on [•];

WHEREAS, Buyer, the Special Master and Acquiom Financial LLC (the "Paying Agent") have entered into that certain Payments Administration Agreement (the "Paying Agent Agreement"), dated as of [•], 2025, pursuant to which the Paying Agent has established an account (the "Paying Account") for the purpose of receiving funds disbursed pursuant to this Agreement;

WHEREAS, Buyer and the Special Master desire for the Escrow Agent to open two separate, distinct and non-commingled escrow accounts into which Buyer will deposit (or cause to be deposited), funds to be held and disbursed in accordance with this Escrow Agreement;

WHEREAS, on the date hereof, Buyer shall deposit $50,000,000.00 (the "Deposit Amount") by wire transfer of immediately available funds with the Escrow Agent as provided by the Purchase Agreement; and

WHEREAS, on the Closing Date, the Buyer shall deposit an amount in cash equal to the Expense Reserve Holdback Amount (as defined in the Purchase Agreement) by wire transfer of immediately available funds (the "Holdback Escrow Funds", and together with the Deposit Amount, the "Escrow Funds") with the Escrow Agent for the purpose of establishing a separate source of funds to secure and satisfy the Special Master's compensation and out-of-pocket costs, fees and expenses incurred by the Special Master pursuant to Section 3.4(c) of the Purchase Agreement.

NOW, THEREFORE, in consideration of the promises herein, the parties hereto agree as follows:

**I.      Terms and Conditions**

---

[1] **Note to Bidder:** Prior to the entry of the Escrow Agreement, the Escrow Agent will require the Buyer to complete a KYC via an electronic questionnaire. A link to the electronic questionnaire will be sent to the Buyer's desired contact person.

1.1    <u>Appointment of the Escrow Agent</u>. Buyer and the Special Master hereby appoint the Escrow Agent as their escrow agent, and the Escrow Agent hereby accepts its duties as provided herein.

1.2    <u>Deposit Escrow Account (Deposits)</u>. Immediately following the execution of this Agreement, Buyer shall deposit, or cause to be deposited, the Deposit Amount by wire transfer of immediately available funds to the Escrow Agent using the wire instructions set forth on <u>Schedule I</u>. As promptly as practicable following receipt of the Deposit Amount, the Escrow Agent shall deposit the Deposit Amount into a separate, distinct and non-commingled interest bearing escrow account, insured by the Federal Deposit Insurance Corporation ("<u>FDIC</u>") established by the Escrow Agent to hold the Deposit Amount (the "<u>Deposit Escrow Account</u>"). The Escrow Agent shall maintain the Deposit Escrow Account as set forth on <u>Exhibit B</u>. The Deposit Amount shall not be used for any purposes other than as set forth in this Escrow Agreement and the Purchase Agreement.

1.3    <u>Deposit Escrow Account (Disbursements)</u>. The Escrow Agent shall retain the Deposit Amount in the Deposit Escrow Account and shall not make any disbursement of all or any portion of the Deposit Amount except in accordance with the following <u>Sections 1.3.1</u>, <u>1.3.2</u> and <u>1.3.3</u>:

1.3.1

(a)    If the Closing occurs, then in accordance with <u>Section 3.3(a)</u> of the Purchase Agreement, the Buyer and the Special Master shall deliver to the Escrow Agent joint written instructions signed by an authorized representative of the Buyer listed on Exhibit A-1 hereto and the Special Master ("<u>Joint Instructions</u>") to disburse the Deposit Amount to the Paying Account by wire transfer of immediately available funds out of the Deposit Escrow Account, and the Escrow Agent shall promptly (and, in any event within two (2) Business Days) after the receipt of the Joint Instructions, disburse the Deposit Amount in accordance with and as specified in such Joint Instructions. The Joint Instructions shall specify the amount of funds to be disbursed from the Deposit Escrow Account and shall identify the payee to whom the disbursement shall be made, which shall be either Buyer or the Paying Account. For purposes of this Agreement, "<u>Business Day</u>" shall mean any day of the year other than (a) a Saturday, Sunday or federal holiday in the United States or (b) a day on which national banking institutions in New York, New York are required or authorized to close.

(b)    Notwithstanding anything to the contrary in this Agreement, all withholding and tax reporting (other than tax reporting of interest income earned with respect to the Escrow Earnings) of amounts paid pursuant to this Agreement shall be governed exclusively by the Paying Agent Agreement, and in no event shall the Escrow Agent withhold tax from any amounts paid pursuant to this Agreement. Buyer acknowledges and agrees that no withholding applies to any payments of Closing Consideration paid pursuant to this Agreement under Chapter 3 or Chapter 4 of the Code.

1.3.2    If the Purchase Agreement is terminated as a result of a Deposit Forfeiture Termination Event, then pursuant to <u>Section 3.3(b)</u> of the Purchase Agreement, Buyer and the Special Master shall promptly (and in any event within five (5) Business Days

of such termination) deliver Joint Instructions to the Escrow Agent, directing the release of the Deposit Amount to the Paying Account in accordance with the wire instructions set forth on Schedule I, and the Escrow Agent shall promptly (and, in any event within two (2) Business Days) after the receipt of the Joint Instructions, release the Deposit Amount in accordance with and as specified in such Joint Instructions; *provided*, that, in lieu of the foregoing, the Buyer may elect, in accordance with Section 3.3(b) of the Purchase Agreement, in writing, within five (5) Business Days after such termination to forever waive, forfeit and discharge from its Specified Litigation Claim (as defined in the Purchase Agreement) an amount equal to the Net Deposit Amount (as defined in the Purchase Agreement) effective immediately upon such termination and the Buyer shall execute and deliver to the Special Master a Termination Release (as defined in the Purchase Agreement) within two (2) Business Days after the Deposit Amount Release Date (as defined below), and in such case, within forty (40) Business Days after such election, pursuant to a written instruction to the Escrow Agent by the Special Master, the Net Deposit Amount shall be released by the Escrow Agent from the Deposit Escrow Account by wire transfer of immediately available funds to the account designated in writing by the Buyer (the date of such release, the "Deposit Amount Release Date"); provided, further, that any funds remaining in the Deposit Escrow Account after the Net Deposit Amount is released to the Buyer by the Escrow Agent pursuant to Section 3.3(b) of the Purchase Agreement shall be, pursuant to a written instruction to the Escrow Agent by the Special Master, released by the Escrow Agent to the Paying Agent to disburse such funds pursuant to the terms of the Paying Agent Agreement.

1.3.3    If the Purchase Agreement is terminated for any reason other than a Deposit Forfeiture Termination Event, then pursuant to Section 3.3(c) of the Purchase Agreement, Buyer and the Special Master shall promptly (and in any event within two (2) Business Days of such termination) deliver Joint Instructions to the Escrow Agent directing the release of the balance of the Deposit Escrow Account to the Buyer or its designees, and the Escrow Agent shall promptly (and, in any event within two (2) Business Days) after the receipt of the Joint Instructions, disburse the Deposit Amount in accordance with and as specified in such Joint Instructions.

1.4    Holdback Escrow Account (Deposits). At the Closing, and in accordance with Section 3.4(c) of the Purchase Agreement, the Buyer shall deposit, or cause to be deposited, the Expense Reserve Holdback Amount by wire transfer of immediately available funds to the Escrow Agent using the wire instructions set forth on Schedule I. As promptly as practicable following receipt of any portion of the Holdback Escrow Funds, Escrow Agent shall deposit such portion of the Holdback Escrow Funds into a separate, distinct and non-commingled escrow account established by Escrow Agent (the "Holdback Escrow Account", and together with the Deposit Escrow Account, the "Escrow Accounts"). The Escrow Agent shall maintain the Holdback Escrow Account as set forth on Exhibit B. No Holdback Escrow Funds shall be used for any other purposes other than as set forth in this Escrow Agreement and the Purchase Agreement.

1.5    Holdback Escrow Account (Disbursements). After the Closing occurs, at any time and from time to time, within two (2) Business Days from the receipt of the Special Master's written instructions, signed by the Special Master ("Special Master Instructions"), the Escrow

Agent shall disburse the Holdback Escrow Funds (or a portion of such funds) as instructed in such Special Master Instructions and this <u>Section 1.5</u>. The Special Master Instructions shall specify the amount of funds to be disbursed from the Holdback Escrow Account to the Paying Account. Disbursements of funds from the Holdback Escrow Account shall be made in accordance with the payment instructions set forth in such Special Master Instructions.

## II.    Provisions as to the Escrow Agent

2.1    This Agreement expressly and exclusively sets forth the duties of the Escrow Agent with respect to any and all matters pertinent hereto and no implied duties or obligations shall be read into this Agreement against the Escrow Agent. In performing its duties and obligations under this Agreement, or upon the claimed failure to perform such duties or obligations, the Escrow Agent shall have no liability in connection herewith except for the Escrow Agent's fraud, willful misconduct or gross negligence. In no event shall the Escrow Agent be liable hereunder for incidental, indirect, special, consequential or punitive damages of any kind whatsoever (including but not limited to lost profits), even if the Escrow Agent has been advised of the likelihood of such loss or damage and regardless of the form of action. The Escrow Agent shall have no liability with respect to the transfer or distribution of any funds effected by the Escrow Agent pursuant to wiring or transfer instructions provided to the Escrow Agent in accordance with the provisions of this Agreement. Any wire transfers of funds made by the Escrow Agent pursuant to this Agreement will be made subject to and in accordance with the Escrow Agent's usual and ordinary wire transfer procedures in effect from time to time, including without limitation call-back procedures. The Escrow Agent's inability to receive or confirm funds transfer instructions pursuant to such security procedures may result in a delay in accomplishing such funds transfer and the Parties agree that the Escrow Agent shall not be liable for any loss caused by any such delay, other than as a result of Escrow Agent's fraud, willful misconduct or gross negligence. No provision of this Agreement shall require the Escrow Agent to risk or advance its own funds or otherwise incur any financial liability in connection with this Agreement. The Escrow Agent shall not be obligated to take any legal action or to commence any proceedings in connection with the performance of this Agreement or any property held hereunder or to appear in, prosecute or defend in any such legal action or proceedings.

2.2    This Agreement constitutes the entire agreement between the Escrow Agent, the Buyer and the Special Master in connection with the subject matter of this Agreement, and no other agreement entered into between the Buyer and the Special Master, or either of them, including, without limitation, the Purchase Agreement, shall be considered as adopted or binding, in whole or in part, upon the Escrow Agent; *provided*, that, to the extent there exists a conflict between the terms and provisions of this Agreement and the Purchase Agreement, solely as between the Buyer and the Special Master, the terms and provisions of the Purchase Agreement will control.

2.3    Except in cases of the Escrow Agent's fraud, willful misconduct or gross negligence, the Escrow Agent shall be protected in acting upon any written instructions, notice, request or instrument which the Escrow Agent in good faith reasonably believes to be genuine and what it purports to be. The Escrow Agent may consult with nationally recognized outside legal counsel with expertise in the matter at issue in the event of any dispute or question as to the construction of any of the provisions hereof or its duties hereunder, and it shall incur no liability

WEIL:\100597384\3\67816.0003

and shall be fully protected in acting reasonably and in good faith in accordance with the advice of such counsel.

2.4     In the event of any disagreement between Buyer and the Special Master, or between either or both of them and any other person, resulting in adverse claims or demands being made in connection with the matters covered by this Agreement, or in the event that the Escrow Agent reasonably and in good faith is in doubt as to what action it should take hereunder, the Escrow Agent may, at its option, refuse to comply with any such claims or demands on it, or refuse to take any other action hereunder (but only for so long as such disagreement continues or such reasonable doubt exists), and in any such event, the Escrow Agent shall not be or become liable in any way or to any party for its failure or refusal to act (absent Escrow Agent's fraud, willful misconduct or gross negligence), and the Escrow Agent shall be entitled to continue to refrain from acting until (i) the rights of the Buyer and the Special Master and all other interested persons shall have been fully and finally adjudicated by a court of competent jurisdiction or (ii) all disagreements been adjudged and all reasonable doubt resolved by agreement among the Buyer and the Special Master and all other interested persons, and the Escrow Agent shall have been notified thereof in writing signed by the Buyer and the Special Master. Notwithstanding the preceding sentence, the Escrow Agent may in its reasonable discretion obey the order, judgment, decree or levy of any court of competent jurisdiction or of an agency of the United States or any political subdivision thereof, or of any agency of any State of the United States or of any political subdivision thereof having authority over the Escrow Agent, and the Escrow Agent is hereby authorized in its reasonable discretion, to comply with and obey any such orders, judgments, decrees or levies and it shall not be liable to any of the Parties or to any other person, firm or corporation, by reason of such compliance notwithstanding such writ, order or decree being subsequently reversed, modified, annulled, set aside or vacated. The rights of the Escrow Agent under this Section 2.4 are cumulative of all other rights which it may have by law or otherwise.

2.5     Buyer agrees to indemnify the Escrow Agent from and against any and all reasonable, documented and out-of-pocket losses, liabilities and expenses (collectively, "Losses") which the Escrow Agent incurs in connection with its performance under this Agreement; *provided*, *however*, that the Escrow Agent shall not be entitled to indemnity with respect to Losses that have been finally adjudicated by a court of competent jurisdiction to have been caused by the Escrow Agent's fraud, willful misconduct or gross negligence. Notwithstanding anything in this Agreement to the contrary, in no event shall Buyer or the Special Master be liable for incidental, indirect, special, consequential or punitive damages of any kind whatsoever (including but not limited to lost profits) of the Escrow Agent, even if such Party has been advised of the likelihood of such loss or damage and regardless of the form of action; *provided*, this sentence shall not prejudice the Escrow Agent's right to be indemnified by Buyer for Losses paid by the Escrow Agent to third parties. This Section 2.5 shall survive the termination of this Agreement and any resignation or removal of the Escrow Agent.

2.6     Any entity into which the Escrow Agent may be merged or converted or with which it may be consolidated, or any entity to which all or substantially all of the escrow business of the Escrow Agent may be transferred, shall be the Escrow Agent under this Agreement without further act, and the Escrow Agent (or its successor) shall provide prompt written notice of such transfer to Buyer and the Special Master.

2.7    The Escrow Agent may resign at any time from its obligations under this Agreement by providing written notice to the Buyer and the Special Master. In addition, the Buyer and the Special Master may jointly terminate this Agreement by providing written notice to the Escrow Agent. Such resignation or termination shall be effective on the date set forth in such written notice, which shall be no earlier than thirty (30) days after such written notice has been furnished. The Buyer and the Special Master shall promptly appoint a mutually agreeable successor escrow agent following receipt or delivery, as applicable, of any such notice of resignation or termination (as applicable). In the event no successor escrow agent has been appointed on or prior to the date such resignation or termination is to become effective, (i) the Escrow Agent shall be entitled to tender into the custody of any court of competent jurisdiction all Escrow Funds and other property (if any) then held by the Escrow Agent and shall thereupon be relieved of all further duties and obligations under this Agreement and (ii) the Buyer and the Special Master (or either of them acting alone) may apply to the Court for the appointment of a successor escrow agent or other appropriate relief. The Escrow Agent shall have no responsibility for the appointment of a successor escrow agent hereunder.

## III.    Compensation of the Escrow Agent

3.1    The Escrow Agent hereby acknowledges and agrees that no fees, expenses or other compensation for the Escrow Agent's services as contemplated by this Agreement will be payable by the Parties, as set forth on Exhibit B hereto. Notwithstanding anything to the contrary herein, and for the avoidance of doubt, the Special Master will not be responsible for any fees or other liabilities in connection with this Agreement.

## IV.    Miscellaneous

4.1    During the term of this Agreement, the Escrow Funds shall be deposited as indicated in Exhibit B. Any interest will accrue on the Escrow Funds deposits, beginning the day immediately following the day the Escrow Funds deposits are received, based on the daily average balances of the Escrow Funds so held in the Escrow Accounts. Any interest will be credited monthly and become part of the Escrow Funds. Deposits into the Escrow Accounts are insured, subject to the applicable rules and regulations of the FDIC, in the standard FDIC insurance amount of $██████, including principal and accrued interest, and are not secured. Escrow Agent or its affiliates may receive compensation from third parties based on balances deposited in the Escrow Accounts.

4.2    The Buyer and the Special Master agree that, subject to the terms and conditions of this Agreement, for U.S. federal, state and local income tax purposes, the Buyer shall be treated as the owner of the Escrow Funds until such funds are released in accordance with this Agreement and all interest and income from the investment of the Escrow Funds ("Escrow Earnings") shall be reported as having been earned by Buyer for U.S. federal, state and local income tax purposes as of the end of the calendar year in which it was earned, whether or not such income was disbursed during such calendar year, to the extent required by the United States Internal Revenue Service ("IRS"), on IRS Form 1099 (or other appropriate form as required by U.S. law of the Escrow Agent). Upon written instructions delivered to the Escrow Agent by Buyer and the Special Master and within ten (10) days following the end of each calendar quarter, the Escrow Agent shall release and disburse to any account or accounts designated by Buyer from the Escrow Funds held in the

WEIL:\100597384\3\67816.0003

Escrow Accounts an amount equal to [twenty-one] ([21]%) percent of the Escrow Earnings earned since the preceding calendar quarter on the Escrow Funds held in the Escrow Accounts (if any). Any residual interest that posts after the final distribution of the Escrow Accounts shall be delivered (i) to the Buyer in an amount equal to [twenty-one] ([21]%) percent of the amount of such residual interests and (ii), with respect to any amounts in excess of the amount distributed to Buyer under clause (i), to the Paying Account in accordance with the wire instructions set forth on Schedule I or as otherwise set forth in Joint Instructions. On or before the execution and delivery of this Agreement, each of Buyer and the Special Master shall provide to the Escrow Agent a correct, duly completed, dated and executed current IRS Form W-9 or Form W-8, whichever is appropriate, or any successor forms thereto, in a form and substance satisfactory to the Escrow Agent (which such forms the Escrow Agent shall be permitted to transmit to the depository institution where the Escrow Funds are held) including appropriate supporting documentation and/or any other form, document, and/or certificate required or reasonably requested by the Escrow Agent to validate the form provided. Except for the delivery and filing of tax information reporting forms required pursuant to the Internal Revenue Code of 1986, as amended, to be delivered and filed with the IRS by the Escrow Agent, as escrow agent hereunder, or by the institution where the Escrow Account is held, the Escrow Agent shall have no duty to prepare or file any Federal or state tax report or return with respect to any funds held pursuant to this Agreement or any income earned thereon.

4.3     The Escrow Agent shall provide monthly reports of transactions and balances to Buyer and the Special Master as of the end of each month, until the disbursement of all Escrow Funds. This Agreement shall terminate upon the final disbursement of all Escrow Funds.

4.4     Any notice, request for consent, report, or any other communication required or permitted in this Agreement, including the monthly reports described in Section 4.3, shall be in writing and shall be deemed to have been given when delivered (i) personally, (ii) by facsimile transmission with written confirmation of receipt, (iii) by electronic mail to the email address given below, and email confirmation of receipt is obtained promptly after completion of the transmission, (iv) by overnight delivery with a reputable national overnight delivery service, or (v) by United States mail, postage prepaid, or by certified mail, return receipt requested and postage prepaid, in each case to the appropriate address set forth below or at such other address as any party hereto may have furnished to the other parties hereto in writing:

If to the Escrow Agent:

Acquiom Clearinghouse LLC
950 17th Street, Suite 1400
Denver, CO 80202

█████████████████████████
█████████████████████████████
██████████████████████████████████████

If to Buyer:

[•]

[•]
[•]
[•]
Attention: [•]
Telephone: [•]
Email: [•]

with a copy (which shall not constitute notice) to:

[•], counsel to the Buyer
[•]
[•]
Attention: [•]
Telephone: [•]
Email: [•]

If to the Special Master:

Robert B. Pincus in his capacity as Special
Master for the United States District Court for the District of Delaware



Email:

With a copy (which shall not constitute notice) to:

Weil, Gotshal & Manges LLP, counsel to the Special Master
767 Fifth Avenue
New York, NY 10153
Matthew S. Barr
Eoghan P. Keenan
Chase A. Bentley

Any party may unilaterally designate a different address by giving notice of each change in the manner specified above to each other party.

4.5    This Agreement (including any claims, issues, controversies or matters arising hereunder, whether arising in law, contract, tort or equity) shall be governed by and construed according to the laws of the State of Delaware, without regard to conflicts of laws rules or principles. Except as otherwise permitted herein, neither this Agreement nor any rights or obligations hereunder may be assigned by any party hereto without the express written consent of each of the other parties hereto. This Agreement shall inure to and be binding upon the parties hereto and their respective successors, heirs and permitted assigns. TO THE EXTENT NOT PROHIBITED BY APPLICABLE LAW THAT CANNOT BE WAIVED, EACH PARTY HERETO HEREBY WAIVES, AND COVENANTS THAT IT WILL NOT ASSERT (WHETHER AS PLAINTIFF, DEFENDANT OR OTHERWISE), ANY RIGHT TO TRIAL BY

8

JURY IN ANY FORUM IN RESPECT OF ANY ISSUE, CLAIM, DEMAND, ACTION OR CAUSE OF ACTION ARISING IN WHOLE OR IN PART UNDER, RELATED TO, BASED ON OR IN CONNECTION WITH THIS AGREEMENT OR THE SUBJECT MATTER HEREOF, WHETHER NOW EXISTING OR HEREAFTER ARISING AND WHETHER SOUNDING IN TORT OR CONTRACT OR OTHERWISE. ANY PARTY HERETO MAY FILE AN ORIGINAL COUNTERPART OR A COPY OF THIS SECTION 4.5 WITH ANY COURT AS WRITTEN EVIDENCE OF THE CONSENT OF EACH SUCH PARTY HERETO THE WAIVER OF ITS RIGHT TO TRIAL BY JURY.

4.6     The terms of this Agreement may be altered, amended, modified or revoked only by an instrument in writing signed by all the parties hereto. No course of conduct shall constitute a waiver of any terms or conditions of this Agreement, unless such waiver is specified in writing, and then only to the extent so specified. A waiver of any of the terms and conditions of this Agreement on one occasion shall not constitute a waiver of the other terms of this Agreement, or of such terms and conditions on any other occasion.

4.7     If any provision of this Agreement shall be held or deemed to be or shall in fact, be illegal, inoperative or unenforceable, the same shall not affect any other provision or provisions herein contained or render the same invalid, inoperative or unenforceable to any extent whatsoever.

4.8     This Agreement is for the sole benefit of Buyer, the Special Master and the Escrow Agent, and their respective successors and permitted assigns, and nothing herein, express or implied, is intended to or shall confer upon any other person or entity any legal or equitable right, benefit or remedy of any nature whatsoever under or by reason of this Agreement. The Escrow Agent shall have the right to perform any of its duties hereunder through its affiliates, agents, attorneys, custodians or nominees; *provided*, that such right shall not relieve the Escrow Agent of any of its duties or obligations hereunder.

4.9     No party to this Agreement shall be liable to any other party hereto for losses due to, or if it is unable to perform its obligations under the terms of this Agreement because of, acts of God, fire, war, terrorism, floods, strikes, electrical outages, equipment or transmission failure, or other causes reasonably beyond its control.

4.10    Following the public announcement of the transactions contemplated by the Purchase Agreement, Escrow Agent may reference the Parties as clients and disclose that it is serving as the escrow agent in connection herewith.

4.11    All titles and headings in this Agreement are intended solely for convenience of reference and shall in no way limit or otherwise affect the interpretation of any of the provisions hereof.

4.12    This Agreement may be executed in one or more counterparts, each of which shall be deemed an original but all of which together shall constitute one and the same instrument. Counterparts may be delivered via electronic mail (including pdf or any electronic signature complying with the U.S. federal ESIGN Act of 2000, e.g., www.docusign.com) or other transmission method and any counterpart so delivered shall be deemed to have been duly and validly delivered and be valid and effective for all purposes.

9

4.13    Contemporaneously with the execution and delivery of this Agreement and, if necessary, from time to time thereafter, each of the Parties shall execute and deliver to the Escrow Agent a Certificate of Incumbency substantially in the forms of <u>Exhibit A-1</u> and <u>A-2</u> hereto, respectively (each, a "<u>Certificate of Incumbency</u>") for the purpose of establishing the identity and authority of persons entitled to issue notices, instructions or directions to the Escrow Agent on behalf of the applicable Party. Until such time as the Escrow Agent receives from a Party a new Certificate of Incumbency replacing the most recent Certificate of Incumbency theretofore delivered to the Escrow Agent, the Escrow Agent shall be fully protected in relying, without further inquiry, on the most recent Certificate of Incumbency furnished to the Escrow Agent. Whenever this Agreement provides for joint written notices, joint written instructions or other joint actions to be delivered to the Escrow Agent, the Escrow Agent shall be fully protected in relying, without further inquiry, on any joint written notice, instructions or action executed by persons named in such Certificate of Incumbency.

4.14    The Buyer and Escrow Agent agree that in no circumstance shall the Special Master or his Representatives (as defined in the Purchase Agreement) be personally or otherwise liable for any amounts or obligations owed to the Buyer, and the Special Master and his Representatives are acting as an arm of the Court (as defined in the Purchase Agreement) and are entitled to judicial immunity in the performance of their duties in connection herewith.

**IMPORTANT INFORMATION ABOUT PROCEDURES FOR OPENING A NEW ACCOUNT:**

**To help the government fight the funding of terrorism and money laundering activities, federal law requires all financial institutions to obtain, verify and record information that identifies each person who opens an account. When a party opens an account, the Escrow Agent will ask for each party's name, address, date of birth, or other appropriate information that will allow the Escrow Agent to identify such party. The Escrow Agent may also ask to see each party's driver's license or other identifying documents.**

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed as of the date first above written.

ACQUIOM CLEARINGHOUSE LLC, as the Escrow Agent

By:_____
Name:
Title:

DALINAR ENERGY CORPORATION, as Buyer

By:_____
Name:
Title:

ROBERT B. PINCUS, solely in his capacity as the Special Master

_____

**EXHIBIT A-1**

**Certificate of Incumbency
(List of Authorized Representatives)**

Client Name: [BUYER]

As an authorized officer of the above referenced entity, I hereby certify that each person listed below is an authorized signer for such entity, and that the title and signature appearing beside each name is true and correct.

**Name  Title  Signature          Phone          Alt. Phone  Email**

IN WITNESS WHEREOF, this certificate has been executed by a duly authorized officer on:[2]

_____.
        Date

By:_____
Name:
Title:

---

[2] **Note to Draft:** The specimen signature page of each authorized signer (including those delivered in counterpart) must include the signature of the witnessing authorized officer. It is permissible for an authorized signer to witness and date his/her own signature if such signer is also an authorized officer of the referenced entity.

**EXHIBIT A-2**

**Certificate of Incumbency**


Client Name: ROBERT B. PINCUS, solely in his capacity as the Special Master

In my capacity as the Special Master, I hereby certify that the signature appearing beside my name is true and correct.

| <u>Name</u> | <u>Title</u> | <u>Signature</u> | <u>Phone</u> | <u>Alt. Phone</u> | <u>Email</u> |
|---|---|---|---|---|---|
| | | | | | |


IN WITNESS WHEREOF, this certificate has been executed by the Special Master on:

_____.
    Date

## <u>SCHEDULE I</u>

WIRE TRANSFER INSTRUCTIONS

**<u>Buyer</u>**:

[BANK NAME]
ABA #:
Account Name:
Account #:
Reference:
Attention:

**<u>Paying Account</u>**:

[BANK NAME]
ABA #:
Account Name:
Account #:
Reference:
Attention:

**<u>Deposit Escrow Account</u>**:

HSBC Bank
ABA #:
Account Name:
Account #:
Reference:
Attention:

**<u>Holdback Escrow Account</u>**:

HSBC Bank
ABA #:
Account Name:
Account #:
Reference:
Attention:

**EXHIBIT B**

**<u>SCHEDULE OF ESCROW AGENT FEES</u>**



---

[3] **Note to Draft**: The final interest rate will be determined based on the aggregate amounts to be held in escrow.

WEIL:\100597384\3\67816.0003

**B-2**

Agreed Form

# PAYMENTS ADMINISTRATION AGREEMENT

This Payments Administration Agreement (this "Agreement") is entered into as of [●], 2025 by and among Dalinar Energy Corporation, a Delaware corporation ("Buyer"), Robert B. Pincus, solely in his capacity as special master (the "Special Master" and together with Buyer, the "Parties") for the Honorable Leonard P. Stark, United States District Court for the District of Delaware (the "Court"), and Acquiom Financial LLC, a Colorado limited liability company (in its capacity as the payments administrator, "Agent"), in connection with the Stock Purchase Agreement, dated as of June 25, 2025 (as may be amended or modified from time to time, the "Purchase Agreement"), by and between Buyer and the Special Master, which contemplates the sale of all of the issued and outstanding capital stock (the "Shares") of PDV Holding, Inc., a Delaware corporation (the "Company") to Buyer. This Agreement is entered into for the benefit of the creditors who are party to the case of *Crystallex International Corp. v. Bolivarian Republic of Venezuela* (D. Del. Case. No. 17-151-LPS) and have obtained a writ of attachment by January 12, 2024 (a "Claim") and such Claim is secured by a valid and duly perfected lien on the Shares (collectively, the "Creditors", and together with the Expense Amount Recipients (as defined below), collectively, "Payees"). Solely as between the Parties, capitalized terms used but not otherwise defined in this Agreement shall have the respective meanings given to such terms in the Purchase Agreement.

1.    **Appointment.** The Parties hereby engage Agent as the payments administrator concerning the Account (as defined below) for the purposes set forth herein, and Agent hereby accepts such appointment and agrees to perform the services set forth herein.

2.    **Account; Fees.** The Special Master (or its counsel or designee) will advise Agent of the closing date of the transactions contemplated by the Purchase Agreement and will instruct Agent of the date that Agent shall commence payments hereunder (such date, the "Initial Payment Date"). At least three (3) Business Days prior to the Initial Payment Date, the Parties will provide, or cause to be provided, to Agent completed account opening forms and, no later than the Initial Payment Date, the Special Master (or its counsel or designee) will provide an execution version of the Purchase Agreement. Agent shall establish and administer a regulated broker-dealer paying account and any related trust or custodial account for unclaimed funds (collectively, the "Account") for the purposes set forth herein. The funds in the Account are non-interest-bearing. On or before 10:00 a.m. Eastern Time on the Initial Payment Date, Buyer shall wire, or cause to be wired, the necessary and immediately available funds to the Account pursuant to the wire instructions on Exhibit A and will pay, or cause to be paid, the fees on Exhibit B that are due as of such time. Upon receipt of such funds, Agent shall promptly provide the Special Master with written confirmation (email being sufficient) to the appropriate email addresses or notice addresses as set forth on the signature pages hereto that the funds have been received by Agent on behalf of and for the benefit of the Payees. Following the Initial Payment Date, the Special Master and/or Acquiom Clearinghouse LLC, a Delaware limited liability company, in its capacity as escrow agent (the "Escrow Agent") pursuant to that certain Escrow Agreement, dated as of the date hereof, by and among Buyer, the Special Master and the Escrow Agent, may from time to time deposit or cause to be deposited additional funds pursuant to the Purchase Agreement (collectively, "Additional Amounts") to fund additional payments through the Account as contemplated hereunder (collectively, "Additional Payments"), including payments to the Expense Amount Recipients with respect to the Special Master's compensation and out-of-pocket costs, fees and expenses incurred by the Special Master after the Closing out of the funds deposited with the

Escrow Agent in accordance with the Purchase Agreement (collectively, "Approved Expense Amounts"). For purposes of this Agreement, "Expense Amount Recipient" shall mean any recipient of any Approved Expense Amount.

**3.    Payee Materials; Review.**

a.    **Delivery of Payee Materials.** Agent shall make any documents and other information required to be returned by the Payees (collectively, the "Payee Materials"), available to the applicable Payees on the date directed by the Special Master (or its counsel or designee) (each, a "Solicitation Date"). Each Payee shall deliver the duly completed Payee Materials, documentation representing their Claims that is satisfactory to the Special Master, any required tax forms and information (including an Internal Revenue Service ("IRS") Form W-9 or appropriate Form W-8, as applicable), and all other required materials (each such Payee that has done so, a "Tendering Payee") prior to, and as a condition to, payment. Agent shall be provided with tax forms for each recipient (other than recipients of transaction expenses as set forth on the Spreadsheet) prior to being required to make payments to such persons. If payment is to be made to a person other than the registered Payee, Agent shall not be required to process such payment until the required Payee Materials and other necessary materials have been properly completed by the new recipient. Agent shall further make available, electronically or by email, the Payee Materials to the Special Master.

b.    **Examination of Documents.** Agent shall examine the materials received from each Tendering Payee to ascertain whether they appear to have been properly completed and executed in accordance with the instructions set forth in the Payee Materials. In the event Agent determines that any document has been improperly completed or executed, or that any other irregularity exists, Agent shall attempt to cause such irregularity to be corrected. As to any irregularity that Agent cannot resolve, Agent shall promptly provide notice to the Special Master for instructions and final determination.

c.    **Maintaining Records and Reports.** Agent shall keep and maintain complete and accurate ledgers showing the amount of cash paid to each Payee. Upon making payment to Payees, Agent shall, if so requested by the Special Master, make available the Payee Materials to the Special Master. Agent shall, in accordance with its standard procedures, preserve electronic versions of all documents (physical and electronic) described in this section and received by Agent, and will dispose of any physical documents no earlier than ninety (90) days after receipt, *provided* that Agent makes available copies of such documents to the Special Master (or its counsel or designee) prior to such disposal.

**4.    Spreadsheets; Payments.**

a.    **Delivery of Spreadsheets.** The Special Master (or its counsel or designee) shall deliver to Agent and Buyer a spreadsheet (the "Initial Closing Spreadsheet") containing (in each case to the extent applicable) Payees that will be paid any amounts on the Initial Payment Date, payment amounts, email and physical addresses of such Payees, tax characterizations, and, if applicable, withholding amounts. The Initial Closing Spreadsheet shall also contain any other information and documents required to solicit and verify the Payee Materials and other necessary materials. The Special Master (or its counsel or designee) shall prepare a preliminary form of such Initial Closing Spreadsheet and deliver such Initial Closing Spreadsheet, subject to completion and further changes by the Special Master (or its counsel or designee) as reflected in the final Initial Closing Spreadsheet, by 2:00 pm Eastern Time at least two (2) Business Days prior to the

2

Solicitation Date. The Special Master (or its counsel or designee) shall deliver such Initial Closing Spreadsheet by 2:00 p.m. Eastern Time at least two (2) Business Days prior to the Initial Payment Date; *provided,* that if the Initial Closing Spreadsheet is delivered after such time, the Parties acknowledge that any substantial revisions could delay the Solicitation Date, and all payments will be made on a commercially reasonable efforts basis and may be delayed to the next Business Day. Should any revisions to the Initial Closing Spreadsheet be required, the Special Master (or its counsel or designee) shall deliver a revised Initial Closing Spreadsheet to Agent and Buyer any time prior to 10:00 a.m. Eastern Time on the Initial Payment Date (such final form of the Initial Closing Spreadsheet, the "Closing Spreadsheet"). Any subsequent payments of Additional Payments shall be made pursuant to written disbursement instructions delivered to Agent and Buyer by the Special Master (or its counsel or designee) (each such subsequent instructions, a "Subsequent Spreadsheet" and together with the Closing Spreadsheet, "Spreadsheets").

b.    **Payments.**    With respect to all payments hereunder other than payments of Approved Expense Amounts, subject to sufficient funds being available in the Account, Agent shall pay each Payee that has properly signed and completed all required documents no later than two (2) full Business Days after receipt of the applicable Spreadsheet the amount due to such Payee pursuant to such Spreadsheet less any applicable withholding. Except as provided below, all payments shall be in United States (U.S.) dollars and shall be made by ACH, check or wire transfer in accordance with the Payee Materials (if applicable) or as otherwise specified on the Spreadsheets.    The Parties hereby direct Agent to make available to the Payees, subject to eligibility, the option to receive their payments in a foreign currency (the "Foreign Currency Payment Option"). If a Payee elects the Foreign Currency Payment Option, the Parties hereby direct Agent to deliver such Payee's payment to the currency exchange provider conducting the exchange on behalf of the Payee (the "Currency Exchange Provider") and acknowledge and agree that the Payee shall receive by wire its converted payment directly from Currency Exchange Provider generally within two (2) Business Days of the Currency Exchange Provider initiating the currency exchange. Any payments made pursuant to this Agreement shall be considered payments in United States (U.S.) dollars for tax reporting and withholding purposes.

c.    **Expense Amount Recipients.** Solely with respect to the disbursement by Agent of any Approved Expense Amounts after the Closing, within two (2) Business Days of receipt of written instructions signed by the Special Master that attach (i) a copy of an order of the Court that authorizes payment of such Approved Expense Amount (each such order, an "Order") and (ii) the applicable Spreadsheet, then, subject to sufficient funds being available in the Account, the Agent shall pay each Expense Amount Recipient the amount due to such Expense Amount Recipient pursuant to such Order and Spreadsheet less any applicable withholding. All payments shall be in United States (U.S.) dollars and shall be made by ACH, check or wire transfer in accordance with the Payee Materials (if applicable) or as otherwise specified on the applicable Spreadsheet.  Any payments made pursuant to this Agreement shall be considered payments in United States (U.S.) dollars for tax reporting and withholding purposes.

d.    **Employee Compensation Payments.** The Parties hereby represent that no payments deposited in the Account will be deemed employee compensation payments.

5.    **Tax Matters.**

a.    **U.S. Payees.** For distributions to U.S. persons (actual or presumed), Agent shall complete tax reporting required by U.S. law of Agent. Unless otherwise set forth on the applicable

Spreadsheet as interest or other reportable income (collectively, "Other Income") not reportable on Forms 1099-B, Agent shall report payments to U.S. persons (actual or presumed) as gross proceeds on Forms 1099-B.

      b.    **Foreign Payees.** Except for distributions identified on the Spreadsheet as Other Income, Agent shall not withhold on distributions made to Payees that demonstrate their status as non-U.S. persons in accordance with U.S. Treasury Regulations ("Foreign Payees"). Agent shall report distributions to Foreign Payees that are identified on the Spreadsheet as domestic source Other Income for which withholding may be required (as set forth on the Spreadsheet) on Forms 1042-S, using Buyer's Federal Employer Identification Number ("FEIN"). Agent shall withhold from such distributions the applicable amounts (as set forth on the Spreadsheet or as otherwise directed by the Special Master) and shall remit such taxes to the appropriate authorities on Buyer's FEIN. To the extent direction is not otherwise provided by the Special Master to Agent, Agent may, after notice to the Special Master, consult with tax counsel in connection with making any tax form validation or withholding determinations hereunder.

      c.    **Compensation Payments.** Without limitation to section 4.d. above, Agent shall not be responsible for performing any tax reporting for distributions that constitute employment-related compensation payments.

      d.    **Withholding.** Notwithstanding anything to the contrary in this Agreement, Agent shall comply with any instruction from the Special Master to withhold tax from any amounts paid pursuant to this Agreement. The Agent and Buyer acknowledge and agree that no withholding applies to any payments of Closing Consideration paid pursuant to this Agreement under Chapter 3 or Chapter 4 of the Code.

**6.**    **Exculpation; Indemnification.** Agent shall not be liable for any loss to any Party in connection herewith except to the extent that its fraud, bad faith, gross negligence or willful misconduct was the primary cause of any loss to any Party. Notwithstanding anything in this Agreement to the contrary, in no event shall Agent be liable for special, incidental, punitive, indirect, or consequential losses or damages of any kind (including but not limited to lost profits) (all of the foregoing, "Excluded Damages") even if it has been advised of the likelihood of such loss or damage and regardless of the form of action; *provided*, that this sentence shall not apply to Excluded Damages that are required by final adjudication to be paid by Buyer to a third party plaintiff or any consequential losses that are reasonably foreseeable. Buyer shall indemnify Agent for any reasonable, documented and out-of-pocket losses, liabilities and expenses arising out of or in connection with this Agreement, except to the extent caused by Agent's fraud, bad faith, gross negligence or willful misconduct. This section shall survive the resignation or removal of Agent and the termination of this Agreement. Agent shall have no obligation to make or facilitate any payment unless Buyer shall have provided, or cause to be provided, the necessary readily available funds in accordance with the terms hereof to make such payments and shall not be liable or responsible for any delay or failure of Buyer or other person or entity to comply with any of their respective obligations. In no event shall the Special Master or any of his consultants, agents, attorneys, accountants, advisors, financing sources and other representatives (individually, "Representatives") be personally or otherwise liable for any amounts or obligations owed to the Agent or any other party in connection herewith, as the Special Master and his Representatives are acting as an arm of the Court and are entitled to judicial immunity in the performance of their duties. This section shall survive the resignation or removal of Agent and the termination of this

Agreement. Notwithstanding anything to the contrary herein, Buyer hereby agrees that any obligation for indemnification under this agreement shall be borne 100% by Buyer.

**7.    Miscellaneous.**

a.    **Confidentiality.**  Agent shall, and shall cause its officers, employees, advisors and agents to, hold all documents and information (including, but not limited to, names, addresses, bank accounts, tax identification numbers and amounts receivable) furnished by the Parties to Agent, whether on, before or after the date hereof, in connection with the engagement of Agent hereunder (including the terms of the Purchase Agreement, the transactions contemplated thereby and the identity of the parties thereto) (the "Confidential Information") in strict confidence.  Agent shall only use the Confidential Information for the sole purpose of performing its obligations, duties and responsibilities contemplated by this Agreement and shall only communicate such Confidential Information to (i) the recipients of documents or funds hereunder, (ii) Agent's officers, employees, advisors and agents who have a need to know such information in order to perform Agent's obligations, duties and responsibilities contemplated by this Agreement and subject to obligations of confidentiality to Agent and Parties and (iii) as required law, rule, regulation or legal process after prior written notice (to the extent legally permissible) to the applicable Party hereunder and taking reasonable steps to obtain protective treatment of such Party's Confidential Information.

b.    **Agent's Duties, Compliance.**  Agent hereby represents that it is a registered broker-dealer and member of the Financial Industry Regulatory Authority (FINRA) and Securities Investor Protection Corporation (SIPC). Agent's duties shall be limited to those specifically set forth herein, which shall be deemed purely ministerial in nature. Agent may take any actions it determines in good faith is reasonably necessary to comply with applicable laws, rules and regulations including, without limitation, in connection with verification of identities under Section 326 of the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001; *provided* that, to the extent permitted by applicable law, Agent shall provide notice to the Parties promptly after taking such action. Agent may perform any of its duties hereunder directly or through affiliates or agents (including the bank where the Account is held); *provided* that, Agent shall be liable to the Parties on account of any action or omission by any affiliate or agent to the same extent that any affiliate or agent is liable to Agent, except that Agent shall be fully liable for the actions and omissions of such affiliates or agents to the extent that Agent acted with fraud, bad faith, gross negligence, or willful misconduct in the selection of such affiliate or agent. Notwithstanding anything to the contrary herein, payments for securities held by a securities depository (not directly in the name of the applicable beneficial holder) may be subject to additional requirements and processing time. Agent will not be required to provide any services that would require it to register as a transfer agent or money services business, be licensed as a money transmitter or obtain a banking license, and any provisions herein shall be deemed automatically modified to provide for such alternative services as necessary to avoid such registration or licensure. Agent is not required to have knowledge of the terms of, or compliance by any party with, any other agreement between the Parties in connection herewith. In the event of any conflict between the terms and provisions of this Agreement, those of the Purchase Agreement, any exhibit attached to this Agreement, or any other agreement among the Parties, as between Agent and the Parties, the terms and conditions of this Agreement shall control, and as between the Parties, the Purchase Agreement shall control.

WEIL:\100597387\3\67816.0003

c.    **Definition of Business Day.** "Business Day" means any day of the year other than (a) a Saturday, Sunday or federal holiday in the United States or (b) a day on which national banking institutions in New York, New York are required or authorized to close.

d.    **Notices.** Any notices, requests, claims, demands or other communications given pursuant to this Agreement shall be in writing and shall be delivered, and deemed given, as follows (i) on the date delivered in person, (ii) on the date of confirmed receipt when emailed, (iii) on receipt after dispatch by registered or certified mail (postage prepaid and return receipt requested) or (iv) on the next Business Day if transmitted by national overnight courier, in each case to the applicable addresses set forth on the signature pages hereto.

e.    **Authorized Representatives.** The persons designated as "Authorized Representatives" on the signature page are authorized to act on behalf of the applicable Party. Agent may rely upon, and shall not be liable for acting upon, any written notice, document, instruction or request furnished hereunder (including instructions or documents provided by an Authorized Representative of a Party or such Party's counsel, or provided by a Payee or a person acting on behalf of such Payee) and reasonably believed in good faith by it to be genuine and to have been signed or presented by the proper entity or individual without inquiry and without requiring substantiating evidence of any kind. Without limiting the intent of the foregoing, Agent may in its sole discretion (i) employ or decline to employ any process or procedure that it deems necessary or advisable to carry out its responsibilities set forth herein, including, without limitation, in connection with the confirmation of identities (including Payee identities), account information or payment instructions and (ii) determine the sufficiency of any documents or instructions delivered to it hereunder including, without limitation, Payee Materials required as a condition of payment. Without limiting the foregoing, the specified Party acknowledges and agrees that Agent may authenticate Payees by sending a one time passcode (OTP) to the Payee email addresses included in the applicable Spreadsheet and that this procedure constitutes a commercially reasonable method of authenticating the identity of such Payees. Agent may rely on the continued authority of each Authorized Representative until Agent has been duly notified in writing by the applicable Party of any updates to its Authorized Representatives.

f.    **Resignation, Termination.** The Special Master may terminate this Agreement and discharge Agent from its duties or obligations hereunder by giving fifteen (15) days' advance written notice of such termination to Agent specifying a date when such termination shall take effect. Agent's sole responsibility after such notice period expires shall be to deliver the remainder of any funds deposited into the Account pursuant to this Agreement to an account designated by the Special Master. Additionally, this Agreement shall automatically terminate upon completion of all distributions required hereunder, including any Additional Amounts. No termination of this Agreement shall relieve any party hereto from any liability incurred prior to such termination.

g.    **Amendments, Waivers.** Except for changes to the Authorized Representatives as set forth above, the provisions of this Agreement may be altered, amended or supplemented, in whole or in part, only by a writing signed by Agent and the Parties. No waiver by any party hereto of any of the provisions hereof shall be effective unless explicitly set forth in writing and signed by the party so waiving.

h.    **Assignment.** Neither this Agreement nor any right or interest of a party hereunder may be assigned in whole or in part without the prior written consent of Agent and the Parties; *provided* that any entity into which Agent may be merged or converted or with which it may be

6

consolidated shall be the successor and deemed assignee of Agent hereunder without further act, and Agent may assign its rights and obligations under this Agreement to any entity to which all or substantially all the payments administration business may be transferred.

i.      **Third Party Beneficiaries.** Nothing in this Agreement shall confer any rights, remedies or claims of any nature upon any person other than the Parties or Agent and their respective successors or permitted assigns.

j.      **Governing Law.** This Agreement, and any claims, causes of action or proceedings (whether at law or in equity, based upon contract, tort, statute or otherwise) that may be based upon or arise out of or related to this Agreement or the negotiation, execution, performance, breach, interpretation, construction or validity of this Agreement, shall be governed by, construed and enforced in accordance with internal laws of the State of Delaware, without giving effect to any laws, provisions or rules (whether of the State of Delaware or any other jurisdiction) that would cause the application of the laws of any jurisdiction other than the State of Delaware and without regard to any borrowing statute that would result in the application of the statute of limitations of any other jurisdiction.

k.      **Submission to Jurisdiction.**  Agent and the Parties hereby irrevocably submit to the exclusive jurisdiction of the Court of Chancery of the State of Delaware sitting in Wilmington, Delaware (or if such court declines to exercise such jurisdiction in any appropriate state or federal court in the State of Delaware sitting in Wilmington, Delaware) any claims, causes of action or proceedings (whether at law or in equity, based upon contract, tort, statute or otherwise) that may be based upon, arise out of or relate to this Agreement or the negotiation, execution, performance, breach, interpretation, construction or validity of this Agreement.

l.      **Waiver of Jury Trial.**  BUYER, THE SPECIAL MASTER AND AGENT HEREBY WAIVE ANY RIGHTS TO TRIAL BY JURY WITH RESPECT TO ANY CLAIMS, CAUSES OF ACTION OR PROCEEDINGS BASED UPON, ARISING OUT OF OR RELATED TO THIS AGREEMENT OR THE NEGOTIATION, EXECUTION, PERFORMANCE, BREACH, INTEPRETATION, CONSTRUCTION OR VALIDITY OF THIS AGREEMENT.

m.      **Third Party Fees.** Agent (or its affiliates) may receive fees from third parties as transaction fees based on balances deposited and may receive, directly or indirectly, fees and other revenue from Payees for service level upgrades requested by such Payees including but not limited to the Foreign Currency Payment Option, in which case such fees or revenue shall be deducted from the applicable payments. Any such compensation based on balances deposited may be reflected as a reduction or waiver of fees that Agent or its affiliates otherwise would have charged for services to be rendered hereunder. If any provision of this Agreement is determined to be prohibited or unenforceable, then such provision shall be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions thereof.

n.      **Counterparts.** This Agreement may be executed in one or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument. The parties hereto hereby consent to conducting business electronically and all signatures of the parties to this Agreement may be transmitted by facsimile or email or other electronic or digital means, and such facsimile, email or other electronic delivery will, for all purposes, be deemed to be the original signature of such party whose signature it reproduces, and will be binding upon such party.

o.     **Authority.** The individual signing below on behalf of a party is authorized by that party to execute this Agreement on behalf of that party and to legally and validly bind that party to the terms of this Agreement.

*[Signature pages follow.]*

WEIL:\100597387\3\67816.0003

**IN WITNESS WHEREOF**, the parties hereto have executed this Agreement as of the date set forth above.

**ROBERT B. PINCUS, solely in his Capacity as Special Master**


By:_____

Robert B. Pincus
Special Master for the United States District Court for the District of Delaware
Address: PO Box 4570 Wilmington, DE 19807
Email: RBPincus@gmail.com

With copies to (which shall not constitute notice to the Special Master):
Weil, Gotshal & Manges LLP, counsel to the Special Master
767 Fifth Avenue
New York, NY 10153
Attention: Matthew S. Barr
            Eoghan P. Keenan
            Chase A. Bentley
Email:  Horizon.Notice@weil.com

[Authorized Representative 1:
  Name: Robert Pincus
  Email: ███████████████


**Dalinar Energy Corporation**


By:_____
Name: [_]
Title: [_]
Address: [_]
Email: [_]

With Copies to (which shall not constitute notice to the Special Master):
[_], counsel to the [_]
[_]
[_]
Attention: [_]
Email: [_]
[Authorized Representative 1:
  Name: [_]
  Email: [_]]

**ACQUIOM FINANCIAL LLC**

By: _____

Name: _____

Title: _____

Acquiom Financial LLC

950 17th Street, Suite 1400

Denver, CO 80202

████████████████

██████████████████████

Email: █████████████████████

████████████████████████

**Exhibit A**

**<u>Wire Instructions</u>**

**<u>Account Wire Instructions:</u>**

[*To be provided by Agent.*]

**Exhibit B**

**Fee Schedule**



**Note:** Any service requested that is not detailed in this fee schedule may be provided for an additional charge.

Securities products and Payments services offered through Acquiom Financial LLC, an affiliate broker-dealer of SRS Acquiom Inc. and member FINRA/SIPC.

**Note:** *Any service requested that is not detailed in this fee schedule may be provided for an additional charge.*

*Securities products and payments services offered through Acquiom Financial LLC, an affiliate broker-dealer of SRS Acquiom Inc. and member FINRA/SIPC.*

**B-3**

Exhibit C

## Form of Release

**Agreed Form**

[●], 2025

Special Master
PO Box 4570
███████████████████

**RE:    CLOSING RELEASE**

Ladies and Gentlemen:

Reference is made to (a) the case of Crystallex International Corp. v. Bolivarian Republic of Venezuela (D. Del. Case. No. 17-151-LPS) to which each of Gold Reserve, Ltd., a Bermuda exempted company limited by shares, Rusoro Mining Ltd., Koch Minerals Sarl, Koch Nitrogen International Sarl and Siemens Energy Inc. (each a "Record Holder") is a party (or a successor in interest of a party), (b) the respective judgments entered in favor of, or assigned to the Record Holders on [●] (each, a "Claim") as a creditor of the Bolivarian Republic of Venezuela or PDVSA, (c) that certain Stock Purchase Agreement, dated as of June 25, 2025 (the "Agreement"), by and between Dalinar Energy Corporation, a Delaware corporation (the "Buyer") and Robert B. Pincus, solely in his capacity as special master (the "Special Master") for the Honorable Leonard P. Stark, United States District Court for the District of Delaware (the "Court") and the Record Holders, solely with respect to the Sections specified in the preamble of the Agreement, and (d) the deposit made by the Buyer with Acquiom Clearinghouse LLC, a Delaware limited liability company, in its capacity as escrow agent (the "Escrow Agent"), of $50,000,000 (such amount, the "Deposit Amount") in cash, pursuant to the terms of that certain Escrow Agreement, dated as of [●], 2025, by and among the Special Master, the Buyer and the Escrow Agent. Capitalized terms used in this letter agreement (this "Release Letter") without definition have the respective meanings given to them in the Agreement.

Pursuant to Section 3.4(e) of the Agreement, the Buyer and the Record Holders have agreed to pay, at the Closing, an amount equal to the Credit Bid Amount by means of a credit against such amounts due and owing under the Claims owed to the Record Holders effective immediately upon the Closing. The Buyer and the Record Holders hereby deliver to the Special Master this Release Letter in accordance with Section 2.3(b)(ii) of the Agreement.

In our capacity as the Record Holders and the Buyer we hereby confirm that the (a) obligations of PDVSA or the Bolivarian Republic of Venezuela (together, the "Venezuela Parties"), as the case may be, to the Record Holder relating to or arising out of the Claims, including principal, accrued interest, costs, expenses and fees for an amount equal to the Claims (the "Forfeited Claim Amount") are hereby deemed satisfied, (b) all commitments and other agreements and obligations of the Venezuela Parties to the Record Holders related to or arising out of the Claims are hereby irrevocably terminated (without recourse and without representation or warranty of any kind (either express or implied)) with no further action on the part of the Venezuela Parties, the Special Master, the Record Holders or the Buyer and (c) all guarantees provided by the Venezuela Parties to each of the Record Holders relating to their respective Claim

are hereby irrevocably terminated (without recourse and without representation or warranty of any kind (either express or implied)) with no further action on the part of the Venezuela Parties, the Special Master, the Record Holder and (d) any security interest or Lien granted to the Record Holder from the Venezuela Parties to secure the Claims (collectively, the "Existing Liens") are hereby irrevocably terminated.

The Record Holder and the Buyer hereby authorize (a) the Special Master to direct the Venezuela Parties or the Company to file or send, as applicable, and (b) the Venezuela Parties or the Company to file or send, as applicable, UCC-3 termination statements with respect to the Existing Liens. By its signature below, each of the Record Holders and the Buyer hereby agrees that such Record Holder and the Buyer will, at its sole cost and expense, execute, as applicable, and deliver to the Venezuela Parties, the Company and the Special Master any such additional lien releases, discharges of security interests, pledges and guarantees, and other similar discharge or release documents, and take such further actions as are reasonably requested, in each case, to release the Existing Liens.

If any term or other provision of this Release Letter is invalid, illegal, or incapable of being enforced by any Law or public policy, all other terms or provisions of this Release Letter shall nevertheless remain in full force and effect so long as the economic or legal substance of the transactions contemplated hereunder is not affected in any manner materially adverse to any party hereto. Upon such determination that any term or other provision is invalid, illegal, or incapable of being enforced, the parties hereto shall negotiate in good faith to modify this Release Letter so as to effect the original intent of the parties hereto as closely as possible in an acceptable manner such that the transactions contemplated hereunder are consummated as originally contemplated to the greatest extent possible.

This Agreement shall be governed by, construed and enforced in accordance with the internal Laws of the State of Delaware, without giving effect to any Laws (whether of the State of Delaware or any other jurisdiction) that would cause the application of the Laws of any jurisdiction other than the State of Delaware and without regard to any borrowing statute that would result in the application of the statutes of limitations or repose of any other jurisdiction. In furtherance of the foregoing, the Laws of the State of Delaware will control even if under such jurisdiction's choice of law or conflict of law analysis, the substantive or procedural law of some other jurisdiction would ordinarily or necessarily apply.

Without limiting the right of any party hereto to appeal any Order of the Court, (a) the Court shall retain exclusive jurisdiction to enforce the terms of this Release Letter and to decide any dispute which may arise or result from, or be connected with, this Release Letter, any breach or default hereunder, or the transactions contemplated hereunder, and (b) any and all proceedings related to the foregoing shall be filed and maintained only in the Court, and the parties hereto hereby consent to and submit to the jurisdiction and venue of the Court.

This Release Letter may be executed in counterparts (and by different parties hereto on different counterparts), each of which shall constitute an original, but all of which when taken together shall constitute a single contract. This Release Letter constitutes the entire agreement among the parties hereto relating to the subject matter hereof and supersedes any and all previous agreements and understandings, oral or written, relating to the subject matter hereof. This

Release Letter shall become effective when it has been executed by the Buyer and the Record Holder, and thereafter shall be binding upon and inure to the benefit of the parties hereto and their respective successors and permitted assigns. Delivery of an executed counterpart of a signature page to this Release Letter by facsimile or by email as a ".pdf" or ".tif" attachment shall be effective as delivery of a manually executed counterpart of this Release Letter.

To the extent there exists a conflict between the terms and provisions of this Release Letter and the Agreement, the terms and provisions of the Agreement will control.

[REMAINDER OF PAGE INTENTIONALLY LEFT
BLANK]

Very truly yours,

Dalinar Energy Corporation, as the Buyer

By: _____
   Name:  [●]
   Title:   [●]

Gold Reserve, Ltd., as Record Holder

By: _____

Name:  [●]
Title:   [●]

Koch Minerals Sarl, as Record Holder

By: _____

Name:  [●]
Title:   [●]

Koch Nitrogen International Sarl, as Record Holder

By: _____
   Name:  [●]
   Title:   [●]]

Rusoro Mining Ltd., as Record Holder

By:_____
   Name:  [●]
   Title:   [●]

Siemens Energy Inc., as Record Holder

By:_____
   Name:  [●]
   Title:   [●]

**B-4**

## Form of Termination Release

**Agreed Form**

[●], 2025

Special Master
PO Box 4570

███████████████

**RE:     TERMINATION RELEASE**

Ladies and Gentlemen:

Reference is made to (a) the case of Crystallex International Corp. v. Bolivarian Republic of Venezuela (D. Del. Case. No. 17-151-LPS) to which Gold Reserve, Ltd., a Bermuda exempted company limited by shares ("Gold Reserve"), and Siemens Energy Inc. ("Siemens", and together with Gold Reserve, the "Record Holders") is a party or a successor in interest of a party, (b) the judgments entered in favor of, or assigned to, the Record Holders in [●] (the "Claims") against the Bolivarian Republic of Venezuela or PDVSA, (c) that certain Stock Purchase Agreement, dated as of June 25, 2025 (the "Agreement"), by and between Dalinar Energy Corporation, a Delaware corporation (the "Buyer") and Robert B. Pincus, solely in his capacity as special master (the "Special Master") for the Honorable Leonard P. Stark, United States District Court for the District of Delaware (the "Court") and the Record Holders, solely with respect to the Sections specified in the preamble of the Agreement, and (d) the deposit made by the Buyer with Acquiom Clearinghouse LLC, a Delaware limited liability company, in its capacity as escrow agent (the "Escrow Agent"), of $50,000,000 (such amount, the "Deposit Amount") in cash, pursuant to the terms of that certain Escrow Agreement, dated as of [●], 2025, by and among the Special Master, the Buyer and the Escrow Agent. Capitalized terms used in this letter agreement (this "Release Letter") without definition have the respective meanings given to them in the Agreement.

The Agreement was terminated on [__], 202[__] by [the Special Master / the Buyer] pursuant to a Deposit Forfeiture Termination Event (as defined in the Agreement), and on [__], 202[__] , in accordance with Section 3.3(b) of the Agreement, the Buyer elected to forever waive, forfeit and discharge from the Record Holders' Claims an amount equal to the Net Deposit Amount effective immediately upon such termination and hereby deliver to the Special Master this Release Letter.

In our capacity as the Record Holders and the Buyer, we hereby confirm that the obligations of PDVSA or the Bolivarian Republic of Venezuela, as the case may be, to the Record Holders of the Claims, relating to or arising out of the Claims, including principal, accrued interest, costs, expenses and fees for an amount equal to the Net Deposit Amount (the "Forfeited Claim Amount") are hereby deemed satisfied. For the avoidance of doubt, all commitments and other agreements and obligations of PDVSA or the Bolivarian Republic of Venezuela to the Record Holders other than the Forfeited Claim Amount shall remain outstanding and any security interest or Lien granted to the Record Holders from PDVSA or the Bolivarian Republic of Venezuela in the assets of PDV Holding, Inc., a Delaware corporation (collectively, the "Existing Liens") and all other rights and obligations of PDVSA or the Bolivarian Republic of Venezuela

shall remain unaffected by this Release Letter.

If any term or other provision of this Release Letter is invalid, illegal, or incapable of being enforced by any Law or public policy, all other terms or provisions of this Release Letter shall nevertheless remain in full force and effect so long as the economic or legal substance of the transactions contemplated hereunder is not affected in any manner materially adverse to any party hereto. Upon such determination that any term or other provision is invalid, illegal, or incapable of being enforced, the parties hereto shall negotiate in good faith to modify this Release Letter so as to effect the original intent of the parties hereto as closely as possible in an acceptable manner such that the transactions contemplated hereunder are consummated as originally contemplated to the greatest extent possible.

This Agreement shall be governed by, construed and enforced in accordance with the internal Laws of the State of Delaware, without giving effect to any Laws (whether of the State of Delaware or any other jurisdiction) that would cause the application of the Laws of any jurisdiction other than the State of Delaware and without regard to any borrowing statute that would result in the application of the statutes of limitations or repose of any other jurisdiction. In furtherance of the foregoing, the Laws of the State of Delaware will control even if under such jurisdiction's choice of law or conflict of law analysis, the substantive or procedural law of some other jurisdiction would ordinarily or necessarily apply.

Without limiting the right of any party hereto to appeal any Order of the Court, (a) the Court shall retain exclusive jurisdiction to enforce the terms of this Release Letter and to decide any dispute which may arise or result from, or be connected with, this Release Letter, any breach or default hereunder, or the transactions contemplated hereunder, and (b) any and all proceedings related to the foregoing shall be filed and maintained only in the Court, and the parties hereto hereby consent to and submit to the jurisdiction and venue of the Court.

This Release Letter may be executed in counterparts (and by different parties hereto on different counterparts), each of which shall constitute an original, but all of which when taken together shall constitute a single contract. This Release Letter constitutes the entire agreement among the parties hereto relating to the subject matter hereof and supersedes any and all previous agreements and understandings, oral or written, relating to the subject matter hereof. This Release Letter shall become effective when it has been executed by the Buyer and the Record Holders, and thereafter shall be binding upon and inure to the benefit of the parties hereto and their respective successors and permitted assigns. Delivery of an executed counterpart of a signature page to this Release Letter by facsimile or by email as a ".pdf" or ".tif" attachment shall be effective as delivery of a manually executed counterpart of this Release Letter.

To the extent there exists a conflict between the terms and provisions of this Release Letter and the Agreement, the terms and provisions of the Agreement will control.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

Very truly yours,

Dalinar Energy Corporation, as the Buyer

By: _____
  Name:  [●]
  Title:  [●]

Gold Reserve, Ltd., as Record Holder

By: _____
  Name:  [●]
  Title:  [●]

Siemens Energy Inc., as Record Holder

By: _____
  Name:  [●]
  Title:  [●]

[SIGNATURE PAGE TO TERMINATION RELEASE LETTER]

**B-5**

**Execution Version**

---

**COMPANY DISCLOSURE SCHEDULES**

**TO THE**

**STOCK PURCHASE AGREEMENT**

by and among

DALINAR ENERGY CORPORATION

and

ROBERT B. PINCUS,

solely in his capacity as the Special Master for the United States District Court for the District of Delaware

_____

Dated as of June 25, 2025

_____

---

# TABLE OF CONTENTS

Section 1.1(d)  Permitted Liens ............................................................................3

Section 1.1(e)  Procedures Summary .....................................................................5

Section 1.1(f)   Specified Debt................................................................................6

Section 4.1  Corporate Existence; Title to Shares ..................................................7

Section 4.2  Governmental Authorization ..............................................................8

Section 4.3  Non-Contravention .............................................................................9

Section 4.4  Capitalization ....................................................................................25

Section 4.5  Subsidiaries; Non-Controlled Entities .............................................26

Section 4.6  Financial Statements .........................................................................30

Section 4.7  Absence of Certain Changes .............................................................31

Section 4.8  No Undisclosed Material Liabilities .................................................32

Section 4.9  Legal Proceedings .............................................................................33

Section 4.10  Taxes ...............................................................................................34

Section 4.11  Company Benefit Plans; Employment ............................................37

Section 4.12  Compliance with Laws; Permits .....................................................46

Section 4.13  Regulatory Matters ..........................................................................49

Section 4.14  Environmental Matters ....................................................................51

Section 4.15  Title to Properties ............................................................................54

Section 4.16  Material Contracts ...........................................................................55

Section 4.17  Intellectual Property and Data Privacy .........................................126

Section 4.18  Brokers; Financial Advisor ...........................................................141

Section 4.19  Real Property .................................................................................142

Section 4.20  Affiliate Transactions ....................................................................149

Section 4.21  Insurance ........................................................................................150

Section 6.1  Conduct of the Business Pending the Closing .................................184

Section 6.6(a)  Indemnification, Exculpation and Insurance ..............................187

Section 7.1  Conditions Precedent to the Obligations of the Parties ...................188

WEIL:\100591052\5\67816.0003

## COMPANY DISCLOSURE SCHEDULE

This Company Disclosure Schedule (this "Disclosure Schedule") is being delivered pursuant to and forms part of that certain Stock Purchase Agreement (the "Agreement"), dated as of June 25, 2025 by and between Dalinar Energy Corporation, a Delaware corporation ("Buyer"), and Robert B. Pincus, solely in his capacity as special master (the "Special Master") for the Honorable Leonard P. Stark, United States District Court for the District of Delaware (the "Court"). Capitalized terms used but not defined herein shall have the meanings ascribed to such terms in the Agreement. The representations and warranties set forth in Article IV the Agreement are made and given subject to this Disclosure Schedule.

This Disclosure Schedule is being provided under an order of the Court in the Specified Litigation pursuant to the Sale Procedures Order.  The Transactions are being compelled by the Court. Neither the Bolivarian Republic of Venezuela, nor its subsidiary entities, PDVSA or PDV Holding, Inc. (the "Company"), have approved or endorsed the Transactions and all of the representations, warranties and covenants set forth in the Agreement are qualified in their entirety by such fact.  The foregoing disclosure is deemed disclosed against each section of this Disclosure Schedule.

The disclosure of any matter in any section of this Disclosure Schedule of any facts or circumstances shall be deemed to be an adequate response and disclosure of such facts or circumstances with respect to all representations or warranties calling for disclosure of such information, if it is reasonably apparent from a disclosure item or the documentation referenced that another disclosure section is also applicable. The disclosure of any matter or item in any schedule shall not be deemed to constitute an acknowledgement that any such matter is required to be disclosed. The inclusion of any matter, information or item in any section of this Disclosure Schedule shall not be deemed to constitute an admission of any liability by the Special Master or the Company to any third party or otherwise imply, that any such matter, information or item is material or creates a measure for materiality for the purposes of the Agreement.  The disclosure of any Contract will be deemed modified by any subsequent amendments thereto.

In no event shall the listing of any matter in this Disclosure Schedule be deemed or interpreted to expand the scope of the representations, warranties and/or covenants relating to the Special Master or the Company that are set forth in the Agreement.

Headings have been inserted herein for convenience of reference only and are not in lieu of their respective definitions in the Agreement, and will not affect the meaning or interpretation of this Disclosure Schedule. All information and disclosures contained herein are made as of the date of the Agreement and their accuracy is confirmed only as of that date and not at any time thereafter, except as otherwise provided in the Agreement.

2

**Section 1.1(d)**

**Permitted Liens**

1.  Liens on metals and the right to receive metals arising out of any transaction in the Ordinary Course relating to the sale and/or use of precious metals or other catalyst necessary or useful for the operation of refinery assets of the Acquired Companies in the Ordinary Course; provided that such Liens do not encumber assets other than the catalyst and the related metals and the proceeds of the foregoing.

2.  Liens on equipment of the Acquired Companies granted in the Ordinary Course.

3.  Liens securing the obligations under the Indenture, dated as of February 11, 2021, among CITGO Petroleum Corporation, as Issuer, the Guarantors party thereto and Argent Institutional Trust Company (as successor to TMI Trust Company), as Trustee (as supplemented by the First Supplemental Indenture, dated as of November 30, 2023, among CITGO Petroleum Corporation, as Issuer, the Guarantors party thereto and Argent Institutional Trust Company (as successor to TMI Trust Company), as Trustee) ("2021 Indenture").

4.  Liens securing the obligations under the Indenture, dated as of September 20, 2023 among CITGO Petroleum Corporation, as Issuer, the Guarantors party thereto and Argent Institutional Trust Company, as Trustee (as supplemented by the First Supplemental Indenture, dated as of November 30, 2023 among CITGO Petroleum Corporation, as Issuer, the Guarantors party thereto and Argent Institutional Trust Company, as Trustee) ("2023 Indenture").

5.  Liens securing the obligations under the Loan Agreement by and between Gulf Coast Industrial Development Authority, as Issuer, and CITGO Petroleum Corporation, dated as of April 1, 1998 ("1998 Loan Agreement").

6.  Liens securing the obligations under the Loan Agreement between Illinois Development Finance Authority, as Issuer, and CITGO Petroleum Corporation, dated as of June 1, 2002 ("2002 Loan Agreement").

7.  Liens securing the obligations under the Receivables Purchase Agreement, dated as of December 18, 2020, among CITGO AR2008 Funding Company, LLC, as the Seller, CITGO Petroleum Corporation, as the Servicer, the various purchasers and purchaser agents from time to time party thereto, and Barclays Bank PLC, as Program Administrator (as amended by that certain Amendment No. 1 to Receivables Purchase Agreement, dated as of September 30, 2021, that certain Amendment No. 2 dated as of September 20, 2022, that certain Amendment No. 3 dated as of April 15, 2024 and that certain Amendment No. 4, dated as of September 5, 2024 (the "Receivables Purchase Agreement").

8.  Liens securing the obligations under the Purchase and Sale Agreement, dated as of December 18, 2022, among CITGO AR2008 Funding Company, LLC, as Purchaser, and

3

CITGO Petroleum Corporation, as Seller (as amended by that certain Amendment No. 1 to Purchase and Sale Agreement, dated as of September 20, 2022 and that certain Amendment No. 2 to Purchase and Sale Agreement, dated as of April 15, 2024, the "Purchase and Sale Agreement").

9. Pledges or deposits in the ordinary course of business in connection with (i) workers' compensation, unemployment insurance and other social security legislation, other than any Lien imposed by ERISA, and (ii) public utility services provided to the Acquired Companies.

10. Deposits to secure the performance of bids, trade contracts and leases (other than Indebtedness), and leases, statutory obligations, surety and appeal bonds, performance bonds and other obligations of a like nature, in each case, incurred in the Ordinary Course.

11. Liens (i) of a collecting bank arising under Section 4-210 of the Uniform Commercial Code on items in the course of collection, and (ii) in favor of a banking institution arising as a matter of law encumbering deposits (including the right of setoff) that are customary in the banking industry.

12. Liens securing the obligations under the Master Reimbursement Agreement, dated as of December 6, 2024, between CITGO Petroleum Corporation and Barclays Bank PLC, as the Bank (the "Master Reimbursement Agreement"), not to exceed an aggregate face amount of $200.0 million at any one time.

4

## **Section 1.1(e)**

### **Procedures Summary**

1. [To be provided under separate cover.]

WEIL:\100591052\5\67816.0003

## Section 1.1(f)

**Specified Debt**



## <u>Section 4.1</u>

### Corporate Existence; Title to Shares

**(a)**

    1.  None.

**(b)**

    1.  None.

7

**<u>Section 4.2</u>**

**Governmental Authorization**

1. All notifications and information required to be filed or supplied pursuant to the HSR Act.

WEIL:\100591052\5\67816.0003

## Section 4.3

### Non-Contravention

1. Collectively, the "Specified D&O Agreements"

   a. 

9



10



WEIL:\100591052\5\67816.0003



12



13

WEIL:\100591052\5\67816.0003



14



WEIL:\100591052\5\67816.0003



16



WEIL:\100591052\5\67816.0003



18



19



WEIL:\100591052\5\67816.0003



21



WEIL:\100591052\5\67816.0003



23

WEIL:\100591052\5\67816.0003



24

## Section 4.4

### Capitalization

**(a)**

    1.  None.

**(b)**

    1.  None.

WEIL:\100591052\5\67816.0003

## Section 4.5

## Subsidiaries; Non-Controlled Entities

**(a)**

| Entity | Jurisdiction | Authorized Equity Interests | Outstanding Equity Interests |
|---|---|---|---|



27



**(b)**



**(c)**

1. None.

**(d)**

1. Items listed on Section 1.1(d) of the Company Disclosure Schedule are incorporated by reference.

28

2. 

| Pledgor(s) | Pledged Equity | % Owned / Type of Interest | Certificate No. |
|---|---|---|---|
| | | | |

WEIL:\100591052\5\67816.0003

## <u>Section 4.6</u>

### Financial Statements

**(a)**

    1.  See attached.

**(b)**

    1.  None.

WEIL:\100591052\5\67816.0003

## Section 4.7

### Absence of Certain Changes

**(a)**

    1.  ███████████████████████████████████

**(b)**

    1.  None.

**(c)**

    1.  None.

WEIL:\100591052\5\67816.0003

<u>**Section 4.8**</u>

**No Undisclosed Material Liabilities**

**(a)**

    1.  None.

**(b)**

    1.  None.

**(c)**

    1.  None.

**(d)**

    1.  None.

**(e)**

    1.  None.

WEIL:\100591052\5\67816.0003

## Section 4.9

**Legal Proceedings**

1. See Exhibit 4.9 attached hereto. For the avoidance of doubt, nothing in Exhibit 4.9 will be deemed to broaden the scope of the representations and warranties included in Article IV of the Agreement and no Person makes any representations or warranties with respect to any detail provided beyond the scope of such representations and warranties.[2]

2. Items listed in Sections 4.12 and 4.14 of the Company Disclosure Schedules are incorporated herein by reference. To the extent other matters described, listed or contained within the Company Disclosures Schedules are "Legal Proceedings" they are incorporated as if set forth fully herein.

---

[2] **Note to Draft**: To include all unresolved matters listed on the Material Litigation and Claims Tracker

33

## Section 4.10

## Taxes

**(a)**

1. None.

**(b)**

1. None.

**(c)**

| COMPANY | STATE | TAX TYPE 1 | TAX TYPE 2 | TAX PERIODS AUDITED | STATUTE OF LIMITATIONS WAIVER |
|---------|-------|-----------|-----------|---------------------|-------------------------------|

34



**(d)**

| COMPANY | STATE | TAX TYPE 1 | TAX TYPE 2 | TAX PERIODS AUDITED | STATUTE OF LIMITATIONS WAIVER |
|---------|-------|------------|------------|---------------------|-------------------------------|

35



**(e)**

1. 

**(f)**

1. None.

**(g)**

1. None.

**(h)**

1. None.

**(i)**

1. None.

WEIL:\100591052\5\67816.0003

**<u>Section 4.11</u>**

**Company Benefit Plans; Employment**

**(a)**



**Health and Welfare**



38



WEIL:\100591052\5\67816.0003



**(b)**

    1.  None.

**(c)**

**(d)**

    1.  None.

**(e)**

(iii)

(iv)

**(f)**

40

1. None.

**(g)**



**(i)**

1. None.

**(j)**

(i), (iii)



(ii)

41

(iv)



With respect to the last sentence of <u>Section 4.11(j)</u>:

1.  

**(k)**

   1.  None.

**(l)**

   1.  

**(m)**

   1.  None.

**(n)**





WEIL:\100591052\5\67816.0003



44



**(o)**

    1.  None.

**(p)**

    1.  None.

**(q)**

    1.  None.

**(r)**

    1.  None.

**(s)**

    1.  None.

(t)

    1.  None.

WEIL:\100591052\5\67816.0003

**Section 4.12**

**Compliance with Laws; Permits**

**(a)**

1. Items 1, 2, and 4 listed on <u>Section 4.14</u> of the Company Disclosure Schedules and Item 1 listed on <u>Section 4.9</u> of the Company Disclosure Schedules are incorporated herein by reference.

2. 

WEIL:\100591052\5\67816.0003



25.

WEIL:\100591052\5\67816.0003



**(b)**

1. Items 1, 2, and 4 listed on <u>Section 4.14</u> and Item 1 listed on <u>Section 4.9</u> of the Company Disclosure Schedules are incorporated herein by reference.

2.

48

## Section 4.13

### Regulatory Matters

**(a)**

1. Items listed on <u>Section 4.9</u> of the Company Disclosure Schedules are incorporated herein by reference.

**(b)**

(ii)

1. 

2. Items listed on <u>Section 4.9</u> of the Company Disclosure Schedules are incorporated herein by reference.

**(c)**

1. Items listed on <u>Section 4.9</u> of the Company Disclosure Schedules are incorporated herein by reference.

2.

49

WEIL:\100591052\5\67816.0003

## Section 4.14

### Environmental Matters

1. See Exhibit 4.14A attached hereto.[3]

2. See Exhibit 4.14B attached hereto.[4]

3. Item 1 listed on Section 4.9 of the Company Disclosure Schedules is incorporated herein by reference. Items 2-27 listed on Section 4.12(a) and Item 2 listed on Section 4.12(b) of the Company Disclosure Schedules are incorporated herein by reference.

4. **Updates since the SLR Report**:



---

[3] **Note to Draft**: the SLR Environmental, Health and Safety Due Diligence Assessment will be attached as an exhibit (VDR #1.4.18.1).

[4] **Note to Draft**: the current ECL report (VDR #1.4.13.57) will be attached as an exhibit.

WEIL:\100591052\5\67816.0003



52



53

## Section 4.15

### Title to Properties

1.  None.

WEIL:\100591052\5\67816.0003

**<u>Section 4.16</u>**

**Material Contracts**

**(a)**

**(i)**

(A)





WEIL:\100591052\5\67816.0003



57

WEIL:\100591052\5\67816.0003



WEIL:\100591052\5\67816.0003



WEIL:\100591052\5\67816.0003



**(iii)**

WEIL:\100591052\5\67816.0003



**(iv)**

WEIL:\100591052\5\67816.0003



---

[5] **Note to Draft**: the Master Settlement Agreement Tracker (VDR # 1.5.1.29) will be attached as an exhibit.

WEIL:\100591052\5\67816.0003



63



64



WEIL:\100591052\5\67816.0003



66



WEIL:\100591052\5\67816.0003



68



WEIL:\100591052\5\67816.0003



WEIL:\100591052\5\67816.0003



71



WEIL:\100591052\5\67816.0003



73



74



75



76



77



78



79



*Lubricants:*



WEIL:\100591052\5\67816.0003



WEIL:\100591052\5\67816.0003



WEIL:\100591052\5\67816.0003



*Crude Supply & Trading:*

WEIL:\100591052\5\67816.0003



WEIL:\100591052\5\67816.0003



WEIL:\100591052\5\67816.0003



WEIL:\100591052\5\67816.0003



88



89



WEIL:\100591052\5\67816.0003



91



92



93



WEIL:\100591052\5\67816.0003



WEIL:\100591052\5\67816.0003



WEIL:\100591052\5\67816.0003



97



98



WEIL:\100591052\5\67816.0003



100



101



102



WEIL:\100591052\5\67816.0003



104



105



106



107



108



109



110



WEIL:\100591052\5\67816.0003



WEIL:\100591052\5\67816.0003



WEIL:\100591052\5\67816.0003



WEIL:\100591052\5\67816.0003



115



116



117



118



119



WEIL:\100591052\5\67816.0003



121



WEIL:\100591052\5\67816.0003



WEIL:\100591052\5\67816.0003



124

WEIL:\100591052\5\67816.0003

WEIL:\100591052\5\67816.0003

**Section 4.17**

**Intellectual Property and Data Privacy**

**[(a)**

**(i)**

| Country | Serial No. | Filing Date | Patent No. | Issue Date | Title | Owner |
|---------|-----------|-------------|------------|------------|-------|-------|
|         |           |             |            |            |       |       |

**(ii)**

1.  See Exhibit 4.17(a)(ii) attached hereto.[8]

**(iii)**

| Domain Name | Account Holder |
|-------------|----------------|
|             |                |

---

[8] **Note to Draft**: The CITGO Trademark Status Report will be attached as an exhibit (VDR #2.1.6.3.9).

WEIL:\100591052\5\67816.0003



WEIL:\100591052\5\67816.0003



128



129





WEIL:\100591052\5\67816.0003



132



133





135

WEIL:\100591052\5\67816.0003



136

WEIL:\100591052\5\67816.0003



**(iv)**

| Registration No. | Registration Date | Title | Owner |
|---|---|---|---|



**(b)**

    1.  None.

**(c)**

    **1.**  None.

**(d)**

    1.  None.

**(e)**

    1.  

WEIL:\100591052\5\67816.0003



**(f)**

(i)

(ii)

(iii)

**(g)**



**(h)**

WEIL:\100591052\5\67816.0003

**<u>Section 4.18</u>**

**Brokers; Financial Advisor**

1.  None.

WEIL:\100591052\5\67816.0003

**Section 4.19**

**Real Property**

**(a)**



142



143

WEIL:\100591052\5\67816.0003



144



**(b)**

| Refineries | Physical Addresses |
|------------|--------------------|

| Terminals | Physical Addresses |
|---|---|

WEIL:\100591052\5\67816.0003



| Lubricants | Physical Addresses |
|---|---|

| Miscellaneous | Physical Addresses |
|---|---|

WEIL:\100591052\5\67816.0003

**(c)**

| Jointly Owned Property | Physical Addresses | Ownership Structure | Acquired Company's Ownership Percentage |
|---|---|---|---|



**(d)**

1.  None

**(e)**

1.  None.

**(f)**

1.  None.

**(g)**

1.  None.

**(h)**

1.  None.

148

**Section 4.20**

**Affiliate Transactions**



149

## Section 4.21

### Insurance

1. See attached.

WEIL:\100591052\5\67816.0003

| Insured | Coverage Group | Coverage | Policy Effective | Policy Expiration | Insurer Group | Insurer Company | Policy # |
|---------|----------------|----------|------------------|-------------------|---------------|-----------------|----------|

WEIL:\100591052\5\67816.0003



152

WEIL:\100591052\5\67816.0003



153

WEIL:\100591052\5\67816.0003



154

WEIL:\100591052\5\67816.0003



155

WEIL:\100591052\5\67816.0003



156

157

WEIL:\100591052\5\67816.0003



158

WEIL:\100591052\5\67816.0003



159

WEIL:\100591052\5\67816.0003



160



161

WEIL:\100591052\5\67816.0003



162



WEIL:\100591052\5\67816.0003



164



WEIL:\100591052\5\67816.0003

166

WEIL:\100591052\5\67816.0003



167

WEIL:\100591052\5\67816.0003



168



169

WEIL:\100591052\5\67816.0003



170



171

WEIL:\100591052\5\67816.0003



172

WEIL:\100591052\5\67816.0003



173

WEIL:\100591052\5\67816.0003



174



175



176



177

WEIL:\100591052\5\67816.0003



178



179



WEIL:\100591052\5\67816.0003



181

WEIL:\100591052\5\67816.0003



182

WEIL:\100591052\5\67816.0003



183

**<u>Section 6.1</u>**

**Conduct of the Business Pending the Closing**

**(a)**

    1.  None.

**(b)**

**(i)**

    1.

**(ii)**

    1.

**(v)**

(A) – (C)



184



(x)

WEIL:\100591052\5\67816.0003



WEIL:\100591052\5\67816.0003

## Section 6.6(a)

**Indemnification, Exculpation and Insurance**

1. The Indemnification Agreements.

WEIL:\100591052\5\67816.0003

### Section 7.1

**Conditions Precedent to the Obligations of the Parties**

1.  Approval pursuant to the HSR Act.

WEIL:\100591052\5\67816.0003

**B-6**

Execution Version

**BUYER DISCLOSURE SCHEDULES**

**TO THE**

**STOCK PURCHASE AGREEMENT**

by and among

DALINAR ENERGY CORPORATION,

as the Buyer,

and

ROBERT B. PINCUS,

solely in his capacity as the Special Master for the United States District Court for the District of
Delaware

———————————

Dated as of June 25, 2025

———————————

## TABLE OF CONTENTS

Section 1.1(a)  Equity Financing Sources ..........................................................................2

Section 1.1(b)  Knowledge of the Buyer ...........................................................................3

Section 5.1  Corporate Existence and Power .....................................................................4

Section 5.2  Corporate Authorization .................................................................................5

Section 5.3  Governmental Authorization ..........................................................................6

Section 5.4  Non-Contravention .........................................................................................7

Section 5.5  Litigation ........................................................................................................8

Section 5.6  Regulatory Matters .........................................................................................9

Section 5.7  Financing ........................................................................................................9

Section 5.8  Solvency .......................................................................................................11

Section 5.9  Purported Equity Pledge ..............................................................................11

Section 5.10  Claim Obligations ......................................................................................13

Section 5.11  Closing Consideration ................................................................................13

Section 5.12  No Additional Representations ...................................................................14

WEIL:\100340122\5\67816.0003

## BUYER DISCLOSURE SCHEDULES

These Buyer Disclosure Schedules (these "Disclosure Schedules") are being delivered pursuant to and form part of that certain Stock Purchase Agreement (the "Agreement"), dated as of June 25, 2025 by and among Dalinar Energy Corporation, a Delaware corporation (the "Buyer"), Robert B. Pincus, solely in his capacity as special master (the "Special Master" and, together with the Buyer, the "Parties" and each a "Party") for the Honorable Leonard P. Stark, United States District Court for the District of Delaware (the "Court"). Capitalized terms used but not defined herein shall have the meanings ascribed to such terms in the Agreement. The representations and warranties set forth in Article V the Agreement are made and given subject to these Disclosure Schedules.

These Disclosure Schedules are being provided under an order of the Court in the Specified Litigation pursuant to the Sale Procedures Order. The Transactions are being compelled by the Court. Neither the Bolivarian Republic of Venezuela, nor its subsidiary entities, PDVSA or PDV Holding, Inc. (the "Company"), have approved or endorsed the Transactions as of the date of this Agreement.

The disclosure of any matter in any section of the Buyer Disclosure Schedules shall be deemed to be an adequate response and disclosure of such facts or circumstances with respect to all representations or warranties calling for disclosures of such information, if it is reasonably apparent from a disclosure item or the documentation referenced that another disclosure section is also applicable. The disclosure of any matter or item in any schedule shall not be deemed to constitute an acknowledgement that any such matter is required to be disclosed. The inclusion of any matter, information or item in any section of this Disclosure Schedule shall not be deemed to constitute an admission of any liability by the Buyer to any third party or otherwise imply, that any such matter, information or item is material or creates a measure for materiality for the purposes of the Agreement.

The references to any instrument, report or other document shall be deemed to include any and all exhibits, schedules, annexes and other attachments to such document (but shall not include any amendment, modification or supplement unless specifically identified and listed).

In no event shall the listing of any matter in these Disclosure Schedules be deemed or interpreted to expand the scope of the representations, warranties and/or covenants relating to the Buyer that are set forth in the Agreement.

Headings have been inserted herein for convenience of reference only and are not in lieu of their respective definitions in the Agreement, and will not affect the meaning or interpretation of these Disclosure Schedules. All information and disclosures contained herein are made as of the date of the Agreement and their accuracy is confirmed only as of that date and not at any time thereafter, except as otherwise provided in the Agreement.

## Section 1.1(a)

**Equity Financing Sources**

1. The Record Holders.

## **Section 1.1(b)**

### **Knowledge of the Buyer**



## Section 5.1

**Corporate Existence and Power**

1. None.

**<u>Section 5.2</u>**

**Corporate Authorization**

1.  None.

### Section 5.3

**Governmental Authorization**

1. To the extent required, Buyer will make all necessary filings with any Governmental Body, including, without limitation, filings required by the Committee on Foreign Investment in the United States (CFIUS), if applicable.

## Section 5.4

### Non-Contravention

1. None.

**<u>Section 5.5</u>**

**Litigation**

1.  None.

## **Section 5.6**

### **Regulatory Matters**

(a)

    1.  None.

(b)

    1.  None.

(c)

    1.  None.

(d)

**<u>Section 5.7</u>**

**Financing**

(a)

    1.  None.

(b)

    1.  None.

(c)

    1.  None.

(d)

    1.  None.

(e)

    1.  None.

**Section 5.8**

**Solvency**

1. None

## Section 5.9

## Purported Equity Pledge

1. None.

**Section 5.10**

**Claim Obligations**

1.  $3,398,145,180.63

## Section 5.11

### Closing Consideration

1. None

## **Section 5.12**

### **No Additional Representations**

(a)

    1.  None.

(b)

    1.  None.

**<u>Exhibit C</u>**

**Publication Affidavits**



**VERIFICATION OF PUBLICATION**

**COMMONWEALTH OF VIRGINIA**
**COUNTY OF FAIRFAX**

_____

Being duly sworn, Vanessa Salvo says that she is the principal clerk of USA TODAY, and is duly authorized by USA TODAY to make this affidavit, and is fully acquainted with the facts stated herein: on **Friday, January 12, 2024 and Friday, January 19, 2024**, the following legal advertisement – **CRYSTALLEX INTERNATIONAL CORPORATION** was published in the national edition of **USA TODAY.**

_____
*Vanessa Salvo*
Principal Clerk of USA TODAY
January 19, 2024

**AFFIDAVIT**

**STATE OF NEW JERSEY**                )
                                                           ) ss:
**CITY OF MONMOUTH JUNCTION, in the COUNTY OF MIDDLESEX )**

I, Ian Martin, being duly sworn, depose and say that I am the Advertising Clerk of the Publisher

of THE WALL STREET JOURNAL, a daily national newspaper of general circulation throughout

 the United States, and that the notice attached to this Affidavit has been regularly

published in THE WALL STREET JOURNAL for National distribution for

 2   insertion(s) on the following date(s):

JAN-12-2024,JAN-19-2024;

ADVERTISER: CITGO Holding, Inc.;

and that the foregoing statements are true and correct to the best of my knowledge.

Sworn to before me this
19   day of   January      2024

_____
Notary Public

Keith Oechsner
NOTARY PUBLIC
State of New Jersey
ID # 50106528
My Commission Expires
June 10, 2024

# INDEPENDENT NEWSMEDIA INC. USA

110 Galaxy Drive • Dover, DE • 19901 • 1-800-282-8586

**State of Delaware:**

**County of Kent:**

Before me, a Notary Public, for the County and State aforesaid. G. Konrad La Prade, known to me to be such, who being sworn according to law deposed and says that he is the Publisher of **Delaware State News,** a daily newspaper published at
Dover, County of Kent, and State of Delaware,and that the notice, a copy of which is hereto attached, as published in the **Delaware State News** in its issue of 01/12/24, 01/19/24.

Publisher
Independent Newsmedia Inc. USA

Sworn to and subscribed before me this 19th Day of January, A.D., 2024



_____
Notary Public



**LocaliQ**

DELAWARE          PO Box 631699 Cincinnati, OH 45263-1699

GANNETT

## PROOF OF PUBLICATION

Gus Egloff
Miller Advertising - Legals
909 3Rd AVE
15th Floor
New York NY 10022-4731


STATE OF DELAWARE, COUNTY OF NEW CASTLE

The Wilmington News Journal is a daily newspaper of general circulation, printed and published in the State of Delaware; that the publication, a copy of which is attached hereto, was published in the said newspaper in the issues dated:

01/12/2024, 01/19/2024


Sworn to and subscribed before on 01/19/2024


Legal Clerk

Notary, State of WI, County of Brown

My commision expires

Publication Cost:
Order No:          9725389          # of Copies:
Customer No:       901766           1
PO #:              R1090010

## THIS IS NOT AN INVOICE!

*Please do not use this form for payment remittance.*


VICKY FELTY
Notary Public
State of Wisconsin



**VERIFICATION OF PUBLICATION**

**COMMONWEALTH OF VIRGINIA**
**COUNTY OF FAIRFAX**

_____

Being duly sworn, Vanessa Salvo says that she is the principal clerk of USA TODAY, and is duly authorized by USA TODAY to make this affidavit, and is fully acquainted with the facts stated herein: on **Monday, June 3, 2024 and Monday, June 10, 2024**, the following legal advertisement – **CRYSTALLEX INTERNATIONAL CORPORATION** was published in the national edition of **USA TODAY.**

_Vanessa Salvo_
_____
Principal Clerk of USA TODAY
June 10, 2024

## AFFIDAVIT

**STATE OF NEW JERSEY** )
                                               ) ss:
**CITY OF MONMOUTH JUNCTION, in the COUNTY OF MIDDLESEX )**

I, Ian Martin, being duly sworn, depose and say that I am the Advertising Clerk of the Publisher

of THE WALL STREET JOURNAL, a daily national newspaper of general circulation throughout

the United States, and that the notice attached to this Affidavit has been regularly

published in THE WALL STREET JOURNAL for National distribution for

2   insertion(s) on the following date(s):

JUN-01-2024,JUN-08-2024;

ADVERTISER: CITGO Holding, Inc.;

and that the foregoing statements are true and correct to the best of my knowledge.

Sworn to before me this
10   day of   June      2024

_____
Notary Public

Keith Oechsner
NOTARY PUBLIC
State of New Jersey
ID # 50106528
My Commission Expires
June 10, 2024

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

---

CRYSTALLEX INTERNATIONAL
CORPORATION,

        Plaintiff,

        v.

BOLIVARIAN REPUBLIC
OF VENEZUELA,

        Defendant.

: Misc. No. 17-151-LPS

---

### AFFIDAVIT OF ADAM B. LEVIN REGARDING
### PUBLICATION OF SALE NOTICE

I, Adam B. Levin, being duly sworn, hereby certify that (a) I am Senior Account Executive at Miller Advertising Agency, Inc. and (b) I caused the Notice titled *"NOTICE OF SALE, BIDDING PROCEDURES, AND SALE HEARING"* to be published in *La Razón,* a Spanish-language weekly newspaper based in Caracas, Venezuela, in the issue dated June 9-15, 2024.

A copy of the newspaper tearsheet is attached.

X _____
(Signature)

Sr. Acct. Exec.
(Title)

Sworn to before me this: 11th day of June , 2024

_____
Notary Public

PETER EGLOFF
OFFICIAL SEAL
Notary Public, State of Illinois
My Commission Expires
December 02, 2026

# INDEPENDENT NEWSMEDIA INC. USA

110 Galaxy Drive • Dover, DE • 19901 • 1-800-282-8586

**State of Delaware:**

**County of Kent:**

Before me, a Notary Public, for the County and State aforesaid. G. Konrad La Prade, known to me to be such, who being sworn according to law deposed and says that he is the Publisher of **Delaware State News,** a daily newspaper published at
Dover, County of Kent, and State of Delaware,and that the notice, a copy of which is hereto attached, as published in the **Delaware State News** in its issue of 06/02/24, 06/12/24.

Publisher
Independent Newsmedia Inc. USA

Sworn to and subscribed before me this 12th Day of June, A.D., 2024



_____
Notary Public



**※ LocaliQ**
DELAWARE
GANNETT

PO Box 631699 Cincinnati, OH 45263-1699

## AFFIDAVIT OF PUBLICATION

STATE OF DELAWARE, COUNTY OF NEW CASTLE

The Wilmington News Journal is a daily newspaper of general circulation, printed and published in the State of Delaware; that the publication, a copy of which is attached hereto, was published in the said newspaper in the issues dated:

06/04/2024, 06/11/2024

Sworn to and subscribed before on 06/11/2024

Legal Clerk

Notary, State of WI, County of Brown

My commission expires

Order No:        10231691        # of Copies:
Customer No:     901766         0
PO #:            R5300018

THIS IS NOT AN INVOICE!

*Please do not use this form for payment remittance.*

VICKY FELTY
Notary Public
State of Wisconsin



**VERIFICATION OF PUBLICATION**

**STATE OF NEW YORK**
**COUNTY OF NEW YORK**

_____

Being duly sworn, Vanessa Salvo says that she is the principal clerk of USA TODAY, and is duly authorized by USA TODAY to make this affidavit, and is fully acquainted with the facts stated herein: on **Tuesday, February 25, 2025 and Tuesday, March 4, 2025**, the following legal advertisement – **CRYSTALLEX INTERNATIONAL CORPORATION** was published in the national edition of **USA TODAY.**

*Vanessa Salvo*
_____
Principal Clerk of USA TODAY
March 4, 2025

**AFFIDAVIT**

**STATE OF NEW JERSEY**         )
                                ) ss:

**CITY OF MONMOUTH JUNCTION, in the COUNTY OF MIDDLESEX )**

I, Wayne Sidor, being duly sworn, depose and say that I am the Advertising Clerk of

the Publisher of THE WALL STREET JOURNAL, a daily national newspaper of

general circulation throughout the United States, and that the notice attached to

this Affidavit has been regularly published in THE WALL STREET JOURNAL for

National distribution for

1 insertion(s) on the following date(s): 02/24/2025 and 03/03/2025

ADVERTISER: CITGO Holding, Inc.

and that the foregoing statements are true and correct to the best of my knowledge.

_Wayne Sidor_

Sworn to
before me this
10th day of
March 2025

Notary Public



## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

---

CRYSTALLEX INTERNATIONAL
CORPORATION,

        Plaintiff,

      v.

BOLIVARIAN REPUBLIC
OF VENEZUELA,

        Defendant.

:
:
:
:
:
:
:      Misc. No. 17-151-LPS
:
:
:
:
:

---

### AFFIDAVIT OF ADAM B. LEVIN REGARDING
### PUBLICATION OF SALE NOTICE

I, Adam B. Levin, being duly sworn, hereby certify that (a) I am Senior Account Executive at Miller Advertising Agency, Inc. and (b) I caused the Notice titled *"NOTICE OF SALE, BIDDING PROCEDURES, AND SALE HEARING"* to be published in *La Razón,* a Spanish-language weekly newspaper based in Caracas, Venezuela, in the issues dated March 2, 2025 & March 9, 2025.

A copy of the newspaper tearsheet is attached.

X _____
(Signature)

_____
(Title)

Sworn to before me this: __10th__ day of __March__ , 2025

_____
Notary Public



PETER EGLOFF
OFFICIAL SEAL
Notary Public, State of Illinois
My Commission Expires
December 02, 2026



Arizona · Delaware · Florida · Maryland
Delaware Printing Company · Valley Newspapers
INDEPENDENT
NEWSMEDIA
Celebrating & Connecting Our Communities

# Proof of Publication
3/5/2025

**State of Delaware:**

**County of Kent:**

Before me, a Notary Public, for the County and State aforesaid. Tonda L. Parks, known to me to be such, who being sworn according to law deposed and says that she is the Associate Publisher of **Daily State News**, a daily newspaper published at Dover, County of Kent, and State of Delaware, and that the notice, a copy of which is hereto attached, as published in the **Daily State News** in its issue(s) of
BaytoBayNews.com: 2/26/2025, 3/5/2025
DSN: 2/26/2025, 3/5/2025 .

_____
Tonda L. Parks
Associate Publisher
Independent Newsmedia Inc. USA

Sworn to and subscribed before me this 3/5/2025

Roxanne Brooks

_____
Notary Public this date of 3/5/2025

First Issue        2/26/2025
Last Issue         3/5/2025
Publications       BaytoBayNews.com, DSN
Pub Dates          BaytoBayNews.com: 2/26/2025, 3/5/2025
                   DSN: 2/26/2025, 3/5/2025

---

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| CRYSTALLEX INTERNATIONAL CORPORATION, Plaintiff, v. BOLIVARIAN REPUBLIC OF VENEZUELA, Defendant. | : : : : : : : | Misc. No. 17-151-LPS |

**NOTICE OF SALE, BIDDING PROCEDURES, AND SALE HEARING**

**PLEASE TAKE NOTICE OF THE FOLLOWING:**

On January 14, 2021, the United States District Court for the District of Delaware (the "**Court**")[1] issued an opinion and corresponding order setting forth certain contours for the sale of the shares of PDV Holding, Inc. ("**PDVH**" and such shares, the "**PDVH Shares**") owned by Petroleos de Venezuela, S.A. ("**PDVSA**") in connection with the above-captioned proceeding. PDVH is the sole shareholder and direct parent of CITGO Holding, Inc., which in turn is the sole shareholder and direct parent of CITGO Petroleum Corporation. In furtherance of the Court's order, the Court appointed Robert B. Pincus as special master (the "**Special Master**") on April 13, 2021 to assist the Court with the sale of the PDVH Shares. The Special Master is advised by Weil, Gotshal & Manges LLP, as transaction counsel, and Evercore Group L.L.C., as investment banker.

On October 11, 2022, the Court entered an order (Docket No. 481) (the "**Sale Procedures Order**") that (i) approved bidding procedures, substantially in the form attached to the Sale Procedures Order as **Exhibit 1** (the "**Bidding Procedures**"); (ii) authorized and approved the Notice Procedures for the Sale Hearing; and (iii) granted related relief.

On December 31, 2024, the Court entered an order (Docket No. 1517) (the "**Scheduling Order**") that set a revised timeline and procedures for the sale of the PDVH Shares, including (i) setting forth the procedures for approval of (a) Bidder Protections that will be made available to any Stalking Horse approved by the Court, (b) material terms of a Stock Purchase Agreement and, subsequently, a long-form Stock Purchase Agreement, and (c) Evaluation Criteria for Stalking Horse Bids, Base Bids, and Successful Bids; (ii) setting forth procedures for amendments to the Sale Procedures Order and Bidding Procedures; (iii) setting deadlines for the submission of bids, the Special Master's recommendations, and objections thereto; (iv) scheduling a Sale Hearing; and (v) granting related relief.

On January 27, 2025, the Court entered an order (Docket No. 1554) which adopted certain bidder protections and material terms to be included in the Stock Purchase Agreement.

**Assets to be Sold: PDVH Shares**

Interested parties may submit bids for the purchase and sale of some or all of the PDVH Shares in accordance with the terms and conditions set forth in the Bidding Procedures as may be amended pursuant to the Scheduling Order. To avoid any ambiguity, parties may submit bids for less than 100% of the PDVH Shares so long as such bid satisfies the Attached Judgments.

**Important Dates and Deadlines**

• **March 7, 2025.** Deadline for bidders to submit Stalking Horse Bids.
• **March 14, 2025.** Deadline for the Special Master to file selection of Stalking Horse Bid or Base Bid with the Court.
• **Topping Period.** A 30-day Topping Period will begin after the Court rules on any objections to the Special Master's selection of a Stalking Horse Bid or Base Bid, or earlier if no objections are filed.
• **May 16, 2025.** Deadline for the Special Master to submit his Final Recommendation.
• **July 22, 23, and 24, 2025.** Sale Hearing to be held in Wilmington, Delaware on all or some of these dates.

**Additional Information**

Any party interested in submitting a bid should contact the Special Master's investment banker, Evercore at Project-Horizon@evercore.com, as soon as possible.

The modified Sale Procedures Order, modified Bidding Procedures, including Bidder Protections and Evaluation Criteria, and a Stock Purchase Agreement will be made available as soon as they are finalized and may be requested free of charge by email to the Special Master's counsel, Weil, Gotshal & Manges LLP at Project.Horizon.Weil@weil.com.

**FAILURE TO ABIDE BY THE BIDDING PROCEDURES, THE SALE PROCEDURES ORDER, THE SCHEDULING ORDER, OR ANY OTHER ORDER OF THE COURT MAY RESULT IN THE REJECTION OF YOUR BID.**

Dated: March 5, 2025

[1] Capitalized terms used but not defined herein shall have the respective meanings ascribed to such terms in the Sale Procedures Order, the Bidding Procedures, and the Scheduling Order (each, as defined herein), as applicable. Any summary of the Sale Procedures Order, the Bidding Procedures, or the Scheduling Order contained herein is qualified in its entirety by the actual terms and conditions thereof. To the extent that there is any conflict between any such summary and such actual terms and conditions, the actual terms and conditions shall control.



**LocaliQ**

DELAWARE

GANNETT

PO Box 631699 Cincinnati, OH 45263-1699

## AFFIDAVIT OF PUBLICATION

STATE OF DELAWARE, COUNTY OF NEW CASTLE

The Wilmington News Journal is a daily newspaper of general circulation, printed and published in the State of Delaware; that the publication, a copy of which is attached hereto, was published in the said newspaper in the issues dated:

02/25/2025, 03/04/2025

Sworn to and subscribed before on 03/04/2025

Legal Clerk

Notary, State of WI, County of Brown

My commission expires

Order No:          11060895          # of Copies:
Customer No:       901766            1
PO #:              R2200014

THIS IS NOT AN INVOICE!

*Please do not use this form for payment remittance.*

VICKY FELTY
Notary Public
State of Wisconsin



**VERIFICATION OF PUBLICATION**

**STATE OF NEW YORK**
**COUNTY OF NEW YORK**

_____

Being duly sworn, Vanessa Salvo says that she is the principal clerk of USA TODAY, and is duly authorized by USA TODAY to make this affidavit, and is fully acquainted with the facts stated herein: on **Monday, May 5 and Monday, May 12, 2025**, the following legal advertisement – **CRYSTALLEX INTERNATIONAL CORPORATION** was published in the national edition of **USA TODAY.**

*Vanessa Salvo*
_____
Principal Clerk of USA TODAY
May 12, 2025

# AFFIDAVIT

**STATE OF NEW JERSEY )**
**) ss:**
**CITY OF MONMOUTH JUNCTION, in the COUNTY OF MIDDLESEX )**

I, Keith Oechsner, being duly sworn, depose and say that I am the Advertising Clerk of the Publisher of THE WALL STREET JOURNAL, a daily national newspaper of general circulation throughout the United States, and that the notice attached to this Affidavit has been regularly published in THE WALL STREET JOURNAL for National distribution for

2 insertion(s) on the following date(s):

MAY-03-2025,MAY-10-2025;

ADVERTISER: CITGO Holding, Inc.;

and that the foregoing statements are true and correct to the best of my knowledge.

Sworn to before me this
12 day of May 2025

Notary Public

IAN C. MARTIN
NOTARY PUBLIC
ID # 50086494
COMMISSION EXPIRES 07/18/2028
STATE OF NEW JERSEY



IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

---

| | |
|---|---|
| CRYSTALLEX INTERNATIONAL CORPORATION, | : |
| Plaintiff, | : |
| v. | : |
| BOLIVARIAN REPUBLIC OF VENEZUELA, | : |
| Defendant. | : |

Misc. No. 17-151-LPS

---

## AFFIDAVIT OF ADAM B. LEVIN REGARDING PUBLICATION OF SALE NOTICE

I, Adam B. Levin, being duly sworn, hereby certify that (a) I am Senior Account Executive at Miller Advertising Agency, Inc. and (b) I caused the Notice titled *"AVISO DE DESIGNACIÓN DE CABALLO DE TROYA, INICIO DEL PERÍODO DE FINALIZACIÓN, AUDIENCIA DE VENTA Y PLAZOS RELACIONADOS"* to be published in *La Razón*, a Spanish-language weekly newspaper based in Caracas, Venezuela, in the issues dated May 4, 2025 & May 11, 2025.

A copy of the newspaper tearsheet is attached.

X _____
(Signature)

_____
Sr. Acct. Exec.
(Title)

Sworn to before me this: 14th day of May, 2025

_____
Notary Public

PETER EGLOFF
OFFICIAL SEAL
Notary Public, State of Illinois
My Commission Expires
December 02, 2026



Arizona · Delaware · Florida · Maryland
Delaware Printing Company · Valley Newspapers

**INDEPENDENT**
N E W S M E D I A
*Celebrating & Connecting Our Communities*

## Proof of Publication
**5/14/2025**

**State of Delaware:**

**County of Kent:**

Before me, a Notary Public, for the County and State aforesaid. Tonda L. Parks, known to me to be such, who being sworn according to law deposed and says that she is the Associate Publisher of **Daily State News**, a daily newspaper published at Dover, County of Kent, and State of Delaware, and that the notice, a copy of which is hereto attached, as published in the **Daily State News** in its issue(s) of

BaytoBayNews.com: 5/7/2025, 5/14/2025
DSN: 5/7/2025, 5/14/2025 .



Tonda L. Parks
Associate Publisher
Independent Newsmedia Inc. USA

Sworn to and subscribed before me this 5/14/2025

*Roxanne Brooks*

Notary Public this date of 5/14/2025

| | |
|---|---|
| Order Number | 22272 |
| Order Date | 5/1/2025 |
| Description | Misc. No. 17-151-LPS |
| Number Issues | 4 |
| Pub Count | 2 |
| First Issue | 5/7/2025 |
| Last Issue | 5/14/2025 |
| Publications | BaytoBayNews.com, DSN |
| Pub Dates | BaytoBayNews.com: 5/7/2025, 5/14/2025 |
| | DSN: 5/7/2025, 5/14/2025 |

---

IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF DELAWARE

CRYSTALLEX INTERNATIONAL CORPORATION,
Plaintiff,
v.
BOLIVARIAN REPUBLIC OF VENEZUELA,
Defendant.

: Misc. No. 17-151-LPS

**NOTICE OF DESIGNATION OF STALKING HORSE, COMMENCEMENT OF TOPPING PERIOD, SALE HEARING AND RELATED DEADLINES**

PLEASE TAKE NOTICE OF THE FOLLOWING:

On January 14, 2021, the United States District Court for the District of Delaware (the "**Court**")[1] issued an opinion and corresponding order setting forth certain contours for the sale of the shares of PDVH Holding, Inc. ("**PDVH**" and such shares, the "**PDVH Shares**") owned by Petróleos de Venezuela, S.A. ("**PDVSA**") in connection with the above-captioned proceeding. PDVH is the sole shareholder and direct parent of CITGO Holding, Inc., which in turn is the sole shareholder and direct parent of CITGO Petroleum Corporation. In furtherance of the Court's order, the Court appointed Robert B. Pincus as special master (the "**Special Master**") on April 13, 2021 to assist the Court with the sale of the PDVH Shares. The Special Master is advised by Weil, Gotshal & Manges LLP, as transaction counsel, and Evercore Group L.L.C., as investment banker.

On October 11, 2022, the Court entered an order (Docket No. 481) (the "**Sale Procedures Order**") (i) approving bidding procedures, substantially in the form attached to the Sale Procedures Order as **Exhibit 1** (the "**Bidding Procedures**"); (ii) authorizing and approving the Notice Procedures for the Sale Hearing; and (iii) granting related relief.

On December 31, 2024, the Court entered an order (Docket No. 1517) (the "**December 31 Order**") that set a revised timeline and procedures for the sale of the PDVH Shares, including (i) setting forth the procedures for approval of (a) Bidder Protections that will be made available to any Stalking Horse approved by the Court, (b) material terms of a Stock Purchase Agreement and subsequently, a long-form Stock Purchase Agreement, and (c) Evaluation Criteria for Stalking Horse Bids, Base Bids, and Successful Bids; (ii) setting forth procedures for amendments to the Sale Procedures Order and Bidding Procedures; (iii) setting deadlines for the submission of bids, the Special Master's recommendations, and objections thereto; (iv) scheduling a Sale Hearing; and (v) granting related relief.

On January 27, 2025, the Court entered an order (Docket No. 1554) adopting certain bidder protections and material terms to be included in the Stock Purchase Agreement.

On April 21, 2025, the Court entered an order (Docket No. 1741) (the "**Stalking Horse Order**") designating Red Tree Investments, LLC as the Stalking Horse and providing additional guidance as to the Court's expectations for the Topping Period, among other things.

On April 25, 2025, the Court entered an order (Docket No. 1745) (the "**Scheduling Order**") that set a timeline, as set forth below, for the completion of the Topping Period and briefing related thereto, among other things.

**Assets to be Sold: PDVH Shares**

Interested parties may submit bids for the purchase and sale of some or all of the PDVH Shares in accordance with the terms and conditions set forth in the Bidding Procedures as may be amended pursuant to the December 31 Order. To avoid any ambiguity, parties may submit bids for less than 100% of the PDVH Shares so long as such bid satisfies the Attached Judgments.

**Important Dates and Deadlines**

- **April 28, 2025.** Launch of the Topping Period.
- **May 28, 2025.** Deadline for bidders to submit topping bids.
- **June 11, 2025.** Deadline for Special Master to submit his Final Recommendation.
- **June 20, 2025.** Deadline for the filing of any objections to the Special Master's Final Recommendation.
- **June 27, 2025.** Deadline for the filing of responses to objections to the Special Master's Final Recommendation.
- **July 3, 2025.** Deadline for the filing of replies regarding any objections to the Special Master's Final Recommendation.
- **July 10, 2025.** Deadline for Special Master to submit joint status report, in coordination with all parties-in-interest, setting forth the parameters of the Sale Hearing.
- **July 17, 2025.** Conclusion of the discovery period.
- **July 22, 2025.** Commencement of Sale Hearing to be held in Wilmington, Delaware.

**Additional Information**

Any party interested in submitting a bid should contact the Special Master's investment banker, Evercore at Project-Horizon@evercore.com, as soon as possible.

The updated Sale Procedures Order, modified Bidding Procedures, including Bidder Protections and Evaluation Criteria, and a Stock Purchase Agreement will be made available as soon as they are finalized and may be requested free of charge by email to the Special Master's counsel, Weil, Gotshal & Manges LLP at Project.Horizon.Weil@weil.com.

**FAILURE TO ABIDE BY THE BIDDING PROCEDURES, THE SALE PROCEDURES ORDER, THE DECEMBER 31 ORDER, THE STALKING HORSE ORDER, THE SCHEDULING ORDER, OR ANY OTHER ORDER OF THE COURT MAY RESULT IN THE REJECTION OF YOUR BID.**

Dated: May 14, 2025

[1] Capitalized terms used but not defined herein shall have the respective meanings ascribed to such terms in the Sale Procedures Order, the Bidding Procedures, the December 31 Order, and the Stalking Horse Order (each, as defined herein), as applicable. Any summary of the Sale Procedures Order, the Bidding Procedures, the December 31 Order, the Stalking Horse Order, or the Scheduling Order contained herein is qualified in its entirety by the actual terms and conditions thereof. To the extent that there is any conflict between any such summary and such actual terms and conditions, the actual terms and conditions shall control.



**LocaliQ**
DELAWARE
GANNETT

PO Box 631699 Cincinnati, OH 45263-1699

## AFFIDAVIT OF PUBLICATION

STATE OF DELAWARE, COUNTY OF NEW CASTLE

The Wilmington News Journal is a daily newspaper of general circulation, printed and published in the State of Delaware; that the publication, a copy of which is attached hereto, was published in the said newspaper in the issues dated:

05/06/2025, 05/13/2025

Sworn to and subscribed before on 05/13/2025

Legal Clerk

Notary, State of WI, County of Brown

My commission expires

Order No:        11286538          # of Copies:
Customer No:     901766            1
PO #:            R5010018

THIS IS NOT AN INVOICE!

*Please do not use this form for payment remittance.*

KAITLYN FELTY
Notary Public
State of Wisconsin

Page 1 of 2

**<u>Exhibit D</u>**

**Summary of Bid Draft SPA Material Terms v. Terms of Stock Purchase Agreement v. Terms of Stalking Horse Agreement**

The following chart contains a summary comparison of the material terms of (i) the draft Stock Purchase Agreement, as approved by the Court in its Memorandum Order on January 27, 2025 (D.I. 1554), Memorandum Order on February 24, 2025 (D.I. 1571), and Memorandum Order on March 4, 2025 (D.I.1583), (ii) the material terms of the Stalking Horse Agreement and (iii) the material terms of the Recommended Bidder Stock Purchase Agreement. The summary set forth below does not contain all of the terms of the Stalking Horse Agreement or the Recommended Bidder Stock Purchase Agreement and should not be used or relied upon as a substitute for the full terms and conditions set forth in the Stalking Horse Agreement and the Recommended Bidder Stock Purchase Agreement. The summary of the Stalking Horse Agreement and the Recommended Bidder Stock Purchase Agreement contained herein is qualified in its entirety by the actual terms and conditions thereof. To the extent that there is any conflict between any such summary and such actual terms and conditions, the actual terms and conditions shall control.

| | **Material Terms in the Special Master's Draft SPA** | **Special Master's Original Proposed Position Regarding Any Changes** | **Summary of Material Terms in Stalking Horse Agreement** | **Summary of Material Terms in Recommended Bidder Stock Purchase Agreement** |
|---|---|---|---|---|
| 1. | **Parties to the Agreement**. PDVH/CITGO and PDVSA/the Republic will not be parties to the SPA (unless PDVH/CITGO or PDVSA/the Republic elects to submit a bid). | **Non-Negotiable.** | Buyer: Red Tree Acquisitions, LLC, a Delaware limited liability company.<br><br>Special Master: Robert B. Pincus, solely in his capacity as special master for the Honorable Leonard P. Stark, United States District Court for the District of Delaware.<br><br>Record Holder (solely with respect to Sections specified in the preamble of the Stalking Horse Agreement): Red Tree Investments, LLC, a Delaware limited liability company. | Buyer: Dalinar Energy Corporation, a Delaware corporation.<br><br>Special Master: Robert B. Pincus, solely in his capacity as special master for the Honorable Leonard P. Stark, United States District Court for the District of Delaware. |
| 2. | **Financing Commitment**. All bids must be fully financed and such financing must be free of contingencies other than the Closing Conditions in the SPA. Any bid including third party financing will need to submit final commitment letters in order to be considered for selection as a Stalking | **Non-Negotiable.** | The obligations of the Buyer under the Stalking Horse Agreement are not subject to any conditions regarding the Buyer's, its Affiliates', or any other Person's ability to obtain financing for the consummation of the transactions contemplated by the Stalking Horse Agreement. | No changes from Stalking Horse Agreement.<br><br>Final commitment letters were signed in connection with the signing of the |

| | Material Terms in the Special Master's Draft SPA | Special Master's Original Proposed Position Regarding Any Changes | Summary of Material Terms in Stalking Horse Agreement | Summary of Material Terms in Recommended Bidder Stock Purchase Agreement |
|---|---|---|---|---|
| | Horse, though at this stage commitment letters need not be actually signed. Any bid including third party financing submitted during the Topping Period will need to deliver final commitment letters signed by such third party financing source prior to the end of the Topping Period in order to be considered for the Special Master's Final Recommendation. The bid selected as the Stalking Horse must also submit final commitment letters signed by the third party financing source by the end of the Topping Period. | | The Stalking Horse delivered final commitment letters signed by third party financing sources prior to the end of the Topping Period. | Recommended Bidder Stock Purchase Agreement. |
| 3. | **Purchase Price and Adjustments**. Purchase price will be a fixed dollar amount for the shares of PDVH (*i.e.*, no enterprise value calculation), typical of a public company M&A transaction. No purchase price adjustments will be accepted. No "lock box", "leakage" or similar constructs will be accepted. Bidders will receive protection through the interim operating covenants that PDVH/CITGO will be operated in the ordinary course of business between signing and closing. | **Non-Negotiable**. | The Purchase Price is not subject to any adjustments other than as set forth below. The Stalking Horse Agreement does not contemplate "lock box", "leakage" or similar constructs.<br><br>Purchase Price is an amount equal to (i) $3,698,985,643.02, plus the aggregate interest accrued on judgments held by the Claimholders (other than Claimholders junior to the Record Holder), (ii) plus the Deposit Amount, (iii) plus the Advanced Transaction Expenses Amount, (iv) plus the Closing Transaction Expenses, (v) plus the Expense Reserve Holdback Amount.<br><br>At the Closing, the Buyer and the Record Holder shall pay (i) the Credit Bid Amount and (ii) an | The Purchase Price is not subject to any adjustments other than as set forth below. The Recommended Bidder Stock Purchase Agreement does not contemplate "lock box", "leakage" or similar constructs.<br><br>Purchase Price is an amount equal to (i) $7,323,145,180.63, plus the aggregate interest accrued on judgments held by the Claimholders (other than Claimholders junior to Gold Reserve), (ii) plus the Deposit Amount, (iii) plus the Advanced Transaction Expenses Amount, (iv) plus the Closing Transaction Expenses, (v) plus the Expense Reserve Holdback Amount, (vi) |

| | Material Terms in the Special Master's Draft SPA | Special Master's Original Proposed Position Regarding Any Changes | Summary of Material Terms in Stalking Horse Agreement | Summary of Material Terms in Recommended Bidder Stock Purchase Agreement |
|---|---|---|---|---|
| | | | aggregate amount of cash equal to the Closing Consideration to the Paying Agent. The Credit Bid Amount shall be paid by means of a credit against all amounts due and owing to the Record Holder (and Third-Party Record Holder) under the Specified Litigation Claims. | plus the Termination Fee, (vii) plus the Debt Payoff Amount.

At the Closing, the Buyer shall pay (or cause to be paid) (i) the Credit Bid Amount and (ii) an aggregate amount of cash equal to the Closing Consideration to the Paying Agent. The Credit Bid Amount shall be paid by means of a credit against all amounts due and owing to Gold Reserve, Koch, Rusoro and Siemens under the Specified Litigation Claims. |
| 4. | **Good Faith Deposit**. The Successful Bidder will be required to make a cash deposit in accordance with the terms prescribed by the specific provisions in the Sales Procedures Order / Bidding Procedures. | **Non-Negotiable**. | On the date of the Sale Order Entry, the Buyer shall deposit into the Escrow Account with the Escrow Agent a sum of $50,000,000 in cash.

Buyer shall forfeit the deposit if the Stalking Horse Agreement is terminated by (i) the Special Master due to a breach by Buyer of the Stalking Horse Agreement or (ii) by the Special Master or Buyer due to (A) Closing not having occurred by the Outside Date or (B) Legal Restraint, to the extent such Legal Restraint was not caused by the Buyer in breach of the Stalking Horse Agreement or related to the Buyer's identity. | No changes from Stalking Horse Agreement. |
| 5. | **Treatment of CITGO Debt**. Provide flexibility to bidders on whether to roll | **Provide Flexibility**. | The Stalking Horse Agreement does not contemplate a payment of "Specified Debt." | The Recommended Bidder Stock Purchase Agreement contemplates payoff of "Specified Debt." |

| | Material Terms in the Special Master's Draft SPA | Special Master's Original Proposed Position Regarding Any Changes | Summary of Material Terms in Stalking Horse Agreement | Summary of Material Terms in Recommended Bidder Stock Purchase Agreement |
|---|---|---|---|---|
| | existing CITGO debt or pay off "Specified Debt." | | | The Special Master is required to "Cause" the Acquired Companies to deliver Payoff Letters. |
| 6. | **Indemnities**.  No indemnities will be provided to buyer.  Bidders should seek R&W or other insurance to cover identified risks and/or factor such risks into their proposed purchase price. | **Non-Negotiable**. | The Stalking Horse Agreement does not contemplate any indemnities to Buyer. | No changes from Stalking Horse Agreement. |
| 7. | **Escrows**.  Any portion of the purchase price being payable to an escrow will be strongly disfavored and have no value attributed to it by the Special Master unless the applicable judgment holder consents to receive the escrow. | **Strongly Disfavored**. | The Stalking Horse Agreement does not contemplate any portion of the purchase price being payable to an escrow. | No changes from Stalking Horse Agreement. |
| 8. | **Earn-Out Payment / Deferred Purchase Price**.  Any "earn-out" or deferred purchase price concepts will be strongly disfavored and have no value attributed to them by the Special Master unless the applicable judgment holder consents to receive the earn-out payment/deferred purchase price. | **Strongly Disfavored**. | The Stalking Horse Agreement does not contemplate any "earn-out" or deferred purchase price concepts. | No changes from Stalking Horse Agreement. |
| 9. | **Representations and Warranties Relating to the Company and the Special Master**. R&Ws will be provided on the basis of the information provided by | **Strongly Disfavored**. Given the extensive negotiation of the | The Stalking Horse Agreement includes non-material changes to the representations and warranties relating to the Company and the | No changes from Stalking Horse Agreement. |

| | **Material Terms in the Special Master's Draft SPA** | **Special Master's Original Proposed Position Regarding Any Changes** | **Summary of Material Terms in Stalking Horse Agreement** | **Summary of Material Terms in Recommended Bidder Stock Purchase Agreement** |
|---|---|---|---|---|
| | certain members of CITGO management as described in the Procedures Summary.<br><br>A suite of representations and warranties and corresponding Company Disclosure Schedules will be prepared based upon the representations and warranties negotiated in connection with the sale process to date, together with certain modifications reflecting input from CITGO management. | R&Ws in connection with the sale process to date and significant historical and anticipated future input from CITGO management, further comments / requests for additional R&Ws will be strongly disfavored. | Special Master included in the Special Master Draft SPA. | |
| 10. | **Interim Operating Covenants**. A suite of IOCs intended to minimize changes to the ordinary course operation of the business will be developed with input from CITGO management. For the avoidance of doubt, no dividends or similar distributions by PDVH/CITGO will be permitted during the interim operating period, other than dividends or similar distributions between or among PDVH and its subsidiaries. | **Strongly Disfavored**. Extensive comments / requests for additional IOCs will be strongly disfavored. | The Stalking Horse Agreement includes non-material changes to the interim operating covenants included in the Special Master Draft SPA. | The Recommended Bidder Stock Purchase Agreement includes limited changes to the interim operating covenants included in the Special Master Draft SPA. Among these limited changes are adding certain limitations on CITGO's ability to refinance debt. |
| 11. | **Regulatory Efforts Standard**. Include a hell-or-high-water regulatory efforts standard. | **Strongly Disfavored**. Given the direct impact on closing certainty of revisions to the | The Stalking Horse Agreement does not amend the hell-or-high-water regulatory efforts standard included in the Special Master Draft SPA.<br><br>Buyer to take the lead and have sole responsibility for the strategy for obtaining authorizations from | The Recommended Bidder Stock Purchase Agreement does not amend the hell-or-high-water regulatory efforts standard included in the Special Master Draft SPA. |

| | Material Terms in the Special Master's Draft SPA | Special Master's Original Proposed Position Regarding Any Changes | Summary of Material Terms in Stalking Horse Agreement | Summary of Material Terms in Recommended Bidder Stock Purchase Agreement |
|---|---|---|---|---|
| | | bidder commitment to obtain regulatory approvals, revisions to this covenant which bring into question the certainty of closing will be strongly disfavored. | any Governmental Body; provided, that Buyer shall consult in advance with the Special Master and in good faith take the Special Master's views into account regarding overall strategic direction and consult with the Special Master prior to taking any material or substantive position in any written statement or document or, as practicable, discussions with any Governmental Body. | Dalinar submitted to the Special Master a "Commitment to Take Certain Regulatory Efforts" executed by Rusoro, Koch, Gold Reserve, and XYQ (who are not direct parties to the Recommended Bidder Stock Purchase Agreement), pursuant to which each of Rusoro, Koch, Gold Reserve, and XYQ make commitments to take (or refrain from taking) certain actions to assist the parties with obtaining regulatory approvals, with third party beneficiary rights for Dalinar, and the Recommended Bidder Stock Purchase Agreement includes a covenant obligating Dalinar to enforce its rights under the Regulatory Efforts Covenant. |
| 12. | **No Solicitation**. | Subject to Court order regarding bidder protections. | The Stalking Horse Agreement does not materially amend the no solicitation provisions of the Special Master Draft SPA. The Special Master shall have a good faith obligation to ensure that the Stalking Horse Agreement is not terminated as a direct result of any order in the PDVSA 2020 Bondholder's declaratory judgment action. | The Recommended Bidder Stock Purchase Agreement does not materially amend the no solicitation provisions of the Special Master Draft SPA. The Recommended Bidder Stock Purchase Agreement contains limited mechanical updates to remove the base bid and stalking horse provisions and reflect that the topping period has already passed. |
| 13. | **Casualty Loss**. No "Casualty Loss" or similar provisions will be accepted as they introduce uncertainty to the closing | **Non-Negotiable**. | The Stalking Horse Agreement does not include any "Casualty Loss" or similar provisions. | No changes from Stalking Horse Agreement. |

| | **Material Terms in the Special Master's Draft SPA** | **Special Master's Original Proposed Position Regarding Any Changes** | **Summary of Material Terms in Stalking Horse Agreement** | **Summary of Material Terms in Recommended Bidder Stock Purchase Agreement** |
|---|---|---|---|---|
| | consideration to be delivered to the creditors. | | | |
| 14. | **Closing Conditions**.<br><br>a. <u>Mutual Closing Conditions</u> to include:<br><br>   i.  No Law or Order in effect restraining, enjoining or prohibiting the consummation of the transaction.<br><br>  ii.  The Sale Order Entry shall have occurred.<br><br> iii.  Obtaining of OFAC License.<br><br> iv.  HSR approval (or expiration of waiting period).<br><br>  v.  Other regulatory approvals (if applicable).<br><br>b. <u>Buyer Closing Conditions</u> to include:<br><br>   i.  Bring-down of Special Master R&Ws limited to <u>only</u> fundamental R&Ws. | **Strongly Disfavored**. Additional closing conditions that introduce uncertainty to closing will be strongly disfavored. | In addition to the closing conditions included in the Special Master Draft SPA, the Special Master shall not be obligated to close if CITGO has not delivered the FIRPTA Certificate. | No changes from Stalking Horse Agreement. |

| | **Material Terms in the Special Master's Draft SPA** | **Special Master's Original Proposed Position Regarding Any Changes** | **Summary of Material Terms in Stalking Horse Agreement** | **Summary of Material Terms in Recommended Bidder Stock Purchase Agreement** |
|---|---|---|---|---|
| | ii.   Special Master shall have performed and complied in all material respects with all obligations and agreements required under the SPA.<br><br>iii.   No Company Material Adverse Effect shall have occurred and remain ongoing. Off-market revisions to the definition of Material Adverse Effect will be strongly disfavored. For the avoidance of doubt, it is non-negotiable that events relating to the 2020s litigation will be specifically excluded from consideration in determining a Material Adverse Effect; however, nothing herein expressly excludes the ability of a buyer to argue that a finding by a court of competent jurisdiction that PDVH or any of its subsidiaries is an alter ego of PDVSA or the | | | |

| | Material Terms in the Special Master's Draft SPA | Special Master's Original Proposed Position Regarding Any Changes | Summary of Material Terms in Stalking Horse Agreement | Summary of Material Terms in Recommended Bidder Stock Purchase Agreement |
|---|---|---|---|---|
| | Republic constitutes a Company Material Adverse Effect.<br><br>iv.  The Sale Order shall be in full force and effect in all respects and not subject to any stay, but no affirmation by appellate court is necessary to close.<br><br>c.  <u>Special Master Closing Conditions</u> to include:<br><br>    i.  Bring-down of Buyer R&Ws.<br><br>   ii.  Buyer shall have performed and complied in all material respects with all obligations and agreements required under the SPA. | | | |
| 15. | **Outside Date.** Minimum of 12 months with two automatic 90-day extensions for regulatory approval. | **Non-Negotiable.** | Initial Outside Date is twelve (12) months from the Execution Date and is automatically extended by two 90-day periods if the Closing has not occurred by the Initial Outside Date as a result of nonsatisfaction of any of the closing conditions relating to OFAC, HSR Act or the Sale Order. | Initial Outside Date is twelve (12) months from the Final Recommendation Date and is automatically extended by two 90-day periods if the Closing has not occurred by the Initial Outside Date as a result of nonsatisfaction of any of the closing |

| | Material Terms in the Special Master's Draft SPA | Special Master's Original Proposed Position Regarding Any Changes | Summary of Material Terms in Stalking Horse Agreement | Summary of Material Terms in Recommended Bidder Stock Purchase Agreement |
|---|---|---|---|---|
| | | | Both the Special Master and the Buyer further have the right to extend the Initial Outside Date (as automatically extended) for an additional 180 calendar days in the event the Transaction Support Agreement (*see* "PDVSA 2020 Bonds" below) is terminated for any reason. In no event shall the Outside Date extend beyond a date that is 360 calendar days after the Initial Outside date. | conditions relating to OFAC, HSR Act or the Sale Order. |
| 16. | **Termination Rights**.  Termination rights to include:<br><br>a.  The **Special Master**, subject to Court approval, and the **Buyer** may terminate by mutual written consent.<br><br>b.  The **Special Master** or the **Buyer** may terminate if the closing has not occurred by the Outside Date, other than for a reason that is the fault of the terminating party.<br><br>c.  The **Special Master** may terminate for a Superior Proposal prior to the Sale Hearing and consistent with the Non-Solicitation Provisions of the SPA (subject to the Court's consideration of an Unsolicited Competing Proposal). | **Strongly Disfavored**. Additional termination rights that introduce uncertainty to closing will be strongly disfavored. | In addition to the termination rights included in the Special Master Draft SPA, the Stalking Horse Agreement includes (i) a right for the Special Master to terminate the Stalking Horse Agreement if the Buyer has not delivered a copy of the Transaction Support Agreement (*see* "PDVSA 2020 Bonds" below) duly executed by additional Consenting 2020 Noteholders that together satisfy the Minimum Participation Threshold (each as defined in the Transaction Support Agreement) by 5:00 p.m. Eastern Time on March 24, 2025, and (ii) a right for both the Special Master and the Buyer to terminate the Stalking Horse Agreement if the Court issues an order in which it denies the Special Master's recommendation to designate the Stalking Horse Agreement as either a stalking horse bid or as a base bid. | In addition to the termination rights included in the Special Master Draft SPA, the Recommended Bidder Stock Purchase Agreement includes a right for both the Special Master and the Buyer to terminate the Recommended Bidder Stock Purchase Agreement if the Court issues an order in which it denies the Special Master's recommendation to designate the Recommended Bidder Stock Purchase Agreement as the successful bid. |

| Material Terms in the Special Master's Draft SPA | Special Master's Original Proposed Position Regarding Any Changes | Summary of Material Terms in Stalking Horse Agreement | Summary of Material Terms in Recommended Bidder Stock Purchase Agreement |
|---|---|---|---|
| d.  The **Buyer** may terminate if there has been a breach by the Special Master of any of its representations, warranties, covenants or agreements resulting in the failure of the closing condition (subject to a 45-day cure right).<br><br>e.  Subject to Court approval, the **Special Master** may terminate if there has been a breach by the Buyer of any of its representations, warranties, covenants or agreements resulting in the failure of the closing condition (subject to a 45-day cure right).<br><br>f.  The **Buyer** or the **Special Master** may terminate if there is any Law that makes consummation of the transactions illegal or otherwise prohibited or if any Order enjoining the Buyer, the Special Master or the Company from consummating the Transactions is entered and such Order becomes final and non-appealable. | | | |

| | Material Terms in the Special Master's Draft SPA | Special Master's Original Proposed Position Regarding Any Changes | Summary of Material Terms in Stalking Horse Agreement | Summary of Material Terms in Recommended Bidder Stock Purchase Agreement |
|---|---|---|---|---|
| 17. | **Termination Fee & Expense Reimbursement**. | Subject to Court order regarding bidder protections. | The Stalking Horse Agreement does not materially amend the Termination Fee & Expense Reimbursement provisions of the Special Master Draft SPA.<br><br>Termination Fee shall be (i) the amount, not to exceed $75,000,000 in the aggregate, of actual and documented out-of-pocket expenses incurred by the Buyer and its Affiliates in connection with the negotiation and execution of this Agreement and the other Transaction Documents and the consummation of the Transactions if such fee becomes payable on or prior to the Final Recommendation Date or (ii) if such fee becomes payable after the Final Recommendation Date, an amount equal to $112,000,000; provided, that if the Stalking Horse Agreement is amended to include the satisfaction of additional Attached Judgments junior to the Record Holder, the Termination Fee shall be automatically increased to an amount equal to 3% of the aggregate value of Attached Judgments to be satisfied (whether in cash or agreed non-cash consideration), but in no event shall the Termination Fee exceed $150,000,000. | The Recommended Bidder Stock Purchase Agreement does not materially amend the Termination Fee & Expense Reimbursement provisions of the Special Master Draft SPA.<br><br>The Recommended Bidder would be required to pay the Termination Fee to the Stalking Horse Bidder upon the closing of the transactions contemplated by the Recommended Bidder Stock Purchase Agreement.<br><br>Expense Reimbursement Amount shall be an amount equal to the reasonable and documented out-of-pocket costs, fees and expenses, inclusive of any out-of-pocket financing commitment fees, incurred by the Buyer in connection with the Transactions; provided, that in no event shall the Expense Reimbursement Amount exceed $30,000,000. |

| | **Material Terms in the Special Master's Draft SPA** | **Special Master's Original Proposed Position Regarding Any Changes** | **Summary of Material Terms in Stalking Horse Agreement** | **Summary of Material Terms in Recommended Bidder Stock Purchase Agreement** |
|---|---|---|---|---|
| 18. | **PDVSA 2020 Bonds**.  No trust/escrow constructs or similar revisions impacting certainty of funds payable relating to the PDVSA 2020 Bonds will be included.<br><br>No stand-alone closing conditions relating to the PDVSA 2020 Bonds will be included.<br><br>The SPA will not include any requirement or condition with respect to the 2020 Bond Entities other than that Buyer acknowledges that the 2020 Bond Entities purport to have a pledge of 50.1% of the equity of CITGO Holding, Inc., which is disputed by the Venezuela Parties and is subject to active litigation. | **Non-Negotiable**.  Bidders are welcome to address the 2020s separately, but this should not impact closing certainty or clarity around proceeds to creditors. | The Stalking Horse Agreement does not include trust/escrow constructs or similar revisions impacting certainty of funds payable, or stand-along closing conditions, relating to the PDVSA 2020 Bonds, or any requirement or condition with respect to the 2020 Bond Entities.<br><br>The Record Holder has entered into an Amended and Restated Transaction Support Agreement, dated as of the Stalking Horse Agreement, with certain 2020 Bondholders and providing for the requisite 2020 Bondholders consent to the consummation of the Transactions and the release and full termination of the Equity Pledge. | The Recommended Bidder Stock Purchase Agreement does not include trust/escrow constructs or similar revisions impacting certainty of funds payable, or stand-along closing conditions, relating to the PDVSA 2020 Bonds, or any requirement or condition with respect to the 2020 Bond Entities. |
| 19. | **Alter Ego Claims**.  No trust/escrow constructs or purchase price alterations relating to Alter Ego claims will be included unless expressly agreed to by the affected Sale Process Party or Attached Judgment Creditor.<br><br>No stand-alone closing conditions relating to Alter Ego Claims will be included. | **Strongly Disfavored**.<br><br>**Non-Negotiable**. | The Stalking Horse Agreement does not include trust/escrow constructs or purchase price alterations, or stand-alone closing conditions, relating to Alter Ego claims. | No changes from Stalking Horse Agreement. |
| 20. | **Company Employee-Related Covenants.** | **Strongly Disfavored**.<br>Material comments | The Stalking Horse Agreement does not materially amend the Company Employee- | The Recommended Bidder Stock Purchase Agreement does not materially amend the |

| **Material Terms in the Special Master's Draft SPA** | **Special Master's Original Proposed Position Regarding Any Changes** | **Summary of Material Terms in Stalking Horse Agreement** | **Summary of Material Terms in Recommended Bidder Stock Purchase Agreement** |
|---|---|---|---|
| a. No termination, amendment or waiver of Company employment contracts will be included, without prejudice to the Buyer's right post-Closing to terminate any employment contract consistent with applicable law but subject to PDVH/CITGO's existing contractual obligations to the respective employees.<br><br>b. The SPA will include a customary covenant obligating buyer to maintain employee severance, compensation and benefits consistent with market practice.<br><br>c. The SPA will include a customary covenant obligating buyer to maintain existing D&O indemnification commitments (including acquisition of a D&O tail policy).<br><br>d. The SPA will include a customary release for CITGO management, at a minimum, who participate and cooperate in the sale process. | to these provisions will be strongly disfavored. | Related Covenants included in the Special Master Draft SPA. | Company Employee-Related Covenants included in the Special Master Draft SPA. |

**<u>Exhibit E</u>**

**Financing Commitment Letters and JP Morgan HCL**

**E-1**

*Execution Version*

| | | |
|---|---|---|
| **JPMORGAN CHASE BANK, N.A.**<br>383 Madison Avenue<br>New York, NY 10179 | **THE TORONTO-DOMINION BANK, NEW YORK BRANCH**<br>**TD SECURITIES (USA) LLC**<br>1 Vanderbilt Avenue<br>New York, NY 10017 | **SUMITOMO MITSUI BANKING CORPORATION**<br>277 Park Avenue<br>New York, NY 10172 |

**PERSONAL AND CONFIDENTIAL**

June 25, 2025

Adolin Holdings Inc.
c/o Gold Reserve Ltd.
999 West Riverside Ave., Suite 401
Spokane, Washington 99201

Attention: Paul Rivett, Executive Chairman

Commitment Letter

Ladies and Gentlemen:

Adolin Holdings Inc., a Delaware corporation ("***Initial Borrower***") formed at the direction of Gold Reserve Ltd. and its affiliates (collectively, the "***Sponsor***") has advised JPMorgan Chase Bank, N.A. ("***JPMorgan***"), The Toronto-Dominion Bank, New York Branch ("***TD Bank***") and TD Securities (USA) LLC ("***TDS***"), and Sumitomo Mitsui Banking Corporation ("***SMBC***" and together with JPMorgan, TD Bank and TDS, the "***Commitment Parties***", "***we***" or "***us***") of your desire to, directly or indirectly, including through a group, partnership, consortium, joint venture or other similar arrangement (collectively, and together with the Initial Borrower, "***you***"), consummate the Transactions described in the Transaction Description attached hereto as Exhibit A (the "***Transaction Description***"). Capitalized terms used but not defined herein shall have the meanings assigned to them in the Transaction Description, the Summary of Principal Terms and Conditions attached hereto as Exhibit B (the "***ABL Term Sheet***"), the Summary of Principal Terms and Conditions attached hereto as Exhibit C (the "***Bridge Term Sheet***" and together with the ABL Term Sheet, the "***Term Sheets***"), the conditions annex for the Bridge Facility set forth in Exhibit D-1 attached hereto (the "***Bridge Conditions Annex***") or the conditions annex for the ABL Facility set forth in Exhibit D-2 (the "***ABL Conditions Annex***", and together with this commitment letter, the Transaction Description, the Term Sheets and the Bridge Conditions Annex, the "***Commitment Letter***").

1. Commitments; Titles and Roles

In connection with the foregoing, (a) JPMorgan is pleased to advise you of its commitment to provide (i) 35% of $2.0 billion of commitments to the ABL Facility (the "***ABL Commitment***"), on the terms set forth in the ABL Term Sheet and (ii) 35% of $4.5 billion of commitments to the Bridge Facility (as defined in the Bridge Term Sheet) (the "***Bridge Commitment***" and together with the ABL Commitment, the "***Commitment***"), on the terms set forth in the Bridge Term Sheet, (b) TD Bank is pleased to advise you of its commitment to provide (i) 35% of the ABL Commitment, on the terms and conditions set forth in the ABL Term Sheet and (ii) 35% of the Bridge Commitment, in each case, prior to giving effect to any Bridge Facility Increase, on the terms and conditions set forth in the Bridge Term Sheet and (c) SMBC is pleased to advise you of its commitment to provide (i) 30% of the ABL Commitment, on the terms and conditions set forth in the ABL Term Sheet and (ii) 30% of the Bridge Commitment, in each case, prior to giving effect

to any Bridge Facility Increase, on the terms and conditions set forth in the Bridge Term Sheet, in each case, subject only to the conditions set forth in Section 5 hereof and in the Conditions Annex; *provided* that, the amount of the Bridge Commitment shall be automatically and permanently reduced as provided under "Optional Commitment Reductions and Prepayments" and "Mandatory Commitment Reductions and Prepayments" in the Bridge Term Sheet.  The commitments described in the preceding sentence are several and not joint.

It is agreed that JPMorgan will act as the sole and exclusive administrative agent for the ABL Facility (in such capacity, the "***ABL Administrative Agent***") and as sole and exclusive administrative agent for the Bridge Facility (in such capacity, the "***Bridge Administrative Agent***"; in its capacity as both the ABL Administrative Agent and the Bridge Administrative Agent, the "***Administrative Agent***") and that JPMorgan will act as the lead left arranger and bookrunner for the ABL Facility (in such capacity, the "***ABL Lead Left Arranger***") and as the left lead arranger and bookrunner for the Bridge Facility (in such capacities, the "***Bridge Lead Left Arranger***"; and together with its capacity as the ABL Lead Left Arranger, collectively, the "***Lead Left Arranger***"); *provided* that, you agree that JPMorgan may perform its responsibilities hereunder through its affiliate, J.P. Morgan Securities LLC.

It is agreed that (a) TDS and SMBC will act as joint lead arrangers and joint bookrunners for the ABL Facility (in such capacity, an "***ABL Arranger***", and together with the ABL Lead Left Arranger, the "***ABL Lead Arrangers***") and (b) TDS and SMBC will act as joint lead arrangers and joint bookrunners for the Bridge Facility (in such capacity, a "***Bridge Arranger***", and together with the Bridge Lead Left Arranger, the "***Bridge Lead Arrangers***", and together with the ABL Lead Arrangers, the "***Lead Arrangers***").

You agree that no other agents, co-agents or arrangers will be appointed, no other titles will be awarded and no compensation (other than as expressly contemplated by this Commitment Letter and the Fee Letters referred to below) will be paid in connection with the Facilities unless you and the Lead Arrangers shall so agree.  Notwithstanding the foregoing, with your consent (such consent not to be unreasonably withheld, conditioned or delayed), the Lead Arrangers may appoint additional banks (or affiliates thereof) as joint lead arrangers and/or joint bookrunners for the Facilities; *provided* that in any Lender Presentation (as defined below) and all other offering or marketing materials in respect of any Facility, JPMorgan shall have "left side" designation and shall appear on the top left and shall hold the leading role and responsibility customarily associated with such "top left" placement.

2.  <u>Syndication</u>

The Lead Arrangers intend and reserve the right, prior to or after the execution of definitive documentation for the Facilities, in consultation with you, to syndicate all or part of the Facilities (including, in our discretion, all or part of our Commitment hereunder) to a group of financial institutions (together with JPMorgan, in such capacity, the "***Lenders***") identified by us in consultation with you.  Other than with respect to an assignment with your consent pursuant to customary joinder documentation reasonably acceptable to you and us, notwithstanding the Lead Arrangers' right to syndicate the Facilities and receive commitments with respect thereto, (x) no assignment, syndication, participation or receipt of commitments by the Commitment Parties hereunder shall relieve, release or novate the Commitment Parties from their respective obligations hereunder (including its Commitment hereunder and its obligation to fund the Facilities) until the funding of the full amount of the Loans under the Facilities requested by the Initial Borrower to be funded on the Closing Date has occurred, (y) no assignment or novation by the Commitment Parties shall become effective with respect to all or any portion of the Commitment Parties' respective Commitments until after the funding of the full amount of the Loans under the Facilities requested by the Initial Borrower to be funded on the Closing Date has occurred and (z) unless you otherwise agree in writing, the Commitment Parties shall retain exclusive control over all rights and obligations with respect

2

to their respective Commitments, including all rights with respect to consents, modifications, supplements, waivers and amendments, until the funding of the full amount of the Loans under the Facilities requested by the Initial Borrower to be funded on the Closing Date has occurred.  Without limiting your obligations to assist with syndication efforts as set forth below, it is understood that neither the commencement nor completion of the syndication of the Facilities shall constitute a condition to the availability of the Facilities on the Closing Date.

The Lead Arrangers intend to commence syndication efforts promptly upon your execution of this Commitment Letter and as part of its syndication efforts, the Lead Arrangers intend to have Lenders commit to the Facilities prior to the Closing Date (subject to the limitations set forth in the preceding paragraph). You agree, until the earlier of (1) the termination of the syndication by the Lead Arrangers as determined in good faith by the Lead Arrangers and (2) the date that is ninety (90) days after the Closing Date (such earlier date, the "***Syndication Date***"), to actively assist, the Lead Arrangers in completing a timely syndication that is mutually satisfactory to the Lead Arrangers and you.  Such assistance shall include, without limitation, (a) your using commercially reasonable efforts to ensure that any syndication efforts benefit materially from the Sponsor's (and to the extent practical and appropriate and consistent with the Acquisition Agreement, the Target's) existing lending and investment banking relationships, (b) direct contact between the Sponsor's and your senior management, representatives and advisors (and the use of commercially reasonable efforts to cause direct contact between the Target's senior management, representatives and advisors (to the extent practical and appropriate and consistent with the Acquisition Agreement and the Order)), on the one hand, and the proposed Lenders, on the other hand, in all such cases upon reasonable prior notice and at reasonable times, locations and intervals mutually agreed upon, (c) your and the Sponsor's assistance, and your using commercially reasonable efforts, to the extent practical and appropriate and consistent with the Acquisition Agreement, to cause the Target to assist, in the preparation of lender presentations and other customary marketing materials to be used in connection with the syndication of the Facilities (the "***Lender Presentation***"), (d) the hosting, with the Lead Arrangers, of one or more meetings (which may be in person or virtual) of prospective Lenders at times to be mutually agreed, (e) your and the Sponsor using commercially reasonable efforts to obtain a corporate credit rating for the Ultimate Borrower from Moody's Investor Services, Inc. and S&P Global Ratings, a division of S&P Global Inc. and (f) your ensuring that there shall be (without the prior written consent of the Lead Arrangers) no competing issues of debt, equity or equity-linked securities or credit facility by you, the Ultimate Borrower, the Initial Borrower or any of your or their respective subsidiaries and affiliates (excluding the financing transactions that you have disclosed to us on the date hereof or otherwise which have been consented to by the Lead Arrangers) and, to the extent practical and appropriate and consistent with the Acquisition Agreement, your using commercially reasonable efforts to ensure that there shall be no competing issues of debt or credit facility by the Target, in each case, being offered, placed or arranged (other than, in each case, (i) the Facilities, (ii) any purchase money indebtedness, equipment financings, capital or synthetic lease obligations and similar obligations, in each case of this <u>clause (ii)</u>, incurred in the ordinary course of business, (iii) any indebtedness existing or permitted to be incurred and remain outstanding under the terms of the Acquisition Agreement (as defined in the Transaction Description) and (iv) the Permanent Financing).

The Lead Left Arranger will manage all aspects of the syndication, including decisions as to the selection of institutions to be approached and when they will be approached, when their commitments will be accepted, which institutions will participate, the allocations of the commitments among the Lenders and the amount and distribution of fees among the Lenders, in each case, subject to your consent and other rights set forth above.  In acting as the Lead Left Arranger, JPMorgan will have no responsibility other than to arrange the syndication of the Facilities as set forth herein and is acting solely in the capacity of an arm's length contractual counterparty to the Initial Borrower with respect to the arrangement of the Facilities (including in connection with determining the terms of the Facilities) and not as a financial advisor or fiduciary to, or an agent of, you, the Initial Borrower, the Ultimate Borrower or any other person.

3. <u>Information</u>

To assist the Lead Arrangers in their syndication efforts, you agree to promptly prepare and provide, and to use commercially reasonable efforts to cause the Sponsor to assist in such preparation and provision, to the Lead Arrangers all information with respect to the Initial Borrower and Ultimate Borrower (and to the extent practical and appropriate and consistent with the Acquisition Agreement, the Target) and the Transactions, including all financial information and projections (such projections, together with any estimates, budgets, forecasts and other forward-looking information, the "***Projections***"), as the Lead Arrangers may reasonably request in connection with the arrangement and syndication of the Facilities. You hereby represent and warrant that (with respect to information relating to the Target (including, without limitation, the Ultimate Borrower), to your knowledge), (a) all written information and written data (in each case, other than the Projections and information of a general economic or industry specific nature) (the "***Information***") that has been or will be made available to the Lead Arrangers and the Commitment Parties in connection with the Transactions by you or any of your affiliates and representatives, taken as a whole, does not or will not, when furnished, contain any untrue statement of a material fact or omit to state a material fact necessary in order to make the statements contained therein not materially misleading in light of the circumstances under which such statements are made (after giving effect to all supplements and updates provided thereto) and (b) the Projections that have been or will be made available to the Lead Arrangers and the Commitment Parties in connection with the Transactions by or on behalf of you or any of your representatives have been or will be prepared in good faith based upon assumptions that you believe to be reasonable at the time made and at the time the related Projections are made available to the Lead Arrangers and the Commitment Parties.  You agree that if, at any time from the date hereof until the later of the Closing Date and the Syndication Date, you become aware that any of the representations in the preceding sentence would be incorrect (to your knowledge with respect to information relating to the Target) in any material respect if the Information and Projections were being furnished, and such representations were being made, at such time, then you agree to promptly supplement the Information and the Projections so that such representations will be correct (to your knowledge with respect to information relating to the Target) in all material respects under those circumstances.  In arranging and syndicating the Facilities, we will be entitled to use and rely primarily on the Information and the Projections without responsibility for independent verification thereof.

You hereby authorize the Lead Arrangers to download copies of your or any of your subsidiary's or the Sponsor's trademark logos from its website and post copies thereof and any Information to a deal site on IntraLinks™, DebtDomain, SyndTrak, ClearPar or any other electronic platform chosen by the Lead Arrangers to be its electronic transmission system  (an "***Electronic Platform***") established by the Lead Arrangers to syndicate the Facilities, and to use your or any of your subsidiary's trademark logos on any confidential information memoranda, presentations (including the Lender Presentation) and other marketing materials prepared in connection with the syndication of the Facilities or, with your consent (which consent is not to be unreasonably withheld, conditioned or delayed), in any advertisements that we may place after the closing of the Facilities in financial and other newspapers, journals, the World Wide Web, home page or otherwise, at the Lead Arrangers' own expense describing its services to the Initial Borrower hereunder.  You also understand and acknowledge that we may provide to market data collectors, such as league table, or other service providers to the lending industry, information regarding the closing date, size, type, purpose of, and parties to, the Facilities.

You hereby acknowledge that (a) the Lead Arrangers will make available Information and Projections to the proposed syndicate of Lenders by posting such Information and Projections on an Electronic Platform and (b) certain of the Lenders (each, a "***Public Lender***") may wish to receive only information that (i) is publicly available or (ii) is not material with respect to you, the Initial Borrower, the Ultimate Borrower, Petroleos de Venezuela, the Republic of Venezuela, the Target or your, the Initial Borrower's, the Ultimate Borrower's, Petroleos de Venezuela's, the Republic of Venezuela's, or the

Target's securities for purposes of United States federal and state securities laws (collectively, the "***Public Side Information***").  If reasonably requested by the Lead Arrangers, you will assist us, and you will use commercially reasonable efforts, to the extent practical and appropriate and consistent with the Acquisition Agreement, to cause the Target to assist us, in preparing a customary additional version of the Lender Presentation to be used by Public Lenders.  The information to be included in the additional version of the Lender Presentation will contain only Public Side Information.  It is understood that in connection with your assistance described above, you will provide a customary authorization letter to the Lead Arrangers to be included in any Lender Presentation, which letter authorizes the distribution of the Lender Presentation to prospective Lenders, containing a customary "10b-5" representation (which shall be substantially consistent with the representation in <u>clause (a)</u> of the second sentence of the first paragraph of this <u>Section 3</u>, other than with respect to the knowledge qualification in the case of information relating to the Target) to the Lead Arrangers and (if applicable) a representation to the Lead Arrangers that the public-side version contains only Public Side Information, and which Lender Presentation shall exculpate you, and the Target and your and Target's respective affiliates and us and our affiliates with respect to any liability related to the use of the Lender Presentation or any related marketing material by the recipients thereof.  You agree to identify that portion of the Information with respect to you and the Sponsor (and to use commercially reasonable efforts, to the extent practical and appropriate and consistent with the Acquisition Agreement, to cause the Target to identify that portion of the Information with respect to the Target) that may be distributed to the Public Lenders as "PUBLIC", which, at the minimum, shall mean that the word "PUBLIC" shall appear prominently on the first page thereof.  You agree that (x) by your marking such materials "PUBLIC", you shall be deemed to have authorized the Lead Arrangers (subject to the confidentiality and other provisions of this Commitment Letter) to treat such materials as information that is Public Side Information and (y) the Lead Arrangers shall be entitled to treat any such materials that are not marked "PUBLIC" as being suitable only for distribution to prospective Lenders that are not Public Lenders (each, a "***Private Lender***").  You agree that, subject to the confidentiality and other provisions of this Commitment Letter, the Lead Arrangers on your behalf may distribute the following documents to all prospective Lenders in the form provided to you and to your counsel a reasonable time prior to their distribution, unless you or your counsel advise the Lead Arrangers in writing (including by email) within a reasonable time prior to their intended distribution that such material should only be distributed to Private Lenders: (a) the Transaction Description, the Term Sheets, the Bridge Conditions Annex and the ABL Conditions Annex; (b) drafts and final definitive documentation with respect to the Facilities; (c) administrative materials prepared by the Lead Arrangers for prospective Lenders (such as a lender meeting invitation, allocations and funding and closing memoranda); (d) notification of changes in the terms of the Facilities and (e) historical financial statements of the Ultimate Borrower.  If you advise the Lead Arrangers that any of the foregoing items should be distributed only to Private Lenders, then the Lead Arrangers will not distribute such materials to Public Lenders without your consent.

    4.  <u>Fees</u>

    As consideration for the Commitments of the Commitment Parties hereunder and the Lead Arrangers' and Administrative Agent's agreement to perform the services described herein, you agree to pay (or cause to be paid) the fees set forth in the Term Sheets that are payable on or prior to the Closing Date, in each Fee Letter dated the date hereof and delivered herewith with respect to the Bridge Facility or the ABL Facility, as applicable (collectively, the "***Fee Letters***" and each a "***Fee Letter***").  Once paid, such fees shall not be refundable under any circumstances.  All fees payable hereunder and under the Fee Letters shall be paid in immediately available funds in U.S. Dollars and shall not be subject to reduction by way of withholdings, setoff or counterclaim or be otherwise affected by any claim or dispute related to any other matter.

    5.  <u>Conditions</u>

Notwithstanding anything in this Commitment Letter, the Fee Letters, the definitive documentation for the Bridge Facility (the "***Bridge Facility Documentation***") or the ABL Facility (the definitive documentation for the ABL Pre-Fund Facility is referred to herein as the "***ABL Pre-Fund Facility Documentation***" and the definitive documentation for the ABL Facility after giving effect to the Post Closing Steps is referred to herein as the "***ABL Credit Documentation***"; the ABL Pre-Fund Facility Documentation and ABL Credit Documentation are collectively referred to as the "***ABL Facility Documentation***" and, together with the Bridge Facility Documentation, collectively, the "***Facility Documentation***"), the Term Sheets, the Bridge Conditions Annex, the ABL Conditions Annex, or any other letter agreement or other undertaking concerning the financing of the Transactions to the contrary, the Commitments of the Commitment Parties hereunder and the agreement of the Lead Arrangers and the Administrative Agent to perform the services described herein are subject solely to the conditions expressly set forth in the Term Sheets, the Bridge Conditions Annex and the ABL Conditions Annex. Notwithstanding anything in this Commitment Letter, the Fee Letters, the Facility Documentation, the Term Sheets, the Bridge Conditions Annex, the ABL Conditions Annex, or any other letter agreement or other undertaking concerning the financing of the Transactions to the contrary, (i) the only representations and warranties the accuracy of which shall be a condition to the availability of the Facilities on the Closing Date shall be (A) the Specified Representations (as defined below) and (B) the representations made by or with respect to the Target in the Acquisition Agreement as are material to the interests of the Lenders (in their capacities as such) (but only to the extent that you or your affiliates have the right to terminate your or such affiliate's obligation to consummate the Acquisition (or otherwise does not have an obligation to close) under the Acquisition Agreement or elect not to close the Acquisition, in each case, as a result of a failure of such representations in the Acquisition Agreement to be accurate without liability to any of them) (the "***Specified Acquisition Agreement Representations***") and (ii) the terms of the Facility Documentation shall be in a form such that they do not impair the availability of the ABL Pre-Fund Facility and the Bridge Facility on the Closing Date if the conditions set forth in (1) Annex II to the ABL Term Sheet under the heading "ABL Pre-Fund Facility Documentation" (this clause (1), the "***ABL Pre-Fund Conditions***"), (2) the Bridge Term Sheet and (3) the Bridge Conditions Annex are satisfied or waived by the Commitment Parties with respect to the ABL Pre-Fund Facility and the Bridge Facility, it being understood and agreed that, to the extent any Initial Collateral or, subject to consummation of the Post-Closing Steps and solely in connection with the Ultimate Closing Date, the Ultimate Collateral (including, in each case, the creation or perfection of any security interest) is not or cannot be provided on the Closing Date (other than (i) the creation and perfection of a lien on any such Collateral that is of the type where a lien on such Collateral may be perfected solely by the filing of a financing statement under the Uniform Commercial Code ("***UCC***") and (ii) a pledge of the equity interests of the Initial Borrower, the Ultimate Borrower and the wholly-owned subsidiaries of the Initial Borrower (other than (without limiting any conditions with respect to fundings following the consummation of the Post-Closing Steps) the subsidiaries of the Ultimate Borrower) with respect to which a lien may be perfected on the Closing Date by the delivery of a stock or equivalent certificate, together with a stock power or similar instrument of transfer endorsed in blank for the relevant certificate (other than, in the case of the subsidiaries of PDVH, with respect to any such certificate that has not been made available to you at least two (2) business days prior to the Closing Date, to the extent you have used commercially reasonable efforts to procure delivery thereof, which may instead be delivered within five (5) business days after the Closing Date (or such later date as the Administrative Agent may agree in its sole discretion))) after your use of commercially reasonable efforts to do so without undue burden or expense, then the provision and/or perfection of such Collateral shall not constitute a condition precedent to the availability or initial funding of the ABL Facility and the Bridge Facility on the Closing Date but may instead be delivered and/or perfected, (x) for vehicles and any other assets subject to certificates of title, within thirty (30) days after the Closing Date (or such longer period as the Administrative Agent may agree in its sole discretion), (y) for control agreements, real property mortgages and all other such Collateral, within thirty (30) days after the Closing Date (or such longer period as the Administrative Agent may agree in its sole discretion), pursuant to arrangements to be mutually agreed by the parties hereto acting reasonably, and (z) for landlord lien waivers, estoppels, warehouseman waivers,

6

collateral access or similar letters or agreements, within thirty (30) days after the Closing Date (or such longer period as the Administrative Agent may agree in its sole discretion). For purposes hereof, "**_Specified Representations_**" means the representations and warranties in the Facility Documentation relating to (a) corporate existence or other organizational existence, (b) corporate power and authority and due authorization, execution and delivery, in each case, as it relates to execution, delivery and performance of the Facility Documentation, (c) enforceability of the Facility Documentation, (d) no contravention of the Facility Documentation with organizational documents, (e) subject to the limitations on perfection of security interests set forth in the preceding sentence, the creation, validity and perfection of security interests, (f) solvency as of the Closing Date after giving pro forma effect to the Transactions (solvency to be defined in a manner consistent with the solvency definition set forth in Annex I to Exhibit C), (g) Federal Reserve margin regulations, (h) the Investment Company Act, (i) the Patriot Act and Beneficial Ownership Regulation and (j) use of proceeds on the Closing Date of the Facilities not violating OFAC, the FCPA or other sanctions, anti-corruption or anti-money laundering laws. Notwithstanding anything in this Commitment Letter, any Fee Letter, the Facility Documentation or any other letter agreement or other undertaking concerning the financing of the Transactions to the contrary, the only conditions to availability and initial funding of the ABL Pre-Fund Facility and the Bridge Facility on the Closing Date are the ABL Pre-Fund Conditions, those set forth in the Bridge Term Sheet and those set forth in the Bridge Conditions Annex. For the avoidance of doubt, compliance with your obligations under this Commitment Letter or the Fee Letters, other than satisfaction (or procurement of a waiver) of the ABL Pre-Fund Conditions, the relevant conditions set forth in the Bridge Term Sheet and the relevant conditions set forth in the Bridge Conditions Annex, is not a condition to the availability or initial funding of the Facilities (other than the ABL Facility) on the Closing Date. The Commitment Parties acknowledge and agree that the Target's (as defined herein) compliance with the instructions of the Special Master pursuant to Section 6.10 of the Acquisition Agreement shall not be a condition to the obligations of the Commitment Parties to provide the Facilities on the Closing Date except to the extent there is a failure to comply with such instructions and such failure results in a failure of any condition set forth in Sections 7.1 and 7.2 of the Acquisition Agreement that would permit the Buyer to terminate the Acquisition Agreement. This paragraph is referred to as the "**_Certain Funds Provision_**".

6.    Limitation of Liability, Indemnity, Settlement

(a)   _Limitation of Liability_

You also agree that, in addition to (and not as part of) the indemnification obligations set forth below, notwithstanding any other provision of this Commitment Letter, (i) none of the Administrative Agent, the Lead Arrangers, the Commitment Parties and their respective affiliates and controlling persons and the respective officers, directors, employees, agents, members and successors of each of the foregoing (each, including without limitation, the Lead Arrangers, an "**_Arranger-Related Person_**") or any Related Person (as defined below) of an Arranger-Related Person shall have any Liabilities (as defined below) arising from, or be responsible for, the use by others of Information or other materials (including, without limitation, any personal data) obtained through electronic, telecommunications or other information transmission systems, including an Electronic Platform or otherwise via the internet, and (ii) no Arranger-Related Person shall have any Liabilities, on any theory of liability, for any indirect, special, punitive or consequential damages in connection with their activities related to the Facilities, this Commitment Letter or the Fee Letters; _provided_ that, nothing contained in this clause (ii) shall limit your indemnity or reimbursement obligations to the extent such indirect, special, punitive or consequential damages are included in any third party claim in connection with which an Arranger-Related Person is otherwise entitled to indemnification hereunder. You agree, to the extent permitted by applicable law, to not assert any claims against any Arranger-Related Person with respect to any of the foregoing.  As used herein, (A) the term "**_Liabilities_**" shall mean any losses, claims (including intraparty claims), demands, damages or liabilities of any kind and (B) a "**_Related Person_**" of any person means any of its or their respective officers, directors,

partners, employees, agents, managers, representatives, members, advisors and successors and its affiliates and controlling persons, or any of its or their respective officers, directors, partners, employees, agents, managers, representatives, members and successors.

(b) *Indemnity*

You agree (i) to (A) indemnify and hold harmless the Administrative Agent, the Lead Arrangers, the Commitment Parties and their respective affiliates and controlling persons and the respective officers, directors, employees, agents, members, advisors and successors of each of the foregoing (each, an "**Indemnified Person**") from and against any and all Liabilities and expenses, joint or several, of any kind or nature whatsoever to which any Indemnified Person may become subject arising out of or in connection with this Commitment Letter, the Fee Letters, the Transactions, the Facilities or any related transaction or any claim, litigation, investigation, proceeding, arbitration or administrative, judicial or regulatory action or proceeding in any jurisdiction (including in relation to enforcing the terms of clause (a) above and the terms of this clause (b)), actual or threatened, relating to any of the foregoing (any of the foregoing, a "**Proceeding**"), regardless of whether such Indemnified Person is a party thereto and whether or not such Proceedings are brought by you, your equity holders, affiliates, creditors or any other person, and (B) reimburse such Indemnified Person upon demand for any reasonable and documented out-of-pocket legal expenses of one firm of counsel for all Indemnified Persons taken as a whole and, if reasonably necessary, one firm of local counsel in each appropriate jurisdiction, in each case for all Indemnified Persons taken as a whole (and, in the case of an actual or perceived conflict of interest, of another firm of counsel for all such affected Indemnified Persons taken as a whole) and other reasonable and documented out-of-pocket expenses incurred in connection with investigating or defending any of the foregoing; *provided* that the foregoing indemnity will not, as to any Indemnified Person, apply to any Liabilities or expenses (x) to the extent they have primarily resulted from (A) the willful misconduct, gross negligence or bad faith of such Indemnified Person or any Related Person of such Indemnified Person (as determined by a court of competent jurisdiction in a final and non-appealable decision) or (B) a material breach of any of its obligations under this Commitment Letter (as determined by a court of competent jurisdiction in a final and non-appealable decision) or (y) arising out of, or in connection with, any Proceeding that does not involve an act or omission by you or any of your affiliates and that is brought by an Indemnified Person against any other Indemnified Person other than any Proceeding against the relevant Indemnified Person in its capacity or in fulfilling its role as an agent, arranger or similar role under the Facilities. You agree to reimburse the Administrative Agent, the Lead Arrangers, the Commitment Parties and their affiliates, regardless of whether either Facility closes and/or funds, within 15 days of demand, for all reasonable and documented out-of-pocket expenses (including, but not limited to, due diligence expenses, syndication expenses, consultant's fees and expenses (if any), travel expenses, and reasonable fees, charges and disbursements of counsel), in each case, incurred in connection with the Facilities and any related documentation (including this Commitment Letter, the Fee Letters and the Facility Documentation) or the administration, amendment, modification or waiver thereof; provided that the Lead Arrangers shall notify Gold Reserve in the event that reimbursable expenses (other than any expenses contemplated by the foregoing sentence), reach █████ ████████████████████████████████████████████████████ .

(c) *Settlement*

You shall not, without the prior written consent of the Lead Arrangers (which consent shall not be unreasonably withheld, conditioned or delayed), effect any settlement of any pending or threatened Proceedings in respect of which indemnity could have been sought hereunder by the Lead Arrangers unless (i) such settlement includes an unconditional release of such Indemnified Person in form and substance reasonably satisfactory to the Lead Arrangers from all liability on claims that are the subject matter of such Proceedings and (ii) does not include any statement as to or any admission of fault, culpability or a failure to act by or on behalf of the Lead Arrangers or any injunctive relief or other non-monetary remedy binding

8

on the Lead Arrangers. You acknowledge that any failure to comply with your obligations under the preceding sentence may cause irreparable harm to the Lead Arrangers and the other Indemnified Persons.

  7. <u>Sharing of Information, Absence of Fiduciary Relationships</u>

  You acknowledge that the Commitment Parties and their respective affiliates may be providing debt financing, equity capital or other services (including financial advisory services) to other persons in respect of which you may have conflicting interests regarding the transactions described herein and otherwise. Neither the Commitment Parties nor any of their respective affiliates will use confidential information obtained from you by virtue of the transactions contemplated by this Commitment Letter or its other relationships with you in connection with the performance by them of services for other persons, and neither the Commitment Parties nor any of their respective affiliates will furnish any such information to other persons. You also acknowledge that neither the Commitment Parties nor any of their respective affiliates has any obligation to use in connection with the transactions contemplated by this Commitment Letter, or to furnish to you, confidential information obtained by them from other persons.

  As you know, the Commitment Parties, together with their respective affiliates, are full service securities or banking firms engaged, either directly or through their respective affiliates, in various activities, including securities trading, commodities trading, investment management, research, financing and brokerage activities and financial planning and benefits counseling for both companies and individuals. In the ordinary course of these activities, the Commitment Parties and their respective affiliates may actively engage in commodities trading or trade the debt and equity securities (or related derivative securities) and financial instruments (including bank loans and other obligations) of you, the Target and other companies that may be the subject of the arrangements contemplated by this Commitment Letter for their own account and for the accounts of their customers and may at any time hold long and short positions in such securities. The Commitment Parties and their respective affiliates may also co-invest with, make direct investments in, and invest or co-invest client monies in or with funds or other investment vehicles managed by other parties, and such funds or other investment vehicles may trade or make investments in securities of you, the Target or other companies that may be the subject of the arrangements contemplated by this Commitment Letter or engage in commodities trading with any thereof.

  The Commitment Parties and their respective affiliates may have economic interests that conflict with those of you and your equity holders and/or its affiliates. You agree that the Commitment Parties will act under this Commitment Letter as an independent contractor and that nothing in this Commitment Letter or the Fee Letters or otherwise will be deemed to create an advisory, fiduciary or agency relationship or fiduciary or other implied duty between the Commitment Parties or any of their respective affiliates, on the one hand, and you, the Initial Borrower, your stockholders or your affiliates, on the other, with respect to the transactions contemplated by this Commitment Letter and the Fee Letters. You acknowledge and agree that (i) the transactions contemplated by this Commitment Letter and the Fee Letters are arm's-length commercial transactions between the Commitment Parties and their respective affiliates, on the one hand, and you, on the other, (ii) in connection therewith and with the process leading to such transactions, the Commitment Parties and their respective affiliates are acting solely as a principal and not as agents or fiduciaries of you and the Target, your and their respective management, stockholders, creditors or any other person, (iii) the Commitment Parties and their respective affiliates (as the case may be) have not assumed an advisory or fiduciary responsibility or any other obligation in favor of you with respect to the transactions contemplated hereby or the process leading thereto (irrespective of whether the Commitment Parties or any of their respective affiliates has advised or is currently advising you or the Target on other or related matters), except the obligations expressly set forth in this Commitment Letter and the Fee Letters and (iv) you have consulted your own legal and financial advisors to the extent you deemed appropriate. You further acknowledge and agree that (A) you are responsible for making your own independent judgment with respect to such transactions and the process leading thereto and (B) you are capable of

evaluating and understand and accept the terms, risk and conditions of the transactions contemplated hereby, and the Commitment Parties shall have no responsibility or liability to you with respect to such risks.  Please note that the Commitment Parties and their respective affiliates do not provide tax, accounting, investment, regulatory or legal advice, and you shall consult your own advisors concerning such matters.  Any review by the Commitment Parties or any of their respective affiliates of the Sponsor, the Initial Borrower, the Target, and, in each case, any of their respective affiliates, the transactions contemplated hereby or other matters relating to such transactions will be performed solely for the benefit of the Commitment Parties and shall not be on behalf of the Initial Borrower.  You hereby waive and release any claims that you may have against any Commitment Party (in its capacity as such) and its affiliates with respect to any breach or alleged breach of agency or fiduciary duty in connection with any aspect of any transactions contemplated by this Commitment Letter.  It is understood that this paragraph shall not apply to or modify or otherwise affect any arrangement with any financial advisor separately retained by you or any of your affiliates in connection with the Transactions, in its capacity as such.  You agree that you will not claim that any Commitment Party has rendered any advisory services or assert any claim against any Commitment Party based on an alleged breach of fiduciary duty by such Commitment Party in connection with this Commitment Letter and the transactions contemplated hereby or assert any claim based on any actual or potential conflict of interest that might be asserted to arise or result from the engagement of the Commitment Parties or any of their respective affiliates acting as a financial advisor to you, the Initial Borrower or any of their respective affiliates, on the one hand, and the engagement of the Commitment Parties hereunder and the transactions contemplated hereby, on the other hand.

8.  <u>Confidentiality</u>

This Commitment Letter and the Fee Letters and the contents hereof and thereof are delivered to you on the understanding that none of the Fee Letters and their terms or substance, or this Commitment Letter and its terms or substance, shall be disclosed, directly or indirectly, to any person other than the Commitment Parties (including other lenders, underwriters, placement agents, advisors or any similar persons) except (a) on a confidential basis to the Sponsor, Koch Minerals Sàrl, Koch Nitrogen Intentional Sàrl, Rusoro Mining Limited and your respective officers, directors, employees, stockholders, partners, members, independent auditors, attorneys, accountants, agents and advisors who are directly involved in the consideration of this matter and who have been informed by you of the confidential nature this Commitment Letter and the Fee Letters and who have agreed to treat such information confidentially, (b) if the Commitment Parties consent to such proposed disclosure (such consent not to be unreasonably withheld, conditioned or delayed), (c) pursuant to the order of any court or administrative agency in any pending legal or administrative proceeding, or otherwise as required by applicable law, stock exchange requirement or compulsory legal process or, to the extent requested or required by governmental and/or regulatory authorities, in each case based on the reasonable advice of your legal counsel (in which case, you agree, to the extent practicable and not prohibited by law, to notify us of the proposed disclosure in advance of such disclosure and if you are unable to notify us in advance of such disclosure, such notice shall be delivered to us promptly thereafter to the extent permitted by law), (d) to the extent necessary in connection with the exercise of any remedy or enforcement of any rights hereunder or under the Fee Letters (in which case, you agree, to the extent practicable and not prohibited by law, to notify us of the proposed disclosure in advance of such disclosure and if you are unable to notify us in advance of such disclosure, such notice shall be delivered to us promptly thereafter to the extent permitted by law); (e) you may disclose this Commitment Letter and the Fee Letters on a confidential basis to the Target, Robert B. Pincus, solely in his capacity as the Special Master for the United States District Court for the District of Delaware, and their respective officers, directors, employees, stockholders, partners, members, independent auditors, attorneys, accountants, agents and advisors who are directly involved in the consideration of the Acquisition and who have been informed by you of the confidential nature of this Commitment Letter and the Fee Letters and who have agreed to treat such information confidentially; *provided*, *however*, that the Fee Letters shall be redacted to remove all fees, price caps, "flex" terms, the securities demand provision and other numerical

amounts prior to any such disclosure, (f) you may disclose this Commitment Letter and the contents hereof (but not the Fee Letters) (i) in any information memorandum, syndication distribution, lender presentation, prospectus or offering memorandum, as applicable related to the Permanent Financing, (ii) in any proxy or other public filing relating to the Acquisition and (iii) in the Lender Presentation, (g) you may disclose this Commitment Letter and the contents hereof (but not the Fee Letters) to potential Lenders, and potential equity investors and their respective officers, directors, employees, stockholders, partners, members, independent auditors, attorneys, accountants, agents, advisors and other representatives on a confidential basis and (h) you may disclose the fees contained in the Fee Letters as part of a generic disclosure of aggregate sources and uses related to fee amounts (but without disclosing any specific fees or other economic terms set forth therein or to whom such fees or other amounts are owed) to the extent customary or required in marketing materials (including any marketing materials in connection with an equity financing), any proxy or other public filing, and in the Lender Presentation. To the extent not earlier terminated, the provisions of this paragraph with respect to this Commitment Letter (but not the Fee Letters) shall automatically terminate on the second anniversary hereof.

The Commitment Parties and their respective affiliates will use all confidential information provided to them or such affiliates by or on behalf of you or the Target hereunder or in connection herewith solely for the purpose of providing the services that are the subject of this Commitment Letter and shall treat confidentially all such information and shall not disclose such information to any third party or circulate or refer publicly to such information; *provided* that nothing herein shall prevent the Commitment Parties from disclosing any such information (a) pursuant to the order of any court or administrative agency or in any pending legal or administrative proceeding, or otherwise as required by applicable law or compulsory legal process or upon the request or demand of any regulatory authority having jurisdiction over the Commitment Parties or any of their respective affiliates in which case, the Commitment Parties, to the extent not prohibited by applicable law, agrees (except with respect to any audit or examination conducted by bank examiners or any governmental bank regulatory authority exercising examination or regulatory authority), to the extent practicable and not prohibited by applicable law or regulation, to inform you promptly thereof, (b) to the extent that such information becomes publicly available other than by reason of disclosure by the Commitment Parties or the Commitment Parties' affiliates in violation of any confidentiality obligations owing to you hereunder, (c) to the extent that such information is received by the Commitment Parties or their respective affiliates from a third party that is not, to the Commitment Parties' knowledge, subject to contractual or fiduciary confidentiality obligations owing to you with respect to such information, (d) to the extent that such information was already in the Commitment Parties' or their respective affiliates' possession or is independently developed by the Commitment Parties or their respective affiliates, (e) to the Commitment Parties' respective affiliates and the Commitment Parties' and such affiliates' respective trustees, officers, directors, employees, attorneys, accountants, advisors and other representatives (collectively, the "***Representatives***") who need to know such information in connection with the Transactions and are informed of the confidential nature of such information and who agree (which agreement may be oral or pursuant to company policy) to be bound by the terms of this paragraph (or language substantially similar to this paragraph), (f) to potential or prospective Lenders, participants or assignees and any direct or indirect contractual counterparties to any swap or derivative transaction relating to the Initial Borrower and its obligations under the Facilities who agree to be bound by the terms of this paragraph (or language substantially similar to this paragraph), (g) to rating agencies in connection with obtaining ratings for the Facilities (provided that such information is limited to the Transaction Description, the Term Sheets, the Bridge Conditions Annex and the ABL Conditions Annex and is supplied on a confidential basis), (h) to market data collectors, similar services providers to the lending industry, and service providers to the Commitment Parties and the Lenders in connection with the syndication, administration and management of the Facilities; *provided* that such information is limited to the existence of this Commitment Letter, the use of proceeds from the Facilities, information about the Facilities and the amount of the Commitment, (i) for purposes of establishing a "due diligence defense", (j) to the extent necessary in connection with the exercise of any remedy or enforcement of any rights hereunder or under

11

any Fee Letter, (k) unless such person has been notified to hold such information in confidence from the other parties hereto, to any other party hereto or (l) to the extent you consent to such proposed disclosure. The Commitment Parties' obligations under this paragraph shall automatically terminate and be superseded by the confidentiality provisions in the definitive documentation relating to the Facilities upon the Closing Date, if and to the extent the Commitment Parties are party thereto, and shall in any event terminate upon the second anniversary of the date hereof.

For the avoidance of doubt, nothing in this confidentiality provision shall prohibit any person from voluntarily disclosing or providing any information within the scope of this confidentiality provision to any U.S. governmental, regulatory or self-regulatory organization (any such entity, a "**Regulatory Authority**") to the extent that any such prohibition on disclosure set forth in this confidentiality provision shall be prohibited by the laws or regulations applicable to such Regulatory Authority.

9. Miscellaneous

This Commitment Letter and the Commitment shall not be assignable by any party hereto without the prior written consent of each other party hereto, not to be unreasonably withheld (and any attempted assignment without such consent shall be null and void), are intended to be solely for the benefit of the parties hereto (and the Indemnified Persons), are not intended to confer any benefits upon, or create any rights in favor of, any person other than the parties hereto (and the Arranger-Related Person, Related Persons and Indemnified Persons as set forth in Section 6 hereof) and are not intended to create a fiduciary relationship among the parties hereto.  Any and all obligations of, and services to be provided by, the Commitment Parties hereunder (including, without limitation, their respective Commitments) may be performed and any and all rights of the Commitment Parties hereunder may be exercised by or through any of its affiliates or branches; *provided* that with respect to the Commitment, any assignments thereof to an affiliate will not relieve the Commitment Parties from any of their respective obligations hereunder unless and until such affiliate shall have funded the portion of the Commitment so assigned.  This Commitment Letter may not be amended or any provision hereof waived or modified except by an instrument in writing signed by the Commitment Parties and you.  This Commitment Letter and the Fee Letters (a) are the only agreements that have been entered into among the parties hereto with respect to the Facilities, (b) supersede all prior understandings, whether written or oral, among us with respect to the Facilities, and (c) set forth the entire understanding of the parties hereto with respect thereto.

This Commitment Letter may be executed in any number of counterparts, each of which shall be an original, and all of which, when taken together, shall constitute one agreement.  The words "execution," "signed," "signature," "delivery," and words of like import in or relating to this Commitment Letter, the Fee Letters and/or any document to be signed in connection with this Commitment Letter and the transactions contemplated hereby shall be deemed to include Electronic Signatures (as defined below), deliveries or the keeping of records in electronic form, each of which shall be of the same legal effect, validity or enforceability as a manually executed signature, physical delivery thereof or the use of a paper-based recordkeeping system, as the case may be.  For the avoidance of doubt, the foregoing also applies to any amendment, extension or renewal of this Commitment Letter.  "**Electronic Signatures**" means any electronic symbol or process attached to, or associated with, any contract or other record and adopted by a person with the intent to sign, authenticate or accept such contract or record.

Each of the parties hereto agrees that this Commitment Letter is a binding and enforceable agreement (subject to the effects of bankruptcy, insolvency, fraudulent conveyance, reorganization and other similar laws relating to or affecting creditors' rights generally and general principles of equity (whether considered in a proceeding in equity or law)) with respect to the subject matter contained herein, including an agreement to negotiate in good faith the Facility Documentation by the parties hereto in a manner consistent with this Commitment Letter, it being acknowledged and agreed that the funding of the

Facilities on the Closing Date is subject only to conditions precedent set forth in the Term Sheets and the Bridge Conditions Annex, subject to the Certain Funds Provision.

**THIS COMMITMENT LETTER AND THE RIGHTS AND DUTIES OF THE PARTIES HEREUNDER SHALL BE GOVERNED BY, AND CONSTRUED AND INTERPRETED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK WITHOUT GIVING EFFECT TO ITS PRINCIPLES OR RULES OF CONFLICT OF LAWS TO THE EXTENT SUCH PRINCIPLES OR RULES WOULD REQUIRE OR PERMIT THE APPLICATION OF THE LAWS OF ANOTHER JURISDICTION; _PROVIDED,_ THAT (I) THE INTERPRETATION OF THE DEFINITION OF COMPANY MATERIAL ADVERSE EFFECT (AS DEFINED IN THE ACQUISITION AGREEMENT) AND WHETHER OR NOT A COMPANY MATERIAL ADVERSE EFFECT (AS DEFINED IN THE ACQUISITION AGREEMENT) HAS OCCURRED, (II) THE DETERMINATION OF THE ACCURACY OF ANY SPECIFIED ACQUISITION AGREEMENT REPRESENTATION AND WHETHER AS A RESULT OF ANY INACCURACY THEREOF, THE INITIAL BORROWER (OR ITS APPLICABLE AFFILIATES, INCLUDING (WITHOUT LIMITATION) YOU) HAS THE RIGHT TO TERMINATE ITS OBLIGATION TO CONSUMMATE THE ACQUISITION (OR OTHERWISE DOES NOT HAVE AN OBLIGATION TO CLOSE) UNDER THE ACQUISITION AGREEMENT AS A RESULT OF A FAILURE OF SUCH REPRESENTATIONS IN THE ACQUISITION AGREEMENT TO BE ACCURATE WITHOUT LIABILITY TO ANY OF THEM AND (III) THE DETERMINATION OF WHETHER THE CONDITIONS TO THE ACQUISITION SET FORTH IN THE ACQUISITION AGREEMENT HAVE BEEN SATISFIED OR WAIVED OR ARE EXPECTED TO BE SATISFIED AND WAIVED ON THE CLOSING DATE, IN EACH CASE, SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF DELAWARE APPLICABLE TO CONTRACTS EXECUTED IN AND TO BE PERFORMED IN THAT STATE WITHOUT GIVING EFFECT TO ANY CHOICE OF LAW OR CONFLICT OF LAW PROVISION OR RULE (WHETHER OF THE STATE OF DELAWARE OR ANY OTHER JURISDICTION) THAT WOULD CAUSE THE APPLICATION OF THE LAW OF ANY JURISDICTION OTHER THAN THE STATE OF DELAWARE.**

**EACH OF THE PARTIES HERETO IRREVOCABLY WAIVES THE RIGHT TO TRIAL BY JURY IN ANY ACTION, PROCEEDING, CLAIM OR COUNTERCLAIM BROUGHT BY OR ON BEHALF OF ANY PARTY RELATED TO OR ARISING OUT OF THIS COMMITMENT LETTER OR THE PERFORMANCE OF SERVICES HEREUNDER.**

Each of the parties hereto hereby irrevocably and unconditionally (a) submits, for itself and its property, to the exclusive jurisdiction and venue of the United States District Court for the Southern District of New York sitting in the Borough of Manhattan (or if such court lacks subject matter jurisdiction, the Supreme Court of the State of New York sitting in the Borough of Manhattan), in any suit, action or proceeding arising out of or relating to this Commitment Letter and the Fee Letters, or the transactions contemplated hereby, (b) waives, to the fullest extent it may legally and effectively do so, any objection that it may now or hereafter have to the laying of venue of any such suit, action or proceeding in the federal or state courts located in the City of New York, Borough of Manhattan, (c) waives, to the fullest extent permitted by law, the defense of an inconvenient forum to the maintenance of such suit, action or proceeding in any such court and (d) agrees that a final judgment in any such suit, action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law.  Each of the parties hereto agrees to commence any such suit, action, proceeding or claim in the United States District Court for the Southern District of New York sitting in the Borough of Manhattan (or if such court lacks subject matter jurisdiction, the Supreme Court of the State of New York sitting in the Borough of Manhattan).

Section headings used herein are for convenience of reference only and are not to affect the construction of, or to be taken into consideration in interpreting, this Commitment Letter.

The syndication, information, reimbursement and compensation, limitation of liability, indemnification, settlement, affiliate activities, sharing of information, confidentiality (except to the extent set forth herein), electronic signatures, jurisdiction, governing law, venue, absence of fiduciary relationship and waiver of jury trial provisions contained herein and in the Fee Letters shall remain in full force and effect regardless of whether Facility Documentation shall be executed and delivered and notwithstanding the termination of this Commitment Letter or the Commitment Parties' Commitments hereunder; *provided* that your obligations under this Commitment Letter, other than those relating to the confidentiality, syndication of the Facilities and information, shall automatically terminate and be superseded by the Facility Documentation upon the initial funding thereunder and the payment of all amounts owing at such time hereunder and under the Fee Letters, and you shall be automatically released from all liability in connection therewith at such time.

The Commitment Parties hereby notify you that pursuant to the requirements of the USA PATRIOT Act (Title III of Pub. L. 107-56 (signed into law October 26, 2001)) (the "*Patriot Act*"), and the requirements of 31 C.F.R. § 1010.230 (the "*Beneficial Ownership Regulation*"), the Commitment Parties and each Lender may be required to obtain, verify and record information that identifies Holdings, the Initial Borrower, the Ultimate Borrower and the Ultimate Borrower's subsidiary guarantors, which information includes the name, address and tax identification number of Holdings, the Initial Borrower, the Ultimate Borrower and the Ultimate Borrower's subsidiary guarantors and other information that will allow the Commitment Parties and such Lender to identify Holdings, the Initial Borrower, the Ultimate Borrower and the Ultimate Borrower's subsidiary guarantors in accordance with the Patriot Act and the Beneficial Ownership Regulation.  This notice is given in accordance with the requirements of the Patriot Act and the Beneficial Ownership Regulation and is effective for the Commitment Parties and each Lender.  You hereby acknowledge and agree that the Commitment Parties shall be permitted to share any and all such information with other Lenders.

If the foregoing correctly sets forth our agreement, please indicate your acceptance of the terms of this Commitment Letter and of the Fee Letters (the date of such acceptance, the "*Countersign Date*") by returning to the Lead Arrangers executed counterparts hereof and of the Fee Letters not later than 11:59 p.m., New York City time, on June 30, 2025. The Commitment Parties' Commitments hereunder and the agreements contained herein will expire at such time in the event that the Lead Arrangers have not received such executed counterparts in accordance with the immediately preceding sentence.  If you do so execute and deliver to the Lead Arrangers this Commitment Letter and the Fee Letters, this Commitment Letter, the Commitment and the undertakings of the Commitment Parties hereunder (excluding, for the avoidance of doubt, solely with respect to the ABL Commitment, the occurrence of the date described in the following clause (v)) shall automatically terminate upon the first to occur of (i) the execution of the Facility Documentation by the Loan Parties and the Lenders with commitments thereunder in an aggregate amount no less than the outstanding Commitment hereunder, (ii) the consummation of the Acquisition without the funding of the Facilities, (iii) the termination of the Acquisition Agreement (as defined below) in accordance with its terms, (iv) 5:00 p.m., New York City time, five (5) business days following the Outside Date (giving effect to any effective Automatic Extension (as defined below) and (v) the date on which the Bridge Commitment is automatically and permanently reduced to zero on or prior to the Closing Date as set forth under "Optional Commitment Reductions and Payments" and "Mandatory Commitment Reductions and Payments" in the Bridge Term Sheet (the earliest date in <u>clauses (i)</u> through <u>(v)</u> being the "*Expiration Date*"). You shall have the right to terminate this Commitment Letter and the Commitment hereunder at any time upon written notice to the Commitment Parties from you, subject to your surviving obligations as set forth herein and in the Fee Letters.  As used herein (and in the Fee Letters), (x) an "*Automatic Extension*" shall refer to an automatic extension of the Outside Date that is effected pursuant

to the terms of Section 8.1(b) of the Acquisition Agreement, (y) the "***First Automatic Extension***" shall refer to the initial such automatic extension of the Outside Date and (z) the "***Second Automatic Extension***" shall refer to the second such automatic extension of the Outside Date and it is understood there shall be no Automatic Extensions other than the First Automatic Extension and the Second Automatic Extension.  For purposes of this paragraph (including (without limitation) for the avoidance of doubt, the two immediately preceding sentences and this sentence), each reference to the Acquisition Agreement shall refer to the Acquisition Agreement as defined in the Transaction Description and each reference to the Outside Date shall refer to the Outside Date as defined in the Acquisition Agreement.

We are pleased to have been given the opportunity to assist you in connection with this important financing.

*[Remainder of this page intentionally left blank]*

15

Very truly yours,

**JPMORGAN CHASE BANK, N.A.**

[Signature Page to Commitment Letter]

**THE TORONTO-DOMINION BANK, NEW YORK BRANCH**

**TD SECURITIES (USA) LLC**

[Signature Page to Commitment Letter]

**SUMITOMO MITSUI BANKING CORPORATION**



[Signature Page to Commitment Letter]

Accepted and agreed to as of
the date first written above by:


**ADOLIN HOLDINGS INC.**


By:_____
    Name: Paul Rivett
    Title: Chief Executive Officer


[Signature Page to Commitment Letter]

APPENDIX-I

<u>Limited Payment Acknowledgement and Guaranty</u>

The undersigned, Gold Reserve Ltd., a Bermuda limited company (the "***Limited Pre-Closing Guarantor***"), hereby unconditionally acknowledges receipt of the foregoing Commitment Letter to which this Appendix-I is attached, and each of the Fee Letters (collectively, the "***Obligor Documents***" and each individually, an "***Obligor Document***") and: (a) guarantees, as a primary obligor and not merely as a surety to the Commitment Parties (in the case of the Commitment Letter) and each party (other than the Initial Borrower (or any permitted successor and assigns thereof)) to the Fee Letters (collectively, the "***Beneficiaries***"), the prompt payment in full when due of the full and punctual payment, as and when the same shall become due, of those amounts due and payable by Initial Borrower to the applicable Beneficiary now existing and hereafter owed under the foregoing Obligor Documents that consist of, and solely to the extent consisting of amounts that are payable pursuant to any of: (i) those indemnity and expense reimbursement obligations set forth in the Commitment Letter that are payable prior to the Closing Date (including (without limitation) as set forth in Section 6(b) of the Commitment Letter) and (ii) those fees set forth in the and Fee Letters and the Term Sheets attached as exhibits to the Commitment Letter that are payable prior to the occurrence of the Closing Date, in each case in accordance with the terms of the applicable Obligor Document or Obligor Documents, (the foregoing such obligations being herein collectively called the "***Guaranteed Obligations***"); and (b) agrees that if the Initial Borrower or any other Loan Party shall fail to pay in full when due any of the Guaranteed Obligations, the Limited Pre-Closing Guarantor will promptly pay the same in cash, without any demand or notice whatsoever; *provided, however* that in the case of both clause (a) and clause (b) hereof and subject to the immediately following sentence, if there are no Guaranteed Obligations that remain at the end of the Closing Date (as defined below), then the Limited Pre-Closing Guarantor's obligations and liabilities hereunder shall be deemed satisfied and discharged in full on the Closing Date. The obligations of the Limited Pre-Closing Guarantor hereunder shall constitute a guarantee of payment and to the fullest extent permitted by applicable law. The Limited Pre-Closing Guarantor hereby undertakes that all indebtedness or other obligations owed by it to the Initial Borrower shall be fully subordinated to the payment in full of the Guaranteed Obligations. The Limited Pre-Closing Guarantor's obligations and liabilities hereunder shall be automatically reinstated if and to the extent that for any reason any payment by or on behalf of the Limited Pre-Closing Guarantor in respect of the Guaranteed Obligations is rescinded or must be otherwise restored by any holder of any of the Guaranteed Obligations, whether as a result of any proceedings in bankruptcy or reorganization or otherwise.

The obligations of the Limited Pre-Closing Guarantor hereunder are absolute, irrevocable and unconditional, irrespective of any circumstance whatsoever that might otherwise constitute a legal or equitable discharge or defense of a surety or Limited Pre-Closing Guarantor and, without limiting the generality of the foregoing, the Limited Pre-Closing Guarantor hereby unconditionally and irrevocably waives any defenses it may now or hereafter have in any way relating to, any or all of the following:

> (a) promptness, diligence, notice of acceptance, presentment, demand for performance, notice of nonperformance, default, acceleration or intent to accelerate, protest or dishonor, and any other notice with respect to any of the Guaranteed Obligations and this Guaranty;

> (b) the benefit of any statute of limitations affecting such Limited Pre-Closing Guarantor's liability hereunder or the enforcement hereof;

> (c) any modification or amendment of or supplement to any Obligor Document (including any such modification, or amendment of or supplement to such Obligor Document that has the effect of increasing the Guaranteed Obligations);

APPENDIX-I

(d) any lack of validity or enforceability relating to or against the Initial Borrower for any reason related to any Obligor Document or any governmental requirement purporting to prohibit the payment by the Initial Borrower of the Guaranteed Obligations; or

(e) any voluntary or involuntary liquidation, dissolution, sale of all or substantially all assets, marshalling of assets or liabilities, receivership, conservatorship, assignment for the benefit of creditors, insolvency, bankruptcy, reorganization, arrangement, or composition of the Initial Borrower or any other proceeding involving the Initial Borrower or any asset of the Initial Borrower under any law for the protection of debtors; or any discharge, impairment, modification, release, or limitation of the liability of, or stay of actions or lien enforcement proceeding against, the Initial Borrower, any property of the Initial Borrower, or the estate in bankruptcy of Initial Borrower in the course of or resulting from any such proceeding.

The Limited Pre-Closing Guarantor acknowledges that it will receive substantial direct and indirect benefits from the transactions contemplated by the Obligor Documents and that this Guaranty, including specifically the waivers set forth in this Guaranty, are knowingly made in contemplation of such benefits.

No failure or delay by any Beneficiary in exercising any right, remedy, power or privilege hereunder, under any Obligor Document or any other document entered into by the Limited Pre-Closing Guarantor in connection with the Transactions shall operate as a waiver thereof, nor shall any single or partial exercise of any such right, remedy, power or privilege hereunder, or any abandonment or discontinuance of steps to enforce such a right, remedy, power or privilege, preclude any other or further exercise thereof or the exercise of any other right, remedy, power or privilege. The rights, remedies, powers and privileges of the Beneficiaries herein provided, and provided under any Obligor Document are cumulative and not exclusive of any rights, remedies, powers and privileges provided by law. No notice or demand on the Limited Pre-Closing Guarantor in any case shall entitle the Limited Pre-Closing Guarantor to any other or further notice or demand in similar or other circumstances.

The Limited Pre-Closing Guarantor has validly appointed the CT Corporation System at 28 Liberty Street, New York, NY 10005, or if otherwise, its principal place of business in the City of New York from time to time, as the Limited Pre-Closing Guarantor's agent for service of process. Each of the Beneficiaries shall be third party beneficiaries hereof and shall be entitled to enforce the subordination and other provisions hereof. This Guaranty may not be amended or otherwise modified, except by an instrument in writing signed by each of the Beneficiaries.

**THIS LIMITED PAYMENT ACKNOWLEDGEMENT AND GUARANTY (THE "GUARANTY") AND THE RIGHTS AND DUTIES CREATED AND EXISTING HEREUNDER SHALL BE GOVERNED BY, AND CONSTRUED AND INTERPRETED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK WITHOUT GIVING EFFECT TO ITS PRINCIPLES OR RULES OF CONFLICT OF LAWS TO THE EXTENT SUCH PRINCIPLES OR RULES WOULD REQUIRE OR PERMIT THE APPLICATION OF THE LAWS OF ANOTHER JURISDICTION.**

**THE LIMITED PRE-CLOSING GUARANTOR IRREVOCABLY WAIVES THE RIGHT TO TRIAL BY JURY IN ANY ACTION, PROCEEDING, CLAIM OR COUNTERCLAIM BROUGHT BY OR ON BEHALF OF ANY PARTY RELATED TO OR ARISING OUT OF THIS GUARANTY OR THE PERFORMANCE HEREOF.**

Capitalized terms used but not defined herein shall have the meanings assigned thereto by the Commitment Letter.

The Limited Pre-Closing Guarantor hereby irrevocably and unconditionally (a) submits, for itself and its property, to the exclusive jurisdiction and venue of the United States District Court for the Southern District of New York sitting in the Borough of Manhattan (or if such court lacks subject matter jurisdiction, the Supreme Court of the State of New York sitting in the Borough of Manhattan), in any suit, action or proceeding arising out of or relating to this Guaranty, or the transactions contemplated hereby, (b) waives, to the fullest extent it may legally and effectively do so, any objection that it may now or hereafter have to the laying of venue of any such suit, action or proceeding in the federal or state courts located in the City of New York, Borough of Manhattan, (c) waives, to the fullest extent permitted by law, the defense of an inconvenient forum to the maintenance of such suit, action or proceeding in any such court and (d) agrees that a final judgment in any such suit, action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law.

Duly executed as of this 25th day of June, 2025.

GOLD RESERVE LTD.,
as the Limited Pre-Closing Guarantor

By:    _____
Name:    Paul Rivett
Title:    Chief Executive Officer

[Signature Page to Guaranty]

**EXHIBIT A**

<u>Transaction Description</u>

*All capitalized terms used but not defined herein shall have the meanings given to them in the Commitment Letter to which this term sheet is attached, including the other Exhibits thereto.*

In connection herewith, it is intended that:

1. The Sponsor will acquire, directly or indirectly, including through a group, partnership, consortium, joint venture or other similar arrangement (such acquisition, the "***Acquisition***" and the Sponsor, together with such group, partnership, consortium, joint venture or other similar arrangement, the "***Acquiror***"), equity interests of PDV Holding Inc., a Delaware corporation ("***PDVH***", and together with its direct and indirect subsidiaries, collectively, the "***Target***"), including, but not limited to, CITGO Petroleum Corporation (the "***Ultimate Borrower***") and CITGO Holding, Inc. ("***CITGO Holding***"), pursuant to the Acquisition Agreement (as defined in Exhibit D-1).

2. Immediately upon the occurrence of the Acquisition, the following steps will be consummated in a manner consistent with the orders entered through the date hereof in the civil action styled as *Crystallex International Corp. v. Bolivarian Republic of Venezuela*, Misc. No. 171-15-LPS, and the related cases pending in the U.S. District Court for the District of Delaware, including the treatment of SPA Material Term 5: Treatment of CITGO Debt-Provide Flexibility in that certain Memorandum Order dated January 27, 2025, such that once consummated, (a) Dalinar Energy Corporation ("***Holdings***") shall have caused the Initial Borrower to have merged with and into the Ultimate Borrower, with the Ultimate Borrower being the surviving entity and assuming all of the obligations of the Initial Borrower, including through the Post-Post-Closing Steps Collateral and Guarantee Requirement and the Post-Closing Steps Accessions (as those terms are defined in the Bridge Term Sheet), and (b) the Ultimate Borrower's organizational documents (including but not limited to the bylaws thereof) will have voting and governance capacity and/or minority protections necessary to protect the interests of Holdings and the Acquiror in the Ultimate Borrower in a manner satisfactory to the Lead Arrangers (the foregoing steps, the "***Post-Closing Steps***").

3. The Acquisition and related transaction fees and expenses are expected to be financed as follows:

    a. A Holdings rolled common equity contribution comprised of the conversion of certain amounts received by Gold Reserve Ltd., Koch Minerals Sàrl, Koch Nitrogen International Sàrl and Rusoro Mining Limited on account of or otherwise in connection with the provisions under their respective Attached Judgment (as defined in the Sixth Revised Proposed Order (A) Establishing Sale and Bidding Procedures, (B) Approving Special Master's Report and Recommendation Regarding Proposed Sale Procedures Order, (C) Affirming Retention of Evercore as Investment Banker by Special Master and (D) Regarding Related Matters [D.I. 481] (the "***Order***")), whether from the proceeds of the closing of a Successful Bid (as defined in the Order) or otherwise to Holdings' common equity (the "***Holdings Rolled Common Equity Contribution***").

    b. A Holdings rolled preferred equity contribution (which such preferred equity securities, for the avoidance of doubt, shall be treated as equity in accordance with GAAP and shall be reasonably acceptable to the Lead Arrangers) comprised of the conversion of certain amounts received by Gold Reserve Ltd., Koch Minerals Sàrl, Koch Nitrogen International Sàrl and Rusoro Mining Limited on account of or otherwise in connection with the provisions under their respective Attached Judgment (as defined in the Order), whether from the proceeds of the closing of a Successful Bid (as defined in the Order) or otherwise to Holdings' preferred equity (the "***Holdings Rolled Preferred Equity Contribution***").

    c.    The Holdings Rolled Common Equity Contribution and the Holdings Rolled Preferred Equity Contribution will be in an aggregate amount not less than $3,156,700,000 (subject to adjustments for (i) accrued interest at the time of closing; and (ii) solely to the extent no ABL Pre-Fund Loans are funded on the Closing Date, net cash proceeds from the Holdings Additional Equity Contribution (as defined below)) (the "***Holdings Rolled Contributions***"). It being understood that any cash held by Holdings shall be contributed to the Ultimate Borrower following consummation of the Post-Closing Steps.

    d.    There may also be net cash proceeds from the issuance of common or preferred equity securities (for the avoidance of doubt, which securities shall be treated as equity in accordance with GAAP), in each case, reasonably acceptable to the Lead Arrangers (it being understood such net cash proceeds may include the proceeds of the sale of common or preferred equity interests of Holdings, the Initial Borrower or the Ultimate Borrower, in each case, on terms reasonably acceptable to the Lead Arrangers, purchased by persons with cash paid to such persons on account of or otherwise in connection with the provisions under that certain Attached Judgment (as defined in the Order)) (the "***Holdings Additional Equity Contribution***" and, together with the Holdings Rolled Contributions, the "***Equity Contribution***").

    e.    The Initial Borrower will obtain a senior secured term loan facility on terms and conditions set forth in the ABL Term Sheet with respect to the "ABL Pre-Fund Facility" (the "***ABL Pre-Fund Facility***" and the loans thereunder, the "***ABL Pre-Fund Loans***") in an aggregate principal amount not to exceed $350.0 million or, if lesser, the amount required to pay cash consideration for the Acquisition and fees, expenses and reimbursements payable by the Initial Borrower in connection with the Acquisition. After the consummation of the Acquisition and the Post-Closing Steps, borrowings under the ABL Pre-Fund Facility will automatically convert to Revolving Loans (as defined below) under the ABL Facility as further set forth in the ABL Term Sheet, subject to the terms and conditions included therein. For the avoidance of doubt, the only conditions to the availability of the ABL Pre-Fund Facility and the ABL Pre-Fund Loans are the ABL Pre-Fund Conditions.

    f.    In addition to the Equity Contribution, the Initial Borrower will obtain additional proceeds in an amount that is no less than the amount necessary to consummate the Acquisition from one or more of the following sources (the "***Permanent Financing***"):

        i.    term loans, debt securities, equity securities or equity-linked securities (including securities convertible or exchangeable into or exercisable for equity securities, other equity-linked securities or hybrid debt-equity securities or similar securities).

    g.    In the event that the net cash proceeds of the Permanent Financing and the Equity Contribution are not sufficient to consummate the Acquisition, then the Initial Borrower will obtain a senior secured bridge facility having the terms set forth in the Bridge Term Sheet (the "***Bridge Facility***") in an aggregate principal amount of $4.5 billion, *plus* the amount of any Bridge Facility Increase, *less* the amount of any reductions of the Commitment on or prior to the Closing Date as set forth under "Optional Commitment Reductions and Prepayments" and "Mandatory Commitment Reductions and Prepayments" in the Bridge Term Sheet.

4.    In connection with the Post-Closing Steps (and concurrent with the consummation thereof), all of the debt for borrowed money of the Target, together with its direct and indirect subsidiaries, including but not limited to the Ultimate Borrower and CITGO Holding (other than (a) certain

industrial revenue bond financings incurred in connection with solid waste disposal, waste water treatment and other environmental pollution controls each of which exists on, and is not incurred following, the date hereof in an aggregate principal amount not to exceed $55 million (or such other amount as may be permitted to be incurred in accordance with the terms of the Acquisition Agreement and including debt for borrowed money secured by the Permitted Liens (as defined in the Acquisition Agreement) designated as items 5 and 6 in Schedule 1.1(d) to the Acquisition Agreement), (b) finance leases and similar obligations (including debt for borrowed money secured by the Permitted Liens designated as item 2 in Schedule 1.1(d) to the Acquisition Agreement) in an aggregate principal amount not to exceed $250 million, (c) debt for borrowed money secured by any Specified Permitted Liens, (d) intercompany debt among the Ultimate Borrower and its wholly-owned subsidiaries ("***Ultimate Borrower Subsidiaries***") or among an Ultimate Borrower Subsidiary and another Ultimate Borrower Subsidiary, and (e) debt of joint ventures and other minority owned subsidiaries) will be refinanced, retired or satisfied in full and all associated liens and security interests will be released and Holdings' equity interests in Target (including (without limitation) the Ultimate Borrower) shall be free and clear of any liens or claims (other than the CITGO Holding Pledge (as defined herein)) and the Target's assets shall be free and clear of any liens or claims other than the CITGO Holding Pledge (as defined herein) and as permitted by the Bridge Facility and the ABL Facility (the "***Refinancing***"). As used herein, "***Specified Permitted Liens***" means Permitted Liens designated as items 1, 9, 10 and 11 in Schedule 1.1(d) to the Acquisition Agreement. For the avoidance of doubt, the Refinancing does not include any payment of or satisfaction of the 8.50% senior secured notes due in 2020 issued by Petróleos de Venezuela, S.A., a Venezuelan company ("***PDVSA***") pursuant to the Indenture issued on October 27, 2016, by PDVSA, as issuer, with PDVSA Petróleo, S.A., as guarantor, MUFG Union Bank, N.A., as trustee, GLAS Americas LLC, as collateral agent, Law Debenture Trust Company of New York, as registrar, transfer agent and principal agent, and Banque Internationale À Luxembourg, Société Anonyme, as Luxembourg paying agent.

All of the transactions described above, including the Acquisition, are collectively referred to herein as the "***Transactions***."  The date of the satisfaction or waiver of the conditions set forth in Section 5 of the Commitment Letter, the Bridge Term Sheet and the Bridge Conditions Annex and the initial funding of the Bridge Facility and the initial funding of the ABL Pre-Fund Facility is referred to as the "***Closing Date***" and the date of the satisfaction or waiver of the conditions set forth in the ABL Term Sheet with respect to the ABL Facility and the ABL Conditions Annex (including (without limitation) consummation of the Post-Closing Steps) is referred to as the "***Ultimate Closing Date***", it being understood that the Closing Date and the Ultimate Closing Date shall be the same calendar date; *provided* that the Closing Date shall be deemed to occur prior to the Ultimate Closing Date.

**EXHIBIT B**

CITGO PETROLEUM CORPORATION
$2,000,000,000
Senior Secured Asset-Based Revolving Credit Facility
Summary of Principal Terms and Conditions

      Capitalized terms not otherwise defined herein have the same meanings as specified therefor in the Commitment Letter to which this Exhibit B is attached, including the other Exhibits thereto.

| | |
|---|---|
| **ABL Facility:** | On the Ultimate Closing Date, the Borrower intends to, following consummation of the Post-Closing Steps, obtain a senior-secured asset-based revolving credit facility (the "***ABL Facility***" and the loans made thereunder, the "***Revolving Loans***") with initial aggregate commitments of $2,000,000,000, which are subject to the Borrowing Base (described below) then in effect (the "***ABL Commitments***") and the section entitled "Availability" below. After the Ultimate Closing Date, the Borrower will be able to, at its option, and subject to customary conditions, request an increase in the ABL Commitments by up to $500,000,000 (with the aggregate principal amount of the ABL Commitments not to exceed a total of $2,500,000,000) by obtaining additional commitments from one or more Lenders or, with the consent of the ABL Administrative Agent and Issuing Lenders, but without the consent of any other Lenders, from other entities. |
| **ABL Pre-Fund Facility**: | As set forth on Annex II. |
| **Transactions:** | As set forth in the Transaction Description. |
| **Use of Proceeds of Revolving Loans:** | The proceeds of the Revolving Loans will be used for general corporate purposes following the Ultimate Closing Date, including any fees, costs or other expenses relating to this financing. For the avoidance of doubt, the Revolving Loans shall not be used to finance the Acquisition and the Refinancing (it being understood that the use of proceeds of the ABL Pre-Fund Facility shall solely be subject to the limitations that are set forth on, or consistent with the terms set forth on, Annex II). |
| **Borrower**: | CITGO Petroleum Corporation, a Delaware corporation (the "***Borrower***"). |
| **Holdings**: | Dalinar Energy Corporation, a newly incorporated corporation under the laws of the State of Delaware ("***Holdings***"). |
| **Guarantors**: | Holdings and each existing and subsequently acquired or organized direct and indirect subsidiary of the Borrower (each, a "***Guarantor***") shall unconditionally guaranty all of the Borrower's obligations (the "***Obligations***") under and in connection with the ABL Facility and the Borrower shall unconditionally guaranty all of the Secured Ancillary Obligations (as defined below), in each case, subject to such exceptions and materiality thresholds to be mutually agreed consistent with the Documentation Principles (as |

defined below). Any subsidiary that provides a guarantee of the obligations under any other material indebtedness of any Loan Party (including the Bridge Facility) shall be a Guarantor. The Borrower and the Guarantors are herein referred to collectively, as the "***Loan Parties***" and, individually, as a "***Loan Party***".

**Lead Arrangers**:

JPMorgan, TDS and SMBC will act as joint lead arrangers for the ABL Facility, and will perform the duties customarily associated with such roles (in such capacities, the "***Lead Arrangers***").

**ABL Administrative Agent**:

JPMorgan will act as the sole and exclusive administrative agent for the ABL Facilities (in such capacity, the "***ABL Administrative Agent***").

**Issuing Lenders:**

JPMorgan and other financial institutions to be designated in or in accordance with the ABL Credit Documentation (each, an "***Issuing Lender***" and together, the "***Issuing Lenders***").

**Lenders**:

A syndicate of banks, financial institutions and other entities arranged by the Lead Arrangers (collectively, the "***Lenders***").

**Maturity**

The Revolving Loans will mature on the date that is the earlier of (a) five (5) years after the Ultimate Closing Date and (b) 91 days prior to the scheduled maturity date of debt constituting Material Debt (to be defined in the ABL Credit Documentation in a manner to be agreed and to include the Bridge Facility) (such date, the "***Termination Date***").

**Availability**:

"***Availability***" means an amount equal to (i) the lesser of the ABL Commitments and the Borrowing Base (the "***Line Cap***") *minus* (ii) the sum of the aggregate outstanding amount of borrowings under the ABL Facility (including any protective advances) *plus* the undrawn amount of outstanding letters of credit under the ABL Facility. The ABL Administrative Agent may take reserves against Availability or the Borrowing Base in its Permitted Discretion.

The ABL Pre-Fund Facility (as defined below) will be available in a single drawing on the Closing Date and prior to the Post-Closing Steps subject solely to the satisfaction and/or waiver of the ABL Pre-Fund Conditions. The ABL Pre-Fund Loans (as defined below) shall automatically convert to Revolving Loans under the ABL Facility without further action following consummation of the Post-Closing Steps and satisfaction or waiver of the conditions provided for or referred to under "Initial Conditions" below (the "***ABL Pre-Fund Conversion***").

The ABL Facility (other than, for the avoidance of doubt, the ABL Pre-Fund Facility) will be available to be drawn after the Ultimate Closing Date following consummation of the Post-Closing Steps

2

and subject to the other Initial ABL Facility Conditions (as defined below).

**Swingline Loans**:  Revolving Loans may be made as swingline loans (the "***Swingline Loans***") at the discretion of the ABL Administrative Agent (in such capacity, the "***Swingline Lender***") in order to facilitate the administration of the ABL Facility. Each Lender shall acquire and/or retain an irrevocable and unconditional pro rata participation in each Swingline Loan and each Swingline Loan will be subject to settlement procedures amongst the Swingline Lender and the Lenders no less frequently than weekly.

**Borrowing Base**:  At any time after the Deemed Borrowing Base Termination Date, an amount equal, at any time, to the sum of (in each case, without duplication) (a) the lesser of (A) a cap to be agreed and (B) 100% of the Borrower's and Guarantors' eligible cash that is deposited with JPMorgan in a fully-segregated and blocked account subject to a fully-blocked control agreement, an assignment of deposit account or similar agreement acceptable to the ABL Administrative Agent and over which JPMorgan has the right to approve or prevent withdrawals in its sole discretion (with customary release mechanics to be set forth in the ABL Credit Documentation), *plus* (b) 100% of the Borrower's and Guarantors' eligible paid but unexpired letters of credit, *plus* (c) 90% of the Borrower's and Guarantors' eligible credit card receivable, *plus* (d) 90% of the Borrower's and Guarantors' eligible investment grade accounts receivable, *plus* (e) 85% of the Borrower's and Guarantors' eligible non-investment grade accounts receivable, *plus* (f) the lesser of (A) a cap to be agreed and (B) 80% of the Borrower's and Guarantors' eligible positive exchange balances, *plus* (g) 80% of the market value (as determined by the ABL Administrative Agent in its Permitted Discretion (as defined below)) of the Borrower's and Guarantors' eligible hydrocarbon inventory, *plus* (h) 80% of the market value (as determined by the ABL Administrative Agent in its Permitted Discretion in accordance with the succeeding paragraph) of the Borrower's and Guarantors' eligible retail gasoline inventory, *plus* (i) the least of (A) a cap to be agreed, (B) 85% of the of the Borrower's and Guarantors' eligible inventory (other than any inventory described in the preceding clause (g) or (h), such inventory, "***Non-Hydrocarbon Inventory***") (valued at the lower of cost (FIFO) or market) and (C) up to 85% *multiplied by* the net orderly liquidation value percentage identified in the most recent inventory appraisal ordered by the ABL Administrative Agent *multiplied by* the Borrower's eligible Non-Hydrocarbon Inventory (valued at the lower of cost (FIFO) or market) in each case, *plus* (j) the lesser of (A) 70% of the Borrower's and Guarantors' eligible receivables attributable to RIN fuel credits and (B) 5% of the then effective Borrowing Base (as determined without regard to this clause (j))

3

*less* (k) reserves established by the ABL Administrative Agent in its Permitted Discretion (as defined below).

"***Permitted Discretion***" means a determination made in good faith and in the exercise of reasonable (from the perspective of a secured asset-based lender) business judgment.

The Borrower shall deliver to the ABL Administrative Agent (a) a field examination and inventory and equipment appraisal of the proposed assets to be included in the Borrowing Base (the "***Initial Exam/Appraisal***") completed by an examiner selected by the ABL Administrative Agent, (b) a purchase price accounting adjustment by the Borrower with respect to the Acquisition and an unaudited (or at the option of the Borrower, audited) balance sheet reflecting such purchase price accounting adjustment and (c) a completed borrowing base certificate (the "***Initial Post-Deemed Borrowing Base Certificate***") will be required to be delivered on or prior to the 90th day following the Ultimate Closing Date (the earlier of the date on which each of the foregoing items have been delivered to the ABL Administrative Agent and such 90th day, the "***Deemed Borrowing Base Termination Date***"). Prior to the Deemed Borrowing Base Termination Date, the Borrowing Base shall be equal, at any time, to (the "***Deemed Borrowing Base***") the sum of (i) 65% of the Borrower's and Guarantors' accounts receivable *plus* (ii) 50% of the market value (as determined by the ABL Administrative Agent in its Permitted Discretion) of the Borrower's and Guarantors' hydrocarbon inventory, *less* (iii) reserves established by the ABL Administrative Agent in its Permitted Discretion. Following the Deemed Borrowing Base Termination Date, if any of the Initial Exam/Appraisal, the applicable purchase price accounting adjustment and associated balance sheet or the Initial Post-Deemed Borrowing Base Certificate has not been delivered to the ABL Administrative Agent, the Borrowing Base shall be $0 until the date of such delivery; provided so long as the Borrower is (x) using commercially reasonable efforts to cooperate with the ABL Administrative Agent and the examiner and appraiser, respectively, in the preparation of the field examination and the appraisal but the field examination or the appraisal has not been completed on or before the Deemed Borrowing Base Termination Date, the Administrative Agent may agree to extend the Borrowing Base Termination Date in its Permitted Discretion.

Borrowing Base reporting will occur monthly, springing to weekly during a Weekly Reporting Period. An updated Borrowing Base certificate to be delivered concurrently with certain dispositions of property included in the Borrowing Base having a value to be agreed to a person or persons that are not Loan Parties. Each Borrowing Base certificate shall be in a form to be agreed but shall include calculations with respect to each component of the

Borrowing Base (including, without limitation, a current account statement of the Borrowing Base Account).

"***Aggregate Exposure***" means the sum of (a) the outstanding principal amount of Revolving Loans <u>*plus*</u> (b) the aggregate undrawn amount of all outstanding Letters of Credit <u>*plus*</u> (c) the aggregate amount of all drawings under Letters of Credit that have not been reimbursed in accordance with the ABL Credit Documentation

A "***Weekly Reporting Period***" shall commence following (a) the occurrence of an event of default or (b) when Availability is less than the greater of (i) 15.0% of the Line Cap and (ii) $265,000,000 and shall terminate upon, as applicable, the waiver or cessation of such event of default, no continuing default or event of default or after a thirty (30) consecutive day period during which Availability exceeds the relevant threshold.

**Eligibility:**

The Borrowing Base shall be subject to usual and customary eligibility criteria for facilities of this type to be agreed and set forth in the ABL Credit Documentation.

**Letters of Credit:**

Up to $200,000,000 (or such higher amount as may be requested by the Borrower and agreed to by one or more Issuing Lenders and the Administrative Agent) of the ABL Facility may be available for the issuance of letters of credit (the "***Letters of Credit***") by the Issuing Lenders, of which amount not more than an amount to be agreed shall be available for financial letters of credit. No Letter of Credit shall have an expiration date after the earlier of (a) one year after the date of issuance and (b) the date that is 5 business days prior to the Termination Date (such date, the "***LC Expiration Date***"); <u>provided</u> that any Letter of Credit with a one-year tenor may provide for the renewal thereof for additional one-year periods (which shall in no event extend beyond the date referred to in clause (b) above); <u>provided</u> further that any Letter of Credit may, in the sole discretion of the applicable Issuing Lender, have an expiration date after the LC Expiration Date so long as such Letter of Credit is cash collateralized in a manner satisfactory to the applicable Issuing Lender, but in no event for an amount less than 105% of (x) the undrawn and unexpired amounts of such Letter of Credit and (y) the drawn amounts under such Letter of Credit to the extent such drawn amounts have not been reimbursed in accordance with the terms of the ABL Credit Documentation.

Drawings under any Letter of Credit shall be reimbursed by the Borrower (whether with its own funds or with the proceeds of Revolving Loans) on the same business day. To the extent that the Borrower does not so reimburse the applicable Issuing Lender, the other Lenders under the ABL Facility shall be irrevocably and

unconditionally obligated to reimburse the applicable Issuing Lender on a pro rata basis.

**Optional Prepayments:**

Permitted in whole or in part, with prior written notice but without premium or penalty, subject to limitations as to minimum amounts of prepayments and, if applicable, customary indemnification for breakage costs in the case of prepayment of Term Benchmark Loans other than on the last day of a related Interest Period.

**Mandatory Prepayments:**

If at any time:

(a) the outstanding Revolving Loans and outstanding Letters of Credit exceed the Line Cap at such time, prepayments of applicable Revolving Loans shall be required in an amount equal to such excess (and, if prepayments of Revolving Loans are insufficient to cure such overadvance, cash collateralization of Letters of Credit shall be required in an amount equal to any such remaining excess);

(b) Holdings or any of its subsidiaries receives Net Cash Proceeds (to be defined in the ABL Credit Documentation in a manner to be agreed but to provide for netting of any such proceeds that are required to prepay the Bridge Facility under the Bridge Facility Documentation (or permitted debt that is a component of the Permanent Financing pursuant to the definitive documentation for such Permanent Financing)) in excess of a threshold to be agreed from any sale or disposition by the Holdings or any of its subsidiaries of property or assets outside of the ordinary course of business, including sales or issuances of equity interests of any subsidiary of the Holdings or any casualty or condemnation event;

(c) the Borrower or any of its subsidiaries receives proceeds from the issuance of any debt that is not permitted under the ABL Credit Documentation, prepayment of the Revolving Loans with the net proceeds thereof shall be required (and, if net proceeds remain after such prepayment of Revolving Loans, cash collateralization of Letters of Credit); or

(d) a Cash Dominion Trigger Period is continuing, the Revolving Loans shall be prepaid as set forth in the section entitled "Cash Dominion" below.

Any mandatory prepayment described hereinabove shall be without commitment reduction and be subject to the Intercreditor Agreement (as defined below).

**Interest Rates and Fees:**

As set forth on Annex I.

**Collateral:**

The obligations of each Loan Party in respect of the ABL Facility (the "***ABL Facility Obligations***"), the Guarantees (as defined below) and secured bank products (including ACH transactions,

6

credit card transactions and cash management services) owing to any Lender or its affiliates ("**Secured Cash Management Obligations**"), and swap agreements (other than Excluded Swap Obligations (as defined below)) owing to, any Lender or its affiliates ("**Secured Swaps**" and together with Secured Cash Management Obligations, "**Secured Ancillary Obligations**") (collectively, the ABL Facility Obligations, the Guarantees and the Secured Ancillary Obligations, the "**Secured Obligations**") shall be secured by (i) a perfected first priority security interest in the accounts receivable, deposit accounts, RIN fuel credits (including receivables attributable thereto) certain cash and accounts, inventory, chattel paper, general intangibles (to the extent not otherwise Bridge Priority Collateral), instruments, documents, rights in respect of letters of credit, commercial tort claims and other related items (including, without limitation, books and records) of the Loan Parties (the "**ABL Priority Collateral**") and (ii) a perfected second priority security interest in (A) substantially all of the Borrower's and the other Guarantors' other present and after-acquired tangible and intangible assets (including, without limitation, intellectual property and real property), (B) an assignment of business interruption insurance and (C) (1) 100.0% of the capital stock of the Borrower and each Guarantor and their respective direct subsidiaries and (2) 65.0% of the voting equity interests and 100.0% of the non-voting equity interest of non-Guarantor foreign subsidiaries that are directly held by domestic Loan Parties (the "**Bridge Priority Collateral**", and together with the ABL Priority Collateral, collectively, the "**Collateral**"), in each case, subject to applicable permitted liens (including the CITGO Holding Pledge) and to certain customary exceptions to be mutually agreed consistent with the Documentation Principles and subject to the terms of the Intercreditor Agreement; <u>provided</u> that the Collateral shall not include any Excluded Assets (the definition of which is to be mutually agreed consistent with the Documentation Principles); <u>provided</u>, <u>further</u>, that any required mortgages, control agreements, perfection of liens on vehicles and other assets subject to certificates of title, together with any landlord lien waiver, estoppel, warehouseman waiver or other collateral access or similar letter or agreement will be permitted to be delivered after the Closing Date in accordance with the Certain Funds Provision.

**Guarantees**:

Each Guarantor shall unconditionally guarantee, on a joint and several basis, all Secured Obligations and the Borrower shall unconditionally guarantee the Secured Ancillary Obligations (collectively, the "**Guarantees**").

With respect to any Guarantor, such Guarantor shall not have any obligation to pay or perform under any agreement, contract, or transaction that constitutes a "swap" within the meaning of section 1a(47) of the Commodity Exchange Act (a "**Swap**"), if, and to the extent that, all or a portion of the Guarantee by such Guarantor of,

or the grant by such Guarantor of a security interest to secure, as applicable, such Swap (or any guarantee thereof) is or becomes illegal ("***Excluded Swap Obligations***"), it being understood that the Borrower or a Guarantor that is an "eligible contract participant" ("***ECP***") as defined in the Commodity Exchange Act at the time a Swap is incurred, shall provide a "cross-guarantee" to confer ECP status in accordance with Section 1a(18)(A)(v)(II) of the Commodity Exchange Act on any Guarantor who is not otherwise an ECP.

The ABL Credit Documentation shall prohibit the release of guarantees as a result of a disposition of less than all of a subsidiary's capital stock, unless such disposition of capital stock is a good faith disposition to a bona fide unaffiliated third party for not less than fair market value and for bona fide business purposes.

**Intercreditor Agreement**:

The lien priority, relative rights and other creditors' rights issues in respect of the ABL Facility and the Bridge Facility shall be subject to intercreditor arrangements set forth in an intercreditor agreement (the "***Intercreditor Agreement***"), the terms of which will reflect terms for "crossing lien" financing structures governing such arrangements. The ABL Facility will be secured by a perfected first priority lien on the ABL Priority Collateral and a perfected second priority lien on the Bridge Priority Collateral. The Bridge Facility will be secured by a perfected first priority lien on the Bridge Priority Collateral and a perfected second priority lien on the ABL Priority Collateral.

**Initial Conditions**:

The several obligations of the Lenders to make, or cause one of their respective affiliates to make, ABL Commitments available under the ABL Facility will be subject only to (a) the conditions precedent referred to in <u>Section 5</u> of the Commitment Letter and in Annex II and (b) the section entitled "Availability" above (collectively, the "***Initial ABL Facility Conditions***"). For the avoidance of doubt, this section applies solely to the ABL Facility (other than the ABL Pre-Fund Facility); the only conditions to availability of the ABL Pre-Fund Facility, subject to the Certain Funds Provision, are the ABL Pre-Fund Conditions.

**On-Going Conditions:**

The making of each extension of credit after the Closing Date shall be conditioned upon (a) the accuracy in all material respects (or in respect of each representation or warranty which is subject to any materiality qualifier, in all respects) of all representations and warranties in the ABL Credit Documentation; (b) there being no default or event of default in existence at the time of, or after giving effect to the making of, such extension of credit; and (c) after giving effect to such extensions of credit, the total extensions of credit under the ABL Facility shall not exceed the Line Cap at such time.

8

**ABL Credit Documentation**:

The ABL Credit Documentation shall be based on a precedent to be mutually agreed upon among the Lead Arrangers and the Borrower, and negotiated in good faith and modified pursuant to this ABL Term Sheet and as further modified to reflect (a) the ABL Administrative Agent's required agency, form provisions and operational requirements, (b) the operational and strategic requirements of the Borrower and its subsidiaries (after giving effect to the transactions on the Ultimate Closing Date) in light of its size, assets, industries, geographic location, businesses and business practices, (c) such other terms and conditions usual and customary for facilities and transactions of this type and (d) other modifications as may be mutually agreed by the Borrower and the ABL Administrative Agent (the "***ABL Credit Documentation***").

**Representations and Warranties**:

Subject to the Certain Funds Provision, applicable to Holdings, the Borrower and their respective subsidiaries and usual and customary for facilities of this type, including, without limitation and in each case, subject to materiality and knowledge qualifiers, baskets and exceptions to be set forth in the ABL Credit Documentation:

(a)     Corporate existence, power and authority;

(b)     authorization; enforceability;

(c)     government approvals and no conflicts;

(d)     financial condition; no material adverse effect;

(e)     ownership of property (including IP);

(f)     litigation and environmental matters;

(g)     compliance with law;

(h)     Investment Company Act and other regulations including compliance with Regulations T, U and X;

(i)     taxes;

(j)     ERISA;

(k)     disclosure;

(l)     solvency (as of the Ultimate Closing Date and the date of each bringdown of the representations and warranties);

(m)     capitalization and subsidiaries;

(n)     security interest in Collateral;

(o)     labor matters;

(p)     anti-corruption laws, sanctions (including OFAC) and Anti-Money Laundering (including PATRIOT Act);

(q)     no default;

(r)     use of proceeds;

9

|  | (s) | EEA Financial Institution; |
|---|---|---|
|  | (t) | bank accounts; and |
|  | (u) | material contracts to be agreed. |

**Affirmative Covenants**:

Applicable to Holdings, the Borrower and their respective subsidiaries and usual and customary for facilities of this type, including, without limitation and in each case, subject to materiality and knowledge qualifiers, baskets and exceptions to be set forth in the ABL Credit Documentation:

(a) Delivery of monthly, quarterly and annual financial statements of the Borrower, annual budget, reports, accountants' letters, projections, officers' certificates, quarterly lender calls and other information requested by the Lenders;

(b) continuation of business and maintenance of existence and material rights and privileges;

(c) payment of taxes and other obligations;

(d) maintenance of property and insurance;

(e) inspections;

(f) maintenance of books and records;

(g) compliance with laws, ERISA and material contractual obligations;

(h) environmental laws;

(i) anti-corruption laws and sanctions;

(j) notices of defaults, litigation and other material events;

(k) collateral and borrowing base reporting;

(l) field examinations and appraisals;

(m) communication with accountants;

(n) additional collateral and further assurances;

(o) use of proceeds; and

(p) keepwell provisions.

**Negative Covenants:**

Applicable to Holdings, the Borrower and their respective subsidiaries and usual and customary for facilities of this type, including, without limitation and in each case, subject to materiality and knowledge qualifiers (unless otherwise specified), baskets and exceptions to be set forth in the ABL Credit Documentation:

(a) indebtedness (including guarantee obligations);

(b) liens;

(c)    restricted payments;

(d)    certain payments of debt (including (i) any pre-payment of the Bridge Facility (including any mandatory pre-payment thereof required to be made using excess cash flow of the Loan Parties) and (ii) any payment of junior lien, unsecured and/or subordinated debt);

(e)    restrictive agreements;

(f)    restrictions on subsidiary distributions;

(g)    investments (including restrictions on further investments related to Holdings and its subsidiaries' Asset-Backed Trading business);

(h)    asset sales, provided that the sales of non-core assets contemplated in the financial model provided by the Sponsor prior to March 7, 2025 shall be permitted;

(i)    fundamental changes (including changes in lines of business);

(j)    sales and lease-backs;

(k)    related-party transactions;

(l)    conduct of business (including restrictions on expansion of Holdings and its subsidiaries' Asset-Backed Trading business);

(m)    amendments to organizational documents (including with respect to customary minority protections put into place (if any) pursuant to the Transactions, which such restriction shall not be subject to any materiality, material adverse effect or similar qualifiers);

(n)    amendments to terms of material debt;

(o)    disposition of assets (including (i) requiring 75% of consideration in respect of assets included in the Borrowing Base being cash and (ii) prohibition on transfers of material intellectual property) *provided* that, so long as clause (i) is satisfied, the sales of non-core assets contemplated in the financial model provided by the Sponsor prior to March 7, 2025 shall be permitted);

(p)    speculative hedging;

(q)    changes to fiscal period;

(r)    acquisitions, mergers and consolidations;

(s)    passive holding company covenant applicable to Holdings and

(t)    the Final Sale Order remains in full force and effect, and shall not have been vacated, reversed, or stayed or modified

11

or amended in any manner materially adverse to the Lenders.

The foregoing covenants will include baskets, exceptions and restrictions to be set forth in the ABL Credit Documentation, and in any event, include the following:

(a)    indebtedness: (i) no additional material debt for borrowed money will be permitted (other than under a general debt basket in an amount not to exceed $50 million); and (ii) to include customary "anti-layering" provisions.

(b)    liens;

(c)    Restricted Payments: an unlimited basket subject to Payment Conditions (as defined below).

(d)    certain payments of debt (including payments in respect of the Bridge Facility and any Permanent Financing): unlimited basket subject to Payment Conditions.

(e)    investments: unlimited basket subject to Payment Conditions.

"*Restricted Payment*" shall be defined in a customary manner but will include (without limitation) (x) any settlement, monetary judgment or other payment made (directly or indirectly through a distribution to a parent entity or affiliate) in respect of the 2020 Bond Litigation (as defined below) and (y) any payments made in respect of preferred stock or similar equity instruments issued by Holdings or any parent entity thereof (including the preferred equity securities issued in connection with the Holdings Preferred Equity Contribution (or any replacement of such preferred equity securities)).

"*2020 Bond Litigation*" means any litigation relating to the PDVSA Indenture, the notes issued thereunder, the CITGO Holding Share Pledge Agreement: (as defined in the PDVSA Indenture) and any transaction related thereto.

"*Payment Conditions*" means, with respect to any transaction, (a) such transaction is not entered into, or consummated, prior to the first anniversary of the Ultimate Closing Date, (b) there is no default or event of default existing immediately before or after such transaction, (c) no Bridge Loans are outstanding and the Bridge Facility has been paid in full, (d) at all times during the Pro Forma Period, (i) so long as the Total Leverage Ratio (calculated on a pro forma basis after giving effect to such transaction) as of such date is at least 2.00 to 1.00, (A) (1) Availability (calculated on a pro forma basis after giving effect to such transaction) is greater than the greater of (x) 17.5% of the Line Cap and (y) $300,000,000 and (2) the Fixed Charge Coverage Ratio (calculated on a pro forma basis after giving effect to such transaction) as of

12

such date is at least 1.00 to 1.00 or (B) Availability (calculated on a pro forma basis after giving effect to such transaction) is greater than the greater of (x) 22.5% of the Line Cap and (y) $400,000,000 or (ii) so long as the Total Leverage Ratio (calculated on a pro forma basis after giving effect to such transaction) as of such date is less than 2.00 to 1.00, (A) (1) Availability (calculated on a pro forma basis after giving effect to such transaction) is greater than the greater of (x) 12.5% of the Line Cap and (y) $220,000,000 and (2) the Fixed Charge Coverage Ratio (calculated on a pro forma basis after giving effect to such transaction) as of such date is at least 1.00 to 1.00 or (B) Availability (calculated on a pro forma basis after giving effect to such transaction) is greater than the greater of (x) 17.5% of the Line Cap and (y) $300,000,000, and (c) the Borrower shall have delivered a certificate of a responsible officer to the ABL Administrative Agent certifying as to compliance with the requirements of <u>clauses (a)</u> and <u>(b)</u>. Calculations made on a pro forma basis will give effect to (x) any applicable borrowing and/or other extension of credit in connection with a proposed transaction and (y) such proposed transaction, in each case, as if occurring on the first day of the applicable Pro Forma Period.

"***Pro Forma Period***" means the period commencing thirty (30) days prior to the date the applicable transaction and ending on the date of the applicable transaction.

"***Total Leverage Ratio***" means, the ratio determined, on a pro forma basis, of (a) (i) EBITDA (to be defined in the ABL Credit Documentation in a manner to be agreed) of the Borrower and its consolidated subsidiaries to (b) Total Indebtedness (to be defined in the ABL Credit Documentation in a manner to be agreed) of the Borrower and its consolidated subsidiaries, but which shall include the outstanding principal amount of all third party indebtedness for borrowed money (including pursuant to the Facilities), third party debt obligations evidenced by notes, loan agreements or similar instruments (including, for the avoidance of doubt, deferred purchase price obligations which should be classified as debt on a balance sheet of the Borrower in accordance with GAAP, to the extent such deferred purchase price obligations are then due and payable), all indebtedness secured by (or for which the holder of such indebtedness has an existing right, contingent or otherwise, to be secured by) a lien, finance lease obligations, purchase money indebtedness and guarantee obligations in respect of each of the foregoing, all as reflected on the balance sheet of the Borrower, determined in accordance with GAAP and letters of credit, surety or other bonds and similar agreements that have been drawn and not reimbursed.

13

"***Fixed Charge Coverage Ratio***" means, the ratio determined, on a pro forma basis, of (a) (i) EBITDA *minus* (ii) unfinanced capital expenditures to (b) Fixed Charges of the Borrower.

"***Fixed Charges***" means, with respect to any person and its consolidated subsidiaries, without duplication, (a) cash interest expense *plus* (b) prepayments and scheduled principal payments of debt actually made or required to be made *plus* (c) income taxes paid in cash *plus* (d) Restricted Payments paid in cash *plus* (e) capitalized lease obligation payments made *plus* (f) cash contributions made to any employee pension benefit plan.

The ABL Credit Documentation shall prohibit the formation or existence of any direct or indirect unrestricted subsidiaries of Holdings and the Borrower (and shall not include, for the avoidance of doubt, any baskets with respect to unrestricted subsidiary capacity).

|  |  |
|---|---|
| **Financial Covenant**: | Fixed Charge Coverage Ratio of at least 1.00 to 1.00 (which shall be tested monthly against the most recently delivered financial statements, commencing with those delivered prior to the Trigger Date) to be triggered in the event that (a) a default or an event of default has occurred and is continuing or (b) Availability is less than the greater of (i) 10.0% of the Line Cap and (ii) $175,000,000. |

"***Trigger Date***" means the date on which an event described in clause (a) or clause (b) of the immediately preceding paragraph occurs.

Once triggered, the financial covenant shall remain effective until, as applicable, such event of default has been waived in accordance with the ABL Credit Documentation, no continuing default or event of default or after a 30 consecutive day period during which Availability exceeds the relevant threshold.

|  |  |
|---|---|
| **Cash Dominion:** | Holdings, the Borrower and their respective subsidiaries will be subject to cash dominion upon and during the continuance of a Cash Dominion Trigger Event (as defined below). Funds deposited into any depository account will be swept on a daily basis into a blocked account with the ABL Administrative Agent (the "***Concentration Account***"). A "***Cash Dominion Trigger Event***" shall occur when either (a) an event of default has occurred and is continuing or (b) Availability is less than the greater of (i) 10.0% of the Line Cap and (ii) $175,000,000. Prior to the occurrence of a Cash Dominion Trigger Event, collections which are received into the Concentration Account shall be deposited into the Borrower's operating account. Upon and during the effectiveness of a Cash Dominion Trigger Event, collections which are received into the Concentration Account shall be used to reduce amounts owing under the ABL Facility. The appropriate documentation, including blocked account and/or lockbox |

agreements reasonably acceptable to the ABL Administrative Agent, will be required for all depository accounts of the ABL Borrower and its subsidiaries.

A Cash Dominion Trigger Event shall remain in effect until, as applicable, (a) the waiver of such event of default in accordance with the ABL Credit Documentation or, in the case of a breach of the financial covenant, cured pursuant to the equity cure provisions to be set forth in the ABL Credit Documentation or (b) after a thirty (30) consecutive day period during which Availability exceeds the relevant threshold. Upon a Cash Dominion Triggering Event no longer being in effect, collections received into the Concentration Account shall revert to being deposited into the Borrower's operating account.

|  |  |
|---|---|
| **Events of Default**: | Applicable to Holdings, the Borrower and their respective subsidiaries and usual and customary for facilities of this type, including, without limitation and in each case, subject to materiality qualifiers, baskets and exceptions to be set forth in the ABL Credit Documentation: |

(a)     Nonpayment of principal when due;

(b)     nonpayment of interest, fees or other amounts within 3 calendar days after the date due;

(c)     material inaccuracy of a representation or warranty;

(d)     violation of a covenant (subject, in the case of certain affirmative covenants, to a grace period to be agreed);

(e)     bankruptcy and insolvency events;

(f)     ERISA events that could reasonably be expected to have a material adverse effect;

(g)     material judgments;

(h)     cross-default;

(i)     Change of Control;

(j)     invalidity (actual or asserted) of guarantees, collateral documents or other loan documents; and

(k)     failure to (i) effectuate the Post-Closing Steps or (ii) satisfy the Post-Post-Closing Steps Collateral and Guarantee Requirement, in each case, on the Closing Date.

"***Change of Control***" means the occurrence of any of the following (a) the Permitted Holders shall cease to own, free and clear of all liens or other encumbrances, directly or indirectly, equity interests representing (i) at least 50.1% of the outstanding voting power and economic interests of the Borrower on a fully diluted basis or (ii) 100.0% of the outstanding voting power and economic interests of Holdings on a fully diluted basis, (b) Holdings shall

cease to own, free and clear of all liens or other encumbrances, directly, equity interests representing at least 100.0% of the outstanding voting power and economic interests of the Borrower on a fully diluted basis and (c) the acquisition of direct or indirect Control of the Borrower or Holdings by any Person or group other than the Permitted Holders; <u>provided</u> that, notwithstanding the foregoing, no Change of Control shall occur in any circumstance or transaction that would otherwise constitute a Change of Control with respect to clause (a), (b) or (c) of the definition thereof for so long as either, (i) the Permitted Holders have, at such time, the right or the ability by voting power, contract or otherwise to elect or designate for election at least a majority of the members of the Board of Directors of the Borrower or (ii) at least a majority of the members of the Board of Directors of the Borrower are comprised of Continuing Directors; <u>provided</u> <u>further</u> that, notwithstanding the foregoing, any such occurrence or transaction shall be subject to the completion of applicable requirements pursuant to "know your customer" and anti-money laundering rules and regulations, including the USA PATRIOT Act and the Beneficial Ownership Regulation and failure to satisfy such "know your customer" regulations shall result in a Change of Control. If either of the preceding exceptions set forth in clause (i) or (ii) were previously relied upon such that no Change of Control occurred and subsequently there is an inability to satisfy either exception, then a Change of Control shall occur.

"***Board of Directors***" means, with respect to any Person, the board of directors (or comparable managers) of such Person, or any committee thereof duly authorized to act on behalf of such board of directors (or comparable managers).

"***Control***" means the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of a person, whether through the ability to exercise voting power, by contract or otherwise and "***Controlled***" has a meaning correlative thereto.

"***Continuing Director***" means (a) any member of the Board of Directors who was a director (or comparable manager) of Borrower on the Closing Date, and (b) any individual who becomes a member of such Board of Directors after the Closing Date if such individual was approved, appointed or nominated for election to the Board of Directors by either the Permitted Holders or a majority of the Continuing Directors.

"***Permitted Holders***" means Gold Reserve Ltd., Koch Minerals Sàrl, Koch Nitrogen International Sàrl and Rusoro Mining Limited and their respective Controlled affiliates.

| | |
|---|---|
| **Field Examinations and Appraisals:** | Field examinations and inventory and appraisals will be conducted at the discretion of the ABL Administrative Agent to ensure the |

adequacy of Borrowing Base collateral and related reporting and control systems; provided that, except as provided in the following two provisos, field examinations and appraisals will not be conducted more than once in each twelve (12) month period; provided further that a second field examination and a second field appraisal in a twelve (12) month period may be performed at the Loan Parties' expense if Availability is less than the greater of (a) 15.0% of the Line Cap and (b) $265,000,000; provided further, that that there shall be no limit on the number of additional field examinations and appraisals that may be performed in any 12-month period if an event of default shall have occurred and be continuing.

**Voting**:

Amendments, waivers and consents with respect to the ABL Credit Documentation shall require the approval of Lenders holding not less than a majority of the ABL Commitments, except that (a) the consent of each Lender directly and adversely affected thereby shall be required with respect to (i) reductions in the amount or extensions of the scheduled date of amortization or maturity of any Revolving Loan, (ii) reductions or forgiveness in the rate of interest or any fee or extensions of any due date thereof, (iii) increases in the amount or extensions of the expiry date of any Lender's commitment and (iv) changes in the "waterfall" or any of the pro rata sharing provisions, and (b) the consent of each Lender shall be required to (i) increase the advance rates set forth in the definition of Borrowing Base, (ii) permit any loan party to assign its rights under the Credit Agreement, (iv) modify any of the voting percentages, (v) release any guarantor of any credit extension, except as otherwise permitted in the ABL Credit Documentation, (vi) release all or substantially all of the Collateral and (vii) any direct or indirect subordination of the ABL Facility in right of payment to any other debt (subject to limited exceptions for certain permitted debt to be agreed), subordination of the liens securing the ABL Facility to any other lien securing any other debt or a grant to the holders of any other debt of a right to receive proceeds from Collateral in priority to the Revolving Loans.

**Assignment and Participation**:

After the Closing, the Lenders shall be permitted to assign (other than to any Prohibited Assignee (as defined below) (unless the Borrower has consented to such assignment to such entity, in which case such entity will not be considered a Prohibited Assignee for the purpose of such assignment)) all or a portion of their Revolving Loans and ABL Commitments with the consent, not to be unreasonably withheld or delayed, of (a) the Borrower, unless (i) the assignee is a Lender, an affiliate of a Lender or an Approved Fund (to be defined in the ABL Credit Documentation in a manner to be agreed) or (ii) a default has occurred and is continuing; provided, that, the Borrower shall be deemed to have consented to an assignment of Revolving Loans or ABL Commitments unless it shall have objected thereto by written notice to the ABL Administrative Agent within five (5) business

days after having received notice thereof, (b) the ABL Administrative Agent and (c) the Issuing Lenders. In the case of partial assignments (other than to another Lender, to an affiliate of a Lender or an Approved Fund), the minimum assignment amount shall be an amount to be agreed unless otherwise agreed by the Borrower and the ABL Administrative Agent. The Lenders shall also be permitted to sell participations in their loans. Participants shall have the same benefits as the Lenders with respect to yield protection and increased cost provisions. Voting rights of participants shall be limited to those matters with respect to which the affirmative vote of the Lender from which it purchased its participation would be required. Pledges of loans in accordance with applicable law shall be permitted without restriction. Each Lender may disclose information to prospective participants and assignees. It is understood that the ABL Administrative Agent, in its capacity as such, shall not (x) be obligated to ascertain, monitor or inquire as to whether any Lender or participant or prospective Lender or participant is a Prohibited Assignee or (y) have any liability (other than any liability arising from its gross negligence or willful misconduct) with respect to or arising out of any assignment or participation of loans, or disclosure of confidential information in connection therewith, to any Prohibited Assignee. As used herein, "***Prohibited Assignees***" shall refer to certain banks, financial institutions and other persons that have been specified by the Sponsor in a written designation delivered to the Lead Left Arranger on or prior to the date of the Commitment Letter and "***Prohibited Assignee***" means any one of the Prohibited Assignees.

| | |
|---|---|
| **Yield Protection:** | Usual and customary for facilities of this type. |
| **ERISA Fiduciary Status** | Usual and customary for facilities of this type. |
| **Defaulting Lenders:** | Usual and customary for facilities of this type. |
| **Bail-in Provisions:** | Usual and customary for facilities of this type. |
| **Erroneous Payments** | Usual and customary for facilities of this type. |
| **QFC Stay Regulations:** | Usual and customary for facilities of this type. |
| **Delaware Divisions:** | Usual and customary for facilities of this type. |

**Expenses and Indemnification**: The ABL Administrative Agent, the Lead Arrangers and the Lenders and their affiliates and their respective officers, directors, employees, advisors and agents shall not have any Liabilities, on any theory of liability, for any special, indirect, consequential or punitive damages incurred by the Borrower or any of their subsidiaries arising out of, in connection with, or as a result of, the ABL Facility or the ABL Credit Documentation, except to the extent resulting from the gross negligence, willful misconduct or

bad faith of, as applicable, the ABL Administrative Agent, the Lead Arrangers or the Lenders and their affiliates and their respective officers, directors, employees, advisors and agents, in each case, as determined by a court of competent jurisdiction by final and nonappealable judgment.  As used herein, the term "*Liabilities*" shall mean any losses, claims (including intraparty claims), demands, damages or liabilities of any kind.

The Borrower shall pay (a) all reasonable out-of-pocket and documented expenses of the ABL Administrative Agent, and Lead Arrangers associated with the syndication of the ABL Facility and the preparation, execution, delivery and administration of the ABL Credit Documentation and any amendment, modification or waiver with respect thereto (including the reasonable fees, disbursements and other charges of one primary counsel for the ABL Administrative Agent), (b) all reasonable out-of-pocket and documented expenses of the ABL Administrative Agent, (and prior to the Closing Date, the Lead Arrangers associated with collateral monitoring, collateral reviews (including, without limitation, field examination fees and appraisals)), and (c) all out-of-pocket expenses of the ABL Administrative Agent (including the fees, disbursements and other charges of counsel) in connection with the enforcement of the ABL Credit Documentation.

The ABL Administrative Agent, the Lead Arrangers, the Issuing Lenders and the Lenders (and their affiliates and their respective officers, directors, employees, advisors and agents) (each an "*Indemnified Person*") will be indemnified and held harmless against, any Liabilities or expenses (including the fees, disbursements and other charges of one firm of counsel for all Indemnified Persons, taken as a whole, and if reasonably necessary, one specialist counsel in each area of specialty reasonably necessary and one firm of local counsel in each appropriate jurisdiction, and, in the case of an actual or perceived conflict of interest (as reasonably determined by an Indemnified Person), one additional firm of counsel in each relevant jurisdiction for the affected Indemnified Persons similarly situated, taken as a whole) incurred by such Indemnified Person in connection with or as a result of (i) the execution and delivery of the ABL Credit Documentation and any agreement or instrument contemplated thereby; (ii) the funding of the ABL Facility or the use or the proposed use of proceeds thereof; (iii) any act or omission of the ABL Administrative Agent in connection with the administration of the ABL Credit Documentation; (iv) any actual or alleged presence or release of hazardous materials on or from any property owned or operated by the Borrower or any of their subsidiaries, or any environmental liability resulting from the handling of hazardous materials or violation of environmental laws, related in any way to the Borrower or any of its subsidiaries; and (v) any actual or prospective claim, litigation, investigation,

arbitration or administrative, judicial or regulatory action or proceeding (each, a "***Proceeding***") in any jurisdiction relating to any of the foregoing (including in relation to enforcing the terms of the limitation of liability and indemnification referred to above), regardless of whether or not any Indemnified Person is a party thereto and whether or not such Proceeding is brought by the Borrower, its affiliates or equity holders or any other party; provided that such indemnification shall not, as to any Indemnified Person, be available to the extent that such Liabilities or expenses (x) are determined by a court of competent jurisdiction by final and nonappealable judgment to have resulted from the gross negligence, willful misconduct or bad faith, or breach of the obligations, of such Indemnified Person or (y) result from disputes among Indemnified Persons (not as a result of any act of the Borrower or its subsidiaries).

**Governing Law and Forum**:    New York.

**Counsel to the ABL Administrative Agent and Lead Arrangers**:    Simpson Thacher & Bartlett LLP.

**ANNEX I**

### <u>INTEREST AND CERTAIN FEES</u>

**Interest Rate Options**:





**Interest Payment Dates**:

**Commitment Fee**:

Annex I - 2



**Letter of Credit Fees**:

**Fronting Fee**:

**Default Rate**:

**Rate and Fee Basis**:          All per annum rates shall be calculated on the basis of a year of 360 days (or 365/366 days, in the case of ABR Loans) for actual days elapsed.

**ANNEX I-A**

**PRICING GRID**



**ANNEX II**

Up to $350,000,000
ABL PRE-FUND FACILITY

| | |
|---|---|
| **ABL Pre-Fund Facility:** | On the Closing Date, the Initial Borrower intends to obtain a senior-secured term loan facility in an aggregate principal amount of $350 million or, if lesser, the amount required to pay cash consideration for the Acquisition and fees, expenses and reimbursements payable by the Initial Borrower in connection with the Acquisition (the "***ABL Pre-Fund Facility***" and the loans made thereunder, the "***ABL Pre-Fund Loans***"). On the Closing Date, following consummation of the Post-Closing Steps and subject to the Initial ABL Facility Conditions, the ABL Pre-Fund Conversion (and termination of the ABL Pre-Fund Facility) shall occur automatically. |
| **Use of Proceeds:** | The proceeds of the ABL Pre-Fund Loans will be used by the Initial Borrower to finance the Acquisition and the Refinancing. |
| **Borrower**: | Adolin Holdings Inc., a newly incorporated corporation under the laws of the State of Delaware ("***Initial Borrower***"). |
| **Holdings**: | Dalinar Energy Corporation, a newly incorporated corporation under the laws of the State of Delaware ("***Holdings***"). |
| **Guarantors**: | Holdings and each existing and subsequently acquired or organized direct and indirect subsidiary of the Initial Borrower (each, an "***ABL Pre-Fund Guarantor***") shall unconditionally guaranty all of the Initial Borrower's obligations (the "***ABL Pre-Fund Obligations***") under and in connection with the ABL Pre-Fund Facility, subject to such exceptions and materiality thresholds to be mutually agreed consistent with the Documentation Principles (as defined below). Any subsidiary that provides a guarantee of the obligations under any other material indebtedness of any ABL Pre-Fund Loan Party (including the Bridge Facility) shall be an ABL Pre-Fund Guarantor. The Borrower and the ABL Pre-Fund Guarantors are herein referred to collectively, as the "***ABL Pre Fund Loan Parties***" and, individually, as an "***ABL Pre-Fund Loan Party***". |
| **Lenders**: | The Lenders. |
| **Maturity** | The ABL Pre-Fund Loans will mature on the day that is 364 days after the Closing Date (the "***ABL Pre-Fund Maturity Date***"). No amortization will be required with respect to the ABL Pre-Fund Loans. |
| **Availability**: | Subject to the Certain Funds Provision, the ABL Pre-Fund Facility will be available in a single drawing on the Closing Date subject to the terms and conditions set forth herein. On the earlier of the drawing of the ABL Pre-Fund Facility or the occurrence of the Closing Date without a drawing of the ABL Pre-Fund Facility, all |

commitments in respect of the ABL Pre-Fund Facility will terminate.

**Mandatory Prepayments**:

The Initial Borrower will prepay the ABL Pre-Fund Loans under the ABL Pre-Fund Facility, together with any accrued interest thereon, in full immediately in the event (a) the Post-Closing Steps is not consummated on the Closing Date immediately upon consummation of the Acquisition as described in the Transaction Description or (b) the Initial ABL Facility Conditions are not satisfied and/or waived in their entirety in accordance with the ABL Credit Documentation on the Closing Date.

Other Mandatory Prepayments provisions substantially identical to the Mandatory Prepayment provisions set forth in the Bridge Term Sheet, with amounts that are payable pursuant to such other Mandatory Prepayment Provisions to be allocated and applied ratably to the Bridge Facility and the ABL Pre-Fund Loans.

**Collateral**:

Subject to the Certain Funds Provisions, the ABL Pre-Fund Obligations in respect of the ABL Facility and the Guarantees shall be secured by the Initial Collateral on substantially identical terms as the "Obligations" (as defined in the Bridge Term Sheet), subject to a customary pari passu intercreditor agreement will be entered into by the administrative agent under the ABL Facilities and the Bridge Administrative Agent (and agreed to by Holdings and the Initial Borrower) governing the respective rights and obligations of the lenders to the Bridge Facility and the Lenders with respect to the Initial Collateral and other customary matters.

**Interest Rates**

Substantially identical to the interest rates set forth on Annex I to the Bridge Facility Term Sheet (including, for the avoidance of doubt, with respect to benchmark rate and other floors). For the avoidance of doubt, for purposes of calculating interest, in no event shall an ABL-Pre Fund Loan be deemed to be outstanding for less than one day.

**ABL Pre-Fund Facility Documentation:**   The ABL Pre-Fund Facility will be documented under a single credit agreement together with the ABL Facility and the representations, warranties, covenants, events of default, agency provisions, indemnity, governing law and other terms of the ABL Pre-Fund Facility shall be substantially identical to the representations, warranties, covenants, events of default, agency provisions, indemnity, governing law and other terms of the ABL Facility (unless otherwise set forth herein); *provided* that (i) with respect to the ABL Pre-Fund Facility, the optional prepayment provisions, initial conditions to effectiveness and funding and interest rates shall be substantially identical to the optional prepayment provisions, initial conditions to effectiveness and funding and interest rates of the Bridge Facility; and (ii) the Certain Funds Provision shall apply to the ABL Pre-Fund Facility funded on the Closing Date. The documentation governing the ABL Pre-Fund Facility is referred to herein as the "***ABL Pre-Fund Facility Documentation***".

Annex II B - 3

**EXHIBIT C**

CITGO PETROLEUM CORPORATION
$4,500,000,000
<u>Senior Secured Bridge Loan Facility</u>
<u>Summary of Principal Terms and Conditions</u>

Capitalized terms not otherwise defined herein have the same meanings as specified therefor in the Commitment Letter to which this <u>Exhibit C</u> is attached, including the other Exhibits thereto.

| | |
|---|---|
| **Initial Borrower**: | Adolin Holdings Inc., a newly incorporated corporation under the laws of the State of Delaware ("***Initial Borrower***"). |
| **Ultimate Borrower**: | CITGO Petroleum Corporation, a Delaware corporation ("***CITGO***" or the "***Ultimate Borrower***"). As used herein, the "***Borrower***" shall refer to the person that is then acting as the borrower. |
| **Holdings**: | Dalinar Energy Corporation, a newly incorporated corporation under the laws of the State of Delaware ("***Holdings***"). |
| **Guarantors**: | Each existing and subsequently acquired or organized direct and indirect subsidiary of Holdings. |
| **Lead Arrangers:** | JPMorgan, TDS and SMBC will act as will act as joint lead arrangers for the Bridge Facility, and will perform the duties customarily associated with such roles (in such capacities, the "***Lead Arrangers***"). |
| **Bridge Administrative Agent**: | JPMorgan will act as the sole and exclusive administrative agent for the Bridge Facility (in such capacity, the "***Bridge Administrative Agent***"). |
| **Lenders**: | JPMorgan and other financial institutions selected by the Lead Arrangers and the Borrower in accordance with the terms of the Commitment Letter (each, a "***Lender***" and, collectively, the "***Lenders***"). |
| **Transactions**: | As set forth in the Transaction Description. |
| **Bridge Facility**: | A senior secured bridge loan facility in an aggregate principal amount of $4,500,000,000 (the "***Bridge Facility***" and the loans made thereunder, the "***Bridge Loans***") as may be increased pursuant to the Bridge Facility Increase (as defined below), *less* the amount of any reductions of the Bridge Commitment on or prior to the Closing Date as set forth under "Optional Commitment Reductions and Prepayments" and "Mandatory Commitment Reductions and Prepayments" below. |
| **Bridge Facility Increase**: | Prior to or on the closing date, subject to the consent of not less than 70% of the holders of commitments to the Bridge Facility (such consenting commitment holders, the "***Bridge Facility Increase Consenting Lenders***") (for the avoidance of doubt, calculated prior to any increase in the Bridge Facility commitments pursuant to this paragraph) the commitments under the Bridge Facility may be increased (the "***Bridge Facility Liquidity Increase***") by the amount necessary for Liquidity |

(defined as the sum of unrestricted cash and availability under the ABL Facility) at the Ultimate Borrower, after giving effect to the Acquisition and the Post-Closing Steps, to be not less than $1,500,000,000.    The Bridge Facility Increase shall be provided by the Bridge Facility Increase Consenting Lenders in proportion to each Bridge Facility Increase Consenting Lender's share of the aggregate amount of Bridge Facility Commitments of all Bridge Facility Increase Consenting Lenders.  In the event that a Bridge Facility Increase is consummated, the Initial Borrower shall be obligated to draw the full available amount of any Bridge Facility Commitments in connection with the Closing and cause such proceeds to be contributed, directly or indirectly to the Ultimate Borrower.

**Purpose/Use of Proceeds**:    The proceeds of the Bridge Loans will be used by the Borrower to finance the Acquisition and the Refinancing, including any fees, costs or other expenses relating thereto (including any deposits paid by, or on behalf of, Holdings relating to the Acquisition).

**Collateral**:    Subject to the Certain Funds Provision, prior to the consummation of the Post-Closing Steps Accessions (as defined below), the Obligations (as defined below) shall be secured by a sole and exclusive perfected first priority security interest in substantially all of the tangible and intangible assets of the Initial Loan Parties (including, without limitation, intellectual property, domestic real property, equipment, fixtures and capital stock of the Initial Loan Parties' respective direct wholly-owned subsidiaries) and which shall include a pledge by Holdings of 100% of the outstanding equity interests in the Initial Borrower and, following the consummation of the Acquisition, PDVH (collectively, the "***Initial Collateral***"), in each case, subject to applicable permitted liens, and a customary pari passu intercreditor agreement entered into by the administrative agent under the ABL Facilities and the Bridge Administrative Agent and to certain customary exceptions to be mutually agreed consistent with the Documentation Principles.

Subject to the Certain Funds Provision, on and at all times after the consummation of the Post-Closing Steps Accessions, the Obligations shall be secured by (a) a sole and exclusive perfected first priority security interest in substantially all of the tangible and intangible assets of the Ultimate Loan Parties (including, without limitation, intellectual property, domestic real property, equipment, fixtures and capital stock of the Loan Parties' respective direct wholly-owned subsidiaries) other than the ABL Priority Collateral (as defined below) and which shall include a pledge by Holdings of 100% of the outstanding equity interests owned by Holdings and its subsidiaries in the Ultimate Borrower and (b) a perfected second priority security interest in the ABL Priority Collateral (collectively, the "Ultimate Collateral"), in each case, subject to permitted liens (including the CITGO Holding Pledge) and to certain customary exceptions to be mutually agreed consistent with the Documentation Principles; provided that the Collateral (as defined below) shall not include any Excluded Assets (the definition of which is to be mutually agreed consistent with the Documentation Principles); provided, further, that, with respect to any Collateral, any required mortgages, control agreements, perfection of liens

2

on vehicles and other assets subject to certificates of title, together with any landlord lien waiver, estoppel, warehouseman waiver or other collateral access or similar letter or agreement will be permitted to be delivered after the Closing Date in accordance with the Certain Funds Provision. As used herein, "*ABL Priority Collateral*" means, subject to the Documentation Principles and customary exceptions to be mutually agreed, all personal property of the Loan Parties consisting of accounts receivable, inventory and related assets (including cash, deposit accounts, securities accounts (excluding any equity of subsidiaries) and commodities accounts) and proceeds thereof. As used herein, "*Collateral*" shall refer to any property or assets that is then required to secure the Obligations (including, prior to the Post-Closing Steps Accessions, any of the Initial Collateral and, following the Post-Closing Steps Accessions, any of the Ultimate Collateral).

The "*Post-Post-Closing Steps Collateral and Guarantee Requirement*" means, collectively, (i) the granting of security interests in the Ultimate Collateral on the Closing Date immediately following the consummation of the Post-Closing Steps in accordance with the terms in this "Collateral" section and (ii) the unconditional guarantee of all Obligations by the Ultimate Guarantors.

| | |
|---|---|
| **Intercreditor Agreement**: | Following the consummation of the Post-Closing Steps Accessions (as defined below), a customary crossing lien intercreditor agreement (the "*Intercreditor Agreement*") will be entered into by the administrative agent under the ABL Facility and the Bridge Administrative Agent (and agreed to by Holdings and the Ultimate Borrower) governing the respective rights and obligations of the lenders to the ABL Facility and the Lenders with respect to the Ultimate Collateral and other customary matters. |
| **Availability**: | The Bridge Loans will be available in a single drawing on the Closing Date. The Bridge Loans will be available in U.S. dollars. To the extent undrawn on the Closing Date, all commitments in respect of the Bridge Facility will terminate. |
| **Maturity**: | The Bridge Loans will mature on the day that is 364 days after the Closing Date (the "*Maturity Date*"). No amortization will be required with respect to the Bridge Facility. |
| **Ranking**: | The Bridge Loans will be secured by the Collateral with the priority as set forth under "Collateral" section above and will rank *pari passu* to the Borrower's existing senior secured indebtedness and senior to any existing and future subordinated indebtedness. |
| **Guarantee**: | Prior to the consummation of the Post-Closing Steps Accessions, all Obligations of shall be unconditionally guaranteed by the Initial Guarantors. |

On and at all times after the consummation of the Post-Closing Steps Accessions, all Obligations shall be unconditionally guaranteed by the Ultimate Guarantors.

The Bridge Facility Documentation shall prohibit the release of guarantees as a result of a disposition of less than all of a subsidiary's capital stock, unless such disposition of capital stock is a good faith disposition to a bona fide unaffiliated third party for not less than fair market value and for bona fide business purposes.

**Pricing**: As set forth on <u>Schedule I</u> to this <u>Exhibit A</u>.

**Optional Commitment Reductions and Prepayments**: On or prior to the Closing Date, the Bridge Commitment may be terminated in whole or reduced in part, at the option of the Borrower, at any time without premium or penalty, in minimum amounts and multiples to be agreed; *provided* that any partial reduction of commitment that may result in the aggregate principal amount of Bridge Commitments being reduced to less than $400,000,000 shall result in a termination of the Bridge Commitments.

After the Closing Date, the Bridge Loans under the Bridge Facility may be prepaid, in whole or in part, at the option of the Borrower, at any time without premium or penalty (except SOFR breakage costs), upon three (3) business days' written notice, in minimum amounts and multiples to be agreed; *provided* that any partial prepayment that may result in the aggregate principal amount of Bridge Loans being reduced to less than $400,000,000 shall require a prepayment in whole of the Bridge Loans.

**Mandatory Commitment Reductions and Prepayments**: (a) On or prior to the Closing Date, the Bridge Commitment will be automatically and permanently reduced on a dollar-for-dollar basis by: (A) the aggregate net cash proceeds received by Holdings, the Initial Borrower or any of their respective subsidiaries of any debt-linked securities or any other indebtedness for borrowed money incurred or issued to third parties, (B) (i) the aggregate net cash proceeds from the issuance of any equity securities or equity-linked securities (including securities convertible or exchangeable into or exercisable for equity securities, other equity-linked securities or hybrid debt-equity securities or similar securities) of Holdings, the Initial Borrower or any of their respective subsidiaries to third parties (other than stock options, phantom units or equity issued under a management incentive plan (or in connection with vesting of phantom units and exercising of stock options)) excluding proceeds resulting from the Holdings Additional Equity Contribution in an amount not to exceed $750,000,000 and (ii) the aggregate amount of claims on account of Attached Judgments (as defined in the Order) senior to Gold Reserve Ltd. confirmed in writing in a customary equity commitment letter to be satisfied by the issuance of any equity securities or equity-linked securities (including securities convertible or exchangeable into or exercisable for equity securities, other equity-linked securities or hybrid debt-equity securities or similar securities) of Holdings, the Initial

4

Borrower or any of their respective subsidiaries to third parties (other than stock options, phantom units or equity issued under a management incentive plan (or in connection with vesting of phantom units and exercising of stock options)) excluding claim satisfaction resulting from the Holdings Rolled Contributions in an amount not to exceed the amount specified in clause 3(c) of Exhibit A, (C) the aggregate amount of any commitment for any debt or equity financing received by Holdings, the Initial Borrower or any of their respective subsidiaries that, if funded, would be of a type set forth in clauses (A) or (B) hereof, so long as the conditions precedent to the availability of such commitments are no less favorable to the Borrower or are more favorable to the Borrower than the conditions set forth herein to the availability of the Bridge Facility and (D) following the actual receipt (or receipt in escrow provided that the conditions to the release of such funds are no less favorable to the Borrower or are more favorable to the Borrower than the conditions set forth herein to the availability of the Bridge Facility) of net cash proceeds from any sale or disposition by Holdings, the Initial Borrower or any of their respective subsidiaries of property or assets outside of the ordinary course of business, including sales or issuances of equity interests of any subsidiary of any of Holdings or the Initial Borrower or any casualty or condemnation event (each such sale or disposition, a "***Bridge Reduction Sale***" and such net cash proceeds, "***Bridge Reduction Sale Proceeds***").

The Bridge Commitment will be reduced: (x) in the case of clauses (A), (B) and (D) on the date of receipt by Holdings, the Initial Borrower, PDVH or any of their respective subsidiaries of such net cash proceeds and (y) in the case of clause (C), on the date that the documentation evidencing the commitments of such financing is entered into. For the avoidance of doubt, the reductions pursuant to clauses (a)(A) – (C) shall not be triggered by the Equity Contribution up to the amounts set forth on Exhibit A. Receipt of net cash proceeds shall include the receipt of such net cash proceeds in escrow provided that the conditions to the release of such funds are no less favorable to the Borrower or are more favorable to the Borrower than the conditions set forth herein to the availability of the Bridge Facility. The Initial Borrower agrees to deliver prompt written notice to the Lead Arrangers of the occurrence of any of the foregoing events and a reasonably detailed calculation of the amount of any corresponding Bridge Commitment reduction.

(b) After the Closing Date, the Borrower will repay the Bridge Loans under the Bridge Facility, together with any accrued interest thereon, (i) on the Ultimate Closing Date, immediately following consummation of the Acquisition and the Post-Closing Steps with 100% of all unrestricted cash on the balance sheet of Holdings, the Initial Borrower, PDVH or any of their respective subsidiaries, including, without limitation, CITGO Holdings and the Ultimate Borrower in excess of $250,000,000, (ii) within one (1) business day following the receipt of net cash proceeds by Holdings, the Borrower or any of its subsidiaries from the issuance or incurrence of any debt or any other indebtedness (whether or not secured) for borrowed money incurred or issued to third parties (other than (x) borrowings under the ABL Facility Documentation or in connection with

the Transactions and (y) any purchase money indebtedness, equipment financings, capital or synthetic lease obligations and similar obligations incurred in the ordinary course of business) in an amount equal to 100% of such net cash proceeds, (iii) within one (1) business day following the receipt of net cash proceeds by Holdings, the Borrower or any of its subsidiaries from the issuance of any equity securities or equity-linked securities (including securities convertible or exchangeable into or exercisable for equity securities, other equity-linked securities or hybrid debt-equity securities or similar securities) of Holdings, the Borrower or any of its subsidiaries to third parties (other than stock options, phantom units or equity issued under a management incentive plan (or in connection with vesting of phantom units and exercising of stock options)) in an amount equal to 100% of such net cash proceeds and (iv) within one (1) business day following the receipt (including receipt in escrow) of any Bridge Reduction Sale Proceeds in an amount equal to 100% of such any Bridge Reduction Sale Proceeds; *provided* that, after the Closing Date, Bridge Reduction Sale Proceeds shall be calculated net of any amounts required to be applied to cure an overadvance under the ABL Facility by the terms of the ABL Facility Documentation in connection with any sale or disposition of ABL Priority Collateral, whether directly or indirectly together through the sale or disposition of equity interests in a Loan Party or otherwise.

The Initial Borrower will prepay the Bridge Loans under the Bridge Facility, together with any accrued interest thereon, in full immediately in the event the Post-Closing Steps are not consummated on the Closing Date or the ABL Facility does not become effective or available immediately upon consummation of the Acquisition as described in the Transaction Description.

**Post-Closing Steps Accessions**: The Initial Borrower will be replaced as the Borrower immediately following the consummation of the Post-Closing Steps and the Acquisition pursuant to the accessions and documentation described below each of which shall be reasonably acceptable to the Bridge Administrative Agent (including, but not limited to, (i) customary legal opinions from counsel to the Loan Parties in respect of the closing of the Post-Closing Steps Accessions (which for avoidance of doubt shall not be required to address any issues involving that certain indenture dated as of October 28, 2016 governing the 8.50% senior secured notes due 2020 issued by Petróleos de Venezuela, S.A. or the CITGO Holding Share Pledge Agreement (as defined therein) or the remedies sought or obtained in connection with the civil actions styled as G&A Strategic Investments I LLC, et al. v. Petróleos de Venezuela, S.A and the related actions addressed in common orders therewith), (ii) corporate organizational documents, resolutions and good standing certificates with respect to the Ultimate Borrower and each subsidiary thereof, (iii) customary officer's certificates with respect the Ultimate Borrower and each subsidiary thereof, (iv) supplements to the security documents for the Bridge Facility and with respect to a guarantee of the Obligations (as defined below) from the Ultimate Borrower and each subsidiary thereof, (v) a solvency certificate of the chief financial officer or treasurer (or other comparable officer) of the Ultimate Borrower

in form and substance consistent with the solvency certificate delivered as a condition to the initial borrowing under the Bridge Facility and (vi) customary lien, tax and judgment searches with respect to the Ultimate Borrower and each subsidiary thereof) (such replacement, together with the applicable release of the Initial Borrower and assumption of obligations by the Ultimate Borrower and the concurrent accession of any subsidiaries of the Ultimate Borrower as Guarantors, the "*Post-Closing Steps Accessions*").

Prior to the consummation of the Post-Closing Steps Accessions, Holdings and each existing and subsequently acquired or organized direct and indirect subsidiary of Holdings that is such a subsidiary of Holdings at the time the Bridge Loans are funded on the Closing Date (each, an "*Initial Guarantor*") shall unconditionally guaranty all of the Borrower's (and any other Loan Party's) obligations (the "*Obligations*") under and in connection with the Bridge Facility (as defined below), subject to such exceptions and materiality thresholds to be mutually agreed consistent with the Documentation Principles (as defined below). The Initial Borrower and the Initial Guarantors are herein referred to collectively, as the "*Initial Loan Parties*" and, individually, as an "*Initial Loan Party*".

On and at all times after the consummation of the Post-Closing Steps Accessions, Holdings and each existing and subsequently acquired or organized direct and indirect subsidiary of the Ultimate Borrower (each, an "*Ultimate Guarantor*") shall unconditionally guaranty all of the Obligations, subject to such exceptions and materiality thresholds to be mutually agreed consistent with the Documentation Principles. Following the consummation of the Post-Closing Steps Accessions, any subsidiary that provides a guarantee of the obligations under any other material indebtedness of any Loan Party (as defined below) (including the any of the ABL Facilities) shall be an Ultimate Guarantor.  The Ultimate Borrower and the Ultimate Guarantors are herein referred to collectively, as the "*Ultimate Loan Parties*" and, individually, as an "*Ultimate Loan Party*". As used herein, (x) "*Guarantor*" shall refer to any person that is then acting as a "Guarantor" (including, prior to the Post-Closing Steps Accessions, any Initial Guarantor and, following the Post-Closing Steps Accessions, any Ultimate Guarantor) and (y) "*Loan Party*" shall refer to any person that is then acting as a "Loan Party" (including, prior to the Post-Closing Steps Accessions, any Initial Loan Party and, following the Post-Closing Steps Accessions, any Ultimate Loan Party.) For the avoidance of doubt, certain entities may be Initial Guarantors and Ultimate Guarantors.

| | |
|---|---|
| **Conditions Precedent**: | Subject to the Certain Funds Provision, the several obligations of the Lenders to make, or cause one of their respective affiliates to make, Bridge Loans under the Bridge Facility on the Closing Date will be subject only the conditions precedent referred to in <u>Section 5</u> of the Commitment Letter and in the Bridge Conditions Annex. |
| **Documentation**: | The Bridge Facility Documentation will be consistent with this Bridge Term Sheet, negotiated in good faith and will be initially drafted by |

counsel to the Lead Left Arranger and will be (a) based on a precedent to be agreed with modifications thereto to be mutually agreed to reflect the nature of the Bridge Facility as a term facility, (b) contain market syndicated loan documentation updates to be mutually agreed, (c) will include the Administrative Agent's required agency and other form provisions, including with respect to the Bridge Administrative Agent's customary language for return of erroneous payments made by the Bridge Administrative Agent and the Bridge Administrative Agent's standard form benchmark replacement provisions, (d) will provide for the Post-Closing Steps Accessions, (e) reflect that the Initial Borrower is a special purpose entity and (f) contain other terms and provisions as may be mutually agreed (collectively, the "***Documentation Principles***").

**Representations and Warranties**:

Subject to the Certain Funds Provision, applicable to Holdings, the Borrower and their respective subsidiaries and in accordance with Documentation Principles, including the following: (a) organization; powers; (b) authorization; enforceability; (c) governmental approvals; no conflicts; (d) financial condition; no material adverse change; (e) properties; (f) litigation and environmental matters; (g) compliance with laws and agreements; no default; (h) investment company status; (i) ERISA; (j) disclosure; (k) solvency (to be defined in a manner consistent with <u>Annex I</u> to <u>Exhibit C</u> attached to the Commitment Letter); (l) insurance; (m) capitalization and subsidiaries; (n) security interest in collateral; (o) employment matters; (p) Federal Reserve regulations; (q) use of proceeds; (r) no burdensome restrictions; (s) anti-corruption laws, sanctions (including OFAC) and Anti-Money Laundering (including PATRIOT Act); (t) affiliate transactions; (u) common enterprise; and (v) Affected Financial Institutions (to be defined in the Bridge Facility Documentation); subject, in the case of each of the foregoing representations and warranties, to customary qualifications and limitations to be mutually agreed.

**Post-Closing Steps:**

The Post-Closing Steps shall be effectuated on the Closing Date immediately upon consummation of the Acquisition as described in the Transaction Description.

**Affirmative Covenants**:

In accordance with the Documentation Principles, applicable to Holdings, the Borrower and their respective subsidiaries and usual and customary for bridge facilities of this type.

**Negative Covenants**:

In accordance with the Documentation Principles, applicable to Holdings, the Borrower and their respective subsidiaries and usual and customary for bridge facilities of this type (and shall include restrictions on the incurrence of debt and liens, conduct of business and amendments to the organizational documents with respect to the Borrower consistent with the Documentation Principles), including, without limitation:

(a)     indebtedness (including guarantee obligations);

(b)     liens;

(c)     restricted payments;

(d)     certain payments of debt (including any payment of junior lien, unsecured and/or subordinated debt and the ABL Facility);

(e)     (i) investments (including restrictions on further investments related to Holdings and its subsidiaries' Asset-Backed Trading business) and (ii) capital expenditures;

(f)     transactions with affiliates;

(g)     asset sales (including prohibition on dispositions of material intellectual property), provided that the sales of non-core assets contemplated in the financial models provided by the Sponsor prior to March 7, 2025 shall be permitted;

(h)     acquisitions, mergers and consolidations;

(i)     fundamental changes (including changes in lines of business);

(j)     issuances of dividends by subsidiaries;

(k)     restrictive agreements;

(l)     conduct of business (including restrictions on expansion of Holdings and its subsidiaries' Asset-Backed Trading business);

(m)     sales and lease-backs;

(n)     amendments to organizational documents (including with respect to customary minority protections put into place (if any) pursuant to the Transactions, which such restriction shall not be subject to any materiality, material adverse effect or similar qualifiers);

(o)     amendments to terms of material debt;

(p)     speculative hedging;

(q)     changes to fiscal period;

(r)     passive holding company covenant applicable to Holdings; and

(s)     the Final Sale Order remains in full force and effect, and shall not have been have been vacated, reversed, or stayed or modified or amended in any manner materially adverse to the Lenders.

The foregoing covenants will include baskets, exceptions and restrictions to be set forth in the Bridge Facility Documentation, and in any event, include the following:

(a)     indebtedness: (i) no additional material debt for borrowed money is expected to be permitted (other than under a general debt basket in an amount not to exceed $50 million); and (ii) to include customary "anti-layering" provisions.

(b)     acquisitions, mergers and consolidations: no acquisitions, mergers, consolidations and/or any similar transactions shall be permitted while the Bridge Facility is outstanding.

9

(c)    capital expenditures: subject to a maximum cap in an amount to be agreed, with the ability to be increased with the consent of the majority lenders.

(d)    restricted payments: no dividends or other distributions to Borrower's equity holders shall be permitted while the Bridge Facility is outstanding.

The Bridge Facility Documentation shall prohibit the formation or existence of any direct or indirect unrestricted subsidiaries of Holdings and the Borrower (and shall not include, for the avoidance of doubt, any baskets with respect to unrestricted subsidiary capacity).

**Financial Covenants**:    None.

**Events of Default**:    Applicable to Holdings, the Borrower and their respective subsidiaries and consistent with the Documentation Principles and including, without limitation and in each case, subject to materiality qualifiers, baskets and exceptions to be set forth in the Bridge Facility Documentation:

(a)    Nonpayment of principal when due;

(b)    nonpayment of interest, fees or other amounts within 3 calendar days after the date due;

(c)    material inaccuracy of a representation or warranty;

(d)    violation of a covenant (subject, in the case of certain affirmative covenants, to a grace period to be agreed);

(e)    bankruptcy and insolvency events;

(f)    ERISA events that could reasonably be expected to have a material adverse effect;

(g)    material judgments;

(h)    cross-default;

(i)    Change of Control;

(j)    invalidity (actual or asserted) of guarantees, collateral documents or other loan documents; and

(k)    failure to (i) effectuate the Post-Closing Steps or (ii) satisfy the Post-Post-Closing Steps Collateral and Guarantee Requirement, in each case, on the Closing Date.

"***Change of Control***" means the occurrence of any of the following (a) the Permitted Holders shall cease to own, free and clear of all liens or other encumbrances, directly or indirectly, equity interests representing (i) at least 50.1% of the outstanding voting power and economic interests of the Borrower on a fully diluted basis or (ii) 100.0% of the outstanding voting power and economic interests of Holdings on a fully diluted basis, (b) Holdings shall cease to own, free and clear of all liens or other encumbrances, directly, equity interests representing at least 100% of the outstanding voting power and economic interests of the Borrower on a

fully diluted basis and (c) the acquisition of direct or indirect Control of the Borrower or Holdings by any Person or group other than the Permitted Holders; <u>provided</u> that, notwithstanding the foregoing, no Change of Control shall occur in any circumstance or transaction that would otherwise constitute a Change of Control with respect to clause (a), (b) or (c) of the definition thereof for so long as either, (i) the Permitted Holders have, at such time, the right or the ability by voting power, contract or otherwise to elect or designate for election at least a majority of the members of the Board of Directors of the Borrower or (ii) at least a majority of the members of the Board of Directors of the Borrower are comprised of Continuing Directors; <u>provided</u> <u>further</u> that, notwithstanding the foregoing, any such occurrence or transaction shall be subject to the completion of applicable requirements pursuant to "know your customer" and anti-money laundering rules and regulations, including the USA PATRIOT Act and the Beneficial Ownership Regulation and failure to satisfy such "know your customer" regulations shall result in a Change of Control. If either of the preceding exceptions set forth in clause (i) or (ii) were previously relied upon such that no Change of Control occurred and subsequently there is an inability to satisfy either exception, then a Change of Control shall occur.

"***Board of Directors***" means, with respect to any Person, the board of directors (or comparable managers) of such Person, or any committee thereof duly authorized to act on behalf of such board of directors (or comparable managers).

"***Control***" means the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of a person, whether through the ability to exercise voting power, by contract or otherwise and "***Controlled***" has a meaning correlative thereto.

"***Continuing Director***" means (a) any member of the Board of Directors who was a director (or comparable manager) of Borrower on the Closing Date, and (b) any individual who becomes a member of such Board of Directors after the Closing Date if such individual was approved, appointed or nominated for election to the Board of Directors by either the Permitted Holders or a majority of the Continuing Directors.

"***Permitted Holders***" means Gold Reserve Ltd., Koch Minerals Sàrl, Koch Nitrogen International Sàrl and Rusoro Mining Limited and their respective Controlled affiliates.

**Assignments and Participations**:

After the Closing Date, the Lenders may assign all or, in an amount not less than $1,000,000, any part of, their loans under the Bridge Facility to their affiliates, approved funds or one or more banks, financial institutions or other entities (other than the Borrower and its affiliates or natural persons and any Prohibited Assignee (unless a Demand Failure Event (as defined in the Fee Letter) has occurred and is continuing or the Borrower has consented to such assignment to such entity, in which case such entity will not be considered a Prohibited Assignee for the purpose of such

11

assignment)), subject to the consent of the Bridge Administrative Agent and the Borrower, in each case, not to be unreasonably withheld, conditioned or delayed; *provided* that (a) the Borrower shall be deemed to have consented to any such assignment unless it shall object thereto by written notice to the Bridge Administrative Agent within five (5) business days after having received written notice thereof from the Bridge Administrative Agent or any applicable Lender and (b) such consent of the Borrower shall not be required (i) if such assignment is made to another Lender or an affiliate or approved fund of a Lender or (ii) after the occurrence and during the continuance of an event of default or a Demand Failure Event (as defined in the Fee Letter).  Upon such assignment, the assignee will become a Lender for all purposes under the Bridge Facility Documentation.  A $███ processing fee will be required in connection with any such assignment, with exceptions to be agreed.  Prior to the Closing Date, assignments of the Bridge Commitment shall only be permitted with the prior written consent of the Borrower in accordance with the provisions of the Commitment Letter.  After the Closing Date, the Lenders will also have the right to sell participations in their Bridge Loans to one or more persons (other than the Borrower and its affiliates or natural persons) without restriction, subject to customary limitations on voting rights. It is understood that the Bridge Administrative Agent, in its capacity as such, shall not (x) be obligated to ascertain, monitor or inquire as to whether any Lender or participant or prospective Lender or participant is a Prohibited Assignee or (y) have any liability (other than any liability arising from its gross negligence or willful misconduct) with respect to or arising out of any assignment or participation of loans, or disclosure of confidential information in connection therewith, to any Prohibited Assignee. As used herein, "***Prohibited Assignees***" shall refer to certain banks, financial institutions and other persons that have been specified by the Sponsor in a written designation delivered to the Lead Left Arranger on or prior to the date of the Commitment Letter and "***Prohibited Assignee***" means any one of the Prohibited Assignees.

**Voting**:  Consistent with the Documentation Principles and to require consent of each Lender directly and adversely affected thereby with respect to any amendment, waiver, consent or other modification the effect of which is direct or indirect subordination of the Bridge Facility in right of payment to any other debt (subject to limited exceptions for certain permitted debt to be agreed), subordination of the liens securing the Bridge Facility to any other lien securing any other debt or a grant to the holders of any other debt of a right to receive proceeds from Collateral in priority to the Bridge Loans.

**Yield Protection**:  Consistent with the Documentation Principles.

**Indemnity and Expense Reimbursement**:  Consistent with the Documentation Principles.

**Governing Law and Forum**:  New York.

12

**Bail-in Provisions**:                Consistent with the Documentation Principles.

**Delaware Divisions**:                Consistent with the Documentation Principles.

**ERISA Lender
Representations**:                Consistent with the Documentation Principles.

**Counsel to the Bridge Administrative
Agent and Lead Arrangers**:    Simpson Thacher & Bartlett LLP.

**SCHEDULE I TO EXHIBIT C**

**Interest Rates**:



**SCHEDULE I TO EXHIBIT C**



**Interest Payment Dates**:

**Default Rate**:

**Duration Fees**:

**SCHEDULE I TO EXHIBIT C**



**EXHIBIT D-1**

<u>Conditions Annex (Bridge Facility)</u>

*All capitalized terms used but not defined herein shall have the meaning given to them in the Commitment Letter to which this Conditions Annex is attached, including the other Exhibits thereto. Each reference to the "Administrative Agent" in this Exhibit D-1 shall refer to the Administrative Agent under the Bridge Facility.*

Except as otherwise set forth below, the initial borrowing under the Bridge Facility shall be subject solely to the satisfaction or waiver by each Commitment Party of the following conditions:

1.  The Administrative Agent shall have received the Bridge Facility Documentation and the intercreditor agreement described on Annex II attached to the ABL Term Sheet, which shall be on terms and conditions that are consistent with the terms set forth in this Commitment Letter (including the Bridge Term Sheet) and subject in all respects to the Certain Funds Provision, duly executed and delivered by the applicable Loan Parties.

2.  The Acquisition shall have been consummated simultaneously (or shall be consummated substantially simultaneously) with the funding under the Bridge Facility in all material respects in accordance with the terms of the draft of that certain Stock Purchase Agreement, by and among the Initial Borrower and Robert B. Pincus, solely in his capacity as the Special Master for the United States District Court for the District of Delaware (including the exhibits, schedules and all related documents, the "***Acquisition Agreement***") provided by counsel to Gold Reserve to counsel to the Lead Arrangers at 1:01 a.m. Houston, Texas time on June 25, 2025, without giving effect to any modifications, consents, amendments or waivers thereto by the Initial Borrower (or any affiliate thereof) that are materially adverse to the interests of the Lenders, the Commitment Parties or the Lead Arrangers, in their capacities as such, or which modify terms used in the Commitment Letter that incorporate the definitions from the Acquisition Agreement (in each case, it being understood and agreed that (i) any change in the definition of "Company Material Adverse Effect" in the Acquisition Agreement shall be deemed to be materially adverse to the Lenders, the Commitment Parties and the Lead Arrangers, in their capacities as such, unless each Lead Arranger shall have provided its written consent thereto, (ii) any change in the definition of "Permitted Liens" or modification to Schedule 1.1(d) that modifies the definition of "Refinancing" under this Commitment Letter shall be deemed to be materially adverse to the Lenders, the Commitment Parties and the Lead Arrangers, in their capacities as such, unless (A) each Lead Arranger shall have provided its written consent thereto or (B) such modification causes the aggregate amount of indebtedness of the type that is not for borrowed money and that is either (x) secured on a junior basis with the obligations under the Facilities (as applicable) or (y) secured by a lien on assets that do not, and are not required to, constitute Collateral (it being understood that such lien was not created in contemplation thereof), in each case, by any Permitted Liens, or liens reflected in Schedule 1.1(d) which did not constitute Permitted Liens and were not reflected in Schedule 1.1(d) prior to such modification to increase by an amount that is less than $50,000,000, (iii) any decrease in the purchase price under the Acquisition Agreement shall not be deemed to be materially adverse to the Lenders, the Commitment Parties and the Lead Arrangers, in their capacities as such, so long as such decrease is allocated (A) *first*, to reduce commitments under the Bridge Facility and (B) *second*, after commitments under the Bridge Facility have been reduced to $0, to reduce the amount to be funded under the ABL Pre-Fund Facility and (iv) any increase in the purchase price under the Acquisition Agreement shall not be deemed to be materially adverse to the Lenders, the Commitment Parties and the Lead Arrangers, in their capacities as such, so long as such increase is funded with common equity or other equity reasonably acceptable to the Lead Arrangers.)

3.  Subject in all respects to the Certain Fund Provisions, all documents required for the effectiveness of the ABL Pre-Fund Facility (i) are in final form (which shall be on terms and conditions that are

consistent with the terms set forth in this Commitment Letter (including the ABL Term Sheet)) and subject in all respects to the Certain Funds Provision, and (ii) are duly executed and delivered by the applicable Loan Parties. The ABL Pre-Fund Facility Documentation shall become effective concurrently with the Bridge Facility.

4. Subject in all respects to the Certain Fund Provisions, the following documents shall be in final form and such final form shall comply with the Commitment Letter and Exhibits, such documents shall have been fully executed by the Loan Parties (if applicable) subject to a customary closing escrow with no further action needed for such documents to be effective other than (i) the release of such documents, (ii) the filing or recording such documents with a governmental authority where applicable and (iii) the consummation of the Post-Closing Steps:

   a. the ABL Credit Documentation required for the availability of the ABL Facility and the Revolving Loans (including, without limitation, the Intercreditor Agreement and any documentation related to causing the accession of the Ultimate Borrower to the ABL Facility Documentation (including with respect to the Ultimate Collateral));

   b. the documents necessary to establish that the Administrative Agents will have a perfected first priority security interest in the Ultimate Collateral (as defined in the Bridge Term Sheet) shall have been delivered; and

   c. all documents required to effect the Post-Closing Steps.

5. No Company Material Adverse Effect (as defined in and as interpreted in accordance with the Acquisition Agreement) shall have occurred since the date of the Acquisition Agreement and remain ongoing.

6. All costs, fees and expenses required to be paid pursuant to the Commitment Letter and the Fee Letters to the Commitment Party, the Lenders, the Administrative Agent or the Lead Arrangers shall have been paid to the extent due and payable.

7. The Sponsor shall use its commercially reasonable efforts (to the extent practical and appropriate and consistent with the Acquisition Agreement) to provide the Lead Arrangers copies of: (a) the audited consolidated balance sheets of the Ultimate Borrower and its subsidiaries as of the end of each fiscal year ended after December 31, 2021 and at least 90 days prior to the Closing Date and related audited consolidated statements of income, comprehensive income, stockholders' equity and cash flows of the Ultimate Borrower and its subsidiaries for each fiscal year ended after December 31, 2021 and at least 90 days prior to the Closing Date (the "*Annual Financial Statements*"); (b) the unaudited consolidated balance sheets and related condensed, consolidated statements of income, comprehensive income, stockholders' equity and cash flows of the Ultimate Borrower and its subsidiaries as of September 30, 2024 and each fiscal quarter thereafter (except for the fourth fiscal quarter of each fiscal year) at least 45 days prior to the Closing Date (the "*Quarterly Financial Statements*" and, together with the Annual Financial Statements, the "*Financial Statements*") (provided that the financial statements specified in this clause (b) shall be subject to normal year-end adjustments), all of which financial statements described in clause (a) shall be prepared in accordance with generally accepted accounting principles in the United States and prepared in a customary manner for Rule 144A offerings of high yield debt securities of the Ultimate Borrower; and (c)(1) pro forma statements of income of the Ultimate Borrower and its subsidiaries (giving effect to the Transactions) for the latest full fiscal year provided pursuant to clause (a) above, (2) a pro forma statement of income of the Ultimate Borrower and its subsidiaries (giving effect to the Transactions) for the latest interim period (and the comparative period of the prior year) of the Ultimate Borrower covered by the Quarterly Financial Statements; and (3) a

pro forma balance sheet of the Ultimate Borrower and its subsidiaries (giving effect to the Transactions) as of the last day of the latest fiscal year or quarterly period of the Ultimate Borrower provided pursuant to clause (a) or (b) above.

8. As a condition to the availability of the Bridge Facility, (a) one or more investment banks (collectively, the "***Investment Bank***") shall have been engaged to privately place the Debt Securities (as defined in the Fee Letter) pursuant to an engagement letter among the Investment Bank and you[1], (b) the Sponsor shall use its commercially reasonable efforts to offer the Investment Bank a preliminary offering memorandum or private placement memorandum (an "***Offering Memorandum***") which shall be in customary form for offering memoranda used in high yield private placements of debt securities of the Ultimate Borrower under Rule 144A of the Securities Act (with the Sponsor using its commercially reasonable efforts to obtain and provide the following information, to the extent practical and appropriate and consistent with the Acquisition Agreement); *provided* that this condition shall be deemed satisfied if such Offering Memorandum excludes sections that would customarily be provided by the Investment Bank or its counsel (including a "Description of notes") but is otherwise complete, which Offering Memorandum shall contain information regarding the Ultimate Borrower and its subsidiaries of the type and form customarily included in high yield private placements of debt securities under Rule 144A of the Securities Act by the Ultimate Borrower and including or incorporating by reference financial statements, business and other operating and financial data of the type customary for Rule 144A offerings by first time issuers and, in the case of the annual financial statements, the auditors' reports thereon (it being understood that the Offering Memorandum may exclude information required by Rule 3-09, Rule 3-10 and Rule 3-16 of Regulation S-X, or information required by Item 10, Item 402 and Item 601 of Regulation S-K, XBRL exhibits and information regarding executive compensation and related party disclosure related to SEC Release Nos. 33-8732A, 34-54302A and IC-27444A and other information not customarily provided in an offering memorandum for a Rule 144A offering), and all other operating and financial data necessary for the Investment Bank to receive customary (for high yield unsecured debt securities issued in a private placement of debt securities of the Ultimate Borrower under Rule 144A of the Securities Act) "comfort" letters (including "negative assurance" comfort) from the independent accountants of the Ultimate Borrower upon completion of customary procedures in connection with the offering of the Debt Securities (and the Sponsor shall use its commercially reasonable efforts to cause the Ultimate Borrower to cause the drafts of such comfort letters (including "negative assurance" comfort) to be provided to the Investment Bank), and (c) the Sponsor shall use its commercially reasonable efforts to afford the Investment Bank a period of at least 15 consecutive business days following the delivery of an Offering Memorandum including the information set forth in clause (b) above to seek to offer and sell or privately place the Debt Securities with qualified purchasers thereof (it being understood that none of the information included in the offering memorandum shall at any time during such 15 consecutive business day period contain any untrue statement of a material fact or omit to state any material fact necessary in order to make the statements contained therein not misleading in light of the circumstances under which such statements are made, in each case without amendment or supplement (other than financial information for a more recent fiscal period delivered in accordance with paragraph 6 of this Exhibit D-1 with no less than 5 business days remaining in such 15 consecutive business day period)); *provided* that such 15 consecutive business day period shall exclude July 4, 2025, September 1, 2025, October 13, 2025, November 27, 2025, November 28, 2025, December 24, 2025 through January 5, 2026, January 19, 2026, February 16, 2026, April 3, 2026, May 25, 2026, June 19, 2026, September 7, 2026, October 12, 2026, November 26, 2026, November 27, 2026, December 24, 2026 through January 1, 2027, January 18, 2027 and February 15, 2027, which, for purposes of such

---

[1] NTD: Upon countersignature of commitment papers, expect to add the following "(the Lead Arrangers acknowledge that such engagement letter has been entered into as of the date hereof)".

calculation, shall not constitute a business day (provided that, for the avoidance of doubt, such exclusions (other than for the period commencing on December 24, 2025 and ending on January 5, 2026 and the period commencing on December 24, 2026 and ending on January 1, 2027) shall not restart such 15 consecutive business day period) (the "**Bond Marketing Period**").

9.  The Administrative Agent and each Lender shall have received, at least three business days prior to the Closing Date, all documentation and information as is reasonably requested in writing by the Administrative Agent or such Lender, at least 10 business days prior to the Closing Date, about each of the Initial Borrower and the Ultimate Borrower required by U.S. regulatory authorities under applicable "know your customer" and anti-money laundering rules and regulations, including, without limitation the PATRIOT Act.  If any of the Initial Borrower and/or the Ultimate Borrower qualifies as a "legal entity" customer under 31 C.F.R. § 1010.230, the Initial Borrower and/or the Ultimate Borrower, as applicable, shall have delivered to each requesting Lender at least three business days prior to the Closing Date (to the extent requested by such Lender at least ten business days prior to the Closing Date) a Beneficial Ownership Certification (as defined below) in relation to the Initial Borrower or the Ultimate Borrower, as applicable.  As used herein, the term "**Beneficial Ownership Certification**" shall mean a certification regarding beneficial ownership or control as required by the Beneficial Ownership Regulation.

10. The Lead Arrangers shall have received a certificate of the chief financial officer or treasurer (or other comparable officer) of Holdings substantially in the form of Annex I attached hereto certifying the solvency, after giving pro forma effect to the Transactions, of Holdings and of the Loan Parties on a consolidated basis (or, at Holdings' election, a solvency opinion from an independent investment bank or valuation firm of nationally recognized standing).

11. The Specified Representations and the Specified Acquisition Agreement Representations shall be true and correct in all material respects (except to the extent already qualified by materiality, such representations shall be true and correct in all respects after giving effect to such materiality qualifier) on and as of the Closing Date (although any Specified Representation or Specified Acquisition Agreement Representation which expressly relates to a given date or period shall be required only to be true and correct in all material respects (except to the extent already qualified by materiality, such representations shall be true and correct in all respects after giving effect to such materiality qualifier) as of the respective date or for the respective period, as the case may be).

12. The Administrative Agent shall have received (with any of the below-listed deliverables that are in connection with the Post-Closing Steps Accessions having been received subject to a customary closing escrow pending consummation of the Post-Closing Steps):

    (a) customary legal opinions from counsel to the Loan Parties in respect of the closing of the Bridge Facility and the Post-Closing Steps Accessions, which for avoidance of doubt shall not be required to address any issues involving that certain indenture dated as of October 28, 2016 governing the 8.50% senior secured notes due 2020 issued by Petróleos de Venezuela, S.A. (the "**2020 Indenture**") or the CITGO Holding Share Pledge Agreement (as defined therein) (the "**CITGO Holding Pledge**") or the remedies sought or obtained in connection with the civil actions styled as G&A Strategic Investments I LLC, et al. v. Petróleos de Venezuela, S.A and the related actions addressed in common orders therewith;

    (b) corporate organizational documents, resolutions and good standing certificates with respect to the Loan Parties in respect of the closing of the Bridge Facility and the Post-Closing Steps Accessions;

(c) customary officer's certificates in respect of the closing of the Bridge Facility and the Post-Closing Steps Accessions;

(d) customary lien, tax and judgment searches in respect of the Initial Loan Parties and the Ultimate Loan Parties; and

(e) a customary borrowing request.

13. Subject to the Certain Funds Provision, all documents and instruments required to create and perfect the Administrative Agent's security interests in the Initial Collateral (as defined in the Bridge Term Sheet) shall have been executed and delivered and, if applicable, be in proper form for filing.

14. Payoff letters and other customary lien release documentation (including, but not limited to, UCC-3s, intellectual property security agreement releases, deposit account control agreement terminations and mortgage releases covered by each such payoff letter shall be in final form and executed by the applicable parties thereto, subject to a customary closing escrow with respect to the Refinancing or otherwise held by such applicable agent or representative to the extent required by such indebtedness.

15. All approvals and authorizations that are required to be obtained under Section 7.1(b)-(d) of the Acquisition Agreement in connection with the Transactions shall have been obtained and be in full force and effect.

16. After giving effect to the Transactions, the Loan Parties shall have no indebtedness outstanding other than (a) the Bridge Facility, (b) the Permanent Financing incurred in lieu thereof, (c) the ABL Facility (d) any other indebtedness permitted under the Facility Documentation, (e) Industrial Revenue Bonds in an aggregate principal amount not to exceed $55 million (or such other amount as may be permitted to be incurred in accordance with the terms of the Acquisition Agreement) and (f) finance leases and similar obligations in an aggregate principal amount not to exceed $250 million or such larger amount as may be additionally incurred in the ordinary course; for the avoidance of doubt, nothing under the Facility Documentation shall prohibit any Non-Controlled Entity (as defined in the Acquisition Agreement) from incurring any incremental indebtedness for borrowed money in the ordinary course that is not in excess of $10.0 million in the aggregate for each such Non-Controlled Entity (as is permitted to be incurred in accordance with the terms of the Acquisition Agreement).

17. The Initial Borrower shall have engaged one or more investment and/or commercial banks satisfactory to the Lead Arrangers (collectively, the "*Financial Institution*") to market the Permanent Financing pursuant to one or more reasonably satisfactory engagement letters among the Financial Institutions and the Initial Borrower.[2]

18. The Equity Contribution shall have or, substantially concurrently with the initial borrowing under the Bridge Facility, shall occur.

19. The United States District Court for the District of Delaware shall have entered an order in form and substance reasonably satisfactory to the Lead Arrangers and contemplated under the Acquisition Agreement (which order is in full force and effect, is unstayed and has not been amended, supplemented

---

[2] NTD: Upon countersignature of commitment papers, expect to add the following "The Lead Arrangers acknowledge that such an engagement letter has been entered into as of the date hereof".

or otherwise modified in a manner adverse to the interest of the Lenders without the consent of the Lead Arrangers) approving the Acquisition (the "***Final Sale Order***").[3]

20. The Administrative Agent and Lead Arrangers shall have received evidence of the issuance of an OFAC license authorizing the Acquisition and any transactions ordinarily incident to the Acquisition (such license, the "***OFAC License***").

21. There shall not be in effect any Law or Order by a Governmental Body (as defined in and as interpreted in accordance with Section 7.1(a) of the Acquisition Agreement) of competent jurisdiction restraining, enjoining or otherwise prohibiting the consummation of the Transactions.

---

[3] NTD: This paragraph 19 is submitted under a full reservation of rights pending receipt of, and further negotiation and agreement to, the Final Sale Order, including with respect to approval and entering into the Transactions contemplated by this Commitment Letter.

<div align="right">**EXHIBIT D-2**</div>

<div align="center">Conditions Annex (ABL Facility)</div>

*All capitalized terms used but not defined herein shall have the meaning given to them in the Commitment Letter to which this Conditions Annex is attached, including the other Exhibits thereto. Each reference to the "Administrative Agent" in this Exhibit D-2 shall refer to the Administrative Agent under the ABL Facility.*

Except as otherwise set forth below, availability of the ABL Facility shall be subject solely to the satisfaction or waiver by each Commitment Party of the following conditions:

1. The Administrative Agent shall have received the ABL Facility Documentation (including the Intercreditor Agreement and any documentation related to causing the accession of the Ultimate Borrower to the ABL Facility Documentation (including with respect to the Ultimate Collateral)), which shall be on terms and conditions that are consistent with the terms set forth in this Commitment Letter (including the ABL Term Sheet) and subject in all respects to the Certain Funds Provision, duly executed and delivered by the applicable Loan Parties.

2. The Acquisition shall have been consummated simultaneously (or shall be consummated substantially simultaneously) with the funding under the ABL Facility in all material respects in accordance with the terms of the draft of the Acquisition Agreement provided by counsel to Gold Reserve to counsel to the Lead Arrangers at 1:01 a.m. Houston, Texas time on June 25, 2025, without giving effect to any modifications, consents, amendments or waivers thereto by the Initial Borrower (or any affiliate thereof) that are materially adverse to the interests of the Lenders, the Commitment Parties or the Lead Arrangers, in their capacities as such (in each case, it being understood and agreed that (i) any change in the definition of "Company Material Adverse Effect" in the Acquisition Agreement shall be deemed to be materially adverse to the Lenders, the Commitment Parties and the Lead Arrangers, in their capacities as such), unless each Lead Arranger shall have provided its written consent thereto, (ii) any decrease in the purchase price under the Acquisition Agreement shall not be deemed to be materially adverse to the Lenders, the Commitment Parties and the Lead Arrangers, in their capacities as such, so long as such decrease is allocated (A) *first*, to reduce commitments under the Bridge Facility and (B) *second*, to reduce the amount to be funded under the ABL Pre-Fund Facility and (iii) any increase in the purchase price under the Acquisition Agreement shall not be deemed to be materially adverse to the Lenders, the Commitment Parties and the Lead Arrangers, in their capacities as such, so long as such increase is funded with common equity or other equity reasonably acceptable to the Lead Arrangers.

3. No Company Material Adverse Effect (as defined in and as interpreted in accordance with the Acquisition Agreement) shall have occurred since the date of the Acquisition Agreement and remain ongoing.

4. All costs, fees and expenses required to be paid pursuant to the Commitment Letter and the Fee Letters to the Commitment Party, the Lenders, the Administrative Agent or the Lead Arrangers shall have been paid to the extent due and payable.

5. The Sponsor shall have used its commercially reasonable efforts (to the extent practical and appropriate and consistent with the Acquisition Agreement) to provide the Lead Arrangers copies of: (a) the Annual Financial Statements and (b) the Quarterly Financial Statements (provided that the financial statements specified in this clause (b) shall be subject to normal year-end adjustments), all of which financial statements described in clause (a) shall be prepared in accordance with generally accepted accounting principles in the United States and prepared in a customary manner for Rule 144A offerings of high yield debt securities of the Ultimate Borrower; and (c)(1) pro forma statements of income of the

<div align="center">B-1</div>

Ultimate Borrower and its subsidiaries (giving effect to the Transactions) for the latest full fiscal year provided pursuant to clause (a) above, (2) a pro forma statement of income of the Ultimate Borrower and its subsidiaries (giving effect to the Transactions) for the latest interim period (and the comparative period of the prior year) of the Ultimate Borrower covered by the Quarterly Financial Statements; and (3) a pro forma balance sheet of the Ultimate Borrower and its subsidiaries (giving effect to the Transactions) as of the last day of the latest fiscal year or quarterly period of the Ultimate Borrower provided pursuant to clause (a) or (b) above.

6.  The Administrative Agent and each Lender shall have received, at least three business days prior to the Ultimate Closing Date, all documentation and information as is reasonably requested in writing by the Administrative Agent or such Lender, at least 10 business days prior to the Ultimate Closing Date, about each of the Initial Borrower and the Ultimate Borrower required by U.S. regulatory authorities under applicable "know your customer" and anti-money laundering rules and regulations, including, without limitation the PATRIOT Act.  If any of the Initial Borrower and/or the Ultimate Borrower qualifies as a "legal entity" customer under 31 C.F.R. § 1010.230, the Initial Borrower and/or the Ultimate Borrower, as applicable, shall have delivered to each requesting Lender at least three business days prior to the Ultimate Closing Date (to the extent requested by such Lender at least ten business days prior to the Ultimate Closing Date) a Beneficial Ownership Certification (as defined below) in relation to the Initial Borrower or the Ultimate Borrower, as applicable.  As used herein, the term "***Beneficial Ownership Certification***" shall mean a certification regarding beneficial ownership or control as required by the Beneficial Ownership Regulation.

7.  The Lead Arrangers shall have received a certificate of the chief financial officer or treasurer (or other comparable officer) of the Ultimate Borrower (to the extent practical and appropriate and consistent with the Acquisition Agreement) substantially in the form of Annex I attached hereto certifying the solvency, after giving pro forma effect to the Transactions, of the Ultimate Borrower and of the Loan Parties on a consolidated basis (or, at the Ultimate Borrower's election, a solvency opinion from an independent investment bank or valuation firm of nationally recognized standing).

8.  The Specified Representations and the Specified Acquisition Agreement Representations shall be true and correct in all material respects (except to the extent already qualified by materiality, such representations shall be true and correct in all respects after giving effect to such materiality qualifier) on and as of the Ultimate Closing Date (although any Specified Representation or Specified Acquisition Agreement Representation which expressly relates to a given date or period shall be required only to be true and correct in all material respects (except to the extent already qualified by materiality, such representations shall be true and correct in all respects after giving effect to such materiality qualifier) as of the respective date or for the respective period, as the case may be).

9.  Subject in all respects to the Certain Funds Provision, the Administrative Agent shall have received:

    (a) customary legal opinions from counsel to the Loan Parties, which for avoidance of doubt shall not be required to address any issues involving that certain indenture dated as of October 28, 2016 governing the 8.50% senior secured notes due 2020 issued by Petróleos de Venezuela, S.A. or the CITGO Holding Share Pledge Agreement (as defined therein) or the remedies sought or obtained in connection with the civil actions styled as G&A Strategic Investments I LLC, et al. v. Petróleos de Venezuela, S.A and the related actions addressed in common orders therewith;

    (b) corporate organizational documents, resolutions and good standing certificates with respect to the Loan Parties;

D-2

(c) customary officer's certificates;

(d) customary lien, tax and judgment searches; and

(e) a customary borrowing request.

10. Subject in all respects to the Certain Funds Provision, all documents and instruments required to create and perfect the Administrative Agent's security interests in the Ultimate Collateral shall have been executed and delivered by the Loan Parties and, if applicable, be in proper form for filing.

11. All approvals and authorizations that are required to be obtained under Section 7.1(b) – (d) of the Acquisition Agreement in connection with the Transactions shall have been obtained and be in full force and effect.

12. The Refinancing shall have been consummated.

13. The Post-Closing Steps shall have been consummated.

14. After giving effect to the Transactions, the Loan Parties shall have no indebtedness outstanding other than (a) the Bridge Facility, (b) the Permanent Financing incurred in lieu thereof, (c) the ABL Facility (d) any other indebtedness permitted under the Facility Documentation, (e) Industrial Revenue Bonds in an aggregate principal amount not to exceed $55 million (or such other amount as may be permitted to be incurred in accordance with the terms of the Acquisition Agreement) and (f) finance leases and similar obligations in an aggregate principal amount not to exceed $250 million; for the avoidance of doubt, nothing under the Facility Documentation shall prohibit any Non-Controlled Entity (as defined in the Acquisition Agreement) from incurring any incremental indebtedness for borrowed money in the ordinary course that is not in excess of $10.0 million in the aggregate for each such Non-Controlled Entity (as is permitted to be incurred in accordance with the terms of the Acquisition Agreement).

15. The Equity Contribution shall have occurred or shall occur substantially concurrently with the initial borrowing under the ABL Facility.

16. As of the Closing Date, and concurrently with consummation of the Post-Closing Steps, the Ultimate Borrower shall have not less than $250.0 million of unrestricted cash and drawn balance on the ABL Facility of no more than $350.0 million, consistent with Sources and Uses and principles set forth in the interim operating covenants in the Acquisition Agreement, and as otherwise may be agreed in the further discussions with the Special Master.

17. The United States District Court for the District of Delaware shall have entered the Final Sale Order (which Final Sale Order is in full force and effect, is unstayed and has not been amended, supplemented or otherwise modified in a manner adverse to the interest of the Lenders without the consent of the Lead Arrangers).

18. The Administrative Agent and Lead Arrangers shall have received evidence of the issuance of the OFAC License.

19. There shall not be in effect any Law or Order by a Governmental Body (as defined in and as interpreted in accordance with Section 7.1(a) of the Acquisition Agreement) of competent jurisdiction restraining, enjoining or otherwise prohibiting the consummation of the Transactions.

[Form of]
**SOLVENCY CERTIFICATE**

**[_____] [__], 20[__]**

This Solvency Certificate (this "***Certificate***") is delivered pursuant to Section [__] of that certain Credit Agreement, dated as of [_____] [__], 20[__] (as amended, restated, amended and restated, supplemented or otherwise modified from time to time, the "***Credit Agreement***"), by and among [Holdings][Ultimate Borrower]⁴, a Delaware limited liability company [(the "***Borrower***")][(the "***Parent***")], the lending institutions from time to time parties thereto, and JPMorgan Chase Bank, N.A., as the Administrative Agent.  Capitalized terms used in this Certificate but not otherwise defined in this Certificate shall have the meanings given to them in the Credit Agreement:

I, [_____], the [Chief Financial Officer] of the [Borrower][Parent], in such capacity and not in an individual capacity, do hereby certify, on behalf of the [Borrower][Parent], that as of the date hereof and giving pro forma effect to the Acquisition and the incurrence, as applicable, of indebtedness under the Credit Agreement on the date hereof, with respect to the [Borrower][Parent] individually and the Loan Parties, taken as a whole:

(a)    the fair value of their assets, at a fair valuation, will exceed their debts and liabilities, subordinated, contingent or otherwise;

(b)    the present fair saleable value of their property will be greater than the amount that will be required to pay the probable liability of their debts and other liabilities, subordinated, contingent or otherwise, as such debts and other liabilities become absolute and matured;

(c)    they will be able to pay their debts and liabilities, subordinated, contingent or otherwise, as such debts and liabilities become absolute and matured; and

(d)    they will not have unreasonably small capital with which to conduct the business in which they are engaged as such business is now conducted and is proposed to be conducted after the [Closing] Date.

I, [_____], the [Chief Financial Officer] of the [Borrower][Parent], in such capacity and not in an individual capacity, do hereby further certify that no Loan Party intends to, nor will permit any Subsidiary to, and no Loan Party believes that it or any Subsidiary will, incur debts beyond its ability to pay such debts as they mature, taking into account the timing of and amounts of cash to be received by it or any such Subsidiary and the timing of the amounts of cash to be payable on or in respect of its Indebtedness or the Indebtedness of any such Subsidiary.

For purposes hereof, the amount of any contingent liability at any time shall be computed as the amount that, in light of all facts and circumstances existing at such time, represents the amount that would reasonably be expected to become an actual or matured liability.

The undersigned is generally familiar with the business and financial position of the [Borrower][Parent] and its subsidiaries, on a consolidated basis.

---

⁴ To be adjusted based on delivery of Solvency Certificate for the initial closing and then on a post-closing basis in connection with the Post-Closing Steps.

*[Remainder of this page intentionally left blank]*

IN WITNESS WHEREOF, the [Borrower][Parent] has caused this certificate to be executed on its behalf by its [Chief Financial Officer] as of the date first written above.

[BORROWER][PARENT]

By: _____
Name:
Title: [Chief Financial Officer]

**E-2**

*Execution Version*

**JPMORGAN CHASE BANK, N.A.**
383 Madison Avenue
New York, NY 10179

**PERSONAL AND CONFIDENTIAL**

June 25, 2025

Adolin Holdings Inc.
c/o Gold Reserve Ltd.
999 West Riverside Ave., Suite 401
Spokane, Washington 99201

Attention: Paul Rivett, Executive Chairman

**Fee Letter**

Ladies and Gentlemen:

This fee letter (this "***Fee Letter***") sets forth certain fees payable or caused to be payable by Adolin Holdings Inc., a Delaware corporation ("***Initial Borrower***" or "***you***") formed at the direction of Gold Reserve Ltd. and its affiliates (collectively, the "***Sponsor***") in connection with the Facilities contemplated to be provided pursuant to the commitment letter dated the date hereof (including the exhibits and annexes thereto, the "***Commitment Letter***") between JPMorgan Chase Bank, N.A. ("***JPMorgan***", "***we***" or "***us***"), The Toronto-Dominion Bank, New York Branch, TD Securities (USA) LLC, Sumitomo Mitsui Banking Corporation and you.  To the extent not otherwise defined herein, terms defined in the Commitment Letter are used herein as defined therein.  By accepting the Commitment Letter, you agree to pay the fees set forth in this Fee Letter in accordance with the other terms and conditions set forth herein. This Fee Letter is one of the Fee Letters referred to in the Commitment Letter.

**Bridge Facility Fees**

1. You agree to pay, or cause to be paid to the Bridge Administrative Agent, for the account of the Bridge Administrative Agent, a non-refundable annual administration fee (the "***Bridge Administration Fee***") in an amount equal to

2. You also agree to pay, or cause to be paid to JPMorgan, for its own account, a non-refundable additional bridge arrangement fee (the "***Additional Bridge Arrangement Fee***") in an amount equal to

[REDACTED]

## ABL Facility Fees

1. You agree to pay, or cause to be paid to the ABL Administrative Agent, for the account of the ABL Administrative Agent, a non-refundable annual administration fee (the "***ABL Administration Fee***") in an amount equal to [REDACTED]

2. You also agree to pay, or cause to be paid to JPMorgan, for its own account, a non-refundable additional ABL arrangement fee (the "***Additional ABL Arrangement Fee***") in an amount equal to [REDACTED]

[REDACTED]

[REDACTED]

## Miscellaneous

You acknowledge that this Fee Letter is neither an expressed nor an implied commitment by JPMorgan to act in any capacity with respect to the Bridge Facility or the ABL Facility or to purchase or place any loans in connection therewith; such commitment, if any, is only set forth in the Commitment Letter.

You further acknowledge that all fees payable hereunder shall be in addition to any and all fees payable to the Commitment Parties and the other Lenders under the Commitment Letter. All fees payable hereunder and under the Commitment Letter, once paid, shall not be refundable under any circumstances. All fees payable hereunder and under the Commitment Letter shall be paid in immediately available funds in U.S. Dollars and shall not be subject to reduction by way of withholding, setoff or counterclaim or be otherwise affected by any claim or dispute related to any other matter. In addition, all fees payable hereunder shall be paid without deduction for any taxes, levies, imposts, duties, deductions, charges or withholdings imposed by any national, state or local taxing authority ("***Taxes***"), or will be grossed up by you for such amounts, except (i) to the extent such Taxes would not have been imposed (or would have been imposed but at a lower rate) but for the failure of the payee to provide forms or other information permitting such

payments to be made without (or at a reduced rate of) withholding that are reasonably requested by you and that it is legally eligible to provide and (ii) U.S. federal withholding Taxes imposed pursuant to FATCA (defined as Sections 1471 through 1474 of the Internal Revenue Code of 1986, as amended (the "*Code*"), as of the date of this Fee Letter (or any amended or successor version that is substantively comparable and not materially more onerous to comply with), any current or future regulations or official interpretations thereof, any agreements entered into pursuant to Section 1471(b)(1) of the Code and any fiscal or regulatory legislation, rules or practices adopted pursuant to any intergovernmental agreement, treaty or convention among governmental authorities and implementing such Sections of the Code). JPMorgan may, in its discretion, allocate to any of its affiliates or to any Lenders all or any portion of any fees payable to JPMorgan for its account hereunder. Further, you agree that the fees paid hereunder shall be in addition to reimbursement of JPMorgan's out-of-pocket expenses as provided for in the Commitment Letter, and any other fees payable to JPMorgan or the Lenders pursuant to the Commitment Letter.

You agree that, JPMorgan may, in its sole discretion, share with or allocate to, its affiliates and/or one or more Lenders, all or a portion of any fees payable to JPMorgan pursuant to this Fee Letter.

This Fee Letter and its contents are confidential and subject to the limitation of liability and indemnity provisions of the Commitment Letter. This Fee Letter shall not be furnished by you to any other person or entity other than JPMorgan and its affiliates unless otherwise consented to by us and you, except pursuant to the order of any court or administrative agency in any pending legal or administrative proceeding, or otherwise as required by applicable law, stock exchange requirement or compulsory legal process or, to the extent requested or required by governmental and/or regulatory authorities, in each case based on the reasonable advice of your legal counsel (in which case, you agree, to the extent practicable and not prohibited by law, to notify us of the proposed disclosure in advance of such disclosure and if you are unable to notify us in advance of such disclosure, such notice shall be delivered to us promptly thereafter to the extent permitted by law). The provisions of this Fee Letter shall survive the expiration or termination of the Commitment Letter (including any extensions thereof) and the funding of the Bridge Facility and/or the closing, funding or availability of the ABL Facility, and shall remain in full force and effect regardless of whether definitive documentation relating to the Bridge Facility or the ABL Facility shall be executed and delivered.

For the avoidance of doubt, nothing in the preceding paragraph shall prohibit any person from voluntarily disclosing or providing any information within the scope of this confidentiality provision to any U.S. governmental, regulatory or self-regulatory organization (any such entity, a "Regulatory Authority") to the extent that any such prohibition on disclosure set forth in this confidentiality provision shall be prohibited by the laws or regulations applicable to such Regulatory Authority.

This Fee Letter may be executed in any number of counterparts, each of which when executed shall be an original, and all of which, when taken together, shall constitute one agreement. The words "execution," "signed," "signature," "delivery," and words of like import in or relating to this Fee Letter and/or any document to be signed in connection with this Fee Letter and the transactions contemplated hereby shall be deemed to include Electronic Signatures (as defined below), deliveries or the keeping of records in electronic form, each of which shall be of the same legal effect, validity or enforceability as a manually executed signature, physical delivery thereof or the use of a paper-based recordkeeping system, as the case may be. For the avoidance of doubt, the foregoing also applies to any amendment, extension or renewal of this Fee Letter. "*Electronic Signatures*" means any electronic symbol or process attached to, or associated with, any contract or other record and adopted by a person with the intent to sign, authenticate or accept such contract or record.

This Fee Letter embodies the entire agreement and understanding among the parties hereto and your affiliates with respect to the subject matter hereof and supersedes any prior agreement and fee letter relating to the subject matter thereof.

This Fee Letter may not be amended, and no term or provision hereof may be waived or modified, except by an instrument in writing signed by each of the parties hereto. This Fee Letter may not be assigned by you except as permitted pursuant to the Commitment Letter.

This Fee Letter shall be governed by, and construed and interpreted in accordance with, the laws of the State of New York without giving effect to its principles or rules of conflict of laws to the extent such principles or rules would require or permit the application of the laws of another jurisdiction. Each of the parties hereto hereby irrevocably and unconditionally (a) submits, for itself and its property, to the exclusive jurisdiction and venue of the United States District Court for the Southern District of New York sitting in the Borough of Manhattan (or if such court lacks subject matter jurisdiction, the Supreme Court of the State of New York sitting in the Borough of Manhattan), in any suit, action or proceeding arising out of or relating to this Fee Letter or the transactions contemplated hereby, (b) waives, to the fullest extent it may legally and effectively do so, any objection that it may now or hereafter have to the laying of venue of any such suit, action or proceeding in the federal or state courts located in the City of New York, Borough of Manhattan, (c) waives, to the fullest extent permitted by law, the defense of an inconvenient forum to the maintenance of such suit, action or proceeding in any such court and (d) agrees that a final judgment in any such suit, action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law.  Each of the parties hereto agrees to commence any such suit, action, proceeding or claim in the United States District Court for the Southern District of New York sitting in the Borough of Manhattan (or if such court lacks subject matter jurisdiction, the Supreme Court of the State of New York sitting in the Borough of Manhattan).

Section headings used herein are for convenience of reference only and are not to affect the construction of, or to be taken into consideration in interpreting, this Fee Letter.

Please confirm that the foregoing is in accordance with your understanding by signing and returning to us the enclosed copy of this letter, which will become a binding agreement upon our receipt.

[Remainder of page intentionally left blank]

4

Very truly yours,

**JPMORGAN CHASE BANK, N.A.**

[Signature Page to Fee Letter]

Accepted and agreed to as of
the date first written above by:

**ADOLIN HOLDINGS INC.**

By: _____
    Name: Paul Rivett
    Title: Chief Executive Officer

[Signature Page to Fee Letter]

**E-3**

*Execution Version*

| **JPMORGAN CHASE BANK, N.A.** | **THE TORONTO-DOMINION BANK, NEW YORK BRANCH** | **SUMITOMO MITSUI BANKING CORPORATION** |
|---|---|---|
| 383 Madison Avenue | **TD SECURITIES (USA) LLC** | 277 Park Avenue |
| New York, NY 10179 | 1 Vanderbilt Avenue | New York, NY 10172 |
| | New York, NY 10017 | |

**PERSONAL AND CONFIDENTIAL**

June 25, 2025

Adolin Holdings Inc.
c/o Gold Reserve Ltd.
999 West Riverside Ave., Suite 401
Spokane, Washington 99201

Attention: Paul Rivett, Executive Chairman

<div align="center">

**Fee Letter**

</div>

Ladies and Gentlemen:

This fee letter (this "***Fee Letter***") sets forth certain fees payable or caused to be payable by Adolin Holdings Inc., a Delaware corporation ("***Initial Borrower***" or "***you***") formed at the direction of Gold Reserve Ltd. and its affiliates (collectively, the "***Sponsor***"), in connection with the Facilities contemplated to be provided pursuant to the commitment letter dated the date hereof (including the exhibits and annexes thereto, the "***Commitment Letter***") between JPMorgan Chase Bank, N.A. ("***JPMorgan***"), The Toronto-Dominion Bank, New York Branch ("***TD Bank***"), TD Securities (USA) LLC ("***TDS***") and Sumitomo Mitsui Banking Corporation ("***SMBC***" and together with JPMorgan, TD Bank and TDS, the "***Commitment Parties***", "***we***" or "***us***") and you. To the extent not otherwise defined herein, terms defined in the Commitment Letter are used herein as defined therein. By accepting the Commitment Letter, you agree to pay the fees set forth in this Fee Letter in accordance with the other terms and conditions set forth herein. This Fee Letter is the Fee Letter referred to in the Commitment Letter.

**Bridge Arrangement Fee**

You agree to pay, or cause to be paid to each Commitment Party, for its own account, a non-refundable arrangement fee (the "***Bridge Arrangement Fee***") in an amount equal to ████████████

**ABL Arrangement Fee**

You agree to pay, or cause to be paid to each Commitment Party, for its own account, a non-refundable arrangement fee (the "***ABL Arrangement Fee***") in an amount equal to

**ABL Supplementary Arrangement Fee**

█████████████████████████████████████████████████, you agree to pay, or cause to be paid to each Commitment Party, for its own account, a non-refundable supplementary arrangement fee (the "***ABL Supplementary Arrangement Fee***") in an amount equal to ███ % of such Commitment Party's ABL Commitments on the Ultimate Closing Date in excess of the ABL Successful Syndication Threshold (as defined below) for such Commitment Party, which fee shall be earned and payable in full on the Ultimate Closing Date if

**Additional ABL Fees**

You agree to pay, or cause to be paid:

(a)    to the extent neither an ABL Successful Syndication (as defined below) nor the Closing Date has occurred, to the ABL Administrative Agent, for the account of the Commitment Parties, a non-refundable fee in an aggregate amount equal to:

(i)    ████████████████████████████████, ███% of the ABL Commitment as of such date, which fee shall be fully earned on such date and be payable in full in cash on the ABL Payment Date (as defined below);

(ii)    ███████████████████████████████, an additional ███ % of the ABL Commitment in effect as of such date, which fee shall be fully earned on such date and be payable in full in cash on the ABL Payment Date;

(iii)    ██████████████████████████████, an additional ███ % of the ABL Commitment in effect as of such date, which fee shall be fully earned on such date and be payable in full in cash on the ABL Payment Date;

(iv)    ████████████████████████████, an additional ███ % of the ABL Commitment in effect as of such date, which fee shall be fully earned on such date and be payable in full in cash on the ABL Payment Date;

(v)    ████████████████████████████, an additional ███ % of the ABL Commitment in effect as of such date, which fee shall be fully earned on such date and be payable in full in cash on the ABL Payment Date (the fees referred to in clauses (i), (ii), (iii) and (iv) above and this clause (v), collectively, the "***Additional ABL Fees***").

**Alternate Transaction**

In the event that you or any of your affiliates are the winning bidder for the Target or a majority of the assets of the Target under any applicable sale process, including (without limitation) the Sale Process under the Memorandum Order of the U.S. District Court for the District of Delaware in the matter *Crystallex International Corp. v. Bolivarian Republic of Venezuela* (Misc. No. 171-151-LPS and related cases), and consummate (i) the Acquisition or (ii) in lieu of the Acquisition, any substantially similar transaction in which you or any of your affiliates (A) acquire, directly or indirectly, including through a group, partnership, consortium, joint venture or similar arrangement, (x) all or a portion of the common or preferred stock of the Target or its subsidiaries or (y) a majority of the assets of the Target or its subsidiaries or (B) acquire or provide debt or equity constituting a majority or controlling part of the other capital structure of the Target on a pro forma basis (any such transaction described in this clause (ii), an "*Alternate Transaction*"), in either case, with, in whole or in part, the proceeds of a debt financing other than the Facilities (any such other financing, the "*Alternate Financing*") within twenty-four months after the date hereof, you agree that, unless:



**ABL Flex**





**Miscellaneous**

You acknowledge that this Fee Letter is neither an expressed nor an implied commitment by the Commitment Parties to act in any capacity with respect to the Bridge Facility or ABL Facility or to purchase or place any loans in connection therewith; such commitment, if any, is only set forth in the Commitment Letter.

You further acknowledge that all fees payable hereunder shall be in addition to any and all fees payable to the Commitment Parties and the other Lenders under the Commitment Letter. All fees payable hereunder and under the Commitment Letter, once paid, shall not be refundable under any circumstances. All fees payable hereunder and under the Commitment Letter shall be paid in immediately available funds in U.S. Dollars and shall not be subject to reduction by way of withholding, setoff or counterclaim or be otherwise affected by any claim or dispute related to any other matter. In addition, all fees payable hereunder shall be paid without deduction for any taxes, levies, imposts, duties, deductions, charges or withholdings imposed by any national, state or local taxing authority ("***Taxes***"), or will be grossed up by you for such amounts, except (i) to the extent such Taxes would not have been imposed (or would have been imposed but at a lower rate) but for the failure of the payee to provide forms or other information permitting such payments to be made without (or at a reduced rate of) withholding that are reasonably requested by you and that it is legally eligible to provide and (ii) U.S. federal withholding Taxes imposed pursuant to FATCA (defined as Sections 1471 through 1474 of the Internal Revenue Code of 1986, as amended (the "***Code***"), as of the date of this Fee Letter (or any amended or successor version that is substantively comparable and not materially more onerous to comply with), any current or future regulations or official interpretations thereof, any agreements entered into pursuant to Section 1471(b)(1) of the Code and any fiscal or regulatory legislation, rules or practices adopted pursuant to any intergovernmental agreement, treaty or convention among governmental authorities and implementing such Sections of the Code). The Commitment Parties may, in their discretion, allocate to any of their respective affiliates or to any Lenders all or any portion of any fees payable to such Commitment Party for its account hereunder. Further, you agree that the fees paid hereunder shall be in addition to reimbursement of each Commitment Party's out-of-pocket expenses as provided for in the Commitment Letter, and any other fees payable to the Commitment Parties or the Lenders pursuant to the Commitment Letter.

You agree that, the Commitment Parties may, in their sole discretion, share with or allocate to, its affiliates and/or one or more Lenders, all or a portion of any fees payable to such Commitment Party pursuant to this Fee Letter.

Any syndication of the Bridge Commitment shall be applied pro rata to the Bridge Commitments of the Commitment Parties.

This Fee Letter and its contents are confidential and subject to the limitation of liability and indemnity provisions of the Commitment Letter. This Fee Letter shall not be furnished by you to any person other person or entity other than the Commitment Parties party hereto and their affiliates unless otherwise consented to by us and you except pursuant to the order of any court or administrative agency in any pending

legal or administrative proceeding, or otherwise as required by applicable law, stock exchange requirement or compulsory legal process or, to the extent requested or required by governmental and/or regulatory authorities, in each case based on the reasonable advice of your legal counsel (in which case, you agree, to the extent practicable and not prohibited by law, to notify us of the proposed disclosure in advance of such disclosure and if you are unable to notify us in advance of such disclosure, such notice shall be delivered to us promptly thereafter to the extent permitted by law). The provisions of this Fee Letter shall survive the expiration or termination of the Commitment Letter (including any extensions thereof) and the funding of the Bridge Facility and/or the closing, funding or availability of the ABL Facility, and shall remain in full force and effect regardless of whether definitive documentation relating to the Bridge Facility or the ABL Facility shall be executed and delivered.

For the avoidance of doubt, nothing in the preceding paragraph shall prohibit any person from voluntarily disclosing or providing any information within the scope of this confidentiality provision to any U.S. governmental, regulatory or self-regulatory organization (any such entity, a "*Regulatory Authority*") to the extent that any such prohibition on disclosure set forth in this confidentiality provision shall be prohibited by the laws or regulations applicable to such Regulatory Authority.

This Fee Letter may be executed in any number of counterparts, each of which when executed shall be an original, and all of which, when taken together, shall constitute one agreement. The words "execution," "signed," "signature," "delivery," and words of like import in or relating to this Fee Letter and/or any document to be signed in connection with this Fee Letter and the transactions contemplated hereby shall be deemed to include Electronic Signatures (as defined below), deliveries or the keeping of records in electronic form, each of which shall be of the same legal effect, validity or enforceability as a manually executed signature, physical delivery thereof or the use of a paper-based recordkeeping system, as the case may be. For the avoidance of doubt, the foregoing also applies to any amendment, extension or renewal of this Fee Letter. "*Electronic Signatures*" means any electronic symbol or process attached to, or associated with, any contract or other record and adopted by a person with the intent to sign, authenticate or accept such contract or record.

This Fee Letter embodies the entire agreement and understanding among the parties hereto and your affiliates with respect to the subject matter hereof and supersedes any prior agreement and fee letter relating to the subject matter thereof.

This Fee Letter may not be amended, and no term or provision hereof may be waived or modified, except by an instrument in writing signed by each of the parties hereto. This Fee Letter may not be assigned by you except as permitted pursuant to the Commitment Letter.

This Fee Letter shall be governed by, and construed and interpreted in accordance with, the laws of the State of New York without giving effect to its principles or rules of conflict of laws to the extent such principles or rules would require or permit the application of the laws of another jurisdiction. Each of the parties hereto hereby irrevocably and unconditionally (a) submits, for itself and its property, to the exclusive jurisdiction and venue of the United States District Court for the Southern District of New York sitting in the Borough of Manhattan (or if such court lacks subject matter jurisdiction, the Supreme Court of the State of New York sitting in the Borough of Manhattan), in any suit, action or proceeding arising out of or relating to this Fee Letter or the transactions contemplated hereby, (b) waives, to the fullest extent it may legally and effectively do so, any objection that it may now or hereafter have to the laying of venue of any such suit, action or proceeding in the federal or state courts located in the City of New York, Borough of Manhattan, (c) waives, to the fullest extent permitted by law, the defense of an inconvenient forum to the maintenance of such suit, action or proceeding in any such court and (d) agrees that a final judgment in any such suit, action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law. Each of the parties hereto agrees to commence any such suit, action,

proceeding or claim in the United States District Court for the Southern District of New York sitting in the Borough of Manhattan (or if such court lacks subject matter jurisdiction, the Supreme Court of the State of New York sitting in the Borough of Manhattan).

Section headings used herein are for convenience of reference only and are not to affect the construction of, or to be taken into consideration in interpreting, this Fee Letter.

Please confirm that the foregoing is in accordance with your understanding by signing and returning to us the enclosed copy of this letter, which will become a binding agreement upon our receipt.

[Remainder of page intentionally left blank]

Very truly yours,

**JPMORGAN CHASE BANK, N.A.**

*[Signature Page to Fee Letter]*

**THE TORONTO-DOMINION BANK, NEW YORK BRANCH**



**TD SECURITIES (USA) LLC**



*[Signature Page to Fee Letter]*

**SUMITOMO MITSUI BANKING CORPORATION**



*[Signature Page to Fee Letter]*

Accepted and agreed to as of
the date first written above by:

**ADOLIN HOLDINGS INC.**

By: _____
    Name: Paul Rivett
    Title: Chief Executive Officer

*[Signature Page to Fee Letter]*

**E-4**

*Execution Version*

| JPMORGAN CHASE BANK, N.A. | THE TORONTO-DOMINION BANK, NEW YORK BRANCH TD SECURITIES (USA) LLC | SUMITOMO MITSUI BANKING CORPORATION |
|---|---|---|
| 383 Madison Avenue New York, NY 10179 | 1 Vanderbilt Avenue New York, NY 10017 | 277 Park Avenue New York, NY 10172 |

**PERSONAL AND CONFIDENTIAL**

June 25, 2025

Adolin Holdings Inc.
c/o Gold Reserve Ltd.
999 West Riverside Ave., Suite 401
Spokane, Washington 99201

Attention: Paul Rivett, Executive Chairman

<div align="center"><strong><u>Fee Letter</u></strong></div>

Ladies and Gentlemen:

This fee letter (this "***Fee Letter***") sets forth certain fees payable or caused to be payable by Adolin Holdings Inc., a Delaware corporation ("***Initial Borrower***", or "***you***"), in connection with the Facilities contemplated to be provided pursuant to the commitment letter dated the date hereof (including the exhibits and annexes thereto, the "***Commitment Letter***") between JPMorgan Chase Bank, N.A. ("***JPMorgan***"), The Toronto-Dominion Bank, New York Branch ("***TD Bank***"), TD Securities (USA) LLC ("***TDS***"), Sumitomo Mitsui Banking Corporation ("***SMBC***" and together with JPMorgan, TD Bank and TDS, the "***Commitment Parties***", "***we***" or "***us***") and you. To the extent not otherwise defined herein, terms defined in the Commitment Letter are used herein as defined therein. By accepting the Commitment Letter, you agree to pay the fees set forth in this Fee Letter in accordance with the other terms and conditions set forth herein. This Fee Letter is one of the Fee Letters referred to in the Commitment Letter.

**Bridge Facility Fees**

You agree to pay, or cause to be paid:

(a)     to the Bridge Administrative Agent, for the account of the Commitment Parties, a non-refundable commitment fee in an aggregate amount equal to:

 %                                                              , which fee shall be earned on the date hereof.

 ██████████████████████████████████████████████, an additional ██% of the Bridge Commitment as of such date, which fee shall be fully earned on such date and be payable in full in cash on the Bridge Payment Date;

██████████████████████████████████████████████, an additional ██% of the Bridge Commitment in effect as of such date, which fee shall be fully earned on such date and be payable in full in cash on the Bridge Payment Date;

██████████████████████████████████████████████, an additional ██% of the Bridge Commitment in effect as of such date, which fee shall be fully earned on such date and be payable in full in cash on the Bridge Payment Date;

██████████████████████████████████████████████, an additional ██% of the Bridge Commitment in effect as of such date, which fee shall be fully earned on such date and payable in full in cash on the Bridge Payment Date; and

███████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████

(b)      to the Bridge Administrative Agent, for the account of each Lender, including the Commitment Parties, ████████████████████████████████████████████████████████████████████████████████████████████████████████████████

(c)      to the Bridge Administrative Agent, for the account of each Lender, including the Commitment Parties for its own account, █████████████ in an amount equal to ████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

**ABL Facility Fees**

You agree to pay, or cause to be paid:

██████████% of the ABL Commitment as of the date hereof, which fee shall be fully earned on the date hereof and due and payable on the date the date the Closing Date occurs;

2



, to the ABL Administrative Agent, for the account of the Commitment Parties, a

Alternate Transaction

In the event that you or any of your affiliates are the winning bidder for the Target or a majority of the assets of the Target under any applicable sale process, including (without limitation) the Sale Process under the Memorandum Order of the U.S. District Court for the District of Delaware in the matter *Crystallex International Corp. v. Bolivarian Republic of Venezuela* (Misc. No. 171-151-LPS and related cases), and consummate (i) the Acquisition or (ii) in lieu of the Acquisition, any substantially similar transaction in which you or any of your affiliates (A) acquire, directly or indirectly, including through a group, partnership, consortium, joint venture or similar arrangement, (x) all or a portion of the common or preferred stock of the Target or its subsidiaries or (y) a majority of the assets of the Target or its subsidiaries or (B) acquire or provide debt or equity constituting a majority or controlling part of the other capital structure of the Target on a pro forma basis (any such transaction described in this clause (ii), an "*Alternate Transaction*"), in either case, with, in whole or in part, the proceeds of a debt financing other than the Facilities (any such other financing, the "*Alternate Financing*") within twenty-four months after the date hereof, you agree that, unless:





**Permanent Financing Demand**

       **A.     Debt Securities.**





**B.     Term Loans**.





**Miscellaneous**

You acknowledge that this Fee Letter is neither an expressed nor an implied commitment by the Commitment Parties to act in any capacity with respect to the Bridge Facility or the ABL Facility or to purchase or place any loans in connection therewith; such commitment, if any, is only set forth in the Commitment Letter.

You further acknowledge that all fees payable hereunder shall be in addition to any and all fees payable to the Commitment Parties and the other Lenders under the Commitment Letter. All fees payable hereunder and under the Commitment Letter, once paid, shall not be refundable under any circumstances. All fees payable hereunder and under the Commitment Letter shall be paid in immediately available funds in U.S. Dollars and shall not be subject to reduction by way of withholding, setoff or counterclaim or be otherwise affected by any claim or dispute related to any other matter. In addition, all fees payable hereunder shall be paid without deduction for any taxes, levies, imposts, duties, deductions, charges or withholdings imposed by any national, state or local taxing authority ("*Taxes*"), or will be grossed up by you for such amounts, except (i) to the extent such Taxes would not have been imposed (or would have been imposed but at a lower rate) but for the failure of the payee to provide forms or other information permitting such payments to be made without (or at a reduced rate of) withholding that are reasonably requested by you and that it is legally eligible to provide and (ii) U.S. federal withholding Taxes imposed pursuant to FATCA (defined as Sections 1471 through 1474 of the Internal Revenue Code of 1986, as amended (the "*Code*"), as of the date of this Fee Letter (or any amended or successor version that is substantively comparable and not materially more onerous to comply with), any current or future regulations or official interpretations thereof, any agreements entered into pursuant to Section 1471(b)(1) of the Code and any fiscal or regulatory legislation, rules or practices adopted pursuant to any intergovernmental agreement, treaty or convention among governmental authorities and implementing such Sections of the Code). The Commitment Parties may, in their discretion, allocate to any of its affiliates or to any Lenders all or any portion of any fees payable to the Commitment Parties for its account hereunder. Further, you agree that the fees paid hereunder shall be in addition to reimbursement of the Commitment Parties' out-of-pocket expenses as provided for in the Commitment Letter, and any other fees payable to the Commitment Parties or the Lenders pursuant to the Commitment Letter.

You agree that, the Commitment Parties may, in their sole discretion, share with or allocate to, its respective affiliates and/or one or more Lenders, all or a portion of any fees payable to such Commitment Party pursuant to this Fee Letter.

This Fee Letter and its contents are subject to the confidentiality, limitation of liability and indemnity provisions of the Commitment Letter. This Fee Letter shall not be furnished to any person that becomes a party to the Commitment Letter after the date hereof or to any Lender other than the Lead Arrangers and their respective affiliates unless otherwise consented to by us and you. The provisions of this Fee Letter shall survive the expiration or termination of the Commitment Letter (including any extensions thereof) and the funding of the Bridge Facility and/or the closing, funding or availability of the ABL Facility, and shall remain in full force and effect regardless of whether definitive documentation relating to the Bridge Facility shall be executed and delivered.

This Fee Letter may be executed in any number of counterparts, each of which when executed shall be an original, and all of which, when taken together, shall constitute one agreement. The words "execution," "signed," "signature," "delivery," and words of like import in or relating to this Fee Letter and/or any document to be signed in connection with this Fee Letter and the transactions contemplated hereby shall be deemed to include Electronic Signatures (as defined below), deliveries or the keeping of records in electronic form, each of which shall be of the same legal effect, validity or enforceability as a manually executed signature, physical delivery thereof or the use of a paper-based recordkeeping system, as the case may be. For the avoidance of doubt, the foregoing also applies to any amendment, extension or renewal of this Fee Letter. "*Electronic Signatures*" means any electronic symbol or process attached to, or associated with, any contract or other record and adopted by a person with the intent to sign, authenticate or accept such contract or record.

This Fee Letter embodies the entire agreement and understanding among the parties hereto and your affiliates with respect to the subject matter hereof and supersedes any prior agreement and fee letter relating to the subject matter thereof.

This Fee Letter may not be amended, and no term or provision hereof may be waived or modified, except by an instrument in writing signed by each of the parties hereto. This Fee Letter may not be assigned by you except as permitted pursuant to the Commitment Letter.

This Fee Letter shall be governed by, and construed and interpreted in accordance with, the laws of the State of New York without giving effect to its principles or rules of conflict of laws to the extent such principles or rules would require or permit the application of the laws of another jurisdiction. Each of the parties hereto hereby irrevocably and unconditionally (a) submits, for itself and its property, to the exclusive jurisdiction of any New York State court or Federal court of the United States of America sitting in the Borough of Manhattan, and any appellate court from any such court, in any action or proceeding arising out of or relating to this Fee Letter, or the transactions contemplated hereby, and agrees that all claims in respect of any such action or proceeding may be heard and determined in such New York State court or, to the extent permitted by law, in such Federal court, (b) waives, to the fullest extent it may legally and effectively do so, any objection that it may now or hereafter have to the laying of venue of any suit, action or proceeding arising out of or relating to this Fee Letter, or the transactions contemplated hereby, in any such New York State court or in any such Federal court, (c) waives, to the fullest extent permitted by law, the defense of an inconvenient forum to the maintenance of such action or proceeding in any such court and (d) agrees that a final judgment in any such suit, action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law. Each of the parties hereto agrees to commence any such action, suit, proceeding or claim in any Federal court of the United States of America sitting in the Borough of Manhattan or, if that court does not have subject matter jurisdiction, in any state court located in the Borough of Manhattan. Each of the parties hereto agrees to commence any

such action, suit, proceeding or claim in any Federal court of the United States of America sitting in the Borough of Manhattan or, if that court does not have subject matter jurisdiction, in any state court located in the Borough of Manhattan.

Section headings used herein are for convenience of reference only and are not to affect the construction of, or to be taken into consideration in interpreting, this Fee Letter.

Please confirm that the foregoing is in accordance with your understanding by signing and returning to us the enclosed copy of this letter, which will become a binding agreement upon our receipt.

[Remainder of page intentionally left blank]

Very truly yours,

**JPMORGAN CHASE BANK, N.A.**

[Signature Page to Fee Letter]

**THE TORONTO-DOMINION BANK, NEW YORK BRANCH**



**TD SECURITIES (USA) LLC**

[Signature Page to Fee Letter]

**SUMITOMO MITSUI BANKING CORPORATION**



*[Signature Page to Fee Letter]*

Accepted and agreed to as of
the date first written above by:


**ADOLIN HOLDINGS INC.**

By:_____
    Name: Paul Rivett
    Title: Chief Executive Officer

[Signature Page to Fee Letter]

# E-5

J.P. MORGAN SECURITIES LLC
383 Madison Avenue
New York, New York 10179

**PERSONAL AND CONFIDENTIAL**

June 17, 2025

Dalinar Energy Corporation
c/o Gold Reserve Ltd.
999 West Riverside Ave., Suite 401
Spokane, Washington 99201

Attention: Paul Rivett, Executive Chairman

Ladies and Gentlemen:

Dalinar Energy Corporation, a Delaware corporation ("***you***" or the "***Company***") formed at the direction of Gold Reserve Ltd. and its affiliates has advised J.P. Morgan Securities LLC ("***J.P. Morgan***") that you intend to acquire, directly or indirectly, including through a group, partnership, consortium, joint venture or other similar arrangement (collectively, and together with the Company, "***you***"), the equity interests (the "***Acquisition***") of PDV Holding, Inc. and/or its direct and indirect subsidiaries, CITGO Petroleum Corporation ("***CPC***") and CITGO Holding, Inc. ("***CHI***") (collectively, the "***Acquired Business***"). The Acquisition may include resolution of certain disputes or competing claims with respect to the assets of PDV Holding, Inc., including, without limitation, its ownership of the Acquired Business. This letter supersedes that certain letter, dated June 2, 2025, of J.P. Morgan which, as of the date hereof upon execution and delivery of this letter, is of no further force and effect.

You have advised us that the Acquisition will be financed (the "***Financing***") with a combination of: (i) up to $4,500,000,000 of gross cash proceeds, which will be raised through a combination of one or more new debt facilities (the "***Debt Financing***"), (ii) up to $350,000,000 drawn under a senior-secured asset-based revolving credit facility with aggregate commitments, subject to a borrowing base, of up to $2,000,000,000 (the "***ABL***" and collectively with the Acquisition Credit Facilities, the "***Facilities***"), (iii) up to $1,800,000,000 of gross cash proceeds from the issuance of preferred equity securities of CPC in private offering(s) (the "***Preferred Equity Issuance***") and (iv) the Company's combined judgment claims of $3,156,700,000, secured by writs of attachment, which will be submitted as a credit bid, undertaken for the purpose of completion of the Acquisition. The Debt Financing will consist of CPC's sale and issuance of debt securities (the "***Debt***") and/or senior credit facilities (the "***Acquisition Credit Facilities***") of up to $4,500,000,000 of gross cash proceeds and up to $350,000,000 of borrowings under the ABL. You have further advised us that (i) $55,000,000 aggregate principal amount of CPC's outstanding industrial revenue bonds and (ii) $250,000,000 aggregate principal amount of CPC's finance leases and similar obligations will remain outstanding following the Acquisition (together, the "***Existing***

1

*Debt Rollover*") and (iii) up to $750 million of Judgment Claims may be converted into preferred equity securities of CPC on terms similar or comparable to the Preferred Equity Issuance.

Based upon the information that you have provided to us to date (including the outline of the Acquisition and the Company's internal financial model of the Acquired Business after giving effect to the Acquisition), our current understanding of the business, operations, property, condition (financial or otherwise) and prospects of the Acquired Business after giving effect to the Acquisition, publicly available information, the current market for securities generally (and in particular the market for structured equity investments), our discussions with potential investors regarding the Acquisition undertaken with your permission from July 2024 through the date hereof, the Acquisition being financed in a manner consistent with the description in the previous paragraph, the completion of the Existing Debt Rollover concurrently with the Acquisition and subject to the foregoing and such other matters as we consider relevant, we are pleased to inform you that, as of the date hereof, we are highly confident that, in connection with the Acquisition, the structuring, sale and placement of the Preferred Equity Issuance can be accomplished by us (and/or one of our affiliates, as applicable) as your placement agent. The terms of the transaction, including the ultimate structure, offering price, dividend rate and form (if applicable), liquidation preference (if applicable), conversion rights (if applicable), warrant or other equity component (if applicable), registration rights (if applicable), liquidity features,: redemption and/or put provisions (if applicable), and terms of, and the documentation for, the Preferred Equity Issuance, as applicable, will be determined by J.P. Morgan (and, as applicable, its affiliates) in consultation with you, will be mutually acceptable to J.P. Morgan (and, as applicable, its affiliates) and you, and will be based on market conditions at the time of the sale or placement of the Preferred Equity Issuance, including as it relates to the terms specified in this. paragraph, as well as on the structure and documentation of the Acquisition.

Our view above is based on the outline of the Acquisition as currently structured including our understanding of the business, tax status, operations, property, condition (financial or otherwise) and prospects of the Company and the Acquired Business after giving effect to the Acquisition. Our view above is also subject to (i) there not occurring or becoming known to us any event, development or circumstance since December 31, 2024 that has had or could reasonably be expected to have a material adverse effect on the business, operations, property, condition (financial or otherwise) or prospects of the Acquired Business and its subsidiaries, taken as a whole, or of you and your subsidiaries, taken as a whole, in each case as determined by J.P. Morgan in its sole discretion, (ii) our not becoming aware of any information or any other matter (including any matter relating to financial models and underlying assumptions relating to the proposed transactions) affecting the Acquired Business, the Acquisition or you that in our judgment is inconsistent in a material and adverse manner with any such information or other matter disclosed to us prior to the date hereof or could reasonably be expected to materially impair the sale or placement of the Preferred Equity Issuance or other Financing, (iii) that all members of the senior executive management team of the Acquired Business agree to remain in their roles following the Acquisition or are replaced by individuals with significant experience operating businesses or assets comparable to the Acquired Business, as determined by J.P. Morgan in its sole discretion, (iv) that, prior to and during the offering or placement of any Preferred Equity Issuance, there shall be no competing offering, placement or arrangement of any equity or equity-related securities or bank financing (other than the other Financing) and our having reasonable time to market the Preferred Equity Issuance with the assistance of management and the board of the Company and

management of the Acquired Business (to the extent permitted pursuant to the terms of the draft of that certain Stock Purchase Agreement by and among Adolin Holdings Inc., a Delaware Corporation and wholly-owned subsidiary of the Company, and Robert B. Pincus, solely in his capacity as the Special Master for the United States District Court for the District of Delaware) based on our experience in comparable transactions sold in comparable markets, (v) our satisfactory completion of due diligence, including but not limited to business, legal (including as relates to confirming that the Company has policies, procedures and controls reasonably designed to ensure compliance with sanctions administered and enforced by the Office of Foreign Assets control of the U.S. Department of the Treasury ("*OFAC*")), accounting, financial, tax and structural matters as to the Company and the Acquired Business, and such investigation not disclosing any facts that would materially alter our current view of the Company or the Acquired Business, (vi) our satisfaction with the structure, terms and documentation for the Acquisition (including the pro forma capital structure, including pro forma equity and operating liquidity) and execution by you and/or the Acquired Business, as applicable, of an agreement evidencing the acquisition that has been approved by your and the Acquired Business' boards of directors and is satisfactory in form and substance to us, (vii) there not having occurred a material disruption of or material adverse change in financial, banking or capital markets that, in our sole judgment, could materially impair the sale or placement of any Preferred Equity Issuance or the other Financing, (viii) the receipt of all required governmental and third party consents and approvals in connection with the Acquisition, the Preferred Equity Issuance and the other Financing, including authorization from OFAC, (ix) our satisfaction (in form and substance) with the structure, terms and documentation of the Preferred Equity Issuance (including offering materials and a purchase or placement agreement, if applicable) based on market conditions at the time of the sale or placement of the Preferred Equity Issuance, (x) the receipt of (A) audited historical financial statements of the Acquired Business for the three most recently completed fiscal years that are consistent with the financial results previously furnished to us, (B) unaudited historical financial statements of the Acquired Business for each quarterly period after the end of the most recent fiscal year for which audited financial statements are provided and (C) applicable pro forma financial statement giving effect to the Acquisition, in each case, at least 45 days prior to the closing date for any Preferred Equity Issuance and (xi) our satisfaction with other customary aspects of these types of financings for acquisitions of this type, including, but not limited to, the Acquired Business obtaining corporate credit/family ratings that are satisfactory to us and our having reasonable time to market the Preferred Equity Issuance with the assistance of management and the board of the Company based on our experience in comparable transactions sold in comparable markets. Furthermore, our view is based on conditions in financial markets generally, and in particular the market for structured equity investments, and assumes that there will be no material adverse change in existing conditions in such markets.

This letter does not constitute a commitment by J.P. Morgan or any of its affiliates to underwrite, place or purchase the Preferred Equity Issuance or to arrange or provide any other financing and there can be no assurance that the sale or placement of the Preferred Equity Issuance will in fact be accomplished.  Any such commitment would be made pursuant to one or more written agreements satisfactory to J.P. Morgan, in its sole discretion, and after receipt of all necessary internal approvals.

In connection with this letter, we have relied without independent verification upon the accuracy and completeness of all of the information reviewed by us for purposes of this letter.

In addition, please note that we do not provide, and nothing herein shall be construed to be, accounting, tax or legal advice.

J.P. Morgan and its affiliates must comply with the sanctions laws, regulations, and guidance administered and enforced by OFAC, whether as a matter of law or J.P. Morgan policy. This letter is being provided in reliance on, and should be interpreted in accordance with, guidance issued by OFAC, specifically FAQ 1123 (https://ofac.treasury.gov/faqs/1123) (accessed as of the date hereof). J.P. Morgan and its affiliates will only participate in the Preferred Equity Issuance to the extent authorized by OFAC, including through receipt of a Specific License. As reflected in FAQ 1123, OFAC has signaled that it intends to implement a favorable licensing policy in connection with the kinds of transactions described in this letter, and J.P. Morgan expects that the Company would pursue such authorization in close collaboration with J.P. Morgan. Any portion of this letter that conflicts with any sanctions laws, regulations, and guidance administered and enforced by OFAC, including FAQ 1123 or any successors thereto, shall be deemed null and void.

In addition to the foregoing, J.P. Morgan and its affiliates will only participate in the Preferred Equity Issuance provided that neither you, any of your subsidiaries nor the Acquired Business (i) are a "covered foreign person" as that term is used in the Outbound Investment Rules; (ii) currently engages, or has any present intention to engage in the future, directly or indirectly, in (A) a "covered activity" or a "covered transaction", as each such term is defined in the Outbound Investment Rules, (B) any activity or transaction that would constitute a "covered activity" or a "covered transaction", as each such term is defined in the Outbound Investment Rules, if you, your subsidiaries or the Acquired Business are a U.S. Person or (C) any other activity that would cause J.P. Morgan and its affiliates to be in violation of the Outbound Investment Rules or cause J.P. Morgan affiliates to be legally prohibited by the Outbound Investment Rules from participating in the Debt Financing and ABL. "Outbound Investment Rules" means the regulations administered and enforced, together with any related public guidance issued, by the United States Treasury Department under U.S. Executive Order 14105 of August 9, 2023, or any similar law or regulation; as of the date of this Agreement, and as codified at 31 C.F.R. § 850.101 et seq.

By your acceptance of this letter, you acknowledge that J.P. Morgan and its affiliates (for the purposes of this paragraph, "**JPM**") may be providing debt financing, equity capital or other services (including financial advisory services) to other companies in respect of which you may have conflicting interests regarding the transactions described herein and otherwise. By your acceptance of this letter, you also acknowledge that JPM has no obligation to use in connection with the transactions contemplated by this letter, or to furnish to you, confidential information obtained from other companies.

This letter has been delivered to you for your information and is not to be distributed or disclosed to, or otherwise relied upon by, any other person or entity without J.P. Morgan's prior written consent, except as required by law or compulsory legal process (in which case you agree to notify us prior to any such disclosure). J.P. Morgan consents to the delivery of a copy of this letter to (but, for the avoidance of doubt, for informational purposes only in connection with consideration of your bid on a non-reliance basis) the Special Master for the United States District Court of Delaware, appointed pursuant to that certain Memorandum Order, dated April 13, 2021 [D.I. 258] issued in *Crystallex International Corporation vs. Bolivarian Republic of Venezuela* (Case No. 1:17 mc-00151-LPS), so long as they agree to keep this letter confidential and not

disclose this letter except as otherwise required by the Court in *Crystallex International Corporation vs. Bolivarian Republic of Venezuela* (Case No. 1:17 mc-00151-LPS), provided that you agree to notify us prior to any such disclosure. For the avoidance of doubt, nothing in this letter shall prohibit any person from voluntarily disclosing or providing any information within the scope of this non-disclosure provision to any governmental, regulatory or self-regulatory organization (any such entity, a "***Governmental Authority***") to the extent that any such prohibition on disclosure set forth in this non-disclosure provision shall be prohibited by the laws or regulations applicable to such Governmental Authority. Nothing herein, express or implied, is intended or shall confer upon any third party any legal or equitable right, benefit or remedy of any nature whatsoever under or by reason of this letter.

*[Signature pages follow]*

Very truly yours,

J.P. MORGAN SECURITIES LLC

[Signature Page to Highly Confident Letter]

## Exhibit F

**Commitment Letters Regarding Consent to Accept Non-cash Consideration**

**F-1**

STRICTLY PRIVATE AND CONFIDENTIAL

June 25, 2025

Re: <u>Bidder Equity Commitment Letter / Consent to Accept Non-Cash Consideration</u>

Reference is made to (i) that certain bid letter, dated as of June 25, 2025 (the "**Bid Letter**"), being submitted by Gold Reserve Ltd., f/k/a Gold Reserve Inc., ("**Gold Reserve**") with respect to the acquisition by Dalinar Energy Corporation, a wholly owned subsidiary of Gold Reserve ("**Dalinar Energy**"), of all the issued and outstanding shares of PDV Holding, Inc. ("**PDVH**") in connection with the matter of *Crystallex International Corp. v. Bolivarian Republic of Venezuela*, D. Del. C.A. No. 1:17-mc-00151-LPS (the "**Crystallex Case**") and (ii) the Attached Judgments of each of Gold Reserve, Rusoro Mining Ltd. ("**Rusoro**"), Koch Minerals Sarl ("**KM**"), and Koch Nitrogen International Sarl ("**KNI**," together with KM, "**Koch**", and together with KM, Rusoro and Gold Reserve, the "**Parties**") in the Crystallex Case.

Capitalized terms used herein and not otherwise defined have the meanings given to them in the Stalking Horse Bid Instruction Letter sent by Ray Strong on behalf of Robert B. Pincus, Special Master for the United States District Court for the District of Delaware (the "**Court**"), dated April 28, 2025, and Sales Procedures Order in the Crystallex Case.

By execution hereof, each of Gold Reserve, Rusoro, KM and KNI agrees and acknowledges that they will accept specified non-cash consideration, including in the form of preferred and common equity of Dalinar Energy, on the terms agreed by the Parties as set forth in the Bid Letter, or as otherwise subsequently agreed by the Parties, in consideration for the release and discharge of the amount of their Attached Judgment specified in the Bid Letter, or as otherwise subsequently agreed between the Parties and/or with the Special Master, in connection with the consummation of the Sale Transaction of all the issued and outstanding shares of PDV Holding, Inc. to Dalinar Energy, pursuant to and as contemplated by that draft Share Purchase Agreement submitted as an exhibit to the Bid Letter (the "**SPA**"). Each of the Parties acknowledges and agrees that the foregoing sentence does not alter, amend or modify any other agreements among the Parties with respect to the type or amount of such non-cash consideration, the terms of such non-consideration (including, with respect any preferred or common equity of Dalinar Energy, the terms thereof) or the circumstances (if any) in which such Parties may also receive cash consideration.

This letter is provided solely for the benefit of the parties hereto and their respective successors and permitted assigns, and is not intended to, nor shall it be construed to, create any right, claim, or benefit in favor of any person or entity not a party to this letter, except as expressly provided herein. Notwithstanding the foregoing, the Special Master (as defined in the SPA) is an intended third-party beneficiary of this letter and shall have the right to enforce the terms of this letter as if it were a party hereto.

\*       \*       \*

Agreed and acknowledged by:

**Rusoro Mining Ltd.**



\*              \*              \*

Agreed and acknowledged by:

**Koch Minerals Sarl**



**Koch Nitrogen International Sarl**



Agreed and acknowledged by:

**Gold Reserve Ltd.**

By: _____
    Name: Paul Rivett
    Title: CEO

**F-2**

STRICTLY PRIVATE AND CONFIDENTIAL

June 25, 2025

Re: Bidder Equity Commitment Letter / Consent to Accept Non-Cash Consideration

Reference is made to (i) that certain bid letter, dated as of June 25, 2025 (the "**Bid Letter**"), being submitted by Gold Reserve Ltd., f/k/a Gold Reserve Inc., ("**Gold Reserve**") with respect to the acquisition by Dalinar Energy Corporation, a wholly owned subsidiary of Gold Reserve ("**Dalinar Energy**"), of all the issued and outstanding shares of PDV Holding, Inc. ("**PDVH**") in connection with the matter of *Crystallex International Corp. v. Bolivarian Republic of Venezuela*, D. Del. C.A. No. 1:17- mc-00151-LPS (the "**Crystallex Case**") and (ii) the Attached Judgments of each of Gold Reserve, Siemens Energy Inc. ("Siemens"), Rusoro Mining Ltd. ("**Rusoro**"), Koch Minerals Sarl ("**KM**"), Koch Nitrogen International Sarl ("**KNI**," together with KM, "**Koch**") in the Crystallex Case. Gold Reserve acknowledges that Siemens' Attached Judgment is held by XYQ US, LLC ("**XYQ**") via a subparticipation agreement via Morgan Stanley Senior Funding, Inc. Each of Gold Reserve and XYQ may be hereinafter referred to individually as a "**Party**" or collectively as the "**Parties**."

Capitalized terms used herein and not otherwise defined have the meanings given to them in the Stalking Horse Bid Instruction Letter sent by Ray Strong on behalf of Robert B. Pincus, Special Master for the United States District Court for the District of Delaware (the "**Court**"), dated April 28, 2025, and Sales Procedures Order in the Crystallex Case.

By execution hereof, XYQ agrees and acknowledges that it will accept specified non-cash consideration, including in the form of preferred and common equity of Dalinar Energy, on the terms agreed by the Parties as set forth in the letter agreement dated June 25, 2025 between the Parties and Koch, or as otherwise subsequently agreed by the Parties, in consideration for the release and discharge of the Siemens' Attached Judgment, in connection with the consummation of the Sale Transaction of all the issued and outstanding shares of PDV Holding, Inc. to Dalinar Energy, pursuant to and as contemplated by that draft Share Purchase Agreement submitted as an exhibit to the Bid Letter (the "**SPA**"). Each of the Parties acknowledges and agrees that the foregoing sentence does not alter, amend or modify any other agreements among the Parties with respect to the type or amount of such non-cash consideration, the terms of such non-consideration (including, with respect any preferred or common equity of Dalinar Energy, the terms thereof) or the circumstances (if any) in which such Parties may also receive cash consideration.

XYQ represents and warrants that it holds and controls 100% of the interests of Siemen's claim. XYQ shall take all such commercially reasonable actions and shall use commercially reasonable efforts to cause Siemens to take all such actions as are necessary or desirable to carry out and give effect to the purposes of this Agreement. If XYQ accedes to directly own all right, title and interest in and to Siemens' Claim, XYQ obligations hereunder shall be direct obligations of XYQ to act, as and from such date.

This letter is provided solely for the benefit of the Parties and their respective successors and permitted assigns, and is not intended to, nor shall it be construed to, create any right, claim, or benefit in favor of any person or entity not a party to this letter, except as expressly provided herein. Notwithstanding the foregoing, the Special Master (as defined in the SPA) is an intended third-party beneficiary of this letter and shall have the right to enforce the terms of this letter as if it were a party hereto.

Agreed and acknowledged by:

**Gold Reserve Ltd.**

By: _____
Name: Paul Rivett
Title: CEO

Agreed and acknowledged by:

**XYQ US, LLC**

**<u>Exhibit G</u>**

**Final Bid Letter Submitted by Dalinar**



June 25, 2025

**Via E-Mail**

**Evercore Group L.L.C.**
2 Houston Center
909 Fannin Street, Suite 1800
Houston, TX 77010

**Attention: Ray Strong & William Hiltz**
Ray.strong@evercore.com
hiltz@evercore.com

**cc: Weil, Gotshal & Manges LLP**
767 Fifth Avenue
New York, NY 10153-0119

**Attention: Matt Barr, Eoghan P. Keenan, and Chase Bentley**
matt.barr@weil.com
eoghan.keenan@weil.com
chase.bentley@weil.com

Dear Sirs:

**RE: REVISED TOPPING PROPOSAL FOR PURCHASE OF 100% SHARES OF PDV HOLDING INC. ("PDVH")**

This letter sets out the revised terms of the definitive and binding proposal (the "**Revised Topping Proposal**") by Dalinar Energy Corporation ("**Dalinar Energy**" or the "**Purchaser**"), a wholly-owned subsidiary of Gold Reserve Ltd., f/k/a Gold Reserve Inc.[1] ("**Gold Reserve**"), to purchase 100% of the common shares of PDVH for a net purchase price of **$7.530 billion** (the "**Net Purchase Price**").[2]    The Revised Topping Proposal is supported by Attached Judgment Holders Rusoro Mining Limited ("**Rusoro**"), Koch Minerals SARL and Koch Nitrogen International SARL (collectively, "**Koch**"), and XYQ US, LLC ("**XYQ**"), which controls the Attached Judgment held by Siemens Energy Inc. (the "**Siemens Judgment**").

---

[1] On September 30, 2024, Gold Reserve Inc. completed a continuance and re-domiciled from Alberta, Canada to Bermuda, and in connection therewith changed its name to Gold Reserve Ltd.

[2] The Net Purchase Price is net of the Advanced Transaction Expenses, the Closing Transaction Expenses, and the Expense Reserve Holdback Amount, as those terms are defined in the SPA.

This Revised Topping Proposal amends and replaces the Topping Proposal previously submitted by the Purchaser on June 18, 2025 and the Topping Proposal submitted earlier today, on June 25, 2025. The Purchaser further reserves the right to amend and further improve the terms of the Revised Topping Proposal as appropriate.

**Summary of the Revised Topping Proposal**

- The Net Purchase Price will fully satisfy, in cash delivered at Closing of the Sale Transaction in the amount of **$3.925 billion**, the Attached Judgments of the following Attached Judgment Holders, listed in the priority order established by the Court: Crystallex International Corp. ("**Crystallex**"); Tidewater Investment SRL and Tidewater Caribe S.A. (collectively, "**Tidewater**"); ConocoPhillips Gulf Paria B.V., *et al.* (Judgments #1 and #2) (collectively, "**ConocoPhillips**"); OI European Group B.V. ("**OIEG**"); Northrop Grumman Ship Systems, Inc./Huntington Ingalls ("**Huntington Ingalls**"); ACL1 Investments Ltd., ACL2 Investments Ltd., and LDO (Cayman) XVIII Ltd. (collectively, "**ACL1**"); and Red Tree Investments, LLC ("**Red Tree**").

- The Net Purchase Price will also satisfy, through the exchange of equity securities of Dalinar Energy, a further **$3.605 billion** in Attached Judgments as follows: the Attached Judgment of Rusoro in full, the Attached Judgment of Koch in full, the Attached Judgment of Gold Reserve in full, and the Siemens Judgment in full.

- The Revised Topping Proposal is supported by fully committed debt financing up to **$6.5 billion**, of which **$4.85 billion** will be available at Closing, with an additional **$1.65 billion** in asset-based lending available post-Closing. The certainty of the debt financing is evidenced by the annexed Commitment Letters executed by JP Morgan Chase Bank, N.A. ("**JP Morgan**"), The Toronto-Dominion Bank, New York Branch ("**TD Bank**"), and TD Securities (USA) LLC ("**TDS**"), and Sumitomo Mitsui Banking Corporation ("**SMBC**").

- The Revised Topping Proposal also is supported by additional equity financing of up to **$1.8 billion** that would be raised from the issuance of preferred equity securities of Citgo Petroleum Corporation in private offering(s), as evidenced by the annexed Highly Confident Letter from JP Morgan, the largest financial institution in the United States and one of the largest financial institutions in the world. The preferred equity raise will not reduce the consideration that will be distributed to Attached Judgment Creditors under this Revised Topping Proposal.

- No purchase price adjustments, "lock box," "leakage", or similar constructs are included in the Net Purchase Price.

- No portion of the Net Purchase Price is payable to an escrow or trust, whether in respect of the PDVSA 2020 Bonds, the Alter Ego Claims, or otherwise.

- The Revised Topping Proposal does not include any "earn-out" or deferred purchase price concepts.

- The Revised Topping Proposal does not include any requirements and is not subject to any closing condition precedent related to the PDVSA 2020 Notes or the Alter Ego Claims.

- The Revised Topping Proposal, in prioritizing a higher Net Purchase Price to the benefit of the Sale Process Parties and the Attached Judgment Creditors, is compliant with the requirement of Section 324 of Title 8 of the Delaware Code that the attached shares be sold "to the highest bidder".

- As directed by the Court, and as explained in further detail below, the Purchaser has taken steps to "meaningfully address[]" the risk of the "possible impact of the 2020 Bondholders' rights – whatever they may be (in reality or potentially) on the certainty of closing." (D.I. 1741 at 4). This risk has also now, in Purchaser's view, been substantially reduced, if not eliminated entirely, by the issuance by the U.S. Department of Treasury, Office of Foreign Assets Control ("**OFAC**") on June 20, 2025 of GL-5S, as explained in detail in Gold Reserve's June 24, 2025 filing with the Court (D.I. 1816). The Purchaser reserves the right to take further steps to address this stated risk and looks forward to continued communications with the Special Master and his advisors regarding the same.

- The details of how the Net Purchase Price will satisfy the Attached Judgments at Closing is set out in the below chart.

- In the below chart, a Closing Date of December 31, 2026 is used for illustrative calculation purposes only. The Purchaser is committed to closing the proposed transaction as soon as is possible and, assuming all regulatory approvals are timely provided, expects Closing to occur by <u>December 31, 2025</u>.

| | | Attached Judgments as at December 31, 2026 | | |
|---|---|---|---|---|
| # | Holder: | Value ($mm)[3] | Consideration | Cash Paid at Closing ($mm) |
| 1 | Crystallex | $1,025 | Cash | $1,025 |
| 2 | Tidewater #1 | $80 | Cash | $80 |
| 3 | Tidewater #2 | $3 | Cash | $3 |
| 4 | Conoco Phillips (#1) | $1,444 | Cash | $1,444 |
| 5 | OIEG | $695 | Cash | $695 |
| 6 | Huntington Ingalls | $140 | Cash | $140 |
| 7 | ACL1 | $119 | Cash | $119 |
| 8 | Red Tree #1 | $232 | Cash | $232 |
| 9 | Red Tree #2 | $135 | Cash | $135 |

---

[3] The value of the Attached Judgments is calculated for illustrative purposes through December 31, 2026, using the methodology used by the Special Master to calculate the Attached Judgments through December 31, 2024.

| 10 | Red Tree #3 | $3 | Cash | $3 |
| 11 | Rusoro | $1,584 | Dalinar Securities | -- |
| 12 | Conoco Phillips (#2) | $49 | Cash | $49 |
| 13 | Koch | $473 | Dalinar Securities | -- |
| 14 | Gold Reserve | $1,299 | Dalinar Securities | -- |
| 15 | Siemens | $249 | Dalinar Securities | |
| | **Total** | **$7,530** | | **$3,925** |

The Revised Topping Proposal is submitted pursuant to the topping bid instruction letter sent by Ray Strong on behalf of Robert B. Pincus, Special Master (the "**Special Master**") for the United States District Court for the District of Delaware (the "**Court**"), dated April 28, 2025 (the "**Topping Bid Instruction Letter**"),[4] and the *Sixth Revised Proposed Order (A) Establishing Sale and Bidding Procedures, (B) Approving Special Master's Report and Recommendation Regarding Proposed Sale Procedures Order, (C) Affirming Retention of Evercore as Investment Banker by Special Master and (D) Regarding Related Matters* (D.I. 481) (as amended, modified, supplemented, or superseded, the "**Sale Procedures Order**") dated October 4, 2022, in the case of *Crystallex International Corporation v. Bolivarian Republic of Venezuela*, No. 17 Misc. 151 (D. Del) (the "**Crystallex Case**").

Capitalized terms used herein and not otherwise defined have the meanings given to them in the Topping Bid Instruction Letter and Sale Procedures Order.

### A. Proposed Transaction Structure

The Revised Topping Proposal is for the purchase of 100% of the common shares of PDVH, sold free and clear of all claims, encumbrances, and liabilities on or against the shares, in accordance with the terms of the Sale Procedures Order and subject to the qualifications referenced in Paragraphs A.iv. and F. below.

As directed in the Topping Bid Instruction Letter, the Revised Topping Proposal is based on the following key assumptions and notes:

i. <u>Purchase Price; No Adjustments</u>.   The net purchase price for the shares of PDVH is $7.530 billion.   This is a fixed dollar amount.   No purchase price adjustments, "lock box," "leakage," or similar constructs are included in the purchase price.   The Revised Topping Proposal is made in reliance on the Purchaser receiving protection through the interim operating covenants set forth in the SPA, under which PDVH/CITGO will be operated in the ordinary course of business.

---

[4] To the extent that the Topping Bid Instruction Letter contains terms or conditions that are in variance with, or conflict, with the terms of the Sale Procedures Order or other order of the Court, the Court's Orders control and therefore would supersede any such terms of the Topping Bid Instruction Letter.

ii.   <u>No Escrows</u>.   No portion of the purchase price is payable to an escrow.

iii.   <u>No "Earn-Out" Payment or Deferred Purchase Price</u>.  The Revised Topping Proposal does not include any "earn-out" or deferred purchase price concepts.

iv.   <u>No Trust/Escrow Constructs regarding PDVSA 2020 Bonds Share Pledge</u>. The Revised Topping Proposal does not include any trust/escrow constructs or similar revisions regarding the PDVSA 2020 Notes and does not include any closing conditionality related to the PDVSA 2020 Notes.  The Revised Topping Proposal does take into consideration the Court's additional guidance in the *Order*, dated April 21, 2025 (D.I. 1741) related to such matters.

v.   <u>No Stand-Alone Closing Conditions relating to Alter Ego Claims</u>.  The Revised Topping Proposal and Proposed SPA (defined below) do not include any stand-alone closing conditions relating to Alter Ego claims, and the Proposed SPA does not include trust/escrow constructs or purchase price alterations relating to Alter Ego claims.

**B.  <u>Stock Purchase Agreement</u>**

Attached hereto at <u>Annex 1</u> is a draft Stock Purchase Agreement (the "**Proposed SPA**") that provides for the Purchaser's acquisition of 100% of the shares of PDVH, together with a redline (attached as <u>Annex 2</u>) marked to show Purchaser's proposed changes to the Stalking Horse Agreement, including any proposed changes to all exhibits and schedules thereto.

As requested by the Special Master, comments are provided in Microsoft Word format and both a clean Word version as well as the above-referenced PDF comparison to the Stalking Horse Agreement are attached.

As requested by the Special Master, a PDF comparison to the final version of the Consortium's prior proposed Revised Topping Proposal SPA dated June 18, 2025 is attached as <u>Annex 3</u>.

**C.  <u>Identity of Purchaser</u>**

Dalinar Energy, a Delaware corporation and wholly-owned subsidiary of Gold Reserve, is an American-led energy company, driven by a team of seasoned directors with a proven track record in the industry, and oil and gas in particular.   Supported by investments from two subsidiaries of Koch who will become shareholders of Dalinar Energy upon closing of the Proposed Transaction, Dalinar Energy is focused on driving sustainable growth and optimal performance for CITGO.   Further details regarding Dalinar Energy can be found here: https://www.dalinarenergy.com/.

Dalinar Energy was formed for the purpose of submitting a bid in the Sale Process, entering into the Definitive SPA (defined below) and closing on the Proposed Transaction.   Dalinar Energy is expected to have no other material assets, liabilities, or business.  Per the terms of the Definitive SPA, and as required, Gold Reserve will guarantee certain of Purchaser's obligations under the Definitive SPA.

Gold Reserve has historically been engaged in the business of evaluating, acquiring, exploring, and developing mining projects.   At present, Gold Reserve's primary activities include those related to corporate and legal activities associated with the collection of the unpaid balance of its arbitration award against the Republic of Venezuela and resulting judgments, including its Attached Judgment in these proceedings.

Gold Reserve's Class A common shares trade on the TSX Venture Exchange and are quoted on the OTCQX Markets Exchange.   On September 30, 2024, Gold Reserve Inc. completed a continuance and re-domiciled from Alberta, Canada to Bermuda, and in connection therewith changed its name to Gold Reserve Ltd.     Gold Reserve's registered address in Bermuda is Rosebank Centre, 5th Floor, 11 Bermudiana Road, Pembroke HM 08, Bermuda. Gold Reserve maintains an executive and administrative office at 999 West Riverside Ave., Suite 401, Spokane, Washington 99201.

### D.  <u>Purchase Price and Principal Economic Terms</u>

Purchaser would pay a net purchase price of $7.530 billion for the shares of PDVH, comprised of the below components:

- A credit bid of Gold Reserve's entire Attached Judgment, for which Gold Reserve will receive at Closing accept specified non-cash consideration, including in the form of preferred and common equity of Dalinar Energy, on the agreed terms as set forth in the Bid Letter, or as otherwise subsequently agreed.   The amount of Gold Reserve's Attached Judgment (the "**Gold Reserve Judgment**"), inclusive of post-judgment interest, was calculated by the Special Master as $1,138,508,078.61 as at December 31, 2024.   At the illustrative Closing Date of December 31, 2026, the Gold Reserve Judgment, inclusive of post-judgment interest calculated using the Special Master's methodology, is calculated to be $1,299,000,000.

- A credit bid of Koch's entire Attached Judgment (the "**Koch Judgment**"), for which Koch will receive at Closing accept specified non-cash consideration, including in the form of preferred and common equity of Dalinar Energy, on the agreed terms as set forth in the Bid Letter, or as otherwise subsequently agreed.   The amount of the Koch Judgment, inclusive of post-judgment interest, was calculated by the Special Master as $463,374,390 as at December 31, 2024.     At the illustrative Closing Date of December 31, 2026, the Koch Judgment, inclusive of post-judgment interest calculated using the Special Master's methodology, is calculated to be $473,000,000.

- A credit bid of Rusoro's entire Attached Judgment (the "**Rusoro Judgment**"), for which Rusoro will receive at Closing equity securities of Dalinar Energy.   The amount of the Rusoro Judgment, inclusive of post-judgment interest, was calculated by the Special Master as $1,522,342,917 as at December 31, 2024.     At the illustrative Closing Date of December 31, 2026, the Rusoro Judgment, inclusive of post-judgment interest calculated using the Special Master's methodology, is calculated to be $1,584,000,000.

- A credit bid of  the entire Siemens' Judgment, for which XYQ will receive at Closing equity securities of Dalinar Energy.   The amount of the Siemens Judgment, inclusive

of post-judgment interest, was calculated by the Special Master as $211,384,366.59 as at December 31, 2024.   At the illustrative Closing Date of December 31, 2026, the Siemens Judgment, inclusive of post-judgment interest calculated using the Special Master's methodology, is calculated to be $248,846,961.

- Debt financing up to the amount of $4,500,000,000 to support cash payments in the total amount of $3,925,000,000 to satisfy in full, at Closing, the following Attached Judgment Holders, listed in the priority order established by the Court:  Crystallex; Tidewater; ConocoPhillips (Judgments #1 and #2); OIEG; Huntington Ingalls; ACL1; and Red Tree, as set forth in the above chart.

The purchase price assigned to the shares of PDVH in this Revised Topping Proposal satisfies the Overbid Minimum (as defined in the Stalking Horse Agreement) requirement (*i.e.*, the purchase price assigned to the shares of PDVH exceeds (i) the purchase price payable by the Stalking Horse pursuant to the Stalking Horse Agreement, plus (ii) the Termination Fee payable to the Stalking Horse, plus (iii) $25,000,000).

### E. Sources of Financing

Set out below is a revised Sources and Uses table, which provides a detailed description of the sources and uses of financing for the Revised Topping Proposal.

**PROJECT HORIZON | Sources & Uses**

| SOURCES (Figures in $Millions Unless Noted) | Cash | Claims | Total |
|---|---|---|---|
| CitPet Cash (1) | 1,201 | | 1,201 |
| Gold Reserve Deposit (2) | 50 | | 50 |
| | | | |
| **Debt** | | | |
| Term Loan | 2,000 | | |
| Senior Secured Notes | 2,500 | | |
| $2.0B ABL Draw (3) | 350 | | 4,850 |
| | | | |
| **Equity Securities** | | | |
| Preferred Equity: | | | |
| Rusoro | | 1,000 | |
| Koch | | 350 | |
| Gold Reserve | | 150 | 1,500 |
| | | | |
| Common Equity: | | | |
| Rusoro | | 584 | |
| Koch | | 123 | |
| Gold Reserve | | 1,149 | |
| Siemens | | 249 | 2,105 |
| | | | |
| **Total** | **6,101** | **3,605** | **9,706** |

(1) Assumes net-debt zero cash balance at closing.
(2) Funded from available cash reserves.
(3) ABL draw of $350M permitted at closing.

| USES (Figures in $Millions Unless Noted) | Cash | Securities | Total |
|---|---|---|---|
| **Attached Judgement Redemptions (1)** | | | |
| 1) Crystallex | 1,025 | - | 1,025 |
| 2) Tidewater | 83 | - | 83 |
| 3) Conoco Phillips | 1,444 | - | 1,444 |
| 4) OI European | 695 | - | 695 |
| 5) Huntington Ingalls | 140 | - | 140 |
| 6) ACL1 | 119 | - | 119 |
| 7) Red Tree | 370 | - | 370 |
| 8) Rusoro Mining | - | 1,584 | 1,584 |
| 9) Conoco Phillips | 49 | - | 49 |
| 10) Koch Ag & Energy | - | 473 | 473 |
| 11) Gold Reserve | - | 1,299 | 1,299 |
| 12) Siemens | - | 249 | 249 |
| **Total Redeemed Claims** | **3,925** | **3,605** | **7,530** |
| | | | |
| Retire Existing Citgo Debt | | | |
| 8.375% 2029 SSN | 1,100 | | 1,100 |
| Call Premium on 2029 SSN | 46 | | 46 |
| Minimum Starting Cash | 250 | | 250 |
| Stalking Horse Fee | 75 | | 75 |
| Transaction Fees & Expenses | 468 | | 468 |
| ABL/TLB Repayment | 237 | | 237 |
| **Total** | **6,101** | **3,605** | **9,706** |

(1) Assumes 12/31/26 transaction close. Purchase price to be adjusted to reflect accrued judgement interest at time of closing.

Attached hereto at <u>Annex 4</u> are the Commitment Letters executed by the third-party financing sources that support the debt-financing component of the Revised Topping Proposal, *i.e.*, fully committed debt financing up to $6.5 billion, of which $4.85 billion will be available at Closing, with an additional $1.65 billion in asset-based lending available post-Closing. Purchaser's sources of financing are all free of off-market contingencies other than closing conditions outlined in the SPA. The Commitment Letters demonstrate that Purchaser's financing is not subject to any financing condition, and this Revised Topping Proposal is not subject to any financing condition.

For the convenience of the Special Master, a redline marked to show the changes to the prior version of the Commitment Letters attached to Purchaser's June 18, 2025 Revised Topping Proposal is attached as <u>Annex 5</u>.

### F. <u>Credit Bid</u>

Purchaser confirms that it is submitting a credit bid for the shares of PDVH consistent with the terms outlined in the Sale Procedures Order. The details of the credit bid are set forth above in Section D. For the avoidance of doubt, the credit bid: (i) will provide sufficient cash consideration to pay in full all Transaction Expenses; (ii) will provide sufficient cash (or consented non-cash consideration) to satisfy in full any obligations secured by a senior lien on the shares of PDVH (which, for the purposes of this section F, shall not include the Purported CITGO Equity Pledge); and (iii) is accompanied by evidence of the consent of Gold Reserve, Rusoro, Koch, and XYQ that each has agreed to receive non-cash consideration, in the form of the Bidder Equity Commitment Letter / Consent to Accept Non-Cash Consideration attached hereto at <u>Annex 6</u> and <u>Annex 7</u>.

### G. <u>Good Faith Deposit</u>

Evidence of Purchaser's financial ability to make a cash deposit (in the amount of $50 million) on the date of entry of the sale order by the Court for the Proposed Transaction is attached hereto at <u>Annex 8</u>.

### H. <u>Purchaser Approvals</u>

Attached hereto at <u>Annex 9</u> is evidence of the requisite corporate or other organizational authority and approval for Purchaser with respect to the submission, execution, and delivery of the Revised Topping Proposal (including the execution of the Proposed SPA), participation in any auction, and closing of the Proposed Transaction contemplated by the Proposed SPA in accordance with its terms and the terms of the Sale Procedures Order (including the Bidding Procedures contained therein).

Purchaser does not anticipate a need for further approvals to execute a definitive Stock Purchase Agreement (the "**Definitive SPA**").

Purchaser confirms that it will make in a timely manner (a) all filings and disclosures necessary to comply with the regulations of OFAC, (b) all necessary filings under the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended, and any other antitrust laws, as applicable, and pay the fees associated with such filings, and (c) all necessary filings in connection with

any review by the Committee on Foreign Investment in the United States (CFIUS), if applicable.

This confirms that the Purchaser's Revised Topping Proposal, if selected as the Successful Bid and approved by the Court, is reasonably likely to be consummated within a timeframe acceptable to the Special Master and the Court, after taking into consideration antitrust and any other regulatory matters and given Purchaser's and Gold Reserve's prior experience in such matters and any other relevant considerations.

### I. <u>Due Diligence Requirements</u>

The Revised Topping Proposal is not subject to any other due diligence, except that which is permitted by the Special Master.

### J. <u>Advisors</u>

Purchaser has retained the following advisors in connection with the Proposed Transaction:

Brown Rudnick LLP

Norton Rose Fulbright US LLP

### K. <u>Contacts</u>

The following is a list of persons (including e-mail addresses and phone numbers) who should be contacted with respect to any questions regarding the Revised Topping Proposal:

Paul Rivett
CEO, Director, Dalinar Energy
CEO, Executive Vice-Chairman, Gold Reserve privett@goldreserve.bm
416-278-5806

Dave Onzay
Chief Financial Officer, Gold Reserve donzay@goldreserve.bm
509-623-1500

### L. <u>Special Master Consent</u>

The Purchaser consents to the Special Master, in his discretion, sharing information pertaining to the Purchaser or Purchaser's Revised Topping Proposal with U.S. Government regulators, including OFAC, as well as the Sale Process Parties and Additional Judgment Creditors, subject to the limitations of bidding Sale Process Parties or Additional Judgment Creditors to receive bid information established by the Court, including in the December Order, and subject to the confidentiality restrictions applicable to the Sale Process.

### M. <u>Cooperation</u>

The Purchaser (i) agrees that its advisors will coordinate in good faith with the Special

Master's advisors to discuss and explain its regulatory and other consent analysis, strategy, and timeline for securing all such approvals and consents as soon as reasonably practicable and (ii) agrees to cooperate with the Special Master to provide pertinent factual information regarding its ownership and operations reasonably required to respond to, or otherwise analyze issues arising with respect to, U.S. sanctions laws and regulations, CFIUS, any applicable antitrust laws and other relevant regulatory requirements or requests.

### N. No Entitlement to Reimbursement

The Purchaser agrees that the Revised Topping Proposal does not entitle it to any break-up fee, termination fee, expense reimbursement, or similar type of payment or reimbursement; except for as provided in the January Order or as is otherwise ordered by the Court.

### O. No Liability

The Purchaser agrees that (i) in no circumstance shall the Special Master or his advisors be personally or otherwise liable for any amounts or obligations owed to the Purchaser, (ii) the Special Master and his advisors are acting as an arm of the Court and are entitled to judicial immunity in the performance of their duties, and (iii) PDVH, CITGO and their respective officers, directors and advisors will have no liability or obligation to Purchaser or its affiliates in connection with the execution of the Definitive SPA.

### P. Representations and Warranties

Without limiting any terms expressly provided for in the SPA if, as and when executed, and pursuant to the Bidding Procedures set out in the Sale Procedures Order:

    a. the Purchaser states that it recognizes and acknowledges that the Special Master, his advisors, PDVH, CITGO, and their respective representatives make no representations, covenants, or warranties (or any other promise) as to the accuracy or completeness of any information provided in the data room or otherwise made available by the Special Master and his advisors in connection with the bid process;

    b. the Purchaser states that, other than with respect to Purchaser's reliance on the representations and warranties provided in the Definitive SPA if, as and when executed, Purchaser has relied solely upon its own independent review, investigation, and/or inspection of any relevant documents regarding the assets to be purchased and did not rely on any written or oral statements, representations, promises, warranties, or guaranties whatsoever, whether express or implied, by operation of law or otherwise, regarding PDVH and its subsidiaries or the completeness of any information made available in connection therewith;

    c. the Purchaser states that it has not engaged in any collusion with respect to the submission of the Revised Topping Proposal; and

    d. the Purchaser states that all proof of financial ability to consummate the Proposed Transaction in a timely manner and other information Purchaser submits is true and correct.

**Q. Bidding Procedures**

The Purchaser agrees to be bound by the terms and conditions of the Bidding Procedures, if any, set out in the Sale Procedures Order, as such order may be modified.

**R. Steps Taken to Address Possible Impact of the 2020 Bondholders' Rights**

As directed by the Court, the Purchaser has taken the below-listed steps to "meaningfully address[]" the risk of the "possible impact of the 2020 Bondholders' rights – whatever they may be (in reality or potentially) on the certainty of closing." (D.I. 1741 at 4). That said, as set forth above, Purchaser's view is that is risk has been substantially reduced by OFAC's issuance of GL-5S.

- The Purchaser has submitted to the Special Master an updated and revised evaluation of "any risk to closing posed by the 2020 Bondholders" (*id.* at 5-6) concurrently with its submission of this Revised Topping Proposal, engaged in several communications with the Special Master regarding this analysis, and looks forward to engaging in further communications with the Special Master following the submission of this Revised Topping Proposal and in advance of the Final Recommendation date and the Sale Hearing.

- The Purchaser has reviewed in good faith the Special Master's further comments and suggested amendments to the proposed SPA attached to Purchaser's June 3, 2025 proposal, June 18, 2025 proposal, and earlier June 25, 2025 proposal, all of which in turn took account of prior proposed changes made by the Special Master in the Stalking Horse Agreement, and the Purchaser has incorporated many of the Special Master's comments and suggested amendments into its present proposed SPA, as noted in the attached redline.

- The Purchaser has also reviewed in good faith the Special Master's comments and suggested amendments to the debt commitment letters attached to Purchaser's June 3, 2025 proposal, June 18, 2025 proposal, and earlier June 25, 2025 proposal, all of which in turn took account of prior proposed changes made by the Special Master, and the Purchaser has incorporated many of the Special Master's comments and suggested amendments into its present Commitment Letters, as noted in the attached redlines.

- To address a request made by the Special Master, the Purchaser previously submitted a "Commitment to Take Certain Regulatory Efforts" executed by each of the Consortium members: Gold Reserve, Koch and Rusoro. In response to comments made by the Special Master regarding this document, the Purchaser has updated its terms and attached a revised version hereto, at <u>Annex 10</u>, executed by Gold Reserve, Koch, Rusoro, and XYQ.

- Although the Court has made clear that a settlement with the 2020 Bondholder is not required in Final Bids ("**the Court rejects any suggestion that a Final Bid must include a settlement with the 2020 Bondholders**") (D.I. 1741 at 4), the Purchaser has engaged in extensive, good faith negotiations with the 2020 Bondholders regarding a

potential settlement of their claims. These negotiations have been ongoing for several weeks and have been constructive. The Purchaser remains bound by the terms of a Confidentiality Agreement and cannot reveal the substance of those negotiations to the Special Master at this time. The Purchaser requested permission from the 2020 Bondholders to share the details of these negotiations to the Special Master, but the 2020 Bondholders refused this request. However, the Purchaser hereby represents that, while the negotiations have not resulted in a final settlement as of the date of this Revised Topping Proposal, the Purchaser is confident that, in conjunction with its consortium partners, it could consummate a settlement with the 2020 Bondholders after being named as the Final Recommended Bidder and after the Sale Order is entered by the Court. The Purchaser has developed, working with its lenders, well advanced drafts of debt commitment papers that would support such a settlement

- The Purchaser has concluded that conducting a preferred equity financing after it has been named as the Final Recommended Bidder would strengthen its ability to consummate any settlement with the 2020 Bondholders and the Purchaser, with its consortium partners, has taken definite steps to confirm that it can raise this financing, as evidenced by the Highly Confident Letter attached hereto as <u>Annex 11</u>.

The Purchaser reserves the right to modify or improve its Revised Topping Proposal, and looks forward to continued communications with the Special Master and his advisors regarding the same.


Yours truly,

**DALINAR ENERGY CORPORATION**


Per:  _____

       Name: Paul Rivett

       Title: CEO, Director


**GOLD RESERVE LTD.**


Per:  _____

       Name: Paul Rivett

       Title: CEO, Executive Vice-Chairman



**DALINAR ENERGY CORPORATION REVISED TOPPING PROPOSAL FOR PURCHASE OF 100% SHARES OF PDV HOLDING INC. – JUNE 25, 2025**

**INDEX OF ANNEXES**

| <u>Annex No.</u> | <u>Document Description</u> |
|---|---|
| Annex 1 | Stock Purchase Agreement (Clean Word)<br><br>• Buyer Disclosure Schedules<br><br>• Company Disclosure Schedules<br><br>• Exhibit A to the Stock Purchase Agreement – Escrow Agreement<br><br>• Exhibit B to the Stock Purchase Agreement – Payments Administration Agreement<br><br>• Exhibit C to the Stock Purchase Agreement – Form of Release<br><br>• Exhibit D to the Stock Purchase Agreement – Form of Termination Release<br><br>• Exhibit E to the Stock Purchase Agreement – Sale Order |
| Annex 2 | Stock Purchase Agreement (Redline Against Stalking Horse Agreement)<br><br>• Company Disclosure Schedules<br><br>• Exhibit A to the Stock Purchase Agreement – Escrow Agreement<br><br>• Exhibit B to the Stock Purchase Agreement – Payments Administration Agreement<br><br>• Exhibit C to the Stock Purchase Agreement – Form of Release<br><br>• Exhibit D to the Stock Purchase Agreement – Form of Termination Release |

| Annex 3 | Stock Purchase Agreement (Redline Against Prior Consortium Topping Proposal SPA dated June 18, 2025) <br><br> • Buyer Disclosure Schedules <br><br> • Company Disclosure Schedules <br><br> • Exhibit A to the Stock Purchase Agreement – Escrow Agreement <br><br> • Exhibit B to the Stock Purchase Agreement – Payments Administration Agreement <br><br> • Exhibit C to the Stock Purchase Agreement – Form of Release <br><br> • Exhibit D to the Stock Purchase Agreement – Form of Termination Release |
|---|---|
| Annex 4 | Commitment Letters (Clean Redacted) <br><br> • Debt Commitment Letter with Attachments <br><br> • Agent Fee Letter <br><br> • Initial Commitment Party Fee Letter <br><br> • Syndicate Fee Letter |
| Annex 5 | Commitment Letters (Redacted Redline Against Purchaser's Prior Topping Proposal Commitment Letters date June 18, 2025) <br><br> • Debt Commitment Letter with Attachments <br><br> • Agent Fee Letter <br><br> • Initial Commitment Party Fee Letter <br><br> • Syndicate Fee Letter |
| Annex 6 | Bidder Equity Commitment Letter / Consent to Accept Non-Cash Consideration / Cooperation – Gold Reserve, Koch and Rusoro |
| Annex 7 | Bidder Equity Commitment Letter / Consent to Accept Non-Cash Consideration / Cooperation – XYQ |
| Annex 8 | Proof of Ability to Pay Good Faith Deposit |

| | |
|---|---|
| Annex 9 | Corporate Authorization |
| Annex 10 | Commitment to Take Certain Regulatory Efforts Letter |
| Annex 11 | Equity Financing -- Highly Confident Letter |

## **Exhibit H**

**Regulatory Efforts Commitment**

STRICTLY PRIVATE AND CONFIDENTIAL

June 25, 2025

Re: <u>Commitment to Take Certain Regulatory Efforts</u>

Reference is made to (i) that certain bid letter, dated as of June 25, 2025 (the "**Bid Letter**"), being submitted by Gold Reserve Ltd., f/k/a Gold Reserve Inc. ("**Gold Reserve**"), with respect to the acquisition by Dalinar Energy Corporation, a wholly owned subsidiary of Gold Reserve ("**Dalinar Energy**"), of all the issued and outstanding shares of PDV Holding, Inc. ("**PDVH**") in connection with the matter of *Crystallex International Corp. v. Bolivarian Republic of Venezuela*, D. Del. C.A. No. 1:17-mc-00151-LPS (the "**Crystallex Case**"), (ii) that letter agreement, dated as of June 25, 2025 (the "**Bidder ECL**"), by and among Dalinar Energy, Gold Reserve, Rusoro Mining Ltd. ("**Rusoro**"), Koch Minerals Sarl ("**KM**"), and Koch Nitrogen International Sarl ("**KNI**," and together with KM, "**Koch**"), pursuant to which, among other things, each of Gold Reserve, Rusoro, KM, and KNI agrees and acknowledges that they will, subject to the terms and conditions set forth in the Bidder ECL, accept specified non-cash consideration in consideration for the release and discharge of the amount of their Attached Judgment specified in the Bid Letter, and (iii) that letter agreement, dated as of June 25, 2025 (the "**XYQ Bidder ECL**"), by and between Dalinar Energy and XYQ US, LLC ("**XYQ**"), pursuant to which, among other things, XYQ agrees and acknowledges that it will, subject to the terms and conditions set forth in the XYQ Bidder ECL, accept specified non-cash consideration in consideration for the release and discharge of the amount of its Attached Judgment specified in the Bid Letter.

Capitalized terms used herein and not otherwise defined have the meanings given to them in the Stalking Horse Bid Instruction Letter sent by Ray Strong on behalf of Robert B. Pincus, Special Master for the United States District Court for the District of Delaware (the "**Court**"), dated April 28, 2025, and the Sales Procedures Order in the Crystallex Case.

Without limitation to any of the provisions of the Bid Letter, each of Gold Reserve, Rusoro, Koch, and XYQ agrees and acknowledges that: (i) if such party receives a request for information or documentary material at any time prior to the closing of the transactions contemplated by Bid Letter regarding such party from the Federal Trade Commission, the Department of Justice, the Office of Foreign Assets Control, or any other governmental regulatory body with respect to any regulatory matters regarding any of the transactions contemplated by the Bid Letter (collectively, a "**Regulatory Authority**"), then such party will use its reasonable best efforts to make, or cause to be made, as soon as reasonably practicable and after consultation with Dalinar Energy and the other parties hereto, an appropriate response in compliance with such request; (ii) any non-cash consideration accepted by Koch in consideration for the release and discharge of the amount of Koch's Attached Judgment will be non-voting (to the extent permissible by applicable law), subject only to customary protective provisions, and will constitute a minority of the common equity of Dalinar Energy; (iii) such party shall maintain such protocols (including information protections) as are required to prevent each of its affiliates who, by virtue of its business and location of operation, is a competitor of the assets that are the subject of this investment by Dalinar Energy such that the elimination of competition by agreement between such affiliate and Dalinar Energy would constitute a violation of any of the antitrust laws of the United States (a "**Competing Affiliate**") from having access to competitively sensitive information disseminated to such party by Dalinar Energy or its subsidiaries; and (iv) such party shall not elect, or designate for election, to the board of directors of Dalinar Energy any

individual that also serves as a director or officer of a Competing Affiliate, subject to the de minimis exceptions of 15 U.S.C. 19(a), as adjusted.

Each of the parties acknowledges and agrees that the foregoing sentence does not alter, amend, or modify any other agreements among the parties with respect to the transactions contemplated by the Bid Letter, the type or amount of non-cash consideration specified in the Bid Letter, the terms of such non-cash consideration (including any preferred or common equity of Dalinar Energy), the circumstances (if any) in which such parties may also receive cash consideration, or the efforts of the parties to consummate the transactions contemplated hereby.

This letter is provided solely for the benefit of the parties hereto and their respective successors and permitted assigns, and is not intended to, nor shall it be construed to, create any right, claim, or benefit in favor of any person or entity not a party to this letter, except as expressly provided herein.  Notwithstanding the foregoing, Dalinar Energy is an intended third-party beneficiary of this letter and shall have the right to enforce the terms of this letter as if it were a party hereto.

<div align="center">

*               *               *

</div>

Agreed and acknowledged by:

**Rusoro Mining Ltd.**



\*          \*          \*

*[Signature Page to Letter Re: Commitment to Take Certain Regulatory Efforts]*

Agreed and acknowledged by:

**Koch Minerals Sarl**



**Koch Nitrogen International Sarl**



Agreed and acknowledged by:

**Gold Reserve Ltd.**

By: _____
    Name: Paul Rivett
    Title: CEO

*[Signature Page to Letter Re: Commitment to Take Certain Regulatory Efforts]*

Agreed and acknowledged by:

XYQ US, LLC



*[Signature Page to Letter Re: Commitment to Take Certain Regulatory Efforts]*