**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| CRYSTALLEX INTERNATIONAL CORP., | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | )    Misc. No. 17-151-LPS |
| | ) |
| BOLIVARIAN REPUBLIC OF | ) |
| VENEZUELA, | ) |
| | ) |
| Defendant. | ) |

**DECLARATION OF WILLIAM O. HILTZ
IN SUPPORT OF THE SPECIAL MASTER'S
FINAL RECOMMENDATION**

I, William O. Hiltz, declare as follows:

1.      I am a Senior Managing Director at Evercore Group L.L.C. ("**Evercore**"), an investment banking advisory and investment management firm.  Evercore has extensive experience in providing high-quality investment banking services in traditional M&A processes and financially distressed situations, including advising debtors, creditors, and other constituents in chapter 11 cases and out-of-court restructurings.  Evercore is the investment banker to the Special Master in the above-captioned action (the "**Action**").[1]

2.      I submit this declaration ("**Declaration**") in support of the *Special Master's Final Recommendation* (the "**Recommendation**").

3.      The statements in this Declaration are, except where specifically noted, based on my personal knowledge and information I received from the Special Master, his Advisors, PDV

---

[1]    All capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the *Sixth Revised Proposed Order (A) Establishing Sale and Bidding Procedures, (B) Approving Special Master's Report and Recommendation Regarding Proposed Sale Procedures Order, (C) Affirming Retention of Evercore as Investment Banker by Special Master and (D) Regarding Related Matters* (D.I. 481) (the "**Sale Procedures Order**") or the Recommendation.

Holding, Inc. ("**PDVH**"), Citgo Holding, Inc. and Citgo Petroleum Corporation (collectively, "**CITGO**"), employees, advisors, or professionals of Evercore working directly with me or under my supervision, direction, or control, and the books and records of PDVH and CITGO maintained in the ordinary course of their businesses.

### Background and Qualifications

4.      I am a Senior Managing Director in Evercore's strategic advisory group and head of its Special Committee and Board Advisory practice.  I joined Evercore in 2000 and have 49 years of experience in investment banking, mergers and acquisitions ("M&A"), advisory, and corporate finance.  Prior to joining Evercore, I was Head of the Global Energy Group at UBS Warburg, and prior to UBS's acquisition of Dillon Read & Co. Inc., Head of the Energy Group at Dillon Read since 1995.  From 1982 to 1995, I was a Managing Director at Smith Barney, where at various times I headed the Energy Group, the High Yield and Merchant Banking Group, the Transportation Group, and the General Industrial Group.  I received an A.B. in History and Government from Dartmouth College and an M.B.A. from The Wharton School at the University of Pennsylvania.

5.      I have worked on and been involved in the design of numerous mergers and acquisitions, including the General Mills acquisition of Pillsbury, the Chrysler and Fiat merger, the sale of Dell, the sale of McMoRan to Freeport-McMoRan, the sale of ACS to Xerox, the sale of EDS to Hewlett Packard, the CVS and Caremark merger, and the sale of Aquila to Great Plains. I have further advised Aetna on its sale to CVS, T Mobile on its acquisition of Sprint, Whole Foods on its sale to Amazon, Takeda on its acquisition of Shire, and Energy Futures Holdings on the sale of ONCOR to Sempra Energy, among others.  In addition, I have worked on several restructurings,

including Energy Future Holdings, General Motors, CIT, Northwest Airlines, Continental Airlines, and Eastern Airlines.

6.    Evercore is a leading independent investment banking advisory and investment management firm established in 1996.  Evercore's investment banking business includes its advisory business, which provides a range of investment banking services to multinational corporations on M&A, divestitures, special committee assignments, recapitalizations, restructurings, and other strategic transactions.

7.    Evercore has been involved in many large and complex restructuring cases in this and other districts around the United States, including *In re Mobileum, Inc.*, No. 24-90414 (CML) (Bankr. SD. Tex. Aug. 26, 2024) (D.I. 165); *In re Convergeone Holdings, Inc.,* No. 24-90194 (CML) (Bankr. S.D. Tex. May. 10, 2024) (D.I. 282); *In re Lucky Bucks, LLC,* No. 23-10758 (KBO) (Bankr. D. Del. July 24, 2023) (D.I. 201); *In re Serta Simmons Bedding, LLC,* No. 23-90020 (DRJ) (Bankr. S.D. Tex. Mar. 6, 2023) (D.I. 424); *In re Avaya Inc.,* , No. 23-90088 (DRJ) (Bankr. S.D. Tex. Mar. 22, 2023) (D.I. 344); *In re Lumileds Holding B.V.*, No. 22-11155 (LGB) (Bankr. S.D.N.Y. Oct. 13, 2022) (D.I. 191); *In re Altera Infrastructure L.P.*, No. 22-90130 (MI) (Bankr. S.D. Tex. Oct. 6, 2022) (D.I. 322); *In re Talen Energy Supply, LLC*, No. 22-90054 (MI) (Bankr. S.D. Tex. July 8, 2022) (D.I. 880); *In re Seadrill Partners LLC*, No. 20-35740 (DRJ) (Bankr. S.D. Tex. Jan. 27, 2021) (D.I. 164); *In re iQor Holdings Inc.*, No. 20-34500 (DRJ) (Bankr. S.D. Tex. Nov. 6, 2020) (D.I. 216); *In re Frontier Commc'ns Corp.*, No. 20-22476 (RDD) (Bankr. S.D.N.Y. Oct. 30, 2020) (D.I. 1271); *In re Arena Energy, LP*, No. 20-34215 (MI) (Bankr. S.D. Tex. Sept. 25, 2020) (D.I. 261); *In re Denbury Res. Inc.*, No. 20-33801 (DRJ) (Bankr. S.D. Tex. Sept. 22, 2020) (D.I. 320); *In re Noble Corp. PLC*, No. 20-33826 (DRJ) (Bankr. S.D. Tex. Sept. 3, 2020) (D.I. 258); *In re Sable Permian Res., LLC*, No. 20-33193 (MI) (Bankr. S.D. Tex. Aug. 7, 2020)

(D.I. 278); *In re GNC Holdings, Inc.*, No. 20-11662 (KBO) (Bankr. D. Del. July 20, 2020) (D.I. 467); *In re Unit Corp.*, No. 20-32740 (DRJ) (Bankr. S.D. Tex. June 19, 2020) (D.I. 172); *In re LSC Commc'ns, Inc.*, No. 20-10950 (SHL) (Bankr. S.D.N.Y. May 12, 2020) (D.I. 220); and *In re Alta Mesa Res., Inc.*, No. 19-35133 (MI) (Bankr. S.D. Tex. Mar. 2, 2020) (D.I. 1307).

