IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

CRYSTALLEX INTERNATIONAL CORPORATION,

    *Plaintiff*,

v.

BOLIVARIAN REPUBLIC OF VENEZUELA,

    *Defendant*.

Case No. 17-mc-00151-LPS

## RED TREE INVESTMENTS LLC'S NOTICE OF OBJECTION

Red Tree Investments LLC ("Red Tree") respectfully gives notice that it will assert the following objections to the Special Master's Final Recommendation, D.I. 1837.

**I.    RED TREE, NOT GOLD RESERVE, IS THE "HIGHEST BIDDER"**

1.    Red Tree's bid provides creditors $3.806 billion with certainty. Gold Reserve's bid promises $7.382 billion – but with a serious risk that the bid cannot close due to litigation with the 2020 Bondholders. The Special Master's Final Recommendation choosing Gold Reserve does not meaningfully address that risk. When that risk is taken into account, the expected value of Red Tree's bid is higher than Gold Reserve's.

2.    The litigation risk exists because Gold Reserve's financing still relies on impairing the 2020 Bondholders' 50.1% lien on the equity of CITGO Holding. As the Special Master put it at the Stalking Horse phase, there is a "virtual certainty" that the 2020 Bondholders will litigate to stop the Gold Reserve bid from closing. D.I. 1596 at 14. The 2020 Bondholders have already announced that they are prepared to promptly seek a preliminary injunction from the Southern District of New York. *Petróleos de Venezuela, S.A. v. MUFG Union Bank N.A.*, No. 19 Civ. 10023, D.I. 384 (S.D.N.Y. July 7, 2025) (Ex. A).

3.      Gold Reserve has made no effort to cure this litigation risk since the Stalking Horse hearing.  In fact, Gold Reserve's bid makes the risk worse.  To protect itself, Gold Reserve's apparent strategy is to prevent the 2020 Bondholders' claims from ever being heard on the merits.  Thus, Gold Reserve's proposed sale order would enjoin the 2020 Bondholders from suing Gold Reserve or its financing sources.  D.I. 1387-1 at 25-26, 33-34.  But this Court "cannot intentionally take actions to interfere with or deprive [the 2020 Bondholders] of whatever rights they have."  *See, e.g.*, D.I. 1840-1 at 49:5-8; *see* D.I. 1507 (Dec. 13, 2024 Hrg. Tr.) at 126:21-23 (similar acknowledgment by the Special Master).  Nothing in Section 324 or other governing Delaware law gives the Court authority to issue such an injunction.  But that tactic has still ensured that the 2020 Bondholders will litigate now to block the Gold Reserve bid.

4.      The Special Master's Final Recommendation gives no serious reason to gamble the sale process on a bid that can only close if the 2020 Bondholders' litigation comes out a certain way.  Nor does it justify why senior creditors should bear the risk of that gamble so that the junior creditors who make up the Gold Reserve Consortium can get an outsize return from credit bidding their judgments.  The result defies Delaware law and the Court's orders governing the sale process.

5.      When the litigation risk from the 2020 Bondholders is taken into account, as Delaware law requires, Red Tree, not Gold Reserve, is the highest bidder.  Only Red Tree's bid resolves the 2020 Bondholders' litigation risk and allows the PDVH share sale to close while offering the most possible value to creditors.  The Court should therefore approve the Red Tree bid, and not the Gold Reserve bid, at the Sale Hearing.  In the alternative, the Court could stay the Sale Hearing until the 2020 Bondholders' forthcoming preliminary-injunction motion is decided.

