# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| CRYSTALLEX INTERNATIONAL CORP., | ) |
| *Plaintiff*, | ) ) ) No. 1:17-mc-00151-LPS |
| v. | ) ) **PUBLIC VERSION** |
| BOLIVARIAN REPUBLIC OF VENEZUELA, | ) **EFILED: July 8, 2025** ) |
| *Defendant*. | ) ) |

## THE VENEZUELA PARTIES' NOTICE OF OBJECTIONS TO THE SPECIAL MASTER'S FINAL RECOMMENDATION

On July 2, 2025, the Special Master submitted his Final Recommendation (D.I. 1837), in which he recommended that the Court approve the sale of the shares of PDV Holding, Inc. ("PDVH") to Dalinar Energy Corporation ("Dalinar"), pursuant to a proposal by Dalinar (the "Dalinar Bid") that the Special Master represents is worth $7.382 billion. Pursuant to the scheduling order entered on June 13, 2025 (D.I. 1809), PDVH, CITGO Petroleum Corporation ("CITGO"), Petróleos de Venezuela, S.A. ("PDVSA"), and the Bolivarian Republic of Venezuela (together, the "Venezuela Parties") hereby give notice of their objections to confirmation of the Dalinar Bid on the following bases, which will be more fully briefed in their memorandum in support of their objections, due on July 23, 2025. The Venezuela Parties reserve the right to assert additional objections, including, but not limited to, objections based on or related to information arising from or learned, highlighted, or clarified in discovery or events occurring after the date of this filing and objections to the confirmation of any other bid that the Special Master may recommend or that may be urged by a bidder or party. For the avoidance of doubt, the Venezuela Parties also expressly preserve all objections they have made throughout the sale process thus far.

1. The Venezuela Parties object to the Dalinar Bid as grossly inadequate and thus unconscionable under Delaware law.

    a. The Dalinar Bid is grossly inadequate because it is for less than 50% of the fair market value of the PDVH Shares. *E.g.*, *Burge v. Fid. Bond & Mortg. Co.*, 648 A.2d 414, 419 (Del. 1994).

    b. Even if the Dalinar Bid were to somehow exceed 50% of the PDVH Shares' fair market value—which it does not—it would still be grossly inadequate, unconscionable, unfair, and unprecedented to sell property such as the PDVH Shares (and, with it, control of the "crown jewel" of a foreign state oil company) for many billions of dollars less than its fair market value under any reasonable estimate. *See Burge*, 648 A.2d at 419.

2. The Venezuela Parties object to the Dalinar Bid because defects in the process and failures, errors, and strategic mistakes by the Special Master—including many identified contemporaneously and expressly throughout the sale process by the Venezuela Parties— failed to maximize value and led to a bid billions of dollars below fair market value. These problems amount to "defect[s]… in the process" and other "matter[s] whereby the rights of" creditors and the Republic and PDVSA have been "prejudiced." *Burge*, 648 A.2d at 419. *See generally* Fifth Supp. Decl. of Randall J. Weisenburger (explaining process failures). If the sale process were re-run without such failures, errors, and mistakes (or if a different sale design were employed entirely), the result would be a vastly improved bid. *See generally* Fifth Decl. Weisenburger. The process defects and other errors that caused prejudicial harm include, without limitation:

a. Selecting Red Tree as the stalking horse bidder even though its bid was for less than half the amount of the highest bid submitted during that process set too low of a floor for the Topping Period and distorted bidding.

b. Prioritizing resolution with the 2020 bondholders over the bids' proposed purchase price signaled to bidders that they need not compete on price, but rather only on resolution of the 2020 bondholder litigation; this dynamic was borne out by the bids received on June 18, in which competing bidders attempted to top Red Tree's stalking horse bid, not Gold Reserve's.

c. Refusing to share information with bidders about other bidders' proposals prevented competitive bidding, thus failing to create competitive tension, maximize value or meet the demands of a "public sale." 8 Del. C. § 324(a).

d. Proceeding with the sale process without having sought regulatory guidance on potential antitrust concerns prevented strategic bidders from participating in the sale process, which made it more difficult to maximize value.

