**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| CRYSTALLEX INTERNATIONAL CORP. | x | |
| | x | |
| Plaintiff | x | |
| v. | x | Case. No. 17 – 151 - LPS |
| BOLIVARIAN REPUBLIC OF VENEZUELA | x | |
| Defendants | x | |
| | x | |
| | x | |

**BLACK LION CAPITAL ADVISORS**
**NOTICE OF OBJECTION TO**
**THE SPECIAL MASTER'S FINAL RECOMMENDATION**

1

In the June 17, 2025 proposal submitted by Black Lion Capital Advisors ("Black Lion") on behalf of the Black Lion CITGO Group LLC to purchase 100% of the shares of CITGO corporate parent PDV Holding Inc. (PDVH), Black Lion requested "full access to the data room and auction protocols" and "confirm[ed] our intent to engage in good faith negotiations with the Special Master and Court-appointed advisors to complete" the transaction described in that proposal.

Black Lion stated "Should the Court or Special Master require any additional information or wish to discuss this proposal further, please do not hesitate to contact the undersigned [Dariell Snapp, Senior Partner, and Richard Zepeda, Director]. We are prepared to address any inquiries and to promptly submit any further documentation in support of our bid as the Court may require."

Despite receiving this acquisition proposal on June 18, 2025, the Special Master's attorneys did not contact Black Lion regarding its request for "full access to the data room" until June 25, 2025, according to Will Hiltz of Evercore, the Special Master's financial advisor, when the "the Special Master and Black Lion executed an NDA, and Evercore provided Black Lion with access to the VDR ("Virtual Data Room"), albeit for less than a day."

On June 25, 2025, after listing a number of so-called "deficiencies," the Special Master informed Black Lion through his attorneys at Weil Gotshal & Manges that Black Lion's bid was "noncompliant with the Bid Requirements and was contingent and unfinalized to a significant degree," according to Will Hiltz, and was disqualified from any further consideration.

On June 26, 2025 Chase Bentley of Weil, Gotshal & Manges, also informed Black Lion on behalf of the Special Master that "[W]e are no longer able to facilitate the Black Lion bid (or any other potential bid) including by executing NDAs and granting access to the data room," citing a "no solicitation" provision in the Stock Purchase Agreement that the Special Master had entered into with Red Tree Investments llc and Red Tree Acquisitions, LLC.

Black Lion objects to the Special Master's Final Recommendation of Gold Reserve's bid, bid, pointing out that, as stated in the Expert Report of Albemarle Capital President Edwin Wells:

A) Black Lion's June 17, 2025 bid—which offers "total combined consideration of up to $12 billion"—is by far the highest bid received by the Special Master.

B) The Special Master's disqualification of the Black Lion bid was improper, given the surrounding circumstances and rulings by the Third US Circuit Court of Appeals that required

2

*maximization of value* for Judgment creditors, as Judge Leonard Stark informed the Special Master on June 24, 2025.

C) By delaying for 7 days, from June 18, when the Court received Black Lion's bid, until June 25 to address Black Lion's bid, inform Black Lion promptly of any perceived "deficiencies" and provide Black Lion with the required NDA—which Black Lion had requested in its June 17, 2025 bid—and then cutting off Black Lion's the Client's access to the Virtual Data Room, preventing Black Lion from carrying out due diligence to complete its bid, finalize its financing arrangements and obtain written commitments from financing sources for the $12 billion referred to in Black Lion's bid—the Special Master prevented Black Lion from satisfying the Bid Requirements.

D) As a result of disqualifying Black Lion's bid, also disqualifying the bids of two other entities for reasons not applicable to Black Lion, the Special Master was left with  (a) Red Tree's bid of $3.806 billion, which was only a fraction of Black Lion's bid, and (b) the Gold Reserve group's bid of $7.382 billion, which was almost $5.0 billion  lower than Black Lion's bid.

E) Neither of those two bids are consistent with the present acquisition value for CITGO's refining and marketing business of $12 billion now, as refinery expert Edwin Wells, Albemarle Capital President, has stated in Albemarle's First Expert Report.

F) CITGO can generate more than $3.0 billion of additional operating profits (EBITDA) per year by carrying out certain operational improvements over the next two years, making CITGO then worth $25 - $30 million or more.

G) However, Gold Reserve and Rusoro Mining lack the knowledge, experience and operating expertise to identify and oversee the operational improvements required to rectify CITGO's very substantial cost-effectiveness problems.

H) Moreover, a senior Koch executive officer informed me that Koch's objective was *not* to operate CITGO or acquire any of its refineries or other assets, but only to make sure that Koch was not deprived of the value of its Judgment claim, which Is less than $500 million.

I) The Court had granted "multiple extensions of the Stalking Horse process" and also granted extensions for the Topping Period, as the Special Master and Evercore knew, as Will Hiltz's Declaration confirms.

J) With Black Lion—which had not participated in the PDVH – CITGO sale process previously and, therefore, did not already have a proposed Stock Purchase Agreement or debt or equity financing commitments for their bid —being the only bidder which submitted a Topping Bid that could *maximize.value* for the judgment creditors, as the Special Master knew the Third US Circuit Court of Appeals and Judge Stark requires, the Special Master should have pursued a very different course of action.

K) By June 25, the Special Master should have recommended that Judge Stark postpone the date for the Special Master to submit his Final Recommendation, at least until 2 weeks after June 25 (*i;e;?*until July 9), to enable Black Lion to finalize its proposed Stock Purchase Agreement and obtain written commitments from the financing sources that would provide the financing for its $12.0 billion bid.

L) But the Special Master did not do that. Instead, he signed Gold Reserve's proposed Stock Purchase Agreement on June 25, terminated Black Lion's access to the VDR, and disqualified Black Lion's bid.

M) Now, after Black Lion submits its proposed Stock Purchase Agreement, the Special Master should request Judge Stark's approval to extend the time for Black Lion to finalize its bid and meet any remaining Bid Requirements for an additional two weeks or more, so Black Lion can confirm that it has the financing for a bid of in excess of $8.0 billion and up to $12.0 billion.

*Dairell Snapp*

Dariell J. Snapp
Senior Partner

July 7, 2025

4