**IN THE UNITED STATES DISTRICT COURT FOR
THE DISTRICT OF DELAWARE**

|  |  |
|---|---|
| CRYSTALLEX INTERNATIONAL CORPORATION,<br><br>             Plaintiff,<br><br>v.<br><br>BOLIVARIAN REPUBLIC OF VENEZUELA,<br><br>             Defendant. | Case No. 17-mc-151-LPS |

**RED TREE INVESTMENTS, LLC'S OBJECTIONS TO THE
SPECIAL MASTER'S FINAL RECOMMENDATION**

## <u>TABLE OF CONTENTS</u>

<u>Page</u>

INTRODUCTION .................................................................................................................... 1

ARGUMENT ........................................................................................................................... 2

I.  Gold Reserve's Bid Does Not Adequately Address Closing Risk .................................... 2

    A.  The Gold Reserve Bid Faces Substantial Litigation Risk....................................... 2

    B.  OFAC Regulations Do Not Mitigate Gold Reserve's Litigation Risk .................................................................................................... 5

    C.  The Special Master's Final Recommendation Does Not Meaningfully Account for Closing Risk ................................................................ 8

II.  The Court Should Require Changes to Gold Reserve's Bid To Address Its Closing Risk ................................................................................................................ 8

III.  The Proposed Sale Order Exceeds the Court's Powers ................................................... 11

CONCLUSION ...................................................................................................................... 15

# <u>TABLE OF AUTHORITIES</u>

Page(s)

## CASES

*Berger v. Zeghibe*,
666 F. App'x. 119 (3d Cir. 2016) ............................................................14

*Blossom v. Milwaukee & Chi. R.R. Co.*,
70 U.S. 196 (1865) ....................................................................................14

*Catalytic, Inc. v. Monmouth & Ocean Cty. Bldg. Trades Council*,
829 F.2d 430 (3d Cir. 1987) .....................................................................14

*Chambers v. NASCO, Inc.*,
501 U.S. 32 (1991) ....................................................................................14

*Crystallex Int'l Corp. v. Bolivarian Rep. of Venezuela*,
No. 17-mc-151, 2022 WL 611586 (D. Del. Mar. 2, 2022) .........................6

*Edward J. DeBartolo Corp. v. Fla. Gulf Coast Bldg. & Constr. Trades Council*,
485 U.S. 568 (1988) ....................................................................................6

*Harrington v. Purdue Pharma L. P.*,
603 U.S. 204 (2024) ..................................................................................13

*Pa. Bureau of Corr. v. U.S. Marshals Serv.*,
474 U.S. 34 (1985) ....................................................................................14

*Peacock v. Thomas*,
516 U.S. 349 (1996) ....................................................................................6

*United States v. Branch Coal Corp.*,
390 F.2d 7 (3d Cir. 1968) .........................................................................14

*United States v. N.Y. Tel. Co.*,
434 U.S. 159 (1977) ..................................................................................14

*United States v. Zimmerman*,
Nos. 22-1730 & 22-2192, 2023 WL 2882696 (3d Cir. Apr. 11, 2023) ............14

*US Bank NA as Tr. for Registered Holders of J.P. Morgan Chase Com. Mortg. Sec. Corp. v. B R Penn Realty Owner LP*,
137 F.4th 104 (3d Cir. 2025) ....................................................................13

*Vintage Rodeo Parent, LLC v. Rent-a-Center., Inc.*,
No. CA 2018-0927-SG, 2019 WL 1223026 (Del. Ch. Mar. 14, 2019) ........9

## STATUTES AND RULES

8 *Del. C.* § 324.................................................................................................................13, 15

11 U.S.C. § 363(f) ...............................................................................................................13

11 U.S.C. § 363(m) .......................................................................................................12, 13

28 U.S.C. § 1291 .................................................................................................................12

28 U.S.C. § 1292 .................................................................................................................12

28 U.S.C. § 1651 .................................................................................................................13

31 C.F.R. § 591.310 ..............................................................................................................6

Fed. R. Civ. P. 69(a) ...........................................................................................................13

## OTHER AUTHORITIES

Brian JM Quinn, *Optionality in Merger Agreements*,
　　35 Del. J. Corp. L. 789 (2010) ......................................................................................9

Exec. Order No. 13835(1)(a)(iii), 83 Fed. Reg. 24,001 (May 21, 2018).........................5

Houlihan Lokey, *2024 Transaction Termination Fee Study*, (April 2025)
　　http://bit.ly/4f38od9 ......................................................................................................9

Koch, Inc., "Flint Hills Resources,"
　　http://bit.ly/4eRBCeW ..................................................................................................11

U.S. Dep't of Treasury, *General License No. 5S* (June 20, 2025),
　　http://bit.ly/3GJAUE6 ....................................................................................................5

U.S. Dep't of Treasury, *General License No. 9H* (Oct. 18, 2023),
　　http://bit.ly/4lEwy02 ..................................................................................................6, 7

