# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| CRYSTALLEX INTERNATIONAL CORP., | |
|     Plaintiff, | |
|     v. | Misc. No. 17-151-LPS |
| BOLIVARIAN REPUBLIC OF VENEZUELA, | |
|     Defendants. | |

**2020 BONDHOLDERS' MEMORANDUM IN SUPPORT OF OBJECTION TO THE SPECIAL MASTER'S FINAL RECOMMENDATION**

## <u>TABLE OF CONTENTS</u>

**PAGE**

PRELIMINARY STATEMENT ........................................................................................1

BACKGROUND ........................................................................................................2

    I.      PDVSA 2020 Bonds and the MUFG Litigation ................................... 2

    II.     Crystallex Proceedings and Section 324 Sale ...................................... 4

    III.    Final Recommendation and Proposed Sale Order ................................ 5

ARGUMENT ..........................................................................................................11

    I.      The Court Should Reject the Release and Injunctive Provisions Contemplated by the Proposed Sale Order .......................................... 11

         A.     The Court Lacks the Authority to Order Non-Consensual Third-Party Releases .......................................................... 15

         B.     The Court Lacks the Authority to Order the Injunctive Relief Contemplated by the Proposed Sale Order ............................... 17

    II.     The Court Lacks the Authority to Compel Performance by PDVH's Subsidiaries, Including CITGO Holding ............................................. 21

CONCLUSION........................................................................................................22

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Air Prods. and Chemicals, Inc.* v. *Gen. Services Admin.*,
  700 F. Supp. 3d 487 (N.D. Tex. 2023) ...................................................................16

*Ameron, Inc.* v. *U.S. Army Corps of Eng'rs*,
  787 F.2d 875 (3d Cir. 1986)...............................................................................20

*Ameron, Inc.* v. *U.S. Army Corps of Eng'rs*,
  809 F.2d 979 (3d Cir. 1986)...............................................................................20

*Berger* v. *Zeghibe*,
  666 F. App'x 119 (3d Cir. 2016) .........................................................................18

*Buechner* v. *Farbenfabriken Bayer Aktiengesellschaft*,
  154 A.D.2d 684 (Del. Ch. 1959).........................................................................22

*Chase Nat'l. Bank* v. *City of Norwalk*,
  291 U.S. 431 (1934)...........................................................................................17

*eCommerce Industries, Inc.* v. *MWA Intelligence, Inc.*,
  2013 WL 5621678 (Del. Ch. Sept. 30, 2013) .....................................................22

*Eichenholtz* v. *Brennan*,
  52 F.3d 478 (3d Cir. 1995)..................................................................................17

*Gracey* v. *Albawardi*,
  2024 WL 5116368 (Del. Ch. Dec. 13, 2024).......................................................22

*Grider* v. *Keystone Health Plan Cent., Inc.*,
  500 F.3d 322 (3d Cir. 2007)...............................................................................18

*Harrington* v. *Purdue Pharma L.P.*,
  603 U.S. 204 (2024)..............................................................................15, 16, 18

*Matter of Highland Cap. Mgmt., L.P.*,
  132 F.4th 353 (5th Cir. 2025) .......................................................................15, 18

*In re Lightsquared, Inc.*,
  539 B.R. 232 (S.D.N.Y. 2015)............................................................................20

*Local No. 93, Int'l Ass'n of Firefighters, AFL-CIO C.L.C.* v. *City of Cleveland*,
  478 U.S. 501 (1986)...........................................................................................17

*Martin* v. *Wilks*,
    490 U.S. 755 (1989) ................................................................16

*Meyer* v. *CUNA Mut. Ins. Soc.*,
    648 F.3d 154 (3d Cir. 2011) ...................................................20

*Petróleos de Venezuela S.A.* v. *MUFG Union Bank, N.A.*,
    235 N.E.3d 949 (N.Y. 2024) ...................................................3

*Petroleos de Venezuela S.A.* v. *MUFG Union Bank, N.A.*,
    495 F. Supp. 3d 257 (S.D.N.Y. 2020) ..................................2, 3

*Petróleos de Venezuela S.A.* v. *MUFG Union Bank, N.A.*,
    51 F.4th 456 (2d Cir. 2022) ....................................................3

*Shawe* v. *Elting*, 157 A.3d 152 (Del. 2017) .................................13

*In re Tribune Co.*,
    464 B.R. 126 (D. Del. 2011) ...................................................17

*Trump* v. *CASA, Inc.*,
    606 U.S. __, 2025 WL 1773631 (June 27, 2025) ................19

*Texas v. United States*,
    523 U.S. 296 (1998) ...............................................................16

*United States v. Ward Baking Co.*,
    376 U.S. 327 (1964) ...............................................................17

*U.S. Bank Nat'l Ass'n v. Gunn*,
    2012 WL 899550 (D. Del. 2012) ...........................................20

**Statutes**

8 Del. C. § 226 ......................................................................................13

8 Del. C. § 324 .............................................................................. *passim*

11 U.S.C. § 363 .....................................................................................14

An ad hoc group of holders of a majority of PDVSA 2020 Bonds (the "2020 Bondholders")[1] submit this Memorandum in support of their Objection to the Special Master's Final Recommendation (D.I. 1837), including the Proposed Sale Order (D.I. 1837, Ex. A), Stock Purchase Agreement (D.I. 1837, Ex. B), and Related Documents (D.I. 1837, Exs. C-H).[2]

## PRELIMINARY STATEMENT

This Court previously authorized the Special Master to solicit bids for a sale of the PDVH Shares under Section 324 of Title 8 of the Delaware Code ("Section 324"). The sale contemplated by Section 324, and long contemplated in these proceedings, is just that—the sale of the PDVH Shares. But the Special Master's Final Recommendation goes far beyond the Court's authorization and the bounds of Section 324, and would impose an exceptional and unprecedented set of conditions on the sale of the PDVH Shares. Those conditions would improperly extinguish or limit the rights of third parties—including the 2020 Bondholders—without any consideration whatsoever, and immunize Gold Reserve and other parties against claims based on rights and obligations that are not before, and will not be resolved by, this Court.

