IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| CRYSTALLEX INTERNATIONAL CORPORATION,<br><br>                Plaintiff,<br><br>    v.<br><br>BOLIVARIAN REPUBLIC OF VENEZUELA,<br><br>                Defendant. | C.A. No. 17-mc-151-LPS |

## CRYSTALLEX INTERNATIONAL CORPORATION'S MEMORANDUM IN SUPPORT OF OBJECTIONS TO SPECIAL MASTER'S FINAL RECOMMENDATION

OF COUNSEL:

Robert L. Weigel
Jason W. Myatt
Rahim Moloo
Zachary Kady
GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue
New York, New York  10166
Tel:  (212) 351-4000
Fax:  (212) 351-4035

Miguel A. Estrada
Lucas C. Townsend
Adam M. Smith
GIBSON, DUNN & CRUTCHER LLP
1700 M Street, N.W.
Washington, D.C.  20036
Tel:  (202) 955-8500
Fax:  (202) 467-0539

Dated:  July 24, 2025

Raymond J. DiCamillo (#3188)
Jeffrey L. Moyer (#3309)
Travis S. Hunter (#5350)
RICHARDS, LAYTON & FINGER, P.A.
One Rodney Square
920 North King Street
Wilmington, Delaware  19801
Tel:  (302) 651-7700
Fax:  (302) 651-7701

*Attorneys for Plaintiff*

**TABLE OF CONTENTS**

I.     Introduction ................................................................................................ 1

II.    The Gold Reserve Consortium Bid Does Not Meaningfully Address The Risk That The 2020 Bondholders Pose To Its Proposed Transaction ................... 3

III.   The Gold Reserve Consortium's Bid Fails To Account For Regulatory Risk ............................................................................................................ 16

IV.    The Proposed Sale Order Far Exceeds What Is Contemplated Under Section 324 ............................................................................................................ 18

V.     Conclusion ............................................................................................... 21

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Md. Nat'l Bank v. Porter-Way Harvester Mfg. Co.*,
   300 A.2d 8 (Del. 1972) ........................................................................................18

*Petróleos de Venezuela S.A. v. MUFG Union Bank, N.A.*,
   106 F.4th 263 (2d Cir. 2024) ...............................................................................6

**Statutes**

15 U.S.C. § 19 ...........................................................................................................16

8 *Del. C.* § 324 ..........................................................................................................18

**Other Authorities**

Flint Hills Resources, *Who We Are*, *available at* https://www.fhr.com/who-we-are ...................16

OFAC, *Venezuela Sanctions Regulations - General License No. 5S*
   (June 20, 2025), https://ofac.treasury.gov/media/934391/download?inline ............................6

Pursuant to this Court's Briefing and Discovery Schedule, D.I. 1809; D.I. 1887, Crystallex respectfully submits this memorandum in support of its objections to the Special Master's Final Recommendation, D.I. 1841.[1]

## I.    Introduction

The Special Master's Final Recommendation selects the bid submitted by the Gold Reserve Consortium because, in his view, the price differential between the Consortium's bid and Red Tree's revised Stalking Horse bid outweighs the risk that the Consortium's proposed transaction will not close.[2]  But the difference in price between the two bids is only material insofar as judgment creditors actually receive the higher purchase price in the Consortium's bid.  The Gold Reserve Consortium's proposed transaction relies on $4.5 billion in debt financing secured by the assets of—and ultimately payable by—CITGO Petroleum Corporation ("CITGO Petroleum"). The 2020 Bondholders have made clear that they will seek to block any transaction that leverages the value of CITGO Holding to pay Attached Judgment Creditors in this sale, on the basis that, according to the 2020 Bondholders, such a transaction violates the lien they purport to hold on 50.1% of the CITGO Holding shares.  The 2020 Bondholders may attempt to do so either by obtaining an injunction to preserve their alleged rights under the pledge of the CITGO Holding shares, or by directly exercising their alleged rights to vote the CITGO Holding shares and block the merger.  If either of these actions succeeds, the Gold Reserve Consortium's proposed financing will fail, the sale of PDVH will fall through, judgment creditors will not be paid, and—unless some clear provision is made now for prompt termination of the Gold Reserve SPA and designation of

---

[1] The Special Master also filed a redacted copy of his Notice of Final Recommendation at D.I. 1837.

[2] Capitalized terms used but not defined herein have the meaning ascribed to them in Crystallex's Notice of Objections, D.I. 1847.

1

a backup bidder—this Court, the Special Master, and the parties to this proceeding will likely need to relaunch at least some bidding process for a third time.  A second failed bidding process could deter bidders in a third round of bids, jeopardizing the ultimate success of this proceeding and delaying justice for Crystallex.  Crystallex therefore objects to the Special Master's Final Recommendation unless the SPA is amended to include a clear right of termination if the known risk of the 2020 Bondholders materializes with the result that the Gold Reserve Consortium will be unable to close the sale and pay the Attached Judgment Creditors, and cannot cure that defect within 30 days.

