### IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| CRYSTALLEX INTERNATIONAL CORP., | ) | |
| | ) | |
| *Plaintiff*, | ) | |
| | ) | No. 1:17-mc-00151-LPS |
| v. | ) | |
| | ) | |
| BOLIVARIAN REPUBLIC OF VENEZUELA, | ) | **REDACTED** |
| | ) | |
| *Defendant*. | ) | |

_____

### THE BOLIVARIAN REPUBLIC OF VENEZUELA, PETRÓLEOS DE VENEZUELA, S.A., PDV HOLDING, INC. AND CITGO PETROLEUM CORPORATION'S MEMORANDUM OF LAW IN SUPPORT OF NOTICE OF OBJECTIONS TO <u>SPECIAL MASTER'S FINAL RECOMMENDATION</u>

## TABLE OF CONTENTS

INTRODUCTION ............................................................................................................ 1

NATURE AND STAGE OF PROCEEDINGS ........................................................... 2

LEGAL STANDARD .................................................................................................... 5

ARGUMENT ................................................................................................................... 6

I.     The Dalinar Bid is grossly inadequate and shocks the conscience. ...................... 6

       A.    *The Dalinar Bid price is less than 50% of PDVH's fair market value.* ...... 7

       B.    *The Dalinar Bid is unconscionable in any event.* ...................................... 8

       C.    *Delaware law does not permit inferring that a forced sale generates fair market value, and the Special Master did not act like a "willing seller."* ................................................................................................ 9

II.    The Dalinar Bid resulted from material and prejudicial defects in the sale process ............................................................................................................... 13

       A.    *The Special Master failed to seriously consider alternative transactions at the outset and refused to change course once the process was clearly failing.* ...................................................................... 14

       B.    *The Special Master recommended an unjustifiably low stalking horse bid and failed to generate competition among bidders during the topping period.* ...................................................................................... 16

       C.    *The Special Master failed to foster competition or run a "public sale."* .................................................................................................... 21

       D.    *The Special Master placed an undue emphasis on contingent liabilities and then failed to mitigate the bid-chilling uncertainties they caused.* ........................................................................................ 22

           1.    The Special Master's representations and decisions regarding the 2020 Bondholders' purported claims destroyed value for the PDVH shares. .................................................................. 22

           2.    The Special Master's representations and decisions regarding the PDVH Alter Ego Litigation destroyed value for the PDVH shares. ................................................................................... 25

       E.    *The Court's statements also chilled bidding.* ........................................... 27

   *F.*  *Evercore's incentives prejudiced the sale process.* .................................... 28

   *G.*  *Modifying the design of the sale process and avoiding material errors would generate more value for the PDVH shares if the sale process were re-run.* .......................................................................................... 29

III. The Court should not confirm the Dalinar Bid because of defects in the attachments. ........................................................................................... 30

IV. The Court should not confirm the Dalinar Bid for additional reasons. ............... 32

V. Notice of impossibility or inappropriateness of SPA provisions. ........................ 34

CONCLUSION .............................................................................................................. 35

# TABLE OF AUTHORITIES

**Cases**

*Aetna Cas. & Sur. Co. v. Markarian,*
  114 F.3d 346 (1st Cir. 1997) ................................................... 33

*Atl. Props. Grp., Inc. v. Deibler,*
  1994 WL 45433 (Del. Super. Ct. Jan. 6, 1994), *aff'd*, 652 A.2d 553 (Del. 1995)..................... 9

*Banco Nacional de Cuba v. Chem. Bank N.Y. Tr. Co.* ("*Bancec*"),
  782 F.2d 377 (2d Cir. 1986) ................................................... 32

*BFP v. Resolution Tr. Corp.*,
  511 U.S. 531 (1994).............................................................. 10

*Blossom v. Milwaukee & C.R. Co.*,
  70 U.S. 196 (1865) ............................................................... 24

*Boatmen's Nat'l Bank v. Eidson*,
  796 S.W.2d 920 (Mo. Ct. App. 1990) ..................................... 21

*Buechner v. Farbenfabriken Bayer Aktiengesellschaft*,
  154 A.2d 684 (Del. 1959) ...................................................... 30

*Burge v. Fid. Bond & Mortg. Co.*,
  648 A.2d 414 (Del. 1994) .................................................. passim

*Carlisle v. United States*,
  517 U.S. 416 (1966)............................................................... 33

*Cent. Nat'l Bank of Wilmington v. Indus. Tr. Co.*,
  51 A.2d 854 (Del. Super. Ct. 1947) ......................................... 8

*Crystallex Int'l Corp. v. Bolivarian Republic of Venezuela*,
  24 F.4th 242 (3d Cir. 2022)..................................................... 31

*Crystallex Int'l Corp. v. Bolivarian Republic of Venezuela*,
  932 F.3d 126 (3d Cir. 2019)...................................................... 5

*Deng v. HK Xu Ding Co., Ltd.*,
  2023 WL 3318322 (Del. Super. Ct. May 8, 2023), *aff'd*, 312 A.3d 651 (Del. 2024)................. 8

*DFC Glob. Corp. v. Muirfield Value Partners, L.P.*,
  172 A.3d 346 (Del. 2017) ........................................................ 7

*Gares v. Willingboro Twp.*,
  90 F.3d 720 (3d Cir. 1996) ...................................................... 9

*Gelfert v. Nat'l City Bank of N.Y.*,
   313 U.S. 221 (1941) ........................................................................................ 6

*Girard Tr. Bank v. Castle Apartments, Inc.*,
   379 A.2d 1144 (Del. Super. Ct. 1977) ....................................................... 7, 8, 10

*Grider v. Keystone Health Plan Cent., Inc.*,
   500 F.3d 322 (3d Cir. 2007) .................................................................... 33, 34

*Home Beneficial Life Ins. Co. v. Blue Rock Shopping Ctr., Inc.*,
   379 A.2d 1147 (Del. Super. Ct. 1977) ......................................................... 5, 8

*In re Alexander Jones*,
   Case No. 22-33553 (S.D. Tex. Bankr.) .................................................... 20, 22

*In re Downham Co.*,
   165 A. 152 (Del. Super. Ct. 1932) .................................................................. 10

*In re Time Sales Fin. Corp.*,
   445 F.2d 385 (3d Cir. 1971) .......................................................................... 21

*In re Watertech Holdings, LLC*,
   619 B.R. 324 (Bankr. D.S.C. 2020) ............................................................... 17

*In re WestPoint Stevens, Inc.*,
   600 F.3d 231 (2d Cir. 2010) .......................................................................... 17

*In re Winthrop Mills*,
   106 F. Supp. 464 (D. Me. 1952) .................................................................... 21

*Ivey v. Harney*,
   47 F.3d 181 (7th Cir. 1995) ........................................................................... 33

*J. Ray McDermott & Co. v. Vessel Morning Star*,
   457 F.2d 815 (5th Cir. 1972) ........................................................................... 6

*King v. Lyons*,
   248 P.3d 878 (N.M. 2011) ............................................................................. 21

*Kool, Mann, Coffee & Co. v. Coffey*,
   300 F.3d 340 (3d Cir. 2002) ............................................................................ 7

*Monsanto Co. v. Geertson Seed Farms*,
   561 U.S. 139 (2010) ...................................................................................... 34

*Offredi v. Huhla*,
   60 A.2d 779 (Conn. 1948) ............................................................................. 21

*OI Eur. Grp. B.V. v. Bolivarian Republic of Venezuela*,
   663 F. Supp. 3d 406 (D. Del. 2023) ........................................................ 30

*OI Eur. Grp. B.V. v. Bolivarian Republic of Venezuela*,
   73 F.4th 157 (3d Cir. 2023) .................................................................... 30

*Oldham v. Hossenger*,
   10 Del. 434 (Del. Super. Ct. 1878) ......................................................... 7

*Peacock v. Thomas*,
   516 U.S. 349 (1996) ............................................................................... 32

*Peterson v. Bank Markazi*,
   121 F.4th 983 (2d Cir. 2024) ................................................................. 32

*Poole v. N. V. Deli Maatschappij*,
   243 A.2d 67 (Del. 1968) ....................................................................... 10

*Sec. Tr. & Safe Deposit Co. v. Gallagher*,
   84 A. 806 (Del. Super. Ct. 1911) ............................................................ 7

*Shields v. Bobby Murray Chevrolet, Inc.*,
   261 S.E.2d 238 (N.C. Ct. App. 1980) ................................................... 21

*Sibbach v. Wilson & Co.*,
   312 U.S. 1 (1941) .................................................................................. 33

*United States v. Denedo*,
   556 U.S. 904 (2009) .............................................................................. 33

*US Bank NA v. B R Penn Realty Owner LP*,
   137 F.4th 104 (3d Cir. 2025) ................................................................... 6

*Wood v. Drury*,
   56 Kan. 409, 43 P. 763 (1896) ............................................................. 22

**Statutes**

28 U.S.C. § 1330 ......................................................................................... 31

28 U.S.C. § 1604 ......................................................................................... 31

28 U.S.C. § 2001 ........................................................................................... 6

28 U.S.C. § 2002 ........................................................................................... 6

28 U.S.C. § 2004 ........................................................................................... 6

8 Del. C. § 324 ..................................................................................... passim

Ala. Code § 9-15-80 ................................................................................................... 21

Ind. Code Ann. § 5-22-22-5 ......................................................................................... 21

**Rules**

Fed. R. Civ. P. 69 ................................................................................................ 5, 6, 33

**INTRODUCTION**

The Venezuela Parties ("VPs") have always recognized the difficulty and complexity of this share sale. But difficulty and complexity do not excuse an unconscionable result or defective process. From the start, the Special Master and his advisors have ignored the VPs' suggestions to maximize value and their criticisms of the process he ran, unfairly characterizing them as pretexts for delay. And the Court has, regrettably, shown the Special Master too much deference throughout this process, even as he and his advisors repeatedly committed obvious errors that stifled participation and reduced value. As a result, a process to which the Court and the parties have devoted so much time has, predictably, failed. Not only has it failed to maximize value, its premise is also flawed, given that $19 billion of the $21 billion in attachments are invalid under Delaware law, meaning that this forced sale should never have taken place in the first instance.

