# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| CRYSTALLEX INTERNATIONAL CORPORATION, <br><br> Plaintiff, <br><br> v. <br><br> BOLIVARIAN REPUBLIC OF VENEZUELA, <br><br> Defendant. | Case No. 1:17-mc-00151-LPS |

## CONOCOPHILLIPS' RESPONSE TO OBJECTIONS TO
## SPECIAL MASTER'S FINAL RECOMMENDATION

Sale Process Parties Phillips Petroleum Company Venezuela Limited, ConocoPhillips Petrozuata B.V., ConocoPhillips Gulf of Paria B.V., and ConocoPhillips Hamaca B.V. (Plaintiffs in Cases No. 19-mc-00342-LPS, No. 22-mc-00264-LPS, and No. 22-mc-00464-LPS) ("ConocoPhillips") respectfully submits this response to the objections filed by the Venezuela Parties, the 2020 Bondholders and Gramercy to the Special Master's Final Recommendation:

## PRELIMINARY STATEMENT

ConocoPhillips will not burden the Court with responses to the entirety of the lengthy objections to the Special Master's Final Recommendation filed by the Venezuela Parties (the "VPs"), the 2020 Bondholders (the "Bondholders") and Gramercy Distressed Opportunity Fund, LLC and affiliates ("Gramercy"), which will no doubt be addressed in detail by the Special Master and the Gold Reserve Consortium. Rather, ConocoPhillips will address below certain matters it believes, respectfully, may be of most concern to the Court.

## ARGUMENT

**I.    The Venezuela Parties' Objection to the Adequacy of the Sale Price Does Not Justify Declining Approval of the Special Master's Final Recommendation Under Delaware Law.**

The VPs assert that the "Dalinar Bid is grossly inadequate and shocks the conscience." VP Obj. p. 6. This assertion is based on a comparison of the Gold Reserve Consortium's $7.382 billion purchase price with the $18.6 billion valuation prepared by the VPs' expert, Dr. Alberro. Significant issues as to the reliability of Dr. Alberro's assumptions and methodology were identified at his deposition and in the Supplemental Declarations of William Hiltz of Evercore. Chief among these is Dr. Alberro's reliance on his own forecasts of CITGO's future performance, which greatly exceed the company's own projections, as well as the use of an overly generous WACC rate. These questionable choices increased Dr. Alberro's valuation of CITGO by billions

of dollars. Even putting aside the substantial doubts about the reliability of Dr. Alberro's valuation, however, a sale price that is nearly 40% of what is, at best, an aggressive valuation, is not, in ConocoPhillips' view, "grossly inadequate" or "shocking," particularly given the many hurdles the sale process encountered.

The parties disagree over whether Delaware law precludes confirmation of the results of a foreclosure sale if the sale price is less than 50% of fair market value. In ConocoPhillips' view, a fair reading of the Delaware case law is that it creates a weak presumption that a foreclosure sale price should not be less than 50% of fair market value. But the Delaware courts have not imposed 50% of fair market value as an inflexible requirement. Rather, courts are free to take into account various factors, such as the size of the asset, limitations on the potential universe of buyers, and the likelihood that a better price would be obtained if the auction were redone, in evaluating the fairness of a price obtained in a forced sale. *See, e.g.*, *Burge* v. *Fidelity Bond & Mortg. Co.*, 648 A.2d 414, 419 (Del. 1994) ("It is a well-established rule in Delaware that mere inadequacy of price, standing alone, is an insufficient ground for setting aside a judicial sale. . . . This determination [whether the price is grossly inadequate] is largely dependant [sic] upon the particular circumstances of the individual case."); *Girard Tr. Bank* v. *Castle Apartments, Inc.*, 379 A.2d 1144, 1146 (Del. Super. 1977) ("[T]his [50%] standard is not absolute and does not contemplate the Court will inflexibly apply this standard in every case. . . . [W]here the standard has been applied, there usually has been evidence either (1) that a higher bid was likely to be made at a subsequent sale or (2) that there was lack of knowledge of the sale."); *Home Beneficial Life Ins. Co.* v. *Blue Rock Shopping Center. Inc.*, 379 A.2d 1147, 1149 (Del. Super. 1977) ("the nature and size of the building and the magnitude of its value may be such as to remove it from the category of ordinary real estate transactions because the customary buyers at auction sales would not be in a position to buy this

2

property," which "may lead to a departure from the traditional 50% test"). Indeed, as *Girard* states, the test is "a simplified standard" that "assume[s] conditions which generally prevail with respect to the sale of properties," and therefore that "a standard which may apply to property of moderate price or property whose available usage attracts widespread buying interest, as in the case of residential property, may be unrealistic in the case of property whose price is great or usefulness is limited." *Id.* at 1145-46.

