## IN THE UNITED STATES DISTRICT COURT FOR
## THE DISTRICT OF DELAWARE

| | |
|---|---|
| CRYSTALLEX INTERNATIONAL CORPORATION, | |
| Plaintiff, | |
| v. | Case No. 17-mc-151-LPS |
| BOLIVARIAN REPUBLIC OF VENEZUELA, | |
| Defendant. | |
| RUSORO MINING LTD., | |
| Plaintiff, | |
| v. | Case No. 21-mc-481-LPS |
| BOLIVARIAN REPUBLIC OF VENEZUELA, | |
| Defendant. | |
| KOCH MINERALS SARL and KOCH NITROGEN INTERNATIONAL SARL, | |
| Plaintiffs, | |
| v. | Case No. 21-mc-156-LPS |
| BOLIVARIAN REPUBLIC OF VENEZUELA, | |
| Defendant. | |
| GOLD RESERVE INC., | |
| Plaintiff, | |
| v. | Case No. 22-mc-453-LPS |
| BOLIVARIAN REPUBLIC OF VENEZUELA, | |
| Defendant. | |

## GOLD RESERVE'S RESPONSE TO OBJECTIONS
## TO SPECIAL MASTER'S FINAL RECOMMENDATION

## TABLE OF CONTENTS

I.    THE DALINAR BID ADEQUATELY ADDRESSES THE CLOSING RISK POSED BY THE 2020 BONDHOLDERS ................................................................................................1

a.    The 2020 Bondholders Will Not Seek to Enjoin the Sale Process or Closing .................. 1

b.    It Is Unlikely That the 2020 Bondholders Could Exercise Their Alleged Rights Under the Pledge Agreement to Frustrate Closing ..................................................................... 3

c.    If the 2020 Bondholders Sought an Injunction, It Would Likely Be Denied .................... 6

    i.    Likelihood of Success on the Merits............................................................................ 6

        1.    The Consortium's Post-Closing Steps Do Not Violate the Pledge Agreement .......... 7

        2.    The Consortium's Post-Closing Steps Do Not Breach the Pledge Agreement's Requirement to Keep the Pledged Shares from Being Impaired ....................................... 7

    ii.    Irreparable Harm......................................................................................................... 8

    iii.    The Balance of Equities and Public Interest.............................................................. 9

d.    OFAC Presently Prohibits the 2020 Bondholders from Exercising the Pledge............... 10

e.    The Special Master's Final Recommendation Meaningfully Accounts for Any Risk to Closing ................................................................................................................ 12

f.    Gold Reserve Did Meaningfully Account for the 2020 Risk .......................................... 14

II.    NO CHANGES OR CLARIFICATIONS TO THE SPA ARE NEEDED TO ADDRESS CLOSING RISK ...............................................................................................................14

a.    An Increase of the Non-Refundable Deposit is Improper and Unnecessary .................... 16

b.    There is No Justification for Denying Expense Reimbursement..................................... 17

c.    The Requested Clarification Regarding the Termination Provisions of the SPA is Premature and Without Basis.................................................................................... 18

III.    THE BID IS NOT "GROSSLY INADEQUATE" AND DOES NOT "SHOCK THE CONSCIENCE"..................................................................................................................21

a.    Delaware Courts Consider the Facts Of Each Specific Case in Determining Unconscionability ............................................................................................................ 22

b.    The Venezuela Parties' $18.6 Billion Valuation Is Irrelevant to The Issue Before the Court .................................................................................................................... 23

c.    The Valuation Evidence Before the Court Shows That the Dalinar Bid's Price Is More than Adequate Under the 50% Test .......................................................................... 25

d.    The Dalinar Bid Is the Highest Recommended Bid; It Is the Best Evidence of the Fair Market Value of the PDVH Shares......................................................................... 26

IV.    THE VENEZUELA PARTIES' "ADDITIONAL REASONS" ARE WITHOUT MERIT..29

a.    The Venezuela Parties Present No Evidence of Any Bias or Other Basis for Disqualification................................................................................................................ 29

b.    There Is No Justification to Extend the Deadline for Unsolicited Bids............................ 29

c.   Venezuela's and PDVSA's Objections to Gold Reserve as a Bidder Are Without Merit and Untimely.................................................................................................................. 31

V.   NONE OF THE SPA PROVISIONS ARE "IMPOSSIBLE" OR "INAPPROPRIATE"......34

VI.  CONCLUSION...............................................................................................................35

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Atl. Props. Grp. v. Deibler,*
  C.A. No. 93M-11-001, 1994 Del. Super. LEXIS 32 (Super. Ct. Jan. 5, 1994) .....22, 25, 27, 28

*Brenntag Int'l Chem., Inc. v. Bank of India,*
  175 F.3d 245 (2d Cir. 1999)..................................................................................8

*Burge v. Fid. Bond & Mortg. Co.,*
  648 A.2d 414 (Del. 1994) .................................................................................22, 28

*Cent. Tr. & Sav. Co. v. Chester Cty. Elec. Co.,*
  9 Del. Ch. 123, 77 A. 771 (1910).............................................................................28

*Cont'l Grp., Inc. v. Amoco Chems. Corp.,*
  614 F.2d 351 (3d Cir. 1980).....................................................................................10

*Crystallex Int'l Corp. v. Bolivarian Republic of Venez.,*
  No. 17-151-LPS, D.I. 1741 ......................................................................................12

*Girard Tr. Bank v. Castle Apartments, Inc.,*
  379 A.2d 1144 (Del. Super. Ct. 1977) ................................................................22, 28

*Home Beneficial Life Ins. Co. v. Blue Rock Shopping Ctr., Inc.,*
  379 A.2d 1147 (Del. Super. Ct. 1977) .....................................................................22

*New Castle Cty. v. Candler, No. N13J-00542,*
  2014 Del. Super. LEXIS 2753 (Super. Ct. Jan. 30, 2014).........................................27

*Petróleos de Venez. S.A. v. MUFG Union Bank, N.A.,*
  495 F. Supp. 3d 257 (S.D.N.Y. 2020)....................................................................5, 9

*Petróleos de Venez. S.A. v. MUFG Union Bank, N.A.,*
  106 F.4th 263 (2d Cir. 2024) ....................................................................................4

*Petróleos de Venez. S.A. v. MUFG Union Bank, N.A.,*
  19-cv-10023, D.I. 117 (S.D.N.Y. June 15, 2020) ......................................................5

*Petróleos de Venez. S.A. v. MUFG Union Bank, N.A.,*
  19-cv-10023, D.I. 241 (S.D.N.Y. Dec. 29, 2020)......................................................5

*Petróleos de Venez. S.A. v. MUFG Union Bank, N.A.,*
  19-cv-10023, D.I. 1 (S.D.N.Y. Oct. 29, 2019).....................................................4, 12

*Reilly v. City of Harrisburg,*
  858 F.3d 173 (3d. Cir. 2017)....................................................................................10

*Schweiker v. McClure,*
  456 U.S. 188 (1982)..................................................................................................29

*SEC v. Chappell*,
    107 F.4th 114 (3d Cir. 2024) ............................................................10

*United States v. Microsoft Corp.*,
    253 F.3d 34 (D.C. Cir. 2001) ...........................................................29

*Winter v. Nat. Res. Def. Council, Inc.*,
    555 U.S. 7, 129 S.Ct. 365, 172 L.Ed.2d 249 (2008) ........................6

*Wisdom Imp. Sales Co. v. Labatt Brewing Co.*,
    339 F.3d 101 (2d Cir. 2003) ..............................................................8

**Rules and Statutes**

8 Del. C. § 324(a)...............................................................................26

**Other Authorities**

Executive Order 13835 ......................................................................32

Executive Order 13850 ......................................................................32

Executive Order 13884 ......................................................................32

Dep't of Treas., Office of Foreign Assets Control, *Frequently Asked Questions*
    (Jan. 20, 2022), https://home.treasury.gov/policy-issues/financial-
    sanctions/faqs/595 .....................................................................4, 12

Dep't of Treas., Office of Foreign Assets Control, *General License No. 5S* (June
    20, 2025), https://ofac.treasury.gov/media/934391/download?inline .................................4, 11

General Licenses Issued Pursuant to Venezuela-Related Executive Order 13835,
    85 Fed. Reg. 14572 (Mar. 13, 2020),
    https://www.federalregister.gov/documents/2020/03/13/2020-05109/general-
    licenses-issued-pursuant-to-venezuela-related-executive-order-13835 ...........................12

Statement by Mara Valiñas, Chair of the Independent International Fact-Finding
    Mission on the Bolivarian Republic of Venezuela, at the 55th session of the
    Human Rights Council, United Nations Human Rights, Office of the High
    Commissioner, March 20, 2024, https://www.ohchr.org/en/statements-and-
    speeches/2024/03/statement-marta-valinas-chair-independent-international-
    fact...................................................................................................31

Luigino Bracci Roa desde Venezuela, *Delcy Rodríguez on the Citgo theft from
    Venezuela, full press conference*, (YouTube, May 3, 2023),
    https://www.youtube.com/watch?v=TduWNOOV_XY&t=13s...............................31

Recognition of Juan Guaidó as Venezuela's Interim President, Press Statement,
    Michael R. Pompeo, Secretary of State, https://2017-
    2021.state.gov/recognition-of-juan-guaido-as-venezuelas-interim-president/ ......................32

2016 Annual Report to Shareholders, Gold Reserve Inc., April 28, 2017,
    https://ir.goldreserveinc.com/static-files/04ca6bcf-5f92-4e89-bd3f-
    3d945542099a...........................................................................32, 33

Gold Reserve Inc., *Annual Reports*, https://ir.goldreserveinc.com/annual-reports ......................32

Gold Reserve Inc., *News Archive*, https://goldreserve.bm/news-archive ......................................32

Gold Reserve Inc., *Bolivarian Republic of Venezuela Agrees to Pay Gold Reserve Arbitral Award and Acquire Mining Data and Executes an Agreement to Jointly Develop the Brisas Cristinas Gold Copper Mining Project* (Aug. 8, 2016), https://www.goldreserveinc.com/wp-content/uploads/2016/08/16-13.pdf ......................................................................................................................33

Gold Reserve Inc. Annual Information Form for the Year Ended December 31, 2017, Ex. 99.1 to Form 40-F (April 26, 2018), https://www.sec.gov/Archives/edgar/data/1072725/000107272518000016/gdrzfform40fexhibit991042618.htm ......................................................................33

