IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

CRYSTALLEX INTERNATIONAL
CORPORATION,

Plaintiff,

v.

BOLIVARIAN REPUBLIC
OF VENEZUELA,

Defendant.

C.A. No. 17-mc-151-LPS

## CRYSTALLEX INTERNATIONAL CORPORATION'S
## MEMORANDUM IN RESPONSE TO OBJECTIONS TO SPECIAL MASTER'S FINAL
## RECOMMENDATION

OF COUNSEL:

Robert L. Weigel
Jason W. Myatt
Rahim Moloo
Zachary Kady
GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue
New York, New York 10166
Tel: (212) 351-4000
Fax: (212) 351-4035

Miguel A. Estrada
Lucas C. Townsend
Adam M. Smith
GIBSON, DUNN & CRUTCHER LLP
1700 M Street, N.W.
Washington, D.C. 20036
Tel: (202) 955-8500
Fax: (202) 467-0539

Dated: August 7, 2025

Raymond J. DiCamillo (#3188)
Jeffrey L. Moyer (#3309)
Travis S. Hunter (#5350)
RICHARDS, LAYTON & FINGER, P.A.
One Rodney Square
920 North King Street
Wilmington, Delaware 19801
Tel: (302) 651-7700
Fax: (302) 651-7701

*Attorneys for Plaintiff*

# TABLE OF CONTENTS

I.     Preliminary Statement ............................................................................ 1

II.    The Venezuela Parties' Objections To The Sale Process Lack Merit And Most Are Precluded By The Law Of The Case Doctrine ..................................... 2

    A.    The Court Was Not Required To Employ An Alternative To The Process Adopted In the Sale Procedures Order ......................................... 2

    B.    The Designation Of Red Tree As The Stalking Horse Bidder Was Appropriate ............................................................................................ 9

    C.    The Court Is Conducting A Public Sale Of The PDVH Shares .............. 11

    D.    The Special Master Did Not Place Undue Emphasis On Risks To The Value Of The PDVH Shares And Was Not Required To Delay The Sale Process To Determine Whether Risks Will Materialize .......... 13

    E.    This Court Did Not Chill Bidding ......................................................... 17

    F.    Neither Evercore Nor The Special Master Had A Conflict Of Interest ................................................................................................. 18

III.    Venezuela's Objections Based On The "50% Test" Misapply The Standard And Vastly Overstate PDVH's Value ................................................... 19

    A.    Delaware Law Does Not Bar Execution Sales For Less Than 50% Of An Asset's Market Value ..................................................................... 20

    B.    Regardless, The Fair Market Value Of The PDVH Shares Is Not Twice The Amount Of The Gold Reserve Consortium's Bid ................ 27

IV.    Venezuela's Objections To The SPA's Prohibition On Unsolicited Bids And Violations Of Bidder Protections Should Be Overruled ............................. 31

V.    Venezuela's Objections To The Legitimacy of The Attachments ...................... 32

VI.    The Venezuela Parties' Objections To The Gold Reserve Consortium's Valuation And Previous Settlement Payments From Venezuela Do Not Support The Gold Reserve Consortium's Disqualification ................................. 33

VII.    The Venezuela Parties' Objections To The Gold Reserve Consortium's Bid Based On Purported Dealings With The Maduro Regime Are Speculative And Unsupported .............................................................................. 33

VIII.    Conclusion .......................................................................................... 33

## TABLE OF AUTHORITIES

### Cases

*Acad. Hills Phase IV Maint. Corp. v. Rogers*,
2023 WL 3749357 (Del. Super. Ct. May 25, 2023) ...........................................21, 23

*In re Adobe Trucking, Inc.*,
2011 WL 6258233 (Bankr. W.D. Tex. Dec. 15, 2011)............................................16

*Atl. Props. Grp., Inc. v. Deibler*,
1994 WL 45433 (Del. Super. Ct. Jan. 6, 1994) ...................................................6

*Bedrosian v. U.S. Dep't of Treasury, Internal Revenue Serv.*,
42 F.4th 174 (3d Cir. 2022) ...........................................................4, 17, 18, 32

*BFP v. Resol. Tr. Corp.*,
511 U.S. 531 (1994)...................................................................................27

*Blossom v. Milwaukee & C.R. Co.*,
70 U.S. 196 (1865)..............................................................................23, 24

*Burge v. Fidelity Bond & Mortg. Co.*,
648 A.2d 414 (Del. Super. Ct. 1994) ..........................................................21, 22

*Cent. Nat'l Bank of Wilmington v. Indus. Tr. Co.*,
51 A.2d 854 (Del. Super. Ct. 1947) ......................................................21, 23, 24

*Daubert v. Merrell Dow Pharmaceuticals, Inc.*,
509 U.S. 579 (1993)...................................................................................6

*Deibler v. Atl. Props. Grp., Inc.*,
652 A.2d 553 (Del. 1995) .......................................................................2, 6, 27

*Gen. Elec. Co. v. Joiner*,
522 U.S. 136 (1997)...................................................................................7

*Girard Tr. Bank v. Castle Apartments, Inc.*,
379 A.2d 1144 (Del. Super. Ct. 1977) .....................................................21, 22, 23

*In re Halpern*,
229 B.R. 67 (Bankr. E.D.N.Y. 1999)..........................................................24

*Hexion Specialty Chems., Inc. v. Huntsman Corp.*,
965 A.2d 715 (Del. Ch. 2008)....................................................................17

*Home Beneficial Life Ins. Co. v. Blue Rock Shipping Ctr., Inc.*,
379 A.2d 1147 (Del. Super. Ct. 1977) ........................................................21, 22

*Kumho Tire Co. v. Carmichael*,
526 U.S. 137 (1999).....................................................................................7

*Latvian Shipping Co. v. Baltic Shipping Co.*,
  99 F.3d 690 (5th Cir. 1996) ...................................................................27, 31

*Melikhov v. Drab*,
  2021 WL 5167549 (M.D. Fla. Oct. 8, 2021) ............................................23

*Petróleos de Venezuela S.A. v. MUFG Union Bank, N.A.*,
  106 F.4th 263 (2d Cir. 2024) ....................................................................14

*Pewabic Min. Co. v. Mason*,
  145 U.S. 349 (1892)...................................................................................24

*Redus Fla. Com., LLC v. Coll. Station Retail Ctr., LLC*,
  777 F.3d 1187 (11th Cir. 2014) .................................................................18

*In re Samson Res. Corp.*,
  2023 WL 4003815 (Bankr. D. Del. June 14, 2023) ..................................23

*Sec. Tr. & Safe Deposit Co. v. Gallagher*,
  84 A. 806 (Del. Super. Ct. 1911) .........................................................21, 22

*United States v. Brouri*,
  2020 WL 9549520 (S.D. Fla. Feb. 4, 2020) .............................................23

*Wong Shing v. M/V Mardina Trader*,
  564 F.2d 1183 (5th Cir. 1977) ..................................................................31

**Statutes**

8 *Del. C.* § 324 ..................................................................................................12

8 *Del. C.* § 324(a) .........................................................................................2, 11

**Rules**

Fed. R. Civ. P. 702.............................................................................................6

**Other Authorities**

IMPLEMENTATION GUIDANCE: LITIG., CLAIMS, & ASSESSMENTS, Acct. Standards
  Codification § 450-20-25-2 (FIN. ACCT. STANDARDS BD. 2023) ............29

IMPLEMENTATION GUIDANCE: LITIG., CLAIMS, & ASSESSMENTS, Acct. Standards
  Codification § 450-20-55-10 (FIN. ACCT. STANDARDS BD. 2023) ..........29

SHANNON P. PRATT & ALINA V. NICULITA, VALUING A BUSINESS (5th ed. 2008) .......................29

2 VICTOR B. WOOLLEY, PRACTICE IN CIVIL ACTIONS & PROCEEDINGS IN THE LAW
  COURTS OF THE STATE OF DELAWARE § 1121 (1906)...............................22

## I.    Preliminary Statement

The sale process that this Court developed and implemented provided the Venezuela Parties far more process than what they are entitled to under Delaware law and was more than reasonable. It was designed in part by the Venezuela Parties, *see* D.I. 234, at 1-2, and was overseen by the Special Master the Venezuela Parties recommended to this Court for his "unique[]" qualifications and "expertise necessary to … oversee[] a value-maximizing sale," D.I. 643, at 6. The sale was well advertised, with the Special Master providing both public notice of the sale in several newspapers and engaging in a marketing process to directly reach out to more than 90 potential bidders. D.I. 1838, ¶¶ 9-10. And the Venezuela Parties have always been "free to supplement" the Special Master's marketing efforts by contacting potential bidders they believe would be interested in paying the high price they ascribe to the PDVH Shares. *See* D.I. 234, at 35. The sale process was also unusually transparent: the Special Master regularly filed status updates on the docket and stakeholders had the opportunity to object publicly to the steps taken in the course of this auction. Overseen by experienced dealmakers and financial advisors, the process provided ample opportunity for robust diligence, including access to a virtual data room containing confidential CITGO business information that enabled bidders to assess the true value of the PDVH Shares. And the process produced multiple significant bids from sophisticated and well-counseled bidders. Those bids are presumptively reasonable because they prove the market price for the attached asset in its present state—and no counterfactual speculation about a different market under different conditions can change that.

