## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| CRYSTALLEX INTERNATIONAL CORP., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Misc. No. 17-151-LPS |
| | ) | |
| BOLIVARIAN REPUBLIC OF VENE-ZUELA, | ) | **PUBLIC VERSION** |
| | ) | |
| | ) | |
| Defendant. | ) | |

## SPECIAL MASTER'S RESPONSE
## TO OBJECTIONS TO FINAL RECOMMENDATION

OF COUNSEL:

Matthew S. Barr (Admitted *pro hac vice*)
David Lender (Admitted *pro hac vice*)
Jared R. Friedmann (Admitted *pro hac vice*)
Chase A. Bentley (Admitted *pro hac vice*)
WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153 Tele-
phone: (212) 310-8000
Facsimile: (212) 310-8007
Matt.Barr@weil.com
David.Lender@weil.com
Jared.Friedmann@weil.com
Chase.Bentley@weil.com

Dated: August 7, 2025
12405766 / 21202.00001

Myron T. Steele (#0002)
Matthew F. Davis (#4696)
Bindu A. Palapura (#5370)
Malisa C. Dang (#7187)
POTTER ANDERSON & CORROON LLP
Hercules Plaza, 6th Floor
1313 North Market Street
P.O. Box 951
Wilmington, DE 19801
Telephone: (302) 984-6000
Facsimile: (302) 658-1192 msteele@potter-
anderson.com mdavis@potteranderson.com
bpalapura@potteranderson.com
mdang@potteranderson.com

*Counsel for Special Master Robert B. Pincus*

# TABLE OF CONTENTS

                                                                                    **Page**

I.      Introduction .......................................................................................................... 1

II.     The Special Master Conducted an Appropriate, Carefully Designed, Organized, and Court-Sanctioned Sale Process that was Compliant with Applicable Law ................. 2

        A.      The Special Master designed an appropriate sale process and properly considered transaction alternatives ................................. 3

        B.      The Special Master appropriately selected Red Tree as the Stalking Horse and fostered competition throughout the Topping Period ................. 4

        C.      The confidentiality arrangements were appropriate to the sale process ...................................................................................... 6

        D.      The Special Master and the Court's representations did not suppress the sale price ...................................................................... 7

        E.      The Special Master and his Advisors were unbiased and appropriately incentivized ...................................................... 8

        F.      The Court should give no weight to the Venezuela Parties' witness Randall Weisenburger ............................................................ 9

III.    The Sale Process Achieved a Fair Price for the PDVH Shares ........................................ 10

        A.      The price achieved for the PDVH Shares is the best evidence of its fair market value ............................................................ 10

        B.      The purchase price for the PDVH Shares exceeds 50% of their fair market value ........................................................................ 13

        C.      The price achieved for the PDVH Shares does not shock the conscience .................................................................................... 16

IV.     The Republic and PDVSA Are Subject to This Court's Jurisdiction and Validity of Writs of Attachment ......................................................................... 19

V.      Risks Regarding PDVSA 2020 Bondholders ............................................................... 20

VI.     Regulatory Risks ....................................................................................................... 23

VII.    The Proposed Sale Order Is Consistent with the Special Master's Mandate to Sell the PDVH Shares "Free and Clear" of Claims, Encumbrances, and Liabilities ............... 24

VIII.   The Court Should Reject the Other Objections .......................................................... 32

        A.      28 U.S.C. § 2004 ............................................................................. 32

        B.      Expense Reimbursement .................................................................. 32

        C.      Section 6.16(c) of the SPA—Unsolicited Competing Proposals ............. 33

        D.      Section 6.1(b)(xvi)(C) of the SPA—Limitation on Dividends and Distributions ................................................................................ 33

E.    Sections 2.3(a)(i), 2.3(a)(iii), and 7.3(c)—FIRPTA Certificate and Special Master's Affirmation.................................................................. 34

# **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Barton v. Borit,*
316 F.2d 550 (3d Cir. 1963)..................................................................................15

*BFP v. Reol. Tr. Corp.,*
511 U.S. 531 (1994)..............................................................................................12

*Brickley for CryptoMetrics, Inc. Creditors' Tr. v. ScanTech Identification Beams Sys., LLC,*
566 B.R. 815 (W.D. Tex. 2017)............................................................................29

*Broadway Tr. Co. v. Dill,*
17 F.2d 486 (3d Cir. 1927)....................................................................................27

*Burge v. Fid. Bond & Mortg. Co.,*
648 A.2d 414 (Del. 1994) ...................................................................13, 17, 18

*Cent. Nat'l Bank of Wilmington v. Indus. Tr. Co.,*
51 A.2d 854 (Del. Super. Ct. 1947) ....................................................................13

*Crystallex Int'l Corp. v. Bolivarian Republic of Venez.,*
24 F.4th 242 (3d Cir. 2022) .................................................................................13

*Crystallex Int'l Corp. v. Bolivarian Republic of Venez.,*
932 F.3d 126 (3d Cir. 2019)..................................................................................19

*Crystallex Int'l Corp. v. Bolivarian Republic of Venezuela,*h
No. CV 17-MC-151-LPS, 2021 WL 129803 (D. Del. Jan. 14, 2021) ...................19

*Dell, Inc. v. Magnetar Glob. Event Driven Master Fund Ltd.,*
177 A.3d 1 (Del. 2017) .........................................................................................16

*DFC Glob. Corp. v. Muirfield Value Partners, L.P.,*
172 A.3d 346 (Del. 2017) .....................................................................................12

*Edgewater Growth Cap. Partners LP v. H.I.G. Cap., Inc.,*
68 A.3d 197 (Del. Ch. 2013).................................................................................6

*First Nat'l Bank of Cleveland, Ohio v. Shedd,*
121 U.S. 74 (1887)................................................................................................28

*G&A Strategic Invs. I LLC v. Petroleos de Venezuela, S.A.,*
No. 23-cv-10766-JSR (S.D.N.Y. May 20, 2025).................................................8

iii

*Girard Tr. Bank v. Castle Apartments, Inc.*,
379 A.2d 1144 (Del. Super. Ct. 1977) ......................................................................13, 17, 18

*Gray v. Brignardello*,
68 U.S. 627 (1863) ..........................................................................................................30

*Home Beneficial Life Ins. Co. v. Blue Rock Shopping Ctr., Inc.*,
379 A.2d 1147 (Del. Super. Ct. 1977) ......................................................................13, 17, 18

*Howard v. High River Ltd. P'ship*,
369 B.R. 111 (S.D.N.Y. 2007) *aff'd In re XO Commc'ns, Inc.*, 308 Fed. Appx.
459 (2d Cir. 2008) ............................................................................................................9

*Jacobsohn v. Larkey*,
245 F. 538 (3d Cir. 1917) ..................................................................................................28

*Md. Nat'l Bank v. Porter-Way Harvester Mfg. Co.*,
300 A.2d 8 (Del. 1972) .....................................................................................................25

*Metlyn Realty Corp. v. Esmark, Inc.*,
763 F.2d 826 (7th Cir.1985) ..............................................................................................14

*Miners' Bank of Wilkes-Barre v. Acker*,
66 F.2d 850 (3d Cir. 1933) ................................................................................................27

*OI Eur. Grp. B.V. v. Bolivarian Republic of Venezuela*,
663 F. Supp. 3d 406 (D. Del. 2023), *aff'd*, 73 F.4th 157 (3d Cir. 2023) .................................19

*OI Eur. Grp. B.V. v. Bolivarian Republic of Venezuela*,
73 F.4th 157 (3d Cir. 2023) ...............................................................................................19

*Oldham v. Hossenger*,
10 Del. 434 (Del. Super. Ct. 1878) .....................................................................................13

*Petróleos de Venezuela, S.A. v. PDV Holding, Inc.*,
306 A.3d 572 (Del. Ch. 2023)....................................................................................... 13-14

*Sec. Tr. & Safe Deposit Co. v. Gallagher*,
84 A. 806 (Del. Super. Ct. 1911) .......................................................................................13

*In re Trans World Airlines, Inc.*,
134 F.3d 188 (3d Cir. 1998)...............................................................................................14

*In re TransPerfect Glob., Inc.*,
No. CV 10449-CB, 2018 WL 904160 (Del. Ch. Feb. 15, 2018), *aff'd sub nom.*
*Elting v. Shawe*, 185 A.3d 694 (Del. 2018) ........................................................................27

*Trump v. CASA, Inc.*,
    145 S. Ct. 2540 (2025)........................................................................................28

*United States v. Branch Coal Corp.*,
    390 F.2d 7 (3d Cir. 1968)..................................................................................27

*United States v. Int'l Bhd. of Teamsters, Chauffeurs, Warehousemen & Helpers of Am., AFL-CIO*,
    266 F.3d 45 (2d Cir. 2001)................................................................................31

*United States v. N.Y. Tel. Co.*,
    434 U.S. 159 (1977)...........................................................................................31

*United States v. Vassallo*,
    Nos. 1867, 1868, 1960 U.S. Dist. LEXIS 4491 (D. Del. June 17, 1960) ...............28

*VFB LLC v. Campbell Soup Co.*,
    482 F.3d 624 (3d Cir. 2007)..............................................................................15

**Statutes**

8 *Del.* C. §324(a)...........................................................................................................6

10 *Del.* C. §§ 4771-4987..............................................................................................13

28 U.S.C. § 1651...........................................................................................................31

28 U.S.C. § 2004...........................................................................................................32

**Treatises**

Black's Law Dictionary 971 (6th ed. 1990)..................................................................12

**Other Authorities**

Andrew Scurria, *U.S. Backs Sale of Citgo to Pay Venezuela's Debts*, Wall St. J. Pro Bankr. (May 1, 2023). .....................................................................................11

Nicolle Yapur, *Citgo Auction Adviser Recommends Gold Reserve Bid*, Bloomberg (July 1, 2025) ...................................................................................................11

Robert B. Pincus, as special master in this case (the "**Special Master**"), respectfully submits this response to the objections (D.I. 1847–1849, 1851, 1854–1856, and 1942–1950) to the *Special Master's Final Recommendation* (D.I. 1837) (the "**Final Recommendation**").[1]

## I.    Introduction

The Special Master's recommendation of a sale of the PDVH Shares to Dalinar is the result of the tireless efforts of the Special Master, the Sale Process Parties, the Additional Judgment Creditors, and the Court over the course of many years.  Nevertheless, as they have done throughout this process, the Venezuela Parties—the only parties with a fundamental objection to the sale process itself—attempt, through spurious and unsubstantiated objections, to halt a value-maximizing sale resulting in the payment of over $7 billion of Attached Judgments.  The Venezuela Parties argue that the sale process and the Special Master's execution of the process were flawed, but this is the same sale process that has been heavily litigated by the parties and endorsed by the Court every step of the way.

