# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| CRYSTALLEX INTERNATIONAL CORP., ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v.  ) | Misc. No. 17-151-LPS |
| ) | |
| BOLIVARIAN REPUBLIC OF ) | **PUBLIC VERSION** |
| VENEZUELA, ) | |
| ) | |
| Defendant. ) | |

## CORRECTED SECOND SUPPLEMENTAL DECLARATION OF WILLIAM O. HILTZ IN SUPPORT OF THE SPECIAL MASTER'S
## **FINAL RECOMMENDATION**

OF COUNSEL:

Matthew S. Barr (Admitted *pro hac vice*)
David Lender (Admitted *pro hac vice*)
Jared R. Friedmann (Admitted *pro hac vice*)
Chase A. Bentley (Admitted *pro hac vice*)
WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
Matt.Barr@weil.com
David.Lender@weil.com
Jared.Friedmann@weil.com
Chase.Bentley@weil.com

Myron T. Steele (#0002)
Matthew F. Davis (#4696)
Bindu A. Palapura (#5370)
Malisa C. Dang (#7187)
POTTER ANDERSON & CORROON LLP
Hercules Plaza, 6th Floor
1313 North Market Street
P.O. Box 951
Wilmington, DE 19801
Telephone: (302) 984-6000
Facsimile: (302) 658-1192
msteele@potteranderson.com
mdavis@potteranderson.com
bpalapura@potteranderson.com
mdang@potteranderson.com

Dated: August 7, 2025

*Counsel for Special Master Robert B. Pincus*

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

---

CRYSTALLEX INTERNATIONAL CORP., )
)
      Plaintiff, )
)
  v. )   Misc. No. 17-151-LPS
)
BOLIVARIAN REPUBLIC OF VENEZUELA, )   **PUBLIC VERSION**
)
      Defendant. )

---

## CORRECTED SECOND SUPPLEMENTAL DECLARATION OF WILLIAM O. HILTZ IN SUPPORT OF THE SPECIAL MASTER'S <u>FINAL RECOMMENDATION</u>

I, William O. Hiltz, declare as follows:

1. I am a Senior Managing Director at Evercore Group L.L.C. ("**Evercore**"), an investment banking advisory and investment management firm. Evercore has extensive experience in providing high-quality investment banking services in traditional M&A processes and financially distressed situations. Evercore is the investment banker to the Special Master in the above-captioned action (the "**Action**").[1]

2. I submit this supplemental declaration ("**Declaration**") in further support of the *Special Master's Final Recommendation* (D.I. 1837) (the "**Recommendation**") and the Special Master's forthcoming response to the objections to the Special Master's Recommendation.

3. I previously submitted the *Declaration of William O. Hiltz in Support of the Special*

---

[1] All capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the *Sixth Revised Proposed Order (A) Establishing Sale and Bidding Procedures, (B) Approving Special Master's Report and Recommendation Regarding Proposed Sale Procedures Order, (C) Affirming Retention of Evercore as Investment Banker by Special Master and (D) Regarding Related Matters* (D.I. 481) (the "**Sale Procedures Order**") or the Recommendation.

*Master's Final Recommendation* (D.I. 1838) and the *Supplemental Declaration of William O. Hiltz in Support of the Special Master's Final Recommendation*, served on July 22, 2025 (the "**Supplemental Declaration**"). I incorporate by reference all statements contained therein.

4.  The statements in this Declaration are, except where specifically noted, based on my personal knowledge and information I received from the Special Master, his Advisors, PDV Holding, Inc. ("**PDVH**"), Citgo Holding, Inc. and Citgo Petroleum Corporation (collectively, "**CITGO**"), employees, advisors, or professionals of Evercore working directly with me or under my supervision, direction, or control, and the books and records of PDVH and CITGO maintained in the ordinary course of their businesses.

