# EXHIBIT A

As of March 15, 2023

Robert B. Pincus
In his capacity as Special Master
of the United States District Court for the District of Delaware
108 Rockford Grove Lane
Wilmington, DE 19806

Dear Special Master Robert Pincus:

1. **Assignment:**

This engagement letter (this "**Agreement**") is to formalize the arrangement between Evercore Group L.L.C. ("**Evercore**") and Robert B. Pincus, solely in his capacity as special master ("**Special Master**") for the United States District Court for the District of Delaware (the "**Court**") in *Crystallex International Corp. v. Bolivarian Republic of Venezuela* (D. Del. Case. No. 17-151-LPS) (the "**Specified Litigation**") pursuant to that certain order entered by the Court on April 13, 2021 [Docket No. 258], that certain *Order Regarding Special Master* entered by the Court on May 27, 2021 [Docket No. 277] (the "**May Order**") and the *Order (A) Establishing Sale and Bidding Procedures, (B) Approving Special Master's Report and Recommendation Regarding Proposed Sale Procedures Order, (C) Affirming Retention of Evercore as Investment Banker by Special Master and (D) Regarding Related Matters* entered by the Court on October 7, 2022 [Docket No. 481] (the "**Sale Procedures Order**"). The Special Master, solely in his capacity as special master, hereby retains Evercore as exclusive financial advisor in connection with implementation of the Sale Procedures Order and consummation of the sale of the equity interests of PDV Holding, Inc. ("**PDVH**" and together with its direct and indirect subsidiaries, the "**Company**") held by Petróleos de Venezuela, S.A. ("**PDVSA**") (the "**Sale Transaction**").

The parties hereto entered into that certain engagement dated as of June 2, 2021 (the "**Prior Engagement Letter**"). Upon execution of this Agreement, the Prior Engagement Letter shall automatically terminate as of the date this Agreement becomes effective (other than any provision that by its terms expressly survives termination thereof).

It is the parties' intent that services (as described herein) performed hereunder are, in part, for the purpose of assisting Weil, Gotshal & Manges LLP ("**Weil**") in its capacity as counsel to the Special Master so that Weil can render attorney-client advice to the Special Master. Accordingly, certain actions taken by Evercore are intended to be and shall be privileged and protected by the attorney work product privilege, attorney-client privilege, and other applicable privilege doctrines available under applicable law. The Special Master and Evercore each acknowledge and agree that Weil shall not be responsible for any fees, expenses, indemnification rights or other amounts or payments that may be owed to Evercore directly or indirectly under this Agreement.

2. **Fees and Expenses:**

Evercore will seek payment of its fees and documented expenses from Crystallex International Corporation ("**Crystallex**"), the Bolivarian Republic of Venezuela (the "**Republic**"), PDVH,

Confidential

PDVSA, CITGO Petroleum Corp. ("**CITGO**," and collectively with the Republic, PDVH, PDVSA, the "**Venezuela Parties**"), Phillips Petroleum Company Venezuela Limited and ConocoPhillips Petrozuata B.V. (together, "**ConocoPhillips**," and collectively, with Crystallex and the Venezuela Parties, the "**Sale Process Parties**") in accordance with the May Order and the Sale Procedures Order. The Special Master hereby agrees to take all actions required of the Special Master and to otherwise assist Evercore in seeking (and, as applicable, obtaining approval of) payment of the fees and documented expenses incurred pursuant to this Agreement from the Sale Process Parties, including by making any necessary or desirable filings in the Specified Litigation.

Notwithstanding anything to the contrary in this Agreement, Evercore and the Special Master each acknowledge and agree that the Special Master shall not be personally responsible for any fees or expenses, or other amounts or payments that may be due and payable directly or indirectly under this letter. For the avoidance of doubt, notwithstanding anything herein to the contrary, under no circumstances shall the Special Master be liable to any party for any fees, expenses, or amounts due or claimed in connection to or arising from this Agreement.

As compensation for the services rendered by Evercore hereunder, Evercore shall be paid the following fees in cash by the Sale Process Parties as and when set forth below:

    a. A monthly fee of $200,000 (a "**Monthly Fee**"), which shall be earned in full and payable on the date that the Special Master provides Evercore with (i) written notice of his determination to begin preparations for the Marketing Process or (ii) written notice that he would like Evercore to engage in settlement discussions regarding a claims resolution process with creditors in accordance with the terms of the Sale Procedures Order, and subsequently on the same day of each month thereafter until the earlier of the consummation of a Sale Transaction or the termination of Evercore's engagement. The first twelve (12) Monthly Fees actually paid shall be credited 50% (without duplication) against any Sale Fee that becomes payable hereunder; *provided* that in the event a credit bid by Crystallex in an amount in excess of the Credit Bid Threshold (as defined below) is the prevailing bid, the percentage crediting shall be increased to 75%. In the event an Upfront Amount (as defined below) is payable, the crediting of monthlies will apply to the portion of the Sale Fee that is payable upon consummation of the Sale Transaction; *provided* that in the event a credit bid by Crystallex in an amount in excess of the Credit Bid Threshold (as defined below) is the prevailing bid, the crediting of monthlies will apply to the Upfront Amount up to a maximum of $600,000 in crediting, with the remainder of crediting (if any) applying to the portion of the Sale Fee that is payable upon consummation of the Sale Transaction. Notwithstanding the foregoing, if implementation or consummation of the Sale Transaction is stayed or otherwise delayed for any reason, the Special Master may send a written notice (including by email) to Evercore that, three business days after it is actually received by Evercore, will have the effect of ending the accrual of Monthly Fees until such time as the Special Master rescinds the notice in writing (including by email). Evercore shall not be required to repay any amount of any Monthly Fee paid prior to the receipt of such a notice. The Special Master may only send such a notice if no material amount of work or services have been requested of Evercore for the applicable period, and Evercore shall have no obligation to perform any work or services during the period in which such Monthly Fees do not accrue until such time as Evercore actually receives the next Monthly Fee, which shall be payable not later than 3 business

WEIL:\98537043\7\67816.0003

Confidential

SM0164048_001

days following rescission of the Special Master's stay notice and subsequently on the same day of each month thereafter until the earlier of the consummation of a Sale Transaction or the termination of Evercore's engagement; *provided* that the first Monthly Fee payable after such rescission shall be prorated to account for any period for which a Monthly Fee already was paid hereunder.

b.  A sale fee (a "**Sale Fee**") equal to (a) the amount of the Aggregate Consideration (as defined below) multiplied by (b) 0.35% (the "**Sale Fee Percentage**"); *provided* that

   i.  if a credit bid by Crystallex in an amount no more than $500,000,000 (the "**Credit Bid Threshold**") is the prevailing bid, the Sale Fee shall be the greater of 1) $7,000,000 and 2) 2.0% of the credit bid amount

   ii.  if a credit bid by Crystallex (in an amount in excess of the Credit Bid Threshold) is the prevailing bid, the Sale Fee Percentage shall be 0.25% of the Aggregate Consideration, but, for the avoidance of doubt, Aggregate Consideration in such scenario shall be calculated to include 100% of the implied equity value of the credit bid.

