womblebonddickinson.com



Womble Bond Dickinson (US) LLP

1313 North Market Street
Suite 1200
Wilmington, DE 19801

t:  302.252.4320
f:  302.252.4330

August 13, 2025

The Honorable Leonard P. Stark
United States District Court
District of Delaware
J. Caleb Boggs Federal Building
844 N. King Street
Wilmington, Delaware 19801

Kevin J. Mangan
Partner
Direct Dial: 302-252-4361
Direct Fax: 302-661-7729
E-mail: Kevin.Mangan@wbd-us.com

**Re:** *Crystallex International Corp. v. Bolivarian Republic of Venezuela,* **Case No. 17-mc-151**

Dear Judge Stark,

On behalf of our client, Gold Reserve, this responds to the letter submitted yesterday evening by Red Tree (D.I. 2025).

Gold Reserve has also reviewed the Special Master's response this morning (D.I. 2026) and the Court's order adjourning the status conference scheduled for this afternoon. (D.I. 2028). While Gold Reserve will meet-and-confer with the Special Master and submit its position, if necessary, in the short letter referenced by the Court due tomorrow by 8 pm, Gold Reserve believes it may provide some value to the Court, the Special Master, and the parties to set out in advance its position in respect of the Red Tree letter.

Gold Reserve, as the Court knows, is the Final Recommended Bidder through its acquisition vehicle, Dalinar Energy.  Under the terms of the final Stock Purchase Agreement ("SPA") executed with the Special Master on June 25, 2025, the value of Gold Reserve's bid is **$7.382 billion**.  The Gold Reserve bid was submitted with the support of its consortium partners, Rusoro Mining Limited ("Rusoro"), Koch Minerals SARL and Koch Nitrogen International SARL (collectively, "Koch"), and XYQ US, LLC ("XYQ").  Red Tree, as the Court will recall, is a 2020 Bondholder and was the Stalking Horse Bidder.

Gold Reserve has several points regarding Red Tree's improper letter.

<u>First</u>, Gold Reserve is firmly of the view that Red Tree's letter, while improper for multiple reasons, including those identified by the Special Master, does not require any adjournment of the Sale Hearing. To consider adjourning the Sale Hearing because a losing bidder has acted improperly, and now is attempting to destabilize the Sale Process, should not be countenanced.

Womble Bond Dickinson (US) LLP is a member of Womble Bond Dickinson (International) Limited, which consists of independent and autonomous law firms providing services in the US, the UK, and elsewhere around the world. Each Womble Bond Dickinson entity is a separate legal entity and is not responsible for the acts or omissions of, nor can bind or obligate, another Womble Bond Dickinson entity. Womble Bond Dickinson (International) Limited does not practice law. Please see www.womblebonddickinson.com/us/legal-notice for further details.

Second, Red Tree refers to an "Amber Energy bid submitted last weekend." (*Id.* at 1). Gold Reserve does not know what this refers to. No such bid has been filed on the docket and the terms of any such bid have not been provided to Gold Reserve. Red Tree implies that this Amber Energy bid offers "***$5.859 billion***" to the Attached Judgment Creditors. (*Id.*) If true, it would violate the bidding procedures and protections established by the Court, as well as the terms of the Final Recommended SPA, and therefore this bid would be non-actionable. Specifically, this bid would violate the requirement that any unsolicited competing bid submitted during the No-Shop Period must include an ***overbid minimum above the Purchase Price*** of the Final Recommended Bid.

As the Court will recall, the bidding procedures and protections for the Sale Process are included in the SPA and were the subject of two rounds of full briefing earlier this year, pursuant to the revised procedures established by the Court in its December 31, 2024 Order (D.I. 1516). In the first round of briefing, the Special Master proposed, and the parties then submitted their position on, what the material terms of the SPA should be. *See* (D.I. 1554) (summarizing briefing). In the second round, after the Court resolved those issues, the Special Master and Sale Process Parties converted those Court-ordered terms into a fully-drafted SPA that was published on the docket, and the parties briefed their objections, if any, to this model SPA. *See* (D.I. 1571), (D.I. 1583) (summarizing further briefing). The purpose of this extended process was to determine in advance, as much as possible, the "rules of the road" for the Sale Process going forward – so that parties could compete on price and thus create the value-maximizing Sale Transaction required by Delaware law, the Court and the Sale Procedures Order.

