**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| CRYSTALLEX INTERNATIONAL CORP., | |
| Plaintiff, | |
| v. | Misc. No. 17-151-LPS |
| BOLIVARIAN REPUBLIC OF VENEZUELA, | |
| Defendants. | |

**2020 BONDHOLDERS' REPLY IN FURTHER SUPPORT OF THEIR
OBJECTION TO THE SPECIAL MASTER'S FINAL RECOMMENDATION**

An ad hoc group of holders of a majority of PDVSA 2020 Bonds (the "2020 Bondholders") submit this Reply Memorandum in further support of their Objection to the Special Master's Final Recommendation (D.I. 1943, the "Objection"), and in reply to the Responses to Objections of the Special Master (D.I. 2006), Gold Reserve (D.I. 1991), ConocoPhillips (D.I. 1988), OI European Group B.V. ("OIEG," D.I. 1985), and the Venezuela Parties (D.I. 1984) (collectively, the "Responses").[1]

Far from defending the Sale Order proposed by the Special Master, the Responses themselves powerfully illustrate that it is unlawful, unprecedented, and unprincipled in the respects identified by the 2020 Bondholders. Rather than attempting to defend the actual terms and language of that order—only a handful of pages in the Special Master's brief do so—they try to change the subject, arguing that the Court can order the PDVH shares to be transferred to a buyer free and clear of liens on those shares. That attempted pivot ignores everything else the Proposed Sale Order would do. Among other things, the Proposed Sale Order would (i) enjoin and release claims concerning Gold Reserve's chosen financing for the purchase, which is to be provided by non-debtor CITGO entities that were never even liable to the judgment creditors and whose assets are not before this Court, (ii) force those entities' directors to take actions under threat of contempt even if they violate the 2020 Bondholders' Pledge Agreement, their fiduciary and other duties, or Delaware debtor and creditor law, (iii) extinguish appellate review of the Sale Order, and (iv) potentially even preclude the 2020 Bondholders from litigating their rights in the Southern District of New York—which this Court specifically recognized they have every right to do without

---

[1] All capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Objection.

interference.  No party even attempts to offer any coherent defense of these blatantly unlawful provisions, nor could they.

The PDVH Shares are being sold under Section 324 of Title 8 of the Delaware Code, which authorizes only the transfer of "shares . . . to the purchaser, as fully as if the debtor, or defendant, had transferred the same to such purchaser."  8 Del. C. § 324(c).  That is what this Court has long contemplated as part of the Sale Process, and it is what it should now order—and nothing more.  The fact that the Gold Reserve Consortium chose a financing method that supposedly requires the Court to issue an order inconsistent with the Court's prior statements and rulings and beyond what the law allows is not sufficient justification for the entry of their unprecedented Proposed Sale Order.  Tellingly, in the 120 pages of Responses, no party was able to identify even a single Section 324 sale order containing the offensive provisions challenged by the 2020 Bondholders.  Nor have the 2020 Bondholders been able to identify such an order.  Rather than identify any authority by which the Court could appropriately impose the challenged provisions, the Special Master defends those provisions by asserting that they are "necessary" enhancements to avoid risks a purchaser would prefer not to take on.  But whether a buyer prefers or even insists upon such provisions does not make them lawful.  The Special Master's fallback— that the Court should exercise authority under the All Writs Act to eliminate these risks by enjoining potential claims—ignores (among other things) that, less than a year ago, the Special Master made precisely that argument in attempting to enjoin alter ego cases brought against PDVH, and the Court considered and rejected that argument.

For these reasons, and those that follow, the 2020 Bondholders respectfully request that the Court enter the revised Proposed Sale Order attached as Exhibit A (D.I. 1943-1) to their

Objection (or the revised Proposed Sale Order submitted by Gramercy, D.I. 1968-2), should the Court otherwise approve the Special Master's Final Recommendation.

