# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| CRYSTALLEX INTERNATIONAL CORPORATION, <br><br> *Plaintiff*, <br><br> v. <br><br> BOLIVARIAN REPUBLIC OF VENEZUELA, <br><br> *Defendant*. | Case No. 17-mc-00151 (LPS) |

## RED TREE INVESTMENTS, LLC'S REPLY IN SUPPORT OF ITS OBJECTION TO THE SPECIAL MASTER'S FINAL RECOMMENDATION

## <u>TABLE OF CONTENTS</u>

<u>Page</u>

INTRODUCTION .................................................................................................................. 1

ARGUMENT ....................................................................................................................... 2

I.     Amber Energy, Not Gold Reserve, Is the Current Highest Bidder .................................. 2

     A.     Gold Reserve's Bid Faces an Unacceptable Risk from the 2020 Bondholders ........................................................................................... 2

     B.     The Proposed Sale Order Cannot Mitigate This Risk ............................ 5

     C.     Properly Accounting for Litigation Risk, Amber Energy's Bid Is Superior to Gold Reserve's ................................................................. 9

II.    In the Alternative, the Court Should Modify Gold Reserve's Bid ................... 11

CONCLUSION .................................................................................................................. 13

i

# TABLE OF AUTHORITIES

Page(s)

## CASES

*Gray v. Brignardello,*
  68 U.S. 627 (1863)................................................................................7

*Jacobsohn v. Larkey,*
  245 F. 538 (3d Cir. 1917)......................................................................7

*Mars Steel Corp. v. Cont'l Ill. Nat'l Bank & Tr. Co. of Chi.,*
  834 F.2d 677 (7th Cir. 1987)...............................................................10

*Montrose Med. Grp. Participating Sav. Plan v. Bulger,*
  243 F.3d 773 (3d Cir. 2001)..................................................................8

*In re Moore,*
  608 F.3d 253 (5th Cir. 2010) ..............................................................10

*In re Sears Holdings Corp.,*
  661 B.R. 298 (S.D.N.Y. 2024)..............................................................7

*In re TransPerfect Glob., Inc.,*
  No. CV 10449-CB, 2018 WL 904160 (Del. Ch. Feb. 15, 2018) ............6

*United States v. Branch Coal Corp.,*
  390 F.2d 7 (3d Cir. 1968).......................................................................7

*United States v. Vassallo,*
  1960 U.S. Dist. LEXIS 4491 (D. Del. June 17, 1960)...........................7

## STATUTES AND RULES

8 *Del. C.* § 226......................................................................................6

8 *Del. C.* § 324.............................................................................1, 6, 11

8 *Del. C.* § 324(a)................................................................................10

11 U.S.C. § 363(f)..................................................................................6

11 U.S.C. § 363(m) ................................................................................7

28 U.S.C. § 1291 ....................................................................................7

28 U.S.C. § 1651 ....................................................................................7

**OTHER AUTHORITIES**

U.S. Courts, *Judicial Business of the U.S. Courts* Table B-4A, (Sept. 30, 2024)
  http://bit.ly/44MusUA.................................................................................................3

U.S. Dep't of Treasury, *Venezuela Sanctions FAQ 1123*, (May 1, 2023)
  http://bit.ly/4kJjpla...................................................................................................3

Red Tree hereby replies as follows in support of its objection to the *Special Master's Final Recommendation*, D.I. 1837 (Final Recommendation), 1942 (RT Obj.).

## INTRODUCTION

Red Tree continues to work on a value-maximizing bid for the PDVH shares.  Red Tree reserves the right to submit a new bid, either for the upcoming sale hearing or in a future bidding round.  However, of the bids currently on the table for the sale hearing, Amber Energy offers better value to creditors compared to Gold Reserve.

Amber Energy's current bid offers a total of $8.716 billion—satisfying every creditor senior to Gold Reserve *and* resolving another $2.857 billion in secured debt through a settlement with the 2020 Bondholders.  That is at least $1.334 billion more than Gold Reserve's purported $7.382 billion offer.  And it is as much as $4.686 billion more when one accounts for the risk that the 2020 Bondholders could delay or prevent Gold Reserve's proposed transaction from closing.  Compared to Gold Reserve, Amber Energy is currently the "highest bidder" under § 324 by any measure.

