IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

CRYSTALLEX INTERNATIONAL CORP.,

    Plaintiff,

v.

BOLIVARIAN REPUBLIC OF VENEZUELA,

    Defendant.

Misc. No. 17-151-LPS

**REPLY BRIEF OF ACL1 INVESTMENTS LTD.,
ACL2 INVESTMENTS LTD., AND LDO (CAYMAN) XVIII LTD. IN SUPPORT OF
<u>OBJECTION TO THE SPECIAL MASTER'S FINAL RECOMMENDATION</u>**

*Of counsel*:

Joshua S. Bolian (*pro hac vice*)
Jared A. Hagler (*pro hac vice*)
Riley & Jacobson, PLC
1906 West End Avenue
Nashville, Tennessee 37203
(615) 320-3700
jbolian@rjfirm.com
jhagler@rjfirm.com

Dated: August 13, 2025

ASHBY & GEDDES
Marie M. Degnan (#5602)
Randall J. Teti (#6334)
500 Delaware Ave., 8th Floor
P.O. Box 1150
Wilmington, DE 19899
(302) 654-1888
mdegnan@ashbygeddes.com
rteti@ashbygeddes.com

*Attorneys for ACL1 Investments Ltd., ACL2 Investments Ltd., and LDO (Cayman) XVIII Ltd.*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................... ii

INTRODUCTION ........................................................................................................................ 1

ARGUMENT ................................................................................................................................ 2

I.     The SPA Should Be Amended To Require Termination If The 2020 Bondholders Interfere With The Recommended Transaction ................................................................ 2

    A.     Gold Reserve Understates The Risk Posed By The 2020 Bondholders ................. 2

        1.     The 2020 Bondholders Have Not Given Up On Blocking Gold Reserve's Transaction ................................................................................ 2

        2.     Gold Reserve Understates The Risk That The 2020 Bondholders Could Exercise Their Contractual Rights .................................................... 4

        3.     Gold Reserve Understates The Risk That The 2020 Bondholders Could Obtain An Injunction ............................................................................ 6

    B.     Revising The SPA Is Neither Untimely Nor Unfair To Gold Reserve ..................... 7

        1.     The SPA Has Never Been Immutable ........................................................... 8

        2.     If Gold Reserve Relied On The Form SPA To Presume That No Additional Termination Conditions Were Possible, That Reliance Was Unreasonable ...................................................................................... 9

    C.     The Termination Provision Should Be Mandatory .................................................. 9

II.     Any Sale Process Following Termination Of The Recommended Transaction Could Be Conducted Efficiently ........................................................................................ 10

CONCLUSION ........................................................................................................................... 11

## TABLE OF AUTHORITIES

**Cases**

*Animal Sci. Prods., Inc. v. Hebei Welcome Pharm. Co.*,
  585 U.S. 33 (2018) ................................................................................................... 5

*Arnold v. Soc'y for Sav. Bancorp, Inc.*,
  650 A.2d 1270 (Del. 1994) ...................................................................................... 8

*Brenntag Int'l Chems., Inc. v. Bank of India*,
  175 F.3d 245 (2d Cir. 1999) .................................................................................... 7

*In re Zohar III, Corp.*,
  2019 WL 6910285 (D. Del. Dec. 19, 2019) ............................................................ 6

*Petróleos de Venezuela, S.A. v. MUFG Union Bank, N.A.*,
  2020 WL 7711522 (S.D.N.Y. Dec. 29, 2020) ......................................................... 5

**Rules and Regulations**

31 C.F.R. § 501.803 ....................................................................................................... 4

Fed. R. Civ. P. 65(d)(2)(C) ............................................................................................ 3

**Other Authorities**

OFAC FAQ No. 1123, https://ofac.treasury.gov/faqs/1123 .......................................... 4

# INTRODUCTION

It is far from certain that the transaction recommended by the Special Master will close. The 2020 Bondholders assert, plausibly, that an essential step of the transaction would violate their rights. They have means to exercise their rights to prevent that step and, thus, the transaction. Crystallex International Corp. has proposed a simple, harmless way to blunt the force of that eventuality: The Stock Purchase Agreement (SPA) should terminate if, prior to closing, the 2020 Bondholders obtain a ruling either that they may exercise their alleged rights or that renders the recommended transaction's financing infeasible, and there is no cure within thirty days. D.I. 1949 at 12-16. ACL[1] joins in Crystallex's proposal. D.I. 1946.

