IN THE UNITED STATES DISTRICT COURT FOR
THE DISTRICT OF DELAWARE

| | |
|---|---|
| CRYSTALLEX INTERNATIONAL CORPORATION,<br><br>        Plaintiff,<br><br>v.<br><br>BOLIVARIAN REPUBLIC OF VENEZUELA,<br><br>        Defendant. | Case No. 17-mc-151-LPS |

**GOLD RESERVE'S RESPONSE BRIEF REGARDING COURT'S INCLINATIONS**

Having reviewed the Opening Briefs, Gold Reserve respectfully reiterates its request that the Court (1) set a briefing schedule to resolve the critical, threshold issue here, *i.e.*, whether an Unsolicited Competing Proposal must comply with the bidder protections ordered by the Court; specifically, the Overbid Minimum specified in the January 27, 2025 Order (D.I. 1554), reflected in SPA § 6.16(f)(ii); and (2) schedule the remaining steps in the Sale Process to occur after Judge Failla issues her imminent ruling in the 2020 Bondholders' litigation.

**1. The Opening Briefs confirm the threshold issue exists and should be resolved now.**

Only a few parties engage on the threshold issue identified in Gold Reserve's August 13, 2025 objections to the adjournment of the Sale Hearing, but those that do confirm that it is the critical issue here and that it should be resolved now. The Special Master refers to briefing on the topic as "inevitable" (D.I. 2092 at 2); Crystallex spends circa half a page on the issue (D.I. 2084 at 2); as does ACL takes the position that the bidder protections ordered by the Court can be disregarded (D.I. 2085). Not one party, however, disputes that if Gold Reserve is correct, the Amber Energy bid is a non-actionable underbid that therefore could not, under any circumstances, constitute a "Superior Proposal." This is a threshold issue given that the Sale Hearing was just adjourned because of the existence of the Amber Energy bid and all of the alternative scheduling

1

proposals trigger off the possibility that it could constitute a valid Unsolicited Competing Proposal. If this is not the case, as Gold Reserve asserts, the remainder of the Sale Process and concomitant scheduling will fall into place. If this issue is not resolved, it will continue to bedevil the Sale Process, interfere with the schedule, and frustrate a value-maximizing Sales Transaction.

The significance of this issue is confirmed by the preliminary assertions made by various parties. For example, ACL now claims that the Special Master need not follow any of the bidder protections or the procedures of the No Shop Period. (D.I. 2085 at 2). If this were true, the Sale Process would be turned on its head. While the SPA is of course subject to final approval by the Court, the SPA reflects the bidder protections ordered by the Court after extensive litigation in its January 27, 2025 Order (D.I. 1554), and in the Bid Draft SPA (D.I. 1571, D.I. 1583). The Special Master's Final Recommendation refers to these as the "Bid Requirements" and appropriately treats them as mandatory obligations. (D.I. 1837 ¶ 59). As Crystallex has argued, the Court's Orders control these issues. *See* (D.I. 1992 at 32). Arguments otherwise would mean not only that the prior, extensive litigation regarding the bidder protections was meaningless, but that the Court's Orders adopting the No Shop Period and the bidder protections were illusory. (D.I. 1554 at 11-14); (D.I. 1571); (D.I. 1583).

This cannot be the case. Per the Court's orders, there were two phases of this proceeding before the Final Recommendation—the Stalking Horse period and the Topping Period. Consistent with the Court's orders, and as repeatedly admonished by the Special Master, it was during the Topping Period that bidders were required to "put their best foot forward" and submit their best, final bids. Gold Reserve did just that, and incurred significant expense in so doing. The Special

Master was required to weigh these bids and make his Final Recommendation.[1] Thereafter, under the bidder protections ordered by the Court, the worst-case scenario for the Final Recommended Bidder is that its bid would be topped during the No-Shop Period and that it thus would receive full payment in cash for its Attached Judgment, unless it chose to accept non-cash consideration from the Unsolicited Competing Bidder. This is the entire purpose and meaning of a "bidder protection"—a bidder's position is protected. If this were not the case, a bidder (like Gold Reserve) would have had zero incentive to submit its highest, best bid in the Topping Period.

In any event, it is not proper to resolve the merits of this critical issue in the present submissions. Instead, a briefing schedule should be set so that it can be fully and fairly determined.

**2. The Remaining Schedule Should Trigger off Judge Failla's Imminent Ruling**

The Special Master, the Venezuela Parties, and Gold Reserve agree that it is prudent to hold the Sale Hearing after Judge Failla's imminent ruling.[2] With respect to the specific schedule that should then follow, Gold Reserve attached an illustrative calendar to its opening brief that attempted to mirror the existing Sale Process calendar and draft calendars circulated by the Special Master. However, the timings in that calendar can be substantially shortened should the Court prefer. Attached hereto as Exhibit A is a revised, illustrative calendar for that purpose.

---

[1] Amber Energy's opening brief confirms that it did not meet these requirements. Rather, despite having long been involved in the Sale Process, it intentionally decided to not undertake the work and substantial expense to put in an actionable bid until *after* a Final Recommended bid was selected. (D.I. 2086 at 1).

[2] Red Tree—advocating on behalf of its fellow 2020 Bondholders—asks the Court to set an early deadline for the Special Master to name a Superior Proposal so that if one with a 2020s settlement is selected, that bidder could "seek a stay from Judge Failla" and "preserve bidders' ability to resolve the 2020 Bondholders' litigation before any decision from Judge Failla." (D.I. 2091 at 1-2). Red Tree's plan, in sum, is to allow the 2020 Bondholders to resolve their litigation in the Sale Process, at the AJCs expense and without any court deciding if the 2020s' claims are even valid under Venezuelan law. This is proof positive that waiting for the imminent SDNY ruling provides the best opportunity for the Court to facilitate a value-maximizing sale for AJCs—and not the 2020s—as required by Delaware law.

3

Dated: August 17, 2025

Respectfully submitted,

**WOMBLE BOND DICKINSON (US) LLP**

By: /s/ *Kevin J. Mangan*
Kevin J. Mangan (#3810)
Matthew P. Ward (#4471)
Stephanie S. Riley (#5803)
1313 N. Market St., Suite 1200
Wilmington, DE 19801
Telephone: 302-252-4320
Kevin.mangan@wbd-us.com
Matthew.ward@wbd-us.com
Stephanie.riley@wbd-us.com

-and-

**NORTON ROSE FULBRIGHT US LLP**
Matthew H. Kirtland (*pro hac vice*)
799 9th Street NW, Suite 1000
Washington, DC 20001
Telephone: 202-662-0200
Matthew.kirtland@nortonrosefulbright.com

- and –

Katherine G. Connolly (*pro hac vice*)
555 California Street, Suite 3300
San Francisco, CA 94101
Telephone: 628-231-6816
Katie.connolly@nortonrosefulbright.com

- and –

Taylor J. LeMay (*pro hac vice*)
1550 Lamar Street, Suite 2000
Houston, TX 77010
Telephone: 713-651-3578
Taylor.lemay@nortonrosefulbright.com

*Attorneys for Gold Reserve Ltd.*