# IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| CRYSTALLEX INTERNATIONAL CORPORATION,<br><br>          Plaintiff,<br><br>v.<br><br>BOLIVARIAN REPUBLIC OF VENEZUELA,<br><br>          Defendant. | Case No. 17-mc-151-LPS |

## GOLD RESERVE'S MOTION TO STRIKE
## SPECIAL MASTER'S NOTICE OF DETERMINATION OF SUPERIOR PROPOSAL

**WOMBLE BOND DICKINSON (US) LLP**

By:  */s/ Matthew P. Ward*
Kevin J. Mangan (#3810)
Matthew P. Ward (#4471)
Stephanie S. Riley (#5803)
1313 N. Market St., Suite 1200
Wilmington, DE 19801
Telephone: 302-252-4320
Kevin.mangan@wbd-us.com
Matthew.ward@wbd-us.com
Stephanie.riley@wbd-us.com

**NORTON ROSE FULBRIGHT US LLP**

Matthew H. Kirtland (*pro hac vice*)
799 9th Street NW, Suite 1000
Washington, DC 20001
Telephone: 202-662-0200
Matthew.kirtland@nortonrosefulbright.com

- and –

Katherine G. Connolly (*pro hac vice*)
555 California Street, Suite 3300
San Francisco, CA 94101
Telephone: 628-231-6816
Katie.connolly@nortonrosefulbright.com

- and –

Taylor J. LeMay (*pro hac vice*)
1550 Lamar Street, Suite 2000
Houston, TX 77010
Telephone: 713-651-3578
Taylor.lemay@nortonrosefulbright.com


*Attorneys for Gold Reserve Ltd.*

## <u>TABLE OF CONTENTS</u>

I.     INTRODUCTION ...................................................................................................1

II.    LEGAL STANDARD...........................................................................................3

III.   ARGUMENT.........................................................................................................4

    a.     The Bidder Protections Ordered by the Court—Including the No-Shop Period and Overbid Minimum—Are Mandatory and Essential to Maximizing Value and Ensuring a Fair, Competitive Sale Process........................................................................................ 4

    b.     The Dalinar SPA Reflected Precisely the Court-Ordered Non-Solicitation/No-Shop Period and Overbid Minimum Protections. ............................................................... 9

    c.     The Amber Energy Bid Fails at the First Hurdle—It Missed the Mandatory Overbid Minimum by $1.5 Billion and Thus Is *Per Se* Ineligible for Consideration Under the "Rules of the Road" Established By the Court. ...................................................................... 11

    d.     The *De Facto* Elimination of the Subsequent Overbid Minimum Unfairly Prejudices Gold Reserve.......................................................................................................... 13

    e.     The *De Facto* Elimination of the Subsequent Overbid Minimum Is Irreconcilable with the Clear Command of Delaware Law to Sell the PDVH Shares to the Highest Bidder. .............. 14

    f.     The Special Master and Other Bidders Treated the Bidder Protections, Including the No-Shop Period and the Overbid Minimum, as Mandatory. ....................................... 16

    g.     Judge Sontchi's Expert Opinion Confirms That Derogation of the Overbid Minimum Should Not be Permitted.......................................................................................... 18

IV.   CONCLUSION....................................................................................................19

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Edgewater Growth Cap. Partners LP v. H.I.G. Cap., Inc.*,
  68 A.3d 197 (Del. Ch. 2013) .................................................................15

*GMG Cap. Invs., LLC v. Athenian Venture P'rs I, LP*,
  36 A.3d 776 (Del. 2012) ........................................................................4

*In re Greater Miami Neighborhoods, Inc.*,
  No. 08-10694-BKC-AJC, 2008 WL 4397425 (Bankr. S.D. Fla. Sept. 26,
  2008) ......................................................................................................15

*Knight v. Wertheim & Co.*,
  2 Cir., 1946, 158 F.2d 838 ...................................................................16

*In re Mama's Original Foods, Inc.*,
  234 B.R. 500 (Bankr. C.D. Cal. 1999) ..................................................15

*In re Mickey Thompson Ent. Grp., Inc.*,
  292 B.R. 415 (B.A.P. 9th Cir. 2003) .....................................................15

*Osborn ex rel. Osborn v. Kemp*,
  991 A.2d 1153 (Del. 2010) .....................................................................4

*In re Stanley Eng'g Corp.*,
  164 F.2d 316 (3d Cir. 1947) ..................................................................15

*Travelers Indem. Co. v. Bailey*,
  557 U.S. 137 (2009) ................................................................................3

*Wells Fargo Bank N.A. v. Ashley Bus. Park LLC*,
  548 F. App'x 791 (3d Cir. 2013) ............................................................3

In accordance with the schedule ordered by the Court, Gold Reserve Ltd. f/k/a Gold Reserve Inc. ("Gold Reserve") respectfully moves to strike the Special Master's August 25, 2025 Notice of Determination of Superior Proposal (the "Notice") (D.I. 2113).

