**EXHIBIT A**

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| CRYSTALLEX INTERNATIONAL CORP., | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | Misc. No. 17-151-LPS |
| | : | |
| BOLIVARIAN REPUBLIC OF VENEZUELA, | : | |
| | : | |
| Defendant. | : | |

**EXPERT WITNESS REPORT OF**
**HON. CHRISTOPHER S. SONTCHI (RET.)**

**I.      Overview**

In the last 30 years, sales of all or substantially all of a debtor's assets as a going concern under section 363 of the Bankruptcy Code have become ubiquitous, especially in the District of Delaware.  The goal of every section 363 sale is to sell the assets to the highest and best bidder. This is substantially identical to the goal in the analogous procedure under section 324 of Title 8 of the Delaware Code, which is a "public sale to the highest bidder." The result, if properly managed, is maximization of the value of the assets to the stakeholders in accordance with the priorities set forth under the law.

Interestingly, however, the sole authority and guidance for asset sales in the bankruptcy context is contained in section 363(b)(1) of the Bankruptcy Code – "The [debtor], after notice and a hearing, may use, sell, or lease, other than in ordinary course

of business, property of the estate."[1] Moreover, the Federal Rules of Bankruptcy Procedure are silent as to conduct of a sale of property of the estate under section 363(b)(1). As a result, not unlike the development of English common law, bankruptcy judges (primarily in Delaware, New York, and Texas) have developed practices, based on experience, to ensure that asset sales under section 363 are fair and are conducted in a manner designed to maximize value.

The end point of a section 363 sale, of course, is a hearing in which the court approves the sale. However, leading to that sale hearing are a series of steps that are governed by court orders. These steps almost universally involve the marketing of the assets, the selection of a stalking horse, the remarketing of the assets, the submission of competing bids, the conduct of a topping period or auction, the selection of a winning and a back-up bidder, and, finally, the sale hearing.

By "topping period" or "auction", I mean the post-stalking-horse step where bidders are required to submit their best bids possible to be selected as the successful or final bidder. This step may (or may not) involve an actual auction – where bidders compete against each other in the same room – but the purpose is the same – to select a

---

[1] The statute uses the term "trustee." However, under section 1101(7), in a chapter 11 case, a debtor in possession is a debtor. Furthermore, under section 1107(a), "a debtor in possession shall have all the rights . . . and powers, and shall perform all the functions and duties . . . of a trustee serving in a case under this chapter." As the Third Circuit summarized in *Cybergenics*, "[t]he term "debtor in possession" refers to a debtor in a chapter 11 case for which no trustee has been appointed. When no trustee is appointed, the Bankruptcy Code gives a debtor in possession the powers and duties of a trustee. Hence, by virtue of being a debtor in possession, Cybergenics operated not only as a business entity, but essentially as a trustee as well. *Official Comm. of Unsecured Creditors of Cybergenics Corp. v. Chinery (In re Cybergenics Corp.)*, 226 F.3d 237, 243 (3d Cir. 2000) (internal citation omitted).

final, successful bid. In this opinion, I use the term "auction" interchangeably with "topping period".

Not every sale process involves all these steps. For example, in many cases a marketing process is conducted pre-petition, and the debtor has already selected a stalking horse by the time the bankruptcy is commenced. In rare cases, no auction is conducted. What is universal, however, is that the sale process in the bankruptcy case is governed by rules set forth in one or more court orders and is subject to court supervision.

Participating as a potential acquiror in a court supervised sale process is a time-consuming and expensive endeavor. The public nature of a court-supervised sale and the two-step nature of the stalking horse process are very different than a typical private M&A process. In undergoing the cost of due diligence and publicly dealing with a debtor being second guessed by its creditors and, perhaps, the judge, bidders need to be able to rely on the procedures to mitigate their financial risk and to submit their highest offers. It is fundamental economics that as a buyer's perception of risk rises his price drops because the buyer requires a higher return on the investment. Thus, the establishment of rules governing the sale process and the court's enforcement of those rules are critical in reducing perceived risk and, thus, maximizing value.

One element of any sale process is establishing bidder protections. These are necessary to induce interested bidders to participate in the process and to bring real money to the table. One such protection is establishing a breakup fee for the stalking horse bidder. A stalking horse is simply the first bidder that the seller picks as the initial winner against whom the other bidders compete. The stalking horse sets the price floor.

In exchange for undertaking the time and cost of setting the floor, while also quite possibly losing the auction, the stalking horse receives a breakup fee. The other bidders must then make higher bids in no less than minimum increments. The first overbid must be sufficient to pay the breakup fee plus the minimum increment.

While it is important to protect the stalking horse to set an appropriate minimum sale price, it is just as important to protect the winning bidder to ensure all bidders bid their maximum price at the auction. The auction must be the day of reckoning. To ensure that occurs, the sale procedures usually require that the seller cannot continue to market, nor attempt to sell the property, but must stand by the winner through the sale hearing. However, the sale procedures may provide for a "fiduciary out," where the seller may consider a higher bid from a new bidder after the close of the auction. As in this case, almost universally, any post-auction bid must meet the minimum increment. In effect, the late bid being considered is treated as if the auction were continuing.

Notwithstanding the importance of compliance with clear procedures to maximize value, courts may allow for the debtor and the court itself to exercise discretion to deviate from the rules in appropriate circumstances. However, courts do so rarely and usually in response to evidence of inappropriate behavior such as collusion by bidders to reduce competitive bidding; management skewing the process for personal reasons (such as promise of employment); inadequate marketing or lack of notice; or unexpected material business or economic developments such as 9/11 or a financial crisis akin to that of 2008, etc. Traditionally, courts have not deviated from the rules based solely on price or closing risk.

I understand that in this case a post-auction switch has been proposed from the winning bidder at the auction to an existing bidder that participated at the auction and whose revised bid did not meet the overbid requirement in the rules. In this instance, it appears that meeting the overbid requirement may be a gating issue for whether the new bid can even be considered by the seller. Such a reading would be consistent with protecting the auction result, which generally leads to value maximization.

Moreover, I understand that the late-submitted bid was for less consideration payable to the judgment creditors than the bid of the winning bidder. Sale procedures usually require the debtor to accept the highest bid or the highest and best bid. The highest bid may not be the best bid for reasons such as regulatory complications, closing risk, and other non-monetary considerations. Nonetheless, instances of a court approving a lower bid as a best bid occur very rarely. Indeed, I denied such a request based on claims that the lower bid would preserve jobs in the *Chicago Sun Times* case.

In sum, bankruptcy courts have developed procedures and practice governing the marketing and sale of assets under court supervision. What has emerged over the decades of that experience is that faithful adherence to those procedures reduces risk and maximizes value. While the seller and court must have discretion to deviate from those procedures, it is exceedingly rare to do so. Otherwise, the exception would swallow the rule, which would be value destructive. Based upon my understanding of the facts and circumstances here, this is not an instance where a bankruptcy court supervising a section 363 sale would deviate from the existing rules and procedures in the case.

## II.     Introduction

I have been requested by Gold Reserve Ltd. ("**Gold Reserve**") in connection with the above-captioned case to provide an expert opinion (the "**Opinion**"), based upon my experience as a U.S. Bankruptcy Judge and a bankruptcy lawyer, concerning court-approved procedures to govern the sale of a distressed entity's assets and the importance of compliance with such procedures to ensure a sale is fair and yields the best result. Specifically, I have been asked to opine on the significance of bidder protections, such as a no-shop period and overbid minimum requirements, as means to incentivize participation in an auction by parties who will propose materially meaningful bids and facilitate fairness and integrity for the sale process.

## III.     Qualifications

I am a retired U.S. Bankruptcy Judge for the District of Delaware where I served from 2006 until 2022. I served as Chief Judge of that court from 2018 to 2021. Upon retirement, I was appointed as an International Judge of the Singapore International Commercial Court where I currently serve. I am also a consultant to the World Bank, and a Lecturer in Law at The University of Chicago Law School.

