## Exhibit A

**Transcript of August 11, 2025 *Ex Parte* Meeting of the Court and the Special Master**

Page 1

1    IN THE UNITED STATES DISTRICT COURT
     FOR THE DISTRICT OF DELAWARE
2    Misc. No. 17-151-LPS
     -----------------------------------x
3    CRYSTALLEX INTERNATIONAL CORP,
4              Plaintiff,
5
6         - against -
7
8    BOLIVARIAN REPUBLIC OF VENEZUELA,
9              Defendant.
     -----------------------------------x
10                 Conference Call
11                 August 11, 2025
                   2:30 p.m.
12
13
14        EX PARTE MEETING
15
16
17   B e f o r e:
18        HON. LEONARD P. STARK
19
20
21
22
23
24
25

Page 2

```
 1   A P P E A R A N C E S :
 2   WEIL GOTSHAL & MANGES LLP
     767 Fifth Avenue
 3   New York, New York 10153
             Attorneys for Special Master
 4           Robert B. Pincus
     BY:     CHASE A. BENTLEY, ESQ.
 5            chase.bentley@weil.com
             MATT BARR, ESQ.
 6            matt.barr@weil.com
             JARED FRIEDMANN, ESQ.
 7            jared.friedmann@weil.com
 8
     POTTER ANDERSON & CORROON LLP
 9   Hercules Plaza
     1313 North Market Street
10   6th Floor
     P.O. Box 951
11   Wilmington, Delaware 19801
             Attorneys for Special Master
12           Robert B. Pincus
     BY:     MALISA C. DANG, ESQ.
13            mdang@potteranderson.com
14
15
16
17   ALSO PRESENT:
18      ROBERT B. PINCUS, Special Master
19      WILLIAM HILTZ, Evercore
20      RAY STRONG, Evercore
21      DAVID YING, Evercore
22      MICHAEL ESPOSITO, Clerk for Judge Stark
23
24
25
```

Page 3

```
 1              MR. BENTLEY:  Okay.  Why don't
 2       we get started and I will start by
 3       making sure a few people are on the
 4       call.  I think, I won't go through
 5       necessarily everybody from the Weil and
 6       Evercore teams that are on the call, I
 7       think for the court reporter from
 8       Veritext, I will note the people that
 9       may talk.  It will likely just be me
10       and the Special Master, Bob Pincus, but
11       just to be sure, I'm also joined by
12       Matt Barr and Jared Friedmann from
13       Weil, on the Evercore side we should
14       have one or more of Will Hiltz, David
15       Ying and Ray Strong, and Bob Pincus,
16       Bob, if you could just confirm that
17       you're on the call, I just want to make
18       sure.
19              MR. PINCUS:  I'm on the call.
20       Thank you.
21              MR. BENTLEY:  Great.  Judge
22       Stark, do you have Michael Esposito,
23       your clerk, with you?  Michael, are you
24       on the line?
25              THE COURT:  Mike, are you
```

Page 4

1      there?

2              MR. ESPOSITO:  I'm here, yeah.

3              MR. BENTLEY:  Great.  I'm

4      sorry, I should also say that we have

5      Malisa Dang from Potter Anderson, our

6      local counsel, on the line as well.

7              So why don't we get started

8      since we are the ones that requested

9      the meeting.  I will start by giving,

10     Judge, a very brief high-level overview

11     of the unsolicited bid that came in

12     late on Friday night and then we can

13     move into, you know, what the Special

14     Master is requesting at least on

15     today's ex parte conference.

16              So, first, the bid, this bidder

17     is our Bidder A -- sorry, I'm getting a

18     little background noise.  I don't know

19     if somebody is outside or something.  I

20     apologize.

21              THE COURT:  If everyone can put

22     themselves on mute.  I will do that as

23     well.

24              MR. BENTLEY:  Sorry, where I

25     started was the bidder that submitted

Page 5

```
1       the unsolicited proposal on Friday
2       night is a bidder that's been involved
3       in the process throughout and submitted
4       a topping bid, and during the topping
5       round I believe we denoted them as
6       Bidder A.
7               Bidder A, at the time they
8       submitted their topping bid on June
9       18th, I believe their recommendation,
10      we categorized it as a nonconforming
11      bid because that bid at that time
12      contemplated or was conditioned on
13      receiving, you know, executed sign-off
14      from both the 2020s for the 2020s TSA
15      and also one or more additional
16      judgment creditors.  They ultimately
17      did not, you know, get those deals
18      executed during the topping period or
19      the few days following the expiration
20      of the topping period, and it seems as
21      though they just got those consents and
22      those agreements as of Friday.
23              So they have submitted that
24      updated bid and it seems as though
25      based on the letter that they have sent
```

Page 6

```
 1        to us and the documentation that they
 2        have sent to us that they surpassed the
 3        headline price in terms of what they
 4        were aiming to achieve during the
 5        topping period, they have since
 6        surpassed that.
 7             Just to put some numbers on it,
 8        their bid has a deal with the 2020s, as
 9        I mentioned, where they are proposing
10        to pay the 2020s ████ ████ ███  ███████████
11        █████ ███ ███████ ███ ███████ ████████, and
12        then in terms of distribution of
13        consideration to the holders of
14        attached judgment, it is a mix of cash
15        and noncash that would satisfy
16        approximately 5.9 billion in judgments.
17             Again, some of those judgments
18        are receiving, or, excuse me, judgment
19        holders are receiving noncash
20        consideration.  It appears as though
21        all of those receiving noncash
22        consideration have executed some form
23        of letter agreement with Bidder A
24        documenting the fact that they would
25        discharge their claim in exchange for
```

Page 7

1       the noncash consideration.

2               Just to be clear, and as is the

3       case I think with the Gold Reserve

4       Dalinar bid that has been recommended

5       and with other bids during the topping

6       period, many times when a claimant is

7       agreeing to discharge its judgment in

8       favor of receiving noncash

9       consideration it is not necessarily

10      that it is a one-to-one exchange of

11      consideration.  Oftentimes they are

12      taking cents on the dollar to discharge

13      the claim.

14              So with this updated

15      unsolicited bid coming in at 5.9, that

16      puts it approximately 1.48 billion or

17      1.49 billion below the Dalinar bid.

18      Just to talk in terms of like the

19      waterfall itself, if you recall the

20      Dalinar bid paid all the way through

21      Siemens in the judgment waterfall.

22      This unsolicited bid from Bidder A

23      would pay through Koch.  So the

24      difference that we are talking about is

25      the roughly 1.49 billion that is made

Page 8

1     up of the Gold Reserve claim and the
2     Siemens claim.
3              I will pause there because I
4     think that is probably the most
5     important part or at least the
6     economics of the proposed bid.
7     Obviously there is a lot to dig in on
8     documentation if we are given the
9     authority to do so.  But I will pause
10    there in case, your Honor, you have any
11    questions on the economics of the bid
12    or understanding what the structure is
13    vis-a-vis Bidder A and Dalinar.
14             THE COURT:  Thank you.  I think
15    I understand it.  Unfortunately I'm
16    having a little bit of trouble with my
17    phone, so a little bit dropped out.
18    Importantly, the 5.9 billion cash, I
19    heard that once.  Did you say that
20    twice?
21             MR. BENTLEY:  So the 5.9
22    billion is a mix of cash and noncash,
23    but what I was saying is the 5.9 just
24    reflects the amount of judgments that
25    would receive distributions from this

Page 9

```
 1      Bidder A unsolicited proposal.  So some
 2      of those judgment creditors will
 3      receive noncash consideration.
 4              THE COURT:  Okay.  I was just
 5      trying to figure out if something
 6      important dropped out when you were
 7      first describing what Bidder A said.  I
 8      heard you say that they had reached a
 9      deal with the 2020s and ███ ████ ██
10      ██████ ███████  I think.  If you
11      mentioned the cash component could
12      equal up to the 5.9, if you mentioned
13      in that context, I didn't hear it.  I'm
14      just trying to figure out if I missed
15      anything.
16              MR. BENTLEY:  No, no, I didn't
17      mention it.  From the Special Master's
18      view, as long as the noncash is
19      consented to, then the noncash is just
20      as good as cash as long as it is
21      discharging the claim and it is on a
22      consensual basis.
23              THE COURT:  Good.  Then I don't
24      think, if I missed a word here or
25      there, I don't think I missed anything
```

Page 10

```
 1          substantive.  Just to say it back to
 2          you, you got this unsolicited bid
 3          Friday, it is Bidder A, that you have
 4          dealt with before, and it would involve
 5          a resolution with the 2020s but it ends
 6          up approximately 1 and a half billion
 7          dollars less in total compensation, and
 8          then the point that you ended on, and I
 9          guess this may be a question, it would
10          pay through in the waterfall all of the
11          same parties that the current Dalinar
12          offer does except not Gold Reserve and
13          Siemens and any other member of the
14          Dalinar consortium, do I have that
15          correct?
16               MR. BENTLEY:  Up until the last
17          point, yes.  So it does propose to pay
18          certain members of the Dalinar
19          consortium.  Just to rehash, the
20          Dalinar consortium is comprised of the
21          Gold Reserve, Rusoro, Koch, and
22          Siemens.  This bid -- and maybe I
23          should reiterate those in the order of
24          their priority in the waterfall.  So
25          the Gold Reserve consortium, or the
```

```
 1        Dalinar consortium, is comprised of,
 2        starting at the most senior, Rusoro,
 3        Koch, Gold Reserve, and Siemens.  This
 4        unsolicited Bidder A proposal does have
 5        deals struck with Rusoro and Koch.  It
 6        does not have deals struck to our
 7        knowledge with Gold Reserve and/or
 8        Siemens.
 9               THE COURT:  Got it, okay.
10        Thank you for that.  I think I'm caught
11        up.  You go ahead.
12               MR. BENTLEY:  Okay.  So we
13        wanted to request this ex parte meeting
14        just in the interest of time because we
15        have the sale hearing starting on
16        Monday and wanted to be able to talk
17        through live with you any questions or
18        reactions you might have on our request
19        to engage with this bidder.  I'm happy
20        to go into, you know, what we are
21        hoping to get out of the engagement
22        with the bidder, next steps, any of
23        that, whatever would be most helpful
24        for you.
25               THE COURT:  Yeah.  I will be
```

Page 12

1       fine with just a brief overview of

2       that.  But the request at the end of

3       the day is can you engage with them and

4       presumably they would want access to

5       the data room; is that right?

