IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| CRYSTALLEX INTERNATIONAL CORP., ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Misc. No. 17-151-LPS |
| ) | |
| BOLIVARIAN REPUBLIC OF ) | |
| VENEZUELA, ) | |
| ) | |
| Defendant. ) | |

**SPECIAL MASTER'S**
**UPDATED FINAL RECOMMENDATION**

1.  Robert B. Pincus, in his capacity as special master (the "**Special Master**") for the United States District Court for the District of Delaware (the "**Court**") in the above-captioned case, submits this updated recommendation (this "**Recommendation**"). The Special Master recommends that the Court authorize and approve the sale of all of the shares of PDV Holding, Inc. ("**PDVH**" and the shares of which, the "**PDVH Shares**") to Amber Merger Sub LLC ("**Amber**"), a wholly-owned subsidiary of Amber Energy Inc., an affiliate of Elliott Investment Management L.P. ("**Elliott**"), for a purchase price of approximately $5.892 billion with associated consents from Additional Judgment Creditors, plus additional consideration proposing to discharge $500 million of Attached Judgments as described in further detail herein (the "**Amber Sale Transaction**"). This Recommendation replaces the Special Master's request to approve the sale of the PDVH Shares to Dalinar Energy Corp. ("**Dalinar**") submitted on July 2, 2025 (D.I. 1837) (the "**Dalinar Recommendation**"), but the Special Master incorporates by reference paragraphs 1-10, 12-66, 67-74, 86-109, 112-117 of the Dalinar Recommendation in support of the Amber Sale Transaction with necessary revisions outlined in this Recommendation.

2. Further, the Special Master respectfully requests the Court enter an order substantially in the form annexed hereto as **Exhibit A** (the "**Dalinar SPA Termination Order**") granting the Special Master the authority to terminate the Stock Purchase Agreement, dated June 25, 2025, by and between Dalinar and the Special Master (D.I. 1837, Ex. B) (the "**Dalinar SPA**") in order to execute the proposed stock purchase agreement (the "**Amber SPA**") attached hereto as **Exhibit B** on an expedited basis prior to the Sale Hearing.[1]

3. The Special Master also respectfully requests that the Court enter an Order substantially in the form annexed hereto as **Exhibit C** (the "**Sale Order**") approving the Amber Sale Transaction following the Sale Hearing. In support of this Recommendation, the Declaration of William O. Hiltz in Support of the Special Master's Updated Final Recommendation (the "**Fourth Hiltz Declaration**") is filed concurrently herewith.[2]

4. On July 2, 2025, the Special Master filed the Dalinar Recommendation recommending that the PDVH Shares be sold to Dalinar pursuant to the Dalinar SPA (the "**Dalinar June Sale Transaction**"). On August 8, 2025, the Special Master received an Unsolicited Competing Proposal (as defined in the Dalinar SPA) from Amber, and thereafter, the Court granted the Special Master authority to engage with Amber. On August 11, 2025, the Special Master issued a notice to Dalinar regarding his receipt of such Unsolicited Competing Proposal. On August 18, 2025, the Court held a hearing and ordered, among other things, that

---

[1] For the avoidance of doubt, notwithstanding the authorization by the Court, and the Special Master's subsequent execution, of the Amber SPA contemplated by the Dalinar SPA Termination Order, the Amber SPA shall not be enforceable against the Special Master until entry of the Sale Order.

[2] Filed concurrently herewith by the Special Master is the *Notice of Filing of Certain Bid Materials Received by Special Master* including the bid materials submitted by Dalinar on August 28, 2025, and Bidder C on August 22, 2025. Citations to this such notice herein are denoted as "Other Bid Materials Notice."

(i) the Sale Hearing be rescheduled to commence on September 15, 2025, and (ii) any further Unsolicited Competing Proposals to be considered by the Special Master, absent further order of the Court, must be submitted by August 22, 2025 (the "**August 22 Bid Deadline**"). *See* August 18, 2025 Hr'g Tr. 209:23-210:21, 212:8-16; D.I. 2110 at 3–4. On August 22, 2025, the Special Master received revised Unsolicited Competing Proposals from Amber and a proposed bid from an alternative bidder ("**Bidder C**" and such bid, "**Bid C**").