### Initial Marketing Process

8.      On July 17, 2023, the Court authorized the Special Master to begin preparations for the launch of the initial marketing process on July 24, 2023.  *See* Mem. Order at 11 (D.I. 643).

9.      Evercore began preparation for the initial marketing process immediately thereafter.  Evercore, in consultation with the Sale Process Parties, initially identified 93 potential bidders for the PDVH Shares.  These potential bidders included both private investment funds, sovereign wealth funds, and companies across several industries, including refining, majors, upstream, fuel distribution, midstream, chemicals, integrated, international, trading and financial, and creditor counterparties, as well as related industries.

10.      On October 23, 2023, the Special Master formally launched the initial marketing process.  Evercore began outreach to potential bidders identified in the initial outreach list on this date, distributing marketing materials and non-disclosure agreements ("**NDAs**") to 93 potential bidders.

11.      On December 12, 2023, Evercore began distributing a first round bid letter, as well as CITGO Holdings' 2022 Audited Financials, to 27 potential counterparties that executed NDAs. Twelve potential bidders submitted non-binding indications of interest ("**IOIs**") by the deadline of

January 22, 2024.  Evercore recommended the Special Master advance nine of those bidders to the second round of the initial marketing process.

12.    On February 12, 2024, Evercore opened the virtual data room (the "**VDR**") to those nine potential bidders and began engaging with potential bidders on a near-daily basis regarding their diligence questions and proposed transaction structures.

13.    On April 10, 2024, Evercore sent a letter to the nine potential bidders, which included instructions for participation in the second round of bidding.  On May 27, 2024, Evercore sent amended instruction letters to seven active potential bidders, as two bidders decided not to proceed to the next round.  On June 11, 2024, the end of the second round bid deadline, the Special Master received six bids that, after consultation with Evercore, he deemed to be reasonably actionable as a result of this process.

14.    Evercore commenced robust back-and-forth negotiations with these six bidders to obtain the most favorable terms possible for the sale of the PDVH Shares.  On August 8, 2024, the Special Master entered into a period of exclusivity with Elliott Investment Management L.P. ("**Elliott**").  After extensive negotiations with Elliott and analysis of the options available, the Special Master determined that Elliott's bid, through its affiliated entity Amber Energy, Inc. ("**Amber Energy**"), was the best available at that time and recommended that Amber Energy be selected as the Successful Bidder.

15.    On September 27, 2024, the Special Master filed the *Notice of Special Master's Recommendation* (D.I. 1325) (the "**Initial Recommendation**"), recommending the Court approve a transaction for the purchase of the PDVH Shares by Amber Energy.  The Sale Process Parties and certain Additional Judgment Creditors raised concerns to the Initial Recommendation and the proposed Amber Energy transaction.  *See*, *e.g.*, D.I. 1337; D.I. 1373-2; D.I. 1373-4; D.I. 1373-5;

D.I. 1373-6; D.I. 1373-7; D.I. 1417; D.I. 1418; D.I. 1419.  In an attempt to address the concerns raised, Amber Energy submitted an alternative term sheet to the Special Master (the "**Alternative Transaction Term Sheet**").  *See* D.I. 1414-1.  In response to continued criticism of the proposed transaction with Amber Energy, including the Alternative Transaction Term Sheet, the Court requested the parties submit extensive briefing on how the sale process should proceed and held a full-day hearing on December 13, 2024 (the "**December 13 Hearing**").

16.    At the conclusion of the December 13 Hearing, the Court directed the Special Master to re-open the VDR by December 18, 2024.  *See* D.I. 1505.  Accordingly, the Special Master, with the assistance of his Advisors, reopened the VDR on December 18, 2024, which effectively reopened the bidding process.

17.    On December 31, 2024, the Court issued an order that provided the Court's direction regarding how the sale process would proceed.  *See Memorandum Order Regarding Sale Process and Litigation* (D.I. 1517) (the "**December 31 Order**").  The Court ordered the Special Master to solicit bids for a stalking horse or base bid, with bids due by March 7, 2025.  *Id.* at 4. The Court also ordered the Special Master and his Advisors to conduct additional marketing, including outreach by Evercore to all parties who previously received marketing materials and a good-faith review and evaluation by Evercore as to whether other parties that might be interested in participating in the Sale Process should be contacted.  *See id.* at 1.

18.    The December 31 Order led to a pivot in the sale process, with a new round of bidding to select a stalking horse or base bid.  The marketing process that followed built on the work of the Special Master and his Advisors in previous rounds of bidding and provided an opportunity for potential bidders—including those who participated in previous rounds and newly

identified potential bidders—to conduct diligence and submit new bids in accordance with the Court's guidance.

### 2025 Marketing Process

19.    On December 17, 2024, in anticipation of reopening the VDR, Evercore reached out to potential bidders who had previously signed NDAs with the Special Master to determine if they were interested in obtaining VDR access.  There were 41 parties contacted, comprised of 27 who executed NDAs in 2023 and an additional 14 parties who executed NDAs in 2024.  The Special Master also requested that these parties extend the terms of their NDAs if they wished to resume VDR access.