A.      **The Gold Reserve Bid's Litigation Risk**

6.      To purchase the PDVH shares and pay Additional Judgment Creditors' claims, Gold Reserve's bid relies on borrowing $4.5 billion, which will be ultimately payable by CITGO

Petroleum Corporation. D.I. 1837 at 26-27, ¶ 72. The 2020 Bondholders have repeatedly asserted that any bid involving such financing violates their security interest in 50.1% of the equity of CITGO Holding, as well as their rights under the related Indenture and Pledge Agreement. *See, e.g.*, D.I. 1661 at 1-2; D.I. 1675-1 (Pledge Agreement). As the Special Master's counsel told the Court during the June 24 *ex parte* hearing, the Gold Reserve bid has the same financing structure that the 2020 Bondholders have repeatedly asserted violates their rights. D.I. 1840-1 at 52:22-53:17; D.I. 1837 at 31, ¶ 82(b) (Final Recommendation acknowledging the same); *see also* Ex. B (Apr. 17, 2025 Hrg. Tr.) at 168:16-20 (similar acknowledgment by Crystallex).

7. After Gold Reserve issued a press release announcing a topping bid on June 18,[1] the 2020 Bondholders asked the Southern District of New York to consider a preliminary injunction barring the Gold Reserve transaction if it were recommended by the Special Master. *Petróleos de Venezuela, S.A. v. MUFG Union Bank N.A.*, No. 19 Civ. 10023, D.I. 380 (S.D.N.Y. June 24, 2025) (Ex. C). Since the Final Recommendation was filed, the 2020 Bondholders have informed that court that they are prepared to file a preliminary-injunction motion promptly. No. 19 Civ. 10023 (S.D.N.Y.), D.I. 384 (Ex. A) at 4. The court will hold a hearing on scheduling the 2020 Bondholders' motion on July 10. *Id.*, D.I. 383 at 3.

8. The Special Master candidly admits that Gold Reserve's final bid "makes no improvement whatsoever on . . . addressing the 2020s' risk." D.I. 1840-1 at 52:22-53:17.[2] In fact,

---

[1] Gold Reserve Ltd., *Gold Reserve Announces Submission of Revised Topping Bid By Dalinar Energy for CITGO Parent Company* (June 18, 2025), http://bit.ly/4lDVbK6.

[2] For that reason, Red Tree also objects to awarding Gold Reserve any expense reimbursement if its transaction fails to close because of litigation with the 2020 Bondholders. *See* D.I. 1837-1 at 69, § 8.3(c) (providing for the Buyer to receive an Expense Reimbursement Amount if the SPA is terminated by the Special Master during the No-Shop Period and before the Sale Hearing to enter into another agreement); *id.* at A-8 ("Expense Reimbursement Amount" is a maximum of $30 million). Gold Reserve should bear the risk of out-of-pocket loss due to its litigation strategy.

3

the sale order that Gold Reserve has proposed makes that risk even worse. The proposed order would bar the 2020 Bondholders from seeking relief against Gold Reserve's transaction outside this Court. Among other terms, it would (a) enjoin a swath of persons from pursuing litigation claims against the Consortium or its affiliates, D.I. 1387-1 at 25-26; (b) bar other persons from interfering with the Consortium's "title to or use and enjoyment of the PDVH shares," *id.* at 30; and (c) bar any (non-released) litigation claims against the Consortium or its affiliates except in this Court, and then only if this Court first finds such claims "colorable," *id.* at 33-34. Moreover, Gold Reserve's proposed order would purport to immunize the "validity of the Sale Transaction" from "reversal or modification on appeal" if no stay of the sale order is granted. *Id.* at 32.

9. Gold Reserve's proposal has already triggered litigation from the 2020 Bondholders and is certain to foster more. Gold Reserve's proposal also defies this Court's express statement that it "cannot intentionally take actions to interfere with or deprive [the 2020 Bondholders] of whatever rights they have." D.I. 1840-1 at 49:5-8. And it exceeds the Court's authority under the Delaware statute authorizing this sale. *See* pp. 10-11, *infra.*