e. The Special Master's repeated public indications that resolution of the 2020 bondholder litigation was a gating issue for a successful bid, along with the bidder instructions he issued that suggested the same, inflated the importance and perceived risk of the 2020 Bondholder Litigation, which (1) chilled bidder participation and (2) led bidders to focus on (and divert value to) that issue at the expense of price, preventing value maximization.[1] Having elevated the perceived

---

[1] The Venezuela Parties have repeatedly expressed concerns about the Special Master's treatment of the 2020 Bondholder Litigation, including, for example, regarding the language in bidder instructions regarding assumptions bidders should make and terms bidders should propose regarding resolution of the 2020 Bondholder Litigation. *See, e.g.*, D.I. 1144. For the avoidance of doubt, the Venezuela Parties incorporate those concerns by reference.

    risk profile of the 2020 bondholder litigation, proceeding with the sale process without waiting for resolution of the litigation further chilled bidder participation and depressed the value of the bids received. Only a pause and restart of the sale process after resolution of the 2020 Bondholder Litigation would have mitigated the chilling effect of the Special Master's treatment of that litigation. The Court should reject the recommendation of the Dalinar Bid and suspend the sale process until a decision on those motions is rendered and a proper sale process is adopted.

f. Alter ego claims against PDVH have been in the public record since 2019[2] and were disclosed in the data room before Girard Street and G&A Investments filed their action in SDNY. The Special Master's public and private statements about the New York (and, later, Texas) alter ego litigation (including, but not limited to, his request that this Court enjoin those proceedings) inflated the importance and perceived risk of those cases, which chilled bidder participation and needlessly depressed the value of the bids received. Moreover, this Court's statement that "it will be extremely difficult to persuade the Court that the bidder should be allowed to exit an executed (and Court-approved) SPA based in any significant part on whatever may occur in connection with Alter Ego Claims (pending or potential)" (D.I. 1554 at 21)—and its related suggestion that a ruling against PDVH on those claims would not meet "the Delaware law standard" for a "Material Adverse Effect" (*id.* at 9 n.7)—likewise caused bidders to submit lower bids based on the assumption that they would have to bear this small (but unjustifiably magnified by

---

[2] *See OI European Group, B.V. v. Bolivarian Republic of Venezuela, et al.*, 1:19-cv-00290-LPS, ECF No. 001 (D. Del. Feb. 11, 2019).

  the Special Master) risk. Having elevated the perceived risk profile of the alter ego litigation, proceeding with the sale process without waiting for resolution of (at least) the New York litigation further chilled bidder participation and depressed the value of the bids received. The Special Master's decision to select the winning bidder only hours after the New York Court issued its summary judgment opinion, explaining the broad bases for its earlier order granting summary judgment, meant the Special Master had no time to determine whether the reduction in risk (real or perceived) resulting from that opinion could have been a means to increase the value of bids and further provided no time for existing bidders to consider adjusting their bids or new bidders whose decision not to bid had been premised on the alter ego cases to alter their calculus.

g. The Special Master's repeated capitulation to bidder demands during multiple rounds of the sale process was commercially unreasonable and led to unreasonably low bids, failure to maximize value, and bids that continually set the floor for bidding too low to generate a value maximizing outcome. In particular, granting exclusivity to two separate bidders in 2024, CVR Energy, Inc. and Elliott Investment Management ("Elliott"), led to Elliott securing commercially unreasonable concessions from the Special Master. The Special Master then recommended Elliott as the preliminary winning bidder. Even though Elliott's bid was universally rejected by process participants, the Special Master's failures during the negotiations set a low floor for the new bidding in 2025 and signaled to bidders and would-be bidders that the Special Master would not require a value-maximizing bid. Later, in 2025, the Special Master also capitulated to Red Tree's

      threat to abandon the sale process if it was not named the stalking horse bidder, ultimately leading to a last-minute recommendation of Red Tree as the stalking horse despite its bid being billions of dollars less than the Gold Reserve stalking horse bid.

    h. The Special Master failed to adopt or meaningfully consider alternative sale processes (for example, an IPO, a private placement, a leveraged recapitalization, or any other capital markets or similar alternative) that would better maximize the value of the PDVH Shares or, if pursued in parallel to the sale process, provide either a higher floor for bidding, create bidding tension, or serve as a fallback position for the Special Master to revert to in the event the bidding was inadequate.