U.S. Dep't of Treasury, *Venezuela Sanctions FAQ No. 595* (Nov. 7, 2024),
　　http://bit.ly/3GGxyBL ....................................................................................................5

U.S. Dep't of Treasury, *Venezuela Sanctions FAQ No. 808* (May 1, 2023),
　　http://bit.ly/4o5q4cb ......................................................................................................6

U.S. Dep't of Treasury, *Venezuela Sanctions FAQ No. 1123* (May 1, 2023),
　　http://bit.ly/4kJjpla .........................................................................................................7

U.S. Dep't of Treasury, *Venezuela Sanctions FAQ No. 1124* (May 1, 2023),
　　http://bit.ly/3GVn1CF .................................................................................................6, 7

U.S. Courts, *Judicial Business of the U.S. Courts*, Table B-4A (Sept. 30, 2024),
http://bit.ly/44MusUA..................................................................................................................4

Red Tree hereby objects as follows to the *Special Master's Final Recommendation*, D.I. 1837, that the Court choose Dalinar Energy Corporation, a Gold Reserve affiliate, as winning bidder to purchase the PDVH shares.

## INTRODUCTION

As the Court, the Special Master, and senior creditors have acknowledged, any successful bid must address the closing risk posed by the 2020 Bondholders. Gold Reserve's bid does not do that. The 2020 Bondholders have already indicated they will seek to prevent a sale if Gold Reserve's bid is chosen. If those efforts succeed, the Court may have to start from scratch. At a minimum, a showdown with the 2020 Bondholders could delay closing by a year or more, draining millions that should go to creditors.

Red Tree no longer objects on the basis that the Court should pick its bid instead of Gold Reserve's.[1] But if the Court proceeds with Gold Reserve's bid, substantial changes are needed to protect senior creditors who bear the risk that the bid will not close. The Court should shift more of that risk to Gold Reserve by requiring Gold Reserve to increase its nonrefundable cash deposit to a market-standard three percent of the transaction amount. It should clarify that the Special Master may promptly terminate Gold Reserve's SPA—and pivot to another bid—if the 2020 Bondholders' litigation prevents that bid from closing as currently structured. It should confirm that Gold Reserve will not receive any expense reimbursement if its deal falls through because of the 2020 Bondholders' litigation. And it should require Gold Reserve to take more concrete steps to address another risk—that the participation of Koch, a CITGO competitor, in its bid will prevent that bid from being approved by U.S. antitrust authorities.

---

[1] However, Red Tree reserves the right to submit a revised bid at a later date, whether as a bid to be chosen as Successful Bidder instead of Gold Reserve or as a fallback bid in case the Gold Reserve bid cannot close because of the 2020 Bondholders' litigation.

Separately, the Court should reject the proposed sale order. The proposal purports to impose sweeping releases, a channeling injunction, and a limit on parties' ability to appeal. But the Court does not have the power to grant such relief outside of bankruptcy cases. And where Congress has imposed conditions on the judiciary's power to grant a form of relief, neither the All Writs Act nor a court's inherent authority allows courts to legislate their own exceptions.

## ARGUMENT

### I. GOLD RESERVE'S BID DOES NOT ADEQUATELY ADDRESS CLOSING RISK

#### A. The Gold Reserve Bid Faces Substantial Litigation Risk

The Court's stalking horse order recognized "the reality that a successful bid in the Sale Process ***must***, in one way or another, address the litigation risk posed by the 2020 Bondholders, as this risk (however great or small it may be) impacts the assessment of certainty of closing." D.I. 1741 at 4 (emphasis added); *see* D.I. 1552-1 at 8-9 (as approved and modified by D.I. 1554).[2] But Gold Reserve's bid does nothing to address that risk. Indeed, the Special Master declined to recommend Gold Reserve's bid at the stalking horse phase, in part because of the "virtual certainty" that the 2020 Bondholders would litigate to stop any sale on Gold Reserve's proposed terms. D.I. 1596 at 14.[3]

---

[2] Other parties have similarly highlighted the unacceptable risk to closing incorporated in Gold Reserve's bid. *See, e.g.*, D.I. 1847 at 2 (Crystallex) (objecting that "the bid did nothing to solve the certainty-of-closing problems identified at the Stalking Horse stage"); D.I. 1854-2 (Apr. 17, 2025 Hearing Tr.) at 168:16-20 (Crystallex); D.I. 1844 at 1 (Huntington Ingalls Inc.) (similar).

[3] The Southern District of New York's recent decision denying (without prejudice) the 2020 Bondholders' motion to set a schedule for a preliminary injunction motion does not alleviate the risk. *See Petroleos de Venezuela S.A. v. MUFG Union Bank, N.A.*, No. 19 Civ. 10023, D.I. 390 (S.D.N.Y. July 17, 2025). In that order, Judge Failla merely held that, "[g]iven that it is not clear that the decisions of this Court and of Judge Stark will be issued on conflicting time frames, [she] s[aw] no need at this time to issue such a schedule." *Id.* at 2. That scheduling order does not reduce the risk that the 2020 Bondholders can take action to prevent the Gold Reserve transaction from closing.