Remarkably, despite this Court expressly telling the Special Master just one month ago that the 2020 Bondholders were litigating—and are entitled to litigate—their rights in another court, the Proposed Sale Order would extinguish those rights and enjoin that litigation. The Proposed Sale Order also contains numerous other provisions lacking any statutory or other legal basis, including impermissible third-party releases, provisions immunizing the Sale even if later

---

[1] The PDVSA 2020 Bonds were issued under an Indenture, dated as of October 28, 2016 (the "Indenture"), under which U.S. Bank National Association serves as the trustee (solely in its capacity as successor indenture trustee (the "Trustee")) and GLAS Americas LLC serves as collateral agent (solely in its capacity as collateral agent (the "Collateral Agent")), and a Pledge and Security Agreement, dated as of October 28, 2016 (the "Pledge Agreement").

[2] All capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the Special Master's Final Recommendation, D.I. 1837 ("Final Recommendation").

reversed or modified on appeal, and unlawful mandates to non-judgment debtors (such as CITGO Holding and CITGO Petroleum) who are not before the Court. These provisions are unconstitutional, unlawful under Delaware law, and fundamentally unfair. Separate and apart from the actual sale of PDVH Shares before this Court, the Proposed Sale Order in essence seeks to immunize a series of potential contractual breaches, collateral strips, fraudulent conveyances, illegal dividends, and fiduciary duty breaches associated with the proposed financing by Gold Reserve. The 2020 Bondholders have attached a revised Proposed Sale Order (a clean copy as Exhibit A, and a redline reflecting the revisions as Exhibit B), which excludes these unlawful provisions and should be the order entered by the Court if the Gold Reserve sale is otherwise approved.

## BACKGROUND

### I.    PDVSA 2020 Bonds and the MUFG Litigation

The PDVSA 2020 Bonds were issued in an exchange offer in 2016 in return for earlier-issued notes due in 2017 (the "2017 Bonds"). *Petroleos de Venezuela S.A.* v. *MUFG Union Bank, N.A.*, 495 F. Supp. 3d 257, 264 (S.D.N.Y. 2020) ("*MUFG*"), *vacated and remanded*, 106 F.4th 263 (2d Cir. 2024). To induce investors to participate, the PDVSA 2020 Bonds were secured by a pledge from PDVH, a wholly owned subsidiary of PDVSA, of 50.1% of the equity in CITGO Holding. *Id.* at 261. The PDVSA 2020 Bonds therefore held security interests with respect to CITGO Holding nearly two years before any writs of attachment were entered in this case.

The documents governing the PDVSA 2020 Bonds—the subject of the *MUFG* litigation—provide the Trustee and the Collateral Agent with critical protections. As will be the subject of litigation in *MUFG* if the Gold Reserve transaction is approved, the Pledge Agreement protects the pledged 50.1% equity in CITGO Holding by forbidding any value leakage through distributions to the pledgor or its creditors following an Event of Default, and empowers the 2020

2

Bondholders to direct the voting of the pledged equity. *MUFG*, No. 19-cv-10023 (S.D.N.Y.), D.I. 384. Among other things, the Pledge Agreement contains an "anti-upstreaming" provision requiring that, during any Event of Default, "[a]ll payments, proceeds, dividends, distributions, monies, compensation, property, assets, instruments or rights that are received by [PDVH]" be "held in trust for the benefit of the Collateral Agent for the benefit of the Secured Parties, . . . [and] forthwith paid over to the Collateral Agent." Pledge Agreement § 2.05(f), *MUFG*, D.I. 87-5. The Pledge Agreement further authorizes the Collateral Agent and Trustee, following an Event of Default, to direct PDVH "to vote the Securities representing the Pledged Shares [i.e., the Collateral]" (and obligates PDVH to vote the Securities as directed), and otherwise authorizes the Collateral Agent "to act with respect to the Collateral as outright owner thereof." *Id.* § 2.05(d).

PDVSA defaulted on the PDVSA 2020 Bonds in October 2019, which quickly gave rise to litigation in the Southern District of New York involving their validity and enforceability, and the remedies available to the Trustee and Collateral Agent under the Indenture and Pledge Agreement. *MUFG*, 495 F. Supp. 3d at 267. On October 16, 2020, Judge Katherine Polk Failla granted summary judgment in favor of the Trustee and the Collateral Agent, holding that the Governing Documents were "indisputabl[y] valid[]" under New York law, and rejecting the PDVSA Parties' argument that the act of state doctrine barred a U.S. court from determining their validity. *Id.* at 292. The PDVSA Parties appealed to the Second Circuit, which certified questions on choice of law issues to the New York Court of Appeals, which ultimately concluded that the validity of the 2020 Notes is governed by the law of Venezuela. *Petróleos de Venezuela S.A.* v. *MUFG Union Bank, N.A.*, 235 N.E.3d 949, 954 (N.Y. 2024); *Petróleos de Venezuela S.A.* v. *MUFG Union Bank, N.A.*, 51 F.4th 456, 475 (2d Cir. 2022). The case was remanded to the Southern District of New York, and the parties have submitted supplemental summary judgment

briefs and expert evidence addressing the Governing Documents' validity under Venezuelan law. The Court has stated that it expects to issue a decision by the end of September.

## II.    Crystallex Proceedings and Section 324 Sale

Crystallex International Corporation, a judgment creditor of PDVSA, initiated this action in 2017 by moving for a writ of attachment against PDVH shares. D.I. 2. The Court authorized a sale process pursuant to Section 324. D.I. 234 at 34. Section 324 authorizes the attachment of shares of stock in a Delaware corporation for the purpose of satisfying a debt or other demand, as well as a court-ordered sale of attached shares. As relevant, it provides:

> The shares of any person in any corporation with all the rights thereto belonging . . . may be attached under this section for debt . . . . So many of the shares . . . may be sold at public sale to the highest bidder, as shall be sufficient to satisfy the debt . . . upon an order issued therefor by the court from which the attachment process issued
> . . .
> Such sale, returned and confirmed, shall transfer the shares . . . to the purchaser, ***as fully as if the debtor, or defendant, had transferred the same to such purchaser according to the certificate of incorporation or bylaws of the corporation***, anything in the certificate of incorporation or bylaws to the contrary notwithstanding. ***The court which issued the levy and confirmed the sale shall have the power to*** make an order compelling the corporation, the shares of which were sold, to issue new certificates or uncertificated shares to the purchaser at the sale and to cancel the registration of the shares attached on the books of the corporation upon the giving of an open end bond by such purchaser adequate to protect such corporation.