Crystallex further objects to the Special Master's Final Recommendation because the Gold Reserve Consortium fails to adequately plan for regulatory risks that are inherent in its bid, most notably the risk that Koch's ownership interest in the acquisition vehicle introduces antitrust risk that could prevent or delay the closing in the absence of required approvals from the United States Government.  Crystallex respectfully submits that the Gold Reserve Consortium, and each of its members, should be required to meaningfully account for and deal with these regulatory risks to closing now, thereby ensuring to the greatest extent possible that the Proposed Transaction is able to close expeditiously.

Finally, Crystallex objects to the Special Master's Final Recommendation because it includes a Proposed Sale Order that imposes impermissible obligations on third parties and releases a far broader scope of claims than is appropriate, in contravention of Delaware law and this Court's prior orders.  The Special Master and the Gold Reserve Consortium apparently wish to ensure the finality of the sale—a goal Crystallex shares—but the inclusion of these overbroad provisions in the Proposed Sale Order threatens to have the opposite effect.  Indeed, while the history of this case may demonstrate that some parties will litigate frivolous motions endlessly,

such an overbroad sale order all but guarantees unnecessary, costly, and time-consuming litigation and appeals.

## II.    The Gold Reserve Consortium Bid Does Not Meaningfully Address The Risk That The 2020 Bondholders Pose To Its Proposed Transaction

The Sale Procedures Order requires that a successful bid be one that is "capable of being timely consummated." D.I. 481, ¶ 12.  A bid could have a headline price that would satisfy every judgment in this Court's priority waterfall in full, but if the transaction proposed in the bid cannot close, its putatively high purchase price would be worth nothing because it would never be paid to judgment creditors.  Accordingly, when the Court adopted the Special Master's selection of Red Tree as the Stalking Horse Bidder, it informed all bidders—and the Gold Reserve Consortium in particular—that "a successful bid in the Sale Process must, in one way or another, address the litigation risk posed by the 2020 Bondholders, as this risk (however great or small it may be) impacts the assessment of certainty of closing." D.I. 1741, at 4.  The Court rejected "any suggestion that a Final Bid must include a settlement with the 2020 Bondholders." *Id.*  But it also emphasized that a successful Final Bid must still "address[] the possible impact of the 2020 Bondholders' rights—whatever they may be (in reality or potentiality)—on the certainty of closing, even if such bid does not eliminate that risk, provided that such bid *meaningfully addresses* (and neither ignores nor dismisses as if non-existent) that risk." *Id.* (emphasis added).

Because the Gold Reserve Consortium's Topping Bid—like its prior bid in the Stalking Horse round—does not meaningfully address the risk of the 2020 Bondholders' purported rights on the certainty of closing, it presents an unacceptable risk that judgment creditors will not be paid if the bid is approved in its current form.  For that reason, Crystallex's objection to the Special Master's Final Recommendation should be sustained.

1.    As the Special Master notes in his Final Recommendation, the Gold Reserve Consortium's bid would be financed by a $4.5 billion bridge loan to Adolin Holdings Inc., a subsidiary of the proposed buyer Dalinar. D.I. 1841, ¶ 72.  The availability of that financing turns on the ability of Adolin to merge with CITGO Petroleum and make CITGO Petroleum responsible for paying Adolin's $4.5 billion bridge loan.  After Adolin receives its acquisition financing, it "will distribute the cash portion of the purchase price to [an] Escrow Agent" for "distribution to the holders of Attached Judgments" and will then "merge with and into CITGO Petroleum," resulting in CITGO Petroleum "being the new borrower on the acquisition financing incurred in connection with the Proposed Sale Transaction." *Id.*

According to the 2020 Bondholders, their pledge agreement "specifically prohibits distributing 'profits and other distributions'" from CITGO Holding after an event of default and instead requires that all profits and distributions be paid to the 2020 Bondholders' Collateral Agent. D.I. 1677, at 4-5 (quoting D.I. 1441-2, Pledge Agreement § 2.05(c)).  The 2020 Bondholders maintain that the Gold Reserve Consortium's proposed transaction would violate their alleged rights under the CITGO Holding pledge because it "proposes to devalue CITGO Petroleum and its parent CITGO Holding by $4.5 billion" and "send that value outside the reach of the 2020 Bondholders' lien." D.I. 1677, at 5; *see* D.I. 1848 (2020 Bondholders objecting to Special Master's Final Recommendation on this ground).

The Court has recognized that the 2020 Bondholders "intend to challenge" any bid that "involves the upstreaming of any funds from CITGO to pay creditors of PDVSA." D.I. 1571, at 1.  And the Special Master has similarly acknowledged that the financing structure of the Gold Reserve Consortium's bid would result in the "virtual certainty of litigation by the PDVSA 2020 Bondholders" if selected as the winning bid. D.I. 1596 at 14.  Indeed, the 2020 Bondholders have

4

repeatedly confirmed that they will challenge any proposed transaction that they view as impairing the value of their purported security interest in 50.1% of the CITGO Holding shares or as violating their alleged rights under the Pledge Agreement or Indenture underlying the 2020 Bonds, "including any bid that compromises their security by encumbering CITGO assets to pay PDVSA creditors." D.I. 1661, at 1-2; *see also* D.I. 1375; D.I. 1441; D.I. 1469; D.I. 1553; D.I. 1558; D.I. 1568.