Under Delaware law, the result of a forced sale should not be confirmed if it is grossly inadequate and shocks the conscience of the court. A sale price that is less than 50% of an independent valuation of the fair market value of the PDVH shares presumptively meets this standard. Dalinar's bid for $7.382 billion is well below 50% of the shares' fair market value of $18.6 billion. And even if Dalinar's bid were not below 50% of fair market value, it still would be unconscionable to accept it given that it is an unprecedented billions of dollars below any rational valuation of the shares, including the valuation prepared by the Special Master's own advisor Evercore. The Special Master's attempt to evade the Delaware test by claiming that his process was equivalent to an open-market process by a willing seller is inconsistent with Supreme Court and Delaware precedent, which makes clear that the price obtained in a forced sale is the antithesis of fair market value. It is also belied by his own conduct in administering the sale.

In addition, Dalinar's bid should be rejected because the materially defective process run

1

by the Special Master and his advisors directly contributed to the multi-billion-dollar shortfall. Myriad errors destroyed billions of dollars in value, causing prejudice to the Republic and PDVSA, which will be deprived of the discharge of billions of dollars' worth of debts. Redesigning and re-running the process without these defects, particularly as a new process would occur with materially greater certainty regarding contingent liabilities, would yield a higher bid.

For these and additional reasons below, the Court should not confirm the Dalinar Bid.

## NATURE AND STAGE OF PROCEEDINGS[1]

The Attached Judgment Creditors ("AJCs") collectively hold over $21 billion in judgments against the Republic or PDVSA, which they seek to execute through a sale of PDVSA's shares of PDVH pursuant to 8 *Del. C.* § 324. In May 2021, the Court appointed the Special Master to design a value-maximizing "plan for the sale of shares of PDVH as necessary to satisfy" the AJCs' judgments "and/or devise such other transaction as would satisfy" them, "while maximizing the sale price of any assets to be sold." D.I. 277 ¶ 2. Throughout the design and proposal of a sale procedures order, the VPs presented their concerns to the Special Master and litigated their objections.[2] On October 11, 2022, the Court entered a sale procedures order ("SPO") proposed by the Special Master, D.I. 481, over numerous objections by the VPs, D.I. 469.

On September 27, 2024, the Special Master recommended a preliminary winning bidder, Amber Energy, to the Court. Amber offered to purchase the PDVH shares for $7.286 billion. D.I. 1325. That offer was illusory, however, as it was subject to deductions and holdbacks, and would have held all of the sale proceeds in escrow with no guarantee that they would ever be re-

---

[1] The VPs presume the Court's familiarity with capitalized terms and the history of this matter.
[2] *See* D.I. 354, D.I. 354-1, D.I. 354-2; D.I. 355, D.I. 355-1, D.I. 355-2, D.I. 355-3, D.I. 355-4, D.I. 355-5; D.I. 423, D.I. 423-1, D.I. 423-2; D.I. 457, D.I. 457-1, D.I. 457-2, D.I. 457-3; D.I. 561, D.I. 561-1.

leased for the benefit of the AJCs. All interested parties opposed Amber's September bid.[3] The revised bid Amber proposed in November 2024 (which included a $2 billion decrease in the purchase price) met similar resistance. D.I. 1417; D.I. 1418; D.I. 1419. After the Special Master conceded that a "pivot" in the sale process was necessary, D.I. 1455 at 2–3, the Court ordered the parties to develop yet another plan for a new round of bidding under the SPO that would include the solicitation of stalking horse bids followed by a topping period. *See* D.I. 1517.

On March 21, 2025, the Special Master recommended Red Tree as the stalking horse bidder. D.I. 1596. Red Tree's bid, a $3.699 billion partial credit bid, was not the highest stalking horse bid that the Special Master received. *Id.* ¶ 24. It was $3 billion lower than the $6.949 billion bid submitted by Dalinar. D.I. 1837 ¶ 80 n.17. The Special Master attempted to justify his decision by highlighting that Red Tree had locked up a deal with the 2020 Bondholders to settle their (heavily disputed) pending claims against the CITGO Holding stock which, in the Special Master's mind, provided greater closing certainty. D.I. 1596 ¶ 34. On April 21, over the VPs' objections, the Court adopted that recommendation. D.I. 1741. In doing so, the Court warned that "any bid it is likely to approve at the conclusion of the Sale Process will need a balance that places much greater emphasis on price and lesser emphasis on certainty." D.I. 1741 at 3.

A topping period then began, during which the Court directed the Special Master to create "competitive tension" to increase the price of the bids and to ensure that the process did not devolve into "a competition among bidders to strike a deal with the 2020 Bondholders, rather than (or at the expense of) improving bids" on price. D.I. 1741 at 6. The Court stated that if a final recommended bid did not have "a price at or exceeding" Dalinar's stalking horse bid "while

---

[3] *See, e.g.*, D.I. 1388 (CITGO, PDVH, and PDVSA); H'rg Tr. (Oct. 1, 2024) at 29:19–21 (Crystallex); *id.* at 42:12–13 (ConocoPhillips); D.I. 1373-4 (Red Tree); D.I. 1373-5 (consortium).

also having a greater likelihood of closing," that would "tend to undermine the persuasiveness of any recommendation that the Court approve a Final Bid." D.I. 1741 at 6. On June 18, at the end of the topping period, the Special Master had only the stalking horse bid from Red Tree ($3.699 billion), and "topping" bids from ████████ ($3.831 billion) and Dalinar ($6.949 billion), D.I. 1837 ¶¶ 54, 57, 64, 80 n.17, none of which had materially increased in price.[4]

On June 23, the Special Master told Red Tree he had received a superior proposal. D.I. 1838 ¶ 46. By June 25, Red Tree increased its bid by a nominal $107 million, ████ did not change its bid from June 18 ($3.831), ███ submitted a $3.806 billion bid, with a proposal to increase its purchase price by ~$1.569 billion in non-cash consideration that no bidder had accepted, and Dalinar increased its bid by $433 million (consisting only of Gold Reserve credit bidding the rest of its judgment and providing non-cash consideration to creditor Siemens). *See* D.I. 1838 ¶¶ 47–48, 58, 61, 62–63; D.I. 1837 ¶ 80 n.17. Black Lion also submitted a conditional bid for a purported $8.0 billion that was deemed non-serious by the Special Master. *See* D.I. 1837 ¶ 59.

On June 24, 2025, the Special Master had an *ex parte* conversation with the Court in which the Court reiterated its position that it was inclined to view price, not resolution of the 2020 Bondholder Litigation, as the most important factor for selecting a winner. D.I. 1840-1 at 59:25–62:15. The next day, the Special Master terminated Red Tree's stalking horse status and executed a stock purchase agreement ("SPA") with Dalinar. D.I. 1838 ¶ 67; D.I. 1837-1 at 41.[5]

On July 2, the Special Master recommended the Dalinar Bid. D.I. 1837. Consistent with the SPO, D.I. 481 ¶ 42, the VPs advised the Special Master throughout the sale process of con-

---

[4] Differences between Dalinar's stated bid values and those cited herein use the Special Master's recalculation of those values. *Compare* RJW5 Exs. 20 & 21, *with* D.I. 1837 ¶¶ 69 n.12, 80 n.17.
[5] The VPs do not address herein the ████████████████████████████.

cerns and objections to its implementation, identifying reasons it would fail to maximize value. Exs. 3, 4, 6–23, 53.[6] With the Dalinar Bid now presented to the Court, the VPs object to its approval.[7]

## **LEGAL STANDARD**

Execution procedures, and proceedings supplementary to and in aid of execution, "must accord with the procedure of the state where the court is located, but a federal statute governs to the extent it applies." Fed. R. Civ. P. 69(a). The relevant state law is Delaware law, which requires the Court to issue an order confirming the forced sale of corporate stock. 8 *Del. C.* § 324(a), (c). Delaware courts reject the outcome of a forced sale where the "price is so grossly inadequate as to shock the conscience of the Court," *Home Beneficial Life Ins. Co. v. Blue Rock Shopping Ctr., Inc.*, 379 A.2d 1147, 1149 (Del. Super. Ct. 1977) (citing authorities); *accord Burge v. Fid. Bond & Mortg. Co.*, 648 A.2d 414, 419 (Del. 1994), and/or where "there was 'some defect or irregularity in the process or mode of conducting the sale, or [ ] neglect of duty, or misconduct on the part of the [sale officer] *or some other sufficient matter* whereby the rights of parties to, or interested in the sale are, or may have been, prejudiced,'" *Burge*, 648 A.2d at 419.

To the extent that the Special Master suddenly suggests that federal law governs confirmation, D.I. 1837 ¶ 88, that suggestion should be rejected. At no time in this litigation has anyone disputed that Delaware law controls the propriety or confirmation of the sale. *E.g.*, D.I. 83 at 74 n.48 ("The parties appear to agree that Delaware law" applies.) (citing Section 324), *aff'd*, 932 F.3d 126 (3d Cir. 2019). Further, the Special Master's own SPO states that the "statutory and

---

[6] Herein, "Ex." refers to exhibits supported by the July 24, 2025 Declaration of Nathan P. Eimer; "RJW5 Ex." refers to exhibits appended to Ex. 1 to the Eimer Declaration.

[7] As identified in their Notice (D.I. 1859 ¶ 8), the VPs will respond to objections filed by Red Tree (D.I. 1854). Arguments responsive to Red Tree's position are preserved for a response brief, due August 7, 2025. The VPs likewise reserve the right to respond to any other objections filed.

legal predicates" of the process are, *inter alia*, Rule 69(a) and Section 324. D.I. 481 at 5. While there have been disputes about *how* to apply Delaware law, *e.g.*, D.I. 1521 (Crystallex); D.I. 1522 (Special Master); D.I. 1527 (Special Master), those disputes accepted that Delaware law governs. Alarmingly, the Special Master's Final Recommendation tries to sneak in this major change, nearly copying the "statutory and legal predicates" language from the SPO but *adding* a new reference to 28 U.S.C. § 2004 (the federal judicial sale statute).[8] *Compare* D.I. 481 at 5, *with* D.I. 1837 ¶ 13. Insofar as the Special Master now tries to change the rules of the road, his new argument is wrong and, in any event, forfeited.[9]

## **ARGUMENT**

### I.     **The Dalinar Bid is grossly inadequate and shocks the conscience.**

Delaware courts do not confirm forced sales where the sale price is "grossly inadequate,

---

[8] The SPO is clear that everyone understood Section 324 to apply. For example, the SPO requires two weeks of newspaper notice ahead of sale deadlines (SPO ¶ E), consistent with Section 324(a); the federal analogue contemplates four weeks (28 U.S.C. § 2002). The SPO also expressly notes that the VPs waived certain notice requirements under *Delaware* law. SPO at 8 n.3.