In addition to the obvious — the sheer size and complexity of the asset — there were myriad other obstacles to obtaining the highest conceivable price for the PDVH shares, as envisioned in Dr. Alberro's valuation. As an initial matter, the significant Venezuela overhang cannot be overstated. No doubt many potential purchasers were not interested in participating in an auction for a highly complex asset, which would require them to devote considerable time and resources, given its current ownership by the state-owned oil company of the Republic of Venezuela, an involuntary (and hostile) seller which is unlikely to accept its loss of the asset even after the Court's gavel comes down. The existence of the OFAC sanctions regime, and the likelihood of a challenging regulatory process and uncertainty as to whether OFAC will even allow the winning bidder to close, also likely dissuaded many from participating in the auction. The specter of two significant litigation risks, the alter ego claims and the purported pledge of 50.1% of the CITGO Holdings shares to secure the 2020 bonds, created the potential for multi-billion dollar swings in the value of the PDVH shares, and the plaintiffs in those cases have well publicized their intentions to continue to attempt to interfere with this sale as long as possible. A buyer's inability to obtain normal representations and warranties from the seller likely was also a price-depressing factor. On top of all this, the VPs did all they could to delay or scuttle the sale process, and undoubtedly were themselves responsible for much of any purported loss of value.

Accordingly, mostly for reasons that are either the direct consequence of the VPs' own actions or the U.S. Government's sanctions on the VPs, this is simply not a situation in which ordinary valuation techniques based only on expected future cash flows are an appropriate method for ascertaining fair market value.

Whether the Special Master was a "willing seller," entitling the sale to a presumption that it represents fair market value or not, an issue over which the parties disagree (*see* VPs' Obj. at 9-13; Special Master's Answering Brief on Open Matters Regarding the Sale Process (D.I. 1527) at 2-4), is ultimately not dispositive. The reality is that, despite the many obstacles, this was a widely noticed auction conducted by Evercore, one of the premier investment banking firms in the country, led by a team of senior bankers who combine M&A, energy, and restructuring expertise. In addition to its own extensive list of contacts, Evercore reached out to every potential buyer suggested by the VPs. Ultimately, after the Court provided the Special Master with direction in conducting the latter part of the sale process, a robust competitive auction took place, which saw active participation from a number of bidders.

The VPs' complaint that an actual willing seller would have paused the auction until all litigation risks were resolved, rather than allowing contingent liabilities to depress the price, *see* VPs' Obj. at 22, ignores the critical existential difference between a judicial sale and a voluntary sale. The purpose of this judicial sale is to pay the claims of creditors to whom Venezuela and PDVSA have owed billions of dollars for many years. These judgment debtors do not get the luxury of forcing their creditors to wait even longer to find the ideal time to conduct what is, after all, a forced sale. To state the obvious, it will never be a "good" time from the viewpoint of the VPs to enforce the judgments and sell their ownership interest in PDVH.

"The ultimate question is whether by permitting the sale to stand the result would be an unconscionable treatment for the moving party" — here the VPs. *Girard*, 379 A.2d at 1146. ConocoPhillips believes that the Special Master's Final Recommendation represents a fair price that was achieved in challenging circumstances and in the face of relentless efforts by the VPs to obstruct the process. There is nothing unconscionable as to the VPs in approving this sale and allowing creditors to recover on their long overdue judgments. Absent the emergence of a superior bid before the conclusion of the sale hearing, the Dalinar Bid should be approved by the Court.

**II.    The 2020 Bondholders' Objections and the Changes They Demand to the Sale Order Are Justified in Part, But Are Greatly Overreaching.**

The Bondholders object to many provisions of the Sale Order that they assert provide releases of claims and injunctions against pursuit of claims that may go further than is authorized by Section 324. 8 *Del. C.* § 324. The Bondholders further assert that they are entitled to litigate the validity of their claimed pledge of 50.1% of the CITGO Holding shares in the pending action before Judge Failla in the Southern District of New York, and that nothing in this proceeding should purport to determine their rights.