Gold Reserve Inc. June 30, 2019 Interim Consolidated Financial Statements, Ex. 99.1 to Form 6-K, https://www.sec.gov/Archives/edgar/data/1072725/000107272519000041/gdrzfform6kexhibit991082219.htm .................................................................................33

Gold Reserve Inc., Management's Discussion and Analysis, Ex. 99.3 to Form 40-F (Apr. 9, 2020), https://www.sec.gov/Archives/edgar/data/1072725/000107272520000004/gdrzfform40fexhibit993040920.htm ..................................................................................33

Gold Reserve Ltd. ("Gold Reserve"), f/k/a Gold Reserve Inc., ("Gold Reserve") respectfully submits this Response to the Objections to the Special Master's Final Recommendation filed by Red Tree Investments, LLC ("Red Tree") (D.I. 1942); Phillips Petroleum Company Venezuela Limited, ConocoPhillips Petrozuata B.V., ConocoPhillips Gulf of Paria B.V., and ConocoPhillips Hamaca B.V. (collectively, "ConocoPhillips") (D.I. 1945); Crystallex International Corporation ("Crystallex") (D.I. 1949); OI European Group B.V. ("OIEG") (D.I. 1950), ACL1 Investments Ltd., ACL2 Investments Ltd., and LDO (Cayman) XVIII Ltd. (together, "ACL") (D.I. 1946), and the Bolivarian Republic of Venezuela (the "Republic"), Petróleos de Venezuela, S.A. ("PDVSA"), PDV Holding, Inc. ("PDVH"), and CITGO Petroleum Corporation ("CITGO Petroleum," and together with the Republic, PDVSA, and PDVH, the "Venezuela Parties") (D.I. 1951), and the ad hoc group of holders of a majority of PDVSA 2020 Bonds (the "2020 Bondholders") (D.I. 1943).

Gold Reserve joins, and incorporates herein, the response briefs filed herewith by its bidding consortium members Rusoro Mining Ltd. ("Rusoro") and Koch Minerals Sàrl ("KM") and Koch Nitrogen International Sàrl ("KNI," and together with KM, "Koch"). Collectively, Gold Reserve, Rusoro, and Koch are referred to herein as the Consortium.

## I.    THE DALINAR BID ADEQUATELY ADDRESSES THE CLOSING RISK POSED BY THE 2020 BONDHOLDERS

### a.    The 2020 Bondholders Will Not Seek to Enjoin the Sale Process or Closing

The fundamental premise of the objections filed by Red Tree, and many of the other parties who filed objections, is that multiple changes to the terms of the Stock Purchase Agreement ("SPA") are needed to "protect senior creditors who bear the risk that the bid will not close" based on efforts by the 2020 Bondholders "to prevent a sale if Gold Reserve's bid is chosen." (D.I. 1942 at 1); *see* (D.I. 1949 at 4-7), (D.I. 1945). However, these arguments ignore that the 2020

1

Bondholders have now expressly represented to the U.S. District Court for the Southern District of New York ("SDNY") that, in whatever injunction they may seek in the future, they do not intend to enjoin Gold Reserve's bid or otherwise interfere with the Sale Process.

As the Court is aware, Judge Failla held a conference on July 10, 2025, to consider the 2020 Bondholders' request for a briefing schedule for injunctive relief they may seek.[1] Therein, Judge Failla expressed doubt that she could enjoin the Court or the Sale Process.[2] In response, in an effort to not lose their motion before it was even filed, the 2020 Bondholders were forced to clarify that any injunction that they might seek in the future would not interfere with Gold Reserve's bid or this Court's Sale Process:[3]

> [W]e're not seeking an injunction of Judge Stark, we're not seeking an injunction of the special master, we're not seeking an injunction of the process in Delaware. We're not seeking an injunction of the [G]old [R]eserve bid that we've laid out in our letter or even the sale of PDVH pursuant to that process. … After Judge Stark issues his order, we would seek a preliminary injunction prohibiting plaintiff PDVH in this case and those acting in concert with it, pursuant to Rule 65(d)(2)(C), from violating the pledge agreement. That's what we're asking for.

The 2020 Bondholders repeatedly emphasized the limited nature of any injunction that they might request:[4]

> We don't want you to interfere with Judge Stark's process. We don't want you to interfere with Judge Stark. We don't want you to interfere with the [S]pecial [M]aster. We don't want you to interfere with the sale. All we want is the issue not be decided at the time of his order.

---

[1] SDNY July 10, 2025 Hr'g Tr. 8:16-9:5 (attached as Ex. B).

[2] *Id.*

[3] *Id.* at 9:20-10:12.

[4] *Id.* at 11:5-16.

The 2020 Bondholders further confirmed to Judge Failla that they are "not a party to" the action before this Court, have not intervened in this action and do not wish to, and stated that they would thus "lack standing to appeal" any order by the Court—including the Court's forthcoming order regarding the Special Master's Final Recommendation.[5]

The foregoing representations by the 2020 Bondholders to the SDNY are gamechangers. On their own admission, the 2020 Bondholders do not intend to interfere with Gold Reserve's bid, the Sale Process, or this Court's proceedings. Accordingly, any Objections that seek changes to the Final Recommendation on that basis should be rejected.

> **b.      It Is Unlikely That the 2020 Bondholders Could Exercise Their Alleged Rights Under the Pledge Agreement to Frustrate Closing**

It is unclear whether the 2020 Bondholders can interpose valid Objections or otherwise participate in these proceedings given their representations to the SDNY that they are not a party to this action, have not intervened and do not wish to, and "lack standing to appeal" this Court's decision on the Final Recommendation[6]—particularly an Objection that asks the Court to preserve "their recognized ability to enforce their rights" that they represented to the SDNY that they would not seek. (D.I. 1943 at 11).

Nonetheless, they have repeatedly sought to do so, and their Objection lays out the basis for what injunctive relief they may seek from Judge Failla. The 2020 Bondholders state they will not challenge "the actual sale of the PDVH Shares," but would "challenge the aspects of the [Dalinar Bid's] financing that would strip away the value of their Collateral and violate their rights under the Pledge Agreement." (D.I. 1943 at 7). They claim that the Dalinar Bid violates the Pledge Agreement's "anti-upstreaming" provision and devalues the Collateral by merging Adolin, a

---

[5] SDNY July 10, 2025 Hr'g Tr. 14:9-18; 16:23-25.
[6] *Id.* at 14:9-18; 16:23-25.

wholly owned subsidiary of Dalinar Energy Corporation ("Dalinar"), into CITGO Petroleum after judgment creditors have been paid. *Id.* at 5, 11. The 2020 Bondholders claim they have the power to vote the PDVH Shares to prevent this merger, but that alleged right is subject to the SDNY litigation. *Id.* at 3. In fact, multiple unlikely events would have to occur for the 2020 Bondholders to exercise this alleged right and actually attempt to interfere with closing as Red Tree, Crystallex, and ConocoPhillips fear. *See* (D.I. 1942 at 1), (D.I. 1949 at 4-7), (D.I. 1945).

**First**, OFAC would have to lift the suspension of the 2020 Bondholders' ability to exercise their purported voting rights under the Pledge—a prohibition that has been in effect for more than 5 years, since October 2019, throughout the entire duration of the SDNY litigation.[7] There is no evidence or even indication that OFAC will do this—as discussed below, OFAC recently extended this suspension through December 20, 2025, which is conceivably after closing will occur.[8]

**Second**, the 2020 Bondholders' alleged rights under the Pledge would have to be validated in the pending SDNY litigation. The SDNY anticipates ruling on the pending motions for summary judgment by the end of September.[9] There is a very good chance that the 2020 Bondholders will lose on these motions. As the Court will recall, the Second Circuit reversed the SDNY's previous judgment in favor of the 2020 Bondholders based on the New York Court of Appeals' ruling that Venezuelan law, not New York law, governs the validity of the 2020 Notes.[10] In the now-vacated decision finding the 2020 Notes valid under New York law, the SDNY "determined not to address

---

[7] *See* Dep't of Treas., Office of Foreign Assets Control, *Frequently Asked Questions* (Jan. 20, 2022), https://home.treasury.gov/policy-issues/financial-sanctions/faqs/595 (summarizing history of General License 5); *see Petroleos de Venez. S.A. v. MUFG Union Bank, N.A.*, 19-cv-10023, D.I. 1 (S.D.N.Y. Oct. 29, 2019).

[8] Dep't of Treas., Office of Foreign Assets Control, *General License No. 5S* (June 20, 2025), https://ofac.treasury.gov/media/934391/download?inline.

[9] SDNY July 10, 2025 Hr'g Tr. 7:24-8:2. Judge Failla stated that she intends to have the motions before her "resolved by the end of September." *Id.* at 7:24-8:2.

[10] *Petroleos de Venez. S.A. v. MUFG Union Bank, N.A.*, 106 F.4th 263, 270 (2d Cir. 2024).

[the] intricacies" of Venezuelan law, as the SDNY was "reluctant to interpret another nation's law when such interpretation is not necessary," particularly because "the foreign law at issue is a constitution, as opposed to a mere statute."[11] In such a situation, the submissions of the Republic in support of PDVSA's position of invalidation carry even more weight.[12] In sum, with the application of Venezuelan law, the situation has fundamentally shifted in the long-running SDNY litigation, creating a clear possibility that the 2020 Notes will be invalidated.

**Third**, even if the SDNY validates the pledge, the Venezuela Parties would likely obtain another stay of enforcement pending appeal, as they obtained during their prior appeal.[13] At the April 17, 2025 hearing, the Venezuela Parties confirmed that, in the event of a negative initial ruling, they would again file a motion for a discretionary stay of enforcement of the judgment pending appeal (from the SDNY and, if denied in the first instance, from the Second Circuit).[14] Because the SDNY previously granted such a request for a stay during the over three years the last appeal was pending, there is a very good chance a stay would again be granted.

**Fourth**, even if all these events occurred in favor of the 2020 Bondholders—which is highly unlikely given the cumulative probabilities involved—the Consortium could again attempt to reach a settlement with the 2020 Bondholders. As detailed below, and as disclosed in the Final Recommendation, the Consortium has engaged in negotiations with the 2020 Bondholders and it is possible that a settlement could be reached after entry of the Sale Order, if necessary.[15]

---

[11] *Petroleos De Venez. S.A. v. MUFG Union Bank, N.A.*, 495 F. Supp. 3d 257, 292 (S.D.N.Y. 2020).