The Venezuela Parties, which have consistently sought to prolong and delay the process and made no secret of their goal of impeding any sale, now renew many of the same objections that this Court has already rejected during years of litigation. They also trumpet their oft-made claim that the PDVH Shares are worth fantastical amounts—while never pointing to any actual

company or individual remotely willing to pay so much—and again claim that some other process might have produced better outcomes. But the Venezuela Parties sat on their hands for years when they had the chance to sell PDVH to raise the cash needed to satisfy Crystallex's (and other creditors') judgments. It should go without saying that a judgment debtor whose decade's-long recalcitrance has led to a forced judicial sale of its assets is poorly situated to complain that the sale has not yielded the price it believes the asset could have fetched in a voluntary deal under optimal conditions. This process has proven that there is no market for the attached shares at the price the Venezuela Parties claim they are worth. Because the Venezuela Parties do not seriously claim they have been denied the procedural protections they are entitled to—nor could they—the Court should once again reject their objections to the sale.

## II. The Venezuela Parties' Objections To The Sale Process Lack Merit And Most Are Precluded By The Law Of The Case Doctrine

### A. The Court Was Not Required To Employ An Alternative To The Process Adopted In the Sale Procedures Order

This Court's Sale Process complies with Delaware law's mandate to sell "[s]o many of the shares … as shall be sufficient to satisfy the debt" at a noticed, "public sale to the highest bidder." 8 *Del. C.* § 324(a). This is not an onerous standard requiring courts and judgment creditors to jump through an impossible sequence of hoops to ensure that the judgment debtor is pleased with the result of the forced sale. The law requires only that "a reasonable process be employed to give notice to the public of the sale so that a reasonable price, considering the forced sale nature of the transaction, might be obtained." *Deibler v. Atl. Props. Grp., Inc.*, 652 A.2d 553, 557 (Del. 1995) (adding that a Court's "after-the-fact review," if any, need only confirm that "the process employed in fact operated reasonably"). This Court has more than satisfied that standard. The Sale Process conducted by the Court not only complied with Delaware law's requirement to give public notice to potential bidders in multiple newspapers but also included an extensive marketing process to

2

"promote a competitive and robust bidding and auction process to generate competitive interest in the PDVH Shares." D.I. 481, at 7. The process provided potential bidders access to a virtual data room containing confidential CITGO business information that was "material to potential bidders' understanding of the full and fair value of the shares being sold." D.I. 234, at 37. And the process included not one but two rounds of bidding, in which a Stalking Horse Bid was selected from the first round of bids and potential bidders were given an opportunity to submit a better bid during a 58-day Topping Period. D.I. 1841, ¶¶ 42-50.

The best evidence of the reasonableness of this Court's sale process is that it resulted in multiple substantial bids from sophisticated bidders, all of whom independently valued the attached shares in a relatively tight range that differs dramatically from the Venezuela Parties' whimsical valuation of $18.6 billion. *See* D.I. 1948, at 1. The Gold Reserve Consortium submitted a topping bid of $7.382 billion and Red Tree submitted a revised Stalking Horse Bid of $3.806 billion. D.I. 1841, ¶¶ 68-69. These bids, and other, non-qualifying bids received, reflect the market's appraisal of the shares' value, considering the forced nature of the sale, claims against the underlying assets, and lingering litigation uncertainty caused by the Venezuela Parties' own conduct in failing to pay debts owed to multiple creditors and repeated promise to challenge the sale of the PDVH Shares.

When the Court adopted the Sale Procedures Order, it correctly found that the procedures were "designed to promote a competitive and robust bidding process to generate the greatest level of interest in the PDVH Shares and result in the highest offer in connection with any Sale Transaction." D.I. 481, at 6. Earlier this year, the Court explained that it "has endeavored for years to formulate and implement a process that will result in a Successful Bid that is value-maximizing and also reflective of the fair market value of the PDVH Shares, giving due

3

consideration to the many challenges confronting such a process and the impact of those challenges on the value of PDVH." D.I. 1554, at 4. Despite this, the Venezuela Parties again object to the Special Master's Final Recommendation on the ground that the Court should have employed some process other than that prescribed in the Sale Procedures Order, which they mischaracterize as a "failed process." D.I. 1948, at 14-16. The Court already rejected the Venezuela Parties' arguments in support of various alternative sale processes, *see* D.I. 469, at 2, so the renewal of the same arguments is precluded by the law-of-the-case doctrine. *See, e.g.*, *Bedrosian v. U.S. Dep't of Treasury, Internal Revenue Serv.*, 42 F.4th 174, 181 (3d Cir. 2022) (the law-of-the-case doctrine "prevents reconsideration of legal issues already decided in earlier stages of a case").

More than five years ago, the Venezuela Parties argued that PDVSA should be entrusted with the task of conducting the Sale Process itself. D.I. 188, at 3-4, 17. This Court rejected that argument, explaining that "it would be inequitable to permit PDVSA to conduct the sale at this point" given that the Venezuela Parties had "every opportunity to pay [their] legitimate, Court-recognized debt to Crystallex" and "[e]ven today … could pay Crystallex what [they] owe[] and avoid the sales process altogether." D.I. 234, at 37. The Court refused to "permit a highly-recalcitrant judgment debtor to conduct its own sales process over the objection of its repeatedly-victorious judgment creditor." *Id.*

The Venezuela Parties then objected to the Special Master's Proposed Sale Procedures Order on grounds they again raise in their objection to the Final Recommendation—that the Sale Procedures Order should not provide for "a bankruptcy-style process likely to sell 100% of the PDVH shares" and that the Special Master should have considered "myriad alternative transactions," such as an IPO "or a direct private placement sale." D.I. 457, at 1-3. The Court overruled those objections, finding that the Venezuela Parties' "factual allegations" that the

4

Special Master did not consider alternatives to the Sale Process he recommended "are untrue." D.I. 469, at 2. In support of that finding, the Court cited the Special Master's statement that he "considered a number of alternatives, *none of which appear feasible* based on the diligence provided to me to date by the Venezuela Parties." D.I. 341, ¶ 24 (emphasis added). The Special Master recommended the Sale Process because he believed it to be "the most feasible available alternative, it provides for the best opportunity of a value maximizing result, and other alternatives … were unlikely to generate proceeds necessary to pay off the Crystallex Judgment (and most certainly any additional Attached Judgments)." *Id.* The Venezuela Parties conceded the Special Master's expertise in these matters when they urged his appointment, D.I. 244, at 5-6, and his expert judgment on the form of the sale was reasonable. In any event, as the Court also noted, once this Court prescribed the procedures the process was to follow, "the Special Master's consideration and subjective evaluation of alternate procedures the Court has not adopted has no bearing on whether the Final Bid provides adequate value, considering the totality of benefits and risks associated with the PDVH Shares." D.I. 1729.

To support their latest objections, the Venezuela Parties again offer up a purported expert whose paid opinions unsurprisingly mirror their own recalcitrance. Over the past few years, Mr. Randall J. Weisenburger has been a perpetual proponent of delay, advocating in 2023 that the Court should not even "initiat[e] the sale process" due to perceived uncertainties in OFAC's licensing regime and ongoing litigation. D.I. 561-1, at 4. Mr. Weisenburger again asserts that the Court and Special Master designed a flawed sale process that is ill-suited for the sale of a "successful business." D.I. 1951-2, Ex. 1, at 8. But leaving aside whether a business long-owned by a sanctioned, pariah government can fairly be described as "successful," the PDVH Shares cannot be marketed like a typical business that may or may not be sold depending on whether the

seller is subjectively satisfied with the bids he receives—the shares have been "*in custodia legis* since the levy by the [Marshals]" on August 24, 2018, *see Atl. Props. Grp., Inc. v. Deibler*, 1994 WL 45433, at *9 (Del. Super. Ct. Jan. 6, 1994), and must be sold in accordance with Delaware law for the satisfaction of Crystallex's, and the other judgment creditors', liens.

More fundamentally, Mr. Weisenburger's putatively "expert" testimony does not meet the requirements for admissibility under Fed. R. Civ. P. 702 and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993). As he candidly admitted in his deposition, his opinions reflect entirely personal, and essentially idiosyncratic views, not anchored in any pertinent methodology. Ex. 1, at 35:22-36:4 (Mr. Weisenburger confirming that his "analysis" was "[b]ased on [his] personal views of how [he] saw the situation").[1] And, as he also admitted, he is in no position to critique this Court's sale process because has never participated in a judicial sale and did not even review "any documents related to what Delaware law requires for a judicial sale." *Id.* at 164:15-18, 166:7-19. Had he done so, he would appreciate that Delaware law requires "considering the forced sale nature of the transaction," *Deibler*, 652 A.2d at 557, which his fanciful opinions fail to do, Ex. 1, at 175:19-22 ("Q. Are you offering an opinion on the industry standards for an execution sale? … A. No.").