The Venezuela Parties, without any credible evidence to support their contentions, nevertheless argue that the purchase price is inadequate despite the extensively publicized Marketing Process that yielded a purchase price that comports with fair market value principles.

Other parties also raise objections regarding the execution risks of Dalinar's bid, including related to the PDVSA 2020 Bondholders and regulatory approvals, and the scope of the relief granted by the Proposed Sale Order.  The Special Master considered these topics in great detail, both before and after the selection of the Dalinar bid, and ultimately recommended a final bid that

---

[1]    All capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the *Sixth Revised Proposed Order (A) Establishing Sale and Bidding Procedures, (B) Approving Special Master's Report and Recommendation Regarding Proposed Sale Procedures Order, (C) Affirming Retention of Evercore as Investment Banker by Special Master and (D) Regarding Related Matters* (D.I. 481) (the "**Sale Procedures Order**") or the Final Recommendation.

he believes is reasonably capable of being consummated, and has a price that maximizes value for the judgment creditors and was superior to any other bid received.

In support of this response, the Special Master respectfully submits the *Declaration of William Hiltz in Support of Special Master's Final Recommendation* (the "**Hiltz Decl.**") (D.I. 1838), the *Supplemental Declaration of William O. Hiltz in Support of the Special Master's Final Recommendation* (the "**First Supplemental Hiltz Decl.**"), the *Corrected Second Supplemental Declaration of William O. Hiltz in Support of the Special Master's Final Recommendation* (the "**Second Supplemental Hiltz Decl.**"), and the *Declaration of Jared R. Friedmann in Support of the Special Master's Response to Objections to Final Recommendation* (the "**Friedmann Decl.**").[2]

## II.    The Special Master Conducted an Appropriate, Carefully Designed, Organized, and Court-Sanctioned Sale Process that was Compliant with Applicable Law

The Special Master carried out a carefully designed, open-market sale process that obtained a value-maximizing price for the PDVH Shares.  The Special Master acted pursuant to his mandate, *see* D.I. 277, with the assistance of well-qualified Advisors, diligently followed the Court's directives, and exercised his business judgment throughout the process.  The procedures the Court approved were the result of extensive input from numerous stakeholders, including the Venezuela Parties, the other Sale Process Parties, and the Additional Judgment Creditors, and were designed specifically to protect the interests of the Venezuela Parties while maximizing value. *See* D.I. 1180 at 12.

The Special Master and his Advisors contacted over 130 potential bidders, coordinated extensive diligence (with over 59,000 documents provided, dozens of calls coordinated, and over 1,400 bidder questions answered by CITGO management), and engaged in multiple rounds of extensive, robust back-and-forth negotiations with bidders at both the Stalking Horse Round and

---

[2]    References to "Friedmann Ex." refer to exhibits attached to the Friedmann Declaration.

Topping Period.  *See generally* Hiltz Decl. (D.I. 1838); *see also* Notice of Recommendation of Stalking Horse (D.I. 1596); Notice of Final Recommendation (D.I. 1837); Second Supplemental Hiltz Decl.  After a detailed assessment of the bids received in accordance with the Evaluation Criteria approved by the Court, and with consistent consultation with the Sale Process Parties and the Court in the June 25, 2025, *ex parte* conference, the Special Master ultimately concluded that the Dalinar Topping Bid was the highest and best bid received, and  reasonably reflected the fair market value of the PDVH Shares.  Hiltz Decl. ¶ 68.

The Venezuela Parties question the Court's judgment in adopting the sale procedures that have been in place for years and that the Court supplemented several months ago.  *See* D.I. 481; D.I. 1517.  But the Court entertained numerous rounds of briefing and argument and duly considered the arguments and input from all interested parties, including the Venezuela Parties, before adopting procedures for the sale process, including those memorialized in the Sale Procedures Order and the December 31 Order.  *See* Hiltz Decl. ¶¶ 15-18; D.I. 481 (*sixth* draft of the Sale Procedures Order); D.I. 1517 (the December 31 Order); *see also* D.I. 1433; D.I. 1493; D.I. 1507; D.I. 1554.  The Venezuela Parties themselves had a front row seat to strategy sessions and countless updates provided by the Special Master to the Sale Process Parties—a level of access for a defendant whose assets are subject to a judicial sale that, to the Special Master's knowledge, is unprecedented.  The Special Master has diligently followed the procedures outlined in the Court's orders. The time for disputing the structure of the sale process is long past.

A.  <u>The Special Master designed an appropriate sale process and properly considered transaction alternatives</u>

The Special Master engaged in a lengthy and collaborative process with the Sale Process Parties, including the Venezuela Parties, to design and recommend to the Court a set of sale procedures that would best maximize the value obtained for the PDVH Shares and to carry out the

sale in a manner that is fair to all parties, including the Venezuela Parties. *See, e.g.*, D.I. 481; D.I. 1433; D.I. 1493; D.I. 1517; Second Supplemental Hiltz Decl. ¶ 9. In doing so, the Special Master considered alternatives to the sale process that the Court ultimately adopted, including an initial public offering ("**IPO**"), equitization of claims, equity or debt financing solutions, a partial sale of the PDVH Shares, the creation of a trust for paying claimants over time, a sale of CITGO assets in parts to multiple buyers, a reorganization through an aggregated credit bid, and some combination of the foregoing. *See* Second Supplemental Hiltz Decl. ¶ 9.

The Special Master, assisted by his Advisors, recommended the existing process—over the alternative transaction structures previously suggested by the Venezuela Parties and now repeated by their witness, Randall Weisenburger—for valid and strategic reasons. *See* D.I. 1948 at 14. The Special Master rejected alternative processes as they would almost certainly provide less value to judgment creditors, require complex disclosures, and/or ███████████████████████ ███████████████████████████████████████████████. *See* Second Supplemental Hiltz Decl. ¶ 9–12.

B. *The Special Master appropriately selected Red Tree as the Stalking Horse and fostered competition throughout the Topping Period*

The Venezuela Parties criticize the Special Master's recommendation of Red Tree as the Stalking Horse and argue this led to a deficient Topping Period with no competition on price. *See* D.I. 1948 at 16–21. The Court has already determined that Red Tree's bid was the best choice for a stalking horse, after considering objections and conducting a hearing. There is no need to relitigate this issue. *See* D.I. 1741. Moreover, the Court and the Special Master were correct that the selection of Red Tree would lead to a competitive Topping Period and a higher purchase price. Dalinar increased its own Stalking Horse Proposal bid by $433 million. *See* Hiltz Decl. ¶ 62.

The Venezuela Parties also allege that the Special Master failed to foster competition during the Topping Period, cherry-picking a handful of emails—out of the thousands of emails relating to the Topping Period from the Special Master and his Advisors—to paint a distorted picture of the Special Master's activity during the Topping Period and his efforts to negotiate improved bids. *See* D.I. 1948 at 19–21. Not so.

To the contrary, the Special Master, with the assistance of his Advisors, actively worked bidders during the Topping Period to create tension among multiple suitors. The Special Master reached out to approximately 130 potential bidders at the start of the Topping Period to provide them with an opportunity to bid, providing potential bidders with detailed information about the sale process, the assets being sold, and bid requirements. *See* Hiltz Decl. ¶ 39. Throughout the subsequent weeks, the Special Master and his Advisors held numerous calls with several potential bidders to discuss their topping proposals and provide them the information needed to formulate competitive topping proposals. Hiltz Decl. ¶ 40. After receiving initial bids on June 18, 2025, the Special Master and his Advisors negotiated open issues and assisted the topping bidders in making their bids as competitive as possible. *Id.* Contrary to the assertion that the Special Master "capitulated" to bidders' demands, D.I. 1948 at 30*; see also id.* at 18, n. 19, the Special Master rejected unfavorable terms with multiple bidders and pushed Dalinar to increase what was already the highest bid, to provide an additional $433 million in consideration. *See* D.I. 1837 ¶ 80.

At the conclusion of the Topping Period, after having assessed the bids received and consultation with the Sale Process Parties, the Special Master sought further guidance from the Court during a June 25, 2025, *ex parte* meeting—an appropriate and reasonable time to do so, and an action he has often taken throughout the process. The Court affirmed his interpretations of the Court's prior orders and his inclination to recommend the conforming bid that offered the highest

price and that he believed had a reasonable likelihood of closing.

## C.  *The confidentiality arrangements were appropriate to the sale process*

The Venezuela Parties assert that the Special Master's confidentiality arrangements diverged from Section 324's requirement of a "public sale" (8 *Del. C.* §324(a)) and the Court's directive.  *See* D.I. 1948 at 21–22.  The Court never ordered the Special Master to publicly disclose all bids when they are filed; on the contrary, the confidential treatment of bids is something the Court itself approved and directed.  *See, e.g.* D.I. 1517 ¶ 23.  This is a Court-ordered judicial sale, designed and executed by the Special Master pursuant to the Court's measured mandates.  The cases cited by the Venezuela Parties from state courts outside Delaware and a Texas bankruptcy court are inapposite.  Delaware law nowhere requires that all bids immediately be made public.  It merely refers to a "public sale."  8 *Del. C.* §324(a).  A "public sale" is intended to mean the *asset* being sold is made known publicly, it does not require every detail of the process to be made available in real time.  *See Edgewater Growth Cap. Partners LP v. H.I.G. Cap., Inc.*, 68 A.3d 197, 212 n.72 (Del. Ch. 2013) ("[C]ourts have generally concluded that a sale is public when there is an opportunity to bid and presale advertising or an invitation to attend an auction is sent to interested bidders") (internal quotations omitted).