## The Design and Implementation of the Sale Process

### A. The Special Master's Retention of Evercore

5.  In the 30 years since its formation, Evercore has grown into one of the leading investment banking firms on Wall Street and one of the world's leading providers of investment banking services in traditional M&A processes. Evercore has consistently generated advisory revenues (which excludes revenues from other services Evercore offers, such as underwriting revenues and investment management revenues) that place Evercore among the largest investment banking firms in the world. During the last twelve months, Evercore ranked fifth among investment banks in terms of aggregate transaction value for U.S. advisory according to the London Stock Exchange Group. Evercore also has consistently received awards and recognition for its work on traditional M&A transactions, including the following in 2024 and 2025 alone: "M&A Advisor of the Year" in 2024 from *International Finance Review*; "Investment Bank of the Year for M&A" from *The Banker*'s 2024 Investment Banking Awards; "Deal of the Year for M&A" in 2024 from *The Banker*; and "North America's Best Bank for Independent Advisory" in *Euromoney*'s 2025 Awards for Excellence.

6. On October 11, 2022, the Court affirmed the Special Master's retention of Evercore and approved the parties' proposed engagement letter in all respects. Sale Procedures Order at 10. As of March 15, 2023, Evercore and the Special Master executed the court approved engagement letter, whereby Evercore was formally retained as the Special Master's financial advisor in connection with implementation of the Sale Procedures Order (the "**Engagement Letter**"). Attached hereto as Exhibit A is a true and correct copy of the Engagement Letter.

7. The Engagement Letter sets forth a fee structure where, in addition to a monthly fee, Evercore will receive a percentage of the consideration paid for the PDVH Shares (the "**Sale Fee**"). Accordingly, the higher the sale price, the greater the compensation received by Evercore. A portion of the Sale Fee is earned and payable upon the earlier of (i) announcement by the Special Master of any Sale Transaction and (ii) execution of a binding definitive agreement with respect to any Sale Transaction, and the remainder of the Sale Fee is earned and payable upon consummation of any Sale Transaction. This fee structure is customary for financial advisory services of a similar nature and Evercore has been retained using similar fee structures in numerous other engagements. Moreover, the Court found the terms of the Engagement Letter, including the fee structure, to be "(a) fair, (b), reasonable, and (c) appropriate." Sale Procedures Order at 10.

8. In connection with its role as financial advisor, Evercore has worked tirelessly and in good faith to assist the Special Master in his duties to implement a sale process that maximizes the value of the PDVH Shares. This includes advising the Special Master in the design of the sale process, the marketing of the PDVH Shares, and the review of bids, including analysis of the extent to which the bids are likely to satisfy claims in the waterfall. While Evercore dutifully advised the Special Master, all material decisions, including the recommendation of bids, were ultimately made by the Special Master.

### B. Consideration of Alternative Sale Processes

9. The Special Master engaged in a lengthy and collaborative process with the Sale Process Parties, including the Venezuela Parties, to design and recommend to the Court a sale procedure for carrying out the sale of the PDVH Shares. *See, e.g.,* Sale Procedures Order; D.I. 1433; D.I. 1493; D.I. 1517. In doing so, the Special Master, with Evercore's assistance, considered alternatives to the sale process ultimately recommended to and ordered by the Court, including an initial public offering ("**IPO**"), equitization of claims, equity or debt financing solutions, a less than one hundred percent sale of the PDVH equity, the creation of a trust for paying claimants over time, a sale of CITGO assets in parts to multiple buyers, a reorganization, and some combination of the foregoing.

10. Although the bid instruction letter sent to potential bidders in May 2024 allowed a buyer to acquire less than one hundred percent of the PDVH Shares and gave bidders the flexibility to make an IPO proposal, no bidder pursued those alternatives. Attached as Exhibit B is a true and correct copy of the bid letter that the Special Master's Advisors sent to potential bidders dated May 27, 2024. Further, during the Marketing Process, no bidder expressed an interest in partnering with Venezuela or PDVSA. The lack of interest among private and public bidders in co-owning CITGO with Venezuela suggests that there would be even less willingness for such a structure in public markets. Moreover, a sale of only a portion of the PDVH Shares would, by definition, yield proceeds that satisfy fewer Attached Judgments than the Dalinar bid or another bid that proposes to acquire 100% of the PDVH Shares.