$3,500,000 of the Sale Fee shall be earned and payable upon the earlier of (i) announcement by the Special Master of any Sale Transaction and (ii) execution of a binding definitive agreement with respect to any Sale Transaction (the "**Upfront Amount**"), and the remainder of the Sale Fee shall be earned and payable upon consummation of any Sale Transaction; *provided* that no Upfront Amount shall be owed if a credit bid by Crystallex (in an amount no more than the Credit Bid Threshold) is the prevailing bid.  The Upfront Amount shall be split amongst and paid by the Sale Process Parties that are obligated to pay the Upfront Amount as follows: Crystallex and the Venezuela Parties shall be obligated to pay (and only obligated to pay) one-half each of the Upfront Amount, unless the implied value of the contemplated Sale Transaction is sufficient to provide for a recovery for ConocoPhillips.  If the implied value of the contemplated Sale Transaction is sufficient to provide for a recovery for ConocoPhillips, then ConocoPhillips and Crystallex shall together pay one-half of the Upfront Amount split proportionately between them based on the amount of each of their expected recoveries based on the implied value of the contemplated Sale Transaction (e.g., if Crystallex's expected recovery amounts to 90% of the total expected recoveries of Crystallex and ConocoPhillips combined, Crystallex shall pay 90% of one-half (or 45% of the entire Upfront Amount) and ConocoPhillips 10% of one-half (or 5% of the entire Upfront Amount). The remaining amount of the Sale Fee (i.e., any amount other than the Upfront Amount) shall be payable in connection with consummation of the applicable Sale Transaction and shall be payable by the applicable purchaser directly or from any proceeds from the applicable Sale Transaction.

As used in this Agreement, the term "Aggregate Consideration" shall mean the total fair market value (determined at the time of the closing of a Sale) of all consideration paid or payable, or otherwise to be distributed to, or received by, directly or indirectly, the Court (or the Special Master) in connection with the Sale Transaction or the Company, its bankruptcy estate (if any), its creditors and/or the security holders of the Company in connection with a Sale, including all (i) cash, securities and other property, (ii) Company

WEIL:\98537043\7\67816.0003

Confidential

debt assumed, satisfied, or paid by a purchaser or which remains outstanding at closing (including, without limitation, the amount of any indebtedness, securities or other property "credit bid" in any Sale) and any other indebtedness and obligations, including litigation claims and tax claims that will actually be paid, satisfied, or assumed by a purchaser from the Company or the security holders of the Company and (iii) amounts placed in escrow and deferred, contingent and installment payments.

If the amount of any claim that remains secured by a purported pledge of the stock of CITGO Holding in favor of Rosneft Trading, S.A. (or its assignee) is ascertained to be greater than $0 by a material amount, and a credit bid by Crystallex (in an amount no more than the Credit Bid Threshold) is the prevailing bid, the Special Master and Evercore agree to negotiate in good faith a mutually acceptable increase in the Sale Fee if such an increase is requested by Evercore, subject to the scope of work and consideration of the increased threshold necessary to achieve value to the holders of Attached Judgements (as defined in the Proposed Sale Procedure Order). Following the result of such good faith negotiations, the Special Master shall seek approval of any such increase from the Court upon reasonable notice to the Sale Process Parties. Court approval of any such increase may be sought at any time until the consummation of the applicable Sale Transaction giving rise to the Sale Fee. Each of the Sale Process Parties' rights is reserved with respect to an increase in the Sale Fee.

c.  Only if related services are expressly requested by the Special Master in the performance of his duties, a financing fee (a "**Financing Fee**"), to be mutually agreed upon in advance of consummation of any Financing (as defined below), payable upon consummation of such Financing. The parties agree to negotiate in good faith a mutually acceptable Financing Fee, which, subject to the anticipated scope of work, shall be consistent with the compensation customarily paid to investment bankers of similar standing acting in similar situations. Evercore will, prior to performing any services that would give rise to a Financing Fee, inform the Special Master that the requested services, if performed, would give rise to a Financing Fee.

d.  Only if related services are expressly requested by the Special Master in the performance of his duties, a restructuring fee (a "**Restructuring Fee**"), to be mutually agreed upon in advance of consummation of any Restructuring (as defined below), payable upon consummation of such Restructuring (it being understood that, unless otherwise agreed pursuant to this Section 2(d), Evercore shall not be entitled to a Restructuring Fee on account of any Sale that also constitutes a Restructuring). The parties agree to negotiate in good faith a mutually acceptable Restructuring Fee, which, subject to the anticipated scope of work, shall be consistent with the compensation customarily paid to investment bankers of similar standing acting in similar situations. Evercore will, prior to performing any services that would give rise to a Restructuring Fee, inform the Special Master that the requested services, if performed, would give rise to a Restructuring Fee.

e.  In addition to any fees that may be payable to Evercore and, regardless of whether any transaction occurs, Evercore shall promptly be reimbursed on a monthly basis for (a) all reasonable expenses (including travel and lodging, data processing and communications charges, courier services and other appropriate expenditures) and (b) other documented reasonable fees and expenses, including expenses of counsel, if any.

WEIL:\98537043\7\67816.0003

Confidential

SM0164048_003

f. If Evercore provides services for which a fee is not provided herein, such services shall, except insofar as they are the subject of a separate agreement, be treated as falling within the scope of this Agreement, and the Special Master and Evercore will agree upon a fee for such services based upon good faith negotiations and the scope of work performed.

g. All amounts referenced hereunder reflect United States currency and shall be paid promptly in cash after such amounts accrue hereunder.