One of the critical "rules of the road" established by the Court is that any bid submitted during the present, final phase of these proceedings – the "No-Shop Period" between the date of the Final Recommendation (July 2, 2025) and the start of the Sale Hearing (August 18, 2025) – must include an overbid minimum above the purchase price of the final recommended bid equal to or in excess of two amounts: (a) an Expense Reimbursement Amount payable to the Final Recommended Bidder of up to $30 million; and (b) a $50 million overbid minimum.

The $50 million overbid minimum, as the Court may recall, resulted from a position taken by Gold Reserve (and Rusoro) during the first round of the above-referenced briefing. Initially, the Special Master proposed only a $25 million overbid minimum. Gold Reserve (and Rusoro) argued that this amount should be doubled during the No-Shop Period because it was "reasonable to impose a higher threshold" for post-Final Recommendation overbids "given the attendant, material disruption that such an overbid would cause to the Court's carefully crafted schedule for objections/approval of the Final Recommended Bid[.]" (D.I. 1550 at 3); *see* (D.I. 1539-1 at 3). The Special Master did not object, and argued only that he should retain the discretion to lower this overbid minimum (D.I. 1545-1 at 7-8), subject to the following: "In all circumstances, the Special Master will need to justify his use of discretion in connection with submitting his recommendation to the Court." (D.I. 1545-1 at 7). The Court agreed with both Gold Reserve and the Special Master and, in its January 27, 2025 Order, increased the overbid minimum during the No-Shop Period to $50 million, subject to the Special Master's discretion to lower or raise it, if so justified. (D.I. 1554).

The amount of Court-ordered overbid minimum was reflected in the terms of the model SPA, and no party objected to it. It was then included in the final SPA which Dalinar Energy and the Special Master executed on June 25, 2025. Specifically, Section 6.16(f)(i) of the executed SPA states:

2

> *provided*, that any Unsolicited Competing Proposal received during the No-Shop Period **must satisfy an overbid minimum above the Purchase Price (less the Debt Payoff Amount) equal to or in excess of** (A) the Expense Reimbursement Amount pursuant to Section 8.3(c), if applicable, plus (B) $50,000,000 ((A) and (B), collectively, the "Subsequent Overbid Minimum"); *provided*, further, that the Special Master may, in his sole discretion, lower or raise the Subsequent Overbid Minimum for any Competing Proposal.

(D.I. 1837, Ex. B. at 63, ¶ 6.16(f)(i)) (bold emphasis added).

The requirement that an Unsolicited Competing Proposal include an "***overbid minimum above the Purchase Price***" cannot be satisfied, under any circumstances, by an ***underbid***, i.e., a bid which proposes to pay less to the Attached Judgment Creditors than the Final Recommended Bid. And, while the Court granted the Special Master discretion to ***lower*** or ***raise*** this overbid minimum, it did not approve—nor do the Court's orders or the final SPA allow—the overbid minimum to be ***eliminated*** altogether. No version of the overbid minimum, including the original proposal from the Special Master, D.I. 1528-1 at 3, suggested that it could be lowered to zero. Moreover, the Court did not approve, and no party has ever suggested, that the overbid minimum could be converted into a ***negative number*** that would allow the purchase price of an Unsolicited Competing Proposal during the No-Shop Period to be ***lower*** than the Purchase Price of the Final Recommended Bid.

The "Amber Energy bid" referenced in Red Tree's letter apparently violates all of these requirements given that its stated purchase price of $5.859 billion is $***1.523 billion less*** than the value of the Gold Reserve consortium's Final Recommended Bid. As such, it is a non-starter and non-actionable.

For the avoidance of doubt, Amber Energy cannot artificially inflate the stated purchase price of its bid by including amounts that it apparently has agreed to pay Red Tree and the other 2020 bondholders. Red Tree's letter states that the Amber Energy bid settles the "the 2020 Bondholders' litigation claims and resolves an expected $2.857 billion of claims against PDVSA." (D.I. 2025 at 1). This appears to just be a rehash of the "2020s settlement" that was included in Red Tree's Stalking Horse bid. However, the monetary value of any settlement with the 2020s cannot be included in the stated purchase price of a bid – because such a settlement ***reduces*** the amounts paid to Attached Judgment Creditors, by diverting value to the non-party 2020 bondholders. ***As such, the actual price of the Amber Energy bid is $5.859 billion not $8.821 billion, as the Red Tree letter incorrectly states***.

In Gold Reserve's view, the foregoing points are not subject to dispute, and confirmed by *inter alia* the express terms of the Court's Order setting the material terms of the SPA (D.I. 1554), the Court's Orders which resolved objections to the model SPA and thus prescribed such terms ((D.I. 1571), (D.I. 1583)), and the terms of the final SPA executed by the Special Master and Dalinar Energy that is the subject of the Final Recommendation. (D.I. 1837-1, Ex. B).