## I.    The Proposed Sale Order Exceeds the Court's Authority to Sell the PDVH Shares

### A.    The Sale Order Goes Far Beyond Selling the PDVH Shares Free and Clear

The Special Master attempts to defend the Proposed Sale Order because it "sell[s] the PDVH Shares 'free and clear' of claims, encumbrances, and liabilities."  D.I. 2006 at 24 (heading VII); *see also* D.I. 1988 at 5-6 (ConocoPhillips Response) (similar).  But, as the 2020 Bondholders' Objection explained, the Proposed Sale Order goes far beyond merely transferring the PDVH Shares to Gold Reserve free and clear of claims, encumbrances, and liabilities on those shares.  Instead, in addition to providing for that transfer—the type of transaction long contemplated by this Court—the Sale Order also broadly attempts to immunize Gold Reserve's chosen method of financing for that transaction from any subsequent attack or challenge.  Despite the fact that Gold Reserve's unorthodox financing transaction is not the subject of litigation in this Court, the Sale Order nonetheless purports to shield it from any scrutiny by providing sweeping releases of claims of non-parties,[2] enjoining the world at large,[3] eliminating potential appeals,[4] and directing non-parties such as the directors of CITGO Holding and CITGO Petroleum—entities which, as this Court has previously held, it has no direct control over—to take action, including action that may violate other legal duties.[5]

These provisions, and others like them, exceed this Court's authority under Section 324—and often in alarming ways that the Special Master simply ignores.  For example, the 2020

---

[2]    *See, e.g.*, Proposed Sale Order ¶¶ K, 11, 18.

[3]    *See, e.g.*, *id.* ¶¶ 6, 13, 19, 25.

[4]    *See, e.g.*, *id.* ¶ 21.

[5]    *See, e.g.*, *id.* ¶ 6.

Bondholders have made no secret of their intent, as part of the long-running litigation in the Southern District of New York concerning their security rights over 50.1% of PDVH's shares in CITGO Holding, to enjoin any transaction financing that violates those rights. That includes Gold Reserve's financing transaction, which would lever up CITGO Holding and CITGO Petroleum with billions of dollars of new debt, severely depleting the 2020 Bondholders' collateral while sending all of the proceeds to structurally-junior creditors. This Court has recognized the 2020 Bondholders' ability to litigate those claims, noting that the 2020 Bondholders "have whatever rights they have" and are "litigating them in another court"; that this Court "cannot intentionally take actions to interfere with or deprive them of whatever rights they have"; and that if the 2020 Bondholders "try to get an injunction from me or from the Southern District [of New York] or from some other court, that may be a litigation that has to happen." D.I. 1840-1 at 48-49, 61.

As the 2020 Bondholders pointed out in their Objection (Objection at 9), that very litigation may be precluded by the current Proposed Sale Order. The Special Master's Response neither disputes that troubling prospect, nor attempts to explain how that could possibly be permissible. That is because, as tacitly confirmed by the Special Master's lack of response, these provisions are indefensible—and, like much of the Proposed Sale Order, they stray far beyond what is authorized by Section 324: the sale of the PDVH Shares. Indeed, this Court previously "ma[de] explicit" that selling the "'PDVH Shares free and clear of any and all claims, encumbrances, and liabilities' means 'PDVH Shares free and clear of any and all claims, encumbrances and liabilities *attached to the PDVH Shares themselves*,'" thereby confirming that "[t]he Court was not, and is not, marketing PDVH Shares free and clear of whatever claims, encumbrances, and liabilities are, have been, or may be attached to any asset or subsidiary of

PDVH." D.I. 1515 at 17-18; *see also id.* at 9. Yet that is exactly what the Court, in substance, is being asked to approve in the Proposed Sale Order.