Gold Reserve and the Special Master cannot justify risking the sale process for a bid that offers *less* in total value and may never close.  Gold Reserve's attempts to downplay its litigation risk misstate the facts and the law.  Gold Reserve is also wrong to ask the Court to front-run the Southern District of New York by prejudging an injunction motion in that court which the 2020 Bondholders have not even filed.  And while the Special Master proposes to extinguish the 2020 Bondholders' rights through a draft sale order, that order far exceeds the Court's authority.  As expedient as the Special Master might find it, there is no quick fix the Court can offer to the 2020 Bondholders' litigation.

As currently structured, Gold Reserve's bid simply does not comply with the Court's direction that "a successful bid . . . must, in one way or another, address the litigation risk posed by the 2020 Bondholders." D.I. 1741 at 4. Amber Energy's current bid ***does*** address that risk while offering billions of dollars of value more to creditors than previous bids. If the choice is between Gold Reserve and Amber Energy, the Court should pick Amber Energy as the higher bid.

## ARGUMENT

### I.    AMBER ENERGY, NOT GOLD RESERVE, IS THE CURRENT HIGHEST BIDDER

#### A.    Gold Reserve's Bid Faces an Unacceptable Risk from the 2020 Bondholders

Gold Reserve's bid faces serious closing risk from litigation with the 2020 Bondholders—a risk that will be borne by senior creditors. RT Obj. at 2-8. While Gold Reserve tries to wave away that risk as "minimal," D.I. 1991 (GR Resp.) at 6, Gold Reserve is wrong.

Gold Reserve first selectively quotes the 2020 Bondholders to suggest they would not even try to enjoin a transaction that would impair their $2.9 billion claim. GR Resp. at 1-3. Gold Reserve's suggestion is misleading. In the 2020 Bondholders' own words, "if the Gold Reserve sale is approved, [they] would have no choice but to challenge the aspects of the ***financing*** that would strip away the value of their Collateral and violate their rights under the Pledge Agreement." D.I. 1943 at 7 (emphasis added). That is because Gold Reserve plans to grant its lenders a security interest in the shares of CITGO Petroleum that would impair the 2020 Bondholders' security interest in the shares of CITGO Holding. *See* D.I. 1837-1 (commitment letter) at 486-487.[1] But if the 2020 Bondholders enjoin the grant of that security interest—as they have said they will do—Gold Reserve's bid will fall apart, because a failure to grant the CITGO Petroleum security interest

---

[1] Page citations for D.I. 1837-1 refer to the ECF page number. For all other docket citations, the cited pages refer to the brief pagination.

is an event of default for Gold Reserve's financing.[2]  Moreover, any injunction blocking the Gold Reserve sale would itself allow Gold Reserve's lenders to refuse to fund. *See id.* at 506, 509.

Gold Reserve is also wrong to minimize the 2020 Bondholders' litigation risk as "unlikely." GR Resp. at 3-6.  For example, while Gold Reserve relies heavily on OFAC's General License 5, *id.* at 4, it admits that GL-5 does not prevent the 2020 Bondholders from enjoining its financing, *id.* at 11.  And Gold Reserve offers no support for its prediction (at 4) that OFAC would use licensing decisions to give Gold Reserve an advantage over the 2020 Bondholders.  To the contrary, OFAC's longstanding policy is to give creditors "fair and equivalent treatment."  *See* U.S. Dep't of Treasury, *Venezuela Sanctions FAQ 1123*, http://bit.ly/4kJjpla (May 1, 2023).