Crystallex's proposal that a termination provision be added to the SPA is opposed by Gold Reserve Ltd. (D.I. 1991 at 1-21) and, to some extent, by the Special Master (D.I. 2006 at 20-23) and the Venezuela Parties (D.I. 1984). This brief explains why these parties' arguments against the proposed termination provision are not persuasive.

Gold Reserve maintains that the risk posed by the 2020 Bondholders is so speculative that it warrants no precaution and that the SPA may not now be revised. But Gold Reserve's assessment of the 2020s' risk is one-sided and fails to grapple with arguments on which the judge in the 2020 Bondholders' case has commented favorably. And Gold Reserve's assertion that adding a termination provision to the SPA is untimely or unfair is inconsistent with the Court's express authority over the proposed, non-binding SPA until it is approved following the final sale hearing.

The Special Master, for his part, claims the *right* to terminate the SPA if the 2020s' risk materializes but resists any *obligation* to do so. The wiser course, in ACL's view, would be to make

---

[1] Additional Judgment Creditors ACL1 Investments Ltd., ACL2 Investments Ltd., and LDO (Cayman) XVIII Ltd. (together, "ACL").

termination automatic. A default rule of termination would set clear expectations for potential bidders who may step in should the recommended bid cease to be viable. But it would not be set in stone; the Special Master or other parties could seek relief from termination if there is a clear path to reviving the recommended bid.

Finally, the Venezuela Parties point out that terminating the current SPA would not mean that the Special Master could just proceed to close on a "Plan B" bid. It's true that, as things stand, the Court would need to approve a replacement bid. But it does not follow that such approval must follow a "fundamentally redesign[ed]" sale process, as the Venezuela Parties argue (D.I. 1984 at 4). All the work done to date would facilitate an efficient process to approve a replacement bid.

## ARGUMENT

**I.     The SPA Should Be Amended To Require Termination If The 2020 Bondholders Interfere With The Recommended Transaction**

### A.     Gold Reserve Understates The Risk Posed By The 2020 Bondholders

Without doubt, "the 2020s are not in [this Court's] litigation." Tr. of 6/24/25 *Ex Parte* Meeting (D.I. 1840-1) at 48. However, Gold Reserve opposes adding a termination provision to the SPA on the ground that the 2020 Bondholders' litigation risk is nothing more than "unjustified speculation." D.I. 1991 at 18. Rejecting Gold Reserve's argument does not require this Court to decide whether the 2020s' risk is "great or small." Stalking Horse Designation Order (D.I. 1741) at 4. It suffices to show that the risk is not "non-existent." *Id.* And, indeed, the risk is far from non-existent—Gold Reserve's analysis of the risk (D.I. 1991 at 1-12) is deficient in several respects.

*1.     The 2020 Bondholders Have Not Given Up On Blocking Gold Reserve's Transaction*

As recently as July 24, the 2020 Bondholders have "made clear that they intend to challenge the aspect of the [Gold Reserve] transaction's financing that [allegedly] violates their Pledge Agreement." D.I. 1943 at 6. Yet Gold Reserve claims that, two weeks earlier in another court, the

2

2020 Bondholders committed not "to interfere with Gold Reserve's bid." D.I. 1991 at 3. Gold Reserve's claim misrepresents what the 2020 Bondholders said and is incorrect.

The 2020 Bondholders merely made clear that they do not seek to enjoin this Court's proceeding in this case. Their statements on which Gold Reserve relies were made in a July 10, 2025, conference in the Southern District of New York. The judge in that court had started the conference by stating, "I think folks are asking me to enjoin what's going on in Delaware, and I'm just not sure that I can." D.I. 1991-2 at 8. In response to this statement, the 2020s' counsel clarified that "we're not seeking an i[n]junction of Judge Stark" or "of the process in Delaware." *Id.* at 9.