## I.    INTRODUCTION

The Special Master's determination that Amber Energy's circa ***$5.859 billion*** bid price, is a "Superior Proposal" is contrary to this Court's orders, discards the bidding procedures on which Gold Reserve and other parties relied, and threatens to short-change the Attached Judgment Creditors by ***$1.5 billion*** relative to the Dalinar Energy's ***$7.382 billion*** bid. Gold Reserve expended tens of millions of dollars to participate in this process and committed the full value of its $1.3 billion judgment precisely because the Court ordered bidder protections—as reflected in the model SPA approved by the Court and the Dalinar Energy Stock Purchase Agreement ("Dalinar SPA")—that any post-Final Recommendation bid must exceed Dalinar Energy's purchase price by at least $80 million (*i.e.*, the $50 million overbid amount and the $30 million expense reimbursement). The Special Master has no authority to ignore these Court-ordered bidder protections. Because Amber Energy's lower-priced proposal fails to satisfy the mandatory overbid minimum by a staggering margin, and because the Special Master never sought or obtained authority to dispense with the overbid minimum, Amber Energy's bid violates the No-Shop/Non-Solicitation Period bidder protections ordered by the Court, is ineligible for consideration, and cannot be deemed a "Superior Proposal."

This motion asks the Court to restore the integrity of the Sale Process by striking the Notice of Determination of Superior Proposal. The Court's orders plainly forbid the Special Master from considering or recommending the Amber Energy bid because (1) it was received during the No-Shop Period and (2) is lower in Purchase Price than Dalinar Energy's Final Recommended Bid. The Special Master's decisions not only to entertain Amber Energy's lower-priced bid during the

No-Shop Period, but also to ultimately recommend it as a "Superior Proposal," contravene the bidder protections ordered by the Court, chill future bidding, and violate Delaware's statutory requirement that the PDVH Shares be sold to the highest bidder.

As explained in greater detail below:

- The Court-approved bidder protections, as reflected in the Court's orders, Court-approved SPA, and the Dalinar SPA, prohibit any engagement with a competing bid during the No-Shop Period unless that bid tops Dalinar Energy's purchase price by at least $50 million plus a $30 million expense reimbursement. No party—including the Special Master—may eliminate that price floor.

- Being $1.5 billion in price below Dalinar's Successful Bid, Amber Energy's offer is not an "Unsolicited Competing Proposal," cannot be deemed a "Superior Proposal," and may not be used to terminate the Dalinar SPA. Accepting it would render the Court-ordered overbid minimum illusory.

- Gold Reserve relied on the Court-ordered bidder protections, including the No-Shop Period prohibiting the consideration of other bids that do not meet the Subsequent Overbid Minimum, in marshaling financing, contributing its judgment, and shouldering enormous costs. Allowing a lower bid to prevail would unjustly punish that reliance, deter future participation, and violate Delaware's requirement to maximize value for judgment creditors.

This motion is supported by the Expert Witness Report of the Hon. Christopher S. Sontchi (Ret.) ("Sontchi Report," attached hereto as Exhibit A), a former Chief Judge of the Delaware Bankruptcy Court with unparalleled experience in judicial asset sales. His expert opinions confirm that the Notice is invalid, because "faithful adherence to [court-ordered] procedures reduces risk

and maximizes value." Sontchi Report at 5. He persuasively explains why deviating from these procedures, except in the most extraordinary circumstances, is "value destructive" and undermines the integrity of the process. *Id.* While he acknowledges that "the seller and court must have discretion to deviate from those procedures, doing so should be saved for the rare and extraordinary circumstances, which do not appear to be present in this instance." *Id.* at 36.

This motion is also supported by the declaration of Gold Reserve's Chief Executive Officer, Mr. Paul Rivett. He explains how Gold Reserve relied on the Court-ordered bidder protections in participating in the Sale Process and incurring substantial costs to deliver the Successful Bid to the Special Master—a bid that has the highest purchase price and fully-committed financing from leading financial institutions.

For the reasons set forth in the attached evidence, and further explained below, Gold Reserve respectfully requests that the Court strike the Notice and any subsequent act of the Special Master based thereon.

## II.    LEGAL STANDARD

The present motion seeks enforcement of the Court's orders setting the bidder protections for the Sale Process, including in particular those that established the No-Shop/Non-Solicitation Period and required that any "Unsolicited Competing Proposal" satisfy an overbid minimum above the Purchase Price of the Final Recommended Bid.

"When interpreting its own order, a court generally looks to the 'four corners' of the document." *Wells Fargo Bank N.A. v. Ashley Bus. Park LLC*, 548 F. App'x 791, 794 (3d Cir. 2013). "[A] court should enforce a court order . . . according to its unambiguous terms." *Travelers Indem. Co. v. Bailey*, 557 U.S. 137, 150-51 (2009).

Under Delaware law, which is applicable to interpreting the provisions of the model SPA and the Dalinar SPA, "clear and unambiguous terms" in an agreement are "interpret[ed] …

according to their ordinary meaning." *See GMG Cap. Invs., LLC v. Athenian Venture P'rs I, LP*, 36 A.3d 776, 779-80 (Del. 2012). "When the contract is clear and unambiguous, [a court] will give effect to the plain-meaning of the contract's terms and provisions[.]" *Osborn ex rel. Osborn v. Kemp*, 991 A.2d 1153, 1159-60 (Del. 2010).