I am the sole member of Sontchi, LLC, through which I engage in mediation, the provision of expert services through consultation and as a testifying witness, and service as an independent fiduciary. Since retirement from the U.S. Bankruptcy Court, I have been engaged several times to provide expert services.

During my time as a U.S. Bankruptcy Judge I presided over more than 200 cases involving the sale of a debtor's assets under section 363(b)(1) of the Bankruptcy Code, most of which were subject to sale procedures substantially similar to those in this case.

I am a frequent speaker in the U.S. and abroad on a variety of issues of corporate and insolvency law, having made well over one hundred appearances. I am a Fellow of the American College of Bankruptcy, and I am also a member of the International Insolvency Institute, Judicial Insolvency Network, National Conference of Bankruptcy Judges, American Bankruptcy Institute, and INSOL International. In addition, I am a member of the International Advisory Council of the Singapore Global Restructuring Initiative, and the Founders' Committee for The University of Chicago Law School's Center on Law and Finance.

I have testified before the U.S. Congress on the safe harbors for financial contracts. I have also published several articles on, among other things, creditors' committees, valuation, asset sales, and the safe harbors for financial contracts.

I attended the University of North Carolina at Chapel Hill where I was elected to *Phi Beta Kappa* and obtained a Bachelor of Arts with distinction in Political Science. I received my Juris Doctor from The University of Chicago Law School, after which I served as a law clerk in the Delaware Supreme Court. I am a member in good standing of the Bars of the Delaware Supreme Court, the U.S. District Court for the District of Delaware, and the Third Circuit Court of Appeals.

My curriculum vitae, which more fully sets forth my qualifications to provide this Opinion is also attached hereto as **Appendix A**.

## IV.    Issues to Be Addressed

Gold Reserve has asked me to address the following questions in this opinion:

**Question 1:**  What is the general purpose of court-ordered bidder protections in obtaining a value-maximizing sale transaction in a public sale?

**Question 2:**  How does adherence to such court-ordered bidder protections by the person conducting a public sale (whether a Special Master, court-appointed officer, fiduciary, or other person) assist in obtaining a value maximizing sale transaction?

**Question 3(a):**  What is the general purpose of a non-solicitation period/no-shop period coupled with an overbid minimum after the final recommendation in the context of a sale process that, like here, has the following phases:  stalking horse phase, topping phase, final recommendation, and sale hearing?

**Question 3(b):**  What is the role of these specific bidder protections in obtaining a value-maximizing sale transaction; specifically, the impact, if any, that they have on bidder behavior during the "topping period" and generating highest and best bids during that period in advance of the final recommendation?

## V.    Documents Relied Upon in this Opinion

In providing this Opinion, I have reviewed and relied upon the following documents, which were provided to me by Counsel for Gold Reserve:

| D.I. No. | Document Title |
|---|---|
| 258 | Memorandum Order dated April 13, 2021, appointing Special Master |
| 481 | Sixth Revised Proposed Order (A) Establishing Sale and Bidding Procedures, (B) Approving Special Master's Report and Recommendation Regarding Proposed Sale Procedures Order, (C) Affirming Retention of Evercore as Investment Banker by Special Master and (D) Regarding Related Matters |
| 1201 | Special Master's Motion Requesting Adjournment of the July 15, 2024 Tentative Sale Hearing |
| 1325 | Notice of Special Master's Recommendation |
| 1507 | Transcript of Status Conference held on December 13, 2024 |
| 1517 | Memorandum Order Regarding Sale Process and Litigation |

| 1528 | Letter from (Hon.) Myron T. Steele to The Honorable Leonard P. Stark submitting Joint Status Report on behalf of Special Master |
|------|---|
| 1539 | Gold Reserve and Rusoro's Objections to the Special Master's Joint Status Report |
| 1543 | Venezuela Parties' Joint Response to Objections to the Special Master's Proposed Bidder Protections, Material SPA Terms, and Bid Evaluation Criteria |
| 1545 | Letter from (Hon.) Myron T. Steele to The Honorable Leonard P. Stark |
| 1549 | Venezuela Parties' Joint Reply Regarding Objections to the Special Master's Proposed Bidder Protections, Material SPA Terms, and Bid Evaluation Criteria |
| 1550 | Gold Reserve Inc. and Rusoro Mining Limited Reply Regarding the Special Master's Proposed Bidder Protections, SPA Material Terms and Evaluation Criteria |
| 1552 | Letter from (Hon.) Myron T. Steele to The Honorable Leonard P. Stark |
| 1554 | Memorandum Order dated January 27, 2025 |
| 1557 | Notice of Filing of Long-Form Stock Purchase Agreement |
| 1559 | The Venezuela Parties' Joint Objections to the Special Master's Long-Form Stock Purchase Agreement |
| 1564 | Special Master's Omnibus Response to Objections to Draft Long-Form Stock Purchase Agreement |
| 1570 | The Venezuela Parties' Joint Reply in Support of Objections to Long-Form SPA |
| 1571 | Memorandum Order dated February 24, 2025 |
| 1596 | Notice of Special Master's Recommendation of Stalking Horse |
| 1741 | Order dated April 21, 2025 |
| 1837 | Special Master's Final Recommendation |
| 2009 | Notice of Filing of Unsolicited Bid |
| 2110 | Scheduling Order dated August 22, 2025 |
| 2014 | Gold Reserve's Response to Notice of Filing of Unsolicited Bid |
| 2025 | Letter from Jennifer L. Cree to The Honorable Leonard P. Stark regarding sale hearing |
| 2032 | Letter from Kevin J. Mangan to The Honorable Leonard P. Stark regarding Gold Reserve's response to Red Tree's letter |
| 2047 | Letter from (Hon.) Myron T. Steele to The Honorable Leonard P. Stark regarding sale hearing |

| 2050 | Letter from Kevin J. Mangan to The Honorable Leonard P. Stark regarding Gold Reserve objection to adjournment of sale hearing |
| 2056 | Order dated August 14, 2025 adjourning sale hearing |
| 2113 | Notice of Special Master's Determination of Superior Proposal |
| | *In re Brightmark Plastics Renewal, LLC*, No. 25-10472 (LSS), Transcript of Hearing (Bankr. D. Del. May 9, 2025) |
| | Silberglied, Russell C., *Can a Lower Bid for a Debtor's Assets Be Approved as "Better" Because It Saves More Jobs than the Higher Bid?*, 76 THE BUSINESS LAWYER 817 (Summer 2021) |

Further, this opinion is based upon my experience as a U.S. Bankruptcy Judge for the District of Delaware, a lawyer practicing bankruptcy law in Delaware for thirteen years prior to joining the judiciary, my service as an International Judge with the Singapore International Commercial Court, and my practice at Sontchi, LLC since retiring from the bench. This opinion is also based upon legal research and analysis of existing statutes and case law conducted by me and my associate, Ms. Sara Beth Kohut.

## VI. Statement of Facts

The following statement is based on the facts as presented to me orally by counsel for Gold Reserve, as confirmed by the review by my associate and I of the materials identified herein provided by counsel for Gold Reserve.[2] The following is not intended to be a comprehensive summary of the long-running sale process in the underlying case, but rather is provided as a summary of the facts on which I base my opinion.

I have reviewed the Special Master's Final Recommendation, including his recitation of the procedural background and the key events in the Sale Process thus far.

---

[2] Undefined terms used herein have the meaning set forth in the relevant source document.

(D.I. 1837, 6-15). I understand that the Special Master was appointed on April 13, 2021, and tasked with assisting in the sale of shares held by Intervenor Petroleos de Venezuela, S.A. ("**PDVSA**") in PDV Holding, Inc. (the "**PDVH Shares**"). (D.I. 258). The Special Master negotiated the terms of the Sale Process with certain parties identified as the 2020 Bondholders and the Sale Process Parties[3] and proposed the procedures set forth in the current governing Sale Process Order ("**SPO**"), which was entered by the Court on October 11, 2022. (D.I. 481).