6              MR. BENTLEY:  Presumably.  I

7       mean, they have not asked for it yet.

8       They didn't ask for it in submission of

9       their bid, or, sorry, their unsolicited

10      proposal, but I would expect that as

11      soon as we start talking with them they

12      are going to want to understand any

13      additional information that has been

14      uploaded to the data room, including

15      the financial forecasts and performance

16      and whatnot.  So similar to the last

17      unsolicited proposal, yes, I would

18      suggest that while we're on the phone,

19      that is going to be a part of our

20      request now.

21              THE COURT:  And do you propose,

22      and remind me what the sale procedure

23      order would require, do you propose to

24      let the sale process parties and the

25      Dalinar consortium know about this?

Page 13

```
 1              MR. BENTLEY:  We already have.
 2       So we have provided the sale process
 3       parties with the bid letter, unredacted
 4       bid letter that we received on Friday
 5       night, and we notified Dalinar pursuant
 6       to the SPA that we had received an
 7       unsolicited proposal.  In the event
 8       after engaging with the bidders, if
 9       your Honor approves that, if ultimately
10       the Special Master determines that this
11       was a superior proposal to the Dalinar
12       transaction, Dalinar, we would have to
13       provide notice to Dalinar and then
14       Dalinar would have the opportunity to
15       match this proposal.  So before we can
16       officially terminate the Dalinar SPA,
17       we would have to go through those
18       steps.
19              THE COURT:  And does the sale
20       procedure order give Dalinar in that
21       circumstance a certain amount of time
22       to top it or match it?
23              MR. BENTLEY:  Yes, it is in
24       their SPA.  I cannot recall exactly off
25       the top of my head, but I think it is
```

Page 14

1       something in the range of two or three

2       days.  I know that it is a very short

3       period of time.  It is prescribed in

4       their SPA.

5              THE COURT:  Okay, understood.

6       Yeah, why don't you just give me the

7       brief overview as to what you

8       anticipate would happen and then just

9       make it as concrete as you can what you

10      are asking me for.

11             MR. BENTLEY:  Sure.  So I think

12      that what we would seek to engage with

13      the bidder on is the terms and

14      conditions proposed in their SPA.  In

15      their bid letter that we received they

16      referred to a prior iteration of the

17      SPA markup that they submitted to us,

18      so I think that we've got some work to

19      do on that in terms of getting back to

20      the issues with them and trying to get

21      an updated SPA in the event that we

22      felt there was or the Special Master

23      thought that there was a viable path to

24      this becoming a superior proposal.

25             We need to understand better

Page 15

1      the terms and conditions related to

2      their TSA with the 2020s and then also

3      we would like to understand whether the

4      bidder has engaged with any other

5      additional judgment creditors beyond

6      what is reflected in the waterfall in

7      their letter.  More specifically, I

8      think we're interested in understanding

9      whether they have engaged with Gold

10     Reserve and/or Siemens to offer them

11     any consideration, just, you know,

12     being conscious of the fact that the

13     existing recommended bid does pay Gold

14     Reserve and Siemens something.

15          So those are I think, based on

16     an initial review of the documentation

17     that we received, those are the areas

18     that we will be focused on.  I think

19     that we are very conscious of the

20     timeline with the sale hearing proposed

21     to be starting on Monday and so we

22     would, as soon as we get off the phone

23     with you, if we have authority to

24     engage with the bidder, we will go do

25     that and try to work to a spot as soon

Page 16

```
 1          as possible, you know, in the next
 2          couple of days, work to a spot as to
 3          whether the Special Master thinks that
 4          it still makes sense to start the sale
 5          hearing on Monday or if he would be
 6          recommending to your Honor that it be
 7          adjourned, including, for example, to
 8          let Bidder A engage with Gold Reserve
 9          and Siemens, if they haven't, or if we
10          still need time to better understand
11          their bid, any number of factors that
12          we discuss with them.
13              I think that we still have yet
14          to talk to the sale process parties
15          about this bid.  We have sent the bid
16          letter to them, but I expect that we
17          are going to have a phone call with
18          them tonight and I wouldn't be
19          surprised -- we wouldn't be surprised
20          if some or all of the sale process
21          parties propose adjourning the sale
22          hearing to let this play out, the
23          duration of which I don't think that we
24          can really say with any specificity
25          now, and, again, the Special Master,
```

Page 17

```
 1        together with his advisors, will be
 2        talking around the clock over the next
 3        day or two with the goal of coming back
 4        to the Court and also to the parties if
 5        we believe we are in a situation where
 6        it would be value maximizing to
 7        postpone the sale hearing at all.
 8              THE COURT:  That is helpful to
 9        understand.  If I'm not mistaken, the
10        status report about what the hearing
11        might look like is due today; is that
12        correct?
13              MR. BENTLEY:  Yes, that's
14        correct.  And we have been engaging
15        with the sale process parties and the
16        initial judgment creditors as well as
17        the 2020s over the last several days
18        and we are proposing to still be on
19        track to file that this afternoon.  I
20        don't think that that agenda that we
21        lay out there will necessarily be
22        impacted even if you are ultimately to
23        recommend an adjournment of the sale
24        hearing.  It may be if the Special
25        Master were to change his
```

Page 18

```
 1        recommendation, the witness list and
 2        other matters might change slightly,
 3        but for the most part I think that the
 4        agenda that we will be laying out in
 5        the status report later today should
 6        still remain in place.
 7              THE COURT:  And I take it
 8        unless and until you ask for something
 9        further than what you are asking for
10        today, your view would be to let the
11        briefing, the last two rounds of
12        briefing just continue along the track
13        it is on, which I think is to be
14        completed by Saturday?
15              MR. BENTLEY:  Correct, yes.  As
16        of today, as we are speaking to you
17        now, we don't have any reason, any
18        concrete reason to request that the
19        timing, whether the briefing or
20        commencement of the sale hearing,
21        change at all.  Our goal is to come to
22        a more developed view on that vis-a-vis
23        this unsolicited bid in the next couple
24        of days because we want to make sure,
25        you know, a lot of people are traveling
```

Page 19

```
 1      and preparing and a lot of time and
 2      money being incurred to start the
 3      hearing on the 18th, and so we just
 4      want to be respectful of everybody's
 5      time.
 6               THE COURT:  Okay. Anything else
 7      you want to add before I would say to
 8      you put to me as direct a request as
 9      you can so I can approve it or not?
10               MR. BENTLEY:  Yes, okay.
11      Nothing else that we would like to add.
12               So the simplified request was
13      the Special Master would like authority
14      from the Court to engage with Bidder A
15      with respect to its unsolicited
16      proposal submitted on this past Friday.
17      It would also like authority to regrant
18      or reopen access to the data room to
19      Bidder A.
20               THE COURT:  Okay.  I do grant
21      you, technically the Special Master, I
22      grant the authority to do as you
23      requested, to engage with Bidder A in
24      connection with the unsolicited offer
25      submitted on Friday and, if necessary,
```

Page 20

1    that would include the authority to

2    reopen the data room subject to all the

3    conditions, the confidentiality and all

4    that you have been proceeding

5    consistently through all this time.

6             I would also -- and, I mean, I

7    don't think I need to make any more

8    record of the reasoning.  I think you

9    have set it out and it is consistent

10   with our ongoing efforts to pursue a

11   value maximizing transaction.

12            I would say my recollection is

13   we have a call I think scheduled for

14   Wednesday which is intended to discuss

15   whatever I see in the status report

16   later today and nail down the

17   proceedings of the sale hearing for

18   Monday.  I recognize it is a fluid

19   situation.  You know how to reach out

20   to me through Michael.  Don't hesitate

21   anytime day or night to try to reach

22   us.  We will be as responsive as we can

23   be.