    5. On August 25, 2025, the Special Master determined in good faith that the Amber Sale Transaction was a Superior Proposal pursuant to section 6.16(d) of the Dalinar SPA and provided notice of such determination to Dalinar. *See* D.I. 2113 at 2. The notice triggered a three-business-day period ending on August 28, 2025, for Dalinar to submit proposed changes to the Dalinar June Sale Transaction for Dalinar to match or exceed the Amber Sale Transaction. *See* Dalinar SPA § 6.16(d); D.I. 2110 at 3. Dalinar submitted a revised bid to the Special Master on August 28, 2025 (the transaction contemplated thereby, the "**Dalinar August Sale Transaction**"). An overview of the Amber Sale Transaction, and the Special Master's evaluation thereof, is included in this Recommendation.

    6. For the reasons set forth herein, the Special Master has determined that the Dalinar August Sale Transaction did not match or exceed the Amber Sale Transaction, and therefore, the Amber Sale Transaction continues to constitute a Superior Proposal, provides adequate value to holders of Attached Judgments under Delaware law, and remains the best bid received in this sale process. Notably, the Special Master makes this Recommendation based on the information currently available to him, including with respect to the PDVSA 2020 Bondholder litigation, *Petróleos de Venezuela, S.A. et al. v. MUFG Union Bank, N.A. et al.*, No. 1:19-cv-10023 (S.D.N.Y.) (the "**SDNY Litigation**"). In the event the Court requests the Special

3

Master to indicate whether he affirms or otherwise wishes to revise his recommendation of the Amber Sale Transaction in the future based on intervening events, he will do so.

## OVERVIEW OF THE AMBER SALE TRANSACTION

7. The Amber SPA provides that Amber will acquire 100% of the PDVH Shares in exchange for (i) distributable cash and non-cash proceeds discharging approximately $5.892 billion[3] of Attached Judgments (the "**Base Consideration**"), plus (ii) additional cash consideration offered to discharge $500 million of Attached Judgments (the "**Additional Consideration**")—together the Base Consideration and Additional Consideration account for a total potential purchase price of up to $6.392 billion.[4] The Base Consideration is comprised of (i) cash consideration of $3.853 billion payable to Attached Judgment Creditors through Red Tree and to ConocoPhillips Gulf of Parai B.V. for its Corocoro Judgment; (ii) a package of cash and non-cash consideration payable to Rusoro Mining Limited ("**Rusoro**") in exchange for which it has agreed to discharge the entirety of its Attached Judgment of approximately $1.569 billion; and (iii) non-cash consideration payable to Koch Minerals Sàrl and Koch Nitrogen International Sàrl (collectively, "**Koch**") in exchange for which they have agreed to discharge the entirety of their Attached Judgments of approximately $471 million.[5] The

---

[3] Amounts of Attached Judgments are estimated as of an assumed closing date of June 30, 2026, according to the claims calculations approved by the Court in its *Memorandum Order*, dated April 25, 2024. *See* D.I. 1136 at 3 (citing D.I. 969-1). Actual distributions to holders of Attached Judgments will be determined as of the date of the closing of the sale of the PDVH Shares. The Special Master notes that on August 28, 2025, he received correspondence from ConocoPhillips advising that it had recovered the sum of $869,955 on its Petrozuata/Hamaca Judgment against PDVSA and subsidiaries PDVSA Petróleo, S.A. and Corpoguanipa, S.A., rendered by the United States District Court for the Southern District of New York on August 22, 2018. Claim calculations have been updated accordingly.

[4] To the extent of any inconsistency between this Recommendation and the Amber SPA, the terms of the Amber SPA shall prevail.

[5] Agreements from Rusoro and Koch providing their respective consents to receive non-cash consideration as part of the Amber Sale Transaction are attached hereto as **Exhibit D**.