20.    Of these potential bidders, 28 responded and indicated interest in receiving renewed VDR access.  Twenty-one of those potential bidders provided Evercore with the information necessary to grant them renewed access to the VDR (e.g., the names of persons who should receive access).  These potential bidders were provided with access to the VDR on December 18, 2024.

21.    On January 6, 2025, Evercore reengaged with 65 potential bidders that had been contacted earlier in the marketing process or were otherwise known by Evercore to be involved in the earlier bidding steps.  Evercore reached out to these 65 potential bidders by email and phone to ask whether they were interested in participating in the bidding process and would like to receive VDR access.

22.    Of the 65 potential bidders contacted on January 6, 2025, five responded affirmatively to Evercore's outreach, and three ultimately signed NDAs and were granted VDR access.  In addition, two new parties contacted Evercore indicating interest in the process.  Both signed NDAs and were granted VDR access.

23.    In parallel, Evercore also engaged in communications via emails and calls with CITGO's management team regarding the stalking horse marketing process.

24.     Evercore also undertook a detailed review to identify other potential bidders that might be interested in participating in the marketing process.  To do so, Evercore used a large investor database to identify potential bidders and screened for investors with the following characteristics: (i) prior energy investments across the sector; and (ii) assets under management of at least $10 billion.  From the resulting list, Evercore identified an additional 20 potential bidders that could be contacted with respect to the process.

25.     On January 13, 2025, CITGO sent the Special Master's Advisors its own list of potential additional investors.  From this list, Evercore supplemented its previously identified 20 additional potential bidders with an additional 10 potential bidders, totaling 30 additional potential bidders.

26.     On January 14, 2025, Evercore worked with CITGO's management team to prepare an updated version of the teaser that Evercore had distributed to potential bidders in previous rounds (the "**Teaser**").

27.     On January 16, 2025, Evercore reached out to these 30 additional potential bidders by email to ask whether they would be interested in participating in the sale process and attached the Teaser.  At that point, Evercore had reached out to 136 potential bidders in total.

28.     None of the 30 additional potential bidders contacted on January 16, 2025, expressed interest in obtaining VDR access or participating in the sale process in response to Evercore's outreach.   Accordingly, none of those additional parties signed NDAs or were ultimately granted VDR access.  Evercore was also contacted by two additional interested potential bidders on December 23, 2024, and March 3, 2025, respectively.  Evercore and Weil investigated both additional potential bidders and determined they were not viable bidders.

29.     As a result of the process described, 26 potential bidders in total signed NDAs and were granted VDR access following the reopening of the VDR on December 18, 2024.

30.     Pursuant to the Court's December 31 Order, on January 14, 2025, the Special Master filed a Joint Status Report attaching proposed Bidder Protections for any stalking horse approved by the Court, a list of proposed material terms for a draft stock purchase agreement to be provided to bidders ("**Draft SPA Material Terms**"), noting which terms were non-negotiable and which were strongly favored, and proposed evaluation criteria for stalking horse bids, base bids, and successful bids (the "**Evaluation Criteria**").  *See Joint Status Report* (D.I. 1528); *see also* December 31 Order ¶ 3.  Certain Sale Process Parties and Additional Judgment Creditors filed objections to these Bidder Protections, Draft SPA Material Terms, and Evaluation Criteria, and the Court ruled on the Special Master's proposals and the objections on January 27, 2025 (the "**January 27 Order**").  *See Order on Open Matters and Joint Status Report* (D.I. 1554).   On February 6, 2025, Evercore uploaded the Draft SPA Material Terms, Bidder Protections, and Evaluation Criteria, as modified in accordance with the January 27 Order, to the VDR.

31.     On February 10, 2025, after consulting with the Sale Process Parties, the Special Master filed a draft long-form SPA (the "**Bid Draft SPA**") consistent with the Court-approved Draft SPA Material Terms on the docket and deposited the Bid Draft SPA in the VDR.  *See Notice of Filing of Long-Form Stock Purchase Agreement* (D.I. 1557).  The Venezuela Parties, certain Additional Judgment Creditors, and the PDVSA 2020 Bondholders submitted objections to the Bid Draft SPA, *see* D.I. 1558; D.I. 1559; D.I. 1560, to which the Special Master responded, *see Special Master's Omnibus Response to Objections to Draft Long-Form Stock Purchase Agreement* (D.I. 1564).  The Court ruled on these objections on February 24, 2025, sustaining some and denying others, and invited a further round of briefing regarding the Court's proposal relating to

consent of Attached Judgment Creditors to receive non-cash consideration. *See Memorandum Order of February 24, 2025* (D.I. 1571); D.I. 1572; D.I. 1574-1582. Following this ruling, another round of briefing on the long-form SPA took place, and on March 4, 2025, the Court ruled on the remaining issue on the long-form SPA regarding non-cash consideration. *See Memorandum Order of March 4, 2025* (D.I. 1583); *see also* D.I. 1572; D.I. 1574-1582.

32.     Meanwhile, on February 10, 2025, Evercore sent all 26 potential bidders with VDR access a stalking horse bid instruction letter (the "**Stalking Horse Bid Letter**"). The Stalking Horse Bid Letter provided potential bidders with information about the sale process, including information about the assets being sold (the PDVH Shares), and set forth the required contents for a bid to qualify as a Qualified Bid. The Stalking Horse Bid Letter also expressly included a deadline of March 7, 2025 at 5:00 PM (Central Time) (the "**Stalking Horse Bid Deadline**"), for potential bidders to submit stalking horse proposals ("**Stalking Horse Proposals**").

### Diligence Process

33.     Twenty-seven potential bidders have been granted VDR access since the reopening of the VDR on December 18, 2024. With access to the VDR, these potential bidders have been able to examine more than fifty-nine thousand detailed, confidential documents regarding PDVH, the PDVH Shares, and CITGO.