10. OFAC regulations do not insulate Gold Reserve's bid from litigation, either. *See, e.g.*, D.I. 1816. As the Special Master's counsel noted during the *ex parte* conference, those regulations do not prohibit the 2020 Bondholders from seeking a preliminary injunction to protect their rights under the Indenture and Pledge Agreement. D.I. 1840-1 at 38:15-18 (". . . there still exists the risk of an injunction, which is separate from the extension of the GL5 license"); *see also* D.I. 1824; U.S. Dep't of Treasury, Venezuela Sanctions FAQ No. 1124, http://bit.ly/4npWL3M (May 1, 2023); 31 C.F.R. § 591.310.[3]

---

[3] Moreover, if the 2020 Bondholders seek relief solely relating to PDVH, CITGO Holding, or CITGO Petroleum, the OFAC regulations at issue here would not apply. OFAC has granted a general license for otherwise-prohibited activities "where the only Government of Venezuela

11. Moreover, there is no reason to think that OFAC would treat Gold Reserve differently than other creditors. To the extent a license from OFAC is required to exercise certain of the 2020 Bondholders' remedies, OFAC has stated that, for licensing determinations, it "is committed to fair and equivalent treatment of potential creditors." U.S. Dep't of Treasury, Venezuela Sanctions FAQ No. 1123, https://ofac.treasury.gov/faqs/1123 (May 1, 2023). Based on that policy, it is not credible for Gold Reserve to assert that OFAC would deny a request for a license by the 2020 Bondholders to protect their rights if Gold Reserve sought an OFAC license for a sale that would infringe those rights.

B.  **The Final Recommendation's Failure To Account for Litigation Risk**

12. The Final Recommendation offers zero assessment of Gold Reserve's closing risk beyond a tepid statement that there is "some chance" the 2020 Bondholders could enjoin the sale. D.I. 1837 at 31, ¶82(b); *see also* D.I. 1838, ¶53 (stating, without explanation, that the Special Master "took into account" the 2020 Bondholders' litigation claims). By failing to properly weigh the litigation risk associated with the Gold Reserve bid, the Final Recommendation violates (a) the governing Delaware statute requiring that the PDVH shares be "sold . . . to the highest bidder," 8 *Del. C.* § 324(a); (b) the *Sale Procedures Order* (D.I. 481); (c) the Evaluation Criteria, D.I. 1528-3, as modified by D.I. 1554 at 24-26; (d) the Court's December 31, 2024 *Memorandum Order Regarding Sales Process and Litigation* (D.I. 1517); and (e) the Court's instructions in its order approving Red Tree's bid as the Stalking Horse (D.I. 1741).

13. The Gold Reserve bid will offer no value to creditors if it cannot close. Thus, by definition, Gold Reserve cannot be the "highest bidder" under the operative Delaware statute if the

---

entities involved are PDVH, CITGO Holding, Inc., or any of their subsidiaries." Office of Foreign Assets Control, Venezuela Sanctions General License No. 7C, http://bit.ly/44sa8I8.

2020 Bondholders' challenge prevails. *See* 8 *Del. C.* § 324(a). Even now, the risk from that litigation is substantial enough that the current expected value of the Gold Reserve bid is less than the expected value of the Red Tree bid. That is especially so for senior creditors, who unjustifiably bear the risk that the 2020 Bondholders will block the Gold Reserve transaction.

14. For the same reason, the Gold Reserve bid cannot be a "Successful Bid" under the Sale Procedures Order, D.I. 481. A "Successful Bid" is defined as "the highest Qualified Bid(s) that the Special Master reasonably believes to be capable of being timely consummated after taking into account the factors set forth in the Bidding Procedures . . . ." *Id.* at 16-17, ¶ 12. The Special Master has offered nothing beyond his say-so that he "evaluat[ed] . . . attendant risks with his Advisors" to show that Gold Reserve will be able to close. D.I. 1837 at 31, ¶ 82(b).[4]

15. The Final Recommendation also violates the Court's repeated instructions to meaningfully account for the 2020 Bondholders' litigation risk. *First*, the Court directed in its December 31, 2024 order that, in drafting the SPA and Evaluation Criteria, the Special Master "shall NOT include any requirement or condition with respect to the 2020 Bond Entities other than that bidders acknowledge that the 2020 Bond Entities" assert a lien on the CITGO Holding shares, and that the lien is "subject to active litigation." D.I. 1517 at 7-8, ¶ 28. In practice, however, the Final Recommendation impermissibly makes the defeat of the 2020 Bondholders' litigation a condition of the Gold Reserve transaction.