    i. The Special Master's engagement with Evercore and the contingency fee structure to which he agreed created the wrong incentive structure for an advisor in this sale process and resulted in a situation where (1) the Special Master was unable and/or unwilling to not recommend a winning bidder, even where no acceptable bid was submitted, and (2) the Special Master's advisor stood to benefit from a settlement of the 2020 Bondholder Litigation.

    j. The Special Master's public position that the Court should—and the Court's public statement (D.I. 1544) that it was inclined to—view the outcome of the sale process as the equivalent of fair market value, despite clear Delaware law to the contrary, encouraged bidders to discount their bids and undercut the deterrent effect of Delaware law's 50% test for assessing the propriety of a forced sale of stock.

3. The Venezuela Parties object to the sale because Crystallex's writ of attachment and the other writs of attachment of Additional Judgment Creditors of the Republic are invalid

under Delaware law, which governs these proceedings pursuant to Federal Rule of Civil Procedure 69 and the Foreign Sovereign Immunities Act's directive that if foreign sovereign immunity is overcome, "the foreign state shall be liable in the same manner and to the same extent as a private individual under the same circumstances." 28 U.S.C. § 1606.

a. Under Delaware law, a judgment creditor may only attach and execute upon the shares of a Delaware corporation owned by an alleged alter ego of a judgment debtor if the creditor can show fraud or similar injustice in the use of the corporate form. *E.g.*, *Buechner v. Farbenfabriken Bayer Aktiengesellschaft*, 154 A.2d 684, 687 (Del. 1959); *see also Crosse v. BCBSD, Inc.*, 836 A.2d 492, 497 (Del. 2003); *Wallace ex rel. Cencom Cable Income Partners II, Inc. v. Wood*, 752 A.2d 1175, 1184 (Del. Ch. 1999) (creditors must establish that the judgment debtor, "through its alter-ego, has created a sham entity designed to defraud investors and creditors."). No creditor of the Republic has established fraud or similar injustice sufficient to pierce the veil between the Republic and PDVSA—nor could they. The Court has held as much as to Crystallex. *Crystallex Int'l Corp. v. Bolivarian Republic of Venezuela*, 333 F. Supp. 3d 380, 399, 403-04 (D. Del. 2018).

b. Once judgments held by creditors of the Republic are removed, the remaining Attached Judgments held by creditors of PDVSA amount to approximately only $1.9 billion. That amount could have been satisfied without selling 100%, or any, of the PDVH Shares. Accordingly, the sale contravenes Section 324's directive that only "[s]o many of the shares" as necessary be sold to satisfy (legitimately attached) debts and cannot be confirmed.

    c. Moreover, Gold Reserve, Koch, and Rusoro—members of the consortium supporting the Dalinar Bid—have no right to credit bid because their attachments stem from a judgment against the Republic and are invalid for the reasons explained above.

    d. The Venezuela Parties object to the Dalinar Bid because it would pay Crystallex and other creditors of the Republic, whose attachments are invalid for the reasons explained above.

4. For purposes of appellate preservation, the Venezuela Parties maintain that PDVSA is immune from the jurisdiction of the court in an action to hold it liable, or execute on its property, to satisfy the debts of the Republic on an alter ego basis under the FSIA, and objects to the Third Circuit's erroneous application and interpretation of *First Nat'l City Bank v. Banco Para El Comercio Exterior De Cuba*, 462 U.S. 611, 613 (1983), and *Peacock v. Thomas,* 516 U.S. 349 (1996), in its 2019 decision in this case. The Third Circuit's error was further crystallized by the Second Circuit's subsequent decision in *Peterson v. Bank Markazi*, which expressly disagreed with the Third Circuit's 2019 jurisdictional immunity ruling. *Compare Peterson v. Bank Markazi*, 121 F.4th 983, 1000 n.6 (2d Cir. 2024), *with Crystallex Int'l Corp. v. Bolivarian Republic of Venezuela*, 932 F.3d 126, 139 (3d Cir. 2019). The Third Circuit's error, if corrected, would implicate all attached judgments held by creditors of the Republic and require rejecting the sale for reasons described in the preceding objection.