During the June 24 *ex parte* hearing, the Special Master admitted that Gold Reserve's current bid has the same problematic terms. D.I. 1840-1 at 51:13-14; 52:22-53:17, 55:14-22. As the Special Master explained, the Gold Reserve transaction has a three-step structure that will impair the 2020 Bondholders' asserted lien. D.I. 1837 at 28-29. *First*, a special purpose vehicle, Adolin Holdings, would take on a $4.5 billion secured bridge loan from Gold Reserve's financing sources. *Id. Second*, Adolin would use the proceeds of that loan to pay Sale Process Parties and Additional Judgment Creditors in cash before closing. *Id.* And, *third*, Adolin would then merge with CITGO Petroleum, leaving CITGO Petroleum the obligor on the $4.5 billion bridge loan. *Id.*

The 2020 Bondholders have already asserted that this three-step process impairs their 50.1% security interest in the CITGO Holding equity by loading their collateral with billions of dollars of debt. *See, e.g.*, *Petroleos de Venezuela S.A. v. MUFG Union Bank, N.A.*, No. 19 Civ. 10023, D.I. 384, at 2-4 (S.D.N.Y. July 7, 2025). The Sales Process Parties took similar positions at the stalking horse phase. *See* D.I. 1657 at 1 (Huntington Ingalls); D.I. 1658 at 3 (Crystallex); D.I. 1659 at 4-5 (ConocoPhillips). Even Gold Reserve's bid now acknowledges that a payment of up to $1.8 billion to the 2020 Bondholders may be necessary to address their litigation risk (though Gold Reserve has not actually secured committed financing for that purpose, nor is there evidence that the 2020 Bondholders would accept a 35% discount on their claim). *See* D.I. 1837-1 at 566. While Gold Reserve claims that it has taken steps to face that risk, *see* D.I. 1837-1 (Final Bid Letter) at 575-576, the Special Master is far more candid: The latest Gold Reserve bid "makes no improvement whatsoever on . . . addressing the 2020s' risk." D.I. 1840-1 at 52:22-53:5.

That risk will not be resolved soon. Any challenge to the sale will take time, and appeals are certain to follow no matter who prevails. The median time to resolve a civil appeal in the Second Circuit is almost a full year (11.8 months). An appeal of the complex issues presented

here is likely to take much longer. Indeed, a prior appeal in the 2020 Bondholders' pending litigation took almost **24 months** from entry of judgment in the district court to the issuance of the Second Circuit's decision. U.S. Courts, *Judicial Business of the U.S. Courts*, Table B-4A, http://bit.ly/44MusUA (Sept. 30, 2024); *see Petroleos de Venezuela S.A. v. MUFG Union Bank, N.A.*, No. 19 Civ. 10023, D.I. 215 (Opinion and Order dated Oct. 16, 2020); 51 F.4th 456, 459 (2d Cir. 2022) (opinion dated Oct. 13, 2022). The time to resolution for appeals in the Third Circuit is similar, at approximately 11.7 months. U.S. Courts, *supra*.[4]

And if the 2020 Bondholders succeed in preventing a sale on Gold Reserve's terms, the Special Master tells us that "we may be back into this a year from now," having "incurred substantial fees." D.I. 1840-1 at 51:13-14, 55:18-19. The sale process would begin again for a third time, burning through millions more in the Special Master's fees and expenses.[5] And rather than finally being paid the debt that they are owed after years of waiting, Attached Judgment Creditors would be forced to pay even more in out-of-pocket legal fees to pursue collection.

Notably, the Gold Reserve consortium bears almost none of this risk. Gold Reserve has put up no more cash in support of its bid other than its required $50 million deposit, D.I. 1837-1 at 572, instead choosing to finance 99% of its $7.53 billion bid solely through credit bidding and billions of dollars of CITGO Petroleum debt that will lead to litigation from the 2020

---

[4] Even if the 2020 Bondholders lose the summary judgment motions pending in the Southern District of New York, they may be able to obtain interim relief while they pursue an appeal of that decision, adding yet another layer of uncertainty and potential for delay.

[5] *See, e.g.*, D.I. 1800 at 4-5 (reporting $1.9 million in fees and expenses for the period between February 1, 2025, and February 28, 2025); D.I. 1742 at 4-5 (reporting nearly $1.8 million in fees and expenses for the period between January 1, 2025, and January 31, 2025); D.I. 1584 at 6 (reporting $6.1 million in fees and expenses for the period between October 1, 2024, and December 31, 2024).

Bondholders.[6]  The risk of that financing will be borne by senior creditors which already have waited years to be paid.  Gold Reserve may be willing to bet the sale process on the outcome of the 2020 Bondholders' litigation, but the Court has made clear that more is required of a winning bid.