8 Del. C. § 324 (emphases added).

Other judgment creditors followed, and the Court has recognized more than $20 billion in judgments against PDVSA or its owner, the Bolivarian Republic of Venezuela (the "Republic"). The Court also appointed a Special Master to oversee the sale process. D.I. 258; *see also* D.I. 481 (setting forth advertising, bidding, and sale procedures).

### III.    Final Recommendation and Proposed Sale Order

On July 2, 2025, the Special Master submitted the Final Recommendation, recommending that the Court authorize and approve the sale of all of the shares of PDVH to Dalinar Energy, an acquisition vehicle created by Gold Reserve, for approximately $7.832 billion in cash and judgment claims.   D.I. 1837.   Critically, the Gold Reserve Consortium is only contributing $50 million of its own money to acquire PDVH.  To fund approximately 99% of the cash purchase price, Adolin, a wholly owned subsidiary of Dalinar, was formed to secure new debt financing, the proceeds of which would then be transferred to an escrow paying agent, which would in turn pay PDVSA's judgment creditors.  Immediately thereafter, Adolin would merge into CITGO Petroleum, PDVH's indirect subsidiary, with CITGO Petroleum's assets being used to secure the debt raised to fund the purchase price.  If consummated, the transaction would therefore leave the assets of CITGO Petroleum—the value underlying the 50.1% of CITGO Holding pledged to the 2020 Noteholders—encumbered by billions of dollars of debt and fundamentally impaired. The PDVSA 2020 Bonds would be left secured by 50.1% of the equity of a company with more than $4.3 billion of incremental net debt plus a potentially uncapped amount of structurally senior preferred stock, having received not a dollar of paydown.  Proceeds of the senior financing would fund almost the entirety of the Sale Transaction and repay creditors of PDVSA and the Republic who are structurally junior to the 2020 Bondholders, and who (unlike the 2020 Bondholders) never negotiated for—let alone obtained—collateral in connection with their relationships with PDVSA and the Republic of Venezuela.

The inherent problem with the Sale Transaction is that it not only seeks judicial approval of a fundamentally legal sale of the PDVH Shares under Section 324 over which this Court has proper jurisdiction, but also seeks to use the power of the Court through the Proposed Sale Order to extinguish the rights and claims of third parties as against a fundamentally illegal

financing transaction, including on the ground that it violates the Pledge Agreement by stripping the value of the 2020 Bondholders' Collateral—the assets of CITGO. The legality of the financing transaction is not before this Court in this proceeding under Section 324, which neither contemplates nor authorizes the provisions of the Proposed Sale Order that the parties apparently designed to immunize the financing transaction from challenge or review. Put simply, the Special Master is seeking to impose a financing by the 2020 Bondholders for the benefit of Gold Reserve by extinguishing the 2020 Bondholders' rights under the Proposed Sale Order before any claims are brought or adjudicated.

Given that the 2020 Bondholders' rights are being adjudicated in another forum, this Objection raises only the legal issues relevant to the 2020 Bondholders' entitlement to assert their claims, not the 2020 Bondholders' underlying claims under the Pledge Agreement. The 2020 Bondholders have repeatedly made clear that they intend to challenge the aspect of the transaction's financing that violates their Pledge Agreement where that agreement (and related matters) has been litigated for almost six years, in the Southern District of New York. *See, e.g.*, D.I. 1558 at 3–4; *see also* D.I. 1568 at 2. The parties to the Pledge Agreement consented to the jurisdiction of the Southern District of New York and the Agreement is subject to New York law.

The Proposed Sale Order put forward by the Special Master is all the more objectionable given that this Court has recognized that it could not deprive the 2020 Bondholders of their rights. In its June 24, 2025 *ex parte* meeting with the Special Master, the Court expressly stated: "the 2020s are not in my litigation. The 2020s are not judgment creditors. They have whatever rights they have. They are litigating them in another court . . . . I understand that I cannot intentionally take actions to interfere with or deprive them of whatever rights they have." D.I. 1840-1 at 48–49. The Court has similarly recognized that if the 2020 Bondholders "try to get an

injunction from me or from the Southern District [of New York] or from some other court, that may be a litigation that has to happen." *Id.* at 61. Moreover, just six months prior to its Final Recommendation, the Special Master "agree[d]" in open court that the "the material SPA terms . . . should not [impair] the [2020 Bondholders'] rights." D.I. 1507 at 126.

Despite this Court's direction, just eight days after the Special Master's *ex parte* meeting with the Court, the Special Master proposed a Sale Order that would do exactly what the Court indicated it would not. In the Proposed Sale Order, the Special Master—in concert with Gold Reserve—seeks to impose provisions that would improperly limit, enjoin, and in many cases extinguish claims of the 2020 Bondholders and other parties that are not before this Court.

Lest there be any confusion: the 2020 Bondholders have no intention of challenging the actual sale of the PDVH Shares. However, as described below, if the Gold Reserve sale is approved, the 2020 Bondholders would have no choice but to challenge the aspects of the financing that would strip away the value of their Collateral and violate their rights under the Pledge Agreement. The 2020 Bondholders accordingly only object in this proceeding to the provisions of the Proposed Sale Order that seek to wrongfully prevent or constrain the exercise of the 2020 Bondholders' rights.

Multiple provisions of the Proposed Sale Order improperly provide non-consensual releases of claims by third parties (including the 2020 Bondholders), purport to establish its legality, and immunize the entire Sale Transaction even if it is reversed on appeal. Illustrative examples include[3]:

---

[3] The 2020 Bondholders quote these provisions as illustrative examples of objectionable provisions. The 2020 Bondholders object to each and every provision of similar effect, and each and every provision that extinguishes or limits the rights of third parties. The 2020 Bondholders' proposed revised Sale Order therefore makes clear, consistent with Section 324, that it does not purport to modify, limit, or otherwise affect the rights of third parties.

- "Following the Sale Transaction, the Notice Parties[4] shall have no recourse against Buyer or Buyer Affiliates[5] or against the PDVH Shares, on account of those parties' respective judgments or other Claims[6] against the Republic, PDVSA, or their respective Affiliates." Proposed Sale Order ¶ K; *see also id.* ¶ 11.