It is thus unsurprising that the 2020 Bondholders, through the Trustee and Collateral Agent for their bonds, asked the U.S. District Court for the Southern District of New York to set a briefing schedule to seek relief to prevent the closing of the Gold Reserve Consortium's proposed transaction, "including through an injunction to preserve the status quo while the Court decides the parties' cross-motions for summary judgment," noting that they are "prepared to file a motion for a preliminary injunction promptly." Dkts. 380, 384, *Petróleos de Venezuela, S.A. v. MUFG Union Bank, N.A.*, No. 1:19-cv-10023-KPF (S.D.N.Y.). The 2020 Bondholders have also threatened to block the proposed merger of Adolin and CITGO Petroleum directly by "vot[ing] 50.1% of PDVH's shares in CITGO Holding and thereby effectively control[ling] CITGO Holding." D.I. 1677, at 3. Should the 2020 Bondholders prevail on the merits of their claim, obtain an injunction prohibiting the merger required to finance the Gold Reserve Consortium's proposed transaction, *or* succeed in directly exercising their alleged rights under the pledge, they could derail closing and thus the satisfaction of the judgments in this Court's priority order.

To be sure, the fact that the 2020 Bondholders have promised to take action to prevent the Gold Reserve Consortium's proposed transaction does not mean that such action would be successful. The Southern District of New York has denied the 2020 Bondholders' request for a briefing schedule on a motion for a preliminary injunction because it saw "no need *at this time* to

issue such a schedule." Dkt. 390, at 2, *Petróleos de Venezuela S.A. v. MUFG Union Bank, N.A.*, No. 1:19-cv-10023-KPF (S.D.N.Y. July 17, 2025) (emphasis added). But if this Court were to adopt the Special Master's Final Recommendation and the Southern District of New York were to determine that the 2020 Bondholders' pledge agreement is valid before the closing, the 2020 Bondholders may well be able to persuade the Southern District of New York to grant some relief allowing them to exercise their purported rights to permit them to block the merger between Adolin and CITGO Petroleum, so as to avoid irreparable harm to their rights under the pledge agreement. *See Petróleos de Venezuela S.A. v. MUFG Union Bank, N.A.*, 106 F.4th 263, 265 (2d Cir. 2024) (remanding for the Southern District of New York to determine the validity of the pledge agreement and indenture under Venezuelan law).

Similarly, the 2020 Bondholders currently cannot exercise their purported rights under the pledge agreement because OFAC sanctions prohibit them from engaging in any transactions relating to the pledge of the CITGO Holding shares until December 20, 2025, a date which may be further extended by OFAC. OFAC, *Venezuela Sanctions Regulations – General License No. 5S* (June 20, 2025), https://ofac.treasury.gov/media/934391/download?inline. But it is not reasonable to believe that OFAC will necessarily extend this *status quo* indefinitely, and it is certainly unreasonable to wager the fate of a multi-billion-dollar transaction for the benefit of creditors that have waited years, if not decades, to be made whole, on simply "hoping for the best." The record to-date suggests that OFAC makes such decisions, as circumstances warrant, from time to time and every few months. If and when OFAC allows the sale of the PDVH Shares to close, it may well also allow the 2020 Bondholders to exercise whatever rights they have with respect to CITGO Holding. And, on the face of the pledge, those rights may by then allow the 2020 Bondholders to control the Board of CITGO Holding, the entity that would ultimately need to

approve the merger of Adolin into CITGO Petroleum. In the face of these risks, the only prudent course of action is to make clear *now* that a ruling by the Southern District of New York vindicating the 2020 Bondholders' claimed rights in the CITGO Holding pledge (whether in a ruling on the merits or by granting an injunction) would lead to the prompt termination of the Gold Reserve SPA unless the Consortium can promptly provide evidence of alternative committed financing for the scheduled closing that does not invade the 2020 Bondholders' rights.

Accordingly, while it is far from clear whether the 2020 Bondholders have a high "likelihood of success" in preventing the Gold Reserve Consortium's proposed transaction—either by obtaining an injunction or (with OFAC approval) exercising their purported rights under the pledge—their avowed intent to try "is by definition a risk that weighs on closing certainty" that must be addressed. D.I. 1596, at 14. That is why the Court emphasized that "a successful bid in the Sale Process *must* … meaningfully address[] (and neither ignore[] nor dismiss[] as if non-existent)" the risk the 2020 Bondholders pose to the bidder's proposed transaction. D.I. 1741, at 4 (emphasis added).

**2.** The Gold Reserve Consortium's bid does nothing to meaningfully address the risk that its Proposed Transaction will not close. Despite the Court's encouragement of the Gold Reserve Consortium to improve its bid and the Court's expectation that the ultimately successful bid would have a "greater likelihood of closing than the current Consortium bid," D.I. 1741, at 6, the renewed Gold Reserve Consortium bid "makes *no improvement whatsoever* … on addressing the 2020s' risk," as counsel for the Special Master acknowledged. D.I. 1840-1, at 52:22-53:5 (emphasis added). The Special Master also conceded that, because the Gold Reserve Consortium has not "done anything else to protect [against] that risk," there remains a risk—if the Special Master's

Final Recommendation is adopted—that "there may not be any deal and we may be back into this a year from now." D.I. 1840-1, at 51:8-14.