[9] If the Special Master relies on Section 2004 in his response, the VPs reserve the right to respond in full to this as-yet undeveloped argument. Yet, to the extent such argument is not forfeited, the sale cannot be confirmed under the 28 U.S.C. § 2004. A "public sale" under Section 2004 is one that takes place "at the courthouse" and is accompanied by "notice published once a week for at least four weeks" in newspapers. 28 U.S.C. §§ 2001, 2002. This sale did not take place at the courthouse, and the Special Master published notice in newspapers for two-week periods, consistent with the requirements of *8 Del. C. 324(a)* (*i.e.*, the provision everyone has agreed, until now, governs). Even assuming this is a "public" judicial sale under the federal regime, this notice defect would foreclose confirmation. *See US Bank NA v. B R Penn Realty Owner LP*, 137 F.4th 104, 113 (3d Cir. 2025) ("And when setting the terms and conditions of a judicial sale, courts are guided by §§ 2002–07, which govern notice…."). The Special Master's statement that no one objected to the notice procedures (D.I. 1837 ¶ 53) is irrelevant, as the VPs evaluated notice provisions pursuant to Section 324, which governs under the SPO. Even if the notice defect were not fatal, public sales under federal law are set aside "if the inadequacy [of price] is so great as to shock the conscience or if there are additional circumstances against its fairness, such as chilled bidding." *Gelfert v. Nat'l City Bank of N.Y.*, 313 U.S. 221, 232 (1941); *J. Ray McDermott & Co. v. Vessel Morning Star*, 457 F.2d 815, 819 (5th Cir. 1972) (gross inadequacy of price applicable in reviewing Section 2004 sale). For the reasons described herein, such deficiencies exist here.

shocking the conscience of the court." *Burge*, 648 A.2d at 419 (cleaned up). The default standard is that "if [the fair market] value" of the property sold "is more than twice the sale price, there is such gross inadequacy as will shock the conscience of the Court." *Girard Tr. Bank v. Castle Apartments, Inc.*, 379 A.2d 1144, 1145–46 (Del. Super. Ct. 1977); *accord Burge*, 648 A.2d at 419 (requiring "special judicial scrutiny" of such a bid, which "is considered" grossly inadequate and conscience-shocking). The Dalinar Bid fails this test, and even if it did not, it still would be unconscionable given the magnitude of the price shortfall and the characteristics of the asset.

### A.    The Dalinar Bid price is less than 50% of PDVH's fair market value.

Dalinar proposes purchasing 100% of the PDVH shares for a mix of cash and non-cash consideration it values at $7.382 billion. D.I. 1837 ¶ 69. As explained in the expert report of Dr. José Alberro (Ex. 2),[10] the fair market value of the shares is **$18.6 billion.**[11] Accordingly, the Dalinar Bid reflects only **39.7% of the shares' fair market value**. It thus falls well below the Delaware standard, is grossly inadequate, shocks the conscience, and should not be confirmed. *Burge*, 648 A.2d at 419; *Girard*, 379 A.2d at 1145–46; *see also, e.g.*, *Sec. Tr. & Safe Deposit Co. v. Gallagher*, 84 A. 806, 806 (Del. Super. Ct. 1911) (rejecting sale as grossly inadequate that attained **46%** of fair market value, as assessed by would-be bidder); *Oldham v. Hossenger*, 10 Del. 434, 434 (Del. Super. Ct. 1878) (same for **47%** of fair market value).[12]

---

[10] Dr. Alberro is a PhD economist and valuation expert with extensive experience in the petroleum industry. He calculated the shares' fair market value using the discounted cash flow method ("DCF"), which is "favor[ed]" in cases, like here, involving the "extremely difficult task of valuing the stock of a company which is privately owned and not traded on a public exchange." *Kool, Mann, Coffee & Co. v. Coffey*, 300 F.3d 340, 362–63 (3d Cir. 2002); *accord DFC Glob. Corp. v. Muirfield Value Partners, L.P.*, 172 A.3d 346, 369, n.118 (Del. 2017) (viewing DCF as particularly appropriate for valuing large, privately held companies in the stockholder appraisal).

[11] On July 22, Red Tree and the Special Master served responses to Dr. Alberro's report, to which he and the VPs will respond in a reply report and in subsequent briefing. Pending discovery requests regarding Gold Reserve's judgment may also require adjusting Dr. Alberro's calculations.

[12] Dalinar has decided to take on the 2020 Bondholder litigation. The Bondholders have been

7

Where "gross inadequacy is established, the Court is usually justified in inferring that a resale would correct the situation." *Cent. Nat'l Bank of Wilmington v. Indus. Tr. Co.*, 51 A.2d 854, 858 (Del. Super. Ct. 1947). Here, the VPs have gone further by submitting evidence that, if process failures are corrected, "a higher bid [is] likely to be made at a subsequent sale." *Girard*, 379 A.2d at 1146; *Cent. Nat'l Bank*, 51 A.2d at 858 (testimony "produced to show that a much higher price could be obtained on resale"). The VPs' evidence is detailed in the Fifth Supplemental Declaration of Randall J. Weisenburger ("RJW5", attached as Ex. 1) and Section II, *infra*.

### B.    The Dalinar Bid is unconscionable in any event.

This case is unprecedented in Delaware history, and so too is the magnitude of the shortfall of the recommended bid as compared to fair market value under any reasonable valuation. When assessing inadequacy of price, Delaware courts consider "the nature and size of the property… and the magnitude of its value"—all of which are unique here. *Home Beneficial Life*, 379 A.2d at 1149; *see Burge*, 648 A.2d at 419 ("[A]pproval of a disputed sheriff's sale depends on 'the particular circumstances of the case.'"). As a multibillion-dollar company, PDVH dwarfs any property previously sold in a Section 324 sale. The scale of value that would be lost (and corresponding debt unpaid) in approving Dalinar's bid—*billions* of dollars—is immense. Indeed, no court has ever overseen, much less confirmed, a sale of stock under Section 324 anywhere close to this magnitude and complexity. *See* D.I. 102-1 at 13 (collecting § 324 cases, with largest involving $567,000 judgment); *Deng v. HK Xu Ding Co., Ltd.*, 2023 WL 3318322 (Del. Super.

---

losing, and there is no reason to treat their litigation position as a firm liability. The lien the Bondholders claim on the stock of CITGO Holding is an unliquidated and unquantified risk no different than any other contingency and is not required to be accounted for as part of a valuation. Ex. 2 (Alberro Rpt.) ¶¶ 214–17. To the extent any discount were appropriate, it would be for the contingent (probabilistic) value of the claim, not its full amount. The Dalinar Consortium has estimated the likelihood of the Bondholders prevailing on their claim at ███—a figure that overstates their chances of success—which would give the claim a contingent value of (at most) ████████████ of the (disputed) $2.9 billion sought by the Bondholders. Ex. 52.

8

Ct. May 8, 2023) (vacating $2.4 million attachment intended to be satisfied using § 324), *aff'd*, 312 A.3d 651 (Del. 2024). Moreover, PDVH and its subsidiaries are the "crown jewel" and life-line of a foreign nation in the throes of humanitarian, political, and economic crises. Approving the transfer of that unique asset at a fire sale price would shock the conscience, rendering the Dalinar Bid grossly inadequate and unconscionable even if it could meet the 50% test.

To be clear, the VPs do not claim a forced sale must obtain 100% of fair market value, but nothing in Delaware law endorses approval of a sale marked by a multi-billion-dollar short-fall that awards a shocking windfall to a credit bidder—an unwelcome but predictable outcome of the process the Special Master designed. *See* Ex. 29 (financial analyst warning the process would result in a "███████████████████████████████████"). In light of the unprecedented nature of this case and the scale of the inequity that would arise from approving the Dalinar Bid, the Court should reject it no matter the outcome of the 50% test.

### C. Delaware law does not permit inferring that a forced sale generates fair market value, and the Special Master did not act like a "willing seller."

This Court is bound to follow the Delaware Supreme Court, which recognizes the 50% standard as "well-established."[13] Yet the Special Master has argued that the Court need not com-pare the bid price to an independent valuation of the PDVH shares, because the $7.382 billion bid price resulted from a purported "open-market," competitive process and thus should be pre-sumed to equal fair market value. D.I. 1522 at 3–5; D.I. 1527 at 2–3. This logic is circular and inconsistent with Delaware law. *E.g.*, *Burge*, 648 A.2d at 419 (using "appraised fair market value of the property at the time of the sale" to perform the 50% test); *Atl. Props. Grp., Inc. v. Deibler*, 1994 WL 45433, at *3–4 (Del. Super. Ct. Jan. 6, 1994), *aff'd*, 652 A.2d 553 (Del. 1995) (review-

---

[13] *Burge*, 648 A.2d at 419 (describing 50% test as part of "well-established rule"); s*ee Gares v. Willingboro Twp.*, 90 F.3d 720, 725 (3d Cir. 1996) (courts do not "impose our own view of what state law should be" but rather "apply state law as interpreted by the state's highest court").

ing expert valuations to determine fair market value of stock for 50% test); *In re Downham Co.*, 165 A. 152, 152–53 (Del. Super. Ct. 1932) (using witness testimony and the tax assessed value of property to determine fair market value for 50% test).

The 50% test would be rendered a nullity if whatever price generated in a forced sale is presumptively fair market value. The standard exists *because* forced sales do not approximate fair market value. *See Girard*, 379 A.2d at 1146 (50% standard "has been set substantially below the fair market value to reflect the realities of forced sale"). Indeed, the Delaware Supreme Court defines the fair market value of corporate stock as "the price which would be agreed upon by *a willing seller* and a willing buyer under usual and ordinary circumstances, after consideration of all available uses and purposes, *without any compulsion upon the seller to sell* or upon the buyer to buy." *Poole v. N. V. Deli Maatschappij*, 243 A.2d 67, 70 n.1 (Del. 1968) (emphases added). The U.S. Supreme Court agrees. *See BFP v. Resolution Tr. Corp.*, 511 U.S. 531, 537–38 (1994) (fair market value "is the very *antithesis* of forced-sale value").