While the Bondholders' statement of their entitlement to litigate may be correct, their proposed interference with the relief that can be granted in the Sale Order would fundamentally undermine the Court's ability to conduct a sale of the shares pursuant to Section 324. The asset that is being sold under this Court's supervision to satisfy claims against PDVSA (and by virtue of the alter ego ruling, the Republic) is PDVSA's ownership interest in PDVH, the PDVH shares. Section 324 authorizes the Court to conduct a sale of those shares and to transfer them to the purchaser, the same as if the owner had transferred the shares pursuant to the corporation's governance documents. 8 *Del. C.* § 324(c). As such, the Sale Order can and must provide the Buyer with clear title to the shares, free and clear of any liens or encumbrances resulting from their

5

prior ownership by PDVSA or the Republic. *Maryland Nat'l Bank* v. *Porter-Way Harvester Mfg. Co.*, 300 A.2d 8, 12 (Del. 1972). Any interest in the PDVH shares, including whatever inchoate rights the Bondholders may believe they have, will be discharged by the sale.

There are a number of examples where the Bondholders' proposed changes to the Sale Order would undercut the Buyer's entitlement to acquire the PDVH shares free and clear of all claims and liens. The Bondholders also propose language which would expose the judgment creditors who receive payment of their claims from the sale of the shares to fraudulent transfer or like claims asserted by the Bondholders. These proposed changes to the Sale Order are inconsistent with the very purpose of this sale and should be rejected.

The basic problem with the Bondholders' proposed changes is that they have no lien on the PDVH shares, nor any other property interest in those shares. (To the extent they did have such a property interest, it would be junior to the liens of the creditors in this proceeding.) They are creditors of PDVSA with a purported lien on 50.1% of the shares of CITGO Holding. They do not have rights to assert as against the PDVH shares. To the extent they believe that their rights from a purported pledge of 50.1% of the shares of PDVH's subsidiary, CITGO Holdings, are being impaired, the remedy is not to interfere with the passage of clear title of the shares of PDVH.

Moreover, to the extent the Bondholders seek to reserve the right to retroactively challenge the waterfall of proceeds from this sale after it has concluded, that request should be denied. The creditors in this proceeding will be receiving payments pursuant to a court order of which the Bondholders have ample notice. That court order follows Delaware law, which requires the proceeds of the sale to be paid out in accordance with the priority of liens on the asset that has been sold. There is no apparent basis to burden creditors who receive payment in this proceeding in accordance with a duly authorized court order with having to defend against lawsuits seeking

disgorgement of those payments based on collateral attacks that in substance seek to annul the result of this proceeding.  *See Robins* v. *Garvine*, 136 A.2d 549, 551-52 (Del. 1957) (refusing to entertain collateral attack on duly authorized sheriff's sale in the absence of fraud or lack of jurisdiction).  To the extent the Bondholders believe their rights are being impaired, they need to obtain an appropriate order in advance, not "reserve rights" to do so later.

The following are examples of the Bondholders' unacceptable inserted language and provisions:

1. Paragraph H of the Sale Order as initially drafted recites that the Transaction Documents were not entered into for the purpose of hindering or defrauding creditors — in other words this court-approved sale cannot constitute a fraudulent transfer.  The Bondholders have inserted the words "the Special Master and the Buyer assert" preceding this provision (D.I. 1943-2 at 12), purporting to convert the Court from an arbiter of the law into a mere reciter of the parties' assertions.  This change would leave judgment creditors vulnerable to suits from bondholders seeking to recover the payments the creditors receive from the proceeds of the sale.  This objective is further reflected in the inserted language in paragraph 17 (D.I. 1943-2 at 33-34), which states that the payments to the judgment creditors "shall be subject to disgorgement in the event that such Payments were made in violation of the CITGO Share Holding Agreement, or by fraudulent conveyance, illegal dividend, or other similar legal or equitable doctrine."  The creditors whose attachments on the PDVH shares are being satisfied by the sale of the shares are entitled to receive those payments free and clear of any claims by competing creditors who are either junior to them in the waterfall or have no lien at all on the

7

shares, as the Bondholders do not. The Bondholders' inserts to this effect should be rejected.

2. Paragraph J of the Sale Order as initially drafted provides that the Buyer will not have any liability relating to the sale and transfer of the PDVH shares. The Bondholders propose to carve out from this provision "any liability or any other obligation to the PDVSA 2020 Bondholder Parties." (D.I. 1943-2 at 14). This change goes far beyond the Bondholders' legitimate goal of protecting their right to litigate over whether their purported pledge will be violated by the grant of liens at the CITGO entities. Instead, this carve-out would deprive the Buyer of receiving the very asset it is purchasing — the PDVH shares — free and clear.