[12] *Petróleos de Venezuela S.A. v. MUFG Union Bank, N.A.*, 19-cv-10023, D.I. 117 (S.D.N.Y. June 15, 2020).

[13] *Petróleos de Venezuela S.A. v. MUFG Union Bank, N.A.*, 19-cv-10023, D.I. 241 (S.D.N.Y. Dec. 29, 2020).

[14] April 17, 2025 Hr'g Tr. at 84:20-85:10 (attached as Ex. C) (noting that, if both the SDNY and Second Circuit denied a stay pending appeal, the Venezuela Parties would likely post bond).

[15] (D.I. 1837-1 at 576).

It is unlikely that *any* of the foregoing events will occur before closing to permit the 2020 Bondholders to exercise their alleged rights under the Pledge Agreement so as to attempt to interfere with Dalinar's closing. It is significantly less likely that *all of them* will occur. As such, there is minimal risk that the 2020 Bondholders would be able to impede closing.

**c.      If the 2020 Bondholders Sought an Injunction, It Would Likely Be Denied**

The risk of the 2020 Bondholders' injunction is substantially diminished given their above-referenced, express representations to the SDNY; however, even if they did attempt to reverse course, break these representations, and seek an injunction to interfere with Gold Reserve's bid, it is highly unlikely that it would be granted despite Crystallex's arguments otherwise (D.I. 1949 at 10-11).

As a preliminary yet vital issue, neither CITGO Petroleum nor Gold Reserve are parties to the SDNY action and therefore neither can be enjoined in that action (the sole proceeding where the 2020 Bondholders have said they would seek injunctive relief).

Turning to the merits, if the 2020 Bondholders nonetheless sought an injunction to attempt to prohibit the Dalinar Bid's closing, they would face a substantial uphill battle in satisfying the four-factor test: (1) likelihood of success on the merits; (2) irreparable harm to the moving party in the event the injunction is not granted; (3) the balance of equities between the parties favors granting the injunction; and (4) the public interest favors granting the injunction. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22, 129 S.Ct. 365, 172 L.Ed.2d 249 (2008).

**i.      Likelihood of Success on the Merits.**

First, the 2020 Bondholders will not be able to establish that they are likely to succeed on the merits. This is because the Dalinar Bid's debt financing structure ***does not*** violate the Pledge.

### 1.    The Consortium's Post-Closing Steps Do Not Violate the Pledge Agreement

Section 2.01(a)(iv) of the Pledge Agreement defines Pledged Shares as 50.1% of the capital stock of Citgo Holding and any successor thereto. (D.I. 1441-2 at 4). The 2020 Bondholders may argue that merging Adolin into CITGO Petroleum and causing CITGO Petroleum to pledge all assets to its lenders would violate the terms of the Pledge Agreement. But this is incorrect because the Collateral under the Pledge includes only 50.1% of the capital stock of Citgo Holding and all rights with respect thereto, including rights to dividends. *Id.* It does not include the assets of Citgo Holding, Citgo Holding's ownership of CITGO Petroleum, or the assets of CITGO Petroleum. *Id.* In addition, the Proposed Transaction does not modify, in any way, the interest of Citgo Holding in CITGO Petroleum, and thus does not violate the intent of the Pledge Agreement that 50.1% of the capital stock of Citgo Holding remains subject to the Pledge.[16] Put differently, because the Dalinar Bid involves the assets of a Citgo Holding subsidiary as opposed to the assets of Citgo Holding itself, the Pledge Agreement's limitations are inapplicable.

### 2.    The Consortium's Post-Closing Steps Do Not Breach the Pledge Agreement's Requirement to Keep the Pledged Shares from Being Impaired

Section 2.05(a) of the Pledge specifies that any voting done by the Pledgor must not be for a purpose inconsistent **with terms of the Indenture** or any other Transaction Document.[17] The 2020 Bondholders may argue that this provision specifically limits all voting to be in compliance with the Indenture and therefore binds the Pledgor to the Indenture **even though** it is not a party to the contract. On this basis, the 2020 Bondholders may argue that the Dalinar Bid improperly impairs its rights. There are two strong responses to this argument.

---

[16] *See generally* (D.I. 1837-1 at Exhibits A, B).

[17] (D.I. 1441-2 at 7).

**First**, the bid does not impair the rights of the 2020 Bondholders to receive the principal because the transaction does not change the collateral or impair it.[18] Rather, the 2020 Bondholders will still have their 50.1% interest, and that interest will be worth more than the principal owed.

**Second**, any provision prohibiting interference with the right to collect the principal would be found in the Indenture and only applies to the Subsidiaries of PDVSA.[19] Effective as of the Closing, PDVH will no longer be a Subsidiary of PDVSA and, accordingly, will ***not*** be bound by the terms of the Indenture. The Pledge Agreement contains limited covenants on PDVH as Pledgor. (D.I. 1441-2 at 11-13). In other words, while there may be limits on the voting power as it pertains to the Indenture ***when the Indenture is in effect***, that limitation will go away at Closing because, at that moment, the Pledgor (PDVH) will no longer will be a Subsidiary of the Issuer (PDVSA), and thereafter PDVH's obligations and covenants as Pledgor will be limited to those in Section 4.02. *Id.* at 12-13.

### ii.    Irreparable Harm

The 2020 Bondholders cannot meet the second factor because any harm they allegedly would suffer from the Consortium closing would be compensable by an adequate remedy at law, specifically, to bring a lawsuit seeking monetary damages. *See Wisdom Imp. Sales Co. v. Labatt Brewing Co.*, 339 F.3d 101, 113 (2d Cir. 2003) (defining irreparable harm as "certain and imminent harm for which a monetary award does not adequately compensate"); *Brenntag Int'l Chem., Inc. v. Bank of India*, 175 F.3d 245, 249 (2d Cir. 1999) (find that irreparable harm exists "where, but for the grant of equitable relief, there is a substantial chance that upon final resolution of the action the parties cannot be returned to the positions they previously occupied").

---

[18] *See generally* (D.I. 1837-1 at Exhibits A, B).
[19] *See* (D.I. 1441-1).

The 2020 Bondholders' position is that the value of their purported collateral would be reduced by the amount of additional debt that the Consortium was able to secure post-Closing against the assets of CITGO Petroleum. (D.I. 1943 at 7). This is, by definition, a claim for money damages. The value of the shares be quantified, and the Indenture and Pledge Agreement provides that the equity interest is to be treated as collateral to the value of the 2020 Notes.

Moreover, the fact that the 2020 Bondholders' collateral in the form of the equity interest in Citgo Holding terminates upon compensation of PDVSA's default on the 2020 Notes also weighs against a finding of irreparable harm. To state an obvious, yet sometimes overlooked fact: the 2020 Bondholders do not have a purported **permanent** right to 50.1% of the equity of Citgo Holding; rather, their interest in that collateral was triggered by PDVSA's default and is extinguishable upon the payment of a certain, ascertainable amount: the unpaid amount of the Notes and accrued interest.[20] *See* (D.I. 1441-2 at 13) (Pledge Agreement § 2.08 states that the agreement and all security interests granted within it terminate on the date all Notes under Indenture have been repaid); *see also id.* at 7 (defining "Termination Date"). At any rate, the Consortium's proposed financing structure would not wholly dispose of Citgo Holding shares so much as burden them with debt, as the 2020 Bondholders acknowledge. *See* (D.I. 1943).

### iii.    The Balance of Equities and Public Interest

Although of lesser importance (and unlikely that a court would even reach them, given that the Consortium would likely prevail on the first two, critical factors), the 2020 Bondholders would also face difficulties in satisfying the final two factors of the injunction test.

As to a balance of the equities, the Consortium would be materially prejudiced by an injunction that frustrates closing, as would all the senior Attached Judgment Creditors ("AJCs")—

---

[20] On October 16, 2020, the SDNY calculated the value to be "$1,683,764,500, as well as all accrued and unpaid interest, including pre-judgment interest." *Petroleos de Venez. S.A.*, 495 F. Supp. 3d at 293.

Crystallex, Tidewater, ConocoPhillips, OIEG, Huntington Ingalls and Red Tree.[21] In comparison, as noted above, the 2020 Bondholders would not suffer any irreparable injury from the closing given that the 2020 Bondholders' remedies (to the extent they do not continue to be stayed by OFAC or are not invalidated in the SDNY litigation) are fully compensable by monetary damages.

As to the fourth factor, there is no real public interest in the 2020 Bondholders preserving their alleged contractual rights under the Pledge Agreement. *See Cont'l Grp., Inc. v. Amoco Chems. Corp.*, 614 F.2d 351, 358 (3d Cir. 1980) ("If the interest in the enforcement of contractual obligations were the equivalent of the public interest factor . . . it would be no more than a makeweight for the court's consideration of the moving party's probability of eventual success on the merits."). If anything, the Consortium being blocked from closing would harm the public given that this transaction, *ex hypothesi*, will have been approved by the Court after these long-running Sale Proceedings and would have been deemed by the Court as delivering the maximum value not only to the Venezuela Parties but also all the AJCs. In these circumstances, if anything, the fourth factor weighs heavily against the entry of an injunction.

In sum, because the 2020 Bondholders are unlikely to succeed on any injunctive relief they seek in the SDNY, the Dalinar Bid does not face substantial risk to closing from the 2020 Bondholders. This supposed risk, therefore, does not provide a proper basis for the objections of Red Tree and the other parties.

### d.    OFAC Presently Prohibits the 2020 Bondholders from Exercising the Pledge

Red Tree argues that continued suspension of GL-5 does not prevent the 2020 Bondholders from "seeking and obtaining an injunction to stop the sale," going so far as to claim that this is

---

[21] To be sure, courts consider harm to other interested parties from either the grant or denial of the injunction. *SEC v. Chappell*, 107 F.4th 114, 139 (3d Cir. 2024); *Reilly v. City of Harrisburg*, 858 F.3d 173, 179 (3d. Cir. 2017).

Gold Reserve's "principal argument" as to the why the 2020 Bondholders cannot block closing of the Dalinar Bid. (D.I. 1942 at 5). But this misunderstands Gold Reserve's position.