Freed from the limits of the practical and the permissible, Mr. Weisenburger has crafted dream scenarios that he contends might generate higher returns to judgment creditors. Tellingly, he identifies no one whom he believes would pay more. At the end of the day, his opinions devolve into little more than "if the special master ran a different process, it might have gotten a different result." At bottom, Mr. Weisenburger proffers conclusions that are connected to this case only by

---

[1] All citations in the form "Ex. _" refer to exhibits attached to the Declaration of Jason W. Myatt in support of this brief.

their suitability to the arguments propounded by the parties who engaged him, but that do not even arguably rest on any recognized methodology or his consideration of the facts on the ground.  But, as the Supreme Court has noted many times, "nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert." *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 157 (1999) (quoting *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997)).

Mr. Weisenburger's opinions on the 2020 Bondholder litigation further illustrate this point. He accuses the Special Master of stoking unfounded fears about the risk posed by the 2020 Bondholder litigation and Alter Ego claims.  D.I. 1951-2, Ex. 1, at 25 ("As with the 2020 Bondholder Litigation, in my opinion, the Special Master placed undue emphasis on the risk posed by the PDVH Alter Ego claims during the bidding process.").  But Mr. Weisenburger admits he did not review the 2020 Bondholders Pledge Agreement or indeed any document filed in the Southern District of New York, Ex. 1, at 183:13-184:7, and he merely believes that buyers would not "think the alter ego cases are of significant risk," *id.* at 192:1-18.  Back in the real world, the Venezuela Parties have been engaged in active litigation against the 2020 Bondholders for years, and more recently against the alter-ego claimants in several forums, so it comes as no surprise that, as an objective fact, potential buyers would consider both sets of claims and their respective risks in assessing the value of the PDVH Shares.  D.I. 1515, at 5 (noting that Amber Energy's bid was "contingent on the Injunction Motion" against the Alter-Ego claims "being granted"); D.I. 1741, at 4 (the Court recognizing that the "risk posed by the 2020 Bondholders … impacts the assessment of certainty of closing").  The credible assessments of those risks by sophisticated bidders—and their financing sources—are reflected in the range of market-tested offers received by the Special Master, not from the Venezuela Parties' expert, who admits he did not even consider most of the

facts relevant to those risks.  If the Venezuela Parties believe that bidders have overvalued the risk associated with the 2020 Bondholders, they have only themselves to blame; even now they could pay the debt owed to the 2020 Bondholders and negate any risk they pose to the sale of PDVH, but they choose not to.

Finally, despite criticizing the Special Master in his declaration for not designing a sale that would be the "equivalent of a typical competitive open-market sale for the PDVH shares," D.I. 1951-2, Ex. 1, at 7, Mr. Weisenburger admits that "the PDVH shares were at least extensively marketed," "any interested buyer would … have at least been aware that the PDVH shares were for sale," "[i]t was in newspapers, announcements," and "most people knew that it was for sale" and that "[e]verybody could participate if they wanted to."  Ex. 1, at 77:21-78:16.  In short, "[i]t was a big public sale."  *Id.* at 78:5-7.

This Court previously (and rightly) rejected Mr. Weisenburger's "speculat[ion]," D.I. 640, at 37:7-8, in favor of the Special Master's and his advisors' more credible opinions, D.I. 643, at 6. It remains the case that the Special Master "comes with greater credibility than [Mr. Weisenburger,] an expert for a long-time recalcitrant judgment debtor," D.I. 643, at 6, and the Court should once again reject his speculative, uninformed personal views about how to conduct a judicial sale, a subject Mr. Weisenburger admits he knows nothing about.

The Special Master was given the "incredibly complex task" of "'conduct[ing] a robust sale process amid the unique challenges of selling a domestic company against the will of its foreign sovereign owners.'"  D.I. 1515, at 25.  The Sale Process this Court adopted and has been implementing for years is an eminently reasonable means of conducting an execution sale under these uniquely challenging circumstances.  The Venezuela Parties' renewed objection that this Court should have employed some alternative process should once again be overruled and each of

their specific objections to the Final Recommendation based on decisions made during the Sale Process should be rejected, as discussed below.

### B.      The Designation Of Red Tree As The Stalking Horse Bidder Was Appropriate

The Venezuela Parties object to the Final Recommendation on the ground that it is tainted by this Court's designation of Red Tree as the Stalking Horse Bidder.  D.I. 1948, at 16-19. According to the Venezuela Parties, designating Red Tree as the Stalking Horse signaled to bidders that price did not matter and prompted bidders to focus on reaching a settlement with the 2020 Bondholders instead.  *Id.*  They also object that the Special Master failed to foster competition during the Topping Period and did not provide information necessary for bidders to improve their initial bids and top Red Tree's Stalking Horse bid.  *Id.* at 19-21.  The Venezuela Parties' objections are belied by the record, and should be rejected.

In approving the designation of Red Tree as the Stalking Horse Bidder, the Court informed bidders that it was "sensible" to designate as the Stalking Horse "the bid that appears to have the greatest likelihood of closing, even though the Court expects that any bid it is likely to approve at the conclusion of the Sale Process will need a balance that places *much greater emphasis on price* and lesser emphasis on certainty."  D.I. 1741, at 3 (emphasis added).  The Court further stated that it had "serious reservations about the price of the Red Tree bid" and that the Topping Period should not be a "competition among bidders to strike a deal with the 2020 Bondholders" but rather an opportunity to "improv[e] bids to satisfy judgments of the Additional Judgment Creditors."  *Id.* at 5-6.  The Venezuela Parties' assertion that the Court's Stalking Horse order nevertheless "led bidders in the topping period to assume they could offer extremely low bid prices so long as they paid the 2020 Bondholders," D.I. 1948, at 16, is therefore contradicted by the guidance this Court provided to bidders in that very order.

This argument is also undercut by what occurred during the Topping Period. *None* of Red Tree's competing bidders in the Topping Period—including the recommended Consortium bid— has yet reached a settlement with the 2020 Bondholders. The claim that the Topping Period devolved into a competition to strike a better deal with the 2020 Bondholders is therefore patently false. D.I. 1841, ¶¶ 64-66, 82(b). In reality, the only basis on which the topping bids competed was by increasing prices. Red Tree's topping bid increased the purchase price of its initial bid by over $100 million. *Compare* D.I. 1596, at 8 ($3.699 billion purchase price for Stalking Horse bid), *with* D.I. 1841, ¶ 68 ($3.806 billion purchase price for topping bid). And the Gold Reserve Consortium increased its price by over $300 million. *Compare* D.I. 1636, at 1 ($7.081 billion purchase price for Stalking Horse bid), *with* D.I. 1841, ¶ 78 ($7.382 billion purchase price for topping bid). Given that the Consortium's topping bid made "no improvement … on addressing the 2020s' risk," D.I. 1840-1, at 52:22-53:5, the only two conforming topping bids that the Special Master received competed not on the basis of mitigating the risk of the 2020 Bondholders but *only* on the basis of price.

Nor is there any merit to the Venezuela Parties' contention that the Special Master did not attempt to generate competitive tension in the Topping Period and that bidders did not know how to top the Stalking Horse bid. D.I. 1948, at 19-21. As the Court explained in its order designating Red Tree as the Stalking Horse Bidder, "[i]n addition to the guidance provided by the Evaluation Criteria, bidders considering participating in the Topping Period can find further guidance in the Court's Inclinations (D.I. 1728), the lengthy discussions during the April 17 hearing[,] … and this Order," such that the Court already "provided bidders the 'relatively clear' guidance the Venezuela Parties suggest is required to maximize the chances that the Topping Period will be effective." D.I. 1741, at 3 n.2. The fact that the Special Master received only two conforming topping bids

that proposed relatively modest purchase-price increases to their initial bids is not an indication

that the Special Master did not attempt to generate competitive tension.  It is a reflection of the

fact that the universe of bidders *capable* of purchasing the PDVH Shares is limited and that the

universe of *willing* buyers is further limited by the potential risks of such a purchase, including

regulatory uncertainty (such as the need to secure OFAC and potentially other regulatory

approvals), potential loss of 50.1% of PDVH's assets to the 2020 Bondholders if their pledge is

determined to be valid, and litigation risk from the Venezuela Parties themselves given that every

bidder knows the Venezuela Parties will leave no stone unturned to oppose the sale until all appeals

are exhausted, and will therefore discount its bids to reflect the nuisance and delaying value of that

litigation and the risk, however remote, that the Venezuela Parties might succeed.

The Venezuela Parties' objection to the Final Recommendation based on the designation

of Red Tree as the Stalking Horse Bidder should be overruled.

### C.    The Court Is Conducting A Public Sale Of The PDVH Shares

The Venezuela Parties next object that—notwithstanding Mr. Weisenburger's admission

that the Sale Process amounted to "a big public sale," Ex. 1, at 78:5-7—that process is *not* a "public

sale" under 8 *Del. C.* § 324(a) because the Special Master did not disclose bid prices to competing

bidders in the middle of each round of bidding.  D.I. 1948, at 21-22.  The fact that the Venezuela

Parties also contend the Special Master should have considered alternatives such as a leveraged

recapitalization or direct private placement sale, D.I. 1948, at 14, highlights that their objections

are not motivated by genuine, good-faith concerns about a "public" process but rather a desire to

slow down the sale on any conceivable basis.  Regardless, the "public sale" argument is meritless.