Without the arrangements made for confidentiality, bidders would have been reluctant to participate at all.  Indeed, potential bidders expressed hesitancy to submit bids that would be disclosed publicly in the event they were not selected as the winning bidder.  *See* Second Supplemental Hiltz Decl. ¶ 20.  Confidentiality arrangements are customary in an auction sale process.  *See id*.  The sale process provided enough information about competing bids to foster appropriate competition.  *I.e.,* the terms of all the stalking horse bids were in fact made publicly available on the Court's docket.  *See* D.I. 1597; *see also* D.I. 1603.

D. *The Special Master and the Court's representations did not suppress the sale price*

The Venezuela Parties assert that the Special Master "exaggerate[d] the risk of contingent liabilities" in a way that depressed the sale price attained for the PDVH Shares.  D.I. 1948 at 22–27.  They then assert, astonishingly, that the Court's own statements providing guidance to stakeholders and potential bidders also chilled bidding.  *Id.* at 27–28.  Neither assertion is true.

*First,* the Venezuela Parties argue that the Special Master overemphasized the risk of the PDVSA 2020 Bondholders and "led bidders in the [T]opping [P]eriod to focus on that issue."  *See* D.I. 1948 at 18–19.  On the contrary, the Special Master clearly stated *multiple* times that bidders need *not* eliminate the closing risks posed by the PDVSA 2020 Bondholders.  Repeatedly, he offered ways that bidders could structure their bids to avoid the issue entirely.[3]  Ultimately, bidders were sophisticated entities, with expert advisors, fully able to assess for themselves the risks posed by the PDVSA 2020 Bondholders and structure their bids or adjust their proposed purchase price accordingly.  How they did so was up to them.

*Second*, the Venezuela Parties contend the Special Master exaggerated the importance of the alter ego litigation and failed to mitigate its "chilling effects."  *See* D.I. 1948 at 25–27.  Here too, potential bidders were sophisticated entities that were fully able to, and did, assess the risks posed by the alter ego litigation themselves.  Ultimately, on May 20, 2025, the S.D.N.Y. Court issued an order resolving two of the three alter ego cases shortly before the end of the Topping

---

[3]    *See, e.g.*, D.I. 1660 at 3 ("The Red Tree Bid presents one way, but not the only way, to minimize those risks."); *see also* D.I. 1679 at 4 ("One option is for bidders to engage with the Ad Hoc Group of the PDVSA 2020 Bondholders. . . to attempt to settle the PDVSA 2020 Bondholders' claims. . . Bidders could also propose financing structures that do not present closing risks on account of the PDVSA 2020 Bondholders, or explain to the Special Master's satisfaction how their proposed transactions and accompanying financing will close regardless of the outcome of the litigation."); D.I. 1702 at 1 ("The Special Master suggested other ways bidders can address the closing risks associated with the PDVSA 2020 Bondholder litigation. . ."); Friedmann Ex. 1, Tr. 109:11–19, 125:19–126:17.

7

Period.  *See G&A Strategic Invs. I LLC v. Petroleos de Venezuela, S.A.*, No. 23-cv-10766-JSR, (S.D.N.Y. May 20, 2025), D.I. 245 (order granting summary judgment); *see also* D.I. 1757–1.  In response to that development, and at the request of multiple bidders, the Special Master supported the Venezuela Parties' request to extend the Topping Period by twenty-one days to allow bidders time to address the S.D.N.Y. court's decision and recalibrate their bids accordingly, which the Court granted.  *See* D.I. 1770; 1779.

 *Third*, the Venezuela Parties contend the Court somehow suppressed bidding by giving its inclination that the outcome of the sale process will reflect fair market value, D.I. 1554 at 4, and by expressing support for the Special Master's position that PDVH losing the alter ego cases would not constitute a "material adverse effect", D.I. 1554 at 21.  These arguments are based solely on the Venezuela Parties' speculation rather than credible factual support.  To the contrary, that guidance produced a fair and transparent process.

E. The Special Master and his Advisors were unbiased and appropriately incentivized

 The Venezuela Parties also make baseless attacks on the motivations of the Special Master and his Advisors.  *First*, the Venezuela Parties repeat their unfounded allegations that the Special Master was biased against them by, for example, advocating "to OFAC in favor of granting a license"—arguments the Court has already rejected.  *See* D.I. 1948 at 32; *see also* D.I. 509; D.I. 544; D.I. 1138; D.I. 1180.  The Special Master acted appropriately towards the Venezuela Parties, regularly consulting with them, seeking their input at every stage in the process, and working with them in good faith in an effort to maximize the value obtained for the PDVH Shares.

 *Second*, the Venezuela Parties take issue with Evercore's contingency fee—again attempting to relitigate an issue fully briefed and decided by the Court.  D.I. 1948 at 28.  The Court already determined—over three years ago—that Evercore's contingency fee does not create a conflict of interest.  *See* D.I. 443 at 2–12.  Because Evercore receives a fee calculated as a percentage of the

purchase price, Evercore is incentivized to secure a bid that provides the greatest consideration to holders of Attached Judgments. *See* Second Supplemental Hiltz Decl. ¶ 7. Further, this fee structure is customary for investment banking professionals. *Id.*; *see also Howard v. High River Ltd. P'ship*, 369 B.R. 111, 115 (S.D.N.Y. 2007) *aff'd In re XO Commc'ns, Inc.*, 308 Fed. Appx. 459 (2d Cir. 2008). As the Court has already concluded, "[t]he terms of the proposed Engagement Letter between the Special Master and Evercore . . . are (a) fair, (b) reasonable, and (c) appropriate and are hereby approved in all respects." D.I. 481 ¶ K; *see also* D.I. 443 at 2–12.

F. *The Court should give no weight to the Venezuela Parties' witness Randall Weisenburger*

The Venezuela Parties channel their threadbare criticisms of the sale process through the declaration of Randall Weisenburger. Although the Venezuela Parties tout Mr. Weisenburger's "decades of experience in corporate finance," D.I. 1951-2 ¶ 4, Mr. Weisenburger admitted during his deposition that he has no direct experience or expertise relevant here. Mr. Weisenburger has never served as an expert in a judicial proceeding, Friedmann Ex. 2, Tr. 40:9–13, has never been hired to evaluate a judicial sale process, *id.* 40:15–19, has never conducted research, *id.* 43:19–21, has never participated in any capacity in a judicial sale, *id.* 43:25, 44:1–2, has never sold a company in the refining or commodity industry, *id.* 67:18–25, 68:1, and has never participated in a bankruptcy sale, *id.* 44:15–16, 45:1–17.

And yet, Mr. Weisenburger's "experience" is the sole basis for his opinions. For example, Mr. Weisenburger claims that the Special Master did not seriously consider other options to sell or monetize the PDVH Shares, D.I. 1951-2 ¶¶ 9–20, failed to attract strategic bidders to the process, *id.* ¶¶ 18, 21, failed to mitigate regulatory uncertainty, *id.* ¶¶ 21, 52, required bidders to divert funds to the 2020 Bondholders, *id.* ¶¶ 22, 40, 60, undermined the sale process in selecting a Stalking Horse, *id.* ¶¶ 54–69, and capitulated to threats from bidders *id.* ¶¶ 5, 21, 70. But the only support for Mr. Weisenburger's claims is his "personal opinion" and "personal beliefs." *id.* ¶¶

9

35:5–9; 38:12-39:4.  Mr. Weisenburger admitted that he did not speak with bidders, Friedmann Ex. 2, Tr. 116:19–25, 117:1–7, 120: 14–24, did not perform a valuation, *id.* at 34:4–12, 48:17–25, 49:1–11, 77:10–19, 90:18–25, 91:2, 92:24, 94:16–24, and has no methodology apart from the assumptions he has garnered through his "decades of experience in corporate finance," *id.* 35:10–25, 38:12–39:5, 68:17–23, 69:9–70:2.

This is now the *sixth* declaration Mr. Weisenburger has submitted on behalf of the Venezuela Parties in these proceedings, the contents of which are largely indistinguishable from his previous five.  *Id.* at 21:18–25.  The Court has previously expressed doubts about Mr. Weisenburger's credibility as the "expert for a long-time recalcitrant judgment debtor," noting that the Special Master's input "comes with greater credibility." *Crystallex Int'l Corp. v. Bolivarian Republic of Venez.*, Misc. No. 17-151-LPS, 2023 WL 4561155, at *3 (D. Del. July 17, 2023).  The same is true today.  Mr. Weisenburger's declaration and testimony offer nothing more than personal opinions about a sale process that was approved by this Court long ago.