11. The Special Master also determined that using an IPO to sell the PDVH Shares would almost certainly result in less value to judgment creditors than an auction sale, particularly in light of the lack of recent high-profile IPOs due to market uncertainty and the limited interest from public investors in the energy sector in recent years. Moreover, the arduous disclosure

process involved with an IPO would have required even more cooperation from CITGO than the auction sale process. Relatedly, the complexity of the issues relating to the valuation of the PDVH Shares, including the Alter Ego Claims and the 2020 PDVSA Bondholders Pledge, while difficult enough to explain to sophisticated buyers, would have been nearly impossible to communicate to public shareholders in a way that would yield a value as high as the Court's sale process. The Special Master also considered the expressed desire of creditors to liquidate the attached judgment claims in a quick and efficient manner when deciding against an IPO.

12. Other alternative sale processes, like the leveraged recapitalization proposed by the Venezuela Parties' declarant, Randall J. Weisenburger, are similarly not conducive for maximizing the value of the PDVH Shares. *See* D.I. 1948-1 at ¶¶ 4, 15. A leveraged recapitalization is a refinancing of existing debt that replaces existing debt and equity with a greater amount of debt, resulting in the pro forma company having higher leverage than it did before the transaction. The difference between the pre- and post-transaction leverage, and the debt proceeds associated with that leverage, would be sent to the shareholders—or in this case, the holders of Attached Judgments—as a dividend. The incremental leverage, and by extension the financing proceeds, that would result from a leveraged recapitalization did not have the potential to satisfy nearly as many creditors as the Dalinar transaction. The Dalinar transaction proposes to satisfy $7.38 billion of Attached Judgments. ████████████████

████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████ In fact, no bidder was able to obtain financing approaching the value of the claims satisfied by the Recommended Bid. Additionally, the 2020 Bondholders Pledge and other ongoing litigation create uncertainty that would likely limit the amount of proceeds that could be raised through a leveraged recapitalization.

        C.       **Evercore's Preliminary Draft Valuation – September 2023**

        13.       In September 2023, Evercore prepared a preliminary draft valuation of CITGO in order to coordinate with CITGO on marketing the PDVH Shares in advance of the Special Master formally launching the initial Marketing Process (the "**Preliminary Draft Valuation**"). Attached hereto as Exhibit C is a true and correct copy of the Preliminary Draft Valuation. In sharing the Preliminary Draft Valuation with CITGO, Evercore explained that it is a "draft valuation based on the [Medium-Term Plan] projections put together [by CITGO's management] last year" and that Evercore has "not made any adjustments to the assumptions or run any sensitivities on the projections." Attached hereto as Exhibit D is a true and correct copy of an email dated September 15, 2023 from Kevin Putman of Evercore to CITGO representatives regarding the Preliminary Draft Valuation. The Preliminary Draft Valuation was intended to serve as a rough internal guide as to how the market and interested parties may view the value of the asset at the outset of the Marketing Process, understanding that bidders would likely conduct their own analyses of the company's value, including after conducting diligence on the asset.

        14.       For the purposes of that valuation, Evercore simply relied on projections from CITGO's management in CITGO's Medium-Term Plan for 2023-2028 prepared in December 2022. Attached hereto as Exhibit E is a true and correct copy of CITGO's Medum Term Plan for 2023-2028 showing CITGO's financial projections. Based on these projections, Evercore ascribed

a range of valuations to the PDVH Shares with a midpoint discounted cash flow ("**DCF**") value of $13.2 billion.  Exhibit E.  This type of DCF analysis, which can be a helpful tool in gaining a preliminary understanding of how the market may view a company's value was not intended to become a controlling benchmark for the expected sale price of the PDVH Shares throughout the entirety of the sale process.  Although the DCF analysis factored in EBITDA, perpetuity growth rate, and weighted average cost of capital ("**WACC**"), it does not take into account a whole host of other factors that may affect the value of an asset in the eyes of potential buyers.  For example, the DCF analysis does not include any adjustments for ongoing litigation, including with respect to the 2020 PDVSA Bondholders, or for structural limitations in the transaction, including the absence of representations and warranties and other typical seller covenants.