In addition, the Special Master and Evercore acknowledge and agree that more than one fee may be payable to Evercore under subparagraphs 2(a), 2(b), 2(c), 2(d), and/or 2(f) hereof in connection with any single transaction or a series of transactions, it being understood and agreed that if more than one fee becomes so payable to Evercore in connection with a series of transactions, each such fee shall be paid to Evercore.

The Special Master acknowledges that the fee structure herein, including the Monthly Fees, reflects the substantial commitment of professional time and effort that will be required of Evercore and its professionals and in light of the fact that (i) such commitment may foreclose other opportunities for Evercore and (ii) the actual time and commitment required of Evercore and its professionals to perform its services may vary substantially from week to week and month to month, creating "peak load" issues for Evercore.

### 3.  **Interpretation of Terms:**

As used in this agreement, the term "**Sale**" shall mean whether or not in one transaction, or a series of related transactions, (a) the disposition to one or more third parties of all or a portion of the issued and outstanding equity securities or any other issued and outstanding securities of the Company by the existing security holders of the Company; or (b) an acquisition, merger, consolidation, or other business combination, of which all or a portion of the business, assets or existing equity or securities of the Company are, directly or indirectly, sold or transferred to, or combined with, another company (other than an ordinary course intra-company transaction); or (c) an acquisition, merger, consolidation, sale, or other business combination pursuant to a successful "credit bid" of any securities by existing securities holders; or (d) the formation of a joint venture, partnership or similar entity; or (e) any transaction similar to any of the transactions described in clauses (a)-(d).

As used in this Agreement, the term "**Financing**" shall mean the issuance, sale or placement of newly issued or treasury equity, equity-linked or debt securities, instruments or obligations of the Company with one or more lenders and/or investors or security holders (each such lender or investor, an "**Investor**"), including any "debtor-in-possession financing" or "exit financing" in connection with any case under the Bankruptcy Code (as defined below) or a refinancing, repricing, rights offering or any loan or other financing or obligation.

As used in this Agreement, the term "**Restructuring**" shall mean, collectively, any restructuring, reorganization and/or recapitalization, however such result is achieved, including, without limitation, through one or more of the following: (a) a plan of reorganization or liquidation (a "**Plan**") confirmed pursuant to 11 U.S.C. §101 *et. seq.*, as from time to time amended, or any other current or future federal statute or regulation that may be applicable to such plan (11 U.S.C. §101 *et. seq.* and those other statutes and regulations are referred to herein generally as the "Bankruptcy Code"), (b) any similar proceeding or mechanism under the laws of any non-U.S. jurisdiction or

WEIL:\98537043\7\67816.0003

Confidential

SM0164048_004

authority, or (c) a refinancing, cancellation, forgiveness, satisfaction, retirement, purchase, assumption and/or a material modification or amendment to the terms of the Company's outstanding indebtedness (including bank debt, bond debt, preferred stock, and other on and off balance sheet indebtedness), trade claims, leases (both on and off balance sheet), litigation-related claims and obligations, unfunded pension and retiree medical liabilities, lease obligations, partnership interests and other liabilities,  including pursuant to a sale, repurchase or an exchange transaction, a Plan or a solicitation of consents, waivers, acceptances or authorizations.  For avoidance of doubt, the term Restructuring shall also mean any claims negotiation process and related negotiations with various creditors and claimants including with respect to the 8.5% Senior Secured Notes issued by PDVSA due 2020.

**Other:**

4. Evercore's engagement hereunder is premised on the assumption that the Special Master will make available to, or use reasonable efforts to cause the Sale Process Parties to make available to, Evercore all information and data that Evercore reasonably deems appropriate in connection with its activities.  The parties recognize and consent to the fact that (a) Evercore will use and rely on the accuracy and completeness of public reports and other information provided by others, including information provided by the Special Master, the Sale Process Parties, other parties and their respective officers, employees, auditors, attorneys or other agents in performing the services contemplated by this Agreement, and (b) Evercore does not assume responsibility for, and may rely without independent verification upon, the accuracy and completeness of any such information.  Evercore will, and will cause its controlled affiliates, directors, officers, members, agents, employees and other representatives to, keep confidential all information furnished to it to the extent provided in any protective order entered by the Court and furnished to Evercore by the Special Master or a Sale Process Party.  Further, Evercore agrees and acknowledges that it will execute any confidentiality or joinder agreement required by the Court or reasonably requested by the Special Master pursuant to any such protective order, including, without limitation, the *Special Master Confidentiality Order* [D.I. 291].

5. Evercore's engagement hereunder may be terminated by the Special Master or Evercore at any time upon written notice without liability or continuing obligation to the Special Master or Evercore, except that following such termination, Evercore shall remain entitled to payment of any fees accrued pursuant to Section 2 but not yet paid prior to such termination, and to reimbursement of expenses incurred prior to such termination.  Solely in the case of termination by the Special Master (and not in the case of termination by Evercore), payment of (i) any Sale Fee in respect of any Sale Transaction announced or consummated on or within 15 months of the date of entry of the Sale Procedures Order, and (ii) any other fees that may become payable to Evercore pursuant to the terms of the Sale Procedures Order or any other Court order entered on or before the date of such termination on or within 15 months of the date of entry of the Sale Procedures Order or such other order, as applicable; *provided*, *however*, that in the case of both (i) and (ii), any such fees shall only be payable out of the proceeds of any Sale Transaction or Financing (if applicable) that is overseen and/or directed by the Special Master.

6. Evercore acknowledges that it will provide testimony, as reasonably necessary, with respect to matters related to the implementation and consummation of the Sale Transaction.