However, there are also other reasons that support this point. For example, the entire purpose of the overbid minimum was to ***increase*** the purchase price of the bids during the No-Shop Period. The Amber Energy bid apparently does the exact opposite – reducing by more than $1.5 billion the amount of consideration paid to the AJCs. This would run directly counter to *inter alia* the Delaware law

requirement (8 Del. Section 324(a)), recognized by the Court, that "attached shares be sold "'to the highest bidder[.]'" (D.I. 1741 at 4-5). For a rival bidder – particularly a bidder like Amber Energy that has been involved in the Sale Process for more than a year – to lob in a lower bid at this final stage of the process, literally just a few days before the Sale Hearing is scheduled to commence, and after discovery and extensive briefing concerning the terms of the Final Recommendation has already taken place, will only create the "attendant, material disruption to the Court's carefully crafted schedule for objections/approval of the Final Recommended Bid," that Gold Reserve predicted would occur in respect of an *overbid* that did not top the Final Recommended Bid by less than $50 million. (D.I. 1550 at 3). To create such material disruption because of an *underbid* has no justification whatsoever and, in Gold Reserve's respectful submission, should not be countenanced.

Should the Court require further briefing on this issue, Gold Reserve is prepared to provide it on an expedited schedule set by the Court. However, in no circumstances does Gold Reserve believe that Red Tree's improper letter, or the Amber Energy non-actionable bid, should cause the Court to reschedule the already long-delayed Sale Hearing.

Third, with respect to Red Tree's request for opening statements of up to 15 minutes per party and its request to re-animate the two expert witnesses that its affirmatively stated it would not call just a few weeks ago, Gold Reserve objects for the reasons previously stated by the Special Master and the Venezuela Parties.[1] Furthermore, because Red Tree bases this request entirely on its apparent plan to advocate at the Sale Hearing "in support of the Amber Energy bid," and the Amber Energy bid is not actionable for at minimum, the reasons set forth above, this request should be denied.

---

[1] For example, in an August 11, 2025 inter-party email, the Venezuela Parties stated as follows in pertinent part: "1. The Venezuela Parties oppose Red Tree's proposal to begin the hearing with opening statements, which are unnecessary given that Judge Stark will have the parties' pre-hearing objections briefs. … 4. The Venezuela Parties will oppose any attempt by Red Tree to call their previously withdrawn expert Mr. Kleinrichert at the hearing as untimely and prejudicial. The discovery period has closed, response briefs have already been filed, reply briefs are due on Wednesday, exhibit disclosures are due on Thursday, and the hearing starts in less than one week. Red Tree made a voluntary decision to withdraw its competing bid and objection, a voluntary decision to withdraw Mr. Kleinrichert as a witness, and a voluntary decision to refuse to make him available for a deposition, as required by Fed. R. Civ. P. 26 and the Court's scheduling orders. All these voluntary decisions presumably were made because they were in Red Tree's own interest (we note that Dr. Heaton was made available for a deposition even though it was clear Red Tree no longer had any intention of calling him as a witness). It is too late for Red Tree to change its mind now that it believes presenting Kleinrichert to be in its (or, more accurately, its parent 2020 bondholder Contrarian's) interest. Requiring the parties to prepare to depose and respond to Mr. Kleinrichert's testimony at this late stage would be highly prejudicial given the demands of the pre-hearing schedule and the need to prepare for the hearing. Among other things, Dr. Alberro has not had the opportunity to complete an analysis of Kleinrichert's report, incorporate discovery in the case taken so far into that analysis, or submit a reply report, as he is entitled to do under the scheduling order. On July 25, Josh Bloom purported to reserve Red Tree's right to call Mr. Kleinrichert only if Red Tree submitted a revised bid—not in support of an unsolicited proposal from a different bidder. (Even if Red Tree had submitted a revised bid now, it would be far too late to reinstate him.). 5. It is unclear to us how Dr. Heaton could be called to testify in support of Elliott's bid, given that Elliott's bid was not a subject of his expert disclosure and he was not made available to be deposed on that subject."

Respectfully submitted,

**Womble Bond Dickinson (US) LLP**

*/s/ Kevin J. Mangan*
Kevin J. Mangan

Matthew H. Kirtland (admitted *pro hac vice*)
**Norton Rose Fulbright US LLP**
799 9th Street NW, Suite 1000
Washington, DC 20001
Telephone: 202-662-0200
matthew.kirtland@nortonrosefulbright.com

cc: Counsel of Record (via ECF)

5