Similarly, the Proposed Sale Order would purport to bless and insulate from challenge a financing transaction that is nowhere permitted by the language of Section 324, any precedent identified by any proponent, or any other legal authority: compelling non-debtors CITGO Holding and CITGO Petroleum to effectively lever up their assets to provide **99%** of the financing for a transaction designed to benefit another company's (PDVSA's) judgment creditors. *See* Objection at 5 (explaining transaction structure).[6] Yet, as this Court has recognized, CITGO Holding and CITGO Petroleum—subsidiaries of PDVH—are not before this Court, and neither are their assets. *See* D.I. 1515 at 9 ("[W]hile the subject of the litigation here is the PDVH Shares, the subject of the Alter Ego Actions is the assets of PDVH—assets which are not in the possession or control of this Court. This Court exercises control over the shares, which evidence ultimate ownership of the assets owned or controlled by PDVH, but this Court does not exercise control over those assets themselves." (citation omitted)). Ordering non-parties to finance Gold Reserve's purchase of the PDVH Shares is plainly not necessary to sell the PDVH Shares free and clear of liens on those shares, yet it is in the Proposed Sale Order—and, as discussed further below, the Special Master identifies no authority for it.

---

[6] The Proposed Sale Order's sweeping release provision captures "any liability" that is in any way "related to" the sale of the PDVH Shares, and accordingly would potentially shield the Gold Reserve Consortium from all variety of claims have nothing to do with the mere transfer of ownership of the PDVH Shares, including, for example, misrepresentations, misstatements, or other misconduct in procuring financing for its proposed transaction. *See* Proposed Sale Order ¶ J.

###### B.    The Purported Necessity of the Challenged Provisions Is Irrelevant

The Special Master's primary argument for why the challenged provisions of the Proposed Sale Order are nevertheless permissible is that "no bidder would be willing to participate" or "pay billions of dollars of consideration" without them, they "encourage bidder participation and certainty," and they help to "effectuate a value maximizing sale."  D.I. 2006 at 24-27.  But the assertion that bidders prefer these provisions or would not bid without them is not a legal basis to impose unprecedented terms that exceed the Court's authority.  In fact, the Special Master advanced—and the Court rejected—exactly these arguments when the Special Master made a substantially similar request last year:  for the Court to enjoin the Alter Ego Actions.  At that time, the Special Master asked the Court to issue a broad injunction concerning issues not before it, which was a condition of a bid the Special Master had recommended to the Court.  Just like now, the Special Master told the Court that the sky would fall otherwise, stating that potential bidders "would not be willing to purchase the [PDVH] shares" and that "no reasonable bidder would go forward" without the injunction.  D.I. 1515 at 12-13.

In rejecting the Special Master's position, the Court held that "while the Alter Ego Actions may impact the value of the PDVH Shares, the Court's obligation is to market those shares in a manner designed to maximize their actual value—even if that value may turn out to be negatively impacted by the Alter Ego Actions—not to prevent all other claims that impact the value of the shares."  *Id.* at 6.  The Court made clear that it "never intended the [Sale Procedure Order] to convey that the PDVH Shares are being marketed ***free and clear of all risk***" and, instead, "the whole point of" the Sale Process "is to compensate judgment creditors by allowing them to execute on the ***value*** of judgment debtors' property found in this District."  *Id.* at 17-18.  As a result, "[i]f there is no such property in this District, or if such property is here but it has little value

or even negative value, then the creditors will have to continue their collection efforts elsewhere." *Id.*

Indeed, in deciding that the Alter Ego actions could not and should not be enjoined, the Court expressly analogized them to the 2020 Bondholders' claims, which it recognized also created inherent risks that may affect the value of the PDVH Shares. The Court "[f]undamentally, . . . [was] not persuaded that the situation relating to the Alter Ego Actions is materially different than that existing in connection with the PDVSA 2020 Bondholders—with respect to which the Special Master convinced the Court that while uncertainties might 'chill' bids, they would not prevent a sale, because bidders would factor the attendant risks into their offers." *Id.* at 19. Despite the Court's prior ruling, the Special Master now proposes that the same purported risks—which the Court already made clear should be factored into potential purchasers' bids—should simply be extinguished through a sale order.

Nothing has changed since the Court's prior decision. To be clear, no party has shown that the offensive provisions of the Sale Order are essential. No member of the Gold Reserve Consortium even discussed the provisions in their Responses, and wholly failed to explain how those provisions could be purportedly necessary if the 2020 Bondholders' claims are as toothless as the Gold Reserve Consortium contends. But even if they were, that would not justify these provisions, for the same reasons the Court already set forth in its decision on the Alter Ego motion.