Likewise, Gold Reserve also has no basis for predicting (at 4-5) that the 2020 Bondholders will lose their litigation about the validity of their pledge.  That decision is, of course, for the Southern District of New York to make, not this Court.  Moreover, whichever way the district court rules, its decision will be subject to a lengthy appeal under a *de novo* standard of review.[3] Gold Reserve offers no evidence for its speculation (at 5) that a decision in the 2020 Bondholders' favor would be stayed—let alone that the Southern District would allow Gold Reserve to use that

---

[2] The terms and conditions of Gold Reserve's financing facilities provide that failure to provide a security interest in CITGO Petroleum is an event of default. *See* D.I. 1837-1 at 472, 494 (identifying the failure to "satisfy the Post-Post-Closing Steps Collateral and Guarantee Requirement . . . on the Closing Date" as an event of default); *id.* at 487 (defining "Post-Post-Closing Steps Collateral and Guarantee Requirement" as including "the granting of security interests in the Ultimate Collateral on the Closing Date"); *id.* at 486 (defining "Ultimate Collateral" as including a perfected first-priority security interest in "100% of the outstanding equity interests" of CITGO Petroleum).

[3] The median time to resolve a civil appeal in the Second Circuit is almost a full year (11.8 months), and a prior appeal in the 2020 Bondholders' pending litigation took almost *24 months* from entry of judgment in the district court to the issuance of the Second Circuit's decision.  U.S. Courts, *Judicial Business of the U.S. Courts* Table B-4A, http://bit.ly/44MusUA (Sept. 30, 2024); *see Petroleos de Venezuela S.A. v. MUFG Union Bank, N.A.*, No. 19 Civ. 10023, D.I. 215 (Opinion and Order dated Oct. 16, 2020); 51 F.4th 456, 459 (2d Cir. 2022) (opinion issued on Oct. 13, 2022).

stay to close its transaction over the 2020 Bondholders' objections. And equally speculative is Gold Reserve's claim that, if things went south, it could always "attempt" to reach a settlement with the 2020 Bondholders to keep its deal alive. *See id.*

Gold Reserve also argues that the 2020 Bondholders cannot get an injunction on the merits. GR Resp. at 6-12. But there is no meaningful or fair way for the Court to rule on those arguments. Gold Reserve is asking the Court to rule, without full briefing, on a motion that has not been filed, on an issue that is pending before another court. That request cannot be squared with the Court's recognition that the "2020s are not in [the Court's] litigation," that they are litigating their rights in New York, and that this Court "cannot intentionally take actions to interfere with or deprive them of whatever rights they have." *See* D.I. 1840-1 at Tr. 48:7-21, 49:5-8. Nor is there any way the parties could fully and fairly litigate these complex issues in this expedited, three-day sale hearing. The Court should reject Gold Reserve's improper attempt to get a quick-and-dirty ruling against the 2020 Bondholders.

By contrast, the steps Gold Reserve purportedly took to "meaningfully account" for the 2020 Bondholders' risk (at 14) are an illusion. Gold Reserve does not explain what its "suggested amendments to its bid materials" are, *id.*, let alone how those amendments would allow its transaction to close over the 2020 Bondholders' objection. As the Special Master described, Gold Reserve's "extensive risk analysis," *id.*, was, in fact, "mostly conclusory and frankly, arbitrary," D.I. 1840-1 at 52:9-10. Its "highly confident letter" for financing a $1.8 billion settlement with the 2020 Bondholders, GR Resp. at 14, in fact "does not constitute a commitment" to finance anything. D.I. 1837-1 at 549; *see also* D.I. 1837 at 27 n.15 (acknowledgment of this fact by the Special Master). Nor does Gold Reserve give any reason to think the 2020 Bondholders would settle at a $1.1 billion discount. And Gold Reserve's assurance that a settlement "remains

possible" is pure hand waving.  GR Resp. at 14.  The Special Master's concession at the June 24 *ex parte* hearing remains true:  The Gold Reserve bid "makes no improvement whatsoever on . . . addressing the 2020s' risk."  D.I. 1840-1 at 52:22-53:5.