At the same time, the 2020 Bondholders made clear what they do seek—an injunction that would prevent consummation of Gold Reserve's transaction. The transaction contemplates that Gold Reserve's acquisition vehicle, Dalinar Energy Corp., will acquire PDV Holding, Inc. (PDVH). Immediately thereafter, Dalinar would "cause[]" its borrowing subsidiary to merge into CITGO Petroleum Corporation. Transaction Description, D.I. 1837-1, ECF PageID 41333. Dalinar's only means of doing that would be through its ownership of PDVH, which indirectly owns CITGO Petroleum. Hence, an injunction against PDVH could prevent the CITGO Petroleum merger on which Gold Reserve's financing relies. That is what the 2020 Bondholders seek: an "injunction prohibiting" PDVH, which is party to the New York case, "from [vi]olating the pledge agreement." 7/10/25 Tr. (D.I. 1991-2) at 10. Such an injunction also would automatically bind any person "in active concert or participation with" PDVH. Fed. R. Civ. P. 65(d)(2)(C).

Moreover, the injunction is not the only means by which the 2020 Bondholders seek to prevent consummation of Gold Reserve's transaction. They also, as Crystallex has explained (D.I. 1949 at 5), could prevail on the merits of their New York litigation and vote their collateral shares against the merger that Gold Reserve's financing requires. The 2020 Bondholders have neither

3

dropped their merits case nor suggested that they would not vote their shares against Gold Reserve's contemplated merger.

For these reasons, Gold Reserve's claim that "[t]he 2020 Bondholders have expressly represented . . . that they will not attempt to seek an injunction that will interfere with the Dalinar Bid" (D.I. 1991 at 18) greatly exaggerates matters. Yes, the Bondholders have ruled out one possible injunction. But they continue to threaten a different injunction that would interfere with the Gold Reserve closing.

> 2. *Gold Reserve Understates The Risk That The 2020 Bondholders Could Exercise Their Contractual Rights*

One way the 2020 Bondholders could interfere with the Gold Reserve transaction is by exercising their contractual rights to vote the shares of CITGO Holding, Inc., which are the Bondholders' collateral, against the CITGO Petroleum merger on which Gold Reserve relies. *See* Pledge and Security Agreement (D.I. 1441-2) § 2.05(d). Gold Reserve does not dispute that such a vote would interfere with its transaction's closing. D.I. 1991 at 4. Instead, Gold Reserve argues that three events necessary to the 2020s' voting are unlikely to occur. *Id.* at 4-6. But Gold Reserve ignores colorable counterarguments and, as a result, understates the risk that the Bondholders could vote the shares.

First, OFAC has not committed to maintain its prohibition against the 2020 Bondholders' exercising their rights. While that prohibition currently is in place through December 20 (D.I. 1991 at 11), OFAC is free to lift the prohibition "at any time." 31 C.F.R. § 501.803. Moreover, Gold Reserve's transaction would itself require an OFAC license. It is not clear why Gold Reserve believes that OFAC would let it execute on the PDVH shares without also letting the 2020 Bondholders exercise their rights to their collateral. *See* OFAC FAQ No. 1123 ("OFAC is committed to fair and equivalent treatment of potential creditors."), https://ofac.treasury.gov/faqs/1123.

Second, Gold Reserve can claim "[t]here is a very good chance that the 2020 Bondholders will lose" their New York case (D.I. 1991 at 4) only by ignoring the Bondholders' arguments. Gold Reserve is right that Venezuelan law applies in that case and that, as the Republic interprets its own law, the Bondholders lose. But the New York court will give the Republic's interpretation only "respectful consideration," not "conclusive effect." *Animal Sci. Prods., Inc. v. Hebei Welcome Pharm. Co.*, 585 U.S. 33, 36 (2018). And the Bondholders may prevail under Venezuelan law; they interpret a decision of Venezuela's highest court to favor their position.[2] That interpretation has significant credibility because it "keeps showing up in [the] scholarship" of the Venezuela-law expert opposing the Bondholders, as the New York judge has noted.[3] Whether these or the Bondholders' other merits arguments will prevail is not for this Court to decide. But it is telling that Gold Reserve makes no effort to address them.

Third, the New York court need not stay pending appeal any judgment in the 2020 Bondholders' favor. Gold Reserve views such a stay as "likely" because that court previously granted one. D.I. 1991 at 5. But that prior stay aimed to preserve the status quo. *Petróleos de Venezuela, S.A. v. MUFG Union Bank, N.A.*, 2020 WL 7711522, at *1 (S.D.N.Y. Dec. 29, 2020) (stay "necessary" to prevent "an immediate nonjudicial foreclosure" that would "effectively moot the appeal"). This time around, *not* staying the Bondholders' vote of their shares would preserve the status quo,

---

[2] 2020 Bondholders' Mem. of Law at 17-18, *Petróleos de Venezuela, S.A. v. MUFG Union Bank, N.A.*, No. 19 Civ. 10023, D.I. 347 (S.D.N.Y. Jan. 22, 2025).