## III.    ARGUMENT

### a.    The Bidder Protections Ordered by the Court—Including the No-Shop Period and Overbid Minimum—Are Mandatory and Essential to Maximizing Value and Ensuring a Fair, Competitive Sale Process.

Throughout this proceeding, the Court has labored to design a Sale Process that maximizes the sale price of the PDVH Shares and thus recovery by the Attached Judgment Creditors and ensures fairness to all. In furtherance of these aims, at the request of the Special Master and parties, the Court mandated that specific bidder protections, including the Non-Solicitation/No-Shop Period and overbid minimum, be afforded to the final Successful Bidder. The Sale Process participants universally understood that these bidder protections, which were litigated in multiple rounds of briefing, were mandatory and could not be ignored.

The requirement of an overbid minimum has been included in every version of the Sale Procedures Order ("SPO") from its first iteration proposed by the Special Master after consultation with the Sale Process Parties in August 2021 (*see* (D.I. 302), (D.I. 303)) through to the sixth and final version entered by the Court in October 2022. (D.I. 481). Specifically, the "Stalking Horse Bid Protections" of the SPO provided that the Special Master could "establish an initial overbid minimum and subsequent bidding increment requirements[.]" (D.I. 481 at 20). Since then, the inclusion of an overbid minimum has been a fixture of the Sale Process.

After the complete failure of the first Amber Energy in late 2024, the Court supervised the recommencement of the Sale Process. During the December 2024 hearing, a requirement of an overbid minimum for the purpose of *price maximization* was discussed at length. Crystallex, for

example, firmly argued that to ensure a well-designed process focused on price maximization, the breakup fee payable to the Stalking Horse bidder should "not be subject to negotiation or be left to the discretion of the Special Master, which we've been guarding against[.]" Dec. 2024 Hr'g Tr. 206:4-16 (attached as Exhibit E); *see also* 209:9-12 ("So from our point of view the bottom line is always we should have as little left to discretion and negotiation and we should all have the rules of the road in advance as we possibly can."). Rather, Crystallex urged that "any breakup fee" must "be based on the net benefit to the creditors and *how much it will be paid to the waterfall and how much judgment relief will go to the Venezuela parties*." *Id.* at 206:17-18 (emphasis added). Thus, the breakup fee, as an element of the overbid minimum, has always been understood as a mechanism to ensure an increased purchase price for the benefit of the Attached Judgment Creditors.

On December 31, 2024, the Court issued its order to give structure and certainty to the renewed Sale Process. (D.I. 1517). It ordered a three phase process: (1) the stalking horse phase; (2) the Topping Period which would lead to a Final Recommendation of the Successful Bid; and (3) the Sale Hearing phase, in which any objections to the Final Recommendation would be resolved.

In order to maximize bidder participation and highest-value bids, the Special Master conferred with the Sale Process Parties and Additional Judgment Creditors to propose (a) Bidder Protections for any Stalking Horse approved by the Court, (b) a list of the material terms of a Stock Purchase Agreement, and (c) Evaluation Criteria for all bids, including Stalking Horse Bids, Base Bids, and Successful Bids. (D.I. 1517 at 2). The Court further ordered the Special Master to draft and file a model SPA "consistent with the Court-approved material terms," on which the parties would again brief objections, if any. *Id.* at 2-3. In this way, the Court ensured that the bidder

protections for the remaining of the Sale Process would be set in advance, and the SPA's terms would reflect such terms, to meet the twin goals of value-maximization and fairness.

The Special Master first proposed bidder protections, material SPA terms, and evaluation criteria on January 14, 2025. (D.I. 1528). Those bidder protections included, in part, that: "Any initial bid received during the Topping Period will need to satisfy an overbid minimum equal to or in excess of the Termination Fee plus $25 million." (D.I. 1528-1 at 3). For the period after the Final Recommendation, the Special Master proposed that "[a]ny subsequent bidding increments" would "need to satisfy an overbid minimum equal to or in excess of $25 million; provided, that the Special Master shall have the ability to exercise his discretion to lower the overbid minimum amount for subsequent bids or any auction." *Id.* In addition, as a further bidder protection, the Special Master proposed that a "No-Shop Period" would follow the Topping Period during which the Special Master would be prohibited from "directly or indirectly" soliciting "any proposal or offer that constitutes, or would reasonably be expected to lead to, a competing proposal[.]" *Id.* If the Special Master received an unsolicited competing proposal during this period, he proposed that he would be required to seek prior permission from the Court to engage with that bidder. *Id.*

The No-Shop/Non-Solicitation Period, the amount of the overbid minimum during this period, and the Special Master's discretion to lower this minimum, were the subject of objections and briefing by the parties.