The SPO provides, under the heading "Stalking Horse Bid Protections," that "the Special Master may: (a) establish an initial overbid minimum and subsequent bidding increment requirements not to exceed 5.00% of the Stalking Horse Bid Implied Value, subject to adjustment for any Bids for a lesser percentage of the PDVH Shares than the Stalking Horse Bid[.]" (D.I. 481 at 20).

The initial final bid deadline was June 11, 2024 (D.I. 1201), and this resulted in the Special Master making a Final Recommendation in September 2024 of a bid submitted by Amber Energy (D.I. 1325). This recommendation was opposed by virtually all parties and the Amber Energy bid ultimately was withdrawn. On December 13, 2024, the Court held a hearing at which it considered multiple rounds of briefing and extensive oral argument from the parties and Special Master on how to restart the Sale Process. (D.I. 1507).

---

[3] The "**Sale Process Parties**" include ConocoPhillips Petrozuata B.V. ("**ConocoPhillips**"), Plaintiff Crystallex International Corporation ("**Crystallex**"), and the "**Venezuela Parties**" who are comprised of CITGO Petroleum Corp. ("**CITGO Petroleum**"), Defendant Bolivarian Republic of Venezuela (the "**Republic**"), PDVSA, and PDVH. (*See* D.I. 481).

On December 31, 2024, the Court issued an order setting the procedures under which the Sale Process would resume. (D.I. 1517). There were three periods in the revised sale process: (1) a Stalking Horse period, which was to result in the Special Master recommending a Stalking Horse bid for Court approval; (2) a Topping Period, which was to result in the Special Master selecting the Successful Bidder and making a Final Recommendation of that bid for Court approval; and (3) the Sale Hearing phase, in which the Court would hear any objections to the Final Recommendation and decide whether or not to approve it.

The Court ordered *inter alia* the Special Master to confer with the Sale Process Parties and certain Additional Judgment Creditors and then to propose "(a) Bidder Protections that will be made available to any Stalking Horse approved by the Court; (b) a list of the material terms of a Stock Purchase Agreement ("**SPA**"), noting which terms are non-negotiable and which are strongly favored; and (c) Evaluation Criteria for Stalking Horse Bids, Base Bids, and Successful Bids." (D.I. 1517 at 2). The Court ordered briefing on those proposals, and directed that, after it ruled on those items, the Special Master must make them available in the data room. *Id.* After that ruling, the Special Master would have 14 days to draft and file a model SPA "consistent with the Court-approved material terms," to which the parties would again brief objections. *Id.* at 2-3.

In accord with the December 31, 2024 Order, the Special Master proposed bidder protections, material SPA terms, and evaluation criteria on January 14, 2025. (D.I. 1528). Those bidder protections included, in part, a "**Non-Solicitation Period**" following the Special Master's Final Recommendation, which I understand is now referred to as the

"**No-Shop Period.**"   In the Non-Solicitation Period, the Special Master was broadly prohibited from engaging with or encouraging any proposal or offer that constituted or that reasonably could be expected to lead to a competing proposal.  (D.I. 1528-1 at 2). An exception was made for any "unsolicited competing proposal," with the proposed language providing that "[a]ny subsequent bidding increments" would "need to satisfy an overbid minimum equal to or in excess of $25 million; provided, that the Special Master shall have the ability to exercise his discretion to lower the overbid minimum amount for subsequent bids or any auction." (*Id.* at 2-3). A similar overbid minimum was provided for during the prior "Stalking Horse," phase, with the language stating:  "Any initial bid received during the Topping Period will need to satisfy an overbid minimum equal to or in excess of the Termination Fee *plus* $25 million." (D.I. 1528-1 at 3 (emphasis original)).

Gold Reserve and Rusoro Mining Ltd. ("**Rusoro**") objected to the Special Master's proposals, and requested that the Court order that the overbid minimum would also apply during the Non-Solicitation/No-Shop Period and requested that the overbid during this period should "have a higher threshold, say $50 million," and that the Special Master should not have discretion to lower the overbid minimum. (D.I. 1539-1 at 3).

Relatedly, Gold Reserve and Rusoro also objected to one of the model SPA terms proposed by the Special Master, arguing that the termination provisions should be clarified to state that the Special Master could terminate the Final Recommended Bid only for a Superior Proposal, "prior to entry of the Sale Order and consistent with the Non-Solicitation Provisions of the SPA." (D.I. 1539-2 at 4).

The Venezuela Parties opposed the proposal to increase the overbid minimum, arguing that the $25 million overbid minimum was sufficient and that increasing it to $50 million would "deter bidders from topping the Stalking Horse Bid." (D.I. 1543 at 3). The Special Master did not object to increasing the overbid minimum for the Non-Solicitation/No-Shop Period, "so long as the Special Master retains discretion over the overbid minimum for subsequent bids or any auction." (D.I. 1545-1 at 7). He opposed striking the provision providing this discretion, stating that the SPO "already contemplates that, as is customary, the Special Master shall have the discretion to lower the overbid minimum amount for any subsequent bids or any auction. Given that the evaluation criteria include criteria other than price, the Special Master should have the discretion to lower the overbid minimum if a competing bid may otherwise be a 'better' bid, among other reasons." *Id.* The Special Master also stated that, "[i]n all circumstances, the Special Master will need to justify his use of discretion in connection with submitting his recommendation to the Court." *Id.*

No party objected to Gold Reserve/Rusoro's proposal that the model SPA's termination provisions should be clarified to provide that the Special Master could terminate the Final Recommended Bid only for a Superior Proposal, "prior to entry of the Sale Order and consistent with the Non-Solicitation Provisions of the SPA." (D.I. 1545-2 at 8).

Gold Reserve and Rusoro maintained their positions regarding the increased overbid minimum in their reply briefs, arguing that the Special Master should not have "discretion . . . to entertain topping bids or overbids that do not meet the specified

14

monetary thresholds, and that it would be sensible to increase the threshold for overbids during the non-solicitation period, *i.e.*, <u>after</u> the Final Bid is recommended to the Court, from $25 million to $50 million." (D.I. 1550 at 2)(emphasis in original). They argued that this would bring "transparency and clarity to the Sale Process" by providing clear guidelines to potential bidders. *Id.* at 2-3. Further, they asserted, because "the Sale Process is designed so that all bidders should put their best foot forward during the Stalking Horse phase and then the Topping Period," increasing the overbid minimum to $50 million would be reasonable "given the attendant, material disruption that such an overbid would cause to the Court's carefully crafted schedule for objections/approval of the Final Recommended Bid[.]" *Id.* at 3.

The Venezuela Parties, in their reply briefing, continued to oppose any increase to the proposed $25 million overbid minimum. (D.I. 1549 at 3). They argued that a topping bid would already have to satisfy the termination fee, "which means that a topping bid must exceed the Stalking Horse bid by up to $150 million in addition to the $25 million overbid amount." *Id.* "Adding another $25 million to this [in the Non-Solicitation/No-Shop Period] would be a substantial increase." *Id.* They agreed with the Special Master that he should retain "discretion to reduce the overbid minimum increment in subsequent bidding rounds[.]" *Id.*

On January 23, 2025, the Special Master submitted a revised proposal, which included the following revised overbid minimum language:

> "Any subsequent bidding increments (including bidding increments at any auction) will need to satisfy an overbid minimum equal to or in excess of $50 million, <u>provided</u>, that the Special Master shall have the ability to exercise his discretion to lower the overbid minimum amount for subsequent bids or any auction."