24            But my current intent would be,

25   especially if we don't hear anything

Page 21

```
 1        further from you, is we will go forward
 2        Wednesday, but it would be helpful
 3        unless there is some reason not to do
 4        so, i.e. confidentiality of some sort
 5        that I'm not thinking of off the top of
 6        my head, it would be helpful if you are
 7        prepared no later than that call to
 8        give an update, because, as you say,
 9        about this situation we are discussing,
10        because people are spending money and
11        making plans, and I'm not saying that I
12        wouldn't let the uncertainty play out
13        through as late as Monday, as to
14        whether or not we are having a hearing
15        Monday, but if you have a sense on
16        Wednesday as to whether you think
17        Monday is still the best time to get
18        together or not, I and others will be
19        interested in having your view on that.
20        Understood?
21             MR. BENTLEY:  Yes, completely
22        understood.  Thank you for the color.
23             THE COURT:  Sure.
24             MR. PINCUS:  Thank you very
25        much, your Honor.
```

```
                                            Page 22
 1            THE COURT:  Anything else from
 2     anybody?  Okay, obviously you will have
 3     the transcript made and kept
 4     confidential like we have done in the
 5     past, and we're here if you need us.
 6            MR. BENTLEY:  Great.  Thank you
 7     very much.
 8            THE COURT:  Good luck.  Thanks
 9     everybody.
10            (Time noted:  2:54 p.m.)
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 23

1           C E R T I F I C A T I O N

2

3

4

5     I, TODD DeSIMONE, a Registered

6   Professional Reporter and a Notary Public,

7   do hereby certify that the foregoing is a

8   true and accurate transcription of my

9   stenographic notes.

10       I further certify that I am not

11  employed by nor related to any party to

12  this action.

13

14

15

16

17          TODD DeSIMONE, RPR

18

19

20

21

22

23

24

25

**<u>Exhibit B</u>**

**Transcript of August 13, 2025 *Ex Parte* Meeting of the Court and the Special Master**

HIGHLY CONFIDENTIAL

Page 1

1          IN THE UNITED STATES DISTRICT COURT

2              FOR THE DISTRICT OF DELAWARE

3  _____

4  CRYSTALLEX INTERNATIONAL CORP.,

5          Plaintiff,

6      v.                            Misc. No.

7  BOLIVARIAN REPUBLIC OF               17-151-LPS

8  VENEZUELA,

9          Defendant.

10  _____

11              TELEPHONIC EX PARTE CONFERENCE

12  DATE:          Wednesday, August 13, 2025

13  TIME:          1:49 p.m.

14  BEFORE:        Honorable Leonard P. Stark

15  LOCATION:      Weil, Gotshal & Manges, LLP

16                 767 Fifth Avenue

17                 New York, NY 10153

18  REPORTED BY:  Logan Thoreau

19  JOB NO.:       7543760

20

21

22

23

24

25

HIGHLY CONFIDENTIAL

Page 2

```
 1                A P P E A R A N C E S
 2    ON BEHALF OF SPEICAL MASTER ROBERT PINCUS:
 3         MALISA DANG, ESQUIRE
 4         Potter, Anderson & Corroon LLP
 5         1313 North Market Street
 6         Wilmington, DE 19801
 7         mdang@potteranderson.com
 8         (302) 984-6000
 9
10    ON BEHALF OF SPECIAL MASTER ROBERT PINCUS:
11         CHASE BENTLEY, ESQUIRE
12         JARED R. FRIEDMANN, ESQUIRE
13         MATTHEW BARR, ESQUIRE
14         EOGHAN KEENAN, ESQUIRE
15         ANDREW CLARKE, ESQUIRE
16         Weil, Gotshal & Manges, LLP
17         767 Fifth Avenue
18         New York, NY 10153
19         chase.bentley@weil.com
20         (212) 310-8607
21
22    ALSO PRESENT:
23         Michael Esposito, Judge Stark's Clerk
24         Robert Pincus, Special Master
25         Will Hiltz, Evercore
```

HIGHLY CONFIDENTIAL

Page 3

1              A P P E A R A N C E S (Cont'd)

2    ALSO PRESENT:

3         Ray Strong, Evercore

4         David Ying, Evercore

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

HIGHLY CONFIDENTIAL

                                                    **Page 4**

1                          **E X H I B I T S**

2     **NO.**              **DESCRIPTION**                    **ID/EVD**

3                          **(None marked.)**

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

HIGHLY CONFIDENTIAL

Page 5

1                    P R O C E E D I N G S

2                THE REPORTER:  We're on the record at

3       1:49.

4                MR. BENTLEY:  Great.  Thank you.

5                Your Honor, we'd like to start -- I'll

6       give you a high-level preview of the topics that we'd

7       like to cover.  For the most part, there's just three

8       of them.  The first and the most time pressing, I'll

9       say, is the status conference adjournment, which we

10      previewed for you overnight.  And we filed a letter on

11      the docket this morning requesting that today's status

12      conference be postponed.  And we saw that you also

13      entered an order confirming that and directing us to

14      file an updated status report on next steps by

15      tomorrow.

16               So we have been talking with the sale

17      process parties.  We've been talking with the bidders.

18      We've been talking with all other additional judgment

19      creditors trying to coalesce around next steps.  In

20      part, that's resulted in this request for an ex parte

21      meeting with you to preview what we view as the

22      options for the next steps.  So after we have this ex

23      parte meeting and after getting Your Honor's guidance

24      on next steps with respect to both the status

25      conference and to the sale hearing, we will go meet

HIGHLY CONFIDENTIAL

Page 6

1    and confer with parties and submit that status report

2    tomorrow.

3              You'll note in the letter that we filed

4    this morning, one of the reasons why we requested the

5    adjournment was because of Red Tree's letter that they

6    filed last night.  I'm sorry, I don't have the docket

7    number handy.  But I know that we had referenced it in

8    our letter.  In Red Tree's letter responding on top of

9    the status report regarding the status conference,

10   they noted that a bid had come in from Amber Energy.

11   And they also noted the value of that bid.

12             The last time we talked with Your

13   Honor, we told you that an unsolicited bid came in.

14   We didn't tell you who had submitted it, and we told

15   you, generally speaking, what the value was and the

16   fact that they're -- that they had a deal with the

17   2020s.  We can confirm that it is Amber Energy that

18   submitted that bid.  We had not made a public

19   disclosure about that because the Special Master is

20   evaluating whether that transaction would be deemed to

21   be superior to the existing recommended Dalinar

22   transaction.

23             The intention was to file that redacted

24   version of that bid in short order with a decision.

25   However, I should note that the decision as to whether

HIGHLY CONFIDENTIAL

Page 7

1    it's a superior proposal has not been made -- has not

2    been made yet, I should say.  So the Red Tree letter,

3    I think in our view, threatened to convert the status

4    conference from what is a -- or what was supposed to

5    be mostly a procedural status conference to discuss

6    the agenda and the schedule for the hearing, you know,

7    when experts and witnesses were going to be -- were

8    going to have direct and cross and then, also whether

9    and how much of the opening and closing arguments we

10    would have.  And because this issue was put at play in

11    the Red Tree letter, in our view, the status

12    conference was likely to turn into a finger-pointing

13    exercise and a discussion of a bid that had not yet

14    been made public and, unfortunately, probably would

15    have gotten sidetracked.

16            So I think a couple things just to say

17    about Red Tree's disclosure of the information.  The

18    Special Master did not tell Red Tree that Amber Energy

19    had submitted a bid or had said what the value of the

20    bid was or any other terms about that bid.  We had

21    only divulged that to the sale process parties, and we

22    had told Dalinar as the existing recommended bidder

23    that an unsolicited competing proposal had come in.

24    And we know that Dalinar knew that it was Amber Energy

25    because we had encouraged Amber Energy to reach out to

HIGHLY CONFIDENTIAL

                                              Page 8

1    Dalinar, to Gold Reserve, and also to Siemens to

2    discuss potentially folding them into the Amber Energy

3    bid.

4            So we don't know who provided the

5    information to Red Tree.  It could have been Amber

6    Energy itself.  It could have been any of the sale

7    process parties.  It could have been Gold Reserve.  I

8    don't think that now we are levying any kind of

9    opinion on who we think it is, just the mere fact that

10   we didn't provide that information to Red Tree.  So we

11   don't want it to be inferred or suggested that Red

12   Tree breached some sort of confidentiality obligation

13   they had with the Special Master.  That's not possible

14   because we never talked about the Amber Energy bid

15   with them.

16           So notwithstanding that Red Tree didn't

17   breach the confidentiality obligations to the special

18   master, the fact that the bid was out there and

19   somebody must have breached some confidentiality

20   obligations or otherwise consented to the bid going

21   public happened.  And it happened in a manner that,

22   you know, we were not anticipating.  I think that

23   we've tried to be measured in the way that we provide

24   information to the public and do so, you know, with a

25   message attached to it.  Whereas the disclosure here

HIGHLY CONFIDENTIAL

Page 9

1    was, you know, was done, you know, outside of the

2    process, I'll say.

3                   So given all of that, we think that it

4    was best to postpone or adjourn the status conference.

5    And we recognize that obviously the status conference

6    will have to, you know, by definition it'll have to be

7    put back on at some point when the schedule for the

8    hearing and the commencement of the hearing -- or I

9    should say the commencement date of the hearing is

10   decided.  And that's the, you know, the last topic

11   that we want to talk about today.

12                  So I'll pause there and if you don't

13   have any questions, I think that's all we were going

14   to say about the status conference itself.  And if no

15   questions, then I'll move on to the next topic.

16                  THE COURT:  A couple things.  First,

17   you may have seen in the order I did reschedule a

18   status conference for Friday morning.  So as of now,

19   your status report is due tomorrow and then any

20   responses tomorrow night.  And status conference for

21   Friday, obviously subject to whatever developments or

22   further orders may come.  But as of now, that's on the

23   calendar.

24                  And second, and maybe you will come

25   back to this, but I'm not at all inquiring at this

HIGHLY CONFIDENTIAL

Page 10

1    point whether the Special Master is likely to deem the
2    Amber bid to be a superior bid.  But I am curious
3    about any estimate as to the timing as to which the
4    decision may be forthcoming as to whether or not it is
5    a superior bid.  Is there anything you want to say
6    about that?
7                    MR. BENTLEY:  Yes.  I think that that
8    will be answered in the third topic I wanted to cover,
9    which is the options on the hearing schedule.  So if
10   you don't mind, then I'll cover it there.
11                   THE COURT:  That's fine.  That was all
12   I had for now.
13                   MR. BENTLEY:  Great.  And apologies on
14   the first point.  Yes.  I should have acknowledged
15   that we did see that you rescheduled for the status
16   conference for Friday.  That slipped my mind when I
17   was reciting the facts.
18                   THE COURT:  I'm sure there's a lot of
19   moving parts on your end.  No problem.
20                   MR. BENTLEY:  Yes.  Don't have the
21   time -- or I should say didn't have the time to
22   prepare for this ex parte meeting as I usually do.
23   You know, we've been on phone calls around the clock
24   with the dozen or so parties.
25                   Okay.  So the next topic that I want to

HIGHLY CONFIDENTIAL

Page 11