4

Additional Consideration is comprised entirely of cash, which Amber proposes to be offered to extinguish $500 million of Attached Judgments, with such Additional Consideration (i) first made available to Gold Reserve Ltd., f/k/a Gold Reserve Inc. ("**Gold Reserve**"), and (ii) if Gold Reserve declines such consideration, made available to other Additional Judgment Creditors as determined by the Special Master in consultation with Amber, or as otherwise directed by the Court.[6]  As of the date of this Recommendation, Gold Reserve has not consented to receipt of such Additional Consideration; however, such Additional Consideration will be available for allocation (to Gold Reserve or other Additional Judgment Creditors) until the outside date under the Amber SPA (*i.e.*, at least 12 months and up to 18 months after signing of the Amber SPA). *See* Amber SPA § 8.1(b).  The chart attached hereto as **Annex A** summarizes the Attached Judgments that would be satisfied at closing of the Amber Sale Transaction in accordance with the priority waterfall established in the *Final Priority Order* (D.I. 1102).

        8.      Amber proposes to finance the Proposed Sale Transaction with (i) up to $3.775 billion of committed, funded first lien debt financing from a consortium of lenders (the "**Initial First Lien Lenders**"); (ii) up to $500 million of a $2 billion committed asset-based revolving facility from Barclays Bank PLC and Citigroup Global Markets Inc. (the "**ABL Lenders**"); (iii) $2.850 billion of committed financing convertible notes initially issued to a

---

[6] For the reasons stated in the *Special Master's Determination of Superior Proposal* (D.I. 2113), the amount of the Additional Consideration is not provided in this Recommendation, but will be disclosed prior to the commencement of the Sale Hearing.  Further, the Special Master believes it may ultimately be necessary to request the Court's authority to offer the Additional Consideration to Additional Judgment Creditors junior to Gold Reserve, notwithstanding Gold Reserve's rejection of the offer, because of what the Special Master understands has been Gold Reserve's unwillingness to take anything less than full recovery in cash on its $1.2 billion claim, *see Gold Reserve's Response to Notice of Filing of Unsolicited Bid* (D.I. 2014), even though Additional Judgment Creditors both ahead of and behind Gold Reserve have taken accepted material discounts to the par value of their claims.  *See* Ex. D; *see also* D.I. 1837, Ex. F.

consortium of convertible note holders (the "**Convertible Noteholders**"), which includes a fully committed accordion feature of up to $570 million; and (iv) $25 million in equity financing from affiliates of Elliott (together with the Initial First Lien Lenders, the Convertible Note Holders, and ABL Lenders, the "**Financing Parties**").  The Financing Parties have each executed debt commitment letters, convertible notes commitment letters, and/or equity commitment letters, as applicable, which are attached hereto as **Exhibit E**.

        9.      Amber has also entered into a transaction support agreement (the "**TSA**"), with an ad hoc group (the "**2020 Bondholders AHG**") compromising over 75% of the holders of the 8.5% notes issued by PDVSA due in 2020 (the "**PDVSA 2020 Bonds**" and the holders of the PDSVA 2020 Bonds, the "**PDVSA 2020 Bondholders**").  The TSA is attached hereto as **Exhibit F**.  Pursuant to the TSA, the 2020 Bondholders AHG has agreed to provide the requisite consents to cause the Amber Sale Transaction to be permitted under the indenture governing the PDVSA 2020 Bonds and to cause all of the purported security interests in the equity of CITGO Holding that secure the PDVSA 2020 Bonds to be released and terminated in full.  The TSA further provides that Amber will acquire the PDVSA 2020 Bonds for cash consideration totaling approximately $2.125 billion.  Amber has further represented that it intends to extinguish any PDVSA 2020 Bonds acquired pursuant to the TSA.  *See* August 18, 2025 Hr'g Tr. 194:8-21, 195:23-196:5.

        10.      A copy of the bid letter dated August 8, 2025, and a copy of the updated bid letter dated August 22, 2025, with respect to the Amber Sale Transaction are attached hereto as **Exhibit G**.