34.     Potential bidders conducted extensive due diligence between December 18, 2024, and the present. Between December 18, 2024, and the present, Evercore coordinated 46 diligence calls between potential bidders and CITGO's management team with subject matter experts in attendance. Between December 18, 2024, and the present, Evercore collected more than 1,400 questions from the potential bidders, reviewed and addressed any duplicates, and then worked closely with CITGO's management team to provide potential bidders with answers to those

questions.  Between December 18, 2024, and the present, Evercore also coordinated three site visits and one management presentation.

### Receipt and Evaluation of Stalking Horse Proposals

35.     On March 7, 2025, the Special Master received Stalking Horse Proposals from four bidders (collectively, the "**Stalking Horse Bidders**").  Immediately thereafter, the Special Master, Evercore, and Weil began a careful assessment of the merits of the four Stalking Horse Proposals submitted.

36.     The Special Master, Evercore, and Weil conducted rigorous assessments of the strengths and weaknesses of each bid and compared the bids side-by-side in a systematic manner. The Special Master also consulted with the Sale Process Parties and engaged in numerous calls with them.  After multiple extensions of the Stalking Horse process, the Special Master ultimately recommended the bid submitted by Red Tree as the stalking horse bid (the "**Stalking Horse Bid**," and Red Tree, the "**Stalking Horse**").  *See* D.I. 1590; D.I 1591; D.I. 1596.

### Selection and Confirmation of the Stalking Horse

37.     On March 21, 2025, the Special Master submitted his *Notice of Special Master's Recommendation of Stalking Horse* (D.I. 1596) (the "**Stalking Horse Recommendation**"), recommending the bid submitted by Red Tree as the stalking horse bid.  On March 31, 2025, Rusoro, Gold Reserve, Koch, Siemens, and the Venezuela Parties, submitted objections to the selection of Red Tree as the Stalking Horse, and the Special Master and others responded to those objections. *See, e.g.*, D.I. 1635-1636; D.I. 1638-1640; D.I. 1656-1662; D.I. 1664-1667.  The Court held a hearing on the Stalking Horse Recommendation on April 17, 2025.

38.     On April 21, 2025, the Court confirmed Red Tree as the Stalking Horse.  D.I. 1741. In its order, the Court gave the Special Master additional direction on factors to consider in

selecting the final recommended bid. *See id.* In particular, the Court explained that "[i]t seems sensible to set as the minimum bid for beginning the Topping Period the bid that appears to have the greatest likelihood of closing, even though the Court expects that any bid it is likely to approve at the conclusion of the Sale Process will need a balance that places much greater emphasis on price and lesser emphasis on certainty." *Id.* at 3. The Court explained that "[t]here are numerous ways" the litigation risk posed by the 2020 Bondholders "can be addressed," and "reject[ed] any suggestion that a Final Bid must include a settlement with the 2020 Bondholders." *Id.* at 4. The Court also noted that it had "serious reservations about the price of the Red Tree bid and the implicit overvaluation placed on the TSA (i.e., Red Tree's settlement with the 2020 Bondholders) in the Special Master's evaluation of that bid." *Id.* at 5. The Court indicated that it "expect[ed] that beginning (but not ending) the bidding in the Topping Period with the Red Tree Stalking Horse Bid will have the effect of creating competitive tension, ultimately resulting in a Final Bid with a price at or exceeding that associated with the Consortium bid while also having greater likelihood of closing than the current Consortium bid." *Id.* at 6. The Court noted that it "does not view the risk that the 2020 Bondholders, or other litigants (e.g., plaintiffs pressing any Alter Ego Claims that are ongoing or may yet be filed), will seek to enjoin the Sale Process or transactions (e.g., financing, necessary corporate transactions) as anywhere close to dispositive on the question of whether the Court should accept a Final Bid." *Id.* at 7. And the Court concluded that "[a]ll bidders … are encouraged to engage with the Special Master to demonstrate that their improved bids reflect the best combination of price and certainty." *Id.* at 8.

### Commencement and Extension of the Topping Period

39. On April 28, 2025, Evercore sent a topping period bid instruction letter to approximately 130 of the bidders that Evercore had contacted during the prior outreach on

December 18, 2024, January 6, 2025, and January 16, 2025.  *See* Ex. A (the "**Topping Period Process Letter**").  The Special Master and his Advisors drafted the Topping Period Process Letter over several weeks with input from the Sale Process Parties.  The Topping Period Process Letter provided potential bidders with detailed information about the sale process, including information about the assets being sold (the PDVH Shares), and set forth the Bid Requirements (as defined below).  The Topping Bid Process Letter also expressly included a deadline of 5:00 PM (Central Time) on May 28, 2025, for potential bidders to submit Topping Proposals (the "**Initial Topping Period Bid Deadline**").

40.     Throughout the subsequent weeks, the Special Master and his Advisors held numerous calls with potential bidders to discuss their Topping Proposals and provide them the information needed to formulate the most competitive Topping Proposals they could.  The Special Master and his Advisors also held numerous calls with the Sale Process Parties to obtain their input and keep them apprised of developments during the Topping Period.

41.     On May 20, 2025, Judge Rakoff of the U.S. District Court for the Southern District of New York ruled on the summary judgment motions in *Girard Street Investment Holdings, LLC v. PDV Holding, Inc*., No. 24-cv-4448 (S.D.N.Y.), *Girard Street Investment Holdings, LLC v. PDV Holding, Inc.*, No. 23-cv-10772 (S.D.N.Y.), *and G&A Strategic Investments I LLC, et al v. Petróleos de Venezuela, S.A*., No. 23-cv-10766 (S.D.N.Y.) (consolidated), dismissing the alter ego claims against PDVH.  In light of Judge Rakoff's ruling, on May 23, 2025, the Venezuela Parties moved for an extension of the Topping Period.  *See* D.I. 1575.  On May 30, 2025, the Court granted the motion and extended the Topping Period to June 18, 2025.  *See* D.I. 1779.  The Special Master immediately apprised all who received the Topping Period Process Letter of the extended deadline.