16. *Second*, in the Evaluation Criteria, the Court instructed the Special Master to consider "[c]onditionality related to pending or future litigation (including with respect to the 2020

---

[4] According to the Special Master, Gold Reserve also "shared a memo" on the 2020 Bondholders' litigation claims that did not have "much legal analysis in it" and was "mostly conclusory and frankly arbitrary." D.I. 1840-1 at 52:5-10. The Special Master accordingly gave Gold Reserve's memo (which has not yet been filed or produced in discovery) no weight. D.I. 1837 at 31 n.20.

6

Bonds . . .).") D.I. 1528-3 at 1.  As a result, the Special Master was required to account for the potential for the 2020 Bondholders to block the Gold Reserve transaction – either through their current litigation or through potential future litigation.  But the Final Recommendation fails to give more than lip service to that risk.

17.     *Third*, in its order approving Red Tree as the Stalking Horse, the Court recognized "the reality that a successful bid in the Sales Process must, in one way or another, address the litigation risk posed by the 2020 Bondholders, as this risk (however great or small it may be) impacts the assessment of certainty of closing."  D.I. 1741 at 4.  Likewise, the Special Master acknowledged during the June 24 *ex parte* hearing that, without resolution of the 2020 Bondholders' claims, "there may not be any deal and we may be back into this a year from now," having spent time and incurred fees "pursuing a deal that broke.  That . . . is what the risk is of the Gold Reserve bid."  D.I. 1840-1 at 51:13-14, 55:14-22.

18.     To be sure, the Court has stated that the absence of a solution to the 2020 Bondholders' claims is "not a deal breaker."  D.I. 1840-1 at 61:23-25.  Similarly, the Court has expressed openness to "approving a Final Bid that addresses the possible impact of the 2020 Bondholders' rights" other than through a settlement.  D.I. 1741 at 4.[5]  Still, bids must "meaningfully address[ ] (and neither ignore[ ] nor dismiss[ ] as if non-existent) that risk."  *Id.*  But the Final Recommendation ignores that risk by, in practice, gambling the success of the sale process on the outcome of the 2020 Bondholders' litigation.

---

[5] Of course, bidders could avoid 2020 Bondholder litigation risk by simply paying cash rather than seeking to raise financing from CITGO Holding and CITGO Petroleum.  Bidder A and Bidder B, in fact, offered both offered all-cash bids.  D.I. 1837 at 20-22, ¶¶ 64-65.  But the Special Master rejected those bids nonetheless because, among other reasons, the bidders did not reach final settlements with the 2020 Bondholders.  *Id.*

19. To the extent that the Special Master relied solely on the Court's initial impressions during the June 24 *ex parte* conference, the Court should discount the Special Master's recommendation accordingly. As the Court explained, the Special Master asked with very short notice for the Court's guidance based on a cursory summary of the relevant bids. D.I. 1840-1 at 5:14-18 (thanking the Court for meeting on short notice); *id.* at 32:6-40:23 (summarizing the "landscape of the bids"). There was no presentation from any other party's perspective – including either from the 2020 Bondholders or from the senior creditors who stand to lose the most if Gold Reserve's bid falls through. And the Special Master did not inform bidders of the Court's statements, let alone allow them to tailor their bids accordingly. Because bidders and Additional Judgment Creditors had no opportunity to respond to the Special Master's *ex parte* presentation, the Court's initial reactions to that presentation cannot control whether the Gold Reserve bid is, in fact, the best bid under Delaware law and the Court's orders.