5. The Venezuela Parties object that the Special Master and his advisors were biased against the Venezuela Parties and in favor of recommending a fast sale at all costs, acted at times

as an advocate on behalf of Crystallex, ConocoPhillips, and other creditors—including in the Special Master's conduct before OFAC[3]—and should have been disqualified.

6. Pending further discovery and explanation, the Republic and PDVSA object to the Dalinar Bid due to apparent inconsistencies in Gold Reserve's attached judgment amount and relationship with the Maduro regime. According to a Request for Arbitration[4] filed in 2025 by a wholly owned subsidiary of Gold Reserve, Gold Reserve, whose "main concern in the negotiations was that Venezuela satisfy the debt it owed under the 2014 arbitration award" confirmed by the judgment on which Gold Reserve's writ of attachment in this Court was based, negotiated a settlement agreement in 2016 (the "Settlement Agreement") with the Maduro regime. According to the Request for Arbitration, Venezuela paid Gold Reserve approximately $254 million under the Settlement Agreement, formed a mixed company (55% owned by a state-owned mining company and 45% by the Gold Reserve subsidiary) to develop and exploit mines and deposits of gold and other strategic minerals, and assigned mining rights to the mixed company.

    Gold Reserve represented to this Court that it has received only $13,811,558 toward its attached judgment and the award on which it was based (D.I. 663). The Special Master's calculation of the amount owed on that judgment was based on that representation (*see* D.I. 969-1), and the Dalinar Bid claims full credit for that amount in the value it attributes to Gold Reserve's credit bid. Thus, on information and belief, the Dalinar Bid overstates the

---

[3] *See* D.I. 509; D.I. 1138, and associated briefing, which has not been resolved by the Third Circuit.
[4] GR Mining (Barbados) Inc. Request for Arbitration, available through a link on the Gold Reserve website at
https://static1.squarespace.com/static/678169d94a42245884c4f0f3/t/67c8bf5285fef21c65fa9d10/1741209426758/GR_Vz_2025.03.05_Arb+II_Final+Draft+RFA+%28330pm+ET%29.pdf
(downloaded July 5, 2025). The Republic and PDVSA have requested that Gold Reserve produce the Settlement Agreement and other relevant documents.

9

    amount bid by approximately $240 million, if not more. This overvaluation distorted the bidding process and produced a flawed outcome, whether as a result of Gold Reserve misleading the Special Master, or the Special Master failing adequately to vet the Dalinar Bid.

    The Request for Arbitration also alleges that Gold Reserve extensively cooperated with the Maduro regime in activities related to the joint Gold Reserve/Maduro mining enterprise. The Request for Arbitration does not say when these activities ended, but alleges that "[b]y 2022," Gold Reserve had spent approximately $31 million on operational costs and "social welfare programs in the Project region." Regardless of whether the dealings between Gold Reserve and the Maduro regime violated existing OFAC sanctions—a subject of pending discovery requests—at the very least, they create an issue concerning whether the Gold Reserve-led Dalinar group could obtain a license from OFAC.[5] The Republic and PDVSA do not know whether Gold Reserve failed to inform the Special Master of its entanglements with the Maduro regime, or the Special Master failed to act on that information if it was provided by Gold Reserve.

7. The Venezuela Parties object to Section 6.16(c) of the Dalinar SPA, which suggests that the Special Master may provide an unsolicited competing proposal to the Court only up until the Sale Hearing. This is inconsistent with the Court-adopted Bidder Protections, which provide that, "in the event the Special Master receives an unsolicited competing proposal after submission of the Final Recommendation and prior to the *entry of any Sale Order*, he shall inform the Court and the Final Recommended Bidder of the receipt of such

---

[5] For avoidance of doubt: it remains the position of the Venezuela Parties that no forced sale of the PDVH shares should merit a license.

proposal and, if so directed by the Court, may engage with the bidder submitting such competing proposal." D.I. 1552-1 at 2-3 (emphasis added). The SPA is currently nonbinding, Dalinar SPA § 6.16(a), and does not and cannot supersede the Bidder Protections, which were expressly adopted by the Court. *See* D.I. 1554 at 2 n.3.