### B.    OFAC Regulations Do Not Mitigate Gold Reserve's Litigation Risk

Gold Reserve's principal argument why the 2020 Bondholders cannot block its transaction is that OFAC's suspension of General License 5 ("GL-5") "reduces" or "eliminates" the 2020 Bondholders' remedies.  D.I. 1816 at 2; *see also* D.I. 1837-1 at 575.  It does not.  GL-5 exempted transactions related to the 2020 Bonds from sanctions.  *See* U.S. Dep't of Treasury, *General License No. 5S*, http://bit.ly/3GJAUE6 (June 20, 2025); U.S. Dep't of Treasury, *Venezuela Sanctions FAQ No. 595*, http://bit.ly/3GGxyBL (Nov. 7, 2024).   Although GL-5's suspension means that the sanctions still apply, those sanctions do not prevent the 2020 Bondholders from seeking and obtaining an injunction to stop the sale.

The governing sanctions regime here stems from Executive Order 13835, which bars "transfer[s]" of "equity interest[s] in" entities majority-owned by Venezuela.  Exec. Order No. 13835(1)(a)(iii), 83 Fed. Reg. 24,001 (May 21, 2018) (attached as Exhibit A).  The order says nothing about ***preventing*** a transfer of equity interests, which is what the 2020 Bondholders have indicated they intend to do.  *See, e.g.*, *Petroleos de Venezuela, S.A. v. MUFG Union Bank N.A.*, No. 19 Civ. 10023, D.I. 384, at 4 (S.D.N.Y. July 7, 2025).  Nor do the relevant regulations implementing the executive order forbid ***asking*** a court for such relief.  Those regulations define transfers as "act[s] or transaction[s] . . . the purpose, intent, or effect of which is to create,

---

[6]  The $7.53 billion bid represents Gold Reserve's expected purchase price, which assumes a closing date of December 31, 2026.  D.I. 1837-1 at 570.

surrender, release, convey, transfer, or alter, directly or indirectly, any right, remedy, power, privilege, or interest with respect" to property.  31 C.F.R. § 591.310.  Seeking an injunction to ***prevent*** property rights from being altered does not fit that description.[7]

Consistent with the regulations' plain meaning, OFAC has consistently distinguished between legal action to preserve interests in property and action taken to enforce such interests. Protective actions, such as filing lawsuits or writs of attachment, ***do not*** require a license.  *See* U.S. Dep't of Treasury, *Venezuela Sanctions FAQ No. 808*, http://bit.ly/4o5q4cb (May 1, 2023).  Only actions to enforce rights, such as "execution, garnishment, or other judicial process purporting to transfer or otherwise alter or affect property or interests in property" do.  *Id*.  Even if seeking an injunction to prevent a transfer could somehow be construed as a forbidden "transfer," OFAC has said that it "will not take enforcement action against any person for taking steps to preserve the ability to enforce" the 2020 Bondholders' rights.  U.S. Dep't of Treasury, *Venezuela Sanctions FAQ No. 1124*, http://bit.ly/3GVn1CF (May 1, 2023).[8]

Moreover, even if a license ***were*** necessary, in General License 9H, OFAC has categorically permitted any dealings "that are ordinarily incident and necessary to dealings in any debt . . . in, Petróleos de Venezuela, S.A. (PDVSA)."  U.S. Dep't of Treasury, *General License*

---

[7]  The Venezuela parties have argued that an injunction to prevent the sale would necessarily "be premised on the transfer of rights over equity in [CITGO Holding] shares."  D.I. 1825 at 2.  That is incorrect.  The 2020 Bondholders claim ***existing*** rights to CITGO Holding equity under the pledge agreement.  *See* D.I. 1675-1.  An injunction to prevent a sale that threatens those rights would neither require nor constitute a "transfer" of anything.  In any event, there is nothing stopping the 2020 Bondholders from seeking an injunction pending OFAC authorization.

[8]  As this Court has recognized, any effort by OFAC to interfere in a court-ordered sale of property "would unnecessarily implicate serious separation-of-powers concerns."  *Crystallex Int'l Corp. v. Bolivarian Rep. of Venezuela*, No. 17-mc-151, 2022 WL 611586 (Stark, J.) (D. Del. Mar. 2, 2022) (citing *Peacock v. Thomas*, 516 U.S. 349, 356 (1996)); *see Edward J. DeBartolo Corp. v. Fla. Gulf Coast Bldg. & Constr. Trades Council*, 485 U.S. 568, 577 (1988) (agency actions should be construed to avoid "serious constitutional concerns").

*No. 9H*, http://bit.ly/4lEwy02 (Oct. 18, 2023).  The only exception to General License 9H is that creditors may not engage in the "unblocking" of any property.  *Id.*  Taking legal action to protect the 2020 Bondholders' collateral interest in CITGO Holding would be incident to their holdings in the 2020 Bonds issued by PDVSA, and that action would not involve the unblocking of any property.  Together with the FAQs, General License 9H makes clear that the 2020 Bondholders are permitted to seek judicial relief if necessary to prevent Gold Reserve's transaction.