- "The consummation of the Sale Transaction is legal, valid, and properly authorized under all applicable law, and all of the applicable requirements of applicable law have been complied with in respect of the Sale Transaction." *Id.* ¶ M.

- "By virtue of the Sale Transaction, neither Buyer nor any of Buyer Affiliates . . . as a result of the consummation of the Sale Transaction: . . . (iii) [shall be deemed] to be liable for, or be subject to any obligations relating to, any acts or omissions of PDVSA in the conduct of its business or arising under or related to the PDVH Shares, other than as set forth in the Stock Purchase Agreement . . . . Following the Sale Transaction, the Notice Parties shall have no recourse against Buyer or Buyer

---

[4] "Notice Parties" is defined in the following provision:

> As evidenced by the Publication of Affidavits and the Status Reports [D.I. 771, 839 & 1124], a fair and reasonable opportunity to object to, and be heard with respect to, the Recommendation, the Bidding Rounds, and the Sale Transaction, has been given to any and all Persons who are or could be entitled to notice pursuant to the Sale Procedures Order and the Bidding Procedures, including, but not limited to, the following: [(i)-(xxix) various entities, including judgment creditors and their counsel]; (xxx) all entities known by the Special Master to hold any judgment or have asserted any lien, claim, encumbrance, or other interest in the PDVH Shares, for whom identifying information and addresses are available to the Special Master; (xxxi) the United States Department of Treasury's Office of Foreign Assets Control ("OFAC"); and (xxxii) all other Persons as a result of Publication Notice or other notice (the parties listed at i-xxxii above, the "Notice Parties").

Proposed Sale Order ¶ D.

[5] "Buyer Affiliates" is defined as any "Affiliate of Buyer; *provided, however*, that the term 'Buyer Affiliate' shall exclude PDVH and any of its direct or indirect subsidiaries." Proposed Sale Order at 12 n.5 (italics in original).

[6] "Claim" is defined as "(a) a right to a payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured or (b) an equitable remedy for breach of performance if such breach gives rise to a right to payment, whether or not such right to an equitable remedy is reduced to judgment, fixed, contingent, matured, unmatured, disputed, undisputed, secured or unsecured. Without limiting the foregoing and for the avoidance of doubt, a Claim includes any loss, liability, demand, claim, judgment, sanction, penalty, action, obligation, commitment, assessment, settlement, fee, debt, deficiency, guaranty of any kind, proceeding, damage, cost, or expense (including court costs and professional fees (including attorneys' fees and costs)) whatsoever, whether at law or in equity, whether known or unknown, fixed, liquidated, contingent, or otherwise, whether under any theory of successor or transferee liability and whether imposed by agreement, understanding, law, or otherwise." D.I. 1837-1 at 133–3.

Affiliates, or against the PDVH Shares, on account of those parties' respective judgments or other Claims against the Republic or PDVSA." *Id.* ¶ 18.

- "[T]he reversal or modification on appeal of the authorization provided herein of the Sale Transaction shall neither affect the validity of the Sale Transaction nor the transfer of the PDVH Shares to Buyer free and clear of Claims, unless such authorization is duly stayed before the Closing Date pending such appeal." *Id.* ¶ 21.

In addition, the Proposed Sale Order would enjoin any party, including the 2020 Bondholders, from pursuing an incredibly wide variety of actions in court, potentially including the 2020 Bondholders' current litigation in the Southern District of New York, related future proceedings in that court to enjoin aspects of the proposed sale that are violative of the 2020 Bondholders' rights, and numerous other claims, including claims against CITGO (or the Buyer Affiliate it is merged into) related to PDVSA or the PDVH shares, members of the Gold Reserve consortium, and the Financing Parties. These provisions include, as non-exhaustive examples:

- "All Persons and entities are prohibited and enjoined from taking any action that adversely affects, interferes with, is likely to frustrate or is in any way inconsistent with the ability of the Special Master or his Advisors and agents to transfer the PDVH Shares to Buyer in accordance with the Transaction Documents and this Order." *Id.* ¶ 6.

- "Pursuant to the All Writs Act, . . . all Persons . . . who may or do hold, now or in the future, Claims against the Republic, PDVSA or the PDVH Shares, arising under or out of, in connection with, or in any way relating to, the Republic, PDVSA, the PDVH Shares prior to the Closing, the operation of PDVH or ownership of the PDVH Shares by PDVSA prior to the Closing, or the Sale Transaction, are hereby forever barred, estopped, and permanently enjoined from asserting or pursuing such Claims against Buyer, Buyer Affiliates, or any of their respective successors or assigns including taking any of the following actions with respect to any Claims either directly or indirectly: (i) commencing or continuing in any manner any action, whether at law or in equity, in any judicial, administrative, arbitral, or any other proceeding, against Buyer, Buyer Affiliates, and any of their respective successors or assigns; (ii) enforcing, attaching, collecting, or recovering in any manner any judgment, award, decree, or order against Buyer, Buyer Affiliates, and any of their respective successors or assigns; (iii) creating, perfecting, or enforcing any Claim against Buyer, Buyer Affiliates, and any of their respective successors or assigns, and the PDVH Shares; (iv) asserting a Claim as a setoff, right of subrogation, or recoupment of any kind against any obligation due against Buyer, Buyer Affiliates, any of their respective successors or assigns, or the PDVH Shares; or (v) commencing or continuing any action in any manner or place that does not

comply, or is inconsistent, with the provisions of this Order or the agreements or actions contemplated or taken in respect thereof." *Id.* ¶ 13.

- "Following the Closing Date, no holder of an adverse interest in the PDVH Shares, nor any other person or entity, shall interfere with Buyer's title to or use and enjoyment of the PDVH Shares based on or related to such adverse interest or any actions that Buyer, Buyer Affiliates, PDVH, PDVH's subsidiaries and Affiliates (including CITGO Holding, Inc. and CITGO), the Republic or PDVSA have taken or may take related to the Sale Transaction, this Action or any related action." *Id.* ¶ 19.