Moreover, notwithstanding this Court's admonition that "[a]ny prudent bidder … must factor into its assessment" of its proposed transaction "the risk to closing posed by the 2020 Bondholders," the Gold Reserve Consortium has not adequately analyzed this risk (let alone meaningfully addressed it). D.I. 1741, at 6. The Court instructed the Gold Reserve Consortium to "share with the Special Master any evaluation the Consortium has prepared of any risk to closing posed by the 2020 Bondholders." *Id.* at 5-6. Weeks later, the Gold Reserve Consortium finally shared its purported risk assessment, but counsel for the Special Master found "there was not much legal analysis in it" and that "[i]t was mostly conclusory and frankly, arbitrary." D.I. 1840-1, at 51:19-52:10. The Special Master therefore accorded the Gold Reserve Consortium's thin analysis of the risk that its proposed transaction will not close "no weight" in his decision to recommend that transaction. D.I. 1841, ¶ 82(b) n.20.

The fact that the Gold Reserve Consortium's bid does nothing to mitigate the risk that it will not close—and no judgment creditor will in fact be paid—is clear from even a superficial review of the Special Master's Final Recommendation. The Special Master "acknowledges" that the Gold Reserve Consortium's proposed transaction "contains a degree of risk with respect to the PDVSA 2020 Bondholders" and that "there is at least some chance the PDVSA 2020 Bondholders could be successful in their efforts to enjoin a sale of the PDVH Shares similar to the Proposed Sale Transaction." D.I. 1841, ¶ 82(b). Yet nowhere is it explained how the Gold Reserve Consortium bid "address[es] the litigation risk posed by the 2020 Bondholders" as the "successful bid in the Sale Process *must*." D.I. 1741, at 4 (emphasis added). The reason is simple. Rather than engage with the risks imposed by the 2020 Bondholders and the pledge agreement, the Gold

8

Reserve Consortium essentially submitted the same bid the Special Master rejected in the Stalking Horse round and which this Court criticized for its failure to address the risk its financing structure creates with respect to the 2020 Bondholders. Rather than address that risk, the Gold Reserve Consortium's final bid letter just wishes it away as if it were "non-existent," which this Court already cautioned would not be acceptable. D.I. 1741, at 4.

The Gold Reserve Consortium's only response to the risk of the 2020 Bondholders is that OFAC's issuance of GL-5S, which suspends the ability of the 2020 Bondholders to exercise their purported rights under the pledge agreement until December 20, 2025, has "substantially reduced, if not eliminated entirely," the risk presented by the 2020 Bondholders. D.I. 1841-1, Ex. G, at 3; *see* D.I. 1816 (Gold Reserve letter regarding OFAC's issuance of GL-5S). But, while Crystallex wishes it were otherwise, it would be unreasonable to think that the sale would close before December 20, 2025. And it is little more than speculation that OFAC would further extend the limits of the 2020 Bondholders' general license while simultaneously allowing the sale of the PDVH Shares to close. The wishful scenario posited by the Gold Reserve Consortium may prove especially unlikely if, before closing, the Southern District of New York has ruled on the merits of the 2020 Bondholders' dispute—as Crystallex understands that court has communicated to the parties in that case that it intends to do in the coming months—and that ruling is to any extent favorable to the 2020 Bondholders' claimed pledge rights. It requires a lot of suspension of disbelief on the Gold Reserve Consortium's part to urge that OFAC will continue to block the exercise of rights that (by hypothesis) a federal court has vindicated solely to allow its offer to close.

Failing to show that its bid meaningfully addresses the risk that the 2020 Bondholders will prevent its proposed transaction from closing, the Gold Reserve Consortium simply rested on its

contention that the "risk has been substantially reduced by OFAC's issuance of GL-5S."  D.I. 1841-1, Ex. G, at 11.  But, as Gold Reserve itself recognizes, OFAC has extended the suspension of the 2020 Bondholders' license "nineteen times over the course of the past 5+ years."  D.I. 1816, at 1.  OFAC's latest extension is hardly a momentous development in the risk posed by the 2020 Bondholders.  OFAC suspended rights that applied to enforcement of liens of the Additional Judgment Creditors in this case for a long time too—until one day it did not.  More fundamentally, the Gold Reserve Consortium cannot rule out the possibility that OFAC might lift the suspension if the 2020 Bondholders' pledge agreement is determined to be valid by the Southern District of New York, or if it is persuaded that the 2020 Bondholders' purported rights would be irreparably harmed if the Gold Reserve Consortium's proposed transaction were consummated.