The Special Master nevertheless has asserted—without any legal support—that his sale process merits an exception to the rule because his authority to recommend *no* winning bid put him in a position equivalent to a willing seller, entitling his recommendation to a presumption that it reflects fair market value. D.I. 1527 at 3. For the reasons described below and in Section II, he is not—and did not behave like—a willing seller.

***First,*** the term "willing seller" denotes the owner of property who initiates a sale for its own benefit, not an agent empowered by a court to sell seized property for the benefit of others. Thus, a willing seller will agree to a sale only if he will benefit more by selling the property than by keeping it, all the while knowing he can walk away if the offers received are substantially be-low his assessment of the property's value or if he believes more value could be obtained by sell-

ing the property later. By contrast, the Special Master has no economic stake in the PDVH shares and instead has been charged to sell the shares for the benefit of AJCs. D.I. 277. Those creditors want to turn the shares into cash *now* and have been clamoring to be paid as soon as possible, regardless of whether the bids approximate a rational valuation of the shares or if more value could be obtained later, such as after resolution of the 2020 Bondholder Litigation.

Unlike a willing seller, the Special Master's authority to recommend no bid is not iron-clad, as the SPO allows the Court to ignore his recommendation and select a bid from among those the Special Master recommends against. D.I. 481 ¶ 13. And the Court has made clear that it expects a sale to take place and that it sees its paramount duty as satisfying Crystallex's judgment. D.I. 234 at 40 (saying that Crystallex's efforts to be paid "must soon come to an end"). In addition, the Special Master's investment banking advisor, Evercore, will not be paid the bulk of its Sale Fee if he does not make a recommendation, RJW5 ¶ 85; D.I. 411-1 at 65 (as entered at D.I. 469 at 8), meaning that the Special Master's theoretical power to recommend no winner would prejudice his advisor. Thus, both the Special Master and Evercore have an incentive to recommend a winner regardless of whether a *willing seller* would do so, and the Special Master has at least an appearance of a conflict of interest on the matter. *See* RJW5 ¶¶ 78, 85–87.

***Second***, a willing seller would have walked away from bids far below its own valuation of the asset and/or changed its sale process in response. Here, Evercore's 2023 draft valuation of the PDVH shares (RJW5 Ex. 3) calculated an "Implied EV [enterprise value] Range" of "$10.0 billion to $13.0 billion" with certain methodologies producing valuations in excess of $14 billion. The bids recommended by the Special Master all fell far short of that: $7.286 billion (Am-

ber);[14] $3.699 billion (Red Tree); $7.382 billion (Dalinar). No willing seller would have seriously considered not one but *three* bids that fell so far short of its advisor's valuation. RJW5 ¶¶ 90–91; *id.* ¶¶ 93–95. At each turn, when the bids proved to be failing, a willing seller would have walked away, investigated the cause of the failure, paused for better conditions, or fundamentally changed its approach to seek ways to obtain value. *See* RJW5 ¶¶ 3, 90–95. Here, however, there is no evidence the Special Master ever reached out to potential bidders who declined to participate to see if there were ways to improve the process to earn their participation.[15] And rather than walk away from the unacceptable bids he got, he granted two bidders in 2024 industry-defying exclusive negotiation rights, which led to him relinquishing his leverage, abandoning any semblance of competition, and ultimately recommending lowball, conditional bids whose public support from the Special Master poisoned subsequent rounds of bidding by signaling his openness to deficient proposals. RJW5 ¶¶ 70–83; RJW5 Exs. 25, 27. Worse yet, after the process he designed failed in 2024, the Special Master irrationally decided to re-run it without altering its fundamental design; the predictable result was a second failure.

*Third*, a willing seller would have actively engaged bidders. The Special Master and his team did the opposite: they declined to push bidders to meaningfully improve their bids, refused to consider alternative structures to maximize value, or otherwise passively received bids and simply chose among them. Evercore did not view it as its role to determine the fair value of the PDVH shares, despite that figure being key to analyzing bids. *See* Ex. 29. The Special Master's advisors likewise did not view it as their role to propose value-maximizing bid structures, instead

---

[14] Amber's $7.286 billion *headline* price was entirely illusory, *see supra*.

[15] Nor is there any evidence the Special Master approached the FTC to obtain preclearance for strategic bidders to participate without fear of antitrust limitations—either before or after the current presidential administration (whose policies toward antitrust issues and the petroleum industry are marked shifts from the prior one). A sophisticated willing seller would have done so.

responding to proposals from outsiders by saying that if a bidder proposed it, they might support it (and, at most, they could "try to guide" bidders in a given direction). *Id.* Eventually, even providing "guidance" proved a step too far. Ex. 50 ( █████████████████████████████

████████████████ ). Indeed, the Special Master's counsel at one point indicated ███████

███████████████████████████ rather than pursuing a structure they recognized might be more value-maximizing than their own. Ex. 29 (emphasis added).

Section II identifies additional examples of conduct that did not accord with a willing seller's approach. In short, however, even if the Special Master's recommendation could be re-viewed under a (nonexistent) "willing seller" standard, no such exception could apply here.

## II.    The Dalinar Bid resulted from material and prejudicial defects in the sale process.

Even where the price obtained in a forced sale is "not grossly inadequate," a sale should be rejected where "there was 'some defect or irregularity in the process or mode of conducting the sale … whereby the rights of parties to, or interested in the sale are, or may have been, preju-diced.'" *Burge*, 648 A.2d at 419; *see id.* (emphasizing that "the 50% test is not the sole touch-stone of acceptability" and that courts should "consider factors other than price" to avoid "un-fairness or work an injustice on [parties] having an interest in the outcome of the sale"). Here, the Special Master committed indefensible errors when designing and implementing the sale process—many of which the VPs urged both the Special Master and the Court to avoid in real time. These errors resulted in an inadequate bid that is billions of dollars short of the fair market value of the PDVH shares. This outcome prejudices the Republic and PDVSA by depriving them of the discharge of billions of dollars' worth of debts. If the sale process were redesigned and then re-run, and the Special Master avoided the prejudicial process errors described in this Sec-

tion (and by Mr. Weisenburger), it would generate a significantly higher price.[16]

**A.    *The Special Master failed to seriously consider alternative transactions at the outset and refused to change course once the process was clearly failing.***

The Special Master's insistence that his process provided "the best opportunity to maximize the value of the PDVH Shares" (D.I. 1837-1 at 20, ¶ U) is belied by the inadequate bids it produced. Had the Special Master heeded the VPs' repeated urging to forgo a bankruptcy liquidation-style process in favor of an alternative process better suited to maximizing value, the outcome would have been materially improved. At the very least, the Special Master should have prepared an alternative process in parallel to the existing sale process as a means to drive up competition and the price floor for the shares. *See* RJW5 ¶¶ 9–20. Stubborn adherence to his failed process prejudiced its outcome, the AJCs, the Republic, and PDVSA.

From the start, the VPs explained that a bankruptcy-style liquidation sale was ill suited to maximizing value and urged the Special Master to solicit and seriously consider alternative transactions, like an IPO or a leveraged recapitalization. *See* D.I. 354-1 ¶ 7; RJW5 ¶¶ 10–11 ("[A] bankruptcy-like process is not appropriate for a sale of some or even all of the shares of a functioning, non-distressed company like PDVH—full stop." (quoting D.I. 457-1 ¶ 8)). The Special Master should have cast a wide net for disinterested advisors, including those who specialized in capital market transactions, and solicited creative ideas for maximizing value. He then should have pursued the process that was best suited to maximizing value—whether an IPO, a private placement, or an auction—with the advisor best qualified to carry it out. *See* D.I. 354-1 ¶¶ 5(a), 6; RJW5 ¶ 89. He did none of this. Instead, he selected Evercore (a bankruptcy expert) and bankruptcy lawyers from Weil Gotshal to both design *and* implement the sale process, which predictably turned into a bankruptcy-style auction. *Id.*; *see also* RJW5 ¶ 89.

---

[16] The VPs reserve the right to object to any future sale procedures, process, or outcome.

Over time, the Special Master and his counsel's unwillingness to entertain the VPs' process concerns was even at odds with *Evercore's* warnings. In 2023, ███████████████████ ████████████████████████████████████████████████████ ████████ *Compare* Ex. 24 (██████████████████████████████████ ████████████████████████████████████████) *with* D.I. 354-1 ¶ 32 (Weisenburger noting in 2021 that "the global and national transition to renewable energy" would deter a strategic buyer from purchasing 100% of PDVH shares). ████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ██████████████████████████████████████████ Ex. 24. And yet, it appears the Special Master did not seriously consider such alternatives but stuck to his bankruptcy-style process.

As these design failures came into sharp relief during bidding, the VPs again urged the Special Master to change course. *E.g.*, Exs. 10, 11, 14, 20–23. Yet he remained unmoved—even after the failure of his preliminary recommendation of Amber. The VPs were not alone. A financial analyst for a 2020 Bondholder told the Special Master that the sale process was structurally incapable of achieving fair value and warned—much like Mr. Weisenburger—that the ████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████. Ex. 30. ██████████████████████████████ Ex. 29, ████████, *id.* ██████████████████████████████████). Yet there is no indication that the Special Master (or his team) ever ██████████████████████████████████ transaction. *Id.*

The Special Master's refusal to seriously consider alternative processes—despite his ad-

visors' acknowledgement that they could result in greater proceeds for the AJCs and after the process he had designed *failed* in 2024—is inexplicable. Pursuing a sale process unsuited for the task at hand is a fundamental defect in the sale that warrants rejecting the Dalinar Bid.

### B. The Special Master recommended an unjustifiably low stalking horse bid and failed to generate competition among bidders during the topping period.

The Special Master and his advisors also made prejudicial mistakes in implementing the ill-suited process they designed. For example, he recommended Red Tree's $3.699 billion bid as the stalking horse, even though it was billions of dollars below the next highest bid (Dalinar's $6.949 billion).[17] This set an indefensibly low price floor for the topping period. RJW5 ¶ 54. The Special Master's justification for this value-destroying decision was that the settlement agreement Red Tree reached with the 2020 Bondholders supposedly gave its bid more closing certainty. D.I. 1596 ¶¶ 33–34. That decision gave default approval to a bid that was a mere fraction of the shares' value and led bidders in the topping period to assume they could offer extremely low bid prices so long as they paid the 2020 Bondholders. RJW5 ¶¶ 54, 57–58, 68–69; *see also* D.I. 1644 at 2–5. Predictably, this choice created effectively no competition on *price* in the topping period, leading to the grossly inadequate final recommendation, RJW5 ¶ 54—as well as a needless payment of $75 million breakup fee to Red Tree. *See* D.I. 1654 at 3, 5.