3. Similarly, paragraph K of the Sale Order as initially drafted provides that, following the sale transaction, there will be no recourse against the PDVH shares. The Bondholders seek to carve themselves out of this protection as well, once again denying the Buyer the fundamental protection to which it is entitled – clean title to the PDVH shares. Similar reservations of the Bondholders' purported rights against the PDVH shares are inserted into paragraph 11 (D.I. 1943-2 at 28), paragraph 18 (D.I 1943-2 at 34), and paragraph 19 (D.I 1943-2 at 35). These likewise should be rejected.

4. At the end of paragraph M of the Sale Order (D.I. 1943-2 at 18), the Bondholders propose to insert language to the effect that the Court is making no determination as to the compliance of the sale transaction with the rights of the Bondholders. This is also overbroad — while there should be no determination in this proceeding whether the Gold Reserve Consortium's proposed financing violates the

8

Bondholders' rights under the pledge, the Bondholders' insert would undermine this entire proceeding. Section 324 authorizes the Court to approve the sale and the transfer of the PDVH shares to the Buyer free and clear of any interests in those shares.

5. Paragraph V of the Sale Order (D.I. 1943-2 at 22) is a new provision the Bondholders propose to insert, which essentially recites that the Bondholders' rights are not being determined by this order, but rather will be determined in the case pending in the SDNY. Such an overriding carve-out would seem to be the more efficient way of achieving the Bondholders' legitimate goal of protecting their right to adjudicate the validity of the pledge in the pending SDNY case, and ConocoPhillips respectfully suggests that an edited version of this paragraph should replace all of the Bondholders' proposed inserts which are scattered throughout the document. However, the insert is problematic in one respect, as it provides that nothing in the Sale Order eliminates any right of recourse of the Bondholders against the PDVH shares. But the Bondholders have no lien on the PDVH shares, which can and must be transferred free and clear of the Bondholders' purported claims. The proposed language is both contrary to law and would deprive this Court of the ability to effectuate the sale of the PDVH shares, which must be free and clear of liens and other interest in those shares.

### III. Certain of Gramercy's Proposed Changes to the Sale Order Are Likewise Unacceptable.

Gramercy, an out-of-the money creditor in this sale proceeding whose alter ego claims against PDVH have been dismissed by Judge Rakoff in the SDNY, has filed objections to aspects of the Sale Order, presumably to protect its claims against PDVH in the event its alter ego claim

9

is resuscitated on appeal. Gramercy adopts many of the Bondholders' objections and proposes to insert language that carves out creditors of PDVH in the same manner as the Bondholders attempt to carve themselves out of various provisions of the order. ConocoPhillips will not duplicate its arguments above as to this proposed language, but rather adopts those same arguments as to the language it believes is contrary to law in relation to Gramercy.

## CONCLUSION

For the reasons set forth above, ConocoPhillips urges that the objections of the VPs, the Bondholders and Gramercy be overruled. ConocoPhillips further supports approval of the Final Recommendation, subject to its request for clarification in D.I. 1945 that, in the event the Gold Reserve Consortium's proposed financing structure becomes impracticable due to developments involving the Bondholders, this process will pivot to seeking an alternate transaction unless the Gold Reserve Consortium is able to secure alternate financing within the 45-day cure period, and subject to the emergence of any superior proposal.

|  |  |
|---|---|
| *Of Counsel*:<br><br>Michael S. Kim<br>Marcus J. Green<br>Josef M. Klazen<br>Lydia L. Halpern<br>KOBRE & KIM LLP<br>800 Third Avenue<br>New York, New York 10022<br>(212) 488-1200<br>michael.kim@kobrekim.com<br>marcus.green@kobrekim.com<br>jef.klazen@kobrekim.com<br>lydia.halpern@kobrekim.com | Respectfully submitted,<br><br>ROSS ARONSTAM & MORITZ LLP<br><br>*/s/ Garrett B. Moritz*<br>Garrett B. Moritz (Bar No. 5646)<br>Elizabeth M. Taylor (Bar No. 6468)<br>Hercules Building<br>1313 North Market Street, Suite 1001<br>Wilmington, Delaware 19801<br>(302) 576-1600<br>gmoritz@ramllp.com<br>etaylor@ramllp.com<br><br>*Attorneys for Phillips Petroleum Company Venezuela Limited, ConocoPhillips Petrozuata B.V., ConocoPhillips Gulf of Paria B.V., and ConocoPhillips Hamaca B.V.* |

Richard G. Mason
Amy R. Wolf
Michael H. Cassel
WACHTELL, LIPTON, ROSEN
 & KATZ
51 West 52nd Street
New York, New York 10019
(212) 403-1000
RGMason@wlrk.com
ARWolf@wlrk.com
MHCassel@wlrk.com

Dated: August 7, 2025