Gold Reserve does not argue that the suspension of GL-5 prohibits the 2020 Bondholders from *seeking* injunctive relief. Rather, as detailed above, OFAC's prohibition on the 2020 Bondholders' exercise of any rights they may have under the Pledge Agreement would restrain them from exercising any such rights to frustrate closing, even in the event that the SDNY determines that they exist. Further, if the 2020 Bondholders sought injunctive relief, the suspension of GL-5 would militate against the requisite finding that they are likely to succeed on the merits.

As the Court recognized at the April 17, 2025 hearing, and as the Special Master confirmed, the suspension of GL-5 prohibits the 2020 Bondholders from interfering with the Dalinar Bid's proposed financing by voting the pledged Citgo Holding shares.[22] The Court recognized this again in its April 21, 2025 Order affirming the Special Master's Stalking Horse bid, confirming that the 2020 Bondholders pose no "risk" unless they can persuade OFAC, prior to closing, to "change the position to which it has consistently adhered for over five years, i.e., the suspension" of GL-5.[23]

On June 20, 2025, OFAC issued GL-5S, which extends the longstanding suspension of the 2020 Bondholders' ability to exercise their alleged rights under the Pledge by another six months, from July 3, 2025, to December 20, 2025.[24] This is double the length of OFAC's usual three-month extensions of the suspension of GL-5 and 50% longer than the prior four-month extension.[25] The extended period of this suspension is sufficient to go through a realistic, early closing.

---

[22] April 17, 2025 Hr'g Tr. at 118:6-119:1.

[23] D.I. 1741 at 6-8.

[24] Dep't of Treas., Office of Foreign Assets Control, *General License No. 5S* (June 20, 2025), https://ofac.treasury.gov/media/934391/download?inline.

[25] Eleven of OFAC's nineteen suspension of GL-5 have been for three months (GL-5A, GL-5B, GL-C, GL-5D, GL-5E, GL-5K, GL-5L, GL-5M, GL-5N, GL-5O, and GL-5Q). These past versions of GL-5 are available on the Federal Register. *See, e.g.*, General Licenses Issued Pursuant to Venezuela-Related

Crystallex argues that OFAC will not "extend this *status quo* indefinitely" and speculates that, if the SDNY finds in the 2020 Bondholders' favor, OFAC may lift the suspension.[26] There is no basis for this speculation, as OFAC did not lift the suspension when the 2020 Bondholders initially prevailed in the SDNY; rather, the suspension was continuously extended throughout the years-long appeal process that ultimately reversed that ruling.[27]

This extension is the "indication" the Court referenced in its April 21, 2025 Order that OFAC intends to "continue to suspend GL-5 beyond the date of the expected closing of sale of the PDVH Shares."[28] At minimum, it constitutes definitive proof that the 2020 Bondholders have not persuaded OFAC to change its long-held position. Because OFAC likely will continue to prohibit the 2020 Bondholders from exercising any alleged rights under the Pledge Agreement beyond the closing of the Dalinar Bid, the 2020 Bondholders pose little threat to closing.

        e.      **The Special Master's Final Recommendation Meaningfully Accounts for Any Risk to Closing**

Red Tree ignores[29] that the Special Master's Final Recommendation sets forth, in detail, his analysis of the closing certainty of the Dalinar Bid. (D.I. 1837, ¶ 82). He lays out the state of play as to the 2020 Bondholders as of that date, and although he says "that there is at least some

---

Executive Order 13835, 85 Fed. Reg. 14572 (Mar. 13, 2020) (available at https://www.federalregister.gov/documents/2020/03/13/2020-05109/general-licenses-issued-pursuant-to-venezuela-related-executive-order-13835).

[26] (D.I. 1949 at 6, 9-10).

[27] *See* Dep't of Treas., Office of Foreign Assets Control, *Frequently Asked Questions* (Jan. 20, 2022), https://home.treasury.gov/policy-issues/financial-sanctions/faqs/595 (summarizing history of General License 5); *see Petroleos de Venezuela S.A. v. MUFG Union Bank, N.A.*, 19-cv-10023, D.I. 1 (S.D.N.Y. Oct. 29, 2019).

[28] *Crystallex Int'l Corp. v. Bolivarian Republic of Venez.*, No. 17-151-LPS, D.I. 1741 at 7. The timing of the issuance of GL-5S further confirms this. OFAC historically has issued these extensions a few days in advance of when the existing suspension is set to expire. For example, GL-5R was issued one day before GL-5Q was set to expire on March 7, 2025. Here, OFAC issued GL-5S thirteen (13) days in advance of when GL-5R was set to expire, allowing its impact to be factored into the Sale Process in advance of the July 2, 2025 Final Recommendation Date.

[29] (D.I. 1942 at 8).

chance" the 2020 Bondholders could enjoin the Dalinar Bid, "after evaluation of the attendant risks with his Advisors, he does not believe the combination of the likelihood of such risk and the consequences of it coming to fruition outweigh the expansive gap in purchase price between the Dalinar Topping Bid and the Revised Stalking Horse Proposal." *Id.*

The Court was clear in confirming Red Tree as the Stalking Horse bid that "[a]ny prudent bidder, as well as the Special Master on behalf of the Court," must consider what risk the 2020 Bondholders may pose to closing—but it also cautioned that "such risk [] must be viewed realistically[]." (D.I. 1741 at 6). As the Court noted, any such risk is "dependent on" the 2020 Bondholders obtaining injunctive relief in the SDNY and "persuading OFAC" to abandon its years-long suspension of GL-5. *Id.* at 6-7. The Court also emphasized that it "does not view the risk that the 2020 Bondholders … will seek to enjoin the Sale Process or transactions (e.g., financing, necessary corporate transactions) as anywhere close to dispositive on the question of whether the Court should accept the Final Bid." *Id.* at 7.

The Court also warned the Special Master that it may reject a Final Recommendation that placed substantial value on a settlement with the 2020 Bondholders if the SDNY concludes that the 2020 Bondholders have no rights to the PDVH Shares or indicates that it will stay enforcement of a judgment in their favor, or if OFAC indicates that will continue to suspend GL-5 past the date of closing (an indication which, as described above, Gold Reserve submits has been given). *Id.*

Therefore, it was prudent on the Special Master to not just analyze what risk to closing the 2020 Bondholders may pose, but to also weigh that risk against the (much more likely) chance that that 2020 Bondholders are unable to exercise any of their alleged rights prior to Closing. The Special Master has sufficiently explained that the Dalinar Bid's substantially higher price and its attendant benefits to more creditors outweighs any such risk.

13

### f.    Gold Reserve Did Meaningfully Account for the 2020 Risk

Contrary to the assertions of certain of the objecting parties, Gold Reserve did take steps to "meaningfully address[]" the risk of the "possible impact of the 2020 Bondholders' rights – whatever they may be (in reality or potentially) on the certainty of closing." (D.I. 1837-1 at 567) (quoting D.I. 1741 at 4). As set out therein, Gold Reserve not only adopted the Special Master's comments and suggested amendments to its bid materials, and provided the Special Master with its extensive risk analysis, and obtained a highly confident letter from its financing party for $1.8 billion in potential additional financing to support a potential settlement with the 2020 Bondholders, but it also engaged in good faith negotiations with the 2020 Bondholders regarding a potential settlement, the details of which are subject to a Confidentiality Agreement. *Id.* at 575-76. While a settlement has not been reached, it remains possible that it could be, if necessary, after the Sale Order is entered by the Court. *Id.*[30]

## II.    NO CHANGES OR CLARIFICATIONS TO THE SPA ARE NEEDED TO ADDRESS CLOSING RISK

Crystallex, Red Tree, and ConocoPhillips ask the Court to revise or clarify the terms of the SPA, despite extensive litigation about those terms and their ultimate approval by the Court. *See* (D.I. 1554), (D.I. 1571), (D.I. 1583). Any party, including those that now seek to relitigate the SPA terms, had the opportunity to make proposals to the Special Master, raise objections, or otherwise be heard regarding the SPA. *See id.* Now, after two rounds of bidding, these parties seek to modify certain terms of the SPA for the first time. Each Objection seeking amendments to the SPA should accordingly be rejected as waived and untimely.

---

[30] While Crystallex waves away the potential of settlement as "irrelevant," (D.I. 1949 at 11), it remains that, in the unlikely event that the 2020 Bondholders actually pose a threat to closing, the Consortium could reach a settlement with the 2020 Bondholders. It therefore *is* relevant that a settlement could resolve the unlikely risks that Crystallex complains of, as this meaningfully addresses what minimal risk the 2020 Bondholders pose to closing.

These requests are premised on perceived risks to closing from the 2020 Bondholders and regulatory risks. *See, e.g.*, (D.I. 1942 at 9-11), (D.I. 1949 at 3-17). But, as the Court has stated, "[t]he entire Sale Process has been, and continues to be, subject to risks that cannot be eliminated," including these exact risks. (D.I. 1741 at 7). They are not new. There is no risk unique to the Dalinar Bid that would not have existed with any other actual or potential bidder (other than those, like Red Tree, that siphoned value from their bids to settle with the 2020 Bondholders at the expense of satisfying creditors). Nothing has changed with the 2020 Bondholders' litigation since the SPA was approved that increases any risk they may pose; to the contrary, that risk has materially dissipated, as set forth above. The Court instructed that these risks were to be factored into a bidder's assessment of the transaction. (D.I. 1741 at 6). As confirmed in the attached Declaration of Gold Reserve's CEO and Vice-Chairman, Mr. Paul Rivett, Gold Reserve's assessment relied upon the negotiated terms of the SPA, including the terms of the proposed Sale Order, in participating in the Topping Period to purchase the PDVH Shares, in deciding to materially improve its bid during the Topping Period by contributing the final $200 million of its Attached Judgment to the Purchase Price for the PDVH Shares, and in negotiating terms to add the Siemens Energy Attached Judgment to the Consortium's bid.[31]

In these circumstances, it would be improper to now alter the terms of the SPA and the Sale Order premised on perceived closing risks that have not developed since the SPA was approved by the Court. While each of these issues is addressed in turn below, each should also be rejected for this reason.

---

[31] Decl. of Mr. Paul Rivett ¶¶ 4-8 (attached as Ex. A).