This Court's December 31, 2024 order provided that "[a]ll bids submitted in the Stalking Horse

stage of the Sale Process shall be made public once a Stalking Horse bid is selected and all bids at

each stage of the process shall be made available to non-bidding Sale Process Parties and non-

bidding Additional Judgment Creditors … *on a confidential basis*."  D.I. 1517, ¶ 23 (emphasis added); *see also* D.I. 480-1, Ex. A, at 13; D.I. 481, at 15 (approving Bidding Procedures).  The Court concluded in the Sale Procedures Order that the process contemplated, "including the Marketing Process, Bidding Procedures, and Notice Procedures, shall constitute a 'public sale to the highest bidder' within the meaning of" 8 *Del. C.* § 324.  D.I. 481, at 8.

The Court did not err in so holding, and the Venezuela Parties do not cite any Delaware authority for the proposition that the Sale Process implemented by this Court does not constitute a public sale under Delaware law.  Nor can they.  Contrary to the Venezuela Parties' assertions, bidders did not lack information about other bids that was necessary to compete against each other. At the end of the Stalking Horse round, the Special Master publicly filed the bid materials he received (including each bid's purchase price), subject only to "minimal redactions intended to preserve the confidentiality of the bidder's identity and any other sensitive information."  D.I. 1597; D.I. 1596, ¶ 24; D.I. 1597-1, Ex. A, at 1; *id.*, Ex. B, at 4; *id.*, Ex. C, at 3.  Bidders then had nearly three months to process this information and submit additional or different competitive bids during a second round of bidding in the Topping Period.  D.I. 1841, ¶¶ 44, 54.  The Special Master then publicly filed the bid materials he received in the Topping Period.  D.I. 1837-1; D.I. 1839-1. And all this will be followed by a 3-day public Sale Hearing in open court, during which objectors—including the Venezuela Parties—can argue that the Court should reject all bids or advocate for the adoption of a competing bid other than the Special Master's Final Recommendation, including bids submitted after the Special Master's Final Recommendation to this Court (if any such bids are made).  D.I. 1924; *see* D.I. 1552-1, at 1 (requiring Special Master to "inform the Court" if he receives new bids after the Final Recommendation, thereby allowing the Court to entertain such bids at the Sale Hearing).

The Venezuela Parties' objection that the Sale Process does not provide for a "public sale" under Delaware law should be overruled.

### D. The Special Master Did Not Place Undue Emphasis On Risks To The Value Of The PDVH Shares And Was Not Required To Delay The Sale Process To Determine Whether Risks Will Materialize

The Venezuela Parties next object that Special Master exaggerated the risks that the 2020 Bondholders' litigation and litigation alleging that PDVH is the alter ego of PDVSA pose to the value of the PDVH Shares, which they claim chilled bidding. D.I. 1948, at 22-27. There is no merit to the Venezuela Parties' contention that "the type of sophisticated parties who may participate in the Sale Process," D.I. 1515, at 19—including both bidders and their financing sources—were somehow misled by the Special Master into overvaluing risks to the asset they proposed to purchase. Whether the 2020 Bondholders' litigation and alter-ego litigation against PDVH are risks to the value of the PDVH Shares is a question that sophisticated bidders can answer for themselves, and which any prudent bidder would factor into its assessment of the shares' value. Indeed, PDVSA and the Bondholders have been engaged in litigation over the validity of the bonds and pledge for years without a clear winner emerging, and Venezuela's own expert Dr. Alberro agrees that a reasonable bidder would—if so advised by its lawyers and accountants—offer less than CITGO Petroleum's value because PDVH remains at risk of losing 50.1% of its indirect interest in that company. *See* Ex. 2, at 146:13-147:3. And Venezuela itself has long argued that a decision in favor of the 2020 Bondholders would "potentially deprive the Republic of a critical sovereign asset," *i.e.*, CITGO Holding. Br. for Bolivarian Republic of Venezuela as *Amicus Curiae*, *Petróleos de Venezuela S.A. v. MUFG Union Bank, N.A.*, No. 20-3858, 2021 WL 1118137, at *2 (2d Cir. Mar. 22, 2021), ECF No. 146; Br. for Bolivarian Republic of Venezuela as Amicus Curiae, *Petróleos de Venezuela S.A. v. MUFG Union Bank, N.A.*, No. CTQ-2022-00003, 2021 WL 12343726, at *22 (N.Y. Nov. 22, 2023).

If the 2020 Bondholders succeed in their litigation, they will have an enforceable lien on 50.1% of the shares of CITGO Holding, an outcome that would obviously have a significant impact on the value of the PDVH Shares to the successful bidder. *Petróleos de Venezuela S.A. v. MUFG Union Bank, N.A.*, 106 F.4th 263, 265 (2d Cir. 2024). That is why the Court has emphasized that potential bidders, when "valuing the PDVH Shares," should consider "whether claims held by the PDVSA 2020 Bondholders or other judgment creditors will need to be satisfied" and "'price their view of the risk associated with [that] currently pending litigation when formulating their bids.'" D.I. 643, at 10. In addition, "[a]ny prudent bidder … must factor into its assessment … the risk to closing posed by the 2020 Bondholders being able to assert their rights (assuming they exist) in a manner that would interfere with closing." D.I. 1741, at 6. Recognizing the existence of real risks to the value of the PDVH Shares and to the ability to close any proposed transactions to purchase them is not, as the Venezuela Parties maintain, an overvaluation of those risks. To the contrary, dismissing such real risks "as if non-existent," as each of the Venezuela Parties' experts does, would be to undervalue them, and to correspondingly overvalue the PDVH Shares. *Id.* at 4.

The Venezuela Parties also falsely assert that Crystallex "insist[ed] a Bondholder settlement was crucial to any bid." D.I. 1948, at 24. Given that Crystallex is a senior creditor— indeed, the most senior creditor—there would be nothing untoward in its expressing a view regarding how bidders should address the 2020 Bondholder issue, whether in this manner or any other. But in fact, the Venezuela Parties misrepresent Crystallex's position: Crystallex is interested in securing a process that pays the greatest number of creditors with reasonable certainty. As Crystallex previously stated, a successful bidder need not reach a settlement with the 2020 Bondholders if the bidder submitted a bid whose financing was not conditioned on leveraging CITGO assets or otherwise proposed an alternative mechanism for dealing with the threat the 2020

Bondholders pose to closing a transaction that *is* contingent on leveraging PDVH's assets (D.I. 1692, at 1)—all with the aim of getting creditors, at long last, paid.

The alter-ego litigation against PDVH likewise presented a potential risk that well-counseled bidders would factor into their bids. That is not to say it is a significant risk to the value of PDVH or that every potential bidder would weigh it in the same manner; some potential buyers may be more risk-averse than others. But in any event, the Special Master did not cause bidders to overvalue whatever risk that litigation presents. First of all, concern about the risk of alter-ego litigation appears to have been driven by *bidders*—not the Special Master. As the Court recognized when it denied the Special Master's motion to enjoin the alter-ego claims brought by the Gramercy Parties, "[t]he Special Master ha[d] explained that he filed the Injunction Motion because, in the course of marketing the PDVH Shares, potential bidders told him they would not be willing to purchase the shares if the Alter Ego Actions were not enjoined." D.I. 1515, at 12. Bidders understandably could be concerned about the risk of alter-ego claims because, if such claims were successful, the buyer would be "forced to accept potential liability for claims against the Republic and PDVSA." *Id.* at 18.

Like the risk posed by the 2020 Bondholders, the Court advised potential bidders that they should "factor[] into their bids whatever risk they associate with the Alter Ego Actions," recognizing it is "likely true" that an unfavorable outcome in those cases would "certainly adversely affect the value the process is able to provide to creditors." D.I. 1515, at 18-19. But bidders' consideration of this risk does not "undervalue" the PDVH Shares. Rather, accounting for a known risk is consistent with "the whole point of the endeavor in which the Court is engaged," which "is to compensate judgment creditors by allowing them to execute on the ***value*** of judgment

15

debtors' property found in this District." *Id.* at 18.[2]  Any risks the alter-ego litigation against PDVH might present to the value of the shares results from the Venezuela Parties' longstanding practice of evading their debts and refusing to pay lawful judgments, which has motivated their creditors to pursue increasingly inventive avenues of redress.  It requires some audacity for the Venezuela Parties to blame the Special Master for dings they themselves placed on the assets being sold.