## III.    The Sale Process Achieved a Fair Price for the PDVH Shares

### A.    *The price achieved for the PDVH Shares is the best evidence of its fair market value*

Dalinar's Proposed Sale Transaction is fair, reasonable, and reflective of the fair market value of the PDVH Shares.  As this Court has already explained, the Court "has endeavored for years to formulate and implement a process that will result in a Successful Bid that is value-maximizing and also reflective of the fair market value of the PDVH Shares, giving due consideration to the many challenges confronting such a process and the impact of those challenges on the value of PDVH." D.I. 1554 at 4.  And "the Court anticipate[d] [t]he price that results from the Marketing Process will be the best evidence that exists of the fair market value of the PDVH Shares taking into account the benefits and risks associated with this unique asset." *See id.*

10

The Venezuela Parties assert that, categorically, "forced sales do not approximate fair market value." *See* D.I. 1948 at 10. But this sale process could not be further from a typical sheriff's sale of foreclosed property. The multi-year sale process has involved sophisticated features, including a Stalking Horse Round and a Topping Period, and a competitive and expansive open-market process aimed to maximize the sale price attained for the PDVH Shares. *See* Section II; Hiltz Decl. ¶¶ 19–53; Second Supplemental Hiltz Decl. ¶¶ 25–26. The Special Master knows of no other judicial sale (ever) that has received the same amount of widespread publicity and extensive marketing as the sale of the PDVH Shares. Beyond the notices placed by the Special Master himself, news of this sale was widespread in major newspapers for the last several years.[4]

As the Venezuela Parties point out, the Delaware Supreme Court defines the fair market value of corporate stock as "the price which would be agreed upon by *a willing seller* and a willing buyer . . . *without any compulsion upon the seller to sell* or upon the buyer to buy." D.I. 1948 at 10 (citation omitted). While the Venezuela Parties may not be a "willing seller," the Special Master and the Court have effectively stepped into this role. The Court granted the Special Master discretion to reject "inadequate or insufficient" bids as well as bids that do not "provid[e] for a value maximizing sale transaction." D.I. 481 ¶ 9. The Special Master was also authorized to "adjourn the Auction and/or Sale Hearing" should the above circumstances occur. *Id.* As the Special Master previously explained, the Special Master "has no obligation to accept the highest bid (or any bid), and does not intend to recommend any bid if he believes the price is too low or a superior

---

[4]  *See e.g.*, Andrew Scurria, *U.S. Backs Sale of Citgo to Pay Venezuela's Debts*, Wall St. J. Pro Bankr. (May 1, 2023), https://www.wsj.com/articles/u-s-backs-sale-of-citgo-to-pay-venezuelas-debts-1c56228a; *see also* Nicolle Yapur, *Citgo Auction Adviser Recommends Gold Reserve Bid*, Bloomberg (July 1, 2025), https://www.bloomberg.com/news/articles/2025-07-01/citgo-auction-adviser-is-said-to-recommend-gold-reserve-bid.

bid would be forthcoming." *See* D.I. 1554 at 4–5 (quoting D.I. 1530 at 2); *see also* Second Supplemental Hiltz Decl. ¶ 29. Unlike a typical foreclosure sale, the entire sale process has been carefully overseen by the Court. And unlike property sold within the "strictures of the foreclosure process," the conditions of this sale closely replicate the "price as would be fixed by negotiation and mutual agreement, after ample time to find a purchaser, as between a vendor who is willing (but not compelled) to sell and a purchaser who desires to buy but is not compelled to take the particular . . . piece of property." *See BFP v. Resol. Tr. Corp.*, 511 U.S. 531, 537-38 (1994) (quoting Market Value, Black's Law Dictionary 971 (6th ed. 1990)); *see also DFC Glob. Corp. v. Muirfield Value Partners, L.P.*, 172 A.3d 346, 349 (Del. 2017) ("[E]conomic principles suggest that the *best evidence of fair value was the deal price*, as it resulted from an open process, informed by robust public information, and easy access to deeper, non-public information, in which many parties with an incentive to make a profit had a chance to bid.") (emphasis added).

The Venezuela Parties assert that the Special Master is not fulfilling the role of a "willing seller" because he has no economic stake in the PDVH Shares and instead has been charged to sell the shares for the benefit of holders of Attached Judgments—who are "clamoring to be paid as soon as possible." D.I. 1948 at 10–11. It is true (and self-evident) that the Special Master has no economic stake in the PDVH Shares—the Special Master is an arm of the Court with a mandate to run a sale process aimed at securing a value-maximizing sale of the PDVH Shares in compliance with all governing law. But the Special Master ultimately answers to the Court. He does not work for any judgment creditor, and the sale process he designed is for the benefit of PDVSA and the Republic just as much as it is for the judgment creditors. His lack of economic stake in the outcome does not interfere with his ability to fulfill his mandate and does not change the fact that he would not have recommended any bid if he believed the price was too low or a superior bid would be

forthcoming, as he had the right to do.  D.I. 481 ¶ 9.  The Venezuela Parties' other arguments amount to an attack on the sale process designed by the Court, as well as the Special Master's judgment and integrity—issues that have already been extensively litigated and are equally merit-less.  *See infra* Section II.

A close read of the cases cited by the Venezuela Parties make obvious the difference be-tween this sale process—a lengthy and complex judicial sale overseen by the Court—and a typical forced execution sale under Delaware law.  Virtually all of the cases relied upon by the Venezuela Parties involve a *sheriff's sale at an auction*, the typical way in which sales satisfy unpaid judg-ments occur in Delaware.[5]  This sale process is a judicial sale overseen by a federal district court, and run by a special master with decades of experience in large company mergers and acquisitions, with the aid of advisors with similar expertise.  It hardly resembles a single-day execution sale on the courthouse steps that is typically contemplated by Delaware law.  *See* 10 Del. C. §§ 4771-4987; *Crystallex Int'l Corp. v. Bolivarian Republic of Venez.*, 24 F.4th 242, 255 (3d Cir. 2022) ("The District Court is proceeding through a judicial sale, not an execution sale . . . .").

B. *The purchase price for the PDVH Shares exceeds 50% of their fair market value*

The Venezuela Parties make the remarkable assertion that "the fair market value of the shares is $18.6 billion" and thus "[t]he Dalinar Bid price is less than 50% of PDVH's fair market value."  D.I. 1948 at 7 (emphasis omitted).  PDVH has also previously asserted an even higher valuation of $32 billion to $40 billion in 2023.  *See* PDVH Opening Brief at 14, *Petróleos de*

---

[5]  *See, e.g.*, *Burge v. Fid. Bond & Mortg. Co.*, 648 A.2d 414 (Del. 1994) (sheriff's sale at an auction for a foreclosed piece of real property); *Girard Tr. Bank v. Castle Apartments, Inc.*, 379 A.2d 1144, 1146 (Del. Super. Ct. 1977) (same); *Cent. Nat'l Bank of Wilmington v. Indus. Tr. Co.*, 51 A.2d 854, 858 (Del. Super. Ct. 1947) (same); *Home Beneficial Life Ins. Co. v. Blue Rock Shopping Ctr., Inc.*, 379 A.2d 1147 (Del. Super. Ct. 1977) (same); *Sec. Tr. & Safe Deposit Co. v. Gallagher*, 84 A. 806, 806 (Del. Super. Ct. 1911) (same); *Oldham v. Hossenger*, 10 Del. 434, 434 (Del. Super. Ct. 1878) (same).

*Venezuela, S.A. v. PDV Holding, Inc*., 306 A.3d 572 (Del. Ch. 2023). The theme here is clear, the Venezuela Parties will endeavor to put extraordinary valuations before the Court. But the Venezuela Parties have been unable to identify any bidder willing to pay anything close to the amount of their valuations. In fact, earlier this year, the Venezuela Parties supplied the Special Master with names of potential bidders they believed might be interested in purchasing the PDVH Shares. Hiltz Decl. ¶ 25. But not one of those potential bidders even signed an NDA.

The Venezuela Parties' assertion that the PDVH Shares are worth $18.6 billion is based on a discount cash flow ("**DCF**") analysis from their witness, Dr. José Alberro, PhD. But Dr. Alberro's report contains numerous flaws, and the assumptions he used to reach an $18.6 billion valuation materially diverge from CITGO's own projections and historical financial performance. Further, Dr. Alberro's analysis ignores important factors that substantially impact the prices that buyers are willing to pay in a competitive transaction. Notably, Dr. Alberro's DCF analysis fails to account for contingent liabilities such as the 2020 Bondholders' claim that they have a lien on 50.1% of the CITGO Holding shares, even though it was clearly important to bidders' assessments of value. *See* Alberro Report ¶ 214. In similar scenarios, courts have cast considerable doubt on the accuracy of simplistic valuations that fail to account for contingent liabilities and other important factors bearing on the value of assets. *See In re Trans World Airlines, Inc.*, 134 F.3d 188, 197 (3d Cir. 1998) ("[I]t is proper to consider contingent liabilities when evaluating the insolvency of a corporation."); *Metlyn Realty Corp. v. Esmark, Inc.*, 763 F.2d 826, 835–36 (7th Cir.1985) (noting that "[DCF] valuations are highly sensitive to assumptions about the firm's costs and rate of growth," and that DCF may not be "the best way" to value a business).

Rather than relying on CITGO management's EBITDA projections, carefully tailored to their own business, Dr. Alberro prepared his own EBITDA projections for 2026 through 2030.

14

Alberro Report at 62; First Supplemental Hiltz Decl. ¶ 10.  For this period, Dr. Alberro's projections were ███████████████████████████████████████████████████████ ███████████████████████████████████████████████████████ ██████████████████████████████.  *See* First Supplemental Hiltz Decl. ¶ 10; Second Supplemental Hiltz Decl. ¶¶ 15, 19.  Using CITGO's own projections and for simplicity keeping all other calculations and assumptions in Dr. Alberro's analysis the same, Dr. Alberro's valuation drops by nearly 30% from $18.6 billion to $13.6 billion.  *See* First Supplemental Hiltz Decl. ¶ 13.

Similarly, the weighted average cost of capital ("**WACC**") discount rate and perpetuity growth rate used in Dr. Alberro's DCF analysis rely on assumptions that make little sense. *See* First Supplemental Hiltz Decl. ¶¶ 14–24.  As Mr. Hiltz explains, a WACC between 10.08% to 10.84% and a 1.00% perpetuity growth rate are more appropriate.  *Id.*  Using ██████████ ██████████████████████, a 10.46% WACC, and a 1.00% perpetuity growth rate, while keeping all other assumptions the same, the PDVH enterprise value in Dr. Alberro's DCF analysis decreases by approximately 50% from $18.6 billion to $9.4 billion.  *See* First Supplemental Hiltz Decl. ¶ 24.