15.     CITGO's business is highly dependent on commodity prices which are subject to frequent change, making it difficult to project financial performance.  ████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████  When Evercore prepared the Preliminary Draft Valuation, CITGO's management projected that CITGO's adjusted EBITDA would be approximately $2.8 billion in 2023, $1.8 billion in 2024, and ████ in 2025.  Exhibit C.  In actuality, while CITGO performed better than anticipated in 2023 and achieved adjusted EBITDA of approximately $3.3 billion that year, CITGO's adjusted EBITDA dropped to approximately $1.2 billion in 2024.   Attached hereto as Exhibit F is a true and correct copy of CITGO's Medium-Term Plan for 2025-2030 showing CITGO's financial performance.  ████

7

██████████████████████████████████████████

██████████████████████ Attached hereto as Exhibit G is a true and correct copy of CITGO's July 3, 2025 Flash Report showing CITGO's latest EBITDA projections. Accordingly, the Preliminary Draft Valuation prepared by Evercore in September 2023 is not an accurate representation of the fair market value of the company as it presently exists and should not be used as an indicator of the fair market value of the PDVH Shares.

16. In addition, Evercore utilized a comparable company analysis and applied multiples on 2023E and 2024E CITGO EBITDA. This methodology is consistent with the analysis in my Supplemental Declaration, and when adjusted for updated CITGO performance and projections and for public company trading multiples, it arrives at an updated value range of $8.4 to $10.5 billion, which is substantially lower than the market multiples range of $13.0 billion to $18.5 billion that Dr. Alberro generates in his report.

D.   **Dr. Alberro's Valuation of the PDVH Shares**

17. As discussed in the Supplemental Declaration, Dr. Alberro submitted the *Expert Report of José Alberro, PhD* on July 7, 2025 on behalf of CITGO and PDVH (the "**Alberro Report**") (notice of service at D.I. 1894) in which he described a theoretical valuation of the PDVH Shares.

18. The Supplemental Declaration explained that a meaningfully higher WACC range of 10.08% to 10.84%, compared to the 8.27% WACC that Dr. Alberro used in his discounted cash flow analysis, would result if one were to make three reasonable adjustments to the assumptions in Dr. Alberro's WACC calculation. Attached hereto as Exhibit H is a true and correct copy of Evercore's WACC Comparison to the Dr. Alberro Report, which provides backup calculations showing the adjustments to Dr. Alberro's WACC calculation that I described in the Supplemental

8

Declaration.

19. In addition, another component of the DCF calculation is projected cash flow, which Dr. Alberro determined using EBITDA projections for CITGO that he prepared himself, rather than relying on CITGO's own EBITDA projections. To develop his own EBITDA projections, Dr. Alberro had to first determine projected price forecasts for each of CITGO's products. Those projected prices are a component of the EBITDA calculation. In doing so, Dr. Alberro relied solely on price forecasts from third-party consultants S&P Global Platts, RBN Energy, Turner Mason, and Wood Mackenzie. Alberro Report ¶ 109. Based on information Evercore learned while facilitating the due diligence process, I understand that, when preparing its own EBITDA projections, including the projections in the Medium-Term Plan for 2025-2030 and the Flash Reports, CITGO relies on long-term reports and price forecasts from multiple third-party consultants, including S&P Global Platts, RBN Energy, Turner Mason, Wood Mackenzie, and Argus Media. These third-party consultants include the same third-party consultants that Dr. Alberro used to generate his price forecasts. But in addition to consulting with these third-party consultants, CITGO uses information from its own corporate finance team and historical performance to assess how those prices affect its regional markets, refineries, and operations and generate EBITDA projections that are carefully tailored to the specific refineries. ████████

████████████████████████████████████████

████████████████████████████. Alberro Report ¶ 107.