WEIL:\98537043\7\67816.0003

Confidential

SM0164048_005

7. To the extent the provision of services or other transactions contemplated in this Agreement may, in Evercore's sole judgment, require a specific license from the Office of Foreign Assets Control in the United States Department of the Treasury ("**OFAC**"), such services or transactions will not commence unless and until authorized by a license from OFAC. Any applicable laws, executive orders, regulations, directives or licenses administered or issued by OFAC will take precedence over the terms of this letter in the event of a conflict. Evercore may terminate this Agreement at any time if it appears, in Evercore's sole judgment, that OFAC will not grant a license necessary to complete the services or other transactions contemplated in this Agreement within a reasonable amount of time.  Should Evercore refuse to provide services under this agreement pursuant to this paragraph, the Special Master shall have the right to terminate this agreement and no further fees shall be due under this agreement (other than any outstanding incurred but unpaid fees, and reimbursable expenses incurred prior to such termination).

8. The Special Master and Evercore each acknowledge that to the extent there is any conflict between this Agreement and the Sale Procedures Order, the Sale Procedures Order shall control.

9. Nothing in this Agreement, expressed or implied, is intended to confer or does confer on any person or entity other than the parties hereto or their respective successors and assigns any rights or remedies under or by reason of this Agreement or as a result of the services to be rendered by Evercore hereunder.  The Special Master acknowledges that Evercore is not acting as an agent of the Special Master or in a fiduciary capacity with respect to the Special Master and that Evercore is not assuming any duties or obligations other than those expressly set forth in this Agreement.  Nothing contained herein shall be construed as creating, or be deemed to create, the relationship of employer and employee between the parties, nor any agency, joint venture or partnership. Evercore shall at all times be and be deemed to be an independent contractor.  Nothing herein is intended to create or shall be construed as creating a fiduciary relationship between Evercore and the Special Master. No party to this Agreement nor its employees or agents shall have any authority to act for or to bind the other party in any way or to sign the name of the other party or to represent that that the other party is in any way responsible for the acts or omissions of such party.

10. Pursuant to the Sale Procedures Order, Evercore shall be entitled to judicial immunity to the extent provided therein.  The provisions of this Section 10 shall survive any termination or completion of Evercore's engagement hereunder.

11. Subject to the Sale Procedures Order, the Special Master agrees that he is solely responsible for any decision regarding the Sale Transaction, regardless of the advice provided by Evercore with respect to the Sale Procedures Order.  The Special Master acknowledges that the appointment of Evercore pursuant to this Agreement is not intended to achieve or guarantee, and that Evercore is not in a position to guarantee the achievement of or consummation of, the Sale Transaction.

12. The Special Master recognizes that Evercore has been engaged only by the Special Master and that the Special Master's engagement of Evercore is not deemed to be on behalf of and is not intended to confer rights on any of the Sale Process Parties, any creditor, lender or any other person not a party hereto or any of its affiliates or their respective directors,

7

Confidential

SM0164048_006

officers, members, agents, employees or representatives.  Unless otherwise expressly agreed, no one other than the Special Master is authorized to rely upon the Special Master's engagement of Evercore or any statements, advice, opinions or conduct by Evercore. Without limiting the foregoing, any advice, written or oral, rendered to the Special Master in the course of the Special Master's engagement of Evercore is solely for the purpose of assisting the Special Master (and assisting Weil in representing the Special Master) in implementing the Sale Transaction and does not constitute a recommendation to any of the Sale Process Parties that such party might or should take in connection with the Sale Procedures Order.  Any advice, written or oral, rendered by Evercore may not be disclosed publicly or made available to third parties without the prior written consent of Evercore.

13. In order to coordinate Evercore's efforts on behalf of the Special Master during the period of Evercore's engagement hereunder, the Special Master will promptly inform Evercore of any discussions, negotiations, or inquiries regarding the Sale Transaction, including any such discussions or inquiries that have occurred since the date of the Special Master's appointment (April 13, 2021).

14. This Agreement between Evercore and the Special Master, embodies the entire agreement and understanding between the parties hereto and supersedes all prior agreements and understandings relating to the subject matter hereof, including the Prior Engagement Letter. If any provision of this Agreement is determined to be invalid or unenforceable in any respect, such determination will not affect this Agreement in any other respect, which will remain in full force and effect.  This Agreement may not be amended or modified except in writing signed by each of the parties.

15. In the event that, as a result of or in connection with Evercore's engagement for the Special Master, Evercore becomes involved in any legal proceeding or investigation or is required by government regulation, subpoena or other legal process to produce documents, or to make its current or former personnel available as witnesses at deposition or trial, the Special Master will use reasonable efforts to cause the Sale Process Parties to reimburse Evercore for the reasonable fees and expenses of its counsel incurred (i) in responding to such a request and (ii) in asserting Evercore's rights with respect to judicial immunity.  The provisions of this Section 15 shall survive any termination or completion of Evercore's engagement hereunder.

16. So long as consistent with its duties pursuant to the Sale Procedures Order, and any subsequent order of the Court, Evercore shall have the right to place advertisements in financial and other newspapers and journals at its own expense describing its services hereunder.

17. The Special Master acknowledges that Evercore, in the ordinary course, may have received information and may receive information from third parties which could be relevant to this engagement but is nevertheless subject to a contractual, equitable or statutory obligation of confidentiality, and that Evercore is under no obligation hereby to disclose any such information or include such information in its analysis or advice provided to the Special Master.  In addition, Evercore or one or more of its affiliates may in the past have had, and may currently or in the future have, investment banking, investment management, financial advisory or other relationships with the Sale Process Parties and their affiliates, potential

8

Confidential

parties to any transaction and their affiliates or persons that are competitors, customers or suppliers of (or have other relationships with) the Sale Process Parties or their affiliates or potential parties to any transaction or their affiliates, and from which conflicting interests or duties may arise.  Nothing contained herein shall limit or preclude Evercore or any of its affiliates from carrying on (i) any business with or from providing any financial or non-financial services to any party whatsoever, including, without limitation, any competitor, supplier or customer of the Sale Process Parties, or any other party which may have interests different from or adverse to the Sale Process Parties or (ii) its business as currently conducted or as such business may be conducted in the future.  The Special Master also acknowledges that Evercore and its affiliates engage in a wide range of activities for their own accounts and the accounts of customers, including corporate finance, mergers and acquisitions, equity sales, trading and research, private equity, asset management and related activities. In the ordinary course of such businesses, Evercore and its affiliates may at any time, directly or indirectly, hold long or short positions and may trade or otherwise effect transactions for their own accounts or the accounts of customers, in debt or equity securities, senior loans and/or derivative products relating to the Sale Process Parties or their affiliates, potential parties to any transaction and their affiliates or persons that are competitors, customers or suppliers of the Sale Process Parties.  Without limiting the foregoing, so long as customary information barriers are created and maintained by Evercore, Evercore's engagement hereunder will not limit the ability of Evercore or its affiliates to provide service to any third party, including in relation to a Sale Process Party or any affiliate thereof.