### C.    The Special Master Has Identified No Authority for the Challenged Provisions

The challenged provisions in the Sale Order are not only inconsistent with this Court's decision on the Alter Ego actions, but devoid of any legal authority or precedent. Tellingly, the Special Master does not even attempt to argue that Section 324 itself permits those

provisions.  Nothing in its text remotely suggests so.  *See supra* at __; Objection at 13.  The 2020 Bondholders have been unable to locate even a single instance of such provisions in a Section 324 judicial sale order—which generally track the statute by simply conferring ownership over the shares being sold.[7]

The Special Master nevertheless suggests that the unprecedented provisions of the Proposed Sale Order are allowed under the All Writs Act or pursuant to Delaware common law. Not so.

*First*, the Special Master does not even respond to the 2020 Bondholders' argument that the All Writs Act is unavailable because the parties benefiting from an injunction have an adequate remedy at law:  participation in other legal proceedings concerning the financing transaction.  *See* Objection at 18-19.  Nor does the Special Master respond to the 2020 Bondholders' argument that—consistent with this Court's prior holdings—any other actions would "involve different property, different causes of action, different theories, and different requested relief than the cases pending here," and therefore are not the appropriate subject of an All Writs Act injunction.  *See* D.I. 1515 at 9, 12; Objection at 18-19.  No other party offers any response to these points either.  As a result, any response is waived.  *See Delaware* v. *BP Am. Inc.*, 578 F. Supp. 3d 618, 627 n.6 (D. Del. 2022) (Stark, J.), *aff'd sub nom. City of Hoboken* v. *Chevron Corp.*, 45 F.4th 699 (3d Cir. 2022) ("When a party files an opposition brief and fails to contest an

---

[7]    Other Section 324 sale orders typically provide, at most, for a mere transfer of stock from the judgment debtor to the purchaser.  *See, e.g.*, Order, *Halloran Farkas + Kittila LLP* v. *Barksdale*, C.A. No. N21C-06-002 (Del. Super. Ct. Mar. 3, 2022) Dkt. No. 34 (authorizing sale of attached shares "free and clear of the interests of" the judgment debtor); Order, *Giroux* v. *Wagner*, C.A. No.: N17J-00002 (Del. Super. Ct. Sept. 22, 2017), Dkt. No. 57 (ordering distribution of proceeds of sale of attached shares); Order, *Mfrs. and Traders Tr. Co.* v. *Naz*, C.A. No.: N11L-06-015 JRS (Del. Super. Ct. May 21, 2012), Dkt. No. 27 (ordering that sale winner is now "the sole owner of the 50 shares of common stock . . . which were the subject of the sale").

issue raised in the opening brief, the issue is considered waived or abandoned by the non-movant." (citation omitted)).

Nor, as the 2020 Bondholders' Objection explained and consistent with this Court's prior reasoning, is an injunction under the All Writs Act necessary or appropriate to protect this Court's jurisdiction. *See* Objection at 18. The Special Master offers no substantive response to this Court's prior decision holding otherwise, and instead merely observes that, now, "the Court is on the brink of approving a sale of the PDVH Shares"—as though the calendar or case schedule was the only reason why the Court denied an injunction before. D.I. 2006 at 31. That is not remotely consistent with the Court's reasoning, discussed above, which never discussed the timing of the sale as a relevant consideration.

*Second¸* the Special Master cites cases authorizing the free and clear sale of the property being sold—which as discussed above, is besides the point and ignores the challenged provisions at issue—or involving receiverships, including some of the exact same cases he cited in support of his failed motion to enjoin the Alter Ego Actions. *See* D.I. 1327 at 5. The Special Master most heavily relies on *In re TransPerfect Glob., Inc.*, 2018 WL 904160, at \*26 (Del. Ch. Feb. 15, 2018), *aff'd sub nom. Elting* v. *Shawe*, 185 A.3d 694 (Del. 2018), but *TransPerfect* was a sale proceeding under Section 226 of the Delaware Code, not Section 324. Section 226 provides for the court to appoint a "custodian," and for that custodian to have all of the powers of a receiver, and the authority to act on behalf of the corporation to take all actions necessary "to continue the business of the corporation and not to liquidate its affairs and distribute its assets." 8 Del. C. § 226 (b); *Giuricich* v. *Emtrol Corp.* 449 A.2d 232, 240 (Del. 1982). Section 324 provides no similar authority, and this Court has expressly held that the Special Master "is not a receiver" and instead has a "narrower role to help [the Court] devise the sales procedures and comply with Delaware