The Special Master appears to stand by that concession today.  He does not argue that the 2020 Bondholders' litigation risk is any less serious than he previously acknowledged.  Instead, he states that he "determined" that, despite that risk, Gold Reserve's bid was "superior" and "value-maximizing" compared to the bids then on the table.  D.I. 2006 (SM Resp.) at 22.  But the Special Master made that "determination" before the Amber Energy bid, which pays creditors billions of dollars more while also resolving the 2020 Bondholders' litigation risk.  And the Special Master gave nothing to support that "determination" other than unspecified "analysis provided by his Advisors" that he has not produced or explained.  *See* D.I. 1837 at 31, ¶82(b) n.20.  Given the Court's *de novo* review, there is no reason to defer to the Special Master's outdated say-so that the Gold Reserve bid's litigation risk is worth bearing.  *See* D.I. 1728 at 1.

## B.    The Proposed Sale Order Cannot Mitigate This Risk

Rather than deal with the 2020 Bondholder's litigation risk head on, the Special Master's proposed sale order seeks to front-run the 2020 Bondholders by preventing them from suing Gold Reserve or its financing sources.  RT Obj. at 11-15.  But as Red Tree's objection explained, the Court lacks authority to enter that sale order as drafted.  *See id.*  Gold Reserve does not try to defend the Special Master's proposal.  *See* GR Resp. at 15.  While the Special Master argues that the sale order merely sells the PDVH shares free and clear of liabilities, SM Resp. at 24-31, the authority he cites does not support the sweeping relief he seeks.

To be sure, the Court has ruled that the PDVH shares may be sold " 'free and clear of any and all claims, encumbrances, and liabilities'. . . ***attached to the PDVH Shares themselves***."  D.I. 1515 at 17-18 (brackets omitted) (emphasis in original).  The federal cases the Special Master

cites on free-and-clear sales show no more than that unremarkable proposition. *See* SM Resp. at 27-28. But the proposed sale order goes much further by enjoining nonparties' litigation, releasing claims against PDVH itself, and limiting parties' rights to take appeals. *See* RT Obj. at 11-12. And the Court already held that it will not grant such expansive relief. In its opinion denying the Special Master's motion to enjoin alter ego litigation, the Court made clear that it will not sell the shares "***free and clear of all risk***" or cleanse the shares of "whatever claims, encumbrances, and liabilities are, have been, or may be attached to any asset or subsidiary of PDVH." D.I. 1515 at 17-18 (emphasis in original). The Special Master does not even try to distinguish that opinion.

Nor does the Special Master argue that the Delaware statute governing this sale authorizes his proposed sale order. *See* 8 *Del. C.* § 324. He cites releases granted in a Delaware case involving a statutory sale of a company with a deadlocked board. *In re TransPerfect Glob., Inc.*, No. CV 10449-CB, 2018 WL 904160 (Del. Ch. Feb. 15, 2018), *aff'd sub nom. Elting v. Shawe*, 185 A.3d 694 (Del. 2018); *see* 8 *Del C.* § 226. But the releases in *TransPerfect* cover claims about the released party's "ownership of [the] shares" being sold and "claims relating to the sale process itself." 2018 WL 904160, at *26. Releasing those claims simply prevented the released party from "relitigat[ing] the sales process." *Id.* The proposed sale order goes far beyond *TransPerfect* by seeking to extinguish the substantive rights of third parties. The Special Master cites no Delaware authority supporting that outcome.

Federal law also does not provide the Special Master that authority. The Special Master concedes that, unlike the Bankruptcy Code, no federal statute allows the Court to grant non-consensual releases or broadly strip liens beyond liens on the asset being sold. *See* RT Obj. at 13-14 (citing 11 U.S.C. § 363(f)). While the Special Master cites a case about the Court's powers to set "terms and conditions for a judicial sale," that case does not suggest the Court may disturb non-

6

parties' substantive rights.  SM Resp. at 27 (citing *United States v. Branch Coal Corp.*, 390 F.2d 7, 10 (3d Cir. 1968) (approving order that a bidder forfeit its deposit if the sale did not close)). Nor does a 1917 case the Special Master cites about the appellate standard of review for bankruptcy asset sales.  SM Resp. at 28 (citing *Jacobsohn v. Larkey*, 245 F. 538, 541 (3d Cir. 1917)).