[3] Transcript of 9/25/20 Argument at 99, *Petróleos de Venezuela, S.A. v. MUFG Union Bank, N.A.*, No. 19 Civ. 10023, D.I. 246 (S.D.N.Y. Mar. 18, 2021); *see id.* at 98 ("[Y]our own guy seemed to have been issuing text for years that . . . is precisely the [Bondholders'] interpretation of [the Venezuelan case] *Andrés Velásquez*."); *id.* at 99 ("I think if your strongest argument is 'my expert was right now and he was just an idiot a couple of years ago,' I don't think you want to go down that road."); *id.* at 139-40 ("[D]o not use the word 'consistently' when referring to anything that [the expert] has been saying.").

as the vote would prevent CITGO Petroleum's merger with Dalinar's debt-laden subsidiary. This difference in circumstances means that the New York court will not necessarily enter a stay as it did five years ago. *See In re Zohar III, Corp.*, 2019 WL 6910285, at *8 (D. Del. Dec. 19, 2019) ("The fundamental purpose of a stay pending appeal is the preservation of the status quo.").

Additionally, Gold Reserve argues that, even if each of these events transpires so as to give the Bondholders the ability to prevent Gold Reserve's closing, Gold Reserve "could again attempt to reach a settlement with the 2020 Bondholders." D.I. 1991 at 5. Gold Reserve likely overvalues its settlement potential. It has no committed financing to fund a settlement. *See* Topping Proposal Ltr., D.I. 1837-1, ECF PageID 41454 ("advanced drafts of debt commitment letters"); D.I. 1991 at 14 ("a highly confident letter"). What is more, Gold Reserve has had ample opportunity to craft a deal with the Bondholders but has been unable to do so. And Gold Reserve's settlement prospects would only worsen were all the above-described events to break in favor of the Bondholders.

        3.      *Gold Reserve Understates The Risk That The 2020 Bondholders Could Obtain An Injunction*

A second, separate way the 2020 Bondholders could interfere with the Gold Reserve transaction—at least until they finally lose their New York case—is by obtaining the injunction against PDVH outlined above (p. 3). The injunction would not require OFAC's approval, as Red Tree Investments, LLC (D.I. 1942 at 5-7) and Crystallex (D.I. 1949 at 10-11) have explained. Gold Reserve nonetheless contends that the contemplated injunction "is highly unlikely [to] be granted" under the four-factor injunction test. D.I. 1991 at 6. Yet here, as with the risk that the 2020 Bondholders could exercise their contractual rights, Gold Reserve fails to assess counterarguments and therefore understates the risk.

First, Gold Reserve asserts that the 2020 Bondholders could not show likelihood of success on the merits (D.I. 1991 at 6-8) without confronting the Bondholders' merits argument. As the

6

Bondholders have told this Court repeatedly (*e.g.*, D.I. 1677 at 4-5; D.I. 1553 at 2-3; D.I. 1441 at 15-16), they rely on their pledge agreement's prohibition against payment of "profits and other distributions" to anyone besides the Bondholders' collateral agent. *See* Pledge and Security Agreement (D.I. 1441-2) § 2.05(c), (f). The Gold Reserve transaction arguably violates this provision by causing CITGO Petroleum to pay off a loan, the proceeds of which are used to pay creditors of upstream entities. *See* Special Master's Final Recommendation (D.I. 1837) ¶ 72. Gold Reserve does not address this argument. Instead, it claims likely victory under provisions of the 2020 Bondholders' pledge agreement that the Bondholders themselves have not invoked. D.I. 1991 at 7-8.

Second, Gold Reserve claims that the 2020 Bondholders cannot establish irreparable harm because their alleged harm could be compensated with money damages. D.I. 1991 at 8-9. But the issue is that the Gold Reserve transaction arguably renders the 2020 Bondholders' money damages uncollectable. Gold Reserve's debt facility would impose severe conditions on CITGO Petroleum's ability to fund any payment of the Bondholders' claim. Asset-Backed Revolving Credit Facility Terms and Conditions, D.I. 1837-1, ECF PageID 41347. Such conditions, plus the billions of dollars in secured debt with which Gold Reserve's transaction would burden CITGO, arguably yield "a substantial chance" that the 2020 Bondholders "cannot be returned to the positions they previously occupied." *See* D.I. 1991 at 8 (stating the standard for irreparable harm by quoting *Brenntag International Chemicals, Inc. v. Bank of India*, 175 F.3d 245, 249 (2d Cir. 1999)).