- Gold Reserve, joined by Rusoro, objected and requested that the Court order that the overbid minimum would also apply during the No-Shop Period; that the overbid during that period would "have a higher threshold, say $50 million[;]" and that the Special Master should not have discretion to lower the overbid minimum. (D.I. 1539-1 at 3). Gold Reserve and Rusoro also requested clarification that the Special Master could

only terminate the Final Recommended Bid for a Superior Proposal "consistent with the Non-Solicitation Provisions of the SPA." (D.I. 1539-1 at 3). No party opposed this requested clarification.

- The Venezuela Parties opposed the proposed increase to the overbid minimum in the No-Shop Period. They argued that the $25 million overbid minimum was high enough to protect bidding parties, and that any increase would deter a competing bidder from submitting a competing proposal in excess of the purchase price of the Final Recommended bid. (D.I. 1543 at 3).

- For his part, the Special Master did not object to increasing the overbid minimum for the No-Shop Period, but argued that "[g]iven that the evaluation criteria include criteria other than price, the Special Master should have the discretion to **lower** the overbid minimum if a competing bid may otherwise be a 'better' bid, among other reasons." (D.I. 1545-1 at 7) (emphasis added). The Special Master never proposed or even hinted that the overbid minimum could be eliminated entirely. To the contrary, he assured the parties and the Court that, "in all circumstances, the Special Master will need to justify his use of discretion in connection with submitting his recommendation to the Court." *Id.* Thus, the Special Master recognized that his discretion to **lower** the overbid minimum had to be not only justified by him, but also approved by the Court.

In short, during the extensive briefing to set the bidder protections for the re-launched Sale Process, the Special Master and parties aligned on the need to have a No-Shop/Non-Soliciation Period, and that an overbid minimum was necessary in this period. There was never any suggestion that the overbid minimum was unimportant, dispensable, or discardable by the Special Master (and

certainly no suggestion that the Special Master could entertain a bid that not only failed to comply with the ***overbid minimum*** but was, in fact, ***priced lower*** than the final Successful Bid).

On January 23, 2025, the Special Master submitted a revised SPA proposal, which included the flowing language to implement the increased overbid minimum requested by Gold Reserve and Rusoro: "Any subsequent bidding increments (including bidding increments at any auction) will need to satisfy an overbid minimum equal to or in excess of $50 million; <u>provided</u>, that the Special Master shall have the ability to exercise his discretion to lower the overbid minimum amount for subsequent bids or any auction." (D.I. 1552-1 at 3).

In the Court's January 27, 2025 order setting the bidder protections and other material SPA terms, the Court adopted the proposed $50 million overbid minimum for the No-Shop period, "subject to the Special Master retaining discretion to lower or raise the overbid minimum throughout the process, as he proposes[.]" (D.I. 1554 at 14). The Court also adopted Gold Reserve and Rusoro's unobjected-to request that any termination of the SPA during the No-Shop/Non-Solication Period in favor of a Superior Proposal must comply with the "Non-Solicitation Provision of the SPA." *Id.* at 22.

As directed by the Court (D.I. 1517), the Special Master filed on February 10, 2025, a model SPA incorporating the bidder protections and the SPA terms ordered in the January 27, 2025 Order. (D.I. 1557). The model SPA implemented the Non-Solicitation/No Shop Period at Section 6.16(b). (D.I. 1557 at 60). It also implemented the $50 million overbid minimum at Section 6.16(g). *Id.* at 61-62.

The Venezuela Parties raised a wording objection to the model SPA, asserting that the January 27, 2025 Order increased the overbid minimum to $50 million only for the No-Shop Period, not the Topping Period, and that this distinction appeared not to be reflected in the model

SPA. (D.I. 1559 at 5). In response, the Special Master agreed to revise the model SPA to make clear that the $50 million minimum applied only during the No-Shop Period. (D.I. 1564-1 at 2).

In its February 24, 2025 Order, the Court recognized that the Venezuela Parties' objection had been resolved. (D.I. 1571 at 2). The Court ordered further briefing on a disagreement about the treatment of non-cash consideration, but it otherwise settled in its February 24 Order all objections to the model SPA. *Id.*

Importantly, no participant in the proceedings leading up to the January 27 and February 24 Orders ever suggested that the Special Master should have the discretion to break the No-Shop/Non-Solicitation provision for a competing bid that *eliminated* the overbid minimum. Rather, the record confirms that all participants understood that the purpose of requiring an overbid minimum was to set a price floor in the Final Recommended bid that subsequent bids had to top in order to even be discussed with the Special Master. The record also confirms that the participants understood that the overbid minimum was mandatory and the Special Master's discretion to lower it was narrow, and subject to Court approval, so that the Sale Process leading up to the Sale Hearing would not be derailed by underpriced bids and the process would produce the *maximum sale price* for the benefit of Attached Judgment Creditors.

### b.    The Dalinar SPA Reflected Precisely the Court-Ordered Non-Solicitation/No-Shop Period and Overbid Minimum Protections.