(D.I. 1552-1 at 3). The Special Master's revised proposal also addressed the proposed change to the termination provisions of the SPA that had been requested by Gold Reserve and Rusoro and to which no party had objected (the added language is highlighted in bold below):

> c. The Special Master may terminate for a Superior Proposal **prior to the Sale Hearing and consistent with the Non-Solicitation Provisions of the SPA (subject to the Court's consideration of an unsolicited proposal received after submission of the Final Recommendation).**

(*Id*. at 6; *cf. with* D.I. 1528-2 at 4 ("c. The Special Master may terminate for a Superior Proposal.")).

The Court ruled on the bidder protections (and other issues) on January 27, 2025, adopting the proposed $50 million overbid minimum, "subject to the Special Master retaining discretion to lower or raise the overbid minimum throughout the process, as he proposes, which is helpful for reasons including that 'the evaluation criteria include criteria other than price[.]'" (D.I. 1554 at 14) (quoting D.I. 1545-1 at 7).

On February 10, 2025, as directed by the Court (D.I. 1517), the Special Master filed a model SPA consistent with the bidder protections and the SPA terms ordered by the

Court in the January 27, 2025 Order. (D.I. 1557-1). The model SPA contained the Non-Solicitation/No-Shop Period, which it defined as "the period beginning on the date that is five (5) Business Days after the conclusion of the Topping Period, and ending on the Closing Date or the date on which this Agreement terminates pursuant to its terms." (*Id.* at A-10). The No-Shop Period was referenced in both the "Bidder Protections and Competing Proposals" provisions at Section 6.16 and the Termination provision at Section 8.1(d). *Id.* at 59-63, 65.

The restrictions on the Special Master during the No-Shop Period are set out in Section 16.16(b) of the model SPA:

> (b) During the No-Shop Period, the Special Master shall not, directly or indirectly, solicit, initiate, knowingly encourage or knowingly facilitate any proposal or offer that constitutes, or would reasonably be expected to lead to, a Competing Proposal.

(*Id.* at 60).

In defining "Competing Proposal" at Section 6.16(g), the model SPA stated that any such Proposal:

> must satisfy an overbid minimum above the Purchase Price equal to or in excess of the Termination Fee (to the extent this Agreement constitutes the Stalking Horse Bid Agreement) or the Expense Reimbursement Amount (to the extent this Agreement constitutes the Base Bid Agreement) *plus* $25,000,000 and (ii) any increase in such Competing Proposal must satisfy an overbid minimum equal to or in excess of $50,000,000 (the "Subsequent Overbid Minimum"); provided, further, that the Special Master may, in his sole discretion, lower the Subsequent Overbid Minimum for any Competing Proposal.

(D.I. 1557-1 at 61-62).

The Venezuela Parties objected, arguing that the Court's January 27, 2025 Order only increased the overbid minimum to $50 million for the No-Shop Period, and asked that the provision be revised accordingly, so that it made clear that a $25 million overbid minimum applied to the Topping Period and the $50 million overbid minimum applied to the No-Shop Period. (D.I. 1559 at 5).

The Special Master responded that he did not disagree with the Venezuela Parties and stated that they had agreed to revised language (D.I. 1564 at 4) which was set out in a revised model SPA (D.I. 1564-1 at 2). That language split the above-defined "Subsequent Overbid Minimum" into three separate protections—the first being an "Overbid Minimum" for the Topping Period, an "Improved Overbid Minimum" for the period between the end of the Topping Period and prior to the No-Shop Period, and the "Subsequent Overbid Minimum" that would be applicable during the No-Shop Period:

> (iii) any Unsolicited Competing Proposal received during the No-Shop Period must satisfy an overbid minimum above the Purchase Price (or, if this Agreement shall have been terminated by the Special Master pursuant to Section 8.1(d)(i), above the "Purchase Price" as defined in the Superior Proposal Agreement) equal to or in excess of (A) the Termination Fee (to the extent this Agreement constitutes the Stalking Horse Bid Agreement) or the Expense Reimbursement Amount (to the extent this Agreement constitutes the Base Bid Agreement) *plus* (B) the Expense Reimbursement Amount pursuant to Section 8.3(e), if applicable, *plus* (C) $50,000,000[.]

(D.I. 1564-1 at 2).

On February 24, 2025, the Court recognized that the Venezuela Parties' objection had been resolved by this agreement with the Special Master. (D.I. 1571 at 2). The Court

ordered further briefing regarding only a dispute regarding non-cash consideration but otherwise resolved all objections to the model SPA. (*Id*. at 5).

The Stalking Horse period occurred from March 7, 2025 (when stalking horse bids were due) to March 21, 2025, when the Special Master filed his Stalking Horse Recommendation, recommending that the Court approve a proposal from Red Tree Investments, LLC ("**Red Tree**") as the Stalking Horse. (D.I. 1596). The overbid minimum and the No-Shop Period, as ordered by the Court in its January 27, 2025 Order and reflected in the model SPA approved by the Court, were included in Red Tree's SPA. (D.I. 1596-1 at 66). The Court affirmed the Special Master's Stalking Horse Recommendation, over the objection of Gold Reserve and other parties, and designated Red Tree as the Stalking Horse on April 21, 2025. (D.I. 1741).

The Topping Period took place until June 24, 2025.  On July 2, 2025, the Special Master filed his Final Recommendation, recommending that the Court approve the sale of the PDVH Shares to Dalinar Energy Corporation ("**Dalinar Energy**"), the acquisition vehicle of Gold Reserve. (D.I. 1837). The same bidder protections as were in the Red Tree SPA were included in the Dalinar Energy SPA, revised to remove references to the now-superfluous Stalking Horse Period and Topping Period.  The restrictions on the Special Master in the No-Shop Period were included verbatim in Section 6.16(b) of this version of the SPA:

> (b) During the No-Shop Period, the Special Master shall not, directly or indirectly, solicit, initiate, knowingly encourage or knowingly facilitate any proposal or offer that constitutes, or would reasonably be expected to lead to, a Competing Proposal.

(D.I. 1837-1 at 61).  The exception to this provision for Unsolicited Competing Proposals

is set forth in Section 6.16(c), and the overbid minimum condition for such proposals is

set forth in Section 6.16(f)(i):

> [A]ny Unsolicited Competing Proposal received during the No-Shop Period must satisfy an overbid minimum above the Purchase Price (less the Debt Payoff Amount) equal to or in excess of (A) the Expense Reimbursement Amount pursuant to Section 8.3(c), if applicable, *plus* (B) $50,000,000 ((A) and (B), collectively, the "Subsequent Overbid Minimum"); provided, further, that the Special Master may, in his sole discretion, lower or raise the Subsequent Overbid Minimum for any Competing Proposal.

(D.I. 1837-1 at 63).

On July 1, 2025, the Special Master informed Gold Reserve that he had received an

Unsolicited Competing Proposal and, per the requirements of Section 6.16(c) of the SPA,

had requested the Court's permission to engage with this bidder.  On August 7, 2025, the

Special Master filed on the docket a partially redacted copy of this bidder's proposal.

(D.I. 2009-1).  The stated purchase price of this bid is $8.449 billion, exclusive of

consideration paid to the 2020 Bondholders, which is redacted.  (D.I. 2009-1, Exhibit A).

The Special Master also stated as follows:

> **PLEASE TAKE FURTHER NOTICE THAT**, on July 1, 2025 the Court approved the Special Master to engage with Bidder B with respect to the Bidder B Unsolicited Bid and to reactivate Bidder B's access to the virtual data room. Since receipt of the Bidder B Unsolicited Bid, the Special Master has consistently engaged with Bidder B regarding its progress in furtherance of the proposed transaction. The Special Master understands Bidder B is in active discussions with various parties whose consent or agreement is required pursuant to the terms of the proposed transaction; however, as of the time of this submission, the Special Master has not yet received documentation of any such agreements.

> Accordingly, as of the date hereof, the Special Master has not deemed the Bidder B Unsolicited Bid to be a Superior Proposal (as defined in the SPA). *See* D.I. 1837, Ex. B at 63, § 6.16.

(D.I. 2009 at 2).