```
 1    cover is setting the stage a bit for the bids on the
 2    table.  And just so that you understand kind of the
 3    predicate for when we talk about the next topic, which
 4    is -- or I should say the last topic, which is the
 5    hearing schedule.  And I think that laying out the
 6    bids that we have in front of us now will help to put
 7    all of that in context.
 8              So first, we, of course, have the
 9    recommended Dalinar transaction.  As a reminder, that
10    transaction proposes to deliver approximately $7.38
11    billion to judgment creditors in the form of cash and
12    non-cash consideration.  It is similar to the Dalinar
13    stalking horse bid, meaning both -- or I should say
14    neither of those proposed transactions contemplate a
15    settlement with the PDVSA 2020 bond holders.  And so
16    that transaction was recommended, I believe, on July
17    2nd.  And that's what we've been conducting briefing
18    related to, depositions related to, and parties have
19    put forth, you know, their experts both in support and
20    against that transaction.
21              And then the second bid, I will say --
22    we'll go to the Amber Energy bid next because I think
23    that one has become the topic du jour, you know, given
24    the Red Tree letter last night and given our ex parte
25    earlier this week.  So Amber Energy did submit a bid
```

HIGHLY CONFIDENTIAL

Page 12

1    during the stalking horse round and during the topping

2    bid round.

3                    If you recall, in the final

4    recommendation, we described the collective bids as

5    there being only Dalinar and Red Tree as conforming,

6    and the others as non-conforming.  We can confirm

7    that, you know, two of the bidders that we have in

8    play today that have submitted updated bids, that the

9    unsolicited competing proposals are Bidder A and

10   Bidder B from the topping round.  So that means that

11   Amber Energy submitted what we deemed to be a

12   non-conforming bid during the topping round.

13                   They were denoted as Bidder A during

14   the topping round.  The reason that they were

15   non-conforming at the time was because their

16   transaction relied upon a settlement with the 2020

17   bond holders, which at the time of submission of their

18   topping bid, they did not have.  Today, you know, as

19   we described to you on Monday when we were requesting

20   your authority to engage with Bidder A, they do have

21   that executed settlement agreement with -- or I should

22   say, support agreement with the 2020 bond holders.

23                   And also, since submitting their

24   topping bid -- which I'll remind you that the topping

25   bid was $25 million above the Red Tree stalking horse

HIGHLY CONFIDENTIAL

Page 13