## EVALUATION OF THE SUPERIOR PROPOSAL

11. In evaluating the Amber Sale Transaction, the Special Master considered both price and certainty of closing in accordance with the Evaluation Criteria (D.I. 1545-4 at 8–9; D.I. 1554 (adopting the Evaluation Criteria)) and the Court's orders and other guidance, including the Court's April 21, 2025 *Order* (D.I. 1741) (the "**Stalking Horse Approval Order**"). *See* D.I. 1837 at ¶¶ 7-10, 38, 57, 59-62, 76-77, 82-83. The Court made clear in the Stalking Horse Approval Order that (i) "[a]ny prudent bidder, as well as the Special Master on behalf of the Court, must factor into its assessment of a transaction relating to the purchase of the PDVH Shares the risk to closing posed by the 2020 Bondholders being able to assert their rights (assuming they exist) in a manner that would interfere with closing"; and (ii) "any bid [the Court] is likely to approve at the conclusion of the Sale Process will need a balance that places much greater emphasis on price than Red Tree's Stalking Horse Bid." *See* D.I. 1741 at 3, 6. The Special Master believes that the Amber Sale Transaction places an appropriate emphasis on both price and certainty of closing, and as described below, potentially offers flexibility that could lead to additional upside for judgment creditors depending on the outcome of the SDNY Litigation, such that it constitutes a Superior Proposal according to the Dalinar SPA, provides adequate value to holders of Attached Judgments under Delaware law, and is the best bid for the PDVH Shares received to date in this sale process.

12. ***Purchase Price***. At the conclusion of the solicitation of bids to top the stalking horse (the "**Topping Period**"), the Special Master was faced with a decision between: (i) the Dalinar June Sale Transaction, which offered $7.380 billion in value to holders of Attached Judgments, but with the risk the value would not be realized at all if the transaction could not close due to the claims of the PDVSA 2020 Bondholders; and (ii) Red Tree's Revised

7

Stalking Horse Bid, which offered $3.804 billion to holders of Attached Judgments, a price that the Stalking Horse Approval Order indicated was insufficient. *See generally* D.I. 1837. The Amber Sale Transaction offers a purchase price that is approximately $2.088 billion (or $2.588 billion, when including the Additional Consideration) more than Red Tree's Stalking Horse Bid. Accordingly, the circumstances the Special Master now faces in comparing available bids are materially different from the circumstances at the conclusion of the Topping Period. The Special Master has now received Amber's bid, which satisfies $5.892 billion of Attached Judgments (and up to $6.392 billion with the Additional Consideration) and addresses the risks associated with the PDVSA 2020 Bondholders.[7]

13. At the same time, the Dalinar August Sale Transaction claims to have increased its purchase price by approximately $518 million, comprised of (i) the addition of approximately $718 million attributable to the extinguishment of the Attached Judgment of Consorcio Andino, S.L., Valores Mundiales, S.L. ("**Valores**"), *minus* (ii) $200 million of Gold Reserve's own claim, which it previously agreed to extinguish, but now intends to retain as "compensation for the substantial fees and expenses required to purchase" the Valores claim. *Other Bid Materials Notice*, Ex. A-1 at 2.[8] The Special Master is unaware of the specific terms of the arrangement between Gold Reserve and Valores, other than the fact that Gold Reserve purportedly purchased, and presumably now controls, the Valores claim and "intends to include

---

[7] On August 22, 2025, the Special Master also received a bid from Bidder C. Bidder C proposed a package of consideration payable to Rusoro and creditors junior to Rusoro that required consent from Rusoro and the other creditors—consents which, to the Special Master's knowledge, have yet to be received. Accordingly, the Special Master determined that Bid C was non-conforming and, in any event, inferior to the Amber Sale Transaction. The bid materials submitted by Bidder C in connection with Bid C are filed concurrently herewith.

[8] The Special Master notes that the only compensation a bidder is entitled to for reimbursement of it expenses are those approved by the Court pursuant to the Bidding Procedures Order. D.I. 480.

8

the value" of the claim in its credit bid. *Other Bid Materials Notice*, Ex. A-1 at 2; Ex. A-2 at 1. For example, it is unclear what if any consideration Valores is actually receiving as part of the Dalinar August Sale Transaction. *Other Bid Materials Notice*, Ex. A-2; *cf.* D.I. 1837, Ex. F (each of Gold Reserve, Rusoro and Koch "agrees and acknowledges that they will accept specified non-cash consideration, including in the form of preferred and common equity of Dalinar Energy[.]")  Further, Gold Reserve informed the Special Master that, pursuant to its consortium agreement, each of Rusoro and Koch have consent rights in certain circumstances where Dalinar changes the terms of its bid. Without knowing the specific terms of that consortium agreement, or the agreement with Valores, the Special Master likewise does not know if the consent of Rusoro and Koch is now required or, if it is required, whether either party would be willing to tender such consent (though, the Special Master notes the bid letter accompanying the August Dalinar Sale Transaction does not make reference to support from Rusoro and Koch as the June 25, 2025 topping bid letter does. *See* D.I. 1837, Ex. G.)