<u>**Initial Receipt of Bids and Solicitation of Revised Bids**</u>

42.    On or about the June 18, 2025 deadline (the "**June 18 Topping Period Deadline**"), the Special Master received two (2) topping bids for the PDVH Shares (the "**June 18 Topping Proposals**"), one from Dalinar Energy Corporation ("**Dalinar**" or the "**Recommended Bidder**," and such bid "**June 18 Dalinar Bid**.") and one from another bidder ("**Bidder A**," and such bid, "**Bid A**").[2]    Immediately thereafter, the Special Master, Evercore, and Weil began a careful assessment of the merits of June 18 Topping Proposals, comparing them to each other and to the Stalking Horse Transaction.  The Special Master also assessed each bid's compliance with the Bidding Procedures and bid requirements set forth in the January 27 Order adopting the Bidder Protections, Draft SPA Material Terms, and the Evaluation Criteria (the "**Bid Requirements**").

43.    Pursuant to the Bidder Protections as adopted by the January 27 Order, the Special Master was permitted to request revised bids from the Dalinar, Bidder A, and the Stalking Horse during the five (5) business days following the end of the Topping Period.  *See* D.I. 1554 at 12 (endorsing the five-day deadline in approving bidder protections).  Mirroring this procedure, the court-approved SPA entered into with the Stalking Horse (the "Stalking Horse Agreement") provided for the commencement of a "No-Shop Period" on June 26, 2025, during which the Special Master was required to immediately cease and terminate any discussions or negotiations with potential competing bidders, effectively giving the Special Master until end of day on June 25, 2025 to determine whether he had received a Superior Proposal (as defined in the Stalking Horse SPA).  D.I. 1596-1 §§ 6.16(b), (d), Annex A (definition of "No-Shop Period"); D.I. 1545-1

---

[2]    Dalinar also submitted an initial topping bid during the Topping Period on June 3, 2025 (the "**Initial Dalinar Topping Bid**").

at 5–7 (Non-Solicitation Period).  Accordingly, the Special Master's Advisors directed bidders to submit any final revisions to their Topping Proposals no later than 9:00 AM on June 25, 2025.

44.    Evercore and Weil prepared a list of questions and open points for each Topping Bidder, suggesting areas where the bid could be improved, seeking clarification on aspects of the bid, and addressing open points on matters such as financing sources, bid structure, and proposed modifications to the SPA.  After discussing the bids and respective open points with the Special Master, Evercore and Weil held numerous calls with the bidders throughout the five-business day period to discuss and negotiate these open issues and assist the Topping Bidders in making their bids as competitive as possible.  The Special Master's Advisors had numerous back-and-forth communications with the Topping Bidders and exchanged multiple markups of the proposed SPAs, commitment letters, and the term sheets.  Evercore and Weil engaged in daily negotiations and discussions with the bidders between June 20 and June 24 to discuss and negotiate these issues.  The Special Master, Evercore, and Weil also participated in several calls with the Sale Process Parties to update them on the bids submitted and the Special Master's assessment of their relative merits, and to obtain their input.

45.    On June 20, 2025, the Special Master received an additional topping bid from a third bidder, Black Lion Capital Advisors, LLC ("**Black Lion**," and such bid, the "**Black Lion Bid**"), which Black Lion sent directly to the Court via a letter dated June 17, 2025, and which was docketed on June 23, 2025.  *See* D.I. 1822.

46.    After a detailed assessment of each bid, the Special Master determined that he had received a Superior Proposal to the Stalking Horse Bid, as defined in the Stalking Horse SPA.  *See* Stalking Horse SPA, §§ 6.16(a).  Accordingly, on June 23, 2025, the Special Master delivered a

notice to the Stalking Horse, informing it that the Special Master had received a Superior Proposal to the Stalking Horse Bid.

**Receipt and Evaluation of Topping Period Proposals**

47.    On June 25, 2025, the Special Master received two revised topping bids, one from Dalinar (the "**Dalinar Topping Bid**") and one from the Stalking Horse (the "**Revised Stalking Horse Bid**").  Bidder A did not submit a revised bid proposal to its June 18, 2025 bid, therefore, its bid submitted on June 18, 2025, was determined to be its final proposal.

48.    Later in the day on June 25, 2025, the Special Master also received a proposed bid from an additional bidder ("**Bidder B**," and such bid, "**Bid B**," and together with the Dalinar Topping Bid, Bid A, the Revised Stalking Horse Bid, and the Black Lion Bid, the "**Topping Proposals**") that had not submitted a bid on the June 18, 2025 Topping Bid Deadline.

49.    Immediately upon receipt of the Topping Proposals, the Special Master, Evercore, and Weil conducted rigorous assessments of the strengths and weaknesses of each Topping Proposal and compared the bids side-by-side in a systematic manner, comparing the bids both with each other and with the Stalking Horse Bid.

50.    In evaluating each bid submitted, the Special Master, Evercore, and Weil considered (1) the purchase price offered for the PDVH Shares and (2) the certainty of closing. *See Amended Proposed Evaluation Criteria* (D.I. 1552-1), as approved and modified by the January 27 Order (D.I. 1554).  The Special Master also assessed each bid's compliance with the Bidding Procedures, the Bid Requirements, and the Court's guidance including through various orders and the June 24 Ex Parte Conference.

51.    In determining the purchase price for each bid, the Special Master, Evercore, and Weil assessed the total value of the Attached Judgments expected to be satisfied by both cash and

non-cash consideration, as well as whether any proposed non-cash consideration was consented to by the applicable Attached Judgment Creditor that would receive it.[3]

52.    In assessing the non-cash consideration, the Special Master, Evercore, and Weil applied the Court's rulings that (i) non-cash consideration could be used as currency in the auction only upon consent of the Sale Process Party or Additional Judgment Creditor that would receive it; (ii) non-cash consideration could only be offered according to the priority waterfall and in compliance with the Sale Procedures Order; and (iii) a recipient of non-cash consideration, including contingent cash consideration, could not be paid more than the amount of its claim.  *See* Evaluation Criteria at 8; *Order on Open Matters and Joint Status Report* (D.I. 1554).  Further, to the extent a bid contained cash consideration sufficient to satisfy all Attached Judgments senior in priority to bidders who hold Attached Judgments, the Special Master considered any credit bid or credit bids by such holders of Attached Judgments to be the equivalent of cash consideration for purposes of determining the purchase price and the amount available for distribution to holders of Attached Judgments.    Evaluation Criteria at 8; *Order on Open Matters and Joint Status Report* (D.I. 1554).