### C. When Accounting for Litigation Risk, Red Tree Is the "Highest Bidder" for the PDVH Shares

20. Red Tree is the "highest bidder" under Section 324(a) when the 2020 Bondholders' litigation risk is properly accounted for. Of the two Qualified Bids, only Red Tree's can close with near-100% certainty. As a result, Red Tree's bid offers higher expected value to Additional Judgment Creditors, because those creditors are more likely to receive more proceeds from the sale than the non-viable Gold Reserve bid.

21. Moreover, Red Tree's bid offers as much consideration for the PDVH shares as any other viable bid.[6] Specifically, Additional Judgment Creditors stand to receive approximately as

---

[6] By comparison, the Black Lion bid filed on the public docket purported to offer $8 billion in cash for the PDVH shares. D.I. 1837 at 22-23, ¶66. However, the Special Master has explained that Black Lion did not comply with the bidding requirements because, among other reasons, it was conditioned on further due diligence. D.I. 1838 at 20-21, ¶59.

much in proceeds from the Red Tree bid as from the two other bidders who submitted bids in compliance with the Special Master's process. *See* D.I. 1838-1 at 1. In fact, since its approval as Stalking Horse, Red Tree has materially increased the value of its bid to Additional Judgment Creditors by offering additional consideration to the next junior creditor in line, Rusoro Mining Ltd., potentially up to the full value of its claim. Red Tree is working even now to continue improving its bid by offering additional value to junior creditors and will update the Court on its progress.

22. By comparison, Gold Reserve has staked the sale process on the outcome of the 2020 Bondholders' litigation. The risk of that gamble is borne solely by senior Additional Judgment Creditors, many of whom have waited years in this process to be paid. By comparison, the Gold Reserve Consortium bears almost none of the risk. Gold Reserve has put up no more cash in support of its bid than its required $50 million deposit, D.I. 1837-1, Ex. G (Final Bid Letter) at 8, instead choosing to finance its sale solely through credit bidding and billions of dollars of CITGO Petroleum debt that will prompt litigation.

23. As Red Tree will show at the Sale Hearing, Red Tree's bid offers the greatest combination of price and certainty to Additional Judgment Creditors. Red Tree is therefore the "highest bidder" under Section 324, and its bid should be approved instead.

   **D.**   **In the Alternative, the Court Can Delay the Sale Hearing To Ascertain the Litigation Risk from the 2020 Bondholders**

24. In the alternative, the Court can postpone the Sale Hearing until there is further clarity on the Gold Reserve bid's litigation risk. Under the Sales Procedure Order, a bid is only qualified if it is capable of being timely consummated. D.I. 481 at 16-17, ¶ 12. Since the Gold Reserve bid's viability is entirely dependent on its ability to avoid a litigation challenge from the 2020 Bondholders, the most certain way to evaluate whether that bid can close is to wait for a

ruling from the Southern District of New York, which will effectively allow or forbid the Gold Reserve transaction from moving forward.

25. Because the Southern District of New York may set a hearing date for the 2020 Bondholders' preliminary-injunction motion as early as July 10, a postponement may be appropriate if it would not cause undue delay. Such a postponement would allow the proper forum – the Southern District of New York – to decide these issues. *See* D.I. 1840-1 at 48:11-16 (the Court acknowledging that the 2020 Bondholders "have whatever rights they have. They are litigating them in another court.").

26. Thus, while the Court can determine now that the 2020 Bondholders' litigation risk prevents the Gold Reserve bid from being the highest bidder, it can, if need be, remove any doubt by awaiting a ruling on the preliminary-injunction motion or the summary-judgment motions before Judge Failla. Of course, the propriety of adjourning the Sales Hearing depends on the timing of any hearing or ruling in the Southern District of New York. However, if a resolution of the 2020 Bondholders' rights is promptly forthcoming, awaiting that ruling would clarify the execution risk of the Gold Reserve bid and would thus substantially narrow the issues to be resolved by this Court at the Sale Hearing.[7]

## II.  THE COURT SHOULD REJECT GOLD RESERVE'S PROPOSED SALE ORDER

27. Independently, the Court should reject Gold Reserve's proposed sale order because it exceeds the Court's authority under Section 324.