8. For the avoidance of doubt, if Red Tree objects and seeks confirmation of its own bid (or if any other entity advocates for confirmation of Red Tree's bid), the Venezuela Parties intend to oppose such outcome on the same bases described above regarding the Dalinar Bid, as well as because Red Tree's bid improperly diverts significant sale proceeds to alleged creditors that are not before this Court, do not have a judgment, and whose claim to shares of CITGO Holding, Inc. is based on an invalid and disputed pledge agreement (the "Pledge Agreement"). Red Tree's bid, and the terms of its TSA, suggest that the 2020 Bondholders exerted improper leverage over bidders and the Special Master, using threats of an injunction that misreads the anti-upstreaming provisions of the (invalid) Pledge Agreement and is barred by U.S. sanctions. *See* D.I. 1825. The Venezuela Parties reserve the right to respond to Red Tree's objections on any other bases that may be specific to Red Tree's bid and/or objections. They also continue to reserve the right to raise objections to the confirmation of any other bid that the Special Master may recommend or that may be urged by a bidder or party.

|  |  |
|---|---|
|  | MORRIS, NICHOLS, ARSHT & TUNNELL LLP |
|  | |
|  | /s/ Alexandra M. Cumings |
| OF COUNSEL: | Susan W. Waesco (#4476) |
| Nathan P. Eimer | Alexandra M. Cumings (#6146) |
| Lisa S. Meyer | 1201 North Market Street |
| Daniel D. Birk | Wilmington, DE 19801 |
| Gregory M. Schweizer | (302) 658-9200 |
| Hannah Bucher | swaesco@morrisnichols.com |
| EIMER STAHL LLP | acumings@morrisnichols.com |
| 224 South Michigan Avenue | |
| Suite 1100 | *Attorneys for PDV Holding, Inc. and* |
| Chicago, IL 60604 | *CITGO Petroleum Corporation* |
| (312) 660-7600 | |
| NEimer@eimerstahl.com | |
| LMeyer@eimerstahl.com | |
| DBirk@eimerstahl.com | |
| GSchweizer@eimerstahl.com | |
| HBucher@eimerstahl.com | |

|  |  |
|---|---|
|  | HEYMAN ENERIO GATTUSO & HIRZEL LLP |
|  | |
| OF COUNSEL: | /s/ Samuel Taylor Hirzel, II |
|  | Samuel Taylor Hirzel, II (#4415) |
| Joseph D. Pizzurro | Brendan Patrick McDonnell (#7086) |
| Kevin A. Meehan | 300 Delaware Avenue, Suite 200 |
| Juan O. Perla | Wilmington, DE 19801 |
| David V. Holmes | (302) 472-7300 |
| CURTIS, MALLET-PREVOST, COLT & MOSLE LLP | shirzel@hegh.law |
|  | bmcdonnell@hehg.law |
| 101 Park Avenue New York, NY 10178 | |
| (212) 696-6000 | |
| jpizzurro@curtis.com | |
| kmeehan@curtis.com | *Attorneys for Petróleos de Venezuela, S.A.* |
| jperla@curtis.com | |
| dholmes@curtis.com | |

|  |  |
|---|---|
| OF COUNSEL: | ABRAMS & BAYLISS LLP |
| | |
| Donald B. Verrilli, Jr. | */s/ Christopher Fitzpatrick Cannataro* |
| Elaine J. Goldenberg | A. Thompson Bayliss (#4379) |
| Ginger D. Anders | Christopher Fitzpatrick Cannataro (#6621) |
| MUNGER, TOLLES & OLSON LLP | 20 Montchanin Road, Suite 200 |
| 601 Massachusetts Avenue NW | Wilmington, DE 19807 |
| Suite 500 E | (302) 778-1000 |
| Washington, D.C. 20001 | bayliss@abramsbayliss.com |
| (202) 220-1100 | cannataro@abramsbayliss.com |
| Donald.Verrilli@mto.com | |
| Elaine.Goldenberg@mto.com | *Attorneys for Bolivarian Republic of Venezuela* |
| Ginger.Anders@mto.com | |

George M. Garvey
Adeel Mohammadi
MUNGER, TOLLES & OLSON LLP
350 South Grand Avenue, 50th Floor
Los Angeles, CA 90071
(213) 683-9100
George.Garvey@mto.com
Adeel.Mohammadi@mto.com

July 7, 2025