Finally, even if a license were necessary, ***and*** if General License 9H did not apply, OFAC has made clear that it is "committed to fair and equivalent treatment of potential creditors."  U.S. Dep't of Treasury, *Venezuela Sanctions FAQ 1123*, http://bit.ly/4kJjpla (May 1, 2023).  Just as OFAC has permitted the 2020 Bondholders to take actions to preserve their rights, it has permitted participants in these proceedings to take action to ensure a value-maximizing sale.  *Compare id.* (announcing non-enforcement policy with respect to participation in the sales process), *with* FAQ 1124.  There is no reason to think OFAC would suddenly change course and pick a winner in the home stretch by barring the 2020 Bondholders from seeking relief (or settling with Red Tree) while granting a license for the Gold Reserve transaction.

Gold Reserve urges that the most recent suspension of GL-5 until after the Sale Hearing somehow shows that OFAC has decided to lock out the 2020 Bondholders.  D.I. 1816 at 2.  Just the opposite.  The suspension ***confirms*** OFAC's continued commitment to staying on the sidelines. It ensures that the participants in any sale this Court approves are on equal footing with the 2020 Bondholders—all are subject to E.O. 13835, and all will need a specific license before engaging in transfers of blocked property.  OFAC has made clear "it would be premature to issue any such license or express a definitive view on the issuance of a specific license in a future scenario" until "a potential purchaser has been identified."  FAQ 1123.

### C.    The Special Master's Final Recommendation Does Not Meaningfully Account for Closing Risk

The Special Master asserts that "he does not believe" the risk of a blocked deal outweighs the higher nominal value of Gold Reserve's bid.  D.I. 1837 at 33, ¶82(b); *see also* D.I. 1838 at 17-18, ¶53.  But there is no reason to defer to the Special Master's say-so, even leaving aside the Court's *de novo* standard of review.  *See* D.I. 1728 at 1.  The Sale Procedures Order defines a "Successful Bid" as "the highest Qualified Bid(s) that the Special Master *reasonably* believes to be capable of being timely consummated . . . . "  D.I. 481 at 16-17, ¶12 (emphasis added).  And there is nothing in the record that would allow the Court to determine on what basis the Special Master concluded that Gold Reserve's proposed transaction is "capable of being timely consummated"—let alone whether that basis is "reasonable."

Nor has the Special Master shown that *anyone* has seriously considered the 2020 Bondholders' risk in choosing the Gold Reserve transaction.  He dismisses Gold Reserve's own risk assessment as "mostly conclusory and frankly, arbitrary."  D.I. 1840-1 at 52:9-10; D.I. 1837 at 33, ¶82(b) n.20.  That is not encouraging.  The Special Master also says that he relied "primarily" on an unspecified "analysis provided by his Advisors."  D.I. 1837 at 33, ¶82(b) n.20.  But that is not much better.  The Special Master has not produced that "analysis" or explained what else he considered.  The Special Master cannot wave away a clear threat to closing, D.I. 481 at 16-17, ¶12, or fail to account for it in his valuation of competing bids, *see* D.I. 1741 at 4.  The Court cannot rely on the Special Master's say-so to accept the Gold Reserve bid without modification.

## II.    THE COURT SHOULD REQUIRE CHANGES TO GOLD RESERVE'S BID TO ADDRESS ITS CLOSING RISK

The Gold Reserve bid imposes unacceptable closing risk on Additional Judgment Creditors who have waited years to be paid.  Red Tree respectfully requests that, if the Court approves Gold Reserve's bid, it should take four additional steps to protect creditors from that risk.

*First*, the Court should require Gold Reserve to increase the amount of its nonrefundable good-faith deposit. As it stands, Gold Reserve has almost no incentive to protect its proposed transaction against litigation risk from the 2020 Bondholders, because it is contributing almost no new money to its bid. Gold Reserve's current deposit makes up only ***0.66%*** of its purported purchase price. *See* D.I. 1837-1 at 570-72 (describing $50 million deposit as the only new cash component of a $7.53 billion purchase price). The remaining 99.34% of Gold Reserve's bid is funded either by debt to be repaid by CITGO Petroleum or by the consortium's credit bidding of their judgments. *See id*. If a bid with such enormous leverage is approved, Gold Reserve would be motivated to gamble the success of its bid on the 2020 Bondholders' litigation, because it bears almost none of the risk that bid will fail. Instead, the risk falls on senior creditors.

A more appropriate approach would be for Gold Reserve to pay three percent of its purchase price—*i.e.*, $225 million—in cash as a nonrefundable deposit. "Reverse termination fees" of that size that a buyer must pay if the transaction does not close are market standard. A study by Houlihan Lokey finds that, of 123 M&A transactions in 2024, 69.1% had reverse termination fees, with a median fee of 3.8% of the transaction value. Houlihan Lokey, *2024 Transaction Termination Fee Study*, http://bit.ly/4f38od9 (April 2025); *see also* Brian JM Quinn, *Optionality in Merger Agreements,* 35 Del. J. Corp. L. 789, 811 (2010) (conducting a study of reverse termination fees from 2003 to 2008 and finding an average of 3.29% of transaction value). Similarly, Delaware courts have repeatedly found termination fees of around three percent of the transaction value to be reasonable. *See, e.g.*, *Vintage Rodeo Parent, LLC v. Rent-a-Center., Inc.*, No. CA 2018-0927-SG, 2019 WL 1223026, at *1 n.1 (Del. Ch. Mar. 14, 2019) (collecting cases). And in a related context, the Court has already approved a termination fee for a stalking horse bidder of up to three percent of the consideration to Attached Judgment holders. D.I. 1528-1 at 2

9

(objections overruled by D.I. 1554). Requiring Gold Reserve to pay a three percent deposit would perform a similar purpose by aligning Gold Reserve's incentives with creditors and requiring Gold Reserve to bear more of its own deal's closing risk.