- "[N]o entity or person . . . may commence or pursue any cause of action of any kind that arose or arises from, in whole or in part, the Special Master Order, the Sale Procedures Order, the Bidding Procedures, this Order, any other orders of this Court in this Action, or any cause of action related to the Sale Transaction, without this Court (i) first determining, after notice and a hearing, that such cause of action represents a colorable claim against such party and (ii) specifically authorizing such entity or person to bring such cause of action against such party; *provided, further*, that **no entity or person**, including the Sale Process Parties, any holder of an Attached Judgment, any Potential Bidder, or any persons acting in concert with them*, may commence or pursue any cause of action of any kind against Buyer or Buyer Affiliates that arose or arises from, in whole or in part, this Order or the Sale Transaction*, including any successor or similar liability, transferee liability, or other liability or obligation arising under or related to the sale and transfer of the PDVH Shares to Buyer, without this Court (i) first determining, after notice and a hearing, that such cause of action represents a colorable claim against such party and (ii) specifically authorizing such entity or person to bring such cause of action against such party." *Id.* ¶ 25 (italics and underlining in original, bold emphases added).

Moreover, the Proposed Sale Order improperly directs PDVH's subsidiaries, CITGO Holding and CITGO Petroleum, which are not judgment debtors, to comply with the sale consummation process irrespective of whether such conduct would violate their separate legal obligations:

- "PDVH, CITGO and CITGO Related Parties are directed and hereby ordered to comply with all obligations and covenants contained in the Stock Purchase Agreement and Transaction Documents . . . ., and the Special Master is authorized to seek this Court's assistance and/or an order from the Court to compel compliance if, in his reasonable judgment, PDVH, CITGO or CITGO Related Parties fail to comply with such obligations or covenants under the Stock Purchase Agreement or other Transaction Documents. Any failure by PDVH, CITGO or the CITGO Related Parties to comply, or cause compliance, with any obligation or covenant contained in the Stock Purchase Agreement and Transaction Documents may result

10

in a contempt order and appropriate sanctions against the violating entity, as well as the individual directors, officers or employees responsible for the violation." *Id.* ¶ 6.

## ARGUMENT

**I.     The Court Should Reject the Release and Injunctive Provisions Contemplated by the Proposed Sale Order**

The Proposed Sale Order improperly extinguishes or limits the rights of third parties through, among other provisions, sweeping injunctions and non-consensual releases. These provisions are not authorized under state law, including Section 324, or under federal law, including the All Writs Act. They also contradict this Court's prior recognition that the 2020 Bondholders "have whatever rights they have [and] are litigating them in another court," and that this Court "cannot intentionally take actions to interfere with or deprive them of whatever rights they have." D.I. 1840-1 at 48–49. As the 2020 Bondholders have explained to Judge Failla and will litigate as necessary, the Gold Reserve transaction violates their rights under the Pledge Agreement by breaching its anti-upstreaming provision, materially (if not completely) devaluing the Collateral, and even barring payment to the 2020 Bondholders using CITGO Petroleum assets—the core assets supporting their Collateral. *MUFG*, D.I. 384 at 2–3. This Court should not enter an order that would strip the 2020 Bondholders of their recognized ability to enforce their rights.

For example, the Proposed Sale Order broadly releases Gold Reserve and its Affiliates from liability for "any acts or omissions of PDVSA in the conduct of its business or arising under or related to the PDVH Shares," and states that "the Notice Parties shall have no recourse against Buyer or Buyer Affiliates." Proposed Sale Order ¶ 18. Gold Reserve may attempt to argue that the 2020 Bondholders are Notice Parties whose claims were released because they were given "a fair and reasonable opportunity to object to, and be heard with respect to, the

Recommendation, the Bidding Rounds, and the Sale Transaction." *Id.* ¶ D. Similarly, although the definition of Buyer Affiliate excludes PDVH and its subsidiaries, it is unclear how this definition would apply after closing of the transaction, when Adolin (a Buyer Affiliate) would merge into CITGO Petroleum (a PDVH subsidiary), and therefore whether the 2020 Bondholders would have any recourse against that post-merger entity (even though that new entity's assets would effectively be the subject of their Pledge Agreement). It is improper for the Proposed Sale Order to immunize Gold Reserve and its Affiliates—potentially including the entity that survives the post-closing merger of Adolin and CITGO Petroleum—from causes of action relating to *any* Claim relating to the Republic or PDVSA. *See, e.g.*, *id.* ¶¶ K, 11, 18, 19.

The Proposed Sale Order also contains a nearly limitless injunction, which provides that "[a]ll Persons and entities are prohibited and enjoined from taking any action that adversely affects, interferes with, is likely to frustrate or is in any way inconsistent with the ability of the Special Master or his Advisors and agents to transfer the PDVH Shares to Buyer in accordance with the Transaction Documents and this Order." *Id.* ¶ 6; *see also id.* ¶ 13 (broad injunction preventing all persons from asserting claims against the Gold Reserve Consortium or its Affiliates or successors in any way relating to "the Republic, PDVSA, the PDVH Shares prior to the Closing, the operation of PDVH or ownership of PDVH Shares by PDVSA prior to Closing, or the Sale Transaction"); *id.* ¶ 25 (retaining the Court's jurisdiction over broad categories of potential claims, including "any cause of action of any kind that arose or arises from, in whole or in part, the Special Master Order, the Sale Procedures Order, the Bidding Procedures, [the Proposed Sale Order], any other orders of this Court in this Action, or any cause of action related to the Sale Transaction," and requiring pre-clearance of claims that are otherwise specifically blocked). These and other

offensive provisions also purport to interfere with the 2020 Bondholders' ability to assert their claims, are not supported by any statutory authority and, in many cases, are unconstitutional.

Section 324 authorizes courts to issue orders for the public sale of shares to satisfy debts or other demands.  As this Court has recognized, "[t]he statute sets out specific procedural requirements."  *Crystallex Int'l Corp*. v. *Bolivarian Republic of Venezuela*, 333 F. Supp. 3d 380, 388 n.5 (D. Del. 2018).  Section 324 only authorizes the transfer of the shares "to the purchaser, as fully as if the debtor, or defendant, had transferred the same to such purchaser."  8 Del. C. § 324(c).  Under the plain terms of Section 324, the purchaser may take no greater rights or protections than it would have received in a direct transfer from the defendant "according to the certificate of incorporation or bylaws of the corporation."  *Id*.