In any event, both the Court and the Special Master have recognized that the current suspension of General License No. 5 is material to only *one* of the risks that the 2020 Bondholders present to the Gold Reserve Consortium's proposed transaction—*i.e.*, the risk that they will be able to vote shares of CITGO Holding to block the merger between Adolin and CITGO Petroleum. The Court has explained that the 2020 Bondholders' risk is dependent on at least two independent risks: (1) their ability to obtain "injunctive relief from some court," and (2) their ability to persuade OFAC to lift the suspension of General License No. 5 to allow them "to effectuate any rights they may have."  D.I. 1741, at 6-7.

As counsel for the Special Master notes, "the risk of an injunction" is "separate from the extension of the [suspension of the] GL5 license."  D.I. 1840-1, at 38:8-18.  But the Gold Reserve Consortium's bid does absolutely nothing to mitigate the risk that the 2020 Bondholders might obtain an injunction prohibiting the recommended transaction.  And while the Gold Reserve Consortium stated that it "reviewed in good faith" the Special Master's comments on its proposed

10

SPA, its debt commitment letters, and a commitment to take certain regulatory efforts, and "incorporated many of the Special Master's comments and suggested amendments" to these documents, it never even attempts to explain how any of these revisions might meaningfully address the risk posed by the 2020 Bondholders. D.I. 1841-1, Ex. G, at 11. The Gold Reserve Consortium also stated that it "engaged in extensive, good faith negotiations with the 2020 Bondholders regarding a potential settlement of their claims" but that those "negotiations have not resulted in a final settlement." *Id.*, Ex. G, at 11-12. Any such good-faith efforts by the Gold Reserve Consortium are irrelevant. The Court instructed bidders to "meaningfully address[]" the risk posed by the 2020 Bondholders, not to demonstrate their good faith efforts but stop short of actually changing their bid because they believe, however unreasonably, it nevertheless has a reasonable "certainty of closing." D.I. 1741, at 4. And yet, while the Gold Reserve Consortium stated that it "has taken definite steps" to raise equity financing that might be used to partially fund a transaction with the 2020 Bondholders, D.I. 1841-1, Ex. G, at 12, because such efforts have not yet resulted in new *committed* financing, they do not improve the Gold Reserve Consortium's bid or mitigate the risk of the 2020 Bondholders successfully interfering with the sale of the PDVH Shares in any way. The Special Master thus did not accord these steps "material weight given the Bid Requirement for bidders to have committed financing." D.I. 1841, ¶ 72 n.15. Indeed, throughout his Final Recommendation, the Special Master appropriately declined to give "material weight" to any such failed or uncompleted efforts to improve a bid. D.I. 1841, ¶ 65 n.9 (declining to give "material weight" to Bid B's offer of non-cash consideration "that had not been consented to by Rusoro"); *id.* ¶ 68 & nn.10-11 (declining to give "material weight" to Red Tree's offer of non-cash consideration because it "had not procured the applicable consent").

Because the Gold Reserve Consortium bid neither analyzes nor meaningfully addresses the risk that it will not close if the 2020 Bondholders succeed in their anticipated efforts to stop the transaction, it remains an open question whether it is, in fact, "capable of being timely consummated," which is a requirement for any successful bid under the Sale Procedures Order. D.I. 1841, ¶¶ 11, 78, 98; *see* D.I. 481, ¶ 12. Crystallex and other judgment creditors have accordingly recognized that the structure of the Gold Reserve Consortium's bid effectively renders defeat of the 2020 Bondholders' claims in the Southern District of New York a closing condition for the sale. That is because, if the 2020 Bondholders "succeed on the merits, they could block the merger contemplated by Gold Reserve's financing plans, and thus deprive the bid of its financing." D.I. 1847, at 2; *see* D.I. 1849 (Conoco noting that, if the 2020 Bondholders' claims succeed, that "could render the financing structure for the Gold Reserve Bid impossible or impracticable"); D.I. 1854, ¶ 24 (Red Tree noting that the forthcoming "ruling from the Southern District of New York … will effectively allow or forbid the Gold Reserve Transaction from moving forward").

**3.** In light of the Gold Reserve Consortium's failure to address the problems presented by the 2020 Bondholders, its SPA continues to transfer closing risk to the senior writ holders, such as Crystallex, in the hope that everything works out fine. It is unsurprising that members of the Gold Reserve Consortium, who would largely be out of the money under the Red Tree bid, want to gamble on their bid. And while Crystallex would have made a different recommendation if it were its call to make, it appreciates that the Gold Reserve Consortium's best-case scenario would satisfy more of the outstanding judgments than the current Red Tree bid. However, if the senior writ holders are to bear additional risk because of the uncertainty of the Consortium bid's financing,

they should also be afforded some protection so that the risk is cabined reasonably and not limitless.

Accordingly, any approval of a transaction with the Gold Reserve Consortium should be conditioned on an amendment to the SPA requiring the Special Master to terminate the SPA if the 2020 Bondholders prevail on the merits of their claim, obtain an injunction that impacts the closing of the Proposed Transaction, or otherwise interfere with the Proposed Transaction, and if the Gold Reserve Consortium fails to cure by removing that impediment to closing—presumably in the form of alternative, unconditional committed financing or other funds—within 30 days. At the moment, Section 6.9 of the SPA simply requires Dalinar to "use reasonable best efforts" to "maintain" its financing, or, if such financing "become[s] unavailable prior to the Closing," to "promptly notify the Special Master" and "use its reasonable best efforts promptly to arrange for alternative financing." D.I. 1841-1, Ex. B, § 6.9(e). If Dalinar breaches these covenants, then the Special Master merely has the option to terminate the SPA if the breach "shall not have been cured" prior to 45 days after providing notice of such breach to Dalinar or the "Outside Date" as defined by the SPA, whichever is earlier. *Id.*, Ex. B, § 8.1(f); *see id.*, Ex. B, § 8.1(b) (defining "Outside Date").