The Special Master's decision was contrary to the very concept of a stalking horse. A "stalking horse should be viewed as an acceptable winning bid," RJW5 ¶ 54, but were Red Tree's $3.699 billion stalking horse bid chosen as the *winner*, the sale would undisputedly violate Section 324's command to sell the shares to the "highest bidder," as it would deprive the AJCs of

---

[17] *All* the stalking horse bids were below 50% of PDVH's fair market value and thus should have been rejected. *See* RJW5 ¶ 54. Any willing and rational seller would have stopped the sale process and deemed it a failure or, at most, would have selected the highest bid as a nonbinding base bidder, so as to set a higher floor for the topping period. *See* RJW5 ¶¶ 59, 63–69.

billions of extra dollars provided by Dalinar's bid. 8 *Del. C.* § 324(a); *see* D.I. 1741 at 4–5. Moreover, selecting Red Tree was the opposite of "strategically" selecting a stalking horse to prevent low-ball offers. *In re WestPoint Stevens, Inc.*, 600 F.3d 231, 239 n.3 (2d Cir. 2010); *see* RJW5 ¶¶ 54–69. Indeed, "[t]he very role and value of a stalking horse bidder is to indicate to others that the assets being sold have value" and thus to "attract other buyers to a competitive bidding process." *In re Watertech Holdings, LLC*, 619 B.R. 324, 337 (Bankr. D.S.C. 2020). Awarding Red Tree stalking horse status, however, had the opposite effect.

*First*, as the VPs warned, setting the price so low in the stalking horse round signaled to bidders that "price counts for little," D.I. 1666 at 3, which ultimately "defeat[s] the entire purpose of a stalking horse." RJW5 ¶ 64. Evidence of this failure is plain: no actionable bid submitted in the topping period attempted to beat Dalinar's stalking horse bid price. *See id.* ¶¶ 64–65. The later uptick of the Dalinar Bid by a token $0.4 billion (by adding more credit bids) to give the appearance of movement is no vindication of the Special Master's choice. *See* RJW5 ¶ 65.

Strikingly, the Special Master recommended Red Tree's bid not because he had made a reasoned determination that it represented a higher bid after factoring in the risk posed by the 2020 Bondholders—which he did not even attempt to analyze[18]—but because he succumbed to pressure from Red Tree and senior AJCs. *See* RJW5 ¶ 80; D.I. 1644 at 2–4; 1666 at 1–2; D.I. 1681 at 1; D.I. 1697 at 4; D.I. 1705 at 1–2.

In March 2025, faced with Red Tree's and Dalinar's bids, ███████████████ ████████████████████████████████████████████████████████ ████████████████████████ *See* RJW5 ¶ 58; RJW5 Ex. 18; *see also* Ex. 35. He ████

---

[18] In fact, discovery reveals the Special Master was not convinced that Red Tree's purported agreement with the 2020 Bondholders was free from conditionality. Ex. 40.

17

▮ naming Red Tree the *stalking horse*, however, ███████████████████████████

██████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

██████ . D.I. 1697 at 5; RJW5 ¶ 61; *see also* D.I. 1658 (Crystallex opposing Dalinar stalking

horse bid); D.I. 1659 (ConocoPhillips same).

For its part, Red Tree had ████████████████████████████████████

████████████████████████████████ . Exs. 32, 33. █████████████

██████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████ , Ex. 37, ██

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████ Exs. 36,

38. Red Tree did not increase its bid; ████████████████████████████████

██████ . *See* Exs. 41, 42. Nevertheless, the Special Master capitulated again, recommending Red

Tree ██████████████████████████████████████████ . Ex. 42, 43; RJW5

¶ 80; RJW5 ¶¶ 82–83 (no willing seller would have done this).[19]

*Second*, by prioritizing closing certainty and the 2020 Bondholders in the stalking horse

round, the Special Master predictably led bidders in the topping period to focus on that issue—at

---

[19] ███████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

██████████████████████████ *See* RJW5 ¶ 83.

the expense of improving bid prices—while improperly diverting funds to the Bondholders.[20] *See* RJW5 ¶¶ 33, 37, 54, 67–69. The Special Master's public filings compounded his overemphasis of the 2020 Bondholders. *See* D.I. 1679 at 3 (directing topping bidders to explain how their bid can close if the 2020 Bondholders win in New York, confirm the bidder bears the risk of the 2020 Bondholder Litigation, or structure bids to not implicate that litigation "at all"). ████████ topping bid, for example, merely inched above Red Tree's (inadequate) purchase price but emphasized its "expect[ation]" to settle with the Bondholders. *See* RJW5 Ex. 22.

*Third*, after backing the wrong stalking horse, the Special Master failed to actively foster competition during the topping period. The Special Master apparently had little idea how to get the bidders to improve on their stalking horse bids. *See* Ex. 45 (ten days into the topping period, Special Master asking "████████████████████████████████████████████"). In fact, the Special Master inexplicably denied bidders information about one another's bids, depriving them of sufficient information to compete head to head. RJW5 ¶ 69. ████████████ ████████████████████████████████████████████████████████████ ████████████████████████ "put [their] best foot forward based on the court's guidance." D.I. 1840-1 at 60:14–24; Ex. 46 (████████████████████████ ████████████████████████████████████████████); Ex. 50 ████ ████████████████████████████████████████████████████████ ██████████████████████). What little guidance the Special Master *did* give betrayed no effort to make any more than marginal improvements on the stalking horse bids and a continued

---

[20] The VPs objected to the selection of Red Tree on these bases. *See* D.I. 1654 at 2, 4, 5 (warning that selecting Red Tree " will inevitably depress topping period bids" and "divert billions of dollars of value away from the Attached Judgment Creditors"); D.I. 1666 at 3 (same); D.I. 1697 at 2–3 (warning that the topping period will "devolve into a bidding war to see who can pay the 2020s even more than they" would receive under the Red Tree bid). The VPs were right.

focus on the 2020 Bondholders. *E.g.*, Ex. 47 (█████████████████████████████

████████████████████████████████████████); Ex. 44 (same); Ex. 48 (██████████

████████████████████████████████████████████████████).

This Court conceived of a very different topping period, in which the Special Master would "generat[e] as much 'competitive tension' among bidders as possible," D.I. 1554 at 12, and produce "a Final Bid with a price at or exceeding that associated with [Gold Reserve's stalking horse] bid," D.I. 1741 at 6. If the Special Master was confused by the Court's April 21 Order (D.I. 1741) and expectations for topping bids, he should have sought clarification long before the July 24 *ex parte* meeting (D.I. 1840-1 at 45:16–20)—a mere thirty hours before his deadline to decide whether to terminate the Red Tree SPA. Instead, he allowed the Court's apparently confusing April Order to deter bidding for weeks, leaving no time after he obtained clarity to foster competition or otherwise advise bidders how to improve their bids. Ex. 46 (Dalinar seeking advice); Ex. 51 (Evercore indicating on June 24 that clarity from the Court would be useful).

The Special Master's approach has echoes of the failed stock sale in the currently pending *InfoWars* bankruptcy proceedings, where the court rejected a trustee's recommendation because, despite a "well-intended" process, it "did not maximize value in any way." Ex. 39 (*In re Alexander Jones*, Case No. 22-33553 (S.D. Tex. Bankr.), Dec. 10, 2024 Hr'g Tr.) at 363:9–11. The court observed that a party charged with selling assets "has a duty to try to go out there and scratch and claw and get every dollar possible." *Id.* at 369:14–16; *id.* at 366–67 (trustee's process "left a lot of money on the table" and "the potential for a lot of negotiations on the table"). The Special Master certainly did not "scratch and claw" for better bids. His passive approach in the topping period—and failure to obtain the clarity necessary to even *try*—was similarly deficient.

The Special Master ended the topping period in nearly the same position he began: with

an essentially unchanged Red Tree bid and a bid from Dalinar that improved only marginally. *See* RJW5 ¶¶ 63–65. This was "an objective failure under any metric." RJW5 ¶ 54.

### C.    The Special Master failed to foster competition or run a "public sale."

By refusing to disclose bid prices to competing bidders (in the topping period and every round before that), the Special Master also departed from the basic demands of Delaware law and this Court. Consistent with Section 324's requirement of "public sale" (8 *Del. C.* §324(a)), this Court directed the Special Master to create "competitive tension" to boost bids (D.I. 1741 at 6). After all, "[t]he key element … in a public sale is the opportunity for competitive bidding." *Shields v. Bobby Murray Chevrolet, Inc.*, 261 S.E.2d 238, 240 (N.C. Ct. App. 1980); *see King v. Lyons*, 248 P.3d 878, 895 (N.M. 2011). But without information about other bids, bidders could not actively compete against one another, preventing the process from approximating a public auction. RJW5 ¶ 69. The result of this lack of transparency was to stifle bidding, making it impossible to maximize value. *Id.*

The Special Master's approach failed to meet the standard of a "public sale," which cannot be conducted using sealed bids. *See, e.g.*, *Offredi v. Huhla*, 60 A.2d 779, 781 (Conn. 1948) (a "sale by sealed bids is not a public sale," because a bidder lacks the "full opportunity to know what the competition is and to increase his bid.");[21] *cf. In re Time Sales Fin. Corp.*, 445 F.2d 385, 386 (3d Cir. 1971) (suggesting forced sales be set aside where a bidder was not told about auction date because the bidder "had a vital interest" in being able to either "meet" or "top" "a higher bid"). Indeed, Section 324 refers to a "public sale," *not* to a "public sale or sealed bid" like some states' statutes. *E.g.*, Ala. Code § 9-15-80; Ind. Code Ann. § 5-22-22-5.

---

[21] *See also Boatmen's Nat'l Bank v. Eidson*, 796 S.W.2d 920, 922–23 (Mo. Ct. App. 1990) (sealed bidding is not a "public sale" because it forecloses competitive bidding); *In re Winthrop Mills*, 106 F. Supp. 464, 464 (D. Me. 1952) (similar).