### a.    An Increase of the Non-Refundable Deposit is Improper and Unnecessary

Red Tree asks that the Court increase the Consortium's non-refundable good faith deposit from the lesser of 10% of the bid price or $50 million set forth in the Sale Procedures Order ("SPO") (*see* D.I. 480-1 at 13) to three percent of the Dalinar Bid's purchase price—that is, **$225 million**. (D.I. 1942 at 9). Red Tree argues that this would effectively convert the deposit to a "reverse termination fee" that would "align[] Gold Reserve's incentives with creditors" and incentivize Gold Reserve "to protect its proposed transaction against litigation risk from the 2020 Bondholders[.]" This proposal has no basis and should be summarily rejected.

Gold Reserve, like each Consortium member, *is* a creditor—its incentives are already aligned with all creditors in this process that seek to have their debts paid. Further, Gold Reserve is already incentivized to protect the transaction from any closing risks. Gold Reserve has invested substantial funds into the Sale Process. The $50 million deposit figure was approved by the Court after each party had a full and fair opportunity to request modifications to this amount. *See* (D.I. 1554 at 15). Increasing that figure now by over 400% would be egregious. It is equally as egregious to demand that the Consortium cough up $205 million dollars over several days for the Sale Process to proceed, which is likely why no other creditor has joined Red Tree in this request. Gold Reserve already bears any risk to closing that may exist in the same manner that any other successful bidder would under the litigated and approved SPA, and there is no good reason to subject it to additional risk.

This is particularly true because Red Tree's proposed increase is intended to address a risk that, as noted above, has existed throughout the entirety of the Sale Process and is not unique to the Dalinar Bid. The Special Master first suggested adding the non-refundable good faith deposit to the SPA on January 23 filing (D.I. 1552-1, noting that it reflects suggestions and proposals by multiple parties), and the Court adopted it in its January 27 Order, noting that the term was

consistent with the SPO "and other prior Orders of the Court" (D.I. 1554) and "an appropriate indicator of good faith and financial means for any bid[.]" (D.I. 1571). Red Tree, despite raising other issues with the SPA,[32] did not raise any issues with the amount of the deposit, suggest that it be tied to any perceived risks, or suggest that the successful bid should be subject to additional deposits after the Topping Period. Red Tree has waived this argument, it has no merit otherwise, and it should be rejected.

### b.    There is No Justification for Denying Expense Reimbursement

Red Tree also asks that the Court "confirm" that the Consortium "will not receive any expense reimbursement if the SPA is terminated because of the 2020 Bondholders' litigation," solely because Red Tree views this risk as "obvious." (D.I. 1942 at 10-11). As with Red Tree's request to increase the good faith deposit by 400%, this request has no legal or logical basis and ignores that any risk the 2020 Bondholders pose to closing has existed throughout the entire Sale Process. Indeed, the expense reimbursement was litigated by Red Tree. *See* (D.I. 1554 at 9-10); (D.I. 1535). Red Tree advocated for a $50 million expense reimbursement cap "[t]o maximize creditor value," arguing that "[s]uch fees promote competitive bidding and increase[] the chance that the asset will sell for the highest possible value" because the expense reimbursement would "encourage[e] larger bids backed by third-party financing[.]" (D.I. 1535 at 1-4). While Red Tree now stands to benefit from the larger bids submitted—specifically, Dalinar's Bid that nearly doubles its own—it now seeks withdraw that certainty from the SPA solely because of a risk that existed when Red Tree advocated in favor of an even higher expense reimbursement.[33]

---

[32] *See* (D.I. 1535).

[33] Red Tree even proposed that the "the expense reimbursement also be triggered if the sale is terminated due to a settlement," which the Court adopted. (D.I. 1554). If Red Tree was concerned about excluding the 2020 Bondholders' litigation risk from triggering the expense reimbursement, it should have raised that in their objections to the bidder protections (D.I. 1535)—it clearly understood that the triggers for the expense reimbursement were up for comment. To the extent Red Tree seeks to modify the bidder protections at this

c.    **The Requested Clarification Regarding the Termination Provisions of the SPA is Premature and Without Basis**

Crystallex, Red Tree, and ConocoPhillips argue that the SPA contains only a general right, "dependent on parsing several interrelated provisions," for the Special Master to terminate the SPA if the 2020 Bondholders succeed in obstructing the financing supporting the Dalinar Bid. (D.I. 1942 at 10) (Red Tree); (D.I. 1949 at 12-16) (Crystallex); (D.I. 1945 at 2-4) (ConocoPhillips). In order to avoid "protracted litigation" regarding this issue, the three parties, supported by OIEG and ACL, argue that the SPA should be clarified. (D.I. 1942 at 10). This request should not be granted, for several reasons.

First, whether and if the 2020 Bondholders will actually attempt, much less succeed, in obstructing any component of the Dalinar Bid financing in the future is unjustified speculation. The 2020 Bondholders have expressly represented to the SDNY that they will not attempt to seek an injunction that will interfere with the Dalinar Bid or this Sale Process. This representation is entitled to be relied upon and it alone justifies dismissing this objection.

Second, the question of whether and if any part of the Dalinar Bid financing is actually obstructed in the future is a question, in the first instance, for Dalinar and its lenders. To be sure, Gold Reserve has no interest in sitting by idly if any part of the financing supporting the Dalinar Energy bid is in fact obstructed, but it is not for the Special Master (standing in the shoes of the Seller), or for any objecting party, to control this issue or attempt to impose upon the Buyer a set of prescriptive circumstances that attempt to pre-define when this event will occur. This is particularly true here, where any such obstruction is hypothetical and entirely dependent on a set of complex future circumstances that may or may not occur.

---

point, those arguments are waived. To the extent Red Tree challenges that a termination due to the 2020 Bondholders' litigation would not qualify as a trigger for expense reimbursement, such an argument is premature. In either event, this request should also be denied.

Third, the premise of this objection—that the terms of the SPA require clarification on this issue—is incorrect. The SPA contains a detailed suite of provisions that address this potential circumstance and, under the above-referenced process for review, comment, and objection to the terms of the model SPA, these provisions were approved by the Court. There is no basis or good reason to modify or 'clarify' these provisions.

The starting point for the analysis of the SPA is recognizing that the events identified by the objecting parties would not give rise to a basis for the Special Master (standing in the shoes of the Seller) to terminate the SPA under Section 8.1(f). All of these events are premised on the SDNY issuing some Order in the future that Order has the effect of "preventing" or "enjoining" Dalinar "from consummating the Transactions" set forth in the SPA. That circumstance is covered expressly in Section 8.1(c) of the SPA, which makes clear that the mere entry of an Order does not give the Special Master a termination right until "such Order shall become final and non-appealable." (D.I. 1837-1 at 118). Only at that point does any such Order become a "Legal Restraint"—and for good reason—because until that point the Buyer would still have the right to seek reconsideration or appeal. In the interim, the Debt Financing's commitments remain in effect. This alone compels rejecting these objections.

Furthermore, the referenced hypothetical order from the SDNY would not give rise to a termination right under Section 8.1(f) of the SPA, because the occurrence of those events does not constitute a "breach by the Buyer." *Id.* The provisions cited by the objectors are inapposite, as described below.

•    First, those events would not cause a breach by the Buyer of the "Closing Date representations" in Section 5.7 of the SPA. *Id.* at 82-84. Those representations are not "continuing representations" that are made after the Execution Date, even to the extent they concerned the

Buyer's expectations, as of the Execution Date, about the Closing Date. The occurrence of an event that occurs after the Execution Date would not constitute a "breach by the Buyer of any of its representations" or make any of those representations inaccurate, at the time they were made, under Section 8.1(f) of the SPA. *Id.* at 118.

- Second, those events would not cause a breach of Section 6.9(b) of the SPA. The requirement under Section 6.9(b)(i) of the SPA that the Buyer "maintain in effect . . . the Debt Commitment Letters" would not be breached, because the existence of those events does not render the Debt Commitment Letters ineffective. *Id.* at 103. Likewise, there is no breach of the requirement under Section 6.9(b)(iii) of the SPA, which requires that the Buyer "satisfy on a timely basis (or obtain a waiver of) all conditions applicable to the Buyer contained in the Debt Financing Commitments and Equity Financing Commitments." *Id.* This phrase's wording—"on a timely basis"—is important. The Debt Commitment Letters contain conditions that must be satisfied ***at closing*** but, as is standard, do not require that those conditions be satisfied prior to closing.

- Third, these events would not constitute a "breach" under Section 6.9(e) of the SPA. Section 6.9(e) addresses so-called "Replacement Financing." *Id.* at 105. Importantly, however, the Buyer's obligations under the SPA are not conditioned on the availability of Debt Financing or Replacement Financing. This is expressly confirmed at the end of Section 6.9(e): "Notwithstanding the foregoing, compliance by the Buyer with the provisions of this Section 6.9(e) shall not relieve the Buyer of their obligation to consummate the Transactions whether or not the Debt Financing or any Replacement Financing is available." *Id.*

The provisions of Section 6.9(e) impose obligations on the Buyer to provide notice to the Special Master and to make efforts to obtain Replacement Financing, but do not give the Special

Master the right to terminate the SPA simply because there are conditions to be cleared before the financing is available. *Id.*

- First, Section 6.9(e) is not applicable under the circumstances described by the objectors. It is triggered only when Debt Financing or the Debt Financing Commitments "expire or are terminated or become unavailable prior to Closing." *Id.* The events described by the objecting parties would not implicate this requirement. As noted above, there is no provision in the Debt Financing Commitments that the conditions to closing must be satisfied at any time prior to the closing of the financing.

- Second, even assuming arguendo, that Section 6.9(e) were triggered, there is no reason to believe that the Buyer could not satisfy its requirements, which is simply that the Buyer provide notice to the Special Master and "use its reasonable best efforts promptly to arrange for" replacement financing. *Id.*

In sum, given that the hypothetical circumstances cited by the objecting parties are expressly covered by Section 8.1(c) of the SPA, which requires a final, non-appealable order before a termination right arises, and that the SPA contains a detailed suite of carefully constructed provisions that cover the objecting parties' other concerns, there is no basis for the requested clarification of the SPA, and these objections should be rejected.

## III.    THE BID IS NOT "GROSSLY INADEQUATE" AND DOES NOT "SHOCK THE CONSCIENCE"

The Venezuela Parties argue that the Dalinar Bid's $7.32 billion price is "grossly inadequate" and "shocks the conscience" because it is less than half their claimed value of $18.6 billion. (D.I. 1951 at 6-13). This flawed argument relies on an unsound expert report and an improper reading of the "50% test" that Delaware courts have rejected. It also asks the Court to ignore that the Dalinar Bid is the highest bid for the PDVH Shares, more than doubling Red Tree's

21

$3.699 billion Stalking Horse bid, and that the Sale Process has been one of the most widely

marketed public judicial sales of an asset in American legal history. For these reasons, the resulting

high bid (the Dalinar bid) is the best evidence of the fair market value for the Shares.