Given that it was proper for bidders to factor into their purchase price their assessment of the risk that the 2020 Bondholders or alter-ego claims against PDVH might succeed, the Venezuela Parties pivot to arguing that the Court should have waited to see if those risks materialized.  D.I. 1948, at 25-27.  But such delays are equally likely to result in *additional* risks as they are to resolve current ones, as the Alter Ego litigation filed in August 2024—nearly two years after this Court entered its Sale Procedures Order (D.I. 480-1)—confirm.  And this Court has consistently rejected the Venezuela Parties' repeated demands to delay the Sale Process to await the resolution of other litigation that they claim would affect the value obtained in a sale of the PDVH Shares.  D.I. 643, at 9; D.I. 1647.  That is because, as this Court recognized over two years ago, "a judgment debtor has no right to demand, or expect, that a Court will delay a sale needed to effectuate its judgment until market conditions are most favorable to the debtor."  D.I. 643, at 7; *see In re Adobe Trucking, Inc.*, 2011 WL 6258233, at *13 (Bankr. W.D. Tex. Dec. 15, 2011) ("a secured party is under no

---

[2] The Venezuela Parties' contention that this Court should have delayed the sale process based on the alter-ego litigation against PDVH is even less persuasive.  Judge Rakoff issued an order concluding that PDVH is not the alter ego of PDVSA during the Topping Period on May 20, 2025. D.I. 1948, at 26.  And the Court granted the Venezuela Parties' motion to extend the Topping Period to allow bidders additional time to factor that development into their topping bids and give an opportunity for any newly interested bidders to participate in the Topping Period.  D.I. 1779. There is no evidence that it was necessary to extend the Topping Period even further, and any further delay would have prejudiced judgment creditors.

obligation to delay a[n asset] sale to indulge the debtor's 'hope that the … market might recover in time,' when … faced with 'highly unsteady market conditions'"). The Venezuela Parties' objection that the sale process should have been delayed to await decisions from other courts is thus both meritless and precluded by the law-of-the-case doctrine. *See Bedrosian*, 42 F.4th at 181.

### E.    This Court Did Not Chill Bidding

The Venezuela Parties also accuse the Court of chilling bidding (at 27-28) because it correctly stated that it anticipated that "[t]he price that results from the Marketing Process will be the best evidence that exists of the fair market value of the PDVH Shares taking into account the benefits and risks associated with this unique asset." D.I. 1554, at 4. The Venezuela Parties misconstrue the Court's prior statements, which merely reflect the fact that the Sale Process was designed to actively market the PDVH Shares to all potentially interested bidders, and then pit those bidders against each other in a competitive value-maximizing process, which is exactly what happened. Any potential bidder interested in this sale knew about it. And, if better bidders were available, as the Venezuela Parties imagine, they would have come forward.

The Venezuela Parties further accuse the Court of chilling bidding (at 28) by stating that "it will be extremely difficult to persuade the Court" that a bidder could invoke the SPA's material adverse effect clause "based in any significant part on whatever may occur in connection with Alter Ego Claims." D.I. 1554, at 21.[3] That was appropriate—Delaware law makes clear that such contractual provisions are limited to "*unknown events.*" *Hexion Specialty Chems., Inc. v. Huntsman Corp.*, 965 A.2d 715, 738 (Del. Ch. 2008) (emphasis added) (quotation marks omitted). Requiring bidders to price a known risk into their bids rather than bank on the ability to walk away

---

[3] Nor is it relevant whether credit bidders or cash bidders weighed these perceived risks differently. D.I. 1948, at 27. The Venezuela Parties' debts are satisfied regardless of the form of payment.

later did not improperly chill bidding; it encouraged bidders to "bid not on what they would like to buy, but rather on what is actually being sold in this forced sale," warts and all. D.I. 1493, at 4.

### F.    Neither Evercore Nor The Special Master Had A Conflict Of Interest

Reprising objections that this Court has already rejected and found waived, the Venezuela Parties contend that the Special Master was biased and engaged in improper advocacy with OFAC and that Evercore's compensation structure prejudiced the Sale Process because it was entitled to a contingency fee only if it recommended a winning bidder. D.I. 1948, at 28-29, 32. Given that the Court has previously rejected these objections, they are precluded by the law-of-the-case doctrine. *See Bedrosian*, 42 F.4th at 181.

This Court has already twice rejected the Venezuela Parties' attempts to disqualify the Special Master based on his alleged "advocacy" to OFAC as untimely, waived, and meritless. D.I. 544 (rejecting first attempt to disqualify the Special Master); D.I. 1180, at 8-13 (rejecting second attempt as a "frivolous" attempt "to prevent the Court from carrying out its judicial responsibilities"). The Venezuela Parties' arguments remain untimely, waived, and meritless.

As for Evercore, its compensation structure is common—even the United States Marshals are entitled to receive a percentage of the sale price when they carry out foreclosure sales. *Redus Fla. Com., LLC v. Coll. Station Retail Ctr., LLC*, 777 F.3d 1187, 1196 (11th Cir. 2014) ("Congress entitled the USMS to a commission for the same reason as every employer: to give its agents a stake in a job well done."). Awarding a commission based on a percentage of the sale price "protects both the debtor and the court's integrity by ensuring sound sales" because it encourages the commission recipient to question a low bid's "legitimacy given that a higher bid will result in a higher commission." *Id.* at 1195. It is thus unsurprising that this Court previously held that "neither Evercore nor the Special Master suffers from a conflict of interest" and that "these proceedings have not been tainted by a proposed contingency fee that has been disclosed and is

18

still being vetted, subject to the parties' objections, and to which all parties other than the judgment debtor have agreed," especially given that "everything Evercore has done is consistent with industry standards." D.I. 443, at 2-12. The Venezuela Parties' objections that the Special Master and Evercore are biased or suffer from a conflict of interest should again be overruled.

## III.    Venezuela's Objections Based On The "50% Test" Misapply The Standard And Vastly Overstate PDVH's Value

Next, the Venezuela Parties object to the Final Recommendation on the grounds that the Gold Reserve Consortium bid offers less than 50% of what the Venezuela Parties fantastically perceive as the "market value" for the PDVH Shares. But Delaware law does not recognize a "50% test" for execution sales of complex, high-value assets conducted with the close involvement of the courts. Instead, what Venezuela refers to as Delaware's "50% test" is at best a guideline that sales for less than 50% of the property's likely value (were it not sold in a forced execution sale) should be subject to "special judicial scrutiny." Even then, such scrutiny is not intended to ensure a particular outcome, but rather to confirm that the owner of the asset subject to the forced sale receives fair treatment. The Venezuela Parties have received more than fair treatment here.

Regardless, the Venezuela Parties' claimed valuation of the PDVH Shares is wildly inflated, and wholly disconnected from the actual value of PDVH as confirmed by the offers submitted by the sophisticated buyers seeking to acquire its shares in this sale process. To start, their valuation expert, Dr. Jose Alberro, does not even conduct a valuation of PDVH—he estimates the value *of CITGO Petroleum* and rolls that value up into PDVH with only minor adjustments for operating expenses. *See* D.I. 1951-2, Ex. 2, ¶ 102. But that ignores the risk—however great or small it may be—that PDVH could lose half of its assets, and control of CITGO Holding, to the 2020 Bondholders if they prevail on their long-running litigation in New York, and also ignores

19

the risk posed by the more recently filed Alter Ego Actions, some of which have recently been appealed to the Second Circuit after the Venezuela Parties obtained summary judgment.

In any event, Dr. Alberro takes every opportunity to tilt his analysis in favor of the Venezuela's Parties' desire for as high a valuation as possible. The Special Master's advisors have clearly demonstrated the myriad flaws in Dr. Alberro's analysis. *See, e.g.*, Exs. 3-5. But the Court need not be bogged down in academic analyses projecting future growth of CITGO Petroleum or the refining industry. The Court has before it multiple bids submitted by sophisticated parties in association with experienced market participants, backed by the largest financial institutions in the world. Those bids, clustered between approximately $3.5 billion and $7 billion, reflect the *market's* view of the value of PDVH and differ primarily only due to each bidder's assessment and treatment of the risk posed by the 2020 Bondholders and other litigation risks. There is no merit to the Venezuela Parties' claim that PDVH is worth far more than anyone is willing to pay— that is wishful thinking, not a valuation.

A. **Delaware Law Does <u>Not</u> Bar Execution Sales For Less Than 50% Of An Asset's Market Value**

The Venezuela Parties insist—inaccurately—that Delaware law prohibits approval of a judicial sale whenever the sale price is less than 50% of the value that the asset would likely be sold for if it were not subject to a forced execution sale. D.I. 1948, at 6-7. Ignoring a host of Delaware cases finding otherwise, the Venezuela Parties argue that this "gross inadequa[cy]" alone—without further signs of procedural defects or unfairness—requires a court to set aside such a judicial sale because an unconscionable sale price means that a higher bid would be obtained in a subsequent, properly conducted sale. *Id.* at 8.