If the PDVH Shares' fair market value was truly $18.6 billion, offers to purchase the PDVH Shares should have been within the ballpark of that number.  Yet at no point in the process did the Special Master receive a bid, or even an indication of interest, anywhere close to $18.6 billion.  As the Third Circuit has acknowledged, "the market price 'is a more reliable measure of the stock's value than the subjective estimates of one or two expert witnesses.'"  *VFB LLC v. Campbell Soup Co.*, 482 F.3d 624, 633 (3d Cir. 2007) (citation omitted); *see also Barton v. Borit*, 316 F.2d 550, 552 (3d Cir. 1963) ("[T]he best evidence of fair market value is the price at which comparable

property changes hands at about the time of loss in arm's length transactions between willing buyers and willing sellers."); *Dell, Inc. v. Magnetar Glob. Event Driven Master Fund Ltd.*, 177 A.3d 1, 35-37 (Del. 2017) (finding that far more weight should have been placed on the deal price than the petitioner's expert's DCF analysis and cautioning against attempts to "outguess . . . interested economic players with an actual stake in a company's future" and rely on "widely divergent partisan expert testimony").

The Venezuela Parties also point to Evercore's 2023 preliminary draft valuation of the PDVH shares, which suggested an "'Implied EV [enterprise value] Range' of '$10.0 billion to $13.0 billion.'" *See* D.I. 1948 at 11. But Evercore prepared this preliminary draft valuation nearly two years ago, before the sale process had even commenced. Second Supplemental Hiltz Decl. ¶¶ 13–16. The analysis was a rough, draft valuation, based on extremely limited information, done without any adjustments (including for contingent liabilities) or sensitivities. *Id.* ¶ 13. ███████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████. *Id.* ¶ 15. While CITGO performed better than anticipated in 2023 and achieved adjusted EBITDA of approximately $3.3 billion that year, CITGO's adjusted EBITDA dropped to approximately $1.2 billion in 2024 ████████████████████████████. *Id.*; First Suppl. Hiltz Decl. ¶ 12. Moreover, the $7.382 billion Dalinar sale price is over 50% of even the *high end* of Evercore's 2023 preliminary draft valuation's implied enterprise value range—approximately 56.8% of $13 billion.

C.  *The price achieved for the PDVH Shares does not shock the conscience*

Although a judicial sale "may be set aside . . . when the sales price is so grossly inadequate that it shocks the conscience of the court," "it is a well-established rule in Delaware that mere inadequacy of price, standing alone, is an insufficient ground for setting aside a judicial sale."

*Burge*, 648 A.2d at 419.  Therefore, Delaware courts apply "special judicial scrutiny" if property is sold for less than 50% of its fair market value at a judicial sale.  *Id.*; *see also Girard Tr.*, 379 A.2d at 1145–46.  But "this standard is not absolute and does not contemplate that the Court will inflexibly apply this standard in every instance."  *Girard Tr.*, 379 A.2d at 1146; *see also Home Beneficial Life*, 379 A.2d at 1149–50 (sales "remove[d] from the category of ordinary real estate transactions" "may lead to a departure from the traditional 50% test").

Rather, this standard typically only applies where there "has been evidence either (1) that a higher bid was likely to be made at a subsequent sale or (2) that there was lack of knowledge of the sale or confusion at the sale."  *Girard Tr.*, 379 A.2d at 1146; *see also Burge*, 648 A.2d at 419 (setting aside sale due to an "avoidable, unilateral mistake by the mortgagee's agent").  None of these factors are applicable here.  In fact, the Venezuela Parties' own witness, Mr. Weisenburger, testified that he was merely "speculating based on [his] own personal opinion" that re-running the sale process would result in higher bids, and he acknowledged that it was "possible" that "bid prices might be even lower."  Friedmann Ex. 2, Tr. 158:16–19, 159:12–16.  Mr. Weisenburger also admitted that the PDVH Shares were "extensively marketed," "[i]t was a big public sale," and he suspected "most people knew that it was for sale."  *Id.* at 77:21–78:11.

The Venezuela Parties nonetheless assert that the sale price is unconscionable regardless of whether it is less than 50% of fair market value, implying that the fact that the overall value of the PDVH Shares is supposedly greater than a typical asset sold at judicial auction should some-how subject this sale to a higher standard for approval.  D.I. 1948 at 8–9.  Delaware law does not support this conclusion.  It is true that whether the price was less than 50% of fair market value is not "the sole touchstone of acceptability"; courts also assesses whether there was "some defect or irregularity in the process or mode of conducting the sale, or . . . neglect of duty, or misconduct on

the part of the Sheriff *or some other sufficient matter . . .* whereby the rights of parties to, or interested in the sale are, or may have been, prejudiced." *Burge*, 648 A.2d at 419. But courts in Delaware have not indicated that higher-value property must garner a sale price that is proportionately closer to fair market value than a property with lesser value in order for the sale to be approved. If anything, courts in Delaware have held the opposite. For instance, in *Home Beneficial Life*, cited by the Venezuela Parties, a Delaware court determined that "the nature and size of the building and the magnitude of its value may be such as to remove it from the category of ordinary real estate transactions because the customary buyers at auction sales would not be in a position to buy this property." *Home Beneficial Life,* 379 A.2d at 1149. The court then confirmed the sale, concluding that it did "not appear that anyone other than the mortgagee was prepared to bid on the property nor has it been shown that a higher bidder is likely to bid at a new auction sale." *Id.* at 1149–50; *accord Girard Tr.*, 379 A.2d at 1145–47 (noting that there may be unique considerations that may render the 50% test "unrealistic" such as "property whose price is great or usefulness is limited" and finding that a sale price of 6% of fair market value was not "unconscionable").

The Venezuela Parties point out that this sale is "unprecedented in Delaware history." D.I. 1948 at 8. This is undoubtedly true. But the fact that a sale is unprecedented does not render it shocking to the conscience. Despite the unique characteristics of the asset being sold, the PDVH Shares are not being sold at a "fire sale price," but at the best price the Special Master obtained in the open market after an extensive, multi-step, years-long sale process, involving extensive publicizing, outreach, diligence, and arms-length negotiation—all oriented towards obtaining the highest value attainable for the PDVH Shares. There has been no defect, irregularity, or misconduct in the sale process, nor is there any evidence to support that additional bidders would come forward or that a higher sale price is likely at a subsequent sale. *See supra* Section II. Ultimately, the sale

18

price of $7.382 billion is a fair, reasonable price, and reflective of the PDVH Shares' fair market value.

## IV.    The Republic and PDVSA Are Subject to This Court's Jurisdiction and Validity of Writs of Attachment

The Venezuela Parties attempt to renew their objection that the sale is purportedly premised on attachments that exceed the Court's authority under Delaware law and the Foreign Sovereign Immunities Act ("**FSIA**").  D.I. 1948 at 30–32.  But the Third Circuit has already held that both the Republic and PDVSA are subject to this Court's jurisdiction, notwithstanding the FSIA, and that "[t]he District Court acted within its jurisdiction when it issued a writ of attachment on PDVSA's shares of PDVH to satisfy Crystallex's judgment against Venezuela."  *See Crystallex Int'l Corp. v. Bolivarian Republic of Venez.*, 932 F.3d 126, 152 (3d Cir. 2019).  Moreover, the Venezuela Parties' subsequent motion to quash the writ of attachment was denied.  *Crystallex Int'l Corp. v. Bolivarian Republic of Venezuela*, No. CV 17-MC-151-LPS, 2021 WL 129803, at *8–11.  In particular, the Court found the Venezuela Parties' argument that the Court incorrectly applied federal common law instead of state law in its alter ego decision to be collaterally estopped, untimely, and previously resolved by the Third Circuit.[6]  *Id.*; *OI Eur. Grp. B.V. v. Bolivarian Republic of Venezuela*, 663 F. Supp. 3d 406, 441 (D. Del. 2023), *aff'd*, 73 F.4th 157 (3d Cir. 2023).

Similarly, the Venezuela Parties' argument that "PDVSA is immune from the Court's jurisdiction with respect to attachments held by creditors of the Republic on an alter ego theory under the FSIA has been addressed."  D.I. 1948 at 31.  The Third Circuit affirmed this Court's finding that PDVSA is not immune from suit, explaining that "so long as PDVSA is Venezuela's alter ego under *Bancec*, the District Court had the power to issue a writ of attachment on that entity's non-

---

[6]    The Court also noted that it already "considered 'cases applying state-law alter ego standards' but found them 'unpersuasive and unhelpful.'"  *See Crystallex*, 2021 WL 129803, at *9 n.7

immune assets to satisfy the judgment against the country." *Crystallex*, 932 F.3d at 139.

Further, the Special Master was appointed to run a sale for the benefit of Crystallex, ConocoPhillips, and the Additional Judgment Creditors, and he has worked tirelessly and diligently to do so. *See* D.I. 277. The Court has confirmed the attachments of Crystallex, ConocoPhillips, and the Additional Judgment Creditors and the quantum thereof. *See* D.I. 1136 (adopting the Special Master's final determination of the Attached Judgments at D.I. 969-1). The procedures by which creditors of the Republic and PDVSA became Additional Judgment Creditors under the Sale Procedures Order were heavily briefed before this Court and resulted in the Court's *Memorandum Order* dated July 27, 2023 (D.I. 646) wherein the Court outlined the seven-step process by which a creditor can participate in this sale. *See* D.I. 646 at 3–8. On August 7, 2023, the Special Master instructed creditors that sought to participate in this process to submit statements "outlining the amount of applicable judgments" and to include certain supporting documentation. *See* D.I. 652 at 1–2; *see also* D.I. 654 (the Court's order adopting such procedures). The Special Master with the assistance of his Advisors reviewed the statements submitted and "confirmed (i) the principal amount of each Attached Judgment, (ii) the pre-judgment interest (if any) awarded by the underlying court for each of the Attached Judgments, and (iii) the appropriate rate of post-judgment interest to be applied to each of the Attached Judgments." D.I. 969 ¶ 4. The process for determining the value of Attached Judgments was thorough and appropriate.