E. **Encouraging Bidder Participation Through Confidentiality and Releases**

20. Potential bidders expressed hesitancy to submit bids that would be disclosed publicly in the event they were not selected as the winning bidder. Accordingly, the Special Master determined that to maximize bidder participation in the sale process, it was necessary to offer

confidentiality arrangements whereby details of a bid not recommended by the Special Master, such as price, would also not be publicly disclosed, including to other bidders. Such an arrangement is customary in an auction sale process. However, bidders could choose to disclose their bids publicly. For example, in the Stalking Horse round, Gold Reserve requested that its bid be publicly filed in connection with its opposition to the Special Master's selection of Red Tree's bid as the Stalking Horse over its own bid. *See* D.I. 1603-1.

21. Relatedly, potential bidders also expressed hesitancy to submit bids absent an expectation that the PDVH Shares could be purchased free and clear of all liens, claims, and encumbrances and that any sale order would protect and/or release the buyer from certain claims in connection with their purchase of the PDVH Shares through the sale process. I am unaware of any potential buyer that would be willing to participate in the sale process without assurances that it would be acquiring the PDVH Shares free and clear of certain claims and encumbrances and that it would not be subjected to claims against it for its participation in this sale process, which was overseen in its entirety by the Court. Accordingly, in order to maximize bidder participation, the Special Master determined it was necessary to include a number of protections for the buyer of the PDVH Shares in the Proposed Sale Order. D.I. 1837-1.

### F. The Special Master's Discussions with the 2020 Bondholders

22. In early 2024, in response to bidders repeatedly seeking the Special Master's assistance in developing potential solutions to resolve the risk associated with the PDVSA 2020 Bondholders and *Petróleos de Venezuela, S.A. v. MUFG Union Bank, N.A.*, No. 1:19-cv-10023-KPF (the "**PDVSA 2020 Bondholders Litigation**"), the Special Master began engaging in discussions with the PDVSA 2020 Bondholders related to their treatment, if any, in connection with bids for the PDVH Shares. In fact, some bidders conditioned their bids on securing a resolution negotiated by the Special Master. Attached hereto as Exhibits I and J are true and correct

10

copies of a bid letter from ███████████████████████████████████, respectively, conditioning their bids on the Special Master negotiating a resolution with the 2020 PDVSA Bondholders. Also attached hereto as Exhibit K is a true and correct copy of a letter dated August 20, 2024, from the Special Master's counsel to counsel for the Venezuela Parties regarding the Special Master's negotiations with the PDVSA 2020 Bondholders and discussing bidders' desires for the Special Master to resolve the associated risk.

23. The Sale Process Parties, on the other hand, were resistant to these negotiations. In fact, the Venezuela Parties sent the Special Master and his advisors multiple letters urging him not to negotiate a settlement with the PDVSA 2020 Bondholders. Attached hereto as Exhibits L, M, and N are true and correct copies of letters dated August 9, 2024, August 23, 2024, and September 5, 2024, respectively, from counsel for the Venezuela Parties to the Special Master's counsel regarding the Venezuela Parties' opposition to the Special Master's negotiations with the PDVSA 2020 Bondholders.

24. In the course of negotiations, the 2020 Bondholders prepared a draft settlement proposal and shared it with the Special Master. Attached hereto as Exhibit O is a true and correct copy of the draft Transaction Support Agreement between the PDVSA 2020 Bondholders and the Special Master dated September 13, 2024. However, in the face of resistance from the Sale Process Parties, the Special Master abandoned the negotiations. Moreover, there was extensive briefing and oral argument on the issue of how to account for the 2020 PDVSA Bondholders in connection with sale process, culminating in the Court ordering that "the SPA and Evaluation Criteria shall NOT include any requirement or condition with respect to the 2020 Bond Entities other than that bidders acknowledge that the 2020 Bond Entities purport to have a pledge of 50.1% of the equity of CITGO Holding, Inc." D.I. 1517 at ¶ 28.