18. The Special Master agrees to provide and use reasonable efforts to procure all corporate, financial, identification and other information regarding the Special Master, as Evercore may require to satisfy its obligations as a U.S. financial institution under the USA PATRIOT Act and Financial Crimes Enforcement Network regulations.

19. Evercore may, in the performance of its services hereunder, delegate the performance of all or certain services as it may select to any of its affiliated entities; *provided* that no such delegation by Evercore shall in any respect affect the terms hereof, and Evercore shall be responsible for any acts or omissions by any of its affiliated entities in the performance of any services delegated to such entity.

20. For the convenience of the parties hereto, any number of counterparts of this Agreement may be executed by the parties hereto, each of which shall be an original instrument and all of which taken together shall constitute one and the same Agreement. Delivery of a signed counterpart of this Agreement by facsimile or electronic mail transmission shall constitute valid sufficient delivery thereof.

21. Except as provided herein, the parties hereby irrevocably consent to the exclusive jurisdiction of the Court over any action or proceeding arising out of or relating to this Agreement, and the parties hereby irrevocably agree that all claims in respect of such action or proceeding may be heard by the Court.  The parties irrevocably agree to waive all rights to trial by jury in any such action or proceeding and irrevocably consent to the service of any and all process in any such action or proceeding by the mailing of copies of such process to each party at its address set forth above.  The parties agree that a final judgment in any such action or proceeding shall be conclusive and may be enforced in other

9

Confidential

SM0164048_008

jurisdictions by suit on the judgment or in any other manner provided by law. The Agreement and any claim related directly or indirectly to this Agreement shall be governed by and construed in accordance with the laws of the State of New York (without regard to conflicts of law principles that would result in the application of any law other than the law of the State of New York). The parties further waive any objection to venue in the Court and any objection to any action or proceeding in such state on the basis of forum non conveniens.

WEIL:\98537043\7\67816.0003

Confidential

SM0164048_009

If the foregoing correctly sets forth the understanding and agreement between Evercore and the Special Master, please so indicate in the space provided below, whereupon this letter shall constitute a binding agreement as of the date hereof.

Very truly yours,

Evercore Group L.L.C.

By: _____

David Ying
Senior Managing Director

Agreed to and Accepted as of
March 15, 2023:

Special Master of the United States District Court for the District of Delaware

By:    /s/ Robert B. Pincus
Robert B. Pincus
In his capacity as Special Master
of the United States District Court for the District of Delaware

11

Confidential

SM0164048_010

# EXHIBIT B

Page 1

**Confidential Pursuant to Confidentiality Agreement**

May 27, 2024

Participant:

On behalf of Robert B. Pincus in his capacity as Special Master for the United States District Court for the District of Delaware (the "Special Master") in the matter of *Crystallex International Corp. v. Bolivarian Republic of Venezuela*, D. Del. C.A. No. 1:17-mc-00151-LPS (the "Crystallex Case"), we would like to thank you for your consideration of a potential acquisition of all, or a portion, of the shares of PDV Holding Inc. ("PDVH"). CITGO Petroleum Corporation ("CITGO Petroleum") is a direct, wholly owned subsidiary of CITGO Holding, Inc. ("CITGO Holding" and together with CITGO Petroleum, "CITGO") which in turn is 100% owned by PDVH, which in turn is 100% owned by Petróleos de Venezuela, S.A. ("PDVSA"), a Venezuelan corporation 100% owned and controlled by the Bolivarian Republic of Venezuela. Evercore is assisting the Special Master in the implementation of a court-mandated sale of an amount of the shares of PDVH sufficient to satisfy Attached Judgments (as defined in the Sale Procedures Order (defined below)) (the "Proposed Transaction").

This letter is being furnished to those persons who have been performing diligence as part of the second round of the Special Master's marketing process. To determine the Special Master's interest in pursuing the Proposed Transaction with you, we invite you to submit a final written, definitive and binding proposal with respect to the Proposed Transaction (your "Proposal"). If the Special Master deems your Proposal to be the bid most likely to satisfy the greatest amount of the Attached Judgments when considering value, certainty of closing and such other factors as the Special Master may determine, in his sole discretion, you may be contacted regarding the process to execute a definitive agreement.

This letter, and the procedures and timetable included herein, are confidential and are subject to the terms of the Confidentiality Agreement that you entered into with the Special Master (the "Confidentiality Agreement") in connection with the Proposed Transaction, the terms of which are not modified or varied by this letter. Unless otherwise defined herein, all capitalized terms used shall have their meaning set forth in the Confidentiality Agreement or the *Sixth Revised Proposed Order (A) Establishing Sale and Bidding Procedures, (B) Approving Special Master's Report and Recommendation Regarding Proposed Sale Procedures Order, (C) Affirming Retention of Evercore as Investment Banker by Special Master and (D) Regarding Related Matters* [D.I. 481] (the "Sale Procedures Order") filed in the Crystallex Case, as context may require.

I.   PROPOSAL

Please submit your Proposal in writing to Evercore at any time before **5:00 PM (Central Time) on Tuesday, June 11, 2024,** (the "Proposal Deadline") via email in care of:

| Evercore | Attention: | Ray Strong | William Hiltz |
|---|---|---|---|
| | | Senior Managing Director | Senior Managing Director |
| | Office: | (713) 427-5146 | (212) 857-3154 |
| | Cell: | (347) 549-2043 | (917) 992-3093 |
| | Email: | ray.strong@evercore.com | hiltz@evercore.com |

EVERCORE

Page 2

With a copy to:

| | | |
|---|---|---|
| Weil, Gotshal & Manges LLP | Attention: | Michael J. Aiello |
| | | Ray C. Schrock |
| | | Eoghan P. Keenan |
| | Email: | michael.aiello@weil.com |
| | | ray.schrock@weil.com |
| | | eoghan.keenan@weil.com |

Your Proposal should include, at a minimum, the following information:

A.  **Proposed Transaction Structure.** Confirm that your Proposal is for all, or a portion, of the shares of PDVH, sold free and clear of all claims, encumbrances, and liabilities on or against the shares, in accordance with the terms of the Sale Procedures Order and subject to the qualifications referenced in paragraphs A.iii. and F. below. If your Proposal is for a portion of the shares of PDVH, please indicate (i) the percentage of shares of PDVH proposed to be acquired and (ii) any minority shareholder rights, protections or other desired terms in connection with the Proposed Transaction and any definitive documentation related thereto.