law." D.I. 256 at 89:3-8.  Further, the release in *TransPerfect* was intended to prevent the selling

stockholder from "get[ting] two bites at the apple in establishing the consideration for her shares—

one from the sale process itself and the second in the form of an option to re-litigate the sale

process." *In re TransPerfect Glob., Inc.*, 2018 WL 904160, at *26.  Accordingly, other claims that

"d[id] not relate to the sale process itself" were—unlike in the Proposed Sale Order—expressly

**excluded** from the release.  *Id.*  Neither *TransPerfect* nor the other receiver cases the Special

Master relies upon confer him or the Court with the authority to issue the challenged provisions of

the Proposed Sale Order.[8]

The other cases cited by the Special Master stand for the unremarkable proposition

that the Court can order the sale of property free and clear of claims *on that property*.  For example,

*Maryland National Bank* v. *Porter-Way Harvester Manufacturing Co.* held that farm equipment

could be sold "free and clear of all liens theretofore existing" against that property.  300 A.2d 8,

11 (Del. 1972) (D.I. 2006 at 25).  And *Miners' Bank of Wilkes-Barre* v. *Acker*—a decision from

almost 100 years ago applying Pennsylvania law—held only that a Court may allow a receiver to

sell property "free and clear" of liens and encumbrances against that property.  66 F.2d 850, 853

(3d Cir. 1933) (D.I. 2006 at 27).  The Special Master also cites *United States* v. *Branch Coal Corp.*

for the proposition that "except in cases of abuse, appellate courts will not disturb the exercise of

a district court's discretion in setting the terms and conditions for a judicial sale and the

confirmation thereof," D.I. 2006 at 27, but fails to explain the relevance of either the quoted

---

[8]    *See Broadway Tr. Co.* v. *Dill*, 17 F.2d 486, 486 (3d Cir. 1927) (D.I. 2006 at 27) (addressing court's authority over receivership in winding up the affairs of an insolvent corporation); *First Nat'l Bank of Cleveland, Ohio* v. *Shedd*, 121 U.S. 74, 81–82 (1887) (D.I. 2006 at 27-28) (involving receivership over insolvent railroad company).

standard of appellate review or the facts of the case (which involved a purchaser of assets of a coal company losing its deposit after failing to close).  390 F.2d 7, 10 (3d Cir. 1968).

   *Third*, the Special Master claims that it is necessary to include in the Proposed Sale Order a provision stating that "the reversal or modification of the authorization provided herein of the Sale Transaction shall neither affect the validity of the Sale Transaction nor the transfer of the PDVH Shares to Buyer free and clear of Claims, unless such authorization is duly stayed before the Closing Date pending such appeal" because "buyers would be unwilling to pay billions of dollars of consideration for the PDVH Shares if there was a risk that the sale could be unwound following closing."  D.I. 2006 at 29.  But that language is taken verbatim from Section 363(m) of the Bankruptcy Code.[9]  As the Third Circuit has recognized, this language imposes a "statutory mootness" bar on appellate review because it imposes "a constraint . . . on our capacity to fashion relief."  *See In re Energy Future Holdings*, 949 F.3d 806, 820 (3d Cir. 2020).  Given the wide-reaching effect of this type of language, the Third Circuit has emphasized that it is applicable only to a "narrow and well-defined category of cases," as expressly set forth by Congress.  *In re Boy Scouts of Am.*, 137 F.4th 126, 150 (3d Cir. 2025).  That clearly does not involve this sale, which is not being conducted under the Bankruptcy Code at all.  Indeed, the Special Master cites no example whatsoever in which any court—without express statutory authority—foreclosed the remedies available to an appellate court in the case of reversal.