The proposed sale order even has a term purporting to abridge the parties' right to appeal the sale order if it is not stayed.  *See* RT Obj. at 12; *cf.* 28 U.S.C. § 1291.  To justify that term, the Special Master turns to *dicta* in an 1863 case about a collateral attack on a state receivership proceeding.  SM Resp. at 29-30 (citing *Gray v. Brignardello*, 68 U.S. 627, 636 (1863) (finding that the sale attacked was "without authority of law, and void")); *see also United States v. Vassallo*, 1960 U.S. Dist. LEXIS 4491, at *4 (D. Del. June 17, 1960) (cited in SM Resp. at 28) (citing *Gray* in *dicta* in refusing to set aside a tax foreclosure sale that had already been affirmed on appeal). While *Gray* discusses a common-law rule shielding judicial sales from appeals, the Special Master does not explain how the Court can invoke common law to remove parties' statutory appellate rights—especially when federal statute **does** limit appeals from bankruptcy sales.  *See* 11 U.S.C. § 363(m).  In any event, the common-law rule "applies only to good faith purchasers **who were not parties to the proceeding in which the sale order was entered**."  *In re Sears Holdings Corp.*, 661 B.R. 298, 314 (S.D.N.Y. 2024), *aff'd*, No. 24-1354, 2024 WL 5113165 (2d Cir. Dec. 16, 2024) (emphasis in original) (collecting cases).  Because Gold Reserve is a party, it cannot claim whatever protection *Gray* may offer for non-party good faith purchasers.

The Special Master also invokes the All Writs Act as authority to enjoin challenges to Gold Reserve's transaction or its financing.  SM Resp. at 31 (citing 28 U.S.C. § 1651).  But the Court already held that an All Writs Act injunction against ancillary lawsuits was neither necessary nor appropriate for the sale process.  SM Resp. at 31 (citing D.I. 1515).  The Special Master tries to

argue that the situation is different now because "the Court is on the brink of approving a sale." SM Resp. at 31.  But the Court issued that opinion in the same situation as here, where the Special Master had already named a winning bidder—and where the injunction was supposedly necessary for the winning bid to close, *see* D.I. 1515 at 53.  Nor did the Court's decision that "the Special Master failed to identify any proper legal basis for the Court to enjoin" outside proceedings, *id*. at 9, turn on how imminent or remote a sale would be.  Even now, the Special Master does not explain how his proposed injunctions fall within the "narrow circumstances" in which the "'extraordinary powers' conferred on federal courts by the All Writs Act" can be exercised.  D.I. 1515 at 10.

The Special Master next argues that "[b]idders would be unwilling to purchase the PDVH Shares if they were required to assume" the 2020 Bondholders' litigation risk.  SM Resp. at 26. But the Court already held that this risk is not a "meritorious basis" to enjoin third parties' litigation under the All Writs Act.  D.I. 1515 at 18.  Even if possible litigation overhang reduced the property to "little value or even negative value," that would not justify All Writs Act relief.  *Id.* at 18.  The Special Master gives no reason to reconsider the Court's decision.  In fact, the Special Master previously "convinced the Court that while uncertainties" around the 2020 Bondholders "might 'chill' bids, they would not prevent a sale, because bidders would factor the attendant risks into their offers." *Id.*  at 19 (citing D.I. 643 at 10).  The Special Master was right before.  And the fact that Amber Energy's current bid resolves the 2020 Bondholders' risk only proves his earlier point.