    **B.**    **Revising The SPA Is Neither Untimely Nor Unfair To Gold Reserve**

Gold Reserve argues that proposing to revise the SPA to provide for termination upon the 2020 Bondholders' interference is untimely and unfair. Gold Reserve is incorrect. The SPA is, and has always been, subject to the Court's control and determination that its terms are appropriate for consummating the final sale. Gold Reserve's purported reliance on the SPA does not make a change prompted by Gold Reserve's own financing terms untimely or unfair.

7

### 1. The SPA Has Never Been Immutable

In all the litigation about the SPA, the Court has never ordered that the SPA may not be altered before the Court finally approves it. Nor would such an order have made sense, given the evolving factors affecting the bidding and the varying terms of the submitted bids. Indeed, the SPA itself acknowledges the Court's primacy over its terms, declaring that the SPA is "[s]ubject to approval . . . by the Court." D.I. 1557-1 § 2.1.

The parties did litigate over material terms to be included in or excluded from the SPA, which the Court anticipated would include "all or at least nearly all objections to the SPA." D.I. 1517 ¶ 6. At no point, however, did the Court or the parties commit that later modification could not be made if necessary. Indeed, Gold Reserve, in its effort to avoid making a cash deposit with its bid, emphasized "that the SPA is not a binding document until approved by the Court." D.I. 1560 at 5. The Court has reiterated that sentiment multiple times, including in its February 24, 2025, Order granting in part Gold Reserve's request. D.I. 1571 ¶¶ 3, 5. The SPA is only a "proposed definitive agreement" requiring court review against the terms of the bid and final approval. 9/26/24 Oral Order (D.I. 1321); Sale Procedures Order (D.I. 481) ¶ 12. Such approval may necessarily include conditions on the proposed transaction, including upon what specific occurrences the transaction will be considered terminated.

There is no time bar to the Court's revising the SPA in contemplation of the specifics of the recommended bid, nor grounds to assert that a proposal for such a revision is waived when Gold Reserve's specific bid terms have only been known since last month. *See Arnold v. Soc'y for Sav. Bancorp, Inc.*, 650 A.2d 1270, 1289 (Del. 1994) ("The standard for finding waiver in Delaware is quite exacting. Waiver is the voluntary and intentional relinquishment of a known right . . . . It implies knowledge of all material facts and intent to waive. Moreover, the facts relied upon must be unequivocal in nature." (quotation marks omitted)).

8

        2.     *If Gold Reserve Relied On The Form SPA To Presume That No Additional Termination Conditions Were Possible, That Reliance Was Unreasonable*

Considering the above, Gold Reserve's purported reliance on the non-binding SPA without possibility for revision is unreasonable. As Gold Reserve itself acknowledges, the SPA is subject to the Court's review and approval. Gold Reserve could not, and likely did not, expect that the Court's review would have no impact the terms of the SPA, in view of the specifics of the recommended bid.

That is particularly true of a termination right, which the Special Master has argued is already present in the SPA and may be invoked when and if Gold Reserve's financing becomes infeasible. D.I. 2006 at 22-23. The Special Master is agreeable, however, to a ruling clarifying that his understanding is correct. *Id.* at 23. If the Special Master—Gold Reserve's counterparty under the SPA—believes that a termination right is already present in the SPA and subject to the Court's clarification, then Gold Reserve has little ground to have reasonably relied on the SPA's being immutable as to termination during the Court's review of the SPA for its potential approval.

It is further unclear to what extent Gold Reserve did rely on the SPA, as Gold Reserve's declarant, Paul Rivett, only generally declares that had the terms of the SPA been different, then Gold Reserve's "actions during the Topping Period would have been different." D.I. 1991-1 ¶ 7. Gold Reserve does not aver that its bid cannot proceed with a revised termination provision as proposed by Crystallex, nor could it. The proposed revision only affords the other creditors adequate protection should the risks posed by the 2020 Bondholders to Gold Reserve's financing come to fruition.