After the Red Tree proposal was selected as the Stalking Horse Bid, Dalinar Energy submitted during the Topping Period a significantly higher bid that the Special Master selected as the Recommended Bid. The Dalinar SPA reflects the bidder protections and other terms mandated in the Court's orders. Specifically, it includes the broad prohibition on the Special Master engaging with any competing bids during the No-Shop/Non-Solicitation Period following the Final Recommendation, subject only to a bid satisfying the condition that it include a "Subsequent

Overbid Minimum" above the Purchase Price of the Dalinar bid of at least $80 million (consisting of $50 million plus the Expense Reimbursement Amount up to $30 million), with the Special Master retaining authority to "lower or raise" (but not eliminate) this overbid minimum. (D.I. 1837-1 at 63).

The expectation that an Unsolicited Competing Proposal had to be higher in terms of price, and not merely different in some other way, is why the Dalinar SPA at Section 6.16(d) expressly grants Dalinar just three business days to revise its own proposal to remain competitive. (D.I. 1837-1 at 62). The architecture of Section 6.16(d) leaves no doubt that price is the central fulcrum on which any Superior Proposal must turn. The clause gives Dalinar Energy just three business days—seventy-two hours—to revise its bid to remain competitive. That window is far too narrow to renegotiate complex, multi-party, non-price components of its bid, which is why a Superior Proposal was not meant to be one that would require reopening international financing arrangements, amending regulatory undertakings, or attempting to hammer out a settlement with the 2020 Bondholders. What Dalinar Energy can accomplish in three days is exactly what the provision contemplates: increasing the price it is prepared to pay and/or making amendments to its SPA address objections. In confining the bid revision period to a tightly compressed timeline, the SPA unmistakably signals that a "Superior Proposal" must surpass Dalinar on the metric that can be adjusted quickly: total purchase price. The three-day clock is therefore powerful textual evidence that price, not creative deal architecture, is the decisive criterion. Any other interpretation that invites wholesale bid reconstruction within a three-day window is not merely impractical—it is irreconcilable with the structure and intent of Section 6.16(d).

**c.    The Amber Energy Bid Fails at the First Hurdle—It Missed the Mandatory Overbid Minimum by $1.5 Billion and Thus Is *Per Se* Ineligible for Consideration Under the "Rules of the Road" Established By the Court.**

The Amber Energy bid submitted during the No-Shop Period cannot be deemed a Superior Proposal because its Purchase Price is ***$1.5 billion lower*** than the Purchase Price of the Dalinar SPA. Section 6.16(f)(i) of the Dalinar SPA—which, it bears repeating, simply reflects the Court's prior orders setting the overbid minimum for the No-Shop Period—confirms that the Amber Energy bid does not meet the requirements for an Unsolicited Competing Proposal, is therefore not a Competing Proposal and, by extension, cannot be a Superior Proposal. It defines a "Competing Proposal" as follows:

> [A]ny Unsolicited Competing Proposal received during the No-Shop Period must satisfy an overbid minimum above the Purchase Price (less the Debt Payoff Amount) equal to or in excess of (A) the Expense Reimbursement Amount pursuant to Section 8.3(c), if applicable, *plus* (B) $50,000,000 ((A) and (B), collectively, the "Subsequent Overbid Minimum"); provided, further, that the Special Master may, in his sole discretion, lower or raise the Subsequent Overbid Minimum for any Competing Proposal.

(D.I. 1837-1 at 113) Thus, for a proposal in the No-Shop/Non-Soliciation Period to be deemed a "Competing Proposal," it "**must satisfy an overbid minimum above the Purchase Price (less the Debt Payoff Amount) equal to or in excess of**" $50 million above the Dalinar Energy purchase price, plus the maximum $30 million Expense Reimbursement Amount. (D.I. 1837-1 at 113) (emphasis added).

A qualifying Unsolicited Competing Proposal is by definition one that increases materially the price payable to Attached Judgment Creditors. The Subsequent Overbid Minimum thus acts as a gating mechanism that restricts the Special Master's ability to consider and engage with bids submitted during the No-Shop Period. Even a valid Unsolicited Competing Proposal reflecting a higher price is not necessarily a Superior Proposal. Rather, a Superior Proposal is one "that the Special Master determines in good faith … would constitute a higher or better bid for the Shares

based upon the Evaluation Criteria." *Id.* § 6.16(f)(ii). In that event, the Special Master must obtain "approval of the Court" before terminating the Dalinar SPA in favor of an Unsolicited Competing Proposal that he considers to be a Superior Proposal. Critically, the Special Master may not terminate the Dalinar SPA for a "Superior Proposal" unless he has complied with the requirements of the Non-Solicitation Period. *Id.* § 8.1(d). The requirement of Court approval before termination ensures that the Special Master has in fact complied with his Court-ordered obligations and that Gold Reserve and its Consortium partners can be heard before the substantial resources they invested in submitting a winning bid and in performing under the SPA would be wasted.