On August 11, 2025, the Special Master informed Gold Reserve that he received an Unsolicited Competing Proposal on August 8, 2025. On August 12, 2025, Red Tree filed a letter identifying Amber Energy as the bidder and disclosing that this bid had a purchase price of $5.859 billion. (D.I. 2025). On August 13, 2025, the Special Master requested that the Court adjourn the August 18, 2025 Sale Hearing. (D.I. 2047). The Court granted this request on August 14, 2025. (D.I. 2056).

After a briefing from the parties, a hearing, and a proposed schedule from the Special Master and Gold Reserve, the Court has set the Sale Hearing to commence on Monday, September 15. (D.I. 2110). The Court also set interim deadlines of, inter alia, August 22, 2025, for any further Unsolicited Competing Proposals to be submitted to the Special Master; August 25, 2025, for the Special Master to notify Gold Reserve if he had determined that any such proposal constituted a "Superior Proposal"; August 27, 2025, for Gold Reserve to move to strike or otherwise object to any such notice; August 28, 2025, for Gold Reserve to exercise its "match rights" under the SPA; and August 29, 2025, for the Special Master to file a revised Final Recommendation. (*Id.*).

On August 25, 2025, the Special Master filed a Notice of Determination of Superior Proposal (D.I. 2113), and provided Gold Reserve with a confidential copy of certain terms of a revised bid submitted by Amber Energy on August 22, 2025. While the monetary terms of the bid are confidential, the Special Master's publicly-filed notice states that the

purchase price to be paid to creditors as part of the Sale Price is "composed of cash and non-cash consideration with necessary consents received from Additional Judgment Creditors through Koch Minerals Sàrl and Koch Nitrogen Internation Sàrl (collectively "Koch") in accordance with the waterfall established in the Final Priority Order (D.I. 1102)." (*Id*.).[4] I understand that this amount is approximately the above-referenced $5.859 billion. The purchase price of this bid therefore is lower, and perhaps materially lower, than the circa $7.382 billion purchase price of the Gold Reserve/Dalinar Energy bid stated in the Final Recommendation. (D.I. 1837 at 1).

## VII.    Applicable Law

### A.    Statutory Authority for Asset Sales

I understand the sale of PDVH Shares is being conducted pursuant to 8 Del. C. §324, which provides in relevant part as follows:

> (a) The shares of any person in any corporation with all the rights thereto belonging, or any person's option to acquire the shares, or such person's right or interest in the shares, may be attached under this section for debt, or other demands, if such person appears on the books of the corporation to hold or own such shares, option, right or interest. **So many of the shares, or so much of the option, right or interest therein may be sold at public sale to the highest bidder,** as shall be sufficient to satisfy the debt, or other demand, interest and costs, upon an order issued therefor by the court from which the attachment process issued, and after such notice as is required for sales upon execution process.

---

[4] The Notice also refers to an unspecified amount of "additional consideration" which could be used to satisfy a portion of Gold Reserve's attachment judgment or to pay other Additional Judgment Creditors.  I understand from this additional amount is, in Gold Reserve's view, de minimis in comparison to the total value of its Attachment Judgment and may not result in Gold Reserve obtaining any recovery on its Attached Judgment. https://www.businesswire.com/news/home/20250826670054/en/Gold-Reserve-Provides-Update-on-CITGO-Sale-Process.

(emphasis added). So, at its heart, the transaction contemplated here is a "sale to the highest bidder."

In the bankruptcy context, the analogous provision is found at 11 U.S.C. §363(b)(1), which provides that "[t]he [debtor], after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate[.]"[5] Section 363(b) does not expressly require an auction, but auctions have become "a common feature of chapter 11 practice" as a means of obtaining the "highest and best value" for estate assets. *In re MTE Holdings LLC*, 2021 Bankr. LEXIS 2225, *21 (Bankr. D. Del. Aug. 17, 2021); *see also* Frimet, Zachary R., Reward the Stalking Horse or Preserve the Estate: Determining the Appropriate Standard of Review for Awarding Break-Up Fees in §363 Sales, 20 Fordham J. Corp. & Fin. L. 461, 462 (2015) (hereafter "**Frimet at __**"). Generally, the successful bid in a section 363 sale auction is "the highest and best offer". *In re KLCG Prop., LLC*, 2010 Bankr. LEXIS 3005, *7 (Bankr. D. Del. March 25, 2010); *In re Electroglas, Inc.,* 2009 Bankr. LEXIS 4994, *8 (Bankr. D. Del. Oct. 20, 2009) (buyer's offer was "highest and best offer").

Based on my experience and review, the policies served by 8 Del. C. §324 and 11 U.S.C. §363 are similar: maximize recovery for the estate. But I also expect that a court approving a sale under either statute is likely to conduct the sale process with an eye

---

[5] A sale of the debtor's assets may also arise under other sections of the Bankruptcy Code. A chapter 11 debtor's plan of reorganization may call for "the sale of all or any part of the property of the estate." 11 U.S.C. §1123(a)(5)(D); *see also In re Philadelphia Newspapers*, 599 F.3d 298 (3d Cir. 2010) (addressing right to credit bid in a sale of assets as part of plan confirmation under 11 U.S.C. §1129(b)(2)(A) . However, most asset sales involving an auction are conducted under section 363.

towards providing fairness to all constituents, predictability to participants that the governing procedures will be followed, and compliance with applicable statutes and other obligations.

### B.    Section 363 Sales Are Subject to Court-Approved Procedures

Section 363 sales have become common practice in large corporate bankruptcies. Fruchter, Steven, Section 363 Sales After the Covid-19 Pandemic, 95 Am. Bankr. L.J. 367, 374 (2021) (hereafter "**Fruchter at __**"). The auction is typically conducted by the debtor, subject to court supervision and intervention to resolve legal disputes. *MTE*, 2021 Bankr. LEXIS 2225, *21-22.

A fairly standard set of procedures has developed "to facilities a competitive, transparent, and public bidding process aimed at maximizing the price the debtor ultimately obtains for the sale of assets under section 363." Fruchter at 374. Generally, the auction procedures that have emerged are designed to promote fairness, maximize the value of the estate, and protect the interests of creditors. *See, e.g.*, *In re Virgin Orbit, LLC*, 659 B.R. 36, 38 (Bankr. D. Del. 2024), *aff'd*, *Hampel v. Virgin Orbit Holdings, Inc. (In re Virgin Orbit, LLC)*, 669 B.R. 725 (D. Del. 2025). Courts will typically consider whether proposed procedures are commercially reasonable, equitable, compliant with statutory requirements, and in good faith. These are considerations that the Court assessed in approving the sale procedures and bidding procedures in the instant matter. *See generally* D.I. 481 (approving sale and bidding procedures).

A  bankruptcy auction involves a "difficult balancing act" where the court must "'walk a tightrope between, on the one hand, providing for an orderly bidding process,

recognizing the danger that absent such a fixed and fair process bidders may decline to

participate in the auction, and on the other hand, retaining the liberty to respond to

differing circumstances so as to obtain the greatest return for the bankruptcy estate.'"

*MTE*, 2021 Bankr. LEXIS 2225, *21 (quoting *In re Financial News Network Inc.*, 980 F.2d 165,

166 (2d Cir. 1992)).

These concerns are reflected in the auction procedures put in place to govern an

auction. Typically, it is the debtor who proposes:

> bid procedures that retain more or less flexibility to change the terms
> of the auction based on how it strikes the balance between providing
> comfort to potential bidders that strict rules will be enforced and
> retaining discretion to change course as events unfold. An order that
> contains more rigid requirements that will be enforced by the court
> may send a signal to the market that the waters are safe for
> swimming. An order that leaves the debtors a great deal of discretion
> provides the debtor more flexibility to make real time decisions to
> address developments in sometimes fluid circumstances.

*Id*. at *22-23.