```
 1    bid.  Since then, they have incorporated agreements
 2    from the next -- I think there's -- unless it's you,
 3    Judge Stark.  If it's somebody else that has the
 4    ambulance in the background, I'd ask you to go on
 5    mute.
 6                    THE COURT:  Yeah.  I think it's here in
 7    D.C.
 8                    MR. BENTLEY:  Okay.  Well, that's okay
 9    then.
10                    THE COURT:  Yeah.  Hopefully it'll
11    pass.
12                    MR. BENTLEY:  We'll let it whine on.  I
13    work in New York City, so you know, it's the
14    equivalent of birds out in the country.
15                    So I'll pick up where I left off.  The
16    Amber Energy bid, you know, as compared to the bid
17    that they submitted in the topping round, the topping
18    round is $25 million above the Red Tree stalking horse
19    bid.  They now have secured agreements from the next
20    three creditors in line, which are Rusoro, Conoco,
21    which has their small 48 to $50 million claim, and
22    then Koch.
23                    So that means that Amber Energy has
24    executed support agreements from those three parties
25    to the extent that they're receiving non-cash
```

HIGHLY CONFIDENTIAL

Page 14

1  consideration.  I'm trying to recall off the top of my

2  head, but the Conoco claim in the middle there may

3  actually just be getting cash.  So there may not be an

4  executed agreement with them.  So that brings the

5  Amber Energy bid to, you know, approximately 5.8 or

6  $5.9 billion in proceeds delivered to the -- excuse

7  me, to the waterfall creditors, to the attached

8  judgment creditors.

9             And also, at a settlement with the

10  2020s that contemplates paying the 2020s █████

11  ████████████████████████████████.  And one other term

12  that will become relevant later in the conversation

13  that I'll say about the Amber Energy settlement with

14  the 2020s is that in the event the Special Master

15  recommended the Amber Energy transaction to the court

16  as a superior proposal and as what is effectively a

17  replacement final recommendation, there is a term in

18  their settlement agreement, their support agreement

19  with the 2020s that requires the 2020s -- or the 2020s

20  agree to go and seek a stay of the New York action.

21             So they essentially would, you know,

22  file a motion in front of Judge Failla in New York and

23  request that she not enter a decision on a summary

24  judgment, which she has said in that July 10th status

25  conference that she anticipates issuing in September

HIGHLY CONFIDENTIAL

Page 15

1    or by the end of September.  Now, obviously, depending

2    on the timing of the hearing, depending on, you know,

3    a number of other factors, you know, responses to that

4    motion that the 2020s file, et cetera, that Judge

5    Failla may or may not grant that motion to stay the

6    New York action.  But, you know, I think that's just

7    an important data point.  And again, we'll come back

8    to that when we talk about the hearing schedule.

9              And then the third bid that we have in

10   front of us is the June 30th unsolicited competing bid

11   from Bidder B, which on July 1st we received your

12   authority to engage with Bidder B with respect to that

13   June 30th bid.  The June 30th bid -- we also filed a

14   notice, I should say, and made that bid public, you

15   know, with applicable redactions, I believe it was

16   last week, in connection with filing our reply brief.

17             What we've learned in over the course

18   of the last week is that Bidder B's proposal █████

19   ████████████████████████████████████████████████

20   ██████████████       ███████████████████████

21   ██████████████████████████████████████████████████

22   ████████████████████████████       ███████████████

23   ██████████████████████████████████████████████████

24                    ██████████████████████████████████

25   ██████████████████████████████████████

HIGHLY CONFIDENTIAL



Page 16

1 ████████████████████████████████████

2 ████████████████████  ███████████████

3 ██████████████████████████████████████████

4 █████████████████████████████████

5 █████████████████  █████████████████████

6 █████████████████████████████████████

7 ████████████████████████████████████

8 ███████████████████████████████████████

9 ██████████████████████████████████████████

10 ████████████████ -- I would tell you the name of Bidder B,

11 but I actually don't think that that's been disclosed

12 yet, so we won't say it.  ███████████████████

13 ███████████████████████████ Now, Bidder B

14 still has yet to submit that updated bid letter,

15 which, you know, they've told us is supposed to be

16 coming, you know, ideally today, maybe tomorrow.

17              And the other thing about both of those

18 parties is that they have not submitted executed

19 commitment letters to the extent that their bid needs

20 them.  For example, Bidder B, I don't think,

21 contemplates financing.  They're paying cash, so they

22 wouldn't need a commitment letter.  The Amber Energy

23 bid would need a commitment letter.  They've told us

24 that they're ready to deliver those, you know, in the

25 event we're going to execute an SPA with them.  That

HIGHLY CONFIDENTIAL

Page 17

1   is okay.  And that is, you know, from what we can

2   recall, compliant with all the bid procedures.

3                   And the other point that is similar

4   between the two of them is that we would still need to

5   finalize a stock purchase agreement with each of those

6   two bidders, Amber Energy and Bidder B.  ██████████

7   ███████████████████████████████████████████████

8   ████████████████

9                   Those are the three bids on the table.

10  I'm happy to answer any questions about the summary of

11  the bids, but I just wanted to provide that as some

12  context for, you know, our next topic, which is

13  talking about the scheduling of the sale hearing and

14  what we view as the options for scheduling.

15                  THE COURT:  Right.  The only question I

16  have at this point with respect to Bidder B, if I

17  understand it correctly, the bid that you believe is

18  on the table or imminently on the table from them is

19  █████████████████████████████████████████████████████

20  ████████████████████████    ████████████████████

21  █████████████████████████████████████████  █████

22  ██████████████

23          MR. BENTLEY:  ██████    ██████████████████

24  ████████████████    █████████████████████████████

25  ████████████████████████████████████

HIGHLY CONFIDENTIAL

Page 18



11    THE COURT:  Okay.

12    MR.  BENTLEY:  And I think importantly,

13    you know, for comparison purposes to the existing

14    recommended bid of Dalinar, Dalinar pays through

15    Siemens.  So in the waterfall, once you get to Koch,

16    the next two judgment creditors are first, Gold

17    Reserve and then, Siemens.

18    And I think that, you know, in going

19    back and forth with all of the bidders, you know,

20    encouraging Amber Energy and Bidder B to increase

21    their proposals even further than the August 8th Amber

22    Energy proposal and even further than what we have

23    been told is coming in from Bidder B, we've encouraged

24    them to engage with Gold Reserve, with Siemens, and,

25    you know, even beyond if they have the ability to do

HIGHLY CONFIDENTIAL

Page 19

1    so.

2                    From our understanding and from talking

3    to those judgment creditors, some of the conversations

4    have happened over the last few days.  From what we

5    can tell from talking both with -- Siemens, I think,

6    we've had less conversations with, obviously, because

7    they're not a bidder themselves.  We've talked more

8    with Dalinar, with Gold Reserve.  From what we can

9    tell, the conversations with Gold Reserve have not

10   really gone anywhere for a couple of reasons.  One

11   being the competing bidders.

12                   So Bidder B and Amber Energy are

13   hesitant to provide certain confidential or sensitive

14   information about their bids with Gold Reserve,

15   because Gold Reserve is sponsoring its own bid.  And

16   so they're competing with each other.  And then, on

17   the other hand, the conversations have not been

18   productive to date because Gold Reserve, as you likely

19   saw in the letter they filed on Monday morning, is

20   taking the position that either they get paid in full

21   in cash on their $1.2 billion claim or, you know, they

22   just win with their transaction.

23                   So they really are not engaging as far

24   as we can tell with the other bidders on taking

25   non-cash consideration or taking some kind of a

HIGHLY CONFIDENTIAL

Page 20

1    discount to the face value of their claim.  And for

2    whatever it may be worth, ████████████████████████

3    ████████████████████████████████████████████████

4    ██████████████████████████████████████████████████

5    ████████████████████████████████████████████████

6    ██████████████████████    ████████████████████████

7    ██████████████████████████████████████████

8    ████████████████████████████████████████

9    ████████████████████████████████████████

10   ██████████

11                   So right now, Gold Reserve is taking

12   the position that they're not -- they're sort of

13   refusing to engage on anything but pure cash paid at

14   par.  So I think that's probably the lay of the land

15   of the bids.

16                   THE COURT:  Okay.  And yeah.  Before

17   you move on, I'll just note, you may or may not have

18   seen it given everything you're doing, but Michael

19   handed me a four-page, single-space letter that Gold

20   Reserve filed sometime since my order continuing the

21   status call to Friday.  So it's consistent with the

22   posture that you've just outlined from them.

23                   MR. BENTLEY:  Yeah.  I have not read

24   it.  They sent us an email telling us that, you know,

25   Red Tree has backed them into a corner, and now they

HIGHLY CONFIDENTIAL

Page 21

1    have to send this -- submit this letter.  But I guess

2    I'm not surprised that they ended up filing it.  And

3    then, it says what it says.  But I personally have not

4    read it.

5                    THE COURT:  Got it.  Okay.  I didn't

6    have any other questions about the bids.  Thank you

7    for summarizing them for me.

8                    MR. BENTLEY:  Okay.  So next we will go

9    through what we view as, you know, first the

10   practical, you know, reality of the current schedule,

11   which would be a sale hearing commencing this upcoming

12   Monday, August 18th.  And then, we'll go into what we

13   view as the options because, not to bury the lead, but

14   we think that given the updated bids and the

15   information that has come out and the positions that

16   parties are taking with respect to those bids and with

17   respect to the process, we do not see how commencing

18   the sale hearing on Monday would work practically.

19                    And the reason being all of the

20   briefing to date and all of the depositions and the

21   expert testimony put forth to date has been focused on

22   the Special Master's final recommendation from July

23   2nd, which is comparing a Red Tree bid that was

24   approximately $3.8 billion in value to the judgment

25   creditors plus a $2 billion settlement with the 2020s.

HIGHLY CONFIDENTIAL

Page 22

1   So comparing that to the $7.38 billion Dalinar
2   transaction.

3              And what we have heard from parties,
4   and I'm sure you saw exemplified in the Red Tree
5   letter that was filed last night, parties are
6   insisting on additional witnesses.  I'm not sure that
7   anybody has filed a letter that has suggested
8   additional briefing yet, but we know that that's been
9   communicated to us through numerous calls that we've
10  been having and emails we've been having with parties
11  over the last few days.  And also, suggestions of
12  additional depositions, for example, of the special
13  master's witness, Mr. Hiltz, and asking about
14  comparing the Dalinar transaction now to the Amber
15  Energy transaction instead of to the Red Tree
16  transaction.

17             So all that is to say that we believe
18  that parties would be objecting to moving forward with
19  the hearing on Monday.  We certainly understand those
20  positions given the change in facts that have
21  happened.  And it's unfortunate that these unsolicited
22  competing proposals came in so close to the hearing,
23  but that is technically permitted pursuant to the
24  Dalinar SPA and pursuant to Your Honor's prior orders
25  from earlier this year regarding the evaluation

HIGHLY CONFIDENTIAL

Page 23

 1    criteria and bid protections and process.

 2                    You know, we tried to avoid this last

 3    minute, you know, sidetracking with bids.  But I think

 4    that at least the good thing that came of it was that

 5    two of the bidders -- or I guess, technically one of

 6    the bidders so far and potentially one more bidder,

 7    that substantially increase the value of their bids,

 8    you know, by $2 billion plus.  So that is good.

 9                    But the situation that it leaves us

10    with is that we think that conducting the hearing and

11    not permitting the additional briefing depositions and

12    proffers of experts could potentially create issues,

13    with the hearing and with treatment of the hearing.

14                    So I'll pause there before I go into

15    what we view as the two primary options for

16    rescheduling the hearing and ask if you have any

17    questions.

18                    THE COURT:  No.  I'd like to hear what

19    you see as the options.

20                    MR. BENTLEY:  Okay.  So generally

21    speaking -- and just to frame the two options at a

22    high level, we think that Option A, we'll call it, is

23    having a hearing that is delayed essentially a few

24    weeks.  So we're having a hearing in earlier,

25    mid-September.  And importantly, we think that would

HIGHLY CONFIDENTIAL

Page 24

1    likely be before any decision from New York -- from

2    Judge Failla on the 2020s litigation.  And then,

3    Option B would be delaying until after a decision

4    comes in from Judge Failla on the 2020s litigation,

5    which again, Judge Failla indicated at that July 10th

6    conference that the decision would be forthcoming

7    sometime in September.

8                    So maybe it would help if I lay out in

9    a little bit more detail how we see the mechanics

10   working in both option A and Option B.  Again, Option

11   A is the earlier mid-September hearing, we'll call it

12   the pre-2020s New York ruling option.  In that

13   scenario, we would be telling bidders, both Dalinar,

14   Amber Energy, and Bidder B, that to the extent they

15   have revisions to their bids submitted to date, they

16   need to make those revisions by a date certain in

17   August.

18                    We've been talking about dates with the

19   sale process parties, but just didn't have enough time

20   to settle on something to propose to Your Honor.  But

21   we are thinking that it is probably something in the

22   neighborhood of one of the next couple of Fridays.  So

23   August 22nd or 29th.  And just to be clear, this is

24   not a re-opening of the topping period.  The topping

25   period, the Special Master was permitted to solicit

HIGHLY CONFIDENTIAL

Page 25

1    bids.  This is not a re-solicitation of bids.

2                 The status quo that we have right now

3    is we have a recommended bid, and we have two

4    submitters of unsolicited competing proposals that we

5    have received authority from Your Honor to engage

6    with.  And so we would not be going out broadly and

7    asking for everybody to send an updated bid.  This is

8    not another round.  It is merely giving an end date to

9    the three parties that we're engaged with today.

10                And we think that the end date is

11   important because without the end date, we could find

12   ourselves in a similar situation where one or more of

13   the parties just hold dry powder until the day before

14   the sale hearing and, you know, lob in another updated

15   bid to try and, you know, make a last-ditch effort at

16   winning.  And we think that without this end date,

17   it'll be tough to drive parties to give their best and

18   final that is truly a best bid, meaning they're best

19   bid with their best foot forward.

20                So again, tell bidders they have to

21   submit those final bids by a date certain in August.

22   The Special Master would then determine if he is

23   sticking with the existing recommended Dalinar

24   transaction or pursuant to the Dalinar SPA has deemed

25   that one of the other bids submitted is a "superior

HIGHLY CONFIDENTIAL

Page 26

1    proposal" under the Dalinar SPA, in which case Dalinar

2    I think would have three business days to match that.

3    And immediately after that match period, you either

4    have the answer that the competing bidder is the

5    superior proposal or Dalinar has matched it.  And then

6    the Special Master immediately files the updated

7    recommendation.

8                    The recommendation, we don't anticipate

9    being the same, you know, 20-to-30-plus-page

10   recommendation that we did last time.  A lot of the

11   case law predicates are the same regardless of which

12   of these bids we are submitting.  So we expect it to

13   be a relatively short notice, but providing enough

14   information as to why the Special Master is making

15   this decision so that the parties can respond.  And we

16   would expect a very truncated briefing period, a very

17   truncated period for any necessary depositions to

18   follow immediately after that recommendation.

19                   And again, that would be setting this

20   up for a sale hearing in early-to-mid-September.  One

21   thing that I would note about the calendar for this

22   Option A -- and I guess it comes into play with Option

23   B as well, is there are a number of Jewish holidays

24   that I believe begin on or around September 22nd and

25   continue through mid-October.  You know, we think that

HIGHLY CONFIDENTIAL

Page 27

1    that this Option A schedule will be able to play out

2    and a sale hearing will be able to occur before those

3    holidays kick in on September 22nd.  I just wanted to

4    make sure that that was on your radar.

5                    THE COURT:  Thank you for that.  Let me

6    just ask you before we get to Option B.  If we will

7    end up with something looking like Option A, how much

8    time would the Special Master anticipate building in

9    to make his determination after the last and final

10   date?  And I'll just throw out there Option C of

11   sticking with Monday is still on the table as of now,

12   from my perspective.  So I remain interested in if

13   we're going forward on Monday, how soon the special

14   master thinks he can make a determination as to

15   whether he has a superior proposal in hand at the

16   moment.

17                   MR. BENTLEY:  So we haven't discussed

18   with specificity with Bob as to how long he would need

19   to make that determination.  I believe in the past

20   we've made the determination in as quick as 48 hours.

21   A lot of that is because we need to actually execute

22   an SPA if Bob is going to decide that one of the other

23   bids is superior to the Dalinar transaction.

24                   Now, what we've told parties is that

25   they should be essentially apples to apples with the

HIGHLY CONFIDENTIAL

Page 28

1    Dalinar SPA.  We should not be going backwards and
2    going back to mark-ups submitted early in the topping
3    period because that would not be productive, and we
4    don't have time.  So we do think that we could turn
5    this around very quickly.
6                  Again, we could sort of be working in
7    parallel while parties are working on submitting their
8    bids to prepare an updated notice.  I think that if
9    the notice is going to say that Dalinar remains, then
10   it would be a very short notice -- sorry, Dalinar
11   remains the recommended transaction, it would be a
12   very short notice.  And if it's a different party
13   that's a superior proposal, then it's a -- I would
14   say, a moderately short notice.
15                 And your question on, you know, how
16   that is implicated with -- or plays with Option C,
17   which is to keep the hearing as is.  If Bob, for
18   example, were to decide today that one of these bids
19   is a superior proposal -- first of all, I don't think
20   that he could decide that Bidder B is a superior
21   proposal because they still have yet to submit their
22   bid.  We've just heard from them and from others that
23   it is coming soon.
24                 So if you were to determine that Amber
25   Energy is a superior proposal today, Dalinar under

HIGHLY CONFIDENTIAL

Page 29