    14. If Dalinar is given full credit for its purchase of the Valores claim, then its purchase price would increase to approximately $7.9 billion. Dalinar has further offered a combination of $10 million of cash plus warrants allegedly valued at $10 million, in exchange for the extinguishment of the $396 million Attached Judgment held by Contrarian Capital Management, L.L.C. ("**Contrarian**"); however, that offer expires at 11:59 pm ET today, August 29, 2025. The Special Master has not been provided with any evidence that Contrarian either has or even intends to accept that offer and, therefore, does not believe it should be taken into account as part of the purchase price associated with the Dalinar August Sale Transaction given its imminent expiration. *See Other Bid Materials Notice*, Ex. A-3.

9

15. Accordingly, the difference between the amount of Attached Judgments satisfied by the Amber Sale Transaction and the Dalinar August Sale Transaction is somewhere between $988 million and $2.006 billion.[9] However, because of the substantial outstanding delta on certainty, the Special Master believes that regardless of where on that spectrum the true difference lies, the Amber Sale Transaction continues to constitute a Superior Proposal, provides adequate value to holders of Attached Judgments under Delaware law, and remains the best bid received in this sale process.

16. *Certainty*. Most significantly, the Amber Sale Transaction virtually eliminates any closing risks associated with the SDNY Litigation, by delivering a settlement with the PDVSA 2020 Bondholders. The Amber Sale Transaction can close regardless of the outcome of the 2020 Bondholders litigation, and it secures an approximately $895 million discount on the PDVSA 2020 Bondholders' claims. Specifically, Amber's settlement proposes to pay $2.125 billion of cash consideration on account of $3.02 billion of asserted PDVSA 2020 Bondholder claims.[10]

17. Dalinar contends in its August 28, 2025 bid letter that it has increased its own certainty with respect to the SDNY Litigation, by upsizing its financing support to fund any

---

[9] On the low side, (i) Amber's Additional Consideration is included and discharges an additional $500 million of Attached Judgments and (ii) Dalinar does not receive credit for the $718 million Valores claim as discussed above (*i.e.*, $7.380 billion *minus* $6.392 billion *equals* $989 million). On the high side, (i) Amber's Additional Consideration is not accepted and (ii) Dalinar receives credit for the Valores claim (*i.e.*, $7.899 billion *minus* $5.892 billion *equals* $2.006 billion). No matter the scenario, the difference in "purchase price" reflects the gap between the Attached Judgments satisfied by each bid and does not, for the avoidance of doubt, reflect the difference between actual consideration provided to creditors.

[10] The PDVSA 2020 Bondholders estimate the amount of the PDVSA 2020 Bonds claims at $3.02 billion by calculating interest accrual based on the contractual default interest rate in the PDVSA 2020 indenture and assuming a June 30, 2026 closing of the sale of the PDVH Shares. The Special Master acknowledges that the applicable interest rate and claim calculation may be subject to dispute in the SDNY Litigation.