53.    In assessing the certainty of closing, the Special Master, Evercore, and Weil carefully assessed the certainty associated with each bid, its compliance with applicable law, and the likelihood it would be approved by the Court and then successfully proceed to closing.  The

---

[3]    All amounts with respect to bids quoted in this Recommendation reflect amounts payable to holders of Attached Judgments as at June 30, 2026 as calculated by Evercore (and not amounts submitted by bidders) in accordance with and according to the claims calculations approved by the Court in its *Memorandum Order*, dated April 25, 2024.  *See* D.I. 1136 at 3 (citing D.I. 969-1).  Actual distributions to holders of Attached Judgments will be determined as of the date of the closing of the sale of the PDVH Shares.  These calculations have been prepared for the purposes of comparison of bids in circumstances where bidders ascribed different proposed closing dates for the purposes of their calculations.

Special Master and his Advisors specifically took into account the following considerations, among others: (i) likelihood of securing regulatory approval and timing thereof, including requisite approval from OFAC, the Federal Trade Commission, and other government entities; (ii) conditionality related to pending or future litigation (including with respect to the PDVSA 2020 Bondholders and the alter ego claims); (iii) conditionality related to securing entry of the proposed Sale Order, as well as related to any appeals of the Sale Order; (iv) each bidder's financial wherewithal and certainty of financing sources, including the presence of parent guarantees or other security in the event of a post-Sale Order refusal to close; (v) conditionality related to any other term proposed by the applicable bidder; (vi) certainty of obtaining requisite consents from the holders of Attached Judgments proposed to receive non-cash consideration; and (vii) certainty of financing.  Evaluation Criteria at 8; *Order on Open Matters and Joint Status Report* (D.I. 1554).

## Selection of Recommended Bidder

54.     A summary of the Topping Proposals is as follows.

55.     The attached chart compares certain of the key financial terms for the Topping Proposals.[4]  *See* Ex. B (the "**Bid Comparison Chart**").

56.     Of the Topping Proposals submitted, the Special Master determined only the Dalinar Bid and the Revised Stalking Horse Bid conformed with the Bid Requirements and constituted Qualified Bids.  Bid A and the Black Lion Bid did not meet the necessary criteria.

---

[4]     For comparative purposes, a bid's purchase price, *i.e.*, the value of claims to be satisfied by a bid herein, is estimated as of June 30, 2026 and according to the claims calculations approved by the Court in its Memorandum Order, dated April 25, 2024.  *See* D.I. 1136 at 3 (citing D.I. 969-1).  Actual distributions to holders of Attached Judgments will be determined as of the date of the closing of the sale of the PDVH Shares.  These calculations have been prepared for the purposes of comparison of bids in circumstances where bidders ascribed different proposed closing dates for the purposes of their calculations.  The amounts reflect calculations of Evercore and not amounts submitted by bidders.

57.     The transaction contemplated by Bid A proposed a purchase price (*i.e.*, proceeds available to holders of Attached Judgments) of approximately $3.831 billion comprised entirely of cash consideration.  Bid A also proposed an in-process settlement with the PDVSA 2020 Bondholders, similar to the transaction support agreement contemplated by the Stalking Horse Transaction.  D.I. 1627.  Bid A's proposed financing did not conform with the Bid Requirements because it was contingent on a settlement with the PDVSA 2020 Bondholders that, as of the submission of its bid on the June 18 Topping Deadline, it did not have.  The Draft SPA Material Terms adopted by the Court required bidders to have committed financing.  *See* D.I. 1554 at 14 (adopting D.I. 1545-2 at 2 ("All bids must be fully financed and such financing must be free of contingencies other than Closing Conditions in the SPA").  Bidder A did not have any binding settlement with the PDVSA 2020 Bondholders at the time of its bid submission, which the Special Master and his Advisors view as equivalent to committed financing where the related bid relies on such a settlement.  Therefore, the Special Master determined that Bid A was not a conforming bid. The Special Master informed Bidder A of the deficiencies with its bid after receiving its bid.  After the submission of its bid on June 18, 2025, Bidder A informed the Special Master that it was working to materially improve the price of its bid via the inclusion of additional non-cash consideration payable to Rusoro, which it was in discussions with Rusoro about.  However, Bidder A did not ultimately submit a revised bid reflecting this proposed increased purchase price.

58.     The transaction contemplated by Bid B proposed a purchase price of approximately $3.806 billion comprised entirely of cash consideration.  Bid B also had the potential to increase its purchase price by approximately $1.569 billion if it received the requisite consents for its proposed non-cash consideration.  Bid B also proposed an in-process settlement with the PDVSA 2020 Bondholders, similar to the transaction support agreement contemplated by the Stalking

Horse Transaction. D.I. 1627. However, Bid B was submitted on June 25, 2025, after the Topping Period Deadline, and failed to comply with the Bid Requirements. Bidder B proposed a settlement with the PDVSA 2020 Bondholders, but it did not have a binding settlement at the time of submission of its bid. Bid B's bid letter also stated that the bid remained subject to outstanding due diligence. The Special Master determined that this additional due diligence and the conditionality relating to the proposed but not executed settlement with the PDVSA 2020 Bondholders, failed to comply with the Bid Requirements. The Bid Requirements require bids to be unconditional and bidders to provide a statement that the bid "is not subject to any further due diligence." *See* D.I. 480-1, Ex. A, Bidding Procedures at 10. Further, as set forth above, the Special Master and his Advisors view a proposed but not executed settlement with the PDVSA 2020 Bondholders as equivalent to not having committed financing in circumstances where the related bid relies on such a settlement. Therefore, the Special Master determined Bid B was not a conforming bid.[5] The Special Master informed Bidder of the deficiencies in its bid after receiving its bid.