---

[7] In the alternative, Red Tree agrees with, and joins, Crystallex's objection that the Gold Reserve SPA should be amended to provide a prompt termination right if the 2020 Bondholders prevail in blocking the current transaction. If Gold Reserve's financing falls through because of litigation from the 2020 Bondholders, the Court should be free to promptly pivot to a viable bid.

28. That statute empowers the Court only to sell the PDVH shares "at public sale to the highest bidder, as shall be sufficient to satisfy the debt[s]" of PDVSA, then distribute the proceeds to Additional Judgment Creditors in priority order. 8 *Del. C.* § 324(a); *see also* D.I. 1583 at 2 (describing the Court's limited mandate under Delaware law). The Court has emphatically rejected prior requests to exceed its powers under Section 324 by, for example, enjoining the prosecution of claims that PDVH is an alter ego of PDVSA. D.I. 1515. As the Court has put it, "the Court's obligation is to market [the PDVH shares] in a manner designed to maximize their actual value . . . not to prevent all other claims that impact the value of those shares." *Id.* at 6.

29. The proposed sale order goes far beyond the Court's authority under Section 324(a). As described above, the sale order seeks to enjoin a broad range of litigation claims against Gold Reserve or its affiliates, unless claimants first seek permission from this Court to bring those claims. *See* p. 4, *supra*. The order even purports to shield "the validity of the Sale Transaction" from appeal absent a stay, *see id.*, as if the share sale were a bankruptcy asset sale under Chapter 11, *cf.* 11 U.S.C. § 363(m). But this is not a bankruptcy proceeding. The Court lacks authority, either under Section 324 or other applicable Delaware law, to insulate Gold Reserve or its affiliates from liability or appellate risk. The Court should therefore reject the proposed sale order.

## CONCLUSION

The Court should name Red Tree as the winning bidder or, in the alternative, consider postponing the Sale Hearing until after a decision on the 2020 Bondholders' forthcoming preliminary-injunction motion in the Southern District of New York. The Court should reject Gold Reserve's proposed form of sale order. And the Court should require amendments to Gold Reserve's SPA that would, in the event the Gold Reserve transaction is blocked by litigation with the 2020 Bondholders, (1) preclude Gold Reserve from receiving an expense reimbursement and (2) allow the Special Master to terminate the SPA promptly.

Dated: July 7, 2025

Respectfully submitted,

LANDIS RATH & COBB LLP

Steven F. Molo (*pro hac vice*)
Justin M. Ellis (*pro hac vice*)
Mark W. Kelley (*pro hac vice*)
Lauren F. Dayton (*pro hac vice*)
Joshua D. Bloom (*pro hac vice*)
MOLOLAMKEN LLP
430 Park Avenue
New York, NY  10022
Tel.: (212) 607-8170
smolo@mololamken.com
jellis@mololamken.com
mkelley@mololamken.com
ldayton@mololamken.com
jbloom@mololamken.com

Lois S. Ahn (*pro hac vice*)
MOLOLAMKEN LLP
600 New Hampshire Avenue, N.W.
Washington, D.C.  20037
Tel.: (202) 556-2000
lahn@mololamken.com

*/s/ Jennifer L. Cree*
Rebecca L. Butcher (#3816)
Jennifer L. Cree (#5919)
919 Market Street, Suite 1800
Wilmington, DE  19801
Tel.: (302) 467-4400
butcher@lrclaw.com
cree@lrclaw.com

*Counsel for Red Tree Investments LLC*

12