**Second**, Red Tree joins in Crystallex's objection that the SPA should be amended to give the Special Master a prompt termination right if the Gold Reserve bid cannot close in its current form because of litigation from the 2020 Bondholders. *See* D.I 1847 at 3-4. As Crystallex observes, the current SPA contains only a general right for the Special Master to terminate if Gold Reserve breaches its covenant to "maintain in effect" its financing, and if that breach cannot be cured within 45 days. D.I. 1847 at 2; D.I. 1837-1 § 6.9 at 103; *id.* § 8.1(f) at 118. Crystallex is correct that, if the Special Master attempts to terminate based on an adverse ruling in the 2020 Bondholders' litigation, protracted litigation could well result that will, at best, waste time and, at worst, coerce the Special Master to stick with a nonviable bid against creditors' interests. To prevent that risk, the Court should revise the SPA to provide that, in the event of (1) a decision from the Southern District of New York holding that the 2020 Bonds are enforceable and valid or (2) any other event which legally prevents the Gold Reserve transaction from closing in its current form, the Special Master may terminate the SPA unless Gold Reserve can secure alternate financing within 30 days.

**Third**, the Court should confirm that Gold Reserve will not receive any expense reimbursement if the SPA is terminated because of the 2020 Bondholders' litigation. The current SPA provides Gold Reserve an expense reimbursement of up to $30 million if certain triggers are met. D.I. 1837-1 § 8.3 at 119; *id.* at 139. If the Court approves Gold Reserve's bid, the expense reimbursement right may be triggered by, among other reasons, the Special Master's breach of the SPA or a Material Adverse Effect. *Id.* § 8.3(a) at 119. If triggered in that way, the reimbursement

10

will be paid by Additional Judgment Creditors out of the proceeds of any subsequent share sale. *Id.* However, because Gold Reserve's bid carries such obvious risk of being blocked by the 2020 Bondholders, Additional Judgment Creditors should not have to insure Gold Reserve against that risk. As a result, the Court should clarify that Gold Reserve should not receive any expense reimbursement if litigation relating to the 2020 Bondholders causes the SPA to be terminated.

**Fourth**, as Crystallex has noted, the 2020 Bondholders' litigation is not the only risk to closing that the Gold Reserve bid faces. *See* D.I. 1847 at 5-6. Under Gold Reserve's proposed transaction, equity in CITGO's new corporate parent, Dalinar Energy, would be given to Koch, which operates oil refineries that compete with CITGO. D.I. 1837-1 at 570; *see, e.g.*, Koch, Inc., "Flint Hills Resources," http://bit.ly/4eRBCeW (describing Koch's refining business). Koch's acquisition of a competitor may create regulatory hurdles to closing. *See* D.I. 1847 at 5-6. Moreover, as Crystallex has observed, Koch's current commitments to address antitrust concerns may be insufficient. *See id.* Red Tree therefore joins Crystallex's objection that the SPA should be amended to specifically require the Gold Reserve consortium and each of its members to take specific actions required by law, including, if needed, relinquishing board seats or proposing an alternative investment vehicle through which Koch (or any other consortium member) will invest in Dalinar. *See id*.

## III.    THE PROPOSED SALE ORDER EXCEEDS THE COURT'S POWERS

Separately, the Court must reject Gold Reserve's proposed sale order because it exceeds the Court's powers. Despite insisting that the 2020 Bondholders can be safely ignored, Gold Reserve's proposed sale order includes sweeping measures to end-run the 2020 Bondholders' litigation. *See* D.I. 1837-1 at 2-35. Among other provisions, the sale order purports to:

- Dictate that a wide range of "Notice Parties," including the Additional Judgment Creditors, Sales Process Parties, and 2020 Bondholders, have "no recourse against" Gold Reserve or its affiliates "on account of those parties' respective judgments or

11

other Claims against the Republic, PDVSA, or their respective Affiliates," D.I. 1837-1 at 16; *see also id.* at 25 (similar);

- "[P]rohibit[ ] and enjoin[ ]" "all Persons" from "taking any action that adversely affects, interferes with, is likely to frustrate or is in any way inconsistent with the ability of the Special Master or his Advisors and agents to transfer the PDVH Shares to Buyer in accordance with the Transaction Documents and this Order," *id.* at 22;