Moreover, Section 324 expressly sets forth the universe of additional powers courts have to effectuate such a sale.  Specifically, Section 324 grants courts only the additional authority to compel corporations to issue new certificates or uncertificated shares to purchasers, and to cancel the registration of attached shares upon the purchaser providing adequate protection to the corporation.  *Id*.  But Section 324 *does not* authorize the purchaser to acquire rights in shares *greater* than the seller has, or authorize the Court to impose sweeping injunctions, non-consensual third-party releases, or any of the other problematic provisions at issue here.  The narrow scope of the authority conferred under Section 324 reflects an intentional choice by the Delaware legislature, which, in other statutes addressing judicial sales, afforded courts additional authority to implement transactions.  *See, e.g.*, 8 Del. C. § 226 (authorizing court-appointed custodian with "all the powers and title of a receiver" in cases where a company's directors or stockholders are effectively deadlocked); *Shawe* v. *Elting*, 157 A.3d 152, 163–64 (Del. 2017) (recognizing courts' "broad authority" when ordering sale of a company under Section 226).

13

The absence of statutory authority to impose these terms is also underscored by the contrast between Section 324 and the federal Bankruptcy Code, which provides bankruptcy courts authority to enact provisions similar to those sought by Gold Reserve here, but only in certain situations and subject to certain conditions. For instance, Section 363 of the Bankruptcy Code authorizes the sale of a debtor's assets free and clear of any interest in such property. 11 U.S.C. § 363(f). But such a sale is only permissible under certain circumstances, such as would be otherwise permitted under applicable non-bankruptcy law, or if the interest is a lien and "the price at which such property is to be sold is greater than the aggregate value of all liens on such property." *Id*. Moreover, Section 363 provides that "the reversal or modification on appeal of an authorization . . . of a sale or lease of property does not affect the validity of a sale or lease under such authorization . . . unless such authorization and such sale or lease were stayed pending appeal." *Id.* § 363(m).

Whereas these provisions reflect a congressional determination of how bankruptcy courts should deal with an insolvent debtor through a carefully crafted balance between efficient corporate reorganizations and the rights of third parties, Section 324 has no similar purpose and does not empower courts with the authority available under the Bankruptcy Code. Yet there is little doubt that the Special Master and Gold Reserve developed the Proposed Sale Order to include provisions that may in certain circumstances be used in sales under the Bankruptcy Code, despite the fact that Section 324 offers no similar authority and that this proceeding has offered none of the protections associated with a plan of reorganization or sale under Section 363 of the Bankruptcy Code. Indeed, as discussed below, the objectionable provisions in the Proposed Sale Order exceed even the power of a bankruptcy court tasked with providing a reorganizing debtor with a "fresh start" and expressly empowered to issue "any order . . . necessary or appropriate to

14

carry out" the provisions of the Bankruptcy Code.  *Matter of Highland Cap. Mgmt., L.P.*, 132 F.4th 353, 358–59 (5th Cir. 2025) ("[A] bankruptcy court that approves a non-consensual release and/or injunction protecting non-debtors 'exceed[s] its powers under § 105.'") (citations omitted).

### A.    The Court Lacks the Authority to Order Non-Consensual Third-Party Releases

The 2020 Bondholders join Crystallex and other parties in contesting the Court's authority—under federal or Delaware law—to use the Sale Order as a mechanism to effectuate a non-consensual third-party release.  *See, e.g.*, D.I. 1847 at 5 (Crystallex objecting that "it is not appropriate for PDVH to secure through this judicial sale a release on all potential claims against PDVH *qua* PDVH.").

The Supreme Court has made clear that non-consensual third-party releases are not permitted, except to the extent expressly contemplated and authorized by statute.  In *Harrington* v. *Purdue Pharma L.P.*, 603 U.S. 204 (2024), the Supreme Court struck down a Chapter 11 bankruptcy reorganization plan that provided for a non-consensual third-party release of claims against non-debtors.  The provision at issue purported to release members of the Sackler family— who owned the debtor, Purdue Pharmaceuticals—from future liability and to insulate them from claims of opioid victims in exchange for a pay-out.  The Supreme Court held that the discharge from liability lacked statutory authority, because "the Sacklers [had] not filed for bankruptcy and [had] not placed virtually all of their assets on the table for distribution to creditors," reasoning that no provision of the Bankruptcy Code authorizes that kind of relief.  *Id.* at 215.  In striking down the release, the Court rejected the Sacklers' assertion that a catchall phrase in Section 1123(b)(6) of the Bankruptcy Code amounted to statutory authorization for non-consensual third-party releases.  *Id.* at 218.  The Court made clear that, absent express statutory authority, it would not "endow [the] bankruptcy court with the 'radically different' power to discharge the debts of a

nondebtor without the consent of affected nondebtor claimants." *Id*. Accordingly, even had PDVH sought the protection of the Bankruptcy Code (and it did not), the Code "does not authorize a release and injunction that, as part of a plan of reorganization under Chapter 11, effectively seeks to discharge claims against a nondebtor without the consent of the affected claimants." *Id.* at 227.

The same principle applies with even greater force here. Nothing in Section 324 endows this Court with the power to authorize the broad non-consensual releases (or injunctions) included in the Proposed Sale Order. If the Sale Transaction is approved and goes forward, the 2020 Bondholders would have colorable claims against Gold Reserve and the Financing Parties for, among other things, tortious interference with the 2020 Bondholders' rights under the Indenture and Pledge Agreement. These non-consensual releases reflect a transparent attempt by Gold Reserve and its Affiliates to insulate themselves from liability and wipe out those claims, without them being presented or adjudicated in any court and, indeed, even before they ripen upon the approval of a transaction that would give rise to such claims. *See Texas* v. *United States*, 523 U.S. 296, 300 (1998) ("A claim is not ripe for adjudication if it rests upon contingent future events that may not occur as anticipated, or indeed may not occur at all.") (internal quotation marks omitted); *Air Prods. & Chems., Inc.* v. *Gen. Servs. Admin.*, 700 F. Supp. 3d 487, 498 (N.D. Tex. 2023) (holding challenge to proposed sale was not ripe because it "will only be substantively evaluable after further agency action and administrative processes").