While this provision could possibly be invoked in the event the 2020 Bondholder risks develop adversely, the SPA does not address that obvious category of risk clearly and forthrightly—and with the type of prompt consequences and timelines that allow parties and other potential bidders in the auction to make plans. The current terms of the SPA therefore create a substantial risk of protracted litigation over whether the Special Master's termination right has been triggered. For example, would a breach of the SPA occur when the Gold Reserve Consortium's financing falls through or when it fails to "promptly arrange for alternative

financing"?  D.I. 1841-1, Ex. B, § 6.9(e).  If the latter, what would be considered "promptly"—the arrangement of alternative financing within weeks, months, a year?  If the risk that the 2020 Bondholders block the Gold Reserve Consortium's proposed transaction materializes, the determinations of whether Dalinar can promptly arrange for alternative financing, whether Dalinar is in breach of the SPA, and whether the Special Master properly exercised his termination rights could very well delay the sale of the PDVH Shares for months or even years.  That would severely prejudice judgment creditors because this delay and litigation would increase the costs of this Sale Process, potentially degrade the value of the PDVH Shares, and further delay the satisfaction of creditors' judgments.

Crystallex submits that any SPA that relies for financing on the assets of PDVH's subsidiaries to fund payments to the Attached Judgment Creditors in this action—and which does not contain a settlement with the 2020 Bondholders, an alternative source of funds, or some other way of meaningfully addressing the risk its financing will become unavailable—should permit prompt termination of the SPA if the known risk posed by the 2020 Bondholders materializes.  Specifically, the SPA should provide that the agreement terminates if, prior to closing, the 2020 Bondholders are ruled able to exercise their alleged rights under the pledge agreement or obtain a ruling—whether a preliminary injunction or otherwise—that renders the contemplated financing infeasible and the bidder fails to provide proof of committed alternative sources of financing within 30 days of the event that triggered termination.  Such a clear provision would allow the Special Master—once it becomes clear that the successful bid is *not* "capable of being timely consummated," D.I. 481, ¶ 12—to promptly procced with a bid that *is* ready and willing to proceed

with a transaction that is certain to close, thereby protecting judgment creditors from unnecessary delay and expense. *See* D.I. 1854, at 10 n.7 (Red Tree joining this objection).[3]

The Gold Reserve Consortium has introduced a substantial risk that its proposed transaction will not close because it submitted a bid that relies on $4.5 billion in debt financing secured by the assets of CITGO Petroleum and has done nothing to mitigate the possibility that the 2020 Bondholders will succeed in blocking the transaction for that reason. It would be fundamentally unfair to require judgment creditors to bear the risk that the Gold Reserve Consortium's financing may become unavailable based on the occurrence of a known risk that the Consortium did nothing to address. The risk that the 2020 Bondholders might render the Gold Reserve Consortium's bid nonviable should have been explicitly accounted for in the SPA, and the Consortium—not judgment creditors—should bear the risk to closing that is created by its own financing structure. And, if the Gold Reserve Consortium truly believes in their risk analysis and purported ability to arrange for alternative funding, an amendment like the one proposed by Crystallex is one the Consortium should readily accept.

If the Gold Reserve Consortium SPA is not amended to specifically permit a prompt termination of the SPA and either a restart of this Court's Sale Process or a reversion to the next-highest bid (should a bidder commit to keep its offer open for a sufficient period of time), in the

---

[3] A clear and explicit termination provision with a definitive and non-renewable cure period would allow bidders that were not recommended to consider whether to keep their offers open, and their financing sources available, while the 2020 Bondholders' challenges to the Gold Reserve Consortium bid play out. While there is no assurance any bidder would elect to do so, amending the Gold Reserve SPA to include specific and prompt termination provisions would increase the likelihood that the Special Master could have a back-up bid to recommend to the Court without necessarily having to undertake a new, expensive and time-consuming marketing process. Alternatively, if no bids remained open when the SPA is terminated, the Special Master would be able to re-solicit bids on an expedited timeline without waiting for the 2020 Bondholders and Gold Reserve to resolve their disputes, which could take months or even years.

event the 2020 Bondholders successfully interfere with the Gold Reserve Consortium's proposed transaction, this Court should sustain Crystallex's objection to the Final Recommendation.