*Infowars* is again instructive. That unconfirmable sale was "almost doomed from the minute they decided to go to a sealed bid" because "[n]o one knows what everybody else is bidding" such that "[p]eople don't know if they're actually bidding against themselves." Ex. 39 at 363:13–18; *id.* at 355:18–20 ("no one knew what the other bids were going into the best and finals"). The same is true of the sale process here.[22]

**D.    The Special Master placed an undue emphasis on contingent liabilities and then failed to mitigate the bid-chilling uncertainties they caused.**

The sale process was also marred by the Special Master's repeated exaggeration of the risk of contingent liabilities—namely, the 2020 Bondholder Litigation and the PDVH Alter Ego Litigation—and his concomitant failure to mitigate their effect, such as by pausing the process to allow those risks to resolve. *See* RJW ¶¶ 21–53. This chilled bidder participation and contributed to the lowball bids. *See, e.g.*, *Wood v. Drury*, 56 Kan. 409, 43 P. 763, 764 (1896) (vacating sale because an "attack upon the title" of the property would "naturally deter bidders and depress values" and "probably chilled the sale, and conduced to the inadequacy of the prices offered").[23]

1.    The Special Master's representations and decisions regarding the 2020 Bondholders' purported claims destroyed value for the PDVH shares.

The Special Master repeatedly, consistently, and publicly elevated the risk profile of the 2020 Bondholders' claims and improperly made the resolution of those claims a feature—if not requirement—of the sale process.[24] He ignored the VPs' repeated warnings that his approach was

---

[22] The secrecy and asymmetric information that marked every round of bidding defeats the Special Master's argument that he conducted an "open-market," competitive process. Part I.C, *supra*.
[23] The Special Master's approach to these contingencies is further proof he did not act like a willing seller. A willing seller would not adhere to arbitrary deadlines when uncertainties threatened participation and bidding, but would pause the process until those uncertainties were resolved.
[24] RJW5 ¶¶ 22–43; *see also* D.I. 348 ¶ 55 (stating resolution of 2020 Bondholders' claims likely necessary for any actionable bid); H'rg Tr. (May 17, 2024) at 19:5–20:4 (stating Bondholder's claims should be "resolved" in sale process); D.I. 1144 at 2, 9–10 (instructing bidders to assume the Special Master will secure release of the pledge or to propose an alternative resolution).

forcing bidders to discount their bids and refused to pause the sale process to allow the Bond-holder Litigation to resolve.[25] He also refused to change course even after the Bondholders suf-fered a major string of losses throughout 2024, resulting in vacatur of their judgment. *See* D.I. 1596 ¶ 34 (recommending Red Tree as the stalking horse in 2025 because of the perceived clos-ing certainty with respect to Bondholders). "These errors—both the elevation of the risk and the refusal to pause the sale for it to be resolved—chilled bidding and diminished the amount of sale proceeds that could have otherwise gone to the [AJCs]." RJW5 ¶ 22. That much can be seen from the dismal results in every round of bidding: the 2024 round (where both of Amber's 2024 bids earmarked nearly $2 billion for the Bondholders), the stalking horse round (where emphasis on the Bondholders trumped price), and the topping period (where the Special Master encour-aged bidders to emphasize closing certainty over price and they did so). *See* D.I. 1446-1 at 134–42; D.I. 1414 at 2; D.I. 1414-1 at 2.

This elevation of the Bondholders' claims caused bidders and the Bondholders to over-value those claims, diverting $2 billion in most bids away from creditors. Making resolution of the Bondholders' claims a gating issue for bidding effectively assured the Bondholders—and the market—that their claims would be paid off, regardless of their merit. As a result, no bidder could negotiate a competitive settlement with the emboldened Bondholders that reflected their diminished likelihood of success on the merits.

In fact, the Special Master himself directly contributed to bidders' inability to negotiate a reasonable settlement. Before Red Tree's $2 billion settlement agreement in 2025, the Special Master had (in contravention of his authority, *see* D.I. 1144 at ¶¶ 8, 13; D.I. 479), and without

---

[25] D.I. 561-1 ¶ 25; *see also* RJW5 ¶ 40 (history of the VPs' efforts); *id.* ¶ 41 (history of the Spe-cial Master resisting those efforts); *see also* Exs. 3, 4, 6–9, 12, 15, 53.



PDVSA's consent or involvement (Exs. 12, 17–19), ███████████████████████

████████████████████████████████████████████████████████████

███████████████. Exs. 25, 26 at 8, 27. He never shared this information with the VPs (or, to their knowledge, the Court); never sought guidance on how to handle it; and months later—███

████████████████████████████████████████████████████—

recommended Red Tree's bid that diverted ████████████████ from AJCs. He let the Bond-holders convince him to prioritize them in the sale process and to effectively negotiate against himself by recommending a ████████████████████████████.

Had the Special Master instead let bidders assess this contingent liability on their own, as this Court expected him to do (*see* D.I. 643 at 10), and not signaled his plan to insist on a hefty payout for the Bondholders, bidders could have decided whether to continue to litigate against them or negotiate a commercially reasonable settlement that reflected their diminished likelihood of success on their claim (without the Bondholders having asymmetric leverage, courtesy of the Special Master, to demand nearly full payment for their disputed claims). *See* RJW ¶ 34.

Having elevated the Bondholders to privileged status, it was incumbent upon the Special Master to seek a pause to allow the Bondholder Litigation to resolve so that his error could no longer distort participation. *Blossom v. Milwaukee & C.R. Co.*, 70 U.S. 196, 209 (1865) (courts can and should "postpone the sale" when "the time selected, or other circumstances, will be like-ly to produce great sacrifice of the property"); RJW5 ¶ 43. He did not do so, despite summary judgment motions being fully briefed before he selected Red Tree as the stalking horse, which the New York court has since indicated it will resolve by September 2025. And even when the VPs asked the Court for more time to allow for favorable developments in the Bondholder Liti-gation—and the PDVH Alter Ego Litigation, *see supra* Pt. II.D.2—the Court refused as well. *See*

24

D.I. 1511 at 7 & 1511-1; *see generally* D.I. 1517. The result was to chill bidding, dampen the bid prices the Special Master did get, and artificially lower the price floor in every round of bidding.

> 2.    The Special Master's representations and decisions regarding the PDVH Alter Ego Litigation destroyed value for the PDVH shares.

The Special Master repeated this mistake with the PDVH Alter Ego Litigation—exaggerating its importance and failing to mitigate the chilling effect his reaction caused.

That litigation began in June 2024, RJW5 ¶ 45, and the Special Master moved to enjoin it three months later. D.I. 1248; D.I. 1249. He argued that the mere pendency of those cases "created a cloud of uncertainty around the PDVH [s]hares" and warned that if Alter Ego Claimants were successful, their claims would "harm the value" of CITGO Holding (and CITGO) for the winning bidder. D.I. 1249 at 19; *see also* D.I. 1250 ¶ 6. The Court denied the injunction motion, D.I. 1493; D.I. 1515, but despite the Special Master's own amplification of the risk, he did nothing more to attempt to mitigate it. He chose, once again, to push forward rather than pause until the litigation was resolved, even though Judge Rakoff had set a rapid schedule for resolution of the claims before him. *See* RJW5 ¶ 47. This decision is difficult, if not impossible, to square with (1) the Special Master's own warnings about the harm these cases could cause, RJW ¶ 49; *see also* D.I. 1249 at 9; D.I. 1249 at 19; D.I. 1250 ¶ 6, and (2) the fact that the leading case in the PDVH Alter Ego Litigation was moving quickly and likely to reach a decision on the merits in the first half of 2025. *See G&A Strategic Invs. I LLC, et al. v. Petróleos de Venezuela, S.A., et al.*, 1:23-cv-10766 (JSR), Feb. 27, 2025 Minute Entry (S.D.N.Y. Feb. 27, 2025) (hereafter "*G&A*").

Thus, when the new round of bidding began at the end of 2024, the specter of the Alter Ego Litigation was still haunting the bidders (and their bankers, *see* D.I. 1760 ¶ 3). For example, the VPs argued that the form SPA should expressly provide that a judgment in the Alter Ego Cases finding PDVH to be an alter ego of PDVSA or the Republic would constitute a Material Ad-

verse Effect ("MAE") that would allow a bidder to terminate the SPA. D.I. 1549 at 5 (citing Delaware case law providing that known or potentially contemplated risks can qualify as an MAE). And while the VPs believed (as Judge Rakoff's decision confirmed) that the Alter Ego Claims were meritless, allowing a bidder to terminate the SPA in such circumstance would "encourage bidders to not unnecessarily discount their bids." D.I. 1540 at 4–5. The Special Master disagreed, even though he acknowledged that bidders had informed him that "expressly excluding the alter ego claims from" the MAE provision would deter bidding. D.I. 1545-2 at 5–6; Ex. 28.[26] The Special Master's view regarding the MAE, and this Court's suggestion that it agreed (D.I. 1554 at 21), allowed the Alter Ego Cases to continue to chill bidding. RJW ¶ 51; *infra* Part II.E.

Moreover, even when PDVH and PDVSA prevailed in the Alter Ego Litigation, *see G&A*, ECF No. 245, the Special Master failed to capitalize on the opportunity to generate more interest in the sale and increase competition (particularly given Judge Rakoff's initial decision denying a motion to dismiss). On May 20, 2025, Judge Rakoff issued a "bottom line" order granting summary judgment to PDVH and PDVSA, with an opinion to follow. *See* D.I. 1757. The VPs promptly asked both the Court and the Special Master to extend the topping period to allow time for Judge Rakoff to issue his opinion and for bidders to account for this development, and made clear that an extension could mitigate, but not cure, the chilling effect already caused by the Alter Ego Cases. *See id.* at 5, n.2. The Special Master initially resisted and represented to this Court on May 26 that no bidder had "made a formal request to extend the Topping Period."

---

[26] Discovery confirms that ▮▮▮▮▮▮▮. Ex. 28 ▮▮▮▮▮▮; *id.* ▮▮▮▮▮▮ ).