### a.    Delaware Courts Consider the Facts Of Each Specific Case in Determining Unconscionability

A judicial sale cannot be set aside for "mere inadequacy of price" alone unless the sale

price is "so *grossly* inadequate that it shocks the conscience of the court" (that is, if it is

unconscionable). *Burge v. Fid. Bond & Mortg. Co.*, 648 A.2d 414, 419 (Del. 1994). Delaware

courts give "special [] scrutiny" where a sale process does not result in a bid of at least half the

asset's fair market value (the "'50% test'"). *Id.* While bids below this threshold may "shock the

conscience" of a court, the 50% test is not "absolute" and Courts must not "inflexibly apply" it.

*Girard Tr. Bank v. Castle Apartments, Inc.*, 379 A.2d 1144, 1146 (Del. Super. Ct. 1977) (noting

that it often has only been applied to cases involving "moderately priced properties" and where

there was evidence of a lack of knowledge or confusion about the sale and that a re-sale would

result in a higher bid). This test "does not preclude acceptance of a lesser figure if warranted under

the particular conditions." *Id.* Rather, a determination of unconscionability "is largely dependant

[(*sic*)] upon the particular circumstances of the individual case." *Burge*, 648 A.2d at 419 (citing 2

Woolley's Delaware Practice, § 1121). As the Venezuela Parties recognize (D.I. 1951 at 8),

"factors such as the nature and size of the property . . . and the magnitude of its value are factors

which may lead to a departure from the traditional 50% test." *Home Beneficial Life Ins. Co. v. Blue

Rock Shopping Ctr., Inc.*, 379 A.2d 1147, 1149 (Del. Super. Ct. 1977). When considering "the

adequacy of a bid at a forced sale," courts must consider "the potential market" for the asset as

well. *Atl. Props. Grp. v. Deibler*, C.A. No. 93M-11-001, 1994 Del. Super. LEXIS 32, at *21

(Super. Ct. Jan. 5, 1994).

### b.    The Venezuela Parties' $18.6 Billion Valuation Is Irrelevant to The Issue Before the Court

In arguing that that the Dalinar Bid is "unconscionable," the Venezuela Parties rely solely on Dr. Jose Alberro's opinion, which rests on his discounted cash flow ("DCF") analysis, that the fair market value of the PDVH Shares is $18.6 billion.[34] Dr. Alberro defines fair market value "under Delaware law" as "[t]he price which would be agreed upon by a willing seller and a willing buyer under usual and ordinary circumstances," among other factors.[35] Because Dr. Alberro fails to account for a host of critical factors that are relevant to this hypothetical price—contingent liabilities, regulatory approvals, the realities of the Sale Process, and the bids received from "willing buyers"—his opinion regarding the fair market value of the PDVH Shares is irrelevant.

**First**, Dr. Alberro's analysis excludes contingent liabilities from his assessment of the fair market value of the PDVH Shares, including any contingent risks associated with the 2020 Bondholders' claims.[36] He also does not consider that any sale of the PDVH Shares requires regulatory approval from OFAC (and potentially other agencies), approval from the Court, and is subject to objection and appeal by multiple parties, each of which materially distinguishes the Sale Process from a garden-variety arms' length commercial transaction.[37] This is a critical flaw. Confirming this, although Dr. Alberro "wouldn't include" these contingent liabilities "in the fair market value or the DCF" analysis, he acknowledges that he "would include them in [an] offer" to purchase the PDVH Shares—and that his offer would be *lower* to account for these liabilities.[38]

---

[34] Expert Report of Dr. Jose Alberro ("Alberro Report"), ¶ 1 (D.I. 1951, Ex. 2).

[35] Alberro Report, ¶ 122.

[36] Alberro Report, ¶ 214.

[37] Alberro Dep. 261:16-262:6 (filed separately).

[38] Alberro Dep. 157:9-159:3.

The specter of these contingent liabilities have hung over the Sale Process, as the Court is well aware[39] (and as the Venezuela Parties reference throughout their Objection). These contingent liabilities were priced into the bids received by the Special Master and are exactly why the Elliott bid and the Red Tree bids were priced as they were. Indeed, the contingent 2020 Bondholders liability and the contingent Alter Ego actions liability drove Elliott—a sophisticated party and "strategic bidder"[40]—to propose holding the sale proceeds in escrow. The Venezuela Parties describe the Elliott bid as "illusory" on this basis.[41] While the Elliott bid was ultimately rejected, it demonstrated that these contingent liabilities impact the value that a "willing buyer" would offer for the PDVH Shares. Despite this, Dr. Alberro fails to take account of these liabilities—or all the other real-world facts that are relevant to the actual value of the PDVH Shares—in his opinion.

Interestingly, despite Dr. Alberro's having ignored these facts, the Venezuela Parties have expressly recognized their impact when it suited them. For example, they sought (and obtained) and extension of the Topping Period after the Alter Ego actions were resolved in June 2025 on that basis that bidders might have increased their bids with that contingent liability eliminated.[42] Yet, despite this explicit acknowledgement of the impact of contingent liabilities, they instructed Dr. Alberro to ignore these risks when conducting his analysis.

It is impossible to render a valid fair market value opinion of any asset without considering potential liabilities. Delaware courts have recognized this is particularly true when analyzing the value of shares of a closely held corporation at forced sale, noting that "the Court should examine

---

[39] (D.I. 1741 at 7).

[40] Weisenburger Dep. 101:8-11 (filed separately). ("I would say Elliott is probably a strategic bidder.")

[41] (D.I. 1951 at 2).

[42] *See* (D.I. 1757 at 1) ("The Venezuela Parties respectfully move for an extension of Topping Period to allow bidders, or potential bidders, to account for the elimination of what the Special Master has called a 'cloud of uncertainty,' D.I. 1249 at 7, that has hung over the bidding at least since the Alter Ego Cases were filed in June 2024.").

the entire financial picture, including the liabilities, and not merely the potential equity involved." *Atl. Props. Grp.*, 1994 Del. Super. LEXIS 32, at *21. Dr. Alberro's analysis intentionally excludes this critical aspect of the PDVH Shares. Because it thus does not reflect the "entire financial picture" of the PDVH Shares, Dr. Alberro's opinion has no value whatsoever.

**Second**, Dr. Alberro did not consider the bids submitted in the Sale Process from "willing buyers," completely ignoring half of his definition of fair market value,[43] and he has no opinion on the value of an offer that a willing buyer would make for the PDVH Shares.[44]

In fact, Dr. Alberro did not consider anything that has actually occurred in the Sale Process,[45] nor does he have any knowledge of the Sale Process.[46] His only understanding is limited to what he "read in the newspapers[.]"[47] Accordingly, even if his DCF analysis was reliable (which it is not), on his own admission, Dr. Alberro cannot opine on what constitutes fair market value of the Shares given that he has ignored critical evidence concerning what "willing buyers" actually are willing to pay for the PDVH Shares.

### c. The Valuation Evidence Before the Court Shows That the Dalinar Bid's Price Is More than Adequate Under the 50% Test

To the extent the Court gives Dr. Alberro's DCF analysis any consideration despite these fundamental flaws, it is overstated by nearly double. As set forth in the Supplemental Declaration

---

[43] Alberro Dep. 78:18-22 ("Q.: Did you consider the bids that the Special Master received when you were performing your valuation of the PDVH shares? A: No.").

[44] Alberro Dep. 259:4-7.

[45] Alberro Dep. 76:21-24 ("Q.: So when you're assessing the value of a company, you don't consider what has happened in the real world? A.: If I'm asked to, yes.").

[46] Alberro Dep. 79:6-19 ("I don't have any knowledge of … the way the Special Master did the things he did or did not do and ignoring that whole process. I didn't consider it in my establishment of the fair market value.").

[47] Alberro Dep. 75:6-76:20 (admitting that he has not reviewed any of the bids received by the Special Master) (75:7-10 "Q.: Have you reviewed the bids that the Special Master received before he made his final recommendation? A.: No.").

of William O. Hiltz, with "several well-accepted and straightforward adjustments," Mr. Hiltz determines that that Dr. Alberro's DCF analysis should be decreased to $9.4 billion.[48] Accordingly, even if the Court were to take the Venezuela Parties' invitation to strictly apply the 50% test, Dr. Alberro's DCF analysis, as corrected by Mr. Hiltz, does not justify the conclusion that the Dalinar Bid is undervalued—quite the opposite.

> **d.    The Dalinar Bid Is the Highest Recommended Bid; It Is the Best Evidence of the Fair Market Value of the PDVH Shares**

The Venezuela Parties spend pages arguing that the Special Master is not a "willing seller" and therefore the Sale Process cannot inform the fair market value of the PDVH Shares, stating that the Special Master has made this argument "without any legal support."[49] But the Special Master did provide legal support for this argument, explaining that the Venezuela Parties are relying only on case law from foreclosure sales despite the Sale Process actually being a well-publicized auction where the Special Master can walk away if any bids were too low.[50]

The Venezuela Parties' "willing seller" process complaints rely on the declaration of Randall J. Weisenburger—a witness who has no experience with judicial sales[51] or Delaware law.[52] These arguments ignore that the PDVH Shares are being sold pursuant to Title 8, Section 324 of Delaware law, which requires that they be sold "at [a] public sale to the highest bidder," and that the Sale Process must comport with that requirement. 8 Del. C. § 324(a).[53]

---

[48] Suppl. Decl. of William O. Hiltz ¶ 9.

[49] (D.I. 1951 at Section I.C).

[50] (D.I. 1527 at 3-5).

[51] Weisenburger Dep. 40:14-19; 43:22-44:14.

[52] Weisenburger Dep. 164:15-165:3; 166:7-19; 176:25-177:17 (testifying he has "[n]o idea what Section 324 is").