The Venezuela Parties are wrong—Delaware law does not impose such an arbitrary 50% test. Rather, at most, Delaware law dictates that a sale for less than 50% of an asset's market value

should be examined with "special judicial scrutiny" to confirm that potential bidders were given fair notice of the sale and that the highest bidder was chosen as the winning bid. *Burge v. Fidelity Bond & Mortg. Co.*, 648 A.2d 414, 419 (Del. Super. Ct. 1994) (noting that a court's review of "a sheriff's sale … may consider factors other than price" including "whether there was 'some defect or irregularity in the process or mode of conducting the sale'"). Delaware courts are clear that the so-called 50% test "does not preclude acceptance of a lesser figure if warranted under the particular conditions." *Girard Tr. Bank v. Castle Apartments, Inc.*, 379 A.2d 1144, 1146 (Del. Super. Ct. 1977) (confirming forced sale of real estate "for *less than 6%* of its fair market value") (emphasis added)). Indeed, even where sales have been set aside, Delaware courts have been careful to note that the decision was due to procedural defects in the Sale Process, and explicitly <u>not</u> because the price was grossly inadequate. *Acad. Hills Phase IV Maint. Corp. v. Rogers*, 2023 WL 3749357, at *4 (Del. Super. Ct. May 25, 2023) (declining to confirm sale of property for 6% of its alleged market value because of procedural defects in the sale, but holding that the circumstances of the sale "do[] not lead the Court to believe the price [the buyer] paid is grossly inadequate").

Delaware courts generally apply the 50% test in foreclosure sales of moderately priced real property by a sheriff with minimal judicial oversight, but recognize that the standard "may be unrealistic," *Girard*, 379 A.2d at 1146, in highly complex, "extremely well-publicized," D.I. 1522, at 4, sales of multi-billion-dollar assets such as this one. *See, e.g.*, *Burge*, 648 A.2d 414 (sheriff's foreclosure sale of real property valued between $97,000 and $107,000); *Girard*, 379 A.2d 1144 (same for apartment building valued at $4 million); *Sec. Tr. & Safe Deposit Co. v. Gallagher*, 84 A. 806 (Del. Super. Ct. 1911) (same for property valued at approximately $25,000); *Cent. Nat'l Bank of Wilmington v. Indus. Tr. Co.*, 51 A.2d 854 (Del. Super. Ct. 1947) (same for property valued at $3,000); *accord Home Beneficial Life Ins. Co. v. Blue Rock Shipping Ctr., Inc.*, 379 A.2d 1147,

1149-50 (Del. Super. Ct. 1977). Thus, it is unsurprising that, as the Special Master has noted, the Venezuela Parties fail to cite "any case where a court has applied the 50% test in the context of a widely publicized judicial sale of a highly valuable asset that lasts for many months, is overseen by a Special Master, involves judicial scrutiny throughout the process, and involves sophisticated features"—not to mention a legal mandate—"to maximize the sale price." D.I. 1527, at 4.

To the extent that a 50% threshold is relevant to the sale of PDVH, it could at most serve as a guideline that triggers "special judicial scrutiny" of the sale (*Burge*, 648 A.2d at 419), *if* the Venezuela Parties had established that the PDVH Shares are in fact worth more than twice the recommended bid, which they have not come remotely close to doing. Even so, the "objective" of that scrutiny would not be to scrutinize the price obtained in the sale, but rather "to assure that the defaulting obligor has received just treatment in the execution process." *Girard*, 379 A.2d at 1147. The sale price would be just one part of the puzzle of determining whether the owner of the asset at issue has been fairly treated. *See, e.g.*, *Sec. Tr. & Safe Deposit Co.*, 84 A. at 806 (rejecting $11,500 foreclosure sale of property valued between $12,000 and $25,000 because "there was not a fair attendance at the sale, and there seemed to be some doubt whether this was to be a sale").

In all events, "the particular circumstances of the individual case" should guide judicial review of the execution sale and whether due process was afforded to the party whose assets are being sold to satisfy its unpaid debts. *Burge*, 648 A.2d at 419; *accord Girard*, 379 A.2d at 1146 ("That this [50%] standard is not absolute … is clear from the description of this rule in 2 Woolley on Delaware Practice Sec. 1121, which begins with the words 'subject to the particular circumstances of the case.'"). Delaware law and practice is clear: "[w]hat constitutes gross inadequacy of price may vary with the different circumstances of different sales." 2 VICTOR B. WOOLLEY, PRACTICE IN CIVIL ACTIONS & PROCEEDINGS IN THE LAW COURTS OF THE STATE OF

DELAWARE § 1121 (1906).  For instance, the existence of liens, debt, and other liabilities that could affect the value of the asset can justify a sale price that otherwise appears low to outside observers. *See, e.g.*, *Acad. Hills*, 2023 WL 3749357, at *4 (sale price of less than 6% of the asset's market value was not unconscionable because of outstanding liens attached to the asset); *United States v. Brouri*, 2020 WL 9549520, at *8 (S.D. Fla. Feb. 4, 2020) (approving $30,000 tax foreclosure sale of home where the owner's claimed valuation of $350,000 did not take into account $754,520 in liens against the property, which could not be ignored even if the liens could potentially be "negotiated down by the successful bidder").[4]

The Venezuela Parties argue that the sale of the PDVH Shares fails the 50% test in part because "a higher bid [is] likely to be made at a subsequent sale."  D.I. 1948, at 8 (citing *Cent. Nat'l Bank of Wilmington*, 51 A.2d at 858).  Mr. Weisenburger speculates that a third Sale Process would take place in a newly relaxed antitrust regulatory environment and against the backdrop of PDVH's future "significant victory" and successes in the alter ego and 2020 Bondholder litigation, circumstances which the Venezuela Parties suggest would increase bidder certainty and the potential value of any bids.  *See* D.I. 1951-2, Ex. 1, ¶¶ 97-100.  And so the Venezuela Parties say the sale of PDVH should be delayed at least until after the 2020 Bondholder litigation is resolved. D.I. 1948, at 24 (citing *Blossom v. Milwaukee & C.R. Co.*, 70 U.S. 196, 209 (1865)).  But if there

---

[4] Conversely, courts are likeliest to find that a price under 50% of an asset's market value is unconscionable when there "has been evidence either (1) that a higher bid was likely to be made at a subsequent sale or (2) that there was lack of knowledge of the sale or confusion at the sale." *Girard*, 379 A.2d at 1146.  And whether a sale price reflects an asset's market value is—analogously to the bankruptcy context—"supported by then prevailing marketplace values and by reasonable perceptions about growth, risks, and the market at the time."  *In re Samson Res. Corp.*, 2023 WL 4003815, at *25-26 (Bankr. D. Del. June 14, 2023); *accord Melikhov v. Drab*, 2021 WL 5167549, at *1 (M.D. Fla. Oct. 8, 2021) ("Generally courts have adopted the policy that confirmation will not be refused except for substantial reasons, and that in the absence of fraud or misconduct, the highest bidder will ordinarily be accepted as the purchaser of the property offered for sale.").

were ever a justification for invoking any so-called 50% rule, the wishful musings of a purported "expert" on his hopes and wishes for a better future would not be it.

Even the Venezuela Parties' own (outdated and inapposite) cases recognize that discretion as to when a sale should be conducted is "primarily vested in the officer designated" to conduct the sale—here, the Special Master. *See Blossom*, 70 U.S. at 208-09. Moreover, "[t]here comes a time in the history of a litigation like this when, though the times may be depressed, there must be a sale." *Pewabic Min. Co. v. Mason*, 145 U.S. 349, 358 (1892). While the Venezuela Parties' rights "are to be respected," so are Crystallex's, and "it does not always lie in the mouth of one who, by strenuous and protracted resistance, has delayed for years a sale, to claim still further delay on account of the then depressed financial condition" of the asset to be sold. *Id.*; *cf.* D.I. 544, at 7 (this Court finding that the Venezuela Parties have proceeded "tactical[ly] … and with at least a partial goal of further delaying these proceedings"). Rather, "[a] speedy end of litigation, as speedy as is consistent with the rights of each party, is to be desired." *Pewabic Min. Co.*, 145 U.S. at 358. A "highly recalcitrant debtor," D.I. 234 at 37, "who prolong[s] litigation by appeal from court to court must not complain if sometimes they find themselves, at the end, under burdens which would not have rested upon them but for such delay." *Pewabic Min. Co.*, 145 U.S. at 358; *accord In re Halpern*, 229 B.R. 67, 76-77 (Bankr. E.D.N.Y. 1999) (it is unjust to allow a debtor to delay the sale and "bet[]" on the possible future appreciation of his asset at the creditors' expense); D.I. 257, at 6 ("Delaware law does not guarantee that the maximum price be the result" of a Sale Process "with the aim of maximizing the value of the asset being sold").

In any event, neither the Venezuela Parties nor Mr. Weisenburger provide the "evidence necessary to attempt to make such a showing" that other hypothetical bidders are likely to participate in a third Sale Process, much less submit higher bids. D.I. 1554, at 3; *cf. Cent. Nat'l*

24

*Bank of Wilmington*, 51 A.2d at 858 ("[I]t would be a rare case in which the Court would find gross inadequacy to exist without at the same time finding a probability of receiving a much higher price on resale; the two are certainly very closely related").  There is no indication that any potentially interested parties were unaware of the sale, and no one has identified a credible purported buyer who might offer more value in a third sale process.  The sale has already been delayed several years, which has resulted in the benefit of favorable market conditions for the sale of a company like PDVH.  *See* D.I. 643, at 7 (this Court ordering the sale to proceed regardless of market conditions, but accepting the Special Master's representation that outlooks for refining companies had dramatically improved from 2021 to 2023).  Moreover, the "unusual and seemingly unprecedented circumstances" of the sale of the PDVH shares, D.I. 1554, at 3, will "necessarily and significantly limit[] the pool of potential purchasers," D.I. 1521, at 3, and that is unlikely to change regardless of how many times the exercise is repeated.