## V.    Risks Regarding PDVSA 2020 Bondholders

The objecting parties express concern over the execution risk posed by the PDVSA 2020 Bondholders. *See* D.I. 1854 ¶¶ 3, 8, 10–11, 15–16; *see also* D.I. 1942 at 1–8, D.I. 1949 at 3–12. The Special Master, guided by the Court's instructions, considered this risk in reaching his Final Recommendation and ultimately concluded that the risk did not outweigh the significant difference in purchase price between the Dalinar Topping Bid and the Revised Stalking Horse Bid, or warrant

rejecting all bids and pausing the sale process. *See* D.I. 1837 ¶ 82(b). In approving the Special Master's recommendation of Red Tree as Stalking Horse, the Court emphasized that it "expect[ed] any bid it is likely to approve at the conclusion of the sale process will need a balance that places much greater emphasis on price and lesser emphasis on certainty." D.I. 1741 at 3. The Special Master echoed this message to the bidders. *See e.g.*, Friedmann Ex. 3 (Special Master encouraging Red Tree to increase the price of its bid during the Topping Period).

At the conclusion of the Topping Period, the Special Master was presented with two conforming bids: Dalinar's bid and the Revised Stalking Horse Bid. *See* D.I. 1837 ¶ 63. The Dalinar bid provided a headline price of $7.382 billion, an increase of $433 million from its stalking horse bid.[7] In comparison, the Revised Stalking Horse Bid provided a headline price of $3.806 billion, which did not at all improve on Red Tree's Stalking Horse Bid price despite the Court's direction that it would need to do so. Notably, the Special Master determined that both bids carried risks to closing. As set forth in the Final Recommendation, the Special Master acknowledges that Dalinar's bid contains a degree of risk with respect to the PDVSA 2020 Bondholders D.I. 1837 ¶¶ 82(b). But the Revised Stalking Horse Bid was also highly likely to garner a number of substantive objections stemming from the materially lower bid price, and Red Tree failed to address the Court's questioning whether the Court or an appellate court could "reject a Final Bid that (a) places, expressly or implicitly, substantial value on settlement of the 2020 Bondholders' litigation, but then (b) subsequent events . . . reveal it would be a fundamental injustice to close on such a Final Bid, when bids with a much greater purchase price were rejected."

---

[7]    $433 million is not an insignificant amount and provides a recovery to a further judgment creditor, Siemens. While the Venezuela Parties state this only consists of "of Gold Reserve credit bidding the rest of its judgment and providing non-cash consideration to [] Siemens," creditors are entitled to credit bid and to accept non-cash consideration in satisfaction of their claims. *See* D.I. 1948 at 4; *see also* D.I. 481at 23, ¶ 26, D.I. 1517 ¶ 27.

*See* D.I. 1741 at 7–8.

Accordingly, the Special Master concluded that the Dalinar bid was the superior, value maximizing bid. In particular, the Special Master determined that the combination of the likelihood of the PDVSA 2020 Bondholder risk and the consequences of it coming to fruition did not outweigh the expansive gap in purchase price between the Dalinar bid and the Revised Stalking Horse Bid. D.I. 1837 ¶ 82(b).

Crystallex, Red Tree, and ConocoPhillips argue that the SPA should be amended to provide for its termination in the event that the PDVSA 2020 Bondholders prevail on the merits of their claims in the S.D.N.Y. litigation[8], obtain an injunction that impacts the closing of the Proposed Sale Transaction, or otherwise interfere with the Proposed Sale Transaction, and Dalinar fails to cure by removing such impediment to closing within 30 days. *See* D.I. 1847 at 3–4, D.I. 1949 at 13–14, D.I. 1942 at 10, D.I. 1945 at 1. But such a quick termination trigger could prematurely destroy a value maximizing $7.382 billion bid. The mere issuance of an injunction by the S.D.N.Y. in the PDVSA 2020 Bondholders' litigation does not mean the PDVSA 2020 Bondholders will ultimately prevail on the merits and be in a position to permanently block the Dalinar transaction. Similarly, a district court ruling in favor of the PDVSA 2020 Bondholders without an accompanying injunction may not prevent the Dalinar transaction from moving forward. Accordingly, the occurrence of one of the above-described scenarios in isolation does not, in the Special Master's view, warrant automatic termination of the SPA.

Instead, the existing termination rights that the Special Master secured in the SPA are adequate to address concerns over PDVSA 2020 Bondholder interference with the sale process. *See* SPA §§ 8.1(c), 8.1(f), 6.9(e); D.I. 1837-1, Ex. B, at 55, 68. These termination rights can be

---

[8]    *Petróleos de Venezuela, S.A. et al. v. MUFG Union Bank, N.A. et al.*, No. 1:19-cv-10023.

invoked in circumstances where Dalinar's existing financing arrangements become infeasible, or the consummation of the transaction is prohibited by law, for example, as a result of action taken by the PDVSA 2020 Bondholders, and Dalinar fails to obtain replacement financing in the prescribed period of time. The Special Master disagrees with Crystallex's contention that there is a "substantial risk of protracted litigation" over whether this existing termination right is triggered. *See* D.I. 1949 at 13. However, to be clear, the Special Master is not opposed to a ruling from the Court that clarifies the Special Master's understanding of his termination rights under the SPA.

Lastly, Red Tree argues that Dalinar should be required to provide a higher and non-refundable cash deposit of $225 million. *See* D.I. 1942 at 9–10. Dalinar complied with the Court ordered requirement of a $50 million deposit, which was itself the subject of litigation. *See* D.I. 1554 at 15, D.I. 1560 at 2–3, D.I. 1571 ¶¶ 2–3

## VI.    Regulatory Risks

Crystallex, Red Tree, and the Venezuela Parties each raise various arguments regarding the impact of regulatory approval, particularly OFAC and the FTC, on this sale process. What these arguments have in common is they require assumptions on the theoretical behavior of regulators, which cannot be accurately predicted.

*First*, the Venezuela Parties argue that the Special Master erred by not obtaining pre-clearance for certain strategic bidders. *See* D.I. 1948 at 12, n.15. The Special Master has appropriately sought input from OFAC at various points as directed by the Court. In the Special Master's experience interacting with OFAC throughout the sale process, OFAC has been clear that it does not provide detailed or binding guidance on hypothetical sale scenarios about potential bidders.

*Second*, Red Tree argues that OFAC's current suspension of General License 5 ("**GL-5**") does not prevent the PDVSA 2020 Bondholders from seeking or obtaining an injunction to stop

the sale.  *See* D.I. 1942 at 5–7.  On the other hand, Crystallex argues that the PDVSA 2020 Bond-holders cannot currently exercise their purported rights under the pledge agreement due to OFAC sanctions until the suspension of GL-5 expires but also assert that it is not reasonable to believe OFAC will extend the suspension of GL-5 indefinitely.  *See* D.I. 1949 at 6.  The Special Master does not attempt to guess how OFAC may or may not respond if the 2020 Bondholders seek an injunction of the recommended sale or whether OFAC will extend the suspension of GL-5.[9]

*Third*, Crystallex argues Dalinar's bid fails to adequately plan for regulatory risks, particularly Koch's ownership interest in Dalinar.  *See* D.I. 1949 at 2, 16–17.  But Crystallex merely asserts Dalinar's "commitments *may* be insufficient to secure regulatory approval" and "regulators *could*" take issue with Koch's ability to appoint directors' to Dalinar's board.  *See* D.I. 1949 at 17 (emphasis added).  It is premature to address each and every hypothetical issue that regulators might raise.  The Special Master identified and acknowledged these potential regulatory risks and secured greater protections through the regulatory efforts side letter. D.I. 1837-1, Ex. H.  While regulatory risks associated with Dalinar's bid have not been entirely eliminated, the Special Master believes these protections meaningfully decrease the regulatory risks.

## VII.    The Proposed Sale Order Is Consistent with the Special Master's Mandate to Sell the PDVH Shares "Free and Clear" of Claims, Encumbrances, and Liabilities

Red Tree, the 2020 Bondholders, and Crystallex object that the release and injunction provisions in the proposed Sale Order exceed the Court's authority under Section 324.  *See* D.I. 1942 at 2, 11–15; D.I. 1943 at 1–2, 6–9, 11–22; D.I. 1949 at 2–3, 18–21.  But narrowing or eliminating the buyer protections in the proposed Sale Order would substantially undermine the Court's ability to effectuate a value maximizing sale "in the enormously complex circumstances in which this

---

[9]    The Special Master previously reached out to OFAC for guidance on whether OFAC intends to suspend the GL-5 license, but OFAC declined to provide that guidance.  *See* D.I. 1821 at 1.

proceeding is occurring." *See* D.I. 1729.  Red Tree's objection is particularly puzzling given that

█████████████████████████████████████████████████████████████████████████████

████████████████████████████████.  *See* Friedmann Ex. 4.

The Sale Procedures Order provides that the Special Master has the authority to recommend a bid "that provides for a transfer of PDVH Shares *free and clear of any claims, encumbrances, and liabilities*."  *See* D.I. 481 ¶ 14 (emphasis added).  And a sale of the PDVH Shares free and clear of claims, encumbrances, and liabilities is consistent with Delaware law.  "It has long been settled by case law in this State that a creditor may levy against a secured property" and that "the title acquired by the purchaser at the sale is free and clear of all liens theretofore existing." *See Md. Nat'l Bank v. Porter-Way Harvester Mfg. Co.*, 300 A.2d 8, 11 (Del. 1972).  It is fundamental to the premise of "free and clear" that the buyer of such protected property need not look over its shoulder for fear of other interested parties seeking a new source of recovery.