G.  **The Special Master's Negotiations with Bidders**

25. The Special Master and his Advisors undertook robust back-and-forth negotiations with bidders throughout the sale process. His decisions within the course of these negotiations, including granting exclusivity to ▬▬▬▬▬▬▬▬▬ and subsequently to Elliott Investment Management L.P. ("**Elliott**"), and recommending Red Tree as the Stalking Horse Bidder, were the result of well-reasoned strategies aimed at ultimately obtaining the most favorable terms possible for the sale of the PDVH Shares. For example, the Special Master's recommendation of Red Tree as the Stalking Horse was driven by his judgment that Red Tree's Stalking Horse bid was "the best starting point" and the bid "best situated to encourage further bidding and generat[e] as much competitive tension among bidders as possible during the Topping Period." D.I. 1660 at 1. The Court agreed with the Special Master's judgment on this issue. *Id.* Selecting Red Tree rather than Gold Reserve as the Stalking Horse resulted in Gold Reserve increasing the price of its bid, which was beneficial to the process by providing a recovery to Additional Judgment Creditor Siemens Energy Inc. and addressing the approximately $200 million balance of Gold Reserve's own judgment. No other bidder, aside from Black Lion Capital Advisors, which provided little to no information in connection with its bid that was made contingent on due diligence that it had not yet conducted, proposed a price close to Gold Reserve's bid during the Topping Period.

26. Additionally, during the course of these negotiations with bidders, the Special Master successfully negotiated numerous concessions over material terms. For example, Red Tree agreed to a $75 million cap on the fee it would obtain if its bid were topped, which is approximately $35 million less than the 3% fee approved by the Court. *See* D.I. 1741 at 5.

H.  **The Special Master's Decision to Not Pause the Sale Process**

27. The Venezuela Parties petitioned the Court on numerous occasions to pause the sale

12

process to allow for the resolution of the PDVSA 2020 Bondholders Litigation and the PDVH Alter Ego Claims. However, CITGO's financial performance has weakened over the last couple years following the temporary boon in the oil and gas industry that occurred at the tail end of the COVID-19 pandemic. Thus, the Special Master concluded, in consultation with his advisors, that there was a significant risk that a delay in the sale process could coincide with additional decline in CITGO's financial performance and a corresponding deterioration of the proposed purchase prices in bids for the PDVH Shares.

28. Nevertheless, the Special Master has been supportive of short-term pauses where the potential benefits appeared to outweigh potential downsides. For example, on May 23, 2025, the Venezuela Parties moved for an extension of the Topping Period in light of Judge Rakoff of the U.S. District Court for the Southern District of New York ruling on the summary judgment motions in *Girard Street Investment Holdings, LLC v. PDV Holding, Inc.*, No. 24-cv-4448 (S.D.N.Y.), *Girard Street Investment Holdings, LLC v. PDV Holding, Inc.*, No. 23-cv-10772 (S.D.N.Y.), and *G&A Strategic Investments I LLC v. Petróleos de Venezuela, S.A.*, No. 23-cv-10766 (S.D.N.Y.) (consolidated), dismissing the alter ego claims against PDVH. *See* D.I. 1575. In that case, the Special Master was supportive of a three-week extension of the Topping Period after multiple potential bidders advised the Special Master that having more time after this legal development would aid them in submitting topping bids. *See* D.I. 1770.

### I. The Special Master's Willingness to Not Recommend a Bid

29. I understand that the Court granted the Special Master discretion to reject "inadequate or insufficient" bids as well as bids that do not "provid[e] for a value maximizing sale transaction." Sale Procedures Order at ¶ 9. I also understand that the Court authorized the Special Master to "adjourn the Auction and/or Sale Hearing" should the above circumstances occur. *Id.* Accordingly, the Special Master was prepared to follow the Court's directive and not recommend

13

any bid if he believed that all bids submitted were inadequate. For example, had the bids submitted during the Topping Period not improved upon those submitted during the Stalking Horse phase, the Special Master would have seriously considered exercising his authority to not select any bid at this time.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct to the best of my knowledge.

New York, New York
Dated August 4, 2025

/s/ *William O. Hiltz*
William O. Hiltz
Senior Managing Director
Evercore Group L.L.C.