Proposals should utilize the following key assumptions and notes with respect to structuring the Proposed Transaction:

i.  <u>Treatment of Cash and Debt</u>: Your Proposal should assume that the available cash of PDVH and its subsidiaries will be equal in value to the aggregate debt of PDVH and its subsidiaries at the closing of the Proposed Transaction and that any cash in excess of the debt amount shall be for the benefit of the sellers.

ii.  <u>Working Capital</u>: Your Proposal should assume a normalized amount of working capital, to be determined based upon a working capital calculation included as an exhibit to the definitive SPA, a draft of which will be posted to the data room (the "Target Net Working Capital").  The purchase price will be adjusted on a dollar-for-dollar basis to the extent that the net working capital delivered at closing is greater than or less than, as the case may be, the Target Net Working Capital.

iii.  <u>PDVSA 2020 Bonds Share Pledge</u>: The Special Master is engaged in discussions with holders of notes issued pursuant to that certain Indenture, dated October 27, 2016 (the "Indenture"), by and among PDVSA, as issuer, PDVSA Petróleo, S.A., as guarantor, MUFG Union Bank, N.A., as trustee, GLAS Americas LLC, as collateral agent, Law Debenture Trust Company of New York, as registrar, transfer agent and principal agent, and Banque Internationale À Luxembourg, Société Anonyme, as Luxembourg paying agent, whereby PDVSA issued 8.50% senior secured notes due in 2020 with an aggregate principal amount of $3,367,529,000 (the "PDVSA 2020 Notes"), of which an aggregate principal amount of $1,683,764,500 remains outstanding, purportedly secured by a pledge of the equity of CITGO Holding (the "CITGO Equity Pledge"). The PDVSA 2020 Notes and the CITGO Equity Pledge are currently the subject of litigation in the matter of *Petróleos de Venezuela, S.A., PDVSA Petróleo, S.A., and PDV Holding, Inc., v. MUFG Union Bank, N.A. and GLAS Americas LLC*, Civ. Nos. 20-3858, 20-4127 (the "2020 Notes Litigation"). In your Proposal, please indicate which of the following scenarios you intend to adopt in respect of the CITGO Equity Pledge: (i) the Special Master seeks to negotiate and implement, with approval of the Court, a release of the CITGO Equity Pledge in

E V E R C O R E

Page 3

advance of, or in connection with, implementation of the Proposed Transaction , (ii) you acquire the shares of PDVH subject to the CITGO Equity Pledge and the continuation of the associated 2020 Notes Litigation or (iii) in connection with the closing of a Proposed Transaction, you intend to implement a settlement that addresses the PDVSA 2020 Notes in some other manner, together with any material details relating to such intended treatment of the CITGO Equity Pledge. With respect to clause (i) of the foregoing sentence, the Special Master and the holders of the PDVSA 2020s Notes have not reached such an arrangement at this time with respect to such release and there can be no assurances that such a release will be agreed to prior to the closing of the Proposed Transaction. In the event you do *not* intend to acquire the shares of PDVH subject to the CITGO Equity Pledge pursuant to paragraph A.iii.(ii) above, your Proposal must confirm that your bid will provide sufficient cash consideration to address your proposed treatment of the PDVSA 2020 Notes.

**B. Stock Purchase Agreement.** A draft Stock Purchase Agreement (the "Proposed SPA") that provides for the acquisition of all, or a portion, of the shares of PDVH, together with a redline marked to show your proposed changes (including filling in blanks), if any, to the bid draft Stock Purchase Agreement (the "Bid Draft SPA"), which will be posted to the data room (including proposed changes and accompanying redlines for all exhibits and schedules included in the data room). Please provide such comments in Microsoft Word format and include both a clean Word version as well as a PDF comparison to the Bid Draft SPA posted to the data room. Do not submit an issues list or other summary comments instead of a Proposed SPA with a redline against the Bid Draft SPA to show all proposed comments. The Proposed SPA you submit should include all of your requested changes to the Bid Draft SPA and should include specific, in-line edits and not conceptual, non-specific or footnoted comments. Please note that the Special Master will consider the extent of any comments to the Bid Draft SPA in selecting a counterparty with which to proceed.

**C. Identity of Purchaser or Counterparty.** A statement identifying the legal name, jurisdiction and type of organization/entity form of each entity that will act as purchaser or counterparty in the Proposed Transaction, including the identity of any controlling person(s), principal equityholders, whether current or anticipated, and each other entity that will be otherwise participating in your Proposal (if applicable), as well as a summary of such organization/entities' history, primary business and sufficient information to demonstrate that such organization/entity has the financial wherewithal to timely consummate the Proposed Transaction.

**D. Purchase Price and Principal Economic Terms.** A statement setting forth (i) the total equity value you assign to the shares of PDVH ("Valuation") determined based upon the key assumptions described under paragraph A above, (ii) the amount and a detailed analysis of any non-cash components of the purchase price, including without limitation, a credit bid, stock and/or the assumption of liabilities, and the value of such components, any assumptions related thereto, and reasonable back-up documentation to support such value, (iii) a brief description of the methodology used to derive the Valuation, (iv) an identification of any underlying material assumptions regarding the business of PDVH and CITGO and your determination of the purchase price and (v) disclosure of any related transactions to be pursued or effectuated by you in connection with the Proposed Transaction. The Special Master may consider alternative structures in the event that it maximizes value of the PDVH shares.

**E. Sources of Financing.** A detailed description of the sources of funds that you intend to use to finance the Proposed Transaction. Please provide copies of the financing commitments and other similar documentation (as applicable) from all sources, such that your Proposal clearly and

Page 4

affirmatively demonstrates that it is not subject to any financing condition. Certainty of financing is critical and will factor into the Special Master's decision.