   *Fourth*, the Special Master offers no legal support at all for the provisions of the Proposed Sale Order which would require non-parties—including the directors of CITGO Holding and CITGO Petroleum—to take actions to pay another party's debts and consummate the sale,

---

[9] *See* 11 U.S.C. § 363(m) ("the reversal or modification on appeal of an authorization . . . of a sale or lease of property does not affect the validity of a sale or lease under such authorization . . . unless such authorization and such sale or lease were stayed pending appeal").

potentially in violation of other legal obligations.  *See* Objection at 19.  The Special Master again argues that these provisions are purportedly "necessary," D.I. 2006 at 30, without ever meaningfully explaining why, but—critically—does not dispute the 2020 Bondholders' showing that they are unauthorized.  Objection at 21-22.  Any arguments in defense of those provisions, too, are now waived.  *See BP Am. Inc.*, 578 F. Supp. at 627 n.6.  Indeed, this Court previously held that it does not have jurisdiction over PDVH's subsidiaries, stating in its Alter Ego decision that "while the subject of the litigation here is the PDVH Shares, the subject of the Alter Ego Actions is the assets of PDVH—***assets which are not in the possession or control of this Court***.  This Court exercises control over the shares, which evidence ultimate ownership of the assets owned or controlled by PDVH, ***but this Court does not exercise control over those assets themselves***."  D.I. 1515 at 9 (emphases added, internal citation omitted).[10]  That makes complete sense: notwithstanding Gold Reserve's desire to completely ignore the corporate form, CITGO Holding and CITGO Petroleum are separate entities to PDVSA and PDVH, with their own distinct legal obligations, and cannot simply be ordered to deploy all of their assets for PDVSA and PDVH's benefit.  *See In re HH Liquidation, LLC*, 590 B.R.211, 256-57 (Bankr. D. Del. 2018) (it is a "well-established rule" that "parent and subsidiary corporations are separate entities, having separate assets and liabilities . . . hence, the parent's creditors have no claim to the subsidiary's assets, and vice versa." (brackets omitted)).

*Finally*, the Court also should reject the Special Master's and ConocoPhillips' contention that certain other challenged provisions are "necessary" or otherwise inoffensive:

- Although the Special Master acknowledges that the releases in the Proposed Sale Order do not apply to PDVH or its subsidiaries, including any post-merger entity, *see* D.I. 2006 at

---

[10] The Venezuela Parties' argument that PDVH's subsidiaries should not potentially face liability for complying with a Sale Order and consummating a transaction (D.I. 1984 at 5) underscores why the Sale Order should not compel the performance of those parties.

29, the Special Master does not explain why this should not be clarified as in either the 2020 Bondholders' or Gramercy's proposed amendments.

- Contrary to the Special Master's claim that the injunctions in the Proposed Sale Order are not "nearly limitless" *id.* at 28, on their face such provisions seek to enjoin *all persons or entities* from taking *any action* that may be seen to have the potential to adversely impact the consummation of the Sale Transaction. And, as noted above, the Special Master does not appear to dispute that the proposed wide-ranging injunction could purport to prohibit the 2020 Bondholders from litigating their rights (including challenging the proposed subsidiary financing as violative of the 2020 Bondholders' Pledge Agreement and applicable law) in another forum, as the Court properly acknowledged they could do.

- In response to the 2020 Bondholders' objection to paragraph M of the Proposed Sale Order, which provides that the transfer of PDVH Shares "is authorized under applicable law," the Special Master claims that "it is appropriate for the Sale Order to provide a buyer with the assurance that the asset the buyer is purchasing in a judicial sale is in fact a legal transfer authorized by law." D.I. 2006 at 30. As discussed above, it is appropriate for a buyer to have certainty that the asset being purchased (here, the PDVH shares) is being legally transferred. It is not appropriate for other aspects of the transaction to be immunized. The 2020 Bondholders' proposed edit to that paragraph therefore clarifies that the Court is not making any determination about whether the Sale Transaction violates the 2020 Bondholders' rights, including those under the Indenture and Pledge Agreement, as those rights are not before the Court, and is being litigated elsewhere. *See* Objection, Ex. B ¶ M.