Finally, the Special Master resorts to *ad hominem* attacks against Red Tree, noting that Red Tree's counsel commented on a draft sale order for its earlier bid.  SM Resp. at 25.  The Special Master does not (and could not) claim that Red Tree is somehow estopped from pointing out that the Court lacks power to enter the Gold Reserve sale order.  *Cf. Montrose Med. Grp. Participating*

8

*Sav. Plan v. Bulger*, 243 F.3d 773, 781 (3d Cir. 2001) (judicial estoppel requires that the estopped party had obtained an "unfair advantage"). Instead, the Special Master selectively quotes deposition testimony from Xiao Song, a Red Tree witness, about the importance of buying assets "free and clear of liens." SM Resp. at 25-26 (citing Transcript of July 29, 2025 Deposition of Xiao Song ("Song Dep.") (attached as Exhibit A to the Declaration of Justin M. Ellis) at 201:5-9). But, in addition to having no personal involvement, Mr. Song testified that he had no interest in "ask[ing] for things" in the sale order "that . . . might be nice to have" but were not legally permitted. Song Dep. at 208:22-209:2. In any event, Red Tree is not alone. Nearly every objector agrees that the Court lacks authority to do what the Special Master asks.[4] The Court should reject Gold Reserve's proposed form of sale order.

### C.    Properly Accounting for Litigation Risk, Amber Energy's Bid Is Superior to Gold Reserve's

Amber Energy's current bid offers creditors $5.859 billion, and, through a settlement with the 2020 Bondholders, complete certainty of closing. The Special Master selected Gold Reserve's purported $7.382 billion bid because, in his view, the risks posed by the 2020 Bondholders did not "outweigh the expansive gap in purchase price" between Gold Reserve's and Red Tree's bids at the time. D.I. 1837 at 31, ¶82(b); *see also* D.I. 1838 at 17-18, ¶53. Amber Energy's current bid closes that gap, leaving the nominal difference between the two bids only $1.523 billion.

The Court has long held that the sale process's goal is to "maximize the value of the PDVH shares" to pay creditors. D.I. 469 at 2; *see also* D.I. 1515 at 6. Of course, the value to creditors of any proposed sale is its ***expected*** value—the nominal amount the sale offers discounted by how

---

[4] *See* D.I. 1942 at 11 (Red Tree); D.I. 1943 at 15 (2020 Bondholders); D.I. 1944 at 2 (GLAS Americas LLC); D.I. 1945 at 3 (ConocoPhillips); D.I. 1947 at 3 (U.S. Bank National Association); D.I. 1949 at 18 (Crystallex); D.I. 1951-1 at 32-34 (Venezuela Parties).

likely the sale is to close and when. *See Mars Steel Corp. v. Cont'l Ill. Nat'l Bank & Tr. Co. of Chi.*, 834 F.2d 677, 682 (7th Cir. 1987) (Posner, J.) (discussing expected value of litigation outcomes); *In re Moore*, 608 F.3d 253, 263 (5th Cir. 2010) (recognizing that the highest nominal value may not be the "highest and best offer" if there is "substantial doubt that the higher bidder can raise the cash necessary to complete the deal"). The Court has thus rejected the notion that the bid selection process should focus on the "headline" price, approving evaluation criteria that account for both the nominal recovery to Attached Judgment Creditors and the certainty that creditors will be paid. D.I. 1528-3 at 2-3; D.I. 1741 at 4-5.

Comparing ***expected*** values, Amber Energy's current bid is superior to Gold Reserve's. Law and economics expert Dr. J.B. Heaton has calculated what the expected values of the current Gold Reserve bid would be depending on what the Court decides is: (a) the likelihood that the 2020 Bondholders could block Gold Reserve's transaction; and (b) the length of time that the Gold Reserve transaction takes to close. D.I. 1993-5 (Heaton Rpt.) at 10, ¶¶25-26. As Dr. Heaton's chart shows, if one assumes that the 2020 Bondholders have a modest 40% chance of success, the expected value of Gold Reserve's current bid plummets to $4.43 billion. Heaton Rpt. at 10, ¶25. If the Court also assumes that the 2020 Bondholder litigation delays the sale by an additional year beyond the expected closing date, that puts Gold Reserve's expected value at $4.03 billion. *Id*.