        **C.**     **The Termination Provision Should Be Mandatory**

Crystallex, supported by ACL, proposes "an amendment to the SPA *requiring* the Special Master to terminate the SPA" if the 2020s' risk materializes (and is not cured within thirty days).

9

D.I. 1949 at 13 (emphasis added). That termination is mandatory, not discretionary, serves the salutary goal of avoiding further delay after an event (such as an injunction) that prevents the Gold Reserve transaction from closing. It also provides clarity to potential bidders and financing sources, which, in ACL's view, makes more likely that these parties would timely participate in the post-Gold Reserve sale process.

The Special Master opposes mandatory termination because there could be a scenario in which any success the 2020 Bondholders have is temporary. D.I. 2006 at 22. ACL agrees that such a scenario could come to pass and that, if it does, the Gold Reserve SPA should not necessarily be terminated. But such a scenario could be accommodated by a mandatory termination provision. The Special Master or another party need only move this Court for relief from mandatory termination. All interested parties thus would be afforded an opportunity to address whether termination is warranted, and this Court could decide with the benefit of those perspectives.

## II. Any Sale Process Following Termination Of The Recommended Transaction Could Be Conducted Efficiently

Following any termination of the currently recommended transaction, the Special Master would need to recommend, and the Court would need to approve, an alternative transaction. These requirements follow from the Sale Procedures Order (D.I. 481 ¶¶ 2, 11-14) and the fact that, as of the date of this brief, the Special Master has not confirmed the existence of a Conforming Bid (as defined in D.I. 1837) other than Gold Reserve's. Insofar as these are the points of the Venezuela Parties' response brief (D.I. 1984), ACL agrees with them.

The Venezuela Parties appear to go further, seizing on the potential termination of the recommended transaction to advocate "fundamentally redesign[ing] the sale process." D.I. 1984 at 4. No such redesign would be warranted. Termination of the current transaction would not evince, as the Venezuela Parties argue, a "failed sale process" that was not "value-maximizing."

*Id.* Rather, it would evince only that one of the "risks that cannot be eliminated" (Stalking Horse Designation Order (D.I. 1741) at 7) ended up getting in the way. The process itself has been carefully reticulated and reflects the detailed consideration of the Court, the Special Master, and interested parties. As others have ably explained (*e.g.*, the Special Master, D.I. 2006 at 2-10), there is no merit to the Venezuela Parties' scattershot objections to the process.[4]

Because any post-termination process would build on the process to date (instead of being fundamentally redesigned), there is every reason to believe that it could be efficient. It is premature now to say what such a process should look like. But the work to date—the Court's resolution of numerous disputes, the widespread marketing of the PDVH shares, the discovery on issues that would continue to be relevant—should make any further sale process meaningfully speedier and simpler.

## CONCLUSION

For the foregoing reasons, ACL continues to join in Crystallex's objection to the recommended transaction to the extent that the SPA should terminate if, prior to closing, the 2020 Bondholders obtain a ruling either that they may exercise their alleged rights or that renders the recommended transaction's financing infeasible, and there is no cure within thirty days.

---

[4] The Venezuela Parties recognize that, "[b]ecause Red Tree no longer seeks to have its bid approved, there is no reason or requirement for the Venezuela Parties to oppose it." D.I. 1984 at 4 n.5. Nonetheless, the Venezuela Parties oppose the Red Tree bid. *Id.* at 2. ACL reserves all rights to address the merits of any Red Tree bid at the time such a bid is before the Court.

11

| | |
|---|---|
| Dated: August 13, 2025 | Respectfully submitted. |
| *Of counsel*: | ASHBY & GEDDES |
| Joshua S. Bolian (*pro hac vice*)<br>Jared A. Hagler (*pro hac vice*)<br>Riley & Jacobson, PLC<br>1906 West End Avenue<br>Nashville, Tennessee 37203<br>(615) 320-3700<br>jbolian@rjfirm.com<br>jhagler@rjfirm.com | */s/ Marie M. Degnan*<br>_____<br>Marie M. Degnan (#5602)<br>Randall J. Teti (#6334)<br>500 Delaware Ave., 8th Floor<br>P.O. Box 1150<br>Wilmington, DE  19899<br>(302) 654-1888<br>mdegnan@ashbygeddes.com<br>rteti@ashbygeddes.com<br><br>*Attorneys for ACL1 Investments Ltd., ACL2 Investments Ltd., and LDO (Cayman) XVIII Ltd.* |