The record of the parties' discussions of the overbid minimum confirms that the SPA prohibits the Special Master from considering, much less favoring, a bid received during the No-Shop Period that fails to meet the Subsequent Overbid Minimum. No version of the overbid minimum terms—whether in the SPO, the Special Master's proposals, the model SPA, any SPA submitted by a bidder, or any SPA entered into by the Special Master—provided that it could be eliminated at the Special Master's discretion (let alone that the Special Master could consider a bid that had a materially lower price). The Special Master himself, in objecting to Gold Reserve's request that his discretion to lower the overbid minimum be removed, argued that because "the evaluation criteria include criteria other than price," he should "have the discretion to **lower** the overbid minimum if a competing bid may otherwise be a 'better' bid, among other reasons." (D.I. 1545-1 at 7) (emphasis added). The Special Master never proposed that he should have discretion to eliminate it altogether and thereby be permitted to consider **lower priced** bids.

To dismiss the overbid minimum as something that the Special Master may dispense with entirely, or unilaterally, would ignore the sound reasons why the Court ordered it in the first place. As Gold Reserve stated when it objected to, and asked to double, the original proposed $25 million

overbid minimum for the No-Shop Period, the purpose of this bidder protection is to incentivize bidders to "put their best foot forward during the Stalking Horse phase and then the Topping Period," and to ensure that "the attendant, material disruption that such an overbid would cause to the Court's carefully crafted schedule" would be endured only for a substantially higher competing bid. (D.I. 1550 at 3). With these considerations laid before the Special Master and Additional Judgment Creditors, no party objected to Gold Reserve's request or underlying rationale and, accordingly, the Court ordered the requested $50 million overbid minimum for the No-Shop Period.

The Amber Energy bid self-evidently violates the Court-ordered bidder protections. The Dalinar SPA has a **$7.382 billion** Purchase Price. In contrast, the Amber Energy bid has a Purchase Price of only $5.859 billion—or approximately **$1.5 billion less**. As such, it does not pass through the "gate" of the Subsequent Overbid Minimum to be deemed a valid Unsolicited Competing Proposal, much less a Superior Proposal.[1]

### d.    The *De Facto* Elimination of the Subsequent Overbid Minimum Unfairly Prejudices Gold Reserve.

The *de facto* elimination of the Subsequent Overbid Minimum is not a mere technical violation. Rather, as set out in the Declaration of Gold Reserve CEO Paul Rivett ("Rivett Declaration," attached hereto as Exhibit B), it acutely prejudices Gold Reserve, which relied on the overbid minimum, among other bidder protections, in constructing and submitting its Successful Bid and in performing under the Dalinar SPA. Rivett Declaration ¶¶ 5-6.

---

[1] Even if the Special Master had the discretion to eliminate the Subsequent Overbid Minimum consistent with the Dalinar SPA and the Court's orders—though, as discussed elsewhere, he does not—he would still have to fulfill his promise to the Court "to justify his use of discretion in connection with submitting his recommendation to the Court." (D.I. 1545-1 at 7). Yet the Special Master's cursory Notice of Superior Proposal does not provide any such justification; it does not reference the Subsequent Overbid Minimum. The Special Master thus did not comply with this essential bidder protection in deciding to engage with the Amber Energy bid.

Putting together a qualified bid comes at significant cost. Gold Reserve incurred tens of millions of dollars in fees to secure its committed financing alone. *Id.* ¶ 9. Gold Reserve also relied on the bidder protections when it decided to contribute the final $200 million of its Attached Judgment to the Purchase Price of the Dalinar bid and in spending tens of millions of dollars to add the Siemens Energy Attached Judgment to the Dalinar bid. *Id.* ¶¶ 7-9. Since being selected as the Final Recommended Bidder, Gold Reserve has incurred millions of dollars in additional costs to comply with the Dalinar SPA's regulatory filing requirements. *Id.* ¶ 9. All of these fees and expenses were incurred to put together the Dalinar bid and to perform under the Dalinar SPA, precisely because the bidder protections ordered by the Court were supposed to bar the Special Master from even engaging with a lower-priced bid during the No-Ship Period, much less determining that such a bid, particularly one that is a full $1.5 billion lower in Purchase Price, could constitute a "Superior Proposal." *Id.* at 8-9.

But for the bidding protections, Gold Reserve may not have participated in the Topping Bid process at all. *Id.* at 8. Its absence would necessarily have resulted in a lower-priced bid having been recommended. Gold Reserve, in good faith, relied on the bidder protections in crafting and putting together the highest and winning bid, at great expense to itself and to the benefit of the vast majority of the parties involved in this process. It would be manifestly unjust to now leave Gold Reserve worse off for having relied on those bidding protections.

e.    **The *De Facto* Elimination of the Subsequent Overbid Minimum Is Irreconcilable with the Clear Command of Delaware Law to Sell the PDVH Shares to the Highest Bidder.**

Elimination of the Subsequent Overbid Minimum harms not only Gold Reserve's interests, but also the public interest by contravening the Delaware statutory law mandate to sell the PDVH Shares to the "highest bidder" (8 Del. Section 324).