The orders setting forth the auction and bidding procedures serve as a roadmap

for the sale of the assets at issue. Meltzer, Evelyn J., Key Provisions in §363 Sale Bidding

Procedures (July 1, 2017), available at https://www.troutman.com/insights/key-

provisions-in-363-sale-bidding-procedures.html (hereafter "**Meltzer at __**"). These terms

that will govern the sale "involve a delicate balance between protecting the stalking horse

purchaser and crafting a process that does not chill bidding." Collins, Mark D. and

25

Zachary I. Shapiro, 363 Sales: An Update on Best Practices and Recent Developments, Southeastern Bankruptcy Law Institute Seminar (2014), at 2 (hereafter "**Collins at ___**").[6]

Section 363 sales occur frequently enough in Delaware that the Bankruptcy Court has adopted a local rule to govern the submission of motions to sell estate property under section 363, as well as sales procedures motions and auction provisions. *See* Del. Bankr. L.R. 6004-1 (available at https://www.deb.uscourts.gov/local-rules). Delaware bankruptcy-sale procedures typically include many of the same terms at issue in the instant matter. Local Rule 6004-1 requires Sales Procedures Motions to highlight certain of those provisions if included, such as criteria for qualified bidders, criteria for qualified bids, bid protections for Stalking Horse bidders, No-Shop or No-Solicitation Provisions, break-up/topping fees, bidding increments, and the ability of a debtor to modify bidding or auction procedures. *Id.* The Local Rule requires that a Sale Procedures Orders require that each participating bidder confirm it has not engaged in collusion in connection with bidding or the sale. *Id.*

### C.    Use of Stalking Horse Bidders and Bidder Protections

As was done in the instant matter, a debtor may use a "Stalking Horse" bidder to start a 363 sale by "'establish[ing] a competitive floor or minimum bid amount for the purchase of the debtor's business, thereby preventing lowball offers that would fail to provide a minimum amount of value.'" *Varela v. AE Liquidation, Inc. (In re AE Liquidation, Inc.)*, 866 F.3d 515, 519 n.3 (3d Cir. 2017) (quoting Rakhee V. Patel & Vickie L. Driver, *Toto,*

---

[6] Available at https://www.sbli-inc.org/archive/2014/documents/An_Update_on_Best_Practices_and_Recent_Developments.pdf.

*I've A Feeling We're Not in Kansas Anymore: Bankruptcy Sales Outside the Ordinary Course of Business*, Fed. Law., February 2010, at 56, 58); *see also Virgin Orbit*, 659 B.R. at 38-39 (Stalking Horse bid serves "to establish a floor price for the subject assets in anticipation [that] the future auction would maximize recoveries for all stakeholders[.]"); Frimet at 468; Collins at 2.

An entity that serves as the Stalking Horse Bidder generally invests significant time and resources in pursuing the acquisition, and bears the risk that that investment will be lost if it is not the ultimate prevailing bidder. Frimet at 463. In many instances it is the stalking horse bidder who conducts extensive due diligence and negotiates the terms of the purchase agreement. Fruchter at 378-79; Frimet at 468. While the stalking horse bidder may have more in-depth diligence, subsequent bidders have an advantage in that they can rely on the due diligence and floor-bid set by the stalking horse bidder. Frimet at 469.

The due diligence involved for a distressed company is likely to be greater than that required for a healthy company. Frimet at 474. Moreover, due diligence may be crucial in such situations because the ability to obtain indemnification may be limited. Frimet at 474.

There are advantages to serving as the stalking horse bidder. The stalking horse bidder enjoys the benefit of taking the lead in structuring a favorable deal, including negotiating for bidding procedures that increase its ability to close the sale. Fruchter at 375; Frimet at 469. Additionally, the stalking horse bidder benefits from the incentives offered to become the stalking horse bidder, such as expense reimbursement and break-

27

up fees. Frimet at 469-70; Renaud, Pauline and Neil B. Glassman, Section 363 Sales in the US (Oct. 17, 2009), available at https://www.bayardlaw.com/insights/section-363-sales-in-the-us (hereafter, "**Renaud**").

Nonetheless, it is often necessary for the debtor to provide incentives to mitigate the risks and burdens faced by a potential stalking horse bidder by providing favorable provisions in the bidding and sales procedures. Frimet at 463.

D.    **Sale Procedures Orders and Bidder Protections**

The topping period/auction procedures governing the sale of the PDVH Shares include many of the procedures commonly used in section 363 sale procedures.

Minimum incremental bidding requirements are common. Fruchter at 375, 379 ("The bidding procedures typically require potential purchasers of the assets to submit bids in an amount that exceeds the value of the bid submitted by the stalking horse bidder."; noting cases requiring incremental bid minimums). Generally, these require a potential bidder to bid an amount higher than the stalking horse bidder's bid plus other specified amounts, such as any stalking horse bidder expense reimbursement. Collins at 8-9.

Minimum bid requirements serve to maximize value and protect the stalking horse bidder. *Id*. After the start of the auction, "bidding procedures often include minimum bidding increments to ensure that the leading bidder is only outbid by a materially better bid and for the convenience of the bidders and other parties attending the auction." Collins at 9. Further, the requirement for minimum overbids are typically not challenged, meaning there is a dearth of case law addressing them. Collins 9 at n.19.

28

Bidders also want clarity in the bidding procedures that once the auction concludes, the auction will be closed and the successful bidder announced. Meltzer at 3 ("Case law is clear that reopening an auction is in the court's discretion, and while a court may reopen an auction if a new overbid is substantially better, this factor alone is generally not enough. By formally closing the auction, a potential bidder will have as much comfort as possible that the results of the auction, once closed, are final."). For the same reasons, bidders want the procedures to prohibit the seller from soliciting or encouraging proposals from other potential bidders once the auction is closed. *Id*. Even if reopening the auction potentially adds value to the estate, some courts have refused to reopen the bidding to preserve "the sanctity of the bidding procedures." Collins at 14.

These bidder protections are important in light of the "considerable uncertainty as to whether the initial bidder will ultimately close the §363 sale combined with the risks inherent to the acquisition of distressed assets[.]" Frimet at 475-76. Bidder protections, like those afforded to a stalking horse bidder, typically do not serve to deter interest or participation from others in the auction. Fruchter at 383.

An auction can (and almost always should) be cancelled where there is no bid that meets the terms of the bidding procedures. *See, e.g., In re RTI Holding Co., LLC*, 2021 Bankr. LEXIS 2952, *4-5 (Bankr. D. Del. Oct. 27, 2021) (auction cancelled where no bid qualified under bidding procedures that required a topping bid sufficient to pay certain claims). Once the bid procedures are approved by a court order, violations of those procedures are treated like any other violation of a court order, subject to enforcement and sanctions by the court. *MTE*, 2021 Bankr. LEXIS 2225, *24.

E.      A Section 363 Sale Must Be Fair and Free of Collusion

In approving a proposed completed sale transaction, the court will look at whether the bidding procedures "afforded a full, fair and reasonable opportunity for any entity to make a higher or better offer to purchase the [assets at issue] and no higher or better offer(s) for the [assets at issue] has been made than that of the Purchaser." *See KLCG*, 2010 Bankr. LEXIS 3005, *7. Additionally, the court will consider whether the proposed purchase agreement was negotiated and entered into by the seller and proposed buyer in good faith, without collusion, and as a result of arm's length bargaining. *KLCG*, 2010 Bankr. LEXIS 3005, *9. The court also will look at whether the consideration to be paid is fair, reasonable, and not the result of collusion among bidders. *KLCG*, 2010 Bankr. LEXIS 3005, *24; *see also In re AeroGroup Int'l*, 601 B.R. 571 (Bankr. D. Del. 2019) (finding "§363 Sale was held pursuant to a fair and open process, other interested parties were invited to - - and did - - participate in the auction and the result represents fair and reasonable consideration for the time, place and manner of the §363 Sale."), *aff'd sub nom. Polk 33 Lending, LLC v. THL Corp. Fin., Inc. (In re Aerogroup Int'l, Inc.)*, 620 B.R. 517 (D. Del. 2020); *Electroglas*, 2009 Bankr. LEXIS 4994, *7 (finding "Auction was fair in substance and procedure.").