```
 1    their SPA would have three business days to match it.
 2    So that I think already brings us to Monday and you
 3    know, that has the effect that it does.  But again,
 4    Your Honor heard me go through what we think the
 5    practical implications are just from hearing from
 6    other parties regarding briefing and testimony and
 7    discovery, et cetera.
 8                  THE COURT:  Okay.  I think I follow.
 9    All right.  Do you want to -- I don't know if you had
10    more to say about Option A or if you're ready to move
11    on to Option B?
12                  MR. BENTLEY:  No.  I don't.  I will go
13    through the mechanics of Option B and then, you know,
14    we're happy to answer any questions you have about the
15    scenarios, their mechanics, the pluses, and minuses,
16    et cetera.  So on Option B, the way that we view the
17    mechanics would be there's no change in the
18    recommendation as of today.  So as of today, Dalinar
19    is the final recommended bid.  We would not change
20    that recommendation.  And instead, the next steps
21    would be adjournment of the sale hearing until a date
22    to be determined after the 2020s New York decision.
23                  Now, just for illustrative purposes,
24    let's say the decision comes in on September 30th
25    because Judge Failla said that it will be in by the
```

HIGHLY CONFIDENTIAL

Page 30

1    end of September.  What we would anticipate is once

2    that decision comes in, bidders -- again, the existing

3    bidders, because we're not having a topping period.

4    Bidders would have a short period of time to revise

5    their bids to reflect the implication of the 2020s

6    decision.

7                    Now, I think that the revising of those

8    bids looks a little bit different than it would for

9    Option A, which is essentially giving bidders the next

10   week to sort it out.  The reason being is depending on

11   the 2020s decision, the bidders might have to get

12   updated commitment letters from their financing

13   sources just purely because by effect of the decision,

14   the capital structure of CITGO could change.

15                   So nevertheless, we still think that

16   bidders could pull together those revised bids

17   quickly.  We would like to be able to go and -- you

18   know, if Your Honor is ultimately going to tell us

19   that you prefer Option B, I think that the process

20   would be we would go and figure out what the parties,

21   including with bidders, how long they would need to

22   get their refreshed financing.  We hope and expect

23   that it is something in the neighborhood of a couple

24   weeks.  So by for example, the second week in October,

25   you would have revised final bids that, you know,

HIGHLY CONFIDENTIAL

Page 31

 1   cannot move.

 2                   And thereafter, again, quickly, the

 3   Special Master will make a determination as to what is

 4   the best and final bid and submit a recommendation on

 5   that.  We, again, would have a very truncated set of

 6   briefing and a very truncated, if necessary,

 7   deposition and discovery schedule.  And that should

 8   tee us up for a hearing in mid-October.  Although, I

 9   am checking my email from the Special Master.  I think

10   that -- just to put it on your radar, the Jewish

11   holidays go through October 15th.

12                   So that would probably line up anyway

13   just with, you know, revision of the bids, submission

14   of the recommendation, short briefing.  You're

15   essentially looking at a hearing that could start, you

16   know, the week of October 20th or 27th.

17                   And again, importantly, the primary

18   distinction, I guess, I would say from a procedural

19   standpoint is that this hearing would occur after what

20   we understand is going to be a New York ruling in the

21   2020s litigation during September.

22                   THE COURT:  Okay.  I think I

23   understand.  Is there anything else you wanted to say?

24                   MR. BENTLEY:  No.  I think that's an

25   overview of the mechanics and what we, over the last

HIGHLY CONFIDENTIAL

Page 32

1    24 hours of a series of furious and consistent calls

2    with many parties, have narrowed down as the likely

3    options.  But of course, the Special Master is willing

4    to proceed on any basis that Your Honor would like us

5    to, whether that's option A, B, or C.  We will get it

6    done one way or another.

7                    THE COURT:  Right.  I appreciate that,

8    of course, very much.  I am not prepared at this

9    precise moment to give you any guidance on A versus B

10   versus C.  And we can just call C everything else

11   other than A or B to include going forward on Monday.

12   But perhaps there's some other options as well.  I

13   would say as of now you've got the deadline of four

14   o'clock, which I think was the deadline you had

15   proposed in your letter maybe of this morning, if I

16   recall correctly.

17                    MR. BENTLEY:  Yes.

18                    THE COURT:  And as you always have, the

19   more widely you can confer and represent in that 4

20   p.m. status report what the views are of anybody who

21   would be interested in A versus B versus C, the

22   better.  But I have also, you know, given an

23   opportunity for anyone to weigh in themselves four

24   hours later.  At this point, though I recognize it's

25   very fluid situation, it may very well be that I don't

HIGHLY CONFIDENTIAL

Page 33