required payment to the PDVSA 2020 Bondholders by obtaining an accordion increase of its ABL by $500 million. *See Other Bid Materials Notice*, Ex. A-1 at 3.[11] According to Dalinar, its $1 billion ABL, combined with the $1.8 billion in preferred equity financing covered by its existing Highly Confident Letter, *see* D.I. 1837, Ex. E-5, provides $2.8 billion in potential financing to resolve any potential claims asserted by the PDVSA 2020 Bondholders in the event that they succeed in the SDNY Litigation. However, the Special Master has material reservations with Dalinar's plan for addressing this risk and cautions the Court against relying on Dalinar's uncertain financing. First, $1.8 billion of the solution (*i.e.*, the preferred equity financing) remains uncommitted and does not meet the Bid Requirements for bidders to have committed financing. Therefore, if the PDVSA 2020 Bondholders were successful, Dalinar has only $1 billion of committed financing available via its ABL to address up to $3.02 billion of claims, a significant shortfall. The Special Master raised this issue with Gold Reserve dating back to the early stages of the Topping Period and has continually reiterated it in the months since, but the issue has yet to be addressed.[12] Even if, the preferred equity financing were committed, the total amount of financing available to Dalinar to address the PDVSA 2020 Bonds issue would be $2.8 billion, which may or may not be sufficient to resolve the asserted $3.02 billion of claims. Likewise, notwithstanding the existence of ABL commitments generally, the actual availability of a specific amount of ABL proceeds at closing—both for general working capital purposes and

---

[11] Similar to the Valores arrangement, because the Special Master has not been provided with the Dalinar consortium agreement, it is unclear whether consent of Rusoro or Koch is required to approve an increase in the ABL commitment.

[12] In the same vein, the Special Master requested changes to Dalinar's financing commitment letters to reflect a requirement that its lenders be required to fund at closing notwithstanding a successful exercise of the CITGO Holding Pledge by the PDVSA 2020 Bondholders resulting in 50.1% of the CITGO Holding equity being owned or controlled by parties other than Dalinar. But that request, too, was not fulfilled.

11

to satisfy any obligation to the PDVSA 2020 Bondholders—is yet to be determined. The ability to draw on asset-based loan facilities, including Dalinar's proposed ABL, is calculated at the time of the requested draw and predicated on the borrower's then-existing liquidity and asset borrowing base. Neither of those numbers, as they apply to CITGO's business at the time of closing of the proposed Dalinar transaction, can be forecasted today with sufficient specificity for purposes of ensuring Dalinar's ability to satisfy the PDVSA 2020 Bonds in the event the bonds are deemed valid. As a result, the Special Master continues to not afford Dalinar's purported "certainty" any material weight when assessing its ability to address the closing risks associated with the PDVSA 2020 Bondholders. See D.I. 1837 n 15.

18. Amber's settlement with the PDVSA 2020 Bondholders also provides the Court with additional flexibility in light of where the sale process currently stands vis-à-vis the SDNY Litigation. The submission of this Recommendation triggers the "Successful Bid Date" under Amber's TSA and the PDVSA 2020 Bondholders obligations thereunder, including to cooperate in good faith and negotiate definitive documentation (TSA §§ 1.1 ("Successful Bid Date"), 3.2(b)) and also locks-in the commitment of the PDVSA 2020 Bondholders and Amber to the terms of the settlement agreement regardless of the outcome of the SDNY Litigation. *Id*. §§ 3.1(a)(viii), 3.2(a)(vii), 8.15. With the PDVSA 2020 Bondholders now committed to their settlement, and the Sale Hearing set for September 15, 2025, with a Sale Order to follow at some point after the presumptive outside date for a ruling in the SDNY Litigation (*see* D.I. 2056 ¶ 3; *see also* August 18 2025 Hr'g Tr 203:7-205:20), the Court will have the benefit of 20/20 hindsight in deciding whether the settlement embedded in the Amber Sale Transaction is value accretive to the holders of Attached Judgments or if it instead unnecessarily overpays the PDVSA 2020 Bondholders.

19. Fundamentally, the Special Master believes this Recommendation of the Amber Sale Transaction secures a one-way option for the benefit of the sale process that protects against a significant downside of the PDVSA 2020 Bondholders' potentially frustrating Dalinar's bid if the PDVSA 2020 Bonds were valid, while creating the possibility of a scenario in which additional value could become available to Additional Judgment Creditors in the event the PDVSA Bonds are found to be invalid.