59.     The transaction contemplated by Black Lion proposed a purchase price of $8 billion, comprised entirely of cash consideration, which reflected an increase of approximately $4.194 billion above the Stalking Horse Transaction. The Black Lion Bid contained numerous deficiencies that rendered it noncompliant with the Bid Requirements. First, at the time of submission of its bid, Black Lion had not signed an NDA with the Special Master or entered the VDR, but yet its bid was conditioned on conducting due diligence. Second, the Black Lion Bid

---

[5]     A substantial portion of Bid B's proposed purchase price ($1.354 billion) was non-cash consideration proposed to be paid to Rusoro that had not been consented to by Rusoro. Therefore, this non-cash consideration was not given material weight by the Special Master in light of the inherent uncertainty related to whether the Stalking Horse and Rusoro would reach an agreement.

did not provide sufficient information for the Special Master and his Advisors to make a reasonable determination as to a bidder's financial and other capabilities to timely consummate a Sale Transaction.  Third, the Black Lion Bid did not include a statement or evidence that Black Lion had made or would make in a timely manner all filings and disclosures necessary to obtain the necessary government approvals.  Fourth, the Black Lion Bid did not fully disclose the identity of the bidder and details regarding ownership of such entity.  Fifth, the Black Lion Bid did not include all of the representations and warranties required by the Bidding Procedures.  Sixth, the Black Lion Bid did not demonstrate that it was fully financed or that it lacked contingencies other than the closing conditions in the SPA, and it did not include final commitment letters signed by third-party financing sources.

60.    On June 25, 2025, the Special Master sent an email to Black Lion outlining the deficiencies with its bid and informed Black Lion that its bid was not a conforming bid, explaining that the Special Master had determined that the Black Lion Bid did not meet the Bid Requirements and was not eligible for consideration as a Superior Proposal at this time.  On June 25, 2025, the Special Master and Black Lion executed an NDA, and Evercore provided Black Lion with access to the VDR, albeit for less than a day because the Stock Purchase Agreement executed by the Special Master and Dalinar on June 25, 2025 included a customary non-solicitation covenant, the implication of which required the Special Master to terminate VDR access to all parties other than those associated with the Dalinar bid.

61.    The Revised Stalking Horse Bid proposed total consideration of $3.806 billion, comprised of (i) cash consideration in the amount of $3.319 billion and (ii) consented-to non-cash consideration in the amount of $487 million, with approximately $139 million allocated to Northrop Grumman Ship Systems, Inc., f/k/a Ingalls Shipbuilding, Inc. and n/k/a Huntington

Ingalls Incorporated ("**Huntington Ingalls**") and approximately $347 million allocated to Red Tree. The Revised Stalking Horse Bid had the potential to increase its purchase price by approximately $1.5 billion if it received the requisite consents for its proposed non-cash consideration.[6] Specifically, the Revised Stalking Horse Bid offered non-cash consideration to Rusoro or other Additional Judgment Creditors in two (2) tranches, which Red Tree submitted carries a value of approximately $1.5 billion. However, as of the submission of its bid, Red Tree had not procured Rusoro's consent to receive such non-cash consideration, or otherwise release its attachment, as required by the Court's March 4, 2025 *Memorandum Order* (D.I. 1583).[7] Red Tree's Revised Stalking Horse Bid conformed to the Bid Requirements. Ultimately, the Revised Stalking Horse Bid was substantially similar to its Stalking Horse Transaction, including both in terms of price and a proposed settlement with the PDVSA 2020 Bondholders via a transaction support agreement without any material changes from the prior version.

62.    As illustrated in Exhibit B to this Declaration, the Dalinar Bid has a purchase price of approximately $7.382 billion. The Dalinar Bid had the highest purchase price of the two qualified Topping Proposals received by the Special Master, exceeding the Revised Stalking Horse Bid by $3.576 of agreed-to consideration. Even in the event Rusoro were to consent to receipt of Red Tree's proposed non-cash consideration (which it values at $1.5 billion) or otherwise consents to retaining its Attached Judgment and permitting junior consenting Additional Judgment Creditors to receive such non-cash consideration, Dalinar's bid would exceed the Revised Stalking

---

[6]    Red Tree had not procured the applicable consent for this proposed additional consideration at the time of submission of the Revised Stalking Horse Bid.

[7]    Accordingly, this non-cash consideration was not given material weight when evaluating the purchase price of the Revised Stalking Horse Bid in light of the inherent uncertainty related to whether the Stalking Horse and Rusoro would reach an agreement that would result in Rusoro discharging approximately $1.5 billion of its claim at closing.

Horse Bid by $2.076 billion. Dalinar increased its purchase price by $433 million relative to the bid Dalinar submitted during the stalking horse phase. This was accomplished by paying Gold Reserve's claim in full—rather than leaving $200 million outstanding as contemplated by Dalinar's stalking horse bid and the Initial Dalinar Topping Bid—and paying Siemens Energy, Inc.'s ("**Siemens**") claim in full.

63.    The Dalinar Bid provides that Dalinar would acquire 100% of the PDVH Shares for an aggregate purchase price of approximately $7.382 billion[8] of proceeds distributable to holders of Attached Judgments at closing of the Proposed Sale Transaction, which is comprised of (i) cash consideration in the amount of $3.854 billion and (ii) non-cash consideration in the amount of $3.528 billion, all of which has been formally consented to in writing by the receiving Additional Judgment Creditors Rusoro, Koch, Gold Reserve, and XYQ US, LLC ("**XYQ**") (on behalf of Siemens).