- Enjoin all creditors of the Republic, PDVSA, PDVH, or CITGO from pursuing any "Claims against the Republic, PDVSA, or the PDVH Shares, arising under or out of, in connection with, or in any way relating to, the Republic, PDVSA, the PDVH Shares prior to the Closing, the operation of PDVH or ownership of the PDVH Shares by PDVSA prior to the Closing, or the Sale Transaction," *id.* at 27-28;

- Bar "any other person or entity" from "interfer[ing] with Buyer's title to or use and enjoyment of the PDVH Shares based on or related to such adverse interest or any actions that Buyer, Buyer Affiliates, PDVH, PDVH's subsidiaries and Affiliates (including CITGO Holding, Inc. and CITGO), the Republic or PDVSA have taken or may take related to the Sale Transaction, this Action or any related action," *id.* at 31;

- Dictate that, despite the parties' rights to appeal the sale order, *see* 28 U.S.C. §§ 1291, 1292, "the reversal or modification on appeal of the authorization provided herein of the Sale Transaction shall neither affect the validity of the Sale Transaction nor the transfer of the PDVH Shares to Buyer free and clear of Claims, unless such authorization is duly stayed before the Closing Date pending such appeal," *id.* at 33; and

- Order that "no entity or person, . . . may commence or pursue any cause of action of any kind that arose or arises from, in whole or in part, the Special Master Order, the Sale Procedures Order, the Bidding Procedures, this Order, any other orders of this Court in this Action, or any cause of action related to the Sale Transaction, without this Court (i) first determining, after notice and a hearing, that such cause of action represents a colorable claim against such party and (ii) specifically authorizing such entity or person to bring such cause of action against such party," *id.* at 34-35.

The obvious thrust of these provisions is to prevent the 2020 Bondholders from suing Gold Reserve or its financing sources. D.I. 1837-1 at 26-27, 34-35. The sale order even purports to shield "the validity of the Sale Transaction" from appeal absent a stay, *see id.* at 33, as if the share sale were a bankruptcy asset sale, *cf.* 11 U.S.C. § 363(m) (providing identical limits on appeals from bankruptcy asset sales). But this is not a bankruptcy proceeding. The Court lacks the power to cut off the 2020 Bondholders' litigation in the way that Gold Reserve seeks.

This judicial sale has proceeded for years under 8 *Del. C.* § 324, a statute that permits the Court to sell the PDVH shares to satisfy judgment creditors' claims. *See* D.I. 481 at 5-6 (Sale Procedures Order invoking § 324).[9]  But as the Court has recognized, all Section 324 empowers it to do is to " 'sell the PDVH shares and distribute the proceeds to creditors, in cash.' "  D.I. 1583 at 2 (quoting D.I. 1572 at 4).  For that reason, the Court already rejected attempts to use Section 324 to provide bankruptcy-style protections such as "cramming down" creditors' claims.  *See* D.I. 1583 at 1-2.  The same result is required here.  Nothing in Section 324 authorizes the Court to grant releases, enjoin litigation, or frustrate litigants' appellate rights.

Federal law also does not provide that authority.  The Special Master cites the All Writs Act, 28 U.S.C. § 1651.  D.I. 1837 at 40-41; *see also* D.I. 1837-1 at 24, 26-27, ¶¶ 6, 13.  But this Court has rejected prior attempts to use the Act in similar circumstances, ruling that enjoining ancillary litigation falls outside the "narrow circumstances" in which the " 'extraordinary powers' conferred on federal courts by the All Writs Act" can be exercised.  D.I. 1515 at 12.

For good reason.  Congress has empowered courts to grant non-consensual third-party releases, broadly strip liens, and limit appellate rights—***in the Bankruptcy Code***.  *See, e.g.*, 11 U.S.C. §§ 363(f), 363(m); *but see Harrington v. Purdue Pharma L. P.*, 603 U.S. 204, 227 (2024) (holding that the Bankruptcy Code does "not authorize a release and injunction that . . . effectively seeks to discharge claims against a nondebtor without the consent of affected claimants").  "Where

---

[9]  Specifically, this procedure involves a court-ordered judicial sale to satisfy a judgment governed by Federal Rule of Civil Procedure 69(a).  D.I. 481 at 5-6 (listing statutory and legal predicates for authority over sale procedure); *see also US Bank NA as Tr. for Registered Holders of J.P. Morgan Chase Com. Mortg. Sec. Corp. v. B R Penn Realty Owner LP*, 137 F.4th 104, 114 n.8 (3d Cir. 2025) (seeing "no reason" why federal money judgment creditors could not seek a judicial sale, rather than an execution sale, to satisfy the judgment, in which case Fed. R. Civ. P. 69(a) would apply).  Thus, the judicial sale must "accord with the procedure of the state where the court is located, but a federal statute [here, 28 U.S.C. § 2004] govern[s] to the extent it applies." *J.P. Morgan Chase*, 137 F.4th at 114 n.8 (citing Fed. R. Civ. P. 69(a)).