Moreover, non-consensual third-party releases are constitutionally infirm. First, non-consensual third-party releases, such as the one contemplated in the Proposed Sale Order, bind parties without subjecting them to notice required by due process and a fair opportunity for their claims to be heard and resolved. *See, e.g., Martin* v. *Wilks*, 490 U.S. 755, 763–64 (1989) ("a party seeking a judgment binding on another cannot obligate that person to intervene; . . . Joinder as a

party, rather than knowledge of a lawsuit and an opportunity to intervene, is the method by which potential parties are subjected to the jurisdiction of the court and bound by a judgment or decree") (citations omitted); *see also Chase Nat'l Bank* v. *City of Norwalk*, 291 U.S. 431, 441 (1934) ("[t]he law does not impose upon any person absolutely entitled to a hearing the burden of voluntary intervention in a suit to which he is a stranger"). Second, even assuming proper notice and jurisdiction, courts lack the power to dictate settlement terms, *United States* v. *Ward Baking Co.*, 376 U.S. 327, 334 (1964), or to permit two parties to dispose of a third party's rights, *Local No. 93, Int'l Ass'n of Firefighters, AFL-CIO C.L.C.* v. *City of Cleveland*, 478 U.S. 501, 529 (1986). Third, even in the settlement context, where, unlike here, unique policies favoring settlement apply, a non-settling defendant's claims may not be extinguished through a bar order absent fair consideration in the form of a setoff against any judgment. *See Eichenholtz* v. *Brennan*, 52 F.3d 478, 486 (3d Cir. 1995); *see also In re Tribune Co.*, 464 B.R. 126, 177 (D. Del. 2011). In short, any attempt by the Court to release the 2020 Bondholders' Claims would violate their due process rights.

**B.    The Court Lacks the Authority to Order the Injunctive Relief Contemplated by the Proposed Sale Order**

The 2020 Bondholders object to the Proposed Sale Order to the extent it extinguishes or limits the rights of third parties through sweeping injunctions that would prohibit *anyone*, *anywhere*, from bringing any claim that would frustrate the ability to transfer the PDVH Shares, or asserting claims against the Buyer or its Affiliates in any way relating to PDVSA or the PDVH Shares—and specifically, to the extent it would purportedly bar an action by the 2020 Bondholders challenging the Sale Transaction, if approved, as a violation of the Pledge Agreement. Indeed, and as the Court has recognized, the 2020 Bondholders are entitled to bring their claims and have them adjudicated on the merits. *See* D.I. 1840-1 at 48–49. There is no legal

basis on which the Gold Reserve Consortium, or those acting in concert with it, can preemptively immunize themselves from legal liability without any consideration as to claims that have not been brought or adjudicated.  Like non-consensual releases, "injunctions, though not in themselves releases, similarly act to shield persons and entities from liability and therefore may not be entered to protect non-debtors not legally entitled to release."  *Highland Cap. Mgmt.*, 132 F.4th at 358; *see also Purdue Pharma*, 603 U.S. at 227.

Although the Proposed Sale Order invokes the All Writs Act, that statute does not authorize the sweeping injunctions contained in the Proposed Sale Order.  The All Writs Act simply allows federal courts to issue injunctions that are "necessary or appropriate to effectuate and prevent the frustration of an order it has previously issued in its exercise of jurisdiction." *Berger* v. *Zeghibe*, 666 F. App'x 119, 123 (3d Cir. 2016).  The All Writs Act does *not* expand a court's jurisdiction, and can only be used with respect to the jurisdiction the Court has "otherwise obtained."  *Id*.  Injunctions under the All Writs Act are appropriate only in "narrow circumstances," typically "to enjoin action by state courts that threatens the federal court's jurisdiction."  *Grider* v. *Keystone Health Plan Cent., Inc.*, 500 F.3d 322, 328–29 (3d Cir. 2007).  As the *Grider* court held, an All Writs Act injunction is *not available* where the parties benefitting from such an injunction have an adequate remedy at law.  *Id.* at 332.  *Grider* recognized that the right to object or oppose relief in another court constituted an adequate remedy at law that foreclosed injunctive relief under the All Writs Act.  *Id*.  So too here.  Any party subject to claims in connection with the financing transaction contemplated by the Gold Reserve bid is free to defend against such claims and accordingly has an adequate legal remedy.

Indeed, in denying the Special Master's earlier motion to enjoin alter ego actions, this Court recognized that the powers "conferred on federal courts by the All Writs Act are 'firmly

circumscribed,'" D.I. 1515 at 10 (quoting *Grider*, 500 F.3d at 328–29), and that the All Writs Act did not empower the Court to enjoin other proceedings involving "different property, different causes of action, different theories, and different requested relief," *id.* at 12.  Like the alter ego actions, the *MUFG* litigation in the Southern District of New York is different in those respects, thus foreclosing an injunction here.

This Court does not have jurisdiction under Delaware (or any other) law to enjoin the conduct of non-parties, especially in other jurisdictions, by issuing the expansive injunctions contemplated by the Proposed Sale Order.  Nor is such an injunction "necessary" to effectuate the Sale Transaction.  This proceeding determines only whether, under Section 324, a sale should be effectuated and to whom.  Whether or not such a sale would violate other laws or obligations not at issue here is not a collateral attack on any order this Court might issue.  Nor is an injunction necessary to protect such an order—especially given that the 2020 Bondholders have been open and transparent about their claims, and no party has disputed that those claims are already being litigated elsewhere.

The Supreme Court decided less than a month ago that universal injunctions of the type in the Proposed Sale Order "likely exceed the equitable authority that Congress has granted to federal courts," reasoning that such injunctions can be used as a "shortcut" around Rule 23 of the Federal Rules of Civil Procedure by binding a large, undefined group without the robust protections Rule 23 requires in order to do so.  *Trump* v. *CASA, Inc.*, 606 U.S. __, 2025 WL 1773631 at *9, *13 (June 27, 2025) (citing Fed. R. Civ. P. 23(a)).  *CASA* forecloses enjoining a group of people unless that group is "bound, in process and in substance, by Rule 23."  *In re Golden*, No. 16-40809-ESS, 2025 WL 1886067 at *12 (Bankr. E.D.N.Y. July 7, 2025) ("[T]o the extent that *CASA* describes a problem with 'universal injunctions,' it also points to a solution

embedded in the Federal Rules – a Rule 23 class action.").  Here, for example, the Proposed Sale Order purports to enjoin "all Persons" from asserting a broad category of claims "in any way relating to the Republic, PDVSA, the PDVH Shares prior to the Closing, or the Sale Transaction" against the Gold Reserve Consortium or its Affiliates or successors.  Proposed Sale Order. ¶ 13. The Special Master has not satisfied—and could not satisfy—the requirements of Rule 23 in connection with the injunctions sought here in the Proposed Sale Order.