## III.    The Gold Reserve Consortium's Bid Fails To Account For Regulatory Risk

The Gold Reserve Consortium recognizes that issuing securities in Dalinar to Koch creates a potential regulatory risk to closing if the Federal Trade Commission, Department of Justice, or other government agency finds that Koch—which owns Flint Hills Resources, an operator of a refinery in Corpus Christi, Texas that primarily processes Texas-derived crude oil, and a heavy crude refinery in Minnesota that primarily processes Canadian crude—and Dalinar—which, post-closing would operate multiple refineries, including in Corpus Christi and a heavy crude refinery in Illinois that primarily processes Canadian crude—are competitors in the oil and gas refining industry.  *See* Flint Hills Resources, *Who We Are*, *available at* https://www.fhr.com/who-we-are (last accessed July 24, 2025); D.I. 1841-1, Ex. H, at 2.  That risk appears particularly acute with respect to Koch's right to appoint members to Dalinar's board of directors because the creation of interlocking directorates among competing companies is a *per se* violation of Section 8 of the Clayton Act.  *See* 15 U.S.C. § 19 ("No person shall, at the same time, serve as a director or officer in any two corporations (other than banks, banking associations, and trust companies) that are— (A) engaged in whole or in part in commerce; and (B) by virtue of their business and location of operation, competitors, so that the elimination of competition by agreement between them would constitute a violation of any of the antitrust laws.").

Yet the Gold Reserve Consortium makes no concrete commitments to account for this risk. The regulatory commitment letter submitted with the Consortium's bid provides only that: (1) shares in Dalinar issued to Koch will be non-voting shares only (a limitation undercut by Koch's separate right to appoint directors); (2) Koch will "maintain such protocols" to prevent competing affiliates from "having access to competitively sensitive information disseminated to

16

such [competing entity] by Dalinar Energy or its subsidiaries;" and (3) Koch will not appoint to Dalinar's board of directors an individual who also serves as a director or officer of a Competing Affiliate.  D.I. 1841-1, Ex. H, at 2-3.[4]

These commitments may be insufficient to secure regulatory approval for the Proposed Transaction.  For example, regulators could find that Section 8 of the Clayton Act prohibits any Koch affiliate from appointing directors to Dalinar's board, or that none of Koch's proposed directors is suitable, leading to an impasse.  Neither the SPA nor the Special Master's Final Recommendation contains explicit terms requiring appropriate responses to regulators concerned about these or other risks, or to undertake action promptly to resolve such concerns to regulators' satisfaction.  To obtain this Court's approval, each member of the Gold Reserve Consortium should be required to commit to relinquish board seats, to invest in Dalinar Energy through an alternative investment vehicle, or to undertake any and all actions that may be required to secure expeditious approval of the Proposed Transaction from the relevant regulatory authorities.  Crystallex objects to the Special Master's Final Recommendation to the extent it fails to incorporate such explicit terms requiring adequate responses to these known risks to closing and fails to permit an explicit termination right if any member of the Gold Reserve Consortium fails to take adequate steps to address regulatory barriers to closing within 30 days of such concerns being communicated to the Consortium.

---

[4] The commitment letter defines a Competing Affiliate as "a competitor of the assets that are the subject of this investment by Dalinar Energy such that the elimination of competition by agreement between such affiliate and Dalinar Energy would constitute a violation of any of the antitrust laws of the United States."  D.I. 1841-1, Ex. H, at 2.

**IV.    The Proposed Sale Order Far Exceeds What Is Contemplated Under Section 324**

The overbroad releases and obligations in the Proposed Sale Order threaten to derail the sale of the PDVH Shares and further delay Crystallex's and other Attached Judgment Creditors' receipt of funds in satisfaction of their claims against Venezuela and PDVSA.  Section 324 simply requires the Court to sell the PDVH Shares "at public sale to the highest bidder."  8 *Del. C.* § 324.  And this Court has already warned bidders that the Sale Procedures Order "'does not purport to restrict future enforcement actions against assets other than the PDVH Shares themselves or provide for a release of claims against PDVH.'"  D.I. 1515, at 18 (brackets omitted).  Indeed, "[t]he basis for the Court's ability to sell the PDVH Shares free and clear" of attachments is not some general authority to enhance the value of the shares, but rather Delaware law's requirement "that distributions be made 'on the basis of priority of liens.'"  D.I. 1583, at 2 (quoting *Md. Nat'l Bank v. Porter-Way Harvester Mfg. Co.*, 300 A.2d 8, 11 (Del. 1972)).  The Proposed Sale Order contravenes these prior statements and purports to expand the Court's authority beyond what is permitted under Delaware law.  As set out below, the Proposed Sale Order improperly: (1) releases claims against PDVH itself, rather than releasing only claims against the PDVH Shares as the Court is authorized to do; and (2) makes factual findings about the viability of claims against PDVH following the closing of the sale.  Crystallex therefore objects to the inclusion of the overbroad Proposed Sale Order included as part of the Special Master's Final Recommendation.