D.I. 1763 at 2. This was *false* and downplayed what was happening behind the scenes. Five days earlier (on the day after Judge Rakoff's order issued), his counsel had spoken with two potential bidders who were purportedly " ███████████████████████████████████ ███████████████████████████████," with one even asking whether the Special Master was " ███████████████████." Ex. 49. That very bidder publicly asked the Court for an extension nearly an hour before the Special Master falsely claimed no bidder had expressed an interest in one and indicated that the "financing sources" that had partnered with "new money providers" (i.e., non-credit bidders) were hesitant to support the sale process while the Alter Ego Cases were pending. *See* D.I. 1760 ¶ 3. He eventually relented, and the Court granted a modest extension of the topping period. D.I. 1779.

Judge Rakoff issued his opinion on June 25, 2025, in which PDVH and PDVSA won decisively. *See G&A*, ECF No. 247. This was the same day the Special Master executed the Dalinar SPA, triggering a one-week period where he could no longer solicit or work to improve bids before his July 2 recommendation. *See* D.I. 1837 ¶ 55; D.I. 1837-1 (Ex, B). This left no time for bidders and their lenders to analyze Judge Rakoff's ruling and potentially increase the price of their bids, for the Special Master to use the opinion to drive up bids, or for bidders who may have sat out to meaningfully prepare a bid. Having elevated the risk profile of these cases, the Special Master should have paused to allow Judge Rakoff's opinion to benefit the process.

The Special Master ignored bidders' concerns about the Alter Ego Cases—concerns he had elevated and that were *clearly* affecting bidder behavior—and rushed the sale process ahead, rigidly adhering to the schedule at all costs. This approach made value maximization impossible.

### E.    *The Court's statements also chilled bidding.*

On top of the Special Master's errors, the Court twice made public statements that chilled bidding. *First*, the Court expressed its inclination to agree that the outcome of the sale process

would reflect fair market value. D.I. 1554 at 4. This statement—which reflected an erroneous view of the law, *supra* Part I.C—along with the Special Master's similar position, removed any incentive for bidders to meaningfully compete on price, as they knew that any discount they could obtain would be blessed by the Special Master and the Court. If bidders are told in advance that their discounts will be accorded the status of "fair market value," they will not feel pressure to increase their offers to actually *reflect* fair market value. RJW5 ¶ 56.

*Second*, the Court expressed support for the Special Master's position that if PDVH lost the Alter Ego Cases, it would not constitute an MAE. D.I. 1554 at 21. For the reasons described in Section II.D.2, *supra*, bidders' concern about such an MAE limitation dampened participation and depressed bidding. The Court's public indication that it would not afford an off ramp to a bidder if the Alter Ego Cases went against PDVH only worsened that problem. RJW5 ¶ 51.

### F.    *Evercore's incentives prejudiced the sale process.*

Because Evercore's compensation structure entitled it to a contingency fee only if it recommended a winning bidder, Evercore was biased in favor of recommending any bid—even an inadequate and prejudicial one—over advising the Court that the bidding process had failed.[27] This incentive infected its advice to the Special Master. And because Evercore' engagement letter was public, its incentive to recommend a winning bid increased bidders' leverage, empowering them to propose outlandish terms and extract commercially unreasonable concessions. RJW5 ¶ 87; *id.* ¶ 78.[28] If the sale process is re-run, the Court should ensure that the Special Master's advisors are appropriately incentivized. *See* RJW5 ¶¶ 84–89.

---

[27] The VPs previously objected to the terms of Evercore's engagement. *E.g.*, D.I. 317 at 16–19; D.I. 354-1 ¶¶ 5(a), (c); *id.* ¶¶ 9–10; *id.* ¶¶ 45–49; D.I. 457-1 ¶¶ 13–21.
[28] This is fixable. Had Evercore's fee been tied to the highest bid received—regardless of whether it was consummated—it would have been incentivized to maximize value while suffering no harm if the correct result was to advise that the highest bid was not defensible in court.

Evercore (and by extension, the Special Master) was also incentivized to pursue a settlement with the 2020 Bondholders—despite their claims not being part of this sale process. *See* RJW5 ¶ 88 (describing effects of Evercore's entitlement to a "restructuring fee"). This opportunity improperly "incentivized Evercore to divert time and attention away from securing the best outcome for the [AJCs] and to amplify and pursue" the Bondholders. RJW5 ¶ 88.[29]

### G.    *Modifying the design of the sale process and avoiding material errors would generate more value for the PDVH shares if the sale process were re-run.*

The Special Master's prejudicial mistakes as catalogued herein and in the Weisenburger Declaration resulted in a bid billions of dollars below fair market value. If the sale process were redesigned to better maximize value and implemented free of value-inhibiting mistakes that infected this process, it is highly likely that much more value could be obtained. Such a revamped process is particularly likely to produce materially better bids because the uncertainties surrounding the Alter Ego Litigation and 2020 Bondholder Litigation have been or soon will be reduced. With greater certainty about these contingencies, bidders will be incentivized to submit bids that more accurately reflect fair market value. *See* RJW5 ¶¶ 96–102.

If the process were run again, the Special Master also could, as Mr. Weisenburger and even a Bondholder's advisor have opined, solicit proposals for alternative types of transactions and more seriously consider them. *See* RJW5 ¶¶ 13–15; Ex. 29. At the very least, the Special Master could prepare an alternative, capital markets process in parallel with the sale process contemplated in the existing SPO, and retain the ability to defer to that alternative in the event bids come in woefully below market value again. The presence of a viable alternative in the event of lowball bids would provide, effectively, a floor for bids *and* give the Special Master powerful

---

[29]Evercore's expertise in bankruptcy was not an asset here. RJW5 ¶ 89; D.I. 354-1 ¶ 5(a). Unsurprisingly, it proposed a bankruptcy-like sale process incapable of maximizing value for the PDVH shares. RJW5 ¶ 89. Such design failure was prejudicial. *See* Part II.A, *supra.*

negotiating leverage to drive bids up. RJW5 ¶¶ 14–16.

In addition, if the process was run again, the Special Master could retain unbiased advisors, refuse to capitulate to bidder demands and creditor whims, offer greater opportunity for participation from strategic and non-credit bidders (*e.g.*, by securing a public signal of openness to a relaxed merger review from the FTC, RJW5 ¶¶ 52–53), avoid exaggerating contingent liabilities, and foster competition by allowing bidders to compete.

## III.    The Court should not confirm the Dalinar Bid because of defects in the attachments.

The VPs renew their objection to this sale altogether because it is premised on attachments that are *ultra vires* under Delaware law and the Foreign Sovereign Immunities Act (FSIA). As the VPs have argued, the attachments issued to creditors of the Republic are unlawful under Federal Rule of Civil Procedure 69 and Section 1606 of the FSIA because both sources of law require application of *state law* to execution proceedings and such creditors have not established an alter ego relationship between the Republic and PDVSA under *Delaware* law. *E.g.*, D.I. 179. This Court's conclusion that PDVSA and the Republic are alter egos under federal common law is not sufficient to issue those attachments.[30] *Id.* at 13–14. This Court previously deemed that argument collaterally estopped, untimely, and resolved by the Third Circuit. D.I. 234 at 18–23, 28–33; *OI Eur. Grp. B.V. v. Bolivarian Republic of Venezuela*, 663 F. Supp. 3d 406, 441 (D. Del. 2023). The Third Circuit has not yet ruled on the propriety of the writs of attachment under Delaware law or this Court's rulings on the same. *OI Eur. Grp. B.V. v. Bolivarian Republic of Venezuela*, 73 F.4th 157, 174–76 (3d Cir. 2023) (declining to review until final decision); *Crystallex*

---

[30] In Delaware, a judgment creditor may attach and execute on shares of a corporation owned by an alleged alter ego of a debtor only if the creditor shows fraud or similar injustice in use of the corporate form. *E.g.*, *Buechner v. Farbenfabriken Bayer Aktiengesellschaft*, 154 A.2d 684, 687 (Del. 1959). No creditor of the Republic has done so, nor could they. *E.g.*, D.I. 83 at 25, 29, 33–34 (finding Crystallex failed to establish fraud or injustice).

*Int'l Corp. v. Bolivarian Republic of Venezuela*, 24 F.4th 242, 249, 258 (3d Cir. 2022) (same).

This defect has enormous implications. Attachments held by creditors of the Republic account for approximately $19 billion of the $21 billion of the total attachments held by AJCs, including 8 of the 12 judgments that would be satisfied by the Dalinar Bid (including the foundational Crystallex attachment). The VPs object to the Dalinar Bid to the extent it pays those creditors anything. *At most* this should be a $1.9 billion case addressing attachments held by creditors of *PDVSA*—the only ones that comport with Delaware law. That sum is *far less* than the $7.382 billion Dalinar offers to purchase 100% of the PDVH shares (and far less than the other bids received in the topping period). Thus, if only the properly attached judgments were part of the sale process, such judgments could have been satisfied without selling 100% of the PDVH shares (or, perhaps, *any of them*). Because Section 324(a) requires that the Court sell only "[s]o many of the shares… as shall be sufficient to satisfy the debt[s]," confirming a sale that sells 100% of the PDVH shares, when such sale was unnecessary to satisfy the legitimate attachments, would contravene Delaware law. Indeed, had the Court limited the attachments to those of PDVSA's creditors, PDVSA could have satisfied those judgments directly, obviating the need to sell the PDVH shares at all. And as to the Dalinar Bid specifically, because attachments premised on the Republic's liability are invalid, Dalinar consortium members Gold Reserve, Koch, and Rusoro have *no viable attachments*, eliminating their right to submit a credit bid altogether.

The VPs further object because PDVSA is immune from the Court's jurisdiction with respect to attachments held by creditors of the Republic on an alter ego theory under the FSIA, 28 U.S.C. §§ 1330, 1604. The Supreme Court has yet to address this Court and the Third Circuit's views on *Banco Nacional de Cuba v. Chem. Bank N.Y. Tr. Co.* ("*Bancec*"), 782 F.2d 377 (2d Cir. 1986) and *Peacock v. Thomas*, 516 U.S. 349 (1996). D.I. 83 at 11–18, *aff'd*, 932 F.3d at 136–40.

31

The Second Circuit recently disagreed with the Third Circuit's decision that *Bancec* alone may extend ancillary jurisdiction "to post-judgment proceedings against a foreign sovereign's instrumentality that was not party to the underlying merits proceeding." *Peterson v. Bank Markazi*, 121 F.4th 983, 1000 n.6 (2d Cir. 2024).