[53] *See, e.g.*, (D.I. 481, ¶¶ D, H, 33, 36) (SPO) (explaining the goal of the Sale Process is to "ensure a value maximizing sale process" that "result[s] in the highest offer in connection with any Sale Transaction at least sufficient to satisfy the Attached Judgments"); (D.I. 1554 at 4) (Jan. 27, 2025 Order) ("Second, the Court has endeavored for years to formulate and implement a process that will result in a Successful Bid that is

Whether or not the Special Master is a "willing seller," as the Court anticipated in January, the price resulting from the Sale Process remains the "best evidence that exists of the fair market value of the PDVH Shares taking into account their benefits and risks associated with this unique asset[.]" (D.I. 1554) (quoting D.I. 1522 at 5). Delaware courts have recognized that the shares of closely held corporations, like CITGO, "have no easily determinable fair market value," particularly in the forced sale context. *Atl. Props. Grp.*, 1994 Del. Super. LEXIS 32, at *16 (describing the judicial sale process context as "a critical factor the Court must consider" in determining the value of the Shares). Delaware courts have also held that "the fair market value of a property is often the value for which someone at a Sheriff's Sale is willing to pay[.]" *New Castle Cty. v. Candler, No. N13J-00542*, 2014 Del. Super. LEXIS 2753, at *9 (Super. Ct. Jan. 30, 2014).

As the Venezuela Parties recognize, Dalinar's $7.382 billion bid is the highest-value conforming bid received by the Special Master, exceeding Elliot's $7.286 billion bid (which, with its redirection of sale proceeds into long-term escrows, delivered significantly less value against the outstanding judgments) and nearly doubling Red Tree's $3.699 billion Stalking Horse bid.[54] It also nearly doubles non-conforming bids A and B disclosed in the Special Master's Final Recommendation (D.I. 1837, ¶¶ 64-65), and more than doubles the Stalking Horse bids of Bidder B ($3.422 billion) and Bidder C ($3.5 billion).[55] The Dalinar Bid represents a value in excess of the fair market value given the prices of the bids it beat out, particularly in the context of a forced judicial sale of closely held shares.

---

value-maximizing and also reflective of the fair market value of the PDVH Shares, giving due consideration to the many challenges confronting such a process and the impact of those challenges on the value of PDVH.").

[54] (D.I. 1951 at 11-12).

[55] (D.I. 1597).

The Dalinar Bid is the product of a Sale Process that has been extensively marketed and publicized for years.[56] Potential bidders therefore have long had knowledge of this sale. The data room was available to the parties for months prior to the selection of the Elliot bid and again during this iteration of the Sale Process.[57] The Sale Process procedures and the terms of the SPA were publicly available, and the parties extensively litigated them.[58] The Topping Period was even extended at the Venezuela Parties' request, "to allow bidders, or potential bidders," to revise or choose to place bids in light of the decision in the Alter Ego Cases.[59]

The simple fact is that the Venezuela Parties, Dr. Alberro,[60] and Mr. Weisenburger[61] have not, and cannot, identify any bidder waiting in the wings to bid higher than the Dalinar Bid, and there is no evidence that any such bidder exists.[62] If the Dalinar Bid's price were actually inadequate—much less grossly inadequate—a bidder would have emerged and topped its price. The fact that this has not happened is proof positive that the Dalinar Bid price not only represents, but likely exceeds, the actual fair market value of the PDVH Shares.[63]

---

[56] *See, e.g.*, (D.I. 1837 at Section V; ¶¶ 89-95); (D.I. 1596 at 2-8). As the Court is likely aware, this action and the Sale Process has also been subject to extensive media coverage.

[57] *See, e.g.*, (D.I. 1837 ¶ 34); (D.I. 1517 ¶ 2); (D.I. 1250 ¶ 5).

[58] *See* (D.I. 1554), (D.I. 1571), (D.I. 1583).

[59] *See, e.g.*, (D.I. 1757 at 1).

[60] Alberro Dep. 74:6-75:6.

[61] Weisenburger Dep. 68:7-21.

[62] The Venezuela Parties' failure to identify any reasonable prospect of a larger bid is fatal to their unconscionability claims and their argument that the Sale Process should be re-run. *See, e.g.*, *Cent. Tr. & Sav. Co. v. Chester Cty. Elec. Co.*, 9 Del. Ch. 123, 125, 77 A. 771, 771 (1910) (refusing to set aside a judicial sale "for no other reason than that probably another undisclosed and unnamed bidder will offer" more for the property); *Girard Tr. Bank*, 379 A.2d at 1146 (noting that 50% test is typically only applied where there is "evidence either (1) that a higher bid was likely to be made at a subsequent sale or (2) that there was lack of knowledge of the sale or confusion at the sale, neither of which has been shown here").

[63] There also is no merit to the Venezuela Parties' argument that the Dalinar Bid is "unconscionable" even if it meets the 50% test. As detailed above, "mere inadequacy of price" is insufficient to make a price so "*grossly* inadequate" that it is unconscionable. *Burge*, 648 A.2d at 419. The Court's analysis must not focus on what is best for CITGO as a company or any of the Venezuela Parties as shareholders—to be sure, the Shares are only subject to forced sale because of the "shareholders' individual financial situation." *See Atl. Props. Grp.*, 1994 Del. Super. LEXIS 32, at *20 ("My analysis is more a substantive due process test as

## IV.    THE VENEZUELA PARTIES' "ADDITIONAL REASONS" ARE WITHOUT MERIT

The Venezuela Parties include a section in their brief which they argue includes "additional reasons" why the Court should not confirm the Dalinar Bid. (D.I. 1951 at 32-34). Each of these cursory and unsupported arguments must be rejected.

### a.    The Venezuela Parties Present No Evidence of Any Bias or Other Basis for Disqualification

The Venezuela Parties argue that the Court should not confirm the Dalinar Bid because "the Special Master was biased against the VPs and in favor of accomplishing a sale as soon as possible and at all costs." (D.I. 1951 at 32). The single example the Venezuela Parties provide is one that has already been rejected by the Court twice, *i.e.*, that the Special Master "advocated to OFAC in favor of granting a license, taking it upon himself to pursue the interests of creditors in opposition to the VPs." *Id.* The Venezuela Parties provide no basis for reconsideration of the Court's rejection of this argument, *see* (D.I. 544), nor is it a sufficient basis for an objection.[64]

### b.    There Is No Justification to Extend the Deadline for Unsolicited Bids

The Venezuela Parties object to Section 6.16(c) of the Dalinar SPA on that basis that it "suggests" that the Special Master may provide an unsolicited competing proposal to the Court

---

opposed to the test of what is best for the corporations and shareholders."). Applying this standard, there is no set of circumstances where the value of the Dalinar bid could "shock the conscience."

[64] As the Court noted in April 2023, after the Venezuela Parties raised this argument for the second time, the "substantial burden" to show bias or some other reason for disqualification is on the moving party. (D.I. 544 at 2, n. 3) (citing *Schweiker v. McClure*, 456 U.S. 188, 196 (1982)) ("[T]he burden of establishing a disqualifying interest rests on the party making the assertion."); *see also United States v. Microsoft Corp.*, 253 F.3d 34, 108 (D.C. Cir. 2001) ("Disqualification is never taken lightly. In the wrong hands, a disqualification motion is a procedural weapon to harass opponents and delay proceedings."). Here, the Venezuela Parties cannot make such a serious allegation of bias without presenting *any* evidence—not a single witness or document—in support. Further, the Special Master is an "arm of the Court" mandated to facilitate the sale of the PDVH Shares, for the highest value possible to the creditors' benefit (D.I. 277 ¶ 20); the Venezuela Parties have not alleged anything other than that he was fulfilling these duties. Further, any such allegation that is based on grounds that were known to the Venezuela Parties and not immediately brought to the Court's attention is untimely and waived. (D.I. 544 at 3).

"only up until the Sale Hearing[,]" which they argue is in conflict with the Court-adopted Bidder Protections. (D.I. 1552 at 2-3). The Venezuela Parties are the only party to raise this concern, which does not affect their ability "to satisfy any judgment in full prior to consummation of a sale." (D.I. 1554 at 11). The Court has confirmed that this right "extends even beyond entry of the Sale Order." *Id*. Any other bidder is purely hypothetical, and there is no evidence presented by the Venezuela Parties or otherwise in the record that such a bidder exists.[65]

Nor is there any justification for any bidder to wait until *after* the Sale Hearing to submit a topping bid. The extensive marketing process for the PDVH Shares was launched nearly two years ago. *See* (D.I. 1837 ¶¶ 15, 24); (D.I. 1838, ¶¶ 8-30). The Special Master solicited bids and worked with potential bidders from October 2023 until he made his Stalking Horse Recommendation on March 21 (D.I. 1596 at 2-8), which the Court approved on April 21. (D.I. 1741). The Topping Period ran for 58 days from April 21 to June 25, with the Final Recommendation submitted to the Court on July 2. (D.I. 1837). Potential bidders then have had a further opportunity to submit an unsolicited competing bid since at least June 25—an additional 53 days through the first day of the Sale Hearing on August 18. *Id.* at ¶¶ 54-55. Finally, this provision of the SPA was first introduced months ago on March 21, when the Special Master recommended Red Tree's bid as the Stalking Horse.[66] (D.I. at 1596 (Section 6.16(c)). A bidder that is sitting on the sidelines throughout this process, aware for months of this provision, and yet waiting until ***after*** the Sale Hearing to submit a bid can have no justification or excuse for so doing.

---

[65] The only "Competing Bidder" that came forward following the Special Master's Final Recommendation on July 2 was Red Tree, which has since withdrawn its competing bid.

[66] The Venezuela Parties have thus been aware of and have waived this objection, and it is untimely made.

c.    **Venezuela's and PDVSA's Objections to Gold Reserve as a Bidder Are Without Merit and Untimely**

The Republic and PDVSA ("Venezuela") make a cursory comment that Gold Reserve "is unlikely to obtain OFAC approval." (D.I. 1951 at 34). This has no merit for several reasons. First, this is pure speculation—only OFAC knows whether it will grant the necessary approval. Second, the Special Master has assessed the Dalinar Bid and expressed no concern regarding this issue. (D.I. 1837 ¶ 82).