Because of Venezuela's "widely publicized" "political turmoil" and the presence of "several creditors [who] have brought attachment proceedings in federal court seeking a judicially ordered sale of stock," D.I. 792-2, at 35, the Sale Process has been intentionally designed to market the PDVH Shares to buyers interested in acquiring them despite these risks.  This process is the first and only time anyone has attempted to market the PDVH Shares—which have never previously attracted investor interest that aligned with Venezuela's view of the value of CITGO— in a fraught political climate, against the backdrop of comprehensive U.S. sanctions, and with significant public, press, and investor awareness of the now years-long litigation surrounding their sale.  In these novel circumstances, the Court rightly "anticipate[d] that … the price that results from the Marketing Process will be the best evidence *that exists* of the fair market value of the

PDVH Shares taking into account the benefits and risks associated with this unique asset."  D.I. 1554, at 3-4 (emphasis added).

The Venezuela Parties' attempt to analogize this case to the *InfoWars* bankruptcy proceedings in the U.S. District Court for the Southern District of Texas falls flat.  *See* D.I. 1948, at 20.  The *InfoWars* court noted that the failure to maximize value was due to profound issues in the sale process: bidders bid against themselves, the bid form was so poorly designed that not even the auctioneer could understand it, and (perhaps most fatally to the sale) the proposed final order "doesn't say what the [recommended bidder's] final bid says."  *In re Alexander Jones*, No. 22-33553 (Bankr. S.D. Tex.), Dec. 10, 2024 Hr'g Tr., at 367:16-18, 363:21-364:2.  It was the process defects in that case, not the value of the bid, that caused the court to reject the recommended bid and direct the trustee to relaunch a sale process designed to avoid those procedural issues in the second go-around.  *Id.* at 363:9-20, 367:11-14 (the court noting that it is generally reticent to reopen sale processes because "at some point we've got to stop, and at some point, somebody's going to have to live by it").  The process for the sale of PDVH Shares included none of these value-reducing defects:  the Sale Process was transparent, conducted fairly under careful Court supervision, and the Gold Reserve Consortium's bid is not unclear or difficult to understand.  Moreover, the Special Master, unlike a bankruptcy trustee, has no duty to "scratch and claw" for "every dollar possible," *id.* at 369:14-16, but merely administers the Court-approved Sale Process.  If the Venezuela Parties believe there are willing bidders on the sidelines, they may "scratch and claw" for their bids—but instead they offer nothing constructive.

Apparently aware that Delaware law is not on their side, the Venezuela Parties argue further that even if the Gold Reserve Consortium's bid exceeds 50% of the Venezuela Parties' claimed market value, the sale should still be set aside because the "Bid is unconscionable in any

event," as it could result in a "multi-billion dollar shortfall" compared to the Venezuela Parties' idealized conception of PDVH's market value.  D.I. 1948, at 2, 8-9.  In point of fact, the Gold Reserve Bid appears to place a far higher value on the PDVH Shares than most other bidders, whose bids reflect their assessment of the true value of the company they bid to acquire.  And even if the Gold Reserve Consortium bid or other bids did fall below some theoretical market value of PDVH, Delaware law requires only "a reasonable price, considering the forced sale nature of the transaction."  *Deibler*, 652 A.2d at 558; *see also BFP v. Resol. Tr. Corp.*, 511 U.S. 531, 538 (1994) (explaining that "'fair market value' presumes market conditions that, by definition, simply do not obtain in the context of a forced sale"); *Latvian Shipping Co. v. Baltic Shipping Co.*, 99 F.3d 690, 694 (5th Cir. 1996) ("The highest bidder at a fairly conducted judicial sale should be able to take advantage of a bargain and become owner of the thing adjudicated.").  Before the United States imposed sanctions restricting the transfer of Venezuela and PDVSA's assets, the Venezuela Parties had years to conduct a sale of PDVH on their own terms to raise funds to satisfy their debts, but did not even try to do so.  For that reason, the Venezuela Parties' objection amounts to a collateral attack on the Sale Process itself: if the forced sale of PDVH under any circumstances except at the inflated value that the Venezuela Parties ascribe to it shocks the conscience, then virtually any sale conducted according to the Sale Process supervised and approved by this Court (or any other) would be set aside.  And the Venezuela Parties provide none of the "evidence necessary to attempt to make … a showing" that a sale which by all measures satisfies their own 50% standard would nevertheless be unconscionable.  D.I. 1554, at 3.

### B.  Regardless, The Fair Market Value Of The PDVH Shares Is <u>Not</u> Twice The Amount Of The Gold Reserve Consortium's Bid

The Venezuela Parties' argument that the Gold Reserve Consortium bid price is "grossly unconscionable" under the supposed 50% test is not only wrong as a matter of Delaware law, but

also as a matter of fact.  The Venezuela Parties' $18.6 billion valuation dramatically overstates PDVH's value and is an inappropriate benchmark by which to assess the proposed sale.

The Venezuela Parties' valuation expert, Dr. Alberro, estimates that the value of PDVH's Shares is $18.6 billion using a discounted cash flow ("DCF") method.  *See, e.g.*, D.I. 1948, at 7. But Dr. Alberro himself acknowledges that valuation is in fact a range and that, depending on which of his methodologies he uses, CITGO's enterprise value ranges from $13.0 billion (using Dr. Alberro's market multiples approach) to $18.6 billion (using his preferred DCF method).  D.I. 1951-2, Ex. 2, ¶¶ 197, 212.  It is telling that Venezuela relies only on the highest value proffered by Dr. Alberro.

Even if DCF is the appropriate valuation method for PDVH and its subsidiary CITGO, Dr. Alberro makes a series of assumptions to artificially inflate the alleged value of PDVH.  To start, Dr. Alberro analyzes the wrong asset—his valuation assesses the future value of CITGO Petroleum, not PDVH.  *See, e.g.*, D.I. 1951-2, Ex. 2, § VII.A.6 (relying on CITGO Petroleum's, forecasts, weighted average cost of capital ("WACC"), earnings updates, and free cash flow data to develop PDVH's purported enterprise value).  But PDVH is not an ordinary holding company and Dr. Alberro's approach allows him to ignore the unique risks faced by PDVH and PDVH alone—most notably the risk (however small or great it may be) that PDVH could lose control of 50.1% of CITGO Holding if the 2020 Bondholders prevail in their dispute with PDVSA.  In defense of this decision, Dr. Alberro explains that the "2020 bonds constitute a debt of PDVSA, and not PDVH [and thus] "are not liabilities of the entity whose equity is being valued."  D.I. 1951-2, Ex. 2, ¶ 216.  And, at his deposition Dr. Alberro insisted that it was appropriate not to discount his valuation to account for the risk posed by the 2020 Bondholders because that risk is not a charge reflected in CITGO Petroleum's financial statements.  Ex. 2, at 155:19-156:23.  Dr.

Alberro completely misses the point. The underlying debt may have been PDVSA's, and the asset the 2020 Bondholders are targeting may be CITGO, but neither of those companies bears the risk of losing the value of half of *their assets*—that risk belongs entirely to PDVH because it is PDVH—not PDVSA or CITGO—that pledged 50.1% of its stake in CITGO Holding as collateral for the bonds on which PDVSA has now defaulted. And that is why PDVH—the company actually being sold in this sale—*does* list the 2020 Bondholder litigation as a risk in *its* financial statements. *See* Ex. 7, at 18-19. Dr. Alberro completely ignores this fact because his supposed "valuation" focuses on the wrong company, and is thus irrelevant and inconsistent with Generally Accepted Accounting Principles and accounting literature that instruct analysts to account for exactly these sorts of risks. *See* IMPLEMENTATION GUIDANCE: LITIG., CLAIMS, & ASSESSMENTS, Acct. Standards Codification § 450-20-25-2 (FIN. ACCT. STANDARDS BD. 2023); *id.* § 450-20-55-10 (recommending accrual or disclosure for litigation claims based on "the degree of probability of an unfavorable outcome," "the ability to make a reasonable estimate of loss," and the period in which the claim is made); SHANNON P. PRATT & ALINA V. NICULITA, VALUING A BUSINESS 148 (5th ed. 2008) ("The analyst should at least be alert to opportunities to investigate and evaluate [litigation] contingencies"). If Dr. Alberro's valuation properly reflected the impact of the 2020 Bondholder litigation, it would lead to a meaningful reduction in PDVH's valuation. *See* Ex. 8, ¶ 25 (applying a discount rate based on the probability of the 2020 Bondholders succeeding in their litigation). Indeed, the Venezuela Parties appear to concede the point by urging the Court to await the outcome of the 2020 Bondholder litigation in the hope of achieving better bids. D.I. 1948, at 24-25.