The buyer protections in the proposed Sale Order are necessary to ensure a buyer is willing to purchase the PDVH Shares.  Without those protections, the market for the PDVH Shares would be significantly depressed or even non-existent.  *See id.* at 12 ("[C]hattels sold at an execution sale should be sold free and clear of all encumbrances in order to ensure the highest price and to stimulate bidding.").  Throughout the sale process, potential bidders expressed clear expectations that the PDVH Shares would be sold free and clear of all liens, claims, and encumbrances and that the buyer would receive releases and other protections from litigation arising out of the sale process and the liabilities of the Republic and PDVSA.  *See* Second Supplemental Hiltz Decl. ¶ 21.  In fact, a representative of Red Tree who was involved in the bid process, Xiao Song, admitted that a "free and clear" sale of the PDVH Shares was a condition of Red Tree's bid during the sale process.  Friedmann Ex. 5, Tr. 201:5–9 ("[A]nytime you bid on an asset [such as] . . . the shares

of an entity, . . . you want to know that you're acquiring something free and clear of liens."). Dalinar has likewise indicated that it would not have invested resources bidding on the PDVH Shares if not for the buyer protections in the proposed Sale Order.  *See* D.I. 1991-1 ¶ 8.

Crystallex asserts that the Sale Order need only say that the PDVH Shares are sold "'free and clear of any and all claims, encumbrances, and liabilities *attached to the PDVH Shares them-selves*'"—without any additional specificity.  *See* D.I. 1949 at 18–19 (citing D.I. 1515 at 17–18) (emphasis in original).  But failing to specify the contours of the buyer protections would create significant ambiguity and risk considerable litigation concerning the sale of PDVH Shares.  Bid-ders would be unwilling to purchase the PDVH Shares if they were required to assume that level of litigation risk.  For example, the proposed Sale Order prevents parties from bringing claims against the PDVH Shares, Dalinar, or its affiliates, arising out of the sale of the PDVH Shares or on account of "judgments or other Claims against the Republic, PDVSA, or their respective Affil-iates."  *See* D.I. 1837-1 ¶ K.  No bidder would agree to purchase the PDVH Shares if doing so would expose the bidder to potential lawsuits for purchasing the PDVH Shares as part of this Court-approved sale process, or if it would expose the bidder to lawsuits or liability for billions of dollars of claims against and unpaid judgments owed by the Republic and PDVSA.  *See* Second Supplemental Hiltz Decl. ¶ 21.  That potential liability would far outweigh the benefits of acquiring the PDVH Shares.

The 2020 Bondholders spill considerable ink arguing that the proposed Sale Order contains release and injunction provisions that would only be permissible in the context of a sale under Section 363 of the Bankruptcy Code and not in a judicial sale under Section 324.  *See* D.I. 1943 at 14–15.  But Delaware case law recognizes the importance and necessity of releases in judicial sales involving complex litigation, where no bidder would be willing to participate absent a broad

release.  In *TransPerfect*, the Delaware Court of Chancery approved a judicial sale that included a release of claims, which the court found necessary in light of the "extensive amount of litigation surrounding the sale process[.]"  *In re TransPerfect Glob., Inc.*, No. CV 10449-CB, 2018 WL 904160, at *26 (Del. Ch. Feb. 15, 2018), *aff'd sub nom. Elting v. Shawe*, 185 A.3d 694 (Del. 2018). There, as here, Mr. Pincus was appointed by the court to oversee the sale process.  *Id.*  And there, as here, Mr. Pincus advised the court that, "without such releases, no bidder would pay hundreds of millions of dollars . . . and consummation of a sale would be infeasible."  *Id.*  As in *TransPerfect*, the Special Master is aware of no bidder that would be willing to participate in the sale process without releases protecting the buyer from claims arising out of the Court-approved sale and claims against the Republic and PDVSA.  *See* Second Supplemental Hiltz Decl. ¶ 21.  A sale without such protections would be infeasible.

Furthermore, "[i]t is a well settled rule that, except in cases of abuse, appellate courts will not disturb the exercise of a district court's discretion in setting the terms and conditions for a judicial sale and the confirmation thereof."  *See United States v. Branch Coal Corp.*, 390 F.2d 7, 10 (3d Cir. 1968) (citation omitted).  The 2020 Bondholders disregard the historic tradition of judicial sales, wherein courts sitting in equity may, under proper circumstances, order the sale of property free and clear of all encumbrances.  *See Miners' Bank of Wilkes-Barre v. Acker*, 66 F.2d 850, 853 (3d Cir. 1933) ("A court of equity under proper circumstances has power to order a receiver to sell property free and clear of all incumbrances, and to deny the mortgagee the right to foreclose his mortgage.") (citation omitted); *Broadway Tr. Co. v. Dill*, 17 F.2d 486, 486 (3d Cir. 1927) (similar).  In fact, the Supreme Court established federal courts' inherent power to conduct judicial sales of property under the court's jurisdiction free and clear of encumbrances as early as 1887.  *See First Nat'l Bank of Cleveland, Ohio v. Shedd*, 121 U.S. 74, 81–82 (1887) (affirming a

sale of property of a railroad company "freed and discharged from all liens and incumbrances whatsoever[.]").

The 2020 Bondholders also incorrectly contend that the injunctions in the proposed Sale Order are "nearly limitless." D.I. 1943 at 12, 17–21. Not so. The injunction provisions solely enjoin (i) parties from seeking to frustrate the transfer of shares as the Special Master consummates the sale (Paragraph 6), and (ii) parties from suing Dalinar or its affiliates for claims against the Republic, PDVSA, or the PDVH Shares arising *prior to closing* (Paragraph 13). D.I. 1837-1. These provisions are intended to ensure finality, a longstanding principle in the confirmation of judicial sales that encourages bidder participation and certainty in the sale. As one court in this District explained, "to permit interference with the sale after confirmation, which might be delayed for years after the purchase . . . would have the effect of making bidders timid, for they would remain in a state of insecurity as to their titles until the final disposition of the Court action." *United States v. Vassallo*, Nos. 1867, 1868, 1960 U.S. Dist. LEXIS 4491, at *6 (D. Del. June 17, 1960). Sales "are not to be disturbed except for substantial reasons" so as to "induce bidding at such sales and reliance upon them." *Jacobsohn v. Larkey*, 245 F. 538, 541 (3d Cir. 1917) (internal citations omitted). Here, the Special Master must have the ability to transfer the PDVH Shares to the Buyer without interference from parties that are dissatisfied with the Court's Sale Order. And the Buyer should not be at risk of defending such claims merely because it purchased the PDVH Shares as part of this sale process.[10]

---

[10] The 2020 Bondholders' reliance on the Supreme Court's recent decision concerning universal injunctions is likewise unavailing. D.I. 1943 at 19–20. In *Trump v. CASA, Inc*., the Supreme Court held that injunctions that "prohibit enforcement of a law or policy against *anyone* . . . . likely exceed the equitable authority that Congress granted to federal courts." 145 S. Ct. 2540, 2548 (2025). The provisions in the proposed Sale Order—which merely effectuate a free and clear sale of the PDVH Shares in accordance with longstanding principles of Delaware law— are a far cry from the "limitless" universal injunctions the 2020 Bondholders describe.

Further, the PDVSA 2020 Bondholders contend that the releases in the proposed Sale Order would effect a release of PDVH as an affiliate of Dalinar.  *See* D.I. 1943 at 12.  This is not the case.  The proposed Sale Order expressly carves out PDVH and any of its direct or indirect subsidiaries from the definitions of "Buyer" and "Buyer Affiliates" so that the releases are not applicable to those entities.  *See* D.I. 1837, Ex. A at 2, 12.

Crystallex challenges the proposed Sale Order's findings that "the buyer is not a mere continuation of, or holding itself out as a continuation of, Venezuela, PDVSA, or related entities." D.I. 1949 at 19.  But "[u]nder Delaware law, when one company sells or otherwise transfers all of its assets to another company, the buyer generally is not responsible for the seller's liabilities[.]" *Brickley for CryptoMetrics, Inc. Creditors' Tr. v. ScanTech Identification Beams Sys., LLC*, 566 B.R. 815, 854 (W.D. Tex. 2017) (citation omitted).  Bidders would have little interest in acquiring the PDVH Shares if doing so would put them at risk of liability for the actions of the Republic or PDVSA.  A finding that Dalinar is not a continuation of the previous owner of the PDVH Shares is a common-sense protection that gives force to the free and clear sale that this Court clearly has authority to effectuate.

Red Tree and the 2020 Bondholders also object to the proposed Sale Order's provision that ensures the validity of a fully consummated Sale Transaction in the event of reversal or modification on appeal.  D.I. 1942 at 12; D.I. 1943 at 7–9.  As a practical matter, buyers would be unwilling to pay billions of dollars of consideration for the PDVH Shares if there was a risk that the sale could be unwound following the closing.  Accordingly, the Supreme Court has recognized that, when a judicial sale occurs based on a legitimate court order, the sale should not be unwound, even if the judgment or decree on which the sale is based is later reversed on appeal.  *See Gray v. Brignardello*, 68 U.S. 627, 634 (1863) ("[A]lthough the judgment or decree may be reversed, yet all

rights acquired at a judicial sale, while the decree or judgment were in full force, and which they authorized, will be protected.  It is sufficient for the buyer to know, that the court had jurisdiction and exercised it, and that the order, on the faith of which he purchased, was made and authorized the sale.").  To the extent a party seeks to appeal the Sale Order and prevent the sale from being consummated, the party should obtain a stay pending appeal.  Otherwise, unwinding the transaction would substantially prejudice the buyer.  *See id.*

The other contested provisions of the proposed Sale Order are necessary for the following reasons:

- Paragraph M provides the transfer of PDVH Shares will be a "legal, valid, and effective transfer of the PDVH Shares" and "is authorized under applicable law."  It is appropriate for the Sale Order to provide a buyer with the assurance that the asset the buyer is purchasing in a judicial sale is in fact a legal transfer authorized by law.  (Response to objection at D.I. 1943 at 8).