F. **Credit Bid (if applicable)**. If you hold an Attached Judgment, you may seek to submit a credit bid (a "Credit Bid") for the shares of PDVH, to the extent permitted by applicable law. If you are submitting a Credit Bid, please state as such, and confirm that such Credit Bid will (i) provide sufficient cash consideration to pay in full all Transaction Expenses and (ii) provide sufficient cash to satisfy in full any obligations secured by a senior lien on the shares of PDVH (which, for the purposes of this section F, shall not include the CITGO Equity Pledge); *provided*, that in the event you do *not* intend to acquire the shares of PDVH subject to the CITGO Equity Pledge pursuant to paragraph A.iii.(ii) hereof, your Proposal must confirm that your Credit Bid will provide sufficient cash consideration to address your proposed treatment of the PDVSA 2020 Notes. For avoidance of doubt, the requirements set forth in paragraph A.iii. of this letter shall apply to any Credit Bid Proposal.

G. **Purchaser Approvals.** Evidence of corporate or other organizational authorization and approval from your board of directors (or comparable governing body) or otherwise with respect to the submission, execution and delivery of the Proposal (including the execution of the Proposed SPA), participation in any auction and closing of the Proposed Transaction contemplated by the Proposed SPA in accordance with its terms and the terms of the Sale Procedures Order (including the Bidding Procedures contained therein), and an indication of any anticipated need, timeline and plan to obtain any further equityholder, board, organizational, partnership, investment committee or other approval, including governmental, regulatory and other third-party approvals, consents, notifications, waivers or other similar actions that you anticipate will be required to execute a definitive Stock Purchase Agreement (the "definitive SPA"). Please also include a statement or evidence that (i) you will make in a timely manner (1) all filings and disclosures necessary to comply with the regulations of the Department of Treasury's Office of Foreign Assets Control ("OFAC"), (2) all necessary filings under the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended, and any other antitrust laws, as applicable, and pay the fees associated with such filings and (3) all necessary filings in connection with any review by the Committee on Foreign Investment in the United States (CFIUS), if applicable and (ii) your Proposal is reasonably likely to be consummated, after taking into consideration antitrust and any other regulatory matters, your prior experience and any other relevant considerations, if selected as the Successful Bid, within a timeframe acceptable to the Special Master.

H. **Due Diligence Requirements.** Your Proposal should not be subject to any remaining due diligence. You may be permitted to conduct a confirmatory review of any specific and reasonable due diligence materials or activities that you have requested and received confirmation that such information will be available at a later date. If such outstanding confirmatory due diligence items exist, please specifically indicate and provide details regarding these items that you would require prior to execution of the definitive SPA, and include your expected dates of completion of such items.

I. **Advisors.** A list of the financial, accounting, legal, industry consultants and other advisors that you have retained or plan to retain in connection with the Proposed Transaction.

J. **Contacts.** A list of persons (including e-mail addresses and phone numbers) who should be contacted with respect to any questions regarding your Proposal.

Page 5

**K.**  **Special Master Consent.** Your consent for the Special Master, in his discretion, to share information with U.S. Government regulators, including OFAC, pertaining to you or your Proposal.

**L.**  **Cooperation**. A statement that (i) you agree that your advisors will coordinate in good faith with the Special Master's advisors to discuss and explain your regulatory and other consent analysis, strategy and timeline for securing all such approvals and consents as soon as reasonably practicable and (ii) you agree to cooperate with the Special Master to provide pertinent factual information regarding your ownership and operations reasonably required to respond to, or otherwise analyze issues arising with respect to, U.S. sanctions laws and regulations, the Committee on Foreign Investment in the United States, any applicable antitrust laws and other relevant regulatory requirements or requests.

**M.**  **No Entitlement to Reimbursement**. A statement that your Proposal does not entitle you to any break-up fee, termination fee, expense reimbursement or similar type of payment or reimbursement; provided, however, the definitive SPA will include a termination fee in connection with certain termination events.

**N.**  **No Liability**. A statement that (i) you agree that in no circumstance shall the Special Master or his advisors be personally or otherwise liable for any amounts or obligations owed to you, (ii) the Special Master and his advisors are acting as an arm of the Court and are entitled to judicial immunity in the performance of their duties and (iii) PDVH, CITGO and their respective officers, directors and advisors will have no liability or obligation to you or your affiliates, except and only to the extent it is expressly provided for in the definitive SPA if, as and when executed.

**O.**  **Representations and Warranties**. The following representations and warranties:

  a.   a statement that you recognize and acknowledge that the Special Master, his advisors, PDVH, CITGO and their respective representatives make no representations, covenants or warranties (or any other promise) as to the accuracy or completeness of any information provided in the data room or otherwise made available by the Special Master and his advisors in connection with the bid process;

  b.   a statement that, other than with respect to your reliance on the representations and warranties provided in the definitive SPA if, as and when executed, you have relied solely upon your own independent review, investigation and/or inspection of any relevant documents regarding the assets to be purchased and did not rely on any written or oral statements, representations, promises, warranties or guaranties whatsoever, whether express or implied, by operation of law or otherwise, regarding PDVH and its subsidiaries or the completeness of any information made available in connection therewith;

  c.   a statement that you have not engaged in any collusion with respect to the submission of your Proposal; and

  d.   a statement that all proof of financial ability to consummate the Proposed Transaction in a timely manner and other information you submit is true and correct.

**P.**  **Bidding Procedures**. A statement that you agree to be bound by the terms and conditions of the Bidding Procedures set out in the Sale Procedures Order.

Page 6

    **Q.  Other Material Terms.**  A list of any additional terms or conditions the satisfaction of which you anticipate would be a material condition precedent to executing the definitive SPA with respect to the Proposed Transaction.

## II.  CONDITIONAL SELECTION OF PROSPECTIVE PURCHASER

Based upon, among other things, an analysis of the purchase price and other terms presented in your Proposal, the Special Master, in his sole and absolute discretion, may elect to further pursue the Proposed Transaction with you.

Please note that the existence and terms of this letter and any related communications and/or information provided in connection therewith are subject to your Confidentiality Agreement with the Special Master and should be treated accordingly.