- The Special Master claims that paragraph 25 of the Proposed Sale Order is necessary to avoid the possibility of "a litany of actions in numerous jurisdictions concerning this sale." D.I. 2006 at 31. Once again, though, any such purported convenience does not endow the Court authority to preclude other litigation. Paragraph 25 contains an incredibly broad gatekeeping provision purporting to retain jurisdiction over "any cause of action of any kind that arose or arises from, in whole or in part, the Special Master Order, the Sales Procedures Order, the Bidding Procedures, this Order, and any other orders of this Court in this action, or any cause of action related to the Sale Transaction." Proposed Sale Order ¶ 25. Such gatekeeping provisions appear to be rooted in the much narrower *Barton* doctrine, under which the Supreme Court stripped all courts of subject-matter jurisdiction to hear a lawsuit against a bankruptcy trustee except for the bankruptcy court that appointed the trustee, unless that bankruptcy court grants leave. *See In re VistaCare Group, LLC*, 678 F.3d 218, 224 (3d Cir. 2012) (citing *Barton* v. *Barbour*, 104 U.S. 126 (1881)). While some courts have extended this common law rule to certain extensions of the trustee and other bankruptcy court-appointed officers, *see, e.g.*, *Villegas* v. *Schmidt*, 788 F.3d 156, 159 (5th Cir. 2015), there is no basis for this Court to purportedly retain jurisdiction over any action of any kind against any party that relates in any way to the Sale Transaction. Indeed, the Fifth Circuit—applying the Supreme Court's decision in *Harrington* v. *Purdue Pharma L.P.*, 603 U.S. 204 (2024)—recently held a gatekeeping provision cannot apply to claims against non-debtors beyond the limited *Barton* exceptions, as the broad provision in the Proposed Sale Order would purportedly do here. *In re Highland Capital Management, L.P.*, 132 F.4th 353, 358–59 (5th Cir. 2025). In any event, should this provision be included in the final Sale Order, the 2020 Bondholders respectfully submit that it should relate solely

to claims challenging the transfer of the PDVH Shares—the subject of this action—not claims as to whether the proposed financing scheme violates the 2020 Bondholders' rights. *See* Objection, Ex. B ¶ 24.

- ConocoPhillips contests certain of the 2020 Bondholders' proposed revisions to the Proposed Sale Order, including to paragraph 17, which adds that certain payments "shall be subject to disgorgement in the event that such Payments were made in violation of the CITGO Holding Share Pledge Agreement, or by fraudulent conveyance, illegal dividend, or other similar legal or equitable doctrine," on the basis that the 2020 Bondholders have "no lien on the PDVH shares, or any property interest in those shares." D.I. 1988 at 6-8; *see also* D.I. 1985 at 14 (similar objection by OEIG). This argument misses the point. Whether the 2020 Bondholders have an interest in the PDVH Shares is irrelevant, as regardless there is no basis to immunize from disgorgement payments creditors receive from the sale of the PDVH Shares in the event that those upstreamed payments were made in violation of the 2020 Bondholders' rights under the Pledge Agreement, or are otherwise unlawful as fraudulent conveyances, illegal dividends, or under other similar doctrines. Such potential claims and remedies relate to the financing of the proposed transaction rather than the transfer of the PDVH Shares themselves, and the only reason such modifications to the Proposed Sale Order are necessary is because the Special Master and Gold Reserve Consortium insist on pursuing a sale structure that involves not just the transfer of the PDVH shares, but an unauthorized and improper construct involving that transaction's financing.

\*    \*    \*

In sum, the Proposed Sale Order goes far beyond this Court's authority to order a sale of the PDVH Shares. The Special Master fails to identify any authority for these overreaching provisions, and their purported rationale—that they may help to effectuate a value-maximizing sale—is legally deficient, has previously been rejected by this Court, and has the effect of authorizing anything in the name of expediency.