Accordingly, when the Gold Reserve bid's closing risk is properly accounted for, Amber Energy is currently the "highest bidder" under § 324(a) of the two bids and better satisfies the Court's Evaluation Criteria. In contrast to Gold Reserve's bid, which assumes little risk and seeks all the reward, Amber Energy's bid addresses the litigation risk head on. It does so through a proposed settlement in the form of a transaction support agreement (TSA) with the 2020 Bondholders under which the 2020 Bondholders have agreed to consent to the proposed

transaction. In other words, Amber Energy's bid, through the TSA, eliminates the substantial litigation risk posed by the 2020 Bondholders.

Eliminating that risk adds substantial value to Amber Energy's bid in two ways. ***First***, in addition to the $5.859 billion it promises Attached Judgment Creditors, the bid offers an expected $2.857 billion towards the repayment of Venezuela's debts and $105 million of break fees paid to writ holders. A recent filing by the Republic and PDVSA suggests that this $2.962 billion comprises part of the overall value of the bid. *See* D.I. 1868 at 2 n.1. ***Second***, Amber Energy's bid, with its high degree of closing certainty, offers greater expected value to Additional Judgment Creditors because those creditors are more likely to receive proceeds from a transaction that closes than one that does not. D.I. 1552-1 at 8-9 (as approved and modified by D.I. 1554); *see also* Heaton Rpt. at 6, ¶16 (describing how to calculate the expected value of a bid). It would be a violation of § 324 and an abuse of discretion to pick Gold Reserve's nonviable bid instead.

## II.    IN THE ALTERNATIVE, THE COURT SHOULD MODIFY GOLD RESERVE'S BID

Red Tree has proposed several modifications to Gold Reserve's bid to protect creditors from that bid's litigation risk. RT Obj. at 8-11. Gold Reserve is wrong to argue that Red Tree's proposals are waived. *See* GR Resp. at 14. Red Tree made those proposals in response to the specific bid that Gold Reserve submitted, and the Special Master chose, after the Topping Period. Red Tree could not have waived objections to a bid that did not yet exist. Nor could Red Tree have expected that the Special Master would choose a bid with the maximum level of litigation risk. If the Court chooses Gold Reserve's bid, the Court should adopt each of the three proposals Red Tree has made.

***First***, the Court should increase Gold Reserve's nonrefundable good-faith deposit to three percent of the purchase price, or approximately $225 million. *See* RT Obj. at 14. The Special Master does not respond to this proposal other than to note that the current $50 million deposit

complies with the Court's orders (even though the Gold Reserve bid itself does not comply with the Court's directions regarding the 2020 Bondholders).  SM Resp. at 29.  Gold Reserve does not deny that increasing its deposit, which currently sits at only *0.66%* of its purchase price, D.I. 1837-1 at 570-72, would increase its incentives to address the risk posed by the 2020 Bondholders.  Nor does Gold Reserve deny that the Court has the authority to increase the required deposit or that three percent is market standard.  *See* RT Obj. at 9.  And while Gold Reserve protests that its incentives are aligned with other creditors, that is not true.  Gold Reserve is out of the money under any other bid.  *See* D.I. 1838-1.  An increased deposit would deter Gold Reserve from gambling with other creditors' money and time.

*Second*, Crystallex is correct that the Special Master should be allowed to promptly terminate the SPA if litigation with the 2020 Bondholders prevents Gold Reserve's bid from closing.  *See* D.I 1847 at 3-4.  The Special Master denies that there is a "substantial risk of protracted litigation" over whether he can terminate the SPA if "Dalinar's existing financing arrangements become infeasible."  SM Resp. at 23.  But Gold Reserve's brief makes clear it will challenge any decision by the Special Master to terminate on financing grounds.  *See* GR Resp. at 18 ("[T]he question of whether and if any part of the Dalinar Bid financing is actually obstructed in the future is a question, in the first instance, for Dalinar and its lenders.").  Likewise, Gold Reserve proves Crystallex's point when it suggests that the Special Master may terminate the SPA only upon a "final and non-appealable" order ruling for the 2020 Bondholders.  D.I. 1991 at 19.  An appeal from a preliminary injunction could take months, if not longer, to resolve.  Creditors who have already waited years should not be forced to wait even longer while Gold Reserve litigates with the Special Master over keeping a nonviable bid alive.