14

The purpose of an overbid minimum is to "trigger[] a bidding sequence that may lead to a much higher price." *In re Mickey Thompson Ent. Grp., Inc.*, 292 B.R. 415, 422 (B.A.P. 9th Cir. 2003); *see In re Mama's Original Foods, Inc.*, 234 B.R. 500, 505 (Bankr. C.D. Cal. 1999) (commenting that overbid minimums are intended to "encourage bidding and to achieve the highest sales price"). It is typically part of a larger sale structure that is "designed to get the highest price possible for the assets[.]" *Edgewater Growth Cap. Partners LP v. H.I.G. Cap., Inc.*, 68 A.3d 197, 228 (Del. Ch. 2013). It also provides protection to the bidder, the creditors, and the debtor itself by ensuring that the sale process is only disrupted for a bid that provides enough additional value to make the disruption worthwhile. *In re Greater Miami Neighborhoods, Inc.*, No. 08-10694-BKC-AJC, 2008 WL 4397425, at *2 (Bankr. S.D. Fla. Sept. 26, 2008) ("The purpose of this minimum overbid was to assure that a competing bidder would have to beat [the] "stalking horse" bid by $100,000, thereby assuring that the estates would receive at least $100,000 for the expense and effort of going through an auction process.").

Similarly, a No-Shop Period not only provides finality and confidence in the Sale Process, but also operates to ensure that bidders participated in the Stalking Horse and Topping Period processes in order to drive competition. The overbid minimum is a key factor in giving this period teeth, as otherwise bidding would be chilled during the Stalking Horse and Topping Period phases and bidders would be permitted to wait until the Special Master made a Final Recommendation to finally put forward their best possible offers. *See In re Stanley Eng'g Corp.*, 164 F.2d 316, 319 (3d Cir. 1947) (discussing post-auction bids, and noting that their possibility "'tends to chill bidding at the sale, to dispose of the property by later competition on successive bids, and thus to defeat the very purpose of an auction, which is to fetch together all those who may be interested to buy

and to set them against each other with whatever stimulus that may provide, as opposed to other kinds of sale'" (quoting *Knight v. Wertheim & Co.*, 2 Cir., 1946, 158 F.2d 838)).

As Gold Reserve's evidence shows, the cost of submitting a final, actionable bid in this Sale Process is substantial. The cost of the borrower to secure the final financial commitment letters required by the Special Master is nearly prohibitive. If the bidder protections, including the No-Shop/Non-Solicitation period protections and the associated overbid minimum, were dispensable at will, then bidders would be disincentivized from putting forward their best bid, or any bid, during the Topping Period. That was not what the Court or the AJCs intended when the bidder protections were settled in the January 27, 2025 Order. If that were not the case, bidders would have had to hedge against the risk of being declared the "winner" only to be later cast aside for a lower-priced bid. Moreover, they would have been incentivized to wait until after the Final Recommended Bid was declared before submitting their actual best bid. Again, this would have resulted in a value-destructive, rather than value-maximizing, Sale Transaction.

> **f.    The Special Master and Other Bidders Treated the Bidder Protections, Including the No-Shop Period and the Overbid Minimum, as Mandatory.**

The mandatory nature of the Court-ordered bidder protections is confirmed by the acts of other participants in this process, including the Special Master and other bidders.

The Special Master has expressly acknowledged that he is obligated to follow the bidder protections ordered by the Court. This is evidenced directly by the Special Master's July 1, 2025 request for Court permission to engage with "Bidder B," who submitted an Unsolicited Competing Proposal during the No-Shop Period. In making that request, the Special Master correctly observed that he was "*required* by the material SPA terms approved by the Court (D.I. 1517)" to seek this permission. Email from Chase Bentley to Michael Esposito (July 1, 2025, 09:40 PM) (emphasis added), attached hereto as Exhibit C; *see also* Email from Chase Bentley to Dan Birk (July 2, 2025,

05:43 PM), attached hereto as Exhibit D (stating that the Special Master would not "go around breaching terms of a contract that he agreed to on June 25"). Counsel for the Special Master also noted that Bidder B's proposal "would provide approximately $1 billion more in proceeds to Additional Judgment Creditors" as compared with the Dalinar bid. Exhibit C. While the proposal ultimately failed to comply with other requirements, Bidder B's proposed Purchase Price was later revealed to be $8.45 billion, and thus well-exceeded the required overbid minimum. (D.I. 2009-1 at 3).

The Special Master also treated the bidder protections as mandatory requirements when he sent Gold Reserve Notices of Unsolicited Competing Proposals on July 1, 2025, and August 11, 2025. (D.I. 2111-1), (D.I. 2111-2). Each notice stated it was sent "[p]ursuant to Section 6.16(c)" of the Dalinar SPA and that the Court had been notified "[a]s required by" the Dalinar SPA. *Id.*

Other bidders, like the Special Master, have also treated the Court-ordered bidder protections and mandatory when submitting their proposals.

- Red Tree's Stalking Horse SPA incorporated the overbid minimum that was approved by the Court in its January 27, 2025 Order and was reflected in the Court-approved model SPA. (D.I. 1596-1 at 66). The Dalinar SPA later replicated the same overbid minimum language. (D.I. 1837-1 at 113.)  It appeared again in Red Tree's Topping Bid. (D.I. 1839-1 at 94).