A section 363 sale can be overturned where the purchaser did not act in good faith or there was collusion. 11 U.S.C. §363(m); *In re Abbotts Dairies*, 788 F.2d 143, 148, 149-50 (3d Cir. 1986)(authorizing a sale of assets under section 363(b)(1) requires a finding of the purchaser's good faith; "'The requirement that a purchaser act in good faith . . . speaks to the integrity of his conduct in the course of the sale proceedings. Typically, the

30

misconduct that would destroy a purchaser's good faith status at a judicial sale involves fraud, collusion between the purchaser and other bidders or the trustee, or an attempt to take grossly unfair advantage of other bidders.'"(quoting *In re Rock Indus. Mach. Corp.*, 572 F.2d 1195, 1198 (7th Cir. 1978)); *In re Pursuit Capital Mgmt.*, 2016 U.S. Dist. LEXIS 130980, *11-12 (D. Del. Sept. 26, 2016) ("A purchaser's good faith status at a bankruptcy sale would be destroyed by misconduct involving 'fraud, collusion between the purchaser and other bidders or the trustee, or an attempt to take grossly unfair advantage of other bidders.'" (quoting *Abbotts Dairies*, 788 F.2d at 147)).

As a general matter, parties that do not comply with the bidding procedures should not be permitted to participate in the auction or to complain about the outcome of an auction. *In re New Energy Corp.*, 739 F.3d 1077, 1079 (7th Cir. 2014), *cert. denied*, 135 S. Ct. 75 (2014) ("Natural Chem chose not to play by the auction's rules. That was its right-but, because it did not, it also was not harmed by the outcome.").

### F.    *MTE* Involved Similar Auction Procedures and Fiduciary Discretion

The Delaware Bankruptcy Court recently addressed the discretion afforded to the party conducting a sale under court supervision where the sale also included some of the bidding protections implicated here. In *In re MTE Holdings LLC*, 2021 Bankr. LEXIS 2225 (Bankr. D. Del. Aug. 17, 2021), the court approved auction procedures that had been agreed to by the parties. *Id.* at *5-6. The bid procedures permitted but did not require the debtors to pick a stalking horse bidder. *Id.* at *6. The procedures set criteria for determining a "qualified bidder" but gave the debtors "substantial discretion" to decide whether a bidder was qualified. *Id.* at *7, *24-25. Likewise, the debtors had discretion to

determine which of the qualified bids would be deemed the initial highest bid, taking into account cash consideration as well as other factors, such as assumption of obligations, likelihood the transaction would close, and net value to the estate. *Id*. at *8. After selection of the initial highest bid, subsequent bids were subject to a minimum bid increment of $500,000. *Id*. at *9.

The auction ended with a winning bid from Maple of $85.7 million and a backup bid from Chato of $67.8 million. Id. at *14-15. Both bidders were requested to increase their deposits in light of their increased bids but delayed in doing so. *Id*. at *15-18. Maple expressed unwillingness to take on a certain contract that would require unexpected cure costs. *Id*. at *17. The debtor engaged in mediation with Maple over the issue. *Id*. at *18. Maple eventually increased its deposit and a proposed plan was filed. *Id*. at *19. Chato argued that Maple either was not a qualified bidder, or that because it refused to increase its deposit, Chato suffered damages from its violation of the bid procedures. *Id*. at *20.

The bankruptcy court noted that the procedures gave the debtors "substantial discretion" to determine which bidders were qualified, to waive terms and conditions set forth in the procedures, and to extend deadlines, and that Chato participated knowing of that flexibility. *Id*. at *24-25. However, the court noted that the debtors' discretion was not absolute. The debtor's discretion was "in the first instance," subject to later review (albeit deferential) by the court based on the terms of the procedures order or "perhaps in exceptional cases" oversight to protect the fundamental integrity of the process. *Id*. at *27. Further, the court had "residual authority to grant relief if doing so were necessary to protect the basic fairness and integrity of the auction process, and by extension the sale

the bankruptcy court would ultimately be asked to approve." *Id*. at *25. Moreover, the court retained authority to amend its own orders so despite the broad discretion seemingly provided to the debtors, "none of that excludes the possibility that a court could take appropriate action to address conduct in an auction that was profoundly unfair or prejudicial". Id. at *28. However, the court found there was no basis on the case before it to exercise that authority. *Id*. at *25. Because the procedures gave the debtors discretion to waive terms and conditions, the court found the debtors had authority not to strictly enforce terms like the deposit-increase requirement. Id. at *29-30.

In *MTE*, the party challenging the sale's conformance with the procedures lacked standing to do so because it did not challenge a matter relating to the fundamental fairness or integrity of the auction process, but instead challenged the deposit-increase requirements that did not effect any harm to the disappointed bidder (but instead affected the estate). Id. at *30-31. Here, by contrast, Gold Reserve has challenged the Special Master's exercise of discretion to essentially eliminate (instead of increase or decrease) the overbid minimum, which potentially implicates the fairness and integrity of the sale process.

## VIII.  Opinions

Based on the foregoing Statement of Facts and Applicable Law set forth above, which are incorporated by reference, I offer the following opinions.

**Opinion #1: The general purpose of court-ordered bidder protections in obtaining a value-maximizing sale transaction in a public sale is to incentivize meaningful participation by serious bidders, thereby providing for a competitive bidding process.**

Based upon my experience, bidder protections are important to incentivizing participation by bidders.  Those who bid in a court-supervised public sale of an entity face numerous risks and costs. As discussed further above, the Stalking Horse Bidder especially faces risks and costs associated with undertaking extensive due diligence and tossing their hat in the ring with an opening bid that sets the floor for the sale bidding process.[7]

Just as it is important to protect the stalking horse, it is important to protect the winning bidder. Bidders face the risk that they will invest significant time and resources in pursuing the sale only to end up with nothing to show for those efforts. They may also face additional risks that are beyond the control of the parties, such as the need for regulatory approval of the final sale transaction (like here, where the successful bidder faces the risk of obtaining an OFAC license to consummate the sale). The winning bidder faces all of those risks, plus the risks associated with obtaining final approval from the

---

[7] In setting the price floor the Stalking Horse Bidder risks bidding too high. Later bidders have the advantage of price discovery provided by the stalking horse bid and the bid increments.

court and any other requisite authorities, as well as initiating the process of implementing consummation of its bid based on the assumption that its bid will secure those final approvals.

Bidder protections are a means of mitigating those risks by providing predictability for the process. Reducing the perceived risks and uncertainties of the transaction makes it a more attractive opportunity for potential bidders and reduced risk leads to higher bids.

When sales procedures are negotiated and approved by a court to govern a sales transaction, the participants in that sale generally will expect that they can rely on those procedures being followed by the fiduciary conducting the sale. If not, the participants will expect to have a method of seeking recourse from the court overseeing the process. However, having to seek that recourse will involve additional time and resources that the participant likely did not expect to incur based on their expectations that the bidding procedures would be followed by the fiduciary conducting the sale.

**Opinion #2: Adherence by the fiduciary conducting a sale transaction to the court-approved bidder protections is important to ensure that the sale process is fair and predictable.**

The rules and procedures erected by the court to govern an auction matter to those who seek to and actually do participate in the auction. The participants expect those procedures to be adhered to, and implementation of the procedures serves to maximize value for the transaction because they induce greater participation.

While a fiduciary conducting a sale transaction may have discretion in implementing the sale procedures, he or she must exercise that discretion cautiously and carefully to serve the underlying mission of maximizing value, as well as ensuring that the process remains fair and is conducted with integrity. The fiduciary's exercise of discretion must overall be consistent with the procedures and the fiduciary must be able to justify its decision to the court supervising the fiduciary.