```
 1    make a decision on the next steps until after seeing
 2    what I get tomorrow from you and from anyone else.
 3                   I may very well wait until I -- you
 4    know, we have the discussion that I referred to
 5    earlier scheduled for Friday.  That said we really are
 6    as available as you need us to be.  I won't
 7    necessarily say through the night necessarily, but,
 8    you know, till very late tonight and early tomorrow
 9    morning if there are developments or you want to take
10    another run at -- to the extent you're asking me to
11    decide on this call, and I'm not hearing that you are.
12    But to the extent you are and I'm not giving you a
13    decision, if you want to have a discussion again later
14    that you really, in order to do your work, need to
15    know at least whether Monday's on or off or something
16    to that effect, you know, I'm available.  We can have
17    a further discussion.
18                   It's also possible that we will reach
19    out to you and say we want to have a discussion even
20    if you haven't asked for one.  But if neither of those
21    things happen, then obviously you'll proceed according
22    to the order, and we will get your position tomorrow.
23    And as far as I'm certain, your position could include
24    here's a couple of options and the Special Master is
25    indifferent.  Or here's a couple of options and the
```

HIGHLY CONFIDENTIAL

Page 34

1   Special Master prefers whatever.  So right at this

2   very moment, I'm not deciding on the next steps.  Any

3   reaction or questions about that?

4                   MR. BENTLEY:  Yeah.  My only reaction

5   is just to let you know that when we last talked with

6   the sale process parties, which was this morning, you

7   know, there were two focuses I could tell from their

8   perspective.  One was are we having a hearing on

9   Monday or not?  And two was which of these divergent

10  paths does everybody think is the better one, meaning

11  Option A or Option B?  I think that the consensus was

12  that nobody thought that we should be going forward on

13  Monday.

14                  However, we are happy to confer again

15  with the sale process parties immediately coming out

16  of this ex parte call with you right now.  And we can

17  confirm by email that it is or is not the case that

18  everybody thinks that they would like to know whether

19  Monday is going to be -- there's going to be a sale

20  hearing or not.

21                  And then, on the latter point, I think

22  that we can address the latter point, you know, if

23  it's A or B or something other than a Monday hearing,

24  I think that we're happy to meet and confer, you know,

25  with everybody and propose in the status report due by

HIGHLY CONFIDENTIAL

Page 35

1    4 p.m. tomorrow.  But we will endeavor to file it

2    before then because I think we're just conscious of

3    everybody's time.  So I don't know if that changes

4    Your Honor's position or what you're prepared to say

5    now with respect to Monday or something else, but

6    we're happy to do whatever you would like.

7                    THE COURT:  Sure, yeah.  Well, let me

8    say a few more things first I was also thinking.  You

9    know, 4 p.m. is the deadline, but particularly if

10   there were consensus at least on Monday -- and it

11   sounds like you sensed that there is, but I'm not

12   prepared yet to say, because I really have to think it

13   through, that if I got a letter even tonight that said

14   absolutely everybody in the world agrees we don't want

15   to come to Wilmington Monday, that I wouldn't

16   potentially make you all come to Wilmington Monday

17   anyway.

18                    But that would certainly -- that would

19   be an unprecedented thing for everyone here to agree,

20   and I would have to consider that very seriously.  So

21   I'm not trying to deter you from that.  But I just,

22   you know, I'm not making a decision, particularly as I

23   don't think I have that representation.  It sounds

24   like you think maybe everyone would agree don't go

25   forward Monday.  Although, actually it's now -- this

HIGHLY CONFIDENTIAL

Page 36

1    is the dangers of thinking out loud.  The letter from

2    Gold Reserve I think says -- yeah.  "Does not require

3    any adjournment from the sale hearing."  So you may

4    get an objection.  From at least them.

5                    MR. BENTLEY:  Yeah.  What I would say

6    is I think that we have consensus from the sale

7    process parties, which is Crystallex, Conoco, and

8    Venezuela as to not going forward on Monday.  I would

9    imagine that virtually all other additional judgment

10   creditors other than Gold Reserve would say that they

11   also agree that Monday doesn't make sense.

12                    And if we put it to Gold Reserve, I

13   think the way that we would have to frame it for them

14   is we're going forward on -- the option is to go

15   forward on Monday, whether it is with recommending you

16   or it is with recommending a different bidder.  They

17   may change their tune on that because that would mean

18   that they wouldn't have the ability to brief anything

19   on the other bid and would not have the ability to

20   depose anybody on the other bid.

21                    So, you know, we're happy to have the

22   broad meet and confer just to check those boxes.  I

23   don't mean it -- you know, I don't mean it in the

24   sense of, you know, we have to go through the motions.

25   I mean, so that we actually do get input from

HIGHLY CONFIDENTIAL

Page 37

1   everybody and including Gold Reserve and put it to

2   them in the way that I just framed it.

3                   THE COURT:  Well, let me just, you

4   know -- and maybe Bob wants to speak to this or it's

5   fine if you want to think about it.  But if any part

6   of me is inclined to move forward perhaps as early as

7   next week, seems to me he is going to have to make a

8   decision as to whether or not he has a superior bid in

9   his hands.  I don't want to eat up all the time he

10  might need to make that decision by me not knowing

11  what the -- setting out what the schedule is.

12                  Is that a potential issue that, you

13  know, maybe I need to be forced to make a decision on

14  the schedule or maybe he can tell me how long he needs

15  to decide if what he has now is a superior bid or not.

16                  MR. BENTLEY:  So Bob -- maybe if I

17  could, Your Honor, just ask a clarifying question to

18  make sure I understand it.  And maybe Bob already

19  understands it.  But your question is if you take

20  until Friday at the currently scheduled status

21  conference to decide whether we're going forward on

22  Monday with a sale hearing or not, the intervening

23  time, so today, tomorrow, and Friday morning, is that

24  enough time for Bob to decide whether he's going to

25  continue recommending Gold Reserve or he is going to

HIGHLY CONFIDENTIAL

Page 38

1    switch and recommend a superior proposal?

2                    And the other thing I would just note,

3    you know, before I can let Bob answer for himself.

4    But the other thing I would note is just to remind

5    what I mentioned earlier that Dalinar has a

6    three-business-day right to match if Bob were to

7    determine that there's a superior proposal.  So I

8    think that essentially would require in order to

9    proceed early next week, we'll say, that Bob makes a

10   decision today.  So if Bob were to make a decision

11   today, then Dalinar would have until the end of the

12   day, end of the business day on Monday to decide

13   whether to match.

14                    THE COURT:  Right.  No.  I get that.

15   And definitely what you just set out is part of my

16   question, but I guess just -- I won't characterize.  I

17   don't know if this is more broadly or more concretely.

18   If I stick to the orders that are in place right now,

19   then it seems to me the Special Master, while there's

20   no deadline that I'm aware of about how quickly he has

21   to decide if he has a superior proposal or superior

22   bid, we're on track to have a big hearing on Monday

23   about the bid that he recommended.

24                    And so I would think he would need to

25   make a decision before that hearing at some point.

HIGHLY CONFIDENTIAL

Page 39

1   And so if I'm just going to, in this context take my

2   time, and have a hearing on Friday about whether to

3   have a hearing on Monday; then I just guess I don't

4   know what thoughts, if any, he has as is that the same

5   time in which he should be doing the work to figure

6   out if -- and I don't mean to suggest you're not

7   working hard.  Please don't misunderstand me.  Just,

8   you know, is he in parallel doing that same work, or

9   is he waiting for me to decide whether we're going

10  forward Monday?  I don't want to wait for him and he

11  wait for me at the same time, and then neither of

12  us --

13              MR. BENTLEY:  Understood.

14              MR. PINCUS:  Understood.  Yeah.  And

15  let me answer this, Chase.

16              Your Honor, we have these bids.  They

17  do not include definitive SPAs.  The devil is in the

18  detail.  So without understanding exactly what the

19  terms of those agreements are, you can't even really

20  start the discussion because there's negotiation

21  there, too.  If we don't like things that are in

22  agreements, we need to negotiate with the parties.

23              So I would tell you as a practical

24  matter, if you really want a competitive situation,

25  it's going to take a while, which in my view is going

HIGHLY CONFIDENTIAL

Page 40

1    to be, you know, certainly a week or two at the

2    earliest if you want us to go through --

3                THE COURT:  Right.  So if I follow that

4    correctly -- and I appreciate all that, it's not

5    possible to make a full assessment as to whether a

6    superior bid has been received in less than one to two

7    weeks, which by default would mean the Special Master

8    would have to adhere to his current recommendation, if

9    I follow correctly, if I don't provide that amount of

10   time?

11               MR. PINCUS:  Yeah.  That is correct.

12   And otherwise, you know, if I could even possibly

13   change my recommendation between now and then, you'd

14   be having a hearing on a deal that, you know, has

15   been, you know, topped, potentially.  So I don't see

16   how next week is possible unless you want us just to

17   stick with Gold Reserve and, you know, let people say

18   whatever they say at the hearing.

19               THE COURT:  Right.  Okay.  That is

20   helpful.  Let me just throw this out because it

21   occurred to me.  I'm sure it's occurred to you all.

22   But if under either Option A or B, and potentially

23   some Option Cs, if time is being built in, should I

24   even consider -- does such a person exist?  Should I

25   consider trying to find a mediator?  You know, I know

HIGHLY CONFIDENTIAL

Page 41

1    you guys have tried to do this in the past, but you're

2    in the middle of everything.

3                   I am just struck by what you said

4    earlier about, you know, Gold Reserve, they may

5    be -- you know, they're not incentivized to negotiate.

6    Is it even worth me entertaining the possibility of

7    trying to find someone new to bring into this that

8    could potentially facilitate conversations over the

9    next few weeks if we are going to delay?

10                  MR. BENTLEY:  So, Bob, I'm happy to let

11   you give your reaction or I can start.

12                  MR. PINCUS:  Yeah.  Look, just

13   generally, I'm not sure a mediator is helpful.  We

14   need to have the full positions of these parties

15   before we can even negotiate with them.  I don't think

16   a mediator gets you Gold Reserve moving to a new deal

17   or taking a new deal.  I think the pressure of having

18   the competitive bid that we're going to accept is the

19   only way you get there.  That's my position.

20                  And, Chase, I'll let you finish.

21                  MR. BENTLEY:  Yeah.  My view is that,

22   you know, I think that the history of this situation

23   that we find ourselves in is so long and complicated

24   that the time that it would take for somebody -- you

25   know, even a professional mediator who is, you know,

HIGHLY CONFIDENTIAL

Page 42

1    skilled in getting up to speed on these situations.

2    It would probably take them just a couple weeks or

3    more to get up to speed on it, in which time we're

4    probably dragging past the proposed Option A.

5              So the mediator I think in my mind is

6    probably only realistic if we are in one of the longer

7    scenarios where everybody is waiting for a 2020s

8    decision to come down.  So if the inclination is to

9    stick with one of the faster timelines, I think that

10   practically speaking, it'll be very difficult for a

11   mediator to get up to speed and then to, you know,

12   also make any progress with Gold Reserve.

13             And likewise, as Bob said, you know,

14   the real leverage here, or the real incentive I should

15   say, for Gold Reserve to come to the table and, you

16   know, to negotiate in good faith is when they realize

17   that we are not going forward on Monday.  And instead,

18   there is a real competing proposal out here that the

19   Special Master is considering, and that the court has

20   provided the additional couple weeks of runway for.

21             You know, and from our engagement with

22   Gold Reserve to date, they're taking the view that

23   certainty no longer matters.  And really all that can

24   be considered is the headline price that's delivered

25   to the judgment creditors.  And I think that the only

HIGHLY CONFIDENTIAL

Page 43

1    way to deliver the message that that is not true is

2    that there's this additional, I don't know, whatever

3    you want to call it, two, three, four weeks for a sale

4    hearing to happen in early to mid-September.  And in

5    that time, and frankly, you know, in less time than

6    that, there's the chance that the Special Master

7    changes his recommendation and deems one of these bids

8    to be superior to the Dalinar bid.

9                    THE COURT:  Okay.  I guess one other

10   thing, if you have any thoughts you're prepared to

11   share, my recollection of what Judge Failla said was

12   she intended to decide by no later than September

13   30th.  I believe she had a large criminal trial that

14   was starting right after the call that she had.  And

15   from press reports, I understand that trial ended

16   maybe about a week ago.  And while I did have an ex

17   parte conversation with her, I know nothing more than

18   what I'm telling you.

19                    You know, judges sometimes say I'll get

20   it by September 30th, and maybe it happens sooner than

21   that.  It seems to me at least a possibility if we

22   learn nothing further that perhaps if the special

23   master deemed one of these other bids to be superior

24   in part based on the 2020s, but at the same time

25   before my hearing, Judge Failla makes a ruling, the

HIGHLY CONFIDENTIAL

Page 44

1    2020s may or may not look more or less important.  I

2    guess, I don't know if this is a question or not, but

3    that at least is something that should be thought

4    about.

5              MR. BENTLEY:  Yes.  It's actually a

6    scenario that we've thought a lot about.  Just to play

7    it back in terms of some of the mechanics that we

8    proposed or illustrative mechanics, I guess I'll say

9    for Option A, I think we had set out that there would

10   be revised bids, you know, in either the third or

11   fourth week of August and then a recommendation from

12   the Special Master immediately thereafter.

13             There are two options, essentially.

14   Either the Special Master sticks with Dalinar, which

15   does not have a 2020s transaction, and we are kind of

16   in the position that we have been in all along, which

17   is a recommended bid that doesn't have a 2020s

18   transaction.  And we don't know when the 2020s

19   decision is coming.  And so there's been briefing

20   about termination rights and whatnot.  But the

21   scenarios and the possible implications of that

22   decision, you know, are what they always have been.

23             The bonds could be valid.  The bonds

24   could be not valid.  And on the valid side, you know,

25   there are also multiple iterations of a decision that

HIGHLY CONFIDENTIAL

Page 45

1    the bonds are valid.  Either they can enforce

2    immediately or they are subject to a stay, whether

3    from the New York Court itself or from OFAC.  And

4    then, you know, there's also the complication of the

5    2020s seeking a preliminary junction if they succeed

6    in New York.

7                  So I think that all of those scenarios

8    are the same that we're facing today.  If the

9    recommendation under Option A is to stick with

10   Dalinar.  If the recommendation under Option A is

11   that -- we'll just say Amber Energy for an example.

12   If Amber Energy is the superior proposal, as I

13   previewed earlier the settlement, the support

14   agreement that they have with the 2020s contemplates

15   the 2020s going to Judge Failla and seeking a stay of

16   that action, which would -- if she grants it, the

17   effect would be that she wouldn't enter her order.

18                  Now, it may be too late, for example,

19   even if, you know, bids are due August 22nd and we

20   submit a recommendation a couple days later.  And

21   then, you know, you're on just to use a concrete date

22   as an illustration, you're looking at let's say August

23   26th, the 2020s move to stay.  But Judge Failla says,

24   you know, "I was planning on issuing my order today,

25   and here you go.  Here it is."  And she dockets it.

HIGHLY CONFIDENTIAL

Page 46

1          That does not change that the
2    recommended bid was one with the 2020s deal.  That
3    doesn't change that there is briefing concurrently
4    going on with respect to that Amber Energy deal with
5    the transaction with the 2020s deal.  ███████████
6    ██████████████████████████████████████████  But
7    I think that the scenario that you are flagging and
8    are, you know, potentially concerned about is a
9    decision that the 2020s are not valid.  And here we
10   are, we've recommended a transaction that has a deal
11   with the 2020s that pays them, you know, roughly ███
12   ███████████  Notwithstanding the fact that after that
13   settlement was struck, the bonds have been deemed
14   invalid.
15   ████████████████████████████████████
16   █████████████████████████████████████████████
17   █████████████████  ████████████████████████
18   ██████████████████████████████████████████████
19   █████████████████████████████████████████
20   █████████████████████████████████████████████
21   ████████████████████████████████████████████
22   ████████████████████████  ████████████████████
23   ████████████████████████████████████████████
24   ████████████████████
25          ████████████████████████████████████████

HIGHLY CONFIDENTIAL

Page 47



13    So in our mind that is always a risk

14    that has been on the table.  The timeline, I think,

15    just becomes a little more crystallized now just

16    because of the way that the topping period and

17    subsequent bids have played out.  And obviously, when

18    Bob signed the Dalinar SPA on June 25th and submitted

19    his recommendation on July 2nd, we had no idea that

20    the 2020s decision from Judge Failla was imminent by

21    September.  That status conference wasn't until July

22    10th.

23    So I think that's how we view those

24    scenarios.  There are nuances and iterations that kind

25    of shoot off of each of those.  And happy to answer

HIGHLY CONFIDENTIAL

Page 48

1    questions, but suffice it to say we've spent a lot of

2    time thinking about the different options.

3                    THE COURT:  Great.  Yeah.  I'm glad and

4    not surprised that you have.  Thank you for that.  I

5    think my only further thoughts subject to anything

6    else you might want to ask me or discuss, it seems

7    that it may be worthwhile if you all focus, you know,

8    as soon as I let you go, on if there is consensus on

9    let's not have an evidentiary hearing on Monday,

10   Tuesday, and/or Wednesday of next week.

11                   You know, perhaps, you know, if you're

12   in a position to report something like that, you know,

13   even later today, I could potentially be in a position

14   where, you know, I could at least make clear we don't

15   need all the witnesses and potentially we don't need

16   all the lawyers even to be sticking to their travel

17   plans to get to Wilmington.

18                   What I mean to say, concretely, is even

19   if you don't get consensus or don't even know the

20   positions of everybody on the next steps, full stop,

21   Option A versus B versus C, if we can pull out this

22   piece of, "Okay.  What about Monday?"  You know, and I

23   was in a position to know everybody's position, "Okay.

24   What about Monday though, at least?"  Are we all in

25   agreement that we don't want to have an evidentiary

HIGHLY CONFIDENTIAL

Page 49

1   hearing on Monday about Gold Reserve?  Well then, you

2   know, perhaps I could get you an answer on that piece

3   of the schedule fairly quickly.  But as always, you

4   know, you use your best judgment as to what to do.

5   But that's a thought.

6                    MR. BENTLEY:  Yeah.  I don't want to

7   get ahead of Bob.  I think that my initial reaction is

8   that the parties would appreciate that clarity for

9   Monday.  And we can certainly go ahead and I think

10  that everybody is waiting for an update from us.  So

11  I'm sure they're standing by and ready to get on a

12  phone call as soon as we request it.

13                   My question for you, Your Honor, is

14  whether you would like us to send you an email that

15  says this is what the outcome was of that call, or if

16  you would like us to file a letter that says this is

17  the outcome of that call.

18                   THE COURT:  I think if it's not going

19  to slow you down very much, it's best to have things

20  in the formal record as much as possible.  So, I mean,

21  there's good reason for why we're now having our

22  second ex parte call this week, and you'll make the

23  appropriate record that this has occurred.  And I'm

24  comfortable that I have every interested party's

25  consent to this.  And I cannot think of any way I

HIGHLY CONFIDENTIAL

Page 50

1   could possibly manage my role as a neutral judicial

2   decision maker in this complex case without having

3   access occasionally as needed to these ex parte calls.

4              All that said, it's unusual as you as a

5   litigator know.  And so if it's not going to slow you

6   down much to write a short letter, put it in the

7   docket, make it public, that is preferable to the

8   email.

9              MR. BENTLEY:  I'm sure that is not any

10  burden at all.  We can pull together a letter quickly

11  and file it on the docket.  And also, Michael and I,

12  exchanged emails this morning about the notice of ex

13  parte.  Our intention is to file the notice this

14  afternoon and just combine and make reference to both

15  the ex parte on Monday and today's ex parte.  And of

16  course, when we get on the phone with parties this

17  afternoon to talk about Monday, we'll note that we had

18  another ex parte today.

19             THE COURT:  Of course.  That all sounds

20  great.  And I reiterate, as I said in an email to you

21  and I think said on this call, we, Michael and I, are

22  available.  So I'm not saying you can't use email and

23  certainly if you need to reach us with any urgency in

24  not normal business hours, you're going to have to use

25  email or text or call, and we'll be as responsive as

HIGHLY CONFIDENTIAL

Page 51

1   we can be.  And anything else from your end at this

2   point with me?

3                    MR. BENTLEY:  No.  No.  And I think

4   that we should assume that there's virtually no way

5   that we will be able to get a letter or even an email

6   prior to business hours concluding today.  So I think

7   what we'll do is we'll plan on filing the letter.  And

8   then, once the letter hits the docket to make sure

9   that, Your Honor, you see that it hit the docket, we

10  can send it by email to you so that you have it on

11  your court email on your phone.  And you can see the

12  outcome of the meet and confer.

13                   THE COURT:  That's an excellent idea.

14  I probably should have made clear in my email, even

15  though I have access to my email, I don't get

16  automatic notice as I think you do when something is

17  filed in a case.  So for better or worse, I see at

18  midnight every night a collection of everything that

19  was filed in all my cases.  And much more often than

20  not, I'm up at midnight to look at that email.  But it

21  means, I don't know what happened at five o'clock or

22  at eight o'clock until midnight.

23                   So yeah.  If you file something after

24  five o'clock but before midnight sending me an email

25  and copying me on it will make sure that Michael and I

HIGHLY CONFIDENTIAL