20. For instance, if the Special Master were to have recommended the Dalinar August Sale Transaction instead of the Amber Sale Transaction, and then the PDVSA 2020 Bondholders were successful in the SDNY Litigation (whether before or after entry of the Sale Order), the $895 million discount secured by the TSA would be lost. In the ensuing re-solicitation of bids, assuming the PDVSA 2020 Bondholders demand something at or near their asserted $3.02 billion of claims, and also assuming the total enterprise value of the CITGO business remains in the same range as the value implied by Amber Sale Transaction, the Additional Judgment Creditors would bear the brunt of the resulting reallocation of value—specifically, Rusoro, ConocoPhillips (on its ConocoPhillips Gulf of Paria B.V. Corocoro Judgment) and Koch would not likely recover anything of material value for their Attached Judgments which are immediately senior to Gold Reserve. *See* Fourth Hiltz Decl. ¶ 37.

21. On the other hand, if, at some point between this Recommendation of the Amber Sale Transaction and entry of the Sale Order, the PDVSA 2020 Bonds and the related CITGO Holding Pledge are determined to be invalid,[13] the Court may consider whether it views

---

[13] Such circumstances may or may not occur. Pursuant to the TSA, the PDVSA 2020 Bondholders have agreed to seek a stay of the SDNY Litigation. If that application is granted, then a decision on the merits of the PDVSA 2020 Bondholders' claims may not be issued prior to closing of the Amber Sale Transaction and the settlement would stand.

13

the $2.125 billion settlement as an over-valuation of the PDVSA 2020 Bondholders' claims and a diversion of value from Attached Judgment Creditors. *See* D.I. 1741 at 7. If this scenario arises, this Court will have the discretion to not approve the Amber Sale Transaction and to order the Special Master to resolicit bids. In this scenario, the Special Master believes that the universe of bids for the PDVH Shares would provide materially higher consideration to holders of Attached Judgments. *See* Fourth Hiltz Decl. ¶ 38. Bidders may submit higher bids or may allocate to the holders of Attached Judgments a significant portion of the total consideration they are currently willing to pay to address the 2020 Bondholders litigation risk.

22.  ***Other Evaluation Criteria***.  In reaching his recommendation, the Special Master also considered the following non-exhaustive considerations, as set forth in the Evaluation Criteria, bearing on certainty of closing:

(a) **Likelihood of Regulatory Approval**: The Special Master is reasonably satisfied that Amber is likely to obtain the requisite regulatory approvals. Amber has represented that it will make, in a timely manner, (i) all filings and disclosures necessary to comply with the regulations of OFAC, (ii) all necessary filings under the Hart-Scott Rodino Antitrust Improvements Act of 1976, as amended (the "**HSR Act**"), and (iii) all other necessary filings and submissions required under any relevant antitrust laws, which include filings in Mexico, Morocco, and the Netherlands. Amber will be ultimately indirectly owned by Elliott. In the SPA, Amber has committed to (and to cause its affiliates to, in certain circumstances) take all actions necessary, proper, or advisable to obtain approval for the Amber Sale Transaction under antitrust laws. The Special Master, upon the advice of his Advisors, determined that the Amber Sale Transaction does not pose a significant risk from a regulatory approval perspective.

(b) **Conditionality Related to Pending or Future Litigation**: The Amber Sale Transaction does not include any additional conditionality relating to pending or future litigation as compared to the Bid Draft SPA.

(c) **Conditionality Related to Appeals of the Sale Order**: The Amber Sale Transaction does not include any additional conditionality relating to an appeal of the Sale Order as compared to the Bid Draft SPA or the Dalinar August Sale Transaction.

(d) **Bidder's Financial Wherewithal and Certainty of Financing**: The Special Master is satisfied with respect to Amber's financial wherewithal and certainty of financing. Amber is an affiliate of Elliott, an established and respected fund manager that manages $76.1 billion in assets.[14] As set forth above, Amber has secured financing from the Financing Parties, all of whom are established and respected participants in the financial system. The financing for the Amber Sale Transaction contains closing conditions that either are customary or otherwise viewed as reasonable under the circumstances.

(e) **Conditionality Related to Other Terms Proposed by the Recommended Bidder**: The SPA has no material additional conditionality with respect to its other terms compared to the Dalinar August Sale Transaction or the Bid Draft SPA. The Amber SPA contains customary conditionality, such as receipt of HSR clearance and OFAC approval, accuracy of certain limited fundamental representations and warranties in all material respects, and compliance with covenants in all material respects, and the absence of an occurrence of a "Company Material Adverse Effect." The financing documents proposed by Amber otherwise contain closing conditions that either are customary or otherwise viewed as reasonable under the circumstances.