64.    The chart below summarizes the Attached Judgments that would be satisfied at closing of the Proposed Sale Transaction in accordance with the priority waterfall established in the Final Priority Order.[9]

---

[8]    The Proposed Sale Transaction's estimated purchase price of $7.382 billion reflects the aggregate amount of cash and non-cash consideration to be paid in satisfaction of Attached Judgments in accordance with the Stock Purchase Agreement, with an assumed closing date of June 30, 2026, for purposes of calculating the accrued amount of Attached Judgments, which date the Special Master used to compare all Topping Proposals. As of June 25, 2025, the execution date of the Stock Purchase Agreement, the accrued amount of Attached Judgments to be satisfied by the Proposed Sale Transaction's estimated purchase price was equal to approximately $7.166 billion. Dalinar's final bid letter attached hereto as Exhibit G, reflects an estimated purchase price of approximately $7.530 billion because Dalinar assumed a closing date of December 31, 2026.

[9]    Amounts of Attached Judgments are estimated according to the claims calculations approved by the Court in its *Memorandum Order*, dated April 25, 2024. *See* D.I. 1136 at 3 (citing D.I. 969-1). Actual distributions to holders of Attached Judgments will be determined as of the date of the closing of the sale of the PDVH Shares.

| Priority | Attached Judgment Holder (Applicable Judgment(s)) | Cash Consideration or Non-Cash Consideration | Amount of Satisfied Attached Judgment as of June 25, 2025 | Amount of Satisfied Attached Judgment as of June 30, 2026 |
|---|---|---|---|---|
| 1 | Crystallex Corporation | Cash consideration | $1,009,182,817.30 | $1,019,679,606.70 |
| 2 | Tidewater Caribe S.A., Tidewater Investment SRL | Cash consideration | $77,755,054.77 | $81,306,469.53 |
| 3 | Phillips Petroleum Company Venezuela Limited and ConocoPhillips Petrozuata B.V. (Petrozuata/Hamaca Judgment) | Cash consideration | $1,378,293,951.71 | $1,412,367,042.37 |
| 4 | OI European Group B.V. | Cash consideration | $671,114,006.61 | $686,901,600.91 |
| 5 | Huntington Ingalls Incorporated | Cash consideration | $139,210,190.56 | $139,450,093.97 |
| 6 | ACL1 Investments Ltd., ACL2 Investments Ltd., LDO (Cayman) XVIII Ltd. | Cash consideration | $118,775,792.92 | $118,908,075.68 |
| 7 | Red Tree Investments, LLC (19-cv-2519 (S.D.N.Y.); 19-cv-2523 (S.D.N.Y.); Fee Judgment in cases 22-mc-00068 and 22-mc-00069) | Cash consideration | $324,833,910.53 | $347,095,930.57 |

| Priority | Attached Judgment Holder (Applicable Judgment(s)) | Cash Consideration or Non-Cash Consideration | Amount of Satisfied Attached Judgment as of June 25, 2025 | Amount of Satisfied Attached Judgment as of June 30, 2026 |
|---|---|---|---|---|
| 8 | Rusoro | Non-cash consideration | $1,537,104,465.57 | $1,568,585,159.10 |
| 9 | ConocoPhillips Gulf of Paria B.V. Corocoro Judgment | Cash consideration | $48,244,419.78 | $48,296,957.36 |
| 10 | Koch | Non-cash consideration | $465,781,487.47 | $470,881,329.32 |
| 11 | Gold Reserve | Non-cash consideration | $1,177,001,991.99 | $1,255,605,277.03 |
| 12 | Siemens | Non-cash consideration | $218,257,235.60 | $232,705,880.67 |

65.     The Dalinar Bid provides for a financing structure whereby Adolin Holdings Inc., a subsidiary of Dalinar, will incur a $4.5 billion senior secured bridge facility (in the event that Dalinar is not able to consummate permanent financing in that amount prior to closing), and a $350 million asset-based pre-fund facility as part of a $2 billion senior secured asset-based revolving credit facility.  This senior secured asset-based revolving credit facility is intended to ultimately be held by CITGO Petroleum Corporation ("**CPC**") so that CPC becomes the borrower on such debt.  JP Morgan Chase Bank, N.A. ("**JP Morgan**"), The Toronto-Dominion Bank, New York Branch ("**TD Bank**"), and Sumitomo Mitsui Banking Corporation ("**SMBC**," and together with JP Morgan and TD Bank, the "**Financing Parties**"), which are each highly reputable global financial institutions, have provided signed commitment letters with respect to the full amount of funding of this debt.  The Dalinar Bid's SPA (the "**Dalinar SPA**") is substantially similar in form to the Stalking Horse SPA.  The Dalinar SPA includes no agreed settlement with the PDVSA 2020 Bondholders.

66.     The purchase price offered by the Dalinar Bid is $3.576 billion higher than that offered by the Stalking Horse and the Revised Stalking Horse Bid.  It is also $3.551 billion higher

than that offered by Bid A, and $3.576 billion higher than the cash consideration offered by Bid B.[10]  As discussed above, Bid A did not meet the Bid Requirements.  Bid B, submitted after the Topping Period Deadline, did not have committed financing, did not meet the Bid Requirements, and had substantial components that were contingent and unfinalized.  Finally, while the Black Lion Bid had a purchase price of $8 billion, it was also noncompliant with the Bid Requirements and was contingent and unfinalized to a significant degree.

67.    On June 25, 2025, after consultation with the Sales Process Parties, the Special Master formally terminated the SPA with the Stalking Horse and signed the SPA with Dalinar.

68.    After a detailed assessment of each Topping Proposal and the Stalking Horse pursuant to the Evaluation Criteria, the Special Master, in consultation with his Advisors, determined that the Dalinar Bid was the highest and best bid available.

*/s/ William O. Hiltz*
William O. Hiltz
Senior Managing Director
Evercore Group L.L.C.

---

[10]    The proposed non-cash consideration offered by Bidder B to the applicable holders of Attached Judgment was not consented to at the time of receipt of Bid B, therefore, it is not included for the purposes of the above calculations.