a statute specifically addresses the particular issue at hand, it is ***that*** authority, and not the All Writs Act, that is controlling." *Pa. Bureau of Corr. v. U.S. Marshals Serv.*, 474 U.S. 34, 43 (1985) (emphasis added). The All Writs Act "does not authorize [courts] to issue ad hoc writs whenever compliance with statutory procedures appears inconvenient or less appropriate." *Id.*; *see Chambers v. NASCO, Inc.*, 501 U.S. 32, 44 (1991) ("Because of their very potency, inherent powers must be exercised with restraint and discretion."). Nor does a court's authority to set the "terms and conditions" of a judicial sale—which focuses on sale ***procedures***—permit the kind of sweeping relief the Special Master seeks here. D.I. 1837 at 36. None of the cases cited by the Special Master suggest otherwise. D.I. 1837 at 36, 40-41.[10]

Moreover, the proposed order is inconsistent with the Court's orders governing the sale process. The Court has recognized that it "cannot intentionally take actions to interfere with or deprive [the 2020 Bondholders] of whatever rights they have." *See, e.g.*, D.I. 1840-1 at 49:5-8; *see* D.I. 1507 (Dec. 13, 2024 Hearing Tr.) at 126:21-23 (counsel for Special Master agreeing that SPA terms should not impair the 2020 Bondholders' rights). "[T]he Court's obligation" is to run these proceedings "in a manner designed to maximize" the PDVH shares' value. D.I. 1515 at 8. It is "***not*** to prevent all other claims that impact the value of the shares." *Id.* (emphasis added). To

---

[10] *United States v. N.Y. Tel. Co.*, 434 U.S. 159, 172 (1977) (invoking the All Writs Act to compel a telephone company to provide assistance in installing a pen register); *Berger v. Zeghibe*, 666 F. App'x. 119, 121 (3d Cir. 2016) (relying on All Writs Act in conjunction with Pennsylvania state law to enjoin payments to a third party and redirect them into an escrow account); *Catalytic, Inc. v. Monmouth & Ocean Cty. Bldg. Trades Council*, 829 F.2d 430, 434 (3d Cir. 1987) (discussing the power of federal courts to enjoin third parties under the All Writs Act in the context of a labor dispute); *United States v. Branch Coal Corp.*, 390 F.2d 7, 10 (3d Cir. 1968) (challenging an order declaring a winning bidder would forfeit a deposit if the sale failed to close); *United States v. Zimmerman*, Nos. 22-1730 & 22-2192, 2023 WL 2882696, at *2 (3d Cir. Apr. 11, 2023) (holding that " a sale can include the timeline for vacating the property and the maintenance of the property pending the sale"); *Blossom v. Milwaukee & Chi. R.R. Co.*, 70 U.S. 196, 210 (1865) (finding that a marshal had discretion to repeatedly adjourn the date of a judicial sale).

that end, the Court held that it "is not [ ] marketing [the] PDVH Shares free and clear of whatever claims, encumbrances, and liabilities are, have been, or may be attached to any asset or subsidiary of PDVH." D.I. 1515 at 20. Gold Reserve's sale order purporting to shield itself from litigation over the 2020 Bondholders' claims defies that ruling. *See* pp. 12-13, *supra*.

The Court should reject the proposed sale order as written. Doing so would both ensure that the Gold Reserve bid complies with Delaware law and reduce the transaction's closing risk. Approving the sale order as written would invite further litigation from the 2020 Bondholders, the Venezuela Parties, and others that would further delay when creditors can be paid. There is no basis to prompt that litigation by exceeding the scope of the Court's powers under Section 324.

## CONCLUSION

The Court should reject Gold Reserve's proposed form of sale order and direct the following amendments to Gold Reserve's SPA: (1) requiring Gold Reserve to make a nonrefundable good-faith deposit of no less than $225 million; (2) clarifying that the Special Master may promptly terminate the SPA in the event of (a) a decision from the Southern District of New York holding that the 2020 Bonds are enforceable and valid or (b) any other event which legally prevents the Gold Reserve transaction from closing in its current form, and Gold Reserve does not secure alternate financing sufficient to close within 30 days; (3) clarifying that Gold Reserve will not receive any expense reimbursement if the SPA is terminated due to litigation relating to the 2020 Bondholders; and (4) requiring the Gold Reserve consortium and each of its members to take specific actions required by regulatory authorities.

15

Dated:  July 24, 2025

/s/ *Jennifer L. Cree*

Steven F. Molo (*pro hac vice*)
Justin M. Ellis (*pro hac vice*)
Mark W. Kelley (*pro hac vice*)
MOLOLAMKEN LLP
430 Park Avenue, 6th Floor
New York, NY  10022
Tel.: (212) 607-8170
smolo@mololamken.com
jellis@mololamken.com
mkelley@mololamken.com

Rebecca Butcher (#3816)
Jennifer L. Cree (#5919)
LANDIS RATH & COBB LLP
919 Market Street, Suite 1800
Wilmington, DE  19801
Tel.: (302) 467-4400
butcher@lrclaw.com
cree@lrclaw.com

*Counsel for Red Tree Investments, LLC*