*CASA*'s reasoning is consistent with existing Third Circuit precedent.  For example, in *Meyer* v. *CUNA Mut. Ins. Soc.*, the Third Circuit held that a permanent injunction was "overly broad" because it purported to bind "former class members" after the Rule 23 class was decertified, including because an evaluation of the breadth of an injunction must be "guided by the principle that '[i]n the absence of a certified class action, [a plaintiff] [i]s only entitled to relief for itself.'" 648 F.3d 154, 170–71 (3d Cir. 2011) (citing *Ameron, Inc.* v. *U.S. Army Corps of Eng'rs*, 787 F.2d 875, 888 (3d Cir.), *on reh'g*, 809 F.2d 979 (3d Cir. 1986)).  For the same reason, courts have frequently declined to issue injunctions that are broader than necessary to effectuate the appropriate relief—which here entails only the transfer of the PDVH Shares to the buyer.  *See, e.g.*, *U.S. Bank Nat'l Ass'n* v. *Gunn*, 2012 WL 899550, at *5 (D. Del. 2012) (denying plaintiffs' proposed injunction as too broad where plaintiffs requested that "Defendant or *any* agent acting on his behalf, be enjoined from representing to *any* individual or entity, by *any* form of communication, that he is the lawful owner of the Property" (emphases added)); *In re Lightsquared, Inc.*, 539 B.R. 232, 244 (S.D.N.Y. 2015) (injunction in proposed bankruptcy plan was "far broader than necessary").  It thus would be inappropriate for this Court to issue injunctions that would bind an unknown and undefined group of persons and entities from taking action,

particularly given that many of those persons and entities are not parties to this action and there has been no serious effort to define this group.

Accordingly, this Court lacks the authority and jurisdiction to issue the nearly limitless injunctions contemplated by the Sale Process Order.

## II.    The Court Lacks the Authority to Compel Performance by PDVH's Subsidiaries, Including CITGO Holding

Finally, the Proposed Sale Order also exceeds the Court's authority by compelling PDVH's non-party subsidiaries, including CITGO Holding, to take actions to consummate the Sale Transaction, regardless of whether those actions would violate the rights of the 2020 Bondholders under the Pledge Agreement or otherwise violate applicable law.  Specifically, the Proposed Sale Order provides that "PDVH, CITGO and CITGO Related Parties are directed and hereby ordered to comply with all obligations and covenants contained in the Stock Purchase Agreement and Transaction Documents (regardless of, and independent of, any obligation for the Special Master to 'cause' those parties to comply with such obligations and covenants)" under threat of contempt and sanctions against any violating entity or individual.  Proposed Sale Order ¶ 6.  While the Gold Reserve bid contemplates a series of complex transactions to effectuate its financing, Section 324 contains no authority for the Court to direct the actions of PDVH's subsidiaries.  Rather, as discussed above, it empowers courts to oversee a public sale of shares "as fully as if" the defendant "had transferred the same to such purchaser," in connection with which it authorizes courts to compel the defendant to issue new share certificates or uncertificated shares or to cancel the registration of existing shares.  8 Del. C. § 324.

The provision of the Proposed Sale Order purporting to direct the conduct of PDVH's subsidiaries is particularly problematic in these circumstances because, should the subsidiaries effectuate the transaction, CITGO Holding, CITGO Petroleum, and their respective

directors may be subject to lengthy litigation over significant claims, including, for example, for unlawful dividends, fraudulent conveyances, and fiduciary breach.   Despite the fact that CITGO Holding and CITGO Petroleum are distinct corporate entities from PDVH, with separate contractual, legal, and fiduciary duties under Delaware law, the Proposed Sale Order improperly contemplates imposing obligations upon those entities that are inconsistent with, or may arguably direct them to violate, their legal obligations.

While the Court has in rem jurisdiction over PDVH as a result of the attachment proceeding, that jurisdiction does not extend to controlling the conduct of non-party subsidiaries of PDVH, including CITGO Holding.   "A creditor of the parent corporation may not, in the absence of fraud, disregard the separate existence of a subsidiary corporation and look directly to specific assets of a subsidiary for satisfaction of his claim against the parent."   *Buechner* v. *Farbenfabriken Bayer Aktiengesellschaft*, 154 A.D.2d 684, 687 (Del. Ch. 1959).   Indeed, "[r]everse veil piercing is even more elusive [than regular veil piercing] and 'sanctioned only in the most exceptional circumstances.'"   *Gracey* v. *Albawardi*, No. 2024-0394-LWW, 2024 WL 5116368, at *5 (Del. Ch. Dec. 13, 2024).   It is well settled that "[m]ere control and even total ownership of one corporation by another is not sufficient to warrant the disregard of a separate corporate entity."   *eCommerce Industries, Inc.* v. *MWA Intelligence, Inc.*, No. CV 7471–VCP, 2013 WL 5621678, at *27 (Del. Ch. Sept. 30, 2013).

## CONCLUSION

For the reasons discussed above, the 2020 Bondholders respectfully submit that the Court should decline to enter the Proposed Sale Order in its current form.   The 2020 Bondholders reserve their rights to supplement or modify their objections.   If the Court approves the

recommendation of Gold Reserve's bid, the Court should instead order the revised version of the Proposed Sale Order submitted herewith as Exhibit A.

Dated: Wilmington, Delaware
        July 24, 2025

Respectfully submitted,

*/s/ Daniel A. Mason (#5206)*  

Daniel A. Mason (#5206)
PAUL, WEISS, RIFKIND,
      WHARTON & GARRISON LLP
1313 North Market St., Suite 806
Wilmington, DE 19801
Telephone: 302-655-4410
Facsimile: 302-655-4420
Email: dmason@paulweiss.com

*Counsel for the 2020 Bondholders*

OF COUNSEL:

Jeffrey J. Recher
Paul A. Paterson
Tyler B. Myers
PAUL, WEISS, RIFKIND,
      WHARTON & GARRISON LLP
1285 Avenue of the Americas
New York, New York 10019-6064
Telephone: 212-373-3000
Facsimile: 212-757-3990
Email: jrecher@paulweiss.com
Email: ppaterson@paulweiss.com
Email: tmyers@paulweiss.com