**1.**  The Proposed Sale Order should be rejected because it contains an overbroad release of claims and liabilities.  The release in the Proposed Sale Order spans nearly an entire page, introducing needless confusion and uncertainty by attempting to list every potential type of claim or encumbrance released upon closing of the sale.  *See* D.I. 1841-1, Ex. A, at 14-15.  But the Court's directive that the PDVH Shares will be sold free and clear of claims against them is simple; it means "free and clear of any and all claims, encumbrances, and liabilities ***attached to the PDVH***

***Shares themselves***." D.I. 1515, at 17-18 (emphasis in original). That is all the Proposed Sale Order needs to say. The Gold Reserve Consortium appears to accept this, summarizing their proposed releases by noting that "[f]ollowing the Sale Transaction, the Notice Parties shall have no recourse against Buyer or Buyer Affiliates or against the PDVH Shares, on account of those parties' respective judgments or other Claims against the Republic, PDVSA, or their respective Affiliates." D.I. 1841-1, Ex. A, at 15. The Court should direct the Special Master to amend the proposed releases to remove the unnecessary risk of appeal created by the overbroad releases contained in the Proposed Sale Order.

    2.    The Proposed Sale Order makes factual findings that the buyer is not a mere continuation of, or holding itself out as a continuation of, Venezuela, PDVSA, or related entities. D.I. 1841-1, Ex. A, at 12-13. The Proposed Sale Order also purports to find, as a factual matter, that "the Sale Transaction does not amount to a consolidation, merger, de facto merger, acquisition of all or substantially all assets, or similar transaction of Buyer or Buyer Affiliates with or into the Republic or PDVSA" and that "Buyer and Buyer Affiliates shall have no successor or vicarious liability of any kind or character whatsoever … with respect to the business operations of the Republic, PDVSA, their Affiliates, or the PDVH Shares. *Id.* at 13.

    Although a contrary finding is unlikely, the Court need not make such unnecessary findings in connection with the sale of the PDVH Shares. The Court's task is to sell the PDVH Shares to the highest bidder, not to assess PDVH's relationship with other entities and whether Dalinar could be considered a continuation of PDVH in some hypothetical future proceeding based on predictions about how Dalinar operates PDVH in the future. As the Court has already found, Delaware law requires only that the PDVH Shares be sold free and clear of any claims against the PDVH Shares themselves.

With respect to each of the above provisions concerning the release of claims and proposed factual findings regarding PDVH's continuing liability, the Proposed Sale Order states that "[a] sale of the PDVH Shares without the foregoing protections would yield substantially less value for Crystallex, ConocoPhillips, and the Additional Judgment Creditors." D.I. 1841-1, Ex. A, at 14. That may be true, but it is a risk the Court warned bidders they must account for when submitting their bids. *See* D.I. 1515, at 18 (finding it is "likely true" that "'the value to be obtained in the sale process will be significantly lower if the buyer is forced to accept potential liability for claims against the Republic and PDVSA'"). Nevertheless, "[t]he Court was not, and is not, marketing PDVH Shares free and clear of whatever claims, encumbrances, and liabilities are, have been, or may be attached to any asset or subsidiary of PDVH." *Id.* It is thus plainly improper for the Gold Reserve Consortium to assert, and to ask this Court to find, that they "would not have entered into the Transaction Documents and would not acquire the PDVH Shares but for the foregoing protections." D.I. 1841-1, Ex. A, at 14. Indeed, the Court's prior Orders made explicit that these protections would not be granted, and the Gold Reserve Consortium should not be permitted to insist otherwise now.

"[T]he whole point of the endeavor in which the Court is engaged is to compensate judgment creditors by allowing them to execute on the value of judgment debtors' property found in this District." D.I. 1515, at 18 (emphasis omitted). The Gold Reserve Consortium's proposed order effectively inflates the value of the PDVH Shares—or at least is designed to protect their value—by offering protections beyond those envisioned in the Court's prior orders (protections which other bidders, relying on those orders, presumably did not include in pricing their bids). While Crystallex shares the desire to sell the PDVH Shares for the greatest possible sum and to put this sale process to rest, attempting to shield PDVH from future litigation threatens to have the

opposite effect.  A Proposed Sale Order that includes excessive releases and unnecessary factual findings creates *an increased risk* that the Court's sale order is challenged on appeal because it exceeds what is permitted under Delaware law.  Crystallex therefore objects to the overbroad Proposed Sale Order.

## V.    Conclusion

Crystallex reserves the right to amend or expand upon its objections based on additional facts learned in the discovery process, should they be addressed by responses from the Special Master or other parties to this litigation, or in response to further objections submitted as part of this Court's Sale Process.

OF COUNSEL:

Robert L. Weigel
Jason W. Myatt
Rahim Moloo
Zachary Kady
GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue
New York, New York  10166
(212) 351-4000

Miguel A. Estrada
Lucas C. Townsend
Adam M. Smith
GIBSON, DUNN & CRUTCHER LLP
1700 M Street, N.W.
Washington, D.C.  20036
Tel:  (202) 955-8500
Fax:  (202) 467-0539


Dated: July 24, 2025

*/s/ Travis S. Hunter*
Raymond J. DiCamillo (#3188)
Jeffrey L. Moyer (#3309)
Travis S. Hunter (#5350)
RICHARDS, LAYTON & FINGER, P.A.
One Rodney Square
920 North King Street
Wilmington, Delaware  19801
(302) 651-7700
dicamillo@rlf.com
moyer@rlf.com
hunter@rlf.com

*Attorneys for Plaintiff*