## IV.     The Court should not confirm the Dalinar Bid for additional reasons.

*Bias and disqualification.* The Special Master was biased against the VPs and in favor of accomplishing a sale as soon as possible and at all costs. In just one example, he advocated to OFAC in favor of granting a license, taking it upon himself to pursue the interests of creditors in opposition to the VPs. The VPs moved for the Special Master's disqualification on this ground. D.I. 509; D.I. 515; D.I. 1138; D.I. 1175. The Court denied this request, and the Third Circuit has not yet ruled on it. D.I. 544; D.I. 1180; Order, No. 23-1687 (3d Cir. May 5, 2023) (denying writ of mandamus). The VPs renew and preserve it as an objection to confirming any sale.

*Superior Proposal.* The VPs object to Section 6.16(c) of the Dalinar SPA (D.I. 1837-1 at 112), which suggests that the Special Master may provide an unsolicited competing proposal to the Court only up until the Sale Hearing. The Court-adopted Bidder Protections provide that such proposal is presentable to the Court and potentially actionable until "entry of any Sale Order." D.I. 1552-1 at 2–3. The SPA is nonbinding unless the Court approves it (Dalinar SPA § 6.16(a)), and cannot supersede the Bidder Protections adopted by the Court. *See* D.I. 1554 at 2 n.3.

*Appellate Rights.* The VPs incorporate herein their joinder in Red Tree's objection to Paragraph 21 of the Proposed Sale Order ("PSO"). D.I. 1884; D.I. 1837-1 (PSO). It would be inappropriate to immunize approval of the Dalinar Bid from meaningful appellate review or to issue an advisory opinion about questions that may arise in the future, such as whether Dalinar meets the requirements for the good faith purchaser rule if the attachments or sale are overturned on

appeal, that were never before the Court (particularly as Dalinar has been on notice of the challenge to attachments held by the Republic's creditors and of the VPs' intention to appeal). To ensure protection of the VPs' appellate rights, in the event the Court accepts the Dalinar Bid or any other, the VPs request an administrative stay to give them time to seek a stay pending appeal and—consistent with the Court's past assurances—preserve their ability to obtain appellate relief. D.I. 1884.

_Injunctions._ The VPs join Crystallex's and Red Tree's objections to provisions of the PSO purporting to enjoin conduct deemed contrary to the interests of Dalinar, the Special Master, or his advisors. *See* PSO ¶¶ 6, 10, 13, 19, 20, 25. The Court's jurisdiction to conduct an execution sale under Rule 69 and Section 324 does not grant it authority to impose such injunctions, even in reliance on the All Writs Act ("AWA"). *See U.S. v. Denedo*, 556 U.S. 904, 911 (2009) (AWA authority "is contingent on that court's subject-matter jurisdiction"); *Grider v. Keystone Health Plan Cent., Inc.*, 500 F.3d 322, 328–29 (3d Cir. 2007) (the "extraordinary powers" under AWA are "firmly circumscribed"). Nor does any provision of federal or Delaware law authorize such injunctions here.[31] Because Rule 69 has "the force of a federal statute," *see Sibbach v. Wilson & Co.*, 312 U.S. 1, 13 (1941), the AWA is inoperative because Rule 69 governs, *see Carlisle v. U.S.*, 517 U.S. 416, 429 (1966). Courts consistently recognize that the AWA does not enhance or circumvent state procedures for judgment enforcement. *See, e.g.*, *Aetna Cas. & Sur. Co. v. Markarian*, 114 F.3d 346, 350 (1st Cir. 1997); *Ivey v. Harney*, 47 F.3d 181, 184 (7th Cir. 1995).

Moreover, neither the Special Master nor Dalinar have attempted to prove that they have

---

[31] The Special Master and Dalinar have not and cannot assert that Delaware (or federal) law grants them the right to prevent others from taking actions that "adversely affect[], interfere[] with, is likely to frustrate or is in any way inconsistent with" a sale. PSO ¶ 6; *see also* PSO ¶¶ 10, 13, 19, 20, 25 (identifying other potential actions to enjoin).

suffered or are "likely to suffer" an imminent injury necessary to afford them Article III standing to obtain the broad prospective relief they seek or that the requirements to obtain a permanent injunction are satisfied. *See Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 153, 156–57 (2010). For example, the Special Master and Dalinar do not explain why their ability to raise legal arguments, rights, or defenses (such as judicial immunity) in any proceedings against them would not afford an adequate remedy at law. *See Grider*, 500 F.3d at 332 (stating that the "opportunity to raise" claims in a separate proceeding, is generally an adequate remedy at law).

<u>*Gold Reserve's Unsuitability.*</u> The Republic and PDVSA object because Dalinar's owner Gold Reserve, a foreign mining company that partnered with the Maduro regime for years after obtaining the judgment on which its attachment is based, is unlikely to obtain OFAC approval. In addition, Gold Reserve received $240 million from the Maduro regime that it did not disclose to this Court. These issues, including Gold Reserve's argument that the payment was for the sale of mining data and is unrelated to its judgment, are the subject of pending discovery. D.I. 1859 ¶ 6.

## V.     Notice of impossibility or inappropriateness of SPA provisions.

If entered, the PSO would compel CITGO and PDVH (and their representatives and agents) to comply with "all obligations and covenants" in the SPA "and the Transaction Documents." PSO ¶ 6. CITGO and PDVH do not object to that requirement *with respect to the SPA* so long as it is limited to *only* obligations and covenants the Special Master has told CITGO and PDVH are ones with which he will cause them to comply. Requiring compliance with a broadly defined—arguably unlimited—universe of "all obligations and covenants" in the SPA and Transaction Documents, many of which do not implicate CITGO and PDVH, would be inconsistent with their court-approved status as nonparties to the SPA. D.I. 1552-1 at 4; D.I. 1554 at 14.

As to the SPA, the Special Master agreed to Dalinar's proposed Section 6.1(b)(xvi)(C) without consulting CITGO and PDVH. This provision would restrict dividends from CITGO to

CITGO Holding, contrary to the Special Master's statement that he would permit "dividends or similar distributions between PDVH and its subsidiaries." D.I. 1552-1 at 5. CITGO and PDVH cannot comply with such a restriction, as it could compromise CITGO Holding's and PDVH's ability to pay their operating expenses. CITGO and PDVH also have advised the Special Master that certain SPA provisions may be impossible or inappropriate to comply with. For example, CITGO cannot guarantee that a FIRPTA Certificate, which relies on third-party analyses, will be available by any particular date (SPA §§ 2.3(a)(iii) and 7.3(c)). Nor would it be appropriate for CITGO's CFO to confirm the accuracy of representations and warranties made by the Special Master (SPA § 2.3(a)(i)). Given the threat of a contempt order or sanctions (PSO ¶ 6), CITGO and PDVH herein advise the Court of their limitations in regard to these particular provisions. CITGO and PDVH reserve all rights regarding other SPA provisions, including those about which they have previously raised objections with the Special Master that are not detailed here.

## <u>CONCLUSION</u>

For the foregoing reasons, the Venezuela Parties respectfully request that the Court reject the Special Master's Final Recommendation and not confirm the Dalinar Bid or any other.

MORRIS, NICHOLS, ARSHT & TUNNELL LLP

OF COUNSEL:
Nathan P. Eimer
Daniel D. Birk
Gregory M. Schweizer
Hannah M. Bucher
Alec Solotorovsky
EIMER STAHL LLP
224 South Michigan Avenue
Suite 1100
Chicago, IL 60604
(312) 660-7600
NEimer@eimerstahl.com
LMeyer@eimerstahl.com
DBirk@eimerstahl.com
GSchweizer@eimerstahl.com
HBucher@eimerstahl.com
ASolotorovsky@eimerstahl.com

*/s/ Alexandra M. Cumings*
Susan W. Waesco (#4476)
Alexandra M. Cumings (#6146)
Phillip Reytan (#7255)
1201 North Market Street
Wilmington, DE 19801
(302) 658-9200
SWaesco@morrisnichols.com
ACumings@morrisnichols.com
PReytan@morrisnichols.com

*Attorneys for PDV Holding, Inc. and CITGO Petroleum Corporation*

HEYMAN ENERIO GATTUSO & HIRZEL LLP

OF COUNSEL:
Joseph D. Pizzurro
Kevin A. Meehan
Juan O. Perla
David V. Holmes
CURTIS, MALLET-PREVOST, COLT & MOSLE LLP
101 Park Avenue New York, NY 10178
(212) 696-6000
jpizzurro@curtis.com
kmeehan@curtis.com
jperla@curtis.com
dholmes@curtis.com

*/s/ Samuel Taylor Hirzel, II*
Samuel Taylor Hirzel, II (#4415)
Brendan Patrick McDonnell (#7086)
300 Delaware Avenue, Suite 200
Wilmington, DE 19801
(302) 472-7300
shirzel@hegh.law
bmcdonnell@hehg.law

*Attorneys for Petróleos de Venezuela, S.A.*

ABRAMS & BAYLISS LLP

OF COUNSEL:
Donald B. Verrilli, Jr.
Elaine J. Goldenberg
Ginger D. Anders
MUNGER, TOLLES & OLSON LLP
601 Massachusetts Avenue NW
Suite 500 E
Washington, D.C. 20001
(202) 220-1100

*/s/ Christopher Fitzpatrick Cannataro*
A. Thompson Bayliss (#4379)
Christopher Fitzpatrick Cannataro (#6621)
20 Montchanin Road, Suite 200
Wilmington, DE 19807
(302) 778-1000
bayliss@abramsbayliss.com
cannataro@abramsbayliss.com

Donald.Verrilli@mto.com
Elaine.Goldenberg@mto.com                    *Attorneys for Bolivarian Republic of Venezuela*
Ginger.Anders@mto.com

George M. Garvey
Adeel Mohammadi
MUNGER, TOLLES & OLSON LLP
350 South Grand Avenue, 50th Floor
Los Angeles, CA 90071
(213) 683-9100
George.Garvey@mto.com
Adeel.Mohammadi@mto.com

July 24, 2025

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that copies of *The Bolivarian Republic of Venezuela, Petróleos de Venezuela, S.A., PDV Holding, Inc., and CITGO Petroleum Corporation's Memorandum of Law in Support of Notice of Objections to the Special Master's Final Recommendation* was caused to be served by electronic mail on July 24, 2025, upon all counsel of record:

/s/ Alexandra M. Cumings
Alexandra M. Cumings (#6146)

38