Third, Venezuela supports this speculation with the statement that Gold Reserve "partnered with the Maduro regime for years after obtaining the judgment on which its attachment is based." (D.I. 1951 at 34). Venezuela cites no documents, witness testimony, or other evidence to support this statement, which on its face does not suggest any improper action on Gold Reserve's part or any action which would even imply that OFAC approval may not be granted.[67] Fourth, the relationship to which Venezuela refers predates the sanctions at issue in this case. The settlement agreement Venezuela references was agreed to in 2016.[68] The contested election occurred on May

---

[67] This allegation is particularly offensive since Gold Reserve's legal representative in Venezuela has been imprisoned by the Directorate General of Military Counterintelligence ("DGCIM"), an arm of the government known for the use of torture and other crimes against humanity to repress dissent, based on fabricated charges of an attempted coup against the Maduro regime since June 2023. *See* Statement by Mara Valiñas, Chair of the Independent International Fact-Finding Mission on the Bolivarian Republic of Venezuela, at the 55th session of the Human Rights Council, United Nations Human Rights, Office of the High Commissioner, March 20, 2024, https://www.ohchr.org/en/statements-and-speeches/2024/03/statement-marta-valinas-chair-independent-international-fact (last accessed March 3, 2025). Further, in addition, in a televised conference in May 2023, the Vice President of Venezuela attacked Gold Reserve, as well as others, as enemies of the state. *See* Luigino Bracci Roa desde Venezuela, *Delcy Rodríguez on the Citgo theft from Venezuela, full press conference*, (YouTube, May 3, 2023), https://www.youtube.com/watch?v=TduWNOOV_XY&t=13s (last accessed March 4, 2025).

[68] (D.I. 1951 at 34).

20, 2018, and in 2019 the U.S. recognized Juan Guaidó as interim president of Venezuela[69] and began issuing comprehensive sanctions.[70]

Fifth, all information about Gold Reserve's 2016 settlement agreement with Venezuela following confirmation of its arbitral award in Washington, D.C. is and long has been publicly available. In its 2016 Annual Report to Shareholders, Gold Reserve reported on the "Mixed Company Agreement" and the actions that were taken (*e.g.*, "Established Empresa Mixta Ecosocialista Siembra Minera, S.A., the Mixed Company that will develop the Brisas Cristinas Project, in October 2016").[71] Gold Reserve's annual reports continued to report on the activities of the Mixed Company.[72] These activities were also reported in regular press releases[73] and Gold Reserve's SEC filings (20-F and 40-F). Given the public nature of this information, Venezuela has waived this objection which has been known to it since at least 2016. Venezuela's objection on the basis of any "OFAC approval" concern must be summarily rejected.

Venezuela also states that "Gold Reserve received $240 million from the Maduro regime it did not disclose to this Court." *Id.* This has no merit. Venezuela has the settlement agreement (to which it was a party and under which it paid the amounts in question), which explicitly states that the $240 million paid by Venezuela thereunder was for the purchase of mining data, not for

---

[69] *See* Recognition of Juan Guaidó as Venezuela's Interim President, Press Statement, Michael R. Pompeo, Secretary of State, https://2017-2021.state.gov/recognition-of-juan-guaido-as-venezuelas-interim-president/.

[70] For example, effective in January 2019, Executive Order 13850, designated PDVSA as subject to U.S. sanctions and froze all property and interests. In August 2019, under Executive Order 13884, the U.S. froze the assets of the Maduro government in the U.S. *See also* Executive Order 13835.

[71] 2016 Annual Report to Shareholders, Gold Reserve Inc., April 28, 2017, https://ir.goldreserveinc.com/static-files/04ca6bcf-5f92-4e89-bd3f-3d945542099a.

[72] *See* Gold Reserve Inc., *Annual Reports*, https://ir.goldreserveinc.com/annual-reports (last visited Aug. 7, 2025).

[73] This includes press releases issued on February 29, 2016, November 4, 2016, and December 16, 2016. *See, e.g.*, Gold Reserve Inc., *News Archive*, https://goldreserve.bm/news-archive.

settlement of the arbitral award and judgment.[74] The only amounts paid to Gold Reserve by the Republic towards satisfaction of the amount owed under the award and judgment total $13,811,558 as reported to the Court. (D.I. 663 at 2). Gold Reserve included this breakdown in its 2016 Annual Report to Shareholders[75] and in a press release on August 8, 2016.[76] In Gold Reserve's SEC filings (40-F), Gold Reserve has reported—since 2017—the agreement that the first $240 million received was to be for the purchase of the mining data.[77] Once the payments were received, Gold Reserve reported in its SEC filings, "As agreed, the first $240 million received by Gold Reserve from Venezuela has been recognized as proceeds from the sale of the Mining Data."[78] The same has been reported in Gold Reserve's Annual Information Forms and its SEC 20-F forms.[79]

While this issue has no merit, given the public nature of this information, Venezuela would have waived any objection as to the allocation of its payments for the mining data, which has been

---

[74] To avoid any confusion, the settlement agreement was entered into in 2016 and the payments in question were made in 2017 and 2018.

[75] See 2016 Annual Report to Shareholders, Gold Reserve Inc., April 28, 2017, https://ir.goldreserve inc.com/static-files/04ca6bcf-5f92-4e89-bd3f-3d945542099a (reporting the "execution of a Settlement Agreement in July 2016 with Venezuela which provided for payment of the Award (including accrued interest) in the amount of approximately $770 million in respect of the Brisas project and the acquisition by Venezuela of the Mining Data for $240 million").

[76] Gold Reserve Inc., *Bolivarian Republic of Venezuela Agrees to Pay Gold Reserve Arbitral Award and Acquire Mining Data and Executes an Agreement to Jointly Develop the Brisas Cristinas Gold Copper Mining Project* (Aug. 8, 2016), https://www.goldreserveinc.com/wp-content/uploads/2016/08/16-13.pdf.

[77] See, e.g., Gold Reserve Inc. Annual Information Form for the Year Ended December 31, 2017, Ex. 99.1 to Form 40-F (April 26, 2018), https://www.sec.gov/Archives/edgar/data/1072725/000107272518000016/gdrzfform40fexhibit991042618.htm ("In July 2016, we signed the Settlement Agreement whereby Venezuela agreed to pay us the Award (including interest) and purchase our Mining Data. Under the terms of the Settlement Agreement Venezuela agreed to pay the Company $792 million to satisfy the Award and $240 million for the purchase of the Mining Data for a total of approximately $1.032 billion in monthly installments. The first $240 million to be received by Gold Reserve from Venezuela is related to the sale of the Mining Data.").

[78] See, e.g., Gold Reserve Inc. June 30, 2019 Interim Consolidated Financial Statements, Ex. 99.1 to Form 6-K, https://www.sec.gov/Archives/edgar/data/1072725/000107272519000041/gdrzfform6kexhibit9910 82219.htm.

[79] See, e.g., Gold Reserve Inc., Management's Discussion and Analysis, Ex. 99.3 to Form 40-F (Apr. 9, 2020), https://www.sec.gov/Archives/edgar/data/1072725/000107272520000004/gdrzfform40fexhibit993 040920.htm.

known to it since at least 2018. This is particularly the case where, as here, there was extensive briefing regarding the amounts of the judgments in August and September 2023 following the filing of Gold Reserve's Attached Judgment Statement. (D.I. 663).

## V.    NONE OF THE SPA PROVISIONS ARE "IMPOSSIBLE" OR "INAPPROPRIATE"

CITGO and PDVH make four arguments as to the "impossibility or inappropriateness" of certain SPA provisions. (D.I. 1951 at 34-35). All four of these arguments—to the extent they are even proper objections—are without merit.

First, CITGO and PDVH argue that the paragraph 6 of the Proposed Sale Order would "compel" them to comply with "a broadly defined-arguably unlimited-universe of 'all obligations and covenants' in the SPA and Transaction Documents." (D.I. 1951 at 34). With this argument, CITGO and PDVH attempt to make something out of nothing. They admit that they do not object to the extent paragraph 6 is limited to those obligations and covenants the Special Master has told them are the ones with which he will "cause them to comply." *Id*. Thus, there is no controversy— the Special Master and CITGO and PDVH are agreed as to the relevant provisions.

Second, CITGO and PDVH object to the SPA on the basis that Section 6.1(b)(xvi)(C) "would restrict dividends from CITGO to CITGO Holding[,]" which they say ***could*** compromise CITGO Holding's and PDVH's ability to pay their operating expenses. (D.I. 1951 at 34-35). Again, this is premature. If such a problem actually develops, it can be dealt with at that time.

Third, CITGO and PDVH's argument that the FIRPTA Certificate (SPA §§ 2.3(a)(iii) and 7.3(c)) "***may***" become impossible because it relies on "third-party analyses" is speculative and thus not a proper objection. (D.I. 1951 at 35).

Finally, their argument that it would not be "appropriate" for CITGO's CFO "to confirm the accuracy of representations and warranties made by the Special Master (SPA § 2.3(a)(i))" is

belied by the language of the provision. Section 2.3(a)(i) states "At or prior to the Closing, the **Special Master** shall deliver or otherwise cause to be delivered to the Buyer . . . An affirmation, ***executed by the Special Master***, stating that the Special Master has used reasonable best efforts to cause the Chief Financial Officer of the Company to confirm the satisfaction of the conditions set forth in Section 7.2(a) as of the Closing Date[.]" (D.I. 1837-1 at 55) (emphasis added).

## VI.    CONCLUSION

For the foregoing reasons, Gold Reserve respectfully submits that the objections to the Special Master's Final Recommendation should be dismissed.

[*Signature Follows.*]

35

Dated: August 7, 2025.

Respectfully submitted,

**WOMBLE BOND DICKINSON (US) LLP**

By:  _/s/ Kevin J. Mangan_
Kevin J. Mangan (#3810)
Matthew P. Ward (#4471)
Stephanie S. Riley (#5803)
1313 N. Market St., Suite 1200
Wilmington, DE 19801
Telephone: 302-252-4320
Kevin.mangan@wbd-us.com
Matthew.ward@wbd-us.com
Stephanie.riley@wbd-us.com

-and-

**NORTON ROSE FULBRIGHT US LLP**
Matthew H. Kirtland (*pro hac vice*)
799 9th Street NW, Suite 1000
Washington, DC 20001
Telephone: 202-662-0200
Matthew.kirtland@nortonrosefulbright.com

- and –

Katherine G. Connolly (*pro hac vice*)
555 California Street, Suite 3300
San Francisco, CA 94101
Telephone: 628-231-6816
Katie.connolly@nortonrosefulbright.com

- and –

Taylor J. LeMay (*pro hac vice*)
1550 Lamar Street, Suite 2000
Houston, TX 77010
Telephone: 713-651-3578
Taylor.lemay@nortonrosefulbright.com

*Attorneys for Gold Reserve Ltd.*