Dr. Alberro's claim that "valuation experts do not deduct unquantified and unresolved litigation contingencies when estimating equity value," D.I. 1951-2, Ex. 2, ¶ 217, is not only

refuted by generally accepted accounting principles and PDVH's financial statements, but also is inconsistent with Dr. Alberro's own assessment of what factors a reasonable buyer bidding for the PDVH Shares would take into account. At his deposition, Dr. Alberro acknowledged that he would expect any offer to acquire the PDVH Shares to include a discount for this particular contingency if their lawyers and accountants advised them to do so. Ex. 2, at 144:12-146:22 (testifying that a buyer would "not want to be a fool" and would therefore discount its offer to acquire the PDVH Shares *below* the separate valuation of CITGO Petroleum). He also testified that regardless of the valuation reflected in his report, he would not offer to pay that much for PDVH if he believed that the 2020 pledge would be upheld, but that he believed his own unwillingness to bid what his report claimed in the face of the 2020 risk was somehow not a question of "valuation" (which in his view turns on abstract principles) but on some different question how much parties are willing to bid. *See* Ex. 2, at 157:14-16 ("I wouldn't include [risks posed by the 2020 Bondholders] in the fair market value or the DCF. I would include them in my offer [to acquire PDVH].").

Even if it were proper for Dr. Alberro to conduct a valuation of CITGO Petroleum rather than a valuation of PDVH, the Special Master's financial advisors at Evercore have confirmed that Dr. Alberro's valuation of CITGO Petroleum is also fundamentally flawed. After correcting the myriad flaws in Dr. Alberro's "valuation," Evercore arrived at an assessment that the PDVH Shares could potentially be valued as high as $9.4 billion. Ex. 3, ¶ 24. But Evercore's valuation exercises—which range from $8.4 billion to $13.2 billion depending on the methodology used, timing, and other assumptions that do not reflect the imperatives of a judicial sale, *see* Ex. 5, ¶¶ 14, 16—should be treated as the absolute maximum possible valuation of PDVH. Like Dr. Alberro, Evercore conducted an academic analysis of the value that might be ascribed to CITGO Petroleum, and explicitly *did not account for* the potential risk to the value of the PDVH Shares posed by the

2020 Bondholders, which Dr. Alberro accepts any prudent bidder would factor into their offer. *See id.* ¶ 14 (confirming that Evercore's "analysis does not include any adjustments for ongoing litigation, including with respect to the 2020 PDVSA Bondholders, or for structural limitations in the transaction, including the absence of representations and warranties and other typical seller covenants"); Ex. 2, at 156:24-157:22. In any event, given the carefully planned—and eminently fair Sale Process—a winning bidder should "be able to take advantage of a bargain and become owner of the thing adjudicated." *Latvian Shipping Co.*, 99 F.3d at 694; *see also, e.g.*, *Wong Shing v. M/V Mardina Trader*, 564 F.2d 1183, 1189 (5th Cir. 1977) ("The highest bidder at a sale should reasonably be allowed to believe that he will receive the benefit of his bargain").

## IV. Venezuela's Objections To The SPA's Prohibition On Unsolicited Bids And Violations Of Bidder Protections Should Be Overruled

The Venezuela Parties object to Section 6.16(c) of the recommended SPA, which provides in relevant part: "[I]n the event that during the No-Shop Period but prior to the Court's hearing to consider the Special Master's motion to approve the Sale Order … the Special Master receives an unsolicited Competing Proposal, he shall inform the Court and the Buyer of the receipt of such unsolicited Competing Proposal, and, if approved by the Court … may engage with the Person submitting such Competing Proposal." D.I. 1841-1, Ex. B, § 6.16(c). The Venezuela Parties interpret this provision to suggest that the Special Master cannot provide the Court an unsolicited competing proposal received after the initiation of the Sale Hearing but before entry of the Sale Order, in violation of the Court-approved Bidder Protections. Those Bidder Protections make clear that, "in the event the Special Master receives an unsolicited competing proposal after submission of the Final Recommendation and prior to entry of any Sale Order, he shall inform the Court and the Final Recommended Bidder of the receipt of such proposal and, if so directed by the Court, may engage with the bidder submitting such competing proposal." D.I. 1552-1, at 2-3.

The Venezuela Parties' objection should be overruled because the Court has already ordered the Special Master to provide the Court any unsolicited bid received between his Final Recommendation and entry of the Sale Order, and the Court has not approved any modification to that procedure in the SPA, the approved Bidder Protections, or elsewhere.  The Court approved the Bidder Protection of a non-solicitation or "no-shop" period that was subject to the proviso that the Special Master shall inform the Court of any unsolicited competing proposal received "prior to the entry of any Sale Order."  D.I. 1552-1, at 2-3.  Under the Sale Procedures Order, any non-solicitation provision that has not been approved by the Court is of no effect, and the recommended SPA itself provides that "[i]n the event of any conflict between this Agreement and the Sale Procedures Order or the Sale Order, the Sale Procedures Order or the Sale Order, as applicable, shall govern."  D.I. 1841-1, Ex. B, § 6.16(e).  Because the terms of the SPA make clear that the Court-approved Bidder Protections control in the event of a conflict, the SPA itself resolves the Venezuela Parties' objection, and it should accordingly be overruled.

## V.    Venezuela's Objections To The Legitimacy of The Attachments

The Venezuela Parties also reiterate their objections to the legitimacy of this Court's attachments.  *See* D.I. 1951-1, at 30.  But those arguments are nothing more than a thinly veiled motion for reconsideration of this Court's prior orders rejecting the very arguments Venezuela asserts now.  *See, e.g.*, D.I. 1102 (Attachment Priority Order, summarizing the Court's orders confirming Crystallex's and Additional Judgment Creditors' attachments and effective levying of related writs on the PDVH Shares).  Because the Court has conclusively rejected the Venezuela Parties' challenges to the validity of the attachments in these proceedings, the law-of-the-case doctrine bars their renewed objections.  *See Bedrosian*, 42 F.4th at 181.  To the extent the Venezuela Parties have preserved their right to appeal this Court's prior orders, they will surely do

so, but that does not justify Venezuela's attempt to re-litigate issues that have long-been resolved by this Court in the years-long run-up to the final sale of the PDVH Shares.

## VI.    The Venezuela Parties' Objections To The Gold Reserve Consortium's Valuation And Previous Settlement Payments From Venezuela Do Not Support The Gold Reserve Consortium's Disqualification

The Venezuela Parties next object to the Special Master's Final Recommendation because they allege that the Gold Reserve Consortium bid improperly "overstates the amount bid by approximately $240 million, if not more." D.I. 1859, ¶ 6. Given the paucity of evidence that the Venezuela Parties present, Crystallex takes no position on this objection and reserves the right to respond further to the Venezuela Parties' objection in light of information produced by the Gold Reserve Consortium or other parties.

## VII.    The Venezuela Parties' Objections To The Gold Reserve Consortium's Bid Based On Purported Dealings With The Maduro Regime Are Speculative And Unsupported

The Venezuela Parties next reiterate their objection that the Gold Reserve Consortium is "unsuitab[le]" because it allegedly received the settlement payments "from the Maduro regime" and formed a mixed company with a state-owned mining entity. D.I. 1948, at 34; D.I. 1856, ¶ 6. The Venezuela Parties now claim that this 2016 transaction "create[s] an issue concerning whether the Gold Reserve-led Dalinar group could obtain a license from OFAC." D.I. 1856, ¶ 6. Based on the information submitted to date, these assertions appear speculative and unsupported, but Crystallex reserves the right to respond further on these issues in light of any additional information that may be developed by the parties during discovery. *See* Ex. 9, Ex. A, ¶¶ 2-4.

## VIII.    Conclusion

Accordingly, and subject to the minimal objections submitted by Crystallex on July 24, 2025, D.I. 1949, Crystallex submits that the objections filed by the Venezuela Parties and other objectors should be rejected, and the Court should proceed to confirm the sale of the PDVH Shares

to the highest bidder it deems likely to be able to close the sale transaction and end Venezuela's

decade-long effort to deny Crystallex the just satisfaction of its judgment under Delaware law.

|  |  |
|---|---|
| | */s/ Travis S. Hunter* |
| OF COUNSEL: | Raymond J. DiCamillo (#3188) |
| | Jeffrey L. Moyer (#3309) |
| Robert L. Weigel | Travis S. Hunter (#5350) |
| Jason W. Myatt | RICHARDS, LAYTON & FINGER, P.A. |
| Rahim Moloo | One Rodney Square |
| Zachary Kady | 920 North King Street |
| GIBSON, DUNN & CRUTCHER LLP | Wilmington, Delaware  19801 |
| 200 Park Avenue | (302) 651-7700 |
| New York, New York  10166 | dicamillo@rlf.com |
| (212) 351-4000 | moyer@rlf.com |
| | hunter@rlf.com |
| Miguel A. Estrada | |
| Lucas C. Townsend | *Attorneys for Plaintiff* |
| Adam M. Smith | |
| GIBSON, DUNN & CRUTCHER LLP | |
| 1700 M Street, N.W. | |
| Washington, D.C.  20036 | |
| Tel:  (202) 955-8500 | |
| Fax:  (202) 467-0539 | |

Dated: August 7, 2025