- Paragraph 6 authorizes the Special Master to consummate the sale of the PDVH Shares, enjoins parties from frustrating that sale, and directs PDVH and CITGO to comply with all obligations and covenants in the Stock Purchase Agreement and Transaction Documents.  Because PDVH and CITGO were unwilling to be parties to the SPA, it is necessary for the Court to require them to comply with the SPA to ensure both that the sale can be consummated and that PDVH and CITGO continue to preserve the value of the business during the period prior to closing.[11] (Response to objection at D.I. 1942 at 12; D.I. 1943 at 9).

- Paragraph 15 provides that, upon payment of their Attached Judgments or Closing, whether or not the Attached Judgment is paid in full, holders of Attached Judgments will automatically release all "security interests, liens and pledges, including . . . Attached Judgment[s] . . . and any other Claims *on the Shares* securing the Attached Judgment with no further action (the '**Lien Release**')" (emphasis added).  This provision merely prevents the holders of Attached Judgments from enforcing liens or other security interests that are currently attached to the PDVH Shares.  Dalinar cannot be expected to assume the liabilities of the Republic and PDVSA when it purchases the PDVH Shares.  No buyer would agree to assuming those liabilities.  (Response to objection at D.I. 1942 at 15).

---

[11]   The Venezuela Parties contend that the list of PDVH and CITGO's obligations under the Sale Order should be exhaustive.  D.I. 1948 at 34.  But given the complexities of the sale process, it is impractical (if not impossible) to prescribe a list of every action that will be required in order to consummate the transaction, and thus prescribing an exhaustive list poses a risk that CITGO or PDVH may refuse to take other actions (or refrain from taking other actions) that are necessary in order to consummate the transaction.

- Paragraph 25 provides that the Court will retain jurisdiction over the interpretation, implementation, enforcement, and disputes related to the Sale Order and the SPA.  It provides persons cannot commence actions related to the Sale Transaction without this Court determining the action represents a colorable claim and authorizing such person to bring such cause of action. This Court is the appropriate forum to hear disputes regarding the Sale Order and the Sale Transaction as it has the greatest familiarity with this complex sale process.  Without such a provision, there could be a litany of actions in numerous jurisdictions concerning this sale. (Response to objection at D.I. 1942 at 12; D.I. 1943 at 10).

Finally, Red Tree and the 2020 Bondholders argue that the proposed Sale Order exceeds the Court's authority under the All Writs Act.  D.I. 1942 at 13; D.I. 1943 at 18.  The All Writs Act empowers this Court to issue "all writs necessary or appropriate in aid of [its] jurisdiction[]." 28 U.S.C. § 1651.  The Supreme Court has "repeatedly recognized the power of a federal court to issue such commands under the All Writs Act as may be necessary or appropriate to effectuate and prevent the frustration of orders it has previously issued in its exercise of jurisdiction otherwise obtained."  *United States v. N.Y. Tel. Co.*, 434 U.S. 159, 172 (1977) (citation omitted).  To be sure, this Court previously declined to enjoin litigation already pending in other federal courts under the All Writs Act.  *See* D.I. 1515 at 12.  At this stage, however, where the Court is on the brink of approving a sale of the PDVH Shares, the proposed injunction is necessary to effectuate the proposed Sale Order itself and enable the Sale Transaction to close.  *See N.Y. Tel. Co.*, 434 U.S. at 172; *see also United States v. Int'l Bhd. of Teamsters, Chauffeurs, Warehousemen & Helpers of Am., AFL-CIO*, 266 F.3d 45, 50 (2d Cir. 2001) (the All Writ's Act's reference "to writs issued 'in aid of . . . jurisdiction[]' encompasses orders imposed against third parties to the extent such parties are poised to interfere with the implementation of a prior judicial order").

## VIII.    The Court Should Reject the Other Objections

A.    <u>*28 U.S.C. § 2004*</u>

The Venezuela Parties object to the Special Master's references to 28 U.S.C. § 2004 as a statutory and legal basis for the sale.  *See* D.I. 1948 at 5–6.  While the Court has been guided by Delaware law and Section 324 throughout this sale process, 28 U.S.C. § 2004 simply provides additional authority.  It provides that "any personalty sold under any order or decree of any court of the United States shall be sold in accordance with section 2001 of this title, *unless the court orders otherwise.*"  28 U.S.C. § 2004 (emphasis added).  This Court is a "court of the United States" that issued orders governing the sale process, including the Sale Procedures Order and the December 31 Order.  *See* D.I. 481, D.I. 1942.

B.    <u>*Expense Reimbursement*</u>

Red Tree contends that Dalinar should not be entitled to any expense reimbursement if the SPA is terminated because of the PDSVA 2020 Bondholders' litigation.  *See* D.I. 1854 at 3, n.2, D.I. 1942 at 10–11.  By its terms, the SPA does not provide for expense reimbursement should the Proposed Sale Transaction fail to close because of action taken by the PDVSA 2020 Bondholders.  *See* D.I. 1837, Ex. B § 8.3.  Further, the Court approved these provisions after the parties litigated the issue.  *See* D.I. 1554 at 9–10.

C.  *Section 6.16(c) of the SPA—Unsolicited Competing Proposals*

      The Venezuela Parties object to section 6.16(c) of the SPA, which mandates that the Special Master inform the Court and Dalinar if he receives a competing proposal before the Sale Hearing and, upon Court approval, he may engage with that bidder.  *See* D.I. 1948 at 32.  The Venezuela Parties raise this objection at this late stage despite the fact that they had ample opportunity to object to this provision both formally, when the bid draft SPA was filed on the public docket on February 10, 2025, and informally, when the bid draft SPA was made available in the data room on February 5, 2025.  *See* D.I. 1557.  The Special Master proposed this provision in support of an orderly and efficient sale process.  Moreover, it is consistent with the Court's prior Order that, for the sake of judicial economy, such termination should only be permitted *prior to the Sale Hearing*.  *See* D.I. 1554 at 22.  Parties interested in bidding have been well aware of the sale for years.  Nevertheless, the Special Master does not object to informing the Court, the Sale Process Parties, and Dalinar if he receives an unsolicited competing proposal after the Sale Hearing and prior to entry of the Sale Order.

D.  *Section 6.1(b)(xvi)(C) of the SPA—Limitation on Dividends and Distributions*

      The Venezuela Parties also object to section 6.1(b)(xvi)(C) of the SPA, which imposes certain restrictions on dividends and similar distributions, arguing that compliance may compromise CITGO and PDVH's ability to pay their operating expenses.  *See* D.I. 1948 at 34–35.  This provision is necessary so that the buyer can have confidence that the value of PDVH's business is not diverted prior to closing.  The Venezuela Parties further allege that the Special Master agreed to this section without consulting CITGO and PDVH.  *Id.*  That is false.  The Special Master and his Advisors repeatedly requested input from CITGO, which did not respond in a timely manner. The Special Master's Advisors again raised this point with CITGO's advisors and Gold Reserve's advisors in mid-July 2025.  CITGO's counsel advised that they would seek instructions from

CITGO management and consider providing specifics on the scope and amount of operating payments that would need to be made so that Dalinar could consider this position with its financing sources (who must approve an amendment to this clause). CITGO has yet to respond. Accordingly, a consensual resolution is not possible until CITGO responds.

E. *Sections 2.3(a)(i), 2.3(a)(iii), and 7.3(c)—FIRPTA Certificate and Special Master's Affirmation*

The Venezuela Parties further object to sections 2.3(a)(iii) and 7.3(c) of the SPA on the basis that it "may be impossible or inappropriate" for CITGO to deliver a FIRPTA certificate to Dalinar at or prior to the closing. *See* D.I. 1948 at 35. CITGO is concerned that it will need a third-party analysis before it can deliver a FIRPTA certificate, which the third-party may take time to deliver. But the Special Master accepted this. *See* SPA § 2.3(a)(iii); D.I. 1837, Ex. B. at 5. The SPA only requires the FIRPTA certificate to be delivered on or before the closing—not on any particular date. *See* SPA § 2.3(a)(iii). Both the Special Master's Advisors and Dalinar's Advisors communicated this to CITGO.

The Venezuela Parties also object to section 2.3(a)(i) of the SPA. They argue that this would require CITGO's Chief Financial Officer to confirm representations and warranties made by the Special Master, and this would be inappropriate and unduly burdensome given the threat of a contempt order or sanctions. *See* D.I. 1948 at 35. But this provision merely states that the Special Master must deliver an affirmation "stating that the Special Master has used [his] *reasonable best efforts* to cause the Chief Financial Officer of the Company to confirm the satisfaction" of certain closing conditions. *See* D.I. 1837, Ex. B at 5 (emphasis added). The Special Master, Dalinar, and Dalinar's financing sources have confirmed to CITGO that CITGO's Chief Financial Officer is not obligated to sign any closing certificate.

34

Respectfully submitted,

POTTER ANDERSON & CORROON LLP

OF COUNSEL:

Matthew S. Barr (Admitted *pro hac vice*)
David Lender (Admitted *pro hac vice*)
Jared R. Friedmann (Admitted *pro hac vice*)
Chase A. Bentley (Admitted *pro hac vice*)
WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
Matt.Barr@weil.com
   David.Lender@weil.com
Jared.Friedmann@weil.com
Chase.Bentley@weil.com

Dated: August 7, 2025
12405766 / 21202.00001

By:  */s/ Myron T. Steele*
 Myron T. Steele (#0002)
 Matthew F. Davis (#4696)
 Bindu A. Palapura (#5370)
 Malisa C. Dang (#7187)
 Hercules Plaza, 6th Floor
 1313 North Market Street
 P.O. Box 951
 Wilmington, DE 19801
 Telephone: (302) 984-6000
 Facsimile: (302) 658-1192
 msteele@potteranderson.com
 mdavis@potteranderson.com
 bpalapura@potteranderson.com
 mdang@potteranderson.com

*Counsel for Special Master Robert B. Pincus*