## III.  ALL RIGHTS RESERVED

All communications, inquiries and requests for information relating to the Proposed Transaction, including any materials in connection therewith, should be directed to Evercore. **Neither you nor your employees, representatives, agents, affiliates, partners, co-venturers or other related parties are permitted to contact the Special Master, PDVSA, PDVH, CITGO or its subsidiaries, or any of their direct or indirect affiliates, directors, managers, officers, employees, suppliers, vendors, customers, financiers, counterparties, partners, co-venturers or regulators, either directly or indirectly, in relation to any matter set forth in this letter or in relation to the Proposed Transaction.**

This letter does not constitute an offer to sell PDVH or its assets. You acknowledge and agree that the Special Master has the right, in his sole and absolute discretion, to reject any and all proposals regarding any Proposed Transaction and to negotiate with one or more parties simultaneously and terminate discussions and negotiations of any Proposed Transaction with any one or more parties at any time, for any reason or for no reason; that the procedures which the Special Master may employ in the pursuit of any Proposed Transaction, if any such pursuit is undertaken, are within his sole and absolute discretion; that any such procedures are subject to change at any time for any reason or for no reason and with or without prior notice; that determinations of compliance or noncompliance with such procedures will be solely and completely judged by the Special Master, and the sole remedy for any objection to such procedures, the application thereof or any judgment exercised by the Special Master with respect thereto will be withdrawal, without further recourse, from participation in further discussions with respect to the Proposed Transaction. No agreement or understanding regarding a Proposed Transaction shall be deemed to exist unless and until the definitive SPA regarding the Proposed Transaction has been executed and delivered by the parties thereto, and no prospective purchaser shall have any claim based upon any legal theory in connection with a Proposed Transaction unless and until the parties shall have entered into, executed and delivered the definitive SPA.

**By submitting your Proposal, you acknowledge that you have reviewed this letter and that you agree without reservation to all terms, restrictions and conditions contained herein.**

We encourage you to contact the following individuals with any questions regarding your Proposal or any other matter set forth in this letter:

**EVERCORE**

Page 7

Ray Strong                                    William Hiltz
Senior Managing Director              Senior Managing Director
Office: (713) 427-5146                   Office: (212) 857-3154
Cell: (347) 549-2043                       Cell: (917) 992-3093
ray.strong@evercore.com              hiltz@evercore.com

The Special Master and Evercore appreciate your interest in this process and look forward to working with you with respect to the Proposed Transaction.

Sincerely,

Ray Strong
Senior Managing Director
Evercore on behalf of the Special Master

**E V E R C O R E**

# EXHIBIT C

# THIS EXHIBIT HAS BEEN REDACTED IN ITS ENTIRETY

# EXHIBIT D

# THIS EXHIBIT HAS BEEN REDACTED IN ITS ENTIRETY

# EXHIBIT E

# THIS EXHIBIT HAS BEEN REDACTED IN ITS ENTIRETY

# EXHIBIT F

# THIS EXHIBIT HAS BEEN REDACTED IN ITS ENTIRETY

# EXHIBIT G

# THIS EXHIBIT HAS BEEN REDACTED IN ITS ENTIRETY

# EXHIBIT H

# DCF Methodology Comparison

- Alberro WACC is significantly lower than Evercore calculated WACC for the same period

  ▶ Difference of 300 bps attributable to the market risk premium and company risk premium

- In public fairness opinions, which occurred in a lower interest rate market, the WACC ranged from 8.2% – 13.0%[1]

## WACC Comparison

> Alberro peer group for WACC omits several key peers due to size, location and number of refineries, however, CITGO's earnings profile has not consistently tracked with selected peers

|  | Evercore (September 2023) | Evercore (July 2025) | Alberro Testimony |
|---|---|---|---|
| Risk-free Rate | 4.48% | 4.87% [2] | 4.87% [2] |
| Debt and Preferred / Total Cap | 25.75% | 28.76% | 27.53% |
| Adjusted Levered Equity Beta | 0.66 | 1.02 | 1.01 |
| Market Risk Premium | 6.25% / 7.17% [3] | 6.26% / 7.31% [3] | 4.21% |
| Company Size Risk Premium | 0.57% [3] | 0.49% [3] | NA |
| **Equity Cost of Capital** | **9.27% / 9.81%** | **11.73% / 12.79%** | **9.12%** |
| Pre-Tax Cost of Debt | 8.50% | 7.58% | 8.13% |
| After-Tax of Debt | 6.55% | 5.99% | 6.03% |
| **WACC** | **8.57% / 8.97%** | **10.08% / 10.84%** | **8.27%** |

Source: FactSet as of July 3, 2025, Expert Testimony by Jose Alberro, CITGO MTP projections from January 2025
1. Per fairness opinions filed in connection with (i) HollyFrontier Corporation's acquisition of Sinclair Oil Corporation's assets (August 2021); (ii) HF Sinclair's acquisition of Holly Energy Partners (October 2023); (iii) Marathon Petroleum Corporation's acquisition of Andeavor (April 2018); (iv) PBF Energy Inc.'s acquisition of PBF Logistics LP (October 2022); Kroll (rebranded from Duff and Phelps post acquisition) was cited in (ii) and (iv), while others did not disclose that level of detail. Damodaran was never cited.
2. Risk-free rate reflects the 20-year Treasury yield as of July 3, 2025
3. Cost of Capital Navigator by Kroll

EVERCORE



# EXHIBIT I

# THIS EXHIBIT HAS BEEN REDACTED IN ITS ENTIRETY

# EXHIBIT J

# THIS EXHIBIT HAS BEEN REDACTED IN ITS ENTIRETY

# EXHIBIT K

# THIS EXHIBIT HAS BEEN REDACTED IN ITS ENTIRETY

# EXHIBIT L

# THIS EXHIBIT HAS BEEN REDACTED IN ITS ENTIRETY

# EXHIBIT M

# THIS EXHIBIT HAS BEEN REDACTED IN ITS ENTIRETY

# EXHIBIT N

# THIS EXHIBIT HAS BEEN REDACTED IN ITS ENTIRETY

# EXHIBIT O

# THIS EXHIBIT HAS BEEN REDACTED IN ITS ENTIRETY