## II.    Gold Reserve's Unsupported Arguments Are Outside the Scope of This Action

Although Gold Reserve does not address the 2020 Bondholders' Objection, it makes several unsupported arguments concerning the 2020 Bondholders' intent or ability to enjoin the Sale Transaction. For example, Gold Reserve contends that the proposed transaction does not violate the Pledge Agreement, without even mentioning the anti-upstreaming provision. D.I. 1991 at 6-8. The 2020 Bondholders disagree with Gold Reserve's arguments about the Pledge Agreement and its contention that the 2020 Bondholders are unlikely to receive injunctive relief,

but those disagreements are not before the Court here, and will be the subject of litigation in the Southern District of New York.

Another assertion of Gold Reserve—that the 2020 Bondholders have said they will not seek injunctive relief to prevent the closing of a transaction violative of their rights—rests on a mischaracterization of the Trustee and Collateral Agent's counsel's statements at the July 10, 2025 conference before Judge Failla. *See* D.I. 1991 at 1-3. In the excerpts that Gold Reserve points to, counsel expressed that the 2020 Bondholders have not sought to disrupt the Sale Process or enjoin the Court or Special Master (as opposed to PDVH) in any way—all of which is true. The very purpose of that conference, however, was to discuss an injunction to prevent a potential financing transaction that would violate the Pledge Agreement, and counsel made clear that the 2020 Bondholders would move for such an injunction if necessary. Even Gold Reserve's excerpt quotes the 2020 Bondholders' counsel as stating that, if the Gold Reserve transaction is approved, the 2020 Bondholders "would seek a preliminary injunction prohibiting plaintiff PDVH in this case and those acting in concert with it, pursuant to Rule 65(d)(2)(C), from violating the pledge agreement." *Id.* at 2. Thus, the 2020 Bondholders made abundantly clear that they would seek to enjoin PDVH and potentially other parties from taking actions in connection with the financing of Gold Reserve's transaction that would violate their rights under the Pledge Agreement. This is also entirely consistent with the 2020 Bondholders' position, expressed above, that they do not seek to prevent the sale of the PDVH Shares themselves, but do object to the provisions of the Sale Order which go beyond the Court's authority to effectuate that sale. A determination of whether the Gold Reserve Consortium's financing scheme violates the 2020 Bondholders' rights is beyond the scope of the Sale Process, and the 2020 Bondholders merely seek to ensure that the legality of that financing scheme will be adjudicated in the proper forum at the appropriate time.

## CONCLUSION

For the reasons discussed above, the 2020 Bondholders respectfully submit that the Court should decline to enter the Proposed Sale Order in its current form.  If the Court approves the recommendation of Gold Reserve's bid, the Court should instead order the revised version of the Proposed Sale Order submitted as Exhibit A to the 2020 Bondholders' Objection (D.I. 1943-1), or the version submitted by Gramercy (D.I. 1968-2).

Dated: Wilmington, Delaware
       August 13, 2025

Respectfully submitted,

*/s/ Daniel A. Mason*                                  OF COUNSEL:

Daniel A. Mason (#5206)                               Andrew N. Rosenberg
PAUL, WEISS, RIFKIND,                                 Jeffrey J. Recher
     WHARTON & GARRISON LLP                           Paul A. Paterson
1313 North Market St., Suite 806                      Tyler B. Myers
Wilmington, DE 19801                                  PAUL, WEISS, RIFKIND,
Telephone: 302-655-4410                                   WHARTON & GARRISON LLP
Facsimile: 302-655-4420                               1285 Avenue of the Americas
Email: dmason@paulweiss.com                           New York, New York 10019-6064
                                                      Telephone: 212-373-3000
*Counsel for the 2020 Bondholders*                    Facsimile: 212-757-3990
                                                      Email: arosenberg@paulweiss.com
                                                      Email: jrecher@paulweiss.com
                                                      Email: ppaterson@paulweiss.com
                                                      Email: tmyers@paulweiss.com