Gold Reserve's other arguments against a clear termination right also fail.  While Gold

Reserve dismisses a termination as "hypothetical," GR Resp. at 19, that is based on its unrealistic view of the 2020 Bondholders' litigation risk, *see* pp.3-4, *supra*. Gold Reserve also claims that its covenant to "maintain in effect" its financing would not be violated if the 2020 Bondholders enjoin placing liens on CITGO Petroleum, because those liens are only a "condition[ ] that must be satisfied *at closing*." GR Resp. at 20 (emphasis in original); *see* D.I. 1837-1 § 6.9 at 103. But because those liens are a condition precedent to Gold Reserve's financing, an injunction blocking those liens means its bid will never close. *See* pp. 2-3, *supra*. That zombie-bid scenario is precisely why a clear termination right is needed. And while Gold Reserve also claims there is "no reason to believe" it could not secure alternate financing, *id.* at 21, it has never offered any proof that it *could* get alternate funds. In any event, the time to clear up uncertainty about when Gold Reserve's bid can be terminated is now. The Special Master is correct that the Court can and should "clarif[y] the Special Master's understanding of his termination rights under the SPA." SM Resp. at 29.

    *Third*, the Court should confirm that Gold Reserve is not entitled to any expense reimbursement should its bid fail to close because of the 2020 Bondholders' litigation. RT Obj. at 10-11. As the Special Master notes, "[b]y its terms, the SPA does not provide for expense reimbursement should the Proposed Sale Transaction fail to close because of action taken by the PDVSA 2020 Bondholders." SM Resp. at 32. The Court should clarify that the SPA means what it says. *See* RT Obj. at 10-11. In any case, Gold Reserve offers no reason why it should be insured against a risk that it willingly assumed.

## CONCLUSION

    Red Tree reserves the right to submit a new bid, either for the upcoming sale hearing or in a future bidding round. However, in the event Amber Energy and Gold Reserve are the two bidders being considered at the Sale Hearing, the Court should pick Amber Energy as winning bidder. In the alternative, the Court should reject Gold Reserve's proposed form of sale order and require

amendments to Gold Reserve's SPA that would (1) require Gold Reserve to make a nonrefundable good-faith deposit of no less than $225 million; (2) ensure that the Special Master may promptly terminate the SPA in the event of (a) a decision from the Southern District of New York holding that the 2020 Bonds are enforceable and valid or (b) any other event which legally prevents the Gold Reserve transaction from closing in its current form, and Gold Reserve does not secure alternate financing sufficient to close within 30 days; and (3) clarify that Gold Reserve will not receive any expense reimbursement if the SPA is terminated due to litigation relating to the 2020 Bondholders.


Dated: August 13, 2025


| | /s/ Jennifer L. Cree |
|---|---|
| Steven F. Molo (*pro hac vice*) | Rebecca L. Butcher (#3816) |
| Justin M. Ellis (*pro hac vice*) | Jennifer L. Cree (#5919) |
| Mark W. Kelley (*pro hac vice*) | LANDIS RATH & COBB LLP |
| Lauren F. Dayton (*pro hac vice*) | 919 Market Street, Suite 1800 |
| Joshua D. Bloom (*pro hac vice*) | Wilmington, DE  19801 |
| Pratik Raj Ghosh (*pro hac vice*) | Tel.: (302) 467-4400 |
| MOLOLAMKEN LLP | butcher@lrclaw.com |
| 430 Park Avenue | cree@lrclaw.com |
| New York, NY  10022 | |
| Tel.: (212) 607-8170 | |
| smolo@mololamken.com | |
| jellis@mololamken.com | |
| mkelley@mololamken.com | |
| ldayton@mololamken.com | |
| jbloom@mololamken.com | |
| prajghosh@mololamken.com | |

Lois S. Ahn (*pro hac vice*)
600 New Hampshire Avenue, N.W.
Washington, D.C.  20037
Tel.: (202) 556-2000
lahn@mololamken.com


*Counsel for Red Tree Investments, LLC*

14