- The same overbid minimum language was also found in each of the Stalking Horse bids that were not selected by the Special Master. *See* (D.I. 1597-1).

- Bidder A's and Bidder B's proposed SPAs, which were submitted during the No-Shop Period, likewise included the overbid minimum. (D.I. 1839-1 at 210, 321).

In short, the Special Master and other bidders in this proceeding have consistently treated the Court-ordered bidder protections as mandatory requirements. This provides further reason to hold the Special Master and all bidders to these mandatory protections.

### g. Judge Sontchi's Expert Opinion Confirms That Derogation of the Overbid Minimum Should Not be Permitted.

The Court's prior orders are unambiguous and therefore the Notice should be stricken for all the reason set forth above. Judge Sontchi's expert opinion amplifies the gravity of the Special Master's departure from the Court-ordered bidder protections. Judge Sontchi is uniquely qualified to opine on the issue: in more than fifteen years on the bench he presided over "more than 200" section 363 sales, many of them large, highly contested transactions governed by bidding procedures "substantially similar to those in this case." Sontchi Report at 3, 8. His experience is deep and directly on point. His conclusions are instructive.

**Bidder protections are non-negotiable guardrails that maximize value.** "[F]aithful adherence to [court-approved] procedures reduces risk and maximizes value," because those procedures "induce greater participation" by sophisticated buyers who otherwise would not risk the substantial time and expense of diligence, financing, and regulatory work. *Id.* at 34–35. Eliminating a required overbid minimum after a winning bid has been selected does precisely the opposite: it increases risk, chills participation, and depresses price.

**A no-shop period coupled with a meaningful overbid minimum is essential to ensure the auction is the "day of reckoning."** *Id.* at 37. These protections provide "predictability that there will be finality once the official bidding period concludes, subject only to consideration of materially higher or better bids." *Id.* at 36 (emphasis added). By treating a $1.5 billion-lower Amber Energy bid as "Superior," the Special Master has eviscerated that predictability and deprived Gold Reserve of the benefit for which it paid tens of millions of dollars.

18

**Deviations from court-approved protections are proper only in "rare and extraordinary circumstances, which do not appear to be present in this instance."** *Id.* at 5, 36 (emphasis added). Judge Sontchi acknowledges that a fiduciary must retain a measure of discretion, but stresses that "the exception must not swallow the rule," because value destruction inevitably follows. *Id.* at 6, 34. The Special Master's decision to eradicate the overbid minimum flouts this principle.

**Courts virtually never approve a lower bid as the "best" bid.** Judge Sontchi observes that "instances of a court approving a lower bid as a best bid occur very rarely." *Id.* at 6 (citing his own denial of such a request in the Chicago Sun-Times case). The Special Master's attempt to prefer a bid that indisputably offers at least $1.5 billion less to the Attached Judgment Creditors puts this case squarely outside this narrow band of acceptable discretion and would set a grave precedent inconsistent with the requirement that the PDVH Shares be sold "to the highest bidder."

In short, Judge Sontchi's expert opinions align entirely with the plain language of the Court-order bidder protections: the Subsequent Overbid Minimum is a gating requirement, not an illusory guideline that can be cast aside at will. The Special Master's unilateral decision to ignore this require is "value destructive," "potentially implicates the fairness and integrity of the sale process," and is not justified by any "rare and extraordinary circumstances[.]" *Id.* at 5, 33, 36.

## IV.    CONCLUSION

For the above reasons, Gold Reserve respectfully requests that the Court grant this motion and strike the Special Master's Notice of Superior Proposal and any subsequent act of the Special Master based thereon.

*[Signature Follows.]*

19

Dated: August 27, 2025.

Respectfully submitted,

**WOMBLE BOND DICKINSON (US) LLP**

By: */s/ Kevin J. Mangan*
Kevin J. Mangan (#3810)
Matthew P. Ward (#4471)
Stephanie S. Riley (#5803)
1313 N. Market St., Suite 1200
Wilmington, DE 19801
Telephone: 302-252-4320
Kevin.mangan@wbd-us.com
Matthew.ward@wbd-us.com
Stephanie.riley@wbd-us.com

-and-

**NORTON ROSE FULBRIGHT US LLP**
Matthew H. Kirtland (*pro hac vice*)
799 9th Street NW, Suite 1000
Washington, DC 20001
Telephone: 202-662-0200
Matthew.kirtland@nortonrosefulbright.com

- and –

Katherine G. Connolly (*pro hac vice*)
555 California Street, Suite 3300
San Francisco, CA 94101
Telephone: 628-231-6816
Katie.connolly@nortonrosefulbright.com

- and –

Taylor J. LeMay (*pro hac vice*)
1550 Lamar Street, Suite 2000
Houston, TX 77010
Telephone: 713-651-3578
Taylor.lemay@nortonrosefulbright.com

*Attorneys for Gold Reserve Ltd.*