Over decades of experience, bankruptcy courts have developed procedures and practice governing the marketing and sale of assets under court supervision. Adherence to those procedures reduces risk and maximizes value. While the seller and court must have discretion to deviate from those procedures, doing so should be saved for the rare and extraordinary circumstances, which do not appear to be present in this instance.

**Opinion #3(a): Generally, bidder protections such as a non-solicitation period/no-shop period coupled with an overbid minimum serve to provide bidders with predictability that there will be finality once the official bidding period concludes, subject only to consideration of materially higher or better bids that follow on an unsolicited basis.**

**Opinion #3(b): Bidder protections serve to incentivize robust participation and bidding during the topping period and increase the likelihood of a value-maximizing sale transaction.**

In my experience, a section 363 sale process works in several stages. There is the initial bidding stage, which may result in selection of a Stalking Horse Bidder, whose bid sets the floor for the auction bidding process. The Stalking Horse Bidder will be selected

36

as the highest and best bidder unless another bidder submits a higher or better bid as the auction progresses. In the topping phase, other bidders have that opportunity. Once the person conducting the sale has selected a recommended bid, there still may be opportunities for additional bids to be submitted for consideration subject to established criteria (e.g., the overbid minimum increment) intended to protect the recommended bid.

Terms that provide for a non-solicitation period/no-shop period limit the person conducting the auction from soliciting or encouraging competing bids, except under specified circumstances. The no-shop provision serves to ensure that the auction is the day of reckoning. It prohibits the seller from continuing to market the sale and instead to support the winning bidder through the sale hearing. The sale procedures included a "fiduciary out" that permitted the Special Master to consider a higher bid from a new bidder after the close of the auction, but only if post-auction meets the overbid minimum increment.

A requirement that overbid must meet a minimum amount serves to assure those who have already submitted bids that their bids will not be undercut by a bid that does not meet this requirement. For example, if Bidder A submits a bid for $100 and Bidder B purports to submit a topping bid of $101, then as a technical matter Bidder B's bid is higher. If the sale at issue required overbids to meet a minimum increase of $50, then Bidder B's bid would not be considered unless it had a value of at least $150.

In general, the fiduciary charged with overseeing the sale of a distressed company's assets must exercise his or her discretion in a manner that is focused and narrowly targeted to result in a positive outcome (i.e., a successful sale) in compliance

with the procedures that were approved by a court and distributed to potential bidders. Doing so provides bidders and other parties in interest with predictability, which reduces perceived risks and incentivizes participation in a robust sale process that will maximize value.

Here, based upon the procedures in place, Gold Reserve would have expected that its bid, which had been endorsed by the Special Master, would continue as the recommended bid during the non-solicitation/no-shop period through the sale hearing, subject to the potential for the Special Master receiving an unsolicited bid that met the minimum overbid requirement of at least $50,000,000. While the Special Master retained discretion to increase or decrease the overbid minimum, in my experience, it would be extraordinary for a fiduciary to exercise that discretion so as to permit a bid with a **lower economic value** to the estate (i.e., the Attached Judgment Creditors in this case) to supplant the previously recommended bid.  Moreover, to the extent a subsequent bid does not meet the overbid requirements in the rules, there is a gating issue as to whether a fiduciary could even consider it. Nonetheless, to the extent a subsequent bid is for less consideration to the judgment creditors than the bid of the winning bidder, it would be extraordinary for a fiduciary to determine that the lower bid was, in fact the highest or best bid.

*Christopher S. Sontchi*
_____
Christopher S. Sontchi
U.S. Bankruptcy Judge (Ret.)

Dated: August 27, 2025

# APPENDIX A
# CURRICULUM VITA

# Sontchi, LLC

## Insolvency, Restructuring & Complex Litigation Expertise

**CHRISTOPHER S. SONTCHI**

*Sontchi@sontchillc.com* | +1 (302) 562-6360

## EDUCATION

**The University of Chicago Law School,** Juris Doctor

**The University of North Carolina at Chapel Hill,** Bachelor of Arts with Distinction, *Phi Beta Kappa*

## AWARDS

**Association of Insolvency and Restructuring Advisors Judicial Service Award**

## EXPERIENCE

**Sontchi, LLC**

- Formed 2022.
- Primarily conducts mediations, provides expert advisory services, and serves as an independent fiduciary.

**Singapore International Commercial Court | International Judge**

- Appointed 2022 as International Judge focusing on insolvency matters.
- Leading effort to establish first international insolvency court focused on South and Southeast Asia.

**United States Bankruptcy Court for the District of Delaware** | Judge

- Chief Judge 2018-2021.
- Served 2006-2022.
- Presided over many of the most complex corporate restructurings in the United States and issued over 200 written decisions and countless bench rulings.
- Extensive practical experience as a judicial mediator, successfully handling such complex cases as *Mallinckrodt plc*, and *MD Helicopters*.

**Ashby & Geddes** | Attorney

- Bankruptcy practitioner 1993-2006.
- Represented clients in all aspects of bankruptcy, including debtors, official and unofficial committees, secured creditors, trade vendors, landlords, parties to executory contracts, purchasers of assets, litigation parties, and directors, officers, and employees.

**Delaware Supreme Court** | Law Clerk to Hon. Joseph T. Walsh

## BAR ADMISSIONS

**State of Delaware**

**United States Court of Appeals for the Third Circuit**

**United States District Court for the District of Delaware**

## APPOINTMENTS, COMMISSIONS & COMMITTEES

**The University of Chicago Law School**, Lecturer in Law

**Widener University Delaware Law School**, Adjunct Professor

**World Bank,** Consultant

**American College of Bankruptcy,** Fellow

**Singapore Global Restructuring Initiative, International Advisory Council**, member

**The University of Chicago Law School Center on Law and Finance, Founders' Committee**, Distinguished Member

**International Insolvency Institute**, member

**Judicial Insolvency Network**, founding member

**National Conference of Bankruptcy Judges**, member

**American Bankruptcy Institute**, member

**INSOL International**, member

**American Bankruptcy Institute Commission to Study the Reform of Chapter 11,** committee member

## PUBLICATIONS

**Edward R. Morrison, Mark J. Roe, and Christopher S. Sontchi,** *Rolling Back the Repo Safe Harbors*, 69 The Business Lawyer, No. 4, 1015 (August 2014)

**Christopher S. Sontchi,** *Valuation Methodologies: A Judge's View***,** 20 American Bankruptcy Institute Law Review, No.1, 1 (Spring 2012)

**Christopher S. Sontchi and Sara Beth A.R. Kohut, In Defense of Consensual Opt-Out Third-Party Releases from a Delaware Perspective**, XLIII ABI Journal 11 (November 2024)

**Christopher S. Sontchi and Bruce Grohsgal,** *Should the Appointment of a Committee of Unsecured Creditors Be Made Optional in Chapter 11 Cases?* XXXVIII ABI Journal, No. 11 (November 2019)

**Christopher S. Sontchi,** *Loan to Own is Back – With a Twist***,** 27 Journal of Corporate Renewal, No. 6, 30-33 (July/August 2014)

**Christopher S. Sontchi,** *Mortgages Should Be Removed from Repo Agreement Safe Harbors***,** XXXIII ABI Journal, No. 6, 10-11, 63 (June 2014)

**Christopher S. Sontchi,** *Top 10 Things I Have Learned Since I Took the Bench***,** XXVII ABI Journal, No. 6, 46-47, 78 (July/August 2008)

## CONGRESSIONAL TESTIMONY

*Exploring Chapter 11 Reform: Corporate and Financial Institution Insolvencies; Treatment of Derivatives*, Hearing Before the House Subcommittee on Regulatory Reform, Commercial, & Antitrust Law of the House Committee of the Judiciary, 113th Cong. 6 (Mar. 26, 2014)