```
                                                    Page 52
 1    both see it.  So thank you for that.
 2                    MR. BENTLEY:  Yes.  Will do.
 3                    THE COURT:  Okay.  All right.  Well, if
 4    that's it, thank you as always.  And good luck going
 5    forward.
 6                    MR. BENTLEY:  Thank you very much.
 7    Appreciate it.  Thank you.
 8                    THE COURT:  Okay.  Take care, everyone.
 9    Bye.
10                    THE REPORTER:  Off the record at 3:04
11    p.m.
12                    (Whereupon, at 3:04 p.m., the
13                    proceeding was concluded.)
14
15
16
17
18
19
20
21
22
23
24
25
```

HIGHLY CONFIDENTIAL

Page 53

1                        CERTIFICATE

2            I, LOGAN THOREAU, the officer before whom

3    the foregoing proceedings were taken, do hereby

4    certify that any witness(es) in the foregoing

5    proceedings, prior to testifying, were duly sworn;

6    that the proceedings were recorded by me and

7    thereafter reduced to typewriting by a qualified

8    transcriptionist; that said digital audio recording of

9    said proceedings are a true and accurate record to the

10   best of my knowledge, skills, and ability; that I am

11   neither counsel for, related to, nor employed by any

12   of the parties to the action in which this was taken;

13   and, further, that I am not a relative or employee of

14   any counsel or attorney employed by the parties

15   hereto, nor financially or otherwise interested in the

16   outcome of this action.

17

18

19

20

21               LOGAN THOREAU

22               Notary Public in and for the

23                        State of New York

24

25

HIGHLY CONFIDENTIAL

Page 54

1                   CERTIFICATE OF TRANSCRIBER

2            I, EMILY LEVY, do hereby certify that this

3       transcript was prepared from the digital audio

4       recording of the foregoing proceeding, that said

5       transcript is a true and accurate record of the

6       proceedings to the best of my knowledge, skills, and

7       ability; that I am neither counsel for, related to,

8       nor employed by any of the parties to the action in

9       which this was taken; and, further, that I am not a

10      relative or employee of any counsel or attorney

11      employed by the parties hereto, nor financially or

12      otherwise interested in the outcome of this action.

13

14

15

16

17            EMILY LEVY

18

19

20

21

22

23

24

25