23. *Good Faith*. The Amber Sale Transaction is the product of arm's-length, good-faith negotiations, which comply with the Sale Procedures Order and applicable law. There has been no fraud, unfairness, surprise, or mistake, and the sale price is not so low as to shock the conscience. The Special Master and his Advisors are aware of no misconduct by Amber. Amber has proceeded in good faith in all respects in that, among other things, (i) Amber complied with the provisions of the Sale Procedures Order, Bidding Procedures, December 31 Order, and the Court's other sale process orders, including compliance with confidentiality obligations and restrictions under the Sale Procedures Order and the Bidding Procedures and any applicable non-disclosure or confidentiality agreement; (ii) all consideration to be provided by Amber and all other material agreements or arrangements entered into by Amber and the Special Master in connection with the Amber Sale Transaction have been disclosed and are appropriate

---

[14] *See About Elliott*, Elliot, https://www.elliottmgmt.com/about-elliott/ (last visited Aug. 28, 2025).

in the circumstances; and (iii) the negotiation and execution of transaction documents were at arm's-length and in good faith. Accordingly, Amber has acted in good faith throughout the bidding and sale process

24. In summary, the Special Master is faced with a Dalinar bid that may not be able to close and may require re-solicitation of bids at a significantly depressed level, or an Amber bid that discharges $5.892 billion (and potentially up to $6.392 billion) of Attached Judgments, has a high degree of closing certainty, and secures an $895 million discount on the PDVSA 2020 Bondholders' claims with the possible flexibility for the Court to reject the transaction if circumstances arise where it considers the TSA results in a fundamental injustice. *See* D.I. 1741 at 7–8. Faced with these choices, the Special Master concludes that the Amber Sale Transaction is the best bid for the PDVH Shares, provides adequate value to holders of Attached Judgments under Delaware law, and is a Superior Proposal to the Dalinar August Sale Transaction.

## **TERMINATION OF THE DALINAR SPA**

25. The Special Master also seeks the Court's authority on an expedited basis to terminate the Dalinar SPA in order to enter into the Amber SPA prior to the Sale Hearing. Section 8.1(d) of the Dalinar SPA provides that the Special Master may terminate the Dalinar SPA, with the Court's approval, in order to enter into an agreement for a Superior Proposal. The Special Master believes it is necessary to terminate the Dalinar SPA as soon as possible in order to execute the Amber SPA and ensure that Amber is contractually bound to this transaction prior to the Sale Hearing.

**CONCLUSION**

26. For the reasons set forth herein, the Special Master believes the Amber Sale Transaction is the best bid for the PDVH Shares received to date, provides adequate value to holders of Attached Judgments under Delaware law, and is a Superior Proposal under the Dalinar SPA and the Court's prior orders. The Special Master recommends that the Court approve the sale of the PDVH Shares to Amber and enter an order substantially in the form of the Sale Order. The Special Master also seeks authority from the Court—on an expedited basis—to execute the proposed Amber SPA.

Respectfully submitted,

POTTER ANDERSON & CORROON LLP

OF COUNSEL:

Matthew S. Barr (Admitted *pro hac vice*)
David Lender (Admitted *pro hac vice*)
Jared R. Friedmann (Admitted *pro hac vice*)
Chase A. Bentley (Admitted *pro hac vice*)
WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
Matt.Barr@weil.com
David.Lender@weil.com
Jared.Friedmann@weil.com
Chase.Bentley@weil.com

By: */s/ Myron T. Steele*
Myron T. Steele (#0002)
Matthew F. Davis (#4696)
Bindu A. Palapura (#5370)
Malisa C. Dang (#7187)
Hercules Plaza, 6th Floor
1313 North Market Street
P.O. Box 951
Wilmington, DE 19801
Telephone: (302) 984-6000
Facsimile: (302) 658-1192
msteele@potteranderson.com
mdavis@potteranderson.com
bpalapura@potteranderson.com
mdang@potteranderson.com

Dated: August 29, 2025
12444879 / 21202.00001

*Counsel for Special Master Robert B. Pincus*